# Exhibit 1



1   UNITED STATES DISTRICT COURT

2   CENTRAL DISTRICT OF CALIFORNIA

3   EASTERN DIVISION

4   - - -

5   HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6   - - -

7   MATTEL, INC.,                )
                                 )           **CERTIFIED COPY**
8                    PLAINTIFF,  )
                                 )
9          VS.                   )   NO. CV 04-09049
                                 )
10  MGA ENTERTAINMENT, INC., ET. AL.,  )
                                 )
11                   DEFENDANTS. )   TRIAL DAY 7
                                 )   PAGES 1255-1390
12  AND CONSOLIDATED ACTIONS,    )
                                 )
13

14

15   REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16   RIVERSIDE, CALIFORNIA

17   WEDNESDAY, JUNE 4TH, 2008

18   8:28 A.M.

19

20

21

22

23   THERESA A. LANZA, RPR, CSR
     FEDERAL OFFICIAL COURT REPORTER
24   3470 12TH STREET, RM. 134
     RIVERSIDE, CALIFORNIA  92501
25   951-274-0844
     WWW.THERESALANZA.COM

1352

1    Q    AND IS THAT BECAUSE YOU UNDERSTOOD THAT CARTER BRYANT HAD

2    APPROACHED MGA TO PITCH HIS IDEA; CORRECT?

3    A    YES.

4    Q    NOW, THE QUESTION ABOUT WHETHER OR NOT YOU HAD A CONCERN

5    AROSE WITH RESPECT TO WHETHER OR NOT CARTER BRYANT WAS AN          10:49

6    EMPLOYEE AT THE TIME HE SIGNED THIS AGREEMENT; CORRECT?

7    A    CORRECT.

8    Q    NOW, ISN'T IT TRUE THAT YOU RAISED THAT VERY CONCERN WITH

9    CARTER BRYANT; THAT IS, YOUR CONCERN THAT AS AN EMPLOYEE AT

10   MATTEL, HE WAS GOING TO BE SIGNING AN AGREEMENT WITH MGA;          10:49

11   CORRECT?

12   A    CORRECT.

13   Q    AND DIDN'T CARTER BRYANT TELL YOU WHEN YOU RAISED THAT

14   CONCERN, THAT HE WAS GOING TO RESIGN FROM MATTEL THE MOMENT

15   THAT HE SIGNED THE CONTRACT?                                       10:49

16   A    CORRECT.

17   Q    DO YOU HAVE ANY REASON TO BELIEVE, MS. O'CONNOR, THAT, IN

18   FACT, CARTER BRYANT DID NOT RESIGN FROM MATTEL THE MOMENT THAT

19   HE SIGNED THE CONTRACT WITH MGA?

20   A    I DON'T KNOW IF IT WAS THE EXACT MOMENT.  I REMEMBER WHEN      10:50

21   I RECEIVED IT, I THINK HE WAS GOING TO QUIT EITHER THE NEXT DAY

22   OR LATER ON THAT DAY; IT WAS VERY QUICKLY AFTER HE SIGNED THE

23   CONTRACT.

24   Q    SO YOUR CONCERN ABOUT CARTER BRYANT SIGNING THE AGREEMENT

25   WITH MGA WHILE AN EMPLOYEE AT MATTEL WAS SUFFICIENTLY IMPORTANT     10:50

1353

```
 1   TO YOU TO RAISE IT WITH CARTER BRYANT; YES?
 2   A    ABSOLUTELY.
 3   Q    AND CARTER BRYANT GAVE YOU A PROMISE THAT HE WOULD RESIGN
 4   ONCE HE GOT THE FINAL CONTRACT AND HAD SIGNED IT WITH MGA; YES?
 5   A    CORRECT.                                                        10:50
 6   Q    DID THAT RELIEVE YOUR CONCERN?
 7   A    NOT REALLY.
 8   Q    DID YOU TELL CARTER THAT DIDN'T RELIEVE YOUR CONCERN?
 9   A    I DON'T REMEMBER IF I SAID I'M CONCERNED.  I DON'T
10   REMEMBER MY EXACT WORDS.  BUT HE WAS PRETTY STEADFAST IN NOT          10:50
11   WANTING TO CHANGE HIS MIND.
12   Q    BUT DID YOU TELL ISAAC LARIAN, "LISTEN, CARTER IS NOT
13   GOING TO RESIGN FROM MATTEL UNTIL HE HAS A SIGNED AGREEMENT
14   WITH US."  DID YOU EVER TELL ISAAC LARIAN THAT WAS A CONCERN OF
15   YOURS?                                                               10:51
16   A    YES.
17   Q    DID MR. LARIAN EVER TELL YOU TO TELL CARTER BRYANT TO
18   RESIGN IMMEDIATELY FROM MATTEL ONCE HE HAD SIGNED THE CONTRACT?
19   A    NO.
20   Q    DID MR. LARIAN EVER TELL YOU THAT IT WAS OKAY, THAT HE          10:51
21   DIDN'T CARE, WHEN CARTER BRYANT LEFT MATTEL?
22   A    NO.
23   Q    DID MGA APPROACH CARTER BRYANT OR DID CARTER BRYANT
24   APPROACH MGA?
25        MR. QUINN:  LACKS FOUNDATION, YOUR HONOR.                       10:51
```

WEDNESDAY, JUNE 4, 2008                    TRIAL DAY 7

Exhibit 1 - Page 10

1354

```
 1            THE COURT:  SUSTAINED.

 2            LAY A FOUNDATION FOR THAT, COUNSEL.

 3   BY MR. NOLAN:

 4   Q    DO YOU KNOW HOW CARTER BRYANT WAS INTRODUCED TO MGA?

 5   A    AS I TESTIFIED EARLIER, HE WAS INTRODUCED THROUGH        10:52

 6   VERONICA MARLOW, A FREE-LANCE DESIGNER, I BELIEVE, FOR MGA.

 7   Q    MR. QUINN SHOWED YOU A CALENDAR POSTING WITH RESPECT TO A

 8   DATE OF AUGUST 18TH.

 9            DO YOU RECALL THAT CALENDAR NOTICE THAT WAS SHOWN TO

10   YOU?                                                          10:52

11   A    I RECALL IT FROM THIS MORNING; I DON'T RECALL IT FROM

12   EIGHT YEARS AGO.

13   Q    THAT WAS MY QUESTION.

14            DO YOU KNOW WHETHER OR NOT YOU ACTUALLY MET ON

15   AUGUST 18TH WITH CARTER BRYANT?                               10:52

16   A    NOT WITHOUT LOOKING AT A FRANKLIN PLANNER OR SOME OTHER

17   DOCUMENTATION, NO.

18   Q    IN ANY EVENT, I BELIEVE IN YOUR DEPOSITION, IS IT POSSIBLE

19   IN YOUR MIND, THAT THE FIRST MEETING THAT YOU HAD WITH

20   CARTER BRYANT WAS ACTUALLY ON SEPTEMBER 1ST OF THE YEAR 2000?  10:53

21   A    IT'S POSSIBLE.

22   Q    AS I UNDERSTAND YOUR TESTIMONY, YOU'RE NOT CERTAIN WHETHER

23   OR NOT THERE WERE TWO DIFFERENT MEETINGS ON DIFFERENT DATES OR

24   THAT THE MEETING ON ONE OF THE DATES WAS SPLIT AND THAT

25   MR. LARIAN CAME IN A LITTLE BIT LATER; IS THAT CORRECT?       10:53
```

WEDNESDAY, JUNE 4, 2008                          TRIAL DAY 7

Exhibit 1 - Page 11

1390



1    THE COURT HAS NOT RULED ON.

2            **THE COURT:**  OKAY.  THANK YOU.

3

4

5

6

7

8

9

10

11                        CERTIFICATE

12

13   I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED
     STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF
14   THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE ABOVE-
     ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN
15   CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF
     THE UNITED STATES.

16

17                                          6-4-08
     THERESA A. LANZA, CSR, RPR                DATE
18   FEDERAL OFFICIAL COURT REPORTER

19

20

21

22

23

24

25

WEDNESDAY, JUNE 4, 2008                    TRIAL DAY 7
                                           Exhibit 1 - Page 12

# Exhibit 2

1              UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3                        ---

4      **HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING**

5                        ---

6    MATTEL, INC.,                    :   PAGES 2226 - 2352
                                      :
7           PLAINTIFF,                :
                                      :
8       VS.                           :   NO. ED CV04-09049-SGL
                                      :   [CONSOLIDATED WITH
9    MGA ENTERTAINMENT, INC.,         :   CV04-9059 & CV05-2727]
     ET AL.,                          :
10                                    :
            DEFENDANTS.               :
11   _____

12

13

14

15         REPORTER'S TRANSCRIPT OF PROCEEDINGS

16             RIVERSIDE, CALIFORNIA

17          WEDNESDAY, JUNE 11, 2008

18            JURY TRIAL - DAY 11

19            AFTERNOON SESSION

20

21

22                              MARK SCHWEITZER, CSR, RPR, CRR
                                OFFICIAL COURT REPORTER
23                              UNITED STATES DISTRICT COURT
                                181-H ROYBAL FEDERAL BUILDING
24                              255 EAST TEMPLE STREET
                                LOS ANGELES, CALIFORNIA 90012
25                              (213) 663-3494

CERTIFIED COPY

Exhibit 2 - Page 13

1    Q.   April '98 -- it would be between October '97 and October

2    '98; right?  October, November, December, January, February,

3    March, April.  That's six months; right?

4    A.   Right.

5    Q.   Would you agree with that?

6    A.   Okay.

7    Q.   So you were initially employed with Mattel from this

8    time frame, from basically November '95 to April of '98; is

9    that right?

10   A.   Yes.

11   Q.   And then there came a time when you left Mattel and went

12   to stay with your parents in Missouri?

13   A.   Yes.

14   Q.   So when did you start working at Mattel again?

15   A.   I went back to Mattel January of 1999.

16   Q.   Okay.  So in October '98, November '98, December '98,

17   January '99 -- three months after October '98; right?

18   A.   Yes, I went back to work in January of 1999.

19   Q.   So how long was it, then, that you worked at Mattel once

20   you started in January of 1999?

21   A.   I worked for them until October of 2000.

22   Q.   So basically from this time period I'm showing here from

23   January '99 until October 2000.  I'm sorry.  I can't even

24   draw a straight line.  But basically that blue shaded area on

25   this time line represented the time you were working at

Exhibit 2 - Page 14

2336

1            You see there's a section there conflicts and other

2   activities, which says:  "My employment with the company

3   requires my undivided attention and effort.  Therefore,

4   during my employment with the company, I will fully comply

5   with the company's conflict of interest policy as it may be

6   amended from time to time.  I shall not, without the

7   company's express written consent, engage in any employment

8   or business other than for the company or invest in or assist

9   in any manner any business competitive with the business or

10   the future business plans of the company."

11            Without even seeing this sort of agreement, you

12   knew common sense that you weren't supposed to be competing

13   with Mattel while you were working at Mattel; right?

14   **A.**   Well, I don't know that I had that much of an

15   understanding about that at the time.

16   **Q.**   Well, you knew it would be unfair to, for example, take

17   a paycheck from a company which pays you for doll designs and

18   at the same time work at a competitive company that would pay

19   you for doll designs.  You know that without seeing this sort

20   of agreement; right?

21   **A.**   I don't know that I had that kind of an understanding.

22   I knew that other people in the company also did side

23   projects.  It was generally common knowledge.

24   **Q.**   When you signed this document November 6, 1995, were you

25   agreeing to devote your undivided attention and effort to

Exhibit 2 - Page 15

 1   Mattel for the time period that you were employed by Mattel?

 2   **A.**   Well, the thing with this agreement was, you know, it

 3   was never really -- it was never really explained much.  It

 4   was part of a packet that we were required to sign in order

 5   to commence employment at Mattel.  There were no explanations

 6   given.  So I'm not sure that I had the best understanding of

 7   this contract at that time.

 8   **Q.**   Well, whether you had a best understanding or any

 9   understanding, let me ask you this:  When you worked for

10   Mattel, during this initial time period, did you believe that

11   you were obligated either legally or ethically or morally to

12   use your undivided attention and effort for Mattel?  I'm

13   talking about this first time frame when you were there

14   from -- full time from November '95 to April of '98.

15   **A.**   Well, again, I'm not sure what the extent of my

16   understanding was about that.

17   **Q.**   Well, let me ask it this way:  During this time period,

18   from November '95 to April '98, did you work for a competitor

19   at the same time you worked at Mattel?

20   **A.**   Well, not knowingly, no.

21   **Q.**   Did you during this time period assist any competitor,

22   between, November '95 to April '98?

23   **A.**   No, not that I can remember.

24   **Q.**   All right.  And you didn't think -- let me ask you this:

25   You're not telling us you thought it would be perfectly fine

Exhibit 2 - Page 16

1    to go ahead and compete with Mattel without them knowing it

2    at the same time you worked for them.  You didn't think that,

3    did you?

4    A.    Well, no, I don't think I thought that.

5    Q.    So I've been focusing now on this first time frame when

6    you worked for Mattel.  Now I'd like to ask you about --

7    well, let me ask you this.  Your mom lives in Missouri?

8    A.    Yes.

9    Q.    And you recall there came a time when you were speaking

10   with her about -- when you were working at Mattel, and we're

11   talking about needing to do something to make some money.

12   A.    I'm not sure of the exact conversation you're referring

13   to.

14   Q.    Okay.  Do you remember a time when your mother suggested

15   that to make some money, perhaps you could sell some of the

16   drawings that you had done?

17   A.    No, I don't remember ever talking to her about that.

18   Q.    Do you remember your mom -- strike that.

19         Do you remember saying to your mom something to the

20   effect of I can't sell these drawings, mom, because they

21   belong to Mattel.  I did them at Mattel.

22   A.    It's possible we had that conversation, but I don't

23   recall it.

24   Q.    Certainly if your mom were to testify to something of

25   that effect, you wouldn't deny that you told her that, that

Exhibit 2 - Page 17

1  is, I can't sell these drawings I did at Mattel because they

2  belong to Mattel.

3  **A.**  Well, I wouldn't deny that that's her memory, but I

4  don't have any recollection of that conversation.

5  **Q.**  Okay.  And it's a long time ago.  So that's why my

6  question is a little bit different.  Although you may not

7  have a recollection of it, you certainly can't deny that you

8  said that to your mother; correct?

9  **A.**  Well, I can't deny that I might have said that to her.

10 But again, I don't have any recollection of that

11 conversation.

12 **Q.**  Well, that was in fact your understanding, which is that

13 if you did designs while you were at Mattel that relate to

14 the dolls, that related to Mattel, that Mattel owns those

15 designs.

16 **A.**  Well, if you're talking about in the context of this

17 conversation that I don't remember, then, you know, I'm not

18 really sure how to answer your question.

19 **Q.**  I'm just asking in terms of kind of your general

20 understanding in this time frame between, say, October '95,

21 April of '98, that you understood that if you're doing

22 designs while you're being paid by Mattel to do designs for

23 dolls, and you do designs for dolls, that those belong to

24 Mattel.

25              You understood that?

Exhibit 2 - Page 18

2340

1   **A.**    I think what my understanding would have been more

2   clearly would have been that any designs that I had been

3   assigned by Mattel, any drawings that I had been assigned to

4   work on would belong to Mattel.

5   **Q.**    So your view was that you were being paid as a designer;

6   correct?

7   **A.**    Yes.

8   **Q.**    And that if, while being paid as a designer for Mattel,

9   you came up with a great idea that would be of benefit to

10  Mattel, that you could just go across the street to a

11  competitor and say I've got this great idea.  I want to give

12  it to you?

13  **A.**    I don't know that I had that understanding.

14  **Q.**    Well, let's talk about what you executed, the documents

15  you executed when you went back to Mattel.

16          Now, we were talking about November '95 to April

17  '98.  So at this point I want to ask you about this second

18  stint, January '99 until October of 2000, okay?

19  **A.**    Um-hm.

20  **Q.**    And if you look in your booklet there, there's an

21  Exhibit 25.  Have you found it?

22  **A.**    Yes.

23  **Q.**    Okay.  And you recognize this as -- actually, I didn't

24  mean to do this.  Let me go back to your first stint.  I may

25  have forgotten this.

Exhibit 2 - Page 19

1   A.   No, not to my knowledge.

2   Q.   So now let's shift forward slightly to January of '99

3   and the second stint with Mattel.  Now, when you start again,

4   you've got to fill out the same documents again; right?

5   A.   Right.

6   Q.   What position, by the way, did you have when you came

7   back to Mattel in January of 99?

8   A.   I think my position was project designer.

9   Q.   And generally, what sort of duties did you have as

10  project designer?

11  A.   As a project designer, again, I would design fashions

12  for Barbie.  I worked in the Barbie collectible department.

13  We would come up with hairstyles, outfits, makeup,

14  accessories, things like that.

15  Q.   And was that pretty much what you did from January '99

16  until October of 2000?

17  A.   Yes.

18  Q.   Did your position ever change?

19  A.   Um, yes, I think I got a promotion, but I can't remember

20  what my title changed to.

21  Q.   What was the nature of the promotion?

22  A.   I'm not sure what you mean.

23  Q.   You said you were promoted.  Did you have different

24  duties?  Were you supervising people?

25  A.   No, I didn't really have any new duties or supervision.

Exhibit 2 - Page 20

2344

```
 1   I think, you know, I got some sort of a raise.  And other
 2   than that, my position was basically the same.
 3   Q.   Okay.  Now I'm going to take you to those other
 4   agreements.  If you'd look at Exhibit 25.  Is that an
 5   employee confidential information and inventions agreement
 6   that you signed in January of '99?
 7   A.   It appears to be, yes.
 8            MR. PRICE:  Your Honor, move Exhibit 25 into
 9   evidence.
10            MR. NOLAN:  No objection.
11            THE COURT:  It's admitted.  You may publish.
12            (Exhibit 25 received.)
13   Q.   BY MR. PRICE:  And this is your signature here at the
14   bottom; is that right?
15   A.   Yes.
16   Q.   And if we look at paragraph 2, you see they have the
17   same basic paragraph concerning ownership of inventions which
18   includes designs, et cetera.
19            Do you see that?
20   A.   Yes.
21   Q.   And if we go to paragraph 3 here, it has a similar
22   provision about your employment requiring undivided attention
23   and effort.
24            Do you see that?
25   A.   Yes.
```

Exhibit 2 - Page 21

2352

```
 1                  (Proceedings concluded at 5:10 P.M.)

 2

 3

 4

 5

 6

 7

 8                     C E R T I F I C A T E

 9

10

11          I hereby certify that pursuant to Title 28,

12   Section 753 United States Code, the foregoing is a true and

13   correct transcript of the stenographically reported

14   proceedings in the above matter.

15          Certified on June 11, 2008.

16

17

18          MARK SCHWEITZER, CSR, RPR, CRR
            Official Court Reporter
19          License No. 10514

20

21

22

23

24

25
```

Exhibit 2 - Page 22

# Exhibit 3

3033

```
 1                  UNITED STATES DISTRICT COURT

 2                 CENTRAL DISTRICT OF CALIFORNIA

 3                            ---

 4         HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

 5                            ---

 6  MATTEL, INC.,                 :  PAGES 3033 - 3190
                                  :
 7            PLAINTIFF,          :
                                  :
 8     VS.                        :  NO. ED CV04-09049-SGL
                                  :  [CONSOLIDATED WITH
 9  MGA ENTERTAINMENT, INC.,      :  CV04-9059 & CV05-2727]
    ET AL.,                       :
10                                :
            DEFENDANTS.           :
11  _____

12

13

14

15            REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                  RIVERSIDE, CALIFORNIA

17               WEDNESDAY, JUNE 18, 2008

18                 JURY TRIAL - DAY 15

19                  AFTERNOON SESSION

20

21

22                              MARK SCHWEITZER, CSR, RPR, CRR
                                OFFICIAL COURT REPORTER
23                              UNITED STATES DISTRICT COURT
                                181-H ROYBAL FEDERAL BUILDING
24                              255 EAST TEMPLE STREET
                                LOS ANGELES, CALIFORNIA 90012
25                              (213) 663-3494
```

CERTIFIED COPY

Exhibit 3 - Page 23

1          THE COURT:  All right.  Let's bring the jury in.

2          **(WHEREUPON THE JURY ENTERS.)**

3          THE COURT:  Good afternoon, members of the jury.

4          Mr. Bryant, Mr. Nolan, you may proceed.

5          MR. NOLAN:  Thank you.

6          **CARTER BRYANT, PREVIOUSLY SWORN.**

7          **CROSS-EXAMINATION (CONTINUED)**

8   BY MR. NOLAN:

9   **Q.**   Good afternoon, Mr. Bryant.

10  **A.**   Good afternoon.

11  **Q.**   I want to just try to clean this up in a short bit.

12          Before we broke, I was asking you a series of

13  questions about the time period of September 1st through

14  October 20th of the year 2000.

15  **A.**   Yes.

16  **Q.**   My question to you, sir, is when you were working at

17  Mattel in September of 2000, do you recall what your monthly

18  salary was at Mattel?

19  **A.**   I think I was making around $5,000 a month.

20  **Q.**   And, in fact, did you get paid approximately $5,000 a

21  month from Mattel in the month of September?

22  **A.**   Well, I don't really remember.

23  **Q.**   In any event, do you remember working full time for

24  Mattel from September 1st through September 30th?

25  **A.**   Yes.

Exhibit 3 - Page 24

3048

1   Q.   And were you working full time?

2   A.   Yes.

3   Q.   Do you recall any of your supervisors complaining about

4   your work from September 1st through September 30th?

5   A.   No, not that I remember.

6   Q.   Now, I understand on October 4th you entered into an

7   agreement with MGA; correct?

8           MR. PRICE:   Objection.   Leading.

9           THE COURT:   Very well.

10  Q.   BY MR. NOLAN:   Did you enter into a consulting agreement

11  at any time with MGA?

12  A.   Yes.

13  Q.   What was the date that you signed that consulting

14  agreement?

15  A.   That was October 4, 2000.

16  Q.   Now, my question is under that consulting agreement,

17  were you paid a monthly distribution against future

18  royalties?

19  A.   Yes.

20  Q.   Can you tell the jury how much your monthly payment was

21  pursuant to that consulting agreement with MGA?

22  A.   I believe it was $5,500 a month.

23  Q.   So if my math is right, you got approximately a $500 a

24  month raise at that point in time?

25  A.   Yes.

Exhibit 3 - Page 25

3052

1   Q.   And that lower number was how much?

2   A.   5,000.

3   Q.   What date did you offer your resignation to Mattel?

4   A.   October 4th, 2000.

5   Q.   And who did you give that resignation to?

6   A.   I gave it to my direct supervisor, Ann Driskill.

7   Q.   Did you provide any period of notice?

8   A.   Yes.

9   Q.   And what was the period of notice that you gave them?

10  A.   I told them that my last day would be the 19th of

11  October.

12  Q.   And did you continue to work at Mattel from the period

13  of October 4th through October 19th of the year 2000?

14  A.   Yes.

15  Q.   Why did you give Mattel two weeks' notice?

16  A.   I thought that was the right thing to do.  I didn't feel

17  that I should give them notice and just walk out the door.  I

18  felt that I needed to wrap up my projects that I was working

19  on at Mattel.  You know, I was -- in my past experience, any

20  job I had, you know, if you decided to resign, you gave some

21  sort of notice.

22  Q.   Did you work for Mattel from October 4th through October

23  19th, the year 2000?

24  A.   Yes.

25  Q.   And without disclosing the exact nature of the work, can

Exhibit 3 - Page 25A

1

2          (Proceedings concluded at 5:50 P.M.)

3

4

5

6

7              **C E R T I F I C A T E**

8

9

10         I hereby certify that pursuant to Title 28,

11  Section 753 United States Code, the foregoing is a true and

12  correct transcript of the stenographically reported

13  proceedings in the above matter.

14         Certified on June 18, 2008.

15

16

17  **MARK SCHWEITZER, CSR, RPR, CRR**
    Official Court Reporter
18  License No. 10514

19

20

21

22

23

24

25

Exhibit 3 - Page 26

# Exhibit 4

2936

```
 1              UNITED STATES DISTRICT COURT

 2             CENTRAL DISTRICT OF CALIFORNIA

 3                    EASTERN DIVISION

 4                       - - -

 5        HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

 6                       - - -

 7   MATTEL, INC.,                    )
                                      )
 8                   PLAINTIFF,       )
                                      )
 9             VS.                    )   NO. CV 04-09049
                                      )
10   MGA ENTERTAINMENT, INC., ET. AL.,)
                                      )
11                   DEFENDANTS.      )   TRIAL DAY 15
     _____)   MORNING SESSION
12   AND CONSOLIDATED ACTIONS,        )   PAGES 2936-3032
     _____)
13

14

15        REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16                 RIVERSIDE, CALIFORNIA

17               WEDNESDAY, JUNE 18, 2008

18                     9:07 A.M.

19

20

21

22

23            THERESA A. LANZA, RPR, CSR
          FEDERAL OFFICIAL COURT REPORTER
24           3470 12TH STREET, RM. 134
          RIVERSIDE, CALIFORNIA  92501
25               951-274-0844
              WWW.THERESALANZA.COM
```

CERTIFIED COPY

2964

```
 1   THERE WAS A LONG HALLWAY RIGHT NEXT TO MY CUBICLE.  IT WAS JUST
 2   KIND OF IN A SORT OF VAST, OPEN AREA.
 3   Q    NOW, CAN YOU JUST BRIEFLY DESCRIBE FOR US THE TYPE OF
 4   DESIGNS THAT YOU WERE WORKING ON IN 1999 IN BARBIE
 5   COLLECTIBLES?                                                        09:45
 6   A    WELL, I WAS WORKING ON, YOU KNOW, COLLECTIBLE DOLLS FOR A
 7   MORE ADULT MARKET.  I WAS DOING THINGS LIKE BARBIE AS A SWAN,
 8   AND I DID HOLLYWOOD BARBIE.  I DID A SERIES BASED ON ROMAN
 9   MYTHOLOGY.  JUST VARIOUS TYPES OF THINGS LIKE THAT.
10   Q    MR. PRICE ASKED YOU QUESTIONS CONCERNING WHETHER OR NOT         09:46
11   YOU HAD EVER DESIGNED A DOLL WHILE AT MATTEL.
12        DO YOU RECALL THAT LINE OF QUESTIONS?
13   A    YES.
14   Q    I THINK YOU MADE A REFERENCE TO SOMETHING CALLED A
15   FRANKENSTEIN DOLL; IS THAT RIGHT?                                    09:46
16   A    YES.
17   Q    CAN YOU GIVE THAT A LITTLE MORE COLOR, OR MAYBE LESS
18   COLOR, AND JUST EXPLAIN TO ME WHAT A FRANKENSTEIN DOLL WOULD
19   BE.  IS THAT YOUR OWN TERM, OR HAVE YOU HEARD THAT SOMEWHERE
20   ELSE?                                                                09:46
21   A    NO.  THAT WAS MY TERM THAT I MADE UP.
22        IT JUST MEANT TAKING, YOU KNOW -- MAYBE TAKING THE
23   ARMS OFF ONE DOLL AND PUTTING THEM ON, YOU KNOW, A TORSO, OR
24   MAYBE TAKING A CERTAIN TORSO AND CHANGING THE LEG.  AND A LOT
25   OF TIMES WHAT I WOULD DO, ACTUALLY, WAS, WITH THE HEADS IN          09:47
```

3004

1    Q    IN ANY EVENT, BEFORE THE CONVERSATION WITH VERONICA MARLOW

2    WHERE YOU DISCUSSED BRATZ, HAD YOU EVER HEARD OF MGA?

3    A    NO.

4    Q    HAD YOU EVER HEARD OF ISAAC LARIAN?

5    A    NO.                                                          11:13

6    Q    HAD YOU EVER HEARD OF PAUL TREANTAFELLES GARCIA?

7    A    NO.

8    Q    SOMETIME AFTER THE CONVERSATION WITH VERONICA MARLOW, DID

9    YOU HAVE A MEETING WITH REPRESENTATIVES OF MGA?

10   A    YES.                                                         11:13

11   Q    AND DO YOU RECALL APPROXIMATELY WHEN THAT FIRST MEETING

12   OCCURRED?

13   A    SOMETIME IN LATE AUGUST OF 2000.

14   Q    WHO WAS AT THAT MEETING?

15   A    IT WAS MYSELF; IT WAS PAULA TREANTAFELLES GARCIA;            11:14

16   VICTORIA O'CONNOR AND VERONICA MARLOW.

17   Q    AND AT THAT MEETING, DID YOU BRING YOUR BRATZ DRAWINGS?

18   A    YES.

19   Q    AT SOME POINT IN TIME AFTER THAT MEETING, DID YOU MEET

20   WITH ISAAC LARIAN?                                                11:14

21   A    YES.

22   Q    AND WAS THAT ON THE SEPTEMBER 1ST MEETING?

23   A    YES.

24   Q    AND WHO WAS PRESENT AT THAT MEETING?

25   A    IT WAS MR. LARIAN; MYSELF; PAULA GARCIA;                     11:15

WEDNESDAY, JUNE 18, 2008                  TRIAL DAY 15, MORNING SESSION

Exhibit 4 - Page 29

```
 1           THE COURT:  IT WAS JUST FILED ON JUNE 17TH.  I JUST

 2   WANTED TO GIVE YOU NOTICE OF IT.  WE'LL TAKE THIS UP AT 1:15.

 3           MR. NOLAN:  THANK YOU.

 4           THE COURT:  COURT IS IN RECESS.

 5           (WHEREUPON, MORNING SESSION IS CONCLUDED. )        12:01

 6

 7

 8

 9

10

11

12

13

14                           CERTIFICATE

15

16   I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED
     STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF
17   THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE ABOVE-
     ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN
18   CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF
     THE UNITED STATES.

19

20   _____      _____
     THERESA A. LANZA, CSR, RPR                    DATE    6-20-08
21   FEDERAL OFFICIAL COURT REPORTER

22

23

24

25
```

WEDNESDAY, JUNE 18, 2008                 TRIAL DAY 15, MORNING SESSION

Exhibit 4 - Page 30

# Exhibit 5

1255



1     UNITED STATES DISTRICT COURT

2     CENTRAL DISTRICT OF CALIFORNIA

3     EASTERN DIVISION

4                    - - -

5     HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                    - - -                **CERTIFIED COPY**

7     MATTEL, INC.,                    )
                                       )
8                    PLAINTIFF,        )
                                       )
9           VS.                        )     NO. CV 04-09049
                                       )
10    MGA ENTERTAINMENT, INC., ET. AL.,)
                                       )
11                   DEFENDANTS.       )     TRIAL DAY 7
                                       )     PAGES 1255-1390
12    AND CONSOLIDATED ACTIONS,        )
                                       )
13    _____

14

15    REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16    RIVERSIDE, CALIFORNIA

17    WEDNESDAY, JUNE 4TH, 2008

18    8:28 A.M.

19

20

21

22

23              THERESA A. LANZA, RPR, CSR
              FEDERAL OFFICIAL COURT REPORTER
24              3470 12TH STREET, RM. 134
              RIVERSIDE, CALIFORNIA  92501
25                   951-274-0844
                 WWW.THERESALANZA.COM

1312

1    **THE COURT:**  THAT WAS A LEGAL PHRASE.

2         (LAUGHTER.)

3    **BY MR. QUINN:**

4    Q    JUST IN GENERAL, WHAT WAS THE NATURE OF YOUR INVOLVEMENT?

5    IF YOU COULD JUST GIVE US AN OVERVIEW OF THE NATURE OF YOUR            09:39

6    INVOLVEMENT IN DEALINGS WITH CARTER BRYANT.

7    A    SURE.

8         HE WAS ONE OF THE INVENTORS WHO HAD A DOLL CONCEPT

9    AND CAME TO MGA TO PRESENT HIS DOLL CONCEPT FOR US TO LICENSE,

10   TO SEE IF WE WERE INTERESTED IN LICENSING IT.                          09:39

11   Q    DID YOU MEET WITH MR. BRYANT IN THE SUMMER OF 2000?

12   A    I DID.

13   Q    CAN YOU TELL US HOW THAT CAME TO BE SET UP.  WHAT WERE THE

14   CIRCUMSTANCES OF THAT MEETING?

15   A    THE MEETING WAS SET UP BECAUSE PAULA TREANTAFELLES TOLD ME        09:39

16   THAT SHE HAD A GENTLEMAN WHO WAS INTERESTED IN PRESENTING A

17   DOLL CONCEPT, AND I BELIEVE -- I DON'T REMEMBER WHO SCHEDULED

18   THE MEETING, BUT SHE TOLD ME THAT SHE AND I WOULD BE MEETING

19   WITH HIM AS HE PRESENTED HIS DOLL CONCEPT TO US.

20   Q    DID SHE EXPLAIN TO YOU WHY SHE WANTED YOU THERE?                  09:39

21   A    SHE DIDN'T HAVE TO EXPLAIN IT TO ME, SINCE I MANAGED THE

22   INVENTOR RELATIONS.

23   Q    LOGICAL THAT YOU WOULD BE THERE?

24   A    YES.

25   Q    DID YOU ATTEND THAT FIRST MEETING WITH MR. BRYANT?               09:40

WEDNESDAY, JUNE 4, 2008                          TRIAL DAY 7

Exhibit 5 - Page 32

1354

1    **THE COURT:** SUSTAINED.

2    LAY A FOUNDATION FOR THAT, COUNSEL.

3    **BY MR. NOLAN:**

4    Q    DO YOU KNOW HOW CARTER BRYANT WAS INTRODUCED TO MGA?

5    A    AS I TESTIFIED EARLIER, HE WAS INTRODUCED THROUGH                        10:52

6    VERONICA MARLOW, A FREE-LANCE DESIGNER, I BELIEVE, FOR MGA.

7    Q    MR. QUINN SHOWED YOU A CALENDAR POSTING WITH RESPECT TO A

8    DATE OF AUGUST 18TH.

9         DO YOU RECALL THAT CALENDAR NOTICE THAT WAS SHOWN TO

10   YOU?                                                                          10:52

11   A    I RECALL IT FROM THIS MORNING; I DON'T RECALL IT FROM

12   EIGHT YEARS AGO.

13   Q    THAT WAS MY QUESTION.

14        DO YOU KNOW WHETHER OR NOT YOU ACTUALLY MET ON

15   AUGUST 18TH WITH CARTER BRYANT?                                              10:52

16   A    NOT WITHOUT LOOKING AT A FRANKLIN PLANNER OR SOME OTHER

17   DOCUMENTATION, NO.

18   Q    IN ANY EVENT, I BELIEVE IN YOUR DEPOSITION, IS IT POSSIBLE

19   IN YOUR MIND, THAT THE FIRST MEETING THAT YOU HAD WITH

20   CARTER BRYANT WAS ACTUALLY ON SEPTEMBER 1ST OF THE YEAR 2000?                10:53

21   A    IT'S POSSIBLE.

22   Q    AS I UNDERSTAND YOUR TESTIMONY, YOU'RE NOT CERTAIN WHETHER

23   OR NOT THERE WERE TWO DIFFERENT MEETINGS ON DIFFERENT DATES OR

24   THAT THE MEETING ON ONE OF THE DATES WAS SPLIT AND THAT

25   MR. LARIAN CAME IN A LITTLE BIT LATER; IS THAT CORRECT?                      10:53

WEDNESDAY, JUNE 4, 2008                              TRIAL DAY 7

Exhibit 5 - Page 33

```
 1   THE COURT HAS NOT RULED ON.

 2            THE COURT:  OKAY.  THANK YOU.

 3

 4

 5

 6

 7

 8

 9

10

11                          CERTIFICATE

12

13   I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED
     STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF
14   THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE ABOVE-
     ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN
15   CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF
     THE UNITED STATES.

16

17                                          6-4-08
     THERESA A. LANZA, CSR, RPR                 DATE
18   FEDERAL OFFICIAL COURT REPORTER

19

20

21

22

23

24

25
```

# Exhibit 6

2428

```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3                         ---

 4       HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

 5                         ---

 6   MATTEL, INC.,              :   PAGES 2428 - 2524
                                :
 7           PLAINTIFF,         :
                                :
 8       VS.                    :   NO. ED CV04-09049-SGL
                                :   [CONSOLIDATED WITH
 9   MGA ENTERTAINMENT, INC.,   :   CV04-9059 & CV05-2727]
     ET AL.,                    :
10                              :
             DEFENDANTS.        :
11   _____:

12

13

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16               RIVERSIDE, CALIFORNIA

17             THURSDAY, JUNE 12, 2008

18               JURY TRIAL - DAY 12

19               AFTERNOON SESSION

20

21

22                          MARK SCHWEITZER, CSR, RPR, CRR
                            OFFICIAL COURT REPORTER
23                          UNITED STATES DISTRICT COURT
                            181-H ROYBAL FEDERAL BUILDING
24                          255 EAST TEMPLE STREET
                            LOS ANGELES, CALIFORNIA 90012
25                          (213) 663-3494
```

CERTIFIED COPY

Exhibit 6 - Page 35

2433

|     |                                                                          |
| --- | ------------------------------------------------------------------------ |
| 1   | **(WHEREUPON THE JURY ENTERS.)**                                         |
| 2   | THE COURT:  Good afternoon, members of the jury.                         |
| 3   | Mr. Bryant, Counsel, you may proceed.                                    |
| 4   | MR. PRICE: Can we put up Exhibit 25.                                     |
| 5   | **CARTER BRYANT, PREVIOUSLY SWORN.**                                     |
| 6   | **DIRECT EXAMINATION (CONTINUED)**                                       |
| 7   | BY MR. PRICE:                                                            |

**Q.**    Mr. Bryant, when we broke last time, I was talking to you about the agreements you signed when you started with your second stint at Mattel.

Do you recall that?

**A.**    Yes.

**Q.**    And one of the agreements was this employee confidential information agreement; correct?

**A.**    Yes.

**Q.**    If we could blow it up so we can see what it says.  And I want to ask you about this section here, 2-A.  "I agree to communicate to the company as promptly and fully as practicable all inventions as defined below, conceived or reduced to practice by me, alone or jointly by others, at any time during my employment by the company."

Do you see that?

**A.**    Yes.

**Q.**    And inventions included designs.  Do you see that?  "As used in this agreement, the term investigations includes but

Exhibit 6 - Page 36

2434

1    is not limited to all discoveries, improvements, processes,

2    developments, designs, et cetera."

3              Do you see that?

4    A.    Yes.

5    Q.    And do you recall also the provision here concerning

6    that the agreement does not apply to an invention which

7    qualifies under the provision of section -- I think it's 2870

8    of the California Labor Code?

9              Do you see that?

10   A.    Yes, I see it.

11   Q.    Does that section provide that the requirement to assign

12   shall not apply to an invention that the employee developed

13   entirely on his or her own time without using the employer's

14   equipment, supplies, facilities, or trade secret information

15   except for those inventions that either, one, relate at the

16   time of conception or reduction to practice of the invention

17   to the employer's business, or actually or demonstrably

18   anticipated research of development of the employer?

19             Do you see that?

20   A.    Yes.

21   Q.    And you understand Mattel's business was the toy

22   business?

23   A.    Yes.

24   Q.    And so that under this agreement, if you came up with a

25   design or something that related to the toy business while

Exhibit 6 - Page 37

1  you were at Mattel, that that was to be assigned and belonged

2  to Mattel under your agreement.

3  **A.**   Are you asking me if I understood that?

4  **Q.**   Yes.

5  **A.**   No.

6  **Q.**   Let me ask you this:  You mentioned that you had heard

7  about moonlighting.

8          Do you remember that?

9  **A.**   Yes.

10 **Q.**   It's true, is it not, that while you were at Mattel --

11 well, let me ask you, while you were at Mattel, did you know

12 of any Mattel employees who worked for any Mattel competitors

13 while they were simultaneously employed by Mattel?

14 **A.**   Not anybody specifically.  I had just heard about it.

15 **Q.**   While you were at Mattel, did you know of any Mattel

16 employees who worked for other toy companies while they were

17 employed at Mattel?

18 **A.**   Again, not anybody specifically.

19 **Q.**   Did you have any information, at the time you were at

20 Mattel, that indicated to you that Mattel permitted Mattel

21 employees to work for other toy companies while they were

22 employed by Mattel?

23 **A.**   It was just kind of a general sort of rumor.

24         MR. PRICE:  Your Honor, I'd like to play from

25 Mr. Bryant's deposition, January 23, 2008, page 833, line 4

Exhibit 6 - Page 38

2504

```
 1   thought of?

 2   A.    Sure.

 3   Q.    But you knew the body wasn't going to have the body you

 4   thought of; right?

 5   A.    No.  I -- I'm sorry.  Yes.

 6   Q.    So there came a time when you presented this at a

 7   meeting at MGA; correct?

 8   A.    Yes.

 9   Q.    And during that meeting and discussions, you even

10   mentioned that this face is sort of generally my idea of how

11   generally the Bratz dolls will look.

12   A.    I don't know if I said that or not.

13   Q.    Well, you certainly didn't say that about the body.

14   A.    I don't remember what I said about the body either.

15   Q.    So in addition to working on this three-dimensional doll

16   to present at a pitch, you also put together your drawings

17   for the pitch book; correct?

18   A.    Yes.

19   Q.    And your testimony is the first meeting you had was

20   sometime in August; correct?

21   A.    Yes.

22   Q.    And this meeting you were present at, correct?

23   A.    Yes.

24   Q.    Paula Treantafelles?

25   A.    Yes.
```

Exhibit 6 - Page 39

2505

1   Q.   Victoria O'Connor?

2   A.   Yes.

3   Q.   Was Isaac Larian there?

4   A.   No, not at the first meeting.

5   Q.   And at this first meeting, did you bring this doll you

6   created?

7   A.   No.

8   Q.   Is that because it wasn't complete?

9   A.   Um, I don't remember.

10  Q.   You did bring drawings?

11  A.   Yes.

12  Q.   And if we look at Exhibit 302.  And if you'll page

13  through there.  Is 302, are these the drawings you presented

14  at this first meeting that you tell us you had with

15  Ms. Treantafelles, Ms. O'Connor?

16  A.   Yes.  I'm not sure -- I can't remember if I had the

17  notebook at that time or if I just showed my portfolio.

18  Q.   If you had what?

19  A.   I said I can't remember if I had the notebook, the

20  little binder notebook at the time, or if I just had my

21  portfolio.

22  Q.   Let me try to clarify that.  First, one other thing.

23  Ms. Veronica Marlow was also at this meeting?

24  A.   Yes.

25  Q.   And you say you're not sure you had your notebook.  What

Exhibit 6 - Page 40

2506

1   do you mean by your notebook?

2   **A.**   With, I put together a little pitch book that had color

3   copies of my drawings.

4   **Q.**   So at the first meeting, you think you just showed your

5   poster boards?

6   **A.**   Well, I know that's what I showed first.   I can't

7   remember if I left them with this notebook or not.

8   **Q.**   So when you say that you were showing your poster

9   boards, do you have any in front of you in those originals?

10   **A.**   Yeah, I'm talking about like, you know, these drawings.

11   **Q.**   And you are holding up the one we saw earlier that had

12   that -- the date on it that you put on sometime after '99;

13   correct?

14   **A.**   I'm sorry?

15   **Q.**   You are holding up one of those poster boards which has

16   that date on it in '98 that you put on it sometime after '99.

17   **A.**   Yes.

18   **Q.**   So these poster boards that you showed them in this

19   meeting, again, as of the time you joined Mattel, those

20   poster boards, wherever they were, were blank.

21   **A.**   Well, yes.

22   **Q.**   And then you changed them from a blank poster board to

23   the sorts of drawings you have shown us.   You did that

24   process while you were at Mattel; correct?

25   **A.**   If you mean transferring the drawing from my original

Exhibit 6 - Page 41

2512

1   did you have communications with anyone at MGA?

2   A.   Well, I think I may have spoken to Victoria O'Connor.

3   Q.   Did you talk with Ms. Garcia?

4   A.   I don't remember.

5   Q.   So when you had your meeting on September 1st -- let me

6   step back.  Your testimony is you had a meeting on September

7   1st; right?

8   A.   Yes, we did have a meeting September 1st.

9   Q.   And let's talk about the location of that meeting.  Was

10  it at MGA?

11  A.   Yes.

12  Q.   And September 1st, you're still an employee at Mattel;

13  correct?

14  A.   Yes.

15  Q.   And you go to MGA's offices.  Where are they located?

16  A.   Van Nuys.

17  Q.   Was there any security?  Did you have to check in with

18  someone?

19  A.   I don't remember.

20  Q.   Do you remember having to go and sign in and getting a

21  sort of a temporary tag to be escorted somewhere?

22  A.   No, I don't remember.

23  Q.   Was the meeting in Mr. Larian's office?

24  A.   I believe so, yes.

25  Q.   You understood that he was the Chief Executive Officer

Exhibit 6 - Page 42

2513

1   of another toy company, a company other than Mattel, which is

2   MGA?

3   A.   Yes.

4   Q.   And you were bringing to him these designs for Bratz as

5   well as a three-dimensional creation to pitch your Bratz

6   concept; correct?

7   A.   Yes.

8   Q.   And your hope was that the CEO of MGA would agree to

9   produce the Bratz dolls; correct?

10  A.   Well, yes, sure.

11  Q.   Tell us who was at this meeting that was on September

12  1st.

13  A.   Well, it was myself, Mr. Larian, pretty sure his

14  daughter Yasmin was there, and Paula Treantafelles-Garcia,

15  Victoria O'Connor, and I think Veronica Marlow might have

16  been present.

17  Q.   Now, when you had presented your drawings to Ms. Garcia

18  and Ms. O'Connor in August, was Ms. Garcia excited about

19  them?

20  A.   Um, she seemed like it, yeah.

21  Q.   You got positive feedback; right?

22  A.   Um, yeah, I got a good vibe.

23  Q.   Who was it that suggested that you bring your designs to

24  Mr. Larian, CEO?

25  A.   Well, what I recall at that first meeting, I think that

Exhibit 6 - Page 43

2514

1   Victoria had told me that Mr. Larian was out of town, but she

2   thought he would like to see them.

3   **Q.**   In this meeting September 1st, one of the things you

4   told Mr. Larian was that you were at that time employed by

5   Mattel; right?

6   **A.**   I'm quite sure that I did.

7   **Q.**   And when you told Mr. Larian that you were then employed

8   by Mattel, you don't recall him saying anything in response

9   to that, do you?

10  **A.**   I think we talked.  You know, I think he asked me maybe

11  something about, you know, are these something that you came

12  up with on your own and, you know, on your own time.  And you

13  know, I told him that yes, they were.

14          MR. PRICE:  Your Honor, I'd like to play from

15  Mr. Bryant's deposition page 91, lines 3 through --

16          THE COURT:  Help me out.  Direct me to the volume.

17          MR. PRICE:  It is volume 1.  It is dated November

18  4, 2004.  And it's lines 3 through 7.

19          THE COURT:  Any objection?

20          MR. NOLAN:  No objection.

21          THE COURT:  You may play it.

22          MR. PRICE:  Thank you.

23          WHEREUPON THE VIDEOTAPED DEPOSITION

24          EXCERPTS OF CARTER BRYANT, AS PROVIDED

25          BY COUNSEL, ARE INCORPORATED HEREIN.

Exhibit 6 - Page 44

2515

1        "QUESTION:  When you told Mr. Larian that you

2    were then employed by Mattel, what did he say?

3        "ANSWER:  I really don't recall what he said

4    exactly.

5        "QUESTION:  Well, generally.

6        "ANSWER:  I don't even remember generally what

7    he said."

8  Q.    Now, you told Mr. Larian that you were employed by

9  Mattel because you thought it was important for him to know

10 that; right?

11 A.    Um, well, I suppose so.

12 Q.    Well, I'm asking you to more than suppose.  I'm asking

13 for your testimony now.  Isn't a reason you told Mr. Larian

14 that you were employed by Mattel is that you felt it was

15 important for him to know that?

16 A.    Well, to the best of my recollection, yes, I think so.

17 Q.    After the September 1st meeting, when you showed the

18 Bratz drawings and this doll that you created to Mr. Larian

19 and others, at that point do you think you had a good

20 reception?

21 A.    Um, you know, I thought it went fairly well.  I kind of

22 got the feeling from Mr. Larian that he kind of thought they

23 were very odd-looking characters.  But, I mean, I thought it

24 went pretty well.

25 Q.    You said you got the impression from Mr. Larian, you

Exhibit 6 - Page 45

2516

1  actually used the words odd-looking characters.

2          When is the last time that you heard that phrase?

3  A.   That I heard that phrase?

4  Q.   Let me ask it this way:  Do you recall Mr. Larian saying

5  they are odd-looking characters?

6  A.   No, not specifically.  I guess I'm just paraphrasing.

7  Q.   And after that meeting, you began having discussions

8  with MGA about becoming a consultant to MGA to make Bratz a

9  reality; right?

10 A.   Yes.

11 Q.   How soon after this meeting did you get -- did someone

12 from MGA communicate with you to say, you know, we want this

13 to happen?

14 A.   Well, I don't remember the exact amount of time that

15 passed, but I think it was, you know -- it was at least

16 several days.

17 Q.   And you were contacted by an attorney from MGA?

18          MR. NOLAN:  Objection as to foundation.  Time.

19          THE COURT:  Wait a second.  Sustained.

20 Q.   BY MR. PRICE:  Within two weeks of September 1st, you

21 began engaging in negotiations with an attorney at MGA;

22 right?

23 A.   Well, I don't remember exactly who I talked to first.

24 It seemed like I talked to Isaac first after that initial

25 meeting.

Exhibit 6 - Page 46

2517

1    Q.    Mr. Larian?

2    A.    Yes.  Sorry.

3    Q.    And Mr. Larian was excited?

4    A.    He seemed to be.

5    Q.    He mentioned, when he talked to you, how successful he

6    thought this might be; correct?

7    A.    Are we talking about this first conversation that we

8    had?

9    Q.    Let's say -- well, let me ask you, how many

10   conversations did you have with Mr. Larian in September?

11   A.    Oh, I don't recall.  More than one.

12   Q.    And those discussions, you talked about, for example,

13   how you might be paid?

14   A.    Yes.

15   Q.    You talked about the fact that you wanted a royalty?

16   A.    Yes, I think so.

17   Q.    You talked about how fiscally and successfully you could

18   become rich?

19   A.    I don't remember ever saying that.  That's not something

20   I really recall.

21   Q.    I'm not talking about you saying that.  I'm talking

22   about during these conversations, didn't Mr. Larian say

23   something to the effect of, with the deal we're talking

24   about, you could be rich?

25   A.    Yeah, he might have said something like that.

Exhibit 6 - Page 47

1

2

3

4

5

6                    **C E R T I F I C A T E**

7

8

9          I hereby certify that pursuant to Title 28,

10   Section 753 United States Code, the foregoing is a true and

11   correct transcript of the stenographically reported

12   proceedings in the above matter.

13             Certified on June 12, 2008.

14

15

16   **MARK SCHWEITZER, CSR, RPR, CRR**
     Official Court Reporter
17   License No. 10514

18

19

20

21

22

23

24

25

Exhibit 6 - Page 48

# Exhibit 7

2708

1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3                    EASTERN DIVISION

4                        - - -

5        HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                        - - -

7    MATTEL, INC.,                    )
                                      )
8                   PLAINTIFF,        )
                                      )
9            VS.                      )    NO. CV 04-09049
                                      )
10   MGA ENTERTAINMENT, INC., ET. AL.,)
                                      )
11                  DEFENDANTS.       )    TRIAL DAY 14
     _____)    MORNING SESSION
12   AND CONSOLIDATED ACTIONS,        )    PAGES 2708-2817
                                      )
13

14

15        REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16                 RIVERSIDE, CALIFORNIA

17               TUESDAY, JUNE 17, 2008

18                     8:47 A.M.

19

20

21

22

23                 THERESA A. LANZA, RPR, CSR
                  FEDERAL OFFICIAL COURT REPORTER
24                 3470 12TH STREET, RM. 134
                  RIVERSIDE, CALIFORNIA  92501
25                     951-274-0844
                   WWW.THERESALANZA.COM

2811

```
 1   OF POWER, WE BELIEVE IN OURSELVES.'

 2          I THINK THAT'S KIND OF HOW I PICTURED BRATZ.

 3   Q    DID YOU HAVE NAMES FOR THESE CHARACTERS?

 4   A    YES.

 5   Q    FIRST OF ALL, IN YOUR MIND, COLLECTIVELY, DID YOU HAVE A      11:57

 6   NAME IN MIND FOR THIS COLLECTION OF CHARACTERS?

 7   A    AFTER I STARTED DOING SOME ROUGH SKETCHES, YEAH, THE NAME

 8   JUST KIND OF CAME TO ME.

 9   Q    AND WHAT WAS THE NAME?

10   A    BRATZ.                                                        11:57

11   Q    WITH AN 'S' OR A 'Z'?

12   A    WITH A 'Z'.

13   Q    HOW DID YOU COME UP WITH THAT NAME?

14   A    IT JUST KIND OF POPPED IN MY HEAD AS I SAT THERE KIND OF

15   DRAWING; TO ME, I JUST KIND OF THOUGHT, OH, YOU KNOW, THEY LOOK    11:57

16   LIKE BRATZ.

17   Q    WHAT WERE THE NAMES OF THE CHARACTERS THAT YOU CONCEIVED

18   OF IN AUGUST OF 1998?

19   A    THERE WAS JADE, HALLIDAE, ZOE, AND LUPE.

20   Q    DID EACH OF THEM HAVE THE SAME PERSONALITY IN YOUR           11:58

21   CONCEPT?  HOW DID THEY DIFFER?

22   A    I WANTED THEM EACH TO HAVE, YOU KNOW, KIND OF A

23   DISTINCTIVE PERSONALITY; HAVE DISTINCTIVE, YOU KNOW, INTERESTS;

24   DISTINCTIVE FASHION STYLES.

25   Q    WAS ZOE THE SAME CHARACTER AS JADE?                          11:58
```

TUESDAY, JUNE 17, 2008              TRIAL DAY 14, MORNING SESSION

Exhibit 7 - Page 50

```
 1

 2

 3                                    CERTIFICATE

 4

 5   I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED
     STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF
 6   THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE
     ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN
 7   CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF
     THE UNITED STATES.

 8

 9

10   THERESA A. LANZA, RPR, CSR                    6-18-08
     OFFICIAL COURT REPORTER                       DATE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

TUESDAY, JUNE 17, 2008              TRIAL DAY 14, MORNING SESSION

Exhibit 7 - Page 51

# Exhibit 8

1   UNITED STATES DISTRICT COURT

2   CENTRAL DISTRICT OF CALIFORNIA

3   EASTERN DIVISION

4   - - -

5   HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6   - - -

7   MATTEL, INC.,                          )

8                           PLAINTIFF,     )

9              VS.                         )   NO. CV 04-09049

10  MGA ENTERTAINMENT, INC., ET. AL.,      )

11                          DEFENDANTS.    )   TRIAL DAY 9
                                           )   MORNING SESSION
12  AND CONSOLIDATED ACTIONS,              )   PAGES 1669-1756
                                           )

13

14

15   REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16   RIVERSIDE, CALIFORNIA

17   FRIDAY, JUNE 6, 2008

18   9:27 A.M.

19

20

21

22

23   THERESA A. LANZA, RPR, CSR
     FEDERAL OFFICIAL COURT REPORTER
24   3470 12TH STREET, RM. 134
     RIVERSIDE, CALIFORNIA  92501
25   951-274-0844
     WWW.THERESALANZA.COM

**CERTIFIED COPY**

1675

```
 1   A     YES, I DO.

 2   Q     AND YOU SAID, AGAIN, IT'S POSSIBLE YOU DON'T REMEMBER

 3   BECAUSE THAT WAS SO LONG AGO.

 4   A     I DID.

 5   Q     SO WE'RE TALKING ABOUT EVENTS THAT HAPPENED SEVEN, EIGHT    09:35

 6   YEARS AGO; AND IT'S SOMETIMES DIFFICULT TO REMEMBER THOSE

 7   THINGS; CORRECT?

 8   A     THAT'S CORRECT.

 9   Q     SO LET'S FOCUS, THEN, ON THIS SEPTEMBER 2000 MEETING.

10         YOU DO REMEMBER THAT MR. BRYANT WAS THERE.                 09:35

11   A     YES.

12   Q     YOU DO REMEMBER THAT HE SHOWED YOU THESE DRAWINGS AND

13   CALLED THEM "BRATZ."

14   A     YES.

15   Q     AND IF YOU GO BACK AND THINK ABOUT IT, YOU REALLY DON'T    09:35

16   RECALL ONE WAY OR ANOTHER -- IT'S POSSIBLE HE DID; IT'S

17   POSSIBLE HE DIDN'T -- WHETHER HE SAID THAT HE WORKED ON THESE

18   DRAWINGS AT NIGHTS AND ON WEEKENDS?

19   A     I'M SORRY.  CAN YOU REPEAT THAT.

20   Q     YOU DON'T REALLY RECALL WHETHER IN THIS MEETING, WHEN      09:36

21   MR. BRYANT PRESENTED THESE DRAWINGS TO YOU, WHETHER HE SAID

22   THAT HE WORKED ON THESE DRAWINGS AT NIGHTS OR ON THE WEEKENDS?

23   A     HE TOLD ME HE DID THEM IN 1998, WHEN HE WAS IN MISSOURI,

24   ON NIGHTS AND WEEKENDS.

25   Q     SO SITTING BACK EIGHT YEARS AGO, YOU HAVE A SPECIFIC       09:36
```

1676

1    RECOLLECTION THAT MR. BRYANT TOLD YOU THAT HE WORKED ON THESE

2    IN 1998; IS THAT RIGHT?

3    A    YES, I DO.

4    Q    AND DID HE TELL YOU THAT HE HAD WORKED AT MATTEL BETWEEN

5    APRIL '95 AND APRIL 1998?                                      09:36

6    A    NO, NOT TO THAT DETAIL.  HE TOLD ME HE WORKED AT MATTEL

7    RIGHT NOW.

8    Q    HE TOLD YOU AT THAT TIME HE WORKED AT MATTEL?

9    A    CORRECT; IN SEPTEMBER OF 2000.

10   Q    AND IF MS. O'CONNOR TESTIFIED SHE HAS NO RECOLLECTION OF  09:36

11   THERE BEING ANY DISCUSSION AS TO WHEN MR. BRYANT CREATED THESE

12   DRAWINGS, SHE WOULD BE, AGAIN, INCORRECT.

13   A    HER RECOLLECTION WOULD BE WRONG AGAIN.  I HEARD HER SAY

14   THAT THE CONTRACT WAS SIGNED ON SEPTEMBER 18TH, AND WHEN YOU

15   SHOWED HER, OR MR. NOLAN SHOWED HER, THE CONTRACT, THE TIME    09:37

16   STAMP ON THE BOTTOM, WHERE IT SAYS OCTOBER 4TH, SHE SAID,

17   'OKAY, MAYBE IT WAS DONE ON OCTOBER 4, 2000.'

18   Q    LET ME ASK YOU THIS, SIR:  IT'S TRUE, IS IT NOT, THAT,

19   SITTING THERE IN SEPTEMBER, YOU NEVER TOLD MR. BRYANT AT THAT

20   MEETING THAT IF HE CREATED THESE DOLLS WHILE THEY WERE AT      09:37

21   MATTEL, THAT THAT WASN'T SOMETHING YOU WERE INTERESTED IN?

22   A    THERE WERE NO DOLLS THAT HE WAS SHOWING US IN SEPTEMBER 1,

23   2000, WITH THE DRAWINGS.

24        ARE YOU REFERRING TO THE DRAWINGS?

25   Q    LET ME REPHRASE IT SO THAT WE'RE NOT BICKERING ABOUT      09:37

FRIDAY, JUNE 6, 2008                    TRIAL DAY 9, MORNING SESSION

Exhibit 8 - Page 54

1745

1    WAS A LICENSING SHOW, AND I DON'T REMEMBER THE EXACT DATE OF

2    IT, WHERE BRATZ WAS NAMED PROPERTY OF THE YEAR, AND WE WON, AND

3    AT THAT SHOW I STOOD UP IN FRONT OF A THOUSAND PEOPLE AND I

4    SAID VICTORIA O'CONNOR WAS ONE OF THE PEOPLE WHO WAS

5    INSTRUMENTAL IN MAKING A LICENSING PROGRAM FOR MGA, FOR                 11:43

6    STARTING THE LICENSING DEPARTMENT AT MGA; SO YOU'RE MISTAKING

7    THE TWO SHOWS.

8    Q    I'M BASING THAT ON THE TRANSCRIPT.

9         SO IF MS. O'CONNOR TESTIFIED IN RESPONSE TO

10   MR. NOLAN'S QUESTIONS, OR AGREED THAT YOU HAD SINGLED HER OUT          11:43

11   AT SOME TOY OF THE YEAR AWARD CEREMONY, THAT WOULD BE MISTAKEN

12   AS TO WHICH ONE IT WAS?

13   A    MAYBE MR. NOLAN MADE A MISTAKE.  HE'S A LAWYER.

14        IT WAS DEFINITELY A LICENSING SHOW IN 2002 OR 2003, I

15   DON'T REMEMBER THE EXACT DATE, WHERE BRATZ WAS NAMED PROPERTY          11:43

16   OF THE YEAR; AND, AGAIN, I GOT UP AND I ACKNOWLEDGED

17   VICTORIA O'CONNOR AS BEING THE PERSON WHO STARTED THE LICENSING

18   DEPARTMENT AT MGA.

19   Q    WELL, THERE WAS A TOY OF THE YEAR AWARD IN 2002.

20   A    I THINK THERE WAS, YES.                                           11:44

21   Q    AND BRATZ WAS RECOGNIZED.

22   A    YES, AS TOY OF THE YEAR.

23   Q    AND AT THE TIME BRATZ WAS RECOGNIZED, I TAKE IT YOU MADE

24   SOME REMARKS.

25   A    I DID.                                                           11:44

FRIDAY, JUNE 6, 2008                          TRIAL DAY 9, MORNING SESSION

Exhibit 8 - Page 54A

```
 1                         CERTIFICATE

 2

 3   I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED
     STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF
 4   THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE
     ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN
 5   CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF
     THE UNITED STATES.
 6

 7

 8   _____        6-8-08
     THERESA A. LANZA, RPR, CSR            _____
     OFFICIAL COURT REPORTER                     DATE
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

# Exhibit 9

*Final*

**MGA ENTERTAINMENT**
**16730 Schoenborn Street**
**North Hills, California  91343**

Dated as of September 18, 2000

Mr. Carter Bryant
1319 West 160th Street
Gardena, California 90247

Dear Mr. Bryant:

Set forth below are the terms and conditions upon which we (hereinafter "MGA") are retaining you ("Bryant") to consult and advise MGA in the design and development of certain products which MGA wishes to manufacture and distribute (hereinafter our agreement is sometimes referred to as the "MGA Consulting Agreement").  The parties' agreement is as follows:

1.      **Retention as Consultant/Services:**  MGA retains Bryant to provide his services to consult with MGA and advise MGA on the design and development by MGA of a line of dolls presently known as "Bratz" (the "MGA Products").  Bryant will render his services at such locations and times as may be reasonably be designated by MGA. It is understood and agreed that Bryant shall provide his services on a "top priority" basis as his services pertain to other clients of Bryant.  In addition, Bryant and all other Bryant staff will take direction from and be under the supervision of such person(s) as may be reasonably designated by MGA from time to time upon notice to Bryant.  It is understood and agreed that, subject to MGA's prior written consent, Bryant may retain third party contractors ("Contractors") to assist at his direction in the services to be rendered hereunder.  Such third parties shall be compensated in a manner ("Contractor Fees") to be determined between Bryant and such third parties and shall be subject to the terms of this Agreement, including without limitation, paragraphs 3, 4, and 7, below. Bryant shall enter into agreements with all Contractors on a form approved by MGA as conforming to the terms of this Agreement and confirming MGA's ownership of all results and proceeds of the services provided by any such Contractors; such form is attached a Exhibit "A" to this Agreement, and is incorporated herein by reference.

2.      **Term/Exclusivity:**  The Term shall commence on the date of this Agreement.  MGA shall have the right to terminate this Agreement on not less than forty-five (45) days prior written notice to Bryant. During the Term of this Agreement, Bryant will not provide consulting services to any person, firm or corporation engaged in the design, development and manufacture and sale of dolls or similar products.

3.      **Ownership:**

         (a)      All results and proceeds of the services provided by Bryant hereunder and any Contractor, including without limitation, any inventions, and any documentation related thereto, and any other material, whether written or oral (collectively, the  "Bryant Work Product") shall be considered "work made for hire" and shall be owned exclusively, throughout the world, and in perpetuity by MGA (including all copyrights and patents therein and thereto, and all renewals and extensions thereof). MGA shall have the sole and exclusive right to use the Bryant Work Product, in whole or in part, in whatever manner MGA may desire, including without limitation, the right to cut, edit, revise, alter and/or otherwise modify the Bryant Work Product and the results of Bryant's services hereunder and the Contractors' services, and to freely use, perform, distribute, exhibit and exploit such materials and license others to do so in any and all media now known or hereafter devised.  MGA shall have the sole and exclusive right to copyright or patent the Bryant Work Product in MGA's name, as the owner and author thereof, and to secure any and all registrations, renewals and extensions of such copyrights and

{00006662.DOC/2 / 10/04/2000  03:05 PM}

1



(△π EXHIBIT 520
Deponent _TONNU_
Date _7/19/07_ Rptr _ACN_
WWW.DEPOBOOK.COM

**ATTORNEY'S EYES
ONLY**

**BRYANT 00794**

patents in MGA's name or Bryant's name or the Contractors' names, as permitted pursuant to applicable statute. Bryant expressly waives, and shall cause all Contractors to waive, any "moral rights" (as such term is commonly understood around the world) in and to the Bryant Work Product prepared by Bryant and/or the Contractors pursuant to the Agreement. Bryant shall, upon request, execute, acknowledge and deliver, and shall cause each Contractor to execute, acknowledge and deliver, to MGA such additional documents as MGA may deem necessary to evidence and effectuate MGA's rights hereunder, and Bryant hereby grants to MGA the right as Bryant's attorney-in-fact to execute, acknowledge, deliver and record in the U.S. Copyright Office, the U.S. Patent Office or elsewhere any and all such documents. If, whether by statutory amendment to the U.S. Copyright and/or Patent Laws, or a decision by a court of competent jurisdiction interpreting such laws, MGA shall not be deemed to be the author or owner of the Bryant Work Product, this Agreement and each agreement with a Contractor shall, nevertheless, constitute an irrevocable assignment by Bryant and each Contractor, as applicable, to MGA of any and all of Bryant's and each Contractors' right, title and interest, including copyright and patent (and all renewals and extensions thereof), in and to the Bryant Work Product. Bryant acknowledges and agrees, and shall cause each Contractor to acknowledge and agree, that he and they have no interest in and shall not, by virtue of this Agreement or any services rendered by Bryant and/or each Contractor to MGA acquire any interest in the MGA Products and that MGA may exploit the MGA Products and any derivative works thereto, without obligation to Bryant and/or the Contractors, except as provided in Paragraph 4, below.

(b)     Without limiting the generality of the provisions of Paragraph 3(a), above, with respect only to any inventions, and any documentation related thereto, and any other material, whether written or oral, created by or for Bryant relating to the MGA Products prior to the commencement of the term of this Agreement, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by Bryant, Bryant hereby irrevocably grants, conveys, transfers, sets over and assigns to MGA in perpetuity all of Bryant's right, title and interest, in an to the such material, including, without limiting the generality of the foregoing, all rights under copyright and patent (and all renewals and extensions thereof) including the right to produce and authorize the production of any and all derivative works, and all proprietary rights of any kind therein, now known or hereafter created throughout the world. MGA shall have the sole and exclusive right to use such material, in whole or in part, in whatever manner MGA may desire, including without limitation, the right to cut, edit, revise, alter and/or otherwise modify such materials and to freely use, perform, distribute, exhibit and exploit such materials and license others to do so in any and all media now known or hereafter devised or refrain from doing so as MGA may determine. Bryant expressly waives any "moral rights" (as such term is commonly understood around the world) in and to such materials.

4.     **Compensation/Costs:**

(a)     For the first six (6) months of the Term of this Agreement, MGA shall pay Bryant for his services at the rate of five thousand five hundred dollars ($5,500.00) per month; for the next three (3) months of the Term, MGA shall pay Bryant for his services at the rate of five thousand dollars ($5,000.00) per month. All sums paid to Bryant as monthly fees shall be deemed to be non-refundable, fully-recoupable advances against any royalties that may be payable to Bryant pursuant to paragraph 4(b), below.

(b)     MGA shall pay to Bryant a royalty of three percent (3%) of the Net Sales Receipts from the sales by MGA of any of the MGA Products developed by MGA on which Bryant provided his consulting services. As used herein, the term "Net Sales Receipts" means all monies actually received by MGA from its customers on sales of MGA Products less (i) any and all excise, sales, value added or comparable or similar taxes; (ii) freight and similar third party handling charges paid or payable by MGA; and (iii) returns, discounts, allowances or credits (inclusive of co-op and trade discounts and allowances). MGA shall account to Bryant on a calendar quarterly basis within thirty (30) days after the end of each quarter. All statements of royalties rendered by MGA hereunder shall be conclusive, final,

{00006662.DOC/2 / 10/04/2000  03:05 PM}

2

ATTORNEY'S EYES ONLY

BRYANT 00795

TRIAL EXHIBIT 00015–002
Exhibit 9 - Page 57

and binding on Bryant, shall constitute an account stated, and shall not be subject to any question for any reason whatsoever unless specific written objection, stating the basis thereof, is given by Bryant to MGA within two (2) years after the date rendered.  No action, suit, or proceeding of any nature in respect of any royalty statement or other accounting rendered by MGA hereunder may be maintained against MGA unless such action, suit, or proceeding is commenced against MGA  in a court of competent jurisdiction within one (1) year after the date of MGA's notice rejecting such objection. Bryant or his representatives shall have the right, not more than once per year and not more than once per statement of royalties, to examine MGA's books and records relating to the sales of such MGA Products, such examination to be conducted during MGA's normal business hours and upon reasonable prior written notice.

(c)     All costs and expenses incurred by Bryant in connection with the performance of his obligations hereunder shall be borne solely by Bryant, except as otherwise agreed and incurred with MGA's prior written consent.  In the event MGA requests Bryant to travel to the Orient on MGA's behalf in connection with his services hereunder, MGA will reimburse Bryant for all travel expenses incurred in connection therewith, such as parking, airfare (economy class), auto rental, meals and hotel accommodations. Reimbursement shall be at the actual cost of such item without any mark-up.

(d)     Bryant shall submit invoices to MGA for his monthly fees (and reimbursable expenses, if and as agreed) on a monthly basis.  Each invoice shall provide sufficient detail to support the monthly fee charges and hours rendered (and shall include satisfactory copies of bills and/or payments for reimbursable expenses, as applicable).  MGA shall pay each such invoice within fifteen (15) days after receipt of such invoice, provided, however, MGA reserves the right to request further explanation or documentation before paying any invoice submitted by Bryant.

(e)     MGA shall use its reasonable business efforts, consistent with its business judgment, to market, promote, distribute, sell and/or exploit the MGA Products and to collect on all monies due from sales.  MGA has not made and does not hereby make any representation or warranty with respect to the quantity of sales (if any) of MGA Products embodying the Property which MGA may sell.  Bryant recognizes and acknowledges that the sale of MGA Products is speculative and agrees that MGA's judgment and the judgment of its subsidiaries and affiliated companies with regard to the sales of any of its MGA Products and with regard to the marketing, promotion, advertising and exploitation of the MGA Products shall be binding and conclusive upon Bryant.  Bryant warrants and agrees that Bryant will not make any claim, nor shall any liability be imposed upon MGA based upon any claim, that more sales could have been made or that better business could have been done than what was actually made or done by MGA or any of MGA's subsidiaries or its affiliated companies, or that better prices or terms could have been obtained.

5.     **Warranties and Indemnity:**  Bryant represents, warrants and agrees that:

(a)     he has the right and is free to execute this Agreement, to grant the rights granted by him to MGA hereunder, and to perform each and every term and provision hereof;

(b)     neither the execution and delivery of this Agreement nor the performance by Bryant of any of his obligations hereunder will constitute a violation, breach or default under any agreement, arrangement or understanding, or any other restriction of any kind, to which Bryant is a party or by which Bryant is bound;

(c)     the Bryant Work Product shall be free of all liens and encumbrances and there will be no claims, demands or actions pending or threatened with respect thereto; and that the Bryant Work Product is original and no part thereof infringes or shall infringe upon any common law or statutory rights or intellectual property rights of any third party including, without limitation, contractual rights,

{00006662.DOC/2 / 10/04/2000  03:05 PM}

3

**ATTORNEY'S EYES ONLY**        **BRYANT 00796**

patents, copyrights, mask-work rights, trade secrets, rights of privacy and other intellectual property rights;

     (d)     he shall comply with all applicable laws and regulations in force during the Term of this Agreement with respect to the services to be rendered hereunder; and

     (e)     he shall indemnify and hold MGA harmless from and against any and all claims, losses, costs, judgments, settlements, damages and expenses (including reasonable counsel fees) arising from any breach by him of any of the warranties, representations and agreements made by him hereunder.

6.     **Default/Termination:**

     (a)     In the event either Party fails to perform any of its material obligations hereunder, or breaches any representation, warranty or agreement contained herein, the other Party may terminate this Agreement on thirty (30) days prior written notice, provided the breaching Party shall not have remedied such failure within such thirty (30) day period.

     (b)     Upon the termination of this Agreement Bryant shall turn over to MGA all materials relating to the MGA Products furnished by MGA to Bryant or shall give MGA satisfactory evidence of their destruction.

7.     **Confidentiality:**

     (a)     Bryant shall keep in confidence and not disclose to any third party, without the written permission of MGA, the Confidential Information made known to him under this Agreement. As used herein, the term "Confidential Information" means information relating to MGA's products (whether current or projected), product titles, customers, employees, tools and techniques, designs, drawings, schematics and other documentation relating thereto and other confidential and proprietary business information of MGA and which is expressly labeled or identified to Bryant in writing as "confidential" or which, under the circumstances of such disclosure, Bryant knows, or reasonably should know, are treated by MGA as confidential. This requirement of confidentiality shall not apply to any information that is (i) in the public domain through no wrongful act of Bryant; (ii) rightfully received by the Bryant from a third party who is not bound by a restriction of nondisclosure; (iii) already in the Bryant's possession without restriction as to disclosure; or (iv) required to be disclosed by operation of law or by order of a court or administrative body of competent jurisdiction, (provided that prior to such disclosure, MGA shall first receive notice thereof from Bryant and have the opportunity to contest such order or requirement of disclosure or seek appropriate protective order).

     (b)     Bryant agrees and acknowledges that all Confidential Information disclosed to him shall be and remain the sole property of MGA. Nothing contained in this Agreement shall be construed as granting to Bryant any right, title or interest of any kind, by license or otherwise, to the Confidential Information disclosed by MGA, the intellectual property therein or any part or copy thereof. Bryant further acknowledges and agrees that nothing contained herein shall be construed as granting Bryant any right to develop, manufacture, produce and/or distribute any product(s) derived from or which otherwise uses any of the Confidential Information disclosed by MGA, or authorize or in any way assist others to do so. Bryant may not make, sell, license or distribute copies of the Confidential Information disclosed by MGA and may not sublicense, transfer or assign in any manner whatsoever this Agreement or any of Bryant's rights or obligations under this Agreement.

     (c)     Bryant acknowledges that his failure to perform any of the terms or conditions of this Agreement shall result in immediate and irreparable damage to MGA. Bryant also acknowledges that there may be no adequate remedy at law for such failures and that in the event thereof MGA shall be

{00006662.DOC/2 / 10/04/2000  03:05 PM}

4

ATTORNEY'S EYES ONLY

BRYANT 00797

entitled to equitable relief in the nature of injunction and to all other available relief, at law and/or in equity.

8. **Notices:** All notices, statements and/or payments to be given to the parties hereunder shall be addressed to the parties at the addresses set forth on the first page hereof or at such other address as the parties shall designate in writing from time to time.  All notices shall be in writing and shall either be served by personal delivery, mail, or facsimile (if confirmed by mail or personal delivery of the hard copy), all charges prepaid.  Except as otherwise provided herein, such notices shall be deemed given when personally delivered, all charges prepaid, or on the date five (5) days following the date of mailing, except that notices of change of address shall be effective only after the actual receipt thereof. Copies of all notices to MGA shall be sent to Fischbach, Perlstein & Lieberman LLP, 1875 Century Park East, Suite 850, Los Angeles, California 90067, Attention: David S. Rosenbaum, Esq. Copies of all notices to Bryant shall be sent to Carter Bryant 1319 West 160th Street, Gardena, California 90247.

9. **Independent Contractor/No Partnership/Third Party Beneficiary:** Bryant's relationship with MGA is that of an independent contractor.  Bryant does not have, and will not represent that he has, any power, right or authority to bind MGA, or to assume or create any obligation or responsibility, express or implied, on behalf of MGA in MGA's name.  Nothing stated in the Agreement shall be construed as constituting a partnership or as creating the relationships of employer/employee or principal/agent between the parties.  In all matters relating to the Agreement, Bryant shall not act as MGA's employee within the meaning or application of any federal or state unemployment insurance laws, or any other laws or regulations which may impute any obligations or liabilities to MGA by reason of an employment relationship.  Bryant will be solely responsible for all taxes, including without limitation, employee and employer, and that he carries all of his own insurance. Neither of the parties hereto shall hold itself out contrary to the terms of this provision by advertising or otherwise.  This Agreement shall not be construed to be for the benefit of any third party.

10. **Services Rendered Deemed Special, etc.:** Bryant acknowledges that the services to be rendered by him hereunder are of a special, unique, extraordinary and intellectual character which gives them peculiar value, the loss of which cannot be adequately compensated for in an action at law and that a breach of any term, condition or covenant hereof will cause irreparable harm and injury to MGA and in addition to any other available relief MGA will be entitled to seek injunctive relief.

11. **General Provisions:**

(a) This Agreement may not be assigned by either Party hereto either voluntarily or by operation of law.  Any such assignment shall not relieve such Party of its obligations hereunder.

(b) The titles of the paragraphs of this Agreement are for convenience only and shall not in any way affect the interpretation of any paragraph of this Agreement or the Agreement itself.

(c) A waiver by either Party of the terms or conditions of this Agreement in any instance shall not be deemed or construed to be a waiver of such terms or conditions for the future or of any subsequent breach thereof.  All remedies, rights, undertakings, obligations and agreements contained herein shall be cumulative and none of them shall be in limitation of any other remedy, right, undertaking, obligation or agreement of either Party.

(d) Neither Party hereto shall be liable to the other for any incidental, consequential, special or punitive damages of any nature or kind, arising out of in connection with a breach by such Party of this Agreement, whether such liability is asserted on the basis of contract, tort (including negligence or strict liability), or otherwise, even if such Party has been warned of the possibility of any such loss or damage.

{00006662.DOC/2 / 10/04/2000  03:05 PM}

5

**ATTORNEY'S EYES ONLY**          **BRYANT 00798**

TRIAL EXHIBIT 00015-005
Exhibit 9 - Page 60

PAGE.01       818894894                                        OCT 04 '00 16:51

(e)     This Agreement shall be construed and interpreted pursuant to the laws of the State of California, applicable to agreements made and to be performed entirely therein, and the parties hereto submit and consent to the jurisdiction of the courts of the State of California, including Federal Courts located therein, should Federal jurisdiction requirements exist, in any action brought to enforce (or otherwise relating to) this contract.

(f)     This Agreement constitutes the entire Agreement between the parties hereto and supersedes all prior agreements, whether written or oral, with respect to the subject matter herein contained. No provision of this Agreement shall be deemed waived, amended or modified by either Party unless such waiver, amendment or modification shall be in writing and signed by a duly authorized officer of the Party against whom the waiver, amendment or modification is to be enforced.

(g)     Nothing contained in this Agreement shall be construed so as to require the commission of any act contrary to law, and wherever there is any conflict between any provision of this Agreement and any material statute, law, ordinance, order or regulation contrary to which the parties hereto have no legal right to contract, the latter shall prevail, but in such event any provision of this Agreement so affected shall be curtailed and limited only to the extent necessary to bring it within the legal requirements.

Kindly indicate your agreement with the foregoing by signing in the space provided below.

Very truly yours,

MGA ENTERTAINMENT

By: _____

Its: _____

AGREED TO AND ACCEPTED:

_____
CARTER BRYANT

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
Social Security Number

(00006662.DOC/2 / 10/04/2000  03:05 PM)

6

** TOTAL PAGE.04 **

BRYANT 00799

ATTORNEY'S EYES ONLY

*608*8081B              mga entertainment       Oct 04 00 04:38p