# EXHIBIT 1



## ORRICK

ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 MARSH ROAD
MENLO PARK, CA 94025
tel 650-614-7400
fax 650-614-7401
WWW.ORRICK.COM

July 28, 2009

Diana M. Rutowski
(650) 614-7685
drutowski@orrick.com

*VIA FACSIMILE & U.S. MAIL*

Jon D. Corey
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017

Re:     *Mattel, Inc. v. MGA Entertainment, et al.*

Dear Mr. Corey:

I write this letter in an effort to begin the process of meeting and conferring with respect to requests for production served by MGA during the course of Phase One that seek information related to those MGA claims currently at issue in Phase Two. Specifically, at least the following RFPs seek information potentially relevant to Phase Two:

MGA's RFPs in *MGA Entertainment, Inc. v. Mattel, Inc.*, Case No. CV 04-9049 SGL (RNBx):

> Request Nos. 1-67, 69-104, 108-112, 114-115, 131, 170, 180, 384-434, 445, 452-455, 458-463, 468-469, 473-476, 479-483, 485, 492-493, 540, 549-553, 555-557, 564-567, 574-586, 588, 594-596, 600-603, 611-641, 651-657, 674, 698-737, 743-745, 748-756, 775-780, 783-786, 790-792

MGA's RFPs in *Mattel, Inc. v. Carter Bryant and MGA Entertainment, Inc.*, CV 04-9059 NM (RNBx):

> Request Nos. 44, 47-71, 112-130, 140-164, 168-179, 184-209, 211-219, 259, 338-340, 342

Because the RFPs are so numerous, to streamline our meet and confer efforts, MGA requests that for each RFP identified, Mattel (1) confirm that it has produced all non-privileged documents responsive to the request during Phase One, (2) confirm that it is withholding documents based on its objections and the particular objection(s) based on which it is withholding, or (3) confirm that Mattel has not conducted a diligent search and reasonable inquiry in response to the RFP.

OHS West:260700290.2

EXHIBIT ____1____

PAGE ____6A____



# ORRICK

Jon D. Corey
July 28, 2009
Page 2

We propose having a meet and confer teleconference on August 4, 2009 to walk through these requests and responses. Please let us know what times on August 4 would work for you.

I look forward to working with you.

Very truly yours,

Diana M. Rutowski

DMR/ek

EXHIBIT __1__

PAGE __1__

**EXHIBIT 2**

**From:**     James Webster [ameswebster@innemanuel.com]
**Sent:**     Tuesday, August 04, 2009 4:36 PM
**To:**       Rutowski, Diana
**Cc:**       Searcy, Marshall; Robert Dart
**Subject:** Meet and confer regarding MGA phase I requests for production

In reference to Marshall Searcy's August 3 letter to you – we expected to conduct the meet and confer at 4pm today but were unable to reach you.

We propose to have this call on Friday August 7in the afternoon. Please let us know your availability.

Thank you.

**EXHIBIT** _____ 2 _____

**PAGE** _____ 8 _____



**From:** James Webster

**Sent:** Thursday, August 13, 2009 3:06 PM

**To:** Rutowski, Diana

**Cc:** Robert Dart

Diana - during Tuesday's call to discuss MGA's letter of July 22, 2009 regarding the information it seeks about Mattel's response to hundreds of Phase 1 Requests for Production, you requested that we provide you with some examples of Phase 1 Order impacting those Requests. Please note the following which we provide as an accommodation.

The Discovery Master made various Orders (i) denying MGA's Motions to Compel Production in response to certain of the Requests identified in your July 28, 2009 letter, and/or (ii) denying Mattel's Motions to Compel on substantially identical requests to those identified in that letter. Such Orders include the following examples:

     1.    Judge Infante Order dated May 22, 2007 Granting in Part and Denying in Part MGA's Motion to Compel Production (denies Motion to Compel on MGA RFPs 38, 43, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 99, 101, 103, 104 of MGA's First Set of Requests in Case No. 04-9049)

     2.    Judge Infante Order Denying MGA's Motion to Compel dated April 24, 2008 (denies Motion to Compel on all outstanding emails, holding that Mattel has produced all relevant emails and does not need to consult back-up tapes to complete its production) ("[t]he searches Mattel has conducted to date for electronic information are adequate to discharge its obligation under Rule 34 . . . . MGA has had ample opportunity to obtain discovery in this action, and the discovery MGA now seeks is unreasonably cumulative and duplicative.")

     3.    Judge Infante Order Granting in Part and Denying in Part Mattel's Motion to Compel Production dated August 14, 2007 (denies Motion to Compel on Mattel RFPs similar – and in many cases narrower – than MGA RFPs 196, 203, 204 of MGA's First Set of Requests in Case No. 04-9059)

     4.    Judge Infante Order Granting in Part and Denying in Part Mattel's Motion to Compel Production dated April 14, 2008 (denies Motion to Compel on Mattel RFPs similar – and in many cases narrower – than MGA RFPs 211 and 212 of MGA's First Set of Requests in Case No. 04-9059)

As explained during our yesterday's call, I reiterate that in order to conduct a meaningful meet and confer on the issues raised in your July 28, 2009 letter, MGA must set forth the relevance to Phase II issues of each of the hundreds of Requests for Production identified therein.

Please let me know if you wish to discuss this issue any further.

James Webster / Partner
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
Direct: (213) 443-3132
Main Phone: (213) 443-3000
Main Fax: (213) 443-3100
E-mail: jameswebster@quinnemanuel.com

Web: www.quinnemanuel.com

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

EXHIBIT _____ 3

PAGE _____ 9

**EXHIBIT 4**



1  QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
      John B. Quinn (Bar No. 090378)
2     (johnquinn@quinnemanuel.com)
      Michael T. Zeller (Bar No. 196417)
3     (michaelzeller@quinnemanuel.com)
      Jon D. Corey (Bar No. 185066)
4     (joncorey@quinnemnauel.com)
   865 South Figueroa Street, 10th Floor
5  Los Angeles, California 90017-2543
   Telephone:  (213) 443-3000
6  Facsimile:   (213) 443-3100
7  Attorneys for Mattel, Inc.
8  [Additional counsel listed on following page]
9

10               UNITED STATES DISTRICT COURT

11             CENTRAL DISTRICT OF CALIFORNIA

12  CARTER BRYANT, an individual,        )  Case No. CV 04-09049 SGL (RNBx)
                                         )
13              Plaintiff,               )  Consolidated with
                                         )  Case No. CV 04-09059
14        v.                             )  Case No. CV 05-02727
                                         )
15  MATTEL, INC., a Delaware             )  STIPULATION FOR APPOINTMENT
    corporation,                         )  OF A DISCOVERY MASTER; AND
16                                       )
                Defendant.               )  [PROPOSED] ORDER
17                                       )
                                         )  Discovery Cutoff Date:  Not Set
18  ──────────────────────────────────   )  Trial Date:  Not Set

19

20

21

22

23

24

25

26

27

28

EXHIBIT _____4_____

PAGE _____10_____

1   LITTLER MENDELSON
        Robert F. Millman (Bar No. 062152)
2       Douglas A. Wickham (Bar No. 127268)
        Keith A. Jacoby (Bar No. 150233)
3   2049 Century Park East, 5th Floor
    Los Angeles, California 90067-3107
4   Telephone: (310) 553-0308
    Facsimile: (310) 553-5583
5
    Attorneys for Carter Bryant
6
    O'MELVENY & MYERS LLP
7       Diana M. Torres (Bar No. 162284)
    400 S. Hope Street
8   Los Angeles, California 90017
    Telephone: (213) 430-6000
9   Facsimile: (213) 430-6407

10  O'MELVENY & MYERS LLP
        Dale Cendali
11  Times Square Tower
    7 Times Square
12  New York, NY 10036

13  CHRISTENSEN, GLASER, FINK, JACOBS WEIL & SHAPIRO, LLP
        Patricia Glaser (Bar No. 55668)
14  10250 Constellation Boulevard - 19th Floor
    Los Angeles, CA 90067
15  Telephone: (310) 553-3000
    Facsimile: (310) 556-2920
16
    Attorneys for MGA Entertainment, Inc.
17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT _____ 4

PAGE _____ 11 _____   - 2 -

STIPULATION FOR APPOINTMENT OF A DISCOVERY
MASTER AND [PROPOSED] ORDER

1    WHEREAS, the parties are in agreement that a discovery master should be
2  appointed in this matter to resolve any discovery disputes and to minimize the
3  burden on the Court; and

4    WHEREAS, the parties have agreed upon a nominee, Hon. Edward A. Infante
5  (Ret.), and he has agreed to serve as a discovery master in this matter;

6    NOW, THEREFORE, to facilitate the fair and efficient completion of pre-
7  trial discovery, the parties Mattel, Inc. and Carter Bryant and MGA Entertainment,
8  Inc., by and through their respective counsel of record, hereby stipulate and agree as
9  follows:

10    1.    The Discovery Master shall be appointed to assure and provide cost-
11  effective discovery and to minimize the burden of discovery disputes upon the
12  Court.  Any and all discovery motions and other discovery disputes in the above
13  captioned action shall be decided by a master ("Discovery Master") pursuant to
14  Federal Rule of Civil Procedure 53.  Any motions currently pending before
15  Magistrate Judge Block shall be transferred to the Discovery Master.  The moving
16  party shall provide to the Discovery Master all papers associated with each pending
17  motion.

18    2.    The Discovery Master shall be Hon. Edward A. Infante (Ret.).  His
19  business address is: Two Embarcadero Center, Suite 1500, San Francisco, CA
20  94111.

21    3.    Judge Infante shall serve as the Discovery Master until all issues herein
22  have been finally disposed of or determined, or until he shall withdraw in
23  accordance with applicable law.  If at any time he becomes unable to serve as the
24  Discovery Master, the parties shall confer to present an alternative agreed-upon
25  designee to the Court.  In the event that the parties cannot agree to an alternate
26  designee, then the Court shall appoint a Discovery Master.

27    4.    The Discovery Master shall have the authority to set the date, time, and
28  place for all hearings determined by the Discovery Master to be necessary; to

EXHIBIT ___4___

PAGE ___12___

-3-

STIPULATION FOR APPOINTMENT OF A DISCOVERY
MASTER AND [PROPOSED] ORDER

1   preside over hearings (whether telephonic or in-person); to take evidence in
2   connection with discovery disputes; to issue orders resolving discovery motions
3   submitted to the Discovery Master; to conduct telephonic conferences to resolve
4   discovery disputes arising during depositions; to issue orders awarding non-
5   contempt sanctions, including, without limitation, the award of attorney's fees, as
6   provided by Rules 37 and 45; and to prepare, file and serve other orders, reports and
7   recommendations, as appropriate.
8       5.     All discovery disputes shall be resolved by motion (except those arising
9   during a deposition which the Discovery Master determines can be resolved by
10  telephonic conference during the deposition). The moving party shall first identify
11  each dispute, state the relief sought, and identify the authority supporting the
12  requested relief in a meet and confer letter that shall be served on all parties by
13  facsimile or electronic mail. The parties shall have five court days from the date of
14  service of that letter to conduct an in-person conference to attempt to resolve the
15  dispute. If the dispute has not been resolved within five court days after such
16  service, the moving party may seek relief from the Discovery Master by formal
17  motion or letter brief, at the moving party's option. The opposing party shall have
18  five court days from the date of service of the motion or letter brief to submit a
19  formal opposition or response. Any reply brief or letter brief shall be served within
20  three court days from the date of service of a formal opposition or response. The
21  hearing on the motion shall take place within five court days of the service of any
22  reply brief or letter unless (a) the parties agree to another hearing date or agree that
23  no hearing is necessary; (b) the Discovery Master determines that no hearing is
24  necessary; or (c) the Discovery Master is not available, in which case the hearing
25  shall take place on the Discovery Master's first available date. The foregoing shall
26  not prohibit (i) the parties from agreeing to alternate procedures, or (ii) a party from
27  seeking the Discovery Master's immediate resolution of a dispute or resolution of a
28  dispute upon shortened time upon a showing of good cause why a party would be

1   prejudiced absent prompt resolution.  Service of any document by fax or electronic
2   mail prior to 6:00 p.m. shall constitute service on that day.

3       6.    The Discovery Master's orders resolving discovery disputes, reports, or
4   recommendations pursuant to Rule 53(e) or (f) shall be treated as rulings made by a
5   Magistrate Judge of the United States District Court.  The Discovery Master shall
6   file each order, report, or recommendation pursuant to Rule 53(e) or (f) and serve
7   the parties within five court days of his/her decision on a matter.

8       7.    A court reporter shall transcribe any hearing or other proceeding before
9   the Discovery Master.

10      8.    The cost of any proceeding before the Discovery Master, including the
11  fees of the Discovery Master, the fees of court reporters who transcribe hearings or
12  other proceedings before the Discovery Master, and the fees of any other person
13  necessary to the efficient administration of the proceeding before the Discovery
14  Master, shall be paid one-half by Mattel, Inc., and one-half by MGA Entertainment,
15  Inc. and Carter Bryant unless, consistent with the Federal Rules of Civil Procedure,
16  the Discovery Master Orders otherwise.  By agreeing to share costs among the
17  parties, no party waives its right to seek recovery or reimbursement for such costs
18  from any other party.

19      9.    The Discovery Master shall be compensated according to his regular
20  hourly rate of $750.

21      10.    Pursuant to Federal Rule of Civil Procedure 53(b)(2), the Discovery
22  Master shall proceed with all reasonable diligence.

23      11.    Based on an affidavit filed by Hon. Edward A. Infante pursuant to
24  28 U.S.C. § 455 and Federal Rule of Civil Procedure 53(b)(3), the parties are not
25  aware that he has a relationship to the parties, to counsel, to the action, or to the
26  Court that would require disqualification of a judge under 28 U.S.C. § 455, and
27  based thereon the parties expressly waive any ground for disqualification disclosed
28  therein of Hon. Edward A. Infante to serve as master in these proceedings.

EXHIBIT _____ 4_____

PAGE _____ 14_____

- 5 -

STIPULATION FOR APPOINTMENT OF A DISCOVERY
MASTER AND [PROPOSED] ORDER

1   12.   The Discovery Master shall not have ex parte communications with ~~the Court~~, a party or counsel.

2

3   13.   The Discovery Master shall preserve and maintain all documents and

4   materials submitted by the parties as well as all orders, reports, and

5   recommendations issued by the Discovery Master.  These documents, materials,

6   orders, reports and recommendations shall be the record of the Discovery Master's

7   activities, and shall be maintained in chronological order until the Discovery Master

8   is informed by the parties that all issues herein have been finally disposed of and

9   determined.

10   14.   The Discovery Master is hereby authorized to receive and consider

11   information and documents designated "CONFIDENTIAL" and "CONFIDENTIAL-

12   ATTORNEYS EYES ONLY" pursuant to the January 4, 2005 Stipulated Protective

13   Order.  The Discovery Master agrees to be bound by the January 4, 2005 Order.

14   15.   All third parties subject to discovery requests or deposition in this

15   litigation shall be bound by the terms of this Stipulation and Order.

16

17   Dated: November 22, 2006          O'MELVENY & MYERS LLP

18

19                                     By:

20                                         Diana Torres
                                           Attorneys for MGA Entertainment, Inc.

21

22   Dated: November 29, 2006          LITTLER MENDELSON

23

24                                     By:

25                                         Douglas A. Wickham
                                           Attorneys for Carter Bryant

26

27

28

STIPULATION FOR APPOINTMENT OF A DISCOVERY
MASTER AND [PROPOSED] ORDER

EXHIBIT ____4____

PAGE ____15____

1   Dated: ~~November~~ December 4, 2006          QUINN EMANUEL URQUHART
                                                  OLIVER & HEDGES, LLP
2

3                                          By: _____
                                                Jon D. Corey
4                                               Attorneys for Mattel, Inc.

5

6                         **ORDER**

7       The foregoing Stipulation for Appointment of a Discovery Master is SO

8   ORDERED *as modified.*

9

10  Dated: _12-6-06._              _____

11                                      Hon. Stephen G. Larson
                                        United States District Court Judge
12

13

14                  **CONSENT OF DISCOVERY MASTER**

15      If appointed by the Court, I, the undersigned, consent to serve as Discovery

16  Master in the above referenced proceeding consistent with this Order.

17

18  Dated: _12-5-06_              _____
                                      Hon. Edward A. Infante (Ret.)
19

20

21

22

23

24

25

26

27

28

                                        STIPULATION FOR APPOINTMENT OF A DISCOVERY
                                        MASTER AND [PROPOSED] ORDER

                    EXHIBIT ___4___   -7-

                    PAGE ___16___

## PROOF OF SERVICE

1013A(3) CCP Revised 5/1/88

1
2

**STATE OF CALIFORNIA )**
**COUNTY OF LOS ANGELES )**

3
4

I am employed in the county of Los Angeles State of California. I am over the age of 18 and not a party to the within action; my business address is: 865 South Figueroa Street, 10th Floor, Los Angeles, CA 90012.

5
6

On December 5, 2006, I served the foregoing document described as **STIPULATION FOR APPOINTMENT OF A DISCOVERY MASTER; AND [PROPOSED ORDER** on all interested parties in this action.

7
8
9
10

**Keith A. Jacoby, Esq.**
**Douglas Wickham, Esq.**
**Littler Mendelson**
**A Professional Corporation**
2049 Century Park East, 5th Floor
Los Angeles, California 90067-3107
Phone: 310-553-0308
**Fax: 310-553-5583**

**Diana M. Torres, Esq.**
**O'Melveney & Meyers**
400 S. Hope Street
Los Angeles, CA 90071
Phone: 213-430-6000
**Fax: 213-430-6407**

11
12
13

[ ]   By placing [ ] the original [X ] true copies thereof enclosed in sealed envelopes addressed as follows:

14

**[X]   BY MAIL**

15

[ ]   I deposited such envelope in the mail at Los Angeles, California. The envelope was mailed with postage thereon fully prepaid.

16
17
18

[ ]   As follows: I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with U.S. postal service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

19
20

[ ]   **BY TELECOPIER** By transmitting the above listed document(s) to the fax number(s) set forth above on this date.

21

[ ]   **BY PERSONAL SERVICE** I delivered such envelope by hand to the addressee.

22

Executed on December 5, 2006, at Los Angeles, California.

23

[ ]   (State) I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

24
25

[X]   (Federal) I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

26
27

__Cheri Hatch__
Print Name

_____
Signature

28

EXHIBIT ____4____

PAGE ____17____

# EXHIBIT 5

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA 92501
CIVIL MINUTES -- GENERAL

Case No. CV 04-09049 SGL(RNBx)                       Date: July 9, 2009
Title:      MATTEL, INC. V. MGA ENTERTAINMENT, INC., et al.
=================================================================
PRESENT:  HONORABLE STEPHEN G. LARSON, U.S. DISTRICT JUDGE

          Cindy Sasse                          None Present
          Courtroom Deputy                     Court Reporter

ATTORNEYS PRESENT FOR                    ATTORNEYS PRESENT FOR
PLAINTIFFS:                              DEFENDANTS:

None Present                             None Present

PROCEEDINGS:   ORDER GRANTING EX PARTE APPLICATION RE TEMPORARY
               RECEIVERSHIP (DOCKET #5728)

               ORDER GRANTING EX PARTE APPLICATION RE COST
               SHIFTING (DOCKET #5865)

               ORDER GRANTING IN PART EX PARTE APPLICATION FOR
               RELEASE OF JUROR TRANSCRIPTS (DOCKET #5805)

               ORDER GRANTING IN PART MATTEL'S MOTION RE
               DISCOVERY MASTER ORDER NO 27 AND REMANDING
               DISCOVERY MASTER ORDER NO. 27 FOR
               RECONSIDERATION BY THE DISCOVERY MASTER IN LIGHT
               OF THE FILING OF THE TAAC (DOCKET #5561)

               ORDER DENYING MOTION TO STRIKE THE FORENSIC
               AUDITOR'S REPORTS (DOCKET #5705)

MINUTES FORM 90                                 Initials of Deputy Clerk __cls_____
CIVIL -- GEN                    1

EXHIBIT _____5_____

PAGE _____18_____

## I. ORDER GRANTING EX PARTE APPLICATION
## RE TEMPORARY RECEIVERSHIP (DOCKET #5728)

Because the only opposition to the Ex Parte Application regarding the winding up of the Temporary Receivership involves the issue of cost-shifting, which is addressed separately, below, the Court **GRANTS** the Ex Parte Application. A separate order addressing this Ex Parte Application has been concurrently filed.

## II. ORDER GRANTING EX PARTE APPLICATION RE
## COST SHIFTING (DOCKET #5865)

The MGA parties' opposition to the Temporary Receiver's Ex Parte Application argued that the costs of the Temporary Receivership should be shifted to Mattel (as the party who sought appointment of a Temporary Receiver). However, the Court has previously ruled that, at some yet-to-be defined date in the future, the Court will consider whether to shift the costs of both the Temporary Receivership and the Forensic Audit. Therefore, Mattel filed an Ex Parte Application seeking either to be relieved of the responsibility to respond to the MGA parties' argument or, alternatively, for an order setting a briefing schedule on the issue. It is not the intention of the Court to address the cost-shifting issue at this time; rather, as the Court has stated previously on the record, that issue is more efficiently resolved at a later date, most likely a date after completion of Phase 2 of the trial. Accordingly, the Court **GRANTS** Mattel's Ex Parte Application re Cost Shifting. Mattel is relieved of any duty to respond to MGA's argument regarding the appropriate allocation of costs arising from the Temporary Receiver that is set forth in the MGA parties's June 26, 2009 Opposition to the Temporary Receiver's Ex Parte Application.

## III. ORDER GRANTING IN PART EX PARTE APPLICATION FOR
## RELEASE OF JUROR TRANSCRIPTS (DOCKET #5805)

The Court has received and reviewed the MGA Parties' Ex Parte Application For Partial Release of *In Camera* Juror Interview Transcripts, as well as the Opposition; the Reply, and the accompanying exhibits. The Court **GRANTS IN PART** the Ex Parte Application. Although the Court declines to award the relief sought, the Court will take steps to ensure that the transcript of the juror interviews are provided to the Ninth Circuit for its consideration of the appeal filed by the MGA parties.

The relevant *in camera* juror interviews were conducted on July 25, 2008; the findings made by the Court on the basis of those interviews are set forth in detail in the Court's Order Denying Motion for Mistrial, dated August 8, 2008. Counsel for the parties agreed that the juror interviews, which were conducted mid-trial, should be conducted *in camera*, and the MGA parties did not request that the Court grant them access to the transcripts to prepare their Motion for Mistrial. The Court indicated on the

MINUTES FORM 90
CIVIL -- GEN

2

Initials of Deputy Clerk __cls_____

EXHIBIT ____5____

PAGE ____19____

record around the time of the filing of the Motion for Mistrial that it was not the Court's intent to grant the parties access to the transcripts.

After the conclusion of the trial, the MGA parties did not at any time request this Court grant access to the transcripts. To the contrary, some ten months passed between the date of the Order Denying Motion for Mistrial and the MGA parties' first post-trial request for access to those transcripts. That request was made to the Ninth Circuit, not this Court, on June 10, 2009. When the Ninth Circuit denied the request in favor of the MGA's presentation of the issue to this Court in the first instance, the MGA parties thereafter filed the present Ex Parte Application in a expeditious manner.

Ostensibly, as set forth in both the Motion filed before the Ninth Circuit and the Ex Parte Application before this Court, the reason the MGA parties seek access to those transcripts is so that they may use them to challenge the Court's Order Denying Motion for Mistrial. Although the MGA parties filed its Notice of Appeal on May 4, 2009, and although that Notice clearly indicated that the Order Denying Motion for Mistrial would be implicated in the appeal, the MGA parties failed to file its Motion seeking release of the transcripts until June 10, 2009. The MGA parties' failure to seek this relief until a month after they filed their Notice of Appeal and a month before their opening brief was due, and their decision to present the issue of release of the transcripts to the appellate court (rather than this Court) in the first instance, created the very urgency that cause them to seek ex parte relief from this Court. As such, the Court declines to grant the relief sought.

Nevertheless, in the interest of due process and in order to facilitate the full consideration of the issue by the Ninth Circuit, the Court will take steps to ensure that the transcripts of the *in camera* interviews are provided to the Ninth Circuit for *in camera* filing.

## IV. ORDER GRANTING IN PART MATTEL'S MOTION RE DISCOVERY MASTER ORDER NO 27 AND REMANDING DISCOVERY MASTER ORDER NO. 27 FOR RECONSIDERATION BY THE DISCOVERY MASTER IN LIGHT OF THE FILING OF THE TAAC (DOCKET #5561)

In the challenged portion of Discovery Master Order No. 27 ("DM Order No. 27"), the Discovery Master denied Mattel's Motion to Compel discovery sought by service of a subpoena on non-party Bingham McCutchen LLP ("Bingham"), a law firm that represents Intervenor Omni 808, as well as a number of non-party entities that are familiar to those involved in this litigation:  OmniNet Capital, LLC ("OmniNet"), Vision Capital, LLC ("Vision"), IGWT Group, LLC ("IGWT"), and IGWT 826 Investments, LLC ("IGWT 826").  Broadly categorized, the subpoena sought production of (1) fee agreements relating to Vision and Omni 808; (2) documents regarding the formation, control, and financing of Omni 808, Vision, and Lexington Financial Limited

MINUTES FORM 90
CIVIL – GEN

3

Initials of Deputy Clerk __cls_____

EXHIBIT _____5_____

PAGE _____20_____

("Lexington"); (3) documents identifying stakeholders and officers of Omni 808, Vision, and Lexington; (4) all contracts relating to Omni 808, Vision Capital, and Lexington; (5) all communications relating to Omni 808, Vision Capital, and Lexington, excluding attorney-client privileged documents; and (6) Bingham's representation of MGAE and certain named individuals who have some connection with MGAE, including a number of Mr. Larian's family members.

The Discovery Master correctly recognized the essential legal standard in assessing whether a subpoena may be enforced. The information must satisfy the discovery relevance standard, i.e., it must be "'reasonably calculated to lead to the discovery of admissible evidence.'" DM Order No. 27 at 19 (quoting Fed. R. Civ. P. 26(b)(1)). The decision of whether to enforce a subpoena ultimately implicates a balancing test that pits relevance of the materials sought and need to the requesting party against hardship to the party resisting the subpoena. DM Order No. 27 at 20. Non-parties are generally required to bear lesser burdens than parties in responding to subpoenas. Exxon Shipping Co. v. United States Dept. of Interior, 34 F.3d 774, 779 (9th Cir. 1994) ("The Federal Rules also afford nonparties special protection against the time and expense of complying with subpoenas.").

However, the Discovery Master overstated the burden of proof allocated to Mattel, as the party seeking discovery. See DM Order No. 27 at 20 ("As the party moving to compel compliance with the subpoena, Mattel bears the initial burden of establishing that the information sought is relevant and necessary to the claims or defenses at issue.") This standard is both overstated and incomplete. It is overstated in that Mattel need not show that the evidence sought is "necessary to the claims or defenses." Although Mattel indeed bears the burden of establishing relevancy, that showing is not one of "necessity." Rather, Mattel must bear the burden of establishing the discovery relevancy standard -- that the materials sought are "reasonably calculated to lead to the discovery of admissible evidence" -- is met. It need not establish that the materials sought are "necessary" to its case.

This point leads to the manner in which the stated burden is incomplete. As clearly articulated by cases cited by Bingham, although Mattel bears an initial burden of establishing relevancy, the party resisting discovery thereafter has the burden of establishing that discovery should be denied. See Bryant v. Ochoa, 2009 WL 1390794 at *1 (S.D. Cal. 2009) ("The party seeking to compel discovery has the burden of establishing that its request satisfies the relevancy requirements of Rule 26(b)(1). . . . Thereafter, the party opposing discovery has the burden of showing that the discovery should be prohibited, and the burden of clarifying, explaining or supporting its objections."); DIRECTV, Inc. v. Trone, 209 F.R.D. 455, 458 (C.D. Cal. 2002) (same); see also Blankenship v. Hearst Corp., 519 F.2d 418, 429 (9th Cir. 1975) (reversing the district court's issuance of a protective order based on a failure of the party resisting discovery to meet its burden by asserting that the defendant's deposition would merely yield cumulative evidence).

MINUTES FORM 90                                      Initials of Deputy Clerk __cls_____
CIVIL – GEN                          4

EXHIBIT ____5____

PAGE ____21____

The effect of this subtle variation on the burden of proof from that stated by the Discovery Master is magnified by the recent filing of the TAAC, which significantly heightens the relevancy of the issue of how the MGA parties and the parties represented by Bingham may be related, the formation of certain of those entities, and other issues implicated by Mattel's requests. Because the question of relevance is featured so prominently in the quintessential balancing test to which the present discovery motion was subjected, the filing of the TAAC dramatically altered the calculus that underlies the conclusions reached in DM No. 27.

For reasons related to judicial economy and preservation of scarce judicial resources (which this case has stretched to the outer limits), the Court defers decision, in light of the changed calculus that has occurred as the result of the filing of the TAAC, of the issues presented in the challenged portions of DM No. 27 to the Discovery Master. For that reason, the Court **REMANDS** the challenged portions of DM No. 27 to the Discovery Master for his reconsideration and re-balancing in light of the recently filed TAAC. The Discovery Master may, in his discretion, set the matter for further briefing and/or hearing, he may take the matter under submission based on the existing record, or he may take other action as he deems appropriate to resolve the present issues.

Notwithstanding the remand of DM Order No. 27, one issue raised by Mattel requires further consideration by the Court. At page 25 of DM Order No. 27, the Discovery Master appears to impose a blanket prohibition on discovery of materials that are in the possession of a subpoena recipient, but that are related to a non-party over whom the Court has not been shown to have jurisdiction. The Discovery Master cites no legal authority for such a blanket prohibition, and the Court, in its own research, has found none. Such a blanket prohibition precludes the application of the balancing test that applies almost universally to discovery motions; accordingly, and because this blanket prohibition is unprecedented, the Court finds that it is contrary to law. As to this narrow issue, the Court **GRANTS** Mattel's Motion. The issue of discovery of materials relating to Lexington is **REMANDED** to the Discovery Master for reconsideration in light of this ruling and in light of the filing of the TAAC.

## V. ORDER DENYING MOTION TO STRIKE
## THE FORENSIC AUDITOR'S REPORTS (DOCKET #5705)

In an unsealed filing that has since been ordered sealed by the Court, counsel for Omni 808 Investors, LLC ("Omni 808"), Todd E. Gordinier, made unwarranted, unsubstantiated personal attacks against the Court-Appointed Forensic Auditor, Ronald L. Durkin. Mr. Gordinier's selective public disclosure of portions of the Forensic Auditor's Summary Report, coupled with the maintenance of the Summary Report, as well as the later-filed Responsive Report and Final Report, under seal in their entirety, has led to an unbalanced public presentation of the issues discussed therein. In an

MINUTES FORM 90
CIVIL -- GEN

5

Initials of Deputy Clerk __cls_____

EXHIBIT _____5_____

PAGE _____22_____

attempt to cure this deficiency, the Court has considered the possibility that it should simply unseal the relevant Reports and allow those Reports to speak for themselves.

Because the MGA entities were the primary subject of the Forensic Audit, the MGA parties have, quite understandably, objected to the proposed unsealing. Mattel, for its part, advocates quite emphatically, and not unreasonably, that the Reports should be unsealed in light of the selective disclosure. See Tr. at 31-32 ("It's the underlying analysis that refutes the selective disclosures that MGA and Omni made in a public forum to smear . . . both Mr. Durkin and Mattel.") At the other end of the spectrum, Omni 808 has moved to strike the Reports in their entirety.

In the end, although the Court does not order the unsealing of the Reports, it **DENIES** the Motion to Strike. The Court ordered the Forensic Audit to evaluate whether a receiver should be appointed; as the record bears witness, the Court eventually rejected the suggestion that it should appoint a permanent receiver, and the Court has instead appointed an MGA Monitor with more limited powers than a receiver. Nevertheless, the fact that the Reports were intended to serve a very limited purpose does not mean that there is no possibility that the Forensic Auditor's Reports will not serve any purpose henceforth.

As it currently stands, the Court **ORDERS** that no party shall cite to or rely upon the Reports for any purpose absent further Order of this Court.[1] However, the documents attached to the Reports, to the extent they are otherwise discoverable, are not insulated from discovery on the basis that they have been made part of the Reports. Conversely, documents, such as charts and interview notes, that were prepared by the Forensic Auditor are the property of the Court and are not subject to discovery or use in this or any other litigation by any party or non-party.[2]

Had it been counsel for the MGA parties who mounted the unwarranted, unsubstantiated, and public personal attacks on Mr. Durkin, the Court would find, notwithstanding the sensitive information contained therein, the unsealing of the Reports was an appropriate remedy for the selective disclosure.[3] However, here, it is

---

[1] This Order does not supersede the Court's Order permitting the Forensic Auditor to share information with the Court-Appointed Monitor.

[2] Toward that end, the Court **CLARIFIES** to the parties that the work papers, drafts, notes, detailed time records, and any other materials prepared by or at the direction of the Forensic Auditor are the property of the Court. The Court **ORDERS** the Forensic Auditor, as the custodian of those records on behalf of the Court, to retain those materials, whether maintained in electronic, hard copy, or any other medium, until further order of the Court.

[3] As it stands, counsel for MGAE, James I. Stang, wisely sought, and was granted, leave to file his more restrained, but just as unwarranted and unsubstantiated, personal attacks on Mr. Durkin under seal. See MGA Entertainment, Inc.'s Response to Final In Camera Report of Forensic Auditor Ronald L.

MINUTES FORM 90
CIVIL -- GEN

6

Initials of Deputy Clerk __cls_____

EXHIBIT _____5_____

PAGE_____23_____

counsel for Omni 808 who made those attacks public, and although Mattel maintains
that both the MGA parties and Omni 808 are jointly responsible for the selective
disclosure, see July 6, 2009, Tr. at 33, whether, or to what extent, the MGA parties act
or have acted in concert is an issue to be decided in Phase 2 of this action.

Nevertheless, Mr. Gordinier's attack on Mr. Durkin cannot pass without comment
by the Court. The Court's comments are directed toward Mr. Gordinier personally,
which is not the Court's usual practice. Although the irony of this form of address is not
lost on the Court (given the subject of this Order), it is appropriate. Mr. Gordinier signed
all three filings in which the personal attacks appear, and continues to stand behind
those filings. Moreover, Mr. Gordinier expressly and unabashedly claimed personal
responsibility for the brief that was not filed under seal, by both stating that he gave it a
lot of thought before filing it and by implicitly acknowledging that although he considered
filing his brief under seal, he ultimately rejected that course of action. See May 18,
2009 Tr. at 46-47 ("My brief speaks for itself. We have nothing to hide. . . . I didn't feel it
appropriate, necessary, or desirable to file my brief under seal. And I don't have a
problem with the Court or anybody reading what I have to say, because I gave it a lot of
thought, and I gave it at lot of consideration.").

At the July 6, 2009, hearing, the Court outlined its concerns that while the attacks
on Mr. Durkin were public, the Reports are not, and that "it doesn't seem fair" to the
Court to allow those allegations to stand alone without a chance to respond to them.
July 6, 2009, Tr. at 25-26. In response, Mr. Gordinier contended that his comments
"respond[ed] to the report," and that "[w]hat we said was that there were problems with
that report." July 6, 2009, Tr. at 28. This statement is an implicit denial that any
personal attacks were made; however, as set forth in great detail below, the record
belies Mr. Gordinier's post hoc protestations.

Lest Mr. Gordinier's statement reflecting his implicit denial that he engaged in
personal attacks be perceived as one being made at oral argument without ample time
to reflect upon its significance, the statement is also made by Mr. Gordinier in Omni
808's Reply Memorandum, a document upon which he had ample time to reflect: "Each
and all of the references in Omni's Statement of Position refer to the contents of Mr.
Durkin's Reports and the shortcomings contained therein and omitted therefrom, not to
his person." Id. at 2 n.1. To be sure, the criticisms leveled at Mr. Durkin are framed in

---

Durkin (docket #5918) at 4 (accusing Mr. Durkin of "making McCarthy-like statements of non-existent
buybacks and unsupported insinuations of conflicts of interest"); id. at 9 (suggesting that Mr. Durkin's
formulation of certain search terms relating to criminal acts in Farsi without a concurrent formulation of
those terms in English demonstrated a "predisposition that Persian members of MGA's management and
staff (and only the Persian members) might be engaged in illegal conduct"). Mr. Stang's attacks pale in
comparison to those advanced by Mr. Gordinier, and they were filed under seal. Thus, although the
Court's analysis and conclusions regarding the Forensic Auditor's Reports applies with equal force to Mr.
Stang's statements, his are not the focus of the Court's attention at this time.

MINUTES FORM 90                                             Initials of Deputy Clerk __cls_____
CIVIL -- GEN                              7

EXHIBIT _____5_____

PAGE _____24_____

terms of his Reports. Still other criticisms are, as counsel maintains, addressed to the Reports themselves; those must be analyzed based on their substance. However, as aptly demonstrated by the cited and quoted portions of Mr. Gordinier's filings that appear below, his criticisms do not, by any measure, confine themselves to those Reports, and instead reach out in a highly personal manner to attack the author, his professionalism, his competence, his objectivity, and his integrity.[4]

Indeed, in a display the likes of which have not been previously witnessed by this Court, Mr. Gordinier strayed far afield of legitimate criticism of the discussions, analyses, and conclusions reached in the Summary Report and the Reports that followed. To be sure, there are instances in which Mr. Gordinier addressed the message found in those Reports; just as surely, however, as detailed below, Mr. Gordinier attacked the messenger. Specifically, the papers filed by Mr. Gordinier on behalf of Omni 808 call into question Mr. Durkin's professionalism and competence, as well as his objectivity and integrity. Moreover, and alarmingly, they falsely accuse Mr. Durkin of being influenced by an ethnocentric bias against Mr. Larian and Mr. Kadisha. Such attacks, aimed at Mr. Durkin personally rather than the discussion, analyses, and conclusions set forth in his Reports, appear throughout Omni 808's papers. See Omni 808 Investors, LLC's Statement of Position re Order to Show Cause re Appointment of a Permanent Receiver (docket #5446) ("SOP"), filed May 14, 2009, at 11 (referring to Mr. Durkin's "irresponsible" analysis); id. (noting that Mr. Durkin is "far too experienced" to believe that he "produced . . . a balanced presentation"); id. (stating that "Mr. Durkin's report is a polemic" and "a piece of advocacy"); id. at 12 n.9 (calling into question Mr. Durkin's "objectivity" based on the fact that the Court ordered Mr. Durkin's fees be paid (at least in the first instance) by Mattel); id. (suggesting that Mr. Durkin's ex parte communications with Mattel were improper); id. at 13 n.10 (characterizing Mr. Durkin's quotation of Mr. Larian's and Mr. Kadisha's account of how the two men were acquainted, from "the Persian community," as "at best, unprofessional" and, "at worst,

---

[4] Adding still further to the mounting irony, in the same footnote that Mr. Gordinier disclaims engaging in improper personal attacks, he falsely accuses counsel for Mattel of advancing their own improper ad hominen attacks against Neil Kadisha, who has been referred to as a "common thief" in certain unspecified Mattel filings. Mr. Kadisha is the Managing Partner of a diversified investment firm, Omninet Capital, LLC, and an investor in Omni 808. To call someone a "common thief" is, undoubtably, by any measure, a highly personal attack, therefore an attack addressed "to the man," or ad hominen. However, in the same manner Mr. Gordinier accuses Mr. Durkin of failing to provide appropriate context to the Court in his Reports, Mr. Gordinier himself fails to acknowledge that counsel for Mattel's use of the term "common thief" in connection with Mr. Kadisha merely quotes Los Angeles County Superior Court Judge Henry W. Shatford's conclusion regarding Mr. Kadisha, as set forth in his 191-page Statement of Decision, dated October 24, 2006, which was issued after a 200-day trial, which is currently pending appeal, and which conferred upon Mr. Kadisha the oft-repeated moniker of "common thief," as well as "embezzler," and "perjurer." See Uzyel v. Kadisha, Cal. App. Nos. B196045, B203804, B198007, B199850, B201425, 2009 WL 646096 (Mar. 4, 2009) (appellate brief). As always, context is key. The use by counsel for Mattel of another court's findings and conclusions to advance an argument is not inappropriate. Those findings and conclusions may, or may not, be relevant to matters presented to the Court. Used in this manner, although undoubtably addressed "to the man" (and his credibility), it is not an improper ad hominen attack.

EXHIBIT _____5_____

PAGE _____25_____

evidence of improper cultural bias"); id. (in the same footnote, referring to the same
quotation, stating that "[t]he tone [of the report] itself is compelling proof that Mr. Durkin
had no intention of providing an 'objective' report to the Court."); id. at 23 (referring to
the Summary Report as "Mr. Durkin's ill-concealed advocacy piece"); id. (noting that
advocacy, rather than objectivity, "is certainly the posture [Mr. Durkin] is most
comfortable with"); Omni 808 Investors, LLC's Memorandum in Support of Its Requests
to Strike Summary and Responsive Reports of Ronald L. Durkin (docket #5705)
("Motion to Strike"), filed June 8, 2009, at 4 (noting Omni's "doubts that the Court or any
party would benefit further by continuing this façade of Mr. Durkin's 'impartiality'"); id. at
7 (calling Mr. Durkin's explanation of his conclusion regarding the relatedness of certain
parties as "not only fatuous[,] but [also] intellectually dishonest"); id. at 9 (suggesting
that Mr. Durkin intentionally concealed from the Court the fact that Mr. Larian sought
other funding sources before turning to Mr. Kadisha); id. at 10 (noting that "Mr. Durkin's
repeated references to Mr. Larian's and Mr. Kadisha's common 'Persian' heritage can
only be viewed as an attempt to draw some nefarious ethnic connection between
them"); id. at 12 (calling the reference to Mr. Larian's and Mr. Kadisha's ethnicity
"unprofessional symptoms of improper cultural bias [that] have no place in a supposedly
objective report"); Omni 808 Investors, LLC's Reply Memorandum (docket #5809)
("Reply Memo") at 14 (suggesting that not only Mr. Durkin, but also counsel for Mattel,
harbor "cultural biases" that lead them to "suggest[] that [Mr. Larian's and Mr. Kadisha's]
common heritage makes [them] more likely to act contrary to their own interests); id. at
15 (stating that, according to his own interview notes, Mr. Durkin "misrepresented" to
the Court in his Summary Report how Mr. Larian and Mr. Kadisha portrayed their
relationship with each other).

        As alluded to, Omni 808's criticisms have not been limited to personal attacks;
some of the criticisms are in fact aimed at the Reports themselves. See e.g., SOP at 16
("Mr. Durkin's conclusion that the Wachovia-Omni transaction impacted 'MGAEI's
solvency and ability to continue conducting operations' is simply wrong."). Any
comment by the Court regarding the substance of the discussions, analyses, and
conclusions presented to the Court in the Forensic Auditor's Summary, Responsive,
and Final Reports is inadvisable at this time. With the filing of the Third Amended
Answer and Counterclaims, much of the subject matter of the Forensic Auditor's
Reports have been incorporated into the claims at issue in this action. As such, it would
be premature for the Court to comment upon the substance of issues that are yet to be
adjudicated, and that are subject to a trial by jury. Nevertheless, the Court has
reviewed the Forensic Auditor's Summary, Responsive, and Final Reports, and the
exhibits attached thereto. The Court has also reviewed and considered the criticisms
aimed at the Forensic Auditor, cited and quoted above, as well as the entirety of all the
papers responding to the Forensic Auditor's Reports filed to date. After this review, the
Court is firmly convinced that all the personal criticisms of Mr. Durkin are unwarranted
and unsubstantiated.

        At best, the criticism of Mr. Durkin's performance and presentation represents a

EXHIBIT _____5_____

PAGE _____26_____

different interpretation of available evidence. That such disagreements would arise between the analyses offered by a Court-Appointed Forensic Auditor and that offered by counsel for a party whose transactions have been a subject of that audit is by no means surprising. A jury considering the relevant evidence might ultimately make factual determinations that tend to agree with Mr. Durkin's assessment, it might ultimately tend to agree with Mr. Gordinier's assessment, or it may very well reject both positions in favor of another. The answer to the merits of the claims at issue in this action must await another day. Today, the Court merely notes that its examination of the Forensic Auditor's Reports reveal that Mr. Gordinier's personal attacks aimed at their author were unjustified.

Some specific attacks directed toward Mr. Durkin – relating to his background as a law enforcement officer, his communications with counsel for Mattel, and specific (but baseless) allegations of ethnocentric bias -- are worthy of more specific comment by the Court.

Stopping short of explicitly stating such, Mr. Gordinier appears to labor under the assumption that Mr. Durkin has been unable to put behind him the prosecutorial mindset under which he presumably operated during his former service to this Nation as an agent of the Federal Bureau of Investigation ("FBI"). At the outset, the Court notes that Mr. Gordinier's unstated assumptions do a disservice to the prosecutors and the law enforcement officers who work with those prosecutors, both of whom conduct their work under the clearly delineated duty to ferret out not only evidence of guilt but also "evidence favorable to the accused." See e.g., Berger v. United States, 295 U.S. 78, 88 (1935) (noting that the role of the prosecutor is not to win at all costs and observing that the prosecutor "is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done."); Brady v. Maryland, 373 U.S. 83, 87 (1963) (imposing a duty on prosecutors to provide to the defense exculpatory evidence when requested to do so).

Secondly, even if prosecutorial duties were not so defined, the Court finds no suggestion that Mr. Durkin skewed the evidence in favor of any particular viewpoint. Undoubtedly, there is a ***complete absence*** of any evidence that, as Mr. Gordinier has suggested, Mr. Durkin has embarked upon a campaign to purposely mislead the Court.

Mr. Gordinier also suggests that, because Mr. Durkin's bills are being paid by Mattel, Mattel has, through this payment or through other communications with Mr. Durkin, bought Mr. Durkin's loyalty. This is utter nonsense. As demonstrated by the Court's communications with him, Mr. Durkin is a Court-Appointed Officer who understands that his role is to work on behalf of the Court and not on behalf of any party. In any event, the Court's Order of January 7, 2009, which appointed Mr. Durkin, imposed the costs of the audit on Mattel "in the first instance," but expressly provided for

MINUTES FORM 90
CIVIL -- GEN                                    10

Initials of Deputy Clerk __cls_____

EXHIBIT _____5_____

PAGE _____27_____

the possibility that the audit expenses be shared or shifted to the MGA parties.
Moreover, to suggest, however subtly, that ex parte communications with counsel for
Mattel were improper ignores the Court's mandate to the Forensic Auditor in the
January 7, 2009, Order, which states that Mr. Durkin was provided with attorney contact
information and that he "shall direct his initial communications to counsel." At no time
has the Court precluded the Forensic Auditor's communications with Mattel or its
counsel; in fact, because the Forensic Audit was undertaken based on evidence
gathered by and presented to the Court by Mattel, Mr. Durkin would have been remiss
in his duties if he failed to communicate with Mattel and its counsel.

Mr. Durkin was vested with powers and discretion to complete a Court-ordered
Forensic Audit.  Pursuant to an Order of this Court, he undertook this task and
exercised those powers and that discretion, presenting his Reports in conformity with
the Court's instructions. Despite counsel's attacks, the Court's review of the evidence
before it discerns no abuse of those powers or of that discretion.

Particularly troubling to the Court is that counsel speculates that, because Mr.
Durkin noted in his report that Mr. Larian knew Mr. Kadisha from "the Persian
Community," Mr. Durkin could be "of the view that this common heritage makes Mr.
Kadisha more likely to act contrary to his own interests or to do something via third-
parties that he wouldn't otherwise do?" See SOP at 13-14 n.10 (appearing to pose this
thought as a rhetorical question). There is no indication in the record, or otherwise, that
Mr. Durkin holds such a view.  To the contrary, Mr. Durkin's comment regarding the
acquaintanceship of Mr. Larian and Mr. Kadisha from "the Persian Community" (which
is noted in the report within quotation marks and is expressly attributed to a reference
made by Mr. Larian himself) is clearly predicated on interviews with these two
individuals, each of whom related independently to Mr. Durkin and his colleagues that
they knew each other from "the Persian Community." See Durkin Summary Report, Ex.
14, at 2 ¶ 3 (Notes re March 25, 2009, interview with Mr. Larian: "He indicated that he
knew Kadisha from the Persian community.") and Ex. 14, at 15 ¶ 2 (Notes re March 26,
2009, interview with Mr. Kadisha: "Kadisha stated that he knows Larian from the
Persian community.").  The purpose for this reference is made clear in the footnote set
forth at the end of the sentence in which the reference appears; namely, the Report
discusses evidence that the relationship between Mr. Larian and Mr. Kadisha is
stronger and more personal than either man claimed it was. See Summary Report at 5
n.18; Ex. 15 (personal emails).

In the Reply Memo, Mr. Gordinier takes issue with this explanation, this time
including not only Mr. Durkin but also counsel for Mattel as the targets for his
unsubstantiated allegations of "cultural bias." Mr. Gordinier first mischaracterizes an
argument made by Mattel. Mattel argued, and quite correctly, both that how well Mr.
Larian and Mr. Kadisha knew each other was relevant to a determination of whether
certain transactions between the two were arms-length transactions, and that this point
was likely not lost on either of these two very sophisticated and successful

MINUTES FORM 90                                         Initials of Deputy Clerk __cls_____
CIVIL -- GEN                              11

EXHIBIT _____5_____

PAGE _____28_____

businessmen.[5]  As noted previously, both Mr. Larian and Mr. Kadisha stated that they
knew each other from "the Persian community" which, in the Forensic Auditor's view,
was intended to, or at least had the tendency to minimize the existing relationship
between the two.  Mr. Gordinier incorrectly characterizes this argument as Mattel's
contention that Mr. Larian's and Mr. Kadisha's "Persian relationship" and "common
Persian heritage" was somehow relevant to a determination of whether the Omni 808
transaction was an arms-length transaction.  Mattel made no such argument.  Neither
counsel for Mattel nor Mr. Durkin have implied that Mr. Larian's and Mr. Kadisha's
ethnicity factors into the analysis.  Other than to point to Mr. Larian's and Mr. Kadisha's
separate, but identical, accounts of how they knew each other which, in turn, suggests
how well they know each other, neither counsel for Mattel nor Mr. Durkin have stated or
implied that Mr. Larian's and Mr. Kadisha's shared ethnicity is relevant to any matter
currently or potentially before the Court.  Compare Opposition at 8-9 with Reply Memo
at 14-15.

Moreover, Mr. Gordinier's substantive point, that Mr. Durkin "misrepresented" to
the Court what Mr. Larian and Mr. Kadisha told him about the closeness of their
relationship, fares no better.  See Reply Memo at 15.  On this point, it is important to set
this stage properly.  Counsel for all parties have attempted to glean far too much from
two sterile paragraphs of interview notes taken by Mr. Durkin.  Much can be inferred
from conversations and interviews through not only what is said, but what is not said, by
the interviewee's demeanor, by the tone of the speaker, by the length and placement of
pauses, and by non-verbal gestures and body language.  With all these variables, much
of what is communicated does not find its way into notes.[6]  For instance, Mr. Durkin's
interview of Mr. Larian lasted over two and a half hours; however, the interview notes
are a mere five and a half pages.  Similarly, a one-hour and ten minute interview of Mr.
Kadisha yielded only three and a half pages of interview notes.  This is not to suggest
that the notes should have been longer or that the interviews should have been
recorded or transcribed; rather, it is to suggest that counsel's arguments based on
another's notes are not particularly probative.

In contrast, Mr. Durkin's assessment, based on his interviews with both of them,

---

[5]  In fact, the Court just this week issued a 30-page, single-spaced opinion resolving a 10-day
bench trial conducted over the sole issue of whether a transaction between "closely related" entities
reflected its fair market value, one of the more significant arguments ultimately rejected by the Court in
that case being that the close relationship between the parties necessarily rendered the transaction a
"sweetheart deal."  See July 6, 2009, Order, Siegel v. Warner Bros. Entertainment, Inc., et al., CV 04-
08400 SGL (RZ) (docket #554).

[6]  Indeed, the interview notes upon which the parties rely concede as much.  See Summary
Report, Ex. 14 at 2, 15 ("This interview memorandum is a factual representation of the topics discussed
during the interview and is not intended to be a word for word or exact transcription of the conversation.").
Thus, in addition to not taking into account all non-verbal communication, the notes do not even represent
everything that was said during the interview.

EXHIBIT _____ 5 _____

PAGE _____ 29 _____

is that Mr. Larian and Mr. Kadisha attempted to minimize their relationship because both of them understand the relevance of any friendship or other connection between them to the assessment of the arms-length nature of any transactions in which they have engaged. Mr. Durkin's assessment does not come from the gentle teasing of a strained meaning from two sterile paragraphs of brief notes taken by another person; rather, his assessment springs from his participation in the interview process, the entirety of the interviews he conducted of Mr. Larian and Mr. Kadisha, and his review of all of the evidence. As such, the Court defers to his assessment, at least insofar as how Mr. Larian and Mr. Kadisha portrayed their relationship to him.

As for that scant language from which the parties glean so much meaning, the entirety of which is set forth below, it in no way supports the contention made by Mr. Gordinier that Mr. Durkin "misrepresented" to the Court what Mr. Larian and Mr. Kadisha conveyed to him about the closeness of their relationship. On this topic, the notes of Mr. Larian's interview merely state the following:

> Larian decided to contact Neil Kadisha of OmniNet as he knew his company was in the distressed loan business. He indicated that he knew Kadisha from the Persian community. Kadisha said he wouldn't do the deal alone in today's environment and wanted Larian and their other friends to invest in the deal with MGA. Larian stated that Kadisha negotiated the debt with Wachovia and got it down significantly, Larian said he is not bitter about Kadisha getting a good deal on buying the loan.

Summary Report, Ex. 14, at 2 ¶ 3 (emphasis added). This paragraph contains the word "friends," and perhaps could even be read as an implicit statement by Mr. Larian that he and Mr. Kadisha are "friends." But the language does not compel such an inference. Moreover, it does not comport with the notes of Mr. Kadisha's interview, which on this topic state only the following:

> Larian and Kadisha have never been to dinner together. Kadisha stated that he knows Larian from the Persian community and he sees him often at religious events, etc. He has no investments with Larian. Kadisha did not talk with Larian last night, this morning or in the last two days.

Summary Report, Ex. 14, at 15, ¶ 2. Mr. Durkin's assessment that Mr. Larian and Mr. Kadisha sought to minimize the extent of their relationship is not contradicted by these short passages.

The criticism that Mr. Durkin was acting pursuant to an ethnic or cultural bias is clearly baseless. The allegations are irresponsible, and they are made to capitalize on

MINUTES FORM 90
CIVIL – GEN

13

Initials of Deputy Clerk __cls_____

EXHIBIT _____5_____

PAGE _____30_____

their inherent sensational nature for counsel's own purposes of diverting attention away
from the substance of the Reports. Sensationalism aside, when viewed in context, the
Reports' reference to Mr. Larian and Mr. Kadisha knowing each other from "the Persian
community" was plainly innocuous. The reference was a direct quotation from both Mr.
Larian and Mr. Kadisha. It was used in a broader discussion regarding how (and thus,
impliedly, how well) the two knew each other, which is itself relevant to the issue of
whether certain transactions relevant to the present litigation were made at arms length.

This is a most unfortunate incident. The Court certainly understands, in a case
as hotly contested as this one -- with such high stakes, with such complex legal issues,
and with such truly extraordinary legal talent on all sides – that lawyers, however ethical
and committed to the highest standards of professionalism (as the Court presumes and
has found all counsel of record here to be), make statements or commit acts in haste
that they subsequently regret. All of the players to this drama, are, after all is said and
done, human. As such, all of us are vulnerable to all-too-common human frailties. The
Court would place itself at the very top of any list of lawyers who have spoken
improvidently at one time or another in this case (and any number of others). What the
Court has witnessed here, however, in both manner and substance, for the reasons
noted above, goes beyond what the Court can let pass without some manner of
reprobation. So let the Court be clear: Nothing excuses the attempted character
assassination in which Mr. Gordinier has engaged.

**IT IS SO ORDERED.**

Initials of Deputy Clerk __cls_____

EXHIBIT _____5_____

PAGE _____31_____