# EXHIBIT 4

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA 92501
CIVIL MINUTES -- GENERAL

Case No. CV 04-09049 SGL(RNBx)                          Date: July 9, 2009
Title:      MATTEL, INC. V. MGA ENTERTAINMENT, INC., et al.
==================================================================
PRESENT: HONORABLE STEPHEN G. LARSON, U.S. DISTRICT JUDGE

|  |  |
|---|---|
| Cindy Sasse | None Present |
| Courtroom Deputy | Court Reporter |

| ATTORNEYS PRESENT FOR | ATTORNEYS PRESENT FOR |
|---|---|
| PLAINTIFFS: | DEFENDANTS: |
| None Present | None Present |

**PROCEEDINGS:   ORDER GRANTING EX PARTE APPLICATION RE TEMPORARY
RECEIVERSHIP (DOCKET #5728)**

**ORDER GRANTING EX PARTE APPLICATION RE COST
SHIFTING (DOCKET #5865)**

**ORDER GRANTING IN PART EX PARTE APPLICATION FOR
RELEASE OF JUROR TRANSCRIPTS (DOCKET #5805)**

**ORDER GRANTING IN PART MATTEL'S MOTION RE
DISCOVERY MASTER ORDER NO 27 AND REMANDING
DISCOVERY MASTER ORDER NO. 27 FOR
RECONSIDERATION BY THE DISCOVERY MASTER IN LIGHT
OF THE FILING OF THE TAAC (DOCKET #5561)**

**ORDER DENYING MOTION TO STRIKE THE FORENSIC
AUDITOR'S REPORTS (DOCKET #5705)**

EXHIBIT ___4___
PAGE ___085___

## I. ORDER GRANTING EX PARTE APPLICATION
## RE TEMPORARY RECEIVERSHIP (DOCKET #5728)

Because the only opposition to the Ex Parte Application regarding the winding up of the Temporary Receivership involves the issue of cost-shifting, which is addressed separately, below, the Court **GRANTS** the Ex Parte Application. A separate order addressing this Ex Parte Application has been concurrently filed.

## II. ORDER GRANTING EX PARTE APPLICATION RE
## COST SHIFTING (DOCKET #5865)

The MGA parties' opposition to the Temporary Receiver's Ex Parte Application argued that the costs of the Temporary Receivership should be shifted to Mattel (as the party who sought appointment of a Temporary Receiver). However, the Court has previously ruled that, at some yet-to-be defined date in the future, the Court will consider whether to shift the costs of both the Temporary Receivership and the Forensic Audit. Therefore, Mattel filed an Ex Parte Application seeking either to be relieved of the responsibility to respond to the MGA parties' argument or, alternatively, for an order setting a briefing schedule on the issue. It is not the intention of the Court to address the cost-shifting issue at this time; rather, as the Court has stated previously on the record, that issue is more efficiently resolved at a later date, most likely a date after completion of Phase 2 of the trial. Accordingly, the Court **GRANTS** Mattel's Ex Parte Application re Cost Shifting. Mattel is relieved of any duty to respond to MGA's argument regarding the appropriate allocation of costs arising from the Temporary Receiver that is set forth in the MGA parties's June 26, 2009 Opposition to the Temporary Receiver's Ex Parte Application.

## III. ORDER GRANTING IN PART EX PARTE APPLICATION FOR
## RELEASE OF JUROR TRANSCRIPTS (DOCKET #5805)

The Court has received and reviewed the MGA Parties' Ex Parte Application For Partial Release of *In Camera* Juror Interview Transcripts, as well as the Opposition, the Reply, and the accompanying exhibits. The Court **GRANTS IN PART** the Ex Parte Application. Although the Court declines to award the relief sought, the Court will take steps to ensure that the transcript of the juror interviews are provided to the Ninth Circuit for its consideration of the appeal filed by the MGA parties.

The relevant *in camera* juror interviews were conducted on July 25, 2008; the findings made by the Court on the basis of those interviews are set forth in detail in the Court's Order Denying Motion for Mistrial, dated August 8, 2008. Counsel for the parties agreed that the juror interviews, which were conducted mid-trial, should be conducted *in camera*, and the MGA parties did not request that the Court grant them access to the transcripts to prepare their Motion for Mistrial. The Court indicated on the

MINUTES FORM 90
CIVIL -- GEN

2

Initials of Deputy Clerk __cls_____

EXHIBIT ___4___
PAGE ___086___

record around the time of the filing of the Motion for Mistrial that it was not the Court's intent to grant the parties access to the transcripts.

After the conclusion of the trial, the MGA parties did not at any time request this Court grant access to the transcripts. To the contrary, some ten months passed between the date of the Order Denying Motion for Mistrial and the MGA parties' first post-trial request for access to those transcripts. That request was made to the Ninth Circuit, not this Court, on June 10, 2009. When the Ninth Circuit denied the request in favor of the MGA's presentation of the issue to this Court in the first instance, the MGA parties thereafter filed the present Ex Parte Application in a expeditious manner.

Ostensibly, as set forth in both the Motion filed before the Ninth Circuit and the Ex Parte Application before this Court, the reason the MGA parties seek access to those transcripts is so that they may use them to challenge the Court's Order Denying Motion for Mistrial. Although the MGA parties filed its Notice of Appeal on May 4, 2009, and although that Notice clearly indicated that the Order Denying Motion for Mistrial would be implicated in the appeal, the MGA parties failed to file its Motion seeking release of the transcripts until June 10, 2009. The MGA parties' failure to seek this relief until a month after they filed their Notice of Appeal and a month before their opening brief was due, and their decision to present the issue of release of the transcripts to the appellate court (rather than this Court) in the first instance, created the very urgency that cause them to seek ex parte relief from this Court. As such, the Court declines to grant the relief sought.

Nevertheless, in the interest of due process and in order to facilitate the full consideration of the issue by the Ninth Circuit, the Court will take steps to ensure that the transcripts of the *in camera* interviews are provided to the Ninth Circuit for *in camera* filing.

## IV. ORDER GRANTING IN PART MATTEL'S MOTION RE DISCOVERY MASTER ORDER NO 27 AND REMANDING DISCOVERY MASTER ORDER NO. 27 FOR RECONSIDERATION BY THE DISCOVERY MASTER IN LIGHT OF THE FILING OF THE TAAC (DOCKET #5561)

In the challenged portion of Discovery Master Order No. 27 ("DM Order No. 27"), the Discovery Master denied Mattel's Motion to Compel discovery sought by service of a subpoena on non-party Bingham McCutchen LLP ("Bingham"), a law firm that represents Intervenor Omni 808, as well as a number of non-party entities that are familiar to those involved in this litigation: OmniNet Capital, LLC ("OmniNet"), Vision Capital, LLC ("Vision"), IGWT Group, LLC ("IGWT"), and IGWT 826 Investments, LLC ("IGWT 826"). Broadly categorized, the subpoena sought production of (1) fee agreements relating to Vision and Omni 808; (2) documents regarding the formation, control, and financing of Omni 808, Vision, and Lexington Financial Limited

MINUTES FORM 90
CIVIL -- GEN                                    3                    Initials of Deputy Clerk __cls_____

EXHIBIT __4__
PAGE __087__

("Lexington"); (3) documents identifying stakeholders and officers of Omni 808, Vision, and Lexington; (4) all contracts relating to Omni 808, Vision Capital, and Lexington; (5) all communications relating to Omni 808, Vision Capital, and Lexington, excluding attorney-client privileged documents; and (6) Bingham's representation of MGAE and certain named individuals who have some connection with MGAE, including a number of Mr. Larian's family members.

The Discovery Master correctly recognized the essential legal standard in assessing whether a subpoena may be enforced. The information must satisfy the discovery relevance standard, i.e., it must be "'reasonably calculated to lead to the discovery of admissible evidence.'" DM Order No. 27 at 19 (quoting Fed. R. Civ. P. 26(b)(1)). The decision of whether to enforce a subpoena ultimately implicates a balancing test that pits relevance of the materials sought and need to the requesting party against hardship to the party resisting the subpoena. DM Order No. 27 at 20. Non-parties are generally required to bear lesser burdens than parties in responding to subpoenas. Exxon Shipping Co. v. United States Dept. of Interior, 34 F.3d 774, 779 (9th Cir. 1994) ("The Federal Rules also afford nonparties special protection against the time and expense of complying with subpoenas.").

However, the Discovery Master overstated the burden of proof allocated to Mattel, as the party seeking discovery. See DM Order No. 27 at 20 ("As the party moving to compel compliance with the subpoena, Mattel bears the initial burden of establishing that the information sought is relevant and necessary to the claims or defenses at issue.") This standard is both overstated and incomplete. It is overstated in that Mattel need not show that the evidence sought is "necessary to the claims or defenses." Although Mattel indeed bears the burden of establishing relevancy, that showing is not one of "necessity." Rather, Mattel must bear the burden of establishing the discovery relevancy standard -- that the materials sought are "reasonably calculated to lead to the discovery of admissible evidence" -- is met. It need not establish that the materials sought are "necessary" to its case.

This point leads to the manner in which the stated burden is incomplete. As clearly articulated by cases cited by Bingham, although Mattel bears an initial burden of establishing relevancy, the party resisting discovery thereafter has the burden of establishing that discovery should be denied. See Bryant v. Ochoa, 2009 WL 1390794 at *1 (S.D. Cal. 2009) ("The party seeking to compel discovery has the burden of establishing that its request satisfies the relevancy requirements of Rule 26(b)(1). . . . Thereafter, the party opposing discovery has the burden of showing that the discovery should be prohibited, and the burden of clarifying, explaining or supporting its objections."); DIRECTV, Inc. v. Trone, 209 F.R.D. 455, 458 (C.D. Cal. 2002) (same); see also Blankenship v. Hearst Corp., 519 F.2d 418, 429 (9th Cir. 1975) (reversing the district court's issuance of a protective order based on a failure of the party resisting discovery to meet its burden by asserting that the defendant's deposition would merely yield cumulative evidence).

MINUTES FORM 90
CIVIL -- GEN                                    4                    Initials of Deputy Clerk __cls_____

EXHIBIT ___4___
PAGE ___088___

The effect of this subtle variation on the burden of proof from that stated by the Discovery Master is magnified by the recent filing of the TAAC, which significantly heightens the relevancy of the issue of how the MGA parties and the parties represented by Bingham may be related, the formation of certain of those entities, and other issues implicated by Mattel's requests. Because the question of relevance is featured so prominently in the quintessential balancing test to which the present discovery motion was subjected, the filing of the TAAC dramatically altered the calculus that underlies the conclusions reached in DM No. 27.

For reasons related to judicial economy and preservation of scarce judicial resources (which this case has stretched to the outer limits), the Court defers decision, in light of the changed calculus that has occurred as the result of the filing of the TAAC, of the issues presented in the challenged portions of DM No. 27 to the Discovery Master. For that reason, the Court **REMANDS** the challenged portions of DM No. 27 to the Discovery Master for his reconsideration and re-balancing in light of the recently filed TAAC. The Discovery Master may, in his discretion, set the matter for further briefing and/or hearing, he may take the matter under submission based on the existing record, or he may take other action as he deems appropriate to resolve the present issues.

Notwithstanding the remand of DM Order No. 27, one issue raised by Mattel requires further consideration by the Court. At page 25 of DM Order No. 27, the Discovery Master appears to impose a blanket prohibition on discovery of materials that are in the possession of a subpoena recipient, but that are related to a non-party over whom the Court has not been shown to have jurisdiction. The Discovery Master cites no legal authority for such a blanket prohibition, and the Court, in its own research, has found none. Such a blanket prohibition precludes the application of the balancing test that applies almost universally to discovery motions; accordingly, and because this blanket prohibition is unprecedented, the Court finds that it is contrary to law. As to this narrow issue, the Court **GRANTS** Mattel's Motion. The issue of discovery of materials relating to Lexington is **REMANDED** to the Discovery Master for reconsideration in light of this ruling and in light of the filing of the TAAC.

## V. ORDER DENYING MOTION TO STRIKE
## THE FORENSIC AUDITOR'S REPORTS (DOCKET #5705)

In an unsealed filing that has since been ordered sealed by the Court, counsel for Omni 808 Investors, LLC ("Omni 808"), Todd E. Gordinier, made unwarranted, unsubstantiated personal attacks against the Court-Appointed Forensic Auditor, Ronald L. Durkin. Mr. Gordinier's selective public disclosure of portions of the Forensic Auditor's Summary Report, coupled with the maintenance of the Summary Report, as well as the later-filed Responsive Report and Final Report, under seal in their entirety, has led to an unbalanced public presentation of the issues discussed therein. In an

Initials of Deputy Clerk __cls_____

EXHIBIT ___4___
PAGE ___089___

attempt to cure this deficiency, the Court has considered the possibility that it should simply unseal the relevant Reports and allow those Reports to speak for themselves.

Because the MGA entities were the primary subject of the Forensic Audit, the MGA parties have, quite understandably, objected to the proposed unsealing. Mattel, for its part, advocates quite emphatically, and not unreasonably, that the Reports should be unsealed in light of the selective disclosure. See Tr. at 31-32 ("It's the underlying analysis that refutes the selective disclosures that MGA and Omni made in a public forum to smear . . . both Mr. Durkin and Mattel.") At the other end of the spectrum, Omni 808 has moved to strike the Reports in their entirety.

In the end, although the Court does not order the unsealing of the Reports, it **DENIES** the Motion to Strike. The Court ordered the Forensic Audit to evaluate whether a receiver should be appointed; as the record bears witness, the Court eventually rejected the suggestion that it should appoint a permanent receiver, and the Court has instead appointed an MGA Monitor with more limited powers than a receiver. Nevertheless, the fact that the Reports were intended to serve a very limited purpose does not mean that there is no possibility that the Forensic Auditor's Reports will not serve any purpose henceforth.

As it currently stands, the Court **ORDERS** that no party shall cite to or rely upon the Reports for any purpose absent further Order of this Court.[1]  However, the documents attached to the Reports, to the extent they are otherwise discoverable, are not insulated from discovery on the basis that they have been made part of the Reports. Conversely, documents, such as charts and interview notes, that were prepared by the Forensic Auditor are the property of the Court and are not subject to discovery or use in this or any other litigation by any party or non-party.[2]

Had it been counsel for the MGA parties who mounted the unwarranted, unsubstantiated, and public personal attacks on Mr. Durkin, the Court would find, notwithstanding the sensitive information contained therein, the unsealing of the Reports was an appropriate remedy for the selective disclosure.[3]  However, here, it is

---

[1]  This Order does not supersede the Court's Order permitting the Forensic Auditor to share information with the Court-Appointed Monitor.

[2]  Toward that end, the Court **CLARIFIES** to the parties that the work papers, drafts, notes, detailed time records, and any other materials prepared by or at the direction of the Forensic Auditor are the property of the Court. The Court **ORDERS** the Forensic Auditor, as the custodian of those records on behalf of the Court, to retain those materials, whether maintained in electronic, hard copy, or any other medium, until further order of the Court.

[3]  As it stands, counsel for MGAE, James I. Stang, wisely sought, and was granted, leave to file his more restrained, but just as unwarranted and unsubstantiated, personal attacks on Mr. Durkin under seal. See MGA Entertainment, Inc.'s Response to Final In Camera Report of Forensic Auditor Ronald L.

EXHIBIT __4__
PAGE ____030__

counsel for Omni 808 who made those attacks public, and although Mattel maintains
that both the MGA parties and Omni 808 are jointly responsible for the selective
disclosure, see July 6, 2009, Tr. at 33, whether, or to what extent, the MGA parties act
or have acted in concert is an issue to be decided in Phase 2 of this action.

Nevertheless, Mr. Gordinier's attack on Mr. Durkin cannot pass without comment
by the Court. The Court's comments are directed toward Mr. Gordinier personally,
which is not the Court's usual practice. Although the irony of this form of address is not
lost on the Court (given the subject of this Order), it is appropriate. Mr. Gordinier signed
all three filings in which the personal attacks appear, and continues to stand behind
those filings. Moreover, Mr. Gordinier expressly and unabashedly claimed personal
responsibility for the brief that was not filed under seal, by both stating that he gave it a
lot of thought before filing it and by implicitly acknowledging that although he considered
filing his brief under seal, he ultimately rejected that course of action. See May 18,
2009 Tr. at 46-47 ("My brief speaks for itself. We have nothing to hide. . . . I didn't feel it
appropriate, necessary, or desirable to file my brief under seal. And I don't have a
problem with the Court or anybody reading what I have to say, because I gave it a lot of
thought, and I gave it at lot of consideration.").

At the July 6, 2009, hearing, the Court outlined its concerns that while the attacks
on Mr. Durkin were public, the Reports are not, and that "it doesn't seem fair" to the
Court to allow those allegations to stand alone without a chance to respond to them.
July 6, 2009, Tr. at 25-26. In response, Mr. Gordinier contended that his comments
"respond[ed] to the report," and that "[w]hat we said was that there were problems with
that report." July 6, 2009, Tr. at 28. This statement is an implicit denial that any
personal attacks were made; however, as set forth in great detail below, the record
belies Mr. Gordinier's post hoc protestations.

Lest Mr. Gordinier's statement reflecting his implicit denial that he engaged in
personal attacks be perceived as one being made at oral argument without ample time
to reflect upon its significance, the statement is also made by Mr. Gordinier in Omni
808's Reply Memorandum, a document upon which he had ample time to reflect: "Each
and all of the references in Omni's Statement of Position refer to the contents of Mr.
Durkin's Reports and the shortcomings contained therein and omitted therefrom, not to
his person." Id. at 2 n.1. To be sure, the criticisms leveled at Mr. Durkin are framed in

_____

Durkin (docket #5918) at 4 (accusing Mr. Durkin of "making McCarthy-like statements of non-existent
buybacks and unsupported insinuations of conflicts of interest"); id. at 9 (suggesting that Mr. Durkin's
formulation of certain search terms relating to criminal acts in Farsi without a concurrent formulation of
those terms in English demonstrated a "predisposition that Persian members of MGA's management and
staff (and only the Persian members) might be engaged in illegal conduct"). Mr. Stang's attacks pale in
comparison to those advanced by Mr. Gordinier, and they were filed under seal. Thus, although the
Court's analysis and conclusions regarding the Forensic Auditor's Reports applies with equal force to Mr.
Stang's statements, his are not the focus of the Court's attention at this time.

EXHIBIT ___4___
PAGE _____091__

terms of his Reports. Still other criticisms are, as counsel maintains, addressed to the Reports themselves; those must be analyzed based on their substance. However, as aptly demonstrated by the cited and quoted portions of Mr. Gordinier's filings that appear below, his criticisms do not, by any measure, confine themselves to those Reports, and instead reach out in a highly personal manner to attack the author, his professionalism, his competence, his objectivity, and his integrity.[4]

Indeed, in a display the likes of which have not been previously witnessed by this Court, Mr. Gordinier strayed far afield of legitimate criticism of the discussions, analyses, and conclusions reached in the Summary Report and the Reports that followed. To be sure, there are instances in which Mr. Gordinier addressed the message found in those Reports; just as surely, however, as detailed below, Mr. Gordinier attacked the messenger. Specifically, the papers filed by Mr. Gordinier on behalf of Omni 808 call into question Mr. Durkin's professionalism and competence, as well as his objectivity and integrity. Moreover, and alarmingly, they falsely accuse Mr. Durkin of being influenced by an ethnocentric bias against Mr. Larian and Mr. Kadisha. Such attacks, aimed at Mr. Durkin personally rather than the discussion, analyses, and conclusions set forth in his Reports, appear throughout Omni 808's papers. See Omni 808 Investors, LLC's Statement of Position re Order to Show Cause re Appointment of a Permanent Receiver (docket #5446) ("SOP"), filed May 14, 2009, at 11 (referring to Mr. Durkin's "irresponsible" analysis); id. (noting that Mr. Durkin is "far too experienced" to believe that he "produced . . . a balanced presentation"); id. (stating that "Mr. Durkin's report is a polemic" and "a piece of advocacy"); id. at 12 n.9 (calling into question Mr. Durkin's "objectivity" based on the fact that the Court ordered Mr. Durkin's fees be paid (at least in the first instance) by Mattel); id. (suggesting that Mr. Durkin's ex parte communications with Mattel were improper); id. at 13 n.10 (characterizing Mr. Durkin's quotation of Mr. Larian's and Mr. Kadisha's account of how the two men were acquainted, from "the Persian community," as "at best, unprofessional" and, "at worst,

---

[4] Adding still further to the mounting irony, in the same footnote that Mr. Gordinier disclaims engaging in improper personal attacks, he falsely accuses counsel for Mattel of advancing their own improper ad hominen attacks against Neil Kadisha, who has been referred to as a "common thief" in certain unspecified Mattel filings. Mr. Kadisha is the Managing Partner of a diversified investment firm, Omninet Capital, LLC, and an investor in Omni 808. To call someone a "common thief" is, undoubtably, by any measure, a highly personal attack, therefore an attack addressed "to the man," or ad hominen. However, in the same manner Mr. Gordinier accuses Mr. Durkin of failing to provide appropriate context to the Court in his Reports, Mr. Gordinier himself fails to acknowledge that counsel for Mattel's use of the term "common thief" in connection with Mr. Kadisha merely quotes Los Angeles County Superior Court Judge Henry W. Shatford's conclusion regarding Mr. Kadisha, as set forth in his 191-page Statement of Decision, dated October 24, 2006, which was issued after a 200-day trial, which is currently pending appeal, and which conferred upon Mr. Kadisha the oft-repeated moniker of "common thief," as well as "embezzler," and "perjurer." See Uzyel v. Kadisha, Cal. App. Nos. B196045, B203804, B198007, B199850, B201425, 2009 WL 646096 (Mar. 4, 2009) (appellate brief). As always, context is key. The use by counsel for Mattel of another court's findings and conclusions to advance an argument is not inappropriate. Those findings and conclusions may, or may not, be relevant to matters presented to the Court. Used in this manner, although undoubtably addressed "to the man" (and his credibility), it is not an improper ad hominen attack.

EXHIBIT ___4___
PAGE ___092___

evidence of improper cultural bias"); id. (in the same footnote, referring to the same
quotation, stating that "[t]he tone [of the report] itself is compelling proof that Mr. Durkin
had no intention of providing an 'objective' report to the Court."); id. at 23 (referring to
the Summary Report as "Mr. Durkin's ill-concealed advocacy piece"); id. (noting that
advocacy, rather than objectivity, "is certainly the posture [Mr. Durkin] is most
comfortable with"); Omni 808 Investors, LLC's Memorandum in Support of Its Requests
to Strike Summary and Responsive Reports of Ronald L. Durkin (docket #5705)
("Motion to Strike"), filed June 8, 2009, at 4 (noting Omni's "doubts that the Court or any
party would benefit further by continuing this façade of Mr. Durkin's 'impartiality'"); id. at
7 (calling Mr. Durkin's explanation of his conclusion regarding the relatedness of certain
parties as "not only fatuous[,] but [also] intellectually dishonest"); id. at 9 (suggesting
that Mr. Durkin intentionally concealed from the Court the fact that Mr. Larian sought
other funding sources before turning to Mr. Kadisha); id. at 10 (noting that "Mr. Durkin's
repeated references to Mr. Larian's and Mr. Kadisha's common 'Persian' heritage can
only be viewed as an attempt to draw some nefarious ethnic connection between
them"); id. at 12 (calling the reference to Mr. Larian's and Mr. Kadisha's ethnicity
"unprofessional symptoms of improper cultural bias [that] have no place in a supposedly
objective report"); Omni 808 Investors, LLC's Reply Memorandum (docket #5809)
("Reply Memo") at 14 (suggesting that not only Mr. Durkin, but also counsel for Mattel,
harbor "cultural biases" that lead them to "suggest[] that [Mr. Larian's and Mr. Kadisha's]
common heritage makes [them] more likely to act contrary to their own interests); id. at
15 (stating that, according to his own interview notes, Mr. Durkin "misrepresented" to
the Court in his Summary Report how Mr. Larian and Mr. Kadisha portrayed their
relationship with each other).

As alluded to, Omni 808's criticisms have not been limited to personal attacks;
some of the criticisms are in fact aimed at the Reports themselves. See e.g., SOP at 16
("Mr. Durkin's conclusion that the Wachovia-Omni transaction impacted 'MGAEI's
solvency and ability to continue conducting operations' is simply wrong."). Any
comment by the Court regarding the substance of the discussions, analyses, and
conclusions presented to the Court in the Forensic Auditor's Summary, Responsive,
and Final Reports is inadvisable at this time. With the filing of the Third Amended
Answer and Counterclaims, much of the subject matter of the Forensic Auditor's
Reports have been incorporated into the claims at issue in this action. As such, it would
be premature for the Court to comment upon the substance of issues that are yet to be
adjudicated, and that are subject to a trial by jury. Nevertheless, the Court has
reviewed the Forensic Auditor's Summary, Responsive, and Final Reports, and the
exhibits attached thereto. The Court has also reviewed and considered the criticisms
aimed at the Forensic Auditor, cited and quoted above, as well as the entirety of all the
papers responding to the Forensic Auditor's Reports filed to date. After this review, the
Court is firmly convinced that all the personal criticisms of Mr. Durkin are unwarranted
and unsubstantiated.

At best, the criticism of Mr. Durkin's performance and presentation represents a

MINUTES FORM 90                                                    Initials of Deputy Clerk __cls_____
CIVIL -- GEN                           9

EXHIBIT ____4____
PAGE ____093____

different interpretation of available evidence. That such disagreements would arise
between the analyses offered by a Court-Appointed Forensic Auditor and that offered by
counsel for a party whose transactions have been a subject of that audit is by no means
surprising. A jury considering the relevant evidence might ultimately make factual
determinations that tend to agree with Mr. Durkin's assessment, it might ultimately tend
to agree with Mr. Gordinier's assessment, or it may very well reject both positions in
favor of another. The answer to the merits of the claims at issue in this action must
await another day. Today, the Court merely notes that its examination of the Forensic
Auditor's Reports reveal that Mr. Gordinier's personal attacks aimed at their author were
unjustified.

Some specific attacks directed toward Mr. Durkin – relating to his background as
a law enforcement officer, his communications with counsel for Mattel, and specific (but
baseless) allegations of ethnocentric bias -- are worthy of more specific comment by the
Court.

Stopping short of explicitly stating such, Mr. Gordinier appears to labor under the
assumption that Mr. Durkin has been unable to put behind him the prosecutorial
mindset under which he presumably operated during his former service to this Nation as
an agent of the Federal Bureau of Investigation ("FBI"). At the outset, the Court notes
that Mr. Gordinier's unstated assumptions do a disservice to the prosecutors and the
law enforcement officers who work with those prosecutors, both of whom conduct their
work under the clearly delineated duty to ferret out not only evidence of guilt but also
"evidence favorable to the accused." See e.g., Berger v. United States, 295 U.S. 78, 88
(1935) (noting that the role of the prosecutor is not to win at all costs and observing that
the prosecutor "is the representative not of an ordinary party to a controversy, but of a
sovereignty whose obligation to govern impartially is as compelling as its obligation to
govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall
win a case, but that justice shall be done."); Brady v. Maryland, 373 U.S. 83, 87 (1963)
(imposing a duty on prosecutors to provide to the defense exculpatory evidence when
requested to do so).

Secondly, even if prosecutorial duties were not so defined, the Court finds no
suggestion that Mr. Durkin skewed the evidence in favor of any particular viewpoint.
Undoubtedly, there is a **complete absence** of any evidence that, as Mr. Gordinier has
suggested, Mr. Durkin has embarked upon a campaign to purposely mislead the Court.

Mr. Gordinier also suggests that, because Mr. Durkin's bills are being paid by
Mattel, Mattel has, through this payment or through other communications with Mr.
Durkin, bought Mr. Durkin's loyalty. This is utter nonsense. As demonstrated by the
Court's communications with him, Mr. Durkin is a Court-Appointed Officer who
understands that his role is to work on behalf of the Court and not on behalf of any
party. In any event, the Court's Order of January 7, 2009, which appointed Mr. Durkin,
imposed the costs of the audit on Mattel "in the first instance," but expressly provided for

Initials of Deputy Clerk __cls_____

EXHIBIT ___4___
PAGE _____094

the possibility that the audit expenses be shared or shifted to the MGA parties. Moreover, to suggest, however subtly, that ex parte communications with counsel for Mattel were improper ignores the Court's mandate to the Forensic Auditor in the January 7, 2009, Order, which states that Mr. Durkin was provided with attorney contact information and that he "shall direct his initial communications to counsel." At no time has the Court precluded the Forensic Auditor's communications with Mattel or its counsel; in fact, because the Forensic Audit was undertaken based on evidence gathered by and presented to the Court by Mattel, Mr. Durkin would have been remiss in his duties if he failed to communicate with Mattel and its counsel.

Mr. Durkin was vested with powers and discretion to complete a Court-ordered Forensic Audit. Pursuant to an Order of this Court, he undertook this task and exercised those powers and that discretion, presenting his Reports in conformity with the Court's instructions. Despite counsel's attacks, the Court's review of the evidence before it discerns no abuse of those powers or of that discretion.

Particularly troubling to the Court is that counsel speculates that, because Mr. Durkin noted in his report that Mr. Larian knew Mr. Kadisha from "the Persian Community," Mr. Durkin could be "of the view that this common heritage makes Mr. Kadisha more likely to act contrary to his own interests or to do something via third-parties that he wouldn't otherwise do?" See SOP at 13-14 n.10 (appearing to pose this thought as a rhetorical question). There is no indication in the record, or otherwise, that Mr. Durkin holds such a view. To the contrary, Mr. Durkin's comment regarding the acquaintanceship of Mr. Larian and Mr. Kadisha from "the Persian Community" (which is noted in the report within quotation marks and is expressly attributed to a reference made by Mr. Larian himself) is clearly predicated on interviews with these two individuals, each of whom related independently to Mr. Durkin and his colleagues that they knew each other from "the Persian Community." See Durkin Summary Report, Ex. 14, at 2 ¶ 3 (Notes re March 25, 2009, interview with Mr. Larian: "He indicated that he knew Kadisha from the Persian community.") and Ex. 14, at 15 ¶ 2 (Notes re March 26, 2009, interview with Mr. Kadisha: "Kadisha stated that he knows Larian from the Persian community."). The purpose for this reference is made clear in the footnote set forth at the end of the sentence in which the reference appears; namely, the Report discusses evidence that the relationship between Mr. Larian and Mr. Kadisha is stronger and more personal than either man claimed it was. See Summary Report at 5 n.18; Ex. 15 (personal emails).

In the Reply Memo, Mr. Gordinier takes issue with this explanation, this time including not only Mr. Durkin but also counsel for Mattel as the targets for his unsubstantiated allegations of "cultural bias." Mr. Gordinier first mischaracterizes an argument made by Mattel. Mattel argued, and quite correctly, both that how well Mr. Larian and Mr. Kadisha knew each other was relevant to a determination of whether certain transactions between the two were arms-length transactions, and that this point was likely not lost on either of these two very sophisticated and successful

MINUTES FORM 90                                                              Initials of Deputy Clerk __cls_____
CIVIL -- GEN                                       11

EXHIBIT ____4____
PAGE _____095____

businessmen.[5] As noted previously, both Mr. Larian and Mr. Kadisha stated that they knew each other from "the Persian community" which, in the Forensic Auditor's view, was intended to, or at least had the tendency to minimize the existing relationship between the two. Mr. Gordinier incorrectly characterizes this argument as Mattel's contention that Mr. Larian's and Mr. Kadisha's "Persian relationship" and "common Persian heritage" was somehow relevant to a determination of whether the Omni 808 transaction was an arms-length transaction. Mattel made no such argument. Neither counsel for Mattel nor Mr. Durkin have implied that Mr. Larian's and Mr. Kadisha's ethnicity factors into the analysis. Other than to point to Mr. Larian's and Mr. Kadisha's separate, but identical, accounts of how they knew each other which, in turn, suggests how well they know each other, neither counsel for Mattel nor Mr. Durkin have stated or implied that Mr. Larian's and Mr. Kadisha's shared ethnicity is relevant to any matter currently or potentially before the Court. Compare Opposition at 8-9 with Reply Memo at 14-15.

Moreover, Mr. Gordinier's substantive point, that Mr. Durkin "misrepresented" to the Court what Mr. Larian and Mr. Kadisha told him about the closeness of their relationship, fares no better. See Reply Memo at 15. On this point, it is important to set this stage properly. Counsel for all parties have attempted to glean far too much from two sterile paragraphs of interview notes taken by Mr. Durkin. Much can be inferred from conversations and interviews through not only what is said, but what is not said, by the interviewee's demeanor, by the tone of the speaker, by the length and placement of pauses, and by non-verbal gestures and body language. With all these variables, much of what is communicated does not find its way into notes.[6] For instance, Mr. Durkin's interview of Mr. Larian lasted over two and a half hours; however, the interview notes are a mere five and a half pages. Similarly, a one-hour and ten minute interview of Mr. Kadisha yielded only three and a half pages of interview notes. This is not to suggest that the notes should have been longer or that the interviews should have been recorded or transcribed; rather, it is to suggest that counsel's arguments based on another's notes are not particularly probative.

In contrast, Mr. Durkin's assessment, based on his interviews with both of them,

---

[5] In fact, the Court just this week issued a 30-page, single-spaced opinion resolving a 10-day bench trial conducted over the sole issue of whether a transaction between "closely related" entities reflected its fair market value, one of the more significant arguments ultimately rejected by the Court in that case being that the close relationship between the parties necessarily rendered the transaction a "sweetheart deal." See July 6, 2009, Order, Siegel v. Warner Bros. Entertainment, Inc., et al., CV 04-08400 SGL (RZ) (docket #554).

[6] Indeed, the interview notes upon which the parties rely concede as much. See Summary Report, Ex. 14 at 2, 15 ("This interview memorandum is a factual representation of the topics discussed during the interview and is not intended to be a word for word or exact transcription of the conversation."). Thus, in addition to not taking into account all non-verbal communication, the notes do not even represent everything that was said during the interview.

EXHIBIT __4__
PAGE ___096___

is that Mr. Larian and Mr. Kadisha attempted to minimize their relationship because both
of them understand the relevance of any friendship or other connection between them
to the assessment of the arms-length nature of any transactions in which they have
engaged. Mr. Durkin's assessment does not come from the gentle teasing of a strained
meaning from two sterile paragraphs of brief notes taken by another person; rather, his
assessment springs from his participation in the interview process, the entirety of the
interviews he conducted of Mr. Larian and Mr. Kadisha, and his review of all of the
evidence. As such, the Court defers to his assessment, at least insofar as how Mr.
Larian and Mr. Kadisha portrayed their relationship to him.

As for that scant language from which the parties glean so much meaning, the
entirety of which is set forth below, it in no way supports the contention made by Mr.
Gordinier that Mr. Durkin "misrepresented" to the Court what Mr. Larian and Mr.
Kadisha conveyed to him about the closeness of their relationship. On this topic, the
notes of Mr. Larian's interview merely state the following:

> Larian decided to contact Neil Kadisha of OmniNet as
> he knew his company was in the distressed loan business.
> He indicated that he knew Kadisha from the Persian
> community. Kadisha said he wouldn't do the deal alone in
> today's environment and wanted Larian and their other
> friends to invest in the deal with MGA. Larian stated that
> Kadisha negotiated the debt with Wachovia and got it down
> significantly, Larian said he is not bitter about Kadisha
> getting a good deal on buying the loan.

Summary Report, Ex. 14, at 2 ¶ 3 (emphasis added). This paragraph contains the word
"friends," and perhaps could even be read as an implicit statement by Mr. Larian that he
and Mr. Kadisha are "friends." But the language does not compel such an inference.
Moreover, it does not comport with the notes of Mr. Kadisha's interview, which on this
topic state only the following:

> Larian and Kadisha have never been to dinner
> together. Kadisha stated that he knows Larian from the
> Persian community and he sees him often at religious
> events, etc. He has no investments with Larian. Kadisha
> did not talk with Larian last night, this morning or in the last two days.

Summary Report, Ex. 14, at 15, ¶ 2. Mr. Durkin's assessment that Mr. Larian and Mr.
Kadisha sought to minimize the extent of their relationship is not contradicted by these
short passages.

The criticism that Mr. Durkin was acting pursuant to an ethnic or cultural bias is
clearly baseless. The allegations are irresponsible, and they are made to capitalize on

EXHIBIT __4__
PAGE _____ 097

their inherent sensational nature for counsel's own purposes of diverting attention away
from the substance of the Reports. Sensationalism aside, when viewed in context, the
Reports' reference to Mr. Larian and Mr. Kadisha knowing each other from "the Persian
community" was plainly innocuous. The reference was a direct quotation from both Mr.
Larian and Mr. Kadisha. It was used in a broader discussion regarding how (and thus,
impliedly, how well) the two knew each other, which is itself relevant to the issue of
whether certain transactions relevant to the present litigation were made at arms length.

This is a most unfortunate incident. The Court certainly understands, in a case
as hotly contested as this one -- with such high stakes, with such complex legal issues,
and with such truly extraordinary legal talent on all sides -- that lawyers, however ethical
and committed to the highest standards of professionalism (as the Court presumes and
has found all counsel of record here to be), make statements or commit acts in haste
that they subsequently regret. All of the players to this drama, are, after all is said and
done, human. As such, all of us are vulnerable to all-too-common human frailties. The
Court would place itself at the very top of any list of lawyers who have spoken
improvidently at one time or another in this case (and any number of others). What the
Court has witnessed here, however, in both manner and substance, for the reasons
noted above, goes beyond what the Court can let pass without some manner of
reprobation. So let the Court be clear: Nothing excuses the attempted character
assassination in which Mr. Gordinier has engaged.

**IT IS SO ORDERED.**

Initials of Deputy Clerk __cls_____

EXHIBIT ___4___
PAGE _____ 098

# EXHIBIT 5

1    Hon. Edward A. Infante (Ret.)
     JAMS
2    Two Embarcadero Center
     Suite 1500
3    San Francisco, California 94111
     Telephone:    (415) 774-2611
4    Facsimile:    (415) 982-5287

5

6                        UNITED STATES DISTRICT COURT

7                      CENTRAL DISTRICT OF CALIFORNIA

8                             EASTERN DIVISION

9

10

11   CARTER BRYANT, an individual,        CASE NO. C 04-09049 SGL (RNBx)
                                          JAMS Reference No. 1100049530
12           Plaintiff,

13       v.                               Consolidated with
                                          Case No. CV 04-09059
14   MATTEL, INC., a Delaware corporation, Case No. CV 05-2727

15           Defendant.                   ORDER GRANTING IN PART AND
                                          DENYING IN PART MGA'S MOTION
16                                        TO COMPEL DOCUMENTS
                                          RESPONSIVE TO FIRST SET OF
17                                        REQUESTS FOR PRODUCTION OF
                                          DOCUMENTS DATED NOVEMBER
18   CONSOLIDATED WITH                    22, 2006
     MATTEL, INC. v. BRYANT and
19   MGA ENTERTAINMENT, INC. v. MATTEL,
     INC.
20                              I. INTRODUCTION

21       On April 13, 2007, MGA Entertainment, Inc. ("MGA") submitted a motion to compel

22   Mattel, Inc. ("Mattel") to produce documents responsive to MGA's First Set of Requests for

23   Production of Documents dated November 22, 2006 (the "requests"), which generally seeks

24   documents that MGA contends are relevant to its Lanham Act and unfair competition claims. On

25   April 25, 2007, Mattel submitted its opposition brief, and on May 2, 2007, MGA submitted a

26   reply brief. The matter was heard via telephonic conference on May 11, 2007. Having

27

28   Bryant v. Mattel, Inc.,
     CV-04-09049 SGL (RNBx)

     EXHIBIT  5
     PAGE     099

1 | considered the motion papers and comments of counsel at the hearing, MGA's motion to compel
2 | is granted in part and denied in part.

3 | ## II. BACKGROUND

4 | There are two themes underlying MGA's claims for unfair competition against Mattel.
5 | First, MGA alleges that Mattel has intentionally "serially imitated and copy-catted the look of
6 | MGA products, trade dress, trademarks, themes, ideas, advertising and packaging, including for
7 | the 'Bratz' line of dolls," to dilute MGA's brand, create customer confusion, and unfairly stifle
8 | competition. MGA's Complaint at ¶¶9, 65. Second, MGA alleges, on information and belief,
9 | that "Mattel has intimidated, coerced and threatened retailers, licensees, suppliers and others in
10 | the industry – both in the U.S. and internationally – in order to inhibit and stifle MGA's ability to
11 | compete with Mattel and to prevent MGA from obtaining licensees, contracts and supplies for its
12 | products." Id. at ¶9.

13 | ### The Alleged Copy-catting

14 | Mattel's alleged serial copycatting "began with the 'Bratz' dolls themselves, but quickly
15 | extended to MGA's packaging, themes, accessories, advertising and even other product lines."
16 | Id. at ¶33. Mattel allegedly "designed its 'My Scene' dolls to evoke the unique and distinctive
17 | look of the 'Bratz' – also with disproportionately oversized heads, artfully made-up almond-
18 | shaped eyes, large, overly-lined and lipsticked lips, trendy, hip clothes and hair styles, and over-
19 | sized feet." Id. at ¶34. Mattel also allegedly "systematically proceeded to modify the 'My Scene'
20 | dolls since their original release, particularly their eyes, to increase their similarity to 'Bratz' more
21 | and more over time." Id.

22 | Further, Mattel allegedly "modified its 'My Scene' packaging, and the manner in which
23 | the dolls are displayed, to more closely mimic the packaging, trade-dress and overall look and
24 | total image of MGA's 'Bratz.'" Id. at ¶41. For example, Mattel allegedly changed its packaging
25 | "to the open and transparent style of the 'Bratz' packaging." Id. at ¶43. Mattel also allegedly
26 | hung its packaging and product display to "look even more closely and confusingly similar to

27 |
28 |

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

2

EXHIBIT 5
PAGE 100

1    MGA's packaging and '*tout ensemble.*'" Id. at ¶45. Mattel also allegedly "discarded its

2    traditional rectangular shaped box, and like 'Bratz', adopted an unusual, non-rectangular shaped

3    box." Id. at ¶46. Mattel also allegedly "adopted the 'flying banner' ribbon-style slogan running

4    across the middle of the box, similar to that used on the 'Bratz' packaging." Id.

5         In addition to the packaging changes, Mattel allegedly copied "MGA's practice of

6    regularly releasing new dolls in connection with a theme – but not just any theme, often MGA's

7    theme." Id. at ¶47. For example, when MGA released its "Wintertime Wonderland" theme,

8    Mattel allegedly released "Chillin Out." Id. at ¶48. Mattel also allegedly imitated Bratz

9    accessories and related products in order to create consumer confusion in the marketplace. Id. at

10   ¶52. Further, Mattel allegedly "began running television commercials for its 'My Scene' dolls

11   bearing a remarkable similarity to 'Bratz' commercials, combining live action with animated

12   sequences set to similar sounding pop music and lyrics." Id. at ¶51. MGA alleges that Mattel's

13   conduct described above "is a calculated and intentional effort unquestionably designed to trade

14   off of MGA's hard work and goodwill, create confusion in the marketplace, steal MGA's thunder

15   and momentum, and dilute and blur away the novelty and distinctiveness of MGA's products."

16   Id. at ¶54.

17        Further, MGA alleges that when it "came out with a 'Bratz' 'Funky Fashion Makeover

18   Head,' Mattel came out with a confusingly similar – indeed, practically identical – 'My Scene'

19   styling head." Id. at ¶55. Mattel also allegedly "used a portion of the Bratz doll's now-famous

20   trademarked tag line 'The Girls With a Passion for Fashion' on Mattel's website for its 'Diva

21   Starz' dolls, asking its website users: 'Do you have a passion for fashion?'" Id. at ¶58.

22        MGA also alleges that Mattel recently came out with a confusingly similar line of "My

23   Scene" plush pets that have the distinctive look of MGA's "Bratz" line. Id. at ¶59. In addition,

24   Mattel allegedly "chose to package its pets the same way that MGA packaged its 'Bratz Petz',

25   sitting in an open box, with no top and with partial side panels that slope from a narrow front

26   panel to a higher back panel." Id. at ¶60. MGA alleges that the similarity of the "My Scene" pets

27

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

3

EXHIBIT ___5___
PAGE ___101___

1   and the "Bratz Petz" has confused sophisticated retailers who have mistakenly merchandised the

2   products together. Id. at ¶61.

3       MGA alleges that Mattel's television commercials and "My Scene" products have become

4   so confusingly similar to MGA's commercials and products that advertising executives have

5   expressed concern. Id. at ¶62. MGA also alleges that the press has taken notice of Mattel's

6   alleged attempts to confuse consumers. Id. at ¶63. Further, MGA alleges that some customers

7   have contacted MGA seeking to purchase "My Scene" dolls. Id. at ¶64.

8       MGA alleges that Mattel's conduct has reached beyond "Bratz" to include other new

9   MGA toy lines. Id. at ¶67. For example, Mattel allegedly modeled its "Wee 3 Friends" line of

10  dolls and packaging on MGA's "4-Ever Best Friends" line. Id. at ¶68. Mattel also allegedly

11  modeled its "Little Mommy Potty Training Baby Doll" on MGA's "Mommy's Little Patient." Id.

12  at ¶69. Mattel also allegedly revamped and renamed one of its "Hot Wheels" lines with the

13  "AcceleRacerS" logo based upon MGA's "AlienRacers" radio controlled racing vehicles. Id. at

14  ¶70.

15                  Additional Allegedly Anti-Competitive Conduct

16      MGA alleges that Mattel has engaged in additional allegedly anti-competitive conduct,

17  including "sending threatening letters to several of its former employees who now work for MGA

18  warning them not to disclose *even publicly available information* about Mattel, including the

19  names and positions of Mattel employees." Id. at ¶75 (emphasis in original). Mattel has also

20  allegedly "warned a number of companies, including the biggest publishing entity in the United

21  Kingdom, not to license MGA products, or risk retribution." Id. at ¶76. MGA alleges that it has

22  lost valuable licensing opportunities as a result of Mattel's conduct. Id.

23      MGA also alleges that "Mattel has used similar intimidation to pressure distributors and

24  retailers, particularly in foreign countries, not to distribute 'Bratz', to reduce shelf and display

25  space for 'Bratz' and to place 'Bratz' in unfavorable locations at retail outlets." Id. at ¶77. MGA

26  further alleges that "[w]hen MGA faced a shortage of doll hair in October 2002, MGA is

27

28
    Bryant v. Mattel, Inc.,
    CV-04-09049 SGL (RNBx)

                                                                                    4

EXHIBIT ____5____
PAGE ____102____

1   informed and believes that the reason for that shortage was that Mattel had locked MGA out by

2   buying up the supply from the two main hair supply companies." Id. at ¶78.

3         MGA also alleges that Mattel manipulated the retail market. More specifically, MGA

4   alleges that "Mattel merchandisers have been caught tampering with MGA's retail displays,

5   replacing favorably located MGA merchandise with Mattel merchandise instead." Id. at ¶79.

6   MGA further alleges on information and belief that "Mattel has falsely told a major United States

7   retailer that MGA was giving another major United States retailer below-market pricing and

8   falsely told a United Kingdom retailer that MGA was discontinuing one of its lines, in order to

9   make such line less attractive to buyers and thereby attempt to increase sales of the competitive

10   Mattel product and improve its own sales, at MGA's expense." Id.

11         Next MGA alleges on information and belief that NPD Funworld ("NPD"), the leading

12   supplier of sales statistics in the toy industry, terminated MGA's subscription ostensibly for

13   misusing NPD data and that "the termination was the result of pressure from Mattel." Id. at ¶¶80-

14   85. MGA also alleges on information and belief that Mattel pressured NPD into changing certain

15   product classifications for "Bratz" products to manipulate the data and preserve Mattel's market

16   share rankings in the "fashion doll" category. Id. at ¶86.

17         MGA further alleges on information and belief that Mattel used its influence as a major

18   contributor to the Children's Advertising Review Unit ("CARU"), which is a unit of the Council

19   of Better Business Bureaus, to "place onerous restrictions on MGA advertisements, and require

20   MGA to amend aspects of commercials that have gone unchallenged in other parties'

21   commercials." Id. at ¶89. As a result of CARU's restrictions, MGA allegedly incurred

22   unnecessary costs for reshooting and producing or re-editing its commercials. Id. at ¶90.

23         MGA also alleges on information and belief that Mattel's subsidiary, Fisher Price,

24   "orchestrated" a change to the selection process for TIA's "Toy-of-the-Year Awards," which

25   allegedly resulted in a Fisher Price toy beating out "BRATZ Formal Funk Super Stylin' Runway

26   Disco." Id. at ¶¶92-96. MGA also alleges on information and belief that one year "Mattel was

27

28

EXHIBIT ___5___
PAGE ___103___

1  instrumental in attempting to keep MGA from participating as a sponsor in the 'Kids' Choice

2  Awards.'" Id. at ¶97.

3      As a result of Mattel's alleged conduct described above, MGA has allegedly suffered, and

4  unless abated, will continue to suffer lost sales, lost licensing fees, lost contracts, lost

5  relationships, lost business opportunities and other damages. Id. at ¶100. MGA also alleges that

6  its ability to enter new markets and product lines has been hampered and delayed. Id.

7  Furthermore, MGA alleges that "[i]ts production costs have increased, its reputation and

8  relationships with important players in the industry have been negatively impacted, the value of

9  its business has been diminished, and its ability to attract, hire and retain employees has been

10  affected." Id. Based upon the foregoing, MGA asserts claims for (1) false designation of origin

11  or affiliation in violation of 15 U.S.C. §1125(a); (2) unfair competition in violation of 15 U.S.C.

12  §1125(a) and unfair competition and unfair business practices in violation of Cal. Bus. & Prof.

13  Code §17200 et seq. and California common law; (3) dilution in violation of 15 U.S.C. §1125(c),

14  Cal. Bus. & Prof. Code §14330 and California common law; and (4) unjust enrichment.

15  MGA's First Set of Requests for Production of Documents

16      On November 22, 2006, MGA propounded one hundred fifteen (115) document requests

17  seeking discovery regarding, among other things: (a) Mattel's alleged copycatting efforts and

18  activities with respect to Bratz and other MGA product lines; (b) anti-competitive business

19  practices allegedly carried out by Mattel; and (c) any similar or related activities. In response,

20  Mattel objected to many requests primarily on the grounds that they were overly broad and

21  unduly burdensome. Mattel agreed, however, to produce documents responsive to many of the

22  requests.

23      The parties met and conferred in person on March 9, 2007. MGA's counsel demanded

24  that Mattel withdraw all objections based on relevance. Alger Decl. in Support of Mattel's

25  Opposition at ¶7. Mattel's counsel responded that Mattel was producing responsive documents

26  and would continue to produce responsive documents, but had concerns over the "lack of focus

27

28    Bryant v. Mattel, Inc.,
  CV-04-09049 SGL (RNBx)

EXHIBIT 5
PAGE 104

6

1    and infinite scope" of MGA's document requests. Id. Mattel's counsel suggested that MGA

2    narrow the requests to "those products, retailers, licensees, and time frames that MGA has put at

3    issue in its Complaint and response to interrogatories." Id. MGA's counsel, however, rejected

4    the proposal. Id.

5          A few days later, counsel for MGA sent Mattel's counsel a letter offering several

6    suggestions for limiting the requests. Glad Decl. in Support of MGA's Motion, Ex. 1. In

7    particular, MGA stated that "it would be amenable to certain limitations on the number and

8    identities of custodians whose files must be searched, so long as Mattel is willing to accept

9    reciprocal accommodations for MGA's own document review." Id. Mattel did not respond to the

10   letter, and the instant motion ensued.

11                                        III. STANDARDS

12         Rule 26 of the Federal Rules of Civil Procedure provides that "[p]arties may obtain

13   discovery regarding any matter, not privileged, that is relevant to the claim or defense of any

14   party." Fed.R.Civ.P. 26(b)(1). Fishing expeditions to discover new claims, however, are not

15   permitted. See Fed.R.Civ.P. 26(b)(1); Rivera v. NIBCO, Inc., 364 F.3d 1057, 1072 (9th Cir.

16   2004) ("District courts need not condone the use of discovery to engage in 'fishing

17   expeditions.'"); Bernstein v. Travelers Ins. Co., 447 F.Supp.2d 1100, 1102 (N.D. Cal. 2006)

18   (citing Rule 26(b), Advisory Committee's Note to Amendments Effective December 1, 2000)

19   (Congress' changes in the language of Rule 26(c), substituting the words "claim or defense" for

20   the phrase "subject matter involved in the pending action," were intended to target discovery that

21   swept far beyond the claims and defenses of the parties and that seemed designed not to fairly

22   litigate the issues presented by the pleadings but to develop new claims or defenses.). Further,

23   pursuant to Rule 26(b)(2), Fed.R.Civ.P., the court shall limit discovery where "the burden or

24   expense of the proposed discovery outweighs its likely benefit, taking into account the needs of

25   the case, the amount in controversy, the parties' resources, the importance of the issues at stake in

26   the litigation, and the importance of the proposed discovery in resolving the issues."

27

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

7

EXHIBIT    5

PAGE    105

IV. DISCUSSION

A. General Objections

MGA contends that Mattel has improperly withheld documents based on three generalized objections. First, MGA contends that Mattel has asserted an objection based upon relevance to requests that are not related to facts specifically alleged in MGA's complaint. MGA contends the objection is improper because it essentially grafts a heightened pleading standard onto discovery requests, is inconsistent with the standard for discovery set forth in Rule 26(b), Fed.R.Civ.P., and goes against the very purpose of discovery. MGA denies "fishing" for new claims, contending that it is seeking discovery tending to support or refute existing claims.

Second, MGA contends that Mattel has improperly refused to produce "documents related to MGA's BRATZ dolls unless the documents are 'in the context' of Mattel's BARBIE or MY SCENE products." MGA's Motion at 9:10-11. MGA contends that all of the documents related to Bratz that it seeks are relevant, regardless of whether they refer to or contemplate Barbie or My Scene. In particular, MGA contends that documents related to Bratz, even if they do not refer to Barbie or My Scene, are relevant to its claims that (1) Mattel has exerted pressure on licensees not to license Bratz products; (2) Mattel has exerted pressure on retailers or distributors not to distribute Bratz products; (3) Mattel has tampered with Bratz displays; and (4) Mattel intentionally copied Bratz products.

Third, MGA contends that Mattel has improperly limited its production of My Scene documents to only those documents related to the specific acts of product and packaging infringement identified in MGA's complaint. MGA contends that it is entitled to far more, including documents concerning potential acts of infringement not mentioned in the complaint and documents concerning the development of the My Scene product line from inception of this suit to the present. In particular, MGA contends that documents concerning the current development of My Scene may tend to show continuing infringement, and therefore are relevant to prove that Mattel's conduct is willful.

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

EXHIBIT ___S___
PAGE ___106___

8

1    Mattel contends that it has produced documents in response to many of MGA's requests,

2  and will continue to do so. Mattel objects, however, to those requests that require Mattel to

3  produce virtually every document, anywhere in the world, that mentions MGA, Larian, Bratz, or

4  any other MGA product. Mattel contends that MGA is engaging in an improper fishing

5  expedition, casting its requests so broadly as to require production of documents relating to

6  products and entire product lines that are irrelevant to the suit. Mattel also contends that the

7  requests are overbroad because they seek documents about subjects such as quality and pricing

8  which do not appear anywhere in MGA's pleadings. Id. Furthermore, Mattel contends that

9  MGA's requests are not linked in any manner to MGA's claims in the suit and do not reference

10  any particular alleged wrongdoing by Mattel.

11    Mattel also contends that responding to MGA's document requests would impose a

12  considerable, unjustifiable burden on Mattel. Mattel emphasizes that it is a large company, with

13  over 140 subsidiaries and affiliates in approximately 43 different countries. Mattel represents that

14  it has over 5,000 employees in the United States and more than 25,000 employees at subsidiaries

15  and affiliates worldwide.

16    Mattel also represents that its products are sold in thousands of stores. It represents that it

17  deals with Wal-Mart, Target, K-Mart, and Toys "R" Us on a daily basis, and that these four

18  retailers have more than 4,500 stores in the United States. Mattel also represents that it deals with

19  many hundreds more retailers domestically and overseas. Further, Mattel represents that it has

20  relationships with more than 1,400 licensees and licensors.

21    Mattel also represents that the toys it produces vary widely, including collectible card

22  games, electronic handheld devices, toy cars, and the Barbie doll line. Mattel asserts that it

23  introduces annually more than 2,000 different types of toys, dolls and other products in more than

24  150 nations throughout the world. Mattel asserts that many products often involve the creation of

25  many categories of documents relating to design, marketing, consumer and market research,

26  planning, engineering, cost, manufacturing, distribution, sales and finance. Mattel represents that

27

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

9

EXHIBIT 5
PAGE 107

1  these types of documents are stored on Mattel's over 800 computer servers worldwide, and that

2  countless others are stored in hardcopy or stored on individual employees' desktop computers and

3  laptops. Furthermore, Mattel represents that many of its network systems, including its e-mail

4  system, are not readily searchable, or searchable at all, by use of keyword terms. For example,

5  Mattel asserts that the computer system used by Mattel's designers and engineers overwhelmingly

6  consists of graphical files whose content cannot be searched by keywords.

7       Mattel estimates that MGA and its products are referenced in millions of pages of

8  documents and computer files at Mattel. More specifically, Mattel contends that many groups

9  across Mattel, such as marketing, consumer research, sales, finance, human resources and safety

10  testing, have documents that refer or relate to MGA or its products in some way. Mattel also

11  contends that a large volume of this information is from third party analysts and third party

12  sources, including retail sales reports that track doll sales across the entire industry, newspaper

13  and magazine articles, commercials and advertisements. Mattel also represents that it collects

14  great quantities of documents about its competitors that are readily available on the Internet or

15  other public sources, including catalogs, advertising, press releases, and media reports, and from

16  retailers and distributors throughout the world.

17       Furthermore, Mattel represents that its documents, particularly its marketing and sales

18  research documents, often reference many competing products, not just the Bratz dolls at issue.

19  Mattel contends that these types of documents would be difficult to search and collect because, in

20  many instances, the only way to determine whether a particular document mentions Bratz would

21  be to review the entire document.

22       Mattel contends that virtually any employee at Mattel might have documents that are

23  responsive to MGA's requests. Mattel estimates that "to locate all such documents would take

24  years, cost millions of dollars, and seriously interfere with the operation of Mattel's business."

25  Mattel's Opposition at 17. Matter also asserts that "[s]uch efforts – including search of Mattel's

26  servers, its employees' computer workstations, hard copy files, computer disks, and video files –

27

28
  Bryant v. Mattel, Inc.,
  CV-04-09049 SGL (RNBx)

EXHIBIT ___5___

PAGE ___108___

1  would be in addition to the cost of attorney review of the materials before they are produced in

2  litigation." Id. Mattel also contends that the burden and expense of production is multiplied

3  several times further if Mattel is required to search the files in the possession of its worldwide

4  subsidiaries.

5      Mattel contends that even if the search for responsive documents could be accomplished,

6  the resulting document production would provide MGA with countless documents with little or

7  no relevance. For example, Mattel anticipates that many documents would be discussions of the

8  competition in the context of irrelevant dolls, such as any number of mainline Barbie dolls.

9  Mattel contends that other documents would simply be third party market reports which are

10  equally available to MGA from public sources. Accordingly, Mattel requests that the motion be

11  denied in full.

12      In its reply, MGA counters that the requests are not unduly burdensome. MGA contends

13  that contrary to Mattel's assertions, the requests are factually self-limited, containing restrictive

14  language and defining the outer parameters for the documents sought. Furthermore, MGA

15  contends that it told Mattel that it would be amenable to certain limitations on the number and

16  identities of custodians whose files must be searched, so long as Mattel was amenable to

17  reciprocal accommodations for MGA's own document review. MGA contends that, at a

18  minimum, Mattel should be required to search the physical and electronic files of its employees.

19  MGA contends that Mattel should not be released wholesale from its discovery obligations based

20  on a purported burden, particularly when it failed to work with MGA in good faith to mitigate that

21  burden.

22      Lastly, MGA argues that any burden to Mattel is outweighed by the benefit to be secured

23  from the discovery. MGA contends that it "realistically has no other way of obtaining documents

24  tending to support its claims that Mattel engaged in a pattern of conduct with suppliers,

25  distributors, licensees and others constituting unfair competition except from Mattel." MGA's

26

27

28
Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

EXHIBIT  5  11
PAGE  109

1  Reply at 10. Therefore, MGA believes that the benefits of the discovery it seeks are

2  immeasurable and that in contrast, the burden to Mattel is not unreasonable.[1]

3  B. Document Requests

4       In addition to the three general objections described above, Mattel has asserted other

5  objections to certain categories of document requests which MGA contends are improper. The

6  general objections stated above, as well as the additional objections asserted by Mattel, are

7  reviewed herein in the context of the nine categories of document requests at issue.

8  1. Document Request Nos. 32-33, 61

9       Request nos. 32, 33 and 61 seek production of communications with sales personnel,

10  merchandisers and retailers relating to alteration of displays or retail spacing of MGA products

11  other than Bratz. MGA contends that the documents it seeks are relevant to the allegation in

12  paragraph 79 of its complaint that "Mattel merchandisers have been caught tampering with

13  MGA's displays, replacing favorably located MGA merchandise with Mattel merchandise

14  instead." In its reply brief, MGA clarifies that it "seeks information tending to show that at any

15  time after June 2001, Mattel sales personnel tampered with, or directed others to tamper with,

16  MGA's in-store displays." MGA's Reply at 8.

17       During the meet and confer process, Mattel agreed to produce documents responsive to

18  request nos. 32-33 and 61 insofar as they related to displays, retail spacing, or shelf space for

19  Bratz, but refused to produce responsive documents relating to any other MGA products. Glad

20  Decl. in Support of MGA's Motion, Ex. 1. Mattel contends that request nos. 32 and 33 are

21  overbroad and unduly burdensome insofar as they require production of communications relating

22  to displays, retail spacing, or shelf-space for any other MGA products. Mattel views the requests

23  as a directive to "go out and find, review and produce essentially all of its retailer

24

25      [1] In a footnote, MGA mentions that Mattel has also withheld documents relating to conduct occurring outside of the United States, and that this issue will be addressed in a separate motion. MGA's Motion at 10, n. 29.

26  Nothing in this Order is intended in any way to permit or foreclose discovery relating to conduct occurring outside of the United States.

27

28  Bryant v. Mattel, Inc.,
    CV-04-09049 SGL (RNBx)

EXHIBIT _S_

PAGE _110_

1  communications about any 'change' in any 'display' or any 'retail spacing' for any MGA
2  product." Mattel's Opposition at 10. Mattel contends that MGA, not Mattel, should bear the
3  burden of identifying specific incidents of alleged tampering, and thereafter Mattel will attempt to
4  find and produce pertinent documents relating to those incidents. Id.

5       Mattel also contends that request no. 61 is overbroad and amounts to an improper fishing
6  expedition, seeking virtually all documents that mention MGA, Larian, Bratz, or any other MGA
7  product, whether or not they have anything to do with anything placed at issue by MGA. Mattel's
8  Opposition at 7-8. Mattel also contends that the request has no linkage to any possible consumer
9  confusion between Bratz and My Scene or between the other products mentioned in MGA's
10  complaint or MGA's responses to Mattel's contention interrogatories. Id. at 8.

11       Request nos. 32, 33, and 61 seek documents relevant to MGA's allegation that "Mattel
12  merchandisers have been caught tampering with MGA's displays, replacing favorably located
13  MGA merchandise with Mattel merchandise instead." MGA's allegation of tampering is broader
14  than just Bratz products, and therefore, Mattel's objection to producing responsive documents for
15  MGA products other than the Bratz line is overruled.

16       Further, the requests are not unduly burdensome. Request nos. 32 and 33 are limited to
17  communications between Mattel and its sales personnel and merchandisers relating to alterations
18  of display or retail spacing for MGA products, and therefore do not require Mattel to search for
19  documents from every single one of its employees. Request no. 61 is also reasonably tailored to
20  seek relevant information, requiring production of communications between Mattel and any
21  retailer, sales person or merchandiser referring or relating to the allocation of shelf space, altering
22  of retail displays, or placement of Bratz in retail stores, including but not limited to
23  communications concerning the placement of "Bratz" relative to My Scene. Contrary to Mattel's
24  assertion, request no. 61 does not require Mattel to search for virtually all documents that mention
25  MGA, Larian, Bratz, or any other MGA product, whether or not they have anything to do with
26  anything placed at issue by MGA. Instead request no. 61 is clearly limited to a defined category
27
28
   Bryant v. Mattel, Inc.,
   CV-04-09049 SGL (RNBx)

EXHIBIT ___S___ 13
PAGE ___111___

1   of communications with certain individuals and/or entities regarding a defined subject matter. In

2   addition, MGA indicates in its reply brief that it seeks documents and communications from June

3   2001 forward. With this temporal limitation, MGA's motion is granted as to request nos. 32, 33

4   and 61.

5                                   2. Document Request Nos. 37-39

6        Request nos. 37 through 39 call for production of Mattel's communications with CARU

7   relating to MGA and restrictions to be placed on MGA, as well as documents supporting Mattel's

8   allegation in its answer that MGA violated CARU standards. MGA contends that the documents

9   it seeks are relevant to its allegation in paragraph 89 of its complaint that "Mattel used its

10   influence as a major contributor to CARU's budget to induce CARU to place onerous restrictions

11   on MGA advertisements, and to require MGA to amend aspects of commercials that have gone

12   unchallenged in other parties' commercials."

13        In its opposition brief, Mattel represents that is prepared to produce documents that bear

14   on MGA's claims and Mattel's defenses involving CARU, but nothing further. Mattel contends

15   that the sweep of these requests "goes far beyond any particular advertisements or the allegations

16   in MGA's complaint that Mattel pressured CARU or obtained better treatment different than

17   MGA." Mattel's Opposition at 10. Furthermore, Mattel contends that the requests are improper

18   because CARU investigates complaints and claims in confidence.

19        MGA's request nos. 37 and 39 seek information relevant to MGA's allegation that Mattel

20   influenced CARU to place restrictions on MGA's advertisements. The Federal Rules of Civil

21   Procedure do not require MGA to identify every instance when CARU imposed restrictions or

22   required amendments to MGA's advertisements before propounding discovery on the subject.

23        Request no. 38 is much broader, however, seeking all communications between Mattel

24   and CARU referring or relating to MGA, Larian, Bratz, or MGA products. Request no. 38 is not

25   limited to the subject of MGA's advertisements, or any other subject that is at issue in the case.

26   Further, request no. 38 is, to a certain extent, cumulative of request nos. 37 and 39.

27

28   Bryant v. Mattel, Inc.,
     CV-04-09049 SGL (RNBx)

EXHIBIT    5
PAGE     112

1    Accordingly, MGA's motion is granted with respect to request nos. 37 and 39, but denied
2    as to request no. 38.

3                          3. Document Request No. 43

4    Request no. 43 seeks documents relating to any attempts by Mattel to price My Scene
5    below Bratz. MGA contends that the documents it seeks are likely to lead to admissible evidence
6    relating to whether Mattel has an "organic process" for setting prices, or whether it set prices
7    based on confidential information obtained from MGA. MGA's Motion at 13:22.

8    Mattel contends that there is no allegation in MGA's complaint of below-market pricing.
9    Further, Mattel contends that the request is overbroad and seeks documents that have no relevance
10   to any other subject matter in suit.

11   Request no. 43 seeks documents that have no relevance to any claim or defense in the
12   case. There is no allegation in MGA's complaint related to below-market pricing. Nor is there
13   any allegation that Mattel misappropriated confidential pricing information from MGA.
14   Accordingly, MGA's motion is denied as to request no. 43.

15                          4. Document Request No. 47

16   Request no. 47 calls for production of documents relating to Mattel's communications
17   with buyers, merchandisers, general merchandise managers, or retailers relating to whether MGA
18   was giving any other U.S. retailer below-market pricing or whether MGA was discontinuing one
19   of its product lines. MGA contends that these documents are relevant to the allegation in
20   paragraph 79 of its complaint that "Mattel has falsely told a major United States retailer that
21   MGA was giving another major United States retailer below-market pricing and falsely told a
22   United Kingdom retailer that MGA was discontinuing one of its lines."

23   Mattel contends that request no. 47 is improper because it demands documents about
24   "alleged statements to an unidentified retailer and an unidentified toy line" without giving Mattel
25   "a hint as to where to look in order to perform a good-faith search for documents." Mattel's
26   Opposition at 12.

27

28
     Bryant v. Mattel, Inc.,
     CV-04-09049 SGL (RNBx)

     15

EXHIBIT     5
PAGE        113

1       Request no. 47 seeks documents relevant to MGA's allegation that Mattel made a false

2   representation to a major United States retailer that MGA was giving another retailer below-

3   market pricing, and falsely told a United Kingdom retailer that MGA was discontinuing a product

4   line. The Federal Rules of Civil Procedure do not require MGA to identify the businesses to

5   whom Mattel allegedly made the false statements as a precondition to propounding discovery.

6   Nor is MGA required to identify every instance in which Mattel allegedly made such false

7   representations before propounding discovery. Nevertheless, the request is extremely broad and

8   burdensome, requiring Mattel to search for "all documents referring or relating to any

9   communications between Mattel" and buyers, merchandisers, general merchandise managers, or

10  retailers referring or relating to whether MGA was giving another United States retailer below-

11  marketing pricing, or whether MGA was discontinuing one of its lines. To alleviate some of the

12  burden to Mattel, the request is hereby limited to require production of only Mattel's

13  communications with any buyers, merchandisers, general merchandise managers or retailers

14  about MGA providing below-market pricing or MGA discontinuing a product line. With this

15  limitation, MGA's motion is granted as to request no. 47.

16                                          5. Document Request Nos. 48 – 50

17      Request nos. 48 through 50 essentially seek all documents referring or relating to Mattel's

18  communications with any buyers, merchandisers, general merchandise managers, retailers,

19  suppliers, licensees, and potential licensees, referring or relating to Bratz, Larian or MGA

20  regarding the origins, design, development, product launch, sales, promotions, advertising,

21  quality, or price of Bratz or any other MGA product. During the meet and confer, Mattel agreed

22  to produce some, but not all, responsive documents. In particular, Mattel objected to producing

23  documents relating to the pricing of Bratz or any MGA product. Mattel also objected to

24  producing documents relating to Bratz unless the documents also referenced Mattel's My Scene

25  or Barbie products.

26

27

28
    Bryant v. Mattel, Inc.,
    CV-04-09049 SGL (RNBx)

16

EXHIBIT  5
PAGE  114

MGA contends that these documents are relevant to its allegation that Mattel interfered with its business dealings with third parties. In its reply brief, MGA asserts that it seeks documents and communications between Mattel and certain third parties "from June 2001 tending to support or refute MGA's assertions that Mattel interfered with MGA's dealings with such parties by providing false or misleading information concerning MGA products, the ownership of 'Bratz' and exerting pressure on these parties not to license or sell MGA products." MGA's Reply at 8.

Mattel contends that these requests are overbroad and amount to an improper fishing expedition, seeking virtually all documents that mention MGA, Larian, Bratz, or any other MGA product, whether or not they have anything to do with anything placed at issue by MGA. Mattel's Opposition at 7-8. Mattel also contends that the requests have no linkage to any possible consumer confusion between Bratz and My Scene or between the other products mentioned in MGA's complaint or MGA's responses to Mattel's contention interrogatories. Id. at 8.

This category of requests is clearly overbroad, requiring production of documents that merely mention MGA, Larian, Bratz or other MGA products, regardless of whether or not they have anything to do with the claims and defenses in the case. MGA has not made any attempt to link these requests to any of the numerous and far-ranging allegations of unfair competition set forth in its complaint. Instead MGA makes a very generalized argument that the requests seek information relevant to its allegation that Mattel interfered with MGA's business dealings with third parties. Furthermore, Mattel has carried its burden of establishing that the burden and expense of complying with the requests far exceed their likely benefit, taking into account the needs of the case. Accordingly, MGA's motion is denied as to request nos. 48 through 50.

### 6. Document Request Nos. 51 – 55

This category of document requests requires production of essentially all documents referring or relating to any communications between Mattel and any public relations firms, members of the press, current or former MGA employees, or former Mattel employees, relating to

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

17

EXHIBIT ___S___
PAGE ___115___

1    Bratz, Larian, or MGA regarding the origins, design, development, product launch, sales,

2    promotions, advertising, quality, or price of Bratz or any other MGA product. During the meet

3    and confer process, Mattel agreed to produce some, but not all responsive documents.

4        MGA contends that these documents are relevant to its allegations that Mattel has engaged

5    in serial imitation of MGA products in an attempt to dilute their distinctiveness and create

6    confusion in the marketplace. MGA also contends that these documents are likely to lead to

7    admissible evidence relating to the creation and ownership of Bratz, Mattel's knowledge and

8    awareness of Bratz products and marketing and its attempt to imitate those products and dilute

9    their distinctiveness.

10       Mattel contends that these requests are overbroad and amount to an improper fishing

11   expedition, seeking virtually all documents that mention MGA, Larian, Bratz, or any other MGA

12   product, whether or not they have anything to do with anything placed at issue by MGA. Mattel's

13   Opposition at 7-8. Mattel also contends that the requests have no linkage to any possible

14   consumer confusion between Bratz and My Scene or between the other products mentioned in

15   MGA's complaint or MGA' responses to Mattel's contention interrogatories. Id. at 8.

16       Like the previous category of requests, this category of requests is grossly overbroad,

17   requiring production of documents that merely mention MGA, Larian, Bratz or other MGA

18   products, regardless of whether or not they have anything to do with the claims and defenses in

19   the case. MGA has not made any attempt to link these requests to any of the allegations of unfair

20   competition set forth in its complaint or to the responses it provided to Mattel's contention

21   interrogatories. Furthermore, Mattel has carried its burden of establishing that the burden and

22   expense of complying with these requests far exceed their likely benefit, taking into account the

23   needs of the case. Accordingly, MGA's motion is denied as to request nos. 51-55.

24                          7. Document Request Nos. 56 – 58

25       This category of requests requires production of all documents relating to business

26   dealings between any licensee, supplier, manufacturer, retailer, distributor, or merchandiser and

27

28   Bryant v. Mattel, Inc.,
     CV-04-09049 SGL (RNBx)                                                        18


EXHIBIT   5
PAGE      116

1   MGA. MGA contends that these document requests are specifically tailored to documents in

2   Mattel's possession, custody or control concerning MGA's business dealings with licensees,

3   suppliers, manufacturers, retailers, distributors, or merchandisers, and are directly relevant to its

4   claims that Mattel interfered with MGA's business dealings with third parties.

5          Again, Mattel contends that these requests are overbroad and amount to an improper

6   fishing expedition, seeking virtually all documents that mention MGA, Larian, Bratz, or any other

7   MGA product, whether or not they have anything to do with anything placed at issue by MGA.

8   Mattel's Opposition at 7-8. Mattel also contends that the requests have no linkage to any possible

9   consumer confusion between Bratz and My Scene or between the other products mentioned in

10  MGA's complaint or MGA' responses to Mattel's contention interrogatories. Id. at 8. Mattel

11  also objects to request nos. 57 and 58 insofar as they require Mattel to produce documents that

12  refer "explicitly or implicitly" to business dealings involving MGA.

13         Like the previous two categories of document requests, this category of requests is grossly

14  overbroad. Request nos. 56 and 57 require production of documents referring or relating to

15  MGA's business dealings, without specifying any products or other subject matter limitations.

16  Request no. 58 is narrower, but is unreasonable insofar as it requires Mattel to produce documents

17  that refer "explicitly or implicitly" to business deals involving MGA's Bratz or other products.

18  Furthermore, Mattel has carried its burden of establishing that the burden and expense of

19  complying with the requests far exceed their likely benefit, taking into account the needs of the

20  case. Accordingly, MGA's motion is denied as to request nos. 56 through 58.

21                      8. Document Request Nos. 59, 60, 62-63, 99, 101

22         This category of requests requires production of all documents relating to (a) any

23  interference with or inhibition of the licensing or potential licensing of MGA's products, or

24  relating to any limitations or restrictions on any MGA licensee (request nos. 59, 62-63); (b) any

25  third party's licensing or potential licensing of MGA products (request no. 60); and (c)

26  communications between Mattel and MGA's licensees and distributors referring to MGA, Bratz

27

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

19

EXHIBIT    5

PAGE ____  1 1 7

or the claims in this lawsuit (request nos. 99, 101). MGA contends that the documents it seeks are relevant to its allegation that Mattel exerted its influence on retailers and other third parties not to do business with MGA.

Mattel contends that request nos. 59, 60, 62 and 63 are overbroad, seeking all documents that might bear on MGA's business without identifying any particular business dealings. Mattel also contends that they are overbroad insofar as they require production of all documents related to "any MGA PRODUCT world wide," where "product" is defined as "each image, character, logo, doll, toy, accessory, product, packaging or other thing or matter that is or has ever been manufactured, marketed or sold by MGA or others under license." Mattel's Opposition at 9.

Mattel also contends that request nos. 99 and 101 are overbroad and amount to an improper fishing expedition, seeking virtually all documents that mention MGA, Larian, Bratz, or any other MGA product, whether or not they have anything to do with anything placed at issue by MGA. Mattel's Opposition at 7-8. Mattel also contends that the requests have no linkage to any possible consumer confusion between Bratz and My Scene or between the other products mentioned in MGA's complaint or MGA' responses to Mattel's contention interrogatories. Id. at 8.

Request nos. 59, 60, 62, and 63 seek information relevant to MGA's allegations, including among others, that Mattel "warned a number of companies, including the biggest publishing entity in the United Kingdom, not to license MGA products, or risk retribution," and that Mattel "terminated one of its licensees, apparently in retribution for licensing Bratz." MGA's Complaint at ¶76. They are also reasonably tailored to require production of only those documents and communications that refer or relate to interference with or inhibition of the licensing or potential licensing of MGA's products, that refer or relate to any limitations or restrictions on any MGA licensee, and that refer or relate to any third party's licensing or potential licensing of MGA products. Mattel has not established that searching for theses types of responsive documents is unduly burdensome. Therefore, MGA's motion is granted as to request nos. 59, 60, 62 and 63.

In contrast, however, request nos. 99 and 101 are overbroad, requiring Mattel to search for and produce all documents referring or relating to communications between Mattel and any MGA licensee or distributor that refer or relate to MGA, Bratz, this lawsuit, other litigation involving the parties or their employees, claims by MGA against Mattel or claims by Mattel against MGA or its employees. For example, the requests would potentially require production of documents that merely mentioned MGA and Bratz but that otherwise have no relevance to the claims and defenses in the suit. Therefore, MGA's motion is denied as to request nos. 99 and 101.

<u>9. Document Request Nos. 64, 65, 66, 67</u>

This category of requests requires production of all documents relating to (a) any third party's agreement or decision not to license, manufacture, promote, distribute or sell MGA products or supply materials or services to MGA, or to limit, restrict, curtail or reduce such activities (request nos. 64-65); and (b) any interference with or inhibition of the supply of goods or services to MGA, or of MGA's distribution of its products (request nos. 66-67). MGA contends that these documents are relevant to its claims that Mattel interfered with MGA's business dealings with distributors, retailers, and other third parties, as alleged in paragraphs 76-79 of its complaint.

Mattel contends that these requests are overbroad, seeking all documents that might bear on MGA's business without identifying any particular business dealings. Mattel also contends that they are overbroad insofar as they require production of all documents related to "any MGA PRODUCT world wide," where "product" is defined as "each image, character, logo, doll, toy, accessory, product, packaging or other thing or matter that is or has ever been manufactured, marketed or sold by MGA or others under license." Mattel's Opposition at 9.

These requests seek information relevant to MGA's allegation that Mattel interfered with its business dealings. In particular, MGA has alleged that Mattel "warned a number of companies, including the biggest publishing entity in the United Kingdom, not to license MGA products, or risk retribution," and that Mattel "terminated one of its licensees, apparently in

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

21

EXHIBIT ____5____
PAGE _____119____

1    retribution for licensing Bratz." MGA's Complaint at ¶76. MGA's requests are reasonably

2    calculated to lead to information relevant to this allegation. Although the definition of product is

3    broad, the definition does not render the requests overbroad because they are otherwise limited in

4    subject matter. Further Mattel has failed to establish that it is unduly burdensome to search for

5    and produce documents responsive to this category of requests. Therefore, MGA's motion is

6    granted as to request nos. 64, 65, 66, and 67.

7                             **10. Document Request Nos. 102-104**

8         This category of requests requires production of Mattel's communications with three

9    companies referring to MGA, Bratz or Larian. MGA contends that these documents are relevant

10    to its claims that Mattel interfered with its business dealings with third parties.

11         Mattel now represents that it will produce communications with Nickelodeon that bear on

12    MGA's allegation regarding sponsorship of the 2005 Kids Choice Awards. Mattel contends,

13    however, that communications with Cartoon Network or 4kids Entertainment are not relevant to

14    any claim or defense in suit.

15         Mattel's communications with Nickelodeon regarding MGA, Bratz or Larian are relevant

16    in light of MGA's allegation that Mattel was "instrumental in attempting to keep MGA from

17    participating as a sponsor in the 'Kids' Choice Awards.'" Id. at ¶97. Therefore, MGA's motion

18    is granted as to request nos. 102. In contrast, MGA has failed to establish that similar

19    communications with Cartoon Network and 4kids Entertainment are relevant to a claim or

20    defense in suit. Therefore, MGA's motion is denied as to request nos. 103 and 104.

21    //

22    //

23    //

24

25

26

27

28    Bryant v. Mattel, Inc.,
      CV-04-09049 SGL (RNBx)

EXHIBIT   5

PAGE     120

## V. CONCLUSION

For the reasons set forth above, MGA's motion to compel is granted in part as to document request nos. 32 ( as modified), 33 (as modified), 61 (as modified), 37, 39, 47 (as modified) , 59, 60, 62, 63, 64, 65, 66, 67, and 102, and denied in part as to document request nos. 38, 43, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 99, 101, 103 and 104.  MGA's request for sanctions is denied.  Mattel shall produce responsive documents as set forth above no later than June 15, 2007.

Pursuant to Paragraph 6 of the Stipulation and Order for Appointment of a Discovery Master, MGA shall file this Order with the Clerk of Court forthwith.

Dated: May 22, 2007

HON. EDWARD A. INFANTE (Ret.)
Discovery Master

EXHIBIT   5   23
PAGE   121

## PROOF OF SERVICE BY E-MAIL

I, Anthony Sales, not a party to the within action, hereby declare that on May 22, 2007, I served the attached ORDER GRANTING IN PART AND DENYING IN PART MGA'S MOTION TO COMPEL DOCUMENTS RESPONSIVE TO FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS DATED NOVEMBER 22, 2006 in the within action by e-mail addressed as follows:

| | | |
|---|---|---|
| Robert Millman Esq. | Littler Mendelson | rfmillman@littler.com |
| Douglas Wickham Esq. | Littler Mendelson | dwickham@littler.com |
| Keith Jacoby Esq. | Littler Mendelson | kjacoby@littler.com |
| Dominic Messiha Esq | Littler Mendelson | dmessiha@littler.com |
| Diba Rastegar Esq. | Littler Mendelson | drastegar@littler.com |
| Michelle Park Esq. | Littler Mendelson | mpark@littler.com |
| Alaya B. Meyers, Esq. | Littler Mendelson | ameyers@littler.com |
| Brady Mitchell, Esq. | Littler Mendelson | bmitchell@littler.com |
| Carol Miller, Esq. | Littler Mendelson | cmiller@littler.com |
| Ryan P. Eskin, Esq. | Littler Mendelson | reskin@littler.com |
| John Quinn Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | jbq@quinnemanuel.com |
| Michael Zeller Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | michaelzeller@quinnemanuel.com |
| Jon Corey Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | joncorey@quinnemanuel.com |
| Duane Lyons Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | duanelyons@quinnemanuel.com |
| Timothy Alger Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | timalger@quinnemanuel.com |
| Dominic Surprenant Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | DominicSurprenant@QuinnEmanuel.com |
| B. Dylan Proctor Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | dylanproctor@quinnemanuel.com |
| Shane McKenzie Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | shanemckenzie@quinnemanuel.com |
| Bridget Morris Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | bridgetmorris@quinnemanuel.com |
| Tamar Buchakjian Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | tamarbuchakjian@quinnemanuel.com |
| Juan Pablo Alban, Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | juanpabloalban@quinnemanuel.com |
| Dale Cendali Esq. | O'Melveny & Myers LLP | dcendali@omm.com |
| Diana Torres Esq. | O'Melveny & Myers LLP | dtorres@omm.com |
| James Jenal Esq. | O'Melveny & Myers LLP | jjenal@omm.com |
| Alicia Meyer Esq. | O'Melveny & Myers LLP | ameyer@omm.com |
| Jennifer Glad Esq. | O'Melveny & Myers LLP | jglad@omm.com |
| David Hurwitz, Esq. | O'Melveny & Myers LLP | dhurwitz@omm.com |
| Johanna Schmitt Esq. | O'Melveny & Myers LLP | jschmitt@omm.com |
| Patricia Glaser Esq. | Christensen, Glaser, Fink, Jacobs, Weil & Shapiro, LLP | pglaser@chrisglase.com |

I declare under penalty of perjury under the laws of the Untied States of America that the above is true and correct.

Executed on May 22, 2007, at San Francisco, California.

ANTHONY SALES

EXHIBIT 5
PAGE 122