1  QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
     John B. Quinn (Bar No. 090378)
2    (johnquinn@quinnemanuel.com)
     Michael T. Zeller (Bar No. 196417)
3    (michaelzeller@quinnemanuel.com)
     Jon D. Corey (Bar No. 185066)
4    (joncorey@quinnemanuel.com)
   865 South Figueroa Street, 10th Floor
5  Los Angeles, California 90017-2543
   Telephone: (213) 443-3000
6  Facsimile: (213) 443-3100

7  Attorneys for Mattel, Inc.

8              UNITED STATES DISTRICT COURT

9             CENTRAL DISTRICT OF CALIFORNIA

10                  SOUTHERN DIVISION

11  | MATTEL, INC., a Delaware corporation, | CASE NO. CV 04-9049 DOC (RNBx) |
    | | Consolidated with |
12  | | Case Nos. CV 04-09059 & CV 05-2727 |
13  | Plaintiff, | Hon. David O. Carter |
14  | vs. | MATTEL, INC.'S OPPOSITION TO THE MGA DEFENDANTS' MOTION TO VACATE RECALL PROVISIONS OF INJUNCTION, OR, IN THE ALTERNATIVE TO CLARIFY AND/OR MODIFY SUCH RECALL PROVISIONS; MOTION TO CLARIFY AND/OR LIMIT MONITOR'S AUTHORITY AS AN ADJUDICATIVE OFFICER OF THE COURT |
15  | MGA ENTERTAINMENT, INC., a California corporation, et al., | |
16  | Defendant. | |
17  | AND CONSOLIDATED ACTIONS | |
18  | | |
19  | | [Declarations of Scott L. Watson and Bridget A. Hauler submitted concurrently] |
20  | **PUBLIC REDACTED VERSION** | |
21  | | Hearing Date: November 9, 2009 |
22  | | Time: 8:30 a.m. |
    | | Place: Courtroom 9D |
23  | | **Phase 2:** |
24  | | Discovery Cut-off: June 1, 2010 |
    | | Pre-trial Conference: TBD |
    | | Trial Date: TBD |

25

26

27

28

00505.07975/3177411.1

MATTEL'S OPP. TO MGA'S MOTION TO VACATE THE RECALL PROVISIONS OF THE INJUNCTION

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................................................. 1

BACKGROUND ................................................................................... 1

ARGUMENT ....................................................................................... 12

I.   THE COURT LACKS JURISDICTION OVER MGA'S MOTION ........... 12

    A.   The Court Lacks Jurisdiction To Vacate The Order ............................ 14

    B.   The Court Likewise Lacks Jurisdiction To Consider MGA's
    "Alternative Modification" Motion ...................................................... 14

II.   MGA'S MOTION IMPROPERLY SEEKS RECONSIDERATION ............ 15

    A.   Recall Issues Have Been Litigated Extensively .................................... 16

    B.   No Change In Law Justifies Reconsideration ....................................... 16

    C.   No Changes In Fact Warrant Reconsideration ...................................... 19

III.   THE ORDER PROPERLY REQUIRES MGA TO REMOVE BRATZ
FROM RETAIL SHELVES .................................................................... 20

IV.   THE INJUNCTION ORDER PROPERLY APPLIES TO ALL
INFRINGING PRODUCTS ..................................................................... 22

V.   THE TERMS AND DEADLINES SET IN THE INJUNCTION
ORDER SHOULD NOT BE MODIFIED ................................................. 23

VI.   THE COURT APPOINTED THE MONITOR TO FILL THE
"SPECIAL MASTER" ROLE DESCRIBED IN THE INJUNCTION
ORDER ............................................................................................... 24

CONCLUSION ...................................................................................... 25

# TABLE OF AUTHORITIES

**Page**

## Cases

Abbott Spine, Inc. v. Gannon Rice Medical, Inc.,
   2006 WL 2091709 (D. Ariz. July 21, 2006)..............................18

Armstrong v. Virgin Records, Ltd.,
   91 F. Supp. 2d 628 (S.D.N.Y. 2000) ......................................23

Chere Amie, Inc. v. Windstar Apparel, Corp.,
   175 F. Supp. 2d 562 (S.D.N.Y. 2001) ...............................21, 22

Chere Amie, Inc. v. Windstar Apparel, Corp.,
   191 F. Supp. 2d 343 (S.D.N.Y. 2001) ....................................22

Cherry River Music Co. v Simitar Ent., Inc.,
   38 F. Supp. 2d 310 (S.D.N.Y. 1999)......................................21

Coastal Corp. v. Texas Eastern Corp.,
   869 F.2d 817 (5th Cir. 1989) ..............................................14

CyberMedia v. Symantec Corp.,
   19 F. Supp. 2d 1070 (N.D Cal. 1998).....................................23

eBay, Inc. v. MercExchange, LLC,
   547 U.S. 388 (2006)........................................................17

Fisher-Price Toys v. My-Toy Co.,
   385 F. Supp. 218 (S.D.N.Y. 1974) ........................................21

Giraldes v. Prebula,
   2007 WL 2688780 (E.D. Cal. Sept. 12, 2007) ...........................15

Griggs v. Provident Consumer Discount Co.,
   459 U.S. 56 (1982)..........................................................13

Ivanova v. Columbia Pictures Industries, Inc.,
   217 F.R.D. 501 (C.D. Cal. 2003)............................................3

Kiki Undies Corp. v. Promenade Hosiery Mills, Inc.,
   308 F. Supp. 489 (S.D.N.Y. 1969) ........................................21

Lewis v. Tobacco Workers' Int'l Union,
   577 F.2d 1135 (4th Cir. 1978) ............................................14

Marlyn Nutraceuticals, Inc. v. Mucos Pharma
   571 F.3d 873 (9th Cir. 2009).......................15, 16, 17, 18, 19

00505.07975/3177411.1

McClatchy Newspapers v. Central Valley Typographical Union No. 46,
    686 F.2d 731 (9th Cir. 1982) .................................................................. 13

Merit Diamond Corp. v. Frederick Goldman, Inc.,
    376 F. Supp. 2d 517 (S.D.N.Y. 2005) ....................................................... 21

Natural Resources Def. Council, Inc. v. Southwest Marine Inc.,
    242 F.3d 1163 (9th Cir. 2001) ........................................................... 13, 15

Protect Our Water v. Flowers,
    377 F. Supp. 2d 882 (E.D. Cal. 2004) ...................................................... 13

Prudential Real Estate Affiliates, Inc. v. PPR Realty, Inc.,
    204 F.3d 867 (9th Cir. 2000) .................................................................. 14

U.S. v. Vroman,
    997 F.2d 627 (9th Cir. 1993) .................................................................. 13

**Miscellaneous**

5 McCarthy on Trademarks and Unfair Competition, § 30.22, at 43 ........................... 2

Local Rule 7-18 .................................................................................. 20

## Preliminary Statement

This is the *sixth* time that MGA has asked a court to block enforcement of the Phase 1 Injunctive Order. Five times it has been turned down. The Ninth Circuit recently found that MGA's appeal of this very order did not present any substantial issues, and this Court denied MGA's most recent attempt to derail the recall only a month ago. Now, apparently hoping the transfer of the action will yield a different result, MGA once again seeks to relitigate issues that were determined conclusively by Judge Larson, in many cases on summary judgment. Prior to issuing the Injunction Order nearly a year ago, Judge Larson not only considered the entire record of a three-month trial, including millions of pages of discovery, but separately engaged in a detailed evaluation of thousands of MGA products— many of them too new even to have been considered by the jury. MGA is currently appealing that Order to the Ninth Circuit. This Court does not even have jurisdiction to grant the relief MGA seeks, nor would it be proper to do so. MGA's effort to reargue facts decided in Phase 1 and reconsider long-settled legal rulings should be rejected.

## Background

The facts of this action cannot be recited in detail within page limitations. Nevertheless, MGA's skewed recitation of the prior proceedings, which flatly conflicts with the facts as found by the jury and with rulings of the Court, requires correction.[1]

Phase 1 Overview. This case began when Mattel filed suit against Carter Bryant in April 2004, alleging state law claims based on his design of Bratz while employed by Mattel. MGA intervened in that action, claiming its copyright interests in Bratz were at stake, and the case was removed to federal court. In subsequent pleadings, Mattel

---

[1] Because the record in this case is extraordinarily large – the docket exceeds 6,000 entries – Mattel provides in the accompanying declarations only the most pertinent background documents and orders, not the full panoply of evidence before the Court when it first determined to require a recall. That evidence, including thousands of MGA products, quite literally filled a courtroom. Should the Court wish to entertain MGA's reconsideration motion – which it should not – Mattel will submit the lodged products and other materials that was before the Court previously.

1   asserted claims against MGA arising out of its aid to Bryant while he was still employed

2   at Mattel, including state law tort claims and claims of copyright infringement.  Mattel

3   also alleged trade secret thefts by MGA, of both Bratz and other proprietary information,

4   and RICO violations based on a variety of misconduct.  MGA in turn alleged that Mattel

5   violated trade dress rights in Bratz and engaged in illegal competition.

6          The district court bifurcated the trial.  The Court recognized there was overlap

7   between Mattel's Bratz-based claims arising from Bryant's Mattel employment and the

8   trade secret and RICO claims, but concluded that settling ownership of Bratz first would

9   clarify aspects of the remaining claims.[2]  The Phase 1 trial resolved that Mattel owned

10  Bratz, and that MGA should therefore stop producing and recall its infringing products.[3]

11  In particular, the Court issued a permanent injunction (the "Injunction Order"), which

12  incorporates the recall provisions, after a 13 week trial in which the jury found that: (i)

13  Bryant designed Bratz while employed by Mattel; (ii) MGA and Larian knowingly

14  interfered with his contract with Mattel; (iii) MGA and Larian aided and abetted Bryant's

15  breaches of duty, and converted Mattel's property; and (iv) MGA and Larian infringed

16  Mattel's copyrights in Bryant's Bratz designs.[4]  The jury awarded Mattel more than $100

17  million in damages.[5]

18          The Injunction Order is currently on appeal to the Ninth Circuit.  With one

19  exception, discussed below, where MGA has used the appeal to block Phase 2 discovery

20  from proceeding, the parties are proceeding with discovery as to Phase 2 claims.

21          Summary Judgment.  Although MGA voices its ongoing dissent in its motion, the

22

23  [2]  See July 2, 2007 Omnibus Order, Declaration of Scott L. Watson, filed concurrently
    ("Watson Decl.") Ex. 61.

24  [3]  See Final Verdict Form As Given, dated July 17, 2008, Watson Decl. Ex. 1; see also
    Phase B Verdict Form As Given, dated August 26, 2008, Watson Decl. Ex. 2; Order

25  Granting Declaratory Judgment, dated December 3, 2008, Watson Decl. Ex. 5; Order
    Granting Mattel, Inc.'s Motion For Permanent Injunction, dated December 3, 2008,

26  Watson Decl. Ex. 4.
    [4]  Id.

27  [5]  See Phase B Verdict Form As Given, dated August 26, 2008, Watson Decl. Ex. 2. see
    also April 27, 2009 Court Order, at 7-11, Watson Decl. Ex. 20 (denying MGA's

28  remittitur motion).

1    Court resolved before trial that Mattel's contract with Bryant was both enforceable and

2    applicable to his Bratz designs and works.  Bryant first began working for Mattel in

3    1995.  In late 1997, he moved to Missouri to live with his parents but continued to work

4    for Mattel until he quit in April 1998.[6]  Eight months later, at the start of 1999, Bryant

5    returned to Mattel to be one of a handful of designers in Mattel's "Barbie Collectibles"

6    group,[7] and entered into an Employee Confidential Information and Inventions

7    Agreement with Mattel that assigned to Mattel all doll design work he would create

8    while employed by Mattel as a doll designer.  The Court upheld the validity of that

9    Agreement on summary judgment, finding that Bryant assigned to Mattel any "Bratz-

10   related 'inventions' . . . that he is found to have created during the period of his

11   employment with Mattel."[8]  The Court also ruled that "the original Bratz drawings

12   clearly fall within the scope of the Inventions Agreement."[9]  Bryant settled with Mattel

13   shortly after summary judgment.

14          The Phase 1(a) Trial.  The timing of Bryant's creation of Bratz, and MGA's

15   knowledge thereof, was the central issue in Phase 1(a).  According to MGA, Bryant

16   created Bratz in 1998 in Missouri during the 8 month interlude between his two stints at

17   Mattel, and MGA investigated and so believed.  Overwhelming evidence controverted

18   both claims.  For example:

19          •      MGA propped up its 1998 story by noting that certain Bratz drawings, and
               a notary book relating to Bryant's Bratz drawings, bore handwritten
20             "1998" dates.  But Bryant admitted that the 1998 dates he placed on his
               Bratz drawings were not so dated in 1998 -- they were backdated later.[10]
21             As for the notary book, while Bryant claimed to have had a notary write
               "Missouri 1998" in her book after stamping his drawings to show when
22             and where they were created, the drawings were not actually notarized
               until August 1999, well into Bryant's second stint at Mattel, and Mattel's
23             expert showed that the "Missouri 1998" notation in the notary book was

---

24   [6]  See 6/17/08 PM Trial Tr. 2891:5-2893:4, Watson Decl. Ex. 84.
     [7]  See id. at 2834:16-18; 6/18/08 AM Trial Tr. at 2959:23-2960:1, Watson Decl. Ex. 85.
25   [8]  April 25, 2008 Order, at 5, Watson Decl. Ex. 7; see also Final Jury Instructions As
     Given, at No. 21, Watson Decl. Ex. 64 ("As a matter of law, the Inventions Agreement is
26   a valid and enforceable agreement."); id. at No. 23 ("As a matter of law, there was a
     valid contract between Mattel and Mr. Bryant, namely the Inventions Agreement.").
27   [9]  April 25, 2008 Order, at 4-5, Watson Decl. Ex. 7.
     [10]  See 6/12/08 PM Trial Tr. 2486:25-2487:3, Watson Decl. Ex. 69.
28

(another) *ex post* addition to the text.[11] The only Bratz drawings bearing contemporaneously-added dates bore dates in 1999, not 1998.[12]

- Bratz drawings allegedly made by Bryant in 1998 also appeared on pages torn from a notebook that had drawings and entries relating to Mattel projects that Bryant worked on in 1999.[13] Through an indentation analysis and other methods, Mattel's document expert showed that two of Bryant's earliest Bratz drawings were actually torn from a notebook that contained Bryant drawings from a Mattel "Jewel" project from 1999.[14]

- Larian instructed that no one at MGA was to discuss Bryant's involvement with Bratz outside of the company,[15] and codified that instruction in writing, e-mailing MGA's personnel that "[t]here must be no mention about Mattel or any of their properties, Carter, any MGA Bratz arts, etc."[16]

- Larian, variously: (1) identified himself, not Bryant, as the creator of Bratz[17]; (2) claimed that he, Larian, "was the inspiration behind the Bratz dolls"[18]; (3) averred that he "modeled the idea for Bratz after [his] own children who wear midriff-bearing shirts, low-rise jeans and baseball caps"[19]; (4) claimed that Bratz evolved "after a challenge from a Walmart Buyer to design and bring a product that will beat Barbie" (TX 630); (5) stated it was his son's "idea for Bratz"[20]; and (6) declared under penalty of perjury to the U.S. Patent Office that he personally created the Bratz feet, even though it is indisputable that Bryant created that invention.[21]

- While still employed by Mattel, Bryant sent MGA his signed contract from a Mattel fax machine.[22] To conceal that it had been sent from Mattel, Larian directed an MGA executive to redact the fax header from Bryant's signed contract signature page before sending it even to his own attorney.[23] The concealed fax header read "Barbie Collectibles"-- Bryant's department at Mattel. The copy sent to counsel also had the

[11] See 6/13/08 PM Trial Tr. at 2677:15-2678:5, Watson Decl. Ex. 70; 6/18/08 AM Trial Tr. at 2988:19-2989:1, Watson Decl. Ex. 85; 6/24/08 PM Trial Tr. 3600:1-8; Watson Decl. Ex. 71; 6/20/08 PM Trial Tr. 3342:11-3345:5, Watson Decl. Ex. 72.
[12] See TX 777, Hauler Decl. Ex. 2; TX 1327, Watson Decl. Ex. 79; TX 1328, Watson Decl. Ex. 59; 6/12/08 PM Trial Tr. at 2485:10-2486:8, Watson Decl. Ex. 69.
[13] See 6/13/08 PM Trial Tr. 2635:3-2636:17; 2647:10-1, Watson Decl. Ex. 70; TX 5-39-42, Watson Decl. Ex. 44; TX 4623-2-4, Watson Decl. Ex. 45; TX 10756, Watson Decl. Ex. 46; TX 13657, Hauler Decl. Ex. 3; TX 1155-C-027, Watson Decl. Ex. 47; 6/18/08 PM Trial Tr. 3133:22-3136:21; 3131:8-19, Watson Decl. Ex. 66; TX 1155-C-01-13, Watson Decl. Ex. 48.
[14] See 6/20/08 AM Trial Tr. 3297:5-3318:12, Watson Decl. Ex. 81; 6/20/08 PM Trial Tr. 3323:15-3325:9, Watson Decl. Ex. 72.
[15] See 6/12/08 AM Trial Tr. 2382:5-2383:17, Watson Decl. Ex. 68.
[16] TX 4507, Watson Decl. Ex. 49.
[17] See 6/12/08 AM Trial Tr. 2388:15-2389:6, Watson Decl. Ex. 68.
[18] TX 947 at ¶ 8, Watson Decl. Ex. 52.
[19] TX 4941, Watson Decl. Ex. 53.
[20] TX 6000, Watson Decl. Ex. 54.
[21] Compare TX 500, Watson Decl. Ex. 55, with TX 1, Watson Decl. Ex. 56; see also 6/17/08 AM Trial Tr. 2733:16-18, Watson Decl. Ex. 65.
[22] See 6/12/08 PM Trial Tr. at 2519:12-23, Watson Decl. Ex. 69.
[23] See 6/4/08 Trial Tr. 1327:23-1329:11, Watson Decl. Ex. 73.

contract signature date of September 18, 2000 whited-out.[24]

After two months of trial, the jury rejected MGA's false claims. The jury found that Bryant conceived and created dozens of Bratz designs and concepts while employed by Mattel.[25] The jury also found that that MGA and Larian were liable for every intentional tort alleged against them in Phase 1, including aiding and abetting Bryant's breaches of the duty of loyalty and his fiduciary duty to Mattel (which the jury found Bryant owed), conversion and intentional interference with contract.[26]

The Phase 1(b) Trial. The second stage of trial addressed copyright infringement and compensatory and punitive damages. On the day before trial ended, Larian took the stand to try to avoid a finding of willfulness. ██████████████

██████████ Larian testified he always believed, and his lawyers had confirmed, that Bryant created Bratz in 1998, making the purported assignment of Bratz to MGA lawful and legitimate.[28] The jury found that MGA and Larian infringed Mattel's copyrights in Bratz and awarded more than $100 million in damages, but did not award punitive damages or find that MGA had acted willfully in its infringement.[29]

This Larian testimony was knowingly false – an *ex post* fabrication designed to enable MGA to retain what it stole. ██████████████████

██████████████████████████

██████████████████████████

██████████████████████████

██████████████████████████

---

[24] Compare TX 13383, Watson Decl. Ex. 57 with TX 13621, Watson Decl. Ex. 58.
[25] See Final Jury Verdict As Given, dated July 17, 2008, Watson Decl Ex. 1.
[26] See id.; see also Final Jury Instructions As Given, Nos. 23, 28, Watson Decl. Ex. 64.
[27] August 15, 2008 *In Chambers* Hearing Tr., at 7643:25-7644:1, Watson Decl. Ex. 41 ("But I also feel very strongly about what I'm perceiving as perjury.").
[28] See generally Mattel's Motion To Compel Production Documents In Furtherance Of Crimes And Frauds and For Which MGA Waived Privilege, dated March 13, 2009, Watson Decl. Ex. 19.
[29] See Phase B Verdict Form As Given, dated August 26, 2008, Watson Decl. Ex. 2.
[30] See August 15, 2008 *In Chambers* Hearing Tr., at 7632:15-20 (emphasis added), Watson Decl. Ex. 41.

███████████████████████████████████

███████████████████.[31]  The "story"

changed to the false 1998 creation story.  Bryant backdated his Bratz drawings,[32]

Evidence Eliminator was run on his computers,[33] and Larian, for his part, committed

perjury – ████████████████████████████████

████.[34]  Given the timing of the testimony, and MGA's insistence that any production of

the e-mails must be accompanied by the proffered testimony of the unavailable lawyer

involved, Judge Larson chose only to strike the testimony.

Phase 1(c).  Phase I(c) was tried in equity to the Court.  Literally a courtroom full

of evidence was submitted.[35]  This included both products that had been before the jury

and additional ones (some new and some that MGA had never produced as ordered).[36]

The Court ruled on the basis of "the parties' briefs and exhibits submitted during Phase

1C of the trial, the argument of counsel, as well as the entire record (including the

evidence properly submitted in Phase 1A and Phase 1B of the trial) and its previous

Orders" after "carefully examin[ing] each of the exhibits attached to the proposed

preliminary injunction, as well as the actual exhibits stored in the courthouse."  Some

1,000-plus pages of exhibits were attached to Mattel's proposed injunction.  The

equitable proceeding followed 37 days of trial, which included testimony from 51

witnesses and 1,469 trial exhibits.

Following its review, on December 3, 2008, the Court made findings in equity as

to the scope of infringement to be enjoined.[37]  The Court granted declaratory relief

---

[31]  Id. at 7634:8-10.
[32]  See 6/12/08 PM Trial Tr. at 2486:25-2487:3, Watson Decl. Ex. 69.
[33]  See 6/13/08 PM Trial Tr. at 2691:10-2692:12, Watson Decl. Ex. 70.
[34]  August 15, 2008 In Chambers Hearing Tr., at 7632:15-17, Watson Decl. Ex. 41.
[35]  See December 3, 2008 Omnibus Order, at 10, Watson Decl. Ex. 3 (referencing "Courtroom Four" as the storage room for these exhibits).
[36]  See Notice of Lodging of Bratz Products in Support of Mattel Inc.'s Motion for a Permanent Injunction, dated October 14, 2008, Watson Decl. Ex. 62; Notice of Lodging of Bratz Products in Support of Mattel Inc.'s Motion for a Permanent Injunction, dated October 23, 2008, Watson Decl. Ex. 63.
[37]  See Order Granting Mattel's Motion For Permanent Injunction, dated December 3, (footnote continued)

1 affirming Mattel's ownership of Bratz.[38]  The Court imposed a constructive trust,[39]

2 enjoined MGA from continuing to sell Bratz products and ordered their recall.[40]

3       These detailed rulings were explained in a companion opinion.[41]  The Court made

4 clear the irreparable harm to Mattel, noting that it "can envision no case more

5 appropriate for a finding of irreparable harm."[42]  The Court remarked that "[a]fter

6 millions of pages of discovery are produced, thousands of filings are submitted, scores

7 and scores of motions are decided by the Court, and after months of trial and two jury

8 verdicts in favor of the plaintiff, defendants remain steadfast in their intention to

9 continue to produce their infringing products."[43]  The Court found that Mattel

10 "established irreparable injury on the basis of the MGA parties' past infringement and

11 the high probability of continued acts of infringement."[44]

12       <u>MGA's Prior Attempts to Challenge the Recall</u>.  Since ordered in late 2008, MGA

13 has repeatedly sought to stay or prolong the recall, including as recently as last month.

14       The Court specifically ruled on December 3 that its injunction orders were non-

15 final (including because MGA's JMOL motions had not yet been adjudicated).[45]

16 Nevertheless, MGA applied *ex parte* to stay the non-final orders on December 11,

17 2008.[46]  Without waiting for the Court to rule, MGA then filed a separate emergency

18

19 ───────────────────
   [38] 2008, Watson Decl. Ex. 4.

20 [39] <u>See</u> Order Granting Declaratory Judgment, dated December 3, 2008, Watson Decl. Ex. 5.

21 [40] <u>See</u> Order Granting Constructive Trust, dated December 3, 2008, Watson Decl. Ex. 6.
   [41] <u>See</u> December 3, 2008 Omnibus Court Order, Watson Decl. Ex. 3.

22 [42] <u>Id.</u>
   [43] <u>Id.</u> at 13.

23 [44] <u>Id.</u>; <u>see also id.</u> at 11-12 ("Mattel has established its exclusive rights to the Bratz drawings, and the Court has found that hundreds of the MGA parties' products --

24 including all the currently available core female fashion dolls Mattel was able to locate in the marketplace -- infringe those rights. The MGA parties have evinced an intention

25 to continue to market those dolls. This represents a wholesale inability on the part of Mattel to enforce its exclusive rights under the Copyright Act, amounting to irreparable

26 harm.").
   [44] <u>Id.</u> at 13.

27 [45] <u>Id.</u> at 16; <u>see also</u> April 27, 2009 Court Order, at 10, Watson Decl. Ex. 20.
   [46] MGA Parties' *Ex Parte* Application and Motion For Stay Pending Appeal, dated

28 December 11, 2008, Watson Decl. Ex. 25.

1  motion in the Ninth Circuit on December 19, 2008.[47] ████████████████████

2  ████████████████████████████████████████████████████

3  ██████████████████.[48]  The Court held a hearing on December 30.  Although the

4  Court denied the stay pending appeal sought by MGA (as did the Ninth Circuit, which

5  ordered briefing over Christmas[49]), the Court delayed the recall date and ruled that

6  retailers and distributors could purchase the Spring and Fall 2009 Bratz lines through

7  December 31, 2009.[50]   The December 31, 2009 deadline that MGA now complains

8  about was set at its request last January.[51]

9           The Court finalized the injunction orders, including their recall provisions, and

10  made them effective on April 27, 2009.  MGA immediately appealed all of them,[52] and

11  applied *ex parte* again for a stay pending appeal.[53]  The Court denied that request on May

12  21, 2009.[54]  MGA then filed an emergency motion in the Ninth Circuit seeking a stay.[55]

13  The Ninth Circuit again denied the stay, finding that "MGA has not met the prevailing

14  standard to show a substantial likelihood of ultimate success on the merits."[56]

15           Just one month ago, MGA orally requested a stay of the recall provisions, arguing

16  -- as it does here now -- that Bratz product should not be recalled in advance of Mattel

17  product arriving in the stores.  The Court rejected MGA's claim that "the whole point of

18  that recall order was so that it would clear the market for Mattel to come in with its

19

20  [47]  Appellants' Emergency Motion For Stay Pending Appeal, dated December 19, 2008,
21  Watson Decl. Ex. 24.
    [48]  Id. at 1.
    [49]  January 12, 2009 Ninth Circuit Order, at 2, Watson Decl. Ex. 26.
22  [50]  See December 30, 2008 Court Order, at 2, Watson Decl. Ex. 23.
    [51]  See MGA Parties' *Ex Parte* Application and Motion For Stay Pending Appeal, dated
23  December 11, 2008, at 6, Watson Decl. Ex. 25; see also January 7, 2009 Court Order,
    Watson Decl. Ex. 83.
24  [52]  See Notice of Appeal To The United States Court Of Appeals For the Ninth Circuit
    Permanent Injunction Appeal, dated May 4, 2009, Watson Decl. Ex. 16.
25  [53]  See MGA Parties' *Ex Parte* Application and Motion For Stay Pending Appeal, dated
    May 8, 2009, Watson Decl. Ex. 13.
26  [54]  May 21, 2009 Court Order, at 7, Watson Dec. Ex. 12.
    [55]  Appellants' Emergency Motion For Stay Pending Appeal Of Permanent Injunction,
27  dated May 26, 2009, Watson Decl. Ex. 11.
    [56]  June 10, 2009 Ninth Circuit Order, at 3, Watson Decl. Ex. 10.
28

1  vision of Bratz" as "mistaken."[57]   Rather, the Court explained, the recall order was

2  imposed "in light of the scope of infringement found by the Court (which was broad) and

3  in light of the fact that the Bratz dolls compete directly with existing Mattel products."[58]

4  The Court did "not see any basis to stay the proceeding or recall at this time."[59]

5          Receivership and Monitorship Proceedings.   Because MGA entered into post-

6  verdict transactions to mislead the Court and evade Court orders and refused to provide

7  accurate or adequate financial information to the Court, the Court first appointed a

8  forensic auditor to examine MGA's finances, and then appointed a temporary Receiver

9  and ultimately a Monitor to ensure compliance with Court orders.

10         On December 31, 2009, MGA filed ████████████████████████████

11 ████████████████████████████████████████████████████████████

12 ████████████████████████████████████████████████████████████

13 ████████████████████████████████████████████████████████████

14 █████████████████████████████████████████[62]  The Court held

15 Mattel's then-pending motion for a receiver in abeyance and appointed a Forensic

16 Auditor, Mr. Ronald Durkin, to determine the truth about MGA's finances.  Following

17 the Forensic Auditor's first report,[63] the Court found "just cause" to appoint a temporary

18 receiver, concluding that "it appears likely that the MGA parties, agents and related

19 entities . . . are engaged in a course of conduct with related parties designed to frustrate

20 the Court's Orders, Findings and Injunctions."[64] ███████████████████████

21

22  [57] September 22, 2009 Court Order, at 2, Watson Decl. Ex. 76.
    [58] Id.
23  [59] September 22, 2009 Hearing Tr., at 86:19-20, Watson Decl. Ex. 86.
    [60] See MGA Parties' *Ex Parte* Application and Motion For Stay Pending Appeal, dated
24  December 11, 2008, at 1-5, Watson Decl. Ex. 25; see also Declaration of Brian Wing In
    Support Thereof, dated December 11, 2008, at ¶¶ 9-10, 13, Watson Decl. Ex. 22.
25  [61] MGA Parties' Corrections To The Opposition To Mattel, Inc.'s *Ex Parte* Application
    For Appointment Of A Receiver Or For Alternative Relief, dated December 31, 2008, at
26  1, Watson Decl. Ex. 21.
    [62] Id.
27  [63] *In Camera* Report Of Forensic Auditor Ronald L. Durkin, dated April 23, 2009,
    Watson Decl. Ex. 33.
28  [64] April 27, 2009 Court Order, at 17, Watson Decl. Ex. 20.

00505.07975/3177411.1



1   ███████████████████████████████████████████████████████

2   ████████████████  Omni 808, which intervened for purposes of the receivership,

3   attacked the Auditor as racist,[66] leading to a reprimand by the Court.[67]

4       The temporary Receiver, Mr. Patrick Fraioli, became the permanent Monitor after

5   his initial term expired.  Pursuant to the Court's orders, Mr. Fraioli has assumed direction

6   of the details of the recall.  ████████████████████████████████████

7   ███████████████████████████████████████████████████████

8   ██████████████████████████████  In September, the Monitor ordered briefing from the

9   parties and held a hearing on October 13, 2009 concerning the scope of the recall.[69] ███

10  ███████████████████████████████████████████████████████

11  ███████████████████████████████████████████████████████

12  ██████████████████████████[71]

13      Phase 2 Discovery.  During Phase 2 discovery, Mattel uncovered further evidence

14  confirming that Larian perjured himself and that MGA's infringement was willful.  In

15  August, in response to an Order requiring it to produce for *in camera* review hundreds of

16  emails that it had withheld as privileged (and had "certified" to the Court were

17  privileged), MGA produced a critical October 2002 e-mail chain between Larian and

18

19  [65] See, e.g., Mattel, Inc.'s Brief In Support Of Appointment Of A Permanent Receiver,
    dated May 14, 2009, at 3, Watson Decl. Ex. 34; see also Mattel's Memorandum

20  Regarding The MGA/Omni 808 Transactions, dated May 14, 2009, at 4-11, Watson
    Decl. Ex. 35.

21  [66] See, e.g., Omni 808 Investor's, LLC's Memorandum In Support Of Its Request To
    Strike Summary And Responsive Reports Of Ronald L. Durkin, June 8, 2009, at 8-12,

22  Watson Decl. Ex. 36.
    [67] July 9, 2009 Court Order, Watson Decl. Ex. 37.

23  [68] See First Report of Monitor, dated June 19, 2009, Watson Decl. Ex. 27; Second
    Interim Report of Monitor, dated July 31, 2009, Watson Decl. Ex. 28; Third Interim

24  Report of Monitor, dated August 24, 2009, Watson Decl. Ex. 29; Fourth Interim Monthly
    Report of Monitor, dated Oct. 1, 2009, Watson Decl. Ex. 30; Fifth Interim Report of the

25  Monitor, dated October 27, 2009, Watson Decl. Ex. 32.
    [69] See Fifth Interim Report of the Monitor, dated October 27, 2009, Watson Decl. Ex.

26  32.
    [70] See id.; see also October 9, 2009 letter from Monitor's counsel to MGA's counsel,

27  Watson Decl. Ex. 38.
    [71] Fifth Interim Report of the Monitor, dated October 27, 2009, at 15, Watson Decl. Ex.

28  32.

00505.07975/3177411.1

MATTEL'S OPP. TO MGA'S MOTION TO VACATE THE RECALL PROVISIONS OF THE INJUNCTION

1  MGA executive Victoria O'Connor.[72]  The chain begins with Larian forwarding to

2  O'Connor his statement to a reporter that Bratz was "BORN ON SEPTEMBER 2000."[73]

3  O'Connor responded, stating: ***"don't you think we should say Bratz was born in***

4  ***October when a certain person was no longer with their company***?" to which Larian

5  replied, "good point.  Thanks."[74]

6      On August 31, 2009, the Court issued an Order To Show Cause regarding the

7  improper withholding of this e-mail.[75]



20                         .[79]  During Phase 2 discovery, Mattel sought

---

[72]  October 2002 e-mail chain between Larian and O'Connor, Watson Decl. Ex. 39; see also Phase 2 Discovery Matter Order No. 33, dated May 18, 2009, at 60, Watson Decl. Ex. 9; August 3, 2009 letter from A. Hurst to Discovery Master O'Brien, et al., Watson Decl. Ex. 31.

[74]  See October 2002 e-mail chain between Larian and O'Connor, Watson Decl. Ex. 39.

[74]  Id. (emphasis added).

[75]  August 31, 2009 Order, Watson Decl. Ex. 8.

[76]  September 22, 2009 In Chambers Hearing Tr., at 8:18-25, Watson Decl. Ex. 40; see also id. at 11:2-4 ("                                                    ").

[77]  Id. at 10:11-16.

[78]  Id. at 6:22; 13:7-10, Watson Decl. Ex. 40.

[79]  See September 22, 2009 In Chambers Hearing Tr., at 10:11-16, Watson Decl. Ex. 40; (footnote continued)

00505.07975/3177411.1

-11-

1   a larger group of communications than it had in Phase 1, ▮▮▮▮▮▮▮

2   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

4   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

5   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[81]

6        Instead of submitting the e-mails *in camera*, however, MGA moved for

7   reconsideration, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

8   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

9   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

10  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[83]   While flatly

11  inconsistent with MGA's current position, MGA has to date successfully avoided even in

12  camera review. Mattel has now moved for a remand under Ninth Circuit procedures to

13  ensure that there are not further unwarranted delays in obtaining this critical Phase 2

14  discovery, MGA is opposing that request, telling the Ninth Circuit it lacks jurisdiction

15  over Mattel's conditional cross-appeal even as it tells the Discovery Master that the

16  Ninth Circuit's jurisdiction over that cross-appeal divests this Court of the power to

17  proceed. [84]

18                    **Argument**

19  **I.   THE COURT LACKS JURISDICTION OVER MGA'S MOTION**

20

21  ───────────────────────────────────

see also August 15, 2008 *In Chambers* Hearing Tr., at 7643:25-7644:1; 7632:15-16, Watson Decl. Ex. 41.

[80]   See Mattel's Motion To Compel Production Of Communications Made In Furtherance Of Crimes And Frauds And As To Which MGA Waived Privilege, dated March 13, 2009, Watson Decl. Ex. 19.

[81]   Phase 2 Discovery Matter Order No. 42, dated July 29, 2009, at 9, 13, Watson Decl. Ex. 18.

[82]   See Mattel's Combined Answering Brief on Appeal and Opening Brief Of Cross-Appeal, dated August 10, 2009, Watson Decl. Ex. 42.

[83]   MGA Parties' Motion For Reconsideration Of Order No. 42, dated August 11, 2009, Watson Decl. Ex. 82; see also MGA Parties' Supplemental Memorandum In Support Of Motion For Reconsideration, dated August 18, 2009, Watson Decl. Ex. 17.

[84]   See Mattel's Motion For Limited Remand Of Cross-Appeal, dated October 13, 2009, Watson Decl. Ex. 43.

1       On May 4, 2009, MGA filed a notice of appeal of the Court's Injunction Orders.[85]

2   The Notice of Appeal is titled "Permanent Injunction Appeal" and expressly appeals "the

3   Court's December 3, January 7 and April 27 Injunctive Orders."[86]   MGA's pending

4   appeal of the order at issue in this motion deprives this Court of jurisdiction.   A district

5   court is divested of jurisdiction over an order while the order is on appeal.   See Griggs v.

6   Provident Consumer Discount Co., 459 U.S. 56, 58 (1982); see also U.S. v. Vroman, 997

7   F.2d 627, 627 (9th Cir. 1993) ("The district court was without jurisdiction to respond to

8   Vroman's motion for reconsideration because he filed it after having filed a notice of

9   appeal.") (citing Griggs); Protect Our Water v. Flowers, 377 F. Supp. 2d 882, 883 (E.D.

10   Cal. 2004) (citing Natural Resources Def. Council, Inc. v. Southwest Marine Inc., 242

11   F.3d 1163, 1166 (9th Cir. 2001)).   MGA seeks to vacate or modify an order it has

12   appealed.   MGA's appeal precludes that relief.

13       MGA claims that Rule 62(c) authorizes its motion "because of changed factual

14   and legal circumstances."[87]   But Rule 62(c) merely grants the Court power to "preserve

15   the status quo during the pendency of an appeal; it does not restore jurisdiction to the

16   district court to adjudicate anew the merits of the case."   Natural Resources, 242 F.3d at

17   1166. "Rule 62(c) codifies 'the . . . narrowly limited right of a trial court 'to make orders

18   appropriate to preserve the status quo while the case is pending in (an) appellate court.'"

19   McClatchy Newspapers v. Central Valley Typographical Union No. 46, 686 F.2d 731,

20   734-35 (9th Cir. 1982) (district court's amendment of order to require appellant to

21   reinstate employees "required a change from the status quo" and was therefore

22   improper).   Indeed, *MGA itself* argued just weeks ago that Rule 62(c) "does not allow

23   this Court to change the status quo with respect to . . . rulings so long as they're on

24   appeal."[88]   MGA made that argument to convince the Discovery Master not to proceed

25   

---

26   [85]   Notice of Appeal To The United States Court Of Appeals For the Ninth Circuit Permanent Injunction Appeal, dated May 4, 2009, Watson Decl. Ex. 16.

27   [86]   Id. at 3.
[87]   Motion at 14.

28   [88]   September 25, 2009 Hearing Tr., at 30:8-10, Watson Decl. Ex. 87; see also id. at (footnote continued)

1   on Mattel's Phase 2 discovery motion ███████████████████

2   ████████████████████████████████.[89]  The rule of divestiture

3   certainly applies to MGA's effort here to vacate or modify the very order under appeal.

### A.   The Court Lacks Jurisdiction To Vacate The Order

5       Controlling Ninth Circuit authority precludes a district court from exercising

6   jurisdiction to vacate an injunction on appeal. Prudential Real Estate Affiliates, Inc. v.

7   PPR Realty, Inc., 204 F.3d 867, 880 (9th Cir. 2000) (affirming holding that district court

8   lacked jurisdiction to vacate an injunction pending appeal). Other Circuits have held the

9   same. Coastal Corp. v. Texas Eastern Corp., 869 F.2d 817, 820 (5th Cir. 1989) (district

10  court lacked authority to dissolve injunction under Rule 62(c)); Lewis v. Tobacco

11  Workers' Int'l Union, 577 F.2d 1135, 1139 (4th Cir. 1978) (district court lacked power

12  to vacate injunction because "the district court lost its power to vacate the order when the

13  notices of appeal were filed"). The plain language of Rule 62(c) does not allow for

14  "dissolution," Coastal Corp., 869 F.2d at 819, which is what MGA seeks when it asks the

15  Court to vacate the recall provisions "in their entirety."[90]  MGA has cited no case

16  permitting the relief it seeks, and Mattel is aware of none.

### B.   The Court Likewise Lacks Jurisdiction To Consider MGA's

### "Alternative Modification" Motion

19      The Court also lacks jurisdiction to consider MGA's alternative request for an

20  order modifying the Injunction Order, which seeks to modify virtually every material

21  provision of the injunction. The Order requires MGA to "procure the return, and to

22  withdraw and recall . . . including without limitation from retail shelves" all of the

---

24  12:8-19 ("the Ninth Circuit does not view the District Court's jurisdiction under Rule
    62(c) to be very broad and enable it to do anything pertaining to the case while an
25  interlocutory injunction order is on appeal, rather, as expressed in McClatchy . . . 'Rule
    62(c) is merely expressive of a power inherent in the court to preserve the status
26  quo[.]'"); id. at 30:20-21 (the "Ninth Circuit takes a narrow view of what Rule 62
    allows").
27  [89]  See Phase 2 Discovery Matter Order No. 42, dated July 29, 2009, Watson Decl. Ex.
    18.
28  [90]  Notice of Motion at 2; id. at 1 (MGA moves to "vacate . . . the recall provisions of the
    (footnote continued)

1  infringing products.[91]  MGA asks the Court to limit that provision so MGA is only

2  required to provide notice of the injunction and facilitate voluntary return of product.[92]

3  MGA also seeks to add language limiting the temporal scope of the recall to post July 1,

4  2008 sales, claiming that the Injunction Order is "inappropriately expansive in the time

5  period it seeks to cover."[93]  MGA concededly "seeks a variety of *changes* to the timing

6  requirements."[94]  MGA even seeks to strike four paragraphs of the injunction.[95]

7      The Court lacks jurisdiction to make such alterations.  See, e.g., Giraldes v.

8  Prebula, 2007 WL 2688780, at *1 (E.D. Cal. Sept. 12, 2007) ("Clearly, the court lacks

9  authority to reconsider or alter the order denying that motion, which is currently under

10  review by the Ninth Circuit.").  Natural Resources is the only authority MGA cites in

11  support of jurisdiction.  The district court there made two clarifying modifications (for

12  example, replacing "reasonable time" with a more concrete 18 months) which the Ninth

13  Circuit called "minor adjustments that effectuated the underlying purposes of the original

14  requirements."  Id. at 1167.  MGA does not even purport to seek to "effectuate the

15  underlying purposes" of the Injunction Order, which is all Rule 62(c) permits.  See

16  Natural Resources, 242 F.3d at 1167. MGA is claiming the Injunction Order is wrong –

17  "inappropriately expansive" – and that the Court should change it.[96]  The Court lacks

18  jurisdiction to do so.

19  **II.   MGA'S MOTION IMPROPERLY SEEKS RECONSIDERATION**

20      MGA's Motion is an improper attempt to seek reconsideration following the

21  transfer of this action.  MGA's stated ground for bringing this motion now, the issuance

22  of the Ninth Circuit's opinion in Marlyn Nutraceuticals, Inc. v. Mucos Pharma, does not

23  even arguably support the motion.  Judge Larson spent years supervising this case and

24  _____

25  Court's interlocutory injunction").
    91  Injunction Order at ¶ 4, Watson Decl. Ex. 4.
26  92  Motion at 20-21; MGA's Proposed Order at 11:22-12:20.
    93  Motion at 23:16-17.
27  94  Id. at 3 (emphasis added); see also Notice of Motion at 2 ("MGA seeks modification as to certain timing and other requirements.").
    95  Motion at 25:8-10.
28

1   months adjudicating the injunction and recall issues.  As Marlyn itself makes clear, "a

2   motion for reconsideration should not be granted, absent highly unusual circumstances,

3   unless the district court is presented with newly discovered evidence, committed clear

4   error, or if there is an intervening change in the controlling law." Marlyn, 571 F.3d 873,

5   880 (9th Cir. 2009) (citation omitted).  MGA has not made that showing.

6       **A.    Recall Issues Have Been Litigated Extensively**

7       Mattel and MGA have been actively involved with the recall and related issues

8   since Mattel moved for a recall in September 2008.  ████████████████████

9   █████████████████████████████████████████████████████

10  █████████████████████████████████████████████████████

11  █████████████████████████████████████████████████████

12  █████████████████████████████████████████████████████

13  ████████████████████████████████████████████████[97]

14  This motion is not an appropriate response to that concern.

15      **B.    No Change In Law Justifies Reconsideration**

16      Marlyn, the purported new law MGA rests its Motion on, was decided nearly four

17  months ago, long before Judge Larson's latest rejection of MGA's efforts to undo the

18  recall.[98]  MGA did not even raise the case when they asked Judge Larson to vacate the

19  recall last month.  Nor has MGA raised the case in their Ninth Circuit appeal, even

20  though their reply brief was filed months after the decision was issued.

21      Marlyn involved an appeal of a preliminary injunction in a trademark infringement

22  lawsuit.  The express language of the case repeatedly makes its limits clear:

23      ***We emphasize that this case comes before us on review of a preliminary***

24      ***injunction.***  Because our review of a preliminary injunction is limited to

25  _____

26  [96]  Id. at 23.
    [97]  See October 9, 2009 letter to J. Russell (MGA's Phase 1 counsel) from counsel for

27  the Monitor, Watson Decl. Ex. 38; see also Fifth Interim Report of the Monitor, dated
    October 27, 2009, Watson Decl. Ex. 32.

28  [98]  See September 22, 2009 Order, at 2, Watson Decl. Ex. 74 (denying request to stay the
    (footnote continued)

1     the law applied by the district court and because the fully developed

2     factual record may be materially different from that initially before the

3     district court, our disposition of appeals from most preliminary injunctions

4     may provide little guidance as to the appropriate disposition on the merits.

5 Id. at 876-77 (emphasis added) (internal quotes omitted).  Likewise, the Third Circuit

6 authority the Ninth Circuit found persuasive in Marlyn held that "a district court

7 considering a motion for a ***preliminary*** injunction directing recall of a product in a

8 trademark infringement case should consider additional factors in assessing the request."

9 Id. at 879 (emphasis added).

10     MGA's reading of the case – that "a recall order is only appropriate in [the Ninth]

11 Circuit when the party seeking the recall can establish *both* factors necessary to obtain an

12 ordinary prohibitory injunction *and* has prevailed with respect to three additional

13 factors"[99] – doubly misstates the holding.  Ordering a recall of an allegedly infringing

14 product at the outset of a case on a motion for a preliminary injunction is obviously far

15 different than ordering one after years of litigation and months of trial, with the benefit

16 of the "fully developed record" the Marlyn court emphasized it lacked.  Marlyn, 571

17 F.3d at 876-77.  Moreover, even at the preliminary injunction stage, the Marlyn court

18 merely "requir[ed] the district court to *consider* [specified] factors before granting a

19 preliminary injunction directing product recall in a trademark infringement case."  Id.

20 (emphasis added).  These factors are to be balanced to do equity; nothing in Marlyn

21 requires that a plaintiff establish all seven factors as MGA states.[100]

22     MGA urges that after eBay courts do not treat preliminary and permanent

23 injunctions differently.[101]  But Marlyn itself disproves that.  The Ninth Circuit affirmed

24 the district court's presumption of irreparable harm based on proof of likely success on

25 the merits, id. at 877 – a presumption that does not apply to permanent injunction

26

_____

27   [99] recall).
  [99] Motion at 15 (emphasis in original).

28   [100] See Marlyn, 571 F.3d at 879-80.

1  motions following eBay. See eBay, Inc. v. MercExchange, LLC, 547 U.S. 388, 392-94

2  (2006) (rejecting such a presumption when traditional equitable principles require

3  otherwise). It is precisely because there *are* material differences between preliminary

4  and permanent injunctions that the Marlyn court emphasized the limited scope of its

5  holding. 571 F.3d at 876-77; see also Abbott Spine, Inc. v. Gannon Rice Medical, Inc.,

6  2006 WL 2091709, 1 (D. Ariz. July 21, 2006) (noting the "material distinction between a

7  preliminary and permanent injunction and the concomitant purposes and burdens of

8  proof associated with each"). In any case, as MGA acknowledges, "[m]andatory

9  injunctions have always required a higher standard than prohibitory ones."[102] Judge

10 Larson already considered the relevant "additional" factors identified by Marlyn.

11 Reconsideration of them would not change anything.

12      First, MGA cites the jury verdict as evidence that the Marlyn willful infringement

13 factor weighs against a recall.[103] MGA made the same argument previously when it

14 urged that it was "important to consider" that the jury did not find willful infringement

15 which "militates against an injunction."[104] The Court properly rejected MGA's argument

16 even before it became clear that MGA had been wrongfully withholding critical evidence

17 going directly to the issue of willfulness.[105]

18      The second factor is "the risk of confusion" and injury to plaintiffs weighed

19 against the burden on the defendant. Marlyn, 571 F.3d at 879. MGA offers no evidence

20 that Mattel's injury by the continued infringement and presence of competing infringing

21 products in the marketplace is less than the burden on MGA. In fact, Judge Larson held

22 to the contrary: "In light of the scope of infringement found by the Court, and in light of

23

24  [101] Motion at 16.
     [102] Id. at 14.
25  [103] Id. at 17.
     [104] MGA's Opposition To Mattel's Motion For Permanent Injunction, dated October 13,
26  2008, at 14, Watson Decl. Ex. 75.
     [105] December 3, 2008 Omnibus Court Order, Watson Decl. Ex. 3; August 31, 2009 Court
27  Order, at 2 n.1, Watson Decl. Ex. 8 (recognizing that the improperly withheld e-mail is
     directly "relevant to the issue of willfulness"); September 22, 2009 *In Chambers* Hearing
28  Tr., at 8:18-25, Watson Decl. Ex. 40.

the fact that the injunction addresses products that directly compete with Mattel's products, the Court has ordered the recall of infringing products from retailers."[106] MGA cites the September 22, 2009 Order for the proposition that "Judge Larson recently reiterated that he was not concerned about any special harm to Mattel when granting the recall order."[107] In fact, that Order explained that the recall was imposed "in light of the scope of the infringement found by the Court (which was broad) and in light of the fact that the Bratz dolls compete directly with existing Mattel products."[108] Therefore, the "the rationale underlying the recall Order remains firmly intact."[109]

The last factor – risk of danger to the public – is simply inapt in an intellectual property case involving dolls. It should be given little weight. Even considering all three additional Marlyn factors, the balance clearly weighs in favor of a recall.

### C.   No Changes In Fact Warrant Reconsideration

MGA argues that the September 2009 declaration of Mr. Kilpin, ████████ ████████████████████████████, reflects a materially changed position from that advanced by Mattel in May 2009.[110] MGA is wrong on the facts and their significance.

First, MGA is wrong in its assumption that the date of Mattel's launch of Bratz is material. The recall order was imposed "*in light of the fact that the Bratz dolls compete directly with existing Mattel products*."[111] The Court expressly rejected the contention that 'the whole point of that recall order was so that it would clear the market for Mattel to come in with its vision for Bratz."[112] Thus, the recall is not dependent on Mattel's ability to put product on the shelf at a certain date. In fact, there were no references to Bratz launch dates at all in the original briefing on Mattel's recall motion; nothing in that

---

[106] December 3, 2008 Omnibus Order, at 14, Watson Decl. Ex. 3.
[107] Motion at 16.
[108] September 22, 2009 Court Order, at 2, Watson Decl. Ex. 74.
[109] Id.
[110] Motion at 12.
[111] September 22, 2009 Court Order, at 2, Watson Decl. Ex. 74 (emphasis provided); December 3, 2008 Omnibus Order, at 14, Watson Decl. Ex. 3.
[112] September 22, 2009 Order, at 2, Watson Decl. Ex. 74.

1 record evidenced that Mattel was *ever* going to make Bratz.[113]  The Injunction Order

2 issued six months before the May 2009 representation that MGA claims was recently

3 changed, showing its insignificance for present purposes.  Because Mattel's timeframe

4 for launching product is irrelevant to the recall, any purported change in that timeframe

5 is not a "material" new fact.  Local Rule 7-18.

6        Second, MGA misrepresents the current status of Mattel's productions and its

7 commitment to produce and market Bratz.[114] ██████████████████████████████

8 ████████████████████████████████████████████████████████████████████████

9 ████████████████████████████████████████████████████████████████████████

10 ████████████████████████████████████████████████████████████████████████

11 ███████████████████████████████████████",[116]

12 **III.    THE ORDER PROPERLY REQUIRES MGA TO REMOVE BRATZ**

13        **FROM RETAIL SHELVES**

14        The Injunction Order expressly requires MGA to "sweep the shelves."  Paragraph

15 4 states: "Defendants are hereby ORDERED to *procure the return, and to withdraw* and

16 recall . : . including without limitation *from retail shelves* and from on-line retailers, *all*

17 of the dolls" described in the Order.[117]  MGA "summarizes" this language as requiring

18 only a "request" that products be returned and argues it is not required to ensure retailers

19 "remov[e] the product from the shelves,"[118] but that is *exactly* what is required.[119]

20        MGA argues that reading Paragraph 4 to require more than a "request" to retailers

21

22 ────────────────────────────
   [113] See December 30, 2008 Hearing Tr. at 32:2-33:15-17, Watson Decl. Ex. 78.
   [114] Motion at 18.

23 [115] Fifth Interim Report of the Monitor, dated October 27, 2009, at 5, Watson Decl. Ex. 32.

24 [116] Id.
   [117] Injunction Order at ¶ 4 (emphasis added), Watson Decl. Ex. 4.

25 [118] Motion at 20:10.
   [119] MGA cites a dictionary definition of "recall" as evidence that it is only required "to

26 ask or order to return."  Motion at 20:1-3.  But Paragraph 4 also orders MGA to "procure the return" of and "withdraw" the infringing products from shelves, not just recall them.

27 "Procure" means "to get possession of; obtain by particular care and effort," and "withdraw" means "to take back or away, to remove from use."  See

28 http://www.merriam-webster.com/dictionary/procure;          http://www.merriam-
   (footnote continued)

1  would render Paragraph 6 "surplusage."[120] That has it backwards. Paragraph 6 requires

2  MGA to send notice of the Court's order requiring that dolls be returned.  MGA's

3  argument here – that nothing other than the notice and payment of shipping described in

4  Paragraph 6 is required – would render Paragraph 4 meaningless.  Paragraph 4 plainly

5  requires more than merely notice to retailers; it requires MGA, once it gives notice, to

6  "procure the return, and to withdraw and recall . . . from retail shelves" all of the

7  infringing products.  Any hardship that MGA suffers in recalling infringing products

8  owes to its choice to continue selling infringing products even as the recall deadlines

9  approach.    Courts reject claims of hardship by defendants who continue selling

10  infringing products in the face of a potential (much less actual) impending recall order

11  and thereby "deliberately sail[] into harm's way."  Cherry River Music Co. v Simitar

12  Ent., Inc., 38 F. Supp. 2d 310, 323-24 (S.D.N.Y. 1999) (ordering recall despite potential

13  burdens to defendant).  And the balancing of hardships has already been done; the Court

14  balanced them before it issued the Injunction Order.[121]  There is nothing troublesome

15  about the Court's requirement that MGA take an active role in removing its infringing

16  products from the marketplace.  Such orders are commonplace.[122]  MGA misrepresents

17  the cases it cites as upholding recall orders "only because they did *not* impose" a

18  requirement that the defendant actively ensure removal of product from the shelves.[123]

---

20  [120] webster.com/dictionary/withdraw, Watson Decl. Ex. 76.
   [120] Motion at 21:2-11.
21  [121] See December 3, 2008 Omnibus Order, at 13-14, Watson Decl. Ex. 3.
   [122]  See, e.g., Fisher-Price Toys v. My-Toy Co., 385 F. Supp. 218, 223 (S.D.N.Y. 1974)
22  (ordering that "defendant make a diligent effort to recall all infringing dolls already
   distributed so that they, too, may be destroyed"); Chere Amie, Inc. v. Windstar Apparel,
23  Corp., 175 F. Supp. 2d 562, 566 (S.D.N.Y. 2001) (finding contempt of recall order where
   defendant failed to demonstrate the "steps it took to carry out the recall"); Kiki Undies
24  Corp. v. Promenade Hosiery Mills, Inc., 308 F. Supp. 489 (S.D.N.Y. 1969) (requiring
   defendant to "[e]xercise its best efforts to withdraw from its customers, retailers and all
25  others all of the materials" subject to the injunction).
   [123]  Motion at 20:11-12.  For example, in Merit Diamond Corp. v. Frederick Goldman,
26  Inc., 376 F. Supp. 2d 517, 527 (S.D.N.Y. 2005), the court granted a preliminary
   injunction and ordered that the infringing products be "*completely removed from store
27  shelves,*" stressing that the injunction would be "greatly diminished, if not completely
   vitiated" if the "infringing items are not withdrawn from store shelves."  MGA's
28  argument that it would have to drive around to stores and purchase back all products at
   (footnote continued)

1    The Court appointed the Monitor to ensure that MGA comply with its Orders and
2    to protect Mattel's valuable property pending the recall and full implementation of the
3    Injunction Order. The Monitor has made every effort to work with both sides to ensure
4    compliance with the Order. MGA has failed to comply. ▮▮▮▮▮▮▮▮
5    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
6    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
7    ▮▮▮▮▮▮▮▮▮    Failure to actively carry out a recall order by ensuring
8    removal of infringing product from the shelves is contempt. See Chere Amie, Inc. v.
9    Windstar Apparel, Corp., 191 F. Supp. 2d 343, 352 and 175 F. Supp. 2d 562, 565-66
10   (S.D.N.Y. 2001) (after defendant was ordered to recall any products bearing an
11   infringing mark, court imposed contempt sanctions because defendant had not
12   determined "if or how [retailers] w[ere] proceeding with the recall" and had "unilaterally
13   fashioned recall procedures" designed to frustrate the recall process).[125] MGA cannot
14   now avoid the consequences of its non-compliance by rewriting the Injunction Order.

15   **IV.    THE INJUNCTION ORDER PROPERLY APPLIES TO ALL**
16   **        INFRINGING PRODUCTS**

17       The Injunction Order clearly applies to infringing products wherever they are
18   located. After the Court so ordered, MGA argued the alleged impropriety of these
19   provisions in both its December 2008 and May 2009 stay applications.[126] The Court and

20   ────────────────────────────
21   retail prices (Motion at 21:12-24) is silliness, and ▮▮▮▮▮▮▮▮▮▮▮▮
22   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
23   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

24   [124] Letter from Randall Leff to Jason Russell, dated October 9, 2009 at ¶¶ 5, 8, Watson
     Decl. Ex. 38; see also Fifth Interim Report of the Monitor, dated October 27, 2009 at 9-
25   15, Watson Decl. Ex. 32.
     [125] See also 5 McCarthy on Trademarks and Unfair Competition, § 30.22, at 43
26   ("Diligent compliance with the terms of an injunction is needed to avoid contempt.
     More is required than a grudging, half-hearted or foot dragging attempt at compliance."))
27   [126] See MGA Parties' Ex Parte Application and Motion for Stay Pending Appeal, dated
     December 11, 2008, at 15:11-17, Watson Decl. Ex. 25; see also MGA's Ex Parte
28   Application for Stay Pending Appeal, dated May 8, 2009 at 19, 21, Watson Decl. Ex. 13.

1    the Ninth Circuit both then rejected MGA's arguments.[127]

2          There is no reason to reassess the Court's prior determinations on this issue now.

3    MGA's own cases recognize that where extraterritorial conduct is "part of, or a

4    consequence of, an act of infringement occurring within the United States," it is

5    actionable under the Copyright Act. <u>CyberMedia v. Symantec Corp.</u>, 19 F. Supp. 2d

6    1070, 1079 (N.D Cal. 1998); <u>see also</u> <u>Armstrong v. Virgin Records, Ltd.</u>, 91 F. Supp. 2d

7    628, 634-36 (S.D.N.Y. 2000) ("[T]o the extent that any of the foreign defendants in this

8    action could be found contributorily or vicariously liable for acts of subsequent

9    infringement within the United States, this Court would possess subject matter

10   jurisdiction over Armstrong's Copyright Act claims against those defendants."). That

11   rule clearly applies here as the voluminous trial record shows. Moreover, defendant

12   MGA Hong Kong – MGA's Hong Kong subsidiary that manufactures and sells Bratz

13   dolls – is specifically named in the Injunction Order and is subject to its terms.[128] And,

14   the Injunction Order is not based solely on the Copyright Act but also on Mattel's state

15   law claims for unfair competition, breach of fiduciary duty, breach of duty of loyalty,

16   and breach of contract, all of which support the injunctive relief the Court has granted.

17   That the Injunction Order may require defendants to take action both within and outside

18   of the United States is immaterial.[129]

19   V.    **THE TERMS AND DEADLINES SET IN THE INJUNCTION ORDER**

20         **SHOULD NOT BE MODIFIED**

21         MGA claims that the Injunction Order is "inappropriately expansive" and that its

22   deadlines "no longer make sense."[130]   Neither argument is properly raised here, and

23

---

24   [127]  May 21, 2009 Order at 7, Watson Decl. Ex. 12; June 10, 2009 Ninth Circuit Order, at 3, Watson Decl. Ex. 10.
     [128]  See Injunction Order at 2 and ¶¶ 1, 2, Watson Decl. Ex. 4.

25   [129]  See Ivanova v. Columbia Pictures Industries, Inc., 217 F.R.D. 501, 509 (C.D. Cal.

26   2003) (noting that "any effort by [defendant] to license the 34 Pictures for distribution in any country or in any medium would be a contempt" of the Permanent Injunction

27   "prohibit[ing] him from 'licensing, distributing, marketing, offering for distribution or sale, or otherwise exploiting or benefitting from'" the infringing works).
     [130]  Motion at 24-25.

28

1  MGA provides no basis for modification. MGA argues that the requirement that it send

2  recall notices to all retailers and distributors to whom it has sold infringing products is

3  unduly burdensome.[131]   But MGA does not explain what would be especially

4  burdensome about sending a form letter to its pre-July 2008 customers. Providing notice

5  to all those who bought infringing product from MGA is critical not only to an effective

6  recall, but to protect MGA's purchasers from infringement actions if they continue to sell

7  infringing products. Likewise, MGA's argument that recall of pre-July 2008 products

8  will somehow result in a double recovery for Mattel is baseless. The recall is not a

9  "recovery" at all; it is designed to avoid still further harm to Mattel.

10       MGA also argues that, "[i]n light of the year-long stay," certain of the deadlines in

11  the Injunction Order "no longer make sense."[132] MGA asserts that the Injunction Order

12  was originally expected to "go into effect immediately" and that as originally conceived,

13  "retailers and distributors would receive no advance notice."[133] As a purported remedy,

14  MGA now proposes to give itself much *longer* periods of time to comply.[134] MGA has

15  not justified the wholesale revision of the deadlines set forth in the Court's Injunction

16  Order which it seeks. And it defies logic that MGA should receive extended deadlines

17  for compliance with the Order based on "the year-long stay."

18  **VI.   THE COURT APPOINTED THE MONITOR TO FILL THE**

19       **"SPECIAL MASTER" ROLE DESCRIBED IN THE INJUNCTION**

20       Again omitting the actual language of the Orders it purports to construe, MGA

21

22  [131] Id. at 23-24.
    [132] Id. at 24.
23  [133] Id.
    [134] The Injunction Order states that MGA "shall fully comply with Paragraph 6 of this
24  Order within two (2) calendar days," a deadline which MGA proposes to extend to
    "twenty-one (21) calendar days." Watson Decl. Ex. 4. The Order provides that MGA
25  "shall fully comply with Paragraph 5 of this Order within seven (7) calendar days,"
    which MGA extends to "twenty-one (21) calendar days." MGA extends the amount of
26  time it has to fully comply with Paragraphs 3 and 4 of the Order from 30 to 60 days. The
    Order requires MGA to deliver infringing products it receives "to Mattel's counsel
27  within two (2) calendar days," and MGA proposes to extend this deadline to 14 calendar
    days. Finally, MGA purports to extend the deadline to report to the Court on its
28  compliance from 40 to 70 calendar days. Compare Injunction Order at ¶¶ 8 and 9,
    (footnote continued)

1  claims that the Court "did not appoint" the Special Master contemplated by the

2  Injunction Order.  But the May 21 Order appointing the Monitor is clear:

> The Monitor shall monitor compliance by the parties with this Court's
> Injunction and other Orders as directed by the Court, specifically this
> Court's December 3, 2008, Order Granting Mattel, Inc.'s Motion for
> Permanent Injunction, January 7, 2009 Order re Modification and Stay of
> Permanent Injunction Order, and April 27, 2009 Omnibus Order (the
> "Injunction Orders"); . . . At the appropriate time, the Monitor shall direct
> the MGA turnover to Mattel of any of the Bratz Assets subject to recall,
> impoundment, or destruction, as set forth in this Court's Injunction Orders
> of December 3, 2008, and as otherwise directed by the Court.[135]

8  These are the exact duties contemplated by the Special Master portion of the

9  Injunction Order.[136]  Indeed, the Court's December 3 Order specifically named Patrick

10  Fraioli, who is currently serving as the Monitor, as a candidate for the Special Master

11  position.[137]  The Monitor is clearly serving as the Injunction Order's contemplated

12  Special Master.  To the extent there is any confusion, the Court should clarify so.

13  Finally, regardless of what role the Monitor is filling at present, MGA has provided no

14  grounds for its request to strike paragraphs 10-13 of the Injunction Order.[138]

### Conclusion

16  For the foregoing reasons, MGA's Motion should be denied in its entirety.

17  DATED:  October 29, 2009          QUINN EMANUEL URQUHART OLIVER &
                                      HEDGES. LLP

19                                    By /s/ Michael T. Zeller
20                                       Michael T. Zeller
                                         Attorneys for Mattel. Inc.

---

[135] Watson Decl. Ex. 4 with MGA Proposed Order to Vacate at 17, ¶¶ 8 and 9.
[136] May 21, 2009 Court Order at 10-11, Watson Decl. Ex. 12.
[137] See Injunction Order at ¶ 10, 11, Watson Decl. Ex. 4.
      December 3, 2008 Omnibus Order, at 16-17, Watson Decl. Ex. 3.

[138] Motion at 25:8-10.