# Exhibit 37

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA 92501
CIVIL MINUTES -- GENERAL

Case No. CV 04-09049 SGL(RNBx)                      Date: July 9, 2009
Title:      MATTEL, INC. V. MGA ENTERTAINMENT, INC., et al.
==================================================================
PRESENT:   HONORABLE STEPHEN G. LARSON, U.S. DISTRICT JUDGE

|                          |                          |
|--------------------------|--------------------------|
| Cindy Sasse              | None Present             |
| Courtroom Deputy         | Court Reporter           |

| ATTORNEYS PRESENT FOR PLAINTIFFS: | ATTORNEYS PRESENT FOR DEFENDANTS: |
|-----------------------------------|-----------------------------------|
| None Present                      | None Present                      |

**PROCEEDINGS:**   ORDER GRANTING EX PARTE APPLICATION RE TEMPORARY
RECEIVERSHIP (DOCKET #5728)

ORDER GRANTING EX PARTE APPLICATION RE COST
SHIFTING (DOCKET #5865)

ORDER GRANTING IN PART EX PARTE APPLICATION FOR
RELEASE OF JUROR TRANSCRIPTS (DOCKET #5805)

ORDER GRANTING IN PART MATTEL'S MOTION RE
DISCOVERY MASTER ORDER NO. 27 AND REMANDING
DISCOVERY MASTER ORDER NO. 27 FOR
RECONSIDERATION BY THE DISCOVERY MASTER IN LIGHT
OF THE FILING OF THE TAAC (DOCKET #5561)

ORDER DENYING MOTION TO STRIKE THE FORENSIC
AUDITOR'S REPORTS (DOCKET #5705)

EXHIBIT 37 PAGE 710

## I. ORDER GRANTING EX PARTE APPLICATION
## RE TEMPORARY RECEIVERSHIP (DOCKET #5728)

Because the only opposition to the Ex Parte Application regarding the winding up of the Temporary Receivership involves the issue of cost-shifting, which is addressed separately, below, the Court **GRANTS** the Ex Parte Application. A separate order addressing this Ex Parte Application has been concurrently filed.

## II. ORDER GRANTING EX PARTE APPLICATION RE
## COST SHIFTING (DOCKET #5865)

The MGA parties' opposition to the Temporary Receiver's Ex Parte Application argued that the costs of the Temporary Receivership should be shifted to Mattel (as the party who sought appointment of a Temporary Receiver). However, the Court has previously ruled that, at some yet-to-be defined date in the future, the Court will consider whether to shift the costs of both the Temporary Receivership and the Forensic Audit. Therefore, Mattel filed an Ex Parte Application seeking either to be relieved of the responsibility to respond to the MGA parties' argument or, alternatively, for an order setting a briefing schedule on the issue. It is not the intention of the Court to address the cost-shifting issue at this time; rather, as the Court has stated previously on the record, that issue is more efficiently resolved at a later date, most likely a date after completion of Phase 2 of the trial. Accordingly, the Court **GRANTS** Mattel's Ex Parte Application re Cost Shifting. Mattel is relieved of any duty to respond to MGA's argument regarding the appropriate allocation of costs arising from the Temporary Receiver that is set forth in the MGA parties's June 26, 2009 Opposition to the Temporary Receiver's Ex Parte Application.

## III. ORDER GRANTING IN PART EX PARTE APPLICATION FOR
## RELEASE OF JUROR TRANSCRIPTS (DOCKET #5805)

The Court has received and reviewed the MGA Parties' Ex Parte Application For Partial Release of *In Camera* Juror Interview Transcripts, as well as the Opposition, the Reply, and the accompanying exhibits. The Court **GRANTS IN PART** the Ex Parte Application. Although the Court declines to award the relief sought, the Court will take steps to ensure that the transcript of the juror interviews are provided to the Ninth Circuit for its consideration of the appeal filed by the MGA parties.

The relevant *in camera* juror interviews were conducted on July 25, 2008; the findings made by the Court on the basis of those interviews are set forth in detail in the Court's Order Denying Motion for Mistrial, dated August 8, 2008. Counsel for the parties agreed that the juror interviews, which were conducted mid-trial, should be conducted *in camera*, and the MGA parties did not request that the Court grant them access to the transcripts to prepare their Motion for Mistrial. The Court indicated on the

MINUTES FORM 90
CIVIL -- GEN                                2                    Initials of Deputy Clerk __cls_____

EXHIBIT 37 PAGE 71

record around the time of the filing of the Motion for Mistrial that it was not the Court's intent to grant the parties access to the transcripts.

After the conclusion of the trial, the MGA parties did not at any time request this Court grant access to the transcripts. To the contrary, some ten months passed between the date of the Order Denying Motion for Mistrial and the MGA parties' first post-trial request for access to those transcripts. That request was made to the Ninth Circuit, not this Court, on June 10, 2009. When the Ninth Circuit denied the request in favor of the MGA's presentation of the issue to this Court in the first instance, the MGA parties thereafter filed the present Ex Parte Application in a expeditious manner.

Ostensibly, as set forth in both the Motion filed before the Ninth Circuit and the Ex Parte Application before this Court, the reason the MGA parties seek access to those transcripts is so that they may use them to challenge the Court's Order Denying Motion for Mistrial. Although the MGA parties filed its Notice of Appeal on May 4, 2009, and although that Notice clearly indicated that the Order Denying Motion for Mistrial would be implicated in the appeal, the MGA parties failed to file its Motion seeking release of the transcripts until June 10, 2009. The MGA parties' failure to seek this relief until a month after they filed their Notice of Appeal and a month before their opening brief was due, and their decision to present the issue of release of the transcripts to the appellate court (rather than this Court) in the first instance, created the very urgency that cause them to seek ex parte relief from this Court. As such, the Court declines to grant the relief sought.

Nevertheless, in the interest of due process and in order to facilitate the full consideration of the issue by the Ninth Circuit, the Court will take steps to ensure that the transcripts of the *in camera* interviews are provided to the Ninth Circuit for *in camera* filing.

## IV. ORDER GRANTING IN PART MATTEL'S MOTION RE DISCOVERY MASTER ORDER NO 27 AND REMANDING DISCOVERY MASTER ORDER NO. 27 FOR RECONSIDERATION BY THE DISCOVERY MASTER IN LIGHT OF THE FILING OF THE TAAC (DOCKET #5561)

In the challenged portion of Discovery Master Order No. 27 ("DM Order No. 27"), the Discovery Master denied Mattel's Motion to Compel discovery sought by service of a subpoena on non-party Bingham McCutchen LLP ("Bingham"), a law firm that represents Intervenor Omni 808, as well as a number of non-party entities that are familiar to those involved in this litigation: OmniNet Capital, LLC ("OmniNet"), Vision Capital, LLC ("Vision"), IGWT Group, LLC ("IGWT"), and IGWT 826 Investments, LLC ("IGWT 826"). Broadly categorized, the subpoena sought production of (1) fee agreements relating to Vision and Omni 808; (2) documents regarding the formation, control, and financing of Omni 808, Vision, and Lexington Financial Limited

MINUTES FORM 90
CIVIL -- GEN                                    3                    Initials of Deputy Clerk __cls_____

EXHIBIT 37 PAGE 712

("Lexington"); (3) documents identifying stakeholders and officers of Omni 808, Vision, and Lexington; (4) all contracts relating to Omni 808, Vision Capital, and Lexington; (5) all communications relating to Omni 808, Vision Capital, and Lexington, excluding attorney-client privileged documents; and (6) Bingham's representation of MGAE and certain named individuals who have some connection with MGAE, including a number of Mr. Larian's family members.

The Discovery Master correctly recognized the essential legal standard in assessing whether a subpoena may be enforced. The information must satisfy the discovery relevance standard, i.e., it must be "'reasonably calculated to lead to the discovery of admissible evidence.'" DM Order No. 27 at 19 (quoting Fed. R. Civ. P. 26(b)(1)). The decision of whether to enforce a subpoena ultimately implicates a balancing test that pits relevance of the materials sought and need to the requesting party against hardship to the party resisting the subpoena. DM Order No. 27 at 20. Non-parties are generally required to bear lesser burdens than parties in responding to subpoenas. Exxon Shipping Co. v. United States Dept. of Interior, 34 F.3d 774, 779 (9th Cir. 1994) ("The Federal Rules also afford nonparties special protection against the time and expense of complying with subpoenas.").

However, the Discovery Master overstated the burden of proof allocated to Mattel, as the party seeking discovery. See DM Order No. 27 at 20 ("As the party moving to compel compliance with the subpoena, Mattel bears the initial burden of establishing that the information sought is relevant and necessary to the claims or defenses at issue.") This standard is both overstated and incomplete. It is overstated in that Mattel need not show that the evidence sought is "necessary to the claims or defenses." Although Mattel indeed bears the burden of establishing relevancy, that showing is not one of "necessity." Rather, Mattel must bear the burden of establishing the discovery relevancy standard -- that the materials sought are "reasonably calculated to lead to the discovery of admissible evidence" -- is met. It need not establish that the materials sought are "necessary" to its case.

This point leads to the manner in which the stated burden is incomplete. As clearly articulated by cases cited by Bingham, although Mattel bears an initial burden of establishing relevancy, the party resisting discovery thereafter has the burden of establishing that discovery should be denied. See Bryant v. Ochoa, 2009 WL 1390794 at *1 (S.D. Cal. 2009) ("The party seeking to compel discovery has the burden of establishing that its request satisfies the relevancy requirements of Rule 26(b)(1). . . . Thereafter, the party opposing discovery has the burden of showing that the discovery should be prohibited, and the burden of clarifying, explaining or supporting its objections."); DIRECTV, Inc. v. Trone, 209 F.R.D. 455, 458 (C.D. Cal. 2002) (same); see also Blankenship v. Hearst Corp., 519 F.2d 418, 429 (9th Cir. 1975) (reversing the district court's issuance of a protective order based on a failure of the party resisting discovery to meet its burden by asserting that the defendant's deposition would merely yield cumulative evidence).

EXHIBIT 37 PAGE 713

The effect of this subtle variation on the burden of proof from that stated by the Discovery Master is magnified by the recent filing of the TAAC, which significantly heightens the relevancy of the issue of how the MGA parties and the parties represented by Bingham may be related, the formation of certain of those entities, and other issues implicated by Mattel's requests. Because the question of relevance is featured so prominently in the quintessential balancing test to which the present discovery motion was subjected, the filing of the TAAC dramatically altered the calculus that underlies the conclusions reached in DM No. 27.

For reasons related to judicial economy and preservation of scarce judicial resources (which this case has stretched to the outer limits), the Court defers decision, in light of the changed calculus that has occurred as the result of the filing of the TAAC, of the issues presented in the challenged portions of DM No. 27 to the Discovery Master. For that reason, the Court **REMANDS** the challenged portions of DM No. 27 to the Discovery Master for his reconsideration and re-balancing in light of the recently filed TAAC. The Discovery Master may, in his discretion, set the matter for further briefing and/or hearing, he may take the matter under submission based on the existing record, or he may take other action as he deems appropriate to resolve the present issues.

Notwithstanding the remand of DM Order No. 27, one issue raised by Mattel requires further consideration by the Court. At page 25 of DM Order No. 27, the Discovery Master appears to impose a blanket prohibition on discovery of materials that are in the possession of a subpoena recipient, but that are related to a non-party over whom the Court has not been shown to have jurisdiction. The Discovery Master cites no legal authority for such a blanket prohibition, and the Court, in its own research, has found none. Such a blanket prohibition precludes the application of the balancing test that applies almost universally to discovery motions; accordingly, and because this blanket prohibition is unprecedented, the Court finds that it is contrary to law. As to this narrow issue, the Court **GRANTS** Mattel's Motion. The issue of discovery of materials relating to Lexington is **REMANDED** to the Discovery Master for reconsideration in light of this ruling and in light of the filing of the TAAC.

## V. ORDER DENYING MOTION TO STRIKE
## THE FORENSIC AUDITOR'S REPORTS (DOCKET #5705)

In an unsealed filing that has since been ordered sealed by the Court, counsel for Omni 808 Investors, LLC ("Omni 808"), Todd E. Gordinier, made unwarranted, unsubstantiated personal attacks against the Court-Appointed Forensic Auditor, Ronald L. Durkin. Mr. Gordinier's selective public disclosure of portions of the Forensic Auditor's Summary Report, coupled with the maintenance of the Summary Report, as well as the later-filed Responsive Report and Final Report, under seal in their entirety, has led to an unbalanced public presentation of the issues discussed therein. In an

attempt to cure this deficiency, the Court has considered the possibility that it should simply unseal the relevant Reports and allow those Reports to speak for themselves.

Because the MGA entities were the primary subject of the Forensic Audit, the MGA parties have, quite understandably, objected to the proposed unsealing. Mattel, for its part, advocates quite emphatically, and not unreasonably, that the Reports should be unsealed in light of the selective disclosure. See Tr. at 31-32 ("It's the underlying analysis that refutes the selective disclosures that MGA and Omni made in a public forum to smear . . . both Mr. Durkin and Mattel.") At the other end of the spectrum, Omni 808 has moved to strike the Reports in their entirety.

In the end, although the Court does not order the unsealing of the Reports, it DENIES the Motion to Strike. The Court ordered the Forensic Audit to evaluate whether a receiver should be appointed; as the record bears witness, the Court eventually rejected the suggestion that it should appoint a permanent receiver, and the Court has instead appointed an MGA Monitor with more limited powers than a receiver. Nevertheless, the fact that the Reports were intended to serve a very limited purpose does not mean that there is no possibility that the Forensic Auditor's Reports will not serve any purpose henceforth.

As it currently stands, the Court ORDERS that no party shall cite to or rely upon the Reports for any purpose absent further Order of this Court.[1]  However, the documents attached to the Reports, to the extent they are otherwise discoverable, are not insulated from discovery on the basis that they have been made part of the Reports. Conversely, documents, such as charts and interview notes, that were prepared by the Forensic Auditor are the property of the Court and are not subject to discovery or use in this or any other litigation by any party or non-party.[2]

Had it been counsel for the MGA parties who mounted the unwarranted, unsubstantiated, and public personal attacks on Mr. Durkin, the Court would find, notwithstanding the sensitive information contained therein, the unsealing of the Reports was an appropriate remedy for the selective disclosure.[3]  However, here, it is

---

[1] This Order does not supersede the Court's Order permitting the Forensic Auditor to share information with the Court-Appointed Monitor.

[2] Toward that end, the Court CLARIFIES to the parties that the work papers, drafts, notes, detailed time records, and any other materials prepared by or at the direction of the Forensic Auditor are the property of the Court. The Court ORDERS the Forensic Auditor, as the custodian of those records on behalf of the Court, to retain those materials, whether maintained in electronic, hard copy, or any other medium, until further order of the Court.

[3] As it stands, counsel for MGAE, James I. Stang, wisely sought, and was granted, leave to file his more restrained, but just as unwarranted and unsubstantiated, personal attacks on Mr. Durkin under seal. See MGA Entertainment, Inc.'s Response to Final In Camera Report of Forensic Auditor Ronald L.

MINUTES FORM 90
CIVIL -- GEN                              6                    Initials of Deputy Clerk __cls_____

counsel for Omni 808 who made those attacks public, and although Mattel maintains that both the MGA parties and Omni 808 are jointly responsible for the selective disclosure, see July 6, 2009, Tr. at 33, whether, or to what extent, the MGA parties act or have acted in concert is an issue to be decided in Phase 2 of this action.

Nevertheless, Mr. Gordinier's attack on Mr. Durkin cannot pass without comment by the Court. The Court's comments are directed toward Mr. Gordinier personally, which is not the Court's usual practice. Although the irony of this form of address is not lost on the Court (given the subject of this Order), it is appropriate. Mr. Gordinier signed all three filings in which the personal attacks appear, and continues to stand behind those filings. Moreover, Mr. Gordinier expressly and unabashedly claimed personal responsibility for the brief that was not filed under seal, by both stating that he gave it a lot of thought before filing it and by implicitly acknowledging that although he considered filing his brief under seal, he ultimately rejected that course of action. See May 18, 2009 Tr. at 46-47 ("My brief speaks for itself. We have nothing to hide. . . . I didn't feel it appropriate, necessary, or desirable to file my brief under seal. And I don't have a problem with the Court or anybody reading what I have to say, because I gave it a lot of thought, and I gave it at lot of consideration.").

At the July 6, 2009, hearing, the Court outlined its concerns that while the attacks on Mr. Durkin were public, the Reports are not, and that "it doesn't seem fair" to the Court to allow those allegations to stand alone without a chance to respond to them. July 6, 2009, Tr. at 25-26. In response, Mr. Gordinier contended that his comments "respond[ed] to the report," and that "[w]hat we said was that there were problems with that report." July 6, 2009, Tr. at 28. This statement is an implicit denial that any personal attacks were made; however, as set forth in great detail below, the record belies Mr. Gordinier's post hoc protestations.

Lest Mr. Gordinier's statement reflecting his implicit denial that he engaged in personal attacks be perceived as one being made at oral argument without ample time to reflect upon its significance, the statement is also made by Mr. Gordinier in Omni 808's Reply Memorandum, a document upon which he had ample time to reflect: "Each and all of the references in Omni's Statement of Position refer to the contents of Mr. Durkin's Reports and the shortcomings contained therein and omitted therefrom, not to his person." Id. at 2 n.1. To be sure, the criticisms leveled at Mr. Durkin are framed in

---

Durkin (docket #5918) at 4 (accusing Mr. Durkin of "making McCarthy-like statements of non-existent buybacks and unsupported insinuations of conflicts of interest"); id. at 9 (suggesting that Mr. Durkin's formulation of certain search terms relating to criminal acts in Farsi without a concurrent formulation of those terms in English demonstrated a "predisposition that Persian members of MGA's management and staff (and only the Persian members) might be engaged in illegal conduct"). Mr. Stang's attacks pale in comparison to those advanced by Mr. Gordinier, and they were filed under seal. Thus, although the Court's analysis and conclusions regarding the Forensic Auditor's Reports applies with equal force to Mr. Stang's statements, his are not the focus of the Court's attention at this time.

MINUTES FORM 90
CIVIL -- GEN                                    7                    Initials of Deputy Clerk ___cls_____

terms of his Reports. Still other criticisms are, as counsel maintains, addressed to the Reports themselves; those must be analyzed based on their substance. However, as aptly demonstrated by the cited and quoted portions of Mr. Gordinier's filings that appear below, his criticisms do not, by any measure, confine themselves to those Reports, and instead reach out in a highly personal manner to attack the author, his professionalism, his competence, his objectivity, and his integrity.[4]

Indeed, in a display the likes of which have not been previously witnessed by this Court, Mr. Gordinier strayed far afield of legitimate criticism of the discussions, analyses, and conclusions reached in the Summary Report and the Reports that followed. To be sure, there are instances in which Mr. Gordinier addressed the message found in those Reports; just as surely, however, as detailed below, Mr. Gordinier attacked the messenger. Specifically, the papers filed by Mr. Gordinier on behalf of Omni 808 call into question Mr. Durkin's professionalism and competence, as well as his objectivity and integrity. Moreover, and alarmingly, they falsely accuse Mr. Durkin of being influenced by an ethnocentric bias against Mr. Larian and Mr. Kadisha. Such attacks, aimed at Mr. Durkin personally rather than the discussion, analyses, and conclusions set forth in his Reports, appear throughout Omni 808's papers. See Omni 808 Investors, LLC's Statement of Position re Order to Show Cause re Appointment of a Permanent Receiver (docket #5446) ("SOP"), filed May 14, 2009, at 11 (referring to Mr. Durkin's "irresponsible" analysis); id. (noting that Mr. Durkin is "far too experienced" to believe that he "produced . . . a balanced presentation"); id. (stating that "Mr. Durkin's report is a polemic" and "a piece of advocacy"); id. at 12 n.9 (calling into question Mr. Durkin's "objectivity" based on the fact that the Court ordered Mr. Durkin's fees be paid (at least in the first instance) by Mattel); id. (suggesting that Mr. Durkin's ex parte communications with Mattel were improper); id. at 13 n.10 (characterizing Mr. Durkin's quotation of Mr. Larian's and Mr. Kadisha's account of how the two men were acquainted, from "the Persian community," as "at best, unprofessional" and, "at worst,

---

[4] Adding still further to the mounting irony, in the same footnote that Mr. Gordinier disclaims engaging in improper personal attacks, he falsely accuses counsel for Mattel of advancing their own improper ad hominem attacks against Neil Kadisha, who has been referred to as a "common thief" in certain unspecified Mattel filings. Mr. Kadisha is the Managing Partner of a diversified investment firm, Omninet Capital, LLC, and an investor in Omni 808. To call someone a "common thief" is, undoubtably, by any measure, a highly personal attack, therefore an attack addressed "to the man," or ad hominem. However, in the same manner Mr. Gordinier accuses Mr. Durkin of failing to provide appropriate context to the Court in his Reports, Mr. Gordinier himself fails to acknowledge that counsel for Mattel's use of the term "common thief" in connection with Mr. Kadisha merely quotes Los Angeles County Superior Court Judge Henry W. Shatford's conclusion regarding Mr. Kadisha, as set forth in his 191-page Statement of Decision, dated October 24, 2006, which was issued after a 200-day trial, which is currently pending appeal, and which conferred upon Mr. Kadisha the oft-repeated moniker of "common thief," as well as "embezzler," and "perjurer." See Uzyel v. Kadisha, Cal. App. Nos. B196045, B203804, B198007, B199850, B201425, 2009 WL 646096 (Mar. 4, 2009) (appellate brief). As always, context is key. The use by counsel for Mattel of another court's findings and conclusions to advance an argument is not inappropriate. Those findings and conclusions may, or may not, be relevant to matters presented to the Court. Used in this manner, although undoubtably addressed "to the man" (and his credibility), it is not an improper ad hominem attack.

Initials of Deputy Clerk __cls_____

evidence of improper cultural bias"); id. (in the same footnote, referring to the same quotation, stating that "[t]he tone [of the report] itself is compelling proof that Mr. Durkin had no intention of providing an 'objective' report to the Court."); id. at 23 (referring to the Summary Report as "Mr. Durkin's ill-concealed advocacy piece"); id. (noting that advocacy, rather than objectivity, "is certainly the posture [Mr. Durkin] is most comfortable with"); Omni 808 Investors, LLC's Memorandum in Support of Its Requests to Strike Summary and Responsive Reports of Ronald L. Durkin (docket #5705) ("Motion to Strike"), filed June 8, 2009, at 4 (noting Omni's "doubts that the Court or any party would benefit further by continuing this façade of Mr. Durkin's 'impartiality'"); id. at 7 (calling Mr. Durkin's explanation of his conclusion regarding the relatedness of certain parties as "not only fatuous[,] but [also] intellectually dishonest"); id. at 9 (suggesting that Mr. Durkin intentionally concealed from the Court the fact that Mr. Larian sought other funding sources before turning to Mr. Kadisha); id. at 10 (noting that "Mr. Durkin's repeated references to Mr. Larian's and Mr. Kadisha's common 'Persian' heritage can only be viewed as an attempt to draw some nefarious ethnic connection between them"); id. at 12 (calling the reference to Mr. Larian's and Mr. Kadisha's ethnicity "unprofessional symptoms of improper cultural bias [that] have no place in a supposedly objective report"); Omni 808 Investors, LLC's Reply Memorandum (docket #5809) ("Reply Memo") at 14 (suggesting that not only Mr. Durkin, but also counsel for Mattel, harbor "cultural biases" that lead them to "suggest[] that [Mr. Larian's and Mr. Kadisha's] common heritage makes [them] more likely to act contrary to their own interests); id. at 15 (stating that, according to his own interview notes, Mr. Durkin "misrepresented" to the Court in his Summary Report how Mr. Larian and Mr. Kadisha portrayed their relationship with each other).

As alluded to, Omni 808's criticisms have not been limited to personal attacks; some of the criticisms are in fact aimed at the Reports themselves. See e.g., SOP at 16 ("Mr. Durkin's conclusion that the Wachovia-Omni transaction impacted 'MGAEI's solvency and ability to continue conducting operations' is simply wrong."). Any comment by the Court regarding the substance of the discussions, analyses, and conclusions presented to the Court in the Forensic Auditor's Summary, Responsive, and Final Reports is inadvisable at this time. With the filing of the Third Amended Answer and Counterclaims, much of the subject matter of the Forensic Auditor's Reports have been incorporated into the claims at issue in this action. As such, it would be premature for the Court to comment upon the substance of issues that are yet to be adjudicated, and that are subject to a trial by jury. Nevertheless, the Court has reviewed the Forensic Auditor's Summary, Responsive, and Final Reports, and the exhibits attached thereto. The Court has also reviewed and considered the criticisms aimed at the Forensic Auditor, cited and quoted above, as well as the entirety of all the papers responding to the Forensic Auditor's Reports filed to date. After this review, the Court is firmly convinced that all the personal criticisms of Mr. Durkin are unwarranted and unsubstantiated.

At best, the criticism of Mr. Durkin's performance and presentation represents a

different interpretation of available evidence. That such disagreements would arise between the analyses offered by a Court-Appointed Forensic Auditor and that offered by counsel for a party whose transactions have been a subject of that audit is by no means surprising. A jury considering the relevant evidence might ultimately make factual determinations that tend to agree with Mr. Durkin's assessment, it might ultimately tend to agree with Mr. Gordinier's assessment, or it may very well reject both positions in favor of another. The answer to the merits of the claims at issue in this action must await another day. Today, the Court merely notes that its examination of the Forensic Auditor's Reports reveal that Mr. Gordinier's personal attacks aimed at their author were unjustified.

Some specific attacks directed toward Mr. Durkin – relating to his background as a law enforcement officer, his communications with counsel for Mattel, and specific (but baseless) allegations of ethnocentric bias -- are worthy of more specific comment by the Court.

Stopping short of explicitly stating such, Mr. Gordinier appears to labor under the assumption that Mr. Durkin has been unable to put behind him the prosecutorial mindset under which he presumably operated during his former service to this Nation as an agent of the Federal Bureau of Investigation ("FBI"). At the outset, the Court notes that Mr. Gordinier's unstated assumptions do a disservice to the prosecutors and the law enforcement officers who work with those prosecutors, both of whom conduct their work under the clearly delineated duty to ferret out not only evidence of guilt but also "evidence favorable to the accused." See e.g., Berger v. United States, 295 U.S. 78, 88 (1935) (noting that the role of the prosecutor is not to win at all costs and observing that the prosecutor "is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done."); Brady v. Maryland, 373 U.S. 83, 87 (1963) (imposing a duty on prosecutors to provide to the defense exculpatory evidence when requested to do so).

Secondly, even if prosecutorial duties were not so defined, the Court finds no suggestion that Mr. Durkin skewed the evidence in favor of any particular viewpoint. Undoubtedly, there is a *complete absence* of any evidence that, as Mr. Gordinier has suggested, Mr. Durkin has embarked upon a campaign to purposely mislead the Court.

Mr. Gordinier also suggests that, because Mr. Durkin's bills are being paid by Mattel, Mattel has, through this payment or through other communications with Mr. Durkin, bought Mr. Durkin's loyalty. This is utter nonsense. As demonstrated by the Court's communications with him, Mr. Durkin is a Court-Appointed Officer who understands that his role is to work on behalf of the Court and not on behalf of any party. In any event, the Court's Order of January 7, 2009, which appointed Mr. Durkin, imposed the costs of the audit on Mattel "in the first instance," but expressly provided for

the possibility that the audit expenses be shared or shifted to the MGA parties.
Moreover, to suggest, however subtly, that ex parte communications with counsel for
Mattel were improper ignores the Court's mandate to the Forensic Auditor in the
January 7, 2009, Order, which states that Mr. Durkin was provided with attorney contact
information and that he "shall direct his initial communications to counsel."  At no time
has the Court precluded the Forensic Auditor's communications with Mattel or its
counsel; in fact, because the Forensic Audit was undertaken based on evidence
gathered by and presented to the Court by Mattel, Mr. Durkin would have been remiss
in his duties if he failed to communicate with Mattel and its counsel.

        Mr. Durkin was vested with powers and discretion to complete a Court-ordered
Forensic Audit.  Pursuant to an Order of this Court, he undertook this task and
exercised those powers and that discretion, presenting his Reports in conformity with
the Court's instructions.  Despite counsel's attacks, the Court's review of the evidence
before it discerns no abuse of those powers or of that discretion.

        Particularly troubling to the Court is that counsel speculates that, because Mr.
Durkin noted in his report that Mr. Larian knew Mr. Kadisha from "the Persian
Community," Mr. Durkin could be "of the view that this common heritage makes Mr.
Kadisha more likely to act contrary to his own interests or to do something via third-
parties than he wouldn't otherwise do?"  See SOP at 13-14 n.10 (appearing to pose this
thought as a rhetorical question).  There is no indication in the record, or otherwise, that
Mr. Durkin holds such a view.  To the contrary, Mr. Durkin's comment regarding the
acquaintanceship of Mr. Larian and Mr. Kadisha from "the Persian Community" (which
is noted in the report within quotation marks and is expressly attributed to a reference
made by Mr. Larian himself) is clearly predicated on interviews with these two
individuals, each of whom related independently to Mr. Durkin and his colleagues that
they knew each other from "the Persian Community."  See Durkin Summary Report, Ex.
14, at 2 ¶ 3 (Notes re March 25, 2009, interview with Mr. Larian:  "He indicated that he
knew Kadisha from the Persian community.") and Ex. 14, at 15 ¶ 2 (Notes re March 26,
2009, interview with Mr. Kadisha:  "Kadisha stated that he knows Larian from the
Persian community.").  The purpose for this reference is made clear in the footnote set
forth at the end of the sentence in which the reference appears; namely, the Report
discusses evidence that the relationship between Mr. Larian and Mr. Kadisha is
stronger and more personal than either man claimed it was.  See Summary Report at 5
n.18; Ex. 15 (personal emails).

        In the Reply Memo, Mr. Gordinier takes issue with this explanation, this time
including not only Mr. Durkin but also counsel for Mattel as the targets for his
unsubstantiated allegations of "cultural bias."  Mr. Gordinier first mischaracterizes an
argument made by Mattel.  Mattel argued, and quite correctly, both that how well Mr.
Larian and Mr. Kadisha knew each other was relevant to a determination of whether
certain transactions between the two were arms-length transactions, and that this point
was likely not lost on either of these two very sophisticated and successful

MINUTES FORM 90                                    Initials of Deputy Clerk __cls_____
CIVIL -- GEN                          11

businessmen.[5] As noted previously, both Mr. Larian and Mr. Kadisha stated that they
knew each other from "the Persian community" which, in the Forensic Auditor's view,
was intended to, or at least had the tendency to minimize the existing relationship
between the two. Mr. Gordinier incorrectly characterizes this argument as Mattel's
contention that Mr. Larian's and Mr. Kadisha's "Persian relationship" and "common
Persian heritage" was somehow relevant to a determination of whether the Omni 808
transaction was an arms-length transaction. Mattel made no such argument. Neither
counsel for Mattel nor Mr. Durkin have implied that Mr. Larian's and Mr. Kadisha's
ethnicity factors into the analysis. Other than to point to Mr. Larian's and Mr. Kadisha's
separate, but identical, accounts of how they knew each other which, in turn, suggests
how well they know each other, neither counsel for Mattel nor Mr. Durkin have stated or
implied that Mr. Larian's and Mr. Kadisha's shared ethnicity is relevant to any matter
currently or potentially before the Court. Compare Opposition at 8-9 with Reply Memo
at 14-15.

Moreover, Mr. Gordinier's substantive point, that Mr. Durkin "misrepresented" to
the Court what Mr. Larian and Mr. Kadisha told him about the closeness of their
relationship, fares no better. See Reply Memo at 15. On this point, it is important to set
this stage properly. Counsel for all parties have attempted to glean far too much from
two sterile paragraphs of interview notes taken by Mr. Durkin. Much can be inferred
from conversations and interviews through not only what is said, but what is not said, by
the interviewee's demeanor, by the tone of the speaker, by the length and placement of
pauses, and by non-verbal gestures and body language. With all these variables, much
of what is communicated does not find its way into notes.[6] For instance, Mr. Durkin's
interview of Mr. Larian lasted over two and a half hours; however, the interview notes
are a mere five and a half pages. Similarly, a one-hour and ten minute interview of Mr.
Kadisha yielded only three and a half pages of interview notes. This is not to suggest
that the notes should have been longer or that the interviews should have been
recorded or transcribed; rather, it is to suggest that counsel's arguments based on
another's notes are not particularly probative.

In contrast, Mr. Durkin's assessment, based on his interviews with both of them,

---

[5] In fact, the Court just this week issued a 30-page, single-spaced opinion resolving a 10-day
bench trial conducted over the sole issue of whether a transaction between "closely related" entities
reflected its fair market value, one of the more significant arguments ultimately rejected by the Court in
that case being that the close relationship between the parties necessarily rendered the transaction a
"sweetheart deal." See July 6, 2009, Order, Siegel v. Warner Bros. Entertainment, Inc., et al., CV 04-
08400 SGL (RZ) (docket #554).

[6] Indeed, the interview notes upon which the parties rely concede as much. See Summary
Report, Ex. 14 at 2, 15 ("This interview memorandum is a factual representation of the topics discussed
during the interview and is not intended to be a word for word or exact transcription of the conversation.").
Thus, in addition to not taking into account all non-verbal communication, the notes do not even represent
everything that was said during the interview.

37    721

is that Mr. Larian and Mr. Kadisha attempted to minimize their relationship because both of them understand the relevance of any friendship or other connection between them to the assessment of the arms-length nature of any transactions in which they have engaged. Mr. Durkin's assessment does not come from the gentle teasing of a strained meaning from two sterile paragraphs of brief notes taken by another person; rather, his assessment springs from his participation in the interview process, the entirety of the interviews he conducted of Mr. Larian and Mr. Kadisha, and his review of all of the evidence. As such, the Court defers to his assessment, at least insofar as how Mr. Larian and Mr. Kadisha portrayed their relationship to him.

As for that scant language from which the parties glean so much meaning, the entirety of which is set forth below, it in no way supports the contention made by Mr. Gordinier that Mr. Durkin "misrepresented" to the Court what Mr. Larian and Mr. Kadisha conveyed to him about the closeness of their relationship. On this topic, the notes of Mr. Larian's interview merely state the following:

> Larian decided to contact Neil Kadisha of OmniNet as he knew his company was in the distressed loan business. He indicated that he knew Kadisha from the Persian community. Kadisha said he wouldn't do the deal alone in today's environment and wanted Larian and their other friends to invest in the deal with MGA. Larian stated that Kadisha negotiated the debt with Wachovia and got it down significantly, Larian said he is not bitter about Kadisha getting a good deal on buying the loan.

Summary Report, Ex. 14, at 2 ¶ 3 (emphasis added). This paragraph contains the word "friends," and perhaps could even be read as an implicit statement by Mr. Larian that he and Mr. Kadisha are "friends." But the language does not compel such an inference. Moreover, it does not comport with the notes of Mr. Kadisha's interview, which on this topic state only the following:

> Larian and Kadisha have never been to dinner. together. Kadisha stated that he knows Larian from the Persian community and he sees him often at religious events, etc. He has no investments with Larian. Kadisha did not talk with Larian last night, this morning or in the last two days.

Summary Report, Ex. 14, at 15, ¶ 2. Mr. Durkin's assessment that Mr. Larian and Mr. Kadisha sought to minimize the extent of their relationship is not contradicted by these short passages.

The criticism that Mr. Durkin was acting pursuant to an ethnic or cultural bias is clearly baseless. The allegations are irresponsible, and they are made to capitalize on

37   722

their inherent sensational nature for counsel's own purposes of diverting attention away
from the substance of the Reports.  Sensationalism aside, when viewed in context, the
Reports' reference to Mr. Larian and Mr. Kadisha knowing each other from "the Persian
community" was plainly innocuous.  The reference was a direct quotation from both Mr.
Larian and Mr. Kadisha.  It was used in a broader discussion regarding how (and thus,
impliedly, how well) the two knew each other, which is itself relevant to the issue of
whether certain transactions relevant to the present litigation were made at arms length.

     This is a most unfortunate incident.  The Court certainly understands, in a case
as hotly contested as this one -- with such high stakes, with such complex legal issues,
and with such truly extraordinary legal talent on all sides -- that lawyers, however ethical
and committed to the highest standards of professionalism (as the Court presumes and
has found all counsel of record here to be), make statements or commit acts in haste
that they subsequently regret.  All of the players to this drama, are, after all is said and
done, human.  As such, all of us are vulnerable to all-too-common human frailties.  The
Court would place itself at the very top of any list of lawyers who have spoken
improvidently at one time or another in this case (and any number of others).  What the
Court has witnessed here, however, in both manner and substance, for the reasons
noted above, goes beyond what the Court can let pass without some manner of
reprobation.  So let the Court be clear:  Nothing excuses the attempted character
assassination in which Mr. Gordinier has engaged.

     **IT IS SO ORDERED.**

# Exhibit 38

# REDACTED

# SUBJECT TO

# PROTECTIVE ORDER

# Exhibit 39

**Anderson, Diane**

| | |
|---|---|
| **From:** | Isaac Larian |
| **Sent:** | Wednesday, October 23, 2002 8:39 AM |
| **To:** | Victoria O'Connor |
| **Subject:** | RE: FW: Interview for the French magazine CAPITAL |

good point. Thanks.

-----Original Message-----
From: Victoria O'Connor
Sent: Wednesday, October 23, 2002 8:38 AM
To: Isaac Larian
Subject: RE: FW: Interview for the French magazine CAPITAL

don't you think we should say Bratz was born in October when a certain person was no longer with their company?

-----Original Message-----
From: Isaac Larian
Sent: Wednesday, October 23, 2002 1:35 AM
To: Victoria O'Connor; Sandrine de Raspide
Subject: FW: FW: Interview for the French magazine CAPITAL

FYI

-----Original Message-----
From: Isaac Larian
Sent: Wednesday, October 23, 2002 1:25 AM
To: 'Nathalie RIESEN'
Subject: RE: FW: Interview for the French magazine CAPITAL

Natalie,

Please see below

-----Original Message-----
From: Nathalie RIESEN [mailto:nathalie.villard@wanadoo.fr]
Sent: Wednesday, October 23, 2002 12:42 AM
To: ilarian@mgae.com
Subject: Re: FW: Interview for the French magazine CAPITAL

Thank you Isaac.
I have a few more questions about the story of the Bratz you would be kind to answer by email:
. Date of birth of the Bratz, time of development, first launch in the US

BORN SEPTEMBER 2000; 9 MONTH TO DEVELOP ( LIKE A BABY!); LAUNCHED IN THE USA IN JULY 2001 AND IN SPAIN JUNE 2001 ( BEFORE USA).ISAAC
. Total yearly Sales of the Bratz (in dollars) since their launch.
2001: $65 MILLION

2002: $350 MILLION ( INCLUDING LICENSED GOODS)

2003: PROJECTED $1 BILLION ( INCLUDING LICENSED GOODS)

. Increase of their market share of the doll market

BRATZ CURRENTLY HAVE 33% OF FASHION DOLL MARKET SHARE IN THE USA AND GROWING.

1

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    MGA2 0070266

39    746

. Further development of the Bratz expected in 2003

THE BRATS LINE IS EXPANDING GREATLY FOR 2003. MGA , FOR THE FIRST TIME IS LAUNCHING A VERY INNOVATIVE AND FASHIONABLE LINE OF ELECTRONICS CALLED " BRATZ ELECTRIC FUNK" FOR 2003 AND THIS LINE IS EXPECTED TO GENERATE WHOLESALE SALES IN EXCESS OF $100 MILLION. WE ARE LITERALLY SIGNING 2-3 NEW LICENSEE'S A DAY FOR A VARIETY OF PRODUCTS ( I WILL E MAIL YOU THE LIST). we HAVE ALSO EXPANDED THE TOY LINE GREATLY FOR 2003 AND WILL HAVE OVER 100 NEW ITEMS INTRODUCED IN 2003, BY MGA ALONE. ISAAC

. Sales, Profits and margin of MGAE in 2002 / 2001 /2000

2000 SALES $90 MILLION

2001 SALES  $110 MILLION

2002 SALES $350 MILLION ( ESTIMATE)

. Brief description of MGAE headquarters in LA, its location...

MGAE IS PRESENTLY HEAD QUARTERED IN NORTH OF LA in 43,000 SQUARE FEET OFFICES. WE HAVE OUTGROWN THE FACILITIES AND ARE LOOKING TO MOVE TO A BIGGER FACILITY SOON. ISAAC
. Brief description of your management team

OUR MANAGEMENT TEAM CONSIST OF A GREAT GROUP PASSIONATE AND GROWTH AND EXCELLENCE ORIENTED INDIVIDUALS WHO CARE FOR THE BUSINESS. OUR MISSION STATEMENT IS TO BE NO 1 OR 2 IN ANYTHING WE DO OR DON'T DO IT. INNOVATIVE CONSUMER ENTERTAINMENT PRODUCTS IS THE HEART OF MAGE'S BUSINESS.MGA HAS WON NUMEROUS PRODUCT EXCELLENCE AWARDS EVERY YEAR INCLUDING THE MOST PRESTIGIOUS TOY OF THE YEAR AWARD AND FAMILY FUN TOY OF THE YEAR AWARD ( 3 YEARS IN THE ROW IN DIFFERENT CATEGORIES). ISAAC
. Your age, family situation and hobbies.

I AM 48 YEARS OLD ( BUT 13 AT HEART!) MARRIED FOR THE PAST 18 YEARS TO ANGELA AND HAVE 3 CHILDREN ( JASON:16, YASMINE: 14, CAMERON:8). A KID AT HEART, MY HOBBIES ARE CREATING TOYS, PLAYING VOLLEYBALL, MOUNTAIN BIKE RIDING , CAMPING AND BACKPACKING. TWO OF THE DOLLS ( YASMINE AND CAMERON) ARE NAMED AFTER MY KIDS.

Thank you very much for all this. This story will come out in Capital (leading French business magazine) at the end of
November.

PLEASE VISIT WWW.MGAE.COM FOR MORE INFORMATION ABOUT MGA. PLEASE SEND ME TWO COPIES OF THE MAGAZINE WHEN IT COMES OUT.

THANK YOU FOR YOUR INTEREST IN MGA. BY THE WAY, ARE YOUR THREE DAUGHTERS BRATZ FANS? ISAAC

Best regards,
Nathalie

nathalie.villard@wanadoo.fr
Journaliste
CAPITAL
Tel 00 +33 (4) 66 03 24 03 / (1) 56 99 49 33
 Fax 00 +33 (4) 66 03 24 02


 inMesssage du 23/10/2002 02:49
>De : Isaac Larian <ilarian@mgae.com>
>A : Dave Malacrida <DMalacrida@mgae.com>
>Copie à : 'nathalie.villard@wanadoo.fr' <nathalie.villard@wanadoo.fr>
>Objet : FW: Interview for the French magazine CAPITAL
>
> Natalie, It was a pleasure talking to you.
>
> Dave, Please send Natalie our recent news clipinings by e mail ASAP.

2

CONFIDENTIAL - ATTORNEYS' EYES ONLY

MGA2 0070267

39    727

```
>
> Thanks,
>
> Isaac
>
>
>
> -----Original Message-----
> From: Nathalie RIESEN [mailto:nathalie.villard@wanadoo.fr]
> Sent: Tuesday, October 22, 2002 4:49 AM
> To: ilarian@mgae.com
> Subject: RE: Interview for the French magazine CAPITAL
>
>
> >I'll call you today at 10:00 am (your time).
> Nathalie
>
> Messsage du 22/10/2002 03:21
> >De : Isaac Larian <ilarian@mgae.com>
> >A : 'Nathalie RIESEN' <nathalie.villard@wanadoo.fr>
> >Copie à : Rene Turin <RTurin@mgae.com>
> >Objet : RE: Interview for the French magazine CAPITAL
> >
> > Dear Natalie,
> >
> > Lets do October 22 at 10 am.
> >
> > Thanks,
> >
> > Isaac Larian
> > Isaac Larian
> > CEO
> > M G A  Entertainment
> > 16730 Schoenborn Street
> > North Hills, California 91343
> > Tel: 818-894-3150
> > Fax:818-894-1267
> > e-mail: Ilarian@MGAE.COM
> > Please Visit
> > www.MGAE.com
> > And the beautiful BRATZ at
> > www.Bratzpack.com
> > Hey! Its MGA!
> >
> >
> >
> > -----Original Message-----
> > From: Nathalie RIESEN [mailto:nathalie.villard@wanadoo.fr]
> > Sent: Monday, October 21, 2002 8:47 AM
> > To: ilarian@mgae.com
> > Subject: Re: Interview for the French magazine CAPITAL
> >
> >
> > >Dear Isaac,
> > Thanks for your prompt answer.
> > When can I call you for a 15 mn interview, between 8:00 and 10:00 am (your
> > time), either on Oct 22, 28, 29, 30 or 31?
> > Interview: the ingredients of the success of the Bratz.
> > . Birth of the concept? Is there a "Mr or Mrs Bratz"?
> > . How many people involved in the Bratz business today at MGAE?
> > . How different are they from the Barbie world and among the doll market
> in
> > general?
> > . Sales and market share in the US and oversea
> > Thanks.
> > Best regards,
> > Nathalie
```

3

CONFIDENTIAL - ATTORNEYS' EYES ONLY

MGA2 0070268

```
> >
> >  nathalie.villard@wanadoo.fr
> > > Journaliste
> > > CAPITAL
> > > Tel 00 +33 (4) 66 03 24 03 / (1) 56 99 49 33
> > > Fax 00 +33 (4) 66 03 24 02
> >
> > Messsage du 06/03/1904 16:20
> > >De : Nathalie Villard <nathalie.villard@wanadoo.fr>
> > >A :  <nathalie.villard@wanadoo.fr>
> > >Copie à :
> > >Objet : FW: Interview pour le magazine franç ais        CAPITAL
> > >
> > >
> > > ----------
> > > De : Isaac Larian <ilarian@mgae.com>
> > > Date : Fri, 18 Oct 2002 19:55:3D -0700
> > > À : Sandrine de Raspide <SDeRaspide@mgae.com>, 'Nathalie Villard'
> > > <nathalie.villard@wanadoo.fr>
> > > Cc : Dave Malacrida <DMalacrida@mgae.com>
> > > Objet : RE: Interview pour le magazine franç ais CAPITAL
> > >
> > > Dear Nathalie,
> > >
> > > I will be happy to do an interview.
> > >
> > > I am now in HK and back in the USA next Tuesday.
> > >
> > > I would like to ask for the list of questions in advance please.
> > >
> > > Best Regards,
> > >
> > > Isaac Larian
> > > Isaac Larian
> > > CEO
> > > M G A  Entertainment
> > > 16730 Schoenborn Street
> > > North Hills, California 91343
> > > Tel: 818-894-3150
> > > Fax:818-894-1267
> > > e-mail: Ilarian@MGAE.COM
> > > Please Visit
> > > www.MGAE.com
> > > And the beautiful BRATZ at
> > > www.Bratzpack.com
> > > Hey! Its MGA!
> > >
> > >
> > >
> > > -----Original Message-----
> > > From: Sandrine de Raspide
> > > Sent: Friday, October 18, 2002 5:53 PM
> > > To: 'Nathalie Villard'
> > > Cc: Isaac Larian; Dave Malacrida
> > > Subject: RE: Interview pour le magazine franç ais CAPITAL
> > >
> > >
> > > Dear Nathalie,
> > >
> > > Thanks for your interest in Bratz.  Per our company policy, all
> interviews
> > > need to be conducted through Isaac Larian, our CEO.  Isaac is copied on
> > this
> > > e-mail and will let you know if he can make himself available for a
> phone
> > > interview before the 31st of October.
> > > Isaac, Capital is a business magazine (500,000 prints/month) that will
```

4

CONFIDENTIAL - ATTORNEYS' EYES ONLY

MGA2 0070269

39        729

```
> do
> > a
> > > special report on the toy industry worldwide.
> > > Kind regards,
> > > Sandrine
> > >
> > > -----Original Message-----
> > > From: Nathalie Villard [mailto:nathalie.villard@wanadoo.fr]
> > > Sent: Friday, October 18, 2002 5:44 AM
> > > To: sderaspide@mgae.com
> > > Subject: Interview pour le magazine franç ais CAPITAL
> > > Importance: High
> > >
> > >
> > > Bonjour,
> > > Dans son numéro de Décembre, Capital (leader de la presse économique,
> 500
> > > 000 ex/mois) prépare un Dossier international de 18 pages sur le
> business
> > > mondial du jouet.
> > > Entre autres articles, je prépare une histoire sur le succès du
> phénomène
> > > Bratz, la naissance du concept, ses déclinaisons, son univers de
> > concurrence
> > > avec Mattel, ses licences...
> > > Pourrions-nous convenir rapidement d'un rdv téléphonique avant le 31
> > > Octobre. Beaucoup de personnes ici en France m'ont dit que vous pourriez
> > > m'être très utile.
> > > D'avance merci.
> > > Cordialement,
> > > Nathalie Villard
> > >
> > > nathalie.villard@wanadoo.fr
> > > Journaliste
> > > CAPITAL
> > > Tel 00 +33 (4) 66 03 24 03 / (1) 56 99 49 33
> > > Fax 00 +33 (4) 66 03 24 02
> > >
> > >
> >
>
```

5

CONFIDENTIAL - ATTORNEYS' EYES ONLY

MGA2 0070270

# Exhibit 40

# REDACTED

# SUBJECT TO

# PROTECTIVE ORDER

# Exhibit 41

# REDACTED

# SUBJECT TO

# PROTECTIVE ORDER

# Exhibit 42

# REDACTED


# SUBJECT TO


# PROTECTIVE ORDER

# Exhibit 43

# REDACTED

# SUBJECT TO

# PROTECTIVE ORDER

# Exhibit 44



ATTORNEY'S EYES
ONLY

BRYANT 00179

44   909



Plays Drums
and Spins
the
turn table

Studies:
French
Acting
Political Science

ATTORNEY'S EYES ONLY

BRYANT 00180

44      910

EX 5-0040



Plays Bass

Studies:
Classical Violin
Child Psycology

ATTORNEY'S EYES ONLY

BRYANT 00181

44 911 EX 5-0041



**ATTORNEY'S EYES
ONLY**          **BRYANT 00182**

44      912

EX 5-0042



ATTORNEY'S EYES
ONLY

BRYANT 00273

44  913

EX 5-0084



**ATTORNEY'S EYES
ONLY**

**BRYANT 00274**

44   914   EX 5-0085



ATTORNEY'S EYES
ONLY

BRYANT 00275

44    915    EX 5-0086

# Exhibit 45

# REDACTED

# SUBJECT TO

# PROTECTIVE ORDER

# Exhibit 46



CONFIDENTIAL-
ATTORNEYS' EYES ONLY

M 0001032



EX 10756-0001

# Exhibit 47

BORIG 01726

EXHIBIT **47** PAGE 92)

TRIAL EXHIBIT 01155C-027

# Exhibit 48



Pen-Tab Industries, Inc.
Front Royal, VA 22630
New York, Chicago, Los Angeles

# 120

**SHEETS** 10½" x 8"
**3 SUBJECT**
# NOTEBOOK
## COLLEGE RULE

ITEM #71220

0  41551 71220  2

EXHIBIT 48 PAGE 952
TRIAL EXHIBIT 01155C-001

BORIG 01715

EXHIBIT 48 PAGE 923 TRIAL EXHIBIT 01155C-002



EXHIBIT 40 PAGE 924



TRIAL EXHIBIT 01155C-004



EXHIBIT **48** PAGE **926**

TRIAL EXHIBIT 01155C-005

BORIG 01716

EXHIBIT 48 PAGE 927

TRIAL EXHIBIT 01155C-006



EXHIBIT 4B PAGE 928

TRIAL EXHIBIT 01155C-007

BORIG 01717

EXHIBIT 48 PAGE 929

TRIAL EXHIBIT 01155C-008



EXHIBIT 48 PAGE 930

TRIAL EXHIBIT 01155C-009



EXHIBIT 48 PAGE 931

TRIAL EXHIBIT 01155C-010



BORIG 01718

EXHIBIT 48 PAGE 932
TRIAL EXHIBIT 01155C-011



BORIG 01719

EXHIBIT 48 PAGE 933

TRIAL EXHIBIT 01155C-012

Notes / Ideas on Carrie Angle —

- Shimmery hair stuff
- Kerr Hair ??
- Stained glass ?
- 17/18th Century
- Empire waist look

EXHIBIT 48 PAGE 934
TRIAL EXHIBIT 01155C-013

# Exhibit 49

| From: | Isaac Larian |
|---|---|
| To: | Victoria O'Connor; Dave Malacrida; Aileen Storer; Paula Treantafelles; Margo Chazen; Dianna Eisenberg |
| CC: | Abe Mirza; Julie Mote; Beth Cahill |
| BCC: | |
| Sent Date: | 2002-03-12 12:17:42:953 |
| Received Date: | 2002-03-12 12:17:42:953 |
| Subject: | FW: Hi |
| Attachments: | |

Victoria, Dave: Who gave David Dees info and what he does for us to this Yahoo lady and why?

This Yahoo lady is giving us too much legal grief even though she does not mean it.

Please DO NOT send any information or reply to her e mails unless you have cleared it with me.

Julie/Beth/ Abe:                              There must be no mention about Mattel or any of their properties, Carter , any MGA Bratz arts ,etc.


-----Original Message-----
From: Paula Treantafelles
Sent: Monday, March 11, 2002 5:55 PM
To: Isaac Larian; Abe Mirza; Beth Cahill
Subject: FW: Hi

-----Original Message-----
From: David Dees [mailto:davodees@hotmail.com]
Sent: Saturday, March 09, 2002 12:37 PM
To: bryant598@cs.com
Subject: Hi

Hi Carter,

I thought you would enjoy this letter i wrote to the Bratzworld club on Yahoo. It starts off with the club leader introducing it. Dees.

Hello!

I'm posting a wonderful letter from David Dees- the guy who does the awesome art we love to look at on the Bratz website and on posters and wherever Bratz girls are. I just want to post it to its own message so I can save that as a text file in the David Dees folder in files so you can read it anytime you like. We've



EXHIBIT
4507

CONFIDENTIAL - ATTORNEYS' EYES ONLY

MGA 3801819

always liked it that MGA communicates with the Bratz fans and this takes it even further into VERY COOL land.

Make sure you also check out his portfolio for all the other stuff he does- you've probably seen lots of it- he's extremely talented!

Okay enough from me- I'll post his letter right after this
:)
snowflakebebe

>Hello my name is Christian (I'm a girl!) and I do a fan list for the Bratz
>dolls and I was wondering if you could post and maybe share some of your
>other Bratz art that we may not have seen (we have lots of it in the files
>section) - or talk about your experience working on the illustrations of
>the
>Bratz. I am in contact with MGA and they have endorsed this "fan club" so
>if
>I need to get permission from them for anything I can ask- but I hope
>you'll
>share some art if you can. We have the link to your portfolio up in our
>files and bookmark section. Come visit sometime :) We love your art. Its
>a
>big part of the fun of the Bratz :)

Hi Christian,

Thanks so much for your letter and interest in the world of Bratz. I talked to the art director at MGA , and she said that of course i am not the one to be releasing any Bratz art ahead of time, so i will check and see if i can post some of that older airbrush art for you. She also said MGA is in the process of building a new website that is going to be packed to the hilt with cool art of all the new fashions, and believe me, they are wild and colorful as i just finished about thirty new pieces of art that will amaze you.

I work freelance as an illustrator and have my own studio at home where i paint at my leisure, but if a job comes in you can be sure that it is usually being rushed. My immediate live-in family consists of two furry felines. A crosseyed siamese mix named Buddy, and a female red striped tabby named Goose.

I am swamped right now with colorizing lots of the new wacky funk styles, and there are new hats and boas and tops that I got a kick out of. However I can't take credit for creating the Bratz Dolls, or even the first Bratz illustrations, for that honor would go to a fellow named Carter Bryant*, who is truly a genius of fashion and the soul and only person who first drew those great pouty lips and that extreme look that only our heros share. I have never met him personally, but on the phone and emails he is certainly the nicest sincere fellow ever, and very optimistic and complementary about my art in his approach. It felt good early on when he would tell me i was doing a good job bringing them to life. Can you tell I am a fan of his as

CONFIDENTIAL – ATTORNEYS' EYES ONLY

MGA 3801820

EXHIBIT 49   PAGE 4507-2
9.36
EX 4507-0002

well?

Let me tell you about MGA. It is located in North Hills, California, at the west end of the beautiful San Fernando Valley, where i lived for many years, but now i live in Salt Lake, where the Olympics just were. Anyway, when you walk into the big, high ceiling lobby there is a real pretty receptionist with reddish brown hair (and that sometimes wears leopard prints), and if you look to the left you will see the stairs wind up to the second floor where all the cool stuff happens. And as you start up them there is, to the right, a little rock garden with plants, and it always has some of the new toys, like robot dogs, insectobots, or baby dolls sitting in there as if they are playing. As you get to the top of the stairs, that is if you can get permission to come up to this top secret place, the first thing you notice to your right is two big doors opening into a spacious office with a fancy glass desk, usually covered with toys, and sitting there working busily away is a great fellow named Isaac, who is the owner, president, and creator of most of the MGA toys. He always seems to leave his doors open and when i stop by to pick up a job i glance in and wave if he happens to look up.

The first big area past there has lots of low partitioned cubicles with all the business people who keep the finances working, but then the next rows are the package and advertising designers, which is sort of the front line of the creativity, and as you continue up the steps there is a silly sign hanging that says Design Farm, and that is the beginning of the art studios. It always freaks me out to go in there because it is a busy beehive of toy ideas and designers flying around like a tornado. It is a big open room with black walls and bright lights shining down spotlighting the work areas, and colorful toys and wacky new ideas and drawings lining the walls. The middle area has a long table work table covered with new toy packages being assembled for the first time, with most of the mocked up packages being created by cutting and pasting by hand, and only after the idea is shown through many approval lines is it mass produced. Sometimes a whole new line of Bratz accessories will be displayed, and i am amazed at the details of the clothes at such a small scale. When i pop in i am usually asked for my opinion about the new toys, such as if i think they will be popular or how to promote them, and i am always happy to put in my two cents. There are about a dozen or so design areas with computers that surround the work table, and at each station is someone with more talent than you can imagine all corraled into one group. That is why they come up with such great stuff. There is also a window on one wall and whenever i look out of it, it is stunning to look down into the warehouse which quite a large expanse of big boxes and lifts carrying them around. I guess that is the tour.

About working on the illustrations, well they are all colored on the computer. The best thing i can say is that i finally figured out a great way to paint their hair that flows great, and looks sort of real. But that is in the last group of art i just finished and it will available to you soon i suppose. If you have any suggestions about any of the art I always welcome your viewpoint.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Anyway that is about it. I will send in anything that i am allowed to release to you guys, or check my website for new art that i am putting up all the time. Feel free to download any art that you like off my site. See ya. david.

(* You can do a google.com search under Carter Bryant and you can see some things he has done.

-snowflakebebe)

WOW what a cool letter... i have to say again that everyone so far involved with the Bratz company is so cool, and responds personally and actually takes some time.... as for Carter Bryant i searched and searched and came up with nothing. so if any one find his website, can you post the URL.. ;) many thanks...

Pink Glitter
>>Vayne<<
xxx

---

Get your FREE download of MSN Explorer at http://explorer.msn.com/intl.asp.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

MGA 3801822

49   938 4507 - 4

EX 4507-0004

# Exhibit 50

| | |
|---|---|
| **From:** | Isaac Larian |
| **To:** | Dee Dee Valencia |
| **CC:** | |
| **BCC:** | |
| **Sent Date:** | 2003-02-06 20:05:14:687 |
| **Received Date:** | 2003-02-06 20:05:14:687 |
| **Subject:** | RE: Bratz |
| **Attachments:** | |

Good ideas.

Lets share with the team after NY and execute.

-----Original Message-----
**From:** Dee Dee Valencia
**Sent:** Thursday, February 06, 2003 11:59 AM
**To:** Isaac Larian
**Subject:** RE: Bratz

Okay ... I am jotting down my first thought .... I'll think more. Had experience in past lives in collectible market....

Limited Edition Collectible # of pcs low low low - build for the future

SELLING - DISTRIBUTION
-Go for 2 partners; 1 TV (QVC) and other Hallmark sold in Collectibles Section (next would be ornaments with Hallmark)
-Offer the first 1,000 to our fan club members - 1st come first serve - build frenzy then you can advertise that the remaining # is going to be on QVC and in Hallmark only for a limited time.
-This strategy would also help, 'literally presell' the program to QVC & Hallmark. Built in demand, advertised, slam dunk!
-After market sales - will boom - ebay.... keep track of it .. powerful ...

FEATURES:
-Signed by....???? - I know we want to keep Carter under wraps ...

-Custom / Original art of girls as the certificate of authenticity - framed for room and showing off to friends

-The box is JUST AS IMPORTANT as THE PRODUCT in the collectible market. So packaging needs to be authentic and out of this world.

Product Ideas:
-Porcelain real hair, real fabrics as accents - high high detail
-Tie to well known hip fashion designer that designed clothing for extra equity
-Set of 4 dolls 6"-8"high (size smaller than mass market dolls - these are display only pcs)
-They need to be sold in a showcase cool environment - funky - this is part of the display in their room
-Something exclusive for the girl herself ... exclusive fashion bag is my first thought.

I'll think more.... we should absolutely utilize the Bratz Fan Club more. They 'expect' to be the first ones to know what is up and coming for Bratz. This is a built in base for exclusive or allocated or presold sell of goods.

DD



CONFIDENTIAL - ATTORNEYS' EYES ONLY       **50**    939    MGA  3801558
EX 4942-0001

-----Original Message-----
**From:** Isaac Larian
**Sent:** Wednesday, February 05, 2003 8:13 PM
**To:** Summer Wells; Paula Treantafelles; Dee Dee Valencia; Shawn Brower; Randi Kagan
**Subject:** Bratz

What do you think about the idea of developing a high end ,really cute, older, collectable plush to sell only in Specialty and gift? For dolls, may be we do a plastic head?

Let me know what do you think?

Isaac Larian
CEO
MGA ENTERTAINMENT
*A Consumer Entertainment Product Company*
16730 Schoenborn Street
North Hills, California, 91343-6122
Tel: 818-894-3150
Fax:818-894-1267
Ilarian@mgae.com
www.MGAE.COM
Meet the girls with Passion for Fashion
www.Bratzpack.com

CONFIDENTIAL - ATTORNEYS' EYES ONLY

50    940    MGA 3801559
EX 4942-0002

# Exhibit 51

## FORMER MATTEL EMPLOYEES - 04/20/06

| | A<br>ACTIVE EMPLOYEES | B<br>MGA POSITION | C<br>MGA DATES | D<br>MATTEL DATES |
|---|---|---|---|---|
| 1 | | | | |
| 2 | | | | |
| 3 | Abundis, Ricardo | SR. SALES ANALYST | 12/06/04-PRESENT | 07/00-11/04 |
| 4 | Bate, Ken | QUALITY ASSURANCE MANAGER | 7/31/2006-PRESENT | 7/2000-10/2000 |
| 5 | Bloodworth III, John E. | Product Manager, Games | 08/21/06-PRESENT | 06/01/06-08/06 |
| 6 | Bloodworth III, John E. | Product Manager, Games | 08/21/06-PRESENT | 03/1998-01/2000 |
| 7 | Bloomfield, Kevin | SR. DESIGNER | 11/25/02-PRESENT | 10/00-11/00 |
| 8 | Brawer, Ron | EVP MARKETING | 10/05/04-PRESENT | 1996-2004 |
| 9 | Brisbois, Janine (CANADA) | VP NATL ACCTS. | 10/04/05-PRESENT | 1/2001-9/2005 |
| 10 | Castilla, Jorge | MGR. SALES PLANNING | 04/03/06-PRESENT | 06/98-03/05 |
| 11 | Chang, Suzy | Sr. Development Designer | 08/28/06-Present | Summer 2000 |
| 12 | Cheng, Steve | SR. DESIGNER | 04/03/02-PRESENT | 09/99-06/01 |
| 13 | Cody Jr, Gerry | Sr. Designer - Boys Toys | 11/20/06-PRESENT | 11/99-4/00 |
| 14 | Cody Jr, Gerry | Sr. Designer - Boys Toys | 11/20/06-PRESENT | 06/04-01/05 |
| 15 | Contreras, Nick | VP CUSTOMER MKTG | 11/29/04-PRESENT | 1994-2004 |
| 16 | Cooney Jr., Daniel | VP National Account Manager | 05/15/06-PRESENT | 01/04-05/06 |
| 17 | Cooney Jr., Daniel | VP National Account Manager | 05/15/06-PRESENT | 10/96-09/01 |
| 18 | Domingo, Luisito H | DEV. DESIGNER | 07/07/03-PRESENT | 10/96-10/01 |
| 19 | Dominguez, Greg Paul | PROD. DESIGNER | 04/01/02-PRESENT | 11/99-07/00 |
| 20 | Feldman, Joe | DESIGN ENGINEER | 12/08/04-PRESENT | 7/93-2/04 |
| 21 | Forrest, Craig | Product Manager, Games | 5/15/06-PRESENT | 10/97-01/05 |
| 22 | Garcia, Mia | DEV. DESIGNER | 2/23/05-PRESENT | 2000-2004 |
| 23 | Garcia, Paula | VP GIRLS TOY PD | 04/17/00-PRESENT | 12/97-04/00 |
| 24 | Gonzalez, Eduardo | Sr. Director of Quality Assurance | 10/16/06-PRESENT | 4/1985-1/1997 |
| 25 | Gonzalez, Eduardo | QUALITY ASS. MGR. | 1/3/05-8/8/05 | 4/1985-1/1997 |
| 26 | Hall, Tracy | Sr. Director of Prod. Dev, CEYE | 08/07/05 – PRESENT | 09/1987-04/1989 |
| 27 | Hansen, Melody | FACE PAINTER | 03/13/06-PRESENT | 04/94-01-06 |
| 28 | Hansen, Todd | PACKAGING ENG. | 5/2/05-PRESENT | 1994-1996 |
| 29 | Hatch, Jill | Sr. Director, National Sales | 09/18/06 – PRESENT | 04/04 – 09/02/2006 |
| 30 | Hatch, Jill | Sr. Director, National Sales | 09/18/06 - PRESENT | 06/96 - 01/03 |
| 31 | Hinh, Michael | MGR. CATEGORY ADV. | 6/27/05-PRESENT | 10/02-6/05 |
| 32 | Hsu, Janet | VP LIFESTYLES | 3/9/05-PRESENT | 8/2002-3/2005 |
| 33 | Koa, Alice | CUST. MKTG. MGR. | 2/21/05-PRESENT | 10/03-2/05 |
| 34 | Kaufman, Ken | ADVERTISING EXEC. | 01/03/05-PRESENT | 1995-2004 |
| 35 | Keller, Pamela E | VP Supply Chain & Operations | 09/25/06 - PRESENT | 10/95 - 01/99 |
| 36 | Keosian, Alejandro Gabriel | GR. DESIGNER | 08/11/03-PRESENT | 02/02-08/03 |
| 37 | Kim, Joyce | SR. PLAYSET DESIGN | 2/23/05-PRESENT | 9/88-9/04 |
| 38 | Kim, Young | SEAMSTRESS | 01/15/04-PRESENT | 09/98-06/02 |
| 39 | Kirst, Kristen | HAIR ROOTER | 03/31/03-PRESENT | 12/00-02/03 |
| 40 | Komatsu, Ellen | DEV. DESIGNER | 08/25/03-PRESENT | 10/98-03/02 |

Confidential - For Attorney's Eyes Only

Exhibit no. 1932
Date: 1/28/08
Contreras   P. Pybum
(8 pgs)

MGA 1134723

51      941

EX 1932-0001

# FORMER MATTEL EMPLOYEES - 04/20/06

| | A | B | C | D |
|---|---|---|---|---|
| 41 | Larson, Jill | Sales Associate | starts 12/19/06 | 09/90-Present |
| 42 | Law, Chi Shing | DEV DESIGN MGR | 05/01/06-PRESENT | 08/00-08/02 |
| 43 | Leahy, Margaret | SR. SCULPTOR | TEMP TO PERM EFF 4/4/05 | 03/95-09/00 |
| 44 | Lumabao, Bo | PRD/MKT MANAGER | 2/14/05-PRESENT | 4/01-10/02 |
| 45 | Marks, Dorothy | SAMPLE MAKER | 07/26/05-PRESENT | 01/01/03-04/12/04 |
| 46 | Martin, Raymond John | PROD. MANAGER | 02/23/04-PRESENT | 06/97-02/03 |
| 47 | McBride, Susan | PROD. MANAGER | 06/03/02-PRESENT | 2000-2001 |
| 48 | Min, Aye Aye | HAIR ROOTER | 03/20/2006-PRESENT | 07/1994-02/2006 |
| 49 | Nigoghossian, Christine | SR. DOLL DESIGNER | 04/25/05-PRESENT | 1991-2002 |
| 50 | Palijo, Amelia Ivy Arafiles | SR. SCULPTURIST | 02/23/04-PRESENT | 08/98-01/04 |
| 51 | Parkinson, Ana Mancia | DEV. DESIGNER | 05/10/04-PRESENT | 1990-2004 |
| 52 | Paulino, Denise | SAMPLE MAKER | 01/18/05-PRESENT | 05/1991-3/2001 |
| 53 | Pestonji, Danny | DESIGNER | 06/01/04-PRESENT | 06/95-11/01 |
| 54 | Phoosopha, Poottipong | FACE PAINTER | 12/08/03-PRESENT | 03/97-10/01; 02/02-12/03 |
| 55 | Pickard, Michael | PACKAGING ENG. | 03/22/04-PRESENT | 10/92-02/02 |
| 56 | Ratleff, Leland | Senior HR Director | 12/04/06-PRESENT | 1985-12/1/06 |
| 57 | Ronquillo, Desiree Elisabeth | SR. DEV. DESIGNER | 05/03/04-PRESENT | 02/01-04/04 |
| 58 | Ruiz, Micaela | SAMPLE MAKER | 2/13/06-PRESENT | 1985-2/2006 |
| 59 | Sasic-Koetsier, Natasha | ILLUSTRATOR | 06/01/04-PRESENT | NOT APPLICABLE |
| 60 | Salazar, Maria Elena | SEAMSTRESS | 03/31/03-PRESENT | 1996-2001 |
| 61 | Salemnia, Shirin | RESEARCH MGR. | 02/17/03-PRESENT | 06/00-01/03 |
| 62 | Scott, Harvey | SAMPLE MAKER | 08/01/05-PRESENT | 1992-07/2005 |
| 63 | Su, Jier | DIR. PROJECT PLANNING | 8/15/05-PRESENT | 11/1998-07/2005 |
| 64 | Smith, Steffen J. | SR. PKG. ENG. | 10/13/03-PRESENT | 01/99-12/00 |
| 65 | Soai, Dennis | DEV. DESIGNER | 03/04/02-PRESENT | 06/95-02/00 |
| 66 | Thompson, Maria | SOURCING MANAGER | 04/04/04-PRESENT | 07/91-03/05 |
| 67 | Tran, Chau Ngoc | SAMPLE MAKER | 05/10/04-PRESENT | 08/88-10/03 |
| 68 | Upshaw, Gail | SEAMSTRESS | 5/23/05-PRESENT | 9/63-3/01 |
| 69 | Wang, Chang-Chin | ASSOC. FACE DES. | 05/03/04-PRESENT | 11/98-04/04 |
| 70 | Ward, Lance | STRUCTURAL ENG. | 08/02/04-PRESENT | 12/99-10/03 |
| 71 | Whittaker, Dawn | DESIGN DEV. MGR. | 12/06/04-PRESENT | 1998-2004 |
| 72 | Wong, Jenny | GR. DESIGNER | 09/09/02-PRESENT | 11/99-02/02 |
| 73 | | | | |
| 74 | | | | |
| 75 | 1 Confidentiality/Inventions Agreement | | | |
| 76 | 2 Proprietary Information Agreement | | | |
| 77 | 3 Employment Agreement | | | |
| 78 | | | | |
| 79 | | | | |
| 80 | NON-ACTIVE EMPLOYEES | MGA POSITION | MGA DATES | MATTEL DATES |

Confidential - For Attorney's Eyes Only

MGA 1134724

51    9-12

EX 1932-0002

## FORMER MATTEL EMPLOYEES - 04/20/06

| | A | B | C | D |
|---|---|---|---|---|
| 81 | | | | |
| 82 | Aryapour, Daryoush | CREATIVE SER. DIR. | 10/25/99-04/14/00 | 03/96-06/99 |
| 83 | Blaser, Janet | DEV. DESIGNER | 06/14/04-09/10/04 | 04/95-04/04 |
| 84 | Bower Violette, Mari Joanne | PROD. MANAGER | 10/13/03-PRESENT | 07/99-03/03 |
| 85 | Brown, Lilia | GR. DESIGNER | 03/31/03-05/05/05 | UNKNOWN |
| 86 | Burlando, Gabriella | PROD. MANAGER | 03/5/02-06/27/06 | 11/97-10/01 |
| 87 | Chonavel, Fabienne | MARKETING MGR. | 04/10/92-08/23/02 | 8/95-2/96 |
| 88 | Dailey, Christine | VP PROD. DEV. | 05/14/01-11/22/02 | 05/84-01/86 |
| 89 | Gillmour, Kami | VP MARKETING | 05/24/99-07/14/00 | 05/90-04/99 |
| 90 | Hardouin, Christopher | PROJECT MGR. | 06/04/01-07/15/04 | 7/04-PRESENT |
| 91 | Hitch, Martin | VP INTL. SALES | 01/04/01-06/04/02 | 04/90-01/98 |
| 92 | Huntley, James | VP MARKETING | 5/23/05-PRESENT | 4/01-5/05 |
| 93 | Kagan, Randi | MARKETING DIR. | 09/23/02-07/22/03 | 11/97-04/98 |
| 94 | Koch, Andreas | PRODUCT MGR. | 10/18/99-01/11/01 | 04/98-12/98 |
| 95 | Mayer, Lyn Carol | FABRIC ARTIST | 07/21/03-05/05/05 | 02/98-04/01 |
| 96 | Mils, Frank | MANAGER OF QA | 03/20/06-07/07/06 | 08/97-07/01 |
| 97 | Nguyen, Xuanlan T | PATTERN MAKER | 05/19/03-01/03/05 | 08/92-10/99 |
| 98 | O'Brien, Gary Thomas | FIELD SALES DIR. | 05/10/04-07/22/04 | 1998-2002 |
| 99 | Otero, Jose | WEB DESIGNER | 08/11/03-2/1/06 | 20037 |
| 100 | Owen, Dan | SR. PAYSET MGR. | 08/23/04-12/13/05 | 01/99-08/04 |
| 101 | Parasole, Nicolletta | GR. DESIGNER | 01/05/04-6/27/04 | UNKNOWN |
| 102 | Rambeau, Roger | VP OPERATIONS | 05/13/96-04/03/98 | 10/72-10/85 |
| 103 | Reed, Wendy | SOFT GOODS SPEC. | 11/06/00-04/12/01 | 07/87-10/00 |
| 104 | Reyes, Scot Anthony | SM DOLL DESIGNER | 05/23/04-3/11/05 | 05/01-11/02; 01/04 |
| 105 | Ross, Lon | MARKETING DIR. | 11/13/00-08/03/01 | 1996-2000 |
| 106 | Schwartz, Dena | SR. PROD. MGR. | 05/21/01-04/08/02 | 1984-1988 |
| 107 | Shaver, Brandi | GR. DESIGNER | 05/03/04-06/30/06 | NOT APPLICABLE |
| 108 | Stinnett, Holly | SR. BRAND MGR. | 03/21/03-1/12/05 | 05/96-10/02 |
| 109 | Tawil, Lisa | LICENSING COORD. | 04/08/02-07/18/03 | 10/98-2/01 |
| 110 | Terry, Gord | DIR. OF SALES | 10/01/01-06/06/02 | 06/94-03/97 |
| 111 | Ward, Mercedeh | SR. PROD. DESIGNER | 10/00-10/01; 3/7/05-8/5/05 | 1985-2000 |
| 112 | Whitaker, Joseph | CONSULTANT | 11/05/96-03/7/97 | 88-'89; '82-'83; '64-'78 |
| 113 | Williams, Patrick | SVP SALES | 01/07/01-05/29/01 | 5/96-11/98 |
| 114 | Wong, Tong | DEV. DESIGNER | 03/10/03-05/16/03 | 1999-2003 |
| 115 | Wright, Cherrise | SOFT GOODS MGR. | 03/03/04-8/24/05 | 11/84-05/99 |
| 116 | Zbojniewicz, Dave* | DIR BUS PLANNING | 04/04-09/04 | 09/04-PRESENT |
| 117 | | | | |
| 118 | * Independent Contractor | | | |
| 119 | | | | |
| 120 | | | | |

Confidential - For Attorney's Eyes Only

MGA 1134725

51   943

FORMER MATTEL EMPLOYEES - 04/20/06

| | A | B | C | D |
|---|---|---|---|---|
| | MGA TEMPS | MGA POSITION | MGA DATES | MATTEL DATES |
| 121 | | | | |
| 122 | | | | |
| 123 | Bryant, Carter | PRODUCT DESIGNER | ????-PRESENT | DON'T ASK |
| 124 | Feicht, Steve | ARTIST/JR. DESIGNER | 07/18/02-PRESENT | 01/97-01/02 |
| 125 | Ho, Jeff | SR. PROD. ARTIST | ????-10/04 | 1998-???? |
| 126 | Rhee, Anna | DOLL FACE DESIGN | ????-PRESENT | DON'T ASK |
| 127 | | | | |
| 128 | ** Signed Copyright Assignment | | | |

Confidential - For Attorney's Eyes Only

MGA 1134726



EX 1932-0004

51   944

## FORMER MATTEL EMPLOYEES - 04/20/06

| | E MATTEL POSITION | F NDA | G COMMENTS |
|---|---|---|---|
| 1 | MATTEL POSITION | NDA | COMMENTS |
| 2 | | | |
| 3 | SR. SALES ANALYST | YES | |
| 4 | SENIOR PRODUCT ENGINEER | YES | |
| 5 | Production/QA (Contract Position) | YES | 1 & 2 |
| 6 | QA Technical Lead | YES | 1 & 2 |
| 7 | LEAD ILLUSTRATOR | YES | |
| 8 | SVP MARKETING | YES | |
| 9 | SALES DIRECTOR | YES | 3 CANADA |
| 10 | Int'l Planning Manager | YES | |
| 11 | Design Internship at Pleasant Co., Mattel Inc. | YES | 1 & 2 |
| 12 | TOY DESIGNER | YES | |
| 13 | Intern, Design | YES | 1 & 2 |
| 14 | Temporary Designer | YES | 1 & 2 |
| 15 | DIR. CUSTOMER MKTG | YES | |
| 16 | Director of Sales - TRU | YES | |
| 17 | Marketing Sr. Brand Manager | YES | |
| 18 | SR. DESIGNER | YES | |
| 19 | FREELANCE DESIGNER | NO | 1 & 2 |
| 20 | STAFF DESIGNER | YES | |
| 21 | Producer/QA Lead | YES | 1 & 2 |
| 22 | SR. DESIGNER | YES | |
| 23 | PRODUCT PLANNER | NO | 1 & 3 |
| 24 | PROD. INTEGRITY ENG. | YES | 1 & 2 |
| 25 | PROD. INTEGRITY ENG. | YES | |
| 26 | Project Designer | YES | 2 |
| 27 | FACE DESIGNER | YES | |
| 28 | PACKAGING ENG. | YES | |
| 29 | Sr. Account Executive | YES | 1 & 2 |
| 30 | Sr. Account Executive | YES | 1 & 2 |
| 31 | MGR. CATEGORY ADV. | YES | |
| 32 | DIR. SR. ACCT. MGR. | YES | |
| 33 | BUS ANALYST-TARGET | YES | |
| 34 | VP CREATIVE ADV. | YES | |
| 35 | Manager - Global Sourcing | YES | |
| 36 | FREELANCE DESIGNER | YES | |
| 37 | PROJECT DESIGNER | YES | |
| 38 | PATTERN MAKER | YES | |
| 39 | DOLL HAIR DESIGNER | YES | |
| 40 | DESIGNER | NO | 1 & 2 |

Confidential - For Attorney's Eyes Only

MGA 1134727

EXHIBIT 51 945

EX 1932-0005

## FORMER MATTEL EMPLOYEES - 04/20/06

| | E | F | G |
|---|---|---|---|
| 41 | Retail Service Rep. | YES | 1 & 2 upon orientation |
| 42 | STAFF ENGINEER | YES | |
| 43 | MANAGER | YES | |
| 44 | ACCOUNT EXECUTIVE | YES | |
| 45 | SAMPLE MAKER | YES | |
| 46 | SR. PROJECT ENG. | YES | |
| 47 | SENIOR PRODUCER | NO | 1 & 2 |
| 48 | HAIR DESIGNER | YES | |
| 49 | FREELANCE DESIGNER | YES | |
| 50 | SR. SCULPUTOR | YES | |
| 51 | FREELANCE DESIGNER | YES | |
| 52 | SAMPLEMAKER | YES | |
| 53 | DESIGNER | YES | |
| 54 | FREELANCE DESIGNER | YES | |
| 55 | PACKAGING ENG. | YES | |
| 56 | HR Director – Boys Division | | Upon Orientation |
| 57 | SR. DEV. DESIGNER | YES | |
| 58 | LEAD SAMPLE MAKER | YES | |
| 59 | SEE BELOW* | YES | |
| 60 | PATTERN MAKER | YES | |
| 61 | MKT/RES ANALYST | YES | |
| 62 | SAMPLE MAKER | YES | |
| 63 | SR. PRODUCT PLANNER | YES | |
| 64 | PACKAGING ENG. | YES | |
| 65 | PROJECT DESIGNER | NO | 1 & 2 |
| 66 | PROJ ADM SPECIALIST | YES | |
| 67 | DESIGNER'S ASST. | YES | |
| 68 | DESIGNER ASSOC. | YES | |
| 69 | FACE DESIGNER | YES | |
| 70 | SR. PROJECT ENG. | YES | |
| 71 | PROJECT DESIGNER | YES | 1 & 2 |
| 72 | GR. DESIGNER | NO | 1 & 2 |
| 73 | | | |
| 74 | | | |
| 75 | | | |
| 76 | | | |
| 77 | | | |
| 78 | | | |
| 79 | | | |
| 80 | MATTEL POSITION | NDA | VOLUNTARY |

Confidential - For Attorney's Eyes Only

MGA 1134728

51     9 46

EX 1932-0006

# FORMER MATTEL EMPLOYEES - 04/20/06

| | E | F | G |
|---|---|---|---|
| 81 | | | |
| 82 | SR. ART DIRECTOR | N/A | YES |
| 83 | DEV. DESIGNER | YES | YES |
| 84 | SR. ENGINEER | YES | YES |
| 85 | FREELANCE | YES | NO |
| 86 | ASSO. PROD. MGR. | NO | 1 & 2 |
| 87 | PRODUCT MGR. | N/A | NO |
| 88 | MARKETING MGR. | N/A | NO |
| 89 | MARKETING DIR. | N/A | YES |
| 90 | UNKNOWN | NO | 1 & 2 |
| 91 | BUS. DEV. MGR. | N/A | YES |
| 92 | DIRECTOR MARKETING | YES | |
| 93 | PRODUCT MGR. | N/A | NO |
| 94 | ASSOC. PRODUCT MGR. | N/A | YES |
| 95 | FREELANCE DESIGNER | YES | NO |
| 96 | SENIOR ENGINEER | YES | |
| 97 | PATTERN MAKER | YES | |
| 98 | ACCT. EXECUTIVE | YES | NO |
| 99 | PROD. ARTIST | YES | NO |
| 100 | ASSOC. ART DIRECTOR | YES | |
| 101 | FREELANCE | YES | NO |
| 102 | VP OF MANUFACTURING | N/A | YES |
| 103 | ASSOC. PRODUCT DES. | N/A | YES |
| 104 | SR. DESIGNER | YES | YES |
| 105 | SR. BRAND MGR. | N/A | YES |
| 106 | SR. SEWING ENGINEER | N/A | YES |
| 107 | SEE BELOW ** | YES | |
| 108 | SR. PRODUCT COORD. | YES | NO |
| 109 | MARKETING/BUS. DEV. | N/A | NO |
| 110 | SR. ACCT. MANAGER | N/A | NO |
| 111 | PROJECT DESIGNER | YES | MUTUAL |
| 112 | SVP, MKTG, & PD | N/A | TEMPORARY |
| 113 | NAT'L SALES DIRECTOR | N/A | MUTUAL |
| 114 | PROJECT DESIGNER | YES | YES |
| 115 | SR. MANAGER | NO | YES |
| 116 | DIR. OF FINANCE/BOYS | YES | YES |
| 117 | | | |
| 118 | | | |
| 119 | | | |
| 120 | | | |

Confidential - For Attorney's Eyes Only

# FORMER MATTEL EMPLOYEES - 04/20/06



| | E | F | G |
|---|---|---|---|
| 121 | MATTEL POSITION | NDA | |
| 122 | | | |
| 123 | DONT ASK | NO | |
| 124 | ART DIRECTOR | ICA | |
| 125 | FREELANCE | N/A | |
| 126 | DONT ASK | ** | |
| 127 | | | |
| 128 | | | |

Confidential - For Attorney's Eyes Only

MGA 1134730

51      948  EX 1932-0008

# Exhibit 52

Claimant
Isaac Larian
First
Exhibits IL 1 and ILA-D
*14*.05.04

IN THE HIGH COURT OF JUSTICE

CHANCERY DIVISION

INTELLECTUAL PROPERTY

B E T W E E N:

MGA ENTERTAINMENT, INC.

Claimant

- and -

THOMAS CHRISTOPHER JOSEPH METSON

Defendant

## AFFIDAVIT OF ISAAC LARIAN

I, **ISAAC LARIAN**, of 16730 Schoenborn Street, North Hills, California, CA 91343, USA

MAKE OATH and say as follows:

### Introduction

1.  I am the Chief Executive Officer of the Claimant. I make this statement in support of the Claimant's applications for a disclosure order under CPR Part 25.1(1)(h), CPR Part 31 and the Court's equitable jurisdiction, and an interim injunction to restrain the Defendant from dealing in unlawful BRATZ trading cards under CPR 25.1(a) (set out in the Application Notice issued in these proceedings.

2.  Save where otherwise stated, I make this statement from facts within my own knowledge. Where I state facts which are not within my own knowledge, the source of my information is identified. I am duly authorised to make this Affidavit on behalf of the Claimant. 295

M17447.115/LT:327391.2/eaai

(53 pgs)

Exhibit no. *947*
Date: *10/8/07*
*Woodmak* P. Pyburn

52

949

MGA 0868039

EX 947-0001

3.    I have been the Chief Executive Officer of the Claimant since the Claimant was founded in 1979.

4.    There is now produced and shown to me marked **Exhibit "IL 1"** a bundle of copy documents to which I shall refer in this affidavit by reference to the relevant page numbers.

**The Claimant**

5.    The Claimant was founded as a consumer electronics business in 1979.  It entered the toy business in 1987 when it obtained an exclusive licence to sell Nintendo hand-held games in the US.  The Claimant subsequently obtained licences for other toy products including HELLO KITTY and POWER RANGERS and then developed its own branded toys such as BRATZ dolls.

6.    The Claimant has offices in Los Angeles, Hong Kong, Mexico and Canada and has over 450 employees. The Claimant sells its products around the world including in the US and Europe.

7.    Today, the Claimant has achieved earnings in excess of US$600 million in 2003 and its earnings are projected to be US$1 billion in 2004.  About 65-70% of the Claimant's business relates to BRATZ dolls and related merchandise (see below).

8.    I established the Claimant and was the inspiration behind the BRATZ dolls.  I have been the main driving force behind the success of the Claimant.

**The BRATZ Dolls**

9.    The Claimant started promoting and selling the BRATZ dolls in the US in June 2001.  The first four characters were "Cloe", "Sasha", "Jade" and "Yasmin".

10.   The BRATZ dolls have distinctive oversized heads decorated with exaggerated eyes and

*296*

M17447.115/LT:327391.2/labd                    2

Confidential - Attorney's Eyes Only

*52*   *950*

MGA 0868040

EX 947-0002



eyelashes, multi-coloured eye make-up, two-tone lipstick and rugged cheeks. These dolls were at that time, completely unique and were aimed at girls between the ages of 7 –12 years olds. At **Exhibit "IL A"** are samples of the latest BRATZ dolls on the UK market.

11.   The Claimant launched the BRATZ dolls in the UK in September 2001.

12.   Today, there are currently 8 full sized female dolls in the BRATZ collection called "Cloe", "Sasha", "Jade", "Yasmin", "Meygan", "Dana", "Nevra" and "Fianna" and 4 mini female dolls called "Ailani", "Nazalia", "Talia" and "Zada". There are also 5 full sized male dolls in the BRATZ collection called "Cameron", "Dylan",  "Eitan", "Koby" and "Cade" and 4 mini male dolls called Mikko", "Colin", "Deavon" and "Lakin".

13.   As a result of the BRATZ dolls' uniqueness and designs, they have become a world-wide success.  More than 50 million BRATZ dolls have been sold around the world to date, of which around 2.25 million have been sold in the United Kingdom as of 30 April 2004.

14.   At pages 1 to 4 of **Exhibit IL 1** is a copy of a schedule that appears on the website of the Office of National Statistics.  I can see from this schedule that there were approximately 2,231,000 girls between the ages of 7-12 (inclusive) in the middle of 2002, Therefore, with cumulative sales of over 2 million, I estimate that a significant proportion of girls in this age group have one or more BRATZ dolls.

15.   For two consecutive years in 2001 and 2002, the BRATZ dolls have won the toy industry's most prestigious awards, The People's Choice Toy of the Year Award.  In 2003, BRATZ dolls won the Toy Industry Association, Inc.'s Property Toy of the Year Award, the TIA Girl Toy of the Year Award, the Family Fun Toy of the Year, Toy Wishes Magazine Hot Dozen, MSN BC Hottest Toy of the Year 2003, MSN.com Top Holiday Toy 2003, NBC Today Show Toy Test Winner 2003, Toys R Us/Amazon.com, E-bay and KB Toys Hot List for 2003, and CNN Money Top Ten Holiday Toys for Girls 2003. At pages 5 to 6 of **Exhibit IL 1** are copies of articles confirming that the Claimant has won these awards.

297

**Confidential - Attorney's Eyes Only**

52        95/

MGA 0868041

EX 947-0003

211.    In the circumstances, I respectfully request that this Honourable Court should grant the injunction and disclosure order sought by the Claimant in this action.

Sworn at   14730 Schoenborn St.          )
           North Hills, CA. 91343         )
                                          )

           May 14, 2004

           Before me     Joseph David Newcomb

                    JOSEPH DAVID NEWCOMB
                    Commission # 1466241
                    Notary Public - California
                    Los Angeles County
                    My Comm. Expires Jan 27, 2008

                                346

Confidential - Attorney's Eyes Only                    52        952                    MGA 0868090

                                                                            EX 947-0052

# Exhibit 53

**From:** Isaac Larian (President / CEO)
**To:** Isaac Larian (President / CEO)
**CC:**
**BCC:**
**Sent Date:** 2003-07-14 17:52:29:375
**Received Date:** 2003-07-14 17:52:29:437
**Subject:** Fw: Fact-checking
**Attachments:**

Isaac Larian
CEO
MGA Entertainment Inc.
A Consumer Entertainment Product Company
16730 Schoenborn St
North Hills, Ca. 91343-6122
Tel : 818-894-3150
Fax : 818-894-1267

——Original Message——
From: Chris Palmeri <chris_palmeri@businessweek.com>
To: Larianl1@mgae.com <Larianl1@mgae.com>
Sent: Mon Jul 14 18:01:48 2003
Subject: Fact-checking

Isaac,

I have a Mattel story running this week that features Bratz prominently.
I quote you as saying: Like they say in business school, no risk, no
reward. I describe you as the chief executive of privately-held MGA
Entertainment, Inc. of North Hills, Calif. We say that through May of
this year, Bratz had doll sales in the U.S. of $22 million vs. $27
million for traditional Barbie and $4 million for My Scene. We say that,
overall, Bratz will do about $500 million in sales this year, vs. $1.5
billion for Barbie. We describe you as a 49 year old Iranian immigrant,
trained as a civil engineer, who modeled Bratz after your own children
who wear midriff-bearing shirts, low-rise jeans and baseball caps.

Is all of that accurate? Please let me know asap. And thanks for your
help.

213 480-5225

Exhibit no. 4941
Date: 3/26/08
Larian, I. P. Pyburn

CONFIDENTIAL

53    953

MGA 3805091

EX 4941-0001

# Exhibit 54

**Immigrant's Creative Company Shakes Up Toy Industry**

By JEFF WEISS; Contributing Reporter

1,098 words

29 March 2004

San Fernando Valley Business Journal

English

2004 San Fernando Valley Business Journal. All rights reserved.

Large Business Award - MGA Entertainment, North Hills

Only 16 years old, with a mere $750 in his pocket, and with parents across the globe in Iran, Isaac Larian never expected to eventually be the founder of one of the fastest growing toy companies in the world.

Initially undecided whether to emigrate to the United States or to Israel, Larian opted to pursue the American dream. The Business Journal's recipient of the family business Best Large Company award, MGA Entertainment, is the end product of Larian's hard work, determination, and foresight in capitalizing upon opportunity.

Yet before becoming a toy mogul, Larian set out to forge a career in the civil engineering industry before realizing his true talents lay elsewhere.

"I came here to get a civil engineering degree because I thought I'd be a civil engineer and go back to Iran and build infrastructure," Larian said. "I graduated in 1978 from Cal State Los Angeles but I never worked as an engineer. Shortly after graduating, the (Iranian) revolution broke out and I discovered that engineering wasn't for me. I was more of an entrepreneur."

The following year Larian and his brother Farhad founded MGA as a consumer electronics company. Their first foray into the toy industry didn't come until 1987 when Isaac saw the opportunity to manufacture Nintendo's hand-held electronic games.

"I'm an entrepreneur and in 1987 I saw an opportunity to become the distributor for Nintendo's hand-held games. I just saw opportunity. Most entrepreneurs do that," Larian said.

After two years in the hand-held video game industry, MGA left the toy game and returned to consumer

Page 229        © 2005 Dow Jones Reuters Business Interactive LLC (trading as Factiva). All rights reserved.


Δπ EXHIBIT 6000
Deponent  Weiss
Date 7/26/08 Rptr. SL
WWW.DEPOBOOK.COM

electronics. Returning in 1993 to produce Mighty Morphin Power Rangers accessories, MGA never left the toy industry, having its first breakthrough item with 1997's wildly successful Singing Bouncing Baby Doll.

"Singing Bouncing Baby was our first doll and it was a huge hit," Larian said. "We ended up winning Family Fun Toy of the Year which is the Oscars of the toy industry. We ended up doing in excess of a million pieces," said Larian.

Introducing Bratz

But MGA's greatest success came later, with the introduction of 2001's Bratz dolls. Against all odds, Larian pioneered a line of dolls able to undercut the success of Barbie, the only company to do so since Barbie's 1959 debut.

However, the modest Larian is quick to acknowledge others for contributing to the company's success. A close knit family, Larian's sister, Shirin Makabi, is the company's director of travel and expenses. Shirin's husband, Eli Makabi, is MGA's vice-president in charge of traffic in sales. In addition, the Makabis co-own the business with Larian. But Larian family involvement does not stop there; Larian's children have played a crucial role in MGA's development.

"My oldest son, 17-year-old Jason, is very creative and a music writer. He has come up with some of our popular toys," Larian said. "He came up with Commandobot—a robot that was the first ever robot toy to work on voice recognition. It was a fantastic seller that was featured in Wired magazine. It was Jason's idea for Bratz."

Larian's other children have also been key to product development.

"Yasmin, my 15-year-old daughter, is involved in the business as well. She's particularly interested in fashion and focus groups. One of the Bratz is named after her," Larian said. "My 10-year-old son, Cameron, is also the namesake for one of the boy Bratz. Cameron comes up with different product ideas. One of our best ideas was a winter wonderland Bratz line. We were on a family ski vacation and he said 'Dad, you should do a Bratz winter break.' So we did it and it sold wonderfully."

Thanking the employees

Larian also credits the company's 430 employees for much of MGA's success.

"Our success is due to the passion of the people we have working for us. Each one has contributed to our success because they are passionate about the company and winning."

Page 230        © 2005 Dow Jones Reuters Business Interactive LLC (trading as Factiva). All rights reserved.

EX 6000-0002

With business booming, a Bratz licensing deal with 20th Century Fox has been inked. A Bratz DVD and a Bratz feature film are soon on the way.

"The Bratz are a true phenomenon that has taken the toy/doll industry by storm," Jim Gianopulos, chairman of Fox Filmed Entertainment, said. "They are more than just toys; they reflect the cultural diversity and contemporary style that kids relate to. That kind of success and impact on young people make the company a natural in a major motion picture, and we look forward to turning the Bratz figures into major motion picture stars."

MGA's projected revenue for 2004 is $1 billion and the company has openings for 110 employees in a variety of positions. Although MGA's success is now assured, there were obstacles along the way.

"I noticed some discrimination when I first got into the business world. I think that after living here for 33 years, there is unfortunately discrimination whether you're Jewish, Persian, black or whatever," Larian said. "But it made me stronger to go out and fight. People become resilient and they get angry and they need to turn that anger into positive energy."

Larian has certainly come a great distance from being a teenager with inclinations towards civil engineering and less than a thousand dollars in his pocket. Thanks to MGA, Barbie's pedestal seems a little less secure.

"I'm having a lot of fun and enjoying what I'm doing here right now and I think as long as you have fun at your job, it's a great thing," Larian said. "I believe that in life you have to have passion for what you do and if you lose that passion you shouldn't do it. My vision is for MGA to become a multibillion-dollar entertainment company and specialize in other things besides just toys."

Looking back on the whirlwind rise of MGA, Larian still seems a bit surprised by the amount of success he's encountered.

"My life is proof that dreams come true. You can't give up. They were definitely moments of self-doubt. I just didn't want to fail, I always had that desire to win," Larian said. "We've made history by unseating Barbie and for a small San Fernando Valley company to do that is a miracle."

Document SFVBJ00020041020e03t0003p

Page 231      © 2005 Dow Jones Reuters Business Interactive LLC (trading as Factiva). All rights reserved.