# Exhibit 63

1   QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
      John B. Quinn (Bar No. 090378)
2     johnquinn@quinnemanuel.com
      Michael T. Zeller (Bar No. 196417)
3     (michaelzeller@quinnemanuel.com)
      Jon D. Corey (Bar No. 185066)
4     (joncorey@quinnemanuel.com)
    865 South Figueroa Street, 10th Floor
5   Los Angeles, California  90017-2543
    Telephone:  (213) 443-3000
6   Facsimile:   (213) 443-3100

7   Attorneys for Mattel, Inc.

8                   UNITED STATES DISTRICT COURT

9                  CENTRAL DISTRICT OF CALIFORNIA

10                       EASTERN DIVISION

11  CARTER BRYANT, an individual,      CASE NO. CV 04-9049 SGL (RNBx)

12              Plaintiff,             Consolidated with
                                       Case No.    CV 04-09059
13        vs.                          Case No.    CV 05-2727

14  MATTEL, INC., a Delaware           NOTICE OF LODGING OF BRATZ
    corporation,                       PRODUCTS IN SUPPORT OF
15                                     MATTEL INC.'S MOTION FOR A
              Defendant.               PERMANENT INJUNCTION
16

17  AND CONSOLIDATED ACTIONS          Date:   Nov. 10, 2008
                                       Time:   1:00 p.m.
18                                     Place:  Courtroom 1

19                                     **Phase 1(a)**
                                       Trial Date:   May 27, 2008
20
                                       **Phase 1(b)**
21                                     Trial Date:   July 23, 2008

22

23

24

25

26

27

28

07209/2677018.1

EXHIBIT _63_ PAGE _1030_

1  TO THE COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2          PLEASE TAKE NOTICE that pursuant to Local Rule 11-5.1, and consistent

3  with the Court's October 6, 2008 Order Granting Mattel, Inc.'s *Ex Parte* Application

4  for Leave to Lodge Non-Paper Physical Exhibits, Mattel, Inc. hereby lodges with

5  the Court certain Bratz products identified in Exhibit A hereto in support of Mattel's

6  Motion for a Permanent Injunction.  Mattel lodges these products as an addition to

7  the Bratz products Mattel lodged with the Court on October 14, 2008.

8

9  DATED:  October 23, 2008          QUINN EMANUEL URQUHART OLIVER &
                                        HEDGES, LLP
10

11                                    By/s/ Michael T. Zeller
12                                        Michael T. Zeller
                                          Attorneys for Mattel, Inc.
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT _63_  PAGE _1031_

1

## Exhibit A

2

| | PRODUCT | PHOTO ID | SKU | BOX |
|---|---|---|---|---|
| 1. | Pampered Pupz Sasha | 1698 | 358312 | Quinn Emanuel 9 |
| 2. | Pop Diva Jade | 1699 | 368472 | Quinn Emanuel 9 |
| 3. | Hair Stylistz Yasmin | 1702 | 362425 | Quinn Emanuel 9 |
| 4. | Hair Style Yasmin | 1703 | 374466 | Quinn Emanuel 9 |
| 5. | Hair Style Cloe | 1704 | 374473 | Quinn Emanuel 9 |
| 6. | Magic Fashion Nails Sasha | 1705 | 368564 | Quinn Emanuel 9 |
| 7. | Magic Make-Up Sasha | 1706 | 355182 | Quinn Emanuel 9 |
| 8. | Girlfriendz Nite Out Cloe | 1708 | 407973 | Quinn Emanuel 8 |
| 9. | Sunkissed Doll Cloe | 1712 | 368403 | Quinn Emanuel 9 |
| 10. | Walking Bratz Sasha | 1715 | 365969 | Quinn Emanuel 9 |
| 11. | Walking Bratz Cloe | 1716 | 361275 | Quinn Emanuel 9 |
| 12. | Big BRATZ Girls Rock (Hip Hop Hottie) Sasha | 1717 | 411918 | Quinn Emanuel 5 |
| 13. | Big BRATZ Girls Rock (Rock Star) Cloe | 1718 | 411895 | Quinn Emanuel 5 |
| 14. | Big BRATZ Girls Rock (Pop Princess) Yasmin | 1719 | 411901 | Quinn Emanuel 6 |
| 15. | New Big Bratz Sasha- Hair Style Collector Sasha | 1720 | 411567 | Quinn Emanuel 6 |
| 16. | Starz Singerz Jade | 1721 | 358398 | Quinn Emanuel 9 |
| 17. | Be-Bratz.com Style 1 | 1722 | 365426 | Quinn Emanuel 9 |
| 18. | Collector Series Anyssa 11" Doll | 1723 | 379256 | Quinn Emanuel 7 |
| 19. | Collector Series Daphne 11" Doll | 1724 | 384571 | Quinn Emanuel 9 |
| 20. | Elf Meygan 10" Doll- Holiday | 1725 | 379706 | Quinn Emanuel 8 |
| 21. | Girlfriendz Nite Out II Dana | 1726 | 408864 | Quinn Emanuel 8 |
| 22. | Magic Make-Up Maribel | 1728 | 355175 | Quinn Emanuel 9 |
| 23. | Be-Bratz.com Electronic Doll | 1729 | 365440 | Quinn Emanuel 7 |
| 24. | Fashion Designer Styling Torso Yasmin | 1730 | 372653 | Quinn Emanuel 8 |
| 25. | Fashion Designer Styling Torso Cloe | 1731 | 372660 | Quinn Emanuel 8 |

EXHIBIT 63   PAGE 1632

Case 2:04-cv-09049-SGL-RNB      Document 4389      Filed 10/23/2008      Page 4 of 4

| | | | |
|---|---|---|---|
| 26. Movie Starz Styling Body Yasmin | 1732 | 358466 | Quinn Emanuel 8 |
| 27. Magic Hair Color Funky Fashion Makeover Torso Sasha | 1733 | 379553 | Quinn Emanuel 7 |
| 28. Hair Magic Styling Torso Yasmin | 1734 | 348870 | Quinn Emanuel 7 |
| 29. Magic Hair Color Torso 14" Yasmin | 1735 | 379539 | Quinn Emanuel 7 |
| 30. Flower Girlz Cloe | 1738 | 354925 | Quinn Emanuel 9 |
| 31. Pampered Pupz Cloe | 1740 | 358282 | Quinn Emanuel 9 |
| 32. Star Singerz Sasha | 1742 | 355120 | Quinn Emanuel 9 |
| 33. Hair Torso Cloe | 1747 | 379546 | Quinn Emanuel 9 |

07209/2677018.1

NOTICE OF LODGING IN SUPPORT OF MATTEL INC.'S MOTION FOR A PERMANENT INJUNCTION

EXHIBIT A

EXHIBIT _63_ PAGE _1033_

# Exhibit 64

FILED
CLERK, U.S. DISTRICT COURT

JUL 10 2008

CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION          BY DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| MATTEL, INC.,<br><br>    Plaintiff,<br><br>    vs.<br><br>MGA ENTERTAINMENT, INC.,<br><br>    Defendant.<br><br>AND CONSOLIDATED ACTIONS | CASE NO. CV 04-9049 SGL (RNBx)<br><br>Consolidated with<br>Case No. CV 04-09059<br>Case No. CV 05-02727<br><br>Hon. Stephen G. Larson<br><br>**FINAL JURY INSTRUCTIONS AS GIVEN** |

67    1034

## JURY INSTRUCTION NO. 1

Members of the Jury:  Now that you have heard all of the evidence and will soon hear the arguments of the attorneys, it is my duty to instruct you as to the law of the case.

A copy of these instructions will be sent with you to the jury room when you deliberate.

You must not infer from these instructions or from anything I may say or do as indicating that I have an opinion regarding the evidence or what your verdict should be.

It is your duty to find the facts from all the evidence in the case.  To those facts you will apply the law as I give it to you.  You must follow the law as I give it to you whether you agree with it or not.  And you must not be influenced by any personal likes or dislikes, opinions, prejudices, or sympathy.  That means that you must decide the case solely on the evidence before you.  You will recall that you took an oath to do so.

In following my instructions, you must follow all of them and not single out some and ignore others; they are all important.

-1-

Case No. Case No. CV 04-9049 SGL (RNBx)
JOINT PROPOSED JURY INSTRUCTIONS

64    1035

## <u>JURY INSTRUCTION NO. 2</u>

When a party has the burden of proof on any claim by a preponderance of the evidence, it means you must be persuaded by the evidence that the claim is more probably true than not true.

You should base your decision on all of the evidence, regardless of which party presented it.

In criminal trials, the prosecution must prove that the defendant is guilty beyond a reasonable doubt. But in civil trials, such as this one, the party who is required to prove something by a preponderance of the evidence need prove only that it is more likely to be true than not true.

Case No. Case No. CV 04-9049 SGL (RNBx)
JOINT PROPOSED JURY INSTRUCTIONS

EXHIBIT 64 PAGE 1036

## JURY INSTRUCTION NO. 3

The law defines cause in its own particular way.  A cause of injury, damage, loss or harm is something that is a substantial factor in bringing about an injury, damage, loss or harm.

A "substantial factor" is something which is more than a slight, trivial, negligible, or theoretical factor in producing a particular result.

Case No. Case No. CV 04-9049 SGL (RNBx)
JOINT PROPOSED JURY INSTRUCTIONS

1
2                           **JURY INSTRUCTION NO. 4**
3
4           You should decide the case as to each defendant separately.  Unless
5      otherwise stated, the instructions apply to all parties.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

-4-                  Case No. Case No. CV 04-9049 SGL (RNBx)

## JURY INSTRUCTION NO. 5

The evidence you are to consider in deciding what the facts are consists of:

(1)  The sworn testimony of any witness;

(2)  The exhibits which are received into evidence; and

(3)  Any facts to which the lawyers have agreed.

EXHIBIT 64 PAGE 1039

## JURY INSTRUCTION NO. 6

In reaching your verdict, you may consider only the testimony and exhibits received into evidence.  Certain things are not evidence, and you may not consider them in deciding what the facts are.  I will list them for you.

(1)    Arguments and statements by lawyers are not evidence.  The lawyers are not witnesses.  What they have said in their opening statements, closing arguments, and at other times is intended to help you interpret the evidence, but it is not evidence.  If the facts as you remember them differ from the way the lawyers have stated them, your memory of them controls.

(2)    Questions and objections by lawyers are not evidence.  Attorneys have a duty to their clients to object when they believe a question is improper under the rules of evidence.  You should not be influenced by the objection or by the court's ruling on it.

(3)    Testimony that has been excluded or stricken, or that you have been instructed to disregard, is not evidence and must not be considered.  In addition sometimes testimony and exhibits are received only for a limited purpose; when I have given a limiting instruction, you must follow it.

(4)    Anything you may have seen or heard when the court was not in session is not evidence.  You are to decide the case solely on the evidence received at the trial.

EXHIBIT 64   1040

## JURY INSTRUCTION NO. 7

Some evidence may be admitted for a limited purpose only.

When I instruct you that an item of evidence has been admitted for a limited purpose, you must consider it only for that limited purpose and for no other.

64          1041

## JURY INSTRUCTION NO. 8

Evidence may be direct or circumstantial. Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did. Circumstantial evidence is proof of one or more facts from which you could find another fact. You should consider both kinds of evidence. The law makes no distinction between the weight to be given to either direct or circumstantial evidence. It is for you to decide how much weight to give to any evidence.

-8-                    Case No. Case No. CV 04-9049 SGL (RNBx)

64   1042

## JURY INSTRUCTION NO. 9

If weaker and less satisfactory evidence is offered by a party, when it was within that party's ability to produce stronger and more satisfactory evidence, the evidence offered should be viewed with distrust.

EXHIBIT *64* 1043

1

2                          **JURY INSTRUCTION NO. 10**

3

4          In deciding the facts in this case, you may have to decide which testimony to

5    believe and which testimony not to believe.  You may believe everything a witness

6    says, or part of it, or none of it.  Proof of a fact does not necessarily depend on the

7    number of witnesses who testify about it.

8

9          In considering the testimony of any witness, you may take into account:

10

11              (1)    the opportunity and ability of the witness to see or hear or know

12    the things testified to;

13

14              (2)    the witness's memory;

15

16              (3)    the witness's manner while testifying;

17

18              (4)    the witness's interest in the outcome of the case and any bias or

19    prejudice;

20

21              (5)    whether other evidence contradicted the witness's testimony;

22

23              (6)    the reasonableness of the witness's testimony in light of all the

24    evidence; and

25

26              (7)    any other factors that bear on believability.

27

28

                                   -10-          Case No. Case No. CV 04-9049 SGL (RNBx)
                                                JOINT PROPOSED JURY INSTRUCTIONS

1    The weight of the evidence as to a fact does not necessarily depend on the
2  number of witnesses who testify about it.

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

64      1045

## JURY INSTRUCTION NO. 11

From time to time during the trial, it became necessary for me to talk with the attorneys out of the hearing of the jury, either by having a conference at the bench when the jury was present in the courtroom, or by calling a recess.  Please understand that while you were waiting, we were working.  The purpose of these conferences is not to keep relevant information from you, but to decide how certain evidence is to be treated under the rules of evidence and to avoid confusion and error.

Of course, we have done what we could to keep the number and length of these conferences to a minimum.  I did not always grant an attorney's request for a conference.  Do not consider my granting or denying a request for a conference as any indication of my opinion of the case or of what your verdict should be.

Case No. Case No. CV 04-9049 SGL (RNBx)
JOINT PROPOSED JURY INSTRUCTIONS

64        1046

## JURY INSTRUCTION NO. 12

The parties have agreed to certain facts to be placed in evidence. You should therefore treat these facts as having been proved.

Case No. Case No. CV 04-9049 SGL (RNBx)
JOINT PROPOSED JURY INSTRUCTIONS

64 1047

## JURY INSTRUCTION NO. 13

A deposition is the sworn testimony of a witness taken before trial. The witness is placed under oath to tell the truth and lawyers for each party may ask questions. The questions and answers are recorded. When a person is unavailable to testify at trial, the deposition of that person may be used at the trial.

The depositions of a number of witnesses were taken in this case. You should consider deposition testimony, presented to you in court in lieu of live testimony, insofar as possible, in the same way as if the witness had been present to testify.

-14-      Case No. Case No. CV 04-9049 SGL (RNBx)
JOINT PROPOSED JURY INSTRUCTIONS

# JURY INSTRUCTION NO. 14

The evidence that a witness has lied under oath on a prior occasion or given inconsistent testimony under oath may be considered, along with all other evidence, in deciding whether or not to believe the witness and how much weight to give to the testimony of the witness and for no other purpose.

Case No. Case No. CV 04-9049 SGL (RNBx)
JOINT PROPOSED JURY INSTRUCTIONS

64     1047

## JURY INSTRUCTION NO. 15

Evidence has been presented to you in the form of answers of one of the parties to written interrogatories submitted by the other side.  These answers have been given in writing and under oath, before the actual trial, in response to questions that were submitted in writing under established court procedures.  You should consider the answers, insofar as possible, in the same way as if they were made from the witness stand by the party that responded to the written interrogatories.

Case No. Case No. CV 04-9049 SGL (RNBx)
JOINT PROPOSED JURY INSTRUCTIONS

64      1050

## JURY INSTRUCTION NO. 16

Evidence has been presented to you in the form of admissions of one of the parties to written requests submitted by the other side.  These answers have been given in writing and under oath, before the actual trial, in response to requests that were submitted in writing under established court procedures.  The matters admitted are deemed conclusively established as to the party that made the admission.

64      1051

## JURY INSTRUCTION NO. 17

Some witnesses, because of education or experience, are permitted to state opinions and the reasons for those opinions.

Opinion testimony should be judged just like any other testimony.  You may accept it or reject it, and give it as much weight as you think it deserves, considering the witness's education and experience, the reasons given for the opinion, and all the other evidence in the case.

Case No. Case No. CV 04-9049 SGL (RNBx)
JOINT PROPOSED JURY INSTRUCTIONS

64      1052

## JURY INSTRUCTION NO. 18

Certain charts and summaries not received in evidence have been shown to you in order to help explain the contents of books, records, documents, or other evidence in the case. They are not themselves evidence or proof of any facts. If they do not correctly reflect the facts or figures shown by the evidence in the case, you should disregard these charts and summaries and determine the facts from the underlying evidence.

69        1053

# JURY INSTRUCTION NO. 19

Certain charts and summaries have been received into evidence to illustrate information brought out in the trial.  Charts and summaries are only as good as the underlying evidence that supports them.  You should, therefore, give them only such weight as you think the underlying evidence deserves.

69      1054

## JURY INSTRUCTION NO. 20

All parties are equal before the law and a corporation is entitled to the same fair and conscientious consideration by you as any party.

Under the law, a corporation is considered to be a person. It can only act through its employees, agents, directors, or officers. Therefore, a corporation is responsible for the acts of its employees, agents, directors, and officers performed within the scope of authority.

Case No. Case No. CV 04-9049 SGL (RNBx)
JOINT PROPOSED JURY INSTRUCTIONS

64      1055

## JURY INSTRUCTION NO. 21

In its first claim, Mattel contends that it has certain rights to all Bratz-related ideas, concepts, drawings, designs, and other works "conceived or reduced to practice," that is, created, by Carter Bryant, alone or jointly with others, while he was employed by Mattel, including Bratz drawings and the idea for the name "Bratz."

MGA and Isaac Larian deny Mattel's contention.

Mattel's claim is based on a contract between Carter Bryant and Mattel called the "Employee Confidential Information and Inventions Agreement" or simply the "Inventions Agreement." As a matter of law, the Inventions Agreement is a valid and enforceable agreement.

Section 2(a) of the Inventions Agreement provides:

"I agree to communicate to the Company as promptly and fully as practicable all inventions [as defined below] conceived or reduced to practice by me (alone or jointly [with] others) at any time during my employment by the Company. I hereby assign to the Company and/or its nominees all my right, title

-22-

64     1056

1   and interest in such inventions, and all my right, title and interest in any patents,

2   copyrights, patent applications or copyright applications based thereon.  I will

3   assist the Company and/or its nominees (without charge but at no expense to me)

4

5   at any time in every proper way to obtain for its and/or their own benefit, patents,

6   and copyrights for all such inventions anywhere in the world and to enforce its

7   and/or their rights in legal proceedings."

8

9

10  The Inventions Agreement defines the term "inventions" as follows:

11

12  "[T]he term 'inventions' includes, but is not limited to, all discoveries,

13  improvements, processes, developments, designs, know-how, data computer programs

14  and formulae, whether patentable or unpatentable."

15

16  To prevail on its first claim, Mattel must show, by the preponderance of the

17  evidence, that any particular Bratz-related idea, concept, drawing, design or work was

18  "conceived or reduced to practice," that is, created, by Mr. Bryant, alone or jointly

19  with others, while employed by Mattel.

20

21  It is for you to decide what, if any, Bratz-related works were created by Mr.

22  Bryant, alone or jointly with others, while he was employed by Mattel.

23

24

25

26

27

28

-23-          Case No. Case No. CV 04-9049 SGL (RNBx)
              JOINT PROPOSED JURY INSTRUCTIONS

64          1057

## JURY INSTRUCTION NO. 22

In its second claim, Mattel contends that that MGA and Isaac Larian intentionally interfered with the Inventions Agreement between Mattel and Carter Bryant. To establish this claim, Mattel must prove the following by a preponderance of the evidence:

1.    That there was a contract or contracts between Mattel and Carter Bryant;

2.    That MGA and/or Mr. Larian knew of the contract;

3.    That MGA and/or Mr. Larian intended to disrupt the performance of this contract;

4.    That the conduct of MGA and/or Mr. Larian prevented performance or made performance more difficult;

5.    That Mattel was harmed in some way; and

Case No. Case No. CV 04-9049 SGL (RNBx)
JOINT PROPOSED JURY INSTRUCTIONS

64   1058

Case 2:04-cv-09049-SGL-RNB      Document 4115      Filed 07/10/2008      Page 26 of 37

6.      That the conduct of MGA and/or Mr. Larian was a substantial factor in causing Mattel's harm.

-25-

Case No. Case No. CV 04-9049 SGL (RNBx)
JOINT PROPOSED JURY INSTRUCTIONS

64      1057

## JURY INSTRUCTION NO. 23

As a matter of law, there was a valid contract between Mattel and Mr. Bryant, namely the Inventions Agreement.

As a matter of law, Mr. Bryant directly competed with Mattel by entering into a contract with MGA, Mattel's competitor, to produce a competing product while he was still employed by Mattel. Whether the remaining requirements of Mattel's claim for intentional interference with contractual relations have been satisfied or not is for you to decide.

It is also a matter of law that MGA and/or Isaac Larian's mere offering of employment to Carter Bryant would not be sufficient, by itself, to establish an intentional interference with the contract between Mattel and Mr. Bryant.

64     1060

## JURY INSTRUCTION NO. 24

In deciding whether MGA or Isaac Larian acted intentionally, you may consider whether they knew that a disruption in the performance of a contract or contracts was substantially certain to result from their conduct.

64      1061

## JURY INSTRUCTION NO. 25

In its third and fourth claims, Mattel contends that MGA and Isaac Larian aided and abetted Carter Bryant's breaches of (1) his fiduciary duty to Mattel and (2) his duty of loyalty to Mattel.  To establish that MGA and/or Mr. Larian are liable for aiding and abetting breaches of fiduciary duty or breach of the duty of loyalty, Mattel must prove the following by a preponderance of the evidence:

1.     Mr. Bryant's conduct constituted a breach of such duty or duties;

2.     MGA and/or Mr. Larian knew that Mr. Bryant's conduct constituted a breach of duty or duties; and

3.     MGA and/or Mr. Larian gave substantial assistance or encouragement to Mr. Bryant to breach his duty or duties.

64     1062

## JURY INSTRUCTION NO. 26

To establish that Mr. Bryant breached his fiduciary duty to Mattel, Mattel must prove the following by a preponderance of the evidence:

1.    That Mr. Bryant owed a fiduciary duty to Mattel;

2.    That Mr. Bryant breached his fiduciary duty to Mattel;

3.    That Mattel did not give informed consent to Mr. Bryant's conduct;

4.    That Mattel was harmed in some way; and

5.    That Mr. Bryant's conduct was a substantial factor in causing Mattel's harm.

Once a party assumes a fiduciary duty to another, that party is obligated to act on behalf of the other party, to hold the interest of the other paramount over his own interests, and to take no action that would further his interests over the other person's interest.

-29-        Case No. Case No. CV 04-9049 SGL (RNBx)
JOINT PROPOSED JURY INSTRUCTIONS

64        1063

## JURY INSTRUCTION NO. 27

To establish that Mr. Bryant breached his duty of loyalty to Mattel, Mattel must prove the following by a preponderance of the evidence:

    1.    That Mr. Bryant was Mattel's employee;

    2.    That Mr. Bryant knowingly acted against Mattel's interests while he was employed by Mattel;

    3.    That Mattel did not give informed consent to Mr. Bryant's conduct;

    4.    That Mattel was harmed in some way; and

    5.    That Mr. Bryant's conduct was a substantial factor in causing Mattel's harm.

An employee owes his or her employer a duty of loyalty. The scope of the employee's duty varies with the nature of the employee's relationship with his employer.

Case No. Case No. CV 04-9049 SGL (RNBx)
JOINT PROPOSED JURY INSTRUCTIONS

64      1067

### JURY INSTRUCTION NO. 28

As a matter of law, Carter Bryant owed both a fiduciary duty and duty of loyalty to Mattel.

Mr. Bryant's fiduciary duty to Mattel is predicated upon paragraph 1(a) of the Inventions Agreement and is related to Mr. Bryant's obligation to keep Proprietary Information confidential.

Section 1(a) of the Inventions Agreement provides:

"I acknowledge that the Company possesses and will continue to develop and acquire valuable Proprietary Information (as defined below), including information that I may develop or discover as a result of my employment with the Company. The value of that Proprietary information depends on it remaining confidential. The Company depends on me to maintain that confidentiality, and I accept that position of trust."

The Inventions Agreement defines the term "Proprietary Information" as follows:

-31-                    Case No. Case No. CV 04-9049 SGL (RNBx)
                        JOINT PROPOSED JURY INSTRUCTIONS

64        1065

1       "'Proprietary Information' means any information (including formula,

2   pattern, compilation, device, method, technique or process) that derives

3   independent economic value, actual or potential, from not being generally known

4   to the public or to other persons who can obtain economic value from its disclosure

5

6   or use, and includes information on the Company, its customers, suppliers, joint

7   ventures, licensors, licensees, distributors, and other persons and entities with

8

9   whom the Company does business."

10

11

12       As a matter of law, Mr. Bryant breached his duty of loyalty to Mattel when

13   he entered into a contract with MGA, Mattel's competitor, while still employed by

14   Mattel, to produce a line of fashion dolls to be marketed in direct competition with

15

16   Mattel's products.

17

18       At the same time, merely seeking employment from a competitor, and a

19   failure to notify an employer of a decision to seek new employment until a

20

21   decision is final, does not constitute a breach of duty of loyalty.

22

23

24

25

26

27

28

64        1066

## JURY INSTRUCTION NO. 29

In its final claim, Mattel contends that MGA, MGA Entertainment (HK) Limited, and Isaac Larian wrongfully exercised control over Mattel's property, including tangible Bratz-related works such as Mr. Bryant's drawings.  To establish this claim for conversion, Mattel must prove the following by a preponderance of the evidence:

    1.    That tangible property was "conceived or reduced to practice" --- that is, created --- by Carter Bryant, alone or jointly with others, during the period in which he was employed by Mattel (January 4, 1999, to October 19, 2000);

    2.    That any of the defendants intentionally took possession of such property for a significant period of time;

    3.    That Mattel did not consent;

    4.    That Mattel was harmed; and

    5.    That any one of the defendant's conduct was a substantial factor in causing Mattel's harm..

-33-

64   1067

1
2
3

### JURY INSTRUCTION NO. 30

4
5
6
7
8

   When you begin your deliberations, you should elect one member of the jury as your presiding juror.  That person will preside over the deliberations and speak for you here in court.

9
10
11

   You will then discuss the case with your fellow jurors to reach agreement if you can do so.  Your verdict must be unanimous.

12
13
14
15

   Each of you must decide the case for yourself, but you should do so only after you have considered all of the evidence, discussed it fully with the other jurors, and listened to the views of your fellow jurors.

16
17
18

   Do not hesitate to change your opinion if the discussion persuades you that you should.  Do not come to a decision simply because other jurors think it is right.

19
20
21
22
23

   It is important that you attempt to reach a unanimous verdict but, of course, only if each of you can do so after having made your own conscientious decision. Do not change an honest belief about the weight and effect of the evidence simply to reach a verdict.

24
25
26
27
28

-34-                   Case No. Case No. CV 04-9049 SGL (RNBx)
                       JOINT PROPOSED JURY INSTRUCTIONS

64   1068

## JURY INSTRUCTION NO. 31

If it becomes necessary during your deliberations to communicate with me, you may send a note through the bailiff, signed by your presiding juror or by one or more members of the jury. No member of the jury should ever attempt to communicate with me except by a signed writing; I will communicate with any member of the jury on anything concerning the case only in writing, or here in open court. If you send out a question, I will consult with the parties before answering it, which may take some time. You may continue your deliberations while waiting for the answer to any question. Remember that you are not to tell anyone—including me—how the jury stands, numerically or otherwise, until after you have reached a unanimous verdict or have been discharged. Do not disclose any vote count in any note to the court.

64   1069

Case 2:04-cv-09049-SGL-RNB      Document 4115      Filed 07/10/2008      Page 37 of 37

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## JURY INSTRUCTION NO. 32

A verdict form has been prepared for you.  After you have reached unanimous agreement on a verdict, your presiding juror will fill in the form that has been given to you, sign and date it, and advise the court that you are ready to return to the courtroom.

-36-                    Case No. Case No. CV 04-9049 SGL (RNBx)

64        1070

# Exhibit 65

2708

1                   UNITED STATES DISTRICT COURT

2                  CENTRAL DISTRICT OF CALIFORNIA

3                        EASTERN DIVISION

4                           -  -  -

5         HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                           -  -  -

7   MATTEL, INC.,                  )
                                   )
8                    PLAINTIFF,    )
                                   )
9              VS.                 )   NO. CV 04-09049
                                   )
10  MGA ENTERTAINMENT, INC., ET. AL., )
                                   )
11                   DEFENDANTS.   )   TRIAL DAY 14
    _____)   MORNING SESSION
12  AND CONSOLIDATED ACTIONS,      )   PAGES 2708-2817
                                   )
13

14

15        REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16                     RIVERSIDE, CALIFORNIA

17                   TUESDAY, JUNE 17, 2008

18                        8:47 A.M.

19

20

21

22

23                 THERESA A. LANZA, RPR, CSR
                   FEDERAL OFFICIAL COURT REPORTER
24                 3470 12TH STREET, RM. 134
                   RIVERSIDE, CALIFORNIA  92501
25                      951-274-0844
                      WWW.THERESALANZA.COM

EXHIBIT 65
PAGE 1071

2709

```
 1    APPEARANCES:

 2
      ON BEHALF OF MATTEL, INC.:
 3
                          QUINN EMANUEL
 4                        BY:   JOHN QUINN
                                JON COREY
 5                              MICHAEL T. ZELLER
                                HARRY OLIVAR
 6                              TIMOTHY ALGER
                          865 S. FIGUEROA STREET,
 7                        10TH FLOOR
                          LOS ANGELES, CALIFORNIA   90017
 8

 9

10    ON BEHALF OF MGA ENTERTAINMENT:

11                        SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                          BY:   THOMAS J. NOLAN
12                              JASON RUSSELL
                                RAOUL KENNEDY
13                              LAUREN AGUIAR
                                CARL ROTH
14                        300 SOUTH GRAND AVENUE
                          LOS ANGELES, CALIFORNIA   90071-3144
15                        213-687-5000

16

17

18

19

20

21

22

23

24

25
```

TUESDAY, JUNE 17, 2008          TRIAL DAY 14, MORNING SESSION

EXHIBIT 65
PAGE 1072

2710

1                              I N D E X

2                                                           PAGE

3      PLAINTIFF CASE (CONTINUED)....................... 2727

4

5

6      PLAINTIFF
       WITNESS            DIRECT      CROSS      REDIRECT     RECROSS
7      CARTER BRYANT  (CONTINUED)

8      BY MR. PRICE        2727
       BY MR. NOLAN                   2779
9

10

11
              EXHIBITS          RECEIVED
12
                 20              2759
13             10480             2763
                1326             2766
14                27             2767
                 593             2769
15

16

17

18

19

20

21

22

23

24

25

TUESDAY, JUNE 17, 2008            TRIAL DAY 14, MORNING SESSION

EXHIBIT 65
PAGE 1073

2732

1   ORIGINAL NOTEBOOK DRAWINGS AND SOMETIME IN 1998; IS THAT RIGHT?

2   A    YES.

3   Q    EXHIBIT 5-100, WHICH IS BRYANT 00290.

4        IS THIS ANOTHER EXAMPLE OF A DRAWING WHICH YOU CLAIM

5   WAS DONE IN 1998, AFTER THOSE ORIGINAL NOTEBOOK DRAWINGS?          09:19

6   A    NO, I WOULDN'T AGREE WITH YOU ON THAT.

7   Q    OKAY.

8        WHEN WAS THIS ONE DONE?

9   A    THIS, I BELIEVE, WAS DRAWN IN 2000.

10  Q    AND WHEN IN 2000?                                            09:19

11  A    I THINK IT WAS LATE NOVEMBER OF 2000.

12  Q    SO YOU'RE SAYING THIS ONE WAS DONE AFTER YOU LEFT MATTEL;

13  IS THAT RIGHT?

14  A    YES.

15  Q    LET'S LOOK AT 5-101.                                         09:21

16       IS THIS A DOCUMENT WHICH YOU CLAIM WAS DRAWN AFTER

17  THOSE ORIGINAL DRAWINGS BUT SOMETIME IN 1998?

18  A    WHAT WAS THE NUMBER ON IT, AGAIN?

19  Q    IT'S BRYANT 290 AND IT'S 5-101.

20  A    OKAY.                                                        09:21

21  Q    IS THIS THE DRAWING WHICH YOU CLAIM WAS DONE IN 1998,

22  AFTER THOSE ORIGINAL DRAWINGS IN THE BLACK NOTEBOOK?

23  A    YES.

24  Q    BY THE WAY, IT IS YOUR UNDERSTANDING, IS IT NOT, THAT

25  THOSE ORIGINAL DRAWINGS THAT WE'RE LOOKING AT WITH THE TORN        09:22

TUESDAY, JUNE 17, 2008                TRIAL DAY 14, MORNING SESSION

EXHIBIT 65
PAGE 1074

2733

1   SHEETS OF PAPER --

2   A    YES.

3   Q    -- THOSE CAME OUT OF THE BLACK NOTEBOOK?

4   A    I AM NOT COMPLETELY CERTAIN WHICH NOTEBOOK THOSE CAME

5   OUT OF.

6   Q    YOU WERE LOOKING AT THEM FRIDAY WITH THE BLACK NOTEBOOK.

7        WOULD YOU LIKE TO SEE IT AGAIN?

8   A    SURE.

9   Q    THIS IS THE ORIGINAL OF 1155-C.

10       IS IT YOUR UNDERSTANDING THAT THOSE ORIGINAL DRAWINGS

11  THAT YOU MADE, WHICH WERE 5-39, 5-40, 5-41, AND 5-42, CAME OUT

12  OF THAT NOTEBOOK?

13  A    I BELIEVE SO, YES.

14  Q    I'M GOING TO SWITCH YOU NOW TO A DIFFERENT EXHIBIT.  IF

15  YOU WOULD LOOK AT EXHIBIT 1.

16       IS EXHIBIT 1 A COLLECTION OF SOME OF THE PITCH

17  MATERIALS THAT YOU INTENDED TO SHOW MGA IN 2000?

18  A    YES, BASED ON THE OLD '98 DRAWINGS.

19  Q    AND JUST TO BE CLEAR, EVERY ONE OF THESE PAGES -- LET ME

20  DEFINE IT THIS WAY.  I'M GOING TO ASK YOU WHETHER THEY WERE

21  CREATED AFTER 1998.  AND BY THAT I MEAN, YOU PUT PENCIL TO

22  PAPER TO CREATE THESE PARTICULAR DRAWINGS WHILE YOU WORKED AT

23  MATTEL; CORRECT?

24       MR. NOLAN:  OBJECTION, YOUR HONOR.  VAGUE AND

25  AMBIGUOUS AS TO THE PROCESS.

09:22
09:23
09:23
09:24
09:24

EXHIBIT 65
PAGE 1075

2734

1          THE COURT:   REPHRASE.

2          I'M A LITTLE CONFUSED MYSELF.

3   BY MR. PRICE:

4   Q    ALL I MEAN BY 'THESE WERE CREATED WHEN YOU WORKED FOR

5   MATTEL,' I MEAN THAT ORIGINALLY THEY WERE BLANK PAGES AND WHILE     09:25

6   YOU WERE AT MATTEL TO CREATE THESE, YOU FIRST PUT PEN OR PENCIL

7   OR A MAGIC MARKER OR A PASTEL MARKER, WHATEVER, TO PAPER.

8   A    YES.   USING THE DRAWINGS FROM 1998.

9   Q    SO WHAT YOU'RE SAYING IS THAT YOU -- AGAIN, THE PROCESS OF

10  USING A LIGHT BOX AND YOU PUT THAT ON A BLANK POSTER BOARD, AND     09:25

11  THEN YOU TOOK PEN, PENCIL, WHATEVER, AND DREW THESE DRAWINGS IN

12  EXHIBIT 1 IN 1999; CORRECT?

13  A    YES.

14  Q    WHILE WORKING AT MATTEL?

15  A    NOT WHILE PHYSICALLY AT MATTEL; BUT OFF HOURS, YES.            09:25

16  Q    WHILE EMPLOYED BY MATTEL?

17  A    WHILE EMPLOYED BY MATTEL, YES.

18  Q    WOULD YOU LOOK AT EXHIBIT 2.

19         COULD YOU TELL US, WERE THESE DOCUMENTS IN EXHIBIT 2

20  DONE ALSO IN PREPARATION FOR THE PITCH THAT YOU MADE TO MGA IN      09:26

21  2000?

22  A    WELL, THEY LOOK LIKE THE SAME DRAWINGS THAT WE JUST LOOKED

23  AT.

24  Q    WITHOUT TEXT.

25  A    RIGHT, WITHOUT TEXT.                                           09:26

TUESDAY, JUNE 17, 2008          TRIAL DAY 14, MORNING SESSION

EXHIBIT 65
PAGE 1076

2817

1

2

3                              CERTIFICATE

4

5   I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED
    STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF
6   THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE
    ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN
7   CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF
    THE UNITED STATES.

8

9                                          6-18-08

10  THERESA A. LANZA, RPR, CSR                DATE
    OFFICIAL COURT REPORTER

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT 65
PAGE 1027

# Exhibit 66

3033

1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3                        ---

4      HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

5                        ---

6   MATTEL, INC.,                  :   PAGES 3033 - 3190
                                    :
7            PLAINTIFF,            :
                                    :
8      VS.                         :   NO. ED CV04-09049-SGL
                                    :   [CONSOLIDATED WITH
9   MGA ENTERTAINMENT, INC.,       :   CV04-9059 & CV05-2727]
    ET AL.,                        :
10                                 :
            DEFENDANTS.            :
11

12

13

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16               RIVERSIDE, CALIFORNIA

17            WEDNESDAY, JUNE 18, 2008

18             JURY TRIAL - DAY 15

19              AFTERNOON SESSION

20

21

22                          MARK SCHWEITZER, CSR, RPR, CRR
                            OFFICIAL COURT REPORTER
23                          UNITED STATES DISTRICT COURT
                            181-H ROYBAL FEDERAL BUILDING
24                          255 EAST TEMPLE STREET
                            LOS ANGELES, CALIFORNIA 90012
25                          (213) 663-3494

CERTIFIED
COPY

EXHIBIT 66
PAGE 1078

3034

1    **Appearances of Counsel:**

2

3    On Behalf of Mattel:

4        Quinn, Emmanuel, Urquhart, Oliver & Hedges, LLP
         By John B. Quinn, Esq.
5            B. Dylan Proctor, Esq.
             Michael T. Zeller, Esq.
6            Harry Olivar, Esq.
             John Corey, Esq.
7            Diane Hutnyan, Esq.
             William Price, Esq.
8        855 South Figueroa Street
         10th Floor
9        Los Angeles, CA 90017
         (213) 624-7707

10

11

12   On Behalf of MGA Entertainment:

13       Skadden, Arps, Slate, Meagher & Flom LLP
         By Thomas J. Nolan, Esq.
14           Carl Alan Roth, Esq.
             Jason Russell, Esq.
15           Lauren Aguiar, Esq.
             David Hansen, Esq.
16           Matthew Sloan, Esq.
             Robert Herrington, Esq.
17       300 South Grand Avenue
         Los Angeles, CA 90071-3144
18       (213) 687-5000

19   On Behalf of Carter Bryant
         Keker & Van Nest
20       By:  Christa Anderson, Esq.
                Michael H. Page, Esq.
21       710 Sansome Street
         San Francisco, CA 94111-1704
22       (415) 391-5400

23

24

25

EXHIBIT _66_
PAGE _1079_

3035

1            I N D E X

2

3  CARTER BRYANT, PREVIOUSLY SWORN..................... 3047

4  CROSS-EXAMINATION (CONTINUED) ...................... 3047

5  REDIRECT EXAMINATION BY MR. PRICE:.................. 3070

6

7

8            E X H I B I T S

9

10  (Exhibit 10016 received.)........................... 3067

11  (Exhibit 1127 received.)............................ 3116

12  (Exhibit 10756 received.).......................... 3134

13  (Exhibit 13657 received.).......................... 3136

14  (Exhibits 12150 and 12151 received.)............... 3138

15  (Exhibit 13666 received.).......................... 3143

16  (Exhibit 13667 received.).......................... 3144

17

18

19

20

21

22

23

24

25

EXHIBIT 66
PAGE 1080

1   original of 1155-C, is it your understanding that those

2   original drawings that you made, which were 5-39, 5-40, 5-41,

3   and 5-42, came out of that notebook?

4           "ANSWER:  I believe so, yes."

5           Do you recall giving that testimony to the jury on

6   June 17th?

7   A.   I'm a little bit confused as to what it is you are

8   referring to.

9   Q.   1155-C is the black notebook.

10  A.   Okay.

11  Q.   You've got the original.  The question was was it your

12  understanding that those original drawings that you made came

13  out of that notebook?  "Answer:  I believe so, yes."

14          Do you recall giving that testimony?

15  A.   Yes.

16  Q.   And so it's your understanding, obviously, then, that

17  that notebook is just a 1999 notebook.  That means the

18  original drawings were in 1999.

19          MR. NOLAN:  Objection, your Honor.  Argumentative.

20  Characterization regarding the 1999 notebook.

21          THE COURT:  Rephrase, Counsel.

22  Q.   BY MR. PRICE:  Your understanding is that if it can be

23  established that that notebook contains only entries you made

24  in 1999, that would mean that the drawings were in 1999.

25          ·    MR. NOLAN:  Objection, your Honor.  Vague and

EXHIBIT 66
PAGE 1081

1    ambiguous as to what remains in the book or was missing in

2    the book.

3              THE COURT:  Rephrase.

4    Q.   BY MR. PRICE:  Let me do it this way:  So there are some

5    drawings in this notebook which appear to be the Jewel

6    project; correct?

7    A.   Yes.

8    Q.   And there's also a few pages from that, an entry, notes,

9    ideas on large Angel.  The copy is 1155-C-013.

10             Do you see that?

11   A.   Yes.

12   Q.   And Angel is a 1999 project; right?

13   A.   I worked on a number of Angel projects.  I worked on one

14   for Ashton Drake.  I worked on illustration of an angel for

15   my portfolio.  And I also worked  on an angel at Mattel at my

16   second stint.

17   Q.   And you said you worked on an angel at Mattel at your

18   second stint, that means after January 1999?

19   A.   Correct.

20   Q.   And what does that say there?

21   A.   I think it says Ken hair.

22   Q.   That probably refers to something at Mattel.  Wouldn't

23   you agree?

24   A.   It could.  I don't know.

25   Q.   And the angel in 1999 ideas you were working on included

EXHIBIT 66
PAGE 1082

3132

1   empire waist look; right?

2   A.   I don't remember.  I don't think so.

3   Q.   Is it your understanding that these notes referring to

4   Ken hair refers to 1999, your second stint at Mattel?

5   A.   You know, I don't know.  These are just sort of, you

6   know, random notes.  I don't remember exactly which project

7   they were referring to.  Could have been that one.

8   Q.   Well, let's talk about Jewel.  You were shown some

9   drawings which have a date for Jewel of January 1998; is that

10  right?

11  A.   Yes.

12  Q.   And among them, for example, was, let's say, 15601.  You

13  remember this?

14  A.   Yes.

15  Q.   And also 15603.  This is January 28, 1998?

16  A.   Yes.

17  Q.   And 15603.  I think there's a 15604.  There are a number

18  that had this January '98 date on them.

19        Do you remember that?

20  A.   Yes.

21  Q.   Now, I would like you to look at the last page of

22  Exhibit 26.  That's your conflict of interest questionnaire

23  when you joined Mattel in '99.  That's Exhibit 26.

24        Could we show the last page.

25        I'll show you your signature here.

EXHIBIT 66
PAGE 1683

3133

1          Now, what date did you put in your conflict of

2   interest questionnaire in January of 1999?

3   A.   I'm sorry.  What, now?

4   Q.   What date did you put, in January 1999, when you

5   rejoined Mattel, the new year, and you filled out the

6   conflict of interest questionnaire, what date did you put on

7   that conflict of interest questionnaire?

8   A.   Oh, at the bottom?

9   Q.   Or anywhere else you can see it.

10  A.   There are some dates that say 5/98 through 11/98.

11  Q.   How about here where you signed it?

12  A.   Yes.

13  Q.   And you were -- your intent was to sign it on the date

14  that you signed it.  Your intent was to date that on the date

15  you signed it; right?

16  A.   Yes.

17  Q.   And what date did you put on there in January of 1999?

18  A.   I put 01/04/98.

19  Q.   Now, let me show you what we'll mark as Exhibit 10756.

20          May I approach, your Honor?

21          THE COURT:  You may.

22  Q.   BY MR. PRICE:  Do you recognize 10756 as a sketch, Jewel

23  Barbie sketch that you did?

24  A.   Yes.

25          MR. PRICE:  Move Exhibit 10756 into evidence.

EXHIBIT _66_
PAGE _1084_

3134

1          MR. NOLAN:  Just foundation as to time, when he did

2    it.

3          MR. PRICE:  That will come after I show him some --

4          THE COURT:  Is there an objection?

5          MR. NOLAN:  No.

6          THE COURT:  Very well.  Received.

7          (Exhibit 10756 received.)

8    Q.   BY MR. PRICE:  So this is a Jewel Barbie diagram you

9    did; correct?

10   A.   Yes.

11   Q.   So looking at it, can you tell what date this is?

12   A.   Well, not with absolute certainty.

13   Q.   Fathom a guess?  What's your best estimate?

14   A.   It was either '98 or '99.

15   Q.   Well, if you'd look at your black notebook, and we can

16   put these side by side, 1155-C, if you look at the copy, it

17   might help you orient yourself.  1155-C-027.  Do you see

18   1155-C-027 in that black notebook?

19   A.   Yes.

20   Q.   And do you see any similarities between that drawing and

21   the drawing that's in Exhibit 10756?

22   A.   Um, a little bit.

23   Q.   For example, there's a -- these are Jewel Barbies;

24   right?

25   A.   Yes.

EXHIBIT 66
PAGE 1085

3135

1   Q.   And now, Jewel refers actually to a jewel of some sort?

2   A.   Right.

3   Q.   And what's this sort of design here which we have in the

4   middle?

5   A.   Well, I'm not really sure exactly what you'd call it,

6   but I think it's just some sort of where the fabric is

7   gathered together.

8   Q.   Is that a design you use for a lot of Barbies?

9   A.   Oh, I -- I don't know.

10  Q.   And the thing on the neck, is there a name for that

11  other than a necklace?

12  A.   No.

13  Q.   It would just be a necklace?

14  A.   Yes.

15  Q.   I guess you've got the hand looks sort of similar here,

16  doesn't it?

17  A.   Um, yes.

18  Q.   Do these look like sketches you make, kind of a

19  progression?

20  A.   It's possible.

21  Q.   And let me show you now Exhibit 13657.

22       Do you recognize 13657?

23  A.   Yes.

24  Q.   This is a Jewel Barbie drawing you did?

25  A.   Yes.

EXHIBIT 66
PAGE 1086

3136

1          MR. PRICE:  Move that into evidence, your Honor.

2          MR. NOLAN:  No objection.

3          THE COURT:  It's admitted.  You may publish.

4          **(Exhibit 13657 received.)**

5    Q.    BY MR. PRICE:  And maybe at the same time you could hold

6    this up so the jury can see it.

7          Do you see this has the same sort of waist

8    treatment?

9    A.    Yes.

10   Q.    Same kind of hand pose?

11   A.    Yes.  I normally draw hands like that.

12   Q.    You say it has also a necklace or choker or whatever

13   you'd call it?

14   A.    Yes.

15   Q.    Does this appear to be the last step at a progression

16   for this drawing from 10756 to 115-C-027?

17   A.    It's possible.  I often did a lot of, you know,

18   preliminary type sketches.

19   Q.    And what's the date of this sketch, which is

20   Exhibit 13657?

21   A.    It looks like it says 2/99.

22   Q.    If we could put 13657 perhaps side by side with that

23   page from the black notebook, 1155-C-027.  13657 is the end

24   result after kind of starting out with a rough sketch

25   1155-C-027; right?

EXHIBIT 66
PAGE 1087

3137

```
 1              MR. NOLAN:  Objection, your Honor.  Lack of

 2     foundation.

 3              THE COURT:  Overruled.  You may answer.

 4              THE WITNESS:  I couldn't say definitively.  Like I

 5     said, I did, you know, a lot of preliminary type sketches.

 6     Some looked pretty similar.  Some looked similar to the --

 7     more similar to the finished product than others.

 8     Q.   BY MR. PRICE:  I'm going to show you what we'll mark for

 9     identification 12150 and 12151.

10              Is 12150 a drawing you did?

11     A.   Yes.

12     Q.   Is 12151 another drawing you did?

13     A.   I'm sorry.  What was the first one you asked me?

14     Q.   12150.

15     A.   I don't think I have that.

16     Q.   Those are both drawings you did?

17     A.   Yes.

18     Q.   They are both Jewel Barbie drawings?

19     A.   Yes.

20     Q.   And Jewel Barbie was not a main line Barbie, was it?

21     A.   Well, the first one that I worked on, I don't really

22     know what they ended up doing with it, but this other one was

23     for the collectible group.

24              MR. PRICE:  Move 12150 and 12151 in evidence, your

25     Honor.
```

EXHIBIT 66
PAGE 1088

3190

1

2          (Proceedings concluded at 5:50 P.M.)

3

4

5

6

7                    C E R T I F I C A T E

8

9

10          I hereby certify that pursuant to Title 28,

11   Section 753 United States Code, the foregoing is a true and

12   correct transcript of the stenographically reported

13   proceedings in the above matter.

14          Certified on June 18, 2008.

15

16

17   MARK SCHWEITZER, CSR, RPR, CRR
     Official Court Reporter
18   License No. 10514

19

20

21

22

23

24

25

EXHIBIT 66
PAGE 1089

# Exhibit 67

# THIS PAGE
# INTENTIONALLY LEFT BLANK

EXHIBIT _6 7_ PAGE _1090_

# Exhibit 68

2353

1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3                          EASTERN DIVISION

4                              - - -

5           HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                              - - -

7    MATTEL, INC.,                    )

8                    PLAINTIFF,       )

9             VS.                     )   NO. CV 04-09049

10   MGA ENTERTAINMENT, INC., ET. AL.,)

11                   DEFENDANTS.      )   TRIAL DAY 12
                                      )   MORNING SESSION
12   AND CONSOLIDATED ACTIONS,        )   PAGES 2353-2427

13

14

15        REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16                    RIVERSIDE, CALIFORNIA

17                  THURSDAY, JUNE 12, 2008

18                        9:24 A.M.

19

20

21

22

23              THERESA A. LANZA, RPR, CSR
                FEDERAL OFFICIAL COURT REPORTER
24                 3470 12TH STREET, RM. 134
                 RIVERSIDE, CALIFORNIA  92501
25                     951-274-0844
                   WWW.THERESALANZA.COM

CERTIFIED COPY

2354

1    APPEARANCES:

2

ON BEHALF OF MATTEL, INC.:

3
                              QUINN EMANUEL
4                             BY:   JOHN QUINN
                                    JON COREY
5                                   MICHAEL T. ZELLER
                                    HARRY OLIVAR
6                                   TIMOTHY ALGER
                              865 S. FIGUEROA STREET,
7                             10TH FLOOR
                              LOS ANGELES, CALIFORNIA   90017
8

9

10   ON BEHALF OF MGA ENTERTAINMENT:

11                            SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                              BY:   THOMAS J. NOLAN
12                                  JASON RUSSELL
                                    RAOUL KENNEDY
13                                  LAUREN AGUIAR
                                    CARL ROTH
14                            300 SOUTH GRAND AVENUE
                              LOS ANGELES, CALIFORNIA   90071-3144
15                            213-687-5000

16

17

18

19

20

21

22

23

24

25


THURSDAY, JUNE 12, 2008                 TRIAL DAY 12, MORNING EXHIBIT 68
                                                          PAGE 1092

2355

```
 1                              I N D E X

 2                                                    PAGE

 3    PLAINTIFF CASE (CONTINUED)......................  2372

 4

 5

 6

      WITNESS          DIRECT      CROSS     REDIRECT      RECROSS
 7    RACHEL HARRIS

 8    BY MR. QUINN     2372                  2414
      BY MR. NOLAN                 2389                    2423
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

THURSDAY, JUNE 12, 2008                    TRIAL DAY 12, MORNING SESSION

EXHIBIT 68
PAGE 1093

2377

1   FROM MATTEL?

2   A    AT THAT TIME, NO.

3   Q    AT ANY TIME, DID SHE INDICATE THAT?

4   A    IN THE FUTURE, YES.

5   Q    THIS WAS SOME FUTURE CONVERSATION YOU HAD WITH HER?          09:59

6   A    YES.  JUST, SHE HAD MENTIONED THAT SHE KNEW CARTER FROM

7   MATTEL WHEN SHE WAS THERE.

8   Q    SO MS. TREANTAFELLES --

9         MR. NOLAN:  OBJECTION, YOUR HONOR.  FOUNDATION AS TO

10  TEMPORAL TIME IN THAT CONVERSATION.                              09:59

11        THE COURT:  SUSTAINED.

12  BY MR. QUINN:

13  Q    CAN YOU TELL US WHEN IT WAS THAT MS. TREANTAFELLES TOLD

14  YOU THAT SHE HAD KNOWN MR. BRYANT WHEN SHE HAD WORKED AT

15  MATTEL?                                                         09:59

16  A    I CAN'T SAY THE EXACT DATE.  I DON'T KNOW THE EXACT DATE.

17  Q    CAN YOU PUT IT, ROUGHLY?  WAS IT IN 2000, OCTOBER

18  NOVEMBER, DECEMBER?

19  A    YES.

20  Q    OTHER THAN THAT OCCASION, JUST BEFORE THE MEETING WHERE     10:00

21  SHE TOLD YOU THAT MATTEL WOULD BE UPSET AND YOU SHOULDN'T SAY

22  ANYTHING ABOUT MR. BRYANT COMING OVER, WAS THERE EVER ANY OTHER

23  OCCASION WHEN MS. TREANTAFELLES SAID TO YOU THAT YOU REALLY

24  SHOULDN'T BE SAYING ANYTHING ABOUT MR. BRYANT'S INVOLVEMENT IN

25  BRATZ?                                                          10:00

2378

1    A    NO.

2    Q    DID YOU EVER HAVE A CONVERSATION WITH ANYONE ELSE AT MGA

3    WHERE IT WAS INDICATED TO YOU THAT YOU SHOULDN'T SAY ANYTHING

4    ABOUT MR. BRYANT'S INVOLVEMENT IN BRATZ?

5    A    YES.                                                              10:00

6    Q    WHO WAS IT THAT YOU HAD THAT CONVERSATION WITH?

7    A    MERCEDEH.

8    Q    MERCEDEH WARD?

9    A    YES.

10   Q    ANYONE ELSE THAT YOU SPOKE TO -- WELL, LET ME FOLLOW UP ON        10:01

11   THAT.

12           WHAT WAS IT THAT MERCEDEH WARD SAID ABOUT WHY YOU

13   SHOULDN'T SAY ANYTHING ABOUT MR. BRYANT'S INVOLVEMENT IN BRATZ?

14           MR. NOLAN:   OBJECTION, YOUR HONOR.   FOUNDATION AS TO

15   TIME.                                                                  10:01

16           THE COURT:   SUSTAINED.

17   BY MR. QUINN:

18   Q    WHEN WAS IT THAT MERCEDEH WARD SAID THIS TO YOU?

19   A    SHE WOULD PERIODICALLY COME INTO MY OFFICE, AND WE WOULD

20   DISCUSS DIFFERENT PRODUCTS AND THINGS; SO IT WAS AT ONE OF            10:01

21   THOSE OCCASIONS THAT SHE HAD MENTIONED IT TO ME.

22   Q    DOES THAT SEEM TO YOU LIKE IT WAS SOMETIME IN THE YEAR

23   2000?

24           MR. NOLAN:   OBJECTION, YOUR HONOR.   LEADING.

25           THE COURT:   REPHRASE.                                        10:01

THURSDAY, JUNE 12, 2008              TRIAL DAY 12, MORNING SESSION

                                        EXHIBIT _68_
                                        PAGE _1695_

2379

1          SUSTAINED.

2    BY MR. QUINN:

3    Q    CAN YOU NARROW IT AT ALL IN TIME, IN TERMS OF THE MONTH OR

4    YEAR, WHEN YOU HAD THIS CONVERSATION WITH MERCEDEH WARD?

5    A    IT WAS DEFINITELY WITHIN HER FIRST FEW WEEKS AT MGA.          10:01

6    Q    AND DO YOU KNOW WHEN MERCEDEH WARD STARTED AT MGA?

7    A    I DO.  SHE STARTED WITHIN DAYS OF MY START DATE.

8    Q    DID SHE INDICATE TO YOU WHY YOU SHOULDN'T SAY ANYTHING

9    ABOUT MR. BRYANT'S INVOLVEMENT WITH BRATZ?

10            MR. NOLAN:  OBJECT ON THE BASIS OF HEARSAY,             10:02

11   YOUR HONOR.

12            THE COURT:  SUSTAINED.

13   BY MR. QUINN:

14   Q    WHAT WAS MERCEDEH WARD'S POSITION?  WAS SHE IN CHARGE OF

15   ENGINEERING FOR BRATZ?                                          10:02

16   A    YES.

17   Q    AND WHEN YOU HAD THIS CONVERSATION WITH HER, DID SHE

18   INDICATE TO YOU WHY YOU SHOULDN'T SAY ANYTHING TO ANYONE ABOUT

19   HIS INVOLVEMENT IN BRATZ?

20            THE COURT:  THAT SEEMS TO BE THE SAME QUESTION,         10:02

21   COUNSEL.

22            MR. NOLAN:  SAME OBJECTIONS.

23            MR. QUINN:  THAT'S AN ADMISSION, YOUR HONOR.

24            THE COURT:  OVERRULED.

25   / / /                                                           10:02

THURSDAY, JUNE 12, 2008                    TRIAL DAY 12, MORNING SESSION

EXHIBIT 68
PAGE 1096

2380

1   BY MR. QUINN:

2   Q    DID SHE INDICATE TO YOU WHY --

3            THE COURT:   I'LL HEAR YOU AT SIDE-BAR, IF YOU WANT,

4   COUNSEL.   THIS SEEMS TO BE AN ADMISSION OF A PARTY OPPONENT.

5            MR. NOLAN:   SIDE-BAR REAL QUICKLY.                      10:02

6            (WHEREUPON, THE FOLLOWING PROCEEDINGS

7            WERE HELD AT SIDE-BAR:)

8            THE COURT:   I WASN'T THINKING ABOUT IT BEING A PARTY

9   OPPONENT.

10           MR. NOLAN:   YOUR HONOR, THIS IS A CONVERSATION BY AN   10:03

11  EMPLOYEE TWO WEEKS INTO MGA, APPARENTLY.   WHEN THE TIME THIS

12  TOOK PLACE, SHE IS NOT AN OFFICER, SHE'S NOT A DIRECTOR, SHE'S

13  NOT IN MANAGEMENT, PER SE.   SHE'S IN A PARTICULAR AREA.   THIS

14  IS WITHIN HER FIRST TWO WEEKS WHERE -- IT'S A CONFIDENTIAL

15  LINE.   I DON'T THINK THAT IS GROUNDS FOR IMPOSING UPON HER THE  10:03

16  ABILITY TO BIND THE COMPANY ON AN ADMISSION.   AND I THINK IT'S

17  JUST RANCK HEARSAY.

18           THE COURT:   COUNSEL?

19           MR. QUINN:   WHAT THE WITNESS SAID IS SHE WAS IN

20  CHARGE OF ENGINEERING FOR BRATZ.   THIS IS A CONVERSATION ON   10:04

21  THAT VERY SUBJECT.   SO, AS TO THAT SUBJECT, I THINK SHE'S FULLY

22  QUALIFIED.

23           THE COURT:   WHO IS THE SOURCE OF THE ACTUAL

24  STATEMENT?

25           MR. QUINN:   MERCEDEH WARD MAKES THE STATEMENT.       10:04

2381

1          THE COURT:  WHO IS THE HEAD OF ENGINEERING.

2          MR. QUINN:  EXACTLY; THAT'S WHAT THE WITNESS SAID.

3          THE COURT:  COUNSEL, I'D LIKE TO HAVE THIS DONE

4     OUTSIDE OF THE PRESENCE OF THE JURY.

5          DOES THIS WITNESS KNOW THE -- DO WE HAVE ANYTHING          10:04

6     ABOUT WHERE MERCEDEH WARD GOT THAT INFORMATION FROM?

7          MR. QUINN:  I DON'T KNOW THE ANSWER TO THAT.  I WOULD

8     ASK.

9          THE COURT:  NO.

10         MR. NOLAN:  IT'S DOUBLE HEARSAY.          10:04

11         THE COURT:  SHE MAY NOT BE A DIRECTOR, BUT IT'S A

12    HIGH ENOUGH POSITION IN THE PARTICULAR CONTEXT OF THE BRATZ

13    DIVISION.  I'LL OVERRULE THE OBJECTION.

14         THANK YOU, COUNSEL.

15         (WHEREUPON, SIDE-BAR PROCEEDINGS WERE CONCLUDED.)          10:05

16    BY MR. QUINN:

17    Q    MS. HARRIS, DID MERCEDEH WARD INDICATE TO YOU WHY YOU

18    SHOULDN'T SAY ANYTHING TO ANYONE ABOUT MR. BRYANT'S INVOLVEMENT

19    WITH BRATZ?

20    A    YES.          10:05

21    Q    WHAT DID SHE SAY?

22    A    SHE HAD MENTIONED THAT CARTER HAD PREVIOUSLY WORKED AT

23    MATTEL AND HAD PRESENTED THE DOLL LINE TO MATTEL AND THEY HAD

24    TURNED IT DOWN; SO THEREFORE, ONCE HE PRESENTED IT TO MGA AND

25    DECIDED TO LEAVE, THAT WE SHOULD JUST NOT MENTION ANY OF THAT          10:05

THURSDAY, JUNE 12, 2008                    TRIAL DAY 12, MORNING SESSION

EXHIBIT  68
PAGE  1098

2382

```
 1   HAD HAPPENED.
 2   Q    DID SHE SAY YOU SHOULDN'T MENTION IT WITHIN MGA OR OUTSIDE
 3   OF MGA?
 4   A    OUTSIDE OF MGA.
 5   Q    WAS THERE EVER ANYONE ELSE AT MGA WHO GAVE YOU THE           10:06
 6   INSTRUCTION THAT CARTER BRYANT REALLY SHOULDN'T BE MENTIONED AS
 7   HAVING ANYTHING TO DO WITH BRATZ?
 8   A    ISAAC LARIAN, AT CERTAIN TIMES, IN JUST GENERAL MEETINGS.
 9   Q    ISAAC LARIAN?
10   A    YES.                                                         10:06
11   Q    AND THIS WAS ON ONE OCCASION OR ON MORE THAN ONE OCCASION?
12   A    AT MOST, TWO.
13   Q    WHAT DO YOU RECALL MR. LARIAN SAYING ON THE FIRST OCCASION
14   ABOUT NOT SAYING ANYTHING ABOUT MR. BRYANT HAVING ANYTHING TO
15   DO WITH BRATZ?                                                    10:06
16        MR. NOLAN:  FOUNDATION WITH RESPECT TO TIME.
17        THE COURT:  SUSTAINED.
18   BY MR. QUINN:
19   Q    WHEN, APPROXIMATELY, WAS THE FIRST OCCASION?
20   A    I WOULD SAY WITHIN THE FIRST TWO MONTHS OR SO.               10:06
21   Q    AND CAN YOU RECALL WHERE YOU WERE, WHERE HE WAS, WHEN HE
22   GAVE YOU THIS INSTRUCTION?
23   A    NO.
24   Q    AND WHAT WAS IT THAT MR. LARIAN SAID TO YOU AT THAT TIME?
25   A    I DON'T RECALL WORD FOR WORD.                                10:07
```

2383

```
 1   Q    ALL RIGHT.
 2        WHAT'S YOUR BEST RECOLLECTION OF THE INSTRUCTION THAT
 3   YOU RECEIVED?
 4   A    JUST THAT WE SHOULDN'T MENTION THAT CARTER WAS INVOLVED
 5   WITH IT; THAT IT SHOULD HAVE BEEN A DOLL LINE COMING FROM MGA.     10:07
 6   Q    DID HE SAY THAT YOU SHOULDN'T MENTION IT TO ANYONE WITHIN
 7   MGA, OR YOU SHOULDN'T MENTION IT TO ANYONE OUTSIDE OF MGA, OR
 8   BOTH?
 9   A    OUTSIDE OF MGA.
10   Q    WAS THERE EVER ANOTHER OCCASION -- I TAKE IT THERE WAS        10:07
11   ANOTHER OCCASION WHERE YOU RECEIVED SIMILAR INSTRUCTION FROM
12   MR. LARIAN.
13   A    I'M SURE THERE WAS.  I DON'T REMEMBER IF IT WAS E-MAILED
14   OR IN PERSON.  I DON'T RECALL.
15   Q    BUT YOU'RE CONFIDENT YOU RECEIVED THAT INSTRUCTION MORE       10:07
16   THAN ONCE?
17   A    YES.
18   Q    LET ME ASK YOU THIS ABOUT MR. LARIAN:  DID YOU GIVE ANY
19   CONSIDERATION AT ALL TO NOT FOLLOWING HIS INSTRUCTION?
20   A    NO.                                                           10:07
21   Q    WHY?
22        MR. NOLAN:  OBJECTION AS TO THE RELEVANCE OF WHY,
23   YOUR HONOR.
24        THE COURT:  SUSTAINED.
25        WELL, OVERRULED.                                              10:08
```

2384

1  BY MR. QUINN:

2  Q    WHY?

3  A    BECAUSE I WAS WORKING FOR THE COMPANY, AND I WAS LOYAL TO

4  THE COMPANY.

5  Q    WERE PEOPLE AFRAID OF MR. LARIAN AT MGA?                    10:08

6          MR. NOLAN:  OBJECTION.  RELEVANCE; ALSO FOUNDATION.

7          THE COURT:  SUSTAINED.

8  BY MR. QUINN:

9  Q    DID MR. LARIAN SAY ANYTHING TO YOU ABOUT WHAT YOU SHOULD

10 SAY ABOUT WHO CAME UP WITH THE BRATZ DOLL?  HE SAID, 'DON'T     10:08

11 MENTION CARTER BRYANT.'  DID HE SAY ANYTHING TO YOU ABOUT WHO

12 SHOULD BE CREDITED WITH COMING UP WITH THE BRATZ DOLL?

13 A    JUST MGA.

14 Q    NOW, YOU TOLD US ABOUT WHAT MERCEDEH WARD TOLD YOU ABOUT

15 MR. BRYANT HAVING PRESENTED THE BRATZ DOLL AT MATTEL.           10:08

16          THAT'S WHAT SHE SAID?

17 A    YES.

18 Q    YOU DON'T KNOW WHETHER THAT'S TRUE OR NOT?

19 A    NO IDEA.

20 Q    BASED ON THE INSTRUCTIONS THAT YOU RECEIVED FROM           10:09

21 MS. GARCIA AND MR. LARIAN, WAS IT YOUR UNDERSTANDING THAT

22 MR. BRYANT'S PARTICIPATION IN BRATZ WAS TO BE KEPT SECRET?

23          MR. NOLAN:  OBJECTION, YOUR HONOR.  FOUNDATION; ALSO

24 RELEVANCE WITH RESPECT TO HER STATE OF MIND.

25          THE COURT:  SUSTAINED.                                 10:09

EXHIBIT 68

PAGE 1101

2387

```
 1              LAY A FOUNDATION IN TERMS OF THIS.

 2              I'LL SUSTAIN THE SECOND ONE.

 3    BY MR. QUINN:

 4    Q    AS DIRECTOR OF CREATIVE SERVICES, DID YOU -- I TAKE IT

 5    THAT'S A DEPARTMENT?                                          10:12

 6    A    YES.

 7    Q    AND DID YOU INTERACT WITH MR. LARIAN A GREAT DEAL IN THAT

 8    JOB?

 9    A    YES.

10    Q    IN YOUR RELATIONS WITH HIM, WAS HE SOMEONE WHO GOT        10:12

11    INVOLVED A LOT IN THE DETAILS OF THE BUSINESS?

12    A    YES, HE DID.

13    Q    WOULD YOU REGARD HIM -- SOME PEOPLE -- IT'S NOT

14    NECESSARILY A BAD THING, BUT YOU HEAR THE PHRASE SOMETIMES

15    "MICROMANAGER."                                               10:12

16    A    SOMEWHAT.

17              MR. NOLAN:   OBJECTION.   IRRELEVANT WITH RESPECT TO

18    CHARACTERIZATION; ALSO LACK OF FOUNDATION.

19              THE COURT:   REPHRASE YOUR QUESTION, COUNSEL.

20    BY MR. QUINN:                                                 10:12

21    Q    IN TERMS OF THE THINGS THAT YOU WORKED WITH HIM ON, DID HE

22    GET VERY INVOLVED IN THE DETAILS?

23    A    YES.

24    Q    FROM THE TIME YOU STARTED THERE -- I TAKE IT YOU FIRST

25    HEARD ABOUT THIS BRATZ PROJECT WITHIN THE FIRST TEN DAYS OF   10:13
```

THURSDAY, JUNE 12, 2008                TRIAL DAY 12, MORNING SESSION

EXHIBIT _68_
PAGE _1102_

2388

```
 1    YOUR STARTING AT MGA?

 2    A    YES.

 3    Q    FROM THE TIME THAT YOU STARTED, WAS THERE EVER ANY

 4    CONSIDERATION TO NOT GOING FORWARD WITH THE BRATZ DOLL?

 5           MR. NOLAN:  OBJECTION, YOUR HONOR.  AGAIN, CALLS FOR    10:13

 6    SPECULATION; LACK OF FOUNDATION.

 7           THE COURT:  SUSTAINED.

 8    BY MR. QUINN:

 9    Q    YOU GOT INVOLVED IN THE BRATZ DOLL YOURSELF, I TAKE IT?

10    A    YES.                                                      10:13

11    Q    AND WAS THERE EVER ANY INDICATION TO YOU THAT THERE WAS

12    ANY DOUBT AS TO WHETHER THE COMPANY WAS GOING FORWARD WITH THE

13    BRATZ DOLL?

14    A    NO.

15    Q    LET ME SEE IF I CAN REFRESH YOUR RECOLLECTION.           10:13

16           IF YOU COULD LOOK, PLEASE -- YOU SHOULD SEE UP THERE

17    A COPY OF YOUR DEPOSITION.  IF YOU COULD TURN, PLEASE, TO

18    PAGE 264.  IF YOU COULD JUST READ THAT TO YOURSELF, NOT OUT

19    LOUD, ON PAGE 264, LINES 3 TO 11, PERHAPS DOWN TO 15.  LET ME

20    KNOW WHEN YOU HAVE HAD A CHANCE TO DO THAT.                   10:15

21    A    OKAY.

22    Q    DOES READING THAT REFRESH YOUR RECOLLECTION ABOUT ANY

23    OTHER DIRECTION YOU RECEIVED ABOUT WHO SHOULD BE CREDITED WITH

24    THE IDEA FOR THE BRATZ DOLL?

25    A    YES.                                                     10:15
```

EXHIBIT 68
PAGE 1103

2389

```
 1   Q    WHAT IS IT THAT YOU NOW REMEMBER, HAVING READ YOUR

 2   TESTIMONY?

 3   A    JUST THAT IF ANYONE WAS TO ASK, IT WAS TO BE CREDITED TO

 4   ISAAC OR THE INSPIRATION OF HIS DAUGHTER.

 5   Q    AND WHO WAS IT WHO TOLD YOU THAT?                        10:15

 6   A    THAT CAME FROM ISAAC.

 7            MR. QUINN:  NOTHING FURTHER.

 8            THE COURT:  CROSS-EXAMINATION?

 9                     CROSS-EXAMINATION

10   BY MR. NOLAN:

11   Q    I REPRESENT MGA.

12            WE'VE NEVER MET, HAVE WE?

13   A    NO.

14   Q    YOU WERE TERMINATED BY MGA; IS THAT CORRECT?

15   A    YES.                                                     10:16

16   Q    AND AFTER YOU WERE TERMINATED BY MGA, DID YOU APPLY FOR A

17   JOB AT MATTEL?

18   A    YES.

19   Q    NOW, LAST NIGHT WHEN I WAS READING YOUR DEPOSITION, I

20   NOTICED THAT YOUR DEPOSITION WAS TAKEN FEBRUARY 26, 2008;      10:16

21   CORRECT?

22   A    YES.

23   Q    SO THAT'S A FEW MONTHS AGO.

24            I THINK YOU SAID THAT YOUR APPLICATION WAS STILL

25   PENDING AT MATTEL; IS THAT CORRECT?                           10:16
```

EXHIBIT 68

PAGE 1104

2390

```
 1   A    WELL, I'VE PUT APPLICATIONS IN ON-LINE AT MATTEL FOR
 2   YEARS.  THAT'S THE TOY INDUSTRY.  THERE'S ONLY SO MANY TOY
 3   COMPANIES, AND IN ORDER TO CONTINUE WORKING IN CALIFORNIA, I
 4   WOULD NEED TO APPLY TO EVERY TOY COMPANY THAT'S OUT THERE.
 5   Q    CAN YOU TELL THE JURY HOW MANY TIMES YOU'VE APPLIED FOR        10:16
 6   EMPLOYMENT AT MATTEL.
 7   A    AS POSITIONS ARISE AT MATTEL, IF THEY ARE OF INTEREST, I
 8   HAVE APPLIED; SO IT COULD HAVE BEEN TWO OR THREE OVER THE
 9   YEARS.
10   Q    COULD IT BE MORE THAN TWO OR THREE?                           10:17
11   A    POSSIBLY.
12   Q    AND YOUR LATEST APPLICATION, YOU'VE NOT HEARD BACK YET
13   FROM MATTEL; CORRECT?
14   A    NO.  THE POSITIONS ARE ALREADY FILLED.  THERE'S NOT ANY
15   AVAILABLE POSITIONS THAT I HAVE APPLIED FOR.                       10:17
16   Q    HAVE YOU WITHDRAWN YOUR APPLICATION?
17   A    NO.  I DON'T THINK THERE'S A WAY TO DO THAT ON-LINE.
18   Q    WE'VE BEEN TALKING TODAY ABOUT EVENTS IN THE YEAR 2000;
19   RIGHT?
20   A    YES.                                                          10:17
21   Q    YOU STARTED TO WORK AT MGA -- YOUR FIRST DAY WAS
22   OCTOBER 11TH?
23   A    YES.
24   Q    OF THE YEAR 2000?
25   A    YES.                                                          10:17
```

2427

1

2

3                                CERTIFICATE

4

5   I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED
    STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF
6   THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE
    ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN
7   CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF
    THE UNITED STATES.

8

9   _Theresa A. Lanza_                          _6-13-08_

10  THERESA A. LANZA, RPR, CSR                      DATE
    OFFICIAL COURT REPORTER

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

THURSDAY, JUNE 12, 2008                 TRIAL DAY 12, MORNING SESSION

EXHIBIT 68
PAGE 1106

# Exhibit 69

2428

1        UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA

3                    ---

4    HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

5                    ---

6    MATTEL, INC.,                    :   PAGES 2428 - 2524
                                      :
7            PLAINTIFF,               :
                                      :
8        VS.                          :   NO. ED CV04-09049-SGL
                                      :   [CONSOLIDATED WITH
9    MGA ENTERTAINMENT, INC.,         :   CV04-9059 & CV05-2727]
     ET AL.,                          :
10                                    :
             DEFENDANTS.              :
11   _____

12

13

14

15        REPORTER'S TRANSCRIPT OF PROCEEDINGS

16            RIVERSIDE, CALIFORNIA

17        THURSDAY, JUNE 12, 2008

18          JURY TRIAL - DAY 12

19           AFTERNOON SESSION

20

21

22                                    MARK SCHWEITZER, CSR, RPR, CRR
                                      OFFICIAL COURT REPORTER
23                                    UNITED STATES DISTRICT COURT
                                      181-H ROYBAL FEDERAL BUILDING
24                                    255 EAST TEMPLE STREET
                                      LOS ANGELES, CALIFORNIA 90012
25                                    (213) 663-3494

CERTIFIED COPY

EXHIBIT 69
PAGE 1107

2429

```
1   Appearances of Counsel:

2

3   On Behalf of Mattel:

4        Quinn, Emmanuel, Urquhart, Oliver & Hedges, LLP
         By John B. Quinn, Esq.
5            B. Dylan Proctor, Esq.
             Michael T. Zeller, Esq.
6            Harry Olivar, Esq.
             John Corey, Esq.
7            Diane Hutnyan, Esq.
             William Price, Esq.
8        855 South Figueroa Street
         10th Floor
9        Los Angeles, CA 90017
         (213) 624-7707
10

11  On Behalf of MGA Entertainment:

12       Skadden, Arps, Slate, Meagher & Flom LLP
         By Thomas J. Nolan, Esq.
13           Carl Alan Roth, Esq.
             Jason Russell, Esq.
14           Lauren Aguiar, Esq.
             David Hansen, Esq.
15           Matthew Sloan, Esq.
         300 South Grand Avenue
16       Los Angeles, CA 90071-3144
         (213) 687-5000
17

18  For Carter Bryant:

19       Keker & Van Nest
         By Christa Anderson, Esq.
20           Michael H. Page, Esq.
         710 Sansome Street
21       San Francisco, CA 94111-1704
         (415) 391-5400
22

23

24

25
```

EXHIBIT _69_
PAGE _1108_

2430

1              I N D E X

2

3  CARTER BRYANT, PREVIOUSLY SWORN........................ 2433

4  DIRECT EXAMINATION (CONTINUED) BY MR. PRICE........... 2433

5

6

7              E X H I B I T S

8
   (Exhibit 2201 received.)............................. 2518
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT 69
PAGE 1109

2484

1          "QUESTION:  You do not recall -- or you did

2      add this 8/1998?

3          "ANSWER:  Yes.

4          "QUESTION:  You just don't recall when you

5      added that?

6          "ANSWER:  I don't recall.

7          "QUESTION:  Do you recall for what purpose you

8      added that?

9          "ANSWER:  No, I don't."

10   Q.   BY MR. PRICE:  Getting back to the first page there,

11   Mr. Bryant, one thing we can say for certain is that this

12   8/98 was added sometime in 1999.

13   A.   I couldn't say that for certain, no.

14   Q.   Let me rephrase.

15         One thing we can say for certain is this 8/98 was

16   added sometime after you began working at Mattel.

17   A.   I'm still not exactly sure what you're asking me.

18   Q.   You began working for Mattel again in January of 1999;

19   right?

20   A.   Right.

21   Q.   At that time that poster board, wherever it existed, was

22   blank.

23   A.   Yes.

24   Q.   So my question is you added this date 8/1998 at some

25   time after January of 1999; correct?

EXHIBIT 69
PAGE 1110

2485

1    A.    I think I added it after I left Mattel.

2    Q.    So it could have been in 2000 or 2001?

3    A.    Yes.

4    Q.    Could have been 2004?

5    A.    Possibly.  I don't remember it being that late.

6    Q.    Are you aware of a single one of your Bratz drawings

7    which has a 1998 date on it which was actually put there,

8    where the date was put there in 1998?

9    A.    I'm not sure.

10    Q.    Sitting here today, you can't think of a single drawing

11    that has a 1998 date on it that was put there by you in 1998;

12    correct?

13    A.    No, I can't really.  Generally, you know, I don't

14    usually put a date on like a master drawing, line drawing.  I

15    typically don't necessarily date those.

16    Q.    So the answer is you can't identify a specific one today

17    where you put a '98 date on it in 1998; correct?

18    A..    No, I can't.

19    Q.    You can identify, however, at least three drawings where

20    you put a 1999 date on them in 1999.

21    A.    Yes.

22    Q.    And those are the ones we looked at earlier.  The 1327,

23    the 1328, and the Exhibit 777; correct?

24    A.    If you could show those to me again.

25    Q.    Sure.  1327, September 19, '99.  That was put there in

EXHIBIT 69
PAGE ////

2486

1    '99; right?

2    A.    Yes.

3    Q.    And then 1328, September 19, 1999, that was put there in

4    '99; right?  In fact, September 19, 1999?

5    A.    I'm assuming so, yes.

6    Q.    And then Exhibit 777, where you have August 27, '99,

7    which was put there about August 27, '99; correct?

8    A.    Yes.

9    Q.    If you look at the originals in front of you, you'll see

10   that there are some other poster boards which have Bratz

11   dolls on them.  And there are these dates of '98 on them.

12          Do you see that?

13   A.    Yes.

14   Q.    And maybe you could pull up one of those.  And which

15   character is that?

16   A.    This is Sasha.  I think she was originally called

17   Hallidae.

18   Q.    Let's put up Exhibit 3, page 5.  And I think Mr. Bryant

19   was holding up the original.  Is that the original that you

20   are looking at that you are holding up?

21   A.    Yes.

22   Q.    And you'll notice that again, this has this August 1998

23   date on it; right?

24   A.    Yes.

25   Q.    And if there's any date in these exhibits or in these

EXHIBIT 69
PAGE 1112

2487

1  originals that say '98 to your knowledge, those dates were

2  put in there sometime after 1999; correct?

3  A.    Yes.

4  Q.    And possibly as late as 2000, 2001; right?

5  A.    It's possible, yes.

6  Q.    Were those dates put on those drawings after April of

7  2004?

8  A.    No.

9  Q.    So they were put on there before the actual -- this

10  lawsuit began?

11  A.    Yes, to the best of my recollection.

12  Q.    Do you have anything that can help you demonstrate when

13  after 1999 those dates are put on?  For example, a note in

14  one of your note pads or anything like that?

15  A.    Well, the only thing that I can really remember is that

16  it seems at some point I was asked through MGA to turn in

17  those original drawings.

18  Q.    To what, sir?

19  A.    To turn in those original drawings to them.

20  Q.    Okay.  Are we talking about --

21  A.    Yeah, like these.

22  Q.    And also with respect to these colorized poster boards

23  that are part of Exhibit 3, those were created the same way

24  that we've discussed where you started with a blank poster

25  board and projected something on and traced a drawing, and

EXHIBIT 69
PAGE 1113

2488

1   then colored it in?

2   A.   Right.

3   Q.   And that activity of changing that from a blank poster

4   board to a -- what we have in front of us, that activity,

5   took place sometime after you started working for Mattel;

6   correct?

7   A.   Yes.

8   Q.   And by the way, much MGA asked you to turn over

9   originals, was that in connection with this case that they

10  asked you to turn over the originals?

11  A.   No, I don't think so.

12  Q.   Did they tell you why they wanted you to turn over the

13  originals?

14  A.   No, I don't remember why.

15  Q.   So at some point you actually asked other people at

16  Mattel to help you, assist you in creating materials for a

17  pitch; correct?

18  A.   Yes.

19  Q.   There is a woman who was your roommate, one of your

20  roommates, Elise Cloonan; is that right?

21  A.   Yes.

22  Q.   She was a very good friend of yours?

23  A.   Yes.

24  Q.   A graphic artist who worked at Mattel?

25  A.   Yes.

EXHIBIT 69
PAGE 1114

2518

1   Q.   And that was kind of -- because he was kind of excited

2   about this, and he was getting you excited about it; right?

3   A.   Well, sure.

4   Q.   Because he wanted you to become a consultant at MGA to

5   make this Bratz a reality; right?

6   A.   Yes.

7   Q.   And in doing that, you had to have some discussions with

8   MGA's counsel; right?

9   A.   Yes.

10  Q.   If you'd look at Exhibit 2201.  And this is not in the

11  drawings book.  It would be in the other black book.

12  A.   Okay.

13  Q.   Do you recognize 2201 as a communication you had with a

14  Mr. Rosembaum sometime around September 14 of 2000?

15  A.   Yes.

16        MR. PRICE:   Your Honor, move Exhibit 2201 in

17  evidence.

18        MR. NOLAN:   No objection, your Honor.

19        THE COURT:   It's admitted.  You may publish.

20        (Exhibit 2201 received.)

21  Q.   BY MR. PRICE:  You see this is the first page?

22  A.   Yes.

23  Q.   Was this something -- how did you send this to

24  Mr. Rosembaum?

25  A.   I don't remember exactly.

EXHIBIT 69
PAGE 1115

2519

1   Q.   Did you send a letter in the mail?

2   A.   I don't -- I don't remember.

3   Q.   You weren't communicating by mail in September with MGA,

4   were you?

5   A.   It's possible.  I don't remember.

6   Q.   Do you·recall using a messenger service?

7   A.   Well, again, it's possible.  But no, I don't remember

8   that.

9   Q.   Do you know if you faxed it from Mattel?

10  A.   Again, it's possible.  But I don't remember.  There's no

11  fax heading or anything like that.  So I don't know.

12  Q.   Did you fax documents from Mattel to MGA between

13  September 1st and the time that you left Mattel October 19th?

14  A.   Yes.

15  Q.   What documents do you specifically remember faxing?

16  A.   Well, I think the only thing that I can remember faxing

17  was the final page of the contract agreement.

18  Q.   Where did you fax it from?

19  A.   One of the fax machines at Mattel.

20  Q.   Is that when you were in Barbie collectibles?

21  A.   Yes.

22  Q.   Do you know that it was just the last page?

23  A.   No, I'm not sure.

24  Q.   Let's look at the next page on this document.  September

25  14.  "Enclosed is a copy of my original offer of employment

EXHIBIT 69
PAGE 1116

2520

1   with Mattel.  To the best of my knowledge, other than an

2   agreement of confidentiality, there are no other expressed

3.  contracts that have been signed.  I am unable to look into

4   this too much further with our Human Resources director

5   without risking suspicion, but I am quite certain that this

6   should suffice."

7          Who was the Human Resources director that you were

8   referring to then?

9   A.   I don't remember that person's name.

10  Q.   It's just four days after this that you actually begin

11  representing that you are working for MGA; correct?

12  A.   I'm not sure.

13  Q.   If you look at Exhibit 30, which is in evidence.  Do you

14  recognize this as a letter you sent September 18, 2000, to a

15  Mr. Kinuyo representing that you are working with MGA

16  Entertainment, that we are located in Los Angeles,

17  California, and that sample cards should be sent to MGA

18  Entertainment, attention Carter Bryant, 1319 West 160th

19  Street, Gardena, California 90247, USA.

20          This is something you sent out around September 18,

21  2000; correct?

22  A.   Yes.

23  Q.   And you intended to give the impression to the recipient

24  of this letter, you intended to give them the impression that

25  you worked with MGA; correct?

EXHIBIT 69
PAGE 1117

2524

1

2

3

4

5

6                            C E R T I F I C A T E

7

8

9          I hereby certify that pursuant to Title 28,

10   Section 753 United States Code, the foregoing is a true and

11   correct transcript of the stenographically reported

12   proceedings in the above matter.

13          Certified on June 12, 2008.

14

15

16          MARK SCHWEITZER, CSR, RPR, CRR
            Official Court Reporter
17          License No. 10514

18

19

20

21

22

23

24

25

EXHIBIT 69
PAGE 1118