# Exhibit 70

2610

1              UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3                       ---

4      HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

5                       ---

6   MATTEL, INC.,                :   PAGES 2610 - 2707
                                 :
7            PLAINTIFF,          :
                                 :
8      VS.                       :   NO. ED CV04-09049-SGL
                                 :   [CONSOLIDATED WITH
9   MGA ENTERTAINMENT, INC.,     :   CV04-9059 & CV05-2727]
    ET AL.,                      :
10                               :
                                 :
11           DEFENDANTS.         :

12

13

14

15         REPORTER'S TRANSCRIPT OF PROCEEDINGS

16              RIVERSIDE, CALIFORNIA

17             FRIDAY, JUNE 13, 2008

18             JURY TRIAL - DAY 13

19              AFTERNOON SESSION

20

21

22                              MARK SCHWEITZER, CSR, RPR, CRR
                                OFFICIAL COURT REPORTER
23                              UNITED STATES DISTRICT COURT
                                181-H ROYBAL FEDERAL BUILDING
24                              255 EAST TEMPLE STREET
                                LOS ANGELES, CALIFORNIA 90012
25                              (213) 663-3494

CERTIFIED COPY

EXHIBIT 70
PAGE 1119

2611

1    Appearances of Counsel:

2

3    On Behalf of Mattel:

4         Quinn, Emmanuel, Urquhart, Oliver & Hedges, LLP
          By John B. Quinn, Esq.
5             B. Dylan Proctor, Esq.
              Michael T. Zeller, Esq.
6             Harry Olivar, Esq.
              John Corey, Esq.
7             Diane Hutnyan, Esq.
              William Price, Esq.
8         855 South Figueroa Street
          10th Floor
9         Los Angeles, CA 90017
          (213) 624-7707
10

11

12   On Behalf of MGA Entertainment:

13        Skadden, Arps, Slate, Meagher & Flom LLP
          By Thomas J. Nolan, Esq.
14            Carl Alan Roth, Esq.
              Jason Russell, Esq.
15            Lauren Aguiar, Esq.
              David Hansen, Esq.
16            Matthew Sloan, Esq.
              Robert Herrington, Esq.
17        300 South Grand Avenue
          Los Angeles, CA 90071-3144
18        (213) 687-5000

19

20   On Behalf of Carter Bryant:

21        Keker & Van Nest
          By Christa Anderson, Esq.
22            Michael H. Page, Esq.
          710 Sansome Street
23        San Francisco, CA 94111-1704
          (415) 391-5400

24

25   (Continued)

EXHIBIT 70
PAGE 1120

2612

```
1   Appearances of Counsel (Continued):

2   On Behalf of Peter Marlow:

3        Keats McFarland & Wilson
         By Larry W. McFarland, Esq.
4        9720 Wilshire Boulevard
         Penthouse Suite
5        Beverly Hills, CA 90212
         (310) 777-3750
6

7        Law Office of Steven M. Goldsobel
         By Steven M. Goldsobel, Esq.
8        1900 Avenue of the Stars
         Suite 1800
9        Los Angeles, CA 90067
         (310) 552-9291
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

EXHIBIT 70
PAGE 1121

2613

1                              I N D E X

2

3   (HEARING HELD OUTSIDE THE PRESENCE OF THE JURY.) ...... 2614

4   CARTER BRYANT, PREVIOUSLY SWORN....................... 2625

5   DIRECT EXAMINATION (CONTINUED) BY MR. PRICE:........... 2625

6                            E X H I B I T S

7     (Exhibit 1155-C received.)........................... 2638

8     (Exhibit 13649 received.)............................ 2641

9     (Exhibit 13627 marked for identification.)........... 2663

10    (Exhibit 1313-C received.)........................... 2667

11    (Exhibit 60 received.)............................... 2675

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT 70
PAGE 1122

2634

```
 1    Q.    And I'd like to show you the originals that are in your
 2    book as Exhibit 5, Bates 179, 180, 181, 182.
 3              Your Honor, we have found the cite.  If we could
 4    play 627.  And this is volume 3, November 8, 2004.
 5              THE COURT:  Volume 3.
 6              MR. PRICE:  627, line 20 to 628, line 11.
 7              MR. NOLAN:  No objection.
 8              THE COURT:  You may proceed.
 9              MR. PRICE:  Thank you.
10              WHEREUPON THE VIDEOTAPED DEPOSITION
11              EXCERPT OF CARTER BRYANT, AS PROVIDED
12              BY COUNSEL, ARE INCORPORATED HEREIN.
13              "QUESTION:  During that time period, August
14         '98, did you often drive by the Kickapoo school, or
15         was that an unusual event when you did it on that
16         occasion?
17              "ANSWER:  I don't remember what route I
18         usually took, but it could have been a typical
19         route, yes.
20              "QUESTION:  Could have been typical?
21              "ANSWER:  Well, I don't remember exactly which
22         way I drove.
23              "QUESTION:  You just don't recall your usual
24         route to work or home from work?
25              "ANSWER:  I don't recall which way I normally
```

EXHIBIT 70
PAGE 1123

2635

1    took.  It would depend on traffic or other

2    factors."

3  **Q.**  BY MR. PRICE:  Mr. Bryant, I'm going to give you the

4  exhibits I just spoke about, which is 5 Bates 179, 180, 181,

5  and 182 and ask if you would look at those and tell me if

6  those are some of the drawings that you claim you did after

7  driving by Kickapoo High?

8  **A.**  Yes.

9  **Q.**  And it's your best recollection you did it that very

10  day; correct?

11  **A.**  I -- I think so, yes.

12  **Q.**  And if we look at the 179 document, and what I'd like

13  you to do is we have a copy of it here, but could you show it

14  to the jury.  Show the original.

15      Now, if we look at the edges, that's been torn from

16  a notebook, has it not?

17  **A.**  It appears to have been, yes.

18  **Q.**  Now, if you'd look at Exhibit 5180.  It's Bates number

19  5-00180.  It's page 40 of Exhibit No. 5.

20      Do you have the original of that there?

21  **A.**  Yes.

22  **Q.**  And that also has those rough edges that's been torn out

23  of a notebook; right?

24  **A.**  Yes.

25  **Q.**  But neither of these drawings has a date on them; is

EXHIBIT 70
PAGE 1124

2636

1    that right?

2    A.    No.

3    Q.    Is that correct?

4    A.    That's correct.

5    Q.    And if you'd look at the next exhibit you have in front

6    of you, 5, and that's Bates No. 181.  And if we look at the

7    original there, again, it's again ripped out of a notebook of

8    some sort; correct?

9    A.    Yes.

10            MR. NOLAN:  Just for the record, we're looking at

11   Exhibit 5 through -- (inaudible.)

12            I apologize, your Honor.

13            MR. PRICE:  If we could look at 5, Bates No. 00182.

14            THE WITNESS:  Let's see, I'm not finding that one.

15   There we go.  Sorry.

16   Q.    BY MR. PRICE:  That's also been torn out of a notebook?

17   A.    Yes.

18   Q.    And it's also undated?

19   A.    Yes.

20   Q.    It's true you would sometimes keep spiral notebooks?

21   A.    Yes.

22   Q.    And you'd do your drawings in those notebooks?

23   A.    Yes.

24   Q.    Those notebooks would also have sometimes a date in them

25   which would let you figure out the date you were using the

EXHIBIT 70
PAGE 125

2637

1   notebook; right?

2   A.   Um, well, I don't know.  My recollection is that my

3   notebooks, I usually kept, you know, I'd keep them over a

4   period of time.

5   Q.   Well, but for example, if you had those four drawings

6   right before, say, a page in your notebook where you had a

7   bank statement, you would -- that would help you determine

8   when in fact you made those drawings; right?

9   A.   It might.  Not necessarily.

10  Q.   Well, certainly if you tear them out of the notebook,

11  you can't use the chronology to date the notebooks.  Fair

12  enough?

13  A.   That's true, but I didn't usually keep my notebooks in

14  any kind of chronological order.

15  Q.   Well, let me show you what we'll mark as Exhibit 1155-C.

16          THE COURT:   Counsel, help me out here.  1155, where

17  would C be located?

18          MR. PRICE:   If I can pass this up.

19  Q.   This is a photo copy that actually has numbers on them

20  that might make things easier to find.  I've given you the

21  original and the photocopies.

22          And you recognize that original as one of the

23  originals; right?

24  A.   Yes.

25  Q.   And if you could --

EXHIBIT 70
PAGE 1126

2646

1      notes?

2              "ANSWER:  No.  I believe it was in '99."

3   Q.   BY MR. PRICE:  And that document which is being referred

4   to, Bates 333, if you would look in your notebook there, the

5   spiral notebook, Exhibit 1155-C, and look at page 13, you can

6   see that's the same document.

7   A.   Yes.

8   Q.   And if you could show that to the jury.

9            Now, where does that document -- so that document

10  is, or that page which has these notes on this large angel

11  doll that you believe was in '99, that's a few pages before

12  the drawings you have of the Jewel doll; correct?

13  A.   Well, it looks like I've got some Jewel drawings before

14  it and after it.

15  Q.   If you look at -- you're looking at 1155-C, page 13.  If

16  you'd look at page 19.  See, that's about six pages in the

17  notebook after you have your 1999 notes about the large

18  angel; right?

19  A.   Yes.

20  Q.   And then you go a couple pages more on page 21.

21  A.   Yes.

22  Q.   That's also several pages that after this 1999 large

23  angel entry; correct?

24  A.   Yes.

25  Q.   Was Jewel a collectible doll, by the way?

EXHIBIT 70
PAGE 1127

2647

1    A.   Well, one of the Jewel projects I did was, yes.

2    Q.   Which is different from main line Barbie; right?

3    A.   Yes.

4    Q.   And when you joined Mattel in January of 1999, you were

5    working at some point after that in Barbie collectibles?

6    A.   Yes.

7    Q.   And for how long were you working in Barbie

8    collectibles?

9    A.   I worked there from January of '99 to October of 2000.

10   Q.   And in what time frame, when you were there from January

11   '99 to October 2000, were you working on the Jewel

12   collectible doll?

13   A.   I don't recall the exact time frame.  I think it was --

14   I think it was in '99.

15   Q.   Do you have any particular time as to when in 1999 you

16   were working on the Jewel collectible doll?

17   A.   I thought I just answered that.

18   Q.   A month period?

19   A.   I don't remember the exact month.  I think it was early

20   on.

21   Q.   Now, you understand, do you not, that when you have a

22   notebook like that, and you draw on it, that sometimes the

23   pressure you make in your drawing can create indentations on

24   the next page?

25   A.   Yes.

EXHIBIT 70
PAGE 1128

2648

1   Q.   So that even if you tear a page out of a notebook, you

2   can sometimes see by looking at the page after it whether or

3   not a certain drawing had originally been in that notebook.

4   A.   Yes.

5   Q.   And I believe that with respect to the notebook we've

6   been looking at, which has your '99 bank statements in it and

7   this '99 angel notation in it, that you have torn out of that

8   notebook at least 20 pages of something; right?

9   A.   Again, I'm not sure exactly how many pages were torn

10  out.

11  Q.   Well, clearly there aren't 120 pages left in that

12  notebook; right?

13  A.   Right.

14  Q.   And sometimes, when you make a drawing in a notebook,

15  even if you tear the page out, there will sometimes be

16  bleed-throughs, you know, from the ink on the page behind it?

17  A.   Yes.

18  Q.   So sometimes you can still determine whether or not a

19  drawing was originally in that notebook; right?

20  A.   Yes.

21  Q.   Okay.  But if we -- if you look at 179, 180, 181, and

22  182 --

23          THE COURT:   Exhibit 1155-C?

24          MR. PRICE:   We're out of that exhibit, your Honor.

25  I'm sorry.  Let me be clear.  It's Exhibit 5-179, 180, 181,

EXHIBIT 70
PAGE 1129

2676

1    characters, six total.  Names are Zoe, Lupe, Hallidae, Jade,

2    two males from 1998.  I think that says Missouri.

3            MR. PRICE:  Your Honor, actually could we publish

4    the original to the jury?

5            MR. NOLAN:  No objection, your Honor.

6            THE COURT:  You may.

7            MR. PRICE:  It looks like at the top it says page

8    11.

9            THE COURT:  You just want that page published to

10   the jury?

11           MR. PRICE:  Yes.

12           THE COURT:  You want it passed around?

13           MR. PRICE:  Yes, it looks like that's what we're

14   doing now.

15   Q.   You'll notice there appear to be some holes in the ink

16   there.

17           Do you see that?

18   A.   Yes.

19   Q.   You understand that was some samples taken for this

20   case?

21   A.   Yes.

22   Q.   And what you've got with Ms. Prince, what is put down

23   here is what you requested that she write down; correct?

24   A.   Yes, to the best of my recollection.

25   Q.   And would you agree that this last line here, the first

EXHIBIT 70
PAGE 1130

2677

1    four lines appear to be fairly equally spaced?

2         Do you see that?

3    A.   Well, it looks like she started writing awfully big and

4    then started running out of room.

5    Q.   The first four lines appear to have the same size and be

6    equally spaced.  Would you agree with that?

7    A.   No.

8    Q.   Would you agree that the last line appears to be

9    fairly -- it's going to be smaller than the other lines?

10   A.   Yes.

11   Q.   Kind of scrunched in; right?  It's not a technical term.

12   A.   Like I said, it looks like she started writing bigger

13   than she thought she was going to need to and ran out of

14   room.

15   Q.   The last line, the line that is tinier than the rest,

16   that's the one that says from 1998, Missouri; is that right?

17   A.   Yes.

18   Q.   You knew that having these drawings notarized in August

19   of 1999 could in no way prove that they were done in 1998;

20   right?

21   A.   I don't know if I had that understanding or not.

22   Q.   Well, you understand all that the notary can say is that

23   she saw those documents on the day she notarized the

24   documents; right?

25   A.   Right.

EXHIBIT 70
PAGE 113

2678

1   Q.   And that the notary wasn't saying oh, these documents

2   were done in 1998.  You understood that.

3   A.   I mean, I seem to remember what I told her was when they

4   were created, and that's what she put into the -- into the

5   book.

6   Q.   Exactly.  She put this into the book because you told

7   her to put that into the book.

8   A.   Yes.

9   Q.   But you understood, as someone familiar with copyrights

10  and poor man's copyrights and notaries, that all the

11  notarization on these drawings would prove is those drawings

12  were in existence as of August 26, 1999; right?

13  A.   Well, I think, yeah, I generally understood that.

14  Q.   In fact, you testified that's the reason you wanted them

15  notarized at that point, because you were about to send them

16  to Alaska Mama; right?

17  A.   Yes.

18  Q.   And you wanted to establish that they existed on August

19  26, 1999, before someone else saw them; right?

20  A.   Yes.

21  Q.   And are you aware of any of your drawings, any of them,

22  which you claim were done in 1998, that have a date on them

23  of 1998 where that date was put on them in 1998?

24  A.   I'm not sure.

25  Q.   Sitting here today, you can't think of a single drawing

EXHIBIT 70
PAGE 1132

2679

1  that you claim you created in 1998 where you put a date of

2  1998 on it contemporaneously, that is, in 1998?

3  A.    I can't think of anything right offhand, but in doing

4  random sketches, I didn't really have a practice of

5  necessarily dating them.

6  Q.    You are aware this lawsuit was filed in April 2004;

7  correct?

8  A.    Yes.

9  Q.    And I think as of the time that you lawsuit was filed

10 and during the summer of 2004, you had a laptop computer?

11 A.    Yes.

12 Q.    It's a computer which you had bought in 2001; is that

13 right?

14 A.    It was either 2001 or early 2002.

15 Q.    Let me just see if I can refresh your recollection

16 rather than play it.  If you'd look at volume 4 of your

17 deposition.  It's dated January 23, 2008.

18 A.    Okay.

19 Q.    Page 749, lines 2 to 4.

20 A.    Okay.  Which lines?

21 Q.    Lines 2 to 4.

22 A.    Okay.

23 Q.    2, 3, and 4.

24 A.    Okay.

25 Q.    Does that refresh your recollection that this laptop

EXHIBIT 70
PAGE 1133

```
 1              THE COURT:  Let's go to sidebar for a moment,
 2   counsel.
 3              (SIDEBAR CONFERENCE HELD.)
 4              THE COURT:  You're correct.  The Court was going to
 5   entertain suggestions on what instruction.
 6              MR. NOLAN:  I think we submitted something to you.
 7              THE COURT:  In the order?
 8              MS. AGUIAR:  No, I think in the proposed order
 9   ruling on the Motion in Limine 13, I think there's a
10   paragraph at the end.
11              THE COURT:  One second.
12              MR. ZELLER:  I assume we signed off on this filing?
13              MS. AGUIAR:  We jointly submitted it.
14              THE COURT:  It was jointly submitted.  Very good.
15   It says joint.  So I am assuming it's joint.
16              MR. ZELLER:  I assume so as well.
17              THE COURT:  Fair enough.  I will read that.
18              MR. NOLAN:  We've been in this area for a while,
19   and I was waiting for him to make the argumentative question
20   before the instruction.
21              THE COURT:  Very well.  It would be an appropriate
22   time to do it.
23              (CONCLUSION OF SIDEBAR CONFERENCE.)
24              THE COURT:  Members of the jury, this is probably
25   an appropriate time to instruct you on this testimony
```

EXHIBIT 70
PAGE 1137

2691

1    concerning Evidence Eliminator.  The Court instructs you that

2    this evidence that you have heard and are hearing may only be

3    considered for purposes of evaluating Mr. Bryant's

4    credibility and his consciousness of guilt, and that there is

5    no evidence that any of the MGA parties had any connection

6    with Mr. Bryant's purchase, installation, or use of Evidence

7    Eliminator.

8            Counsel, you may proceed.

9            MR. PRICE:  Thank you.

10   Q.    Mr. Bryant, may I ask you to assume that both sides'

11   experts in this case are correct, in that Evidence Eliminator

12   safe shutdown mode was used two days before your computer was

13   imaged?  Assuming that?

14   A.    Yes.

15   Q.    Who else would have done it besides you?

16   A.    Again, I am totally in the dark on this.  I'm not saying

17   that it couldn't have been me.  I just have no recollection

18   of doing it.

19   Q.    Previously under oath you suggested maybe your

20   housekeeper did it; right?

21   A.    It could have been.  You know, other people did have

22   access to my computer.

23   Q.    Your computer, though, you have testified was password

24   protected?

25   A.    Yes, but, you know, some of the other people that I know

EXHIBIT 70
PAGE 1135

2692

1   are a lot more computer literate than I am, and they know how

2   to create their own passwords to get on the computer.

3   Q.   So it's possible that your housekeeper is more computer

4   literate than you and found out some way to break your

5   password code?

6            MR. NOLAN:   Objection, your Honor.  Argumentative.

7            THE COURT:   Sustained.

8   Q.   BY MR. PRICE:  You said that you believed it could have

9   been your housekeeper.  Do you honestly believe that she

10  could have entered your computer and bypassed your passwords?

11  A.   She's a lot more computer literate than I am.  Actually,

12  most everyone is.

13  Q.   Since you were buying this program Evidence Eliminator,

14  I take it you would have had to rely on the literature to

15  figure out, you know, what it did, to see whether or not it

16  was worth buying.

17  A.   I just remember, you know, the ad coming up on the

18  computer screen for this program, and after -- I didn't read

19  it really carefully, but what I thought it did was to help

20  Internet run faster.  I thought it would help, you know,

21  erase, you know, Internet searches, Internet history

22  searches, block pop-ups, you know.  I didn't want things

23  like, you know, adult content coming up on my computer when

24  kids are around or anything like that.

25  Q.   Well, actually, so in order to get an idea of whether or

EXHIBIT 70
PAGE 1136

2693

1  not you want to buy it, since you weren't computer literate,

2  you had to read what the website said about why someone

3  should spend money to buy Evidence Eliminator; right?

4  A.    Yeah, I read some of it.

5  Q.    And do you recall everything that was on the website?

6  A.    No.

7  Q.    Might it help your recollection if I showed you some

8  screen shots of the current website?  Might it refresh your

9  recollection of the sorts of things you saw when you were

10  looking at Evidence Eliminator and deciding to purchase it?

11          MR. NOLAN:  Objection, your Honor.  Lack of

12  foundation.

13          THE COURT:  It is a foundational question.

14          THE WITNESS:  It might.  Again, you know, I bought

15  that program in 2002.  So I don't remember a whole lot about

16  what I actually saw.

17  Q.    BY MR. PRICE:  Let's see if it does, then.  I'll place

18  before you what we'll mark as 13629, which we'll mark for

19  identification.

20          I may have misspoken.  My understanding is this

21  actually is from 2002.  But if it doesn't refresh your

22  memory, that's fine.  Why don't you look at it, and I'll see

23  if your memory is refreshed.  Just kind of flip through it.

24  A.    I kind of recollect this phrase, it says defend

25  yourself.  Make your Internet access safer.  Get yourself a

EXHIBIT 70
PAGE 1137

2707

1

2

3

4

5

6

7                    C E R T I F I C A T E

8

9

10          I hereby certify that pursuant to Title 28,

11    Section 753 United States Code, the foregoing is a true and

12    correct transcript of the stenographically reported

13    proceedings in the above matter.

14          Certified on June 13, 2008.

15

16

17    MARK SCHWEITZER, CSR, RPR, CRR
      Official Court Reporter
18    License No. 10514

19

20

21

22

23

24

25

EXHIBIT 70
PAGE 1138

# Exhibit 71

3589

1               UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3                EASTERN DIVISION

4                - - -

5   HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                - - -

7  MATTEL, INC.,            )   **CERTIFIED**

                           )   **COPY**

8         PLAINTIFF,     )

9      VS.              )   NO. CV 04-09049

10  MGA ENTERTAINMENT, INC., ET. AL., )

11        DEFENDANTS.   )   TRIAL DAY 17

                           )   AFTERNOON SESSION

12  AND CONSOLIDATED ACTIONS,    )   PAGES 3589-3689

13

14

15   REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16           RIVERSIDE, CALIFORNIA

17         TUESDAY, JUNE 24, 2008

18            2:55 P.M.

19

20

21

22

23        THERESA A. LANZA, RPR, CSR
          FEDERAL OFFICIAL COURT REPORTER

24         3470 12TH STREET, RM. 134
          RIVERSIDE, CALIFORNIA  92501

25            951-274-0844
           WWW.THERESALANZA.COM

EXHIBIT _21_ PAGE _1139_

3590

```
1   APPEARANCES:

2

    ON BEHALF OF MATTEL, INC.:
3
                         QUINN EMANUEL
4                        BY:  JOHN QUINN
                              JON COREY
5                             MICHAEL T. ZELLER
                              HARRY OLIVAR
6                             TIMOTHY ALGER
                         865 S. FIGUEROA STREET,
7                        10TH FLOOR
                         LOS ANGELES, CALIFORNIA  90017
8

9

10  ON BEHALF OF MGA ENTERTAINMENT:

11                       SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                         BY:  THOMAS J. NOLAN
12                            JASON RUSSELL
                              RAOUL SLOAN
13                            LAUREN AGUIAR
                              CARL ROTH
14                       300 SOUTH GRAND AVENUE
                         LOS ANGELES, CALIFORNIA  90071-3144
15                       213-687-5000

16

17  ON BEHALF OF THIRD-PARTY DEFENDANT PETER MARLOW:

18                       LAW OFFICE OF STEVEN M. GOLDSOBEL
                         BY:  STEVEN M. GOLDSOBEL
19                       1900 AVENUE OF THE STARS
                         SUITE 1800
20                       LOS ANGELES, CA  90067
                         310-552-4848
21

22

23

24

25
```

TUESDAY, JUNE 24, 2008

TRIAL DAY 17, AFTERNOON SESSION

EXHIBIT _7I_ PAGE _1140_

3591

I N D E X

                                                       PAGE

DEFENSE CASE (CONTINUED).........................   3592

PLAINTIFF WITNESS...............................   3619

| DEFENSE WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| JACQUELINE PRINCE (VIA VIDEO DEPOSITION) | | | | |
| BY MR. ZELLER | 3592 | | | |

| PLAINTIFF WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| PETER MARLOW | | | | |
| BY MR. ZELLER | 3619 | | | |
| BY MS. AGUIAR | | 3658 | | |

| EXHIBITS | RECEIVED |
|---|---|
| 61 | 3618 |
| 62 | 3618 |
| 5723 (PP. 1,2) | 3632 |
| 10034 | 3678 |

TUESDAY, JUNE 24, 2008

TRIAL DAY 17, AFTERNOON SESSION

EXHIBIT _7 L_ PAGE //4/

3599

1    ASKING ABOUT IS, IS WHAT WERE THE CIRCUMSTANCES THAT

2    LED TO IT?  WAS IT SOMETHING THAT HE ASKED IN ADVANCE

3    YOU TO DO AND SCHEDULED AN APPOINTMENT OR DID HE DROP

4    BY?  IF YOU COULD PLEASE JUST EXPLAIN FOR US THE

5    CIRCUMSTANCES.

6    A.   HE ASKED IF HE COULD HAVE MY PHONE NUMBER, HE

7         WANTED TO CALL ME AT HOME AND TALK TO ME ABOUT

8    SOMETHING AND I SAID, SURE.  THEN WHEN I WAS AT HOME,

9    I DON'T REMEMBER IF IT WAS THE SAME DAY OR THE NEXT

10   DAY HE CALLED ME AND ASKED IF HE COULD COME BY AND I

11   SAID, SURE.  HE SAID ARE YOU -- AND ASKED IF I WAS A

12   NOTARY AND IF I COULD NOTARIZE SOME DOCUMENTS FOR HIM.

13   AND I SAID, SURE, COME ON OVER.

14   Q.   IS THERE ANYTHING ELSE YOU CAN RECALL ABOUT THAT

15        CONVERSATION?

16   A.   THAT WAS IT.

17   Q.   AND THE -- WHEN HE ASKED FOR YOUR HOME PHONE OR

18        EXCUSE ME -- I TAKE IT WHEN YOU SAID THAT HE ASKED

19   FOR YOUR PHONE NUMBER, IT WAS YOUR HOME PHONE NUMBER?

20   A.   YES.

21   Q.   AND DID HE -- YOU MENTIONED THAT HE CALLED A DAY

22        OR SO AFTER YOU GAVE HIM THE NUMBER?

23   A.   I DON'T REMEMBER IF IT WAS THE NEXT DAY.

24   Q.   BUT IT WAS SOON AFTER?

25   A.   YEAH, SOON AFTER.

3600

Q.   AND THEN WAS IT SOON AFTER THAT THAT HE ACTUALLY
      CAME BY AND DID -- AND HAD THE DRAWINGS NOTARIZED?

A.   YES.

Q.   SO IT'S FAIR TO SAY THAT WHEN YOU HAD THIS
CONVERSATION WITH HIM FIRST, WHEN HE ASKED FOR YOUR
PHONE NUMBER AND THEN WHEN HE CALLED YOU, THAT WAS
WITHIN A COUPLE OF DAYS OF AUGUST 26TH, 1999?

A.   I WOULD SAY YES.

Q.   WHEN MR. BRYANT ASKED FOR YOUR HOME PHONE
      NUMBER, WAS THAT THERE IN THE MATTEL DESIGN CENTER
THAT HE ASKED YOU?

A.   YES.

Q.   DID HE COME BY YOUR CUBICLE TO DO THAT?

A.   YES.

Q.   AND WERE -- WERE YOU SITTING IN YOUR CUBICLE
      WHEN HE CAME BY TO ASK FOR IT?

A.   YES.

Q.   AND THEN YOU SAID THAT HE CALLED YOU AT HOME?

A.   RIGHT.

Q.   AT THE TIME WHEN MR. BRYANT SHOWED UP, DO YOU
      HAVE A RECOLLECTION AS TO WHETHER, WHEN HE FIRST
SHOWED UP, YOU KNEW BY THEN HE WANTED SOME DRAWINGS OR
OTHER THINGS NOTARIZED?

A.   I DIDN'T KNOW UNTIL HE GOT INSIDE AND WE SAT
      DOWN IN MY LIVING ROOM AND STARTED TALKING.

3601

```
 1        Q.  WAS THERE ANYONE ELSE IN YOUR APARTMENT WHEN HE

 2             SHOWED UP?

 3        A.  MY TWO LITTLE BOYS.

 4        Q.  WAS ANYONE ELSE AROUND AT ANYTIME WHEN YOU AND

 5             MR. BRYANT WERE THERE?

 6        A.  NO.

 7        Q.  AND SO THE DRAWINGS THEMSELVES WERE ACTUALLY

 8             NOTARIZED ALL ON THAT -- ON THAT SAME OCCASION?

 9        A.  RIGHT.

10        Q.  DID MR. BRYANT TELL YOU WHY IT IS THAT HE WANTED

11             TO DOCUMENT THAT HE DID THE DRAWINGS BEFORE HE

12        WORKED FOR MATTEL?

13        A.  YES.  BECAUSE HE SAID HE DIDN'T WANT ANYONE TO

14             THINK THAT HE DID THOSE WHILE HE WAS AT MATTEL.

15        Q.  DID YOU HAVE ANY UNDERSTANDING AS TO WHY

16             MR. BRYANT DIDN'T WANT ANYONE TO THINK THAT HE

17        CAME UP WITH THE DRAWINGS WHEN HE WAS AT MATTEL?

18        A.  NO.

19        Q.  DO YOU HAVE ANY EXPECTATION OR UNDERSTANDING

20             FROM ANY SOURCE AS TO WHY MR. BRYANT WANTED THAT?

21        A.  NO. I WOULD JUST THINK THAT HE JUST WANTED TO

22             MAKE SURE THAT IT WAS UNDERSTOOD THAT HE DID THOSE

23        WHEN HE WASN'T THERE.

24        Q.  BUT IT WAS CLEAR TO THAT YOU THAT THAT'S WHAT HE

25             WAS CONCERNED ABOUT?
```

TUESDAY, JUNE 24, 2008                    TRIAL DAY 17, AFTERNOON SESSION

EXHIBIT _3_ PAGE 1144

3689

1       HAVE A GOOD WEEK.  I'LL SEE YOU NEXT TUESDAY.

2          THE CLERK:  COURT STANDS ADJOURNED.

3

4

5

6

7

8

9

10                          CERTIFICATE

11

12   I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED
     STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF
13   THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE
     ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN
14   CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF
     THE UNITED STATES.

15

16

17   THERESA A. LANZA, RPR, CSR            6-30-08
     OFFICIAL COURT REPORTER                 DATE

18

19

20

21

22

23

24

25

TUESDAY, JUNE 24, 2008

TRIAL DAY 17, AFTERNOON SESSION
EXHIBIT __71__ PAGE _1145_

# Exhibit 72

3320

1        UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA

3              EASTERN DIVISION

4                  - - -

5      HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                  - - -

7   MATTEL, INC.,                    )
                                     )            **CERTIFIED**
8                  PLAINTIFF,        )            **COPY**
                                     )
9        VS.                         )   NO. CV 04-09049
                                     )
10  MGA ENTERTAINMENT, INC., ET. AL.,)   TRIAL DAY 16
                                     )   AFTERNOON SESSION
11                 DEFENDANTS.       )   PAGES 3320-3468
                                     )
12  AND CONSOLIDATED ACTIONS,        )
                                     )

13

14

15      REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16              RIVERSIDE, CALIFORNIA

17            FRIDAY, JUNE 20, 2008

18                  1:41 P.M.

19

20

21

22

23          THERESA A. LANZA, RPR, CSR
          FEDERAL OFFICIAL COURT REPORTER
24          3470 12TH STREET, RM. 134
          RIVERSIDE, CALIFORNIA  92501
25              951-274-0844
              WWW.THERESALANZA.COM

EXHIBIT 72
PAGE 1146

3321

```
 1    APPEARANCES:

 2
      ON BEHALF OF MATTEL, INC.:
 3
                         QUINN EMANUEL
 4                       BY:   JOHN QUINN
                               JON COREY
 5                             MICHAEL T. ZELLER
                               HARRY OLIVAR
 6                             TIMOTHY ALGER
                               WILLIAM PRICE
 7                       865 S. FIGUEROA STREET,
                         10TH FLOOR
 8                       LOS ANGELES, CALIFORNIA  90017
                         213-624-7707
 9

10
      ON BEHALF OF MGA ENTERTAINMENT:
11
                         SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
12                       BY:   THOMAS J. NOLAN
                               MATTHEW SLOAN
13                             RAOUL KENNEDY
                               LAUREN AGUIAR
14                             CARL ROTH
                         300 SOUTH GRAND AVENUE
15                       LOS ANGELES, CALIFORNIA  90071-3144
                         213-687-5000
16

17

18

19

20

21

22

23

24

25
```

FRIDAY, JUNE 20, 2008                    TRIAL DAY 16, AFTERNOON SESSION

EXHIBIT 72
PAGE 1147

3322

1                          I N D E X

2                                              PAGE

3    PLAINTIFF CASE (CONT'D)...................    3323

4

5

6    PLAINTIFF
     WITNESS          DIRECT      CROSS     REDIRECT      RECROSS
7    LLOYD CUNNINGHAM (CONTINUED)

8    BY MR. QUINN      3323                 3415
     BY MR. SLOAN                 3353                    3426
9

10

11           EXHIBITS          RECEIVED

12             (NONE)

13

14

15

16

17

18

19

20

21

22

23

24

25

FRIDAY, JUNE 20, 2008              TRIAL DAY 16, AFTERNOON SESSION

EXHIBIT 72
PAGE //48

3323

1      RIVERSIDE, CALIFORNIA; FRIDAY, JUNE 20, 2008; 1:41 P.M.

2                          -oOo-

3           (JURORS ENTER COURTROOM.)

4           THE COURT:  GOOD AFTERNOON, MEMBERS OF THE JURY.

5           MR. CUNNINGHAM.                                    01:41

6           COUNSEL, YOU MAY PROCEED.

7           MR. QUINN:  THANK YOU, YOUR HONOR.

8                   DIRECT EXAMINATION (CONTINUED)

9  BY MR. QUINN:

10 Q    WE WERE LOOKING AT EXHIBIT 5-39 WHEN WE BROKE,        01:41

11 MR. CUNNINGHAM.

12          MR. QUINN:  IF WE COULD HAVE THAT BACK UP ON THE

13 SCREEN.

14 BY MR. QUINN:

15 Q    IN YOUR EXAMINATION OF THE PAGES IN THE NOTEBOOK,     01:41

16 MR. CUNNINGHAM, DID YOU FIND ANY INDENTATIONS FROM THIS

17 DRAWING, EXHIBIT 5-39?

18 A    I DID, SIR.

19 Q    WAS THIS DRAWING PREPARED THE SAME WAY AS THE OTHER

20 DRAWING WE LOOKED AT, THE BALLPOINT PEN, THE FELT-TIP PEN?  01:41

21 A    YES.  IT WAS PREPARED VERY SIMILARLY, ON VERY SIMILAR

22 SPIRAL-RING BINDER PAPER, AS EXHIBIT 5-42.

23 Q    AND HAVE YOU PREPARED SOME DEMONSTRATIVE EXHIBITS TO HELP

24 US UNDERSTAND YOUR FINDINGS WITH RESPECT TO THE INDENTATION

25 WITH RESPECT TO EXHIBIT 5-42?                              01:42

EXHIBIT 72
PAGE 1149

3324

1   A    I DID, SIR.

2   Q    IF WE COULD TAKE A LOOK AT DEMONSTRATIVE C-14.

3        WHAT IS THIS?

4   A    C-14 IS AN ENLARGEMENT OF A SECTION OF EXHIBIT 5-39; THAT

5   WOULD BE THE HEAD, PORTIONS OF THE HAIR, THE NECK, THE ARM, AND    01:42

6   A LITTLE BIT OF THE UPPER TORSO.

7   Q    AND DEMONSTRATIVE C-15?

8   A    C-15 IS MY ACTUAL INDENTATION DEVELOPMENT.  IT'S NOT VERY

9   CLEAR, IT'S HARD TO SEE, BUT I'LL USE THE POINTER; THE

10  EYEBROWS, THE OUTLINE OF THE EYE, ANOTHER PARTIAL OUTLINE OF       01:42

11  ANOTHER EYE, AND ANOTHER EYEBROW.

12  Q    AND DEMONSTRATIVE C-16?

13  A    NOW, I HIGHLIGHTED THIS BECAUSE IT'S A LITTLE EASIER TO

14  SEE.  I DIDN'T HIGHLIGHT THE OTHER EYE.  YOU CAN JUST SEE THE

15  TOP OF THE CONTOUR OF THE EYE; HOWEVER, THIS EYE IS HIGHLIGHTED    01:43

16  AND BOTH THE EYEBROWS ARE HIGHLIGHTED.

17  Q    AND DEMONSTRATIVE C-17, WHAT IS THAT?

18  A    THIS IS MY OVERLAY.  THIS IS THE ORIGINAL DRAWING, THE

19  ENLARGED PORTION, AND IT SHOWS THE EYEBROWS, THE OUTLINE OF

20  BOTH EYES.                                                         01:43

21       AND COULD YOU GO BACK TO THE PREVIOUS OUTLINE,

22  PLEASE.

23  Q    C-16?

24  A    YES.

25       HERE'S WHAT I DEVELOPED ON PAGE 63 IN THE SPIRAL-RING        01:43

FRIDAY, JUNE 20, 2008                TRIAL DAY 16, AFTERNOON SESSION

EXHIBIT 72
PAGE 1150

1   NOTEBOOK:   THE EYEBROWS; A PARTIAL OUTLINE OF THE RIGHT EYE,

2   WHICH IS ON THE LEFT SIDE HERE; AND THE OUTLINE OF THE LEFT

3   EYE, WHICH IS ON THE RIGHT HERE.

4   Q    IS THIS INDENTATION ANALYSIS THAT YOU DID, MR. CUNNINGHAM,

5   IN YOUR PROFESSIONAL OPINION, SUFFICIENT TO ESTABLISH, WITH        01:44

6   CERTAINTY, THAT THOSE TWO LOOSE NOTEBOOK PAGES WHICH HAVE THE

7   DRAWINGS ON THEM WERE CREATED IN CONTACT WITH PAGES 61 AND 63

8   OF THE BLACK NOTEBOOK?

9   A    YES, SIR.

10   Q    LET'S STEP BACK FOR A SECOND AND TALK A LITTLE BIT ABOUT      01:44

11   INDENTATION ANALYSIS IN GENERAL.

12         DOES EVERY PIECE OF WRITING ON A PAGE LEAVE AN

13   INDENTATION ON THE FOLLOWING PAGES?

14   A    OH, NO, SIR.

15   Q    WHY NOT?                                                      01:44

16   A    IT DEPENDS ON THE WRITING INSTRUMENT.   FOR EXAMPLE, A

17   SHARP HEAD ON A BALL-POINT PEN VERSUS A SOFTER FIBER-TIP HEAD,

18   THE BALL-POINT PEN WILL LEAVE BETTER INDENTATIONS ON THE

19   FOLLOWING PAGE OR PAGES THAN, SAY, A DULL PENCIL, EVEN.

20         IT ALSO DEPENDS ON THE PEN PRESSURE THAT THE WRITER          01:44

21   EXERTS WHILE USING THE PEN.   SOME PEOPLE WRITE WITH A NICE,

22   SOFT FLOW WRITING THAT HARDLY INDENTS INTO PAPER.   OTHER PEOPLE

23   PRESS PRETTY HARD WHEN THEY USE A WRITING INSTRUMENT.   THAT'S

24   ANOTHER FACTOR THAT'S VERY IMPORTANT.   AND IT ALSO DEPENDS ON

25   THE GAUGE OR THE THICKNESS OF THE PAPER.                           01:45

EXHIBIT 72
PAGE 1151

3326

1   Q    DO ALL OF THE INDENTATIONS THAT YOU FIND ON A DOCUMENT

2   NECESSARILY COME FROM THE SAME SHEET OF PAPER?

3   A    OH, NO.  NO, SIR.

4   Q    WHY IS THAT?

5   A    IT'S VERY COMMON THAT IF AN INDIVIDUAL -- AND I'LL USE MY     01:45

6   YELLOW TABLET AGAIN -- THE SUBJECT PAPER, FOR EXAMPLE, IS THE

7   FOURTH PAGE DOWN.  THAT'S THE ONE I'M GOING TO CONDUCT MY

8   EXAMINATION FOR INDENTED WRITING ON.  WHILE IT'S POSSIBLE THAT

9   AT SOME POINT SOMEONE WROTE ON THE PAGE RIGHT ABOVE IT -- MAYBE

10  THE SAME PERSON OR ANOTHER PERSON WROTE ON THE PAGE ABOVE THAT    01:45

11  PAGE, AND THEN MAYBE THE SAME PERSON OR ANOTHER PERSON WROTE ON

12  THE PAGE ABOVE THAT PAGE.  WELL, IF A PERSON IS USING PRETTY

13  NORMAL PEN PRESSURE AND A BALL-POINT PEN, THE INDENTATIONS FROM

14  ALL THREE OF THESE PAGES ARE GOING TO INDENT ONTO THE SUBJECT

15  PAGE THAT I AM EXAMINING FOR INDENTED WRITING; AND, THEREFORE,    01:46

16  I'M GOING TO HAVE INDENTATIONS FROM THREE PAGES THAT HAVE KIND

17  OF INTERMINGLED WITH EACH OTHER.

18  Q    DID YOU FIND THAT IN THIS CASE; THAT IS TO SAY, DID YOU

19  FIND INDENTATIONS ON PAGES IN THE NOTEBOOK THAT CAME FROM MORE

20  THAN ONE SHEET OF PAPER?                                          01:46

21  A    I DID.

22  Q    AND HOW WAS THAT APPARENT TO YOU?

23  A    ON PAGE 61, MY INDENTATIONS DEVELOPED WERE THAT OF THE

24  DRAWN IMAGE OF THE DOLL, WHICH IS EXHIBIT 5-42; BUT THERE WERE

25  OTHER IMAGES, SUCH AS A DRAWING OF, APPARENTLY, A BOY ON A BOAT   01:46

EXHIBIT 72
PAGE 1152

3341

```
1              THE COURT:  I'M SORRY?

2              MR. SLOAN:  WITHDRAWN.

3              THE COURT:  VERY WELL.

4              THE WITNESS:  YES.  NOT BASED UPON THE ENTRY OF THE

5    FIFTH LINE ALONE, BUT BASED UPON EVERYTHING I TESTIFIED; IN      02:21

6    OTHER WORDS, THE WHOLE PICTURE OF EVERYTHING WRITTEN IN THE

7    "DIFFERENT KIND OR TYPE" SECTION.

8    BY MR. QUINN:

9    Q    NOW, YOU'RE NOT SAYING THAT THE FACT THESE WERE NOTARIZED

10   IN 1999 IS ANY EVIDENCE THAT, IN FACT, THESE DRAWINGS WERE       02:22

11   CREATED IN 1998?

12             MR. SLOAN:  OBJECTION, YOUR HONOR.  LACK OF

13   FOUNDATION; CALLS FOR SPECULATION.

14             THE COURT:  SUSTAINED.

15             REPHRASE, COUNSEL.                                      02:22

16   BY MR. QUINN:

17   Q    DO YOU HAVE AN OPINION AS TO WHETHER OR NOT THE FACT THAT

18   THESE DOCUMENTS WERE NOTARIZED IN 1999 IS, IN FACT, ANY

19   EVIDENCE THAT THE DOCUMENTS WERE CREATED IN 1998?

20             MR. SLOAN:  OBJECTION.  LACKS FOUNDATION.              02:22

21             THE COURT:  SUSTAINED.

22   BY MR. QUINN:

23   Q    DO YOU KNOW WHEN THE DOCUMENTS WERE CREATED?

24             MR. SLOAN:  OBJECTION.  LACK OF FOUNDATION.

25             THE COURT:  OVERRULED.                                 02:22
```

FRIDAY, JUNE 20, 2008          TRIAL DAY 16, AFTERNOON SESSION

EXHIBIT 72
PAGE 1153

3342

1        THE WITNESS:  NO, I DON'T KNOW WHEN THE DRAWINGS WERE

2   CREATED.

3   BY MR. QUINN:

4   Q    YOUR TESTIMONY THAT YOU'VE GIVEN THE JURY ABOUT THE

5   SPACING OF THE ENTRY, THE FORMAT, THE HABITS OF THE WRITER, THE         02:22

6   COMMAS, THE CONCEPT OF THE SELF-SERVING HANDWRITTEN ENTRY, IS

7   THIS TESTIMONY SUPPORTED BY WELL-RECOGNIZED PRINCIPALS OF

8   HANDWRITING IDENTIFICATION?

9   A    YES.  AND THESE ARE ISSUES THAT I AM INVOLVED WITH QUITE

10  OFTEN DURING MY EXAMINATIONS.                                          02:23

11  Q    AND BASED ON YOUR EXAMINATION OF THIS ENTRY IN THE NOTARY

12  BOOK, WHAT, IN THE END, WAS YOUR CONCLUSION?

13  A    MY CONCLUSION IS THAT THE FIRST FOUR LINES WERE WRITTEN

14  AND SPACED APPROPRIATELY AND THE SIZE OF THE WRITING OF THE

15  SECOND, THIRD, AND FOURTH LINE IS VERY SIMILAR.  NATURALLY,            02:23

16  THERE WILL BE AN "A," FOR EXAMPLE, IN "HALLIDAE" ON LINE THREE

17  THAT'S A LITTLE LARGER THAN AN "A" IN "CHARACTERS" ON THE

18  SECOND LINE, AND I WOULD EXPECT TO SEE A LITTLE DIFFERENCE IN

19  CERTAIN LETTER FORMS BECAUSE NO ONE WRITES A LETTER FORM

20  EXACTLY THE SAME SIZE AND THE SAME WAY TWICE.                          02:24

21        BUT OVERALL, THE THREE LINES OF WRITING, WHICH ARE

22  THE SECOND, THIRD, AND FOURTH LINES, ARE VERY SIMILAR SIZED.

23  THERE WAS AMPLE ROOM, IF THE PERSON INTENDED TO WRITE A FIFTH

24  LINE, TO SQUEEZE UP OR TIGHTEN UP THE FIRST FOUR LINES.  AND

25  BASED UPON ALL OF THE ELEMENTS THAT I TESTIFIED ON, I FIND THAT        02:24

FRIDAY, JUNE 20, 2008                 TRIAL DAY 16, AFTERNOON SESSION

EXHIBIT 72
PAGE 1154

3343

1  THE FIRST FOUR LINES WERE DESIGNED AND SPACED FOR FOUR LINES

2  ALONE, ESPECIALLY WITH THOSE LONG PROTRUDING COMMAS THAT COME

3  DOWN TO THE BOTTOM PRINTED LINE; AND THE FIFTH LINE WAS NOT

4  WRITTEN CONTINUOUSLY RIGHT AFTER THE FIRST FOUR LINES OF

5  WRITING.                                                02:24

6  Q    DO YOU HAVE AN OPINION AS TO WHETHER THE PERSON WHO WROTE

7  THE FIRST FOUR LINES, AS THAT PERSON WAS WRITING THEM, INTENDED

8  AT THAT TIME TO WRITE A FIFTH LINE?

9        MR. SLOAN:  OBJECTION, YOUR HONOR.  LACK OF

10  FOUNDATION; CALLS FOR SPECULATION.                     02:25

11        THE COURT:  LAY A FOUNDATION FOR THIS, COUNSEL.

12  BY MR. QUINN:

13  Q    BASED UPON YOUR ANALYSIS, THE SPACING, THE SPEED WITH

14  WHICH THE WRITER WROTE, AND THE OTHER FACTORS YOU'VE

15  IDENTIFIED, DO YOU HAVE AN OPINION WHETHER OR NOT THE PERSON    02:25

16  WHO WROTE THE FIRST FOUR LINES, AT THE TIME THEY WERE WRITING

17  IT, INTENDED TO WRITE A FIFTH LINE?

18        MR. SLOAN:  YOUR HONOR, CALLS FOR SPECULATION.

19        THE COURT:  OVERRULED.

20        MR. SLOAN:  LACK OF FOUNDATION.

21        THE COURT:  OVERRULED.                            02:25

22        IT'S JUST A YES OR NO QUESTION, THOUGH.  HE ASKED YOU

23  IF YOU HAD AN OPINION.

24        THE WITNESS:  YES.

25        THE COURT:  FOUNDATION FOR THE OPINION, COUNSEL.   02:25

FRIDAY, JUNE 20, 2008            TRIAL DAY 16, AFTERNOON SESSION

EXHIBIT 72
PAGE 1155

3344

BY MR. QUINN:

Q    WHAT IS THE BASIS FOR YOUR OPINION AS TO WHETHER OR NOT THE WRITER INTENDED TO WRITE THAT FIFTH LINE AT THE TIME?

THE COURT:  WITHOUT GIVING THE CONCLUSION, JUST THE BASIS OF THE OPINION.

THE WITNESS:  THE BASIS OF THE OPINION, AS I TESTIFIED BEFORE, AS YOU CAN SEE ON THIS DEMONSTRATIVE, WITHOUT THE FIFTH LINE, THE FIRST FOUR LINES ARE SPACED APART QUITE CONSISTENTLY; THE COMMAS EXTEND TO THE BOTTOM LINES.  THE FIRST FOUR LINES OF WRITING WAS WRITTEN VERY FLUENTLY AND NATURALLY, AND THE COMMAS ALSO ACT AS AN OBSTRUCTION.  THE FIFTH LINE WAS WRITTEN VERY SLOW AND DELIBERATELY.

IN OTHER WORDS, THE SPONTANEITY, THE RHYTHM, AND THE TYPE OF WRITING, EVEN THE LETTER FORMS, ARE DIFFERENT IN SOME REGARDS.  THEREFORE, I BELIEVE THAT --

THE COURT:  LET ME STOP YOU THERE.

BY MR. QUINN:

Q    LET ME ASK YOU NOW THE PUNCH LINE, YOUR OPINION.

BASED UPON THAT ANALYSIS, WHAT IS YOUR OPINION AS TO WHETHER OR NOT THE WRITER, THE PERSON WHO WROTE THE FIRST FOUR LINES, INTENDED TO WRITE THE FIFTH LINE AT THE TIME THAT THE PERSON WROTE THOSE LINES?

MR. SLOAN:  OBJECTION.  LACK OF FOUNDATION; CALLS FOR SPECULATION.

THE COURT:  OVERRULED.

02:25
02:26
02:26
02:26
02:26
02:27

FRIDAY, JUNE 20, 2008                    TRIAL DAY 16, AFTERNOON SESSION

EXHIBIT 72
PAGE 1156

3345

1          YOU MAY ANSWER.

2          **THE WITNESS:**  IT'S MY OPINION THAT THE PERSON

3    INTENDED TO WRITE THE FOUR LINES AND AFTER THE PERIOD IN

4    "MALES," THAT WAS THE COMPLETED ENTRY.  AT A LATER POINT, THE

5    WORDS "FROM 1998 MISSOURI" WERE SQUEEZED INTO THAT POSITION.        02:27

6    BY MR. QUINN:

7    Q    THANK YOU, MR. CUNNINGHAM.

8          NOW, LET ME ASK YOU ABOUT DR. LYTER.

9          HAVE YOU LEARNED THAT MGA IN THIS CASE HAS RETAINED A

10   PERSON TO TESTIFY BY THE NAME OF DR. LYTER?                         02:27

11   A    I DO HAVE THAT INFORMATION, SIR.

12   Q    AND DO YOU KNOW DR. LYTER?

13   A    I DO KNOW DR. LYTER.

14   Q    WHAT IS DR. LYTER'S BACKGROUND?

15         WELL, LET ME ASK, HOW MANY TIMES HAVE YOU WORKED WITH         02:27

16   DR. LYTER, OR ON THE SAME MATTER AS DR. LYTER?

17         **MR. SLOAN:**  YOUR HONOR, OBJECTION.  RELEVANCE.

18         **THE COURT:**  COUNSEL, WHERE ARE YOU GOING WITH THIS?

19         **MR. QUINN:**  TO CRITIQUE THE OTHER OPINION, YOUR

20   HONOR, RATHER THAN BRING HIM BACK.                                  02:28

21         **THE COURT:**  ARE YOU GOING TO BE CALLING DR. LYTER?

22         **MR. SLOAN:**  WE WILL BE CALLING DR. LYTER.

23         **THE COURT:**  OVERRULED.

24         YOU MAY PROCEED.

25   / / /                                                              02:28

EXHIBIT 72
PAGE 1157

3346

1    BY MR. QUINN:

2    Q    ON HOW MANY DIFFERENT OCCASIONS HAVE YOU WORKED ON THE

3    SAME MATTER WITH DR. LYTER?

4    A    I DON'T KNOW EXACTLY, BUT APPROXIMATELY 15 CASES OVER MY

5    CAREER.                                                        02:28

6    Q    AND WOULD THAT INCLUDE CASES WHERE YOU AND HE HAVE BEEN

7    RETAINED EXPERTS TO THE SAME PARTY, AS WELL AS CASES WHERE YOU

8    WERE ADVISING OPPOSITE SIDES IN THE CASE?

9    A    NOT REALLY.  THERE WERE CASES WHERE I EXAMINED AND WORKED

10   ON DOCUMENT CASES AND I SUGGESTED MY CLIENT HIRE DR. LYTER FOR   02:28

11   AN INK ANALYSIS PROBLEM WITHIN THE CASE.

12   Q    AND IN THAT CONNECTION, DID YOU END UP WORKING WITH HIM IN

13   SOME FASHION?

14   A    I DID, SIR.

15   Q    AND ARE YOU FAMILIAR WITH DR. LYTER'S BACKGROUND AND       02:28

16   CREDENTIALS AND AREAS OF EXPERTISE?

17   A    I HAVE READ HIS RESUMÉ AND I'VE SPOKEN TO DR. LYTER ON

18   MANY OCCASIONS PERSONALLY, AND I AM FAMILIAR WITH HIS LINE OF

19   EXPERTISE.

20   Q    AND HAVE YOU ALSO READ SOME OF HIS EXPERT REPORTS THAT     02:2

21   HE'S DONE?

22   A    OVER THE YEARS, I HAVE.

23   Q    IS DR. LYTER A QUESTIONED DOCUMENT EXAMINER OR A FORENSIC

24   DOCUMENT EXAMINER?

25        MR. SLOAN:  OBJECTION, YOUR HONOR.  VAGUE AND             02:2

FRIDAY, JUNE 20, 2008                TRIAL DAY 16, AFTERNOON SESSION

EXHIBIT 72
PAGE 1158

3468

1          ALL GOOD THINGS HAVE TO COME TO AN END AT SOME POINT

2     IN TIME.

3              MR. QUINN:  WE HAVE TO DO A CROSS-EXAMINATION TOO.

4              MR. NOLAN:  OF COURSE.

5              MR. QUINN:  WE BELIEVE IN GOOD FAITH THAT WE ARE DOWN     06:18

6     TO SOME WITNESSES WHO WILL BE PRETTY SHORT.  BUT I DON'T KNOW

7     THAT WE CAN DO THEM AND ALSO DO MR. LYTER.

8              THE COURT:  THE COURT IS CERTAINLY GOING TO BE AS

9     FLEXIBLE WITH MGA AS IT HAS BEEN WITH MATTEL.

10             MR. NOLAN:  I APPRECIATE THAT.                            06:18

11             THE COURT:  VERY GOOD.

12             EVERYONE HAVE A GOOD WEEKEND.

13

14

15

16

17                          CERTIFICATE

18

19    I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED
      STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF
20    THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE
      ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN
21    CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF
      THE UNITED STATES.
22

23    _____        6-24-08

24    THERESA A. LANZA, RPR, CSR                DATE
      OFFICIAL COURT REPORTER
25

FRIDAY, JUNE 20, 2008                  TRIAL DAY 16, AFTERNOON SESSION

EXHIBIT 72

PAGE 1159

# Exhibit 73

1255

1    UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF CALIFORNIA

3    EASTERN DIVISION

4    - - -

5    HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6    - - -

7    MATTEL, INC.,                          )
                                            )     **CERTIFIED COPY**
8                         PLAINTIFF,        )
                                            )
9         VS.                               )     NO. CV 04-09049
                                            )
10   MGA ENTERTAINMENT, INC., ET. AL.,      )
                                            )
11                        DEFENDANTS.       )     TRIAL DAY 7
     _____      )     PAGES 1255-1390
12   AND CONSOLIDATED ACTIONS,              )
                                            )
13   _____      )

14

15           REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16                      RIVERSIDE, CALIFORNIA

17                   WEDNESDAY, JUNE 4TH, 2008

18                        8:28 A.M.

19

20

21

22

23                   THERESA A. LANZA, RPR, CSR
                   FEDERAL OFFICIAL COURT REPORTER
24                   3470 12TH STREET, RM. 134
                   RIVERSIDE, CALIFORNIA  92501
25                        951-274-0844
                      WWW.THERESALANZA.COM

WEDNESDAY, JUNE 4, 2008                          TRIAL DAY 7

EXHIBIT 73
PAGE 1160

1326

1   Q    WERE YOU STILL UNCOMFORTABLE THAT MR. BRYANT WAS STILL

2   WORKING FOR A MATTEL COMPETITOR?

3   A    YES.

4   Q    DID YOU SPEAK WITH MR. LARIAN OR MS. TREANTAFELLES OR

5   ANYONE ELSE ABOUT THAT FACT?

6   A    YES.

7   Q    WHO DID YOU SPEAK TO?

8   A    FOR CERTAIN, I SPOKE TO ISAAC LARIAN, AND I'M SURE I SPOKE

9   TO PAULA AS WELL.

10  Q    DID YOU CALL ATTENTION TO THE FACT THAT YOU RECEIVED THIS

11  SIGNED CONTRACT AND IT HAD THIS FAX HEADER ON THE TOP?

12  A    I DID.

13  Q    IF YOU COULD LOOK AT EXHIBIT 15.

14       I'M GOING TO ASK YOU IF YOU CAN IDENTIFY THAT

15  DOCUMENT.

16  A    OKAY.

17  Q    CAN YOU IDENTIFY IT?

18  A    YES.

19  Q    WHAT IS IT?

20  A    IT'S THE LICENSE AGREEMENT BETWEEN MGA AND CARTER BRYANT.

21  Q    AND IS THAT THE FINAL SIGNED AGREEMENT?

22  A    YES, IT APPEARS TO BE.

23       MR. QUINN:   I'D OFFER EXHIBIT 15, YOUR HONOR.

24       MR. NOLAN:   NO OBJECTION, YOUR HONOR.

25       THE COURT:   IT'S ADMITTED.   YOU MAY PUBLISH.

WEDNESDAY, JUNE 4, 2008

TRIAL DAY 7

EXHIBIT 73
PAGE 1161

1327

1    BY MR. QUINN:

2    Q    AND THIS IS THE AGREEMENT THAT YOU RECEIVED FROM

3    MR. BRYANT BY FAX.

4    A    I BELIEVE SO.

5    Q    IT SHOWS THERE, IN THE UPPER RIGHT, THAT IT'S DATED AS OF          09:58

6    SEPTEMBER 18, 2000.

7            DO YOU SEE THAT?

8    A    YES.

9    Q    WAS THAT DATE THERE WHEN YOU RECEIVED THIS DOCUMENT FROM

10   MR. BRYANT?                                                             09:59

11   A    I BELIEVE SO, BUT I COULDN'T SAY FOR CERTAIN.

12   Q    BUT YOU DID NOTICE THAT A DATE WAS MISSING THERE.

13           THIS APPEARS TO BE THE DOCUMENT YOU GOT FROM

14   MR. BRYANT.

15   A    YES.                                                              09:59

16   Q    AND YOU UNDERSTOOD THAT MR. BRYANT WAS STILL WORKING FOR

17   MATTEL AT THE TIME.

18   A    CORRECT.

19   Q    AND DID YOU RECEIVE THIS AROUND OR ABOUT SEPTEMBER 18,

20   2000?                                                                  09:59

21   A    I BELIEVE SO, BUT IT WAS A LONG TIME AGO.

22   Q    SURE.

23           I'D LIKE YOU TO JUMP FORWARD NOW TO SOME TIME LATER

24   IN THE NEXT YEAR, IN 2001, WERE YOU EVER ASKED TO SEND THIS

25   CONTRACT TO ANYONE?                                                    09:59

WEDNESDAY, JUNE 4, 2008

TRIAL DAY 7
EXHIBIT 73
PAGE 1162

1328

1   A    YES.

2   Q    WHO WERE YOU ASKED TO SEND IT TO?

3   A    PATTIE GLASER.

4   Q    WHO'S PATTIE GLASER?

5   A    OUTSIDE COUNSEL FOR MGA ENTERTAINMENT.

6   Q    SHE'S A LAWYER WHO DID WORK FOR MGA?

7   A    YES.

8   Q    WHO ASKED YOU TO SEND THAT AGREEMENT TO MS. GLASER?

9   A    ISAAC LARIAN.

10  Q    WHEN HE ASKED YOU TO SEND THAT AGREEMENT TO HIS OUTSIDE

11  LAWYER, DID HE GIVE YOU ANY PARTICULAR INSTRUCTIONS?

12  A    NO; NOT THAT I REMEMBER; JUST TO FAX IT TO HER.

13  Q    DID HE GIVE YOU ANY INSTRUCTIONS WITH RESPECT TO THE FAX

14  HEADER?

15  A    I WAS ASKED TO WHITE OUT THE FAX HEADER AT SOME POINT, AND

16  I DON'T RECALL IF THAT WAS UPON RECEIVING THE EXECUTED CONTRACT

17  OR AT THE TIME I SENT THE FAX TO PATTIE GLASER.

18  Q    I MAY HAVE GOTTEN THAT WRONG.  LET ME BACK UP.

19        AT SOME POINT YOU WERE ASKED TO WHITE OUT THE FAX

20  HEADER THAT SAID "BARBIE COLLECTIBLES"?

21  A    YES.

22  Q    YOU'RE JUST NOT SURE WHEN THAT WAS.

23  A    CORRECT.

24  Q    ARE THERE A COUPLE OF POSSIBILITIES YOU'RE THINKING OF AS

25  TO WHAT THAT WAS?

10:00

10:00

10:00

10:00

10:01

WEDNESDAY, JUNE 4, 2008

TRIAL DAY 7

EXHIBIT 73

PAGE 1163

1329

1          MR. NOLAN:   I THINK IT'S LEADING; AND IT'S ALSO

2     TESTIFYING.

3          THE COURT:   SUSTAINED.

4     BY MR. QUINN:

5     Q    WHAT'S YOUR BEST RECOLLECTION AS TO WHEN IT WAS YOU WERE          10:01

6     ASKED TO WHITE OUT THAT FAX HEADER?

7     A    I BELIEVE IT WAS UPON FIRST RECEIVING IT.

8     Q    AND WHO WAS IT THAT ASKED YOU TO DO THAT?

9     A    ISAAC LARIAN.

10    Q    DID HE DO THAT AFTER YOU CALLED HIS ATTENTION TO IT?             10:01

11    A    YES.

12    Q    DO YOU RECALL WHEN IT WAS THAT HE LATER ASKED YOU TO SEND

13    IT TO HIS OUTSIDE LAWYER?

14    A    IT WAS SOME TIME IN 2001.

15    Q    DID HE TELL YOU WHY HE WANTED YOU TO SEND IT TO HIS              10:01

16    OUTSIDE LAWYER?

17    A    NOT THAT I RECALL.

18    Q    PUTTING ASIDE THE ISSUE OF THE HEADER, DID HE TELL YOU TO

19    MAKE ANY OTHER CHANGES BEFORE FAXING THIS TO MS. GLASER?

20    A    NOT THAT I RECALL.                                               10:02

21    Q    WHEN YOU SENT IT TO MS. GLASER, DID YOU HAVE A COPY OF THE

22    CONTRACT OR DID YOU HAVE TO GET A COPY OF THE CONTRACT?

23    A    I BELIEVE THE CONTRACT WAS HANDED TO ME AND TOLD TO FAX IT

24    TO HER.

25    Q    WHO HANDED IT TO YOU AND TOLD YOU TO FAX IT TO HER?             10:02

WEDNESDAY, JUNE 4, 2008

TRIAL DAY 7
EXHIBIT 73
PAGE 1169

1330

1   A    ISAAC LARIAN.

2   Q    DID YOU DO THAT?

3   A    I DID.

4   Q    WOULD YOU TAKE A LOOK AT EXHIBIT 13383, WHICH IS IN YOUR

5   BINDER.   MY QUESTION TO YOU IS WHETHER YOU CAN IDENTIFY THAT          10:02

6   DOCUMENT?

7   A    YES.

8   Q    WHAT IS THAT?

9   A    THIS IS THE FAX THAT I SENT TO PATTIE GLASER WITH THE

10  LICENSE AGREEMENT BETWEEN CARTER BRYANT AND MGA.                       10:03

11  Q    THAT YOU SENT IN RESPONSE TO MR. LARIAN'S REQUEST.

12  A    YES.

13          MR. QUINN:   WE'D OFFER THAT, YOUR HONOR.

14          MR. NOLAN:   NO OBJECTION, YOUR HONOR.

15          THE COURT:   IT'S ADMITTED.   YOU MAY PUBLISH.               10:03

16          MR. QUINN:   IF WE COULD JUST ENLARGE THIS FIRST PAGE,

17  HERE.

18  BY MR. QUINN:

19  Q    IS THIS THE FAX COVER PAGE THAT YOU USED TO TRANSMIT THE

20  CONTRACT TO MS. GLASER?                                               10:03

21  A    YES.

22  Q    AND DOES SEEING THIS REFRESH YOUR RECOLLECTION AS TO WHEN

23  IT WAS YOU SENT IT TO MS. GLASER?

24  A    YES.

25  Q    IF WE COULD SEE THE NEXT PAGE.                                   10:03

EXHIBIT 73
PAGE 1165

1390

1  THE COURT HAS NOT RULED ON.

2  **THE COURT:**  OKAY.  THANK YOU.

3

4

5

6

7

8

9

10

11                          CERTIFICATE

12

13  I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED
    STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF
14  THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE ABOVE-
    ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN
15  CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF
    THE UNITED STATES.
16

17  _____          _____
    THERESA A. LANZA, CSR, RPR                DATE
18  FEDERAL OFFICIAL COURT REPORTER

19

20

21

22

23

24

25

WEDNESDAY, JUNE 4, 2008                    TRIAL DAY 7

EXHIBIT 73
PAGE 1/66

# Exhibit 74

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA 92501
CIVIL MINUTES -- GENERAL

Case No.    CV 04-09049 SGL(RNBx)                        Date: September 22, 2009
Title:      MATTEL, INC. V. MGA ENTERTAINMENT, INC., et al.
========================================================================
PRESENT:   HONORABLE STEPHEN G. LARSON, U.S. DISTRICT JUDGE

           Cindy Sasse                          None Present
           Courtroom Deputy                     Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFFS:       ATTORNEYS PRESENT FOR DEFENDANTS:

None Present                            None Present


**PROCEEDINGS:  ORDER AFTER HEARING**

        Pursuant to the Court's September 3, 2009, Order, the Court heard the testimony of Richard De Anda regarding an email communication between him (as Mattel's head of security) and Canadian law enforcement officials, which references a package sent to those officials. Although the Court finds, based on the evidence currently before the Court, in the context of this case, that it was inadvisable for Mr. De Anda to send to Canadian law enforcement officials a package containing approximately six miniature toy cars, the Court does not find anything improper regarding his actions as they were not subjectively intended as an attempt to influence, nor were they even marginally likely to influence, an ongoing investigation. Rather, the Court finds that the toys were token gifts given, in keeping with social conventions, in response to his receipt of certain token gifts, namely a coffee mug, a tie tack, and a pen, by the Canadian law enforcement officials.

        The Court conducted sealed proceedings regarding the August 31, 2009, Order to Show Cause ("OSC"). On the basis of counsel's representations of the subjective thought processes by which the document at issue came to appear on the privilege log of the MGA parties, the Court finds that the OSC is **SATISFIED** as it relates to counsel herein and **DISCHARGES** the OSC. Consideration of any evidentiary or other case-related sanctions or implications regarding prior findings by the Court and/or jury in this matter must await adjudication of the issue of whether the crime/fraud exception applies to various other documents placed on MGA's privilege logs, as well as completion of the Discovery Master's *in camera* review of numerous other documents listed on

MINUTES FORM 90                                     Initials of Deputy Clerk __cls_____
CIVIL -- GEN                            1           Time: 02/59

EXHIBIT __24__ PAGE __467__

MGA's privilege logs and resolution of certain discovery motions related thereto.

In light of the anticipated transfer of these consolidated cases to the docket of the Honorable David O. Carter, the Court **VACATES** the pending pretrial conference date and trial date for Phase 2.

The Court **EXTENDS** the discovery cutoff date to June 1, 2010.

As the judicial officer most familiar with this case, Judge Larson has consented to assist the parties' and the Settlement Officers' attempt at a global resolution to these consolidated cases. Accordingly, counsel for Mattel is directed to provide its proffered settlement proposals to the Court (*in camera* to chambers) and to the MGA parties within ten days of the entry of this Order.

The hearing dates as to Mattel's Motion for Leave to File Fourth Amended Answer and Counterclaims (docket #6311) and Motion of the MGA parties re Discovery Master Order No. 46 (docket #6476) are **VACATED** pending re-setting by the newly assigned judicial officer.

Mattel's Ex Parte Application re service of responses to the August 31, 2009, OSC (docket #6708) is **DENIED AS MOOT.**

The Ex Parte Application of the MGA parties to compel Mr. DeAnda's deposition in advance of the September 21, 2009, hearing date (docket #6767) is **DENIED AS MOOT.**

Two Proposed Stipulations and Orders by the parties (#6687 (to continue October 1, 2009, hearing date) and #6706 (re extension of expert discovery dates)) are also **DENIED AS MOOT.**

The oral request of the MGA parties for a stay pending settlement discussions is **DENIED.** In general, stays of ***discovery*** in these consolidated cases have, in the past, proven to be counter-productive.  As for the more specific request to stay the ***recall order***, the Court notes that counsel for the MGA parties is mistaken in her contention that "the whole point of that recall order was so that it would clear the market for Mattel to come in with its vision of Bratz."[1]  Instead, as set forth in the Court's December 3, 2008, Omnibus Order, the Court imposed the recall order in light of the scope of infringement found by the Court (which was broad) and in light of the fact that the Bratz dolls compete directly with existing Mattel products.  Id. at 14.  Thus, the rationale underlying the recall Order remains firmly intact.  For that reason, the request is **DENIED.**

**IT IS SO ORDERED.**

---

[1]  Mattel also denies the MGA parties' factual assumption that it will not be able to market its own dolls under the name "Bratz."  Resolution of the factual issue is unnecessary at this time, and the Court does not consider it.

MINUTES FORM 90
CIVIL -- GEN                                    2

Initials of Deputy Clerk __cls_____
Time: 02/59

EXHIBIT _7*4*_ PAGE_468_

# Exhibit 75

# REDACTED

# SUBJECT TO

# PROTECTIVE ORDER

# Exhibit 76

procure - Definition from the Merriam-Webster Online Dictionary          Page 1 of 2



THE ALL-NEW TAURUS — Ford Drive one.   A GAUNTLET OF PYLONS   TAURUS vs INFINITI   ▸ CLICK HERE FOR VIDEO

**Merriam-Webster OnLine**

Also Visit:  | Unabridged | Visual | Britannica Online Encyclopedia | ESL: | Learner's NEW | for Kids: | Word Central

**Home**
Visit Our Sites
Premium Services
Downloads
Word of the Day
Word Games
Open Dictionary
Spelling Bee Hive
Word for the Wise
Online Store
Help
About Us

◉ Dictionary ○ Thesaurus ○ Spanish/English ○ Medical     [ Search ]

**procure**

One entry found.

◉ On ○ Off

Ads by Google

**Free Definitions**
The Quickest & Easiest Way To Look Up Definitions. Search On.
www.Google.com/Dictionary

Main Entry: **pro·cure**
Pronunciation: \prə-ˈkyu̇r, prō-\
Function: *verb*
Inflected Form(s): **pro·cured; pro·cur·ing**
Etymology: Middle English, from Anglo-French *procurer,* from Late Latin *procurare,* from Latin, to take care of, from *pro-* for + *cura* care
Date: 14th century

*transitive verb*

**1 a :** to get possession of : obtain by particular care and effort **b :** to get and make available for promiscuous sexual intercourse

**2 :** BRING ABOUT, ACHIEVE <*procured* the prisoner's release>

*intransitive verb*

**:** to procure women

— **pro·cur·able**  \-ˈkyu̇r-ə-bəl\ *adjective*

Learn more about "procure" and related topics at Britannica.com

Ads by Google

**Cure Hip Bursitis Forever**
The Facts, Options and Cures. How Pro Athletes Heal So Quickly.
www.AidMyBursa.com

**Learn French in 10 Days**
World-famous Pimsleur Method. As seen on PBS - $9.95 w/ Free S&H.
PimsleurApproach.com/Learn-French

Pronunciation Symbols

Share this entry:

Link to this page:
<a href="http://www.merriam-webster.com/dictionary/procure">procure</a>

Cite this page:

MLA Style
"procure." Merriam-Webster Online Dictionary. 2009.
Merriam-Webster Online. 28 October 2009
<http://www.merriam-webster.com/dictionary/procure>

APA Style
procure. (2009). In *Merriam-Webster Online Dictionary.*
Retrieved October 28, 2009, from http://www.merriam-webster.com/dictionary/procure

Search "procure" in:
Thesaurus
Spanish/English
Medical Dictionary
Open Dictionary
Browse words next to:
procure

Browse the Dictionary:
ABCDEFGHIJKLMNOPQRSTUVWXYZ#

procure     [ Go ]

THE ALL-NEW TAURUS — Ford Drive one.   CATCH-ME-IF-YOU-CAN   TAURUS SHO vs AUDI A6   ▸ CLICK HERE FOR VIDEO

Ads by Google

**Shamir Progressive Lenses**
Need to correct presbyopia? Learn about Shamir progressives
www.shamirlens.com

**Read French Books w/ Ease**
Use French bestsellers with English glossaries to read like a native.
www.linguality.com

TRUMP   LAS VEGAS   From $89/Night
...plus $50 Spa Credit & 4pm late check out
LIMITED TIME OFFER   [ BOOK NOW ▸ ]

EXHIBIT 26
PAGE 1215



Products     Premium Services     Company Info     Contact Us     Advertising Info     Privacy Policy

© 2009 Merriam-Webster, Incorporated

EXHIBIT 76
PAGE 126

withdraw - Definition from Merriam-Webster Online Dictionary                Page 1 of 2




Uncover all our delicious M&M'S® Brand recipes at BrightIdeas.com  get recipe


Merriam-Webster OnLine

Also Visit: | Unabridged | Visual | Britannica Online Encyclopedia | ESL: | Learner's | for Kids: | Word Central

⦿ Dictionary ◯ Thesaurus ◯ Spanish/English ◯ Medical        [ Search ]

Home
Visit Our Sites
Premium Services
Downloads
Word of the Day
Word Games
Open Dictionary
Spelling Bee Hive
Word for the Wise
Online Store
Help
About Us


discover NEW GAMES
EAT YOUR WORDS
Merriam-Webster.com

## withdraw

One entry found.

⦿ On ◯ Off

Ads by Google

**Free Definitions**
The Quickest & Easiest Way To Look Up Definitions. Search On.
www.Google.com/Dictionary

Main Entry: **with·draw**
Pronunciation: \with-'drò, with-\
Function: *verb*
Inflected Form(s): **with·drew** \-'drü\; **with·drawn** \-'dròn\; **with·draw·ing** \-'drò(-)iŋ\
Etymology: Middle English, from *with* from + *drawen* to draw
Date: 13th century

*transitive verb*

**1 a** : to take back or away : REMOVE <pressure upon educational administrators to withdraw academic credit — J. W. Scott> **b** : to remove from use or cultivation **c** : to remove (money) from a place of deposit **d** : to turn away (as the eyes) from an object of attention <*withdrew* her gaze> **e** : to draw (as a curtain) back or aside **2 a** : to remove from consideration or set outside a group <*withdrew* his name from the list of nominees> <*withdrew* their child from the school> **b** (1) : TAKE BACK, RETRACT (2) : to recall or remove (a motion) under parliamentary procedure

*intransitive verb*

**1 a** : to move back or away : RETIRE **b** : to draw back from a battlefield : RETREAT
**2 a** : to remove oneself from participation **b** : to become socially or emotionally detached <had *withdrawn* farther and farther into herself — Ethel Wilson>
**3** : to recall a motion under parliamentary procedure
— **with·draw·able** \-'drò-ə-bəl\ *adjective*

Learn more about "withdraw" and related topics at Britannica.com

Ads by Google

**Notice of Withdrawal**
Online form creates a notice of withdrawal from partnership.
www.LawDepot.com

**Paroxetine Withdraw**
Latest medical side effects, FDA warnings, and legal case review.
www.PaxilNews.com

Pronunciation Symbols

Share this entry:

Link to this page:
<a href="http://www.merriam-webster.com/dictionary/withdraw">withdraw</a>

Cite this page:

MLA Style
"withdraw." Merriam-Webster Online Dictionary. 2009.
    Merriam-Webster Online. 28 October 2009
    <http://www.merriam-webster.com/dictionary/withdraw>

Search "withdraw" in:
Thesaurus
Spanish/English
Medical Dictionary
Browse words next to:
withdraw

Browse the Dictionary:
ABCDEFGHIJKLMNOPQRSTUVWXYZ#

withdraw                [ Go ]


Uncover all our delicious M&M'S® Brand recipes at BrightIdeas.com  get recipe

Ads by Google

**Need Help to Quit SSRIs?**
Natural, Proven Method to Withdraw Safely & Comfortably. Free Support!
www.PointofReturn.com

**Learn French in 10 Days**
World-famous Pimsleur Method. As seen on PBS - $9.95 w/ Free S&H.
PimsleurApproach.com/Learn-French

**Get Verizon High Speed Internet And Save Over $150 With**
NOW 6 3 MONTHS FREE
OFFER ENDS 11/07/09
$19.99 /month FOR MONTHS 7-12, PLUS TAXES AND FEES. 1-YR. AGREEMENT REQUIRED. SPEEDS UP TO 1.1 MBPS
verizon  [ Get It Today! ]

EXHIBIT 76
PAGE 1217

**APA Style**
withdraw. (2009). In *Merriam-Webster Online Dictionary*.
Retrieved October 28, 2009, from http://www.merriam-webster.com/dictionary/withdraw



CEDARS-SINAI
SPINE CENTER

1-800-CEDARS-1
(1-800-233-2771)

Products    Premium Services    Company Info    Contact Us    Advertising Info    Privacy Policy

© 2009 Merriam-Webster, Incorporated

EXHIBIT 76
PAGE 1218

# Exhibit 77

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| MATTEL, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>MGA ENTERTAINMENT, INC., et al.,<br><br>Defendants.<br>_____<br><br>AND CONSOLIDATED ACTIONS<br>_____ | CASE NO. CV 04-9049 SGL (RNBx)<br><br>Consolidated with<br>CASE NO. CV 04-9059 SGL (RNBx)<br>CASE NO. CV 05-2727 SGL (RNBx)<br>Hon. Stephen G. Larson<br><br><br>**COURT'S PHASE B JURY<br>INSTRUCTIONS AS GIVEN** |

EXHIBIT  27
PAGE  1219

# JURY INSTRUCTION NO. 1

Members of the Jury:

Now that you have heard all of the evidence and the arguments of the attorneys, it is my duty to instruct you as to the law of the case.

A copy of these instructions will be sent with you to the jury room when you deliberate.

You must not infer from these instructions or from anything I may say or do as indicating that I have an opinion regarding the evidence or what your verdict should be.

It is your duty to find the facts from all the evidence in the case. To those facts you will apply the law as I give it to you. You must follow the law as I give it to you whether you agree with it or not. And you must not be influenced by any personal likes or dislikes, opinions, prejudices, or sympathy. That means that you must decide the case solely on the evidence before you. You will recall that you took an oath to do so.

In following my instructions, you must follow all of them and not single out some and ignore others; they are all important.

EXHIBIT 77
PAGE 1220

1

## JURY INSTRUCTION NO. 2

2

You should decide the case as to each party separately. Unless otherwise stated,

3

the instructions apply to all parties.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

EXHIBIT  22
PAGE  1221

1    **JURY INSTRUCTION NO. 3**

2    Whether or not you have taken notes, you should rely on your own memory of

3    the evidence. Notes are only to assist your memory. You should not be overly influenced

4    by your notes or those of your fellow jurors.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

EXHIBIT 77
PE 1222

1

## JURY INSTRUCTION NO. 4

2

The evidence you are to consider in deciding what the facts are consists of:

3

4      1.     the sworn testimony of any witness;

5

6      2.     the exhibits which are received into evidence; and

7      3.     any facts to which the lawyers have agreed or stipulated.

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

5

## JURY INSTRUCTION NO. 5

In reaching your verdict, you may consider only the testimony and exhibits received into evidence. Certain things are not evidence, and you may not consider them in deciding what the facts are. I will list them for you:

(1)   Arguments and statements by lawyers are not evidence. The lawyers are not witnesses. What they have said in their opening statements, will say in their closing arguments, and at other times is intended to help you interpret the evidence, but it is not evidence. If the facts as you remember them differ from the way the lawyers have stated them, your memory of them controls.

(2)   Questions and objections by lawyers are not evidence. Attorneys have a duty to their clients to object when they believe a question is improper under the rules of evidence. You should not be influenced by the objection or by the court's ruling on it.

(3)   Testimony that has been excluded or stricken, or that you have been instructed to disregard, is not evidence and must not be considered.  In addition sometimes testimony and exhibits are received only for a limited purpose; when I have given a limiting instruction, you must follow it.

(4)   Anything you may have seen or heard when the court was not in session is not evidence. You are to decide the case solely on the evidence received at the trial.

6

EXHIBIT 77
PAGE 1224

1

**JURY INSTRUCTION NO. 6**

2

Evidence may be direct or circumstantial. Direct evidence is direct proof of a

3

4

fact, such as testimony by a witness about what that witness personally saw or heard or

5

did. Circumstantial evidence is proof of one or more facts from which you could find

6

another fact. You should consider both kinds of evidence. The law makes no distinction

7

between the weight to be given to either direct or circumstantial evidence. It is for you to

8

decide how much weight to give to any evidence.

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

7

77
1225

### JURY INSTRUCTION NO. 7

There are rules of evidence that control what can be received into evidence. When a lawyer asks a question or offers an exhibit into evidence and a lawyer on the other side thinks that it is not permitted by the rules of evidence, that lawyer may object. If I overrule the objection, the question may be answered or the exhibit received. If I sustain the objection, the question cannot be answered, and the exhibit cannot be received. Whenever I sustain an objection to a question, you must ignore the question and must not guess what the answer might have been.

Sometimes I have ordered that evidence be stricken from the record. That means that when you are deciding the case, you must not consider that evidence.

EXHIBIT 27
PAGE 1226

## JURY INSTRUCTION NO. 8

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, or part of it, or none of it. Proof of a fact does not necessarily depend on the number of witnesses who testify about it.

In considering the testimony of any witness, you may take into account:

(1) the opportunity and ability of the witness to see or hear or know the things testified to;

(2) the witness's memory;

(3) the witness's manner while testifying;

(4) the witness's interest in the outcome of the case and any bias or prejudice;

(5) whether other evidence contradicted the witness's testimony;

(6) the reasonableness of the witness's testimony in light of all the evidence; and

(7) any other factors that bear on believability.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify about it.

9

EXHIBIT 77
PAGE 1227

## JURY INSTRUCTION NO. 9

I will now say a few words about your conduct as jurors.

First, you are not to discuss this case with anyone, including members of your family, people involved in the trial, or anyone else; this includes discussing the case in internet chat rooms or through internet "blogs," internet bulletin boards or e-mails. Nor are you allowed to permit others to discuss the case with you. If anyone approaches you and tries to talk to you about the case, please let me know about it immediately;

Second, do not read or listen to any news stories, articles, radio, television, or online reports about the case or about anyone who has anything to do with it;

Third, do not do any research, such as consulting dictionaries, searching the Internet or using other reference materials, and do not make any investigation about the case on your own;

Fourth, if you need to communicate with me simply give a signed note to the bailiff to give to me; and

Fifth, do not make up your mind about what the verdict should be until after you have gone to the jury room to decide the case and you and your fellow jurors have discussed the evidence. Keep an open mind until then.

Finally, until this case is given to you for your deliberation and verdict, you are not to discuss the case with your fellow jurors.

10

EXHIBIT 77
PAGE 1228

## JURY INSTRUCTION NO. 10

During deliberations, you will have to make your decision based on what you recall of the evidence. You will not have a transcript of the trial.

EXHIBIT 77
PAGE 1229

1

## JURY INSTRUCTION NO. 11

2    You must not make any assumptions about a witness based solely upon the use of

3    an interpreter to assist that witness.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 77
PAGE 1230

1

## JURY INSTRUCTION NO. 12

2

3          From time to time during the trial, it became necessary for me to talk with the

4     attorneys out of the hearing of the jury, either by having a conference at the bench when

5     the jury was present in the courtroom, or by calling a recess.  Please understand that while

6     you were waiting, we were working.  The purpose of these conferences is not to keep

7     relevant information from you, but to decide how certain evidence is to be treated under

8     the rules of evidence and to avoid confusion and error.

9          Of course, we have done what we could to keep the number and length of these

10    conferences to a minimum.  I did not always grant an attorney's request for a conference.

11

12    Do not consider my granting or denying a request for a conference as any indication of

13    my opinion of the case or of what your verdict should be.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 77
PAGE 1231

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**JURY INSTRUCTION NO. 13**

The parties have agreed to certain facts. You should therefore treat these facts as having been proved.

14

EXHIBIT  77
PAGE  1232

**JURY INSTRUCTION NO. 14**

A deposition is the sworn testimony of a witness taken before trial. The witness is placed under oath to tell the truth and lawyers for each party may ask questions. The questions and answers are recorded. When a person is unavailable to testify at trial, the deposition of that person, including a videotaped deposition, may be used at the trial.

15

EXHIBIT 77
PAGE 1233

**JURY INSTRUCTION NO. 15**

Some witnesses, because of education or experience, are permitted to state opinions and the reasons for those opinions.

Opinion testimony should be judged just like any other testimony. You may accept it or reject it, and give it as much weight as you think it deserves, considering the witness's education and experience, the reasons given for the opinion, and all the other evidence in the case.

16

EXHIBIT _77_
PAGE _1234_

**JURY INSTRUCTION NO. 16**

Certain charts and summaries not received in evidence have been shown to you in order to help explain the contents of books, records, documents, or other evidence in the case. They are not themselves evidence or proof of any facts. If they do not correctly reflect the facts or figures shown by the evidence in the case, you should disregard these charts and summaries and determine the facts from the underlying evidence.

17

EXHIBIT 77
PAGE 235

## JURY INSTRUCTION NO. 17

Other charts and summaries have been received into evidence to illustrate information brought out in the trial. Charts and summaries are only as good as the underlying evidence that supports them. You should, therefore, give them only such weight as you think the underlying evidence deserves.

18

EXHIBIT 77
PAGE 1236

**JURY INSTRUCTION NO. 18**

You have heard evidence that both Mattel and MGA purchased and evaluated
each other's existing products and had those products in their respective facilities. In this
trial, there is no allegation that it is illegal or improper for a company or person to
purchase, possess, or evaluate the publicly available product of a competitor.

19

EXHIBIT ___77___
PAGE ___1237___

**JURY INSTRUCTION NO. 19**

When a party has the burden of proof on any claim by a preponderance of the evidence, it means you must be persuaded by the evidence that the claim is more probably true than not true.

You should base your decision on all of the evidence, regardless of which party presented it.

20

EXHIBIT 27
PAGE 1238

## JURY INSTRUCTION NO. 20

Mattel claims that the defendants, MGA Entertainment, Inc. ("MGA"), Isaac
Larian and MGA Entertainment (HK) Ltd. ("MGA Hong Kong"), engaged in copyright
infringement of certain items that you found in Phase A of this trial were created by
Carter Bryant when he worked at Mattel. The defendants deny that claim.

Copyright is the exclusive right to copy.

This right to copy includes the exclusive rights to:

(1)   Authorize, or make additional copies, or otherwise reproduce the
copyrighted work;

(2)   Recast, transform, or adopt the work, that is, to prepare derivative works
based upon the copyrighted work;

(3)   Distribute copies of the copyrighted work to the public by sale or other
        transfer of ownership; and

(4)   Display publicly a copyrighted work.

It is the owner of a copyright who may exercise these exclusive rights to copy.

As a matter of law, Mattel is the owner, by assignment, of the Bratz-related items
that you found were created by Carter Bryant, alone or jointly with others, while
employed by Mattel, which items have been registered by Mattel at the U.S. Copyright
Office. In general, copyright law protects against production, adaptation and distribution
of substantially similar copies of the owner's copyrighted work without the owner's
permission. An owner may enforce these rights to exclude others in an action for
copyright infringement.

EXHIBIT 77
PAGE 1239

1          You must consider each defendant's acts separately to determine whether that

2   defendant has engaged in an act that is an infringement of Mattel's copyright.

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT  77
PAGE  1240

1

## JURY INSTRUCTION NO. 21

Copyright law allows the author of an original work to prevent others from copying the way or form the author used to express the ideas in the author's work. Only the particular way of expressing an idea can be copyrighted. Copyright law does not give the author the right to prevent others from copying or using the underlying ideas contained in the work, such as any procedures, processes, systems, methods of operation, concepts, principles or discoveries.

The right to exclude others from copying extends only to how the author expressed the ideas in the copyrighted work. The copyright is not violated when someone uses an idea from a copyrighted work, as long as the particular way of expressing that idea in the work is not copied.

23

EXHIBIT ___27___
PAGE ___1241___

1

## JURY INSTRUCTION NO. 22

2

Anyone who copies original elements of a copyrighted work without the owner's

3

permission infringes the copyright.

4

5

Mattel claims that the defendants have infringed copyrights for the Bratz-related

6

items described above.  On Mattel's copyright infringement claim, Mattel has the burden

7

of proving both of the following by a preponderance of the evidence:

8

    1.    Mattel is the owner of a valid copyright; and

9

10

    2.    The defendants copied original elements from the copyrighted work.

11

If you find that Mattel has proved both of these elements, your verdict should be

12

for Mattel.

13

If, on the other hand, Mattel has failed to prove either of these elements, your

14

verdict should be for the defendants.

15

As a matter of law, the first element is satisfied because Mattel is the owner of

16

17

each of the items you found were created by Carter Bryant, alone or jointly with others,

18

while employed by Mattel and which Mattel has registered with the U.S. Copyright

19

Office.

20

Whether or not the second element is satisfied is for you to decide.

21

22

23

24

25

26

27

28

EXHIBIT __77__
PAGE __1242__

## JURY INSTRUCTION NO. 23

A copyright owner is entitled to exclude others from creating derivative works based upon the owner's copyrighted work. The term derivative work refers to a work based on one or more pre-existing works. Accordingly, Mattel is entitled to exclude others from recasting, transforming, or adapting, without Mattel's permission, the copyrighted works you found were created by Carter Bryant, alone or jointly with others, while he was employed by Mattel.

25

EXHIBIT 77
PAGE 1243

## JURY INSTRUCTION NO. 24

An owner is entitled to copyright protection of a compilation.  A compilation is a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship.

The owner of a compilation may enforce the right to exclude others in an action for copyright infringement.

EXHIBIT 77
PAGE 1244

**JURY INSTRUCTION NO. 25**

As explained above, Mattel has the burden of proving that the defendants copied original elements from Mattel's copyrighted work.  There are two ways in which Mattel may meet that burden.

First, Mattel may show the defendants copied from the work by showing by a preponderance of the evidence that the defendants actually copied a significant amount of protectable expression from the work.

Second, in the alternative, Mattel may also show the defendants copied from the work by showing by a preponderance of the evidence that the defendants had access to Mattel's copyrighted works and that there are substantial similarities between the defendants' works and original elements of Mattel's works.

It is undisputed in this case that defendants had access to Mattel's copyrighted works.  Whether there are substantial similarities between the defendants' works and original elements of Mattel's works is for you to decide.

27

EXHIBIT 77
PAGE 1245

## JURY INSTRUCTION NO. 26

You are to make a determination regarding substantial similarity according to a two-step process, which includes application of the "extrinsic test" and the "intrinsic test." To prevail on its claims for copyright infringement, Mattel must satisfy both of these tests.

First, you must apply the extrinsic test. Under the extrinsic test, Mattel must establish that specific ideas and expressive elements of the works Mattel owns and the Bratz-related products that Mattel claims are infringing are substantially similar.

The Court has determined what elements of the works that you found were created by Carter Bryant, solely or jointly while working at Mattel, are protectable under copyright law. These are the elements that you should consider for the purpose of your comparisons to each of the allegedly infringing products under the extrinsic test:

First, the particularized, synergistic compilation and expression of the human form and anatomy that expresses a unique style and conveys a distinct look or attitude;

Second, the particularized expression of a doll's head, lips, eyes, eyebrows, eye features, nose, chin, hair style and breasts, including the accentuation or exaggeration of certain anatomical features relative to others (doll lips, eyes, eyebrows, and eye features) and de-emphasis of certain anatomical features relative to others (doll nose and thin, small doll bodies); and

Third, the particularized doll clothes, doll shoes, and doll accessories that express aggressive, contemporary, youthful style.

In contrast, certain basic elements of Carter Bryant's works are not protectable. Specifically, copying of protected expression or ideas cannot be established by the mere

28

EXHIBIT 27
PAGE 1246

1  fact that both Carter Bryant's works and the allegedly infringing designs bear a

2  resemblance or similarity to human form and human physiology; have hair, heads, two

3
   eyes, eyebrows, lips, nose, chin, mouth, and other features that track human anatomy and
4
5  physiology; wear or have human clothes, shoes, and accessories; depict a certain age,

6  race, ethnicity, or have an "urban" appearance; possess common or standard anatomical

7  features relative to others or depict common or standard treatment of fashion doll  subject

8  matter. Nevertheless, particular compilations or combinations of these otherwise non-

9
   protectable elements in the works which express a particular style or convey a distinct
10
11 look or attitude, are protectable.

12      You should consider only the elements I have just listed for purposes of the

13 extrinsic test. Focusing on the protectable elements of the works by Carter Bryant as

14 compared to those elements in the allegedly infringing Bratz-related works, you must

15
   determine whether Mattel has proven by the preponderance of the evidence that the works
16
17 are substantially similar. If you so find, you must next consider the intrinsic test. If you

18 do not so find, you must find for the defendants.

19      The intrinsic test looks at the overall similarity of ideas and expression in the

20 works from the perspective of an ordinary observer. You should ask yourself whether the

21 ordinary, reasonable audience, in this case girls between the ages of 7 and 12, would

22
   determine or recognize the defendants' products as reflecting the total concept and feel, or
23
24 as a "picturization," of the Bratz-related works that you have found Carter Bryant created

25 alone or jointly with others while employed by Mattel.

26      Mattel does not need to establish that the works it alleges are infringing are

27 identical or virtually identical to the works it owns, nor that the allegedly infringing

28

29

EXHIBIT   77
PAGE   1247

1  works do not contain any non-infringing material. However, Mattel does need to

2  establish that, focusing on the protectable elements of Carter Bryant's designs which I

3  have identified under the extrinsic test, and the overall look and feel of the works under

4
5  the intrinsic test, there are substantial similarities between the copyright-protected works

6  and the allegedly infringing works.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

30

EXHIBIT  77
PAGE  1248

# JURY INSTRUCTION NO. 27

The degree of similarity required to support a finding of substantial similarity is affected by the degree of access MGA, Isaac Larian and MGA Hong Kong had to Carter Bryant's works. The greater the level of access, the lower the showing of similarity required to support a finding of substantial similarity. However, the burden of proving substantial similarity by a preponderance of the evidence always remains with Mattel.

EXHIBIT 27
PAGE 1249

**JURY INSTRUCTION NO. 28**

Copyright law protects distinctive characters. Defendants' works infringe Mattel's copyrights if they copy recognizable and distinctive traits, attributes, and elements of the personalities of the characters portrayed in Carter Bryant's works.

32

EXHIBIT 27
PAGE 1250

**JURY INSTRUCTION NO. 29**

If you find that defendants had access to the copyrighted works and substantial similarity between the copyrighted works and allegedly infringing works, you must find that defendants infringed Mattel's copyrights. Defendants contend that certain Bratz-related works were created independently, that is, that defendants did not actually copy or prepare derivative works from Carter Bryant's works when they created these Bratz-related works, notwithstanding their admitted access to these works. A claim of independent creation applies where a defendant can prove that he or she created the allegedly infringing work without copying or adapting or preparing derivative works from the original to which he or she had access.

Defendants bear the burden of proof on the issue of independent creation.

If you find that Mattel has shown the elements of infringement and defendants have not established independent creation by a preponderance of the evidence, then you must find for Mattel on its claim of copyright infringement.

33

EXHIBIT __77__
PAGE __1251__

**JURY INSTRUCTION NO. 30**

A two-dimensional work, such as a drawing, can be infringed by a three-dimensional work, such as a doll. A doll, which consists of different materials or includes aspects that are not visible in a copyrighted drawing, nevertheless will infringe the drawing when the works are substantially similar in their appearance under the extrinsic and intrinsic tests. A three-dimensional work is not an independent creation merely because it includes or is a result of artistic or non-artistic work not included in the copyrighted work. Rather, the question is whether the three-dimensional work is substantially similar to the two-dimensional work as a whole using the extrinsic/intrinsic test described above.

34

EXHIBIT 77
PAGE 1252

**JURY INSTRUCTION NO. 31**

A copyright can be infringed by intermediate or preparatory works, including works prepared in the product development or marketing stage, that are substantially similar to a copyrighted work, regardless of whether the end product of the copying also infringes the copyright.

35

EXHIBIT 27
PAGE 1253

**JURY INSTRUCTION NO. 32**

Mattel has presented evidence concerning certain copyright infringement lawsuits brought by MGA in Hong Kong pursuant to Hong Kong law.

The Court has excluded, and you may not consider, any reference to any legal arguments or legal conclusions associated with those lawsuits.

You may, however, consider any factual statements or factual representations that MGA made in those lawsuits.

It is for you to decide how much weight, if any, to give to those factual statements or factual representations.

36

EXHIBIT __77__
PAGE __1254__

**JURY INSTRUCTION NO. 33**

If you find that MGA infringed Mattel's copyright in the Bratz works, you may

consider Mattel's claim that Isaac Larian vicariously infringed that copyright. Mattel has

the burden of proving each of the following by a preponderance of the evidence:

1.  Isaac Larian profited directly from the infringing activity of MGA;

2.  Isaac Larian had the right and ability to supervise/control the infringing

activity of MGA; and

3.  Isaac Larian failed to exercise that right and ability.

If you find that Mattel proved each of these elements, your verdict should be for

Mattel if you also find that MGA infringed Mattel's copyright. If, on the other hand,

Mattel has failed to prove any of these elements, your verdict should be for Isaac Larian

on Mattel's claim for copyright infringement, unless you find that Isaac Larian is liable

for contributory infringement under the instruction that follows.

## JURY INSTRUCTION NO. 34

A defendant may be liable for copyright infringement engaged in by another if he/it knew or had reason to know of the infringing activity and intentionally materially contributes to that infringing activity.

If you find that MGA infringed Mattel's copyright in Bratz works, but that MGA Hong Kong and/or Isaac Larian did not directly or vicariously engage in acts of infringement, you should proceed to consider Mattel's claim that MGA Hong Kong and Isaac Larian contributorily infringed that copyright. To prove contributory copyright infringement, Mattel must prove both of the following elements by a preponderance of the evidence:

1.    Isaac Larian and/or MGA Hong Kong knew or had reason to know of the infringing activity of MGA; and

2.    Isaac Larian and/or MGA Hong Kong intentionally materially contributed to MGA's infringing activity.

If you find that MGA infringed Mattel's copyright and you also find that Mattel has proved both of these elements, your verdict should be for Mattel. If, on the other hand, Mattel has failed to prove either or both of these elements as against MGA Hong Kong and/or Isaac Larian, and also failed to prove direct or vicarious infringement by MGA Hong Kong and/or Isaac Larian, your verdict should be for those defendants.

38

EXHIBIT 77
PAGE 1256

## JURY INSTRUCTION NO. 35

Mattel claims that defendants fraudulently concealed the facts underlying

Mattel's claims of intentional interference with contract and conversion.  Defendants deny

these allegations.

To prove fraudulent concealment, Mattel must show the following by a

preponderance of the evidence

(1)    the defendants took affirmative steps to conceal the facts that could have led

Mattel to discover that Carter Bryant created Bratz-related works while

employed by Mattel or that Carter Bryant entered into a contract with and

worked with MGA while he was still employed by Mattel; and

(2)    Mattel was not aware of such facts that either did or would have, with

diligence, led Mattel to discover that Carter Bryant created Bratz works

while employed by Mattel or that Carter Bryant entered into a contract with

and worked with MGA while he was still employed by Mattel.

If you so find by the preponderance of the evidence, you should find for Mattel

on its allegations of fraudulent concealment.  If not, you should find for defendants on the

allegations of fraudulent concealment.

39

EXHIBIT 77
PAGE 1257

**JURY INSTRUCTION NO. 36**

It is the duty of the Court to instruct you about the measure of damages.  By instructing you on damages, the Court does not mean to suggest for which party your verdict should be rendered.

It is for you to determine what damages, if any, have been proved.

Your award must be based upon evidence and not upon speculation, guesswork or conjecture.

40

EXHIBIT 77
PAGE 1258

## JURY INSTRUCTION NO. 37

In Phase A, you determined that Mattel had proved its claim for intentional interference with contractual relations against the defendants MGA and Isaac Larian. You must now decide how much money, if any, should be awarded as damages.

The amount of damages must include an award for each item of harm that was caused by MGA's and Isaac Larian's wrongful conduct, even if the particular harm could not have been anticipated.

Mattel must prove the amount of damages. However, Mattel does not have to prove the exact amount of damages that will provide reasonable compensation for the harm. You must not speculate or guess in awarding damages.

The following are the specific items of damages claimed by Mattel:

(1)    Compensatory and general damages, including disgorgement of profits earned by MGA and Isaac Larian as a result of their wrongful conduct;

(2)    Prejudgment interest at the maximum rate, which is 7%, calculated from the date Mattel's claim arose;

(3)    Punitive damages.

41

EXHIBIT   27
PAGE   1259

**JURY INSTRUCTION NO. 38**

In Phase A, you determined that Mattel had proved its claims against the defendants MGA and Isaac Larian for aiding and abetting Carter Bryant's breach of fiduciary duty and breach of the duty of loyalty. You must now decide how much money, if any, should be awarded as damages.

The amount of damages must include an award for each item of harm that was caused by MGA's and Isaac Larian's wrongful conduct, even if the particular harm could not have been anticipated.

Mattel must prove the amount of its damages. However, Mattel does not have to prove the exact amount of damages that will provide reasonable compensation for the harm. You must not speculate or guess in awarding damages.

The following are the specific items of damages claimed by Mattel:

(1) Compensatory and general damages, including disgorgement of profits earned by MGA and Isaac Larian as a result of their wrongful conduct;

(2) Prejudgment interest at the maximum rate, which is 7%, calculated from the date Mattel's claim arose;

(3) Punitive damages.

42

**JURY INSTRUCTION NO. 39**

Mattel is entitled to obtain disgorgement of profits as an element of its damages for the wrongful acts of aiding and abetting breach of fiduciary duty and duty of loyalty that you have found. Accordingly, if you find that MGA and/or Isaac Larian obtained profits or advantages because of these specific wrongful acts, those profits and advantages should be awarded to Mattel.

43

## JURY INSTRUCTION NO. 40

In Phase A of this trial, you found that Mattel had proved its claims for conversion of tangible property against MGA, Isaac Larian and MGA Hong Kong. You must now decide how much money will reasonably compensate Mattel for the harm. This compensation is called damages.

Mattel must prove the amount of its damages. However, Mattel does not have to prove the exact amount of damages that will provide reasonable compensation for the harm. You must not speculate or guess in awarding damages.

The following are the specific items of damages claimed by Mattel:

(1)    The fair market value of the tangible Bratz works created by Carter Bryant while he was employed by Mattel; and

(2)    Prejudgment interest at the maximum rate, which is 7%, calculated from the date Mattel's property was converted;

(3)    Punitive damages.

Fair market value is measured as of the time the tangible item was converted. Fair market value is the highest price that a willing buyer would have paid to a willing seller assuming that there is no pressure on either one to buy or sell, and that the buyer and seller know all the uses and purposes for which the tangible items are reasonably capable of being used.

44

EXHIBIT   72
PG  1262

## JURY INSTRUCTION NO. 41

1
2          If you find for the plaintiff, Mattel, on any of its copyright infringement claims
3    against the defendants, you must determine Mattel's damages.  Mattel is entitled to
4    recover any profits of the defendants attributable to the infringement.  Mattel must prove
5
6    damages by a preponderance of the evidence.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT   77
PAGE   1263

## JURY INSTRUCTION NO. 42

You may make an award of the defendants' profits only if you find that the plaintiff showed a causal relationship between the infringement and the defendants' gross revenue.

The defendants' profit is determined by deducting expenses from the defendants' gross revenue.

The defendants' gross revenue is all of the defendants' receipts from sale of a product containing or using the copyrighted work or associated with the infringement. Mattel has the burden of proving the defendants' gross revenue by a preponderance of the evidence.

Expenses are all operating costs and production costs incurred in producing the defendants' gross revenue. The defendants have the burden of proving the defendants' expenses by a preponderance of the evidence.

Indirect profits are the defendants' profits with a less direct connection or link to the infringement. A plaintiff such as Mattel may be entitled to indirect profits in addition to direct profits. To recover indirect profits, Mattel must establish a causal relationship between the infringement and the profits generated indirectly from such infringement.

In other words, Mattel must offer some evidence that the infringement at least partially caused the profits that the infringer generated as a result of the infringement.

Unless you find that a portion of the profit from the sale of a product containing or using the copyrighted work is attributable to factors other than use of the copyrighted work, all of the profit is to be attributed to the infringement. The defendants have the

46

1    burden of proving the portion of the profit, if any, attributable to factors other than

2    infringing the copyrighted work.

3         Defendants are not required to prove with precision the percentage of its profits

4    attributable to factors other than infringement, so long as the apportionment is reasonable

5    and just. However, in determining what portion of the defendants' profits are attributable

6    to copyright infringement, the benefit of the doubt should be given to Mattel and not

7    defendants.

8

9         If the copyrighted portions are so intermingled with the rest of the infringing

10   work that they cannot well be distinguished from it, the entire profits realized by the

11   defendants are to be given to the plaintiff. At the same time, defendants do not need to

12   demonstrate that the profits not attributable to infringement are completely free of

13   infringing material.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT   77

PAGE   1265

### JURY INSTRUCTION NO. 43

1

2         Mattel also claims that defendants engaged in willful infringement of Mattel's

3  copyrights.  An infringement is considered willful when the plaintiff has proved both of

4  the following elements by a preponderance of the evidence:

5

6         1.    The defendants engaged in acts that infringed the copyright; and

7         2.    The defendants knew that those acts infringed the copyright.

8         A defendant cannot deduct overhead expenses, operating expenses, or taxes from

9  his/its gross revenue when the copyright infringement is willful.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

48

EXHIBIT __77__
PAGE __1266__

## JURY INSTRUCTION NO. 44

Mattel seeks damages under more than one legal claim or theory and as to three defendants. In awarding damages as to any particular claim or defendant, you should not consider or discount your award based on amounts, if any, that you award as to any other claim or defendant. That is, you should award the full amount of damages you find appropriate, if any, as to each separate claim against each defendant. The Court will ensure, once your verdict has been reached, that the plaintiff does not obtain duplicative damages.

49

EXHIBIT 27
PAGE 1267

**JURY INSTRUCTION NO. 45**

If you decide that Isaac Larian's, MGA's or MGA Hong Kong's conduct caused Mattel harm, you must decide whether that conduct justifies an award of punitive damages. The purposes of punitive damages are to punish a wrongdoer for the conduct that harmed the plaintiff and to discourage similar conduct in the future.

You may award punitive damages against Isaac Larian only if Mattel proves by clear and convincing evidence that Isaac Larian engaged in that conduct with malice, oppression, or fraud.

When a party has the burden of proving any claim or defense by clear and convincing evidence, it means you must be persuaded by the evidence that the claim or defense is highly probable. This is a higher standard of proof than proof by a preponderance of the evidence.

You should base your decision on all of the evidence, regardless of which party presented it.

You may award punitive damages against MGA or MGA Hong Kong only if Mattel proves that MGA or MGA Hong Kong acted with malice, oppression, or fraud. To do this, Mattel must prove one of the following by clear and convincing evidence:

1.    That the malice, oppression, or fraud was conduct of one or more officers, directors, or managing agents of MGA or MGA Hong Kong, who acted on behalf of MGA or MGA Hong Kong; or

2.    That an officer, a director, or a managing agent of MGA or MGA Hong Kong had advance knowledge of the unfitness of another officer, director, or managing

22
1268

1    agent of MGA or MGA Hong Kong and employed that person with a knowing disregard

2    of the rights or safety of others; or

3

     3.     That the conduct constituting malice, oppression, or fraud was authorized by

4

5    one or more officers, directors, or managing agents of MGA or MGA Hong Kong; or

6

     4.     That one or more officers, directors, or managing agents of MGA or MGA

7    Hong Kong knew of the conduct constituting malice, oppression, or fraud and adopted or

8    approved that conduct after it had occurred.

9

     "Malice" means that a defendant acted with intent to cause injury or that a

10

11    defendant's conduct was despicable and was done with a willful and knowing disregard of

12    the rights or safety of another. A defendant acts with knowing disregard when the

13    defendant is aware of the probable dangerous consequences of his or its conduct and

14    deliberately fails to avoid those consequences.

15

     "Oppression" means that a defendant's conduct was despicable and subjected

16

17    Mattel to cruel and unjust hardship in knowing disregard of its rights.

18

     "Despicable conduct" is conduct that is so vile, base, or contemptible that it

19    would be looked down on and despised by reasonable people.

20

     "Fraud" means that a defendant intentionally misrepresented or concealed a

21    material fact and did so intending to harm Mattel.

22

     An employee is a "managing agent" if he or she exercises substantial independent

23

24    authority and judgment in his or her corporate decision making such that his or her

25    decisions ultimately determine corporate policy.

26         There is no fixed formula for determining the amount of punitive damages, and

27    you are not required to award any punitive damages. If you decide to award punitive

28

EXHIBIT 22
PAGE 1269

1   damages, you should consider all of the following separately for each defendant in

2   determining the amount:

3       a.    How reprehensible was that defendant's conduct?

4       b.    Is there a reasonable relationship between the amount of punitive damages

5
    and Mattel's harm or between the amount of punitive damages and potential harm to
6
7   Mattel that the defendant knew was likely to occur because of his or its conduct?

8   Punitive damages may not be used to punish a defendant for the impact of its alleged

9   misconduct on persons other than Mattel.

10      c.    In view of that defendant's financial condition, what amount is necessary to

11
    punish him or it and discourage future wrongful conduct? You may not increase the
12
13  punitive award above an amount that is otherwise appropriate merely because a defendant

14  has substantial financial resources. Any award you impose may not exceed that

15  defendant's ability to pay.

16

17

18

19

20

21

22

23

24

25

26

27

28

52

EXHIBIT  27
PAGE  1270

## JURY INSTRUCTION NO. 46

You have heard testimony regarding the prospect of an injunction being issued in this case. It is for the Court to decide what, if any, injunctive relief to order.

EXHIBIT 77
1271

**JURY INSTRUCTION NO. 47**

When you begin your deliberations, your foreperson will preside over the deliberations and will speak for you here in Court.

You will then discuss the case with your fellow jurors to reach agreement if you can do so. Your verdict must be unanimous.

Each of you must decide the case for yourself, but you should do so only after you have considered all of the evidence, discussed it fully with the other jurors, and listened to the views of your fellow jurors.

Do not hesitate to change your opinion if the discussion persuades you that you should. Do not come to a decision simply because other jurors think it is right.

It is important that you attempt to reach a unanimous verdict but, of course, only if each of you can do so after having made your own conscientious decision. Do not change an honest belief about the weight and effect of the evidence simply to reach a verdict.

54

## JURY INSTRUCTION NO. 48

If it becomes necessary during your deliberations to communicate with me, you may send a note through the bailiff, signed by your presiding juror or by one or more members of the jury. No member of the jury should ever attempt to communicate with me except by a signed writing; I will communicate with any member of the jury on anything concerning the case only in writing, or here in open court. If you send out a question, I will consult with the parties before answering it, which may take some time. You may continue your deliberations while waiting for the answer to any question. Remember that you are not to tell anyone—including me—how the jury stands, numerically or otherwise, until after you have reached a unanimous verdict or have been discharged. Do not disclose any vote count in any note to the court.


EXHIBIT 22
PAGE 1273

**JURY INSTRUCTION NO. 49**

1

2        A verdict form has been prepared for you.  After you have reached unanimous

3    agreement on a verdict, your presiding juror will fill in the form that has been given to

4    you, sign and date it, and advise the court that you are ready to return to the courtroom.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 27
PAGE 1274