# Exhibit 78

1

1        UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA

3            EASTERN DIVISION

4               - - -

5    HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6               - - -

7   MATTEL, INC.,                )
                                 )
8                   Plaintiff,   )
                                 )
9         vs.                    )   No. CV 04-09049
                                 )
10   MGA ENTERTAINMENT, INC., ET. AL.,  )
                                 )
11                  Defendants.  )
     _____    )   HEARING

12

13

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16              Riverside, California

17            Tuesday, December 30, 2008

18                10:04 A.M.

19

20

21

22

23          THERESA A. LANZA, RPR, CSR
            Federal Official Court Reporter
24             3470 12th Street, Rm. 134
            Riverside, California  92501
25               951-274-0844
               WWW.THERESALANZA.COM

EXHIBIT 78
PAGE 1275

2

```
1    APPEARANCES:

2
     On behalf of Mattel, Inc.:
3
                        QUINN EMANUEL
4                       By:   JOHN QUINN
                              MICHAEL T. ZELLER
5                             DYLAN PROCTOR
                        865 S. FIGUEROA STREET,
6                       10TH FLOOR
                        LOS ANGELES, California   90017
7                       213-624-7707

8

9
     ON BEHALF OF MGA ENTERTAINMENT:
10
                        SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
11                      BY:   THOMAS J. NOLAN
                              JASON RUSSELL
12                      300 SOUTH GRAND AVENUE
                        LOS ANGELES, CALIFORNIA   90071-3144
13                      213-687-5000

14

15

16

17

18

19

20

21

22

23

24

25
```

Tuesday, December 30, 2008                        Mattel vs. MGA

EXHIBIT 78
PAGE 1276

3

1                                    i N D E X

2                                                              Page

3      HEARING.......................................    4

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Tuesday, December 30, 2008                    Mattel vs. MGA

EXHIBIT 78
PAGE 1277

4

```
 1    RIVERSIDE, CALIFORNIA; TUESDAY, DECEMBER 30, 2008; 10:04 A.M.

 2                              -oOo-

 3          THE CLERK:  Calling calendar item one, Mattel versus

 4    MGA Entertainment, Inc., CV 04-09049-SGL.

 5          May we have counsel please come forward and state          00:14

 6    your appearances for the record.

 7          MR. QUINN:  John Quinn, Mike Zeller,

 8    Dylan Proctor for Mattel.

 9          MR. NOLAN:  Tom Nolan, Jason Russell,

10    Jennifer del Castillo on behalf of Isaac Larian.               00:17

11          THE COURT:  We're on calendar this morning for MGA's

12    motion for this Court to issue a stay pending appeal.

13          The Court has received the filings in this matter and

14    has reviewed them.  There are a few matters, and I'll rule on

15    them just preliminary; I think I've basically ruled on them;   00:18

16    some are moot.

17          There is before the Court Mattel's ex-parte

18    application to redesignate MGA's compendium of third-party

19    declarations.  I'm going to deny that as moot pursuant to the

20    stipulation that was reached out and communicated to the Court.  00:18

21          There is Mattel's ex-parte application regarding a

22    briefing schedule regarding the declaration.  That is also

23    denied as moot.  The Court has received and reviewed the papers

24    that were submitted, both in support of and in opposition to

25    the particular declarations, and the Court will rule on the    00:19
```

Tuesday, December 30, 2008                         Mattel vs. MGA

EXHIBIT 78
PAGE 127

5

1  substance of those.  There's no need to set forth a briefing

2  schedule.

3       The third ex-parte was Mattel's ex-parte to strike

4  the declarations of Mr. Wing, Mr. Kennedy, and the third-party

5  declarations.  I'll address that in the context of discussing          00:19

6  the actual motion itself.

7       At the end of the day, with respect to most of those

8  objections -- although I'll hear further from the parties -- my

9  sense is that most of them go to the weight of the evidence as

10  opposed to the legal objections themselves, particularly the          00:19

11  hearsay objections and the foundational objections, the

12  arguments, and the speculation.  But I'll take that up.  I'd

13  like to hear further argument on what weight the Court should

14  give to those in light of the objections that are stated.

15       I also have before me -- there was also the ex-parte          00:19

16  application for an amendment of the briefing schedule itself

17  regarding the MGA parties' ex-parte application and motion to

18  stay pending appeal.  I directed my courtroom deputy to enter a

19  denial of that.  That was the ex-parte that was brought at the

20  end of last week to modify the reply in opposition schedule.          00:20

21  And the Court did review that and consider that.

22       And, finally, I received Mattel's ex-parte

23  application for appointment of a receiver for MGA for

24  alternative relief.  The Court is going to schedule this -- I

25  did receive the opposition this morning from Mr. Russell.          00:20

Tuesday, December 30, 2008                          Mattel vs. MGA

EXHIBIT 78
PAGE 1279

6

1   However, I'm going to schedule this for a hearing on Monday,

2   January 5th, at 10:00 a.m.  I'm not going to hear this today;

3   so that will be heard on Monday, January 5th, at 10:00 a.m.

4        I think those are the outstanding ex-parte

5   applications.  I know there are other objections to various          00:21

6   declarations that have been submitted on both sides; but,

7   again, I'm going to hold off and I will consider all of those

8   evidentiary objections in ruling on the underlying substantive

9   motion itself.  Let me hear on the underlying motion at this

10  point.  MGA is the moving party, so, Mr. Nolan or Mr. Russell,     00:21

11  you may proceed first.

12       **MR. NOLAN:**  Thank you, your Honor.

13       I think in keeping with the Court's prior rulings,

14  Mr. Russell and I had decided to share certain of the arguments

15  in view of the fact that the motion with respect to the            00:21

16  receivership has been pushed off until --

17       **THE COURT:**  That's fine.

18       **MR. NOLAN:**  I'll address the pending motion before

19  the Court.

20       Your Honor, like most matters that have come before          00:21

21  you, I think the briefing in the case has been extensive, and I

22  think that everybody on both sides, depending on whose side

23  you're on, would also say that their briefs were excellent and

24  thorough and reviewed all of the applicable case law.

25       As I was reviewing the briefs, it seems to me that          00:22

Tuesday, December 30, 2008                          Mattel vs. MGA

EXHIBIT 78
PAGE 1280

7

```
 1   the issues can be placed in a construct for the Court which is
 2   rather straightforward and simple to articulate, possibly more
 3   complicated to apply under the circumstances.  But I think the
 4   fundamental issue here is that this is not a redo of the
 5   argument that we made with respect to the motion for permanent        00:22
 6   injunction, although some of the arguments sound as though they
 7   are similar.
 8           We respectfully submit that the standard for setting
 9   an appeal, a stay pending the appeal, takes into consideration
10   frankly more factors than may have been available at the time        00:22
11   of the permanent injunction.
12           I start with the premise that in any case, the
13   Supreme Court has recognized that there are four factors to be
14   considered in weighing whether or not a stay pending appeal is
15   warranted.  And we can get into a discussion as to what weight        00:23
16   should be applied to each of those standards.  I think the
17   cases are clear.  We believe, and the cases that we've cited,
18   is that the analysis is really, on a continuum, irreparable
19   harm and likelihood of success.
20           I want to turn to the likelihood of success factor        00:23
21   first, because in many ways, it is the most awkward issue to
22   address to a court, which we have the greatest respect for and
23   know full well that the Court and its staff has devoted a
24   tremendous amount of time to all of the issues that have been
25   presented in this case, from day one.        00:24
```

Tuesday, December 30, 2008                          Mattel vs. MGA

EXHIBIT 78
PAGE 1281

8

| | | |
|---|---|---|
| 1 | We weren't here day one; we got in here about day | |
| 2 | sixteen; but it certainly has been extensive since we've been | |
| 3 | here.  There have been numerous issues that have been presented | |
| 4 | to the Court; many of them are novel; almost all of them are | |
| 5 | serious and complicated.  Many of them are of first impression | 00:24 |
| 6 | that have enormous interest in the field of copyright law. | |
| 7 | This is a case that no one can doubt is being watched very | |
| 8 | carefully, not only by practitioners, but by the media, | |
| 9 | cartoonists, mothers, and even children. | |
| 10 | We respectfully disagree, as you know -- and I made a | 00:24 |
| 11 | New Year's resolution that I was never going to argue the | |
| 12 | statute of limitations again in front of you, having gone to | |
| 13 | the mat five times. | |
| 14 | THE COURT:  So you only have two more days. | |
| 15 | MR. NOLAN:  So I was so thankful that you set the | 00:25 |
| 16 | schedule for today. | |
| 17 | But in all seriousness, your Honor, it's hard to come | |
| 18 | before a court that you respect and say, You got it wrong and | |
| 19 | by making a ruling, giving us a stay, you're somehow sending a | |
| 20 | message that you think you got it wrong. | 00:25 |
| 21 | But fortunately, the law doesn't require us to meet | |
| 22 | that standard. | |
| 23 | I think based on the irreparable harm that we | |
| 24 | demonstrate in our papers -- | |
| 25 | THE COURT:  Let me ask you something, Mr. Nolan, | 00:25 |

Tuesday, December 30, 2008                    Mattel vs. MGA

EXHIBIT 78
PAGE 1282

1    because you make these points -- these points are well made in

2    your papers, and I appreciate your approach here.  One of the

3    things that's puzzling to me is the procedural posture of this

4    motion vis-à-vis what's going on in the Ninth Circuit.

5         The Court made decisions in terms of the structure of    00:26

6    how the trial was going to play out.  We tried certain things

7    in what we've called Phase 1-A.  We tried certain things in

8    Phase 1-B.  And then because we had left over the equitable

9    issues, the equitable defenses, the equitable claims, we

10   structured a third phase, Phase 1-C.  And after each of those    00:26

11   phases, decisions were made; in the first two, by the jury; in

12   the third, by the Court.  The decisions by the Court, both in

13   terms of the equitable defenses, to include statute of

14   limitations, as well as the equitable claims, most notably

15   unfair competition, were predicated in large measure based upon    00:26

16   findings that were made in Phases 1-A and 1-B by the jury, as

17   well as by rulings that the Court made before the trial and

18   during the trial.

19        All of that is subject to challenge not before the

20   Ninth Circuit, but before this Court in the post-trial motions,    00:27

21   which not only have been scheduled for February 11th, which the

22   Court has already received -- you've made motions.  You, MGA,

23   have made motions.  Mattel has made motions.  They've submitted

24   a written JMOL.  And as you point out -- and Mattel points this

25   out as well, that you pointed out -- the basis for the Court's    00:27

Tuesday, December 30, 2008                          Mattel vs. MGA

EXHIBIT 78
PAGE 1283

10

1  rulings, particularly following 1-C, which resulted in the

2  orders that all have been stayed pending February 11th, could

3  very well be eviscerated -- I think is the word that you used

4  -- depending on how the Court rules, having now the benefit of

5  hindsight. The Court makes decisions in the course of a trial,      00:27

6  as every court does; and that's the whole reason or rationale

7  for having post-trial motions, is now that everything is in,

8  now that all is done, we look back and we determine was error

9  made or was error not made. And then and only then, in a

10 normal case, do we have an appeal to the Ninth Circuit if you      00:28

11 believe that the Court still has it wrong.

12       In a certain sense, you're suggesting -- you're

13 projecting that somehow the Court not only has gotten it wrong

14 and you respectfully disagree with what I have decided, but you

15 respectfully disagree with what I have yet to decide on           00:28

16 February 11th, and have gone to the Ninth Circuit now, in fact,

17 even before this Court had this hearing to rule on your

18 ex-parte application.

19       It's a very bizarre situation, because then, perhaps,

20 we might have the Ninth Circuit passing judgment, as it must,      00:28

21 in terms of likelihood of success, on issues that this Court

22 hasn't even ruled on. It really has created -- and I'm not

23 suggesting that this was by design, but it certainly has

24 created a potential procedural mess.

25       Now, I can't speak for the Ninth Circuit, and they          00:29

EXHIBIT 78
PAGE 1284

11

1    will do what they're going to do.  From my perspective, though,

2    all of that is tremendously premature.

3          There is this issue that I want to have addressed

4    today in terms of the irreparable harm, the irreparable injury,

5    whether or not the stay that the Court has already issued is or

6    is not sufficient to address whatever irreparable harm may or

7    may not exist.

8          Do you understand the Court's -- I want to give you

9    my perspective on where I'm coming from and why I think to a

10   large extent a stay, if at all, may be justified on some of the

11   equitable grounds that you have set forth.  But to be talking

12   about an appeal at this point strikes this Court, anyway -- and

13   again, I'm speaking for myself and not the Ninth Circuit -- as

14   unripe and premature.

15         Moreover, having reviewed all of the evidence -- and

16   I may be touching on Mr. Russell's area now; I don't know if

17   that's his area to get into, on the irreparable harm

18   evidence -- but depending on how the objections play out, my

19   tentative -- and I certainly want to hear from Mattel on

20   this -- is that it is clear that there is an argument, anyway,

21   that there's a concern that if there's not certainty, at least

22   for '09, that sales are going to be damaged, such that it could

23   have an irreparable harm on MGA.

24         There's nothing to suggest that goes beyond '09.  All

25   of the evidence focuses on '09; so there's nothing to sustain

Tuesday, December 30, 2008                    Mattel vs. MGA

EXHIBIT 78
PAGE 1285

1    evidentiary, from my perspective, a stay pending appeal, which

2    may take years before the Ninth Circuit, given the enormous

3    size of this record.

4         And again, that's for the Ninth Circuit to decide,

5    and maybe they can get it done in six months.  I'm not          00:31

6    suggesting that they can't.  But based on the Court's

7    experience, that might be a very lengthy stay.

8         So not only is that premature, I really, based on

9    what you have submitted so far, don't see any basis for that.

10   At most, we have an issue that arguably is not addressed by the   00:31

11   stay that I've placed in effect here, which may need to be

12   addressed by a longer stay.

13        There's the issue that Mattel raises about, if we're

14   going to go down that road, the need for a receiver, which I'll

15   hear that on Monday.  But this is basically where I am at this   00:31

16   point.

17        **MR. NOLAN:**  I understand, your Honor.

18        As many issues in this case, procedurally

19   substantive, this case seems to push the boundaries on so many

20   issues.  First of all, I appreciate the Court's recognition     00:31

21   that it was not mischievous on our part in terms of setting up

22   the procedural posture that we found ourselves in after the

23   injunction was issued.  Given the breadth of the injunction,

24   candidly, when we received the December 3rd order, it knocked

25   us on our heels; and, more importantly, knocked the supply      00:32

Tuesday, December 30, 2008                    Mattel vs. MGA

EXHIBIT 78
PAGE 1286

13

1   chain upon which we rely in terms of decisions that are being

2   made with respect to purchases.

3          When we were here arguing the injunction, the Court

4   made the point, I think under the analysis of public interest,

5   that the Court would stay until February in order to allow the          00:32

6   retailers during this difficult economic time to at least enjoy

7   the benefit of the retail sales for the Christmas season.

8          THE COURT:   That addressed the '08 season.   What

9   you've raised, essentially, is that --

10          MR. NOLAN:   The '09.          00:32

11          THE COURT:   -- the '09 season is at stake.

12          In reading all of your declarations, and assuming I

13   accept all of it, that's the most that the evidence supports.

14          MR. NOLAN:   You're right, your Honor.   The evidence

15   supports --          00:33

16          THE COURT:   -- not stay pending appeal.

17          MR. NOLAN:   Let me at least try to get to that final

18   point, your Honor, on the '09 issue.

19          What we came to learn after the injunction was

20   entered was that, in fact, important purchasing decisions for          00:33

21   the '09 season, both the spring and the fall lines, were being

22   decided in December and early January.

23          Now I know that Mattel has submitted a declaration

24   saying that that's nonsense and that we can wait until March

25   and magically people can move shelves; but the weight of the          00:33

Tuesday, December 30, 2008                          Mattel vs. MGA

EXHIBIT 78
PAGE 1287

14

1    evidence and our interpretation of the submission is that

2    clearly -- and it makes sense -- decisions are being made.  The

3    Hong Kong toy fair starts in January.  In fact, it starts next

4    Monday; important meetings, products are being shown; decisions

5    are being made for the spring season; retailers are committing          00:34

6    space for that period of time.

7          What the retailers were saying to us, given the

8    import of the injunction and the terms of the injunction, and

9    the recall in particular -- which we believe may be the largest

10   toy recall ever ordered by a court -- is that retailers were            00:34

11   hesitant, are hesitant, and have cancelled orders in certain

12   respects; in other respects, they said, We will give you the

13   benefit of at least going to the court in an effort to

14   determine whether or not there can be some clarity as to what

15   happens after February.  And if the stay were extended beyond           00:34

16   February, then purchasing decisions could be made, the sales

17   could go forward, et cetera, et cetera, which we've allowed in

18   our papers.

19         We have indicated, and we've described the injunction

20   in its present setting, whether or not it terminates in                 00:35

21   February or whatever, the injunction is, in essence, a death

22   warrant for the Bratz brand.  There is no showing that Mattel

23   has any desire or any interest in pursuing the Bratz brand.

24         THE COURT:  Well, you raise a critical point.  It's a

25   death nail provided if, and only if, Mattel does not decide to         00:35

Tuesday, December 30, 2008                        Mattel vs. MGA

EXHIBIT 78
PAGE 1288

15

1  pursue it.  And one of the questions that I have for Mattel --

2  and I don't know if they're prepared to answer that today, but

3  at some point, Mattel is going to have to make a decision, and

4  I think the time for making that decision is probably sooner as

5  opposed to later.  Because whether I accept Mattel's                 00:35

6  declarations or your declarations, I think it's well understood

7  in the industry that a decision on this needs to be made

8  relatively soon.  And I've done everything I can short of

9  standing on my head to try to get the parties to work this out.

10  But barring that, and barring some agreement, I understand what  00:36

11  you're saying.

12        MR. NOLAN:  And so given that information, which was

13  a new reaction by retailers and licensees, we then needed to

14  make the decision as to how we bring this information and get

15  the relief that we need, to see whether or not we can get       00:36

16  clarity.

17        The permanent injunction was entered.  It was Phase 3

18  of the trial.  The permanent injunction is appealable in order

19  to effectuate the rights of MGA, which all of us have talked

20  about and made the analogy of a death warrant in this case, and  00:36

21  it certainly is, depending on what Mattel wants to do.  But

22  it's certainly a death warrant for Mr. Larian's interest in the

23  Bratz brand.

24        We were very much like in a situation where you're

25  trying to protect the property rights and the profound interest  00:37

Tuesday, December 30, 2008                          Mattel vs. MGA

EXHIBIT 78
PAGE 1289

16

1   of either 750 employees that are related only to the Bratz or

2   the --

3          **THE COURT:**  That's the part I don't get.  I

4   understand that the -- the injunction is certainly appealable,

5   and you have a right to appeal the injunction, although I          00:37

6   specifically stayed the injunction until February 11th because,

7   depending on what happens on February 11th, the injunction may

8   or may not have its current form.  And I certainly understand

9   and appreciate you bringing to this Court's attention the

10  necessity, from your perspective, of modifying the stay.          00:37

11         But the whole running up to the Ninth Circuit on the

12  stay at the same time is where you really throw me.

13         **MR. NOLAN:**  Okay.

14         **THE COURT:**  Just in case I don't get it?

15         **MR. NOLAN:**  You get it.  Let me just try to explain     00:38

16  where we were at.

17         Let's go back in history a little bit.

18         ·We get the injunction December 3rd.  I believe that's

19  a Thursday.  That Monday, the next Monday, after we process and

20  get information and the press is all over it -- it's on CNN;      00:38

21  it's on the Today Show -- retailers are contacting us and

22  telling us what their reaction is:  Hey, congratulations on the

23  stay until February; it doesn't help us; you've got a lot of

24  costs here, and you've got your spring line coming out.

25         That Monday we advise Mattel that we are going to go        00:38

EXHIBIT 78
PAGE 1290

17

1    into court here and ask for a stay beyond the time period

2    specified in the injunction.

3           We file our papers; we have a meet and confer; we

4    enter into a stipulation with respect to the briefing.  The

5    papers are clear, in one instance, for sure, uncontroverted,        00:39

6    that our position is that we needed a ruling by December 31st.

7    No issue there.  You could take an argument as to whether or

8    not we were entitled to it, whether or not we had made a proper

9    showing; but certainly, the position was that based on our

10   showing from retailers, we needed to have a ruling by               00:39

11   December 31st.

12          With papers in hand, with our moving papers in hand,

13   including the retailer submissions under seal, Mattel enters

14   into a stipulation on briefing which would have allowed us to

15   tee this issue up before the Court and frankly avoid, which was     00:39

16   our intent -- and I'm not trying to get any points for doing

17   this -- of getting this resolved and brought to the Court's

18   attention prior to the holiday season.  That's what we were

19   trying to do, which would still give us an opportunity to have

20   the hearing before your Honor.  And then depending on the           00:40

21   outcome of that, we could then still get to the Ninth Circuit

22   if we had to.

23          Mattel files its objections on Thursday, the day the

24   opposition is due, in the morning, with respect to designations

25   and whether or not it was proper, without a phone call to us,       00:40

Tuesday, December 30, 2008

Mattel vs. MGA

EXHIBIT 78
PAGE 1291

18

1   without trying to clear it, and without asking for any relief

2   in the briefing schedule.  And the Court, I think not truly

3   appreciating the situation and the sensitivity of the timing,

4   vacated a few hours before the opposition was due -- I think by

5   our calendar, it was about four hours before their opposition          00:40

6   was scheduled to be filed -- vacated it and said that a new

7   briefing schedule would be arrived at between us after you made

8   a ruling with respect to the designations, indicating that the

9   Court would be dark this particular week, the week of the

10  Christmas holiday.                                                      00:41

11        We then filed a protective motion in the Ninth

12  Circuit seeking a stay.  On Saturday, when we got the Court's

13  e-mail with respect to allowing for the briefing to occur and

14  setting forth the current schedule, we, meaning Mr. Falk, who

15  is present here, notified the Ninth Circuit of the Court's             00:41

16  briefing schedule; and so the Ninth Circuit was fully aware of

17  it.

18        We were faced on that Thursday afternoon, Thursday

19  evening, with the possibility of time running out on the clock

20  without having the opportunity to go and get a ruling.  And            00:41

21  that's the reason why we filed in the Ninth Circuit.  We have

22  the appellate right to do so.  I mean, it's a notice of appeal

23  that we filed.  And we indicated to the Ninth Circuit -- and

24  the Ninth Circuit has ordered a briefing schedule, and they are

25  well aware of the hearing that we're having today.  This was           00:42

Tuesday, December 30, 2008                          Mattel vs. MGA

EXHIBIT 78
PAGE 1292

19

1   not in any way to try to prematurely get an issue before the

2   Ninth Circuit.  It was solely and squarely designed to try to

3   get an answer, to get clarity, to avoid a massive layoff of

4   people in early January.

5          And I don't want to overstate that point.  I think      00:42

6   Mr. Kennedy, at the injunction hearing, put it rather

7   eloquently at the end when he said, I'm standing here not

8   representing MGA and Isaac Larian, but I'm representing

9   800 people.  I'm here again this morning telling you that every

10  decision that we made was in an effort to try to avoid having a   00:42

11  decision made by retailers and licensees that would have a

12  profound impact not only on the parties to this litigation, but

13  on employees, their families, licensees, and retailers.  That's

14  why we did it.  That's the procedural history.

15         Mattel has moved in the Ninth Circuit on the            00:43

16  jurisdictional issue.  The Ninth Circuit also asked for

17  accelerated briefing on that point.  That jurisdictional issue

18  is before the Ninth Circuit.  Presumably, they will make a

19  decision in that regard.  But, certainly, Rule 62-C allows

20  us -- in fact, mandates us -- to come to you and ask for the     00:43

21  stay.

22         So that's my way of saying, in case I didn't get it,

23  trying to explain to you the thought processes that we went

24  through.  It was never, never designed to cause what turned out

25  to be a horrific briefing schedule which dropped an enormous     00:43

Tuesday, December 30, 2008                           Mattel vs. MGA

EXHIBIT 78
PAGE 1293

20

1   amount of paper on this Court and its staff.  We are kind of

2   used to it, and we set it in motion; but that's the reasons why

3   we did it, your Honor.  It was heartfelt.

4           I go back to -- we view it as a death warrant on the

5   Bratz brand.  And I noticed -- and I'm sure the Court has

6   noticed it -- this is outside of the record, but the San Diego

7   Tribune, without any marketing efforts by anybody, ran a

8   cartoon on the editorial page regarding Bratz and Mattel on

9   Christmas.

10          THE COURT:  I missed that.

11          MR. NOLAN:  It had a little girl sitting on the knee

12  of Santa Claus with a note, and it said, Can't Barbie and Bratz

13  get along, or something like that.

14          And we can address that other point that you made,

15  because we take serious issue -- and we dropped a footnote in

16  our papers with respect to the Court's finding with respect to

17  the hostility between the parties.  And I'm happy, in chambers

18  with Mr. Quinn, to bring some additional information to your

19  attention.

20          But to go back to the fundamental issue that we have

21  here, your Honor, is --

22          THE COURT:  Just before I forget, because you both

23  addressed that in footnotes; so did Mr. Zeller, or Mr. Quinn,

24  in his brief.  While I have certainly encouraged settlement

25  efforts between the parties, let's both be mindful of the

Tuesday, December 30, 2008

Mattel vs. MGA

EXHIBIT 78
PAGE 1294

21

1   importance of confidentiality to those discussions.  And if

2   there is ever a need to discuss that, let's do that entirely

3   off the record.  Let's not mingle that.

4        **MR. NOLAN:**  I'm aware of that sensitivity.  It was

5   certainly brought to my attention.  And what I've said in the

6   past -- and I repeat it again -- is that despite the rhetoric,

7   both in the briefs and orally through this trial, and despite

8   the perception of some people of hostility, Mr. Quinn and I

9   have maintained what I'm proud to say is a good working

10  relationship.

11       **THE COURT:**  I have no doubt about that.

12       **MR. NOLAN:**  My comments in the footnote related to

13  conversations that Mr. Quinn made to me as opposed to anybody

14  else.

15       **THE COURT:**  Very well.

16       I want to give Mattel an opportunity to address this,

17  but let's return to the point that the Court made.  And that

18  is, in terms of reading your evidence most favorably, I

19  understand two things, basically.  There's an urgency on the

20  part of the retailers to have some kind of reassurance, at

21  least for the '09 buying season, relatively soon.  You made

22  reference to December 31st, but it's clear that there's already

23  been a movement on one retailer to January 2nd.  I do

24  understand the urgency is relatively soon.  Whether there's any

25  magical drop-dead date, that does not seem to be supported by

Tuesday, December 30, 2008                    Mattel vs. MGA

EXHIBIT 78
PAGE 1294

1   the evidence.  But I get, from reading what you've submitted,

2   that there is a need to have some degree of certitude, again

3   reading the evidence most favorably to MGA at this point.  I

4   have not heard from Mattel that there's a need to act with some

5   degree of certainty soon.  And the second point is, if that's          00:47

6   not done, at least for '09, that will have the effect that you

7   have.

8           Beyond that, I'm not seeing anything further, unless

9   I'm missing something.

10          MR. NOLAN:  And I want to address that, if I can;            00:47

11  because I certainly didn't want to suggest that I agreed that

12  the presentation was only limited to 2009.

13          What we have done --

14          THE COURT:  If that's not the case, point to me what

15  evidence you have of going beyond that.                               00:47

16          MR. NOLAN:  The evidence that we have going beyond

17  that, your Honor, is that in the absence of certainty with

18  respect to whether or not Mattel is ultimately going to

19  prevail --

20          THE COURT:  That, nobody can give you.                       00:48

21          MR. NOLAN:  Well, the Ninth Circuit can.

22          THE COURT:  I'm sorry?

23          MR. NOLAN:  The Ninth Circuit could, when it rules on

24  the appeal.

25          THE COURT:  The Ninth Circuit doesn't have the final        00:48

Tuesday, December 30, 2008                          Mattel vs. MGA

EXHIBIT 78
PAGE 1295

23

1    word.

2            MR. NOLAN:   No.   But we have a right to go to appeal.

3    And what we're saying here -- and I think that the --

4            THE COURT:   My point is, you're not going to know how

5    the Ninth Circuit is going to ultimately decide these cases.   I        00:48

6    mean, Jason Russell will be arguing the jellyfish well into

7    2010 and 2011, I suspect.   We're not going to have that

8    certainty.

9            The question is, in terms of the buying cycles, the

10   evidence that you've submitted supports, again in your favor,        00:48

11   that for the '09 cycle to go forward, without interruption,

12   without having the deleterious effects of an interruption, we

13   need to have a stay for '09.   I don't see any other evidence

14   going beyond that at this point.

15           I mean, 2010 is a different year, and depending on        00:49

16   the posture of this case at that point in time -- there's just

17   so many variables and so many possible permutations that I

18   don't think anyone could project with any degree of certainty,

19   even the Ninth Circuit themselves, where this case is going to

20   be at at that point in time.   So I'm just trying to cabin what        00:49

21   the evidence shows, assuming that I accept it.

22           MR. NOLAN:   Let me try to break it down this way with

23   respect to 2009:   The evidence is directed towards the spring

24   cycle.

25           THE COURT:   And the fall cycle.        00:49

Tuesday, December 30, 2008                          Mattel vs. MGA

EXHIBIT 78
PAGE 1296

24

1          MR. NOLAN:   And the fall cycle.  There's no doubt,

2   your Honor, with respect to that.

3          What we would submit is that the declaration of

4   Larry Falcon that we've submitted in our reply brief, given his

5   vast experience, not only at MGA, but more importantly, at most      00:49

6   of the major licensees and toy companies, Hasbro, Vandyke -- he

7   sets forth what the normal cycle is and normal purchases, the

8   process that it goes through.

9          If, in 2010 -- let's just make an assumption for just

10  a moment.  Let's say that there was a finding that the showing      00:50

11  for 2009 was adequate -- I'm just saying work with me here.

12         THE COURT:   I will.

13         MR. NOLAN:   The same issue applies in 2010 with

14  respect to retailers saying, All right, it used to be that this

15  injunction was going to take effect in February; you got that      00:50

16  extended to the end of the year; we're not going to make any

17  purchase decisions in the year 2010 because of the uncertainty.

18         THE COURT:   Right.  But you've presented no evidence

19  whatsoever as to when the 2010 purchasing decisions are going

20  to be made.  You've presented no evidence that anything that      00:50

21  happens now -- that's what I'm saying.

22         What's before the Court right now is evidence related

23  to the 2009 cycle; correct?

24         MR. NOLAN:   Mr. Russell pointed out to me that the

25  Wal-Mart declarations that have been submitted talk about the      00:51

Tuesday, December 30, 2008                    Mattel vs. MGA

EXHIBIT 78

PAGE 1297

25

1   historical nature of these decisions and that that's, in

2   effect, how they purchase and how they make their decisions;

3   and those decisions will be made in 2009, as they will be in

4   2010 or 2011.

5           I do admit, your Honor, that they do not specifically          00:51

6   identify the year 2010.

7           **THE COURT:**  You're referring to the Gary Severson

8   declaration?

9           **MR. NOLAN:**  As one, your Honor.

10          **THE COURT:**  He concludes by saying, "Indeed, unless          00:51

11  we learn soon" -- he doesn't say December 31st, just soon --

12  "that the orders are stayed to the conclusion of MGA's appeal,

13  Wal-Mart may" -- not will, but may -- "have to cancel all fall

14  '09 Bratz line orders."

15          That's what the Wal-Mart declaration says.                      00:51

16          **MR. NOLAN:**  Right.  But, your Honor, the other

17  declarations that were submitted in support of the moving

18  papers, from Toys"R"Us and some of the other retailers, do

19  indicate that the same decision process is going to be

20  followed.                                                              00:52

21          **THE COURT:**  Actually, the Wal-Mart and the Zellers

22  are identical language, coincidentally or not.  They say,

23  "Indeed, unless we learn soon" -- again, not December 31st, but

24  just soon -- "that the orders are stayed until the conclusion

25  of MGA's appeal, Wal-Mart Canada Corporation will have to              00:52

Tuesday, December 30, 2008                        Mattel vs. MGA

EXHIBIT 78
PAGE 1298

1   cancel all fall '09 line orders."  Zellers has the exact same

2   language:  "Indeed, unless we learn soon that the orders are

3   stayed until the conclusion of MGA's appeal, Zellers will not

4   make any fall '09 Bratz line orders."

5          They all are pretty much -- the weight of the          00:52

6   evidence seems to be triggered towards that fall '09 line.

7          **MR. NOLAN:**  Your Honor, since Mr. Russell was going

8   to deal with the objections and the weight arguments with

9   respect to the declarations, let me ask him to address

10  specifically this, and then I'll come back and make one last   00:53

11  point that I wanted to make.

12         **MR. RUSSELL:**  And I apologize for interrupting

13  Mr. Nolan; it's just that I was the one who was more familiar.

14         I think your Honor is correct, you read the literal

15  language for most of these declarations.  They are obviously   00:53

16  focused on 2009, and our intent was to try to resolve any

17  appeal as expeditiously as possible.  But I don't think you can

18  read these declarations out of their context.  They all say to

19  every single retailer, purchasing decisions are always

20  concluded.  That's what the Severson declaration you just read  00:53

21  is making clear.

22         This is a historical pattern.  They complete their

23  purchasing decisions in January.  That historically has been

24  true, and that's true now.  Obviously we can't all forecast for

25  sure when every company will do something two years hence, but  00:53

EXHIBIT 78
PAGE 1299

27

1   there's every reason to believe, and I believe it's the fair

2   inference, particularly if the evidence is drawn in our favor,

3   that that would be true in 2010.

4       THE COURT:   I understand if we get to 2000 -- I

5   understand that this is a yearly thing.   But what I'm saying is   00:54

6   that a decision now not to stay pending appeal for, say, 2010

7   or 2011 is not by itself going to necessarily result in the

8   cancelling of the 2010 or 2011 lines, because they are not even

9   going to get to them, for the very reasons that you just

10  stated, until the end of 2009.   00:54

11      Correct?

12      MR. RUSSELL:   Yes.  Absolutely, your Honor.   But

13  there's a related point, and I think this is also made clear

14  both from the retailers and from Mr. Falk and Mr. Wing, and

15  that is, if one is to assume, as I think we have to on this   00:54

16  undisputed record, that if your Honor's orders go into

17  immediate effect, and since your Honor has no evidence from

18  Mattel -- and, I submit, could not supplement to say that they

19  will, in fact, exploit Bratz; they had that opportunity; they

20  have foregone it.   So your Honor, the evidence is, if your   00:54

21  orders go into effect, Bratz is off the market for 2009.

22  That's a certainty based on the record before you.

23      THE COURT:   But if, for example, we have a hearing on

24  February 11th and the Court makes a ruling that alters its

25  injunction in some way, then it would have been for naught to   00:55

Tuesday, December 30, 2008                         Mattel vs. MGA

EXHIBIT 78
PAGE 1300

28

1   have done anything affecting 2010; correct?

2         **MR. RUSSELL:**  I don't know that we can say that, your

3   Honor, because if your Honor were to enter judgment as a matter

4   of law in our favor on these issues, that doesn't change the

5   fact that there's a need for certainty now pending appeal.  And          00:55

6   the reason --

7         **THE COURT:**  No.  Now, pending the ordering of the

8   2009 Bratz line.

9         **MR. RUSSELL:**  Okay.

10        **THE COURT:**  I know you want me to conclude that there          00:55

11  is a factual basis to support a stay pending appeal.  I just

12  don't see it.

13        **MR. RUSSELL:**  The reason I would say -- I understand

14  what you're saying.  You're saying if I do it for this one

15  season.  But we still need certainty absent a stay, pending          00:55

16  appeal.  That's what people are saying.  They need to know this

17  is going to go to the circuit; this is actually going to be

18  revisited.

19        **THE COURT:**  I know they use language about they need

20  that stay pending appeal.  And I suspect that whoever helped          00:56

21  them draft the declaration included that language.  But the

22  point of what they are saying is they need to know right now so

23  that they are not going to commit to putting aside shelf space

24  over at Wal-Mart or Sears if they are going to have the line

25  pulled come February.  That's how I'm reading this --          00:56

Tuesday, December 30, 2008                      Mattel vs. MGA

EXHIBIT 78
PAGE 1301

29

1          MR. RUSSELL:  There's no question that the direct

2    import is as you say, your Honor.  The key issue for MGA's

3    survival right this second is that it be allowed to sell its

4    products to its main retailers.  We are going to and have

5    appealed -- and again, we're not here to discuss the propriety,          00:56

6    but it will be appealed, we believe, so long as MGA is allowed

7    to survive.

8          If your Honor's decision were 'I will stay this order

9    for the entirety of the 2009 season, all of the way, and I

10   assure retailers that I will not order the recall at any point          00:56

11   all of the way up through December 31st, 2009,' that might,

12   might, moot this issue.

13         Right now we have an appeal and we're seeking a stay

14   pending appeal to avoid this harm.  And the harm is we must be

15   allowed to sell our product.                                            00:57

16         THE COURT:  Very well.

17         Let me hear from Mattel.  I've given the floor to MGA

18   for the entire time so far.

19         MR. QUINN:  Good morning, your Honor.

20         THE COURT:  Good morning, Mr. Quinn.                              00:57

21         MR. QUINN:  Your Honor, I think it's worth taking a

22   moment to step back and reflect on what brought us all here

23   together between Christmas and New Years.

24         It's great to see old friends.  But what brought us

25   here was an ex-parte application which said that if a stay is           00:57

Tuesday, December 30, 2008                          Mattel vs. MGA

EXHIBIT 78
PAGE 1302

30

```
 1    not ordered pending an appeal by midnight tomorrow, the
 2    consequences, not just for the Bratz line but for MGA, would be
 3    catastrophic.  We heard words like 'death sentence' -- this
 4    morning I went through the papers -- 'catastrophe'; 'survival
 5    in jeopardy'; MGA faces extinction'.                          00:58
 6            Your Honor, I think we have to say on this record, on
 7    that application, the verdict has got to be not proven.
 8            THE COURT:  Let me stop you there, Mr. Quinn, because
 9    I do agree that there may have been some overstatement in some
10    of the language that was used.  But there does seem to be     00:58
11    evidence that suggests that -- and again, I do think the
12    December 31st deadline was perhaps a bit artificial, as
13    demonstrated by one of the most recent declarations that I've
14    seen, that there was a renegotiation to January 2nd.  But there
15    does seem to be a sense from the evidence that some time soon, 00:58
16    to use the word that is used in most of the declarations that I
17    have read, the fall 2009, certainly the spring 2009 and most
18    likely the fall 2009 orders, decisions, are going to be made,
19    and at least some of these major retailers, Sears, Wal-Mart,
20    Zellers -- which I gather is no connection to Mr. Zeller --    00:59
21    have provided evidence that they will not -- without some
22    degree of certainty, that they are not going to be pulled from
23    the shelves, make that kind of commitment.
24            Given the clear importance of the Bratz line to MGA's
25    financial health, it's not a big leap to see that this would   00:59
```

Tuesday, December 30, 2008                    Mattel vs. MGA

EXHIBIT 78
PAGE 1303

31

| | |
|---|---|
| 1 | have significant economic impact on the viability of MGA. |
| 2 | That's my reading of the evidence. |
| 3 | **MR. QUINN:**  And I think that's a fair reading, your |
| 4 | Honor.  I agree with the Court's summary. |
| 5 | **THE COURT:**  And my stay until February 11th was |
| 6 | certainly in part, as I stated on the record, to get us through |
| 7 | the Christmas season so as not to adversely affect the 2008 |
| 8 | season; and yes, I am mindful that Mattel pressed me to rule on |
| 9 | the equitable defenses and claims earlier so as not to run into |
| 10 | this problem; and you were right, but I needed the time to make |
| 11 | the decision.  Be that as it may, the timing is what the timing |
| 12 | is. |
| 13 | But it was also mindful of the fact that I was making |
| 14 | my decisions, as I've indicated to Mr. Nolan, based on jurors' |
| 15 | findings, on the Court's earlier rulings, all of which are |
| 16 | subject to the post-trial litigation, and I thought it was |
| 17 | prudent, because we can't unring the bell, to wait until |
| 18 | February 11th to allow those orders to take effect; so it was |
| 19 | an expressed, deliberate effort by the Court to avoid appeal of |
| 20 | those issues; not to make them final; not to enter final |
| 21 | judgment until the Court had the benefit of addressing all of |
| 22 | the issues with the benefit of hindsight that you have in a |
| 23 | post-trial motion hearing. |
| 24 | So I'm in agreement with you about the prematurity of |
| 25 | a stay pending appeal.  I'm also in agreement with you that |

00:59

01:00

01:00

01:00

01:01

Tuesday, December 30, 2008                              Mattel vs. MGA

EXHIBIT 78
PAGE 1304

32

1    even reading the evidence most favorable to MGA, it doesn't

2    justify at this point a stay pending appeal.  But I am

3    concerned about this buying period.  I don't know from

4    Mattel -- and I really would love to get an answer today; I

5    can't force an answer to this -- I'd love to know what Mattel          01:01

6    is doing with Bratz, what they intend to do with Bratz, because

7    it doesn't make any economic sense for anybody to kill a

8    profitable brand if there is an intention to proceed with it.

9    So that's one factor.

10          I have concerns that now that you filed this ex-parte          01:01

11   application concerning the receiver about the financial

12   allegations that you have made regarding financial

13   improprieties, we need to have a hearing on that and get to the

14   bottom of that whole thing.  I very briefly reviewed the

15   opposition that Mr. Russell submitted to the Court which          01:02

16   strenuously objects and opposes those allegations, but we

17   obviously need to find out what's going on on that front.

18          I was hoping to be in a position to nominate or name

19   a special master to oversee this injunction and a discovery

20   master so I could lift the stay on discovery, but the parties          01:02

21   frustrated that effort by stipulating to January 21st as the

22   date for objections, which I have advanced to January 5th.  But

23   that needs to be resolved.  So my question is what to do with

24   the stay as it exists right now.

25          I do understand that you have objections to their          01:02

Tuesday, December 30, 2008

Mattel vs. MGA

EXHIBIT 78
PAGE 1305

33

```
 1   evidence, but I'm really not getting a whole lot from Mattel
 2   saying that -- except for one declaration -- that this is not
 3   accurate.  I have to credit -- if someone from Sears is telling
 4   me that we're just not going to do this; someone from the
 5   industry saying, Oh, that's not true, really doesn't hold all        01:03
 6   that much weight.
 7           I've got to credit the Sears and the Wal-Mart and the
 8   Zellers.  I understand they are similar declarations and all
 9   that, but still, that's the evidence before the Court and I
10   have little reason not to accept that.  So I guess I'm thinking      01:03
11   out loud right here.  I want to structure something.
12           But going back to that first question, that would go
13   a long way towards helping the Court if it had an understanding
14   of what it is that Mattel wants to do.
15           MR. QUINN:  Well, your Honor, it is not Mattel's            01:03
16   intention to let the Bratz brand die.  And beyond that, I'm
17   going to have to confer with my client.
18           I've heard what the Court said.  Even if the Court
19   disregards all our objections, I think it's fair to summarize
20   the evidence that's been submitted as saying these retailers        01:03
21   would very much like to know soon.  They are making decisions.
22   The Hong Kong toy fair is next Monday apparently; that's where
23   you show products.  They want to make decisions, like all
24   businessmen.  I assume they would like to know.  It would be
25   more convenient to them to know sooner rather than later.           01:04
```

Tuesday, December 30, 2008                          Mattel vs. MGA

EXHIBIT 78
PAGE 1306

34

1          But the case that's been put before you that the fall

2     2009 line won't go forward or will be cancelled or will be lost

3     if this Court doesn't rule right away, that, your Honor, I

4     submit, has not been proven.

5          We challenged them, and the best evidence of this,          01:04

6     your Honor, I think, is in the supplemental compendium of

7     declarations that came in with the reply.  This was after we

8     had filed our opposition.  This is after we had nitpicked their

9     declarations and said they are highly hedged; they don't

10    identify any orders; they say 'soon'.  They say what they say.   01:04

11          And what did they submit in reply after that?

12          Two more declarations from Wal-Mart, Big Wal-Mart,

13    presumably, Wal-Mart in Canada.  The first declaration is from

14    Mr. Cameron.  Having been challenged, they say now, "Due to our

15    need for merchandise planning certainty and concern about        01:05

16    supplier financial risk, Wal-Mart Canada will avoid ordering

17    substantial quantities of any products if there's a significant

18    likelihood that those products will have to be removed from the

19    shelves in 2009."

20          Your Honor, they are just saying they are going to          01:05

21    avoid it.  They don't say they won't do it.  Now the gauntlet

22    was thrown down when they went to that declarant and asked him

23    to sign a statement.  And he apparently couldn't say that.

24    Because I think we know why, among other reasons, he said

25    "Wal-Mart Canada will not add additional products on a large      01:05

Tuesday, December 30, 2008                          Mattel vs. MGA

EXHIBIT 78
PAGE 1307

35

1    scale."

2            And we have a similar statement from Mr. Falk,

3    another reply declaration, who says "Retailers are concerned

4    that there will be no alternatives to Bratz."

5            What I think this is telling us -- and a fair          01:06

6    reading, read it both ways, I think, in fairness -- what they

7    are saying here is 'We'd like to know.'

8            But basically we can't make big changes in short

9    order.  We don't know of any alternatives out there that we're

10   going to be able to do easily.  There's a huge transaction cost  01:06

11   to the retailer community to decide tomorrow, next week, two

12   weeks from now, that we're not going to do Bratz.  They have

13   not identified anything.  They would like to know sooner.

14           THE COURT:  Mr. Quinn, I don't think we're all that

15   far apart in terms of what you're saying and what I'm saying.   01:06

16           I agree that the December 31st deadline is

17   artificial.  I agree that there is no need for a stay pending

18   appeal.  But crediting the declarations that you just read,

19   crediting what you just said, there is a recognition that there

20   needs to be some certainty soon.                               01:07

21           MR. QUINN:  Your Honor, there's a recognition, a

22   statement that they would like to have it.  There is no

23   statement in here where people are saying 'We will not order

24   the March' -- and they are very careful not to say that --

25   'Unless we know right away, we will not order the 2009...'     01:07

Tuesday, December 30, 2008                    Mattel vs. MGA

EXHIBIT 78
PAGE 1308

36

1          Look at the other reply declaration from Mr. Cameron,

2    your Honor.

3          **THE COURT:**  Actually, what the Sears declaration from

4    Mr. Elliott says is that unless they learn soon that the orders

5    are stayed, until the conclusion of MGA's appeal...' that          01:07

6    latter part, I suspect that sounds like a lawyer's writing, not

7    Mr. Elliott's writing.  Be that as it may, 'Sears holdings will

8    cancel all fall 2009 Bratz line of orders.'

9          So I do have evidence indicating -- and there's other

10   declarations to similar effect.                                    01:08

11         **MR. QUINN:**  Well, your Honor, if you read them

12   carefully, there are no orders identified -- which is an

13   interesting thing given the prominence of the significance of

14   orders in this briefing -- there is no order identified, other

15   than an $840,000 order which Toys"R"Us says 'We'll give you        01:08

16   until January 2nd.'

17         Your Honor, it would have been easy if there were

18   orders, if there were Sears orders that were material.  And I

19   would think they would want to show you that such orders exist.

20   But they have not been able to do that.  I acknowledged the        01:08

21   language in that declaration, your Honor, but the fact of the

22   matter is there are no orders identified.

23         And elsewhere, if you look at the Falcon declaration,

24   he accepts Mr. Weinstein's chronology that what really happens

25   is the decisions are made and then the orders come and are         01:09

Tuesday, December 30, 2008                        Mattel vs. MGA

EXHIBIT 78
PAGE 1309

1    accepted in March and April.  Falcon's approach to that is to

2    sort of trivialize the orders and say that's kind of an

3    afterthought.  But I think on this record that's really what

4    the evidence is; that people go to the Hong Kong toy fair next

5    week, they do the other things they need to do to go about          01:09

6    their decision-making process, and it's logical, and at the end

7    of all that, they place their orders.  And the only evidence

8    that the Court has before it on that is that the orders are

9    placed in March and April.  We're talking about fall of 2009.

10            The other declaration I wanted to call to your           01:09

11   attention is the declaration of Mr. Cameron from Wal-Mart,

12   Canada.  He says that 'Wal-Mart Canada will avoid ordering

13   substantial quantities of any product if there's a significant

14   likelihood that those products will have to be removed from the

15   shelves.'  He does not say they won't order them.  They would     01:10

16   rather not live with the uncertainty.  And you can understand

17   that.  He says 'we don't replace large volumes of products,

18   additional products, on a large scale.  We're reluctant to do

19   that.  It's a hassle.'

20            But the burden here is theirs, your Honor.  They have    01:10

21   to prove to you that something was going to happen before

22   February 11th.  And that gets us to the rightness issue, your

23   Honor.

24            Both sides, of course, have made JMOL applications.

25   Their characterization of their motion is that it potentially     01:10

Tuesday, December 30, 2008                        Mattel vs. MGA

EXHIBIT 78
PAGE 1310

38

```
 1   could eviscerate the basis for the injunctions.  I'm absolutely
 2   certain that counsel for MGA made those motions in good faith;
 3   that they did not regard it as an empty exercise; and that they
 4   believe in them.  I'm certain that they believe, for example,
 5   that they can persuade your Honor that as a matter of law, only    01:11
 6   the first generation Bratz dolls infringed.
 7          Now, if they are right about that, that's going to
 8   completely change the injunction, completely change it.  They
 9   have challenged the constructive trusts and the name Bratz,
10   that Mattel would have the right to use the name Bratz, as a       01:11
11   matter of law.  If they are right about that -- they say they
12   are -- then that's going to completely change the injunction.
13          To decide this issue, your Honor, about whether to
14   give a stay, it's impossible to do it.  We agree with the
15   statement of the standard that Mr. Nolan sets.  It's impossible    01:11
16   to do it without assessing the likelihood of success on the
17   merits.
18          THE COURT:  And I'm with you.  You cannot assess the
19   likelihood of success because we don't even know at this point
20   what is going to be appealed.                                      01:11
21          MR. QUINN:  Exactly, your Honor.  And we also don't
22   know, for the same reasons, what the irreparable harm would be
23   from not having the stay.
24          There's a gap.
25          THE COURT:  That's where I -- and for those reasons,        01:12
```

EXHIBIT 78
PAGE 1311

39

1  that's why I think it is, in my opinion, nonsense to even

2  discuss a stay pending appeal since we can't make that

3  calculus.

4       **MR. QUINN:**  All right.

5       **THE COURT:**  Going back to your first statement,                01:12

6  though, that it is not Mattel's intention to see the Bratz

7  brand die.  Given what appears to the Court anyway as

8  legitimate concerns, I understand that the evidence is -- there

9  are some words there that suggest some room for

10  maneuverability, but given the evidence that clearly indicates   01:12

11  from the retailers that there are serious concerns about the

12  decisions that will be made affecting the 2009 line which could

13  have a profound impact on the Bratz brand, why does it not make

14  sense at least to preserve the status quo?  And we can discuss

15  on Monday whether or not part of preserving the status quo      01:13

16  involves appointing a receiver to make sure that the status quo

17  is being preserved.  That's an issue that I'm reserving for

18  Monday's discussion for this year, for this buying season.

19       **MR. QUINN:**  Your Honor, I think the --

20       **THE COURT:**  Put aside the motion for a stay.  Now        01:13

21  let's consider this a modification of the Court's previous

22  order staying this until February 11th just to preserve the

23  2009 buying season.  Why doesn't that make sense, if what you

24  tell me is that it is Mattel's intention not to allow the Bratz

25  brand to die?                                                   01:13

Tuesday, December 30, 2008                         Mattel vs. MGA

EXHIBIT 78
PAGE 1312

40

1    **MR. QUINN:**  Your Honor, because I submit the evidence

2    is that it hasn't even been proven that it will die.  There are

3    atmospherics; there are carefully hedged declarations; there is

4    concern expressed that 'we would like to know'.  But your

5    Honor, this is extraordinary relief.  This is their                    01:14

6    application.  They went to extraordinary lengths to get, I

7    don't know how many declarations, a dozen, and then

8    supplemental declarations.

9         Your Honor, isn't it significant that they are unable

10   to come up with any evidence that, indeed, these orders will          01:14

11   not be placed.  People would like to know sooner, but where's

12   the evidence that, indeed, it won't happen?

13        You have Wal-Mart wringing their hands saying 'We'd

14   really like to avoid it.  We'd rather not do it.  We don't want

15   to do it.  It's a hassle.'  Certainty is better in the business       01:14

16   world.  But what it comes down to, your Honor, is even if we're

17   now talking about just this next fall's line, what they are

18   asking you to do is eliminate the uncertainty for the business

19   world by giving an advisory opinion.

20        In some jurisdictions, in some states of the union,              01:15

21   courts give advisory opinions.  The United States District

22   Courts don't give advisory opinions.

23        **THE COURT:**  That is a very big concern of this Court,

24   because the last thing I want to do is give an advisory

25   opinion.  But what we're talking about here is not so much an         01:15

Tuesday, December 30, 2008                    Mattel vs. MGA

EXHIBIT 78
PAGE 1343

41

```
 1   advisory opinion, but an effort on the part of the Court to
 2   preserve the status quo pending my decisions on February 11th.
 3   And essentially what MGA is arguing is that for me to preserve
 4   the status quo pending my decision on February 11th, it was too
 5   simplistic for the Court simply to stay it to February 11th;        01:15
 6   what I really needed to do is stay it for the buying season
 7   2009.  And that's what it's coming down to.
 8            I agree with you that for me, and respectfully for
 9   the Ninth Circuit at this point, to issue a stay pending appeal
10   would be, in my opinion, an improper advisory opinion.             01:15
11   However, what I intend to do is preserve the status quo pending
12   February 11th.  And what MGA has succeeded in doing is raising
13   a real concern.  And, mind you, you've raised the issue
14   yourself in the form of this ex-parte that you just filed about
15   the finances.                                                      01:16
16            MR. QUINN:  That's a different issue, I think.
17            THE COURT:  It is a different issue, but it's related
18   in the sense that -- a touchstone for this Court will be
19   preserving the status quo pending the final resolution of this
20   case before this Court.  And that does not happen, final          01:16
21   judgment does not get entered, until after I've decided the
22   motions on February 11th.
23            MR. QUINN:  And I understand what the Court is
24   saying, and I guess I would just come back to what I've already
25   said.  I think we have to take the evidence that has been         01:16
```

Tuesday, December 30, 2008                          Mattel vs. MGA

EXHIBIT 78
PAGE 1374

42

1   submitted to us and take it and see what it says.  And there is

2   nobody there who says it's impossible for us to place orders in

3   March and April.  We'd like to know soon.  There is no evidence

4   that there are any orders out there now.  I submit a fair

5   reading of the declarations is that, in fact, that's not how          01:17

6   this proceeds.

7           Decisions are going to be made, but they have not

8   made the case that this Court should take the extraordinary

9   step of preserving this now or taking action now before the

10  Court has heard the JMOL motions.                                     01:17

11          THE COURT:  Let me stop you there.

12          You do agree, Mr. Quinn, that the Court should

13  preserve the status quo pending February 11th; correct?

14          MR. QUINN:  We believe that the order that the Court

15  entered was appropriate.                                             01:17

16          THE COURT:  Okay.  Because you agree that we should

17  preserve the status quo pending February 11th.

18          MR. QUINN:  Yes.

19          THE COURT:  Very good.

20          MR. QUINN:  But what we're saying is that the case          01:17

21  has not been made that this Court needs to enter a new and

22  different injunction.

23          THE COURT:  I understand that.

24          MR. QUINN:  Your Honor, if I may?

25          THE COURT:  Please do.                                       01:18

Tuesday, December 30, 2008                          Mattel vs. MGA

EXHIBIT 78
PAGE 135

43

```
1              MR. QUINN:  If I may, your Honor, turn the podium
2    over to Mr. Zeller.
3              THE COURT:  You may.
4              MR. ZELLER:  Thank you, your Honor.
5              One point, I guess what I want to do, because I think
6    certainly there is large agreement as to where we are, and
7    certainly with respect to what Mr. Quinn has been saying.
8              First and foremost, I think it's important to put on
9    the record that the Court has jurisdiction to decide the stay
10   motion; that's regardless of anything else that's going on in
11   the Ninth Circuit.  And I can certainly provide the Court with
12   the appropriate citations for that.
13             Number two, there is no appeal pending, which we've
14   said is a predicate for an appeal, for a stay pending appeal.
15   And certainly on the record I think the Court is saying that in
16   any event, they have certainly not made the case even reading
17   the evidence most favorably to MGA.
18             But it certainly is also a predicate that there be a
19   judgment, namely a final order, before they can appeal it.
20   That's really a determination of the Court's intent as to
21   whether or not that order of December 3rd was final.  We have
22   certainly -- our take on it is that it is not.  I think the
23   Court is confirming that it is not by saying that it's all
24   subject to the JMOLS that are being heard.
25             Perhaps I'm oversimplifying, but the way I hear it,
```

01:18
01:18
01:19
01:19
01:19

Tuesday, December 30, 2008                    Mattel vs. MGA

EXHIBIT 78
PAGE 136

44

1    the way that certainly MGA is portraying this, is that people

2    need to know soon; the retailers want to know soon; they want

3    certainty sooner rather than later.  It would seem that the

4    issue is how quickly are the JMOLs resolved, which everyone

5    agrees is essential for a final determination of the            01:19

6    injunction.

7           And I don't know, of course, what people's schedules

8    are, but it seems like this relief that they are asking for in

9    terms of the stay for all of 2009 is overkill, even reading

10   everything that they say about --                              01:20

11         THE COURT:  They are not asking for that.  That's

12   what I'm suggesting is that all of the evidence supports is

13   potentially a stay for 2009, for the buying season, and the

14   selling season, I suppose, for '09.

15         MR. ZELLER:  Right.                                      01:20

16         THE COURT:  I suppose it would be the buying and

17   selling season, because obviously they are not going to buy if

18   they cannot sell; so we'd have to preserve the selling, which

19   presumably would go through this time next year.

20         If you're getting to advancing the February 11th        01:20

21   date, I'm sorry, the Court is not prepared do that.  And I know

22   it was probably you that raised this issue earlier about the

23   need to move this forward.  I'm trying to move this case as

24   quickly as I can, but I can only move it as quickly as I can.

25         MR. ZELLER:  I understand, your Honor.  I was not        01:21

EXHIBIT 78
PAGE 1317

45

1    necessarily making an offer in some respects.  I'm pointing out

2    that that's not even what they have asked for.  I think that

3    frankly, that should have been the relief.

4         The only uncertainty that they really are pointing to

5    is that everyone wants to know sooner rather than later what        01:21

6    the Court is really ultimately going to do.  We certainly think

7    that's an advisory opinion --

8         **THE COURT:**  Let me disagree with you and hear your

9    response, Mr. Zeller, because I don't think that's what they

10   are saying.  They are not saying that they need to hear what       01:21

11   the Court is ultimately going to do, because that would be an

12   advisory opinion.

13        What they need to hear -- all the buyers are

14   concerned about is this next year; they just want to hear that

15   whatever I do, however I decide, however the Ninth Circuit         01:21

16   decides, that their products are not going to get ripped from

17   the shelves some time in 2009; that's my reading of those

18   declarations.  They don't need to know how I'm going to decide

19   this case legally, whether these dolls are owned by Mattel or

20   MGA or constructive trusts, or any of that nonsense, from their    01:21

21   perspective, which is very important to us.  I think from their

22   perspective they just want to have this very successful line of

23   dolls on their shelves.  Whether it's stamped with MGA, whether

24   it's stamped with Mattel, there's certainly no evidence before

25   the Court that any of that really matters.                         01:22

Tuesday, December 30, 2008                          Mattel vs. MGA

EXHIBIT 78
PAGE 1318

46

1        So I don't think it calls for an advisory opinion as

2    much as it calls for the Court to ensure that these orders can

3    go forward in this next month or so.

4        **MR. ZELLER:**  I do think it actually asks for the

5    Court to prejudge what it is going do.  I mean, the ultimate          01:22

6    point is that if MGA's argument is credited that the JMOLs they

7    think that they are going to prevail on would eviscerate the

8    injunction, that's going to happen by we'll call it March,

9    before ultimately there are actual orders that are placed.  So

10   what we're really talking about is this claim about uncertainty      01:22

11   for a three-month period at most.  And then to extrapolate it

12   into, well, that means that everyone should be given certainty

13   for the rest of the year -- well, I do think that is an

14   advisory opinion.

15       **THE COURT:**  Let me go back to a couple of points,             01:23

16   then.

17       I don't want anyone in this courtroom to think that

18   anything that the Court does with respect to the stay should

19   reflect in any way on how the Court is going to rule on

20   February 11th.  I have no idea, no idea, how I'm going to rule        01:23

21   on February 11th, which is part of the reason why I think the

22   appeal is premature.

23       In any event, this should not signal one or the

24   other.  What I'm talking about now is simply preserving the

25   status quo.                                                          01:23

Tuesday, December 30, 2008                              Mattel vs. MGA

EXHIBIT 78
PAGE 1319

47

```
1          But second of all, if this really is about -- again,
2   it's the portions -- and I'm thinking out loud now -- it's the
3   portions of the order that would have the affect on the
4   retailers; namely, the removal from the shelves that the
5   retailers are concerned about.  Issues like ownership,              01:24
6   constructive trusts, et cetera, as far as I know and as far as
7   the evidence is before me, would have no affect on the
8   retailers; so there may very well be -- let's say
9   hypothetically I were to rule in Mattel's favor on
10  February 11th, there may be portions of the ruling that could       01:24
11  take affect immediately and what I would be staying now or
12  staying for the year is the removal of the dolls.
13          Again, I'm thinking somewhat out loud.  I need to
14  think this through.  But the point I'm trying to make and to
15  get you to respond to, Mr. Zeller, is that the imposition on        01:24
16  Mattel of getting the stay for 2009 is not perhaps as great as
17  you're making it out to be if, in fact, your desire is not to
18  kill the Bratz line.
19          MR. ZELLER:  I hear what the Court is saying.  But
20  we're not at this point talking about the imposition on Mattel.     01:25
21  It has more to do with the fact that they are ultimately asking
22  the Court to prejudge the issue.
23          THE COURT:  I agree that this is part of the Court's
24  equitable consideration.  There is not much of an imposition on
25  Mattel.  That was the point that Mr. Russell made a few moments      01:25
```

Tuesday, December 30, 2008                    Mattel vs. MGA

EXHIBIT 78
PAGE 1320

48

1   ago.

2          MR. ZELLER:  If the Court would like me to address

3   the harm to Mattel, I can certainly do that.

4          THE COURT:  It's in your papers.  You have it in your

5   papers.  I'm cognizant of your position on the harm to Mattel,          01:25

6   I think.

7          MR. ZELLER:  If I may just, perhaps, put this

8   slightly differently, your Honor, because I think the Court is

9   absolutely correct in identifying the point that if some

10  showing could be made, that perhaps modification of particular          01:25

11  provisions of the injunction would be appropriate.  That is

12  certainly something that is in play, which is one of the

13  reasons why we don't think any of this is the subject of a

14  proper appeal, why there's no final order, why all these things

15  are still here in the district court for the district court to          01:26

16  decide.

17         But the fact is that there is no evidence that that

18  modification, if it occurs by some other motion, by

19  February 11th, whenever it is, that the Court should be

20  prejudging that right now.  That's not the relief that MGA has          01:26

21  asked for.  There's no evidence whatsoever that that is going

22  to resolve this concern that retailers say that they have.

23         THE COURT:  I'm not going there either.  I'm not

24  suggesting that I'm going to modify any of the orders that I've

25  issued right now based on anything that MGA has submitted to          01:26

Tuesday, December 30, 2008                    Mattel vs. MGA

EXHIBIT 78
PAGE 1321

49

1  this point.  I may be modifying it based on my rulings on the

2  JMOL and motions on February 11th, but there's nothing that's

3  been submitted so far that would have an impact on the

4  underlying preliminary injunction.  All this would have an

5  impact on is preserving the status quo between now and          01:26

6  February 11th.  I want to be able to be sitting here on

7  February 11th knowing that, essentially, we're in the same

8  condition in terms of the product line, in terms of the

9  company, in terms of the workers, in terms of all of the things

10  that they discussed, as we are right now.  That's really my     01:27

11  focus, and I think that's the only proper focus at this point.

12        MR. ZELLER:  And for all of those various reasons, I

13  don't think there is necessarily disagreement on that

14  particular issue, other than the fact that the only relief that

15  MGA is asking for is something that doesn't accomplish what the  01:27

16  Court is looking to accomplish, and, moreover, what MGA claims

17  that it needs.  I mean, there's just simply no evidence that

18  doing anything at this point is going to eliminate that

19  uncertainly.  And it's just inherent in the litigation process.

20  I mean, that's where we are ultimately.                          01:27

21        THE COURT:  You're right.  And I know that there is

22  uncertainty inherent in the litigation process.  And there's

23  been uncertainty inherent, from MGA's perspective, ever since

24  that jury came back and said that Carter Bryant did these

25  drawings and came up with this idea and came up with this name   01:28

EXHIBIT 78
PAGE 1322

1   while he was employed at Mattel.  That's when the uncertainty,

2   in large measure, began.  I suppose it began when you filed

3   your lawsuit.

4           I mean, there's always degrees of uncertainty, and we

5   can't eliminate that.  And it's not the job of the Court to

6   eliminate that.  But when there is a particularized threat, as

7   I think has been identified by MGA, perhaps the Court should

8   consider addressing that.  And that's where I'm at right now.

9           **MR. QUINN:**  And to be clear about this, there's no

10  disagreement by Mattel and by us that we're looking to preserve

11  the status quo.  But the fundamental problem is that there is

12  no relief that MGA has asked for, or even identified, that

13  would provide that.  And we don't think that there is evidence

14  that retailers are not going to order --

15          **THE COURT:**  You say that, but I do have declarations

16  before me from retailers saying that -- the clear gist of it --

17  I mean, it's unfortunate that they appear not to be using their

18  own words.  The gist of it, though, seems to be clearly that

19  they need to know that they're going to have these products for

20  '09 or they're not going to order them.

21          And not only do they say that, there's an element --

22  I mean, the Court has become more familiar with the whole doll

23  industry and branding and purchases and sales than I probably

24  was a year ago at this time.  It makes sense.  There's an

25  element of -- it resonates that these decisions -- and we heard

Tuesday, December 30, 2008                     Mattel vs. MGA

EXHIBIT 78
PAGE 1323

51

1  testimony in the trial about the role that these toy fairs play

2  and how the orders go out and when the new lines are unveiled;

3  so the Court does have that evidence and background in mind as

4  well.

5        MR. ZELLER:  But one thing of interest is that that's      `01:30`

6  all that these declarations can say.  They do not say, Judge,

7  if you do not stay, any possible effect on us, the retailers,

8  for all of 2009 -- so that when you decide on February 11th,

9  these JMOLs, we're not going to order.  That is just not before

10 the Court.  It's not what MGA has asked for.  It's not what the    `01:30`

11 retailers said.  That's fundamentally the problem here, is that

12 MGA -- ultimately, what they're really looking for is

13 certainty.  But the vehicle that they are trying to achieve

14 this through is not going to provide that certainty.  We're on

15 a path -- this was with MGA's consent, with its input -- that    `01:30`

16 has the JMOLs being heard February 11th.  And that is the

17 course that we are on.  And this is why I refer to it as being

18 part of the litigation process.  And there's just no one who

19 tells the Court, I have X amount of orders worth Y amount of

20 dollars that I am going to cancel come January 31st if the      `01:31`

21 Court doesn't rule on these JMOLs --

22        THE COURT:  Eight hundred thousand from Toys"R"Us.

23        MR. ZELLER:  Double hearsay.  And they don't put in

24 the declaration, Toys"R"Us itself.  Mr. Wing says he heard from

25 somebody else within MGA that someone from TRU said that.      `01:31`

Tuesday, December 30, 2008                    Mattel vs. MGA

EXHIBIT 78
PAGE 1324

52

1         The truth of that -- I understand that perhaps the

2    Court may want to, in this context, consider it; but the

3    fact -- in terms of admissibility, I don't think it's

4    admissible at all.  But even if it just goes to weight -- I

5    mean, something like that, I think, should be afforded very,          01:31

6    very little weight.  No TRU declaration.  No identification of

7    who these people are, either within MGA or at TRU.  And,

8    certainly, there surely must have been someone within MGA who

9    actually had that conversation rather than Mr. Wing declaring

10   to it.                                                                01:32

11          .   I mean, part of our point on all of this has been

12   that we're mindful that certain readings can be given to the

13   evidence, and we're not necessarily disputing that, but the

14   point is, they should have put in the actual evidence and the

15   actual facts.  It's what they don't say, particularly in this        01:32

16   context, that has significance.  No one says, I'm a retailer;

17   I'm going to cancel X amount of orders by Y date if I don't

18   have this kind of certainty by a particular date.

19              THE COURT:  Very well.  Thank you, Mr. Zeller.

20              Mr. Nolan, I'm going to give you a few minutes.           01:32

21              MR. NOLAN:  I appreciate the offer; but, frankly, I

22   think the Court has gone over this.

23          We respectfully submit that what Mattel is doing is

24   ignoring the language in the declaration submitted from Sears

25   and from the other retailers.  I'm looking at Mr. Fisher from        01:32

Tuesday, December 30, 2008                          Mattel vs. MGA

EXHIBIT 78
PAGE 1325

53

1    Target, where in Paragraph 4, he says, "Target began purchasing

2    for purchases of Bratz and other toy products for the fall 2009

3    season on or about October 2008 and expects to have its fall

4    2009 assortment and purchasing plan largely completed in

5    January of 2009."  Not March; not, We're going to wait on it.    01:33

6    They have to make decisions.

7            I'll land on one last point.  Mr. Quinn pointed out

8    to you that there is -- and he admits that there's a toy fair

9    in Hong Kong starting on Monday.  And that's where, to use his

10   language -- I didn't quote it exactly -- that's where you show   01:33

11   your wares.

12           So let me just ask hypothetically what we're supposed

13   to do over there if you accept Mattel's position and say, Wait;

14   just wait until after the JMOLs.  Isaac Larian and salesmen

15   from MGA should go over to Hong Kong and say, You know what, I   01:33

16   know you've read about the injunction, and I know it has a

17   profound impact and impound requirements, and you don't know

18   whether or not we're going to be able to market Bratz; but

19   trust me; we've got really super arguments on this

20   February 11th JMOL.                                              01:34

21           It's not logical.  In order to preserve the

22   status quo, to get to the February 11th date, your Honor, I

23   respectfully submit that your instincts in terms of looking at

24   the record that has been supplied -- although I can

25   respectfully disagree with respect to whether or not it goes    01:34

Tuesday, December 30, 2008                          Mattel vs. MGA

EXHIBIT 78
PAGE 1326

54

1   beyond 2009, for purposes of modifying the order, yes, it was

2   couched in terms of extraordinarily relief.  It was, however,

3   presented to this Court as a lifeline.

4          Allow us to exist, purchasing and selling in 2009.

5   Give us clarity.  Let us come in here on February 11th and                    01:34

6   argue with as much vigor as we can that some of the rulings

7   were wrong and should be corrected and we'll have a profound

8   impact going forward, in our favor.  We have that right.  All

9   we ask, your Honor, all we ask for, is to have these employees

10  who stand behind Bratz wake up January 2nd of 2009 with a job.                01:35

11          MR. QUINN:  Your Honor, may I briefly.

12          THE COURT:  Very briefly.

13          MR. QUINN:  The case for irreparable harm here simply

14  has not been made.  Notwithstanding the statements about death

15  nail and death warrant, we know that this is a company that                   01:35

16  produces financial statements every month.  They have auditors,

17  Ernst & Young.  The last balance sheet they provided to us is

18  two years old now, December of 2006.  Mr. Wing has those

19  financial statements.  He has them to hand.  So even if we

20  credit the idea that there will be an impact on orders, even if               01:35

21  we accept that and read the evidence broadly, as they invite

22  you to, they have not made a case that their survival is at

23  stake here.  They argued -- you'll recall, your Honor, with

24  respect to the bond, they argued that only a $3 million bond

25  was appropriate, because their Bratz profits in the first six                 01:36

Tuesday, December 30, 2008                              Mattel vs. MGA

EXHIBIT 78

PAGE 1327

55

```
 1   months of last year were only $2.8 million.  This is a company

 2   that appellate counsel here represented to the Ninth Circuit

 3   was worth hundreds of millions of dollars in a filing just last

 4   week.

 5           THE COURT:  I know.                                    01:36

 6           MR. QUINN:  That's the whole other side of this

 7   equation that we haven't spoken about in this hearing.  They

 8   have not made the case that they can't survive even if orders

 9   are impacted.  And I submit, the fair reading of the evidence

10   is, yes, the process might be telescoped; it might be          01:36

11   accelerated; it will be outside the norm; but the purchasing

12   folks and the people who place orders can do what they need to

13   do right after this Court issues its order on February 11th.

14   You don't even get over that first hurdle.  But if you get over

15   that hurdle, we don't have a case made here that their survival  01:37

16   is at stake.

17           Thank you, your Honor.

18           MR. RUSSELL:  Your Honor, please, one minute.

19           THE COURT:  One minute, Mr. Russell.  You can always

20   have one minute.                                               01:37

21           MR. RUSSELL:  Thank you, your Honor.

22           It's hard to take that argument seriously in light of

23   what Mr. Quinn himself told the jury.  They told the jury that

24   80 percent of the profits of MGA came from Bratz and that

25   without Bratz, there was no other profitable lines for MGA from  01:37
```

EXHIBIT 78
PAGE 1328

56

1    2001 through 2007.

2            He points to $3 million of profits.  It's true, but

3    profit is different than revenues.  And the reason profits

4    suffered, respectfully, is because of extraordinary costs like

5    this case.  What we're talking about here, and the evidence is      01:37

6    uncontroverted, MGA's primary, or in Mr. Quinn's showing, only

7    profitable line, if this Court's orders are not stayed, will be

8    enjoined.  MGA's revenue from its only, according to Mr. Quinn,

9    profitable line will not be received by the company.  Mr. Wing

10   says it's at least 44 percent of the revenues.  MGA will lose       01:38

11   $150 million in sunk costs.  There is no question that this

12   will cause grave, potentially catastrophic, harm; and they

13   haven't even tried to rebut that.

14           Now, I understand he wants to get to the receiver

15   argument, which we were forced to respond to in 12 hours.  And      01:38

16   we can do that on Monday.  But for purposes of today, there is

17   absolutely no showing, none whatsoever, from Mattel that this

18   will not kill MGA.  It will kill MGA.  That is the record

19   before trial.  That is the record before you.

20           **THE COURT:**  Very well.                                  01:38

21           I think both prudence and equity require the Court to

22   modify its previous order, extending the stay to February 11th.

23           Having said that, I find simply no grounds to grant

24   the motion as phrased, a motion for stay pending appeal, for

25   the reasons that I stated earlier.  There is simply no way of       01:39

Tuesday, December 30, 2008                          Mattel vs. MGA

EXHIBIT 78
PAGE 1329

57

1    measuring the likelihood of success of an appeal of a decision

2    that has yet to be made.  And, likewise, the Court does have

3    serious questions about the irreparable harm.

4         In suggesting that I need to modify my previous stay,

5    I am not making a finding of irreparable harm.  And it's not on

6    that basis.  Rather, it is on the basis that I believe there is

7    a serious concern that the Court has that the status quo would

8    not be preserved on February 11th if the Court did not take

9    appropriate steps to modify its previously-entered stay.

10        So it is my intention to do so.

11        . I happen to believe that this is inextricably

12   intertwined, however, with issues raised by Mattel in terms of

13   the finances of MGA, which at this point, quite frankly, are a

14   mystery to the Court.  And that mystery was compounded in part

15   by what I read on appeal, what I've heard from counsel, what

16   I've seen in other papers.  I just don't know what exactly is

17   going on with all of that, and I want to explore that at

18   Monday's hearing on that motion.

19        What I intend to do, following Monday's hearing, is

20   issue a written order which will set forth how '09 will

21   proceed, pending, of course, any decisions that the Court makes

22   on February 11th.  Because if the Court were to rule in MGA's

23   favor on February 11th, that would, if not eviscerate,

24   certainly unravel those decisions made after Phase 1-C. But I

25   do accept the evidence that a degree of certainty needs to be

Tuesday, December 30, 2008                    Mattel vs. MGA

EXHIBIT 78
PAGE 1330

58

1    maintained in order to preserve the status quo; and the Court

2    will be issuing an order to that effect following the hearing

3    on Monday.

4           That is the most that I can give at this point.  I

5    trust that there is probably a lot of work for MGA to do with          01:41

6    its suppliers and buyers to make sure that we can go forward.

7    The Court would certainly provide leave to both parties to

8    submit language that the Court might wish to consider to

9    address the concern, and only the concern, that the Court has

10   identified, how to preserve the 2009 buying season, purchasing        01:41

11   and buying season, for Bratz.

12          I think that is all the evidence supports.  I think

13   that's all the relief that is warranted at this stage, at this

14   posture of the litigation, and much remains to be seen in terms

15   of how things fold out on February 11th.  The more immediate          01:41

16   concern of the Court, though, is preserving the status quo; and

17   we'll take that up and the financial questions that the Court

18   has on Monday.

19          Are there any questions concerning where the Court is

20   at at this point?                                                      01:42

21          Mr. Nolan?

22          MR. NOLAN:  No, your Honor.  Thank you.

23          THE COURT:  Mr. Quinn?

24          MR. QUINN:  No, your Honor.

25          THE COURT:  Very well.                                         01:42

Tuesday, December 30, 2008                          Mattel vs. MGA

EXHIBIT 78
PAGE 1331

59

```
 1              Good day.  And Happy New Year.

 2

 3

 4                        CERTIFICATE

 5

 6   I hereby certify that pursuant to section 753, title 28, United
     States Code, the foregoing is a true and correct transcript of
 7   the stenographically recorded proceedings held in the above-
     entitled matter and that the transcript page format is in
 8   conformance with the regulations of the Judicial Conference of
     the United States.
 9

10   _____        1-7-09
     THERESA A. LANZA, CSR, RPR          _____
11   Federal Official Court Reporter        Date

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Tuesday, December 30, 2008                    Mattel vs. MGA

EXHIBIT 78
PAGE 1332

# Exhibit 79



Sculptural Body Drawing; 9/19/99
To be used for all dolls

Jointed here, @ shoulders

Jointed @ Hips

Sculpted Fingernails

Total Doll Height w/ Head 11½" 12"

9"

Actual Size

Basic Shoe Sculpt

2" appx.

2¼" appx.

CONFIDENTIAL    Attorney's Eyes Only    BRYANT 01975

DEPOSITION EXHIBIT

EXHIBIT 74 PAGE 1333
EX 1327-0001



EXHIBIT 79 PAGE 1334

EX 1327-0002

# Exhibit 80

2818

1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3                              ---

4          HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

5                              ---

6    MATTEL, INC.,                 :   PAGES 2818 - 2935
                                   :
7              PLAINTIFF,          :
                                   :
8       VS.                        :   NO. ED CV04-09049-SGL
                                   :   [CONSOLIDATED WITH
9    MGA ENTERTAINMENT, INC.,      :   CV04-9059 & CV05-2727]
     ET AL.,                       :
10                                 :
               DEFENDANTS.         :
11   _____:

12

13

14

15            REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                   RIVERSIDE, CALIFORNIA

17                 TUESDAY, JUNE 17, 2008

18                 JURY TRIAL - DAY 14

19                   AFTERNOON SESSION

20

21

22                              MARK SCHWEITZER, CSR, RPR, CRR
                                OFFICIAL COURT REPORTER
23   CERTIFIED                   UNITED STATES DISTRICT COURT
                                181-H ROYBAL FEDERAL BUILDING
24   COPY                        255 EAST TEMPLE STREET
                                LOS ANGELES, CALIFORNIA 90012
25                              (213) 663-3494

EXHIBIT 80 PAGE 1335

2819

```
1    Appearances of Counsel:

2

3    On Behalf of Mattel:

4         Quinn, Emmanuel, Urquhart, Oliver & Hedges, LLP
          By John B. Quinn, Esq.
5            B. Dylan Proctor, Esq.
             Michael T. Zeller, Esq.
6            Harry Olivar, Esq.
             John Corey, Esq.
7            Diane Hutnyan, Esq.
             William Price, Esq.
8         855 South Figueroa Street
          10th Floor
9         Los Angeles, CA 90017
          (213) 624-7707
10

11

12   On Behalf of MGA Entertainment:

13        Skadden, Arps, Slate, Meagher & Flom LLP
          By Thomas J. Nolan, Esq.
14           Carl Alan Roth, Esq.
             Jason Russell, Esq.
15           Lauren Aguiar, Esq.
             David Hansen, Esq.
16           Matthew Sloan, Esq.
             Robert Herrington, Esq.
17        300 South Grand Avenue
          Los Angeles, CA 90071-3144
18        (213) 687-5000

19   On Behalf of Carter Bryant:

20        Keker & Van Nest
          By Christa Anderson, Esq.
21        Michael H. Page, Esq.
          710 Sansome Stret
22        San Francisco, CA  94111-1704
          (415) 391-5400
23

24

25
```

EXHIBIT __80__ PAGE 1336

2820

1                              I N D E X

2

3    CARTER BRYANT, PREVIOUSLY SWORN..................... 2821

4    CROSS-EXAMINATION (CONTINUED) BY MR. NOLAN: ......... 2821

5

6

7                            E X H I B I T S

8

9    (Exhibit 15471-266 received.)....................... 2846

10   (Exhibit 15471-276 received.)....................... 2847

11   (Exhibit 15471-124 received.)....................... 2848

12   (Exhibit 15439 received.)........................... 2850

13   (Exhibit 18544 for identification.)................. 2858

14   (Exhibit 18545 for identification.)................. 2862

15   (Exhibits 18544 and 18545 received.)................ 2863

16   (Exhibit 15609 received.)........................... 2894

17   (Exhibits 18460-001 and 15601-001 received.)........ 2897

18   (Exhibit 15243-001 received.)....................... 2898

19   (Exhibit 18486 received.)........................... 2899

20   (Exhibit 11167 received.)........................... 2901

21   (Exhibit 18494 received.)........................... 2903

22   (Exhibits 18497 and 18498 received.)................ 2911

23

24

25

EXHIBIT __80__ PAGE 1337

2833

1   unique or creative in any fashion?

2   A.   No, I think that's a fairly typical way to draw hands.

3   Q.   Have you seen that pose in other drawings?

4   A.   What do you mean by that pose?

5   Q.   Well, the hand pose.  In particular, the arms, the

6   placement of the hands.  Have you seen it in drawings or

7   magazine articles or ads?

8   A.   I think so, yes.

9   Q.   This is Exhibit No. 48.  If we blow it up, can you see

10  there's a date there in the lower right-hand corner.  Do you

11  see that?  Do you see that it says June 1999?

12  A.   Yes.

13  Q.   Okay.  And Ms. Martinez testified that she did not date

14  the Toon Teens drawing at the time that she did that.  And my

15  question to you is did you always date your drawings when you

16  did them?

17  A.   No.

18  Q.   Ms. Martinez testified that she placed that date, June

19  1999, on Exhibit 48 after she was called by the legal

20  department at Mattel.

21        My question to you, sir, is did you ever date a

22  Bratz doll in this case because you were told by the legal

23  department to date it?

24  A.   No.

25  Q.   I want to go back to your contract with Mattel,

EXHIBIT __80__ PAGE _1338_

2834

1    Exhibit No. 25.

2            Can I have that back up, Aaron?

3            So this is an employee confidential information and

4    inventions agreement.  We've already testified to that;

5    correct?

6    A.    Yes.

7    Q.    Let me ask you this question, sir.  By signing this

8    contract, did Mattel promise you a specific term of

9    employment?

10           MR. PRICE:  Objection.  That's totally irrelevant.

11           THE COURT:  Overruled.  You may answer.

12           THE WITNESS:  No.

13   Q.    BY MR. NOLAN:  In fact, when you were first hired, you

14   were hired part time; correct?  Back in 1995?

15   A.    Yes.

16   Q.    When you came back on the second time, you were assigned

17   to Barbie Collectibles; correct?

18   A.    Yes.

19   Q.    Was there a guarantee, for instance, that you would work

20   at Mattel for a year?

21           MR. PRICE:  Objection.  This is irrelevant.

22           THE COURT:  Counsel, I'm not sure where you're

23   going with this.

24           MR. NOLAN:  Let me do it another way.  I apologize.

25           THE COURT:  All right.

EXHIBIT 80 PAGE 1339

2835

1  Q.   BY MR. NOLAN:   Mr. Bryant, when you signed

2  Exhibit No. 25 and the conflict of interest questionnaire,

3  Exhibit No. 26, on your first day of employment, January 24,

4  1999, did Mattel give you a copy of these agreements?

5  A.   I don't remember.

6  Q.   Was there anything in this agreement that you thought

7  would prohibit you from ever seeking other employment?

8  A.   No.

9  Q.   Do you understand the term "at-will employee"?

10 A.   Generally, yes.

11 Q.   What was your understanding of an at-will employee?

12          MR. PRICE:   Irrelevant to this case.

13          THE COURT:   Sustained, Counsel.   Why don't you

14 rephrase.

15 Q.   BY MR. NOLAN:   While you were working at Mattel the

16 second time, did you have an understanding as to whether or

17 not you could be subject to a layoff?

18          MR. PRICE:   Objection.   This is irrelevant.

19          THE COURT:   Counsel, where is this going?   To what

20 issue?

21          MR. NOLAN:   Just a real quick sidebar.

22          THE COURT:   Very well.

23          (SIDEBAR CONFERENCE HELD.)

24          THE COURT:   I want to give you leeway to obviously

25 get into this witness's understanding of the contract.   But

EXHIBIT 80 PAGE 1340

2890

1   Q.   I want to go back to one additional point, and we'll try

2   to do this quickly.  You've got a lot of exhibits in front of

3   you, Mr. Bryant.  Can you look at 62-001.

4   A.   Oh, boy.  They are all mixed up.  Which one now?

5   Q.   62-001.  Do you see that as a master drawing of the four

6   heads?

7   A.   Yes, sir.

8   Q.   I want you to set that aside for a moment.  Can you take

9   a look at Exhibit 18281.

10  A.   I'm sorry.  These are mixed up.  I'm not finding it.

11  Q.   You know what I'm going to do to speed this along?  I'll

12  reorganize these so that it's a little bit easier for you to

13  follow, and I'll come back to this later if you don't mind.

14  A.   Okay.

15  Q.   Was Bratz the only project that you conceived of in

16  August of 1998?

17  A.   Well, no, I was doing other projects.

18  Q.   Can you describe for the jury -- let's go back in time,

19  and let's put up the time line for the employment that we're

20  looking at.

21       And let's just go to your April 29, 1998,

22  resignation from Mattel.  As I recall from your testimony

23  from Mr. Price, you were employed at Mattel for a period of

24  time from 1995 through April of 1998; correct?

25  A.   Yes.

EXHIBIT __80__ PAGE 1341

2891

1    Q.   Could you tell the jury whether or not you were always

2    actually physically working in the Mattel building for that

3    entire period of time?

4    A.   Well, no.

5    Q.   Did there come a time when you left the physical

6    building of Mattel and moved back home?

7    A.   Yes.

8    Q.   And do you recall when that was?

9    A.   That was -- I think it was right before Christmas of

10   1997.

11   Q.   And you were working in Barbie Basics at the time; yes?

12   A.   Right.

13   Q.   Was there a particular reason why you started thinking

14   about leaving Mattel?

15          MR. PRICE:   Object.   Irrelevant.

16          THE COURT:   Sustained.

17   Q.   BY MR. NOLAN:   Did you move back to Missouri before

18   Christmas of 1997?

19   A.   Yes.

20   Q.   And before leaving, did you have a conversation with

21   anybody at Mattel regarding your departure?

22   A.   Yes.

23   Q.   And who did you have that conversation with?

24   A.   I spoke with my supervisor, Cassidy Park.

25   Q.   And what did you tell Cassidy Park?

EXHIBIT __80__ PAGE 1342

2892

1        MR. PRICE:  Object.  That's hearsay, your Honor.

2        THE COURT:  How is that not hearsay, Counsel?

3        MR. NOLAN:  Okay.  I don't know.  I was just

4    trying.  I'm sorry.

5        THE COURT:  Sustained.

6    Q.   BY MR. NOLAN:  You had a conversation when you left;

7    correct?

8    A.   Yes.

9    Q.   Now, did your employment status at Mattel change?

10   A.   Yes.

11   Q.   And how did it change?

12   A.   I went from being a full-time employee to being

13   basically a part-time employee.

14   Q.   And when you moved to be a part-time employee, when you

15   moved to become a part-time employee, did you have a physical

16   move in residence?

17   A.   Yes.

18   Q.   And where did you move to?

19   A.   I moved to Kimberling City, Missouri.

20   Q.   And during that period of time, did you continue to do

21   some work for Mattel?

22       MR. PRICE:  Object as to the period of time.

23   Q.   BY MR. NOLAN:  The period of time that you were back in

24   Missouri in early 1998.

25   A.   Yes.

EXHIBIT 80 PAGE 1343

2893

1    Q.   Okay.  Could you describe for the jury --

2              THE COURT:  Could you please tell, just for the

3    record, you're referring to January to April of 1998?

4              MR. NOLAN:  Yes.  I apologize.  January to April.

5    Q.   In fact, why don't we just time this for a moment.

6    Let's go to Exhibit 15609.  Do you have that in front of you?

7    A.   Probably.

8    Q.   15609.  Do you have that in front of you?

9    A.   Yes.

10             MR. NOLAN:  This is in evidence, your Honor.

11   Q.   And do you recognize this letter?

12   A.   Yes.

13   Q.   Did you sent it?

14   A.   Yes.

15   Q.   And who is it addressed to?

16   A.   It was addressed to Cassidy Park, Cynthia Miller, and

17   Human Resources.

18   Q.   And why did you send this letter to Mattel on April 15th

19   of 1998?

20             MR. PRICE:  Objection.  That's irrelevant, your

21   Honor.

22             THE COURT:  Sustained.  As to his reason.

23   Q.   BY MR. NOLAN:  After sending Exhibit 15609, did you

24   consider yourself to be an employee of Mattel?

25   A.   No.

EXHIBIT __80__ PAGE 1344

2894

1   Q.   Now, in the letter, it said:  "I will still be available

2   for free-lancing projects."

3           Do you see that?

4           Your Honor, we'd offer 15609.

5           MR. PRICE:  No objection.

6           THE COURT:  It's admitted.  You may publish.

7           (Exhibit 15609 received.)

8           MR. NOLAN:  Thank you.

9   Q.   Now, this is the resignation.  It says:  "Dearest

10  Cassidy, Cynthia, and others concerned, please accept this

11  written notice of my resignation effective two weeks after

12  the date above, April 29, 1998.  I have decided to stay in

13  Missouri and pursue other interests.  I just want to say

14  thank you both so much for everything you've done for me

15  while I have been at Mattel.  My time and experience there

16  has been extremely valuable.  I will still be available for

17  free-lancing projects in the future, should you decide you

18  want to work with me on a project."

19          Do you see that?

20  A.   Yes.

21  Q.   So from the time you physically moved from El Segundo

22  and went back to Missouri in early January 1998, was it true

23  you were continuing to do free-lance projects for Mattel?

24          MR. PRICE:  Vague as to time.

25          MR. NOLAN:  During the period of January through

EXHIBIT 80 PAGE 1345

2935

1

2

3

4

5

6

7                          C E R T I F I C A T E

8

9

10          I hereby certify that pursuant to Title 28,

11   Section 753 United States Code, the foregoing is a true and

12   correct transcript of the stenographically reported

13   proceedings in the above matter.

14          Certified on June 17, 2008.

15

16

17   MARK SCHWEITZER, CSR,  RPR,  CRR
     Official Court Reporter
18   License No. 10514

19

20

21

22

23

24

25

EXHIBIT 80 PAGE 1346

# Exhibit 81

3191

1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3                        - - -

4       HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

5                        - - -

6    MATTEL, INC.,                    :   PAGES 3191 - 3319
                                      :
7            PLAINTIFF,               :
                                      :
8       VS.                           :   NO. ED CV04-09049-SGL
                                      :   [CONSOLIDATED WITH
9    MGA ENTERTAINMENT, INC.,         :   CV04-9059 & CV05-2727]
     ET AL.,                          :
10                                    :
             DEFENDANTS.              :
11   _____:

12

13

14

15         REPORTER'S TRANSCRIPT OF PROCEEDINGS

16              RIVERSIDE, CALIFORNIA

17             FRIDAY, JUNE 20, 2008

18             JURY TRIAL - DAY 16

19               MORNING SESSION

20

21

22                              MARK SCHWEITZER, CSR, RPR, CRR
                                OFFICIAL COURT REPORTER
23                              UNITED STATES DISTRICT COURT
                                181-H ROYBAL FEDERAL BUILDING
24                              255 EAST TEMPLE STREET
                                LOS ANGELES, CALIFORNIA 90012
25                              (213) 663-3494

CERTIFIED
COPY

EXHIBIT 81
PAGE 1347

3192

1   Appearances of Counsel:

2

3   On Behalf of Mattel:

4        Quinn, Emmanuel, Urquhart, Oliver & Hedges, LLP
         By John B. Quinn, Esq.
5            B. Dylan Proctor, Esq.
             Michael T. Zeller, Esq.
6            Harry Olivar, Esq.
             John Corey, Esq.
7            Diane Hutnyan, Esq.
             William Price, Esq.
8        855 South Figueroa Street
         10th Floor
9        Los Angeles, CA 90017
         (213) 624-7707
10

11

12  On Behalf of MGA Entertainment:

13       Skadden, Arps, Slate, Meagher & Flom LLP
         By Thomas J. Nolan, Esq.
14           Carl Alan Roth, Esq.
             Jason Russell, Esq.
15           Lauren Aguiar, Esq.
             David Hansen, Esq.
16           Matthew Sloan, Esq.
             Robert Herrington, Esq.
17       300 South Grand Avenue
         Los Angeles, CA 90071-3144
18       (213) 687-5000

19

20

21

22

23

24

25

EXHIBIT 81
PAGE 1348

3193

1                          I N D E X

2

3   CARTER BRYANT, PREVIOUSLY SWORN........................ 3227

4   REDIRECT EXAMINATION (CONTINUED) BY MR. PRICE:......... 3228

5   RECROSS-EXAMINATION BY MR. NOLAN: ..................... 3252

6   FURTHER REDIRECT EXAMINATION BY MR. PRICE:............. 3276

7   LLOYD W. CUNNINGHAM, SWORN............................ 3296

8   DIRECT EXAMINATION BY MR. QUINN: ...................... 3296

9

10                       E X H I B I T S

11    (Exhibit 15364 received.)........................... 3267

12    (Exhibit 13634 and 13635 received.)................... 3311

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT 81
PAGE 1349

3296

1   Lloyd Cunningham.

2           THE CLERK:  Please come forward, and raise your

3   right hand.

4               **LLOYD W. CUNNINGHAM, SWORN.**

5           THE CLERK:  State your full name, and spell the

6   last name for the record.

7           THE WITNESS:  Yes.  My name is Lloyd W.

8   Cunningham, C-U-N-N-I-N-G-H-A-M.

9           THE CLERK:  Thank you.

10              **DIRECT EXAMINATION**

11  BY MR. QUINN:

12  Q.   Good morning, Mr. Cunningham.

13  A.   Good morning, sir.

14  Q.   What is it that you do?

15  A.   I'm a forensic document examiner.

16  Q.   And what is a forensic document examiner?

17  A.   A forensic document examiner is commonly referred to as

18  a handwriting identification expert; however, most in the

19  field of forensic document examination also examine and

20  compare typewritten material.  We examine and compare

21  computer-generated material.  We examine documents for any

22  types of alterations, additions, or erasures, and we examine

23  preliminary inks and paper fiber.

24  Q.   How long have you worked as a forensic document

25  examiner?

EXHIBIT _81_
PAGE _350_

3297

1  A.   Full time for 28 years.

2  Q.   Now, we at Mattel retained you to examine some documents

3  in this case; isn't that correct?

4  A.   This is, sir.

5  Q.   And as part of your work in what we asked you to do, did

6  you examine a black notebook, Exhibit 1155?

7  A.   I did, sir.

8  Q.   Do you have that up there with you, sir?

9  A.   Yes, I have this black spiral ring notebook.

10 Q.   And did we also ask you to examine some loose pages,

11 Exhibits 5-39 to 5-42?

12 A.   Yes, I did examine those as well, sir.

13 Q.   And do you see those up there somewhere?

14 A.   I'll have to look, sir.

15 Q.   I'm told it's 179 to 182.

16      Do you see those?

17 A.   I have Exhibit 5-42 now, and I also have Exhibit 539,

18 the originals.

19 Q.   And could you hold those up so that the jury can see

20 what we're talking about there.

21 A.   Yes, sir.

22 Q.   And did you examine those documents as well?

23 A.   I did examine these as well, sir.

24 Q.   Were you able to reach any conclusions about whether

25 those loose pages came out of that black spiral notebook?

EXHIBIT 81
PAGE 1351

3298

1   A.   Yes, I did reach conclusions.

2   Q.   And what conclusions did you reach?

3   A.   My conclusions are that 5-39 and 5-42 positively were at

4   one point part of the spiral ring notebook.

5   Q.   Can you tell where in the notebook they were located?

6   A.   Yes, in the back section there is a page divider which

7   is peach in color.  Just prior to the page divider, there is

8   an intact spiral ring page with some sort of calculations on

9   it.  And right after this peach divider are two blank pages

10  and the documents, Exhibit 5-39 and 5-42, were resting on top

11  of these documents, blank pages, when they were drawn.

12  Q.   Towards the back of the notebook?

13  A.   Towards the back of the notebook, yes, sir.

14  Q.   Did we also ask you to take a look at a notary book?

15  A.   Yes, you did, sir.

16  Q.   And do you have that in front of you?

17  A.   I do, sir.

18  Q.   And that is Exhibit 60 in evidence?

19  A.   Yes.

20  Q.   Can you hold that up, please?

21  A.   It's a notary journal, and it's Exhibit 60.

22  Q.   And did you examine that as well?

23  A.   I did, sir.

24  Q.   And were you -- was your attention directed to a

25  particular entry in that notary book?

EXHIBIT 81
PAGE 1352

3299

1   A.    It was, sir.

2               MR. QUINN:  And this is in evidence, your Honor.

3   If we could project onto the screen page Exhibit 60-19.

4               THE COURT:  You may.

5   Q.    BY MR. QUINN:  Is this the entry at the top there on

6   this page that you were asked to examine?

7   A.    Yes.  As I'm pointing with the laser pointer, sir, it's

8   the section that is at the top of the entry for Carter

9   Bryant, and it's actually in a block entitled document kind

10  or type.

11  Q.    And did you reach any conclusions regarding that entry

12  in the notary book?

13              MR. SLOAN:  Your Honor, I'm going to lodge a

14  preliminary interjection here.  I'm assuming --

15              THE COURT:  What's your objection, Counsel?

16              MR. SLOAN:  Foundation.

17              THE COURT:  Sustained.

18  Q.    BY MR. QUINN:  The point is did you reach any

19  conclusions, yes or no?  Don't tell me what the conclusions

20  were?

21  A.    Yes, I did.

22  Q.    We're going to get into your conclusions, but first

23  let's back up, if we can.  And I'd like to talk to you about

24  your experience and your background as a forensic document

25  examiner.

EXHIBIT 81
PAGE 1353

3300

1   How did you come to be a forensic document

2   examiner?

3   **A.**   I was the inspector of police with the San Francisco

4   Police Department Fraud Unit.  And at that time I was invited

5   to attend a questioned document school sponsored by the

6   Secret Service in Washington, D.C.  After completion of the

7   Secret Service course for document examination, I was then

8   accepted into a full-time two-and-a-half-year internship

9   program with the United States Postal Crime Laboratory.

10   Upon completion of my training and education with

11   the United States Postal Crime Laboratory, I was accepted

12   into the FBI's questioned document school in Quantico,

13   Virginia.

14   During my training as an intern, I also attended

15   numerous continuing education seminars sponsored by my

16   associations, and part of my assignments were to do research

17   papers and present those papers at the scientific meetings

18   and workshops.

19   Currently and for a number of years, I still attend

20   at least two continuing educational workshops a year

21   sponsored by forensic societies.

22   **Q.**   Were you involved in establishing a questioned document

23   section within the San Francisco Police Department?

24   MR. SLOAN:  Objection.  Leading, your Honor.

25   THE COURT:  Overruled.

EXHIBIT _81_
PAGE _1354_

3301

1          THE WITNESS:   Yes.   While a member of the

2   San Francisco Police Department, I established the first

3   forensic document section within the San Francisco Police

4   Department Crime Laboratory.

5   Q.   BY MR. QUINN:   And while you've been with the

6   San Francisco Police Department, have you examined documents

7   at the request of other law enforcement agencies?

8   A.   Yes.   While with San Francisco police and currently, I

9   examine numerous cases for law enforcement agencies.

10   Q.   Can you give us some examples of other law enforcement

11   agencies that have asked you to examine documents for them?

12   A.   Yes.   I'm examined documents for the FBI, the United

13   States Secret Service, the IRS, the U.S. Customs, the Drug

14   Enforcement Agency, for the Northern California U.S.

15   Attorney's Office.   Currently I examine most of the cases for

16   the Alameda County District Attorney's Office, and I examine

17   cases for local police departments in the San Francisco Bay

18   area.

19          In fact, I just examined a case for the Palm

20   Springs Police Department.

21   Q.   And do you routinely examine documents in connection

22   with civil cases such as this one?

23   A.   I do, sir.

24   Q.   And in that connection, are you retained just by

25   plaintiffs or by defendants, or do you work both sides?

EXHIBIT 61
PAGE 1355

3302

1    **A.**    Oh, I work for both plaintiffs and defendants.   It

2    doesn't matter who I work for.   They will all get the same

3    answer.

4    **Q.**    Can you tell us in approximately how many cases or how

5    many instances you've given reports regarding questioned

6    documents?

7    **A.**    Well, at this point in my career, it's in excess of

8    6,000 reports I've prepared on the subject of forensic

9    document examination.

10   **Q.**    And on how many occasions have you actually testified as

11   a forensic document examination expert?

12   **A.**    In excess of 500 times.

13   **Q.**    Are you a member of any recognized professional

14   questioned document examiner associations?

15   **A.**    I am, sir.

16   **Q.**    And can you give us some examples of those?

17   **A.**    I am a member of the Southwestern Association of

18   Forensic Document Examiners.   In fact, I am the past

19   president of that particular forensic association.

20              I'm a life member of the questioned document

21   section for the International Association for Identification.

22              I'm an honorary member with the American Society of

23   Questioned Document Examiners.

24   **Q.**    Is there such a thing as national standards that exist

25   for forensic document examiners?

EXHIBIT _81_
PAGE _1356_

1   A.   Yes.   There are national standards and guidelines.

2   Q.   And have you been involved at all in establishing what

3   those standards and guidelines should be?

4   A.   I was, yes, sir.

5   Q.   Can you describe for the jury what your experience has

6   been in establishing national standards for examination of

7   questioned documents?

8   A.   Yes.   Approximately 10 years ago, the federal government

9   through the FBI decided they wanted to standardize the

10  protocols and guidelines for all forensic sciences throughout

11  the United States.

12       I was invited by the federal government through the

13  FBI as a civilian forensic document examiner to serve on a

14  committee to establish the guidelines and protocols for

15  handwriting identification.   There are in fact only two of us

16  from the civilian sector who were invited to serve on this

17  federal committee.

18       Since then, the guidelines and standards set in

19  handwriting identification have been registered with the

20  American Society of Testing Materials in Washington, D.C.,

21  and they are widely used through many civilian and government

22  crime laboratories in the United States.

23  Q.   The work that you did in this case in examining the

24  documents that you examined at our request, did you comply

25  with and follow those standards and guidelines?

EXHIBIT 81
PAGE 1357

3304

1  A.    I certainly did, sir.

2  Q.    Have you ever been involved in teaching forensic

3  document examination?

4  A.    I have, sir.

5  Q.    And what has your experience been in that regard?

6  A.    For approximately 14 years I taught at San Jose State

7  University through their Administration of Justice

8  Department, and for the same number of years, I taught for

9  the California Department of Justice.  I taught police

10  officers in their continuing education on how to investigate

11  and handle cases involving documents.  I've taught to many

12  police academies in the San Francisco Bay area.  I've taught

13  to and taught District Attorney's offices, Public Defender's

14  offices, trial lawyers associations, and I've also taught for

15  the American Bar Association.

16          Currently, I do teach the subject of handwriting

17  identification in advanced matters at workshops and seminars

18  for my colleagues.

19  Q.    Thank you, Mr. Cunningham.

20          Let's talk first about the black notebook,

21  Exhibit 1155, which you have before you there.

22          Did you examine this notebook to determine whether

23  any pages were missing?

24  A.    I certainly did, sir.

25  Q.    And what conclusion did you reach in that regard?

EXHIBIT 81
PAGE 1358

3305

1   **A.**   I concluded that quite a number of the pages had been

2   removed from the black spiral notebook, approximately half of

3   them had been removed.

4   **Q.**   And how did you determine that?

5   **A.**   Well, on the face of the notebook, there is a 120-count

6   number, and based on the 120-count number, I counted the

7   remaining pages, and I determined that approximately half the

8   pages were removed.

9             Also at the time I examined the notebook, there

10  were some fragments of paper still embedded in the spiral

11  ring as you tear a piece out, sometimes a little piece may

12  stick to the spiral ring.  And I found some of those pieces

13  as well.  But all in all, it's the number of pages and the

14  thickness of the notebook, I was able to determine many pages

15  had been removed.

16  **Q.**   Now, you showed us those two loose pages, 5-39 and 5-42.

17  Do you have those with you there still?

18  **A.**   Yes, I do, sir.

19  **Q.**   Let me talk to you about what you found regarding these

20  pages.  Based on the work that you did, were you able to

21  determine whether those pages were ever in the notebook?

22  **A.**   Yes.  I positively concluded that both of these pages

23  were part of the notebook.

24            MR. SLOAN:  Objection, your Honor.  Lack of

25  foundation.

EXHIBIT *81*
PAGE *1359*

3306

1           THE COURT:  Sustained.  Counsel -- well, at this

2   point in time, are you ready to seek designation?

3           MR. QUINN:  Yes, your Honor.

4           THE COURT:  Very well.  Do you wish to voir dire?

5           MR. SLOAN:  No, your Honor.

6           MR. QUINN:  We request that he be designated by the

7   Court as an expert.

8           THE COURT:  In?

9           MR. QUINN:  Questioned document examination.

10          THE COURT:  Any objection?

11          MR. NOLAN:  No objection, your Honor.

12          THE COURT:  Very well.  The witness is so

13  designated.  You may now proceed.

14          MR. QUINN:  Thank you, your Honor.

15  Q.   Mr. Cunningham, did you find in that notebook a page

16  where there appears to be what looks like some financial

17  information, maybe some bank entries, deposits, and that sort

18  of thing?

19  A.   Yes.  I did.

20          MR. SLOAN:  Your Honor, objection.  Relevance.

21          THE COURT:  Overruled.

22          THE WITNESS:  I'm turning to the page now, and it

23  has some type of calculation that I'm not familiar with;

24  however, the next page is a page divider.

25  Q.   BY MR. QUINN:  All right.  If we could put up on the

EXHIBIT 21
PAGE 1346

3307

1   screen.  And this is in evidence.  Page 57 of Exhibit 1155.

2   Is that the page that you're referring to, sir?

3   A.    Yes.  This is the page that I'm referring to, and I

4   considered these to be some form of calculations.

5   Q.   Now, you started to tell us that behind this page you

6   found what?

7   A.    Behind that page is a page or sheet divider, and it's

8   kind of light brown in color.  And that was the next page

9   behind that calculation.

10  Q.    And how many of those dividers are in this black

11  notebook?

12  A.    I'm not sure, sir.  I think there are two.

13  Q.    And is that the second one, the last one?

14  A.    This one I'm referring to is the second of the two page

15  dividers near the back portion of the notebook.

16  Q.    All right.  So the next page after the divider is page

17  61; correct?

18  A.    That's correct, sir.

19  Q.    And did you examine that page?

20  A.    Yes.  I examined page 61, which comes right after the

21  divider.

22  Q.    And why did you examine that page?

23  A.    I had conducted a preliminary examination of all the

24  pages in the spiral notebook with what's called side light or

25  light grazing over the surface of the pages.  That enables me

EXHIBIT 81

PAGE 1361

1   to see if there are any almost invisible indentations in the

2   paper fiber.  And once I reach page 61, I was able to see

3   that there were some indentations in that paper fiber, and

4   that prompted me to use a scientific instrument to develop

5   these indentations in the paper fiber of 61.

6   Q.   What did you find when you examined that page, page 61

7   after the divider?

8   A.   When I examined page 61 with the scientific instrument,

9   which is called the indentation materializer, I developed

10  sketches or drawings of several types of media, and one of

11  these sketches that I developed was the sketch from

12  Exhibit 5-42, which is an image of a doll with long curly

13  hair.

14  Q.   And can you tell us what page it was that you found an

15  indentation of 5-42?  What page in the exhibit?

16  A.   Page 61 in the spiral ring notebook, I found this image,

17  5-42, indented into that page.

18  Q.   All right.  And what does that tell you as a forensic

19  document examiner?

20  A.   That page 42 was positively in the notebook when the

21  image was drawn, and page 42 was resting on top of page 61

22  when it was drawn in order for these indentations to go

23  through to the next page.

24  Q.   How about the other loose drawing that you showed us,

25  Exhibit 5-39?  Did you find any evidence of these

EXHIBIT 81
PAGE 1362

3309

1  indentations indicating that that had also been in the
2  notebook?
3  A.    Yes, I did.   I found portions of Exhibit 539 indented
4  into the paper fiber, especially around the eyes and eyebrows
5  that I'm pointing to into the paper fiber of Exhibit page 63.
6  Q.    You made reference to indentation and some of the
7  equipment that you use to identify this.   I'd like to back up
8  a little bit and talk about some of these concepts.
9          What is indented writing?
10  A.    Indented writing, the best way that I can describe what
11  indented writing is is if I wrote on the top sheet of this
12  yellow tablet, what I wrote on the top sheet with normal pen
13  pressure and a ball-point pen, I should be able to develop on
14  the second page.   I should be able to develop it on the third
15  page, and probably even onto the fourth page by using the
16  scientific instrument called the indentation materializer.
17          I would also be able to, once I've developed the
18  indentation, to preserve it and use it as an exhibit at a
19  later time.
20  Q.    You called that an indentation materializer?
21  A.    Yes, sir.
22  Q.    And what does that do?   How does that work?
23  A.    It's an electrostatic process.   It's very similar to the
24  electrostatic process used in photocopy machines.   And it's
25  nondestructive to the document.   It doesn't harm the document

EXHIBIT 81
PAGE 1363

3310

1    in any way.  And it's placed on the instrument.  An imaging

2    film is pooled over the document.  The document and the

3    imaging film are then electrostatically charged, and when we

4    apply toner, similar to dry toner used in the laser jet

5    printer or photocopy machine, then we can develop what we

6    call visualize the indented writing.  It's just a wonderful

7    instrument.

8    Q.   What do you mean by develop in this context?

9    A.   Develop means that if you looked at the page with your

10   naked eye, you probably wouldn't see the indented writing,

11   but the instrument is capable of making it so you can see

12   this indented writing by developing it.

13   Q.   All right.  Do you have there in front of you Exhibits

14   13634 and 13635?

15   A.   I do, sir.

16   Q.   And can you identify those for us, please?

17   A.   Yes.

18   Q.   What are they?

19   A.   Exhibits 13635 and 13634 are my actual developments of

20   the indented writing.  This is the form they are in once I

21   develop the indented writing in the paper fiber from a

22   document, and I'm able to preserve these indentations.  So

23   13634 and 13635 are the results of what I developed in the

24   paper fiber in the notebook of pages 61 and 63.

25            MR. QUINN:  Your Honor, offer those in evidence.

EXHIBIT 81
PAGE 1364

3311

1          MR. SLOAN:  No objection.

2          THE COURT:  They are admitted.  You may publish.

3          **(Exhibit 13634 and 13635 received.)**

4          MR. QUINN:  If we could put these up on the screen.

5    Q.   This is 13634 that we're looking at?

6    A.   I have to get a little closer to the screen.

7          MR. QUINN:  With the Court's permission?

8          THE COURT:  Yes.

9          THE WITNESS:  Thank you.

10         This is 13634, and this is my indented development.

11   Q.   BY MR. QUINN:  And the other page, 13635.  If we could

12   put that up on the screen, please.  Can't see much there.

13   A.   Right.  But right in the area I'm circling, these are

14   some indented writing images from 13635, which would be

15   eyebrows and the outline of eyes.

16   Q.   All right.  So what you're holding are the actual films

17   you use that lift these images off the page?

18   A.   Yes, they are.

19   Q.   And how do you do that?

20   A.   I do that with use of the indentation materializer, and

21   I lift them with imaging film and a sealant and dry toner.

22   Q.   Have you prepared some demonstrative exhibits to help us

23   understand what you found here?

24   A.   I have prepared those, sir.

25   Q.   All right.  What is -- the first one I think is

EXHIBIT 81
PAGE 1365

3312

1   demonstrative C-2.  If we could put that up on the screen.

2   Can you tell us what we're looking at here?

3   A.   Yes, this is an enhanced scan of my indented writing

4   development.  It's somewhat hard to see until it's been

5   enlarged like it is now.  For example, you can see the lips

6   of a doll, the chin of a doll.  You can see some curly Q's of

7   the hair coming down from the doll.  You can also see the

8   cuff on the right hand of the doll and the hand.  You can see

9   the cuff and the left hand of the doll, and you can see the

10  legs.

11          These are the images I developed in the paper fiber

12  of page 61, which came from Exhibit 5-42.

13  Q.   And you say this one is enhanced.

14  A.   Yes.

15  Q.   How do you enhance it?  In what ways is it enhanced?

16  A.   This was enhanced through a scanning process.  And the

17  purpose it was enhanced is so the jurors and the trier of

18  fact would be able to see what I'm talking about.

19  Q.   Did you prepare another demonstrative to help with us

20  this?

21  A.   I did, sir.

22  Q.   If we could look at C-3.  Is this a demonstrative

23  exhibit that you prepared, Mr. Cunningham?

24  A.   It is, sir.  And this particular demonstrative is the

25  same image that I just previously showed; however, to make it

EXHIBIT 81
PAGE 1366

1   even more easier to see the outline, I highlighted it with

2   the yellow highlighter.  And when I'm speaking about

3   highlighted it, I highlighted what we call the ball-point pen

4   impressions that indented into the next page, which was page

5   61.

6   Q.    And the next demonstrative, C-4.  What are we looking at

7   here?

8   A.    Right here, this is what I considered to be an overlay.

9   This is the actual image of the doll of Exhibit 5-42, and the

10  highlighted areas are the ball-point pen ink areas --

11  Q.    The dark black?

12  A.    Pardon me?

13  Q.    The dark black is the ball-point?

14  A.    No.  This particular document was prepared on spiral

15  ring notebook paper with lines.  The softer, finer lines are

16  ball-point pen ink lines.  The heavier lines, which I am

17  showing with the laser pointer, those are a fiber-tip or

18  felt-tip pen line with a water-based ink.  Ball-point ink is

19  more of a viscous thick ink.  Whereas in a fiber-tip pen, you

20  have more of a flowing water-based ink.  So the thicker lines

21  are prepared with a fiber-tip water-based ink.  The thinner

22  softer lines were prepared with a ball-point ink.

23  Q.    Which would you expect to leave a firmer indentation on

24  the page below?  The ball-point or the felt-tip?

25  A.    Oh, no doubt, a ball-point pen, when you're writing on

EXHIBIT 21
PAGE 1367

3314

1   paper with normal pen pressure, will leave much better

2   indentations than a soft or spongy felt-tip pen with water

3   ink because the ball-point ink generally has a sharper point,

4   which embeds or makes a trough in the paper fiber, and in

5   turn, that trough causes much clearer indentations on the

6   following sheet or sheets of paper.

7   Q.   Now, you indicated that this demonstrative C-4 is an

8   overlay.   It's an overlay of what over what?

9   A.   The indentations that I developed are overlaid over the

10  original drawing to show how they perfectly match.

11  Q.   So the indentations come from the page that you believe

12  had to have been underneath?

13  A.   Yes, the indentations came from page 61, which in my

14  opinion, that page was underneath Exhibit 5-42 when this

15  image was drawn.

16          MR. SLOAN:   Your Honor, I'm going to object to

17  Mr. Cunningham --

18          THE COURT:   At this point you're right.   There's no

19  need to be standing there.   Please return to the witness

20  stand.

21          Thank you, Counsel.

22  Q.   BY MR. QUINN:   Did you prepare some additional

23  demonstratives to help us understand this better?

24  A.   Yes, sir, I did.

25  Q.   So the next one I think would be C-5.

EXHIBIT 61
PAGE 368

3315

1  A.    Yes, that's correct.

2  Q.    What does this represent?

3  A.    This is an enlargement of the image of the doll on

4  Exhibit 5-42, and it's an enlargement of the doll's right

5  hand and some of the curly Q's from the hair coming down the

6  right side of the doll.  It also shows some areas of the pant

7  leg and upper torso.

8  Q.    Now, this image that we're looking at here, does that

9  have any of the indented image that you lifted reflected on

10  it?

11  A.    Not on this particular image here.  I think it will be

12  in the next.

13  Q.    Okay.  So next one would be C-6?

14        MR. SLOAN:  Your Honor, I'm going to raise one

15  objection here.  I think the Court should explain to the jury

16  that these are demonstratives.  They are not coming into

17  evidence.

18        MR. QUINN:  They are demonstratives, your Honor.

19  What I've identified as demonstratives we won't be offering

20  into evidence.

21        THE COURT:  Very good.  Since this is the first

22  time we're doing this, why don't we refer to them as

23  demonstrative exhibits.  Generally, ladies and gentlemen,

24  everything that you have seen that the Court has not stricken

25  is going to go back into evidence with you at the end of this

EXHIBIT 21
PAGE 1349

3316

1   trial. These demonstrative exhibits that are being used by

2   the expert to explain his testimony are simply that. They

3   are demonstrative exhibits that are assisting in the aid of

4   his testimony but will not be back with you at the end of

5   trial. Why not, for the jury's understanding, refer to them

6   as demonstrative exhibits.

7          MR. QUINN: I thought I had. But I will continue

8   to.

9          THE COURT: Very well. Thank you, Counsel.

10  Q.  BY MR. QUINN: So C-6 here, the demonstrative, what are

11  we looking at here? Can you see it from here?

12  A.  Yes, I can. Yes, this is an enlargement of the section

13  of my indented writing development. And this is the right

14  hand, the right cuff, some of the curly Q of hair coming down

15  the right side of the image, part of the torso, and a portion

16  of the legs.

17  Q.  And then C-7.

18  A.  Now, to make it easier for you to see, I have

19  highlighted my indented writing image, and that is the

20  portion that's been enlarged. Once again, the curly Q of the

21  hair on the right side. The cuff and the hand, portions of

22  the leg and torso.

23  Q.  And then demonstrative C-8.

24  A.  Yes, this is another overlay of the original image that

25  was drawn on Exhibit 5-42, and it shows exactly the same

EXHIBIT 81
PAGE 1370

3317

1  curly Q of the ball-point pen ink impression, and note that

2  the fiber-tip thicker line of the cuff is formed quite

3  differently than the ball-point ink portion of the cuff.  And

4  if you can go back to the previous image, please.

5  Q.   Demonstrative C-7?

6  A.   Yes.   This is what I developed in the indented writing

7  of that.   The exact same curly Q of the hair, and the cuff,

8  not the cuff that was written with the black water-based

9  fiber-tip ink, but the cuff that was drawn with the

10  ball-point ink.   Everything is in full agreement between my

11  indented writing development and that portion and other

12  portions on Exhibit 5-42.

13  Q.   You just used a phrase "full agreement."  Does that have

14  a meaning for a questioned document examiner?

15  A.   Yes.   Full agreement means that I could find no

16  differences between my indented writing development and those

17  portions found on Exhibit 542 which, in my opinion, just the

18  evidence from the curly Q of hair, the way the cuff was

19  written, the way the hand was -- excuse me, the way the cuff

20  was drawn and the way the hand was drawn is sufficient

21  enough, although I did have other information, but that is

22  sufficient enough to conclude that they are one and the same.

23  Q.   And as a questioned document examiner, what did that

24  cause you to conclude?  That correlation between the

25  indentation for the ball-point pen, that the ball-point pen

EXHIBIT 81
PAGE 1371

3318

1   left, and the image on the exhibit?

2   A.   That causes me to conclude that Exhibit 535, that drawn

3   image of the doll was in fact in the spiral ring notebook

4   resting on top of the blank page 61 when at least the

5   ball-point pen image was drawn.

6   Q.   Let's take a look at the other image, other drawing,

7   loose drawing, Exhibit 5-39.  Did you find in the notebook

8   any indentations which related to this design as well?

9   A.   Yes.  And specifically, in the upper part, the eyes and

10  the eyebrows, I found indented writing from this particular

11  image, which is 5-39 in the paper fiber of page 63 that is

12  still contained in the spiral ring notebook.

13            MR. QUINN:  Your Honor, is this a good time?

14            THE COURT:  Yes.  Let's take our lunch break at

15  this time.

16            **(WHEREUPON THE JURY WITHDRAWS.)**

17            THE COURT:  Very good, Counsel.  I'll see you after

18  lunch.  1:30.

19

20            (Lunch recess taken at 12:00 P.M.)

21

22

23

24

25

EXHIBIT 81
PAGE 1372

3319

**C E R T I F I C A T E**

I hereby certify that pursuant to Title 28, Section 753 United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings in the above matter.

Certified on June 20, 2008.

MARK SCHWEITZER, CSR, RPR, CRR
Official Court Reporter
License No. 10514

EXHIBIT 81
PAGE 1373

# Exhibit 82

# REDACTED

# SUBJECT TO

# PROTECTIVE ORDER

# Exhibit 83

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA 92501
CIVIL MINUTES -- GENERAL

Case No.    CV 04-09049 SGL(RNBx)                    Date: January 7, 2009

Title:    MATTEL, INC. V. MGA ENTERTAINMENT, INC., et al.
=================================================================================
PRESENT:  HONORABLE STEPHEN G. LARSON, U.S. DISTRICT JUDGE

        Jim Holmes                          None Present
        Courtroom Deputy                    Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFFS:     ATTORNEYS PRESENT FOR DEFENDANTS:

None Present                          None Present

PROCEEDINGS:    ORDER MODIFYING STAY OF PERMANENT INJUNCTION

ORDER APPOINTING FORENSIC AUDITOR

      After an initial hearing on December 30, 2008, and a sealed hearing on January 5, 2009, and after consideration of the parties' papers relating to the MGA parties' motion for stay pending appeal (which specific relief the Court denied for the reasons stated on the record), and after consideration of the parties' papers relating to Mattel's ex parte application to appoint a receiver, the Court issues the following Order modifying the stay set forth in the Court's December 3, 2008, Order, and appointing a forensic auditor.

MODIFYING STAY OF PERMANENT INJUNCTION

      Notwithstanding any previous Order of the Court, the December 3, 2008, Order Granting Mattel, Inc.'s Motion for Permanent Injunction (docket #4439), shall remain **STAYED**, ineffective and non-final, until further order of the Court. Specifically, retailers and distributors will be permitted to purchase the Spring and Fall 2009 lines of Bratz and Bratz-related products from MGA and MGA licensees, up to and including December 31, 2009.

      In the event that the Court awards control over the rights to the Bratz products referenced in the Court's December 3, 2008, Order and the January 7, 2009 Stipulation and Order (regarding

MINUTES FORM 90                                    Initials of Deputy Clerk __jh_____
CIVIL -- GEN                      1

EXHIBIT _83_ PAGE _1393_

i

the Spring and Fall 2009 lines) to a Court-appointed receiver or to Mattel, Inc., that award will be subject to a requirement that retailers and distributors be permitted to purchase the Spring and Fall 2009 lines up to and including December 31, 2009.

## APPOINTMENT OF FORENSIC AUDITOR

As discussed on the record, the Court **HOLDS IN ABEYANCE** Mattel's ex parte application for appointment of a receiver pending a forensic audit of MGA Entertainment, Inc., Isaac Larian, and MGA Entertainment Hong Kong.

For good cause shown, the Court hereby **APPOINTS** Ronald L. Durkin to serve as the Court's forensic auditor (hereinafter referred to as "the Auditor"). Mr. Durkin's qualifications appear in an attachment to this Order. The Court has provided the Auditor with the parties' attorneys' contact information. The Auditor shall direct his initial communications to counsel.

Defendants MGA Entertainment, Inc., Isaac Larian, and MGA Entertainment Hong Kong, shall provide the Auditor with access to any and all MGA records, regardless of the medium or media of the maintenance of those records, **including but not limited to the "Document/Information Request List" attached to this Order,** that the Auditor deems necessary to enable him to provide the Court with a report, in camera, regarding MGA's finances sufficient to enable the Court to determine whether or not appointment of a receiver is warranted. The audit shall extend to any and all related entities as the Auditor deems necessary. Defendants shall also make available for interview individuals identified to them by the Auditor. Defendants shall make its computer systems, physical premises, and offices, available to the Auditor upon his reasonable request during normal business hours. Defendants shall permit the Auditor's reasonable use of its office machines, such as copiers and fax machines, as may be necessary to complete the audit.

The Auditor shall have the authority to seek the services of fellow professionals (as well as para-professionals and support staff) necessary to accomplish the Court-appointed audit. The provisions of this Order extend to the Auditor's delegatees as he so directs. The Auditor and his delegatees shall be compensated at their reasonable customary hourly rates.

The expense of the forensic audit shall be borne, in the first instance, by Mattel. After the Court considers the Auditor's report[s], the Court will consider whether the audit expenses should be shared with, or shifted completely to, defendants, based on the equities. The Auditor and his team shall submit periodic billing statements to Mattel to an address specified by Mattel's counsel.

All parties (and individuals and entities under their control) shall cooperate with the Auditor so that he may report to the Court in an expeditious manner.

**IT IS SO ORDERED.**

MINUTES FORM 90
CIVIL -- GEN

2

Initials of Deputy Clerk __jh_____

EXHIBIT  83  PAGE 1394

i

### FORENSIC AUDITOR
### DOCUMENT/INFORMATION REQUEST LIST
### January 7, 2009

1.   Audited financial statements for the last three years.  If audited financial statements are not available, then the most current draft of financial statements for the last three years.

2.   Quarterly financial statements for the last three years.

3.   Detailed electronic monthly general ledgers and trial balances for the last three years. If electronic files are not available, then please produce in hard copies.

4.   Detailed electronic revenue or sales subsidiary ledgers for the last three years.  If electronic files are not available, then please produce the request in hard copies.

5.   Detailed electronic receipts or cash subsidiary ledgers for the last three years. If electronic files are not available, then please produce in hard copies.

6.   Detailed electronic accounts payables and disbursements subsidiary ledgers for the last three years.  Details should include, but should not be limited to, vendor/payee ID, vendor/payee name, check/payment number, payment date (Standard Mask, i.e. MM/DD/YY, MM/DD/YYYY; not Jan 1, 2005), payment amount, currency indicator (if other than US dollars), foreign exchange rate (if other than US dollars), invoice number, invoice date (Standard Mask, i.e. MM/DD/YY, MM/DD/YYYY; not Jan 1, 2005), invoice amount, comment or description, and any other information contained in the file.  If electronic files are not available, then please produce in hard copies.

7.   Detailed electronic vendor master files of all active and inactive vendors for the last three years.  Details should include, but should not be limited to, vendor ID, vendor name, status (active/inactive), vendor address (including City, State, Zip, Country), date created, created by user ID. If electronic files are not available, then please produce in hard copies.

8.   Detailed electronic payroll files for the last three years.  Details should include, but not be limited to, employee ID, employee name, payment date, payment number, deductions (e.g. tax, contributions, etc.), gross payment amount, net payment amount, and any other information contained in the file.  If electronic files are not available, then please produce in hard copies.

9.   Any and all records that substantiate transfers of assets to other entities, individuals, and/or parties, within the US and outside of the US.

10.  Copies of all bank statements, canceled checks, wire instructions, and all other information and notices sent with bank statements for the last three years.

MINUTES FORM 90                                3                 Initials of Deputy Clerk __jh_____
CIVIL -- GEN

EXHIBIT __8__ PAGE __395__

Case 2:04-cv-09049-DOC-RNB   Document 7071-14   Filed 10/29/09   Page 111 of 153   Page
ID #:247250
Case 2:04-cv-09049-SGL-RNB   Document 4657   Filed 01/07/2009   Page 4 of 10

11.    Federal and state tax returns for the last three years.

12.    A summary of all contributions, loans and any sources of funding during the last twelve months. Copies of agreements and/or contracts supporting these transactions.

13.    A summary of all related party transactions detailing any compensation, loans, advances, payments, fees or any other form of consideration paid to Isaac Larian, family members, or affiliates, or any other related party.

14.    Detail of all loan facilities with an indication of creditor and relevant terms.

15.    Copies of any notices from federal or state tax authorities regarding audits or audit adjustments during the last 3 years.

16.    All detailed corporate credit card statements for the last three years. If electronic files are not available, then please produce in hard copies.

17.    Information and documents regarding expense reimbursement of owners, officers, employees, family members, or affiliates.

18.    Detailed human resources files (electronic) of all employee information (for all current and terminated employees to date) including but not limited to employee name, employee number, address, phone number, start date, termination date, status, position, social security number, and any other information contained in the files. If electronic files are not available, then please produce in hard copies.

19.    Electronic files of all emails including attachments to the emails from the network server and from backup tapes (please identify dates of backup tapes in order for selection of time period).

20.    Forensic images of personal computer hard drives and PDAs of selected individuals.

EXHIBIT __83__ PAGE _1396_





**Ronald L. Durkin**
CPA/CFF, CFE, CIRA

### Senior Managing Director

619 481 5201

rdurkin@durkinforensic.com

701 B Street Suite 1310
San Diego, CA 92101

Ronald L. Durkin is a CPA with over 30 years combined experience in public accounting and as a Special Agent with the FBI. He has testified in accounting, financial, and bankruptcy matters in U.S. District Court, U.S. Bankruptcy Court, U.S. Tax Court and in various State courts. During his tenure with the FBI, Ron was responsible for investigations involving white collar crime, political and public corruption, money laundering, organized crime, labor racketeering, racketeer-influenced and corrupt organization statute (RICO) violations, and narcotics matters. Since leaving the FBI, he has assisted clients in matters involving fraud prevention, detection, and internal investigations. He has worked on cases involving Foreign Corrupt Practices Act, employee embezzlement, management fraud, financial statement fraud, conflict-of-interest, check kiting, bankruptcy fraud, money laundering, and Ponzi schemes.

In 2008 Ron retired from KPMG. While at KPMG, Ron was the National Partner in Charge of the Fraud and Misconduct Investigations practice and served as the Western Region's forensic practice leader as well as the office coordinating partner for the Los Angeles office's forensic practice.

EXHIBIT __83__ PAGE _1397_



## Service Lines

Fraud & Misconduct Investigations
Fraud Risk Management
Forensic in the Audit/Shadow Procedures

## Education and Certifications

Bachelor of Science, Accounting,
California State University, Sacramento

Masters of Business Administration
(Emphasis in Accounting), California
State University, Sacramento

Certified Public Accountant,
licensed in California, Arizona,
Nevada, and Washington

Certified in Financial Forensics

Certified Fraud Examiner

Certified Insolvency and
Restructuring Advisor

He is a frequent speaker at the FBI Academy and at the AICPA National Fraud Conference, California and other State CPA Societies, and he has made presentations to the IRS Criminal Investigative Division and the U.S. Postal Inspectors CPA seminars. He is a member of the AICPA National Accreditation Commission and a former member of the Business Valuation and Forensic Litigation Services Executive Committee. He is the former chair of the AICPA Anti-Fraud Programs and Controls Task Force and past chair of the AICPA Litigation and Dispute Resolution Services Subcommittee. Ron is also the Chair of the California Society of CPA's Litigation Services Steering Committee and the past Chair of the California Society of CPAs Fraud Section.

Ron was a 2003 AICPA Volunteer of the Year. Ron was also honored with the Distinguished Achievement Award by the AICPA in 2006 for his long time commitment to the AICPA. In 2007, Ron was awarded the first-ever FLS Lifetime Achievement Award by the AICPA.

EXHIBIT _83_ PAGE _1398_

i



**Durkin FORENSIC INCORPORATED**

## Professional Associations

American Institute of Certified Public Accountants (Immediate Past Chair of Litigation & Dispute Resolution Services Subcommittee) – member since 1995

California Society of Certified Public Accountants (member of Steering Committee for statewide Litigation Services Sections and Chair of Fraud Section)

Association of Certified Fraud Examiners (Member of Faculty since 1995)

Association of Insolvency and Restructuring Advisors

Society of Former Special Agents of the FBI

Institute of Internal Auditors

## Investigative and Integrity Advisory Experience

On an International level, he has worked on a number of matters involving alleged Foreign Corrupt Practices Act (FCPA) violations. Working on behalf of U.S. based companies, Ron investigated allegations that members of management of foreign subsidiaries were involved in either bribing foreign officials, diverting corporate opportunities and funds, or conspiring with others to defraud U.S. based victims.

Conducted an investigation of certain allegations of political and public corruption surrounding an international sporting event that was to be held in the US. The allegations involved FCPA, bribery, and public corruption.

Conducted an investigation of an alleged kickback scheme on the part of a purchasing manager of a global technology company.

Conducted an internal investigation with a multi-national corporation regarding corruption involving a former manager in the accounts receivable department. The case was referred to the United States Attorney's Office and the FBI for prosecution.

EXHIBIT 83 PAGE 1399

Case 2:04-cv-09049-DOC-RNB   Document 7071-14   Filed 10/29/09   Page 115 of 153   Page
ID #:247254
Case 2:04-cv-09049-SGL-RNB       Document 4657       Filed 01/0·,/2009       Page 8 of 10



Conducted an internal investigation, on behalf of a publicly
traded company, regarding alleged diversion of funds with the
accounts payable department. The case was referred to the
United States Attorney's Office and the FBI for prosecution.

Investigated allegations of fraud in the real estate industry, in-
cluding new construction projects, as well as management and
operation of office buildings, apartment buildings and shop-
ping centers.

Investigated allegations of corruption by certain members of a
County Board of Supervisors who were indicted by a Federal
Grand Jury.

Served as an undercover agent in a case involving 35 State
Court judges who were indicted and convicted of public corruption.

Conducted a number of investigations of cases involving Pyra-
mid and Ponzi schemes. He also has testified in U.S. District Court,
State Court, and Bankruptcy Court in several of these cases.

During career with the FBI and as a bankruptcy trustee, inves-
tigated allegations of fraud, corruption and organized crime
within the solid waste industry.

EXHIBIT __83__ PAGE _1400_

Case 2:04-cv-09049-DOC-RNB   Document 7071-14   Filed 10/29/09   Page 116 of 153   Page
ID #:247255
Case 2:04-cv-09049-SGL-RNB   Document 4657    Filed 01/07/2009   Page 9 of 10



As the Chapter 11 Trustee of two failed insurance agencies,
he conducted investigations into allegations of fraud and mis-
management on the part of senior management.

As a Chapter 7 Trustee, Chapter 11 Trustee, and Examiner in
bankruptcy matters, has conducted hundreds of investigations
where allegations of fraud have been alleged.

Served as a "keeper" for the Department of Corporations,
investigated a State securities fraud matter.

Served as trustee of the parent of one of the largest financial
institutions in California where securities fraud and other ac-
tions were alleged against senior management.

EXHIBIT _23_ PAGE _140_



## Publications

One of the principal authors of the AICPA Practice Aid 07-1 – "Forensic Accounting – Fraud Investigations" (2007)

Chair of the AICPA Forensic Procedures Task Force responsible for the writing of the "Forensic Procedures and Specialists: Useful Tools and Techniques" – AICPA Special Report, 2006

Chair of the AICPA Antifraud Programs and Controls Task Force responsible for the writing of "Management Override of Internal Controls: The Achilles' Heel of Fraud Prevention" – AICPA Practice Aid, 2005

Principal author – AICPA Technical Consulting Practice Aid 97-1 "Fraud Investigations in Litigation and Dispute Resolution Services"

Co-author – California Society of CPA "The Witness Chair" – SAS 99 – Is It Enough To Help Close the Expectation Chasm? (2003)

Author – "A Systematic Approach to Fraud Investigation" – The CPA Expert, Spring 2000 (AICPA Newsletter for providers of Business Valuation and Litigation Services)

Co-author – "Defining the Practice of Forensic Accounting" The CPA Expert, 1999 Special Issue (AICPA Newsletter for providers of Business Valuation and Litigation Services)

Contributing and Reviewing author to Guide to Fraud Investigations published by Practitioners Publishing Company

Contributing author to Handbook of Litigation Services for John Wiley and Sons. The chapter written by Mr. Durkin is entitled "Criminal Cases and the Investigative Accountant."

Book review of Investigating White Collar Crime: Embezzlement and Financial Fraud for "CPA Management Consultant".

EXHIBIT 84 PAGE 1402

# Exhibit 84

2818

1           UNITED STATES DISTRICT COURT

2           CENTRAL DISTRICT OF CALIFORNIA

3                      ---

4       HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

5                      ---

6   MATTEL, INC.,                :   PAGES 2818 - 2935
                                 :
7           PLAINTIFF,           :
                                 :
8       VS.                      :   NO. ED CV04-09049-SGL
                                 :   [CONSOLIDATED WITH
9   MGA ENTERTAINMENT, INC.,     :   CV04-9059 & CV05-2727]
    ET AL.,                      :
10                               :
            DEFENDANTS.          :
11  _____

12

13

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                RIVERSIDE, CALIFORNIA

17              TUESDAY, JUNE 17, 2008

18              JURY TRIAL - DAY 14

19                AFTERNOON SESSION

20

21

22                          MARK SCHWEITZER, CSR, RPR, CRR
                            OFFICIAL COURT REPORTER
23                          UNITED STATES DISTRICT COURT
                            181-H ROYBAL FEDERAL BUILDING
24                          255 EAST TEMPLE STREET
                            LOS ANGELES, CALIFORNIA 90012
25                          (213) 663-3494

CERTIFIED COPY

EXHIBIT __84__ PAGE 1403

1   Q.   I want to go back to one additional point, and we'll try

2   to do this quickly.  You've got a lot of exhibits in front of

3   you, Mr. Bryant.  Can you look at 62-001.

4   A.   Oh, boy.  They are all mixed up.  Which one now?

5   Q.   62-001.  Do you see that as a master drawing of the four

6   heads?

7   A.   Yes, sir.

8   Q.   I want you to set that aside for a moment.  Can you take

9   a look at Exhibit 18281.

10  A.   I'm sorry.  These are mixed up.  I'm not finding it.

11  Q.   You know what I'm going to do to speed this along?  I'll

12  reorganize these so that it's a little bit easier for you to

13  follow, and I'll come back to this later if you don't mind.

14  A.   Okay.

15  Q.   Was Bratz the only project that you conceived of in

16  August of 1998?

17  A.   Well, no, I was doing other projects.

18  Q.   Can you describe for the jury -- let's go back in time,

19  and let's put up the time line for the employment that we're

20  looking at.

21        And let's just go to your April 29, 1998,

22  resignation from Mattel.  As I recall from your testimony

23  from Mr. Price, you were employed at Mattel for a period of

24  time from 1995 through April of 1998; correct?

25  A.   Yes.

EXHIBIT 84 PAGE 1404

2891

1   Q.   Could you tell the jury whether or not you were always

2   actually physically working in the Mattel building for that

3   entire period of time?

4   A.   Well, no.

5   Q.   Did there come a time when you left the physical

6   building of Mattel and moved back home?

7   A.   Yes.

8   Q.   And do you recall when that was?

9   A.   That was -- I think it was right before Christmas of

10  1997.

11  Q.   And you were working in Barbie Basics at the time; yes?

12  A.   Right.

13  Q.   Was there a particular reason why you started thinking

14  about leaving Mattel?

15          MR. PRICE:   Object.   Irrelevant.

16          THE COURT:   Sustained.

17  Q.   BY MR. NOLAN:   Did you move back to Missouri before

18  Christmas of 1997?

19  A.   Yes.

20  Q.   And before leaving, did you have a conversation with

21  anybody at Mattel regarding your departure?

22  A.   Yes.

23  Q.   And who did you have that conversation with?

24  A.   I spoke with my supervisor, Cassidy Park.

25  Q.   And what did you tell Cassidy Park?

EXHIBIT __84__ PAGE __1405__

2892

1            MR. PRICE:   Object.   That's hearsay, your Honor.

2            THE COURT:   How is that not hearsay, Counsel?

3            MR. NOLAN:   Okay.   I don't know.   I was just

4    trying.   I'm sorry.

5            THE COURT:   Sustained.

6    Q.   BY MR. NOLAN:   You had a conversation when you left;

7    correct?

8    A.   Yes.

9    Q.   Now, did your employment status at Mattel change?

10   A.   Yes.

11   Q.   And how did it change?

12   A.   I went from being a full-time employee to being

13   basically a part-time employee.

14   Q.   And when you moved to be a part-time employee, when you

15   moved to become a part-time employee, did you have a physical

16   move in residence?

17   A.   Yes.

18   Q.   And where did you move to?

19   A.   I moved to Kimberling City, Missouri.

20   Q.   And during that period of time, did you continue to do

21   some work for Mattel?

22           MR. PRICE:   Object as to the period of time.

23   Q.   BY MR. NOLAN:   The period of time that you were back in

24   Missouri in early 1998.

25   A.   Yes.

EXHIBIT 84  PAGE 1406

2893

1   **Q.**   Okay. Could you describe for the jury --

2          THE COURT: Could you please tell, just for the

3   record, you're referring to January to April of 1998?

4          MR. NOLAN: Yes. I apologize. January to April.

5   **Q.**   In fact, why don't we just time this for a moment.

6   Let's go to Exhibit 15609. Do you have that in front of you?

7   **A.**   Probably.

8   **Q.**   15609. Do you have that in front of you?

9   **A.**   Yes.

10         MR. NOLAN: This is in evidence, your Honor.

11   **Q.**   And do you recognize this letter?

12   **A.**   Yes.

13   **Q.**   Did you sent it?

14   **A.**   Yes.

15   **Q.**   And who is it addressed to?

16   **A.**   It was addressed to Cassidy Park, Cynthia Miller, and

17   Human Resources.

18   **Q.**   And why did you send this letter to Mattel on April 15th

19   of 1998?

20         MR. PRICE: Objection. That's irrelevant, your

21   Honor.

22         THE COURT: Sustained. As to his reason.

23   **Q.**   BY MR. NOLAN: After sending Exhibit 15609, did you

24   consider yourself to be an employee of Mattel?

25   **A.**   No.

EXHIBIT 84 PAGE 1407

1   Q.   Now, in the letter, it said:   "I will still be available

2   for free-lancing projects."

3            Do you see that?

4            Your Honor, we'd offer 15609.

5            MR. PRICE:   No objection.

6            THE COURT:   It's admitted.   You may publish.

7            **(Exhibit 15609 received.)**

8            MR. NOLAN:   Thank you.

9   Q.   Now, this is the resignation.   It says:   "Dearest

10  Cassidy, Cynthia, and others concerned, please accept this

11  written notice of my resignation effective two weeks after

12  the date above, April 29, 1998.   I have decided to stay in

13  Missouri and pursue other interests.   I just want to say

14  thank you both so much for everything you've done for me

15  while I have been at Mattel.   My time and experience there

16  has been extremely valuable.   I will still be available for

17  free-lancing projects in the future, should you decide you

18  want to work with me on a project."

19           Do you see that?

20  A.   Yes.

21  Q.   So from the time you physically moved from El Segundo

22  and went back to Missouri in early January 1998, was it true

23  you were continuing to do free-lance projects for Mattel?

24           MR. PRICE:   Vague as to time.

25           MR. NOLAN:   During the period of January through

EXHIBIT __84__ PAGE _1408_

2935

1

2

3

4

5

6

7                           C E R T I F I C A T E

8

9

10              I hereby certify that pursuant to Title 28,

11     Section 753 United States Code, the foregoing is a true and

12     correct transcript of the stenographically reported

13     proceedings in the above matter.

14              Certified on June 17, 2008.

15

16

17              MARK SCHWEITZER, CSR, RPR, CRR
                Official Court Reporter
18              License No. 10514

19

20

21

22

23

24

25

EXHIBIT 84  PAGE 1409

# Exhibit 85

2936

1              UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3                    EASTERN DIVISION

4                      - - -

5         HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                      - - -

7   MATTEL, INC.,                    )   **CERTIFIED**
                                     )
8                  PLAINTIFF,        )   **COPY**
                                     )
9         VS.                        )   NO. CV 04-09049
                                     )
10  MGA ENTERTAINMENT, INC., ET. AL.,)
                                     )
11                 DEFENDANTS.       )   TRIAL DAY 15
    _____    )   MORNING SESSION
12  AND CONSOLIDATED ACTIONS,        )   PAGES 2936-3032
                                     )
13  _____

14

15       REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16               RIVERSIDE, CALIFORNIA

17             WEDNESDAY, JUNE 18, 2008

18                   9:07 A.M.

19

20

21

22

23              THERESA A. LANZA, RPR, CSR
              FEDERAL OFFICIAL COURT REPORTER
24              3470 12TH STREET, RM. 134
              RIVERSIDE, CALIFORNIA  92501
25                 951-274-0844            EXHIBIT __85__ PAGE 1410
              WWW.THERESALANZA.COM

2937

```
 1    APPEARANCES:

 2
      ON BEHALF OF MATTEL, INC.:
 3
                          QUINN EMANUEL
 4                        BY:   JOHN QUINN
                                JON COREY
 5                              MICHAEL T. ZELLER
                                HARRY OLIVAR
 6                              TIMOTHY ALGER
                          865 S. FIGUEROA STREET,
 7                        10TH FLOOR
                          LOS ANGELES, CALIFORNIA   90017
 8

 9

10    ON BEHALF OF MGA ENTERTAINMENT:

11                        SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                          BY:   THOMAS J. NOLAN
12                              JASON RUSSELL
                                RAOUL KENNEDY
13                              LAUREN AGUIAR
                                CARL ROTH
14                        300 SOUTH GRAND AVENUE
                          LOS ANGELES, CALIFORNIA   90071-3144
15                        213-687-5000

16

17

18

19

20

21

22

23

24

25
```

EXHIBIT __85__ PAGE __141__

2938

```
 1                         I N D E X

 2                                                    PAGE

 3   PLAINTIFF CASE (CONT'D)........................  2939

 4

 5   PLAINTIFF
     WITNESS          DIRECT      CROSS     REDIRECT     RECROSS
 6   CARTER H. BRYANT  (CONTINUED)

 7   BY MR. NOLAN                  2939

 8

 9
                EXHIBITS        RECEIVED
10
                 1155            2940
11              15058            2961
                15110            2970
12               1310            3014

13

14

15

16

17

18

19

20

21

22

23

24

25
```

EXHIBIT **85** PAGE **1412**

2958

```
 1   THAT INTERVIEW?

 2   A    NO.

 3   Q    DID YOU ASK ANY QUESTIONS CONCERNING MEL ODOM AND HOW HE

 4   CAME TO ASHTON DRAKE?

 5   A    YES.                                                        09:36

 6   Q    WHAT QUESTIONS DID YOU ASK CONCERNING MEL ODOM'S

 7   INVOLVEMENT WITH THE GENE DOLL?

 8   A    I ASKED THE PERSON THAT I WAS INTERVIEWING -- I JUST SAID,

 9   'HOW DID YOU GET THIS CONCEPT?  HOW DID THE DESIGNER BRING YOU

10   THIS CONCEPT?'  AND SHE TOLD ME THAT IT HAD BEEN BROUGHT TO      09:36

11   THEM.

12          MR. PRICE:  OBJECTION.  HEARSAY.  THIS IS NOT OFFERED

13   FOR THE TRUTH.

14          THE COURT:  COUNSEL, IS THIS GOING TO ANYTHING?  IS

15   THIS BEYOND THE TRUTH OF THE MATTER ASSERTED?                    09:37

16          MR. NOLAN:  IT'S JUST FOR STATE OF MIND.

17          THE COURT:  I DON'T SEE HOW THAT'S RELEVANT AT THIS

18   POINT.  I'LL SUSTAIN THE OBJECTION.

19   BY MR. NOLAN:

20   Q    BEFORE THE MEETING IN CHICAGO, HAD YOU EVER HEARD OF A      09:37

21   COMPANY CALLED ALASKA MAMA?

22   A    NO.

23   Q    AFTER MEETING IN CHICAGO, HAD YOU HEARD OF THE NAME

24   ALASKA MAMA?

25   A    YES.                                                        09:37
```

EXHIBIT __85__ PAGE 1413

WEDNESDAY, JUNE 18, 2008          TRIAL DAY 15  MORNING SESSION

2959

```
 1   Q    DID YOU KNOW WHERE ALASKA MAMA WAS LOCATED?

 2   A    I DON'T REMEMBER.

 3   Q    DID YOU HAVE AN UNDERSTANDING, IN SEPTEMBER OF 1998, AS TO

 4   WHAT ALASKA MAMA WAS?

 5   A    YES.                                                          09:37

 6   Q    WHAT WAS YOUR UNDERSTANDING?

 7   A    MY UNDERSTANDING WAS THAT THEY WERE AN ARTIST AND DESIGNER

 8   REP, REPRESENTATIVE.

 9   Q    AT SOME POINT IN TIME, DID YOU COME TO THE DECISION THAT

10   YOU NEEDED TO MAKE MORE MONEY THAN YOU WERE MAKING AT OLD NAVY?    09:38

11   A    YES.

12   Q    AND HOW OLD WERE YOU AT THAT TIME?

13   A    I THINK I WAS ABOUT 29.

14   Q    DID YOU MAKE ANY DECISION AS TO WHERE YOU WOULD SEEK

15   EMPLOYMENT?                                                        09:38

16   A    WELL, AFTER I INTERVIEWED WITH ASHTON DRAKE AND NOTHING

17   CAME ABOUT OF THAT, I DECIDED TO REAPPLY TO MATTEL.

18   Q    SO AT THIS POINT IN TIME, OTHER THAN YOUR SALARY AS A

19   SALES CLERK AT OLD NAVY AND THE APPROXIMATE $800 THAT YOU HAD

20   MADE IN FREELANCING FROM ASHTON DRAKE, HAD YOU HAD ANY OTHER       09:38

21   INCOME AFTER YOU HAD RESIGNED FROM MATTEL?

22   A    NO, NOT THAT I REMEMBER.

23   Q    TELL US ABOUT WHEN YOU REAPPLIED TO MATTEL.

24   A    LET'S SEE.  I THINK I REAPPLIED IN OCTOBER OF 1998.

25   Q    DO YOU REMEMBER WHO YOU GOT IN TOUCH WITH?                    09:39
```

EXHIBIT  85  PAGE 1414

WEDNESDAY  JUNE 18  2008

2960

1    A    YES.  I CALLED MY FORMER SUPERVISOR, CASSIDY PARK.

2    Q    DID YOU SUBMIT ANYTHING IN CONNECTION WITH YOUR

3    REAPPLICATION TO MATTEL?

4    A    WELL, NO, I DIDN'T REALLY SUBMIT ANYTHING, THAT I

5    REMEMBER.  I DID HAVE AN INTERVIEW.                          09:39

6    Q    DO YOU RECALL WHO YOU INTERVIEWED WITH?

7    A    YES.  I INTERVIEWED WITH -- WELL, MY FIRST INTERVIEW WAS

8    WITH IVY ROSS.

9    Q    AND HOW MANY INTERVIEWS DID YOU HAVE?

10   A    I ACTUALLY HAD TWO.                                     09:40

11   Q    BOTH WITH IVY ROSS, OR DID YOU MEET WITH OTHER PEOPLE?

12   A    NO.  THE FIRST WAS WITH IVY ROSS, AND THE SECOND WAS WITH

13   RON LONGSDORF AND ANNE DRISKILL.

14   Q    AND WHO'S RON LONGSDORF AND ANNE DRISKILL?  WERE THEY

15   EMPLOYEES OF MATTEL?                                         09:40

16   A    YES.

17   Q    DO YOU KNOW WHAT THEIR POSITIONS WERE?

18   A    I THINK RON'S POSITION WAS SENIOR VICE PRESIDENT OF BARBIE

19   COLLECTIBLES, AND I'M NOT EXACTLY SURE WHAT ANNE DRISKILL'S

20   TITLE WAS.                                                   09:40

21   Q    AT SOME POINT DURING THE INTERVIEW PROCESS, DID YOU SUBMIT

22   AN UPDATED PORTFOLIO?

23   A    YES.

24   Q    DO YOU HAVE EXHIBIT 15058 IN FRONT OF YOU?

25   A    YES.                                                    09:41

EXHIBIT __85__ PAGE 1415

WEDNESDAY   JUNE 18   2008          TRIAL DAY 15   MORNING SESSION

2961

1   Q    DO YOU RECOGNIZE 15058?

2   A    YES.

3   Q    WHAT IS 15058?

4   A    THIS LOOKS LIKE ONE OF THE PORTFOLIO PIECES THAT I HAD

5   DONE.                                                            09:41

6        MR. NOLAN:  MAY I APPROACH WITH THE ORIGINAL OF THIS?

7        THE COURT:  YOU MAY.

8   BY MR. NOLAN:

9   Q    DO YOU RECOGNIZE WHAT I'VE PLACED IN FRONT OF YOU AS THE

10  ORIGINAL OF 15058?                                              09:41

11  A    YES.

12  Q    AND COULD YOU SHOW THAT TO THE JURY.

13       MR. NOLAN:  YOUR HONOR, WE'D OFFER UP A COPY OF 15058

14  INTO EVIDENCE.

15       THE COURT:  ANY OBJECTION?                                 09:42

16       MR. PRICE:  NO OBJECTION.

17       THE COURT:  IT'S ADMITTED.

18       YOU MAY PUBLISH.

19       (EXHIBIT 15058 RECEIVED.)

20  BY MR. NOLAN:

21  Q    NOW, AGAIN, MR. BRYANT, I WANT TO POINT OUT, WHAT'S SHOWN

22  ON THE SCREEN IS A COPY; YOU HAVE THE ORIGINAL, BUT THAT'S YOUR

23  SIGNATURE AND THE DATE.

24       DO YOU SEE THAT?

25  A    YES.                          EXHIBIT __85__ PAGE _1416_   09:42

2987

1  BY MR. NOLAN:

2  Q    WAS JACQUELINE PRINCE A CLOSE, PERSONAL FRIEND OF YOURS?

3  A    I MEAN, WE WEREN'T REALLY CLOSE.  WE WERE FRIENDLY AT

4  WORK.

5  Q    DID SHE KEEP HER NOTARY STAMP AT WORK?                    10:2C

6         MR. PRICE:  OBJECTION.  LACK OF FOUNDATION.

7  BY MR. NOLAN:

8  Q    DO YOU KNOW WHETHER OR NOT --

9         THE COURT:  I TAKE IT YOU'RE WITHDRAWING THE

10  QUESTION?                                                     10:2C

11         MR. NOLAN:  I WAS GOING TO REPHRASE IT.

12         THE COURT:  VERY WELL.

13         WAIT FOR THE COURT'S RULING.

14  BY MR. NOLAN:

15  Q    DO YOU HAVE ANY KNOWLEDGE ONE WAY OR THE OTHER AS TO      10:2C

16  WHETHER OR NOT JACQUELINE PRINCE HAD A NOTARY STAMP?

17  A    YES, SHE DID.

18  Q    DO YOU KNOW WHERE SHE KEPT THE NOTARY STAMP?

19         MR. PRICE:  OBJECTION.  LACK OF FOUNDATION.

20         MR. NOLAN:  JUST YES OR NO.                            10:2C

21         THE COURT:  VERY WELL.

22         THE WITNESS:  NO.

23  BY MR. NOLAN:

24  Q    SO IF I UNDERSTAND YOUR TESTIMONY, YOU WANTED

25  JACQUELINE PRINCE, WHO'S THE ADMINISTRATIVE ASSISTANT TO      10:2C

EXHIBIT  85  PAGE 1417

WEDNESDAY, JUNE 10, 2009          TRIAL DAY 15  MORNING SESSION

1   RON LONGSDORF, TO NOTARIZE YOUR DRAWINGS; CORRECT?

2            MR. PRICE:  OBJECTION.  LEADING.

3            THE COURT:  SUSTAINED.

4   BY MR. NOLAN:

5   Q    DID YOU HAVE ANY CONCERN, MR. BRYANT, IN AUGUST OF 1999,    10:20

6   ABOUT APPROACHING JACQUELINE PRINCE TO NOTARIZE SOMETHING FOR

7   YOU?

8   A    NO, NOT THAT I REMEMBER.

9   Q    I MEAN, THE FACT THAT SHE WAS THE ADMINISTRATIVE ASSISTANT

10  TO A SENIOR MANAGEMENT PERSON, AN EMPLOYEE AT MATTEL, WAS NOT A    10:21

11  CONCERN TO YOU?

12           MR. PRICE:  OBJECTION.  LEADING.

13  BY MR. NOLAN:

14  Q    WAS IT A CONCERN TO YOU?

15           THE COURT:  VERY WELL.    10:21

16           AS REPHRASED, YOU MAY ANSWER.

17           THE WITNESS:  NO.

18  BY MR. NOLAN:

19  Q    DID THERE COME A TIME WHEN YOU MET WITH JACQUELINE PRINCE?

20  A    YOU MEAN OUTSIDE OF WORK?    10:21

21  Q    OUTSIDE OF WORK.

22  A    YES.

23  Q    DO YOU RECALL WHEN THAT WAS?

24  A    THAT WAS AUGUST '99.

25  Q    FOR WHAT PURPOSE DID YOU MEET WITH JACQUELINE PRINCE?    10:21

EXHIBIT  85  PAGE 1418

2989

1    A    I MET WITH HER TO HAVE HER NOTARIZE MY MASTER DRAWINGS.

2    Q    AND AT THE TIME THAT YOU MET WITH JACQUELINE PRINCE, HAD

3    YOU MADE A DECISION, ONE WAY OR THE OTHER, TO SEND OUT YOUR

4    BRATZ DRAWINGS TO A COMPANY?

5    A    I BELIEVE SO, YES.                                      10:22

6    Q    AND THE NAME OF THAT COMPANY WAS WHAT?

7    A    ALASKA MAMA.

8    Q    DID ANYBODY FROM MGA TELL YOU IN 1999 TO SEND YOUR

9    DRAWINGS TO ALASKA MAMA?

10   A    NO.                                                     10:22

11   Q    HAD YOU, IN 1999, AT THE TIME YOU DECIDED TO SEND YOUR

12   BRATZ DRAWINGS TO ALASKA MAMA, EVER HEARD OF MGA?

13   A    NO.

14   Q    HAD YOU EVER HEARD OF ISAAC LARIAN?

15   A    NO.                                                     10:23

16   Q    EVER HEAR OF PAULA TREANTAFELLES GARCIA?

17   A    NO.

18   Q    DID SOMEONE FORCE YOU TO SEND YOUR BRATZ DRAWINGS TO

19   ALASKA MAMA IN AUGUST OF 1999?

20   A    NO.                                                     10:23

21   Q    WHERE DID YOU MEET JACQUELINE PRINCE?

22   A    DO YOU MEAN TO SIGN THE --

23   Q    I APOLOGIZE.  I'M TRYING TO...

24        YOU MET WITH HER; CORRECT?

25   A    YES.                    EXHIBIT __85__ PAGE 1419        10:23

WEDNESDAY   JUNE 18   2008          TRIAL DAY 15   MORNING SESSION

2990

```
 1   Q    WITH THE INTENT TO HAVE YOUR DRAWINGS NOTARIZED; YES?

 2   A    YES.

 3   Q    WHERE WAS THAT MEETING HELD?

 4   A    THAT WAS AT HER HOME.

 5   Q    WAS ANYBODY ELSE PRESENT?                                   10:23

 6   A    I THINK HER SON WAS PRESENT.

 7   Q    AND HOW OLD WAS HER SON?  DO YOU REMEMBER?

 8   A    I'M GOING TO SAY I THINK HE WAS AROUND FIVE.

 9   Q    DID YOU HAVE YOUR BRATZ DRAWINGS WITH YOU AT

10   JACQUELINE PRINCE'S HOUSE?                                       10:24

11            MR. PRICE:  OBJECTION.  VAGUE AS TO WHICH BRATZ

12   DRAWINGS.

13            THE COURT:  SUSTAINED.

14   BY MR. NOLAN:

15   Q    DID YOU BRING ANY OF THE BRATZ MASTER DRAWINGS WITH YOU TO  10:24

16   THAT MEETING WITH JACQUELINE PRINCE?

17   A    YES.

18   Q    AND WHY DID YOU BRING BRATZ MASTER DRAWINGS WITH YOU TO

19   JACQUELINE PRINCE?

20   A    TO HAVE THEM NOTARIZED.                                     10:24

21   Q    DID YOU BRING ALL OF YOUR MASTER DRAWINGS OF BRATZ

22   CHARACTERS AND ACCESSORIES AND HAIRSTYLES TO MS. PRINCE IN

23   AUGUST OF 1999 TO BE NOTARIZED?

24   A    I'M NOT EXACTLY CERTAIN, BUT I THINK SO.

25   Q    IN ANY EVENT, DO YOU RECALL WHETHER OR NOT MS. PRINCE       10:24
```

3032

1          **THE COURT:**  IT WAS JUST FILED ON JUNE 17TH.  I JUST

2    WANTED TO GIVE YOU NOTICE OF IT.  WE'LL TAKE THIS UP AT 1:15.

3          **MR. NOLAN:**  THANK YOU.

4          **THE COURT:**  COURT IS IN RECESS.

5          (WHEREUPON, MORNING SESSION IS CONCLUDED. )                12:01

6

7

8

9

10

11

12

13

14                              CERTIFICATE

15

16   I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED
     STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF
17   THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE ABOVE-
     ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN
18   CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF
     THE UNITED STATES.
19
20   _Theresa C. Lanza_                      _6-20-08_
     THERESA A. LANZA, CSR, CRPR                 DATE
21   FEDERAL OFFICIAL COURT REPORTER

22

23

24

25                           EXHIBIT __85__ PAGE _1421_

WEDNESDAY, JUNE 18, 2008              TRIAL DAY 15, MORNING SESSION

# Exhibit 86

1

1            UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3                 EASTERN DIVISION

4                    - - -

5      HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6

7    MATTEL, INC.,                    )
                                      )
8                    Plaintiff,       )
                                      )
9            vs.                      )  No. CV 04-09049
                                      )
10   MGA ENTERTAINMENT, INC., ET. AL.,)
                                      )
11                   Defendants.      )
     _____   )  Status Hearing
12   AND CONSOLIDATED ACTIONS,        )
                                      )
13

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                Riverside, California

17            Tuesday, September 22, 2009

18                   10:19 A.M.

19

20

21

22

23              THERESA A. LANZA, RPR, CSR
              Federal Official Court Reporter
24              3470 12th Street, Rm. 134
              Riverside, California  92501
25                   951-274-0844
                 WWW.THERESALANZA.COM

```
 1              MS. HURST:   It's exactly the same.
 2              THE COURT:   It just got recorded twice?
 3              MS. HURST:   Correct.
 4              THE COURT:   Very good.  The Court will accept that
 5    representation.                                              12:19
 6              What I'm going to do at this point is meet with
 7    counsel in chambers concerning this.
 8              Why don't we go ahead, since we've been going for two
 9    hours now, let's take a ten-minute break.  Let's resume at
10    12:30.  And I'll have my courtroom deputy give you instructions  12:19
11    in terms of who's to come back and all of the musical chairs.
12    We'll set things up there, and that will give the court
13    reporter a chance to get set up as well.
14              We're in recess.
15              (Whereupon a brief recess was held.)              12:19
16              (In-chambers proceedings occurred
17               which are not a part of this record.)
18              (Proceedings held after resuming in open court:)
19              THE COURT:   We're back on the record outside of the
20    in-camera proceedings.                                       01:53
21              The Court at this point in time is simply going to
22    summarize essentially the elements of the order that will be
23    going out today in greater detail.
24              First, as indicated, the Court is going to vacate the
25    pretrial and trial dates that are presently set.             01:54
```

Tuesday, September 22, 2009                    Status Hearing

EXHIBIT __86__ PAGE 1423

| | |
|---|---|
| 1 | Second, the Court is going to continue the discovery |
| 2 | cutoff date to June 1, 2010; that order is made without |
| 3 | prejudice to reconsideration before the judge to whom this case |
| 4 | is going to be assigned, but I think it's important that we |
| 5 | have a discovery cutoff date.  I know in its previous motion, | 01:54 |
| 6 | Mattel was seeking an 8-month continuance.  The Court believes |
| 7 | that at least the continuance from December to June is in |
| 8 | order.  And I'll leave it up to Judge David Carter who will be |
| 9 | taking over this case to make a final decision on that.  But |
| 10 | pending any change by Judge Carter, the discovery cutoff date | 01:54 |
| 11 | will be June 1, 2010. |
| 12 | The Court will also be vacating -- I believe there |
| 13 | are two pending motions before the Court right now, and those |
| 14 | will be reassigned for hearing by Judge Carter. |
| 15 | The order to show cause set forth in the August 31st, | 01:55 |
| 16 | 2009 order is deemed satisfied. |
| 17 | The request for stay made by MGA in camera is denied. |
| 18 | Again, of course, that can be submitted for |
| 19 | reconsideration before Judge Carter, but this Court does not |
| 20 | find any basis to stay the proceedings or recall at this time. | 01:55 |
| 21 | The Court has made itself available for settlement |
| 22 | proceedings; this is at the urging of Judge Carter; and counsel |
| 23 | for Mattel has indicated that they anticipate, and the Court |
| 24 | hereby directs them, to provide to MGA their written settlement |
| 25 | position within ten days of today's date.  After receipt, the | 01:56 |

Tuesday, September 22, 2009                    Status Hearing

EXHIBIT __86__ PAGE _1424_

 1   Court will organize a telephonic conference in which we will

 2   set dates for settlement prior to this Court's departure.

 3         I think the Court previously indicated its findings

 4   with respect to Mr. de Anda.

 5         Is there anything else that I have not covered that I          01:56

 6   needed to cover today?

 7         First, from Mattel's perspective.

 8         MR. ZELLER:   One thing that I would ask at this

 9   juncture, particularly in light of Your Honor's leaving the

10   bench and the transfer of the case, the Court will recall that      01:56

11   -- and I don't recall exactly when this ruling was made, but it

12   was made during the course of the hearing, and Your Honor

13   indicated this from the bench -- that basically Mr. Durkin's

14   report could not be used.

15         We are in a position where we don't have all of the           01:57

16   source documents that Mr. Durkin attached to his report,

17   including such matters as e-mails and financials and the like,

18   which is causing some problems in terms of, number one,

19   refuting statements that MGA has been making in briefs even as

20   recently as Friday to Your Honor.   And I give some specific         01:57

21   examples.   But, number two, just the inconvenience of this in

22   trying to take depositions without these documents.

23         So I would ask Your Honor to allow us to at least use

24   the source documents, the actual documents; not Mr. Durkin's

25   work product, not his report, not demonstratives that he            01:57

Tuesday, September 22, 2009                      Status Hearing

EXHIBIT  86  PAGE 1425

92

1          THE COURT:   I will be issuing an order later today or

2    first thing tomorrow which will address all of these issues.

3    But the OSC at this point, based on the information before the

4    Court, is deemed satisfied.

5          MR. JENNINGS:   Thank you.                              02:03

6          THE COURT:   Court is adjourned.

7

8

9

10

11

12

13

14

15

16                          CERTIFICATE

17

18   I hereby certify that pursuant to section 753, title 28, United
     States Code, the foregoing is a true and correct transcript of
19   the stenographically recorded proceedings held in the above-
     entitled matter and that the transcript page format is in
20   conformance with the regulations of the Judicial Conference of
     the United States.
21

22   _____        9-23-09
     THERESA A. LANZA, CSR, RPR,                Date
23   Federal Official Court Reporter

24

25

Tuesday, September 22, 2009                    Status Hearing

EXHIBIT 86 PAGE 1426

# Exhibit 87

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION

CARTER BRYANT, an individual,

     Plaintiff,

    vs.

MATTEL, INC., a Delaware
corporation,

     Defendants.

No. CV 04-9049 SGL (RNBx)
Consolidated with
Nos. CV 04-9405 and
05-2727

# CERTIFIED
# COPY

_____
AND CONSOLIDATED ACTIONS.

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Los Angeles, California

Friday, September 25, 2009

Reported by:
CHERYL R. KAMALSKI
CSR No. 7113

Job No. 120692

EXHIBIT 87   PAGE 1427

```
 1              appealed," not over the orders appealed.  This is
 2    a subject matter test.
 3              This is pretty simple.  If the District Court
 4    orders a disclosure of these documents, it moots the
 5    appeal.  That's it.  It would moot the appeal.
 6    Conversely, if the Ninth Circuit issued an order denying
 7    the conditional cross-appeal on the grounds that the legal
 8    predicates for application of the crime/fraud exception or
 9    waiver exception were insufficient, as a matter of law,
10    then no amount of facts, old facts, new facts, other facts
11    would be sufficient to justify an order for disclosure by
12    this Court.  That would preclude an order for disclosure
13    from this Court.  It would even preclude an order for in-
14    camera inspection, because it would be a decision by the
15    Ninth Circuit that the legal predicates are insufficient
16    to sustain application.
17              Because those circumstances are both possible
18    here, and the crime/fraud and waiver issues are both
19    clearly before the Ninth Circuit on the conditional
20    cross-appeal, there is no jurisdiction in the District
21    Court now to consider this matter.
22              It's also entirely within Mattel's power, if it
23    wishes to rectify this situation and have the District
24    Court consider this, because it can dismiss the
25    cross-appeal if it wishes to have this matter considered
```

Page 11

EXHIBIT **87** PAGE **1428**

1   in the District Court.

2           Now, Mattel's argument was that somehow

3   Rule 62(c) saves their ability to bring this back before

4   the District Court, even though it's pending on appeal.

5   Rule 62(c) is the rule that authorizes the District Court

6   to act to maintain the status quo with respect to

7   injunctive relief while the case is on appeal.  As

8   expressed in McClatchey, the Ninth Circuit does not view

9   the District Court's jurisdiction under Rule 62(c) to be

10  very broad and enable it to do anything pertaining to the

11  case while an interlocutory injunction order is on appeal,

12  rather, as expressed in McClatchey, and I'm looking at

13  pages 734 to 735, with the quotation to Morse Federal

14  Practice,

15           "Rule 62(c) is merely expressive

16           of a power inherent in the court to

17           preserve the status quo where in its

18           sound discretion the court deems the

19           circumstances so justify."

20           An order to produce the documents, which would

21  clearly change the status quo here.  And, frankly, with

22  all due respect, they haven't appealed an interlocutory

23  injunction order.  They've appealed an order denying the

24  compelled production of the documents, conditionally for

25  instructions on remand.  So 62(c) doesn't apply anyway.

EXHIBIT _87_ PAGE _1429_

1          So you can't have both courts in a position to

2     act over the same issue at the same time.

3          An order to disclose here would moot the

4     conditional cross-appeal.  If the conditional -- if Mattel

5     chooses to continue to prosecute the conditional

6     cross-appeal, an order from the Ninth Circuit could result

7     saying there's no way the crime/fraud exception should

8     ever apply here, that would preclude any further action in

9     the District Court under the doctrine of law of the case.

10    Because those two scenarios are possibilities here, it

11    clearly demonstrates that both courts would be asserting

12    jurisdiction over the same issues simultaneously were you

13    to proceed with respect to these documents.

14         And for those reasons, under Griggs and

15    McClatchey, respectfully, we submit that the order for --

16    the Motion for Reconsideration would have to be granted,

17    order No. 42 vacated, and the Motion to Compel denied

18    without prejudice at this time, pending the issuance of

19    mandate from the Ninth Circuit back to the District Court,

20    at which time Mattel could, again, choose to raise

21    whatever it wants to, consistent with the proceedings on

22    appeal.

23         MR. O'BRIEN:  One of the concerns I have, I know

24    the discovery cut-off, I believe, was extended by

25    Judge Larson, although -- has the order from the Monday

Page 13

EXHIBIT __87__ PAGE _1430_

1    reach the merits of this.  I appreciate that the judge was

2    focused on his August order when we were in chambers the

3    other day, and he was thinking that that order was a

4    Rule 403 determination.  But in June, the Court reviewed

5    the documents on the crime/fraud exception, in camera, and

6    issued an order on June 20th that says, quote,

7                   "The preponderance of the

8              evidence does not support a finding

9              that the MGA parties sought legal

10             advice in order to further a crime or

11             fraud."

12        I'm actually reading from your order No. 42 now,

13   at page 2, lines 14 to 15.

14        That was a finding on the merits.  It may be that

15   the later August ruling was more motivated by Rule 403,

16   although I think there are things the Court said that went

17   to the substance, frankly, of the crime/fraud and waiver

18   issues, then, as well, but the notion that the judge

19   didn't decide this on the merits, I'm sure that

20   Judge Larson was thinking of a different order when we

21   were in chambers the other day.  But that's incorrect.

22   It's also true on the waiver point that he reached the

23   merits.  And this is in your order No. 42, at page 3,

24   lines 16 and 17,

25                   "On July 2nd, 2008" -- that's

Page 29

EXHIBIT 87  PAGE 1431

```
 1              July 2nd, not August, July -- "the
 2          Court denied Mattel's June 24th, 2008
 3          waiver motion."
 4          These motions were denied on the merits, and
 5   Mattel is challenging the denials on the merits in its
 6   cross-appeal.  It's not just challenging a Rule 403
 7   determination.  It's raised the merits of the issues.
 8              Now, Rule 62 does not allow this Court to change
 9   the status quo with respect to those rulings so long as
10   they're on appeal.  In the two cases Mr. Quinn mentioned,
11   Plotkin and Giraldes, there was no change in the
12   status quo.  The same status resulted from a final
13   adjudication.  In Davis versus United States the Court
14   said new facts don't change the jurisdictional question.
15   There were new factual allegations to be made in an
16   amended complaint, and the Court said the District Court
17   could not issue an order allowing an amendment of the
18   complaint once that dismissal was on appeal.  So new facts
19   are not the answer here.
20              Under Griggs, McClatchey, where the Court,
21   Ninth Circuit, takes a narrow view of what Rule 62 allows,
22   the same tissues are on appeal as were decided by the
23   District Court -- the same issues are to be considered now
24   as were previously decided by the District Court and are
25   presently pending on appeal.  There is a possibility of
```

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

EXHIBIT __87__ PAGE _1432_

1    inconsistent adjudication between the two courts, that

2    means there's no jurisdiction in this court.

3           MR. O'BRIEN:  Thank you.  Let's go to the next

4    motion, and that's Mattel's Motion to Take Additional

5    Depositions and the Cross-Motion to Set an Overall Hours

6    Limit on the Depositions.

7           In light of the fact that the discovery cut-off

8    has been extended, and given the complexity of the case, I

9    think that this is a situation that does justify

10   additional depositions under the federal rules.  The

11   number of depositions obviously is the area of dispute

12   here, and also the hour limit.  So I'm going to rule that

13   additional depositions are in order.

14          What I'd like to get a handle on is how many

15   depositions are necessary to try the case, not how many

16   depositions it would be nice to take --

17          MR. QUINN:  Right.

18          MR. O'BRIEN:  -- in an ideal world, with

19   unlimited resources and all that sort of thing.  So if you

20   can focus on how many depositions you need and why, that

21   would be helpful.

22          And then I'll, Ms. Hurst, give you a chance --

23   I'm certainly cognizant of the concern that this be a

24   never-ending situation, so I want to get your take on the

25   number of depositions that are necessary.  Keep in mind,

Page 31

EXHIBIT  87  PAGE 1433

1           I, the undersigned, a Certified Shorthand

2  Reporter of the State of California, do hereby certify:

3           That the foregoing proceedings were taken

4  before me at the time and place herein set forth; that

5  any witnesses in the foregoing proceedings, prior to

6  testifying, were duly sworn; that a record of the

7  proceedings was made by me using machine shorthand

8  which was thereafter transcribed under my direction;

9  that the foregoing transcript is a true record of the

10  testimony given.

11           Further, that if the foregoing pertains to

12  the original transcript of a deposition in a Federal

13  Case, before completion of the proceedings, review of

14  the transcript [  ] was [  ] was not requested.

15           I further certify I am neither financially

16  interested in the action nor a relative or employee

17  of any attorney or party to this action.

18           IN WITNESS WHEREOF, I have this date

19  subscribed my name.

20

21  Dated: _____SEP 28 2009_____

22

23                   Cheryl R. Kamalski

                      CHERYL R. KAMALSKI

24                    CSR No. 7113

25

EXHIBIT __87__ PAGE __1434__