MELINDA HAAG (State Bar No. 132612)
mhaag@orrick.com
ANNETTE L. HURST (State Bar No. 148738)
ahurst@orrick.com
WARRINGTON S. PARKER III (State Bar No. 148003)
wparker@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building, 405 Howard Street
San Francisco, CA 94105
Tel. (415) 773-5700/ Fax: (415) 773-5759

WILLIAM A. MOLINSKI (State Bar No. 145186)
wmolinski@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
777 South Figueroa Street, Suite 3200
Los Angeles, CA 90017
Tel. (213) 629-2020/Fax: (213) 612-2499

THOMAS S. MCCONVILLE (State Bar No. 155905)
tmcconville@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
4 Park Plaza, Suite 1600
Irvine, CA 92614-2258
Tel: (949) 567-6700/Fax: (949) 567-6710

Attorneys for MGA Parties

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an individual<br><br>Plaintiff,<br><br>v.<br><br>MATTEL, INC., a Delaware Corporation<br><br>Defendant.<br><br>AND CONSOLIDATED ACTIONS.<br><br><br>**[PUBLIC REDACTED VERSION]** | Case No. CV 04-9049 DOC (RNBx)<br>Consolidated with Case Nos. CV 04-9059 and CV 05-2727<br><br>**DISCOVERY MATTER**<br><br>**[To Be Heard By Discovery Master Robert C. O'Brien]**<br><br>MGA PARTIES' OPPOSITION TO:<br><br>(1)  MATTEL, INC.'S MOTION TO COMPEL *IN CAMERA* REVIEW OF ALLEGEDLY NON-LEGAL LARIAN COMMUNICATIONS; AND<br><br>(2)  MATTEL, INC.'S MOTION TO COMPEL PRODUCTION AND/OR *IN CAMERA* REVIEW OF ALLEGEDLY NON-PRIVILEGED COMMUNICATIONS OF PARALEGALS<br><br>MGA'S CROSS-MOTION FOR A PROTECTIVE ORDER.<br><br>[Declarations of Isaac Larian, Janice L. Foti & Cynthia A. Lock  submitted concurrently; Declaration of Amy S. Park (submitted *in camera*)] |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY OF ARGUMENT ....................................... 1

STATEMENT OF FACTS ................................................................. 4

    A.    MGA And Larian's July And August Re-Review Of Privilege Logs And Corresponding Document Productions ................................ 4

    B.    Mattel's Further Demands That MGA And Larian Re-Review Privilege Logs ...................................................................... 6

    C.    Facts Pertinent To The Substantive Issues Raised By The Motions ........................................................................... 9

ARGUMENT ................................................................................ 12

I.    MATTEL HAS FAILED TO MEET ITS THRESHOLD LEGAL BURDEN OF ESTABLISHING AN ENTITLEMENT TO IN CAMERA REVIEW ................................................................ 14

    A.    Mattel's Contention That Mr. Larian "Funneled" Business Communications Through Lawyers That Were Then Withheld From Production Is Refuted By The Available Evidence ................. 14

    B.    MGA's Communications With Ms. Cahill And MGA's Other Paralegals Are Subject To Attorney-Client Privilege ....................... 18

II.    MATTEL HAS COMPLETELY FAILED TO SATISFY THE DISCRETIONARY FACTORS FOR AN IN CAMERA REVIEW OF 1500 ADDITIONAL DOCUMENTS ............................................ 19

    A.    The Volume Of Documents Proposed To Be Reviewed Militates Against A Further In Camera Review ................................. 19

    B.    Mattel Has Not Demonstrated the Importance Of The Information Sought To Be Reviewed ............................................ 20

    C.    Particularly Given The MGA Parties' Handling Of The Recent Meet And Confer Process, There Is No Good Reason To Believe That In Camera Review Will Result In The Production Of Further Documents ............................................................. 20

III.    THE DISCOVERY MASTER SHOULD GRANT THE MGA PARTIES' CROSS-MOTION REQUIRING MATTEL TO SERVE A COMPREHENSIVE, NON-DUPLICATIVE LIST FOR ANY ADDITIONAL PRIVILEGE RE-REVIEW ................................... 21

CONCLUSION ............................................................................. 23

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

## FEDERAL CASES

**Page(s)**

*Admiral Ins. Co.* v. *U.S. Dist. Court for Dist. Of Ariz.*,
  881 F.2d 1486 (9th Cir. 1988)..............................................................16

*Coltec Indus. Inc.* v. *Am. Motorists Insurance Co.*,
  197 F.R.D. 368 (N.D. Ill. 2000) ...........................................................18

*Federal Trade Comm'n* v. *GlaxoSmithKline*,
  294 F.3d 141 (D.C. Cir. 2002) .............................................................16

*In re Grand Jury Investigation*,
  974 F.2d 1068 (9th Cir. 1992) .............................................................13

*Kintera, Inc.* v. *Convio, Inc.*,
  219 F.R.D. 503 (S.D. Cal. 2003).........................................................17

*Laser Indus.* v. *Reliant Technologies, Inc.*,
  167 F.R.D. 417 (N.D. Cal. 1996).........................................................19

*McCaugherty* v. *Sifferman*,
  132 F.R.D. 234 (N.D. Cal. 1990) .........................................................15

*Mineba Co.* v. *Papst*,
  228 F.R.D. 13 (D.D.C. 2005) ..............................................................15

*Neuberger Berman Real Estate Income Fund, Inc.* v. *Lola Brown Trust No.*,
  *230*, F.R.D. 398 (D. Md. 2005)...........................................................15

*Newport Pacific Inc.* v. *County of San Diego*,
  200 F.R.D. 628 (S.D. Cal. 2001).........................................................12

*Owens* v. *First Family Fin. Servs.*,
  379 F. Supp. 2d 840 (D. Miss. 2005)...................................................18

*Platypus Wear, Inc.* v. *K. D. Co.*,
  905 F. Supp. 808 (S.D. Cal. 1995).......................................................12

*United States* v. *Davis*,
  132 F.R.D. 12 (S.D.N.Y. 1990) ...........................................................15

*United States* v. *ChevronTexaco Corp.*,
  241 F. Supp. 2d 1065 (N.D. Cal. 2002) ...............................................17

*United States* v. *Jara*,
  973 F.2d 746 (9th Cir. 1992)...............................................................13

*United States* v. *Zolin*,
  491 U.S. 554 (1989) .............................................. 2, 3, 13, 14, 15, 17, 19, 20, 21

1

**Page(s)**

*Upjohn Co.* v. *United States*,
    449 U.S. 383 (1981) ............................................................................. 16

*In re Vioxx Prods. Liab. Litig.*,
    501 F. Supp. 2d 789 (E.D. La. 2007) ................................................... 15

**STATE CASES**

*Aamco Transmissions Inc.* v. *Marino*,
    1991 WL. 193502 (E. D. Pa. Sept. 24, 1991) ....................................... 15

*B.F.G.* v. *Ameritech Corp.*,
    2001 WL. 1414468 (N.D. Ill. Nov. 13, 2001) ...................................... 15

*Bamberger Int'l Inc.* v. *Rohm & Haas Co.*,
    1997 WL. 33762249 (D.N.J. May 18, 1997) ........................................ 15

*Georgia-Pacific Corp.* v. *GAF Roofing Mfg. Corp.*,
    1996 WL. 29392 (S.D.N.Y. Jan. 25, 1996) .......................................... 15

*Jordan* v. *United States  Department of Justice*,
    2009 WL. 2913223 (D. Colo. September 8, 2009) ................................ 18

*Qualcomm Inc.* v. *Broadcom Corp.*,
    2008 WL. 66932 (S.D. Cal. Jan. 7, 2008) .............................................. 4

*United States* v. *Chevron Corp.*,
    1996 WL. 264769 (N.D. Cal. Mar. 13, 1996) ...................................... 15

**STATE STATUTES**

Cal. Evid. Code §915(a) ......................................................................... 12

Cal. Evid. Code §952 .............................................................................. 18

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1             **NOTICE OF CROSS-MOTION AND CROSS-MOTION**

2 **TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

3         PLEASE TAKE NOTICE THAT, on a date and time to be determined by the

4 Discovery Master, Plaintiffs and Counter-defendants MGA Entertainment Inc.,

5 MGA HK Limited, MGAE de Mexico S.R.L. de C.V., and Isaac Larian

6 (collectively, the "MGA Parties" or "MGA") will, and hereby do, cross-move

7 pursuant to Rule 26(c) for a protective order that after the parties comply with

8 Order No. 73, if Mattel has any further issues with MGA's privilege log, Mattel

9 serve a single, non-duplicative, list setting forth all privilege log entries for which it

10 requests re-review and the reasons therefore, that Mattel thereafter be required to

11 refrain from sending further such requests without leave of the Discovery Master

12 upon a showing of good cause, that the Discovery Master extend the meet and

13 confer period to authorize MGA to commence re-review of any such documents it

14 agrees to re-review only after the Discovery Master has completed the pending *in*

15 *camera* review so that MGA has the benefit of any guidance from the Discovery

16 Master regarding privilege judgments that are already under review, and that absent

17 authorization from the Discovery Master for good cause, Mattel file only a single

18 motion thereafter if there remain any disputes after such meet and confer is

19 completed.

20        The grounds for this Cross-Motion are that Mattel's serial repetitive letters

21 and serial repetitive motions demanding that MGA re-review privilege log entries

22 that have already been reviewed multiple times cause an undue burden to MGA.

23 MGA has already spent hundreds of hours re-reviewing privilege log entries, and

24 each time Mattel sends a new, often duplicative request or files a new, duplicative

25 motion, it results in enormous inefficiency as MGA ends up reviewing the same

26 documents over and over again in order to assess the context for each withheld

27 document. Mattel unreasonably refuses to screen its requests for duplication,

28 demonstrating that it is at best careless and at worst intends to place this undue

1  burden on MGA. Given Mattel's demonstrated inability to act carefully and in

2  good faith when invoking costly and burdensome privilege re-reviews, good cause

3  exists to grant the requested protective order.

4    This Cross-Motion is based upon this Notice and Motion, the memorandum

5  of points and authorities following herein, the Declarations of Isaac Larian, Janice

6  L. Foti, and Cynthia A. Lock, filed herewith, and the Declaration of Amy S. Park

7  submitted *in camera*, the papers and pleadings previously filed with the Court in

8  this action and referenced herein, and such further evidence and argument as may

9  be presented prior to or at the hearing on this Cross-Motion.

CERTIFICATE OF COMPLIANCE

11    Counsel for the MGA Parties discussed the issue of Mattel's refusal to

12  eliminate duplicates with Mattel on more than on one occasion, and also

13  corresponded regarding the topic on several occasions. MGA also informed Mattel

14  that it would request the instant relief. Finally, MGA demanded that Mattel

15  withdraw its two pending motions because they were moot in light of Order No. 73.

16  Mattel refused to agree to any of the foregoing.

Dated:    November 4, 2009

Respectfully submitted,

ANNETTE L. HURST
Orrick, Herrington & Sutcliffe LLP


By: _____
ANNETTE L. HURST
Attorneys for Plaintiff

OPPOSITION TO MATTEL'S MTC *IN CAMERA* REVIEW OF
ALLEGEDLY NON-LEGAL LARIAN COMMUNICATIONS
CV-04-9049 DOC (RNBx)

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

### INTRODUCTION AND SUMMARY OF ARGUMENT

3      Mattel's Motion to Compel an *In Camera* Review of Improperly Withheld

4   Non-Legal Larian Communications filed on October 13, 2009 ("October 13

5   Motion" or "Mot.") and Mattel's Motion to Compel Production and/or an *In*

6   *Camera* Review of Non-Privileged communications of Unsupervised Paralegals

7   filed on November 2, 2009 ("Nov. 2 Motion"), should be denied.  These Motions

8   are Mattel's eighth and ninth motions directed to the MGA Parties' privileged

9   documents or privilege logs, are duplicative of each other, and are moot in light of

10  Order No. 73.  Despite the fact that it requested *in camera* review of nearly 1300

11  documents in its October 13 Motion, Mattel brought the October 13 Motion without

12  engaging in any meaningful meet and confer.  Mattel then brought the November 2

13  Motion requesting *in camera* review of 429 documents, 211 of which were already

14  part of the October 13 Motion, and after the Discover Master had already issued

15  Order No. 73 requiring both sides to re-review all of their respective privilege logs.

16  Mattel's CEO Robert Eckert recently stated in his Q3 earnings call that Mattel will

17  continue to spend any amount of money on this litigation:  "[Mattel] will invest

18  whatever it takes for however long it takes as long as somebody wants to continue

19  litigating this."  Mattel's approach to the privilege log issues makes clear that it has

20  absolutely no regard for efficiency or common sense.  The Discovery Master must

21  step in to correct these abuses.  The October 12 and November 2 Motions should be

22  denied, and the Cross-Motion for Protective Order granted.

23      At the outset, both of Mattel's Motions should be denied as being moot in

24  light of Discovery Master Order No. 73 issued on October 30, 2009.  Order No. 73

25  already requires MGA (and Mattel) to re-review all privilege log entries for

26  sufficiency to demonstrate privilege.  Order No. 73 also orders the parties to revise

27  their logs, if necessary, to comply with the Federal Rules of Civil Procedure.

28  Despite Order No. 73, Mattel has refused to withdraw its Motions.  Indeed, Mattel

-1-

1   filed its November 2 Motion after receiving Order No. 73 on October 30.  Given

2   that Mattel's Motions and accompanying Appendices are premised on MGA

3   privilege logs that the Discovery Master has already anticipated may be revised,

4   Mattel's Motions are moot (or at least premature).  Furthermore, Order No. 73

5   provides a mechanism by which the parties are to wait until the expiration of a 45

6   day period to meet and confer concerning any issues as to the revised privilege logs.

7   Thus, Mattel is not precluded from raising any remaining issues with MGA's

8   privilege logs.  Allowing Mattel's Motions to go forward when the privilege logs

9   on which they are based may be revised is wholly inefficient and unproductive.

10  Mattel's Motions should be denied in light of Order No. 73.

11          If the Discovery Master does not deny Mattel's Motions as moot or unripe, it

12  should deny the Motions on the merits.  The issues raised in these Motions are part

13  of a series of repetitive, harassing meet and confer letters and motions demanding

14  re-review of many of the same documents over and over again, some of which have

15  already been submitted to the Discovery Master for *in camera* review.  In its

16  Motions, Mattel did not even bother to cite or discuss the cases setting forth the

17  proper legal standard for *in camera* review.  The Motions for further *in camera*

18  review should be denied because Mattel has not met the legal threshold under *Zolin*

19  for *in camera* review, and has not and cannot demonstrate that the discretionary

20  factors set forth in *Zolin* support further *in camera* review of another 1500

21  documents.  MGA's Cross-Motion for Protective Order requiring Mattel to serve a

22  comprehensive, single, non-duplicative list of all documents on MGA and Larian's

23  privilege logs of which it intends to seek re-review (if any), after the parties'

24  compliance with Order No. 73, should be granted.

25          First, Mattel has not met the threshold legal requirement to invoke *in camera*

26  review of these purportedly "non-legal" communications.  Mattel posits that MGA

27  engaged in the improper practice of "funneling" non-legal communications through

28  in-house attorneys to shield them from scrutiny.  What Mattel failed to disclose in

OPPOSITION TO MATTEL'S MTC *IN CAMERA* REVIEW OF
ALLEGEDLY NON-LEGAL LARIAN COMMUNICATIONS
CV-04-9049 DOC (RNBx)

1    its Motion positing a widespread practice of improper funneling and subsequent

2    withholding of non-legal communications is that the MGA Parties have in fact

3    *produced thousands of documents copied to in-house counsel*.  Where MGA has

4    withheld communications with in-house counsel, it has properly withheld

5    communications made for a legal purpose.  Mattel has not met the legal threshold

6    for an *in camera* review of 1500 additional documents.  Part I(A), *infra*.

7        Second, even if Mattel had met the threshold legal requirements to invoke *in*

8    *camera* review, it plainly fails with respect to the discretionary elements of the test

9    announced in *Zolin*.  1500 documents is an astronomical number in this context.  It

10   will require hundreds, if not thousands, of hours of review by the Discovery Master

11   in addition to the attorney review by MGA that will precede such a submission.  It

12   is on its face an inappropriate request, particularly where Mattel has made no

13   meaningful effort to meet and confer and has demonstrated nothing wrong at all

14   with the process by which MGA has already been re-reviewing privilege log

15   entries.  As recognized both by Judge Larson and the Discovery Master, MGA's

16   new counsel have taken extraordinary steps to address any issues related to

17   privilege logs.  Commending MGA counsel's efforts, Judge Larson stated:  ███

18   █████████████████████████████████████████████████████████████████████

19   ████████████████████████████████████████████████████ MGA's only

20   demand has been that Mattel simply refrain from duplicating its requests—an

21   entirely reasonable one under the circumstances.  When the required discretionary

22   factors are considered, it is apparent that no *in camera* review of another 1500

23   documents is necessary or appropriate.  Part I(B), *infra*.

24       Finally, in light of Mattel's repeated duplicative demands for re-review of

25   MGA and Larian's privilege logs, MGA and Larian cross-move for a protective

26   order requiring Mattel to identify, once and for all, all of the privilege log entries

27   that it wishes re-reviewed.  Serial re-reviews of the privilege logs are plainly

28   inefficient and wasteful, and Mattel has to date proven itself incapable of coming

OPPOSITION TO MATTEL'S MTC *IN CAMERA* REVIEW OF
ALLEGEDLY NON-LEGAL LARIAN COMMUNICATIONS
CV-04-9049 DOC (RNBx)

1   up with a comprehensive list and sticking to it.  Accordingly, MGA requests that

2   the Discovery Master order it to do so.  Once Mattel has done so and there has been

3   a comprehensive additional review and response, if any disputes remain for

4   adjudication, they will surely be much narrower than these serial, scattershot

5   requests for the re-review of hundreds or thousands of documents.  Part III, *infra*.

### STATEMENT OF FACTS

A.     <u>**MGA And Larian's July And August Re-Review Of Privilege Logs And Corresponding Document Productions.**</u>

9        On May 18, 2009, the Discovery Master issued Order No. 33 requiring an *in*

10  *camera* review of approximately 540 documents.  Order No. 33.  In opposing the

11  Motion that resulted in Order No. 33, then-counsel for MGA and Larian had not

12  agreed to re-review the documents during meet and confer but instead had relied

13  upon an earlier "certification" made by Skadden Arps during the Phase 1

14  Proceedings.  Krug Decl. Ex. 12 at 500, n.4.  As soon as Orrick came into the case

15  in early July 2009, it undertook the process of collecting and reviewing every one

16  of the documents that were to be the subject of the *in camera* review to confirm

17  whether they should continue to be withheld and submitted to the Discovery

18  Master, or whether they should be produced in whole or in part.  Declaration of

19  Cynthia A. Lock ("Lock Decl.") ¶¶4-5.  *See Qualcomm Inc. v. Broadcom Corp.,*

20  2008 WL 66932, at *13 (S.D. Cal. Jan. 7, 2008) (sanctioning outside counsel for

21  ignoring the warning signs that the document search and production were

22  inadequate and accepting the unsubstantiated assurances of client).

23       Although Orrick's review process was hampered by the ongoing transfer of

24  files including the migration of numerous document databases, Orrick ultimately

25  spent hundreds of hours collecting and reviewing documents from the privilege

26  logs as part of the submission in response to Order No. 33.  *Id.* ¶¶6-7.  While this

27  review was ongoing during the month of July, Mattel made another letter request

28  for re-review of privilege documents.  *Id.* ¶15; Lock Decl. Ex. 6 (July 17, 2009

OPPOSITION TO MATTEL'S MTC *IN CAMERA* REVIEW OF
ALLEGEDLY NON-LEGAL LARIAN COMMUNICATIONS
CV-04-9049 DOC (RNBx)

1   Letter from Dylan Proctor). This July 17, 2009 letter request demanded that MGA

2   and Larian re-review an additional 300 documents, as well as produce another 200

3   documents agreed to be produced by prior counsel. *Id.* ¶¶15, 18. At least nineteen

4   of the documents listed in Mattel's July 17 letter had already been identified in

5   Order No. 33 as part of the *in camera* review. *Id.* ¶16. On August 24, 2009, MGA

6   and Larian responded in detail to the July 17 letter with a *thirty-two page single-*

7   *spaced letter* responding to the privilege challenges. *Id.* ¶19; Lock Decl. Ex. 8

8   (August 24, 2009 Letter to Dylan Proctor). Mattel did not respond further. Lock

9   Decl. ¶19.

10           In the meantime, however, Mattel did quibble with the fact that Orrick had

11  undertaken to re-review the documents to be submitted *in camera*. Indeed, Mattel

12  went so far as to accuse MGA and Larian of contempt of Order No. 33 for failing to

13  submit documents for *in camera* review when Orrick had promised to produce them

14  but had not yet done so pending its final privilege review. *Id.* ¶10; Lock Decl. Ex.

15  1 (August 18 and 19, 2009 emails between Cynthia A. Lock and Dylan Proctor).

16  Despite these threats and accusations, as a result of Orrick's review MGA and

17  Larian ultimately produced approximately 100 documents of those that had been

18  identified for submission *in camera* in Order No. 33 (Lock Decl. Ex. 2 (August 21,

19  2009 Letter to Dylan Proctor)), produced 195 of the 200 documents identified for

20  production by prior counsel in response to Mattel's July 17 letter (Lock Decl. Ex. 7

21  (August 14, 2009 Letter to Dylan Proctor)), and produced approximately 180

22  documents of the other 300 documents identified in the July 17 letter (Lock Decl.

23  Ex. 9 (September 17, 2009 Letter)). Lock Decl. ¶¶9, 11-12, 18, 20. Thus, since the

24  re-review process began, MGA and Larian have produced nearly 500 documents.

25           Rejecting Mattel's assertions that MGA had done something wrong by re-

26  reviewing the documents to be submitted *in camera*, the Discovery Master

27  expressly thanked Orrick for doing so and confirmed it had employed the correct

28  procedure:

1    Thank you. By the way, I do want to commend MGA in this
2    situation, not for the late production, but for producing documents
     absent -- I think some of those documents were the documents --
3    were a subset of the documents that were provided to us for an in
4    camera review, so I do appreciate the fact that you've been able to
     go through and get some of those documents to Mattel, without
5    commenting on when they should have been produced or that sort
6    of thing, 19 because it is helpful to … relieve some of our burden in
     going through those documents.
7    But also, I'm sure, Mattel appreciates it. So thank you for getting
8    that done.

9    Lock Decl. ¶13; Lock Decl. Ex. 4 (Transcript of August 27, 2009 Hearing) at

10   20:10-21:3.  Discovery Master O'Brien also encouraged the parties to continue to

11   work together during the meet and confer process to relieve the burden on the

12   Discovery Master.  *Id.*  Judge Larson twice confirmed this view as well at the

13   hearing in response to the Court's August 31, 2009 Order to Show Cause, nothing

14   that ███████████████████████████████████████████████

15   ███████████████████████████████████████████████

16   ███████████████████████████████████████████████

17   ██████████████████Lock Decl. Ex. 5 (Transcript of September 22, 2009

18   Proceedings) at 4:19-5:6, 21:22 - 25:10.

19       **B.    Mattel's Further Demands That MGA And Larian Re-Review**
20            **Privilege Logs**

21       On September 9, 2009, Mattel demanded review of an additional 1,200

22   documents from MGA and Larian's privilege logs, contending that Mr. Larian had

23   funneled non-legal communications through in-house lawyers.  Lock Decl. ¶21;

24   Lock Decl. Ex. 10 (September 9, 2009 Letter from Dylan Proctor to Annette Hurst).

25   Some of the documents listed in Mattel's September 9 letter had already been

26   submitted to the Discovery Master for *in camera* review.  Lock Decl. ¶22.  Others

27   had been previously identified in Mattel's July 17 letter to which MGA and Larian

28

OPPOSITION TO MATTEL'S MTC *IN CAMERA* REVIEW OF
ALLEGEDLY NON-LEGAL LARIAN COMMUNICATIONS
CV-04-9049 DOC (RNBx)

1   had already responded in exhaustive detail on August 24, and had heard nothing

2   further on the subject. *Id.*

3        On September 16, 2009, MGA responded. *Id.* ¶23; Lock Decl. Ex. 11

4   (September 16, 2009 Letter to Dylan Proctor). Consistent with its repeated efforts

5   to respond to Mattel's concerns about privilege logs, MGA and Larian offered to

6   review the documents once the requests were de-duplicated. *Id.* Mattel did not

7   respond. *Id.* ¶24. Instead, on October 9, 2009, Mattel sent yet another letter

8   demanding further and additional review of privilege logs. Lock Decl. ¶25; Lock

9   Decl. Ex. 12 (October 9, 2009 Letter from Dylan Proctor to Annette Hurst). This

10  time, Mattel listed 400 documents, contending that they were communications with

11  a paralegal and therefore improperly withheld. *Id.* ¶26. Comparison of the October

12  9 letter with the September 9 letter reveals that approximately half of the documents

13  listed also appeared on the September 9 letter. *Id.* ¶27; *compare* Lock Decl. Ex. 10

14  (September, 9, 2009 Letter from Dylan Proctor to Annette Hurst) with Decl. Ex. 12

15  (October 9, 2009 Letter from Dylan Proctor to Annette Hurst). For example, of the

16  documents listed on Mattel's September 9 and October 9 letters under "MGA's

17  Supplemental Privilege Log – August 14, 2007, revised March 20, 2008 and April

18  17, 2009 ("Rev. Aug. Log")," the following entry numbers appear in both the

19  September 9 and October 9 letters: 299 (also on the July 17 letter), 420, 554 (also

20  on the July 17 letter), 556, 591 (also on the July 17 letter), 603.2, 604 (also on the

21  July 17 letter), 618.1r (also on the July 17 letter), 707, 713, 724, 726, 727, 728, 730,

22  732, 739, 744, 847, 848, 849, 850, 851, 858, 859, 869r, 884, 889r, 904, 922, 925,

23  936, 936r, 938, 939, 941, 944, 948, 949, 950, 952, 958r, 979, 994, 996, 998, 1003,

24  1020, 1024, 1032, 1033, 1035, 1050, 1052, 1065, 1069 and 1085. Lock Decl. ¶27.

25  The other logs listed in the September 9 and October 9 letters contain similar

26  numbers of duplicate entries among the July 17, September 9 and October 9 letters.

27  *Id.*

28

1    Because of the Columbus Day holiday, under the Discovery Master

2    Stipulation MGA's response to Mattel's October 9 letter was not due until October

3    19. *Id.* ¶28.  And, on October 9, MGA had confirmed to Mattel that it would

4    respond to the request for meet and confer during the week of October 12.  Lock

5    Decl. Ex. 13 (October 9, 2009 Email to Dylan Proctor).  Rather than wait for

6    MGA's response, on October 13, Mattel filed a Motion seeking *in camera* review

7    of every document on its "Appendix A" ("October 13 Appendix A").

8    Appendix A to the October 13 Motion purports to reflect 1,296 privilege log

9    entries appearing on various MGA and Larian logs.  *See* October 13 Appendix A

10   titled "Appendix A of MGA Privilege Log Entries:  Larian/In-House

11   Communications."  Mattel explains nowhere exactly what the October 13 Appendix

12   A is supposed to represent.  Mattel offers no testimony as to what the October 13

13   Appendix A summarizes, or whether it is a summary of entries on MGA and

14   Larian's privilege logs in accordance with any unifying principle.  The best MGA

15   and Larian can ascertain, the October 13 Appendix A is a listing of some

16   communications including Isaac Larian and in-house counsel or paralegals.

17   On November 2, 2009, Mattel filed yet another Motion seeking production of

18   or *in camera* review of 429 documents, which it listed on another Appendix A

19   ("November 2 Appendix A").  *See* Appendix A titled "Appendix A of MGA

20   Privilege Log Entries:  Unsupervised Paralegal Communications."  Again Mattel

21   fails to explain what the November 2 Appendix A is supposed to represent, or how

22   it differs from the October 13 Appendix A.  In fact, of the 429 documents listed on

23   the November 2 Appendix A, 211 of them appear on the October 13 Appendix A.

24   On November 3, 2009, MGA requested that Mattel withdraw both of its Motions in

25   view of Order No. 73, but Mattel refused to do so.  Lock Decl. Ex. 16 (November

26   3, 2009, Lock email to Proctor) and Ex. 17 (November 3, 2009, Proctor letter to

27   Lock).

28

1

2

3

**C.    Facts Pertinent To The Substantive Issues Raised By The Motions.**

**1.    MGA's Legal Employees And Production Of Documents Involving Communications With Them.**

4

5

6

7

8

9

10

11

12

13

14

Prior to 2002, MGA did not employ any in-house counsel. Declaration of Isaac Larian ("Larian Decl.") ¶2. MGA's first General Counsel was Julie Mote, who started work for MGA in March 2002. *Id.*; Declaration of Janice L. Foti ("Foti Decl.") ¶5. Prior to that time, MGA relied exclusively on outside counsel for legal services. MGA had relationships with many outside counsel for a variety of different types of matters: David Rosenbaum for transactional licensing matters; Alan Rose of Oppenheimer Wolff & Donnelly for patent prosecution and other IP matters; Lucy Arant for trademark matters; and Patty Glaser handled MGA's litigation. Larian Decl. ¶2. In working with MGA's outside counsel, Mr. Larian always understood that their employees, including paralegals and secretaries, were included within the scope of the privilege. *Id.*

15

16

17

18

19

20

21

22

23

24

25

MGA's first in-house legal employee was Beth Cahill, who was hired by Mr. Larian with the title Director of Legal. *Id.* ¶3; Foti Decl. ¶4. Once Julie Mote was hired as General Counsel, Ms. Cahill was supervised by the General Counsel at MGA. Larian Decl. ¶6. Ms. Mote was with the company until October 4, 2002. Foti Decl. ¶5. Mitchell Kamarck, who succeeded Ms. Mote as MGA's General Counsel, joined the company on September 23, 2002 and left on January 23, 2004. *Id.* ¶6. Thereafter, MGA employed several other in-house attorneys as follows: Donna Cunningham, Chief Administrative Officer, General Counsel, July 28, 2003 to September 2003 (Ms. Cunningham left MGA on August 26, 2003, but consulted as General Counsel until September 2003.)[1]; Daphne Gronich, MGA's General Counsel from December 15, 2003 until December 31, 2007; David Oakes, Senior

26

27

28

---

[1] Ms. Cunningham also had consulted as General Counsel beginning on June 4, 2003 until she was hired on July 28, 2003. Foti Decl. ¶7.

1  Counsel, from July 14, 2003 until December 8, 2008; Judy Kim, Temporary In-

2  house Counsel from October 20, 2003 until January 12, 2007.  *Id.* ¶¶7-9.

3      All of the in-house attorneys who are identified in any of the entries listed on

4  Appendix A were employed exclusively for the purpose of providing legal advice

5  to MGA.  Larian Decl. ¶8.  None of MGA's in-house attorneys had business

6  responsibilities, such as business development, negotiation of business terms of

7  contracts, public relations, government lobbying, or the other types of business

8  duties that lawyers sometimes fulfill.  *Id.*  None of these in-house counsel held titles

9  such as "Business Affairs" or "Licensing."  Foti Decl. ¶9.  Although Ms.

10  Cunningham was originally hired with dual titles, she was with the company such a

11  short time that she never assumed a business role.  Larian Decl. ¶9.  Rather, all of

12  her work was legal in nature.  *Id.*

13      Mr. Larian did *not* copy in-house counsel on such communications because

14  he was trying to "shield" or "funnel" business communications through lawyers,

15  but for purposes of efficiency in communicating the information people needed in

16  order to do their jobs.  *Id.* ¶11.  Mr. Larian copied in-house and outside attorneys on

17  his communications both for the purposes of obtaining legal advice and for the

18  purpose of keeping them informed regarding issues developing in the company that

19  may require their future attention.  *Id.* ¶¶10-11.  Sometimes Mr. Larian cc:ed

20  attorneys on an e-mail addressed to others in the company for the purpose of letting

21  them know he wanted their input on a matter.  *Id.* ¶10.  Sometimes Mr. Larian cc:ed

22  them on an e-mail addressed to others in MGA to keep them apprised of facts and

23  circumstances that he believed did not require immediate legal advice but might

24  warrant their future attention in a legal capacity.  *Id.*  Like any busy executive, Mr.

25  Larian copies everyone whom he believes needs to know the information in order to

26  fulfill their duties.  *Id.* ¶11.  Mr. Larian always understood in doing so that

27  communications for the purposes of obtaining legal advice, or giving facts

28

- 10 -

necessary to obtain legal advice, were privileged. *Id.* MGA left it up to its trial

counsel to sort out what should be produced and what should not. *Id.*

And, MGA and Larian have produced *thousands* of documents reflecting

communications with in-house counsel. Lock Decl. ¶¶30-32. Documents

reflecting communications with every single one of the attorneys listed on the

October 13 Motion Appendix A have been produced. *Id.* When Skadden

conducted its privilege review, it used the appropriate legal standards for assessing

the privilege with respect to communications with in-house counsel. Declaration of

Amy S. Park ("Park Decl.") ¶¶2-5 (submitted *in camera*).

## 2.    Beth Cahill's Tenure At MGA.

Prior to hiring Ms. Cahill in 2001, MGA had never had an in-house legal

employee, and Mr. Larian had not previously hired any in-house legal employees.

Larian Decl. ¶¶2-3. When she was hired by MGA, Ms. Cahill was a certified

paralegal with 10 years of experience who had worked at several large companies

as a paralegal and contract administrator. *Id.* ¶3. In her last position before MGA

hired her, Ms. Cahill managed the legal department of Applause. *Id.* Ms. Cahill's

experience included working with outside counsel on a variety of matters, including

intellectual property matters. *Id.*

Mr. Larian hired Ms. Cahill principally because the volume of

communications between outside counsel and MGA had become difficult to

manage with MGA's existing personnel. *Id.* ¶4. Ms. Cahill's principal duty when

she was hired was to manage the flow of information to and from MGA's various

outside counsel, with particular responsibility for assisting Mr. Larian in developing

a network of outside attorneys to handle worldwide trademark, patent and IP

protection. *Id.*

During her initial tenure prior to the time MGA hired Ms. Mote as General

Counsel, Ms. Cahill was MGA's primary point of contact for outside counsel with

the responsibility for coordinating MGA's communications with them. *Id.* During

1   this time, Ms. Cahill assisted Mr. Larian in hiring a number of lawyers to work on

2   IP matters on a worldwide basis.  *Id.*

3       Throughout her tenure at MGA, Ms. Cahill interacted closely with MGA's

4   employees and acted as a liaison between MGA's employees and inside or outside

5   counsel.  *Id.* ¶7.  Ms. Cahill often received requests for legal advice or that legal

6   action be taken from MGA's employees.  *Id.*  Ms. Cahill would then communicate

7   these requests for advice or action to MGA's in-house and/or outside counsel.  *Id.*

8   Ms. Cahill also frequently, and at the request of outside counsel, obtained

9   information that outside counsel needed to provide MGA with legal advice.  *Id.*

10      Mr. Larian did not believe there was any difference in how the attorney-

11  client privilege applied to his communications with outside counsel depending on

12  whether it was a paralegal employed by MGA, or one employed by their firms, who

13  was serving as the point of contact and managing the flow of information.  *Id.* ¶5.

14  It made much more sense for MGA to save money by having a salaried employee

15  perform the functions needed by outside counsel in terms of collecting and

16  managing MGA's information, rather than having MGA provide all of it *en masse*

17  to outside counsel and letting them do the work.  *Id.*  Mr. Larian always believed

18  that his communications with Ms. Cahill after she was hired were covered by the

19  attorney-client privilege, because her duties were to coordinate MGA's services

20  from outside counsel.  *Id.*

## ARGUMENT

21

22  *In camera* review is disfavored.  *Newport Pacific Inc. v. County of San

23  Diego*, 200 F.R.D. 628, 633 (S.D. Cal. 2001).[2]  The Ninth Circuit requires that a

24  _____

[2] Indeed, under California law it is prohibited altogether for the purpose of
25  assessing a claim of attorney-client privilege.  Cal. Evid. Code §915(a).  Mattel has
    made no showing that the documents sought to be reviewed here are relevant to a
26  federal claim.  Federal courts apply state privilege law with respect to a claim or
    defense when state law supplies the rule of decision.  Fed. R. Ev. 501.  In a federal
27  question case, where the documents sought are relevant only to pendent state law
    claims and not to the federal claims, state privilege law applies.  *Platypus Wear,*
28  *Inc. v. K. D. Co.*, 905 F. Supp. 808, 811 (S.D. Cal. 1995) (state law applies where
    the evidence sought went only to state law theories of liability).

1    party contesting assertions of privilege satisfy the two-step test under *United States*

2    *v. Zolin*, 491 U.S. 554  (1989), before an *in camera* review can be ordered.  The

3    standard in *Zolin* applies for consideration of *in camera* review requested for any

4    reason.  As the court held in *In re Grand Jury Investigation*, 974 F.2d 1068, 1074

5    (9th Cir. 1992), "we find that the standard established in *Zolin* for crime-fraud in

6    camera review applies equally well when a party seeks in camera review to contest

7    assertions of the privilege."

8        The *Zolin* two-part test involves both legal and discretionary factors.  Under

9    the first prong, the party opposing the privilege must first show a factual basis

10   sufficient to support a reasonable, good faith belief that non-privileged documents

11   are being withheld.  *Zolin*, 491 U.S. 554 at 572; *In re Grand Jury Investigation*, 974

12   F.2d at 1074.  As the Ninth Circuit further explained in *United States v. Jara,* 973

13   F.2d 746 (9th Cir. 1992), this threshold requirement is designed to make sure that

14   the important policy goal of "protecting open and legitimate disclosure between

15   attorneys and clients" is not compromised by readily allowing *in camera* review of

16   privileged materials.  *Jara,* 973 F.2d at 749.

17       Once the *Zolin* first-step legal threshold of a good faith basis to believe there

18   are problems has been met, there are several additional discretionary factors that

19   must be considered before a court decides to conduct an *in camera* review.  In

20   particular, a court is required to consider at least the three factors enumerated by the

21   Supreme Court in *Zolin*, including: (1) the volume of materials the court has been

22   asked to review, (2) the relative importance to the case of the alleged privileged

23   information, and (3) the likelihood that the evidence produced through *in camera*

24   review will establish that information is not privileged.  *Zolin*, 491 U.S. at  572.

25       Mattel has met neither the legal nor discretionary requirements of *Zolin* for *in*

26   *camera* review of nearly 1500 more documents.  As an initial matter, it is

27   significant to note that Mattel wholly failed to cite or discuss the *Zolin* test in any

28   way in its Motions, despite the Ninth Circuit's clear precedent requiring application

OPPOSITION TO MATTEL'S MTC *IN CAMERA* REVIEW OF
ALLEGEDLY NON-LEGAL LARIAN COMMUNICATIONS
CV-04-9049 DOC (RNBx)

of that test to *all* requests for *in camera* review. In the Motions, Mattel completely ignored the proper standard for *in camera* review as articulated by the Supreme Court and Ninth Circuit. Mattel's complete failure to discuss and demonstrate evidence meeting the two-part *Zolin* test, and its reliance instead upon the straw man that it is MGA and Larian's burden to sustain a showing of privilege (October 13 Mot. at 7), is an independent ground requiring outright denial of the Motions. This is particularly true where the complete failure to discuss the pertinent legal standard in the Motions will inevitably lead to the filing of replies that sandbag MGA with new arguments. Should the Discovery Master nonetheless proceed to consider the Motions under the proper standards despite Mattel's failure to cite and discuss them, then the Motions should be denied under those standards.

As to the *Zolin* legal threshold, Mattel misunderstands and misapplies the legal standards of the dominant purpose doctrine, and has not demonstrated any improper "funneling" of business communications through lawyers. Part I, *infra*. As to the *Zolin* discretionary factors, Mattel has not even attempted to show why further review as part of the meet and confer process is inadequate to the task, especially in light of Order No. 73and in light of the enormous burden and expense associated with the *in camera* review of another 1500 documents. Part II, *infra*. When examined from any angle, Mattel's Motions are fundamentally flawed.

## I.   MATTEL HAS FAILED TO MEET ITS THRESHOLD LEGAL BURDEN OF ESTABLISHING AN ENTITLEMENT TO *IN CAMERA* REVIEW.

### A.   Mattel's Contention That Mr. Larian "Funneled" Business Communications Through Lawyers That Were Then Withheld From Production Is Refuted By The Available Evidence.

Mattel cites a variety of cases for the proposition that communications with in-house counsel are not privileged unless made for legal purposes. October 13 Mot. at 8-11. MGA and Larian do not dispute this basic proposition. The cases cited by Mattel, however, all concern attorneys acting in dual capacities and have no application here, because none of the attorneys involved in the communications

- 14 -

1    listed on the October 13 Appendix A had dual business and legal roles.[3]  These

2    cases are wholly inapposite, and therefore cannot demonstrate Mattel's entitlement

3    to review under the first prong of the *Zolin* test.

4        Moreover, the notion that MGA and Larian were improperly "funneling"

5    business communications through lawyers which were then withheld by MGA's

6    litigation counsel in this case is decisively refuted by the sheer volume of

7    communications involving those lawyers that were produced.  MGA has produced

8    approximately 2,100 documents that include one or more of MGA's in-house

9    counsel.  Lock Decl. ¶¶31-32.  Skadden's general privilege review procedures

10   employed the proper legal standards.  Park Decl. ¶¶2-5 (submitted *in camera*).  In

11   re-reviewing documents identified by Mattel during the meet and confer process,

12   Orrick has also independently confirmed the basis for withholding numerous

---

13

14   [3] *In re Vioxx Prods. Liab. Litig.*, 501 F. Supp. 2d 789, 797 (E.D. La. 2007)
(recognizing the uniquely regulated nature of the drug industry and the decision
making role played by Merck's in-house counsel in publication of corporate

15   communications); *Neuberger Berman Real Estate Income Fund, Inc. v. Lola Brown
Trust No.*, 230 F.R.D. 398, 411 (D. Md. 2005) (recognizing the "pervasive role"

16   played by the in-house counsel where in-house counsel also acted in the capacity of
an officer or director); *Georgia-Pacific Corp. v. GAF Roofing Mfg. Corp.*, 1996

17   WL 29392, at *4 (S.D.N.Y. Jan. 25, 1996) (recognizing that "staff attorneys may
serve as company officers with mixed business-legal responsibility" and finding

18   that in-house counsel was acting in business capacity when he served as negotiator
on behalf of management); *McCaugherty v. Sifferman*, 132 F.R.D. 234, 238 (N.D.

19   Cal. 1990) ("the ultimate goal of the relevant work … was a *business* goal" and
communications occurred in an environment "where there was a clear business

20   purpose"); *Bamberger Int'l Inc. v. Rohm & Haas Co.*, 1997 WL 33762249, at *3
(D.N.J. May 18, 1997) (memorandum prepared by an internal investigator was the

21   result of business investigation); *United States v. Chevron Corp.*, 1996 WL 264769,
at *4 (N.D. Cal. Mar. 13, 1996)("Chevron was legitimately involving its in-house

22   counsel in its *business decisions*"); *United States v. Davis*, 132 F.R.D. 12, 16
(S.D.N.Y. 1990)(in-house counsel's "role as general counsel was steeped in the

23   negotiating process" and related to "economic matters, and not legal in nature");
*B.F.G. v. Ameritech Corp.*, 2001 WL 1414468, at *6 (N.D. Ill. Nov. 13,

24   2001)("corporation direct[ed] in-house attorney to work with a business team");
*Mineba Co., Ltd. v. Papst*, 228 F. R. D. 13, 21 (D.D.C. 2005) (recognizing that an

25   in-house counsel may perform multiple functions and denying privilege where the
in-house counsel was "simply one of multiple individuals at management levels in

26   the company copied on the memoranda"); *Aamco Transmissions Inc. v. Marino*,
1991 WL 193502, at *3 (E. D. Pa. Sept. 24, 1991)(reports prepared by internal

27   investigator and consumers affairs department not privileged where general
counsel's office was merely copied with no evidence that legal advice was sought).

28

communications with in-house counsel.  Lock Decl. Ex. 8.  Orrick's August 24

letter explains in detail the basis for withholding many documents where MGA's

in-house counsel were copied.  *Id.* at pages 70, 72, 74, 75, 82, 83, 84, 86, 87, 88,

89, 90, 91, 92, 93, 94, 95, 96, 97, 98 and 99.  In each instance, MGA's in-house

counsel transmitted or provided legal advice, or gathered information for the

purpose of communicating legal advice or obtaining legal advice from outside

counsel.  Mattel has not challenged this is any way.

Mattel argues that Ms. Treantefelles (née Garcia) was copied on numerous

communications by Mr. Larian with in-house attorneys.  ***So what***.  That is only to

be expected since she was and is a senior manager of the company, with long tenure

at MGA and important responsibilities.  Lock Decl. Ex. 14 (Garcia Depo. May 24,

2007) at 24:24-25:19.  It is entirely proper for those in a company, especially a

relatively small company with few executives, to disseminate important legal

information by including one another in key communications.  The fact that several

non-attorneys were copied on legal communications proves precisely nothing.

*Upjohn Co. v. United States*, 449 U.S. 383, 394 (1981) (attorney-client privilege is

applicable to communications "not available from upper-echelon management, [that

were] needed to supply a basis for legal advice . . . concerning matters within the

scope of the employee's corporate duties, and the employees themselves were

sufficiently aware that they were being questioned in order that the corporation

could obtain legal advice."); *Admiral Ins. Co. v. U.S. Dist. Court for Dist. Of Ariz.*,

881 F.2d 1486, 1492 (9th Cir. 1988) ("privilege applies to communications by any

corporate employee regardless of position when the communications concern

matters within the scope of the employee's corporate duties and the employee is

aware that the information is being furnished to enable the attorney to provide legal

advice to the corporation"); *Federal Trade Comm'n v. GlaxoSmithKline*, 294 F.3d

141, 148 (D.C. Cir. 2002) ("[w]e can imagine no useful purpose in having a court

review the business judgment of each corporate official who deemed it necessary or

1    desirable for a particular employee or contractor to have access to a corporate

2    secret.  It suffices instead that the corporation limited dissemination to specific

3    individuals whose corporate duties relate generally to the contents of the

4    documents."); *United States v. ChevronTexaco Corp.*, 241 F. Supp. 2d 1065, 1077

5    (N.D. Cal. 2002) (production of communications between non-attorney corporate

6    employees discussing or transmitting legal advice given by counsel would

7    "obviously reveal privileged communications."); *Kintera, Inc. v. Convio, Inc.*, 219

8    F.R.D. 503, 51314 (S.D. Cal. 2003) (emails from the vice president of sales to a

9    "narrow group" of non-lawyer employees regarding internal document collection

10   efforts for purposes of transmitting information to counsel for advice were

11   protected by the attorney-client privilege).

12          The examples cited by Mattel as its "evidence" of "funneling" business

13   communications demonstrate only that non-attorneys reasonably believed that

14   MGA's in-house counsel should be aware of the issues discussed in the documents.

15   From a non-attorney's perspective, it was reasonable to inform MGA's in-house

16   counsel of the sensitive and confidential issues discussed in the documents.  Rather

17   than proving that MGA's employees had some nefarious purpose behind copying

18   in-house counsel, Mattel's examples demonstrate that MGA's employees were

19   careful to keep its attorneys informed of issues within the company, particularly

20   sensitive issues that could later require the involvement of attorneys.  From a

21   compliance perspective, this is a highly salutary purpose and exactly the kind of

22   thing that should not be discouraged.

23          Given the foregoing, Mattel has not meet the *Zolin* legal threshold for an *in*

24   *camera* review of 1500 additional documents simply because a number of in-house

25   counsel, who had solely legal functions, were copied on communications involving

26   non-lawyers.  Mattel's Motions should be denied outright.

27

28

1

2

### B.    MGA's Communications With Ms. Cahill And MGA's Other Paralegals Are Subject To Attorney-Client Privilege.

3    Beth Cahill, MGA's first legal employee, was hired in October 2001 with the

4    title of Director of Legal.  Larian Decl. ¶3; Foti Decl. ¶4.  MGA hired its first in-

5    house lawyer, Julie Mote, in March 2002.  Larian Decl. ¶2; Foti Decl. ¶5.  After

6    March 2002, Beth Cahill was supervised and worked under the direction of

7    numerous MGA's General Counsel, including Julie Mote (March 5, 2002 to

8    October 4, 2002), and Mitchell Kamarck (September 23, 2002 to January 23, 2004).

9    Larian Decl. ¶6; Foti Decl. ¶¶5-6.  Ms. Cahill's principal duties were to coordinate

10   the flow of information to and from outside counsel.  Such duties also properly

11   support a claim of privilege.  *See* Cal. Evid. Code §952; *Jordan v. United States*

12   *Department of Justice*, 2009 WL 2913223, at *22 (D. Colo. September 8, 2009)

13   (memorandums prepared by the paralegals at the direction of counsel were

14   protected by work product privilege); *Owens v. First Family Fin. Servs.,* 379 F.

15   Supp. 2d 840, 847-48 (D. Miss. 2005) (work of paralegal covered by the attorney-

16   client privilege); *Coltec Indus. Inc. v. Am. Motorists Insurance Co.*, 197 F. R. D.

17   368, 376 (N.D. Ill. 2000) (document authored by a paralegal protected by the

18   attorney-client privilege).  Communications that MGA's in-house paralegals had

19   with in-house or outside counsel related to the request for or communication of

20   legal advice are protected by the attorney-client privilege.  We have found no cases

21   refusing to apply the privilege to paralegal communications because they were

22   client employees acting to coordinate the communications of outside counsel rather

23   than the employees of outside counsel.  Such a rule would do nothing other than to

24   impose unnecessary costly burdens on clients seeking outside legal advice.[4]

25

26

---

27   [4] Mattel's November 2 Appendix A adds additional documents that it contends are not protected by the attorney-client privilege because the communications involve "unsupervised" paralegals.  However, this argument ignores that after Ms. Mote was hired, all of MGA's paralegals were supervised by in-house counsel.

28

1    **II.    MATTEL HAS COMPLETELY FAILED TO SATISFY THE**
2         **DISCRETIONARY FACTORS FOR AN *IN CAMERA* REVIEW OF**
         **1500 ADDITIONAL DOCUMENTS.**

3         Even if Mattel had made a threshold legal showing for *in camera* review

4    (which it has not), the present facts and circumstances plainly militate against an

5    order for *in camera* review of another 1500 documents.  There are three

6    discretionary factors that the Discovery Master must consider before ordering *in*

7    *camera* review in light of the facts and circumstances of this particular case.  *Zolin,*

8    491 U.S. at 572.  Because Mattel cannot establish that any of these factors weighs

9    in its favor, let alone all of them, Mattel's Motions should be denied.

10        **A.    The Volume Of Documents Proposed To Be Reviewed Militates**
              **Against A Further *In Camera* Review.**
11

12        After having already litigated at length and won an *in camera* review of

13   approximately 540 documents, Mattel now seeks an order that the Discovery

14   Master should conduct an *in camera* review of an additional nearly 1500

15   documents.  The burden on the Discovery Master created by a review of such a

16   large volume of documents is significant and militates against granting an *in*

17   *camera* review.  *Id.* at 571 ("[W]e cannot ignore the burdens *in camera* review

18   places upon the district courts, which may well be required to evaluate large

19   evidentiary records without open adversarial guidance by the parties.").  As one

20   district court has recognized:

21            The larger the volume of documents reviewed *in camera*,
              the greater the potential harm to the privilege and the
22            greater the burden on the courts.  These kinds of burdens
              consume finite judicial resources, resources that judges
23            could otherwise be committing to other pressing
              obligations . . . In other words, large-scale inspections of
24            the kind that would be involved here impose real and
              substantial costs on the administration of justice.

25   *Laser Indus. v. Reliant Technologies, Inc.*, 167 F.R.D. 417, 421 n.6 (N.D. Cal.

26   1996).

27

28

1    Additionally, the burden on MGA to pay for further *in camera* review by the

2    privately-compensated Discovery Master is prohibitive, especially when there is

3    already one substantial review ongoing.  Counsel have demonstrated a complete

4    willingness to undertake further review as part of a reasonable meet and confer

5    process, and Mattel has done nothing to demonstrate that such process has failed or

6    is otherwise inadequate.  To the contrary, the Court and Discovery Master have

7    rejected precisely that contention.  This discretionary factor plainly militates against

8    *in camera* review.

9       **B.    Mattel Has Not Demonstrated the Importance Of The Information**
10              **Sought To Be Reviewed.**

11    As to the second consideration listed by *Zolin*, Mattel has not explained how

12    these 1500 documents are likely to be important to its case.  Indeed, Mattel has not

13    even identified the claim or defense to which the alleged privileged information is

14    relevant.  Mattel served nearly three thousand document requests on the MGA

15    Parties seeking every bit of information under the sun prior to the time that these

16    documents were reviewed and logged on a privilege log.  Lock Decl. ¶33.  The fact

17    that these documents may be responsive to one or more of that enormous number of

18    document requests does not in any way demonstrate their *importance* to the case as

19    a whole, let alone to the specific claims to be tried in Phase 2.  Mattel has not

20    offered any evidence or argument on this issue in its Motion, again failing to

21    sustain its burden on the discretionary factors.

22       **C.    Particularly Given The MGA Parties' Handling Of The Recent**
               **Meet And Confer Process, There Is No Good Reason To Believe**
23              **That *In Camera* Review Will Result In The Production Of Further**
               **Documents.**
24

25    Finally, it is highly unlikely that an *in camera* review will reveal that any

26    documents are improperly being withheld.  The MGA Parties have repeatedly

27    demonstrated their willingness to re-review documents where there is any

28    reasonably articulated concern, and in doing so have produced documents as

- 20 -

appropriate (whether or not the prospect of *in camera* review was in the offing). The Court and Discovery Master have expressed appreciation for and confidence in this process.  Indeed, the fact that nearly 500 documents have been produced since the re-review process began conclusively demonstrates the integrity of the process. Lock Decl. ¶¶9, 11-12, 18, 20; Lock Decl. Exs. 2, 3, 7, 9.  There simply is no reason for another *in camera* review, particularly not a review of another 1500 documents.

The totality of the facts and circumstances in this case strongly weigh against Mattel's request for an *in camera* review.  Mattel's Motions should be denied under the *Zolin* discretionary factors.

## III.  THE DISCOVERY MASTER SHOULD GRANT THE MGA PARTIES' CROSS-MOTION REQUIRING MATTEL TO SERVE A COMPREHENSIVE, NON-DUPLICATIVE LIST FOR ANY ADDITIONAL PRIVILEGE RE-REVIEW.

These Motions were completely unnecessary and inappropriate, and were the product either of Mattel's carelessness or deliberate efforts to cause MGA undue burden.

Mattel's July 17 letter asked for re-review of documents already the subject of Order No. 33.  Lock Decl. ¶16.  The list in Mattel's September 9 letter included nearly two dozen documents identified either in its July 17 letter or Order No. 33. *Id.* ¶22.  The list in Mattel's October 9 letter was half comprised of documents listed in its September 9 letter.  *Id.* ¶27.  The October 9 list also included documents that had been identified in Mattel's July 17 letter.  *Id.*  More than half of the documents for which Mattel sought review in the November 2 Motion were already covered by the October 13 Motion.  We can only imagine what its November 9 and December 9 letters and Motions will contain, since the ratio of requests for duplicative review actually increases with each letter Mattel sends or motion it files.

1    Moreover, the obvious duplication is just the tip of iceberg in terms of the

2    actual inefficiency caused by Mattel's serial duplicative letters and motions. Many

3    of the communications at issue are related to one another and have already been

4    reviewed two, three or four times. Each time Mattel sends a new letter or files a

5    new Motion, it requires counsel for the MGA Parties to re-plow old ground—even

6    when there is not overt duplication of requests.

7    But Mattel has a complete list of the documents that were the subject of its

8    prior motion for *in camera* review and all of its other letter requests and Motions.

9    The nicest explanation for what Mattel is doing is that it is just plain careless. It is

10   an undue burden on MGA to be forced to comb through Mattel's correspondence to

11   eliminate duplicates because of Mattel's *carelessness*, and it is even more offensive

12   to do so if this is a deliberate litigation strategy by Mattel to deliberately burden the

13   MGA Parties. As Mattel's CEO, Bob Eckert, recently put it in his Q3 2009 analyst

14   earnings call, "[w]e will invest whatever it takes for however long it takes as long

15   as somebody wants to continue litigating this." Lock Decl. Ex. 15 at 141. Mattel's

16   refusal to perform even the most basic review of its demands to ensure that it does

17   not duplicate requests for review, coupled with its premature rush to Court in these

18   Motions, demonstrates that Mattel has no interest in an efficient, orderly process.

19   Instead, as MGA has repeatedly demonstrated, Mattel seeks to exacerbate the costs

20   and burdens of litigation by conducting this process in the most harassing,

21   inefficient means possible.

22   Notwithstanding Mattel's unreasonable demands, MGA has consistently

23   responded in good faith. Mattel's attempts to deflect attention from its

24   unreasonable demands by claiming that somehow MGA did not engage in a

25   meaningful meet and confer process is disingenuous. Nothing in MGA's responses

26   suggest a refusal to meet and confer or a refusal to review documents. To the

27   contrary, MGA agreed to re-review the documents and agreed to provide a date

28   certain as to when such review would be completed after Mattel removed the

OPPOSITION TO MATTEL'S MTC *IN CAMERA* REVIEW OF
ALLEGEDLY NON-LEGAL LARIAN COMMUNICATIONS
CV-04-9049 DOC (RNBx)

duplicate entries. *See* Lock Decl. Ex. 11 at 116. (September 16, 2009 letter). Orrick also expressly pledged to the Court that it would continue to ensure the integrity of the process at the hearing on the 8/31 Order to Show Case. Lock Decl. Ex. 5 (September 22 Hearing, 12:5-13).

Mattel refused to acknowledge even the most basic need for efficiency by refusing to eliminate duplicate entries, and in fact expressly repudiated any notion that it was obligated to do by sending a further letter with an even greater degree of duplication and then filing the October 13 Motion before the deadline to respond had even expired. It is Mattel, not MGA, who has made a mockery of good faith meet and confer and has engaged in a process that plainly violates the considerations of Rule 26(c).

Accordingly, the MGA Parties' Cross-Motion for Protective Order should be granted, requiring that after the parties' comply with Order No. 73, if Mattel has any further concerns it shall serve a single, non-duplicative, non-repetitive list setting forth *all* of the privilege entries for which it requests re-review and the reasons therefor. The Discovery Master should order that Mattel may not serve a further request for re-review absent prior authorization for good cause. The MGA Parties also respectfully request that they be permitted to defer review of the documents on such list until the Discovery Master has completed the pending *in camera* review, so that we will have the benefit of the Discovery Master's guidance in the event there is any disagreement with the privilege calls made by Orrick in connection with the submission in response to Order No. 33. At that point, Mattel should be ordered to file a *single* additional Motion covering any remaining privilege log issues absent further authorization of the Discovery Master upon a showing of good cause.

## CONCLUSION

MGA has engaged in a good faith and exhaustive review of its privilege logs and production of documents from those privilege logs. The Discovery Master has

1   already ordered an additional review, an Order which Mattel wholly ignored in

2   filing its November 2 Motion.  Mattel has no regard for the burdens it imposes upon

3   MGA in litigation—indeed, imposing undue burden upon MGA is an end in itself.

4   Under these circumstances, and without a shred of evidence that MGA's review is

5   improper or inadequate, Mattel's Motions should be denied, and the Cross-Motion

6   granted.

7

8   Dated:    November 4, 2009                    Respectfully submitted,

9                                                ANNETTE L. HURST
                                                 Orrick, Herrington & Sutcliffe LLP

10

11                          By:  _____
                                      ANNETTE L. HURST
12                                    Attorneys for Plaintiff

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28