# EXHIBIT 1

# REDACTED

# SUBJECT TO

# PROTECTIVE ORDER

# EXHIBIT 2

# REDACTED

# SUBJECT TO

# PROTECTIVE ORDER

# EXHIBIT 3

# REDACTED

# SUBJECT TO

# PROTECTIVE ORDER

# EXHIBIT 4

Case 2:04-cv-09049-SGL-RNB    Document 5934    Filed 07/09/2009    Page 1 of 14

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA  92501
<u>CIVIL MINUTES -- GENERAL</u>

Case No. CV 04-09049 SGL(RNBx)                    Date: July 9, 2009
Title:       MATTEL, INC. V. MGA ENTERTAINMENT, INC., et al.
==================================================================
PRESENT:   HONORABLE STEPHEN G. LARSON, U.S. DISTRICT JUDGE

            Cindy Sasse                    None Present
            Courtroom Deputy               Court Reporter

ATTORNEYS PRESENT FOR              ATTORNEYS PRESENT FOR
PLAINTIFFS:                        DEFENDANTS:

None Present                       None Present

PROCEEDINGS:   ORDER GRANTING EX PARTE APPLICATION RE TEMPORARY
               RECEIVERSHIP (DOCKET #5728)

               ORDER GRANTING EX PARTE APPLICATION RE COST
               SHIFTING (DOCKET #5865)

               ORDER GRANTING IN PART EX PARTE APPLICATION FOR
               RELEASE OF JUROR TRANSCRIPTS (DOCKET #5805)

               ORDER GRANTING IN PART MATTEL'S MOTION RE
               DISCOVERY MASTER ORDER NO 27 AND REMANDING
               DISCOVERY MASTER ORDER NO. 27 FOR
               RECONSIDERATION BY THE DISCOVERY MASTER IN LIGHT
               OF THE FILING OF THE TAAC (DOCKET #5561)

               ORDER DENYING MOTION TO STRIKE THE FORENSIC
               AUDITOR'S REPORTS (DOCKET #5705)

EXHIBIT __4__
PAGE __105__

### I. ORDER GRANTING EX PARTE APPLICATION
### RE TEMPORARY RECEIVERSHIP (DOCKET #5728)

Because the only opposition to the Ex Parte Application regarding the winding up of the Temporary Receivership involves the issue of cost-shifting, which is addressed separately, below, the Court **GRANTS** the Ex Parte Application. A separate order addressing this Ex Parte Application has been concurrently filed.

### II. ORDER GRANTING EX PARTE APPLICATION RE
### COST SHIFTING (DOCKET #5865)

The MGA parties' opposition to the Temporary Receiver's Ex Parte Application argued that the costs of the Temporary Receivership should be shifted to Mattel (as the party who sought appointment of a Temporary Receiver). However, the Court has previously ruled that, at some yet-to-be defined date in the future, the Court will consider whether to shift the costs of both the Temporary Receivership and the Forensic Audit. Therefore, Mattel filed an Ex Parte Application seeking either to be relieved of the responsibility to respond to the MGA parties' argument or, alternatively, for an order setting a briefing schedule on the issue. It is not the intention of the Court to address the cost-shifting issue at this time; rather, as the Court has stated previously on the record, that issue is more efficiently resolved at a later date, most likely a date after completion of Phase 2 of the trial. Accordingly, the Court **GRANTS** Mattel's Ex Parte Application re Cost Shifting. Mattel is relieved of any duty to respond to MGA's argument regarding the appropriate allocation of costs arising from the Temporary Receiver that is set forth in the MGA parties's June 26, 2009 Opposition to the Temporary Receiver's Ex Parte Application.

### III. ORDER GRANTING IN PART EX PARTE APPLICATION FOR
### RELEASE OF JUROR TRANSCRIPTS (DOCKET #5805)

The Court has received and reviewed the MGA Parties' Ex Parte Application For Partial Release of *In Camera* Juror Interview Transcripts, as well as the Opposition, the Reply, and the accompanying exhibits. The Court **GRANTS IN PART** the Ex Parte Application. Although the Court declines to award the relief sought, the Court will take steps to ensure that the transcript of the juror interviews are provided to the Ninth Circuit for its consideration of the appeal filed by the MGA parties.

The relevant *in camera* juror interviews were conducted on July 25, 2008; the findings made by the Court on the basis of those interviews are set forth in detail in the Court's Order Denying Motion for Mistrial, dated August 8, 2008. Counsel for the parties agreed that the juror interviews, which were conducted mid-trial, should be conducted *in camera*, and the MGA parties did not request that the Court grant them access to the transcripts to prepare their Motion for Mistrial. The Court indicated on the

MINUTES FORM 90
CIVIL – GEN

2

Initials of Deputy Clerk __cls_____

EXHIBIT __4__
PAGE ____ **106**

record around the time of the filing of the Motion for Mistrial that it was not the Court's intent to grant the parties access to the transcripts.

After the conclusion of the trial, the MGA parties did not at any time request this Court grant access to the transcripts. To the contrary, some ten months passed between the date of the Order Denying Motion for Mistrial and the MGA parties' first post-trial request for access to those transcripts. That request was made to the Ninth Circuit, not this Court, on June 10, 2009. When the Ninth Circuit denied the request in favor of the MGA's presentation of the issue to this Court in the first instance, the MGA parties thereafter filed the present Ex Parte Application in a expeditious manner.

Ostensibly, as set forth in both the Motion filed before the Ninth Circuit and the Ex Parte Application before this Court, the reason the MGA parties seek access to those transcripts is so that they may use them to challenge the Court's Order Denying Motion for Mistrial. Although the MGA parties filed its Notice of Appeal on May 4, 2009, and although that Notice clearly indicated that the Order Denying Motion for Mistrial would be implicated in the appeal, the MGA parties failed to file its Motion seeking release of the transcripts until June 10, 2009. The MGA parties' failure to seek this relief until a month after they filed their Notice of Appeal and a month before their opening brief was due, and their decision to present the issue of release of the transcripts to the appellate court (rather than this Court) in the first instance, created the very urgency that cause them to seek ex parte relief from this Court. As such, the Court declines to grant the relief sought.

Nevertheless, in the interest of due process and in order to facilitate the full consideration of the issue by the Ninth Circuit, the Court will take steps to ensure that the transcripts of the *in camera* interviews are provided to the Ninth Circuit for *in camera* filing.

## IV. ORDER GRANTING IN PART MATTEL'S MOTION RE DISCOVERY MASTER ORDER NO 27 AND REMANDING DISCOVERY MASTER ORDER NO. 27 FOR RECONSIDERATION BY THE DISCOVERY MASTER IN LIGHT OF THE FILING OF THE TAAC (DOCKET #5561)

In the challenged portion of Discovery Master Order No. 27 ("DM Order No. 27"), the Discovery Master denied Mattel's Motion to Compel discovery sought by service of a subpoena on non-party Bingham McCutchen LLP ("Bingham"), a law firm that represents Intervenor Omni 808, as well as a number of non-party entities that are familiar to those involved in this litigation: OmniNet Capital, LLC ("OmniNet"), Vision Capital, LLC ("Vision"), IGWT Group, LLC ("IGWT"), and IGWT 826 Investments, LLC ("IGWT 826"). Broadly categorized, the subpoena sought production of (1) fee agreements relating to Vision and Omni 808; (2) documents regarding the formation, control, and financing of Omni 808, Vision, and Lexington Financial Limited

Initials of Deputy Clerk __cls_____

EXHIBIT  ⟋⟋
PAGE ____ **107**

("Lexington"); (3) documents identifying stakeholders and officers of Omni 808, Vision, and Lexington; (4) all contracts relating to Omni 808, Vision Capital, and Lexington; (5) all communications relating to Omni 808, Vision Capital, and Lexington, excluding attorney-client privileged documents; and (6) Bingham's representation of MGAE and certain named individuals who have some connection with MGAE, including a number of Mr. Larian's family members.

The Discovery Master correctly recognized the essential legal standard in assessing whether a subpoena may be enforced.  The information must satisfy the discovery relevance standard, i.e., it must be "reasonably calculated to lead to the discovery of admissible evidence.'" DM Order No. 27 at 19 (quoting Fed. R. Civ. P. 26(b)(1)).  The decision of whether to enforce a subpoena ultimately implicates a balancing test that pits relevance of the materials sought and need to the requesting party against hardship to the party resisting the subpoena.  DM Order No. 27 at 20. Non-parties are generally required to bear lesser burdens than parties in responding to subpoenas. Exxon Shipping Co. v. United States Dept. of Interior, 34 F.3d 774, 779 (9th Cir. 1994) ("The Federal Rules also afford nonparties special protection against the time and expense of complying with subpoenas.").

However, the Discovery Master overstated the burden of proof allocated to Mattel, as the party seeking discovery.  See DM Order No. 27 at 20 ("As the party moving to compel compliance with the subpoena, Mattel bears the initial burden of establishing that the information sought is relevant and necessary to the claims or defenses at issue.")  This standard is both overstated and incomplete.  It is overstated in that Mattel need not show that the evidence sought is "necessary to the claims or defenses."  Although Mattel indeed bears the burden of establishing relevancy, that showing is not one of "necessity."  Rather, Mattel must bear the burden of establishing the discovery relevancy standard -- that the materials sought are "reasonably calculated to lead to the discovery of admissible evidence" -- is met.  It need not establish that the materials sought are "necessary" to its case.

This point leads to the manner in which the stated burden is incomplete.  As clearly articulated by cases cited by Bingham, although Mattel bears an initial burden of establishing relevancy, the party resisting discovery thereafter has the burden of establishing that discovery should be denied.  See Bryant v. Ochoa, 2009 WL 1390794 at *1 (S.D. Cal. 2009) ("The party seeking to compel discovery has the burden of establishing that its request satisfies the relevancy requirements of Rule 26(b)(1). . . . Thereafter, the party opposing discovery has the burden of showing that the discovery should be prohibited, and the burden of clarifying, explaining or supporting its objections."); DIRECTV, Inc. v. Trone, 209 F.R.D. 455, 458 (C.D. Cal. 2002) (same); see also Blankenship v. Hearst Corp., 519 F.2d 418, 429 (9th Cir. 1975) (reversing the district court's issuance of a protective order based on a failure of the party resisting discovery to meet its burden by asserting that the defendant's deposition would merely yield cumulative evidence).

EXHIBIT   4
PAGE ____108

The effect of this subtle variation on the burden of proof from that stated by the Discovery Master is magnified by the recent filing of the TAAC, which significantly heightens the relevancy of the issue of how the MGA parties and the parties represented by Bingham may be related, the formation of certain of those entities, and other issues implicated by Mattel's requests. Because the question of relevance is featured so prominently in the quintessential balancing test to which the present discovery motion was subjected, the filing of the TAAC dramatically altered the calculus that underlies the conclusions reached in DM No. 27.

For reasons related to judicial economy and preservation of scarce judicial resources (which this case has stretched to the outer limits), the Court defers decision, in light of the changed calculus that has occurred as the result of the filing of the TAAC, of the issues presented in the challenged portions of DM No. 27 to the Discovery Master. For that reason, the Court **REMANDS** the challenged portions of DM No. 27 to the Discovery Master for his reconsideration and re-balancing in light of the recently filed TAAC. The Discovery Master may, in his discretion, set the matter for further briefing and/or hearing, he may take the matter under submission based on the existing record, or he may take other action as he deems appropriate to resolve the present issues.

Notwithstanding the remand of DM Order No. 27, one issue raised by Mattel requires further consideration by the Court. At page 25 of DM Order No. 27, the Discovery Master appears to impose a blanket prohibition on discovery of materials that are in the possession of a subpoena recipient, but that are related to a non-party over whom the Court has not been shown to have jurisdiction. The Discovery Master cites no legal authority for such a blanket prohibition, and the Court, in its own research, has found none. Such a blanket prohibition precludes the application of the balancing test that applies almost universally to discovery motions; accordingly, and because this blanket prohibition is unprecedented, the Court finds that it is contrary to law. As to this narrow issue, the Court **GRANTS** Mattel's Motion. The issue of discovery of materials relating to Lexington is **REMANDED** to the Discovery Master for reconsideration in light of this ruling and in light of the filing of the TAAC.

## V. ORDER DENYING MOTION TO STRIKE
## THE FORENSIC AUDITOR'S REPORTS (DOCKET #5705)

In an unsealed filing that has since been ordered sealed by the Court, counsel for Omni 808 Investors, LLC ("Omni 808"), Todd E. Gordinier, made unwarranted, unsubstantiated personal attacks against the Court-Appointed Forensic Auditor, Ronald L. Durkin. Mr. Gordinier's selective public disclosure of portions of the Forensic Auditor's Summary Report, coupled with the maintenance of the Summary Report, as well as the later-filed Responsive Report and Final Report, under seal in their entirety, has led to an unbalanced public presentation of the issues discussed therein. In an

EXHIBIT __4__
PAGE ____109____

attempt to cure this deficiency, the Court has considered the possibility that it should simply unseal the relevant Reports and allow those Reports to speak for themselves.

Because the MGA entities were the primary subject of the Forensic Audit, the MGA parties have, quite understandably, objected to the proposed unsealing. Mattel, for its part, advocates quite emphatically, and not unreasonably, that the Reports should be unsealed in light of the selective disclosure. See Tr. at 31-32 ("It's the underlying analysis that refutes the selective disclosures that MGA and Omni made in a public forum to smear . . . both Mr. Durkin and Mattel.") At the other end of the spectrum, Omni 808 has moved to strike the Reports in their entirety.

In the end, although the Court does not order the unsealing of the Reports, it **DENIES** the Motion to Strike. The Court ordered the Forensic Audit to evaluate whether a receiver should be appointed; as the record bears witness, the Court eventually rejected the suggestion that it should appoint a permanent receiver, and the Court has instead appointed an MGA Monitor with more limited powers than a receiver. Nevertheless, the fact that the Reports were intended to serve a very limited purpose does not mean that there is no possibility that the Forensic Auditor's Reports will not serve any purpose henceforth.

As it currently stands, the Court **ORDERS** that no party shall cite to or rely upon the Reports for any purpose absent further Order of this Court.[1] However, the documents attached to the Reports, to the extent they are otherwise discoverable, are not insulated from discovery on the basis that they have been made part of the Reports. Conversely, documents, such as charts and interview notes, that were prepared by the Forensic Auditor are the property of the Court and are not subject to discovery or use in this or any other litigation by any party or non-party.[2]

Had it been counsel for the MGA parties who mounted the unwarranted, unsubstantiated, and public personal attacks on Mr. Durkin, the Court would find, notwithstanding the sensitive information contained therein, the unsealing of the Reports was an appropriate remedy for the selective disclosure.[3] However, here, it is

_____

[1] This Order does not supersede the Court's Order permitting the Forensic Auditor to share information with the Court-Appointed Monitor.

[2] Toward that end, the Court CLARIFIES to the parties that the work papers, drafts, notes, detailed time records, and any other materials prepared by or at the direction of the Forensic Auditor are the property of the Court. The Court ORDERS the Forensic Auditor, as the custodian of those records on behalf of the Court, to retain those materials, whether maintained in electronic, hard copy, or any other medium, until further order of the Court.

[3] As it stands, counsel for MGAE, James I. Stang, wisely sought, and was granted, leave to file his more restrained, but just as unwarranted and unsubstantiated, personal attacks on Mr. Durkin under seal. See MGA Entertainment, Inc.'s Response to Final In Camera Report of Forensic Auditor Ronald L.

MINUTES FORM 90
CIVIL -- GEN                                              6                    Initials of Deputy Clerk __cls_____

EXHIBIT _4_
PAGE ___110___

counsel for Omni 808 who made those attacks public, and although Mattel maintains that both the MGA parties and Omni 808 are jointly responsible for the selective disclosure, see July 6, 2009, Tr. at 33, whether, or to what extent, the MGA parties act or have acted in concert is an issue to be decided in Phase 2 of this action.

Nevertheless, Mr. Gordinier's attack on Mr. Durkin cannot pass without comment by the Court. The Court's comments are directed toward Mr. Gordinier personally, which is not the Court's usual practice. Although the irony of this form of address is not lost on the Court (given the subject of this Order), it is appropriate. Mr. Gordinier signed all three filings in which the personal attacks appear, and continues to stand behind those filings. Moreover, Mr. Gordinier expressly and unabashedly claimed personal responsibility for the brief that was not filed under seal, by both stating that he gave it a lot of thought before filing it and by implicitly acknowledging that although he considered filing his brief under seal, he ultimately rejected that course of action. See May 18, 2009 Tr. at 46-47 ("My brief speaks for itself. We have nothing to hide. . . . I didn't feel it appropriate, necessary, or desirable to file my brief under seal. And I don't have a problem with the Court or anybody reading what I have to say, because I gave it a lot of thought, and I gave it at lot of consideration.").

At the July 6, 2009, hearing, the Court outlined its concerns that while the attacks on Mr. Durkin were public, the Reports are not, and that "it doesn't seem fair" to the Court to allow those allegations to stand alone without a chance to respond to them. July 6, 2009, Tr. at 25-26. In response, Mr. Gordinier contended that his comments "respond[ed] to the report," and that "[w]hat we said was that there were problems with that report." July 6, 2009, Tr. at 28. This statement is an implicit denial that any personal attacks were made; however, as set forth in great detail below, the record belies Mr. Gordinier's post hoc protestations.

Lest Mr. Gordinier's statement reflecting his implicit denial that he engaged in personal attacks be perceived as one being made at oral argument without ample time to reflect upon its significance, the statement is also made by Mr. Gordinier in Omni 808's Reply Memorandum, a document upon which he had ample time to reflect: "Each and all of the references in Omni's Statement of Position refer to the contents of Mr. Durkin's Reports and the shortcomings contained therein and omitted therefrom, not to his person." Id. at 2 n.1. To be sure, the criticisms leveled at Mr. Durkin are framed in

---

Durkin (docket #5918) at 4 (accusing Mr. Durkin of "making McCarthy-like statements of non-existent buybacks and unsupported insinuations of conflicts of interest"); id. at 9 (suggesting that Mr. Durkin's formulation of certain search terms relating to criminal acts in Farsi without a concurrent formulation of those terms in English demonstrated a "predisposition that Persian members of MGA's management and staff (and only the Persian members) might be engaged in illegal conduct"). Mr. Stang's attacks pale in comparison to those advanced by Mr. Gordinier, and they were filed under seal. Thus, although the Court's analysis and conclusions regarding the Forensic Auditor's Reports applies with equal force to Mr. Stang's statements, his are not the focus of the Court's attention at this time.

EXHIBIT 4
PAGE 111

terms of his Reports. Still other criticisms are, as counsel maintains, addressed to the Reports themselves; those must be analyzed based on their substance. However, as aptly demonstrated by the cited and quoted portions of Mr. Gordinier's filings that appear below, his criticisms do not, by any measure, confine themselves to those Reports, and instead reach out in a highly personal manner to attack the author, his professionalism, his competence, his objectivity, and his integrity.[4]

Indeed, in a display the likes of which have not been previously witnessed by this Court, Mr. Gordinier strayed far afield of legitimate criticism of the discussions, analyses, and conclusions reached in the Summary Report and the Reports that followed. To be sure, there are instances in which Mr. Gordinier addressed the message found in those Reports; just as surely, however, as detailed below, Mr. Gordinier attacked the messenger. Specifically, the papers filed by Mr. Gordinier on behalf of Omni 808 call into question Mr. Durkin's professionalism and competence, as well as his objectivity and integrity. Moreover, and alarmingly, they falsely accuse Mr. Durkin of being influenced by an ethnocentric bias against Mr. Larian and Mr. Kadisha. Such attacks, aimed at Mr. Durkin personally rather than the discussion, analyses, and conclusions set forth in his Reports, appear throughout Omni 808's papers. See Omni 808 Investors, LLC's Statement of Position re Order to Show Cause re Appointment of a Permanent Receiver (docket #5446) ("SOP"), filed May 14, 2009, at 11 (referring to Mr. Durkin's "irresponsible" analysis); id. (noting that Mr. Durkin is "far too experienced" to believe that he "produced . . . a balanced presentation"); id. (stating that "Mr. Durkin's report is a polemic" and "a piece of advocacy"); id. at 12 n.9 (calling into question Mr. Durkin's "objectivity" based on the fact that the Court ordered Mr. Durkin's fees be paid (at least in the first instance) by Mattel); id. (suggesting that Mr. Durkin's ex parte communications with Mattel were improper); id. at 13 n.10 (characterizing Mr. Durkin's quotation of Mr. Larian's and Mr. Kadisha's account of how the two men were acquainted, from "the Persian community," as "at best, unprofessional" and, "at worst,

---

[4] Adding still further to the mounting irony, in the same footnote that Mr. Gordinier disclaims engaging in improper personal attacks, he falsely accuses counsel for Mattel of advancing their own improper ad hominen attacks against Neil Kadisha, who has been referred to as a "common thief" in certain unspecified Mattel filings. Mr. Kadisha is the Managing Partner of a diversified investment firm, Omninet Capital, LLC, and an investor in Omni 808. To call someone a "common thief" is, undoubtably, by any measure, a highly personal attack, therefore an attack addressed "to the man," or ad hominem. However, in the same manner Mr. Gordinier accuses Mr. Durkin of failing to provide appropnate context to the Court in his Reports, Mr. Gordinier himself fails to acknowledge that counsel for Mattel's use of the term "common thief" in connection with Mr. Kadisha merely quotes Los Angeles County Superior Court Judge Henry W. Shatford's conclusion regarding Mr. Kadisha, as set forth in his 191-page Statement of Decision, dated October 24, 2006, which was issued after a 200-day trial, which is currently pending appeal, and which conferred upon Mr. Kadisha the oft-repeated moniker of "common thief," as well as "embezzler," and "perjurer." See Uzyel v. Kadisha, Cal. App. Nos. B196045, B203804, B198007, B199850, B201425, 2009 WL 646096 (Mar. 4, 2009) (appellate brief). As always, context is key. The use by counsel for Mattel of another court's findings and conclusions to advance an argument is not inappropriate. Those findings and conclusions may, or may not, be relevant to matters presented to the Court. Used in this manner, although undoubtedly addressed "to the man" (and his credibility), it is not an improper ad hominen attack.

EXHIBIT 4
PAGE 112

evidence of improper cultural bias"); id. (in the same footnote, referring to the same quotation, stating that "[t]he tone [of the report] itself is compelling proof that Mr. Durkin had no intention of providing an 'objective' report to the Court."); id. at 23 (referring to the Summary Report as "Mr. Durkin's ill-concealed advocacy piece"); id. (noting that advocacy, rather than objectivity, "is certainly the posture [Mr. Durkin] is most comfortable with"); Omni 808 Investors, LLC's Memorandum in Support of Its Requests to Strike Summary and Responsive Reports of Ronald L. Durkin (docket #5705) ("Motion to Strike"), filed June 8, 2009, at 4 (noting Omni's "doubts that the Court or any party would benefit further by continuing this façade of Mr. Durkin's 'impartiality'"); id. at 7 (calling Mr. Durkin's explanation of his conclusion regarding the relatedness of certain parties as "not only fatuous[,] but [also] intellectually dishonest"); id. at 9 (suggesting that Mr. Durkin intentionally concealed from the Court the fact that Mr. Larian sought other funding sources before turning to Mr. Kadisha); id. at 10 (noting that "Mr. Durkin's repeated references to Mr. Larian's and Mr. Kadisha's common 'Persian' heritage can only be viewed as an attempt to draw some nefarious ethnic connection between them"); id. at 12 (calling the reference to Mr. Larian's and Mr. Kadisha's ethnicity "unprofessional symptoms of improper cultural bias [that] have no place in a supposedly objective report"); Omni 808 Investors, LLC's Reply Memorandum (docket #5809) ("Reply Memo") at 14 (suggesting that not only Mr. Durkin, but also counsel for Mattel, harbor "cultural biases" that lead them to "suggest[] that [Mr. Larian's and Mr. Kadisha's] common heritage makes [them] more likely to act contrary to their own interests); id. at 15 (stating that, according to his own interview notes, Mr. Durkin "misrepresented" to the Court in his Summary Report how Mr. Larian and Mr. Kadisha portrayed their relationship with each other).

     As alluded to, Omni 808's criticisms have not been limited to personal attacks; some of the criticisms are in fact aimed at the Reports themselves. See e.g., SOP at 16 ("Mr. Durkin's conclusion that the Wachovia-Omni transaction impacted 'MGAEI's solvency and ability to continue conducting operations' is simply wrong."). Any comment by the Court regarding the substance of the discussions, analyses, and conclusions presented to the Court in the Forensic Auditor's Summary, Responsive, and Final Reports is inadvisable at this time. With the filing of the Third Amended Answer and Counterclaims, much of the subject matter of the Forensic Auditor's Reports have been incorporated into the claims at issue in this action. As such, it would be premature for the Court to comment upon the substance of issues that are yet to be adjudicated, and that are subject to a trial by jury. Nevertheless, the Court has reviewed the Forensic Auditor's Summary, Responsive, and Final Reports, and the exhibits attached thereto. The Court has also reviewed and considered the criticisms aimed at the Forensic Auditor, cited and quoted above, as well as the entirety of all the papers responding to the Forensic Auditor's Reports filed to date. After this review, the Court is firmly convinced that all the personal criticisms of Mr. Durkin are unwarranted and unsubstantiated.

     At best, the criticism of Mr. Durkin's performance and presentation represents a

Initials of Deputy Clerk __cls_____

EXHIBIT __4__
PAGE ___113__

different interpretation of available evidence. That such disagreements would arise
between the analyses offered by a Court-Appointed Forensic Auditor and that offered by
counsel for a party whose transactions have been a subject of that audit is by no means
surprising. A jury considering the relevant evidence might ultimately make factual
determinations that tend to agree with Mr. Durkin's assessment, it might ultimately tend
to agree with Mr. Gordinier's assessment, or it may very well reject both positions in
favor of another. The answer to the merits of the claims at issue in this action must
await another day. Today, the Court merely notes that its examination of the Forensic
Auditor's Reports reveal that Mr. Gordinier's personal attacks aimed at their author were
unjustified.

Some specific attacks directed toward Mr. Durkin – relating to his background as
a law enforcement officer, his communications with counsel for Mattel, and specific (but
baseless) allegations of ethnocentric bias – are worthy of more specific comment by the
Court.

Stopping short of explicitly stating such, Mr. Gordinier appears to labor under the
assumption that Mr. Durkin has been unable to put behind him the prosecutorial
mindset under which he presumably operated during his former service to this Nation as
an agent of the Federal Bureau of Investigation ("FBI"). At the outset, the Court notes
that Mr. Gordinier's unstated assumptions do a disservice to the prosecutors and the
law enforcement officers who work with those prosecutors, both of whom conduct their
work under the clearly delineated duty to ferret out not only evidence of guilt but also
"evidence favorable to the accused." See e.g., Berger v. United States, 295 U.S. 78, 88
(1935) (noting that the role of the prosecutor is not to win at all costs and observing that
the prosecutor "is the representative not of an ordinary party to a controversy, but of a
sovereignty whose obligation to govern impartially is as compelling as its obligation to
govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall
win a case, but that justice shall be done."); Brady v. Maryland, 373 U.S. 83, 87 (1963)
(imposing a duty on prosecutors to provide to the defense exculpatory evidence when
requested to do so).

Secondly, even if prosecutorial duties were not so defined, the Court finds no
suggestion that Mr. Durkin skewed the evidence in favor of any particular viewpoint.
Undoubtedly, there is a **complete absence** of any evidence that, as Mr. Gordinier has
suggested, Mr. Durkin has embarked upon a campaign to purposely mislead the Court.

Mr. Gordinier also suggests that, because Mr. Durkin's bills are being paid by
Mattel, Mattel has, through this payment or through other communications with Mr.
Durkin, bought Mr. Durkin's loyalty. This is utter nonsense. As demonstrated by the
Court's communications with him, Mr. Durkin is a Court-Appointed Officer who
understands that his role is to work on behalf of the Court and not on behalf of any
party. In any event, the Court's Order of January 7, 2009, which appointed Mr. Durkin,
imposed the costs of the audit on Mattel "in the first instance," but expressly provided for

MINUTES FORM 90
CIVIL – GEN                                    10                    Initials of Deputy Clerk __cls_____

EXHIBIT __4__
PAGE _____**114**

the possibility that the audit expenses be shared or shifted to the MGA parties. Moreover, to suggest, however subtly, that ex parte communications with counsel for Mattel were improper ignores the Court's mandate to the Forensic Auditor in the January 7, 2009, Order, which states that Mr. Durkin was provided with attorney contact information and that he "shall direct his initial communications to counsel." At no time has the Court precluded the Forensic Auditor's communications with Mattel or its counsel; in fact, because the Forensic Audit was undertaken based on evidence gathered by and presented to the Court by Mattel, Mr. Durkin would have been remiss in his duties if he failed to communicate with Mattel and its counsel.

Mr. Durkin was vested with powers and discretion to complete a Court-ordered Forensic Audit.  Pursuant to an Order of this Court, he undertook this task and exercised those powers and that discretion, presenting his Reports in conformity with the Court's instructions.  Despite counsel's attacks, the Court's review of the evidence before it discerns no abuse of those powers or of that discretion.

Particularly troubling to the Court is that counsel speculates that, because Mr. Durkin noted in his report that Mr. Larian knew Mr. Kadisha from "the Persian Community," Mr. Durkin could be "of the view that this common heritage makes Mr. Kadisha more likely to act contrary to his own interests or to do something via third-parties that he wouldn't otherwise do?"  See SOP at 13-14 n.10 (appearing to pose this thought as a rhetorical question).  There is no indication in the record, or otherwise, that Mr. Durkin holds such a view.  To the contrary, Mr. Durkin's comment regarding the acquaintanceship of Mr. Larian and Mr. Kadisha from "the Persian Community" (which is noted in the report within quotation marks and is expressly attributed to a reference made by Mr. Larian himself) is clearly predicated on interviews with these two individuals, each of whom related independently to Mr. Durkin and his colleagues that they knew each other from "the Persian Community."  See Durkin Summary Report, Ex. 14, at 2 ¶ 3 (Notes re March 25, 2009, interview with Mr. Larian: "He indicated that he knew Kadisha from the Persian community.") and Ex. 14, at 15 ¶ 2 (Notes re March 26, 2009, interview with Mr. Kadisha: "Kadisha stated that he knows Larian from the Persian community.").  The purpose for this reference is made clear in the footnote set forth at the end of the sentence in which the reference appears; namely, the Report discusses evidence that the relationship between Mr. Larian and Mr. Kadisha is stronger and more personal than either man claimed it was.  See Summary Report at 5 n.18; Ex. 15 (personal emails).

In the Reply Memo, Mr. Gordinier takes issue with this explanation, this time including not only Mr. Durkin but also counsel for Mattel as the targets for his unsubstantiated allegations of "cultural bias."  Mr. Gordinier first mischaracterizes an argument made by Mattel.  Mattel argued, and quite correctly, both that how well Mr. Larian and Mr. Kadisha knew each other was relevant to a determination of whether certain transactions between the two were arms-length transactions, and that this point was likely not lost on either of these two very sophisticated and successful

MINUTES FORM 90
CIVIL -- GEN                                    11                    Initials of Deputy Clerk __cls_____

EXHIBIT 4
PAGE 115

businessmen.[5]  As noted previously, both Mr. Larian and Mr. Kadisha stated that they knew each other from "the Persian community" which, in the Forensic Auditor's view, was intended to, or at least had the tendency to minimize the existing relationship between the two.  Mr. Gordinier incorrectly characterizes this argument as Mattel's contention that Mr. Larian's and Mr. Kadisha's "Persian relationship" and "common Persian heritage" was somehow relevant to a determination of whether the Omni 808 transaction was an arms-length transaction.  Mattel made no such argument.  Neither counsel for Mattel nor Mr. Durkin have implied that Mr. Larian's and Mr. Kadisha's ethnicity factors into the analysis.  Other than to point to Mr. Larian's and Mr. Kadisha's separate, but identical, accounts of how they knew each other which, in turn, suggests how well they know each other, neither counsel for Mattel nor Mr. Durkin have stated or implied that Mr. Larian's and Mr. Kadisha's shared ethnicity is relevant to any matter currently or potentially before the Court.  Compare Opposition at 8-9 with Reply Memo at 14-15.

Moreover, Mr. Gordinier's substantive point, that Mr. Durkin "misrepresented" to the Court what Mr. Larian and Mr. Kadisha told him about the closeness of their relationship, fares no better.  See Reply Memo at 15.  On this point, it is important to set this stage properly.  Counsel for all parties have attempted to glean far too much from two sterile paragraphs of interview notes taken by Mr. Durkin.  Much can be inferred from conversations and interviews through not only what is said, but what is not said, by the interviewee's demeanor, by the tone of the speaker, by the length and placement of pauses, and by non-verbal gestures and body language.  With all these variables, much of what is communicated does not find its way into notes.[6]  For instance, Mr. Durkin's interview of Mr. Larian lasted over two and a half hours; however, the interview notes are a mere five and a half pages.  Similarly, a one-hour and ten minute interview of Mr. Kadisha yielded only three and a half pages of interview notes.  This is not to suggest that the notes should have been longer or that the interviews should have been recorded or transcribed; rather, it is to suggest that counsel's arguments based on another's notes are not particularly probative.

In contrast, Mr. Durkin's assessment, based on his interviews with both of them,

---

[5]  In fact, the Court just this week issued a 30-page, single-spaced opinion resolving a 10-day bench trial conducted over the sole issue of whether a transaction between "closely related" entities reflected its fair market value, one of the more significant arguments ultimately rejected by the Court in that case being that the close relationship between the parties necessarily rendered the transaction a "sweetheart deal."  See July 6, 2009, Order, Siegel v. Warner Bros. Entertainment, Inc., et al., CV 04-08400 SGL (RZ) (docket #554).

[6]  Indeed, the interview notes upon which the parties rely concede as much.  See Summary Report, Ex. 14 at 2, 15 ("This interview memorandum is a factual representation of the topics discussed during the interview and is not intended to be a word for word or exact transcription of the conversation.").  Thus, in addition to not taking into account all non-verbal communication, the notes do not even represent everything that was said during the interview.

Initials of Deputy Clerk __cls_____

EXHIBIT 4
PAGE 116

is that Mr. Larian and Mr. Kadisha attempted to minimize their relationship because both
of them understand the relevance of any friendship or other connection between them
to the assessment of the arms-length nature of any transactions in which they have
engaged. Mr. Durkin's assessment does not come from the gentle teasing of a strained
meaning from two sterile paragraphs of brief notes taken by another person; rather, his
assessment springs from his participation in the interview process, the entirety of the
interviews he conducted of Mr. Larian and Mr. Kadisha, and his review of all of the
evidence. As such, the Court defers to his assessment, at least insofar as how Mr.
Larian and Mr. Kadisha portrayed their relationship to him.

As for that scant language from which the parties glean so much meaning, the
entirety of which is set forth below, it in no way supports the contention made by Mr.
Gordinier that Mr. Durkin "misrepresented" to the Court what Mr. Larian and Mr.
Kadisha conveyed to him about the closeness of their relationship. On this topic, the
notes of Mr. Larian's interview merely state the following:

> Larian decided to contact Neil Kadisha of OmniNet as
> he knew his company was in the distressed loan business.
> He indicated that he knew Kadisha from the Persian
> community. Kadisha said he wouldn't do the deal alone in
> today's environment and wanted Larian and their other
> friends to invest in the deal with MGA. Larian stated that
> Kadisha negotiated the debt with Wachovia and got it down
> significantly, Larian said he is not bitter about Kadisha
> getting a good deal on buying the loan.

Summary Report, Ex. 14, at 2, ¶ 3 (emphasis added). This paragraph contains the word
"friends," and perhaps could even be read as an implicit statement by Mr. Larian that he
and Mr. Kadisha are "friends." But the language does not compel such an inference.
Moreover, it does not comport with the notes of Mr. Kadisha's interview, which on this
topic state only the following:

> Larian and Kadisha have never been to dinner
> together. Kadisha stated that he knows Larian from the
> Persian community and he sees him often at religious
> events, etc. He has no investments with Larian. Kadisha
> did not talk with Larian last night, this morning or in the last two days.

Summary Report, Ex. 14, at 15, ¶ 2. Mr. Durkin's assessment that Mr. Larian and Mr.
Kadisha sought to minimize the extent of their relationship is not contradicted by these
short passages.

The criticism that Mr. Durkin was acting pursuant to an ethnic or cultural bias is
clearly baseless. The allegations are irresponsible, and they are made to capitalize on

EXHIBIT 4
PAGE 117

their inherent sensational nature for counsel's own purposes of diverting attention away from the substance of the Reports. Sensationalism aside, when viewed in context, the Reports' reference to Mr. Larian and Mr. Kadisha knowing each other from "the Persian community" was plainly innocuous. The reference was a direct quotation from both Mr. Larian and Mr. Kadisha. It was used in a broader discussion regarding how (and thus, impliedly, how well) the two knew each other, which is itself relevant to the issue of whether certain transactions relevant to the present litigation were made at arms length.

This is a most unfortunate incident. The Court certainly understands, in a case as hotly contested as this one -- with such high stakes, with such complex legal issues, and with such truly extraordinary legal talent on all sides -- that lawyers, however ethical and committed to the highest standards of professionalism (as the Court presumes and has found all counsel of record here to be), make statements or commit acts in haste that they subsequently regret. All of the players to this drama, are, after all is said and done, human. As such, all of us are vulnerable to all-too-common human frailties. The Court would place itself at the very top of any list of lawyers who have spoken improvidently at one time or another in this case (and any number of others). What the Court has witnessed here, however, in both manner and substance, for the reasons noted above, goes beyond what the Court can let pass without some manner of reprobation. So let the Court be clear: Nothing excuses the attempted character assassination in which Mr. Gordinier has engaged.

**IT IS SO ORDERED.**

MINUTES FORM 90
CIVIL -- GEN

14

Initials of Deputy Clerk __cls_____

EXHIBIT 4
PAGE 113

# EXHIBIT 5

# REDACTED

# SUBJECT TO

# PROTECTIVE ORDER

# EXHIBIT 6

# REDACTED

# SUBJECT TO

# PROTECTIVE ORDER

# EXHIBIT 7

# REDACTED

# SUBJECT TO

# PROTECTIVE ORDER

# EXHIBIT 8

# REDACTED

# SUBJECT TO

# PROTECTIVE ORDER

# EXHIBIT 9

# REDACTED

# SUBJECT TO

# PROTECTIVE ORDER

# EXHIBIT 10

# REDACTED

# SUBJECT TO

# PROTECTIVE ORDER

# EXHIBIT 11

# REDACTED

# SUBJECT TO

# PROTECTIVE ORDER

# EXHIBIT 12

# REDACTED

# SUBJECT TO

# PROTECTIVE ORDER

# EXHIBIT 13

# REDACTED

# SUBJECT TO

# PROTECTIVE ORDER

# EXHIBIT 14

# REDACTED

# SUBJECT TO

# PROTECTIVE ORDER

# EXHIBIT 15

# REDACTED

# SUBJECT TO

# PROTECTIVE ORDER

# EXHIBIT 16

# REDACTED

# SUBJECT TO

# PROTECTIVE ORDER

# EXHIBIT 17

**Valerie Lozano**

| | |
|---|---|
| **From:** | Jon Corey |
| **Sent:** | Tuesday, October 27, 2009 11:10 AM |
| **To:** | MGA / Bryant Team |
| **Subject:** | Fw: Mattel's Motion to Compel |

Jon Corey
Quinn Emanuel Urquhart Oliver & Hedges LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017

Direct: (213) 443-3130
Main Phone: (213) 443-3000
Main Fax: (213) 443-3100

E-mail: joncorey@quinnemanuel.com
Web: www.quinnemanuel.com

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s)
named above. This message may be an attorney-client communication and/or work product and as such is privileged and
confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended
recipient, you are hereby notified that you have received this document in error and that any review, dissemination,
distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please
notify us immediately by e-mail, and delete the original message.

**From:** Molinski, William <wmolinski@orrick.com>
**To:** Jon Corey
**Cc:** Chaudoir, Christopher <cchaudoir@orrick.com>; Parker, Warrington <wparker@orrick.com>
**Sent:** Tue Oct 27 11:09:44 2009
**Subject:** Mattel's Motion to Compel

Jon:
In Mattel's Motion to Enforce and Compel filed on October 16, 2009, Mattel asserts that it has not received two documents
identified in MGA's interrogatory response. See, Mattel's Motion, page 22, fn 59. Please be advised that the two bates
numbers listed were incorrectly identified. The correct numbers are MGA 3473855 (replacing MGA 665527) and
M0059802 (replacing MGA 59802). My apologies for the confusion.
Regards,
Bill



O R R I C K

**BILL A. MOLINSKI**

ORRICK, HERRINGTON & SUTCLIFFE LLP
777 SOUTH FIGUEROA STREET
SUITE 3200
LOS ANGELES, CA 90017-5855

*tel* 213-612-2256
*fax* 213-612-2499
*mobile* 310-502-7580
wmolinski@orrick.com

**EXHIBIT 17**
**PAGE 498**

1

# EXHIBIT 18

**Valerie Lozano**

| | |
|---|---|
| **From:** | Valerie Lozano |
| **Sent:** | Monday, November 02, 2009 11:20 AM |
| **To:** | Molinski, William |
| **Cc:** | Jon Corey |
| **Subject:** | Mattel adv. MGA |
| **Attachments:** | 11_2 JDC Letter.pdf |

Bill: attached please find correspondence from Jon Corey.


Regards,


**Valerie A. Lozano | Quinn Emanuel Urquhart Oliver & Hedges, LLP** | 865 S. Figueroa Street, 10th Floor, Los Angeles, CA 90017
Direct: +1.213.443.3280 | Main Phone: +1.213.443.3000 | Main Fax: +1.213.443.3100 | E-mail:
valerielozano@quinnemanuel.com

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

EXHIBIT 18
PAGE 499

1

**quinn emanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017 | TEL 213-443-3000 FAX 213-443-3100

WRITER'S DIRECT DIAL NO.
(213) 443-3130

WRITER'S INTERNET ADDRESS
joncorey@quinnemanuel.com

November 2, 2009

<u>VIA E-MAIL</u>

William Molinski, Esq.
Orrick Herrington & Sutcliffe, LLP
777 S. Figueroa St. Ste. 3200
Los Angeles, CA 90017

Re:   <u>Mattel adv. MGA</u>

Dear Bill:

Thank you for your e-mail dated October 27, 2009.

Your email stated that two documents (Bates numbered MGA 665527 and MGA 59802) identified in MGA's August 31, 2009 Response to Mattel's Supplemental Interrogatory Regarding Defendants' Affirmative Defenses, were incorrectly identified.  You provided two replacement Bates numbered documents.  We appreciate your explanation that, with respect to document Bates numbered M0059802, the original document was incorrectly identified or otherwise a typographical error.  However, with respect to the replacement document Bates numbered MGA 3473855, we do not understand how this document provides any support for MGA's Information Readily Ascertainable affirmative defense under which it is listed, and your e-mail did not provide one.  We request that MGA provide us with an explanation.

Very truly yours,

/s/ Jon Corey

Jon D. Corey

**quinn emanuel urquhart oliver & hedges, llp**

NEW YORK | 51 Madison Avenue, 22nd Floor, New York, New York 10010 | TEL 212-849-7000 FAX 212-849-7100
SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, California 94111 | TEL 415-875-6600 FAX 415-875-6700
00505.07975/3178174.1
SILICON VALLEY | 555 Twin Dolphin Drive, Suite 560, Redwood Shores, California 94065 | TEL 650-801-5000 FAX 650-801-5100
TOKYO | Akasaka Twin Tower Main Building, 6th Floor, 17-22 Akasaka 2-Chome, Minato-ku, Tokyo 107-0052, Japan | TEL +81-3-5561-1711
LONDON | 16 Old Bailey, London EC4M 7EG, United Kingdom | TEL +44-20-7653-2000 FAX +44-20-7653-2100

EXHIBIT 18
PAGE 500

# EXHIBIT 19

Case 2:04-cv-09049-DOC-RNB   Document 7133-3   Filed 11/05/09   Page 52 of 62   Page ID
#:250647
Case 2:04-cv-09049-(   )-RNB    Document 6851    Filed (   )2/2009    Page 1 of 2

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA  92501
CIVIL MINUTES -- GENERAL

Case No.    CV 04-09049 SGL(RNBx)                          Date: September 22, 2009
Title:      MATTEL, INC. V. MGA ENTERTAINMENT, INC., et al.
=============================================================================
PRESENT:  HONORABLE STEPHEN G. LARSON, U.S. DISTRICT JUDGE

          Cindy Sasse                              None Present
          Courtroom Deputy                         Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFFS:        ATTORNEYS PRESENT FOR DEFENDANTS:

None Present                             None Present


**PROCEEDINGS:  ORDER AFTER HEARING**

        Pursuant to the Court's September 3, 2009, Order, the Court heard the testimony of Richard
De Anda regarding an email communication between him (as Mattel's head of security) and
Canadian law enforcement officials, which references a package sent to those officials.  Although
the Court finds, based on the evidence currently before the Court, in the context of this case, that it
was inadvisable for Mr. De Anda to send to Canadian law enforcement officials a package
containing approximately six miniature toy cars, the Court does not find anything improper
regarding his actions as they were not subjectively intended as an attempt to influence, nor were
they even marginally likely to influence, an ongoing investigation.  Rather, the Court finds that the
toys were token gifts given, in keeping with social conventions, in response to his receipt of certain
token gifts, namely a coffee mug, a tie tack, and a pen, by the Canadian law enforcement officials.

        The Court conducted sealed proceedings regarding the August 31, 2009, Order to Show
Cause ("OSC").  On the basis of counsel's representations of the subjective thought processes by
which the document at issue came to appear on the privilege log of the MGA parties, the Court
finds that the OSC is **SATISFIED** as it relates to counsel herein and **DISCHARGES** the OSC.
Consideration of any evidentiary or other case-related sanctions or implications regarding prior
findings by the Court and/or jury in this matter must await adjudication of the issue of whether the
crime/fraud exception applies to various other documents placed on MGA's privilege logs, as well
as completion of the Discovery Master's *in camera* review of numerous other documents listed on

MINUTES FORM 90                                      Initials of Deputy Clerk __cls_____
CIVIL -- GEN                        1                 Time: 02/59

EXHIBIT **19**
PAGE ___501___

Case 2:04-cv-09049-DOC-RNB   Document 7133-3   Filed 11/05/09   Page 53 of 62   Page ID
#:250648
Case 2:04-cv-09049-(   )-RNB   Document 6851   Filed (   )2/2009   Page 2 of 2

MGA's privilege logs and resolution of certain discovery motions related thereto.

In light of the anticipated transfer of these consolidated cases to the docket of the Honorable David O. Carter, the Court **VACATES** the pending pretrial conference date and trial date for Phase 2.

The Court **EXTENDS** the discovery cutoff date to June 1, 2010.

As the judicial officer most familiar with this case, Judge Larson has consented to assist the parties' and the Settlement Officers' attempt at a global resolution to these consolidated cases. Accordingly, counsel for Mattel is directed to provide its proffered settlement proposals to the Court (*in camera* to chambers) and to the MGA parties within ten days of the entry of this Order.

The hearing dates as to Mattel's Motion for Leave to File Fourth Amended Answer and Counterclaims (docket #6311) and Motion of the MGA parties re Discovery Master Order No. 46 (docket #6476) are **VACATED** pending re-setting by the newly assigned judicial officer.

Mattel's Ex Parte Application re service of responses to the August 31, 2009, OSC (docket #6708) is **DENIED AS MOOT.**

The Ex Parte Application of the MGA parties to compel Mr. DeAnda's deposition in advance of the September 21, 2009, hearing date (docket #6767) is **DENIED AS MOOT.**

Two Proposed Stipulations and Orders by the parties (#6687 (to continue October 1, 2009, hearing date) and #6706 (re extension of expert discovery dates)) are also **DENIED AS MOOT.**

The oral request of the MGA parties for a stay pending settlement discussions is **DENIED.** In general, stays of ***discovery*** in these consolidated cases have, in the past, proven to be counter-productive. As for the more specific request to stay the ***recall order***, the Court notes that counsel for the MGA parties is mistaken in her contention that "the whole point of that recall order was so that it would clear the market for Mattel to come in with its vision of Bratz."[1]  Instead, as set forth in the Court's December 3, 2008, Omnibus Order, the Court imposed the recall order in light of the scope of infringement found by the Court (which was broad) and in light of the fact that the Bratz dolls compete directly with existing Mattel products. Id. at 14.  Thus, the rationale underlying the recall Order remains firmly intact.  For that reason, the request is **DENIED.**

**IT IS SO ORDERED.**

---

[1]  Mattel also denies the MGA parties' factual assumption that it will not be able to market its own dolls under the name "Bratz."  Resolution of the factual issue is unnecessary at this time, and the Court does not consider it.

MINUTES FORM 90
CIVIL -- GEN

2

Initials of Deputy Clerk __cls_____
Time: 02/59

EXHIBIT __19__
PAGE ____502____

# EXHIBIT 20

Case 2:04-cv-09049-SGL-RNB      Document 6544      Filed 08/31/2009      Page 1 of 4

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA  92501
### CIVIL MINUTES - GENERAL

Case No.      CV 04-09049-SGL(RNBx)                          Date: August 31, 2009

Title:      CARTER BRYANT -v- MATTEL, INC.

==========================================================================

PRESENT:   HONORABLE STEPHEN G. LARSON, UNITED STATES DISTRICT JUDGE

Cindy Sasse                                    Theresa Lanza
Courtroom Deputy Clerk                         Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFFS:       ATTORNEYS PRESENT FOR DEFENDANTS:

John Quinn                                     Annette L. Hurst
Michael T. Zeller                              Warrington S. Parker, III
B. Dylan Proctor                               William A. Molinski


PROCEEDINGS:   **MOTIONS HEARING**

1.   **Mattel Inc.'s Motion for Order for Preclusive Relief or, in the Alternative, Access to Active Files on the Larian Hard Drives, No. 5760, 5769;**

2.   **Mattel, Inc.'s Motion for Clarification of 6/18/09 Order, No. 5783;**

3.   **Mattel Inc.'s Motion to Modify Scheduling Order, No. 6050**

4.   **Order to Show Cause**

The Court addressed the issue the filings of sur-replies; all counsel are directed to follow Local Rule 7-10 regarding the filing of replies.  The Court further heard oral argument and makes the following rulings:

First, in light of the parties' stipulation, as set forth on the record, the Court **DENIES AS**

MINUTES FORM 90
CIVIL -- GEN                    Page 1                Initials of Deputy Clerk: cls
                                                      Time: 00/41

EXHIBIT **20**

PAGE **503**

**MOOT** Mattel Inc.'s Motion for Order for Preclusive Relief or, in the Alternative, Access to Active Files on the Larian Hard Drives.

Second, the Court **GRANTS** Mattel, Inc.'s Motion for Clarification.  The Court's June 18, 2009, Order is **CLARIFIED** in the following manner:  The Court's June 18, 2009, Order, including its discussion of willfulness, was intended to be and is limited to the equitable issue of the scope of an appropriate accounting, and shall not be construed to apply to any circumstances beyond the scope of an appropriate accounting.

Third, the Court **DENIES WITHOUT PREJUDICE** Mattel, Inc.'s Motion to Amend the Scheduling Order as premature.  The Court will re-visit the issue of the case scheduling order when it takes up Mattel, Inc.'s motion for leave to file a Fourth Amended Answer and Counterclaims on October 1, 2009.  In addition, the Court sets a status conference at which all lead counsel of record shall appear on September 21, 2009, at 1:30 p.m.  On or before September 18, 2009, the parties are **ORDERED** to file with the Court a report, not to exceed 10 pages, of the status of discovery for Phase 2 – what has been completed and what must still be completed prior to trial.  Counsel shall also advise the Court of the parties' positions with respect to (1) any further bifurcation of Phase 2 trial and (2) a stay of the trial of Phase 2 pending the Ninth Circuit's ruling on the appeal of Phase 1.

Finally, the Court addresses an issue of concern that arose in the papers submitted in advance of this hearing.  Specifically, Exhibit 2 to the Second Supplemental Declaration of Dylan Proctor in support of Mattel's Motion for Clarification, dated August 26, 2009, appears relevant to the issue of whether certain acts of copyright infringement were willful acts of infringement.  Upon consideration of the evidence in Phase 1, the jury found that the infringement was not willful.  However, this document, Bates Nos. MGA2 0070266-0070270, was not offered as evidence in Phase 1, as it was withheld by counsel for the MGA parties on a claim of attorney client privilege.  It was finally produced in its current, more complete form on August 21, 2009, well after the conclusion of Phase 1 of the trial, and only upon the eve of an impending *in camera* review of the document by the Discovery Master pursuant to his Order.[1]

The more complete version shows MGA employee Victoria O'Connor was concerned with Mr. Larian's representations to a media source regarding the timing of the creation of Bratz, the central issue tried in Phase 1.  Ms. O'Connor stated: "[D]on't you think we should say Bratz was born in October when a certain person was no longer with their company?"  Mr. Larian responded: "[G]ood point.  Thanks."

---

[1]  The document was produced earlier to Mattel in an incomplete form, but the produced version eliminates the communications most relevant to the issue of willfulness.  The document takes the form of an email string, a printed version of electronic communications now familiar to most individuals (and certainly to all litigation attorneys), with the most recent communication appearing first.  The incomplete document ends with Isaac Larian forwarding the communication, on Wednesday, October 23, 2002, at 1:35 a.m., to other individuals as an "FYI."  The more complete version continues with a response from Victoria O'Connor, at 8:38 a.m., and Mr. Larian's reply one minute later.

MINUTES FORM 90
CIVIL -- GEN                                    Page 2

Initials of Deputy Clerk: cls
Time: 00/41

EXHIBIT **20**
**504**
PAGE _____

This document has clear relevance to the claims and defenses at issue in the Phase 1 trial. The withholding of this document under a claim of privilege concerns the Court, as it implicates the duty of the Court to oversee the conduct of the lawyers who appear before it, and who are largely responsible for maintaining the integrity of the adversarial process.

Toward that end, the Court **ORDERS** counsel for the MGA parties to **APPEAR AND SHOW CAUSE** on September 21, 2009, at 1:30 p.m., why sanctions should not be imposed for their repeated failure to produce this document at an earlier date.

With respect to the email communications referenced in this Order, the Court **ORDERS** counsel for the MGA parties to file a report with the Court (served on all parties and Court-Appointed Officers) that, at a minimum, provides to and/or reports to the Court:

(1)    Copies of all versions of all privilege logs, whether or not provided to Mattel, the Discovery Master, the Court-Appointed Forensic Auditor, the Temporary Receiver, or the Monitor, upon which the document referred to above appears, including any version of this email exchange among the senders and recipients (including those "cc'd" or "bcc'd") that contains communications not set forth in the incomplete version of the document that was produced in discovery.

(2)    A description of the process whereby the document referred to above (or any version of it) came to appear on any privilege log.  That description shall include, with respect to the document that bears Bates Nos. MGA2 0070266-0070270, the identity of any attorney responsible for the designation of the document as privileged, the identity of any attorney responsible for reviewing that designation, and the identity of any attorney who, upon discovery of the non-privileged nature of the document, continued to withhold the document from production.  Each of those attorneys,[2] whether or not current or past counsel of record, shall file a declaration regarding what actions he or she took (or refrained from taking) with respect to this document.

(3)    Any other information known to any current or past counsel of record relevant to a determination of why this unprivileged, relevant document was withheld pursuant to a claim of privilege.

(4)    If any of the information referenced in (1)-(3) above is itself subject to a claim of either attorney-client or work-product privilege, that information may not be withheld from the Court, but need not be served on any party or Court-Appointed Officer (unless the Court orders otherwise) and shall instead be delivered to the Courtroom

---

[2] Each current and past counsel of record is **ORDERED** to disseminate a copy of this Order to every attorney (whether or not currently associated with any law firm that is or was counsel of record) whom is known to have been, or who is not known to have been but who is likely to have been, involved in the designation of maintenance of this document as privileged.

Initials of Deputy Clerk: cls
Time: 00/41

EXHIBIT **ZD**
PAGE _____ **505**

Deputy Clerk, Cindy Sasse, in a separate, *in camera* filing.

Counsel for the MGA parties shall file their written report(s) no later than September 14, 2009.  Any party may respond no later than September 18, 2009.

The Court recognizes that the Court's current inquiry may overlap to a certain extent with Orders or issues or proceedings before the Discovery Master.  The focus of the Court's inquiry is on attorney conduct; the focus of the Discovery Master is on discovery of evidence.  Therefore, the Court's actions here should not be construed to impact in any way upon the Discovery Master's proceedings and Orders.  More specifically, but not exclusively, this OSC shall not be construed to limit the Discovery Master's ability to continue to hear and resolve discovery disputes on the schedule he sees fit to set, nor shall it be construed to extend any deadline or briefing schedule set by the Discovery Master, and nor shall it be construed to effectuate any delay on the Discovery Master's anticipated *in camera* inspection of certain documents identified as privileged, which may proceed (or be delayed) as the Discovery Master deems appropriate.

**IT IS SO ORDERED.**

EXHIBIT **ZD**

PAGE ___ 506

# EXHIBIT 21

# REDACTED

# SUBJECT TO

# PROTECTIVE ORDER

# EXHIBIT 22

# REDACTED

# SUBJECT TO

# PROTECTIVE ORDER