1

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

- - - - - - -


| | |
|---|---|
| CARTER BRYANT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) No. SACV 04-9049-DOC |
| | )    Volume II |
| MATTEL, INC., | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |


REPORTER'S TRANSCRIPT OF PROCEEDINGS

Motions

Santa Ana, California

Monday, November 9, 2009


Jane C.S. Rule, CSR 9316
Federal Official Court Reporter
United States District Court
411 West 4th Street, Room 1-053
Santa Ana, California 92701
(714) 558-7755

09-11-09 MattelV2

SACV 04-9049-DOC - 11/09/2009 - Vol. II

2

```
1    APPEARANCES OF COUNSEL:

2

3    FOR INTERVENTOR DEFENDANT MGA ENTERTAINMENT, INC.:

4            ORRICK, HERRINGTON & SUTCLIFFE, LLP
             BY:  THOMAS S. MC CONVILLE
5                 Attorney at Law
             4 Park Plaza Suite 1600
6            Irvine, California 92614
             (949) 567-6700
7
             - AND -
8
             ORRICK, HERRINGTON & SUTCLIFFE, LLP
9            BY:  ANNETTE L. HURST
                  Attorney at Law
10           405 Howard Street
             San Francisco, California 94105
11           (415) 773-5700

12

13   FOR DEFENDANT MATTEL, INC.:

14           QUINN, EMANUEL, URQUHART, OLIVER & HEDGES
             By:  MICHAEL T. ZELLER
15                BRETT DYLAN PROCTOR
                  SCOTT WATSON
16                MICHAEL MOORE
                  Attorneys at Law
17           865 South Figueroa Street
             10th Floor
18           Los Angeles, California 90017-2543
             (213) 443-3000
19

20   ALSO PRESENT:

21           JILL THOMAS, Asst. General Counsel, Mattel, Inc.

22           ISAAC LARIAN, CEO, MGA Entertainment

23           JEANNE PISONI, General Counsel, MGA Entertainment

24           PATRICK FRAIOLI, Attorney, Court-Appointed Monitor

25
```

JANE C.S. RULE, CSR NO. 9316 - U.S. COURT REPORTER

1                    **I N D E X**

2

3

4    MOTION BY MGA PARTIES TO VACATE RECALL PROVISION OF
     INJUNCTION, OR IN THE ALTERNATIVE, TO CLARIFY AND/OR MODIFY
5    SUCH RECALL PROVISIONS; MOTION TO CLARIFY AND/OR LIMIT
     MONITOR'S AUTHORITY AS AN ADJUDICATIVE OFFICER OF THE COURT
6

7

8                   **SEALED PROCEEDINGS**

9                    (Pages 33 - 42)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SACV 04-9049-DOC - 11/09/2009 - Vol. II

4

```
 1            SANTA ANA, CALIFORNIA, MONDAY, NOVEMBER 9, 2009

 2                            VOLUME II

 3                          (6:24 p.m.)

 4            THE COURT:  All right, counsel.  We are on the

 5   record.  And counsel, we have a new reporter this evening,

 6   Jane, so would you make your appearances, beginning with

 7   Mattel, please.

 8            MR. ZELLER:  Good evening, your Honor, Mike Zeller

 9   for Mattel.

10            THE COURT:  Okay, thank you.

11            MR. DYLAN:  B. Dylan Proctor for Mattel.

12            THE COURT:  Pleasure.

13            MR. WATSON:  Scott Watson for Mattel, your Honor.

14            THE COURT:  Pleasure.

15            And who are the two seated in the back?

16            MR. MOORE:  Good evening.  Michael Moore.

17            THE COURT:  What happened to your arm?

18            MR. MOORE:  Oh, I hurt it at the gym.

19            THE COURT:  Are you okay?

20            MR. MOORE:  Yeah, I'm fine.

21            THE COURT:  Okay.  We didn't do that to you.

22            (Laughter.)

23            MS. THOMAS:  And Jill Thomas, in-house counsel.

24            THE COURT:  Nice meeting you.  It's a pleasure.

25            And counsel?
```

```
 1              MS. HURST:  Good evening, your Honor.  Annette

 2   Hurst for MGA Entertainment and its affiliates, and

 3   Mr. Larian.

 4              THE COURT:  Pleasure.

 5              MR. MC CONVILLE:  Tom McConville, your Honor, on

 6   behalf of MGA.

 7              THE COURT:  And let the record reflect that I've

 8   known Mr. McConville from the U.S. Attorneys Office when he

 9   was here.  He was local counsel.

10              MS. PISONI:  Jeanne Pisoni, general counsel for

11   MGA.

12              THE COURT:  It's a pleasure.  Nice meeting you.

13              MR. LARIAN:  Your Honor, Isaac Larian, CEO of MGA

14   Entertainment.

15              THE COURT:  Thank you very much.

16              MR. FRAIOLI:  Your Honor, good evening.  Patrick

17   Fraioli, court-appointed monitor.

18              THE COURT:  It's nice meeting you.  By the way, I

19   know you wanted to talk to me before the proceedings this

20   evening, or today.  I just was a little leery of that.  I

21   didn't know what you would say, and since I'm coming into

22   the case, I didn't want to have the perception of -- because

23   this was a motion concerning you, of meeting with you

24   privately, so --

25              MR. FRAIOLI:  Absolutely, your Honor.
```

```
 1                  THE COURT:  That's why.

 2                  Well, counsel, who would like to start?

 3             MS. HURST:  Thank you, your Honor.

 4                  THE COURT:  And I obviously know you, but just

 5     state your name and who you represent for the record.

 6             MS. HURST:  Thank you, your Honor.  Annette Hurst

 7     for the MGA parties.

 8                  Your Honor, I carefully reviewed the tentative

 9     order the Court provided this morning, and I'd like to

10     address one aspect of that order --

11                  THE COURT:  Certainly.

12             MS. HURST:  -- if I may.  And that is with respect

13     to the extraterritoriality of the recall, your Honor.

14                  THE COURT:  Certainly.

15             MS. HURST:  Your Honor, the Court notes at page 16

16     of the tentative order that there is some notion that

17     perhaps -- because there is a link between extraterritorial

18     liability, that the extraterritorial reach of the injunction

19     may also be appropriate.  Your Honor, respectfully, that was

20     the precise contention that was rejected in the cyber media

21     case.

22                  THE COURT:  Okay.

23             MS. HURST:  And it's also inconsistent, your

24     Honor, with Section 502 of the act, which provides an

25     injunction shall extend, quote, "throughout the United
```

Case 2:04-cv-09049-DOC-RNB   Document 7407   Filed 01/15/10   Page 7 of 62   Page ID #:255580
SACV 04-9049-DOC - 11/09/2009 - Vol. II

7

 1    States," end quote, your Honor.  Particularly in the cyber
 2    media case, your Honor, it was the contention that some
 3    portion of the infringement had occurred in the United
 4    States.  In that case, the software had been originally
 5    created in the United States.  The plaintiff requested that
 6    the injunction extend to the manufacturing facility in
 7    Dublin Ireland, as well, and the recall extend to things
 8    that had been sold from the manufacturing facility in Dublin
 9    Ireland.  And the Court rejected that contention saying that
10    although on occasion damages have been allowed where there
11    is a course of conduct that includes both the United States
12    and foreign territories, that has never occurred in the
13    case -- there has not been injunctive relief.
14              THE COURT:  Let me ask you two things.
15              MS. HURST:  Yes, your Honor.
16              THE COURT:  I want you to educate me.  Remember,
17    you didn't give me the two weeks, so I need to catch up
18    quickly.
19              If I took a percentage of these infringing dolls,
20    what am I dealing with domestically, in your opinion, and
21    what am I dealing with in terms of numbers or percentage
22    extraterritorially?  And I'm going to ask the same question
23    of Mattel.  Am I dealing with 60 percent domestically,
24    40 percent extraterritorially, am I dealing with 80/20?
25              MS. HURST:  If I may, your Honor, I'll consult

Case 2:04-cv-09049-DOC-RNB   Document 7407   Filed 01/15/10   Page 8 of 62   Page ID #:255581
SACV 04-9049-DOC - 11/09/2009 - Vol. II

8

1    with my client.

2            THE COURT:  Go ahead and take your time with that.

3    I'll tell you why it's important in just a moment.

4            Just a moment.

5            (Interruption in the proceedings.)

6            THE COURT:  Why am I asking that?  I'll tell you

7    why I'm asking it.  Courts should not make orders that we

8    cannot enforce.  So therefore, I understand my control

9    domestically.  I can say to Macy's, "Get these back and do

10   it now."  But I have a little problem with the Italian

11   stores or the English stores, and the accounting and the

12   difficulty raises the cost, which you are concerned about.

13   By the same token, if I could have this case tried in

14   January, the only reason that the monitor exists is, one,

15   the pecuniary issues, but number two, the harm to Mattel.

16   So if you shrink that harm and if in a perfect world, we can

17   get this case to trial in January, it shrinks Mattel's

18   argument that this is somehow damaging them.  But

19   apparently, we can't get this case to trial in January.

20           MS. HURST:  Your Honor --

21           THE COURT:  Now, what's your percentage?

22           MS. HURST:  Your Honor, approximately 70 percent

23   in the United States versus abroad, 70 to 75 percent in the

24   United States.

25           THE COURT:  So the first question I am going to

1    ask Mattel when you address the Court is, how do I actually

2    impose this order effectively overseas?  I am not used to

3    making -- no, think about it.  You are not answering it now.

4    You're thinking, you're thinking.

5            And number two, why can't I account for at least

6    the overseas portion in terms of money?  In other words, an

7    accounting which the monitor can easily get, because asking

8    an English or a French or Italian store to, in a sense,

9    return what they've already paid some amount of money for is

10   a laborious task, and one that may not meet with compliance

11   before the trial date, quite frankly.  So 70/30, that's your

12   answer?

13           MS. HURST:  That's our estimate, your Honor.

14           THE COURT:  All right.  Please continue.

15           MS. HURST:  And with regard to the 70, your Honor,

16   a high percentage of that is held in the hands of the big

17   four retailers who MGA expects will comply with the recall

18   notice.

19           THE COURT:  Now, should I require you to post a

20   bond?  Should I take that 30 percent, being creative, and

21   let's assume that I can come up with some abstract number,

22   should I force you into the position of posting a bond

23   concerning these overseas products?

24           MS. HURST:  No, your Honor.  The --

25           THE COURT:  Why?

Case 2:04-cv-09049-DOC-RNB   Document 7407   Filed 01/15/10   Page 10 of 62   Page ID
#:255583
SACV 04-9049-DOC - 11/09/2009 - Vol. II

10

```
1          MS. HURST:  Because the pending order requiring

2     the escrowing of profits would already cover those sales,

3     your Honor.  Those sales have already been made, and the

4     profit calculations associated with them have already been

5     handled.  And to the extent that there were profits, those

6     have been escrowed, and that's going to be happening on an

7     ongoing basis, your Honor.

8          THE COURT:  Okay.  Now, what kind of damages am I

9     dealing with from your perspective, before I ask Mattel?  In

10    other words, I am not familiar with the doll business.

11         How much do one of these dolls sell for,

12    approximately?  Fifty dollars, $150?

13         MS. HURST:  No, your Honor.  They are the lower

14    end of the range.  So it could be anywhere from 12 to 25, in

15    those ranges.

16         THE COURT:  Okay.  Do the dolls come with dresses,

17    different outfits that you change into?

18         MS. HURST:  Yes, your Honor.

19         THE COURT:  Could I then buy a basic doll with

20    basic clothing and as a parent buying for my child, then

21    extend, you know, $15 doll, basic dress or outfit included

22    in the package, can I go out and spend another $20 and get

23    accessories?

24         MS. HURST:  Yes.  And the accessories are sold by

25    a variety of manufacturers and are generally
```

SACV 04-9049-DOC - 11/09/2009 - Vol. II

11

```
 1   interchangeable, your Honor.
 2           THE COURT:  So they don't have to be Mattel or
 3   Bratz?
 4           MS. HURST:  No.
 5           THE COURT:  Okay.  In other words, you've got
 6   knockoffs.
 7           MS. HURST:  Whether they are knockoffs, your
 8   Honor, would depend on whether they are substantially
 9   similar or, in certain cases, virtually identical to
10   copyrighted works.
11           THE COURT:  But they fit our doll.
12           MS. HURST:  Surely, your Honor, but mere
13   compatibility is not the test for infringement.
14           THE COURT:  No, I am not talking about that.  I'm
15   just talking about what's out there.  In other words, other
16   entities unconnected with Mattel and/or MGA can actually
17   produce these accessories.
18           MS. HURST:  Absolutely, your Honor.  That whole
19   chain of distribution are the parties who are being affected
20   by this who are not before the Court and in a position to
21   have their interests --
22           THE COURT:  What do you value this 30 percent
23   overseas or extraterritorial at?  What is my dollar value,
24   from your perspective?  And I'll ask Mattel.
25           Go over and talk to your client.  Take your time
```

Case 2:04-cv-09049-DOC-RNB   Document 7407   Filed 01/15/10   Page 12 of 62   Page ID #:255585
SACV 04-9049-DOC - 11/09/2009 - Vol. II

12

1    with these answers, because remember, you are going to live

2    with them a long time.

3            *(Attorney discussion held off the record.)*

4            MS. HURST:  Your Honor, because the height of the

5    annual selling season in the toy business is about to

6    commence or is right now commencing in light of the holiday

7    season in the fourth quarter, it's extremely difficult to

8    predict.

9            THE COURT:  You really want to leave me with that

10   answer and leave Mattel in the position of stating the

11   figure to me?  Go back and talk to your client again.  In

12   other words, that's fine, you can leave it with a big zero,

13   but when Mattel fills that in, that will be the number.

14           *(Attorney discussion held off the record.)*

15           MS. HURST:  Your Honor, is the Court asking for

16   the value of the products that may be subject to the -- that

17   would be subject to the recall?  Is that the question?

18           THE COURT:  Yes.

19           MS. HURST:  Your Honor, I believe we'll have to

20   take a recess in order to answer that question accurately.

21           THE COURT:  Okay.  Continue on.  Why don't you

22   finish your argument and we'll come back to that figure.

23           See, here is my concern.  Right now you are

24   required to, in a sense, repurchase this product.  I don't

25   know how a -- I know how a store is going to act

Case 2:04-cv-09049-DOC-RNB   Document 7407   Filed 01/15/10   Page 13 of 62   Page ID #:255586
SACV 04-9049-DOC - 11/09/2009 - Vol. II

13

 1   domestically.  I have power domestically as a federal court.

 2   I'm not certain how a store reacts in England.  I don't know

 3   if they allow a sale back to you, and they think that's

 4   advantageous, or they look at that, if they are in Paris,

 5   France, for instance, and they decide, "We purchased the

 6   doll for $12.  We can sell it for $30.  Why are we going to

 7   return it?"  Where is the power of the Court, that long-arm

 8   reach?

 9          So I'm not certain how extraterritorially, which

10   fits with your argument, the stores are going to react.  I

11   am pretty certain how they are going to react domestically,

12   because the courts have power domestically, but when I don't

13   have power, when I reach across an extraterritorial boarder,

14   then we can make all the orders we want, but if they don't

15   make sense and there is noncompliance, that somewhat favors

16   your argument, "Why are we doing that?"

17          MS. HURST:  Your Honor, let -- let me also address

18   the Court's question about harm, implicit question, at

19   least, about harm to Mattel.

20          Mattel does not have Bratz dolls on the shelves.

21   That is the copyright that is at issue, not Barbie.

22   Barbie -- there is no Barbie intellectual property upon

23   which they are suing in this lawsuit.

24          THE COURT:  Okay.

25          MS. HURST:  The copyright interest to be

Case 2:04-cv-09049-DOC-RNB   Document 7407   Filed 01/15/10   Page 14 of 62   Page ID #:255587
SACV 04-9049-DOC - 11/09/2009 - Vol. II

14

1    vindicated, your Honor, the harm is the Bratz copyright.

2    They have no Bratz product on the shelves, and they are not

3    going to have Bratz product on the shelf until late spring

4    at the soonest.

5              THE COURT:  Okay.

6              MS. HURST:  And accordingly, your Honor, the

7    monitor has twice found in his last two reports that the

8    continued sales support the brand, they support the value of

9    the trademark portfolio that was also transferred under the

10   constructive trust, and then having product off the shelves,

11   everybody has agreed, it would be detrimental to the brand.

12   You lose the retail shelf space, you lose the attention of

13   the consumer, and in fact, your Honor, because of that,

14   beginning in June of this year, Mattel started sending

15   letters complaining that MGA wasn't doing enough to sell

16   Bratz.

17             THE COURT:  I see.  It wasn't doing enough to sell

18   Bratz.  It was diverting its attention to its other product

19   lines, and it should vigorously sell Bratz to Mattel's

20   benefit.  And that was the subject of the proposed -- one of

21   the new counterclaims and the proposed fourth-amended

22   counterclaim, which the Court may hear about later, saying

23   you're breaching your --

24             THE COURT:  The fourth-amended counterclaim?

25             MS. HURST:  Yes, your Honor.

```
 1            THE COURT:  Is that before me yet?

 2            MS. HURST:  It was filed before Judge Larson and

 3   then he kicked it off calendar.  And we had a discussion

 4   during the recess, your Honor, about when that's going to be

 5   re-noticed for hearing.

 6            THE COURT:  I am just curious, and I'm going to

 7   joke with both of you, why am I at a fourth-amended

 8   counterclaim?  Why am I at a fourth-amended whatever?  I'm

 9   joking, but I'm not.  We'll get back to the fourth-amended

10   counterclaim when it's in front of me.

11            MS. HURST:  Thank you, your Honor.  It's not our

12   fourth-amended counterclaim.

13            THE COURT:  It's on file with Judge Larson, that's

14   before me.  But there won't be a fifth, trust me.

15            MS. HURST:  Well, it hasn't been filed yet.  It

16   was a motion for leave to amend, just to be clear, your

17   Honor.

18            THE COURT:  Okay.

19            MS. HURST:  But in all events, there was a claim,

20   and that proposed fourth-amended counterclaim, saying you're

21   breaching your obligations under the constructive trust

22   order by not selling enough Bratz.

23            THE COURT:  Okay.  We'll find out what Mattel

24   wants tonight in just a few moments.

25            (Attorney discussion held off the record.
```

Case 2:04-cv-09049-DOC-RNB   Document 7407   Filed 01/15/10   Page 16 of 62   Page ID #:255589
SACV 04-9049-DOC - 11/09/2009 - Vol. II

16

1          MS. HURST:  Your Honor, as the Ninth Circuit, en

2    banc, discussed in the Subafilms case, the reason that the

3    copyright laws generally do not have extraterritorial reach

4    is because copyright law is subject to local consumer, and

5    no court in any country, other than this one, although MGA

6    has the utmost respect for the courts in this country and is

7    doing everything it can to comply with those orders, no

8    court in other countries has considered the issue of whether

9    dolls are even subject to copyright protection in those

10   countries.  And if so, whether the dolls that have been sold

11   by Mattel infringe the limited number of copyrights that

12   actually would be transferred to Mattel under the

13   constructive trust order.  And this -- these local

14   determinations --

15          Indeed, your Honor, by the way, a fundamental

16   prerequisite to making such determinations is that Mattel

17   could own the ideas and the works done on his own time of

18   their former employee, Carter Bryant, a proposition also not

19   recognized in many countries throughout the world, where

20   they don't recognize even the Work Made for Hire Doctrine.

21   It would be inimical to the public policy of other countries

22   to consider this to be an infringement.

23          THE COURT:  Okay.

24          MS. HURST:  Your Honor, for that reason, the Ninth

25   Circuit recognized en banc in Subafilms that copyright law

JANE C.S. RULE, CSR NO. 9316 - U.S. COURT REPORTER

1   is not extraterritorial.  It is subject to local concern and

2   in order for us to protect the concerns of our citizens and

3   our commerce here, we respect those local norms.

4           THE COURT:  Okay.

5           MS. HURST:  With all of that said, your Honor, MGA

6   has adopted a nine-page detailed line-by-line recall plan.

7   Your Honor, colloquially, they brought in the Marines.

8   Mr. Collins from Saracycle (phonetic) has years of

9   experience doing reverse logistics, which started when he

10  was in the Marine Corps.  This is a company who is taking

11  this recall seriously.  They are spending hundreds of

12  thousands, if not millions of dollars, on it already in fees

13  to Saracycle, in lawyer fees, in meetings with the monitor,

14  in making all these documents available, in meeting with the

15  monitor in Hong Kong to show him the tooling to be

16  impounded.

17           And your Honor, emphatically, I want to say to you

18  here we did not bring this motion as some kind of an effort

19  to test you on whether you are going to take a second look

20  at Judge Larson's orders.  That is not what this is about.

21  This was precipitated, your Honor, by confusion between the

22  monitor and MGA about what the order required, and an

23  earnest desire to resolve that before we are in a situation

24  where we are facing a contempt motion, your Honor.

25           THE COURT:  Just a moment.

1        Why didn't you bring this to Judge Larson's

2    attention earlier, then?  In other words, he just left the

3    bench, I think, November 1st or 2nd.  Since there was such

4    mass confusion over his order, why didn't you bring this to

5    his attention?

6        MS. HURST:  Your Honor, these events happened

7    within the last few weeks, basically, as part of the recall

8    planning process.

9        THE COURT:  When did he make his order?

10        MS. HURST:  Well, Judge Larson told us at the end

11    of August he would no longer be handling substantive matters

12    on the case and he would only be handling settlement.  As of

13    that time, your Honor, it was our understanding we were not

14    to -- he vacated all hearings and the date at that time.

15        THE COURT:  I thought he had hearings in

16    September.  And in fact, according to his -- because he

17    called me asking me if I would take this case.  Apparently,

18    my colleagues weren't too interested, I am not too sure I'm

19    too interested.  I am just kidding you.

20        MS. HURST:  Thank you, your Honor.

21        THE COURT:  He was holding hearings up until

22    September 24th or 26th or something.  I forget the date, but

23    then he informed me he was going to act as a settlement

24    judge, and he had hearings set in September.  Now, I don't

25    recall the specific date, but I know that this was handed

```
 1    down sometime in August.  There was plenty of time.  This
 2    isn't mass confusion.  So I accept your argument, frankly,
 3    but I don't believe it.  You could have brought it earlier.
 4    And I'm going to ask you once again, why didn't you bring
 5    this earlier?
 6              MS. HURST:  Your Honor --
 7              THE COURT:  Okay.  Go on with your argument.
 8              MS. HURST:  I apologize, your Honor.  I'm
 9    flabbergasted.  I am aware of no reason other than the one
10    that I have stated to the Court in terms of the timing of
11    resolution -- of when this issue was raised.
12              Your Honor, quite frankly, there has also been --
13    pardon me one moment.
14              THE COURT:  All right.  Take your time.
15              (Attorney discussion held off the record.)
16              THE COURT:  Now, in your briefing you are claiming
17    that you tried to bring this to Judge Larson's attention.
18    Perhaps I'm wrong.  Do we have a record of that?
19              MS. HURST:  No, your Honor.  We renewed the
20    request for stay before Judge Larson, but we did not bring
21    these other issues to Judge Larson's attention.
22              THE COURT:  Okay.  Now, I'm going to be very
23    careful because I don't want to have a preconception on my
24    part.  That wouldn't be fair to you.  So let's back up.
25              Concerning the extraterritorial recall, that issue
```

Case 2:04-cv-09049-DOC-RNB   Document 7407   Filed 01/15/10   Page 20 of 62   Page ID #:255593
SACV 04-9049-DOC – 11/09/2009 – Vol. II

20

1    was decided by Judge Larson sometime in August.

2              MS. HURST:  No, your Honor.

3              THE COURT:  When was it decided?

4              MS. HURST:  It was never decided.  It was never --

5    that issue was never raised before Judge Larson.

6              THE COURT:  No.  When did Judge Larson extend the

7    recall?  In other words, was his order confusing?

8              MS. HURST:  Yes.

9              THE COURT:  It didn't speak to extraterritorial

10   recall?

11             MS. HURST:  Yes, your Honor.

12             THE COURT:  Then my apologies, I'm wrong.  Let me

13   back up on that.  So your belief is that this recall never

14   spoke to the domestic versus extraterritorial?

15             MS. HURST:  That's correct, your Honor.

16             THE COURT:  Then let me apologize to you, and I'll

17   go back and look at that record.

18             MS. HURST:  Your Honor, so the orders that were

19   all issued on December 3rd, the constructive trust order

20   said "worldwide."

21             THE COURT:  Uh-huh.

22             MS. HURST:  But the copyright injunction didn't.

23             THE COURT:  Okay.  Now, hold on.  What does

24   "worldwide" mean?

25             MS. HURST:  Extraterritorial, your Honor.

 1          THE COURT:  Okay.

 2          MS. HURST:  In particular, the constructive trust

 3   order said "Transfer your worldwide trademark portfolio."

 4          THE COURT:  And when was that issued?

 5          MS. HURST:  December 3rd of 2008, on the same day

 6   as this injunction.  And so this injunction --

 7          THE COURT:  Don't worry.  Take your time.  We've

 8   got all night, believe it or not.

 9          MR. MC CONVILLE:  I know.

10          THE COURT:  You can have as much time as you need.

11          *(Attorney discussion held off the record.)*

12          MS. HURST:  So, your Honor, there were three

13   orders issued on December 3rd, 2008.

14          THE COURT:  Okay.

15          MS. HURST:  That are the ones that are presently

16   on appeal before the Ninth Circuit.

17          THE COURT:  Okay.

18          MS. HURST:  There was a declaratory judgment

19   transferring the copyrights.

20          THE COURT:  Uh-huh.

21          MS. HURST:  There was a constructive trust order

22   transferring the trademarks.

23          THE COURT:  Okay.

24          MS. HURST:  And then there was a third order,

25   which is the copyright injunction.

SACV 04-9049-DOC - 11/09/2009 - Vol. II

22

```
 1              THE COURT:  Okay.  And that's --

 2              MS. HURST:  That's the one that includes these

 3   recall provisions, your Honor.

 4              THE COURT:  Now, it says "worldwide."

 5              MS. HURST:  In the constructive trust order,

 6   transferring the trademarks.

 7              THE COURT:  Okay.

 8              MS. HURST:  But not in the injunction.  And so MGA

 9   was going along, and then on September 15th, there was an

10   initial presentation of the recall plan with the monitor,

11   and that was on September 15th, where there was the draft

12   plan.

13              THE COURT:  Now, let me stop and repeat back to

14   you what I'm hearing so that you know I'm either absorbing

15   or not, you can correct me.

16              That means because of the confusion concerning the

17   injunction, that you really didn't get your antenna up, in a

18   sense, and you weren't really alert to this worldwide until

19   sometime when you must have talked to the monitor and

20   realized the extent of this.

21              MS. HURST:  Right.  And that happened after the

22   recall plan meeting on September 15th, your Honor.

23              THE COURT:  I see.  Now, when did Judge Larson

24   actually step away?  Give me a date that he stepped away

25   from the case and started acting as a settlement judge,
```

Case 2:04-cv-09049-DOC-RNB   Document 7407   Filed 01/15/10   Page 23 of 62   Page ID #:255596
SACV 04-9049-DOC - 11/09/2009 - Vol. II

23

 1   because he told me he was going to have some kind of motions

 2   that he was going to hear in September at some point before

 3   he left, and before, if I would graciously take this case,

 4   he wanted to at least decide whatever those motions were.

 5   What date?

 6          MS. HURST:  I think it was September 21st or 22nd,

 7   your Honor.

 8          THE COURT:  Okay.  So you have about six days

 9   alert.  Did you call it to his attention?

10          MS. HURST:  Actually, on the 15th, there was no

11   alert.  That was the initial presentation of the plan, your

12   Honor, and then for several weeks after that, the

13   discussions with the monitor continued, and I think it was

14   on October 9th, your Honor, that Mr. Russell from Skadden

15   Arps, who had been handling this, had his conversation with

16   Mr. Fraioli in which it became apparent that this was a

17   significant potential point of disagreement.  And it was in

18   that October 9th conversation that Mr. Fraioli also said for

19   the first time, "Look, I'm really not a special master on

20   these issues" --

21          THE COURT:  Wait, stop.  And when had Judge

22   Larson -- so you'll help me with dates, remember I wasn't

23   there -- step away from this case?

24          MS. HURST:  It was that third week of September

25   hearing, your Honor.  Whatever the date was, I can't recall.

Case 2:04-cv-09049-DOC-RNB   Document 7407   Filed 01/15/10   Page 24 of 62   Page ID #:255597
SACV 04-9049-DOC - 11/09/2009 - Vol. II

24

1    I apologize.

2              THE COURT:  So September 9th, you have no place to

3    go?

4              MS. HURST:  Right.  By October 9th, we had no

5    other place -- and believe me, your Honor, we did not want

6    this to be our first motion with this Court.  And I

7    appreciate everything the Court has said, but the recall

8    notices need to start going out in the next week or so, your

9    Honor, and MGA really wanted to make sure it was complying

10   appropriately.

11             THE COURT:  I understand why it's here.

12             MS. HURST:  Okay.

13             THE COURT:  Now, modification of deadlines.  Look

14   down at page 16, paragraph C, line 21.  You are going to be

15   concerned about that also, whether it's domestic or

16   extraterritorial, aren't you?

17             MS. HURST:  Yes, your Honor, although frankly, the

18   extraterritoriality significantly enhances the problems

19   associated with all of these issues.

20             THE COURT:  Let's assume, tentatively, that I

21   ruled in your favor, at least had some modification of the

22   extraterritorial order, which I'm not representing to you,

23   that I'm just dealing with the domestic order, what's the

24   difficulty complying with this 70 percent or this deadline

25   domestically?

1        MS. HURST:  Your Honor, largely, it's just an

2   issue of providing reasonable time frames for the return.

3   The product will be off the shelf by the ordered date of

4   January 21st.

5        THE COURT:  Uh-huh.

6        MS. HURST:  And then it's a matter of having a

7   reasonable amount of time to collect it all from there and

8   ship it back so that MGA is not incurring excess charges and

9   so forth.

10       With respect to the timing of sending out the

11  notices, your Honor, there is two issues --

12       THE COURT:  Well, you know the concern.  If I was

13  in Mattel's position, they are going to argue that this is

14  the toy season.  This is the very time that they want this

15  product off the shelf.

16       MS. HURST:  Well, your Honor, Judge Larson has

17  already permitted it to be sold through the end of the year

18  expressly.  And then -- so it's the order -- the

19  modification orders in the spring of 2009, April 27 and

20  May 21, 2009, specifically say that MGA and their chain of

21  distribution can continue selling through the end of the

22  year, and -- and then the recall deadline is January 21st,

23  your Honor.

24       THE COURT:  Okay.

25       MS. HURST:  And so the court -- Judge Larson, in

Case 2:04-cv-09049-DOC-RNB   Document 7407   Filed 01/15/10   Page 26 of 62   Page ID #:255599
SACV 04-9049-DOC - 11/09/2009 - Vol. II

26

1   part animated by these concerns about not having the brand

2   not be on the shelves and accommodating retailers and

3   distributors and licensees with whom MGA had long-term

4   relationships, permitted expressly that the product be sold

5   through.

6           THE COURT:  Okay.

7           MS. HURST:  Your Honor, with respect to the other

8   timing issue, we proposed -- the way the order is currently

9   worded, arguably, it requires us to send a notice to anybody

10  we ever sold anything to.  Your Honor, this product wasn't

11  on the shelf for nine years.  It was on the shelf for five

12  years before there was ever really any claim, and it was on

13  the shelf for eight years before there was a motion for an

14  injunction.  So to have to send to everyone, whoever they

15  sold products to, first of all, seems extraordinarily

16  burdensome.  But putting that aside, your Honor, there is a

17  double recovery issue here because Mattel has gotten the

18  damage verdict already for all the sales that occurred

19  before July of 2008.  To get a recall on top of that would

20  be a penalty to MGA, your Honor, that would be inappropriate

21  for that reason.

22          THE COURT:  Okay.  Let me give you a thought for a

23  moment.

24          With Microsoft, we were dealing with about a

25  billion dollars of product, and Microsoft, both domestically

1   and extraterritorially, had a much larger problem than you

2   have dealing with a version of Microsoft that had hit the

3   shelves in both the United States and Europe.  There, that

4   was an extraterritorial order by this Court.  But

5   Microsoft's argument initially was that they couldn't

6   possibly do this.

7          This Court recognizes that you can't accomplish

8   the impossible, but that doesn't preclude you from making

9   the attempt.  So I'm not amenable to hearing all of the

10  problems and why you can't do it, but you also have an

11  understanding Court that you can't do the impossible, but

12  you have to make the effort.  So I'm not so unreasonable to

13  believe that you are going to sweep the shelves a hundred

14  percent.  I am not going to hold you in contempt, but I will

15  if I don't see the effort.  So it's the effort to get the

16  train moving as quickly as possible that I'm most concerned

17  about.  I understand the practicality of that, and having

18  gone through the Microsoft case, I know that that's

19  difficult, but certainly you don't face the same obstacles.

20  There, the product was much more dispersed and much more

21  difficult to deal with, okay?

22          MS. HURST:  And, your Honor, Microsoft, with all

23  its wherewithal, is in a much better position, but I

24  appreciate what the Court is saying and --

25          THE COURT:  It's the effort.  In other words, we

Case 2:04-cv-09049-DOC-RNB   Document 7407   Filed 01/15/10   Page 28 of 62   Page ID #:255601
SACV 04-9049-DOC - 11/09/2009 - Vol. II

28

1   need to see you get started, okay?

2           Let me turn to your opposition for just a moment.

3   We'll come right back to you, okay?

4           All right.  On behalf of Mattel.  Once again, your

5   name.

6           MR. ZELLER:  Yes.  Mike Zeller for Mattel.

7           THE COURT:  Hold the microphone closer to you.

8           MR. ZELLER:  Yes, sir.

9           THE COURT:  Closer.

10          MR. ZELLER:  With respect to the surprise aspect

11  of this, I would direct the Court's attention to two parts.

12          THE COURT:  Okay.

13          MR. ZELLER:  The first is the MGA party's ex-parte

14  application, which was their first motion to stay, which is

15  dated December 9th, 2008.

16          THE COURT:  December 9th, 2008.  Thank you.

17          MR. ZELLER:  Right.

18          THE COURT:  Where would I find that?

19          MR. ZELLER:  We have this attached to the

20  declaration on the motion for reconsideration.

21          THE COURT:  Thank you.

22          MR. ZELLER:  It's Exhibit 25.

23          THE COURT:  Thank you.  Okay.

24          MR. ZELLER:  And this is the declaration of Scott

25  Watson.

1          And in this -- we actually attached the entire

2    brief, but on page 15, this starts off by saying, "The

3    court's order could be read to require MGA to take steps

4    outside of the United States based on principles of U.S.

5    copyright law."  And there is a citation.  Then they go on

6    to talk about "The U.S. copyright laws do not apply outside

7    of the United States.  In an order purporting to enjoin a

8    party" --

9          THE COURT:  Just a little slower so I get a good

10   record.

11         MR. ZELLER:  Yes.

12         -- "from taking or refraining from actions outside

13   the U.S. in reliance on such laws would be inappropriate.

14   CEG Subafilms, Ltd., v. MGM-Pathe, P-a-t-h-e, Communications

15   Company," and then citing the Ninth Circuit case.

16         And so this is, in fact, an argument that has been

17   made and has been made repeatedly by the MGA parties in

18   support of their stay application.  Stay applications that

19   were denied by Judge Larson and then subsequently by the

20   Ninth Circuit, as well.  So that's part one of what I would

21   point to, your Honor.

22         Part two of what I would point to is the monitor's

23   fifth report.  And this is at page 13, starting at line 23.

24         THE COURT:  Okay.

25         MR. ZELLER:  And where it talks about how MGA buys

SACV 04-9049-DOC - 11/09/2009 - Vol. II

```
 1    the monitor, about how it didn't believe that, basically,
 2    product needed to be taken off the shelves.  And it says,
 3    quote, "This was inconsistent with the prior detailed plan
 4    that MGA had provided to the monitor," end quote.
 5            And while -- I will say, your Honor, we have not
 6    been privy -- "we" being Mattel -- have not been privy to
 7    all these plans, as I understand this, and I believe that
 8    the monitor would be able to address this in more detail,
 9    but I believe that this plan always made quite clear that
10    this was to be a worldwide recall, and how far back this
11    plan goes, I would -- I would say at least it must go to the
12    summer.
13            THE COURT:  Now, help me.  Did Judge Larson --
14    strike that.  I'll wait.  I want to talk to the monitor in
15    just a moment in everyone's presence.
16            MR. ZELLER:  Certainly, your Honor.  But I can
17    certainly say that from my participation in the meetings
18    with the recall working group consisting of the monitor,
19    also Skadden Arps representing MGA, that it was always my
20    understanding that they knew full well that it was a
21    worldwide recall.  And that's -- again, some information has
22    been designated monitor's eyes only, so I have not been
23    privy to particular plans, but that's -- that's my best
24    understanding.
25            THE COURT:  Okay.  Explain that.  Monitor's eyes
```

JANE C.S. RULE, CSR NO. 9316 - U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 7407   Filed 01/15/10   Page 31 of 62   Page ID #:255604
SACV 04-9049-DOC - 11/09/2009 - Vol. II

31

1    only, were these directions from Judge Larson?

2              MR. ZELLER:  I don't know that I can fully answer

3    that, your Honor.

4              THE COURT:  Okay.

5              MR. ZELLER:  I believe that it is a designation

6    that MGA has made.  The exact genesis of it, I believe, is

7    from at least an understanding that such materials could be

8    so designated.

9              THE COURT:  Okay.

10             MR. ZELLER:  But I do not know -- again, we don't

11   have complete transparency into the process.

12             THE COURT:  Now, do you have an objection to the

13   monitor -- I know there is an objection, apparently, from

14   MGA, but is there some objection to this monitor?

15             MR. ZELLER:  No, your Honor.

16             THE COURT:  Is there some objection on MGA's part

17   to the monitor?

18             MS. HURST:  To the monitor, your Honor?

19             THE COURT:  Uh-huh.

20             MS. HURST:  In general?

21             THE COURT:  Uh-huh.

22             MS. HURST:  *(Laughter.)*

23             THE COURT:  You might as well speak it now or hold

24   your peace.  Do you want another monitor?  Is that what you

25   are asking, or do you want to limit his authority?

JANE C.S. RULE, CSR NO. 9316 - U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 7407   Filed 01/15/10   Page 32 of 62   Page ID #:255605
SACV 04-9049-DOC - 11/09/2009 - Vol. II

32

```
 1              MS. HURST:  Your Honor --

 2              THE COURT:  Why don't I have the monitor step out

 3     for just a moment.

 4              And, counsel, can I have your permission to seal

 5     this portion so, therefore, you can speak frankly?

 6              MS. HURST:  Thank you, your Honor.

 7              THE COURT:  Counsel?

 8              MR. ZELLER:  No objection.

 9              THE COURT:  Okay.  Let's seal this portion from

10     this point forward.  Therefore, if you have anything that

11     you want to say concerning his inability from your

12     perspective, you are free to do so.

13              MR. MC CONVILLE:  Your Honor, just to be clear, I

14     don't know who these other folks are in the courtroom, but

15     if it's going to be reported in the media, there can be an

16     issue that the monitor is going to find out regardless.

17              THE COURT:  Well, that's okay.

18              Are you the media?

19              UNIDENTIFIED SPEAKER:  I am not.

20              UNIDENTIFIED SPEAKER:  I am not either.

21              THE COURT:  He's not the media.  Thank you very

22     much.

23                  * * SEALED PROCEEDINGS FOLLOW * *

24              (Written Court approval required to view.)

25
```



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25





1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25





Case 2:04-cv-09049-DOC-RNB   Document 7407   Filed 01/15/10   Page 43 of 62   Page ID #:255616
SACV 04-9049-DOC - 11/09/2009 - Vol. II

43

```
 1              SANTA ANA, CALIFORNIA, MONDAY, NOVEMBER 9, 2009

 2              * * OPEN COURT PROCEEDINGS RESUMED * *

 3              THE COURT:  Now, the rest of the record is

 4    unsealed now.  The other portion will remain sealed.

 5              MR. ZELLER:  One thing I think needs to be kept in

 6    mind about the presentation that MGA has made on this point

 7    is that the product that is being sold now and that had been

 8    sold in 2009 principally is old product.  MGA originally

 9    procured the extension through what was initially the end of

10    December of this year and then subsequently to January 21st,

11    2010, based upon representations that they were going to be

12    selling a new 2009 spring and fall Bratz line.  As I

13    understand it, that has not been largely the case.

14              What we are really fighting about here today, and

15    in terms of a particular recall, is that -- the Court may

16    recall this in looking at the appointment of the temporary

17    receiver -- there was evidence that Isaac Larian transferred

18    old inventory, I mean tens of millions of dollars of old

19    Bratz inventory, to another entity, IGWT.  And I believe

20    that that is a fair amount of the inventory that we are

21    talking about here today.

22              There is absolutely no reason in terms of value to

23    the brand or survival of the brand, as MGA has tried to wrap

24    up this argument, to selling that old product that is in

25    inventory.
```

1          THE COURT:  Okay.

2          MR. ZELLER:  And that, I think, is kind of mocking

3    almost of our argument about the fact that somehow MGA or

4    Mattel wants it both ways.  We want the brand to survive and

5    yet we want them to stop selling Bratz.  The fact is that

6    the inventory they are talking about is old product, that

7    has nothing to do with the survival of the brand.  And in

8    fact, part of the problem we have is after having made those

9    representations to Judge Larson, that basically there was

10   this 2009 spring and fall line, and that that would be

11   really why they should be permitted to continue to sell --

12   and I'm not suggesting there wasn't something there, but in

13   terms of overall percentage, in terms of the amount of Bratz

14   product that they were moving, my understanding is -- and

15   again, we don't have complete transparency into this for

16   reasons we can talk about on the discovery front, because we

17   also have not received updated financials from MGA, but

18   certainly the tens of millions of dollars in old inventory

19   that we've seen pails certainly percentage-wise in

20   comparison to what it is that MGA said they were going to

21   sell throughout the course of 2009.  So this leaves, at

22   least inferentially, a small amount of 2009 actual Bratz

23   products.

24          THE COURT:  Now, let me ask the same question.

25   Look over the horizon for me.  Educate me.  What's out

 1     there?  What am I dealing with with product, in a sense,

 2     domestically and extraterritorially, from your viewpoint?

 3              MR. ZELLER:  I will caveat it by saying that we

 4     have not been blessed with that information.

 5              THE COURT:  Once again, you don't want to leave me

 6     with a zero.

 7              MR. ZELLER:  No, I'm not going to, your Honor.

 8              THE COURT:  What's your best guess?

 9              MR. ZELLER:  I will tell you what it is that I

10     know based on what MGA has said.

11              Going back to, in fact, the stay applications, the

12     requests that the injunction be extended until December and

13     then January of 2010 --

14              THE COURT:  Uh-huh.

15              MR. ZELLER:  -- MGA represented that they would

16     sell approximately $58.4 million in Bratz in 2009.  That was

17     their expert, Mr. Meyer, M-e-y-e-r.

18              The amount that we know was transferred in

19     approximately -- in fact, it was going on during the phase

20     one trial.  When this inventory, this Bratz inventory was

21     transferred from MGA to IGWT, and it had a retail value of

22     in excess of $50 million, this was actually taking place

23     during the phase one trial is when this occurred.

24              THE COURT:  I see.

25              MR. ZELLER:  So, I mean, one can certainly look

```
 1   inferentially, is that if we are talking about $58.4 million
 2   in income, in total sales, a substantial portion of this
 3   must be that older inventory.  And also, the question
 4   remains today, which is, where is this inventory?  We've had
 5   endless conversations as part of the recall working group to
 6   try and understand, even what inventory is out there, where
 7   is it, and how is it going to be returned?
 8               THE COURT:  Time out.
 9               MR. ZELLER:  Yes.
10               THE COURT:  Who will you depose that will help you
11   with this issue?
12               MR. ZELLER:  There are, I believe, two or three
13   individuals who are -- based on documents we have seen so
14   far.
15               THE COURT:  Who?
16               MR. ZELLER:  Brad Snyder, I believe is his name --
17   and if you would bear with me, your Honor.
18               THE COURT:  Okay.  Give me the names at your
19   convenience and take your time.  Your group can huddle.
20               MR. ZELLER:  I've actually written them down.
21               THE COURT:  Okay.
22               MR. ZELLER:  Bear with me, your Honor.
23               THE COURT:  While you are getting those names, let
24   me just toss out an idea to you.
25               MR. ZELLER:  Yes.
```

```
 1          THE COURT:  It would be helpful, I think, from

 2    Mattel's perspective so that you are not guessing -- you are

 3    doing a lot of work in terms of what I call circumstantial,

 4    you know, a lot -- why wouldn't they be some of the first

 5    people deposed?

 6          MR. ZELLER:  And we, in fact, did have them among

 7    those critical witnesses who the Court asked about.

 8          THE COURT:  Good.  Where is Brad Snyder located?

 9    Counsel, you can help me from MGA.  Where is he located?

10          MS. HURST:  He's here, your Honor.

11          THE COURT:  Good.  He can be deposed Thursday.

12    Who is your next one?

13          MR. ZELLER:  Then also the 30B6 witness of IGWT,

14    which are these Larian entities.

15          THE COURT:  What's his name?

16          MR. ZELLER:  Well, it may be Mr. Snyder, but it

17    would be a designee of the company.

18          THE COURT:  So you can be ready for deposition on

19    Thursday?

20          MR. ZELLER:  Yes, your Honor.

21          THE COURT:  Good.  You can get Mr. Snyder down

22    here Thursday.

23          MS. HURST:  Your Honor, we don't have a 30B6

24    notice, so we don't know what the topics are.

25          THE COURT:  We'll start with Mr. Snyder.
```

SACV 04-9049-DOC - 11/09/2009 - Vol. II

48

```
 1              MS. HURST:  All right.

 2              THE COURT:  And whether he's a 30B witness or not,

 3    he can be asked questions.  In other words, let's get to the

 4    bottom of this in terms of what's out there, if at all

 5    possible, so we are not guessing.  It's too much what I call

 6    circular work, and you need to start being able to ask

 7    questions quickly.  It will also be cost effective for MGA.

 8              Now, let's start with Mr. Snyder Thursday; is that

 9    acceptable?

10              MR. ZELLER:  Yes, your Honor.

11              THE COURT:  Can we start with Mr. Snyder at 7:30

12    or 8:00 in the morning?  Is that available across the street

13    at that time?

14              MR. ZELLER:  Yes, your Honor.

15              THE COURT:  All right.  We'll start with

16    Mr. Snyder.

17              Now, why don't you continue on.  He won't be

18    designated as your 30B witness yet, counsel.  We'll start

19    with Mr. Snyder, okay, and you can designate your 30B and

20    we'll get to that witness shortly, maybe this weekend.

21              MS. HURST:  Your Honor, may I suggest that Nanette

22    Hambleton be the witness because she's the one who's been

23    running the recall planning and has all the data about

24    inventory that she's been collecting.

25              THE COURT:  We can have both.  We can have both.
```

Case 2:04-cv-09049-DOC-RNB   Document 7407   Filed 01/15/10   Page 49 of 62   Page ID #:255622
SACV 04-9049-DOC - 11/09/2009 - Vol. II

49

```
1    By the way, you are going to give me Saturday.  You are

2    going to be here Saturday.  May be here half a day on

3    Sunday, we'll see how you do.

4              MR. ZELLER:  Yes, your Honor.

5              THE COURT:  So we are going into depositions.

6              MR. ZELLER:  So what I was running through was at

7    least what I know.  And the other thing that I know is that

8    at various times I repeated Mr. Meyers estimate of

9    $58.4 million.

10             THE COURT:  Okay.

11             MR. ZELLER:  Also there was a range generally that

12   was given approximately in the $60 million range by other

13   witnesses, as well.  So if we take the percentage that MGA

14   has provided internationally, what we are really talking

15   about is about 12 million to 18 million, maybe somewhere in

16   there.

17             THE COURT:  I'm just joking, but that seems like

18   chump change.

19             MR. ZELLER:  Well, it's not in the sense that the

20   amount that's been escrowed so far for Bratz profits is

21   slightly north of $2 million.  And part of this is --

22             THE COURT:  So you've got $1.7 million with your

23   discovery referee?

24             MR. ZELLER:  Well, what I would say is this, your

25   Honor, the accountings have certainly been challenging, and
```

SACV 04-9049-DOC - 11/09/2009 - Vol. II

50

 1    I can provide the transcript to your Honor, but the -- MGA's

 2    counsel said at the argument we had, Mattel will not see one

 3    dime from these accountings.  I mean, that's the gauntlet, I

 4    would say, being thrown down.  And the entire premise of

 5    this course was that Judge Larson thought that at least the

 6    impact of this would be somewhat mitigated by having a fair

 7    accounting by 2009.  And it's certainly no reflection on the

 8    monitor who was --

 9              THE COURT:  How can you have a fair accounting

10    without depositions taking place at the same time?  You're

11    just relying on documents.

12              MR. ZELLER:  I absolutely agree with that.  I

13    absolutely agree with that.  We have sought financial

14    information, financial information has been ordered that we

15    do not have.

16              THE COURT:  Okay.

17              MR. ZELLER:  And that's a problem.  That's a very

18    large problem.  And in fact, pending before your Honor are

19    two interrogatories that are designed to get at additional

20    financial information about Mr. Larian that they appealed.

21    The discovery master found that that was relevant discovery,

22    it was compelled.  We served these back in March, and we

23    still do not have basic information about Isaac Larian's

24    financial holdings.

25              THE COURT:  Are part of these costs because you

51

 1    believe that, frankly, MGA has been stalling you?

 2             MR. ZELLER:  Yes, your Honor.

 3             THE COURT:  So therefore, whether the cost of the

 4    discovery master or referee -- see, I don't know if those

 5    are reasonable or not, and I'm coming in late in the game,

 6    but I'll know very quickly.  We'll see how the parties

 7    react.  So do you have any objection to the monitor?

 8             MR. ZELLER:  No, your Honor, I don't.

 9             THE COURT:  And explain to me, once again, how you

10    are going to enforce this extraterritorially.

11             MR. ZELLER:  I believe that the answer is the one

12    that the Court provides in the tentative, which is that the

13    Court has authority -- and this is the point we've made

14    since the beginning of this -- the Court has the authority

15    over MGA and the other parties through this litigation.  It

16    may be certainly the case, it's not even something that's

17    determined at this juncture as to whether or not the Court

18    has jurisdiction over a German retailer.  That is not an

19    issue right now.  The issue is what does MGA have to do to

20    comply?  And there is no question, both under state law and

21    under federal law that that is appropriately

22    extraterritorial in reach.

23             THE COURT:  That's going to be my question back to

24    MGA.  That is, once again, you have to understand you have a

25    very reasonable Court.  It's -- I'm not asking you to do the

Case 2:04-cv-09049-DOC-RNB   Document 7407   Filed 01/15/10   Page 52 of 62   Page ID #:255625
SACV 04-9049-DOC - 11/09/2009 - Vol. II

52

1   impossible.  I am not inflicting contempt proceedings on

2   you.  What I have to see, though, is a start, a good-faith

3   effort.  And I understand that a French or English or

4   Italian store may react and simply not comply, that doesn't

5   cause me a problem, but you may get voluntary compliance,

6   you may start that process.  And so I don't know why you'd

7   be resisting that.  In other words, it doesn't seem to me to

8   cost a significant amount.  I understand I don't have

9   extraterritorial reach, I can't reach out to an Italian

10  store, et cetera.  I am not going to ever punish you for

11  noncompliance when you make reasonable efforts.  It's the

12  fact that you're arguing that this is an obstacle to begin

13  with when we haven't even tried.

14          Now, if I'm so hardheaded, quite frankly, that I'm

15  looking for a way to impose sanctions on you, that's not the

16  case, that's not the case.  I picked up so many cases like

17  this on a volunteer basis on the criminal side where they've

18  been half completed or two-thirds completed, and I can't

19  tell you how much stress that puts on me to get up to speed.

20  On one hand, I'm trying not to overturn decisions made by a

21  colleague, believing that that colleague is much more versed

22  because he or she has heard the trial.  On the other hand,

23  it now becomes my case.  So -- well, anything else, counsel?

24  If not, we'll call Mr. O'Brien in in just a moment.

25          MR. ZELLER:  One thing I would add, and this goes

JANE C.S. RULE, CSR NO. 9316 - U.S. COURT REPORTER

 1    to the issue of compliance and extraterritorial reach.  This

 2    is a practical matter.  I am told by Mattel that just like

 3    in the United States, the overwhelming percentage of the

 4    product is going to be in the hands of the big retailers, at

 5    least half of that is true in places like Europe.  That

 6    there are large retailers in those jurisdictions, as well.

 7    So this is going to deal with a substantial amount of that

 8    product, you know, in multiple jurisdictions and --

 9              THE COURT:  Sure, sure.  I would expect that large

10    retailers who have a relationship with either -- with MGA or

11    any entity, are probably going to comply because there is

12    future business involved, that it's a de minimis problem.  I

13    don't expect the small retailers, frankly, to be swept.  I

14    just expect them to get notice, and I'm not going to punish

15    MGA as long as they are making a good-faith attempt.  So let

16    me speak to the monitor for just a moment.

17              MR. ZELLER:  If I may just make one additional

18    point, because the one thing I also want to add about this

19    whole process is that the tentative points out or quotes

20    Mattel as basically suggesting that all that's required is

21    sending out notices, and I would say, your Honor, that in

22    fact, on page 24 of our brief, the part that's quoted, and

23    this is on page 17 of the tentative, it's actually quoting a

24    part of our brief where we talk about MGA's argument.  So

25    that's actually not our position, and I just wanted to point

SACV 04-9049-DOC - 11/09/2009 - Vol. II

54

 1    that out because we -- we do agree, and the Court cites the

 2    Fisher Price case, for example, which is they must make

 3    efforts to procure the return, they have relationships, they

 4    can offer incentives and they can do reasonable things.  But

 5    I didn't want the impression to be left, at one point the

 6    argument that we were saying all they had to do is send the

 7    notice, because that's -- our position is in line with the

 8    tentative, your Honor.

 9            THE COURT:  Okay.  Now, why don't you have a seat,

10    and why don't the monitor come up for just a moment.  I want

11    to speak to you.

12            I don't see any reason why I am not appointing you

13    as the monitor, but putting some limits on it.  In other

14    words, you and I work together.  You don't ever go out and

15    act on your own, understood?

16            THE MONITOR:  Yes, your Honor.

17            THE COURT:  And that would be the last day as a

18    monitor in my court and other courts.

19            Number two, are you available to me on weekends?

20            THE MONITOR:  Yes, your Honor.

21            THE COURT:  Is there any reason why I can't deal

22    with my monitor on weekends without any of you present?

23            MR. ZELLER:  No.

24            THE COURT:  No -- you are the client, aren't you.

25            If I was you, I'd speak to my client first before

JANE C.S. RULE, CSR NO. 9316 - U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 7407   Filed 01/15/10   Page 55 of 62   Page ID #:255628
SACV 04-9049-DOC - 11/09/2009 - Vol. II

55

1    I say anything unless you are going to become the attorney.

2            Now, is there any reason why I can't speak to him

3    on weekends?

4            MS. HURST:  Your Honor, the monitor is not a Rule

5    706 expert of the sort that you have just described.  The

6    monitor has unfettered access to all of the books and

7    records of MGA, including its attorney-client privileged

8    information.

9            THE COURT:  So I can be receiving extraneous

10   information potentially?

11           MS. HURST:  Correct.

12           THE COURT:  That might be inappropriate.

13           MS. HURST:  Correct, your Honor.

14           THE COURT:  What I don't want to do is step on any

15   ethics.  So let's sort out how I use it.  How do I use it?

16   In other words, accounting?

17           MS. HURST:  Yes, your Honor.

18           THE COURT:  Monitoring?

19           MS. HURST:  For compliance with the injunctive

20   orders, your Honor.

21           THE COURT:  Compliance?  Right.  But no ex parte

22   communications with him; is that correct?  No reason; is

23   that correct?

24           MS. HURST:  That's our view, your Honor.

25           MR. ZELLER:  We defer, your Honor.  We have no

1    objection between the Court and the monitor.

2           THE COURT:  If I need to communicate with the ex

3    parte, I'll get them in here.

4           But let's start off with making certain that there

5    is not an impression on one side, because you're so

6    knowledgeable, that I'm meeting with the ex parte in an

7    informal conversation.  So we'll do it.

8           THE MONITOR:  Yes, your Honor.

9           THE COURT:  So remember that's costly.

10          As long as you got that out on the table, it gets

11   costly.

12          I see no reason why you wouldn't be the continuing

13   monitor, but staying with me this evening for a while, I'm

14   going to sort out what I think your role is, and when I

15   decide this extraterritorial issue, that will give me

16   guidelines about what you are going to pursue.

17          How did Judge Larson use you?  I am not certain

18   yet.  I've heard Prosper's name, I've heard Robert O'Brien's

19   name, who I've talked to and known professionally.  I heard

20   Dick Tevrisian's name, who I know very well.

21          MS. HURST:  He wanted us to let you know, your

22   Honor, he only charges 6500 a day.

23          (Laughter.)

24          THE COURT:  Knowing that you are here, he will

25   probably raise the prices on you, counsel.  I'm just joking.

1           I'm glad to see him involved.  He's no nonsense

2      and he'll tell you exactly.

3           MS. HURST:  It pails in comparison to Ambassador

4      Prosper's fees, I can assure the Court.

5           THE COURT:  He also tells you exactly --

6           MS. HURST:  He does.

7           THE MONITOR:  Your Honor, you asked how Judge

8      Larson had used me.

9           THE COURT:  Yeah.

10          THE MONITOR:  First and foremost, I took direction

11     from the orders that he had issued.

12          THE COURT:  Okay.  So written orders.

13          THE MONITOR:  And a little bit of context might

14     help your Honor understand the history.  After the

15     receivership period was when the monitor was appointed.  And

16     I think Judge Larson had in mind a role somewhat less than a

17     receiver, but somewhat more than an observer.

18          THE COURT:  See, that's what I'm not clear on,

19     that cloud out there.

20          THE MONITOR:  Yes, and he was very specific in his

21     order, that's the May 21st order, appointing the monitor,

22     ordering and directing the monitor to have certain

23     obligations.

24          THE COURT:  Did he have ex parte communications

25     with you?

SACV 04-9049-DOC - 11/09/2009 - Vol. II

58

 1          THE MONITOR:  Regarding procedural issues that

 2    arose between the parties, your Honor, but not substance.

 3          THE COURT:  Okay.

 4          MS. HURST:  Your Honor, there were certain reports

 5    that were filed with exhibits only in camera to which the

 6    parties have never been privy.

 7          THE COURT:  Why?

 8          MS. HURST:  I don't know, your Honor.

 9          THE MONITOR:  It was at the direction of the

10    court, of Judge Larson.  And this raises an issue, your

11    Honor, that I wanted to address with you because you were

12    asking about currently whether or not there is certain

13    information that I would have and it bore on your discussion

14    of whether or not there would be ex parte communication.

15    What I wanted to mention is you had a question before about

16    the monitor's eyes only designation, and I think that helps

17    inform what we are talking about.

18          Because the monitor, by order of the Court, has

19    pretty much unfettered access to all of MGA's confidential

20    materials --

21          THE COURT:  I see.

22          THE MONITOR:  And because MGA and Mattel are

23    direct competitors, the monitor had many discussions with

24    MGA and fewer with Mattel about the preservation of

25    competitively sensitive information, cash flow, information

```
 1   related to products on both sides.

 2            THE COURT:  I see.

 3            THE MONITOR:  And that information was necessary

 4   to be obtained from both parties.  For example, most

 5   recently from Mattel regarding the spring line and whether

 6   or not it would exist.  Also, MGA much more in depth.

 7            At some point, it occurred to me, and I presented

 8   to the parties as well as Judge Larson, the idea that there

 9   might be in accordance with the protective order, having an

10   attorney's eyes only designation, there might be a way for

11   the monitor to obtain information that wouldn't be shared

12   with the other side, absent a notice and an opportunity to

13   object, but -- and that's the genesis of the monitor's eyes

14   only designation, which has been in effect in this case and

15   has been used freely by both parties.

16            The one -- and it's set out in writing.  The one

17   stipulation in the monitor's eyes only designation is that

18   the monitor can always share with the Court any information

19   designated monitor's eyes only.

20            THE COURT:  Let me repeat back to you what I think

21   I just heard.  That you're consulting with both parties,

22   obtaining information from both parties, but not sharing

23   some of that information with the other party because it's,

24   in a sense, confidential.

25            THE MONITOR:  Absolutely.
```

60

```
 1           THE COURT:  And then you are having an in camera

 2    document submitted to the Court.  I mean, the question

 3    that's raised in my mind isn't one of ethics.  I trust your

 4    ethics.  The question is if I was in the party's position, I

 5    wouldn't know what's being given to the Court.  In other

 6    words, I would be very concerned -- my impression would be,

 7    is the Court getting some bias prejudice against one of the

 8    parties that we're not aware of and how do we counter that

 9    where we are not even privy to it?  That would be my

10    concern.

11           So whether Mattel or MGA or both are concerned

12    about that, the resolution is to get this case going.  It

13    seems like we are going in circles around it, but we are not

14    getting down to work yet.

15           THE MONITOR:  I certainly have no objection to the

16    Court imposing a no ex parte communication monitor --

17           THE COURT:  Let's wait.  Right now -- that's why I

18    didn't meet with you this morning.  I respect your request

19    to meet with me.  Apparently, that's been a past

20    relationship.  But if we are going to meet, I'll notify the

21    parties.  Communicate with me in writing when I ask, I'll

22    give you further direction.  But right now, I will appoint

23    you as the monitor.

24           THE MONITOR:  Thank you, your Honor.

25           THE COURT:  I look forward to working with you.
```

1           THE MONITOR:  Thank you, your Honor, as do I.

2           THE COURT:  Okay.  Now, I don't know what I'm

3   going to do about this extraterritorial yet, but I don't

4   think it affects the conversation I'm about to have with

5   O'Brien.  This is logistical conversation right now, and I

6   want him to know it's off and running on Thursday, but I'd

7   like to go off the record for just a moment.

8           *(Informal discussion held off the record.)*

9           THE COURT:  Counsel, any reason we need to keep

10  Jane any longer?  Do you stipulate we can let Jane go?

11          MS. HURST:  Yes.

12          THE COURT:  Thank you.

13          *(Informal discussion held off the record.)*

14          *(No further proceedings recorded.)*

15                          -oOo-

16

17

18

19

20

21

22

23

24

25

Case 2:04-cv-09049-DOC-RNB   Document 7407   Filed 01/15/10   Page 62 of 62   Page ID #:255635
SACV 04-9049-DOC - 11/09/2009 - Vol. II

62

1                          -oOo-

2                       **CERTIFICATE**

3

4        I hereby certify that pursuant to Section 753,

5   Title 28, United States Code, the foregoing is a true and

6   correct transcript of the stenographically reported

7   proceedings held in the above-entitled matter and that the

8   transcript page format is in conformance with the

9   regulations of the Judicial Conference of the United States.

10

11  Date:  December 1, 2009

12

13

14        _____

15        JANE C.S. RULE, U.S. COURT REPORTER
          CSR NO. 9316

16

17

18

19

20

21

22

23

24

25