SACV 04-9049-DOC - 01/05/2010

1

1          **UNITED STATES DISTRICT COURT**

2          **CENTRAL DISTRICT OF CALIFORNIA**

3      **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4                   - - - - - - -

5

6    CARTER BRYANT,                    )
                                       )
7             Plaintiff,              )
                                       )
8        vs.                          ) No. SACV 04-9049-DOC
                                       )
9    MATTEL, INC.,                    )
                                       )
10            Defendant.              )
     _____)

11

12

13

14          REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                  Status Conference

16               Santa Ana, California

17             Tuesday, January 5, 2010

18

19

20

21   Jane C.S. Rule, CSR 9316
22   Federal Official Court Reporter
     United States District Court
23   411 West 4th Street, Room 1-053
     Santa Ana, California 92701
24   (714) 558-7755

25   10-01-05 Mattel

1   **APPEARANCES OF COUNSEL:**

2

3   FOR INTERVENOR DEFENDANT MGA ENTERTAINMENT, INC.:

4           ORRICK, HERRINGTON & SUTCLIFFE, LLP
            BY:  THOMAS S. MC CONVILLE
5                SCOTT WATSON
                 Attorneys at Law
6           4 Park Plaza Suite 1600
            Irvine, California 92614
7           (949) 567-6700

8           - AND -

9           ORRICK, HERRINGTON & SUTCLIFFE, LLP
            BY:  ANNETTE L. HURST
10               Attorney at Law
            405 Howard Street
11          San Francisco, California 94105
            (415) 773-5700

12

13  FOR DEFENDANT MATTEL, INC.:

14          QUINN, EMANUEL, URQUHART, OLIVER & HEDGES
            By:  JOHN B. QUINN
15               MICHAEL T. ZELLER
                 Attorneys at Law
16          865 South Figueroa Street
            10th Floor
17          Los Angeles, California 90017-2543
            (213) 443-3000

18

19  FOR COUNTER-DEFENDANT CARLOS GUSTAVO MACHADO GOMEZ:

20          SCHEPER, KIM & OVERLAND, LLP
            By:  MARK E. OVERLAND
21               ALEXANDER H. COTE
                 Attorneys at Law
22          One Bunker Hill
            601 West Fifth Street
23          12th Floor
            Los Angeles, California 90071
24          (213) 613-4680

25

JANE C.S. RULE, CSR NO. 9316 - U.S. COURT REPORTER

SACV 04-9049-DOC - 01/05/2010

3

```
1    APPEARANCES OF COUNSEL (Continued):

2

3    ALSO PRESENT:

4            JEANNE PISONI, General Counsel, MGA Entertainment

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

SACV 04-9049-DOC - 01/05/2010

4

1          **I N D E X**

2

3

4          **STATUS CONFERENCE**

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              SANTA ANA, CALIFORNIA, TUESDAY, JANUARY 5, 2010

 2                            (5:31 p.m.)

 3              THE COURT:  All right.  MGA and Bratz, if I could

 4   speak to you for just a moment.

 5              And why don't I get lead counsel's appearance for

 6   a moment, along with Mr. Overland.

 7              So counsel on behalf of MGA.

 8              MR. MC CONVILLE:  Good evening, your Honor.  Tom

 9   McConville and Annette Hurst here on behalf of MGA.

10              THE COURT:  Good evening.  How are you doing?

11              MS. HURST:  Good evening, your Honor.  Happy new

12   year.

13              THE COURT:  Okay.

14              And on behalf of Mattel?

15              MR. ZELLER:  Good evening, your Honor.  Mike

16   Zeller.

17              MR. QUINN:  John Quinn for Mattel, your Honor.

18              THE COURT:  And on behalf, Mr. Overland?

19              MR. OVERLAND:  On behalf of Mr. Machado, Mark

20   Overland and --

21              (Interruption in the proceedings.)

22              THE COURT:  Just a moment.  Jane needs to hear

23   you.

24              MR. OVERLAND:  Mark Overland.

25              THE COURT:  And?
```

1          MR. COTE:  Alexander Cote, C-o-t-e.  Thank you.

2          THE COURT:  Anybody else?

3          *(No response.)*

4          THE COURT:  All right.  There are three matters

5     before the Court this evening.  First of all, the parties'

6     updated deposition schedule, and I can work with you on that

7     informally.  I probably don't even need a record for that,

8     but I do want this to be a more formal proceeding this

9     evening concerning two other matters.

10          First of all, let me tell you how extremely

11     pleased I am with what I'm hearing.  I decided to move you

12     to January 5th because I anticipated, after our informal

13     conversation, that when I had asked you why we recessed the

14     deposition of Isaac Larian, you informed me that it was the

15     Jewish holy days, and, of course, we honor any religious

16     preference of any faith at any time.  But it was represented

17     that this would be continued and completed on January 4th.

18     I don't have a record of that, but that's my clear

19     recollection in a lot of the informal discussions we'd had.

20          The part that I'm extremely pleased about is that

21     you've started to track your depositions, and I almost

22     hesitated this evening in calling you into court because you

23     were making progress.  That, the Court truly appreciates.

24          Let me tell you I'm in a quandary, and let me just

25     talk to you for a moment.  It's not a very good record, but

SACV 04-9049-DOC - 01/05/2010

7

```
 1   it's my innermost thoughts about what's occurred concerning
 2   Mr. Larian's deposition.
 3            On one hand, it's difficult for me to push Mattel,
 4   in a sense, and give them concrete dates concerning your
 5   RICO allegations, and then to have Mr. Larian not available,
 6   I think that's extremely unfair to Mattel, and therefore, if
 7   I allow that to occur, it puts Mattel in the position, I
 8   believe, of being prejudiced, because if I didn't proceed
 9   with those RICO violations, and there was testimony on Isaac
10   Larian's part that would be beneficial, I think that's
11   highly unfair of the Court.  That's one thought.
12            The second thought is that Mr. Larian had come in
13   to court and was very concerned about finances.  I think
14   when I first met counsel, you were very concerned, and your
15   counsel was here on that very first date that we met -- your
16   client was, I'm sorry.  And you had expressed the desire to
17   go to the magistrate judge, and I think your reasoning was
18   that your client had simply exhausted funds at that time.
19   That's another factor.
20            The third is that -- my guess is, and it's simply
21   a guess, that MGA and Mr. Larian were pretty close to a
22   financial predicament, regardless of the allegations
23   involving -- who is the gentleman from Switzerland?
24            MR. ZELLER:  Mr. Samhoui.
25            THE COURT:  Mr. Samhoui.
```

JANE C.S. RULE, CSR NO. 9316 - U.S. COURT REPORTER

SACV 04-9049-DOC - 01/05/2010

8

```
 1          So even if Mattel's best theory is put forward,
 2   there may have been millions from Mattel's argument that
 3   were sequestered or funneled, but those moneys, if Mattel is
 4   right, had to remain hidden, in a sense, because disclosure
 5   and help with the company didn't bring any benefit.  In
 6   other words, MGA could have been on the ropes.
 7          Now enters the Circuit.  What Judge Trott
 8   suggested in this reverse royalty situation might have the
 9   preemptor of, first, a way of resolving the case, at least
10   from his perspective, and the suggestion of the parties from
11   his perspective.  But up to this time, it does little to
12   disturb the hundred-million-dollar verdict that Mattel
13   obtained.  And the activities by the Circuit can't be read
14   by this Court in a way that benefits either party.
15          One way of reading that is that the whole verdict
16   is going to be overturned because an incorrect standard was
17   applied.  That might not be the case.  I can't read that.
18   It may simply be a ruling that injunctive relief was going
19   to be stayed at that point, and MGA was going to temporarily
20   continue on until the Court resolved the merits of these
21   issues, and the Circuit took the very conservative position
22   and perhaps -- not "perhaps," "always" the wise position of
23   simply taking the time to closely look at this before MGA
24   was shut down as a company.
25          On the other hand, we could be starting off with a
```

1    whole new trial with an incorrect standard and a reversal of

2    the hundred million dollars.

3            Now, what's concerning me is this:  When I first

4    had the case transferred to me, I thought and still do

5    believe that it's beneficial to have both executives here.

6    Not all the time, but certainly I'd given over a month and a

7    half to -- or maybe two months' notice that I expected a

8    compliance with this Saturday's date, and it's been brought

9    to my attention, now, that Mr. Larian has left and is in

10   Hong Kong.

11           What's changed the landscape is that with Mattel

12   seeking money, the defendant shouldn't be placed in the

13   position of bankruptcy.  I mean, from your position with

14   MGA, why shouldn't he be doing business?  Why is he sitting

15   here on a Saturday?  Why can't he be in Hong Kong?

16           From my perspective, I would think a lot more

17   favorably about that position if he would have been here on

18   January 4th and finished the deposition.  In other words, by

19   being here on January 4th, if then this motion was brought

20   to me for reconsideration, the answer would have been an

21   absolute "yes."  I don't need him here on a Saturday.  I

22   don't need Mr. Eckert here on a particular Saturday.  In

23   fact, I let every Saturday from Thanksgiving to Christmas

24   over the Christmas holiday pass, and even last Saturday

25   pass.  This was an arbitrary date to give all parties two

1    months' notice.

2         Now, to further complicate just all of this

3    reasoning and balancing that's going to have to take place

4    on my part, it's come to my attention that you tried to

5    contact, on behalf of MGA, Mattel because Mr. Larian wanted

6    to be in Hong Kong and tried to get some depo or something

7    worked out between Christmas and New Years.  The problem

8    with that is that, first, I think that's a very reasonable

9    position for you to take, and I would back you on that

10   position.  There is nothing sacred between Christmas and New

11   Years, but remember, I promised all counsel that time.

12         So now I've got attorneys for Mattel who aren't

13   available who relied upon the Court, quite frankly,

14   humanitarianly coming to each of you and saying, "What's

15   your family situation?  How many children do you have?

16   What's your vacation schedule?"  As far as your practice is

17   concerned, this is your practice now.  This is your practice

18   now.  And -- but I've been gracious also, and there's been a

19   number of exceptions up till January 4th.

20         So with this motion for reconsideration, I don't

21   know why I even have to decide that.  In other words, courts

22   don't have to decide every motion placed in front of me.  I

23   can simply wait and see what Mr. Larian does.  I've made my

24   order.  The next call is his.  I'm going to be here on

25   Saturday, frankly.  I'm going to be here at 8:00, and so are

1    you.  And whether he's here or not, we'll see.

2            Now, what's unfair about that is that Mr. Eckert

3    is sitting here.  So I'm going to wait, and we're going to

4    talk every day, and you are going to tell me what

5    Mr. Larian's position is.  I have ordered him here on

6    Saturday, we'll see.

7            Now, what am I going to do if he doesn't appear?

8    That's the real question you should be asking.  I don't

9    know.  I'm going to wait.  Remember, when we get mad at our

10   kids and we yell at them, it always feels good, and then

11   what happens is we always feel badly afterwards if we're too

12   strong.  Power that's not exercised is much better than

13   power that is exercised.  So it's Mr. Larian's call.  He'll

14   decide whether he wants to appear on Saturday or not.

15           So I guess we'll just wait.  And I think with

16   Mr. Eckert, I'll have further instructions maybe tomorrow,

17   maybe Thursday.  I'll try not to inconvenience the

18   gentleman.  Maybe I'll have to put him on call and have him

19   stay in the mountains, wherever he lives, but I'll try not

20   to inconvenience one CEO needlessly.  The reason for the

21   Saturday session would now be to continue on with the

22   deposition of Mr. Larian, who apparently was not going to be

23   here and apparently just got on the plane on January 4th.

24   Now, that doesn't have any import concerning this case.

25           Remember, it's actually interesting to this Court,

```
 1    and I'm enjoying this process so far.  I've got all the
 2    power on the backside.  I've got adverse inferences.  I
 3    don't have to react immediately to the parties because
 4    apparently this squabbling has been going on for so long,
 5    from unprepared 30(b)6 witnesses to people coming to
 6    depositions unprepared, that I'm kind of a
 7    Johnny-Come-Lately to this process after a couple of years
 8    out in Riverside.  So I'll wait, but if I step in, it will
 9    be because I have an excellent record, and I don't think I
10    have a good enough record right now, frankly.
11           My greatest concern is that if I was in the
12    Circuit and I saw a district court simply order a person in
13    on a Saturday, and there was no particular reasoning, and
14    then that judge backed up that order, I'd have the sense
15    that that judge was either mean-spirited or simply doing
16    that to bedevil the parties.  I really hoped to have a
17    frank, heart-to-heart conversation, with each of your
18    permission, with the CEOs on that date and ask both sides to
19    be better prepared for the 30(b)6s, because it's very costly
20    to Mr. Larian for MGA, who has been complaining about money,
21    so unpreparedness costs him money, which is of great
22    concern.
23           And for Mattel, when you are asking for money as
24    the plaintiff, you've got to jump through the hoops.  I
25    mean, after all, they are the defendants, you are the
```

1    plaintiffs, you are asking for something.  There is a pretty

2    heavy burden on you.

3            I wanted to find Mr. Sam- --

4            MR. ZELLER:  Samhoui.

5            THE COURT:  Samhoui, and wanted to employ the

6    parties to help before it got very expensive and time

7    consuming, because the adverse inference that can come from

8    that could be absolutely devastating, so I was hoping to

9    have just a heart-to-heart on the record with Mr. Larian

10   that day and with Mr. Eckert, because I hold them both

11   responsible for litigation, not counsel.  You may decide the

12   tactics, but you take directives from the litigants.

13           So we are going to wait, and we'll have another

14   discussion tomorrow evening and see what Mr. Larian's

15   position is.  But meanwhile, you will be prepared for his

16   deposition throughout the week and on Saturday, and I'll

17   take no action this evening on the motion to reconsider.

18           Now, the second issue I think we need to resolve

19   this evening is how are you doing on this updated deposition

20   schedule?  I've been told that you worked very hard,

21   actually, over the recess, as hard as, you know, we possibly

22   could.  How are we doing?

23           MR. MC CONVILLE:  I think we made progress, your

24   Honor.  There's -- part of the difficulty -- not

25   "difficulty," but --

SACV 04-9049-DOC - 01/05/2010

14

```
 1            THE COURT:  It's the other side that's always
 2   difficult.
 3            (Laughter.)
 4            MR. MC CONVILLE:  No, no.  Actually, they have a
 5   new guy in charge, and he's running the scheduling show.  I
 6   joke.
 7            THE COURT:  Who is he?
 8            MR. WATSON:  Good evening, your Honor.  Scott
 9   Watson.
10            THE COURT:  No, he's not running anything.
11            (Laughter.)
12            THE COURT:  Scott, have a seat.  In fact, you can
13   go out in the hallway if you'd like to.  Have a seat.
14            I am just kidding you.  He is not running
15   anything.  I only have four counsel here running things.
16            MR. MC CONVILLE:  No, no.  And I didn't want to --
17            THE COURT:  See him?  That's it, okay?
18            MR. MC CONVILLE:  And what -- Mr. Zeller and I
19   have worked closely on this too --
20            THE COURT:  You are not to have any conversation
21   with this gentleman.  I have four counsel conversing about
22   depositions.
23            Sit down.  That's it.
24            MR. MC CONVILLE:  Understood.
25            THE COURT:  This is between lead counsel.
```

JANE C.S. RULE, CSR NO. 9316 - U.S. COURT REPORTER

1           How are we doing on the depositions?

2           MR. MC CONVILLE:  So the only point I was going to

3    make is the parties looked at their names.  There were some

4    substitute witnesses from the original 25, so we're -- I

5    don't want to say "scrambling," but we are working hard to

6    get the dates for the late names that we shared.

7           THE COURT:  Let me tell you something.  I only

8    want to step in when there is non-cooperation or if I have

9    to.  In other words, I always trust counsel.

10          Mr. Overland, correct?

11          I always trust counsel to make decisions between

12   the parties, and then if they are good decisions and even if

13   they are bad decisions, I usually acquiesce to them, because

14   you are much more knowledgeable about what you need.

15          Do I need to step in?

16          MR. MC CONVILLE:  I think the only issue was

17   Mr. Larian's deposition, which the Court's already

18   addressed.

19          THE COURT:  Yeah, we are just waiting.

20          MR. MC CONVILLE:  There are some other outstanding

21   dates.  I don't believe --

22          THE COURT:  Remember this, Counsel, Mr. Larian

23   would have been here January 4th, and if you would have

24   brought this motion, the answer would have been "yes."

25          MR. MC CONVILLE:  Understood.

1          THE COURT:  It's as simple as that.  There is

2     nothing magic about this Saturday, but now I am going to

3     impose deadlines on Mattel on their RICO and hold to that,

4     and I'm not going to back away from those deadlines, because

5     the message I then send is deadlines mean nothing.  And once

6     that happens with Mr. Larian, there is no reason that Mattel

7     won't do that to you, and doubly because, from their

8     perspective and your perspective, they can out resource you.

9          MR. MC CONVILLE:  Yes, sir.

10          THE COURT:  So they can make your lives really

11     miserable.  So speeding this trial along is really to

12     Mr. Larian's benefit, not to his detriment if he has limited

13     resources or a smaller company.  To get this case into court

14     quickly is to Mr. Larian's benefit, okay?

15          MR. MC CONVILLE:  Yes, sir.

16          THE COURT:  But Mr. Larian isn't here to hear

17     that, and I have to go through counsel, who will then convey

18     it to Mr. Larian, and that's ineffective, in my opinion.

19          So where is Mr. Larian?

20          MR. MC CONVILLE:  I believe he is in Hong Kong.

21          THE COURT:  No, no, "I believe."  That's the way

22     police officers talk to me, "I believe," "could have been,"

23     "to the best of my memory," "the best of my recollection."

24          MR. MC CONVILLE:  He is in Hong Kong.

25          THE COURT:  He's in Hong Kong.  When did he leave?

SACV 04-9049-DOC - 01/05/2010

17

```
 1                MS. HURST:  He left on the 3rd.
 2                THE COURT:  Why?  The trade show isn't until this
 3   weekend.
 4                MS. HURST:  No, your Honor.  The trade show is the
 5   reason why all of the people in this business come to
 6   Hong Kong during the first three weeks of January.
 7                THE COURT:  Just a moment.  Did anybody contact
 8   me?  In other words, if all of the parties would have agreed
 9   or let me know earlier, we could have had a deposition
10   between Christmas and New Years.
11                MS. HURST:  Your Honor --
12                THE COURT:  I'll have it on Christmas Eve, believe
13   it or not.
14                MS. HURST:  I believe it, your Honor.
15                THE COURT:  Yeah, so I mean, why didn't you trust
16   the Court and just say --
17                MS. HURST:  Because we wanted to respect counsel's
18   vacation schedule, your Honor.
19                THE COURT:  Okay.
20                MS. HURST:  I mean, I didn't -- look, I don't want
21   to --
22                THE COURT:  No.  Thank you very much for the
23   speech.
24                Now, go over there on Mattel's side for a moment
25   and think about it this way.  I've imposed deadlines on
```

```
 1    Mattel.  They are being threatened with dismissal of their

 2    civil RICO.  They've got to gather as much evidence as they

 3    can, and Mr. Larian is a major part of this deposition, and

 4    he is not here.  I mean, what impression does that leave

 5    with you, counsel?

 6            You don't have to answer that.

 7            And Mr. Samhoui, I want to talk and find him,

 8    because that's going to cause all sorts of effort and time,

 9    maybe even an expansion of the deposition schedule on one

10    side.  And then if we are not successful and there's

11    game-playing, the potentiality of an adverse inference --

12    you do not want an adverse inference from a court.

13            MS. HURST:  No, we don't, your Honor.

14            THE COURT:  And I don't want to give one; do you

15    understand that?

16            MS. HURST:  I do.

17            THE COURT:  But you will leave me in no other

18    position, and an adverse inference is deadly.  It starts

19    with something like -- well, I don't even want to propose

20    it.

21            MS. HURST:  I understand, your Honor.

22            THE COURT:  So let's do this.  I'm going to wait.

23    I'll leave it to you to place the phone call.

24            Come on up here, counsel.  It's nice seeing you

25    again.  Apparently --
```

SACV 04-9049-DOC - 01/05/2010

19

```
 1              No, not you.  The lady back there in the black
 2     jacket.
 3              MS. HURST:  Ms. Pisoni.
 4              THE COURT:  Yes, come up.  You speak to Mr. Larian
 5     all the time.  Come on up and join us, for goodness sakes.
 6     It's a pleasure to see you back.
 7              MS. HURST:  If I may --
 8              THE COURT:  You ran away at about 10:00 at night
 9     and never came back to see us.  It's nice to see you.
10              MS. PISONI:  Good evening, your Honor.
11              THE COURT:  Good evening.
12              MS. PISONI:  Happy new year.
13              THE COURT:  Happy new year.
14              So you've heard everything that's been said in the
15     case.  You have a conversation.  You know where things lie.
16     I'm just waiting.  All of the cards are in Mr. Larian's hand
17     right now.  We'll see what he does.
18              MS. HURST:  Your Honor, if I may, one
19     clarification.  We never discussed or understood that the
20     deposition was expected to continue on January 4th.
21              THE COURT:  No, let me stop.  Let me stop.  I
22     have -- just a minute.  This is where I regret not having a
23     record.
24              MS. HURST:  Right.
25              THE COURT:  This deposition went for either two or
```

1    three days, and I expected that you were going to be in

2    session and came over across the way, and not only that, had

3    a conversation not only over there but back here.  And I

4    asked why the deposition wasn't being taken -- wasn't

5    being -- ongoing, and I was told the following:  It was a

6    Jewish holiday, and I felt very bad.  I didn't realize that

7    on that particular day.  I was told specifically that we

8    would continue January 4th.

9             MS. HURST:  So, your Honor, let me just say this.

10   This may be a miscommunication that we had with Mr. O'Brien,

11   but what Mr. O'Brien told us was that the deposition -- if

12   we came back for the Saturday session on the 9th, that we

13   would try to combine the deposition with that day.

14            THE COURT:  Oh --

15            MS. HURST:  Just so the Court understands --

16            THE COURT:  -- okay.  Then the 9th is fine.

17            MS. HURST:  That's what we understood when we

18   filed the application.  And -- and when Mr. Larian left for

19   Hong Kong, that was the understanding, just so the Court --

20            THE COURT:  Sure.

21            MS. HURST:  -- you know, and perhaps there was a

22   miscommunication between us and Mr. O'Brien.

23            THE COURT:  Sure.

24            MS. HURST:  But the 9th was the target when we

25   filed the application.

JANE C.S. RULE, CSR NO. 9316 – U.S. COURT REPORTER

SACV 04-9049-DOC - 01/05/2010

21

```
 1            THE COURT:  Now, the 9th is fine; do you
 2    understand that?
 3            MS. HURST:  Yes, your Honor.
 4            THE COURT:  I am not going to impose any sanction
 5    over the 4th.  I just want to keep a time schedule, and I
 6    know that there can be variances.  What I don't understand
 7    is why people just get on planes.
 8            Let me talk to you about two other things.  I know
 9    that the Ninth Circuit is trying to resolve the case.  I
10    hope that they do.  I've sent out a bell-weather flag to the
11    Ninth Circuit that I'm prepared to hand down the rulings on
12    those 96 e-mails.  I'm not doing that at the present time.
13            But from Mattel's position, you've always been
14    curious what's in those 96 e-mails; it may have be a lot, it
15    may be de minimis.  But it makes settlement discussions
16    between you and the Ninth Circuit or in front of Judge
17    Tevrisian very difficult, I would think at any point, until
18    you get a court's rulings on that.
19            The second problem that you've got is I would hate
20    to be pushing you this hard, frankly, and have the Circuit
21    hand down a decision on this case, let's say in June,
22    because we are going at a pace that really prepares us for
23    trial in April.  Well, I can't put you in a trial posture in
24    April if the Circuit takes three, four, or five months,
25    which could be a minimal amount of time to hand down a
```

JANE C.S. RULE, CSR NO. 9316 - U.S. COURT REPORTER

1    decision because, first of all, you couldn't even subpoena

2    witnesses.  They've got to hand down a decision, in fairness

3    to you, by probably February or March, because you have to

4    have a month or and a month and a half to get subpoenas out

5    there for different people.  So I'd like this case to go to

6    trial in April.

7            So how are we going to -- how are going to get

8    this order, although we are going to talk about the number

9    87 tonight, that's not the critical order.  The critical

10   order is the 96 e-mails.  This is what you've been

11   complaining about.  This is what Judge Larson made a record

12   about that he believed that Larian was lying.

13           And this is the transcript that you've got, from

14   Mattel's position, where you've got a federal judge saying,

15   "Larian testified basically on the last day of trial," or

16   his testimony, "Mr. Larian is lying."  Now, that's got to

17   cause curiosity on your part, but this is your motion.  You

18   really control it.  And I'm not going to do anything that

19   interferes with the Circuit, or gives a perception to the

20   Circuit that the district court, you know, is pushing the

21   Circuit.  The Circuit pushes the district court.

22           So how are we going to resolve that?  Because

23   settlement discussions, quite frankly -- I don't think if

24   the Circuit realizes it or not -- are almost impossible, I

25   would think from Mattel's position, until you know whether

SACV 04-9049-DOC - 01/05/2010

23

```
 1   this has any substance or not.
 2           MR. ZELLER:  Well, one thing that Mattel is
 3   prepared to do, if I understand the situation, is that we're
 4   really talking because of the conditional cross-appeal, and
 5   we are willing, since the Court, here, is ready to rule on
 6   those issues --
 7           THE COURT:  Has been for almost a month.
 8           MR. ZELLER:  Yeah, and we're willing to withdraw
 9   that cross-appeal.
10           Now, we need MGA's consent to do it.
11           THE COURT:  Well, let's find out.  Have you asked
12   them?
13           MR. MC CONVILLE:  No, we have not.
14           THE COURT:  Why don't you ask them?
15           (Attorney discussion held off the record.)
16           THE COURT:  I think they want to make a phone call
17   first.
18           MS. HURST:  Yeah, I think so, your Honor.  This is
19   the first time we've heard about this, and my able partner
20   is lead appellate counsel, and I would want to consult with
21   her on that.
22           THE COURT:  Sure.  So take your time, and we'll
23   discuss this tomorrow night and the next night, but you
24   understand that settlement negotiations are almost
25   impossible without the e-mails if they are going to be
```

1   released.

2        MS. HURST:  Your Honor, we had previously

3   suggested this course of action, so I can't imagine that we

4   are going to have any objections.

5        THE COURT:  Sure.

6        MS. HURST:  But I would like to confirm --

7        THE COURT:  All of the time in the world, but

8   that's just why I'm certain that settlement really can't go

9   anyplace.

10       Now, how are we going to set up the Mattel's

11  objections to Discovery Matter Number 87?

12       I told you that the Court was prepared to look at

13  those.  They weren't my first priority.  The 96 e-mails

14  were, because I was curious about Judge Larson's comments

15  also.  I don't think it will take us that long, not four

16  months, certainly.

17       So what are your concerns?

18       MR. ZELLER:  Well, I think at the end of the day,

19  your Honor, the -- I mean, the -- we filed the objections

20  just as a protective matter.  I think the understanding has

21  been, all along, that this Court was going to look at any

22  e-mails that were not ordered produced, or that perhaps MGA

23  was ordered to produce and objected to.  So I don't see this

24  as being a substantive issue, unless the Court has

25  particular issues over it, but it was simply a matter of

1   just ensuring procedurally that we were properly in front of

2   you.

3           THE COURT:  I just want your consent to get

4   started.

5           MR. ZELLER:  Yes, absolutely.

6           THE COURT:  Okay.

7           MS. HURST:  Your Honor, we did not file an

8   objection to Order Number 87.

9           THE COURT:  Right.

10          MS. HURST:  We produced most of the documents in

11  the form required by the discovery master, and we'll have

12  completed the remainder by the end of this week.

13          THE COURT:  Okay.

14          MS. HURST:  You know, our position I think on this

15  is set out in our opposition, and I doubt we have anything

16  to add to the papers, other than this.  I do want to

17  emphasize that there was a typo on one of the entry numbers

18  and --

19          THE COURT:  I saw that.

20          MS. HURST:  -- that was not Discovery Master

21  O'Brien making the decision to withhold the document that

22  that was produced, so that should not, you know, cause the

23  Court to question his analysis in any way.  That was a typo,

24  your Honor.

25          THE COURT:  Who is being deposed?

SACV 04-9049-DOC – 01/05/2010

26

```
 1              MR. ZELLER:  There was one person, Ms. Coleman,
 2     and Mattel was taking that deposition.
 3              THE COURT:  Oh.
 4              MR. MC CONVILLE:  She had childcare issues, so
 5     it's actually in Sherman Oaks, but there was one today, as
 6     we understood it.
 7              THE COURT:  Okay.
 8              MS. HURST:  We had noticed Ms. Thomas, your Honor,
 9     but we decided to take a look at the list of 25 over the
10     holidays, that we would withdraw our request for Ms. Thomas
11     and put a different witness on the list, and that's the
12     reason why I don't have a second depo today, your Honor.
13              THE COURT:  Okay.
14              Mr. McConville, I am not certain how much progress
15     has truly been made.  I believe there has been substantial
16     progress.  I just don't know if this completes this in a
17     timely fashion.  I mean, timely from my perspective, being
18     ready to go to trial in April, if at all possible.
19              What are the substantial disagreements between the
20     two of you right now?
21              MR. ZELLER:  I -- I don't know that there is
22     something that the Court needs to intervene in tonight.
23              THE COURT:  Okay.  Then why don't I just stay out?
24              MR. ZELLER:  Right.  I think some more discussion,
25     that's not to say that --
```

JANE C.S. RULE, CSR NO. 9316 – U.S. COURT REPORTER

SACV 04-9049-DOC - 01/05/2010

27

```
 1              THE COURT:  Then let me stay out.  There is no
 2    reason to pressure right now.  As long as you're talking,
 3    I'll stay out.
 4              MR. ZELLER:  Right.
 5              THE COURT:  What do we need to do this evening,
 6    then?
 7              (No audible response.)
 8              THE COURT:  Just a moment.
 9              Anything?  Do you want to go home tonight?
10              MR. ZELLER:  One thing I would like to --
11              THE COURT:  I'm glad to hear you don't.
12              (Laughter.)
13              MR. ZELLER:  And the answer is "yes" to the
14    Court's question, but one thing I would like to raise,
15    because I know that we have talked about it periodically, is
16    that there are a host of other discovery disputes.
17              THE COURT:  Oh, I know.
18              MR. MC CONVILLE:  And over interrogatories,
19    document requests, you name it.  And so because, you know,
20    obviously we are the ones who are under the gun on the RICO
21    allegations, and I'm certainly mindful of the Court's
22    guidance and instruction --
23              THE COURT:  As long as you are working hard.
24    Remember, I said anytime you didn't want to work hard, just
25    tell me?  But as long as you are working hard in making that
```

1    effort, I've got discretion on the backside to loosen up and

2    give you more time.  I just have to see that effort on the

3    plaintiff's part to begin with.  But I'm not so onerous or

4    obstinate that when you are working that hard and not

5    getting -- I don't mean "results," but I can loosen on the

6    backside and give you more time.  Right now I'm not inclined

7    to, but --

8                MR. ZELLER:  Sure, I understand.

9                THE COURT:  -- you tell me what you haven't been

10   able to accomplish.

11               MR. ZELLER:  One thing I would like to have the

12   Court's guidance is, you know, in say the next couple of

13   weeks, because, I mean, as you know, and I'm sure -- have us

14   actually do is we were certainly prepared to file motions on

15   discovery issues.

16               THE COURT:  Sure.

17               MR. ZELLER:  We obviously don't want to burden the

18   Court.  On the other hand, I am concerned about getting,

19   particularly, our RICO documents in a timely fashion because

20   while the testimony is crucial, you know, obviously the

21   documents that may contradict that testimony, as well as

22   fill in that testimony, we don't have.

23               THE COURT:  Particularly in Mexico.

24               MR. MC CONVILLE:  Right.  And so what I was hoping

25   was perhaps to get the Court's guidance as to -- at least in

SACV 04-9049-DOC - 01/05/2010

29

```
 1    the short run, what would the Court think would be the most

 2    productive avenue for this, for raising these issues with

 3    the Court.  Would it be to do something that short?  Would

 4    it be to wait until we have the sessions and perhaps raise

 5    those issues and discuss them orally?

 6              THE COURT:  You saw last time when you brought me

 7    motions how quickly they were decided.

 8              MR. MC CONVILLE:  Right.

 9              THE COURT:  They were decided really within

10    minutes concerning the under seal Carter Bryant.  I think

11    that took me literally five minutes.  Now, we thought about

12    it beforehand, so I don't mean to be flippant, and you can

13    perceive what you want to, but there was a lot of thought

14    that went into that before I made the ruling.  But as far as

15    rulings are concerned, I don't find that difficult.  So it's

16    really how you want to bring them to me.

17              Certainly we are all done with the 800-some pages

18    of motions, and that's because you voluntarily reached an

19    accommodation.  You can bring it to me in written form or in

20    oral form.  As long as I have enough time to think about it

21    beforehand, okay?  And I don't care if that's -- because I'm

22    going to be here 24/7 for you, you decide.  Because

23    remember, whatever standard you set, they follow, or

24    whatever standard they set, you follow; it will be coequal.

25    So if we start getting one side who is coming in with oral
```

JANE C.S. RULE, CSR NO. 9316 - U.S. COURT REPORTER

SACV 04-9049-DOC - 01/05/2010

```
 1    motions, and that other side decides later on to play the
 2    game of here is X-amount of written paper, no.  So that's
 3    not guidance for you, but thus far, from my perspective,
 4    because I'm not part of the daily depositions, I don't know
 5    the problems in detail.  I just know what the past is like,
 6    and I am not going back to that past morras.  We are
 7    starting off again on a new foot.  So I think that's really
 8    for you and Annette to decide how you want to proceed, but
 9    it will be across the board, it will be coequal, okay?
10              MR. ZELLER:  Sure.
11              THE COURT:  So you tell me.
12              MR. ZELLER:  We can discuss it and let you know
13    where the parties are.
14              THE COURT:  Okay.
15              Now, Mr. Overland.
16              MR. OVERLAND:  Yes, your Honor.  This relates to
17    Mr. Machado's deposition, which I think is scheduled on the
18    19th of this month.
19              THE COURT:  Yes, sir.
20              MR. OVERLAND:  If the Court may recall,
21    Mr. Machado had his deposition scheduled previously.  I
22    think it was in October last year --
23              THE COURT:  Yeah.
24              MR. OVERLAND:  -- and he exercised his Fifth
25    Amendment privilege.  And that was based mainly on an
```

 1    investigation being conducted in the Central District by the

 2    United States Attorneys Office.  We have now received a

 3    letter from the responsible assistance U.S. attorney that

 4    Mr. Machado is neither a target nor is he under

 5    investigation in the Central District.  That resolves part

 6    of the problem.  The problem is compounded by the fact that

 7    the assertion of the privilege was also based on possible

 8    state prosecution in California and in Arizona, in Maricopa

 9    County, Phoenix, and the reason for that is that the

10    allegations with respect to the access to the computerized

11    data was with respect to computers located in Phoenix and in

12    El Segundo.

13            I don't have any information that there is any

14    present investigation being conducted by either of those

15    authorities, so I'm not sure how valid a claim of privilege

16    is with respect to that.  However, because of Mattel's

17    aggressive litigation tactic, which I don't think I have to

18    summarize for the Court but -- but which I'd like to talk

19    about a little with respect to the prosecution in Mexico

20    that's being conducted.  I'm not comfortable in saying that

21    Mr. Machado should not claim the privilege, and, of course,

22    it's for the Court to determine whether it's a valid

23    exercise of a privilege, and, of course, the Court can

24    always issue a 6,002 order and order him to testify, and

25    we'd abide by that order.  Mr. Machado wants to testify.

 1          THE COURT:  Why don't you take that position on

 2    behalf of your client regardless, and put the Court in the

 3    position of making that ruling.  It protects you.  It

 4    protects your client.  In all likelihood, I will probably

 5    make that order.

 6          MR. OVERLAND:  That will be fine, but I have --

 7          THE COURT:  Because frankly, I haven't seen many

 8    state -- especially county entities gear up on a case of

 9    this magnitude.  They just, as a practical matter, they

10    don't have the resources and don't do it.  But from an

11    attorney's perspective, you can't take that position.

12          MR. OVERLAND:  That would be fine, and we'd be

13    willing to prepare such an order for the Court's signature.

14    That wouldn't be the problem.  The problem that I do have is

15    with respect to the prosecution in Mexico, and from my

16    conversations with the Mexican attorneys, apparently the law

17    in Mexico is that if it is a non-violent offense, such as

18    this, the prosecution has to be promoted by a -- the agreed

19    party, Mattel in this case, and Mattel has done that in

20    Mexico in the sense that it's hired attorneys to make

21    responsive pleadings in the criminal case.  It's, in effect,

22    becoming a quasi-prosector in the case.  And there is some

23    language in the United States v. Balsas (phonetic) that the

24    privilege against self-incrimination extends to foreign

25    prosecutions if there is a cooperative venture between the

 1    American prosecutors and the foreign prosecutors.

 2                So I think that in order to be totally protected

 3    in addition to the 6,002 order, if we can get an order that

 4    Mattel, since it is promoting the prosecution in Mexico, not

 5    use any of the information that's derived in -- in this

 6    case --

 7                THE COURT:  In Mexico?

 8                MR. OVERLAND:  In Mexico.  And I think that that

 9    would be sufficient so we don't have to go into the Balsas

10    issue at all.

11                THE COURT:  I think Mattel would be more than

12    happy to do that because they are after a civil --

13    monetary --

14                MR. OVERLAND:  So if --

15                THE COURT:  Unless they don't want Mr. Machado to

16    testify, of course, because then you may have a valid Fifth

17    Amendment issue.

18                So let me hear from counsel.

19                MR. ZELLER:  Well, what our position is, and I'd

20    have to talk to our client, the simple fact that we sent

21    Mr. Cote an e-mail within the last 24 hours following up on

22    that last conversation.  Mr. Cote said in an e-mail that

23    they were not going to ask for any relief from the Court.

24    Now we have two requests.  These are completely --

25                THE COURT:  That's fine.  So Mr. Machado will be

 1    here on the 19th, and we'll find out what we are going to

 2    do.  In other words, it forces us into making a decision by

 3    the 19th.

 4             MR. OVERLAND:  I am not asking for any relief.

 5    I'm suggesting that if they want the testimony, then this

 6    would be a way to resolve it.  If they don't want to do

 7    it --

 8             THE COURT:  Yeah, we are not going to get into the

 9    "would've, could've, should'ves" right now.  I mean, we

10    can't anticipate.  You've got plenty of time to decide.  It

11    tells me a lot, too.  If Mattel really thinks Machado was a

12    valuable witness, or could be, or they really want

13    information, or they really want it to be a RICO, frankly,

14    in a practical sense, do you know what they are going to do?

15    They are going to acquiesce to your request.

16             Now, if not, if they don't think -- take the

17    opposite position, the impression could be that Mr. Machado

18    never was that important of a witness, the RICO is whatever

19    it is.  That's their decision again.  I don't have to

20    anticipate that right now, but as long as we are in an

21    anticipation game, let's play this game:

22             We are now in trial, which I can't wait for, and

23    Machado takes the stand, and the in-limine motion is, "We

24    want to impeach Machado because he took the Fifth Amendment

25    at some point in time."  Prejudicial effect is probably

 1   going to outweigh the probative value.  That's not a final

 2   ruling because he took the Fifth for a good reason under the

 3   advice of counsel way back when.  That's something the jury

 4   probably isn't going to do if there is acquiescence.  I

 5   mean, it has all sorts of wonderful corollary issues growing

 6   out of it.  I don't have to deal with them right now.  I

 7   just have to get you to trial somehow, so let's get Machado

 8   up here on the 19th.

 9            MR. MC CONVILLE:  And your Honor, MGA would like

10   Mr. Machado to testify.

11            THE COURT:  Well, I know you would.

12            MR. ZELLER:  Adversely, he shouldn't look for

13   relief when Mr. Machado shouldn't be looking for relief and,

14   he's going to testify truthfully.  Why would he be concerned

15   about what's going to be used in Mexico.

16            THE COURT:  Thank you very much.  Now, we've had a

17   lot of posturing going on.  It's been very interesting.

18            (Laughter.)

19            THE COURT:  Mr. Machado will be here on the 19th,

20   and none of that made very much sense to me, okay?

21            MR. OVERLAND:  Can we prepare a proposed order

22   to --

23            THE COURT:  You can.  And as counsel, I would

24   think it's your duty to protect your client.

25            MR. OVERLAND:  Thank you.

SACV 04-9049-DOC - 01/05/2010

36

```
 1            THE COURT:  And Mattel can decide how much they
 2   want Mr. Machado.
 3            Okay.  Now, what else are we going to do tonight?
 4   If nothing, I'll see you tomorrow.
 5            (Interruption in the proceedings.)
 6            THE COURT:  Why don't we always say 8:00 in the
 7   morning.
 8            You want his name, don't you?
 9            THE REPORTER:  Yes.
10            THE COURT:  Yeah, your name.
11            MR. COTE:  Alexander Cote.
12            THE COURT:  Yeah, let's always say 8:00 in the
13   morning unless we say otherwise.  It's always 8:00, so that
14   way there's never "I got here at 8:30," or "I got here at
15   7:30."  Let's make it 8:00, okay?
16            MR. COTE:  Okay.  See you then.
17            THE COURT:  Okay.  Well, then what are we going to
18   do tomorrow?  We are doing something tomorrow.  We are doing
19   something every single day, and we're doing something every
20   weekend, this big happy family.  What are we doing tomorrow?
21            Well, you are all down here, then.  We'll all sit
22   down and look at each other.  You can decide how costly that
23   is for your client, but we are going to be busy every single
24   day.  So if you want to spend your clients' money doing
25   nothing, that's it, but you are all ordered back at
```

 1   8:00 tomorrow morning, so there you go.

 2          MR. ZELLER:  I certainly do think, your Honor,

 3   that we are -- we'll decide how we want to -- we'll discuss

 4   it with them in order to decide on how to proceed with some

 5   of these discovery disputes, but there are many of them.

 6          THE COURT:  I'm waiting for them.

 7          MR. ZELLER:  We have not received the

 8   interrogatory answers that's been ordered.  We have a whole

 9   slew of problems.

10          THE COURT:  I hear you have a whole slew of

11   problems.  That doesn't help me at all.

12          MR. ZELLER:  I understand.

13          THE COURT:  Get the people in for the deposition.

14   Bring the problems to me.  But this "would've, could've,

15   should've," I'm not interested in.  And how you want to

16   bring them to me, Mike, up to you.  You and Annette decide

17   that, okay?

18          MS. HURST:  I had previously proposed to Mr.

19   Zeller that we each sit down with our long list of

20   grievances and discuss them.  I would suggest --

21          THE COURT:  Well, that's what we are doing

22   tomorrow.

23          MS. HURST:  I would suggest to the Court that the

24   Court perhaps -- the Court could send us out in the hallway

25   at 8:00 a.m., and we can sit down and go through our

SACV 04-9049-DOC – 01/05/2010

38

1   respective long list of grievances and see where we are.

2           THE COURT:  Okay.  Here's what I've got.  I get to

3   be the senior judge, now, in this courthouse, which is

4   unfortunate for the Court.  We have a judges' meeting from

5   7:00 tomorrow, because I have meetings with my judges at

6   7:00, not at 8:30 or noon, and that meeting with last from

7   7:00 to 8:30.  Then I've got a conference call involving

8   this Las Vegas shooting from 9:00 until about 10:00.  So I'm

9   available for you for about 15 minutes, about 8:45.  I'm

10  going to simply order you back here at 8:00.  You can start

11  to work on your own at that time.  I'll be available from --

12  so you know my time, from about 10:30 until about 12:00, and

13  then I've got another conference call on another matter,

14  okay?  And then I'm available all afternoon, tomorrow

15  evening, the next day, this weekend.

16          Now, so far I've just held you to Saturdays, okay?

17  All of your Saturdays are cancelled; they belong to me, now.

18  On Sundays, if you noticed, I haven't imposed a Sunday on

19  you, have I, because of religious preferences.  I don't know

20  what your religions are.

21          Mr. McConville, you are listening, I know you are,

22  because you are going to love this talk.

23          But in every other case in major litigation, like

24  Dickie Scruggs from Mississippi, et cetera, they're here on

25  a half day Sunday also.  So how you progress depends upon

JANE C.S. RULE, CSR NO. 9316 – U.S. COURT REPORTER

SACV 04-9049-DOC - 01/05/2010

39

```
 1    whether you get any time at all, but you are here every
 2    single day.  And if you are doing nothing, you are here
 3    every single day.  This case I am preparing for April.
 4    That's when I want to go to trial, okay?
 5           Okay.  Now, it's been a pleasure, and I'm glad to
 6    see my family back.  I've missed all of you, believe it or
 7    not.  I haven't had enough entertainment in my life, and
 8    here you are.
 9           So we'll see you tomorrow at 8:00.  Just go out in
10    the hallway and start without me, and then I'll be here all
11    day.  Good night.
12           ALL COUNSEL:  Good night.
13           (Recess.)
14                            -oOo-
15
16
17
18
19
20
21
22
23
24
25
```

1                                    -oOo-

2                               **CERTIFICATE**

3

4          I hereby certify that pursuant to Section 753,

5    Title 28, United States Code, the foregoing is a true and

6    correct transcript of the stenographically reported

7    proceedings held in the above-entitled matter and that the

8    transcript page format is in conformance with the

9    regulations of the Judicial Conference of the United States.

10

11   Date:  January 19, 2010

12

13

14                         _____

                          JANE C.S. RULE, U.S. COURT REPORTER
15                         CSR NO. 9316

16

17

18

19

20

21

22

23

24

25