QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
  John B. Quinn (Bar No. 090378)
  johnquinn@quinnemanuel.com
  Michael T. Zeller (Bar No. 196417)
  michaelzeller@quinnemanuel.com
  Jon D. Corey (Bar No. 185066)
  joncorey@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California  90017-2543
Telephone:  (213) 443-3000
Facsimile:  (213) 443-3100

Attorneys for Mattel, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| MATTEL, INC., a Delaware corporation,<br><br>                 Plaintiff,<br><br>         vs.<br><br>MGA ENTERTAINMENT, INC., a California corporation, et al.,<br><br>                 Defendant.<br><br>AND CONSOLIDATED ACTIONS | CASE NO. CV 04-9049 DOC (RNBx)<br>Consolidated with<br>Case No. CV 04-09059<br>Case No. CV 05-02727<br><br>**DISCOVERY MATTER**<br><br>Hon. David O. Carter<br><br>**MATTEL, INC.'S SUBMISSION PURSUANT TO ORDER OF FEBRUARY 12, 2010, REGARDING CERTAIN DISCOVERY DISPUTES**<br><br>Date:    TBD<br>Time:    TBD<br>Place:   Courtroom 9D<br><br>**Phase 2**<br>Discovery Cut-off:  TBD<br>Pre-trial Conference:   TBD<br>Trial Date:   TBD |

00505.07975/3325449.5

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

ISSUE NO. 8: MGA SHOULD BE ORDERED TO PRODUCE 30(B)(6) WITNESSES IMMEDIATELY ..................................................................1

ISSUE NO. 10: MGA MEXICO'S ILL-PREPARED WITNESS.............................2

ISSUE NO. 11: MATTEL NEEDS ADDITIONAL TIME WITH MR. LARIAN ...............................................................................................4

ISSUE NO. 12: MR. MOINIAN'S DEPOSITION SHOULD BE ORDERED ..........8

ISSUE NO. 13: THE COURT SHOULD COMPEL MACHADO AND TRUEBA TO TESTIFY WITHOUT INVOKING THE FIFTH AMENDMENT ..................................................................................9

ISSUE NO. 16: MGA SHOULD PRODUCE THE DOCUMENTS IT PROVIDED TO THE FORENSIC AUDITOR .............................................11

ISSUE NO. 17: THE COURT SHOULD ORDER MGA TO PRODUCE CORE FINANCIAL DOCUMENTS ................................................11

ISSUE NO. 18: MGA SHOULD BE COMPELLED TO PRODUCE INDEMNIFICATION AND FEE AGREEMENTS WITH ITS WITNESSES ....................................................................................13

ISSUE NO. 19(A): MATTEL IS ENTITLED TO TESTIMONY BY ISAAC LARIAN IN OTHER ACTIONS...............................................14

ISSUE NO. 19(B): MATTEL'S FOURTH SET OF REQUESTS FOR PRODUCTION (PHASE 2 )..........................................................14

ISSUE NO. 19(C): MGA SHOULD PRODUCE SAMPLES OF ALL PRODUCTS THAT IT CONTENDS MATTEL INFRINGES.....................15

ISSUE NO. 19(D): MGA MUST PRODUCE FINANCIAL INFORMATION.......16

ISSUE NO. 19(E): MGA SHOULD IDENTIFY WHICH MGA ENTITY PRODUCED DOCUMENTS AND PRODUCE THOSE IT HAS WITHHELD ......................................................................................17

ISSUE NO. 19(F): THE COURT SHOULD ORDER MGA TO PRODUCE EXHIBITS TO THE ECKERT DEPOSITION ...............................18

ISSUE NO. 20: MGA MEXICO SHOULD BE COMPELLED TO PROVIDE SUBSTANTIVE ANSWERS TO MATTEL'S REQUESTS FOR ADMISSION ....................................................................................19

00505.07975/3325449.5

-i-

# TABLE OF AUTHORITIES

**Page**

## Cases

Baker v. Limber,
   647 F.2d 912 (9th Cir. 1981) ................................................................ 10

Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp.,
   267 F.3d 1370 (Fed. Cir. 2001) ........................................................... 10

Enwere v. Terman Apartments, L.P.,
   2009 WL 1814423 (N.D. Cal. June 23, 2009) ...................................... 6

Harry v. Safeway Stores, Inc.,
   215 F. Supp. 324 (D.C. D.C. 1963) .................................................... 10

Hickman v. Taylor,
   329 U.S. 495 (1947) ............................................................................. 4

Miller v. Rykoff-Sexton, Inc.,
   845 F.2d 209 (9th Cir. 1988) ............................................................... 9

Pardazi v. Cullman  Med. Ctr.,
   896 F.2d 1313 (11th Cir. 1990) ........................................................... 8

Tran v. Tyco Electronics, Corp.,
   2008 WL 2037279 (D. Or. May 7, 2008) ............................................ 6

United States v. Vacant Land,
   15 F.3d 128 (9th Cir. 1993) ................................................................. 9

Wilson v. Paladin Enterprises,
   186 F. Supp. 2d 1140 (D. Or. 2001) .................................................... 8

## Statutes

Fed. R. Civ. P. 36(a)(4)............................................................................. 19

Fed. R. Civ. P. 37(d)(2) .............................................................................. 1

Federal Rule of Evidence 901.................................................................... 19

Pursuant to the Court's Order of February 12, 2010 (the "Order"), Mattel hereby submits the following memorandum discussing issue numbers 8, 10, 11, 12, 13, 16, 17, 18, 19 and 20 set forth in the Order.

## ISSUE NO. 8: MGA SHOULD BE ORDERED TO PRODUCE 30(B)(6) WITNESSES IMMEDIATELY

MGA has failed to provide any 30(b)(6) testimony since the Phase 1 trial and has failed to provide dates for a 30(b)(6) witness on <u>any</u> of the topics on which Mattel seeks testimony. It should be ordered to provide knowledgeable witnesses immediately.

On January 26, 2010, Mattel served its First Phase 2 Notice of Deposition of MGA Entertainment, Inc., calling for testimony on February 5, 2010.[1] MGA did not object to that deposition notice, did not move for a protective order, and did not appear for deposition. In addition, Mattel advised MGA that it sought 30(b)(6) witnesses on a number of Phase 2 topics that it had identified in notices served before the Phase 1 trial (but that were subject to the stay of Phase 2 discovery).[2] Despite Mattel's repeated requests, MGA has not offered a single date for a single topic.

In its February 11 filing, MGA claimed for the first time that it intends to seek a protective order regarding Mattel's notices. The time for that has passed. Mattel's First Phase 2 Notice called for testimony on February 5. Mattel's prior Notices called for testimony long before even that. At MGA's express urging, the rule adopted in this case has been that a failure to seek a protective order prior to the noticed date of a

---

[1]   Because of the page limitations set forth in the February 12 Order, Mattel is unable to attach the relevant deposition notices, or copies of other discovery requests and responses referenced below. A list of the included topics of examination is attached as Exhibit A. Mattel will provide the Notices themselves, or any other referenced documents, upon the Court's direction.

[2]   Specifically, Mattel advised MGA that it seeks testimony on each of the topics in Mattel's Fourth Notice of Deposition of MGA Entertainment, Inc., dated January 9, 2008, and Topic 26 from Mattel's Second Notice of Deposition of MGA Entertainment, Inc., dated February 1, 2007.

30(b)(6) deposition waives the right to do so under <u>Fed. R. Civ. P.</u> 37(d)(2).[3]  Thus, under the rule MGA itself obtained, MGA cannot now seek a protective order.

Nor, even if it had not been waived, would there a basis for such relief.  Each of the topics noticed by Mattel is directly relevant and proper.  They seek, for example, testimony on matters such as MGA's use of Mattel's trade secrets, MGA's net worth and the factual bases for its claims against Mattel.[4]  MGA complains about the number of topics in Mattel's requests, but that scarcely justifies MGA's refusal to produce a witness in response to a single one of them (particularly given its failure to seek a protective order from this Court).  Numbers alone in any event are hardly controlling.  The point of including a number of requests is to ensure that MGA understands what areas will be explored so that it can properly select and educate its witnesses.  While a single topic could be phrased more broadly than all Mattel's topics combined, that would defeat the purpose of a proper notice.  Moreover, MGA itself has served requests for Mattel 30(b)(6) witnesses on **284** topics in this litigation; it hardly can complain now that Mattel's Phase 2 notices cover roughly half that.  MGA should be ordered to produce properly educated 30(b)(6) witnesses immediately.

## ISSUE NO. 10: MGA MEXICO'S ILL-PREPARED WITNESS

*MGA Mexico's Witness Was Inadequately Prepared*.  MGA produced thousands of pages of documents containing Mattel trade secrets.  Mattel noticed MGA Mexico's deposition to determine how they were obtained, how they had been used, where they had come from, whether they had been seized by Mexican law enforcement, and

---

[3]  Discovery Matter Order No. 71, dated Oct. 15, 2009 ("[A]bsent agreement, a party who for one reason or another does not wish to comply with a notice of deposition must seek a protective order.") (citation omitted)) (no docket number).

[4]  <u>See</u> Exhibit A at Topic Nos. 26, 49-50 (p.1); 63 (p.5).  By way of further examples, MGA has failed to produce a witness on topics such as First Phase 2 Notice Topic 45, seeking "MGA's "COMMUNICATIONS with MATTEL employees while they are employed by MATTEL," and Fourth Notice Topic 51, seeking testimony on "Mattel's alleged intimidation, coercion or threats to retailers, licensees, suppliers and others in the industry."

whether and what searches were made for additional Mattel documents.  MGA Mexico has claimed ignorance and refused to provide any testimony on these topics.

Mattel raised this issue with the Court on December 17, 2009, and MGA agreed to further prepare its witness, Louis Small, on these topics.  But at his subsequent deposition, Mr. Small still could not answer these questions.  He testified that he did not know whether the produced trade secrets were ever in MGA Mexico's offices, how they got there, whether they were ever used by MGA Mexico, or how MGA's counsel obtained them.  Mr. Small also testified that he made no effort to learn whether the documents were copied or used by MGA Mexico and he did not know of any search MGA Mexico had done to answer that question; he did not ask anyone how the documents arrived in MGA Mexico's possession; he did not speak with counsel that produced the documents to determine how they had been received; he did not review any documents except the 30(b)(6) notice, the contents of the CD produced by MGA, and Mr. Machado's declaration.  Mr. Small also chose not to meaningfully question Gustavo Machado,[5] Pablo Vargas, or Mariana Trueba – the individuals Mattel has accused of taking the documents in the first place.

Moreover, Carlos Aguirre, MGA Mexico's operations manager, accompanied Mexican law enforcement during the execution of the search warrant and signed his name on each page of the Mattel hard-copy documents that Mexican law enforcement officers collected in the search.  Some of the produced trade secret documents have a signature on them that corresponds to Mr. Aguirre's signature.  Mr. Small did not show those documents to Mr. Aguirre to confirm his signature.

MGA Mexico should not be permitted to disclaim all knowledge of documents it has produced.  Where MGA Mexico has not reviewed its files or interviewed its witnesses, its preparation is deficient.  It should be ordered to provide a fully prepared

---

[5]  Mr. Machado's counsel told Mr. Small that Machado would not answer any questions because of an alleged Fifth Amendment right against self-incrimination. This statement, however, was made before the Court overruled his assertion.

witness.

     *MGA Mexico Has Waived Privilege Over The Inventory List*.   While MGA Mexico has maintained ignorance of the documents seized in the search, it nevertheless produced a document inventorying those documents.   At the December 17, 2009 hearing, Mattel's counsel discussed this document in open Court, identified it by Bates number, provided a copy to opposing counsel, and asked that the witness review it before testifying.   MGA Mexico's counsel agreed.[6]   When Mr. Small was asked about the document at his subsequent deposition, however, he testified that he had not seen it before.   The Discovery Master directed counsel to review it with the witness over the lunch break.   Upon resuming, MGA Mexico's counsel claimed the inventory list was work product and purported to claw it back under the stipulated protective order.

     MGA Mexico has waived any claim of privilege on this document.   It permitted the document to be discussed and agreed in open court to show it to its 30(b)(6) witness.   The document was marked at deposition.   Under these circumstances, there is a clear waiver of privilege.   E.g., Hickman v. Taylor, 329 U.S. 495, 510 (1947) (no privilege over "any deposition or notes of evidence given publicly in open Court").   Nor is this document privileged in any case.   It is solely a factual report of the documents seized during the search of MGA Mexico's offices.   This is analogous to the list Mattel had created of the contents of the CD seized in the search, which the Court ordered Mattel to produce in its January 26, 2010 Order.[7]   MGA should not be permitted to claw-back a list of the hardcopy documents seized in the search, when Mattel was ordered to produce a list of the electronic documents seized during the same search.

## ISSUE NO. 11: MATTEL NEEDS ADDITIONAL TIME WITH MR. LARIAN

     Isaac Larian is intimately involved with running every aspect of MGA.   He decided to purchase Bratz from Carter Bryant; he interviewed and hired each of the employees who founded MGA Mexico and stole Mattel trade secrets to do so; he

---

[6]   December 17, 2009 Hearing Tr. at 13:14-16:7.

[7]   Docket No. 7434 at 8.

orchestrated the financial transactions at issue in this Phase of the case.  By his own declaration, he is acting as MGA's chief sales representative and its head of design and costing.[8]  He is necessarily involved with all ten causes of action Mattel has brought against MGA, and with each of the multiple trade secret thefts alleged against the MGA parties.  MGA's claims against Mattel involve allegations of copying five separate product lines, and numerous discrete claims of unfair competition.  Substantial time with Mr. Larian would be justified even in the best of circumstances.  But Mattel's need for additional time has been exacerbated by Larian's conduct during his deposition.

*First*, Larian made outbursts over the course of the deposition, each of which interrupted questioning and required time for the Discovery Master to attend to.  For example, Larian at one point criticized Mattel's counsel and told him "I'm not going to put up your nonsense.  Do you understand?  Are you going to continue with this?"[9] Similarly, rather than answer questions posed, Larian used the questions to interject non-responsive claims about Mattel.  For example, when Mattel asked Mr. Larian whether he had ever told retailers not to carry Mattel products, he provided non-responsive answers such as "I don't recall it one way or another, but I recall the Wee 3 Friends was another knockoff of MGA's product, our Forever Best Friend,"[10] which required further follow-up to get him to answer to the question.  And when asked about the value of the Bratz brand, Mr. Larian responded, "No.  I think that's for another day."[11]  Mattel is submitting excerpts of the video demonstrating these and other examples of his interruptions.[12]

---

[8]   Declaration of Isaac Larian in Support of MGA Parties' *Ex Parte* Application for Relief Amending the December 7, 2009 Minute Order, dated December 31, 2009 (Docket No. 7389, at ¶ 2).

[9]   Larian Depo. Tr. at 650:6 to 650:8.

[10]   Id. at 1286:6-25.

[11]   Id. at 1266:7-1270:12.

[12]   The video includes excerpts found in the Larian Depo. Tr. at lines 650:1-14; 656:3-13; 736:1-5; 818:16-819:4; 826:15-827:3; 930:10-25; 1268:25-1270:12; 1497:13-1510:9; 1786:19-1787:1; 1800:14-24.

1   *Second*, Mr. Larian alleged "emotional distress" claims for the first time at his

2   deposition, on the grounds that his son was being allegedly bullied at school by a

3   relative of a Quinn Emanuel attorney.[13]  Nearly an hour was spent on discussions with

4   the Discovery Master and investigating this new claim before MGA's counsel agreed it

5   would not rely on it for damages.  Even then, MGA's counsel refused to stipulate that it

6   would not seek to introduce it as evidence at trial.  Mattel thus requires a ruling either

7   that (i) Larian's "emotional distress" claim is inadmissible or (ii) Larian must produce

8   his psychiatric records and other documents relevant to his purported "emotional

9   distress" and submit himself to full examination as to his mental state.  See, e.g., Tran

10   v. Tyco Electronics, Corp., 2008 WL 2037279, at *2 (D. Or. May 7, 2008) (holding it

11   would "be unfair to allow Plaintiff to proceed with a claim for emotional-distress

12   damages" without providing medical records); Enwere v. Terman Apartments, L.P.,

13   2009 WL 1814423, *4 (N.D. Cal. June 23, 2009) (allegations of emotional distress

14   placed mental condition at issue and required production of medical records and

15   examination).

16   *Third*, Mattel has not yet been able to exhaust Larian's knowledge on MGA's

17   own claims.  Larian insisted at his deposition that he can provide full testimony on

18   claimed similarities only if he has the products in front of him.[14]  MGA's claims alone

19   encompass over 200 products, and placing each of these in front of the witness will be a

20   long, time-consuming process.[15]  Mattel requires additional time to engage in the

21   process that Mr. Larian himself has insisted upon in order to defend itself against these

---

13   Id. at 1497:13-1510:9.

14   See, e.g., Larian Depo. Tr. at 1670:1-14; 1706:11-1707:6; 1707:23-1708:4; 1710:1-6; 1710:21-1713:21; 1714:13-17; 1714:24-1715:14; 1715:21-1718:12; 1753:15-21; 1764:6-11; 1764:20-1765:1; 1766:9-17; 1771:12-24; 1778:1-6; 1778:22-25; 2058:8-12.

15   Larian similarly testified that he could not answer questions without looking at certain documents, which too necessarily consumes deposition time.  See, e.g., Larian Depo. Tr. at 585:25-586:23; 1611:4-13; 1721:23-1722:2; 1723:10-1724:17; 1813:19-1814:11; 1816:1-1817:15; 1866:5-17; 1899:3-10; 2065:10-21.

1  MGA claims for which Larian has asserted MGA is seeking "billions" of dollars.[16]

2  *Fourth*, Mr. Larian's counsel improperly instructed him not to answer questions

3  regarding his perjury and obstruction in this case.  As this Court is aware, the Larian-

4  O'Connor emails was withheld based on an improper assertion of attorney-client

5  privilege.   MGA's counsel instructed Mr. Larian not to answer basic questions

6  regarding this obstruction, including whether he believed the document to be

7  privileged, and whether Mr. Larian or anyone at MGA had anything to do with the

8  email being withheld from Mattel.[17]  He should be ordered to answer those questions.

9  *Finally*, Mr. Larian wasted time at his deposition with evasive, nonresponsive

10  and obstructionist answers.  While Mattel moves to compel full answers to some of

11  these,[18] equally problematic from Mattel's perspective was the time wasted following

12  up on intentionally non-responsive and evasive answers.[19]  Mr. Larian repeatedly

13  avoided answering even basic questions by qualifying his "I do not recall" answers with

14  the phrase "as I sit here now."  He provided no information regarding distributions by

15  MGA to shareholders[20] or his communications with Joseph Moinian, one of the

16  investors in Omni.[21]   He pleaded complete ignorance as to his understanding of

17  numerous e-mails he sent or received.[22]

18  In total, despite appearing for five days of deposition in Phase 2, Larian testified

19

20  [16]   Transcript from episode of "Nightline," dated December 22, 2006 (Docket No. 4969-9 at 47).

21  [17]   Larian Depo. Tr. at 888:19-21-889:5; 948:18-24; 949:25-950:17; 951:7-19;

22  952:4-18; 953:4-17; 958:22-959:12.

23  [18]   In addition to the instructions not to answer noted in footnote 17, *supra*, Mattel moves to compel responses to the questions in the Larian Depo. Tr. at

24  550:15-22; 869:8-871:16.

25  [19]   While Mattel is not moving to compel further responses as to these, it has identified them in Exhibit B.

26  [20]   Id. at 1289:6-25.

27  [21]   Id. at 1111:9-1112:21.

28  [22]   E.g., id. at 1260:9-1262:6; 1333:10-1336:5; 1339:15-1340:7; 1619:3-1623:20; 1728:5-1730:3; 1730:18-1732:16; 1734:6-1735:20.

for only approximately 31 hours, or just over six hours per day.  In contrast, MGA examined a Mattel employee, Jaime Elias, who has far more discrete knowledge and is nowhere the central witness that Mr. Larian is, for over 23 hours.  That is not equitable, and Mr. Larian should be ordered to return to deposition until he is finished.

**ISSUE NO. 12: MR. MOINIAN'S DEPOSITION SHOULD BE ORDERED**

Joseph Moinian is CEO, President and Owner of Moinian Development Group, LLC, an Omni 808 member that allegedly invested $10 million in the Omni-Wachovia transaction.  Emails produced by defendants indicate that Larian funneled money for the Wachovia debt acquisition through Mr. Moinian.[23]  Mattel sought Mr. Moinian's deposition, and Omni's counsel, who is paid by MGA, appeared before the Court on January 7, 2010 to discuss the scheduling of Mr. Moinian's deposition.  After a recess so that counsel could consult with Mr. Moinian, Omni's counsel, Mr. Gordinier, stated that he "ha[d] a conversation with Mr. Moinian and asked him if he would do you a favor and work out circumstances which would permit him to be here," and that "the answer is yes."[24]  Omni's counsel represented that he anticipated being able to schedule the deposition by "next week" (the week of January 10) and that Mr. Moinian would appear for deposition in Santa Ana in "the next three, four weeks" (by February 4).[25]  Despite these representations and multiple requests by Mattel, Mr. Gordinier has not since offered any such dates.

Mr. Moinian should be compelled to appear for deposition.  Moinian Development is a member in Omni 808, an intervening party-defendant that is itself a California company and that holds more than $300 million in debt in a California entity.  Moinian Development also owns many millions of dollars of real property

---

[23]   Mattel's allegation that Mr. Moinian was acting as a front for Larian is supported by e-mails between Larian and Moinian and internal MGA e-mails.

[24]   January 7, 2010 Hearing (PM Session) at 3:13-20.

[25]   Id. at 4:4-7.

1   located within the Central District.[26]  See, e.g., Wilson v. Paladin Enterprises, 186 F.

2   Supp. 2d 1140, 1145-46 (D. Or. 2001) ("personal visits, real property transactions, and

3   designation of a personal representative" create general jurisdiction).  Independently,

4   Mr. Moinian has waived any jurisdictional objections.  Mr. Moinian, through his

5   counsel, agreed to appear for deposition in Santa Ana.  Mr. Gordinier's representation

6   on the record, after consultation with his client, is binding.  See Pardazi v. Cullman

7   Med. Ctr., 896 F.2d 1313, 1317-18 (11th Cir. 1990) ("consent[] to the court's

8   jurisdiction" waives jurisdictional objections).

9   **ISSUE NO. 13: THE COURT SHOULD COMPEL MACHADO AND TRUEBA**

10  **TO TESTIFY WITHOUT INVOKING THE FIFTH AMENDMENT**

11       *The Court Has Jurisdiction to Order Machado and Trueba to Appear.*  There are

12  no jurisdictional concerns that affect Mattel's request for Machado and Trueba to be

13  ordered to appear for deposition and answer questions without further resort to the Fifth

14  Amendment.  Mr. Machado is a party-defendant who, at the time of suit, resided in

15  Marina Del Rey, California and worked at MGA's offices in Van Nuys, California.  He

16  was served with the complaint naming him as a defendant while he was living in

17  Calfornia and entered into a stipulation expressly acknowledging this Court's

18  jurisdiction.[27]  Any jurisdictional issues have been disposed of long ago.

19       Ms. Trueba has already submitted to the jurisdiction of this Court by appearing

20  personally for deposition and through counsel to speak on her behalf on Fifth

21  Amendment issues.[28]  There is no jurisdictional bar to requiring her to appear again.

22  See United States v. Vacant Land, 15 F.3d 128, 131 (9th Cir. 1993) (voluntary

23  appearance waives claims of lack of personal jurisdiction).  Moreover, Ms. Trueba is

---

24
25  [26]   See http://www.moinian.com/corporate/news-media-detail.php?id=5
26  (Moinian Development web page detailing purchase of $80 million of property in downtown Los Angeles).

27  [27]   Stipulation to Set Aside Defaults Entered Against Carlos Gustavo Machado Gomez and Time to Answer or Move, dated July 30, 2007 (Docket No. 692).

28  [28]   January 19, 2010 Hearing Tr., Vol. I, at 5:17-21.

1    under the control of MGA.  Although she no longer works for MGA Mexico, it

2    continues to pay her legal fees.[29]  Ms. Trueba was employed by MGA Mexico at the

3    time Mattel served the MGA Parties with a deposition notice for her testimony, and she

4    has already appeared for deposition once at MGA's request.  The Court may therefore

5    require that the MGA Parties ask her to appear on pain of an adverse inference.  See

6    Miller v. Rykoff-Sexton, Inc., 845 F.2d 209, 212 (9th Cir. 1988) (affirming unfavorable

7    inference where plaintiff knew of witness within its control with information on

8    material issue, but chose not to call him).[30]

9        *Machado and Trueba May Not Invoke the Fifth Amendment*.  The Court has

10   already ruled that Mr. Machado has no Fifth Amendment right against testifying in this

11   case because he does not have a reasonable fear of prosecution in the United States.[31]

12   Ms. Trueba cannot invoke the Fifth Amendment for the same reason:  her concerns for

13   prosecution are strictly limited to Mexico, not the United States.  Ms. Trueba's assertion

14   of the privilege also was overbroad and improper.  She refused to answer even those

15   questions designed to determine the alleged basis of her assertion of privilege.  She

16   refused to state whether she had been investigated by law enforcement in the United

17   States for any of her conduct relating to Mattel or MGA, whether she had asked for or

18   received a non-prosecution letter from any state or federal agency, or whether she had

19   any apprehension of being prosecuted in the United State.[32]  Thus, even if Mr. Trueba

20   had a right to invoke, she has failed to meet her burden to provide information in

21   support of her invocation.  See, e.g., Baker v. Limber, 647 F.2d 912, 917 (9th Cir.

22   1981) (no Fifth Amendment right where deponent refused to answer any questions

23

24   [29]   Kuemmerle Depo. Tr., dated December 9, 2009, at 646:11-16.

25   [30]   See also Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp., 267 F.3d 1370, 1384
     n. 7 (Fed. Cir. 2001) (same); Harry v. Safeway Stores, Inc., 215 F. Supp. 324, 326-

26   327 (D.C. D.C. 1963) (permitting adverse inference rule where party had control
     over former employee).

27   [31]   January 19, 2010 Hearing Tr., Vol. II, at 6:22-7:1.

28   [32]   Trueba Depo. Tr. at 16:23-20:6.

1  except to state his name for the record).  The Court should overrule her invocation as it

2  did with Machado.

3  **ISSUE NO. 16: MGA SHOULD PRODUCE THE DOCUMENTS IT PROVIDED**

4  **TO THE FORENSIC AUDITOR**

5         The Court-appointed forensic auditor, Ronald Durkin, reviewed financial

6  documents that he obtained from MGA, including some that he attached as exhibits to

7  his reports.  MGA has yet to produce these relevant documents which relate to, among

8  other issues, the MGA Parties' financial transactions with Omni and IGWT.   In

9  September 2009, Mattel raised its need for the Durkin documents with Judge Larson.

10 MGA's counsel responded by stating that it possessed and was imaging the hard drive

11 MGA supplied to Mr. Durkin and that MGA would "review and callout the privileged

12 documents."  Emphasizing that the review of these documents is "a time-consuming

13 process," MGA represented that it was "in the process" of reviewing and producing the

14 documents "in the ordinary course."  Despite this representation, MGA has continued to

15 withhold these documents.

16        Mattel is entitled to discovery of all the documents Mr. Durkin received,

17 including those he attached as exhibits to his report, and requests that the Court compel

18 MGA to produce them.  Exhibit C contains a list of the exhibits to the Durkin reports

19 which MGA has failed to produce.  Because of the nature of the forensic auditor's

20 duties, Mattel does not have a full inventory of the remaining documents that Mr.

21 Durkin has in his possession.  MGA does, however, and it should be ordered to produce

22 all such non-privileged documents.

23 **ISSUE NO. 17: THE COURT SHOULD ORDER MGA TO PRODUCE CORE**

24 **FINANCIAL DOCUMENTS**

25        *Documents from Woolard Deposition*.  During his deposition, Mr. Woolard,

26 MGA's former head of accounting and interim CFO, testified about various financial

27 institutions with which MGA discussed financing.  Mr. Woolard also testified about

28 two separate valuations of the Bratz intellectual property done by or on behalf of MGA,

one by Mesirow Financial in or around spring of 2008 and another by Ernst & Young a few years before his employment with MGA (in 2007). These documents have not been produced. Mr. Woolard also identified a "sales report" prepared in the ordinary course of business and distributed by the sales administrative group on which he was "copied regularly." Mattel has not received these either. Documents evidencing MGA's financial condition and valuing the Bratz intellectual property are directly relevant to central issues of this litigation, and have been compelled by Order.[33] The MGA Parties should be ordered to produce all such documents.

*Documents from Ma Deposition*. During his deposition, Patrick Ma, VP of Finance at MGA Hong Kong ("MGA HK"), referred to financial documents created by or on behalf of MGA HK. These documents are relevant to MGA's financial condition, potentially fraudulent transfers of MGA capital, and Mattel's damages. Mr. Ma testified about the following categories of documents: audited financial statements and corresponding representation letters for years 2001-2008, a list of related companies in the general ledger, documents providing for the calculation of the factor applied to inter-company transfers, correspondence relating to the termination of the HSBC credit facility, financial statements and corresponding representation letters for MGA Shenzhen, MGA HK financial information presented to Ernst & Young to prepare 2009 financial statements, the attachments referenced in Exhibit 8127, MGA HK's

---

[33]   See Mattel's Second Set of Documents Requests to MGA (Phase 1), dated June 6, 2007, at RFP No. 44 ("All DOCUMENTS THAT REFER OR RELATE TO the value of the Bratz brand."); id. at RFP No. 45 ("DOCUMENTS sufficient to calculate YOUR net worth on a year basis for each year from 1999 to the present."); see also Phase 2 Discovery Matter Amended Order No. 11, dated March 31, 2009, at 38 (compelling requests); Mattel's First Set of Requests for Documents to MGA (Phase 2), dated January 7, 2009, at RFP Nos. 1, 3-6, 13 (requests all documents showing (and/or referring or relating to) MGA's "projected revenue, costs, profits or financial performance," "net worth," "solvency or insolvency," "audited or unaudited monthly, quarterly and annual financial statements," and documents sufficient to show each person/entity MGA "sought, solicited, requested, obtained, received or were denied credit, financing or funding" on or after January 1, 2007).

accounting journal, monthly financial packages for MGA HK and MGA Shenzhen, daily cash reports for MGA HK, MGA HK budgets, Excel spreadsheets of Bratz sales, and P&L statements for Bratz by brand.  These documents have not been produced, even though they are responsive to previously propounded document requests, including some which have been compelled by the Court.[34] The Court should order the MGA Parties to produce all documents referenced by Mr. Ma and any others that are responsive to the compelled requests.

### ISSUE NO. 18: MGA SHOULD BE COMPELLED TO PRODUCE INDEMNIFICATION AND FEE AGREEMENTS WITH ITS WITNESSES

On July 29, 2009, MGA moved to compel Mattel to produce documents responsive to MGA's Request No. 530, which seeks:

> All DOCUMENTS, including but not limited to agreements, draft agreements and correspondence, REFERRING OR RELATING TO the payment or offer of payment of attorneys fees by MATTEL to any PERSON in connection [with] this ACTION.

Because MGA had successfully prevented Mattel from obtaining nearly identical discovery in the past, Mattel cross-moved for mirror-image discovery pertaining to MGA's payments for witnesses in this action.  In Order No. 60, the Discovery Master

---

[34] See Mattel's Second Set of Documents Requests to MGA (Phase 1), dated June 6, 2007, at RFP No. 44 ("All DOCUMENTS that evidence, reflect, or REFER OR RELATE TO YOUR profits, by product number or SKU, from the sale of each BRATZ DOLL sold by YOU or YOUR licensees."); id. at RFP No. 41 ("YOUR general ledgers from January 1, 1995 through the present; id. at RFP No. 45 ("DOCUMENTS sufficient to calculate YOUR net worth on a year basis for each year from 1999 to the present."); see also Phase 2 Discovery Matter Amended Order No. 11, dated March 31, 2009 , at 38 (compelling requests); Mattel's First Set of Requests for Documents to MGA (Phase 2), dated January 7, 2009, at RFP Nos. 1 and 13 (requests all documents showing (and/or referring or relating to) MGA's "projected revenue, costs, profits or financial performance," and "audited or unaudited monthly, quarterly and annual financial statements . . . .").

1   granted MGA's motion and Mattel's cross-motion.[35]

2      Though five months have passed since Order No. 60 issued, MGA has not

3   produced all responsive documents.  At his January 26, 2010 deposition, Ron

4   Brawer testified that in October 2009 he entered into a part-time employment

5   contract with MGA which included an indemnity provision.[36]  MGA ignored

6   Mattel's subsequent request that it produce the "documents referring or relating to

7   the payment of Mr. Brawer's legal fees in this action."  MGA should be compelled

8   to produce all documents, including indemnification and fee agreements, drafts, and

9   correspondence, pertaining to Mr. Brawer and to any other witness identified in its

10  initial disclosures, as required by the Discovery Master's Order.

11  **ISSUE NO. 19(A): MATTEL IS ENTITLED TO TESTIMONY BY ISAAC**

12  **LARIAN IN OTHER ACTIONS.**

13     Larian testified at his recent deposition that he was "pretty sure" he had been

14  deposed since the conclusion Phase 1 of this action in 2008 but that he could not

15  "recall" specifics.[37]  Larian should be compelled to produce this and any other

16  transcripts of sworn testimony that remain unproduced.  These transcripts are

17  unquestionably likely to lead to the discovery of admissible evidence,[38] particularly to

18  the extent that they relate to Mattel, Bratz, Bryant, MGA, Larian finances or any of the

19  other issues raised by Mattel or MGA in this litigation or provide valuable

20  impeachment.

21  **ISSUE NO. 19(B): MATTEL'S FOURTH SET OF REQUESTS FOR**

22  **PRODUCTION (PHASE 2 )**

23  _____

    [35]   Phase 2 Discovery Matter Order No. 60, dated September 9, 2009 (Docket

24  No. 6630 at 27-28).

25  [36]   Deposition of Ron Brawer at 278:8-282:22.

    [37]   See Isaac Larian Deposition Transcript, dated Jan. 20, 2010, at 1902:1-15.

26  [38]   In May 2007, the former Discovery Master compelled MGA to produce all

27  deposition transcripts that refer or relate to Bratz.  See Order Granting Mattel's
    Motion to Compel Production of Documents and Interrogatory Responses By MGA,

28  dated May 15, 2007, at 11 (Docket No. 487).

On December 8, 2009, Mattel served its Fourth Set of Requests for Production (Phase 2) on MGA.   These requests seek targeted information about MGA's investments in the Bratz brand and the competing "Moxie Girlz" brand that MGA developed after being ordered to maintain and preserve the Bratz brand.[39]  The requests are directly relevant to Mattel's claims and defenses including its allegations that MGA has intentionally harmed the Bratz brand.  They are also relevant to MGA's claims that Mattel's conduct in the marketplace damaged Bratz and damages causation as to MGA's claims.  On January 7, 2010, MGA objected to the requests and refused to produce a single document in response.   While Mattel made follow-up requests for the documents, MGA failed to respond.  MGA should be ordered to produce all documents responsive to these requests.

## ISSUE NO. 19(C): MGA SHOULD PRODUCE SAMPLES OF ALL PRODUCTS THAT IT CONTENDS MATTEL INFRINGES

MGA has accused Mattel of infringing the trade dress of a variety of MGA products.  In an interrogatory response, MGA identified over 200 products in various lines that Mattel allegedly infringed.[40]  In late December 2006, Mattel sought the production of samples of the allegedly infringed products.[41]  The former Discovery

---

[39]   For example, Request No. 1 seeks "Documents sufficient to identify the total expenditures by [MGA] on advertising for Bratz for each year (or partial year) from 2003 to the present."  Request Nos. 4a and 7 seek identical information as to Little Tykes and Moxie Girlz, respectively.  Other requests seek documents showing similar expenditures on market research, production costs, and documents related to the allocation of resources among those product lines.

[40]   MGA Entertainment, Inc.'s Supplemental Response to Interrogatory No. 2 of Mattel, Inc.'s First Set of Interrogatories re Claims of Unfair Competition, dated June 20, 2007.

[41]   Mattel, Inc.'s First Set of Requests for Documents and Things re Claims of Unfair Competition to MGA Entertainment, Inc. dated December 18, 2006, Request for Production No. 1.  The Request reads, "A sample of each of the CONTESTED MGA PRODUCTS, together with each such product's packaging and all instructions, promotional literature, coupons, bounce-back cards and any other materials inserted in or associated with such packaging."

Master ordered a full production.[42]   While MGA has made some of these items available for Mattel to photograph, MGA still has not produced actual samples of the products or otherwise supplemented its production.   Mattel needs the products themselves, not just photos, to allow its experts to evaluate whether, in fact, consumers are confused by the products and packaging, and to use with deponents and as evidence at trial.   While Mattel has acquired some of these products on its own, it has not been able to acquire most of them.   Moreover, Mattel has acquired some products that do not match the product numbers or stock keeping unit numbers ("SKU") that MGA used to identify them.   To avoid any confusion and to allow it to prepare its defense, MGA should be ordered to produce a sample of all allegedly infringed products.

## ISSUE NO. 19(D): MGA MUST PRODUCE FINANCIAL INFORMATION

On June 6, 2007, Mattel propounded its Second Set of Requests for Production of Documents seeking numerous categories of financial information relevant to the parties' respective damages claims.   On December 28, 2007, the Discovery Master ordered MGA to produce documents responsive to Request Nos. 2-46 of Mattel's Second Set of Requests.[43]   Among the documents MGA produced were those relied upon by both parties for purposes of calculating Phase 1 damages.   Later, in Order No. 11, the Discovery Master ordered MGA to supplement its production of documents responsive to Request Nos. 4-37, 40-41 and 43-46 of the Second Set of Requests.[44]   MGA produced updated versions of some, but not all, the previously produced financial documents.   As for the documents MGA did update, none was produced in native format even though most of the documents produced in response to the December 28, 2007 Order were produced as Excel files.

---

[42]   Order Granting in Part and Denying in Party Mattel's Motion to Compel Production of Documents by MGA dated August 14, 2007 at 14.

[43]   Order Granting Mattel, Inc.'s Motion to Compel Production of Documents by MGA Entertainment (Docket No. 1426).

[44]   Phase 2 Discovery Matter Amended Order No. 11 (Docket No. 5093).

It has been almost a year since MGA was ordered to supplement its production of previously produced financial documents.  Despite repeated meet and confer efforts, MGA has still failed to do so.  Even the limited information MGA did provide is now stale.  The information is undeniably relevant to both parties' damages claims – hence production was ordered in the first place.  Indeed, when the parties met and conferred on November 17, 2009, MGA did not dispute its obligation to supplement its production.  MGA should be ordered to produce in native format updated versions of the previously produced financial documents, including those identified in Exhibit D (or current versions of similar financial documents containing like categories of financial information) and documents relating to Bratz market share.[45]

## ISSUE NO. 19(E): MGA SHOULD IDENTIFY WHICH MGA ENTITY PRODUCED DOCUMENTS AND PRODUCE THOSE IT HAS WITHHELD

Between November 2007 and January 2008, Mattel served MGA Mexico with three sets of requests for production seeking information related to Mattel's trade secret claims and MGA's "Unclean Hands" affirmative defense, among other things.  Well over a year later MGA Mexico had still not produced a single document.  MGA Mexico claimed that some of its documents were already produced by other MGA Parties, but refused to identify which ones.

Mattel moved to compel, and in Order No. 52, the Discovery Master granted Mattel's motion with respect to 318 of the requests, directing MGA Mexico to produce all non-privileged documents responsive to these requests and to "specifically identify by Bates number" any responsive documents it claimed to have already produced.[46]  MGA Mexico then produced documents and sent Mattel a letter identifying Bates ranges for "documents responsive to the requests addressed in Order No. 52," which

---

[45]  See Mattel, Inc.'s Second Set of Requests for Documents and Things to MGA Entertainment, Request No. 46 (requesting Bratz market share documents).

[46]  Phase 2 Discovery Matter Order No. 52, dated August 26, 2009 (Docket No. 6437 at 10).

MGA claimed it has previously produced.  However, the Bates ranges listed in the letter included over 424,000 pages of documents that were, in fact, never produced to Mattel.  Adding to the enigma, Mattel received another production on September 21, 2009 that contained custodial data consistent with an MGA Mexico production but that bore Bates numbers with an "MGA2" prefix.  Mattel requested that MGA clarify which of the MGA Parties had produced the documents, but MGA would not provide this information.

The Court should order MGA Mexico to immediately produce the documents identified in Exhibit E.  MGA Mexico has admitted that these documents are "responsive to the requests addressed in Order No. 52."  Yet, MGA Mexico has still not produced a single page of them.  It is clear that these documents have already been collected and Bates numbered, so MGA Mexico has no excuse for further delay.

MGA should also be required to identify which MGA entity produced the documents Mattel received on September 21, 2009, and which, if any, documents produced by MGA were in the possession of MGA Mexico.  One of the central issues in this case is MGA's possession of Mattel's confidential and proprietary trade secret information.  Because the fact of production itself serves to establish possession, MGA's refusal to identify the MGA entity producing certain documents obscures relevant, non-privileged information.

### ISSUE NO. 19(F): THE COURT SHOULD ORDER MGA TO PRODUCE EXHIBITS TO THE ECKERT DEPOSITION

During Mr. Eckert's deposition, MGA's counsel showed Mr. Eckert several tangible exhibits, including Bratz and other dolls.[47]  Mattel objected on the grounds (which Mattel has since confirmed) that MGA had never produced the tangible items.  MGA has ignored Mattel's repeated requests that it produce those items.  The Court should order MGA to make these items available for inspection.

---

[47]  The tangible things at issue are exhibits 7511, 7512, 7515, 7516, 7517, 7524, 7525, 7526 and 7527 to the deposition of Robert Eckert.

**ISSUE NO. 20: MGA MEXICO SHOULD BE COMPELLED TO PROVIDE SUBSTANTIVE ANSWERS TO MATTEL'S REQUESTS FOR ADMISSION**

On December 4, 2009, Mattel served its First Set of Requests for Admission (Phase 2) on MGA Mexico.  Mattel sought admissions regarding basic facts supporting its trade secret theft claims, such as the identification, source and location of documents containing Mattel trade secrets recovered by the Mexican authorities, and MGA Mexico's possession and later production of these documents.  MGA Mexico failed to provide substantive answers to the Requests.  For example, Request No. 7 asks MGA Mexico to admit that Mattel trade secret documents, which have been produced with MGA Bates numbers, were in MGA Mexico's possession before they were produced. Beyond admitting that the documents were found in the Mexican authorities' search, MGA Mexico denies this Request.[48]

Moreover, in response to a number of Requests, MGA Mexico responds that it "lacks sufficient information to admit or deny this request."  The Federal Rules make clear that MGA may respond that way only if it "states that it has made reasonable inquiry and that the information it knows or can readily obtain is insufficient to enable it to admit or deny."  Fed. R. Civ. P. 36(a)(4).  MGA Mexico has not made such a statement.  Nor could it.[49]  For example, Request Nos. 49 and 51 ask MGA Mexico to admit that it did not prepare or author the Mattel documents.  Although MGA claims lack of knowledge, it has this information.[50]  Similarly, Request Nos. 31, 33, and 35 ask MGA Mexico to admit that the Mattel documents were located in the homes of

---

[48]   MGA Mexico also refuses to admit that the Mattel documents are authentic under Federal Rule of Evidence 901 (Request No. 63).

[49]   Other than speaking with Mr. Aguirre, who was not even asked to identify his signature on the documents collected in the search, MGA Mexico has not represented that it has made an inquiry of the other MGA employees who witnessed the search.  Small Depo. Tr. at 1295:10-14.

[50]   MGA Mexico's responses also are incompatible with its responses to Request Nos. 54 and 56, wherein MGA Mexico denies that Mattel prepared or authored the documents.  This is nonsensical.

Machado, Vargas, or Trueba at any time after their resignation from Mattel Mexico, and Request Nos. 39, 43, and 47 ask MGA Mexico to admit that the Mattel documents were in the possession, custody, or control of those witnesses between the date they resigned from Mattel and the day before the Mexican authorities' search.  Again, MGA Mexico said it lacked knowledge to respond.  Even if MGA Mexico does not already know this information, it can "readily obtain" it after "reasonable inquiry" because Machado, Vargas and Trueba are within MGA Mexico's control.  MGA Mexico's objections should be overruled, and it should be compelled to provide substantive responses to all these Requests,[51] or the Requests should be deemed admitted.

DATED:  February 16, 2010          QUINN EMANUEL URQUHART OLIVER & HEDGES. LLP


                                   By _/s/ Michael T. Zeller_____
                                       Michael T. Zeller
                                       Attorneys for Mattel. Inc.

---

[51]  Specifically, Request Nos. 7-8, 31-36, 49-52, and 63-64, as included in Exhibit F.

00505.07975/3325449.5

-20-

# EXHIBIT A

## Second Notice Topic of Examination (dated February 1, 2007)

26.  YOUR net worth.

## Fourth Notice Topics of Examination (dated January 9, 2008)

1.      The invention, creation, origin, conception, authorship, design and development of the CONTESTED MGA PRODUCTS, including without limitation the circumstances under which and the date(s) on which each occurred and the IDENTITY and role(s) of each PERSON involved.

2.      Any revisions, modifications or changes made to any of the CONTESTED MGA PRODUCTS, including without limitation any proposed alternatives, modifications or changes (whether or not implemented) to such CONTESTED MGA PRODUCTS, the date(s) on which such revisions, modifications or changes were made or proposed and the reasons for their implementation or non-implementation.

3.      The development of YOUR 2005 product line, including the IDENTITY of each PERSON who participated in the decision making leading up to YOUR 2005 product line and any changes or modifications thereto, and the invention, creation, origin, conception, authorship, design, development, manufacture, distribution and sale of products therein.

4.      The development of YOUR 2006 product line, including the IDENTITY of each PERSON who participated in the decision making leading up to YOUR 2005 product line and any changes or modifications thereto, and the invention, creation, origin, conception, authorship, design, development, manufacture, distribution and sale of products therein.

5.      The content, meaning, authenticity and source of COMMUNICATIONS, advertisements, and/or promotional statements that provide a basis for any claim by YOU against MATTEL.

6.      COMMUNICATIONS between YOU and any PERSON, including without limitation any retailer or distributor, that REFER OR RELATE TO the CONTESTED MATTEL PRODUCTS.

7.      The first date of manufacture, shipment and availability for distribution and retail sale of each of the CONTESTED MGA PRODUCTS.

8.      The first date that each of the CONTESTED MGA PRODUCTS was shown to any PERSON not employed by MGA, whether in concept, prototype, or finished form, and the IDENTITY of each PERSON involved therein.

9.      The sculptures, including all preliminary sculptures and all versions of such sculptures, made, produced or prepared in connection with the CONTESTED BRATZ DOLLS PRODUCTS.

10.     The tooling and manufacture of any of the CONTESTED MGA PRODUCTS, including but not limited to all invoices, contracts, sales orders, purchase orders and payment relating thereto and including but not limited to all DOCUMENTS relating to the engineering, preparation, fabrication and creation of the molds and face paint masks used in connection therewith and to the film and/or digital files used in connection with the packaging therefor.

11.     The marketing, advertising, promotion and licensing of the CONTESTED MGA PRODUCTS, including but not limited to all marketing studies, marketing plans, sales plans, sales forecasts, strategies, surveys and analyses and including the identity of the channels in which such have been or are disseminated or distributed.

12.     The ownership of any right, title or interest, whether in whole or in part, in or to the CONTESTED MGA PRODUCTS.

13.     Any copyright, patent, design right or any other registration or application for registration of the CONTESTED MGA PRODUCTS, including but not limited to all COMMUNICATIONS relating thereto, and all filings, declarations, affidavits, correspondence, notes and other DOCUMENTS relating thereto.

14.     The display, exhibition, publication, circulation, or other dissemination of the CONTESTED MGA PRODUCTS to distributors, retailers, licensees, the media, or the public, including but not limited to toy and trade shows and conventions and the date(s) on which such occurred.

15.     YOUR expenditures in advertising or promoting the CONTESTED MGA PRODUCTS, including by year and by medium.

16.     Any contracts or licenses entered into, negotiated, proposed, or requested RELATING TO any of the CONTESTED MGA PRODUCTS.

17.     The target market or potential target market, and the demographics of any actual, potential or prospective consumers, customers, purchasers or licensees of the CONTESTED MGA PRODUCTS.

18.     The number of units of the CONTESTED MGA PRODUCTS manufactured, produced, ordered, stored in inventory, imported, exported, shipped, sold, or offered for sale by any PERSON, including but not limited to YOU.

19.     YOUR revenues, costs and profits for each of the CONTESTED MGA PRODUCTS, including but not limited to YOUR per-unit cost, and YOUR gross, incremental and net profits for each of the CONTESTED MGA PRODUCTS.

20.     Any complaints or dissatisfaction concerning the CONTESTED MGA PRODUCTS, including but not limited to the returns of, or the number of or rate of defects for, such products.

21.     Any potential or actual confusion, any potential or actual mistake or any potential or actual deception of any PERSON as to the origin, affiliation, sponsorship or association of the CONTESTED MGA PRODUCTS or CONTESTED MATTEL PRODUCTS that YOU are aware of, including but not limited to all studies, surveys, interviews, reports and COMMUNICATIONS regarding any such confusion, mistake or deception.

22.     Any potential or actual confusion, any potential or actual mistake or any potential or actual deception of any PERSON as to the origin, affiliation, sponsorship or association of the CONTESTED MATTEL PRODUCTS that you are aware of, including but not limited to all studies, surveys, interviews, reports and COMMUNICATIONS regarding any such confusion, mistake or deception.

23.     Any consumer studies, reports, surveys, interviews or reports regarding the CONTESTED MGA PRODUCTS or the CONTESTED MATTEL PRODUCTS, included but

not limited to YOUR knowledge of the reasons why consumers purchase any of the CONTESTED MGA PRODUCTS or any of the CONTESTED MATTEL PRODUCTS.

24.    Marketing studies, marketing plans, sales plans, sales forecasts, strategies and analyses that REFER OR RELATE TO THE CONTESTED MATTEL PRODUCTS.

25.    MATTEL's alleged copying, infringement or dilution of the CONTESTED MGA PRODUCTS or any claimed EMBODIMENT thereof.

26.    To the extent not disclosed in response to any other Topic, all other facts RELATING TO any claim made by YOU against MATTEL or the CONTESTED MATTEL PRODUCTS, and the IDENTITY of all PERSONS with knowledge thereof.

27.    COMMUNICATIONS between YOU and MATTEL RELATING TO the CONTESTED MGA PRODUCTS or the CONTESTED MATTEL PRODUCTS.

28.    Any damage, loss, injury or unjust enrichment that YOU claim has been sustained by reason of any act or omission by MATTEL, including but not limited to any alleged lost profits, lost sales, lost royalty, lost opportunity, lost license, revenue, price erosion, or consequential or incidental damage, including but not limited to the causation for any such alleged unjust enrichment, damage, loss, or injury and the amounts of all such damage, loss, injury or unjust enrichment.

29.    When, and under what circumstances, YOU became aware that Mattel had created, designed, developed, sold, offered for sale or licensed the CONTESTED MATTEL PRODUCTS.

30.    The copying, reproduction or use of any MATTEL work, product, or EMBODIMENT by YOU or on YOUR behalf since January 1, 1999.

31.    Any similarity or dissimilarity between any of the CONTESTED MGA PRODUCTS and any of the CONTESTED MATTEL PRODUCTS.

32.    The hiring, engagement, or retention by YOU of any current or former MATTEL employee or contractor since January 1, 1999, including but not limited to the terms of all employment agreements and agreements RELATING TO confidentiality or the invention, authorship, or ownership of any concept or product.

33.    YOUR receipt, reproduction, copying, storage, transmission, transfer, retention, destruction, deletion or use of any DOCUMENTS, data and/or information, including but not limited to any compilation of information, that was prepared, made, created, generated, assembled or compiled by or for MATTEL and that was not publicly available at the time of YOUR receipt of such DOCUMENT, data and/or information.

34.    YOUR knowledge of any MATTEL product prior to the time that such product had been announced or disclosed by MATTEL to retailers or the public, including but not limited to the CONTESTED MATTEL PRODUCTS.

35.    YOUR receipt, reproduction, copying, storage, transmission, transfer, retention, destruction, deletion or use of any MATTEL line list or other DOCUMENT prepared by MATTEL identifying MATTEL products in the planning, design or development phase.

36.    The search and seizure of DOCUMENTS by Mexican authorities from MGA's office in Mexico City, Mexico, and all COMMUNICATIONS that REFER OR RELATE thereto.

37.     All payments of money or any item of value made by YOU, directly or indirectly, or offered, proposed, promised, requested or solicited by or from YOU, directly or indirectly, in connection criminal proceedings or potential or prospective criminal proceedings against YOU or any of YOUR employees, including without limitation Gustavo Machado, and including without limitation YOUR payment or reimbursement of legal fees for or on behalf of any PERSON.

38.     COMMUNICATIONS between YOU and any PERSON RELATING TO the resignation or departure of any FORMER MATTEL EMPLOYEES from Mattel.

39.     The compensation, money or any other item of value paid to any FORMER MATTEL EMPLOYEE, whether directly or indirectly, by YOU.

40.     The identity of DOCUMENTS RELATING TO any MATTEL product or plan that any FORMER MATTEL EMPLOYEE provide or disclosed to or shared with YOU, directly or indirectly.

41.     COMMUNICATIONS with any PERSON, RELATING TO YOUR receipt, reproduction, copying, storage, transmission, transfer, retention, destruction, deletion or use of any DOCUMENTS, data and/or information, including but not limited to any compilation of information, that was prepared, made, created, generated, assembled or compiled by or for MATTEL and that YOU received, directly or indirectly, from any FORMER MATTEL EMPLOYEE.

42.     The content, authenticity, accuracy and meaning of each personnel file maintained or created by YOU RELATING TO any FORMER MATTEL EMPLOYEE.

43.     COMMUNICATIONS between YOU and Pablo Vargas San Jose prior to April 20, 2004.

44.     COMMUNICATIONS between YOU and Janine Brisbois  prior to September 27, 2005.

45.     COMMUNICATIONS between YOU and Ron Brawer prior to October 2, 2004.

46.     COMMUNICATIONS between YOU and Carlos Gustavo Machado Gomez ("Machado") prior to April 20, 2004.

47.     COMMUNICATIONS between YOU and Mariana Trueba Almada ("Trueba") prior to April 20, 2004.

48.     The existence or extent of competition or substitution between any of the CONTESTED MGA PRODUCTS and any of the CONTESTED MATTEL PRODUCTS.

49.     The factual basis for YOUR claim that any of the CONTESTED MGA PRODUCTS have acquired secondary meaning or are famous.

50.     The factual basis for YOUR claim that any of MATTEL's actions have caused actual dilution.

51.     Mattel's alleged intimidation, coercion or threats to retailers, licensees, suppliers and others in the industry."

52.     The factual basis for YOUR claim that Mattel "serially imitated and copy-catted [*sic*] the look of MGA products, trade dress, trademarks, themes, ideas, advertising and packaging."

53.     The basis for YOUR claim that the Bratz dolls launched in 2001 were "unique and distinctive."

54.     The identification of YOUR alleged trade dress in connection with the CONTESTED MGA PRODUCTS, including without limitation with respect to "themes," and the factual bases for YOUR claim that YOU have any legally protected interest in such trade dress.

55.     The factual basis for YOUR allegation that advertising executives have expressed concern about "Bratz" and Mattel's "My Scene," what concerns they expressed and the IDENTITY of each such executive.

56.     The factual basis for YOUR allegation that the press confused YOUR products with MATTEL products and "has taken notice" of alleged confusion between "Bratz" and "My Scene."

57.     All COMMUNICATIONS relating to customers who have allegedly contacted YOU to purchase Mattel's "My Scene" dolls or any of the CONTESTED MATTEL PRODUCTS.

58.     The factual basis for YOUR claim that MATTEL has infringed, diluted or otherwise violated any trade dress that YOU contend YOU own in the CONTESTED MGA PRODUCTS.

59.     The factual basis for YOUR claim that MATTEL has engaged in "strong-arm tactics, and other illegitimate, unfair and anti-competitive means."

60.     COMMUNICATIONS between YOU and any PERSON RELATING TO the departure from MATTEL of any current or FORMER MATTEL EMPLOYEE or MATTEL contractor.

61.     COMMUNICATIONS between YOU and any PERSON RELATING TO the obligations to MATTEL, including the duty of confidentiality, of any current or FORMER MATTEL EMPLOYEE or MATTEL contractor.

62.     COMMUNICATIONS between YOU and any current or FORMER MATTEL EMPLOYEE or MATTEL or contractor RELATING TO the ownership of any idea, concept, design, or product.

63.     COMMUNICATIONS between YOU and any PERSON RELATING TO the retention, destruction, transfer, or use of any information or DOCUMENTS known to or possessed by any current or former MATTEL employee or contractor.

64.     Mattel's alleged "warnings," "threats" or "intimidation" that are the subject of YOUR claims, including but not limited to all COMMUNICATIONS with any present or former licensees of MATTEL and any present or former distributors and retailers of MGA and MATTEL products.

65.     MATTEL's alleged responsibility for "shortage of doll hair in October 2002."

66.     MATTEL's alleged "manipulation of the retail market," including by its alleged tampering with MGA's retail displays.

67.     MATTEL's alleged false statements about YOU or YOUR business practices.

68.     MATTEL's alleged violation of any rules or restrictions relating to data provided to subscribers by NPD or any other wrongful conduct relating to NPD.

5

69.     COMMUNICATIONS between YOU and NPD, other than periodic reports transmitted by NPD or information made available to YOU by NPD, between January 1, 2000 and the present.

70.     YOUR contracts and agreements with NPD since January 1, 1999, including without limitation any allegation by NPD that YOU were or have been in breach or violation thereof.

71.     The status of YOUR NPD subscription between January 1, 1999 and the present.

72.     MATTEL's alleged inducement of CARU to place onerous restrictions on MGA advertisements, and require MGA to amend aspects of commercials that have gone unchallenged in other parties' commercials.

73.     COMMUNICATIONS between YOU and CARU between January 1, 2000 and the present RELATING TO MATTEL, ANY CONTESTED MGA PRODUCTS, ANY CONTESTED MATTEL PRODUCTS or any other subject or matter that YOU are relying upon in this ACTION.

74.     MATTEL's allegedly improper influence with or within TIA, including but not limited to the procedures for and manner in which the Toy of the Year was selected for 2003.

75.     YOUR COMMUNICATIONS with TIA RELATING TO Toy of the Year since January 1, 2000 or any other subject or matter on which YOU base any claim.

76.     MATTEL's purported power, influence and intimidation to threaten retailers, suppliers, licensees, distributors, manufacturers and industry bodies so as to limit or prevent MGA from doing business.

77.     MATTEL's alleged intimidation of or threats against MGA's current and potential employees.

78.     YOUR monthly, quarterly and annual financial reports, including financial statements (both audited and unaudited) for the years 1998 through the present, inclusive.

79.     The identity of DOCUMENTS that YOU have reason to believe were created by or originated from MATTEL (excluding MATTEL products that YOU purchased at retail) at any time since January 1, 1998.

80.     The destruction of any DOCUMENT RELATING TO the CONTESTED MGA PRODUCTS or the CONTESTED MATTEL PRODUCTS.

81.     COMMUNICATIONS with, or inquiry or investigation by, any government entity, industry organization, safety compliance, or consumer organization RELATING TO the CONTESTED MGA PRODUCTS or the CONTESTED MATTEL PRODUCTS.

82.     YOUR understanding or belief of whether the BRYANT/MGA AGREEMENT was lawful when YOU entered into it, and DOCUMENTS and COMMUNICATIONS related thereto.

83.     The public perception of the CONTESTED MGA PRODUCTS, including without limitation with respect to the appropriateness or suitability of Bratz for children.

84.     The factual basis for YOUR alleged belief that YOU had the right to market products developed as a result of the BRYANT/MGA AGREEMENT and to the lawful right to fully exploit the drawings drawn and presented by BRYANT prior to the execution of the

BRYANT/MGA AGREEMENT, and the DOCUMENTS and COMMUNICATIONS YOU so relied upon when YOU entered into the agreement.

85.    The factual basis for YOUR contention that YOU believed at the time YOU entered into the BRYANT/MGA AGREEMENT that it would be lawful for YOU to acquire THE BRATZ PITCH MATERIALS from BRYANT, and the DOCUMENTS and COMMUNICATIONS YOU so relied upon at the time YOU entered into the BRYANT/MGA AGREEMENT.

86.    YOUR belief or non-belief that BRYANT created or improved any of THE BRATZ PITCH MATERIALS while employed by MATTEL, and the DOCUMENTS and COMMUNICATIONS YOU so relied upon.

87.    Any investigation or inquiry YOU conducted to confirm the timing  of BRYANT'S work prior to executing the BRYANT/MGA AGREEMENT, including but not limited to DOCUMENTS and COMMUNICATIONS RELATING thereto.

88.    The factual bases for YOUR affirmative defenses.

89.    The IDENTITY of all DOCUMENTS that were in the possession of Farhad Larian that YOU claim were reviewed by Quinn Emanuel Urquhart Oliver & Hedges LLP at any time prior to January 1, 2007.

90.    The factual bases for YOUR allegations in the GLASER LETTER, including YOUR allegation that DOCUMENTS in the possession of Farhad Larian and reviewed by Quinn Emanuel Urquhart Oliver & Hedges LLP were purportedly privileged and confidential.

91.    Any services Farhad Larian has provided to YOU since January 1, 2005, including any litigation consulting services.

92.    The IDENTITY of DOCUMENTS that Farhad Larian was provided with or had access to, including YOUR allegedly privileged and confidential DOCUMENTS, since January 1, 2001.

93.    The terms of any contracts or agreements, including any confidentiality agreements, between YOU and Farhad Larian.

94.    The identity of each doll, accessory, product, work or item produced, developed, manufactured, licensed, sold or offered for sale by or for YOU or on YOUR behalf that was BASED ON any BRATZ DESIGN or any design derivative of any BRATZ DESIGN.

95.    Except for deposition testimony provided in this ACTION, the testimony, transcripts, declarations, affidavits and other sworn written statements of any other type by or from YOU or made on YOUR behalf that REFER OR RELATE TO BRATZ and that REFER OR RELATE TO the time period prior to June 30, 2001 (regardless of when such testimony or sworn statement was taken, given, signed, made or filed).

96.    The authenticity, content, timing, meaning, and truth and accuracy of YOUR COMMUNICATIONS with any PERSON, including without limitation any retailer and the media, that REFER OR RELATE TO the National Labor Committee dated December 21, 2006 entitled "Made in China: The Sweatshop Behind the Bratz" or the Hau Tai K4 factory.

97.    The identity of each doll, product, packaging or other matter that YOU have accused of infringing, diluting or otherwise violating YOUR purported rights in any of the CONTESTED

7

MGA PRODUCTS, the IDENTITY of each manufacturer of each doll, product, packaging or other matter and the specific aspects of each such doll, product, packaging or other matter that YOU have claimed was confusingly or substantially similar to any of the CONTESTED MGA PRODUCTS.

98.     The identity, and outcome and resolution, of each lawsuit that YOU have brought or cease and desist letter YOU have sent each doll, product, packaging or other matter that YOU have accused of infringing, diluting or otherwise violating YOUR purported rights in any of the CONTESTED MGA PRODUCTS.

99.     The job responsibilities of each FORMER MATTEL EMPLOYEE in the first six months after each joined MGA.

100.     YOUR scheduling, planning, inventory, shipping, distribution or forecasting software since January 1, 2005, including but not limited to any and all changes, improvements, acquisitions, upgrades and purchases.

101.     DOCUMENTS created by each of the FORMER MATTEL EMPLOYEES in the first six months after each joined MGA

102.     The make-up, source, calculation and purpose of the amounts presented in MGA documents Bates-numbered MGA 0101018-21 (Exhibit 661) and MGA 08185789 (Exhibit 662).

### First Phase 2 Notice Topics of Examination (dated January 26, 2010)

1.     Any and all opportunities that YOU claim that YOU lost or that became less valuable as a result of any and all conduct by MATTEL alleged or asserted by YOU in this ACTION.  In connection with this topic, MGA shall, without limitation, identify the alleged lost opportunity, the PERSON with whom MGA believed it had an opportunity, the alleged value of the opportunity, all bases underlying the claimed value of the opportunity, DOCUMENTS and COMMUNICATIONS  RELATING TO such opportunity, and any and all reasons that the opportunity was not pursued by YOU to conclusion or obtained.

2.     The benefits, profits or gains, if any, that YOU claim MATTEL has received as a result of any and all wrongful acts by MATTEL alleged or asserted by YOU in this ACTION, including but not limited to any and all calculations, analyses, quantifications, reviews or summaries that supports or RELATES TO the type or amount of any such harm or benefit.

3.     Any other injury or damages that YOU claim MATTEL caused YOU to incur or suffer, including but not limited to YOUR calculations and analyses RELATING TO such alleged damages or injury.

4.     The factual basis for the claims YOU are alleging or asserting in this ACTION against MATTEL.

5.     The formation, operations, activities and management of IGWT, LEXINGTON, VISION CAPITAL, LLC, and OMNI 808 INVESTORS, LLC, including but not limited to the IDENTITY of their current and former officers, directors, owners, members, and managing members, the amount and source of any capital contributions, money borrowed or other cash or assets acquired, the IDENTITY of any bank or investment account with any financial institution for them, PAYMENTS and transfers made to and from such accounts, and the IDENTITY of any

PERSON who has transferred or drawn funds from, or is authorized to transfer or draw funds from, any such bank or investment account.

6.      Actual and/or contemplated transactions involving IGWT, OMNI 808 INVESTORS, LLC, LEXINGTON, VISION CAPITAL, LLC, and/or THE ALLEGED INVESTORS (including but not limited to transactions RELATING TO the purchase of a portion of YOUR debt from Wachovia), and the terms and conditions of such transactions, including but not limited to YOUR transfer of any funds to or from them; the purported sale or transfer of YOUR PRODUCTS to or from them; YOUR COMMUNICATIONS with them; any information, including without limitation YOUR financial information, transmitted to or from or discussed with them; and all direct and indirect sources of funds used in any such transactions.

7.      YOUR relationship with OMNI 808 INVESTORS, LLC and THE ALLEGED INVESTORS.

8.      PAYMENTS of any ITEM OF VALUE between YOU or LARIAN and OMNI 808 INVESTORS, LLC or THE ALLEGED INVESTORS, including without limitation any assets belonging to YOU or LARIAN which have been pledged or proposed or requested to be pledged as security in favor of OMNI 808 INVESTORS, LLC and/or THE ALLEGED INVESTORS.

9.      Any plans YOU have made or consideration YOU have given to filing for bankruptcy since January 1, 2007, including without limitation YOUR consultations with financial advisors in that regard and YOUR attempts to move, transfer or withdraw assets from MGA prior to any such filing.

10.      YOUR distributions and any other PAYMENTS to LARIAN, including without limitation members of his family and any trusts associated with LARIAN, from January 1, 2004 to the present, and any PAYMENTS by LARIAN to YOU in that time period, including without limitation the amounts thereof and reasons therefor.

11.      PAYMENTS YOU have made in excess of $100,000 since January 1, 2004 to any PERSON, including without limitation the recipients thereof and reasons therefor.

12.      Transactions between YOU and LARIAN, or any PERSON affiliated with LARIAN, between 2004 and the present, including without limitation transactions involving the sale of BRATZ PRODUCTS.

13.      The quantity of each BRATZ PRODUCT sold by YOU or YOUR licensees for each year from 2001 to the present to each purchaser, and YOUR profits from such sales, including without limitation: revenues; gross, net and incremental profits; cost of goods sold, unit cost and other costs; customer returns, rebates or credits; marketing and advertising costs, budgets, expenditures and investments (including media and nonmedia advertising, promotions, photography, online advertising, and merchandising).

14.      YOUR creation and development of MOXIE GIRLZ and BFC, INK., including without limitation the amounts and sources of funds used in connection therewith, the timing thereof, YOUR financial condition before and after such creation and development and YOUR investments therein and promotions thereof.

15.      YOUR acquisition of all or any portion of LITTLE TIKES, ZAPF, and SMOBY, including without limitation the amounts and sources of funds used in connection therewith, the

timing thereof, YOUR financial condition before and after such acquisition and YOUR investments therein.

16.     YOUR investments in BRATZ, MOXIE GIRLZ, LITTLE TIKES, BFC, INK., SMOBY, and ZAPF, and the PRODUCTS associated therewith, from 2001 to the present (or for each year for which the PRODUCT was designed, manufactured, distributed or sold by YOU or on YOUR behalf), including but not limited to YOUR advertising, market research, product development, product design, promotional expenditures, website development, and any other costs associated with or incurred in connection with their development, production or promotion.

17.     Market research or analysis RELATING TO BRATZ and any of YOUR other PRODUCTS.

18.     Market research or analysis RELATING TO BRATZ and MY SCENE.

19.     YOUR COMMUNICATIONS with retail buyers and distributors regarding anticipated and actual volume of sales and shelf space for YOUR PRODUCTS and MATTEL's PRODUCTS.

20.     YOUR BRATZ inventory levels and production capacity, including factory capacity, manufacturing orders, and production processes.

21.     Any and all measures YOU have taken to protect YOUR trade secrets or other confidential information, and the timing of YOUR implementation of such measures.

22.     Any and all steps or measures YOU have taken to enforce YOUR claimed intellectual property rights, including without limitation lawsuits YOU have filed, threatened to file (whether by letter or otherwise) or contemplated filing based on any perceived misappropriation of YOUR trade secrets or confidential information.

23.     YOUR supply chain processes for each year from 2001 to the present, including YOUR use of the terms "sales forecasting," "sales forecasts," "sales planning," and "demand planning."

24.     YOUR Forecast Portal (as the term is used in the DOCUMENT Bates numbered MGA2 0048977-83), its origins and objectives, its functions, its usage, and its results to date.

25.     YOUR demand planning processes for each year from 2001 to the present, including the reasons for YOUR implementation of demand planning, its objectives, any changes in demand planning, and how YOU have assessed or measured its results to date.

26.     YOUR scheduling, planning, inventory, shipping, distribution or forecasting software from January 1, 2001 to the present, including without limitation YOUR use of the John Galt, Atlas Planning System, Axapta, Velocity, Great Plains, Targit, WMS ("Warehouse Management System"), WMOS ("Warehouse Management Open Systems"), and including without limitation their purposes and functions, any modifications over time, YOUR concerns about their weaknesses, including any critical analysis RELATED thereto, what PRODUCTS and functions YOU kept on such systems, and any and all changes, improvements, acquisitions, and upgrades to such systems.

27.     YOUR processes for sales planning, sales forecasting, and inventory forecasting, planning and replenishment for each year from 2001 to the present, including but not limited to YOUR use of any software systems, databases, algorithms, reports, meetings, the participants

10

and their roles, as well as any significant changes in those processes and participants and the reasons therefor.

28.     YOUR product development processes for each year from 2001 to the present, including but not limited to product research, line planning, marketing planning, focus groups, testing, viability studies, design freezes for product and packaging, tool start, final engineer pilot runs, and pre-production samples.

29.     Any  analyses of YOUR performance in sales planning, sales forecasting, demand planning, and inventory forecasting, planning and replenishment from 2001 to the present, including but not limited to measures the company has used, reports, memos, computer records and consultant studies about such performance and the performance reviews of participants in that process, as well as any changes in those measures, processes and procedures and the reasons therefor.

30.     Analyses, commentary, awards, complaints or COMMUNICATIONS from retailers or distributors RELATING TO YOUR in-stock performance, as well as clearance of and markdown on YOUR PRODUCTS, from 2001 to the present.

31.     YOUR investigations RELATING TO any issue or allegation in this ACTION, including without limitation the IDENTITY of any PERSON who conducted any such investigation and any reports, notes, transcripts, recordings, or other DOCUMENTS prepared in connection therewith.

32.     YOUR policies, procedures and practices regarding use of COMMUNICATIONS by MAIL or WIRE, including but not limited to (a) the identification of YOUR methods of conveyance of COMMUNICATIONS (blackberry service, etc.), (b) the identification of the conveyors (phone company, express mail service, etc.), and (c) YOUR records and recordkeeping RELATING TO such conveyors of COMMUNICATIONS, and the means by which and locations through which the COMMUNICATIONS YOU have produced in this ACTION were transmitted.

33.     YOUR policies, procedures, and practices RELATING TO YOUR use of WIRELESS DEVICES to send or receive e-mail messages to or from MGA's e-mail system from January 1, 2000 to the present.

34.     YOUR financial condition, including without limitation revenues, profits, losses, assets, liabilities, balance sheets, profit and loss statements, financial statements, asset book value, and liquidity.

35.     All actual, planned, proposed, offered or requested PAYMENTS by or on behalf of YOU to any government official, government entity, or law enforcement authority, including without limitation in Brazil.

36.     All COMMUNICATIONS with law enforcement in Mexico, Canada and the United States by or on behalf of YOU or any of YOUR current or former employees RELATING TO any alleged theft or taking of alleged MATTEL confidential or trade secret information by YOU or PERSONS currently or formerly employed by YOU or RELATING TO any other allegation contained in MATTEL's claims in this ACTION.

37.     All PAYMENTS made directly or indirectly to any vendors or any other PERSON in Mexico, including without limitation attorneys, law firms and consultants, RELATING TO any

actual or potential investigation or prosecution of any PERSON or entity for any alleged theft or other taking of alleged MATTEL confidential or trade secret information since 2001, including without limitation the IDENTITY of all recipients of such PAYMENTS, the amounts of each such PAYMENT, the reasons for each such PAYMENT and the use of each such PAYMENT by the recipient.

38.     Any and all smuggling in which YOU have participated or engaged in and all efforts YOU have made to smuggle PRODUCTS or goods across international borders, including without limitation into or out of the United States.

39.     The value of BRATZ from 2004 to the present.

40.     Any efforts YOU have made or contemplated making since January 1, 2008, to encumber, assign, sell or transfer BRATZ intellectual property or any BRATZ rights YOU claim to hold (not including license agreements entered into in the ordinary course of YOUR business).

41.     YOUR 2009 and 2010 BRATZ lines, including without limitation YOUR investments therein, the DESIGN elements incorporated therein and YOUR actual and projected profits therefrom.

42.     Any and all joint defense and/or common interest agreements YOU have entered into in connection with this ACTION, and COMMUNICATIONS in connection therewith, including but not limited to the inception and termination dates of each agreement, if any, and the IDENTITY of each PERSON who is a party to each such agreement.

43.     Any and all agreements RELATING TO the requested, actual, promised or contemplated PAYMENT of attorney's fees by YOU for the benefit of or on behalf of any PERSON not then-employed by YOU in connection with any actual, potential or prospective dispute or litigation with MATTEL, including without limitation DOCUMENTS RELATING thereto, the terms and conditions thereof and COMMUNICATIONS RELATING thereto.

44.     The IDENTITY of every PERSON whose attorney's fees YOU have paid in connection with this ACTION or in connection with any actual, potential or prospective dispute or litigation with MATTEL, and the amount of such fees.

45.     YOUR COMMUNICATIONS with MATTEL employees while they are employed by MATTEL, and YOUR policies and practices RELATING TO such communications.

46.     YOUR spoliation and/or concealment of DOCUMENTS or other evidence in connection with this ACTION.

47.     YOUR preservation of, searches for, collections of and productions of DOCUMENTS in connection with this ACTION, including without limitation which sources of information and STORAGE DEVICES YOU have searched for responsive DOCUMENTS in connection with this ACTION (and which YOU have not) and YOUR search methods in connection with those searches.

48.     Any and all efforts by YOU or by any PERSON acting on YOUR behalf to search for, identify, locate, preserve, remove or delete any DOCUMENT, physical or electronic, that contains or contained any portion of any DOCUMENT originating from or authored by MATTEL, including without limitation any DOCUMENT containing internal MATTEL information, and the results of such efforts, including the identification of DOCUMENTS

located and the location, including custodian, file name, or STORAGE DEVICE (including path and file name), where any such DOCUMENT was discovered.

# EXHIBIT B

## Questions On Which Mattel Seeks an Order
## Compelling Larian to Answer

**Volume III:**

    1.   550:15-22

**Volume IV:**

    2.   869:8-871:16

## Non-Responsive, Evasive or Obstructionist Answers

**Volume III:**

| | | | |
|---|---|---|---|
| 3. | 599:2-9 | 5. | 660:8-661:16 |
| 4. | 643:10-25 | 6. | 678:9-20 |

**Volume IV:**

| | | | |
|---|---|---|---|
| 7. | 867:5-23 | 9. | 923:11-929:8 |
| 8. | 880:10-25 | 10. | 982:10-983:14 |

**Volume V:**

| | | | |
|---|---|---|---|
| 11. | 1105:19-21 | 19. | 1274:11-20 |
| 12. | 1109:11-22 | 20. | 1275:2-22 |
| 13. | 1110:6-8 | 21. | 1286:6-25 |
| 14. | 1110:20-1111:2 | 22. | 1289:6-25 |
| 15. | 1111:9-1113:21 | 23. | 1291:1-10 |
| 16. | 1241:23-1242:22 | 24. | 1327:7-20 |
| 17. | 1260:9-1262:6 | 25. | 1333:10-1336:5 |
| 18. | 1266:7-1270:12 | 26. | 1339:15-1340:7 |

1      27.    1377:15-23

2

3

**Volume VI:**

| | | | | |
|---|---|---|---|---|
| 28. | 1430:25-1432:24 | 36. | 1673:14-1675:11 |
| 29. | 1456:10-22 | 37. | 1676:23-1678:3 |
| 30. | 1526:21-1528:10 | 38. | 1678:13-1679:17 |
| 31. | 1619:3-1621:2 | 39. | 1682:24-1683:10 |
| 32. | 1621:16-1622:15 | 40. | 1683:23-1685:10 |
| 33. | 1649:21-1650:19 | 41. | 1685:18-24 |
| 34. | 1670:1-14 | 42. | 1693:8-20 |
| 35. | 1671:1-24 | | |

**Volume VII:**

| | | | | |
|---|---|---|---|---|
| 43. | 1706:3-1707:6 | 52. | 1730:18-1731:16 |
| 44. | 1707:23-1708:4 | 53. | 1734:6-1735:20 |
| 45. | 1709:18-1713:24 | 54. | 1736:9-1739:8 |
| 46. | 1714:13-17 | 55. | 1742:18-1744:18 |
| 47. | 1714:24-1715:14 | 56. | 1809:19-1810:21 |
| 48. | 1719:6-22 | 57. | 1844:20-1845:10 |
| 49. | 1721:6-1722:2 | 58. | 1865:19-1867:2 |
| 50. | 1728:5-1730:3 | 59. | 1867:25-1868:9 |
| 51. | 1729:9-1730:3 | | |

**Question on Which Mr. Larian Was Improperly Instructed Not to Answer**

**Volume IV:**

| | | | | |
|---|---|---|---|---|
| 60. | 888:19-21-889:5 | 62. | 949:25-950:17 |
| 61. | 948:18-24 | 63. | 951:7-19 |

1     64.   952:4-18

2     65.   953:4-17

3     66.   958:22-959:12

# EXHIBIT C

| EXHIBIT | DESCRIPTION | DFI Range |
|---|---|---|
| Durkin Report Exhibit 8 | Wachovia Credit Facility to MGAEI | DFI 8 001-005 |
| Durkin Report Exhibit 9 | Schedule prepared by MGAEI entitled Notes Payable-Wachovia | DFI 9 001 |
| Durkin Report Exhibit 12 | Master Assignment and Exchange Agreement | DFI 12 001-063 |
| Durkin Report Exhibit 13 | Organizational Charts | DFI 13 001-007 |
| Durkin Report Exhibit 15 | Emails between Mr. Larian and Mr. Kadisha | DFI 15 001-003 |
| Durkin Report Exhibit 20 | Gozini Promissory Note | DFI 20 001-004 |
| Durkin Report Exhibit 21 | 4/21/09 Email from Jeanine Pisoni | DFI 21 001-003 |
| Durkin Report Exhibit 22 | Emails between Mr. Larian and Mr. Moinian, and Mr. Larian and Angela Larian and Shirin Makabi | DFI 22 001-002 |
| Durkin Report Exhibit 23 | 11/24/08 Emails between Mr. Larian and Mr. Moinian | DFI 23 001-002 |
| Durkin Report Exhibit 24 | 11/28/08 Email from Mr. Larian to Angela Larian, Shirin Makabi, and Brian Wing | DFI 24 001 |
| Durkin Report Exhibit 25 | 12/2/08 Email from Mr. Larian to Shirin Makabi, Angela Larian, and Brian Wing | DFI 25 001 |
| Durkin Report Exhibit 26 | 12/2/08 Email from Mr. Larian to Leon Farahnik | DFI 26 001 |
| Durkin Report Exhibit 27 | Emails from Mr. Larian to Mr. Wing and from Mr. Larian to Mr. Costantini | DFI 27 001-004 |
| Durkin Report Exhibit 28 | 4/3/09 Email from Steve Schultz to Ron Durkin | DFI 28 001-038 |
| Durkin Report Exhibit 30 | 1/21/09 Emails from Mr. Larian to Jeff Hurst, Ricardo Abundis, et al, and from from Mr. Schneider to Barbara Leitner and Becky Harris | DFI 30 001-003 |
| Durkin Report Exhibit 32 | Email from Mary Venzo to Mr. Larian | DFI 32 001-005 |
| Durkin Report Exhibit 33 | Secured Delayed Draw Demand Note | DFI 33 001-010 |
| Durkin Report Exhibit 35 | 12/31/08 Balance Sheet equity section | DFI 35 001-036 |
| Durkin Report Exhibit 36 | Detail of distributions made to owners | DFI 36 001-004 |
| Durkin Report Exhibit 37 | Detail of $50 million distributions | DFI 37 001-002 |
| Durkin Report Exhibit 38 | Supporting schedules | DFI 38 001-005 |
| Durkin Report Exhibit 42 | Omni 808 Credit Agreement Interest Statement | DFI 42 001 |
| Durkin Report Exhibit 43 | Redlands Lease | DFI 43 001-0058 |
| Durkin Report Exhibit 44 | MGA North Licensee Agreement | DFI 44 001-047 |
| Durkin Report Exhibit 45 | Supporting information | DFI 45 001-028 |

| EXHIBIT | DESCRIPTION | DFI Range |
|---|---|---|
| Durkin Report Exhibit 46 | MGA lender ppt detailing the history of MGAEI | DFI 46 001-002 |
| Durkin Report Exhibit 47 | IGWT and Toybox Bank Statements | DFI 47 001-011 |
| Durkin Report Exhibit 48 | Deloitte management letter | DFI 48 001-013 |
| Durkin Report Exhibit 49 | MGAEI Accounting Policies and Procedures Documents | DFI 49 001-045 |
| Durkin Report Exhibit 50 | Examples of Larian personal expenses | DFI 50 001-003 |
| Durkin Report Exhibit 51 | Audit Reports | DFI 51 001-003 |
| Durkin Report Exhibit 52 | Wachovia's Study, April 22, 2008 and January 4, 2008 | DFI 52 001-024 |
| Durkin Report Exhibit 54 | 3/30/08 Emails between Dora Kadisha and Mr. Larian | DFI 54 001 |
| Durkin Report Exhibit 55 | 8/10/08 Emails from Mr. Larian to Tom Allison and Sheon Karol | DFI 55 001-002 |
| Durkin Report Exhibit 56 | 8/17/08 Emails between Mr. Larian and Mr. Kadisha | DFI 56 001-002 |
| Durkin Report Exhibit 57 | Emails between Isaac Larian, Dora Kadisha and Angela Larian | DFI 57 001-003 |
| Durkin Report Exhibit 58 | 10/21/08 Email from Lisa Tonnu to Shirin Makabi | DFI 58 001-003 |
| Durkin Report Exhibit 59 | 10/21/08 from Lisa Tonnu to Khong Wee "Mike" Phua | DFI 59 001 |
| Durkin Report Exhibit 63 | 12/2/98 email, "Notice of Directors Meeting of ABC Int'l Traders Inc." | DFI 63 01-002 |
| Durkin Report Exhibit 66 | Email from Mr. Larian to Jeanine Pisoni | DFI 66 001-003 |
| Durkin Report Exhibit 67 | Email from Steve Schultz | DFI 67 001-002 |
| Durkin Report Exhibit 68 | Emails regarding IGWT inventory and sales | DFI 68 001-005 |
| Durkin Report Exhibit 72 | Series of emails regarding creation of financial statements | DFI 72 001-064 |
| Durkin Report Exhibit 73 | Sonier et Associes invoices | DFI 73 001-037 |
| Durkin Report Exhibit 74 | Statements of Accounts | DFI 74 002-014 |
| Durkin Report Exhibit 75 | Email from Mondana regarding movement of the $20 million | DFI 75 001-002 |

Exhibit C
Page 38

# EXHIBIT D

| Title | Bates Nos. |
|---|---|
| MGAE de Mexico, S. de R. de L. de C.V. 2004 Forecast (2004 budget) | MGA 117920 - MGA 117924 |
| MGAE de Mexico, S. de R. de L. de C.V. 2005 Forecast (2005 budget) | MGA 1824791 - MGA 1824806 |
| Mexico 2004 Actuals Sales by Customer | MGA 3815258 - MGA 3815263 |
| Mexico 2005 Actuals Sales by Customer | MGA 3815279 - MGA 3815286 |
| Mexico 2006 Actuals Sales by Customer | MGA 3815330 - MGA 3815337 |
| Mexico 2007 Actuals Sales by Customer | MGA 3815435 - MGA 3815442 |
| Mexico 2004 Actuals Sales by SKU | MGA 3815264 - MGA 3815274 |
| Mexico 2005 Actuals Sales by SKU | MGA 3815287 - MGA 3815308 |
| Mexico 2006 Actuals Sales by SKU | MGA 3815338 - MGA 3815393 |
| Mexico 2007 Actuals Sales by Item | MGA 3815443 - MGA 3815497 |
| Mexico 2004 Actuals Returns by Item | MGA 3815249 - MGA 3815257 |
| Mexico 2005 Actuals Returns by Item | MGA 3815275 - MGA 3815278 |
| Mexico 2006 Actuals Returns by Item | MGA 3815309 - MGA 3815329 |
| Mexico 2007 Actuals Returns by Item | MGA 3815394 - MGA 3815434 |
| Bratz Sales by Profit Center | MGA 0868723-865 |
| Ad Media Expense | MGA 3896251.xls |
| Ad Production Expense | MGA 3720119.xls |
| Lovins Royalty Reports | MGA 3896247.xls |
| Parinchy Royalty Report | MGA 3896250.xls |
| Product Lists | MGA 3896255.xls |
| MGA Asset Allocations | MGA 3896256.xls |
| Price Lists | MGA 1392502.xls |
| DVD, TV, Music Revenue | MGA 3743395.xls |
| DVD, TV Revenue, Production Cost | MGA 3743417.xls |
| Bratz US v. Worldwide Sales | MGA 0218615-6 |
| MGA Worldwide Segment P&L | MGA 1610366-71 |
| MGA Distributions List | MGA 3865982-6029 |
| Trial Balances | MGA3765665.xls; 2004 MGA 0061444-890 |
| Cost, Product, Inventory Lists | MGA 3723089.xls |
| Sales by Customer | MGA2 0065459-532; MGA 3896241.xls |
| Sales Returns by SKU | MGA2 0065883-962; MGA 3896243.xls |

| Title | Bates Nos. |
|-------|-----------|
| Sales by SKU | MGA2 0065533-882; MGA 3896238.xls |
| Tooling and Depreciation (Mold) | MGA2 0062466-961; MGA 3896253.xls |
| Bryant Royalty Report | MGA2 0062965-3054; MGA 3896245.xls |
| HK Standard Cost | MGA2 0063058-5307; MGA 3735015.xls |
| License Payment Log | MGA2 0066248-8606; MGA 3896502.xls |
| MGA Forecasts, Plans | (MGA2 0218606-69, MGA2 0215417-8); (MGA2 0062962-4; MGA2 0063055-7); (MGA2 0065453-4) |

# EXHIBIT E

The following Bates ranges, which MGA Mexico identified as previously produced to Mattel in its September 16, 2009 production letter, have not actually been produced:

| | |
|---|---|
| MGA 4453516-MGA 4453543 | MGA 4469602-MGA 4469615 |
| MGA 4453544-MGA 454298 [sic] | MGA 4469616-MGA 4469692 |
| MGA 4454299-MGA 4458187 | MGA 4473051-MGA 4473062 |
| MGA 4458214-MGA 4458230 | MGA 4473063-MGA 4473275 |
| MGA 4458231-MGA 4458311 | MGA 4473276-MGA 4473511 |
| MGA 4461586-MGA 4461599 | MGA 4473512-MGA 4474328 |
| MGA 4461737-MGA 4461739 | MGA 4474329-MGA 4474340 |
| MGA 4462804-MGA 4462832 | MGA 4474341-MGA 4474353 |
| MGA 4462833-MGA 4463054 | MGA 469693-MGA 4473050 [sic] |
| MGA 4463055-MGA 4463063 | MGA 3787467 - MGA 3787468 |
| MGA 4463064-MGA 4463246 | MGA 3789915 - MGA 3793951 |
| MGA 4463247-MGA 4463259 | MGA 3857506 - MGA 3862000 |
| MGA 4463852-MGA 4466135 | MGA 3862529 - MGA 3865981 |
| MGA 4468076-MGA 4468081 | MGA 3881089 - MGA 3881129 |
| MGA 4468082-MGA 4468376 | MGA 3896995 - MGA 3999999 |
| MGA 4468377-MGA 4469064 | MGA 0616178 - MGA 0799999 |
| MGA 4468569-MGA 4468784 | MGA 0887426 - MGA 0999999 |

# EXHIBIT F

## Mattel Inc.'s First Set of Requests for Admission to MGA Mexico (Phase II)

REQUEST FOR ADMISSION NO. 1:

Admit that the MATTEL-AUTHORED DOCUMENTS were in YOUR possession before YOU produced them to MATTEL in THIS ACTION.

REQUEST FOR ADMISSION NO. 2:

Admit that the MATTEL-AUTHORED DOCUMENTS were not in YOUR possession before YOU produced them to MATTEL in THIS ACTION.

REQUEST FOR ADMISSION NO. 3:

Admit that the MATTEL-AUTHORED DOCUMENTS were physically located in the home of VARGAS at any time between the period of April 19, 2004 and the present.

REQUEST FOR ADMISSION NO. 4:

Admit that the MATTEL-AUTHORED DOCUMENTS were not physically located in the home of VARGAS at any time between the period of April 19, 2004 and the present.

REQUEST FOR ADMISSION NO. 5:

Admit that the MATTEL-AUTHORED DOCUMENTS were physically located in the home of TRUEBA at any time between the period of April 19, 2004 and the present.

REQUEST FOR ADMISSION NO. 6:

Admit that the MATTEL-AUTHORED DOCUMENTS were not physically located in the home of TRUEBA at any time between the period of April 19, 2004 and the present.

REQUEST FOR ADMISSION NO. 7:

Admit that the MATTEL-AUTHORED DOCUMENTS were physically located in the home of MACHADO at any time between the period of April 19, 2004 and the present.

REQUEST FOR ADMISSION NO. 8:

Admit that the MATTEL-AUTHORED DOCUMENTS were not physically located in the home of MACHADO at any time between the period of April 19, 2004 and the present.

REQUEST FOR ADMISSION NO. 9:

Admit that the MATTEL-AUTHORED DOCUMENTS were not prepared by MGA.

REQUEST FOR ADMISSION NO. 10:

Admit that the MATTEL-AUTHORED DOCUMENTS were prepared by MGA.

1

REQUEST FOR ADMISSION NO. 11:

Admit that the MATTEL-AUTHORED DOCUMENTS were not authored by MGA.

REQUEST FOR ADMISSION NO. 12:

Admit that the MATTEL-AUTHORED DOCUMENTS were authored by MGA.

REQUEST FOR ADMISSION NO. 13:

Admit that, under Rule 901 of the Federal Rules of Evidence, the MATTEL-AUTHORED DOCUMENTS produced by MGA are authentic.

REQUEST FOR ADMISSION NO. 14:

Admit that, under Rule 901 of the Federal Rules of Evidence, the MATTEL-AUTHORED DOCUMENTS produced by MGA are not authentic.

Exhibit F
Page 43