UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| MATTEL, INC., | ) | CASE NO. SACV 04-9049 DOC (RNBx) |
| Plaintiff(s), | ) ) ) | |
| v. | ) ) | **[TENTATIVE] O R D E R GRANTING IN PART AND DENYING IN PART MOTION TO OVERRULE CERTAIN DISCOVERY MASTER RULINGS AT THE DEPOSITION OF BRIAN WING** |
| MGA ENTERTAINMENT, INC., | ) ) | |
| Defendant(s). | ) ) ) ) ) ) ) ) | |
| _____ | ) | |

      Before the Court is MGA Entertainment, Inc. and Isaac Larian (collectively the "MGA Parties") Motion to Overrule Certain Discovery Master Rulings at the Deposition of Brian Wing (the "Motion"). After considering the moving, opposing, and replying papers, [as well as the parties' oral argument,] the Court hereby [GRANTS IN PART AND DENIES IN PART] the Motion.

    **I.**    **Background**

      Between February 17 and February 19, 2010, Mattel, Inc. ("Mattel") deposed former MGA Entertainment, Inc. ("MGA") executive Brian Wing ("Wing") in Santa Ana,

1  California.  Between 2004 and 2006, and later between 2008 and 2009, Wing served as a high
2  level executive holding various posts at MGA.  Prior to his time at MGA, Wing worked as an
3  accountant at the firm of Ernst & Young ("EY"), and helped secure MGA's business for EY,
4  though he did not do any of the "actual audit" work for MGA that followed.  *See* Brian Wing
5  Depo. Tr. at 22.
6      In 2004, Wing left EY for a position as Vice President of Taxation at MGA,
7  despite concerns about leaving a promising career track at EY for a company embroiled in
8  litigation and captained by a Chief Executive Officer that Wing had heard was "difficult and
9  demanding."  *Id.* at 30:10-11.  Wing claims he was exposed to beaucoup financial data during
10 his time as Vice President of Taxation, including audit reports, sales reports, budget reports,
11 profit-loss statements, and tax returns.  *See id.* at 40.  Wing also survived mass layoffs during his
12 first stint at MGA, a partial product of which was his promotion to the position of Senior Vice
13 President of Finance and Taxation.  He also witnessed MGA's entry into the Wachovia credit
14 facility and, later, the beginning stages of Omni 808 Investors, LLC ("Omni")'s purchase of
15 MGA's debt from Wachovia.  In 2006, as a result of having "taken the position as far as [he]
16 could" as well as his discomfort "with some of the decisions that were being made for the
17 company at the time."  *Id.* at 51:20-23; 51-54 (discussing discomfort with co-mingling of assets,
18 dividend payout, foreign acquisitions).  Wing worked at EY between 2006 and 2008.
19     After returning to MGA in 2008, Wing claimed to have had deep involvement in
20 MGA's daily operations during the sensitive period when Phase 1 of this litigation ended, and
21 MGA encountered the scope of the monetary damages and equitable injunction that issued from
22 the verdict.  Wing recounted that MGA responded to the trial and the eventual outcome of that
23 trial by altering its product lines, including most significantly the Bratz line.  *See id.* at 86, 94.
24 For example, Wing discussed with other MGA employees the prospect of unwinding Bratz
25 licenses as an inducement to enter into licenses for another MGA product – Moxie Girlz.  *See id.*
26 at 515-25.  Eventually, Wing purportedly noticed, and became concerned with, irregularities at
27 MGA.  He claims he was finally terminated by MGA in May 2009 as a result of a letter he
28 drafted and delivered to MGA's General Counsel, Ms. Jeanine Pisoni ("Pisoni"), which relayed

Wing's concerns about events at MGA.

Soon thereafter, the Receiver put in place by Judge Larson, Mr. Patrick Fraioli, instructed Wing to return to work at MGA. Wing did not stay long – he was escorted out MGA's offices almost immediately after his re-arrival. *See id.* at 110. Wing's concerns at the time of his termination included, but were not limited to: (1) the falsification of accounting records in the pursuit of credit; (2) the feasibility of a restructuring plan; (3) the handling of the Wachovia debt; (4) the potential winding down of certain agreements that predated the instant litigation. Mattel contends that some or all of these "concerns" may have been memorialized in Wing's letter to Pisoni. Indeed, Wing testified that the "general purpose of the letter was to document what [he] perceived to be wrongdoings at the company; to assist and – sorry – to request that the general counsel investigate those claims, and also to make a record of those claims, as we had the receive in running the company at the time." *Id.* at 316:25-317:5.[1]

Wing discussed his letter to Pisoni with the receiver.[2] *Id.* at 318-19. Separately, in

---

[1] Notably, both counsel agreed on the inapplicability of the attorney-client privilege to the specific description of the subject matter of the communication. *See id.* at 316-17. As the Court has previously acknowledged, this is a recurring issue in depositions conducted by both parties, and the Court is unclear on how specific inquiry into the subject matter of communications with counsel does not have the potential to erode the privilege with little countervailing benefit.

[2] The record on this issue reveals a deep misunderstanding between all participants about the purpose and scope of the attorney-client privilege. This is not an issue where artificial distinctions between "topics" and "content" are dispositive. *See id.* at 317:18-24. While the topic/content dichotomy has come up in the context of waiver, *see United States v. Smith*, 454 F.3d 707, 713 (7th Cir. 2006); *United States v. White*, 887 F.2d 267 (D.C. Cir. 1989), the Court fails to see how compelled responsive testimony about the topic of a attorney-client communication does not place the disclosing party in the untenable position of having to choose between: (a) accepting prejudice that may result from a jury's knowledge that a particular topic – which may appear facially innocuous – was discussed with an attorney; or (b) disclosing the content of the communication in order to rebut that prejudice and thereby waiving the privilege. Of course, allowing the privilege to attach to the topic of an attorney-client communication while still holding that disclosure of that topic does not waive the privilege would read an incongruity into the law. However, such an incongruity serves both the purpose of the

3

late May to June 2009, an independent investigator hired by MGA in connection with MGA's internal investigation reached out to Wing to schedule and conduct an interview. *See id.* at 345-350. Wing testified that he understood that the investigator was operating on MGA's behalf. *See id.* at 347:11-14. The investigator did not admonish Wing that the contents of their conversation were "privileged and not to be disclosed." *See id.* at 347:20-22; *see also id.* at 348:16-19 ("My understanding was that he had been hired by MGA to investigate some of my claims in the letter that I wrote at the beginning of May to the general counsel of MGA.").

## II. Discussion

The MGA Parties' appeal focuses on the Discovery Master rulings issued with respect to two issues:[3]

1. The content of the letter sent by Wing to Pisoni, and the content of the later conversations between Wing and MGA's third-party investigator.

2. Conversations between Wing and other MGA employees about inducing existing Bratz licensees to enter into Moxie Girlz licenses. On this second topic, the MGA Parties request to lay a foundation during cross-examination as to the fact that the content of those conversations was informed, in whole or in part, by legal advice

---

waiver doctrine, *see White*, 887 F.2d at 271 ("An averment that lawyers have looked into a matter does not imply an ***intent to reveal the substance of the lawyers' advice***") (emphasis added), and the purpose of the privilege, *see Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S.Ct. 677 (1981) ("full and frank communication between attorneys and their clients"). In this case, the Court considers inquiry into the topic necessary to test the assertion of privilege with respect to the broader conversation with the receiver.

[3] Though the MGA Parties objected on several other occasions during Wing's deposition, *see* Mattel's Opp'n at 6, none of the Discovery Master rulings issued with respect to these objections have been appealed. In any event, many of the objections are unsustainable. For example, MGA's objection to the disclosure of facts received from an attorney contrasts clear precedent. *See Hickman v. Taylor*, 329 U.S. 495, 507, 67 S.Ct. 385 (1947) ("either party may compel the other to disgorge whatever facts he has in his possession"); *see also Prot. Nat'l Ins. Co. v. Comm'w Ins. Co.*, 137 F.R.D. 267, 280 (D. Neb. 1989) ("There is simply nothing wrong with asking for facts from a deponent even though those facts may have been communicated to the deponent by the deponent's counsel.").

disseminated by MGA's attorneys.

### A. Letter and Internal Investigation

The attorney-client privilege applies: "(1) where a legal advice of any kind is sought; (2) from a professional legal adviser in his capacity as such; (3) the communications relating to that purpose; (4) made in confidence; (5) by the client; (6) are at this instance permanently protected; (7) from disclosure by himself or by the legal adviser; (8) unless the protection be waived." *Admiral Ins. Co. v. U.S. Dist. Court for Dist. of Arizona*, 881 F.2d 1486, 1492 (9th Cir. 1989) (citing *In re Fischel*, 557 F.2d 209, 211 (9th Cir. 1977)). "The fact that a person is a lawyer does not make all communications with that person privileged." *United States v. Martin*, 278 F.3d 988, 999 (9th Cir. 2002). "Because it impedes full and free discovery of the truth, the attorney-client privilege is strictly construed." *Id.* (quoting *Weil v. Inv./Indicators, Rsrch. & Mgmt., Inc.*, 647 F.2d 18, 24 (9th Cir. 1981)). The party invoking the privilege bears the burden of establishing its applicability. *See Tennenbaum v. Deloitte & Touche*, 77 F.3d 337, 341 (9th Cir. 1996).

In *Upjohn v. United States*, 449 U.S. 383, 101 S.Ct. 677 (1981), the Supreme Court held that the privilege attaches to communications between a corporation's counsel and employees of the corporation, on the grounds that effective information gathering from employees, even those that fall outside the corporation's "control group," often precedes the provision of effective legal advice. *Id.* at 392 (noting that limitation of privilege to corporation's control group "discourag[es] the communication of relevant information by employees of the client to attorneys seeking to render legal advice to the client corporation"). The Supreme Court expressed the separate concern that "the control group test makes it more difficult to convey full and frank legal advice to the employees who will put into effect the client corporation's policy." *Id.* (citing *Duplan Corp. v. Deering Miliken, Inc.*, 397 F. Supp. 1146, 1164 (D.S.C. 1974)).

Any privilege that attaches to communications between a corporation's attorneys and its employees belongs to the corporation. *United States v. Int'l Bhd of Teamsters*, 119 F.2d 210, 215 (2d Cir. 1997) (holding that corporation's waiver trumps employee's invocation of privilege). Only the corporation can waive the protections of the attorney-client privilege, even

as to conversations between employees and the corporation's attorneys. *See United States v. Chen*, 99 F.3d 1495, 1502 (9th Cir. 1996) (citing *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 348, 105 S.Ct. 1986 (1985) ("[T]he power to waive the corporate attorney-client privilege rests with the corporation's management and is normally exercised by its officers and directors."). As a result, employees, even when they later become ex-employees, lack the power to waive the privilege absent the corporation's consent. *See Chen*, 99 F.3d at 1502 ("It follows *a fortiori* that since a corporate employee cannot waive the corporation's privilege, that same individual as an ex-employee cannot do so. An employee must generally keep an employer's confidences.") (citing Restatement (Second) of Agency § 395 (1958)).

### 1. Letter to Pisoni

The Ninth Circuit requires adherence to the eight part test identified in *Admiral Ins. Co.* and the objecting party's failure to specifically establish each element requires a denial of the privilege. *See United States v. Ruehle*, 583 F.3d 600, 606-07 (9th Cir. 2009). Here, the MGA Parties have failed to demonstrate – as is their burden – that Wing's letter to Pisoni was sent for the purpose of obtaining legal advice either for himself or for MGA. Indeed, at his deposition, Wing testified that he did not issue the letter for the "purpose of obtaining legal advice for MGA in any way." *See* Wing Depo. Tr. at 311:5-12.

MGA's only response is that "[w]hatever you might call Mr. Wing, the letter seeking an investigation by in-house counsel is protected by attorney-client privilege." *See* Reply at 2:18-19. As an initial matter, the MGA Parties have not submitted the letter for the Court's *in camera* review, and the Court declines to credit the representation that the letter sought "an investigation by in-house counsel." *Id.* Not only is it unclear, based on the testimony alone, whether the letter even requested an investigation – instead of merely airing grievances – but the Court cannot ignore the potential that an investigation by in-house counsel was not the type requested. Wing himself testified that at the time he delivered his letter, the executive ranks at MGA were dwindling and he had few allies in management. He may have simply sent the letter to Pisoni as a result of personal comfort, and not, as the MGA Parties suggest, because he intended to trigger an investigation or obtain legal advice for MGA.

Indeed, the only way that MGA's invocation of privilege as to the letter can survive Wing's incontrovertible testimony to the contrary is if this Court were to adopt a *per se* rule that all communications made to in-house counsel are issued for the purpose of securing legal advice for the company. *See* Reply at 2:26-28 (citing *In re Allen*, 106 F.3d 582 (4th Cir. 1997). But *In re Allen* is neither binding upon this Court nor applicable. Specifically, *In re Allen* presented an inverse scenario: the party challenging privilege hinged its argument on the claim that the recipient of the communication at issue *was not acting as an attorney*. *Id.* at 600. But that is not license for a party invoking privilege to disclaim the need to prove any of the *Admiral Ins. Co.* factors on the sole basis that an in-house counsel received the communication.

*United States ex. rel. Parikh v. Premera Blue Cross*, No. C01-476P, 2006 WL 3733783 (W.D. Wa. Dec. 15, 2006), a case relied upon by the MGA Parties, *see* Reply at 2, illustrates that the eight-factor test is not subsumed by the fact a communication was sent to in-house counsel. The MGA Parties properly invoke that case for the proposition that the privilege attaches to communications between corporate counsel and its employees during an internal investigation made for the purpose of securing legal advice. *See* Reply at 2. However, *Parikh* nonetheless held that the privilege did not apply to certain employees' communications, because no evidence supported the corporation's claim that those employees believed their communications to be in furtherance of a legal investigation. *See* 2006 WL 3733783, at *7. This case is, of course, distinguishable on two grounds. First, unlike Istafanous in *Parikh*, there was no ambiguity as far as Pisoni's role at the company, and Wing was fully aware that she served as MGA's general counsel. Second, while the purpose of the investigation was opaque in *Parikh*, here Wing **himself initiated** the contact with Pisoni.

Though these distinctions must be acknowledged, they are unavailing to MGA. As an initial matter, Wing sent the letter to Pisoni at a time when MGA faced crisis, and little evidence suggests that the letter was not intended to curb perceived corporate inefficiencies and/or misbehavior, as opposed to securing legal advice. Second, it makes little sense to impute a purpose to Wing when he, as the author of the communication at issue, has stated under oath that he did not act with purpose to seek legal advice for himself or MGA.

7

The remaining arguments as to "hostility" towards MGA at the time of the letter's delivery are therefore irrelevant. At the same time, the Court does not seek to foreclose the MGA parties from creating a comprehensive record in an attempt to satisfy their burden and, on that basis, [ORDERS] MGA to produce the letter at issue for *in camera* review on or before 10:00 p.m. on March 5, 2010.

### 2.     Communications with Investigator

*Contra* Justice Berger's suggestion that the Supreme Court define with clarity the scope of the attorney-client privilege, *Upjohn* declined to rule on whether the scope of the privilege extends to former employees. *See* 449 U.S. at 394 n.3. The Ninth Circuit has since held that *Upjohn* extends to communications with former employees. *Admiral Ins. Co.*, 881 F.2d at 1493 (reinforcing prior "finding that the *Upjohn* rationale necessarily extended the privilege to former corporate employees") (citing *In re Coordinated Pretrial Proceedings*, 658 F.2d 1355, 1361 n.7 (9th Cir. 1981), *cert. denied*, 455 U.S. 990, 102 S.Ct. 1615)  *See In re Allen*, 106 F.3d at 606 (noting that extension to former employees vindicates *Upjohn*'s concern for corporate attorney's ability to solicit information from all knowledgeable sources); *see also id.* n.14 (distinguishing contrary cases on the basis that, *inter alia*, "[t]hose courts . . . concluded that the former employee had ceased being employed by the client *before* the relevant conduct occurred") (emphasis in original).[4]

But *Upjohn* does not uniformly extend to adverse former employees. Though the MGA Parties cite *In re Allen* for this proposition, *see* 106 F.3d at 603 n.11 (finding that communications with adverse employees are also "made in order to formulate and render legal

---

[4]     Mattel's claimed exception – "the present-day communication concerns a confidential matter that was uniquely within the knowledge of the former employee when he worked for the client corporation" – is not the law in this Circuit. Indeed, Mattel cites a district court case, *see* Opp'n at 9-10 (citing *Infosystems, Inc. v. Ceridian Corp.*, 197 F.R.D. 303, 305-06 (E.D. Mich. 2000), in a circuit that, unlike the Ninth Circuit, has not ruled on whether the privilege extends to former employees. Moreover, Mattel strains witout success to argue that Wing did not have unique knowledge about an investigation that **he himself triggered**.

1  advice"), there is simply no evidence that these communications were made in confidence.
2  Wing was escorted out of his office by MGA after returning in express disregard of the earlier
3  "paid leave" that he was subject to. In *In re Allen* and *In re Coordinated Pretrial Proceedings In*
4  *Petroleum Prod. Antitrust Litig.*, the privilege designation was not being openly resisted by a
5  former employee not only adverse to the corporation, but potentially subject to retaliation as a
6  result of his communications with counsel. Profound injustice that may result if a whistleblower
7  terminated by his employer were precluded from substantiating a claim for retaliation by proving
8  that the impetus for his termination was the content of his conversations with the corporation's
9  agents. Indeed, the lack of authority addressing "the bevy of *qui tam* cases involving
10 whistleblowers, employee complaint cases and the like," *see* Reply at 4:8-10, suggests that such
11 cases survive precisely because plaintiffs and relators are permitted to introduce evidence about
12 communications with individuals within the corporate hierarchy.
13         The fact remains that Wing was not only hostile to MGA, but openly so. He had
14 hired an attorney, cooperated with the receiver, entered premises without authorization, and
15 accused his employer's Chief Executive Officer of misconduct. The Court therefore considers
16 the circumstances here materially indistinguishable from *United States v. King*, 536 F. Supp. 253
17 (C.D. Cal. 1982), which both parties cite, in which the court held the privilege inapplicable
18 where the former employee "was cooperating with the government" and "had obtained her own
19 attorney" at the time that the purported privileged communication occurred. *Id.* at 259-60.

### 3. Follow-up Communications

21         The MGA Parties also invoke the work product doctrine with respect to
22 communications that followed Wing's initial letter to Pisoni. The work product doctrine protects
23 "written statements, private memoranda and personal recollections prepared or formed by an
24 adverse party's counsel in the course of his legal duties." *See Upjohn*, 497 U.S. at 397-98. It is
25 unclear from the briefing whether the letter itself is argued to be work product, even though
26 Wing is not an attorney. To the extent that the MGA Parties so contend, their Motion is
27 [DENIED].
28         Second, the MGA Parties' Motion and Reply papers are inconsistent with respect

1  to the application of the work product doctrine. Specifically, while the MGA Parties argue that
2  the work product doctrine applies to "Wing's communications" in the Motion, *see* Motion at
3  11:5, it later argues that "the work product doctrine applies to documents created by
4  investigators working for attorneys," *see* Reply at 5:21-22. The latter argument is potentially
5  meritorious, but (assuming it is the argument the MGA Parties intend to pursue), it remains
6  unclear what documents the MGA Parties are referring to. Mattel has filed no motion to compel
7  before this Court with respect to any documents created by the third party investigator.

8       **B.**     **License Agreements**

9          The MGA Parties request cross-examination to create a foundation with respect to
10 certain issues concerning the unwinding of licensing agreements. The Court [GRANTS] the
11 MGA Parties' request and [ORDERS] that Wing's resumed deposition on March 6, 2010 shall
12 commence with questioning by the MGA Parties that shall be limited to three hours.

13     **III.**     **Disposition**

14         For the foregoing reasons, the Court [GRANTS IN PART AND DENIES IN
15 PART] the Motion. The Court further [VACATES] the Order Granting in Part and Denying in Part
16 Ex Parte Application to Clarify or Suspend 72 Hour Deadline to Appeal Special Discovery Master
17 Privilege Rulings in Deposition of Brian Wing, with the exception of the following portions of the Wing
18 Deposition Transcript: 515:12-23; 516:22-517:12; 520:15-521:14; 524:14-525:7; 528:14-529:2.

22 IT IS SO ORDERED.
23 DATED: March 4, 2010

                                                                         _____
                                                                          DAVID O. CARTER
                                                                        United States District Judge