1

2

3

4

5

6

7

8              UNITED  STATES  DISTRICT  COURT

9          FOR  THE  CENTRAL  DISTRICT  OF  CALIFORNIA

10

11   MATTEL, INC.,                      )         CASE NO. CV 04-9049 DOC (RNBx)
                                        )
12              Plaintiff(s),           )
                                        )         **O R D E R GRANTING IN PART**
13        v.                            )         **AND DENYING IN PART MOTION**
                                        )         **TO OVERRULE CERTAIN**
14   MGA ENTERTAINMENT, INC.,           )         **DISCOVERY MASTER RULINGS**
                                        )         **AT THE DEPOSITION OF BRIAN**
15              Defendant(s).           )         **WING**
                                        )
16                                      )
                                        )
17                                      )
                                        )
18                                      )
                                        )
19   _____   )

20

21          Before the Court is MGA Entertainment, Inc. and Isaac Larian (collectively the

22   "MGA Parties") Motion to Overrule Certain Discovery Master Rulings at the Deposition of

23   Brian Wing (the "Motion").  After considering the moving, opposing, and replying papers, as

24   well as the parties' oral argument, the Court hereby GRANTS IN PART AND DENIES IN

25   PART the Motion.

26        **I.        Background**

27          Between February 17 and February 19, 2010, Mattel, Inc. ("Mattel") deposed

28   former MGA Entertainment, Inc. ("MGA") executive  Brian Wing ("Wing") in Santa Ana,

1   California.  Wing held various high level executive positions at MGA between 2004 and 2006,

2   and later between 2008 and 2009.  Prior to his time at MGA, Wing worked as an accountant at

3   the firm of Ernst & Young ("EY"), and helped secure MGA's business for EY, though he did

4   not do any of the "actual audit" work for MGA that followed.  *See* Brian Wing Depo. Tr. at 22.

5           In 2004, Wing left EY for a position as Vice President of Taxation at MGA,

6   despite concerns about leaving a promising career track at EY for a company embroiled in

7   litigation and captained by a Chief Executive Officer that Wing had heard was "difficult and

8   demanding." *Id.* at 30:10-11.  Wing claims he was exposed to beaucoup financial data during

9   his time as Vice President of Taxation, including audit reports, sales reports, budget reports,

10  profit-loss statements, and tax returns.  *See id.* at 40.  Wing also survived mass layoffs during his

11  first stint at MGA, a partial product of which was his promotion to the position of Senior Vice

12  President of Finance and Taxation.  He also witnessed MGA's entry into the Wachovia credit

13  facility and, later, the beginning stages of Omni 808 Investors, LLC ("Omni")'s purchase of

14  MGA's debt from Wachovia.  Wing first left MGA in 2006, as a result of having "taken the

15  position as far as [he] could" as well as his discomfort "with some of the decisions that were

16  being made for the company at the time." *Id.* at 51:20-23; 51-54 (discussing discomfort with co-

17  mingling of assets, dividend payout, foreign acquisitions).  Wing worked at EY between 2006

18  and 2008.

19          After returning to MGA in 2008, Wing claimed to have had deep involvement in

20  MGA's daily operations when Phase 1 of this litigation ended, and MGA grappled with the

21  scope of the monetary damages and equitable relief that issued from the verdict.  Wing testified

22  that MGA responded to the trial and the eventual outcome of that trial by altering its product

23  lines, including most significantly the Bratz line.  *See id.* at 86, 94.  For example, Wing

24  discussed with other MGA employees the prospect of unwinding Bratz licenses as an

25  inducement to enter into licenses for another MGA product – Moxie Girlz.  *See id.* at 515-25.

26  Eventually, Wing purportedly noticed, and became concerned with, irregularities at MGA.  He

27  claims he was finally terminated by MGA in May 2009 as a result of a letter he drafted and

28  delivered to MGA's General Counsel, Ms. Jeanine Pisoni ("Pisoni").

1        Soon thereafter, the Court-appointed Receiver, Mr. Patrick Fraioli, instructed

2   Wing to return to work at MGA.  Wing did not stay long – he was escorted out MGA's offices

3   almost immediately after his re-arrival.  *See id.* at 110.  Wing's concerns at the time of his

4   termination included, but were not limited to: (1) the falsification of accounting records in the

5   pursuit of credit; (2) the feasibility of a restructuring plan; (3) the handling of the Wachovia

6   debt; (4) the potential winding down of certain agreements that predated the instant litigation.

7   Mattel contends that some or all of these "concerns" may have been memorialized in Wing's

8   letter to Pisoni.  Wing testified that the "general purpose of the letter was to document what [he]

9   perceived to be wrongdoings at the company; to assist and – sorry – to request that the general

10  counsel investigate those claims, and also to make a record of those claims, as we had the

11  receive in running the company at the time."  *Id.* at 316:25-317:5.

12       In late May to June 2009, an independent investigator hired by MGA in connection

13  with MGA's internal investigation reached out to Wing to schedule and conduct an interview.

14  *See id.* at 345-350.  Wing testified that he understood that the investigator was operating on

15  MGA's behalf.  *See id.* at 347:11-14.  The investigator did not admonish Wing that the contents

16  of their conversation were "privileged and not to be disclosed."  *See id.* at 347:20-22; *see also id.*

17  at 348:16-19 ("My understanding was that he had been hired by MGA to investigate some of my

18  claims in the letter that I wrote at the beginning of May to the general counsel of MGA.").

19  **II.    Discussion**

20       The MGA Parties' appeal focuses on the Discovery Master's rulings issued with

21  respect to two issues:[1]

22  1.    The content of the letter sent by Wing to Pisoni, and the content of later

23        conversations between Wing and MGA's third-party investigator.

24  2.    Conversations between Wing and other MGA employees about inducing existing

25        Bratz licensees to enter into Moxie Girlz licenses.  The MGA Parties seek to cross-

26

27        [1]    Though the MGA Parties objected on several other occasions during
    Wing's deposition, *see* Mattel's Opp'n at 6, none of the Discovery Master rulings issued
28  with respect to these objections have been appealed.

3

1  examine Wing and establish that the content of such conversations was informed

2  by attorneys' legal advice.

3  ### A.   Letter and Internal Investigation

4  The attorney-client privilege applies: "(1) where legal advice of any kind is sought;

5  (2) from a professional legal adviser in his capacity as such; (3) the communications relating to

6  that purpose; (4) made in confidence; (5) by the client; (6) are at this instance permanently

7  protected; (7) from disclosure by himself or by the legal adviser; (8) unless the protection be

8  waived." *Admiral Ins. Co. v. U.S. Dist. Court for Dist. of Arizona*, 881 F.2d 1486, 1492 (9th Cir.

9  1989) (citing *In re Fischel*, 557 F.2d 209, 211 (9th Cir. 1977)).  "The fact that a person is a

10  lawyer does not make all communications with that person privileged." *United States v. Martin*,

11  278 F.3d 988, 999 (9th Cir. 2002).

12  "Because it impedes full and free discovery of the truth, the attorney-client

13  privilege is strictly construed." *Id.* (quoting *Weil v. Inv./Indicators, Rsrch. & Mgmt., Inc.*, 647

14  F.2d 18, 24 (9th Cir. 1981)).  The party invoking the privilege bears the burden of establishing

15  its applicability. *See Tennenbaum v. Deloitte & Touche*, 77 F.3d 337, 341 (9th Cir. 1996).

16  In *Upjohn v. United States*, 449 U.S. 383, 101 S.Ct. 677 (1981), the Supreme

17  Court held that the privilege attaches to communications between a corporation's counsel and

18  employees of the corporation, as comprehensive information gathering precedes the provision of

19  effective legal advice. *Id.* at 392 (noting interest in encouraging "the communication of relevant

20  information by employees of the client to attorneys seeking to render legal advice to the client

21  corporation").

22  Any privilege that attaches to communications between a corporation's attorneys

23  and its employees belongs to the corporation. *United States v. Int'l Bhd of Teamsters*, 119 F.2d

24  210, 215 (2d Cir. 1997) (holding that corporation's waiver trumps employee's invocation of

25  privilege).  Only the corporation can waive the protections of the attorney-client privilege, even

26  as to conversations between employees and the corporation's attorneys. *See United States v.*

27  *Chen*, 99 F.3d 1495, 1502 (9th Cir. 1996) (citing *Commodity Futures Trading Comm'n v.*

28  *Weintraub*, 471 U.S. 343, 348, 105 S.Ct. 1986 (1985) ("[T]he power to waive the corporate

1  attorney-client privilege rests with the corporation's management and is normally exercised by

2  its officers and directors."). As a result, employees, even when they become ex-employees, lack

3  the power to waive the privilege absent the corporation's consent. *See Chen*, 99 F.3d at 1502

4  ("It follows *a fortiori* that since a corporate employee cannot waive the corporation's privilege,

5  that same individual as an ex-employee cannot do so. An employee must generally keep an

6  employer's confidences.") (citing Restatement (Second) of Agency § 395 (1958)).

7  **1.     Letter to Pisoni**

8  The Ninth Circuit requires adherence to the eight part test identified in *Admiral*

9  *Ins. Co.* and the objecting party must establish each element with specificity. *See United States*

10  *v. Ruehle*, 583 F.3d 600, 606-07 (9th Cir. 2009).

11  Wing testified that he did not issue the letter for the "purpose of obtaining legal

12  advice for MGA in any way." *See* Wing Depo. Tr. at 311:5-12. MGA's only response is that

13  "[w]hatever you might call Mr. Wing, the letter seeking an investigation by in-house counsel is

14  protected by attorney-client privilege." *See* Reply at 2 (citing *In re Allen*, 106 F.3d 582 (4th Cir.

15  1997)). *In re Allen* presented an inverse scenario: the party challenging privilege hinged its

16  argument on the claim that the recipient of the communication at issue *was not acting as an*

17  *attorney*. *Id.* at 600. But that is not license for a party invoking the privilege to disclaim the

18  need to prove any of the *Admiral Ins. Co.* factors on the sole basis that an in-house counsel

19  received the communication. *See United States ex. rel. Parikh v. Premera Blue Cross*, No. C01-

20  476P, 2006 WL 3733783, at *7 (W.D. Wa. Dec. 15, 2006), (holding that privilege did not attach

21  to employees' communications to in-house counsel).

22  At the March 4, 2010 hearing on this matter, the MGA Parties lodged Wing's letter

23  to Pisoni for the Court's *in camera* review. The Court finds that the text of the letter is

24  ambiguous at best: it remains unclear whether the letter was issued with a predominant purpose

25  to secure legal advice *for MGA*, as opposed to airing personal grievances against the corporation.

26  The letter does not therefore rebut Wing's clear testimony, delivered under oath, that the letter

27  was not delivered for the purpose of securing legal advice for MGA.

28

1

### 2.      Communications with Investigator

2        The *Upjohn* rationale extends to communications with former employees.  *Admiral*

3   *Ins. Co.*, 881 F.2d at 1493 (reinforcing prior "finding that the *Upjohn* rationale necessarily

4   extended the privilege to former corporate employees") (citing *In re Coordinated Pretrial*

5   *Proceedings*, 658 F.2d 1355, 1361 n.7 (9th Cir. 1981), *cert. denied*, 455 U.S. 990, 102 S.Ct.

6   1615); s*ee In re Allen*, 106 F.3d at 606 (noting that extension to former employees vindicates

7   *Upjohn*'s concern for corporate attorney's ability to solicit information from all knowledgeable

8   sources); *see also id.* n.14 (distinguishing contrary cases on the basis that, *inter alia*, "[t]hose

9   courts . . . concluded that the former employee had ceased being employed by the client *before*

10   the relevant conduct occurred") (emphasis in original).

11        The parties dispute whether *Upjohn* likewise extends to adverse former employees,

12   like Wing..  Though the MGA Parties rely upon *In re Allen*, *see* 106 F.3d at 603 n.11 (finding

13   that communications with adverse employees are also "made in order to formulate and render

14   legal advice"), and *In re Coordinated Pretrial Proceedings In Petroleum Prod. Antitrust Litig.*,

15   there is no evidence that Wing intended for his conversations with the investigator to secure

16   legal advice for MGA.

17        Indeed, the facts suggest otherwise:  Wing was escorted out of his office by MGA

18   after returning in express disregard of the earlier "paid leave" that he was subject to.  The Court

19   therefore considers the circumstances here materially indistinguishable from *United States v.*

20   *King*, 536 F. Supp. 253 (C.D. Cal. 1982), which both parties cite, in which the court held the

21   privilege inapplicable where the former employee "was cooperating with the government" and

22   "had obtained her own attorney" at the time that the purported privileged communication

23   occurred.  *Id.* at 259-60.

24        Profound injustice may result if a whistleblower terminated by his employer were

25   precluded from substantiating a claim for retaliation by proving that the impetus for his

26   termination was the content of his conversations with the corporation's agents.  Indeed, the lack

27   of authority addressing "the bevy of *qui tam* cases involving whistleblowers, employee

28   complaint cases and the like," *see* Reply at 4:8-10, suggests that such cases survive precisely

1  because plaintiffs and relators are permitted to introduce evidence about communications with

2  individuals within the corporate hierarchy.[2]

3      The fact remains that Wing was not only hostile to MGA, but openly so.  He had

4  hired an attorney, cooperated with the receiver, entered premises without authorization, and

5  accused his employer's Chief Executive Officer of misconduct.  The MGA Parties have

6  therefore failed to satisfy their burden to prove the existence of the privilege with respect to

7  Wing's communications with MGA's investigator.

8              **3.      Follow-up Communications**

9      The MGA Parties also invoke the work product doctrine as to communications that

10  followed Wing's initial letter to Pisoni.  The work product doctrine protects "written statements,

11  private memoranda and personal recollections prepared or formed by an adverse party's counsel

12  in the course of his legal duties." *See Upjohn*, 497 U.S. at 397-98.  Wing is not an attorney.  To

13  the extent that the MGA Parties so contend, their Motion is DENIED.

14      Second, the MGA Parties' Motion and Reply papers are inconsistent with respect

15  to the application of the work product doctrine.  Specifically, while the MGA Parties argue that

16  the work product doctrine applies to "Wing's communications" in the Motion, *see* Motion at

17  11:5, they later argue that "the work product doctrine applies to documents created by

18  investigators working for attorneys," *see* Reply at 5:21-22.  Mattel has filed no motion to compel

19  before this Court with respect to documents authored by the third party investigator.

20              **B.      License Agreements**

21      The MGA Parties request cross-examination to create a foundation with respect to

22  certain issues concerning the unwinding of licensing agreements.  The Court GRANTS the

23  MGA Parties' request and ORDERS that Wing's resumed deposition on March 6, 2010 shall

24  commence with questioning by the MGA Parties that shall be limited to four hours for

25  foundation **and** any other matters.

26  _____

27      [2]      The Court notes but does not consider, for obvious reasons, the
distinguishable decision in *Long v. Howmedica Osteonics Corp.*, No. 07-3005, 2007 WL

28  4532215, at *3 (E.D. La. Dec. 19, 2007).

**III.     Disposition**

For the foregoing reasons, the Court GRANTS the MGA Parties' request to cross-examine Wing at his resumed deposition and DENIES the MGA Parties' request that the Court overrule the Discovery Master's privilege rulings as to Wing's communications with MGA's third party investigator and Wing's letter to Pisoni.  The Court further VACATES the Order Granting in Part and Denying in Part Ex Parte Application to Clarify or Suspend 72 Hour Deadline to Appeal Special Discovery Master Privilege Rulings in Deposition of Brian Wing, with the exception of the following portions of the Wing Deposition Transcript: 515:12-23; 516:22-517:12; 520:15-521:14; 524:14-525:7; 528:14-529:2.

IT IS SO ORDERED.

DATED: March 5, 2010

_David O. Carter_

_____

DAVID O. CARTER
United States District Judge