Case 2:04-cv-09049-DOC-RNB   Document 7659   Filed 03/17/10   Page 1 of 105   Page ID #:259183
SACV 04-9049-DOC - 03/09/2010 - Vol. II

1

1              **UNITED STATES DISTRICT COURT**

2              **CENTRAL DISTRICT OF CALIFORNIA**

3          **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4                   - - - - - - -

5

6    CARTER BRYANT,                    )
                                       )
7              Plaintiff,              )
                                       )
8         vs.                          ) No. SACV 04-9049-DOC
                                       )      Volume II
9    MATTEL, INC.,                     )
                                       )
10             Defendant.              )
     _____)

11

12

13

14           REPORTER'S TRANSCRIPT OF PROCEEDINGS

15               Status Conference/Motions

16                 Santa Ana, California

17               Tuesday, March 9, 2010

18

19

20

21   Jane C.S. Rule, CSR 9316
22   Federal Official Court Reporter
     United States District Court
23   411 West 4th Street, Room 1-053
     Santa Ana, California 92701
24   (714) 558-7755

25   10-03-09 MattelV2

1   **APPEARANCES OF COUNSEL:**

2

3   FOR INTERVENOR DEFENDANT MGA ENTERTAINMENT, INC.:

4           ORRICK, HERRINGTON & SUTCLIFFE, LLP
            BY:  THOMAS S. MC CONVILLE
5                Attorney at Law
            4 Park Plaza
6           Suite 1600
            Irvine, California 92614
7           (949) 567-6700

8           - AND -

9           ORRICK, HERRINGTON & SUTCLIFFE, LLP
            BY:  ANNETTE L. HURST
10               Attorney at Law
            405 Howard Street
11          San Francisco, California 94105
            (415) 773-5700

12

13  FOR DEFENDANT MATTEL, INC.:

14          QUINN, EMANUEL, URQUHART, OLIVER & HEDGES
            By:  JOHN B. QUINN
15               MICHAEL T. ZELLER
                 JOHN GORDON
16               Attorneys at Law
            865 South Figueroa Street
17          10th Floor
            Los Angeles, California 90017-2543
18          (213) 443-3000

19

20  FOR MOVANT OMNI 808 INVESTORS LLC:

21          BINGHAM MC CUTCHEN, LLP
            By:  PETER N. VILLAR
22               Attorney at Law
            600 Anton Boulevard
23          18th Floor
            Costa Mesa, California 92626

24

25

SACV 04-9049-DOC - 03/09/2010 - Vol. II

3

```
1    APPEARANCES OF COUNSEL (Continued):

2

3    FOR OBJECTOR MARIA MALDONADO BASHAW:

4             LAW OFFICES OF MARIA MALDONADO BASHAW
              By:  MICHAEL T. ZELLER
5                  Attorney at Law
              1920 Main Street
6             Suite 1090
              Irvine, California 92614
7             (949) 873-3048

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

SACV 04-9049-DOC - 03/09/2010 - Vol. II

4

**I N D E X**

**STATUS CONFERENCE / MOTIONS HEARING**

**SEALED PROCEEDINGS**

(Pages 89 - 94)

**EXAMINATION**

| Witness Name | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| MOORE, MICHAEL | | | | |
| By Mr. Quinn | 47 | | | |
| By Ms. Hurst | | 60 | | |

JANE C.S. RULE, CSR NO. 9316 - U.S. COURT REPORTER

1             SANTA ANA, CALIFORNIA, TUESDAY, MARCH 9, 2010

2                            VOLUME II

3                           (7:39 p.m.)

4             THE COURT:  All right.  We are on the record in

5    Mattel and MGA's matter, and Mr. Quinn is here.

6             Well, Counsel, why don't you make your own

7    appearances, please.

8             MR. QUINN:  Good evening, your Honor.  John Quinn

9    for Mattel.

10            MR. ZELLER:  Mike Zeller for Mattel.

11            THE COURT:  Thank you.

12            MS. HURST:  Your Honor, Annette Hurst for the MGA

13   parties.

14            MR. MC CONVILLE:  Tom McConville.

15            THE COURT:  We've had a series of informal

16   meetings, the Court chooses now to start putting some of the

17   proceedings on the record.

18            The duplicate Bates numbers or duplicates that are

19   Bates numbered concerning the 1433 documents, where are we

20   at on that?

21            MS. HURST:  Your Honor, our best estimate at this

22   time is that there are no more than 1123 unique documents

23   referencing Mr. Bousquette.

24            THE COURT:  Do we have a stipulation as to that or

25   a disagreement?

JANE C.S. RULE, CSR NO. 9316 - U.S. COURT REPORTER

SACV 04-9049-DOC - 03/09/2010 - Vol. II

6

```
 1              MS. HURST:  We haven't been able to confer with
 2   counsel about that, your Honor.
 3              THE COURT:  Go over and talk.  We'll do this
 4   sequentially, I can come back at 8:00, but lead counsel will
 5   be going through these documents in a moment, not
 6   associates, so sit down.
 7              (Attorney discussion held off the record.)
 8              THE COURT:  I'll do one thing each time, so four
 9   of you will be busy for a moment looking at 1433 documents.
10   And we'll be back at eight, nine, 12, it doesn't matter.
11   That will be completed before we move on to the next portion
12   of this hearing.
13              (Attorney discussion held off the record.)
14              MR. ZELLER:  Yes, that's agreed, your Honor.
15              THE COURT:  It's agreed?
16              MR. ZELLER:  Yes.
17              THE COURT:  I want to hear the stipulation on the
18   record between the two of you, so there is no disagreement
19   in the future.
20              MS. HURST:  Status of Mattel's production prior to
21   March 8th, 2010, is that there were approximately 1123
22   nonduplicate documents that referenced the key word search
23   term "Bousquette."
24              THE COURT:  Okay.  Is that stipulated to by
25   Mattel?
```

SACV 04-9049-DOC - 03/09/2010 - Vol. II

7

```
 1              MR. ZELLER:  Yes, your Honor.

 2              THE COURT:  All right.  Thank you.

 3              Well, that saved you literally hours.

 4              Now, informally on Saturday, the Court had had a

 5   discussion with Mr. McConville and Mr. Quinn, and I

 6   expressed some sympathy about motions that were being

 7   prepared by Mattel for a request to continue the filing date

 8   for your fourth amended.

 9              Oftentimes when -- and usual when cases are filed

10   and claims are made, you don't have the benefit of a

11   30(b)(6) at the time of your filing.  And I think both in

12   terms of the Court's 25 depositions and even this last

13   informal request by Mr. Quinn in Mr. McConville's presence,

14   letting me know that the request for more time was being

15   prepared by associate counsel for the Court's consideration,

16   that much of my amenability to that will depend upon how

17   compliant Mattel is with these discovery requests.  You are

18   the plaintiff, you are asking for money.  The initial burden

19   falls on you, regardless of whatever you perceive MGA's

20   conduct is.

21              I think I stated Saturday to encapsulize this,

22   that as far as this Court's concerned, if and when the Ninth

23   Circuit hands down a resolution, you will be moving at

24   breathtaking speed towards litigation, and I want that on

25   the record so there is no misunderstanding of how stringent
```

SACV 04-9049-DOC - 03/09/2010 - Vol. II

8

```
 1   the filings will be and how quickly you'll be in litigation.
 2   So I'm not going to grant any continuance at the present
 3   time.
 4           And Mr. Quinn, I don't want you to assume there
 5   will be a continuance granted unless I'm satisfied this
 6   evening.  After all, I don't know why you received that
 7   benefit in terms of a 30(b)(6) except MGA holds the key in
 8   their own hands, literally.  This Court is very dissatisfied
 9   with the 30(b)(6) witnesses coming out of Mexico, these
10   empty vessels and the continuing of the inability to explain
11   how the documents got over to the MGA offices.
12           So at the present time, I suggest that you
13   continue to prepare that motion.  If the Ninth Circuit
14   reverses Judge Larson, then I think I stated Saturday in our
15   informal meeting that there is only going to be one trial,
16   and I'll discuss that with counsel.  If the circuit upholds
17   Judge Larson -- if the Circuit Court upholds Judge Larson,
18   then if the RICO is going forward, it will be going forward
19   very quickly.
20           The Bousquette transcript that I inquired about
21   was a deposition that took place apparently in 2008, and the
22   Court is becoming more and more familiar with the case.  I
23   hope I'm starting to catch up with the parties who are on
24   this case, as this is a transfer case to the Court, so I
25   hope to be as knowledgeable as counsel.
```

SACV 04-9049-DOC - 03/09/2010 - Vol. II

9

1          Apparently Mr. Bousquette is the former Mattel

2     president of at least the Mattel brands and apparently was

3     either fired or terminated from Mattel, but the

4     representation has been made that in excess of 700 times,

5     Mr. Bousquette used the phrase "I can't recall" or "I don't

6     know."

7          Mattel -- I'm sorry, MGA has been seeking e-mails

8     from -- or for the deposition in Chicago, and the Court had

9     strongly urged Mattel to make absolutely certain that these

10    are the extent of their hard drive search.  I want to hear

11    your efforts in a few moments, but the adverse inference

12    would be if there are newly discovered e-mails, that this is

13    a consciously withheld document or documents by Mattel.

14         So let me turn to Mr. Zeller and Mr. Quinn first.

15    I want to hear your representations concerning how the

16    search was conducted, what you've been able to find as of

17    this evening, and be very careful, because you're binding

18    yourself to your statements tonight.

19         MR. ZELLER:  Yes, your Honor.  When the issue was

20    discussed on Saturday, we, of course, have double-checked

21    our efforts.  We have -- we have searched the Matt

22    Bousquette hard drive that we have.  We used search terms

23    and reviewed everything that was returned for

24    responsiveness, and we have produced those.  And I can give

25    some of the numbers now that the Court inquired of earlier

SACV 04-9049-DOC - 03/09/2010 - Vol. II

10

```
 1    today.

 2              THE COURT:  Please.

 3              MR. ZELLER:  We've withheld seven documents on

 4    grounds of privilege.  In terms of the 52 documents that

 5    were produced, there were 10 exact duplicates, and then four

 6    partial duplicates.

 7              THE COURT:  Just a moment.

 8              Fifty-two documents produced.  And how many exact

 9    duplicates?

10              MR. ZELLER:  Ten.

11              THE COURT:  Ten exact duplicates.  And four

12    partial?

13              MR. ZELLER:  Four.

14              THE COURT:  Were those because they are an

15    e-mail --

16              MR. ZELLER:  Yeah.

17              THE COURT:  -- string or stream?

18              Okay.

19              MR. ZELLER:  What we found on the -- on the hard

20    drive is that the total number of files was 21,804.

21              THE COURT:  Okay.

22              MR. ZELLER:  We ascertained that there were 1,567

23    user-generated files.

24              THE COURT:  Okay.

25              MR. ZELLER:  Obviously a number of these were
```

JANE C.S. RULE, CSR NO. 9316 - U.S. COURT REPORTER

1    system files and the like.  One particular area pertains to

2    such things that people would generally call media files or

3    wave files or graphical files and the like.  Anything that

4    was a graphical file, we looked at.

5                Of the files, the user-generated files, 877 of

6    them were e-mail files, and for all of those 877, we ran our

7    search terms.

8                THE COURT:  Now, before, the inference I have is

9    that your search terms were too narrow and you broadened the

10   search terms, and that's why these additional documents are

11   forthcoming.

12               MR. ZELLER:  Correct.

13               THE COURT:  Has MGA seen the search terms that you

14   used?

15               MR. ZELLER:  No, your Honor.

16               THE COURT:  Why?

17               MR. ZELLER:  Because there has been a dispute over

18   the privileged nature of the key words that have been used

19   for searches and for production.

20               THE COURT:  What's the dispute?

21               MR. ZELLER:  Well, I'll try not to recreate the

22   entirety of history on this.  The bottom line is that

23   Mattel's view has been that key words that are used for

24   searches for production should not, in fact, be shrouded in

25   privilege.

 1          MGA has taken the opposite position.  And, in

 2   fact, this was manifested most recently on the -- one of the

 3   Michael Moore deposition appeals.  It was the one, in fact,

 4   involving the key words.  We made a pitch to the Court in

 5   that there couldn't have been a waiver because, frankly,

 6   these aren't just privileged.

 7          Meanwhile, of course, we don't get search terms

 8   from MGA because they are asserting privilege, so from our

 9   perspective, you know, as long as there is an open playing

10   field or an even playing field, rather, that's what we are

11   looking for, but right now, there is lack of reciprocity.

12          THE COURT:  Now, how are these argued to be

13   privileged?

14          MR. ZELLER:  That would be MGA's argument.  I

15   don't know.

16          THE COURT:  Counsel, how are search terms

17   privileged?  In other words, how can the Court ascertain

18   that a search -- Counsel, sit down.

19          MR. ZELLER:  Sorry.

20          THE COURT:  How can the Court ascertain that

21   appropriate terms are used without incurring additional cost

22   and going to a special master, which you've been the first

23   to complain about?

24          MS. HURST:  Your Honor, I -- I do not have the

25   benefit of Mr. Zeller's history on this.  My understanding

SACV 04-9049-DOC - 03/09/2010 - Vol. II

13

```
 1     of why Mattel has recently claimed privilege and why MGA may

 2     have claimed privilege in the past is that the selection of

 3     the terms by counsel are the work product of counsel, and

 4     because those are a selection by counsel of terms, that

 5     there is either attorney-client privilege or surely work

 6     product reflected in that selection of terms when the

 7     searching is being done specifically for purposes of

 8     production.

 9              Now, look, my view on this is --

10              THE COURT:  Then help me with my view.

11              MS. HURST:  If they want to be safe and know

12     they've done it, they can disclose it, or we don't have to

13     have them disclose it and we can ask for our own examination

14     of the hard drive for the search terms of our selection, and

15     then they don't have to disclose anything.

16              THE COURT:  Which gets into the claim of

17     overbreadth.  In other words, once you are not sharing the

18     search terms so the other party can ask in good faith if it

19     can be broadened or include certain other search terms of

20     which you may have a dispute and properly bring that to the

21     Court, then with the past history and the distress of the

22     parties in this case, this Court has no way of ascertaining

23     if this is a broad search or a narrow search or if we are

24     not running into the exact problems we are tonight with a

25     deposition looming in Chicago that a narrow search is
```

1    conducted, and now a broader search is conducted.

2           And therefore, you have no way of verifying, and

3    they have no way of verifying.  I can easily verify that by

4    employing a special master, but remember, that's costly,

5    trying to save your client money.

6           MS. HURST:  Your Honor, I think it's up to Mattel

7    if they want to disclose the search terms ran on the hard

8    drive.

9           THE COURT:  Well, I think that's tit for tat,

10   though.  I think it's a fair gamble on their part.  Now,

11   legally, I'm having difficult times understanding why this

12   is attorney work product or privileged.  I can make that in

13   a few moments.  I'd rather have you two discuss this for a

14   few minutes informally.

15          MR. ZELLER:  Yes, sir.

16          THE COURT:  Why don't you two go out in the

17   hallway.

18          And you can take Mr. Quinn with you and

19   Mr. McConville, so they're useful.

20          Now, counsel, I don't mean to be rude, but I just

21   don't want you moving around.  It distracts me when I'm

22   talking to counsel, so if you need to get something, go up

23   to the table, get your documents, you are more than welcome

24   to, but once they are arguing, I don't want movement in the

25   court.

SACV 04-9049-DOC - 03/09/2010 - Vol. II

15

```
 1              MR. ZELLER:  Thank you.

 2              THE COURT:  Thank you.

 3              (Attorney discussion held off the record.)

 4              (Recess.)

 5              THE COURT:  Okay, thank you, Counsel.

 6         All right.  Counsel?

 7              MR. ZELLER:  There is no agreement, your Honor, on

 8    the disclosure of search terms.

 9              THE COURT:  Okay.

10         Do you have similar issues concerning the breadth

11    of the search terms that MGA has been using?

12              MR. ZELLER:  Yes, we do.

13              THE COURT:  Describe some of those areas of

14    concern from Mattel's viewpoint.

15              MR. ZELLER:  Well, I think that there are a large

16    number of examples that we can use --

17              THE COURT:  Describe with specificity those areas

18    that you are seeking.

19              MR. ZELLER:  Yes.  There have been a number of

20    e-mails in this case that were not produced prior to the

21    phase one trial, as the court is aware.  Some of those were

22    withheld on privilege grounds, and there is a history behind

23    that.

24         However, there are also any number of other

25    documents that --
```

JANE C.S. RULE, CSR NO. 9316 - U.S. COURT REPORTER

```
 1              THE COURT:  Describe with specificity what those

 2     are.

 3              MR. ZELLER:  Those would include, in particular,

 4     research reports, e-mails about research reports.

 5              THE COURT:  Thank you.  Describe with specificity

 6     what those are.

 7              MR. ZELLER:  Three -- I can give three specific

 8     examples of what was simply produced last night.  These are

 9     marketing research type reports that MGA had prepared.

10              In some instances, before phase one trial, these

11     are -- and this is a very common practice, obviously, within

12     toy companies, to do market research.  It can take the form

13     often of focus groups.  And many toy companies, in fact, do

14     this on a very frequent basis in which they will show

15     children products, prospective products, products in

16     development in order to get their reactions to understand

17     how their brand is being reacted to.

18              THE COURT:  Okay.  Thank you.  Keep going.

19              MR. ZELLER:  And so the -- MGA -- and we took some

20     discovery on this in phase one and got no real satisfactory

21     answer and we certainly did not --

22              THE COURT:  MGA.

23              MR. ZELLER:  Right.

24              THE COURT:  MGA.

25              MR. ZELLER:  MGA conducts the research that we now
```

SACV 04-9049-DOC - 03/09/2010 - Vol. II

1    know has been done.  We now have a few of those documents.

2    We have nowhere near the quantity or the scope of what's

3    been described now by two witnesses in particular, most

4    recently Mr. Brawer, as well as the COO who testified today.

5    Both of them have described numerous times in which, of

6    course, focus groups have been conducted specifically with

7    respect to Bratz.

8             Those sort of -- that kind of focus group testing

9    usually is then analyzed, and conclusions are drawn about

10   how consumers perceive the brand, what's distinctive, what

11   isn't, what's different from competitors and what's not.

12   All of that information is directly relevant to a number of

13   claims in this case.

14            We, for the first time, really, last night, got

15   three of these, call them loosely, PowerPoint presentations

16   that lay out conclusions about how consumers perceive Bratz.

17   And there is -- there's clearly a number of years of prior

18   research reports that have been prepared.  There are people

19   who do this all the time.  They not only hire outside

20   vendors --

21            THE COURT:  Thank you.  It's irrelevant to me.

22            Now, where do you think MGA has tried to narrow

23   the search terms, or where aren't you satisfied, or where do

24   you have suspicions that these search terms are narrowed,

25   but you are just suspicious of the depth and breadth?  Give

1    me two examples, let's just start with those.

2           MR. ZELLER:  I think one example would be the

3    Larion hard drive.

4           THE COURT:  Okay.  Just a moment.

5           Okay.  Give me a second example.

6           MR. ZELLER:  Another example would be more broadly

7    the MGA e-mail server known as Archive 1.

8           THE COURT:  Now, have you suggested search terms

9    in the past to MGA?

10          MR. ZELLER:  Not in that form, no.  We did to the

11   discovery master.

12          THE COURT:  Then how -- in other words, for both

13   sides, the parties are so distrustful of each other for such

14   a long period of time, at least from my impression, that MGA

15   may feel that the search was too narrow when it was

16   initially initiated, and now there are documents that may or

17   may not be of benefit that come to them on the eve of the

18   Bousquette deposition.  They don't appear to be voluminous

19   from my standpoint, and the deposition is going to go

20   forward in Chicago.

21          But you, I would imagine, have the same inherent

22   distrust of MGA.  MGA, in particular, when it first came to

23   this Court was very concerned about the financial ability of

24   Mr. Larion and MGA to defend.  I initially took the position

25   that I had great concern about that.  I didn't want the

SACV 04-9049-DOC - 03/09/2010 - Vol. II

19

```
 1    sides unbalanced.  But since the Ninth Circuit's ruling, it
 2    appears to me that if the sides are unevenly balanced, they
 3    are certainly not so unevenly balanced that Mr. Larion can't
 4    defend himself, and he has resources now.
 5            How do you propose, before I turn to MGA, from
 6    Mattel's perspective, to have some guarantee that a
 7    reasonable search is being conducted, and how do you give
 8    MGA and the Court confidence that your requests aren't
 9    overbroad and actually go to the business model, marketing
10    the future development of MGA?
11            MR. ZELLER:  And the way that we have at least --
12    and I think this is the right approach.  What we have
13    proposed is, and we have done this in discussions in
14    briefing with Judge Smith, is that to the extent that there
15    is -- as the Court has noted, there is that distrust, but we
16    do believe, and this process had started with respect to at
17    least the Brawer hard drive, which is for the parties to
18    come up with a set of search terms, at least some of those
19    presumably will be agreed upon, and that there be a
20    mechanism for which if there are disputes --
21            THE COURT:  Well, if you can't agree tonight or
22    set out a framework, how would I have the expectation that
23    you are going to agree on the Brawer hard drive?
24            MR. ZELLER:  Well, I believe the parties have.
25            THE COURT:  Have they?
```

```
 1                    MR. ZELLER:  I believe that's correct.

 2                    THE COURT:  Counsel, have they?

 3                    MR. MC CONVILLE:  Yes, your Honor, the parties

 4      have reached an agreement, I believe the stipulation was

 5      filed with the Court yesterday.

 6                    THE COURT:  Yesterday?

 7                    MR. MC CONVILLE:  On the Brawer hard drive, I

 8      believe.

 9                    THE COURT:  Okay.  Did you reach that without

10      Judge Smith's help, or was that with Judge Smith's

11      suggestion and help?

12                    MR. ZELLER:  I believe that with respect to the

13      list of search terms that have been discussed and ultimately

14      agreed upon, I believe that was without the direct

15      involvement of Judge Smith.

16                    Now, he was the impetus --

17                    THE COURT:  Let the record reflect that there is

18      confetti flying through the court.

19                    I'm just kidding you.

20                    (Laughter.)

21                    MR. ZELLER:  He was definitely the impetus because

22      the Court will recall in the report and recommendation,

23      reached the conclusion that a search of Mr. Brawer's hard

24      drive were appropriate.  He set up a meet and confer process

25      for the parties to participate in, and that's -- that was
```

1    the framework in which there was this resolution on the key

2    word terms.  There were other disputes, as I understand it,

3    but not on the key words.

4            THE COURT:  Assume that the Court for a moment

5    doesn't have any opinion concerning the depth or breadth of

6    the hard drives, but assume for the moment that this Court

7    is very displeased with both parties' use of privilege logs

8    and what's been placed on the privilege logs by the

9    respective parties.  Is there any other mechanism other than

10   this Court forcing Judge Smith into these respective areas?

11           I'm literally verifying that there is some

12   reasonable -- I don't expect a hundred percent on the search

13   terms, but that there is some reasonable effort on Mattel's

14   part, and the Court's not privy to that and MGA is not privy

15   to that, and in the future or vice versa, that there is some

16   independent arbitrator that's monitoring the depth and

17   breadth of these search terms, is there any other mechanism

18   that you think of that I can employ and that would be cost

19   saving to you and save time?

20           MR. ZELLER:  I do think having Judge Smith do that

21   would be cost saving.  There are -- there has historically

22   been and continue, even as we speak, to be problems with the

23   part of the process that involves -- because, of course,

24   people have a legitimate right to protect their privileged

25   information and to review the materials before they go to

1   the other side for privilege.

2          However, and the Wing documents are a perfect

3   example, where something was turned over, the stipulation

4   was that they review it for privilege, and the next thing I

5   know, I've got thousands of documents being withheld on

6   supposed relevance grounds, and that has burned up, from my

7   perspective, a huge amount of resources.  So I don't think

8   there is a --

9          THE COURT:  Let me hear from your opposition.

10   Thank you, Mr. Zeller.

11          Counsel, I'm paying you the courtesy of asking

12   first, before I make a ruling, is there any other mechanism

13   you can think of concerning the depth and breadth of these

14   search terms that's cost effective and not time consumptive

15   from your party's perspective, instead of imposing a

16   structure on you?  I'm asking first.

17          MS. HURST:  Your Honor, with respect to the Larion

18   hard drive, which is one of the items that Mr. Zeller

19   identified, the Court may recall when we were first here in

20   November, I offered that if they would give me a list of

21   search terms, we would run them.  And then, you know, if it

22   was within reason to produce, we would do it so that they

23   could confirm that counsel who have not had any allegations

24   before the Court --

25          THE COURT:  Has this come before Judge Smith?

SACV 04-9049-DOC - 03/09/2010 - Vol. II

23

```
 1              MS. HURST:  Yes, your Honor, I made the same offer
 2    and the argument on the Larion hard drives with respect to
 3    that report and recommendation again in front of Judge
 4    Smith.  If they give us the search terms, if there is some
 5    disputes, I'm happy to have Judge Smith or Discovery Master
 6    O'Brien, who may have greater familiarity with the substance
 7    of the case, work it out, but your Honor, if it's within
 8    reason, we'll run it --
 9              THE COURT:  Okay.
10              MS. HURST:  -- and produce it.
11              THE COURT:  Have you given them a list of search
12    terms?  Has it ever been offered?
13              MR. ZELLER:  No, because the -- on the Larion hard
14    drive, what we also want to know are the deleted files.
15    That is something that is --
16              THE COURT:  No, I understand that, but that
17    doesn't -- that's only half the puzzle.  Part of it are the
18    search terms on nondeleted files, the other are the deleted
19    files, so let's not cloud the two.
20              Let's take the first issue, have you ever given
21    them a list of search terms?
22              MR. ZELLER:  No, we haven't.
23              THE COURT:  How long would it take you to produce
24    that list?
25              MR. ZELLER:  I think frankly within a day.
```

SACV 04-9049-DOC - 03/09/2010 - Vol. II

```
 1            THE COURT:  You can have it tonight.  Which
 2   associate is working on that?
 3            MR. ZELLER:  I may be writing it as we -- between
 4   breaks.
 5            THE COURT:  Okay.
 6            Counsel, how long would it take -- now, counsel,
 7   let's -- it sounds like quid pro quo so far.  In other
 8   words, you haven't given those over because you think they
 9   are privileged, which they are not, and you haven't given
10   some things on your side from their perspective, so what
11   would you like from them?
12            MS. HURST:  Wait a minute.  I just gave them
13   something.
14            (Laughter.)
15            THE COURT:  Larion.  Let's see what they are
16   willing to give up.
17            (Laughter.)
18            MS. HURST:  I just gave them something.
19            THE COURT:  What would you like from them?
20            MS. HURST:  May I just be heard on the Bousquette
21   issue, your Honor, before the Court finalizes its ruling?
22            THE COURT:  I'm not.  I'm just asking what you'd
23   like from them.
24            MS. HURST:  What would I like from them?  I would
25   like the documents required to be produced by Discovery
```

1    Master's Order 89 and 91.

2              THE COURT:  So do you want to check their search

3    terms on the Bousquette documents?

4              MS. HURST:  Do I want to check their search terms?

5              THE COURT:  Sure.  Do you want to see if their

6    search terms are valid or not?  They turned up 50 -- let's

7    see, 52 plus 10 exact duplicates and four partials.  Do you

8    want to check their search terms?

9              MS. HURST:  How about if I give them a list of

10   search terms?

11             THE COURT:  Fine.

12             MS. HURST:  And then if there are any documents

13   responsive to those search terms, we'll find out on the way

14   to Chicago tomorrow, I get to postpone the deposition.

15             THE COURT:  And then they get to give you a list

16   of the search terms.

17             MS. HURST:  Right.  That's what I offered with

18   respect to the Larion hard drive.

19             THE COURT:  How long will that take you to do?

20   We'll do things sequentially tonight.

21             MS. HURST:  Yep, I can do it while we are sitting

22   here.

23             THE COURT:  Okay.  I'm going to leave the bench.

24   How long?  Ten minutes, five hours, it doesn't matter.

25             MS. HURST:  Fifteen minutes for me.

SACV 04-9049-DOC - 03/09/2010 - Vol. II

26

```
 1                THE COURT:  Counsel, how long?

 2                MR. ZELLER:  For our list or to respond to her

 3     list?

 4                THE COURT:  Your list.  10:00 or 2:00 in the

 5     morning, it doesn't matter to me.

 6                MR. ZELLER:  Fifteen minutes.

 7                THE COURT:  Fifteen minutes?

 8                See you in 15 minutes.

 9                (Recess.)

10                THE COURT:  We are back on the record, and the

11     clerk's brought the Court Mattel's?  The small print?

12                MR. QUINN:  Yes.

13                THE COURT:  With many more items than MGA's larger

14     print with two items.  And we have some disputed terms I

15     heard.

16                MS. HURST:  Yes.

17                THE COURT:  How many disputed terms do you have?

18                MS. HURST:  We agreed to a protocol for the

19     disputed terms.

20                THE COURT:  No, there is no protocol.  They will

21     be done tonight.

22                MS. HURST:  Okay.

23                THE COURT:  Thank you very much.

24                Now, we'll move on to some other matters and we'll

25     conclude that in the early morning hours.
```

SACV 04-9049-DOC - 03/09/2010 - Vol. II

27

```
 1              I want to take up Maria -- oh, I left my notes
 2    back there.  Just a moment.
 3              (Interruption in the proceedings.)
 4              THE COURT:  Okay.  Maria, is she present?
 5              MS. BASHAW:  I'm right here.
 6              THE COURT:  Thank you very much.  It's a pleasure.
 7    I'll be right back with you.  Indulge us for a moment.
 8              I know that there's a motion that's been filed by
 9    counsel representing Omni about their constitutional
10    concerns, and I'll take that up.
11              Where is counsel concerning Omni?
12              MR. VILLAR:  I am here, your Honor.
13              THE COURT:  You have constitutional concerns that
14    the Court is --
15              MR. VILLAR:  I'm not --
16              THE COURT:  Come on up here so I can hear you.  I
17    wouldn't want to cause you any concern.
18              MR. VILLAR:  Your Honor, Peter Villar on behalf of
19    Omni 808.
20              If the Court is referring to our opposition to
21    Mattel's ex-parte application --
22              THE COURT:  That's correct.
23              MR. VILLAR:  -- I guess you can -- we have
24    procedural concerns.
25              THE COURT:  I can work with you.  As far as time
```

Case 2:04-cv-09049-DOC-RNB   Document 7659   Filed 03/17/10   Page 28 of 105   Page ID #:259210
SACV 04-9049-DOC - 03/09/2010 - Vol. II

28

 1    concern, if you need more time, we have all of the time in

 2    the world.  So in the document that we got was that there

 3    was opposition because this was too precipitous and the time

 4    periods were too short.  Are you aware of that filed by your

 5    office?

 6              MR. VILLAR:  Yes, I am.

 7              THE COURT:  Okay.  If you can remain for just one

 8    moment, and you don't have to respond to this.  I want to

 9    address the parties with just a couple of documents.

10              Let's go to Brian Wing for just a moment in these

11    privilege logs.

12              I want to take a heretofore privileged document,

13    which is no longer deemed to be privileged by the Court,

14    from Isaac Larion, President CEO, sent Tuesday,

15    September 2nd, 2008, 9:00 p.m. to Sharon McConvey and Angela

16    Larion, CC to Brian Wing, "Subject, the next payment is for

17    Joe Moinian, 10 million, and must be paid by December 17th."

18              "A, we hopefully have about 11 million coming from

19    insurance."

20              "B, what's the personal cash available?  Let's

21    plan now, please."

22              Can I inquire of MGA how that is either relevant

23    or a privilege document and how this got on a privilege log?

24              MR. MC CONVILLE:  Yes, your Honor.

25              THE COURT:  Please.

```
 1              MR. MC CONVILLE:  So the -- the Wing documents

 2     were produced shortly in advance of Mr. Wing's deposition,

 3     literally I think on the day of his deposition began.

 4              THE COURT:  How did this get on a privilege log?

 5              MR. MC CONVILLE:  It's a little buildup.

 6              THE COURT:  Don't need it.

 7              MR. MC CONVILLE:  I would say that document, as

 8     the Court has described it, was likely the result of --

 9              THE COURT:  Your law firm didn't put this on the

10     privilege log?

11              MR. MC CONVILLE:  We did, I'm sure we did.

12     Because our firm was working on it.  My point is, we were

13     working at very fast pace doing our best.

14              THE COURT:  I have lots more.

15              MR. MC CONVILLE:  Understood.

16              THE COURT:  Lots more.

17              MR. MC CONVILLE:  So the other -- there were

18     multiple bases for withholding documents.

19              So Brian Wing went in -- from MGA's perspective,

20     he took a bunch of documents that he wasn't entitled to keep

21     or take.

22              THE COURT:  Well, let's go back to the ex-parte

23     document filed with the Court by Todd Gordinier of Bingham.

24     Let's go to page 2 for a moment.

25              MR. MC CONVILLE:  Okay.
```

SACV 04-9049-DOC - 03/09/2010 - Vol. II

30

1          THE COURT:  Okay.  Moinian Development Group,

2     10 million.  Doesn't this appear to be 10 million, and

3     couldn't the inference be that Mr. Larion is paying the

4     10 million?

5          MR. MC CONVILLE:  It could be but for the sworn

6     testimony that disputes it.  I mean, your Honor, if you

7     read -- if you read Mattel's papers on these points, they

8     say one could surmise what happened.  One, in fact, could

9     surmise or one could go to the facts of what actually

10    happened, which have been disclosed.

11          Mr. Larion testified, "At some point, I was

12    thinking about buying Joe Moinian's interest.  I did not buy

13    Joe Moinian's interest."  So I don't believe it's a RICO

14    predicate act or relevant to -- about doing it, but not

15    actually do it.

16          THE COURT:  I deem this first document referred to

17    as nonprivileged and relevant.  It will be disclosed to the

18    Mattel parties.

19          Now, I have so many concerns, that I need to have

20    Brian Wing back in court.  He's minimally going to be going

21    through about 200 pages of personal notes and deciphering

22    those notes for the Court, and the Court, believe me, has

23    been hard at it much more than you parties will recognize in

24    going through those personal notes.  Most of them I think I

25    understand now.

1            So I want to be courteous because I know

2     Mr. Wing's represented by counsel, but I don't think

3     counsel's engaged in trial after 6:00 in the evening, and I

4     don't think Mr. Wing should be unavailable to the Court

5     after 6:00.

6            So when can we get Mr. Wing back, do you think?

7            MR. MC CONVILLE:  I don't know, your Honor.

8            THE COURT:  Counsel?  Can anybody be of help to

9     the Court?

10           MR. MC CONVILLE:  I -- I don't know what he said

11    with regard to his availability.

12           THE COURT:  I don't think I'm too concerned about

13    his, quote unquote, availability.  I want him back, and I'm

14    only asking before I act.

15           MR. MC CONVILLE:  We will contact him.

16           THE COURT:  Call him on the phone.  Do you have

17    his attorney's number, why don't you call him?

18           MR. MC CONVILLE:  I don't have his attorney's

19    number.

20           THE COURT:  Sure you do.

21           MR. MC CONVILLE:  Well, what we do know is Mattel

22    has a better relationship with him.

23           THE COURT:  Yeah, call.

24           MR. ZELLER:  Your Honor, this is their former CFO.

25           THE COURT:  It doesn't matter.  You have got

JANE C.S. RULE, CSR NO. 9316 - U.S. COURT REPORTER

SACV 04-9049-DOC - 03/09/2010 - Vol. II

32

```
 1   somebody, some number, find it for me and call him.
 2           MR. ZELLER:  But the idea that we should have to
 3   do that because they claim it's some better relationship,
 4   I --
 5           THE COURT:  I am not -- you're quibbling.  I just
 6   want to reach him.  Call him.  And I want to pay the
 7   courtesy of asking, otherwise I'm going to simply order him
 8   back into court, and I want to make this as convenient as
 9   possible, and it will be tomorrow night or the following
10   night; those are the two options.
11           Counsel, why don't you turn to Bates number Wing
12   007801 for a moment.  These are simply illustrative.  It's
13   certainly not comprehensive concerning the Court's concerns.
14           So let's turn to 0007801.  And tell me when you're
15   there.
16           MR. MC CONVILLE:  Your Honor, I don't have the
17   documents -- the Wing documents with me.  I apologize.
18           THE COURT:  You are going to go get them, then, or
19   you have them on a hard drive.  Go find them or go back to
20   your offices and get them.
21           And then I want you to turn down, when you reach
22   to the bullet point entitled "Legal Analysis for Skadden
23   Injunction Appeal in Phase II Discovery."
24           Is he having to go back and get them?
25           MR. MC CONVILLE:  We're trying to figure out if we
```

JANE C.S. RULE, CSR NO. 9316 - U.S. COURT REPORTER

1    can locate them.

2           MS. HURST:  If we can get them here online in the

3    courtroom, your Honor.

4           THE COURT:  Well, we'll work off my document,

5    then, maybe that will save some time.

6           Can you possibly explain to me on 0007801

7    concerning Mr. Larion's comment, "Why are you spending time

8    doing that, legal team's job is to do this," that it appears

9    to Mr. Larion himself who's acknowledging that this isn't a

10   privileged document, right from Mr. Larion's own words?  Why

11   is that placed on a privileged log?

12          MS. HURST:  Your Honor, Mr. Larion, all

13   appearances to the contrary, is not omniscient.  Mr. Wing's

14   direct requests were made from Mr. Wing's counsel both

15   outside and inside the company.  The fact that Mr. Larion

16   was not aware of all of them does not make this

17   unprivileged.

18          THE COURT:  The Court deems that that is not

19   privileged.  It will be disclosed to the defense.

20          Now, we are going to get Mr. Wing back into court.

21   I want to speak to him.  And, of course, Mr. Larion will be

22   back also.

23          All I can say is that this is the beginning, I

24   think, of our discussion, certainly not the end of it.

25          Now, Ms. Bashaw, let me deal with your matter

SACV 04-9049-DOC - 03/09/2010 - Vol. II

34

```
 1    tonight because I don't know, since you're represented by
 2    counsel, and of course the Court doesn't want to impose upon
 3    you needlessly, but if you'd like to come forward for just a
 4    moment.  You're represented by counsel, and if at any time
 5    you need a continuance, the Court certainly doesn't want to
 6    be precipitous, I'll be here every night this week and the
 7    weekend.  First of all, I appreciate you coming to court.
 8            MS. BASHAW:  Thank you.  I'm actually representing
 9    myself, my CA, my corporate advisors.
10            THE COURT:  Oh, you are?
11            One of the many representations made in at least
12    some of the ex-parte documents that the Court received is
13    the complete lack of a connection between Omni -- just one
14    moment.  I want to find it specifically so I can read it
15    into the record.  I may have it back in the back.  Just one
16    moment.  Excuse me, I'm sorry.
17                (Interruption in the proceedings.)
18            THE COURT:  Do you know -- do you have any
19    relationship with Omni?
20            MS. BASHAW:  I am not familiar with Omni, other
21    than what I just mentioned by the -- in the motion to
22    compel, but I am not familiar with the company.
23            THE COURT:  No relationship with Omni?
24            MS. BASHAW:  No.
25            THE COURT:  Or their counsel?
```

SACV 04-9049-DOC - 03/09/2010 - Vol. II

35

```
 1              MS. BASHAW:  No.
 2              THE COURT:  You allegedly were in the business of
 3    what I refer to as P.O. boxes or route boxes in England
 4    amongst many of your endeavors.
 5              MS. BASHAW:  No, not exactly.  I mean, we have --
 6    we can provide that service, so we have connections or
 7    relationships with other companies that can provide that
 8    service.
 9              THE COURT:  Okay.  Could I have just one moment.
10    Why don't you have a seat.  I'll be right back with you.
11    Thank you for your courtesy.
12              Counsel, I'll be right back with you.
13              If you want to start working on your
14    disagreements, it might save you some time.
15              (Recess.)
16              THE COURT:  Okay.  Back on the record.  All
17    counsel are present.
18              I want to show you something for just a moment.
19              MS. BASHAW:  Okay.
20              THE COURT:  Why don't you stay there for just a
21    moment.
22              Let me retrace the little I know, and remember, I
23    want to be corrected at any time, okay?
24              MS. BASHAW:  Yes.
25              THE COURT:  You are the chief executive of ICA?
```

1          MS. BASHAW:  I'm a principal.  There's three of

2   us.

3          THE COURT:  Principal, okay.  I'll cross out chief

4   executive and make you principal.

5          MS. BASHAW:  Please.

6          THE COURT:  And my understanding is that ICA helps

7   set up accounts overseas, amongst your help might be a P.O.

8   box?

9          MS. BASHAW:  Okay, yes.

10         THE COURT:  Among other services.

11         MS. BASHAW:  Yes.

12         THE COURT:  It's alleged that Lexington Financial

13  had a mailbox drop box in London, and Mattel represents in

14  their documents that they had gone to the high court of

15  justice and sought records of the posing company, and that

16  company had produced records linking ICA to the drop box in

17  London, which is Lexington's.

18         It's my understanding from reading your documents,

19  that you state that you no longer have records.

20         MS. BASHAW:  Correct.

21         THE COURT:  What happened to those records?

22         MS. BASHAW:  Well, Lexington is no longer our

23  client or at least the principal of Lexington and Lexington

24  by default, they are no longer our clients, so we don't have

25  any records, we returned the records to them when they

```
 1    decided to go elsewhere for services.

 2              THE COURT:  So you returned the records to

 3    Lexington?

 4              MS. BASHAW:  To the owner.

 5              THE COURT:  Can you tell me about when that

 6    occurred?

 7              MS. BASHAW:  I don't have the exact date.

 8              THE COURT:  Okay.  I want to show you in your

 9    documents to the Court for a moment, and please help me with

10    this.

11              MS. BASHAW:  Okay.

12              THE COURT:  I want you to look at the bottom.

13              Counsel, you might be interested in this.

14              You might be interested in this.

15              I want you to start looking just at the --

16              MS. BASHAW:  Okay.

17              THE COURT:  I'll just use that as an example.

18              MS. BASHAW:  Okay.

19              THE COURT:  I received a -- initially an ex-parte

20    confidential, in-camera review pursuant to a February 12th

21    order on February 16th, 2010, and you haven't seen that yet.

22    That is a document code on the bottom of your documents to

23    the Court.

24              MS. BASHAW:  Yes.

25              THE COURT:  I want to show you the document code
```

SACV 04-9049-DOC - 03/09/2010 - Vol. II

```
 1    on the letter that I received.  It appears surprisingly

 2    similar, and I'm wondering if there is an explanation for

 3    that, like did Bingham write this for you?

 4              MS. BASHAW:  No.

 5              THE COURT:  You had no contact with Bingham

 6    attorneys?

 7              MS. BASHAW:  I may have had contact, but they did

 8    not write it for me.

 9              THE COURT:  Remember I asked you 10 minutes ago --

10              MS. BASHAW:  Yes.

11              THE COURT:  -- if you had any contact with Bingham

12    attorneys, and I can have your testimony read back, and you

13    said no.

14              MS. BASHAW:  I don't remember that you asked that.

15    I remember that you asked about Omni, but --

16              THE COURT:  Have you had contact with Bingham

17    attorneys?

18              MS. BASHAW:  Yes, I've spoken to an attorney at

19    Bingham.

20              THE COURT:  It appears to me that it was processed

21    by the Bingham McCutchin firm.

22              MS. BASHAW:  No, I did it myself.

23              THE COURT:  You did it yourself?

24              MS. BASHAW:  I did.

25              THE COURT:  And you placed that document code at
```

SACV 04-9049-DOC – 03/09/2010 – Vol. II

```
 1    the bottom of that document?

 2            MS. BASHAW:  I did not place that document code at

 3    the bottom of the document.

 4            THE COURT:  Who did?

 5            MS. BASHAW:  I don't know.

 6            THE COURT:  Who would know?

 7            I'm going to caution you, now, I want you to think

 8    very, very carefully, and please don't answer precipitously,

 9    the consequences are much more than you can possibly

10    envision at the present time.

11            MS. BASHAW:  Okay.

12            THE COURT:  If you want advice of counsel or take

13    a recess, I want to afford you that opportunity.

14            MS. BASHAW:  Okay.

15            THE COURT:  Do you want a recess?

16            MS. BASHAW:  Yes.

17            THE COURT:  I think it would be well advised.

18            I'll order you back tomorrow at 6:00.

19            MS. BASHAW:  Thank you.

20            THE COURT:  Thank you very much.

21            All right.  Counsel, we have a lot of work to do

22    this week.  When will Mr. Wing be joining us?

23            MR. MC CONVILLE:  Pardon me?

24            THE COURT:  When will Mr. Wing be rejoining us,

25    Brian Wing?
```

SACV 04-9049-DOC - 03/09/2010 - Vol. II

40

```
 1              MR. ZELLER:  I only have Mr. Margolis, if I'm

 2      pronouncing it correctly, his office number, and so --

 3              THE COURT:  He is not in at this time tonight?

 4              MR. ZELLER:  He's not answering.

 5              THE COURT:  He doesn't work the same hours my

 6      esteemed counsel does, and I'm so proud of counsel, your

 7      enthusiasm drives this Court to new heights.

 8              (Laughter.)

 9              MR. ZELLER:  I did send him an e-mail, but I

10      haven't gotten a response yet.

11              MS. HURST:  Your Honor, if I may for the record,

12      on that first document that the Court identified, that

13      document has been previously produced at Bates number

14      MGA20540632.  It should be in the binder.

15              Your Honor, we had people who don't know as much

16      about the case working overnight and 24 hours, it's not

17      nefarious, the document's been previously produced.  I just

18      want the Court to be aware of that.

19              THE COURT:  Well, we have a lot of work to do with

20      a lot of documents concerning Mr. Wing, and Mr. Wing needs

21      to come in with the 200 pages of handwritten notes and sit

22      with counsel and decipher those notes, and we need to get

23      started on that, but I am not going to hold up the Chicago

24      deposition, so, gosh, I know you by first name basis, and I

25      don't mean to -- Annette, last name?
```

JANE C.S. RULE, CSR NO. 9316 - U.S. COURT REPORTER

SACV 04-9049-DOC - 03/09/2010 - Vol. II

41

```
1              MS. HURST:  Hurst.
2              THE COURT:  Ms. Hurst, you are going back to
3    Chicago.
4              MS. HURST:  I am going to Chicago, your Honor.
5              THE COURT:  Mr. McConville will be here joining me
6    tomorrow.
7              Are you going back to Chicago?
8              MR. ZELLER:  No, I'll be here.
9              THE COURT:  Are you going back to Chicago?
10             MR. QUINN:  No, but I had hoped to go someplace
11   else.
12             THE COURT:  Nope.  Both of you gentlemen are
13   ordered back here tomorrow, and you're ordered at 8:00 a.m.
14             MR. MC CONVILLE:  8:00 a.m.
15             THE COURT:  8:00 a.m., and we are going to sit and
16   wait for Mr. Wing and Mr. Margolis, and we're just going to
17   sit here and get to work.  And I'll try and save your
18   weekend, but I don't know if I'll be able to.
19             MS. HURST:  Your Honor, may I request that
20   Mr. Wine, a partner in our firm, be permitted to assist in
21   these proceedings in my absence tomorrow?
22             THE COURT:  For tomorrow.  I don't want you
23   out-resourced, so Mr. Wine can help tomorrow.
24             MS. HURST:  Thank you, your Honor.
25             THE COURT:  I think we'll leave the rest of the
```

SACV 04-9049-DOC - 03/09/2010 - Vol. II

42

```
 1    Court's inquiry concerning Wing until Mr. Wing and his
 2    counsel are present, because we have much more
 3    accomplishments, so let's put those off to the side for a
 4    moment.
 5              Oh, do you -- are you from the Bingham McCutchin
 6    firm?
 7              MR. VILLAR:  Yes.
 8              THE COURT:  Can you come forward, sir.
 9              Do you have an explanation for this code that you
10    might want to share with the Court at this time, or would
11    you like a little bit of time to discuss that with your
12    partners?
13              MR. VILLAR:  If I could just -- if I could just
14    read it, I could respond to it.
15              THE COURT:  Certainly.  I'll bring that to you.
16              This is your coding from the letter that I
17    received, in-camera documents.
18              MR. VILLAR:  Okay.
19              THE COURT:  This is the coding on the briefing
20    filed by Ms. Bashaw who had no contact initially with
21    counsel at your firm, but apparently now has.
22              MR. VILLAR:  And your Honor, I can respond to that
23    right --
24              THE COURT:  Now, be careful now.
25              MR. VILLAR:  I have nothing to --
```

```
 1            THE COURT:  I just want to make sure I'm not

 2    pushing you, because your last document said there was some

 3    constitutional issue concerning the Court, you know, having

 4    these hearings, and I don't want you to feel uncomfortable.

 5            MR. VILLAR:  I don't feel uncomfortable in the

 6    least bit, your Honor, and I have absolutely nothing to hide

 7    from the Court.

 8            I have had a couple of conversations with

 9    Ms. Bashaw to try to get to the bottom of the -- of these

10    allegations regarding ICA and Ms. Bashaw.  And so

11    Ms. Bashaw, I don't know that she knew I represented Omni.

12    And so if you were to ask her if she had a conversation with

13    me, I think the answer would be yes.

14            THE COURT:  Who processed the document for her?

15            MR. VILLAR:  She processed the document herself.

16    Let me look at that number.

17            Your Honor, we did not write this document, we did

18    not write her document.  The only potential explanation if

19    that is -- if this number on this -- well, I don't know.

20    Honestly, I'm not sure.

21            She had asked us to provide a -- a sample of an

22    objection that we had done in the case, a sample of a

23    opposition that we did in this case, and we may have

24    provided that to her, so the only -- the only potential

25    explanation I can think of is she somehow copied -- but it's
```

SACV 04-9049-DOC - 03/09/2010 - Vol. II

44

```
 1   on the table of contents, so I don't know, but that was
 2   the -- that was the --
 3               THE COURT:  That's not her testimony so far.
 4               MR. VILLAR:  That's not her testimony?
 5               THE COURT:  No.  I am going to instruct you not to
 6   have a conversation with her or any member of your firm
 7   between now and the next meeting; is that understood?
 8               MR. VILLAR:  Absolutely.
 9               THE COURT:  I would hold you in contempt if you
10   did --
11               MR. VILLAR:  Absolutely.
12               THE COURT:  -- or any member of your firm.  No
13   misgivings about that; acceptable?
14               MR. VILLAR:  Absolutely.
15               THE COURT:  Any misunderstanding at all?
16               MR. VILLAR:  No.
17               THE COURT:  Thank you very much.  If I could have
18   those documents back.
19               (Interruption in the proceedings.)
20               THE COURT:  Mr. Moore, are you here?
21               MR. MOORE:  Yes.
22               THE COURT:  Thank you very much.  If you'd come
23   forward and raise your right hand.
24               And Stephanie, would you be kind enough to
25   administer an oath.
```

1              **MICHAEL CHRISTOPHER MOORE, WITNESS SWORN**

2         THE WITNESS:  I do.

3         THE COURT:  Thank you, Mr. Moore.  If you'd please

4    be seated.

5         I appreciate your courtesy this evening.  I

6    certainly didn't mean to inconvenience you.

7         THE WITNESS:  Thank you.

8         THE COURT:  Would you state your full name for the

9    record, sir.

10         THE WITNESS:  Michael Christopher Moore.

11         THE COURT:  My understanding, by way of

12    background, is that you are or were in-house counsel for

13    Mattel; is that correct?

14         THE WITNESS:  That's right, I am.

15         THE COURT:  Are you still in-house counsel for

16    Mattel?

17         THE WITNESS:  I am.

18         THE COURT:  Okay.  So in the tentative that I

19    wrote up initially, my understanding was that in 2006, that

20    you worked with outside counsel law firm of Quinn Emanuel to

21    register with the copyright office the series of Bratz

22    drawings that Carter Bryant created while he was a Mattel

23    employee, and those, of course, came by way of what I recall

24    in my reading as the summary judgment issued by Judge

25    Larson.

SACV 04-9049-DOC - 03/09/2010 - Vol. II

 1          And accordingly, the statement has been made or

 2    the representation that the decision to register these

 3    drawings and ancillary decisions regarding the copyright

 4    allegations were made by outside litigation counsel solely

 5    for the purposes of the ongoing litigation with MGA in this

 6    case.

 7          And it's been represented or argued by counsel

 8    that this was effectuated because of the advice, and solely

 9    because of the advice, received from outside counsel, Quinn

10    Emanuel, concerning the completion of the copyright

11    application submitted to the copyright office, and the

12    question -- the issue before the Court are specifically

13    boxes 6A and 6B of the copyright registration, which require

14    the applicant to list any preexisting materials and what

15    materials has been added, as the registered work is a

16    derivative work, and they were left blank by Mattel.

17          You initially testified that the boxes were left

18    blank but then were instructed not to answer a series of

19    questions concerning what was asserted to be the

20    attorney-client privilege.  I -- I've written a tentative,

21    but the hearing tonight is going to be two-fold, part of

22    this will be in camera.

23          But Counsel?  Mr. Quinn?

24          MR. QUINN:  Yes, your Honor.  I'm prepared to lay

25    the foundation that the Court requested.  We have copies of

SACV 04-9049-DOC - 03/09/2010 - Vol. II

47

1     the exhibits, your Honor, to mark and to distribute.

2             THE COURT:  Counsel?

3             MR. QUINN:  While we are distributing those

4     exhibits, the copyright registrations, your Honor, if I may

5     proceed with the --

6             THE COURT:  You may.  I'm aware of the copyright

7     registration.

8             MR. QUINN:  All right.

9             THE COURT:  We'll get that for our record, of

10    course, but I hope I'm that prepared, at least.

11            Counsel?

12                       **DIRECT EXAMINATION**

13    BY MR. QUINN:

14    Q    In 2006, did Mattel cause filings of registration for

15    the Bratz design drawings, Exhibits 13873 to 13878, to be

16    filed?

17    A    Yes, those copyright registration forms were filed.

18    Q    And what involvement, if any, did you have in that

19    process?

20    A    I worked with the Quinn Emanuel law firm.  I reviewed

21    the copyright registration forms.  I discussed with them

22    whether the copyright registration forms were to be filed.

23         They were -- we discussed how the forms were filled

24    out.

25    Q    Whose idea, if anyone's, was it to prepare copyright

JANE C.S. RULE, CSR NO. 9316 - U.S. COURT REPORTER

1    registrations for the Bratz designs in October of 2006?

2    A    I first heard of the idea from Quinn Emanuel.

3    Q    And whose idea, if anyone's, was it to file those

4    copyright registrations?

5    A    Again, I first heard of that idea from Quinn Emanuel.

6    Q    Who specifically at Quinn Emanuel did you communicate

7    with concerning the idea of filing the copyright

8    registrations for the Bratz designs?

9    A    I remember speaking with Michael Zeller, Dylan Proctor,

10   and I believe -- I believe that's it.

11   Q    With whom did you first discuss the idea of preparing

12   and filing copyright registration forms for the Bratz

13   designs?

14   A    That would be attorneys from the Quinn Emanuel firm,

15   Michael Zeller and Dylan Proctor.

16   Q    Did you personally ever conceive of any idea to file

17   copyright registration forms for the Bratz designs before

18   Quinn Emanuel suggested it to you?

19   A    No, I didn't.

20   Q    Was it your understanding that the registration forms

21   for the Bratz designs were to be filed in connection with

22   any particular litigation?

23   A    Yes.

24   Q    And what was your basis for that understanding?

25   A    I understood that through my communications with

SACV 04-9049-DOC - 03/09/2010 - Vol. II

49

```
 1   counsel.
 2   Q    Was there any documentary basis for that understanding
 3   or any documents that reflected that understanding, that
 4   these were being prepared in connection with the litigation?
 5   A    Yes, I remember there being a cover letter that was
 6   filed in connection with the copyright applications.
 7            MR. QUINN:  Do you -- do we have that exhibit
 8   before the witness?  It's Bates number M0059694.
 9            Your Honor, may we approach the witness?
10            THE COURT:  You can do so without asking, Counsel.
11            MR. QUINN:  Thank you, your Honor.
12            THE COURT:  And Counsel, you can approach also at
13   any time.
14            MS. HURST:  Thank you, your Honor.
15            THE COURT:  You don't have to be formal about
16   that.
17   BY MR. QUINN:
18   Q    Mr. Moore, we are going to hand you a copy of a
19   document that's Bates numbered -- it's a three-page
20   document -- four pages actually, Bates number M0059694
21   through 97, letter on Quinn Emanuel letterhead dated
22   September 30, 2006.
23       Do you have that before you, sir?
24   A    I do.
25   Q    Can you identify this document?
```

JANE C.S. RULE, CSR NO. 9316 - U.S. COURT REPORTER

1    A    I remember it being the cover letter that was filed in

2    connection with the copyright registration forms.

3    Q    Is that the letter that you are referring to?

4    A    Yes.

5    Q    Other than the three attorney -- Quinn Emanuel

6    attorneys who you mentioned, did you speak with anyone else

7    about whether to file copyright registrations for the Bratz

8    drawings?

9    A    I did.

10   Q    And who were -- who did you speak with?

11   A    I spoke with -- I remember speaking with two other

12   attorneys from Mattel, Don Aitken and Jill Thomas.

13   Q    Were they in-house attorneys like yourself at Mattel?

14   A    Yes.

15   Q    Were any nonattorneys present when you spoke with

16   Ms. Thomas about whether to file the copyright registration?

17   A    No, not that I can remember.

18   Q    The same question concerning Mr. Aitken?

19   A    No.

20   Q    Did you have any expectation as to whether your

21   discussions with Ms. Thomas regarding whether Mattel should

22   file copyright registrations for the Bratz designs were

23   privileged attorney-client communications?

24         MS. HURST:  Objection.  Calls for a legal

25   conclusion.

```
 1              MR. QUINN:  It's --

 2              THE COURT:  It goes to the state of mind.

 3    Overruled.

 4              THE WITNESS:  Yeah, I expected my communications

 5    would be privileged.

 6    BY MR. QUINN:

 7    Q    Same questions with regard to your communication with

 8    the other in-house lawyer, Mr. Aitken?

 9    A    Yes, and those communications I expected would also be

10    privileged.

11    Q    Did you have any expectation as to whether your

12    discussions with Ms. Thomas regarding whether Mattel should

13    file copyright registration for the Bratz designs were

14    protected attorney work product?

15    A    I did.

16    Q    And what was your expectation in that regard?

17    A    I expected that the communications would be protected

18    under the work product doctrines.

19    Q    And then same question concerning your communication

20    with Mr. Aitken?

21    A    I also expected those communications to be protected.

22    Q    Did you have any communication with anyone about how

23    copyright registration forms for the Bratz design drawings

24    should be filled out?

25    A    Yes.
```

SACV 04-9049-DOC - 03/09/2010 - Vol. II

```
 1    Q    With whom did you have those communications?
 2    A    With the lawyers from Quinn Emanuel I've mentioned,
 3    Dylan Proctor, Michael Zeller.
 4    Q    Did you provide Quinn Emanuel any direction on how any
 5    of the copyright registration forms should be filled out?
 6    A    I -- I did.  I provided the name of Robert Walsh, the
 7    paralegal who would be signing the copyright registration
 8    forms.
 9    Q    Other than that, did you provide any direction, other
10    than to tell them the name of the paralegal who would sign?
11    A    I may have provided them with the address for where the
12    correspondence for the copyright registration should be
13    sent.
14    Q    Anything else?
15    A    No.
16    Q    Did you do any research on your own to determine
17    whether the copyright registration forms should be filed?
18    A    No, not on my own.
19    Q    Did you do any research on your own to determine how
20    the copyright registration forms should be filled out?
21    A    No.
22    Q    Other than the Quinn Emanuel attorneys, did you ever
23    speak with anyone else about how the registration forms for
24    the Bratz drawings were filled out?
25    A    Yes, I did.
```

SACV 04-9049-DOC - 03/09/2010 - Vol. II

53

```
 1    Q    Who did you speak with?

 2    A    I spoke with Don Aitken.

 3    Q    That's your colleague, the in-house counsel?

 4    A    Also in-house counsel at Mattel.  And I spoke with

 5    Robert Walsh, the paralegal.

 6    Q    Were any nonattorneys present when you spoke with

 7    Mr. Aitken about how the registration forms were filled out?

 8    A    I can't remember any.

 9    Q    Were any nonattorneys present when you spoke with

10    Mr. Walsh on that subject?

11    A    No.

12    Q    Did you have any expectation as to whether your

13    discussions with Mr. Aitken regarding how the form should be

14    filled out were protected attorney-client communications?

15    A    Yes.

16    Q    And what was your expectation?

17    A    I expected they would be.

18    Q    Same question regarding your discussions with Don

19    Aitken as to whether the forms -- whether your discussions

20    with Mr. Aitken regarding how the form should be filled out

21    were protected by the attorney work product privilege?

22    A    I expected they would be protected.

23    Q    And then the same questions concerning your

24    conversations with Mr. Walsh?

25    A    In my conversations with Mr. Walsh, I expected to be
```

1    protected under both privileges.

2    Q    Do you know who filled out the copyright registration

3    forms for the Bratz design drawings in October 2006?

4    A    I received the forms from Quinn Emanuel.  They were

5    filled out already.

6    Q    Did you add anything to them other than to instruct the

7    paralegal to sign them?

8    A    No.

9    Q    What, if anything, did you do with the filled-out

10   registration forms after you received them?

11   A    I reviewed them.  I had discussions with outside

12   counsel, and I spoke to my paralegal, Rob Walsh, asked him

13   to review the forms and sign the document.

14   Q    You referred earlier to the cover letter we marked for

15   identification, the cover letter that Quinn Emanuel

16   prepared, which is marked as M59694 through 97.

17        Do you know who was involved in preparing the cover

18   letter for those October 2006 copyright registrations?

19   A    I remember that attorneys for Quinn Emanuel were,

20   specifically Mike Zeller, Dylan Proctor and Bruce

21   Van Dalsem.

22   Q    Do you know whether anyone outside of Quinn Emanuel did

23   any independent research regarding any matter discussed in

24   the cover letter?

25   A    No.

1    Q    Did you do any independent research regarding the

2    letter?

3    A    No.

4    Q    Did you personally suggest any language to go into the

5    letter?

6    A    No.

7    Q    Was anyone at Mattel tasked with being the primary

8    point of contact with Quinn Emanuel concerning the

9    October 2006 copyright registrations?

10   A    Yes, I was asked to be the primary point of contact.

11   Q    At the time -- did you authorize the copyright

12   registration forms to be filed?

13   A    Yes.

14   Q    At the time you did that, did you have any

15   understanding as to why boxes 6A and 6B on the forms were

16   blank?

17   A    I don't remember if I did have an understanding at that

18   time.

19         THE COURT:  I don't know if I'm going to accept

20   that answer, so I want you to think back.  I want you to be

21   very careful about what you say to this Court.

22         THE WITNESS:  Yes, sir.

23         THE COURT:  You may want to reflect a little bit.

24   If that's still your answer, that's your answer, but "I

25   don't know, I can't remember," okay?  I need you to think

SACV 04-9049-DOC - 03/09/2010 - Vol. II

56

```
 1   back and be very certain about your answer.
 2            MR. QUINN:  Let me pose the question with the
 3   Court's permission again.
 4            THE COURT:  I think he understands it.
 5            Do you want some time to get off the stand for a
 6   moment?  You're welcome to, but I can't caution you enough,
 7   and you'll understand that very quickly.
 8            THE WITNESS:  Yes.
 9            THE COURT:  Why don't we take a recess.
10            Why don't you step down for a minute.
11            THE WITNESS:  Yes.
12            THE COURT:  Counsel, we'll take a brief recess.
13            MR. QUINN:  Okay.
14            (Recess.)
15            THE COURT:  All right then.  We are back on the
16   record.  All counsel and parties are present.  The witness
17   is present.
18            Mr. Quinn?
19   BY MR. QUINN:
20   Q    Mr. Moore, at the time you authorized the copyright
21   registration forms to be filed in October of 2006, did you
22   have any understanding as to why boxes 6A and 6B on the
23   forms were blank?
24   A    I can put two and two together and think about reasons
25   why those boxes would be blank.
```

JANE C.S. RULE, CSR NO. 9316 - U.S. COURT REPORTER

1    Q    I'm asking you about your recollection of what your

2    understanding was at the time?

3    A    I don't remember what I understood at the time.

4    Q    Sitting here now, can you think of any reasons why

5    those boxes might have been left blank?

6    A    Yes.

7    Q    And what is that?

8    A    That there wasn't anything to complete, no -- nothing

9    to put in the box.

10   Q    Meaning with respect to whether the drawings were

11   derivative?

12   A    Yes.

13   Q    Other than information from Quinn Emanuel, did you

14   obtain any independent information as to whether boxes 6A

15   and 6B on the copyright registration forms should be filled

16   out?

17   A    I did not.

18   Q    You indicated that the forms were filled out by Quinn

19   Emanuel when you received them?

20   A    Yes.

21   Q    And was boxes 6A and 6B blank when you received them?

22   A    I believe they were.

23   Q    I mean, do you have any recollection of eliminating

24   anything yourself, eliminating anything from 6A to 6B?

25   A    I did not change the form.

```
 1    Q    Did you do any independent research regarding how boxes
 2    6A and 6B on the copyright registration forms should be
 3    filled out?
 4    A    No.
 5    Q    Did you have any independent understanding apart from
 6    what Quinn Emanuel attorneys may have told you as to why
 7    boxes 6A and 6B were answered the way they were in the
 8    copyright registration form?
 9    A    No.
10    Q    Other than any information you received from Quinn
11    Emanuel, did you obtain any independent information about
12    why box 2 was answered the way it was on the copyright
13    registration form?
14    A    No.
15    Q    Did you do any independent research as to why box 2 was
16    filled out the way it was on the copyright registrations?
17    A    No.
18    Q    Did you have any independent understanding apart from
19    what Quinn Emanuel attorneys told you as to why box 2 was
20    filled out the way it was on the copyright registrations?
21    A    No.
22    Q    Other than Don Aitken and Robert Walsh, did you discuss
23    with anyone else at Mattel why the copyright registration
24    forms were filled out the way they were?
25    A    No.
```

1    Q    Are you aware of anyone at Mattel other than Don Aitken

2    and Robert Walsh having any understanding of why the

3    copyright registration forms were filled out the way they

4    were?

5    A    No.

6    Q    Are you aware of anyone at Mattel other than Don Aitken

7    and Robert Walsh having any knowledge of why the copyright

8    registration forms were filled out the way they were?

9    A    No.

10   Q    Do you have any understanding of Mattel having any

11   business reason for the copyright -- for the copyright

12   registration forms in the particular manner in which they

13   were filled out?

14   A    No.

15          MS. HURST:  Objection.  Vague.

16          THE COURT:  Overruled.

17   BY MR. QUINN:

18   Q    Do you have any understanding of Mattel having any

19   business reason for filing the copyright registration forms

20   at all?

21   A    No, I do not.

22   Q    Are you aware of anyone at Mattel knowing of any

23   business reason for filing the copyright registration forms

24   in the particular manner in which they were filled out?

25   A    No.

1  Q    Are you aware of anyone at Mattel knowing of any

2  business reason for filing the copyright registration forms

3  at all?

4  A    No.

5  Q    Do you have any understanding apart from litigation

6  strategy of why the copyright registrations were filed?

7  A    No.

8  Q    Did your understanding of why the copyright

9  registration forms were filed come from anything other than

10 confidential attorney-client communications with Quinn

11 Emanuel?

12 A    No.

13 Q    Did your understanding of how the copyright

14 registration forms were completed come from anything other

15 than confidential attorney-client communications with Quinn

16 Emanuel?

17 A    No.

18            MR. QUINN:  Nothing further.

19            THE COURT:  Cross-examination.

20            MS. HURST:  Does the court need a copy?

21            THE COURT:  No, thank you.

22                   **CROSS-EXAMINATION**

23 BY MS. HURST:

24 Q    So you admit the Bratz design drawings are not

25 derivative works of Toon Teens?

1  A     No.

2          THE COURT:  That's not a clear answer to me.  I

3  didn't understand.  I understood the question.  I didn't

4  understand the answer.

5          Do you want to reask the question?  It's got a

6  negative in there, is why.

7  BY MS. HURST:

8  Q   You agree that the Bratz design drawings that were

9  subject of these registrations about which you were

10 testifying are not derivative works of Toon Teens, correct?

11         MR. QUINN:  Objection.

12         THE COURT:  Overruled.

13         Answer the question.

14         THE WITNESS:  I can't speak to right now what

15 Mattel's position is.

16         THE COURT:  That's not the question.  You are

17 in-house counsel.

18         THE WITNESS:  Yes.

19         THE COURT:  You are there for a purpose.  Answer

20 the question.

21         THE WITNESS:  I -- the -- the claim wasn't made in

22 the appl- -- in the copyright registration form that Bratz

23 was a derivative of anything, so the copyright registration

24 form doesn't make that claim.

25         Are you asking what I -- what I think?  Is that

JANE C.S. RULE, CSR NO. 9316 - U.S. COURT REPORTER

SACV 04-9049-DOC - 03/09/2010 - Vol. II

62

1    what -- or my opinion?  Is that what I'm being asked?  I

2    just want to make sure I am clear on the question.

3    BY MS. HURST:

4    Q    You agree that the Bratz design drawings that are the

5    subject of these registrations are not derivative works of

6    Toon Teens; isn't that correct?

7    A    I personally think they are not derivative works.

8    Q    Okay.  It's also true that the Bratz design drawings

9    were not based on the Toon Teens work of Lilli Martinez;

10   isn't that correct?

11            MR. QUINN:  Objection, your Honor.  It's vague and

12   ambiguous, lacks any foundation.

13            THE COURT:  Overruled.

14            You can answer that question.

15            THE WITNESS:  I don't know what the drawings were

16   based on.

17   BY MS. HURST:

18   Q    Were the Bratz design drawings based on Lilli Martinez'

19   Toon Teens or not?

20            MR. QUINN:  Objection.  Asked and answered, your

21   Honor.

22            THE COURT:  Overruled.

23            THE WITNESS:  I don't know.

24   BY MS. HURST:

25   Q    Who at Mattel does know?

JANE C.S. RULE, CSR NO. 9316 - U.S. COURT REPORTER

1            MR. QUINN:  Assumes facts not in evidence.

2            THE COURT:  Overruled.

3            THE WITNESS:  If I had to ask internally, I would

4    consult with others in the law department to determine the

5    position of Mattel.

6    BY MS. HURST:

7    Q    Is there anyone outside the law department of Mattel

8    who can state on behalf of Mattel whether or not the Bratz

9    design drawings are based on Lilli Martinez' Toon Teens

10   work?

11           MR. QUINN:  It's vague and ambiguous, lacks

12   foundation.

13           THE COURT:  Overruled.

14           THE WITNESS:  I don't know.  I would have to look,

15   ask.

16   BY MS. HURST:

17   Q    If there was a fraud in failing to identify Toon Teens

18   on these copyright registrations, whose fraud was it?

19           MR. QUINN:  It's argumentative.  It assumes --

20   incompetent hypothetical.

21           THE COURT:  Oh, it's just an opinion.

22           You can answer that.

23           Who's responsible if there was?

24           THE WITNESS:  If -- you know, I am not sure

25   whether it would be outside counsel of Mattel.

SACV 04-9049-DOC - 03/09/2010 - Vol. II

64

```
 1    BY MS. HURST:

 2    Q    If there was a material omission in these copyright

 3    applications by virtue of the failure to identify Toon Teens

 4    as a preexist -- as preexisting material, whose material

 5    omission was that?

 6              MR. QUINN:  It's argumentative, your Honor.  It

 7    assumes facts --

 8              THE COURT:  Overruled.

 9              You can answer that.  Outside counsel, Mattel's,

10    yours, whose?

11              THE WITNESS:  I didn't complete the copyright

12    registration form.  I don't know if it was outside counsel

13    of Mattel's.

14    BY MS. HURST:

15    Q    What more would you need to know in order to make the

16    determination of who's responsible for a material omission

17    in these copyright applications?

18    A    Well, I'd get legal advice from counsel to figure that

19    out.

20    Q    You think Quinn Emanuel will be the ones to ask for

21    that advice?

22              MR. QUINN:  It's argumentative, your Honor.

23              THE COURT:  It is argumentative.

24              MR. QUINN:  It's irrelevant.  It's a hypothetical

25    upon hypothetical.
```

SACV 04-9049-DOC - 03/09/2010 - Vol. II

65

```
 1              MS. HURST:  I'll withdraw that, your Honor.
 2   BY MS. HURST:
 3   Q    How many drafts of the applications were there?
 4   A    I don't remember.
 5   Q    Was there more than one?
 6   A    There might have been.  There weren't many, if there
 7   was more than one.
 8   Q    Were there any discussions about the content of the
 9   applications after they came to you in the form in which
10   they were ultimately submitted to the copyright office?
11   A    I discussed the content of the copyright registration
12   forms with Quinn Emanuel after I received them.
13   Q    No, I'm asking you now specifically about the form --
14   the final forms submitted to the copyright office, were
15   they -- were the contents of those discussed, once you
16   received them in what you understood to be the then final
17   form?
18   A    I might have done so with outside counsel, internal
19   counsel.
20   Q    You don't remember?
21   A    I don't remember.
22   Q    You don't remember whether there were any more
23   discussions after you received them in the form in which you
24   submitted them to the copyright office; is that correct?
25   A    Not of the content.  I don't remember discussing the
```

JANE C.S. RULE, CSR NO. 9316 - U.S. COURT REPORTER

1    content again.

2    Q    So when you received them in their final form, those

3    were intended to be submitted to the copyright office,

4    correct?

5    A    Yes.

6    Q    And in that form, they were not intended to be

7    confidential because you intended to disclose them to the

8    copyright office, correct?

9    A    I expected they would be disclosed to the copyright

10   office.

11   Q    At what point in the process did you decide there would

12   be a copyright office filing?

13   A    I don't remember exactly, but obviously before the

14   documents were filed.

15   Q    Once Quinn Emanuel raised the idea, was there ever any

16   doubt in your mind that you would proceed and file the

17   applications?

18   A    I don't remember exactly.  I -- this is all related to

19   communications with counsel, and I don't -- I have

20   discussions with counsel, and I don't take it as a given

21   that if they give me advice, you know, necessarily we would

22   be filing the applications, but I can't remember exactly.

23   Q    So you don't remember whether you ever had any doubt

24   that these would be filed?

25   A    I -- I can't remember the circumstances that I was told

 1  about the filing or the potential filing of these copyright

 2  registration forms, so it's hard for me to really answer the

 3  question.

 4  Q    From the very beginning when Quinn Emanuel raised the

 5  idea with you, you agreed it was a good one, and you

 6  intended to file the applications; isn't that true?

 7  A    I don't agree with that.

 8  Q    Well, what's incorrect about that?

 9  A    You're asking me to confirm something I was not sure

10  of.  I don't think that I necessarily would agree with every

11  bit of advice -- legal advice I'm given, but --

12  Q    I'm only asking about these applications, Mr. Moore,

13  I'm not asking about every bit of legal advice you've ever

14  been given?

15  A    Okay, then I don't remember.

16  Q    Whose property are the Bratz design drawings that were

17  the subject of the registration?

18  A    I understood that there was a basis that claimed that

19  they were Mattel's property.

20  Q    And where did you acquire that understanding and

21  instructing on behalf of Mattel that these documents be

22  filed with the copyright office?

23  A    It was through my communications with counsel.

24  Q    Any other place?

25  A    No, not that I can remember.

SACV 04-9049-DOC - 03/09/2010 - Vol. II

68

1    Q     Whose property is the copyright in the Bratz design

2    drawings that are the subject of these registrations?

3    A     Well, I believe that it's Mattel's property.

4    Q     Not Quinn Emanuel's?

5    A     I don't think they are Quinn Emanuel's property, no.

6    Q     Is Mattel claiming in connection with its ownership of

7    copyright in the Bratz design drawings that are the subject

8    of the 2006 registrations, that they are or are not

9    derivative works of Toon Teens?

10   A     In the copyright applications, registration forms that

11   were filed, I mean, you know, we -- no derivative work was

12   claimed.

13   Q     Is Mattel's purported property in the form of

14   copyrights in those Bratz design drawings, property in the

15   form of a derivative work or an original work?

16          MR. QUINN:  It calls for a legal conclusion, your

17   Honor.  It's asking for his opinion.

18          THE COURT:  Overruled.  He's in-house counsel.

19          You can answer that.

20          THE WITNESS:  I mean, we don't -- I don't think

21   Mattel believes -- my personal opinion is I don't think

22   Mattel believes that these are derivative works.

23   BY MS. HURST:

24   Q     So you agree -- Mattel agrees that the Bratz design

25   drawings are not based on Toon Teens, correct?

```
 1   A    I mean, I don't know what Mattel believes.  I can't --
 2   I don't think I can speak to Mattel's belief right now.
 3           THE COURT:  What you've done is you've segued from
 4   his personal belief to Mattel's belief.  He can say his
 5   personal belief.  I'll also allow him -- you to ask about
 6   Mattel's belief, but you have to know, I don't think he's a
 7   30(b)(6) representative, although as house counsel, I'm a
 8   little amiss as to what he does now in the corporation.
 9   BY MS. HURST:
10   Q    One of your responsibilities at Mattel is the handling
11   of copyrights, correct?
12   A    Yes.
13           THE COURT:  You might want to find out if the
14   gentleman has filed any prior copyrights or what he actually
15   does inside the company.
16   BY MS. HURST:
17   Q    And you've previously filed copyright applications on
18   behalf of Mattel, correct?
19   A    Yeah, I haven't personally filled out any registration
20   forms, but yeah, I've caused the registration forms to be
21   filed.
22   Q    And you've supervised the preparation of such forms on
23   behalf of Mattel, correct?
24   A    I have.
25   Q    And you've sent numerous cease and desist letters
```

SACV 04-9049-DOC - 03/09/2010 - Vol. II

70

```
1    seeking to enforce Mattel's interest in copyrights, correct?
2    A    I believe I have sent cease and desist letters about
3    copyright infringements.
4          THE COURT:  "I believe," that's a pretty selfish
5    response to me.  They always say to me "I believe," "to the
6    best of my recollection."  I find those uncredible to
7    noncredible statements.  Did you or didn't you?
8          THE WITNESS:  I apologize.
9          THE COURT:  Did you or didn't you?
10         THE WITNESS:  I did.
11         THE COURT:  No qualifying words.  If you don't
12   know, state you don't know, but no qualifying words will be
13   accepted by me; understood?
14         THE WITNESS:  Yes, sir.
15         THE COURT:  Thank you.
16   BY MS. HURST:
17   Q    You've sent cease and desist letters asserting
18   copyright interests on behalf of Mattel, correct?
19   A    I have.
20   Q    You were the point person at Mattel with respect to the
21   preparation and filing of these copyright registrations,
22   correct?
23   A    Yes.
24   Q    What is Mattel's belief as to whether or not the Bratz
25   design drawings that were the subject of these registrations
```

SACV 04-9049-DOC - 03/09/2010 - Vol. II

71

1     are or are not based upon Toon Teens?

2              MR. QUINN:  Asked and answered, your Honor.

3              THE COURT:  Overruled.

4              Answer the question.

5              THE WITNESS:  Okay.  I -- I personally believe

6     that the Bratz drawings were not derivative of Toon Teens.

7              THE COURT:  What I'm confused about in the

8     colloquy between the two of you is if there is any higher

9     counsel in the firm.  I -- I am assuming something that may

10    not be true, and that is that you are house counsel and lead

11    house counsel.  You may not be.  You may simply be an

12    underling who answers to a higher -- I don't mean an

13    underling, but a lesser counsel in the Mattel organization

14    that answers to a higher house counsel.  So I need to know,

15    because if he is house counsel, he should have these answers

16    on behalf of Mattel also.  This is the legal department, for

17    goodness sakes.

18             So I want to know your position eventually at

19    Mattel.  Are you an associate?

20             THE WITNESS:  Okay.

21             THE COURT:  Are you an associate?

22             THE WITNESS:  I am an expert counsel, and that is

23    a title that --

24             THE COURT:  How many house counsel are there?

25             THE WITNESS:  There may be 30 or so.

```
 1              THE COURT:  Thirty?
 2              THE WITNESS:  It's a little bit of a guess, but
 3    it's about that.
 4              THE COURT:  All right.  Thank you.
 5              Counsel.
 6    BY MS. HURST:
 7    Q    How long have you held the title "expert counsel"?
 8    A    I believe I've held it for about two years, maybe two
 9    and a half.
10    Q    What was your title at the time these registrations
11    were prepared?
12    A    I believe I was senior -- I'm sorry, I was senior
13    counsel.
14    Q    And in 2006, how long had you been in-house counsel
15    with Mattel?
16    A    About six years.
17    Q    And throughout that entire six-year period, you had had
18    responsibilities for both trademarks and copyrights,
19    correct?
20    A    No.
21    Q    Have you ever supervised copyright enforcement
22    litigation at Mattel?
23    A    I've supervised or I've been involved in litigation
24    over Mattel's copyright interests, yes.
25    Q    Other than this litigation, correct?
```

SACV 04-9049-DOC - 03/09/2010 - Vol. II

73

```
 1    A    Yes.

 2    Q    The Simba litigation, correct?

 3    A    Yes.

 4    Q    And that asserted copyright infringement?

 5    A    It did.

 6    Q    And that was a multi jurisdictional international

 7    copyright dispute; isn't that correct?

 8    A    There were a couple of cases against Simba, some of

 9    them involved copyright.

10    Q    And they were located in several countries around the

11    world, correct?

12    A    Yeah, I remember there being copyright litigation in a

13    number of countries.

14    Q    And that was all prior to 2006 that you were

15    supervising that litigation, correct?

16    A    Yeah, I was involved in primary contact for litigation

17    against Simba for a number of years, and I believe it was

18    before 2006.

19    Q    At one time in your early tenure at Mattel, you

20    reported to Michele McShane; is that correct?

21    A    I did.

22    Q    And she was the head of the IP section within the law

23    department there at Mattel?

24    A    Yes.

25    Q    And Ms. McShane left in 2003; is that correct?
```

SACV 04-9049-DOC - 03/09/2010 - Vol. II

74

```
 1    A     Yes.

 2    Q     And then you reported directly to Mr. Normile, correct?

 3    A     For a period of time, correct.

 4    Q     And Mr. Normile is general counsel, correct?

 5    A     Yes, he is.

 6    Q     Has Mr. Aitken ever had responsibility for supervising

 7    this litigation?

 8    A     He might have had some supervision over some aspects.

 9    I don't know.

10    Q     Can you identify any period of time in which Mr. Aitken

11    had had overall responsibility for the supervision of this

12    litigation within Mattel?

13    A     Well, I reported to Mr. Aitken, and I still report to

14    Mr. Aitken, and he was involved in aspects of the

15    litigation, so I believe -- I can't identify specific

16    periods of time or any specifics, but I just don't want to

17    exclude something.  I just don't remember.

18    Q     Did you or Mr. Aitken authorize the filing of the

19    copyright registrations in the form in which they were

20    filed?

21    A     I believe -- I believe we both did, but again, I was

22    primarily the contact.

23          THE COURT:  Did you both do that or not?  "I

24    believe," the qualifying words, I don't accept it.

25          THE WITNESS:  I don't remember if it was both of
```

JANE C.S. RULE, CSR NO. 9316 - U.S. COURT REPORTER

1    us, your Honor.

2    BY MS. HURST:

3    Q    I asked you whether or not these Bratz design drawings

4    are based on Lilli Martinez' Toon Teens.  You answered with

5    respect to the legal concept of derivative work.  I'm asking

6    you to put aside the legal concept of derivative work and

7    tell me, are the Bratz design drawings based on Toon Teens

8    or not?

9              MR. QUINN:  Your Honor, we object to the preamble.

10   He's answered that question also.  He was asked before about

11   "based on," he answered the question.

12             THE COURT:  I don't think he did.  Overruled.

13             You can answer it one more time.

14             THE WITNESS:  I don't know what the Toon Teens

15   drawings -- I'm sorry, the Bratz drawings were based on.

16   They look similar to some drawings, but I don't know what

17   they are based on.

18   BY MS. HURST:

19   Q    Are the Bratz design drawings that were the subject of

20   the registrations about which you testified in your direct

21   examination, do they incorporate any preexisting material

22   from Toon Teens?

23   A    I don't know.

24   Q    Who at Mattel can come here and testify on behalf of

25   the company whether or not these Bratz design drawings are

SACV 04-9049-DOC - 03/09/2010 - Vol. II

76

1  original or derivative works?

2  A    I don't know the answer to that.

3  Q    Was the subject of Toon Teens discussed in your

4  communications with Quinn Emanuel concerning the contents of

5  these copyright applications?

6            MR. QUINN:  Objection.  Privilege, your Honor.

7            THE COURT:  Counsel?

8            MS. HURST:  Your Honor, these have been voluntary

9  disclosures this evening.  The voluntary disclosures have

10  included the contents of the copyright applications.

11            THE COURT:  Well, I may be asking some questions

12  in camera.  I'm going to sustain the objection.

13            MS. HURST:  Your Honor, there is a prima facia

14  case that believes that the crime fraud exception applies.

15  The witness has testified he was the point person with

16  respect to these and that he has no good-faith basis for

17  understanding whether or not this is a derivative work.

18            THE COURT:  Thank you, Counsel.  Your next

19  question, please.

20            (Attorney discussion held off the record.)

21  BY MS. HURST:

22  Q    Mr. Moore, do you have before you previously admitted

23  Exhibit 13874?

24  A    I don't think I do.

25            MS. HURST:  I apologize, your Honor.  I thought

JANE C.S. RULE, CSR NO. 9316 - U.S. COURT REPORTER

SACV 04-9049-DOC - 03/09/2010 - Vol. II

1    Mr. Gordon had provided those to the witness.  I have them.

2    I'll give them to him.

3    BY MS. HURST:

4    Q    Do you have before you Exhibit 13874, Mr. Moore?

5    A    I do.

6    Q    It was Mr. Walsh, a paralegal at Mattel, acting

7    pursuant to your supervision who prepared Exhibit 13874; is

8    that correct?

9    A    Well, what Mr. Walsh did is he reviewed the application

10   and he signed it, yes.

11          MS. HURST:  Move to strike as nonresponsive.

12   BY MS. HURST:

13   Q    Let me ask you that again, Mr. Moore.

14          MR. QUINN:  Your Honor, was there a ruling on

15   the --

16          THE COURT:  No.

17   BY MS. HURST:

18   Q    It was Mr. Walsh, a paralegal at Mattel, acting

19   pursuant to your supervision who prepared Exhibit 13874;

20   isn't that correct?

21          MR. QUINN:  Just asked and answered, your Honor.

22          THE COURT:  No, overruled.

23          You can answer that question.

24          THE WITNESS:  Okay.  Mr. Walsh prepared this

25   application.  By "prepared," I mean he reviewed it and he

SACV 04-9049-DOC - 03/09/2010 - Vol. II

78

```
 1    signed the application.
 2    BY MS. HURST:
 3    Q    And when you testified at your deposition that he
 4    prepared it, that's what you meant, that he reviewed and
 5    signed it?
 6    A    Yes.
 7              MR. QUINN:  Your Honor, if we're going to get --
 8    under the rule of completeness, I'd like to read his
 9    testimony on this subject on the record.
10              THE COURT:  Do that on cross-examination.
11              Counsel?
12              Or redirect, I'm sorry.
13    BY MS. HURST:
14    Q    In fact, you testified as to Exhibits 13874, 13875,
15    13876, 13877 and 13878 that Mr. Walsh prepared and signed
16    the applications pursuant to your supervision; isn't that
17    correct?
18    A    I'd have to read the testimony to confirm, but that
19    sounds right.  I also testified that Quinn Emanuel filled in
20    the forms.
21    Q    Okay.  You have your deposition before you, Mr. Moore?
22    A    It looks like I do.  Yes.
23    Q    Would you turn, please, to page 178?
24    A    Okay.
25    Q    Do you see there at the bottom, line 25, do you see
```

SACV 04-9049-DOC - 03/09/2010 - Vol. II

79

 1   that?

 2   A    I see line 25.

 3   Q    I ask you, "And it was Mr. Walsh, a paralegal at

 4   Mattel, acting pursuant to your supervision who prepared

 5   Exhibit 13874; is that correct?"

 6        Do you see that question?

 7   A    I do.

 8   Q    And what was your answer?

 9   A    I answered "Yes."

10   Q    Is there anything there in that answer about Quinn

11   Emanuel attorneys?

12   A    No.

13   Q    All right.  Now, would you turn to page 190, please?

14   A    Okay.

15   Q    I apologize, page 186, I skipped one.

16   A    Okay.

17   Q    Do you see there on page 186, line 25, I ask you, "And

18   Mr. Walsh prepared the application for copyright in

19   Exhibit 13875 while he was a paralegal at Mattel acting

20   pursuant to your supervision, correct?"

21        Do you see that question?

22   A    I see it.

23   Q    And what was your answer?

24   A    I answered, "That's right."

25   Q    And was there any mention to Quinn Emanuel in that

1   answer?

2   A    I didn't mention Quinn Emanuel, no.

3   Q    Now would you turn to page 190, please?

4   A    Okay.

5   Q    At page 190, line 19, I ask you, "And the application

6   set forth in Exhibit 13876 was prepared by Mattel paralegal

7   Robert Walsh acting pursuant to your supervision, correct?"

8        Do you see that question?

9   A    I do.

10  Q    And what was your answer?

11  A    "That's correct."

12  Q    And was there any mention of Quinn Emanuel in that

13  answer?

14  A    No.

15  Q    Would you turn to page 211, please?

16  A    Okay.

17  Q    211, line 17, I ask you, "And the application for

18  copyright registration in Exhibit 13877 was prepared by

19  Robert Walsh, a paralegal at Mattel, pursuant to your

20  supervision, correct?"

21       Do you see that question?

22  A    I do.

23  Q    And what was your answer?

24  A    I answered, "Yes."

25  Q    And was there any mention of Quinn Emanuel in that

SACV 04-9049-DOC - 03/09/2010 - Vol. II

81

1    answer?

2    A     No.

3    Q     All right.  Please turn to page 216.

4    A     Okay.

5    Q     At page 216 at line 6, I ask you, Mr. Walsh who

6    signed -- pardon me, this does not include the word

7    "prepared," so I won't use this one.

8         At any time during the deposition, did I actually ask

9    you whether Quinn Emanuel had any role whatsoever in the

10   preparation of these applications for registration?

11   A     I don't remember exactly.

12   Q     In fact, it was you and your counsel who volunteered

13   that Quinn Emanuel had had a role in the preparation of the

14   applications; isn't that true?

15             MR. QUINN:  Argumentative.

16             THE COURT:  I'm sorry?

17             MR. QUINN:  I said argumentative.

18             THE COURT:  No, overruled.

19             You can answer that.

20             THE WITNESS:  I don't know.  I believe I answered

21   that Quinn Emanuel filled out the forms in response to a

22   question.

23   BY MS. HURST:

24   Q     What was it that refreshed your recollection that Quinn

25   Emanuel filled out the forms?

JANE C.S. RULE, CSR NO. 9316 - U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB  Document 7659  Filed 03/17/10  Page 82 of 105  Page ID
#:259264
SACV 04-9049-DOC - 03/09/2010 - Vol. II

82

```
 1              MR. QUINN:  Assumes facts not in evidence,
 2    argumentative.
 3              THE COURT:  What I'm not certain of is if he had
 4    gone through these series of answers about his supervision,
 5    and then if there was a addition to that testimony about
 6    Quinn Emanuel at a later time --
 7              MS. HURST:  That is what happened.
 8              THE COURT:  -- or whether he said that earlier.
 9    So I'm assuming based upon your questions that you believe
10    that the transcript will show me that there is a series of
11    answers not mentioning Quinn Emanuel, and then after, what,
12    some recess or break of some type?
13              MS. HURST:  After Mr. Zeller joined the
14    proceedings.
15              THE COURT:  After Mr. Zeller joined the
16    proceedings --
17              MS. HURST:  He did, he was not present for the
18    deposition, and then he later joined the proceedings, and
19    then there was a recess and then --
20              THE COURT:  You can answer the question.
21    BY MS. HURST:
22    Q    What refreshed your recollection that Quinn Emanuel was
23    involved?
24    A    Nothing refreshed my recollection.
25    Q    So you knew the whole time I was asking you if Robert
```

SACV 04-9049-DOC - 03/09/2010 - Vol. II

83

1    Walsh prepared those applications, that Quinn Emanuel had

2    been involved?

3    A    Yes.

4    Q    In 2002, Mattel looked into the question whether Bratz

5    might infringe Toon Teens; is that correct?

6              MR. QUINN:  Your Honor, it's privileged.  It's way

7    beyond the scope of this proceeding.

8              THE COURT:  I'll sustain the objection.

9              I want some time also to ask questions, Counsel,

10   in the second phase.

11             MS. HURST:  All right.

12             THE COURT:  It's unduly consumptive of time.

13             MS. HURST:  Your Honor, I'll represent that the

14   witness did testify to that at his deposition and was aware

15   of it at the time the registrations were filed.

16             THE COURT:  All right.

17             *(Attorney discussion held offed record.)*

18             MS. HURST:  Your Honor, I was just going to go

19   through the remaining questions as identified in the order

20   at this point.  I know -- I'm sensitive to the court's

21   comment regarding undue consumption of time.

22             THE COURT:  Well, I don't want there to be a

23   dearth of time.  It's about 11:00 and the court reporter

24   will continue a little while longer.  I'll need time, and

25   you're going to be in Chicago tomorrow, so you can continue

SACV 04-9049-DOC - 03/09/2010 - Vol. II

84

```
 1    on, but I'm not going to show any mercy in terms of you

 2    being in Chicago and then making the claim that you can't

 3    continue tomorrow at 8:00 in the morning, because I'm going

 4    forward with this tonight and tomorrow, and I don't think

 5    you can be in two places at one time.

 6              MS. HURST:  I can't, your Honor.

 7              THE COURT:  So what --

 8              MS. HURST:  Your Honor, let me move to dismiss any

 9    allegations in this case that are based on the notion that

10    Bratz is somehow biased on Toon Teens.

11              THE COURT:  Thank you.  Wrap up your questions,

12    now.

13              MS. HURST:  Thank you, your Honor.

14    BY MS. HURST:

15    Q    Is Mattel claiming that any of the Bratz design

16    drawings upon which it obtained a registration are

17    derivative works?

18    A    I -- I don't know what Mattel is now claiming.

19    Q    In filing the applications for the Bratz design

20    drawings, was Mattel claiming that they were derivative

21    works of Toon Teens?

22    A    In the copyright registration forms, there was not a

23    claim that Toon Teens was a derivative -- Bratz was a

24    derivative of Toon Teens, I'm sorry.

25    Q    So no?
```

JANE C.S. RULE, CSR NO. 9316 - U.S. COURT REPORTER

SACV 04-9049-DOC - 03/09/2010 - Vol. II

85

```
 1              THE COURT:  Let him answer the question, Counsel.

 2              THE WITNESS:  I'm sorry.  Can you repeat the

 3    question?

 4              MS. HURST:  Your Honor, I'm not sure if the Court

 5    wishes me to do that based on its comments.

 6              THE COURT:  Well, you can have him answer the

 7    question.  You are supplying the answer.  Just reask the

 8    question.

 9              MS. HURST:  All right.

10    BY MS. HURST:

11    Q    In filing the applications for registration for the

12    Bratz design drawings, was Mattel claiming that any of those

13    drawings were derivative works of Toon Teens?

14    A    I don't know.  I don't think so.

15              THE COURT:  We're spending a lot of time.  Who

16    would know that answer, sir?

17              MR. QUINN:  In terms of what Mattel is claiming,

18    your Honor?

19              THE COURT:  Uh-huh.

20              MR. QUINN:  Mr. Zeller and I can answer that.

21              THE COURT:  Who would know that answer without the

22    suggestion of Quinn Emanuel, who inside the corporation?

23              THE WITNESS:  I would have to consult with

24    internal counsel, your Honor, to know.

25              THE COURT:  Okay.
```

```
 1              All right, Counsel.
 2    BY MS. HURST:
 3    Q    At the time Mattel filed its copyright applications for
 4    the Bratz design drawings, were any of those drawings based
 5    on preexisting material in the form of Toon Teens?
 6    A    I don't know.
 7    Q    At the time Mattel filed the applications for
 8    registration with respect to the Bratz design drawings, did
 9    it believe that any of them were based on preexisting
10    material in the form of Toon Teens?
11              MR. QUINN:  Your Honor, these -- this is one of
12    the questions that the Court's tentative indicated was
13    privileged, and I understood the purpose of this proceeding
14    was in part to see if the foundation for the claim of
15    privilege could be laid.  We are still claiming privilege,
16    your Honor.
17              THE COURT:  Uh-huh.  Now, Counsel, that was my
18    ruling.
19              MS. HURST:  And are we going to have argument on
20    that, your Honor?
21              THE COURT:  No.
22              MS. HURST:  All right.
23    BY MS. HURST:
24    Q    In filing the copyright applications for the Bratz
25    design drawings, did Mattel knowingly fail to identify Toon
```

SACV 04-9049-DOC - 03/09/2010 - Vol. II

87

 1    Teens as preexisting material upon which those drawings were

 2    based?

 3              MR. QUINN:  That's question 14, that the Court's

 4    tentative states is privileged.

 5              MS. HURST:  It's actually question 12, which is

 6    not addressed in the tentative, your Honor.

 7              THE COURT:  It's sustained, Counsel.  You have two

 8    more questions, and that will conclude your examination this

 9    evening.

10              MS. HURST:  Thank you, your Honor.

11    BY MS. HURST:

12    Q    In filing these applications with Bratz design drawings

13    with the copyright office, did Mattel deliberately choose

14    not to identify Toon Teens as preexisting material upon

15    which the drawings were based?

16              MR. QUINN:  It's privileged, your Honor.

17              MS. HURST:  It's question 13.  It was approved in

18    the tentative, your Honor.

19              THE COURT:  Answer the question.

20              Overruled.

21              THE WITNESS:  I -- I don't know.

22    BY MS. HURST:

23    Q    Who would know whether or not Mattel deliberately chose

24    not to identify Toon Teens as preexisting material?

25    A    Well, outside counsel would know, and I'd have to check

JANE C.S. RULE, CSR NO. 9316 - U.S. COURT REPORTER

1    with others internally to confirm who would know at Mattel.

2              MS. HURST:  That was my second question, your

3    Honor.

4              THE COURT:  Okay.  Counsel, thank you very much.

5              I'd like to have an in-camera proceeding for just

6    a moment.  I'm going to excuse you.  If you'd be kind enough

7    to wait out in the hallway, and the remainder of this will

8    remain sealed.

9              I don't think this will take long, Counsel, so

10   don't go very far.

11             MS. HURST:  Thank you, your Honor.

12             THE COURT:  Thank you.

13                 **  *  SEALED PROCEEDINGS FOLLOW *  * **

14             **(Written Court approval required to view.)**

15

16

17

18

19

20

21

22

23

24

25

SACV 04-9049-DOC - 03/09/2010 - Vol. II

89

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SACV 04−9049−DOC − 03/09/2010 − Vol. II

90

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25





1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1      **SANTA ANA, CALIFORNIA, TUESDAY, MARCH 9, 20**10

2          **\* \* OPEN COURT PROCEEDINGS RESUMED \* \***

3          THE COURT:  All right.  Counsel, your positions

4    are clear in the briefs.  This is the Court's ruling.  It's

5    not going to require any further argument by counsel.

6          This Court finds that Mr. Moore's beliefs about

7    the information contained in boxes 6A and 6B of the

8    copyright application were not directed by counsel.  This

9    Court has formed the opinion that Mr. Moore has completed

10   other copyright applications and encountered these very

11   issues related to derivative works in the past.  His

12   testimony has been nebulous, I want to be kind about that.

13         Moreover, the transcript of his deposition reveals

14   inconsistency with respect to the extent to which outside

15   counsel was involved in the process.  Finally, it's clear to

16   this Court that Mr. Moore has done independent thinking

17   about the issues in this case well before the 2006 copyright

18   applications were filed.

19         Therefore, based on the entire and extensive

20   record and the briefing of counsel, this Court finds the

21   questioning of Mr. Moore on his beliefs about the

22   information contained in the copyright application, it does

23   not tread upon the attorney-client privilege or work product

24   doctrine.

25         I want to state and admonish counsel that

SACV 04-9049-DOC - 03/09/2010 - Vol. II

96

1    Mr. Moore's beliefs about the copyright applications do not

2    estop any legal determination by this court as to whether

3    the contents of those applications were derivative works.

4    This is a determination for the court to make, and this was

5    the direction that MGA's counsel was heading with her

6    questions.  It's not availing as a matter of law.

7              Therefore, these documents are not privileged.

8              Now, this ruling has far-reaching implications.  I

9    want to speak to you about Mr. Nolan and Mr. Larion shortly.

10   I want to see them both in court.  I want to set up a

11   schedule, and that ought to be a very interesting hearing

12   also.

13             When is this court going to have an answer from

14   MGA concerning these 30(b)(6) issues down in Mexico?  I'm

15   highly dissatisfied.

16             Sit down.  These empty vessels are taking on the

17   hue of a mystifying appearance, which is not acceptable.

18             MR. MC CONVILLE:  So the short answer to your

19   question is we've offered Mr. Small to come back and testify

20   March 17th --

21             THE COURT:  Does he have anything to say, or is

22   this going to be the usual --

23             MR. MC CONVILLE:  Well, I don't know if the

24   Court --

25             THE COURT:  Because let me caution you, you hold

JANE C.S. RULE, CSR NO. 9316 - U.S. COURT REPORTER

SACV 04-9049-DOC - 03/09/2010 - Vol. II

1   the keys to cutting off these deposition in your own hand.

2           MR. MC CONVILLE:  Understood.  I'm just going to

3   report to you what will happen.

4           So as I understand the dispute, Mattel says he is

5   not prepared because he can't respond as to how these

6   documents got to MGA Mexico.  The answer to those questions

7   are with people who are being prosecuted in Mexico for

8   taking these documents.

9           THE COURT:  I've heard this before.

10          MR. MC CONVILLE:  Right.  So when Mr. Small comes

11  in and say, tell us where the documents came from, we are

12  going to come back and say, we don't know where the

13  documents came from because the people who are being

14  prosecuted won't tell us because they are being prosecuted

15  by Mattel.

16          THE COURT:  Okay.

17          MR. MC CONVILLE:  I mean, he's going to go ask

18  them again to please tell us --

19          THE COURT:  Okay, that's fine.  You hold the key

20  in your own hand.

21          All right, then, I think tomorrow evening and

22  tomorrow is going to be interesting.  We need to get to

23  these Wing documents as closely as possible.  I'm cognizant

24  that you can't be in two places at one time.  So you're

25  heading for Chicago.

SACV 04-9049-DOC - 03/09/2010 - Vol. II

98

1          So Mr. McConville is lead counsel concerning the

2    Wing documents, and you can bring in another counsel for

3    this limited purpose tomorrow.

4          MR. MC CONVILLE:  Thank you, sir.

5          THE COURT:  So you are not outresourced.  But we

6    need Mr. Wing, we need apparently his counsel.  I've heard

7    some rumor that his counsel is engaged in trial.

8          MR. MC CONVILLE:  We sent an e-mail while we've

9    been sitting here.  I don't remember exactly what it said.

10         MS. HURST:  I just have a question.  No argument.

11         THE COURT:  Sit down.

12         MR. ZELLER:  What I see in the e-mail, and

13   Mr. McConville is on these as well, is he just said that he

14   had been attempting to reach Mr. Wing, and that he'll report

15   as soon as he does contact him.

16         THE COURT:  Okay.

17         Now, I don't want you driving unsafely, so I want

18   you to go home and get some rest, but I do need you back

19   tomorrow.  And so you give me a suggested time, and we have

20   some other briefing, though, that hasn't been completed.

21              *(Interruption in the proceedings.)*

22         THE COURT:  I am still waiting for the

23   supplemental briefing that I ordered on recommendation

24   number 5 of Judge Smith's January 21st, 2010 R and R.  Can

25   somebody help me with this?

JANE C.S. RULE, CSR NO. 9316 - U.S. COURT REPORTER

SACV 04-9049-DOC - 03/09/2010 - Vol. II

1          MR. ZELLER:  Mattel has been --

2          THE COURT:  Sit down.

3          MR. ZELLER:  I'm sorry.

4          Mattel has been ready to file that at any time.

5   It was our understanding that it was supposed to be done

6   simultaneously, and MGA has not agreed to a date.

7          THE COURT:  Let's find out a date now.

8          MS. HURST:  Monday.

9          THE COURT:  Monday.

10         MS. HURST:  May we be permitted to address the

11  impact of the agreed search term procedure from this evening

12  as well on further aspects of recommendation number 5?

13         THE COURT:  Concerning discovery master order

14  number 89-91, you represented that there were going to be

15  continuing efforts.  They were going to -- you were going to

16  supplement that production by today.  Are you satisfied that

17  that's been completed?

18         MR. ZELLER:  For Mattel, we -- we produced in

19  excess of 25,000 pages today.

20         THE COURT:  Are you satisfied that this has been

21  completed?

22         MR. ZELLER:  I'm sorry, satisfied --

23         THE COURT:  Well, I stayed your obligations on the

24  good-faith expectation that you would continue your efforts

25  of production.

SACV 04-9049-DOC - 03/09/2010 - Vol. II

```
 1             MR. ZELLER:  Yes, sir.

 2             THE COURT:  I believe you stated to me yesterday,

 3   and I may be mistaken, that those efforts were continued,

 4   and you told me that by 5:00 today, that all the documents

 5   related to the categories that you are not appealing would

 6   be supplemented.

 7             MR. ZELLER:  We have -- we have done that

 8   supplementation, your Honor.

 9             THE COURT:  So then in good faith, this has been

10   completed?

11             MR. ZELLER:  The answer to that question, I don't

12   know.  I know that there is a very large volume of

13   information we have been processing.

14             THE COURT:  Who does?  Who knows?

15             MR. ZELLER:  My colleagues.  I would have to

16   consult with them.  There are people who are dealing with

17   all these production issues and --

18             (Interruption in the proceedings.)

19             THE COURT:  Two other things I wanted to cover,

20   and Counsel, you were saying something and I wasn't paying

21   attention.  I'll be back with you in a moment.

22             I'll be right back.

23             (Recess.)

24             THE COURT:  Okay.  This was filed this evening,

25   the stipulation regarding schedule for compliance with the
```

SACV 04-9049-DOC - 03/09/2010 - Vol. II

```
 1   electronic discovery special master's January 21st, 2010
 2   report, but in reading through this, most of these are
 3   simply disagreements between counsel again, so this will be
 4   resolved tomorrow also by the Court, and I'll hear arguments
 5   tomorrow on each one of these.
 6              I'm sorry, Counsel, you started to say.
 7              MS. HURST:  Your Honor, the order regarding
 8   answering questions on recommendation number 5 expressly
 9   precluded addressing anything other than the questions.  I
10   was asking for permission to address what the impact of
11   tonight's agreement regarding key word searching, just to
12   address how that should be considered as well in responding
13   to those questions.
14              THE COURT:  Okay.
15              MS. HURST:  Is that acceptable to the Court?
16              THE COURT:  I don't know yet.  Let me think about
17   that.
18              MS. HURST:  All right.
19              THE COURT:  I'll answer that tomorrow.
20              Well, listen, go home and get some sleep.  And
21   what time would you like to reconvene tomorrow?  You name
22   the time.
23              (No audible response.)
24              THE COURT:  I'm going to be here at 7:30.  You are
25   more than welcome to be here.  I don't know what your
```

JANE C.S. RULE, CSR NO. 9316 - U.S. COURT REPORTER

SACV 04-9049-DOC - 03/09/2010 - Vol. II

```
 1    lodgings are, et cetera.  I don't want you to be exhausted.

 2    I don't want you to be driving unsafely, so it doesn't have

 3    to be 7:30, but I'll be here at 7:30.  It can be 9:00, 9:30,

 4    I don't care when we start tomorrow.  Just name a time and

 5    let's get started.

 6                MS. HURST:  We are probably going to need to get

 7    one other person here down from San Francisco if we're going

 8    to do all the electronic discovery stuff that's the subject

 9    of the stipulation.

10                THE COURT:  Okay.  Call them.

11                MR. MC CONVILLE:  I'll talk to them, but it's

12    easiest for me to get here, your Honor, so I will defer to

13    whenever they want to get here.

14                THE COURT:  But if you need that person down, get

15    him down.

16                MR. MC CONVILLE:  I will, I'll talk to him.

17                THE COURT:  No, no.  I'm going to set the time,

18    now, for tomorrow.  What time?  10:00?  So you can get ahold

19    of him tonight.  11:00, 11:30?

20                MR. ZELLER:  I think our preference would be 9:00.

21                THE COURT:  Okay.

22                MR. ZELLER:  I think that's a reasonable start.

23                THE COURT:  Is that reasonable to get your person

24    down here?

25                MR. MC CONVILLE:  9:30.  I think the flight gets
```

SACV 04-9049-DOC - 03/09/2010 - Vol. II

103

```
1    here by 9:00, so --
2           MS. HURST:  You can start on the Wing stuff before
3    he gets here.
4           THE COURT:  9:30, and if he's within a reasonable
5    period, we'll wait.
6           All right.  I'll order all parties back at 9:30.
7    We need to wrestle with the Wing matters.
8           Now, I'll speak about prior counsel in just a
9    moment and Mr. Larion.  Do you want to stay on the record
10   concerning that?  I'd be happy to if you'd like to.
11          MS. HURST:  I would like some guidance on the
12   record as to what the scope of the Court's contemplating --
13          THE COURT:  I'm going to be setting up a schedule
14   and we're going to be going through much of the same process
15   that we did this evening concerning privilege and, for want
16   of a better term, who was running the show, whether counsel
17   was running the show or Mr. Larion, just as whether
18   Mr. Quinn and his firm were running the show with Mattel or
19   Mattel was.
20          You've heard my ruling tonight.  This is not
21   privileged information.  And I'm going to delve just as
22   deeply into Mr. Larion and past counsel's representation,
23   which you're quite aware of, and the other side isn't, and
24   you know exactly what I'm talking about.
25          MS. HURST:  No.  I just wanted to know the
```

SACV 04-9049-DOC - 03/09/2010 - Vol. II

1    scope --

2           THE COURT:  Counsel, you know exactly what I'm

3    talking about.  You can tell that to the other counsel.

4    Never tell that to the Court.

5           So we'll set up a schedule.  We can do that while

6    you are on the plane tomorrow.  You know, we'll talk to

7    Mr. McConville.

8           You'll be talking to counsel when she lands, so we

9    are not going to do anything, but it's going to be the next

10   couple of days or this weekend, and we'll get into that

11   very, very quickly.

12          Good night, then.  We'll see you tomorrow at 9:30.

13          *(Recess.)*

14                         -oOo-

15

16

17

18

19

20

21

22

23

24

25

JANE C.S. RULE, CSR NO. 9316 - U.S. COURT REPORTER

SACV 04-9049-DOC - 03/09/2010 - Vol. II

105

```
 1                          -oOo-

 2                        CERTIFICATE

 3

 4        I hereby certify that pursuant to Section 753,

 5   Title 28, United States Code, the foregoing is a true and

 6   correct transcript of the stenographically reported

 7   proceedings held in the above-entitled matter and that the

 8   transcript page format is in conformance with the

 9   regulations of the Judicial Conference of the United States.

10

11   Date:  March 16, 2010

12

13

14        _____

15        JANE C.S. RULE, U.S. COURT REPORTER
          CSR NO. 9316

16

17

18

19

20

21

22

23

24

25
```

JANE C.S. RULE, CSR NO. 9316 - U.S. COURT REPORTER