# EXHIBIT A

EXECUTION COPY

CREDIT AGREEMENT

Dated as of October 27, 2006

by and among

MGA ENTERTAINMENT INC.,
as Borrower,

WACHOVIA CAPITAL MARKETS, LLC,
as Arranger,

WACHOVIA BANK, NATIONAL ASSOCIATION,
as Administrative Agent,

Each of
WELLS FARGO HSBC TRADE BANK, NATIONAL ASSOCIATION
and
WESTLB AG, NEW YORK BRANCH,
as Syndication Agents,

and

THE FINANCIAL INSTITUTIONS INITIALLY SIGNATORY HERETO
AND THEIR ASSIGNEES PURSUANT TO SECTION 12.5.,
as Lenders

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT A PAGE 3
OMNI0000334

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT A PAGE 4

OMNI0000335

## TABLE OF CONTENTS

Article I. Definitions ................................................................................................ 1
Section 1.1.  Definitions.......................................................................................... 1
Section 1.2.  General; References to Times. ......................................................... 19
Section 1.3.  Effectiveness of Euro Provisions. .................................................... 20
Section 1.4.  Currencies; Currency Equivalents.................................................... 20

Article II. Credit Facility........................................................................................ 20
Section 2.1.  Revolving Loans. ............................................................................. 20
Section 2.2.  Swingline Loans............................................................................... 21
Section 2.3.  Letters of Credit. .............................................................................. 22
Section 2.4.  Rates and Payment of Interest on Loans. ........................................ 26
Section 2.5.  Number of Interest Periods. ............................................................. 27
Section 2.6.  Repayment of Loans. ....................................................................... 27
Section 2.7.  Prepayments. .................................................................................... 27
Section 2.8.  Continuation. .................................................................................... 28
Section 2.9.  Conversion. ...................................................................................... 28
Section 2.10. Notes. ............................................................................................... 29
Section 2.11. Voluntary Reductions of the Commitment. ..................................... 29
Section 2.12. Expiration or Maturity Date of Letters of Credit Past Termination
             Date................................................................................................. 30
Section 2.13. Amount Limitations. ........................................................................ 30
Section 2.14. Increase of Commitments. ............................................................... 30

Article III. Payments, Fees and Other General Provisions ..................................... 31
Section 3.1.  Payments. .......................................................................................... 31
Section 3.2.  Pro Rata Treatment. ......................................................................... 31
Section 3.3.  Sharing of Payments, Etc. ............................................................... 32
Section 3.4.  Several Obligations. ......................................................................... 33
Section 3.5.  Minimum Amounts. .......................................................................... 33
Section 3.6.  Fees. .................................................................................................. 33
Section 3.7.  Computations. ................................................................................... 34
Section 3.8.  Usury................................................................................................. 34
Section 3.9.  Agreement Regarding Interest and Charges..................................... 34
Section 3.10. Statements of Account. .................................................................... 35
Section 3.11. Defaulting Lenders........................................................................... 35
Section 3.12. Taxes. ............................................................................................... 36

Article IV. Yield Protection, Etc............................................................................. 37
Section 4.1.  Additional Costs; Capital Adequacy................................................ 37
Section 4.2.  Suspension of LIBOR Loans. .......................................................... 39
Section 4.3.  Illegality. .......................................................................................... 39
Section 4.4.  Compensation.................................................................................... 39
Section 4.5.  Treatment of Affected Loans. .......................................................... 40
Section 4.6.  Affected Lenders. ............................................................................. 40
Section 4.7.  Change of Lending Office................................................................. 41
Section 4.8.  Assumptions Concerning Funding of LIBOR Loans. ...................... 41
Section 4.9.  Redenominations............................................................................... 41
Section 4.10. Exchange Indemnification. .............................................................. 42

- i -

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT A PAGE 5

OMNI0000336

Section 4.11.  Regulatory Limitation. ........................................................42

Article V. Conditions Precedent ...................................................................42

Section 5.1.  Initial Conditions Precedent..................................................42
Section 5.2.  Conditions Precedent to All Loans and Letters of Credit. ......44

Article VI. Representations and Warranties......................................................45

Section 6.1.  Representations and Warranties...............................................45
Section 6.2.  Survival of Representations and Warranties, Etc....................49

Article VII. Affirmative Covenants ................................................................50

Section 7.1.  Preservation of Existence and Similar Matters. ......................50
Section 7.2.  Compliance with Applicable Law and Material Contracts. ...........50
Section 7.3.  Maintenance of Property........................................................50
Section 7.4.  Conduct of Business...............................................................50
Section 7.5.  Insurance. ..............................................................................50
Section 7.6.  Payment of Taxes and Claims.................................................51
Section 7.7.  Visits and Inspections. ...........................................................51
Section 7.8.  Use of Proceeds; Letters of Credit. ........................................51
Section 7.9.  Books and Records.................................................................51
Section 7.10.  Further Assurances................................................................52
Section 7.11.  New Subsidiaries/Guarantors................................................52

Article VIII. Information ...............................................................................53

Section 8.1.  Quarterly Financial Statements...............................................53
Section 8.2.  Year-End Statements..............................................................53
Section 8.3.  Compliance Certificate...........................................................54
Section 8.4.  Other Information...................................................................54
Section 8.5.  Electronic Delivery of Certain Information. ............................55

Article IX. Negative Covenants ....................................................................56

Section 9.1.  Financial Covenants...............................................................56
Section 9.2.  Restricted Payments...............................................................56
Section 9.3.  Indebtedness...........................................................................57
Section 9.4.  Investments. ...........................................................................59
Section 9.5.  Liens......................................................................................60
Section 9.6.  Negative Pledges....................................................................61
Section 9.7.  Restrictive Agreements. .........................................................61
Section 9.8.  Fundamental Changes.............................................................61
Section 9.9.  Disposition of Assets..............................................................62
Section 9.10.  Derivatives Contracts.............................................................63
Section 9.11.  Fiscal Year. ...........................................................................63
Section 9.12.  Transactions with Affiliates...................................................63
Section 9.13.  ERISA Exemptions................................................................63

Article X. Default.........................................................................................63

Section 10.1.  Events of Default...................................................................63
Section 10.2.  Remedies Upon Event of Default............................................67
Section 10.3.  Remedies Upon Default.........................................................68
Section 10.4.  Allocation of Proceeds. .........................................................68
Section 10.5.  Collateral Account. ...............................................................69

LEGAL02/30055542v16

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT A PAGE 6

OMNI0000337

Section 10.6.  Performance by Agent............................................................69
Section 10.7.  Rights Cumulative.................................................................70

Article XI. The Agent ............................................................................................70

Section 11.1.  Authorization and Action.......................................................70
Section 11.2.  Agent's Reliance, Etc.............................................................70
Section 11.3.  Notice of Defaults..................................................................71
Section 11.4.  Wachovia as Lender...............................................................71
Section 11.5.  Approvals of Lenders.............................................................71
Section 11.6.  Collateral Matters..................................................................72
Section 11.7.  Lender Credit Decision, Etc...................................................73
Section 11.8.  Indemnification of Agent.......................................................73
Section 11.9.  Successor Agent.....................................................................74
Section 11.10. Titled Agents.........................................................................74

Article XII. Miscellaneous....................................................................................75

Section 12.1.  Notices. ..................................................................................75
Section 12.2.  Expenses.................................................................................76
Section 12.3.  Setoff......................................................................................76
Section 12.4.  Litigation; Jurisdiction; Other Matters; Waivers. ................77
Section 12.5.  Successors and Assigns..........................................................78
Section 12.6.  Amendments...........................................................................80
Section 12.7.  Nonliability of Agent and Lenders.........................................82
Section 12.8.  Confidentiality........................................................................82
Section 12.9.  Indemnification. .....................................................................83
Section 12.10. Termination; Survival. ..........................................................84
Section 12.11. Severability of Provisions......................................................85
Section 12.12. GOVERNING LAW...............................................................85
Section 12.13. Patriot Act. ............................................................................85
Section 12.14. Counterparts. .........................................................................85
Section 12.15. Obligations with Respect to Loan Parties. ...........................85
Section 12.16. Limitation of Liability............................................................85
Section 12.17. Entire Agreement. .................................................................86
Section 12.18. Construction. .........................................................................86
Section 12.19. Judgment Currency. ..............................................................86

SCHEDULE 1.1.(A)       List of Loan Parties
SCHEDULE 1.1.(B)       List of Pledgors
SCHEDULE 1.1.(C)       List of Grantors
SCHEDULE 6.1.(b)       Ownership Structure
SCHEDULE 6.1.(g)       Indebtedness and Guaranties
SCHEDULE 6.1.(h)       Material Contracts
SCHEDULE 6.1.(i)       Litigation
SCHEDULE 6.1.(j)       Taxes
SCHEDULE 6.1.(u)       Broker's Fees
SCHEDULE 9.4.          Existing Investments
SCHEDULE 9.5.          Existing Indebtedness
SCHEDULE 9.12.         Transactions with Affiliates


EXHIBIT A              Form of Assignment and Assumption
EXHIBIT B              Form of Notice of Borrowing

- iii -

LEGAL02/30055542v16

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| EXHIBIT C | Form of Notice of Continuation |
| EXHIBIT D | Form of Notice of Conversion |
| EXHIBIT E | Form of Notice of Swingline Borrowing |
| EXHIBIT F | Form of Swingline Note |
| EXHIBIT G | Form of Revolving Note |
| EXHIBIT H | Form of Alternate Currency Note |
| EXHIBIT I | Form of Opinion of Counsel |
| EXHIBIT J | Form of Compliance Certificate |
| EXHIBIT K | Form of Guaranty |
| EXHIBIT L | Form of Pledge Agreement |
| EXHIBIT M | Form of Security Agreement |
| EXHIBIT N | Form of Confidentiality Agreement |

LEGAL02/30055542v16

- iv -

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

THIS CREDIT AGREEMENT (this "Agreement") dated as of October 27, 2006 by and among MGA ENTERTAINMENT INC., a corporation formed under the laws of the State of California (the "Borrower"), WACHOVIA CAPITAL MARKETS, LLC, as Arranger (the "Arranger"), WACHOVIA BANK, NATIONAL ASSOCIATION, as Agent, each of WELLS FARGO HSBC TRADE BANK, NATIONAL ASSOCIATION and WESTLB AG, NEW YORK BRANCH, as Syndication Agents (each a "Syndication Agent"), and each of the financial institutions initially a signatory hereto together with their assignees pursuant to Section 12.5.(b).

WHEREAS, the Agent and the Lenders desire to make available to the Borrower a revolving credit facility in the initial amount of $200,000,000, which will include a $50,000,000 letter of credit subfacility, a $25,000,000 swingline subfacility and a $50,000,000 alternate currency subfacility, on the terms and conditions contained herein.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties hereto, the parties hereto agree as follows:

## ARTICLE I. DEFINITIONS

### Section 1.1. Definitions.

In addition to terms defined elsewhere herein, the following terms shall have the following meanings for the purposes of this Agreement:

"**Accession Agreement**" means an Accession Agreement substantially in the form of Annex I to the Guaranty.

"**Additional Costs**" has the meaning given that term in Section 4.1.

"**Adjusted LIBOR**" means, with respect to each Interest Period for any LIBOR Loan, the rate obtained by dividing (a) LIBOR for such Interest Period by (b) a percentage equal to 1 minus the stated maximum rate (stated as a decimal) of all reserves, if any, required to be maintained with respect to Eurocurrency funding (currently referred to as "Eurocurrency liabilities") as specified in Regulation D of the Board of Governors of the Federal Reserve System (or against any other category of liabilities which includes deposits by reference to which the interest rate on LIBOR Loans is determined or any applicable category of extensions of credit or other assets which includes loans by an office of any Lender outside of the United States of America to residents of the United States of America). Any change in such maximum rate shall result in a change in Adjusted LIBOR on the date on which such change in such maximum rate becomes effective.

"**Affiliate**" means any Person directly or indirectly controlling, controlled by, or under common control with, the Borrower. For purposes of this definition, "control" (including with correlative meanings, the terms "controlling", "controlled by" and "under common control with") means the possession directly or indirectly of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities or by contract or otherwise. The Affiliates of a Person shall include any officer or director of such Person. In no event shall the Agent or any Lender be deemed to be an Affiliate of the Borrower.

"**Agent**" means Wachovia Bank, National Association, as contractual representative for the Lenders under the terms of this Agreement, and any of its successors.

"**Agreement Date**" means the date as of which this Agreement is dated.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT A PAGE 9
OMNI0000340

"**Alternate Currency**" means, at any time, any of (a) the Euro, (b) the Pound Sterling, (c) Canadian Dollars and (d) with the prior written consent of the Agent and each Alternate Currency Lender, any other Currency other than Dollars in each case so long as (i) such Currency is freely transferable and convertible into Dollars and (ii) no central bank or other governmental authorization in the country of issue of such Currency is required to permit use of such Currency by any Lender for making any Loan and/or to permit the Borrower to borrow and repay the principal thereof and to pay the interest thereon (unless such authorization has been obtained and is in full force and effect).

"**Alternate Currency Commitment**" means the obligation of an Alternate Currency Lender to make Alternate Currency Loans pursuant to Section 2.1.(a)(ii) in an aggregate amount up to, but not exceeding at any time of determination, the Dollar Equivalent of the amount set forth for such Lender as such Lender's "Alternate Commitment Amount" on its signature page hereto or as set forth in the applicable Assignment and Assumption, as the same may be reduced from time to time to reflect any assignments to or by such Lender effected in accordance with Section 12.5.

"**Alternate Currency Commitment Percentage**" means, as to each Alternate Currency Lender, the ratio, expressed as a percentage, of (a) the amount of such Lender's Alternate Currency Commitment to (b) the aggregate amount of the Alternate Currency Commitments of all Alternate Currency Lenders; provided, however, that if at the time of determination the Alternate Currency Commitments have terminated or been reduced to zero, the "Alternate Currency Commitment Percentage" of each Alternate Currency Lender shall be the Alternate Currency Commitment Percentage of such Alternate Currency Lender in effect immediately prior to such termination or reduction.

"**Alternate Currency Equivalent**" means, with respect to any amount in Dollars, the amount of any Alternate Currency that could be purchased with such amount of Dollars using the reciprocal of the foreign exchange rate(s) specified in the definition of the term "Dollar Equivalent", as determined by the Agent.

"**Alternate Currency Lender**" means a Lender having an Alternate Currency Commitment.

"**Alternate Currency Loan**" means a LIBOR Loan made by an Alternate Currency Lender denominated in an Alternate Currency.

"**Alternate Currency Note**" has the meaning given that term in Section 2.10.(a).

"**Applicable Law**" means all applicable provisions of constitutions, statutes, laws, rules, regulations and orders of all governmental bodies and all orders and decrees of all courts, tribunals and arbitrators.

"**Applicable Margin**" means the percentage set forth below corresponding to the ratio of Total Indebtedness to EBITDA as determined in accordance with Section 9.1.(a) in effect at such time:

*[handwritten annotation: number of days that have lapsed since the First Amendment Date:]*

| Level | Total Indebtedness to EBITDA | Applicable Margin for LIBOR Loans | Applicable Margin for Base Rate Loans |
|-------|------------------------------|-----------------------------------|---------------------------------------|
| 1 | ≤ 0.75 to 1.00 | 0.750% | 0.0% |
| 2 | > 0.75 to 1.00 and ≤ 1.25 to 1.00 | 0.875% | 0.0% |
| 3 | > 1.25 to 1.00 | 1.000% | 0.0% |

The Applicable Margin shall be determined on a going forward basis by the Agent from time to time, based on the ratio of Total Indebtedness to EBITDA as set forth in the Compliance Certificate most

- 2 -

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

recently delivered by the Borrower pursuant to Section 8.3. in connection with financial statements of the Borrower delivered pursuant to Section 8.1. or 8.2. Any adjustment to the Applicable Margin shall be effective (a) in the case of a Compliance Certificate delivered in connection with quarterly financial statements of the Borrower delivered pursuant to Section 8.1., as of the date 50 days following the end of the last day of the applicable fiscal quarter covered by such Compliance Certificate, (b) in the case of a Compliance Certificate delivered in connection with annual financial statements of the Borrower delivered pursuant to Section 8.2., as of the date 95 days following the end of the last day of the applicable fiscal year covered by such Compliance Certificate, and (c) in the case of any other Compliance Certificate asked for by the Agent pursuant to Section 8.3., as of the date 5 Business Days following the Agent's request for such Compliance Certificate. If the Borrower fails to deliver a Compliance Certificate pursuant to Section 8.3., the Applicable Margin shall be based on Level 3 until the date of the delivery of the required Compliance Certificate. As of the Agreement Date, and thereafter until changed as provided above, the Applicable Margin is determined based on Level 2.

"**Approved Fund**" means any Fund that is administered or managed by (a) a Lender, (b) an affiliate of a Lender or (c) an entity or an affiliate of an entity that administers or manages a Lender.

"**Arranger**" means Wachovia Capital Markets, LLC, together with its successors and permitted assigns.

"**Assignee**" has the meaning given that term in Section 12.5.(b).

"**Assignment and Assumption**" means an Assignment and Assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 12.5.), and accepted by the Agent, substantially in the form of Exhibit A or any other form approved by the Agent.

"**Available Amount**" means, at any time of determination, the amount, if any, by which (a) the aggregate amount of the Commitments exceeds (b) the sum of (i) the aggregate principal amount of all outstanding Loans denominated in Dollars, (ii) the Dollar Equivalent of the aggregate principal amount of all outstanding Alternate Currency Loans and (iii) the aggregate amount of all Letter of Credit Liabilities.

"**Banking Service Contract**" means any document, agreement or instrument evidencing or giving rise to a Banking Service Obligation.

"**Banking Service Obligations**" means cash management services, controlled disbursement services, treasury management services, and foreign exchange and interest rate risk-management products and services.

"**Base Rate**" means the per annum rate of interest equal to the greater of (a) the Prime Rate or (b) the Federal Funds Rate plus one-half of one percent (0.5%). Any change in the Base Rate resulting from a change in the Prime Rate or the Federal Funds Rate shall become effective as of 12:01 a.m. on the Business Day on which each such change occurs. The Base Rate is a reference rate used by the Lender acting as the Agent in determining interest rates on certain loans and is not intended to be the lowest rate of interest charged by the Lender acting as the Agent or any other Lender on any extension of credit to any debtor.

"**Base Rate Loan**" means a Revolving Loan bearing interest at a rate based on the Base Rate.

"**Benefit Arrangement**" means at any time an employee benefit plan within the meaning of Section 3(3) of ERISA which is not a Plan or a Multiemployer Plan and which is maintained or otherwise contributed to by any member of the ERISA Group.

LEGAL02/30055542v16

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT A PAGE 11
OMNI0000342

"**Borrower**" has the meaning set forth in the introductory paragraph hereof and shall include the Borrower's successors and permitted assigns.

"**Business Day**" means any day other than a Saturday, Sunday or other day on which banks in Charlotte, North Carolina or New York, New York are authorized or required to close and (a) with reference to a LIBOR Loan denominated in Dollars, any such day that is also a day on which dealings in Dollar deposits are carried out in the London interbank market and (b) with reference to an Alternate Currency Loan, any such day that is also a day on which banks in London are open for general banking business, including dealings in foreign currency and exchange (including dealing or deposits in the relevant Alternate Currency in the London interbank market) and with respect to determinations in connection with, and payments of principal and interest on, Revolving Loans denominated in Euros, any day on which the Trans-European Automated Real-Time Gross Settlement Express Transfer System (T) (or, if such clearing system ceases to be operative, such other clearing system (if any) determined by the Agent to be a suitable replacement) is open for settlement of payment in Euros.

"**Canadian Dollars**" or "**CA$**" means the official currency of Canada.

"**Capitalized Lease Obligation**" means an obligation under a lease that is required to be capitalized for financial reporting purposes in accordance with GAAP. The amount of a Capitalized Lease Obligation is the capitalized amount of such obligation as would be required to be reflected on a balance sheet of the applicable Person prepared in accordance with GAAP as of the applicable date.

"**Cash Equivalents**" means: (a) securities issued, guaranteed or insured by the United States of America or any of its agencies with maturities of not more than one year from the date acquired; (b) certificates of deposit with maturities of not more than one year from the date acquired issued by a United States federal or state chartered commercial bank of recognized standing, or a commercial bank organized under the laws of any other country which is a member of the Organization for Economic Cooperation and Development, or a political subdivision of any such country, acting through a branch or agency, which bank has capital and unimpaired surplus in excess of $500,000,000 and which bank or its holding company has a short-term commercial paper rating of at least A-2 or the equivalent by S&P or at least P-2 or the equivalent by Moody's; (c) reverse repurchase agreements with terms of not more than seven days from the date acquired, for securities of the type described in clause (a) above and entered into only with commercial banks having the qualifications described in clause (b) above; (d) commercial paper issued by any Person incorporated under the laws of the United States of America or any State thereof and rated at least A-2 or the equivalent thereof by S&P or at least P-2 or the equivalent thereof by Moody's, in each case with maturities of not more than one year from the date acquired; (e) investments in money market funds registered under the Investment Company Act of 1940, as amended, which have net assets of at least $500,000,000 and at least 85% of whose assets consist of securities and other obligations of the type described in clauses (a) through (d) above; and (f) short-term investments in cash equivalents issued by, or maintained with, a Person not formed under the laws of the United States of America or any State thereof and made in accordance with the Borrower's customary investment practices for cash management needs of the Borrower and its Subsidiaries.

"**Collateral**" means all "Collateral" under and as defined in the Pledge Agreement and the Security Agreement.

"**Collateral Account**" means a special non-interest bearing deposit account or securities account maintained by, or on behalf of, the Agent and under its sole dominion and control.

- 4 -

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

"**Commitment**" means, as to each Lender (other than the Swingline Lender), such Lender's ·obligation (a) to make Revolving Loans denominated in Dollars pursuant to Section 2.1.(a)(i), (b) to issue (in the case of the Lender then acting as Agent) or participate in (in the case of the other Lenders) Letters of Credit pursuant to Section 2.3.(a) and 2.3.(i), respectively (but in the case of the Lender acting as the Agent excluding the aggregate amount of participations in ·the Letters of Credit held by the other Lenders), and (c) to participate in Swingline Loans pursuant ·to Section 2.2.(e), in an· amount in the aggregate not to exceed the amount set forth for such Lender on its signature page hereto as such Lender's "**Commitment Amount**" or as set forth in the applicable Assignment and Assumption, as the same may be reduced from time to time pursuant to Section·2.11. or increased or reduced as appropriate to reflect any assignments to or by such Lender effected in accordance with Section 12.5.

"**Commitment Fee**" means the per annum percentage set forth in the table below·corresponding to the Level at which the "**Applicable Margin**" is determined in accordance ·with the definition·thereof:

| Level | Commitment Fee |
|-------|----------------|
| 1 | 0.150% |
| 2 | 0.175% |
| 3 | 0.200% |

As of the Agreement Date, and thereafter until any change in Level as provided in the definition of "**Applicable Margin**", the Commitment Fee equals 0.175%.

"**Commitment Percentage**" means, as to each Lender, the ratio, expressed as a percentage, of (a) the amount of such Lender's Commitment to (b) the aggregate amount of the Commitments of all· Lenders; provided, however, that if at the time of determination the Commitments have terminated or been reduced to zero, the "Commitment Percentage" of each Lender shall be the Commitment Percentage of such Lender in effect immediately prior to such termination or reduction.

"**Competitor**" means, at the time of determination, a Person who (or has an Affiliate that), in the immediately·preceding 12-month period, marketed, manufactured, produced, sold, distributed, provided or otherwise exploited (or who has publicly announced its intention to do any of the foregoing) any of the ·same or similar products or services as the Borrower makes available to its customers at such time of determination or in the immediately preceding 12-month period.

"**Compliance Certificate**" has the meaning given that term in Section 8.3.

"**Continue**", "**Continuation**" and "**Continued**" each refers to the continuation of a LIBOR Loan from one Interest Period to another Interest Period pursuant to Section 2.8.

"**Convert**", "**Conversion**" and "**Converted**" each refers to the conversion of (a) a Revolving Loan of one Type into a Revolving Loan of another Type pursuant to Section 2.9. or (b) the conversion of an Alternate Currency Loan into a Base Rate Loan pursuant to Section 4.5.

"**Credit Event**" means any of the following: (a) the making (or deemed making) of any Loan, (b) the Continuation of a LIBOR Loan, (c) the Conversion of a Base Rate Loan into a LIBOR Loan, and (d) the issuance of a Letter of Credit.

"**Currency**" means Dollars or any Alternate Currency, as applicable.

-5-

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

"**Default**" means any of the events specified in Section 10.1., whether or not there has been satisfied any requirement for the giving of notice, the lapse of time, or both.

"**Defaulting Lender**" has the meaning given that term in Section 3.11.

"**Derivatives Contract**" means any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement. Not in limitation of the foregoing, the term "Derivatives Contract" includes any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement, including any such obligations or liabilities under any such master agreement.

"**Derivatives Termination Value**" means, in respect of any one or more Derivatives Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Derivatives Contracts, (a) for any date on or after the date such Derivatives Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a) the amount(s) determined as the mark-to-market value(s) for such Derivatives Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Derivatives Contracts (which may include any Lender).

"**Disposition**" means any sale, transfer, lease, contribution, conveyance or other disposition (including by way of merger or consolidation) of, or the granting of options, warrants or other rights to, any asset to any other Person in one or a series of transactions. The term "Dispose" has a correlative meaning.

"**Dollar Equivalent**" means with respect to any monetary amount in an Alternate Currency, at any time for the determination thereof, the amount of Dollars obtained by converting such Alternate Currency involved in such computation into Dollars calculated on the basis of the most favorable spot exchange rate determined by the Agent for the purchase of Dollars with the applicable Alternate Currency at the relevant time on the date of determination thereof specified herein or, if the date of determination thereof is not otherwise specified herein, on the date two Business Days prior to such determination.

"**Dollars**" or "**$**" means the lawful currency of the United States of America.

"**Domestic Subsidiary**" means any Subsidiary that is incorporated or organized under the laws of any state of the United States or the District of Columbia.

"**EBITDA**" means, for any period, Net Income for such period, plus the following (but only to the extent included in determination of such Net Income): (a) depreciation and amortization; (b) interest expense; (c) income tax expense; (d) extraordinary or non-recurring losses; and (e) non-recurring, non-cash expenses (including, as applicable, impairment of goodwill from acquisitions), and minus the following (but only to the extent included in determination of such Net Income): (f) interest income and (g) extraordinary or non-recurring gains.

- 6 -

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

"**Effective Date**" means the later of: (a) the Agreement Date; and (b) the date on which all of the conditions precedent set forth in Section 5.1. shall have been fulfilled or waived in writing by the Requisite Lenders.

"**Eligible Assignee**" means (a) a Lender, (b) an affiliate of a Lender, (c) an Approved Fund, and (d) any other Person (other than a natural person) approved by (i) the Agent and (ii) unless an Event of Default shall exist, the Borrower (each such approval not to be unreasonably withheld or delayed); provided that notwithstanding the foregoing, "Eligible Assignee" shall not include the Borrower, any of the Borrower's Affiliates or Subsidiaries or any Competitor.

"**EMU**" means economic and monetary union as contemplated in the Treaty on European Union.

"**EMU Legislation**" means legislative measures of the European Council for the introduction of, changeover to or operation of a single or unified European currency (whether known as the Euro or otherwise).

"**Environmental Laws**" means any Applicable Law relating to environmental protection or the manufacture, storage, remediation, disposal or clean-up of Hazardous Materials including, without limitation, the following: Clean Air Act, 42 U.S.C. § 7401 et seq.; Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq.; Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq.; Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq.; National Environmental Policy Act, 42 U.S.C. § 4321 et seq.; regulations of the Environmental Protection Agency and any applicable rule of common law and any judicial interpretation thereof relating primarily to the environment or Hazardous Materials.

"**Equity Interest**" means, with respect to any Person, any share of capital stock of (or other ownership interests in) such Person, any warrant, option or other right for the purchase or other acquisition from such Person of any share of capital stock of (or other ownership interests in) such Person, any security convertible into or exchangeable for any share of capital stock of (or other ownership interests in) such Person or warrant, right or option for the purchase or other acquisition from such Person of such shares (or such other ownership interests), and any other ownership interest in such Person (including, without limitation, partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such share, warrant, option, right or other interest is authorized or otherwise existing on any date of determination.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as in effect from time to time.

"**ERISA Group**" means the Borrower, any Subsidiary and all members of a controlled group of corporations and all trades or businesses (whether or not incorporated) under common control which, together with the Borrower or any Subsidiary, are treated as a single employer under Section 414 of the Internal Revenue Code.

"**Euro**" or "**€**" means the single currency of Participating Member States of the European Union.

"**Event of Default**" means any of the events specified in Section 10.1., provided that any requirement for notice or lapse of time or any other condition has been satisfied.

"**Excluded Subsidiary**" means any Subsidiary: (a)(i) holding title to assets which are or are to become collateral for any Indebtedness of such Subsidiary that is secured by a Lien in assets of such

- 7 -

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Subsidiary and (ii) which is prohibited from Guarantying the Indebtedness of any other Person pursuant to (x) any document, instrument or agreement evidencing such secured Indebtedness or (y) a provision of such Subsidiary's organizational documents which provision was included in such Subsidiary's organizational documents as a condition to the extension of such secured Indebtedness or (b) which is a Joint Venture and which is prohibited from Guarantying the Indebtedness of any other Person pursuant to a provision of such Subsidiary's organizational documents (or shareholders agreement among the holders of the Equity Interests of such Subsidiary).

"**Federal Funds Rate**" means, for any day, the rate per annum (rounded upward to the nearest 1/100th of 1%) equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day, provided that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate quoted to the Agent by federal funds dealers selected by the Agent on such day on such transaction as determined by the Agent.

"**Fees**" means any fees payable by the Borrower hereunder or under any other Loan Document.

"**Fixed Charges**" means, for any period, the sum of the following for the Borrower and the Subsidiaries (other than Subsidiaries the income of which is to be excluded from Net Income for such period pursuant to clause (a) of the definition of the term Net Income) determined on a consolidated basis: (a) interest expense paid in cash during such period, (b) all regularly scheduled principal payments made with respect to Indebtedness during such period, other than any balloon, bullet or similar principal payment which repays such Indebtedness in full, (c) income tax expense paid in cash during such period, (d) capital expenditures paid in cash during such period and (e) all Restricted Payments paid during such period as permitted by Section 9.2.(b).

"**Foreign Lender**" means any Lender that is organized under the laws of a jurisdiction other than the United States of America, any State thereof or the District of Columbia.

"**Foreign Subsidiary**" means a Subsidiary that is not a Domestic Subsidiary.

"**Fund**" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"**GAAP**" means generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity or agency having similar functions of comparable statute and authority in the accounting profession, which are applicable to the circumstances as of the date of determination.

"**Governmental Approvals**" means all authorizations, consents, approvals, licenses and exemptions of, registrations and filings with, and reports to, all Governmental Authorities.

"**Governmental Authority**" means any national, state or local government (whether domestic or foreign), any political subdivision thereof or any other governmental, quasi-governmental, judicial, public or statutory instrumentality, authority, body, agency, bureau, commission, board, department or other

- 8 -

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT A PAGE 16

OMNI0000347

entity (including, without limitation, the Federal Deposit Insurance Corporation, the Comptroller of the Currency or the Federal Reserve Board, any central bank or any comparable authority) or any arbitrator with authority to bind a party at law.

"**Grantor**" means, initially, the Borrower and each of the Subsidiaries set forth on Schedule 1.1.(C), together with any other Person that becomes a "Grantor" under the Security Agreement.

"**Guarantor**" means any Subsidiary that is a party to the Guaranty as a "Guarantor" and in any event shall include each Material Subsidiary (unless an Excluded Subsidiary or a Foreign Subsidiary).

"**Guaranty**", "**Guaranteed**", "**Guarantying**" or to "**Guarantee**" as applied to any obligation means and includes: (a) a guaranty (other than by endorsement of negotiable instruments for collection or deposit in the ordinary course of business), directly or indirectly, in any manner, of any part or all of such obligation, or (b) an agreement, direct or indirect, contingent or otherwise, and whether or not constituting a guaranty, the practical effect of which is to assure the payment or performance (or payment of damages in the event of nonperformance) of any part or all of such obligation whether by: (i) the purchase of securities or obligations, (ii) the purchase, sale or lease (as lessee or lessor) of property or the purchase or sale of services primarily for the purpose of enabling the obligor with respect to such obligation to make any payment or performance (or payment of damages in the event of nonperformance) of or on account of any part or all of such obligation, or to assure the owner of such obligation against loss, (iii) the supplying of funds to or in any other manner investing in the obligor with respect to such obligation, (iv) repayment of amounts drawn down by beneficiaries of letters of credit (including Letters of Credit), or (v) the supplying of funds to or investing in a Person on account of all or any part of such Person's obligation under a Guaranty of any obligation or indemnifying or holding harmless, in any way, such Person against any part or all of such obligation. As the context requires, "Guaranty" shall also mean the Guaranty to which the Guarantors are parties substantially in the form of Exhibit K.

"**Hazardous Materials**" means all or any of the following: (a) substances that are defined or listed in, or otherwise classified pursuant to, any applicable Environmental Laws as "hazardous substances", "hazardous materials", "hazardous wastes", "toxic substances" or any other formulation intended to define, list or classify substances by reason of deleterious properties such as ignitability, corrosivity, reactivity, carcinogenicity, reproductive toxicity, "TCLP" toxicity or "EP toxicity"; (b) oil, petroleum or petroleum derived substances, natural gas, natural gas liquids or synthetic gas and drilling fluids, produced waters and other wastes associated with the exploration, development or production of crude oil, natural gas or geothermal resources; (c) any flammable substances or explosives or any radioactive materials; (d) asbestos in any form; (e) toxic mold; and (f) electrical equipment which contains any oil or dielectric fluid containing levels of polychlorinated biphenyls in excess of fifty parts per million.

"**Indebtedness**" means, with respect to a Person, at the time of computation thereof, all of the following (without duplication, including duplication among the Borrower and its Subsidiaries): (a) all obligations of such Person in respect of money borrowed (other than trade debt incurred in the ordinary course of business which is not more than 120 days past due or, which if more than 120 days past due, is being contested in good faith by appropriate proceedings which operate to suspend the collection thereof and for which adequate reserves have been established on the books of such Person in accordance with GAAP); (b) all obligations of such Person, whether or not for money borrowed (i) represented by notes payable, or drafts accepted, in each case representing extensions of credit, (ii) evidenced by bonds, debentures, notes or similar instruments, or (iii) constituting purchase money indebtedness, conditional sales contracts, title retention debt instruments or other similar instruments, upon which interest charges are customarily paid or that are issued or assumed as full or partial payment for property or services rendered; (c) Capitalized Lease Obligations of such Person; (d) all reimbursement obligations (contingent

- 9 -

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

or otherwise) of such Person in respect of letters of credit or acceptances (whether or not the same have been presented for payment); (e) any repurchase obligation or liability, contingent or otherwise, of such Person with respect to any accounts or notes receivable sold, transferred or otherwise disposed of by such Person, (f) all obligations, contingent or otherwise, of such Person if the transaction giving rise to such obligation (i) is considered indebtedness for borrowed money for tax purposes but is classified as an operating lease and (ii) does not (and is not required to pursuant to GAAP) appear as a liability on the balance sheet of such Person; (g) all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Mandatorily Redeemable Stock issued by such Person or any other Person, valued at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends, except to the extent such obligations can be satisfied at the option of such Person by the issuance of common stock or other equivalent Equity Interests of such Person; (h) all obligations of such Person in respect of any purchase obligation, repurchase obligation, takeout commitment or forward equity commitment, in each case evidenced by a binding agreement (excluding any such obligation to the extent the obligation can be satisfied by the issuance of Equity Interests (other than Mandatorily Redeemable Stock)); (i) net obligations under any Derivatives Contract not entered into as a hedge against existing Indebtedness or currency exchange rate risk, in an amount equal to the Derivatives Termination Value thereof; (j) all Indebtedness of other Persons which such Person has Guaranteed or is otherwise recourse to such Person (except for guaranties of customary exceptions for fraud, misapplication of funds, environmental indemnities and other similar exceptions to recourse liability (but not exceptions relating to bankruptcy, insolvency, receivership or other similar events)); and (k) all Indebtedness of another Person secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property or assets owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness or other payment obligation up to the lesser of (x) the value of the property or assets which are subject to such Lien and (y) the amount of such Indebtedness. Indebtedness of any Person shall include Indebtedness of any partnership or joint venture in which such Person is a general partner or joint venturer to the extent of such Person's pro rata share of the ownership of such partnership or joint venture (except if such Indebtedness, or portion thereof, is recourse to such Person, in which case the greater of such Person's pro rata portion of such Indebtedness or the amount of the recourse portion of the Indebtedness, shall be included as Indebtedness of such Person). All Loans and Letter of Credit Liabilities shall constitute Indebtedness of the Borrower.

"**Intellectual Property**" has the meaning given that term in Section 6.1.(s).

"**Interest Period**" means, with respect to any LIBOR Loan, each period commencing on the date such LIBOR Loan is made, or in the case of the Continuation of a LIBOR Loan the last day of the preceding Interest Period for such Loan, and ending 1, 2, 3 or 6 months or, if available from all of the Lenders, 1 year thereafter, as the Borrower may select in a Notice of Borrowing, Notice of Continuation or Notice of Conversion, as the case may be, except that each Interest Period that commences on the last Business Day of a calendar month, or on a day for which there is no corresponding day in the appropriate subsequent calendar month, shall end on the last Business Day of the appropriate subsequent calendar month. Notwithstanding the foregoing: (i) if any Interest Period would otherwise end after the Termination Date, such Interest Period shall end on the Termination Date; and (ii) each Interest Period that would otherwise end on a day which is not a Business Day shall end on the immediately following Business Day (or, if such immediately following Business Day falls in the next calendar month, on the immediately preceding Business Day).

"**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended.

"**Investment**" means, with respect to any Person, any acquisition or investment (whether or not of a controlling interest) by such Person, by means of any of the following: (a) the purchase or other

- 10 -

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

acquisition of any Equity Interest in another Person, (b) a loan, advance or extension of credit to, capital contribution to, Guaranty of Indebtedness of, or purchase or other acquisition of any Indebtedness of, another Person, including any partnership or joint venture interest in such other Person, or (c) the purchase or other acquisition (in one transaction or a series of transactions) of assets of another Person that constitute the business or a division or operating unit of another Person. Any binding commitment to make an Investment in any other Person, as well as any option of another Person to require an Investment in such Person, shall constitute an Investment. Except as expressly provided otherwise, for purposes of determining compliance with any covenant contained in a Loan Document, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment.

"**Joint Venture**" means (a) any Subsidiary of the Borrower of which the Borrower owns, directly or indirectly, less than 80% of the outstanding Equity Interests or (b) any other Person (other than a Subsidiary) in which the Borrower owns, directly or indirectly, an Investment which is accounted for in the financial statements of the Borrower on an equity basis of accounting.

"**L/C Commitment Amount**" equals $50,000,000.

"**Lender**" means each financial institution from time to time party hereto as a "Lender," together with its respective successors and permitted assigns, and as the context requires, includes the Swingline Lender.

"**Lending Office**" means, with respect to a Lender (a) in the case of Base Rate Loans, the office of such Lender specified as its "Domestic Lending Office" on its signature page hereto or in the Assignment and Assumption pursuant to which it became a Lender, (b) the office of such Lender specified as its "Eurocurrency Lending Office" on its signature page hereto or in the Assignment and Assumption pursuant to which it became a Lender (or, if no such office is specified, its office referred to in clause (a)), or (c) in any case, such other office of such Lender as such Lender may from time to time specify to the Borrower and the Agent as its "Domestic Lending Office" or "Eurocurrency Lending Office".

"**Letter of Credit**" has the meaning given that term in Section 2.3.(a).

"**Letter of Credit Documents**" means, with respect to any Letter of Credit, collectively, any application therefor, any certificate or other document presented in connection with a drawing under such Letter of Credit and any other agreement, instrument or other document governing or providing for (a) the rights and obligations of the parties concerned or at risk with respect to such Letter of Credit or (b) any collateral security for any of such obligations.

"**Letter of Credit Liabilities**" means, without duplication, at any time and in respect of any Letter of Credit, the sum of (a) the Stated Amount of such Letter of Credit plus (b) the aggregate unpaid principal amount of all Reimbursement Obligations of the Borrower at such time due and payable in respect of all drawings made under such Letter of Credit. For purposes of this Agreement, a Lender (other than the Lender acting as the Agent) shall be deemed to hold a Letter of Credit Liability in an amount equal to its participation interest in the related Letter of Credit under Section 2.3.(i), and the Lender acting as the Agent shall be deemed to hold a Letter of Credit Liability in an amount equal to its retained interest in the related Letter of Credit after giving effect to the acquisition by the Lenders other than the Lender acting as the Agent of their participation interests under such Section.

"**Level**" has the meaning given that term in the definition of the term "Applicable Margin."

- 11 -

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

"**LIBOR**" means, for any LIBOR Loan in any Currency for any Interest Period therefor, the rate per annum (rounded upwards, if necessary, to the nearest 1/100 of 1%) appearing on Telerate Page 3750 (or any successor page) as the London interbank offered rate for deposits in such Currency at approximately 11:00 a.m. (London time) two Business Days prior to the first day of such Interest Period for a term comparable to such Interest Period.  If for any reason such rate is not available, the term "LIBOR" shall mean, for any LIBOR Loan in any Currency for any Interest Period therefor, the rate per annum (rounded upwards, if necessary, to the nearest 1/100 of 1%) appearing on the Reuters Screen LIBO Page as the London interbank offered rate for deposits in such Currency at approximately 11:00 a.m. (London time) two Business Days prior to the first day of such Interest Period for a term comparable to such Interest Period; provided, however, if more than one rate is specified on the Reuters Screen LIBO Page, the applicable rate shall be the arithmetic mean of all such rates.  If for any reason none of the foregoing rates is available, LIBOR shall be, for any Interest Period and any Currency, the rate per annum reasonably determined by the Agent as the rate of interest at which deposits in such Currency in the approximate amount of the LIBOR Loan comprising part of such borrowing would be offered by the Lender acting as the Agent to major banks in the London interbank market at their request at or about 11:00 a.m. (London time) two Business Days prior to the first day of such Interest Period for a term comparable to such Interest Period.

"**LIBOR Loans**" means (a) Revolving Loans denominated in Dollars and bearing interest at a rate based on LIBOR and (b) Alternate Currency Loans.

"**Lien**" as applied to the property of any Person means:  (a) any security interest, encumbrance, mortgage, deed to secure debt, deed of trust, assignment of leases and rents, pledge, lien, charge or lease constituting a Capitalized Lease Obligation, conditional sale or other title retention agreement, or other security title or encumbrance of any kind in respect of any property of such Person, or upon the income, rents or profits therefrom; (b) any arrangement, express or implied, under which any property of such Person is transferred, sequestered or otherwise identified for the purpose of subjecting the same to the payment of Indebtedness or performance of any other obligation in priority to the payment of the general, unsecured creditors of such Person; (c) the filing of any financing statement under the Uniform Commercial Code or its equivalent in any jurisdiction, other than any precautionary filing not otherwise constituting or giving rise to a Lien, including a financing statement filed (i) in respect of a lease not constituting a Capitalized Lease Obligation pursuant to Section 9-505 (or a successor provision) of the Uniform Commercial Code or its equivalent as in effect in an applicable jurisdiction or (ii) in connection with a sale or other disposition of accounts or other assets not prohibited by this Agreement in a transaction not otherwise constituting or giving rise to a Lien; and (d) any agreement by such Person to grant, give or otherwise convey any of the foregoing.

"**Loan**" means a Revolving Loan, a Swingline Loan or an Alternate Currency Loan.

"**Loan Document**" means this Agreement, each Note, each Letter of Credit Document, the Guaranty, each Security Document and each other document or instrument (other than a Derivatives Contract or a Banking Service Contract) now or hereafter executed and delivered by a Loan Party to the Agent or a Lender in connection with, pursuant to or relating to this Agreement.

"**Loan Party**" means each of the Borrower and each other Person who guarantees all or a portion of the Obligations and/or who pledges any Collateral to secure all or a portion of the Obligations. Schedule 1.1.(A) sets forth the Loan Parties in addition to the Borrower as of the Agreement Date.

"**Mandatorily Redeemable Stock**" means, with respect to any Person, any Equity Interest of such Person which by the terms of such Equity Interest (or by the terms of any security into which it is convertible or for which it is exchangeable or exercisable), upon the happening of any event or otherwise,

- 12 -

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

(a) matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise (other than an Equity Interest to the extent redeemable in exchange for common stock or other equivalent Equity Interests at the option of the issuer of such Equity Interest), (b) is convertible into or exchangeable or exercisable for Indebtedness or Mandatorily Redeemable Stock (which would not include an Equity Interest convertible to, or exchangeable for, common stock or other equivalent common Equity Interests at such Person's option), or (c) is redeemable at the option of the holder thereof, in whole or in part (other than an Equity Interest which is redeemable solely in exchange for common stock or other equivalent common Equity Interests), in each case on or prior to the date on which all Revolving Loans are scheduled to be due and payable in full.

"**Mandatory Cost**" means the cost to an Alternate Currency Lender of complying with all reserve, special deposit, capital adequacy, solvency, liquidity ratios, fees or other requirements of or imposed by the Bank of England, the Financial Services Authority, the European Central Bank or any other Governmental Authority attributable to each Alternate Currency Loan or any unpaid sum (rounded up if necessary to 4 decimal places) as determined by an Alternate Currency Lender.

"**Material Adverse Effect**" means a materially adverse effect on (a) the business, assets, liabilities, financial condition or results of operations of the Borrower and the Subsidiaries taken as a whole, (b) the ability of the Borrower or any other Loan Party to perform its obligations under any Loan Document to which it is a party, (c) the validity or enforceability of any of the Loan Documents or (d) the rights and remedies of the Lenders and the Agent under any of the Loan Documents.

"**Material Contract**" means any contract or other arrangement (other than Loan Documents), whether written or oral, to which the Borrower, any Subsidiary or any other Loan Party is a party as to which the breach, nonperformance, cancellation or failure to renew by any party thereto is reasonably likely to have a Material Adverse Effect.

"**Material Subsidiary**" means, at the time of determination, any Subsidiary (a) that owns, directly or indirectly, 10.0% or more of Total Assets, (b) to which 10.0% or more of the total revenue of the Borrower and the Subsidiaries determined on a consolidated basis as of the most recently ended period of four consecutive fiscal quarters of the Borrower for which the Borrower has delivered financial statements pursuant to Section 8.1. and 8.2. (or if the Borrower has not yet delivered any such financial statements, then the financial statements referred to in Section 6.1.(k)), is directly or indirectly attributable or (c) any Domestic Subsidiary that owns any accounts or any inventory located in the United States.

"**Material Subsidiary Group**" means, at the time of determination, any group of Subsidiaries (a) that in the aggregate own, directly or indirectly, 10.0% or more of Total Asset or (b) to which 10.0% or more of the total revenue of the Borrower and the Subsidiaries determined on a consolidated basis as of the most recently ended period of four consecutive fiscal quarters of the Borrower for which the Borrower has delivered financial statements pursuant to Section 8.1. and 8.2. (or if the Borrower has not yet delivered any such financial statements, then the financial statements referred to in Section 6.1.(k)), is directly or indirectly attributable in the aggregate.

"**Moody's**" means Moody's Investors Service, Inc., and its successors.

"**Multiemployer Plan**" means at any time a multiemployer plan within the meaning of Section 4001(a)(3) of ERISA to which any member of the ERISA Group is then making or accruing an obligation to make contributions or has within the preceding five plan years made contributions, including for these purposes any Person which ceased to be a member of the ERISA Group during such five year period.

- 13 -

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

"**Negative Pledge**" means, with respect to a given asset, any provision of a document, instrument or agreement (other than any Loan Document) which prohibits or purports to prohibit the creation or assumption of any Lien on such asset as security for Indebtedness of the Person owning such asset or any other Person; provided, however, that an agreement that conditions a Person's ability to encumber its assets upon the maintenance of one or more specified ratios that limit such Person's ability to encumber its assets but that do not generally prohibit the encumbrance of its assets, or the encumbrance of specific assets, shall not constitute a Negative Pledge.

"**Net Income**" means, for any period, the net income or loss of the Borrower and the Subsidiaries for such period determined on a consolidated basis, excluding the following to the extent included in the determination of such net income or loss): (a) the income of any Subsidiary to the extent that the declaration or payment of dividends or other distributions by such Subsidiary of that income is not at the time permitted by Applicable Law or any agreement or instrument applicable to such Subsidiary, except to the extent of the amount of cash dividends or other cash distributions actually paid to the Borrower or any Subsidiary during such period and (b) the income of any Person in which the Borrower or any Subsidiary holds an Equity Interest that is accounted for using the equity method of accounting, except to the extent of the amount of cash dividends or other cash distributions actually paid to the Borrower or such Subsidiary during such period.

"**Note**" means a Revolving Note, a Swingline Note or an Alternate Currency Note.

"**Notice of Borrowing**" means a notice in the form of Exhibit B to be delivered to the Agent pursuant to Section 2.1.(b) evidencing the Borrower's request for a borrowing of Revolving Loans.

"**Notice of Continuation**" means a notice in the form of Exhibit C to be delivered to the Agent pursuant to Section 2.8. evidencing the Borrower's request for the Continuation of a LIBOR Loan.

"**Notice of Conversion**" means a notice in the form of Exhibit D to be delivered to the Agent pursuant to Section 2.9. evidencing the Borrower's request for the Conversion of a Loan from one Type to another Type.

"**Notice of Swingline Borrowing**" means a notice in the form of Exhibit E to be delivered to the Agent pursuant to Section 2.2. evidencing the Borrower's request for a Swingline Loan.

"**Obligations**" means, individually and collectively: (a) the aggregate principal balance of, and all accrued and unpaid interest on, all Loans; (b) all Reimbursement Obligations and all other Letter of Credit Liabilities; and (c) all other indebtedness, liabilities, obligations, covenants and duties of the Borrower and the other Loan Parties owing to the Agent or any Lender (or, in the case of a Derivatives Contract or any Banking Service Obligations, any affiliate of any Lender) of every kind, nature and description, under or in respect of this Agreement or any of the other Loan Documents or any Derivatives Contract or any Banking Service Contract entered into by the Borrower with any Person that is or was a Lender (or any affiliate of any Lender) at the time such Derivatives Contract or Banking Service Contract was executed, including, without limitation, the Fees and indemnification obligations, whether direct or indirect, absolute or contingent, due or not due, contractual or tortious, liquidated or unliquidated, and whether or not evidenced by any promissory note.

"**OFAC**" means U.S. Department of the Treasury's Office of Foreign Assets Control and any successor Governmental Authority.

"**Participant**" has the meaning given that term in Section 12.5.(d).

- 14 -

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT A PAGE 22
OMNI0000353

"**Participating Member State**" means each state so described in any EMU Legislation.

"**PBGC**" means the Pension Benefit Guaranty Corporation and any successor agency.

"**Permitted Holders**" means: (a) Isaac Larian; (b) Shirin Makabi; (c) any of his or her immediate family members consisting of his or her spouse and his or her lineal descendants (whether natural or adopted) or those of his or her spouse; (d) any trusts established for the sole benefit of any of the foregoing individuals; and (e) any corporation, partnership or limited liability company of which all of the outstanding Equity Interests are owned, directly or indirectly, by any of the Persons referred to in clauses (a) through (d).

"**Permitted Liens**" means, as to any Person: (a) Liens securing taxes, assessments and other charges or levies imposed by any Governmental Authority (excluding any Lien imposed pursuant to any of the provisions of ERISA or pursuant to any Environmental Laws) or the claims of materialmen, mechanics, carriers, warehousemen or landlords for labor, materials, supplies or rentals incurred in the ordinary course of business, which are not at the time required to be paid or discharged under Section 7.6.; (b) Liens consisting of deposits or pledges made, in the ordinary course of business, in connection with, or to secure payment of, obligations under workers' compensation, unemployment insurance or similar Applicable Laws; (c) Liens consisting of encumbrances in the nature of zoning restrictions, easements, and rights or restrictions of record on the use of real property, which do not materially detract from the value of such property or materially and adversely impair the intended use thereof in the business of such Person; and (d) Liens under the Loan Documents.

"**Person**" means an individual, corporation, partnership, limited liability company, association, trust or unincorporated organization, or a government or any agency or political subdivision thereof.

"**Plan**" means at any time an employee pension benefit plan (other than a Multiemployer Plan) which is covered by Title IV of ERISA or subject to the minimum funding standards under Section 412 of the Internal Revenue Code and either (a) is maintained, or contributed to, by any member of the ERISA Group for employees of any member of the ERISA Group or (b) has at any time within the preceding five years been maintained, or contributed to, by any Person which was at such time a member of the ERISA Group for employees of any Person which was at such time a member of the ERISA Group.

"**Pledge Agreement**" means the Pledge Agreement to which the Pledgors are parties substantially in the form of Exhibit L.

"**Pledgor**" means, initially, the Borrower and each of the Subsidiaries set forth on Schedule 1.1.(B), together with any other Person that becomes a "Pledgor" under the Pledge Agreement.

"**Post-Default Rate**" means a rate per annum equal to the Base Rate as in effect from time to time plus the Applicable Margin for Base Rate Loans plus two percent (2.0%).

"**Pound Sterling**" or "£" means the official currency of the United Kingdom of Great Britain and Northern Ireland.

"**Prime Rate**" means the rate of interest per annum announced publicly by the Lender then acting as the Agent as its prime rate from time to time. The Prime Rate is not necessarily the best or the lowest rate of interest offered by the Lender acting as the Agent or any other Lender.

"**Principal Office**" means the address of the Agent specified in Section 12.1., or any subsequent office which the Agent shall have specified by written notice to the Borrower and Lenders as the Principal

- 15 -

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT A PAGE 23
OMNI0000354

Office referred to herein, to which payments due are to be made and at which Loans will be disbursed and Letters of Credit requested.

"**Pro Forma Basis**" means, with respect to the calculation of the financial covenants contained in Section 9.1. or any applicable incurrence test hereunder as of any date, that any acquisition, Investment, incurrence of Indebtedness, granting or assumption of any Lien, Restricted Payment or Disposition, shall be deemed to have occurred as of the first day of the most recent period of four consecutive fiscal quarters preceding the date of such transaction for which the Borrower has delivered financial statements pursuant to Section 8.1. and 8.2. (or if the Borrower has not yet delivered any such financial statements, then the financial statements referred to in Section 6.1.(k)). In connection with the foregoing, (a) with respect to any Disposition, (i) income statement and cash flow statement items (whether positive or negative) attributable to any Subsidiary or other property disposed of shall be excluded to the extent relating to any period occurring prior to the date of such transaction and (ii) Indebtedness which is retired shall be excluded and deemed to have been retired as of the first day of the applicable period and (b) with respect to any acquisition (i) income statement items (whether positive or negative) attributable to the Person or other property acquired shall be included to the extent relating to any period applicable in such calculations to the extent (x) such items are not otherwise included in such income statement items for the Borrower and the Subsidiaries in accordance with GAAP and (y) such items are supported by audited financial statements or other information reasonably satisfactory to the Agent and (ii) any Indebtedness incurred or assumed by the Borrower or any Subsidiary (including the Person or property acquired) in connection with such transaction and any Indebtedness of the Person or property acquired which is not retired in connection with such transaction (x) shall be deemed to have been incurred as of the first day of the applicable period and (y) if such Indebtedness has a floating or formula rate, shall have an implied rate of interest for the applicable period for purposes of this definition determined by utilizing the rate which is or would be in effect with respect to such Indebtedness as at the relevant date of determination. Furthermore, pro forma calculations of EBITDA shall not give effect to any add backs for cost savings and/or increases to EBITDA for any applicable period for all acquisitions, except (x) in cases where such add backs are made in accordance with the requirements of Regulation S-X promulgated under the Securities Act and (y) for such add backs for cost savings and/or increases to EBITDA that are based on reasonable management estimates, determined in good faith and supported by details reasonably satisfactory to the Agent.

"**Register**" has the meaning given that term in Section 12.5.(c).

"**Regulatory Change**" means, with respect to any Lender, any change effective after the Agreement Date in Applicable Law (including without limitation, Regulation D of the Board of Governors of the Federal Reserve System) or the adoption or making after such date of any interpretation, directive or request applying to a class of banks, including such Lender, of or under any Applicable Law (whether or not having the force of law and whether or not failure to comply therewith would be unlawful) by any Governmental Authority or monetary authority charged with the interpretation or administration thereof or compliance by any Lender with any request or directive regarding capital adequacy.

"**Reimbursement Obligation**" means the absolute, unconditional and irrevocable obligation of the Borrower to reimburse the Agent for any drawing honored by the Agent under a Letter of Credit.

"**Requisite Alternate Currency Lenders**" means, as of any date, Alternate Currency Lenders having more than 50% of the aggregate amount of the Alternate Currency Commitments (not held by Defaulting Lenders who are not entitled to vote), or, if the Alternate Currency Commitments have been terminated or reduced to zero, Alternate Currency Lenders holding more than 50% of the principal amount of the aggregate outstanding Alternate Currency Loans (not held by Defaulting Lenders who are

- 16 -

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT A PAGE 24
OMNI0000355

not entitled to vote). Alternate Currency Commitments and Revolving Loans held by Defaulting Lenders shall be disregarded when determining the Alternate Currency Requisite Lenders.

"**Requisite Lenders**" means, as of any date, Lenders having more than 50% of the aggregate amount of the Commitments (not held by Defaulting Lenders who are not entitled to vote), or, if the Commitments have been terminated or reduced to zero, Lenders holding more than 50% of the principal amount of the Dollar Equivalent of the aggregate outstanding Loans and Letter of Credit Liabilities (not held by Defaulting Lenders who are not entitled to vote). Commitments, Revolving Loans and Letter of Credit Liabilities held by Defaulting Lenders shall be disregarded when determining the Requisite Lenders. For purposes of this definition, a Lender (other than the Swingline Lender) shall be deemed to hold a Swingline Loan or a Letter of Credit Liability to the extent such Lender has acquired a participation therein under the terms of this Agreement and has not failed to perform its obligations in respect of such participation.

"**Responsible Officer**" means with respect to the Borrower or any Subsidiary, the chief executive officer, the chief financial officer and any senior vice president of the Borrower or such Subsidiary.

"**Restricted Payment**" means: (a) any dividend or other distribution, direct or indirect, on account of any Equity Interest of the Borrower or any Subsidiary now or hereafter outstanding; (b) any redemption, conversion, exchange, retirement, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any Equity Interest of the Borrower or any Subsidiary now or hereafter outstanding; and (c) any payment made to retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire any Equity Interests of the Borrower or any Subsidiary now or hereafter outstanding; except, in the case of clauses (a), (b) and (c) above, for dividends or other distributions in respect of any Equity Interest to the extent paid in Equity Interests of an identical or junior class to the holders of that class.

"**Revolving Loan**" means a loan made by a Lender to the Borrower pursuant to Section 2.1.(a)(i) or (ii).

"**Revolving Note**" has the meaning given that term in Section 2.10.(a).

"**Sanctioned Entity**" means (a) an agency of the government of, (b) an organization directly or indirectly controlled by, or (c) a Person resident in, in each case, a country that is subject to a sanctions program identified on the list maintained by the OFAC and published from time to time, as such program may be applicable to such agency, organization or Person.

"**Sanctioned Person**" means a Person named on the list of Specially Designated Nationals or Blocked Persons maintained by the OFAC as published from time to time.

"**Securities Act**" means the Securities Act of 1933, as amended from time to time, together with all rules and regulations issued thereunder.

"**Security Agreement**" means the Security Agreement to which the Grantors are parties substantially in the form of Exhibit M.

"**Security Document**" means the Pledge Agreement, the Security Agreement and any other security agreement, financing statement, or other document, instrument or agreement creating, evidencing or perfecting any of the Agent's Liens in any of the Collateral.

- 17 -

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

"**Solvent**" means, when used with respect to any Person, that (a) the fair value and the fair salable value of its assets (excluding any Indebtedness due from any affiliate of such Person) are each in excess of the fair valuation of its total liabilities (including all contingent liabilities computed at the amount which, in light of all the facts and circumstances existing at such time, represents the amount that could reasonably be expected to become an actual and matured liability); (b) such Person is able to pay its debts or other obligations in the ordinary course as they mature; and (c) such Person has capital not unreasonably small to carry on its business and all business in which it proposes to be engaged.

"**S&P**" means Standard & Poor's Rating Services, a division of The McGraw-Hill Companies, Inc., and its successors.

"**Stated Amount**" means the amount available to be drawn by a beneficiary under a Letter of Credit from time to time, as such amount may be increased or reduced from time to time in accordance with the terms of such Letter of Credit.

"**Subsidiary**" means, for any Person, any corporation, partnership or other entity of which at least a majority of the Equity Interests having by the terms thereof ordinary voting power to elect a majority of the board of directors or other individuals performing similar functions of such corporation, partnership or other entity (without regard to the occurrence of any contingency) is at the time directly or indirectly owned or controlled by such Person or one or more Subsidiaries of such Person or by such Person and one or more Subsidiaries of such Person, and shall include all Persons the accounts of which are consolidated with those of such Person pursuant to GAAP.

"**Swingline Commitment**" means the Swingline Lender's obligation to make Swingline Loans pursuant to Section 2.2. in an amount up to, but not exceeding, $25,000,000, as such amount may be reduced from time to time in accordance with the terms hereof.

"**Swingline Lender**" means Wachovia Bank, National Association, together with its respective successors and assigns.

"**Swingline Loan**" means a loan denominated in Dollars made by the Swingline Lender to the Borrower pursuant to Section 2.2.(a).

"**Swingline Note**" means the promissory note of the Borrower payable to the order of the Swingline Lender in a principal amount equal to the amount of the Swingline Commitment as originally in effect and otherwise duly completed, substantially in the form of Exhibit F.

"**Taxes**" has the meaning given that term in Section 3.12.

"**Termination Date**" means October 26, 2011.

"**Titled Agents**" means each of the Arranger and the Syndication Agents, and their respective successors and permitted assigns.

"**Total Assets**" means the total assets of the Borrower and the Subsidiaries determined on a consolidated basis as of the most recently ended fiscal quarter of the Borrower for which the Borrower has delivered financial statements pursuant to Section 8.1. and 8.2. (or if the Borrower has not yet delivered any such financial statements, then the financial statements referred to in Section 6.1.(k)).

"**Total Indebtedness**" means, at any time of determination, all Indebtedness of the Borrower and the Subsidiaries (other than Subsidiaries the income of which would be excluded from Net Income at such

- 18 -

LEGAL02/30055542v16

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT A PAGE 26
OMNI0000357

time pursuant to clause (a) of the definition of the term Net Income) at such time determined on a consolidated basis.

"**Treaty on European Union**" means the Treaty of Rome of March 25, 1957, as amended by the Single European Act of 1986, the Maastricht Treaty (which was signed at Maastricht on February 7, 1992, and came into force on November 1, 1993), and the Amsterdam Treaty of 1998, and as further amended from time to time.

"**Type**" with respect to any Revolving Loan, refers to whether such Loan is a LIBOR Loan or Base Rate Loan.  Type does not refer to whether a Loan is an Alternate Currency Loan.

"**Unfunded Liabilities**" means, with respect to any Plan at any time, the amount (if any) by which (a) the value of all benefit liabilities under such Plan, determined on a plan termination basis using the assumptions prescribed by the PBGC for purposes of Section 4044 of ERISA, exceeds (b) the fair market value of all Plan assets allocable to such liabilities under Title IV of ERISA (excluding any accrued but unpaid contributions), all determined as of the then most recent valuation date for such Plan, but only to the extent that such excess represents a potential liability of a member of the ERISA Group to the PBGC or any other Person under Title IV of ERISA.

"**Wachovia**" means Wachovia Bank, National Association, together with its successors and assigns.

"**Wholly Owned Subsidiary**" means any Subsidiary of a Person in respect of which all of the equity securities or other ownership interests (other than, in the case of a corporation, directors' qualifying shares) are at the time directly or indirectly owned or controlled by such Person or one or more other Subsidiaries of such Person or by such Person and one or more other Subsidiaries of such Person.

"**Zapf**" means Zapf-Creation AG, a corporation formed under the laws of the Federal Republic of Germany.

**Section 1.2.  General; References to Times.**

Unless otherwise indicated, all accounting terms, ratios and measurements shall be interpreted or determined in accordance with GAAP as in effect from time to time; provided that, if at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Borrower or the Requisite Lenders shall so request, the Agent, the Lenders and the Borrower shall negotiate in good faith to amend promptly such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Requisite Lenders not to be unreasonably withheld or delayed); provided further that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Borrower shall provide to the Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.  References in this Agreement to "Sections", "Articles", "Exhibits" and "Schedules" are to sections, articles, exhibits and schedules herein and hereto unless otherwise indicated.  References in this Agreement to any document, instrument or agreement (a) shall include all exhibits, schedules and other attachments thereto, (b) shall include all documents, instruments or agreements issued or executed in replacement thereof, to the extent permitted hereby and (c) shall mean such document, instrument or agreement, or replacement or predecessor thereto, as amended, supplemented, restated or otherwise modified as of the date of this Agreement and from time to time thereafter to the extent not prohibited hereby and in effect at any given time.  Wherever from the context it appears appropriate, each term

- 19 -

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT A PAGE 27

OMNI0000358

stated in either the singular or plural shall include the singular and plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, the feminine and the neuter. Unless explicitly set forth to the contrary, a reference to "Subsidiary" means a Subsidiary of the Borrower or a Subsidiary of such Subsidiary or Subsidiaries and a reference to an "Affiliate" means a reference to an Affiliate of the Borrower. Titles and captions of Articles, Sections, subsections and clauses in this Agreement are for convenience only, and neither limit nor amplify the provisions of this Agreement. Unless otherwise indicated, all references to time are references to Charlotte, North Carolina time.

**Section 1.3. Effectiveness of Euro Provisions.**

With respect to any state (or the currency of such state) that is not a Participating Member State on the date of this Agreement, the provisions of Sections 2.4.(c), 4.9.(a) and 4.9.(b) shall become effective in relation to such state (and the currency of such state) at and from the date on which such state becomes a Participating Member State.

**Section 1.4. Currencies; Currency Equivalents.**

At any time, any reference in the definition of the term "Alternate Currency" or in any other provision of this Agreement to the Currency of any particular nation means the lawful currency of such nation at such time whether or not the name of such Currency is the same as it was on the date hereof.

ARTICLE II. CREDIT FACILITY

**Section 2.1. Revolving Loans.**

(a)      Generally.   Subject to the terms and conditions hereof, during the period from the Effective Date to but excluding the Termination Date, (i) each Lender severally and not jointly agrees to make Revolving Loans denominated in Dollars to the Borrower in an aggregate principal amount at any one time outstanding up to, but not exceeding, the amount of such Lender's Commitment and (ii) each Alternate Currency Lender agrees to make Alternate Currency Loans in any Alternate Currency to the Borrower in an aggregate principal amount at any one time outstanding up to, but not exceeding, the amount of such Alternate Currency Lender's Alternate Currency Commitment. Subject to the terms and conditions of this Agreement, during the period from the Effective Date to but excluding the Termination Date, the Borrower may borrow, repay and reborrow Revolving Loans hereunder.

(b)      Requesting Revolving Loans.   The Borrower shall give the Agent notice pursuant to a Notice of Borrowing or telephonic notice of each borrowing of Revolving Loans. Each such Notice of Borrowing or telephone notice shall be delivered or given to the Agent before 12:00 noon (i) in the case of LIBOR Loans denominated in Dollars, on the date three Business Days prior to the proposed date of such borrowing, (ii) in the case of Alternate Currency Loans, on the date four Business Days prior to the proposed date of such borrowing and (iii) in the case of Base Rate Loans, on the date one Business Day prior to the proposed date of such borrowing. Any such telephonic notice shall include all information to be specified in a written Notice of Borrowing and shall be promptly confirmed in writing by the Borrower pursuant to a Notice of Borrowing sent to the Agent by telecopy on the same day of the giving of such telephonic notice. Promptly upon receipt of a Notice of Borrowing or telephonic notice of borrowing, the Agent will notify each Lender (or in the case of a borrowing of Alternate Currency Loans, each Alternate Currency Lender) of the information contained in such Notice of Borrowing or telephonic notice. Each Notice of Borrowing or telephonic notice of each borrowing shall be irrevocable once given and binding on the Borrower.

- 20 -



CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT A PAGE 28
OMNI0000359

(c)     Disbursements of Revolving Loan Proceeds.  Each applicable Lender will make available for the account of its applicable Lending Office to the Agent at the Principal Office, in immediately available funds and in the applicable Currency, the proceeds of the Revolving Loan to be made by such Lender not later than 1:00 p.m. on the date of the proposed borrowing.  With respect to Revolving Loans to be made after the Effective Date, unless the Agent shall have been notified by any Lender prior to the specified date of borrowing that such Lender does not intend to make available to the Agent the Revolving Loan to be made by such Lender on such date, the Agent may assume that such Lender will make the proceeds of such Revolving Loan available to the Agent on the date of the requested borrowing as set forth in the Notice of Borrowing and the Agent may (but shall not be obligated to), in reliance upon such assumption, make available to the Borrower the amount of such Revolving Loan to be provided by such Lender.  Subject to satisfaction of the applicable conditions set forth in Article V. for such borrowing, the Agent will make the proceeds of such borrowing available to the Borrower no later than 2:00 p.m. on the date and at the account specified by the Borrower in such Notice of Borrowing.

**Section 2.2.  Swingline Loans.**

(a)     Swingline Loans.  Subject to the terms and conditions hereof, during the period from the Effective Date to but excluding the Termination Date, the Swingline Lender agrees to make Swingline Loans to the Borrower in an aggregate principal amount at any one time outstanding up to, but not exceeding, the amount of the Swingline Commitment.  If at any time the aggregate principal amount of the Swingline Loans outstanding at such time exceeds the Swingline Commitment in effect at such time, the Borrower shall immediately pay the Agent for the account of the Swingline Lender the amount of such excess.  Subject to the terms and conditions of this Agreement, the Borrower may borrow, repay and reborrow Swingline Loans hereunder.

(b)     Procedure for Borrowing Swingline Loans.  The Borrower shall give the Agent and the Swingline Lender notice pursuant to a Notice of Swingline Borrowing or telephonic notice of each borrowing of a Swingline Loan.  Each Notice of Swingline Borrowing shall be delivered to the Swingline Lender no later than 12:00 noon on the proposed date of such borrowing.  Any such notice given telephonically shall include all information to be specified in a written Notice of Swingline Borrowing and shall be promptly confirmed in writing by the Borrower pursuant to a Notice of Swingline Borrowing sent to the Swingline Lender by telecopy on the same day of the giving of such telephonic notice.  On the date of the requested Swingline Loan and subject to satisfaction of the applicable conditions set forth in Article V. for such borrowing, the Swingline Lender will make the proceeds of such Swingline Loan available to the Borrower in Dollars, in immediately available funds, at the account specified by the Borrower in the Notice of Swingline Borrowing not later than 2:00 p.m. on such date.

(c)     Interest.  Swingline Loans shall bear interest at a per annum rate equal to the Base Rate plus the Applicable Margin for Base Rate Loans.  Interest payable on Swingline Loans is solely for the account of the Swingline Lender.  All accrued and unpaid interest on Swingline Loans shall be payable on the dates and in the manner provided in Section 2.4. with respect to interest on Base Rate Loans (except as the Swingline Lender and the Borrower may otherwise agree in writing in connection with any particular Swingline Loan).

(d)     Swingline Loan Amounts, Etc.  Each Swingline Loan shall be in the minimum amount of $100,000 and integral multiples of $100,000 or such other minimum amounts agreed to by the Swingline Lender and the Borrower.  The Borrower must give the Swingline Lender prior written notice of any voluntary prepayment of a Swingline Loan no later than 12:00 noon on the date of such prepayment.

(e)     Repayment and Participations of Swingline Loans.  The Borrower agrees to repay each Swingline Loan within one Business Day of demand therefor by the Swingline Lender; provided, that the

- 21 -

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT A PAGE 29
OMNI0000360

proceeds of a Swingline Loan may not be used to repay a Swingline Loan. Notwithstanding the foregoing, the Borrower shall repay the entire outstanding principal amount of, and all accrued but unpaid interest on, the Swingline Loans on the Termination Date (or such earlier date as the Swingline Lender and the Borrower may agree in writing). In lieu of demanding repayment of any outstanding Swingline Loan from the Borrower, the Swingline Lender may, on behalf of the Borrower (which hereby irrevocably directs the Swingline Lender to act on its behalf for such purpose), request a borrowing of Base Rate Loans from the Lenders in an amount equal to the principal balance of such Swingline Loan. The amount limitations of Section 3.5.(a) shall not apply to any borrowing of Base Rate Loans made pursuant to this subsection. The Swingline Lender shall give notice to the Agent of any such borrowing of Base Rate Loans not later than 12:00 noon on the proposed date of such borrowing and the Agent shall give prompt notice of such borrowing to the Lenders. No later than 2:00 p.m. on such date, each Lender will make available to the Agent at the Principal Office for the account of Swingline Lender, in immediately available funds, the proceeds of the Base Rate Loan to be made by such Lender and, to the extent of such Base Rate Loan, such Lender's participation in the Swingline Loan so repaid shall be deemed to be funded by such Base Rate Loan. The Agent shall pay the proceeds of such Base Rate Loans to the Swingline Lender, which shall apply such proceeds to repay such Swingline Loan. At the time each Swingline Loan is made, each Lender shall automatically (and without any further notice or action) be deemed to have purchased from the Swingline Lender, without recourse or warranty, an undivided interest and participation to the extent of such Lender's Commitment Percentage in such Swingline Loan. If the Lenders are prohibited from making Loans required to be made under this subsection for any reason, including without limitation, the occurrence of any Default or Event of Default described in Section 10.1.(f) or 10.1.(g), upon notice from the Agent or the Swingline Lender, each Lender severally agrees to pay to the Agent for the account of the Swingline Lender in respect of such participation the amount of such Lender's Commitment Percentage of each outstanding Swingline Loan. If such amount is not in fact made available to the Agent by any Lender, the Swingline Lender shall be entitled to recover such amount on demand from such Lender, together with accrued interest thereon for each day from the date of demand thereof, at the Federal Funds Rate. If such Lender does not pay such amount forthwith upon demand therefor by the Agent or the Swingline Lender, and until such time as such Lender makes the required payment, the Swingline Lender shall be deemed to continue to have outstanding Swingline Loans in the amount of such unpaid participation obligation for all purposes of the Loan Documents (other than those provisions requiring the other Lenders to purchase a participation therein). Further, such Lender shall be deemed to have assigned any and all payments made of principal and interest on its Loans, and any other amounts due such Lender hereunder, to the Swingline Lender to fund Swingline Loans in the amount of the participation in Swingline Loans that such Lender failed to purchase pursuant to this Section until such amount has been purchased (as a result of such assignment or otherwise). A Lender's obligation to make payments in respect of a participation in a Swingline Loan shall be absolute and unconditional and shall not be affected by any circumstance whatsoever, including without limitation, (i) any claim of setoff, counterclaim, recoupment, defense or other right which such Lender or any other Person may have or claim against the Agent, the Swingline Lender or any other Person whatsoever, (ii) the occurrence or continuation of a Default or Event of Default (including without limitation, any of the Defaults or Events of Default described in Section 10.1.(f) or 10.1.(g)) or the termination of any Lender's Commitment, (iii) the existence (or alleged existence) of an event or condition which has had or is reasonably likely to have a Material Adverse Effect, (iv) any breach of any Loan Document by the Agent, any Lender or the Borrower or (v) any other circumstance, happening or event whatsoever, whether or not similar to any of the foregoing.

**Section 2.3.   Letters of Credit.**

(a)   <u>Letters of Credit</u>.   Subject to the terms and conditions of this Agreement, the Agent, on behalf of the Lenders, agrees to issue for the account of the Borrower during the period from and including the Effective Date to but excluding the date 30 days prior to the Termination Date, one or more

- 22 -

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT A PAGE 30
OMNI0000361

letters of credit (each a "Letter of Credit") denominated in Dollars up to a maximum aggregate Stated
Amount at any one time outstanding not to exceed the L/C Commitment Amount.

(b)     Terms of Letters of Credit.   At the time of issuance, the amount, form, terms and
conditions of each Letter of Credit, and of any drafts or acceptances thereunder, shall be subject to
approval by the Agent and the Borrower. Notwithstanding the foregoing, in no event may the expiration
date of any Letter of Credit extend beyond the earlier of (i) the date one year from its date of issuance or
(ii) the Termination Date; provided, however, a Letter of Credit may contain a provision providing for the
automatic extension of the expiration date in the absence of a notice of non-renewal from the Agent but in
no event shall any such provision permit the extension of the expiration date of such Letter of Credit
beyond the Termination Date; provided, however, the Agent shall not permit any such renewal if the
Agent has determined that it would have no obligation at such time to issue such Letter of Credit in its
renewed form under the terms of this Agreement.

(c)     Requests for Issuance of Letters of Credit.   The Borrower shall give the Agent written
notice (or telephonic notice promptly confirmed in writing) at least 5 Business Days prior to the requested
date of issuance of a Letter of Credit, such notice to describe in reasonable detail the proposed terms of
such Letter of Credit and the nature of the transactions or obligations proposed to be supported by such
Letter of Credit, and in any event shall set forth with respect to such Letter of Credit the proposed
(i) Stated Amount, (ii) beneficiary, and (iii) expiration date.  The Borrower shall also execute and deliver
such customary letter of credit application forms as requested from time to time by the Agent.  Provided
the Borrower has given the notice prescribed by the first sentence of this subsection and subject to the
other terms and conditions of this Agreement, including the satisfaction of any applicable conditions
precedent set forth in Article V. and delivery to the Agent of all items required to be delivered in
connection with the issuance of such Letter of Credit, the Agent shall issue the requested Letter of Credit
on the requested date of issuance for the benefit of the stipulated beneficiary.  The Agent shall not at any
time be obligated to issue any Letter of Credit if such issuance would conflict with, or cause the Agent or
any Lender to exceed any limits imposed by, any Applicable Law.  References herein to "issue" and
derivations thereof with respect to Letters of Credit shall also include extensions or modifications of any
outstanding Letters of Credit, unless the context otherwise requires.  Upon the written request of the
Borrower, the Agent shall deliver to the Borrower a copy of each issued Letter of Credit within a
reasonable time after the date of issuance thereof.  To the extent any term of a Letter of Credit Document
is inconsistent with a term of any Loan Document, the term of such Loan Document shall control.

(d)     Reimbursement Obligations.   Upon receipt by the Agent from the beneficiary of a Letter
of Credit of any demand for payment under such Letter of Credit, the Agent shall promptly notify the
Borrower of the amount to be paid by the Agent as a result of such demand and the date on which
payment is to be made by the Agent to such beneficiary in respect of such demand; provided, however,
the Agent's failure to give, or delay in giving, such notice shall not discharge the Borrower in any respect
from the applicable Reimbursement Obligation.  The Borrower hereby unconditionally and irrevocably
agrees to pay and reimburse the Agent for the amount of each demand for payment under such Letter of
Credit on or prior to the date on which payment is to be made by the Agent to the beneficiary thereunder,
without presentment, demand, protest or other formalities of any kind (other than notice as provided in
this subsection). Upon receipt by the Agent of any payment in respect of any Reimbursement Obligation,
the Agent shall promptly pay to each Lender that has acquired a participation therein under the second
sentence of Section 2.3.(i) such Lender's Commitment Percentage of such payment.

(e)     Manner of Reimbursement.   Upon its receipt of a notice referred to in the immediately
preceding subsection (d), the Borrower shall advise the Agent whether or not the Borrower intends to
borrow hereunder to finance its obligation to reimburse the Agent for the amount of the related demand
for payment and, if it does, the Borrower shall submit a timely request for such borrowing as provided in

- 23 -

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

the applicable provisions of this Agreement.  If the Borrower fails to so advise the Agent, or if the Borrower fails to reimburse the Agent for a demand for payment under a Letter of Credit by the date of such payment, then (i) if the applicable conditions contained in Article V. would permit the making of Revolving Loans, the Borrower shall be deemed to have requested a borrowing of Revolving Loans (which shall be Base Rate Loans) in an amount equal to the unpaid Reimbursement Obligation and the Agent shall give each Lender prompt notice of the amount of the Revolving Loan to be made available to the Agent not later than 1:00 p.m. and (ii) if such conditions would not permit the making of Revolving Loans, the provisions of subsection (j) of this Section shall apply.  The limitations of Section 3.5.(a) shall not apply to any borrowing of Base Rate Loans under this subsection.

(f)     Effect of Letters of Credit on Commitments.  Upon the issuance by the Agent of any Letter of Credit and until such Letter of Credit shall have expired or been terminated, the Commitment of each Lender shall be deemed to be utilized for all purposes of this Agreement in an amount equal to the product of (i) such Lender's Commitment Percentage and (ii) the sum of (A) the Stated Amount of such Letter of Credit plus (B) any related Reimbursement Obligations then outstanding.

(g)     Agent's Duties Regarding Letters of Credit; Unconditional Nature of Reimbursement Obligations.  In examining documents presented in connection with drawings under Letters of Credit and making payments under Letters of Credit against such documents, the Agent shall only be required to use the same standard of care as it uses in connection with examining documents presented in connection with drawings under letters of credit in which it has not sold participations and making payments under such letters of credit.  The Borrower assumes all risks of the acts and omissions of, or misuse of the Letters of Credit by, the respective beneficiaries of such Letters of Credit.  In furtherance and not in limitation of the foregoing, neither the Agent nor any of the Lenders shall be responsible for, and the Borrower's obligations in respect of the Letters of Credit shall not be affected in any manner by, (i) the form, validity, sufficiency, accuracy, genuineness or legal effects of any document submitted by any party in connection with the application for and issuance of or any drawing honored under any Letter of Credit even if it should in fact prove to be in any or all respects invalid, insufficient, inaccurate, fraudulent or forged; (ii) the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign any Letter of Credit, or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason; (iii) failure of the beneficiary of any Letter of Credit to comply fully with conditions required in order to draw upon such Letter of Credit; (iv) errors, omissions, interruptions or delays in transmission or delivery of any messages, by mail, cable, telex, telecopy or otherwise, whether or not they be in cipher; (v) errors in interpretation of technical terms; (vi) any loss or delay in the transmission or otherwise of any document required in order to make a drawing under any Letter of Credit, or of the proceeds thereof; (vii) the misapplication by the beneficiary of the proceeds of any drawing under any Letter of Credit; or (viii) any consequences arising from causes beyond the control of the Agent or the Lenders.  None of the above shall affect, impair or prevent the vesting of any of the Agent's or any Lender's rights or powers hereunder.  Any action taken or omitted to be taken by the Agent under or in connection with any Letter of Credit, if taken or omitted in the absence of gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final, non-appealable judgment), shall not create against the Agent or any Lender any liability to the Borrower or any Lender.  In this regard, the obligation of the Borrower to reimburse the Agent for any drawing made under any Letter of Credit, and to repay any Revolving Loan made pursuant to the second sentence of the immediately preceding subsection (e), shall be absolute, unconditional and irrevocable and shall be paid strictly in accordance with the terms of this Agreement and any other applicable Letter of Credit Document under all circumstances whatsoever, including without limitation, the following circumstances: (A) any lack of validity or enforceability of any Letter of Credit Document or any term or provisions therein; (B) any amendment or waiver of or any consent to departure from all or any of the Letter of Credit Documents; (C) the existence of any claim, setoff, defense or other right which the Borrower may have at any time against the Agent, any Lender, any beneficiary of a Letter of Credit or any other Person,

- 24 -

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

whether in connection with this Agreement, the transactions contemplated hereby or in the Letter of Credit Documents or any unrelated transaction; (D) any breach of contract or dispute between the Borrower, the Agent, any Lender or any other Person; (E) any demand, statement or any other document presented under a Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein or made in connection therewith being untrue or inaccurate in any respect whatsoever; (F) any non-application or misapplication by the beneficiary of a Letter of Credit of the proceeds of any drawing under such Letter of Credit; (G) payment by the Agent under any Letter of Credit against presentation of a draft or certificate which does not strictly comply with the terms of such Letter of Credit; and (H) any other act, omission to act, delay or circumstance whatsoever that might, but for the provisions of this Section, constitute a legal or equitable defense to or discharge of the Borrower's Reimbursement Obligations. Notwithstanding anything to the contrary contained in this Section or Section 12.9., but not in limitation of the Borrower's unconditional obligation to reimburse the Agent for any drawing made under a Letter of Credit as provided in this Section and to repay any Revolving Loan made pursuant to the second sentence of the immediately preceding subsection (e), the Borrower shall have no obligation to indemnify the Agent or any Lender in respect of any liability incurred by the Agent or such Lender arising solely out of the gross negligence or willful misconduct of the Agent or such Lender in respect of a Letter of Credit as determined by a court of competent jurisdiction in a final, non-appealable judgment. Except as otherwise provided in this Section, nothing in this Section shall affect any rights the Borrower may have with respect to the gross negligence or willful misconduct of the Agent or any Lender with respect to any Letter of Credit.

(h)     Amendments, Etc.  The issuance by the Agent of any amendment, supplement or other modification to any Letter of Credit shall be subject to the same conditions applicable under this Agreement to the issuance of new Letters of Credit (including, without limitation, that the request therefor be made through the Agent), and no such amendment, supplement or other modification shall be issued unless either (i) the respective Letter of Credit affected thereby would have complied with such conditions had it originally been issued hereunder in such amended, supplemented or modified form or (ii) the Requisite Lenders (or all of the Lenders if required by Section 12.6.) shall have consented thereto. In connection with any such amendment, supplement or other modification, the Borrower shall pay the Fees, if any, payable pursuant to the last sentence of Section 3.6.(b).

(i)     Lenders' Participation in Letters of Credit.  Immediately upon the issuance by the Agent of any Letter of Credit each Lender shall be deemed to have irrevocably and unconditionally purchased and received from the Agent, without recourse or warranty, an undivided interest and participation to the extent of such Lender's Commitment Percentage of the liability of the Agent with respect to such Letter of Credit, and each Lender thereby shall absolutely, unconditionally and irrevocably assume, as primary obligor and not as surety, and shall be unconditionally obligated to the Agent to pay and discharge when due, such Lender's Commitment Percentage of the Agent's liability under such Letter of Credit.  In addition, upon the making of each payment by a Lender to the Agent in respect of any Letter of Credit pursuant to the immediately following subsection (j), such Lender shall, automatically and without any further action on the part of the Agent or such Lender, acquire (i) a participation in an amount equal to such payment in the Reimbursement Obligation owing to the Agent by the Borrower in respect of such Letter of Credit and (ii) a participation in a percentage equal to such Lender's Commitment Percentage in any interest or other amounts payable by the Borrower in respect of such Reimbursement Obligation (other than the Fees payable to the Agent pursuant to the third and last sentences of Section 3.6.(b)).

(j)     Payment Obligation of Lenders.  Each Lender severally agrees to pay to the Agent on demand in immediately available funds in Dollars the amount of such Lender's Commitment Percentage of each drawing paid by the Agent under each Letter of Credit to the extent such amount is not reimbursed by the Borrower pursuant to Section 2.3.(d); provided, however, that in respect of any drawing under any Letter of Credit, the maximum amount that any Lender shall be required to fund,

- 25 -

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

whether as a Revolving Loan or as a participation, shall not exceed such Lender's Commitment Percentage of such drawing. If the notice referenced in the second sentence of Section 2.3.(e) is received by a Lender not later than 11:00 a.m., then such Lender shall make such payment available to the Agent not later than 2:00 p.m. on the date of demand therefor; otherwise, such payment shall be made available to the Agent not later than 1:00 p.m. on the next succeeding Business Day. Each Lender's obligation to make such payments to the Agent under this subsection, and the Agent's right to receive the same, shall be absolute, irrevocable and unconditional and shall not be affected in any way by any circumstance whatsoever, including without limitation, (i) the failure of any other Lender to make its payment under this subsection, (ii) the financial condition of the Borrower or any other Loan Party, (iii) the existence of any Default or Event of Default, including any Event of Default described in Section 10.1.(f) or 10.1.(g) or (iv) the termination of the Commitments. Each such payment to the Agent shall be made without any offset, abatement, withholding or deduction whatsoever.

(k)    Information to Lenders. The Agent shall periodically deliver to the Lenders information setting forth the Stated Amount of all outstanding Letters of Credit. Other than as set forth in this subsection, the Agent shall have no duty to notify the Lenders regarding the issuance or other matters regarding Letters of Credit issued hereunder. The failure of the Agent to perform its requirements under this subsection shall not relieve any Lender from its obligations under Section 2.3.(j).

Section 2.4. Rates and Payment of Interest on Loans.

(a)    Rates.    The Borrower promises to pay to the Agent for the account of each Lender interest on the unpaid principal amount of each Loan made by such Lender for the period from and including the date of the making of such Loan to but excluding the date such Loan shall be paid in full, at the following per annum rates:

(i)    during such periods as such Loan is a Base Rate Loan, at the Base Rate (as in effect from time to time) plus the Applicable Margin;

(ii)    during such periods as such Loan is a LIBOR Loan denominated in Dollars, at Adjusted LIBOR for such Loan for the Interest Period therefor plus the Applicable Margin; and

(iii)    during such periods as such Loan is an Alternate Currency Loan, at LIBOR for such Loan for the Interest Period therefor plus the Applicable Margin (plus Mandatory Costs, if applicable, if such Loan was lent from a Lender's Lending Office in the United Kingdom or a Participating Member State).

Notwithstanding the foregoing, while an Event of Default exists, the Borrower shall pay to the Agent for the account of each Lender interest at the Post-Default Rate on the outstanding principal amount of any Loan made by such Lender, on all Reimbursement Obligations and on any other amount payable by the Borrower hereunder or under any other Loan Document (including without limitation, accrued but unpaid interest to the extent permitted under Applicable Law).

(b)    Payment of Interest.    Accrued and unpaid interest on each Loan shall be payable (i) in the case of a Base Rate Loan, monthly in arrears on the first day of each calendar month, (ii) in the case of a LIBOR Loan, in arrears on the last day of each Interest Period therefor, and, if such Interest Period is longer than three months, at three-month intervals following the first day of such Interest Period, and (iii) in the case of any Loan, in arrears upon the payment, prepayment or Continuation thereof or the Conversion of such Loan to a Loan of another Type (but only on the principal amount so paid, prepaid, Continued or Converted). Interest payable at the Post-Default Rate shall be payable from time to time on demand. Promptly after the determination of any interest rate provided for herein or any change therein,

- 26 -

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

the Agent shall give notice thereof to the Lenders to which such interest is payable and to the Borrower. All determinations by the Agent of an interest rate hereunder shall be conclusive and binding on the Lenders and the Borrower for all purposes, absent manifest error.

(c)  Calculations for Converted Currencies.  Subject to Section 1.3., with respect to the Currency of any state that becomes a Participating Member State, the accrual of interest or fees expressed in this Agreement with respect to such Currency shall be based upon the applicable convention or practice in the London Interbank Market for the basis of accrual of interest or fees in respect of the Euro, which convention or practice shall replace such expressed basis effective as of and from the date on which such state becomes a Participating Member State; provided that if any Loan in the Currency of such state is outstanding immediately prior to such date, such replacement shall take effect, with respect to such Loan, at the end of the then current Interest Period.

## Section 2.5.  Number of Interest Periods.

There may be no more than 6 different Interest Periods for LIBOR Loans outstanding at the same time.

## Section 2.6.  Repayment of Loans.

The Borrower shall repay the entire outstanding principal amount of, and all accrued but unpaid interest on, the Revolving Loans on the Termination Date.

## Section 2.7.  Prepayments.

(a)  Optional.  Subject to Section 4.4., the Borrower may prepay any Loan, in whole or in part, at any time without premium or penalty.  The Borrower shall give the Agent at least one Business Day's prior written notice of the prepayment of any Revolving Loan denominated in Dollars and at least 3 Business Days' prior notice of the prepayment of any Alternate Currency Loan.

(b)  Mandatory.

(i)  Currency Fluctuations.  If at any time (as determined by the Agent under the immediately following clause (iv)), solely because of currency fluctuations, either (x) the Dollar Equivalent of the aggregate principal amount of all outstanding Loans, together with the aggregate amount of all Letter of Credit Liabilities, exceeds 105% of the aggregate amount of the Commitments in effect at such time, or (y) the Dollar Equivalent of the aggregate principal amount of all outstanding Alternate Currency Loans exceeds 105% of the aggregate amount of the Alternate Currency Commitments in effect at such time, then the Borrower shall prepay Loans in an amount such that, after giving effect thereto, the Dollar Equivalent of the aggregate principal amount of all outstanding Loans, together with the aggregate amount of all Letter of Credit Liabilities and the Dollar Equivalent of the Alternate Currency Loans does not exceed the aggregate amount of the Alternate Currency Commitments.

(i)  Commitment Overadvance.  If at any time for any reason other than currency fluctuations, either (x) the Dollar Equivalent of the aggregate principal amount of all outstanding Loans, together with the aggregate amount of all Letter of Credit Liabilities, exceeds the aggregate amount of the Commitments in effect at such time, or (y) the Dollar Equivalent of the aggregate principal amount of all outstanding Alternate Currency Loans exceeds the aggregate amount of the Alternate Currency Commitments in effect at such time, then the Borrower shall prepay Loans in an amount such that, after giving effect thereto, the Dollar Equivalent of the

- 27 -

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT A PAGE 35
OMNI0000366

aggregate principal amount of all outstanding Loans, together with the aggregate amount of all Letter of Credit Liabilities does not exceed the Commitments and the Dollar Equivalent of the Alternate Currency Loans does not exceed the aggregate amount of the Alternate Currency Commitments.

(iii)    Application of Payments; Breakage. Prepayments under this subsection (b) shall be applied to pay all amounts of principal outstanding on the Loans and any Reimbursement Obligations pro rata in accordance with Section 3.2. and if any Letters of Credit are outstanding at such time the remainder, if any, shall be deposited into the Collateral Account for application to any Reimbursement Obligations.  If the Borrower is required to pay any outstanding LIBOR Loans by reason of this Section prior to the end of the applicable Interest Period therefor, the Borrower shall pay all amounts due under Section 4.4.

(iv)    Frequency of Calculations. The Borrower's compliance with this subsection (b) shall be tested from time to time by the Agent at its sole discretion, but in any event shall be tested on the date on which the Borrower requests the Lenders to make a Loan or the Agent to issue a Letter of Credit.

(c)    Derivatives Contracts. No repayment or prepayment pursuant to this Section shall affect any of the Borrower's obligations under any Derivatives Contract between the Borrower and any Lender (or any affiliate of any Lender).

**Section 2.8.  Continuation.**

So long as no Default or Event of Default shall exist, the Borrower may on any Business Day, with respect to any LIBOR Loan, elect to maintain such LIBOR Loan or any portion thereof as a LIBOR Loan in the same Currency by selecting a new Interest Period for such LIBOR Loan.  Each new Interest Period selected under this Section shall commence on the last day of the immediately preceding Interest Period.  Each selection of a new Interest Period shall be made by the Borrower giving to the Agent a Notice of Continuation not later than 12:00 noon (a) on the third Business Day prior to the date of any such Continuation of a LIBOR Loan denominated in Dollars or (b) the fourth Business Day prior to the date of such Continuation of an Alternate currency Loan.  Such notice by the Borrower of a Continuation shall be by telephone or telecopy, confirmed promptly in writing if by telephone, in the form of a Notice of Continuation, specifying (i) the proposed date of such Continuation, (ii) the LIBOR Loans and portions thereof subject to such Continuation and (iii) the duration of the selected Interest Period, all of which shall be specified in such manner as is necessary to comply with all limitations on Loans outstanding hereunder.  Each Notice of Continuation shall be irrevocable by and binding on the Borrower once given.  Promptly after receipt of a Notice of Continuation, the Agent shall notify each Lender by telecopy, or other similar form of transmission, of the proposed Continuation.  If the Borrower shall fail to select in a timely manner a new Interest Period for any LIBOR Loan in accordance with this Section, or if a Default or Event of Default shall exist, such Loan will automatically, on the last day of the current Interest Period therefor, Convert into a Base Rate Loan notwithstanding the first sentence of Section 2.9. or the Borrower's failure to comply with any of the terms of such Section.

**Section 2.9.  Conversion.**

The Borrower may on any Business Day, upon the Borrower's giving of a Notice of Conversion to the Agent, Convert all or a portion of a Loan of one Type into a Loan of another Type; provided, however, a Base Rate Loan may not be Converted to a LIBOR Loan if a Default or Event of Default shall exist.  Any Conversion of a LIBOR Loan into a Base Rate Loan shall be made on, and only on, the last day of an Interest Period for such LIBOR Loan and, upon Conversion of a Base Rate Loan into a LIBOR

- 28 -

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Loan, the Borrower shall pay accrued interest to the date of Conversion on the principal amount so Converted. Each such Notice of Conversion shall be given not later than 12:00 noon and on the Business Day prior to the date of any proposed Conversion into Base Rate Loans and on the third Business Day prior to the date of any proposed Conversion into LIBOR Loans. Promptly after receipt of a Notice of Conversion, the Agent shall notify each Lender by telecopy, or other similar form of transmission, of the proposed Conversion. Subject to the restrictions specified above, each Notice of Conversion shall be by telephone (confirmed immediately in writing) or telecopy in the form of a Notice of Conversion specifying (a) the requested date of such Conversion, (b) the Type of Loan to be Converted, (c) the portion of such Type of Loan to be Converted, (d) the Type of Loan such Loan is to be Converted into and (e) if such Conversion is into a LIBOR Loan, the requested duration of the Interest Period of such Loan. Each Notice of Conversion shall be irrevocable by and binding on the Borrower once given.

**Section 2.10. Notes.**

(a)     Revolving Notes and Alternate Currency Notes. If so requested by a Lender (on or at any time after the Effective Date), the Borrower shall deliver to such Lender a promissory note of the Borrower substantially in the form of Exhibit G (each a "Revolving Note"), payable to the order of such Lender in a principal amount equal to the amount of its Commitment as originally in effect and otherwise duly completed. If so requested by an Alternate Currency Lender (on or at any time after the Effective Date), the Borrower shall deliver to such Alternate Currency Lender a promissory note of the Borrower substantially in the form of Exhibit H (each an "Alternate Currency Note"), payable to the order of such Alternate Currency Lender in a principal amount equal to the amount of its Alternate Currency Commitment as originally in effect and otherwise duly completed.

(b)     Records. The date, amount, interest rate, Type and duration of Interest Periods (if applicable) of each Loan made by each Lender to the Borrower, and each payment made on account of the principal thereof, shall be recorded by such Lender on its books and such entries shall be binding on the Borrower, absent manifest error; provided, however, that the failure of a Lender to make any such record shall not affect the obligations of the Borrower under any of the Loan Documents.

(c)     Lost, Stolen, Destroyed or Mutilated Notes. Upon receipt by the Borrower of (i) written notice from a Lender that a Note of such Lender has been lost, stolen, destroyed or mutilated, and (ii) (A) in the case of loss, theft or destruction, an unsecured agreement of indemnity from such Lender in form reasonably satisfactory to the Borrower, or (B) in the case of mutilation, upon surrender and cancellation of such Note, the Borrower shall at its own expense execute and deliver to such Lender a new Note dated the date of such lost, stolen, destroyed or mutilated Note.

**Section 2.11. Voluntary Reductions of the Commitment.**

The Borrower shall have the right to terminate or reduce the aggregate unused amount of the Commitments (for which purpose use of the Commitments shall be deemed to include the aggregate amount of Letter of Credit Liabilities and the aggregate principal amount of all outstanding Swingline Loans) at any time and from time to time without penalty or premium upon not less than 5 Business Days prior written notice to the Agent of each such termination or reduction, which notice shall specify the effective date thereof and the amount of any such reduction and shall be irrevocable once given and, effective only upon receipt by the Agent. The Agent will promptly transmit such notice to each Lender. The Commitments, once terminated or reduced may not be increased or reinstated.

- 29 -

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT A PAGE 37
OMNI0000368

**Section 2.12. Expiration or Maturity Date of Letters of Credit Past Termination Date.**

If on the date the Commitments are terminated or reduced to zero (whether voluntarily, by reason of the occurrence of an Event of Default or otherwise), there are any Letters of Credit outstanding hereunder, the Borrower shall, on such date, pay to the Agent an amount of money sufficient to cause the balance of available funds on deposit in the Collateral Account to equal the Stated Amount of such Letter(s) of Credit for deposit into the Collateral Account.

**Section 2.13. Amount Limitations.**

Notwithstanding any other term of this Agreement or any other Loan Document, no Lender shall be required to make a Loan, the Agent shall not be required to issue a Letter of Credit and no reduction of the Commitments pursuant to Section 2.11. shall take effect, if immediately after the making of such Loan, the issuance of such Letter of Credit or such reduction in the Commitments:

(a)     The aggregate principal amount of all outstanding Loans denominated in Dollars, together with the Dollar Equivalent at such time of the aggregate principal amount of all outstanding Alternate Currency Loans and the aggregate amount of all Letter of Credit Liabilities, would exceed the aggregate amount of the Commitments at such time; or

(b)     The Dollar Equivalent at such time of the aggregate principal amount of all outstanding Alternate Currency Loans would exceed the aggregate amount of the Alternate Currency Commitment.

**Section 2.14. Increase of Commitments.**

With the prior consent of the Agent, the Borrower shall have the right at any time prior to the date 45 days before the Termination Date to request increases in the aggregate amount of the Commitments (provided that after giving effect to any increases in the Commitments pursuant to this Section, the aggregate amount of the Commitments may not exceed $400,000,000) by providing written notice to the Agent, which notice shall be irrevocable once given. Each such increase in the Commitments must be in an aggregate minimum amount of $50,000,000 and integral multiples of $25,000,000 in excess thereof. No Lender shall be required to increase its Commitment and any new Lender becoming a party to this Agreement in connection with any such requested increase must be an Eligible Assignee. If a new Lender becomes a party to this Agreement, or if any existing Lender agrees to increase its Commitment, such Lender shall on the date it becomes a Lender hereunder (or increases its Commitment, in the case of an existing Lender) (and as a condition thereto) purchase (a) from the other Lenders its Commitment Percentage (or in the case of an existing Lender, the increase in the amount of its Commitment Percentage, in each case as determined after giving effect to the increase of Commitments) of any outstanding Revolving Loans, by making available to the Agent for the account of such other Lenders at the Principal Office, in same day funds, an amount equal to the sum of (A) the portion of the outstanding principal amount of such Revolving Loans to be purchased by such Lender plus (B) the aggregate amount of payments previously made by the other Lenders under Section 2.3.(j) which have not been repaid plus (C) interest accrued and unpaid to and as of such date on such portion of the outstanding principal amount of such Revolving Loans and (b) if such Lender will also have an Alternate Currency Commitment, from the other Alternate Currency Lenders its Alternate Currency Commitment Percentage of any outstanding Alternate Currency Loans, by making available to the Agent for the account of such other Alternate Currency Lenders at the Principal Office, in same day funds and in the same Currencies of the existing Alternate Currency Loans, an amount equal to the sum of (A) the portion of the outstanding principal amount of such existing Alternate Currency Loans to be purchased by such Lender plus (B) interest accrued and unpaid to and as of such date on such portion of the outstanding principal amount of such existing Alternate Currency Loans. The Borrower shall pay to the Lenders amounts payable, if any, to

- 30 -

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT A PAGE 38
OMNI0000369

such Lenders under Section 4.4. as a result of the prepayment of any such Revolving Loans. No increase of the Commitments may be effected under this Section if (x) a Default or Event of Default shall be in existence on the effective date of such increase or (y) any representation or warranty made or deemed made by the Borrower or any other Loan Party in any Loan Document to which any such Loan Party is a party is not (or would not be) true or correct on the effective date of such increase (except for representations or warranties which expressly relate solely to an earlier date). In connection with any increase in the aggregate amount of the Commitments pursuant to this Section, any Lender becoming a party hereto and the Borrower shall execute such documents and agreements (in the case of the Borrower, including resolutions) as the Agent may reasonably request.

ARTICLE III. PAYMENTS, FEES AND OTHER GENERAL PROVISIONS

**Section 3.1. Payments.**

(a)   _Generally._   Except with to the extent otherwise provided herein, all payments of principal, interest and other amounts to be made by the Borrower under this Agreement or any other Loan Document shall be made in Dollars (or, in the case of payments in respect of Alternate Currency Loans, the applicable Alternate Currency), in immediately available funds, without deduction, set-off or counterclaim, to the Agent at its Principal Office, not later than 2:00 p.m. on the date on which such payment shall become due (each such payment made after such time on such due date to be deemed to have been made on the next succeeding Business Day). Subject to Section 10.4. the Borrower may, at the time of making each payment under this Agreement or any Note, specify to the Agent the amounts payable by the Borrower hereunder to which such payment is to be applied. Each payment received by the Agent for the account of a Lender under this Agreement or any Note shall be paid to such Lender at the applicable Lending Office of such Lender no later than 5:00 p.m. on the date of the Agent's receipt thereof. If the Agent fails to pay such amount to a Lender as provided in the previous sentence, the Agent shall pay interest on such amount until paid at a rate per annum equal to the Federal Funds Rate from time to time in effect. If the due date of any payment under this Agreement or any other Loan Document would otherwise fall on a day which is not a Business Day such date shall be extended to the next succeeding Business Day and interest shall be payable for the period of such extension.

(b)   _Payments in Euros._   With respect to the payment of any amount denominated in Euros, the Agent shall not be liable to the Borrower or any of the Lenders in any way whatsoever for any delay, or the consequences of any delay, in the crediting to any account of any amount required by this Agreement to be paid by the Agent if the Agent shall have taken all relevant steps to achieve, on the date required by this Agreement, the payment of such amount in immediately available, freely transferable, cleared funds (in Euros) to the account of the Borrower which the Borrower shall have specified for such purpose. For the purposes of this paragraph, "all relevant steps" means all such steps as may be prescribed from time to time by the regulations or operating procedures of such clearing or settlement system as the Agent may from time to time reasonably determine for the purpose of clearing or settling payments in Euros.

**Section 3.2. Pro Rata Treatment.**

Except to the extent otherwise provided herein:

(a)   Each borrowing from the Lenders under Section 2.1.(a)(i), 2.2.(e) and 2.3.(e) shall be made from the Lenders, each payment of the Fees under Section 3.6.(a) and the first sentence of Section 3.6.(b) shall be made for the account of the Lenders, and each termination or reduction of the amount of the Commitments under Section 2.11. shall be applied to the respective Commitments of the Lenders, pro rata according to the amounts of their respective Commitments;

- 31 -

LEGAL02/30055542v16

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

(b)     Each borrowing from the Alternate Currency Lenders under Section 2.1.(a)(ii) shall be made from the Alternate Currency Lenders pro rata according to the amounts of their respective Alternate Currency Commitments;

(c)     Each payment or prepayment of principal of Revolving Loans denominated in Dollars or of Alternate Currency Loans by the Borrower shall be made for the account of the Lenders or Alternate Currency Lenders, as applicable, pro rata in accordance with the respective unpaid principal amounts of such Loans held by them, provided that if immediately prior to giving effect to any such payment in respect of any such Loans the outstanding principal amount of such Loans shall not be held by the Lenders or Alternate Currency Lenders, as applicable, pro rata in accordance with their respective Commitments or Alternate Currency Commitments, as applicable, in effect at the time such Loans were made, then such payment shall be applied to such Loans in such manner as shall result, as nearly as is practicable, in the outstanding principal amount of the such Loans being held by the Lenders or Alternate Currency Lenders, as applicable, pro rata in accordance with their respective Commitments or Alternate Currency Commitments, as applicable;

(d)     Each payment of interest on Revolving Loans denominated in Dollars by the Borrower shall be made for the account of the Lenders pro rata in accordance with the amounts of interest on such Loans then due and payable to the respective Lenders;

(e)     Each payment of interest on Alternate Currency Loans by the Borrower shall be made for the account of the Alternate Currency Lenders pro rata in accordance with the amounts of interest on such Loans then due and payable to the Alternate Currency Lenders;

(f)     The Conversion and Continuation of Revolving Loans (other than Alternate Currency Loans) of a particular Type (other than Conversions provided for by Section 4.5.) shall be made pro rata among the Lenders according their respective Revolving Loans and the then current Interest Period for each Lender's portion of each Revolving Loan of such Type shall be coterminous;

(g)     The Continuation of Alternate Currency Loans shall be made pro rata among the Alternate Currency Lenders according their respective Alternate Currency Loans and the then current Interest Period for each Lender's portion of each Alternate Currency Loan shall be coterminous;

(h)     The Lenders' participation in, and payment obligations in respect of, Letters of Credit under Section 2.3., shall be pro rata in accordance with their respective Commitments; and

(i)     The Lenders' participation in, and payment obligations in respect of, Swingline Loans under Section 2.2., shall be pro rata in accordance with their respective Commitments. All payments of principal, interest, fees and other amounts in respect of the Swingline Loans shall be for the account of the Swingline Lender only (except to the extent any Lender shall have acquired and funded a participating interest in any such Swingline Loan pursuant to Section 2.2.(e), in which case such payments shall be pro rata in accordance with such participating interests).

**Section 3.3.  Sharing of Payments, Etc.**

If a Lender shall obtain payment of any principal of, or interest on, any Loan made by it to the Borrower under this Agreement, or shall obtain payment on any other Obligation owing by the Borrower or any other Loan Party through the exercise of any right of set-off, banker's lien or counterclaim or similar right or otherwise or through voluntary prepayments directly to a Lender or other payments made by the Borrower to a Lender not in accordance with the terms of this Agreement and such payment should

- 32 -

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

be distributed to the Lenders pro rata in accordance with the applicable provisions of Section 3.2. or Section 10.4., as applicable, such Lender shall promptly purchase from the other Lenders participations in (or, if and to the extent specified by such Lender, direct interests in) the Loans made by the other Lenders or other Obligations owed to such other Lenders in such amounts, and make such other adjustments from time to time as shall be equitable, to the end that all the Lenders shall share the benefit of such payment (net of any reasonable expenses which may be incurred by such Lender in obtaining or preserving such benefit) pro rata in accordance with Section 3.2. or Section 10.4., as applicable.   To such end, all the Lenders shall make appropriate adjustments among themselves (by the resale of participations sold or otherwise) if such payment is rescinded or must otherwise be restored.   The Borrower agrees that any Lender so purchasing a participation (or direct interest) in the Loans or other Obligations owed to such other Lenders may exercise all rights of set-off, banker's lien, counterclaim or similar rights with respect to such participation as fully as if such Lender were a direct holder of Loans in the amount of such participation.   Nothing contained herein shall require any Lender to exercise any such right or shall affect the right of any Lender to exercise, and retain the benefits of exercising, any such right with respect to any other indebtedness or obligation of the Borrower.

### Section 3.4.  Several Obligations.

No Lender shall be responsible for the failure of any other Lender to make a Loan or to perform any other obligation to be made or performed by such other Lender hereunder, and the failure of any Lender to make a Loan or to perform any other obligation to be made or performed by it hereunder shall not relieve the obligation of any other Lender to make any Loan or to perform any other obligation to be made or performed by such other Lender.

### Section 3.5.  Minimum Amounts.

(a)   <u>Borrowings and Conversions</u>.   Except as otherwise provided in Sections 2.2.(e) and 2.3.(e), each borrowing of Base Rate Loans shall be in an aggregate minimum amount of $500,000 and integral multiples of $250,000 in excess thereof.   Each borrowing of and each Conversion to LIBOR Loans shall be in an aggregate minimum amount of $1,000,000 and integral multiples of $250,000 in excess of that amount (or in the case of Alternate Currency Loans, the Alternate Currency Equivalent thereof), or in any case, the aggregate amount of the unused Commitments or Alternate Currency Commitments, as applicable.

(b)   <u>Reductions of Commitments</u>.   Each reduction of the Commitments under Section 2.11. shall be in an aggregate minimum amount of $5,000,000 and integral multiples of $2,000,000 in excess thereof.

### Section 3.6.  Fees.

(a)   <u>Commitment Fee</u>. During the period from the Effective Date to but excluding the Termination Date, the Borrower agrees to pay to the Agent for the account of the Lenders a fee with respect to the average daily difference between the (i) aggregate amount of the Commitments and (ii) the Dollar Equivalent of the aggregate principal amount of all outstanding Revolving Loans plus the aggregate amount of all Letter of Credit Liabilities (the "Unused Amount").   Such fee shall be computed by multiplying the Unused Amount with respect to such quarter by the applicable Commitment Fee.   Such fee shall be payable in arrears on the last day of each March, June, September or December of each calendar year.   Any such accrued and unpaid fee shall also be payable on the Termination Date or any earlier date of termination of the Commitments or reduction of the Commitments to zero.

- 33 -

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

(b)     Letter of Credit Fees.  The Borrower agrees to pay to the Agent for the account of each Lender a letter of credit fee at a rate per annum equal to the Applicable Margin for LIBOR Loans (or while an Event of Default exists, at a per annum rate equal to 2.0%) times the daily average Stated Amount of each Letter of Credit for the period from and including the date of issuance of such Letter of Credit (x) through and including the date such Letter of Credit expires or is terminated or (y) to but excluding the date such Letter of Credit is drawn in full and is not subject to reinstatement, as the case may be.  The fees provided for in the immediately preceding sentence shall be nonrefundable and payable in arrears on (i) the last day of March, June, September and December in each year until the Commitments are terminated, (ii) the Termination Date, (iii) the date the Commitments are terminated or reduced to zero and (iv) thereafter from time to time on demand of the Agent.  In addition, the Borrower shall pay to the Agent for its own account and not the account of any Lender, an issuance fee in respect of each Letter of Credit equal to the greater of (i) $200 or (ii) one-eighth of one percent (0.125%) per annum on the initial Stated Amount of such Letter of Credit payable (A) for the period from and including the date of issuance of such Letter of Credit through and including the expiration date of such Letter of Credit and (B) if the expiration date of any Letter of Credit is extended (whether as a result of the operation of an automatic extension clause or otherwise), for the period from but excluding the previous expiration date to and including the extended expiration date.  The fees provided for in the immediately preceding sentence shall be nonrefundable and payable upon issuance (or in the case of an extension of the expiration date, on the previous expiration date).  The Borrower shall pay directly to the Agent from time to time on demand all commissions, charges, costs and expenses in the amounts customarily charged by the Agent from time to time in like circumstances with respect to the issuance of each Letter of Credit, drawings, amendments and other transactions relating thereto.

(c)     Administrative and Other Fees.  The Borrower agrees to pay the administrative and other fees of the Agent as may be agreed to in writing by the Borrower and the Agent from time to time.

Section 3.7.  Computations.

Unless otherwise expressly set forth herein, any accrued interest on any Loan, any Fees or any other Obligations due hereunder shall be computed on the basis of a year of 365 or 366 days, as applicable, and the actual number of days elapsed; provided, however, interest on LIBOR Loans shall be computed on the basis of a year of 360 days and the actual number of days elapsed.

Section 3.8.  Usury.

In no event shall the amount of interest due or payable on the Loans or other Obligations exceed the maximum rate of interest allowed by Applicable Law and, if any such payment is paid by the Borrower or any other Loan Party or received by any Lender, then such excess sum shall be credited as a payment of principal, unless the Borrower shall notify the respective Lender in writing that the Borrower elects to have such excess sum returned to it forthwith.  It is the express intent of the parties hereto that the Borrower not pay and the Lenders not receive, directly or indirectly, in any manner whatsoever, interest in excess of that which may be lawfully paid by the Borrower under Applicable Law.

Section 3.9.  Agreement Regarding Interest and Charges.

The parties hereto hereby agree and stipulate that the only charge imposed upon the Borrower for the use of money in connection with this Agreement is and shall be the interest specifically described in Sections 2.4.(a)(i) through (iii) and in Section 2.2.(c).  Notwithstanding the foregoing, the parties hereto further agree and stipulate that all agency fees, syndication fees, commitment fees, closing fees, letter of credit fees, underwriting fees, default charges, late charges, funding or "breakage" charges, increased cost charges, reasonable attorneys' fees and reimbursement for reasonable costs and expenses actually paid by

- 34 -

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

the Agent or any Lender to third parties or for damages incurred by the Agent or any Lender, in each case in connection with the transactions contemplated by this Agreement and the other Loan Documents, are charges made to compensate the Agent or any such Lender for underwriting or administrative services and costs or losses performed or incurred, and to be performed or incurred, by the Agent and the Lenders in connection with this Agreement and shall under no circumstances be deemed to be charges for the use of money. All charges other than charges for the use of money shall be fully earned and nonrefundable when due.

**Section 3.10.  Statements of Account.**

The Agent will account to the Borrower monthly with a statement of Loans, Letters of Credit, accrued interest and Fees, charges and payments made pursuant to this Agreement and the other Loan Documents, and such account rendered by the Agent shall be deemed conclusive upon Borrower absent manifest error. The failure of the Agent to deliver such a statement of accounts shall not relieve or discharge the Borrower from any of its obligations hereunder.

**Section 3.11.  Defaulting Lenders.**

(a)    _Generally._   If for any reason any Lender (a "Defaulting Lender") shall fail or refuse to perform any of its obligations under this Agreement or any other Loan Document to which it is a party within the time period specified for performance of such obligation or, if no time period is specified, if such failure or refusal continues for a period of two Business Days after notice from the Agent, then, in addition to the rights and remedies that may be available to the Agent or the Borrower under this Agreement or Applicable Law, such Defaulting Lender's right to participate in the administration of the Loans, this Agreement and the other Loan Documents, including without limitation, any right to vote in respect of, to consent to or to direct any action or inaction of the Agent or to be taken into account in the calculation of the Requisite Lenders, shall be suspended during the pendency of such failure or refusal. If a Lender is a Defaulting Lender because it has failed to make timely payment to the Agent of any amount required to be paid to the Agent hereunder (without giving effect to any notice or cure periods), in addition to other rights and remedies which the Agent or the Borrower may have under the immediately preceding provisions or otherwise, the Agent shall be entitled (i) to collect interest from such Defaulting Lender on such delinquent payment for the period from the date on which the payment was due until the date on which the payment is made at the Federal Funds Rate, (ii) to withhold or setoff and to apply in satisfaction of the defaulted payment and any related interest, any amounts otherwise payable to such Defaulting Lender under this Agreement or any other Loan Document and (iii) to bring an action or suit against such Defaulting Lender in a court of competent jurisdiction to recover the defaulted amount and any related interest. Any amounts received by the Agent in respect of a Defaulting Lender's Loans shall not be paid to such Defaulting Lender and shall be held uninvested by the Agent either applied against the purchase price of such Loans under the following subsection (b) or and paid to such Defaulting Lender upon such Defaulting Lender's curing of its default.

(b)    _Assignment of Defaulting Lender's Commitment._   The Borrower may, by giving written notice thereof to the Agent, a Defaulting Lender and the other Lenders, demand that such Defaulting Lender assign (in which case such Defaulting Lender shall assign) its Commitment and its Alternate Currency Commitment, if applicable, to an Eligible Assignee subject to and in accordance with the provisions of Section 12.5.(b) for the purchase price provided for below. No party hereto shall have any obligation whatsoever to initiate any such replacement or to assist in finding an Eligible Assignee. Upon any such assignment, the Defaulting Lender's interest in the Loans and its rights hereunder (but not its liability in respect thereof or under the Loan Documents or this Agreement to the extent the same relate to the period prior to the effective date of the purchase except to the extent assigned pursuant to such purchase) shall terminate, and the Defaulting Lender shall promptly execute all documents reasonably

- 35 -

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT A PAGE 43

OMNI0000374

requested to surrender and transfer such interest to the purchaser or assignee thereof, including an appropriate Assignment and Assumption and, notwithstanding Section 12.5.(b), shall pay to the Agent an assignment fee in the amount of $7,000. The purchase price for the Commitment and its Alternate Currency Commitment, if applicable, of a Defaulting Lender shall be equal to the amount of the principal balance of the Loans outstanding and owed by the Borrower to the Defaulting Lender. Prior to payment of such purchase price to a Defaulting Lender, the Agent shall apply against such purchase price any amounts retained by the Agent pursuant to the last sentence of the immediately preceding subsection (a). The Defaulting Lender shall be entitled to receive amounts owed to it by the Borrower under the Loan Documents which accrued prior to the date of the default by the Defaulting Lender, to the extent the same are received by the Agent from or on behalf of the Borrower. There shall be no recourse against any Lender or the Agent for the payment of such sums except to the extent of the receipt of payments from any other party or in respect of the Loans.

**Section 3.12. Taxes.**

(a)     Taxes Generally.   All payments by the Borrower of principal of, and interest on, the Loans and all other Obligations shall be made free and clear of and without deduction for any present or future excise, stamp or other taxes, fees, duties, levies, imposts, charges, deductions, withholdings or other charges of any nature whatsoever imposed by any taxing authority, but excluding (i) franchise taxes, (ii) any taxes imposed on or measured by any Lender's assets, net income, receipts or branch profits, (iii) any taxes (other than withholding taxes) with respect to the Agent or a Lender that would not be imposed but for a connection between the Agent or such Lender and the jurisdiction imposing such taxes (other than a connection arising solely by virtue of the activities of the Agent or such Lender pursuant to or in respect of this Agreement or any other Loan Document), and (iv) any taxes, fees, duties, levies, imposts, charges, deductions, withholdings or other charges to the extent imposed as a result of the failure of the Agent or a Lender, as applicable, to provide and keep current (to the extent legally able) any certificates, documents or other evidence required to qualify for an exemption from, or reduced rate of, any such taxes fees, duties, levies, imposts, charges, deductions, withholdings or other charges or required by the immediately following subsection (c) to be furnished by the Agent or such Lender, as applicable (such non-excluded items being collectively called "Taxes"). If any withholding or deduction from any payment to be made by the Borrower hereunder is required in respect of any Taxes pursuant to any Applicable Law, then the Borrower will:

(i)     pay directly to the relevant Governmental Authority the full amount required to be so withheld or deducted;

(ii)     promptly forward to the Agent an official receipt or other documentation reasonably satisfactory to the Agent evidencing such payment to such Governmental Authority; and

(iii)     pay to the Agent for its account or the account of the applicable Lender, as the case may be, such additional amount or amounts as is necessary to ensure that the net amount actually received by the Agent or such Lender will equal the full amount that the Agent or such Lender would have received had no such withholding or deduction been required.

(b)     Tax Indemnification.   If the Borrower fails to pay any Taxes when due to the appropriate Governmental Authority or fails to remit to the Agent, for its account or the account of the respective Lender, as the case may be, the required receipts or other required documentary evidence, the Borrower shall indemnify the Agent and the Lenders for any incremental Taxes, interest or penalties that may become payable by the Agent or any Lender as a result of any such failure. For purposes of this Section,

- 36 -

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

a distribution hereunder by the Agent or any Lender to or for the account of any Lender shall be deemed a payment by the Borrower.

(c)     Tax Forms.   Prior to the date that any Foreign Lender becomes a party hereto, such Foreign Lender shall deliver to the Borrower and the Agent such certificates, documents or other evidence, as required by the Internal Revenue Code or Treasury Regulations issued pursuant thereto (including Internal Revenue Service Forms W-8ECI and W-8BEN, as applicable, or appropriate successor forms), properly completed, currently effective and duly executed by such Foreign Lender establishing that payments to it hereunder and under the other Loan Documents are (i) not subject to United States Federal backup withholding tax and (ii) not subject to United States Federal withholding tax imposed under the Internal Revenue Code. Each such Foreign Lender shall, to the extent it may lawfully do so, (x) deliver further copies of such forms or other appropriate certifications on or before the date that any such forms expire or become obsolete and after the occurrence of any event requiring a change in the most recent form delivered to the Borrower or the Agent and (y) obtain such extensions of the time for filing, and renew such forms and certifications thereof, as may be reasonably requested by the Borrower or the Agent.   The Borrower shall not be required to pay any amount pursuant to the last sentence of subsection (a) above to any Foreign Lender or the Agent, if it is organized under the laws of a jurisdiction outside of the United States of America, if such Foreign Lender or the Agent, as applicable, fails to comply with the requirements of this subsection.   If any such Foreign Lender, to the extent it may lawfully do so, fails to deliver the above forms or other documentation, then the Agent may withhold from any payments to be made to such Foreign Lender under any of the Loan Documents such amounts as are required by the Internal Revenue Code. If any Governmental Authority asserts that the Agent did not properly withhold or backup withhold, as the case may be, any tax or other amount from payments made to or for the account of any Lender, such Lender shall indemnify the Agent therefor, including all penalties and interest, any taxes imposed by any jurisdiction on the amounts payable to the Agent under this Section, and costs and expenses (including all reasonable fees and disbursements of any law firm or other external counsel and the allocated cost of internal legal services and all disbursements of internal counsel) of the Agent.  The obligation of the Lenders under this Section shall survive the termination of the Commitments, repayment of all Obligations and the resignation or replacement of the Agent.

### ARTICLE IV. YIELD PROTECTION, ETC.

**Section 4.1. Additional Costs; Capital Adequacy.**

(a)     Additional Costs.  The Borrower shall promptly pay to the Agent for the account of each affected Lender from time to time such amounts as such Lender may determine to be necessary to compensate such Lender for any costs incurred by such Lender that it determines are attributable to its making or maintaining of any LIBOR Loans or its obligation to make any LIBOR Loans hereunder, any reduction in any amount receivable by such Lender under this Agreement or any of the other Loan Documents in respect of any of such Loans or such obligation or the maintenance by such Lender of capital in respect of its Loans or its Commitment or Alternate Currency Commitment, if applicable (such increases in costs and reductions in amounts receivable being herein called "Additional Costs"; provided, Additional Costs shall not include Mandatory Costs or amounts payable under Section 4.10.), to the extent resulting from any Regulatory Change that:  (i) changes the basis of taxation of any amounts payable to such Lender under this Agreement or any of the other Loan Documents in respect of any of such Loans, its Commitment or Alternate Currency Commitment, if applicable (other than taxes, fees, duties, levies, imposts, charges, deductions, withholdings or other charges which are excluded from the definition of Taxes pursuant to the first sentence of Section 3.12.(a)); or (ii) imposes or modifies any reserve, special deposit or similar requirements (other than Regulation D of the Board of Governors of the Federal Reserve System or other reserve requirement to the extent utilized in the determination of Adjusted LIBOR for such Loan) relating to any extensions of credit or other assets of, or any deposits

LEGAL02/30055542v16

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

with or other liabilities of, such Lender, or any commitment of such Lender (including, without limitation, the Commitment or Alternate Currency Commitment, if applicable, of such Lender hereunder); or (iii) has or would have the effect of reducing the rate of return on capital of such Lender to a level below that which such Lender would have achieved but for such Regulatory Change (taking into consideration such Lender's policies with respect to capital adequacy).

(b)     Lender's Suspension of LIBOR Loans.  Without limiting the effect of the provisions of the immediately preceding subsection (a), if, by reason of any Regulatory Change, any Lender either (i) incurs Additional Costs based on or measured by the excess above a specified level of the amount of a category of deposits or other liabilities of such Lender that includes deposits by reference to which the interest rate on LIBOR Loans is determined as provided in this Agreement or a category of extensions of credit or other assets of such Lender that includes LIBOR Loans or (ii) becomes subject to restrictions on the amount of such a category of liabilities or assets that it may hold, then, if such Lender so elects by notice to the Borrower (with a copy to the Agent), the obligation of such Lender to make or Continue, or to Convert any other Type of Loans into, LIBOR Loans hereunder shall be suspended until such Regulatory Change ceases to be in effect (in which case the provisions of Section 4.5. shall apply).

(c)     Additional Costs in Respect of Letters of Credit.  Without limiting the obligations of the Borrower under the preceding subsections of this Section (but without duplication), if as a result of any Regulatory Change or any risk-based capital guideline or other requirement heretofore or hereafter issued by any Governmental Authority there shall be imposed, modified or deemed applicable any tax (other than taxes, fees, duties, levies, imposts, charges, deductions, withholdings or other charges which are excluded from the definition of Taxes pursuant to the first sentence of Section (ref Taxes) (a)), reserve, special deposit, capital adequacy or similar requirement against or with respect to or measured by reference to Letters of Credit and the result shall be to increase the cost to the Agent of issuing (or any Lender of purchasing participations in) or maintaining its obligation hereunder to issue (or purchase participations in) any Letter of Credit or reduce any amount receivable by the Agent or any Lender hereunder in respect of any Letter of Credit, then, upon demand by the Agent or such Lender, the Borrower shall pay promptly, and in any event within 3 Business Days of demand, to the Agent for its account or the account of such Lender, as applicable, from time to time as specified by the Agent or a Lender, such additional amounts as shall be sufficient to compensate the Agent or such Lender for such increased costs or reductions in amount.

(d)     Notification and Determination of Additional Costs.  Each of the Agent and each Lender agrees to notify the Borrower of any event occurring after the Agreement Date entitling the Agent or such Lender to compensation under any of the preceding subsections of this Section as promptly as practicable; provided, however, the failure of the Agent or any Lender to give such notice shall not release the Borrower from any of its obligations hereunder (and in the case of a Lender, to the Agent); provided, further that neither the Agent nor any Lender shall be entitled to claim any additional cost, compensation, reduction in amounts, loss, tax or other additional amount under this Article IV. if the Agent or such Lender, as applicable, fails to provide such notice to the Borrower within 90 days of the date the Agent or such Lender, as applicable, becomes aware of the occurrence of the event giving rise to the additional cost, reduction in amounts, loss, tax or other additional amount.  The Agent or such Lender agrees to furnish to the Borrower (and in the case of a Lender, to the Agent) a certificate setting forth in reasonable detail the basis and amount of each request by the Agent or such Lender for compensation under this Section.  Absent manifest error, determinations by the Agent or any Lender of the effect of any Regulatory Change shall be conclusive, provided that such determinations are made on a reasonable basis and in good faith.

- 38 -



CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT A PAGE 46
OMNI0000377

**Section 4.2.  Suspension of LIBOR Loans.**

Anything herein to the contrary notwithstanding, if, on or prior to the determination of LIBOR or Adjusted LIBOR, as applicable, for any Interest Period:

(a)    the Agent reasonably determines (which determination shall be conclusive) that by reason of circumstances affecting the relevant market, adequate and reasonable means do not exist for ascertaining Adjusted LIBOR for such Interest Period,

(b)    the Agent reasonably determines (which determination shall be conclusive) that Adjusted LIBOR will not adequately and fairly reflect the cost to the Lenders of making or maintaining LIBOR Loans for such Interest Period,

(c)    in the case of any Alternate Currency Loan, a fundamental change has occurred in the foreign exchange or interbank markets with respect to the applicable Alternate Currency (including, without limitation, changes in national or international financial, political or economic conditions or currency exchange rates or exchange controls), or

(d)    in the case of any Alternate Currency Loan, the Agent has reasonably determined that it has become materially impractical for the Alternate Currency Lenders to make Alternate Currency Loans,

then the Agent shall give the Borrower and each Lender prompt notice thereof and, so long as such condition remains in effect, (x) in the case of clauses (a) and (b), the Lenders shall be under no obligation to, and shall not, make additional LIBOR Loans, Continue LIBOR Loans or Convert Loans into LIBOR Loans and the Borrower shall, on the last day of each current Interest Period for each outstanding LIBOR Loan, either repay such Loan or Convert such Loan into a Base Rate Loan and (y) in the case of clauses (c) and (d), the Alternate Currency Lenders shall be under no obligation to, and shall not, make any additional Alternate Currency Loans or Continue any Alternate Currency Loans.

**Section 4.3.  Illegality.**

Notwithstanding any other provision of this Agreement, if any Lender shall reasonably determine (which determination shall be conclusive and binding) that it has become unlawful for such Lender to honor its obligation to make or maintain LIBOR Loans hereunder, then such Lender shall promptly notify the Borrower thereof (with a copy to the Agent) and such Lender's obligation to make or Continue, or to Convert Loans of any other Type into, LIBOR Loans shall be suspended until such time as such Lender may again make and maintain LIBOR Loans (in which case the provisions of Section 4.5. shall apply).

**Section 4.4.  Compensation.**

The Borrower shall pay to the Agent for the account of each Lender, upon the request of such Lender through the Agent, such amount or amounts as shall be sufficient (in the reasonable opinion of such Lender) to compensate it for any loss, cost or expense that such Lender reasonably determines is attributable to:

(a)    any payment or prepayment (whether mandatory or optional) of a LIBOR Loan, or Conversion of a LIBOR Loan, made by such Lender for any reason (including, without limitation, acceleration) on a date other than the last day of the Interest Period for such LIBOR Loan; or

- 39 -

LEGAL02/30055542v16

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

(b)      any failure by the Borrower for any reason (including, without limitation, the failure of any of the applicable conditions precedent specified in Article V. to be satisfied) to borrow a LIBOR Loan from such Lender on the requested date for such borrowing, or to Convert a Base Rate Loan into a LIBOR Loan or Continue a LIBOR Loan on the requested date of such Conversion or Continuation.

Upon the Borrower's request, any Lender requesting compensation under this Section shall provide the Borrower with a statement setting forth in reasonable detail the basis for requesting such compensation and the method for determining the amount thereof. Absent manifest error, determinations by any Lender in any such statement shall be conclusive, provided that such determinations are made on a reasonable basis and in good faith.

**Section 4.5.  Treatment of Affected Loans.**

If the obligation of any Lender to make LIBOR Loans or to Continue, or to Convert Base Rate Loans into, LIBOR Loans shall be suspended pursuant to Section 4.1.(b) or 4.3., then such Lender's LIBOR Loans shall be automatically Converted into Base Rate Loans on the last day(s) of the then current Interest Period(s) for LIBOR Loans (or, in the case of a Conversion required by Section 4.1.(b) or 4.3., on such earlier date as such Lender may specify to the Borrower with a copy to the Agent) and, unless and until such Lender gives notice as provided below that the circumstances specified in Section 4.1. or 4.3. that gave rise to such Conversion no longer exist:

(a)      to the extent that such Lender's LIBOR Loans have been so Converted, all payments and prepayments of principal that would otherwise be applied to such Lender's LIBOR Loans shall be applied instead to its Base Rate Loans; and

(b)      all Loans that would otherwise be made or Continued by such Lender as LIBOR Loans shall be made or Continued instead as Base Rate Loans, and all Base Rate Loans of such Lender that would otherwise be Converted into LIBOR Loans shall remain as Base Rate Loans.

If such Lender gives notice to the Borrower (with a copy to the Agent) that the circumstances specified in Section 4.1. or 4.3. that gave rise to the Conversion of such Lender's LIBOR Loans pursuant to this Section no longer exist (which such Lender agrees to do promptly upon such circumstances ceasing to exist) at a time when LIBOR Loans made by other Lenders are outstanding, then such Lender's Base Rate Loans shall be automatically Converted, on the first day(s) of the next succeeding Interest Period(s) for such outstanding LIBOR Loans, to the extent necessary so that, after giving effect thereto, all Revolving Loans denominated in Dollars held by the Lenders holding such Loans and by such Lender are held pro rata (as to principal amounts, Types and Interest Periods) in accordance with their respective Commitments and all Alternate Currency Loans held by the Alternate Currency Lenders holding Alternate Currency Loans and by such Lender are held pro rata (as to principal amounts, Currencies and Interest Periods) in accordance with the respective Alternate Currency Commitments.

**Section 4.6.  Affected Lenders.**

If (a) a Lender requests compensation pursuant to Section 3.12. or 4.1., and the Requisite Lenders are not also doing the same, or (b) the obligation of any Lender to make LIBOR Loans or to Continue, or to Convert Base Rate Loans into, LIBOR Loans shall be suspended pursuant to Section 4.1.(b) or 4.3. but the obligation of the Requisite Lenders shall not have been suspended under such Sections, then, so long as there does not then exist any Default or Event of Default, the Borrower may demand that such Lender (the "Affected Lender"), and upon such demand the Affected Lender shall promptly, assign its Commitment to an Eligible Assignee subject to and in accordance with the applicable provisions of

- 40 -

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Section 12.5. for a purchase price equal to the aggregate principal balance of all Loans then owing to the Affected Lender plus any accrued but unpaid interest thereon and accrued but unpaid fees owing to the Affected Lender, or any other amount as may be mutually agreed upon by such Affected Lender and Eligible Assignee. Each of the Agent and the Affected Lender shall reasonably cooperate in effectuating the replacement of such Affected Lender under this Section, but at no time shall the Agent, such Affected Lender nor any other Lender be obligated in any way whatsoever to initiate any such replacement or to assist in finding an Eligible Assignee. The exercise by the Borrower of its rights under this Section shall be at the Borrower's sole cost and expense and at no cost or expense to the Agent, the Affected Lender or any of the other Lenders. The terms of this Section shall not in any way limit the Borrower's obligation to pay to any Affected Lender compensation owing to such Affected Lender pursuant to Section 3.12. or 4.1. with respect to periods up to the date of replacement.

**Section 4.7.   Change of Lending Office.**

Each Lender agrees that it will use reasonable efforts to designate an alternate Lending Office with respect to any of its Loans affected by the matters or circumstances described in Section 3.12., 4.1. or 4.3. to reduce the liability of the Borrower or avoid the results provided thereunder, so long as such designation is not disadvantageous to such Lender as determined by such Lender in its sole discretion, except that such Lender shall have no obligation to designate a Lending Office located in the United States of America.

**Section 4.8.  Assumptions Concerning Funding of LIBOR Loans.**

Calculation of all amounts payable to a Lender under this Article IV. shall be made as though such Lender had actually funded LIBOR Loans through the purchase of deposits in the relevant market bearing interest at the rate applicable to such LIBOR Loans in an amount equal to the amount of the LIBOR Loans and having a maturity comparable to the relevant Interest Period; provided, however, that each Lender may fund each of its LIBOR Loans in any manner it sees fit and the foregoing assumption shall be used only for calculation of amounts payable under this Article IV.

**Section 4.9. Redenominations.**

(a)     Redenomination of Loans.  Subject to Section 1.3., any Loan to be denominated in the Currency of a Participating Member State shall be made in the Euro.

(b)     Redenomination of Obligations.  Subject to Section 1.3., any obligation of any party under this Agreement or any other Loan Document which has been denominated in the Currency of a Participating Member State shall be redenominated into the Euro.

(c)     Further Assurances.  The terms and provisions of this Agreement will be subject to such reasonable changes of construction as determined by the Agent to reflect the implementation of the EMU in any Participating Member State or any market conventions relating to the fixing and/or calculation of interest being changed or replaced and to reflect market practice at that time, and subject thereto, to put the Agent, the Lenders and the Borrower in the same position, so far as possible, that they would have been if such implementation had not occurred. In connection therewith, the Borrower agrees, at the request of the Agent, at the time of or at any time following the implementation of the EMU in any Participating Member State or any market conventions relating to the fixing and/or calculation of interest being changed or replaced, to enter into an agreement amending this Agreement in such manner as described in the immediately preceding sentence as the Agent shall reasonably request.

- 41 -

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**Section 4.10. Exchange Indemnification.**

The Borrower shall, upon demand from an Alternate Currency Lender, pay to such Alternate Currency Lender, the amount of (a) any loss or cost or increased cost incurred by such Alternate Currency Lender, (b) any reduction in any amount payable to or in the effective return on the capital to such Alternate Currency Lender, (c) any interest or any other return, including principal, foregone by such Alternate Currency Lender as a result of the introduction of, change over to or operation of the Euro, or (d) any currency exchange loss, in any such case that such Alternate Currency Lender sustains as a result of any payment being made by the Borrower in a currency other than that originally extended to the Borrower. A certificate of an Alternate Currency Lender setting forth the basis for determining such additional amount or amounts necessary to compensate such Alternate Currency Lender shall be conclusively presumed to be correct absent manifest error.

**Section 4.11. Regulatory Limitation.**

If as a result of increases in the value of Alternate Currencies against the Dollar or for any other reason, the obligation of an Alternate Currency Lender to make Alternate Currency Loans (taking into account the amount of the Obligations and all other indebtedness required to be aggregated under 12 U.S.C.A. §84, as amended, the regulations promulgated thereunder and any other Applicable Law) is determined by such Alternate Currency Lender to exceed its then applicable legal lending limit under 12 U.S.C.A. §84, as amended, and the regulations promulgated thereunder, or any other Applicable Law, the amount of such Alternate Currency Lender's Alternate Currency Commitment shall immediately be reduced to the maximum amount which such Alternate Currency Lender may legally advance (as determined by such Alternate Currency Lender), and, to the extent necessary under such laws and regulations (as determined by such Alternate Currency Lender, with respect to the applicability of such laws and regulations to itself), the Borrower shall reduce, or cause to be reduced, complying to the extent practicable with the remaining provisions hereof, the Obligations outstanding hereunder by an amount sufficient to comply with such maximum amounts.

## ARTICLE V. CONDITIONS PRECEDENT

**Section 5.1. Initial Conditions Precedent.**

The obligation of the Lenders to effect or permit the occurrence of the first Credit Event hereunder, whether as the making of a Loan or the issuance of a Letter of Credit, is subject to the following conditions precedent:

(a) The Agent shall have received each of the following, in form and substance satisfactory to the Agent:

(i) counterparts of this Agreement executed by each of the parties hereto;

(ii) Revolving Notes and Alternate Currency Notes executed by the Borrower, payable to each applicable Lender requesting such Notes and complying with the applicable provisions of Section 2.10., and, if requested by the Swingline Lender, the Swingline Note executed by the Borrower;

(iii) the Guaranty executed by each Guarantor existing as of the Effective Date;

(iv) the results of a recent UCC, tax, judgment and lien search in each of the jurisdictions in which UCC financing statements or other filings or recordations should be made

- 42 -

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

to evidence or perfect security interests in Collateral being granted under the Security Documents as of the Effective Date, such search to reveal no Liens of record with respect to any of such Collateral other than Liens to be terminated prior to the Effective Date;

(v)     the Pledge Agreement executed by each Pledgor existing as of the Effective Date and the Security Agreement executed by each Grantor existing as of the Effective Date;

(vi)     all certificates representing any shares of Equity Interests pledged pursuant to the Pledge Agreement, together with an undated stock power for each such certificate executed in blank by a duly authorized officer or agent of the Loan Party with rights in such Equity Interest, together with an Acknowledgment and Consent, substantially in the form of Schedule 2 to the Pledge Agreement, duly executed by the issuer of such Equity Interest;

(vii)     each document (including, without limitation, any UCC financing statement) required by the Security Documents or under Applicable Law or reasonably deemed necessary or appropriate by the Agent to be filed, registered or recorded in order to create in favor of the Agent, for the benefit of the Lenders, a perfected first-priority Lien on the Collateral described therein, shall have been filed, registered or recorded or shall have been delivered to the Agent and be in proper form for filing, registration or recordation;

(viii)     an opinion of counsel to the Loan Parties, addressed to the Agent and the Lenders, addressing the matters set forth in Exhibit I;

(ix)     the articles of incorporation, articles of organization, certificate of limited partnership or other comparable organizational instrument (if any) of each Loan Party certified as of a recent date by the Secretary of State of the state of formation of such Loan Party;

(x)     a certificate of good standing or certificate of similar meaning with respect to each Loan Party issued as of a recent date by the Secretary of State of the state of formation of each such Loan Party and certificates of qualification to transact business or other comparable certificates issued by each Secretary of State (and any state department of taxation, as applicable) of each state in which such Loan Party is required to be so qualified and where the failure to be so qualified is reasonably likely to have a Material Adverse Effect;

(xi)     a certificate of incumbency signed by the Secretary or Assistant Secretary (or other individual performing similar functions) of each Loan Party with respect to each of the officers of such Loan Party authorized to execute and deliver the Loan Documents to which such Loan Party is a party, and in the case of the Borrower, and the officers of the Borrower then authorized to deliver Notices of Borrowing, Notices of Swingline Borrowings, Notices of Continuation and Notices of Conversion and to request the issuance of Letters of Credit;

(xii)     copies certified by the Secretary or Assistant Secretary (or other individual performing similar functions) of each Loan Party of (i) the by-laws of such Loan Party, if a corporation, the operating agreement of such Loan Party, if a limited liability company, the partnership agreement of such Loan Party, if a limited or general partnership, or other comparable document in the case of any other form of legal entity and (ii) all corporate, partnership, member or other necessary action taken by such Loan Party to authorize the execution, delivery and performance of the Loan Documents to which it is a party;

(xiii)     a certificate from a Responsible Officer of the Borrower to the effect that (x) all representations and warranties of the Loan Parties contained in the Loan Documents are true,

- 43 -

LEGAL02/30055542v16

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT A PAGE 51
OMNI0000382

correct and complete in all material respects and (y) immediately after giving effect to the transactions contemplated by this Agreement, no Default or Event of Default shall exist;

(xiv)    evidence of payment of the Fees then due and payable under Section 3.6., and any other Fees payable to the Agent, the Titled Agents and the Lenders on or prior to the Effective Date;

(xv)    a Compliance Certificate calculated on a Pro Forma Basis as of June 30, 2006 (in any event, giving pro forma effect to the use of the proceeds of the Loans to be funded on the Effective Date); and

(xvi)    such other documents, agreements and instruments as the Agent on behalf of the Lenders may reasonably request; and

(b)    In the good faith judgment of the Agent:

(i)    There shall not have occurred or become known to the Agent or any of the Lenders any event, condition, situation or status since the date of the information contained in the financial and business projections, budgets, pro forma data and forecasts concerning the Borrower and the Subsidiaries delivered to the Agent and the Lenders prior to the Agreement Date that has had or is reasonably likely to have a Material Adverse Effect;

(ii)    No litigation, action, suit, investigation or other arbitral, administrative or judicial proceeding shall be pending or threatened which is reasonably likely to (1) have a Material Adverse Effect except a set forth in Schedule 6.1.(i) or (2) restrain or enjoin, impose materially burdensome conditions on, or otherwise materially and adversely affect the ability of the Borrower or any other Loan Party to fulfill its obligations under the Loan Documents to which it is a party;

(iii)    The Borrower and the Subsidiaries shall have received all approvals, consents and waivers, and shall have made or given all necessary filings and notices, as shall be required to consummate the transactions contemplated hereby without the occurrence of any default under, conflict with or violation of (1) any Applicable Law or (2) any agreement, document or instrument to which the Borrower or any other Loan Party is a party or by which any of them or their respective properties is bound, except for such approvals, consents, waivers, filings and notices the receipt, making or giving of which would not reasonably be likely to (A) have a Material Adverse Effect, or (B) restrain or enjoin, impose materially burdensome conditions on, or otherwise materially and adversely affect the ability of the Borrower or any other Loan Party to fulfill its obligations under the Loan Documents to which it is a party; and

(iv)    There shall not have occurred or exist any other material disruption of financial or capital markets that is reasonably likely to materially and adversely affect the transactions contemplated by the Loan Documents.

**Section 5.2.  Conditions Precedent to All Loans and Letters of Credit.**

The obligations of the Lenders to make any Loans and of the Agent to issue Letters of Credit are all subject to the further condition precedent that: (a) no Default or Event of Default shall exist as of the date of the making of such Loan or date of issuance of such Letter of Credit or would exist immediately after giving effect thereto; and (b) the representations and warranties made or deemed made by the Borrower and each other Loan Party in the Loan Documents to which any of them is a party, shall be true

- 44 -

LEGAL02/30055542v16

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT A PAGE 52
OMNI0000383