and correct in all material respects on and as of the date of the making of such Loan or date of issuance of such Letter of Credit with the same force and effect as if made on and as of such date except to the extent that such representations and warranties expressly relate solely to an earlier date (in which case such representations and warranties shall have been true and correct in all material respects on and as of such earlier date) and except for changes in factual circumstances not prohibited under the Loan Documents. Each Credit Event shall constitute a certification by the Borrower to the effect set forth in the preceding sentence (both as of the date of the giving of notice relating to such Credit Event and, unless the Borrower otherwise notifies the Agent prior to the date of such Credit Event, as of the date of the occurrence of such Credit Event). In addition, if such Credit Event is the making of a Loan or the issuance of a Letter of Credit after the Effective Date, the Borrower shall be deemed to have represented to the Agent and the Lenders at the time such Loan is made or Letter of Credit issued that all conditions to the occurrence of such Credit Event contained in this Section 5.2. have been satisfied (other than those conditions waived by the Lenders in accordance with Section 12.6.).

## ARTICLE VI. REPRESENTATIONS AND WARRANTIES

Section 6.1. Representations and Warranties.

In order to induce the Agent and each Lender to enter into this Agreement and to make Loans and issue Letters of Credit, the Borrower represents and warrants to the Agent and each Lender as follows:

(a)     Organization; Power; Qualification. Each of the Borrower, the other Loan Parties and the other Subsidiaries is a corporation, partnership or other legal entity, duly organized or formed, validly existing and in good standing under the jurisdiction of its incorporation or formation, has the power and authority to own or lease its respective properties and to carry on its respective business as now being and hereafter proposed to be conducted and is duly qualified and is in good standing as a foreign corporation, partnership or other legal entity, and authorized to do business, in each jurisdiction in which the character of its properties or the nature of its business requires such qualification or authorization and where the failure to be so qualified or authorized is reasonably likely to have, in each instance, a Material Adverse Effect.

(b)     Ownership Structure. As of the Agreement Date, Schedule 6.1.(b) is a complete and correct list of all of the Subsidiaries setting forth for each Subsidiary, (i) its jurisdiction of organization, (ii) the nature of such Equity Interests, (iii) the percentage of ownership represented by such Equity Interests and (iv) whether such Subsidiary is a Material Subsidiary, an Excluded Subsidiary and/or a Foreign Subsidiary. As of the Agreement Date, all holders of outstanding Equity Interests of the Borrower are Permitted Holders and Schedule 6.1.(b) sets forth, as of the Agreement Date, the percentage of all such Equity Interests (x) directly owned by Isaac Larian; (y) directly owned by Shirin Makabi and (z) in the aggregate, indirectly owned by Isaac Larian and by Shirin Makabi, and owned by immediate family members of either of them or trusts for the benefit of such family members. Except as disclosed in such Schedule, as of the Agreement Date (i) each of the Borrower and the Subsidiaries owns, free and clear of all Liens (other than Permitted Liens), and has the unencumbered right to vote, all outstanding Equity Interests in each Person shown to be held by it on such Schedule, (ii) all of the issued and outstanding capital stock of each such Person organized as a corporation is validly issued, fully paid and nonassessable and (iii) there are no outstanding subscriptions, options, warrants, commitments, preemptive rights or agreements of any kind (including, without limitation, any stockholders' or voting trust agreements) for the issuance, sale, registration or voting of, or outstanding securities convertible into, any additional shares of capital stock of any class, or partnership or other ownership interests of any type in, any such Person.

- 45 -


CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT A PAGE 53
OMNI0000384

(c)     Authorization of Agreement, Etc.  The Borrower has the right and power, and has taken all necessary action to authorize it, to borrow and obtain other extensions of credit hereunder.  The Borrower and each other Loan Party has the right and power, and has taken all necessary corporate or similar action to authorize it, to execute, deliver and perform each of the Loan Documents to which it is a party in accordance with their respective terms and to consummate the transactions contemplated hereby and thereby.  The Loan Documents to which the Borrower or any other Loan Party is a party have been duly executed and delivered by the duly authorized officers of such Person and each is a legal, valid and binding obligation of such Person enforceable against such Person in accordance with its respective terms except as the same may be limited by bankruptcy, insolvency, and other similar laws affecting the rights of creditors generally and the availability of equitable remedies for the enforcement of certain obligations (other than the payment of principal) contained herein or therein and as may be limited by equitable principles generally.

(d)     Compliance of Loan Documents with Laws, Etc.   The execution, delivery and performance of this Agreement and the other Loan Documents to which any Loan Party is a party in accordance with their respective terms and the borrowings and other extensions of credit hereunder do not and will not, by the passage of time, the giving of notice, or both:  (i) require any Governmental Approval or violate any Applicable Law (including all Environmental Laws) relating to any Loan Party; (ii) conflict with, result in a breach of or constitute a default under the organizational documents of any Loan Party, or any indenture, agreement or other instrument to which any Loan Party is a party or by which it or any of its respective properties may be bound; or (iii) result in or require the creation or imposition of any Lien upon or with respect to any property now owned or hereafter acquired by any Loan Party.

(e)     Compliance with Law; Governmental Approvals.  Each of the Borrower, each other Loan Party and each other Subsidiary is in compliance with each Governmental Approval applicable to it and in compliance with all other Applicable Laws (including without limitation, Environmental Laws) relating to such Person except for noncompliances which, and Governmental Approvals the failure to possess which, individually or in the aggregate, are not reasonably likely to cause a Default or Event of Default or have a Material Adverse Effect.

(f)     Title to Properties; Liens.   The Borrower, each other Loan Party and each other Subsidiary have good, marketable and legal title to, or a valid leasehold interest in, its respective material assets.

(g)     Existing Indebtedness.  Schedule 6.1.(g) is, as of the Agreement Date, a complete and correct listing of all Indebtedness of the Borrower and the Subsidiaries, including without limitation, Guarantees of the Borrower and the Subsidiaries.  As of the Agreement Date, none of the Borrower, any other Loan Party or any other Subsidiary is a party to, or otherwise subject to any provision contained in, any instrument evidencing or relating to any Indebtedness or in any other agreement (including any organizational document) which limits the amount of, or otherwise imposes restrictions on the incurring of, Indebtedness by the Borrower, any of other Loan Party or any other Subsidiary.

(h)     Material Contracts.  Schedule 6.1.(h) is, as of the Agreement Date, a true, correct and complete listing of all Material Contracts.  No event or condition exist which with the giving of notice, the lapse of time, or both, would permit any party to any such Material Contract to terminate such Material Contract.

(i)     Litigation.   Except as set forth on Schedule 6.1.(i), there are no actions, suits, investigations or proceedings pending (nor, to the knowledge of the Borrower, are there any actions, suits or proceedings threatened) against or in any other way relating adversely to or affecting the Borrower, any other Loan Party, any other Subsidiary or any of their respective properties in any court or before any

- 46 -

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT A PAGE 54
OMNI0000385

arbitrator of any kind or before or by any other Governmental Authority which is reasonably likely to have a Material Adverse Effect. There are no strikes, slow downs, work stoppages or walkouts or other labor disputes in progress or, to the knowledge of the Borrower, threatened relating to the Borrower, any other Loan Party or any other Subsidiary which is reasonably likely to have a Material Adverse Effect.

(j)     Taxes.   All federal, state and other tax returns of the Borrower, any other Loan Party or any other Subsidiary required by Applicable Law to be filed have been duly filed, and all federal, state and other taxes, assessments and other governmental charges or levies upon the Borrower, each other Loan Party and each other Subsidiary and its respective properties, income, profits and assets which are due and payable have been paid, except any such nonpayment which is at the time permitted under Section 7.6.  Except as set forth on Schedule 6.1.(j), as of the Agreement Date, none of the United States income tax returns of the Borrower, any other Loan Party or any other Subsidiary is under audit.  All charges, accruals and reserves on the books of the Borrower, each other Loan Party and each other Subsidiary in respect of any taxes or other governmental charges are in accordance with GAAP.

(k)     Financial Statements.   The Borrower has furnished to each Lender copies of (i) the audited consolidated balance sheet of the Borrower and the Subsidiaries for the fiscal years ending December 31, 2004 and December 31, 2005, and the related audited consolidated  statements of income, cash flows and stockholders' equity for the fiscal years ending on such dates, with the opinion thereon of Ernst  &  Young LLP, and (ii) the unaudited consolidated balance sheet of the Borrower and the Subsidiaries for the fiscal quarter ending June 30, 2006, and the related unaudited consolidated statements of income, cash flows and stockholders' equity of the Borrower and the Subsidiaries for the period of two fiscal quarters ending on such date.  Such financial statements (including in each case related schedules and notes) present fairly, in all material respects and in accordance with GAAP consistently applied throughout the periods involved, the consolidated financial position of the Borrower and its consolidated Subsidiaries as at their respective dates and the results of operations and the cash flow for such periods (subject, as to interim statements, to changes resulting from normal year-end audit adjustments and addition of notes thereto).  Since June 30, 2006 through and including the Agreement Date, neither the Borrower nor any of the Subsidiaries has incurred any material liabilities (contingent or otherwise, but excluding liabilities incurred in the ordinary course of the Borrower's business), unusual or long-term material  commitments  or  uncalized  or  forward  anticipated  material  losses  from  any  unfavorable commitments that would be required to be set forth in its financial statements or in the notes thereto, except as disclosed in writing to Agent and the Lenders on or prior to the Agreement Date.

(l)     No Material Adverse Change.   Since December 31, 2005, there has been no material adverse change in the business, assets, liabilities, financial condition or results of operations of the Borrower and the Subsidiaries taken as a whole.  Each of the Borrower, the other Loan Parties and the other Subsidiaries is Solvent.

(m)     ERISA.   Each member of the ERISA Group is in compliance with its obligations under the minimum funding standards of ERISA and the Internal Revenue Code with respect to each Plan and is in compliance with the presently applicable provisions of ERISA and the Internal Revenue Code with respect to each Plan, except in each case for noncompliances which is reasonably likely to have a Material Adverse Effect.  As of the Agreement Date, no member of the ERISA Group has (i) sought a waiver of the minimum funding standard under Section 412 of the Internal Revenue Code in respect of any Plan, (ii) failed to make any contribution or payment to any Plan or Multiemployer Plan or in respect of any Benefit Arrangement, or made any amendment to any Plan or Benefit Arrangement, which has resulted, or is reasonably likely to result, in the imposition of a Lien or the posting of a bond or other security under ERISA or the Internal Revenue Code or (iii) incurred any liability under Title IV of ERISA other than a liability to the PBGC for premiums under Section 4007 of ERISA.

- 47 -

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

(n)     Not Plan Assets; No Prohibited Transaction.  None of the assets of the Borrower, any other Loan Party or any other Subsidiary constitutes "plan assets" within the meaning of ERISA, the Internal Revenue Code and the respective regulations promulgated thereunder.  The execution, delivery and performance of this Agreement and the other Loan Documents, and the borrowing and repayment of amounts hereunder, do not and will not constitute "prohibited transactions" under ERISA or the Internal Revenue Code.

(o)     Absence of Defaults.  None of the Borrower, any other Loan Party or any other Subsidiary is in default under its articles of incorporation, bylaws, partnership agreement or other similar organizational documents, and no event has occurred, which has not been remedied, cured or waived, which, in any such case:  (i) constitutes a Default or an Event of Default; or (ii) constitutes, or which with the passage of time, the giving of notice, or both, would constitute, a default or event of default by the Borrower, any other Loan Party or any other Subsidiary under any agreement (other than this Agreement) or judgment, decree or order to which the Borrower, any other Loan Party or any other Subsidiary is a party or by which the Borrower, any other Loan Party or any other Subsidiary or any of their respective properties may be bound where such default or event of default could, individually or in the aggregate, is reasonably likely to have a Material Adverse Effect.

(p)     Investment Company; Etc.  None of the Borrower, any other Loan Party or any other Subsidiary is (i) an "investment company" or a company "controlled" by an "investment company" within the meaning of the Investment Company Act of 1940, as amended, or (ii) subject to any other Applicable Law which purports to regulate or restrict its ability to borrow money or to consummate the transactions contemplated by this Agreement or to perform its obligations under any Loan Document to which it is a party.

(q)     Margin Stock.  None of the Borrower, any other Loan Party or any other Subsidiary is engaged principally, or as one of its important activities, in the business of extending credit for the purpose, whether immediate, incidental or ultimate, of buying or carrying "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System.

(r)     Affiliate Transactions.  Except as permitted by Section 9.12., none of the Borrower, any other Loan Party or any other Subsidiary is a party to any transaction with an Affiliate.

(s)     Intellectual Property.  Each of the Borrower, each other Loan Party and each other Subsidiary, as applicable, owns or has the right to use, under valid license agreements or otherwise, all patents, licenses, franchises, trademarks, trademark rights, service marks, service mark rights, trade names, trade name rights, trade secrets and copyrights (collectively, "Intellectual Property") necessary to the conduct of its businesses, without known conflict with any patent, license, franchise, trademark, trademark right, service mark, service mark right, trade secret, trade name, copyright or other proprietary right of any other Person except as set forth in Schedule 6.1.(i).  The Borrower, each other Loan Party and each other Subsidiary have taken all such steps as they deem reasonably necessary to protect their respective rights under and with respect to such Intellectual Property.  Except as set forth in Schedule 6.1.(i), no material claim has been asserted by any Person with respect to the use of any such Intellectual Property by the Borrower, any other Loan Party or any other Subsidiary, or challenging or questioning the validity or effectiveness of any such Intellectual Property.  The use of such Intellectual Property by the Borrower, the other Loan Parties and the other Subsidiaries, does not infringe on the rights of any Person, subject to such claims and infringements as do not, in the aggregate, give rise to any liabilities on the part of the Borrower, any other Loan Party or any other Subsidiary that is reasonably likely to have a Material Adverse Effect except as set forth in Schedule 6.1.(i).

- 48 -

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT A PAGE 56
OMNI0000387

(t)     Business.  As of the Agreement Date, the Borrower and the Subsidiaries are engaged in the business of designing, manufacturing, distributing and licensing of dolls, handheld electronics, toys, entertainment products, sporting goods, home décor and lifestyle products and consumer electronics, together with other business activities incidental thereto.

(u)     Broker's Fees.  Except as set forth in Schedule 6.1.(u), no broker's or finder's fee, commission or similar compensation will be payable with respect to the transactions contemplated hereby, and no other similar fees or commissions will be payable by any Loan Party for any other services rendered to the Borrower or any of its Subsidiaries ancillary to the transactions contemplated hereby.

(v)     Accuracy and Completeness of Information.  No written information, report or other papers or data (excluding financial projections and other forward looking statements) furnished to the Agent or any Lender by, on behalf of, or at the direction of, the Borrower, any other Loan Party or any other Subsidiary in connection with, pursuant to or relating in any way to this Agreement, when furnished, contained any untrue statement of a fact material to the creditworthiness of the Borrower or any other Loan Party or omitted to state a material fact necessary in order to make such statements contained therein, in light of the circumstances under which they were made, not misleading. All financial statements (including in each case all related schedules and notes) furnished to the Agent or any Lender by, on behalf of, or at the direction of, the Borrower, any other Loan Party or any other Subsidiary in connection with, pursuant to or relating in any way to this Agreement, present fairly, in all material respects and in accordance with GAAP consistently applied throughout the periods involved, the financial position of the Persons involved as at the date thereof and the results of operations for such periods (subject, as to interim statements, to changes resulting from normal year-end audit adjustments). All financial projections and other forward looking statements prepared by or on behalf of the Borrower, any other Loan Party or any other Subsidiary that have been or may hereafter be provided to the Agent or any Lender were or will be prepared in good faith based on assumptions that the management of the Borrower believed were reasonable when such assumptions were made. As of the Effective Date, no fact is known to the Borrower which has had, or in the future is reasonably likely to have, a Material Adverse Effect which has not been set forth in the financial statements referred to in Section 6.1.(k) or in such information, reports or other papers or data or otherwise disclosed in writing to the Agent and the Lenders.

(w)     Foreign Assets Control.  None of the Borrower, any Subsidiary or any Affiliate of the Borrower: (i) is a Sanctioned Person, (ii) has any of its assets in Sanctioned Entities, or (iii) derives any of its operating income from investments in, or transactions with, Sanctioned Persons or Sanctioned Entities.

**Section 6.2. Survival of Representations and Warranties, Etc.**

All statements contained in any certificate, financial statement, agreement, instrument or other document delivered by or on behalf of the Borrower, any other Loan Party or any other Subsidiary to the Agent or any Lender pursuant to or in connection with this Agreement or any of the other Loan Documents (including, but not limited to, any such statement made in or in connection with any amendment hereto or thereto or any statement contained in any certificate, financial statement or other instrument delivered by or on behalf of the Borrower prior to the Agreement Date and delivered to the Agent or any Lender in connection with the underwriting or closing of the transactions contemplated hereby) shall constitute representations and warranties made by the Borrower to the Agent and the Lenders under this Agreement. All representations and warranties made under this Agreement and the other Loan Documents shall be deemed to be made at and as of the Agreement Date, the Effective Date, and the date of the occurrence of any Credit Event, except to the extent that such representations and warranties expressly relate solely to an earlier date (in which case such representations and warranties shall have been true and correct in all material respects on and as of such earlier date) and except for

- 49 -



CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT A PAGE 57
OMNI0000388

changes in factual circumstances not prohibited under the Loan Documents. All such representations and
warranties shall survive the effectiveness of this Agreement, the execution and delivery of the Loan
Documents and the making of the Loans and the issuance of the Letters of Credit.

## ARTICLE VII. AFFIRMATIVE COVENANTS

For so long as this Agreement is in effect, unless the Requisite Lenders (or, if required pursuant
to Section 12.6., all of the Lenders) shall otherwise consent in the manner provided for in Section 12.6.,
the Borrower shall comply with the following covenants:

### Section 7.1.  Preservation of Existence and Similar Matters.

Except as otherwise permitted under Section 9.8., the Borrower shall, and shall cause each other
Loan Party and each other Subsidiary to, preserve and maintain its respective existence, rights, franchises,
licenses and privileges in the jurisdiction of its incorporation or formation and qualify and remain
qualified and authorized to do business in each jurisdiction in which the character of its properties or the
nature of its business requires such qualification and authorization and where the failure to be so
authorized and qualified is reasonably likely to have a Material Adverse Effect.

### Section 7.2.  Compliance with Applicable Law and Material Contracts.

The Borrower shall, and shall cause each other Loan Party and each other Subsidiary to, comply
with (a) all Applicable Laws, including the obtaining of all Governmental Approvals, the failure with
which to comply is reasonably likely to have a Material Adverse Effect, and (b) all terms and conditions
of all Material Contracts to which it is a party, the failure with which to comply could give any other
party thereto the right to terminate such Material Contract.

### Section 7.3.  Maintenance of Property.

In addition to the requirements of any of the other Loan Documents, the Borrower shall, and shall
cause each other Loan Party and each other Subsidiary to, protect and preserve all of its respective
material properties, including, but not limited to, all Intellectual Property, and maintain in good repair,
working order and condition all tangible properties, ordinary wear and tear excepted.

### Section 7.4.  Conduct of Business.

The Borrower shall, and shall cause and the other Loan Parties and the other Subsidiaries to, carry
on, their respective businesses as described in Section 6.1.(t) and such other business that the Borrower
believes in good faith is related to or an extension of the business engaged in by the Borrower, the other
Loan Parties and the other Subsidiaries as of the Agreement Date.

### Section 7.5.  Insurance.

In addition to the requirements of any of the other Loan Documents, the Borrower shall, and shall
cause each other Loan Party and each other Subsidiary to, maintain insurance with financially sound and
reputable insurance companies against such risks and in such amounts as is customarily maintained by
Persons engaged in similar businesses or as may be required by Applicable Law, and from time to time
deliver to the Agent upon its request a detailed list, together with copies of all policies of the insurance
then in effect, stating the names of the insurance companies, the amounts and rates of the insurance, the
dates of the expiration thereof and the properties and risks covered thereby.

- 50 -

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT A PAGE 58
OMNI0000389

**Section 7.6.  Payment of Taxes and Claims.**

The Borrower shall, and shall cause each other Loan Party and each other Subsidiary to, pay and discharge when due (a) all taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits or upon any properties belonging to it, and (b) all lawful claims of materialmen, mechanics, carriers, warehousemen and landlords for labor, materials, supplies and rentals which, if unpaid, might become a Lien on any properties of such Person; provided, however, that this Section shall not require the payment or discharge of any such tax, assessment, charge, levy or claim which is being contested in good faith by appropriate proceedings which operate to suspend the collection thereof and for which adequate reserves have been established on the books of the Borrower, such Subsidiary or such other Loan Party, as applicable, in accordance with GAAP.

**Section 7.7.  Visits and Inspections.**

The Borrower shall, and shall cause each other Loan Party and each other Subsidiary to, permit (a) representatives or agents of the Agent, from time to time after reasonable prior notice if no Event of Default shall be in existence, as often as may be reasonably requested, but only during normal business hours, in a manner to limit material disruption to the Borrower, the Loan Parties and the Subsidiaries and at the expense of the Agent and (b) representatives or agents of any Lender or the Agent if a Default or Event of Default shall exist, at the expense of the Borrower, as the case may be, to: (i) visit and inspect all properties of the Borrower, the other Loan Parties and the other Subsidiaries to the extent any such right to visit or inspect is within the control of such Person; (ii) inspect and make extracts from their respective books and records, including but not limited to management letters prepared by independent accountants; and (iii) discuss with its officers and employees, and its independent accountants, its business, assets, liabilities, condition or results of operations.  If a Default or Event of Default exists and is continuing and if requested by the Agent, the Borrower shall execute an authorization letter addressed to its accountants authorizing the Agent or any Lender to discuss the financial affairs of the Borrower, the other Loan Parties and the other Subsidiaries with its accountants.

**Section 7.8.  Use of Proceeds; Letters of Credit.**

The Borrower shall only use the proceeds of the Loans and the Letters of Credit to make Restricted Payments to the extent permitted by Section 9.2., and for other general corporate purposes.  No part of the proceeds of any Loan or Letter of Credit will be used for the purpose of buying or carrying "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or to extend credit to others for the purpose of purchasing or carrying any such margin stock unless (a) the Borrower gives prior written notice thereof to the Agent; (b) such use will comply with the provisions of Regulations U and X of the Board of Governors of the Federal Reserve System; and (c) the Borrower executes and delivers such documents and agreements as the Agent may reasonably request in order for the Agent and the Lenders to comply with the provisions of such Regulation U. No part of the proceeds of any Loan or Letter of Credit will be used to fund any operations in, to finance any investments or activities in, or to make any payments to, a Sanctioned Person or Sanctioned Entity. No part of the proceeds of any Loan, and no Letter of Credit may be issued for the account of, or otherwise on behalf of, any Subsidiary the income of which is to be excluded from Net Income pursuant to clause (a) of the definition of the term Net Income.

**Section 7.9.  Books and Records.**

The Borrower shall, and shall cause the other Loan Parties and the other Subsidiaries to, maintain books and records pertaining to its respective business operations in such detail, form and scope as it in good faith determines is consistent with good business practice and in accordance with GAAP.

- 51 -

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT A PAGE 59
OMNI0000390

**Section 7.10.  Further Assurances.**

The Borrower shall, at the Borrower's cost and expense and upon request of the Agent, execute and deliver or cause to be executed and delivered, to the Agent such further instruments, documents and certificates, and do and cause to be done such further acts that may be reasonably necessary or advisable in the reasonable opinion of the Agent to carry out more effectively the provisions and purposes of this Agreement and the other Loan Documents.

**Section 7.11.  New Subsidiaries/Guarantors.**

(a)  Requirement to Become Guarantor.  Within 10 days of any Person (other than an Excluded Subsidiary or a Foreign Subsidiary) becoming a Material Subsidiary after the Effective Date, the Borrower shall deliver to the Agent each of the following items, each in form and substance satisfactory to the Agent: (i) an Accession Agreement executed by such Material Subsidiary and a supplement to the Security Agreement executed by such Material Subsidiary and (ii) the items that would have been delivered under Sections 5.1.(a)(iv), (vii) through (xii) and (xvi) if such Material Subsidiary had been one on the Effective Date; provided, however, promptly (and in any event within 10 days) upon any Excluded Subsidiary ceasing to be subject to the restriction which prevented it from becoming a Guarantor on the Effective Date or delivering an Accession Agreement pursuant to this Section, as the case may be, such Subsidiary shall comply with the provisions of this Section.  The Borrower shall send to each Lender copies of each of the foregoing items once the Agent has received all such items with respect to a Material Subsidiary.

(b)  Additional Pledges.  Within 10 days of the Borrower or any Domestic Subsidiary (other than an Excluded Subsidiary) acquiring, forming or otherwise receiving after the Effective Date any Equity Interest in a Subsidiary, the Borrower shall cause to be delivered to the Agent each of the following in form and substance satisfactory to the Agent: (i) a supplement to the Pledge Agreement executed by the Borrower or such Domestic Subsidiary, as applicable, subjecting such Equity Interests to the Lien of the Pledge Agreement, (ii) the items that would have been delivered under Sections 5.1.(a)(vi) through (xii) and (xvi) if such Subsidiary Equity Interests had been Collateral under the Pledge Agreement on the Effective Date and (iii) if such Equity Interests are owned by a Domestic Subsidiary that is not already a Guarantor, the items referred to in clauses (i) and (ii) of the immediately preceding subsection (a).  Notwithstanding the immediately preceding sentence of this subsection, the Borrower or a Domestic Subsidiary shall only be required to subject to the Lien of the Pledge Agreement (x) 65% (or such greater percentage that, due to a change in an Applicable Law after the Agreement Date, (A) could not reasonably be expected to cause the undistributed earnings of such Foreign Subsidiary as determined for United States federal income tax purposes to be treated as a deemed dividend to such Foreign Subsidiary's United States parent and (B) could not reasonably be expected to cause any material adverse tax consequences) of the issued and outstanding Equity Interest of a Foreign Subsidiary entitled to vote (within the meaning of Treas. Reg. Section 1.956-2(c)(2)) and (y) 100% of the issued and outstanding Equity Interest of a Foreign Subsidiary not entitled to vote (within the meaning of Treas. Reg. Section 1.956-2(c)(2)).

(c)  Release of a Guarantor.  The Borrower may request in writing that the Agent release, and upon receipt of such request the Agent shall release, a Guarantor from the Guaranty so long as: (i) such Guarantor (x) qualifies, or will qualify simultaneously with its release from the Guaranty, as an Excluded Subsidiary or (y) has ceased to be, or simultaneously with its release from the Guaranty will cease to be, a Material Subsidiary; (ii) such Guarantor is not otherwise required to be a party to the Guaranty under the immediately preceding subsection (a); (iii) no Default or Event of Default shall then be in existence or would occur as a result of such release; (iv) the representations and warranties made or deemed made by

- 52 -



CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT A PAGE 60
OMNI0000391

the Borrower and each other Loan Party in the Loan Documents to which any of them is a party, shall be true and correct in all material respects on and as of the date of such release with the same force and effect as if made on and as of such date except to the extent that such representations and warranties expressly relate solely to an earlier date (in which case such representations and warranties shall have been true and correct in all material respects on and as of such earlier date) and except for changes in factual circumstances not prohibited under the Loan Documents; and (v) the Agent shall have received such written request at least 10 Business Days prior to the requested date of release. Delivery by the Borrower to the Agent of any such request shall constitute a representation by the Borrower that the matters set forth in the preceding sentence (both as of the date of the giving of such request and as of the date of the effectiveness of such request) are true and correct with respect to such request.

(d)    Release of Pledge and Security Agreement.  The Borrower may request in writing that the Agent release, and upon receipt of such request the Agent shall release the Equity Interests of a Subsidiary from the Lien of the Pledge Agreement, and such Subsidiary from the Security Agreement if a party thereto, so long as: (i) such Subsidiary has ceased to be, or simultaneously with the release of its Equity Interests from the Pledge Agreement will cease to be, a Subsidiary; (ii) no Default or Event of Default shall then be in existence or would occur as a result of such release; and (iii) the Agent shall have received such written request at least 10 Business Days prior to the requested date of release. Delivery by the Borrower to the Agent of any such request shall constitute a representation by the Borrower that the matters set forth in the preceding sentence (both as of the date of the giving of such request and as of the date of the effectiveness of such request) are true and correct with respect to such request.

ARTICLE VIII. INFORMATION

For so long as this Agreement is in effect, unless the Requisite Lenders (or, if required pursuant to Section 12.6., all of the Lenders) shall otherwise consent in the manner set forth in Section 12.6., the Borrower shall furnish the following information to the Agent (and Agent shall furnish copies of such information to each Lender as provided in Section 8.5., if applicable, or otherwise within 5 Business Days of the Agent's receipt thereof):

**Section 8.1.  Quarterly Financial Statements.**

As soon as available, but in any event within 45 days after the end of each of the first, second and third fiscal quarters of the Borrower, the unaudited consolidated and, if available, consolidating balance sheet of the Borrower and the Subsidiaries as at the end of such period and the related unaudited consolidated and, if available, consolidating statements of income, stockholders' equity and cash flows of the Borrower and the Subsidiaries for such period, setting forth in each case in comparative form the figures as of the end of and for the corresponding periods of the previous fiscal year, all of which shall be certified by the chief executive officer or chief financial officer of the Borrower, in his or her opinion, to present fairly, in accordance with GAAP and in all material respects, the consolidated and, if available, consolidating financial position of the Borrower and the Subsidiaries as at the date thereof and the results of operations for such period (subject to normal year-end audit adjustments and the addition of notes thereto).

**Section 8.2.  Year-End Statements.**

As soon as available, but in any event within 90 days after the end of each fiscal year of the Borrower, the audited consolidated and, if available, consolidating balance sheet of the Borrower and the Subsidiaries as at the end of such fiscal year and the related audited consolidated and, if available, consolidating statements of income, stockholders' equity and cash flows of the Borrower and the Subsidiaries for such fiscal year, setting forth in comparative form the figures as at the end of and for the

- 53 -

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

previous fiscal year, all of which shall be (a) certified by the chief executive officer or chief financial officer of the Borrower, in his or her opinion, to present fairly, in accordance with GAAP and in all material respects, the consolidated and, if available, consolidating financial position of the Borrower and the Subsidiaries as at the date thereof and the results of operations for such period and (b) accompanied by the report thereon of independent certified public accountants of recognized national standing reasonably acceptable to the Agent, whose certificate shall be unqualified and in scope and substance reasonably satisfactory to the Requisite Lenders.

**Section 8.3.  Compliance Certificate.**

At the time financial statements are furnished pursuant to Sections 8.1. and 8.2., and as required by Sections 9.2. and 9.9., a certificate substantially in the form of Exhibit J (a "Compliance Certificate") executed by the chief financial officer of the Borrower: (a) setting forth in reasonable detail as at the end of such quarterly accounting period, fiscal year, or other fiscal period, as the case may be, the calculations required to establish whether or not the Borrower was in compliance with the covenants contained in Sections 9.1. through Section 9.5. and 9.9. and (b) stating that, to the best of his or her knowledge, information and belief after reasonable inquiry, no Default or Event of Default exists, or, if such is not the case, specifying such Default or Event of Default and its nature, when it occurred, whether it is continuing and the steps being taken by the Borrower with respect to such event, condition or failure.

**Section 8.4.  Other Information.**

(a)     Management Reports.  Promptly upon receipt thereof, copies of all management reports, if any, submitted to the Borrower or its Board of Directors by its independent public accountants;

(b)     Press Releases.  Promptly upon the issuance thereof, copies of all press releases issued by the Borrower, any other Loan Party or any other Subsidiary (other than press releases announcing the release of new products or other similar trade press releases);

(c)     ERISA.  If and when any member of the ERISA Group (i) gives or is required to give notice to the PBGC of any "reportable event" (as defined in Section 4043 of ERISA) with respect to any Plan which might constitute grounds for a termination of such Plan under Title IV of ERISA, or knows that the plan administrator of any Plan has given or is required to give notice of any such reportable event, a copy of the notice of such reportable event given or required to be given to the PBGC; (ii) receives notice of complete or partial withdrawal liability under Title IV of ERISA or notice that any Multiemployer Plan is in reorganization, is insolvent or has been terminated, a copy of such notice; (iii) receives notice from the PBGC under Title IV of ERISA of an intent to terminate, impose liability (other than for premiums under Section 4007 of ERISA) in respect of, or appoint a trustee to administer any Plan, a copy of such notice; (iv) applies for a waiver of the minimum funding standard under Section 412 of the Internal Revenue Code, a copy of such application; (v) gives notice of intent to terminate any Plan under Section 4041(c) of ERISA, a copy of such notice and other information filed with the PBGC; (vi) gives notice of withdrawal from any Plan pursuant to Section 4063 of ERISA, a copy of such notice; or (vii) fails to make any payment or contribution to any Plan or Multiemployer Plan or in respect of any Benefit Arrangement or makes any amendment to any Plan or Benefit Arrangement, and of which has resulted or could reasonably be expected to result in the imposition of a Lien or the posting of a bond or other security, a certificate of the chief executive officer or chief financial officer of the Borrower setting forth details as to such occurrence and the action, if any, which the Borrower or applicable member of the ERISA Group is required or proposes to take;

(d)     Litigation.  To the extent the Borrower, any other Loan Party or any other Subsidiary is aware of the same, prompt notice of the commencement of any proceeding or investigation by or before

LEGAL02/30055542v16

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

any Governmental Authority and any action or proceeding in any court or other tribunal or before any arbitrator against or in any other way relating adversely to, or adversely affecting, the Borrower, any other Loan Party or any other Subsidiary or any of their respective properties, assets or businesses which is reasonably likely to have a Material Adverse Effect, and prompt notice of the receipt of notice that any United States income tax returns of the Borrower, any other Loan Party or any other Subsidiary are being audited;

    (e)   Change of Management or Financial Condition.   Prompt notice of any change in the senior management of the Borrower and any change in the business, assets, liabilities, financial condition or results of operations of the Borrower, any other Loan Party or any other Subsidiary, which has had or is reasonably likely to have a Material Adverse Effect;

    (f)   Patriot Act Information.   From time to time and promptly upon each request, information identifying the Borrower or any other Loan Party as a Lender may request in order to comply with the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001));

    (g)   Default.   Notice of the occurrence of any Default or Event of Default promptly upon a Responsible Officer of the Borrower obtaining knowledge thereof;

    (h)   Material Contracts.   Promptly upon entering into any Material Contract after the Agreement Date, a copy to the Agent of such Material Contract;

    (i)   Other Information.   From time to time and promptly upon each request, such data, certificates, reports, statements, opinions of counsel, documents or further information regarding the business, assets, liabilities, financial condition or results of operations of the Borrower or any of its Subsidiaries as the Agent (or any Lender through the Agent) may reasonably request.

**Section 8.5.  Electronic Delivery of Certain Information.**

    (a)   The Borrower may deliver documents, materials and other information required to be delivered pursuant to Article VIII. (collectively, "Information") in an electronic format acceptable to the Agent by e-mailing any such Information to an e-mail address of the Agent as specified by the Agent from time to time.   Any Information provided in such manner shall only be deemed to have been delivered to the Agent and the Lenders on the date on which the Agent posts such Information on the Borrower's behalf (which the Agent shall do promptly upon receipt by the Agent) on an internet or intranet website to which each Lender and the Agent has access, whether a commercial, third-party website (such as Intralinks or SyndTrak) or a website sponsored by the Agent.

    (b)   Notwithstanding anything in this Section to the contrary (i) the Borrower shall deliver paper copies of Information to the Agent or any Lender that requests the Borrower to deliver such paper copies until a written request to cease delivering paper copies is given to the Borrower by the Agent or such Lender and (ii) in every instance the Borrower shall be required to provide to the Agent a paper original of the Compliance Certificate required by Section 8.3.

    (c)   The Agent shall have no obligation to request the delivery or to maintain copies of any of the Information or other materials referred to above, and in no event shall have any responsibility to monitor compliance by the Borrower with any such requests.   Each Lender shall be solely responsible for requesting delivery to it or maintaining its copies of such Information or other materials.

LEGAL02/30055542v16

EXHIBIT A PAGE 63

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER    OMNI0000394

## ARTICLE IX. NEGATIVE COVENANTS

For so long as this Agreement is in effect, unless the Requisite Lenders (or, if required pursuant to Section 12.6., all of the Lenders) shall otherwise consent in the manner set forth in Section 12.6., the Borrower shall comply with the following covenants:

### Section 9.1. Financial Covenants.

The Borrower shall not permit:

(a)     Maximum Leverage Ratio.   The ratio of (i) Total Indebtedness to (ii) EBITDA for the period of four consecutive fiscal quarters of the Borrower most recently ending, to exceed 2.00 to 1.00 at any time.

(b)     Minimum Fixed Charge Coverage Ratio.   The ratio of (i) EBITDA for the period of four consecutive fiscal quarters of the Borrower most recently ending to (ii) Fixed Charges for such period, to be less than 1.25 to 1.00 at any time.

For the four consecutive fiscal quarter periods ending on the following dates, the amount of interest expense to be utilized when determining EBITDA and Fixed Charges and the amount of Restricted Payments to be utilized when determining Fixed Charges shall be (x) for the period ending December 31, 2006, the actual amount thereof for the fiscal quarter ending December 31, 2006 times 4, (y) for the period ending March 31, 2007, the actual amount thereof for the period of two consecutive fiscal quarters ending March 31, 2007 times 2, and (z) for the period ending June 30, 2007, the actual amount thereof for the period of three consecutive fiscal quarters ending June 30, 2007 times 4 divided by 3.

### Section 9.2. Restricted Payments.

The Borrower shall not, and shall not permit any of its Subsidiaries to, declare or make any Restricted Payment; provided, however, that the Borrower and the Subsidiaries may declare and make the following Restricted Payments:

(a)     a Subsidiary may declare and make Restricted Payments to any Loan Party and to any Wholly Owned Subsidiary;

(b)     the Borrower and its Subsidiaries may declare and pay cash dividends to its respective stockholders so long as no Default or Event of Default would exist immediately after giving effect to such dividend on a Pro Forma Basis; provided, that solely for purposes of determining whether a Default or Event of Default would exist immediately after giving effect to such dividend on a Pro Forma Basis, Fixed Charges shall also include Restricted Payments paid during the applicable period as permitted by the immediately following subsection (d);

(c)     in addition to dividends permitted under the immediately preceding clause (a) and (b), the Borrower may declare and pay cash dividends to its stockholders so long as (i) no Default or Event of Default would exist immediately after giving effect to such dividend on a Pro Forma Basis, (ii) the aggregate amount of dividends paid on or after the Effective Date pursuant to this subsection (c) will not exceed $100,000,000 in the aggregate after the payment of any such dividend, (iii) immediately after giving effect to any such dividend the Available Amount would be at least $30,000,000, (iv) the Borrower shall have delivered to the Agent (x) a certificate from the Borrower's chief financial officer setting forth a calculation of the Available Amount after giving effect to such dividend and (y) a Compliance

- 56 -

LEGAL02/30055542v16

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Certificate demonstrating that after giving effect to such dividend on a Pro Forma Basis, the Borrower would have been in compliance with the covenants set forth in Section 9.1.(a); and

(d) in addition to dividends permitted under the immediately preceding clause (a) through (c), during any calendar year in which or with which a taxable year of the Borrower ends for which the Borrower had a valid S corporation election in effect under Section 1362 or any successor provisions of the Internal Revenue Code (each a "Calendar Year"), the Borrower, at its option, may declare and pay cash dividends to its shareholders for the purpose of enabling the shareholders to pay federal and state and local income and self-employment taxes with respect to the income of the Borrower (each such dividend shall constitute a "Permitted Tax Distribution"), provided that: (A) in calculating the shareholders' income tax liability with respect to the income of the Borrower, the Borrower shall take into account any taxable losses the Borrower previously allocated to the shareholders during the term of this Agreement that are available to offset such income; (B) state taxes payable with respect to the taxable income of each shareholder allocable to the Buyer shall be presumed to be deductible for purposes of determining federal taxable income; (C) for federal income tax purposes, the allocable net long-term capital gain of the Borrower shall be presumed to be taxable at the preferential federal tax rate for the applicable year with respect to such net long-term capital gain, and the allocable ordinary income of the Borrower shall be presumed to be taxable at the highest marginal federal income tax rate in effect for individuals for the applicable year; (D) the allocable income of the Borrower shall be presumed to be taxable for state and local income tax purposes at the highest state and local income tax rate in effect for the applicable year of the state of which the shareholders are resident (and in the case where the shareholders are residents of different states, the highest state and local income tax rate in effect for the applicable year for the state of which the shareholders are resident with the highest state and local income tax rate); (E) the Borrower will make distributions during the calendar year within 10 days of the due date of the relevant estimated tax payments (and in the case of the final estimated tax payment for state and local taxes, within 10 days of the end of the calendar year) in an amount necessary to satisfy the shareholders' estimated tax liabilities through the relevant estimated tax payment due date, calculated in good faith by the Borrower's chief financial officer based on the assumptions set forth in the immediately preceding clauses (A) through (D); (F) subject to the terms of this subsection (d), the Borrower may make further distributions within 10 days of the April 15th following such calendar year in an amount necessary to satisfy the shareholders' tax liabilities for such taxable year, calculated in good faith by the Borrower's chief financial officer based on the assumptions set forth in the immediately preceding clauses (A) through (D); and (G) no Default or Event of Default specified in Section 10.1.(a), Section 10.1.(b), Section 10.1.(f) or Section 10.1.(g) shall exist.

**Section 9.3.  Indebtedness.**

The Borrower shall not, and shall not permit any other Loan Party or any other Subsidiary to, create, assume, incur or otherwise become or remain obligated in respect of, or permit to be outstanding, any Indebtedness other than:

(a)     Indebtedness under the Loan Documents;

(b)     Indebtedness existing as of the Agreement Date set forth on Schedule 6.1.(g);

(c)     Indebtedness (including without limitation, Capitalized Lease Obligations) incurred by the Borrower or a Subsidiary to finance the acquisition of fixed assets used in the ordinary course of business of the Borrower or such Subsidiary so long as (i) such Indebtedness is incurred within 90 days of the acquisition of such asset), (ii) such Indebtedness when incurred shall not exceed the cost of the asset acquired and (iii) the outstanding principal amount of all Indebtedness permitted by this subsection shall not exceed $50,000,000 in the aggregate at any time;

- 57 -

LEGAL02/30055542v16

(d)     unsecured Indebtedness of the Borrower to any Subsidiary and of any Subsidiary to the Borrower or any other Subsidiary, provided (i) that Indebtedness of any Subsidiary that is not a Loan Party owing to any Loan Party shall be subject to Section 9.4. and (ii) Indebtedness of any Loan Party to a Subsidiary that is not a Loan Party shall be subordinated in a written agreement to the Obligations on terms satisfactory to the Agent;

(e)     Indebtedness of any Person that becomes a Subsidiary after the Agreement Date or that is secured by a Lien in assets acquired after the Agreement Date, provided that (i) such Indebtedness exists at the time such Person becomes a Subsidiary or such assets were acquired and was not created in contemplation of or in connection with such Person becoming a Subsidiary or such acquisition, (ii) if such Indebtedness is secured by a Lien, such Lien is permitted by Section 9.5.(c), and (iii) no Default or Event of Default would exist immediately after giving effect to such Person becoming a Subsidiary or such acquisition on a Pro Forma Basis;

(f)     obligations (contingent or otherwise) of the Borrower or any Subsidiary existing or arising under any Derivative Contract permitted under Section 9.10.;

(g)     Guarantees by the Borrower of Indebtedness of any Subsidiary and by any Subsidiary of Indebtedness of the Borrower or any other Subsidiary, provided that (i) the Indebtedness so Guaranteed is permitted by this Section (other than subsection (b) or (e)), (ii) Guarantees by a Loan Party of Indebtedness of any Subsidiary that is not a Loan Party shall be subject to Section 9.4. and (iii) Guarantees permitted under this subsection shall be subordinated to the Obligations of the applicable Subsidiary to the same extent and on the same terms as the Indebtedness so Guaranteed is subordinated to the Obligations;

(h)     Indebtedness representing replacement, renewal, extension, refinancing or refunding of Indebtedness permitted by the immediately preceding subsections (b), (c) and (e), provided that (i) such Indebtedness (plus accrued interest or premiums, if any) does not exceed the principal amount of outstanding or committed Indebtedness so replaced, renewed, extended, refinanced or refunded plus financing fees and other customary expenses associated therewith, (ii) such replacing, renewing, extending, refinancing or refunding Indebtedness shall have no mandatory repayments or redemptions prior to the Indebtedness being replaced, renewed, extended, refinanced or refunded and (iii) in the case of any replacing, renewing, extending, refinancing or refunding of Indebtedness ranking pari passu to the Obligations, the replacing, renewing, extending, refinancing or refunding Indebtedness is made pari passu or subordinated to the Obligations and, in the case of any replacing, renewing, extending, refinancing or refunding of Indebtedness subordinated to the Obligations, the replacing, extending, refinancing or refunding Indebtedness is made subordinate to the Obligations to substantially the same or a greater extent as the Indebtedness replaced, renewed, extended, refinanced or refunded;

(i)     unsecured Indebtedness of the Borrower or any Subsidiary, provided that such Indebtedness is subordinated in a written agreement to the Obligations on terms reasonably satisfactory to the Agent;

(j)     So long as Zapf is not a Subsidiary, Guarantees by the Borrower of Indebtedness of Zapf in an aggregate amount at any time outstanding not to exceed $20,000,000, provided that the Indebtedness represented by such Guarantee shall be subject to Section 9.4.; and

(k)     other Indebtedness of the Borrower and the Subsidiaries (other than Indebtedness of Foreign Subsidiaries owing to any of the Loan Parties) in an aggregate amount at any time outstanding not to exceed $10,000,000, provided that such Indebtedness is unsecured and that any principal payments

- 58 -

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT A PAGE 66

OMNI0000397

in respect of such Indebtedness shall not be made prior to the earlier of the Termination Date and the payment in full of the Obligations.

**Section 9.4. Investments.**

The Borrower shall not, and shall not permit any other Loan Party or any other Subsidiary to, directly or indirectly, acquire, make or purchase any Investment, or permit any Investment of such Person to remain outstanding, other than the following:

(a)    Investments in Cash Equivalents;

(b)    Investments in existence on the Agreement Date and set forth on Schedule 9.4.;

(c)    Investments made by the Borrower in any Domestic Subsidiary and by any Subsidiary in the Borrower or in a Domestic Subsidiary; provided, that the amount of Investments by Loan Parties in (including, without limitation, Indebtedness owing by, and Guarantees of Indebtedness of) any Subsidiary that is not a Loan Party (including all such Investments existing as of the Agreement Date) shall not exceed 15% of Total Assets in the aggregate at any time; provided, that when determining if the Borrower or any Subsidiary will be in compliance with this subsection (c) immediately after giving effect to a proposed Investment in a Domestic Subsidiary that will not be a Loan Party immediately following such Investment, Total Assets shall include the amount by which Total Assets will be increased as a result of such Investment;

(d)    Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors, including those in bankruptcy or similar proceedings, to the extent reasonably necessary in order to prevent or limit loss;

(e)    payroll, travel and similar advances to employees to cover matters that are expected at the time of such advances to be treated as expenses of the Borrower or any Subsidiary for accounting purposes, that are made in the ordinary course of business;

(f)    Investments received in connection with the Disposition of any asset permitted by Section 9.9.;

(g)    Investments in the form of Derivatives Contracts permitted under Section 9.10.;

(h)    Investments in Foreign Subsidiaries (including all such Investments existing as of the Agreement Date) not to exceed 40% of Total Assets in the aggregate at the time of any such Investment;

(i)    Investments in any other Person (other than a Subsidiary) which Investments are accounted for in the financial statements of the Borrower on an equity basis of accounting, in an aggregate amount not to exceed $25,000,000 at any time;

(j)    Investments in Indebtedness owing by, and Equity Interests of, Zapf not to exceed, at any time, $75,000,000 in the aggregate for all such Indebtedness and Equity Interests on a combined basis; provided, that the Borrower and its Subsidiaries shall not acquire more than 30% of the outstanding Equity Interests of Zapf;

- 59 -

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

(k)     Investments in the form of the acquisition of the Little Tikes division of Newell Rubbermaid Inc., so long as the aggregate amount of such Investments does not exceed $100,000,000;

(l)     Investments in the form of the purchase or other acquisition (in one transaction or a series of transactions) of (i) at least a majority of the Equity Interest in another Person or (ii) the assets of another Person that constitute the business or a division or operating unit of another Person, in each case to which the Requisite Lenders have consented in writing (such consent not to be unreasonably withheld or delayed and no such consent to be withheld solely because the Lenders are not being paid a fee in connection with such consent); and

(m)     Investments of a nature not otherwise permitted by any of the foregoing subsections in an amount not to exceed $25,000,000 in the aggregate at any time.

**Section 9.5.  Liens.**

The Borrower shall not, and shall not permit any other Loan Party or any other Subsidiary to, create, incur, assume or permit to exist any Lien upon any of their property, revenues or assets, whether now owned or hereafter acquired, except:

(a)     Liens existing on the Agreement Date and set forth on Schedule 9.5.;

(b)     Liens securing Indebtedness (including Capitalized Lease Obligations) permitted by Section 9.3.(c), provided that (i) such Liens do not at any time encumber any property other than the property (and proceeds thereof) the acquisition of which was financed by such Indebtedness and (ii) such Liens attach to such property concurrently with or within 90 days after the acquisition thereof;

(c)     any Lien (i) existing on property of a Person at the time of its consolidation with or merger into the Borrower or a Subsidiary or at the time such Person becomes a Subsidiary or (ii) existing on any property acquired by the Borrower or any Subsidiary at the time such property is so acquired (whether or not the Indebtedness secured thereby shall have been assumed), provided that in each such case, (x) such Lien was not created or assumed in contemplation of such consolidation or merger or such Person's becoming a Subsidiary or such acquisition of property and (y) such Lien shall extend solely to the property so acquired or in the case of an acquisition of a Subsidiary, the assets of such Subsidiary;

(d)     Liens securing judgments (including judgment, surety, or appeal bonds) so long as the judgment it secures (i) does not otherwise give rise to an Event of Default under Section 10.1.(i) and (ii) shall either (x) have been discharged, bonded or execution thereof stayed pending appeal within 30 days after the entry thereof or shall have been discharged within 30 days after the expiration of any such stay or (y) be covered by insurance and the insurer has acknowledged in writing that it is obligated to pay such judgment in full or has not denied liability with respect to such coverage;

(e)     Liens in favor of customs and revenue authorities arising under Applicable Law to secure payment of customs duties in connection with the importation of goods;

(f)     normal and customary rights of setoff upon deposits of cash in favor of banks or other depository institutions;

(g)     leases or subleases granted to others not interfering in any material respect with the business of the Borrower or any of its Subsidiaries;

- 60 -

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

(h)     extensions, renewals, or replacements of any Lien referred to in the immediately preceding subsections (a) through (c), provided, that (i) the principal amount of the Indebtedness secured thereby is not increased and (ii) any Lien resulting from such extensions, renewals, or replacements is limited to the assets originally encumbered the Lien so extended, renewed or replaced; and

(i)     other Permitted Liens.

## Section 9.6. Negative Pledges.

The Borrower shall not, and shall not permit any other Loan Party or any other Subsidiary to, enter into, assume or otherwise be bound by any Negative Pledge except for a Negative Pledge contained in (a) an agreement (i) evidencing Indebtedness which the Borrower or such Subsidiary may create, incur, assume, or permit or suffer to exist by Section 9.3., (ii) which Indebtedness is secured by a Lien permitted to exist by Section 9.5., and (iii) which prohibits the creation of any other Lien on only the property securing such Indebtedness as of the date such agreement was entered into; (b) an agreement relating to the sale of a Subsidiary or assets pending such sale, provided that in any such case the Negative Pledge applies only to the Subsidiary or the assets that are the subject of such sale; (c) a lease, license or sub-license entered into in the ordinary course of business which Negative Pledge covers only the asset that are the subject of such lease, license or sub-license and (d) the organizational documents of any Joint Venture (or shareholders agreement among the holders of the Equity Interests of such Joint Venture), which organizational documents (or shareholders agreement) prohibit such Joint Venture, the Borrower, such other Loan Party or such other Subsidiary from granting a Lien in the assets of such Joint Venture or the Equity Interests of such Joint Venture.

## Section 9.7. Restrictive Agreements.

The Borrower shall not, and shall not permit any other Loan Party or any other Subsidiary to, create or otherwise cause or suffer to exist or become effective any consensual encumbrance or restriction of any kind on the ability of any Subsidiary (other than an Excluded Subsidiary) to: (a) pay dividends or make any other distribution on any of such Subsidiary's capital stock or other equity interests owned by the Borrower or any Subsidiary; (b) pay any Indebtedness owed to the Borrower or any Subsidiary; (c) make loans or advances to the Borrower or any Subsidiary; or (d) transfer any of its property or assets to the Borrower or any Subsidiary.

## Section 9.8. Fundamental Changes.

The Borrower shall not, and shall not permit any other Loan Party or any other Subsidiary to (i) enter into any transaction of merger or consolidation or (ii) liquidate, wind up its affairs or dissolve itself (or suffer any liquidation or dissolution); provided, however, the following actions may be taken so long as immediately prior to the taking of such action, and immediately thereafter and after giving effect thereto, no Default or Event of Default is or would be in existence:

(a)     the Borrower may merge with any Subsidiary so long as the Borrower is the surviving entity;

(b)     a Subsidiary may merge or consolidate with any other Subsidiary provided that if (i) a Loan Party is party to such merger or consolidation, a Loan Party shall be the surviving entity or the surviving entity becomes a Loan Party and (ii) a Domestic Subsidiary is a party to such merger or consolidation, a Domestic Subsidiary shall be the surviving entity;

- 61 -

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT A PAGE 69

OMNI0000400

(c)      a Subsidiary that is not a Wholly Owned Subsidiary may liquidate, wind up its affairs or dissolve so long as the Disposition resulting from the disposition of property allocated or to be distributed to a Person other than the Borrower or any Wholly Owned Subsidiaries in connection with such liquidation, winding up or dissolution is otherwise permitted under Section 9.9.;

(d)      a Subsidiary may merge with any Person that is not a Subsidiary (i) to effect a Disposition to the extent such Disposition is permitted by Section 9.9. or (ii) to effect an Investment permitted by Section 9.4.; provided in the case of this clause (ii) that if (x) a Loan Party is party to such merger, a Loan Party shall be the surviving entity or the surviving entity becomes a Loan Party and (y) a Domestic Subsidiary is a party to such merger, a Domestic Subsidiary shall be the surviving entity;

(e)      a Wholly Owned Subsidiary may liquidate, wind up its affairs or dissolve; and

(f)      the Borrower may merge with and into a newly formed Wholly Owned Subsidiary (the "Successor Borrower") for the purpose of changing the Borrower's state of formation or to change its tax status to a C corporation so long as (i) the Borrower shall have given the Agent at least 10 Business Days' prior written notice of such merger; (ii) contemporaneously with the consummation of such merger, the Successor Borrower shall have executed and delivered an assumption agreement in form and substance satisfactory to the Agent pursuant to which the Successor Borrower shall assume all of the Borrower's Obligations under this Agreement and the other Loan Documents to which it is a party; (iii) contemporaneously with the consummation of such merger, the Successor Borrower delivers to the Agent the following: (A) items of the type referred to in Sections 5.1.(a)(iv), (vii) through (xii) and (xvi) with respect to the Successor Borrower as in effect after consummation of such merger and (B) as requested by the Agent, copies of all documents entered into by the Borrower or the Successor Borrower to effectuate the consummation of such merger, including, but not limited to, articles of merger and the plan of merger; (iv) immediately prior to such merger, and immediately thereafter and after giving effect thereto, no Default or Event of Default is or would be in existence; and (v) the Borrower and the Successor Borrower each takes such other action and delivers such other documents, instruments, opinions and agreements as the Agent may reasonably request.

**Section 9.9.  Disposition of Assets.**

The Borrower shall not, and shall not permit any other Loan Party or any other Subsidiary to, Dispose of any of the assets of the Borrower, any other Loan Party or any other Subsidiary to any Person (other than a Loan Party), except:

(a)      Dispositions of inventory in the ordinary course of business;

(b)      Dispositions of obsolete, damaged, worn out or surplus property which the Borrower, any other Loan Party or a Subsidiary determines in good faith is no longer used or useful in the business of the Borrower and the Subsidiaries;

(c)      Restricted Payments to the extent permitted under Section 9.2.;

(d)      (i) licenses or sub-licenses of Intellectual Property in the ordinary course of business and (ii) leases, licenses or subleases of other property in the ordinary course of business and which do not materially interfere with the business of the Borrower and the Subsidiaries to the extent not prohibited under any Loan Document;

- 62 -

LEGAL02/30055542v16

EXHIBIT A PAGE 70

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

OMNI0000401

(e)      Dispositions resulting from any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, any asset of the Borrower, any other Loan Party or any other Subsidiary; and

(f)      other Dispositions so long as (i) no Default or Event of Default would exist after giving effect to such Disposition on a Pro Forma Basis and (ii) prior to the consummation of any single Disposition for which the cash and non-cash consideration will exceed 15% of Total Assets, the Borrower shall have delivered to the Agent a Compliance Certificate demonstrating that after giving effect to such Disposition on a Pro Forma Basis, the Borrower would have been in compliance with the covenants set forth in Section 9.1.

**Section 9.10.  Derivatives Contracts.**

The Borrower will not, and will not permit any other Loan Party or any other Subsidiary to, enter into any Derivatives Contract, except (a) Derivatives Contracts entered into to hedge or mitigate risks to which the Borrower, another Loan Party or any other Subsidiary has actual exposure (other than those in respect of Equity Interests of the Borrower, any other Loan Party or any other Subsidiary) and (b) Derivatives Contracts entered into (i) in order to effectively cap, collar or exchange interest rates with respect to any Indebtedness or Investment of the Borrower, any other Loan Party or any other Subsidiary or (ii) as a hedge against currency exchange rate risk to which the Borrower, any other Loan Party or any other Subsidiary is exposed, in the case of each of the preceding clauses (a) and (b), that are not, in and of themselves, for speculative purposes.

**Section 9.11.  Fiscal Year.**

The Borrower shall not change its fiscal year from that in effect as of the Agreement Date.

**Section 9.12.  Transactions with Affiliates.**

Except for the transactions set forth in Schedule 9.12., the Borrower shall not, and shall not permit any other Loan Party or any other Subsidiary to, permit to exist or enter into, any transaction (including the purchase, sale, lease or exchange of any property or the rendering of any service) with any Affiliate (other than a Loan Party or a Wholly Owned Subsidiary), except transactions in the ordinary course of and pursuant to the reasonable requirements of the business of the Borrower and the Subsidiaries and upon terms which are no less favorable to the Borrower, such Loan Party or such Subsidiary than would be obtained in a comparable arm's length transaction with a Person that is not an Affiliate.

**Section 9.13.  ERISA Exemptions.**

The Borrower shall not, and shall not permit any other Loan Party or any other Subsidiary to, permit any of its respective assets to become or be deemed to be "plan assets" within the meaning of ERISA, the Internal Revenue Code and the respective regulations promulgated thereunder.

ARTICLE X. DEFAULT

**Section 10.1.  Events of Default.**

Each of the following shall constitute an Event of Default, whatever the reason for such event and whether it shall be voluntary or involuntary or be effected by operation of Applicable Law or pursuant to any judgment or order of any Governmental Authority:

- 63 -

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT A PAGE 71

OMNI0000402

(a)    Default in Payment of Principal.  The Borrower shall fail to pay when due (whether upon demand, at maturity, by reason of acceleration or otherwise) the principal of any of the Loans, or any Reimbursement Obligation.

(b)    Default in Payment of Interest and Other Obligations.  The Borrower shall fail to pay when due (i) any interest on any of the Loans and in the case of this clause (i) only such failure shall continue for a period of 5 Business Days or (ii) any of the other payment Obligations owing by the Borrower under this Agreement or any other Loan Document, or any other Loan Party shall fail to pay when due any payment Obligation owing by such other Loan Party under any Loan Document to which it is a party, and in the case of this clause (ii) only such failure shall continue for a period of 10 Business Days.

(c)    Default in Performance.  (i) The Borrower shall fail to perform or observe any term, covenant, condition or agreement contained in Section 8.1., Section 8.2., Section 8.3., Section 8.4.(g) or in Article IX. or (ii) the Borrower or any other Loan Party shall fail to perform or observe any term, covenant, condition or agreement contained in this Agreement or any other Loan Document to which it is a party and not otherwise mentioned in this Section and in the case of this clause (ii) only, such failure shall continue for a period of 30 days after the date upon which the Borrower has received written notice of such failure from the Agent; provided, however, an Event of Default under this subsection (c) shall not occur as a result of a breach of Section 9.1.(b) so long as within 10 days of the date the Borrower has delivered a Compliance Certificate required pursuant to the terms of this Agreement setting forth such breach, the Agent shall have received reasonably satisfactory evidence that shareholders of the Borrower have made contributions to the equity of the Borrower in an amount that had Fixed Charges for the period for which such breach occurred been reduced by the same amount, such breach would not have occurred.

(d)    Misrepresentations.  Any written statement, representation or warranty made or deemed made by or on behalf of the Borrower or any other Loan Party under this Agreement or under any other Loan Document, or any amendment hereto or thereto, or in any other writing or statement at any time furnished or made or deemed made by or on behalf of the Borrower or any other Loan Party to the Agent or any Lender, shall at any time prove to have been incorrect or misleading, in light of the circumstances in which made or deemed made, in any material respect when furnished or made or deemed made.

(e)    Indebtedness Cross-Default; Derivatives Contracts.

(i)    The Borrower, any other Loan Party or any other Subsidiary shall fail to pay when due and payable, within any applicable grace or cure period, the principal of, or interest on, any Indebtedness (other than the Loans and Reimbursement Obligations and Indebtedness in respect of Derivatives Contracts) having an aggregate outstanding principal amount of $10,000,000 or more ("Material Indebtedness");

(ii)    (x) the maturity of any Material Indebtedness shall have been accelerated in accordance with the provisions of any indenture, contract or instrument evidencing, providing for the creation of or otherwise concerning such Material Indebtedness or (y) any Material Indebtedness shall have been required to be prepaid or repurchased prior to the stated maturity thereof;

(iii)    any other event shall have occurred and be continuing (and all applicable notice and cure periods have lapsed), which permits any holder or holders of Material Indebtedness, any trustee or agent acting on behalf of such holder or holders or any other Person, to accelerate the

- 64 -

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT A PAGE 72

OMNI0000403

maturity of any such Material Indebtedness or require any such Material Indebtedness to be prepaid or repurchased prior to its stated maturity; or

(iv)    as a result of any Loan Party's failure to perform or observe any term, covenant, condition or agreement contained· in any Derivatives Contract, such Derivatives Contract is terminated and the Derivatives Termination Value owed by such Loan Party as a result thereof is $10,000,000 or more.

(f)    Voluntary Bankruptcy Proceeding. . The Borrower, any other Loan Party, any Material Subsidiary or any Material Subsidiary Group shall:  (i) commence a voluntary case under the Bankruptcy Code of 1978, as amended, or other federal bankruptcy laws (as now or hereafter in effect); (ii) file a petition seeking to take advantage of any other Applicable Laws, domestic or foreign, relating to bankruptcy, insolvency, reorganization, winding-up, or composition or adjustment of debts; (iii) consent to any petition filed against it in an involuntary case under such bankruptcy laws or other Applicable Laws or consent to any proceeding or action described in the immediately following subsection; (iv) apply for or consent to the appointment of, or the taking of possession by, a receiver, custodian, trustee, or liquidator of itself or of a substantial part of its property, domestic or foreign; (v) admit in writing its inability to pay its debts as they become due; (vi) make a general assignment for the benefit of creditors; (vii) make a conveyance fraudulent as to creditors under any Applicable Law; or (viii) take any corporate or partnership action for the purpose of effecting any of the foregoing.

(g)    Involuntary Bankruptcy Proceeding.  A case or other proceeding shall be commenced against the Borrower, any other Loan Party, any Material Subsidiary or any Material Subsidiary Group in any court of competent jurisdiction seeking:  (i) relief under the Bankruptcy Code of 1978, as amended, or other federal bankruptcy laws (as now or hereafter in effect) or under any other Applicable Laws, domestic or foreign, relating to bankruptcy, insolvency, reorganization, winding-up, or composition or adjustment of debts; or (ii) the appointment of a trustee, receiver, custodian, liquidator or the like of such Person, or of all or any substantial part of the assets, domestic or foreign, of such Person, and such case or proceeding shall continue undismissed or unstayed for a period of 60 consecutive calendar days, or an order granting the remedy or other relief requested in such case or proceeding against the Borrower, such other Loan Party, such Material Subsidiary or such Material Subsidiary Group (including, but not limited to, an order for relief under such Bankruptcy Code or such other federal bankruptcy laws) shall be entered.

(h)    Litigation: Enforceability.  The Borrower or any other Loan Party shall disavow, revoke or ·terminate (or attempt to terminate) any Loan Document to which it is a party or shall otherwise challenge or contest in any action, suit or proceeding in any court or before any Governmental Authority · the validity or enforceability of any Loan Document, or any Loan Document shall cease to be in full force and effect (except as a result of the express terms thereof or an action by the Agent or a Lender).

(i)    Judgment.  A judgment or order for the payment of money or for an injunction shall be entered against the Borrower, any other Loan Party or any other Subsidiary by any court or other tribunal and (i) such judgment or order shall continue for a period of 30 days without being paid, stayed or dismissed through appropriate appellate proceedings and (ii) either (A) the amount of such judgment or order not covered by insurance, or the amount as to which the insurer has denied liability, exceeds, individually or together with all other such outstanding judgments or orders entered against the Borrower, such Subsidiaries and such other Loan Parties, $10,000,000 or (B) in the case of an injunction or other non-monetary judgment, such injunction or judgment is reasonably likely to have a Material Adverse Effect.

LEGAL02/30055542v16

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

(j)    Attachment.  A warrant, writ of attachment, execution or similar process shall be issued against any property of the Borrower, any other Loan Party or any other Subsidiary which exceeds, individually or together with all other such warrants, writs, executions and processes, $10,000,000 in amount and such warrant, writ, execution or process shall not be discharged, vacated, stayed or bonded for a period of 30 days; provided, however, that if a bond has been issued in favor of the claimant or other Person obtaining such warrant, writ, execution or process, the issuer of such bond shall execute a waiver or subordination agreement in form and substance satisfactory to the Agent pursuant to which the issuer of such bond subordinates its right of reimbursement, contribution or subrogation to the Obligations and waives or subordinates any Lien it may have on the assets of any Loan Party.

(k)    ERISA.  Any member of the ERISA Group shall fail to pay when due an amount or amounts aggregating in excess of $10,000,000 which it shall have become liable to pay under Title IV of ERISA; or notice of intent to terminate a Plan or Plans having aggregate Unfunded Liabilities in excess of $10,000,000 shall be filed under Title IV of ERISA by any member of the ERISA Group, any plan administrator or any combination of the foregoing; or the PBGC shall institute proceedings under Title IV of ERISA to terminate, to impose liability (other than for premiums under Section 4007 of ERISA) in respect of, or to cause a trustee to be appointed to administer, any Plan or Plans having aggregate Unfunded Liabilities in excess of $10,000,000; or a condition shall exist by reason of which the PBGC would be entitled to obtain a decree adjudicating that any such Plan must be terminated; or there shall occur a complete or partial withdrawal from, or a default, within the meaning of Section 4219(c)(5) of ERISA, with respect to, one or more Multiemployer Plans which could cause one or more members of the ERISA Group to incur a current payment obligation in excess of $10,000,000.

(l)    Loan Documents.  An Event of Default (as defined therein) shall occur under any of the other Loan Documents.

(m)    Change of Control/Change in Management.

(i)    Prior to the first public offering of the common stock of the Borrower, the Permitted Holders cease to "beneficially own" (as defined in Rules 13d-3 and 13d-5 under the Securities Exchange Act of 1934, as amended), directly or indirectly, a majority in the aggregate of the total voting power of the then outstanding voting stock of the Borrower, whether as a result of issuance of Equity Interests of the Borrower, or any transfer of Equity Interests by any Permitted Holder, or otherwise (for purposes of this clause (i) and the immediately following clause (ii), the Permitted Holders shall be deemed to beneficially own any voting stock of a Person (the "specified person") held by any other Person (the "parent entity") so long as the Permitted Holders beneficially own, directly or indirectly, in the aggregate a majority of the voting power of the then outstanding voting stock of the parent entity); or

(ii)    Following the first public offering of the common stock of the Borrower:

(x)    Any "person" (as such term is used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended), other than one or more Permitted Holders, beneficially owns (as defined in the immediately preceding clause (i), except that for purposes of this clause (ii) such person shall be deemed to "beneficially own" all shares that any such person has the right to acquire, whether such right is exercisable immediately or only after the passage of time), directly or indirectly, more than the greater of (A) 25.0% of the total voting power of the voting stock of the Borrower or (B) the total voting power of the voting stock of the Borrower beneficially owned by the Permitted Holders; or

- 66 -

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT A PAGE 74

OMNI0000405

(y)    During any period of 12 consecutive months ending after the date of the first public offering of the common stock of the Borrower, individuals who at the beginning of any such 12-month period constituted the Board of Directors of the Borrower (together with any new directors whose election by such Board or whose nomination for election by the shareholders of the Borrower was approved by a vote of a majority of the directors then still in office who were either directors at the beginning of such period or whose election or nomination for election was previously so approved) cease for any reason to constitute a majority of the Board of Directors of the Borrower then in office; or

(iii)    If Isaac Larian ceases for any reason to be principally involved in the senior management of the Borrower, and the Borrower shall have failed to replace the resulting vacancy in senior management with (A) a member of the existing senior management or (B) another individual having reasonably comparable industry experience, in each case within a period of 120 days.

(n)    **Collateral.**  The Agent shall, for any reason not otherwise expressly permitted under the Loan Documents, cease to hold a valid, enforceable, perfected and first-priority Lien in any material portion of the Collateral.

### Section 10.2.  Remedies Upon Event of Default.

Upon the occurrence of an Event of Default the following provisions shall apply:

(a)    <u>Acceleration; Termination of Facilities.</u>

(i)    <u>Automatic.</u>  Upon the occurrence of an Event of Default specified in Section 10.1.(f) or 10.1.(g), (A)(i) the principal of, and all accrued interest on, the Loans at the time outstanding, (ii) an amount equal to the Stated Amount of all Letters of Credit outstanding as of the date of the occurrence of such Event of Default for deposit into the Collateral Account pursuant to Section 10.5. and (iii) all of the other Obligations (other than obligations in respect of Derivatives Contracts and Banking Services Contracts), including, but not limited to, the other amounts owed to the Lenders, the Swingline Lender and the Agent under the Loan Documents shall become immediately and automatically due and payable without presentment, demand, protest, or other notice of any kind, all of which are expressly waived by the Borrower and (B) all of the Commitments, all of the Alternate Currency Commitments, the Swingline Commitment, the obligation of the Lenders to make Loans, and the obligation of the Agent to issue Letters of Credit hereunder, shall all immediately and automatically terminate.

(ii)    <u>Optional.</u>  If any other Event of Default shall exist and be continuing, the Agent shall, at the direction of the Requisite Lenders:  (A) declare (1) the principal of, and accrued interest on, the Loans at the time outstanding, (2) an amount equal to the Stated Amount of all Letters of Credit outstanding as of the date of the occurrence of such other Event of Default for deposit into the Collateral Account pursuant to Section 10.5. and (3) all of the other Obligations (other than obligations in respect of Derivatives Contracts and Banking Services Contracts), including, but not limited to, the other amounts owed to the Lenders and the Agent under the Loan Documents to be forthwith due and payable, whereupon the same shall immediately become due and payable without presentment, demand, protest or other notice of any kind, all of which are expressly waived by the Borrower and (B) terminate the Commitments, the Alternate Currency Commitments, the Swingline Commitment, the obligation of the Lenders to make Loans hereunder and the obligation of the Agent to issue Letters of Credit hereunder.

- 67 -

EXHIBIT A PAGE 75

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER



OMNI0000406

(b)    _Other Remedies._  The Requisite Lenders may direct the Agent to, and the Agent if so directed shall, exercise any and all of its rights and remedies under any and all of the other Loan Documents and under any and all Applicable Laws.  To the extent permitted by Applicable Law, the Agent and the Lenders shall be entitled to the appointment of a receiver for the assets and properties of the Borrower and the Subsidiaries, without notice of any kind whatsoever and without regard to the adequacy of any security for the Obligations or the solvency of any party bound for its payment, to take possession of all or any portion of the business operations of the Borrower and the Subsidiaries and to exercise such power as the court shall confer upon such receiver.

**Section 10.3.  Remedies Upon Default.**

Upon the occurrence of a Default specified in Section 10.1.(g), the Commitments and the Alternate Currency Commitments, if applicable, shall immediately and automatically terminate.

**Section 10.4.  Allocation of Proceeds.**

If an Event of Default shall exist and maturity of any of the Obligations has been accelerated, all payments received by the Agent under any of the Loan Documents, in respect of any principal of or interest on the Obligations or any other amounts payable by the Borrower hereunder or thereunder, shall be applied in the following order and priority:

(a)    amounts due the Agent in respect of fees and expenses due under Section 12.2.;

(b)    amounts due the Lenders in respect of fees and expenses due under Section 12.2., pro rata in the amount then due each Lender;

(c)    payments of interest on Swingline Loans;

(d)    payments of interest on all other Loans and Reimbursement Obligations, to be applied for the ratable benefit of the Lenders;

(e)    payments of principal of Swingline Loans;

(f)    payments of principal of all other Loans, Reimbursement Obligations and other Letter of Credit Liabilities, to be applied for the ratable benefit of the Lenders; provided, however, to the extent that any amounts available for distribution pursuant to this subsection are attributable to the issued but undrawn amount of an outstanding Letter of Credit, such amounts shall be paid to the Agent for deposit into the Collateral Account;

(g)    amounts due the Agent and the Lenders pursuant to Sections 11.8. and 12.9.;

(h)    payment of all other Obligations and other amounts due and owing by the Borrower and the other Loan Parties under any of the Loan Documents, if any, to be applied for the ratable benefit of the Lenders and affiliates of Lenders, as applicable; and

(i)    any amount remaining after application as provided above, shall be paid to the Borrower or as otherwise required by Applicable Law.

- 68 -

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT A PAGE 76

OMNI0000407

**Section 10.5.  Collateral Account.**

(a)      As collateral security for the prompt payment in full when due of all Letter of Credit Liabilities and the other Obligations, the Borrower hereby pledges and grants to the Agent, for the ratable benefit of the Agent and the Lenders as provided herein, a security interest in all of its right, title and interest in and to the Collateral Account and the balances from time to time in the Collateral Account (including the investments and reinvestments therein provided for below).  The balances from time to time in the Collateral Account shall not constitute payment of any Letter of Credit Liabilities until applied by the Agent as provided herein.  Anything in this Agreement to the contrary notwithstanding, funds held in the Collateral Account shall be subject to withdrawal only as provided in this Section.

(b)      Any amounts on deposit in the Collateral Account from time to time shall be invested and reinvested by the Agent in such Cash Equivalents as the Agent shall determine in its sole discretion.  All such investments and reinvestments shall be held in the name of and be under the sole dominion and control of the Agent for the ratable benefit of the Lenders.  The Agent shall exercise reasonable care in the custody and preservation of any funds held in the Collateral Account and shall be deemed to have exercised such care if such funds are accorded treatment substantially equivalent to that which the Agent accords other funds deposited with the Agent, it being understood that the Agent shall not have any responsibility for taking any necessary steps to preserve rights against any parties with respect to any funds held in the Collateral Account.

(c)      If a drawing pursuant to any Letter of Credit occurs on or prior to the expiration date of such Letter of Credit, the Borrower and the Lenders authorize the Agent to use any monies deposited in the Collateral Account and proceeds thereof to make payment to the beneficiary with respect to such drawing or the payee with respect to such presentment.

(d)      If an Event of Default exists, the Requisite Lenders may, in their discretion, at any time and from time to time, instruct the Agent to liquidate any such investments and reinvestments and apply proceeds thereof to the Obligations in accordance with Section 10.4.

(e)      So long as no Default or Event of Default exists, and to the extent amounts on deposit in or credited to the Collateral Account exceed the aggregate amount of the Letter of Credit Liabilities then due and owing, the Agent shall, from time to time, at the request of the Borrower, deliver to the Borrower within 10 Business Days after the Agent's receipt of such request from the Borrower, against receipt but without any recourse, warranty or representation whatsoever, such amount of the credit balances in the Collateral Account as exceeds the aggregate amount of the Letter of Credit Liabilities at such time.

(f)      The Borrower shall pay to the Agent from time to time such fees as the Agent normally charges for similar services in connection with the Agent's administration of the Collateral Account and investments and reinvestments of funds therein.

**Section 10.6.  Performance by Agent.**

If the Borrower shall fail to perform any covenant, duty or agreement contained in any of the Loan Documents, the Agent may, after notice to the Borrower, perform or attempt to perform such covenant, duty or agreement on behalf of the Borrower after the expiration of any cure or grace periods set forth herein.  In such event, the Borrower shall, at the request of the Agent, promptly pay any amount reasonably expended by the Agent in such performance or attempted performance to the Agent, together with interest thereon at the applicable Post-Default Rate from the date of such expenditure until paid.  Notwithstanding the foregoing, neither the Agent nor any Lender shall have any liability or responsibility

- 69 -

EXHIBIT A PAGE 77

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

OMNI0000408

whatsoever for the performance of any obligation of the Borrower under this Agreement or any other Loan Document.

**Section 10.7. Rights Cumulative.**

The rights and remedies of the Agent and the Lenders under this Agreement and each of the other Loan Documents shall be cumulative and not exclusive of any rights or remedies which any of them may otherwise have under Applicable Law. In exercising their respective rights and remedies the Agent and the Lenders may be selective and no failure or delay by the Agent or any of the Lenders in exercising any right shall operate as a waiver of it, nor shall any single or partial exercise of any power or right preclude its other or further exercise or the exercise of any other power or right.

ARTICLE XI. THE AGENT

**Section 11.1. Authorization and Action.**

Each Lender hereby appoints and authorizes the Agent to take such action as contractual representative on such Lender's behalf and to exercise such powers under this Agreement and the other Loan Documents as are specifically delegated to the Agent by the terms hereof and thereof, together with such powers as are reasonably incidental thereto. Not in limitation of the foregoing, each Lender authorizes and directs the Agent to enter into the Loan Documents for the benefit of the Lenders. Each Lender hereby agrees that, except as otherwise set forth herein, any action taken by the Requisite Lenders in accordance with the provisions of this Agreement or the Loan Documents, and the exercise by the Requisite Lenders of the powers set forth herein or therein, together with such other powers as are reasonably incidental thereto, shall be authorized and binding upon all of the Lenders. Nothing herein shall be construed to deem the Agent a trustee or fiduciary for any Lender or to impose on the Agent duties or obligations other than those expressly provided for herein. At the request of a Lender, the Agent will forward to such Lender copies or, where appropriate, originals of the documents delivered to the Agent pursuant to this Agreement or the other Loan Documents. The Agent will also furnish to any Lender, upon the request of such Lender, a copy of any certificate or notice furnished to the Agent by the Borrower, any other Loan Party or any other Affiliate of the Borrower, pursuant to this Agreement or any other Loan Document not already delivered to such Lender pursuant to the terms of this Agreement or any such other Loan Document. As to any matters not expressly provided for by the Loan Documents (including, without limitation, enforcement or collection of any of the Obligations), the Agent shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Requisite Lenders (or all of the Lenders if explicitly required under any other provision of this Agreement), and such instructions shall be binding upon all Lenders and all holders of any of the Obligations; provided, however, that, notwithstanding anything in this Agreement to the contrary, the Agent shall not be required to take any action which exposes the Agent to personal liability or which is contrary to this Agreement or any other Loan Document or Applicable Law. Not in limitation of the foregoing, the Agent shall not exercise any right or remedy it or the Lenders may have under any Loan Document upon the occurrence of a Default or an Event of Default unless the Requisite Lenders (or all of the Lenders if explicitly required under any provision of this Agreement) have so directed the Agent to exercise such right or remedy.

**Section 11.2. Agent's Reliance, Etc.**

Notwithstanding any other provisions of this Agreement or any other Loan Documents, neither the Agent nor any of its directors, officers, agents, employees or counsel shall be liable for any action taken or omitted to be taken by it or them under or in connection with this Agreement or any other Loan

- 70 -

LEGAL02/30055542v16

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Document, except for its or their own gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final, non-appealable judgment. Without limiting the generality of the foregoing, the Agent: (a) may consult with legal counsel (including its own counsel or counsel for the Borrower or any other Loan Party), independent public accountants and other experts selected by it and shall not be liable for any action taken or omitted to be taken in good faith by it in accordance with the advice of such counsel, accountants or experts; (b) makes no warranty or representation to any Lender or any other Person and shall not be responsible to any Lender or any other Person for any statements, warranties or representations made by any Person in or in connection with this Agreement or any other Loan Document; (c) shall not have any duty to ascertain or to inquire as to the performance or observance of any of the terms, covenants or conditions of any of this Agreement or any other Loan Document or the satisfaction of any conditions precedent under this Agreement or any Loan Document on the part of the Borrower or other Persons (except for the delivery to it of any certificate or document specifically required to be delivered to it pursuant to Section 5.1.) or inspect the property, books or records of the Borrower or any other Person; (d) shall not be responsible to any Lender for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement or any other Loan Document, any other instrument or document furnished pursuant thereto or any collateral covered thereby or the perfection or priority of any Lien in favor of the Agent on behalf of the Lenders in any such collateral; and (e) shall incur no liability under or in respect of this Agreement or any other Loan Document by acting upon any notice, consent, certificate or other instrument or writing (which may be by telephone or telecopy) believed by it to be genuine and signed, sent or given by the proper party or parties.

**Section 11.3. Notice of Defaults.**

The Agent shall not be deemed to have knowledge or notice of the occurrence of a Default or Event of Default unless the Agent has received notice from a Lender or the Borrower referring to this Agreement, describing with reasonable specificity such Default or Event of Default and stating that such notice is a "notice of default." If any Lender (excluding the Lender which is also serving as the Agent) becomes aware of any Default or Event of Default, it shall promptly send to the Agent such a "notice of default." Further, if the Agent receives such a "notice of default", the Agent shall give prompt notice thereof to the Lenders.

**Section 11.4. Wachovia as Lender.**

Wachovia, as a Lender, shall have the same rights and powers under this Agreement and any other Loan Document as any other Lender and may exercise the same as though it were not the Agent; and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated, include Wachovia in each case in its individual capacity. Wachovia and its affiliates may each accept deposits from, maintain deposits or credit balances for, invest in, lend money to, act as trustee under indentures of, serve as financial advisor to, and generally engage in any kind of business with, the Borrower, any other Loan Party or any other affiliate thereof as if it were any other bank and without any duty to account therefor to the other Lenders. Further, the Agent and any affiliate may accept fees and other consideration from the Borrower for services in connection with this Agreement and otherwise without having to account for the same to the other Lenders. The Lenders acknowledge that, pursuant to such activities, Wachovia or its affiliates may receive information regarding the Borrower, other Loan Parties, other Subsidiaries and other Affiliates (including information that may be subject to confidentiality obligations in favor of such Person) and acknowledge that the Agent shall be under no obligation to provide such information to them.

**Section 11.5. Approvals of Lenders.**

All communications from the Agent to any Lender requesting such Lender's determination, consent, approval or disapproval (a) shall be given in the form of a written notice to such Lender, (b) shall

- 71 -

LEGAL02/30055542v16

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

be accompanied by a description of the matter or issue as to which such determination, approval, consent
or disapproval is requested, or shall advise such Lender where information, if any, regarding such matter
or issue may be inspected, or shall otherwise describe the matter or issue to be resolved, (c) shall include,
if reasonably requested by such Lender and to the extent not previously provided to such Lender, written
materials and, as appropriate, a brief summary of all oral information provided to the Agent by the
Borrower in respect of the matter or issue to be resolved, and (d) shall include the Agent's recommended
course of action or determination in respect thereof.  Each Lender shall reply promptly, but in any event
within 10 Business Days (or such lesser or greater period as may be specifically required under the Loan
Documents) of receipt of such communication.  Except as otherwise provided in this Agreement, unless a
Lender shall give written notice to the Agent that it specifically objects to the recommendation or
determination of the Agent (together with a written explanation of the reasons behind such objection)
within the applicable time period for reply, such Lender shall be deemed to have conclusively approved
of or consented to such recommendation or determination.

**Section 11.6.  Collateral Matters.**

(a)     The Agent is authorized on behalf of all of the Lenders, without the necessity of any
notice to or further consent from any Lender, from time to time prior to an Event of Default, to take any
action with respect to any Collateral or Loan Documents which may be necessary to perfect and maintain
perfected the Liens upon the Collateral granted pursuant to any of the Loan Documents.

(b)     The Lenders hereby authorize the Agent, at its option and in its discretion, to release any
Lien granted to or held by the Agent upon any Collateral (i) upon termination of this Agreement in
accordance with Section 12.10.; or (ii) as required or permitted by Section 7.11.(d).  Upon request by the
Agent at any time, the Lenders will confirm in writing the Agent's authority to release particular types or
items of Collateral pursuant to this Section or any other applicable provision of any of the other Loan
Documents.

(c)     Upon any sale and transfer of Collateral which is expressly permitted pursuant to the
terms of this Agreement, and upon at least 10 Business Days' prior written request by the Borrower, the
Agent shall (and is hereby irrevocably authorized by all of the Lenders to) execute such documents as
may be necessary to evidence the release of the Liens granted to the Agent for the benefit of the Lenders
herein or pursuant hereto upon the Collateral that was sold or transferred; provided, however, that (i) the
Agent shall not be required to execute any such document on terms which, in the Agent's opinion, would
expose the Agent to liability or create any obligation or entail any consequence other than the release of
such Liens without recourse or warranty; and (ii) such release shall not in any manner discharge, affect or
impair the Obligations or any Liens upon (or obligations of the Borrower or any Loan Party in respect of)
all interests retained by the Borrower or any Subsidiary, including (without limitation) the proceeds of the
sale, all of which shall continue to constitute part of the Collateral.  In the event of any sale or transfer of
Collateral, or any foreclosure with respect to any of the Collateral, the Agent shall be authorized to deduct
all of the expenses reasonably incurred by the Agent from the proceeds of any such sale, transfer or
foreclosure.

(d)     The Agent shall have no obligation whatsoever to the Lenders or to any other Person to
assure that the Collateral exists or is owned by any Loan Party or is cared for, protected or insured or that
the Liens granted to the Agent herein or pursuant hereto have been properly or sufficiently or lawfully
created, perfected, protected or enforced or are entitled to any particular priority, or to exercise or to
continue exercising at all or in any manner or under any duty of care, disclosure or fidelity any of the
rights, authorities and powers granted or available to the Agent in this Section or in any of the Loan
Documents, it being understood and agreed that in respect of the Collateral, or any act, omission or event
related thereto, the Agent may act in any manner it may deem appropriate, in its sole discretion, given the

- 72 -

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT A PAGE 80

OMNI0000411

Agent's own interest in the Collateral as one of the Lenders and that the Agent shall have no duty or
liability whatsoever to the Lenders, except to the extent found in a final non-appealable judgment by a
court of competent jurisdiction to have resulted from the Agent's gross negligence or willful misconduct.

### Section 11.7.  Lender Credit Decision, Etc.

Each Lender expressly acknowledges and agrees that neither the Agent nor any of its officers,
directors, employees, agents, counsel, attorneys-in-fact or other affiliates has made any representations or
warranties as to the financial condition, operations, creditworthiness, solvency or other information
concerning the business or affairs of the Borrower, any other Loan Party, any Subsidiary or any other
Person to such Lender and that no act by the Agent hereafter taken, including any review of the affairs of
the Borrower, any other Loan Party or any other Subsidiary, shall be deemed to constitute any such
representation or warranty by the Agent to any Lender.  Each Lender acknowledges that it has made its
own credit and legal analysis and decision to enter into this Agreement and the transactions contemplated
hereby, independently and without reliance upon the Agent, any other Lender or counsel to the Agent, or
any of their respective officers, directors, employees and agents, and based on the financial statements of
the Borrower, the Subsidiaries or any other Affiliate thereof, and inquiries of such Persons, its
independent due diligence of the business and affairs of the Borrower, the other Loan Parties, the
Subsidiaries and other Persons, its review of the Loan Documents, the legal opinions required to be
delivered to it hereunder, the advice of its own counsel and such other documents and information as it
has deemed appropriate.  Each Lender also acknowledges that it will, independently and without reliance
upon the Agent, any other Lender or counsel to the Agent or any of their respective officers, directors,
employees and agents, and based on such review, advice, documents and information as it shall deem
appropriate at the time, continue to make its own decisions in taking or not taking action under the Loan
Documents.  Except for notices, reports and other documents and information expressly required to be
furnished to the Lenders by the Agent under this Agreement or any of the other Loan Documents, the
Agent shall have no duty or responsibility to provide any Lender with any credit or other information
concerning the business, operations, property, financial and other condition or creditworthiness of the
Borrower, any other Loan Party or any other Affiliate thereof which may come into possession of the
Agent, or any of its officers, directors, employees, agents, attorneys-in-fact or other affiliates.   Each
Lender acknowledges that the Agent's legal counsel in connection with the transactions contemplated by
this Agreement is only acting as counsel to the Agent and is not acting as counsel to such Lender.

### Section 11.8.  Indemnification of Agent.

Each Lender agrees to indemnify the Agent (to the extent not reimbursed by the Borrower and
without limiting the obligation of the Borrower to do so) pro rata in accordance with such Lender's
respective Commitment Percentage, from and against any and all liabilities, obligations, losses, damages,
penalties, actions, judgments, suits, reasonable out-of-pocket costs and expenses, or disbursements of any
kind or nature whatsoever which may at any time be imposed on, incurred by, or asserted against the
Agent (in its capacity as Agent but not as a Lender) in any way relating to or arising out of the Loan
Documents, any transaction contemplated hereby or thereby or any action taken or omitted by the Agent
under the Loan Documents (collectively, "Indemnifiable Amounts"); provided, however, that no Lender
shall be liable for any portion of such Indemnifiable Amounts to the extent resulting from the Agent's
gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final, non-
appealable judgment or if the Agent fails to follow the written direction of the Requisite Lenders (or all of
the Lenders if expressly required hereunder) unless such failure results from the Agent following the
advice of counsel to the Agent of which advice the Lenders have received notice.  Without limiting the
generality of the foregoing but subject to the preceding proviso, each Lender agrees to reimburse the
Agent (to the extent not reimbursed by the Borrower and without limiting the obligation of the Borrower
to do so), promptly upon demand for its ratable share of any out-of-pocket expenses (including counsel

- 73 -

EXHIBIT A PAGE 81

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER      OMNI0000412

fees of the counsel(s) of the Agent's own choosing) incurred by the Agent in connection with the preparation, negotiation, execution, or enforcement of, or legal advice with respect to the rights or responsibilities of the parties under, the Loan Documents, any suit or action brought by the Agent to enforce the terms of the Loan Documents and/or collect any Obligations, any "lender liability" suit or claim brought against the Agent and/or the Lenders, and any claim or suit brought against the Agent, and/or the Lenders arising under any Environmental Laws.  Such out-of-pocket expenses (including counsel fees) shall be advanced by the Lenders on the request of the Agent notwithstanding any claim or assertion that the Agent is not entitled to indemnification hereunder upon receipt of an undertaking by the Agent that the Agent will reimburse the Lenders if it is actually and finally determined by a court of competent jurisdiction that the Agent is not so entitled to indemnification.  The agreements in this Section shall survive the payment of the Loans and all other amounts payable hereunder or under the other Loan Documents and the termination of this Agreement.  If the Borrower shall reimburse the Agent for any Indemnifiable Amount following payment by any Lender to the Agent in respect of such Indemnifiable Amount pursuant to this Section, the Agent shall share such reimbursement on a ratable basis with each Lender making any such payment.

**Section 11.9.  Successor Agent.**

The Agent may at any time give notice of its resignation to the Lenders and the Borrower.  Upon receipt of any such notice of resignation, the Requisite Lenders shall have the right, with the consent of the Borrower (so long as no Event of Default shall exist and be continuing and which consent shall not be unreasonably delayed or withheld), to appoint a successor which shall be a Lender.  If no such successor shall have been so appointed by the Requisite Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation, then the retiring Agent may on behalf of the Lenders, appoint a successor Agent provided that if the Agent shall notify the Borrower and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (a) the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Agent on behalf of the Lenders under any of the Loan Documents, the retiring Agent shall continue to hold such collateral security until such time as a successor Agent is appointed) and (b) all payments, communications and determinations provided to be made by, to or through the Agent shall instead be made by or to each Lender directly, until such time as the Requisite Lenders appoint a successor Agent as provided for above in this Section.  Upon the acceptance of a successor's appointment as Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Agent, and the retiring (or retired) Agent shall be discharged from all of its duties and obligations hereunder and under the other Loan Documents (if not already discharged therefrom as provided above in this Section).  In addition, such successor shall issue letters of credit in substitution for the Letters of Credit, if any, outstanding at the time of such succession or shall make other arrangements satisfactory to the retiring (or retired) Agent, in either case, to assume effectively the obligations of the retiring (or retired) Agent with respect to such Letters of Credit.  The fees payable by the Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.  After the retiring Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article and Sections 12.2. and 12.9. shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting as Agent.

**Section 11.10.  Titled Agents.**

Each of the Titled Agents in each such respective capacity, assumes no responsibility or obligation hereunder, including, without limitation, for servicing, enforcement or collection of any of the

- 74 -

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Loans, or for any duties as an agent hereunder for the Lenders. The titles of "Arranger" and "Syndication Agent" are solely honorific and imply no fiduciary responsibility on the part of the Titled Agents to the Agent, the Borrower or any Lender and the use of such titles does not impose on the Titled Agents any duties or obligations greater than those of any other Lender or entitle the Titled Agents to any rights other than those to which any other Lender is entitled.

### ARTICLE XII. MISCELLANEOUS

**Section 12.1. Notices.**

Unless otherwise provided herein, communications provided for hereunder shall be in writing and shall be mailed, telecopied or delivered as follows:

If to the Borrower:

>  MGA Entertainment Inc.
>  16380 Roscoe Boulevard, Suite 200
>  Van Nuys, California 91460
>  Attn: General Counsel
>  Telephone:      (818) 894-2525
>  Telecopy:       (818) 895-0771

with a copy to:

>  Kaye Scholer LLP
>  1999 Avenue of the Stars, Suite 1700
>  Los Angeles, California  90067
>  Attn: Barry L. Dastin
>  Telephone:      (310) 788-1070
>  Telecopy:       (310) 788-1202

If to the Agent:

>  Wachovia Bank, National Association
>  One South Broad Street
>  PA 4830
>  Philadelphia, Pennsylvania 19107
>  Attn: Beth Rue
>  Telephone:      (267) 321-6619
>  Telecopy:       (267) 321-6700

and to:

>  Wachovia Bank, National Association
>  One Wachovia Center
>  301 South College Street
>  Charlotte, North Carolina 28288
>  Attn: Shawna Selner
>  Telephone:      (704) 715-4571
>  Telecopy:       (704) 383-0288

- 75 -

EXHIBIT A PAGE 83

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

OMNI0000414

If to a Lender:

> To such Lender's address or telecopy number, as applicable, set forth on its signature page hereto or in the administrative questionnaire required by the Agent and provided by such Lender;

or, as to each party at such other address as shall be designated by such party in a written notice to the other parties delivered in compliance with this Section. Except as otherwise specifically set forth herein, all such notices and other communications shall be effective (i) if mailed, when received; (ii) if telecopied, when transmitted; or (iii) if hand delivered or sent by overnight courier, when delivered. Notwithstanding the immediately preceding sentence, all notices or communications to the Agent or any Lender under Article II. shall be effective only when actually received. Neither the Agent nor any Lender shall incur any liability to any Loan Party (nor shall the Agent incur any liability to the Lenders) for acting upon any telephonic notice referred to in this Agreement which the Agent or such Lender, as the case may be, believes in good faith to have been given by a Person authorized to deliver such notice or for otherwise acting in good faith hereunder. Failure of a Person designated to get a copy of a notice to receive such copy shall not affect the validity of notice properly given to any other Person.

**Section 12.2. Expenses.**

The Borrower agrees (a) to pay or reimburse the Agent for all of its reasonable out-of-pocket costs and expenses incurred in connection with the preparation, negotiation and execution of, any amendment, supplement or modification to, and preservation of any rights under, any of the Loan Documents (including due diligence expenses and travel expenses relating to closing), and the consummation of the transactions contemplated thereby, including the reasonable fees and disbursements of counsel to the Agent and costs and expenses in connection with the use of IntraLinks, Inc., SyndTrak or other similar information transmission systems in connection with the Loan Documents, (b) to pay or reimburse the Agent and the Lenders for all their reasonable fees and expenses incurred in connection with the enforcement of the Loan Documents, including the reasonable fees and disbursements of their respective counsel and any payments in indemnification or otherwise payable by the Lenders to the Agent pursuant to the Loan Documents, (c) to pay, and indemnify and hold harmless the Agent and the Lenders from, any and all recording and filing fees and any and all liabilities with respect to, or resulting from any failure to pay or delay in paying, documentary, stamp, excise and other similar taxes, if any, which may be payable or determined to be payable in connection with the execution and delivery of any of the Loan Documents, or consummation of any amendment, supplement or modification of, or any waiver or consent under or in respect of, any Loan Document and (d) to the extent not already covered by any of the preceding subsections, to pay or reimburse the Agent and the Lenders for all their reasonable costs and expenses incurred in connection with any bankruptcy or other proceeding of the type described in Section 10.1.(f) or 10.1.(g), including the reasonable fees and disbursements of counsel to the Agent and any Lender, whether such fees and expenses are incurred prior to, during or after the commencement of such proceeding or the confirmation or conclusion of any such proceeding. If the Borrower shall fail to pay any amounts required to be paid by it pursuant to this Section, the Agent and/or the Lenders may pay such amounts on behalf of the Borrower and either deem the same to be Loans outstanding hereunder or otherwise Obligations owing hereunder.

**Section 12.3. Setoff.**

Subject to Section 3.3. and in addition to any rights now or hereafter granted under Applicable Law and not by way of limitation of any such rights, the Borrower hereby authorizes the Agent, each Lender, each affiliate of the Agent or any Lender, and each Participant, at any time while an Event of Default exists and is continuing, without prior notice to the Borrower or to any other Person, any such

- 76 -

EXHIBIT A PAGE 84

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER          OMNI0000415

notice being hereby expressly waived, but in the case of a Lender, an affiliate of a Lender or a Participant subject to receipt of the prior written consent of the Agent exercised in its sole discretion, to set off and to appropriate and to apply any and all deposits (general or special, including, but not limited to, indebtedness evidenced by certificates of deposit, whether matured or unmatured, and in whatever Currency) and any other indebtedness at any time held or owing by the Agent, such Lender, any such affiliate of the Agent or such Lender, or such Participant, to or for the credit or the account of the Borrower against and on account of any of the Obligations then due.

**Section 12.4. Litigation; Jurisdiction; Other Matters; Waivers.**

(a)    EACH PARTY HERETO ACKNOWLEDGES THAT ANY DISPUTE OR CONTROVERSY BETWEEN OR AMONG THE BORROWER, THE AGENT OR ANY OF THE LENDERS WOULD BE BASED ON DIFFICULT AND COMPLEX ISSUES OF LAW AND FACT AND WOULD RESULT IN DELAY AND EXPENSE TO THE PARTIES. ACCORDINGLY, TO THE EXTENT PERMITTED BY APPLICABLE LAW, EACH OF THE LENDERS, THE AGENT AND THE BORROWER HEREBY WAIVES ITS RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING OF ANY KIND OR NATURE IN ANY COURT OR TRIBUNAL IN WHICH AN ACTION MAY BE COMMENCED BY OR AGAINST ANY PARTY HERETO ARISING OUT OF THIS AGREEMENT, THE NOTES, OR ANY OTHER LOAN DOCUMENT OR BY REASON OF ANY OTHER SUIT, CAUSE OF ACTION OR DISPUTE WHATSOEVER BETWEEN OR AMONG THE BORROWER, THE AGENT OR ANY OF THE LENDERS OF ANY KIND OR NATURE RELATING TO ANY OF THE LOAN DOCUMENTS.

(b)    EACH OF THE BORROWER, THE AGENT AND EACH LENDER HEREBY AGREES THAT ANY FEDERAL DISTRICT COURT AND ANY STATE COURT LOCATED IN THE BOROUGH OF MANHATTAN, NEW YORK, NEW YORK SHALL HAVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN OR AMONG THE BORROWER, THE AGENT OR ANY OF THE LENDERS, PERTAINING DIRECTLY OR INDIRECTLY TO THIS AGREEMENT, THE LOANS AND LETTERS OF CREDIT, THE NOTES OR ANY OTHER LOAN DOCUMENT OR TO ANY MATTER ARISING HEREFROM OR THEREFROM. THE BORROWER AND EACH OF THE LENDERS EXPRESSLY SUBMIT AND CONSENT IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR PROCEEDING COMMENCED IN SUCH COURTS WITH RESPECT TO SUCH CLAIMS OR DISPUTES. EACH PARTY FURTHER WAIVES ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE VENUE OF ANY SUCH ACTION OR PROCEEDING IN ANY SUCH COURT OR THAT SUCH ACTION OR PROCEEDING WAS BROUGHT IN AN INCONVENIENT FORUM, AND EACH AGREES NOT TO PLEAD OR CLAIM THE SAME. THE CHOICE OF FORUM SET FORTH IN THIS SECTION SHALL NOT BE DEEMED TO PRECLUDE THE BRINGING OF ANY ACTION BY THE AGENT OR ANY LENDER OR THE ENFORCEMENT BY THE AGENT OR ANY LENDER OF ANY JUDGMENT OBTAINED IN SUCH FORUM IN ANY OTHER APPROPRIATE JURISDICTION.

(c)    THE PROVISIONS OF THIS SECTION HAVE BEEN CONSIDERED BY EACH PARTY WITH THE ADVICE OF COUNSEL AND WITH A FULL UNDERSTANDING OF THE LEGAL CONSEQUENCES THEREOF, AND SHALL SURVIVE THE PAYMENT OF THE LOANS AND ALL OTHER AMOUNTS PAYABLE HEREUNDER OR UNDER THE OTHER LOAN DOCUMENTS, THE TERMINATION OR EXPIRATION OF ALL LETTERS OF CREDIT AND THE TERMINATION OF THIS AGREEMENT.

LEGAL02/30055542v16

EXHIBIT A PAGE 85

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER          OMNI0000416

**Section 12.5. Successors and Assigns.**

(a)    _Successors and Assigns Generally._  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Agent and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an Eligible Assignee in accordance with the provisions of the immediately following subsection (b), (ii) by way of participation in accordance with the provisions of the immediately following subsection (d) or (iii) by way of pledge or assignment of a security interest subject to the restrictions of the immediately following subsection (f) (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in the immediately following subsection (d) and, to the extent expressly contemplated hereby, the affiliates and the partners, directors, officers, employees, agents and advisors of the Agent and the Lenders and of their respective affiliates) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    _Assignments by Lenders._  Any Lender may at any time assign to one or more assignees (an "Assignee") all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment, its Alternate Currency Commitment, if applicable, and the Loans at the time owing to it); _provided_ that any such assignment shall be subject to the following conditions:

(i)    _Minimum Amounts._

(A)    in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment, Alternate Currency Commitment, if applicable, and the Loans at the time owing to it or in the case of an assignment to a Lender, an affiliate of a Lender or an Approved Fund, no minimum amount need be assigned; and

(B)    in any case not described in the immediately preceding subsection (A), the aggregate amount of the Commitment or Alternate Currency Commitment (which for this purpose includes Loans outstanding thereunder) or, if the applicable Commitment or Alternate Currency Commitment is not then in effect, the Dollar Equivalent of the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date) shall not be less than $5,000,000 in the case of any assignment in respect of a Commitment, unless each of the Agent and, so long as no Default or Event of Default shall exist, the Borrower otherwise consents (each such consent not to be unreasonably withheld or delayed).

(ii)    _Proportionate Amounts._  Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loan or the Commitment or Alternate Currency Commitment assigned.

(iii)    _Required Consents._  No consent shall be required for any assignment except to the extent required by clause (i)(B) of this subsection (b) and, in addition:

(A)    the consent of the Borrower (such consent not to be unreasonably withheld or delayed) shall be required unless (x) an Event of Default shall exist at the

- 78 -

EXHIBIT A PAGE 86

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER          OMNI0000417

time of such assignment or (y) such assignment is to a Lender, an affiliate of a Lender or an Approved Fund;

        (B)    the consent of the Agent (such consent not to be unreasonably withheld or delayed) shall be required for assignments in respect of a Commitment or Alternate Currency Commitment if such assignment is to a Person that is not already a Lender with a Commitment, an affiliate of such Lender or an Approved Fund with respect to such Lender; and

        (C) the consent of the Swingline Lender (such consent not to be unreasonably withheld or delayed) shall be required for any assignment in respect of a Commitment.

    (iv)    <u>Assignment and Acceptance</u>.  The parties to each assignment shall execute and deliver to the Agent an Assignment and Acceptance, together with a processing and recordation fee of $3,500 for each assignment, and the assignee, if it is not a Lender, shall deliver to the Agent an administrative questionnaire in the form customarily required by the Agent.

    (v)    <u>No Assignment to Borrower or Competitor</u>.  No such assignment shall be made to the Borrower, any of the Borrower's Affiliates or Subsidiaries or any Competitor.

    (vi)    <u>No Assignment to Natural Persons</u>.  No such assignment shall be made to a natural person.

Subject to acceptance and recording thereof by the Agent pursuant to the immediately following subsection (c), from and after the effective date specified in each Assignment and Acceptance, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 4.4., 12.2. and 12.9. and the other provisions of this Agreement and the other Loan Documents as provided in Section 12.10. with respect to facts and circumstances occurring prior to the effective date of such assignment.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this paragraph shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with the immediately following subsection (d).

    (c)    <u>Register</u>.  The Agent, acting solely for this purpose as an agent of the Borrower, shall maintain at the Principal Office a copy of each Assignment and Acceptance delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments and Alternate Currency Commitments of, and principal amounts of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive, and the Borrower, the Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

    (d)    <u>Participations</u>.  Any Lender may at any time, without the consent of, or notice to, the Borrower or the Agent, sell participations to any Person (other than a natural person or the Borrower or any of the Borrower's Affiliates or Subsidiaries or any Competitor) (each, a "Participant") in all or a

- 79 -

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment, Alternate Currency Commitment and/or the Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower, the Agent and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver of any provision of any Loan Document described in Section 12.6.(b) that adversely affects such Participant.  Subject to the immediately following subsection (e), the Borrower agrees that each Participant shall be entitled to the benefits of Sections 3.12., 4.1., 4.4. to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section. To the extent permitted by Applicable Law, each Participant also shall be entitled to the benefits of Section 12.3. as though it were a Lender, provided such Participant agrees to be subject to Section 3.3. as though it were a Lender.  Upon request from the Agent, a Lender shall notify the Agent and the Borrower of the sale of any participation hereunder.

(e)     Limitations upon Participant Rights.  A Participant shall not be entitled to receive any greater payment under Sections 3.12. and 4.1. than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent.  A Participant that would be a Foreign Lender if it were a Lender shall not be entitled to the benefits of Section 3.12. unless the Borrower is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Borrower and the Agent, to comply with Section 3.12.(c) as though it were a Lender.

(f)     Certain Pledges.  Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(g)     No Registration.  Each Lender agrees that, without the prior written consent of the Borrower and the Agent, it will not make any assignment hereunder in any manner or under any circumstances that would require registration or qualification of, or filings in respect of, any Loan or Note under the Securities Act or any other securities laws of the United States of America or of any other jurisdiction.

**Section 12.6. Amendments.**

(a)     Except as otherwise expressly provided in this Agreement, any consent or approval required or permitted by this Agreement or any other Loan Document to be given by the Lenders may be given, and any term of this Agreement or of any other Loan Document may be amended, and the performance or observance by the Borrower or any other Loan Party or any Subsidiary of any terms of this Agreement or such other Loan Document or the continuance of any Default or Event of Default may be waived (either generally or in a particular instance and either retroactively or prospectively) with, but only with, the written consent of the Requisite Lenders (and, in the case of an amendment to any Loan Document, the written consent of each Loan Party a party thereto).

(b)     Notwithstanding the foregoing, without the prior written consent of each Lender adversely affected thereby, no amendment, waiver or consent shall do any of the following:

- 80 -

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT A PAGE 88
OMNI0000419

(i)     increase the Commitments (except for any increase in the Commitments effectuated pursuant to Section 2.14.) or Alternate Currency Commitments, or subject the Lenders to any additional obligations;

(ii)     reduce the principal of, or interest that has accrued or the rates of interest that will be charged on the outstanding principal amount of, any Loans or other Obligations;

(iii)     reduce the amount of any Fees payable hereunder or postpone any date fixed for payment thereof;

(iv)     modify the definition of the term "Termination Date" or otherwise postpone any date fixed for any payment of any principal of, or interest on, any Loans or any other Obligations (including the waiver of any Default or Event of Default as a result of the nonpayment of any such Obligations as and when due), or extend the expiration date of any Letter of Credit beyond the Termination Date;

(v)     amend or otherwise modify the provisions of Section 3.2.;

(vi)     modify the definition of the term "Requisite Lenders" or otherwise modify in any other manner the number or percentage of the Lenders required to make any determinations or waive any rights hereunder or to modify any provision hereof, including without limitation, any modification of this Section 12.6. if such modification would have such effect;

(vii)     release any Guarantor from its obligations under the Guaranty (except as otherwise permitted by Section 7.11.(c));

(viii)     release any of the Collateral from the Lien of the Security Documents (except as otherwise permitted by Section 7.11.(d)) or contractually subordinate any such Lien;

(ix)     amend or otherwise modify the provisions of Section 2.13.(a); or

(x)     entirely release the Borrower from all of the Obligations owing by the Borrower.

(c)     No amendment, waiver or consent, unless in writing and signed by the Agent, in such capacity, in addition to the Lenders required hereinabove to take such action, shall affect the rights or duties of the Agent under this Agreement or any of the other Loan Documents. Any amendment, waiver or consent relating to Section 2.2. or the obligations of the Swingline Lender under this Agreement or any other Loan Document shall, in addition to the Lenders required hereinabove to take such action, require the written consent of the Swingline Lender. No amendment, waiver or consent, unless in writing and signed by the Requisite Alternate Currency Lenders, in addition to the Lenders required hereinabove to take such action, shall affect the rights or duties of the Alternate Currency Lenders under this Agreement or any of the other Loan Documents.

(d)     No waiver shall extend to or affect any obligation not expressly waived or impair any right consequent thereon and any amendment, waiver or consent shall be effective only in the specific instance and for the specific purpose set forth therein. Except as otherwise provided in Section 11.5., no course of dealing or delay or omission on the part of the Agent or any Lender in exercising any right shall operate as a waiver thereof or otherwise be prejudicial thereto. Any Event of Default occurring hereunder shall continue to exist until such time as such Event of Default is waived in writing in accordance with the terms of this Section, notwithstanding any attempted cure or other action by the Borrower, any other Loan

- 81 -

EXHIBIT A PAGE 89

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER          OMNI0000420

Party or any other Person subsequent to the occurrence of such Event of Default.  Except as otherwise explicitly provided for herein or in any other Loan Document, no notice to or demand upon the Borrower shall entitle the Borrower to any other or further notice or demand in similar or other circumstances.

**Section 12.7.  Nonliability of Agent and Lenders.**

The relationship between the Borrower, on the one hand, and the Lenders and the Agent, on the other hand, shall be solely that of borrower and lender.  Neither the Agent nor any Lender shall have any fiduciary responsibilities to the Borrower, any other Loan Party or any other Subsidiary and no provision in this Agreement or in any of the other Loan Documents, and no course of dealing between or among any of the parties hereto, shall be deemed to create any fiduciary duty owing by the Agent or any Lender to any Lender, the Borrower, any other Loan Party or any other Subsidiary.  Neither the Agent nor any Lender undertakes any responsibility to the Borrower to review or inform the Borrower of any matter in connection with any phase of the Borrower's business or operations.

**Section 12.8.  Confidentiality.**

Each of the Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its affiliates' respective directors, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by, or required to be disclosed to, any rating agency or regulatory or similar authority (including any self-regulatory authority, such as the National Association of Insurance Commissioners) having or purporting to have jurisdiction over it, (c) to the extent required by Applicable Laws or regulations or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies under any Loan Document or any action or proceeding relating to this Agreement or any other Loan Document (or any Derivative Contract with a Lender or the Agent) or the enforcement of rights hereunder or thereunder, (f) to any actual or proposed Assignee or Participant, or to any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Borrower and its obligations, in each case, so long as such Assignee, Participant, counterparty or advisor has executed a confidentiality agreement substantially in the form of Exhibit N or other form acceptable to the Borrower, the Agent and such Assignee, Participant, counterparty or advisor, as applicable, (g) with the consent of the Borrower, (h) to Gold Sheets and other similar bank trade publications, such information to consist of deal terms and other information customarily found in such publications, (i) to the extent such Information can be demonstrated (x) to have become publicly available other than as a result of a breach of this Section actually know by the Agent or such Lender to be a breach of this Section or (y) to have become available to the Agent or any Lender on a nonconfidential basis from a source other than the Borrower.  Notwithstanding the foregoing, the Agent and each Lender may disclose any such confidential information, without notice to the Borrower or any other Loan Party, to Governmental Authorities in connection with any regulatory examination of the Agent or such Lender or in accordance with the regulatory compliance policy of the Agent or such Lender.  As used in this Section, the term "Information" means all information received from or on behalf of the Borrower, any other Loan Party or any Subsidiary or Affiliate relating to any Loan Party or any of their respective businesses, other than any such information that can be demonstrated to have become available to the Agent or any Lender on a nonconfidential basis prior to disclosure by the Borrower, any other Loan Party or any Subsidiary or Affiliate.  Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

- 82 -

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT A PAGE 90

OMNI0000421

**Section 12.9.   Indemnification.**

(a)      The Borrower shall and hereby agrees to indemnify, defend and hold harmless the Agent, each of the Lenders, any affiliate of the Agent or any Lender, and their respective directors, officers, shareholders, agents and employees (each referred to herein as an "Indemnified Party") from and against any and all of the following (collectively, the "Indemnified Costs"):  losses, costs, claims, damages, liabilities, deficiencies, judgments or reasonable out-of-pocket expenses of every kind and nature (including, without limitation, amounts paid in settlement, court costs and the reasonable fees and disbursements of counsel incurred in connection with any litigation, investigation, claim or proceeding or any advice rendered in connection therewith, but excluding losses, costs, claims, damages, liabilities, deficiencies, judgments or expenses indemnification in respect of which is specifically covered by Section 3.12. or 4.1. or expressly excluded from the coverage of such Section 3.12. or 4.1.) incurred by an Indemnified Party in connection with, arising out of, or by reason of, any suit, cause of action, claim, arbitration, investigation or settlement, consent decree or other proceeding (the foregoing referred to herein as an "Indemnity Proceeding") which is in any way related directly or indirectly to: (i) this Agreement or any other Loan Document or the transactions contemplated thereby; (ii) the making of any Loans or issuance of Letters of Credit hereunder; (iii) any actual or proposed use by the Borrower of the proceeds of the Loans or Letters of Credit; (iv) the Agent's or any Lender's entering into this Agreement; (v) the fact that the Agent and the Lenders have established the credit facility evidenced hereby in favor of the Borrower; (vi) the fact that the Agent and the Lenders are creditors of the Borrower and have or are alleged to have information regarding the financial condition, strategic plans or business operations of the Borrower and the Subsidiaries; (vii) the fact that the Agent and the Lenders are material creditors of the Borrower and are alleged to influence directly or indirectly the business decisions or affairs of the Borrower and the Subsidiaries or their financial condition; (viii) the exercise of any right or remedy the Agent or the Lenders may have under this Agreement or the other Loan Documents; (ix) any civil penalty or fine assessed by the OFAC against, and all reasonable costs and expenses (including reasonable counsel fees and disbursements) incurred in connection with defense thereof by, the Agent or any Lender as a result of conduct of the Borrower, any other Loan Party or any Subsidiary that violates a sanction enforced by the OFAC; or (x) any violation or non-compliance by the Borrower or any Subsidiary of any Applicable Law (including any Environmental Law) including, but not limited to, any Indemnity Proceeding commenced by (A) the Internal Revenue Service or state taxing authority or (B) any Governmental Authority or other Person under any Environmental Law, including any Indemnity Proceeding commenced by a Governmental Authority or other Person seeking remedial or other action to cause the Borrower or any of the Subsidiaries (or their respective properties) (or the Agent and/or the Lenders as successors to the Borrower) to be in compliance with such Environmental Laws; provided, however, that the Borrower shall not be obligated to indemnify any Indemnified Party for (A) any acts or omissions of such Indemnified Party in connection with matters described in this subsection to the extent arising from the gross negligence or willful misconduct of such Indemnified Party, as determined by a court of competent jurisdiction in a final, non-appealable judgment or (B) Indemnified Costs to the extent arising directly out of or resulting directly from claims of one or more Indemnified Parties against another Indemnified Party.

(b)      The Borrower's indemnification obligations under this Section 12.9. shall apply to all Indemnity Proceedings arising out of, or related to, the foregoing whether or not an Indemnified Party is a named party in such Indemnity Proceeding.  In this regard, this indemnification shall cover all Indemnified Costs of any Indemnified Party in connection with any deposition of any Indemnified Party or compliance with any subpoena (including any subpoena requesting the production of documents).  This indemnification shall, among other things, apply to any Indemnity Proceeding commenced by other creditors of the Borrower or any Subsidiary, any stockholder of the Borrower or any Subsidiary (whether such stockholder(s) are prosecuting such Indemnity Proceeding in their individual capacity or derivatively on behalf of the Borrower), any account debtor of the Borrower or any Subsidiary or by any

- 83 -

EXHIBIT A PAGE 91

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

OMNI0000422

Governmental Authority. If indemnification is to be sought hereunder by an Indemnified Party, then such Indemnified Party shall notify the Borrower of the commencement of any Indemnity Proceeding; provided, however, that the failure to so notify the Borrower shall not relieve the Borrower from any liability that it may have to such Indemnified Party pursuant to this Section 12.9. except to the extent the delay or failure to so notify is detrimental to the Borrower or any Subsidiary as determined by a court of competent jurisdiction in a final, non-appealable judgment.

(c)     This indemnification shall apply to any Indemnity Proceeding arising during the pendency of any bankruptcy proceeding filed by or against the Borrower and/or any Subsidiary.

(d)     All reasonable out-of-pocket fees and expenses of, and all reasonable amounts paid to third-persons by, an Indemnified Party to the extent Indemnified Costs shall be advanced by the Borrower at the request of such Indemnified Party notwithstanding any claim or assertion by the Borrower that such Indemnified Party is not entitled to indemnification hereunder, upon receipt of an undertaking by such Indemnified Party that such Indemnified Party will reimburse the Borrower if it is actually and finally determined by a court of competent jurisdiction that such Indemnified Party is not so entitled to indemnification hereunder.

(e)     An Indemnified Party may conduct its own investigation and defense of, and may formulate its own strategy with respect to, any Indemnity Proceeding covered by this Section and, as provided above, all Indemnified Costs incurred by such Indemnified Party shall be reimbursed by the Borrower. No action taken by legal counsel chosen by an Indemnified Party in investigating or defending against any such Indemnity Proceeding shall vitiate or in any way impair the obligations and duties of the Borrower hereunder to indemnify and hold harmless each such Indemnified Party; provided, however, that if (i) the Borrower is required to indemnify an Indemnified Party pursuant hereto and (ii) the Borrower has provided evidence reasonably satisfactory to such Indemnified Party that the Borrower has the financial wherewithal to reimburse such Indemnified Party for any amount paid by such Indemnified Party with respect to such Indemnity Proceeding, such Indemnified Party shall not settle or compromise any such Indemnity Proceeding without the prior written consent of the Borrower (which consent shall not be unreasonably withheld or delayed). Notwithstanding the foregoing, an Indemnified Party may settle or compromise any such Indemnity Proceeding without the prior written consent of the Borrower where (x) no monetary relief is sought against such Indemnified Party in such Indemnity Proceeding or (y) there is an allegation of a violation of law by such Indemnified Party.

(f)     If and to the extent that the obligations of the Borrower under this Section are unenforceable for any reason, the Borrower hereby agrees to make the maximum contribution to the payment and satisfaction of such obligations which is permissible under Applicable Law.

(g)     The Borrower's obligations under this Section shall survive any termination of this Agreement and the other Loan Documents and the payment in full in cash of the Obligations, and are in addition to, and not in substitution of, any other of their obligations set forth in this Agreement or any other Loan Document to which it is a party.

**Section 12.10. Termination; Survival.**

At such time as (a) all of the Commitments and Alternate Currency Commitments have been terminated, (b) all Letters of Credit have terminated or expired, (c) none of the Lenders nor the Swingline Lender is obligated any longer under this Agreement to make any Loans and (d) all Obligations (other than obligations which survive as provided in the following sentence) have been paid and satisfied in full, this Agreement shall terminate. The indemnities to which the Agent, the Lenders and the Swingline Lender are entitled under the provisions of Sections 3.12., 4.1., 4.4., 4.10., 11.8., 12.2. and 12.9. and any

- 84 -

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

other provision of this Agreement and the other Loan Documents, and the provisions of Section 12.4. and 12.19., shall continue in full force and effect and shall protect the Agent, the Lenders and the Swingline Lender (i) notwithstanding any termination of this Agreement, or of the other Loan Documents, against claims arising after such termination as well as before related to matters and events existing on or prior to the date of termination of this Agreement in accordance with its terms and (ii) at all times after any such party ceases to be a party to this Agreement with respect to all matters and events existing on or prior to the date such party ceased to be a party to this Agreement. The Agent agrees to furnish to the Borrower, upon the Borrower's request and at the Borrower's sole cost and expense, any release, termination, or other agreement or document evidencing the foregoing termination and the release of the Liens created under any of the Security Documents as may be reasonably requested by the Borrower.

### Section 12.11. Severability of Provisions.

Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective only to the extent of such prohibition or unenforceability without invalidating the remainder of such provision or the remaining provisions or affecting the validity or enforceability of such provision in any other jurisdiction.

### Section 12.12. GOVERNING LAW.

THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS EXECUTED, AND TO BE FULLY PERFORMED, IN SUCH STATE.

### Section 12.13. Patriot Act.

The Lenders and the Agent each hereby notifies the Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)), it is required to obtain, verify and record information that identifies the Borrower and the other Loan Parties, which information includes the name and address of the Borrower and the other Loan Parties and other information that will allow such Lender or the Agent, as applicable, to identify the Borrower and the other Loan Parties in accordance with such Act.

### Section 12.14. Counterparts.

This Agreement and any amendments, waivers, consents or supplements may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all of which counterparts together shall constitute but one and the same instrument. A signature delivered by facsimile shall be effective as an original signature.

### Section 12.15. Obligations with Respect to Loan Parties.

The obligations of the Borrower to direct or prohibit the taking of certain actions by the other Loan Parties as specified herein shall be absolute and not subject to any defense the Borrower may have that the Borrower does not control such Loan Parties.

### Section 12.16. Limitation of Liability.

Neither the Agent nor any Lender, nor any affiliate, officer, director, employee, attorney, or agent of the Agent or any Lender shall have any liability with respect to, and the Borrower hereby waives,

- 85 -

LEGAL02/30055542v16

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT A PAGE 93

OMNI0000424

releases, and agrees not to sue any of them upon, any claim for any special, indirect, incidental, or consequential damages suffered or incurred by the Borrower in connection with, arising out of, or in any way related to, this Agreement or any of the other Loan Documents, or any of the transactions contemplated by this Agreement or any of the other Loan Documents. The Borrower hereby waives, releases, and agrees not to sue the Agent or any Lender or any of the Agent's or any Lender's affiliates, officers, directors, employees, attorneys, or agents for punitive damages in respect of any claim in connection with, arising out of, or in any way related to, this Agreement or any of the other Loan Documents, or any of the transactions contemplated by this Agreement or financed hereby.

## Section 12.17.  Entire Agreement.

This Agreement and the other Loan Documents referred to herein embody the final, entire agreement among the parties hereto, and supersede any and all prior commitments, agreements, representations, and understandings, whether written or oral, relating to the subject matter hereof and thereof and may not be contradicted or varied by evidence of prior, contemporaneous, or subsequent oral agreements or discussions of the parties hereto. There are no oral agreements among the parties hereto.

## Section 12.18.  Construction.

The Agent, the Borrower and each Lender acknowledge that each of them has had the benefit of legal counsel of its own choice and has been afforded an opportunity to review this Agreement and the other Loan Documents with its legal counsel and that this Agreement and the other Loan Documents shall be construed as if jointly drafted by the Agent, the Borrower and each Lender.

## Section 12.19.  Judgment Currency.

The obligation of the Borrower to make payments to or for the account of the Alternate Currency Lenders of the principal of and interest on Alternate Currency Loans in the Currency specified for such payment shall not be discharged or satisfied by any tender, or any recovery pursuant to any judgment, which is expressed in or converted into any other Currency, except to the extent that such tender or recovery shall result in the actual receipt by the Agent or the Alternate Currency Lenders, as applicable, of the full amount of the particular Currency expressed to be payable pursuant to the applicable Loan Document. The Agent or an Alternate Currency Lender, as applicable, shall, using all amounts obtained or received from the Borrower pursuant to any such tender or recovery in payment of principal of and interest on such Obligations, promptly purchase the applicable Currency at the most favorable spot exchange rate determined by the Agent, in the case of the Agent, or by such Alternate Currency Lender, as applicable, to be available to it. The obligation of the Borrower to make payments to or for the account of the Alternate Currency Lenders in respect of Alternate Currency Loans in the applicable Currency shall be enforceable as an alternative or additional cause of action solely for the purpose of recovering in the applicable Currency the amount, if any, by which such actual receipt shall fall short of the full amount of the Currency expressed to be payable pursuant to the applicable Loan Document. Not in limitation of the foregoing and not in duplication of amounts payable under Section 4.10. or any other provision of this Agreement, the Borrower shall indemnify and hold harmless each Alternate Currency Lender against any loss incurred by such Alternate Currency Lender as a result of any payment or recovery described in this Section and as a result of any variation having occurred in rates of exchange between the date of any such amount becoming due under this Agreement or any other Loan Document and the date of actual payment thereof. The foregoing indemnity shall constitute a separate and independent obligation of the Borrower and shall continue in full force and effect notwithstanding any such payment or recovery.

- 86 -

EXHIBIT A PAGE 94
OMNI0000425

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

IN WITNESS WHEREOF, the parties hereto have caused this Credit Agreement to be executed by their authorized officers all as of the day and year first above written.

MGA ENTERTAINMENT INC.

By: _____

Name:  Isaac Larian

Title:  President

[Signatures Continued on Next Page]

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**[Signature Page to Credit Agreement with MGA Entertainment Inc.]**

WACHOVIA BANK, NATIONAL ASSOCIATION, as Agent,
as a Lender and as Swingline Lender

By: _Beth Rue_

Beth Rue
Vice President

Commitment Amount:  $50,000,000

Alternate Currency Commitment:  $50,000,000

**Domestic Lending Office:**

Wachovia Bank, National Association
One Wachovia Center
301 South College Street
Charlotte, North Carolina  28288
Attn:  Shawna Selner
Telephone:       (704) 715-4571
Telecopy:        (704) 383-0288

**Eurocurrency Lending Office:**

Wachovia Bank, National Association
3 Bishops Gate
London, England  EC2N3AB
Attn:  Michelle Clark/Ian King
Telephone:       0207 956 4310/4316
Telecopy:        0207 927 4645

[Signatures Continued on Next Page]

[Signature Page to Credit Agreement with MGA Entertainment Inc.]

WELLS FARGO HSBC TRADE BANK,
NATIONAL ASSOCIATION

By: _____
    Name: Michelle Yang
    Title: VP and Senior Relationship Manager

Commitment Amount:  $40,000,000

Alternate Currency Commitment:  $0

**Domestic Lending Office:**

Wells Fargo HSBC Trade Bank,
National Association
333 South Grand Avenue, Suite 800
Los Angeles, California  90071
Attn:  Michelle Yang
Telephone:    (213) 253-3547
Telecopy:    (213) 625-1055

**Eurocurrency Lending Office:**

Wells Fargo HSBC Trade Bank,
National Association
333 South Grand Avenue, Suite 800
Los Angeles, California  90071
Attn:  Michelle Yang
Telephone:    (213) 253-3547
Telecopy:    (213) 625-1055

[Signatures Continued on Next Page]

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT A PAGE 97

OMNI0000428

[Signature Page to Credit Agreement with MGA Entertainment Inc.]

WESTLB AG, NEW YORK BRANCH

By: _____
    Name:    ROLF SCHMITZ
    Title:   EXECUTIVE DIRECTOR

By: _____
    Name:    Brendan McGlynn
    Title:   Manager

Commitment Amount:  $40,000,000

Alternate Currency Commitment:  $0

**Domestic Lending Office:**

WestLB AG, New York Branch
1211 Avenue of the Americas
New York, New York  10036
Attn:  Sal Battinelli
Telephone:      (212) 852-6112
Telecopy:       (212) 852-6148

**Eurocurrency Lending Office:**

_____
_____
_____
_____
Attn: _____
Telephone:      (___) _____
Telecopy:       (___) _____

[Signatures Continued on Next Page]

EXHIBIT A PAGE 98

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

[Signature Page to Credit Agreement with MGA Entertainment Inc.]

UBS LOAN FINANCE LLC

By: _____
    Name:  Richard L. Tavrow
    Title:  Director

By: _____
    Name:  Arja R. Otsa
    Title:  Associate Director


Commitment Amount:  $25,000,000

Alternate Currency Commitment:  $0


**Domestic Lending Office:**

UBS Loan Finance LLC
677 Washington Boulevard
Stamford, Connecticut  06901
Attn:  Shaneequa Thomas
Telephone:     (203) 719-3385
Telecopy:      (203) 719-3888


**Eurocurrency Lending Office:**

_____
_____
_____
Attn: _____
Telephone:    (___) _____
Telecopy:     (___) _____


[Signatures Continued on Next Page]


EXHIBIT A PAGE 99

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

OMNI0000430

[Signature Page to Credit Agreement with MGA Entertainment Inc.]

HSBC BANK USA, NATIONAL ASSOCIATION

By: _____
    Name:  Andrew Hietala
    Title:   Vice President

Commitment Amount:  $20,000,000

Alternate Currency Commitment:  $0

**Domestic Lending Office:**

HSBC Bank USA, National Association
660 S. Figueroa Street, Suite 800
Los Angeles, California  90017
Attn:  Andrew W. Hietala
Telephone:     (213) 553-8009
Telecopy:      (213) 553-8056

**Eurocurrency Lending Office:**

HSBC Bank USA, National Association
One HSBC Center, Floor 26
Buffalo, NY 14203
Attn: Donna L. Riley
Telephone:     (716) 841-4178
Telecopy:      (716) 841-0269

[Signatures Continued on Next Page]

EXHIBIT A PAGE 100

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

[Signature Page to Credit Agreement with MGA Entertainment Inc.]

BANK OF THE WEST

By: _Shikha_____

Name: Shikha Rehman
Title: Vice President

Commitment Amount:  $15,000,000

Alternate Currency Commitment:  $0

**Domestic Lending Office:**

Bank of the West
300 South Grand Avenue
Mail Sort SC-CAL-07-C
Los Angeles, California  90071
Attn:  Shikha Rehman
Telephone:        (213) 972-0631
Telecopy:         (213) 972-0650

**Eurocurrency Lending Office:**

Bank of the West_
Commercial Loan Servicing
1977 Saturn St.
Monterey Park, CA 91755
Attn: _Sandra Fox
Telephone:        (323) 727-3065
Telecopy:         (323) 727-3099

[Signatures Continued on Next Page]

EXHIBIT A PAGE 101

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

[Signature Page to Credit Agreement with MGA Entertainment Inc.]

BANK OF CHINA, LOS ANGELES BRANCH

By: _____
Name: _____Jason Fu_____
Title: _____Vice President_____

Commitment Amount:  $10,000,000

Alternate Currency Commitment:  $0

**Domestic Lending Office:**

Bank of China, Los Angeles Branch
444 S. Flower Street, #3900
Los Angeles, California  90071
Attn:  Jason Fu
Telephone:        (213) 688-8700 ext 235
Telecopy:         (213) 688-1015

**Eurocurrency Lending Office:**

_____
_____
_____
_____

Attn: _____
Telephone:      (      ) _____
Telecopy:       (      ) _____

EXHIBIT A PAGE 102

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

OMNI0000433