# EXHIBIT F

EXECUTION VERSION

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## OMNI 808 INVESTORS LLC

**(a California limited liability company)**

A/72623224.4

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

OMNI0010257

## TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| ARTICLE 1 | DEFINITIONS | 1 |
| ARTICLE 2 | FORMATION AND CONTINUATION OF COMPANY | 8 |
| 2.1 | Formation and Continuation | 8 |
| 2.2 | Name; Principal Place of Business | 8 |
| 2.3 | Agent for Service of Process | 8 |
| 2.4 | Agreement | 8 |
| 2.5 | Company Business | 8 |
| 2.6 | Term | 9 |
| ARTICLE 3 | UNITS | 9 |
| 3.1 | Units | 9 |
| 3.2 | Unit Certificates | 9 |
| ARTICLE 4 | MEMBERSHIP | 10 |
| 4.1 | Members | 10 |
| 4.2 | Representations and Warranties | 10 |
| 4.3 | Additional Members; Substitute Members; Assignees | 11 |
| 4.4 | Resignation or Withdrawal of a Member | 12 |
| 4.5 | Disassociation of a Member | 12 |
| 4.6 | Rights of a Disassociated Member | 12 |
| 4.7 | Voting Rights | 12 |
| 4.8 | Limitations on Powers of Members | 12 |
| 4.9 | Ownership | 13 |
| ARTICLE 5 | CONTRIBUTIONS TO CAPITAL | 13 |
| 5.1 | Capital Contributions | 13 |
| 5.2 | Additional Capital Contributions | 13 |
| 5.3 | Capital Accounts | 13 |
| ARTICLE 6 | MANAGEMENT | 13 |
| 6.1 | Generally | 13 |
| 6.2 | Resignation and Removal of Managers | 14 |
| 6.3 | Managers | 14 |
| 6.4 | Additional Matters | 15 |

i

A/72623232AA

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER                OMNI0010258

TABLE OF CONTENTS
(continued)

Page

| | | |
|---|---|---|
| 6.5 | Committees | 15 |
| 6.6 | Officers | 16 |
| 6.7 | Voting and Approval Rights | 16 |
| ARTICLE 7 | DISTRIBUTIONS | 17 |
| 7.1 | Distributions Upon Dissolution | 17 |
| 7.2 | Operating Distributions | 17 |
| 7.3 | Restrictions on Distributions | 17 |
| 7.4 | Tax Distributions | 18 |
| 7.5 | Return of Distributions | 18 |
| 7.6 | No Other Withdrawals or Distributions | 18 |
| 7.7 | In-Kind Distributions | 18 |
| 7.8 | Withholding on Distributions | 18 |
| ARTICLE 8 | ALLOCATIONS | 18 |
| 8.1 | Allocation of Profits and Losses | 18 |
| 8.2 | General Rules for Allocations | 19 |
| 8.3 | Regulatory Allocations | 19 |
| 8.4 | Other Allocation Rules | 21 |
| 8.5 | Tax Allocations; Section 704(c) of the Code | 21 |
| 8.6 | Partnership Tax Treatment | 22 |
| 8.7 | Section 754 Election | 22 |
| ARTICLE 9 | ACCOUNTING AND RECORDS | 22 |
| 9.1 | Financial and Tax Reporting | 22 |
| 9.2 | Books and Records | 22 |
| 9.3 | Delivery to Members and Inspection | 23 |
| 9.4 | Reliance on Books and Records | 23 |
| 9.5 | Tax Matters Partner | 23 |
| ARTICLE 10 | LIABILITY, EXCULPATION AND INDEMNIFICATION; COMPETING ACTIVITIES | 23 |
| 10.1 | Liability | 23 |
| 10.2 | Exculpation | 24 |

ii

A/72623234.4

EXHIBIT F - PAGE 140

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER                OMNI0010259

TABLE OF CONTENTS
(continued)

Page

| 10.3 | Duties and Liabilities of Covered Persons | 24 |
|---|---|---|
| 10.4 | Indemnification | 24 |
| 10.5 | Expenses | 24 |
| 10.6 | Insurance | 24 |
| 10.7 | Confidential Information | 25 |
| ARTICLE 11 | DISSOLUTION AND TERMINATION | 25 |
| 11.1 | Termination | 25 |
| 11.2 | Authority to Wind Up | 26 |
| 11.3 | Winding Up; Certificate of Dissolution | 26 |
| 11.4 | Distribution of Property | 26 |
| 11.5 | Capital Account Deficit | 26 |
| ARTICLE 12 | TRANSFER RIGHTS AND RESTRICTIONS | 26 |
| 12.1 | General | 26 |
| 12.2 | Requirements for Transfer | 26 |
| 12.3 | Transferee as Assignee | 27 |
| 12.4 | Void Transfers | 27 |
| ARTICLE 13 | MISCELLANEOUS | 27 |
| 13.1 | Amendments | 27 |
| 13.2 | Successors and Assigns | 27 |
| 13.3 | Governing Law and Severability | 27 |
| 13.4 | Counterparts; Facsimiles | 28 |
| 13.5 | Notices | 28 |
| 13.6 | Entire Agreement | 28 |
| 13.7 | Interpretation | 28 |
| 13.8 | Dispute Resolution | 29 |

EXHIBITS

Exhibit A    Members and Unit Ownership
Exhibit B    Initial Managers
Exhibit C    Initial Officers
Exhibit D    Tax Matters Partner

iii

A/72623224.4

EXHIBIT F - PAGE 141

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

OMNI0010260

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## OMNI 808 INVESTORS LLC

This Limited Liability Company Agreement (as amended from time to time, this "**Agreement**") of OMNI 808 INVESTORS LLC, a California limited liability company (the "**Company**"), is entered into as of August __, 2008, by and among the initial members set forth on Exhibit A attached hereto (the "**Initial Members**"), with reference to the following facts:

### RECITALS

A.     The Company will be entering into (i) that certain Master Assignment and Exchange Agreement, by and among the Company, MGA Entertainment Inc., a California corporation ("**MGA**"), Wachovia Bank, National Association and certain other parties signatory thereto (the "**Assignment Agreement**") pursuant to which the Company shall acquire the right to receive repayment on certain indebtedness of MGA as described therein (the "**Loans**"), and (ii) certain agreements related to the Assignment Agreement.

B.     In connection with the consummation of the transactions contemplated by the Assignment Agreement, the parties hereto desire to enter into this Agreement in order to define the rights and obligations of the Members and to establish the rights, preferences and privileges of the Units (as defined below).

### AGREEMENT

NOW, THEREFORE, in consideration of the foregoing premises and the mutual agreements and representations set forth herein, and intending to be legally bound, the parties by this Agreement set forth the agreement for the Company under the laws of the State of California upon the terms and subject to the conditions of this Agreement.

### ARTICLE 1
### DEFINITIONS

The following terms shall have the meanings set forth below for purposes of this Agreement:

"**Accounting Period**" means the period beginning on January 1 and ending on December 31 of each year, other than (a) 2008, for which the Accounting Period shall begin on the date hereof and end on December 31, 2008 and (b) the year during which the Company is liquidated (within the meaning of Treasury Regulation Section 1.704-1(b)(2)(ii)(g); provided, however, that (x) an Accounting Period shall end and a new Accounting Period shall commence on any date on which an Additional Member or Substitute Member is admitted to the Company or a Member ceases to be a Member for any reason, and (y) any period that otherwise would be treated as an Accounting Period shall be treated as one or more Accounting Periods to the extent

1

A/72623224.4

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

OMNI0010261

required so that during each such Accounting Period no Member's interest changes within the meaning of Section 706(d)(1) of the Code.

"**Act**" means the California Beverly-Killea Limited Liability Company Act, as codified in Title 2.5 of the California Corporations Code, as amended from time to time.

"**Additional Member**" means any Person who has been admitted to all the rights of a Member pursuant to Section 4.3.1 of this Agreement.

"**Adjusted Capital Account Deficit**" means, with respect to any Member for any Accounting Period or other period, the deficit balance, if any, in such Member's Capital Account as of the end of such year or other period, after giving effect to the following adjustments:

> (a)    Credit to such Capital Account any amounts that such Member is obligated to restore or is deemed obligated to restore as described in the penultimate sentence of Treasury Regulation Section 1.704-2(g)(1) and in Treasury Regulation Section 1.704-2(i); and

> (b)    Debit from such Capital Account the items described in Treasury Regulation Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Treasury Regulation § 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

"**Affiliate**" means, with respect to any specified Person, (a) any other Person directly or indirectly controlled by, controlling or under common control with such specified Person, (b) any other Person that directly or indirectly owns 10% or more of such specified Person's capital stock or other voting interests, (c) any executive officer, director, member or general partner of any such specified Person or other Person described in clause (b) of this definition, and (d) with respect to any natural person that qualifies as an Affiliate of a specified Person, also includes any other natural person related to such Affiliate by blood, marriage or adoption not more remote than first cousin or any trust for the benefit of the foregoing natural persons.

"**Agreement**" has the meaning given such term in the Preamble.

"**Articles**" means the Articles of Organization of the Company originally filed with the Secretary of State of the State of California, as the same may be amended from time to time.

"**Assignee**" means a transferee of Units who has not been admitted as a Substitute Member pursuant to Section 4.3.2. As provided in Section 4.3.3, an Assignee shall have no rights of a Member or by virtue of holding the transferred Units to vote on, consent to, approve, or participate in the determination of any matter, or to otherwise participate in the management of the business and affairs of the Company or to become a Member. An Assignee shall only have an Economic Interest, solely entitling it to receive distributions and to be allocated the Profits and Losses attributable to the Units transferred to the Assignee.

"**Assignment Agreement**" has the meaning given such term in the Recitals.

2

A/72623224.4

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER          OMNI0010262

"**Bankruptcy**" means, with respect to any Person, that:  (a) a petition has been filed by or
against such Person as a "debtor" and the adjudication of such Person as bankrupt under the
provisions of the bankruptcy laws of the United States of America has commenced and, in the
case of an involuntary bankruptcy, such petition shall not have been dismissed within 60 days
from the date of filing; (b) such Person has made an assignment for the benefit of its creditors
generally; or (c) a receiver has been appointed for substantially all of the property and assets of
such Person.

"**Business Day**" means any day other than a Saturday, Sunday, or a day on which
banking institutions in the State of California are authorized or obligated by law or executive
order to close.

"**Capital Account**" means, with respect to each Member, a separate account established
and maintained in accordance with the following provisions:

The Capital Account of each Member shall be <u>increased</u> by:

(c)   the amount of money and the Fair Market Value of any property
contributed by such Member to the Company (determined by the Managers as of the date of
contribution) pursuant to the provisions of this Agreement (net of any liabilities secured by such
property that the Company is considered to assume or hold such property subject to for purposes
of Section 752 of the Code);

(d)   such Member's share of Profits (or items thereof), if any,
allocated to its Capital Account pursuant to this Agreement; and

(e)   any other amounts required by Treasury Regulation Section
1.704-1(b), provided, that the Managers determine that such increase is consistent with the
economic arrangement among the Members as expressed in this Agreement.

The Capital Account of each Member shall be <u>decreased</u> by:

(a)   the amount of money and the Fair Market Value of any property
distributed to such Member by the Company (determined by the Managers as of the date of
distribution) pursuant to the provisions of this Agreement (net of any liabilities secured by such
property that such Member is considered to assume or hold such property subject to for purposes
of Section 752 of the Code);

(b)   such Member's share of Losses (or items thereof) allocated to its
Capital Account pursuant to this Agreement; and

(c)   any other amounts required by Treasury Regulation Section
1.704-1(b); provided, that the Managers determine that such decrease is consistent with the
economic arrangement among the Members as expressed in this Agreement.

Upon the admission of an Additional Member to the Company and upon other events
when the Gross Asset Value of the assets of the Company are adjusted, the Capital Accounts of
the Members shall be adjusted to reflect their interests in the then Fair Market Value of the

3

A/72623224.4

EXHIBIT F - PAGE 144

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER            OMNI0010263

Company's assets. If Units are issued pursuant to the exercise of an option or warrant issued by the Company, the Capital Account of the exercising person shall reflect not only the cash or property contributed by such Person, but also any excess of the Fair Market Value of such Person's proportionate share of the Company's assets over such contribution (and the Capital Accounts of the other Members shall be adjusted pursuant to the first sentence of this paragraph).

"**Capital Contributions**" of a Member means that amount of cash and/or the agreed upon net value of other property actually contributed by such Member to the Company.

"**Code**" means the Internal Revenue Code of 1986, as amended from time to time.

"**Company**" has the meaning given such term in the Preamble.

"**Company Business**" has the meaning given such term in Section 2.5.

"**Confidential Information**" has the meaning given such term in Section 10.7.1.

"**Control**" means, for purposes of the definition of "Affiliate" and Section 6.7, when used with respect to any specified Person, the power to direct the management and policies of such Person, whether directly or indirectly and whether through the ownership of voting securities, by contract or otherwise; and the terms "**controlling**" and "**controlled**" have meanings correlative to the foregoing.

"**Covered Person**" means (a) any Member, any Affiliate of a Member, any officers, directors, trustees, stockholders, members, managers, beneficiaries, partners, principals, employees, representatives or agents of any Member or its Affiliates, (b) any Person who is elected to serve as a Manager, and (c) any employee or agent of the Company or any Member or who is designated as a Covered Person by the Managers.

"**Depreciation**" means, for each Accounting Period or other period, an amount equal to the federal income taxation depreciation, amortization or other cost recovery deduction allowable with respect to an asset for such Accounting Period or other period, adjusted as determined by the Managers in a manner consistent with Treasury Regulations § 1.704-1(b)(2)(iv)(g)(3).

"**Disassociated Member**" means a Person who has ceased to be a Member as a result of incapacity, death, Bankruptcy, Dissolution, or redemption by the Company or transfer of all such Member's Units.

"**Dissolution**" of a Member which is not a natural person means that such Member has terminated its existence, whether partnership, limited liability company or corporation, wound up its affairs and dissolved; provided, however, that a change in the membership of any Member that is a partnership or limited liability company shall not be deemed or constitute a "Dissolution" hereunder, whether or not the Member is deemed technically dissolved for tax, partnership or limited liability company law purposes, so long as the business of the Member is continued after the change in question.

"**Economic Interest**" means the right to share in Profits and Losses of, and receive or accrue dividends or other distributions from, the Company pursuant to this Agreement, but shall

4

A/72623224.4

EXHIBIT F - PAGE 145

not include any other rights of a Member, including, without limitation, the right to vote or participate in management of the Company or, except as required by the Act, to receive any information concerning the Company.

"**Fair Market Value**" of any specified securities or other property or assets shall mean, the price at which the property or assets would change hands (as of any date of determination of Fair Market Value as provided herein) between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts, as determined in good faith by the Managers (excluding any Manager with a direct or indirect pecuniary interest in the valuation determination in question or who was designated as a Manager by a Member with a direct or indirect pecuniary interest in the valuation determination in question). If all Managers have such a pecuniary interest (or were designated by a Member with such a pecuniary interest) the determination of Fair Market Value shall be made by an independent third party appraiser experienced in such valuations selected by the Managers and reasonably acceptable to both Initial Members. The costs of the appraiser shall be paid by the Company, and the determination of the appraiser so selected shall be final and binding on all parties absent manifest error.

"**GAAP**" means United States generally accepted accounting principles as in effect at the time in question.

"**Gross Asset Value**" means, with respect to any asset, such asset's adjusted basis for United States federal income tax purposes, except as follows:

(a)     the initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross Fair Market Value of such asset;

(b)     the Gross Asset Value of all Company assets shall be adjusted to equal their respective gross Fair Market Values, as of the following times: (i) the distribution by the Company to a Member of more than a *de minimis* amount of Company assets as consideration for all or a portion of such Member's Interest; (ii) the contribution to the Company by a Member of more than a *de minimis* amount of assets in exchange for an Interest; (iii) the liquidation of the Company within the meaning of Treasury Regulation § 1.704-1(b)(2)(ii)(g); and (iv) any other instance in which such adjustment is permitted under Treasury Regulations § 1.704-1(b)(2)(iv); provided, however, that adjustments pursuant to clause (i), (ii) or (iv) of this sentence shall be made only if the Tax Matters Partner reasonably determines (after good faith consultation with the Managers) that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company;

(c)     the Gross Asset Value of any Company asset distributed to any Member shall be the gross Fair Market Value of such asset on the date of distribution; and

(d)     the Gross Asset Value of all Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulations § 1.704-1(b)(2)(iv)(m); provided, however, that the Gross Asset Value of any Company asset

5

EXHIBIT F - PAGE 146

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER          OMNI0010265

shall not be adjusted pursuant to this paragraph (d) to the extent that the Tax Matters Partner reasonable determines (after good faith consultation with the Managers) that an adjustment pursuant to subparagraph (b) is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this subparagraph (d).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to paragraph (a) or paragraph (b) above, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

"**Initial Members**" has the meaning given such term in the Preamble.

"**Interest**" means a Member's entire rights and interest in the Company, including the right to share in distributions and allocations hereunder, to vote or participate in management of the Company to the extent set forth herein and to receive information concerning the business and affairs of the Company as set forth herein.

"**Managers**" means the Persons designated or elected as Managers of the Company pursuant to Article 6.

"**Members**" means the Initial Members, any Substitute Members and any Additional Members admitted pursuant to this Agreement, but does not include Assignees.

"**MGA**" has the meaning given such term in the Recitals.

"**Percentage Interest**" means, as determined from time to time with respect to each Member, the percentage which is equal to (a) the number of Units held by such Member divided by (b) the aggregate number of Units then held by all Members.

"**Person**" means an individual and any domestic or foreign: corporation, partnership, limited liability company, association, trust, estate, custodian, nominee or any other individual, entity or organization, including any government or political subdivision or agency or instrumentality thereof.

"**Profits**" and "**Losses**" means, for each Accounting Period, an amount equal to the Company's net taxable income or loss for such Accounting Period, determined in accordance with § 703(a) of the Code (but including in taxable income or loss, for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to § 703(a)(1) of the Code), with the following adjustments:

(a)      any income of the Company exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be added to such taxable income or loss;

(b)      any expenditures of the Company described in § 705(a)(2)(B) of the Code (or treated as expenditures described in § 705(a)(2)(B) of the Code pursuant to Treasury Regulation § 1.704-1(b)(2)(iv)(i)) and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be subtracted from such taxable income or loss;

A/72673224.4

EXHIBIT F - PAGE 147

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER                    OMNI0010266

(c)     in the event the Gross Asset Value of any Company asset is adjusted in accordance with paragraph (b) or (c) of the definition of "Gross Asset Value" above, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits or Losses;

(d)     gain or loss resulting from any disposition of any asset of the Company with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the asset disposed of, notwithstanding that the adjusted tax basis of such asset differs from its Gross Asset Value;

(e)     in lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Accounting Period or other period; and

(f)     to the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required pursuant to Treasury Regulation § 1.704-1(b)(2)(iv)(m)(2) or § 1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts of the respective Members as a result of a distribution other than in liquidation of a Member's Interest, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Profits or Losses.

"**Regulatory Allocations**" has the meaning given such term in Section 8.3.2.

"**Substitute Member**" means an Assignee who has been admitted to all the rights of a Member pursuant to this Agreement.

"**Tax Distribution Amount**" means, with respect to a Unit for a fiscal year, the federal and state income tax liability with respect to the Profits of the Company allocated for such Unit for such fiscal year. The calculation of such federal and state income tax liability shall (a) assume that the holder of such Unit is taxable as an individual for United States federal and state income tax purposes, (b) assume that the holder of such Unit is in the highest marginal United States federal and state income tax bracket applicable to individuals in the State of California, (c) assume that California State income taxes are deductible for federal income tax purposes, and (d) not take into account any adjustments to taxable income, gain, loss, deduction or credit allocable to Member as a result of Section 704(c) of the Code and/or as result of any adjustments to the basis of partnership property on behalf of a Member pursuant to an election under Section 754 of the Code (or any state law provisions similar to Section 704(c) and/or Section 754 of the Code). In determining the amount of estimated federal and state income tax liability for any fiscal year, if the Company has Losses for any fiscal year, the amount of tax losses allocated for such Unit for such fiscal year shall be carried forward and applied to offset any taxable income allocated for such Unit for each succeeding fiscal year or years until such tax losses are fully absorbed by taxable income consistent with applicable rules relating to loss carryforwards under the Code determined as if the same individual held such Unit during all such fiscal years.

7

AJ72623224.4

EXHIBIT F - PAGE 148

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER           OMNI0010267

"**Tax Matters Partner**" has the meaning given such term in <u>Section 9.5</u>.

"**Treasury Regulations**" means the income tax regulations, including temporary regulations, promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

"**Units**" means Units of the Company or, as the context requires, the Units held by the Members as set forth in <u>Exhibit A</u> hereto, but shall not include warrants, options or rights exercisable or exchangeable for or convertible into units of membership interest in the Company, including Units, to the extent not vested and not exercised, exchanged or converted, as applicable.

"**Unit Certificates**" has the meaning given such term in <u>Section 3.2.1</u>.

### ARTICLE 2
### FORMATION AND CONTINUATION OF COMPANY

2.1     <u>Formation and Continuation</u>.  The Company was formed as a limited liability company pursuant to the provisions of the Act upon the filing of the Articles with the Office of the Secretary of State of the State of California on August 12, 2008.  The Managers and the Members hereby agree to continue the Company as a limited liability company under the Act, upon the terms and subject to the conditions set forth in this Agreement.  The Managers are hereby authorized to file and record any amendments to the Articles and <u>Exhibit A</u> hereto (in the event of any change in the information contained therein) and such other documents as may be required or appropriate under the Act or the laws of any other jurisdiction in which the Company may conduct business or own property.  The Members and Managers hereby acknowledge that Omninet Capital, LLC ("**Omninet**") assisted in the formation of the Company and hereby authorize the reimbursement of any and all out of pocket, third party expenses incurred by Omninet in connection with such formation activities.

2.2     <u>Name; Principal Place of Business</u>.  Unless and until amended in accordance with this Agreement and the Act, the name of the Company will be "OMNI 808 Investors LLC."  The principal place of business of the Company shall be 9420 Wilshire Boulevard, Suite 400, Beverly Hills, CA 90212, or such other place or places as the Managers from time to time determine.

2.3     <u>Agent for Service of Process</u>.  The Company's initial agent for service of process required by the Act is as set forth in the Articles and may be changed if and as determined by the Managers.

2.4     <u>Agreement</u>.  In consideration of the mutual covenants and agreements contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each of the Members executing this Agreement and each Person from time to time serving as a Manager (by virtue of accepting such position) agrees to the terms and conditions of this Agreement, as it may be further amended from time to time in accordance with the terms hereof.  Except to the extent a provision of this Agreement expressly incorporates United States federal income tax rules by reference to sections of the Code or Treasury Regulations or unless expressly prohibited or invalid under the Act, the terms of this Agreement

8

A/72623724.4

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER          OMNI0010268

shall govern even when inconsistent with or different from the provisions of the Act or any other applicable law or rule.

2.5    Company Business. The Company is formed for the object and purpose of, and the nature of the business to be conducted and promoted by the Company is, the purchase, holding, and management of the Loans and any lawful act or activity necessary or proper in connection therewith (the "Company Business").

2.6    Term. The term of the Company commenced upon the filing of the Articles with the California Secretary of State and its existence shall be perpetual, unless its existence is sooner terminated pursuant to Article 11 of this Agreement.

## ARTICLE 3
## UNITS

3.1    Units. Interests in the Company shall be denominated as "Units." The total number of Units authorized for issuance is 1,000. It is not necessary that all authorized Units be issued or outstanding. The total number of authorized Units may not be increased and no class or series of Units may be authorized or issued without the approvals required by Section 6.7. The holders of Units shall be entitled to distributions as provided in Articles 7 and 11 and shall be entitled to vote on any matters put to a vote of the Members (other than those matters for which voting or approval rights exist in favor of designated Persons or the holders of specified Units hereunder) but shall have no other rights unless expressly set forth in this Agreement.

3.2    Unit Certificates.

3.2.1    Certificate. Units shall be represented by certificates of membership interest ("Unit Certificates") and shall constitute certificated securities governed by Division 8 of the California Uniform Commercial Code. The form and content of the Unit Certificates shall be determined in the Managers' sole discretion, subject only to this Section 3.2 and any express requirements of the Act. Unit Certificates shall be numbered serially by type in the order issued and shall be signed by the officers of the Company designated for such purpose by the Managers. Each Unit Certificate shall state the name of the Company, that the Company is a limited liability company organized under the laws of the State of California, the name of the Person to whom the certificate is issued, the issue date, and the number, and, if applicable, class, series or subclass of Units represented thereby. All Unit Certificates shall bear the following restrictive legends, in addition to any other legends required by applicable law or contract:

THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY OTHER APPLICABLE SECURITIES LAW. THESE SECURITIES HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO DISTRIBUTION OR RESALE, AND MAY NOT BE SOLD, TRANSFERRED, PLEDGED OR OTHERWISE CONVEYED OR ENCUMBERED WITHOUT SUCH REGISTRATION OR UNLESS THE COMPANY RECEIVES AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE COMPANY, OR IS OTHERWISE

9


A/72623224.4

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER    OMNI0010269

SATISFIED THAT REGISTRATION IS NOT REQUIRED FOR SUCH SALE, TRANSFER, PLEDGE, CONVEYANCE OR ENCUMBRANCE UNDER THE SECURITIES ACT OR ANY OTHER APPLICABLE SECURITIES LAW.

THE SALE, TRANSFER, PLEDGE, HYPOTHECATION, CONVEYANCE OR ENCUMBRANCE OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE IS SUBJECT TO THE TERMS AND CONDITIONS OF A LIMITED LIABILITY COMPANY AGREEMENT BY AND AMONG THE COMPANY AND HOLDERS OF ITS SECURITIES. COPIES OF SUCH LIMITED LIABILITY COMPANY AGREEMENT MAY BE OBTAINED BY ANY BONA FIDE PROPOSED PURCHASER, ASSIGNEE OR PLEDGEE UPON WRITTEN REQUEST TO THE COMPANY.

        3.2.2   <u>Cancellation of Unit Certificates</u>. Except as herein provided with respect to lost, stolen, or destroyed Unit Certificates, no new Unit Certificates shall be issued in lieu of previously issued Unit Certificates until former Unit Certificates representing a like number of Units shall have been surrendered and cancelled. All Unit Certificates surrendered to the Company for any transfer permitted hereunder shall be cancelled in connection with such transfer.

        3.2.3   <u>Lost, Stolen or Destroyed Unit Certificates</u>. Any Member claiming that a Unit Certificate has been lost, stolen, or destroyed may make an affidavit or affirmation of that fact and request a replacement therefor. Upon the posting of a bond or undertaking an indemnity obligation satisfactory to the Company (in each case, as reasonably required by the Managers), a replacement Unit Certificate may be issued of the same tenor and representing the same number of Units as was represented by the purportedly lost, stolen or destroyed Unit Certificate.

## ARTICLE 4
## MEMBERSHIP

    4.1   <u>Members</u>. Effective as of the date hereof, the Members of the Company shall be as set forth on the signature pages and <u>Exhibit A</u> to this Agreement.

    4.2   <u>Representations and Warranties</u>. Each Member hereby represents and warrants, severally for and as to itself only, to the Company and each other Member, as follows:

        4.2.1   <u>Purchase Entirely for Own Account</u>. Such Member is acquiring its Units for its own account for investment purposes only and not with a view to any resale, distribution, subdivision or fractionalization thereof, and has no contract, understanding, undertaking, agreement or arrangement of any kind with any Person to sell, transfer or pledge its Units or all or any portion of its Interest represented thereby, nor does such Member have any present plan or intention to enter into any such contract, understanding, undertaking, agreement or arrangement.

        4.2.2   <u>Investment Experience; Accredited Investor</u>. By reason of such Member's business or financial experience, such Member has the capacity to protect its own interests in connection with the transactions contemplated hereunder, is able to bear the risk of investment in the Company, and at the present time could afford a complete loss of such

A/72623224.4

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER       OMNI0010270

investment. Such Member is an "accredited investor" as such term is defined in Rule 501 promulgated under the Securities Act of 1933, as amended (the "Securities Act").

4.2.3    Securities Laws. Such Member acknowledges that the Units have not been registered under the Securities Act or any state securities laws, as they are being acquired in a transaction not involving a public offering, and as a result, the Units may not be resold or transferred by the Member without appropriate registration or the availability of an exemption from such requirements.

4.2.4    Entity Power and Authority. Such Member, if it is a corporation, limited partnership or other form of business entity, is duly organized or formed, validly existing and in good standing under the laws of its jurisdiction of organization or formation and the execution, delivery and performance by it of this Agreement is within its powers, has been duly authorized by all necessary corporate or other action on its behalf, requires no action by or in respect of, or filing with, any governmental body, agency or official, and does not and will not contravene, or constitute a default under, any provision of applicable law or regulation or of its certificate of incorporation or other comparable organizational documents or any agreement, judgment, injunction, order, decree or other instrument to which such Member is a party or by which such Member or any of its properties is bound. This Agreement constitutes a valid and binding agreement of such Member, enforceable against such Member in accordance with its terms.

4.2.5    Individual Power and Authority. If such Member is an individual, the execution, delivery and performance by such Member of this Agreement is within such Member's legal right, power and capacity, requires no action by or in respect of, or filing with, any governmental body, agency, or official, and does not and will not contravene, or constitute a default under, any provision of applicable law or regulation or of any agreement, judgment, injunction, order, decree or other instrument to which such Member is a party or by which such Member or any of his or her properties is bound. This Agreement constitutes a valid and binding agreement of such Member, enforceable against such Member in accordance with its terms.

4.2.6    Survival. The foregoing representations, warranties and agreements shall survive the date of the Member's admission to the Company.

4.3    Additional Members; Substitute Members; Assignees.

4.3.1    Additional Members. From time to time additional Persons may be admitted to the Company as Additional Members, subject to compliance with applicable law and the approval of the Managers required by Section 6.7, and subject also to such proposed Additional Member agreeing to be bound by (a) the terms of this Agreement by executing and delivering a counterpart signature page hereto and (b) any other agreements or instruments by which a Member is or is required or deemed to be bound as a condition to or by virtue of the ownership of Units. If so admitted, the Additional Member shall have all the rights and powers, and shall be subject to all the restrictions and liabilities of, a Member hereunder.

4.3.2    Substitute Members. An Assignee of Units of the Company shall be admitted as a Substitute Member only if permitted by applicable law and only upon the approval of the Managers required by Section 6.7, and subject further to such proposed Substitute Member

11

A/72623224.4

EXHIBIT F - PAGE 152

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER        OMNI0010271

agreeing to be bound by (a) the terms of this Agreement by executing and delivering a counterpart signature page hereto and (b) any other agreements or instruments by which a Member is or is required or deemed to be bound as a condition to or by virtue of the ownership of Units. If so admitted, the Substitute Member shall have all the rights and powers, and shall be subject to all the restrictions and liabilities of, the Member who assigned such Units to the extent that such rights powers, restrictions and liabilities resulted from such assigning Member's ownership of the assigned Units (and were not associated specifically with such Member's identity). The admission of a Substitute Member shall not release any Member who assigned such Units from liabilities or obligations to the Company, the other Members or any other Person that may have arisen prior to the transfer.

      4.3.3   <u>Rights of Assignees</u>. Unless and until subsequently admitted as a Substitute Member, an Assignee shall not have any rights to vote on, consent to, approve or participate in the determination of any matter, or to otherwise participate in the management of the business and affairs of the Company or to become a Member, which rights shall be retained by the Member or Substitute Member who transferred the applicable Units to the Assignee. Unless and until admitted as a Substitute Member, each Assignee shall only be entitled to receive distributions (including its return of capital) and to be allocated the Profits and Losses attributable to those Units that were transferred to and retained by the Assignee.

      4.4   <u>Resignation or Withdrawal of a Member</u>. Except as specifically provided in this Agreement, no Member shall have the right to resign or withdraw as a Member of the Company or withdraw its interest in the capital of the Company.

      4.5   <u>Disassociation of a Member</u>. The incapacity, death, Bankruptcy, or Dissolution of a Member or the redemption by the Company of all of such Member's Units: (a) will cause such Member to become a Disassociated Member, and (b) automatically will terminate the Disassociated Member's status as a Member of the Company.

      4.6   <u>Rights of a Disassociated Member</u>. Any Member who becomes a Disassociated Member, or its legal representative, successor or permitted assign, may request admission to the Company as a Substitute Member pursuant to Section 4.3.2. If no request for admission as a Substitute Member status is made and granted pursuant to Section 4.3.2, the Disassociated Member or its legal representative, successor or assign, as the case may be, shall have only the limited economic rights of an Assignee hereunder.

      4.7   <u>Voting Rights</u>. Members shall have no voting, approval, or consent rights, except as mandated by the Act or as expressly provided in this Agreement. In matters on which Members are entitled to vote in their capacity as Members, the holders of Units shall vote together as a single class, with each Unit entitling the holder thereof to one vote.

      4.8   <u>Limitations on Powers of Members</u>. As provided in Section 6.3.1, the management of the Company is exclusively vested in the Managers. No Member shall have the authority in its capacity as a Member to act as an agent for or on behalf of the Company, to enter into any transaction or execute any agreement on behalf of the Company or any subsidiary thereof or to otherwise bind the Company or any such subsidiary or to pledge its credit or render it liable for any purpose. No Member shall have any power to participate in the management of

12

A/72623224.4

EXHIBIT F - PAGE 153

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER      OMNI0010272

the Company except and solely to the extent expressly mandated by the Act or authorized by this Agreement.

4.9     Ownership.  Each Member's Interest and Units in the Company shall for all purposes be personal property of such Member.  All assets and property of the Company, whether real or personal, tangible or intangible, shall be deemed to be owned by the Company as an entity, and no Member shall have any direct ownership interest in any such Company property.

## ARTICLE 5
## CONTRIBUTIONS TO CAPITAL

5.1     Capital Contributions.  Each of the Initial Members (or their Affiliates on behalf of such Members), have made Capital Contributions to the Company in the amounts set forth on Exhibit A attached hereto.  In exchange for such Capital Contribution and executing and delivering this Agreement, each Member shall have the rights set forth in this Agreement.

5.2     Additional Capital Contributions.  No Member shall be required under any circumstance to make any Capital Contribution after the date of admission hereunder as a Member.  No Member shall be permitted to make any additional Capital Contribution without the approval of the Managers.

5.3     Capital Accounts.  A separate Capital Account shall be established and maintained for each Member by the Managers.  The Capital Accounts are intended to comply with the requirements of Section 704 of the Code.  The Managers shall have the authority to interpret this Section 5.3 accordingly, and shall be empowered to make such adjustments to the Members' Capital Accounts as the Managers from time to time determine are appropriate to satisfy such requirements.

## ARTICLE 6
## MANAGEMENT

6.1     Generally.  The business and affairs of the Company shall be managed by a Board of Managers which shall initially be comprised of the same number of natural persons as there are Members.  The number of authorized Managers shall automatically adjust for any increase or decrease in the number of Members.  The Managers shall be elected as follows:

6.1.1     The Members holding more than 50% of the Units shall elect each of the Managers; provided, that, each Member agrees to vote all of its Units in respect of the election of a Manager in accordance with Section 6.1.2.

6.1.2     Each Member shall have the right to nominate one person to serve as a Manager on the Board of Managers.  Each of the Members agrees to vote all of their respective Units in favor of each Member's nominee for Manager, such that each Member is represented on the Board of Managers by such Member's nominee.  At all times, each Member is permitted to have one person who has been nominated by such Member serving as a Manager on the Board of Managers.  The initial Managers elected shall be as set forth on Exhibit B attached hereto.

13

A/72623224.4

EXHIBIT F - PAGE 154

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER          OMNI0010273

6.1.3    Each Manager shall hold office until a successor is duly designated or until such Manager's earlier death, disqualification, resignation or removal.

6.2    Resignation and Removal of Managers. Any Manager may resign at any time and with or without stating any reason for such resignation. A Manager may be removed and replaced at any time, with or without cause, by an affirmative vote of the Members holding more than 50% of the Units; provided, however, that each Member agrees not to vote to remove any Manager unless the Member who nominated such Manager notifies the Members that it so desires that such Manager be removed. If a Member notifies the Members that it so desires to remove the Manager it nominated, then each of the Members agrees to vote all of its respective Units in favor of removing such Manager. Any vacancy created by the resignation or removal of a Manager shall be filled by a nomination made by such Member who nominated the Manager who resigned or was removed, and such nominee shall be elected in accordance with the applicable provisions of Section 6.1 above.

6.3    Managers.

6.3.1    Exclusive Management by Managers. Subject to the provisions of this Agreement or the Act relating to actions required to be approved or consented to by the Members, the business, property and affairs of the Company shall be exclusively managed and all powers of the Company shall be exclusively exercised by or under the direction of the Managers. Any action taken, decision made, approval or authorization given by a majority of the Managers at a meeting when a quorum is present shall be deemed the act, decision, approval or authorization of the Managers for all purposes, unless otherwise expressly required by the Act or this Agreement. If the action is to be taken by written consent, then consent of a majority of the Managers then serving on the Board of Managers shall be deemed the consent of the Managers for all purposes. The Managers shall be deemed to be a "manager" within the meaning of the Act. The Managers, acting collectively and subject to any specific consent or approval rights or requirements provided herein, shall have the power to do any and all acts necessary or convenient to or in furtherance of the purposes described herein, including exercising all powers, rights and authority, statutory or otherwise, possessed by or accorded to a "manager" under the laws of the State of California. Without limiting the foregoing, each Manager shall have the ability and the authority to execute contracts and deliver instruments binding upon the Company, provided that such Manager is authorized to do so and the action in question has been authorized or approved by the requisite vote or consent of the Managers and the Members hereunder, if applicable.

6.3.2    Meetings of Managers. Regular meetings of the Managers shall be held at least once during each calendar year. Regular and special meetings of the Managers may be called by any Manager or by the Chief Executive Officer of the Company, and meetings shall be held upon four days notice by mail or 48 hours notice delivered personally or by telephone, e-mail, telegraph, or facsimile. A notice need not specify the purpose of any meeting, but shall specify the place and time and, if applicable, instructions for accessing any electronic means of communication by which the meeting will be held. Notice of a meeting need not be given to any Manager who (a) signs a waiver of notice or a consent to holding the meeting, or (b) attends the meeting without protesting prior to its commencement the lack of proper notice. Any such waiver or consent to a meeting need not specify the purpose of such meeting and may be given

14

A/72623224.4

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

OMNI0010274

before or after the meeting. All such waivers and consents shall be filed with the Company records or made a part of the minutes of the meeting. The presence of two Managers in person or by proxy shall constitute a quorum of the Managers for the transaction of business. A majority of the Managers present at a meeting may adjourn the meeting to another time and place. If the meeting is to be adjourned for more than 24 hours, notice of the adjournment shall be given a reasonable period of time prior to the time of the adjourned meeting to the Managers who are not present at the time of the adjournment. Meetings of the Managers may be held at any place within or without the State of California that is specified in the notice of the meeting or at such other place as may be approved by Managers sufficient to constitute a quorum. Managers may participate in a meeting through use of video or telephone conference or other electronic communications equipment then permitted to be used for such purpose under the Act, so long as all Managers participating in such meeting can hear and be heard by one another. Participation in a meeting in such manner constitutes a presence in person at such meeting. Every act or decision done or made by a majority of the Managers present at a meeting duly held at which a quorum is present shall be deemed the act or decision of the entire Board of Managers, unless the Act or this Agreement expressly requires a higher percentage approval of the Managers or approval by specified Managers.

6.3.3    <u>Action By Written Consent</u>. Any action required or permitted to be taken at a meeting by the Managers may be taken by the Managers without a meeting, if a majority of the Managers then serving on the Board of Managers consent to or approve the action in question; <u>provided, however</u>, if this Agreement requires that more than a majority of the Managers approve any such action, any such written approval or consent must be signed by the number of Managers so required to approve such action. Any such written consent may be given by e-mail or other electronic means then recognized as valid for such purpose under the Act. Any such action by written consent shall have the same force and effect as if the requisite vote necessary to take such action was given in person at a meeting of the Managers.

6.4    <u>Additional Matters</u>. Each Manager shall be deemed a Covered Person entitled to the indemnification and other rights provided in **Article 10**, and shall be reimbursed by the Company for travel and other expenses reasonably incurred in attending or participating in meetings of the Managers or otherwise fulfilling such Manager's duties as a Manager. The Managers shall not have the right to compensation for their services as members of the Board of Managers unless such compensation is approved by the Board of Managers.

6.5    <u>Committees</u>. The Managers may designate one or more committees for specific purposes, each committee to consist of one or more of the Managers. Such resolution shall specify any power or authority delegated to such committee by the Managers and may designate one or more Managers as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee. Any member of the committee shall be removed at any time such committee member does not have the support of at least a majority of the Managers then serving on the Board of Managers. Any such committee, to the extent expressly provided in the resolution creating such committee but subject in all cases to the provisions of this Agreement, shall have and may exercise all the powers and authority of the Board of Managers in the management of the business and affairs of the Company delegated to such committee. Each committee shall keep regular minutes of its meetings and report the same to the full Board of Managers when required.

15

A/72623224.4

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

OMNI0010275

6.6     Officers.  The Managers may appoint officers at any time.  The officers of the Company shall include a President and Chief Executive Officer, a Chair of the Board of Managers, and such other officers as may be deemed necessary by the Managers from time to time.  Any individual may hold any number of offices.  The officers shall exercise such powers and perform such duties as shall be determined from time to time by the Managers.  Any officer may be removed by the Managers at any time, either with or without cause, subject only to any provisions expressly pertaining to such removal as may be set forth in a written employment agreement.  As of the date of this Agreement the initial officers of the Company, and their respective titles, are as forth on Exhibit C, which exhibit shall be amended by the Managers from time to time to reflect any changes in or additions to such information.

6.7     Voting and Approval Rights.  The Company shall not, and the Managers shall not permit the Company to, without the prior written approval of each Manager:

6.7.1     authorize, issue, sell, or repurchase any Units or other equity securities in the Company, or modify the capital structure of the Company;

6.7.2     admit any Members to the Company (whether as Additional Members, Substitute Members or otherwise);

6.7.3     enter into or consummate (i) a sale of all or substantially all of the assets of the Company in one or a series of related transactions, (ii) a reorganization, merger or consolidation of the Company with or into any other Person, or an acquisition of the Company effected by an exchange of outstanding membership interests of the Company, as a result of which the Members immediately prior to such transaction directly or indirectly own immediately after such transaction less than 50% of the voting power of the Person surviving the transaction, (iii) the winding up, liquidation, or dissolution of the Company, or (iv) any other transaction as a result of which the Company's Members immediately prior to such transaction no longer control the Company following such transaction, whether through voting power, ownership, the ability to nominate or elect Managers, or otherwise;

6.7.4     make or permit any material change in the Company Business;

6.7.5     amend this Agreement; or

6.7.6     commit or agree to undertake any of the foregoing actions.

Notwithstanding anything to the contrary contained herein, the Board of Managers may make such modifications to the terms of the Loans (including without limitation, the amendment to the terms of such Loans, the sale of such Loans, the termination of such Loans, the forgiveness, in whole or in part, of such Loans, the extensions of any repayment due dates on such Loans, the refinancing of such Loans or any other kind of modifications to such Loans) as is determined by the Board of Managers to be desirable, and such modifications need not be approved by each Manager, but may be approved in accordance with Sections 6.3.2 or 6.3.3.

16

AJ7267232A.4

EXHIBIT F - PAGE 157

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER                    OMNI0010276

## ARTICLE 7
## DISTRIBUTIONS

7.1    Distributions Upon Dissolution. **Article 11** shall govern distributions made following the dissolution of the Company.

7.2    Operating Distributions. The timing and amount of all distributions shall be determined by the Managers; provided, however, the Managers shall cause the distributions contemplated by this Section 7.2 to be made subject to the limitations set forth in Section 7.3 below. Subject to **Article 11** (which governs distributions upon a dissolution of the Company), all distributions shall be made in the following order:

7.2.1    First, to the holders of all outstanding Units, in proportion to their respective Percentage Interests, an amount up to the cumulative aggregate Tax Distribution Amounts, less the amount of prior distributions pursuant to this Section 7.2.1;

7.2.2    Thereafter, to the Members in proportion to their respective Percentage Interests at the time the distribution is paid.

7.3    Restrictions on Distributions. The following restrictions on distributions shall apply:

7.3.1    The Company shall not make any distribution to the Members to the extent that at the time of the distribution, after giving effect to the distribution, all liabilities to creditors of the Company, other than liabilities to Members on account of their Interests and any liabilities for which recourse of creditors is limited to specified property of the Company, exceed the Fair Market Value of the assets of the Company.

7.3.2    The Company shall not make any distribution to the Members to the extent such distribution would result in a default under, or a violation of or cause the acceleration of any indebtedness under, any credit or loan agreement with the Company's senior lender(s) or under any material agreement for indebtedness of the Company.

7.4    Tax Distributions.

7.4.1    The Company covenants and agrees that it will use commercially reasonable efforts to not enter into any credit or loan agreement on or after the Issue Date which does not permit the Company to make distributions to its Members of Tax Distribution Amounts.

7.4.2    The Company covenants and agrees that it will use commercially reasonable efforts to make a distribution pursuant to Section 7.2.1 at least once per calendar year.

7.5    Return of Distributions. Members and Assignees who receive distributions made in error or in violation of the Act or this Agreement shall hold such improper distributions in trust for, and promptly return such improper distributions to, the Company. Except for such erroneous or improper distributions, no Member or Assignee shall be obligated to return any distribution to the Company or pay the amount of any distribution for the account of the Company or to any creditor of the Company. The amount of any distribution returned to the

17

A/72623274.4

EXHIBIT F - PAGE 158

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

OMNI0010277

Company by a Member or Assignee or paid by a Member or Assignee for the account of the Company or to a creditor of the Company shall be credited back to the Capital Account(s) from which it was deducted when it was distributed to the Member or Assignee.

7.6    No Other Withdrawals or Distributions.  Except as provided in this **Article 7** or **Article 11**, no withdrawals of Capital Contributions or other distributions to the Members shall be required or permitted hereunder.

7.7    In-Kind Distributions.  If property is distributed in-kind to the Members, the difference between the gross Fair Market Value of such property (as determined by the Managers) and its Gross Asset Value shall be considered gain or loss that is recognized by the Company and such gain or loss shall be allocated to the Members in accordance with the provisions of **Article 8**.

7.8    Withholding on Distributions.  The Managers are authorized to withhold from any payments, distributions, or allocations made to the Members, and to pay over to any federal, state, local or foreign government any amounts required to be so withheld and paid over pursuant to the Code or any provisions of any other federal, state, local or foreign law, and the Managers shall allocate any such amounts to that Member with respect to whom such amount was withheld.  All amounts required to be withheld pursuant to the Code or any provision of any state, local or foreign tax law with respect to any payment, distribution or allocation to the Company or any Member and treated by the Code (whether or not withheld pursuant to the Code) or any such tax law as amounts payable by or in respect of any Member or any Person owning a direct or indirect interest in such Member shall be treated for all purposes as amounts distributed to that Member with respect to whom such amount was withheld.

## ARTICLE 8
## ALLOCATIONS

8.1    Allocation of Profits and Losses.  Subject to the other provision of this **Article 8**, Profits and Losses, and, to the extent necessary, individual items of income, gain, loss or deduction of the Company, for any fiscal year or any other period shall be allocated among the Members so that the Capital Account of each Member, after making such allocation, is, as nearly as possible, equal (or in proportion thereto, if the total amount to be allocated is insufficient) to the distributions that would be made to such Member pursuant to **Article 11** if the Company were dissolved, its affairs wound up, and its assets sold for cash equal to their respective Gross Asset Values, all Company liabilities were satisfied (limited with respect to each nonrecourse liability to the Gross Asset Value of the assets securing such liability), and the net assets of the Company were distributed in accordance with Section 7.2 to the Members immediately after making such allocation.  For purposes of determining Capital Accounts and making allocations under this Section 8.1, (a) Capital Accounts shall first be reduced by any distributions made for the fiscal year, and (b) each Member's Capital Account balance shall be deemed to be increased by such Member's share of "partnership minimum gain" (as that term is defined in Treasury Regulation Section 1.704-2(d)(1)-(4)) and "partner nonrecourse debt minimum gain" (as that term is defined in Treasury Regulation Section 1.704-2(i)).

18

A/72623724.4

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER                    OMNI0010278

8.2    General Rules for Allocations. The rules of this Section 8.2 shall govern all allocations under this Article 8:

8.2.1    Except as otherwise provided in this Agreement, an allocation of Profits or Losses shall be treated as an allocation between the Members of the same share of each item of income, gain, loss and deduction that is taken into account in computing such Profits or Losses, as the case may be. In the event there is no equivalent "book" item, the tax item shall be allocated in proportion to the Members' interests in Profit and Losses pursuant to Section 8.1, as determined by the Managers.

8.2.2    For purposes of determining the Profits or Losses allocable to any period, Profits and Losses shall be determined on a daily, monthly or other basis, as determined by the Managers using any permissible method under § 706 of the Code and the Treasury Regulations promulgated thereunder.

8.2.3    The provisions in this Agreement regarding the maintenance of Capital Accounts and allocations of Profits, Losses and other items of Company income, gain, loss or deduction are intended to effect an allocation of tax items of the Company that are in accordance with the Members' "interests in the partnership" within the meaning of Treasury Regulations Section 1.704-1(b)(3) by utilizing the principles of allocation contained in Treasury Regulation Section 1.704-1(b)(2)(iv) and Treasury Regulation Section 1.704-2 with respect to maintenance of capital accounts and allocations, and shall be interpreted and applied accordingly. For purposes of applying the provisions of this Agreement with respect to Capital Accounts, it shall be assumed that the Company satisfies the requirements of Treasury Regulation Section 1.704-1(b)(2)(ii)(b)(2) and (3). Capital Account balances shall not be used to determine the amount or timing of distributions to the Members pursuant to the Agreement.

8.3    Regulatory Allocations.

8.3.1    Notwithstanding any provision of this Article 8 to the contrary, (a) any "partner nonrecourse deductions" (as defined in Section 1.704-2(i)(1) and (2) of the Treasury Regulations) attributable to "partner nonrecourse debt" (as defined in Section 1.704-2(b)(4) of the Treasury Regulations) shall be allocated to the Members who bear the economic risk of loss for the liability (within the meaning of Treasury Regulation § 1.752-2) in accordance with Section 1.704-2(i)(1) of the Treasury Regulations; (b) if there is a net decrease during any Company taxable year in the "partner nonrecourse debt minimum gain" (as determined under Section 1.704-2(i)(3) of the Treasury Regulations), items of income and gain for such year (and, if necessary, subsequent years) shall be allocated among the Members in the manner provided in Section 1.704-2(i)(4) of the Treasury Regulations; (c) if there is a net decrease during any Company taxable year in the Company's partnership minimum gain (as determined under Section 1.704-2(d) of the Treasury Regulations), items of income and gain shall be allocated among the Members for such year (and, if necessary, subsequent years) in the manner provided in Section 1.704-2(f) of the Treasury Regulations (relating to minimum gain chargebacks); (d) if any Member unexpectedly receives any adjustments, allocations or distributions described in Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6) of the Treasury Regulations, items of income and gain shall be specially allocated to all such Members (in proportion to the amounts of their respective capital account deficits) in an amount and manner sufficient to eliminate any capital account

19

A/72632224.4

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER    OMNI0010279

deficit of such Member (adjusted for the items described in, and in the manner provided under, Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations)(relating to qualified income offsets); (e) all allocations of nonrecourse deductions (as defined in Treasury Regulation Section 1.704-2(b)(1)) for any taxable period shall be allocated to the Members in proportion to the Members' Percentage Interests; (f) if the allocation of Loss to a Member as provided in Section 8.1 hereof would create or increase an Adjusted Capital Account Deficit, there shall be allocated to such Member only that amount of Loss as will not create an Adjusted Capital Account Deficit, and the Loss that would, absent the application of the preceding sentence, otherwise be allocated to such Member shall be allocated to the other Members in accordance with their relative Percentage Interests, subject to the limitations of this provision, and (g) to the extent that an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Treasury Regulation §§ 1.704-1(b)(2)(iv)(m)(2) or 1.704-1(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts as a result of a distribution to a Member in complete liquidation of its Interest in the Company, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis), and such gain or loss shall be specially allocated to the Members in accordance with their Percentage Interests in the Company in the event that Treasury Regulation § 1.704-1(b)(2)(iv)(m)(2) applies, or to the Member to whom such distribution was made in the event that Treasury Regulation § 1.704-1(b)(2)(iv)(m)(4) applies.

8.3.2    The allocations set forth in Section 8.3.1 hereof (the "**Regulatory Allocations**") are intended to comply with certain requirements of Treasury Regulation § 1.704-1(b) and 1.704-2. It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss, or deduction pursuant to this Section 8.3(b). Therefore, notwithstanding any other provision of this Article 8 (other than the Regulatory Allocations), the Managers shall make such offsetting special allocations of Company income, gain, loss, or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not in effect. In exercising its discretion under this Section 8.3.2, the Board of Managers shall take into account future Regulatory Allocations that, although not yet made, are likely to offset other Regulatory Allocations previously made.

8.4    Other Allocation Rules.

8.4.1    Solely for purposes of determining a Member's proportionate share of the "excess non-recourse liabilities" of the Company within the meaning of Treasury Regulations Section 1.752-3(a)(3), the Members' interests in Company profits are equal to their respective Percentage Interests, unless the Managers determine that another allocation more appropriately reflects the Members' interest in the Company, in which case the Managers may reallocate such liabilities accordingly.

8.4.2    If any fees, or other payments by the Company are recharacterized by a final determination of the Internal Revenue Service as nondeductible distributions to any Member, then, notwithstanding all other allocation provisions (other than the Regulatory

20

A/72673224.4

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

OMNI0010280

Allocations pursuant to Section 8.3.1 hereof), gross income shall be allocated to such Member (for the year(s) of adjustment) in an amount equal to the fees or payments recharacterized. If any item of income, cost or expense of the Company is recharacterized by a final determination of the Internal Revenue Service as a tax item directly received or incurred by any Member and not by the Company, the Managers shall take such actions, including modification of the allocations of other items of Company Profit or Loss, as it determines are necessary in order to reflect the intent of this **Article 8**.

8.4.3    If an Interest is transferred in a manner permitted by this Agreement, the Profits and Losses of the Company for the period prior to and subsequent to such transfer shall be calculated using such monthly or other convention as determined in the discretion of the Managers.

8.5    Tax Allocations; Section 704(c) of the Code.

8.5.1    In accordance with § 704(c) of the Code and the Treasury Regulations thereunder, income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall, solely for income tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial Gross Asset Value.

8.5.2    If the Gross Asset Value of any Company asset is adjusted pursuant to Paragraph (b) or (d) of the definition of "Gross Asset Value" contained in **Article 1** hereof, subsequent allocations of income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under § 704(c) of the Code and the Treasury Regulations thereunder.

8.5.3    Any elections or other decisions relating to allocations under this Section 8.5, shall be made by the Tax Matters Partner after attaining the approvals required pursuant to Section 6.8.1(q) hereof, provided, however, that without any such approval, the Tax Matters Partner shall be required to select the traditional method of making allocations under Section 704(c) of the Code in accordance with Treasury Regulation § 1.704-3(b).

8.5.4    The Members are aware of the income tax consequences of the allocations made by this **Article 8** and hereby agree to be bound by the provisions of this **Article 8** in reporting their shares of Company income and loss for income tax purposes. Each Member agrees that it is solely responsible and will timely pay all income and other taxes applicable to the receipt, ownership (including allocations of taxable income) and disposition of its Units.

8.6    Partnership Tax Treatment. The Members expect and intend that the Company shall be treated as a partnership for all federal and state income tax purposes, and the Members agree that they will not:  (a) take a position on any federal, state, local or other tax return, or otherwise assert a position, inconsistent with such expectation and intent; or (b) elect for the Company to be treated as an association for tax purposes or do any other act or thing which

21

A/72623224.4

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER                OMNI0010281

could cause the Company to be treated as other than a partnership for federal income tax purposes.

8.7     Section 754 Election. The Company shall make an election under Section 754 of the Code in its initial Tax Return and shall not thereafter revoke or terminate such election without first obtaining the approval of the Board of Managers.

## ARTICLE 9
## ACCOUNTING AND RECORDS

9.1     Financial and Tax Reporting. The Company shall prepare its financial statements in accordance with GAAP, and shall prepare its income tax information returns using such methods of accounting and tax year as the Managers deem necessary or appropriate under the Code and Treasury Regulations.

9.2     Books and Records. The books and records of the Company shall be maintained in a fashion that facilitates income tax reporting and Capital Account maintenance. The books and records of the Company shall reflect all the Company's material transactions and shall be appropriate and adequate for the Company's business. The Company shall maintain all of the following at its principal office:

9.2.1     A current list of the full name and last known business or residence address of each Member and Assignee, together with the Capital Contributions, Capital Account and type and amount of Units held by each Member and Assignee;

9.2.2     A current list of the full name and business or residence address of each Manager;

9.2.3     Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six (6) most recent taxable years;

9.2.4     A copy of the Articles and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which the Articles or any amendments thereto have been executed;

9.2.5     A copy of this Agreement and any and all amendments hereto together with executed copies of any powers of attorney pursuant to which this Agreement or any amendments thereto have been executed;

9.2.6     Copies of the financial statements of the Company, if any, for the six (6) most recent fiscal years; and

9.2.7     The books and records of the Company as they related to the internal affairs of the Company for at least the then-current and last four preceding fiscal years.

9.3     Delivery to Members and Inspection. Upon the request of any Member (and solely to the extent required by the Act, any Assignee), for any proper purpose reasonably related

22

A/72623224.4

EXHIBIT F - PAGE 163

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER          OMNI0010282

to the interest of that Person as a Member (or Assignee), the Managers shall provide the requesting Member (or Assignee), during the Company's regular business hours and at the sole expense of such Member (or Assignee), access to the information required to be maintained pursuant to Section 9.2. Any such Member (or Assignee) provided such access shall keep and maintain all such information in strict confidence, and the Company may condition access to any confidential or proprietary information on the requesting Member (or Assignee) first executing and delivering a confidentiality and non-disclosure agreement with customary scope and substance.

9.4     Reliance on Books and Records.  Any Member (or Assignee legally entitled to access thereto) shall be fully protected in relying in good faith upon the records and books of account of the Company and upon such information, opinions, reports or statements presented to the Company by any of its other Members or employees, or by any other Person, as to matters the Member reasonably believes are within such other Person's professional or expert competence and, if applicable, who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, Profits or Losses of the Company or any other facts pertinent to the existence and amount of assets from which distributions to the Members (and any Assignees) might properly be paid.

9.5     Tax Matters Partner.  The Members hereby designate the Person named on Exhibit D as the tax matters partner (the "Tax Matters Partner") pursuant to Section 6231(a)(7) of the Code. The Tax Matters Partner shall have the right to direct the Company to make any other election for federal and state income Tax purposes as it determines appropriate.

## ARTICLE 10
## LIABILITY, EXCULPATION AND INDEMNIFICATION; COMPETING ACTIVITIES

10.1     Liability.  Except as otherwise provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Covered Person shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Covered Person.

10.2     Exculpation.  No Covered Person shall be liable to the Company or any other Covered Person for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company or its subsidiaries. A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any Person as to matters the Covered Person reasonably believes are within such other Person's professional or expert competence, if applicable, and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, Profits, Losses or any other facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid.

23

AJ7262322A.4

EXHIBIT F - PAGE 164

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER          OMNI0010283

10.3    Duties and Liabilities of Covered Persons.  To the extent that, at law or in equity, a Covered Person has duties and liabilities relating thereto to the Company or to any other Person, a Covered Person acting under this Agreement shall not be liable to the Company or to any other Person for its good faith reliance on the provisions of this Agreement.  The provisions of this Agreement, to the extent that they restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the parties hereto to replace such other duties and liabilities of such Covered Person; provided, however, that the foregoing provisions are not intended to eliminate or limit the fiduciary duties of loyalty, care or candor that otherwise might be owed by the Managers to the Members.

10.4    Indemnification.  To the fullest extent permitted by applicable law, a Covered Person shall be entitled to indemnification from the Company for any loss, damage or claim incurred by such Covered Person by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company or its subsidiaries; provided, however, that any indemnity under this Section 10.4 shall be provided out of and to the extent of Company assets only, and no Covered Person shall have any personal liability on account thereof.

10.5    Expenses.  To the fullest extent permitted by applicable law, expenses (including legal fees) incurred by a Covered Person in defending any claim, demand, action, suit or proceeding shall be advanced to or on behalf of the Covered Person by the Company from time to time, prior to the final disposition of such claim, demand, action, suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Covered Person to repay such amount, if it shall be ultimately determined that the Covered Person is not entitled to be indemnified as authorized in this **Article 10**.

10.6    Insurance.  The Company may (but is not obligated to) purchase and maintain insurance, to the extent and in such amounts as the Managers from time to time may deem reasonable, on behalf of Covered Persons and such other Persons as the Managers shall determine, against any liability that may be asserted against or expenses that may be incurred by any such Person in connection with the activities of the Company or its subsidiaries or such indemnities, regardless of whether the Company would have the power or obligation to indemnify such Person against such liability under the provisions of this Agreement.  The Managers and the Company may enter into indemnity contracts with Covered Persons and adopt written procedures pursuant to which arrangements are made for the advancement of expenses and the funding of obligations under Section 10.5 and containing such other procedures regarding indemnification as are appropriate.

10.7    Confidential Information.

10.7.1    Confidential Information.  Each Member and Manager acknowledges and agrees that the information, observations, trade secrets and data concerning the business and affairs of the Company obtained by the Members and Managers by reason of such Person's status as Member or Manager ("**Confidential Information**") are the property of the Company.  Therefore, each Member and Manager hereby agrees not to disclose to any unauthorized person or use for such Member's or Manager's personal benefit any Confidential Information without the prior written consent of the Managers (or, in the case of a Manager, unless the use or disclosure of such information is appropriate or necessary to perform the responsibilities of such

24

A/72623224.4

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Manager hereunder or as from time to time authorized by the Board of Managers), unless and to the extent that such Confidential Information (a) becomes generally known to and available for use by the public other than as a result of a wrongful disclosure by any Person who, to the knowledge of the Member considering disclosure, has an obligation or duty to the Company not to disclose such Confidential Information or (b) must be disclosed under a subpoena or other governmental order (but then, only after the Company is given notice of such subpoena or order and the opportunity to seek to challenge or limit such compelled disclosure or obtain a protective order). This covenant shall survive and continue to be binding upon each Member and Manager, notwithstanding the termination of such Person's status as a Member or Manager or any transfer or purported transfer of all or a portion of such Person's Units, Interest or Economic Interest.

    10.7.2   Return of Confidential Information.  Any Member or Manager whose Interest or status as a Member or Manager, as the case may be, is terminated shall at such time deliver to the Company all memoranda, notes, plans, records, reports (including, without limitation, all business plans, financial projections and financial models), computer tapes and discs and software and other documents and data relating to Confidential Information which such Member has in its, his, or her possession or under such Member's or Manager's control.

    10.7.3   No Limitation on Rights to Confidential Information.  Notwithstanding any other provision of this Agreement, nothing herein shall in any way limit the Company's rights with respect to the limitations on disclosure, use and return of Confidential Information as may be set forth in any employment, consulting or similar agreement with any Member or Manager.

## ARTICLE 11
## DISSOLUTION AND TERMINATION

    11.1   Termination.  The Company shall be dissolved, its property disposed of and its affairs wound up upon the first to occur of the following:

        (a)   the date such dissolution is approved by the requisite Managers pursuant to Section 6.7;

        (b)   the entry of a decree of judicial dissolution under the Act; or

        (c)   the date 60 days after the Company is not treated as a partnership for United States federal income tax purposes, provided, that the Managers and the Company have used all commercially reasonable efforts to restore its partnership tax status in such 60 day period, except that no dissolution shall occur pursuant to this clause if treatment of the Company other than as a partnership for federal income tax purposes occurs as a result of a voluntary election by the Tax Matters Partner of such other tax treatment.

    11.2   Authority to Wind Up.  The Managers shall have all necessary right, power and authority required to marshal the assets of the Company, to pay the Company's creditors, to establish reasonable reserves for contingent liabilities of the Company, to distribute assets and otherwise wind up the business and affairs of the Company.  The Managers shall have the authority to continue to conduct the business and affairs of the Company insofar as such

25

AJ72623224.4

EXHIBIT F - PAGE 166

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER          OMNI0010285

continued operation remains consistent, in the judgment of the Managers, with the orderly winding up of the Company.

11.3   Winding Up; Certificate of Dissolution.   The winding up of the Company shall be completed when all debts, liabilities and obligations of the Company have been fully paid and discharged or reasonably adequate provision has been made therefor, and all of the remaining property and assets of the Company have been distributed to the Members. Promptly upon the completion of winding up of the Company, the Managers shall cause a Certificate of Dissolution, a Certificate of Cancellation, or both of them, to be filed with the California Secretary of State as provided in the Act.

11.4   Distribution of Property.   Upon the dissolution of the Company, the affairs of the Company shall be wound up and the assets of the Company shall be liquidated and applied to pay the Company's creditors in the order of priority provided in the Act. Any remaining property and assets of the Company shall be distributed to the Members in accordance with **Article 7**.

11.5   Capital Account Deficit.   Any Member with an Adjusted Capital Account Deficit shall not be required to contribute such deficit amount to the Company upon the liquidation thereof.

## ARTICLE 12
## TRANSFER RIGHTS AND RESTRICTIONS

12.1   General.   Each Member may transfer all or a portion of its interests in the Company, subject only to compliance with the provisions of this **Article 12**.

12.2   Requirements for Transfer.   No transfer will be permitted at any time (regardless of whether the Managers approve such transfer) if it would, or would be likely to, in the reasonable judgment of at least 80% of the then-authorized number of Managers:

12.2.1   result in violation of the Securities Act, any applicable state law or the applicable securities laws of any other jurisdiction;

12.2.2   result in a violation of any law, rule, or regulation applicable to the proposed transferee, any Member, any Manager, or the Company; or

12.2.3   cause the Company to be deemed a "publicly traded partnership" as such term is defined in Section 7704(b) of the Code.

12.3   Transferee as Assignee.   Each purported transferee of Units or Interests hereunder shall receive only the transferor's Economic Interest in the Company, and the purported transferee shall have the status of an Assignee only, and shall not be admitted as a Member or have any rights of a Member, unless such purported transferee is subsequently admitted as a Substitute Member in accordance with Section 4.3.2.

26

A/72623224.4

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER          OMNI0010286

12.4    Void Transfers.  Any voluntary or involuntary transfer in violation of this **Article 12** shall be null and void ab initio, and shall not operate to transfer any Units or any portion of any Interest or Economic Interest in the Company to the purported transferee.

### ARTICLE 13
### MISCELLANEOUS

13.1    Amendments.  Any amendment to this Agreement shall be adopted and be effective as an amendment hereto only if approved unanimously by all of the Managers then serving on the Board of Managers; provided, however, that (a) any amendment that would adversely affect the rights hereunder of any Member, in its capacity as a Member, without similarly affecting the rights hereunder of all similarly situated Members who hold the same class of Units, shall not be effective without such Member's prior written consent (it being understood, however, that nothing in this clause (a) shall confer a right upon any Member to approve an amendment to any provision of this Agreement that provides a specific right to a specified Member (such as a voting right or the right to nominate a Manager), whether or not such Member holds the same class of Units) and (b) no amendment shall be made, and any such purported amendment shall be null and void ab initio void, to the extent the result thereof would be to cause the Company to be treated as anything other than a partnership for purposes of United States income taxation.

13.2    Successors and Assigns.  The provisions of this Agreement shall inure to the benefit of, and shall be binding upon, (a) the Members and their respective successors and permitted assigns and (b) the Company's successors and assigns.

13.3    Governing Law and Severability.  This Agreement shall, in all respects, be construed in accordance with and governed by the laws of the State of California without giving effect to its conflicts or choice of law principles.  If any provision of this Agreement becomes or is deemed invalid, illegal or unenforceable in any jurisdiction by reason of the scope, extent or duration of its coverage, then such provision shall be deemed amended to the extent necessary to conform to applicable law so as to be valid and enforceable or, if such provision cannot be so amended without materially altering the intention of the parties, then such provision shall be stricken and the remainder of this Agreement shall continue in full force and effect.  Should there ever occur any conflict between any provision contained in this Agreement and any present or future statute, law, ordinance or regulation contrary to which the parties have no legal right to contract, the latter shall prevail, but the provision of this Agreement affected thereby shall be curtailed and limited only to the extent necessary to bring it into compliance with the law.  All the other terms and provisions of this Agreement shall continue in full force and effect without impairment or limitation.

13.4    Counterparts; Facsimiles.  This Agreement may be executed by PDF or facsimile signature and in two or more counterparts, each of which shall be deemed an original, but all of which when taken together shall constitute one and the same instrument.  PDF or facsimile signatures shall, for all purposes, be treated as originals.

27

A/72623224.4



EXHIBIT F - PAGE 168

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER                    OMNI0010287

13.5   Notices.  All notices provided for in this Agreement shall be in writing, duly signed by the party giving such notice, and shall be delivered, sent by facsimile or mailed by registered or certified mail as follows:

| If to the Company: | OMNI 808 Investors LLC |
| | 9420 Wilshire Blvd., |
| | Suite 400 |
| | Beverly Hills, CA  90212 |
| | Fax:  (310) 300-4101 |
| | Attention:  Chief Executive Officer |

If to any Member:    at the address set forth below such Member's name on the signature pages to this Agreement or at such other address as such Member may have notified the Company and the other Members from time to time.

All notices and communications shall be deemed to have been received unless otherwise set forth herein:  (a) in the case of personal delivery, on the date of such delivery; (b) in the case of facsimile transmission, on the date on which the sender receives confirmation facsimile transmission that such notice was received by the addressee, provided that a copy of such transmission is additionally sent by mail as set forth in (d) below within one business day of the facsimile transmission; (c) in the case of overnight air courier, on the second Business Day following the day sent, with receipt confirmed by the courier; and (d) in the case of mailing by first class certified or registered mail, postage prepaid, return receipt requested, on the fifth Business Day following such mailing.  Each party may, by written notice to the Company and the other Members, change their address for purposes of notices.

13.6   Entire Agreement.  This Agreement (including any exhibits or schedules attached hereto) and the documents referred to herein constitute the entire agreement and understanding of the parties with respect to the terms and conditions of the transactions referred to herein and therein and supersede all prior or contemporaneous oral or written agreements and understandings between the parties relating to such subject matter.

13.7   Interpretation.  Throughout this Agreement, nouns, pronouns and verbs shall be construed as masculine, feminine, neuter, singular or plural, whichever shall be applicable.  All references herein to "Articles," "Sections" and "Paragraphs" shall refer to corresponding provisions of this Agreement.  Whenever the words "including," "includes" or words of similar import appear in this Agreement, they shall be deemed to be followed by the words "without limitation."

13.8   Dispute Resolution.  All claims, controversies or disputes arising under or in connection with this Agreement, whether sounding in contract or tort, including arbitrability and any claim that this Agreement was induced by fraud ("Covered Claims") shall be resolved by binding arbitration in Los Angeles, California in accordance with the following terms and conditions:

28

A/72623724.4

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER                OMNI0010288

13.8.1   Administrator. The arbitration of all Covered Claims will be administered by the Los Angeles offices of JAMS (the "**Arbitration Administrator**").

13.8.2   Procedural Law. Except as otherwise provided herein, the arbitration of all Covered Claims will be governed by California procedural law (including the Code of Civil Procedure, Civil Code, Evidence Code and Rules of court (excluding local rules) as if the Covered Claims had been brought in a Superior Court of the State of California; provided, however, that (i) the parties waive any right to jury; (ii) there shall be no interlocutory appellate relief (such as writs) available; and (iii) discovery will be limited to matters which are directly relevant to the issues in the arbitration.

13.8.3   Arbitrator. The arbitration shall be conducted by a single, neutral arbitrator ("**Arbitrator**"), who shall be a retired judge in the Los Angeles office of the Judicial Arbitration and Mediation Service ("**JAMS**"), to be selected as follows: Within seven (7) Business Days from service of an arbitration complaint, the parties will either agree upon an Arbitrator or, failing such agreement, shall exchange lists containing the names of five (5) candidates proposed by each party to serve in such capacity. No later than the third Business Day thereafter, the parties will serve each other with a Combined List (*i.e.*, the Parties' ten (10) proposed candidates) ranking each candidate in order of preference (one (1) being the most preferred and ten (10) being the least preferred). If any proposed candidate shall be common to both lists, that person shall serve as the Arbitrator (with the person whose last name comes first alphabetically being chosen in case more than one person is common to both lists). Otherwise the candidate with the lowest aggregate ranking shall serve as the Arbitrator (with the person whose last name comes first alphabetically being chosen in case of a tie). If any person selected in accordance with the procedures provided in this Section is unable or unwilling to act as the Arbitrator, the person whose ranking is next lowest shall be approached until an Arbitrator is selected. If none of the candidates on the Combined List is capable or willing to serve as the Arbitrator, the parties may either agree to repeat the process until an Arbitrator is selected or, at the election of either party, proceed in accordance with the then prevailing rules of the Arbitration Administrator regarding arbitrator selection. If, at any time following the selection of an Arbitrator, the Arbitrator is unable or unwilling to continue serving, the candidate on the Combined List with the next lowest ranking shall be approached until a replacement Arbitrator is selected in accordance with the procedure set forth in this Section.

13.8.4   Emergency Relief. Applications for emergency relief made prior to the appointment of the Arbitrator shall be made in accordance with the Arbitration Administrator's Optional Rules for Emergency Measures of Protection.

13.8.5   Excluded Claims. "Covered Claims" as used in this Agreement does not include compulsory or permissive cross-claims between or among the parties that arise in a legal action brought by or against a non-signatory hereto ("**Non-Signatory Action**"). However, a party that has the right to assert a permissive cross-claim against another party in a Non-Signatory Action may choose to treat that claim as a Covered Claim and assert it in accordance with the terms of this Agreement.

29

A/72623224.4

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

OMNI0010289

13.8.6   No Class Action. The parties shall not pursue any claims arising under or relating to this Agreement on a class or other representative basis and will not seek to coordinate or consolidate any arbitration hereunder with any other proceeding

13.8.7   Record and Proceedings. A full stenographic or electronic record of all proceedings in the arbitration shall be maintained, and the Arbitrator shall issue rulings, a statement of decisions and a judgment as if the Arbitrator were a sitting Judge of the Superior Court of the State of California, with all of the powers (including with respect to remedies) vested in such a judge.

13.8.8   Appeal. To appeal the judgment of an Arbitrator, a party must follow all of the prerequisites for appealing a judgment of the Superior Court, directing all such prerequisites to the Arbitration Administrator in lieu of the clerk.

(a)   All appeals will be made to three (3) neutral arbitrators ("**Appellate Arbitrators**"), each of whom shall be a retired judge in the office of JAMS; *provided, however*, that within seven (7) days of service of the Arbitrator's judgment, the parties shall seek to agree upon the Appellate Arbitrators and, failing such agreement, shall exchange new lists of proposed arbitrators (which may but need not contain any of the names on the Combined List).

(b)   The Appellate Arbitrators will conduct a hearing, review the judgment of the Arbitrator, and issue an appellate decision applying the same standards of review (and all of the same presumptions) as if the Appellate Arbitrators were judges of the Court of Appeal reviewing a judgment of the Superior Court. The Appellate Arbitrators will be vested with the same powers as a Court of Appeal (including the power to remand a matter to an Arbitrator).

(c)   The Appellate Arbitrators' decision will be final and binding (unless remanded to the Arbitrator) as to all matters of substance and procedure.

13.8.9   *Res Judicata,* Collateral Estoppel and Law of the Case. A decision of the Arbitrator and Appellate Arbitrators shall have the same force and effect with respect to collateral estoppel, *res judicata* and law of the case that such decision would have been entitled to if decided in a court of law, but in no event shall such a decision be used by or against a party to this Agreement in a Non-Signatory Action.

13.8.10   Jurisdiction/Venue/Enforcement of Award. The parties consent and submit to the exclusive personal jurisdiction and venue of the Superior Court and the Federal District Court, located in County of Los Angeles, State of California, to compel arbitration of Covered Claims in accordance with this Agreement, to enforce any arbitration award granted pursuant to this Agreement, including, any award granting equitable or injunctive relief, and to otherwise enforce this Agreement and carry out the intentions of the parties to resolve all Covered Claims through arbitration.

13.8.11   Confidentiality. All arbitration proceedings, including, but not limited to any appellate proceedings, will be closed to the public and confidential, and all records relating

30

A/72623224.4

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

OMNI0010290

thereto will be permanently sealed, except as necessary to obtain court confirmation of the judgment of the Arbitrator or the decision of the Appellate Arbitrators, as applicable, and except as necessary to give effect to *res judicata* and collateral estoppel (*e.g.*, in a dispute between the parties that is not a Covered Claim), in which case all filings with any court shall be sealed to the extent permissible by the court. A party (including such party's counsel or other representatives) may disclose to the media only the fact and generic nature of a Covered Claim that is being, or has been, arbitrated pursuant to this Agreement. Nothing in this Section 13.8 is intended to, or shall, preclude a party from communicating with, or making disclosures to, its lawyers, tax advisors, auditors and insurers, as necessary and appropriate or from making such other disclosures as may be required by law.

       13.8.12  Fees and Costs. The Arbitrator and Appellate Arbitrators shall be authorized to and shall permit the prevailing party in any claim or action resolved pursuant to this Article 11 to recover, in addition to any other damages or compensation awarded by the Arbitrator or Appellate Arbitrators, such prevailing party's reasonable costs and expenses of such claim or action, including reasonable attorneys fees and the amount such prevailing party may have paid or be obligated to pay with respect to the fees of the Arbitrator and Appellate Arbitrators and the administrative costs of the arbitration.

       13.8.13  Attorneys' Fees. If any party brings an action before an arbitrator or court of competent jurisdiction to resolve any dispute, claim or controversy arising out of this Agreement or otherwise for the enforcement of this Agreement, the prevailing party shall be entitled, in addition to any other damages or compensation awarded to such prevailing party in such action, to recover its reasonable costs and expenses of such claim or action, including reasonable attorneys fees and the amount such prevailing party may have paid or be obligated to pay with respect to the fees of arbitration and the administrative or court costs associated therewith.

       *[Remainder of Page Intentionally Left Blank — Signature Pages Follow]*

AJ72623224.4

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER      OMNI0010291

IN WITNESS WHEREOF, this Limited Liability Company Agreement has been duly executed by the parties hereto as of the date first written above.

**NEIL KADISHA**

*Neil Kadisha*

Address:        9420 Wilshire Blvd, Suite 400
                Beverly Hills, CA 90212

                Attention:   Neil Kadisha
                Facsimile:   310-300-4131
                E-mail:      neil@omninet.com


**Moinian Development Group, LLC, a New York LLC**

By: _____
        Name:  Joseph Moinian
        Title:   Manager

Address:        530 Fifth Avenue, 18th Floor
                New York, NY 10036

                Attention:  Joseph Moinian
                Facsimile:  212-808-4118
                E-mail:     joseph@moiniangroup.com


**GOLD LEAF INVESTMENTS, LP, a California LP**
By: Union Communications I, LLC, a Delaware LLC
    Its, General Partner

By: _____
        Name:  Benjamin Nazarian
        Title:   Member

Address:        9420 Wilshire Blvd, Suite 400
                Beverly Hills, CA 90212

                Attention:   Benjamin Nazarian
                Facsimile:   310-300-4101
                E-mail:      ben@omninet.com


Signature Page to LLC Agreement of OMNI 808 Investors LLC

AJ72623224.4

EXHIBIT F - PAGE 173

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

OMNI0010292

IN WITNESS WHEREOF, this Limited Liability Company Agreement has been duly executed by the parties hereto as of the date first written above.

NEIL KADISHA

_____

Address:      9420 Wilshire Blvd, Suite 400
Beverly Hills, CA 90212

           Attention:   Neil Kadisha
           Facsimile:   310-300-4131
           E-mail:     neil@omninet.com

Moinian Development Group, LLC, a New York LLC

By:_____
     Name:  Joseph Moinian
     Title:   Managing Member

Address:      530 Fifth Avenue, 18th Floor
New York, NY 10036

           Attention: Joseph Moinian
           Facsimile: 212-808-4118
           E-mail:   joseph@moiniangroup.com

GOLD LEAF INVESTMENTS, LP, a California LP
By: Union Communications I, LLC, a Delaware LLC
    Its, General Partner

By:_____
     Name:  Benjamin Nazarian
     Title:   Member

Address:      9420 Wilshire Blvd, Suite 400
Beverly Hills, CA 90212

           Attention:   Benjamin Nazarian
           Facsimile:   310-300-4101
           E-mail:     ben@omninet.com

Signature Page to LLC Agreement of OMNI 808 Investors LLC

A/72623224.4

EXHIBIT F - PAGE 174

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

OMNI0010293

VISION CAPITAL, LLC

By: _Leon Neman_
    Name: LEON NEMAN
    Title: MANAGER.

Address:

        Attention:
        Facsimile:
        E-mail:

### DAVID & ANGELLA NAZARIAN FAMILY TRUST

By:_____
    Name:
    Title:

Address:

        Attention:
        Facsimile:
        E-mail:

### ELAHE PEZESHKIFAR, TRUSTEE OF THE ARSALAN GOZINI CHARITABLE LEAD ANNUITY TRUST, UNDER TRUST AGREEMENT DATED OCTOBER 14, 2004

By:_____
    Name:
    Title:

Address:

        Attention:
        Facsimile:

        E-mail:

Signature Page to LLC Agreement of OMNI 808 INVESTORS LLC

DRAFT

A/72623224.4

EXHIBIT F - PAGE 175

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

OMNI0010294

**VISION CAPITAL, LLC**

By:_____
       Name:
       Title:

Address:

       Attention:
       Facsimile:
       E-mail:

**DAVID & ANGELLA NAZARIAN FAMILY TRUST**

By:_____
       Name:       *David Nazarian*
       Title:       *Trustee*

Address:  *1801 Century Peak West, 5th Floor*
          *Los Angeles, CA 90067*

       Attention:
       Facsimile:
       E-mail:

**ELAHE PEZESHKIFAR, TRUSTEE OF THE ARSALAN GOZINI CHARITABLE LEAD ANNUITY TRUST, UNDER TRUST AGREEMENT DATED OCTOBER 14, 2004**

By:_____
       Name:
       Title:

Address:

       Attention:
       Facsimile:

       E-mail:

**Signature Page to LLC Agreement of OMNI 808 INVESTORS LLC**

A/72623224.4                                      DRAFT

EXHIBIT F - PAGE 176

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER       OMNI0010295

**VISION CAPITAL, LLC**

By:_____
    Name:
    Title:

Address:

            Attention:
            Facsimile:
            E-mail:


**DAVID & ANGELLA NAZARIAN FAMILY TRUST**

By:_____
    Name:
    Title:

Address:

            Attention:
            Facsimile:
            E-mail:


**ELAHE PEZESHKIFAR, TRUSTEE OF THE ARSALAN GOZINI CHARITABLE LEAD ANNUITY TRUST, UNDER TRUST AGREEMENT DATED OCTOBER 14, 2004**

By:_____
    Name:  **ELAHE PEZESHKIFAR**
    Title:  Trustee

Address:  11111 Santa Monica Blvd., Suite 600
          Los Angeles, CA 90025

          Attention:  Arsalan "Steve" Gozini
          Facsimile:  310.820.8070

          E-mail:  steve.gozini@bhproperties.us


Signature Page to LLC Agreement of OMNI 808 INVESTORS LLC

A/72623224.4                                           DRAFT

EXHIBIT F - PAGE 177

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER                OMNI0010296

**Exhibit A**

**Members and Unit Ownership**

| Member Name | Number of Units held by such Member | Initial Capital Contribution by such Member |
|---|---|---|
| Neil Kadisha | 200 | $10,000,000 |
| Gold Leaf Investments, LP | 200 | $10,000,000 |
| Moinian Development Group, LLC | 200 | $10,000,000 |
| Vision Capital, LLC | 200 | $10,000,000 |
| David & Angella Nazarian Family Trust | 100 | $5,000,000 |
| Elahe Pezeshkifar, Trustee of the Arsalan Gozini Charitable Lead Annuity Trust, Under trust agreement dated October 14, 2004 | 100 | $5,000,000 |
| Total: | **1,000** | **$50,000,000** |

A/72623224.4

EXHIBIT F - PAGE 178

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

OMNI0010297

**Exhibit B**

**Initial Managers**

| Nominating Member | Manager |
| --- | --- |
| Neil Kadisha | Neil Kadisha |
| Moinian Development Group, LLC | Joseph Moinian |
| Elahe Pezeshkifar, Trustee of the Arsalan Gozini Charitable Lead Annuity Trust, Under trust agreement dated October 14, 2004 | Arsalan Gozini |
| Vision Capital, LLC | Leon Neman |
| David & Angella Nazarian Family Trust | David Nazarian |
| Gold Leaf Investments, LP | Benjamin Nazarian |

AJ72623224.4

EXHIBIT F - PAGE 179

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER                OMNI0010298

## Exhibit C

### Initial Officers

| Name | Office |
|------|--------|
| Neil Kadisha | President and Chief Executive Officer |
| Joseph Moinian | Chairman of Board of Managers |

A/72623224.4

EXHIBIT F - PAGE 180

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

OMNI0010299

**Exhibit D**

**Tax Matters Partner**

Neil Kadisha

A/72623224.4

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

OMNI0010300