# EXHIBIT G

Kadisha, Neil 8/28/2009 9:40:00 AM

```
 1         UNITED STATES DISTRICT COURT
 2         CENTRAL DISTRICT OF CALIFORNIA
 3              EASTERN DIVISION
 4
 5   CARTER BRYANT, an        )
     individual,              )
 6                            )
             Plaintiff,       )
 7                            )
        vs.                   ) Case No.
 8                            ) CV 04-9049 SGL (RNBX)
     MATTEL, INC., A DELAWARE )
 9   corporation,             )
                              )
10           Defendant.       )
                              )
11   _____)
                              )
12   AND CONSOLIDATED ACTIONS.)
     _____)
13
14
15
16
17
18
19      Video deposition of NEIL KADISHA,
20   taken on behalf of Mattel, Inc., at
21   865 South Figueroa Street, Tenth Floor,
22   Los Angeles, California, commencing at
23   9:40 a.m., Friday, August 28, 2009,
24   before J'ana Siegers, CSR Number 10845.
25
```

Kadisha, Neil 8/28/2009 9:40:00 AM

1 believe it was possible to do it.

2 So another condition that I told to my

3 investors, and I had in mind, is that because it was

4 going to be a quick deal, one of the conditions for

5 me to go ahead was if the deal was going to be made

6 somewhere around $100 million. I would ask Isaac

7 Larian to lend or cause somebody else to lend

8 $60 million to the entity so that would allow us to

9 have enough leverage and make our deal more

10 interesting.

11 And by the way, I discussed this with

12 Wachovia very early on because they also didn't want

13 to deal with Mr. Larian on this transaction. I told

14 them that I will not be buying this unless Mr. Larian

15 had something at risk because I don't have enough

16 time to do as much as I want due diligence. I can do

17 to certain level due diligence, but I have to rely on

18 his integrity and also the fact that he has something

19 more to lose if things go down with MGA. So in a

20 way, as a lender to Omni 808, I ensured that if MGA

21 was going to go down and the numbers were not correct

22 that we were getting, Mr. Larian had another

23 $60 million as a lender to Omni 808 at risk.

24 So more or less this was my idea about

25 the concept of this deal. And every one of the

Kadisha, Neil 8/28/2009 9:40:00 AM

1  of this investment, unless he is willing to cause
2  either himself or other people or by his guarantee
3  maybe a bank provide $60 million into this deal, this
4  is not a deal that I would be interested to pursue,
5  and earlier on this morning I explained what was my
6  reasoning behind it.
7      So Mr. Larian knew, and I made it clear
8  and my position did not change, if the deal was going
9  to be $150 million, then I would not have been buying
10  it. I had a very specific goal here. I did my own
11  evaluation. I tried to buy it at 90 million. We
12  ended up at 109. And this was my parameter: If it
13  went over 110, I would not have purchased it, and I
14  don't think it was realistic to think that Wachovia
15  and group would be selling it at less than 90. So
16  that was my target price, and we came obviously very
17  close to what I had in mind.
18      Out of that 100 and -- approximately
19  $100 million, I knew that I do not want to put more
20  than $50 million. Whether I invested all of it
21  myself or my friends invested with me, I did not want
22  to be investing more than $50 million. And I had to
23  look to 50 or $60 million loan, and if Mr. Larian was
24  not willing to commit to that, then maybe I would not
25  have been interested.

Kadisha, Neil 8/28/2009 9:40:00 AM

1    So this was more or less the condition.

2    I never thought of him as being my partner in buying

3    this. He was supposed to provide the leverage so

4    that our $50 million has a potential of higher income

5    because of the risk involved.

6    I mean, everybody makes a different

7    decision on business, and I make my decision based on

8    my gut feeling. And with my gut feeling, I was not

9    prepared to put more than $50 million at that stage

10   in the capital of the company, although whether it's

11   today or after that, it is possible that under

12   certain circumstances, we will increase our capital.

13   Q.   And so if I understand you correctly,

14   then, as of the time when you were going into this

15   deal, you expected that Mr. Larian, either himself or

16   through others, would basically be providing any

17   financing that was in excess of this $50 million that

18   you saw as sort of the cap at that time, that you

19   would --

20   A.   Specifically --

21   Q.   -- you or your friends would contribute?

22   A.   Specifically I have always mentioned to

23   him 60 million, and that's where we ended up. I

24   thought that it would be 60 million.

25   Q.   Then maybe just to go back here for a

EXHIBIT G - PAGE 185

Kadisha, Neil 8/28/2009 9:40:00 AM

1    make a deal this fast and with this amount, there has

2    to be this leverage which I'm relying on him and I

3    hope they don't have a problem, and also I explained

4    what I explained to you.

5        I said, "To be honest, there are so many

6    moving targets here, including the lawsuit, including

7    the Bratz, including what's happening in the company,

8    that nobody knows about it more than Mr. Larian. And

9    for me to take your place and not have Mr. Larian

10   have any exposure would be risky. I will reduce my

11   risk if Mr. Larian is, in a way, putting some money

12   as a loan here and has some skin at risk. This way,

13   I feel more comfortable that at least he believes in

14   the future of the company and as much as he runs for

15   his own company, he has $60 million more reason to

16   run and do whatever he has to do."

17   Q.   When you had mentioned earlier that, in

18   terms of your intentions, how it changed with respect

19   to Mr. Larian between the initial offer letter where

20   we talked about this potential of a preferred equity

21   position and then ultimately it changing, was there

22   some conversations or information that you had

23   received from anybody with respect to the potential

24   negative consequences of Mr. Larian having some kind

25   of equity interest in the debt acquisition?

EXHIBIT G - PAGE 186

Page 171

Kadisha, Neil 8/28/2009 9:40:00 AM

```
 1    I will come to conclusion that there is no hope, we
 2    will take a step forward to get our money based on
 3    the agreement and legal rights that we have.
 4        Q.   During that first phone conversation that
 5    you had with Isaac Larian that you described earlier
 6    in which you and he talked about the Wachovia debt,
 7    did Mr. Larian say at that time that MGA was already
 8    deemed to be in default of the loans by Wachovia?
 9        A.   I believe he did tell me that Wachovia is
10    unreasonable in the way they are handling this loan
11    and they are nitpicking and they are basically
12    calling technical default, whereas their loan has
13    been paid and the company is not really in actual
14    default of not paying what they have to pay to
15    Wachovia. I think he was defensive about it and he
16    thought he's right and the bank is wrong.
17        Q.   Speaking of today, is it true that, in
18    your view, the approximately $300 million in debt is
19    owned entirely by Omni 808?
20        A.   Of course.
21        Q.   There is a --
22        A.   Of course when I say "of course" -- I
23    mean you are asking if all the debt is owned by
24    Omni 808. The answer is yes.
25        Q.   And has any of that debt been transferred
```

Kadisha, Neil  8/28/2009  9:40:00 AM

```
1    interest on these loans is due and owing from MGA?
2       A.   No.  They have been paying some interest.
3    Obviously the principal, they owe us.  300-some
4    million dollars they owe us the principal.  And the
5    interest, the months that we have waived not to get
6    paid are owed to us.  They are added to the amount of
7    principal, and they earn interest.
8            And the only thing that we have not added
9    to the principal is the legal fees which they have to
10   be current on it, and they are right now behind.
11   And, in fact, I think as of yesterday I asked one of
12   our lawyers to communicate and say, you know, they
13   really are playing with our patience, so we're going
14   to play it a little tough with them to get our money.
15      Q.   Forgive me, but I thought I understood
16   when I -- when we talked earlier about payments on
17   principal that you used the phrase in response to it
18   that it was all due now.
19      A.   Okay.
20      Q.   So my question is:  Isn't it true that
21   from Omni 808's perspective --
22      A.   Mm-hmm.
23      Q.   -- that because MGA is in default --
24      A.   Yes.
25      Q.   -- on the loan, that all of its
```

Kadisha, Neil 8/28/2009 9:40:00 AM

```
 1    Q.   Have you ever had any contact with
 2  someone named Brad Schneider?
 3    A.   Doesn't ring a bell.  I don't remember
 4  his name.
 5    Q.   Brian Wing, W-i-n-g?
 6    A.   I think Brian Wing once came to my
 7  office.
 8    Q.   Do you recall what that was in connection
 9  with?
10    A.   I think he came to see how we can help
11  MGA financially.  And he started by saying, "Now that
12  we owe you 100-and-some million dollar", and I
13  stopped him right there and I said, "I never ever
14  want to hear again that you owe us $100 million
15  because you may say it a few times and you may
16  believe it.  You owe us $300 million.  What I have
17  paid, what I have spent, what is my cost is my cost.
18  It has nothing to do with you." And he didn't like
19  what I had to say, but I guess that was the end of
20  that.
21         I remember it because it was like a very
22  interesting episode, but that was -- no, I told them
23  that we expect to be paid our interest and our
24  dealing with them is all about 300-and-some million
25  dollars.  Whether we are willing -- whether we are
```

Kadisha, Neil 8/28/2009 9:40:00 AM

```
 1        DEPOSITION OFFICER'S CERTIFICATE
 2
 3   STATE OF CALIFORNIA    )
                            ) ss.
 4   COUNTY OF ORANGE       )
 5
 6      I, J'ana Siegers, hereby certify:
 7      I am a duly qualified Certified Shorthand
 8   Reporter in the State of California, holder of
 9   Certificate Number CSR 10845 issued by the Court
10   Reporters Board of California and which is in full
11   force and effect.  [Fed. R. Div. P. 28(a)].
12      I am authorized to administer oaths or
13   affirmations pursuant to California Code of Civil
14   Procedure, Section 2093(b) and prior to being
15   examined, the deponent was first duly sworn by me.
16   [Fed. R. Civ. P. 28(a), 30(f)(1)].
17      I am not a relative or employee or attorney or
18   counsel of any of the parties, nor am I a relative or
19   employee of such attorney or counsel, nor am I
20   financially interested in this action.  [Fed. R. Civ.
21   P. 28].
22      I am the deposition officer that
23   stenographically recorded the testimony in the
24   foregoing deposition and the foregoing transcript is
25   a true record of the testimony given by the deponent.
```

DEPOSITION OFFICER'S CERTIFICATE

STATE OF CALIFORNIA   )
                      )   SS.
COUNTY OF ORANGE      )

I, J'ANA SIEGERS, HEREBY CERTIFY:

I AM A DULY QUALIFIED CERTIFIED SHORTHAND REPORTER IN THE STATE OF CALIFORNIA, HOLDER OF CERTIFICATE NUMBER CSR 10845 ISSUED BY THE COURT REPORTERS BOARD OF CALIFORNIA AND WHICH IS IN FULL FORCE AND EFFECT. [FED. R. DIV. P. 28(A)]

I AM AUTHORIZED TO ADMINISTER OATHS OR AFFIRMATIONS PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE, SECTION 2093(B) AND PRIOR TO BEING EXAMINED, THE DEPONENT WAS FIRST DULY SWORN BY ME. [FED. R. CIV. P. 28(A), 30(F)(1)]

I AM NOT A RELATIVE OR EMPLOYEE OR ATTORNEY OR COUNSEL OF ANY OF THE PARTIES, NOR AM I A RELATIVE OR EMPLOYEE OF SUCH ATTORNEY OR COUNSEL, NOR AM I FINANCIALLY INTERESTED IN THIS ACTION.
[FED. R. CIV. P. 28]

I AM THE DEPOSITION OFFICER THAT STENOGRAPHICALLY RECORDED THE TESTIMONY IN THE FOREGOING DEPOSITION AND THE FOREGOING TRANSCRIPT IS A TRUE RECORD OF THE TESTIMONY GIVEN BY THE

EXHIBIT G - PAGE 191

A & E Court Reporters     (213) 955-0070     Fax: (213) 955-0077

```
 1 | DEPONENT.  [FED. R. CIV. P. 30(F)(1)]
 2 |     BEFORE COMPLETION OF THE DEPOSITION, REVIEW OF
 3 | THE TRANSCRIPT [ ] WAS [ ] WAS NOT REQUESTED.  IF
 4 | REQUESTED, ANY CHANGES MADE BY THE DEPONENT (AND
 5 | PROVIDED TO THE REPORTER) DURING THE PERIOD ALLOWED
 6 | ARE APPENDED HERETO.  [FED. R. CIV. P. 30(E)]
 7 |
 8 |
 9 | DATED:     8/30/09
```

_Jana Siegen_ (signature)