## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

Case No. SACV 04-9049 DOC (RNBx)            Date: April 9, 2010

Title: MATTEL, INC. v. MGA ENTERTAINMENT, INC.

---

DOCKET ENTRY
       [I hereby certify that this document was served by first class mail or Government messenger service, postage prepaid, to all counsel (or parties) at their respective most recent address of record in this action on this date.]
                                                              Date:_____  Deputy Clerk: _____

---

PRESENT:

### THE HONORABLE DAVID O. CARTER, JUDGE

  Stephanie Mikhail                                                Not Present
Courtroom Clerk                                             Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFFS: ATTORNEYS PRESENT FOR DEFENDANTS:

  NONE PRESENT                                         NONE PRESENT

---

PROCEEDING (IN CHAMBERS): ORDER DENYING EX PARTE APPLICATION TO COMPEL PRODUCTION OF DOCUMENTS AND TESTIMONY CONCERNING MARKETING OF BRATZ 2010 AND MONSTER HIGH

      Before the Court is MGA Entertainment, Inc. and Isaac Larian (collectively the "MGA Parties") ex parte Application to Compel Production of Documents and Testimony Concerning Marketing of Bratz 2010 and Monster High (the "Application"). Bratz 2010 is a term of art used to reference a contemplated line of dolls to which Mattel, Inc. ("Mattel") was awarded certain intellectual property rights as the result of a post-judgment injunctive order entered by Judge Larson following the Phase 1 jury trial. "Monster High" is a line of dolls purportedly contemplated by Mattel for future production. After considering the moving and opposing papers, as well as the rough transcript of the deposition of Mr. Timothy Kilpin, the Court DENIES the Application.

    **I.**    **Background**

On April 8, 2010, the MGA Parties deposed Timothy Kilpin ("Kilpin"), Mattel's 30(b)(6) designee with respect to Mattel's intentions for the Bratz brand in 2010. During the deposition, counsel for the MGA Parties inquired of Kilpin about Mattel's plans for the Bratz 2010 and Monster High Lines, as well as market research conducted by Mattel in conjunction with those contemplated products. Counsel for Mattel objected and instructed Kilpin not to answer, claiming that the Court previously prohibited discovery into future product lines on grounds that such information is both irrelevant to the claims at issue in the instant litigation and highly sensitive.

The Discovery Master instructed the parties to raise their arguments before the Court and the MGA Parties' Application followed.

## II. Legal Standard

Fed. R. Civ. P. 26(b) provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense . . . [r]elevant information need not be admissible at trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence."

## III. Discussion

By the Application, the MGA Parties seek to compel discovery into: (1) "the brand positioning or brand attributes relevant to Mattel's development of any Bratz product"; and (2) any discussion of any potential effect of Bratz 2010 or Monster High Dolls on the sales of any other Mattel products. The MGA Parties argue that such discovery will provide relevant evidence with respect to Mattel's claimed loss opportunity and lost profit damages. Specifically, the MGA Parties argue that inquiry into Mattel's plans for Bratz 2010, since stalled by the Ninth Circuit's stay of the post-Phase 1 injunctive relief, may reveal that Mattel does not value the Bratz line of dolls, as such dolls are too "edgy" and therefore dissonant with Mattel's present product offering, which includes the not as "edgy" Barbie dolls. The MGA Parties further argue that market research conducted by Mattel may establish, in relevant part, that the Bratz line of dolls does not "cannibalize" the market for Mattel's other doll lines, including Barbie – i.e., Bratz appealed to a new market of "older" female consumers who would not have purchased Barbie anyway. These arguments are unconvincing.

First, Mattel's recent intentions for the Bratz 2010 line of dolls provides no significant insight into the manner in which Mattel would have valued or even monetized the Bratz intellectual property between 1998 and 2003. Much may have changed since Carter Bryant conceived Bratz – MGA controlled and thereby maneuvered the line of dolls into a particular social niche, and much of that development may be irreversible. Bratz now is not Bratz then – an argument made emphatically by MGA's attorneys to the Phase 1(b) jury in closing arguments. The post-Phase 1 injunctive relief delivered the intellectual property to Mattel as it was after the trial and not as it was when Bryant was still employed by Mattel.

Nor does lost opportunity begin and end with the production of a line of dolls.  The instant dispute does not require a considered analysis of the damages to which Mattel may eventually be entitled (indeed, such a discussion would be premature and imprudent), but MGA's approach encourages constant second-guessing of almost any judgment in which the intellectual property of one entity is awarded to another, and lost opportunity damages issue.  Mattel may have lost the opportunity to do with the intellectual property as it saw fit – whether that meant selling the intellectual property to a competitor, restricting use of the intellectual property to markets outside Mattel's purview, or obtaining royalties from a separate entity willing to incur the costs of marketing, branding, and producing the intellectual property.

In any event, MGA may avail itself of narrower and more effective vehicles for the discovery of information into whether Mattel incurred lost opportunity costs and, if so, the extent of such costs.  For example, the parties conducted a several hour long hearing discussing an inchoate product line called "Teen Toons," which, Mattel once argued, resembled Bratz.  Indeed, Mattel's failure to capitalize upon the Teen Toons idea between 1997 and 2000 was one of many arguments made to the Phase 1(b) jury by counsel for MGA in support of the claim that Mattel would have never acted on Bratz anyway.  Another example involves almost unrestricted discovery into Mattel's product development and marketing approach throughout the 1990s: the segment of consumers targeted by Mattel and the product image inculcated by Mattel, as well as Mattel's prior willingness to put forth products that required deviations from established approaches, are directly relevant to the claims at issue.  Indeed, the obvious inversion of MGA's argument is that Mattel may have been more willing to avail itself of the Bratz opportunity after years of watching Bratz's sales skyrocket than it would have been ten years prior.  The point is not that Mattel's intentions with respect to Bratz 2010 are dispositive in one direction or another, but that such intentions are so muddled by significant intervening events that they provide no insight.

Second, Mattel's subjective understanding of the market for dolls is irrelevant to the determination of whether the Bratz line "cannibalized" Mattel's market share or, as MGA would suggest, simply appealed to an untapped consumer base.  Mattel's ability to measure and understand the market may simply be flawed – a point MGA has and continues to rely upon as evidence of Mattel's lack of vision and Mattel's inability to properly value Bratz.  And MGA offers no reason why Mattel's market analysis between 2008 and 2009 surpasses: (1) MGA's own segmentation and analysis of the fashion doll market between 1998 and 2006; (2) Mattel's segmentation and analysis of the fashion doll market between 1998 and 2006; and/or (3) analysis conducted by any other entity that performed relevant market research, including the small army of expert witnesses in both phases of this lawsuit.

The discovery sought by the MGA Parties is therefore not reasonably calculated to lead to the discovery of admissible evidence.  Moreover, MGA's proposed discovery potentially involves the inquiry by a manufacturer into the present market analysis and product strategy of a direct competitor in a small, if not oligarchic, market.  While the protective order operates as a potential stopgap against the misuse of information obtained during the discovery process, the Court finds the protective order

insufficient to guard against the eventual disclosure of such information at trial.

For the foregoing reasons, the Court DENIES the Application.

The Clerk shall serve this minute order on all parties to the action.