78.   When deposed in connection with this case, Castilla refused to answer questions and instead invoked the Fifth Amendment right not to incriminate himself nearly 500 times.

79.   <u>Nick Contreras</u>:  Nick Contreras was a Senior Manager in Mattel's sales group, a position of trust.  In that position, he had access to Mattel's confidential and proprietary information, and was bound by his Inventions Agreements and by Mattel's Code of Conduct, which he signed, to keep that information confidential and not to disclose it.  A true and correct copy of Contreras' Inventions Agreement with Mattel is attached as Exhibit J.

80.   In October 2004, Contreras resigned from Mattel to work for MGA.  In the week before giving notice to Mattel, Contreras printed dozens of sensitive documents containing trade secret information related to Mattel's relationship with and plans regarding significant Mattel customers.

81.   Within a week of his resignation, Contreras invited Yoon Jung Kim, a Mattel Category Analyst for Target, to a lunch meeting.  When Kim began working at Mattel in 2004, she reported to Contreras.  During that meeting, Contreras offered Kim a job at MGA, as well as a substantial raise.  He also asked for her "help" in copying Mattel files containing highly confidential trade secret Mattel information.  Contreras handed Kim a thumb drive and asked her to download the documents from a shared network drive used by the Mattel "Customer Business Team" for Target.  This drive included information regarding Mattel's historical and projected sales, pricing and "Point of Sale" reports and presentations regarding Mattel's relationship with and strategy regarding this significant Mattel customer.  A month later, Contreras again contacted Kim to inquire about her joining MGA – and to ask if the thumb drive of Mattel documents was ready.

82.   <u>Daniel Cooney</u>:  Daniel Cooney returned to Mattel (having worked there earlier) in January 2004 as a member of the Toys 'R Us sales team.  In February 2005, Cooney was promoted to Mattel's Director of National Accounts for

Toys 'R Us, a position of trust and confidence.  In this position, Cooney had access to Mattel's confidential and proprietary information regarding Mattel's future product lines, advertising and promotional campaigns, methods and techniques to improve sales and product placement with Toys R' Us and product profitability. Cooney acknowledged his position of trust and confidence and agreed that he would preserve and would not disclose or misuse Mattel's proprietary or confidential information on numerous occasions, including as part of his signed Mattel Code of Conduct and Employee Confidential Information and Inventions Agreement.  A true and correct copy of Cooney's agreement with Mattel is attached as Cooney.

83.   On April 28, 2006, Cooney informed Gene Murtha, his supervisor, that he was resigning from Mattel.  On May 2, 2006, Peter Lorenz, from the Global Security department, arrived at Mr. Cooney's home to collect all Mattel property.  He collected one large box of files, some loose binders and computer equipment from Mr. Cooney.  Mr. Cooney confirmed that they contained all the property that belonged to Mattel and that he had returned all Mattel property. Cooney also filled out an exit interview checkout form, where he asserted that he had returned all confidential and proprietary information in his possession.

84.   Notwithstanding these affirmations, in the week before he left, Mr. Cooney saved documents to a folder titled "Dan's Files" located on a CD/DVD. He copied to that location documents containing Mattel confidential and trade secret information.  The CD/DVD containing the folder "Dan's Files" was not returned to Mattel, and Mr. Cooney had the CD/DVD in his possession at the time of his exit interview.  Moreover, when deposed in connection with this case, Cooney admitted that he did, in fact, take certain documents from Mattel, including one that he had previously identified, by name, as having been returned.  On information and belief, the documents taken by Cooney contain confidential and trade secret information including tools for evaluating and meeting retailer-specific metrics, sales, cost and

1  pricing information, inventory levels and upcoming promotion and advertising plans

2  and budgets.

3          85.   Additional Employees:  MGA has hired more than 100 Mattel

4  employees since Carter Bryant, ranging from Senior Vice-President level to lower

5  level employees.  On information and belief, many of these employees were

6  specifically targeted and recruited by MGA, including by Larian and Brawer, based

7  on the Mattel confidential and proprietary information they could access.  Mattel is

8  informed and believes that a number of these former Mattel employees accessed,

9  copied and took Mattel confidential and proprietary information, including Mattel's

10  strategic plans; business operations, methods and systems; marketing and

11  advertising strategies and plans; future product lines; product profit margins; and

12  customer requirements.  On information and belief, the misappropriated confidential

13  and proprietary information taken from Mattel was disclosed to and used by MGA

14  for the benefit of MGA and to the detriment of Mattel.

15  **VI.   MGA SECRETLY PAYS MATTEL EMPLOYEES TO WORK ON**

16        **BRATZ**

17          86.   In addition to Bryant, MGA knowingly bribed and secretly used

18  other Mattel employees to work on MGA products, including Bratz, while they were

19  Mattel employees.  On December 28, 2007, MGA vendor and agent Veronica

20  Marlow revealed at her deposition that, beginning in 2000 and continuing over a

21  time period spanning at least five years, at least three Mattel employees in addition

22  to Bryant worked on Bratz while employed by Mattel:  Ana Isabel Cabrera, Beatriz

23  Morales and Maria Elena Salazar.  Like Bryant, these Mattel employees owed a

24  duty of loyalty to Mattel.  Each signed Inventions Agreements assigning Mattel all

25  rights to intellectual property they created while employed by Mattel and

26  specifically promising that they would not work for any other employer during their

27  tenure at Mattel without Mattel's specific assent.  A true and correct copy of these

28  Agreements are attached as Exhibits L-N.

87.     Each of the three Mattel employees worked for MGA through Marlow, to whom MGA and Bryant have paid millions of dollars since 2000. Larian was aware of this misconduct since at the latest October 2002, when he made inquiries as to why Veronica Marlow was being compensated by MGA in an amount sufficient to pay for "4 high quality doll fashion designers with experience full time."

88.     Following Marlow's December 2007 deposition, Ms. Cabrera and Ms. Morales, who were still Mattel employees, admitted to working on Bratz while Mattel employees, to knowing that such conduct was wrong, and to being paid for such work. Both specifically acknowledged that they continued to work on Bratz even after Mattel had made them aware of this litigation involving Bryant's secret, illegal work with MGA and had reiterated the need to protect Mattel's intellectual property. Both admitted that they tried to conceal their work for MGA.

89.     MGA and Larian knew that their bribery and use of Mattel employees was wrongful. They were expressly informed that the pattern and sample makers had "secure day jobs with an outlook of many more years of stability" and "more than 100 years total of doll-making experience between them." MGA and Larian continued their acts of bribery and other misconduct even after this litigation was filed.

90.     MGA and Larian, by and through their agents Peter Marlow and Veronica Marlow, paid the Mattel employees in cash, used false names and false social security numbers in tax and other business records to conceal their wrongdoing, and failed to disclose these payments despite Court Orders compelling them to disclose instances of paying Mattel employees.

## VII.  MGA DIVERTS RESOURCES FROM BRATZ, STEALS FROM MATTEL, AND LAUNCHES A NEW DOLL LINE

91.     After the jury's verdicts and Court's rulings that Mattel is the rightful owner of Bratz, and on information and belief even before, MGA

1  dramatically decreased its investments in Bratz and instead allocated its resources
2  elsewhere, reducing the value of the brand that rightly belongs to Mattel. MGA
3  dumped Bratz product on the market with the purpose of maximizing short term
4  gains and the effect of decreasing the value of Bratz. By MGA's own calculations,
5  Bratz is worth far less than it was in prior years due at least in part to MGA's failure
6  to maintain and promote the brand.

7       92.   Following the issuance of the Court's and jury's rulings, MGA
8  launched a new doll line, in 2009, designed to replace Bratz. MGA cannibalized
9  Bratz to create this line. MGA used resources that were otherwise dedicated to
10  Bratz to support the new line. MGA took elements from Bratz, including ideas and
11  designs meant for Bratz, and used them instead on the new line, called "Moxie
12  Girlz."

13       93.   MGA also chose a name for the line that came from
14  Mattel. When MGA first determined to produce Bratz in 2000, it considered several
15  names suggested by Bryant while he was employed by Mattel, including "Moxie"
16  (and variants). The name "Moxie" was and is confidential and trade secret Mattel
17  information that was unlawfully shared with MGA by a Mattel doll designer, and
18  which MGA is now using to market products that directly compete with Mattel's.

## VIII. COUNTER-DEFENDANTS SEEK TO TRANSFER AND ENCUMBER THEIR ILL-GOTTEN GAINS AND UNLAWFULLY CONCEAL THEIR WRONGDOING

22       94.   Having stolen Bratz, and Mattel's confidential trade secret
23  information, and used those thefts to build an extremely profitable business, MGA
24  and Larian and their co-conspirators sought to secret and encumber their ill-gotten
25  gains and to conceal their wrongdoing. In the wake of Mattel's initial suit against
26  Bryant in 2004, this part of the scheme accelerated, using interstate mail and wire
27  communications to further the objects of this scheme. This part of the scheme
28  continues to this day and will continue into the future. Its objects include:

1      **A.     Larian and MGA Destroy Evidence and Commit Perjury**

2              95.     On information and belief, Larian and MGA have themselves,

3      and through their agents and co-conspirators, destroyed, deleted, withheld, altered,

4      fabricated and back-dated documents and engaged in other acts of spoliation and

5      concealment, with the intent and purpose of concealing the origin of Bratz, hiding

6      their wrongdoings, and obstructing these proceedings.  Larian has personally

7      directed that documents be altered, withheld, and deleted in order to avoid a finding

8      that he and MGA acted willfully and obstructed these proceedings.  These actions

9      include, without limitation:

10             •       Farhad Larian, a former MGA executive and director and Isaac

11                     Larian's brother, deliberately destroyed several boxes of

12                     documents relevant to Mattel's claims against Bryant and MGA

13                     to keep them from Mattel.  Farhad Larian did so while still on

14                     MGA's payroll.

15             •       Larian instructed an MGA executive, Victoria O'Connor, to

16                     "white out" a fax header on Bryant's Bratz contract with MGA

17                     to conceal that Bryant had faxed the contract to MGA from

18                     Mattel's Design Center and thereby conceal Mattel's rights to

19                     Bratz.

20             •       Larian personally instructed MGA's Senior Vice President of

21                     Finance, Brian Wing, to delete an e-mail related to Mattel so that

22                     it would not be produced to Mattel in this action.

23             •       Larian and MGA have abused the attorney-client privilege,

24                     knowingly misrepresenting as privileged documents that MGA

25                     itself later conceded were not actually privileged, including a

26                     critical e-mail between Larian and Victoria O'Connor regarding

27                     the creation date of Bratz, all in order to avoid the production of

28                     these documents in this litigation.

- MGA and its vendors used cash payments, fake names, and fake social security numbers to conceal their bribery of Mattel employees to work on Bratz while they were employed by Mattel.

- Bryant altered numerous original Bratz drawings by adding false and misleading date notations of "8/1998" and "© 8/1998" to the drawings to support MGA's false claim that they were drawn while Bryant was not employed by Mattel.

- While working with MGA, and while MGA was paying for his legal defense, Bryant ran a program called "Evidence Eliminator" on his computer to permanently delete electronic information on his computer and prevent it from being produced to Mattel in this action.

- MGA and/or Bryant removed Bratz drawings from a Mattel design notebook in Bryant's possession by physically tearing the pages out of the notebook in an attempt to conceal their creation at Mattel.

- On the day of his resignation from Mattel to join MGA, Machado ran a program called "System & Internet Washer Pro" on a personal computer, attempting to erase information and communications relevant to this action.

96.     On information and belief, Larian and MGA have also conspired to commit perjury and engaged in acts of perjury and other acts of obstruction in connection with MGA's theft of Mattel's property and Mattel's claims relating thereto.  These actions include, among others, MGA and Larian's submission of false information in sworn applications to the U.S. Copyright Office and the U.S. Patent and Trademark Office; Larian's repeated sworn testimony during Phase 1 that Bryant told him, and that Larian believed, that Bryant had not created Bratz

1 while employed by Mattel; Larian's sworn statements that he knew nothing about

2 the decision to withhold a critical document from these proceedings under a false

3 claim of privilege; and MGA's and Larian's submission of false statements in this

4 action regarding MGA's ability to receive outside funding and MGA's financial

5 condition.

**B. The Purported Acquisition of the Wachovia Debt**

7 97. On October 27, 2006, MGA entered into a Credit Agreement

8 with a syndicate of banks led by Wachovia bank (the "Credit Agreement") pursuant

9 to which Wachovia provided a senior revolving credit facility to MGA in an

10 aggregate available amount for borrowing up to $400 million (the "Credit Facility").

11 Before opening the Credit Facility, MGA had little to no debt. As of December

12 2007, the principal balance of the Credit Facility was $313 million. The Credit

13 Agreement was secured by certain assets that did *not* include MGA's purported

14 intellectual property rights.

15 98. Between 2004 and 2008, MGA paid out distributions/dividends

16 to Larian and his family in the sum of at least $489 million, much of it from the

17 credit facility. By May 2008, Wachovia concluded that Larian had been engaging in

18 the "de facto liquidation" of MGA. Even before that time, MGA was in financial

19 distress, as evident by, among other things, the negative equity reflected on MGA's

20 2008 year-end balance sheet, Wachovia's declaration of events of default under the

21 Credit Facility and MGA's own admissions and representations to the Court.

22 99. In response to Wachovia's measures, and in an effort to maintain

23 control over MGA's ill-gotten gains and Mattel's intellectual property, to frustrate

24 the jury's verdicts and obstruct the Court's orders in Mattel's favor, and to hinder,

25 delay and defraud Mattel and MGA's other creditors, Larian, as he had done before,

26 decided to use a front to buy the Credit Facility from Wachovia at a massive

27 discount "through some friends." MGA itself did not attempt to buy the debt from

28

1  Wachovia, even though doing so would have been in its and its creditors' best
2  interests.

3       100.   To effectuate this part of the scheme, in 2008 Larian approached
4  his friend Neil Kadisha and proposed that he, Kadisha and possibly others jointly
5  acquire MGA's debt to Wachovia.  Larian and Kadisha then assembled a group of
6  friends and family members, including Joseph Moinian, Arsalan Gozini and Leon
7  Neman, ostensibly for the purpose of pooling together assets to use to acquire the
8  Credit Facility from Wachovia.

9       101.   The participants in Omni 808's acquisition of the Credit Facility
10  (the "Omni transaction") all have long business and personal relationships with each
11  other apart from that transaction.  For example, Larian and Kadisha, and their
12  respective wives, are social friends.  Leon Neman is Larian's brother-in-law and a
13  former director of MGA.  Joseph Moinian is a friend of Larian's and Kadisha's
14  "very close friend."

15       102.   On July 29, 2008, Kadisha made an offer to acquire the Credit
16  Facility from Wachovia for approximately $110 million (representing 35% of the
17  $313 million principal amount of the debt obligations outstanding as of the
18  acceleration date).  A July 29, 2008 offer letter to Wachovia states that Larian would
19  have a "non-voting limited interest" in the loan acquisition.

20       103.   On August 12, 2008, Omni 808 was formed for the special
21  purpose of acquiring the Credit Facility from Wachovia.  On August 31, 2008, the
22  members of Omni 808 entered into the Limited Liability Company Agreement of
23  Omni 808 Investors LLC.  On August 29, 2008, the members of Omni 808, who at
24  all material times have been the agents of Omni 808, summarized the purported
25  sources of Omni 808's funding as follows:

26      •   Neil Kadisha: $10 million;

27      •   A trust controlled by Arsalan Gozini:  $5 million.

28

- Gold Leaf Investments, LP (controlled by Benjamin Nazarian): $10 million;

- Vision Capital, LLC (controlled by brothers Leon, Yoel and John Neman): $10 million;

- David and Angella Nazarian Family Trust: $5 million; and

- Moinian Development Group, LLC (controlled by Joseph Moinian): $10 million.

104.   Initially, Larian, Omni 808 and their agents and co-conspirators denied, including in representations to the Court, that Larian or MGA contributed any of the funding for the debt acquisition.  Specifically, Omni 808's counsel told the Court that it is "true" that the "investors and . . . money" used for the Omni 808 transaction did not come from MGA or Larian and that there are no documents showing that "either Mr. Larian or MGA paid money . . . to purchase this debt." MGA stood by silently as Omni 808 made those false representations to the Court.

105.   It was only later, in the face of incontrovertible evidence, that Counter-defendants admitted that the majority of the funds used for that transaction – at least $60 million, and likely far more – was provided to Omni 808 by Larian and his family members.  Larian and his family members made a purported $60 million loan to Omni 808 through Larian's IGWT 826 entity, which Larian formed on August 27, 2008 – the day after the Phase 1 trial ended.  IGWT 826 is registered at the home address of Shirin Makabi and Jahangir Eli Makabi.  Shirin Makabi is Isaac Larian's sister, Jahangir Eli Makabi is Isaac Larian's brother-in-law, and both are shareholders or beneficial shareholders of MGA through various trusts.  IGWT 826's "loan" to Omni 808 for the Wachovia debt acquisition came via wire transfers from Mr. Larian through his family trusts.  The funds IGWT 826 ostensibly loaned to Omni were, in whole or in part, generated by Larian's and MGA's wrongful conduct towards Mattel and transferred through Larian-controlled conduits to conceal the true source of the funds.

1        106.   On September 3, 2008, Omni 808, MGA and Wachovia entered

2    into a Master Assignment and Exchange Agreement whereby Wachovia assigned

3    approximately $291.5 million of its interest in the Credit Facility to Omni 808 for a

4    payment of approximately $110 million, with Wachovia retaining an approximately

5    $22 million priority loan.  Omni 808 provided its funding to Wachovia through use

6    of wire transfers.  At the same time, Omni 808 undertook in a promissory note to

7    pay back IGWT 826 the principal sum of $60 million.

8        107.   Also on September 3, 2008, MGA, Larian and their co-

9    conspirators – recognizing that Wachovia's existing security package under the

10   Credit Agreement that would be assigned to Omni 808 did not include MGA's

11   purported intellectual property rights – entered into a "Side Letter Agreement" in an

12   effort to encumber the Bratz intellectual property rights that, just weeks earlier, the

13   Court and jury had found belonged to Mattel.  In the Side Letter Agreement, MGA

14   purported to grant or agree to grant to Omni 808 a "first priority perfected security

15   interest . . . in not only the current Collateral securing Obligations, but also the

16   following additional Collateral: a security interest in substantially all of the personal

17   property assets of each Obligor, *including each Obligor's rights in intellectual*

18   *property*."  MGA, Larian and their co-conspirators "contemplated and intended"

19   from the onset of the transaction that MGA's debt obligations to Omni 808 "would

20   be secured by an expanded collateral package comprising substantially all of the

21   Obligors' personal[] property assets, as described in the Guarantee and

22   Subordination Agreement and in the Side Letter Agreement."  MGA's and Larian's

23   motive to attempt to encumber the Bratz intellectual property rights is clear: to

24   prevent Mattel from obtaining and benefitting from it.

25       108.   Although Larian and his co-conspirators now admit that Larian

26   contributed $60 million to the debt acquisition (after they initially claimed that

27   Larian was behind none of the funding for the debt acquisition), Larian appears to

28   have contributed substantially more than that.  Larian and his co-conspirators have

1   disguised and continue to seek to disguise the level of Larian's funding and the true

2   source of the funds used for the debt acquisition by relying on shell companies and

3   undisclosed side-agreements between Larian and the members of Omni 808.

4         109.   Among the shell entities used for purposes of the Omni

5   transaction is Vision Capital, formed on August 19, 2008.  Vision Capital's

6   purported principal, former MGA director Leon Neman, is Larian's brother-in-law.

7   He testified that a company called Lexington Financial Limited funded Vision

8   Capital's $10 million investment in Omni 808.  Lexington is registered in the

9   Caribbean island nation of Nevis, which is known for its secrecy laws.  Lexington's

10  London address is a company that provides "virtual office" services.  Despite

11  Mattel's efforts during discovery, Mattel has yet to discover the actual source of

12  funds used for Vision Capital's investment in Omni.

13        110.   Although Larian and his co-conspirators persist in their denials,

14  evidence shows that Larian agreed to "pay back" at least three Omni 808 members,

15  representing at least $20 million of the funding Omni 808 purportedly used to

16  acquire the Wachovia note, shortly after the Omni transaction closed.  On

17  September 13, 2008, just days after the Omni debt acquisition closed, Larian asked

18  Omni 808 member Joe Moinian if it was "OK for me to return your money by

19  December."  On November 12, 2008, Larian told his wife and sister that "[w]e need

20  to pay back [Arsalan Gozini's] $5mil by end Nov (IGWT – Omni)."  And, in

21  December 2008, Larian told his close friend Leon Farahnik that "David Nazarian,

22  Joe [Moinian] and Arsalan [Gozini]" – three Omni members – "all want there [sic]

23  money this month[]."

24        111.   Larian claims that he was lying to Farahnik, one of his closest

25  friends, about his need to repay those Omni 808 members.  But as is now known, in

26  December 2008 Larian did repay Gozini, through a wire transfer, the sum of

27  $5,065,753.42, which represented Gozini's $5 million investment in Omni 808 plus

28  accrued interest.  Larian claims this was a "loan" from Larian to Gozini unrelated to

1  Gozini's $5 million investment in Omni, as evidenced by a promissory note that

2  bears a date of December 1, 2008. But that promissory note was not prepared until

3  March 2009, and was prepared then for the purpose of misleading Mattel, the Court

4  and the Court-appointed forensic auditor during his examination of MGA's

5  finances. Larian and his co-conspirators further sought to disguise Larian's

6  acquisition of Gozini's interest in Omni by creating a document, in May 2009,

7  through which Gozini purports to assign his interest to Kadisha in a transfer that

8  does not appear or purport to be supported by consideration.

9      112.   On October 16, 2008, Larian, MGA and their co-conspirators

10  entered into another series of fraudulent transactions to hide their assets and hinder

11  Mattel's rights as a creditor. First, Omni 808 executed an Amended and Restated

12  Subordinated Promissory Note regarding IGWT's $60 million loan. Second, MGA

13  and Omni 808 executed a Secured Delayed Draw Demand Note (the "Draw Demand

14  Note"), with a face value of $40 million, through which Omni 808 agreed to provide

15  additional funds to MGA beyond the Wachovia debt purchase. Third, Omni 808

16  and IGWT 826 executed a Senior Promissory Note with a face value of $40 million.

17      113.   Pursuant to the terms of the Draw Demand Note, Omni 808

18  agreed to make available up to $40 million of additional purported credit to MGA.

19  MGA, Larian and their co-conspirators structured the Draw Demand Note as a

20  "back to back line" with the Senior Promissory Note whereby any draws by MGA

21  on the Draw Demand Note would be funded by draws by Omni 808 on the Senior

22  Promissory Note with IGWT 826. The parties structured the transaction in that

23  manner to enable Larian (through IGWT) to obtain "first position" secured debt with

24  respect to funds Larian loaned to MGA, thus effectively converting the illegal

25  proceeds of MGA's misconduct into Larian's purportedly secured debt. Moreover,

26  as with Larian's initial $60 million purported loan to Omni 808 through his IGWT

27  826 entity, the Draw Demand Note allowed Larian to receive purported interest

28  payments that were financed by MGA and ultimately delivered to Larian through

Omni 808 and IGWT 826.  On or about October 17, 2008, pursuant to a written request submitted by MGA to Omni 808, Omni 808 provided MGA $6 million in funding under the Draw Demand Note.  Those funds were, in whole or in part, generated by Larian's and MGA's wrongful conduct towards Mattel and transferred through Larian-controlled conduits to conceal the true source of the funds.

114.  Since the Omni transactions closed, Larian and his co-conspirators have continued to engage in fraudulent conduct to create the appearance of an arm's length relationship between Omni 808 and MGA.  On December 31, 2008, at Larian's request, Kadisha sent a letter to Larian in which Omni 808 declared MGA to be in default under the Credit Agreement and threatened to initiate remedies.  Larian asked Kadisha to prepare that letter for the purpose of frustrating the Court's Orders and Mattel's rights.  That Kadisha's December 31, 2008 letter is a sham intended to mislead is confirmed by Larian's statement that regardless of MGA's financial condition, Omni 808 would "never" put MGA into bankruptcy because of MGA's "friendly relationship" with Omni.

115.  Also in December 2008, Larian asked Kadisha, and Kadisha agreed, to prepare a letter to send to the Court to express Omni 808's "disappoint[ment]" with the injunction ruling, as well as Omni 808's "commit[ment] to providing financing for MGA and its principals."  That letter was intended to mislead the Court into believing that because Omni 808 – a purported independent third party lender to MGA – stood behind MGA, MGA would be able to satisfy a monetary judgment.  Of course, the actual purpose of Omni 808 was precisely the opposite of what it represented in the letter to the Court; that is, Omni 808 was formed to frustrate Mattel's ability to recover from MGA money and property rightfully belonging to Mattel, not to ensure that Mattel would be able to collect on a judgment against MGA.

116.  Omni 808, funded largely or entirely by Larian himself, claims to have as much as a $350 million security interest in "everything [MGA] has,"

MATTEL'S FOURTH AMENDED ANSWER AND COUNTERCLAIMS

1    potentially including MGA's intellectual property rights that rightly belong to

2    Mattel.  The full extent of the fraudulent acts committed by Larian and his co-

3    conspirators with respect to the Omni transaction is not yet known to Mattel because

4    such information is in the exclusive possession and control of Larian and his co-

5    conspirators, and they have refused to disclose information to Mattel.

6         **C.**     **Distributions to Larian Family Members**

7              117.   Between 2001 and  2008, Bratz products generated revenues for

8    MGA in excess of $3 billion.  Knowing that these were the proceeds of wrongful

9    conduct, and fearing that Mattel would discover this wrongdoing and assert its

10   rights, MGA and Larian commenced to distribute at least $489 million of these

11   proceeds to Larian, his family members, and their associated trusts, including at

12   least $430 million between 2004 and 2008 while this litigation was ongoing.  These

13   distributions had the actual and intended effect of draining MGA of assets, including

14   assets that rightfully belong to Mattel, and placing them in the possession and/or

15   control of Larian and his co-conspirators, thereby hindering, delaying and/or

16   defrauding Mattel's rights as a creditor of MGA.  These distributions also had the

17   effect of limiting the assets available to MGA to maintain and promote Bratz –

18   Mattel's property – and to maintain the viability and solvency of MGA.

19        **D.**     **MGA and Larian Misrepresent Their Financial Conditions**

20             118.    As part of their scheme to steal from Mattel and conceal and

21   obstruct their wrongdoing, MGA and Larian have knowingly and repeatedly made

22   false representations as to their financial situation.  After the Phase 1A verdict,

23   MGA and Larian represented on multiple occasions to both this Court and the Ninth

24   Circuit Court of Appeals that MGA was in dire financial straits and might file

25   imminently for bankruptcy.  MGA and Larian also represented to the Court that

26   MGA had not obtained and could not obtain credit.  MGA was forced to retract as

27   false the representation that it could not obtain credit, and in internal MGA

28

1  documents that were not previously disclosed to Mattel or the Court, Larian

2  confirmed that MGA "will never file for bankruptcy (even if we threaten it)."

3       119.   MGA has repeatedly made self-serving claims as to its finances

4  only to later renounce such claims when it became more helpful to its legal position

5  to assert that it was perfectly solvent. During trial, when MGA sought a Petition for

6  Writ of Mandamus, it was in MGA's interest to claim that without Ninth Circuit

7  intervention, it would be destroyed. MGA represented to the Ninth Circuit in

8  August 2008: "Unless the order denying a mistrial is overturned (and the trial stayed

9  in the interim), the MGA Parties will be financially ruined and MGA will be unable

10  to carry on what had been a successful business employing 1700 people."

11       120.   Subsequently, when opposing Mattel's Motion for Permanent

12  Injunction, it was in MGA's interest to proclaim its financial viability – and that is

13  what MGA did. In seeking a permanent injunction, Mattel urged that an injunction

14  was appropriate because MGA's claims of impending insolvency meant it could not

15  satisfy any money judgment. On October 13, 2008, MGA submitted the declaration

16  of a financial expert in response, proclaiming that MGA could pay damages and

17  arguing that "Mattel submitted no evidence – because it could not – that MGA

18  cannot satisfy the money judgment that follows from the Phase 1(b) verdict."

19       121.   On January 7, 2009, in response to Mattel's concerns about

20  financial misconduct at MGA, the Court appointed a forensic auditor to analyze

21  MGA's finances. The Court further ordered Mattel to bear the cost of the forensic

22  auditor. Mattel has incurred at least $1,944,026.55 in costs associated with the

23  forensic auditor. On April 27, 2009, the Court ordered the appointment of a

24  temporary receiver to protect against the dissipation of MGA's assets and to prevent

25  MGA from engaging in conduct intended to frustrate the Court's orders.

26

27

28

# CLAIMS FOR RELIEF

## First Counterclaim

### Violation of the Racketeer Influenced and Corrupt Organizations Act

### 18 U.S.C. §§ 1962(c) and 1964(c)

### (Against Larian, MGA, Bryant, MGA HK, MGA de Mexico, Machado and Does 6 through 10)

122.   Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 121, above, as though fully set forth at length.

123.   Beginning at various times from approximately 1999 through the filing of this Fourth Amended Answer and Counterclaims, and continuing into the future, in the Central District of California and elsewhere, Counter-defendants Larian, MGA, MGA HK, MGA de Mexico, Bryant, Machado and Does 6 through 10 were and are associated-in-fact in, and with, a continuing Criminal Enterprise which has conducted its affairs through a pattern of racketeering activity, and whose conduct and activities affect interstate or foreign commerce.  The enterprise was and is engaged in a scheme to unlawfully compete with Mattel, by stealing the trade secrets and confidential and proprietary information of Mattel, by depriving Mattel of the honest services of its employees, by infringing on Mattel's rights, by concealing its wrongdoing and reaping the benefits of such unlawful competition against Mattel, and by obstructing efforts by Mattel and the Court to address and remedy this wrongdoing.  The counter-defendants named here knowingly and intentionally participated, directly and indirectly, in the conduct of the Criminal Enterprise's affairs through a pattern of racketeering activity, and in so doing, injured Mattel in its business and property.  Their actions include multiple, related acts in violation of: 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1503 (influencing or injuring officer or juror generally), 18 U.S.C. § 1512 (tampering with a witness victim, or informant), 18 U.S.C. § 1952 (interstate

1  and foreign travel to aid racketeering), and 18 U.S.C. § 2319(a) and 17 U.S.C. §

2  506(a)(1)(A) (criminal copyright infringement).

3        124.   The predicate acts alleged herein occurred after the effective date

4  of 18 U.S.C. §§ 1961 et seq., and the last such act occurred within 10 years after the

5  commission of a prior act of racketeering activity.  These racketeering activities

6  include repeated acts of:

7        (a)   Mail Fraud:  Counter-defendants MGA, Larian, MGA HK,

8  Bryant, Machado, and certain of the Doe Counter-defendants, having devised a

9  scheme or artifice to defraud Mattel of its rights to receive honest services from its

10  employees and to maintain the secrecy of its confidential and trade secret

11  information and property; to transfer the ill-gotten gains from such thefts and

12  wrongs, secret MGA assets and purportedly obtain priority over Mattel; and to

13  obstruct the judicial process and thwart the verdicts of the jury and Orders of the

14  Court, including by failing to preserve Mattel's property, did for the purpose of

15  furthering and executing this scheme, deposit or cause to be deposited matters or

16  things to be sent or delivered by the Postal Service and by commercial interstate

17  carriers, take or receive matters or things therefrom, and knowingly cause matters or

18  things to be delivered by mail or such carriers, in violation of 18 U.S.C. § 1341, 18

19  U.S.C. § 1346, and 18 U.S.C. § 2.  This fraudulent scheme, and its objects, are

20  alleged with particularity in paragraphs 24-121, and has been furthered by, among

21  other acts of mail fraud, the true and correct copies of communications and evidence

22  appended as Exhibits O (MGA/Larian Mail Fraud Communications); Exhibit P

23  (MGA HK Mail Fraud Communications); Exhibit Q (Bryant Mail Fraud

24  Communications); and Exhibit R (Machado Mail Fraud Communications).

25        (b)   Wire Fraud:  Counter-defendants MGA, Larian, MGA HK,

26  MGA de Mexico, Bryant, Machado, and certain of the Doe Counter-defendants,

27  having devised a scheme or artifice to defraud Mattel of its rights to receive honest

28  services from its employees and to maintain the secrecy of its confidential and trade

1  secret information and property; to transfer the ill-gotten gains from such thefts and

2  wrongs, secret MGA assets and purportedly obtain priority over Mattel; and to

3  obstruct the judicial process and thwart the verdicts of the jury and Orders of the

4  Court, including by failing to preserve Mattel's property, did for the purpose of

5  furthering and executing this scheme, transmit and cause to be transmitted by means

6  of wire communications in interstate or foreign commerce, writing, signs, signals,

7  pictures and sound, in violation of 18 U.S.C. § 1343, 18 U.S.C. § 1346, and 18

8  U.S.C. § 2.  This fraudulent scheme, and its objects, are alleged with particularity in

9  paragraphs 24-121, and has been furthered by, among other acts of wire fraud, the

10 true and correct copies of communications and evidence appended as Exhibit S

11 (MGA/Larian Wire Fraud); Exhibit T (MGA HK Wire Fraud); Exhibit U (MGA de

12 Mexico Wire Fraud); Exhibit V (Bryant Wire Fraud); and Exhibit W (Machado

13 Wire Fraud).

14            (c)      Spoliation and Concealment of Evidence :  Counter-

15 defendants MGA, Larian, Bryant, Machado, and certain of the Doe Counter-

16 defendants, did corruptly alter, destroy, mutilate, or conceal more than one record,

17 document, or other object, or attempted to do so, with the intent to impair the

18 object's integrity or availability for use in an official proceeding.  Such actions are

19 in violation of 18 U.S.C. § 1512 and 18 U.S.C. § 2, as alleged with greater

20 particularity in the foregoing paragraphs, including without limitation paragraphs

21 29-30, 54, 90, 95, 96, and 111;

22            (d)      Obstruction of Justice/Influencing or Injuring Officer or

23 Juror Generally:  Counter-defendants MGA, Larian, Bryant, and certain of the Doe

24 Counter-defendants, did seek to corruptly impede, obstruct or influence the due

25 administration of justice, including by committing perjury.  Such actions are in

26 violation of 18 U.S.C. § 1503 and 18 U.S.C. § 2, as alleged with greater particularity

27 in the foregoing paragraphs, including without limitation paragraphs 90-121;

28

1     (e)     Interstate and Foreign Travel in Aid of Racketeering

2 Enterprises/Commercial Bribery:  Counter-defendants MGA and Larian traveled in

3 interstate and foreign commerce, or used the mail or any facility in interstate or

4 foreign commerce, with the intent to commit commercial bribery, in violation of 18

5 U.S.C. § 1952, 18 U.S.C. § 2, and the laws of the State of California, Cal. Penal

6 Code § 641.3, as alleged with greater particularity in the foregoing and following

7 paragraphs, including without limitation paragraphs 24-93;

8     (f)     Criminal Copyright Infringement: Counter-defendants

9 MGA, Larian, MGA HK, MGA de Mexico, Bryant, Machado and certain of the Doe

10 Counter-defendants willfully infringed and continue to willfully infringe Mattel's

11 copyrights, including without limitation with respect to documents containing

12 Mattel trade secret and confidential information and Bratz works created by Bryant

13 while a Mattel employee, for purposes of commercial advantage and private

14 financial gain, all in violation of 18 U.S.C. § 2319(a) and 17 U.S.C. § 506(a)(1)(A),

15 as alleged with greater particularity in the foregoing paragraphs and following

16 paragraphs, including without limitation paragraphs 24-85, 91-96, and 143-148.

17     125.   MGA had a role in the racketeering activity that was distinct

18 from the undertaking of those acting on its behalf.  MGA also attempted to benefit,

19 and did benefit, from the activity of its employees and agents alleged herein, and

20 thus was not a passive victim of racketeering activity, but an active perpetrator.

21     126.   Mattel has been injured in its business or property as a direct and

22 proximate result of Counter-defendants' violations of 18 U.S.C. § 1962(c), including

23 injury by reason of the predicate acts constituting the pattern of racketeering

24 activity, as alleged with greater particularity in the foregoing paragraphs, including

25 without limitation paragraphs 32, 34, 50, 53, 62, 77, 80, 84, 85, 91-93, 113, 115,

26 117, and 121.

27     127.   As a result of Counter-defendants' violations of 18 U.S.C.

28 § 1962(c), Mattel has suffered substantial damages, in an amount to be proved at

trial.  Pursuant to 18 U.S.C. § 1964(c), Mattel is entitled to recover treble its general and special compensatory damages, plus interest, costs and attorneys fees, incurred by reason of Counter-defendants' violations of 18 U.S.C. § 1962(c).

### Second Counterclaim

### Conspiracy To Violate the Racketeer

### Influenced And Corrupt Organizations Act

### (18 U.S.C. §§ 1962(d) and 1964(c))

### (Against Larian, MGA, Bryant, MGA HK, MGA de Mexico, Machado, IGWT 826, Omni 808 and Does 6 through 10)

128.   Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 127 above, as though fully set forth at length.

129.   Beginning at various times from approximately 1999 through the filing of this Fourth Amended Answer and Counterclaims, and continuing into the future, in the Central District of California and elsewhere, Counter-defendants Larian, MGA, MGA HK, MGA de Mexico, Bryant, Machado, IGWT 826, Omni 808, certain of the Doe Counter-defendants, and others acting in concert with or on behalf of the foregoing, knowingly, willfully, and unlawfully, did conspire, combine, confederate and agree together to violate 18 U.S.C. § 1962(d) by furthering, promoting, and facilitating the Criminal Enterprise detailed in paragraphs 28-29, 31-32, 35-36, 48-57, and 60-120 in violation of  18 U.S.C. § 1962(c).

130.   Counter-defendant Omni 808, knowing that the Criminal Enterprise was engaged in a scheme to aid MGA in unfairly and wrongfully competing with Mattel, and knowing that the scheme was being furthered by the commission of two or more predicate acts in a ten year period, agreed to assist, advance and further that Enterprise's unlawful objectives including by participating in and structuring the purchase of the Wachovia debt so as to conceal the origin of the funds, thwart the Court's Orders and the jury verdicts, and secure priority over Mattel and burden its rights to Bratz.

1    131.    In furtherance of this unlawful conspiracy and its multiple

2  objects, as alleged herein, Counter-defendants Larian, MGA, Bryant, MGA HK,

3  MGA de Mexico, Bryant, Machado, IGWT 826, Omni 808, and various co-

4  conspirators committed numerous overt acts, including but not limited to those set

5  forth in paragraphs 28-29, 31-32, 35-36, 48-57, and 60-120.

6    132.    Mattel has been injured in its business or property as a direct and

7  proximate result of the Counter-defendants' violations of 18 U.S.C. § 1962(d),

8  including injury by reason of the predicate acts constituting the pattern of

9  racketeering activity.  As a result of the conspiracy between and among Counter-

10  defendants Larian, MGA, MGA HK, MGA de Mexico, Bryant, Machado, IGWT

11  826 and Omni 808 to violate 18 U.S.C. § 1962(c), Mattel has suffered substantial

12  damages, in an amount to be proved at trial.  Pursuant to 18 U.S.C. § 1964(c),

13  Mattel is entitled to recover treble its general and special compensatory damages,

14  plus interest, costs and attorneys fees, incurred by reason of Counter-defendants'

15  violations of 18 U.S.C. § 1962(d).

16                          **Third Counterclaim**

17                   **Misappropriation of Trade Secrets**

18                     **(*Cal. Civ. Code § 3426 et seq.*)**

19        **(Against Counter-defendants MGA, MGA de Mexico,**

20              **Larian, Machado and Does 6 through 10)**

21    133.    Mattel repeats and realleges each and every allegation set forth in

22  paragraphs 1 through 132 above, as though fully set forth at length.

23    134.    As used herein, "Trade Secret Material" shall mean the

24  documents, materials, designs, names, and other information stolen by Machado,

25  Trueba, Vargas, Brisbois, Castilla, Cooney, Contreras, Brawer, other former Mattel

26  employees, and other persons acting for, on behalf of or at the direction of MGA

27  and/or Larian, including but not limited to "Moxie," and the confidential trade secret

28  information stolen in the United States, Mexico and Canada.  Prior to these thefts by

1   Counter-defendants, the Trade Secret Materials gave Mattel a significant
2   competitive advantage over its existing and would-be competitors, including
3   MGA.  This advantage, as to MGA, was compromised as a result of Counter-
4   defendants' unlawful activities.

5         135.   Mattel made reasonable efforts under the circumstances to
6   maintain the confidentiality of the Trade Secret Materials, including by having
7   employees and consultants who may have access the Trade Secret Materials sign
8   confidentiality agreements that oblige them not to disclose the Trade Secret
9   Materials or characteristics of the Trade Secret Materials; by limiting the circulation
10  of said materials within Mattel; by protecting and limiting access to computers with
11  log-in identifications and passwords; by limiting each employee's access to
12  electronic files to those that the particular employee needs to access; by educating
13  employees on the nature of Mattel's information that is confidential and proprietary;
14  and by reminding employees on a regular and periodic basis of their obligation to
15  protect and maintain Mattel's confidential and proprietary information.

16        136.   Mattel's Trade Secret Materials derive independent economic
17  value from not being generally known to the public or to other persons who can
18  obtain economic benefit from their disclosure.

19        137.   Counter-defendants have illegally obtained the trade secret
20  materials, as set forth above, and through other means of which Mattel is presently
21  unaware.

22        138.   Counter-defendants have used and disclosed Mattel's Trade
23  Secret Materials without Mattel's consent and without regard to Mattel's rights, and
24  without compensation, permission, or licenses for the benefit of themselves and
25  others.

26        139.   Counter-defendants' conduct was, is, and remains willful and
27  wanton, and was taken with blatant disregard for Mattel's valid and enforceable
28  rights.

140.   Counter-defendants' wrongful conduct has caused and, unless enjoined by this Court, will continue in the future to cause irreparable injury to Mattel. Mattel has no adequate remedy at law for such wrongs and injuries. Mattel is therefore entitled to a permanent injunction restraining and enjoining Counter-defendants, and each of them, as well as their agents, servants, and employees, and all persons acting thereunder, in concert with, or on their behalf, from further using in any manner Mattel's trade secrets.

141.   In addition, as a proximate result of Counter-defendants' misconduct, Mattel has suffered actual damages, and Counter-defendants have been unjustly enriched.

142.   The aforementioned acts of the Counter-defendants were willful and malicious, including in that Counter-defendants misappropriated Mattel's trade secrets with the deliberate intent to injure Mattel's business and improve their own. Mattel is therefore entitled to enhanced damages. Mattel is also entitled to reasonable attorney's fees.

### Fourth Counterclaim

### Copyright Infringement

### (Against MGA, MGA HK, Larian, Bryant, and Does 6 through 10)

143.   Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 142 above, as though fully set forth at length.

144.   Mattel is the owner of copyrights in works that are fixed in tangible media of expression and that are the subject of valid, and subsisting, copyright registrations owned by Mattel. These include, without limitation, the works that are the subject of Registrations VA 1-378-648, VA 1-378-649, VA 1-378-650, VA 1-378-651, VA 1-378-652, VA 1-378-653, VA 1-378-654, VA 1-378-655, VA 1-378-656, VA 1-378-657, VA 1-378-658, VA 1-378-659, VA 1-378-660, VAu 715-270, VAu 715-271 and VAu 715-273. These also include, without limitation, the works that are the subject of Registrations VAu 960-439, VAu 964-

1 | 304, VAu 964-306, VAu 964-308, VAu 964-309, VAu 964-310, VAu 964-311,

2 | VAu 964-315, VAu 964-318, VAu 964-319, VAu 964-320 and VAu 964-321.

3 |       145.   Counter-defendants have reproduced, created derivative works

4 | from and otherwise infringed upon the exclusive rights of Mattel in its protected

5 | works without Mattel's authorization.  Counter-defendants' acts violate Mattel's

6 | exclusive rights under the Copyright Act, including without limitation Mattel's

7 | exclusive rights to reproduce its copyrighted works and to create derivative works

8 | from its copyrighted works, as set forth in 17 U.S.C. §§ 106 and 501.

9 |       146.   Counter-defendants' infringement (and substantial contributions

10 | to the infringement) of Mattel's copyrighted works is and has been knowingly made

11 | without Mattel's consent and for commercial purposes and the direct financial

12 | benefit of Counter-defendants.  Counter-defendants, moreover, have deliberately

13 | failed to exercise their right and ability to supervise the infringing activities of

14 | others within their control to refrain from infringing Mattel's copyrighted works and

15 | have failed to do so in order to deliberately further their significant financial interest

16 | in the infringement of Mattel's copyrighted works.  Accordingly, Counter-

17 | defendants have engaged in direct, contributory and vicarious infringement of

18 | Mattel's copyrighted works.

19 |       147.   By virtue of Counter-defendants' infringing acts, Mattel is

20 | entitled to recover Mattel's actual damages plus Counter-defendants' profits,

21 | Mattel's costs of suit and attorneys' fees, and all other relief permitted under the

22 | Copyright Act.

23 |       148.   Counter-defendants' actions described above have caused and

24 | will continue to cause irreparable damage to Mattel, for which Mattel has no remedy

25 | at law.  Unless Counter-defendants are restrained by this Court from continuing

26 | their infringement of Mattel's copyrights, these injuries will continue to occur in the

27 | future.  Mattel is accordingly entitled to injunctive relief restraining Counter-

28 | defendants from further infringement.

## Fifth Counterclaim

## Breach of Contract

## (Against Bryant and Machado)

149.   Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 148, above, as though fully set forth at length.

150.   Pursuant to his Employment Agreement, Bryant agreed that he would not, without Mattel's express written consent, engage in any employment or business other than for Mattel or assist in any manner any business competitive with the business or future business plans of Mattel during his employment with Mattel. Pursuant to his Mattel Employment Agreement, Bryant further assigned to Mattel all right, title and interest in "inventions," including without limitation "designs" and other works that he conceived, created or reduced to practice during his employment by Mattel.  In addition, pursuant to the Conflict Questionnaire, Bryant certified that, other than as disclosed, he had not worked for any competitor of Mattel and had not engaged in any business venture or transaction involving a Mattel competitor that could be construed as a conflict of interest.  Bryant further promised that he would notify his supervisor immediately of any change in his situation that would cause him to change any of the foregoing certifications or representations.

151.   The Employment Agreement and the Conflict Questionnaire are valid, enforceable contracts, and Mattel has performed each and every term and condition of the Employment Agreement and Conflict Questionnaire required to be performed by Mattel.

152.   Bryant materially breached the foregoing contracts with Mattel, in that, among other things, he secretly aided, assisted and worked for a Mattel competitor during his employment with Mattel without the express written consent of Mattel.

153.   As a consequence of Bryant's breach, Mattel has suffered and will, in the future, continue to suffer damages in an amount to be proven at trial.

1  Such damages include, without limitation, the amounts paid by the competitor to
2  Bryant during his Mattel employment; the amounts paid by MGA to Bryant during
3  his Mattel employment; the amount that Mattel paid Bryant during the time he
4  wrongfully worked with MGA; the value of information and intellectual property
5  owned by Mattel which Bryant provided to MGA; the value of the benefits that
6  MGA obtained from Bryant during the time he was employed by Mattel; and the
7  value of the benefits that MGA obtained from Bryant as a result of the work he
8  performed for or with MGA during his Mattel employment.

9       154.   Bryant's conduct has caused, and unless enjoined will continue
10 to cause, irreparable injury to Mattel that cannot be adequately compensated by
11 money damages and for which Mattel has no adequate remedy at law.  Bryant
12 specifically acknowledged in his Employment Agreement that his breach of the
13 Agreement "likely will cause irreparable harm" to Mattel and that Mattel "will be
14 entitled to injunctive relief to enforce this Agreement, in addition to damages and
15 other available remedies."  Accordingly, Mattel is entitled to orders mandating
16 Bryant's specific performance of his contracts with Mattel and restraining Bryant
17 from further breach.

18      155.   Pursuant to his Mattel Conflict Questionnaire, Conflict of
19 Interest Manual, and Code of Ethical Business Conduct, Machado agreed that he
20 would "not divulge any company information to unauthorized recipients" and that
21 he would not "get involved in any type of outside business activity, transaction or
22 action which, due to its nature (notwithstanding the personal gain received by the
23 employee), may . . . have a negative impact on Mattel's capacity to compete through
24 the disclosure of proprietary, commercial, pricing, technical information and any
25 other private or confidential information," among other things.

26      156.   The Conflict Questionnaire, the Conflict of Interest Manual, and
27 Code of Ethical Business Conduct are valid, enforceable contracts, and Mattel has
28 performed each and every term and condition of the Conflict Questionnaire, the

MATTEL'S FOURTH AMENDED ANSWER AND COUNTERCLAIMS

1 | Conflict of Interest Manual, and Code of Ethical Business Conduct required to be
2 | performed by Mattel.

3 | 157.   Machado materially breached the foregoing contracts with
4 | Mattel, in that, among other things, he possessed, used and disclosed Mattel
5 | confidential information to third-parties, including to a direct competitor of Mattel
6 | and its employees in breach of those referenced agreement.  In addition, he secretly
7 | aided, assisted and worked for a Mattel competitor during his employment with
8 | Mattel without the express written consent of Mattel.

9 | 158.   As a consequence of Machado's breach, Mattel has suffered and
10 | will, in the future, continue to suffer damages in an amount to be proven at trial.
11 | Such damages include, without limitation, the amounts paid by the competitor to
12 | Machado during his Mattel employment; the amount that Mattel paid Machado
13 | during the time he wrongfully worked with MGA; the value of information and
14 | intellectual property owned by Mattel which Machado provided to MGA; the value
15 | of the benefits that MGA obtained from Machado during the time he was employed
16 | by Mattel; and the value of the benefits that MGA obtained from Machado as a
17 | result of the work he performed for or with MGA during his Mattel employment.

### Sixth Counterclaim

### Intentional Interference with Contract

### (Against MGA, Larian and Does 6 through 10)

21 | 159.   Mattel repeats and realleges each and every allegation set forth in
22 | paragraphs 1 through 158, above, as though fully set forth at length.

23 | 160.   Valid agreements existed between Mattel and the Mattel
24 | employees who MGA induced to steal or were complicit in stealing Mattel trade
25 | secrets and other proprietary and confidential information and who MGA bribed or
26 | induced to work for or assist MGA while Mattel employees (collectively, the
27 | "Mattel Employees"), including without limitation Bryant, Brawer, Machado,

28 |

1  Trueba, Vargas, Castilla, Contreras, Cooney, Cabrera, Morales, Salazar, and other

2  former Mattel employees.

3      161.   At all times herein mentioned, MGA, Larian and Does 6 through

4  10 knew that the Mattel Employees had a duty under their agreements not to work

5  for or assist any competitor of Mattel, such as MGA, and not to disclose confidential

6  or trade secret Mattel information to any competitor of Mattel.  In addition, at all

7  times mentioned herein, MGA, Larian and Does 6 through 10 knew that Bryant had

8  assigned to Mattel, and was obligated to disclose to Mattel all inventions, including

9  designs and other works, created, conceived or reduced to practice during their

10  employment with Mattel.

11      162.   Despite such knowledge, Counter-defendants MGA, Larian and

12  Does 6 through 10 intentionally and without justification solicited, induced and

13  encouraged the Mattel Employees to breach their contracts with Mattel.

14      163.   As a direct and proximate result of Counter-defendants' efforts

15  and inducements, the Mattel Employees did breach their contracts with Mattel.

16      164.   As a result of said breaches, Mattel has suffered damages and

17  will imminently suffer further damages, including the loss of its competitive

18  position and lost profits, in an amount to be proven at trial.

19      165.   Counter-defendants performed the aforementioned conduct with

20  malice, fraud and oppression, and in conscious disregard of Mattel's rights.

21  Accordingly, Mattel is entitled to recover exemplary damages from Counter-

22  defendants in an amount to be determined at trial.

23                    **Seventh Counterclaim**

24                    **Breach of Fiduciary Duty**

25                    **(Against Bryant and Machado)**

26      166.   Mattel repeats and realleges each and every allegation set forth in

27  paragraphs 1 through 165, above, as though fully set forth at length.

28

167. Bryant and Machado held positions of trust and confidence with Mattel. In their positions, Bryant and Machado had access to and were entrusted with Mattel's proprietary and confidential information, supervised the work of others, exercised discretion and worked independently in many of their job assignments and duties. In their positions, Bryant and Machado also represented Mattel in its dealings with third parties and, in actions in the course and scope of their employment with Mattel, were agents of Mattel. They confirmed their relationship of trust with Mattel in respective employee agreements. Bryant and Machado thus owed Mattel a fiduciary duty that included, but was not limited to, an obligation not to take any action that would be contrary to Mattel's best interests or that would deprive Mattel of any opportunities, profit or advantage which Bryant or Machado might bring to Mattel.

168. Bryant breached his fiduciary duty to Mattel in that, while employed by Mattel, he secretly aided and assisted a competitor of Mattel, including without limitation by entering into an agreement with a Mattel competitor. As alleged above, Bryant also breached the aforementioned duty by using Mattel property and resources for the benefit of, and to aid and assist, himself personally and MGA.

169. Machado breached his fiduciary duty to Mattel in that while employed by Mattel, he secretly aided and assisted a competitor of Mattel by, among other things, misappropriating Mattel trade secret and proprietary information and providing said information to officers of MGA and MGA de Mexico. Machado also breached the aforementioned duty by using Mattel property and resources for the benefit of, and to aid and assist, himself personally, MGA, and MGA de Mexico.

170. As a direct and proximate result of Counter-defendants' wrongful conduct, Mattel has incurred damages in an amount to be determined at trial.

171. Counter-defendants acted with malice, fraud and oppression, and in conscious disregard of Mattel's rights. Accordingly, Mattel is entitled to an award of exemplary damages against Counter-defendants in an amount to be determined at trial.

172. Furthermore, Counter-defendants' conduct has caused, and unless enjoined will continue to cause, irreparable injury to Mattel that cannot be adequately compensated by money damages and for which Mattel has no adequate remedy at law. Accordingly, Mattel is entitled to an order restraining further breaches of fiduciary duty to Mattel and/or restraining Counter-defendants from continuing to benefit from such breaches.

## Eighth Counterclaim

### Aiding and Abetting Breach of Fiduciary Duty

### (Against MGA, Larian and Does 6 through 10)

173. Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 172, above, as though fully set forth at length.

174. At all times herein mentioned, MGA, Larian and Does 6 through 10 knew that Bryant held a position of trust and confidence at Mattel. At all times herein mentioned, MGA, Larian and certain of the Doe Counter-defendants knew that Bryant owed a fiduciary duty to Mattel not to take any action that would be contrary to Mattel's best interests, including but not limited to secretly developing and designing Bratz while employed by Mattel and by secretly assisting Larian and MGA.

175. At all times herein mentioned, MGA, Larian and Does 6 through 10 also knew that Brawer, Machado, Trueba, Vargas, Castilla, Contreras and Cooney held positions of trust and confidence at Mattel. At all times herein mentioned, MGA, Larian and Does 6 through 10 knew that these employees owed a fiduciary duty to Mattel not to take any action that would be contrary to Mattel's

1 | best interests, including but not limited to taking confidential trade secret

2 | information from Mattel's premises and providing that information to a competitor.

3 |     176.  Despite such knowledge, Counter-defendants MGA, Larian and

4 | Does 6 through 10 intentionally and without justification solicited, encouraged,

5 | aided and abetted and gave substantial assistance to these employees to breach their

6 | fiduciary duties to Mattel, knowing that their conduct would constitute breaches of

7 | their fiduciary duties to Mattel.

8 |     177.  As a direct and proximate result of Counter-defendants' efforts,

9 | these employees did breach their fiduciary duties to Mattel and Mattel has incurred

10 | damages in an amount to be proven at trial. Mattel, therefore, is entitled to recover

11 | compensatory damages in an amount to be determined at trial.

12 |     178.  In taking the aforesaid actions, MGA, Larian and Does 6 through

13 | 10 acted with malice, fraud and oppression, and in conscious disregard of Mattel's

14 | rights. Accordingly, Mattel is entitled to recover exemplary damages from Counter-

15 | defendants in an amount to be determined at trial.

16 | **Ninth Counterclaim**

17 | **Breach of Duty of Loyalty**

18 | **(Against Bryant and Machado)**

19 |     179.  Mattel repeats and realleges each and every allegation set forth in

20 | paragraphs 1 through 178, above, as though fully set forth at length.

21 |     180.  As employees of Mattel, Bryant and Machado owed a duty of

22 | undivided loyalty to Mattel. Pursuant to this duty, Bryant and Machado could not

23 | compete with Mattel or assist a competitor of Mattel during their employment with

24 | Mattel. Pursuant to this duty, Bryant and Machado were required to always give

25 | preference to Mattel's business over their own, similar interests during the course of

26 | their employment with Mattel.

27 |     181.  Bryant and Machado breached their duty of loyalty to Mattel in

28 | that, while employed by Mattel, they secretly aided, assisted and worked for a

1  competitor of Mattel, including without limitation by entering into agreements with

2  a Mattel competitor.  As alleged above, they also breached the aforementioned duty

3  by using Mattel property and resources for the benefit of, and to aid and assist,

4  themselves personally and the competitor of Mattel.

5       182.   As a direct and proximate result of Counter-defendants'

6  wrongful conduct, Mattel has incurred damages in an amount to be determined at

7  trial.

8       183.   Counter-defendants acted with malice, fraud and oppression, and

9  in conscious disregard of Mattel's rights.  Accordingly, Mattel is entitled to an

10  award of punitive damages against Counter-defendants in an amount to be

11  determined at trial.

12       184.   Furthermore, Counter-defendants' conduct has caused, and

13  unless enjoined will continue to cause, irreparable injury to Mattel that cannot be

14  adequately compensated by money damages and for which Mattel has no adequate

15  remedy at law.  Accordingly, Mattel is entitled to an order restraining further breach

16  of Counter-defendants' duty of loyalty to Mattel and/or restraining Counter-

17  defendants from continuing to benefit from such breach.

18       185.   In breaching their duty of loyalty to Mattel, Bryant and Machado

19  acted with malice, fraud and oppression, and in conscious disregard of Mattel's

20  rights.  Accordingly, Mattel is entitled to recover exemplary damages from Counter-

21  defendants in an amount to be determined at trial.

22  **Tenth Counterclaim**

23  **Aiding and Abetting Breach of Duty of Loyalty**

24  **(Against MGA, Larian and Does 6 through 10)**

25       186.   Mattel repeats and realleges each and every allegation set forth in

26  paragraphs 1 through 185, above, as though fully set forth at length.

27       187.   MGA, Larian and Does 6 through 10 knew that Bryant, as an

28  employee of Mattel, owed a duty of loyalty to his employer.  MGA, Larian and

Does 6 through 10 knew that this duty included an obligation on the part of Bryant not to compete with Mattel or assist a competitor of Mattel during the term of his employment with Mattel.  MGA, Larian and certain of the Doe Counter-defendants also knew that Bryant was required to give preference to Mattel's business over his own, similar interests or those of Mattel's competitors during the course of his employment with Mattel.

188.   MGA, Larian and certain of the Doe Counter-defendants knew that the Mattel Employees (excluding Bryant), including without limitation Brawer, Machado, Trueba, Vargas, Castilla, Contreras, Cooney, Cabrera, Morales and Salazar, were employed by Mattel and, as employees of Mattel, that they owed duties of loyalty to Mattel.  MGA, Larian and certain of the Doe Counter-defendants knew that these duties included an obligation on the part of the Mattel Employees (excluding Bryant) not to compete with Mattel or assist a competitor of Mattel during their Mattel employment.

189.   Despite such knowledge, Counter-defendants MGA, Larian and Does 6 through 10 intentionally and without justification solicited, encouraged, aided and abetted and gave substantial assistance to the Mattel Employees to breach their duties of loyalty to Mattel, knowing that their conduct would constitute breaches of their duties of loyalty to Mattel.

190.   As a further consequence of Counter-defendants' efforts, Mattel has suffered injury and is entitled to compensatory damages in an amount to be proven at trial.

191.   In taking the aforesaid actions, MGA, Larian and Does 6 through 10 acted with malice, fraud and oppression, and in conscious disregard of Mattel's rights.  Accordingly, Mattel is entitled to recover exemplary damages from Counter-defendants in an amount to be determined at trial.

## Eleventh Counterclaim

### Conversion

### (Against MGA, MGA HK, MGA de Mexico, Larian and Machado)

192.   Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 191, above, as though fully set forth at length.

193.   Counter-defendants wrongfully converted Mattel property and resources by appropriating and using them for their own benefit and gain and for the benefit and gain of others, without the permission of Mattel.

194.   Mattel was entitled to, among other things, the exclusive right and enjoyment in property and tangible materials owned by Mattel, including without limitation such proper and materials that were created by Bryant while he was a Mattel product designer.  Such property was taken by Bryant from Mattel to further his own interests and, in at least some instances, provided by Bryant to Larian and MGA in furtherance of the interests of Bryant, Larian and MGA.

195.   In addition, Counter-defendants wrongfully converted Mattel's property by removing the Trade Secret Materials in electronic and paper form from Mattel's offices.  Counter-defendants did so without Mattel's permission and continue to possess them.

196.   In addition, Counter-defendants have converted and continue to convert other tangible property, including without limitation Bratz inventory, and transferred, sold, alienated or otherwise purported to encumber that property, despite Mattel's rights therein.

197.   As a direct and proximate result of Counter-defendants' wrongful conversion of Mattel property, including those relating to Bratz and Mattel's Trade Secret Materials, Mattel has incurred damages.  Mattel, therefore, is entitled to recover compensatory damages in an amount to be determined at trial.

198.   As a result of Counter-defendants' acts of conversion, Mattel is entitled to damages in an amount sufficient to indemnify Mattel for the loss

1  suffered, including but not limited to the lost profits that Mattel suffered as a result

2  of the conversion and the profits generated by the Counter-defendants that would

3  not have been generated but for the conversion.

4      199.  Counter-defendants performed the aforementioned conduct with

5  malice, fraud and oppression, and in conscious disregard of Mattel's rights.

6  Accordingly, Mattel is entitled to recover exemplary damages from Counter-

7  defendants in an amount to be determined at trial.

8      200.  Furthermore, Counter-defendants' conduct has caused, and

9  unless enjoined will continue to cause, irreparable injury to Mattel that cannot be

10  adequately compensated by money damages and for which Mattel has no adequate

11  remedy at law.  Accordingly, Mattel is entitled to an order restraining Counter-

12  defendants from further conversion of Mattel property and resources and/or

13  restraining Counter-defendants from continuing to benefit from such conversion.

14  **Twelfth Counterclaim**

15  **Unfair Competition**

16  **(Against MGA, MGA HK, Larian, Bryant and Does 6 through 10)**

17  **(Common Law and Cal. Bus. & Prof. Code § 17200)**

18      201.  Mattel repeats and realleges each and every allegation set forth in

19  paragraphs 1 through 200, above, as though fully set forth at length.

20      202.  Section 17200 of the California Business and Professions Code

21  prohibits unfair competition, including "any unlawful, unfair or fraudulent business

22  act or practice . . . ."

23      203.  By engaging in the foregoing conduct, Counter-defendants have,

24  individually and in combination, engaged in unlawful, unfair and/or fraudulent acts

25  of unfair competition in violation of both the common law of the state of California

26  and Cal. Bus. & Prof. Code § 17200 et seq.  Such conduct included, without

27  limitation, MGA's commercial bribery of Bryant in violation of Cal. Penal Code §

28  641.3 and misappropriation of trade secrets in violation of 18 U.S.C. § 1832(a).

00505.07975/3437282.1

MATTEL'S FOURTH AMENDED ANSWER AND COUNTERCLAIMS

1        204.   As a result of the aforementioned conduct, Mattel has suffered

2   damages and will imminently suffer further damages, including but not limited to

3   lost profits in an amount to be proven at trial.  No adequate remedy at law exists for

4   the wrongs and injuries Mattel has suffered and will continue to suffer, and Mattel is

5   entitled to an injunction enjoining Counter-defendants' continued wrongful acts.

6   Mattel is also entitled to recover compensatory and exemplary damages pursuant to

7   the doctrine of common law unfair competition and Cal. Civ. Code § 3294.

8                    **Thirteenth Counterclaim**

9              **Avoidance of Actual Fraudulent Transfers Under**

10        **Cal. Civil Code §§ 3439.04(a)(1), 3439.07, 3439.08**

11         **(Against MGA, Larian, Omni 808 and IGWT 826)**

12        205.   Mattel repeats and realleges each and every allegation set forth in

13   paragraphs 1 through 204, above, as though fully set forth at length.

14        206.   Mattel is a creditor (within the meaning of Cal. Civ. Code

15   § 3439.01) of MGA because Mattel has claims against MGA including but not

16   limited to claims that have already resulted in a jury verdict in Mattel's favor in this

17   action.

18        207.   MGA engaged in fraudulent transfers, including, without

19   limitation:

20            (a)     Upon information and belief, and as set forth on Exhibit X

21   hereto, between 2004 and 2008 MGA paid more than $320 million in dividends and

22   distributions to Larian and/or to trusts controlled by Larian (the "Dividend

23   Transfers").  Upon information and belief, the Dividend Transfers – which Mattel

24   first learned about only within the past year, because MGA failed and refused to

25   provide information about them during discovery, and indeed continues to do so –

26   were made with the intent to wrongfully transfer assets away from MGA to ensure

27   that such assets would not be available to satisfy claims by MGA's creditors,

28   particularly including Mattel following the filing of this action in 2004.  Moreover,

1  as part of the Dividend Transfers, MGA paid substantial sums as purported interest

2  to Larian through his IGWT 826 entity, and through Omni 808, as discussed at

3  paragraph 113.

4        (b)   As discussed in paragraph 107, on or about September 3,

5  2008, in connection with Omni 808's purchase of the Wachovia Debt at a significant

6  discount to face value, MGA purported to transfer a security interest in its Bratz-

7  related intellectual property to Omni 808 pursuant to the Side Letter Agreement.

8  The transfer was specifically intended to frustrate the Phase 1 jury verdict and Court

9  orders finding that MGA did not have valid and enforceable title to the Bratz-related

10  intellectual property (the "IP Transfer," and collectively with the Dividend Transfer,

11  the "Fraudulent Transfers").

12        208.   Upon information and belief, these Fraudulent Transfers were

13  made by MGA with actual intent to hinder, delay, and/or defraud MGA's creditors,

14  including Mattel. <u>Cal. Civ. Code</u> § 3439.04(a)(1).  As previously set forth in

15  paragraphs 97-116 above, and among other things:

16        (a)   Each of the Fraudulent Transfers was made to insiders of

17  MGA.  Larian is the controlling shareholder and President of MGA.  Moreover,

18  Omni 808 was controlled by Larian and/or by insiders, affiliates or parties related to

19  MGA and Larian, who exercised the power to direct or cause the direction of its

20  management and policies.

21        (b)   Each of the Fraudulent Transfers was made with the intent

22  to defraud creditors of MGA, including Mattel, by stripping MGA of money and

23  other assets to ensure that such money and assets would not be available to satisfy

24  claims against MGA and to move assets that could not be completely stripped into

25  friendly hands so that any attempt by MGA's creditors to satisfy their claims against

26  MGA would be rendered more difficult and expensive.

27        (c)   Each of the Fraudulent Transfers occurred after MGA was

28  on notice of Mattel's actual or potential claims against MGA and at times when

1  MGA understood the significant likelihood that Mattel's claims would result in
2  judgment in Mattel's favor.

3          (d)    The Fraudulent Transfers, in the aggregate and
4  individually, comprise a significant percentage of MGA's assets as of the respective
5  times of the Fraudulent Transfers. Moreover, a significant amount of the Dividend
6  Transfers and the entirety of the IP Transfer were made in 2007 and 2008, years in
7  which MGA itself claims it sustained net losses of $137.0 million and $150.4
8  million respectively.

9          209.   Mattel does not know, at this time, the full scope of the unlawful
10  transfers MGA and Larian have made and continue to make because such facts are
11  exclusively in the possession of and known by Counter-defendants. On information
12  and belief, MGA's and Larian's unlawful transfers are ongoing, and unless stopped
13  by the Court will continue to occur and be made in the future.

14          210.   Counter-defendants are each liable to Mattel for the value of the
15  assets transferred to them or to the extent necessary to satisfy all of Mattel's claims
16  against MGA in full, whichever is less, plus pre-judgment interest at the highest rate
17  determined to be applicable by the Court, pursuant to Cal. Civil Code § 3439.08.

18          211.   Alternatively, each of the Fraudulent Transfers should be
19  avoided and attached to the extent necessary to satisfy all of Mattel's claims against
20  MGA in full plus pre-judgment interest at the highest rate determined to be
21  applicable by the Court, pursuant to Cal. Civil Code § 3439.07.

22          212.   Counter-defendants engaged in the Fraudulent Transfers with
23  malice, fraud and oppression, and in conscious disregard of Mattel's rights.
24  Accordingly, Mattel is entitled to an award of punitive damages against Counter-
25  defendants in an amount to be determined at trial.

26          213.   Injunctions should be issued against any disposition or further
27  transfers of MGA assets and against any disposition or further transfer of the
28  transferred assets and/or their proceeds.

## Fourteenth Counterclaim

## Avoidance of Constructive Fraudulent Transfers Under

## Cal. Civil Code §§ 3439.04(a)(2), 3439.05, 3439.07, 3439.08

## (Against MGA, Larian, Omni 808 and IGWT 826)

214. Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 213, above, as though fully set forth at length.

215. Mattel is a creditor (within the meaning of Cal. Civ. Code § 3439.01) of MGA because Mattel has claims against MGA including but not limited to claims that have already resulted in a jury verdict in Mattel's favor in this action.

216. After Mattel's claims had arisen, MGA engaged in fraudulent transfers, Cal. Civ. Code §§ 3439.04(a)(2), 3439.05(a), including, without limitation, the Dividend Transfers and the IP Transfer.

217. At the time of the Fraudulent Transfers, MGA was insolvent or was rendered insolvent by the Fraudulent Transfers, and/or was about to engage in a business or transaction for which its remaining assets were unreasonably small and, on information and belief, intended to incur, or believed or reasonably should have believed it would incur, debts beyond its ability to pay as they became due.

218. MGA received less than reasonably equivalent value in exchange for the Fraudulent Transfers. Cal. Civ. Code §§ 3439.04(a)(2), 3439.05(a). MGA did not receive any consideration for the Dividend Transfers, consisting of dividends and distributions. Any funds made available to MGA in exchange for the IP Transfer constituted less than reasonably equivalent value in view of the significant value of the Bratz-related intellectual property that was purportedly encumbered by the IP Transfer.

219. Mattel does not know, at this time, the full scope of the unlawful transfers MGA and Larian have made and continue to make because such facts are exclusively in the possession of and known by Counter-defendants. On information

1  and belief, MGA's and Larian's unlawful transfers are ongoing, and unless stopped

2  by the Court will continue to occur and be made in the future.

3      220.   Counter-defendants are each liable to Mattel for the value of the

4  assets transferred to them or to the extent necessary to satisfy all of Mattel's claims

5  against MGA in full, whichever is less, plus pre-judgment interest at the highest rate

6  determined to be applicable by the Court, pursuant to Cal. Civil Code § 3439.08.

7      221.   Alternatively, each of the Fraudulent Transfers should be

8  avoided and attached to the extent necessary to satisfy all of Mattel's claims against

9  MGA in full plus pre-judgment interest at the highest rate determined to be

10  applicable by the Court, pursuant to Cal. Civil Code § 3439.07.

11     222.   Counter-defendants engaged in the Fraudulent Transfers with

12  malice, fraud and oppression, and in conscious disregard of Mattel's rights.

13  Accordingly, Mattel is entitled to an award of punitive damages against Counter-

14  defendants in an amount to be determined at trial.

15     223.   Injunctions should be issued against any disposition or further

16  transfers of MGA assets and against any disposition or further transfer of the

17  transferred assets and/or their proceeds.

18  ### Fifteenth Counterclaim

19  **Prohibited Distributions Under Cal. Corp. Code §§ 501, 506**

20  **(brought derivatively *ex rel.* all MGA creditors)**

21  **(Against Larian)**

22     224.   Mattel repeats and realleges each and every allegation set forth in

23  paragraphs 1 through 223, above, as though fully set forth at length.

24     225.   At the time of the Dividend Transfers, MGA was likely to be

25  unable to meet its liabilities as they mature. Cal. Corp Code § 501.

26     226.   Larian, as controlling shareholder and President of MGA

27  received the Dividend Transfers, consisting of distributions and dividends, with

28  knowledge of facts indicating the impropriety thereof, including that the Dividend

00505.07975/3437282.1

MATTEL'S FOURTH AMENDED ANSWER AND COUNTERCLAIMS

1 Transfers were not made out of available surplus for profits and that the Dividend

2 Transfers would endanger MGA's financial position. <u>Cal. Corp Code</u> § 506.

3       227.   Larian is liable to MGA (for the benefit of all of its creditors) for

4 the full amount of the Dividend Transfers plus pre-judgment interest at the highest

5 rate determined to be applicable by the Court.

6       228.   Mattel was a creditor of MGA as of the date of the Dividend

7 Transfers, because Mattel has claims against MGA including but not limited to

8 claims that have already resulted in a jury verdict in Mattel's favor in this action.

9 Mattel has standing to assert this claim *ex rel.* all of MGA's creditors.

10      229.   Larian benefited personally from the Dividend Transfers and

11 faces a substantial likelihood of liability resulting from this claim.  As a result of

12 Larian's role as controlling shareholder and President of MGA, the majority of

13 MGA's board of directors were beholden to Larian at the time of the Dividend

14 Transfers and remain so.  Reasonable doubt thus exists that MGA's directors are

15 disinterested and independent, and that the Dividend Transfers were the product of

16 valid exercises of business judgment.  Thus, any effort to cause MGA to assert this

17 claim would be futile.

18      230.   A copy of this Complaint was delivered to MGA's board of

19 directors through counsel for MGA prior to the filing hereof.

20                    **Sixteenth Counterclaim**

21                  **Breach of Constructive Trust**

22            **(Against Larian, MGA and Does 6 through 10)**

23      231.   Mattel repeats and realleges each and every allegation set forth in

24 paragraphs 1 through 230, above, as though fully set forth at length.

25      232.   MGA, Larian, and Does 6 through 10, by virtue of their wrongful

26 acquisition of Mattel's valuable property, including Bratz, held that property in

27 constructive trust for Mattel.

28

233.    As constructive trustees, they were required to preserve that property, and to protect it against destruction or loss in value.  Instead of satisfying those duties, MGA, Larian, and certain of the Doe Counter-defendants wrongfully permitted and intentionally caused Bratz to lose value.  They failed to act as faithful trustees.

234.    In fact, after using Mattel's employees, confidential information, and trade secrets to build Bratz, on information and belief MGA, Larian, and certain of the Doe Counter-defendants set about to liquidate and devalue Bratz for their own benefit, including through a series of financial transactions that had the actual and intended effect of draining MGA of assets, including assets that were critical to maintaining the value of Bratz and promoting it.

235.    Through their intentional and negligent misconduct, rather than preserve and protect Mattel's valuable property, MGA, Larian, and certain of the Doe Counter-defendants wrongfully and intentionally destroyed the value of that property to deprive Mattel of the ability to benefit from it.

236.    As a result of this misconduct, Mattel has suffered injury and is entitled to compensatory damages in an amount to be proven at trial.

237.    In addition, in taking the aforesaid actions, MGA, Larian, and Does 6 through 10 acted with malice, fraud and oppression, and in conscious disregard of Mattel's rights.  Accordingly, Mattel is entitled to recover exemplary damages from them in an amount to be determined at trial.

### Seventeenth Counterclaim

### Declaratory Relief

### (Against MGA, Larian, MGA Mexico, MGA HK, IGWT 826, Omni 808, Bryant and Does 6 through 10)

238.    Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 237, above, as though fully set forth at length.

239.   As shown in the foregoing paragraphs, an actual controversy exists between Mattel and Counter-defendants, including regarding Counter-defendants' lack of ownership interests in Bratz and Mattel's rights in the same.

240.   Accordingly, Mattel seeks a declaration of the Court that Counter-defendants have no valid or protectable ownership rights or interests in Bratz, and that Mattel is the true owner of the same, and further seeks an accounting and imposition of a constructive trust over Bratz, including without limitation registrations and applications for registrations relating thereto made or filed by Counter-defendants and third parties, and over all revenues and other monies or benefits derived or obtained from MGA's and Bryant's purported ownership, use, sale, distribution and licensing of Bratz.

241.   Mattel seeks a declaration of the Court that any and all agreements between Bryant and/or any other individuals then-employed by Mattel, on the one hand, and MGA, on the other hand, in which Bryant or any of them purport to assign to MGA any right, title or interests in any work or properties that they conceived, created or reduced to practice while Mattel employees, including but not limited to the Bratz designs, is void and of no effect, including without limitation because Bryant and/or any other such individuals had previously assigned said right, title or interest to Mattel and because Mattel was otherwise the owner of said right, title or interest.

242.   Mattel seeks a declaration of the Court that any and all encumbrances, security interests or rights of priority that Larian, IGWT 826, Omni 808, or any agent, affiliate or alter ego of any of them, purports to hold senior or preferred to Mattel's rights as a creditor of MGA are invalid and/or are equitably subordinated to Mattel's rights as a creditor of MGA.

243.   Mattel seeks a declaration of the Court that Counter-defendants have no rights over the "Moxie Girlz" name or mark, that Mattel is the true beneficial owner of that name and mark, and Mattel is entitled to an accounting and

1  imposition of a constructive trust over Moxie Girlz, including without limitation

2  registrations and applications for registrations relating thereto made or filed by

3  Counter-defendants and third parties, and over revenues and other monies or

4  benefits derived or obtained from MGA's and Bryant's purported ownership, use,

5  sale, distribution and licensing of Moxie Girlz.

6  **Prayer for Relief**

7  WHEREFORE, Mattel respectfully requests judgment:

8  1.   For a declaration that Counter-defendants have no valid or

9  protectable ownership interests or rights in Bratz designs, works or properties

10  conceived, made, created or reduced to practice by Bryant during the term of his

11  Mattel employment and/or by any others then-employed by Mattel, as well as in all

12  derivatives prepared therefrom, and that Mattel is the true owner of the foregoing;

13  2.   For a declaration that any agreement between Bryant and/or by

14  any others then-employed by Mattel, on the one hand, and MGA or any person or

15  entity, on the other hand, in which Bryant or such others then-employed by Mattel

16  purported to assign any right, title or interests in any work or properties that they

17  conceived, made, created or reduced to practice while employed by Mattel,

18  including but not limited to the Bratz designs, is void and of no effect;

19  3.   For an Order enjoining and restraining Counter-defendants, their

20  agents, servants and employees, and all persons in active concert or participation

21  with them, from further wrongful conduct, including without limitation from

22  imitating, copying, distributing, importing, displaying, preparing derivatives from

23  and otherwise infringing Mattel's copyright-protected works;

24  4.   For an Order, pursuant to 17 U.S.C. § 503(a) and other

25  applicable law, impounding all of Counter-defendants' products and materials that

26  infringe Mattel's copyrights, as well as all plates, molds, matrices and other articles

27  by which copies of the works embodied in Mattel's copyrights may be reproduced

28  or otherwise infringed;

1        5.    For an Order mandating that Counter-defendants return to Mattel

2  all tangible items, documents, designs, diagrams, sketches or any other

3  memorialization of inventions conceived, created, made or reduced to practice

4  during Bryant's employment with Mattel as well as all Mattel property converted by

5  Counter-defendants;

6        6.    For an Order mandating specific performance by Bryant to

7  comply with and satisfy Bryant's contractual obligations to Mattel;

8        7.    That Mattel be awarded, and Counter-defendants be ordered to

9  disgorge, all payments, revenues, profits, monies and royalties and any other

10  benefits derived or obtained as a result of the conduct alleged herein, including

11  without limitation of all revenues and profits attributable to Counter-defendants'

12  infringement of Mattel's copyrights under 17 U.S.C. § 504;

13        8.    For an accounting of all profits, monies and/or royalties from the

14  exercise of ownership, use, distribution, sales and licensing of Bratz;

15        9.    For the imposition of a constructive trust over Bratz, including

16  without limitation all rights and benefits relating thereto and registrations and

17  applications for registrations relating thereto made or filed by Counter-defendants

18  and third parties, and all profits, monies, royalties and any other benefits derived or

19  obtained from Counter-defendant's exercise of ownership, use, sale, distribution and

20  licensing of Bratz;

21        10.    For the imposition of a constructive trust over "Moxie Girlz,"

22  including without limitation all registrations and applications for registrations

23  relating thereto made or filed by Counter-defendants and third parties, rights and

24  benefits relating thereto and profits, monies, royalties and any other benefits derived

25  or obtained from Counter-defendant's exercise of ownership, use, sale, distribution

26  and licensing of "Moxie Girlz";

27        11.    That Mattel recover its actual damages and lost profits;

28

12.     That Counter-defendants be ordered to pay exemplary damages in a sum sufficient to punish and to make an example of them, and deter them and others from similar wrongdoing;

13.     That Counter-defendants be ordered to pay treble its general and special damages, plus interest, costs and attorney's fees incurred by reason of Counter-defendants' violations of 18 U.S.C. §§ 1962(c)-(d).

14.     That Counter-defendants be ordered to pay double damages due to their willful and malicious misappropriation of Mattel's trade secrets with deliberate intent to injure Mattel's business and improve its own;

15.     That Counter-defendants pay to Mattel the full cost of this action and Mattel's attorneys' and investigators' fees;

16.     For an Order that Larian is liable for all wrongs of his agents, alter-egos or others committed on his behalf;

17.     That Counter-defendants' Fraudulent Transfers be avoided and set aside; that the transferred assets and their proceeds be restored to MGA and attached and/or subjected to a constructive trust for Mattel's benefit; that Counter-defendants be required to account for their past and future fraudulent transfers; and that Counter-defendants be enjoined against any further fraudulent transfers and any disposition of the transferred assets and/or their proceeds; and

\\
\\
\\
\\
\\
\\
\\
\\
\\

18.     That Mattel have such other and further relief as the Court may deem just and proper.

DATED:  April 12, 2010            QUINN EMANUEL URQUHART & SULLIVAN, LLP


By _____
     John B. Quinn
     Attorneys for Defendant and Counter-
     claimant Mattel, Inc.

## **DEMAND FOR JURY TRIAL**

Mattel, Inc. respectfully requests a jury trial on all issues triable thereby.

DATED:  April 12, 2010

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By _____
John B. Quinn
Attorneys for Defendant and Counter-claimant Mattel, Inc.

00505.07975/3437282.1

MATTEL'S FOURTH AMENDED ANSWER AND COUNTERCLAIMS

# Exhibits A-X Filed Under Seal Pursuant to Court Order