# EXHIBIT 1



1   PAUL, HASTINGS, JANOFSKY & WALKER LLP
    GLENN D. DASSOFF (SB# 96809)
2   ELENA R. BACA (SB# 160564)
    SAMANTHA J. BLACK (SB# 228829)
3   695 Town Center Drive
    Seventeenth Floor
4   Costa Mesa, CA  92626-1924
    Telephone:  (714) 668-6200
5   Facsimile:  (714) 979-1921

6   Attorneys for Plaintiff
    MATTEL, INC.

7

**FILED**
LOS ANGELES SUPERIOR COURT

OCT 2 1 2004

JOHN A. CLARKE, EXECUTIVE OFFICER/CLERK
BY_____
      J. SUNGA, DEPUTY

Case assigned to
Judge Ernest Hiroshige

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                        COUNTY OF LOS ANGELES

10

D.54

11   MATTEL, INC., a Delaware
     corporation,
12
                    Plaintiff,
13
          vs.
14
     RONALD BRAWER, an individual,
15   and DOES 1-50 inclusive,

16                  Defendants.

CASE NO.  BC 323381

**COMPLAINT FOR DECLARATORY RELIEF**

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT

Exhibit 1 - Page 3

Plaintiff Mattel, Inc. ("Mattel") hereby alleges on knowledge as to the allegations in paragraph (2), and on information and belief as to all other allegations, the following:

## I.   NATURE OF THE ACTION

1.    Mattel seeks declaratory relief against Defendant Ronald Brawer ("Brawer"), a former high-level member of its management team who routinely participated in highly confidential meetings and who regularly requested and received confidential materials.   At the same time that Brawer was secretly making plans to join a direct competitor, he took steps to maximize his exposure to Mattel's confidential information.

## II.   PARTIES

2.    Plaintiff Mattel is a Delaware corporation, headquartered in El Segundo, California.  Mattel is authorized to do business in, and does business in, the State of California.

3.    Mattel alleges that Brawer was, until October 1, 2004, an employee of Mattel.  Mattel further alleges that Brawer is, and at all times relevant herein was, a resident of the County of Los Angeles, State of California.

4.    Mattel is unaware of the true names or capacities of Does 1 through 50, inclusive, and, therefore sues these defendants by such fictitious names.  Mattel will amend this Complaint to allege their true names and capacities when ascertained.  Mattel alleges that each of the Doe defendants is responsible or liable in some manner to Mattel for the conduct alleged in this Complaint and that Mattel's damages as herein alleged were proximately caused by those Doe defendants.

-1-

COMPLAINT

Exhibit 1 - Page 4

5.     Mattel alleges that at all times herein mentioned each of the defendants was the agent, servant and/or employee of each of the other defendants and in connection with the action hereinafter alleged, was acting within the scope of such agency and employment, and each defendant ratified each and every act, omission and thing done by each and every other defendant named herein.

III.     JURISDICTION AND VENUE

6.     This Court has personal jurisdiction over Brawer because he is a resident of the State of California.

7.     This Court has original jurisdiction of this civil action because the matter in controversy exceeds the jurisdictional minimum of this Court.

8.     Venue is proper in this County because the alleged acts and wrongs occurred in this County.

IV.     FACTS COMMON TO REQUEST FOR DECLARATORY RELIEF

A.     MATTEL DEVELOPED PROPRIETARY INFORMATION NOT DISCLOSED TO ITS BUSINESS COMPETITORS

9.     For over 45 years, Mattel has engaged in the design, manufacture, and marketing of toys and family products, including Barbie®, Hot Wheels®, Matchbox®, American Girl®, Fisher-Price®, Little People®, Rescue Heroes®, and Power Wheels®, as well as a wide array of entertainment-inspired toy lines.  To develop its products, business methods, and practices, Mattel has expended substantial resources in its confidential information, including, but not limited to: product research, design, and development; its marketing and advertising research, plans, methods, and processes; its business research and forecasts; its costs, budgets, pricing, credit terms, deal terms, and

-2-

COMPLAINT

Exhibit 1 - Page 5

finances; its manufacturing, distribution, and sales methods and processes; its business and legal strategies and practices; and in its intellectual property (collectively the "Proprietary Information").

10.    As a result of Mattel's investment in its Proprietary Information, Mattel derives independent economic value from the fact that its confidential Proprietary Information is not known to competitors and others outside of Mattel.  While Mattel may eventually disclose some of its Proprietary Information to the public, until the time that Mattel elects to make any such disclosure, its Proprietary Information remains highly confidential.  Mattel has made reasonable efforts to protect the confidentiality and secrecy of its Proprietary Information.  Accordingly, Mattel's Proprietary Information qualifies as trade secrets.

B.    MATTEL PROTECTED ITS PROPRIETARY INFORMATION THROUGH ITS POLICIES, AGREEMENTS, AND OTHER PRACTICES

11.    On April 22, 1996, Defendant Brawer became an employee of Tyco Toys, Inc. ("Tyco") in Mount Laurel, New Jersey.  The same day, Brawer entered into an Employee Invention & Trade Secret Agreement with Tyco (the "Original Confidentiality Agreement").

12.    In March 1997, Tyco was merged with and into Mattel, with Mattel as the surviving corporation.  On April 9, 1997, Brawer became a Marketing Director for Mattel in Mount Laurel, New Jersey, and remained bound by the Original Confidentiality Agreement.

13.    Throughout Brawer's employment by Mattel, Mattel continued its ongoing efforts to protect its Proprietary Information from unauthorized disclosure.  To

-3-

COMPLAINT

Exhibit 1 - Page 6

that end, in January 2003, Mattel's "Code of Conduct" was circulated to Mattel employees worldwide, again stating Mattel's policy that:

> "Employees and Directors have an obligation to protect the confidentiality of Mattel's proprietary information. Proprietary information is any information not generally known to the public that is useful to Mattel, that would be useful to its competitors or other third parties or that would be harmful to Mattel or its customers if disclosed. Proprietary information includes trade secrets, revenue and profit information and projections, new product information, marketing plans, design and development efforts, manufacturing processes and any information regarding potential acquisitions, divestitures and investments.

> We can protect the security of Mattel's proprietary information by limiting access to it. Confidential information should not be discussed with those who are not obligated to maintain the information in confidence and in public places where the information is not likely to be kept secret, such as planes, restaurants and elevators. The obligation to preserve confidential information continues even after employment ends."

The Code of Conduct applied to Brawer, a Mattel executive, and required that he, as well as those persons reporting to him, meet their confidentiality obligations to Mattel.

14.     Throughout 2004, Mattel reminded and stressed to its employees the importance of protecting Mattel's confidential and proprietary materials and information. It also implemented a focused Intellectual Property Protection Program.

15.     On March 5, 2004, the President of Mattel Brands, Matt Bousquette, distributed a memorandum to the employees in his Executive Group (i.e., Director or above) that enclosed a survey confirming compliance with Mattel's Code of Conduct (the "Code of Conduct Survey") and an updated Employee Confidentiality and Inventions Agreement (the "2004 Confidentiality Agreement"). Bousquette requested that these employees, which included Brawer, review and sign the two documents by March 9, 2004.

16.     On March 9, 2004, Bousquette convened his Executive Group to discuss the Mattel Code of Conduct Survey, the 2004 Confidentiality Agreement, and his March 5, 2004, memorandum. Brawer was present during this meeting.

17.     While other members of the Executive Group completed and returned the survey and 2004 Confidentiality Agreement, on March 18, 2004, Brawer wrote to Bousquette and said that he "applaud[ed] the company's vigorous protection of it's intellectual property," but intended to have "one section" reviewed prior to signing. Brawer stated that he anticipated returning his signed 2004 Confidentiality Agreement by March 24, 2004.

18.     Thereafter, Brawer entered into negotiations with Mattel representatives regarding the language of the "one section" of the 2004 Confidentiality Agreement about which Brawer expressed concern, Section 3(b), which defines "Mattel's Proprietary Information."

-5-

COMPLAINT

Exhibit 1 - Page 8

19.    Every one of Bousquette's direct reports except Brawer signed and returned the 2004 Confidentiality Agreement.  Brawer repeatedly assured Mattel representatives that he would provide the Company with his proposed revisions to Section 3(b) of the 2004 Confidentiality Agreement.  Mattel's representatives believed, based on Brawer's actions and statements, that he had a concern relating only to a single provision in the 2004 Confidentiality Agreement and that this concern would be resolved. Notwithstanding these assurances, as of the time of his departure on October 1, 2004, Brawer still had not signed the 2004 Confidentiality Agreement.

C.    **BRAWER MOVED THROUGH TRUSTED EXECUTIVE POSITIONS AT MATTEL WHILE ENGAGED IN ONGOING AND UNDISCLOSED DISCUSSIONS WITH COMPETITOR MGA**

20.    By 2003, Brawer had advanced within Mattel to a Senior Vice President position over customer marketing, which Mattel considered a position of trust and confidence.  In his executive position, Brawer directly supervised eight employees in the Mattel Brands organization; in addition, and as the direct result of his senior management position within Mattel, Brawer was provided access to Proprietary Information, including, but not limited to, detailed information related to development, manufacture, marketing, pricing, shipping, and performance of Mattel's then-current and anticipated future product lines, and other confidential business plans between Mattel and its most significant retail customers.

21.    On or about April 19, 2004, Mattel announced a restructuring of the company's sales organization.  Jerry Cleary was announced as the Executive Vice President, Sales and Merchandising.

22.    Brawer initially seemed unhappy that Mattel had chosen Cleary rather than him to fill the position but subsequently informed Mattel that he would accept a

-6-

Exhibit 1 - Page 9

1   different position that Mattel had offered to him, as a Senior Vice President/General

2   Manager ("GM").  The GM position also is an executive position of trust and confidence.

3   The role of a GM is to lead a cross-functional "Customer Business Team."  Each GM is

4   accountable for a strategic partnership with a key Mattel retailer, covering all aspects of

5   the business, including both traditional toy sales and retail development of licensed

6   products.

7

8        23.   In or about late May 2004, Brawer began performing GM duties,

9   working with one of Mattel's major retail customer accounts ("Large Toy Retailer").

10  Thereafter, Brawer began receiving Proprietary Information related not only to the Senior

11  Vice President, Customer Marketing position that he still formally held, but also began

12  receiving detailed information related to the GM role.  Brawer appeared to have

13  enthusiastically embraced his new role and began requesting and analyzing detailed

14  information related to Mattel and its four key retail accounts.

15

16       24.   Based on his repeated representations that he would sign the 2004

17  Confidentiality Agreement and that with a minor modification he would have no objection

18  to it, Mattel believed that Brawer, who had already assumed the responsibilities for the

19  GM position, was firmly on board with his new executive position at Mattel even though

20  he and Mattel had not finalized his employment agreement for the GM position or the

21  2004 Confidentiality Agreement.

22

23       25.   MGA Entertainment ("MGA") is a corporation engaged in the design,

24  manufacture, and marketing of toys.  MGA offers to the public toys and other consumer

25  goods that directly compete with Mattel's products.  In the fall of 2003, Mattel had reason

26  to believe that competitor MGA was contacting its employees.  When asked by Alan

27  Kaye, Mattel's Senior Vice President of Human Resources, in or around December 2003,

28  whether he was talking to MGA, Brawer denied that he had been in contact with MGA.

-7-

COMPLAINT

Exhibit 1 - Page 10

Kaye explained that, given Brawer's high-level position at Mattel and access to Mattel's proprietary information, any such contact with MGA would pose a conflict. Brawer promised that he would not talk to MGA.

26. However, after Brawer's resignation, a review of Mattel's telephone records revealed that Brawer had ongoing contact with MGA during the summer of 2004. Notably, Brawer failed to disclose these calls. As Brawer knew, if Mattel had known of the existence of such a conflict, Mattel would have required Brawer, at a minimum, to limit his exposure to Proprietary Information. Brawer not only failed to disclose the conflict, but he also took steps to maximize his exposure to Proprietary Information.

27. Mattel's records reveal that, on June 1, 2004, Brawer telephoned MGA's offices. The next day, Brawer attended the line review where, for the first time, Mattel presented its Spring 2005 products for review. That same day, a few hours after Brawer viewed Mattel's Proprietary Information at line review, Brawer again telephoned MGA's offices.

28. The following month, on July 7, 2004, Brawer telephoned MGA's offices again. Between Brawer's June 2, 2004, and July 7, 2004 calls to MGA, Brawer participated in a variety of sensitive meetings where Mattel's Proprietary Information was discussed, including, but not limited to, Barbie® products for Spring 2005, Mattel's strategy and negotiations related to its relationship with the Large Toy Retailer, Mattel's developing product lines, promotional plans, market strategy, and licensing opportunities. In addition, during this time, Brawer specifically requested line review presentation documents, drawings, information related to Mattel's market research results, sales reports, advertising/media schedules, and product testing. Among the various confidential reports and information provided to Brawer during this period were analyses of the sales performance of Mattel products (including male action figures, Barbie® products, young

-8-

COMPLAINT

Exhibit 1 - Page 11

1   and older girls products, and Matchbox® products) versus competing products, third

2   quarter and year-end financial and sales forecasts, as well as the personnel files for his

3   various team members.

4

5          29.    During July 2004, Brawer repeatedly called MGA.  For example, on

6   July 7, 2004, Brawer telephoned MGA.  Brawer's calendar reflects that, on July 7, 2004,

7   Brawer attended the Matchbox®  line review where Proprietary Information related to this

8   Mattel Brand was discussed and internally disclosed.  Brawer's July 7, 2004 telephone

9   call to MGA occurred after the Matchbox® line review concluded.

10

11         30.    On July 8, 2004, the day after the Matchbox® line review, Brawer

12  twice telephoned MGA's offices.  On July 9, 2004, after receiving an analysis of Mattel's

13  Barbie® Brand, Brawer telephoned MGA's offices.  Later that day, Brawer telephoned

14  MGA's offices yet again, immediately prior to attending the Hot Wheels® product line

15  review.

16

17         31.    Brawer again telephoned MGA on August 2, 2004.  Between

18  Brawer's July 9, 2004, and August 2, 2004, MGA calls, Brawer continued participating in

19  sensitive meetings where Mattel Proprietary Information was discussed, including, but not

20  limited to, meetings regarding Mattel's historical relationships with the Large Toy

21  Retailer, the anticipated future terms of Mattel's agreements with the Large Toy Retailer,

22  forecasts for various Mattel product lines, Mattel's 2005 Fall Global Account Plan

23  (including detailed product cost, manufacturing, shipping and delivery plans for 2005),

24  and market research related to Mattel's target consumers.  During this time period, Brawer

25  also requested that he be provided monthly with a report/analysis detailing the sales of

26  Mattel's Hot Wheels® products, Barbie® products, games, young girls, and other

27  products.

28

-9-

COMPLAINT

Exhibit 1 - Page 12

32.     Throughout August and early September 2004, Brawer continued to participate in meetings where he learned additional Proprietary Information, even though some were meetings Brawer had not attended in months.  Examples include, but are not limited to, the Fall 2005 Barbie® line review, Fall 2004 My Scene® meeting, Fall 2005 Radio Control meeting, Internal line review, Big Idea Campaign, Global Line Review, a licensing summit with Mattel's present and potential licensors, the initial Long Range Planning meetings, and Advertising/Media meetings.  In addition, between August 23 and 25, 2004, Brawer attended the "Global Line Review."  At the Global Line Review, Mattel internally presented detailed information related to its entire product line over a several-day period.

33.     Throughout August and early September 2004, Brawer regularly received Proprietary Information, including, but not limited to, weekly reports related to sales of Mattel products, consumption reports, point of sale information, present and potential Mattel licensees and licensors, advertising/media reports and schedules, shipping reports, financial analyses, test market reports, and clearance survey reports.  Brawer also participated in Mattel's Long Range Planning meetings, in which Mattel's business plans, sales by brand, financial forecasting, and other long-term business planning for 2005 through 2008 were being formulated and discussed.

D.     BRAWER FINALLY ANNOUNCED TO MATTEL MANAGEMENT THAT HE HAD DEFECTED TO COMPETITOR MGA

34.     On September 15, 2004, Brawer left work at noon to begin a two-day religious holiday.  As Brawer left, he carried a large cardboard box with binders and other materials.  Though Brawer had supposedly left for the holiday, several hours after his departure, Brawer instructed his assistant to print Mattel's 2004 sales plan for the Large Toy Retailer for him, claiming he needed it for a meeting.

-10-

COMPLAINT

Exhibit 1 - Page 13

35.     On September 17, 2004, the day Brawer was scheduled to return to work after the holiday, at or about 7:30 a.m., Brawer informed his supervisor, Jerry Cleary, that he was leaving Mattel, effective October 1, 2004, to work for competitor MGA.  Cleary asked Brawer to leave Mattel's premises, but indicated that Mattel would be in contact with Brawer regarding an exit interview.  Finally, Cleary instructed Brawer not to disclose his resignation until a joint communication could be distributed.  Brawer agreed to this, but then immediately began contacting Mattel employees, telling them that he had left to go to MGA, and providing them with his contact information.

36.     On September 20, 2004, Mattel hand-delivered a letter to Brawer reminding him of his continuing confidentiality obligations, not only through October 1, 2004, but continuing beyond the termination of his employment.

E.      <u>BRAWER REFUSED TO ACKNOWLEDGE HIS OBLIGATION TO KEEP CONFIDENTIAL MATTEL'S PROPRIETARY INFORMATION</u>

37.     At his Exit Interview, on September 29, 2004, Brawer was unwilling to complete or sign the form that sought to: confirm what Proprietary Information Brawer had received in writing or during meetings; determine whether Brawer had returned all copies of Proprietary Information in his possession; confirm that all Proprietary Information had not been copied, retained or disclosed; and confirm that Brawer understood his ongoing obligation to maintain the confidentiality of Mattel's Proprietary Information.

38.     During his Exit Interview, Mattel reminded Brawer that he had ongoing duties of confidentiality to Mattel, even after the termination of his employment. Brawer was given a copy of his Original Confidentiality Agreement, which he had signed on April 22, 1996, and another copy of the Code of Conduct.  During his Exit Interview, Brawer noted that he had not signed the Code of Conduct, apparently suggesting he was

-11-

COMPLAINT

Exhibit 1 - Page 14

1   not bound by Mattel's policy because he had not signed it. Mattel's representative

2   explained to him that it was Mattel's policy and, as a general matter, he was bound by the

3   policy whether or not he signed it. Mattel provided Brawer with a revised 2004

4   Confidentiality Agreement, which included the revisions to Section 3(b) Mattel last

5   offered to Brawer. Brawer refused to sign the revised 2004 Confidentiality Agreement,

6   disclosing for the first time that: (i) his objections were not limited to Section 3(b); (ii) he

7   disagreed with everything in the 2004 Confidentiality Agreement; and (iii) he never

8   intended to sign it.

9

10          39.    During his Exit Interview, Brawer confirmed he had accepted the

11   position of Executive Vice President of Sales & Marketing of MGA and intended to

12   formally begin work on October 5, 2004. Brawer refused to state whether he already had

13   a written agreement or written job offer from MGA.

14

15          40.    On October 1, 2004, Brawer's final day of employment with Mattel,

16   Mattel hand-delivered to Brawer a letter that identified with reasonable particularity the

17   nature of Mattel's proprietary information, reminded Brawer of his confidentiality

18   obligations to Mattel, and further requested that Brawer acknowledge and agree that he

19   would maintain the confidentiality of Mattel's proprietary information (as identified in the

20   letter) by signing and returning a copy of the letter to Mattel. As of the date of filing of

21   this Complaint, Brawer has not responded to this letter.

22

23

24

25

26

27

28

-12-

COMPLAINT

Exhibit 1 - Page 15

# FIRST CAUSE OF ACTION

## (Declaratory Relief Against Brawer)

41.     Mattel repeats and realleges the allegations in paragraphs 1 through 40, inclusive, and by reference incorporates the same as though set forth herein.

42.     Mattel, through extensive research and the considerable expenditure of time, effort, and money has developed commercially valuable information concerning the design, manufacture, and marketing of toys and other family products.  Such information includes, but is not limited to, confidential information regarding:  (i) personnel; (ii) product research, design, development and performance; (iii) marketing and advertising research, plans, methods and processes; (iv) business research and forecasts; (v) costs, budgets, pricing, credit terms, deal terms, and finances; (vi) manufacturing, distribution, and sales methods and processes; (vii) potential acquisitions or investments; and (viii) business and legal strategies and practices.

43.     The above-described information constitutes the trade secrets of Mattel in that such information derives independent economic value, both actual and potential, from not being generally known to the public or to other persons who could obtain economic value from its disclosure or use.

44.     Mattel has taken reasonable steps to maintain the secrecy of its trade secrets and its confidential, Proprietary Information.

45.     Mattel entrusted Brawer with its trade secret information for use solely in performing his duties as an officer and/or director of Mattel.

-13-

46.     While Brawer was employed by Mattel, and immediately after he resigned his employment, Mattel repeatedly attempted to confirm with Brawer his understanding and acceptance of Mattel's definition of trade secrets and his obligation to maintain the confidentiality of these secrets.  Brawer has rebuffed these efforts.

47.     There now exists an actual and present controversy between Mattel and Brawer regarding the confidential nature of Mattel's Proprietary Information, including, but not limited to, Mattel's: Global Line Review; Spring 2005 line review; Fall 2005 line review; line reviews for specific Mattel brands; 2005 Fall Global Action Plan (including detailed product cost, manufacturing, shipping and delivery plans for 2005); strategy and negotiations related to Mattel's relationship with the Large Toy Retailer; developing product lines; promotional plans; market strategy; licensing strategy, relationships, and opportunities; confidential personnel information related to Mattel employees; advertising and media plans; product testing reports; sales information of Mattel products; shipping capabilities and reports; and the Long Range Plan 2005-2008.

48.     In addition, an actual and present controversy between Mattel and Brawer exists regarding the extent to which Mattel is entitled to protection of its Proprietary Information on the one hand, and Brawer's ability, on the other hand, to undertake the responsibilities inherent in his new position with MGA without disclosing or using the confidential Proprietary Information that Brawer learned while employed by Mattel.  Such conflict may occur in situations including, but not limited to, situations in which Brawer may be asked to evaluate competitive marketing, product, or pricing plans, or situations where Brawer may be asked to propose or consider changes in MGA's media, advertising, or shipping plans.

-14-

COMPLAINT

Exhibit 1 - Page 17

1   49.   Mattel is informed and believes, and on that basis alleges, that if

2   Brawer were to disclose Mattel's trade secrets, Mattel would be caused great and

3   irreparable harm.

4

5   WHEREFORE, Mattel prays for relief and judgment as follows:

6

7   1.   That Mattel be granted declaratory relief and such injunctive relief as

8   may be necessary and appropriate; and

9

10   2.   That Mattel have such other and further relief as this Court deems

11   just and equitable.

12

13   DATED: October 21, 2004      PAUL, HASTINGS, JANOFSKY & WALKER LLP

14                                GLENN D. DASSOFF
                                  ELENA R. BACA

15                                SAMANTHA J. BLACK

16

17   By: _____
                GLENN D. DASSOFF

18   Attorneys for Plaintiff

19   MATTEL, INC.

20

21   LA/1057759.2

22

23

24

25

26

27

28

-15-

COMPLAINT

Exhibit 1 - Page 18

CM-010

**ATTORNEY OR PARTY WITHOUT ATTORNEY** *(Name, state bar number, and address)*:
Glenn D. Dassoff  (SB# 96809)
Elena R. Baca  (SB# 160564)
Paul, Hastings, Janofsky & Walker
695 Town Center Drive, Seventeenth Floor
Costa Mesa, CA 92626-1924
TELEPHONE NO.: (714) 668-6200    FAX NO.: (714) 979-1921
ATTORNEY FOR *(Name)*: Plaintiff MATTEL, INC.

SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
STREET ADDRESS: 111 North Hill Street
MAILING ADDRESS: Los Angeles, CA  90012
CITY AND ZIP CODE
BRANCH NAME: Central

CASE NAME: Mattel v. Brawer

| FOR COURT USE ONLY |
| --- |

# FILED

LOS ANGELES SUPERIOR COURT

OCT 2 1 2004

JOHN A. CLARKE, EXECUTIVE OFFICER/CLERK

BY

**J. SUNGA, DEPUTY**

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: BC 323381 |
| --- | --- | --- |
| [X] Unlimited (Amount demanded exceeds $25,000) [ ] Limited (Amount demanded is $25,000 or less) | [ ] Counter   [ ] Joinder  Filed with first appearance by defendant (Cal. Rules of Court, rule 1811) | JUDGE: DEPT.: |

*All five (5) items below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)
**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)
**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)
**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)
**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 1800–1812)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
[ ] Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
[ ] RICO (27)
[X] Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [ ] is  [X] is not  complex under rule 1800 of the California Rules of Court. If case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties    d. [ ] Large number of witnesses
   b. [ ] Extensive motion practice raising difficult or novel    e. [ ] Coordination with related actions pending in one or more courts issues that will be time-consuming to resolve    in other counties, states or countries, or in a federal court
   c. [ ] Substantial amount of documentary evidence    f. [ ] Substantial post-judgment judicial supervision
3. Type of remedies sought *(check all that apply)*:
   a. [ ] monetary   b. [X] nonmonetary; declaratory or injunctive relief   c. [ ] punitive
4. Number of causes of action *(specify)*: /
5. This case [ ] is  [X] is not  a class action suit.
Date: October 21, 2004

Glenn D. Dassoff  (SB# 96809)
(TYPE OR PRINT NAME)                              ▶ *(signature)* Glenn D. Dassoff
(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate, Family, or Welfare and Institutions Code). (Cal. Rules of Court, rule 201.8.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 1800 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a complex case, this cover sheet shall be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2003]

**CIVIL CASE COVER SHEET**

Legal Solutions Plus

Cal. Rules of Court, rules 201.8, 1800–1812;
Standards of Judicial Administration, § 19

Exhibit 1 - Page 19

| SHORT TITLE. Mattel v. Brawer | CASE NUMBER BC323381 |
|---|---|

## CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION
### (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

> This form is required pursuant to LASC Local Rule 2.0 in all new civil case filings in the Los Angeles Superior Court.

**Item I.** Check the types of hearing and fill in the estimated length of hearing expected for this case:

JURY TRIAL? ☐ YES  CLASS ACTION? ☐ YES  LIMITED CASE? ☐ YES  TIME ESTIMATED FOR TRIAL 10–15 ☐ HOURS/ ☒ DAYS

**Item II.** Select the correct district and courthouse location (4 steps – If you checked "Limited Case", skip to Item III, Pg. 4):

**Step 1:** After first completing the Civil Case Cover Sheet Form, find the main civil case cover sheet heading for your case in the left margin below, and, to the right in Column **A**, the Civil Case Cover Sheet case type you selected.

**Step 2:** Check **one** Superior Court type of action in Column **B** below which best describes the nature of this case.

**Step 3:** In Column **C**, circle the reason for the court location choice that applies to the type of action you have checked. For any exception to the court location, see Los Angeles Superior Court Local Rule 2.0.

> **Applicable Reasons for Choosing Courthouse Location (See Column C below)**

1. Class Actions must be filed in the County Courthouse, Central District.
2. May be filed in Central (Other county, or no Bodily Injury/Property Damage).
3. Location where cause of action arose.
4. Location where bodily injury, death or damage occurred.
5. Location where performance required or defendant resides.
6. Location of property or permanently garaged vehicle.
7. Location where petitioner resides.
8. Location wherein defendant/respondent functions wholly.
9. Location where one or more of the parties reside.
10. Location of Labor Commissioner Office.

**Step 4:** Fill in the information requested on page 4 in Item III; complete Item IV.  Sign the declaration.

| | A Civil Case Cover Sheet Category No. | B Type of Action (Check only one) | C Applicable Reasons - See Step 3 Above |
|---|---|---|---|
| **Auto Tort** | Auto (22) | ☐ A7100  Motor Vehicle - Personal Injury/Property Damage/Wrongful Death | 1., 2., 4. |
| | Uninsured Motorist (46) | ☐ A7110  Personal Injury/Property Damage/Wrongful Death – Uninsured Motorist | 1., 2., 4. |
| **Other Personal Injury/Property Damage/Wrongful Death Tort** | Asbestos (04) | ☐ A6070  Asbestos Property Damage | 2. |
| | | ☐ A7221  Asbestos - Personal Injury/Wrongful Death | 2. |
| | Product Liability (24) | ☐ A7260  Product Liability (not asbestos or toxic/environmental) | 1., 2., 3., 4., 8. |
| | Medical Malpractice (45) | ☐ A7210  Medical Malpractice - Physicians & Surgeons | 1., 2., 4. |
| | | ☐ A7240  Other Professional Health Care Malpractice | 1., 2., 4. |
| | Other Personal Injury Property Damage Wrongful Death (23) | ☐ A7250  Premises Liability (e.g., slip and fall) | 1., 2., 4. |
| | | ☐ A7230  Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, vandalism, etc.) | 1., 2., 4. |
| | | ☐ A7270  Intentional Infliction of Emotional Distress | 1., 2., 3. |
| | | ☐ A7220  Other Personal Injury/Property Damage/Wrongful Death | 1., 2., 4. |
| **Non-Personal Injury/Property Damage/Wrongful Death Tort** | Business Tort (07) | ☐ A6029  Other Commercial/Business Tort (not fraud/breach of contract) | 1., 2., 3. |
| | Civil Rights (08) | ☐ A6005  Civil Rights/Discrimination | 1., 2., 3. |
| | Defamation (13) | ☐ A6010  Defamation (slander/libel) | 1., 2., 3. |
| | Fraud (16) | ☐ A6013  Fraud (no contract) | 1., 2., 3. |
| | Intellectual Property (19) | ☐ A6016  Intellectual Property | 2., 3. |

CIV 109 03-04
LASC Approved

**CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION**

LASC, rule 2.0
Page 1 of 4
LA-481

Exhibit 1 - Page 20

| SHORT TITLE Mattel v. Brawer | CASE NUMBER |
| --- | --- |

| A Civil Case Cover Sheet Category No. | B Type of Action (Check only one) | | C Applicable Reasons - See Step 3 Above |
| --- | --- | --- | --- |
| Professional Negligence (25) | ☐ | A6017  Legal Malpractice | 1., 2., 3. |
| | ☐ | A6050  Other Professional Malpractice (not medical or legal) | 1., 2., 3. |
| Other (35) | ☐ | A6025  Other Non-Personal Injury/Property Damage tort | 2., 3. |
| Wrongful Termination (36) | ☐ | A6037  Wrongful Termination | 1., 2., 3. |
| Other Employment (15) | ☐ | A6024  Other Employment Complaint Case | 1., 2., 3. |
| | ☐ | A6109  Labor Commissioner Appeals | 10. |
| Breach of Contract/ Warranty (06) (not insurance) | ☐ | A6004  Breach of Rental/Lease Contract (not Unlawful Detainer or wrongful eviction) | 2., 5. |
| | ☐ | A6008  Contract/Warranty Breach-Seller Plaintiff (no fraud/negligence) | 2., 5. |
| | ☐ | A6019  Negligent Breach of Contract/Warranty (no fraud) | 1., 2., 5. |
| | ☐ | A6028  Other Breach of Contract/Warranty (not fraud or negligence) | 1., 2., 5. |
| Collections (09) | ☐ | A6002  Collections Case-Seller Plaintiff | 2., 5., 6. |
| | ☐ | A6012  Other Promissory Note/Collections Case | 2., 5. |
| Insurance Coverage (18) | ☐ | A6015  Insurance Coverage (not complex) | 1., 2., 5., 8. |
| Other Contract (37) | ☐ | A6009  Contractual Fraud | 1., 2., 3., 5. |
| | ☐ | A6031  Tortious Interference | 1., 2., 3., 5. |
| | ☐ | A6027  Other Contract Dispute (not breach/insurance/fraud/negligence) | 1., 2., 3., 8. |
| Eminent Domain/Inverse Condemnation (14) | ☐ | A7300  Eminent Domain/Condemnation   Number of parcels _____ | 2. |
| Wrongful Eviction (33) | ☐ | A6023  Wrongful Eviction Case | 2., 6. |
| Other Real Property (26) | ☐ | A6018  Mortgage Foreclosure | 2., 6. |
| | ☐ | A6032  Quiet Title | 2., 6. |
| | ☐ | A6060  Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2., 6. |
| Unlawful Detainer - Commercial (31) | ☐ | A6021  Unlawful Detainer-Commercial (not drugs or wrongful eviction) | 2., 6. |
| Unlawful Detainer - Residential (32) | ☐ | A6020  Unlawful Detainer-Residential (not drugs or wrongful eviction) | 2., 6. |
| Unlawful Detainer - Drugs (38) | ☐ | A6022  Unlawful Detainer-Drugs | 2., 6. |
| Asset Forfeiture (05) | ☐ | A6108  Asset Forfeiture Case | 2., 6. |
| Petition re Arbitration (11) | ☐ | A6115  Petition to Compel/Confirm/ Vacate Arbitration | 2., 5. |

*Left margin vertical labels:* Non-Personal Injury/Property Damage/ Wrongful Death Tort (Cont'd.) — Employment — Contract — Real Property — Unlawful Detainer — Judicial Review

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

Exhibit 1 - Page 21

| SHORT TITLE. Mattel v. Brawer | CASE NUMBER |
|---|---|

| | **A**<br>Civil Case Cover Sheet<br>Category No. | **B**<br>Type of Action<br>(Check only one) | **C**<br>Applicable Reasons -<br>See Step 3 Above |
|---|---|---|---|
| **Judicial Review (Cont'd.)** | Writ of Mandate<br>(02) | ☐ A6151  Writ - Administrative Mandamus | 2., 8. |
| | | ☐ A6152  Writ - Mandamus on Limited Court Case Matter | 2. |
| | | ☐ A6153  Writ - Other Limited Court Case Review | 2. |
| | Other Judicial Review<br>(39) | ☐ A6150  Other Writ / Judicial Review | 2., 8. |
| **Provisionally Complex Litigation** | Antitrust/Trade<br>Regulation (03) | ☐ A6003  Antitrust/Trade Regulation | 1., 2., 8. |
| | Construction Defect (10) | ☐ A6007  Construction defect | 1., 2., 3. |
| | Claims Involving Mass<br>Tort (40) | ☐ A6006  Claims Involving Mass Tort | 1., 2., 8. |
| | Securities Litigation (28) | ☐ A6035  Securities Litigation Case | 1., 2., 8. |
| | Toxic Tort<br>Environmental (30) | ☐ A6036  Toxic Tort/Environmental | 1., 2., 3., 8. |
| | Insurance Coverage<br>Claims from Complex<br>Case (41) | ☐ A6014  Insurance Coverage/Subrogation (complex case only) | 1., 2., 5., 8. |
| **Enforcement of Judgment** | Enforcement<br>of Judgment<br>(20) | ☐ A6141  Sister State Judgment | 2., 9. |
| | | ☐ A6160  Abstract of Judgment | 2., 6. |
| | | ☐ A6107  Confession of Judgment (non-domestic relations) | 2., 9. |
| | | ☐ A6140  Administrative Agency Award (not unpaid taxes) | 2., 8. |
| | | ☐ A6114  Petition/Certificate for Entry of Judgment on Unpaid Tax | 2., 8. |
| | | ☐ A6112  Other Enforcement of Judgment Case | 2., 8., 9. |
| **Miscellaneous Civil Complaints** | RICO (27) | ☐ A6033  Racketeering (RICO) Case | 1., 2., 8. |
| | Other Complaints<br>(Not Specified Above)<br>(42) | ☒ A6030  Declaratory Relief Only | 1., 2., 8. |
| | | ☐ A6040  Injunctive Relief Only (not domestic/harassment) | 2., 8. |
| | | ☐ A6011  Other Commercial Complaint Case (non-tort/non-complex) | 1., 2., 8. |
| | | ☐ A6000  Other Civil Complaint (non-tort/non-complex) | 1., 2., 8. |
| **Miscellaneous Civil Petitions** | Partnership/Corporation<br>Governance (21) | ☐ A6113  Partnership and Corporate Governance Case | 2., 8. |
| | Other Petitions<br>(Not Specified Above)<br>(43) | ☐ A6121  Civil Harassment | 2., 3., 9. |
| | | ☐ A6123  Workplace Harassment | 2., 3., 9. |
| | | ☐ A6124  Elder/Dependent Adult Abuse Case | 2., 3., 9. |
| | | ☐ A6190  Election Contest | 2. |
| | | ☐ A6110  Petition for Change of Name | 2., 7. |
| | | ☐ A6170  Petition for Relief from Late Claim Law | 2., 3., 4., 8. |
| | | ☐ A6100  Other Civil Petition | 2., 9. |

CIV 109 03-04
LASC Approved

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

LASC, rule 2.0
Page 3 of 4

Exhibit 1 - Page 22

| SHORT TITLE: Mattel v. Brawer | CASE NUMBER |
|---|---|

Item III. Statement of Location: Enter the address of the accident, party's residence or place of business, performance, or other circumstance indicated in Item II., **Step 3** on Page 1, as the proper reason for filing in the court location you selected.

| REASON: CHECK THE NUMBER UNDER COLUMN C WHICH APPLIES IN THIS CASE<br>☐1. ☒2. ☐3. ☐4. ☐5. ☐6. ☐7. ☐8. ☐9. ☐10. | ADDRESS:<br>333 Continental Boulevard | |
|---|---|---|
| CITY:<br>El Segundo | STATE<br>CA | ZIP CODE:<br>90245 |

Item IV. *Declaration of Assignment:* I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that the above-entitled matter is properly filed for assignment to the Stanley Mosk courthouse in the Central District of the Los Angeles Superior Court (Code of Civ. Proc., § 392 et seq., and LASC Local Rule 2.0, subds. (b), (c) and (d)).

Dated: October 21, 2004

_____
(SIGNATURE OF ATTORNEY/FILING PARTY)
Glenn D. Dassoff

---

**PLEASE HAVE THE FOLLOWING DOCUMENTS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1. Original Complaint or Petition.

2. If filing a Complaint, a completed Summons form for issuance by the Clerk.

3. Civil Case Cover Sheet form JC 982.2(b)(1).

4. Complete Addendum to Civil Case Cover Sheet form CIV 109 _____ (eff. Date).

5. Payment in full of the filing fee, unless fees have been waived.

6. Signed order appointing the Guardian ad Litem, JC form 982(a)(27), if the plaintiff or petitioner is a minor under 18 years of age, or if required by Court.

7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the summons and complaint, or other initiating pleading in the case.

CIV 109 03-04
LASC Approved

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

LASC, rule 2.0
Page 4 of 4

Exhibit 1 - Page 23