# EXHIBIT B

EXHIBIT B - PAGE 11

## MASTER ASSIGNMENT AND EXCHANGE AGREEMENT

**THIS MASTER ASSIGNMENT AND EXCHANGE AGREEMENT** (this "Agreement"), dated as of September 3, 2008, is by and among OMNI 808 Investors LLC, a California limited liability company, as Assignee ("Assignee"), each of the Assignors listed on the signature pages hereof (each an "Assignor" and collectively, "Assignors"), MGA Entertainment Inc., a California corporation ("Borrower"), MGA Entertainment (Mexico), Inc., a California corporation ("MGA Mexico") and The Little Tikes Company, an Ohio corporation ("Little Tikes" and, collectively with MGA Mexico, the "Subsidiary Guarantors"), and Wachovia Bank, National Association ("Wachovia"), as Agent under the Credit Agreement referred to below (in such capacity, "Agent"). It is understood and agreed that the rights and obligations of the Assignors hereunder are several and not joint. Capitalized terms not otherwise defined herein shall have the meanings set forth in the Credit Agreement referred to below; unless otherwise specified, references to the Credit Agreement mean the Credit Agreement as in effect on the date hereof.

### RECITALS:

A.    Borrower, Agent and Assignors are currently parties to that certain Credit Agreement, dated as of October 27, 2006, as amended (the "Credit Agreement"), pursuant to which Assignors have made certain credit facilities available to Borrower and Borrower has issued certain notes evidencing indebtedness thereunder (the "Existing Notes").

B.    Each Assignor desires to sell, assign and delegate, for value, its respective Assigned Interest (as defined below) to the Assignee.

C.    Assignee desires to purchase and assume, for value, the Assigned Interests, and to receive New Assignee Notes (as defined below) from Borrower evidencing the Assigned Interests.

D.    Each Assignor desires to cancel its Existing Notes and, to the extent not already terminated, terminate its respective Commitments (as defined in the Credit Agreement) under the Credit Agreement in exchange for (a) a new senior promissory note (including any replacement thereof, each a "Senior Promissory Note" and collectively, the "Senior Promissory Notes") to be issued by Borrower separate and apart from the Credit Agreement in an original principal amount equal to such Assignor's ratable portion of the aggregate principal amount of the Loans set forth on Schedule II-B attached hereto (collectively, the "Exchanged Loans", and as to each Assignor its ratable portion being its "Exchanged Loan"), and (b) other good and valuable consideration pursuant to the Exchange Transaction Documents.

E.    Assignee desires to receive New Assignee Notes evidencing the Assigned Interests, which New Assignee Notes will be subordinate to the Senior Promissory Notes pursuant to and in accordance with the terms of the Guarantee and Subordination Agreement (as defined below) by and among Assignee, Assignors, Borrower and each Subsidiary Guarantor.

F.    Wachovia desires to resign as Agent and Assignee desires to accept appointment as successor agent under the Credit Agreement, each pursuant to Section 11.9 thereof.

A/72635657.7/3001762-0000334318

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

NOW THEREFORE, in consideration of the mutual promises set forth herein and other valuable consideration, the receipt of which are hereby acknowledged, each of the parties hereto hereby agrees as follows:

**SECTION 1.     ASSIGNMENT.**  On the Effective Date, the following events shall occur contemporaneously:

**1.1     Assignment of Assigned Interests.**  Each Assignor hereby irrevocably sells, transfers, assigns, grants and conveys to Assignee, and Assignee hereby irrevocably purchases and assumes from the respective Assignors, as of the Effective Date, all of the respective Assignors' rights and obligations in the Assigned Interests.  For purposes of this Agreement:

"Assigned Interests" means each Assignor's right, title, and interest in, to and under the Loans identified on Schedule II-A attached hereto (including without limitation any letters of credit, guarantees, and swingline loans included in such facilities), but does not include any Retained Interests or Rights and Claims.

"Retained Interests" means (a) the Agent's and each Assignor's right, title, and interest in, to and under (i) any claims (including "claims" as defined in Bankruptcy Code §101(5)), suits, causes of action or any other right of the Agent or such Assignor, whether known or unknown (including contract claims, tort claims, malpractice claims, and claims under any law governing the purchase and sale of, or indentures for, securities), against Agent, or any Assignor, or any attorney, accountant, financial advisor or other entity engaged by or otherwise providing services to our on behalf of Agent or any Assignor arising under or in connection with the Credit Agreement or the transactions related thereto or contemplated thereby, in each case related to events or circumstances occurring or arising prior to the Effective Date, (ii) any claim of the Agent or such Assignor (a "Reimbursement Claim") arising in connection with the return, disgorgement or reimbursement by the Agent or such Assignor to Borrower, or any other entity, of all or any portion of any payment or transfer received by the Agent or such Assignor on account of the Assigned Interests prior to the Effective Date, including any claims arising under Bankruptcy Code §502(h), (iii) the Exchanged Loans identified on Schedule II-B attached hereto, (iv)  any reports, memoranda or other work product of any kind prepared by any attorney or financial or other advisor to Agent or any Assignor before or after the Effective Date, and (v) Obligations with respect to Derivative Contracts and Banking Service Obligations (which through the Effective Date shall, in each case, be satisfied by payment made by Borrower on the Effective Date in an amount not to exceed $-0-), and (b) each Assignor's obligations under, and Agent's right, title, and interest in, to and under, Article 11 and Sections 12.2 and 12.9 of the Credit Agreement and any other provision benefiting Agent, with respect to any actions taken or omitted to be taken by Agent, its sub-agents and their respective Related Parties while Wachovia was acting as Agent under the Loan Documents.

In addition, and without limitation of the foregoing, Agent and each Assignor shall retain the following (the "Rights and Claims"): (1) an undivided interest in any claim the Agent or such Assignor may have against Borrower or any of its Affiliates or Subsidiaries pursuant to the indemnities under any provision of the Loan Documents, including, without limitation, Sections 3.12, 4.1, 4.4, 4.10, 11.8, 12.2, 12.4 and 12.9 of the Credit Agreement, Section 20 of the Security Agreement and Section 12 of the Pledge Agreement, relating to events or circumstances

2

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

occurring or arising prior to the Effective Date, and (2) any other right, remedy or claim that the Agent or such Assignor may have pursuant to Sections 11.9, 12.5 and 12.10 of the Credit Agreement or any other provision of any Loan Document that is intended to survive for the benefit of an assignor of Loans or a retiring Agent.

**1.2   Limited Recourse Nature of Assignment.** Each such sale and assignment is without recourse to any Assignor (other than with respect to the breach of any representation and warranty of any such Assignor contained herein) and, except as expressly provided in this Agreement, without representation or warranty by any Assignor.

**1.3   Each Sale and Assignment is an Assignment under Credit Agreement.** Borrower acknowledges and agrees that each such sale and assignment shall be considered an assignment pursuant to Section 12.5 of the Credit Agreement.

**1.4   Payments Received by Agent or Assignors.** Subject to the terms of Section 2 below, all payments of principal and interest, any late charges, prepayment fees, premiums, commitment fees, out-of-pocket expenses, professional fees and expenses and all other sums paid and received by Agent or any Assignor prior to the Effective Date shall be the property of the Agent and such Assignor, as applicable, under the terms of the Loan Documents.

**1.5   Payments Received by Assignee.** Subject to the provisions of the Guarantee and Subordination Agreement, all payments of principal and interest, any late charges, prepayment fees, premiums, commitment fees, out-of-pocket expenses, professional fees and expenses and all or other sums paid and received on and after the Effective Date by Assignee pursuant to the Loan Documents shall be the property of Assignee, and any such sums actually received by Agent or Assignor on or after the Effective Date (other than the Purchase Price hereunder) shall be held by Agent or such Assignor in trust for Assignee and shall be promptly remitted (without interest thereon) to Assignee in the form received by Agent or such Assignor, except that in the case of any such payment or credit received by Agent or such Assignor in the form of a check, draft or other negotiable instrument paid to the order of Agent or such Assignor, Agent or such Assignor shall endorse such check, draft or other instrument to Assignee, without recourse, representation or warranty.

**1.6   Subrogation for Claims.** To the extent that Borrower or any other person enforces any claim for return, disgorgement or reimbursement against any Assignor for all or any portion of any payment or transfer received by such Assignor on account of the Assigned Interests prior to the Effective Date and receives payment or satisfaction from such Assignor in respect thereof, the parties agree that, to the extent permitted by law and without the need for further action on the part of any party, such Assignor shall be subrogated to the rights of Assignee against any other person, including Borrower, with respect to such claim (including the right to assert any Reimbursement Claims).

**1.7   Payment of Purchase Price.** The consummation of the assignment transaction contemplated hereby shall be effected at a closing (the "Closing") which is to occur on the Effective Date, at the offices of Assignee's special counsel, Bingham McCutchen LLP, at Three Embarcadero Center, San Francisco, California 94111, or at such other location upon which the Parties may agree. The aggregate consideration to be paid for the Assigned Interests is

3

A/72635657.7/3001762-0000334318

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

$109,723,845.00 (the "Purchase Price").   Upon the Effective Date, Assignee shall (a) pay $104,723,845.00 to the Agent, for the benefit of each Assignor in accordance with its respective Assigned Interest, by wire transfer of immediately available funds to an account designated in writing by Agent and (b) order Agent to release the $5,000,000 Deposit as more particularly described in that certain Letter of Intent dated as of August 18, 2008 by and among Assignee, Agent and each of the Assignors signatory thereto (the "Letter of Intent"), which Deposit shall immediately be applied to the payment of the balance of the Purchase Price.

      1.7.1   Each Assignor shall deliver to Borrower for cancellation each Existing Note (or if lost, destroyed or otherwise missing, an affidavit of lost note) evidencing the Loans outstanding as of the Effective Date and Borrower shall deliver to each Assignor a Senior Promissory Note substantially in the form of <u>Exhibit A</u> attached hereto, which Senior Promissory Note shall be (a) unsecured and (b) issued (i) in an aggregate principal amount equal to such Assignor's Exchanged Loan set forth on <u>Schedule II-B</u> attached hereto and (ii) separate and apart from the credit facilities set forth in the Credit Agreement.

      1.7.2   Upon delivery of each Senior Promissory Note, (a) each Existing Note shall be cancelled, (b) each Assignor shall be deemed to have consented and agreed that such Assignor's Exchanged Loan shall cease to be an Obligation outstanding and owing under or otherwise evidenced by the Credit Agreement and the Loans Documents and instead shall be exchanged for, and treated as, as a separate and independent obligation of Borrower payable in accordance with the terms of such Senior Promissory Note and the applicable Exchange Transaction Documents, (c) to the extent not already terminated, the respective Commitment of such Assignor under the Credit Agreement shall automatically be terminated, (d) each Assignor shall no longer be a Lender under the Credit Agreement and (e) all of such Assignor's rights, remedies, powers, privileges and interests in, to or under the Credit Agreement and the other Loan Documents and any Liens and security interests on the Collateral shall automatically and without further action terminate and be released as a result of the assignment and other transactions contemplated hereby, other than such Assignor's Retained Interests and Rights and Claims.

      1.7.3   Wachovia shall be deemed to have resigned as Agent and Assignee shall be deemed to have been appointed as successor Agent (in such capacity, the "Successor Agent"), each pursuant to Section 11.9 of the Credit Agreement, and Wachovia, in its capacity as Agent, and its sub-agents and their respective Related Parties shall each continue to be a beneficiary of the provisions of Article 11 and Sections 12.2 and 12.9 of the Credit Agreement in respect of any actions taken or omitted to be taken by any of them while Wachovia was acting as Agent under the Loan Documents, including, without limitation, any actions taken or omitted to be taken pursuant to any fact or circumstance described in the recitals to the Release Agreement (as defined below) or the Indemnity (as defined below) and any Claims (as defined in the Release Agreement) or Indemnified Costs (as defined in the Indemnity).

      1.7.4   Wachovia and each of the New Lenders shall enter into an agency agreement (the "New Agency Agreement") pursuant to which Wachovia will serve as agent (the "Senior Promissory Note Agent") for the Assignors in connection with the Senior Promissory Notes.

4

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT B - PAGE 15
OMNI0001350

1.7.5    Assignee, Agent on behalf and for the benefit of the New Lenders, and Borrower and each Subsidiary Guarantor shall execute and deliver the Guarantee and Subordination Agreement (in the form previously agreed upon by the parties) dated as of the Effective Date (the "Guarantee and Subordination Agreement").

1.7.6    Mr. Isaac Larian shall execute and deliver the Indemnity in the form previously agreed upon by the parties) dated as of the Effective Date (the "Indemnity").

1.7.7    Borrower, each of the Subsidiary Guarantors, Mr. Isaac Larian, each other stockholder of Borrower listed on Schedule IV hereto, Agent and each Assignor shall execute and deliver the Release Agreement in the form previously agreed upon by the parties) dated as of the Effective Date (the "Release Agreement").

**1.8    Defined Terms.**  The transactions above are collectively referred to herein as the "Transactions".  The Senior Promissory Notes, the New Agency Agreement, the Guarantee and Subordination Agreement, the Indemnity, the Release Agreement and each of the agreements, instruments, releases, indemnities and other documents executed in connection therewith are collectively referred to herein as the "Exchange Transaction Documents".

**SECTION 2.    RETURN OF PROCEEDS OF REMEDIES.**  On the Effective Date, Agent will pay to Borrower and to Little Tikes, in each case, an amount (the "Proceeds of Remedies") equal to (a) the aggregate proceeds received by Agent through the Effective Date as a result of the exercise of remedies under the Loan Documents (subject to reasonable confirmation by Borrower and Assignee of the amount thereof), minus, in the case of Borrower, (b) the sum of (i) accrued interest, fees, charges and reasonable professional expenses through the Effective Date plus (ii) a holdback of $100,000 (the "Holdback") to be used to pay the reasonable fees and expenses of professionals after the Effective Date.  Any part of the holdback not expended within six months following the Effective Date shall be promptly returned to Borrower.

**SECTION 3.    FURTHER ASSURANCES.**    Following the Effective Date, Borrower, each of the other Loan Parties, Assignors, Assignee, Agent and Senior Promissory Note Agent shall (at Assignee's expense, in the case of Assignors, Agent and the Senior Promissory Note Agent, except that fees, expenses and costs of Agent's counsel in connection therewith shall be reimbursed from the Holdback so long as the Holdback has not been depleted or otherwise returned to Borrower), execute and deliver to the other parties hereto all such documents as any other party hereto may reasonably deem necessary from time to time, to (a) effect the assignment and transfer of the Assigned Interests in accordance with the terms of this Agreement and (b) continue, in favor of Successor Agent, for the benefit of Assignee, the perfection and priority of the security interests of Agent, for the benefit of Assignors, and of each Assignor with respect to the Collateral, the Loan Documents and the Assigned Interests, including, without limitation, any and all (i) authorizations to file assignments of the financing statements with respect to the Assigned Interests on Form UCC-3, (ii) assignments of loan documents, (iii) assignments of security instruments and (iv) assignments, powers of attorney or such other documents as shall be reasonably necessary with respect to titled collateral.

5

A/72635657.7/3001762-0000334318

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**SECTION 4.    CONDITIONS TO EFFECTIVENESS.**   This Agreement shall become effective on the date that each of the following conditions shall have been satisfied (the "Effective Date"):

4.1    **Receipt of Documents by Assignee.**   Assignee and Agent (on behalf of Assignors) shall have received each of the following, each in form and substance reasonably satisfactory to Assignee and Agent:

(a)    duly executed counterparts of this Agreement, signed by each of the parties hereto;

(b) ·   duly executed originals of· a Revolving Note, ˙Swingline Note and Alternate Currency Note (collectively, the "New Assignee Notes"), substantially in the forms specified in the Credit Agreement and with the subordination legends required under the Guarantee and Subordination Agreement;

(c)    duly executed counterparts of the Guarantee and Subordination Agreement, signed by each of the parties thereto;

(d)    duly executed counterparts of the Senior Promissory Notes issued by Borrower to the Assignors (and guaranteed by Assignee and the Subsidiary Guarantors) pursuant to this Agreement;

(e)    duly executed counterparts of the Release Agreement, signed by each of the parties thereto;

(f)    duly executed counterparts of the Indemnity, signed by each of the parties thereto;

(g)    ·a certificate from a Responsible Officer of Borrower to the effect that (i) the information set forth on <u>Schedule II</u> hereto is true·and correct, and setting forth, after giving effect to the transactions contemplated hereunder, the outstanding principal balance of all Loans and the stated amount of any outstanding Letters of Credit, (ii) the Loan Documents listed on <u>Schedule III</u> hereto constitute all of the documents evidencing or securing the Loans, including, without limitation, each Note, each Guaranty and each Security Document in effect as of the Effective Date, and in each case any and all amendments thereto, (iii) the information set forth on <u>Schedule IV</u> is true and correct, and setting forth a complete list of owners as of the Effective Date of Borrower's outstanding capital stock or similar equity interests and setting forth the percentage of such stocks or similar equity interests held by each such party, (iv) except as disclosed on <u>Schedule III</u> hereto, the Loan Documents have not been amended, waived or modified in any material respect, and (v) Borrower is not a party to, or bound by, any document or agreement that could materially and adversely affect the Assigned Interests or Assignee's rights and remedies under this Agreement or the Loan Documents;

(h)    a certificate from Wachovia, in its capacity as Agent, (i) attaching true, complete and correct copies, and certifying the delivery, of letters rescinding and terminating all notices to account debtors regarding the direction of  payment to Agent, and (ii) certifying that Wells Fargo Bank, N.A. has been directed to cease setting off pursuant to the Loan Documents;

6

A/72635657.7/3001762-0000334318

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

(i)     each of the original stock certificates evidencing equity interests in any Person that has been pledged to Agent as Collateral for the Obligations pursuant to the Pledge Agreement or any of the other Loans Documents, along with associated stock powers, and each other item of original Collateral, if any, that has been delivered to, and is in the possession of, Agent as "possessory" collateral for purposes of perfecting Agent's security interest therein pursuant to the Security Agreement or any of the other Loans Documents; and

(j)     Borrower and Assignee shall have entered into a letter agreement, dated as of the Effective Date, pursuant to which Borrower, among other things, provides further assurances that it will in good faith cooperate with Assignee to negotiate and enter into, as promptly as practicable after the Effective Date, an amendment and restatement of the Credit Agreement and certain of the other Loan Documents consistent with the basic business terms to be set forth therein and otherwise as to be mutually agreed.

**4.2     Representations and Warranties of the Assignors and Assignee.** Each of the representations and warranties of Assignors and Assignee contained herein shall be true and correct in all material respects.

**SECTION 5.     REPRESENTATIONS OF THE ASSIGNOR.** In order to induce Assignee to enter into this Agreement and pay the Purchase Price for the Assigned Interests, each Assignor, separately but not jointly, represents and warrants to Assignee and agrees as follows:

**5.1     Legal and Beneficial Owner.** It is the legal and beneficial owner of the relevant Assigned Interest.

**5.2     No Liens.** Such Assigned Interest is free and clear of any lien, encumbrance or other adverse claim.

**5.3     Power and Authority.** Such Assignor has full power and authority, and has taken all action necessary, to execute and deliver this Agreement and to consummate the transactions contemplated hereby.

**5.4     Schedule II Information.** The information with respect to such Assignor set forth on Schedule II hereto is true and correct.

**5.5     Loan Documents.** Assignor has delivered, or caused Agent to deliver, to Assignee, true and complete copies of each of the Loan Documents listed on Schedule III hereto.

**5.6     No Amendments.** Other than as set forth in any of the Loan Documents listed on Schedule III attached hereto, none of the Loan Documents listed on Schedule III to which such Assignor is a party, whether as a Lender, Agent or otherwise, have been amended, waived or otherwise modified in writing.

Other than as set forth above, Assignors assume no responsibility with respect to (a) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Loan Document, (b) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any collateral thereunder, (c) the financial condition of Borrower, any of its Subsidiaries or Affiliates or any other Person

7

A/72635657.7/3001762-0000334318

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

obligated in respect of any Loan Document or (d) the performance or observance by Borrower, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Loan Document.

**SECTION 6.    ASSIGNEE'S REPRESENTATIONS.**    In order to induce the Assignors to enter into this Agreement and assign the Assigned Interests to Assignee, Assignee represents and warrants to Assignors and agrees as follows:

**6.1    Power and Authority**. It has full power and authority, and has taken all action necessary, to execute and deliver this Agreement and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement.

**6.2    Obligations of a Lender**. From and after the Effective Date, it shall be bound by the provisions of the Credit Agreement as a Lender thereunder and, to the extent of the relevant Assigned Interest, shall have the obligations of a Lender thereunder.

**6.3    Sophisticated Party**. Assignee (i) is a sophisticated person with respect to the purchase of the Assigned Interests, (ii) is able to bear the economic risk associated with the purchase of the Assigned Interests, (iii) has adequate information concerning the business and financial condition of Borrower and its Subsidiaries and Affiliates to make an informed decision regarding the purchase of the Assigned Interests, (iv) has such knowledge and experience, and has made investments of a similar nature, so as to be aware of the risks and uncertainties inherent in the purchase of rights and assumption of liabilities of the type contemplated in this Agreement and (v) has independently, and without reliance upon Agent or any Assignor, and based on such information as Assignee has deemed appropriate, made its own analysis and decision to enter into this Agreement. Assignee acknowledges that Agent and no Assignor has given Assignee any investment advice, credit information or opinion on whether the purchase of the Assigned Interests is prudent.

**6.4    Receipt of Loan Documents; Financial Statements**. It has received a copy of the Credit Agreement and has received or has been accorded the opportunity to receive copies of the most recent financial statements delivered pursuant to Sections 8.1 and 8.2 thereof, as applicable, and such other documents and information as it deems appropriate to make its own credit analysis and decision to enter into this Agreement and to purchase the Assigned Interests.

**6.5    Independent Credit Analysis**. It (a) has, independently and without reliance upon the Agent or any Assignor, and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement and to purchase the Assigned Interests, and (b) will, independently and without reliance on the Agent or any Assignor, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Credit Documents.

**6.6    No Reliance**. Assignee acknowledges that (i) Agent and any Assignor currently may have, and later may come into possession of, information with respect to the Assigned Interests or Borrower or its Subsidiaries or Affiliates that is not known to Assignee and that may be material to a decision to purchase the Assigned Interests ("Assignee Excluded Information"),

8

A/72635657.7/3001762-0000334318

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

(ii) Assignee has determined to purchase the Assigned Interests notwithstanding its lack of knowledge of the Assignee Excluded Information, (iii) Agent and the Assignors are under no obligation whatsoever to provide any Assignee Excluded Information to Assignee, including, without limitation, any work product prepared by attorneys and financial and other advisors to Agent or Assignors, whenever generated, (iv) except as otherwise provided in this Agreement, Assignee has not relied and will not rely on Agent or any Assignor to furnish or make available any documents or other information regarding the credit, affairs, financial condition or business of Borrower or any of its Subsidiaries or Affiliates or any other matter concerning Borrower or any of its Subsidiaries or Affiliates, and (v) neither Agent nor any Assignor shall have any liability to Assignee, and Assignee acknowledges and agrees that it shall have no claim against Agent or any Assignor, with respect to the nondisclosure of the Assignee Excluded Information in connection with the Transactions.

## SECTION 7.    REDUCTION OF COMMITMENT; EXISTING DEFAULTS.

7.1     **Borrower Acknowledgement of Existing Defaults**.    Borrower hereby acknowledges, confirms and agrees (a) that Events of Default have occurred and are continuing under the Loan Documents as of the Effective Date, including, without limitation, each of the Existing Defaults listed on Schedule I attached hereto; (b) that on July 21, 2008 (the "Acceleration Date"), Agent, on behalf of Assignors, accelerated the then outstanding Loans and all other Obligations owing to Assignors and Agent under the Credit Agreement and other Loan Documents, and that such Obligations as remain outstanding as of the Effective Date, after giving effect to the Transactions contemplated hereby and by the other Exchange Transaction Documents, are presently due and owing in full; (c) that on the Acceleration Date, Agent, on behalf of Assignors, terminated each of the Commitments and that as of the Effective Date no Assignor has any outstanding Commitment to make any Loans or to extend any other credit under the Credit Agreement or any other Loan Document to or for the benefit of Borrower, any Subsidiary Guarantor or any other Loan Party; and (d) that it has no affirmative defenses or offsets with respect to any of the Existing Defaults and, to the extent that Borrower or any Subsidiary Guarantor or any Subsidiary or Affiliate of Borrower has any such affirmative defenses or offsets, such affirmative defenses and offsets are hereby waived to the fullest extent permitted by law.

7.2     **Reservation of Rights**. Assignee expressly reserves the right to declare, in accordance with the terms of the Loan Documents, additional Events of Default, at any such time as such additional Events of Default shall otherwise occur and be continuing. This Section 7.2 shall constitute notice that, subject to the terms and conditions set forth in the Loan Documents, any forbearance by Assignee, by the Successor Agent or any other Lender from the exercise of its respective rights, remedies, powers and privileges shall be done solely at the election of Assignee, the Successor Agent and such other Lenders, shall be temporary and on a day-to-day basis and that Assignee, the Successor Agent and such other Lenders reserve the right, without any further notice or action, to immediately commence the exercise of any such default rights, remedies, powers and privileges in accordance with the terms of the Loan Documents. Neither Borrower nor any Subsidiary Guarantors or other Loan Party should assume that because only certain actions have been taken as of the date hereof, that additional default rights and remedies will not be exercised in the future. Borrower acknowledges and agrees that the forbearance by Assignee, the Successor Agent and each other Lender of any such rights and remedies shall not

9

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

constitute a waiver of any of such rights and remedies, and that Assignee, the Successor Agent and each other Lender hereby expressly reserve all such rights and remedies that they have or may have against the Loan Parties or any other party to the Loan Documents whether under the Loan Documents, applicable law or otherwise.

**SECTION 8.     NOTICES.**  Unless otherwise provided herein, all notices and other communications required or permitted under this Agreement shall be in writing and shall be deemed to have been duly given when delivered, if delivered personally, or if sent by overnight mail or overnight courier, or if sent by facsimile transmission with confirmed receipt, provided that in the case of notice sent by facsimile transmission, the party sending the notice shall confirm such notice by one of the other means provided for above, to the parties at the following addresses (or at such other addresses as shall be specified by like notice):

(a)     If to Assignee at:

OMNI 808 Investors LLC
9420 Wilshire Boulevard, Suite 400
Beverly Hills, California 90212
Attention:  Chief Executive Officer
Telephone: (310) 300-4100
Facsimile: (310) 300-4101

with a copy to:

Bingham McCutchen LLP
Three Embarcadero Center
San Francisco, California 94111
Attention:  Peter Carson, Esq.
Telephone:  (415) 393-2000
Facsimile:  (415) 393-2286

(b)     If to the Agent or any Assignor:

Wachovia Bank, National Association
One Wachovia Center
301 South College Street
Charlotte, North Carolina 28288
Attention: Thomas M. Cambern, Managing Director
Telephone: (704) 383-1172
Facsimile: (704) 383-6249

A/72635657.7/3001762-0000334318

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT B - PAGE 21
OMNI0001356

with a copy to:

Davis Polk & Wardwell
450 Lexington Avenue
New York, New York 10017
Attention: John Fouhey, Esq.
Telephone: (212) 450-4358
Facsimile: (212) 450-3538

(c)     If to the Borrower at:

MGA Entertainment Inc.
16830 Roscoe Boulevard, Suite 200
Van Nuys, California 91460
Attention: General Counsel
Telephone: (818) 894-2525
Facsimile: (818) 895-0771

with a copy to:

MGA Entertainment Inc.
16830 Roscoe Boulevard, Suite 200
Van Nuys, California 91460
Attention: Isaac Larian, Chief Executive Officer
Telephone: (818) 894-3150
Facsimile: (818) 894-1267

The giving of any notice required hereunder may be waived in writing by the party entitled to receive such notice.

### SECTION 9.     MISCELLANEOUS PROVISIONS.

9.1     **Confidentiality**.  Each party hereto agrees that, without the prior consent of each other party, it shall not disclose the contents of this Agreement (or the Letter of Intent, including the Purchase Price) to any person, except that any party may make any such disclosure (a) as required to implement or enforce this Agreement, (b) if required to do so by any law, court, regulation, subpoena or other legal process, (c) to any governmental authority or self-regulatory entity having or asserting jurisdiction over it, (d) if its attorneys advise it that it has a legal obligation to do so or that failure to do so may result in it incurring a liability to any other entity or sanctions that may be imposed by any governmental authority, or (e) to its Affiliates, professional advisors and auditors.

9.2     **Severability**.  Each part of this Agreement is intended to be severable.  If any term, covenant, condition or provision hereof is unlawful, invalid, or unenforceable for any reason whatsoever, and such illegality, invalidity, or unenforceability does not affect the remaining parts of this Agreement, then all such remaining parts hereof shall be valid and enforceable and shall have full force and effect as if the invalid or unenforceable part had not been included.

11

A/72635657.7/3001762-0000334318

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**9.3    Closing Expenses.** Except as set forth in Sections 2 and 3 above, each of the parties hereto shall be responsible for the payment of its respective costs and expenses in negotiating and carrying out its obligations under this Agreement, including, without limitation, the costs of its counsel.

**9.4    Amendment.** This Agreement may not be amended except by an instrument in writing signed by a duly authorized representative of each of the parties hereto.

**9.5    Headings.** The headings contained in this Agreement are inserted for convenience only and shall not affect the meaning or interpretation of this Agreement or any provision hereof.

**9.6    Construction.** Unless the context otherwise requires, singular nouns and pronouns, when used herein, shall be deemed to include the plural of such noun or pronoun, pronouns of one gender shall be deemed to include the equivalent pronoun of the other gender and references to a particular Section or Schedule shall be deemed to mean the particular Section of this Agreement and any Schedule attached hereto. The parties acknowledge that each party and its counsel have reviewed this Agreement and the parties hereby agree that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or any amendments or exhibits hereto.

**9.7    Successors and Assigns.** This Agreement and the terms, covenants, conditions, provisions, obligations, undertakings, rights and benefits hereof, including the Schedules hereto, shall be binding upon and shall inure to the benefit of the undersigned parties and their respective successors and assigns.

**9.8    Prior Understandings; Integrated Agreement.** This Agreement supersedes any and all prior discussions and agreements, written or oral, between the parties hereto with respect to the assignment of the Loan Documents and other matters contained herein, and this Agreement contains the sole, final and complete expression and understanding between the parties hereto with respect to the transaction contemplated herein.

**9.9    Reaffirmation of Loan Documents.** Borrower and each Subsidiary Guarantor expressly acknowledges and agrees that, after giving effect hereto, the Credit Agreement and the other Loan Documents to which it, or any of its Subsidiaries, is a party are valid and enforceable by Assignee against it and such Subsidiaries, and expressly reaffirms each of its and its Subsidiaries' Obligations under each such Loan Document.

**9.10    Counterparts.** This Agreement may be executed and delivered in any number of counterparts, each of which shall constitute an original, but all of which shall constitute but one and the same instrument.

**9.11    Governing Law.** This Agreement shall be construed, and the rights and obligations of the parties hereunder determined, in accordance with the substantive laws of the State of New York, without regard to conflict of law principles.

12

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

9.12     **No Third-Party Beneficiaries.**  No Person, organization or association other than the parties hereto shall have any rights or claims under this Agreement.  This Agreement shall confer no rights upon Borrower or any of its Subsidiaries or Affiliates or any other Person.

9.13     **Waiver Of Jury Trial.**  EACH OF THE PARTIES HERETO HEREBY KNOWINGLY, VOLUNTARILY, INTENTIONALLY AND IRREVOCABLY WAIVES THE RIGHT EACH MAY HAVE TO A TRIAL BY JURY OF ANY DISPUTE ARISING UNDER OR RELATING TO THIS AGREEMENT AND AGREE THAT ANY SUCH DISPUTE SHALL BE TRIED BEFORE A JUDGE SITTING WITHOUT A JURY.

A/72635657.7/3001762-0000334318

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT B - PAGE 24
OMNI0001359

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

ASSIGNEE:

**OMNI 808 INVESTORS LLC**, a California limited liability company

By: _____

Name:  Neil Kadisha

Title:  Chief Executive Officer

[SIGNATURE PAGE TO MASTER ASSIGNMENT AND EXCHANGE AGREEMENT]

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

ASSIGNORS:

WACHOVIA BANK, NATIONAL
    ASSOCIATION, as Agent and as a
    Lender

By: _____
    Name: Thomas M. Cambern
    Title: Managing Director

[SIGNATURE PAGE TO MASTER ASSIGNMENT AND EXCHANGE AGREEMENT]

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT B - PAGE 26
OMNI0001361

WELLS FARGO HSBC TRADE BANK,
NATIONAL ASSOCIATION

By: _____

Name:  *DARRYL HALCEE*

Title:  *VICE PRESIDENT / PRINCIPAL*

[SIGNATURE PAGE TO MASTER ASSIGNMENT AND EXCHANGE AGREEMENT]

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

WESTLB AG, NEW YORK BRANCH

By: _____

Name:     E. KEITH MIN
Title:      EXECUTIVE DIRECTOR

By: _____

Name:
Title:       SALVATORE BATTINELLI
            MANAGING DIRECTOR

[SIGNATURE PAGE TO MASTER ASSIGNMENT AND EXCHANGE AGREEMENT]

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

UBS LOAN FINANCE LLC

By: _____
    Name:   Richard L. Tavrow
    Title:    Director
             Banking Products
             Services, US

By: _____
    Name:   Mary E. Evans
    Title:    Associate Director
             Banking Products
             Services, US

[SIGNATURE PAGE TO MASTER ASSIGNMENT AND EXCHANGE AGREEMENT]

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

HSBC BANK USA, NATIONAL ASSOCIATION

By: _____
Name:
Title:  BRUCE F. DENII

[SIGNATURE PAGE TO MASTER ASSIGNMENT AND EXCHANGE AGREEMENT]

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT B - PAGE 30
OMNI0001365

BANK OF THE WEST

By: *Michael Creith*

Name: MICHAEL CREITH

Title: V. P.

[SIGNATURE PAGE TO MASTER ASSIGNMENT AND EXCHANGE AGREEMENT]

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

BANK OF CHINA, LOS ANGELES
BRANCH

By: _____

Name:    Feng Chang

Title:   Branch Manager & VP

[SIGNATURE PAGE TO MASTER ASSIGNMENT AND EXCHANGE AGREEMENT]

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

CHANG HWA COMMERCIAL BANK,
LTD., NEW YORK BRANCH

By: _____
Name: Jim C.Y. Chen
Title: V.P. & General Manager

[SIGNATURE PAGE TO MASTER ASSIGNMENT AND EXCHANGE AGREEMENT]

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

MIDFIRST BANK

By: _____
Name: Glen Shipley
Title: Senior Vice President

[SIGNATURE PAGE TO MASTER ASSIGNMENT AND EXCHANGE AGREEMENT]

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**BORROWER:**

**MGA ENTERTAINMENT INC.**, a California corporation

By: _____

Name: _____Isaac Larian_____

Title: _____CEO_____


**SUBSIDIARY GUARANTORS:**

**MGA ENTERTAINMENT (MEXICO), INC.**, a California corporation

By: _____

Name: ___ISAC LARIAN___

Title: _____CEO_____


**THE LITTLE TIKES COMPANY**, an Ohio corporation

By: _____

Name: ___ISAAC LARIAN___

Title: _____CEO_____


[SIGNATURE PAGE TO MASTER ASSIGNMENT AND EXCHANGE AGREEMENT]

EXHIBIT B - PAGE 35
OMNI0001370

## EXHIBIT A

## FORM OF SENIOR PROMISSORY NOTE

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT B - PAGE 36
OMNI0001371

# SENIOR PROMISSORY NOTE

$_____                                                    September 3, 2008

     FOR VALUE RECEIVED, MGA Entertainment Inc., a California corporation (with its successors, the "**Borrower**"), promises to pay to the order of [LENDER], on the Maturity Date in lawful money of the United States of America in same day funds, $_____ (the "**Loan**"; and this note, as amended from time to time, the "**Note**") (or such lesser amount as may be outstanding on the Maturity Date ).  The Borrower shall pay interest on the unpaid principal amount of the Loan until maturity on the dates and at a rate per annum as hereinafter set forth.  Interest hereunder shall be computed on the basis of a year of 365 or 366 days, as applicable, and paid for the actual number of days elapsed (including the first day but excluding the last day).

     This Note is one of a series of related notes issued by the Borrower pursuant to the Assignment and Exchange Agreement dated as of September 3, 2008 (the "**Assignment and Exchange Agreement**") among the Borrower, the initial holder hereof and certain other parties.  All such notes are referred to herein as the "**Notes**" and all of the loans evidenced thereby are referred to as the "**Loans.**"  Pursuant to the Agency Agreement dated as of September 3, 2008 (the "**Agency Agreement**"), Wachovia Bank, National Association ("**Wachovia**"), is acting as agent (in such capacity, the "**Agent**") for the holders of the Notes.  All payments of the principal of and interest on this Note and the Loan evidenced hereby shall be made to the Agent for the account of the holder hereof, at its offices at One Wachovia Center, 301 South College Street, Charlotte, North Carolina 28288, or such other office as the Agent may specify pursuant to the Agency Agreement.

     1.    *Certain Definitions.*  As used herein, the following terms have the following meanings:

     "**Affiliate**" means, with respect to any Person, a Person directly or indirectly controlling, controlled by or under common control with, such Person.  For purposes of this definition, "control" (including with correlative meanings, the terms "controlling", "controlled by" and "under common control with") means the possession directly or indirectly of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities or by contract or otherwise.  The Affiliates of a Person shall include any officer or director of such Person.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**DRAFT**

"**Allowed Purchaser Debt**" of any Obligor means all Debt of such Obligor to the Purchaser other than Debt evidenced by the Subordinated Purchaser Notes, *provided* that Customary Expenses and Indemnities shall also constitute Allowed Purchaser Debt.

"**Base Rate**" for any day means the per annum rate of interest equal to the greater of (i) the Prime Rate for such day and (ii) the Federal Funds Rate for such day plus one half of one percent (0.5%). Any change in the Base Rate resulting from a change in the Prime Rate or the Federal Funds Rate shall become effective as of 12:01 a.m. on the Business Day on which such change occurs. The Base Rate is a reference rate used by the Lender acting as the Agent in determining interest rates on certain loans and is not intended to be the lowest rate of interest charged by the Lender acting as the Agent or any other Lender on any extension of credit to any debtor.

"**Business Day**" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City or Charlotte, North Carolina are authorized or required by law to remain closed.

"**Credit Agreement**" has the meaning given in the Assignment and Exchange Agreement; unless otherwise specified, references to the Credit Agreement or any Loan Document herein mean the Credit Agreement or such Loan Document as in effect on the date hereof.

"**Current Collateral**" means the property (identified by category, such as inventory and accounts, rather than specific items of property) that is subject to the liens created under the Loan Documents to secure the "Secured Obligations" (as defined therein), it being understood and agreed that (a) such property will be the collateral securing the Subordinated Purchaser Notes as of the date hereof, after giving effect to the transactions contemplated by the Assignment and Exchange Agreement, and (b) if additional categories of property (such as intellectual property) are, after the date hereof, subjected to the liens created under the Loan Documents, such property does not constitute Current Collateral.

"**Customary Expenses and Indemnities**" means any and all (i) reasonable out-of-pocket fees, costs and expenses (including, without limitation, reasonable attorneys fees, costs and expenses; audit, appraisal, environmental and other third party evaluation, consulting or expert fees, costs and expenses; and search, filing, registration and recording and other similar fees, costs and expenses) incurred or sustained by the Purchaser in connection with (A) the preparation, negotiation and execution of the Assignment and Exchange Agreement and the other documents entered

2

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**DRAFT**

into or delivered into connection with the Purchaser's purchase of the Debt evidenced by the Subordinated Purchaser Notes, (B) the preparation, negotiation, execution and administration of the Subordinated Purchaser Notes and the Debt evidenced thereby, including, without limitation, any amendment, supplement, modification, consent, waiver, replacement or restatement of or to the Subordinated Purchaser Notes, the Credit Agreement or any of the other Loan Documents (as such term is defined in the Credit Agreement), (C) the creation, perfection, preservation and protection of any security interest or other liens securing the Debt evidenced by the Subordinated Purchaser Notes and the Credit Agreement and (D) the enforcement, attempted enforcement or preservation of any rights or remedies (including in connection with any "workout" or restructuring) regarding the Debt evidenced by the Subordinated Purchaser Notes and the Credit Agreement, including in any proceed under the United States Bankruptcy Code or other debtor relief law or in any appellate proceeding (it being understood and agreed that Customary Expenses and Indemnities shall not include any commitment, consent, waiver or amendment or similar fees of any kind payable in respect of the Debt evidenced by the Subordinated Purchaser Notes) and (ii) customary indemnification rights set forth in the Subordinated Purchaser Notes, the Credit Agreement or any of the other Loan Documents for actual losses, costs, claims, damages, liabilities, deficiencies, judgments or reasonable out-of-pocket expenses and other Indemnified Costs (as such term is defined in the Credit Agreement) incurred or sustained by the Purchaser, any of the Purchaser's Affiliates or any of the Purchaser's or such Affiliate's respective directors, officers, members or other equity members, agents or employees.

"**Debt**" means, with respect to any Person, without duplication,

(1)     all indebtedness for borrowed money of such Person;

(2)     all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments;

(3)     all obligations of such Person in respect of letters of credit, bankers' acceptances or other similar instruments;

(4)     all obligations of such Person to pay the deferred and unpaid purchase price of property or services which are recorded as liabilities under GAAP, excluding trade payables arising in the ordinary course of business;

(5)     all obligations of such Person as lessee under capital leases;

3

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT B - PAGE 39
OMNI0001374

**DRAFT**

(6)     all indebtedness of other Persons guaranteed by such Person to the extent so guaranteed;

(7)     all indebtedness of other Persons secured by a lien on any asset of such Person, whether or not such indebtedness is assumed by such Person; and

(8)     all obligations of such Person under hedging agreements.

"**Equity Interest**" means, with respect to any Person, any share of capital stock of (or other ownership interests in) such Person, any warrant, option or other right for the purchase or other acquisition from such Person of any share of capital stock of (or other ownership interests in) such Person, any security convertible into or exchangeable for any share of capital stock of (or other ownership interests in) such Person or warrant, right or option for the purchase or other acquisition from such Person of such shares (or such other ownership interests), and any other ownership interest in such Person (including, without limitation, partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such share, warrant, option, right or other interest is authorized or otherwise existing on any date of determination.

"**Federal Funds Rate**" means, for any day, the rate per annum (rounded upward to the nearest 1/100th of 1%) equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day, *provided* that (x) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day, and (y) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate quoted to the Agent by federal funds dealers selected by the Agent on such day on such transaction as determined by the Agent.

"**GAAP**" means generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity or agency having similar functions of comparable statute and authority in the accounting profession, which are applicable to the circumstances as of the date of determination.

4

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**DRAFT**

"**Maturity Date**" means December 1, 2009, or, if such day is not a Business Day, the next succeeding Business Day.

"**Obligors**" means the Borrower and each Subsidiary Guarantor.

"**Person**" means an individual, corporation, partnership, limited liability company, association, trust or unincorporated organization, or a government or any agency or political subdivision thereof.

"**Prime Rate**" means the rate of interest per annum publicly announced from time to time by the Agent as its prime rate. Each change in the Prime Rate will be effective for purposes hereof from and including the date such change is publicly announced as being effective. The Prime Rate is not necessarily the best or the lowest rate of interest offered by the Agent.

"**Purchaser**" means OMNI 808 Investors LLC.

"**Requisite Lenders**" means the holders of at least a majority of the outstanding principal amount of the Loans.

"**Senior Promissory Note Obligations**" of any Obligor means all obligations of such Obligor arising out of or with respect to the Notes, including (i) all principal of and interest on all Loans (including any interest ("**Post-Petition Interest**") that accrues (or that would accrue but for such case, proceeding or action) after the commencement of any case, proceeding or other action relating to the bankruptcy, insolvency or reorganization of any Obligor (whether or not such interest is allowed or allowable as a claim in any such case, proceeding or other action) on all loans evidenced by the Notes), (ii) all other amounts payable by any Obligor from time to time pursuant to the Notes (including any Post-Petition Interest with respect to such amounts) and (iii) any extensions of any of the foregoing (including Post-Petition Interest).

"**Subordinated Debt**" of any Obligor means all obligations of such Obligor to the Purchaser except for Allowed Purchaser Debt.

"**Subordinated Purchaser Notes**" means any notes issued by the Borrower to the Purchaser on or after September 3, 2008 to evidence the loans outstanding under the Credit Agreement in the aggregate principal amount of $291,551,931 acquired by the Purchaser pursuant to the Assignment and Exchange Agreement (and any replacement or successor notes evidencing that class of Debt under the Credit Agreement as in effect from time to time), it being understood and agreed that the

5

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT B - PAGE 41
OMNI0001376

**DRAFT**

Purchaser may make new loans under the Credit Agreement constituted as a separate class of Debt, which would constitute Allowed Purchaser Debt.

"**Subsidiary**" means, for any Person, any corporation, partnership or other entity of which at least a majority of the Equity Interests having by the terms thereof ordinary voting power to elect a majority of the board of directors or other individuals performing similar functions of such corporation, partnership or other entity (without regard to the occurrence of any contingency) is at the time directly or indirectly owned or controlled by such Person or one or more Subsidiaries of such Person or by such Person and one or more Subsidiaries of such Person, and shall include all Persons the accounts of which are consolidated with those of such Person pursuant to GAAP.

"**Subsidiary Guarantors**" means MGA Entertainment (Mexico), Inc., The Little Tikes Company and any other Person that becomes a guarantor of the Notes pursuant to paragraph 9(g) hereof.

2.    *Interest Rate; Additional Amounts.*

(a)    *Interest Rate.* The Loan shall bear interest for each day at a rate per annum equal to the Base Rate for such day *plus* 2%, payable in arrears on the first Business Day of each month, *provided* that, in the case of any overdue amounts of principal or interest, the Borrower shall, on demand by the Lender, pay interest on such amount, for each day overdue, at a rate per annum equal to the Base Rate for such day *plus* 4%.

(b)    *Taxes.* The Borrower will pay all amounts due hereunder free and clear of and without reduction for any taxes, levies, imposts, deductions, withholding or charges imposed or levied by the United States of America or any political subdivision or taxing authority thereof with respect thereto ("**Taxes**"). The Borrower will pay on behalf of the Lender all such Taxes so imposed or levied and any additional amounts as may be necessary so that the net payment of principal and interest on this Note received by the Lender after payment of all such Taxes shall be not less than the full amount provided hereunder. The Borrower will deliver to the Lender originals or certified copies of official receipts evidencing the payment of any Taxes within 45 days following the day on which payment of such Taxes is due pursuant to applicable law.

(c)    *Increased Costs.* If after the date of this Note the adoption of, or any change in, any applicable rule, executive order, decree, regulation or interpretation is amended, modified, enacted or promulgated by any government or governmental authority that (i) changes the basis of

6

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**DRAFT**

taxation of payments to the Lender or its lending office in respect to the principal of and interest on the Loan (except for changes in the rate of taxation on the overall net income of the Lender by the United States of America or such lending office by the jurisdiction in which such office is located), (ii) imposes, modifies or deems applicable any reserve, special deposit or similar requirement against any of the assets of, deposits with or for the account of, or credit extended by the Lender's lending office or (iii) imposes on the Lender (or its lending office) any other conditions affecting the Loan or this Note, and the result of any of the foregoing is to increase the cost to the Lender (or its lending office) of agreeing to make or making, funding or maintaining the Loan or would have the effect of reducing the rate of return on the capital of the Lender or any entity controlling the Lender (its **"Parent"**) as a consequence of agreeing to make the Loan, or to reduce the amount of any sum receivable by the Lender (or its lending office) on this Note, then the Borrower shall pay to the Lender or its Parent upon demand such amount as will compensate the Lender or its Parent for such additional cost or reduction in return. A certificate of the Lender setting forth the basis for the determination of any amount necessary to compensate the Lender or its Parent as aforesaid shall be conclusive as to the determination of such amount in the absence of manifest error.

3.    *Prepayments*. The Borrower will have the right at any time to prepay the Loan in whole or in part upon one Business Day's notice to the Agent. The Borrower will not make any prepayment of any of the other Loans, in whole or in part, unless, on the same day, it prepays, in full or a ratable portion of, as the case may be, the outstanding principal amount of the Loan.  If at any time the **"Permitted Holders"** (as defined in the Credit Agreement) cease to "beneficially own" (as defined in Rules 13d-3 and 13d-5 under the Securities Exchange Act of 1934, as amended), directly or indirectly, a majority in the aggregate of the total voting power of the then outstanding voting stock of the Borrower, whether as a result of issuance of Equity Interests of the Borrower, or any transfer of Equity Interests by any Permitted Holder, or otherwise (for purposes of this provision, the Permitted Holders shall be deemed to beneficially own any voting stock of a Person held by any other Person (the **"parent entity"**) so long as the Permitted Holders beneficially own, directly or indirectly, in the aggregate a majority of the voting power of the then outstanding voting stock of the parent entity), the Borrower shall immediately prepay, together with accrued interest thereon, the outstanding principal amount of the Loans.

4.    *General Provisions Regarding Payments*.  The Borrower will pay all amounts due hereunder free and clear of and without reduction for any taxes, levies, imposts, deductions, withholding or charges and without set-off or counterclaim, at the place for payment specified above in U.S. dollars available

7

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**DRAFT**

the same day in the city in which such place for payment is located. The Borrower hereby waives diligence, presentment, demand, protest and notice of any kind whatsoever.

    5.    *Subordination.*

      (a)     Each Obligor acknowledges that the Subordinated Debt is subordinated in right of payment, to the extent and in the manner provided in the Guarantee and Subordination Agreement dated as of September 3, 2008 by the Purchaser in favor of the Agent and the holders of the Notes (the **"Guarantee and Subordination Agreement"**), to the prior payment in full in cash of all Senior Promissory Note Obligations. The subordination provisions are for the benefit of and enforceable by the Agent and the Lenders.

      (b)     The Borrower, by issuing this Note, and each Subsidiary Guarantor, by guaranteeing this Note, acknowledges and agrees that those subordination provisions are, and are intended to be, an inducement and a consideration to the Lenders to accept the Notes, and each Lender is deemed conclusively to have relied on those subordination provisions in accepting its Note.

      (c)     The Subordinated Purchaser Notes, and any replacements (in whole or in part) thereof, shall bear a legend stating that such instrument and any Debt evidenced thereby is subordinated to the Notes pursuant to the Guarantee and Subordination Agreement.

    6.    *Subsidiary Guarantees.*

      (a)     Each Subsidiary Guarantor hereby unconditionally guarantees, jointly and severally, the full and punctual payment (whether at stated maturity, upon acceleration or otherwise) in cash of each Senior Promissory Note Obligation. Upon failure by any Obligor to pay punctually any Senior Promissory Note Obligation, each Subsidiary Guarantor shall forthwith on demand pay the amount not so paid at the place and in the manner specified herein.

      (b)     The obligations of each Subsidiary Guarantor hereunder shall be unconditional and absolute and, without limiting the generality of the foregoing, shall not be released, discharged or otherwise affected by:

          (i)     any extension, renewal, settlement, compromise, waiver or release in respect of any obligation of any Obligor under the Notes, by operation of law or otherwise;

8

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**DRAFT**

(ii)     any modification or amendment of or supplement to the Notes;

(iii)    any change in the corporate existence, structure or ownership of any Obligor, or any insolvency, bankruptcy, reorganization or other similar proceeding affecting any Obligor or its assets or any resulting release or discharge of any obligation of any Obligor contained in the Notes;

(iv)    the existence of any claim, set off or other rights that each Subsidiary Guarantor may have at any time against any other Obligor, any Lender or any other entity, whether in connection herewith or with any unrelated transactions, *provided* that nothing herein shall prevent the assertion of any such claim by separate suit or compulsory counterclaim;

(v)     any invalidity or unenforceability relating to or against any Obligor for any reason of the Notes or any provision of applicable law or regulation purporting to prohibit the payment by any Obligor of principal, premium or interest on any loan evidenced by, or any other amount payable pursuant to the Notes; or

(vi)    any other act or omission to act or delay of any kind by any other Obligor, the Agent, any Lender or any other Person or any other circumstance whatsoever which might, but for the provisions of this paragraph, constitute a legal or equitable discharge of or defense to each Subsidiary Guarantor's obligations hereunder.

(c)  Each Subsidiary Guarantor shall be liable under the Notes only for amounts aggregating up to the largest amount that would not render its obligations hereunder subject to avoidance under section 548 of the United States Bankruptcy Code or any comparable provision of any other applicable law.

(d)  Each Subsidiary Guarantor's obligations hereunder shall remain in full force and effect until all Senior Promissory Note Obligations shall have been paid in full in cash. If at any time any payment of any Senior Promissory Note Obligation is rescinded or must be otherwise restored or returned upon the insolvency, bankruptcy or reorganization of the Borrower or otherwise, each Subsidiary Guarantor's obligations hereunder with respect to such payment shall be reinstated as though such payment had been due but not made at such time.

9

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**DRAFT**

(e)      Each Subsidiary Guarantor irrevocably waives acceptance hereof, presentment, demand, protest and any notice not provided for herein, as well as any requirement that at any time any action be taken by any Person or entity against each Subsidiary Guarantor, any Obligor or any other Person or entity.

(f)      Upon making full payment with respect to any obligation of any Obligor hereunder, each Subsidiary Guarantor shall be subrogated to the rights of the payee against such Obligor with respect to such obligation, *provided* that no Subsidiary Guarantor shall enforce any payment by way of subrogation or any right to receive payment by way of contribution from another Subsidiary Guarantor so long as any Senior Promissory Note Obligation remains unpaid.

(g)      If acceleration of the time for payment of any Senior Promissory Note Obligation is stayed upon the insolvency, bankruptcy or reorganization of any Obligor, all such Senior Promissory Note Obligations otherwise subject to acceleration under the terms of the Notes shall nonetheless be payable by each Subsidiary Guarantor hereunder forthwith on demand by the Agent.

7.      *Representations and Warranties.* Each Obligor represents and warrants to the Lender that: (a) such Obligor is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and is duly authorized to enter into, deliver and perform this Note, which constitutes a valid and binding obligation of such Obligor, enforceable in accordance with its terms, (b) none of the making of this Note or the performance by such Obligor of its obligations hereunder will violate any provision of law or any agreement, indenture, note or other instrument binding upon such Obligor or any of its Subsidiaries or its certificate of incorporation or by-laws or other constitutional documents or give cause for acceleration of any Debt of such Obligor or any of its Subsidiaries and (c) no authority from or approval by any governmental body, commission or agency is required in connection with the making or validity of and the execution, delivery and performance of this Note.

8.      *Information.* So long as any amount is outstanding under this Note, the Borrower agrees that it shall furnish the following information to the Agent:

(a)      As soon as available, but in any event within 45 days after the end of each of the first, second and third fiscal quarters of the Borrower, the unaudited consolidated and, if available, consolidating balance sheet of the Borrower and its Subsidiaries as at the end of such period and the related unaudited consolidated and, if available, consolidating statements of income, stockholders' equity and cash flows

10

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**DRAFT**

of the Borrower and its Subsidiaries for such period, setting forth in each case in comparative form the figures as of the end of and for the corresponding periods of the previous fiscal year, all of which shall be certified by the chief executive officer or chief financial officer of the Borrower, in his or her opinion, to present fairly, in accordance with GAAP and in all material respects, the consolidated and, if available, consolidating financial position of the Borrower and its Subsidiaries as at the date thereof and the results of operations for such period (subject to normal year end audit adjustments and the addition of notes thereto).

(b)     As soon as available, but in any event within 120 days after the end of each fiscal year of the Borrower, the audited consolidated and, if available, consolidating balance sheet of the Borrower and its Subsidiaries as at the end of such fiscal year and the related audited consolidated and, if available, consolidating statements of income, stockholders' equity and cash flows of the Borrower and its Subsidiaries for such fiscal year, setting forth in comparative form the figures as at the end of and for the previous fiscal year, all of which shall be (i) certified by the chief executive officer or chief financial officer of the Borrower, in his or her opinion, to present fairly, in accordance with GAAP and in all material respects, the consolidated and, if available, consolidating financial position of the Borrower and its Subsidiaries as at the date thereof and the results of operations for such period and (ii) accompanied by the report thereon of independent certified public accountants of recognized national standing reasonably acceptable to the Agent, whose certificate shall be unqualified and in scope and substance reasonably satisfactory to the Agent.

(c)     From time to time and promptly upon each request, such information identifying the Borrower or any of its Subsidiaries as a Lender may request to comply with the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)).

(d)     Prompt notice of any change in the senior management of the Borrower and any change in the business, assets, liabilities, financial condition or results of operations of the Borrower and its Subsidiaries (on a consolidated basis) since the date hereof, which has had or is reasonably likely to have a material adverse effect.

(e)     Notice of the occurrence of any Event of Default promptly upon a responsible officer of the Borrower obtaining knowledge thereof.

(f)     Prompt notice of the Borrower's or any of its Subsidiary's, as applicable, entering into (i) definitive loan or other financing

11

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**DRAFT**

documentation with (A) the Purchaser to provide any Purchaser Financing (including any additional Debt committed to be provided under an "accordion" provision contained in the Credit Agreement (as amended)), (B) any lender to provide Third Party Working Capital Financing (as such term is defined below), or (C) any other Person to provide Debt in the aggregate outstanding or otherwise committed principal amount of at least $10,000,000, (ii) any material amendment of the Subordinated Purchaser Notes or any other loan or other financing documentation documenting the Debt evidenced by the Subordinated Purchaser Notes, and (iii) any amendment to or waiver under the loan or other financing documentation relating to any of the Debt described in clause (i) above for the purpose of (A) further increasing the aggregate outstanding or otherwise committed principal amount thereof, (B) materially changing any covenant contained therein or (C) increasing the interest, fees or charges associated therewith, such notice in each case to describe in reasonable detail the material economic terms of such Debt or amendment.

(g)    From time to time and promptly upon each written request, such other information or documents regarding the business, assets, liabilities, financial condition or results of operations of the Borrower and its Subsidiaries (on a consolidated basis) as the Agent (or any Lender through the Agent) may reasonably request.

The holder hereof agrees to maintain the confidentiality of all information received by it from or on behalf of the Borrower to the same extent as is provided in Section 12.8 of the Credit Agreement.

9.    *Covenants.*  So long as any amount is outstanding under this Note, the Borrower agrees that:

(a)    The Borrower will not, and will not permit any of its Subsidiaries to, declare or make (i) any dividend or other distribution on any Equity Interest of the Borrower or (ii) any payment on account of the purchase, redemption, retirement or acquisition of (A) any Equity Interest of the Borrower or (B) any option, warrant or other right to acquire any Equity Interest of the Borrower, *provided* that the Borrower may make "Permitted Tax Distributions," as defined in the Credit Agreement, subject to the conditions that (x) at least 10 days prior to making any such payment the Borrower shall deliver to the Agent a certificate of its chief financial officer setting forth in reasonable detail the information and calculations with which the amount of such payment was determined and (y) no such payment may be made if any Event of Default shall have occurred and be continuing under clauses (i) or (iv) of Paragraph 10 of this Note.

12

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT B - PAGE 48
OMNI0001383

**DRAFT**

(b)     Except as set forth on Schedule 9(b), the Borrower will not, and will not permit any of its Subsidiaries to, permit to exist or enter into any transaction (including the purchase, sale, lease or exchange of any property or the rendering of any service) with any Affiliate, except transactions in the ordinary course of and pursuant to the reasonable requirements of the business of the Borrower and its Subsidiaries and upon terms that are no less favorable to the Borrower or such Subsidiary than would be obtained in a comparable arm's length transaction with a Person that is not an Affiliate.  For purposes of this covenant, the Purchaser and each of its Affiliates shall be considered Affiliates of the Borrower and its Subsidiaries.

(c)     The Borrower will not, and will not permit any of its Subsidiaries to, incur, assume or be liable for any Debt to, or issue any Equity Interests to, Omninet Capital, LLC and any Affiliate of Omninet Capital, LLC other than the Purchaser.

(d)     The Borrower will not, and will not permit any of its Subsidiaries to, incur, assume or be liable for any Debt other than (i) the Senior Promissory Note Obligations, (ii) Debt evidenced by the Subordinated Purchaser Notes, (iii) Debt comprised of working capital loans (**"Third Party Working Capital Financing"**) provided by a lender other than the Purchaser or any Affiliate of the Purchaser or of the Borrower, *provided* that the aggregate outstanding principal amount of all such loans under this clause (iii) does not at any time exceed $15,000,000, (iv) Debt consisting of additional loans made by the Purchaser to the Borrower and its Subsidiaries (**"Purchaser Financing"**), (v) unsecured Debt, (vi) Debt permitted by Section 9.3(c) of the Credit Agreement and (vii) other Debt outstanding on the date hereof.

(e)     The Borrower will not, and will not permit any of its Subsidiaries to, directly or indirectly, create, assume or suffer to exist any lien of any nature whatsoever on any Current Collateral, except for (i) liens securing Third Party Working Capital Financing, but only if and to the extent that the Subordinated Purchaser Notes are secured equally and ratably with the obligations so secured for so long as such obligations are so secured, (ii) liens securing Purchaser Financing, but only if and to the extent that the Subordinated Purchaser Notes are secured equally and ratably with the obligations so secured for so long as such obligations are so secured, (iii) liens securing the Subordinated Purchaser Notes, (iv) liens otherwise permitted under Section 9.5 of the Credit Agreement and (v) liens in existence on the date hereof.

13

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT B - PAGE 49
OMNI0001384

**DRAFT**

(f)     The Borrower will not consolidate or merge with or into any other Person, or sell, lease or otherwise transfer or permit any of its Subsidiaries to sell, lease or otherwise transfer (including by way of merger or consolidation), directly or indirectly, all or any substantial part of the assets of the Borrower and its Subsidiaries, taken as a whole, to any other Person unless, either before or concurrently with the consummation of such transaction, the Borrower repays, together with accrued interest, the outstanding principal amount of the Notes.

(g)     If any Subsidiary of the Borrower other than the Subsidiary Guarantors becomes a guarantor of the Subordinated Purchaser Notes, the Borrower shall immediately cause such Subsidiary to guarantee the Notes on terms substantially as set forth in paragraph 6 and to become party to the Guarantee and Subordination Agreement.

10.     *Events of Default.*  If any of the following events ("**Events of Default**") shall occur and be continuing: (i) the Borrower shall fail to make payment when due of any principal of or interest on the Loans and, in the case of failure to make a payment of interest on the Loans, such failure continues for a period of five Business Days; or (ii) any representation or warranty made by the Borrower in this Note shall prove to have been incorrect in any material respect when made; or (iii) the Borrower shall fail to observe or perform any covenant contained in this Note and, except in the case of paragraphs 9(a), (c), (d), (e) or (f), such failure continues for a period of 30 days after the date upon which the Borrower has received written notice of such failure from the Agent; or (iv) proceedings are instituted by or against the Borrower or any of its Subsidiaries under the United States Bankruptcy Code or under any bankruptcy, reorganization or insolvency law or other law for the relief of debtors; *then*, in the case of any of the Events of Default specified above, the Agent may, at the request of the Requisite Lenders, by written notice to the Borrower, declare the Loans to be forthwith due and payable, together with accrued interest, whereupon the same shall become forthwith due and payable, without demand, protest, presentment, notice of dishonor or any other notice or demand whatsoever, all of which are hereby waived by the Borrower, *provided* that in the case of the Event of Default specified in clause (iv) above, without any notice to the Borrower or any other act of the Agent or any Lender, the Loans shall become forthwith due and payable, together with accrued interest, without demand, protest, presentment, notice of dishonor or any other notice or demand whatsoever, all of which are hereby waived by the Borrower.

11.     *Expenses; Indemnity.*  The Borrower shall pay (i) all reasonable out-of-pocket expenses of the Agent in connection with the preparation and administration of this Note, any waiver or consent hereunder or any amendment hereof or any Event of Default or alleged Event of Default hereunder and (ii) if an

14

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**DRAFT**

Event of Default occurs, all reasonable out-of-pocket expenses incurred by the Agent or any Lender, including (without duplication) the reasonable fees and disbursements of outside counsel in connection with such Event of Default and collection, bankruptcy, insolvency and other enforcement proceedings resulting therefrom. Without limitation of the foregoing, the Borrower and each Subsidiary Guarantor agrees to indemnify the Agent and the Lender and the Affiliates of each and the respective directors, officers, agents and employees of the foregoing (each an "**Indemnitee**") and hold each Indemnitee harmless from and against any and all liabilities, losses, damages, costs and reasonable expenses of any kind, including, without limitation, the reasonable fees and disbursements of counsel and settlement costs, which may be incurred by such Indemnitee in connection with any investigative, administrative or judicial proceeding (whether or not such Indemnitee shall be designated a party thereto) brought or threatened relating to or arising out of this Note, *provided* that no Indemnitee shall have the right to be indemnified hereunder for such Indemnitee's own gross negligence or willful misconduct.

12.     *Assignments and Participations.*  This Note shall be binding upon the Borrower, each Subsidiary Guarantor and their respective successors and assigns and is for the benefit of the Lender and its successors and assigns, except that the Borrower and the Subsidiary Guarantors may not assign or otherwise transfer their rights or obligations under this Note. The Lender may at any time grant participations in all or any portion of the Loan and the Note may be assigned as provided in the Agency Agreement. Upon request of the Lender in connection with any such assignment, the Borrower and each Subsidiary Guarantor will, against delivery of this Note, issue one or more replacement Notes in the name of the holders of the Loans after giving effect to such assignment, as specified by the Lender.

13.     *Acknowledgements.*  This Note is one of a series of related Notes issued by the Borrower pursuant to the Assignment and Exchange Agreement as part of an integrated transaction and for good and valuable consideration, including in exchange for secured Debt owed by the Borrower pursuant to instruments contained terms and conditions significantly more onerous than the terms and conditions of the Notes.

14.     *Miscellaneous.*  This Note may be amended, and any waiver of the provisions hereof may be given, with the approval of the Requisite Lenders, and any such amendment or waiver shall be binding upon the holder hereof (including any successor holder) notwithstanding that such holder did not approve such amendment or waiver, *provided* that without the consent of the holder hereof at the time no such amendment or waiver shall (i) reduce the principal amount hereof or the interest payable hereon (or the method of accruing interest hereon), (ii) postpone the Maturity Date or any monthly interest payment date, (iii) modify

15

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT B - PAGE 51
OMNI0001386

**DRAFT**

the second sentence of paragraph 3 of this Note (or otherwise provide for payments of principal on the Notes other than equally and ratably to all holders thereof) or (iv) modify the definition of "Requisite Lenders." Any such waiver or amendment must be in writing and shall be effective only to the extent specifically set forth in such writing. Any notice to be given under this Note shall be in writing and shall be deemed to have been duly given when received by the recipient. No delay on the part of the Agent or the Lender in exercising any of its powers or rights in respect hereof, and no partial or single exercise, shall constitute a waiver thereof.

      15.    *GOVERNING LAW; JURISDICTION.* THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF NEW YORK. EACH OBLIGOR HEREBY SUBMITS TO THE NONEXCLUSIVE JURISDICTION OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AND OF ANY NEW YORK STATE COURT SITTING IN NEW YORK CITY FOR PURPOSES OF ALL LEGAL PROCEEDINGS ARISING OUT OF OR RELATING TO THIS NOTE. EACH OBLIGOR IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION THAT SUCH OBLIGOR MAY NOW OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH PROCEEDING BROUGHT IN SUCH COURT AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. EACH OBLIGOR HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS NOTE.

*[Signature pages follow.]*

16

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT B - PAGE 52
OMNI0001387

**DRAFT**

IN WITNESS WHEREOF, each Obligor has caused this Note to be duly executed as of the day and year first above written.

MGA ENTERTAINMENT INC., as Borrower

By: _____
      Name:
      Title:

MGA ENTERTAINMENT (MEXICO), INC., as Subsidiary Guarantor

By: _____
      Name:
      Title:

THE LITTLE TIKES COMPANY, as Subsidiary Guarantor

By: _____
      Name:
      Title:

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**DRAFT**

**SCHEDULE 9(b)**

**Transactions with Affiliates**

[TO BE PROVIDED BY MGA]

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

## SCHEDULE I

### NON-EXCLUSIVE LIST OF EXISTING EVENTS OF DEFAULTS

1.      Borrower's failure to comply with the covenant set forth in Section 9.1(a) of the Credit Agreement (fixing a maximum ratio of Total Indebtedness to EBITDA) for each period of four consecutive fiscal quarters ending September 30, 2007, December 31, 2007, March 31, 2008 and June 30, 2008.

2.      Borrower's failure to comply with the covenant set forth in Section 9.1(b) of the Credit Agreement (fixing a minimum ratio of EBITDA to Fixed Charges) for each period of four consecutive fiscal quarters ending December 31, 2007, March 31, 2008 and June 30, 2008.

3.      Borrower's failure to comply with Sections 8.1 and 8.3 of the Credit Agreement by failing to deliver, within 45 days after the end of each of Borrower's fiscal quarter ending March 31, 2008 and Borrower's fiscal quarter ending June 30, 2008, certified copies of the unaudited consolidated and, if available, consolidating balance sheet of Borrower and its Subsidiaries as at the end of such period and the related unaudited consolidated and, if available, consolidating statements of income, stockholders' equity and cash flows of Borrower and its Subsidiaries for such period, accompanied by a signed compliance certificate.

4.      Borrower's failure to comply with Sections 8.2 and 8.3 of the Credit Agreement by failing to deliver as soon as available, but in any event within 90 days after the end of the Borrower's fiscal year ending December 31, 2007, certified copies of the audited consolidated and, if available, consolidating balance sheet of the Borrower and its Subsidiaries as at the end of such fiscal year and the related audited consolidated and, if available, consolidating statements of income, stockholders' equity and cash flows of the Borrower and its Subsidiaries for such fiscal year, accompanied by a signed compliance certificate.

5.      Borrower's failure to comply with Section 8.4(d) of the Credit Agreement by failing to provide notice to Agent of certain litigation matters involving (i) Smoby SA and (ii) Mattel Inc., including an adverse jury verdict in Los Angeles County Superior Court in litigation involving Mattel Inc.

6.      Borrower's failure to comply with Section 8.4(e) of the Credit Agreement by failing to provide notice to Agent of a decline in sales and other adverse changes in the business of Borrower and its Subsidiaries which, together, had a Material Adverse Effect.

7.      Borrower's failure to comply with Section 9.3 of the Credit Agreement by incurring the following Indebtedness:

    (i)   Unsecured loans from Isaac E. Larian to MGA Entertainment, Inc., in the aggregate principal amount of $10,000,000, advanced in August, 2007; and

    (ii)  Unsecured loans from certain Affiliates of MGA Entertainment Inc. to MGA Entertainment (H.K.) Limited, in the aggregate principal amount of $13,310,344.83, to MGA Entertainment Inc., in the aggregate principal amount of $5,989,655.17, advanced in August, 2008 and evidenced by the following notes:

08/22/08 5:26 PM

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT B - PAGE 55
OMNI0001390

1. Promissory note dated August 19, 2008, in the aggregate principal amount of $153,589.66, by MGA Entertainment (H.K.) Limited, a Hong Kong entity with limited liability existing under the laws of Hong Kong, in favor of Jahangir Eli Makabi and Shirin Larian Makabi, as Co-Trustees of the Makabi Living Trust, dated November 12, 1999

2. Promissory note dated August 19, 2008, in the aggregate principal amount of $69,115.34, by MGA Entertainment, Inc., a California corporation, in favor of Jahangir Eli Makabi and Shirin Larian Makabi, as Co-Trustees of the Makabi Living Trust, dated November 12, 1999

3. Promissory note dated August 25, 2008, in the aggregate principal amount of $758,620.69, by MGA Entertainment (H.K.) Limited, a Hong Kong entity with limited liability existing under the laws of Hong Kong, in favor of Jahangir Eli Makabi and Shirin Larian Makabi, as Co-Trustees of the Makabi Living Trust, dated November 12, 1999

4. Promissory note dated August 25, 2008, in the aggregate principal amount of $341,379.31, by MGA Entertainment, Inc., a California corporation, in favor of Jahangir Eli Makabi and Shirin Larian Makabi, as Co-Trustees of the Makabi Living Trust, dated November 12, 1999

5. Promissory note dated August 19, 2008, in the aggregate principal amount of $691,237.93, by MGA Entertainment (H.K.) Limited, a Hong Kong entity with limited liability existing under the laws of Hong Kong, in favor of the Isaac E. Larian and Angela Larian as Trustees of the Larian Living Trust established pursuant to a Declaration of Trust dated November 12, 1998

6. Promissory note dated August 19, 2008, in the aggregate principal amount of $311,057.07, by MGA Entertainment, Inc., a California corporation, in favor of the Isaac E. Larian and Angela Larian as Trustees of the Larian Living Trust established pursuant to a Declaration of Trust dated November 12, 1998

7. Promissory note dated August 25, 2008, in the aggregate principal amount of $3,379,310.34, by MGA Entertainment (H.K.) Limited, a Hong Kong entity with limited liability existing under the laws of Hong Kong, in favor of the Isaac E. Larian and Angela Larian as Trustees of the Larian Living Trust established pursuant to a Declaration of Trust dated November 12, 1998

8. Promissory note dated August 25, 2008, in the aggregate principal amount of $1,520,689.66, by MGA Entertainment, Inc., a California corporation, in favor of the Isaac E. Larian and Angela Larian as Trustees of the Larian Living Trust established pursuant to a Declaration of Trust dated November 12, 1998

9. Promissory note dated August 19, 2008, in the aggregate principal amount of $34,479.31, by MGA Entertainment (H.K.) Limited, a Hong Kong entity with limited liability existing under the laws of Hong Kong, in favor of Jahangir Eli Makabi, an individual

10. Promissory note dated August 19, 2008, in the aggregate principal amount of $15,515.69, by MGA Entertainment, Inc., a California corporation, in favor of Jahangir Eli Makabi, an individual

11. Promissory note dated August 19, 2008, in the aggregate principal amount of $155,175.86, by MGA Entertainment (H.K.) Limited, a Hong Kong entity with limited liability existing under the laws of Hong Kong, in favor of Isaac E. Larian, an individual

I-2

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT B - PAGE 56
OMNI0001391

12. Promissory note dated August 19, 2008, in the aggregate principal amount of $69,829.14, by MGA Entertainment, Inc., a California corporation, in favor of Isaac E. Larian, an individual

13. Promissory note dated August 4, 2008, in the aggregate principal amount of $1,777,468.97, by MGA Entertainment (H.K.) Limited, a Hong Kong entity with limited liability existing under the laws of Hong Kong, in favor of The Angela Larian Qualified Annuity Trust - 2004, dated June 30, 2004

14. Promissory note dated August 4, 2008, in the aggregate principal amount of $799,861.03, by MGA Entertainment, Inc., a California corporation, in favor of The Angela Larian Qualified Annuity Trust - 2004, dated June 30, 2004

15. Promissory note dated August 5, 2008, in the aggregate principal amount of $705,344.83, by MGA Entertainment (H.K.) Limited, a Hong Kong entity with limited liability existing under the laws of Hong Kong, in favor of The Angela Larian Qualified Annuity Trust - 2004, dated June 30, 2004

16. Promissory note dated August 5, 2008, in the aggregate principal amount of $317,405.17, by MGA Entertainment, Inc., a California corporation, in favor of The Angela Larian Qualified Annuity Trust - 2004, dated June 30, 2004

17. Promissory note dated August 8, 2008, in the aggregate principal amount of $705,344.83, by MGA Entertainment (H.K.) Limited, a Hong Kong entity with limited liability existing under the laws of Hong Kong, in favor of The Angela Larian Qualified Annuity Trust - 2004, dated June 30, 2004

18. Promissory note dated August 8, 2008, in the aggregate principal amount of $317,405.17, by MGA Entertainment, Inc., a California corporation, in favor of The Angela Larian Qualified Annuity Trust - 2004, dated June 30, 2004

19. Promissory note dated August 19, 2008, in the aggregate principal amount of $141,068.97, by MGA Entertainment (H.K.) Limited, a Hong Kong entity with limited liability existing under the laws of Hong Kong, in favor of The Angela Larian Qualified Annuity Trust - 2004, dated June 30, 2004

20. Promissory note dated August 19, 2008, in the aggregate principal amount of $63,481.03, by MGA Entertainment, Inc., a California corporation, in favor of The Angela Larian Qualified Annuity Trust - 2004, dated June 30, 2004

21. Promissory note dated August 4, 2008, in the aggregate principal amount of $1,777,468.97, by MGA Entertainment (H.K.) Limited, a Hong Kong entity with limited liability existing under the laws of Hong Kong, in favor of The Isaac E. Larian Qualified Annuity Trust - 2004, dated June 30, 2004

22. Promissory note dated August 4, 2008, in the aggregate principal amount of $799,861.03, by MGA Entertainment, Inc., a California corporation, in favor of The Isaac E. Larian Qualified Annuity Trust - 2004, dated June 30, 2004

23. Promissory note dated August 5, 2008, in the aggregate principal amount of $705,344.83, by MGA Entertainment (H.K.) Limited, a Hong Kong entity with limited liability existing under the laws of Hong Kong, in favor of The Isaac E. Larian Qualified Annuity Trust - 2004, dated June 30, 2004

24. Promissory note dated August 5, 2008, in the aggregate principal amount of $317,405.17, by MGA Entertainment, Inc., a California corporation, in favor of The Isaac E. Larian Qualified Annuity Trust - 2004, dated June 30, 2004

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT B - PAGE 57
OMNI0001392

25. Promissory note dated August 8, 2008, in the aggregate principal amount of $705,344.83, by MGA Entertainment (H.K.) Limited, a Hong Kong entity with limited liability existing under the laws of Hong Kong, in favor of The Isaac E. Larian Qualified Annuity Trust - 2004, dated June 30, 2004

26. Promissory note dated August 8, 2008, in the aggregate principal amount of $317,405.17, by MGA Entertainment, Inc., a California corporation, in favor of The Isaac E. Larian Qualified Annuity Trust - 2004, dated June 30, 2004

27. Promissory note dated August 19, 2008, in the aggregate principal amount of $141,068.97, by MGA Entertainment (H.K.) Limited, a Hong Kong entity with limited liability existing under the laws of Hong Kong, in favor of The Isaac E. Larian Qualified Annuity Trust - 2004, dated June 30, 2004

28. Promissory note dated August 19, 2008, in the aggregate principal amount of $63,481.03, by MGA Entertainment, Inc., a California corporation, in favor of The Isaac E. Larian Qualified Annuity Trust - 2004, dated June 30, 2004

29. Promissory note dated August 4, 2008, in the aggregate principal amount of $394,944.83, by MGA Entertainment (H.K.) Limited, a Hong Kong entity with limited liability existing under the laws of Hong Kong, in favor of The Jahangir Eli Makabi Qualified Annuity Trust - 2004, dated June 30, 2004

30. Promissory note dated August 4, 2008, in the aggregate principal amount of $177,725.17, by MGA Entertainment, Inc., a California corporation, in favor of The Jahangir Eli Makabi Qualified Annuity Trust - 2004, dated June 30, 2004

31. Promissory note dated August 5, 2008, in the aggregate principal amount of $156,724.14, by MGA Entertainment (H.K.) Limited, a Hong Kong entity with limited liability existing under the laws of Hong Kong, in favor of The Jahangir Eli Makabi Qualified Annuity Trust - 2004, dated June 30, 2004

32. Promissory note dated August 5, 2008, in the aggregate principal amount of $70,525.86, by MGA Entertainment, Inc., a California corporation, in favor of The Jahangir Eli Makabi Qualified Annuity Trust - 2004, dated June 30, 2004

33. Promissory note dated August 8, 2008, in the aggregate principal amount of $156,724.14, by MGA Entertainment (H.K.) Limited, a Hong Kong entity with limited liability existing under the laws of Hong Kong, in favor of The Jahangir Eli Makabi Qualified Annuity Trust - 2004, dated June 30, 2004

34. Promissory note dated August 8, 2008, in the aggregate principal amount of $70,525.86, by MGA Entertainment, Inc., a California corporation, in favor of The Jahangir Eli Makabi Qualified Annuity Trust - 2004, dated June 30, 2004

35. Promissory note dated August 19, 2008, in the aggregate principal amount of $31,344.83, by MGA Entertainment (H.K.) Limited, a Hong Kong entity with limited liability existing under the laws of Hong Kong, in favor of The Jahangir Eli Makabi Qualified Annuity Trust - 2004, dated June 30, 2004

36. Promissory note dated August 19, 2008, in the aggregate principal amount of $14,105.17, by MGA Entertainment, Inc., a California corporation, in favor of The Jahangir Eli Makabi Qualified Annuity Trust - 2004, dated June 30, 2004

37. Promissory note dated August 4, 2008, in the aggregate principal amount of $394,944.83, by MGA Entertainment (H.K.) Limited, a Hong Kong entity with limited liability existing under the laws of Hong Kong, in favor of The Shirin Larian Makabi Qualified Annuity Trust - 2004, dated June 30, 2004

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT B - PAGE 58
OMNI0001393

38. Promissory note dated August 4, 2008, in the aggregate principal amount of $177,725.17, by MGA Entertainment, Inc., a California corporation, in favor of The Shirin Larian Makabi Qualified Annuity Trust - 2004, dated June 30, 2004

39. Promissory note dated August 5, 2008, in the aggregate principal amount of $156,724.14, by MGA Entertainment (H.K.) Limited, a Hong Kong entity with limited liability existing under the laws of Hong Kong, in favor of The Shirin Larian Makabi Qualified Annuity Trust - 2004, dated June 30, 2004

40. Promissory note dated August 5, 2008, in the aggregate principal amount of $70,525.86, by MGA Entertainment, Inc., a California corporation, in favor of The Shirin Larian Makabi Qualified Annuity Trust - 2004, dated June 30, 2004

41. Promissory note dated August 8, 2008, in the aggregate principal amount of $156,724.14, by MGA Entertainment (H.K.) Limited, a Hong Kong entity with limited liability existing under the laws of Hong Kong, in favor of The Shirin Larian Makabi Qualified Annuity Trust - 2004, dated June 30, 2004

42. Promissory note dated August 8, 2008, in the aggregate principal amount of $70,525.86, by MGA Entertainment, Inc., a California corporation, in favor of The Shirin Larian Makabi Qualified Annuity Trust - 2004, dated June 30, 2004

43. Promissory note dated August 19, 2008, in the aggregate principal amount of $31,344.83, by MGA Entertainment (H.K.) Limited, a Hong Kong entity with limited liability existing under the laws of Hong Kong, in favor of The Shirin Larian Makabi Qualified Annuity Trust - 2004, dated June 30, 2004

44. Promissory note dated August 19, 2008, in the aggregate principal amount of $14,105.17, by MGA Entertainment, Inc., a California corporation, in favor of The Shirin Larian Makabi Qualified Annuity Trust - 2004, dated June 30, 2004.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT B - PAGE 59
OMNI0001394

## SCHEDULE II-A

### ASSIGNED INTERESTS

| Assignor | Facility Assigned | Aggregate Amount of Outstanding Revolving Loans of Assignor | Percentage Assigned of Revolving Loans | Outstanding Principal Balance of Assigned Revolving Loans |
|---|---|---|---|---|
| Wachovia Bank, National Association | Revolving Loan | $144,992,223.75 | 93% | $134,842,768.09 |
| Wells Fargo HSBC Trade Bank, National Association | Revolving Loan | $27,430,961.25 | 93% | $25,510,793.96 |
| WestLB AG, New York Branch | Revolving Loan | $70,536,757.50 | 93% | $65,599,184.48 |
| HSBC Bank USA, National Association | Revolving Loan | $15,674,835.00 | 93% | $14,577,596.55 |
| Bank of the West | Revolving Loan | $15,674,835.00 | 93% | $14,577,596.55 |
| UBS Loan Finance LLC | Revolving Loan | $15,674,835.00 | 93% | $14,577,596.55 |
| Bank of China, Los Angeles Branch | Revolving Loan | $7,837,417.50 | 93% | $7,288,798.28 |
| Chang Hwa Commercial Bank, Ltd., New York Branch | Revolving Loan | $7,837,417.50 | 93% | $7,288,798.28 |
| Midfirst Bank | Revolving Loan | $7,837,417.50 | 93% | $7,288,798.28 |
| TOTAL | REVOLVING LOAN | $313,496,700.00 | 93% | $291,551,931.00 |

| Assignor | Facility Assigned | Aggregate Amount of Outstanding Alternate Currency Loans of Assignor | Percentage Assigned of Alternate Currency Loans | Outstanding Principal Balance of Assigned Alternate Currency Loans |
|---|---|---|---|---|
| Wachovia Bank, National Association | Alternate Currency | $-0- | 93% | $-0- |
| TOTAL | ALTERNATE CURRENCY | $-0- | 93% | $-0- |

| Assignor | Facility Assigned | Aggregate Amount of Outstanding Swingline Loans of Assignor | Percentage Assigned of Swingline Loans | Outstanding Principal Balance of Assigned Swingline Loans |
|---|---|---|---|---|
| Wachovia Bank, National Association | Swingline | $-0- | 93% | $-0- |
| TOTAL | SWINGLINE | $-0- | 93% | $-0- |

A/72635657.7/3001762-0000334318

II-1

08/22/08 5:26 PM

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT B - PAGE 60
OMNI0001395

## SCHEDULE II-B

### EXCHANGED LOANS

| Assignor | Aggregate Amount of Revolving Loans Retained by all Assignors | Percentage of Retained Loans | Outstanding Principal Balance of Retained Revolving Loans |
|---|---|---|---|
| Wachovia Bank, National Association | $21,944,769.00 | 7% | $10,149,455.66 |
| Wells Fargo HSBC Trade Bank, National Association | $21,944,769.00 | 7% | $1,920,167.29 |
| WestLB AG, New York Branch | $21,944,769.00 | 7% | $4,937,573.03 |
| HSBC Bank USA, National Association | $21,944,769.00 | 7% | $1,097,238.45 |
| Bank of the West | $21,944,769.00 | 7% | $1,097,238.45 |
| UBS Loan Finance LLC | $21,944,769.00 | | $1,097,238.45 |
| Bank of China, Los Angeles Branch | $21,944,769.00 | 7% | $548,619.23 |
| Chang Hwa Commercial Bank, Ltd., New York Branch | $21,944,769.00 | 7% | $548,619.23 |
| Midfirst Bank | $21,944,769.00 | 7% | $548,619.23 |
| TOTAL | $21,944,769.00 | 7% | $21,944,769.00 |

| Assignor | Aggregate Amount of Alternate Currency Loans Retained by all Assignors | Percentage of Retained Alternate Currency Loans | Outstanding Principal Balance of Retained Alternate Currency Loans |
|---|---|---|---|
| Wachovia Bank, National Association | $-0- | 7% | $-0- |
| TOTAL | $-0- | 7% | $-0- |

| Assignor | Aggregate Amount of Swing Line Loans Retained by all Assignors | Percentage of Retained Swingline Loans | Outstanding Principal Balance of Retained Swingline Loans |
|---|---|---|---|
| Wachovia Bank, National Association | $-0- | 7% | $-0- |
| TOTAL | $-0- | 7% | $-0- |

08/22/08 5:26 PM

A/72635657.7/3001762-0000334318

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT B - PAGE 61
OMNI0001396

## SCHEDULE III

### LIST OF LOAN DOCUMENTS

<u>Initial Loan Documents</u>

1.    Credit Agreement, dated as of October 27, 2006 (the **"Credit Agreement"**), by and among MGA Entertainment Inc., as borrower (the **"Borrower"**), the financial institutions that are parties thereto from time to time as lenders and swingline lenders (collectively, the **"Lenders"**), Wachovia Capital Markets, LLC, as arranger (the **"Arranger"**), Wachovia Bank, National Association (**"Wachovia"**), as administrative agent on behalf of the Lenders (the **"Agent"**), Wells Fargo HSBC Trade Bank, National Association (**"WF-HSBC"**) and WestLB AG, New York Branch (**"WestLB"**), as syndication agents, including the following schedules and exhibits thereto:

    a.  Schedule 1.1(A) - List of Loan Parties
    b.  Schedule 1.1(B) - List of Pledgors
    c.  Schedule 1.1(C) - List of Guarantors
    d.  Schedule 6.1(b) - Ownership Structure
    e.  Schedule 6.1(g) - Indebtedness and Guaranties
    f.  Schedule 6.1(h) - Material Contracts
    g.  Schedule 6.1(i) - Litigation
    h.  Schedule 6.1(j) - Taxes
    i.  Schedule 6.1(u) - Broker's Fees
    j.  Schedule 9.4 - Existing Investments
    k.  Schedule 9.5 - Existing Indebtedness
    l.  Schedule 9.12 - Transactions with Affiliates

    m.  Exhibit A - Form of Assignment and Assumption
    n.  Exhibit B - Form of Notice of Borrowing
    o.  Exhibit C - Form of Notice of Continuation
    p.  Exhibit D- Form of Notice of Conversion
    q.  Exhibit E - Form of Notice of Swingline Borrowing
    r.  Exhibit F - Form of Swingline Note
    s.  Exhibit G -Form of Revolving Note
    t.  Exhibit H - Form of Alternate Currency Note
    u.  Exhibit I - Form of Opinion of Counsel
    v.  Exhibit J - Form of Compliance Certificate
    w.  Exhibit K -Form of Guaranty
    x.  Exhibit L - Form of Pledge Agreement
    y.  Exhibit M - Form of Security Agreement
    z.  Exhibit N - Form of Confidentiality Agreement

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT B - PAGE 62
OMNI0001397

2.      The following promissory notes issued pursuant to the Credit Agreement:

    a.  Revolving Note, dated October 27, 2006, in the stated principal amount of $50,000,000, issued by the Borrower in favor of Wachovia;

    b.  Revolving Note, dated October 27, 2006, in the stated principal amount of $40,000,000, issued by the Borrower in favor of WF-HSBC;

    c.  Revolving Note, dated May 25, 2007, in the stated principal amount of $90,000,000, issued by the Borrower in favor of WestLB;

    d.  Revolving Note, dated May 25, 2007, in the stated principal amount of $20,000,000, issued by the Borrower in favor of UBS Loan Finance LLC;

    e.  Revolving Note, dated October 27, 2006, in the stated principal amount of $20,000,000, issued by the Borrower in favor of HSBC Bank USA, National Association;

    f.  Lost Note Affidavit and Indemnity Agreement dated August 28, 2008, executed by Bank of the West, representing a Revolving Note, dated October 27, 2006, in the stated principal amount of $15,000,000, issued by the Borrower in favor of Bank of the West;

    g.  Revolving Note, dated October 27, 2006, in the stated principal amount of $10,000,000, issued by the Borrower in favor of Bank of China, Los Angeles Branch;

    h.  Lost Note Affidavit and Indemnity Agreement dated August 29, 2008, executed by Chang Hwa Commercial Bank, Ltd., New York Branch;

    i.  Lost Note Affidavit and Indemnity Agreement dated August 29, 2008, executed by MidFirst Bank;

    j.  Swingline Note, dated October 27, 2006, in the stated principal amount of $25,000,000, issued by the Borrower in favor of Wachovia; and

    k.  Alternate Currency Note, dated October 27, 2006, made by the Borrower in favor of Wachovia.

3.      Guaranty, dated as of October 27, 2006 (the "**Guaranty**"), executed and delivered by MGA Entertainment (Mexico), Inc. ("**MGA Mexico**"), as grantor, in favor of the Agent and the Lenders, including the following attachments thereto:

    a.  Annex I - Form of Accession Agreement

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT B - PAGE 63
OMNI0001398

4.  Pledge Agreement, dated as of October 27, 2006 (the "**Pledge Agreement**"), executed and delivered by each of the Borrower and MGA Mexico, as pledgors, in favor of the Agent, including the following schedules thereto:

    a.  Schedule I - Pledged Equity Interests
    b.  Schedule I - Form of Acknowledgement and Consent

5.  The following Acknowledgement and Consents to Pledge Agreement;

    a.  Acknowledgement and Consent, dated as of October 27, 2006, executed and delivered by MGA Entertainment Sweden AB;

    b.  Acknowledgement and Consent, dated as of October 27, 2006, executed and delivered by MGA Entertainment Benelux, SPRL;

    c.  Acknowledgement and Consent, dated as of October 27, 2006, executed and delivered by MGA Entertainment Germany, GmbH;

    d.  Acknowledgement and Consent, dated as of October 27, 2006, executed and delivered by MGA Entertainment UK, Limited;

    e.  Acknowledgement and Consent, dated as of October 27, 2006, executed and delivered by MGA Entertainment Iberia, S.L.;

    f.  Acknowledgement and Consent, dated as of October 27, 2006, executed and delivered by MGA Entertainment (France) SARL;

    g.  Acknowledgement and Consent, dated as of October 27, 2006, executed and delivered by MGA Entertainment (Canada) Company;

    h.  Acknowledgement and Consent, dated as of October 27, 2006, executed and delivered by MGAE de Mexico SRL de CV;

    i.  Acknowledgement and Consent, dated as of October 27, 2006, executed and delivered by MGA Entertainment Music, Inc.;

    j.  Acknowledgement and Consent, dated as of October 27, 2006, executed and delivered by MGA Entertainment Productions, Inc.;

    k.  Acknowledgement and Consent, dated as of October 27, 2006, executed and delivered by MGA Mexico; and

    l.  Acknowledgement and Consent, dated as of October 27, 2006, executed and delivered by MGA International, Inc.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT B - PAGE 64
OMNI0001399

6. Security Agreement, dated as of October 27, 2006 (the "**Security Agreement**"), executed and delivered by the Borrower, as grantor, in favor of the Agent, including the following schedules and attachments thereto:

   a. Schedule 1 - Necessary Filings
   b. Schedule 2 - Jurisdictions of Organization, Names, Etc.
   c. Schedule 3 - Locations of Inventory
   d. Annex 1 - Form of Security Agreement Supplement

7. The following UCC Financing Statements:

   a. UCC-1 Financing Statement, showing the Borrower, as debtor, and the Agent, as security party, filed with the California Secretary of State on October 30, 2006 under file number 06-7090318014, including Exhibit A attached thereto (relating to the Security Agreement);

   b. UCC-1 Financing Statement, showing the Borrower, as debtor, and the Agent, as security party, filed with the California Secretary of State on October 30, 2006 under file number 06-7090318135, including Exhibit A and Schedule 1 attached thereto (relating to the Pledge Agreement); and

   c. UCC-1 Financing Statement, showing the MGA Mexico, as debtor, and the Agent, as security party, filed with the California Secretary of State on October 30, 2006 under file number 06-7090317861, including Exhibit A and Schedule 1 attached thereto (relating to the Pledge Agreement)

8. The following Certificated Equity Interests and related Stock Powers:

   a. Certificate No. 1, representing 1,000 shares of common stock of MGA Mexico, issued to the Borrower, together with a related Stock Power certificate executed in blank by the Borrower

   b. Certificate No. 1, representing 1,000 shares of common stock of MGA Entertainment Productions, Inc., issued to the Borrower, together with a related Stock Power certificate executed in blank by the Borrower

   c. Certificate No. 1, representing 1,000 shares of common stock of MGA Entertainment Music, Inc., issued to the Borrower, together with a related Stock Power certificate executed in blank by the Borrower

   d. Certificate No. 3, representing 650 shares of common shares of MGA Entertainment (Canada) Company, issued to the Borrower, together with a related Stock Power certificate executed in blank by the Borrower

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT B - PAGE 65
OMNI0001400

    e.   Certificate No. Four, representing 6,500 shares of ordinary shares of MGA Entertainment (UK) Limited, issued to the Borrower, together with a related Stock Power certificate executed in blank by the Borrower

    f.   Certificate No. 3 representing 500 shares of The Little Tikes Company of common shares issued to MGA , together with a related Stock Power certificate executed in blank by the Borrower

9.   The following Landlord Letter Agreements:

    a.   Landlord Letter Agreement, dated October 27, 2006, executed and delivered by Toybox LLC, as lessor, and addressed to the Agent (relating to the Borrower's premises located in Rialto, California); and

    b.   Landlord Letter Agreement, dated October 27, 2006, executed and delivered by 16300 Roscoe LLC, as lessor, and addressed to the Agent (relating to the Borrower's premises located in Van Nuys, California)

10. Perfection Questionnaire, certified by the Borrow in favor of the Agent

11. LIBOR Indemnity Letter, dated October 24, 2006, executed and delivered by the Borrower, and addressed to the Agent

12. Post-Closing Letter Agreement, dated October 27, 2006, executed and delivered by the Borrower, and addressed to the Agent, including Exhibit A (Post-Closing Items) thereto

Subsequent Loan Documents

13. Security Agreement Supplement, dated as of December 22, 2006, executed and delivered by The Little Tikes Company ("**Little Tikes**") in favor of the Agent, including the following attachment thereto:

    a.   Annex 1 - Necessary Filings and Locations of Inventory

14. Accession Agreement, dated as of December 22, 2006, executed and delivered by Little Tikes in favor of the Agent and the Lenders (relating to the Guaranty)

15. First Amendment to Pledge Agreement, dated as of December 22, 2006, made by and among the Borrower, MGA Mexico and the Agent (relating to a pledge of stock in Little Tikes), including the following exhibit thereto:

    a.   Exhibit 1 - Pledged Equity Interests

16. Acknowledgment and Consent (to Pledge Agreement), executed and delivered by Little Tikes

III-5

08/22/08 5:26 PM

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT B - PAGE 66
OMNI0001401

17. Certificate No. 3, representing 500 shares of Little Tikes, issued to the Borrower, together with a related Stock Power certificate executed in blank by the Borrower

18. Bailment Agreement, dated May 5, 2006, made by and between Little Tikes, as bailor, and Penguin, LLC, as bailee, including the following schedule thereto:

    a.  Schedule A - Bailed Property

19. Consent Letter, dated April 10, 2007, by and among the Borrower, the Agent and the Lenders regarding the Borrower's acquisition of Smoby S.A. ("**Smoby**")

20. Consent and First Amendment to Credit Agreement, dated May 11, 2007, made by and among the Borrower, the lenders and guarantors party thereto and the Agent, including the following schedules and exhibits thereto:

    a.  Schedule 1 - Exhibit Smoby Indebtedness
    b.  Exhibit A - Form of First Amendment to Pledge Agreement
    c.  Exhibit B - From of First Amendment to Security Agreement

21. First Amendment to Pledge Agreement, dated as of May 11, 2007, made by and among each of the Borrower and MGA Mexico, as pledgors, and the Agent, including the following schedule thereto:

    a.  Schedule 1 - Pledged Equity Interests

22. First Amendment to Security Agreement, dated as of May 11, 2007, made by and among the Borrower and Little Tikes, as grantors, and the Agent, as secured party

23. UCC-3 Financing Statement Amendment, filed with the California Secretary of State on May 14, 2007, relating to initial Financing Statement file number 06-7090317861, including Exhibit A and Schedule 1 attached thereto (relating to the Pledge Agreement)

24. UCC-3 Financing Statement Amendment, filed with the California Secretary of State on May 14, 2007, relating to initial Financing Statement file number 06-7090318135, including Exhibit A and Schedule 1 attached thereto (relating to the Pledge Agreement)

25. The following documents relating to an increase in the commitments under the Credit Agreement (up to $400,000,000 in the aggregate):

    a.  Request Letter, dated May 23, 2007, executed and delivered by the Borrower, and addressed to the Agent, requesting an increase in the commitments under the Credit Agreement

    b.  Emails, dated May 23, 2007, among Alston & Bird LLP lawyers regarding an increase in the commitments under the Credit Agreement

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT B - PAGE 67
OMNI0001402

   c. Confirmation Letter, dated May 8, 2007, executed and delivered by Bank of the West, and addressed to the Arranger, confirming its increased commitment of $5,000,000

   d. Confirmation Letter, dated May 21, 2007, executed and delivered by UBS Loan Finance LLC, and addressed to the Arranger, confirming its increased commitment of $10,000,000

   e. Confirmation Letter, dated May 9, 2007, executed and delivered by WestLB, and addressed to the Arranger, confirming its increased commitment of $50,000,000

   f. Wachovia Securities Memo, dated April 25, 2007, regarding commitment increase and restructured loan facility

   g. Commitment Letter, dated April 27, 2007, among Wachovia, the Arranger and the Borrower, regarding the commitment increase

   h. Draft copy of a proposed "Consent and First Amendment to Credit Agreement", dated May 8, 2007

26. Notice and Waiver Letter, dated January 16, 2008, executed and delivered by certain Lenders, and addressed to the Borrower, regarding the Borrower's reimbursement obligation under Letter of Credit No. SM225315W

27. The following letters regarding remedies by the Agent and the Lenders:

   a. Acceleration Letter, dated July 21, 2008, executed and delivered by the Agent, and addressed to the Borrower

   b. Acceleration Letter, dated July 21, 2008, executed and delivered by the Agent, and addressed to MGA Mexico and Little Tikes, as guarantors under the Guaranty

   c. Account Termination and Turnover Letter, dated July 21, 2008, executed and delivered by the Agent, and addressed to the Borrower and Little Tikes, as grantors under the Security Agreement

   d. Setoff Letter, dated July 21, 2008, executed and delivered by Wells Fargo Bank, N.A., and addressed to the Borrower and Little Tikes

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

## SCHEDULE IV

## LIST OF STOCKHOLDERS

| Name of Holder of Class A Common Stock | Number of Shares |
|---|---|
| Isaac E. Larian and Angela Larian as Trustees of the Larian Living Trust established pursuant to a Declaration of Trust dated November 12, 1998 | 1,816,381.80 |
| Jahangir Eli Makabi and Shirin Larian Makabi, as Co-Trustees of the Makabi Living Trust dated November 12, 1999 | 403,618.20 |
| Total | 2,220,000 |

| Name of Holder of Class B Common Stock | Number of Shares |
|---|---|
| Isaac E. Larian and Angela Larian as Trustees of the Larian Living Trust established pursuant to a Declaration of Trust dated November 12, 1998 | 7,400,418 |
| Jahangir Eli Makabi and Shirin Larian Makabi, as Co-Trustees of the Makabi Living Trust dated November 12, 1999 | 1,415,480 |
| The Isaac E. Larian Qualified Annuity Trust – 2004, dated June 30, 2004 | 4,473,509.10 |
| The Angela Larian Qualified Annuity Trust – 2004, dated June 30, 2004 | 4,473,509.10 |
| The Jahangir Eli Makabi Qualified Annuity Trust – 2004, dated June 30, 2004 | 1,108,541.90 |
| The Shirin Larian Makabi Qualified Annuity Trust – 2004, dated June 30, 2004 | 1,108,541.90 |
| Total | 19,980,000 |

08/22/08 5:26 PM

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

EXHIBIT B - PAGE 69
OMNI0001404