# EXHIBIT 1 Part 3

VOLUME 93          MARCH 1980          NUMBER 5

# HARVARD LAW REVIEW

## THE TRADE SECRET STATUS OF HEALTH AND SAFETY TESTING INFORMATION: REFORMING AGENCY DISCLOSURE POLICIES

*Thomas O. McGarity\* and Sidney A. Shapiro\*\**

*Manufacturers of new drugs, pesticides, and other substances are often required by law to provide federal regulatory agencies with costly test results as a prerequisite to obtaining clearance to go to market. In this Article, Professors McGarity and Shapiro analyze the circumstances under which this information should be made available to the public. Balancing the interests for and against disclosure, they conclude that virtually all test results should be disclosed, although competitors should generally be forbidden for some period of time from making use of the disclosed information in their own test programs.*

RECOGNIZING that market mechanisms, even as enhanced by a tort compensation system, do not adequately protect man and the environment from the risks posed by new products, chemicals, and technologies, Congress has empowered several federal regulatory agencies to proscribe the sale of certain products which endanger the public. In making the risk-benefit assessment prerequisite to such a determination, an agency relies upon the results of experimental testing submitted by the proponents of the product. The controversial question whether, and to what extent, such data should be publicly disclosed has recently arisen in several contexts, including approval of new drugs, antibiotics, and food and color additives by the Food and Drug Administration (FDA); and approval of pesticides and chemicals by the Environmental Protection Agency (EPA).

In almost all of these instances, the private regulatees who submit the studies have successfully forestalled most efforts by

---

\* Associate Professor of Law, University of Kansas. B.A., Rice University, 1971; J.D., University of Texas, 1974.

\*\* Associate Professor of Law, University of Kansas. B.S., University of Pennsylvania, 1970; J.D., 1973.

The assistance of the University of Kansas Research Fund is gratefully acknowledged. The authors would like to express their appreciation to Malcolm Burns, Edward Gray, Thomas Krattenmaker, Jeffrey Miller, and Richard Pierce for their comments on earlier drafts of this Article. The authors would also like to acknowledge the assistance of Janice Jacobs, Class of 1981, University of Kansas Law School.

837

Exhibit 1 - Page 165

make it clear that health and safety data should receive absolute proprietary protection. The FIFRA experience, however, indicates that Congress is not likely to disregard the substantial policies favoring data release to secure the benefits of the possible innovation that may flow from further research. Second, Congress might do nothing and allow the public to suffer whatever deleterious effects might result from lost innovation. Congress, however, is not likely to adopt a posture of benign neglect in the face of drug industry protests that the "drug lag" is endangering the health of American patients, despite the present lack of substantial evidence that monopoly profits will reduce this lag.

The fairest and most practical option is the exclusive use period approach. Congress could ratify the FDA's redefinition of "proprietary data" or, if the FDA proves unwilling to take the initial step, redefine the term itself so as to exclude health and safety data as it has recently done in the chemical and pesticide areas. Then, after an appropriate body has made a thorough investigation of the facts and has made reasonable predictions about the efficacy of barriers to entry in stimulating drug research, Congress or the agency pursuant to congressional authority could provide for a generic period of exclusive use that represents a balance between the need for innovation and the policies of encouraging competitive pricing and discouraging duplicative testing. In addition, Congress should give the FDA the authority to ban duplicative tests that endanger their human participants.

Congress has in the past studiously avoided resolving this continuing paradox in the American free enterprise system. No free enterprise economy can function properly unless consumers are informed. Yet consumers cannot become informed if industry-generated data on important aspects of products they consume remain secret; nor can competition produce an efficient marketplace when secrecy erects barriers to entry. On the other hand, competition and consumer sovereignty do not breed innovation. An innovator must be secure in the knowledge that he will reap the benefits of his efforts. Congress has moved to resolve these inherent contradictions in the toxic substance and pesticide areas. Congress should take parallel action with respect to drug regulation. FDA pressure, in the form of changing its antiquated approach toward proprietary information, could prove to be the necessary catalyst.

Exhibit 1 - Page 166

# Stauffer Chemical Company

Westport, Connecticut 06881 / Tel. (203) 222-3000 / Cable "Staufchem"

RETURN RECEIPT REQUESTED          November 13, 1981

Lisa Brown
Division of Pest Management
California Department of
  Food and Agriculture
1220 N. Street
Sacramento, CA  95814

Re:  PR-81-44

Dear Ms. Brown:

     I am writing in response to your letters of October 20
and 27, 1981, which indicated that Ms. Ginger Rutland of
Station KRON had requested from the California Department of
Food and Agriculture (CDFA) a copy of "all data regarding
the health effects of Captan."

     Stauffer maintains that some of the data which the
company has submitted to CDFA to support our registration of
the fungicide Captan are confidential and should not be
released by CDFA.  All of the data which Stauffer considers
to be confidential are listed in the attachment to this
letter.

     Under the California Administrative Code §2360(g),
Stauffer has fifteen days after receipt of your letter to
provide justification why confidentiality should be maintained.
In an October 30, 1981 telephone conversation with John
Behan and a follow-up letter of November 5, 1981, you extended
until November 16, 1981 for Stauffer to respond to your
letters.

     Stauffer maintains that all of the data listed in the
attachment to this letter fall under the California standard
for "trade secrets", California Government Code §6254.7:

     1)   the data are a "compilation of information
          which is not patented,"

     2)   the data are "known only to certain individuals
          within a commercial concern" (Stauffer),

     3)   generation of the data is necessary in order to
          be able to "produce ... an article of trade"
          (Captan), and

Exhibit 1 - Page 167

November 13, 1981
Page 2

    4) having possession of the data gives Stauffer "an opportunity to obtain a business advantage over competitors" who are not able to register Captan without using the data or generating their own data.

For all of the following reasons, Stauffer requests that California maintain the confidentiality of materials listed in the attachment:

- The data clearly have commercial value; Stauffer has spent a considerable amount of money to obtain the data.

- Submission of the data is necessary to obtain a registration for Captan. By developing and owning the data Stauffer has obtained a competitive advantage over other companies which must either pay Stauffer to use the data or generate it themselves.

- Someone obtaining the data could use it to register Captan outside of the United States and thereby place Stauffer at a competitive disadvantage in foreign markets.

- The two confidential pages of Volume I of the RPAR rebuttal document, pp. 94-5, contain marketing data, which would be of value to another company planning to compete with Stauffer; the remainder is health and safety data.

- The U.S. Congress recognizes the commercial value of health and safety data by providing either exclusive use or compensation protection for it. See FIFRA §3(c)(1)(D),

- Stauffer restricts access to the data within the company on a "need to know" basis. The data marked "confidential" have never been publically disclosed either by Stauffer or by the U.S. EPA.

- Reference 54 of Volume 7 of the RPAR rebuttal document contains information which could be used to identify the medical histories of Stauffer employees and should remain confidential in order to protect the privacy of these employees.

If you need further clarification, please call me at 415-231-1177 before releasing any of the data.

Thank you for your attention to this matter.

Sincerely yours,

*Ralph Riggs*

Ralph Riggs
Senior Administrator of
Regulatory Affairs
Pesticide Registrations

Exhibit 1 - Page 168

November 13, 1981

ATTACHMENT

CONFIDENTIAL MATERIALS SUBMITTED TO SUPPORT
STAUFFER CHEMICAL'S CAPTAN REGISTRATION

CAPTAN RPAR REBUTTAL DOCUMENT

Vol. 1    pp. 94 - 95    - Stauffer Captan Quantitative Usage
                           1978

Vol. 2    Reference  4 - Protocol Lifetime Oncogenic Feeding
                         Study in the Mouse and Transmittal Letter
          Reference  5 - Statistical analysis system
          Reference  6 - Evaluation of NCI Captan bioassay
                         (mice) by Dr. Carlton
          Reference  7 - Review of NCI Captan bioassay
                         (rat) by Dr. Carlton
          Reference  8 - Two-Year Oral Toxicity/Carcinogenicity
                         Study of Captan in Rats
          Reference  9 - IRDC letter to Dr. Saunders -
                         November 17, 1981
          Reference 10 - Lifetime Oral Ongocenicity Study of
                         Captan in Mice

Vol. 3    Reference 21 - Metabolism of N (trichloromethylthio) -
                         1, 2 - dicarboximido - 14C-4-cyclohexene
                         (Captan) in the Rat and Goat
          Reference 22 - Pilot Study to Determine the Nature
                         and Magnitude of the Residues from
                         Ingestion of Captan in a Ruminating
                         Animal
          Reference 28 - Effect of Dietary Captan on Soluble
                         Thiol Content of Liver and Duodenal
                         Tissues
          Reference 29 - Crossley, The Stability of Captan in
                         Blood

Vol. 4    NONE

Vol. 5    Reference 49 - Results of Captan Market Basket Survey
                         conducted in 1977 and 1978

          Reference 50 - Captan Residues Found in Market Basket
                         Survey Conducted by Stauffer Chemical
                         Company

Vol. 6    Reference 51 - Captan Residues Found in Market Basket
                         Survey conducted by Chevron Chemical
                         Company
          Reference 52 - Statistical Analysis of Captan Market
                         Basket Survey Data

Vol. 7    Reference 53 - Employee Exposures to Captan, Updated
          Reference 54 - Palshaw, An Epidemiologic Study of
                         Mortality Within a Cohort of Captan
                         Workers

Exhibit 1 - Page 169

Ms. Lisa Brown
November 13, 1981

CAPTAN RPAR
Page 2

|  |  |  |
|---|---|---|
| Reference | 58 - | Debaun et al, The Fate of Captan (carbonyl - 14-C) on Field-Grown Apple Trees |
| Reference | 62 - | Stauffer Chemical Company Residue Report |
| Reference | 63 - | Stauffer Chemical Company Residue Report |
| Reference | 64 - | Northeast Pesticide Impact Assessment Project-proposal plus cover letter |
| Reference | 65 - | Captan Harvester Exposure Study Protocol |
| Reference | 66 - | Protocol - Captan 50 WP: A Percutaneous Absorption Study in Rats |
| Reference | 69 - | Captan Induced Duodenal Tumor Incidence - Chevron data (Adir Memos) |

Vol. 8       NONE

Vol. 9       Reference  99 - Litton Bionetics, Mutagenic Evaluation of Captan in the Somatic Cell Mutation Assay - Final Report
             Reference 110 - Captan Mutagenesis Review
             Reference 127 - Binding of Radiolabeled Captan to DNA and Protamine of Mouse Germinal Cells and the Induction of Unscheduled DNA Synthesis in Germinal Cells Following Captan Administration
             Reference 128 - Mutagenicity of Captan in Cultured Mammalian Cells

Vol. 10      Reference 129 - Captan - W. Scott Report
             Reference 131 - IRDC Captan Pilot Teratology Study in Hamsters
             Reference 132 - IRDC Captan Teratology Study in Hamsters
             Reference 133 - Exhibit A - Three Generation Reproduction Study in Rats with Captan
             Reference 134 - One Generation Reproduction Study in Rats with Captan
             Reference 135 - Protocol for a Study of the Effect of Technical Captan on Pregnancy of the Rabbit

Vol. 11      NONE

Vol. 12      Reference 139 - Captan: Chemical and Physical Properties
             Reference 143 - Pack, The Soil Metabolism of Carbonyl-14-C-Captan

Vol. 13      NONE

Vol. 14      NONE

Exhibit 1 - Page 170

November 13, 1981

## ADDITIONAL CONFIDENTIAL STUDIES

1.  Carlton, W. W.  National Cancer Institute Bioassay of Captan:  Evaluation of Selected Tissues for Neoplasms. May 29, 1981.

2.  Adir, J. S.  Captan 50-WP:  A Percutaneous Absorption Study in Rats.  Stauffer Toxicology Report T-10438. April 20, 1981.

3.  Selsky, C.A.  The Association of Captan with Mouse and Rat Deoxyribonucleic Acid.  Stauffer Toxicology Report T-10435.  April 28, 1981.

4.  The data book <u>Captan Milk Residue Study in Lactating Dairy Cattle</u>, dated February 2, 1977, including a summary of Captan residue data for whole milk.

5.  The data book <u>Captan 50-WP/Benelate:  Application for a 24(a) Registration For Use on Fruit Disease Control</u>.  No pages are marked confidential because the data book was submitted before March 1, 1980, but the following pages should be kept confidential:

    Appendix One:  Confidential except for eleven pages which have "Cooperative Extension, University of California" at the top

    Appendix Two:  Confidential

Exhibit 1 - Page 171

# BLANK PAGE

Artifact of Photocopy Reproduction

## JAN RAYMOND
### LEGISLATIVE HISTORY AND LEGISLATIVE INTENT
### 1 (888) 676-1947

Exhibit 1 - Page 172

ASSEMBLY COMMITTEE ON JUDICIARY                    AB 3738
ELIHU M. HARRIS, Chairman

AB 3738 (Harris)  As introduced 3/25/82

SUBJECT

This bill is intended to enact the Uniform Trade Secrets Act.

DIGEST

This bill would establish a statutory scheme to protect trade secrets, known as the Uniform Trade Secrets Act. Among other things, it would:

- enact a series of definitions

- provide for the enjoining of actual or threatened misappropriation of a trade secret

- permit a complainant to recover actual and exemplary damages for the loss caused by the improper acquisition or disclosure of a trade secret

- authorize a court to use reasonable means to preserve the secrecy of a trade secret

- establish a statute of limitations for actions for misappropriation of a trade secret

The bill's provisions would not apply to misappropriation occurring prior to January 1, 1983.

STAFF COMMENTS

1. This bill would enact the Uniform Trade Secrets Act in California. That Act was drafted and recommended for enactment in all states by the National Conference of Commissioners on Uniform State Laws in 1979, and was approved by the American Bar Association in 1980.

   In its prefatory note to the Act, the National Conference stated that "there is undue certainty concerning the parameters of trade secret protection, and the appropriate remedies for misappropriation of a trade secret." The prefatory note further states that "like traditional trade secret law, the Uniform Act contains general concepts. The contribution of the Uniform Act is substitution of unitary definitions of trade secret

                              (CONTINUED)

Consultant R. LeBov                                AB 3738
5/5/82

                                        Exhibit 1 - Page 173

AB 3738
Page 2

and trade secret misappropriation, and a single statute of limitations for the various property, quasi-contractual, and violation of fiduciary relationship theories of noncontractual liability utilized at common law.  The Uniform Act also codifies the results of the better reasoned cases concerning the remedies for trade secret misappropriation."

2.  Existing California statutory law contains a number of scattered provisions affecting trade secrets.  For example, Penal Code Section 499c provides for criminal penalties for misappropriation of trade secrets. This bill, which provides for civil remedies, is generally not intended to affect any of the existing provisions. It states that, except as otherwise expressly provided, it does not supersede any statute relating to misappropriation of a trade secret, or any statute otherwise regulating trade secrets.

3.  California Rural Legal  Assistance opposes this measure because of its concern that it might be construed to limit public access to pesticide testing data under the Public Records Act.  That Act exempts, from required disclosure, records which may not be disclosed pursuant to provisions of state law.  (Government Code Section 6254)

   According to CRLA, "there is a body of data submitted to the Department of Food and Agriculture relative to the health and environmental hazards and efficacy of pesticides that it licenses and regulates.  It is crucial that the public have access to the data so that the public can participate in the Department's regulatory decisions."  Would this bill inappropriately restrict public access to health and safety testing data submitted to regulatory and licensing agencies?

RL
5/5/82

AB 3738
Page 2

Exhibit 1 - Page 174

RL

AB 3738                              HEARING DATE: 5/5/82

<u>SOURCE</u>

National Conference of Commissioners on Uniform State Laws

<u>SUPPORT</u>

Unknown

<u>OPPOSITION</u>

California Rural Legal Assistance

Exhibit 1 - Page 175

# BLANK PAGE

Artifact of Photocopy Reproduction

## JAN RAYMOND
### LEGISLATIVE HISTORY AND LEGISLATIVE INTENT
### 1 (888) 676-1947

Exhibit 1 - Page 176

AMENDED IN ASSEMBLY MAY 12, 1982

CALIFORNIA LEGISLATURE—1981–82 REGULAR SESSION

## ASSEMBLY BILL                                     No. 3738

Introduced by Assemblyman Harris

March 25, 1982

An act to add Title 5 (commencing with Section 3426) to Part 1 of Division 4 of the Civil Code, relating to trade secrets.

### LEGISLATIVE COUNSEL'S DIGEST

AB 3738, as amended, Harris.   Uniform Trade Secrets Act.

Under existing law, no specific cause of action exists for misappropriation of a trade secret.

This bill would establish that cause of action, through enactment in California of the Uniform Trade Secrets Act, *with certain changes or additions,* which *act* defines terms, provides for injunctive relief, damages, requirements that a court take measures to preserve the secrecy of an alleged trade secret by reasonable means, and a statute of limitations applicable to the cause of action, among other provisions.

Vote: majority. Appropriation: no. Fiscal committee: no. State-mandated local program: no.

*The people of the State of California do enact as follows:*

1    SECTION 1.   Title 5 (commencing with Section 3426)
2  is added to Part 1 of Division 4 of the Civil Code, to read:
3
4    TITLE 5.   UNIFORM TRADE SECRETS ACT.
5
6    3426.   This title may be cited as the Uniform Trade
7  Secrets Act.
8    3426.1.   As used in this title, unless the context requires

98  40

Exhibit 1 - Page 177

AB 3738 — 2 —

1 otherwise:
2 (a) "Improper means" includes theft, bribery,
3 misrepresentation, breach or inducement of a breach of
4 a duty to maintain secrecy, or espionage through
5 electronic or other means.
6 (b) "Misappropriation" means:
7 (1) Acquisition of a trade secret of another by a person
8 who knows or has reason to know that the trade secret
9 was acquired by improper means; or
10 (2) Disclosure or use of a trade secret of another
11 without express or implied consent by a person who:
12 (A) Used improper means to acquire knowledge of
13 the trade secret; or
14 (B) At the time of disclosure or use, knew or had
15 reason to know that his or her knowledge of the trade
16 secret was:
17 (i) Derived from or through a person who had utilized
18 improper means to acquire it;
19 (ii) Acquired under circumstances giving rise to a
20 duty to maintain its secrecy or limit its use; or
21 (iii) Derived from or through a person who owed a
22 duty to the person seeking relief to maintain its secrecy
23 or limit its use; or
24 (C) Before a material change of his position, knew or
25 had reason to know that it was a trade secret and that
26 knowledge of it had been acquired by accident or
27 mistake.
28 (c) "Person" means a natural person, corporation,
29 business trust, estate, trust, partnership, association, joint
30 venture, government, governmental subdivision or
31 agency, or any other legal or commercial entity.
32 ~~(d) "Trade secret" means information, including a~~
33 ~~formula, pattern, compilation, program, device, method,~~
34 ~~technique, or process, that:~~
35 ~~(1) Derives independent economic value, actual or~~
36 ~~potential, from not being generally known to, and not~~
37 ~~being readily ascertainable by proper means by, other~~
38 ~~persons who can obtain economic value from its~~
39 ~~disclosure or use, and~~
40 ~~(2) Is the subject of efforts that are reasonable under~~

98-600

Exhibit 1 - Page 178

— 3 —                                    AB 3738

1   ~~the circumstances to maintain its secrecy.~~
2      3426.2.   (a)  Actual  or  threatened  misappropriation
3   may be enjoined. Upon application to the court, an
4   injunction shall be terminated when the trade secret has
5   ceased to exist, but the injunction may be continued for
6   an  additional  reasonable  period  of  time  in  order  to
7   eliminate  commercial  advantage  that  otherwise  would
8   be derived from the misappropriation.
9      (b)  If  the  court  determines  that  it  would  be
10  unreasonable to prohibit future use, an injunction may
11  condition  future  use  upon  payment  of  a  reasonable
12  royalty for no longer than the period of time the use could
13  have been prohibited.
14     (c)  In  appropriate  circumstances,  affirmative  acts  to
15  protect a trade secret may be compelled by court order.
16     3426.3.   (a)  In  addition  to  or  in  lieu  of  injunctive
17  relief, a complainant may recover damages for the actual
18  loss caused by misappropriation. A complainant also may
19  recover   for   the   unjust   enrichment   caused   by
20  misappropriation  that  is  not  taken  into  account  in
21  computing damages for actual loss.
22     (b) If willful and malicious misappropriation exists,
23  the court may award exemplary damages in an amount
24  not exceeding twice any award made under subdivision
25  (a).
26     3426.4.  If a claim of misappropriation is made in bad
27  faith, a motion to terminate an injunction is made or
28  resisted  in  bad  faith,  or  willful  and  malicious
29  misappropriation exists, the court may award reasonable
30  attorney's fees to the prevailing party.
31     3426.5.  In an action under this title, a court shall
32  preserve the secrecy of an alleged trade secret by
33  reasonable  means,  which  may  include  granting
34  protective  orders  in  connection  with  discovery
35  proceedings, holding in-camera hearings, sealing the
36  records of the action, and ordering any person involved
37  in the litigation not to disclose an alleged trade secret
38  without prior court approval.
39     3426.6.  An  action  for  misappropriation  must  be
40  brought within three years after the misappropriation is

98  70

AB 3738                      — 4 —

1   discovered or by the exercise of reasonable diligence
2   should have been discovered. For the purposes of this
3   section, a continuing misappropriation constitutes a
4   single claim.
5       3426.7. (a) Except as otherwise expressly provided,
6   this title does not supersede any statute relating to
7   misappropriation of a trade secret, or any statute
8   otherwise regulating trade secrets, or Section 6254.7 of
9   the Government Code.
10      (b) This title shall not affect the authority of a court to
11  refuse to allow the privilege provided for under Section
12  1060 of the Evidence Code to be claimed on the grounds
13  that the allowance of the privilege would tend to conceal
14  fraud or otherwise work injustice.
15      (c) This title shall not prohibit or restrict a state or
16  local agency from disclosing or using a public record or
17  other information under the California Public Records
18  Act or any other provision of law if the disclosure or use
19  is otherwise permissible under that act or those
20  provisions of law.
21      3426.8. This title shall not affect any rights or
22  remedies otherwise available under Division 5
23  (commencing with Section 6300) of the Labor Code or
24  the National Labor Relations Act.
25      ~~3426.8.~~
26      3426.9. This title shall be applied and construed to
27  effectuate its general purpose to make uniform the law
28  with respect to the subject of this title among states
29  enacting it.
30      ~~3426.9.~~
31      3426.10. If any provision of this title or its application
32  to any person or circumstances is held invalid, the
33  invalidity does not affect other provisions or applications
34  of the title which can be given effect without the invalid
35  provision or application, and to this end the provisions of
36  this title are severable.
37      ~~3426.10.~~
38      3426.11. This title does not apply to misappropriation
39  occurring prior to January 1, 1983.

O

98  100

Exhibit 1 - Page 180

AB  3738

### ASSEMBLY THIRD READING

AB  3738  (         Harris         )  As Amended:  May 12, 1982

ASSEMBLY ACTIONS:

COMMITTEE____JUD._____VOTE_10-0_ COMMITTEE_____VOTE_____

Ayes:                                      Ayes:


Nays:                                      Nays:

DIGEST

This bill establishes the Uniform Trade Secrets Act, which:

1)  Specifies definitions for the following terms used in the bill:  improper means, misappropriation, and person.

2)  Authorizes enjoining of actual or threatened misappropriation of a trade secret.

3)  Authorizes a complainant to recover actual damages caused by misappropriation.

4)  Authorizes a complainant to also recover for the unjust enrichment caused by misappropriation that is not taken into account in computing damages for actual loss.

5)  Authorizes the court to award exemplary damages of up to twice any award made under provisions #3 and #4 above in cases of willful and malicious misappropriation.

6)  Authorizes the court to award reasonable attorney's fees to the prevailing party if a claim is made in bad faith, a motion to terminate an injunction is made or resisted in bad faith, or willful and malicious misappropriate exists.

7)  Authorizes the court to use reasonable means to preserve the secrecy of a trade secret, including protective orders in connection with discovery proceedings, holding in-camera hearings, sealing the records of the action, and ordering any person involved in the case to refrain from disclosing an alleged trade secret without prior court approval.

8)  Sets the statute of limitation on actions for misappropriation of trade secrets at three years after the misappropriation is discovered or, by the exercise of reasonable diligence, should have been discovered.

- continued -

ASSEMBLY OFFICE OF RESEARCH          AB  3738

Exhibit 1 - Page 181

9) Specifies that, except as otherwise expressly provided, the provisions of this bill do not supersede other specified statutes relating to regulation of trade secrets.

10) Provides that the bill does not affect the authority of the court to refuse to allow a trade secret privilege if the allowance would tend to conceal fraud or otherwise work injustice.

11) Provides that the bill does not prohibit the disclosure of an otherwise disclosable record under the California Public Records Act.

12) Provides that the bill does not affect any rights or remedies available under the Labor Code or the National Labor Relations Act.

13) Applies only to misappropriations of trade secrets occurring on and after January 1, 1983.

FISCAL EFFECT

None

Exhibit 1 - Page 182



California Chamber of Commerce ● 1027 10th St. ● P.O. Box 1736 ● Sacramento, CA 95808 ● (916) 444-6670

May 26, 1982

The Honorable Elihu Harris
California State Assembly
California State Capitol, Rm. 6031
Sacramento, California  95814

RE:  AB 3738 (Harris) Uniform
Trade Secrets Act

Dear Mr. Harris:

The California Chamber of Commerce will be opposing AB 3738 unless the bill is amended to include the language as originally introduced.

The Chamber supports legislation defining trade secret as information, including a formula, pattern, compilation, program, device, method, technique or process that 1) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and 2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. We feel this language is stronger and more protective of trade secrets than current language.

I will be happy to discuss this matter with you at your convenience.

Sincerely,

James G. Van Maren, Group Manager
Agriculture & Consumer Affairs

JGVM/vn

cc  Robert Cornell
Halley, Cornell & Lynch
50 California Street
San Francisco, CA  94111

Exhibit 1 - Page 183



California Chamber of Commerce ● 1027 10th St. ● P.O. Box 1736 ● Sacramento, CA 95808 ● (916) 444-6670

June 17, 1982

Mr. Richard Thomson, Consultant
Senate Judiciary Committee
State Capitol, Rm. 2187
Sacramento, CA  95814

RE:  AB 3738 (Harris)
     Uniform Trade Secrets Act
     Set for hearing in Senate
     Judiciary Committee on June 22

Dear Dick:

The California Chamber of Commerce opposes AB 3738, as amended
May 12, 1982, unless amended to include the definition for a trade
secret set forth in the original bill.

The following language is supported by the National Conference of
Commissioners on Uniform State Laws to codify the basic principles
of common law trade secret protection, preserving its essential
distinctions from patent law.  A Uniform Trade Secrets Act has been
approved by the American Bar Association.  The following definition
was removed from AB 3738 in its May 12 amendment.  We urge that this
definition be reinstated.

     "A concept of information, including a formula, pattern,
     compilation, program, device, method, technique or process
     that 1) derives independent economic value, actual or
     potential, from not being generally known to, and not being
     readily ascertainable by proper means by, other persons who
     can obtain economic value from its disclosure or use, and
     2) is the subject of efforts that are reasonable under the
     circumstances to maintain its secrecy."

We strongly urge a "No" vote unless amended.

                         Sincerely,

                         James G. Van Maren, Manager
                         Agriculture & Consumer Affairs

JGVM/v

Exhibit 1   Page 184

WALTERS, BUKEY AND SHELBURNE
ATTORNEYS AT LAW

ROBERT G. WALTERS
JOHN L. BUKEY
ROBERT S. SHELBURNE
MARGARET MARI MERCHAT
WILLIAM A. VAUGHN
DIANA D. HALPENNY

1010 ELEVENTH STREET, SUITE 200
SACRAMENTO, CALIFORNIA 95814

AREA CODE 916
TELEPHONE 441-3237

July 13, 1982

Honorable Elihu M. Harris
State Capitol, Room 6031
Sacramento, CA 95814

Re: AB 3738

Dear Assemblyman Harris:

This is to inform you that our client, Monsanto, can no longer support your AB 3738 because of the amendment which contains an unacceptable definition of trade secrets.

Although the intent of this legislation is to enact the Uniform Trade Secrets Act, the amendment deletes the definition of trade secrets. The enactment of an acceptable definition of trade secrets is one of the main purposes of the Uniform Trade Secrets Act. Without this provision, Monsanto feels there is little reason to support the measure.

Thank you for your consideration of our views.

Sincerely,

*Bob*

Robert G. Walters

RGW:sw

cc: Chairman, Senate Committee on Judiciary

Exhibit 1 - Page 185

TO:     ELIHU

FROM:   WILLIAM

DATE:   FRIDAY, JULY 16, 1982

SUBJECT: <u>INFORMATION REGARDING AB 3738 (UNIFORM TRADE SECRETS ACT)</u>

Ray Lebov informed me today that Bion Gregory left a message with John Dunlop of Senate Judiciary Committee that Bion was going to withdraw his sponsorship of AB 3738.  Ray contacted Bion for clarification; however, he was not in and will return on Monday, July 19.

Ray feels that Bion may be withdrawing support and sponsorship of the bill because the amendments are no longer in accordance with the uniform act.

As you may know, this bill is being opposed by California Rural Legal Assistance and a spokesperson from the Governor's Office who is Toxic Substance expert.

Do you want to pursue this bill?  Shall I call Bion Gregory and get his comments?  Ray will contact him on Monday morning.

<u>RECAP OF THE AMENDMENTS</u>

1.  Definition of "trade secrets" was removed primiarily due to the opposition'

Exhibit 1 - Page 186

Verrry superficial analysis of AB 3738

1.  The Act needs to specify that independent discovery of a trade
    secret through reverse engineering, chemical analysis, and other
    common industrial methods is not wrongful, and that these
    enumerated methods are merely exemplary.

2.  The Act should not redefine trade secrets apart from 18 USC Sec.190
    The current provision does so in vague terms which would take
    years to litigate.

  a.   The State definition is found in Gov. Code sec. 6254.7.  Despite
    the disclaimer in Sec. 3426.7 of the bill, this bill would
    completely overrule that definition.

3.  The bill must incorporate the provisions of Evidence Code
    sections 1060 and 1040 to the effect that trade secrets may
    be disclosed in thex interests of justice.  This provision was
    crucial in Uribe v Howie, 19 Cal.App.3d ____ (1970 or so), where
    pesticide spray control reports were released in part for this
    reason.

4.  Govt. Code sec. 6254.7 makes clear that all pollution data is
    not a trade secret.  The bill should so state.

5.  Both the Federal Insecticide, Fungicide and Rodenticide Act,
    at 7 U.S.C. sec. 136h, and the Toxic Substances Control Act,
    at 1x5 U.S.C. sec. 2613, make clear that all health and safety
    data begarding chemicals is not a trade secret.  We cannot
    give up this information vital to public health.

Exhibit 1 - Page 187

PLEASE RETURN IMMEDIATELY TO

ASSEMBLY COMMITTEE ON JUDICIARY


6031 State Capitol


Work Sheet

RE:  Bill No.  *AB 3738 - Harris*

Please complete this form and return it to the Assembly Committee on Judiciary as soon as possible.

1.   Origin of the bill:

    (a)   What is the source of the bill?  (What person, organizatio or governmental entity, if any, requested introduction?)

        Commission on Uniform State Laws
        Robert Cornell, Chairman
        Contact:  Jack Knox  415-434-4896.

    (b)   Has a similar bill been before either this or a previous session of the Legislature?  If so, please identify the session, bill number and disposition of the bill.

        No

    (c)   Has there been an interim committee report on the bill? If so, please identify the report.

        No, but same as the Uniform Trade Secrets Act drafted for and approved by the ABA. Retains any pertinent CA stat

2.   Problem or deficiency in the present law which the bill seeks to remedy:

        Codification of common law to provide uniformity.
        Trademarks were omitted from Re-Statement of Law when it was assumed Fed. Patent Law would pre-empt State. Bill clarifies that trademark injunctions should not be permanent only for as long as necessary.

3.   Please attach copies of any background material in explanation of the bill, or state where such material is available for reference by the committee staff and letters of support or opposition.


4   Hearing:

    (a)   Approximate amount of time necessary for hearing.
        10 min.
    (b)   Preference for date of hearing.
        Set for May 5.
    (c)   Names of witnesses to testify at the hearing.
        Jack Knox

Exhibit 1 - Page 188

# UNIFORM TRADE SECRETS ACT

*Drafted by the*

NATIONAL CONFERENCE OF COMMISSIONERS
ON UNIFORM STATE LAWS

*and by it*

Approved and Recommended for Enactment
in All the States

*at its*

ANNUAL CONFERENCE
MEETING IN ITS EIGHTY-EIGHTH YEAR
IN SAN DIEGO, CALIFORNIA
AUGUST 3-10, 1979

With Prefatory Note and Comments

Approved by the American Bar Association at its meeting in
Chicago, Illinois February 4-5, 1980.

Exhibit 1 - Page 189

# UNIFORM TRADE SECRETS ACT

### Commissioner' Prefatory Note

A valid patent provides a legal monopoly for seventeen years in exchange for public disclosure of an invention.  If, however, the courts ultimately decide that the Patent Office improperly issued a patent, an invention will have been disclosed to competitors with no corresponding benefit.  In view of the substantial number of patents that are invalidated by the courts, many businesses now elect to protect commercially valuable information through reliance upon the state law of trade secret protection.  *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470 (1974), which establishes that, neither the Patent Clause of the United States Constitution nor the federal patent laws pre-empt state trade secret protection for patentable or unpatentable information, may well have increased the extent of this reliance.

The recent decision in *Aronson v. Quick Point Pencil Co.*, 99 S.Ct. 1096, 201 USPQ 1 (1979) reaffirmed *Kewanee* and held that federal patent law is not a barrier to a contract in which someone agrees to pay a continuing royalty in exchange for the disclosure of trade secrets concerning a product.

Notwithstanding the commercial importance of state trade secret law to interstate business, this law has not developed satisfactorily. In the first place, its development is uneven.  Although there typically are a substantial number of reported decisions in states that are commercial centers, this is not the case in less populous and more agricultural jurisdictions.  Secondly, even in states in which there has been significant litigation, there is undue uncertainty concerning the parameters of trade secret protection, and the appropriate remedies for misappropriation of a trade secret.  One commentator observed:

> "Under technological and economic pressures, industry continues to rely on trade secret protection despite the doubtful and confused status of both common law and statutory remedies.  Clear, uniform trade secret protection is urgently needed. . . ."
> Comment, "Theft of Trade Secrets: The Need for a Statutory Solution", 120 U.Pa.L.Rev. 378, 380–81 (1971).

In spite of this need, the most widely accepted rules of trade secret law, § 757 of the Restatement of Torts, were among the sections omitted from the Restatement of Torts, 2d (1978).

The Uniform Act codifies the basic principles of common law trade secret protection, preserving its essential distinctions from patent law.

1

Exhibit 1 - Page 190

## TRADE SECRETS ACT

Under both the Act and common law principles, for example, more than one person can be entitled to trade secret protection with respect to the same information, and analysis involving the "reverse engineering" of a lawfully obtained product in order to discover a trade secret is permissible. *Compare* Uniform Act, section 1(2) (misappropriation means acquisition of a trade secret by means that should be known to be improper and unauthorized disclosure or use of information that one should know is the trade secret of another) *with Miller v. Owens-Illinois, Inc.*, 187 USPQ 47, 48 (D.Md.1975) (alternative holding) (prior, independent discovery a complete defense to liability for misappropriation) *and Wesley-Jessen, Inc., v. Reynolds*, 182 USPQ 135, 144–45, (N.D.Ill.1974) (alternative holding) (unrestricted sale and lease of camera that could be reversed engineered in several days to reveal alleged trade secrets preclude relief for misappropriation).

For liability to exist under this Act, a section 1(4) trade secret must exist and either a person's acquisition of the trade secret, disclosure of the trade secret to others, or use of the trade secret must be improper under section 1(2). The mere copying of an unpatented item is not actionable.

Like traditional trade secret law, the Uniform Act contains general concepts. The contribution of the Uniform Act is substitution of unitary definitions of trade secret and trade secret misappropriation, and a single statute of limitations for the various property, quasi-contractual, and violation of fiduciary relationship theories of noncontractual liability utilized at common law. The Uniform Act also codifies the results of the better reasoned cases concerning the remedies for trade secret misappropriation.

### The History of the Special Committee on the Uniform Trade Secrets Act

On February 17, 1968, the Conference's subcommittee on Scope and Program reported to the Conference's Executive Committee as follows:

"14. Uniform Trade Secrets Protection Act.

This matter came to the subcommittee from the Patent Law Section of the American Bar Association from President Pierce, Commissioner Joiner and Allison Dunham. It appears that in 1966 the Patent Section of the American Bar Association extensively discussed a resolution to the effect that 'the ABA favors the enactment of a uniform state law to protect against the wrongful disclosure or wrongful appropriation of trade secrets, know-how or other information maintained in confidence by another.' It was decided, however, not to put such a resolution to a vote at that time but that the appropriate Patent Section Committee would further consider the problem. In determining what would be appropriate for the

2

Exhibit 1 - Page 191

## TRADE SECRETS ACT

Conference to do at this juncture, the following points should be considered:

(1) At the present much is going on by way of statutory development, both federally and in the states.

(2) There is a fundamental policy conflict still unresolved in that the current state statutes that protect trade secrets tend to keep innovations secret, while our federal patent policy is generally designed to encourage public disclosure of innovations. It may be possible to devise a sensible compromise between these two basic policies that will work, but to do so demands coordination of the statutory reform efforts of both the federal government and the states.

(3) The Section on Patents, the ABA group that is closest to this problem, is not yet ready to take a definite position.

It is recommended that a special committee be appointed to investigate the question of the drafting of a uniform act relating to trade secret protection and to establish liaison with the Patent Law Section, the Corporation, Banking and Business Law Section, and the Antitrust Law Section of the American Bar Association."

The Executive Committee, at its Midyear Meeting held February 17 and 18, 1968, in Chicago, Illinois, "voted to authorize the appointment of a Special Committee on Uniform Trade Secrets Protection Act to investigate the question of drafting an act on the subject with instructions to establish liaison with the Patent Law Section, the Corporation, Banking and Business Law Section, and the Antitrust Law Section of the American Bar Association." Pursuant to that action, a Special Committee was appointed, which included Professor Richard Cosway of Seattle, Washington, who is the only original Committee member to serve to the present day. The following year saw substantial changes in the membership of the Committee. Professor Richard F. Dole, Jr., of Iowa City, Iowa, became a member then and has served as a member ever since.

The work of the Committee went before the Conference first on Thursday afternoon, August 10, 1972, when it was one of three Acts considered on first reading. Thereafter, for a variety of reasons, the Committee became inactive, and, regrettably, its original Chairman died on December 7, 1974. In 1976, the Committee became active again and presented a Fifth Tentative Draft of its proposed bill at the 1978 Annual Meeting of the National Conference of Commissioners on Uniform State Laws.

Despite the fact that there had previously been a first reading, the Committee was of the opinion that, because of the lapse of time, the 1978 presentation should also be considered a first reading. The Con-

3

Exhibit 1 – Page 192

## TRADE SECRETS ACT

ference concurred, and the bill was proposed for final reading and adoption at the 1979 Annual Meeting.

On August 9, 1979, the Act was approved and recommended for enactment in all the states.

## UNIFORM TRADE SECRETS ACT

Sec.
1. Definitions.
2. Injunctive Relief.
3. Damages.
4. Attorney's Fees.
5. Preservation of Secrecy.
6. Statute of Limitations.
7. Effect on Other Law.
8. Uniformity of Application and Construction.
9. Short Title.
10. Severability.
11. Time of Taking Effect.
12. Repeal.

*Be it enacted* ........

## § 1.   [Definitions]

As used in this Act, unless the context requires otherwise:

(1) "Improper means" includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means;

(2) "Misappropriation" means:

(i) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(ii) disclosure or use of a trade secret of another without express or implied consent by a person who

(A) used improper means to acquire knowledge of the trade secret; or

(B) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was

(I) derived from or through a person who had utilized improper means to acquire it;

(II) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

4

Exhibit 1 - Page 193

## TRADE SECRETS ACT

(III) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(C) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

(3) "Person" means a natural person, corporation, business trust, estate, trust, partnership, association, joint venture, government, governmental subdivision or agency, or any other legal or commercial entity.

(4) "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that:

(i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and

(ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

### Commissioners' Comment

One of the broadly stated policies behind trade secret law is "the maintenance of standards of commercial ethics." *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470 (1974). The Restatement of Torts, Section 757, Comment (f), notes: "A complete catalogue of improper means is not possible," but Section 1(1) includes a partial listing.

Proper means include:

1. Discovery by independent invention;

2. Discovery by "reverse engineering", that is, by starting with the known product and working backward to find the method by which it was developed. The acquisition of the known product must of course, also be by a fair and honest means, such as purchase of the item on the open market for reverse engineering to be lawful;

3. Discovery under a license from the owner of the trade secret;

4. Observation of the item in public use or on public display;

5. Obtaining the trade secret from published literature.

Improper means could include otherwise lawful conduct which is improper under the circumstances; *e. g.*, an airplane overflight used as aerial reconnaissance to determine the competitor's plant layout during construction of the plant. *E. I. du Pont de Nemours & Co., Inc. v. Christopher*, 431 F.2d 1012 (CA 5, 1970), cert. den. 400 U.S. 1024 (1970). Because the trade secret can be de-

5

Exhibit 1 – Page 194

## TRADE SECRETS ACT

stroyed through public knowledge, the unauthorized disclosure of a trade secret is also a misappropriation.

The type of accident or mistake that can result in a misappropriation under Section 1(2)(ii)(C) involves conduct by a person seeking relief that does not constitute a failure of efforts that are reasonable under the circumstances to maintain its secrecy under Section 1(4)(ii).

The definition of "trade secret" contains a reasonable departure from the Restatement of Torts (First) definition which required that a trade secret be "continuously used in one's business." The broader definition in the proposed Act extends protection to a plaintiff who has not yet had an opportunity or acquired the means to put a trade secret to use. The definition includes information that has commercial value from a negative viewpoint, for example the results of lengthy and expensive research which proves that a certain process will *not* work could be of great value to a competitor.

*Cf. Telex Corp. v. IBM Corp.,* 510 F.2d 894 (CA 10, 1975) per curiam, cert. dismissed 423 U.S. 802 (1975) (liability imposed for developmental cost savings with respect to product not marketed). Because a trade secret need not be exclusive to confer a competitive advantage, different independent developers can acquire rights in the same trade secret.

The words "method, technique" are intended to include the concept of "know-how."

The language "not being generally known to and not being readily ascertainable by proper means by other persons" does not require that information be generally known to the public for trade secret rights to be lost. If the principal person who can obtain economic benefit from information is aware of it, there is no trade secret. A method of casting metal, for example, may be unknown to the general public but readily known within the foundry industry.

Information is readily ascertainable if it is available in trade journals, reference books, or published materials. Often, the nature of a product lends itself to being readily copied as soon as it is available on the market. On the other hand, if reverse engineering is lengthy and expensive, a person who discovers the trade secret through reverse engineering can have a trade secret in the information obtained from reverse engineering.

Finally, reasonable efforts to maintain secrecy have been held to include advising employees of the existence of a trade secret, limiting access to a trade secret on "need to know basis", and controlling plant access. On the other hand, public disclosure of information through display, trade journal publications, advertising, or other carelessness can preclude protection.

The efforts required to maintain secrecy are those "reasonable under the circumstances." The courts do not require that extreme and unduly expensive procedures be taken to protect trade

6

Exhibit 1 - Page 195

## TRADE SECRETS ACT

secrets against flagrant industrial espionage. See *E. I. du Pont de Nemours & Co., Inc. v. Christopher, supra.* It follows that reasonable use of a trade secret including controlled disclosure to employees and licensees is consistent with the requirement of relative secrecy.

## § 2.   [Injunctive Relief]

(a) Actual or threatened misappropriation may be enjoined. Upon application to the court, an injunction shall be terminated when the trade secret has ceased to exist, but the injunction may be continued for an additional reasonable period of time in order to eliminate commercial advantage that otherwise would be derived from the misappropriation.

(b) If the court determines that it would be unreasonable to prohibit future use, an injunction may condition future use upon payment of a reasonable royalty for no longer than the period of time the use could have been prohibited.

(c) In appropriate circumstances, affirmative acts to protect a trade secret may be compelled by court order.

### Commissioners' Comment

Injunctions restraining future use and disclosure of misappropriated trade secrets frequently are sought. Although punitive perpetual injunctions have been granted, *e. g., Elcor Chemical Corp. v. Agri-Sul, Inc.*, 494 S.W. 2d 204 (Tex.Civ.App.1973), Section 2(a) of this Act adopts the position of the trend of authority limiting the duration of injunctive relief to the extent of the temporal advantage over good faith competitors gained by a misappropriator. See, *e. g., K-2 Ski Co. v. Head Ski Co., Inc.*, 506 F. 2d 471 (CA9, 1974) (maximum appropriate duration of both temporary and permanent injunctive relief is period of time it would have taken defendant to discover trade secrets lawfully through either independent development or reverse engineering of plaintiff's products).

The general principle of section 2(a) and (b) is that an injunction should last for as long as is necessary, but no longer than is necessary, to eliminate the commercial advantage or "lead time" with respect to good faith competitors that a person has obtained through misappropriation. Subject to any additional period of restraint necessary to negate lead time, an injunction accordingly should terminate when a former trade secret becomes either generally known to good faith competitors or generally knowable

7

Exhibit 1 - Page 196

## TRADE SECRETS ACT

to them because of the lawful availability of products that can be reverse engineered to reveal a trade secret.

For example, assume that A has a valuable trade secret of which B and C, the other industry members, are originally unaware. If B subsequently misappropriates the trade secret and is enjoined from use, but C later lawfully reverse engineers the trade secret, the injunction restraining B is subject to termination as soon as B's lead time has been dissipated. All of the persons who could derive economic value from use of the information are now aware of it, and there is no longer a trade secret under section 1(4). It would be anti-competitive to continue to restrain B after any lead time that B had derived from misappropriation had been removed.

If a misappropriator either has not taken advantage of lead time or good faith competitors already have caught up with a misappropriator at the time that a case is decided, future disclosure and use of a former trade secret by a misappropriator will not damage a trade secret owner and no injunctive restraint of future disclosure and use is appropriate. See, *e. g., Northern Petrochemical Co. v. Tomlinson*, 484 F.2d 1057 (CA7, 1973) (affirming trial court's denial of preliminary injunction in part because an explosion at its plant prevented an alleged misappropriator from taking advantage of lead time); *Kubik, Inc. v. Hull*, 185 USPQ 391 (Mich.App.1974) (discoverability of trade secret by lawful reverse engineering made by injunctive relief punitive rather than compensatory).

Section 2(b) deals with a distinguishable situation in which future use by a misappropriator will damage a trade secret owner but an injunction against future use nevertheless is unreasonable under the particular circumstances of a case. Situations in which this unreasonableness can exist include the existence of an overriding public interest which requires the denial of a prohibitory injunction against future damaging use and a person's reasonable reliance upon acquisition of a misappropriated trade secret in good faith and without reason to know of its prior misappropriation that would be prejudiced by a prohibitory injunction against future damaging use. *Republic Aviation Corp. v. Schenk*, 152 USPQ 830 (N.Y.Sup.Ct.1967) illustrates the public interest justification for withholding prohibitory injunctive relief. The court considered that enjoining a misappropriator from supplying the U.S. with an aircraft weapons control system would have endangered military personnel in Viet Nam. The prejudice to a good faith third party justification for withholding prohibitory injunctive relief can arise upon a trade secret owner's notification to a good faith third party that the third party has knowledge of a trade secret as a result of misappropriation by another. This notice suffices to make the third party a misappropriator thereafter under section 1(2)(ii)(B)(I). In weighing an aggrieved person's interests and the inter-

8

Exhibit 1 - Page 197

# TRADE SECRETS ACT

ests of a third party who has relied in good faith upon his or her ability to utilize information, a court may conclude that restraining future use of the information by the third party is unwarranted. With respect to innocent acquirers of misappropriated trade secrets, section 2(b) is consistent with the principle of 4 Restatement Torts (First) § 758(b) (1939), but rejects the Restatement's literal conferral of absolute immunity upon all third parties who have paid value in good faith for a trade secret misappropriated by another. The position taken by the Uniform Act is supported by *Forest Laboratories, Inc. v. Pillsbury Co.*, 452 F.2d 621 (CA7, 1971) in which a defendant's purchase of assets of a corporation to which a trade secret had been disclosed in confidence was not considered to confer immunity upon the defendant.

When section 2(b) applies, a court is given discretion to substitute an injunction conditioning future use upon payment of a reasonable royalty for an injunction prohibiting future use. Like all injunctive relief for misappropriation, a royalty order injunction is appropriate only if a misappropriator has obtained a competitive advantage through misappropriation and only for the duration of that competitive advantage. In some situations, typically those involving good faith acquirers of trade secrets misappropriated by others, a court may conclude that the same considerations that render a prohibitory injunction against future use inappropriate also render a royalty order injunction inappropriate. See, generally, *Prince Manufacturing, Inc. v. Automatic Partner, Inc.*, 198 USPQ 618 (N.J.Super. Ct.1976) (purchaser of misappropriator's assets from receiver after trade secret disclosed to public through sale of product not subject to liability for misappropriation).

Section 2(c) authorizes mandatory injunctions requiring that a misappropriator return the fruits of misappropriation to an aggrieved person, *e. g.*, the return of stolen blueprints or the surrender of surreptitious photographs or recordings.

Where more than one person is entitled to trade secret protection with respect to the same information, only that one from whom misappropriation occurred is entitled to a remedy.

## § 3.   [Damages]

(a) In addition to or in lieu of injunctive relief, a complainant may recover damages for the actual loss caused by misappropriation. A complainant also may recover for the unjust enrichment caused by misappropriation that is not taken into account in computing damages for actual loss.

9

Exhibit 1 - Page 198

## TRADE SECRETS ACT

(b) If willful and malicious misappropriation exists, the court may award exemplary damages in an amount not exceeding twice any award made under subsection (a).

### Commissioners' Comment

Like injunctive relief, a monetary recovery for trade secret misappropriation is appropriate only for the period in which information is entitled to protection as a trade secret, plus the additional period, if any, in which a misappropriator retains an advantage over good faith competitors because of misappropriation. Actual damage to a complainant and unjust benefit to a misappropriator are caused by misappropriation during this time alone. See *Conmar Products Corp. v. Universal Slide Fastener Co.*, 172 F. 2d 150 (CA2, 1949) (no remedy for period subsequent to disclosure of trade secret by issued patent); *Carboline Co. v. Jarboe*, 454 S.W.2d 540 (Mo.1970) (recoverable monetary relief limited to period that it would have taken misappropriator to discover trade secret without misappropriation). A claim for actual damages and net profits can be combined with a claim for injunctive relief, but, if both claims are granted, the injunctive relief ordinarily will preclude a monetary award for a period in which the injunction is effective.

As long as there is no double counting, Section 3(a) adopts the principle of the recent cases allowing recovery of both a complainant's actual losses and a misappropriator's unjust benefit that are caused by misappropriation. E. g., *Tri-Tron International v. Velto*, 525 F.2d 432 (CA9, 1975)

(complainant's loss and misappropriator's benefit can be combined). Because certain cases may have sanctioned double counting in a combined award of losses and unjust benefit, e. g., *Telex Corp. v. IBM Corp.*, 510 F.2d 894 (CA10, 1975) (*per curiam*), cert. dismissed, 423 U.S. 802 (1975) (IBM recovered rentals lost due to displacement by misappropriator's products without deduction for expenses saved by displacement; as a result of rough approximations adopted by the trial judge, IBM also may have recovered developmental costs saved by misappropriator through misappropriation with respect to the same customers), the Act adopts an express prohibition upon the counting of the same item as both a loss to a complainant and an unjust benefit to a misappropriator.

Monetary relief can be appropriate whether or not injunctive relief is granted under section 2. If a person charged with misappropriation has acquired knowledge of a trade secret in good faith without reason to know of its misappropriation by another, however, the same considerations that can justify denial of all injunctive relief also can justify denial of all monetary relief. See *Conmar Products Corp. v. Universal Slide Fastener Co.*, 172 F. 2d 1950 (CA2, 1949) (no relief against new employer of employee subject to contractual obligation not to disclose former employer's

10

Exhibit 1 - Page 199

## TRADE SECRETS ACT

trade secrets where new employer innocently had committed $40,000 to develop the trade secrets prior to notice of misappropriation).

If willful and malicious misappropriation is found to exist, section 3(b) authorizes the court to award a complainant exemplary damages in addition to the actual recovery under section 3(a) an amount not exceeding twice that recovery. This provision follows federal patent law in leaving discretionary trebling to the judge even though there may be a jury, *compare* 35 U.S.C. § 284 (1976).

Whenever more than one person is entitled to trade secret protection with respect to the same information, only that one from whom misappropriation occurred is entitled to a remedy.

## § 4.   [Attorney's Fees]

If (i) a claim of misappropriation is made in bad faith, (ii) a motion to terminate an injunction is made or resisted in bad faith, or (iii) willful and malicious misappropriation exists, the court may award reasonable attorney's fees to the prevailing party.

### Commissioners' Comment

Section 4 allows a court to award reasonable attorney fees to a prevailing party in specified circumstances as a deterrent to specious claims of misappropriation, to specious efforts by a misappropriator to terminate injunctive relief, and to willful and malicious misappropriation. In the latter situation, the court should take into consideration the extent to which a complainant will recover exemplary damages in determining whether additional attorney's fees should be awarded. Again, patent law is followed in allowing the judge to determine whether attorney's fees should be awarded even if there is a jury, *compare* 35 U.S.C. Section 285 (1976).

## § 5.   [Preservation of Secrecy]

In an action under this Act, a court shall preserve the secrecy of an alleged trade secret by reasonable means, which may include granting protective orders in connection with discovery proceedings, holding in-camera hearings, sealing the records of

11

Exhibit 1 - Page 200

## TRADE SECRETS ACT

the action, and ordering any person involved in the litigation not to disclose an alleged trade secret without prior court approval.

### Commissioners' Comment

If reasonable assurances of maintenance of secrecy could not be given, meritorious trade secret litigation would be chilled. In fashioning safeguards of confidentiality, a court must ensure that a respondent is provided sufficient information to present a defense and a trier of fact sufficient information to resolve the merits. In addition to the illustrative techniques specified in the statute, courts have protected secrecy in these cases by restricting disclosures to a party's counsel and his or her assistants and by appointing a disinterested expert as a special master to hear secret information and report conclusions to the court.

## § 6.   [Statute of Limitations]

An action for misappropriation must be brought within 3 years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered. For the purposes of this section, a continuing misappropriation constitutes a single claim.

### Commissioners' Comment

There presently is a conflict of authority as to whether trade secret misappropriation is a continuing wrong. *Compare Monolith Portland Midwest Co. v. Kaiser Aluminum & Chemical Corp.,* 407 F.2d 288 (CA9, 1969) (no continuing wrong under California law—limitation period upon all recovery begins upon initial misappropriation) with *Underwater Storage, Inc. v. U. S. Rubber Co.,* 371 F.2d 950 (CADC, 1966), cert. den., 386 U.S. 911 (1967) (continuing wrong under general principles—limitation period with respect to a specific act of misappropriation begins at the time that the act of misappropriation occurs).

This Act rejects a continuing wrong approach to the statute of limitations but delays the commencement of the limitation period until an aggrieved person discovers or reasonably should have discovered the existence of misappropriation. If objectively reasonable notice of misappropriation exists, three years is sufficient time to vindicate one's legal rights.

12

Exhibit 1 - Page 201

## TRADE SECRETS ACT

### § 7.   [Effect on Other Law]

(a) This Act displaces conflicting tort, restitutionary, and other law of this State pertaining to civil liability for misappropriation of a trade secret.

(b) This Act does not affect:

(1) contractual or other civil liability or relief that is not based upon misappropriation of a trade secret; or

(2) criminal liability for misappropriation of a trade secret.

### Commissioners' Comment

This Act is not a comprehensive remedy. It applies to duties imposed by law in order to protect competitively significant secret information. It does not apply to duties voluntarily assumed through an express or an implied-in-fact contract. The enforceability of covenants not to disclose trade secrets and covenants not to compete that are intended to protect trade secrets, for example, are governed by other law. The Act also does not apply to duties imposed by law that are not dependent upon the existence of competitively significant secret information, like an agent's duty of loyalty to his or her principal.

### § 8.   [Uniformity of Application and Construction]

This Act shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this Act among states enacting it.

### § 9.   [Short Title]

This Act may be cited as the Uniform Trade Secrets Act.

13

Exhibit 1 - Page 202

## TRADE SECRETS ACT

### § 10.    [Severability]

If any provision of this Act or its application to any person or circumstances is held invalid, the invalidity does not affect other provisions or applications of the Act which can be given effect without the invalid provision or application, and to this end the provisions of this Act are severable.

### § 11.    [Time of Taking Effect]

This Act takes effect on _____, and does not apply to misappropriation occurring prior to the effective date.

### § 12.    [Repeal]

The following Acts and parts of Acts are repealed:

(1)

(2)

(3)

14

Exhibit 1 - Page 203

# BLANK PAGE

Artifact of Photocopy Reproduction

**JAN RAYMOND**
**LEGISLATIVE HISTORY AND LEGISLATIVE INTENT**
**1 (888) 676-1947**

Exhibit 1 - Page 204

KF165  A5

# UNIFORM LAWS
# ANNOTATED

# Volume 14

## Civil Procedural and Remedial Laws

With

Annotations From State and Federal Courts

ST. PAUL, MINN.

WEST PUBLISHING CO.



LAW LIBRARY

AUG 3 0 1990

UNIVERSITY OF CALIFORNIA
DAVIS

Exhibit 1 - Page 205

# UNIFORM TRADE SECRETS ACT
## WITH 1985 AMENDMENTS

(The 1985 Amendments
are indicated by Underscore and Strikeout)

**Section**

1. Definitions.
2. Injunctive Relief.
3. Damages.
4. Attorney's Fees.
5. Preservation of Secrecy.
6. Statute of Limitations.
7. Effect on Other Law.
8. Uniformity of Application and Construction.
9. Short Title.
10. Severability.
11. Time of Taking Effect.
12. Repeal.

---

### WESTLAW Computer Assisted Legal Research

WESTLAW supplements your legal research in many ways. WESTLAW allows you to
- update your research with the most current information
- expand your library with additional resources
- retrieve direct history, precedential history and parallel citations with the Insta-Cite service

For more information on using WESTLAW to supplement your research, see the WESTLAW Electronic Research Guide, which follows the Explanation.

---

### Law Review Commentaries

Application of trade secret law to new technology—Unwinding the tangled web. Stephen J. Davidson & Robert L. DeMay. 12 Wm. Mitchell L.Rev. 579 (1986).

Balancing employers' trade secret interests in high-technology products against employees' rights and public interests in Minnesota. 69 Minn.Law Review 984 (1985).

Invention and ritual: Notes on the interrelation of magic and intellectual property in preliterate societies. Mark C. Suchman. 89 Columbia L.Rev. 1264 (1989).

Proprietary rights and the norms of science in biotechnology research. Rebecca S. Eisenberg. 97 Yale L.J. 177 (1987).

Uniform Trade Secrets Act. Ramon A. Klitzke. 64 Marquette L.Rev. 277 (1980).

## § 1.  Definitions.

As used in this [Act], unless the context requires otherwise:

(1) "Improper means" includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means;

437

Exhibit 1 - Page 206

§ 1

TRADE SECRETS

(2) "Misappropriation" means:

(i) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(ii) disclosure or use of a trade secret of another without express or implied consent by a person who

(A) used improper means to acquire knowledge of the trade secret; or

(B) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was

(I) derived from or through a person who had utilized improper means to acquire it;

(II) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

(III) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(C) before a material change of his [or her] position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

(3) "Person" means a natural person, corporation, business trust, estate, trust, partnership, association, joint venture, government, governmental subdivision or agency, or any other legal or commercial entity.

(4) "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that:

(i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and

(ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

## COMMENT

One of the broadly stated policies behind trade secret law is "the maintenance of standards of commercial ethics." *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470 (1974). The Restatement of Torts, Section 757, Comment (f), notes: "A complete catalogue of improper means is not possible," but Section 1(1) includes a partial listing.

Proper means include:

1. Discovery by independent invention;

2. Discovery by "reverse engineering", that is, by starting with the known product and working backward to find the method by which it was developed. The acquisition of the known product must, of course, also be by a fair and honest means, such as purchase of the item on the open market for reverse engineering to be lawful;

3. Discovery under a license from the owner of the trade secret;

4. Observation of the item in public use or on public display;

5. Obtaining the trade secret from published literature.

438

Exhibit 1 - Page 207

**TRADE SECRETS** §1

Improper means could include otherwise lawful conduct which is improper under the circumstances; *e.g.,* an airplane overflight used as aerial reconnaissance to determine the competitor's plant layout during construction of the plant. *E.I. du Pont de Nemours & Co., Inc. v. Christopher,* 431 F.2d 1012 (CA5, 1970), cert. den. 400 U.S. 1024 (1970). Because the trade secret can be destroyed through public knowledge, the unauthorized disclosure of a trade secret is also a misappropriation.

The type of accident or mistake that can result in a misappropriation under Section 1(2)(ii)(C) involves conduct by a person seeking relief that does not constitute a failure of efforts that are reasonable under the circumstances to maintain its secrecy under Section 1(4)(ii).

The definition of "trade secret" contains a reasonable departure from the Restatement of Torts (First) definition which required that a trade secret be "continuously used in one's business." The broader definition in the proposed Act extends protection to a plaintiff who has not yet had an opportunity or acquired the means to put a trade secret to use. The definition includes information that has commercial value from a negative viewpoint, for example the results of lengthy and expensive research which proves that a certain process will *not* work could be of great value to a competitor.

*Cf. Telex Corp. v. IBM Corp.,* 510 F.2d 894 (CA10, 1975) per curiam, cert. dismissed 423 U.S. 802 (1975) (liability imposed for developmental cost savings with respect to product not marketed). Because a trade secret need not be exclusive to confer a competitive advantage, different independent developers can acquire rights in the same trade secret.

The words "method, technique" are intended to include the concept of "know-how."

The language "not being generally known to and not being readily ascertainable by proper means by other persons" does not require that information be generally known to the public for trade secret rights to be lost. If the principal ~~person~~ persons who can obtain economic benefit from information ~~is~~ are aware of it, there is no trade secret. A method of casting metal, for example, may be unknown to the general public but readily known within the foundry industry. Information is readily ascertainable if it is available in trade journals, reference books, or published materials. Often, the nature of a product lends itself to being readily copied as soon as it is available on the market. On the other hand, if reverse engineering is lengthy and expensive, a person who discovers the trade secret through reverse engineering can have a trade secret in the information obtained from reverse engineering.

Finally, reasonable efforts to maintain secrecy have been held to include advising employees of the existence of a trade secret, limiting access to a trade secret on "need to know basis", and controlling plant access. On the other hand, public disclosure of information through display, trade journal publications, advertising, or other carelessness can preclude protection.

The efforts required to maintain secrecy are those "reasonable under the circumstances." The courts do not require that extreme and unduly expensive procedures be taken to protect trade secrets against flagrant industrial espionage. See *E.I. du Pont de Nemours & Co., Inc. v. Christopher, supra.* It follows that reasonable use of a trade secret including controlled disclosure to employees and licensees is consistent with the requirement of relative secrecy.

### Amendments

1985 amendments to text and/or changes in comments shown by underlines [added material] and strikeouts [deleted material].

Exhibit 1 - Page 208

§ 1                                                    **TRADE SECRETS**

Action in Adopting Jurisdictions

**Variations from Official Text:**

**Alaska.** Omits par. (3).

In par. (4), introductory material, omits ",
including a formula, pattern, compilation, pro-
gram, device, method, technique, or process,".

**California.** In par. (4)(i), substitutes "the
public or to" for ", and not being readily ascer-
tainable by proper means by,".

**Colorado.** Par. (4) reads: "(4) 'Trade secret'
means the whole or any portion or phase of
any scientific or technical information, design,
process, procedure, formula, improvement,
confidential business or financial information,
listing of names, addresses, or telephone num-
bers, or other information relating to any busi-
ness or profession which is secret and of value.
To be a trade secret the owner thereof must
have taken measures to prevent the secret from
becoming available to persons other than those
selected by the owner to have access thereto
for limited purposes."

**Connecticut.** Par. (2)(ii)(B)(II) reads: "ac-
quired under circumstances giving rise to a
duty to maintain its secrecy or limit its use,
including but not limited to disclosures made
under section 1-19, sections 31-40j to 31-40p,
inclusive, or subsection (b) of section 12-62;
or".

In par. (4), introductory material reads as
follows: "Notwithstanding the provisions of
sections 1-19, 31-40j to 31-40p, inclusive, and
subsection (b) of section 12-62, 'trade secret'
means information, including a formula, pat-
tern, compilation, program, device, method,
technique, process, drawing, cost data or cus-
tomer list that:".

**Delaware.** Introductory material reads:
"The following words, terms and phrases,
when used in this chapter, shall have the mean-
ings ascribed to them in this section, except
where the context clearly indicates a different
meaning:".

In par. (2)(ii)(B), omits "secret" following
"trade".

**District of Columbia.** Introductory material
reads: "For the purposes of this chapter, the
term:".

In par. (1), substitutes "means" for "in-
cludes".

In par. (2)(ii)(B), omits "his knowledge of".

In par. (3), omits "business trust,".

Par. (4)(ii) reads: "Is the subject of reason-
able efforts to maintain its secrecy."

**Idaho.** Effective until July 1, 1993, the Ida-
ho section (I.C. 48-801) reads as follows:

"As used in this chapter unless the context
requires otherwise:

"(1) 'Improper means' include theft, bribery,
misrepresentation, breach or inducement of a
breach of a duty to maintain secrecy, or espio-
nage through electronic or other means.

"(2) 'Misappropriation' means:

"(a) Acquisition of a trade secret of another
by a person who knows or has reason to know
that the trade secret was acquired by improper
means; or

"(b) Disclosure or use of a trade secret of
another without express or implied consent by
a person who:

"(A) Used improper means to acquire knowl-
edge of the trade secret; or

"(B) At the time of disclosure or use, knew
or had reason to know that his knowledge of
the trade secret was:

"(i) Derived from or through a person who
had utilized improper means to acquire it;

"(ii) Acquired under circumstances giving
rise to a duty to maintain its secrecy or limit
its use; or

"(iii) Derived from or through a person who
owned a duty to the person seeking relief to
maintain its secrecy or limit its use; or

"(C) Before a material change of his posi-
tion, knew or had reason to know that it was a
trade secret and that knowledge of it had been
acquired by accident or mistake.

"(3) 'Person' means a natural person, corpo-
ration, business trust, estate, trust, partnership,
association, joint venture, government, govern-
mental subdivision or agency, or any other
legal or commercial entity.

"(4) 'Computer program' means information
which is capable of causing a computer to
perform logical operation(s) and:

"(a) Is contained on any media or in any
format;

"(b) Is capable of being input, directly or
indirectly, into a computer; and

"(c) Has prominently displayed a notice of
copyright, or other proprietary or confidential
marking, either within or on the media con-
taining the information.

"(5) 'Trade secret' means information, in-
cluding a formula, pattern, compilation, pro-

440

Exhibit 1 - Page 209

**Encyclopedias**

Duty of agent after termination of agency not to use or disclose trade secrets of principal, see C.J.S. Agency § 287.

Duty of employee not to disclose trade secrets of employer, see C.J.S. Master and Servant § 72.

Improper use of trade secrets as unfair competition, see C.J.S. Trade–Marks, Trade–Names, and Unfair Competition §§ 121, 122.

Injunctions with respect to trade secrets, see C.J.S. Injunctions §§ 151 to 156.

Tort of misuse or interference with trade secrets, see C.J.S. Torts § 48.

## WESTLAW Electronic Research

See WESTLAW Electronic Research Guide following the Explanation.

### Notes of Decisions

Generally  3
Burden of proof  22
Improper means  4
Jurisdiction  21
Law governing  2
Misappropriation  5
Purpose  1
Questions of fact  23
Trade secret
   Generally  6
   Common law  7
   Competitive advantage  8
   Customer lists and information  15
   Design modifications  16
   Economic value and competitive advantage  8
   Expense of development  11
   Formulas and instructions therefor  14
   Held not to be trade secret in particular cases  20
   Held to be trade secret in particular cases  19
   Hiring agreements and noncompetition covenants  13
   Information not generally known or readily ascertainable  9
   Maintaining secrecy  12
   Modification by competitor to meet customer specification  17
   Multiple owners of trade secret  18
   Noncompetition covenants  13
   Novelty  10

### 1. Purpose

Uniform Trade Secrets Act was intended by legislature to serve public interest by giving protection to trade secrets, which are valuable assets to any business. Kozuch v. CRA–MAR Video Center, Inc., Ind.App. 3 Dist.1985, 478 N.E.2d 110.

Purpose of Trade Secrets Act is to prevent one person or business from profiting from a trade secret developed by another, because it would thus be acquiring free competitive advantage; Act was never intended to apply to discovery in civil actions. Stork–Werkspoor Diesel V.V. v. Koek, La.App. 5 Cir.1988, 534 So.2d 983.

### 2. Law governing

Uniform Trade Secrets Act controls in event of conflict between prior case law and UTSA as enacted by California legislature. American Credit Indem. Co. v. Sacks, 1989, 262 Cal.Rptr. 92, 213 C.A.3d 622.

Not all state legal and equitable rights equivalent to copyright are preempted by federal law and federal copyright law does not preempt state trade secrets claims; copyright does not protect idea itself, only its particular expression while, by contrast, trade secrets law protect author's very ideas if they possess some novelty and are undisclosed or disclosed only on basis of confidentiality. Boeing Co. v. Sierracin Corp., 1987, 738 P.2d 665, 108 Wash.2d 38.

### 3. Generally

Minnesota Uniform Trade Secrets Act displaced only cause of action for misappropriation of trade secrets, and not causes of action which had "more" to their factual allegations than mere misuse or misappropriation of trade secrets, i.e. causes of action which existed in commercial area and which were not dependent on trade secrets. Micro Display Systems, Inc. v. Axtel, Inc., D.Minn.1988, 699 F.Supp. 202.

Use of trade secrets after contract termination is tort. Span-Deck, Inc. v. Fabcon, Inc., D.C.Minn.1983, 570 F.Supp. 81.

Exhibit 1 - Page 210

American Credit Indem. Co. v. Sacks, 1989, 262 Cal.Rptr. 92, 213 C.A.3d 622.

Credit insurance underwriter's customer list was information protected as trade secret under the California version of the Uniform Trade Secrets Act or under common law; the customer list had potential economic value because it would allow a competitor to direct sales efforts to elite 5.5 percent of potential customers which had evinced predisposition to purchase credit insurance, and underwriter took reasonable steps to ensure secrecy of the information, even though particular former employee accused of misappropriation of trade secret claimed she never signed confidentiality agreement. American Credit Indemn. Co. v. Sacks, 1989, 262 Cal.Rptr. 92, 213 C.A.3d 622.

Professional employees of accounting firm did not engage in solicitation or unfair competition when they used company "rolodex" to obtain addresses of clients for whom they had provided professional services in order to mail those clients announcements of their formation of new accounting partnership. Moss, Adams & Co. v. Shilling, 1986, 224 Cal.Rptr. 456, 179 C.A.3d 124.

Customer lists can be properly classified as "trade secrets" under appropriate circumstances as defined under Uniform Trade Secrets Act. Michels v. Dyna–Kote Industries, Inc., Ind.App. I Dist.1986, 497 N.E.2d 586.

Video center's customer list, including only names of purchasers of video hardware and purchasers of memberships in video rental club, was a "trade secret" under Uniform Trade Secrets Act, where list could not have been created by any means other than through business operations, list derived its independent economic value from not being generally known or ascertainable by competitors, and video center took reasonable efforts to maintain secrecy of list through strict instructions to its computer programmers and operators and by locking up computer disks containing list. Kozuch v. CRA–MAR Video Center, Inc., Ind.App. 3 Dist.1985, 478 N.E.2d 110.

Customer lists and lists of persons who have made inquiries as a result of businesses' advertisements may be eligible for trade secret protection. Minuteman, Inc. v. Alexander, 1989, 434 N.W.2d 773, 147 Wis.2d 842.

Securities underwriter did not act with unclean hands in requesting assistance of police in investigating what was originally suspected to be leak of customer information from within company, for purposes of determining whether customer information obtained by purchaser of underwriter's scrap paper was protected as trade secret. B.C. Ziegler and Co.

v. Ehren. App. 1987, 414 N.W.2d 48, 141 Wis.2d 19.

Securities underwriter's customer information, obtained through batches of paper scrap containing customer names and account summaries, qualified for trade secret status; customer account information was stored in locked cabinets in locked room, accessible to one or two of employees, underwriter had policy of confidentiality in disposing of its business paper, and underwriter had made concerted effort to develop customer information over 75 years of doing business. B.C. Ziegler and Co. v. Ehren. App.1987, 414 N.W.2d 48, 141 Wis.2d 19.

Determination that employer's customer list was not trade secret was supported by evidence that employer did its marketing through independent representatives, that representatives had no confidentiality agreement with employer, and that independent representatives developed their own customer lists. Crown Holding Corp. v. Larson, Minn.App.1987, 410 N.W.2d 373.

### 16. —— Design modifications

Inventor's design modifications to rear wheel suspension for off-road motorcycle which would extend the rear wheel travel over earlier rising-rate designs and design of an alternate mount were trade secrets. Richardson v. Suzuki Motor Co., Ltd., Cal.1989, 868 F.2d 1226, certiorari denied 110 S.Ct. 154, 107 L.Ed.2d 112.

### 17. —— Modification by competitor to meet customer specification

If new customer devised an application for product claimed to be the result of trade secrets and if competitor manufacturer modified its own motor to meet those new specifications, manufacturer could not object Electro-Craft Corp. v. Controlled Motion, Inc., Minn. 1983, 332 N.W.2d 890.

### 18. —— Multiple owners of trade secret

Owner of trade secret need not be the only one in the market; several developers of the same information may have trade secret rights in that information; if an outsider would obtain a valuable share of the market by gaining certain information, the information may be a trade secret if not known or readily ascertainable. Electro-Craft Corp. v. Controlled Motion, Inc., Minn.1983, 332 N.W.2d 890.

### 19. —— Held to be trade secret in particular cases

Identity of consultants for former employer was not generally known or readily ascertainable, provided competitive advantage, was obtained at manufacturer's expense, was intend-

Exhibit 1 - Page 211

**TRADE SECRETS**                                                    **§ 2**

ed to be confidential, and, therefore, was "trade secret" under Minnesota and California law. Surgidev Corp. v. Eye Technology, Inc., D.Minn.1986, 648 F.Supp. 661, affirmed 828 F.2d 452.

Computer software system specially designed to meet financial accounting and reporting requirements of public bodies such as school districts and county governments was a "trade secret," as it derived independent economic value from being generally unknown and available solely from its developer, and as developer took reasonable efforts to maintain its secrecy. Aries Information Systems, Inc. v. Pacific Management Systems Corp., Minn.App.1985, 366 N.W.2d 366.

Pipe coating process constituted trade secret where process was not known outside of manufacturer's company, only a few employees of manufacturer knew process, extensive measures were taken to guard secrecy of process, process allowed manufacturer to produce superior product which gave him competitive edge in pipe producing field, process was developed over a number of years and required extensive tests, and information on process of pipe could not be legitimately acquired or duplicated by others. Saunders v. Florence Enameling Co., Inc., Ala.1988, 540 So.2d 651.

**20.  ——  Held not to be trade secret in particular cases**

Under California law, generalized advice concerned consistency of competitor's pizza crust, which distributor passed on to pizza restaurant franchisor, was not trade secret, whose appropriation could give rise to claim of unfair competition. Tominaga v. Shepherd, C.D.Cal. 1988, 682 F.Supp. 1489.

**21.  Jurisdiction**

It was fair and reasonable to require Japanese corporation to defend against misappropriation of trade secrets action in California; California had manifested strong interest in providing forum to its residents for causes of action arising from misappropriation of trade secrets by its enactment of Uniform Trade Secrets Act, California was more appropriate for purposes of availability of evidence, and Japan had relatively small interest in protecting California trade secrets or providing foreign plaintiffs forum to litigate against resident defendant. Magnecomp Corp. v. Athene Co., Ltd., 1989, 257 Cal.Rptr. 278, 209 C.A.3d 526.

**22.  Burden of proof**

*See Notes of Decisions under note number 12 in section 2, infra.*

**23.  Questions of fact**

Whether process constitutes trade secret is question of fact. Saunders v. Florence Enameling Co., Inc., Ala.1988, 540 So.2d 651.

## § 2.  Injunctive Relief.

(a) Actual or threatened misappropriation may be enjoined.  Upon application to the court, an injunction shall be terminated when the trade secret has ceased to exist, but the injunction may be continued for an additional reasonable period of time in order to eliminate commercial advantage that otherwise would be derived from the misappropriation.

(b) ~~If the court determines that it would be unreasonable to prohibit future use~~ In exceptional circumstances, an injunction may condition future use upon payment of a reasonable royalty for no longer than the period of time ~~the for which~~ use could have been prohibited. Exceptional circumstances include, but are not limited to, a material and prejudicial change of position prior to acquiring knowledge or reason to know of misappropriation that renders a prohibitive injunction inequitable.

(c) In appropriate circumstances, affirmative acts to protect a trade secret may be compelled by court order.

### COMMENT

Injunctions restraining future use and disclosure of misappropriated trade se-
crets frequently are sought.  Although punitive perpetual injunctions have been

449

Exhibit 1 - Page 212

§ 2                                                                                    TRADE SECRETS

granted, e.g., *Elcor Chemical Corp. v. Agri-Sul, Inc.,* 494 S.W.2d 204 (Tex.Civ.App. 1973), Section 2(a) of this Act adopts the position of the trend of authority limiting the duration of injunctive relief to the extent of the temporal advantage over good faith competitors gained by a misappropriator. See, e.g., *K–2 Ski Co. v. Head Ski Co., Inc.,* 506 F.2d 471 (CA9, 1974) (maximum appropriate duration of both temporary and permanent injunctive relief is period of time it would have taken defendant to discover trade secrets lawfully through either independent development or reverse engineering of plaintiff's products).

The general principle of Section 2(a) and (b) is that an injunction should last for as long as is necessary, but no longer than is necessary, to eliminate the commercial advantage or "lead time" with respect to good faith competitors that a person has obtained through misappropriation. Subject to any additional period of restraint necessary to negate lead time, an injunction accordingly should terminate when a former trade secret becomes either generally known to good faith competitors or generally knowable to them because of the lawful availability of products that can be reverse engineered to reveal a trade secret.

For example, assume that A has a valuable trade secret of which B and C, the other industry members, are originally unaware. If B subsequently misappropriates the trade secret and is enjoined from use, but C later lawfully reverse engineers the trade secret, the injunction restraining B is subject to termination as soon as B's lead time has been dissipated. All of the persons who could derive economic value from use of the information are now aware of it, and there is no longer a trade secret under Section 1(4). It would be anti-competitive to continue to restrain B after any lead time that B had derived from misappropriation had been removed.

If a misappropriator either has not taken advantage of lead time or good faith competitors already have caught up with a misappropriator at the time that a case is decided, future disclosure and use of a former trade secret by a misappropriator will not damage a trade secret owner and

no injunctive restraint of future disclosure and use is appropriate. See, e.g., *Northern Petrochemical Co. v. Tomlinson,* 484 F.2d 1057 (CA7, 1973) (affirming trial court's denial of preliminary injunction in part because an explosion at its plant prevented an alleged misappropriator from taking advantage of lead time); *Kubik, Inc. v. Hull,* 185 USPQ 391 (Mich.App. 1974) (discoverability of trade secret by lawful reverse engineering made by injunctive relief punitive rather than compensatory).

Section 2(b) deals with ~~a distinguishable~~ the special situation in which future use by a misappropriator will damage a trade secret owner but an injunction against future use nevertheless is ~~unreasonable under the particular~~ inappropriate due to exceptional circumstances ~~of a case. Situations in which this unreasonableness can exist~~ Exceptional circumstances include the existence of an overriding public interest which requires the denial of a prohibitory injunction against future damaging use and a person's reasonable reliance upon acquisition of a misappropriated trade secret in good faith and without reason to know of its prior misappropriation that would be prejudiced by a prohibitory injunction against future damaging use. *Republic Aviation Corp. v. Schenk,* 152 USPQ 830 (N.Y.Sup.Ct.1967) illustrates the public interest justification for withholding prohibitory injunctive relief. The court considered that enjoining a misappropriator from supplying the U.S. with an aircraft weapons control system would have endangered military personnel in Viet Nam. The prejudice to a good faith third party justification for withholding prohibitory injunctive relief can arise upon a trade secret owner's notification to a good faith third party that the third party has knowledge of a trade secret as a result of misappropriation by another. This notice suffices to make the third party a misappropriator thereafter under Section 1(2)(ii)(B)(I). In weighing an aggrieved person's interests and the interests of a third party who has relied in good faith upon his or her ability to utilize information, a court may conclude that restraining future use of the information by the

450

Exhibit 1 - Page 213

**TRADE SECRETS**                                                      **§ 2**

third party is unwarranted. With respect to innocent acquirers of misappropriated trade secrets, Section 2(b) is consistent with the principle of 4 Restatement Torts (First) § 758(b) (1939), but rejects the Restatement's literal conferral of absolute immunity upon all third parties who have paid value in good faith for a trade secret misappropriated by another. The position taken by the Uniform Act is supported by *Forest Laboratories, Inc. v. Pillsbury Co.,* 452 F.2d 621 (CA7, 1971) in which a defendant's purchase of assets of a corporation to which a trade secret had been disclosed in confidence was not considered to confer immunity upon the defendant.

When Section 2(b) applies, a court ~~is given~~ has discretion to substitute an injunction conditioning future use upon payment of a reasonable royalty for an injunction prohibiting future use. Like all injunctive relief for misappropriation, a royalty order injunction is appropriate only if a misappropriator has obtained a competitive advantage through misappropriation and only for the duration of that competitive advantage. In some situations, typically those involving good faith acquirers of trade secrets misappropriat-

ed by others, a court may conclude that the same considerations that render a prohibitory injunction against future use inappropriate also render a royalty order injunction inappropriate. See, generally, *Prince Manufacturing, Inc. v. Automatic Partner, Inc.,* 198 USPQ 618 (N.J.Super.Ct. 1976) (purchaser of misappropriator's assets from receiver after trade secret disclosed to public through sale of product not subject to liability for misappropriation).

A royalty order injunction under Section 2(b) should be distinguished from a reasonable royalty alternative measure of damages under Section 3(a). See the Comment to Section 3 for discussion of the differences in the remedies.

Section 2(c) authorizes mandatory injunctions requiring that a misappropriator return the fruits of misappropriation to an aggrieved person, *e.g.,* the return of stolen blueprints or the surrender of surreptitious photographs or recordings.

Where more than one person is entitled to trade secret protection with respect to the same information, only that one from whom misappropriation occurred is entitled to a remedy.

### Amendments

1985 amendments to text and/or changes in comments shown by underlines [added material] and strikeouts [deleted material].

### Action In Adopting Jurisdictions

**Variations from Official Text:**

**Alaska.** Subsec. (a) reads: "(a) A court may enjoin actual or threatened misappropriation of trade secrets. Upon application to the court, an injunction shall be terminated when the trade secret has ceased to exist, but the injunction may be continued for an additional reasonable period of time in order to eliminate commercial advantage that otherwise would be derived from the misappropriation."

Subsec. (b) reads: "(b) If the court determines that it would be unreasonable to prohibit future use of a trade secret, an injunction may condition future use upon payment of a reasonable royalty for no longer than the period of time the use could have been prohibited."

**Arizona.** In subsec. (b), substitutes "before acquiring" for "prior to acquiring".

**California.** In subsec. (a), omits "reasonable" preceding "period".

Subsec. (b) reads: "If the court determines that it would be unreasonable to prohibit future use, an injunction may condition future use upon payment of a reasonable royalty for no longer than the period of time the use could have been prohibited."

**Colorado.** Section reads: "Temporary and final injunctions including affirmative acts may be granted on such equitable terms as the court deems reasonable to prevent or restrain actual or threatened misappropriation of a trade secret."

**Connecticut.** Section reads:

"(a) Actual or threatened misappropriation may be enjoined upon application to any court of competent jurisdiction. An injunction shall

451

Exhibit 1 - Page 214

§ 2

be terminated when the trade secret has ceased
to exist, but the injunction may be continued
for an additional reasonable period of time in
order to eliminate commercial advantage that
otherwise would be derived from the misap-
propriation.

"(b) If the court determines that it would be
unreasonable to prohibit future use, an injunc-
tion may condition future use upon payment
of a reasonable royalty for no longer than the
period of time the use could have been prohib-
ited.

"(c) In appropriate circumstances, affirma-
tive acts to protect a trade secret may be com-
pelled by court order."

**Delaware.** Subsec. (b) reads: "If the court
determines that it would be unreasonable to
prohibit future use, an injunction may condi-
tion future use upon payment of a reasonable
royalty for no longer than the period of time
the use could have been prohibited."

**District of Columbia.** In subsec. (a), substi-
tutes "a reasonable period" for "an additional
reasonable period".

In subsec. (c), substitutes "an affirmative
act" for "affirmative acts".

**Hawaii.** Subsec. (b) reads: "In exceptional
circumstances, an injunction may condition fu-
ture use upon payment of a reasonable royalty
for no longer than the period of time for which
use could have been prohibited. Exceptional
circumstances include, but are not limited to, a
material and prejudicial change of position pri-
or to acquiring knowledge or reason to know
of misappropriation that renders a prohibitive
injunction inequitable. The alleged wrongful
user shall bear the burden of proof of excep-
tional circumstances."

**Illinois.** In subsec. (a), remainder of text
following "reasonable period of time" reads:
"in appropriate circumstances for reasons in-
cluding, but not limited to an elimination of
the commercial advantage that otherwise
would be derived from the misappropriation,
or where the trade secret ceases to exist due to
the fault of the enjoined party or others by
improper means."

Subsec. (b) reads: "If the court determines
that it would be unreasonable to prohibit fu-
ture use due to an overriding public interest,
an injunction may condition future use upon

payment of a reasonable royalty for no longer
than the period of time the use could have
been prohibited."

**Indiana.** Subsec. (b) reads: "If the court
determines in exceptional circumstances that it
would be unreasonable to prohibit future use,
an injunction may condition future use upon
payment of a reasonable royalty for no longer
than the period of time the use could have
been prohibited."

**Louisiana.** Subsec. (b) reads: "If the court
determines that it would be unreasonable to
prohibit future use, an injunction may condi-
tion future use upon payment of a reasonable
royalty for no longer than the period of time
the use could have been prohibited."

**Maine.** In subsec. (a), inserts "restrained
or" following "may be" in first sentence.

Adds a subsection which reads: "Application.
This section applies to all forms of injunctive
relief, including temporary restraining orders,
preliminary injunctions and permanent injunc-
tions."

**Montana.** In subsec. (a), substitutes "must
be" for "shall be".

Subsec. (b) reads: "If the court determines
that it would be unreasonable to prohibit fu-
ture use, an injunction may condition future
use upon payment of a reasonable royalty for
no longer than the period of time the use could
have been prohibited."

**Nevada.** In subsec. (b), omits ", but are not
limited to,".

**North Dakota.** In subsec. (b), omits ", but
are not limited to,".

**Oregon.** In subsec. (a), inserts "temporarily,
preliminarily, or permanently" following "may
be", and substitutes "vacated" for "terminated".

In subsec. (b), omits "no longer than" pre-
ceding "the period of time".

Subsec. (c) reads: "In appropriate circum-
stances, the court may order affirmative acts to
protect a trade secret."

**Washington.** Subsec. (b) reads: "If the
court determines that it would be unreason-
able to prohibit future use, an injunction may
condition future use upon payment of a rea-
sonable royalty for no longer than the period
of time the use could have been prohibited."

## Law Review Commentaries

Trade secret misappropriation: What is the
proper length of an injunction after public

disclosure? Comment, 51 Albany L.Rev. 271
(1987).

Exhibit 1 - Page 215

**TRADE SECRETS**                                                   **§ 2**

### Library References

**American Digest System**

Injunctive relief, see Injunction ⊜56.

**Encyclopedias**

Injunctive relief, see C.J.S. Injunctions §§ 151 to 156.

### WESTLAW Electronic Research

See WESTLAW Electronic Research Guide following the Explanation.

### Notes of Decisions

Actual or threatened misappropriation   4
Adequacy of other remedies   3
Agreement, relationship or duty prohibiting
   use of trade secret   8
Burden of proof   12
Common law   2
Constitutionality   1
Customer lists   9
Definiteness of order   13
Duration of injunction   14
Injunction held inappropriate in particular
   cases   11
Irreparable harm   6
Present or compelling need   5
Proof required   10
Stay of injunction   15
Unfair competition   7

#### 1.  Constitutionality

Provision of preliminary injunction, enjoining competitor from mailing promotional postcards to persons whose names had been derived from video center's customer list, advertising free membership in competitor's movie club, or offering free movie rentals, did not unconstitutionally restrict competitor's advertising, since provision merely required competitor not to advertise free memberships in its movie club or offer free movie rental to those customers whose names were selected solely from video center's customer list allegedly misappropriated by competitor.  Kozuch v. CRA-MAR Video Center, Inc., Ind.App. 3 Dist.1985, 478 N.E.2d 110.

#### 2.  Common law

Uniform Trade Secrets Act requirement that trier of fact decide whether appropriate circumstances exist which would justify imposition of permanent injunction and to decide, if permanent injunction is not appropriate, length of time movant is entitled to injunctive relief, merely articulates common law as it would apply to permanent injunctions.  Wolfe

v. Tuthill Corp., Full–Rite Div., Ind.1988, 532 N.E.2d 1.

Determining what constitutes an unfair practice under Uniform Trade Secrets Act involves a balancing process between right of employee to individual freedom and right of employer to honest and fair competition and protection of business assets and property.  Engineered Mechanical Services, Inc. v. Langlois, La.App. 1 Cir.1984, 464 So.2d 329, writ denied 467 So.2d 531.

#### 3.  Adequacy of other remedies

Ship engine manufacturer had adequate remedy under Federal Rules of Civil Procedure to prevent cargo owners bringing federal products liability action against manufacturer from using any trade secrets disclosed in discovery process for unfair competitive purposes, and thus, preliminary injunctive relief under state law to prevent disclosure of such secrets was inappropriate.  Stork–Werkspoor Diesel V.V. v. Koek, La.App. 5 Cir.1988, 534 So.2d 983.

#### 4.  Actual or threatened misappropriation

Injunctions may be issued in trade secret cases, but only if misappropriations are actual or threatened.  Tubular Threading, Inc. v. Scandaliato, La.App. 5 Cir.1983, 443 So.2d 712.

#### 5.  Present or compelling need

An injunction against using, selling, distributing or otherwise disseminating any shop drawing or other document relating to trade secret in form of a pipe-handling system if designed and built for plaintiff should not have issued absent a showing of either a present or compelling need or an actual or threatened misappropriation.  Tubular Threading, Inc. v. Scandaliato, La.App. 5 Cir.1983, 443 So.2d 712.

#### 6.  Irreparable harm

Finding of irreparable harm to aircraft window designer was not necessary in order to

Exhibit 1 - Page 216

support injunction against aircraft window supplier from future use of designer's 7/7/7 cockpit window drawings and information derived from those drawings. Boeing Co. v. Sierracin Corp., 1987, 738 P.2d 665, 108 Wash.2d 38.

### 7. Unfair competition

Trade Secrets Act did not apply to cargo owners' consultation of ship engine manufacturer's former employee with regard to products liability suit by cargo owners against manufacturer based on allegation that ship engines were defectively designed and manufactured, and Act did not justify preliminary injunction enjoining employee from further assisting cargo owners in litigation; manufacturer did not allege that any information which had been or might be supplied by employee to cargo owners would be used by cargo owners to compete unfairly with manufacturer. Stork-Werkspoor Diesel V.V. v. Koek, La.App. 5 Cir.1988, 534 So.2d 983.

### 8. Agreement, relationship or duty prohibiting use of trade secret

Manufacturer of polyimide foam was entitled to preliminary injunction restraining its predecessor's employees and its competitor from licensing or disclosing manufacturer's trade secrets and to prevent competitor and employees from licensing employee from licensing equitably belonging to manufacturer; trade secrets had been developed by predecessor's employees, who had signed personal services agreement prohibiting disclosure of inventions made during employment, and competitor had threatened to disclose or license trade secrets obtained from the former employees. Imi-Tech Corp. v. Gagliani, S.D.Cal.1986, 691 F.Supp. 214.

Identity of ophthalmologists, who, as customers, purchased products from former employer and who were solicited or likely to be solicited by former employees, was customer information that former employer was entitled to protect as "trade secret" by permanent injunction under California law against former employees, where some ophthalmologists already were or were to become high volume implanters of former employer's lenses, where some ophthalmologists implanted investigational lenses, where identity of ophthalmologists was not readily accessible, and where ophthalmologists were in established business relationship with former employer and had brand loyalty to employer's product. Surgidev Corp. v. Eye Technology, Inc., D.Minn.1986, 648 F.Supp. 661, affirmed 828 F.2d 452.

Trial court did not abuse its discretion in enjoining independent insurance agent from

using, subsequent to termination of his relationship with life insurer, materials furnished him by insurer during contractual relationship where agent's contract with insurer provided for return of such materials, and finding that materials in agent's possession were property of life insurer was adequately supported by record. Steenhoven v. College Life Ins. Co. of America, Ind.App. 2 Dist.1984, 458 N.E.2d 661, rehearing denied 460 N.E.2d 973.

It is not necessary that information be a trade secret to be protected; rather, a trial court may issue an injunction against a party who has, in violation of an explicit agreement or a common-law duty, wrongfully used confidential information or trade secrets obtained from his employer. Saliterman v. Finney, Minn.App.1985, 361 N.W.2d 175.

If information is found to be a protectable secret, it becomes necessary to determine whether an express or implied contractual or confidential relationship exists between parties which obligates them not to use or disclose the secret information. Engineered Mechanical Services, Inc. v. Langlois, La.App. 1 Cir.1984, 464 So.2d 329, writ denied 467 So.2d 531.

### 9. Customer lists

Louisiana courts decline to enjoin defendants from misappropriation of confidential customer information unless the former employee was not acting solely from memory and such information was not easily ascertainable and generally available to the public. NCH Corp. v. Broyles, D.C.La.1982, 551 F.Supp. 636.

Depending on nature of business, customer list may be "trade secret," and employee may be restrained from using list if he acquired it in confidence from employer, but there is no trade secret if customers' names can be readily ascertained through ordinary business channels or reference resources. Robert S. Weiss and Associates, Inc. v. Wiederlight, 1988, 546 A.2d 216, 208 Conn. 525.

In suit in which competitor was preliminarily enjoined from redeeming promotional postcards mailed to persons listed on video center's customer list, preliminary injunction, enjoining competitor from distributing video center's customer list to its outlying stores, was not erroneous, in that no evidence supported competitor's contention that dissemination of customer list to all outlying stores was only means of permitting those stores to determine whether customers attempting to redeem promotional postcards had been contacted through competitor's use of video center's customer list. Kozuch v. CRA–MAR Video Center, Inc., Ind. App. 3 Dist.1985, 478 N.E.2d 110.

454

Exhibit 1 - Page 217

**10.  Proof required**

In an action for misappropriation of trade secrets, there must be proof of the existence of a trade secret and proof of the wrongful appropriation of the trade secret; without a proven trade secret, there can be no action for misappropriation even if the defendants' actions were wrongful. Electro-Craft Corp. v. Controlled Motion, Inc., Minn.1983, 332 N.W.2d 890.

In order to sustain an action for misappropriation, plaintiff must specifically identify its claimed trade secrets and must introduce evidence of the supposedly secret information. Electro-Craft Corp. v. Controlled Motion, Inc., Minn.1983, 332 N.W.2d 890.

**11.  Injunction held inappropriate in particular cases**

Finding that independent insurance agent improperly used life insurer's materials and information after termination of agent's contractual relationship with insurer in replacing clients' policies with policies from another company was insufficient basis upon which to predicate injunction against agent's contacting or inducing clients to terminate or replace such policies. Steenhoven v. College Life Ins. Co. of America, Ind.App. 2 Dist.1984, 458 N.E.2d 661, rehearing denied 460 N.E.2d 973.

**12.  Burden of proof**

Plaintiff who seeks relief for misappropriation of trade secrets must identify the trade secrets and carry the burden of showing that they exist. Acuson Corp. v. Aloka Co., Ltd., 1989, 257 Cal.Rptr. 368, 209 C.A.3d 425, 1098E.

Plaintiff seeking to establish trade secrets claim under Uniform Trade Secrets Act has burden of proving that legally protectable secrets exist. Boeing Co. v. Sierracin Corp., 1987, 738 P.2d 665, 108 Wash.2d 38.

In trade secrets case, plaintiff has burden of establishing both existence of a legal protectable secret and legal basis upon which to predi-

cate relief; legal basis upon which relief and protection has been afforded consists of a conglomerate of property, agency, tort and contract law and on concept of equity. Engineered Mechanical Services, Inc. v. Langlois, La.App. 1 Cir.1984, 464 So.2d 329, writ denied 467 So.2d 531.

**13.  Definiteness of order**

Prohibition against aircraft window supplier prohibiting use of information or materials derived from aircraft window designer's drawings, from tooling, and from aircraft window supplier's FAA authorized drawings, and employment of those who "reviewed or had knowledge" of designer's drawings, tooling, or derivative information, was sufficiently definite for compliance, notwithstanding argument that term "derived from" was too vague making compliance impossible. Boeing Co. v. Sierracin Corp., 1987, 738 P.2d 665, 108 Wash.2d 38.

**14.  Duration of injunction**

Former employee of pump manufacturer, charged with misappropriating trade secrets, was properly enjoined from designing, manufacturing, or selling pumps which incorporated former employer's trade secrets; though trial court entered "permanent" injunction, court maintained jurisdiction to modify or revoke it as circumstances dictated. Wolfe v. Tuthill Corp., Full–Rite Div., Ind.1988, 532 N.E.2d 1.

**15.  Stay of injunction**

Defendants were entitled to supersedeas or stay of injunction entered against them for violations of Uniform Trade Secrets Act [West's RCWA 19.108.010 et seq.] where defendants had made requisite showing that there were debatable issues on appeal and that stay was necessary to preserve fruits of successful appeal, and adverse effect of stay on plaintiff could be measured in terms of monetary amount. Boeing Co. v. Sierracin Corp., 1986, 716 P.2d 956, 43 Wash.App. 288.

# § 3.  Damages.

(a) In addition to or in lieu of injunctive relief Except to the extent that a material and prejudicial change of position prior to acquiring knowledge or reason to know of misappropriation renders a monetary recovery inequitable, a complainant may is entitled to recover damages for the actual loss caused by misappropriation. A complainant also may recover for Damages can include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing damages for actual loss. In lieu of damages measured by any

Exhibit 1 - Page 218

other methods, the damages caused by misappropriation may be measured by imposition of liability for a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret.

(b) If willful and malicious misappropriation exists, the court may award exemplary damages in an amount not exceeding twice any award made under subsection (a).

## COMMENT

Like injunctive relief, a monetary recovery for trade secret misappropriation is appropriate only for the period in which information is entitled to protection as a trade secret, plus the additional period, if any, in which a misappropriator retains an advantage over good faith competitors because of misappropriation. Actual damage to a complainant and unjust benefit to a misappropriator are caused by misappropriation during this time alone. See *Conmar Products Corp. v. Universal Slide Fastener Co.*, 172 F.2d 150 (CA2, 1949) (no remedy for period subsequent to disclosure of trade secret by issued patent); *Carboline Co. v. Jarboe*, 454 S.W.2d 540 (Mo.1970) (recoverable monetary relief limited to period that it would have taken misappropriator to discover trade secret without misappropriation). A claim for actual damages and net profits can be combined with a claim for injunctive relief, but, if both claims are granted, the injunctive relief ordinarily will preclude a monetary award for a period in which the injunction is effective.

As long as there is no double counting, Section 3(a) adopts the principle of the recent cases allowing recovery of both a complainant's actual losses and a misappropriator's unjust benefit that are caused by misappropriation. *E.g., Tri-Tron International v. Velto*, 525 F.2d 432 (CA9, 1975) (complainant's loss and misappropriator's benefit can be combined). Because certain cases may have sanctioned double counting in a combined award of losses and unjust benefit, *e.g., Telex Corp. v. IBM Corp.*, 510 F.2d 894 (CA10, 1975) (per curiam), cert. dismissed, 423 U.S. 802 (1975) (IBM recovered rentals lost due to displacement by misappropriator's products without deduction for expenses saved by displacement; as a result of rough approximations adopted by the trial judge, IBM also may have recovered developmental costs saved by misappropriator through misappropriation with respect to the same customers), the Act adopts an express prohibition upon the counting of the same item as both a loss to a complainant and an unjust benefit to a misappropriator.

As an alternative to all other methods of measuring damages caused by a misappropriator's past conduct, a complainant can request that damages be based upon a demonstrably reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret. In order to justify this alternative measure of damages, there must be competent evidence of the amount of a reasonable royalty.

The reasonable royalty alternative measure of damages for a misappropriator's past conduct under Section 3(a) is readily distinguishable from a Section 2(b) royalty order injunction, which conditions a misappropriator's future ability to use a trade secret upon payment of a reasonable royalty. A Section 2(b) royalty order injunction is appropriate only in exceptional circumstances; whereas a reasonable royalty measure of damages is a general option. Because Section 3(a) damages are awarded for a misappropriator's past conduct and a Section 2(b) royalty order injunction regulates a misappropriator's future conduct, both remedies cannot be awarded for the same conduct. If a royalty order injunction is appropriate because of a person's material and prejudicial change of position prior to having reason to know that a trade secret has been acquired from a misappropriator, damages, moreover, should not be awarded for past conduct that occurred prior to notice that a misappropriated trade secret has been acquired.

456

Exhibit 1 - Page 219

**TRADE SECRETS**                                                      **§ 3**

Monetary relief can be appropriate whether or not injunctive relief is granted under Section 2. If a person charged with misappropriation has ~~acquired~~ materially and prejudicially changed position in reliance upon knowledge of a trade secret acquired in good faith and without reason to know of its misappropriation by another, however, the same considerations that can justify denial of all injunctive relief also can justify denial of all monetary relief. See *Conmar Products Corp. v. Universal Slide Fastener Co.,* 172 F.2d 1950 (CA2, 1949) (no relief against new employer of employee subject to contractual obligation not to disclose former employer's trade secrets where new employer innocently had committed $40,000

to develop the trade secrets prior to notice of misappropriation).

If willful and malicious misappropriation is found to exist, Section 3(b) authorizes the court to award a complainant exemplary damages in addition to the actual recovery under Section 3(a) an amount not exceeding twice that recovery. This provision follows federal patent law in leaving discretionary trebling to the judge even though there may be a jury, *compare* 35 U.S.C. Section 284 (1976).

Whenever more than one person is entitled to trade secret protection with respect to the same information, only that one from whom misappropriation occurred is entitled to a remedy.

### Amendments

1985 amendments to text and/or changes in comments shown by underlines [added material] and strike-outs [deleted material].

### Action in Adopting Jurisdictions

**Variations from Official Text:**

**Alaska.** Section reads:

"(a) In addition to or in lieu of injunctive relief, a complainant may recover damages for the actual loss caused by misappropriation. A complainant also may recover for the unjust enrichment caused by misappropriation that is not taken into account in computing damages for actual loss.

"(b) If willful and malicious misappropriation exists, the court may award exemplary damages in an amount not exceeding twice the damages awarded under (a) of this section."

**Arizona.** In subsec. (a), substitutes "before acquiring" for "prior to acquiring", and substitutes "may include" for "can include".

**California.** Section reads:

"(a) A complainant may recover damages for the actual loss caused by misappropriation. A complainant also may recover for the unjust enrichment caused by misappropriation that is not taken into account in computing damages for actual loss.

"(b) If neither damages nor unjust enrichment caused by misappropriation are provable, the court may order payment of a reasonable royalty for no longer than the period of time the use could have been prohibited.

"(c) If willful and malicious misappropriation exists, the court may award exemplary

damages in an amount not exceeding twice any award made under subdivision (a) or (b)."

**Colorado.** Subsec. (b) [subsec. (2) of the Colorado section] reads: "If the misappropriation is attended by circumstances of fraud, malice, or a willful and wanton disregard of the injured party's right and feelings, the court or the jury may award exemplary damages in an amount not exceeding the award made under subsection (1) of this section [subsec. (a) of Uniform Act section]."

**Connecticut.** Section reads:

"(a) In addition to or in lieu of injunctive relief, a complainant may recover damages for the actual loss caused by misappropriation. A complainant also may recover for the unjust enrichment caused by misappropriation that is not taken into account in computing damages for actual loss.

"(b) In any action brought pursuant to subsection (a) of this section, if the court finds willful and malicious misappropriation, the court may award punitive damages in an amount not exceeding twice any award made under subsection (a) and may award reasonable attorney's fees to the prevailing party."

**Delaware.** Subsec. (a) reads: "In addition to or in lieu of injunctive relief, a complainant may recover damages for the actual loss caused by misappropriation. A complainant

457

Exhibit 1 - Page 220

**TRADE SECRETS** § 4

unauthorized disclosure or use of a trade secret.

"B. If willful and malicious misappropriation exists, the court may award punitive damages in an amount not exceeding twice any award made under subsection A of this section, or $350,000 whichever amount is less."

**Washington.** Subsec. (a) reads: "In addition to or in lieu of injunctive relief, a complainant may recover damages for the actual loss caused by misappropriation. A complainant also may recover for the unjust enrichment caused by misappropriation that is not taken into account in computing damages for actual loss."

**West Virginia.** In subsec. (a), second sentence, omits "that is not taken into account in computing actual loss".

## Library References

**American Digest System**

Damages as relief in suit for injunction, see Injunction ⬩195 to 198.

Exemplary damages, see Damages ⬩87 to 94.

Measure and amount of damages in action for unfair competition, see Trade Regulation ⬩679 to 685.

Measure of damages for injuries to property, see Damages ⬩103 to 116.

Tort or misuse of interference with trade secrets, see Torts ⬩8(5).

**Encyclopedias**

Damages as relief in suit for injunction, see C.J.S. Injunctions § 238.

Damages for misappropriation of trade secrets, see C.J.S. Damages § 82.

Exemplary damages, see C.J.S. Damages §§ 117(1) to 127.

Measure and amount of damages in action for unfair competition, see C.J.S. Trade–Marks, Trade–Names, and Unfair Competition §§ 213 to 216.

Tort or misuse of interference with trade secrets, see C.J.S. Torts § 48.

### WESTLAW Electronic Research

See WESTLAW Electronic Research Guide following the Explanation.

### Notes of Decisions

Punitive damages   1
Review   2

**1. Punitive damages**

That aircraft window supplier knew its actions to be of dubious legality, yet engaged in massive effort to disguise its copying of designer's drawings without entertaining any honest doubt as to legality of its conduct, but took calculated risk and lost, justified award of punitive damages for misappropriation of trade secrets. Boeing Co. v. Sierracin Corp., 1987, 738 P.2d 665, 108 Wash.2d 38.

**2. Review**

Decision to award up to twice amount of actual damages as punitive damages for misappropriation of trade secrets is discretionary with trial court and amount of award will not be reversed unless clearly erroneous. Boeing Co. v. Sierracin Corp., 1987, 738 P.2d 665, 108 Wash.2d 38.

## § 4.   Attorney's Fees.

If (i) a claim of misappropriation is made in bad faith, (ii) a motion to terminate an injunction is made or resisted in bad faith, or (iii) willful and malicious misappropriation exists, the court may award reasonable attorney's fees to the prevailing party.

459

Exhibit 1 - Page 221

§ 4                                                                    TRADE SECRETS

## COMMENT

Section 4 allows a court to award reasonable attorney fees to a prevailing party in specified circumstances as a deterrent to specious claims of misappropriation, to specious efforts by a misappropriator to terminate injunctive relief, and to willful and malicious misappropriation. In the latter situation, the court should take into consideration the extent to which a complainant will recover exemplary damages in determining whether additional attorney's fees should be awarded. Again, patent law is followed in allowing the judge to determine whether attorney's fees should be awarded even if there is a jury, *compare* 35 U.S.C. Section 285 (1976).

### Action in Adopting Jurisdictions

**Variations from Official Text:**

**Alaska.** Omits this section.

**Connecticut.** Omits "or (iii) willful and malicious misappropriation exists,".

**Idaho.** Omits this section.

**Montana.** Inserts "and costs" following "attorney's fees".

**New Mexico.** Section reads:

"A. The court of proper jurisdiction may award reasonable attorneys' fees to the prevailing party if:

"(1) a claim of misappropriation is made in bad faith;

"(2) a motion to terminate an injunction is made or resisted in bad faith; or

"(3) willful and malicious misappropriation exists."

**Oregon.** Item (iii) reads: "wilful or malicious misappropriation is found by the court or jury".

**Virginia.** Section reads: "If the court determines that (i) a claim of misappropriation is made in bad faith, or (ii) willful and malicious misappropriation exists, the court may award reasonable attorneys' fees to the prevailing party."

### Library References

**American Digest System**

Attorneys' fees as costs, see Costs ⚖171 to 173.

Attorneys' fees, costs and expenses of litigation as damages, see Damages ⚖70 to 73.

Costs in tort actions, see Torts ⚖30.

**Encyclopedias**

Attorneys' fees as costs, see C.J.S. Costs §§ 125 to 133.

Attorneys' fees, costs and expenses of litigation as damages, see C.J.S. Damages § 50.

Costs in tort actions, see C.J.S. Torts § 30.

### WESTLAW Electronic Research

See WESTLAW Electronic Research Guide following the Explanation.

### Notes of Decisions

Comparative rates of attorneys   3
Novelty of issues   2
Wilful and malicious misappropriation   1

―――――――

**1. Wilful and malicious misappropriation**

Aircraft window designer was entitled to its attorney fees, both at trial and on appeal, in its action against aircraft window supplier for misappropriation of trade secrets; trial court found that misappropriation of trade secrets was intentional, willful and malicious. Boeing Co. v. Sierracin Corp., 1987, 738 P.2d 665, 108 Wash.2d 38.

**2. Novelty of issues**

Trial court should not have reduced attorney fee award to aircraft window designer based only on ground that issues presented were nov-

460

Exhibit 1 - Page 222

**TRADE SECRETS**                                                    **§ 5**

el.  Boeing Co. v. Sierracin Corp., 1987, 738 P.2d 665, 108 Wash.2d 38.

**3.  Comparative rates of attorneys**

Final award of attorney fees in action for misappropriation of trade secrets, in which antitrust issue was raised both as affirmative defense and as counterclaim, was just and equitable; trial court correctly discounted hourly rate of aircraft window designer's attorneys, who were charging higher rates than aircraft window supplier's.  Boeing Co. v. Sierracin Corp., 1987, 738 P.2d 665, 108 Wash.2d 38.

## § 5.  Preservation of Secrecy.

In an action under this [Act], a court shall preserve the secrecy of an alleged trade secret by reasonable means, which may include granting protective orders in connection with discovery proceedings, holding in-camera hearings, sealing the records of the action, and ordering any person involved in the litigation not to disclose an alleged trade secret without prior court approval.

### COMMENT

If reasonable assurances of maintenance of secrecy could not be given, meritorious trade secret litigation would be chilled.  In fashioning safeguards of confidentiality, a court must ensure that a respondent is provided sufficient information to present a defense and a trier of fact sufficient information to resolve the merits.  In addition to the illustrative techniques specified in the statute, courts have protected secrecy in these cases by restricting disclosures to a party's counsel and his or her assistants and by appointing a disinterested expert as a special master to hear secret information and report conclusions to the court.

### Action in Adopting Jurisdictions

**Variations from Official Text:**

Oklahoma.  Inserts "pursuant to the provisions of Section 3203 of Title 12 of the Oklahoma Statutes" following "discovery proceedings".

### Library References

**American Digest System**

Access to court records, see Records ⇐32.

Matters privileged from discovery, see Pretrial Procedure ⇐33, 183, 285, 286, 356.

Objections and protective orders in general, see Pretrial Procedure ⇐41.

Protective orders before taking discovery depositions, see Pretrial Procedure ⇐131.

Protective orders with respect to production of documents and things, see Pretrial Procedure ⇐413 to 415.

Publicity of proceedings, see Trial ⇐20.

**Encyclopedias**

Access to court records, see C.J.S. Records § 36.

Objections to examinations, see C.J.S. Discovery § 36.

Publicity of proceedings, see C.J.S. Trial §§ 38, 39.

Trade secrets as matter privileged from discovery, see C.J.S. Discovery §§ 5, 32, 51, 52, 79.

### WESTLAW Electronic Research

See WESTLAW Electronic Research Guide following the Explanation.

461

Exhibit 1 - Page 223

§ 5                                              **TRADE SECRETS**

### Notes of Decisions

**1. Sealing record**
Trial court was justified in sealing record as to action for misappropriation of trade secrets.

Boeing Co. v. Sierracin Corp., 1987, 738 P.2d 665, 108 Wash.2d 38.

## § 6. Statute of Limitations.

An action for misappropriation must be brought within 3 years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered. For the purposes of this section, a continuing misappropriation constitutes a single claim.

### COMMENT

There presently is a conflict of authority as to whether trade secret misappropriation is a continuing wrong. *Compare Monolith Portland Midwest Co. v. Kaiser Aluminum & Chemical Corp.,* 407 F.2d 288 (CA9, 1969) (~~no~~ not a continuing wrong under California law—limitation period upon all recovery begins upon initial misappropriation) with *Underwater Storage, Inc. v. U.S. Rubber Co.,* 371 F.2d 950 (CADC, 1966), cert. den., 386 U.S. 911 (1967) (continuing wrong under general principles—limitation period with respect to a specific act of misappropriation begins at the time that the act of misappropriation occurs).

This Act rejects a continuing wrong approach to the statute of limitations but delays the commencement of the limitation period until an aggrieved person discovers or reasonably should have discovered the existence of misappropriation. If objectively reasonable notice of misappropriation exists, three years is sufficient time to vindicate one's legal rights.

### Amendments

1985 amendments to text and/or changes in comments shown by underlines [added material] and strike-outs [deleted material].

### Action in Adopting Jurisdictions

**Variations from Official Text:**

**Connecticut.** First sentence reads: "No action for misappropriation shall be brought but within three years from the date the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered."

**Illinois.** Substitutes "5 years" for "3 years", and substitutes "this Act" for "this section".

**Maine.** Substitutes "4 years" for "3 years".

**Utah.** Substitutes "shall be brought" for "must be brought".

### Library References

**American Digest System**

Limitation of actions for torts in general, see Limitation of Actions ⬤�mark30.

**Encyclopedias**

Limitation of actions for misappropriation of trade secrets, see C.J.S. Limitations of Actions § 70.

462

Exhibit 1 - Page 224

TRADE SECRETS                                              § 7

## § 7.  Effect on Other Law.

(a) ~~This~~ Except as provided in subsection (b), this [Act] displaces conflicting tort, restitutionary, and other law of this State ~~pertaining to~~ providing civil ~~liability~~ remedies for misappropriation of a trade secret.

(b) This [Act] does not affect:

(1) contractual ~~or other civil liability or relief that is~~ remedies, whether or not based upon misappropriation of a trade secret; ~~or~~

(2) ~~criminal liability for~~ other civil remedies that are not based upon misappropriation of a trade secret. ; or

(3) criminal remedies, whether or not based upon misappropriation of a trade secret.

### COMMENT

This Act ~~is not a comprehensive remedy~~ does not deal with criminal remedies for trade secret misappropriation and is not a comprehensive statement of civil remedies.  It applies to ~~duties imposed by law in order~~ a duty to protect competitively significant secret information that is imposed by law.  It does not apply to ~~duties~~ a duty voluntarily assumed through an express or an implied-in-fact contract.

The enforceability of covenants not to disclose trade secrets and covenants not to compete that are intended to protect trade secrets, for example, ~~are~~ is governed by other law.  The Act also does not apply to ~~duties~~ a duty imposed by law that ~~are~~ is not dependent upon the existence of competitively significant secret information, like an agent's duty of loyalty to his or her principal.

### Amendments

1985 amendments to text and/or changes in comments shown by underlines [added material] and strike-outs [deleted material].

### Action in Adopting Jurisdictions

Variations from Official Text:

Alaska.  Section reads:

"(a) AS 45.50.910–45.50.945 displace conflicting tort, restitutionary, and other state laws pertaining to civil liability for misappropriation of a trade secret.

"(b) AS 45.50.910–45.50.945 do not affect

"(1) contractual or other civil liability or relief that is not based upon misappropriation of a trade secret; or

"(2) criminal liability for misappropriation of a trade secret.

"(c) AS 45.50.910–45.50.945 do not apply to investigations or actions by the attorney general under AS 45.50.471–45.50.561 (unfair trade practices and consumer protection) or under AS 45.50.562–45.50.596 (restraint of trade)."

California.  Subsec. (a) reads: "Except as otherwise expressly provided, this title does not supersede any statute relating to misappropriation of a trade secret, or any statute otherwise regulating trade secrets."

Adds a subsec. (c) which reads: "This title does not affect the disclosure of a record by a state or local agency under the California Public Records Act (Chapter 3.5 (commencing with Section 6250) of Division 7 of Title 1 of the Government Code).  Any determination as to whether the disclosure of a record under the California Public Records Act constitutes a misappropriation of a trade secret and the rights and remedies with respect thereto shall be made pursuant to the law in effect before the operative date of this title."

Connecticut.  Section reads:

"(a) Unless otherwise agreed by the parties, the provisions of this chapter supersede any conflicting tort, restitutionary, or other law of this state pertaining to civil liability for misappropriation of a trade secret.

Exhibit 1 - Page 225

**TRADE SECRETS**                                                    **§ 8**

In subsec. (b), adds a paragraph which reads: "Any defense, immunity or limitation of liability afforded public bodies, their officers, employes or agents under ORS 30.260 to 30.300."

Adds a subsection which reads: "Notwithstanding any other provision in this 1987 Act, public bodies and their officers, employes and agents are immune from any claim or action for misappropriation of a trade secret that is based on the disclosure or release of information in obedience to or in good faith reliance on any order of disclosure issued pursuant to ORS 192.410 to 192.490 or on the advice of an attorney authorized to advise the public body, its officers, employes or agents."

**Virginia.** In subsec. (a), substitutes "Commonwealth" for "State".

**Washington.** Section reads:

"(1) This chapter displaces conflicting tort, restitutionary, and other law of this state pertaining to civil liability for misappropriation of a trade secret.

"(2) This chapter does not affect:

"(a) Contractual or other civil liability or relief that is not based upon misappropriation of a trade secret; or

"(b) Criminal liability for misappropriation of a trade secret."

### Library References

**American Digest System**

Contracts precluding disclosure of trade secrets, see Contracts ⟐118.

Nature of property which may be subject to larceny, see Larceny ⟐5.

Tort or misuse or interference with trade secrets, see Torts ⟐8(5).

**Encyclopedias**

Contracts precluding disclosure of trade secrets, see C.J.S. Contracts §§ 252, 254.

Tort or misuse or interference with trade secrets, see C.J.S. Torts § 48.

Trade secrets as subject of larceny, see C.J.S. Larceny § 3(7).

### WESTLAW Electronic Research

See WESTLAW Electronic Research Guide following the Explanation.

### Notes of Decisions

Generally  1
Sufficiency of evidence  2

**1.  Generally**

Uniform Trade Secrets Act merely displaces conflicting tort, restitutionary and other law regarding civil liability for misappropriation, and does not displace claims for breach of contractual and confidential relationship. Boeing Co. v. Sierracin Corp., 1987, 738 P.2d 665, 108 Wash.2d 38.

**2.  Sufficiency of evidence**

Jury's verdict of breach of fiduciary duty was supported by evidence of employee's possible use of employer's confidential files, employee's retention of employer's documents over weekend, and employee's discussion with employer's customers before leaving job and inference that employee solicited employer's business. Bellboy Seafood Corp. v. Nathanson, Minn.App.1987, 410 N.W.2d 349.

## § 8.  Uniformity of Application and Construction.

This [Act] shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this [Act] among states enacting it.

465

Exhibit 1 - Page 226

§ 8                                                                  **TRADE SECRETS**

Library References

**American Digest System**

> Construction of statute with reference to other laws, see Statutes ⇌222.
>
> Effect of partial invalidity of statute, see Statutes ⇌64(1).

**Encyclopedias**

> Construction of statute with reference to other laws, see C.J.S. Statutes §§ 362, 363.
>
> Declaration as to effect of partial invalidity of statute, see C.J.S. Statutes § 94.

## § 9. Short Title.

This [Act] may be cited as the Uniform Trade Secrets Act.

## § 10. Severability.

If any provision of this [Act] or its application to any person or circumstances is held invalid, the invalidity does not affect other provisions or applications of the [Act] which can be given effect without the invalid provision or application, and to this end the provisions of this [Act] are severable.

Library References

**American Digest System**

> Effect of partial invalidity of statute, see Statutes ⇌64(1).

**Encyclopedias**

> Declaration as to effect of partial invalidity of statute, see C.J.S. Statutes § 94.

## § 11. Time of Taking Effect.

This [Act] takes effect on _____, and does not apply to misappropriation occurring prior to the effective date. With respect to a continuing misappropriation that began prior to the effective date, the [Act] also does not apply to the continuing misappropriation that occurs after the effective date.

COMMENT

The Act applies exclusively to misappropriation that begins after its effective date. Neither misappropriation that began and ended before the effective date nor misappropriation that began before the effective date and continued thereafter is subject to the Act.

Amendments

1985 amendments to text and/or changes in comments shown by underlines [added material] and strike-outs [deleted material].

466

Exhibit 1 - Page 227

**TRADE SECRETS**                                              **§ 12**

Action in Adopting Jurisdictions

**Variations from Official Text:**

**Arizona.** Substance of section is set forth in L.1990, c. 37, § 3, as follows:

**Effect of misappropriations before the effective date of act.**

This act does not apply to misappropriation occurring before the effective date of this act. With respect to a continuing misappropriation that began before the effective date of this act, this act also does not apply to the continuing misappropriation that occurs after the effective date of this act.

**California.** Section reads: "This title does not apply to misappropriation occurring prior to January 1, 1985. If a continuing misappropriation otherwise covered by this title began before January 1, 1985, this title does not apply to the part of the misappropriation occurring before that date. This title does apply to the part of the misappropriation occurring on or after that date unless the appropriation was not a misappropriation under the law in effect before the operative date of this title."

**Connecticut.** Omits this section.

**Delaware.** Omits this section.

**District of Columbia.** Section reads: "This chapter does not apply to misappropriation occurring prior to March 16, 1989. With respect to a continuing misappropriation that began prior to March 16, 1989, the chapter does not apply to the continuing misappropriation that occurs after March 16, 1989."

**Idaho.** Omits this section.

**Illinois.** Section reads: "This Act takes effect on January 1, 1988, and does not apply to misappropriation occurring prior to its effective date."

**Indiana.** Section reads: "If a continuing misappropriation otherwise covered by this chapter began before September 1, 1982, the chapter does not apply to the part of the misappropriation that [occurred] before that date. It does apply to the part that occurs after August 31, 1982, unless the appropriation was not a misappropriation under the law displaced by this chapter."

**Louisiana.** Omits this section.

**Maine.** Omits this section.

**Minnesota.** Omits this section.

**Montana.** Omits this section.

**New Hampshire.** Substance of section is set forth in a note preceding RSA 350–B:1, as follows: "**Application.** 1989, 220:3, eff. Jan. 1, 1990, provided that section 1 of the act, which added this chapter, shall apply to misappropriations of trade secrets occurring on or after Jan. 1, 1990 and shall not apply to misappropriations or continuing misappropriations of trade secrets occurring or beginning prior to Jan. 1, 1990."

**New Mexico.** Omits this section.

**North Dakota.** Omits this section.

**Oklahoma.** Section reads:

"The Uniform Trade Secrets Act shall not be construed to apply:

"1. to a misappropriation occurring prior to the effective date of this act; or

"2. with respect to a continuing misappropriation that began prior to the effective date of this act, to the continuing misappropriation that occurs after the effective date of this act."

**Rhode Island.** Designates the effective date as "July 1, 1986".

**Utah.** Designates the effective date as "May 1, 1989".

**Virginia.** Designates the effective date as "July 1, 1986", and substitutes "to misappropriation" for "to the continuing misappropriation".

**Washington.** Section reads: "This chapter takes effect on January 1, 1982, and does not apply to misappropriation occurring prior to the effective date."

## § 12.  Repeal.

The following Acts and parts of Acts are repealed:

(1)

(2)

(3)

*

467

Exhibit 1 - Page 228

# Policies and Additional Services

**Judicial Notice** – Our authenticated format is designed to be submited along with a Request for Judicial Notice in any judicial proceeding without further authentication. However, there is no federal, state or local rule squarely addressing the requirements for submission of compiled legislative history reports. Recognizing that particular courts, in particular situations may require additional authentication, we can provide custom declarations upon request. Please call with details of your needs.

**Additional Copies** - If your circumstances require additional copies of this report with original signed declarations, duplicate originals are available without additional research fee. In addition, an unbound copy may be ordered for your ease in making photocopies.

**Questions?** - Call and speak with an attorney with many years experience both in practicing law, and in legislative research. Jan Raymond can help you make decisions on whether you need additional research, and what would be most useful to research. He will give you a frank assessment of whether your problem is likely to be solved by further legislative history. He will tell you what kind of documents you can expect to find if you do authorize a search, and assess the likelihood the available documents will be useful.

**Consulting** - Jan Raymond is also available for more in depth consultations on how to use the materials in your practice. A retainer may be required in matters that will require significant increments of time.

**MCLE - Learning More About Legislative Intent** - The need to document legislative history and search out legislative intent arises infrequently in most legal practices, but can be of utmost importance when the need does arise. Many attorneys do not need legislative history research often enough to remain familiar with the legislative process, the significance of different legislative documents, and the options for effective use of the documents. Jan Raymond is available to meet with your group, at no cost to you, to provide an MCLE credit approved overview on legislative intent topics.

**On Line Information Resources** - In addition to our MCLE presentations, basic reference information can be found on line at LEGISLATIVE HISTORY CLEARINGHOUSE - www.lhclearinghouse.com. The information includes definitions of commonly used legislative terms, an overview of the legislative process, and other information regarding legislative history of interest to the legal community.

Exhibit 1 - Page 229

LIBRARY
ORRICK, HERRINGTON & SUTCLIFFE LLP
MENLO PARK, CALIFORNIA

# Authorities

## Using Legislative History Documents

### *In A California Court*

California Code of Civil Procedure 1859 (in pertinent part): "In the construction of a statute the intention of the legislature ... is to be pursued, if possible . . ."

Evidence Code Section 452: "Judicial Notice may be taken of the following matters... (c) Official acts of the legislative, executive or judicial departments of the United States and of any state of the United States."

Evidence Code Section 453: "The trial Court shall take judicial notice of any matter specified in Section 452 if a party requests it and: (a) Gives each adverse party sufficient notice of the request, through the pleadings or otherwise, to enable such adverse party to prepare to meet the request; and, (b) Furnishes the court with sufficient information to enable it to take judicial notice of the matter."

Evidence Code Section 454: "(a) In determining the propriety of taking judicial notice of a matter, or the tenor thereof: (1) Any source of pertinent information, including the advice of persons learned in the subject matter, may be consulted or used... (b) Exclusionary rules of evidence do not apply except Section 352 and the rules of privilege."

Two prominent California Supreme Court cases addressing legislative intent are California Teachers Association v. San Diego Community College District, (1981) 28 Cal. 3d 692, and Commodore Home Systems, Inc. v. Superior Court (1982) 32 Cal. 3d 211. For a topical review of California authorities, see CAL JUR 3d, Volume 58, annotation regarding "Statutes" discussion regarding extrinsic aides commencing with Section 160.

### *General Discussion – All Jurisdictions*

General discussion of the importance and use of legislative intent in State and Federal Courts, see: 73 Am Jur 2d, Statutes, beginning at Section 145, Sutherland on Statutory Construction and 70 ALR 5.

### *Additional Resources*

There are hundreds of published decisions in which courts have relied upon and discussed particular legislative history documents. Please call Jan Raymond, (888) 676 1947, if you would like cases relying on specific types of documents, or to discuss ideas for approaching your particular situation. Or log on to http://www.lhclearinghouse.com/using.htm.

Exhibit 1 - Page 230