MELINDA HAAG (State Bar No. 132612)
mhaag@orrick.com
ANNETTE L. HURST (State Bar No. 148738)
ahurst@orrick.com
WARRINGTON S. PARKER III (State Bar No. 148003)
wparker@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building, 405 Howard Street
San Francisco, CA 94105
Tel. (415) 773-5700/ Fax: (415) 773-5759

WILLIAM A. MOLINSKI (State Bar No. 145186)
wmolinski@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
777 South Figueroa Street, Suite 3200
Los Angeles, CA 90017
Tel. (213) 629-2020/Fax: (213) 612-2499

THOMAS S. McCONVILLE (State Bar No. 155905)
tmcconville@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
4 Park Plaza, Suite 1600
Irvine, CA 92614-2258
Tel: (949) 567-6700/Fax: (949) 567-6710

Attorneys for MGA Parties and IGWT 826 Investments
LLC

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an individual,<br><br>Plaintiff,<br><br>v.<br><br>MATTEL, INC., a Delaware corporation,<br><br>Defendant.<br><br>AND CONSOLIDATED ACTIONS | Case No. CV 04-9049 DOC (RNBx)<br><br>Consolidated with:<br>Case Nos. CV 04-9059 & CV 05-2727<br><br>Hon. David O. Carter<br><br>**MGA PARTIES' SUPPLEMENTAL BRIEF CONCERNING REQUEST FOR PRODUCTION NOS. 12, 13, 26, 27, 40 AND 41 OF MATTEL'S SIXTH SET OF REQUESTS FOR PRODUCTION**<br><br>Date: TBD<br>Time: TBD<br>Dept: Courtroom 9D |

**TABLE OF CONTENTS**

| | | | Page |
|---|---|---|---|
| I. | INTRODUCTION | | 1 |
| II. | BACKGROUND | | 2 |
| | A. | Nick Contreras | 2 |
| | B. | Jorge Castilla | 3 |
| | C. | Dan Cooney | 5 |
| III. | ARGUMENT | | 7 |
| IV. | CONCLUSION | | 10 |

## I. INTRODUCTION

In its June 7, 2010 Order (the "June 7 Order"), the Court granted Mattel's motion to compel requests that sought any document provided or shown to MGA by Nick Contreras, Dan Cooney and Jorge Castilla that was "prepared, authored or created by Mattel." Neither Castilla nor Contreras brought any Mattel documents to MGA, and MGA's search confirmed this. Cooney placed two blank Mattel templates for spreadsheets on the MGA computer system, and all copies of these spreadsheets have been or will be produced by MGA pursuant to this Court's Order.

In the June 7 Order the Court ordered the parties to submit supplemental briefing on broader requests that sought any document created or accessed by Contreras, Cooney or Castilla "referring or relating to" any Mattel product, plan or business information or any Mattel line list. The requests are not limited to non-public Mattel Information and are not limited by time period. As the Court noted, these requests would require the production of almost every document touched by these three individuals at MGA. Mattel wants these documents so it can go fishing to see if there is something, anything that these three individuals created that might be reminiscent to something done at Mattel. This way, Mattel can argue that even if it cannot show these individuals brought a single document to MGA, a jury could speculate that they may have used some information from Mattel because of some claimed similarity in how things were done at Mattel and MGA. This is discovery in search of a claim.

When there is no evidence that departing employees brought any confidential Mattel information to MGA, and where MGA's diligent search uncovers no Mattel information at MGA, the recourse is not to let Mattel go ever so much deeper into MGA's systems to see if a claim can be found. The result is that Mattel should be told that it should not have brought claims based on speculation alone. The result should be that Mattel is denied unfettered access into a competitor's business

simply because a departing employee had information in his head about Mattel. Requests Nos. 12, 13, 26, 27, 40 and 41 are overbroad and Mattel's Motion on these requests should be denied.

Moreover, pursuant to the June 7 Order, MGA met and conferred with Mattel on other similarly broad requests asking, for example, for every communication between Cooney and Toys R Us. Mattel sought these communications to see if Cooney used any Mattel information from him having worked on a Toys R Us account at Mattel. To resolve this issue, MGA offered to produce every email communication sent or received by Cooney, Contreras, Castilla and others for the six-month period following their hiring at MGA. Mattel rejected this offer. Mattel's requests for unlimited discovery must be denied.

## II. BACKGROUND

### A. Nick Contreras[1]

Nick Contreras was a Mattel employee from August 1994 through November 12, 2004. During that time, Contreras worked out of Mattel's offices in El Segundo. He held several positions during his tenure but worked primarily in space planning and customer marketing.

After another Mattel employee, Ron Brawer announced he was leaving Mattel, Contreras expressed interest in joining MGA as well. Contreras then sent his resume to MGA's Human Resources department, and subsequently interviewed with MGA. MGA hired Contreras as Vice President Customer Marketing on October 28, 2004. The next day Contreras notified Mattel that he was resigning effective November 12, 2004. Contreras's first day as an MGA employee was Monday December 6, 2004, and he did not perform any work for MGA prior to then. Before beginning work at MGA, Contreras affirmed in writing that he had not and would not take any confidential information from Mattel.

---

[1] Except where noted, these facts are taken from MGA's Statement of Undisputed Facts, Dkt. # 7899 and 7900, at pp. 83-84, 126-127, and 532-33 and in the Exhibits filed in support thereof (Dkt. # 7924, 7927, 7928, 7930, 7933 and 7937).

1  Mattel's claim with respect to Contreras is that he *attempted* to procure
2  confidential information from Mattel after leaving Mattel. Mattel has not alleged
3  that Contreras removed any documents from Mattel when he resigned. And if there
4  was any evidence to suggest Mr. Contreras took anything with him, Mattel would
5  have known about it since they conducted a detailed investigation into his
6  departure, inspecting his computer for traces of downloading, reviewing emails and
7  likely having him followed from the premises. Supposedly Contreras had lunch
8  with a former co-worker and asked for copies of certain documents (he denies it),
9  but even she agrees *that she never gave him the documents*. Kim Depo. 5714:13-
10 5714:15. Mattel also asserts that he copied various documents during the week he
11 left, but Mattel concedes it has no evidence that he took these documents, no
12 evidence he brought them to MGA, and no evidence that MGA used any of these
13 documents. Storie Depo. 2666:15-2667:8; 3553:13-3354:8 (Mattel not aware of
14 Contreras actually taking any documents with him when he left, and Mattel not
15 aware of Kim providing any documents to Contreras.)
16 Mattel's 30(b)(6) witness admitted that Mattel cannot identify any documents
17 actually taken by Contreras and conceded that Mattel is unaware of any evidence to
18 suggest MGA ever obtained any Mattel information from Contreras let alone that
19 MGA ever used any such information. *Id.*
20     **B.**    **Jorge Castilla**
21 Before being hired by MGA, Jorge Castilla was a Mattel employee from
22 November 1999 through March 24, 2006. Castilla had separate stints in Mattel's
23 offices in Europe and El Segundo. He primarily worked on Mattel's sales
24 forecasting and inventory management systems.
25 In late February 2006, Castilla submitted his resume online for an open
26 position at MGA. He had had no prior contact with MGA. MGA interviewed
27 Castilla, and on March 13, 2006 he accepted an offer of employment with MGA.
28 That same day, Castilla notified his Mattel supervisor that he would be resigning

from Mattel, effective March 26, 2006 and he was asked to leave the premises by day's end. Castilla's last day as a Mattel employee was Friday, March 24, 2006. His first day as an MGA employee was Monday, April 3, 2006. Castilla did not perform any work for MGA prior to April 3, 2006.

During the interview and hiring process, Castilla was instructed several times by MGA that he should not bring any documents or information from Mattel. MGA required Castilla to confirm in writing that he had not taken any information from Mattel. Although Castilla confirmed to MGA he had not taken any Mattel documents *at all*, apparently (unbeknownst to MGA) that was not accurate. Instead, he retained a number of documents that he had apparently placed on a portable storage device. In a statement to the FBI, Castilla said he took documents from Mattel for his own personal reasons in order to be able to remember the projects and reports he worked on at Mattel. (Bates # C00462-464) (L. Kiecklefer Decl. Ex. 73).

Mattel knew about Castilla taking a copy of the documents before he left Mattel. Mattel brought in a forensic specialist, and had a report the day Castilla resigned detailing the copying of every file it later claimed he stole. App. Ex. 7981. But in its exit interview with Castilla, Mattel made no mention of this information nor did it otherwise confront Castilla directly with the facts. *Id*. Mattel did not contact MGA and give it any specifics or ask it to investigate or refrain from using the information taken by Castilla. App. Ex. 1920. Instead, Mattel went to the FBI. And, on March 22, 2006—more than a week after he resigned **and more than a week before he began work at MGA**—two FBI agents visited Castilla at his home. At the FBI's request, Castilla surrendered a personal data storage device containing documents that he had copied from his Mattel computer.

After Castilla surrendered his device to the FBI (which was before he started work at MGA), he no longer had in his possession any documents that contained confidential Mattel information. Mattel concedes it has no evidence of any other

- 4 -

documents being removed beyond the documents on the storage device taken by the FBI. Mattel has no evidence that MGA used or disclosed any Mattel trade secret supposedly sourced from Castilla. Castilla has testified that he did not provide any Mattel documents to MGA before or after beginning work there. Castilla Depo. 80:22-25.

Mattel's sole contention with respect to Castilla is that, even if he brought no documents to MGA, he had information *in his head* about Mattel's business that he could have used at MGA or, Mattel speculates, maybe he had other documents he did not surrender to the FBI. But Mattel concedes it has no evidence of Castilla taking any documents from Mattel beyond those surrendered to the FBI. Mattel also concedes that it has no evidence of Castilla actually using any confidential Mattel information while at MGA. Storie Depo. 2669:1-16; 2671:10-2672:2 (Mattel not aware of how Castilla could have brought any documents to MGA when documents were surrendered to FBI, and not aware of Castilla copying or taking any other documents.) Indeed, while Mattel claims Castilla still may have used information in his head, Mattel could not even identify what trade secrets it believes were in Castilla's head. *Id.* at 2589.

### C. Dan Cooney

Prior to joining MGA, Daniel J. Cooney was a Mattel employee from January 2004 through May 12, 2006. During most of that time, Cooney worked out of his home office in Mt. Laurel, New Jersey. He was a member of the Toys-R-Us sales team at Mattel.

In early 2006, Cooney interviewed for a position at Fisher Price—a different division of Mattel. Cooney was passed over. He subsequently spoke with Ron Brawer, who had been a friend of his from Mattel, who suggested Cooney apply at MGA. MGA interviewed and then hired Cooney on April 27, 2006. The next morning, on April 28, 2006, Cooney notified his Mattel supervisor, Eugene Murtha, that he resigned from Mattel effective May 12, 2006. Cooney's last day as a Mattel

employee was Friday, May 12, 2006. His first day as an MGA employee was Monday, May 15, 2006. Cooney did not perform any work for MGA prior to May 15, 2006. Before coming to work at MGA, Cooney signed a letter agreement confirming that he had not, and would not bring any documents or information to MGA from Mattel.

During his last week of employment, Cooney apparently copied a handful of documents to a folder called "Dan's Files" on his Mattel laptop computer. These documents included Cooney's resume, pictures of his family, his contact list and three templates related to Toys-R-Us *that he had stripped of any identifying Mattel data before copying*. Mattel has no evidence that MGA or Larian had anything to do with this copying. After copying these documents to his "Dan's Files" folder, Cooney then copied the contents of that folder to a disc that he retained when he left Mattel. Mattel claims that the three blank templates are its trade secrets. Cooney testified to having placed two of these templates on his computer at MGA, *after* stripping them of Mattel data. MGA located and produced or, pursuant to the Court's Order, will soon be producing all versions of one of these spreadsheets to Mattel.[2]

Mattel has also identified seventeen documents that Cooney "accessed" the week before and a couple days after he resigned from Mattel. Cooney's supervisor repeatedly testified that there was "nothing unusual" about Cooney accessing any of these documents and he would be expected to do so to update his work and to ensure a smooth transition for his successor after he left Mattel. There is no evidence that any of these documents were ever copied by Cooney or taken with him when he left Mattel, and Mattel concedes it is aware of no such evidence.

---

[2] It is unclear whether the second template is even a Mattel template. Mr. Cooney testified at his deposition that he created a spreadsheet based on a document he received from Toys R Us (not Mattel). In any event, MGA will produce the template from Mr. Cooney's MGA laptop.

### III. ARGUMENT

It is undisputed that neither Mr. Contreras nor Mr. Castilla took a single Mattel document to MGA. While Mr. Castilla removed documents from Mattel, those documents were seized by the FBI before he started at MGA. It was physically impossible, therefore, for him to have brought those documents to MGA. Mr. Contreras never even tried to remove documents from Mattel. According to Mattel, he tried to get a Mattel employee to provide him with documents, but by her own admission she did not do so. Mr. Contreras denies that he even asked her to do so. Mr. Cooney took a blank template to MGA, and that template has been produced.

As a result, what Mattel wants to do is to see every document these individuals created, accessed or were provided to see if Mattel can make the case that these individuals used some knowledge in their head from how Mattel did things to somehow improve MGA's business. Specifically, Mattel asks for every document that was created or accessed by Contreras, Cooney or Castilla that "refer or relate" to any Mattel product, plan, business information or line lists.[3] This type of fishing expedition is exactly what the law on trade secrets in California is designed to prevent.

Speculation that a departing employee may have misappropriated and used trade secrets at a new employer, whether it be information in an employee's head or in documents, will not support a claim for misappropriation. *Flir System, Inc. v. Parrish,* 174 Cal. App. 4th 1270, 1279 (2009). Indeed, in *Flir* the court found that,

---

[3] MGA does not object to the production of non-public product line lists of Mattel's that any of these individuals may have had; and in fact, any such lists would already have been produced since these documents were "authored or created" by Mattel [Mattel's Requests Nos. 11, 14, 25, 28, 39 and 42]. MGA, in fact, has recently requested any line lists or lists of MGA that were in Mattel's possession since numerous witnesses and documents show that Mattel had routinely obtained non-public MGA price and product lists. What is objectionable about these requests, however, is that the use of "refer or relate" greatly broadens the request to numerous irrelevant documents where one of these employees merely mentions a Mattel product line.

even with proof that the departed employee had transferred volumes of data to a home computer before resigning, it was bad faith to have brought the suit when there was no evidence that the information on the hard drive had been improperly accessed or used at the new employer. California courts, in fact, have firmly rejected the inevitable disclosure doctrine, which would have allowed a court or jury to speculate that a plaintiff's trade secrets would inevitably be used merely because of an employee's access and knowledge of those secrets. *Computer Sciences Corp. v. Computer Assoc. Int'l. Inc.*, 1999 WL 075466 (C.D. Cal. 1999).

One of the reasons that the Cal. Code of Civ. Proc. 2019.210 was enacted, which requires a plaintiff to identify the trade secrets that were allegedly misappropriated before obtaining *any* discovery, is to encourage pre-filing investigation and discourage frivolous trade secret claims. *Brescia v. Angelin*, 172 Cal. App. 4th 133, 144 (2009). (Section 2019.210 "promotes well and investigated claims and dissuades the filing of meritless trade secret complaints"). Here, Mattel knew before filing its claim involving Castilla that its purported trade secret documents were seized by the FBI before he could possibly have used or disclosed them at MGA. But Mattel nonetheless filed its claim anyway involving Castilla in hopes that maybe discovery might yield some other document or information that may have made its way to MGA. Likewise, Mattel knew that Contreras did not get the Mattel documents that Mattel asserts he tried to get. This did not stop Mattel, however, from proceeding on its claim involving Contreras, again in hopes that it might find a claim to support.

This is backwards and what CCP § 2019.210 and the courts' rejection of the inevitable disclosure doctrine sought to prevent. Even if one assumes that Castilla planned to bring documents to MGA and that Contreras sought to do the same, at best you have two failed attempts of misappropriation where all evidence shows these men never succeeded in bringing anything of Mattel's to MGA. Mattel does not now get to say that Castilla still left with information in his head and that Mattel

- 8 -

MGA PARTIES' SUPPLEMENTAL BRIEF RE RFP NOS. 12, 13, 26, 27, 40 & 41 OF MATTEL'S SIXTH SET OF REQUESTS FOR PRODUCTION

wants to see if he may have used any of that knowledge by rummaging through a competitor's own confidential business systems. Mattel also does not get to say that even though it cannot show Contreras ever took anything from Mattel, it wants to see everything he did at MGA just to make sure. If this type of open-ended, speculative discovery were permitted, it would encourage the type of strategic lawsuits by one competitor against another that the law is intended to prevent. *See Flir*, 194 Cal. App. 4th at 1279 (where there was no evidence that content of a hard drive taken by a former employee was ever brought to new employer, it was bad faith for plaintiff to proceed with claim).

As the Court correctly observed, Mattel's Requests Nos. 12, 13, 26, 27, 40 and 41, depending on how one interprets "relating to Mattel," could encompass every document Contreras, Cooney and Castilla touched at MGA. Even if one takes a more narrow view, and interprets "relating to" as including only documents that specifically refer to Mattel, it could require significant numbers of irrelevant documents where Contreras, Cooney or Castilla, for example, accessed a report that compares publicly available data of Mattel's sales to MGA's sales. It would also require every email where Contreras, Cooney or Castilla mention Mattel. If Contreras mentions in an email "Barbie", the email would be responsive to these requests. If someone mentions Barbie or Mattel to Contreras, it would be responsive. If Castilla is copied on a news article about Mattel's Barbie sales, it would be responsive. It also presents significant problems as to how one might search for all documents that "relate to" any Mattel product or plan.

MGA has performed a diligent search for any documents that Castilla, Contreras or Cooney brought to MGA from Mattel. Document review teams tasked with reviewing documents extracted from the files of Contreras, Castilla and Cooney searched for any and all documents that reference or contain any non-public Mattel information. Since the issuance of the June 7 order, MGA

lawyers have reviewed the hard copy files of Mr. Castilla located at MGA to ensure that no Mattel documents were in his files. No such documents were located.

The Court in its June 7 Order required MGA and Mattel to meet and confer on other requests that overlay with Requests 12, 13, 26, 27 40 and 41. The requests MGA met over asked, for example, for (1) every communication between Cooney and Toys R Us prior to May 31, 2007; and (2) every communication by Castilla regarding sales planning or inventory management prior to March 31, 2007. To resolve this issue, MGA offered to produce to Mattel every email sent or received by Castilla, Cooney, Contreras and the other five employees accused of taking Mattel trade secrets for a six month period following their hiring by MGA. Mattel refused this offer. Instead, Mattel insists on unlimited discovery into everything these individuals ever did, sent or touched at MGA.

In response to Requests Nos. 11, 14, 25, 28, 37 and 42, MGA has made a diligent and good faith effort to provide every document at MGA that any of these three may have brought from Mattel. To now require MGA to provide every document these three individuals touched that relates or refers to Mattel products is neither warranted nor justified. Requests Nos. 12, 13, 26, 27, 40 and 41 are overbroad and not narrowly tailored to seek only relevant documents.

## IV. CONCLUSION

For the foregoing reasons, the Court should deny Mattel's Motion to Compel Requests Nos. 12, 13, 26, 27, 40 and 41.

Dated: June 14, 2010

ANNETTE L. HURST
Orrick, Herrington & Sutcliffe LLP

By: /s/ Annette L. Hurst
ANNETTE L. HURST
Attorneys for MGA Parties and IGWT 826 Investments LLC