1           **UNITED STATES DISTRICT COURT**

2           **CENTRAL DISTRICT OF CALIFORNIA**

3        **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4                    - - - - - - -

5


6   CARTER BRYANT,                    )
                                      )
7           Plaintiff,                )
                                      )
8        vs.                          ) No. SACV 04-9049-DOC
                                      )
9   MATTEL, INC.,                     )
                                      )          Volume I
10          Defendant.                )
    _____)

11

12

13

14          REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                  Motions Hearing

16              Santa Ana, California

17             Friday, May 28, 2010

18

19

20

21   Jane C.S. Rule, CSR 9316
22   Federal Official Court Reporter
     United States District Court
23   411 West 4th Street, Room 1-053
     Santa Ana, California 92701
24   (714) 558-7755

25   10-05-28 MattelV1

1    **APPEARANCES OF COUNSEL:**

2

3    FOR INTERVENOR DEFENDANT MGA ENTERTAINMENT, INC.:

4              ORRICK, HERRINGTON & SUTCLIFFE, LLP
               BY:  THOMAS S. MC CONVILLE
5                  Attorney at Law
               4 Park Plaza
6              Suite 1600
               Irvine, California 92614
7              (949) 567-6700

8              - AND -

9              ORRICK, HERRINGTON & SUTCLIFFE, LLP
               BY:  ANNETTE L. HURST
10                 Attorney at Law
               405 Howard Street
11             San Francisco, California 94105
               (415) 773-5700

12             - AND -

13             ORRICK, HERRINGTON & SUTCLIFFE, LLP
14             BY:  ANTHONY A. DE CORSO
                   WILLIAM MOLINSKI
15                 Attorneys at Law
               777 South Figueroa Street
16             Suite 3200
               Los Angeles, California 90017
17             (213) 612-2346

18

19   FOR DEFENDANT MATTEL, INC.:

20             QUINN, EMANUEL, URQUHART, OLIVER & HEDGES
               By:  SUSAN ESTICH
21                 MICHAEL T. ZELLER
                   JOHN GORDON
22                 Attorneys at Law
               865 South Figueroa Street
23             10th Floor
               Los Angeles, California 90017-2543
24             (213) 443-3000

25

1    **APPEARANCES OF COUNSEL (Continued):**

2

3    FOR DEFENDANT CARLOS GUSTAVO MACHADO GOMEZ:

4            SCHEPER KIM & HARRIS, LLP
             BY:  ALEXANDER H. COTE
5                MARK OVERLAND
                 DAVID C. SCHEPER
6                Attorneys at Law
             601 West 5th Street
7            12th Floor
             Los Angeles, California 90071
8            (213) 613-4660

9

10   FOR MOVANT OMNI 808 INVESTORS LLC:

11           BINGHAM MC CUTCHEN, LLP
             By:  TODD E. GORDINIER
12               PETER N. VILLAR
                 Attorneys at Law
13           600 Anton Boulevard
             18th Floor
14           Costa Mesa, California 92626

15

16

17

18

19

20

21

22

23

24

25

1                         **I N D E X**

2

3

4                    **MOTIONS HEARING**

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SACV 04-9049-DOC - 05/28/2010 - Vol. I

5

| | |
|---|---|
| 1 | **SANTA ANA, CALIFORNIA, FRIDAY, MAY 28, 2010** |
| 2 | **VOLUME I** |
| 3 | **(9:34 a.m.)** |
| 4 | THE COURT:  All right.  We are on the record.  All |
| 5 | counsel are present, but counsel, for my record -- |
| 6 | MR. ZELLER:  Mike Zeller for Mattel. |
| 7 | THE COURT:  Pleasure. |
| 8 | MS. ESTRICH:  Susan Estrich for Mattel. |
| 9 | THE COURT:  It's a pleasure. |
| 10 | MR. PROCTOR:  Dylan Proctor for Mattel. |
| 11 | THE COURT:  Nice seeing you again. |
| 12 | MR. GORDINIER:  Todd Gordinier for Omni. |
| 13 | MR. OVERLAND:  Mark Overland for Mr. Machado. |
| 14 | THE COURT:  Thank you. |
| 15 | MR. COTE:  Alexander Cote for Mr. Machado. |
| 16 | THE COURT:  Thank you. |
| 17 | MS. HURST:  Annette Hurst for the MGA party and |
| 18 | IGWT. |
| 19 | MR. DE CORSO:  Tony De Corso for the same parties, |
| 20 | your Honor. |
| 21 | THE COURT:  Thank you very much. |
| 22 | MR. MOLINSKI:  Bill Molinski for the same parties, |
| 23 | your Honor. |
| 24 | MR. MC CORMICK:  Tom McConville for the same |
| 25 | parties, your Honor. |

```
 1              MR. VILLAR:  Peter Villar with Omni.

 2              THE COURT:  All right.  Please be seated, and from

 3     now on, you don't have to rise when I come into the

 4     courtroom.  It's a nice courtesy and I appreciate it, but

 5     it's not necessary.

 6              Counsel have allegedly worked out some arrangement

 7     of 10 minutes per argument, and I'll simply leave that

 8     undefined and let you pace yourself.  So the first person

 9     will be?

10              MS. HURST:  Me, your Honor.

11              THE COURT:  Now, I have a series of questions that

12     I want to ask you.  I'm going to let you go through your

13     arguments, but I probably have six or seven pages that I'm

14     going to ask you to respond to.

15              So counsel?

16              MS. HURST:  We agreed we'd start with the RICO and

17     creditor fraud motions.

18              THE COURT:  Okay.

19              MS. HURST:  I'm going to do MGA first and then

20     Omni and then Mr. Machado.

21              THE COURT:  Please.

22              MS. HURST:  Thank you, your Honor.

23              Your Honor, if there is one theme that is

24     appropriate for MGA to sound today, it's overreaching.

25              No matter what MGA does in Mattel's view, that's a
```

1    scheme to defraud.  MGA devalues the brand as a scheme to

2    defraud, but if it promotes the product, it's willful

3    infringement.  MGA takes money out in the form of

4    shareholder distributions, that's a scheme to defraud, but

5    when it puts money back in through the Omni transaction,

6    that's a scheme to defraud.

7           MGA is turning the company into a worthless shell,

8    at the same time it's introducing new product.

9           It used to be, in the third-amended answer and

10   counterclaims, that selling inventory to the highest bidder

11   was a scheme to defraud, but they dropped that.  What's

12   conspicuously missing from the fourth amended answer and

13   counterclaims is any single factual allegation of how Mattel

14   was harmed pursuant to the alleged pattern of racketeering

15   activity.  Not one factual allegation of harm, the thing a

16   RICO plaintiff would ordinarily be chomping at the bit to

17   explain.  In fact, if anything, the entire complaint reads

18   like it's seeking discouragement, a remedy plainly

19   unavailable under RICO.

20          To the extent there is any specific factual

21   allegation of harm in the entire pleading, it's in paragraph

22   53, and that is an allegation that Mattel Mexico lost market

23   share, plainly not legally cognizable under Anza and other

24   authorities.

25          The RICO claims are in this case in order to

1    demonize MGA and Mr. Larion in front of the jury, to in

2    Aldous Huxley, Brave New World style, repeat the lie until

3    it becomes the truth.  Fraud repeated enough times is bound

4    to have a negative effect and has had a negative effect in

5    this case, and it is time for a careful dismantling of those

6    repetitions without factual predicate.  That demonization

7    serves the goal of taking down a competitor, it serves a

8    goal of multiplication of damages that are otherwise

9    unavailable under the copyright act, which is the gravamen

10   of Mattel's claim, and propping up the suspect verdict.

11        Mattel does this or attempts to do this through

12   two RICO counterclaims, the first and second.  They are both

13   defective in the enterprise allegation.  It is black letter

14   law that the person and the enterprise must be distinct,

15   King.

16        The Ninth Circuit criminal pattern jury

17   instruction says, "The enterprise cannot also be the RICO

18   defendant when the charge is that the defendant violated 18

19   USC 1962C."  The enterprise and the defendant cannot be the

20   same because it violates the distinctness requirement.

21        Mattel's alleged association in fact, made up of

22   MGA, MGA Hong Kong, MGA Mexico, Larion, Bryant and Machado,

23   is identical to the named counterdefendants.  There is no

24   distinctness.

25        And, your Honor, I want to add that this assumes

1   an association in fact can be made up of corporate entities,

2   which is inconsistent with the statutory language, 1961(4),

3   and the definition of "person."  The statutory language

4   reads an association in fact can be made up of a group of

5   individuals, not a group of persons, "individual" is used in

6   the statute to signify a natural person.

7            But even assuming they can get over that hurdle,

8   these are all related corporate affiliates.  Mattel has not

9   alleged they serve any purpose distinct from their corporate

10  relationship.  All of the defendants are members of the

11  association in fact enterprise.  None of the non-defendant

12  members are identified as distinct in any way.  This plainly

13  violates the distinctness requirement.  And of course Mattel

14  wants to name all the entities as defendants because it

15  wants to maximize its opportunity to recover damages, which

16  underscores the overreaching.  It's a goal to demonize and

17  eliminate a competitor looking for a legal theory to suit,

18  and that's underscored by the ad hoc pleading as it's

19  evolved, through the amended answer and counterclaims, the

20  first-amended answer and counterclaims, the second amended

21  answer and counterclaims, the third amended answer and

22  counterclaims, and now the fourth-amended answer and

23  counterclaims, all of which have had different variations of

24  enterprises, different variations of predicate acts.  As the

25  Court has noticed, a moving target.

Case 2:04-cv-09049-DOC-RNB   Document 8190   Filed 06/28/10   Page 10 of 75   Page ID #:266304
SACV 04-9049-DOC - 05/28/2010 - Vol. I

10

1      Your Honor, we've identified numerous other

2    defects in the conspiracy allegation, the predicate act

3    allegations, but I want to skip in my initial 10 minutes to

4    two more points.  First, the effort to turn trade secret

5    misappropriation into a predicate act by reformulating it as

6    mail and wire fraud.

7      Your Honor, there is a federal criminal trade

8    secret misappropriation statute, it is Section 1832, it is

9    not a predicate act.  In Smith v. Jackson, the Ninth Circuit

10   said for theories where the gravamen is some other claim, in

11   that case copyright infringement, and it's not a predicate

12   act, you can't reformulate it as mail and wire fraud.  And

13   that analysis applies equally here.

14     Now, Smith v. Jackson was decided on June 5th,

15   1996.  Less than a month later, on July 2nd, 1996, congress

16   amended, as is its prerogative, to include criminal

17   copyright infringement as a predicate act.  Three months

18   later, they added Section 1832 to the federal criminal code.

19   Three months, they knew how to include it as a predicate act

20   if they wanted to, and they didn't.

21     The alleged Bratz-Bryant's scheme to defraud is a

22   great opportunity to explicate this point.  The alleged

23   scheme to defraud, for which there are no particulars as we

24   pointed out under Rule 9B under best that are satisfying, in

25   all events the object of it is a set of drawings and an idea

 1    for a product name.  Section 1832 requires that the trade

 2    secret be related to or incorporated in a product that's

 3    already in commerce.  You couldn't make even a Section 1832

 4    claim out of the alleged scheme to defraud with respect to

 5    Bratz, which means that they are seeking an extraordinary

 6    expansion of predicate act to include common law or state

 7    law statutory misappropriation of trade secrets.  It doesn't

 8    even meet the federal test.  So they are looking to include

 9    state law trade secret misappropriation as a predicate act

10    when federal trade secret misappropriation is not included

11    and even state law theft is not one of the enumerated

12    crimes.

13         That brings me to the issue of harm.  As this

14    Court recognized in the Cal-Pharma case, it is an

15    appropriate analysis to look at the harm allegations on a

16    12B6 motion, as the Supreme Court itself confirmed in the

17    Anza and Hemi cases, both of which are pleading cases.

18         Mattel has not alleged cognizable RICO harm

19    against the MGA parties.  The only two allegations of harm

20    that they even identify in their opposition is forensic

21    auditor fees for the appointment of a judicial officer in

22    this case, and presumably they are seeking lost profits or

23    lost market share related to Barbie.

24         The forensic auditor fees, that is not a

25    cognizable RICO harm.  The Stratus case says if you choose

 1    to do something as a litigation strategy, that's a

 2    self-inflicted wound.  Moreover, the Court's an intervening

 3    factor with respect to the appointment of the forensic

 4    auditor.  It's the one that shifted the fees to the Mattel.

 5    And frankly, your Honor, the application for the appointment

 6    of the forensic auditor was materially based on a

 7    transaction -- that IGWT inventory transaction -- which is

 8    no longer even accused of being a fraud in this case.

 9    That's not RICO harm.

10          Mr. Quinn waived any claim of attorneys' fees as

11    damages in this case in a stipulation on the record at a

12    deposition binding under local Rule 7-1 and judicially

13    noticeable by this Court in the context of the 12B6 motion.

14    That leaves lost Barbie market share, which as a matter of

15    law, under Anza, is not cognizable RICO harm.

16          There is a great passage in Anza, your Honor, at

17    126 Supreme Court 1997 and 1998.  "Illustrating this point

18    is the speculative nature of the proceedings that will

19    follow if Mattel" -- I'm going to substitute Mattel for

20    Ideal here -- "is permitted to maintain its claim.  The

21    Court considering the claim would need to begin by

22    calculating the portion of the price drop attributable to

23    the alleged pattern of racketeering activity."  Here the

24    Court will have to figure out what portion of the MGA sales

25    are due to the infringement as opposed to other factors

SACV 04-9049-DOC - 05/28/2010 - Vol. I

13

1   related to the sale of the product.  It's exactly the same.

2           Next, it would have to calculate the portion of

3   Ideal's lost sales attributable to the relevant part of the

4   price drop.  Same thing.  Then you assume you figured out

5   some piece of the infringement, now we've got to figure out,

6   well, did they really lose the sales based on that or were

7   there a myriad of other factors, intervening factors, that

8   were involved?

9           And then the Supreme Court says, "The element of

10  proximate causation recognized in Holmes is meant to prevent

11  these types of intricate, uncertain inquiries from

12  overrunning RICO litigation."

13          The only type of harm that they can conceivably

14  claim is the type that's been expressly precluded by the

15  Supreme Court in Anza.

16          I think I'm beyond my 10 minutes already, your

17  Honor.  So I'm going to reserve discussion with respect to

18  the creditor fraud claims for my second round.

19          THE COURT:  Okay.  Thank you very much, Counsel.

20          I'll let each of you pace yourselves.  And so who

21  is the next person who's arguing?

22          MS. ESTRICH:  I believe I'm next in this aspect of

23  the motion.

24          THE COURT:  Thank you very much.

25          And certainly I know who you are, but reidentify

Case 2:04-cv-09049-DOC-RNB   Document 8190   Filed 06/28/10   Page 14 of 75   Page ID #:266308
SACV 04-9049-DOC - 05/28/2010 - Vol. I

14

1    yourself for the record.

2              MS. ESTRICH:  Thank you very much.  May it please

3    the Court, I am Susan Estrich from Quinn Emanuel,

4    representing Mattel.

5              THE COURT:  Thank you very much, Counsel.

6              MS. ESTRICH:  The first issue first raised was

7    injury.  Your Honor, we clearly have alleged injury here.

8    Indeed, Judge Larson ruled specifically, and I can read that

9    section of his earlier ruling as to injury.

10             "Damages easily flow from theft of trade secrets

11   and confidential information committed by a direct

12   competitor and from infringements of copyright that have --

13   that have alleged to have been used to make millions, if not

14   billions, of dollars."

15             We are happy to -- we have loud responses, et

16   cetera, on this subject of injury, but I point out at the

17   outset that there was no motion under Rule 12 to dismiss

18   based on injury.  That portion of the brief was styled as a

19   motion under Rule 56, and the reason it was styled that way

20   and struck by your Honor is because, obviously, there are

21   disputed issues of fact here.  How much of our lost sales

22   are attributable to the wrongdoing at issue here is

23   certainly a disputed issue of fact, and as the initial

24   pleading recognized, such issues of fact cannot be dealt

25   with on the pleadings.  For purposes of the pleadings, I

1    would only say that Judge Larson's clear conclusion as to

2    this precise issue and our detailed pleadings, as well as

3    interrogatory responses and further discovery, certainly

4    passes the pleading stage and, indeed, there is really no

5    pending motion on this issue.

6             This brings me to the second issue Ms. Hurst

7    raised, which is the enterprise.

8             We did not here allege that MGA was the

9    enterprise.  We did not here allege that MGA entities were

10   the enterprise.  We alleged an enterprise which comprises an

11   association in fact not only of MGA, MGA Hong Kong, MGA

12   Mexico and Mr. Larion, but also former Mattel employees who

13   were Mattel employees at the time they joined this

14   enterprise and associated with it.  In the case of

15   Mr. Bryant, who was never actually an MGA employee and who

16   is not now an MGA employee, Ms. Hurst makes the point that

17   you can't sue as defendants all members of the enterprise.

18   With all due respect, that's just wrong.  Indeed, the

19   opposite has some credence.  In other words, Odom stands

20   absolutely clearly and specifically says every circuit that

21   has ruled on this issue has concluded that of course you can

22   sue all members of the enterprise.  Indeed, were you to name

23   somebody as a member of an enterprise and not sue them, and

24   just add them in, they might well have a claim that they

25   still had to be shown to have committed two predicate acts,

1    and many commentators have said that to name people broadly

2    who you are not suing deprives them of any opportunity to

3    defend themselves against charges of racketeering.  The

4    distinctness requirement is not distinctness between the

5    defendants and the enterprise.  An associated in fact

6    enterprise consists of a number of defendants, hopefully all

7    of them who are within the jurisdiction, who are associated

8    in fact in an enterprise.

9         The Kushner case -- which Ms. Hurst didn't really

10   cite -- the Kushner case involved a case where they sued Don

11   King and Don King Enterprises, saying Don King Enterprises

12   was the enterprise and Don King, the sole shareholder, was

13   the person.  And the second circuit and some others said,

14   "How can Don King be distinct from Don King Enterprises?"

15   And Justice Breyer in a detailed opinion said, "Well, one is

16   a corporation and one is an individual."

17        We didn't here sue Larion for running MGA as a

18   criminal enterprise.  We named an enterprise that consists

19   not only of MGA itself, but of certain affiliated entities,

20   as well as Mattel employees.  This exact issue was presented

21   to Judge Larson in our first complaint because at the time,

22   we sued MGA, MGA Hong Kong, MGA Mexico, Bryant and Machado,

23   and we had three other former Mattel employees who were not

24   named as defendants but were included at that point and,

25   frankly, are not there for purposes of simplicity.  And he

1    was presented with this argument, and they asked, is this an

2    enterprise?  Because they all have some affiliation, whether

3    it's agency, part-time employment, independent contractor.

4    And he specifically ruled that an association in fact

5    enterprise comprised of counterdefendants, MGA, MGA

6    Hong Kong, MGA Mexico, Bryant and Machado sufficiently

7    pleads the existence of a RICO enterprise.

8            Now, they say he was never really presented with

9    this issue.  Well, actually he was.  Mr. Keker, representing

10   Mr. Bryant, presented exactly this issue.  He argued that

11   there was no -- Mattel, however, has no distinction

12   whatsoever in its counterclaims between the persons alleged

13   to have violated 1962C and the enterprise through which

14   these violations allegedly occurred, and the issue was

15   disposed of.

16           What they are really seeking here, your Honor --

17   and this is a theme that will come back on a number of these

18   points -- is they are really seeking reconsideration.

19   Virtually every argument that Ms. Hurst just made was made

20   by one of the many prior counsel before Judge Larson.

21           Now, obviously, law of the case does not apply to

22   Judge Larson's ruling, but the standard of reconsideration

23   recognizes that you need to have some finality, that federal

24   courts should only decide the same question in the same case

25   ideally once.  And so the standards for reconsideration are

1    generally new cases, new evidence.  Here we don't have any

2    new cases.  The cases are exactly the same as the ones

3    before.  We don't have any new evidence.  If anything, the

4    evidence is showing a larger enterprise.  What we do have is

5    a new judge.  And I would simply submit to you that on their

6    key point, which is enterprise, the law is absolutely clear,

7    Judge Larson made this decision once, there are numerous

8    cases recognizing that you can associate in fact with

9    individuals or entities with whom you have contractual

10   relationships.

11          You, yourself, decided such a case in Cal-Pharma,

12   where they stood up and said there are 19 enterprises here

13   and some of them are between contracting parties, related

14   entities and the like, and you said that's perfectly all

15   right.  The Ninth Circuit said Living Designs, a corporate

16   defendant, its attorneys and its expert witnesses, clearly

17   agents, all together enterprise.  Watts v. Allstate, Eastern

18   District of California, a subsidiary and its parent could

19   form a RICO enterprise, even without the former employees.

20   So I would submit to you that on that issue, they just

21   aren't correct in their reading of the case law.

22          As to conspiracy, MGA's second point, they argue

23   that we never even allege which counterdefendants agreed

24   with whom to commit what substantive RICO violations and to

25   commit what two predicate acts, and they cite Salinas v.

```
 1    United States, 1997.  Salinas v. United States holds that
 2    you don't have to allege that anyone in a RICO conspiracy
 3    did anything but agree.  It says absolutely the RICO
 4    conspiracy statute, 1962D, broadened conspiracy coverage by
 5    omitting the requirement of an overt act.  It did not at the
 6    same time work the radical change of requiring the
 7    government to prove each conspirator agreed that he would be
 8    the one to commit two predicate acts.  That's just not the
 9    law.  The law of RICO conspiracy, as you know in many of
10    your opinions, is very broad.  All it requires is the
11    agreement.  And of course the agreement doesn't even have to
12    be an expressed agreement.  The agreement can be implied,
13    and the agreement is to further or facilitate the
14    enterprise.  And indeed, that language has been broadly
15    construed by the courts to mean, basically, you know what
16    the enterprise is up to and you come in at some point and
17    you agree to further and facilitate one or more objectives
18    of the enterprise.
19              Once we get past the conspiracy and enterprise
20    claims and the injury claim, what MGA is left with is an
21    effort to say, well, your predicate acts aren't good.  Your
22    predicate acts aren't good because obstruction isn't a
23    predicate act and Travel Act isn't a predicate act.  The
24    definition of fraud for purposes of the wire fraud statute
25    is about as broad as anything could be.  It's stated in the
```

1    Carpenter case, and it basically says -- I'll read from the
2    Carpenter case -- basically says that fraud is any
3    deprivation -- it's got a great quote about chicane that I'm
4    just looking for, deceit or chicane.  But it says --
5    Mr. Zeller is going to hand it to me -- there is my favorite
6    quote.
7              "The words 'to defraud' in the mail fraud statute
8    have the common understanding of wronging one in his
9    property rights by dishonest methods or schemes defined to
10   include trick, deceit, chicane or overreaching."  That's it.
11             The United States Supreme Court, in the Carpenter
12   case, specifically held that taking confidential information
13   is wire fraud, that it fits within the definition of mail
14   and wire fraud.  In that case, as the Court may remember,
15   there was a Wall Street Journal reporter by the name of
16   Forrest Winans who wrote the "On the Street" column, and he
17   was engaged in this scheme whereby he leaked his column the
18   day before to his buddies at Kidder, Peabody, understanding
19   that if they made trades knowing that he the next day would
20   be saying "heard on the street this stock is going up" or
21   "heard on the street this stock is going down," that they
22   would make money.  And he was prosecuted for doing so along
23   with the other two buddies -- or one of the buddies pled out
24   and one was prosecuted -- at Kidder, Peabody.  And they came
25   in and the defendants' argument that they went to the

Case 2:04-cv-09049-DOC-RNB   Document 8190   Filed 06/28/10   Page 21 of 75   Page ID #:266315
SACV 04-9049-DOC - 05/28/2010 - Vol. I

21

1    Supreme Court with was, "My goodness, that's not fraud.  We

2    were just -- he just took confidential information from the

3    Wall Street Journal."  And the Court said, absolutely, in no

4    uncertain terms, that taking confidential information is

5    fraud and it's the property of the Wall Street Journal, and

6    you took it and you leaked it; wire fraud and mail fraud.

7            They say, "Well, congress just passed a trade

8    secret act and it didn't list that trade secret act as a

9    predicate act."  No, of course not, because mail fraud and

10   wire fraud were already included as predicate acts.  The

11   United States Supreme Court, in what is binding authority,

12   has held that the words "to defraud," for purposes of those

13   statutes, include leaks of confidential information,

14   including trade secrets.  Every circuit, Fromax, the Federal

15   Circuit cites 50 cases.  The Fromax case saying, "When you

16   misappropriate trade secrets, that can be fraud."  Judge

17   Larson addressed this issue, and he so held.  They then say,

18   "Well, the Honest Services statute, that can't be a

19   predicate act because it doesn't say it's a predicate act."

20   The Honest Services statute was passed by congress and it

21   explicitly says in the statute for purposes of this chapter,

22   the term "scheme" or "artifice to defraud," the language of

23   the wire fraud and mail fraud statute includes a scheme or

24   artifice to deprive another of the intangible right of

25   honest services.  In other words, congress specifically said

1    this qualifies as wire fraud or mail fraud.

2          They say obstruction of justice, we plead

3    obstruction of justice as a predicate act, but certainly

4    some of the acts themselves that contributed to that

5    obstruction of justice were themselves part of the

6    fraudulent scheme, which we have pled a fraudulent scheme to

7    steal Mattel's property, to use Mattel's property, to

8    concede the ill-gotten gains and then to obstruct the

9    process, the remedial process.

10          Living Designs, Ninth Circuit 2005, mail and wire

11   fraud acts predicated on defendant's falsification,

12   destruction and misrepresentation of evidence are sufficient

13   to impose RICO liability.  They say, "UFTA, UFTA is not a

14   predicate act, no UFTA is not a predicate act."  But the

15   fraudulent transactions themselves which violate UFTA fits

16   squarely within the definition of fraud for purposes of mail

17   and wire fraud.  At its core, your Honor, their effort to go

18   through our complaint and say, "well, this isn't a predicate

19   act and this isn't a predicate act" is an effort to write

20   mail and wire fraud out of RICO, because if the only way you

21   can be -- fit within mail and wire fraud is if the conduct

22   is independently violative of a federal statute or state

23   statute which is itself a predicate act, then there is no

24   reason in the world to include wire fraud and mail fraud in

25   the definition of RICO.

1           Now, some years ago in the Sedima case, a

2    defendant came up to the United States Supreme Court and

3    said if you let wire fraud and mail fraud stand in their

4    common understanding as predicate acts, then basically the

5    kitchen sink will be a predicate act, and the scope of

6    liability will be virtually unlimited.  And Justice Marshal

7    wrote a vigorous dissent, he said, "The court today is

8    opening the door."  Well, that was the dissent.  The

9    majority said, "This is what congress had intended.  It

10   intended that wire fraud and mail fraud be included, that

11   they not be subject to the criminal" -- even to the --

12   didn't have to have a criminal conviction.  He said, "At

13   least give us a criminal conviction."  Nope.  That RICO was

14   to be broadly construed to effectuate the purposes which

15   congress had.

16           So they are left with -- there are a few more I

17   should add.  They say the Travel Act -- they say that the

18   Travel Act cannot be a predicate act.  Well, again, Judge

19   Larson already upheld our Travel Act claims.  He said that

20   several allegations supported violation of the California

21   Penal Code, which in turn supports the violation of the

22   Travel Act.  Chief Justice Burger in the Peg opinion said

23   that when you bribe private employees in violation of state

24   law, Travel Act.  Travel Act is the named violation.

25           They say we did nothing to corruptly induce Bryant

1    to steal Mattel property.  Your Honor, I won't bore you with

2    the pages and pages and pages of allegations relating to

3    Bryant, relating to Machado, relating to others at the

4    pleadings stage.

5            So in sum, your Honor, I would say for purposes of

6    the pleading, we have properly pled a RICO enterprise.  It

7    is an associated in fact enterprise comprised of not only

8    MGA entities, but MGA subsidiaries, Mattel employees, non

9    MGA employees, et cetera.  We have appropriately pled a

10   conspiracy.  We are not required to do more.  Let me address

11   one final point.  We have appropriately pled, I should add,

12   a number of predicate acts which they don't even challenge.

13   In other words, even if you were to agree with them today on

14   wire fraud and mail fraud and overreaching and all of that,

15   we've still got obstruction, which they don't really

16   challenge.  We've still got commercial bribery, which they

17   tried to challenge but don't really.

18           Their final point is that we don't meet the

19   particularity standard, and I would simply once again say we

20   have attached detailed -- each and every one that we have to

21   date and are available to date -- instances of mail fraud

22   and wire fraud.  We went through this exercise with Judge

23   Larson earlier in this case.  Judge Larson said, "You need

24   to attach the actual mailings in order to meet the

25   particularity requirement."  We attached the actual mailings

SACV 04-9049-DOC - 05/28/2010 - Vol. I

25

1    along with charts and lists to explain who each of them were

2    applicable to.  Judge Larson said, "That's what you need to

3    do."  That's what we did.  That's what we have done on every

4    subsequent version of the complaint without challenge.  They

5    say, "But you have to tell us what the misstatement was in

6    each of them."  That's just wrong as a matter of law.  As

7    you well know, as Judge Larson held, as numerous courts have

8    held, even an innocuous statement that contains no

9    misrepresentation, if it's in furtherance of the scheme, is

10   itself mail fraud or wire fraud.

11        So I would submit to you, your Honor, that we have

12   done far more than is required at the pleadings stage.  We

13   made an effort at Ms. Hurst's request and the Court's

14   request to simplify our complaint a little bit, so that we

15   didn't have to truck in five boxes, so that we weren't

16   pleading five overlapping enterprises and they would stand

17   here and say, "Oh, you can't tell what the heck they are

18   doing."  If they would like more detail, if the Court is in

19   any way inclined to think that we need more detail, more

20   parties, more non-defendant members of the enterprise, which

21   we really don't need, but if you want them, we've got plenty

22   available.

23        Thank you, your Honor.

24        THE COURT:  Thank you.

25        By agreement who is the next person?

1          MS. HURST:  We said we would do it a motion at a

2     time.

3          THE COURT:  A motion at a time?  So second round.

4          MS. HURST:  Is that acceptable, your Honor?

5          THE COURT:  Certainly.

6          MS. HURST:  Your Honor, the enterprise

7     distinctness requirement cannot be circumvented by pleading

8     an association in fact made up of a corporation and its

9     affiliates and employees and agents.  Riverwoods, the Second

10    Circuit case, says by alleging a RICO enterprise that

11    consists merely of a corporate defendant associated with its

12    own employees or agents carrying on the affairs, the

13    distinctness requirement may not be circumvented.

14    Riverwoods says that.

15          Another case in the Southern District of New York,

16    a court well acquainted with the RICO statute says -- this

17    is the Physician's Mutual case -- the distinctness

18    requirement cannot be circumvented by alleging a RICO

19    enterprise that consists merely of a corporate defendant

20    associated with its own employees and agents carrying on the

21    regular affairs of the corporate defendant.

22          In that case, there were multiple corporate

23    entities that were alleged as an enterprise -- part of an

24    enterprise in fact; exactly what we have here.

25          Now, did King somehow undercut the rationale of

1   these cases?  Absolutely not.  In fact, in King, at 121

2   Supreme Court 2091, the court specifically noted the

3   distinction of the circumstances there at hand from the

4   Riverwoods case.

5         King says, "We note the distinction of the

6   Riverwoods case."  It's less natural, the circumstances

7   presented by the Riverwoods case, to call that a person

8   distinct from the enterprise.

9         The Court goes on to cite all the Second Circuit

10  cases that have employed this rule, that you can't

11  circumvent the distinctness requirement and says, "We do not

12  here consider the merits of these cases and note only their

13  distinction from the instant case."

14        Frankly, your Honor, more overreaching and red

15  herrings.  We are not trying to write mail and wire fraud

16  out of this as a RICO predicate act.  And it's certainly a

17  red herring to say that we have said they have to identify

18  the fraudulent statement in each of the attachments to the

19  complaint.  We are well aware of the distinction between the

20  furtherance of requirement.  The problem is, where is the

21  scheme to defraud?  Where is the facts pleading what MGA did

22  in a scheme to defraud, not what Carter Bryant did, not what

23  the other former employees did, what MGA did, what MGA

24  Hong Kong did, what IGWT 826 did?  It's not even linked to

25  any predicate act.  Vess (phonetic) clearly requires that

1    kind of pleading.

2           If they want to refer to the attachments as

3    solving their 9B problems, then they have to be prepared to

4    show that something in those attachments at least raises the

5    eyebrow, and it's not there.  They haven't pled the facts

6    constituting a scheme to defraud.  Did we say obstruction of

7    justice is not a predicate act at all?  Of course not.  We

8    didn't say that.  We said they haven't pled a cognizable

9    harm flowing from that.

10          With respect to Honest Services, we said it's not

11   a predicate act here because under Bajonas (phonetic), it

12   can't be premised on a breach of fiduciary duty.  The MGA

13   parties don't have a fiduciary duty to Mattel, in any event.

14   And it's an intangible by definition, so it can't cause

15   civil RICO harm.

16          Ms. Estrich says Odom clearly says the defendants

17   can be named -- all of the association in fact members can

18   be named as a defendant.  Odom is not the Riverwoods

19   circumvention situation.  In Odom, the two members of the

20   association in fact were Microsoft and Best Buy, clearly

21   distinct corporate entities with no relationship whatsoever

22   but the marketing contract that they formed which was the

23   subject of that case.  That's not what we have here where

24   they are all related, which is exactly the situation

25   Riverwoods and Physicians Mutual says is an effort to

Case 2:04-cv-09049-DOC-RNB   Document 8190   Filed 06/28/10   Page 29 of 75   Page ID #:266323
SACV 04-9049-DOC - 05/28/2010 - Vol. I

29

1    circumvent the distinctness requirement.

2           There were problems with the pleading, and they

3    chose to amend it.  This pleading is different from the one

4    that Judge Larson considered, the circumstances of this case

5    are completely different from the one that Judge Larson

6    considered.  Judge Larson didn't rule on the enterprise

7    requirement.  He ruled on the continuity requirement.  This

8    is not in any fair sense of the word a motion for

9    reconsideration.

10          Did we bring a motion to dismiss on harm?  On five

11   pages in our opening brief, we mentioned the RICO harm

12   requirement outside of the summary judgment, pages 13, 18,

13   19, 21 and 22.  We identified the harm issue in our RICO

14   case statement motion we filed last November.  They briefed

15   it and we are here arguing it.  It really turns lack of

16   notice on its head.  The burden is on them under Twombly and

17   Rule 9B to get this right.  And they haven't.

18          RICO is a blunt weapon in the hands of a

19   competitor.  It doesn't belong in this case.

20          I'm going to spend a couple of minutes on the

21   creditor claims, your Honor.

22          They've conceded the IP transfer theory is no good

23   now, the side letter is an agreement to agree, couldn't

24   transfer -- that is all acknowledged now, that's gone.  Now

25   we are down to shareholder distributions made over a

 1    five-year period, dozens of them.  They are trying -- they

 2    didn't allege insolvency in 2004, 2005, 2006.  How could

 3    they?  Because they were in Judge Larson's courtroom in the

 4    summer of 2008 claiming damages of $2 billion in MGA's

 5    profits from that period of time.

 6            These claims, these 13 through 15 claims are

 7    clearly defective.  They don't allege the basic elements.

 8    They lump everything together.  There is no pleading

 9    allegations that satisfy the fraud requirement.  It's

10    clearly inconsistent with positions they've taken previously

11    in the case and they shouldn't get leave to amend on this.

12    If they want to go try to do premature enforcement of

13    judgment claims in state court, great, let them.  But try

14    and turn this case, now, into an examination of a snapshot

15    of the financial picture of MGA on dozens, if not hundreds,

16    of different dates across a five-year period, all of the

17    Larion family estate claims, we haven't scratched the

18    surface on discovery of any of that.  It doesn't belong in

19    this case.

20            Respectfully, your Honor, I doubt the Court

21    thought it was dramatically expanding the scope of the case

22    with these shareholder distribution transfer claims on the

23    motion for leave to amend.  And that's all assuming the

24    claims aren't barred by the statute of limitations.

25            The program here is to say fraud enough times that

1    eventually it must be true.  The program is to do that

2    without factual allegations showing of fraud.  Factual

3    allegations don't meet the Rule 8 standard, they certainly

4    don't meet the Rule 9B standard for a scheme to defraud, not

5    under the RICO claims, not under the creditor claims.

6           The overreaching in this case takes a particular

7    form of gotcha, and the constructive trust theory is the

8    best example of this.  Whatever MGA does, it's gonna be

9    wrong somehow.  The constructive trust theory, well, you've

10   devalued the brand, at the same time they are alleging

11   criminal copyright infringement from any ongoing

12   exploitation.  Even the post-verdict exploitation, now they

13   are saying in their opposition papers they were subject to a

14   stay of this Court and later in the Ninth Circuit.  It's all

15   about the gotcha.  When you shine the big blaring light of

16   Mattel's enormous resources down on MGA for six years of

17   litigation and everything you do is wrong one way or

18   another, people are going to make mistakes, but that is not

19   a scheme to defraud.

20          Finally, your Honor, I just want to note the

21   verdicts from phase one are referenced in ten separate

22   paragraphs of the fourth amended answer and counterclaims,

23   ten separate paragraphs, but they do not plead around them

24   for purposes of criminal copyright infringement.  They have

25   incorporated the verdicts by reference, and then failed to

 1    plead around them.  So what do they say the answer to that
 2    is in their opposition?  "Well, what we really meant was
 3    copyright infringement of the trade secret stuff."  Come on,
 4    they don't allege any of the elements of copyright
 5    infringement with respect to that registration of a
 6    copyright, ownership of copyrighted material, infringement
 7    of any specific work.  None of that is there.
 8            What else do they say?  "Oh, well, after the
 9    verdict, that's what we meant."  Your Honor, if this
10    criminal copyright infringement predicate act is down to a
11    theory of after the verdict, then the whole RICO thing falls
12    apart.  The narrative of this RICO claim from the beginning
13    has been, "Well, Bryant stole it, and then they criminally
14    infringed it, and then they needed the, quote/unquote,
15    intellectual infrastructure to exploit it, because MGA
16    couldn't do that by itself because you know there aren't any
17    competitors in this industry other than the ones that steal
18    from Mattel."  That's their narrative of the RICO claim.
19    Without that, it falls apart.  If there is no criminal
20    copyright infringement until 2008, there is no continuity,
21    there is no relatedness of the pattern.  So your Honor,
22    Mattel did not plead that the verdict was procured by any
23    predicate act, nor could it.
24            They can stand up here and complain about the
25    O'Connor e-mail all they want, and then we'll stand up here

 1    and complain about the exclusion of the Rosenbaum e-mail,

 2    which was the sole piece of contemporaneous documentary

 3    evidence confirming that Carter Bryant told MGA and

 4    Mr. Larion in 1998 that was excluded from phase one.  The

 5    single piece of unimpeachable documentary evidence in this

 6    case of what happened in September and October of 2000,

 7    written by a lawyer who was not employed by MGA, we can

 8    stand up here all day long and argue about causation and

 9    what evidence might have come in and what evidence was out.

10    Bottom line, they didn't even plead that the phase one

11    verdicts were somehow procured by suppression of that

12    e-mail.  They did not plead around the fundamental defect in

13    their core predicate act, lack of criminal willfulness as

14    demonstrated on the face of the phase one verdict.

15            Your Honor, pursuant to Rules 9B, 12B6, the first,

16    second and 13th through 16th counterclaims should be

17    dismissed without further leave to amend.  In the case of

18    the 13th through the 16th -- 13th through 15th, the state

19    law creditor claims, Court should not permit further leave

20    to amend in this Court.  It doesn't have to dismiss with

21    prejudice on the merits, although we'd respectfully submit

22    on the statute of limitations, they should be.

23            They want to go pursue that in state court

24    sometime later, if they ever get a judgment, they are free

25    to do that.  The remainder, your Honor, should be dismissed

```
 1    with prejudice at this time.  Thank you.

 2              THE COURT:  Thank you.

 3              Counsel?

 4              MS. ESTRICH:  Thank you very much.

 5              On the enterprise point, your Honor, if a company

 6    and its outside agents can't be associated in fact, we would

 7    almost never have a RICO enterprise because the very idea

 8    and notion of a RICO enterprise is that individual persons,

 9    whether they be corporations or other entities, associate

10    together, some of them contracting partners, some of them

11    agents, some of them independent contractors, and such an

12    enterprise is itself considered by congress to be an

13    unlawful enterprise.  It took the old wheels and chains and

14    the spokes and the whole thing and replaced it with an

15    enterprise concept.  Ms. Hurst does not address, nor can

16    she, how it is that including Mattel employees, who were

17    Mattel employees, who associated, in fact, with a competitor

18    and then proceeded to steal property, provide services,

19    commit bribery, et cetera, how that fits within the

20    pre-Kushner cases -- because I should add, the cases they

21    are relying on, Justice Brian Kushner was very clear to say,

22    "We are reversing the second circuit on this point.  These

23    other cases are distinct, we are not saying they are right."

24    Right or wrong, your Honor, this case is not just about MGA

25    Enterprises.  We've got contracting parties.  We've got
```

Case 2:04-cv-09049-DOC-RNB   Document 8190   Filed 06/28/10   Page 35 of 75   Page ID #:266329
SACV 04-9049-DOC - 05/28/2010 - Vol. I

35

 1    subsidiaries.  We've got Mattel employees.  And it is

 2    absolutely clear that Living Designs says that outside

 3    lawyers who are, of course, agents of their clients, can

 4    certainly associate in fact with their clients.  The cases

 5    we've submitted say that subsidiaries can associate with

 6    their parent.  And I know of no case that says that you

 7    can't associate in fact with somebody else's employee.

 8         I am not accusing in any way MGA of saying or

 9    making claims they didn't make.  They say -- once again,

10    Ms. Hurst says that as to IGWT, we have not identified which

11    predicate acts IGWT committed.  IGWT is not named in the

12    enterprise claim.  It is named in the conspiracy claim, as

13    to which there is absolutely no obligation to name specific

14    predicate acts.

15         What did MGA do wrong, she says?  Well, I only

16    have 10 minutes.  How long the first trial took, what was

17    it, weeks and weeks?  We've got 50 pages of allegations of

18    things that MGA did wrong.  We've got $100 million verdict

19    sitting there, at least for the purposes of these pleadings,

20    suggesting that maybe MGA has done something wrong.

21    Inevitably, in Ms. Hurst's argument, we're going to issues

22    of fact.  Issues of fact are not appropriate at the

23    pleadings stages.  The fact that they mention RICO injury on

24    page 13 or page 17 doesn't substitute -- at least as I

25    understand the rules in your courtroom -- from making a

1    motion under Rule 12.  If you look at the five-page motion

2    here, it doesn't mention moving to dismiss under Rule 12 for

3    lack of injury.  And the reason it doesn't do that is

4    because case after case after case have recognized that

5    issues as to injury are very rarely susceptible to

6    disposition on the pleadings, because if you take the

7    pleadings in the light most favorable to the pleading party,

8    they will always plead injury.

9           Here we are not just pleading it.  We've got a

10   ruling from Judge Larson saying we've met the standard.

11   We've got a verdict from a jury that suggests we've been

12   hurt a little bit, and we've got a lot of discussion here

13   today about how much of the lost sales, or how much of the

14   forensic auditor's fees were occasioned, frankly, by

15   obstruction.

16          Now, Ms. Hurst says that we have not somehow

17   pled -- that we have simultaneously -- I'm trying to get

18   this right, that we have simultaneously included the phase

19   one jury verdict, which apparently we shouldn't have, but we

20   are bound by the phase one jury verdict that willfulness has

21   not been shown and, therefore, there is no criminal

22   copyright infringement.

23          Your Honor, we have before you, as you know, a

24   number of motions pending on crime fraud and waiver, which

25   go directly to the issues Ms. Hurst is discussing about the

```
 1    Rosenbaum e-mail and the O'Connor e-mail.  I am happy to
 2    address them in full, but it is evidenced to me, at least,
 3    that the discussion we're having here is way premature.  Our
 4    pleadings on obstruction very clearly raise all of those
 5    issues.  Our pleadings on obstruction very clearly state, as
 6    do our pleadings on criminal copyright infringement, that we
 7    think the infringement here was willful.  Judge Larson has a
 8    number of comments with which you are familiar from our
 9    extensive crime fraud briefing suggesting that the
10    withholding of the Larion-O'Connor e-mail, the e-mails
11    between Ms. Glazer and Mr. Larion back in 2001 --
12              MS. HURST:  Those should not be referred to, your
13    Honor.  They are privileged material.
14              MS. ESTRICH:  Those issues are subject to pending
15    motions before this Court.  They certainly are not a basis
16    right now for a motion to dismiss.
17              As to the constructive trust claims, Ms. Hurst
18    says we don't allege insolvency.  We do allege insolvency.
19    It's right there in the complaint.  Those claims have been
20    in our pleadings in our discovery since the forensic auditor
21    came in and alerted us, frankly, through his investigation
22    to details of the finances of MGA of which we had been
23    unaware.
24              Did you want me to stop?
25              MS. HURST:  No.  I was just waiting to see if you
```

Case 2:04-cv-09049-DOC-RNB   Document 8190   Filed 06/28/10   Page 38 of 75   Page ID #:266332
SACV 04-9049-DOC - 05/28/2010 - Vol. I

38

1    were going to violate Judge Larson's order not to disclose

2    the contents of the forensic auditor's report.

3              MS. ESTRICH:  I'm not.  I'm just referencing it.

4              There is ample case law -- indeed, it's undisputed

5    here in California that a creditor is not required to wait

6    until a judgment is reduced to a final judgment in order to

7    bring suit.  Indeed, I researched this issue, and they might

8    well have had a claim that if we didn't bring these claims

9    here and now, we would be barred by res judicata from trying

10   to do so at a later date because they arise out of the same

11   sets of transactions and occurrences which are the current

12   subjects of debate in our RICO fraud claims.  And you know,

13   four years later, after four years of discovery, to tell us

14   to go to state court and raise claims which are incorporated

15   in many respects in our RICO claim seems to us a rather sort

16   of absurd duplication of resources.

17             Finally, let me talk about this IP issue, because

18   it's very confusing.

19             Ms. Hurst says we have conceded that the IP, this

20   alleged transfer of IP, purported transfer of IP of Bratz is

21   no longer at issue.  I checked with Mr. Zeller.  I checked

22   with Mr. Proctor, our counsel is here.  No one knows where

23   we conceded that.  In fact, what's going on here is sort of

24   a little bit of a dance on the other side.  MGA says it's

25   not at issue, but Mr. Kadesha (phonetic) in his deposition

1   says, "Oh, yeah, we think we have an interesting Bratz IP."

2   Omni in its papers, which will be addressed later, says,

3   "Well, the side letter agreement itself is just an agreement

4   to agree to transfer Bratz IP," and they say therefore, we

5   have not proven that the side letter agreement transfers the

6   IP.  Nowhere does Omni in all of its briefs -- and maybe

7   Mr. Gordinier will highlight this today -- nowhere do they

8   ever say we have no interest in Bratz IP.  Clearly, if

9   nothing was ever transferred, there is nothing to void, and

10  our claim at that point would be moot.  But at this point,

11  we don't have from anybody in a position to make the

12  concession, which is not us.  We don't know.  We have reason

13  to suspect that where you've got a side letter agreement, as

14  well as other evidence saying Bratz IP is going to Omni, we

15  have an obligation to bring that claim now.  If we didn't

16  bring it now, we would be at risk for losing what remains at

17  least one of the most valuable elements in this case.

18          Finally, just to say in conclusion, as to the

19  Bratz allegations, we respectfully recognize, your Honor,

20  that you have told us twice that you don't want to deal with

21  misappropriation of Bratz as a trade secret or otherwise

22  until and unless the Ninth Circuit comes down with a ruling,

23  and we'll look at it at that point in light of the Ninth

24  Circuit's ruling.  We filed the motion on this simply to

25  ensure that down the road no one would say to us, "You

Case 2:04-cv-09049-DOC-RNB   Document 8190   Filed 06/28/10   Page 40 of 75   Page ID #:266334
SACV 04-9049-DOC - 05/28/2010 - Vol. I

40

```
 1   delayed and we've been prejudiced by the delay because you
 2   should have raised this issue when we were in discovery" --
 3   and the discovery is certainly ongoing here, and we respect
 4   that.  But the allegation that there is no injury in this
 5   case with or without the misappropriation of Bratz ignores
 6   the detailed record, the findings of Judge Larson, the
 7   obvious conclusion of the verdict, and the rules of proper
 8   pleading.
 9           I would simply say as to the fact that Judge
10   Larson had a different complaint, you've got all the good
11   stuff from his complaint.  Certainly there are additional
12   facts that have developed over time with discovery and,
13   indeed, we are each day discovering more facts, but each of
14   the allegations in Ms. Hurst's argument as to which there
15   was a Judge Larson ruling -- and I would commend -- I'm sure
16   your clerks have read Judge Larson's careful ruling -- each
17   of those issues, as you can well imagine, were very fully
18   briefed before him.  The enterprise issue was briefed.  The
19   trade secret misappropriation issue was briefed.  The Travel
20   Act issue was briefed.  The issue of injury was briefed.
21   And all of those issues were ruled on.  There should be some
22   reason, other than a change of courtrooms, to revisit those
23   issues, indeed, particularly to revisit them at the
24   pleadings stage.
25           Thank you, your Honor.
```

SACV 04-9049-DOC - 05/28/2010 - Vol. I

41

```
 1              THE COURT:  All right.  Counsel, where would you
 2   like to go from here?
 3              MR. GORDINIER:  I think, your Honor, what we have
 4   discussed is treating each motion separately.  So I think we
 5   are finished with the first motion.  Fair enough?
 6              THE COURT:  And where would you like to move now?
 7              MS. HURST:  Omni.
 8              MR. GORDINIER:  Now we were going to move to
 9   Omni's motion.
10              MR. COTE:  Can I just ask for one point of
11   clarification, your Honor?  Are we going to be taking breaks
12   today or might I be excused to use the restroom?
13              THE COURT:  Omni.  Whatever you like, Counsel.
14   You are certainly excused.
15              MR. COTE:  Thank you.
16              THE COURT:  And you can return if you'd like to.
17              (Laughter.)
18              MS. ESTRICH:  You might offer too much there.
19              MR. ZELLER:  Does that apply to me?
20              MR. GORDINIER:  Yes, Todd Gordinier, your Honor,
21   representing Omni.
22              And as we discussed, we are going to treat these
23   motions separately, and I am here only on this motion.  As
24   the Court is aware, Omni has filed a Rule 12B6 motion
25   seeking dismissal of the claims that have been asserted
```

SACV 04-9049-DOC - 05/28/2010 - Vol. I

42

1    against it in the fourth amended counterclaim.  The Court

2    has received extensive briefing on the issues before it, and

3    obviously, subject to what my learned deponent has to say

4    and the Court's questions, I'm going to be fairly brief

5    here.

6           We've cited to you a plethora of Ninth Circuit

7    authority that considers the requirements for the RICO

8    conspiracy claim.  And this complaint falls far short, your

9    Honor, under any published opinion, either in district court

10   level or the Ninth Circuit with respect to RICO conspiracy.

11          Let me start with the point that is in itself

12   dispositive.  Having accused my client of all manner of

13   fraud for the last 18 months, Mattel now claims in its

14   opposition that its RICO conspiracy claim against Omni does

15   not sound in fraud and that it's not obligated to meet the

16   requirements of Rule 9B.

17          Aside from the fact that your Honor has already

18   ruled to the contrary, in granting the motion to amend, the

19   Court specifically said that Mattel's allegations with

20   respect to this are going to have to meet Rule 9B.  The

21   authority controlling in the Ninth Circuit is quite clear

22   that allegations of the kind that we have here that are

23   replete with fraud, concealment -- you know, there are a

24   dozen references in the roughly 20 -- there are 20

25   paragraphs that we are talking about here, your Honor, that

Case 2:04-cv-09049-DOC-RNB   Document 8190   Filed 06/28/10   Page 43 of 75   Page ID #:266337
SACV 04-9049-DOC - 05/28/2010 - Vol. I

43

1    relate to Omni.  So we can focus everybody, it's paragraphs
2    96 to 117 -- perhaps 97 to 116.  Instructive here -- and let
3    me take the 9B point first -- is the Jamster case.  It's
4    Judge Miller's opinion.  There are a couple of different
5    formulations of what Rule 9B requires, and under either
6    formulation, this complaint falls far short.  One court says
7    it requires -- and I'm quoting from Jamster here -- that
8    "plaintiffs plead with detail the time, place and manner of
9    each act of fraud, plus the role of each defendant in each
10   scheme."  That's not here, your Honor.
11         Another formulation says courts have also phrased
12   the heightened pleading standard as requiring the who, what,
13   when, where, and how of the misconduct charged.  That's not
14   here, your Honor.  In these 20 pages -- 20 paragraphs --
15   excuse me -- there are not even close to a recitation of the
16   required information with respect to my client.  And that
17   alone requires dismissal.
18         More on an additional independent ground, your
19   Honor -- and Jamster is illustrative on this point, as well,
20   at page 5 of that opinion.  As I'm sure the Court knows from
21   having read this pleading and read the -- the briefs, what
22   we have here really is pleading by adjective.  To quote from
23   Jamster, "Plaintiffs cannot meet their particularized
24   pleading burden by artfully inserting modifiers such as
25   unauthorized charges or fraudulently collecting moneys in an

1   attempt to show a common purpose.  The same allegations set

2   forth above without the adjectives read, in effect, that

3   defendants agreed to bill for Jamster charges and to further

4   the common purpose of collecting moneys from customers.

5   Without the adjectives, the allegations allege conduct

6   consistent with ordinary business conduct and an ordinary

7   business purpose."

8           Your Honor, let's take a look at what they've

9   alleged without the adjectives.

10          Paragraph 97 alleges that a consortium of banks

11  led by Wachovia loaned $300 million plus to MGA, a business

12  decision by Wachovia.  It also alleges that as collateral

13  and security for the loan, Wachovia received security

14  interests in MGA's inventory and accounts receivable.

15  That's true, your Honor.  That's deemed true in this

16  complaint, and let me stop right there and observe to the

17  Court what Mattel has known for well over a year.  The

18  Wachovia credit facility to MGA did not -- never did include

19  collateral of intellectual property.  It never did.  Mattel

20  has asserted for over a year that our acquisition of --

21  Omni's acquisition of that debt operated as a transfer of

22  intellectual property that they knew was not right.

23          Then what happened in 2008 is -- and we go through

24  the allegations stripped of their adjectives -- Wachovia

25  declared a default, a business decision by Wachovia.

1    Wachovia then instituted foreclosure proceedings and set

2    about liquidating MGA.  Business decisions made by Wachovia

3    together presumably with their consortium of banks.  Among

4    other things, they swept the cash out of MGA at that time

5    and instructed all of MGA's vendors to pay future moneys to

6    Wachovia and its consortium, not to MGA.  In other words,

7    what Wachovia was doing was essentially foreclosing and

8    instituting a liquidation procedure of MGA.  That's what MGA

9    was facing.  Wachovia, of course, had its own issues.

10          Another business decision made by Wachovia was a

11   decision to sell that debt, sell it at a discount.  Let's go

12   back to what the complaint says about what Omni did,

13   stripped of adjectives.

14          Omni was formed in August of 2008 to require the

15   distressed loan from Wachovia, and it acquired it at a

16   discount.  That's true.  That happens all the time, and

17   particularly was being done very, very actively during that

18   time when institutions like Wachovia needed cash badly.  The

19   Court is no doubt aware that Wachovia was forced to sell

20   itself a month after this.

21          The documents and the allegations are of a

22   business transaction instituted by business decisions made

23   by Wachovia, not by MGA and not by Omni 808.  Omni 808 was

24   able to require the debt at a discount because Mr. Kadesha

25   had a lot of cash available at a time when institutions were

1    not making loans.  This isn't the first or the last time he

2    did this.  Most critically, your Honor, there is no

3    allegation in these 20 paragraphs that Omni either agreed to

4    the criminal enterprise or had knowledge of the criminal

5    enterprise, as alleged in the earlier 100 paragraphs.  And

6    they can't do that, and your Honor knows why.  There is no

7    relationship here -- and we cited the Court to a case that

8    isn't challenged by Mattel in its opposition.  There is no

9    relationship, your Honor, to Omni -- between Omni acquiring

10   the Wachovia debt and any of the allegations that are flying

11   back and forth here about alleged trade secrets in Mexico,

12   trade secrets in Canada, issues in Hong Kong, doing things

13   with employees.  None of that has any relationship, either

14   temporally or substantively to the Omni-Wachovia

15   transaction.  And that's why the 20 paragraphs are not able

16   to allege either knowledge or agreement, which are required.

17          The fraudulent transfer claims are equally

18   informed here, your Honor.  They have not alleged a

19   transfer.  Most basically, they concede that there was --

20   that the dividend transfers that you've heard some

21   discussion about earlier, those moneys are not alleged to

22   have gone to Omni.  They didn't go to Omni.  There is just

23   no transfer there.  Similarly, the IP -- the Court has read

24   their opposition.  It's perhaps very telling here.  Their

25   fourth amended complaint asserts that the side letter

1    agreement operated as a transfer of the IP.  They didn't
2    attach it.  On the side rail, there are all of the binders
3    that have all of the different documents they attached.
4    They didn't attach that side letter agreement, your Honor.
5    They did allege that it had operated as a transfer.  They
6    had the document.  They knew it did no such thing.
7           When we actually brought the side letter agreement
8    to the Court's attention in our motion, what did they say in
9    the opposition?  Well, we are not saying that they did it --
10   that it transferred by that document.  That is, in fact,
11   what the complaint says, but they can't say it because it
12   didn't.  There is no doubt about that.
13          Most fundamentally, your Honor, all this back and
14   forth, as the Court no doubt knows from its experience, the
15   California UCC would not permit or allow the transfer of any
16   property -- I say transfer, encumbrance is the right word --
17   would not permit a party to encumber anything it didn't own.
18   And so this whole back and forth is entirely a red herring,
19   but the side letter agreement doesn't even purport to do
20   that.  The side letter agreement was part of what was going
21   on in the business environment -- series of business
22   decisions at the time.  But, Judge, it has nothing to do and
23   certainly isn't a part of any criminal enterprise.  It was a
24   series of business judgments that were being made by people,
25   you know, ironically to try to save MGA.  MGA was in danger

Case 2:04-cv-09049-DOC-RNB   Document 8190   Filed 06/28/10   Page 48 of 75   Page ID #:266342
SACV 04-9049-DOC - 05/28/2010 - Vol. I

48

 1    of being liquidated.

 2            Your Honor, for the same reason, the declaratory

 3    relief claims -- claim should not survive.  They are clearly

 4    seeking an advisory opinion here, your Honor.  I don't

 5    really want to spend very much time on it, but I'm sure you

 6    and your colleagues will find that this is an advisory

 7    opinion, and -- that they are seeking and it's not an

 8    appropriate point for the Court at this point.

 9            Finally, this is a unique situation in the sense

10    that we're not here at the outset of litigation with

11    somebody framing a complaint.  They've had 18 months of

12    unfettered, one-sided discovery against my client, and this

13    is the best they could do.  And it's not good enough.  Not

14    by a long shot.  And the Court has already said in granting

15    this motion to amend this will be Mattel's final pleading.

16    This isn't the first, second, third or really even the

17    fourth, because as the Court knows, there was an interim

18    step.  This is the best they have against Omni.  And your

19    Honor, it doesn't meet the standards that the Ninth Circuit

20    has set for a RICO conspiracy claim and it doesn't comply

21    for the reasons we've said with the -- for the lack of a

22    better word -- fraudulent transfer claims.  We've asked the

23    Court to dismiss us, to let the parties go ahead if you're

24    going to let -- there are some, I guess, claims that aren't

25    at issue here, but Omni doesn't belong in this lawsuit, it

 1    never did, and it should end it.

 2            Thank you very much, your Honor.

 3            THE COURT:  Counsel, thank you.

 4            MR. ZELLER:  Mike Zeller for Mattel.  Thank you,

 5    your Honor.

 6            Let me start with his last point.

 7            The phrase that Mr. Gordinier used was quote,

 8    "unfettered discovery," end quote.  Currently pending before

 9    this Court are multiple motions to compel that go directly

10    to Omni's and MGA's violation of court orders to turn over

11    discovery concerning these transactions, as well as

12    additional requests that we've made.  Exhibit A of exactly

13    the unfettered discovery that Mr. Gordinier purports to

14    raise, we found out that, in fact, there are agreements

15    between Isaac Larion and Arsalan Gozini to transfer Gozini's

16    interest in Omni 808, an equity interest.  Even to this day,

17    in the briefs that Omni has filed, they continue to make

18    their claim that is a recharacterization of their initial

19    misrepresentations to the Court that somehow now what they

20    really meant all along was that Mr. Larion had no equity

21    interest, but even the documents that they are withholding

22    apparently show that to be false.

23            What MGA and Omni did -- and they actually

24    continue to withhold some of these documents I'll get to in

25    a second to this day.  After we sought -- we even refiled

1    the amended pleading here, MGA and Omni produced a document

2    for the first time that showed, in fact, an agreement for

3    March and April of 2009 in which Arsalan Gozini agreed to

4    transfer his interest to Isaac Larion in exchange for wiping

5    out the so-called loan, which we also now know is false,

6    there was never a loan.  It was, in fact, a payment that

7    Mr. Gozini made for Mr. Larion to buy into Omni.

8    Interestingly enough, as part of all this, we then

9    subsequently got an e-mail from Mr. Gozini that he forwarded

10   to Mr. Larion, never produced, by the way, by either MGA or

11   Omni, we ended up having to get it through a different

12   source.  That document references another promissory note

13   between Isaac Larion and Mr. Gozini that matured in December

14   of 2008.  To this day, we do not have those -- that

15   promissory note, we do not have the correspondence

16   referencing it.  Interestingly, Mr. Gozini, at his

17   deposition, when asked about it, basically just completely

18   refused to answer questions.

19           So the idea that somehow we have been given

20   visibility into the actual agreements between these parties,

21   including those who, if they were members of Omni, is really

22   quite -- quite untrue.  And this is widely documented in the

23   discovery motions that we have pending.

24           Turning to the RICO arguments.  Mr. Gordinier

25   refers to only a mere 20 -- paragraphs of allegations

Case 2:04-cv-09049-DOC-RNB   Document 8190   Filed 06/28/10   Page 51 of 75   Page ID #:266345
SACV 04-9049-DOC - 05/28/2010 - Vol. I

51

 1    against his clients.  In fact, those are just simply the

 2    paragraphs that describe Omni's agreement to join.  The

 3    fraudulent scheme is pleaded at length throughout the

 4    amended pleading along with the exhibits that are attached

 5    because there is more than one, we'll say, series of acts

 6    that MGA was committing that Omni agreed to further as part

 7    of the conspiracy.  Some of them were, yes, wire and mail

 8    fraud.  As to those particular acts, 9B applies.  However,

 9    as to the others and the general components of the

10    conspiracy, Rule 8 applies.  And, in fact, that is something

11    that Judge Larson previously ruled on, as well.

12          And on the motion to dismiss, what he ruled

13    previously was, "In considering a Rule 12B6 motion seeking

14    to dismiss a RICO claim, the court measures the sufficiency

15    of the alleged predicate acts of wire fraud and mail fraud

16    by the 9B pleading with particularity standard.  However,

17    the court measures the sufficiency of all other predicate

18    acts by the more lenient standard set forth in Rule 8A."

19          And furthermore, the authority -- and we cite this

20    in our briefs -- is that certainly for a RICO conspiracy

21    claim, those other aspects can be alleged under a more

22    lenient Rule 8 standard.  But to go to my other further

23    point is that even if Rule 9B applies, courts recognize that

24    that requirement will be relaxed where the information is

25    clearly within the knowledge of the defendant, which is

1    precisely -- not only was it a reputation of Mr. Gordinier's

2    comment that somehow Mattel has been given unfettered

3    discovery into these transactions, which I will also note,

4    it has literally been two years of dragging this information

5    out of them.  The Court is well aware of the

6    misrepresentations that were initially made as to

7    Mr. Larion's supposed noninvolvement in these transactions.

8    But even to this day, and certainly as of the time that we

9    sought and obtained leave to file the amended pleading, we

10   have been deprived of facts, facts that are exclusively

11   within Omni's knowledge, and we still don't have.  So I also

12   submit, your Honor, and this is -- that even to the extent

13   that 9B is applied in any respect as to Omni, that it is

14   still relaxed to whatever degree is necessary based upon the

15   fact that the information is within the defendant's

16   possession and has not been given to us, as one example that

17   I've already provided to the Court.

18            A second major point appears to be that Mattel has

19   supposedly known for over a year that the Omni deal did not

20   include as collateral to the --

21            THE COURT:  Just one moment, Counsel.

22            (Interruption in the proceedings.)

23            THE COURT:  All right, Counsel.

24            MR. ZELLER:  Thank you, your Honor.

25            The second point that Omni made was essentially

 1   that -- the phraseology was that Mattel has known for over a

 2   year that the collateral did not include the Bratz IP.  What

 3   we, in fact, still don't have from either MGA or Omni is a

 4   binding, definitive statement that there was no transfer or

 5   encumbrance of Bratz intellectual property.

 6           THE COURT:  I'm sorry.  I didn't mean to be rude.

 7   Don't change your flight yet, okay?  If everybody can answer

 8   my questions in half an hour, we might have a shot at that,

 9   but I just don't think so.  I mean, I really want to hear

10   from you today.

11           MS. HURST:  Thank you, your Honor.  Better safe

12   than sorry.

13           THE COURT:  You might try 4:00, but if it was me,

14   I'd plan on the last flight out.

15           I'm sorry.  Mr. Zeller, you can start over again

16   if you want to.

17           MR. ZELLER:  No problem.

18           THE COURT:  No, it's all right.  You can start

19   over again if you want to.

20           MR. ZELLER:  We still have no statement, a

21   definitive, binding, unequivocal statement by MGA or by Omni

22   that there was no transfer or encumbrance of intellectual

23   property.  What we do know is that there are at least a

24   couple of documents.  We cite them in the complaint

25   specifically.  We -- one was an Isaac Larion e-mail that

```
 1    says that the Bratz IP will be assigned to Omni.  We have
 2    the side letter agreement, which says that it will be
 3    encumbered.  That certainly is sufficient at this point.  I
 4    mean, we are literally into a classic factual dispute.  If
 5    MGA and Omni wanted to enter into some binding stipulation
 6    that says there's been no transfer, no encumbrance, and so
 7    on, then that issue can potentially become moot, but it's
 8    not a pleading issue.  It is something that they are
 9    literally arguing outside of the pleadings.
10            And rather than go through and remark on
11    Mr. Gordinier's particulars of going through the paragraphs,
12    paragraph by paragraph, you'll notice what he did was
13    attempt to basically explain and give an innocent
14    explanation for every allegation that was in there, in those
15    particular paragraphs, ignoring, of course, dozens of other
16    paragraphs.  But even setting those aside, this is simply
17    not the standard here.  This is a 12B6 motion to dismiss.
18    Facts are drawn in our favor.  The allegations are assumed
19    to be true.  Merely because a party can come up here and say
20    that somehow there is an innocent explanation for all this,
21    those are the merits.  It has nothing to do with 12B6.  So I
22    won't burn the Court -- or waste the Court's time in
23    refuting those particular aspects.  Insofar as there is no
24    supposed allegation that Omni had a knowledge or agreed as
25    part of the RICO conspiracy, there are multiple allegations,
```

1  factual allegations, regardless of whether it's Rule 8 or 9B

2  that meet those standards.

3          Just to give a couple of examples -- and they are

4  talked about at some length -- is the fact that

5  documentation was backdated, that there was an intent from

6  the very beginning to obstruct Mattel's rights, both as a

7  creditor and as one -- you know, money judgment creditor, as

8  well as one with respect to the Bratz IP.  I mean, there are

9  a litany of factual allegations that are very specific when

10 assumed to be true, as it is required, and when the factual

11 inferences are drawn in our favor, show both knowledge and

12 that they agreed to join the RICO conspiracy.

13         It's a complete red herring to say that somehow

14 Mattel has to establish that Omni was on the scene stealing

15 Mexican trade secrets.  That has nothing to do with the

16 requirements for a RICO conspiracy.  As the Court is well

17 aware, one can join a conspiracy late.  The furtherance of

18 the objectives that are described in the complaints

19 specifically make it quite clear that the ones that Omni was

20 furthering had to do with the obstruction of justice as well

21 as attempting to obstruct Mattel's rights.  But merely

22 because they joined the conspiracy late has nothing to do

23 with whether or not this is a sufficient conspiracy.  And

24 indeed, while I think this goes -- I think the argument that

25 Omni seems to be making gets ahead of anything that is

 1    relevant to 12B6.  Also, of course, as the Court is aware,

 2    once a conspirator joins the conspiracy, they are liable for

 3    everything.  They are jointly and severally liable.

 4              But again, it seems in many respects that we are

 5    simply getting ahead of ourselves in terms of arguments that

 6    are -- that are appropriate for a 12B6 motion.

 7              That's --

 8              THE COURT:  Okay.  Thank you, counsel.

 9              MR. GORDINIER:  I'll be very brief, your Honor.

10              THE COURT:  Mr. Gordinier.

11              MR. GORDINIER:  First, on the arguments that

12    relate to the materials outside of the complaint with

13    their -- respecting the discovery stuff and particularly

14    Mr. Gozini, I have three answers to that.  First is that's

15    an entirely improper argument in this context because it's

16    not plead and it's not before the Court under 12B.  Second,

17    it's inaccurate because it's not what Mr. Gozini said.

18    Mr. Gozini said that he transferred his interest to

19    Mr. Kadesha, and that's what I told the Court, I don't know,

20    seven months ago.  Finally, even if you assume this false

21    argument, it's not pertinent to the RICO claims or the

22    fraudulent transfer claims that they are attempting to

23    assert.  Notice that counsel doesn't even try to argue that

24    the 20 allegations which reference -- 20 paragraphs that

25    reference Omni purport to allege either knowledge or

 1    agreement to the criminal enterprise, because they just

 2    simply don't.  They just simply don't.

 3            What the Court is -- and one other point.  Judge

 4    Larson's order didn't involve us.  We weren't there, but you

 5    ought to be aware in terms of the context -- this has been

 6    going on for a while -- that was pre-Twombly, so it didn't

 7    apply to us.  It didn't apply to any allegations relating to

 8    Omni, but it's also not the standard that this Court is

 9    guided by.

10            I'm going to let the Court be done with Omni here.

11    I -- oh, finally, he mentioned the discovery issues.  There

12    isn't a single discovery motion directed to Omni.  We've

13    complied with every order.  There are no outstanding motions

14    directed to Omni.  So I am not quite sure what that was

15    about, but there is no discovery dispute.  And what we're

16    here today is they've taken discovery -- they can consider

17    it unfettered or fettered -- they've taken discovery

18    one-sided for 18 months.  We are not a party, so we took no

19    discovery.  We were not entitled to take any discovery.  And

20    we've provided -- they have all the documents -- they have

21    all of the documents on the transaction, and you can judge

22    for yourself the careful phrasing of what they are saying

23    and what they are not saying.  But the time has come to --

24    Omni is not mentioned at all in the first hundred

25    paragraphs, other than in the beginning where they say what

```
 1    we are.  And I'm quite satisfied that the Court can read the

 2    20 paragraphs that do purport to address the Wachovia

 3    transaction and come to the right conclusion.

 4              So with that, I'm going to submit on the

 5    Omni-related motion.  Can we go off the record for one

 6    second?

 7              THE COURT:  Sure.

 8              (Discussion held off the record.)

 9              THE COURT:  All right.  Counsel?

10              MR. ZELLER:  Nothing further, your Honor.

11              THE COURT:  Okay.  Where would you like to go to

12    next?

13              MR. COTE:  I believe this is my motion next.

14              THE COURT:  And what motion will you be arguing?

15              MR. COTE:  Mr. Machado's motion to dismiss.

16              THE COURT:  And then at 11:30, give me a time

17    estimate between all of you when we finish off the first

18    round, so I know what to do.  Tell me where you're at in a

19    quick conversation.

20              Okay.  Mr. Machado.  You represent Mr. Machado,

21    and I certainly know you, but the record does not.

22              MR. COTE:  The name is Alexander Cote, your Honor.

23              Mr. Machado's motion is directed at a very limited

24    aspect of the RICO allegations against him.  The one problem

25    we talk about in our motion is timing.  This is a single
```

 1    scheme case.  It's a single scheme that only lasted a few

 2    months, which is not a substantial period of time, and

 3    therefore, does not satisfy closed-ended continuity under

 4    RICO.  It's a single scheme that bears no risk of repetition

 5    in the future because it's no opportunity for Mr. Machado to

 6    go back to Mattel and allegedly steal more of its trade

 7    secrets.  So there is no risk of repetition in the future,

 8    which means it doesn't satisfy open-ended continuity under

 9    RICO.

10         The Court, I think, can really boil down the

11    issues raised by our motion with reference to two different

12    cases, your Honor.  The first case is the Turner case, which

13    is the Ninth Circuit case we cited, and the other one is the

14    Bro-Tech case, which is an Eastern District of Pennsylvania

15    case, also cited in our papers.  Both are very recent.

16    Turner is from '04, and I think Bro-Tech is even more

17    recent --

18         THE COURT:  Just a moment.  I'm troubled by

19    anytime I'm interfering with a family.

20         I gave you the options.  Mr. Gordinier, let's do

21    this.  I don't want you to miss that, obviously.  But I want

22    the answers today because I am going to be working on it the

23    next couple of weeks.  Ms. Estrich substituted in by

24    agreement of all counsel, so you can have other counsel

25    substitute in, if you want, for the answers this afternoon.

1    That way you won't miss that.  That's a big event.

2          MR. GORDINIER:  Okay.

3          THE COURT:  Just get the agreement.  Listen,

4    during trial, I will only recognize four people or maybe

5    five, depending, and -- but I wasn't going to allow the

6    substitution.  In other words, if the parties worked it out,

7    Ms. Estrich could apply, that's fine, but what I wasn't

8    going to hear later on was, well, you did that for Mattel,

9    why aren't you doing that for MGA.  I'm not going to have a

10   parade of associates jumping in at the last moment, deciding

11   they are going to make their mark on the record.  It's not

12   going to happen.  Now, I let that go for deposition purposes

13   because I wanted those well prepared.  And frankly, I may

14   allow substitution later on by two additional counsel and

15   maybe it will be Ms. Estrich this time and -- whatever, but

16   then you will be the only two for trial purposes.  In other

17   words, there will be nobody else.  And the same thing for

18   MGA.  We'll talk about that if we get into a trial posture,

19   okay, but those are the only counsel.  So maybe you are

20   coming in as trial counsel, I don't know.  We'll see.

21          So I'm not against that, but I don't want to get

22   into a situation where I'm drawing a hard line about motions

23   being filed, who's dropping off the 860 pages of nonsense,

24   and then have to sit through because I created this

25   precedent, now, we're the next exception.  That's just not

1    going to happen.

2            So today if everybody agrees, I think it's great.

3    And quite frankly, if I missed my son's driving lesson, I

4    would regret it the rest of my life.  So let's not do that.

5    You are going to make the appearance, apparently, by

6    agreement, okay.  I just have a few questions, quite

7    frankly, and I can ask them now, but if I get out of order,

8    what's going to happen is that I have got so many questions

9    that I want to keep them straight in my mind and they are

10   important.  So you decide later on, but if you stay, that's

11   your own choice and I think it's a silly decision.  He's

12   quite capable, okay?

13           Counsel, thank you very much.  Sorry for the

14   interruption.

15           MR. GORDINIER:  With any luck, it may happen

16   within the lunch break.

17           THE COURT:  Go take it and we'll still be here, I

18   promise you.

19           And, Counsel, if you want to start over with your

20   thought, please.

21           MR. COTE:  I'll start at the beginning of where I

22   left off.

23           I was pointing out to the Court that in my view of

24   this case, it's most closely analogized to two of the cases

25   we cited in our briefing.  And it's really those two cases,

1    I think, that the Court -- I would recommend that the Court

2    focus on when reviewing the motion.  And the two cases are

3    Turner, which is a Ninth Circuit case from '04 --

4             THE COURT:  Uh-huh.

5             MR. COTE:  -- and the Bro-Tech case, which is

6    Eastern District of Pennsylvania, which I think is '07 or

7    '08.  Both very recent cases.

8             This case is quite similar to Turner in the

9    following respect.  This case alleges that there were

10   predicate acts between -- against my client -- I am just

11   talking about Mr. Machado, between February and -- during

12   February, April and May of 2004.  Then the complaint has one

13   more predicate act in October of 2004, six months later.

14   They've got one more predicate act after that in February of

15   '05.  In Turner, there were 94 acts in one two-month period.

16   Then there was another one in August of 2000, another one in

17   September of 2000, and then there's even more after that

18   months and months later.

19            In both cases, those outlying predicate acts

20   stretch the purported scheme to a year, and that's where the

21   similarity really is sharpest because even though in both of

22   those cases, the predicate acts -- the alleged predicate

23   acts stretch out over a year, Turner is very clear.  It

24   says, "Because almost all of the alleged fraudulent

25   communications occurred during the two-month period, and

1    then the additional three categories of communication

2    occurred only sporadically at other times, appellants have

3    failed to allege a series of related predicates extending

4    over a substantial period of time."  And then Turner

5    dismissed the RICO claims.  The same result I think should

6    come here.

7              Now, Mattel is going to get up here, I'm sure,

8    your Honor, and they are going to say, hold on a minute.

9    Those later predicate acts showed use of trade secrets, and

10   maybe there's even other e-mails that show use of trade

11   secrets, plus maybe there is some more spoliation that we

12   can find, although it's not in the complaint right now.  And

13   maybe there's some criminal copyright we can allege,

14   although that's not in the complaint right now either.  And

15   Mattel will argue, this shows either a substantial period of

16   time or maybe it shows an open-ended continuity, either one

17   of which would be good enough under RICO.  In our view, it

18   does neither.  And the largest problem and the one that

19   requires the most attention are the wire fraud allegations.

20   Mattel attaches two e-mails after Mr. Machado resigned that

21   purport to show his use of the trade secrets he allegedly

22   stole.  The problem with those allegations is wire fraud

23   requires the taking of property.  Wire fraud ends when the

24   property is taken.  The cases we cite for that are the three

25   Supreme Court cases that often are cited together for these

```
 1    kinds of propositions.  It's the Kann case, the Parr case,
 2    and the Maze case.  Maze says the only mailings -- they are
 3    talking about mail fraud, but it's the same analysis -- the
 4    only mailings that play -- only mailings that play a
 5    significant part in enabling the defendant to acquire
 6    dominion over the property amount to mail fraud.  That's on
 7    page 401 in the U.S. Reporter.  The Maze court goes on to
 8    say, congress could have drafted the mail fraud statute so
 9    as to require only that the mail is being, in fact, used as
10    a result of the fraudulent scheme.  They could have done
11    that, but Maze is clear, congress did not do that.  And
12    that's the allegation that we are facing here.
13            This brings us to the Bro-Tech case, which I
14    mentioned earlier, your Honor.  The facts in Bro-Tech are
15    eerily similar.  Four employees leave company A to go work
16    for company B, and they take what are alleged to be trade
17    secrets with them using the same kind of thumb drive that
18    Mr. Machado is accused of using here.
19            But despite all of those allegations, the Bro-Tech
20    court is clear, there is no closed-ended continuity
21    established here.  The criminal scheme concluded when the
22    employees left their first employer.  That's the end of the
23    criminal scheme.  As the Bro-Tech court says, the alleged
24    subsequent business use of the misappropriated information
25    does not function to extend the fraudulent scheme's duration
```

Case 2:04-cv-09049-DOC-RNB   Document 8190   Filed 06/28/10   Page 65 of 75   Page ID #:266359
SACV 04-9049-DOC - 05/28/2010 - Vol. I

65

 1    because such use is not a predicate act.

 2           The court goes on to say, indeed, the use is only

 3    possible because the predicate acts of taking the trade

 4    secrets is concluded.  Turner reaches a similar conclusion,

 5    although the facts are not quite as identical.  Turner says

 6    once the scheme is accomplished, the fraud, if indeed there

 7    was any fraud, is complete.

 8           That, I think, ends the wire fraud analysis.  The

 9    wire fraud allegations that Mattel wants to add to the

10    complaint, because they are not in the complaint now, about

11    e-mails that Mr. Machado sent while he was working at MGA to

12    other people at MGA at best can only show use, if they show

13    anything at all.  And if they show use, that doesn't satisfy

14    the wire fraud statute.

15           And Mattel wants to offer two more predicate acts

16    to its laundry list in the complaint, and both can be

17    addressed I think very quickly.  The first one is criminal

18    copyright infringement.  They say that Mr. Machado is guilty

19    of criminal copyright infringement.  The problem is the

20    complaint fails to identify a single document that

21    Mr. Machado ever touched that is protected by United States

22    copyright.  And there is no reason to expect they be

23    protected by United States copyright because these are

24    documents that were created by employees in Mexico of a

25    Mexican company that would relate to the Mexican toy market.

1    There is just simply no allegations in the complaint that

2    you can base to find an allegation of criminal copyright

3    infringement.

4              The other predicate act Mattel wants to bring in

5    is the alleged spoliation of evidence.  The one incident in

6    the complaint is that Mr. Machado did something to his

7    computer the day he left.  Well, if we accept that as true

8    and adequately pled, it's still within the same three-month

9    period.  And that's not enough to establish a RICO

10   continuity.  So they say, "Well, maybe there is other

11   spoliation we could allege later, although we haven't

12   alleged it yet."  For example, they say that Mr. Machado

13   gave his personal laptop to his father in 2005, and his

14   father dropped it and sold it because it didn't work anymore

15   in 2006.

16             All of those activities are things that took place

17   well before Mr. Machado was a party to this lawsuit, well

18   before Mr. Machado had any reason to believe he was going to

19   be a party to this lawsuit.  In the -- the notion that

20   Mr. Machado could be guilty of criminal spoliation by

21   getting rid of the trade secrets he misappropriated puts

22   Mr. Machado in the same kind of -- the horns of the dilemma

23   that Ms. Hurst was talking about.  If he keeps the trade

24   secrets, he's using them, he's violating the trade secret

25   statute.  If he gets rid of the trade secrets, he has

1    criminally exfoliated evidence.  What is Mr. Machado to do?

2         That ends the discussion on the closed-ended

3    continuity, your Honor.  Mattel also alleges open-ended

4    continuity, but it fails for the same reason.  There is no

5    risk of repetition because the scheme is completed at the

6    time the trade secrets are allegedly taken.  Mr. Machado

7    can't go back and take more trade secrets.

8         And with respect to the computers that he

9    allegedly injured or exfoliated, those computers are gone.

10   He doesn't have access to the Mattel computer, he doesn't

11   have access to the laptop that was given away by definition.

12        So in conclusion, your Honor, Mattel is trying to

13   bring a straightforward trade secret claim and transform it

14   into a RICO claim.  But trade secret claim by itself can't

15   be a RICO claim.  And when you think about the law, it

16   really has to be this way.  Every trade secret case is going

17   to require taking the secret and later using it.  You can't

18   have a trade secret case if it's only taken and not used or

19   if it's only used and not taken.  But with the ubiquity of

20   e-mail and phones and mail and other communications that

21   fall under the mail and wire fraud statutes, every trade

22   secret case is going to have some e-mails that are going to

23   show or purport to show use, which means if use is enough to

24   satisfy wire fraud, every trade secret claim is going to be

25   a RICO claim.  There is no need to have the uniform trade

1    secrets act in a world like that because every trade secret

2    case would land right here in front of a federal court.

3           And the Bro-Tech court recognizes this.  They say,

4    "Rather than a federal court action with potential trouble

5    damages, plaintiff's remedy is to ask for damages from the

6    defendants for theft of trade secrets."  And that's the

7    exact same result we are asking for here, your Honor.

8           Thank you.

9           THE COURT:  Thank you.

10          (Interruption in proceeding.)

11          THE COURT:  All right.  We are back on the record.

12          MS. ESTRICH:  Mr. Cote's basic argument here is

13   that all Mr. Machado did was take some stuff of Mattel's.

14   That rewrites our complaint.  That's not the scheme that

15   we've alleged.  It's not the enterprise we've alleged and

16   it's not the scheme to defraud we've alleged for purposes of

17   mail and wire fraud.  To go back to my earlier quote, the

18   words to defraud simply mean wronging one in his property

19   rights by dishonest methods or schemes.  Our allegation here

20   is not simply that Mr. Machado took Mattel's property,

21   including copyrighted information, confidential information,

22   and trade secrets.  It's that he took it, he used it, and

23   then he proceeded to cover up and obstruct and spoliate.

24          I'll get to criminal copyright infringement and

25   obstruction in just a moment, but let me start with the

 1    fraud point.

 2          Their essential argument boils down to this -- and

 3    I think Mr. Cote stated accurately, that fraud ends with the

 4    taking of the property, that once you take the property,

 5    nothing after that matters.  Turner does not stand for that

 6    proposition.  Turner stands for the proposition that where

 7    you've got a bunch of mailings that are all about an effort

 8    to collect a single judgment, even if there are 94 of

 9    them -- there are a number of cases they cite that are on

10    this point.  Even if there are 94 separate mailings, if they

11    are all about a single judgment, then you don't meet the

12    continuity standards.  Because as we discussed earlier, your

13    Honor, RICO was indeed intended to address ongoing criminal

14    enterprises, and that is the source of the continuity

15    requirement.  The only case that stands for the proposition

16    that we have been able to find and, frankly, that they have

17    been able to find that for purposes of a scheme to defraud,

18    it ends with the taking, and it doesn't matter if you use it

19    a hundred times, is indeed this Bro-Tech decision.  I don't

20    know what the Bro-Tech complaint said, how it defined its

21    scheme to defraud.  From reading the opinion -- and we made

22    an effort to get the complaint, but frankly, the RICO

23    allegations aren't even in the complaint -- it may well be

24    that in Bro-Tech, that's what they pled, that this was --

25    that the fraud was limited to the taking of this recipe for

1    ion compound.  But to the extent Bro-Tech is read to stand

2    for the proposition that a fraud is over, for purposes of

3    wire fraud or mail fraud, with the taking, it's simply not

4    right.  And it's not right because the United States Supreme

5    Court addressed exactly that argument in the Carpenter case.

6            Back to Forrest Winans of the Wall Street Journal.

7    He takes the confidential information from the Wall Street

8    Journal.  He gives it to his friends at Kidder, Peabody so

9    they can in turn make trades, but there is no mail or wire

10   fraud against the Wall Street Journal at that point.  So

11   they go to the Supreme Court and they make essentially the

12   very argument you've heard today.  No mailing, no use of the

13   wires, the taking must have been over because he took it, he

14   gave it out, and he didn't use the mails to do it.  And the

15   United States Supreme Court in the final paragraph of its

16   opinion said not only did the Wall Street Journal have a

17   protectable property right in keeping information

18   confidential prior to publication, and the conspiracy to

19   trade on this information was within the reach of the mail

20   and wire fraud statutes, but petitioners in this case argued

21   that the use of wires and mail to print and send the journal

22   after the taking was complete -- that is the next day when

23   Mr. Winans' column would then appear in the paper -- that

24   that was, in effect, too late, and would not satisfy the

25   requirements of the mail and wire fraud statute.  And the

Case 2:04-cv-09049-DOC-RNB   Document 8190   Filed 06/28/10   Page 71 of 75   Page ID
#:266365
SACV 04-9049-DOC - 05/28/2010 - Vol. I

71

```
 1   Supreme Court rejected the argument.  "The courts" -- and
 2   this is a direct quote -- "The courts below were quite right
 3   in observing that circulation of the heard column was not
 4   only anticipated, but an essential part of the scheme."
 5           We have alleged that Mr. Machado sent monthly
 6   reports to Mr. Larion, documenting the successful use -- the
 7   successful use of Mattel's confidential copyrighted property
 8   and information to boost the sales of MGA Mexico.  That was
 9   the anticipated purpose of the scheme.  If we hadn't alleged
10   that, your Honor, I expect Mr. Cote, being the fine lawyer
11   that he is, would be up here arguing to me that I hadn't
12   shown any injury or alleged any injury.  Because if all I
13   alleged was that Mr. Machado took this stuff and left it at
14   home and never did anything with it, he would probably be
15   arguing to me, how was Mattel injured?  The injury didn't
16   come until he used the information.  There is simply no
17   basis, other than Bro-Tech, which may be a peculiarity of
18   pleading or perhaps a peculiarity of Pennsylvania, for
19   saying that when it comes to wire fraud and mail fraud, you
20   cannot use subsequent communications by mail or wire once
21   the taking has been completed to support the elements of
22   mail and wire fraud.  Carpenter is directly to the contrary.
23   Since Bro-Tech was not cited until the reply brief -- and I
24   am not suggesting any irregularity there -- I do have a
25   number of other cases which we have since found from other
```

1    jurisdictions which I would simply call to your attention,

2    that reach exactly the contrary result of Bro-Tech.  That

3    would be General Motors Corporation -- and now I'm going to

4    butcher these names -- v. Ignacio Lopez Arriortura -- I'll

5    give you the site -- 948 F.Supp. 670, from 1996 is one of

6    those cases.  Gould v. Mitsui Mining & Smelting, 750 F.Supp

7    838, is another of those cases.  And that's from the

8    Northern District of Ohio.

9         Indeed, in one of their cases, the Macias case,

10   the Northern District of California, 2008WL94806, the

11   Northern District dismissed the claims because they said

12   there was no use and exploitation, and that that was

13   required for the mail fraud and wire fraud claims because

14   you needed some injury to your property, and until you had

15   some use and exploitation, you had no injury to your

16   property.

17        Now, our predicate acts are not limited to wire

18   and mail fraud.  I'm going to get to criminal copyright and

19   to spoliation very quickly, but there is a problem here.  We

20   still don't have all of Mr. Machado's communications.  We

21   have pending before Judge Smith a motion to get access to

22   his hard drives.  We know that he did a lot of communicating

23   in 2005, and by my latest count, we had roughly 200 e-mails

24   is all from 2005.  Mr. Machado invoked -- as the Court well

25   knows, when we initially tried to depose him, we came to

 1    your Honor, we were not able to depose Mr. Machado until

 2    after we filed this complaint.

 3            So, frankly, to the extent there would be any need

 4    for additional pleading on Mr. Machado, the fact that we

 5    still haven't gotten this hard drive, that he didn't testify

 6    until after we saw and received leave to follow the Court's

 7    request, would certainly argue for granting us additional

 8    time or an additional opportunity.  But I think we have more

 9    than enough now to meet both closed-end and open-ended

10    continuity.  And I would point not only to the -- we

11    actually alleged 20 months worth of mail and wire fraud

12    communications, but to criminal copyright enforcement

13    infringement and obstruction.  As to criminal copyright

14    infringement, we have alleged that all of the documents that

15    Mr. Machado took with him, copied onto his laptop and copied

16    onto a USB drive, copied -- he first copied onto a USB

17    drive, onto a laptop, made a DVD, and ultimately made

18    another copy in October of 2005 when they came to search --

19    when the Mexican police came to the office, we were alleging

20    that those are copyright protected, that we have at least

21    some dates of multiple copying going into 2005.  We know we

22    copied the DVD in January of 2005 because it's dated.  We

23    know we copied it again in October of 2005 -- I'm long past

24    their one-year period here -- because the Mexico police

25    allowed him to do so.  Registration is not required,

SACV 04-9049-DOC - 05/28/2010 - Vol. I

74

1    contrary to Mr. Cote's argument.  Sony Corporation of

2    America v. Universal City Studios 464US417483, absolutely

3    holds that -- or states, at least, that liability for

4    criminal copyright infringement is not conditioned on prior

5    registration --

6            THE COURT:  Now I'm going to stop you right there

7    for just a moment because I'm not enthralled.

8            MS. ESTRICH:  I can tell.

9            THE COURT:  No, just a moment.  We're going to

10   stop.  We are going to go off the record and resume at 1:30.

11           Now, let me talk to you informally.

12           (Informal discussion held off the record.)

13           (Recess.)

14                          -oOo-

15

16

17

18

19

20

21

22

23

24

25

```
 1
 2                             -oOo-
 3                          CERTIFICATE
 4
 5         I hereby certify that pursuant to Section 753,
 6    Title 28, United States Code, the foregoing is a true and
 7    correct transcript of the stenographically reported
 8    proceedings held in the above-entitled matter and that the
 9    transcript page format is in conformance with the
10    regulations of the Judicial Conference of the United States.
11
12    Date:  June 4, 2010
13
14
15                    _____
16                    JANE C.S. RULE, U.S. COURT REPORTER
                      CSR NO. 9316
17
18
19
20
21
22
23
24
25
```