UNITED  STATES  DISTRICT  COURT

FOR  THE  CENTRAL  DISTRICT  OF  CALIFORNIA

| | | |
|---|---|---|
| CARTER BRYANT, | ) | CASE NO. CV 04-9049 DOC (RNBx) |
| Plaintiff, | ) | |
| | ) | O R D E R ON MOTIONS TO |
| v. | ) | DISMISS |
| | ) | |
| MATTEL, INC., | ) | |
| Defendant. | ) | |
| ———————————————— | ) | |
| AND CONSOLIDATED ACTIONS | ) | |
| | ) | |
| ———————————————— | ) | |

Barbie may thrive on competition, but did the Bratz thrive on racketeering?

\*\*\*

The following motions[1] came before the Court for hearing on May 28, 2010:

---

[1] The motions filed by MGA Entertainment, Inc., Isaac Larian, and MGAE de Mexico, in which Carlos Gustavo Machado Lopez joined, originally included arguments seeking dismissal of one or more counterclaims pursuant to Fed. R. Civ. P. 56.  By Minute Order dated May 13, 2010, the Court struck as premature the submissions' summary judgment arguments.

(1) Counter-Defendants[2] MGA Parties and IGWT 826's Motion to Dismiss RICO and Creditor Claims; (2) MGA Entertainment, Inc. and Isaac Larian's Motion to Dismiss U.S.-Based Trade Secret and Employee-Based State Law Tort Claims; (3) MGAE de Mexico's Motion to Dismiss for Lack of Personal Jurisdiction and on Ground of *Forum Non Conveniens*; (4) Carlos Gustavo Machado Gomez's Motion to Dismiss First Counterclaim;[3] and (5) Omni 808 Investors, LLC's Motion to Dismiss.

### Background

Mattel's Fourth Amended Answer and Counterclaims (FAAC) brings seventeen counterclaims arising under federal law and the laws of the state of California. The counterclaims are predicated upon certain acts alleged to have been taken by MGA Entertainment, Inc. ("MGA"), its founder and Chief Executive Officer Isaac Larian ("Larian"), its Mexican subsidiary MGAE de Mexico ("MGA Mexico"), its Hong Kong subsidiary MGA Hong Kong ("MGA HK"), its current and former employees including but not limited to Carter Bryant ("Bryant") and Carlos Gustavo Machado Gomez ("Machado"), its creditor Omni 808 Investors, LLC ("Omni"), and Omni's creditor IGWT 826 ("IGWT") over the last decade. In broad terms, Mattel alleges that counter-defendants undertook to deprive Mattel of its intellectual property, wrongfully solicit its employees' services, misappropriate its confidential and proprietary information, infringe its copyrights, secret assets, and obstruct justice.

MGA and Larian appealed from the Phase 1 post-trial orders and the Ninth Circuit vacated the equitable relief issued after the first phase on July 22, 2010 with instructions.

### Discussion[4]

---

[2] Mattel is the Defendant to the action numbered CV 04-9049 and its counterclaims are the subject of this order. However, this Order does not definitively identify the party(ies) that will be labeled Plaintiff(s) or Defendant(s) at the time of trial.

[3] Defendant Carlos Gustavo Machado Gomez also joins in the MGA Parties' and IGWT 826's Motion to Dismiss, MGA Entertainment, Inc. and Isaac Larian's Motion to Dismiss, and MGAE de Mexico's Motion to Dismiss.

[4] The Court declines to follow the sequence of argument in the parties' briefing.

The FAAC's seventeen counterclaims are: (1) violation of 18 U.S.C. §§ 1962(c) and 1964(c); (2) violation of 18 U.S.C. §§ 1962(d) and 1964(c); (3) misappropriation of trade secrets; (4) copyright infringement; (5) breach of contract; (6) intentional interference with contract; (7) breach of fiduciary duty; (8) aiding and abetting breach of fiduciary duty; (9) breach of duty of loyalty; (10) aiding and abetting breach of duty of loyalty; (11) conversion; (12) unfair competition; (13) avoidance of actual fraudulent transfers; (14) avoidance of constructive fraudulent transfers; (15) prohibited distributions; (16) breach of constructive trust; and (17) declaratory relief.  The named defendants are MGA, MGA Mexico, MGA HK, Larian, Bryant, Machado, Omni, and IGWT (collectively "counter-defendants").

## I.   Violation of 18 U.S.C. § 1964(c) Based on Violation of § 1962(c) (Substantive RICO)

The FAAC's first counterclaim alleges that MGA, MGA Mexico, MGA HK, Larian, Machado,[5] and Does 6 through 10 violated section 1964(c) of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), which provides that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains" and other damages identified by the statute.  18 U.S.C. § 1964(c).  Section 1962 provides that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."  18 U.S.C. § 1962(c).

### A.   Person, Enterprise, and Distinctness

To establish liability under section 1962(c), one must prove the existence of a (1) person who is "employed by or associated with" (2) an enterprise that is not simply the "person referred to by a different name."  *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S.

_____

[5] For simplicity, the named counter-defendants to the first counterclaim are collectively referred to as "the members."

158, 161, 121 S. Ct. 2087 (2001). Mattel alleges that the members constituted an associated-in-fact enterprise "engaged in a scheme to unlawfully compete with Mattel."  FAAC ¶ 123.  The members argue that Mattel fails to plead a valid enterprise because the association formed by MGA, MGA's employees, and MGA's subsidiaries is no different from MGA.

A corporation is an "individual" for the purposes of § 1961(4).  *See United States v. Blinder*, 10 F.3d 1468, 1473 (9th Cir. 1993) (citing *United States v. Feldman*, 853 F.2d 648, 655-56 (9th Cir. 1988)).  Thus, MGA can associate in fact with other "individuals" to form an enterprise that is "not a legal entity."  *Id.*; *see also* 18 U.S.C. § 1961(4).  But the enterprise formed by MGA and these other "individuals" must be distinct from MGA, since MGA cannot be "employed by or associated with" itself.  *King*, 533 U.S. at 161-62.

Measuring distinctness is elementary if the enterprise is an individual (dissociative personalities notwithstanding), tougher if the enterprise is a corporation, and hardest if the enterprise is composed of individuals who form an association that is, by definition, "not a legal entity."  18 U.S.C. § 1961(4).  Unlike the corporation – an entity *King* distinguished by its "rights and responsibilities" under law – an associated-in-fact enterprise is conceptually slippery.  It lacks the features most groups possess:

> [An associated-in-fact enterprise n]eed not have a hierarchical structure or "chain of command"; [can make] decisions [] on an ad hoc basis and by any number of methods - by majority vote, consensus, a show of strength, etc. [Need not have] fixed roles [for its members] . . . [Need not have] name, regular meetings, dues, established rules and regulations, disciplinary procedures, or initiation ceremonies.

*Boyle v. United States*, - - - U.S. - - -, 129 S.Ct. 2237, 2245-46 (2009).

Instead, an associated-in-fact enterprise is characterized by its purpose, the relationships between its individual members, and its longevity.  *Id.* at 2245. Each element satisfies a different part of the RICO statute: an "enterprise" must have a purpose; an "associat[ion]" needs relationships; and "affairs" cannot be conducted through a pattern of

1  racketeering activity unless the enterprise has sufficient longevity. *Id.*

2         The corporation's purpose, relationships, and longevity subsume the purpose,

3  relationships, and longevity of an enterprise formed between the corporation and its employees

4  and/or subsidiaries. Thus, a corporation cannot be employed by or associated with an enterprise

5  composed of the corporation and its employees and/or subsidiaries. *See Living Designs, Inc. v.*

6  *E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 361 (9th Cir. 2005); *Anatian v. Coutts Bank*

7  *(Switzerland) Ltd.*, 193 F.3d 85, 88-89 (2d Cir. 1999) (citing *Riverwoods Chappaqua*, 30 F.3d

8  339, 344 (2d Cir. 1994)); *Gasoline Sales, Inc. v. Aero Oil Co.*, 39 F.3d 70, 73-74 (3d Cir. 1994)

9  ("[A] corporation generally cannot be a defendant under section 1962(c) for conducting an

10  'enterprise' consisting of its own subsidiaries or employees, or consisting of the corporation

11  itself in association with its subsidiaries or employees.");[6] *Bachman v. Bear Stearns & Co., Inc.*,

12  178 F.3d 930, 932 (7th Cir. 1999) ("A firm and its employees, or a parent and its subsidiaries,

13  are not an enterprise separate from the firm itself.") (citing *Emery v. Am. Gen. Fin., Inc.*, 134

14  F.3d 1321, 1324-25 (7th Cir. 1998)). Although the corporation and its employees are distinct,

15  *King*, 533 U.S. at 161, it is odd to speak of a corporation as associated with or employed by an

16  association of the corporation and its employees. *Id.* at 163.

17         But a corporation *is* distinct from an enterprise composed of the corporation and a

18  professionally independent entity. *See Living Designs*, 431 F.3d at 362 (corporation distinct

19  from associated-in-fact enterprise composed of corporation, law firm, and expert witnesses); *c.f.*

20  *Odom v. Microsoft Corp.*, 486 F.3d 541, 552-53 (9th Cir. 2007) (enterprise composed of two

21  corporations); *see also Riverwoods*, 30 F.3d at 344 (distinctness is satisfied even if "there is only

22  a partial overlap between the RICO person and the RICO enterprise"). Since Bryant and

23  Machado weren't always employed by MGA, Mattel argues the enterprise composed of the two

24  _____

25         [6] The FAAC tracks the language of a hypothetical exception created by *Aero Oil.*
   FAAC ¶ 125 ("MGA had a role in the racketeering activity that was distinct from the
26  undertaking of those acting on its behalf."). This exception doesn't comport with *King*'s
   observation that a corporation has distinct obligations and responsibilities. Instead, the
27  employees should have a role distinct from their traditional undertaking on behalf of the
   corporation. The language in ¶ 125 is therefore irrelevant.
28

1    defecting Mattel employees was distinct from MGA.[7]

2              The members respond that Bryant and Machado were the target of the pattern of

3    racketeering, not members of the enterprise. *See* Docket 7996 at 3 n. 1.  However, Mattel

4    alleges that Bryant and Machado were participating members of the enterprise, not its targets.

5    FAAC ¶¶ 28 ("Bryant worked with MGA [] while he was still employed by Mattel."); 31

6    (same); 33 (similar); 52 (Machado met with Larian).  Moreover, the principle that the

7    "'enterprise' is not the 'pattern of racketeering activity'," *Izenberg v. ETS Svcs., LLC*, 589 F.

8    Supp. 2d 1193, 1202 (C.D. Cal. 2008), does not preclude one enterprise member from engaging

9    in an act of racketeering directed at another enterprise member.  The principle merely applies to

10   a scenario in which "several individuals, independently and without coordination, engaged in a

11   pattern [of racketeering activity]." *Boyle*, 129 S.Ct. at 2245 n. 4.

12             Finally, the members summarily argue the enterprise fails because the members

13   merely "carry[] on the regular affairs of the corporation."  Since the manner in which the

14   enterprise must be constituted is governed by *Boyle* and not the line of cases addressing

15   distinctness, this argument is unrelated to whether the person must be distinct from the

16   enterprise.  Even if the affairs of the enterprise must be distinct from the affairs of each of its

17   members, such a determination would be fact-intensive and is unfit for resolution at this early

18   stage.  Notably, Mattel does not allege that the enterprise carried on the regular affairs of MGA.

19             The members' limited challenge to the distinctness and cognizability of the

20   enterprise fails.

21                        **B.    Predicate Acts**

22             Mattel alleges that the members conducted the enterprise's affairs through

23   predicate acts of mail fraud, wire fraud, spoliation and concealment of evidence, obstruction of

24   justice, interstate and foreign travel in aid of racketeering enterprises, and criminal copyright

25   _____

26             [7] Obviously, Machado and Bryant were employed by MGA for some period of
     time.  But the members don't discuss whether distinctness can be subject to temporal
27   limitations and the Court declines to visit the issue *sua sponte*, since it is fact intensive
     and can be addressed at summary judgment and/or trial.
28

infringement.  FAAC ¶ 123(a)-(f).

A RICO plaintiff must establish that the alleged "person" conducted or participated in the conduct of the alleged enterprise's affairs "through a pattern of racketeering activity."  18 U.S.C. § 1962(c).  A "'pattern of racketeering activity' requires at least two predicate acts of racketeering activity . . . the latter of which occurred within ten years . . . after the commission of a prior act of racketeering."  18 U.S.C. § 1961(5).  "Racketeering activity," includes, for the purposes of the present order, any act indictable under 18 U.S.C. §§ 1343 (wire fraud), 1344 (mail fraud), 1512 (tampering with a witness, victim, or an informant), 1503 (obstruction of justice), 1952 (racketeering), and 2319 (criminal infringement of a copyright).

### 1.    Mail Fraud and Wire Fraud (RICO Predicate Acts)

Mail fraud and wire fraud share elements and are therefore evaluated under the same framework.  *Miller v. Yokohama Tire Corp.*, 358 F.3d 616, 621 (9th Cir. 2004) (citing *Neder v. United States*, 527 U.S. 1, 119 S.Ct. 1827 (1999)).  A claim for mail fraud or wire fraud must allege that the defendant: "(1) devised [] or intend[ed] to devise a scheme to defraud (or to perform specified fraudulent acts), and (2) use[d] the mail [or wires] for the purpose of executing, or attempting to execute, the scheme (or specified fraudulent acts)."  *Carter v. United States*, 530 U.S. 255, 261, 120 S.Ct. 2159 (2000).  The statutes encompass "any scheme to deprive another of money or property by means of false or fraudulent pretenses."  *Carpenter v. United States*, 484 U.S. 19, 27, 108 S.Ct. 316 (1987).   The scheme to defraud requires concealment of a "material fact," *Neder v. United States*, 527 U.S. 1, 22-23, 119 S.Ct. 1827 (1999), but not reliance, *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 128 S.Ct. 2131, 2140 (2008).

Mattel alleges that the members' acts of mail fraud and wire fraud furthered or executed a "scheme or artifice to defraud Mattel of its rights to receive honest services from its employees and to maintain the secrecy of its confidential and trade secret information and property; to transfer the ill-gotten gains from such thefts and wrongs, secret MGA assets and purportedly obtain priority over Mattel; and to obstruct the judicial process and thwart the verdicts of the jury and Orders of the Court, including by failing to preserve Mattel's property."

1 | FAAC ¶¶ 124(a)-(b).  In effect, Mattel challenges the crime and the cover up.

2 |         a.     Scheme to Deprive Mattel of Employees' Honest Services

3 |       A "scheme or artifice to defraud" under the mail fraud and wire fraud statutes

4 | includes "a scheme or artifice to deprive another of the intangible right of honest services."  18

5 | U.S.C. § 1346.  The Supreme Court has "construe[d]" the statute to cover only "fraudulent

6 | schemes to deprive another of honest services through bribes or kickbacks supplied by a third

7 | party who had not been deceived."  *Skilling v. United States*, 130 S.Ct. 2896, 2928 (June 24,

8 | 2010).  This includes bribes of private sector employees.  *See id.* at 2932 n. 45 (discussing

9 | "undisclosed self-dealing by . . . a private employee"); *id.* n. 46 (contending that re-construal

10 | does not render § 1346 superfluous of bribery statutes, which do not address "state and local

11 | corruption and . . . private-sector fraud"); *see also United States v. Procter & Gamble Co.*, 47 F.

12 | Supp. 676, 678 (D. Mass. 1942) (cited with approval in *Skilling*).

13 |       Mattel alleges Bryant, Machado, Trueba, Vargas, Brisbois, and Castilla worked for

14 | MGA while at Mattel in exchange for bribes of cash or future employment.  *See, e.g.*, FAAC

15 | ¶¶ 30 (employment contract); 86-90 (indirect bribes); 43 ("induce[ment]"); 44 (future

16 | employment benefits); 61 (meeting); 77 ("lur[ing]"); 81 (job and raise); 67 (misappropriation);

17 | 80 (same); 85 (same).[8]  The allegations expressly encompass acts of bribery and are therefore

18 | sufficient to sustain a claim that the members used the mails or wires to execute a scheme to

19 | deprive Mattel of the honest services of its employees.

20 |       The members respond that the alleged honest services fraud (1) deprived Mattel of

21 | an intangible property interest not recoverable under civil RICO and (2) was perpetuated by

22 | entities that owed no fiduciary duty to Mattel.  However, the members conflate the standing

23 | requirements of a civil RICO claim, 18 U.S.C. § 1964(c), with the mail fraud and wire fraud

24 | statutes, and fail to recognize that a person, like Mattel in this case, can suffer tangible harm by

25 | reason of the deprivation of an intangible right.  Furthermore, the members' fiduciary

26 | _____

27 |     [8] The FAAC's remaining allegations about Mattel employees contracting to work
with MGA and committing acts of self-dealing do not state a claim for honest services

28 | fraud.  *Skilling*, 130 S.Ct. at 2931.

relationship argument is extra-statutory.  Indeed, *Skilling* cited with approval a pre-*McNally*
prosecution that, like this case, concerned "the payment of gratuities or bribes by the defendant
[corporation], its subsidiaries and agents, to certain employees of [another corporation] in
exchange for which the employees obtained from their employer possession of [proprietary
information] which they turned over to the [defendant corporation]."  *See Procter & Gamble*, 47
F. Supp. at 678; *see* 130 S.Ct. at 2929.

b.  Scheme to Deprive Right to Secrecy of Confidential and
Trade Secret Information

The members argue that trade secret misappropriation cannot constitute a scheme
under §§ 1341 and 1343 because a violation of 18 U.S.C. § 1832 (trade secret misappropriation)
cannot be bootstrapped into the mail fraud and wire fraud statutes.

The same conduct can violate the mail fraud or wire fraud statutes and some other
statute not listed in § 1961(1).  *See Midwest Grinding Co., Inc. v. Spitz*, 976 F.2d 1016, 1021-22
(7th Cir. 1992) (while "telling a simple lie or committing perjury is not *per se* a RICO predicate
act" it can still constitute mail or wire fraud).  Alternatively, the same conduct can violate *two*
statutes listed by § 1961(1), since certain types of schemes to defraud are independently
wrongful.  *See* 18 U.S.C. § 1961(1) (listing financial institution fraud, fraud and related activity
in connection with access devices, fraud and misuse of visas, permits, and other documents).

But not all illegal conduct violates the mail fraud and wire fraud statutes.  *United
States v. Gallant*, 570 F. Supp. 303 (S.D.N.Y. 1983) (violation of statute alone is not mail/wire
fraud); *Evercrete Corp. v. H-Cap Ltd.*, 429 F. Supp. 2d 612 (S.D.N.Y. 2006) (same).  A
violation of some other statute does not constitute mail fraud or wire fraud unless (obviously)
fraud is involved.  *Chagby v. Target Corp.*, No. CV 08-4425-GHK (PJWx), 2008 WL 5686105,
at *4 (C.D. Cal. Oct. 27, 2008).  For example, since copyright infringement cannot be
effectuated through fraud, *c.f.* 18 U.S.C. § 2319, a scheme to infringe copyrights is not a scheme
or artifice proscribed by the mail fraud or wire fraud statutes.  *See Smith v. Jackson*, 84 F.3d
1213 (9th Cir. 1996); *see Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.*, 98 F. Supp.
2d 480 (S.D.N.Y. 2000) (same with patent infringement, which has "no deceptive element").

9

1         Trade secret misappropriation can be fraudulent, unlike copyright infringement

2   and patent infringement.  18 U.S.C. § 1832(a).  The employer discloses trade secret materials to

3   the employee pursuant to the employee's promise to keep that information confidential, *Miller v.*

4   *Yokohama Tire Corp.*, 358 F.3d 616, 621-22 (9th Cir. 2004), and the employee may commit mail

5   fraud or wire fraud by betraying that trust through the use of the mails or wires.  *Carpenter v.*

6   *United States*, 484 U.S. 19, 25, 108 S.Ct. 316 (1987).[9]  Here, Mattel alleges it was defrauded of

7   its trade secrets.  FAAC ¶¶ 37-42 (Machado, Trueba, and Vargas secured Mattel's trust); 48

8   (Trueba extracted Mattel confidential information); *id.* (Machado, Vargas, and Trueba attended

9   three day Mattel planning meeting even though their resignations were imminent).  The

10  members don't contest the strength of these allegations, which aver the theft of Mattel's trade

11  secrets by fraud.  Thus, the alleged scheme is cognizable to the extent it involves the deprivation

12  of Mattel's right to maintain the secrecy of its confidential and trade secret information.

13                  c.      Scheme to Obstruct Justice and Thwart Jury Verdicts

14        The alleged scheme also aimed "to obstruct the judicial process and thwart the

15  verdicts of the jury and Orders of the Court, including by failing to preserve Mattel's property."

16  FAAC ¶ 124.  Though Mattel's Opposition states that the scheme was "aimed at, among other

17  things, 'defraud[ing] Mattel of its rights to receive honest services from its employees and to

18  maintain the secrecy of its confidential and trade secret information and property,'" *see* Docket

19  7880, at 12, that is an understatement.  The false or fraudulent statements, if any, were made to

20  the Court in order to prevail in the litigation – they did not just "cover up" already consummated

21  schemes.  In other words, Mattel alleges that MGA sought to deprive Mattel of business or

22  property through false or fraudulent litigation conduct.  This sort of scheme may be cognizable

23  under the mail fraud and wire fraud statutes.  *See, e.g.*, *Living Designs*, 431 F.3d at 364-65

24  (plaintiffs accepted lower settlement in prior litigation due to lack of access to wrongfully

25  concealed documents).  The members ignore these issues, which can be addressed again at

26  _____

27      [9] The members argue that *Carpenter* does not control since it was decided before
    § 1832.  However, *Carpenter* did not discuss trade secret misappropriation and more

28  importantly, § 1832 recognizes claims for fraud.

1    summary judgment and/or trial.

2           The members instead argue that the alleged litigation conduct was not committed

3    in furtherance of a scheme to defraud Mattel of its honest services and the secrecy of its

4    confidential and trade secret information.  However, the "cover up" of a scheme to defraud

5    executes the scheme.  *See Spitz*, 976 F.2d at 1021-22 (7th Cir. 1992) ("cover up" of

6    consummated scheme can be in furtherance of scheme).  And Mattel alleges that the members'

7    litigation misconduct concealed their scheme to bribe Mattel employees and steal Mattel trade

8    secrets.  FAAC ¶¶ 95 (alleging document destruction, deletion and manipulation, concealment of

9    identities); *id.* 96, 104, 114, 118-21 (perjurious statements).  The members' limited challenge to

10   the alleged sub-scheme to engage in litigation and post-litigation misconduct fails.

11                    d.      Scheme to Conceal Assets

12          The alleged scheme also aimed to "transfer the ill-gotten gains from such thefts

13   and wrongs, secret MGA assets and purportedly obtain priority over Mattel."  FAAC ¶ 124(a)-

14   (b).  As a general matter, a scheme to nefariously conceal assets can be a scheme to deprive

15   another of business or property through false or fraudulent pretenses.  *See, e.g.*, *Rothberg v.*

16   *Chloe Foods Corp.*, No. CV-06-5712 (CPS), 2007 WL 2128376, at *11-12 (E.D.N.Y. July 25,

17   2007); *Gutierrez v. Givens*, 1 F. Supp. 2d 1077, 1086 (S.D. Cal. 1998).  The alleged scheme

18   need not have been successful to be wrongful, since mere "intent to deprive the victim of money

19   or property," *United States v. Ciccone*, 219 F.3d 1078, 1082 (9th Cir. 2000), can give rise to a

20   claim under the mail fraud and/or wire fraud statutes.  *C.f. United States v. Vaughn*, 797, F.2d

21   1485, 1493 (9th Cir. 1986).

22          The members argue that acts taken to shield the enterprise from detection do not

23   constitute mail fraud or wire fraud.  However, Mattel alleges the concealment of assets furthered

24   a scheme to defraud Mattel of its property; not a scheme to conceal the enterprise.  FAAC ¶ 124.

25                    e.      Particularity

26          Every act of mail or wire fraud need not be pled with the "particularity" required

27   by Fed. R. Civ. P. 9(b).  *Schmuck v. United States*, 489 U.S. 705, 714, 109 S.Ct. 1443 (1989).

28   ("It is sufficient for the mailing to be 'incident to an essential part of the scheme' or 'a step in

[the] plot.'"); *M'Baye v. N.J. Sports Prod., Inc.*, No. 06-CV-3439, 2007 WL 431881, at *7

(S.D.N.Y. Feb. 7, 2007).  This is because the scheme, *not* the communications in furtherance of

the scheme, must be fraudulent.  *Schmuck*, 489 U.S. at 715 ("'innocent' mailings – ones that

contain no false information – may supply the mailing element [and] the elements of mail fraud

[can] be satisfied where the mailings have been routine") (internal citations omitted).

Rule 9(b)'s particularity requirements only apply to (1) the scheme itself; and

(2) any mail or wire communications alleged to be fraudulent.  *See M'Baye*, No. 06 Civ 3439,

2007 WL 431881, at *7 (quoting *Evercrete Corp. v. H-Cap Ltd.*, 429 F. Supp. 2d 612, 624

(S.D.N.Y. 2006)); *see also Living Designs*, 486 F.3d at 554 ("The only aspects of wire fraud that

require particularized allegations are the factual circumstances of the fraud itself.").  The FAAC

does not allege that the mail or wire communications that executed the fraudulent scheme were

themselves fraudulent.  Regardless, Mattel pleads the mail fraud and wire fraud scheme with

particularity.  FAAC ¶¶ 25-27 (Bryant secured position of trust by entering into specifically

identified agreements with Mattel); 28 (Bryant failed to disclose his work for MGA's benefit to

Mattel and induced other Mattel employees to work for MGA); 31 (Bryant designed Bratz with

MGA while employed by Mattel); 37-42 (Machado, Vargas, and Trueba secured positions of

trust with Mattel by signing specifically identified agreements); 48 (Trueba accessed Mattel

information by attending a Barbie meeting four days before departure and soliciting advertising

strategy two days before departure).  Mattel also attaches, for good measure, hundreds of

communications that show the existence of the scheme.

Because the members' arguments are premised on a misunderstanding of Mattel's

pleading obligations, they fail to raise a viable Rule 9(b) challenge.

## 2.    Violation of the Travel Act (**RICO Predicate Act**)

Mattel alleges that MGA and Larian violated 18 U.S.C. § 1952.  For the purposes

of this order, § 1952 proscribes (1) interstate travel or use of interstate facilities (2) with intent to

promote unlawful activity (3) followed by promotion or attempted promotion of the unlawful

activity.  18 U.S.C. § 1952.  Unlawful activity includes "extortion, bribery, or arson in violation

of the laws of the State in which committed or of the United States."  *Id.* at (b)(2).  California's

1  commercial bribery statute, Cal. Penal Code § 641.3, proscribes any non-employer from

2  "offer[ing] or giv[ing] [] money or any thing of value" to an employee who "corruptly and

3  without the knowledge or consent of the employer [] agree[s] to use his or her position for the

4  benefit of that other person."  In effect, Penal Code § 641.3 is California's version of the federal

5  honest services fraud statute.

6      Contrary to the members, Mattel adequately pleads a violation of the Travel Act.

7  FAAC ¶¶ 30, 43, 44, 61, 67, 77, 80, 81, 85-90.  The members object to Mattel's use of

8  "information and belief," but there are plenty of allegations not based on information and belief.

9  Moreover, information and belief is itself sufficient to sustain a claim as long as it is supported

10  with "a statement of the facts upon which the belief is based."  *Zatkin v. Primuth*, 551 F. Supp.

11  39, 42 (S.D. Cal. 1982).  The facts upon which Mattel's Travel Act claim is predicated can be

12  found between paragraphs 85 and 90 of the FAAC.  Specifically, MGA vendor Veronica

13  Marlow received a salary that Larian characterized as enough for "4 high quality doll fashion

14  designers with experience full time," and thereafter used those funds to bribe Mattel employees

15  to work for MGA's benefit.  FAAC ¶ 87.

16      Citing legislative history, the members argue that the Travel Act was never

17  intended to apply to civil actions, such as this one.  However, section 1952's unambiguous

18  statutory language should not be re-construed in order to redeem its perceived purpose.  *See*

19  *Amalgamated Transit Union Local 1309 AFL-CIO v. Laidlaw Transit Servs., Inc.*, 448 F.3d

20  1092, 1096 (9th Cir. 2006). The members also argue that Cal. Penal Code § 641.3 did not

21  prohibit MGA and Larian from bribing Machado, Vargas, and Trueba in Mexico and Brisbois in

22  Canada, since the statute does not apply to extra-territorial conduct.  However, Penal Code

23  § 641.3 proscribes bribery conducted "in whole or in part" in California, which is what Mattel

24  alleges.  *See* FAAC ¶¶ 36, 43-47, 52, 56, 61-63.[10]  Finally, in a footnote, the members argue that

25  Mattel must allege injury because intent to commit bribery doesn't violate the Travel Act.  The

26

27     [10] *Markey v. Kudelski S.A.*, No. 06-CV-1300 W (RBB), 2008 WL 65401 (S.D. Cal.

28  Jan. 3, 2008) did not address extra-territorial concerns directly.

1    premise is correct but the conclusion all wrong.  Section 1952 requires not just intent but

2    performance or attempted performance as well.  18 U.S.C. § 1952.  It does not, however, require

3    a showing of injury – an issue properly addressed in the context of 18 U.S.C. § 1964(c).

4              The members' arguments against the Travel Act allegation fail.

5    **C.     "Pattern"**

6              The commission of at least two acts of racketeering within a ten year period can

7    constitute a "pattern of racketeering activity."  18 U.S.C. § 1961(5).  The acts of racketeering

8    must be related and "amount to or pose a threat of continued criminal activity.'"  *Turner v. Cook*,

9    362 F.3d 1219, 1229 (9th Cir. 2004) (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239,

10   109 S.Ct. 2893 (1989)).  Machado seeks dismissal of the first counterclaim on the grounds that

11   his alleged acts of racketeering did not constitute a "pattern."

12             **1.     Continuity**

13             RICO predicate acts may be bound by closed-ended or open-ended continuity.

14   *Turner*, 362 F.3d at 1229.  Closed-ended continuity is established by a series of predicate acts

15   "over a substantial period of time" that "threaten[] . . . future criminal conduct."  *Id.* (quoting

16   *Howard v. Am. Online, Inc.*, 208 F.3d 741, 750 (9th Cir. 2000)).  Open-ended continuity is

17   established by "a form of predicate misconduct that 'by its nature projects into the future with a

18   threat of repetition.'"  *Id.* (citing *Religious Tech. Ctr. v. Wollersheim*, 971 F.2d 364, 366 (9th Cir.

19   1992)).  Neither form of continuity requires "a showing that the defendants engaged in more

20   than one 'scheme' or 'criminal episode'."  *Medallion Television Enters., Inc. v. SelecTV of Cal.,*

21   *Inc.*, 833 F.2d 1360, 1363-64 (9th Cir. 1987).

22             Mattel alleges that Machado committed acts of mail fraud and wire fraud (in

23   furtherance of a scheme to defraud Mattel of the secrecy of its confidential information and

24   honest services), spoliation (in order to conceal his wrongdoing), and criminal copyright

25   infringement (by using Mattel documents in his capacity as an MGA employee).  However,

26   Machado's receipt of bribes, betrayal of Mattel, and misappropriation of trade secrets was

27   concentrated between the start of 2004 when he met Susana Kuemmerle, FAAC ¶ 43, and April

28   19, 2004 when he made off with Mattel's trade secret information, *id.* ¶ 44-51. *See* Ex. R to

1  FAAC (April 16 and April 17, 2004 communications); Ex. W (emails and phone calls between

2  Machado and MGA/Larian between February and April 2004).  Even Machado's alleged

3  spoliation occurred on "the day of his resignation." FAAC ¶ 95.

4          Mattel responds that Machado's post-resignation use of Mattel's trade secrets

5  constitutes predicate acts of mail fraud and wire fraud, because *every* use of Mattel's trade secret

6  information executed the illegal scheme to deprive Mattel of the secrecy of its confidential

7  information.  For example, in May 2004, October 2004, and February 2005, Machado prepared

8  reports for Larian and MGA by using Mattel trade secret information.  *See*  Ex. W to FAAC.

9          The subsequent use of Mattel's trade secret did not execute a scheme to defraud

10  Mattel of its right to maintain the secrecy of its confidential and trade secret information.  The

11  scheme targeted Mattel's ability to "decide how to use" its confidential information, *Carpenter*,

12  484 U.S. at 25-27, which like the confidential employer-employee relationship, s*ee Intermedics,*

13  *Inc. v. Ventritex, Inc.*, 822 F. Supp. 634, 651 (N.D. Cal. 1993), can be lost but once.  *See Bro-*

14  *Tech Corp. v. Thermax, Inc.*, 651 F. Supp. 2d 378 (E.D. Pa. 2009) (subsequent use "does not

15  function to extend the fraudulent scheme's duration because such use is not a predicate act of the

16  scheme").  Indeed, 18 U.S.C. § 1832 prohibits the acquisition, duplication, use, and knowing

17  receipt of trade secrets, but suggests by omission that only the acquisition of trade secrets can be

18  consummated by fraud.  *See* 18 U.S.C. § 1832(1) (imposing liability upon person who "by fraud,

19  artifice, or deception *obtains* [trade secret] information") (emphasis added).[11]  Not surprisingly,

20  Mattel cites no authority for the proposition that the use of fraudulently obtained business or

21  property executes an already consummated mail fraud or wire fraud scheme.

22          The FAAC alleges that Machado first disclosed much of Mattel's trade secret

23  information to MGA while he was still employed by Mattel.  *See, e.g.*, Ex. W to FAAC.

24

25  _____

26          [11] Of course, subsequent use of an employer's trade secret information may
     constitute an independently wrongful act subject to liability under the tort of
27  misappropriation of trade secrets. *See, e.g.*, *Harry Miller Corp. v. Mancuso Chem. Ltd.*,
     469 F. Supp. 2d 303, 317 (E.D. Pa. 2007); *Underwater Storage, Inc. v. United States*
28  *Rubber Co.*, 371 F.2d 950, 953 (D.C. Cir. 1966).

However, the FAAC also appears to allege that Machado withheld some Mattel trade secret information initially, only to first access such information later in his tenure at MGA Mexico. *See* FAAC ¶¶ 53-54.  Discovery is ongoing into the timing of Machado's disclosures and it is premature to resolve these issues on the basis of the FAAC's ambiguous allegations.  Finally, since Machado's acts of mail fraud and wire fraud may have been sufficiently continuous, the Court need not resolve whether continuity is, in the alternative, established by Machado's alleged acts of spoliation and criminal copyright infringement.

### 2.      Relatedness

As discussed *supra*, Mattel argues that Machado's post-resignation e-mails were acts of wire fraud, because those e-mails disclosed Mattel trade secret information.  Machado argues that e-mails sent by Machado after he left Mattel were not related to the other alleged predicate acts.  The continued relevance of this dispute is called into question by the Court's ruling that (1) subsequent uses of already disclosed Mattel trade secret did not execute a scheme to deprive Mattel of the right to maintain the secrecy of its confidential and trade secret information; and (2) Machado may have engaged in other post-resignation acts of mail fraud or wire fraud to the extent he later disclosed Mattel trade secrets that he initially withheld.

Assuming Machado's post-resignation e-mails constituted acts of wire fraud, they were sufficiently related to the other alleged predicate acts.  Relatedness is established when predicate acts have "the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics. . . ." *Id.* at 192 (citing 18 U.S.C. § 3575(e) (repealed effective 1987)).[12]  Predicate acts must be vertically related "to the activities of the enterprise" and horizontally "related to each other." *See United States v. Daidone*, 471 F.3d 371, 375 (2d Cir. 2006).  Mattel alleges that Machado led a close-knit team of former Mattel Mexico employees in an effort to misuse Mattel's trade secret information for MGA Mexico's benefit.  The departing employees used thumb drives and emails to capture

---

[12] The statute's repeal does not diminish its relevance to the relatedness inquiry. *See Sedima*, 105 S.Ct. at 3285 n. 14; *see also Bulletin Displays, LLC v. Regency Outdoor Advertising, Inc.*, 518 F. Supp. 2d 1182, 1191-92 (C.D. Cal. 2007).

16

1   Mattel's trade secret information and disclosed Mattel's confidential information to MGA at the

2   same meetings and to the same individuals in MGA's corporate hierarchy.  And like the alleged

3   infringement of Mattel's copyrights and subsequent acts of spoliation, Machado's disclosure of

4   Mattel trade secrets sought to deprive Mattel of its intellectual property and reduce Mattel's

5   market position.  In other words, Machado's post-resignation acts of mail and/or wire fraud were

6   related to his other acts of racketeering, as well as the acts of racketeering committed by Trueba,

7   Vargas, and other members of the enterprise.

8                    **D.    Standing**[13]

9           A civil RICO plaintiff must be "injured in his business or property by reason of a

10  violation of section 1962."  18 U.S.C. § 1964(c).  The "[c]ompensable injury flowing from a

11  violation of [section 1962(c)] 'necessarily is the harm caused by predicate acts sufficiently

12  related to constitute a pattern, for the essence of the violation is the commission of those acts in

13  connection with the conduct of an enterprise."  *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451,

14  457, 126 S.Ct. 1991 (2006) (quoting *Sedima*, 473 U.S. at 497).  The injury must be "concrete

15  financial loss, and not mere injury to a valuable intangible property interest."  *Oscar v. Univ.*

16  *Students Co-Operative Ass'n*, 965 F.2d 783, 785 (9th Cir. 1992) (en banc) (internal quotation

17  marks omitted).

18          The violation of § 1962(c) must be the proximate cause of plaintiff's concrete

19  financial loss.  *Hemi Group, LLC v. City of New York*, - - - U.S. - - -, 130 S.Ct. 983, 989 (2010)

20  (citing *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 112 S.Ct. 1311 (1992)).  The

21  alleged RICO violation must have "led directly to the plaintiff's injuries," *Bridge v. Phoenix*

22  *Bond & Indem. Co.*, 553 U.S. 639, 128 S.Ct. 2131, 2142 (2008).  And mere foreseeability is

23  insufficient to establish proximate cause between the RICO violation and the injury.  *See Couch*

24  *v. Cate*, No. 09-15599, 2010 WL 1936277, at *4 (9th Cir. May 14, 2010).  Though the Supreme

25  Court has declined to impose a "black-letter rule," *see Bridge*, 128 S.Ct. at 1242, it has rejected

26

27          [13] Contrary to Mattel, the members challenge injury throughout their briefing in

28  attacking each of the RICO predicate acts.

1  claims where the RICO violation was distinct from the conduct that caused the injury. *See, e.g.*

2  *Hemi Group*, 130 S.Ct. at 990 ("conduct directly responsible for the City's harm was the

3  customers' failure to pay their taxes" and not defendant's fraud); *Anza*, 547 U.S. at 458 (no

4  causation even though defendant committed both the RICO violation and the distinct conduct

5  causing the injury).[14]

6           Mattel makes two preliminary arguments.  First, Mattel argues that Judge Larson,

7  who previously presided over this case, concluded that "[d]amages easily flow from the theft of

8  trade secrets and confidential information committed by a direct competitor and from

9  infringement of copyrights that are alleged to have been used to make millions-if not billions-of

10  dollars." *Bryant v. Mattel, Inc.*, 573 F. Supp. 2d 1254, 1269 (C.D. Cal. 2007).  But Judge

11  Larson's order pre-dated *Hemi Group*, which held that injury cannot just "easily flow" from the

12  § 1962(c) violation.  *See* 130 S.Ct. at 990 (holding violation must directly cause injury).  Second,

13  Mattel argues that standing is inappropriate for resolution at the Rule 12(b)(6) stage.  However,

14  *Hemi Group* affirmed a 12(b)(6) dismissal, and if it works for Chief Justice Roberts, it works for

15  this Court.[15]

16           Mattel alleges that it suffered the following injuries: (1) MGA's profits and

17  Mattel's lost opportunity from the use, sale, distribution and licensing of Bratz, FAAC ¶¶ 32, 34;

18  (2) the theft of Mattel's confidential and proprietary information, *id.* ¶¶ 50, 53; 62, 77, 80, 84, 85

19  (3) counter-defendants' diversion of resources from the Bratz line of dolls after the Phase 1 jury

20  awarded ownership of the line to Mattel, *id.* ¶¶ 91-93; (4) the concealment of funds obtained as a

21  result of MGA and Larian's alleged RICO violations, *id.* ¶¶ 113; (5) Mattel's loss of priority as a

22  result of the Omni transaction, *id.* ¶ 115; (6) the dissipation of MGA funds; *id.* ¶ 117; and (7) the

23  costs of the forensic auditor appointed by Judge Larson as a result of Mattel's concern that MGA

24  was dissipating funds, *id.* ¶ 121.

25

26           [14] Mattel tries to revive foreseeability by quoting the Second Circuit's decision in

27  *Anza*, but the case was reversed on the very proposition quoted by Mattel.

28           [15] This argument applies to the conspiracy counterclaim as well.

1        The third, fourth, fifth, and sixth categories are not "concrete financial injuries."

2   Mattel lacks priority because it has no judgment against any of the counter-defendants.  Access

3   to MGA's funds and intellectual property is nothing more than an intangible business interest (if

4   that).  Such interests are not recoverable under § 1964(c).  *See Oscar*, 965 F.2d at 785.

5        Lost profits can be recoverable if they are concrete and deprived by the wrongful

6   conduct, instead of an intervening event or market condition.  *See Sierra Nat. Ins. Holdings, Inc.*

7   *v. Altus Fin., S.A.*, No. CV 01-1339 AHM (CWx), 2001 WL 1343855 (C.D. Cal. June 20, 2001).

8   The members do not dispute this, but offer a number of arguments in favor of summary

9   judgment as to Mattel's lost profits injury.  However, this order does not address arguments

10  brought pursuant to Rule 56, which can be addressed at the appropriate time.[16]  Furthermore,

11  Mattel alleges the theft of its trade secrets resulted in concrete financial loss by depriving Mattel

12  of valuable contracts and access to retailers, FAAC ¶ 53, to which the members offer no

13  response.

14       Mattel's standing to bring its first counterclaim must be resolved at summary

15  judgment and/or trial upon analysis of each defendant's alleged acts of racketeering and the

16  nature of the injury caused by those acts.

17       **II.**    **Violation of 18 U.S.C. § 1964(c) Based on Violation of § 1962(d) (RICO**

18             **Conspiracy)**

19       The FAAC's second counterclaim alleges that "Larian, MGA HK, [MGA

20  Mexico], Bryant, Machado, IGWT 826, [and] Omni 808" conspired to violate § 1962(c) and

21  thereby violated §  1962(d).  FAAC ¶ 129.

22           **A.**    **Conspiracy**

23       "[A] defendant is guilty of conspiracy to violate § 1962(c) if the evidence showed

24  that she 'knowingly agree[d] to facilitate a scheme which includes the operation or management

25  of a RICO enterprise.'"  *United States v. Fernandez*, 388 F.3d 1199, 1230 (9th Cir. 2004)

26  (quoting *Smith v. Berg*, 247 F.3d 532, 538 (3d Cir. 2001)).  "A conspiracy may exist even if a

27  _____

28       [16] The Court declines to consider the new arguments in page 18 of Docket 7996.

1  conspirator does not agree to commit or facilitate each and every part of the substantive offense.

2  The partners in the criminal plan must agree to pursue the same criminal objective and may

3  divide up the work, yet each is responsible for the acts of each other." *Salinas v. United States*,

4  522 U.S. 52, 63-64, 118 S.Ct. 469 (1997).  A conspirator need not have "specific knowledge of

5  or participation in each predicate act conducted by other members" of the conspiracy. *United*

6  *States v. Yannotti*, 541 F.3d 112, 122 (2d Cir. 2008).  "[I]t suffices that he adopt[ed] the goal of

7  furthering or facilitating the criminal endeavor." *Salinas*, 522 U.S. at 65.[17]

8          The members argue that Mattel fails to set forth sufficient facts that show the

9  existence of any unlawful agreement to violate RICO.  This argument ignores literally dozens of

10  paragraphs that allege *inter alia* (1) MGA, Larian, MGA Mexico, and Machado discussing theft

11  of trade secrets; (2) Omni, MGA, Larian, and IGWT combining to conceal MGA's assets;

12  (3) MGA, MGA HK, and MGA Mexico discussing acts of copyright infringement and bribery of

13  Mattel employees; and (4) Bryant, MGA and Larian discussing the theft of trade secrets, bribery,

14  and copyright infringement.  Even if Rule 9(b) applied here, Mattel has alleged detailed facts to

15  sustain its claim that each conspirator adopted the goal of furthering or facilitating the operation

16  or management of the associated-in-fact enterprise.

17          The members also liken this case to *Bell Atl. Corp. v. Twombly*.  But in *Twombly*,

18  the complaint failed to plead "plausible grounds to infer an agreement [or] enough fact to raise a

19  reasonable expectation that discovery will reveal evidence of illegal agreement." *See*, 550 U.S.

20  544, 556-57, 127 S.Ct. 1955 (2007).  Not so here, as many of the co-conspirators are alleged to

21  constituted an associated-in-fact enterprise engaged in serial acts of racketeering.  Moreover, the

22  nature of the uncontested relationships between the alleged co-conspirators is suggestive, if not

23  supportive, of agreement.  For example, Larian ran both MGA and MGA Mexico, had

24  tremendous input in the operations of MGA HK, recruited Bryant and Machado, solicited funds

25  _____

26          [17] The members argue in error that the claim is pled incorrectly because it uses the
    words furthered, promoted, or facilitated, even though furthering or facilitating the

27  organization or management of a criminal enterprise is the essence of a RICO conspiracy

28  claim. *Salinas*, 522 U.S. at 65.

1   for Omni, and funded IGWT with his family members.

2                              **B.    Standing**

3          Only Omni challenges Mattel's standing to bring a § 1964(c) claim arising out of

4   injury to business or property caused by a violation of § 1962(d).

5          Omni's precise conduct is largely irrelevant because of the nature of conspiratorial

6   liability.  In essence, Mattel alleges that Omni was a shell entity formed by Larian to purchase

7   MGA's debt to Wachovia at a discount, and then obtain a security interest in MGA's intellectual

8   property in exchange for little to no value.  *See* FAAC ¶¶ 97, 100-121.  The key fact is that Omni

9   joined the conspiracy when Omni was formed on August 12, 2008.  *Id.* ¶ 103.

10         A plaintiff may recover injuries to his business or property by reason of a violation

11  of § 1962(d) only when the injury results from the commission of an overt act that "violates one

12  of the substantive provisions of § 1962."  *Beck v. Prupis*, 529 U.S. 494, 500, 120 S.Ct. 1608

13  (2000).  Overt acts in furtherance of a conspiracy do not give rise to a § 1964(c) claim unless

14  those acts are independently wrongful under RICO.  *Id.* at 500.  An independently wrongful act

15  is one expressly prohibited by any section of RICO, including § 1961(1).  *Id.*

16         A civil RICO "plaintiff [may] sue co-conspirators who might not themselves have

17  violated one of the substantive provisions of § 1962" pursuant to the well-established rule that a

18  conspirator can be held "vicariously liable for the underlying tort[s]" committed by his co-

19  conspirators.  *Id.* at 500-07 (quoting *Halberstam v. Welch*, 705 F.2d 472, 479 (D.C. Cir. 1983)

20  and *Royster v. Baker*, 365 S.W.2d 496, 499, 500 (Mo. 1963) ("[T]he fact of a conspiracy merely

21  bears on the liability of the various defendants as joint tort-feasors.")); *see also Sec. Investor*

22  *Prot. Corp. v. Vigman*, 908 F.2d 1461, 1468 (9th Cir. 1990), *rev'd sub. nom., Holmes*, 503 U.S.

23  at 264 n. 6 ("All conspirators are liable for the acts of their co-conspirators.") (quoting *Beltz*

24  *Travel Serv. v. Int'l Air Transp. Ass'n*, 620 F.2d 1360, 1367 (9th Cir. 1980)).  Vicarious liability

25  for a co-conspirator's independently wrongful overt acts committed in furtherance of the RICO

26  conspiracy is consistent with the long-standing principle that a conspirator should be held liable

27  for the foreseeable consequences of the unlawful agreement, *i.e.*, overt acts in furtherance of the

28  conspiracy.  *See Pinkerton v. United States*, 328 U.S. 640, 647, 66 S.Ct. 1180 (1946).

1    However, a conspirator cannot reasonably foresee his co-conspirators' commission
2    of overt acts *prior* to his entry into the unlawful agreement.  *United States v. O'Campo*, 973 F.2d
3    1015, 1024 (1st Cir. 1992) ("[S]uch an argument means that 'the concept of foreseeability (a
4    forward looking concept) must be turned around 180 degrees [to] be applied to the conduct of
5    co-conspirators occurring before the entry of a particular defendant into the conspiracy.'")
6    (quoting *United States v. Edwards*, 945 F.2d 1387, 1393 (7th Cir. 1991)).  Thus, a conspirator is
7    not liable for substantive acts committed by his co-conspirators before he joined the conspiracy.
8    *O'Campo*, 973 F.2d at 1023 (holding that a judge may not consider co-conspirators' substantive
9    offenses for the purposes of sentencing); *United States v. Lothian*, 976 F.2d 1257, 1262 (9th Cir.
10   1992); *United States v. Blackmon*, 839 F.2d 900, 908-09 (2d Cir. 1988).  Prior acts may still be
11   considered for the purposes of *conspiratorial liability*. *Id.* at 1022-23; *Lefco v. United States*, 74
12   F.2d 66, 68-69 (3d Cir. 1934) ("[A] conspirator cannot argue that they are responsible only for
13   what they themselves were doing when caught, and as that usually is only part of the conspiracy,
14   they say, the part being less than the whole, it is different from the whole and in consequence is
15   not the conspiracy alleged in the indictment.").  However, "the conspiracy is not independently
16   actionable" under RICO.  *Halberstam v. Welch*, 705 F.2d 472, 479 (D.C. Cir. 1983) (cited by
17   *Beck*, 529 U.S. at 500); *id.* at 508 n. 1-2 (Stevens, J., dissenting).

18   Accordingly, Omni is liable for (1) the injury to Mattel's business or property
19   (2) directly caused by any co-conspirator's foreseeable racketeering acts; (3) committed after
20   August 12, 2008.  Since none of the post-August 12, 2008 racketeering acts directly injured
21   Mattel in its business or property, Mattel lacks standing to bring a § 1964(c) counterclaim
22   predicated upon Omni's alleged violation of § 1962(d).

### 1.    The Omni Transaction

24   Mattel alleges that Wachovia assigned some portion of its interest in the Revolving
25   Credit Facility to Omni.  Thereafter, Omni's purported Side Letter Agreement with MGA
26   contemplated that Omni could obtain a first priority security interest in MGA's intellectual
27   property.  Finally, Omni, Larian and MGA allegedly drafted a disingenuous demand letter from
28   Kadisha to MGA.  These transactions were allegedly concealed from the Court.

1       Loss of Priority: Omni's dealings with Wachovia, MGA/Larian, and IGWT

2  allegedly resulted in Mattel's loss of priority.  However, Mattel never did and does not now have

3  an enforceable judgment against MGA due to the Ninth Circuit's rulings with respect to the

4  post-Phase 1 equitable relief.  And "[w]ithout a harm to a specific business or property interest -

5  a categorical inquiry typically determined by state law - there is no injury to business or property

6  within the meaning of RICO."  *Diaz v. Gates*, 420 F.3d 897, 900 (9th Cir. 2005) (en banc), *cert.*

7  *denied*, 546 U.S. 1131, 126 S.Ct. 1069 (2006).  Even if Mattel *did* have a judgment, it would not

8  have suffered any concrete financial injury unless it attempted in vain to enforce that judgment.

9  *Lincoln House, Inc. v. Dupre*, 903 F.2d 845, 847-48 (1st Cir. 1990) (rejecting claimed injury

10  based on " hypothetical inability to recover from [defendant], *if* [plaintiff] obtains a judgment, in

11  some amount, in the pending [action].") (emphasis in original).[18]

12       Mattel's authorities are unavailing.  *Gutierrez v. Givens*, 1 F. Supp. 2d 1077 (S.D.

13  Cal. 1998) was decided before *Diaz* and involved an unsuccessful attempt to "collect [a]

14  judgment."  *Id.* at 1085; *see also Rothberg v. Chloe Foods Corp.*, No. CV-06-5712 (CPS), 2007

15  WL 2128376, at *2 (E.D.N.Y. July 25, 2007) (plaintiff had judgment in hand and Second Circuit

16  had not imposed requirement of concrete financial injury); *Jeffreys v. Exten*, 784 F. Supp. 146

17  (D. Del. 1992) (plaintiff obtained default judgment and court only analyzed whether plaintiff

18  belonged to a class of creditors, concluding he did not).

19       Costs:  Mattel claims it incurred attorneys' fees and costs "for the forensic auditor

20  to uncover MGA's and Omni's wrongful conduct."  Docket 7868 at 13.  But the auditor was

21  appointed at Mattel's request, FAAC ¶¶ 118-121, and RICO doesn't provide for the recovery of

22  losses caused by self-inflicted wounds.  Even though costs incurred in collecting on a debt may

23

24       [18] Contrary to Mattel and Mattel's authorities, the pendency of separate

25  proceedings was irrelevant to the analysis in *Lincoln House*.  Furthermore, Mattel's
authorities are inapposite.  *National Capital Orthopedics Assoc., P.C. v. Goltz*, No. CIV.

26  A. AW 96-2429, 1997 WL 625117 (D. Md. Sept. 29, 1997) only discussed ripeness, not
injury to business or property.  And *Hecht v. Summerlin Life and Health Ins. Co.*, 536 F.

27  Supp. 1236 (D. Nev. 2008) held that legally contingent claims (not factually contingent

28  claims as here) may be tried in the same proceeding.

be recoverable under RICO, *Stochastic Decisions, Inc. v. DiDomenico*, 995 F.2d 1158 (2d Cir. 1993), Mattel wasn't attempting to collect on a debt when it successfully petitioned for the appointment of a forensic auditor.  Moreover, the district court's order appointing a forensic auditor, *see* Docket 4657, never cited the Omni transaction as a relevant factor.  Furthermore, the alleged wrongful conduct (Omni's purchase) was different from the conduct causing the injury to Mattel (the Court's appointment of the forensic auditor).[19]  Finally, it is tautological for Mattel to argue that the discovery of Omni's illegality spurred the appointment of an auditor charged with "uncover[ing] MGA's and Omni's wrongful conduct."

## 2.    Trade Secret Theft

There are a few temporally vague allegations of conduct that *may* have been committed by co-conspirators after August 12, 2008.  *See, e.g.*, FAAC ¶¶ 67 (Brawer targeting employees to steal trade secrets); 66 (Brawer worked with retailers from time at Mattel); 77, 79-81, 85 (similar for Jorge Castilla, Nick Contreras, and other Mattel employees).  Even if Mattel alleged this conduct continued after August 12, 2008, the allegations, supported by nothing more than Mattel's "information and belief," would be implausible.  All of these former Mattel employees left Mattel well before Omni's formation.  Even if trade secrets were stolen, Mattel doesn't identify any with particularity (except as discussed below) and doesn't identify any concrete financial harm suffered as a result of the use of the trade secrets.  *Compare* FAAC ¶ 53 (alleging Machado's theft of trade secrets eroded Mattel's relationships with retailers).  Mattel has had six years of discovery into these claims and expansive discovery over the last several months under this Court's watchful eye.  If all it has are temporally ambiguous allegations based on "information and belief" about the recruitment of Mattel employees who may or may not have stolen trade secrets that may or may not have caused Mattel injury, the Court sees no basis on which to allow a futile amendment.

---

[19] Both *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096 (2d Cir. 1988) and *Miller v. Glen & Helen Aircraft, Inc.*, 777 F.2d 496 (9th Cir. 1985) are of questionable relevance in light of *Anza* and *Hemi Group*.  *See Miller*, 777 F.2d at 499 (requiring only that damages "flow[] from the commission of the predicate acts").

1    <u>Moxie</u>.  Mattel alleges that MGA made a habit of stealing product ideas from

2    Mattel.  "Moxie" is a line of dolls marketed by MGA after the post-Phase 1 injunctive relief

3    assigned the Bratz line to Mattel.  MGA funded "Moxie" with resources earmarked for Bratz.

4    *Id.* ¶ 92.  The name "Moxie" "was and is confidential and trade secret Mattel information that

5    was unlawfully shared with MGA by a Mattel doll designer."  *Id.* ¶ 93.  Subsequent use of an

6    already disclosed trade secret does not execute a scheme to defraud the trade secret's owner of

7    its right to the confidentiality of the trade secret, *see* section I(C)(1), *supra*, and Mattel alleges

8    that Bryant disclosed the Moxie name to MGA in 2000.  FAAC ¶ 93.  Thus, Omni cannot be

9    liable for MGA's post August 12, 2008 use of the Moxie name.

10                      **3.      Perjury/Obstruction of Justice.**

11           As a general matter, the perjury and obstruction of justice allegations are

12   temporally vague and could include conduct after August 12, 2008.  However, the only specific

13   instances of obstruction that post-date August 12, 2008 relate to the Omni transaction, which did

14   not cause direct injury to Mattel's business or property.  The remaining conduct occurred before

15   Omni joined the conspiracy.  *See* FAAC ¶¶ 95-96.

16           Mattel seeks leave to amend its claim against Omni after years of discovery into

17   the acts of Omni's co-conspirators.  Even if this pleading had been filed *before* discovery, leave

18   to amend would still be denied because amendment would be futile.  Mattel contends that it can

19   obtain further discovery into the Omni transaction and the potential encumbrance of MGA's

20   intellectual property.  Docket 7868 at 20 & n. 16 (discovery into  "Arsalan Gozini [] assign[ing]

21   his interest in Omni to Larian's IGWT entity," or "the promissory note and [other] 'legal

22   documents'" that evidence the Omni transaction).  However, the predicate acts allegedly

23   committed by Omni and its co-conspirators after August 12, 2008 could not have resulted in

24   injury to Mattel.  Thus, leave to amend should be denied because "the allegation of other facts

25   consistent with the challenged pleading could not possibly cure the deficiency."  *Schreiber*

26   *Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986).

27           The second counterclaim is DISMISSED WITHOUT LEAVE TO AMEND as to

28   Omni.

### III.    Misappropriation of Trade Secrets

The FAAC's third counterclaim alleges that MGA, MGA Mexico, Larian, and Machado misappropriated Mattel's trade secrets in violation of the California Uniform Trade Secrets Act (CUTSA), Cal. Civ. Code § 3426, *et seq.*  MGA Mexico moves to dismiss for lack of personal jurisdiction.  In addition, all counter-defendants move to dismiss on *forum non conveniens* grounds.

### A.    Personal Jurisdiction[20]

"It is the plaintiff's burden to establish the court's personal jurisdiction over a defendant."  *Doe v. Unocal Corp.*, 248 F.3d 915, 922 (9th Cir. 2001).  In ruling on a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the court may consider evidence outside the pleadings.  *Id.*  Absent an evidentiary hearing, the court must deny the motion if plaintiff makes a *prima facie* showing of jurisdiction – "[t]hat is, the plaintiff need only demonstrate facts that if true would support jurisdiction over the defendant."  *Ballard v. Savage*, 65 F.3d 1495, 1498 (9th Cir. 1995).

The court has personal jurisdiction over a foreign defendant who has "certain minimum contacts with the forum such that the maintenance of the suit does not offend traditional conceptions of fair play and substantial justice."  *Int'l Shoe Co. v. State of Washington*, 326 U.S. 310, 316, 66 S.Ct. 154 (1945).  A defendant's contacts with the forum may give rise to either general or specific personal jurisdiction.  Substantial, continuous, and systematic contacts give rise to general jurisdiction, by which "the foreign defendant is subject to suit even on matters unrelated to his or her contacts to the forum."  *Doe*, 248 F.3d at 923.

---

[20] Machado joins in the Motion, but the motion does not argue that personal jurisdiction is improper as to Machado; it argues that personal jurisdiction is improper as to MGA Mexico.  Even if Machado intends to challenge personal jurisdiction as to himself, Mattel has made a *prima facie* showing that: (1) Machado availed himself of California to reach agreements with Larian; (2) Machado directed his activities to California by agreeing with Trueba and Vargas to steal trade secrets from El Segundo; (3) Machado's forum related acts give rise to the third counterclaim; and (4) the exercise of jurisdiction is reasonable.

Specific jurisdiction, by contrast, is triggered by less substantial contacts with the forum that "give rise to the cause of action before the court." *Id.*; *see also Hanson v. Denckla*, 357 U.S. 235, 250-253, 78 S.Ct. 1228 (1958).

> The Ninth Circuit had laid out a three-part test for specific personal jurisdiction:
>
> (1) The non-resident purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activites in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e., it must be reasonable.

*Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004).

Availment and direction are distinct concepts. *Id.* at 802. Purposeful availment is commonly evidenced by the consummation or performance of a contract in the forum state. *Id.* MGA Mexico is not on trial for walking into Mattel's offices and stealing trade secrets, but for inducing Mattel Mexico's employees to rob their employer and its parent corporation of trade secret information. This inducement occurred in the United States and, specifically, in the state of California. *See* FAAC ¶¶ 44 (e-mails sent between Larian in California and Machado, Trueba, and Vargas in Mexico); Velásquez Decl., Ex. G (arranging conference call with California resident to consummate employment contracts). The inducement to *disclose* Mattel trade secrets and confidential information also occurred in California. *Id.* ¶ 42 (Machado, Vargas, and Trueba traveled to Los Angeles, shared Mattel trade secrets with Larian, and thereafter used those very trade secrets to set up MGA Mexico).

The members argue that Mattel has "wholly failed to come forward with any admissible evidence" that "Larian or other [MGA Mexico officers] directed Machado, Vargas, and Trueba to take [Mattel trade secrets]." Reply at 9. But this is an issue ill-fit for resolution

1   on the pleadings, if at all before trial.  *See Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d

2   1280, 1285 n. 2 (9th Cir. 1977) ("Where the jurisdictional facts are intertwined with the merits . .

3   . it is preferable that this determination be made at trial").  Larian lavished Machado, Vargas,

4   and Trueba with praise and charm, even though all three individuals were mere senior managers

5   for Mattel Mexico at the time of their departure.  *See* Exs. 27-30 to FAAC.  Larian continued to

6   recruit Machado even after Machado shared a presentation full of Mattel trade secrets with

7   Larian.  Ex. 20 to Kieckhefer Decl. at 2114.  Machado claimed, using an e-mail address named

8   "plot04," that Mattel Mexico was collapsing after the employees' departure and promised to

9   share his plans for MGA Mexico with Larian in the days ahead.  *Id.*  And Machado admitted that

10  the other departing employees knew he was stealing Mattel Mexico's trade secrets – *i.e.*, this

11  may have been coordinated.  Ex. 20 to Kieckhefer Decl. at 2042.  Finally although the Mexican

12  tribunal concluded that MGA and Larian had not *used* the misappropriated trade secrets, Ex. 95

13  to Kieckhefer Decl., that is irrelevant to the issue of inducement.

14          On the other hand, MGA Mexico has advanced evidence that Machado, Vargas,

15  and Trueba were specifically instructed by Larian not to steal trade secrets from Mattel Mexico.

16  *See* Ex. 20 to Kieckhefer Decl. at 2118; Ex. 13 to Kieckhefer Decl. at 1449-1450.  Indeed, both

17  Machado and Trueba have testified that Larian instructed them not to misappropriate trade

18  secrets on the way out the door.  *See* Ex. 20 to Kieckhefer Decl. at 2117.[21]  These conflicting

19  circumstantial and testimonial facts are not fit for resolution at this stage.

20          Mattel also makes a *prima facie* showing that the alleged misappropriation of trade

21  secrets was purposefully directed to California in action and in effect.  Purposeful direction is

22  established by the Supreme Court's three-part test in *Calder v. Jones*, 465 U.S. 783, 104 S.Ct.

23  1482 (1984), under which the "defendant [must] have (1) committed an intentional act,

24  (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be

25  suffered in the forum state."  *Dole Food Co., Inc. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002).

26

27          [21] Mattel's evidentiary objections are OVERRULED as to the Kieckhefer

28  Declaration and otherwise STRICKEN AS MOOT.

1   Prior to her departure, Trueba, allegedly acting at the direction of Larian, solicited trade secrets

2   from a Mattel employee in El Segundo, California.  FAAC ¶ 48.  Furthermore, there are

3   allegations to suggest that MGA Mexico's inducement to misappropriate trade secrets was

4   directed at Mattel; *in addition to* Mattel Mexico.  *See, e.g.*, FAAC ¶¶ Nordquist Decl. ¶ 3 (trade

5   secrets for Hot Wheels brand).  In sum, the allegations support the notion that MGA Mexico

6   directed the theft of Mattel trade secrets being held in California.

7            The alleged inducement of Mattel Mexico's employees to steal trade secrets, as

8   well as the targeting of trade secrets held by Mattel in California satisfy the second prong: the

9   claim arises out of the forum related activities.  This is uncontested by the members.

10           Finally, the exercise of personal jurisdiction over MGA Mexico is reasonable

11  under the Supreme Court's seven-factor test in *Burger King Corp. v. Rudzewicz*, 471 U.S. 462,

12  105 S.Ct. 2174 (1985).  First, Mattel has made a *prima facie* showing on the basis of the

13  FAAC's allegations, its exhibits, and evidence obtained during discovery that MGA Mexico has

14  injected itself into the affairs of California by: (a) directing the theft of Mattel trade secrets;

15  (b) consummating transactions and employment agreements in California; and (c) conducting its

16  business operations through Larian in California.  FAAC ¶¶ 44-48; 52; Ex. S to FAAC at 31-33.

17  Second, MGA Mexico's claimed burden of defending in the forum is purely evidentiary: it is

18  concerned that its 30(b)(6) witness testimony will be used as a "one way ratchet," since

19  damaging hearsay statements made by former MGA Mexico employees interviewed by MGA

20  Mexico's 30(b)(6) designee will be admissible as admissions against interest, but beneficial

21  statements made by those individuals will not.  *See* Docket 7953 at 12.  There are a variety of

22  solutions to this, *see, e.g.*, Fed. R. Evid. 807, that don't require the Court to avoid exercising

23  personal jurisdiction.  Third, contrary to MGA Mexico, there's no conflict between the exercise

24  of personal jurisdiction and Mexico's sovereignty.  The acts of inducement and the harm to

25  Mattel's property are not directly at issue in any Mexican proceeding, nor could they be, since

26  Mexico has little interest in the theft of trade secrets belonging to a California resident.  Fourth,

27  even if California has no interest in regulating Mexican companies which do business in Mexico,

28  it still has an interest in redressing in-state harm caused to its residents by out-of-state

1    individuals and entities.  *See Rudzewicz*, 471 U.S. at 473.  Fifth, whether or not Mexican law

2    applies to this dispute, the most efficient forum for resolution is this one: Mattel already has

3    numerous pending trade secret misappropriation claims against MGA and Larian, whose conduct

4    is obviously relevant to Mattel's claims against MGA Mexico.  The sixth factor is of diminished

5    importance, s*ee Core-Vent Corp. v. Nobel Indus. AB*, 11 F.3d 1482, 1490 (9th Cir. 1993), and

6    doesn't compel the exercise or non-exercise of personal jurisdiction.  While the seventh factor

7    (availability of an alternate forum) weighs against the reasonableness of personal jurisdiction, it

8    is outweighed by the first five factors.

9        In sum, Mattel has made a *prima facie* showing that personal jurisdiction over

10   MGA Mexico is proper.

11            **B.    Forum Non Conveniens**

12        MGA, MGA Mexico, and Larian move to dismiss the trade secret

13   misappropriation claims arising out of the theft of trade secrets in Mexico and Canada on *forum*

14   *non conveniens* grounds.

15        The common-law doctrine of *forum non conveniens* "has continuing application

16   [in federal courts] only in cases where the alternative forum is abroad."  *American Dredging Co.*

17   *v. Miller*, 510 U.S. 443, 449 n. 2, 114 S.Ct. 981 (1994).  A court may dismiss a case on *forum*

18   *non conveniens* grounds when an alternative forum has jurisdiction to hear the case *and* (1) the

19   convenience to the plaintiff[s] of trial in the chosen forum is outweighed by the oppressiveness

20   and vexation to the defendant; or (2) the court's administrative and legal concerns weigh in favor

21   of dismissal.  *Sinochem Intern. Co. Ltd. v. Malaysia Intern. Shipping Corp.*, 549 U.S. 422, 429,

22   127 S.Ct. 1184 (2007) (citing *American Dredging*, 510 U.S. at 447-448).

23        The untimeliness of the motion is fatal.  The fact that a party has been subject to

24   ongoing litigation is itself evidence that the forum was "if not convenient[,] at least workable"

25   for the foreign defendant.  *Zelinski v. Columbia 300, Inc.*, 335 F.3d 633, 643 (7th Cir. 2003).

26   Moreover, the purpose of the doctrine is to *limit* the burden of the forum, not multiply the burden

27   of having to re-start litigation in a foreign forum, divide claims, and conduct discovery anew.

28   *See Lony v. E.I. DuPont de Nemours & Co.*, 935 F.2d 604, 613 (3d Cir. 1991) (noting that

30

1   continuing discovery, court's familiarity with litigation, and progress of litigation supported

2   denial of *forum non conveniens* motion since there was no longer a concern about "costs that

3   must be expended in the litigation and the convenience of the parties").

4           This six year litigation has spanned multiple pleadings, extensive discovery, and

5   motion practice.  The Court has developed a deep familiarity with the issues, having decided

6   hundreds of discovery disputes related to the trade secret misappropriation claims.  There is

7   simply no grounds on which to dismiss these claims now on the eve of dispositive motions and

8   trial, especially in light of the principle that "[m]otions to dismiss based on *forum non*

9   *conveniens* usually should be decided at an early stage in the litigation, so that the parties will

10  not waste resources on discovery and trial preparation in a forum that will later decline to

11  exercise its jurisdiction over the case."  *Id.* at 614.

12          Finally, MGA, MGA Mexico, and Larian attempt to bootstrap a number of

13  arguments previously made in favor of summary judgment into their reply, including choice of

14  law issues.  While choice of law can be relevant to a *forum non conveniens* analysis, it is not

15  relevant here, since the untimeliness of the motion is the basis for its denial.  The law that

16  applies to one or more of the claims in this lawsuit will be determined at the appropriate time.

17      **IV.   Intentional Interference with Contract; Breach of Fiduciary Duty;**

18              **Aiding and Abetting Breach of Fiduciary Duty; Breach of Duty of**

19              **Loyalty; Aiding and Abetting Breach of Duty of Loyalty; Conversion;**

20              **Unfair Competition[22]**

21          MGA, MGA Mexico, MGA HK, Larian and Machado move to dismiss the

22  FAAC's sixth (intentional interference with contract), seventh (breach of fiduciary duty), eighth

23  (aiding and abetting breach of fiduciary duty), ninth (breach of duty of loyalty), tenth (aiding and

24  abetting breach of duty of loyalty), eleventh (conversion), and twelfth (unfair competition)

25  claims on preemption grounds.

26          California's Uniform Trade Secrets Act (CUTSA) provides for the civil recovery

27  _____

28          [22] The filing of a new pleading defeats Mattel's argument as to waiver.

1  of "actual loss" or other injury caused by the misappropriation of trade secrets.  Cal. Civ. Code

2  § 3426.3.  Misappropriation means improper acquisition, or non-consensual disclosure or use of

3  another's trade secret.  *Id.* § 3426.1(b).  The statute defines a "trade secret" as information that

4  derives "independent economic value" from its confidentiality and "[i]s the subject of efforts that

5  are reasonable under the circumstances to maintain its secrecy."  *Id.* § 3426.1(d).

6  CUTSA includes a savings clause that "preempt[s] claims based on the same

7  nucleus of facts as trade secret misappropriation."  *K.C. Multimedia, Inc. v. Bank of America

8  Tech. & Operations, Inc.*, 171 Cal. App. 4th 939, 962 (2009); *see also* Cal. Civ. Code § 3426.7.

9  The savings clause does not affect "contractual remedies" and civil remedies "that are not based

10  upon misappropriation of a trade secret."  *Silvaco Data Sys. v. Intel Corp.*, 184 Cal. App. 4th

11  210, 233 (2010).  "The preemption inquiry for those causes of action not specifically exempted

12  by § 3426.7(b) focuses on whether other claims are not more than a restatement of the same

13  operative facts supporting trade secret misappropriation. . . . If there is no material distinction

14  between the wrongdoing alleged in a [C]UTSA claim and that alleged in a different claim, the

15  [C]UTSA claim preempts the other claim."  *Convolve, Inc. v. Compaq Comp. Corp.*, No. 00 CV

16  5141 (GBD), 2006 WL 839022, at *6 (S.D.N.Y. Mar. 31, 2006) (applying California law).

17  The counterclaims are based on the following factual allegations:

18  (1) Larian/MGA's inducement of Mattel employees to steal proprietary information and work

19  for MGA's benefit (sixth counterclaim), *see* FAAC ¶¶ 159-162; (2) Mattel employees assisting a

20  competitor and misappropriating proprietary information from Mattel (seventh counterclaim),

21  *see id.* ¶¶ 166-172; (3) Larian/MGA inducing Mattel employees to work for a competitor and

22  misappropriate proprietary information (eighth counterclaim), *see id.* ¶¶ 174-176; (4) Bryant and

23  Machado working for a competitor and using Mattel resources for MGA's benefit (ninth

24  counterclaim), *see id.* ¶¶ 179-185; (5) MGA/Larian inducing Mattel employees to work for a

25  competitor and use Mattel resources for MGA's benefit (tenth counterclaim), *see id.* ¶¶ 187-188;

26  (6) MGA/Larian, subsidiaries, and Machado converting Bryant's creations, Mattel trade secrets,

27  and Bratz inventory (eleventh counterclaim), *id.* ¶¶ 192-200; and (7) MGA/Larian, subsidiaries,

28  and Bryant engaging in unfair and unlawful competition, including trade secret misappropriation

32

1   and commercial bribery (twelfth counterclaim), *see id.* ¶¶ 201-204.

2          Three of the factual predicates are not at all related to the misappropriation of trade

3   secrets and therefore seek "civil remedies that are not based upon misappropriation of a trade

4   secret." Cal. Civ. Code § 3426.7.  First, the sixth through twelfth counterclaims encompass

5   allegations that Mattel employees worked for the benefit of MGA while still employed by

6   Mattel.[23]  Second, the sixth through twelfth counterclaims encompass allegations that Mattel

7   employees, and Bryant and Machado in particular, used Mattel's physical materials for MGA's

8   benefit.[24]  Third, the sixth through twelfth counterclaims encompass allegations that MGA

9   converted the Bratz intellectual property, which is not alleged to be a trade secret.

10          The parties dispute whether CUTSA supercedes the counterclaims to the extent

11   they arise out of the theft of so-called "confidential" or "proprietary" information that does not

12   enjoy "trade secret" status.  MGA objects to Mattel's end-run around CUTSA's damages

13   limitations as a perversion of CUTSA's statutory purpose.  Sister courts across this state and the

14   country have rejected MGA's argument. *See Phoenix Tech. Ltd. v. DeviceVM*, No. C 09-04697

15   CW, 2009 WL 4723400, at *5 (N.D. Cal. Dec. 8, 2009); *Leatt Corp. v. Innovative Safety Tech.,*

16   *LLC*, No. 09-CV-1301-IEG (POR), 2010 WL 2803947, at *6 n. 5 (S.D. Cal. July 15, 2010)

17   (distinguishing *Silvaco*); *TMX Funding, Inc. v. Impero Technologies, Inc.*, No. C 10-202 JF

18   (PVT), 2010 WL 2509979, at *7 (N.D. Cal. June 17, 2010); *Roger Dubois N. Am., Inc. v.*

19   *Thomas*, CA No. 05-2566, 2006 WL 2645149 (M.D. Pa. Sept. 14, 2006).

20          However, *Silvaco* repudiated these federal district court opinions:

21          We emphatically reject the . . . suggestion that the uniform act was

22          not intended to preempt 'common law conversion claims based on

23

24          [23] Contrary to MGA, this allegation is not limited to the theft of trade secrets.

25          [24] MGA tilts at windmills when it defends "moonlighting" as a legitimate practice.

26   Mattel doesn't allege moonlighting.  It alleges that MGA and Larian induced Bryant to
     work on the Bratz line of dolls while he was still employed by Mattel; *see* FAAC ¶ 161;

27   *see also id.* ¶ 174 (same); to enter into an employment contract with MGA, *see id.* ¶ 168;

28   and to devalue Mattel's interests, *id.* ¶ 180; *id.* ¶ 187-88 (same).

1    the taking of information that, though not a trade secret, was

2    nonetheless of value to the claimant.'  On the contrary, a prime

3    purpose of the law was to sweep away the adopting states'

4    bewildering web of rules and rationales and replace it with a uniform

5    set of principles for determining when one is – and is not – liable for

6    acquiring, disclosing, or using 'information . . . of value.'  Central to

7    the effort was the act's definition of a trade secret.  Information that

8    does not fit this definition, and is not otherwise made property by

9    some provision of positive law, belongs to no one, and cannot be

10   converted or stolen. [P]ermitting the conversion claim to proceed on

11   a contrary rationale . . . impliedly *create[s]* a new category of

12   intellectual property far beyond the contemplation of the Act,

13   subsuming its definition of 'trade secret' and effectively obliterating

14   the uniform system it seeks to generate.

15   184 Cal. App. 4th at 239 n. 22 (emphasis in original).

16          Some courts have split the baby by electing to dismiss claims under CUTSA's

17   savings clause only after determining that the protected information was a trade secret.  *See, e.g.*,

18   *Think Village-Kiwi, LLC v. Adobe Sys., Inc.*, No. 08-4166, 2009 WL 902337, at *2 (N.D. Cal.

19   Apr. 1, 2009); *Ali v. Fasteners for Retail, Inc.*, 544 F. Supp. 2d 1064, 1070 (C.D. Cal. 2008);

20   *First Advantage Background Servs. Corp. v. Private Eyes, Inc.*, 569 F. Supp. 2d 929, 942 (N.D.

21   Cal. 2008); *Callaway Golf Co. v. Dunlop Slazenger Group Americas, Inc.*, 295 F. Supp. 2d 430,

22   437 (D. Del. 2003).  But this approach puts parties in the uncomfortable position of conceding

23   CUTSA liability in order to prevail on another claim.

24          The better approach may be to determine whether the information alleged to have

25   converted was "made property by some provision of positive law," *Silvaco*, 184 Cal. App. 4th at

26   239 n. 22, on grounds that are qualitatively different from the grounds upon which trade secrets

27   are considered property.  Resolving this question requires analysis of the facts: namely, what the

28   confidential or proprietary information is, how it was converted, and the property interest alleged

1   to have harmed as a result of that conversion.  All of these questions can be addressed at

2   summary judgment and/or trial.

3        The claim for intentional interference with contract is superceded by CUTSA to

4   the extent it arises out of Mattel employees' misappropriation of trade secrets.  *See Bushnell*

5   *Corp. v. ITT Corp.*, 973 F. Supp. 1276, 1288-89 (D. Kan. 1997).[25]

6        Finally, MGA's arguments as to conversion are unavailing.  Intangible property

7   can be converted.  *Kremen v. Cohen*, 337 F.3d 1024, 1036 (9th Cir. 2003); *Boon Rawd Trading*

8   *Intern. Co., Ltd. v. Paleewong Trading Co.*, 688 F. Supp. 2d 940, 954 (N.D. Cal. 2010)

9   (acknowledging the "clear trend that intangible property *can* be the subject of conversion")

10  (emphasis in original).  While MGA attempts to re-characterize "Moxie" as "business goodwill

11  and import rights," the protection (if any) enjoyed by "Moxie" is not fit for resolution at this

12  stage.

13               **V.    California Uniform Fraudulent Transfer Act**

14       The thirteenth and fourteenth counterclaims allege that MGA, Larian, Omni, and

15  IGWT violated Cal. Civ. Code §§ 3439.04(a)(1), (a)(2), and 3439.05(a) by: (1) "pa[ying] more

16  than $320 million in dividends and distributions to Larian and/or trusts controlled by Larian"

17  between 2004 and 2008, and (2) purporting to transfer a security interest in the Bratz intellectual

18  property to Omni, which was controlled by Larian and his associates.  FAAC ¶ 207. Mattel

19  alleges the transactions were made with the intent to defraud MGA's creditors (including Mattel)

20  and conceal MGA's intellectual property in light of the "significant likelihood" that Mattel

21  would prevail in this lawsuit.  The transfers were not made for reasonably equivalent value and

22  were made at a time when MGA was insolvent or "rendered insolvent" by the transfers.  Mattel

23  seeks compensatory, injunctive, and punitive relief.

24       The exercise of supplemental jurisdiction over these claims would be imprudent.

25  _____

26       [25] Mattel's authority, *Core Wealth Mgmt., LLC v. Heller*, No. 1157647, 2010 WL
1453068 (Cal. Ct. App. Apr. 13, 2010), isn't citable and, in any event, failed to recognize

27  that a claim for intentional interference with contract is grounded in tort, not contract.

28  *See Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 1157 (2003).

1   Though the claims may be "related to" the RICO claims over which this Court has original

2   jurisdiction, "exceptional circumstances" militate against the exercise of jurisdiction.  *See* 28

3   U.S.C. § 1367(c)(4).  The claims raise complex issues under bankruptcy law, the resolution of

4   which has little to do with the other claims in this lawsuit; in other words, exercising jurisdiction

5   threatens the proper judicial administration of this case.  *See City of Chicago v. Int'l Coll. of*

6   *Surgeons*, 522 U.S. 156, 174 118 S.Ct. 523 (1997) (quoting *Quackenbush v. Allstate Ins. Co.*,

7   517 U.S. 706, 716, 116 S.Ct. 1712 (1996)).  Nor would the interests of "economy, convenience,

8   fairness, and comity" be served by the exercise of jurisdiction over these claims, which are

9   concerned with Mattel's ability to collect on a hypothetical judgment against MGA.  *See San*

10   *Pedro Hotel Co., Inc. v. City of Los Angeles*, 159 F.3d 470, 478 (9th Cir. 1998) (quoting

11   *Executive Software North America, Inc. v. U.S. Dist. Court*, 24 F.3d 1545, 1554 (9th Cir. 1994)).

12   The diversion of judicial resources to these state law claims would serve no purpose, especially

13   since the viability of these claims rests in large part on the success of Mattel's core claims of

14   copyright infringement, trade secret misappropriation, and RICO.

15           Even if supplemental jurisdiction were proper, Mattel fails to state a claim under

16   the UFTA.  "A fraudulent conveyance under the UFTA involves a transfer by the debtor of

17   property to third person undertaken with the intent to prevent a creditor from reaching that

18   interest to satisfy its claim."  *Filip v. Bucurenciu*, 129 Cal. App. 4th 825, 829 (2005).  For the

19   purposes of this case, a corporation can be a creditor.  Cal. Civ. Code § 3439.01(c), (g).  A

20   "claim" means "a right to payment, whether or not [] reduced to judgment."  *Id.* at (b).  "In order

21   for a fraudulent transfer to occur, among other things, there must be a *transfer* of an *asset* as

22   defined in the UFTA."  *Fidelity Nat. Title Ins. Co. v. Schroeder*, 179 Cal. App. 4th 834, 841

23   (2009) (emphasis in original).  A creditor who brings a claim under the UFTA must allege

24   affirmative injury beyond "[m]ere intent to delay or defraud."  *Mehrtash v. Mehrtash*, 93 Cal.

25   App. 4th 75, 80 (2001).  Injury results from a transfer that puts beyond a creditor's reach that

26   property that it "otherwise would be able to subject to the payment of [its] debt."  *Id.*

27

28

1    Mattel alleges no injury.[26]  In fact, it all but *admits* it can't allege injury by

2    conceding that it's only entitled to the transferred assets "to *the extent necessary* to satisfy all of

3    Mattel's claims."  FAAC ¶ 210 (emphasis added); *see also id.* ¶ 211 (similar language as to

4    scope of attachment); *id.* ¶ 220 (similar to ¶ 210); *id.* ¶ 221 (similar to ¶ 211).  The "extent" of

5    Mattel's entitlement is difficult to determine, due to the FAAC's inability to clearly identify the

6    scope of Mattel's desired relief for the alleged injuries caused by MGA's violations of RICO, as

7    well as MGA's acts of copyright infringement, trade secret misappropriation, and other tortious

8    conduct prohibited by state law.

9    Nor do Mattel's allegations even suggest injury.  If Mattel's claims target the Bratz

10   intellectual property, then MGA's transfer of the Bratz intellectual property could potentially

11   give rise to a claim.  But Mattel only alleges that MGA "purported" to transfer an interest in the

12   Bratz-related intellectual property.  *See id.* ¶ 207(b).  To "purport" is to "have or present the

13   appearance, often false, of being or intending."  WEBSTER'S II NEW RIVERSIDE

14   UNIVERSITY DICTIONARY 956 (1994).  However, the UFTA doesn't proscribe representing,

15   pretending, or intending to transfer assets; it prohibits *transfer*.  *See* Cal. Civ. Code § 3439.04(a);

16   *see also In re Ponce Nicasio Broadcasting, LP*, 2008 WL 361081, at *6 (Bankr. E.D. Cal. Feb.

17   7, 2008) ("An essential element of any cause of action brought under the California UFTA that

18   seeks the avoidance of other remedies related to an allegedly fraudulent transfer is the existence

19   of an actual transfer made by the debtor to a third party.").[27]  Even if the Bratz intellectual

20   property would be subject to payment for Mattel's claim against MGA, Mattel does not allege a

21   transfer that put the Bratz intellectual property beyond its reach.

22   Mattel likewise fails to allege injury from the alleged dividend transfers and

23   interest payments to Omni.  MGA is a multi-national entity that made $320 million in dividend

24

25   _____

26   [26]  Mattel's Opposition confuses Mattel's creditor status with its showing of injury.

27   [27]  Mattel argues that it has raised plausible facts to suggest such a transfer was
     made.  Not so.  Mattel only alleges a "purported" transfer.  Even if Mattel alleged a

28   plausible transfer, the extent of Mattel's entitlement to Bratz remains unresolved.

transfers to its Chief Executive Officer and his trusts over a more than five year period.  FAAC ¶ 207(a).  Much of the $320 million came from funds MGA borrowed from Wachovia; funds over which Mattel never had priority.  *See id.* ¶¶ 97-98.  Moreover, MGA's annual revenue may have approximated "$500 million" during that time period.  *Id.* ¶ 32.  Finally, Larian is a defendant to this case and his assets are not beyond Mattel's reach anyway.  Given this background, it isn't surprising that Mattel fails to allege that the alleged dividend transfers to Larian and/or his trusts involved property that would be subject to the payment of Mattel's claim against MGA.  Mattel's failure to so allege is fatal and any such allegation would be plainly implausible, given the size of the alleged distributions relative to MGA's assets.[28]

The thirteenth and fourteenth counterclaims are DISMISSED WITHOUT LEAVE TO AMEND.

## VI.     Prohibited Distributions

The fifteenth counterclaim is brought derivatively on behalf of all MGA creditors. Mattel alleges that Larian violated Cal. Corp. Code § 501 by transferring MGA's funds to his own coffers.  FAAC ¶ 226.  Section 501 provides that "[n]either a corporation nor any of its subsidiaries shall make any distribution to the corporation's shareholders [] if the corporation or the subsidiary making the distribution is, or as a result thereof would be, likely to be unable to meet its liabilities . . . as they mature."  Cal. Corp. Code § 501.

Rule 23.1 governs derivative actions.[29]  "The derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of shareholders or members who are similarly situated."  Fed. R. Civ. P. 23.1(a).  Courts must "engage in a fact intensive analysis to determine whether a conflict of interest exists under the circumstances of a particular case."  *See ShoreGood Water Co., Inc. v. U.S. Bottling Co.*, No.

---

[28] The alleged interest payments to Omni could not have caused Mattel injury for the same reason.

[29] The Court need not resolve whether Rule 23.1 bars creditor derivative actions, since Mattel does not satisfy Rule 23.1's prerequisites anyway.

1    RDB 08-2470, 2009 WL 2461689, at *4 (D. Md. Aug. 10, 2009).  A court may consider the

2    following factors to determine the adequacy of a representative in a derivative action:

3                    (1) indications that the plaintiff is not the true party in interest;

4                    (2) the plaintiff's unfamiliarity with the litigation and unwillingness

5                    to learn about the suit; (3) the degree of control exercised by the

6                    attorneys over the litigation; (4) the degree of support received by

7                    the plaintiff from other shareholders; (5) the lack of any personal

8                    commitment to the action on the part of the representative plaintiff;

9                    (6) the remedy sought by plaintiff in the derivative action; (7) the

10                   relative magnitude of plaintiff's personal interests as compared to his

11                   interest in the derivative action; and (8) plaintiff's vindictiveness

12                   towards the defendants.

13   *Larson v. Dumke*, 900 F.2d 1363, 1367 (9th Cir. 1990).

14             Not all of the eight factors need to be analyzed here, since the conflict between

15   Mattel and MGA's other creditors is deep and intractable.  First, Mattel has a number of direct

16   claims against MGA in this lawsuit, which seek to recover substantial sums of money from

17   MGA as well as intellectual property held by MGA.  Second, Mattel admittedly stands adverse

18   to Omni – a significant MGA creditor whose interests do not overlap with Mattel's.  Third,

19   Mattel likely stands adverse to other potential MGA creditors, including vendors and retailers,

20   who maintain an interest in MGA's continued vitality and MGA's continued control over the

21   Bratz line of dolls as well as other intellectual property.  Fourth, Mattel's personal interest,

22   expressed through its direct claims against MGA, dwarfs its interest in the derivative claim, as

23   evidenced by the disparity between the amount at issue in the direct counterclaims and the

24   amount at issue in this derivative counterclaim.  Indeed, an argument can be made (and Mattel

25   makes it) that the derivative claim is nothing more than a mechanism to promote the direct

26   claims.  In sum, there is simply no basis upon which the Court could conclude that Mattel would

27   "vigorously and conscientiously" prosecute this suit on behalf of MGA's creditors and "be free

28   from economic interests that are antagonistic to the interests of the class."  *Id.*

1    The fifteenth counterclaim is DISMISSED WITHOUT LEAVE TO AMEND.

2    **VII.   Breach of Constructive Trust**

3    The sixteenth counterclaim alleges that Larian and MGA failed to adequately

4    preserve the intellectual property subject to the constructive trust imposed after Phase 1.  Even if

5    a claim for breach of constructive trust is cognizable, and even if Larian/MGA breached the

6    constructive trust imposed after Phase 1, Mattel suffered no injury.  The order imposing the

7    constructive trust was invalid, because it was overbroad and predicated upon verdicts that were

8    reached after improper instruction.  *See Mattel, Inc. v. MGA Entertainment, Inc.*, No. 09-55673,

9    2010 WL 2853761 (9th Cir. July 22, 2010).  Mattel never had a valid property right to the Bratz

10   intellectual property, and suffered no damage as a result of Larian/MGA's alleged breach of the

11   constructive trust imposed after Phase 1.

12   The sixteenth counterclaim is DISMISSED WITHOUT LEAVE TO AMEND.

13   **VIII.  Declaratory Relief**

14   Mattel alleges an actual controversy exists between itself and counter-defendants

15   about ownership interests in Bratz, rights to the "Moxie Girlz" name or mark, and Mattel's status

16   as MGA's creditor.  FAAC ¶¶ 238-243.

17   For declaratory relief, there must be "'a substantial controversy, between the

18   parties having adverse legal interests, of sufficient immediacy and reality to warrant issuance of

19   a declaratory judgment.'" *Spokane Indian Tribe v. United States*, 972 F.2d 1090, 1092 (9th Cir.

20   1992) (quoting *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct.

21   510 (1941)).  Mattel and Omni do not have adverse legal interests since (1) Omni's alleged

22   participation in a RICO conspiracy did not cause Mattel injury; and (2) Omni purchased a senior

23   secured interest in a credit facility to which Mattel *never* had priority.  The seventeenth claim is

24   DISMISSED WITHOUT LEAVE TO AMEND as to Omni.

25   **Disposition**

26   For the foregoing reasons, the Court ORDERS as follows:

27   1.    The counterclaims against Omni are DISMISSED WITHOUT LEAVE TO

28         AMEND.

2.    The Motion to Dismiss RICO and Creditor Claims (Docket 7896) is
DENIED as to the first and second counterclaims and GRANTED as to the
thirteenth, fourteenth, fifteenth, and sixteenth counterclaims.

3.    Machado's Motion to Dismiss First Counterclaim (Docket 7828) is
DENIED.

4.    The Motion to Dismiss for Lack of Personal Jurisdiction and on Ground of
*Forum Non Conveniens* (Docket 7898) is DENIED.

5.    The Motion to Dismiss U.S. Based Trade Secret and Employee-Based State
Law Tort Claims (Docket 7897) is GRANTED IN PART AND DENIED
IN PART in the manner specified by Section IV of this Order.

IT IS SO ORDERED.

DATED: August 2, 2010

_____
DAVID O. CARTER
United States District Judge