ANNETTE L. HURST (Bar No. 148738)
ahurst@orrick.com
WARRINGTON S. PARKER III (Bar No. 148003)
wparker@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105
Telephone:  +1-415-773-5700
Facsimile:   +1-415-773-5759

WILLIAM A. MOLINSKI (Bar No. 145186)
wmolinski@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
777 South Figueroa Street, Suite 3200
Los Angeles, CA  90017
Telephone:  +1-213-629-2020
Facsimile:   +1-213-612-2499

THOMAS S. MCCONVILLE (State Bar No. 155905)
tmcconville@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
4 Park Plaza, Suite 1600
Irvine, CA 92614-2258
Tel: (949) 567-6700/Fax: (949) 567-6710

Attorneys for the MGA Parties and IGWT 826

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an individual<br><br>Plaintiff,<br><br>v.<br><br>MATTEL, INC., a Delaware corporation,<br><br>Defendant.<br><br>AND CONSOLIDATED CASES | CASE NO.  CV 04-9049 DOC (RNBx)<br><br>Consolidated with Case No.  CV 04-09059 and Case No.  CV 05-02727<br><br>Honorable David O. Carter<br><br>**[PUBLIC REDACTED] MGA PARTIES' SUPPLEMENTAL BRIEF RE PRIVILEGE ISSUE PER COURT ORDER (Dkt. No. 8469)**<br><br>**Trial Date:  January 11, 2011** |

1

# TABLE OF CONTENTS

2

Page

3

4  INTRODUCTION ........................................................................................1

5  STATEMENT OF FACTS ...........................................................................6

6  A.        Procedural Background........................................................6

7  B.        Mr. Larian's Testimony ......................................................7

8  C.        The Contemporaneous Corroborating Evidence..................8

9  D.        Nine Months After The Transaction, Mr. Larian Seeks Legal
            Advice From Litigation Counsel...........................................9

10
   E.        Judge Larson's Comments Following Mr. Larian's August 15,
11            2008 Testimony...................................................................11

12  ARGUMENT ............................................................................................12

13  I.        THERE IS NO BASIS FOR FINDING THAT THE CRIME-FRAUD
             EXCEPTION APPLIES .................................................................12

14            A.    Mattel Does Not Meet The Standard For In Camera Review.............13

15            B.    The "In Furtherance" Standard Cannot Be Met....................................16

16            C.    The Ninth Circuit Opinion Precludes A *Zolin* Finding Of Fraud.......17

17  CONCLUSION.........................................................................................22

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page**

*Avtec Sys.,Inc.* v. *Pfeiffer,*
  21 F.3d 568 (4th Cir. 2004) ...............................................................15

*BC Technical, Inc. v. Ensil Intern. Corp.,*
  2008 WL 4318517, 82-3 (D. Utah 2008) ...........................................18

*Community for Creative Non-Violence* v. *Reid,*
  490 U.S. 730 (1989)...........................................................................14

*Effects Assocs. Inc.* v. *Cohen,*
  908 F.2d 555 (9th Cir. 1990) .............................................................15

*Gomez* v. *Vernon,*
  255 F.3d 1118 (9th Cir. 2001) ...........................................................13

*In re Grand Jury Subpoena 92-1,*
  31 F.3d 826 (9th Cir. 1994) ...............................................................17

*Martha Graham School & Dance Found'n,Inc.* v. *Martha Graham Ctr. of*
  *Contemporary Dance, Inc.,*
  380 F.3d 624 (2d Cir. 2004) ..............................................................15

*Mattel, Inc. v. MGA Entertainment, Inc.,*
  2010 WL 2853761 (9th Cir. 2010) .......................................................7

*In re Napster Copyright Litig.,*
  479 F.3d 1078 (9th Cir. 2007) .............................................5, 13, 19

*Public Affairs Assocs., Inc.* v. *Rickover,*
  177 F.Supp. 601 (D.D.C. 1959) *rev'd on other grounds,*
  284 F. 2d 262 (D.C. Cir. 1960), *vacated,* 369 U.S. 111 ...................15

*In re Richard Roe,*
  *Inc.,* 68 F.3d 38 (2d Cir. 1995) ..........................................................13

*United States* v. *de la Jara,*
  973 F.2d 746 (9th Cir. 1992) .............................................................12

*United States* v. *Zolin,*
  491 U.S. 554 (1989)..............................................................12, 16, 17

### FEDERAL STATUTES

17 U.S.C. § 101 ....................................................................................14

### MISCELLANEOUS

Rest. 2d Agency § 228 .........................................................................15

1          **INTRODUCTION**

2          For the last four and one-half years, Mattel and its attorneys at Quinn

3   Emmanuel have, on a near daily basis in the Court and in the press, pointed at

4   MGA and Isaac Larian and shouted "LIAR, LIAR, THIEF!"  One of their

5   consistent means of doing this to particularly pernicious effect was to attack

6   MGA's relationships with its attorneys, claiming that its attorneys were part of the

7   purported scheme, or at least part of the coverup.  The "Crime-Fraud" Motion was

8   an example of that tactic.

9          It turns out that this was a classic case of the evildoer entering the room and

10   looking behind the door because that's where he would have been hiding.  Because,

11   for nearly the very same period of time that Mattel and Quinn Emmanuel have been

12   shouting at Mr. Larian and MGA, "LIAR, LIAR, THIEF," Mattel and Quinn

13   Emmanuel have been suppressing and hiding evidence of Mattel's own nefarious

14   deeds—evidence which unambiguously demonstrates that Mattel is and always has

15   been the biggest liar and thief in the toy industry.  As MGA has discovered this

16   bombshell in just the last few weeks, for fifteen years from 1992 through 2006, a

17   series of Mattel employees in its "competitive intelligence" department, with the

18   knowledge, approval, and financial support of their bosses and the executives of the

19   company, willfully and deliberately misrepresented themselves to gain entry into

20   the private showrooms of Mattel's competitors at trade shows.  Mattel employees

21   went to Kinkos and printed up fake business cards so that they could LIE their way

22   into the private showrooms of their competitors.  The showrooms were off-limits to

23   competitors, and the toy manufacturers restricted access to retailers who agreed to

24   maintain the information they received in confidence.  Mattel LIED about its

25   employees' identities and pretended to be retailers, because it knew that they could

26   not gain entry to these private showrooms unless they did so.  Documents produced

27   in just the last few days show that Mattel lied its way into the private showrooms of

28   every toy company in the worldwide toy business—not only MGA, but also

1   Bandai, B-Bel, Inc., Binney & Smith, Ceaco, Hasbro, Jada Toys, Jakks Pacific,

2   K'NEX, Leapfrog, Lego, Madam Alexander, NKOK, Ohio Art, Playmates, Radica,

3   Spin Master, Sindy, Tecnitoys Juguetes, Thinkway, Toy Biz, Uncle Milton, V

4   Tech, Wild Planet, Wow Wee Toys, X Concepts and Zapf Creation.  Year after

5   year, Mattel employees printed up fake credentials so they could sneak into a dozen

6   or more competitor showrooms and improperly obtain confidential information.

7        Mattel employees bought spy cameras with Mattel funds so that they could

8   take pictures and videotape the confidential unreleased products of their

9   competitors after LYING their way into those showrooms.  Mattel hired

10  contractors, including a Persian woman named Sharon Rahimi who was hired

11  specifically to lie and sneak her way into MGA's showroom—undoubtedly because

12  Mattel believed it had a heightened chance of putting one over on Mr. Larian with a

13  kinswoman from his own ethnic group.  And then, to complete its acts of

14  THIEVERY and enable Mattel's unfair competitive advantage based thereon,

15  Mattel assembled presentations of hundreds of pages depicting all of these

16  unreleased products, confidential product pricing and advertising plans that these

17  companies, including MGA, had chosen to share under NDA only with retailers,

18  and then distributed and presented them to *hundreds* of Mattel employees including

19  at various times Mattel's top executives Eckert, Bousquette and Friedman.  And

20  then top Mattel executives and numerous other witnesses in this case LIED in their

21  depositions by claiming they never knew or heard anything at all about any tactic of

22  this type by Mattel, thus PERJURING themselves to conceal Mattel's bad acts.

23        In multiple meetings and a mediation in mid-2006, Mattel's in-house counsel

24  Jill Thomas and Quinn Emmanuel partner Jon Corey met with Sal Villasenor, one

25  of the many Mattel perpetrators of these lies and thefts.  For years Mr. Villasenor

26  had been sneaking his way into toy manufacturer showrooms and then making the

27  presentations afterwards—a practice that Eckert denied, and plainly admitted in his

28  deposition would be wrong.  Thomas and Corey met with Villasenor, who had

1   threatened to sue Mattel because he could no longer perform his job without being a

2   liar and thief.  And they learned (and that's charitably assuming they didn't know

3   already) of this more than a decade-long course of illegal conduct.

4         There are literally thousands of pages of documents reflecting these bad acts

5   by Mattel:  the presentations themselves (some of which were videotaped!), the

6   expense reports for fake business cards and spycams, the performance reviews

7   where these "competitive intelligence" employees touted their ability to "get

8   competitor information at trade shows."  The documents were requested by MGA

9   no later than the end of 2006, not long after Thomas and Corey met with

10   Villasenor.  Was a single page of any of those documents ever produced by Mattel

11   in the ensuing four year period of time?  NO, NOT A SINGLE PAGE WAS

12   PRODUCED FOR FOUR YEARS UNTIL AUGUST 2010.  Instead, Thomas, on

13   behalf of Mattel, and Corey, on behalf of Quinn Emmanuel CONCEALED and

14   SUPPRESSED the evidence.  Mattel and Quinn Emmanuel CONCEALED and

15   SUPPRESSED this evidence not only in this action, but all the while they were

16   trying to obtain criminal convictions in Mexico because a few departing employees

17   walked out (without MGA's knowledge) with the very things Mattel had been

18   teaching them to steal from all of its competitors for fifteen years!  And they are

19   still concealing and suppressing the evidence, because it still hasn't all been

20   produced.  Crime and fraud?  Sure—but it was MATTEL, not MGA, who done it.

21   And this is not to mention all of the other evidence that was suppressed by Mattel

22   throughout phase 1 of this case—evidence, like this evidence, that is directly

23   relevant to all of MGA's defenses during phase 1 including unclean hands and the

24   statute of limitations.

25         Against this backdrop, the instant "Crime-Fraud" Motion is revealed to be a

26   ridiculous farce of pot calling kettle black that it always has been.  But even worse,

27   as two events occurring since the original briefing of this Motion reveal, the poor

28   kettle is, and always has been, not black but clean as a whistle.

MGA'S SUPP. BRIEF RE PRIVILEGE ISSUES
CV 04-09049 DOC (RNBx)

1       Those two newly occurring events dispositive in MGA's favor as to the

2    outcome of this Motion are as follows:  (1) the Court-ordered production by MGA

3    on July 21, 2010 of a previously withheld as privileged June 29, 2001 email sent by

4    Isaac Larian to litigation attorney Patricia Glaser and Gregory Fishbach of Acclaim,

5    and (2) the July 22 Ninth Circuit Opinion.

6       The significance of the June 29, 2001 email is as follows.  The Court will

7    recall that MGA's transactional attorney David Rosenbaum (formerly of the

8    Fishbach law firm) conducted due diligence of Carter Bryant in September 2000

9    and reported in an e-mail thread sent to Mr. Larian that Carter Bryant had created

10   Bratz "in 1998."[1]  This is the only contemporaneous documentary evidence of any

11   factual representation by Bryant to MGA in September 2000 about the timing of his

12   creation, and it fully supports MGA's version of events.  On June 29, 2001, nine

13   months later and one day *before* the alleged crime-fraud communication on June

14   30, 2001 that is the subject of this Motion, Mr. Larian wrote an email stating his

15   understanding of the facts that Bryant had created Bratz "OUTSIDE Mattel."

16   (emphasis original).  Mr. Larian went on to elaborate in his June 29 email,

17   expressly referring to Mr. Rosenbaum's earlier due diligence and email confirming

18   the 1998 creation date:  "We made sure of this and got a legal representation of this

19   (Dave Rosenbaum wrote the contract)."[2]  Recall that Mattel's theory is that the next

20   day, on June 30, 2001, Mr. Larian sent an email to Patty Glaser that resulted in her

21   giving advice that supposedly caused Mr. Larian to then change his story and

22   perjure himself about what MGA understood as to the date of creation of Bratz at

23   the time of contracting.  Even giving this ridiculous farce of a theory all credit due,

24   the earliest that advice could have occurred under Mattel's theory was an

25   immediate response on the same day the email was sent—June 30.  Thus, it is plain

26

27   [1] For the Court's convenience, that email is attached hereto as Appendix A.

28   [2] For the Court's convenience, that email is attached hereto as Appendix B.

1   that on June 29, 2001, the day *before* the alleged crime-fraud producing

2   communication of June 30, 2001, Mr. Larian had *already expressed the view that is*

3   *claimed to have been concocted in response to Ms. Glaser's "in furtherance of"*

4   *advice*. This "crime-fraud" theory is conclusively revealed to be the morally

5   bankrupt attempt it always has been to interfere with MGA's relationship with and

6   access to counsel and to disrupt its defense of this lawsuit.

7        The second newly-occurring and dispositive event is the July 22 Ninth

8   Circuit Opinion. The Ninth Circuit has now held that Mattel's Inventions

9   Agreement is ambiguous in two material respects that bear directly on the issue of

10  the creation of Bratz and who owns it. Most significantly, the Court has held the

11  contract to be ambiguous (time spent by Bryant off the Mattel clock) in exactly the

12  way that Mattel posits was the engine of this so-called "crime-fraud" legal scheme.

13  A theory premised upon the purportedly fraudulent acquisition of intellectual

14  property rights to the detriment of the contractual assignee is at best highly

15  inchoate. This is not a stolen car or other tangible property. It's an allegedly stolen

16  abstract right—a right that the Ninth Circuit has now made clear has been subject to

17  reasonable competing contractual interpretations since the first moment this dispute

18  arose. In other words, MGA's defense of this case must be treated as an ordinary

19  commercial dispute (as for Mattel's prosecution of it in light of these

20  circumstances, how to treat that remains to be seen). It is beyond cavil that

21  ordinary commercial events do not support application of the crime-fraud

22  exception. *See In re Napster Copyright Litig.*, 479 F.3d 1078 (9th Cir. 2007).

23        While final disposition of these substantive points will await motions for

24  summary judgment, they certainly preclude at this point any application of the

25  crime-fraud exception. The entire theory that MGA stole Bratz from Mattel at all,

26  let alone knowingly with the assistance of advice of counsel procured in furtherance

27  of some nefarious scheme, has imploded.

28

MGA'S SUPP. BRIEF RE PRIVILEGE ISSUES
CV 04-09049 DOC (RNBx)

## STATEMENT OF FACTS

### A.    Procedural Background.

In Phase 1(a) of the first trial, the question asked of the jury was whether Carter Bryant "conceived and/or reduced to practice" his Bratz drawings during the time when he was employed by Mattel. The question was framed in this fashion because of the Court's summary adjudication of the meaning of Mattel's Inventions Agreement signed by Carter Bryant. Because of the Court's interpretation of the contract, the jury was not asked whether Carter Bryant's drawings were created within the scope of his employment—the ordinary test for authorship under the work-made-for-hire doctrine of the Copyright Act—but instead was only asked when the drawings were created. Dkt. No. 4115 at 21-22. Because the jury was also considering the question whether MGA tortiously interfered with Mattel's contract with Mr. Bryant, MGA's knowledge of what Carter Bryant did and when he did it was also part of the evidence adduced during Phase 1(a).

Mattel settled with Carter Bryant on the courthouse steps. This left MGA in the position of explaining not only what MGA knew and when, but also introducing what had previously been Carter Bryant's defense. MGA thus introduced evidence that Carter Bryant authored the four principal Bratz drawings in August 1998, when he was living at his family home in Missouri and not employed by Mattel, on nights and weekends while working at Old Navy. Parker Decl. Ex. A (5/27/08 Tr. 216-20); Ex. C (6/17/08 Tr. 2863-79); Ex. D (6/18/08 Tr. 2945); Ex. E (6/20/08 Tr. 3275-76).

MGA and Mr. Larian did not dispute, however, that Mr. Bryant continued to work on his drawings after he returned to Mattel in 1999. MGA simply argued that the principal drawings were completed in 1998 and that subsequent elaborations were made outside of Mr. Bryant's work and working hours for Mattel. Therefore, neither the concept of Bratz dolls nor the drawings belonged to Mattel. Ex. A (5/27/08 Tr. 239-41, 251).

1    On July 22, 2010, the Ninth Circuit reversed the Court's summary

2    adjudication order concerning the interpretation of the Bryant Inventions

3    Agreement that was the basis for the entire Phase 1 trial. *Mattel, Inc. v. MGA*

4    *Entertainment, Inc.*, 2010 WL 2853761 (9th Cir. 2010). In its opinion, the Court

5    held that the Agreement was ambiguous in two material respects. First, the Court

6    held that the contract was at best ambiguous as to whether it covered an idea for a

7    product name at all. *Id.* at 3 ("The district court thus erred in holding that the

8    agreement, by its terms, clearly covered ideas."). Second, the Court held that the

9    language "at any time during my employment" was ambiguous in that reasonable

10   people could differ as to whether or not it was intended to cover work performed

11   during off hours outside the scope of employment. *Id.* at 9 ("The phrase 'at any

12   time during my employment' is ambiguous. It could easily refer to the entire

13   calendar period Bryant worked for Mattel, including nights and weekends. But it

14   can also be read more narrowly to encompass only those inventions created during

15   work hours[.]").

16   **B.    Mr. Larian's Testimony.**

17   Isaac Larian testified what he understood concerning the creation of the Bratz

18   doll drawings. Mr. Larian testified that he first met Carter Bryant in September

19   2000, and that Mr. Bryant told Mr. Larian that he created Bratz in 1998 while in

20   Missouri and not employed by Mattel. "He told me he did them in 1998, when he

21   was in Missouri, on nights and weekends." Dkt No. 5021, 5037 (3/13/09 Olivar

22   Decl.) Ex. 38 (6/6/08 Tr. 1675). Mr. Larian testified during Phase 1(b) to his

23   understanding that Mr. Bryant "came up" with Bratz in 1998 and "later on, he was

24   working on the weekends and in the evenings enhancing what he was doing . . . ."

25   Dkt. No. 5021, 5037 Ex. 2 (8/15/08 Tr. 7618-19). Mr. Larian emphasized this point

26   when asked by Mattel:

27   Q: Mr. Larian, did you believe Carter Bryant when he
      told you that he did the concept for Bratz in 1998?

28

1
        A: I believed him, but we went further and looked into it
          to make sure that he was telling the truth.

2

3     *Id.* (8/15/08 Tr. 7619).  Mr. Larian thus testified that there were two periods of

4     time when he understood Mr. Bryant had worked on Bratz during nights and

5     weekends: both during the period of initial creation in 1998 (when Mr. Bryant

6     had been working at Old Navy and therefore would have worked on Bratz during

7     off hours) and later when Mr. Bryant was back at Mattel and continuing to

8     elaborate his drawings.

9          **C.**    **The Contemporaneous Corroborating Evidence.**

10        Mr. Larian's testimony is corroborated by the contemporaneous documentary

11    evidence, the testimony of other witnesses, and is fully consistent with the position

12    MGA took at trial.  MGA hired a transactional attorney, David Rosenbaum, then of

13    the Fishbach law firm, to prepare an agreement with Mr. Bryant. Dkt No. 5021,

14    5037 Ex. 38 (6/6/08 Tr. 1705); Parker Decl. Ex. B (6/6/08 Tr. 1709).  One of the

15    tasks of attorney Rosenbaum of the Fishbach law firm was to conduct due diligence

16    related to Mr. Bryant's sale, and his related express representation and warranty of

17    ownership, of the Bratz intellectual property.  In conducting this due diligence,

18    attorney Rosenbaum confirmed with Mr. Bryant's attorney, Anne Wang, that Carter

19    created the Bratz drawings in 1998 when not employed by Mattel.  Dkt. No. 5084

20    (3/25/08 Decl. of Joel N. Klevens) Ex. F (Wang Depo. 48) ("Carter was the creator

21    and owner" and "he created the doll at a time period separate from his employment

22    . . . ."); see also id. (Wang Depo. 53-54) (Bryant created Bratz before employment

23    with Mattel); Ex. G (Rosenbaum Depo. 80) (Wang "advised me that the work that .

24    .. Bryant had done in developing . . . 'the concept' was done outside the scope of

25    his employment with Mattel and had been done prior to his employment with

26    Mattel."); see also id. (Rosenbaum Depo. 82-85) (Bryant developed Bratz prior to

27    December 1998).

28

1    On September 28, 2000 after conducting this investigation,

2    contemporaneously with the transaction and eight years prior to trial, attorney

3    Rosenbaum sent an email ultimately copied to Mr. Larian later the same day,

4    confirming the results of his due diligence.  Appendix A; Dkt. No. 6284

5    (Rosenbaum Documents Produced June 3, 2008) at 25-26.  The e-mail expressly

6    confirmed that attorney Rosenbaum spoke with Carter Bryant's attorney, that he

7    was told that Mr. Bryant's drawings were created outside the scope of his

8    employment for Mattel, and were made "in 1998."  *Id.*  This document, which is

9    fully consistent with Mr. Larian's testimony, is the only contemporaneous

10   documentary evidence in the case reflecting what Carter Bryant told MGA in

11   September 2000 about the timing of his creation of Bratz.

12   In his agreement signed a few days later on October 4, 2000, Mr. Bryant

13   made an express contractual warranty that he was not violating any other obligation

14   in conveying the IP in the Bratz drawings to MGA.  Dkt. No. 5084 Ex. J

15   (MGA/Bryant Consulting Agreement).

16   **D.    Nine Months After The Transaction, Mr. Larian Seeks Legal**

17   **Advice From Litigation Counsel.**

18   The crux of Mattel's crime-fraud exception argument is an e-mail sent by Mr.

19   Larian to litigation counsel Patricia Glaser in the summer of 2001 that was

20   inadvertently disclosed to Mattel in discovery.  Based on the contents of this

21   indisputably privileged email (which was given back pursuant to protective order

22   and was not supposed to be used any further), Mattel has posited that Mr. Larian's

23   understanding of the creation of the Bratz drawings was in fact other than what he

24   testified as summarized above, and that this supposedly different understanding

25   allegedly conveyed to Ms. Glaser in the summer of 2001 forms the basis for

26   numerous legal wrongs.

27   The inadvertently produced email is dated June 30, 2001, nearly ten months

28   after the Bryant/MGA transaction.  This e-mail, as with all of the e-mails, is written

1  by a non-native English speaker (Mr. Larian spent his first seventeen years in Iran),

2  and it is not the first or last e-mail in the sequence of communications between Mr.

3  Larian and Ms. Glaser.  Rather, it was the second in a sequence of related

4  communications occurring on June 29, June 30, July 2 and July 7, 2001.[3]

5          Another version of the first in this sequence of emails was recently ordered

6  produced in Phase 2 Discovery Matter Order No. 98.[4]  This other version of the

7  first email was sent to MGA's litigation counsel Patty Glaser and to Gregory

8  Fishbach of Acclaim (the wrong Fishbach).  MGA complied with Order 98 and

9  made the compelled disclosure, producing the document through counsel on July

10  21, 2010 as MGA2_1738387.  Hurst Decl. ¶2.  As noted above, it is attached hereto

11  as Appendix B.

12          In the produced version of the June 29, 2001 email, Mr. Larian wrote an

13  account entirely consistent with his testimony and the record.  Mr. Larian

14  confirmed his understanding that Carter Bryant had created Bratz "OUTSIDE

15  Mattel" (emphasis original), and in a further reference to the 1998 time frame,

16  continued to elaborate that "We made sure of this and got a legal representation of

17  this (Dave Rosenbaum wrote the contract)."  *Id.*  There can be no doubt, based upon

18  the contents of this email that Mr. Larian held the view on June 29, 2001 that Carter

19  Bryant had done his original work in creating Bratz in 1998—indeed, he expressly

20  referred to and incorporated David Rosenbaum's earlier work in his summary.

21          Accordingly, Judge Larson, based upon his first review of the full sequence

22  of e-mails between Mr. Larian and Ms. Glaser, which included the privileged

23

24  [3] The entire sequence of these communications is in the Court's binder at Exhibit 2
    (with the duplicate privilege log entries reflecting the same document all clipped
25  together). The numerous other privilege log entries requested by Mattel to be
    submitted in camera are not part of the same subject matter or e-mail thread and
26  have nothing to do with the circumstances of Carter Bryant's conception of Bratz.
    See Exhibits 3-7 of the Court's In Camera Binder.
27  [4] The email was inadvertently sent to a third party outside the privilege, Gregory
28  Fishbach, and therefore was ordered produced.

second version of the July 29 email sent to Ms. Glaser and to Mr. Rosenbaum (the correct Fishbach), made the absolutely correct finding that the evidence did "not support a finding that [Larian] sought legal advice in order to further a crime or fraud." Dkt. No. 4014.

Mattel imagines in the Motion legal advice that Ms. Glaser provided in response to the inadvertently produced June 30 e-mail. According to Mattel, Ms. Glaser must have told Mr. Larian that Mattel would own the rights to Bratz if Mr. Bryant worked on Bratz while he was employed by Mattel, even if Mr. Bryant did the work on nights and weekends. Upon receiving this hypothesized advice, Mattel claims that Mr. Larian decided to conjure up the story that Mr. Bryant created Bratz in 1998 before his employment with Mattel. Dkt. 3908 at 1-4; Dkt. No. 5035 at 18; Mtn. at 11. Obviously that counterfactual assumption cannot be true, since the email written on June 29 the day *before* the June 30 email that supposedly conjured this nonexistent advice makes clear that Mr. Larian *already held the view that the works had been created in 1998 as confirmed by David Rosenbaum before the purported crime-fraud email was ever sent.*

**E.     Judge Larson's Comments Following Mr. Larian's August 15, 2008 Testimony.**

On August 15, 2008, Mr. Larian was testifying on redirect examination under questioning by MGA's attorneys. Counsel asked Mr. Larian whether "it would have been a problem if Carter Bryant had created or made any of these [Bratz] drawings while employed by Mattel . . . ." Dkt. No. 5021, 5037 Ex. 2 (8/15/08 Tr. 7618). Mr. Larian responded by saying that Mr. Bryant told him that he "came up with something in 1998" "and then later on, he was working on the weekend and in the evenings enhancing what he was doing." *Id.* 7618-19. Mr. Larian testified that "I didn't see anything wrong with that." *Id.* 7619. Mr. Larian was then asked whether he "believe[d] Carter Bryant when he told you that he did the concept for

1  Bratz in 1998?" *Id.* at 7619. Mr. Larian responded "I believed him, but we went

2  further and looked into it to make sure that he was telling the truth." *Id.*

3       Following this testimony, Judge Larson called counsel into chambers. The

4  Court expressed concern that Mr. Larian had perjured himself. To explain its

5  reasoning, the Court itself disclosed the content of two privileged documents. Dkt.

6  No. 5021, 5037 Ex. 1 (8/15/08 Tr. 7632). Over the course of the colloquy with

7  counsel, during which counsel proffered testimony by Ms. Glaser in response to the

8  District Court's disclosure of privileged information, the District Court recognized

9  that its initial impression might be mistaken. Dkt. No. 5021, 5037 Ex. 1 (8/15/08

10  Tr. 7639, 7645). After months of trial and a full docket of other matters, it is

11  apparent that Judge Larson simply failed to take account of entire contents of the

12  full series of e-mail exchanges that he had reviewed months earlier in finding that

13  the crime-fraud exception did not apply. Judge Larson ended the hearing without

14  concluding that there was perjury, without finding a waiver of the attorney-client

15  privilege, and without revisiting the earlier finding that there was no application of

16  the crime-fraud exception.

## ARGUMENT

### I. THERE IS NO BASIS FOR FINDING THAT THE CRIME-FRAUD EXCEPTION APPLIES.[5]

     To obtain *in camera* review under the crime-fraud exception, Mattel must establish a good faith basis to believe that the communication was made in furtherance of a crime or fraud, and that basis must be established *without regard to the privileged communications. United States v. Zolin,* 491 U.S. 554, 573 (1989), ("materials that have been determined to be privileged may not be considered in making the preliminary determination") (citing Fed. R. Evid. 104(a)); *United States v. de la Jara,* 973 F.2d 746, 748 (9th Cir. 1992) ("De la Jara correctly argues that under *[Zolin],* the district court could not consider the contents of a privileged letter

_____

[5] MGA has nothing to add at this time to its earlier arguments concerning waiver.

1   in assessing the government's prima facie case until the government had, as a

2   threshold matter *presented nonprivileged evidence* `sufficient to support a

3   reasonable belief that *in camera* review may yield evidence that establishes the

4   exception's applicability"); *Gomez v. Vernon,* 255 F.3d 1118, 1131 (9th Cir. 2001)

5   (same).

6       Even if the *prima facie* threshhold is met, that is not the end of the story.  The

7   crime-fraud exception applies only upon an ultimate showing upon a preponderance

8   of the evidence that "the client was engaged in or planning a criminal or fraudulent

9   scheme when it sought the advice of counsel to further the scheme."  *In re Napster*

10  *Copyright Litig.*, 479 F.3d 1078, 1090 (9th Cir. 2007) (internal quote omitted).  The

11  party seeking disclosure must show "that the attorney client communications are

12  related to and were made *in furtherance of* [the] intended, or present or continuing

13  illegality."  *Id.* (internal quote omitted; emphasis in original).  "[T]he exception

14  applies only when . . . the client communication . . . was itself in furtherance of the

15  crime or fraud."  *In re Richard Roe, Inc.*, 68 F.3d 38, 40 (2d Cir. 1995).  The

16  privilege holder is entitled to adduce evidence and argument *in camera* to rebut the

17  argument for a prima facie showing.  *Napster*, 479 F.3d at 1093.

18      **A.    Mattel Does Not Meet The Standard For *In Camera* Review.**

19      Mattel does not even meet the threshold showing for in camera review.  The

20  June 29, 2001 email that was recently ordered produced by the Discovery Master

21  makes clear that Mr. Larian held the view that the works were created in 1998 at

22  least the day before the purported crime-fraud communication on June 30 upon

23  which Mattel improperly relies.  Moreover, the trial testimony of Mr. Bryant and

24  Mr. Larian, the deposition testimony of attorneys Rosenbaum and Wang, and the

25  documentary evidence including the September 28, 2000 Rosenbaum e-mail

26  establish that in September 2000, Mr. Larian was informed that Mr. Bryant created

27  Bratz in 1998 during a time that was outside of his employment with Mattel.  The

28  only contemporaneous documentary evidence—the Rosenbaum email—is fully

1   consistent with Mr. Larian's testimony.  All of the deposition testimony is

2   consistent.  The later June 30 email is consistent.  None of the nonprivileged record

3   evidence is in any way inconsistent with the Larian testimony.  Without the

4   inadvertently produced e-mail—which cannot be considered in assessing whether to

5   grant in camera review—there never even would have been a hint or a suggestion

6   of any inconsistency.

7          Mattel has posited a complete fiction.  It has simply made up a story out of

8   whole cloth about some advice that was supposedly given that caused Mr. Larian to

9   change his story.  The entire crux of Mattel's argument is the made-up fantasy that

10  after the June 30 communication, Mr. Larian got some advice from Ms. Glaser that

11  caused him to change his tune and say 1998.  The soonest that advice could have

12  occurred "in furtherance of" the scheme would have been immediately upon Ms.

13  Glaser's receipt, *on June 30*, of the email Mattel has now been trying to get for the

14  last four years.  But since Mr. Larian referred to the due diligence of Mr.

15  Rosenbaum confirming creation in 1998 on June 29, the day before this advice ever

16  could been given under Mattel's theory, the theory is obviously ridiculous.

17         In addition, it is pure speculation—and wrong—that an attorney would have

18  provided Mr. Larian advice in mid-2001 requiring him to later "change" his story

19  because Mr. Bryant would not own his copyright if he worked on Bratz on nights

20  and weekends.  No competent intellectual property attorney would have given such

21  advice based on what MGA knew at the time.  There would have been no reason for

22  Mr. Larian to concoct a different story (and for the reasons set forth above it is plain

23  that he did not).

24         The Copyright Act's "works made for hire" provision provides that an

25  employer owns an employee's work only when that work was "prepared by an

26  employee within the scope of his or her employment."  17 U.S.C. § 101.  The

27  Restatement (Second) of Agency governs the interpretation of this provision.

28  *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 740 (1989).  It

1    provides that a work is prepared within the scope of employment—and therefore is

2    owned by an employer—"only if (a) it is of the kind [the employee] is employed to

3    perform; (b) it occurs substantially within the authorized time and space limits;

4    [and] (c) it is actuated, at least in part, by a purpose to serve the master."  Rest. 2d

5    Agency § 228 (1958); *Avtec Sys., Inc. v. Pfeiffer*, 21 F.3d 568, 571 (4th Cir. 2004);

6    *Martha Graham School & Dance Found'n, Inc. v. Martha Graham Ctr. of*

7    *Contemporary Dance, Inc.*, 380 F.3d 624, 635-36 (2d Cir. 2004); *see also Effects*

8    *Assocs., Inc. v. Cohen*, 908 F.2d 555, 557 (9th Cir. 1990) (noting that Community

9    for Creative Non-Violence altered the definition of "works for hire" so that it no

10   longer meant "a work . . . prepared by an employee whenever the hiring party

11   controlled, or had the right to control, the product"); *Public Affairs Assocs., Inc. v.*

12   *Rickover*, 177 F. Supp. 601 (D.D.C. 1959), *rev 'd on other grounds*, 284 F. 2d 262

13   (D.C. Cir. 1960), *vacated*, 369 U.S. 111 (1962).

14        As the Ninth Circuit has now confirmed with its July 22 Opinion, working

15   nights and weekends was not "substantially within the authorized time and space

16   limits" of Mr. Bryant's work for Mattel.  Moreover, it was undisputed that Mattel

17   did not assign this work to Mr. Bryant, and Mr. Bryant did not do this work, with a

18   purpose to serve Mattel.  Mattel does not contend that these were works made for

19   hire—in fact, Mattel admits that Mr. Bryant's works were not works made for hire

20   because it filed applications for copyright registration claiming ownership by

21   contractual assignment, rather than authorship through employment.  Dkt No. 6248

22   (8/11/09 Decl. of Warrington S. Parker) Ex. 3 (Mattel's Bratz Copyright

23   Registrations).

24        The legal premise of Mattel's entire theory—that Mr. Larian had to change

25   his story when informed that nights and weekends would not work—is entirely

26   fallacious.  Had Mr. Bryant worked nights and weekends on Bratz for his own

27   purposes, Mattel would not have owned the drawings under prevailing Copyright

28   Act principles.  And, there is no evidence that MGA understood anything other than

- 15 -

1    prevailing Copyright Act principles applied at that point in time.  And, even had

2    MGA been in possession of the contract, the Ninth Circuit's holding dictates the

3    conclusion that MGA would have been fully justified to believe that the contract

4    would support MGA's ownership, since the contract is at best ambiguous on this

5    very timing point.  In short, there was no legal reason for Mr. Larian to change his

6    story.  The only fabrication here is Mattel's purely made up work of fiction about a

7    change in story that never happened in response to legal advice that was never

8    given—and there is no reason to speculate, let alone make a reasonable inference,

9    that such advice in fact occurred when it would have been erroneous advice as

10   Mattel admits with its own later copyright applications.  The lower threshold under

11   *Zolin* plainly cannot be met.

12              **B.    The "In Furtherance" Standard Cannot Be Met.**

13         The fact that Mr. Larian already held the view that Mattel is now claiming

14   was later concocted in response to legal advice is only the first of two fatal

15   temporal anomalies in its theory.  The second temporal flaw is that the

16   communication posited with Ms. Glaser did not occur until long *after* MGA had

17   already acquired the Bratz rights from Bryant.  The communications with Ms.

18   Glaser occurred *nearly ten months after the transaction.*  Mr. Larian therefore

19   could not have used Ms. Glaser's "advice to fabricate the false 1998 story about the

20   creation of Bratz . . . *to perfect and complete [the] theft of Bratz . . ."* Mot. at 11

21   (emphasis added).  In September 2000, Mr. Larian received communications that

22   provided the facts that were the basis for his trial testimony.  In September 2000,

23   attorney Rosenbaum created documents confirming these facts.  In October 2000,

24   Mr. Bryant confirmed his written representation of ownership of the IP and MGA

25   completed its acquisition of Bratz—the entire basis for the claimed theft and

26   everything else that ensued.  The advice Mattel imagines Ms. Glaser gave could

27   not have been provided sooner than June 30, 2001, *nearly ten months after* Mr.

28

MGA'S SUPP. BRIEF RE PRIVILEGE ISSUES
CV 04-09049 DOC (RNBx)

1   Larian obtained the facts to which he testified and *nearly ten months after* MGA

2   entered into the agreement with Mr. Bryant.

3      Mr. Larian's attorney-client communications therefore could not have been

4   for the purpose of "stealing" Bratz. Since the communications with Ms. Glaser

5   occurred after the acquisition of Bratz, no crime or fraud exception premised on the

6   communications with Ms. Glaser can apply to MGA's acquisition of Bratz. *See,*

7   *e.g., In re Grand Jury Subpoena 92-1*, 31 F.3d 826, 831 (9th Cir. 1994) (crime-

8   fraud exception does not apply to conduct that occurred prior to the

9   communication). Since MGA's acquisition of Bratz is the gravamen of all asserted

10  misconduct to which the privileged communications sought here are relevant, and

11  the communications occurred well thereafter, it is plain that the crime-fraud

12  exception simply cannot be contorted to apply.

13      **C.    The Ninth Circuit Opinion Precludes A *Zolin* Finding Of Fraud.**

14      MGA has explained at length in its prior filings why Mattel's factual and

15  legal theory of the crime-fraud exception would not apply to any of its previously

16  pled predicate acts. *See* Dkt. ##3915, 5083, 6380, 6599 and 7346. MGA has

17  repeatedly explained that Mattel's theory of the crimes or frauds, in addition to the

18  defects laid out above, are factually and legally defective. The Court's denial of the

19  motion to dismiss the RICO claim does not alter the force of these arguments,

20  which assumed that the predicate acts were then in the case.

21      There are, however, two dispositive events that have occurred since the time

22  of the original motion that further necessitate denial of the Motion. First, as

23  discussed above, Phase 2 Discovery Matter Order No. 98 compelled production of

24  the June 29, 2001 email, and that June 29, 2001 email conclusively demonstrates

25  that Mr. Larian told the story which Mattel now alleges he concocted *before* the

26  date upon which he supposedly concocted it: a fatal flaw in Mattel's theory.

27      The second dispositive event is the July 22 Ninth Circuit Opinion. The Ninth

28  Circuit's holding that the Mattel Inventions Agreement is ambiguous in two

- 17 -

1  respects material to the present inquiry precludes any conclusion that Mr. Larian

2  held a fraudulent state of mind to deprive Mattel of the objects of that contract.

3

4

5

6

7

8

9  Thus, had MGA or Larian become aware at any

10  time throughout the ten year period from 1994 through 2004 of the terms of the

11  form contract used by Mattel with Bryant, it also would have become aware of the

12  *ambiguity* of that contract.

13      A theory premised upon the purportedly fraudulent acquisition of intellectual

14  property rights to the detriment of the contractual assignee is at best highly

15  inchoate.  This is not a stolen car or other tangible property.  It's an allegedly stolen

16  abstract right—a right that the Ninth Circuit has now made clear has been subject to

17  reasonable competing contractual interpretations since the first moment this dispute

18  arose.  Moreover, Mattel's theory of criminally willful copyright infringement

19  requires it to prove that MGA knew that Mattel in-fact owned the copyright (which

20  still has not been and likely never will be adjudicated to be the case), and

21  furthermore that MGA was knowingly infringing it with its Bratz products with the

22  intention to violate the Copyright Act (another conclusion that has never been made

23  by anyone—even the erroneously instructed first jury—and never will be).  *See BC*

24  *Technical, Inc. v. Ensil Intern. Corp.*, 2008 WL 4318517, 82-3 (D. Utah  2008).

25      The Ninth Circuit's opinion casts serious doubt upon Mattel's ability to

26  establish that any Bratz products ever marketed by MGA infringed upon the Bryant

27  drawings.  The Ninth Circuit opinion militates the conclusion that nothing beyond

28  the first generation of Bratz products could possibly infringe.  While final

1   disposition of these points will await motions for summary judgment, they certainly

2   preclude at this point any application of the crime-fraud exception.  The entire

3   theory that MGA stole Bratz from Mattel at all, let alone knowingly, has imploded.

4   MGA's defense of this case is an ordinary commercial dispute, and it is high time

5   that it is treated as such.  The Ninth Circuit has made clear that advice given in

6   connection with ordinary commercial events, such as the disputed interpretation of

7   a contract, does not support application of the crime-fraud exception.  *See Napster*,

8   479 F.3d at 1097-1098 ("lawyerly attempt to make [a contract provision]

9   inconspicuous" was "routine wrangling over contract term," and "the fact that a

10  party has taken steps to structure a business transaction to limit its liability does not

11  suffice … to establish that the crime-fraud exception applies.").

12          And, frankly, MGA and Mr. Larian have been victimized in this regard.  The

13  Court's prior summary adjudication order, now found to have been clearly

14  erroneous, enabled Mattel to frame this litigation in terms of MGA's "theft" of

15  Bratz and to tar MGA and Mr. Larian in the public eye for years.  That is now

16  conclusively demonstrated to have been a morally bankrupt approach to what is at

17  best an ordinary commercial dispute.  Even worse, in fact despicably worse, during

18  all of that time Mattel and its lawyers were calling MGA thief and liar, they knew

19  full well that this was at best a case of the pot calling the kettle black.  At worst,

20  they were doing it on purpose to diminish the effect their own horrible conduct

21  would have on the Court when it finally came to light.

22          For fifteen years numerous Mattel employees used false credentials to sneak

23  and lie their way into competitor showrooms at trade shows and steal confidential

24  unreleased product information.

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26    From 2001 through 2006, Mattel employed these practices against MGA,

27  constantly spying on MGA at numerous trade shows by using fake credentials,

28  hiring contractors so none of the former Mattel employees would recognize who

- 20 -

1   Mattel was sending to the MGA showrooms, and using the information gained for

2   unlawful competitive advantage. *See* Dkt. #s 8503, 8504, 8505 and 8506. One of

3   the contractors Mattel hired to lie her way into the MGA showroom was a Persian

4   woman, Sharon Rahimi. It is apparent that Mattel did this in order to better put one

5   over on Mr. Larian by seeking to engender a feeling of trust towards a kinswoman

6   from his same ethnic group.

7

8

9

10                                                                    This

11  was before Mattel filed its trade secret and RICO claims. Document requests in

12  2006 requested all of the pertinent information, but for four years it was never

13  produced. Mattel and Quinn Emanuel actively suppressed the evidence until July

14  2010, until the jig was up with the deposition of Sal Villasenor on July 12, 2010.

15  Only in the last few days have any documents at all been produced, and it is plain

16  that Mattel has more it is trying to hide. In fact, Mattel and Quinn Emanuel have

17  pursued a strategy of absolute suppression of all responsive harmful evidence in

18  this case until forced by disclosure through depositions and court orders to cough it

19  up. If there is any party in this case who has used the attorney-client privilege to

20  shield its own wrongdoing, it is Mattel.

21          To give credit where it is surely due, Mattel and Quinn were brilliant in their

22  execution of this nefarious strategy. Mattel succeeded for five years in concealing

23  its own criminal and fraudulent conduct, all the while painting MGA with black

24  paint that it will probably never be able to fully wash off. And the strategy came

25  just that close to working, and to driving MGA out of business. Certainly it cost

26  hundreds of MGA's employees and their families their livelihoods. Denying

27  Mattel's motion is an important first step in rectifying this wrong. Denying

28  Mattel's motion is, in all events for the reasons expressed above, legally necessary.

MGA'S SUPP. BRIEF RE: PRIVILEGE ISSUES
CV 04-09049 DOC (RNBx)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CONCLUSION

For the foregoing reasons, the motion to compel the Glaser emails should be denied.

Dated:  August 12, 2010          ORRICK, HERRINGTON & SUTCLIFFE LLP


_Annette L. Hurst_
Annette L. Hurst
Attorneys for the MGA Parties and IGWT 826

- 22 -

# Appendix A

Name & Address:
Annette L. Hurst (State Bar No. 148738)
Orrick, Herrington & Sutcliffe LLP
The Orrick Building, 405 Howard Street
San Francisco, CA 94105
Telephone: (415) 773-5700
Facsimile: (415) 773-5759

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARTER BRYANT<br><br>PLAINTIFF(S)<br><br>v.<br><br>MATTEL, INC., a Delaware Corporation<br><br>DEFENDANT(S). | CASE NUMBER:<br>CV 04-9049-DOC (RNBx)<br><br>**NOTICE OF MANUAL FILING** |

PLEASE TAKE NOTICE:

The above-mentioned cause of action has been designated as an electronically filed case. In accordance

with General Order 08-02 and Local Rule 5-4 the following document(s) or item(s) will be manually

filed. **List Documents:** MGA Parties' Supplemental Brief Re Privilege Issues Per Court Order (Dkt. 8469); Declaration Of Annette L. Hurst In Support Of MGA Parties' Supplemental Brief Re Privilege Issues Per Court Order (Dkt. 8469); [Proposed] Order Granting MGA Parties' Supplemental Brief Re Privilege Issues Per Court Order (Dkt. 8469); Application To File Under Seal; [Proposed] Order Granting Application To File Under Seal

**Document Description:**

☐ Administrative Record

☐ Exhibits

☐ Ex Parte Application for authorization of investigative, expert or other services pursuant to the Criminal Justice Act [see Local Civil Rule 79-5.4, Documents to be excluded, (h)]

☒ Other See list of documents described above.

**Reason:**

☒ Under Seal

☐ Items not conducive to e-filing (i.e., videotapes, CDROM, large graphic charts)

☐ Electronic versions are not available to filer

☒ Per Court order dated January 4, 2005

☐ Manual Filing required (*reason*):

| | |
|---|---|
| August 12, 2010 | /s/ Annette L. Hurst |
| Date | Attorney Name<br>MGA Parties<br>Party Represented |

Note: File one Notice in each case, each time you manually file document(s).

American LegalNet, Inc.<br>www.FormsWorkflow.com

# Appendix B

Name & Address:
Annette L. Hurst (State Bar No. 148738)
Orrick, Herrington & Sutcliffe LLP
The Orrick Building, 405 Howard Street
San Francisco, CA 94105
Telephone: (415) 773-5700
Facsimile: (415) 773-5759

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| CARTER BRYANT | CASE NUMBER: |
|---|---|
| PLAINTIFF(S) | CV 04-9049-DOC (RNBx) |
| v. | |
| MATTEL, INC., a Delaware Corporation | **NOTICE OF MANUAL FILING** |
| DEFENDANT(S). | |

PLEASE TAKE NOTICE:

The above-mentioned cause of action has been designated as an electronically filed case. In accordance

with General Order 08-02 and Local Rule 5-4 the following document(s) or item(s) will be manually

filed. **List Documents:** MGA Parties' Supplemental Brief Re Privilege Issues Per Court Order (Dkt. 8469); Declaration Of Annette L. Hurst In Support Of MGA Parties' Supplemental Brief Re Privilege Issues Per Court Order (Dkt. 8469); [Proposed] Order Granting MGA Parties' Supplemental Brief Re Privilege Issues Per Court Order (Dkt. 8469); Application To File Under Seal; [Proposed] Order Granting Application To File Under Seal

**Document Description:**

☐ Administrative Record

☐ Exhibits

☐ Ex Parte Application for authorization of investigative, expert or other services pursuant to the Criminal Justice Act [see Local Civil Rule 79-5.4, Documents to be excluded, (h)]

☒ Other See list of documents described above.

**Reason:**

☒ Under Seal

☐ Items not conducive to e-filing (i.e., videotapes, CDROM, large graphic charts)

☐ Electronic versions are not available to filer

☒ Per Court order dated January 4, 2005

☐ Manual Filing required (*reason*):

| August 12, 2010 | /s/ Annette L. Hurst |
|---|---|
| Date | Attorney Name |
| | MGA Parties |
| | Party Represented |

Note: File one Notice in each case, each time you manually file document(s).

American LegalNet, Inc.
www.FormsWorkflow.com