ANNETTE L. HURST (State Bar No. 148738)
ahurst@orrick.com
WARRINGTON S. PARKER III (State Bar No. 148003)
wparker@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
405 Howard Street
San Francisco, CA  94105-2669
Tel: (415) 773-5700/Fax: (415) 773-5759

WILLIAM A. MOLINSKI (State Bar No. 145186)
wmolinski@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
777 South Figueroa Street, Suite 3200
Los Angeles, CA  90017
Tel. (213) 629-2020/Fax: (213) 612-2499

THOMAS S. MCCONVILLE (State Bar No. 155905)
tmcconville@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
4 Park Plaza, Suite 1600
Irvine, CA 92614-2258
Tel: (949) 567-6700/Fax: (949) 567-6710

Attorneys for MGA Parties and IGWT 826 Investments
LLC

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an individual,<br><br>Plaintiff,<br><br>v.<br><br>MATTEL, INC., a Delaware corporation,<br><br>Defendant.<br><br>AND CONSOLIDATED ACTIONS | Case No.  CV 04-9049 SGL (RNBx)<br>Consolidated with:  Case No. CV 04-9059 and Case No. CV 05-2727<br><br>**Honorable David O. Carter**<br><br>**MGA ENTERTAINMENT, INC.'S REPLY TO FOURTH AMENDED ANSWER AND COUNTERCLAIMS, INCLUDING AFFIRMATIVE DEFENSES AND COMPULSORY COUNTERCLAIMS-IN-REPLY FOR (1) TRADE SECRET MISAPPROPRIATION, (2) VIOLATION OF THE RACKETEERING INFLUENCED AND CORRUPT ORGANIZATIONS ACT, AND (3) WRONGFUL INJUNCTION**<br><br>**Trial Date:  January 11, 2011** |

## **INTRODUCTION**

1.      Beginning in at least 1992 and continuing through at least 2006, a series of Mattel employees in its "market intelligence" department, with the knowledge, approval, and financial support of their bosses and the executives of the company, willfully and deliberately misrepresented themselves to gain entry into the private showrooms of Mattel's competitors (including MGA) at numerous industry trade shows.  Mattel employees went to Kinkos and printed up fake business cards so that they could lie their way into the private showrooms of their competitors. They bought small video recorders (paid for by Mattel) and brought cameras so they could photograph and videotape what they saw in those private showrooms.  The showrooms were off-limits to competitors, and the toy manufacturers restricted access to retailers who agreed to maintain the information they received in confidence.  Mattel lied about its employees' identities and pretended to be retailers, because it knew that they could not gain entry to these private showrooms unless it did so.  Then, Mattel stole the trade secrets and other confidential information of its competitors including but not limited to the appearance, operation and intended play pattern of toys not yet on the market, price lists, and advertising plans and strategies. Mattel embarked on this scheme in order to acquire and maintain an unlawful competitive advantage, and it succeeded wildly.

2.      Mattel gained access using false pretenses to the private showrooms of practically every toy company in the business—not only MGA, but also Bandai, B-Bel, Inc., Binney & Smith, Blue Box, Cadaco, Ceaco, Chicco, Crayola, Creativity for Kids, Decipher, DSI, Empire, Endless Games, Equity Marketing, Famosa, Get Real Girl, Giochi Preziosi, Gund, Hamilton Toys, Hasbro, Irwin Toys, Jada Toys, Jakks Pacific, Justoys, Kessel, K'NEX, Leapfrog, Lego, Madam Alexander, Maisto, McFarlane, Mealgy, Megablocks, Miss Party Surprise, Nikko, NKOK, NSI, NZ Toys, Ohio Art, Playhut, Playmates, Pressman, Radica, Razor, Robert Anner, Schure, Simba, Sony, Spin Master, Sindy, Tacmay, Tecnitoys

Juguetes, Thinkway, Tiger Electronics, Today's Kids, Tomy, Toy Biz, Toy Max, Trendmaster, Uncle Milton, V Tech, Wham-O, Wild Planet, Wizards of the Coast, Wow Wee Toys, X Concepts and Zapf Creation.  Year after year after year, Mattel employees printed up fake credentials, and armed with cameras, entered under false pretenses a dozen or more competitor showrooms to steal confidential information.

       3.     Over time and pursuant to this scheme, Mattel defrauded MGA of unreleased product information regarding at least the following products: Hopscotch Heather, Dream Baby, Bratz, Jumpin Jenny, Scooter Samantha, Hello Kitty Be Beautiful Matchmake Journal and Virtual Crush, iCandy, Liar Liar, Monkey See Monkey Do, A New Breed and Palm Puppies, Hello Kitty Scooter, Insecto Bots, Monster Surgery, Bratz Mobile, My Beautiful Mermaid, Hulk Two-Way Radios, Bratz Styl' It Collection, Bratz Boys, Bratz Winterwonderland Collection, Bratz Formal Funk Collection, Bratz Runway Formal Funk Collection, Bratz FM Limo, Bratz Motorcycle, Bratz Pet Assortment, Bratz City Playsets, Musikids, Lil' Bratz Boyz, Lil' Bratz Slumber Party, Lil' Bratz Spring Break, Lil' Bratz Loungin' Loft, Lil' Bratz Vehicle Assortment, Lil' Bratz Deluxe Mall Playset, My Beautiful Ballerina, Pia Back to School, Jumpin' on the Bed Bouncin' Baby, Rachel Lul A Bye Baby, RC Street Flyer Samantha, Walk 'n Go Jo Jo, Bead Palace, Bratz Stylin' Dance Party, Alien Racers, Micro Blast Jet Skis, Bratz Petz, Lil' Bratz Dance Party, Dazzlin' Disco Café, Sun Kissed Summer, Girls Nite Out, Wild Life Safari Collection, Bratz Lucious Lamp/Alarm Clocks, Flower Fairies, Bratz Internet Café Playset, Bratz Retro Café, Lil' Bratz Transforming Bedroom, Bratz Girls Nite Out.  Some of these products were never released to the market by MGA.

       4.     Indeed, Mattel, in connection with a racketeering enterprise made up of Mattel (including various subsidiaries), its independent contractors including at least Sharon Rahimi and Bain & Company, and lawyers from at least two outside law firms the United States law firm Quinn Emanuel Urquhart & Sullivan LLP and the Mexican law firm Basham Ringe Y Correa (the "Mattel

1   Racketeering Enterprise"), has used the wires in interstate commerce in this scheme

2   to defraud confidential information from nearly every company in the toy business,

3   to criminally infringe copyrights in the distribution of that stolen information on a

4   worldwide basis throughout Mattel and its various foreign subsidiaries, and then to

5   conceal, suppress and destroy evidence of that theft in this litigation through

6   alteration and concealment of documents, tampering and obstruction of justice

7   (including witnesses lying under oath).  Mattel engaged in this pattern and practice

8   of racketeering in order to maintain its unlawful competitive advantage in the toy

9   industry, its vigorously promoted reputation as an ethical company, and most

10  importantly of all from MGA's perspective, its ability to deceive a federal judge into

11  believing that Mattel was good and MGA was evil, thus procuring a wrongful

12  injunction against MGA that deprived MGA of the sales of numerous Bratz

13  products, interfered with MGA's relationships with retailers, interfered with MGA's

14  relationships with licensees, destroyed an estimated one billion dollars

15  (1,000,000,000) in brand equity, and nearly drove MGA out of business.

16          5.      Accordingly, and based upon the allegations set forth herein,

17  MGA hereby replies to Mattel's Fourth Amended Answer and Counterclaims

18  ("FAAC") with a complete denial that Mattel is entitled to any relief whatsoever,

19  and interposes its own additional compulsory counterclaims-in-reply for Trade

20  Secret Misappropriation, violation of the Racketeering Influenced and Corrupt

21  Organizations Act and Wrongful Injunction based upon this newly discovered

22  evidence and other recent events including the July 22 Opinion of the Ninth Circuit

23  Court of Appeals, as well as the law of this case as articulated by the Court in its

24  August 2, 2010 Order on Motions to Dismiss.  MGA hereby demands that the Court

25  enter judgment on behalf of MGA on the basis of MGA's original Complaint in this

26  action and the denials, defenses, and allegations of the counterclaims-in-reply set

27  forth herein.

28

MGA'S REPLY TO COUNTERCLAIMS
CV 04-9049 DOC (RNBx)

## BACKGROUND FACTS COMMON TO AFFIRMATIVE DEFENSES AND COMPULSORY COUNTERCLAIMS-IN-REPLY

6.     As MGA has just discovered after the deposition testimony of Sal Villasenor on July 12, 2010 and documents produced thereafter that should have been produced many years before, for at least fifteen years from 1992 through 2006, a series of Mattel employees in its "market intelligence" department, with the knowledge, approval, and financial support of their bosses and the executives of the company, willfully and deliberately misrepresented themselves to gain entry into the private showrooms of Mattel's competitors at trade shows, armed with cameras and video recorders.

7.     The Toy Industry Association ("TIA") was formed in or about 1916.  For decades since the formation of TIA, each year there has been a toy fair in New York hosted by TIA where all of the major toy manufacturers come together on a worldwide basis to meet with retailers in order to demonstrate their wares.  The New York Toy Fair ("NYTF) has been customarily held in or about February of each year.

8.     During NYTF, it has been the practice of the many of the toy manufacturers to have private showrooms.  These private showrooms are set up for the purpose of private meetings between the toy manufacturers and their customers, the retailers.  Entry to these showrooms is regulated.  Only retailers or distributors are permitted, often by appointment only; many manufacturers require the use of NDAs, and post signs and other information advising the entrants to private showrooms that they are obliged to hold in confidence the nonpublic information presented therein, and not to take pictures or otherwise record what they see. Indeed, Mattel is well aware of these practices because Mattel itself has engaged in such regulation of admission to its private showrooms at the NYTF for many years. MGA has restricted access to its showroom at least since 1998.

9.      In the private showrooms, toy manufacturers typically present to the retailers and distributors their products that are not yet on the market.  The manufacturers will also periodically provide catalogs of their products to be marketed for the upcoming year.  Given the fast pace and highly competitive nature of the retail toy industry, the appearance, operation and intended play pattern of an as-yet unmarketed toy is one of the few true trade secrets that can exist.  Other confidential information presented in show rooms includes wholesale price lists of products not yet on the market, the manufacturers' advertising and marketing plans, and packaging concepts for the next season.  Knowing in advance which products will be advertised by the manufacturer is very important, because it enables retailers to plan their likely purchases (advertised products sell more units), their own in-store allocation of advertising support, and other important marketing elements such as the content of advertising circulars and the like.

10.      As Mattel alleges in its own Counterclaims, for a toy company to systematically find out in advance the nature of a competitor's as-yet unmarketed products, the quoted prices, and the identification of which products will be advertised would be the holy grail of competitive advantage.  Such a practice would enable the party stealing the information to adjust its own product, pricing and advertising plans, to engage in comparative selling practices with retailers, and generally to get a consistent and improper head start on its own competitive products.  It was not MGA, however, but Mattel who engaged in this consistent pattern and practice of stealing confidential information from competitors.

A.      <u>The Market Intelligence Group.</u>

11.      Beginning at a time unknown to MGA but at least since February of 1992, a group of employees within Mattel known as the "market intelligence" department systematically defrauded nearly every toy manufacturer in the business of their confidential information during NYTF.  In advance of NYTF, these Mattel employees, who included at least Jeff Lange, Sal Villasenor, Carey Plunkett, Kelly

Osier, Candace Chang and Tyler Snyder, went to Kinkos in advance of NYTF and printed up fake business cards identifying them as retail representatives and concealing their affiliation with Mattel and bought spy cameras—all paid for by Mattel.  Using these falsified credentials, these Mattel employees misrepresented their identities, affiliations and purposes in order to gain entry to private showrooms of competitors (including MGA) at NYTF under false pretenses, and were successful in doing so year-after-year.  Villasenor entered showrooms for multiple toy companies, including MGA, Hasbro, Lego, Bandai and others from at least 1999 to 2006.  Osier and Plunkett were generally responsible for girls products, so they entered showrooms for MGA and others at multiple toy fairs.  Upon information and belief, each year during NYTF, in addition to using fake credentials, one or more of these identified Mattel employees also signed one or more confidentiality statements in order to gain entry to competitor showrooms.  These were false promises of confidentiality, made without any intention to perform.  Mattel knew that its employees would not be admitted access to private competitor showrooms unless they misrepresented themselves.

12.     This practice of sneaking into private showrooms was not limited to the NYTF.  Instead, Mattel schemed to defraud its competitors at toy fairs worldwide, permitting Mattel to extend its dominance throughout the globe by gaining confidential information about its worldwide competitors' future plans.  During the period from at least 2001 to 2006, Mattel sent its spies around the globe, where they lied their way into competitors' showrooms at the Hong Kong Toy Fair (occurring annually in January of each year), and Nuremberg Toy Fair (occurring annually in February of each year), as well as at the Tokyo Toy Fair.  At these toy fairs, Mattel employed the same practices of using fake names, fake business cards and false pretenses about their purposes to obtain confidential information about competitors' upcoming launches and product lines.

1    13.    These employees and contractors lied their way into the

2    showrooms, stole catalogs, price lists and other information and took unauthorized

3    pictures.

4    **B.    The Distribution And Presentation Of Spy Reports And The Library.**

5

6    14.    To complete the fraudulent scheme and enable Mattel's unfair

7    competitive advantage based thereon, the Mattel thieves then assembled

8    presentations of hundreds of pages to be copied and distributed on a worldwide

9    basis.  These massive presentation documents included page after page of

10   unauthorized reproductions of photos and catalog pages depicting the competitor

11   products.  The written presentations were distributed to hundreds of employees

12   through Mattel, including top executives as well as many employees outside of

13   California and the United States.  Ironically, at least one of the recipients of such

14   presentations was Counter-Defendant Gustavo Machado, to whom one or more

15   presentations were sent in Mexico while he was still employed by Mattel Servicios.

16   Mattel's market intelligence group tailored the information, assembling design

17   information for the design group, and marketing information for the marketing

18   group.

19   15.    In fact, it became an annual right of passage and a hot ticket

20   within Mattel to attend Mr. Villasenor's annual presentation after NYTF.  In

21   addition to distributing the report in written form, Mr. Villasenor, aided by one or

22   more of his cohorts in crime, would publicly display the unauthorized photographs

23   of unreleased competitor products to hundreds of Mattel employees.  In March or

24   April of each year, in the presentation theater at Mattel's headquarters in El

25   Segundo, Villasenor and one or more of his cohorts would present their information

26   to an auditorium packed to capacity with hundreds Mattel employees.  Hundreds of

27   employees attended year after year.  Mattel executives all the way up to the CEO

28   Bob Eckert received copies of the reports and/or attended reviews of all of the stolen

MGA'S REPLY TO COUNTERCLAIMS
CV 04-9049 DOC (RNBx)

NYTF information.  These reviews included the public display of unauthorized reproductions of photographs and other images of the competitor products.  Some of these presentations by Mr. Villasenor were also videotaped.

16.     Mattel took information at NYTF from nearly every toy company in the worldwide toy business over the years—not only MGA, but also Bandai, B-Bel, Inc., Binney & Smith, Blue Box, Cadaco, Ceaco, Chicco, Crayola, Creativity for Kids, Decipher, DSI, Empire, Endless Games, Equity Marketing, Famosa, Get Real Girl, Giochi Preziosi, Gund, Hamilton Toys, Hasbro, Irwin Toys, Jada Toys, Jakks Pacific, Justoys, Kessel, K'NEX, Leapfrog, Lego, Madam Alexander, Maisto, McFarlane, Mealgy, Megablocks, Miss Party Surprise, Nikko, NKOK, NSI, NZ Toys, Ohio Art, Playhut, Playmates, Pressman, Radica, Razor, Robert Anner, Schure, Simba, Sony, Spin Master, Sindy, Tacmay, Tecnitoys Juguetes, Thinkway, Tiger Electronics, Today's Kids, Tomy, Toy Biz, Toy Max, Trendmaster, Uncle Milton, V Tech, Wham-O, Wild Planet, Wizards of the Coast, Wow Wee Toys, X Concepts and Zapf Creation.

17.     Remarkably, this euphemistically named "market intelligence" group also maintained an extensive library of all of the information that they had stolen over the years.  This vast library housed on the Ninth Floor at Mattel in El Segundo containing the fruits of Mattel's long term scheme to defraud its competitors of their confidential information included at least the annual reports made after NYTF by the market intelligence group, the competitor catalogs, price lists and other confidential information they had stolen from the showrooms, and videotapes of the annual presentations of the stolen information.  Access to the library and its contents was regulated; sign-in and sign-out sheets were used.  Even Mattel's legal department used the information.

18.     This library of stolen material was extremely valuable; it permitted Mattel to gather in one place both information about its competitors' future plans as well as a historical record of products in the industry, and to mine

1    these future plans and historical record for ideas for its own products. For MGA,

2    some of the products about which Mattel stole information were never released;

3    upon information and belief, that was true of others as well. Thus, Mattel had an

4    unparalleled library not only of information about products that had become public,

5    but of information about products that have never yet seen the light of day and

6    might well be considered by their originators for future seasons. The plans of its

7    competitors for the upcoming spring and fall seasons was information Mattel could

8    not have obtained absent its use of false pretenses; the historical record was one that

9    it would have been nearly impossible for Mattel to assemble from public sources at

10   a reasonable cost. But by lying and stealing every year in one place and at one time

11   (and then expanding that practice worldwide in this decade), Mattel was able to

12   assemble an invaluable set of materials and then reuse them for decades at its

13   leisure.

14             19.    The methods of Mattel's spies were well known throughout the

15   company, including by its top executives. The market intelligence group openly

16   discussed its tactics. Some of the presentations indicated right on their face that

17   they were based on information taken at NYTF. Because of the nature of the

18   information and the fact that it had come from the NYTF, everyone who had

19   attended a trade show knew that access to showrooms was restricted and there

20   would be no legitimate way to get all of this information.

21             20.    Executives such as Matt Turetzky and Drew Vollero, who

22   reported to Matt Bousquette (President first of the Boys Division, and later of Mattel

23   Brands), supervised the group, approved its expenses, and gave it glowing

24   performance reviews. Bousquette received the reports containing stolen

25   information, as did CEO Eckert. Bousquette was friendly with Villasenor and knew

26   what he was doing to get information. Other former senior executives who have

27   been willing to admit that they were aware of the practices are Sujata Luther and

28   Ron Brawer. The top marketing personnel, such as Tim Kilpin (head of all Girls

1    Marketing) and Russell Arons (head of Barbie Marketing) all received copies of the

2    reports and attended presentations every year, with full knowledge of the restrictive

3    practices of Mattel and its competitors at toy fair showrooms.  General Counsel

4    Robert Normile was specifically apprised of the fraudulent practice of stealing

5    information using false credentials by no later than the end of 2005, but the practice

6    nonetheless continued.  After the 2006 NYTF, Villasenor was instructed to keep

7    getting the information but that Mattel didn't want to know how he was doing it.

8            21.    Over time and pursuant to this scheme, Mattel defrauded MGA

9    of unreleased product information regarding at least the following products:

10   Hopscotch Heather, Dream Baby, Bratz, Jumpin Jenny, Scooter Samantha, Hello

11   Kitty Be Beautiful Matchmake Journal and Virtual Crush, iCandy, Liar Liar,

12   Monkey See Monkey Do, A New Breed and Palm Puppies, Hello Kitty Scooter,

13   Insecto Bots, Monster Surgery, Bratz Mobile, My Beautiful Mermaid, Hulk Two-

14   Way Radios, Bratz Styl' It Collection, Bratz Boys, Bratz Winterwonderland

15   Collection, Bratz Formal Funk Collection, Bratz Runway Formal Funk Collection,

16   Bratz FM limo, Bratz Motorcycle, Bratz Pet Assortment, Bratz City Playsets,

17   Musikids, Lil' Bratz Boyz, Lil' Bratz Slumber Party, Lil' Bratz Spring Break, Lil'

18   Bratz Loungin' Loft, Lil' Bratz Vehicle Assortment, Lil' Bratz Deluxe Mall Playset,

19   My Beautiful Ballerina, Pia Back to School, Jumpin' on the Bed Bouncin' Baby,

20   Rachel Lul A Bye Baby, RC Street Flyer Samantha, Walk 'n Go Jo Jo, Bead Palace,

21   Bratz Stylin' Dance Party, Alien Racers, Micro Blast Jet Skis, Bratz Petz, Lil' Bratz

22   Dance Party, Dazzlin' Disco Café, Sun Kissed Summer, Girls Nite Out, Wild Life

23   Safari Collection, Bratz Lucious Lamp/Alarm Clocks, Flower Fairies, Bratz Internet

24   Café Playset, Bratz Retro Café, Lil' Bratz Transforming Bedroom, and Bratz Girls

25   Nite Out.

26           22.    In fact, some of these products were never released by MGA,

27   and had Mattel not stolen the information from MGA, Mattel would never have had

28

1   any opportunity to view them.  Upon information and belief, the same is true of

2   other companies from whom Mattel defrauded nonpublic product information.

3      **C.**  **Mattel Expands And Extends Its Scheme Against MGA.**

4      23.  By at least 2004, Mattel had extended and expanded this

5   fraudulent scheme as it pertained to thefts of confidential information from MGA

6   and subsequent concealment of that scheme in order to continue stealing

7   information from MGA, and ultimately, to drive MGA out of business.

8      24.  First, Mattel hired an independent contractor whom it believed

9   was likely to be especially successful in spying on MGA.  This woman, named

10  Sharon Rahimi, was engaged as a contractor specifically for the purpose of gaining

11  entry to showrooms, and in particular MGA's showroom, to steal confidential

12  information there.  Rahimi had previously been an employee in Mattel's market

13  intelligence group and thus when she was engaged as a contractor, she knew exactly

14  how the spy operation was supposed to be conducted.  Rahimi, a Persian American,

15  appears to have been hired to infiltrate the MGA showroom in particular because

16  Isaac Larian also is Persian American, and Mattel most likely believed that Ms.

17  Rahimi would therefore be less likely to arouse suspicion and more likely to succeed

18  in her mission to spy on MGA and steal its confidential information.  Rahimi

19  entered the MGA showroom at NYTF in at least 2004 and 2005 under false

20  pretenses and stole confidential information.

21     25.  Additionally, Mattel hired another independent contractor named

22  Bain & Company to obtain other MGA confidential information.  After Mattel

23  agreed to pay Bain several hundreds of thousands of dollars, Bain then contacted

24  dozens of companies and individuals associated with MGA, such as licensees,

25  distributors, and production companies, and upon information and belief, misled

26  them in order to get them to disclose confidential information about MGA.  Had

27  Bain disclosed that the research was being conducted for Mattel, these MGA

28  business partners would not have disclosed MGA confidential information.  Using

these misleading tactics, Bain built up a complete and detailed profile of MGA that included a significant amount of MGA's then-confidential information that could not have been obtained with a candid disclosure.

26.     Then Mattel, including at least its in-house counsel Michael Moore, and Bain, worked together to edit the Bain document to remove information deemed potentially harmful to Mattel's position in this litigation.  After the edits were made, Bain, acting at Moore's behest, instructed Mattel employees who had received the prior unsanitized draft to destroy them.  Those documents were in fact destroyed, and to this day have not been produced by Mattel in this case.

27.     Indeed, Mattel suppressed even the final sanitized version of the Bain report in this litigation for years.  Despite being called for by numerous document requests and prior court orders, Mattel suppressed and concealed the Bain Report containing MGA confidential information until March 26, 2010.  Mattel has not produced the prior versions, emails, or any of the other hundreds of pages of documents that once existed within Mattel related to this report, which were instead spoliated by Mattel pursuant to its plan to sanitize its records of prior versions of the Bain report to avoid potential adverse consequences in this litigation.

28.     Bain was not the only perpetrator of schemes involving Mattel to suppress, conceal and destroy relevant evidence or otherwise to obstruct justice in order to avoid being found out in its fraudulent schemes, to maintain its unlawful competitive advantage, and to use this litigation to drive MGA and Isaac Larian out of the toy business.  Rather, Mattel's attorneys also participated with it in these schemes.

29.     Mattel first engaged Quinn Emanuel to investigate potential claims against MGA related to Bratz no later than mid-2002.  At that time, Mattel had already conducted extensive market research to determine how much impact Bratz was having across Mattel's product lines.  (Mattel did not produce that market research report, dated January 14, 2002 and highly relevant to the statute of

limitations defense, until MGA discovered it after the Sujata Luther deposition in July 2010.)  In 2002, Rumors were also rampant within the design community at Mattel that Carter Bryant was working with MGA on Bratz, and there were multiple different theories of Bratz infringement in play.  Some thought Bratz was a knockoff of Diva Starz.  Others thought Bratz was a knockoff of Toon Teens.

30.     Entries on Mattel's privilege log show that Quinn Emanuel worked with Mattel on the Bratz problem and potential claims related to it beginning in mid-2002.  In August 2002, Mattel CEO Robert Eckert received an anonymous letter asserting that Carter Bryant had worked on Bratz while at Mattel. Eckert requested an investigation.  Mattel continued to investigate, and Quinn Emanuel continued working on the problem through the second half of 2002.

31.     By July 10, 2003, Quinn Emanuel's investigation was in full swing, as Mattel anticipated the publication of a Wall Street Journal article regarding Bratz, which included a discussion of rumors regarding the disputed origins of Bratz.  The article was published on July 18, 2003.  On July 22, 2003, Mattel's lawyers were examining Carter Bryant's employment file and in particular his termination date.  By July 24, 2003, the senior partner at Quinn Emanuel, as well at least one other firm had become involved.  The investigation continued in full force throughout August 2003, when Mattel hired private investigators in addition to the two law firms already working on it.  By September, Quinn Emanuel attorneys were evaluating potential claims and gathering potential evidence from CityWorld in Hong Kong.  Mattel and Quinn Emanuel were in constant communication throughout October 2003 concerning potential claims to be brought in this case.

32.     At about that time, in October or November 2003, Mattel's CEO Bob Eckert commissioned a study within Mattel regarding Barbie and Bratz.  That case study later became known as "The Bratz Brief."  It was a unique document within Mattel; it reads like a high level case study for an MBA course, and there was nothing else like it.  Commissioned by Eckert, The Bratz Brief was prepared by two

high-ranking Mattel executives with responsibility for strategic planning:  Jerome Bossick and Sujata Luther.  Eckert received and edited a draft, altering key terminology and purporting to correct Luther's British idiomatic use of the word "Learnt" (which was in fact grammatically correct) to "Learned."  The Bratz Brief explained the detailed history of Barbie's economic importance to Mattel, why Barbie had failed, and the report attributed that failure to factors existing well before Bratz ever entered the market.  Barbie's failure was caused by a number of factors that had nothing at all to do with Bratz.  At the same time, The Bratz Brief attributed MGA's success to factors that had nothing to do with Carter Bryant or his drawings. In short, The Bratz Brief was an explosive document by any measure, and it has had singular relevance to this litigation.

33.     Throughout late 2003 while The Bratz Brief was being written, delivered to and edited by Eckert, Mattel was considering whether to sue over Bratz. Eckert was involved.  In January 2004, there were numerous presentations by Quinn Emanuel to Mattel.  In March 2004, the Board of Directors authorized suit at CEO Eckert's request.  Then, in April 2004 and with full authorization of Mattel's Board and CEO Eckert, Mattel initiated this lawsuit with its first set of claims against Carter Bryant.  Despite having participated in the investigation that led to the decision to file suit, and despite having commissioned and worked on a document plainly relevant to any claim Mattel might make concerning Bratz, Eckert destroyed and suppressed relevant evidence by continuing to routinely delete his emails and all associated documents—as he has done to this day.  He destroyed his documents concerning The Bratz Brief.

34.     In addition, Eckert wrote an email entitled "What Happened to Barbie" in June 2004 while engaging in strategic planning for an upcoming Board meeting in September 2004.  The email refers on its face to issues in this litigation, seeming to concede that Mattel does not have clear title to Bratz.  Despite the obvious high degree of relevance in phase 1 proceedings, that email was not

1    produced until March 8, 2010, and only after the Court granted an order to compel
2    documents from custodian Matt Bousquette.  It appears to have been recovered from
3    a backup tape and was produced from the custody of Bousquette only after Mattel
4    was ordered by the Court to search for Bousquette's documents.  Eckert's copy of
5    the document no longer exists.  Eckert deleted this document discussing the
6    ownership of Bratz *knowing that this litigation was pending.*

7              35.    The points in the What Happened to Barbie email closely track
8    the points of The Bratz Brief.  It is apparent from the text that Eckert, the author of
9    the e-mail, had access to The Bratz Brief—which MGA now knows is true because
10   of testimony from other witnesses.  But none of the few Eckert documents produced
11   in the case reflect the commissioning of The Bratz Brief, his receipt of any draft of
12   it, his creation of edits to it, his transmission of edits to it, or otherwise reflect in any
13   way his participation in the process of creating it.  Rather, they were destroyed by
14   Eckert, and if any other copies of them are in existence, those have been concealed
15   by Mattel despite numerous document requests and several orders calling for the
16   information.  No documents from Bossick reflecting his participation have been
17   produced, although he is still employed by Mattel.  No documents from Luther
18   reflecting her participation have been produced.

19             36.    The destruction and concealment of The Bratz Brief documents
20   by Mattel, its CEO and its attorneys accomplished much.  By concealing Eckert's
21   involvement in The Bratz Brief, Mattel was able to litigate the entire Phase 1 case
22   without a single witness ever taking responsibility for the creation of that document.
23   Despite the unique nature of the document within Mattel, the fact that Eckert
24   personally commissioned it from two other high ranking executives and personally
25   edited the document, and the fact that he accepted the conclusions thereof and
26   included them in his own analysis of What Happened to Barbie in June 2004 while
27   preparing for the Corporate Strategic Plan to be presented at Mattel's September
28   2004 Board of Directors Meeting, Eckert concealed his involvement by claiming in

1    deposition that he couldn't remember the circumstances of the document. Any

2    reasonable juror would have considered it significant to know in the phase 1 trial

3    that The Bratz Brief was a document emanating from the CEO of Mattel, and to

4    consider the substance of the What Happened to Barbie email.

5           37.    In 2005, MGA filed its Complaint in this litigation. Meanwhile,

6    Mattel had set out to conceal in this case Mattel's fifteen-year scheme to defraud the

7    entire toy industry out of its confidential information. By late 2005, Villasenor had

8    complained to Mattel General Counsel Robert Normile, asserting that he could no

9    longer lie and steal to get information—especially in light of MGA's allegations.

10   Villasenor told Normile that although his stealing competitors' information gave

11   Mattel a competitive advantage, he believed his conduct was unlawful and exposed

12   him to potential criminal liability. Several months later, and *after* NYTF 2006,

13   Villasenor got a new boss, who told him he couldn't use the same methods but was

14   expected to continue getting the same information. His new boss said Mattel "didn't

15   want to know" how he got the information. After that, Villasenor cracked under the

16   pressure, and increased the volume of his complaints.

17          38.    One of Quinn Emanuel's partners working on this case then met

18   repeatedly in 2006 with Villasenor, the man who had for more than a decade been

19   tasked with perpetrating and carrying out the program of Mattel's lies and thefts of

20   confidential information. The Quinn Emanuel partner met with Villasenor, who by

21   that point was about to resign because he could no longer perform his job without

22   the use of false pretenses, and was concerned about exposure to MGA. This partner

23   joined together with Mattel's in-house counsel, Jill Thomas (who was not Mattel's

24   regular attorney for employment matters but rather is the Mattel litigation counsel

25   assigned to the case against MGA), in Mattel's scheme to suppress and conceal the

26   vast scheme to defraud by paying Villasenor hush money in the form of a lucrative

27   severance package, and then deep-sixing all of the documents.

28

39.     They met at a mediation in order to cloak the whole negotiation in as much secrecy as possible.  The settlement agreement had a confidentiality clause, and spread out the payments over time, so that Mattel had a tangible means of holding the confidentiality obligation over Villasenor's head.  The potential whistleblower had been silenced.  After these events, the attorneys at Quinn Emanuel had full knowledge of the depth and breadth of Mattel's spying on competitors.  All of the top executives at Mattel had full knowledge, including Normile who, upon information and belief, reported the problem to his boss Eckert who was keenly interested in the progress of this litigation and anything involving MGA.  Mattel and Quinn Emanuel then successfully concealed the existence of all documents pointing to Mattel's massive scheme to defraud for succeeding four years of this litigation.

40.     There are literally thousands of pages of documents reflecting these bad acts by Mattel:  the presentations themselves (some of which were videotaped), the expense reports for fake business cards and handheld video cameras, the performance reviews where these "market intelligence" employees touted their ability to "get competitor information at trade shows."  Documents evidencing this conduct were requested by MGA no later than the end of 2006, not long after the meetings with Villasenor.  But they were not produced by Mattel and its attorneys.

41.     Instead, Mattel and its attorneys embarked on a brilliant strategy to ensure that its long term scheme to defraud either would never see the light of day, or when it did, the impact would be severely diminished.  The cornerstone of that strategy was the filing of Mattel's counterclaims in this action.

42.     Mattel had known for quite some time that certain employees departing for MGA had, unbeknownst to MGA, removed information Mattel considered confidential.  These employees acted on their own, without MGA's knowledge or consent.  In fact, MGA made them all sign agreements saying they

1   would not take from Mattel, or bring to MGA, any Mattel confidential information.

2   Mattel knew when Machado, Vargas and Trueba left in March 2004 that they were

3   going to work for MGA.  A short time later, Mattel knew that they had removed

4   information it considered confidential.  The customary action under such

5   circumstances is for a company to immediately file suit and demand the return of the

6   documents, seeking court orders for the return of the information.  But Mattel

7   neither demanded the return of that information nor sued MGA.  Brawer left in the

8   fall of 2004, and Mattel did not sue MGA.

9       43.   Nick Contreras left shortly after Brawer in October 2004, and

10  Mattel believed soon thereafter that he had supposedly printed an inordinate number

11  of confidential documents shortly before he left.  Additionally, using information

12  captured by an email spy filter that Mattel had implemented in late 2003 to spy on

13  its employees, Mattel found out that Nick Contreras supposedly had approached

14  another employee shortly after he left  and asked her for documents.  Again, Mattel

15  did nothing.

16      44.   During 2005, other former Mattel employees joined MGA.  In

17  May 2005, Mattel answered MGA's complaint and did not plead any trade secret

18  misappropriation claim against MGA.  Later, in September 2005 Mattel amended its

19  answer, and again did not plead any trade secret misappropriation claim or any other

20  type of claim against MGA related to Machado, Trueba, Vargas, Brawer or

21  Contreras, all of whom had by then left Mattel and come to MGA.  Brisbois left

22  Mattel Canada at almost the same time.  By early 2006, Mattel knew the essentials

23  of any allegations it would make against Brisbois based on a forensic analysis of her

24  computer.  Again, however, Mattel took no action in this case.

25      45.   In March 2006, when Jorge Castilla left, Mattel believed *before*

26  *he left* that Castilla had copied Mattel documents to take with him.  Mattel did not

27  demand the return of the documents in his exit interview, or thereafter.  Mattel did

28  not contact MGA and ask for its cooperation to ensure that no confidential

- 19 -

1   information was used.  Instead, Mattel went to the FBI in the hopes that it could turn

2   Castilla and get him to spy on MGA.  Castilla willingly turned over a PDA to the

3   FBI when asked, and well before he ever set foot on MGA's premises to start work.

4   And again, Mattel did not sue MGA.  When Cooney left a short time later in May

5   2006, Mattel seized his computer, performed a forensic analysis, and quickly

6   became aware he had removed certain documents.  Again, Mattel neither demanded

7   the return of the information nor sued.  Mattel could have brought any of these

8   matters to the Court's attention at any time.

9           46.     In fact, it was not until November of 2006—in some cases nearly

10  three years after these employees had left and allegedly taken with them Mattel

11  trade secrets—that Mattel finally filed its trade secret misappropriation and RICO

12  claims.  No new evidence had been uncovered in late 2006 to strengthen those

13  claims.  In fact, the passage of time had weakened Mattel's claims as the

14  information became stale.  Nothing had happened in the marketplace to signal to

15  Mattel that any information was being used by MGA, thus necessitating action

16  where none had been taken before.  No new evidence had just been uncovered to

17  establish MGA or Larian's involvement in the removal of any information by these

18  employees.  Instead, the counterclaims were motivated by the deterioration of the

19  Villasenor situation.

20          47.     It was a concededly brilliant strategy.  Mattel and its lawyers

21  figured out exactly what Mattel could be accused of based on Mattel's own criminal

22  conduct, then turned those claims on MGA, while at the same time concealing all

23  evidence of Mattel's wrongdoing.  This strategy had many benefits.  If MGA took

24  legal positions attacking the claims, or got them dismissed, then those arguments

25  could be turned against MGA if and when it ever found out about Mattel's conduct.

26  If the claims succeeded to taint MGA, then once Mattel's conduct came out, the

27  impact would be substantially diminished.  The claims were so vast that Mattel was

28  able to distract and tie-up the much smaller MGA in litigation for years.  Mattel

1    succeeded beyond its wildest dreams in pursuing this strategy.  Mattel successfully

2    concealed the evidence of its own criminal conduct for years, all the while claiming

3    that MGA was evil incarnate.

4           48.    Meanwhile, one of the documents that Mattel and Quinn

5    Emanuel had deliberately concealed and deliberately altered was the 2001 NYTF

6    Report.  The largely meaningless cover page of that document was produced in

7    January 2008, but the attachment (which mentioned MGA and depicted the original

8    unreleased Bratz product, giving the document all of its legal significance) was

9    omitted from the original production and was not produced until over 2 years later,

10   on July 7, 2010—when the jig was up because Villasenor was about to testify.  A

11   September 12, 2007 order had specifically compelled Mattel to produce all

12   documents relevant to MGA's statute of limitations defense, which the 2001 NYTF

13   Report demonstrating that Mattel knew about Bratz even before it came on the

14   market surely was.  Yet Mattel did not produce the report.

15          49.    Instead, Mattel, with the knowledge and cooperation of its

16   attorneys, detached the report and produced only the cover page, in clear violation

17   of the Court's order and with the knowing intention to suppress relevant evidence

18   concerning MGA's statute of limitations and laches defenses.

19          50.    Additionally, each year's report from 2000 through at least 2004

20   contained references to MGA and/or Bratz.  Despite numerous document requests

21   that would cover such documents, the aforementioned September 12, 2007 order

22   compelling production on many requests covering these documents, and Discovery

23   Master Order No. 89 compelling production on numerous other requests covering

24   these documents, they were never produced.

25          51.    In fact, after Order No. 89 was entered, Mattel's attorneys

26   expressly promised the Court that Mattel would produce all responsive documents,

27   which promise necessarily included the Villasenor documents referencing MGA

28   (which Mattel had years earlier agreed to produce).  But the Villasenor documents

1    referencing MGA and the market intelligence library on MGA were not produced.

2    They were not produced in March, in April, in May or in June.  It was not until July

3    7, 2010, after Villasenor had already been subpoenaed and was just about to testify,

4    that the first few documents finally began trickling in.

5         52.    Mattel and its attorneys had no intention of producing these

6    documents until MGA found the witness who was the key to the entire scheme.  By

7    July, however, Mattel no longer had any choice because it was about to be found

8    out.  Had the Villasenor deposition not been subpoenaed for July 12, 2010, the

9    documents never would have been produced.  Mattel and Quinn Emanuel came just

10   "that close" to concealing this damning evidence through a second discovery cutoff

11   and another trial.  Even now, however, Mattel and Quinn Emanuel continue to

12   suppress documents related to this pattern and practice of theft, including refusing to

13   product documents from Rahimi, Osier and others engaged in this practice, and

14   refusing to produce reports and videos stored in the infamous Ninth Floor library.

15        53.    In order to suppress and conceal all of the evidence about a long-

16   term scheme to defraud, witnesses who knew what was going on also had to lie

17   about it.  It is reasonable to infer from the evidence produced to date that at least the

18   following Mattel witnesses were aware of the tactics of the market intelligence

19   group and gave misleading or untruthful testimony in order to suppress it and keep it

20   from coming out in this litigation:  Matt Bousquette, Tim Kilpin, Russell Arons, and

21   Gene Murtha.  Quinn Emanuel attorneys prepared and presented every single one of

22   these witnesses at their depositions while the firm had full knowledge of what the

23   spy group had been doing.

24        54.    In fact, the very Quinn Emanuel lawyer who met with Villasenor

25   in 2005 and 2006 to hear his confessions of wrongdoing also represented Keith

26   Storie for six days of deposition as Mattel's 30(b)(6) witness.  But then, in the one

27   deposition of Mr. Storie on the topic of Mattel's theft of MGA confidential

28   information, that attorney bowed out, so that a new lawyer could watch, with a

MGA'S REPLY TO COUNTERCLAIMS
CV 04-9049 DOC (RNBx)

1   straight face, as Storie denied that Mattel employees had ever sneaked into

2   showrooms.

3          55.     The scheme to tamper with witnesses in this litigation extends to

4   other attorneys and witnesses as well.  In-house counsel Thomas, together with the

5   same Quinn Emanuel partner who helped Mattel silence Villasenor, along with one

6   of Mattel's Mexican attorneys from the Basham, Ringe Y Correa law firm, also

7   plotted together to tamper with another witness in the case, Pablo Vargas.  Vargas

8   was the subject of allegations of trade secret misappropriation by Mattel, as

9   reflected in the Counterclaims.  Mattel also was prosecuting these allegations as

10  criminal claims in Mexico.  Vargas consistently denied all wrongdoing.

11         56.     In order to turn Vargas and get him to testify for Mattel, Mattel

12  entered into a settlement agreement with him whereby it agreed to pardon him

13  entirely for his alleged wrongful acts, thus removing the potential threat of years in a

14  Mexican prison.  Miraculously, just after agreeing to this settlement, Vargas

15  suddenly found a high ranking new job in the toy industry in Mexico after a lengthy

16  period of unemployment.  But the settlement created by Mattel and its outside

17  lawyers still had a catch:  Vargas would not be pardoned and thus gain certainty that

18  he could avoid years in a Mexican prison unless and until he testified in a fashion

19  that was acceptable to Mattel.  Vargas showed up in California for deposition

20  testimony, but on the first day of his deposition, testified in a fashion that was

21  largely unhelpful to Mattel, and helpful to MGA and Counter-Defendant Machado.

22  Then, Mattel's Mexican attorney, with the full knowledge of Mattel's in-house

23  counsel and Quinn Emanuel partner, took Vargas's lawyer out to the woodshed and

24  made it clear that Mattel was not happy with Vargas's testimony, effectively

25  threatening Vargas's pardon.  The second day of the deposition, Vargas changed the

26  substance of his testimony on specific points in several respects, and also changed

27  the entire tenor of his testimony to be far more favorable to Mattel.

28

MGA'S REPLY TO COUNTERCLAIMS
CV 04-9049 DOC (RNBx)

57.     By engaging in a long term scheme to defraud its competitors, including MGA, of their confidential information, concealing the evidence of that fraud, tampering with witnesses and obstructing justice in this case, the Mattel Racketeering Enterprise has enjoyed numerous benefits:  (1) Mattel created an unfair and unlawful competitive advantage, and was enabled to continue exploiting the stolen fruits of its thievery for unfair competitive advantage in the form of its stolen research library and to continue with its scheme to defraud; (2) Mattel, with Quinn Emanuel's full knowledge and cooperation, destroyed backup tapes for several years that should have been preserved, and such backup tapes almost certainly contained email evidence relevant to what Mattel employees knew and when they knew it; (3) Mattel and Quinn Emanuel altered and suppressed Mattel's complete 2001 NYTF Report, which is ironclad evidence that Mattel knew about Bratz before it ever came on the market and is important evidence directly relevant to the statute of limitations and laches defenses that were hotly litigated in the phase 1 case and which Quinn Emanuel knew—because its own lawyers had performed the initial evaluation of claims in 2002—presented serious problems to Mattel's claims; (4) numerous Mattel employees, including Eckert, destroyed relevant emails and associated documents; and (5) most important of all and to enormous injury to MGA, Mattel and Quinn Emanuel's pattern of obstruction of justice through the concealment and suppression of voluminous evidence of Mattel's own extensive fraudulent and criminal bad acts enabled them to seize for Mattel the "white hat" in this litigation, convincing Judge Larson to enter a permanent injunction whereby Mattel effectively stole Bratz from MGA—an injunction now demonstrated to be wrongful (*see Nintendo of Am., Inc. v. Lewis Galoob Toys, Inc.*, 16 F.3d 1032, 1036-37 (9th Cir. 1994)) by virtue of its reversal by the Ninth Circuit Court of Appeals even without benefit of this stunning, recently-discovered evidence.

58.     As the Ninth Circuit held, the jury's verdict in phase 1 did not support the sweeping injunction by former District Judge Larson.  In fact, the jury in

phase 1 rejected Mattel's claim of willful infringement, rejected Mattel's demand for punitive damages, and awarded Mattel damages in only a small fraction of the amount demanded.  In particular, the jury rejected the scope of Mattel's claimed copyright infringement claim, awarding only ten million in the face of Mattel's demand in excess of one billion.  Unfortunately, there was no way to know exactly what the jury thought infringed, because although MGA tried to find out by asking Judge Larson to give the jury a list of products to check off, Mattel succeeded in convincing Judge Larson not to use the list and instead to just look at the damages number.  During deliberations, the jury asked whether it could find that only the first generation of Bratz dolls infringed, the Judge Larson correctly answered "yes."  It then awarded only a small fraction of the damages demanded by Mattel—but of course Mattel then disavowed the obvious meaning in that result, expressly contrary to its earlier position.

59.    Even though the jury had rejected Mattel's overreaching demands and sent a clear signal that it viewed only the first generation of MGA products to infringe, Mattel's strategy to conceal the evidence of its own criminal wrongdoing while relentlessly accusing MGA and Larian worked, because Judge Larson then had to consider Mattel's motion for injunction.  In that motion, Mattel sought to force MGA to turn over its Bratz intellectual property to Mattel and stop using it.  Ordinarily in considering such a request, the Court would also be required to consider all equitable defenses such as laches and unclean hands.  Instead, Mattel and its attorneys had succeeded in suppressing all of this critical evidence regarding unclean hands, and several key pieces of evidence relevant to laches as well.

60.    Had Judge Larson known that Mattel had engaged in a long term scheme to defraud MGA and all of its other competitors out of confidential information using false credentials and other false pretenses, Judge Larson surely would have felt differently about entering sweeping injunctive relief, particularly when the jury had already rejected sweeping liability.  Any judicial officer would

have been scandalized by such evidence and would have found it a significant roadblock to entry of injunctive relief.  The scheme by Mattel and its attorneys to keep Mattel's image clean, while demonizing MGA, succeeded wildly when Judge Larson, who did not know about all of this suppressed evidence, entered sweeping injunctive relief on December 3, 2008.  The injunctive orders had the effect of nearly destroying MGA, and destroyed most, if not all, of the brand equity in Bratz.

## REPLY TO COUNTERCLAIMS

Mattel's Fourth Amended Answer and Counterclaims ("FAAC") contravenes Rule 8(a) of the Federal Rules of Civil Procedure in multiple respects.  For example, in many places, the FAAC improperly mixes factual averments with argumentative rhetoric.  The FAAC also includes a selective recitation of alleged historical facts and dozens of allegations improperly made "on information and belief" which are in fact pure speculation, much of which is both irrelevant and inflammatory in tone and content.  In addition, many of the allegations of the FAAC are overly broad, vague or conclusory and include terms which are undefined and which are susceptible to different meanings.  Accordingly, by way of a general response, all allegations are denied unless specifically admitted, and any factual averment admitted is admitted only as to the specific facts and not as to any conclusions, characterizations, implications or speculations which are contained in the averment or in the FAAC as a whole.  These comments and objections are incorporated, to the extent appropriate, into each numbered paragraph of this Reply to Counterclaims.

In addition, headings in pleadings are used by both parties for organizational purposes and ease of reading, and are not to be considered averments to which any response is required.  If headings are to be considered allegations to which a response is required, MGA hereby denies all allegations contained in any of Mattel's headings.

61.    The allegations set forth in paragraph 1 are denied.

62.    The allegations set forth in paragraph 2 are denied.

63.    The allegations set forth in paragraph 3 are denied.

1       64.     The allegations set forth in paragraph 4 are denied.

2       65.     The allegations set forth in paragraph 5 are denied.

3       66.     The allegations set forth in paragraph 6 are denied.

4       67.     MGA admits that the Court has federal question jurisdiction over this action, but denies that any federal or state statute implicated by the Counterclaims applies to the extraterritorial conduct alleged in the Counterclaims. MGA also denies supplemental jurisdiction.

68.     MGA admits that venue is proper in this District as to all parties other than MGAE de Mexico. As to MGAE de Mexico, venue is improper because the Court lacks personal jurisdiction.

69.     The MGA Parties admit the allegations set forth in paragraph 9.

70.     MGA admits that Mattel de Mexico, S.A. de C.V. is an entity existing under the laws of Mexico with a principal place of business in Mexico City, Mexico. The remaining allegations set forth in paragraph 10 are denied. And, MGA objects to Mattel's practice of lumping Mattel and Mattel Mexico throughout the pleading under the name "Mattel." Mattel's lumping makes it impossible to respond to the allegations in any meaningful way. It was Mattel's burden to specify when it meant Mattel Inc. and when it meant another legal entity. Having failed to do so, it is not MGA's job to parse the pleading for it.

71.     MGA admits the allegations contained in the first two sentences of paragraph 11 and denies the remaining allegations set forth in paragraph 11.

72.     MGA is without sufficient knowledge to admit or deny that Bryant currently resides in the State of Missouri and on that basis, denies that allegation. MGA denies all of the remaining allegations set forth in paragraph 12 in part because of the definition of "Mattel."

73.     MGA admits the allegations set forth in the first sentence of paragraph 13 and deny the remaining allegations set forth in paragraph 13.

74.     MGA admits the allegations set forth in the first sentence of paragraph 14 and deny the remaining allegations set forth in paragraph 14.

75.     MGA admits the allegations set forth in paragraph 15.

76.     MGA admits the allegations set forth in paragraph 16.

77.     MGA admits the allegations set forth in the first sentence of paragraph 17, and denies the remainder.

78.     MGA admits that IGWT 826 is a limited liability company organized and existing under the laws of the State of California formed on August 27, 2008, and denies the remainder of the allegations set forth in paragraph 18.

79.     MGA denies the allegations set forth in paragraph 19.

80.     Paragraph 20 is a statement of Mattel's legal position, to which no response is necessary.  To the extent that a response is required, MGA denies the allegations set forth in paragraph 20.

81.     MGA denies the allegations of paragraph 21, in part because of the definition of Mattel.

82.     MGA denies the allegations of paragraph 22.

83.     MGA admits the allegations of the first sentence of paragraph 23 and denies the remainder, in part because of the definition of Mattel.

84.     MGA denies the allegations of paragraph 24, in part because of the definition of Mattel.

85.     MGA denies the allegations of paragraph 25.

86.     MGA denies the allegations set forth in paragraph 26.

87.     MGA denies the allegations set forth in paragraph 31.

88.     MGA denies the allegations set forth in paragraph 28.

89.     MGA denies the allegations set forth in paragraph 29.

90.     MGA denies the allegations set forth in paragraph 30.

91.     MGA denies the allegations set forth in paragraph 31.

92.     MGA admits the allegations set forth in paragraph 32.

1    93.    MGA denies the allegations set forth in paragraph 33.

2    94.    MGA denies the allegations set forth in paragraph 34.

3    95.    MGA denies the allegations set forth in paragraph 35.

4    96.    MGA admits that in or about early 2004, it decided to form a

5  new corporation, MGAE de Mexico, S.R.L. de C.V., to conduct business in Mexico,

6  admits that MGAE de Mexico hired three employees who had worked for Mattel

7  subsidiary Mattel Servicios located in Mexico, and denies the remaining allegations

8  set forth in paragraph 36.

9    97.    MGA denies the allegations of paragraph 37.

10   98.    MGA denies the allegations of paragraph 38.

11   99.    MGA denies the allegations of paragraph 39.

12   100.   MGA denies the allegations of paragraph 40.

13   101.   MGA denies the allegations of paragraph 41.

14   102.   MGA denies the allegations of paragraph 42.

15   103.   MGA denies the allegations of paragraph 43.

16   104.   MGA denies the allegations of paragraph 44.

17   105.   MGA denies the allegations of paragraph 45.

18   106.   MGA denies the allegations of paragraph 46.

19   107.   MGA denies the allegations of paragraph 47.

20   108.   MGA denies the allegations of paragraph 48.

21   109.   MGA denies the allegations of paragraph 49.

22   110.   MGA denies the allegations of paragraph 50.

23   111.   MGA denies the allegations of paragraph 51.

24   112.   MGA denies the allegations of paragraph 52.

25   113.   MGA denies the allegations of paragraph 53.

26   114.   MGA denies the allegations of paragraph 54.

27   115.   MGA denies the allegations of paragraph 55.

28   116.   MGA denies the allegations of paragraph 56.

1    117.    MGA denies the allegations of paragraph 57.

2    118.    MGA denies the allegations of paragraph 58.

3    119.    MGA denies the allegations of paragraph 59.

4    120.    MGA admits that on September 26, 2005, Janine Brisbois

5    ("Brisbois") resigned from Mattel Canada, that she took a position as Vice President

6    of National Accounts at MGAE Canada, and denies the remaining allegations set

7    forth in the first sentence and the remainder of paragraph 60.

8    121.    MGA admits that Brisbois spoke with Larian by telephone on or

9    about the evening of September 22, 2005 and denies the remainder of paragraph 61.

10    122.    MGA denies the allegations of paragraph 62.

11    123.    MGA denies the allegations of paragraph 63.

12    124.    MGA admits that Ron Brawer ("Brawer") resigned from Mattel,

13    and that after the period of his notice, came to work for MGA.  MGA admits that

14    Tyco Toys hired Brawer on April 22, 1996, and denies the remaining allegations set

15    forth in paragraph 64, in part because of the definition of Mattel.

16    125.    MGA denies the allegations of paragraph 65, in part because of

17    the definition of Mattel.

18    126.    MGA admits that Brawer became MGA's Executive Vice

19    President of Sales and Marketing, admits that Brawer was responsible for sales

20    worldwide, admits that Brawer had responsibility for MGA's accounts with some of

21    the same retailers that Brawer worked with while at Mattel, and denies the

22    remaining allegations of paragraph 66.

23    127.    MGA admits that Brawer stated during his exit interview that he

24    had returned all confidential proprietary information to Mattel and denies the

25    remaining allegations of paragraph 67.

26    128.    MGA admits that it hired Jorge Castilla ("Castilla") on or around

27    March 13, 2006.  MGA denies the remaining allegations of paragraph 68, in part

28    because of the definition of Mattel.

1    129.   MGA denies the allegations of paragraph 69.

2    130.   MGA denies the allegations of paragraph 70.

3    131.   MGA denies the allegations of paragraph 71.

4    132.   MGA denies the allegations of paragraph 72.

5    133.   MGA denies the allegations of paragraph 73.

6    134.   MGA denies the allegations of paragraph 74.

7    135.   MGA denies the allegations of paragraph 75.

8    136.   MGA admits that Castilla, before came to work at MGA, turned

9    over to FBI agents a storage media from his personal digital device.  MGA denies

10   the remaining allegations set forth in paragraph 76.

11   137.   MGA denies the allegations of paragraph 77.

12   138.   MGA denies the allegations of paragraph 78.

13   139.   MGA denies the allegations of paragraph 79.

14   140.   MGA denies the allegations of paragraph 80.

15   141.   MGA denies the allegations of paragraph 81.

16   142.   MGA denies the allegations of paragraph 82.

17   143.   MGA denies the allegations of paragraph 83.

18   144.   MGA denies the allegations of paragraph 84.

19   145.   MGA denies the allegations of paragraph 85.

20   146.   MGA denies the allegations of paragraph 86.

21   147.   MGA denies the allegations of paragraph 87.

22   148.   MGA denies the allegations of paragraph 88.

23   149.   MGA denies the allegations of paragraph 89.

24   150.   MGA denies the allegations of paragraph 90.

25   151.   MGA denies the allegations of paragraph 91.

26   152.   MGA denies the allegations of paragraph 92.

27   153.   MGA denies the allegations of paragraph 93.

28   154.   MGA denies the allegations of paragraph 94.

1    155.    MGA denies the allegations of paragraph 95.

2    156.    MGA denies the allegations of paragraph 96.

3    157.    MGA admits the allegations of paragraph 97 with the exception

4   of the word "purported" in the last sentence, which is denied.

5    158.    MGA denies the allegations of paragraph 98.

6    159.    MGA denies the allegations of paragraph 99.

7    160.    MGA denies the allegations of paragraph 100.

8    161.    MGA admits that Leon Neman is Larian's brother-in-law and a

9   former director of MGA.  MGA admits that Larian and Neil Kadisha, and their

10  respective wives, are social friends.  MGA admits that Joseph Moinian could be

11  considered a friend of Larian by virtue of his participation in Omni 808's rescue of

12  MGA from Wachovia's foreclosure.  Other than as expressly admitted, the

13  allegations of paragraph 101 are denied.

14   162.    MGA is without sufficient information to admit or deny the

15  allegations of paragraph 102, and on that basis denies them.

16   163.    MGA is without sufficient information to admit or deny the

17  allegations of paragraph 103, and on that basis denies them.

18   164.    MGA denies the allegations of paragraph 104.

19   165.    MGA denies the allegations of the first sentence of paragraph

20  105.  MGA admits that IGWT 826 loaned approximately sixty million dollars to

21  Omni 808 for the purchase of the Wachovia debt, and that the funds for such loan by

22  IGWT 826 were supplied by members of the Larian and Makabi families and their

23  respective family trusts.  MGA admits that IGWT 826 was formed on August 27,

24  2008 at the behest of Isaac Larian.  Except as expressly admitted herein, the

25  allegations of paragraph 105 are denied.

26   166.    MGA admits the allegations of the first sentence of paragraph

27  106.  MGA is without sufficient basis to admit or deny the allegations of the second

28  and third sentences, and on that basis, denies them.

1          167.    MGA denies the allegations of paragraph 107.

2          168.    MGA denies the allegations of paragraph 108.

3          169.    MGA denies the allegations of paragraph 109.

4          170.    MGA is without sufficient basis to admit or deny the allegations

5    of paragraph 110, and on that basis, denies them.

6          171.    MGA is without sufficient basis to admit or deny the allegations

7    of paragraph 111, and on that basis, denies them.

8          172.    MGA denies the first sentence of paragraph 112, and the

9    succeeding characterizations implied by the use of the words "first," "second," and

10   "third."  MGA admits that MGA and Omni 808 executed a Secured Delayed

11   Demand Draw Note for loans of up to $40 million subject to certain conditions,

12   through which Omni 808 agreed to loan funds to MGA.  MGA is without sufficient

13   basis to admit or deny the remaining allegations of paragraph 112, and on that basis,

14   denies them.

15         173.    MGA admits that the Draw Demand Note provided for a

16   potential additional $40 million in credit for MGA, subject to conditions.  MGA

17   admits that on or about October 17, 2008, MGA made a request, and Omni loaned

18   MGA $6 million pursuant to the terms of the draw demand note.  Except as

19   expressly admitted herein, MGA denies the allegations of paragraph 113.

20         174.    MGA denies the allegations of paragraph 114.

21         175.    MGA admits that Omni 808 sent a letter to the Court, and that

22   the contents of the letter are as set forth therein.  MGA denies the remaining

23   allegations of paragraph 115.

24         176.    MGA denies the allegations of paragraph 116.

25         177.    MGA denies the allegations of paragraph 117.

26         178.    MGA denies the allegations of paragraph 118.

27         179.    MGA denies the allegations of paragraph 119.

28         180.    MGA denies the allegations of paragraph 120.

| | | |
|---|---|---|
| 1 | 181. | MGA denies the allegations of paragraph 121. |
| 2 | 182. | MGA incorporates its responses to paragraphs 1 through 121. |
| 3 | 183. | MGA denies the allegations of paragraph 123. |
| 4 | 184. | MGA denies the allegations of paragraph 124. |
| 5 | 185. | MGA denies the allegations of paragraph 125. |
| 6 | 186. | MGA denies the allegations of paragraph 126. |
| 7 | 187. | MGA denies the allegations of paragraph 127. |
| 8 | 188. | MGA incorporates its responses to paragraphs 1 through 127. |
| 9 | 189. | MGA denies the allegations of paragraph 129. |
| 10 | 190. | MGA denies the allegations of paragraph 130. |
| 11 | 191. | MGA denies the allegations of paragraph 131. |
| 12 | 192. | MGA denies the allegations of paragraph 132. |
| 13 | 193. | MGA incorporates its responses to paragraphs 1 through 132. |
| 14 | 194. | MGA denies the allegations of paragraph 134. |
| 15 | 195. | MGA denies the allegations of paragraph 135. |
| 16 | 196. | MGA denies the allegations of paragraph 136. |
| 17 | 197. | MGA denies the allegations of paragraph 137. |
| 18 | 198. | MGA denies the allegations of paragraph 138. |
| 19 | 199. | MGA denies the allegations of paragraph 139. |
| 20 | 200. | MGA denies the allegations of paragraph 140. |
| 21 | 201. | MGA denies the allegations of paragraph 141. |
| 22 | 202. | MGA denies the allegations of paragraph 142. |
| 23 | 203. | MGA incorporates its responses to paragraphs 1 through 143. |
| 24 | 204. | MGA denies the allegations of paragraph 144. |
| 25 | 205. | MGA denies the allegations of paragraph 145. |
| 26 | 206. | MGA denies the allegations of paragraph 146. |
| 27 | 207. | MGA denies the allegations of paragraph 147. |
| 28 | 208. | MGA denies the allegations of paragraph 148. |

209. MGA incorporates its responses to paragraphs 1 through 148.

210. MGA denies the allegations of paragraph 150.

211. MGA denies the allegations of paragraph 151.

212. MGA denies the allegations of paragraph 152.

213. MGA denies the allegations of paragraph 153.

214. MGA denies the allegations of paragraph 154.

215. MGA denies the allegations of paragraph 155.

216. MGA denies the allegations of paragraph 156.

217. MGA denies the allegations of paragraph 157.

218. MGA denies the allegations of paragraph 158.

219. MGA incorporates its responses to paragraphs 1 through 158 by reference.  MGA further notes that the Court has already held this claim at least partially preempted by Mattel's trade secret misappropriation claim.

220. MGA denies the allegations of paragraph 160.

221. MGA denies the allegations of paragraph 161.

222. MGA denies the allegations of paragraph 162.

223. MGA denies the allegations of paragraph 163.

224. MGA denies the allegations of paragraph 164.

225. MGA denies the allegations of paragraph 165.

226. MGA incorporates its responses to paragraphs 1 through 165 by reference.

227. MGA denies the allegations of paragraph 167.

228. MGA denies the allegations of paragraph 168.

229. MGA denies the allegations of paragraph 169.

230. MGA denies the allegations of paragraph 170.

231. MGA denies the allegations of paragraph 171.

232. MGA denies the allegations of paragraph 172.

233.   MGA incorporates its responses to paragraphs 1 through 172 by reference.

234.   MGA denies the allegations of paragraph 174.

235.   MGA denies the allegations of paragraph 175.

236.   MGA denies the allegations of paragraph 176.

237.   MGA denies the allegations of paragraph 177.

238.   MGA denies the allegations of paragraph 178.

239.   MGA incorporates its responses to paragraphs 1 through 178 by reference.

240.   MGA denies the allegations of paragraph 180.

241.   MGA denies the allegations of paragraph 181.

242.   MGA denies the allegations of paragraph 182.

243.   MGA denies the allegations of paragraph 183.

244.   MGA denies the allegations of paragraph 184.

245.   MGA denies the allegations of paragraph 185.

246.   MGA incorporates its responses to paragraphs 1 through 185 by reference.

247.   MGA denies the allegations of paragraph 187.

248.   MGA denies the allegations of paragraph 188.

249.   MGA denies the allegations of paragraph 189.

250.   MGA denies the allegations of paragraph 190.

251.   MGA denies the allegations of paragraph 191.

252.   MGA incorporates its responses to paragraphs 1 through 191 by reference.

253.   MGA denies the allegations of paragraph 193.

254.   MGA denies the allegations of paragraph 194.

255.   MGA denies the allegations of paragraph 195.

256.   MGA denies the allegations of paragraph 196.

257.    MGA denies the allegations of paragraph 197.

258.    MGA denies the allegations of paragraph 198.

259.    MGA denies the allegations of paragraph 199..

260.    MGA denies the allegations of paragraph 200.

261.    MGA incorporates its responses to paragraphs 1 through 200 by reference.

262.    MGA denies the allegations of paragraph 202.

263.    MGA denies the allegations of paragraph 203.

264.    MGA denies the allegations of paragraph 204.

265.    MGA notes that this claim has been dismissed without leave to amend and therefore no response is required.  To the extent any response is required, MGA incorporates its responses to paragraphs 1 through 204 by reference.

266.    To the extent any response is required to this dismissed claim, MGA denies the allegations of paragraph 206.

267.    To the extent any response is required to this dismissed claim, MGA denies the allegations of paragraph 207.

268.    To the extent any response is required to this dismissed claim, MGA denies the allegations of paragraph 208.

269.    To the extent any response is required to this dismissed claim, MGA denies the allegations of paragraph 209.

270.    To the extent any response is required to this dismissed claim, MGA denies the allegations of paragraph 210.

271.    To the extent any response is required to this dismissed claim, MGA denies the allegations of paragraph 211.

272.    To the extent any response is required to this dismissed claim, MGA denies the allegations of paragraph 212.

273.    To the extent any response is required to this dismissed claim, MGA denies the allegations of paragraph 213.

274.   MGA notes that this claim has been dismissed without leave to amend and therefore no response is required.  To the extent any response is required, MGA incorporates its responses to paragraphs 1 through 213 by reference.

275.   To the extent any response is required to this dismissed claim, MGA denies the allegations of paragraph 215.

276.   To the extent any response is required to this dismissed claim, MGA denies the allegations of paragraph 216.

277.   To the extent any response is required to this dismissed claim, MGA denies the allegations of paragraph 217.

278.   To the extent any response is required to this dismissed claim, MGA denies the allegations of paragraph 218.

279.   To the extent any response is required to this dismissed claim, MGA denies the allegations of paragraph 219.

280.   To the extent any response is required to this dismissed claim, MGA denies the allegations of paragraph 220.

281.   To the extent any response is required to this dismissed claim, MGA denies the allegations of paragraph 221.

282.   To the extent any response is required to this dismissed claim, MGA denies the allegations of paragraph 222.

283.   To the extent any response is required to this dismissed claim, MGA denies the allegations of paragraph 223.

284.   MGA notes that this claim has been dismissed without leave to amend and therefore no response is required.  To the extent any response is required, MGA incorporates its responses to paragraphs 1 through 223 by reference.

285.   To the extent any response is required to this dismissed claim, MGA denies the allegations of paragraph 225.

286.   To the extent any response is required to this dismissed claim, MGA denies the allegations of paragraph 226.

287.    To the extent any response is required to this dismissed claim, MGA denies the allegations of paragraph 227.

288.    To the extent any response is required to this dismissed claim, MGA denies the allegations of paragraph 228.

289.    To the extent any response is required to this dismissed claim, MGA denies the allegations of paragraph 229.

290.    To the extent any response is required to this dismissed claim, MGA denies the allegations of paragraph 230.

291.    MGA notes that this claim has been dismissed without leave to amend and therefore no response is required.  To the extent any response is required, MGA incorporates its responses to paragraphs 1 through 230 by reference.

292.    To the extent any response is required to this dismissed claim, MGA denies the allegations of paragraph 232.

293.    To the extent any response is required to this dismissed claim, MGA denies the allegations of paragraph 233.

294.    To the extent any response is required to this dismissed claim, MGA denies the allegations of paragraph 234.

295.    To the extent any response is required to this dismissed claim, MGA denies the allegations of paragraph 235.

296.    To the extent any response is required to this dismissed claim, MGA denies the allegations of paragraph 236.

297.    To the extent any response is required to this dismissed claim, MGA denies the allegations of paragraph 237.

298.    MGA incorporates its responses to paragraphs 1 through 237 by reference.

299.    MGA admits that there is an actual controversy created by Mattel's claim to ownership of Bratz.  Otherwise, the allegations of paragraph 239 are denied.

300.    MGA agrees that the Court should make a declaration as to the true owner of Bratz—MGA.  Otherwise, the allegations of paragraph 240 are denied.

301.    MGA agrees that the Court should make a declaration as to the true owner of Bratz—MGA.  Otherwise, the allegations of paragraph 241 are denied to the extent any further response is required.

302.    MGA denies that Mattel has any rights as a creditor, or otherwise, and denies the allegations of paragraph 242 to the extent any further response is required.

303.    MGA agrees that the Court should make a declaration as to the true owner of the trademark Moxie Girlz—MGA.  Otherwise, the allegations of paragraph 243 are denied to the extent any further response is required.

## AFFIRMATIVE DEFENSES

Without admitting any wrongful conduct on the part of MGA or any other Counter-Defendant, and without admitting that Mattel suffered any loss, damage, or injury, MGA hereby alleges the following affirmative defenses to the remaining Counterclaims that have not already been dismissed by the Court.  By designating the following as affirmative defenses, MGA does not in any way waive or limit any defenses which are or may be raised by their denials, allegations, and averments set forth herein.  MGA also does not, by alleging any affirmative defense, admit that Mattel does not have the burden of proof for any or all facts and/or legal conclusions underlying any of those defenses.  These defenses are pled in the alternative, and are raised to preserve the rights of MGA to assert such defenses, and are raised without prejudice to their ability to raise other and further defenses.

Additionally, as noted above, MGA has objected to Mattel's definition of Mattel throughout its counterclaims to include Mattel Mexico.  The only claim reasonably pled by Mattel Mexico as a plaintiff, as opposed to by Mattel Inc., is the trade secret misappropriation claim.  These affirmative defenses are pled accordingly.

If, however, Mattel intended to plead more than the trade secret claim on behalf of Mattel Mexico, then MGA hereby asserts all such additional defenses against any other claim of Mattel Mexico as may be applicable at law or in equity.

## FIRST AFFIRMATIVE DEFENSE

### (Failure to State a Claim)

Mattel and Mattel Mexico's counterclaims fail to state a claim against MGA upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

### (Unclean Hands)

Mattel and Mattel Mexico's counterclaims are barred in whole or in part by Mattel and Mattel Mexico's unclean hands and wrongful acts.

## THIRD AFFIRMATIVE DEFENSE

### (Laches)

Mattel and Mattel Mexico's counterclaims are barred by the doctrine of laches.

## FOURTH AFFIRMATIVE DEFENSE

### (Statute of Limitations)

Mattel and Mattel Mexico's counterclaims are barred by the applicable statutes of limitations, including but not limited to, 17 U.S.C. § 507(b), and Code of Civil Procedure §§ 337, 339, 343 and 338(c).

## FIFTH AFFIRMATIVE DEFENSE

### (Common Law Bona Fide Purchaser for Value

Mattel cannot recover either equitable relief or damages herein from MGA because MGA paid valuable consideration for Bryant's assignment of his rights in the original Bratz drawings to MGA, and MGA's CEO, Isaac Larian, made the decision to proceed with the transaction on behalf of MGA acting with a good faith belief that Bryant owned the rights to his original Bratz drawings and that his assignment of such rights to MGA was valid and permissible.

## SIXTH AFFIRMATIVE DEFENSE

### (Priority Between Conflicting Transfers—17 U.S.C. §205(d))

Even if Bryant agreed to assign his Bratz copyrights to Mattel under Mattel's Inventions Agreement (which MGA denies), Mattel cannot recover either equitable relief or damages herein because MGA's later transfer was taken in good faith based upon the good faith belief of MGA's CEO, Isaac Larian, to proceed with the transaction on behalf of MGA in the belief that Bryant owned the rights to his original Bratz drawings, without notice of the earlier transfer, and where the terms of that later transfer included valuable consideration in the form of a promise to pay royalties.

## SEVENTH AFFIRMATIVE DEFENSE

### (Information Readily Ascertainable)

MGA cannot be liable for misappropriation of information that was readily ascertainable by proper means at the time of the alleged acquisition or use.

## EIGHTH AFFIRMATIVE DEFENSE

### (Acts or Omissions of Others)

Mattel and Mattel Mexico's damages, if any, were not caused by MGA and are not attributable to any unlawful acts or omissions of MGA.

## NINTH AFFIRMATIVE DEFENSE

### (Estoppel)

Mattel's counterclaims are barred in whole or in part by the doctrine of estoppel.

## TENTH AFFIRMATIVE DEFENSE

### (Acquiescence)

Mattel's counterclaims are barred in whole or in part by its own acquiescence.

## ELEVENTH AFFIRMATIVE DEFENSE

### (Failure to Mitigate)

MGA denies that Mattel or Mattel Mexico suffered any damages, but even if

MGA'S REPLY TO COUNTERCLAIMS
CV 04-9049 DOC (RNBx)

1  they did, then they also failed to take reasonable steps to mitigate those purported

2  damages.

### TWELFTH AFFIRMATIVE DEFENSE

4  (Comparative Fault)

5  MGA denies that Mattel or Mattel Mexico suffered any damages, but even if

6  they did, any recovery by Mattel or Mattel Mexico is barred or must be reduced as a

7  result of their comparative fault.

### THIRTEENTH AFFIRMATIVE DEFENSE

9  (Good Faith Improver)

10  MGA denies that Mattel is entitled to any equitable relief or profits, but even if

11  it is, MGA is a good faith improver to any idea or property conveyed to Mattel and is

12  entitled to be compensated for the value of that improvement as a condition of any

13  transfer.

### FOURTEENTH AFFIRMATIVE DEFENSE

15  (Setoff)

16  To the extent that MGA is a good faith improver, and to the extent that MGA

17  has been harmed by Mattel's wrongful injunction, MGA is entitled to a setoff of any

18  damages or other monetary relief awarded to Mattel.

### FIFTEENTH AFFIRMATIVE DEFENSE

20  (Duplicative Recovery)

21  If the Court does not vacate the Phase 1 verdicts in their entirety as MGA

22  believes is required by the July 22 Ninth Circuit Opinion, then any monetary recovery

23  by Mattel on the counterclaims in Phase 2 is barred as duplicative of the Phase 1

24  verdicts, and must be setoff against them.

### SIXTEENTH AFFIRMATIVE DEFENSE

26  (Waiver)

27  Mattel's counterclaims are barred in whole or in part by waiver.

28

## SEVENTEENTH AFFIRMATIVE DEFENSE

### (Joint Authorship)

MGA denies that Mattel owns any copyright interest in any of the sculptural works or dolls, but even if it did, such ownership is joint with MGA by virtue of MGA's contribution to those works.

## EIGHTEENTH AFFIRMATIVE DEFENSE

### (Spoliation of Evidence and Obstruction of Justice)

Mattel's claims are barred in whole or in part by Mattel's spoliation of evidence and obstruction of justice.

## NINETEENTH AFFIRMATIVE DEFENSE

### (Illegal Conduct/Fraud)

Mattel's claims are barred in whole or in part by Mattel's own illegal conduct and/or fraud.

## TWENTIETH AFFIRMATIVE DEFENSE

### (Competition Privilege/Justification)

Mattel's counterclaims are barred in whole or in part on the grounds that the acts of MGA were lawful competition or justified.

## TWENTY-FIRST AFFIRMATIVE DEFENSE

### (Employee Right Of Mobility)

In violation of California law and public policy, as reflected, e.g., in California Business & Professions Code section 16600, Mattel is seeking, through its claims and its interpretations of employee contracts to unlawfully restrain employee mobility. Mattel's interpretation of its Inventions Agreement and its attempt to obtain specific relief based upon that Agreement violates Business and Professions Code §16600.

## TWENTY-SECOND AFFIRMATIVE DEFENSE

### (Mattel's Bad Faith Claim Of Misappropriation)

Mattel's claims of misappropriation of trade secrets are brought and have been maintained in bad faith.

## TWENTY-THIRD AFFIRMATIVE DEFENSE

### (Good Faith)

Mattel's counterclaims are barred in whole or in part because the MGA Parties acted in good faith.

## TWENTY-FOURTH AFFIRMATIVE DEFENSE

### (Lack of Authority)

Mattel's counterclaims are barred in whole or in part on the grounds that to the extent any person committed an unlawful or tortious act, the person lacked authority to commit such act on behalf of MGA.

## TWENTY-FIFTH AFFIRMATIVE DEFENSE

### (Lack of Standing)

Mattel's counterclaims are barred in whole or impart by its lack of standing.

## TWENTY-SIXTH AFFIRMATIVE DEFENSE

### (Joinder in Defenses of Co-Defendants)

The MGA Parties hereby adopt and incorporate by reference any and all other affirmative defenses that have been or will be asserted by any other defendant or counter-defendant (including Bryant) in this litigation to the extent that defendants may share in such affirmative defenses.

## TWENTY-SEVENTH AFFIRMATIVE DEFENSE

### (Preemption by California Uniform Trade Secrets Act)

Mattel's state law counterclaims are preempted by the California Uniform Trade Secrets Act ("CUTSA"), Cal. Civ. Code § 3426 *et seq.*, because they are based on the same nucleus of facts as Mattel's Fourth Counterclaim for Misappropriation of Trade Secrets under the CUTSA.

## TWENTY-EIGHTH AFFIRMATIVE DEFENSE

### (Preemption by Copyright Act)

Some or all of Mattel's claims are preempted by the Copyright Act, 17 U.S.C. §§ 101 *et seq.*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## TWENTY-NINTH AFFIRMATIVE DEFENSE

### (*Res Judicata* and Collateral Estoppel (Fed. R. Civ. Proc. 8(c)(1)))

If the Court does not vacate the Phase 1 verdicts in their entirety as MGA believes is required by the July 22 Ninth Circuit Opinion, then Mattel's Phase 2 counterclaims are barred in whole or in part by the doctrines of *res judicata* and collateral estoppel as a result of the Phase 1 proceedings.

## THIRTIETH AFFIRMATIVE DEFENSE

### (Lack of Jurisdiction)

Mattel's claims, including without limitation its claims based upon alleged extra-territorial acts, are barred in whole or in part by lack of subject matter jurisdiction.

## THIRTY-FIRST AFFIRMATIVE DEFENSE

### (Undiscovered Defenses)

The MGA Parties have insufficient knowledge or information upon which to form a belief as to whether additional defenses are available.  The MGA Parties reserve the right to assert any further or additional defenses upon receiving more complete information regarding the matters alleged in the Counterclaims, through discovery or otherwise.

## COMPULSORY COUNTERCLAIMS-IN-REPLY

Pursuant to Federal Rule of Civil Procedure 13(a) and *Davis & Cox v. Summa Corp.*, 751 F.2d 1507 (9th Cir. 1985), Counterclaimant-in-Reply MGA Entertainment, Inc. ("MGA") hereby pleads its counterclaims-in-reply against Counter-Defendant-in-Reply Mattel, Inc., as set forth herein.

## FIRST COUNTERCLAIM-IN-REPLY

### (Trade Secret Misappropriation—Cal. Civ. Code §3426 *et seq.*)

304.    MGA repeats and realleges paragraphs 1 through 60 above as though set forth herein.

MGA'S REPLY TO COUNTERCLAIMS
CV 04-9049 DOC (RNBx)

305.     As used herein, "Trade Secret Materials" shall mean the documents, photographs, catalogs, and other information stolen from MGA by Mattel, as well as by Rahimi, including but not limited to the information concerning MGA in the annual Mattel NYTF reports from 2000 through 2006, related to MGA's unreleased products.  MGA's trade secrets stolen by Mattel and Rahimi includes the information concerning MGA products contained within at least the following documents (Mattel has not yet produced all of the relevant documents concerning this theft, assuming they still exist):  Toy Fair 2000 Competitive Update, Toy Fair 2001 Competitive Toy Review, 2001 New York Toy Fair Report, 2002 Competitive Toy Review, 2003 New York Toy Fair Competitive Review and 2004 New York Toy Fair Trend and Manufacturer Overview.

306.     MGA undertook reasonable efforts under the circumstances to maintain the confidentiality of its Trade Secret Materials, including confidentiality agreements with its employees and consultants, and otherwise limiting disclosure to those who could view the information only upon condition that they not disclose it unless and until it became public information through no fault of their own.

307.     MGA's Trade Secret Materials derive independent value from not being generally known to the public or to other persons who can obtain economic benefit from their disclosure.

308.     Mattel illegally obtained the Trade Secret Materials as set forth above.

309.     Mattel used and disclosed MGA's Trade Secret Materials without MGA's consent and without regarding to MGA's rights, and for its own benefit.

310.     Mattel's conduct has caused, and unless enjoined by this Court, will continue in the future to cause irreparable injury to MGA.  MGA has no adequate remedy at law for such wrongs and injuries.  MGA is therefore entitled to a permanent injunction restraining and enjoining Mattel as well as its agents, servants

and employees, and all persons acting in concert therewith, from further using in any manner the MGA Trade Secret Materials.

311.     In addition, as a proximate result of Mattel's misconduct, MGA has suffered actual damages, and Mattel has been unjustly enriched.

312.     The aforementioned acts of Mattel were willful and malicious, including Mattel's use of deliberate acts of deception to acquire the type of information from MGA that Mattel itself considered to be a trade secret.  MGA is therefore entitled to enhanced damages and reasonable attorneys' fees.

## SECOND COUNTERCLAIM-IN-REPLY
(Civil RICO—18 U.S.C. §1962(c))

313.     MGA repeats and realleges paragraphs 1 through 60 above as though set forth herein.

314.     Beginning at various times from 1992 through the filing of these Counterclaims-in-Reply, in the Central District of California and elsewhere, Counter-defendant Mattel, Inc. was and is associated-in-fact in, and with, the Mattel Racketeering Enterprise which has conducted its affairs through a pattern of racketeering activity, and whose conduct and activities affect interstate or foreign commerce.  Counter-defendant Mattel knowingly engaged in numerous criminal acts in connection with this enterprise, and in so doing, injured MGA in its business or property in the fashion required by 18 U.S.C. 1964.  Mattel's actions include multiple, related acts in violation of:  18 U.S.C. §1343 (wire fraud), 18 U.S.C. §1503 (influencing or injuring officer or juror generally), 18 U.S.C. §1512 (tampering with a witness, victim or informant), 18 U.S.C. §1952 (interstate and foreign travel to aid racketeering), and 18 U.S.C. §2319(a) and 17 U.S.C. §506(a)(1)(A) (criminal copyright infringement).

315.     The predicate acts alleged herein occurred after the effective date of 18 U.S.C. §1961 *et seq.*, and the last such act occurred within ten years after the

commission of a prior act of racketeering activity.  These racketeering activities include repeated acts of:

a.  <u>Wire Fraud</u>:  As alleged with particularity in paragraphs 1-4, 6-25, Mattel, having devised a scheme or artifice to defraud MGA (and others) from their trade secrets and other confidential information in order to acquire and maintain an unlawful competitive advantage, did for the purpose of furthering and executing this scheme, transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, writing, signs, signals, pictures and sound, in violation of 18 U.S.C. §1343;

b.  <u>Spoliation and Concealment of Evidence</u>:  As alleged in paragraphs 26-52, Mattel did corruptly alter, destroy and conceal many documents, and attempted to do so with respect to many more, with the intent to impair their availability for use in an official proceeding, in violation of 18 U.S.C. §1512 and 18 U.S.C. §2;

c.  <u>Obstruction of Justice/Influencing or Injuring Officer or Juror Generally</u>.  As alleged in paragraphs 1-60, Mattel did seek to corruptly impede, obstruct or influence the due administration of justice, including by lying under oath and by corruptly inducing the Court to enter a wrongful injunction through concealment of evidence that would have brought about a contrary result, all in violation of 18 U.S.C. §1503 and 18 U.S.C. §2.

d.  <u>Criminal Copyright Infringement.</u>  As alleged in paragraphs 13-18, Mattel willfully infringed the copyrights of MGA (and numerous others) through knowing violations of the Copyright Act in the deliberately unauthorized reproduction, distribution and public display of photographs and other depictions of its competitors' products for purposes of commercial advantage and private financial gain, all in violation of 18 U.S.C. §2319(a) and 17 U.S.C. §506(a)(1)(A).

316.    Mattel had a role in the racketeering activity distinct from the undertaking of those acting on its behalf in the larger Mattel Racketeering

Enterprise.  Mattel also attempted to benefit, and did benefit, from the activities of its employees and agents alleged herein, and thus was not a passive victim of racketeering activity, but an active perpetrator.

317.    MGA has been injured in its business or property as a direct and proximate result of Mattel's violations of 18 U.S.C. §1962(c), including injury by reason of predicate acts constituting the pattern of racketeering activity, particularly (though without limitation) the scheme to defraud MGA of confidential information, as well as the concealment of evidence and obstruction of justice resulting in a wrongful injunction in this action depriving MGA of sales of numerous Bratz products, interfering with MGA's relationships with retailers, interfering with MGA's relationships with licensees, and destroying an estimated one billion dollars in brand equity.

318.    MGA is therefore entitled to recover its substantial damages in an amount to be proven at trial, and pursuant to 18 U.S.C. §1964(c), is entitled to recover treble its damages, plus interest, costs and attorneys fees, incurred by reason of Mattel's violation of 18 U.S.C. §1962(c).

## THIRD COUNTERCLAIM-IN-REPLY
(Wrongful Injunction)

319.    At the behest of Mattel, on December 3, 2008, the Court entered a sweeping set of equitable orders against MGA that had the effect of destroying all or a substantial part of MGA's value in the BRATZ brand.

320.    On July 22, 2010, the Ninth Circuit Court of Appeals held that the December 3, 2008 equitable orders should not have been entered.  Without regard to Mattel's intent, wrongful acts, or otherwise, this reversal demonstrated that the December 3, 2008 orders were wrongful.  *See Nintendo of Am., Inc. v. Lewis Galoob Toys, Inc.*, 16 F.3d 1032, 1036-37 (9th Cir. 1994).

321.    Accordingly, MGA is entitled to have from Mattel the damages caused by these wrongful equitable orders, and to have restored to it the benefits it

1  lost as a result of these wrongful equitable orders, and to have disgorged from

2  Mattel the benefits it received from these wrongful equitable orders, in an amount

3  subject to proof at trial.

4  **PRAYER**

5  WHEREFORE, MGA prays for relief as follows:

6  a.      On the Reply, that judgment be entered in favor of MGA and against

7  Counterclaimants Mattel and Mattel Mexico on the FAAC and that the FAAC be

8  dismissed with prejudice;

9  b.      On the Reply, that MGA recover its costs of suit; and

10  c.      On the Reply, that MGA recover its attorneys fees pursuant to statute

11  under 17 U.S.C. 505 and Cal. Civ. Code 3426.4;

12  d.      On the Reply, a declaration that MGA is the true owner of the Bratz

13  intellectual property and Moxie Girlz trademarks;

14  e.      On the Counterclaims-in-Reply, that MGA recover its actual damages;

15  f.      On the Counterclaims-in-Reply, that Mattel be ordered to pay double

16  damages due to its willful and malicious misappropriation of MGA's trade secrets

17  with deliberate intent to injure MGA's business and improve its own;

18  g.      On the Counterclaims-in-Reply, that Mattel be ordered to pay treble

19  MGA's damages, plus interest, costs and attorneys' fees incurred by reason of

20  Mattel's violation of 18 U.S.C. §1962(c);

21  h.      On the Counterclaims-in-Reply, that Mattel be ordered to pay damages,

22  to restore to MGA what it has lost, and to disgorge all benefits that it has received as

23  a result of wrongful injunction;

24  i.      On all pleadings in these consolidated actions, that Mattel be ordered to

25  pay the full costs of this action, including all fees paid to Court-ordered Monitors,

26  Discovery Masters, and Rule 706 Experts;

27

28

MGA'S REPLY TO COUNTERCLAIMS
CV 04-9049 DOC (RNBx)

1        j.        That MGA be awarded such other and further relief as the Court may

2   deem just and proper.

3

    Dated:        August 16, 2010              ANNETTE L. HURST
4                                              Orrick, Herrington & Sutcliffe LLP

5

6

7                                                   ANNETTE L. HURST
                                                      Attorneys for
8                                              MGA Entertainment, Inc.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MGA'S REPLY TO COUNTERCLAIMS
CV 04-9049 DOC (RNBx)

1

## DEMAND FOR JURY TRIAL

2      MGA Entertainment, Inc. respectfully requests a jury trial on all issues triable

3  thereby.

4

5    Dated:    August 16, 2010                ANNETTE L. HURST
                                              Orrick, Herrington & Sutcliffe LLP
6

7                                            *Annette L. Hurst*
8                                          _____
                                                ANNETTE L. HURST
9                                                 Attorneys for
                                            MGA Entertainment, Inc.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MGA'S REPLY TO COUNTERCLAIMS
CV 04-9049 DOC (RNBx)