ANNETTE L. HURST (Bar No. 148738)
ahurst@orrick.com
WARRINGTON S. PARKER III (Bar No. 148003)
wparker@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105
Telephone:  +1-415-773-5700
Facsimile:  +1-415-773-5759

WILLIAM A. MOLINSKI (Bar No. 145186)
wmolinski@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
777 South Figueroa Street, Suite 3200
Los Angeles, CA  90017
Telephone:  +1-213-629-2020
Facsimile:  +1-213-612-2499

THOMAS S. MCCONVILLE (State Bar No. 155905)
tmcconville@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
4 Park Plaza, Suite 1600
Irvine, CA 92614-2258
Tel: (949) 567-6700/Fax: (949) 567-6710

Attorneys for the MGA Parties and IGWT 826

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an individual<br><br>Plaintiff,<br><br>v.<br><br>MATTEL, INC., a Delaware corporation,<br><br>Defendant.<br><br>AND CONSOLIDATED CASES | CASE NO.  CV 04-9049 DOC (RNBx)<br><br>Consolidated with Case No.  CV 04-09059 and Case No.  CV 05-02727<br><br>Honorable David O. Carter<br><br>**[CORRECTED] MOTION FOR NEW TRIAL; RENEWED MOTION TO UNSEAL JUROR INTERVIEW TRANSCRIPTS**<br><br>**PUBLIC VERSION**<br><br>**Hearing Date: September 3, 2010<br>Time: 1:30 p.m.<br>Courtroom: Hon. David O. Carter** |

1

**TABLE OF CONTENTS**

2

3
**Page**

4
INTRODUCTION ................................................................................3

PHASE 1 RELEVANT PROCEDURAL AND TRIAL HISTORY ......................3

5
    A.   The District Court Improperly Construes The Employment Agreement Between Mattel and Bryant, Which Affects All State

6
        Law Claims Tried In Phase 1 ......................................................3

7
    B.   Mattel Exploits The Erroneous Contract Ruling. ..........................5

    C.   The Jury Hangs On The Core 1998 Issue. ...................................7

8
    D.   The Phase 1 (B) Depends On These Ownership Errors And

9
        More. ...........................................................................................8

10
    E.   Both Verdicts Were Tainted By Racial Bias. .............................10

        1.   Juror No. 8 Failed to Disclose to the Court and the Parties

11
            Her Biases Against Iranians During Voir Dire......................10

12
        2.   During the Jury's Phase 1A Deliberations, Juror No. 8 Made "Grossly Inappropriate Remarks" About Iranians to

13
            Other Jurors. .....................................................................12

        3.   The Court's Investigation Into the Bias of Juror No. 8 ...........13

14
        4.   The Court's Written Order and Findings.................................15

15
NEWLY DISCOVERED EVIDENCE ....................................................16

16
    A.   The Bratz Brief............................................................................16

    B.   The "What Happened to Barbie" Email. .....................................18

17
    C.   The New Statute Of Limitations Documents................................19

18
ARGUMENT.....................................................................................20

19
I.   THE COURT SHOULD GRANT A NEW TRIAL OF ALL PHASE 1 PROCEEDINGS. ........................................................................20

20
    A.   The Instructional Error On The Contract Claim Infected The Entire Case; There Were Other Significant Instructional Errors........21

21
    B.   The Jury Hung On The Core Question In The Case,

22
        Necessitating A Mistrial. .............................................................29

    C.   MGA Hereby Renews Its Motion To Unseal The Juror Interview

23
        Transcripts; All Verdicts Must Be Vacated Because Of Juror

24
        Misconduct. .................................................................................30

    D.   Newly Discovered Evidence And Discovery Misconduct By

25
        Mattel Requires That All Verdicts Be Vacated. .........................33

CONCLUSION..................................................................................34

26

27

28

1

# TABLE OF AUTHORITIES

2

**Page**

3

## FEDERAL CASES

4

*Caballero* v. *City of Concord*,
  956 F.2d 204 (9th Cir. 1992) ................................................................. 22

5

6

*California* v. *Altus Finance S.A.*,
  540 F.3d 992 (9th Cir. 2008) ................................................................. 30

7

*Castner* v. *First Nat'l Bank of Anchorage*,
  278 F.2d 376 (9th Cir. 1960) ................................................................. 31

8

9

*City Solutions, Inc.* v. *Clear Channel Commc'ns*,
  201 F. Supp. 1035 (N.D. Cal. 2002) ..................................................... 26

10

*E.E.O.C.* v. *Serrano's Mexican Restaurants, LLC*,
  306 Fed. Appx. 406 (9th Cir. 2009) ..................................................... 31

11

12

*Enreach Tech., Inc.* v. *Embedded Internet Solutions, Inc.*,
  403 F. Supp. 2d 968 (N.D. Cal. 2005) .................................................. 25

13

*Galdamez* v. *Potter*,
  415 F.3d 1015 (9th Cir. 2005) ............................................................... 21

14

15

*Gasoline Prods. Co.* v. *Champlin Refining Co.*,
  283 U.S. 494 (1931) .............................................................................. 21

16

*Goodworth Holdings Inc.* v. *Suh*,
  239 F. Supp. 2d 947 (N.D. Cal. 2002) .................................................. 26

17

18

*Green* v. *Reynolds*,
  57 F.3d 956 (10th Cir. 2005) ................................................................. 32

19

*Heller* v. *EBB Auto Co.*,
  8 F.3d 1433 (9th Cir. 1993) ................................................................... 21

20

21

*Jeffries* v. *Wood*,
  114 F.3d 1484 (9th Cir. 1997) ............................................................... 20

22

*Jones* v. *Aero/Chem Corp.*,
  921 F.2d 875 (9th Cir. 1990) ................................................................. 33

23

24

*Lattimore* v. *Polaroid Corp.*,
  99 F.3d 456 (1st Cir. 1996) ................................................................... 28

25

*McCoy* v. *Goldston*,
  652 F.2d 654 (9th Cir. 1981) ................................................................. 30

26

27

*Medrano* v. *City of Los Angeles*,
  973 F.2d 1499 (9th Cir. 1992) ............................................................... 31

28

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3

*Medtronic, Inc.* v. *White*,
526 F.3d 487 (9th Cir. 2008) ................................................................. 25

4

*Murphy* v. *City of Long Beach*,
914 F.2d 183 (9th Cir. 1990) ................................................................. 20

5

6

*Murray* v. *Laborers Union Local No. 324*,
55 F.3d 1445 (9th Cir. 1995) ................................................................. 31

7

*Portney* v. *CIBA Vision Corp.*,
No. 07-0854, 2008 U.S. Dist. LEXIS 106677 (C.D. Cal. July 17, 2008) ......... 26

8

9

*Preseau* v. *Prudential Ins. Co. of Am.*,
591 F.2d 74 (9th Cir. 1979) ................................................................. 31

10

*Pryer* v. *C.O. 3 Slavic*,
251 F.3d 448 (3d Cir. 2001) ................................................................. 21

11

12

*Pumphrey* v. *K.W. Thompson Tool Co.*,
62 F.3d 1128 (9th Cir. 1995) ................................................................. 21

13

*Rinker* v. *County of Napa*,
724 F.3d 1352 (9th Cir. 1983) ................................................................. 31

14

15

*Rita Medical Sys., Inc.* v. *Resect Medical, Inc.*,
No. C 05-03291 WHA, 2007 WL 161049, at *6
(N.D. Cal. Jan. 17, 2007) ................................................................. 26

16

17

*Thompson* v. *Altheimer & Gray*,
248 F.3d 621 (7th Cir. 2001) ................................................................. 30, 31

18

*Union Pac. R.R. Co.* v. *Bridal Veil Lumber Co.*,
219 F.2d 825 (9th Cir. 1955) ................................................................. 30

19

20

*United States* v. *Click*,
807 F.2d 847 (9th Cir. 1987) ................................................................. 31

21

*United States* v. *Henley*,
238 F.3d 1111 (9th Cir. 2001) ................................................................. 30, 32

22

23

*United States* v. *Rosenthal*,
454 F.3d 943 (9th Cir. 2006) ................................................................. 30

24

*United States* v. *Shapiro*,
669 F.2d 593 (9th Cir. 1982) ................................................................. 32

25

26

*United States* v. *Thrasher*,
483 F.3d 977 (9th Cir. 2007) ................................................................. 20

27

28

**TABLE OF AUTHORITIES**
(continued)

Page

**STATE CASES**

*Bancroft-Whitney Co.* v. *Glen*,
411 P.2d 921 (Cal. 1966)..................................................................24

*Calvao* v. *Superior Court*,
201 Cal. App. 3d 921 (1988)............................................................25

*City of Hope Nat'l Med. Ctr.* v. *Genentech, Inc.*,
181 P.3d 142 (Cal. 2008).................................................................26

*GAB Bus. Servs., Inc.* v. *Lindsey & Newsom Claim Servs., Inc.*,
83 Cal. App. 4th 409 (2000)............................................................25

*Mamou* v. *Trendwest Resorts, Inc.*,
81 Cal. Rptr. 3d 406 (Cal. App. 2008) ............................................24

*Odorizzi* v. *Bloomfield School Dist.*,
246 Cal. App. 2d 123 (1966)...........................................................25

*Rickel* v. *Schwinn Bicycle Co.*,
144 Cal. App. 3d 648 (1983)...........................................................26

*Waverly Prods, Inc.* v. *RKO Gen., Inc.*,
217 Cal. App. 2d 721 (1963)...........................................................26

*Worldvision Enterprises, Inc.* v. *American Broadcasting Cos.*,
142 Cal. App. 3d 589 (1983)...........................................................26

**FEDERAL STATUTES**

Federal Rule of Civil Procedure 59 ........................................................20

**STATE STATUTES**

Cal. Bus. & Prof. Code § 16600 .............................................................24

Cal. Lab. Code § 2854 ............................................................................25

**MISCELLANEOUS**

19 Williston on Contracts § 54.27 at 467 (4th ed. 2008).........................24

[CORRECTED] MOTION FOR NEW TRIAL
CV 04-09049 DOC (RNBx)

# NOTICE OF MOTIONS AND MOTIONS

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that, pursuant to Federal Rule of Civil Procedure 59(a) and (d), MGA Entertainment, Inc., MGA HK Limited and Isaac Larian hereby move for new trial on all claims and defenses tried in the Phase 1 proceedings.

A new trial is hereby sought on the claims, findings, and damages against MGA Entertainment, MGA HK Limited and Isaac Larian referenced in the Verdict Forms for Phase 1(A) and Phase 1(B), Dkt. Nos. 4125 and 4279, including the claims for intentional interference with contract, aiding and abetting breach of fiduciary duty, aiding and abetting duty of loyalty, conversion, copyright infringement, the defense of statute of limitations, Mattel's fraudulent concealment rejoinder to the statute of limitations defense, and the responses to Questions 1 to 6 referenced in Dkt No. 4125.

The grounds for the motion are as follows:

First, a new trial is appropriate because the Court improperly construed the employment agreement between Mattel and Carter Bryant.  As a result, the Court improperly instructed the jury concerning the proper interpretation of the employment agreement and its application to each of the claims in the case.  These errors are found in the jury instructions applicable to each claim and the verdict forms.

Second, a new trial is appropriate because the Court improperly and erroneously instructed the jury that Carter Bryant was a fiduciary of Mattel and the Court improperly instructed the jury that Bryant was in breach of his duty of loyalty as a matter of law because he signed an agreement with MGA.

Third, a new trial is appropriate because the jury hung on the core question in the case, specifically, the date of creation of the original four Bratz drawings as

- 1 -

reflected in its failure to reach a verdict on four lines of Question 1 of the Phase 1(A) verdict form.

Fourth, the Court's copyright jury instructions concerning the protectable elements of the works at issue and the standard of infringement to be applied were erroneous, and Mattel has conceded that a new trial on its copyright claims and damages related thereto must be ordered.

Fifth, a new trial is appropriate based on juror bias and misconduct.

Sixth, a new trial is appropriate based on newly discovered evidence and discovery misconduct of Mattel.

PLEASE TAKE NOTICE that MGA Entertainment, Inc., MGA HK Limited and Isaac Larian also hereby renew their motion for the unsealing of juror interview transcripts in connection with the mistrial motion.

These motions are based on this Notice of Motion, the attached Memorandum of Points and Authorities, the pleadings and records of this Court, all matters of which this Court may take judicial notice, and on such oral argument as may be presented by the parties.

Dated:  August 30, 2010          ORRICK, HERRINGTON & SUTCLIFFE LLP


_/s/ Annette L. Hurst_
Annette L. Hurst
Attorneys for the MGA Parties and IGWT 826

[CORRECTED] MOTION FOR NEW TRIAL
CV 04-09049 DOC (RNBx)

# MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

The Court should grant a new trial and vacate all of the Phase 1 verdicts, creating a clean slate concerning the claims and defenses tried in Phase 1. There are five reasons why a new trial should be granted. First, the contractual interpretation errors identified in the July 22 Ninth Circuit Opinion pervaded the instructions on all claims. Second, there were a number of other significant instructional errors, especially with respect to the fiduciary duty and duty of loyalty claims. Third, the jury hung *on the core question of the case* as to whether Carter Bryant first conceived and reduced to practice the four original Bratz drawings in the summer of 1998 in Missouri, necessitating a mistrial. Fourth, juror misconduct and racial bias infected the verdicts, also necessitating a mistrial. Fifth, there is new evidence that could not have, in the exercise of reasonable diligence, been discovered during Phase 1 and would have affected the outcome of the trial. For all of these reasons, a new trial motion encompassing all claims and defenses tried in the Phase 1 proceedings, and vacating all verdicts, should be granted.

## PHASE 1 RELEVANT PROCEDURAL AND TRIAL HISTORY

### A. The District Court Improperly Construes The Employment Agreement Between Mattel and Bryant, Which Affects All State Law Claims Tried In Phase 1.

MGA's liability on Mattel's state law claims—intentional interference with contract, aiding and abetting breach of fiduciary duty, aiding and abetting duty of loyalty, and conversion—were tried in Phase 1(A) of this case. Mattel's copyright infringement claim and its damages on all claims were tried in Phase 1(B).

All of the state law claims tried in Phase 1 were infected by the two contract interpretation errors identified by the Ninth Circuit. The first error was the conclusion that the term "inventions" in Mattel's Inventions Agreement, as a matter of law, covered and assigned to Mattel Bryant's ideas for the name "Bratz" and "Jade." *Id.* at 10534. The second error was the conclusion that Mattel's agreement,

1   as a matter of law, could be construed to grant Mattel ownership of any of Bryant's

2   Bratz works simply because Bryant happened to be employed by Mattel at the time

3   of creation, and without regard to the fact that he was a fashion designer not a doll

4   designer and was acting outside the scope of his employment (even assuming he

5   was employed by Mattel during the period he created Bratz).  *See id.* at 10539.

6   These two erroneous conclusions were reached by the district court in granting

7   Mattel's motion for summary judgment.  *See* Dkt. No. 3285 (4/25/08 Order) at 5

8   (concluding that the employment agreement covered "inventions," which included

9   ideas, "during the period of [Bryant's] employment with Mattel").  And as to both

10  rulings, the Ninth Circuit concluded that the district court "erred in holding that the

11  agreement, by its terms, clearly covered ideas," and "erred by granting summary

12  judgment to Mattel" concerning the scope of the Inventions Agreement.  Slip Op. at

13  10534, 10539.

14       The erroneous constructions of contract were repeated throughout the

15  instructions.  With regard to the intentional interference with contract, the jury was

16  instructed as a matter of law that "any particular Bratz-related *idea*, concept,

17  drawing design or work . . . 'conceived or reduced to practice', that is, created, by

18  Mr. Bryant . . . *while employed by Mattel*" was owned by Mattel.  Dkt. No. 4115

19  (7/10/08 Final Jury Instructions) at 23 (emphasis added); 7/10/08 Trial Tr. at 4805

20  (emphasis added).  This is exactly what the Ninth Circuit found wrong.

21       Next, with regard to the fiduciary duty, the elements of breach of duty and

22  causation of harm were bound up in the ownership issue.  The jury was instructed

23  that Bryant, a rank and file design employee, had a fiduciary duty because Bryant

24  had an "obligation to keep Proprietary Information confidential," which as the jury

25  was instructed, was information "possess[ed]" or "acquir[ed]" by Mattel and which

26  "depends on [the Proprietary Information] remaining confidential."  Dkt. No. 4115

27  at 31; 7/10/08 Trial Tr. at 4808-09.  This instruction incorporates the same two

28  flaws pointed out by the Ninth Circuit.  First, it allowed the jury to equate Bratz

[CORRECTED] MOTION FOR NEW TRIAL
CV 04-09049 DOC (RNBx)

1  with Proprietary Information if the jury found that the ideas and sketches were

2  owned by Mattel under the erroneous construction of the assignment provision.

3  Second, and relatedly, it permitted the jury to premise its liability decision in Phase

4  1(A) and its damages award in Phase 1(B) on the claims of aiding and abetting

5  breach of fiduciary duty *and* duty of loyalty on the claimed disclosure of Bratz-

6  related ideas and works, because Bryant failed in his "obligation to keep [Mattel's]

7  Proprietary Information confidential."  And, as noted below, this is precisely what

8  Mattel argued.  *See* Part B, *infra*.

9         The instructions on the duty of loyalty claim were also infected.  Although

10 erroneously premised at least in part on the fact that Bryant breached his duty of

11 loyalty merely by entering into a contract with MGA (*see* Argument, Part II, *infra*),

12 critical to the duty of loyalty claim was also the instruction that Bryant entered into

13 a contract "to produce *a line of fashion dolls* . . . ."  Dkt. No. 4115 at 32; 7/10/08

14 Trial Tr. at 4809 (emphasis added).  In other words, the duty of loyalty instruction

15 was premised on the fact that Bryant agreed to provide Bratz to MGA and that was

16 somehow wrongful.

17        Finally, the conversion claim was also directly premised upon the issue of

18 ownership.  The instruction provided that any "tangible property" "'conceived or

19 reduced to practice'" *during the time period [Bryant] was employed by Mattel*" is

20 thereby owned by Mattel.  Dkt. No. 4115 at 33;  7/10/08 Trial Tr. at 4810.

21        **B.     Mattel Exploits The Erroneous Contract Ruling.**

22        As reflected in Mattel's opening statements and arguments to the jury, Mattel

23 capitalized upon the erroneous contractual interpretation in three distinct ways.

24        First, the central tenet of Mattel's case was that it owned Bratz, the ideas, the

25 drawings, and that a verdict on all of its claims could be premised on that fact.  As

26 Mattel stated in the first few lines of its opening statement to the jury, "[t]he

27 question for you is going to be, who owns certain drawings to a doll?"  5/27/08

28 Trial Tr. at 61.  In the same vein, Mattel made clear that this case was about the fact

[CORRECTED] MOTION FOR NEW TRIAL
CV 04-09049 DOC (RNBx)

1  that MGA knew that it was talking to a Mattel designer and hid that fact because

2  MGA "knew that if Mattel ever learned . . . that [MGA] had taken this [Bratz] from

3  a Mattel fashion doll designer while he was working for Mattel, that Mattel would

4  own the rights to those drawings." 5/27/08 Trial Tr. at 63.

5        Mattel's arguments in closing reiterated this central point: that MGA knew,

6  through its own employees, that "it would be a *breach of Mattel employee contracts*

7  for Carter Bryant to assist MGA or share design ideas with MGA." 7/10/08 Trial

8  Tr. at 4828.  Indeed, so that no distinction was drawn between Mattel's claims of

9  ownership and the various state law claims, even as to breach of fiduciary duty,

10  Mattel claimed that Bryant breached his fiduciary duty—which, as noted depended

11  on the fact that Bryant possessed confidential information belonging to Mattel—by

12  "deliver[ing] to Isaac Larian and to MGA Mattel's confidential proprietary

13  information: The idea for a unique, ground-breaking line of dolls, the fundamental

14  design for those dolls [which] MGA used . . . to create the Bratz line . . . ." 8/20/08

15  Trial Tr. at 8119.

16        Or, as Mattel summarized its case for the jury, "MGA recognized what it was

17  doing and inducing a Mattel employee who created Mattel designes [sic] to bring

18  his designs to MGA." 7/10/08 Trial Tr. at 5001-02.  This was so, according to

19  Mattel, because "[i]t's unfair if a company competes with you by stealing from you.

20  It's unfair if a company competes with you by taking one of your best designers,

21  while he still works for you, and gives you ideas, effort, and helps you get into the

22  market to compete." 7/10/08 Trial Tr. at 5002.

23        Next, Mattel used the issue of ownership, and the interpretation of Bryant's

24  employment agreement, to blunt any argument that Mattel was not harmed by

25  Bryant's claimed breach of fiduciary duty and duty of loyalty.  In other words,

26  Mattel rebutted any assertion that it lacked the legally required element of harm on

27  the fiduciary duty and duty of loyalty claims by pointing to the issue of Bratz

28

ownership.[1]  Mattel called this MGA's "fall-back position."  7/10/08 Trial Tr. at 4847.

As Mattel articulated MGA's theory, "none of this really matters, because if Carter Bryant was assisting MGA while he was a Mattel employee, the designs he created were created during this gap in his employment . . . during a short time frame in 1998 when he wasn't working for Mattel."  7/10/08 Trial Tr. at 4847.  Mattel's response: "But the evidence, folks, contradicts this theory as well."  7/10/08 Trial Tr. at 4847.  Using this as the launching pad, Mattel then went through the evidence it claimed established its ownership in Bratz based on the date of creation, whether or not the ideas and designs were conceived or created during Bryant's employment at Mattel.  7/10/08 Trial Tr. at 4848-87.  Mattel thus expressly linked the ownership question to the liability question on all of its Phase 1(A) state law claims.

## C.    The Jury Hangs On The Core 1998 Issue.

The Phase 1(A) verdict form asked the jury to answer whether certain items, identified by exhibit number, were "'conceived or reduced to practice'—that is, created—by Carter Bryant, alone or jointly with others, during the period in which he was employed by Mattel (January 4, 1999, to October 19, 2000)."  *See* Dkt. No. 4125.  As to the exhibits referenced in the verdict form, the jury was to answer "yes" or "no."  That is, the jury was to answer whether the item represented by the jury was created during Bryant's employ with Mattel or was *not* created during Bryant's employ with Mattel.

As to four items, the jury had no answer whatsoever.  As reflected on lines 19-22 of the Phase 1(A) verdict form, the jury did not answer "yes."  It did not

---

[1] Although these arguments were presented in the Phase 1(A) liability phase of the trial on Mattel's state law claims, Mattel made them because the jury instructions required that Mattel prove it suffered harm as a result of Bryant's breach of fiduciary duty and duty of loyalty and therefore the aiding and abetting claims on which MGA and Mr. Larian were sued.  Dkt. No. 4115 at 28-30.  7/10/08 Trial Tr. at 4807-08.

1  answer "no."  Those lines recite the question to be answered as to Trial Exhibits 5-

2  39, 5-40, 5-41, and 5-42, and as to those exhibits, the jury reached no decision at

3  all.  Dkt. No. 4125 at 1:19-22.[2]  The jury hung.

4       Critically, the trial exhibits for which the jury could reach no verdict are

5  without dispute *the original drawings of Bratz*.  They are the drawings that Bryant

6  testified he created in 1998 after driving past Kickapoo High School in Missouri

7  during a period of time when he was *not* working at Mattel.  6/13/08 Trial Tr. 2625-

8  27 (Bryant's testimony); *see also* 6/13/08 Trial Tr. 2635 (Bryant's testimony

9  referencing these same exhibits by bate stamp numbers 179, 180, 181 and 182);

10 6/17/08 Trial Tr. at 2728 (Bryant's testimony correlating the bate stamp numbers to

11 Trial Exhibits 5-39, 5-40, 5-41, and 5-42).  These are the drawings that Mattel

12 acknowledged in closing were that drawings that Bryant testified "that [Bryant] did

13 that very day when he came home from Kickapoo High.  He drew these drawings.

14 These are the first ones."  7/10/08 Trial Tr. 7/10/08 at 4870.

15      In short, as to the original drawings, the ones Bryant testified he drew in

16 1998 in Missouri and while not employed by Mattel, there is no jury verdict at all.

17     **D.**    **The Phase 1 (B) Depends On These Ownership Errors And More.**

18      As part of Phase 1(B), the parties tried copyright infringement and damages.

19 Mattel expressly premised its damages theory on the state law claims in Phase 1(B),

20 including damages on its claims for aiding and abetting breach of fiduciary duty

21 and duty of loyalty, on the issue of ownership.  Mattel argued that damages were

22 warranted based on the fact that Bryant disclosed *Mattel's* confidential information,

23 i.e., information owned by Mattel, which information it identified as Bratz.  Mattel

24 asked for all of MGA's and Larian's "ill-gotten gains" based on the aiding and

25 abetting breach of fiduciary duty and duty of loyalty instructions because "it would

26
27
28

---

[2] For each of these items, there were a series of trial exhibits referenced.  For example, the verdict form line referencing Trial Exhibit 5-39 also referenced Trial Exhibits 523 and 752.  The additional references are to identical items also marked as exhibits so that Trial Exhibit 5-39 is identical to Trial Exhibits 523 and 752.

1    be wrong for [MGA and Mr. Larian] to profit even a penny based on *using Mattel's*
2    *proprietary confidential information*."  8/20/08 Trial Tr. at 8120 (emphasis added).

3         To make it plain for the jury, Mattel argued "[t]hey cannot keep any profits
4    that were earned as a result of the theft of Mattel's proprietary information."
5    8/20/08 Trial Tr. at 8126; *see also* 8/20/08 Trial Tr. at 8124 (identifying the
6    wrongdoing for which MGA should pay damages as the exploitation of Mattel's
7    confidential information); 8/20/08 Trial Tr. at 8248-50 (basing damages for breach
8    of fiduciary duty and breach of loyalty and breach of converted property on
9    Bryant's disclosure and MGA's use of Mattel's confidential information).

10        The infringement claim depended on the jury's finding in Phase 1(A) that
11   Bryant conceived or created Bratz during his employment at Mattel.  As the Court
12   instructed the jury, ownership of Bratz was an element of the copyright claim but,
13   "[a]s a matter of law, Mattel is the owner, by assignment, of the Bratz-related items
14   that you found were created by Carter Bryant . . . while employed by Mattel."   Dkt.
15   No. 4267 at 21; 8/20/08 Trial Tr. at 8092; *see also* Dkt. No. 4267 at 24; 8/20/08
16   Trial Tr. at 8093 (instructing jury that ownership element established as matter of
17   law).  The Ninth Circuit recognized that the errors in the district court's
18   interpretation of Bryant's Inventions Agreement alone justified vacating the
19   copyright injunction.  Slip Op. at 10539.  Mattel has agreed that the Ninth Circuit
20   Opinion requires that the copyright infringement verdict be vacated.

21        The Court's failure to grapple with the fact that the jury had hung on the core
22   contention of the Phase 1(A) case—whether Carter Bryant had started his work in
23   1998—also fatally infected Phase 1(B).  This is because the Court never explained
24   to the jury that Mattel, at best, only owned the *new material* in light of its special
25   findings.  Limiting Mattel's ownership to the new material would have profound
26   implications for every aspect of Mattel's claims.

27

28

E.   **Both Verdicts Were Tainted By Racial Bias.**

In the midst of the Phase 1(B) proceedings it came to light that Juror No. 8, who had deliberated in and rendered the Phase 1(A) verdict, was a racist who harbored beliefs about Persians and Iranians going to the very core issue of this case.  As she declared to her fellow jurors "her husband, an attorney, has told her about a client or clients who are Persian and/or Iranian and who are stubborn, rude, and who have stolen other people's ideas." Dkt No. 4238 (8/8/08 Order) at 2.  So disturbing was this declaration to the other jurors, that they raised the issue with the Court. *Id.* at 1-2.  The Court then dismissed Juror No. 8 from the jury.  In doing so, the Court concluded that Juror No. 8 was a "cancer" on the jury.  7/25/08 Trial Tr. at 4396-98.

1.   Juror No. 8 Failed to Disclose to the Court and the Parties Her Biases Against Iranians During *Voir Dire*.

*Voir dire* in this case began on the morning of May 20, 2008 with a pool of fifty-six prospective jurors.  A woman who ultimately became Juror No. 8 was one of those prospective jurors.

As with every potential juror, the Court explicitly asked Juror No. 8 to disclose any potential bias that she might have.  In the Court's words, the jurors, including Juror No. 8, were to disclose "*any reason at all* that you feel that you may not be an appropriate juror in this case.  Err on the side of letting us know information, not the other way around."  5/20/08 Trial Tr. at 27 (emphasis added).  As the Court explained, the duty to disclose was far-reaching, extending even to information not specifically requested by the Court or counsel.  In the Court's words:

> I need to rely on your good faith, for you to seriously consider the nature of this case and all of the questions that we ask, and, perhaps, questions that we don't ask.  **If there is something in your mind that suggests that you would not be a completely fair and impartial juror in this case, if you find yourself, without hearing any of the evidence, any of the exhibits, or any of the**

- 10 -

1

**testimony, forming an opinion as to which side is right
or which side should receive your verdict, you've got
to let us know.  You've got to let me know.  Don't
hesitate.**

2

3

4      *Id.* at 27 (emphasis added).

5          Despite these instructions, despite a clear racial bias against Persians and

6      Iranians going to the very heart of the allegations of this case—specifically whether

7      Isaac Larian, an Iranian, improperly took the Bratz from Mattel—Juror No. 8 failed

8      to disclose her lack of partiality, a racial animosity that caused her to believe that

9      people who are Persian and/or Iranians "are stubborn, rude" and are known to

10     "have stolen other people's ideas." Dkt No. 4238 at 2.

11         This failure to disclose was not due to some misunderstanding of the case or

12     the parties to it.  Prior to questioning the prospective jurors, both parties made mini

13     opening statements to test whether there was any reason that the potential jurors

14     could not be fair and impartial.  During these introductory remarks, both Mattel's

15     counsel and MGA's counsel informed the prospective jurors that Mr. Larian was an

16     "immigrant" and that Mattel alleged that he had stolen the idea for the Bratz dolls

17     from Mattel.  Counsel for Mr. Larian and MGA highlighted the fact that MGA was

18     a "family-owned company. . . proudly led by an immigrant who came over to this

19     country when he was [just] 17 years old, with $750 in his pocket." 5/20/08 Trial

20     Tr. at 37.  Later during *voir dire*, Mr. Nolan expressly stated that Mr. Larian had

21     immigrated from the "Middle East."  *Id.* at 317:22-25.  Mattel's counsel, in

22     contrast, told the jurors that Mr. Larian was an "immigrant to this country," but

23     asserted that his success did not reflect the "American Dream" because he had

24     succeeded through "cheating and stealing."  5/20/08 Trial Tr. at 37.

25         At the close of the parties' mini opening statements, at which point each juror

26     understood the themes of the case and Mr. Larian's ethnicity, the Court questioned

27     each juror individually.  Among other questions, the Court expressly asked each

28     juror whether, in light of the parties' opening remarks, the prospective jurors could

- 11 -

1  serve fairly and impartially. "Is there any reason that you cannot be a fair and

2  impartial juror in this case?" 5/20/08 Trial Tr. at 55.  The Court reiterated that the

3  judicial system and the parties "really need[ed] to depend upon [the prospective

4  juror]" to consider "anything that [they have] heard or seen" in the courtroom in

5  determining whether they could sit for trial.  *Id.* at 55.  "Now is the time to let us

6  know of any concerns, any problems." *Id.* at 273.

7          Some prospective jurors admitted to the Court that, in light of the parties'

8  identities or the introductory remarks of counsel, that they would be unable to serve

9  impartially and fairly.  *See, e.g.,* 5/20/08 Trial Tr. at 215-216.  But not Juror No. 8.

10  Despite Juror No. 8's strong prejudice against Iranians, she explicitly represented to

11  the Court and the parties that that "yes, I can be a fair and impartial juror." 5/20/08

12  Tr. at 238.  She also explicitly represented that she did not have "any particular

13  feelings about one company or the other." *Id.* at 238.  She maintained these

14  answers even after being asked by Mattel's counsel a series of questions about her

15  husband and his work as a commercial lawyer, which formed the basis for her

16  beliefs. *Id.* at 297-98.

17                 2.      During the Jury's Phase 1A Deliberations, Juror No. 8 Made
                          "Grossly Inappropriate Remarks" About Iranians to Other
18                        Jurors.

19          The jurors deliberated for almost a week before rendering a verdict, and, as

20  noted above, hung on the core issue of Bryant starting his work in 1998 and did not

21  clearly decide that issue in Mattel's favor.  During much of the deliberations, Juror

22  No. 8 apparently concealed from her fellow jurors that she harbored biases against

23  Iranians, and specifically biases as to their character and veracity.  On the last day

24  of deliberations, however, Juror No. 8 made what the Court later found to be

25  "grossly inappropriate remarks concerning" Mr. Larian based on his ethnicity, Dkt.

26  No. 4155 (7/25/08 Order) at 1, which, according to the Court, were heard "by most

27  but not all of the jurors." 7/25/08 Tr. at 5; Dkt. No. 4238 at 2.  Specifically, Juror

28  No. 8 informed her fellow jurors that "her husband, an attorney, has told her about a

1    client or clients who are Persian and/or Iranian and who are stubborn, rude, and

2    who have stolen other people's ideas."  Dkt No. 4238 (8/8/08 Order) at 2.

3                    3.      The Court's Investigation Into the Bias of Juror No. 8.

4          The parties presented opening statements in Phase 1(B) of the trial on

5    Wednesday, July 23, 2008.  On the morning of July 25, Juror No. 6 sent a note to

6    the Court that he was "concern[ed]" about something, which he wanted to discuss

7    with the Court.  7/25/08 Trial Tr. at 5646.  The Court invited counsel for each of the

8    parties into chambers and briefly spoke with Juror No. 6.  Juror No. 6 started by

9    informing the Court that it was his view that ███████████████████████

10   ███████████████████████████████████████████████████████████

11   ███████████████████████████████████████████████████████

12   ███████████████████████████████████████████████████████

13   ███████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████████████

15   ██████████████████████████████████████████████████████████████████

16   ███████████████████████████████████████████████████████

17   ████████████████████████████████████████████████████████████

18   ███████████████████████████████████████████████████████████

19   ██████████████████████████████████████████████

20     ████████████████████████████████████████████████████████

21   ████████████████████████████████████████████████████  After Juror No. 6

22   was excused from chambers, the Court and counsel briefly discussed what the issue

23   potentially could be:

24            ██████████████████████████████████████████████

25            ████████████████████████████████████████████████

26            ████████████████████████████████████████████████

27            ████████████████████████████████████████████████

28            ████████████████████████████████████████████████

- 13 -

1

2

3

4

5   After interviewing

Juror No. 6, the Court "found that it was necessary to interview each and every one

of the jurors separately."  7/25/08 Unsealed Tr. at 5.[3]  The Court also found that

7

8

9

10        The Court subsequently interviewed each of the jurors individually in

chambers, outside of the presence of the parties and their counsel.  7/25/08 Trial Tr.

at 5647.  At the conclusion of the Court's investigation, the Court made oral

findings from the bench, and then held a brief public hearing.  During the hearing,

the Court disclosed the substance of Juror No. 8's statements about Iranians, *id.* at

21, and expressed grave concern both that Juror No. 8 would "harbor" such

prejudice in "this day and age," and that she went through the Court's thorough *voir*

*dire* process without disclosing her bias or admitting her inability to be a fair juror.

> The concern that I have was well articulated by Mr.
> Nolan.  It's this sense of – I really can't believe we're
> here at this point and we have this issue in front of us, that
> a juror, in this day and age, would go through the *voir*
> *dire* process that we went through and then harbor and
> make such a statement, harbor such a feeling and then
> make such a statement.

*Id.* at 5655-56.  The Court described these biased views as a "cancer" in the

proceedings, *id.* at 5622, and noted that "two of the jurors actually broke down in

chambers because they were so outraged at what had been said."  *Id.* at 5655.

Indeed, the Court indicated that Juror No. 10 had "expressly indicted that her note

---

[3] The transcripts reflecting these interviews have not been released to counsel.  It is
for these reasons that MGA has made, concurrent with its motion for new trial, its
motion seeking the disclosure of these transcripts to counsel.

[CORRECTED] MOTION FOR NEW TRIAL
CV 04-09049 DOC (RNBx)

to the Court, indicating the pain [that] she was going through, [was] connected to [Juror No. 8's] statement." *Id.* at 5648.  Given the allegations about Juror No. 8's comments and the Court's investigation, the Court separated Juror No. 8 from the remaining nine jurors and placed her in a separate room.  *Id.* at 5649.  The Court made clear that no matter how the matter was resolved, Juror No. 8 was unfit to serve as a juror in the case, "[m]y sense is that everybody agrees that, under any scenario, ... that Juror No. 8 [name omitted] needs to be excused."  *Id.* at 5656.

After hearing the Court's preliminary findings, the MGA Parties made an oral motion seeking a mistrial on the grounds that they had been deprived of their right to have "a unanimous verdict of a fair and impartial jury."  *Id.* at 5652.

### 4.   The Court's Written Order and Findings.

The Court subsequently issued a written order, Dkt. No. 4115, later amended particularly as to finding number 2 below, Dkt. No. 4238, finding, in pertinent part, that:

(1)   Juror No. 8 made "grossly inappropriate remarks concerning defendant Isaac Larian based on his ethnicity during jury deliberations."  Dkt. No. 4115 at 1;

(2)   Juror No. 8 stated "that her husband, an attorney, [had] told her about [a] client or clients who are Iranian and who are stubborn, rude, stingy, are thieves, and have stolen other person's ideas." *Id.*; [4]

(3)   Juror No. 8's remarks had been "heard, in varying degrees, by some but not all of the jurors." *Id.* at 2;

(4)   Juror No. 8's remarks were made toward the end of deliberations, after the jury had purportedly reached agreement on all of the questions on

---

[4] In its Order of August 8, 2008, the Court amended this finding noting that Juror No. 8 stated that "her husband, an attorney, has told her about a client or clients who are Persian and/or Iranian and who are stubborn, rude, and who have stolen other people's ideas." Dkt No. 4238 at 2.  The Court removed the words "stingy" and "thieves."

[CORRECTED] MOTION FOR NEW TRIAL
CV 04-09049 DOC (RNBx)

1    the Verdict Form about which the jury reached a unanimous verdict.

2    *Id.* at 2;

3       (5)    The jurors indicated in their interviews that they did not believe that

4    Juror No. 8's remarks affected the jury's ultimate decision.  *Id.* at 2;

5       (6)    Notwithstanding paragraph 5, above, some of the jurors believed that it

6    was important to remove Juror No. 8 from the jury and at least one

7    juror indicated that "she felt uncomfortable continuing to serve with

8    Juror No. 8 after the remarks were made."  *Id.* at 2;

9       (7)    The jurors indicated that they believed they could be fair to the parties

10    in Phase 1(b) of the trial if Juror No. 8 was removed but some feared

11    that they might actually be biased if she continued to serve.  *Id.* at 2.

12    With the agreement of both parties, the Court dismissed Juror No. 8 from further

13    service on the panel.  *Id.* at 2.

14       While making these findings, the Court concluded that the Phase 1(A) verdict

15    need not be set aside because "Juror No. 8 was not biased *in the legal sense*."  Dkt.

16    No. 4238 at 11 (emphasis added).  The Court did not conclude that Juror No. 8 was

17    *not* a racist, i.e., that she did not harbor the views she ascribed to her husband.  In

18    fact, the Court vilified her for "harbor[ing] such a feeling."  7/25/08 Trial Tr. at

19    5655-56.  Instead, the Court noted that Juror No. 8 *represented* that she could "'lay

20    aside' her biases or her prejudicial experiences" and that she was not asked

21    specifically in voir dire about her views on Iranians and Persians.  Dkt. No. 4238 at

22    4.

23       The jury went on to render its Phase 1(B) verdicts.

24    **NEWLY DISCOVERED EVIDENCE**

25    **A.**    <u>**The Bratz Brief.**</u>

26       On January 14, 2008, Mattel produced M0079765, entitled "The Bratz

27    Brief."  On its face, The Bratz Brief attributes the failure of Barbie to factors that

28    had nothing to do with MGA or Bratz, and the success of Bratz to MGA's hard

- 16 -

1   work and creativity and other factors that had nothing to do with what Carter

2   Bryant drew.

3        The Bratz Brief was produced on plain paper without identifying marks, and

4   no cover e-mails or other documents explaining its genesis were produced by

5   Mattel at any point in the Phase 1 case.  MGA then spent the rest of Phase 1

6   discovery trying to ascertain who was the author of the document, why it had been

7   created and how it was used.  Numerous witnesses were questioned about the

8   document during Phase 1 (Fontanella, Ross, Gomez, Kilpin, Zablow, Scott,

9   Bousquette and Kerner), none of whom were ostensibly able to identify it.

10        Kerner, a Mattel 30(b)(6) witness, was specifically designated on the topic of

11  the effect of Bratz on Mattel products including Barbie and Diva Starz—both of

12  which are discussed in The Bratz Brief.  In fact, the core proposition of The Bratz

13  Brief is that Bratz did not have an effect on Barbie, because she failed all on her

14  own.  Yet despite the admissions of the document directly on topic, Kerner was not

15  prepared and could not identify it or otherwise testify about it.  In fact, down the

16  line, Mattel maintained that the document could not be authenticated.

17        In contrast, here is what MGA now knows about The Bratz Brief after

18  numerous motions to compel granted during Phase 2.  The Bratz Brief was a study

19  commissioned by Mattel's CEO Robert Eckert.  It was written by two other officers

20  of the company, both senior vice-presidents of strategic planning, Jerome Bossick

21  and Sujata Luther.  It was commissioned in or about October or November of 2003.

22  Eckert edited at least one draft of the document, and discussed his edits with

23  Luther.  Later, in June of 2004, Eckert wrote an email entitled "What Happened to

24  Barbie" that tracked the conclusions of The Bratz Brief.  Eckert prepared this

25  analysis for purposes of Mattel's corporate strategic plan.  At the time, Mattel had a

26  significant choice to make in terms of the strategic direction to reinvigorate Barbie,

27  and the understanding conveyed in The Bratz Brief was important to that analysis.

28

1   More than a year later on September 1, 2005, Eckert again recapitulated the

2   analysis found in The Bratz Brief.  He prepared a memorandum for the Mattel

3   Board of Directors that included a section entitled "What Happened to Barbie."

4   That section of the memorandum again closely tracks the conclusions of The Bratz

5   Brief.  In 2005, as in 2004, Mattel was struggling with the strategic question how to

6   reinvigorate Barbie, and considered its analysis of Bratz material to this question.

7   **B.**     **The "What Happened to Barbie" Email.**

8   Relatedly, and as noted above, Mattel produced on March 8, 2010 a

9   document Bates numbered M0949697, the "What Happened to Barbie" email

10   exchange between Mattel's CEO Robert Eckert and the two vice-presidents of

11   strategic planning who had prepared The Bratz Brief, with a copy to the President

12   of Mattel Brands, Bousquette.  The email, dated June 21, 2004, was written by

13   CEO Eckert *after* this lawsuit was filed, in preparation for Mattel's 2004 corporate

14   strategic plan.

15   CEO Eckert testified that it was his practice throughout this litigation to

16   destroy his emails.  Apparently this one was destroyed by Eckert because it has

17   never been produced from his custody.  Accordingly, MGA did not discover the

18   document during Phase 1 discovery.  Rather, the document was produced by Mattel

19   only after the Court granted a motion to compel to search for Bousquette's

20   documents—a motion that was granted despite Mattel's assurances that such

21   documents had already been produced, but which then yielded this email written by

22   Mattel's CEO.

23   The What Happened to Barbie email concedes that Mattel does not own

24   Bratz, with CEO Eckert describing the issue as "open to question."  The What

25   Happened to Barbie email also describes numerous factors responsible for the

26   failure of Barbie, in CEO Eckert's own words, that had nothing to do with Bratz.

27   The What Happened to Barbie email describes factors contributing to the success of

28   Bratz that had nothing to do with Carter Bryant's drawings.

**C.     The New Statute Of Limitations Documents.**

On July 12, 2010, as a result of the testimony of Sal Villasenor, MGA discovered numerous documents had been created by Mattel employees and contractors evidencing Mattel's spying on MGA and other competitors.  Ultimately, MGA discovered in these documents that Mattel had knowledge of Bratz before it ever hit the market.  Despite the Court's order of September 12, 2007 (Dkt. No. 989) requiring Mattel to turn over all information relevant to MGA's statute of limitations and laches defenses, Mattel did not turn over at least three critical documents concerning its early knowledge of Bratz until July and August of this year.

First, there was a February 16, 2001 New York Toy Fair Report, at bates number M 1666021, first produced on July 7, 2010.  An altered version of this document with only the cover memo and without the report was produced in May 2005.  The full report was not produced after the order to compel was granted in September 2007 or at any time since; it was not produced until shortly before the Villasenor deposition.  This document describes Bratz as "Diva Starz with a smarty attitude" and it is apparent that the author had seen Bratz before it ever went onto the market.  Next, there was the "brief summation" of the 2001 New York Toy Fair Report, also dated February 16, 2001, which also discussed Bratz and was circulated to the entire Boys Business Unit.  This document, at bates number M 1679865, was produced after the Villasenor deposition.

On August 7, 2010, Mattel produced the complete 2001 New York Toy Fair Report, dated April 2001.  This report was a one hundred (100) page document replete with information about Bratz, including pictures, pricing and advertising plans.  M 1680714-811.

Also in July 2010, Mattel produced for the first time its January 14, 2002 New Brand Cannibalization Study, M 1665879.  In connection with this detailed study, Mattel had developed and deployed a new methodology involving more than

1  a thousand girls in shopping malls from a dozen geographic markets.  The study

2  was a quantitative look at the impact of Bratz on Barbie and other Mattel brands

3  across different age groups.  The study definitively evidences Mattel's knowledge

4  of harm to its business attributable to MGA as of the January 14, 2002 date.

5      This precise testimony was relevant and responsive to Phase 1 and should

6  have been introduced and used at trial.

7                            **ARGUMENT**

8  **I.    THE COURT SHOULD GRANT A NEW TRIAL OF ALL PHASE 1**
       **PROCEEDINGS.**
9

10      This Court is empowered to, and should, vacate the verdicts pursuant to

11  Federal Rule of Civil Procedure 59.  Based on the Ninth Circuit Opinion, an order

12  vacating the verdicts is appropriate.  The legal error as to contractual interpretation

13  was a predicate for legal elements of all of the other key instructions.  Erroneous or

14  inadequate jury instructions are a basis for new trial.  *See Murphy v. City of Long*

15  *Beach*, 914 F.2d 183, 186 (9th Cir. 1990).  In three separate places in the opinion,

16  the Ninth Circuit expressly discussed the necessity of a retrial on remand,

17  culminating in its pronouncement that "the entire case will probably need to be

18  retried."  *Id.* at 10548; *see id.* at 10539-40 ("On remand, Mattel might well

19  convince a properly instructed jury . . . ."), 10548 ("On remand, Mattel will have to

20  convince a jury. . . .").[5]

21      Moreover, given the errors identified by the Ninth Circuit, a new trial as to

22  all claims and findings must be ordered.  A partial new trial is appropriate only

23  _____
   [5] Under the doctrine of law of the case, legal issues decided explicitly or by
24  necessary implication are binding upon this Court.  *See Jeffries v. Wood*, 114 F.3d
   1484 (9th Cir. 1997) (en banc).  In vacating the equitable relief, the Ninth Circuit
25  ordered that "any further proceedings must be consistent with our decision."  Slip
   Op. at 10549.  The rule of mandate is a specific expression of the doctrine of law of
26  the case, independently requiring that the verdicts be vacated upon issuance of the
   mandate apart from any motion for new trial.  *See United States v. Thrasher*, 483
27  F.3d 977 (9th Cir. 2007).  MGA understands that the Court wished to proceed by
   way of new trial motion, but reiterates for the record its position that law of the case
28  (which may have a different substantive standard) independently requires that all
   verdicts be vacated as soon as the mandate issues.

1    when the issue to be retried is "so distinct and separable from the others that a trial

2    of it alone may be had without injustice." *Gasoline Prods. Co. v. Champlin*

3    *Refining Co.* (283 U.S. 494, 500 (1931); *Pumphrey v. K.W. Thompson Tool Co.*, 62

4    F.3d 1128, 1133 (9th Cir. 1995).  Stated another way, a partial new trial is

5    appropriate "only in those cases where it is plain that the error which has crept into

6    one element of the verdict did not in any way affect the determination of any other

7    issue." *Pryer v. C.O. 3 Slavic*, 251 F.3d 448, 454-55 (3d Cir. 2001).  Here, it is

8    plain, for the reasons given below, that the errors identified by the Ninth Circuit

9    "crept" into each element of the verdicts—from the jury instructions to the actual

10   verdict forms.

11        Finally, as discussed herein, there were also other instructional errors

12   requiring a new trial, a hung jury on the core question of the case, juror bias that

13   infected the proceedings, and new evidence has since been discovered that also

14   would have likely changed the outcome of the Phase 1(A) proceedings.  All of these

15   grounds also require a new trial.

16   **A.    The Instructional Error On The Contract Claim Infected The
            Entire Case; There Were Other Significant Instructional Errors.**

17

18        The improper contract instructions to the Phase 1 jury removed entirely from

19   the jury's consideration the true meaning of Mattel's Inventions Agreement.

20   Following the Court's instructions formulated after its grant of summary judgment,

21   the jury could only consider the dates of Bryant's employment and the testimony

22   about the timing of conception of the Bratz ideas and sketches, and nothing else.

23   The Ninth Circuit Opinion expressly held that this was instructional error.

24   Prejudice is presumed, and the verdicts cannot stand.  *See, e.g., Galdamez v. Potter*,

25   415 F.3d 1015, 1025 (9th Cir. 2005) (reversing verdict based on instructions that

26   improperly cabined the jury's considerations).

27        Indeed, it is apparent from the face of the verdict forms that the jury *did*

28   decide this case on a misapprehension of the law.  *See Heller v. EBB Auto Co.*, 8

- 21 -

[CORRECTED] MOTION FOR NEW TRIAL
CV 04-09049 DOC (RNBx)

1    F.3d 1433, 1441 (9th Cir. 1993) (reversing verdict when instructions allowed jury

2    to decide case on misapprehension of law).  The language of the questions on the

3    verdict forms was framed with reference to the Court's instruction as to the

4    meaning of Mattel's Inventions Agreement.  The instructions as to how to fill out

5    those forms told the jury that it had to find that Mattel owned ideas and Bratz-

6    related works solely on the basis that they were created, conceived or reduced to

7    practice at any time around the clock during the period of time while Bryant was

8    employed at Mattel.  In other words, "nothing about [these] verdict[s] indicates that

9    the result would have been the same without the error."  *Caballero v. City of*

10   *Concord*, 956 F.2d 204, 207 (9th Cir. 1992).[6]

11          Not only is prejudice presumed, but that prejudice is evident from the trial.

12   The question whether or not Mattel's Inventions Agreement granted an ownership

13   interest in Bratz was *a priori*.  This was the first question that the jury had to

14   answer before it considered anything else, and the approach to this issue colored

15   everything that came after.  Rather than permitting the jury to evaluate the case

16   under a rubric whereby this issue was legitimately contested by MGA, the jury was

17   instructed entirely in Mattel's favor and the jury was basically left to evaluate

18   nothing more than the question whether or not Carter Bryant was a liar and MGA

19   knew it.  MGA started deep in the hole, because the instructions required the jury,

20   as a matter of law, to interpret the Inventions Agreement against Bryant, and

21   therefore against MGA.  This situation was grossly exacerbated by Mattel's

22   eleventh hour then-secret settlement with Bryant, which forced MGA at the last

23   minute to put on the evidence of the timing of Bryant's work, thus linking MGA

24   even more tightly to Bryant in the eyes of the jury.  Indeed, the Ninth Circuit's

25   _____

26   [6] Although Mattel may attempt to argue that the facts support the jury's verdict, that
     is not the inquiry.  "[T]he prevailing party is not entitled to have disputed factual
27   questions resolved in his favor because the jury's verdict may have resulted from a
     misapprehension of law rather than from factual determinations in favor of the
28   prevailing party."  *Caballero*, 956 F.2d at 207.

1    Opinion expressly recognizes the logically *a priori* nature of the relationship

2    between the ownership issue and all of the state law tort claims.  Slip Op. at 10548

3    n. 12 ("We've found that the district court didn't properly analyze whether Mattel

4    owns Bryant's ideas under his contract, so it's premature to try to determine

5    whether MGA's acquisition of them was wrongful.").

6            Conversion and Copyright Infringement.

7            Mattel agreed in its August 20 brief (Dkt. No. 8628), and again on the record

8    at the August 26, 2010 hearing, that the verdict with respect to these claims must be

9    vacated.  Accordingly, there appears to be no dispute as to these claims.

10           Intentional Interference with Contract (Phase 1(A) Instructions 22, 23 and

11   24)

12           These instructions all incorporated by reference the Court's erroneous

13   interpretation of the Inventions Agreement set forth in Instruction 21, holding that

14   the contract was clear, unambiguous, valid and enforceable.  The interference with

15   contract claim cannot be divorced from Instruction 21, which the Ninth Circuit has

16   held was erroneous.  The verdict must be vacated.

17           Aiding and Abetting Breach of Duty of Loyalty (Phase 1(A) Instructions 25,

18   27, 28)

19           These instructions incorporate by reference the scope of Bryant's duties and

20   the Inventions Agreement.  Instruction 25 requires that MGA and Larian knew of

21   the scope of duties and that Bryant's conduct constituted a breach thereof.  In

22   Instruction 21, the scope of Bryant's duties was erroneously held by the Court to

23   unambiguously include disclosure and assignment of ideas, as well as inventions

24   created during off hours outside the scope of employment.  Because these

25   instructions were dependent upon an erroneous definition of the scope of Bryant's

26   duties, the verdict must be vacated.

27           Additionally, as noted above, Mattel argued in closing that it met the required

28   harm element of this claim because of the ownership issue as erroneously

[CORRECTED] MOTION FOR NEW TRIAL
CV 04-09049 DOC (RNBx)

1  instructed.  The way Mattel tried the case, all state law claims were premised upon

2  MGA's purported theft of Bratz.  Mattel claimed that it was harmed by Bryant's

3  breach of fiduciary duty and duty of loyalty because Bryant took to MGA that

4  which Mattel owned.  Mattel claimed damages on all of its claims because Bryant

5  took to MGA that which belonged to Mattel.

6      Additionally, Instruction 28 directed the jury to find that Bryant breached his

7  duty of loyalty as a matter of law because he signed an agreement with MGA.  This

8  was also erroneous.  The signing of a contract to work with a competitor, by itself,

9  is not a breach of the duty of loyalty.  California law allows just what Bryant did.  It

10  authorizes discussions and full-scale planning of one's next job.  *See, e.g., Mamou*

11  *v. Trendwest Resorts, Inc.*, 81 Cal. Rptr. 3d 406, 433-34 (Cal. App. 2008)

12  (formation of competing company does not breach duty of loyalty); 19 WILLISTON

13  ON CONTRACTS § 54.27 at 467 (4th ed. 2008) (at-will employees may plan and

14  prepare to create a competitive enterprise).  There is no precedent requiring an

15  employee to quit and clear out his desk *before* accepting a new job, or holding the

16  employee liable for giving two weeks notice after accepting a job, rather than

17  leaving the employer in the lurch.  Indeed, to prohibit this activity would run afoul

18  of California's strong policy favoring employee mobility.  *See* Cal. Bus. & Prof.

19  Code § 16600.  And even were it possible that Bryant's conduct could be

20  considered a violation of his duty of loyalty, which it was not and certainly not as a

21  matter of law, whether an employee has breached his duty of loyalty is a question

22  for the trier of fact.  *See Bancroft-Whitney Co. v. Glen*, 411 P.2d 921, 935 (Cal.

23  1966).  Instruction 28 improperly took the issue from the jury.

24      Aiding and Abetting Breach of Fiduciary Duty (Phase 1(A) Instructions 25,

25  26, 28)

26      These instructions incorporate by reference the scope of Bryant's duties and

27  the Inventions Agreement.  Instruction 25 requires that MGA and Larian knew of

28  the scope of duties and that Bryant's conduct constituted a breach thereof.  In

[CORRECTED] MOTION FOR NEW TRIAL
CV 04-09049 DOC (RNBx)

1   Instruction 21, the scope of Bryant's duties were erroneously held by the Court to

2   unambiguously include disclosure and assignment of ideas, as well as inventions

3   created during off hours outside the scope of employment.  Because these

4   instructions were dependent upon an erroneous definition of the scope of Bryant's

5   duties, the verdict must be vacated.

6       Additionally, as noted above, Mattel argued in closing that it met the required

7   harm element of this claim because of the ownership issue as erroneously

8   instructed.

9       Thus, on all the tort claims, Mattel consistently argued that Bryant took what

10  belonged to Mattel.  Mattel exploited the instructional error regarding the *a priori*

11  issue of the meaning of the Inventions Agreement throughout all claims, thus

12  ensuring that the jury's verdicts on all of the claims would be premised on these

13  instructional errors.  The closing arguments, which as noted above expressly

14  exploited the instructional errors, alone justify vacating the verdicts.  *See*

15  *Medtronic, Inc. v. White*, 526 F.3d 487, 497 (9th Cir. 2008) (reversing judgment as

16  a result of instructional error based on closing argument of counsel).

17      Independently of the errors identified by the Ninth Circuit, however, there

18  were other instructional errors on this claim.  Instruction 28 provided that Bryant

19  was a fiduciary as a matter of law, apparently based upon the language of the

20  Mattel Inventions Agreement.  But, under California law, an employee is only a

21  fiduciary as a matter of law if the employee is an officer who participates in the

22  company's management.  *See Calvao v. Superior Court*, 201 Cal. App. 3d 921, 923

23  (1988); *Odorizzi v. Bloomfield School Dist.*, 246 Cal. App. 2d 123, 129 (1966);

24  *Enreach Tech., Inc. v. Embedded Internet Solutions, Inc.*, 403 F. Supp. 2d 968, 976

25  (N.D. Cal. 2005); Cal. Lab. Code § 2854.  Courts have carefully protected this

26  distinction, insisting that "a corporation cannot make a mail clerk its fiduciary by

27  simply bestowing upon the clerk the title of officer."  *GAB Bus. Servs., Inc. v.*

28  *Lindsey & Newsom Claim Servs., Inc.*, 83 Cal. App. 4th 409, 420 (2000).  Given

[CORRECTED] MOTION FOR NEW TRIAL
CV 04-09049 DOC (RNBx)

1   this default rule, a low-level employee would not expect to be a fiduciary with his

2   primary goal to advance Mattel's interests even above his own.  *Worldvision*

3   *Enterprises, Inc. v. American Broadcasting Cos.*, 142 Cal. App. 3d 589, 595 (1983)

4   (explaining that since employer-employee is not a presumed fiduciary relationship,

5   "additional ties must be brought out in order to create the presumption of a

6   confidential relationship between the two.").  An employee would not expect that to

7   change merely by signing an agreement that references the "trust" that the employer

8   is placing in the employee.  To allow Mattel to circumvent the default rule and

9   impose fiduciary duties (and tort liability) on low-level employees based upon a

10  confidentiality agreement that uses the phrase "trust" means that all of Mattel's

11  employees, even its mail clerks, are now its fiduciaries.

12       Nor do confidentiality agreements, especially illegible boilerplate ones such

13  as Mattel's Inventions Agreement imposed upon Bryant, transform an employee

14  into a fiduciary.  *See City of Hope Nat'l Med. Ctr. v. Genentech, Inc.*, 181 P.3d 142

15  (Cal. 2008) (holding that routine confidentiality obligations do not create fiduciary

16  relationships); *Rickel v. Schwinn Bicycle Co.*, 144 Cal. App. 3d 648, 653-54 (1983);

17  *Waverly Prods, Inc. v. RKO Gen., Inc.* 217 Cal. App. 2d 721, 730-35 (1963);

18  *Portney v. CIBA Vision Corp.*, No. 07-0854, 2008 U.S. Dist. LEXIS 106677 at *7-

19  12 (C.D. Cal. July 17, 2008) ("In a world where the exchange of information and

20  technology is indispensable to national and international commerce, such an

21  exchange will rarely suffice to create a fiduciary [duty]."); *Goodworth Holdings*

22  *Inc. v. Suh*, 239 F. Supp. 2d 947, 960 (N.D. Cal. 2002) (explaining that "[a]

23  fiduciary relationship . . . does not arise simply because parties repose trust and

24  confidence is reposed in each other." (citations omitted)); *City Solutions, Inc. v.*

25  *Clear Channel Commc'ns*, 201 F. Supp. 1035, 1050 (N.D. Cal. 2002) (same).

26  Specifically, in employer-employee relationships, an express obligation of an

27  employee to keep company trade secrets confidential is insufficient to establish a

28  fiduciary relationship.  *Rita Medical Sys., Inc. v. Resect Medical, Inc.*, No. 2007

1  WL 161049, *6 (N.D. Cal. Jan. 17, 2007) (finding no fiduciary duty even where

2  "[t]he [employee's] contract did require him to keep [employer's] trade secrets

3  confidential, to assign patents, and not to compete with [employer].").

4        This issue clearly should not have been directed by the Court in Instruction

5  28.  There is a high likelihood of the potential for inconsistency between the past

6  and current proceedings on the duty issues.  The fiduciary duty claim was parceled

7  out between Phases 1 and 2.  Mattel is claiming that the employees at issue in the

8  Phase 2 claims had duties like Bryant because of the same or similar language in

9  various agreements that they signed.  MGA will be moving for summary judgment

10  on the lack of fiduciary duty.  Assuming the Court adopts the proper legal standard,

11  as it should, then the summary judgment of duty in Phase 1 on the fiduciary duty

12  claim will be revealed as erroneous.  Even if the claim can survive summary

13  judgment in Phase 2, then the Court will be asked to give an instruction on whether

14  the contracts, in and of themselves, created a fiduciary duty.  The Court should not

15  be hamstrung in the retrial by the erroneous Phase 1 instructions on a breach of

16  fiduciary duty claim.  A new instruction will have to be given, and again, there will

17  be inconsistency with Phase 1.

18        Additionally, the retrial will be a complete mess if the Court tries to keep any

19  of the verdicts intact and to instruct a second jury as to their meaning.  The potential

20  for improper duplicative recovery of damages is extremely high.  Given the high

21  degree of overlap of legal and factual issues, a second jury may feel inappropriately

22  hamstrung by a prior result in its own supposedly independent consideration.

23  Especially if the trial is a long one, a carryover verdict could well provide an

24  improper shortcut for a second jury during deliberations.  Alternatively, a second

25  jury may feel the first verdict was wrong, or unjust.  The second jury may seek to

26  undo any holdover verdict *sub silentio*.  The potential for mischief and error is

27  endless.

28

1

2          <u>Fraudulent Concealment</u> (Phase 1(B) Instruction 35)

3          Fraudulent concealment was Mattel's rebuttal to the statute of limitations

4  defenses on the interference with contract and conversion claims.  Since the verdict

5  on both of those claims must be vacated due to the acknowledged instructional

6  error, it makes no sense to allow this dependent rebuttal verdict to stand.

7  Instruction 35 used the language "Bratz-related works" which included, by

8  definition, the ideas and drawings now found not to have been unambiguously

9  covered by the scope of the Inventions Agreement.  Additionally, the phrase "while

10 employed by Mattel" in that instruction perpetuates the ambiguity found by the

11 Ninth Circuit.  The entire notion of what was supposedly fraudulently concealed

12 must be tested with reference to the nature of the original Bryant obligation, and

13 MGA/Larian's understanding thereof, or there can be no meaningful evaluation of

14 the issue.  This dependent rebuttal verdict must also be vacated.

15         <u>Special Verdict</u> (Phase 1(A))

16         The special verdict questions were premised upon the Court's erroneous

17 instruction 21 regarding the meaning of the Inventions Agreement.  The Court

18 equated the relevant verdict questions 1-4 with its erroneous interpretation of the

19 Inventions Agreement ("during the period in which he was employed by Mattel").

20 Questions 5 and 6 incorporate the Court's erroneous construction to unambiguously

21 include "ideas" as well as the timing provision ("while employed by Mattel").  The

22 very foundation for these questions was the Court's erroneous interpretation of the

23 contract.  A new trial is required where special verdict questions may have been

24 improperly influenced by other errors.  *See Lattimore v. Polaroid Corp.*, 99 F.3d

25 456 (1st Cir. 1996).

26         The special verdict cannot withstand the Ninth Circuit's opinion.

27

28

[CORRECTED] MOTION FOR NEW TRIAL
CV 04-09049 DOC (RNBx)

**B.     The Jury Hung On The Core Question In The Case, Necessitating A Mistrial.**

There is another critical problem with the special verdict questions:  the jury did not reach a verdict on four of the questions.  On four lines of Question 1, the jury did not check either "yes" or "no" as to whether the listed exhibits had been created between January 4, 1999 and October 19, 2000.

MGA's theory of the case at trial was that Bryant had conceived and reduced to practice his original drawings during the summer of 1998 (on nights and weekends while he was working at Old Navy), and had elaborated them later in his off hours during the period of time he was employed by Mattel.  The jury failed to reach a verdict on exactly that issue.  The four drawings for which the jury could not answer questions were the same four drawings identified by Mattel's counsel in closing as the original drawings that Bryant drew in the summer of 1998 as inspired by the students at Kickapoo High School in Missouri.  In other words, the jury could not agree whether Carter Bryant had conceived and reduced Bratz-related works to practice prior to Bryant's period of reemployment by Mattel.

The jury's failure to reach a verdict on those four lines of Question 1 in the Phase 1(A) verdict was thus a failure to come to consensus *on the core issue of the case*—whether Carter Bryant was telling the truth about his 1998 conception, and by extension, whether MGA was plainly justified in believing him *since he had been telling the truth.*  The Court completely failed to grapple with the meaning of these four unanswered questions, which had legal reverberations throughout the entire case—at least with respect to the scope of ownership, the scope of potential infringement, the nature of any claimed harm, the amount of any claimed harm, and fraudulent concealment.  If the jury in fact believed that MGA owned the original ideas and conception, then the entire case would have been postured differently both for the tort liability and for Phase 1(B).  It was the Court's obligation to determine the significance of the jury's failure to answer these four questions, and

- 29 -

1   to grapple with the resulting legal implications.  *California v. Altus Finance S.A.*,

2   540 F.3d 992, 1099 (9th Cir. 2008) ("To do other than send the case back for a new

3   trial when decision on a vital issue by the jury is missing would deprive the parties

4   of the jury trial to which they are entitled constitutionally" (citation and internal

5   quote omitted) (reversing for new trial); *Union Pac. R.R. Co. v. Bridal Veil Lumber

6   Co.*, 219 F.2d 825, 831 (9th Cir. 1955) ("the disagreement of the jury on one vital

7   question left a gaping hole in the special verdict") (reversing for new trial).[7]

8        The jury's failure to answer four lines of Question 1 corresponding to the

9   exhibits reflecting the original conception and reduction to practice of Bratz is an

10  independent ground for new trial.

11       **C.    MGA Hereby Renews Its Motion To Unseal The Juror Interview
              Transcripts; All Verdicts Must Be Vacated Because Of Juror
12            Misconduct.**

13       Juror misconduct also is an independent ground for new trial.  The

14  introduction of the extrinsic evidence of the "racial traits" of someone Mr. Larian's

15  ethnicity and the mere presence of a biased—racist—juror is grounds for a new

16  trial.  *See United States v. Rosenthal*, 454 F.3d 943, 950 (9th Cir. 2006) (extrinsic

17  evidence); *Thompson v. Altheimer & Gray*, 248 F.3d 621, 625 (7th Cir. 2001)

18  (biased juror).

19       The Seventh Amendment guarantees Mr. Larian and MGA the right to an

20  unbiased jury.  *See, e.g., McCoy v. Goldston*, 652 F.2d 654, 657 (9th Cir. 1981).

21  Just as "[o]ne racist juror [is] enough" in a criminal case, *United States v. Henley*,

22  238 F.3d 1111, 1121 (9th Cir. 2001), it is enough in a civil case as well. Just as in a

23  criminal case, "[t]he Seventh Amendment requires jury verdicts to be unanimous."

24  ─────────────
    [7] Counsel for both sides were asked to opine whether they were of the view that the
25  jury had hung because of the unanswered questions.  But the parties did not know
    *which* questions were unanswered.  Without having reviewed the verdict form and
26  reviewed which questions remained unanswered, MGA's counsel tentatively agreed
    that the jury had not hung.  For the reasons set forth in the text, it was the Court's
27  duty to determine the significance of the unanswered questions, irrespective of the
    position of MGA's counsel at a time when MGA did not even know which
28  questions were unanswered.

[CORRECTED] MOTION FOR NEW TRIAL
CV 04-09049 DOC (RNBx)

1    *Murray v. Laborers Union Local No. 324*, 55 F.3d 1445, 1451 (9th Cir. 1995).

2    Thus, the presence of even one juror that harbors bias is sufficient to undermine the

3    legitimacy of any verdict.   "[T]he integrity of the jury system is no less to be

4    desired in civil cases."  *Rinker v. County of Napa*, 724 F.3d 1352, 1354 (9th Cir.

5    1983).  Stated another way, "Denial of the right to an unbiased tribunal is one of

6    those trial errors that is not excused by being shown to have been harmless."

7    *Thompson*, 248 F.3d at 625.

8         Moreover, while Judge Larson concluded that the misconduct at issue did not

9    warrant a mistrial, respectfully, that decision was clearly erroneous.  As such, it can

10   be, and should be, overturned by this Court.  *Preaseau v. Prudential Ins. Co. of

11   Am.*, 591 F.2d 74, 80 (9th Cir. 1979) (upon reassignment of case prior orders may

12   be reversed where the newly assigned judge "after examination of the record . . . is

13   firmly convinced that an error of law has been committed . . ." (citation and internal

14   quotes omitted)); *Castner v. First Nat'l Bank of Anchorage*, 278 F.2d 376, 380 (9th

15   Cir. 1960) (same); *E.E.O.C. v. Serrano's Mexican Restaurants, LLC*, 306 Fed.

16   Appx. 406, 407 (9th Cir. 2009) (same).

17        Judge Larson's prior decision on this issue was clearly erroneous for at least

18   three reasons.  First, Judge Larson excused Juror No. 8's failure to disclose bias

19   because she was not asked specifically about anti-Iranian bias.  Dkt. No. 4238 at 7-

20   8.  However, there can be no dispute that the Court asked Juror No. 8 whether she

21   could be fair and impartial.  She said that she could be.  As the Ninth Circuit has

22   held, this type of general question about biases and prejudices is enough to demand

23   a response that would uncover racial bias once the Court has given the juror an

24   overview of the case.  *See Medrano v. City of Los Angeles*, 973 F.2d 1499, 1507-08

25   (9th Cir. 1992); *United States v. Click*, 807 F.2d 847, 850 (9th Cir. 1987).

26        Second, while the Court credited the fact that Juror No. 8 *said* that she could

27   be unbiased, in light of this record, that is simply not enough.  Even were it the case

28   that a juror's good faith belief in her impartiality were enough, which it is not,

[CORRECTED] MOTION FOR NEW TRIAL
CV 04-09049 DOC (RNBx)

1   *United States v. Shapiro*, 669 F.2d 593, 601 (9th Cir. 1982), the fact that Juror No.

2   8 would choose to share the racial slurs is enough to show her racial bias.  As the

3   Ninth Circuit has common sensically concluded—and indeed as the Court

4   recognized—"those who use racial slurs—and thus by extension statements

5   regarding ethnocentric bias—generally subscribe to the views that the use of such

6   terms imply."  Dkt. No. 4238 at 7 (citing *Henley*, 238 F.3d at 1121).

7        Third, the Court incorrectly found that the presence of a racially biased juror

8   was not a sufficient basis to overturn the verdict *in a civil case*.  Dkt. No. 4238 at 9-

9   10.  This too, as noted above, is wrong.  Litigants in criminal *and* civil cases are

10  entitled to a jury unsullied by preconceived notions, particularly those as pernicious

11  as racial prejudice.

12       Finally, if the above is not sufficient, this Court should unseal the Court's

13  interviews of the jurors.  The Court made explicit that its findings regarding the

14  effect of Juror No. 8 was based on the "read[ing] and rereading" of those interview

15  transcripts.  7/25/08 Trial Tr. at 5963.  Moreover, the Court expressly recognized

16  that counsel's inability to fully flesh out the arguments hindered counsel.  It

17  recognized that its refusal to release the transcripts "put[] the court in the awkward

18  position of being the sole possessor of the information" and placed counsel at

19  "somewhat of a disadvantage . . . ." *Id.*  And so it does.  Indeed, more than that, it

20  violates MGA's due process rights.  *See, e.g.*, *Green v. Reynolds*, 57 F.3d 956, 960

21  (10th Cir. 2005) ("essentials of due process" include "meaningful access to the

22  pertinent information considered by the . . . Court").

23       For these reasons, the transcripts should be provided to counsel and the racial

24  bias of Juror 8 should be determined an independent and sufficient ground for

25  granting a new trial.

26

27

28

[CORRECTED] MOTION FOR NEW TRIAL
CV 04-09049 DOC (RNBx)

**D.**   **Newly Discovered Evidence And Discovery Misconduct By Mattel Requires That All Verdicts Be Vacated.**

Finally, there is significant new evidence that necessitates vacating the Phase 1 verdicts and granting a new trial. *See Jones v. Aero/Chem Corp.*, 921 F.2d 875 (9th Cir. 1990). This evidence is significant, should have been produced during Phase 1. The failure to produce it is the result of discovery misconduct by Mattel and not a lack of diligence on the part of MGA. Accordingly, new trial is warranted on the additional ground of newly discovered evidence. Some of that key evidence is discussed herein, but given the time constraints MGA has not had an opportunity to compile a complete listing of every item of new evidence discovered during the Phase 2 proceedings that would have a material impact on the claims already tried.

Newly Discovered "The Bratz Brief" and "What Happened to Barbie?" Evidence.

The Bratz Brief, What Happened To Barbie email, and September 1, 2005 What Happened to Barbie board memorandum from Eckert are all key pieces of evidence that would have impacted the outcome of the Phase 1 trial. These documents demonstrate that the failure of Mattel's Barbie brand products had happened long before Bratz entered the market, and that Bratz's success was attributable to factors other than the Bryant drawings. These documents bear directly on issue of causation of harm and damages.

Newly Discovered Statute of Limitations Evidence.

The statute of limitations defense was one of the most hotly contested defenses during Phase 1. Definitive evidence of Mattel's knowledge of Bratz before it ever entered the market would have been highly significant. Mattel's rebuttal of fraudulent concealment is completely belied by evidence that Mattel was systematically spying on MGA and other competitors, and was fully aware of the products before they ever entered the market.

- 33 -

1

## CONCLUSION

2        For the foregoing reasons, the Phase 1 verdicts should be vacated in their

3   entirety.

4

5   Dated:  August 30, 2010        ORRICK, HERRINGTON & SUTCLIFFE LLP

6

7                                        */s/ Annette L. Hurst*
                                         Annette L. Hurst
8                              Attorneys for the MGA Parties and IGWT 826

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28