QUINN EMANUEL URQUHART & SULLIVAN, LLP
  John B. Quinn (Bar No. 090378)
  (johnquinn@quinnemanuel.com)
  Michael T. Zeller (Bar No. 196417)
  (michaelzeller@quinnemanuel.com)
  Jon D. Corey (Bar No. 185066)
  (joncorey@quinnemanuel.com)
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Attorneys for Mattel, Inc. and
Mattel de Mexico, S.A. de C.V.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| MATTEL, INC., a Delaware corporation,<br><br>    Plaintiff,<br><br>vs.<br><br>MGA ENTERTAINMENT, INC., a Delaware corporation,<br><br>    Defendant.<br><br>AND CONSOLIDATED ACTIONS | CASE NO. CV 04-9049 DOC (RNBx)<br>Consolidated with<br>Case No. CV 04-09059<br>Case No. CV 05-02727<br><br>NOTICE OF DEPOSITION OF MGA ENTERTAINMENT, INC. PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 30(B)(6)<br><br>(Third Phase 2 Notice) |

00505.07975/3586515.4

number(s) for or otherwise associated with such account and the name of each holder, including without limitation, each beneficial holder, of each such account.

Y. "Any" as used in these Topics includes the word "all," and the word "all" as used in these Topics includes the word "any."

Z. The singular form of a noun or pronoun includes within its meaning the plural form of the noun or pronoun so used, and vice versa; the use of the masculine form of a pronoun also includes within its meaning the feminine form of the pronoun so used, and vice versa; the use of any tense of any verb includes also within its meaning all other tenses of the verb so used, whenever such construction results in a broader request for information; and "and" includes "or" and vice versa, whenever such construction results in a broader disclosure of documents or information.

## Topics of Examination

1. Any and all qualitative and quantitative MARKET RESEARCH conducted by or on behalf of MGA RELATING TO or including any MATTEL product, and/or any attributes of any MATTEL product, including but not limited to the manner, methodology and results of such research. This includes but is not limited to such research RELATING TO the following products, as used in MGA's Complaint, dated April 13, 2005:

(a) BRATZ;
(b) My Scene;
(c) Flavas;
(d) Diva Starz;
(e) BRATZ Petz;
(f) My Scene Pets;
(g) 4-Ever Best Friends;
(h) Wee 3 Friends;
(i) Mommy's Little Patient;
(j) Little Mommy Potty Training Baby Doll;

   (k) Alien Racers; and

   (l) AcceleRacerS

  2. All facts of which YOU are aware indicating that any MGA product took market share or sales from any MATTEL product.

  3. All facts of which YOU are aware indicating that any MATTEL product took market share or sales from any MGA product.

  4. The purposes, functions, and operation of YOUR ArchiveOne database, including, but not limited to, the reasons YOU adopted or implemented the ArchiveOne database, its search capabilities, all custodians contained in the ArchiveOne database, the identity of all MGA employees who have been excluded from the database and the reasons for their exclusion, and the destruction or deletion of any data from the ArchiveOne database at any time.

  5. YOUR indemnification agreement with BRYANT, including without limitation:

   (a) All written and oral COMMUNICATIONS with the Internal Revenue Service referring or relating to YOUR agreement to pay the legal fees of BRYANT, including those found at MGA2 1739846-1740228.

   (b) All DOCUMENTS that YOU provided the Internal Revenue Service in response to its request for "all legal agreements with Mr. Carter Bryant, which describe the royalty arrangement in effect with Mr. Bryant and terms of employment," referenced in MGA2 1739846-1739863, at MGA2 1739846.

   (c) The "indemnification agreement with Bryant whereby [MGA] agreed to indemnify Bryant for up to 90% of legal expenses incurred by Bryant as a result of the agreement he entered into with MGA," referenced in MGA2 1740036-1740055, at MGA2 1740043.

   (d) The preparation of "Issue 3," relating to YOUR agreement to pay the legal fees of BRYANT, in YOUR Presentation to the Internal Revenue Service

1  Appeals Division, dated March 5-6, 2009, found at MGA2 1740099-1740152, at
2  MGA2 1470143-1470144.

3      (e)    The factual basis supporting YOUR statement that the Internal
4  Revenue Service was "incorrect" in its position that "MGA incurred legal expenses to
5  defend Bryant when it had no legal obligation to do so," referenced in MGA2 1740036-
6  1740055, at MGA2 1740045.

7      (f)    The factual basis supporting YOUR statement that "MGA was liable
8  for 90% of the legal expenses incurred by Bryant stemming from agreements Bryant
9  entered into with MGA," referenced in MGA2 1740036-1740055, at MGA2 1740052.

10      (g)    The factual basis supporting YOUR statement that "MGAE agreed
11  to pay for certain of Carter Bryant's legal fees and expenses in connection with the
12  litigation, but did not agree to indemnify Bryant as to the outcome of the litigation,"
13  referenced in MGA2 1740227-1740228, at MGA2 1740227.

14      6.    The creation, design and development of BRATZ HEAD GAMEZ.
15      7.    The creation, design and development of BRATZ HOLLYWOOD.
16      8.    The creation, design and development of BRATZ SECRET DATE.
17      9.    YOUR knowledge of MATTEL's My Scene Swappin' Styles theme
18  prior to January 19, 2005.
19      10.    YOUR knowledge of MATTEL's My Scene Hollywood theme prior
20  to January 19, 2005.
21      11.    YOUR knowledge of MATTEL's My Scene Mystery Date concept.
22      12.    All MGA practices and policies RELATING to the consideration,
23  recruitment, potential hiring and hiring of potential MGA employees, including without
24  limitation any written materials that must be signed, forms that must be filled out, or
25  information MGA requires before it will discuss employment with potential employees.
26      13.    YOUR consideration, recruitment, potential hiring or hiring of the
27  following: Omar Busailah, Ricardo Abundis, Janine Brisbois, Jorge Castilla, Dan
28

Cooney, Nick Contreras, Alice Kao, Ken Kauffman, Jill Hatch, Ron Rae, Jim Huntley, Patrick Potgiesser or Thomas Pfau.

14. BRAWER'S involvement in YOUR consideration, recruitment, potential hiring or hiring of any MATTEL PERSONNEL, including without limitation all individuals identified in Deposition Exhibit 664.

15. Ricardo Abundis' duties and responsibilities at MGA, and all work performed and services provided to MGA at any time.

16. OUT LICENSE AGREEMENTS for BRATZ that have generated the 10 highest total royalty or other payments to MGA from the licensee from 2001 to the present, including but not limited to the property or rights covered by each such agreement, MGA's understanding of each and every term (including the royalty rates and other payment terms) of each such agreement and MGA's methodologies, practices and procedures regarding the determination of the royalty rates and other payment terms used in each such agreement.

17. OUT LICENSE AGREEMENTS for OTHER DOLL PRODUCTS that have generated the 10 highest total royalty or other payments to MGA from the licensee from 2001 to the present, including but not limited to the property or rights covered by each such agreement, MGA's understanding of each and every term (including the royalty rates and other payment terms) of each such agreement and MGA's methodologies, practices and procedures regarding the determination of the royalty rates and other payment terms used in each such agreement.

18. OUT LICENSE AGREEMENTS for OTHER CHARACTERS that have generated the 10 highest total royalty or other payments to MGA from the licensee from 2001 to the present, including but not limited to the property or rights covered by each such agreement, MGA's understanding of each and every term (including the royalty rates and other payment terms) of each such agreement and MGA's methodologies, practices and procedures regarding the determination of the royalty rates and other payment terms used in each such agreement.

19.     IN LICENSE AGREEMENTS for OTHER DOLL PRODUCTS that have generated the 10 highest total royalty or other payments from MGA to the licensor from 2001 to the present, including but not limited to the property or rights covered by each such agreement, MGA's understanding of each and every term (including the royalty rates and other payment terms) of each such agreement and MGA's methodologies, practices and procedures regarding the determination of the royalty rates and other payment terms used in each such agreement.

20.     IN LICENSE AGREEMENTS for OTHER CHARACTERS that have generated the 10 highest total royalty or other payments from MGA to the licensor from 2001 to the present, including but not limited to the property or rights covered by each such agreement, MGA's understanding of each and every term (including the royalty rates and other payment terms) of each such agreement and MGA's methodologies, practices and procedures regarding the determination of the royalty rates and other payment terms used in each such agreement.

21.     All YOUR COMMUNICATIONS with SALEMNIA prior to and including February 17, 2003.

22.     SALEMNIA'S position and job responsibilities while employed by YOU, including but not limited to the specific nature, type, extent, quality and timing of work and services that SALEMNIA provided to, performed, or were requested, solicited or proposed by YOU, the work product that she generated, reviewed, revised and/or contributed to, the persons to whom she reported, both directly and indirectly, and the persons who reported to her, both directly and indirectly, at any time from June 1, 2000 through the present.

23.     Payments of money or any other item of value, including but not limited to salary, wages, bonuses, perks, and gifts, that YOU, including but not limited to MGA's executives, employees, licensees, agents, contacts, and acquaintances, have made to, for or on behalf of SALEMNIA since June 1, 2000, including, without limitation, (a) the amounts of each such payment and the equivalent dollar value of

each item of value, (b) the timing of each such payment, (c) the IDENTITY of each payor and payee of each such payment, (d) the IDENTITY of each bank or financial institution account to which such payment was made, and (e) the reasons for each such payment.

24. SALEMNIA's performance as an employee of MGA, including but not limited to evaluations or other measures of her performance, comparisons of her performance with respect to expectations or goals for her position, and reviews of her work.

25. The circumstances and events surrounding the resignation, termination and departure of SALEMNIA from MGA, including but not limited to the timing and reason(s) for her resignation, termination and departure; the purpose, preparation and execution of MGA2 0047760; each of the "documents" referred to in MGA2 0047760 and any copies that were made by SALEMNIA or anyone else at MGA of those documents at any time; all discussions that YOU had with SALEMNIA between May 5, 2008 and May 23, 2008; the selection, hiring, and training of a replacement to handle SALEMNIA'S position or job duties, or any portion thereof, after her resignation or departure; and any COMMUNICATIONS between YOU and ANY PERSON RELATING TO the resignation, termination or departure of SALEMNIA.

26. YOUR knowledge of any planned or actual MATTEL product, process, plan, practice, policy, or any other aspect of SALEMNIA'S employment or potential employment at MATTEL, that SALEMNIA described or shared with YOU.

27. The content, meaning, and authenticity of SALEMNIA's personnel file maintained or created by YOU.

28. Any investigation REFERRING OR RELATING TO SALEMNIA, including the IDENTITY of any PERSON who conducted any such investigation, the witnesses interviewed, and any work product, reports, notes, transcripts, recordings, or

other DOCUMENTS prepared by or for the benefit of any PERSON who conducted such an investigation.

29. YOUR policies, procedures, practices, techniques and processes regarding MARKET RESEARCH for each year from 2000 to the present.

30. COMMUNICATIONS that REFER OR RELATE TO MATTEL or TO any MATTEL product between YOU and third parties, including but not limited to: 1) manufacturers, distributors, wholesalers, retailers, licensees, 2) any contemplated, proposed or potential manufacturers, distributors, wholesalers, retailers, or licensee, and 3) YOUR employees, agents, licensees, manufacturers, distributors, and designers in Hong Kong.

31. YOUR recruiting, hiring, engagement, employment, or retention of MATTEL PERSONNEL, including but not limited to:

(a) COMMUNICATIONS including, but not limited to, those between YOU and any hiring or recruiting agency, REFERRING OR RELATING TO YOUR desire, intent, or need to locate, recruit, contact, or hire any MATTEL PERSONNEL;

(b) COMMUNICATIONS between YOU and any MATTEL PERSONNEL at a time when that individual was not employed by MGA, pertaining to that PERSON's potential or actual recruitment, hiring, engagement, or employment; to MGA's deficiencies, goals, objectives, needs or desires; or to any planned or actual MATTEL product, process, plan, practice or policy.

32. YOUR practices and activities at toy industry fairs and trade shows, including, but not limited to, access to the booths of other toy manufacturers and how such access was obtained, the use of fake drivers' licenses or other identification by YOUR employees, and YOUR security policies for YOUR booth.

33. Information regarding YOUR possession or knowledge of the information described or identified in the Supplemental Response to Interrogatory No. 20 of Mattel, Inc.'s Third Supplemental Objections and Responses to Interrogatory Nos.

20-23 and 28 in MGA Entertainment, Inc.'s Second Set of Interrogatories, served January 11, 2010 and erroneously dated January 11, 2009, including but not limited to:

    (a)    the identification and authentication of any related DOCUMENTS in YOUR possession, custody, or control, physical or electronic, and how you came to possess such DOCUMENTS;

    (b)    any related processes, procedures, or designs that have been implemented or used in YOUR business operations;

    (c)    the IDENTITY of any MGA employee who had access to related DOCUMENTS during their employment at MGA and any use thereof;

    (d)    the retention, transfer, copying and use of MATTEL DOCUMENTS, files or information by any MATTEL PERSONNEL before, during or after their employment at MGA; and

    (e)    COMMUNICATIONS between YOU and any MATTEL PERSONNEL RELATING TO MATTEL or to any planned or actual MATTEL product, business plan, line list, DOCUMENT or pricing.

    34.    All versions of YOUR EMPLOYEE AGREEMENTS, including without limitation YOUR understanding of the purpose, meaning, interpretation or significance of YOUR EMPLOYEE AGREEMENTS and any terms contained therein.

    35.    The purpose, meaning, interpretation or significance of any clause in any version of YOUR EMPLOYEE AGREEMENTS by which YOUR employees assign to YOU any ownership of inventions, ideas, creations, works, confidential information, trade secrets, or proprietary intellectual property created, prepared or developed by YOUR employees.

    36.    All changes made to YOUR EMPLOYEE AGREEMENTS over time, including without limitation YOUR reasons for these changes.

    37.    Any enforcement of YOUR EMPLOYEE AGREEMENTS by YOU, including any actions, lawsuits, demands, or claims that were threatened or

1  filed by YOU against any of YOUR employees or former employees relating to or
2  concerning violations of YOUR EMPLOYEE AGREEMENTS.
3         38.    Any training, instruction, or explanation provided by YOU
4  regarding the purpose, meaning, interpretation or significance of YOUR
5  EMPLOYEE AGREEMENTS and any terms contained therein.
6         39.    Any rules, guidelines, policies, practices or procedures relating
7  to or concerning YOUR ownership of inventions, ideas, creations, works,
8  confidential information, trade secrets, or intellectual property created, prepared or
9  developed by YOUR employees.
10        40.    Any requirement or practice by YOU, at any time since January
11 1, 1995, that YOUR employees sign or execute EMPLOYEE AGREEMENTS.
12        41.    All forecasts and projections of BRATZ revenues, profits and
13 growth rates, including but not limited to the assumptions underlying all such
14 forecasts and projections, prepared by YOU or on YOUR behalf anytime from 2008
15 to the present.
16        42.    YOUR use or knowledge of the use of any WIPING PRODUCT
17 on any media assigned to, used by, possessed by or operated by any MGA current or
18 former employee identified by any party as having knowledge of the underlying
19 facts of this action, including but not limited to the installation, use, operation,
20 removal, deletion or concealment of the installation of any WIPING PRODUCT on
21 any such media.
22        43.    Any and all efforts taken by YOU to collect information
23 regarding YOUR use or knowledge of the use of any WIPING PRODUCT on any
24 media assigned to, used by, possessed by or operated by any MGA current or former
25 employee identified by any party as having knowledge of the underlying facts of
26 this action, including but not limited to the installation, use, operation, removal,
27 deletion or concealment of the installation of any WIPING PRODUCT on any such
28

1 media, including the date on which YOU learned of the use of or knowledge of any
2 WIPING PRODUCT and from whom YOU learned such information.

3       44.    The media on which any WIPING PRODUCT was installed,
4 used, operated, removed, deleted or concealed, including but not limited to the
5 IDENTIFICATION of such media (including the PERSON or PERSONS who used
6 such media), the date or dates on which any WIPING PRODUCT was installed,
7 used, operated, removed, deleted or concealed, IDENTIFICATION of the PERSON
8 or PERSONS who installed, used, operated, removed, deleted or concealed such
9 software.

10       45.    IDENTIFICATION, if possible, for each piece of media on
11 which any WIPING PRODUCT was installed, used, operated, removed, deleted or
12 concealed, of the information on that media that was cleaned, altered, revised,
13 deleted, wiped, destroyed or concealed, including but not limited to any and all
14 efforts undertaken by YOU to identify such information.

15       46.    Any and all policies, procedures or practices, whether formal or
16 informal, regarding the installation, use, operation, deletion, removal or concealment
17 of any WIPING PRODUCT on any computer or any media that YOU own or
18 owned, lease or leased, possess or possessed or is or was in any way under your
19 possession, custody or control.

20       47.    The WIPING PRODUCT or WIPING PRODUCTS that YOU
21 use or used to remove information from hard drives or other media in any computer
22 in your possession, custody or control before such computers were redeployed or
23 disposed of, including but not limited to the name, publisher, vendor, servicer of the
24 WIPING PRODUCT or WIPING PRODUCTS, the PERSON or PERSONS who
25 used the WIPING PRODUCT or WIPING PRODUCTS, and the dates that each
26 WIPING PRODUCT was used.

27       48.    IDENTITY of the person or persons who caused the BeClean
28 software to be installed on, operated or removed from the hard drives identified in

1  the July 12, 2010 Report and Recommendation of the Special Master (Exhibit 1
2  attached hereto).

3      49.   IDENTITY of all PERSONS who, between 12:01 a.m. and 11:59
4  p.m. on April 11, 2007, had physical access to the hard drive or the computer
5  containing hard drive associated with image OAD33AC1 identified in the July 12,
6  2010 Report and Recommendation of the Special Master (Exhibit 1 attached hereto),
7  including but not limited to the time(s) and duration(s) that each PERSON had such
8  access.

9      50.   IDENTITY of all PERSONS who, between 12:01 a.m. and 11:59
10 p.m. on April 11, 2007, electronically or remotely accessed the hard drive or the
11 computer containing hard drive associated with image OAD33AC1 identified in the
12 July 12, 2010 Report and Recommendation of the Special Master (Exhibit 1
13 attached hereto), including but not limited to the time(s) and duration(s) that each
14 PERSON had such access.

15     51.   The physical location of the hard drive or the computer
16 containing hard drive associated with image OAD33AC1 identified in the July 12,
17 2010 Report and Recommendation of the Special Master (Exhibit 1 attached hereto),
18 between 12:01 a.m. and 11:59 p.m. on April 11, 2007.

19     52.   All YOUR COMMUNICATIONS with TUMALIUAN prior to June
20 10, 2002.

21     53.   All YOUR COMMUNICATIONS with TUMALIUAN
22 REFERRING OR RELATING TO any planned or actual MATTEL product, design,
23 process, plan, practice, policy, or any aspect of TUMALIUAN'S employment or
24 potential employment or internship at or for MATTEL.

25     54.   TUMALIUAN'S position and job responsibilities while employed
26 by YOU, including but not limited to the circumstances of his hiring, the specific
27 nature, type, extent, quality and timing of work and services that TUMALIUAN
28 provided to, performed, or were requested, solicited or proposed by YOU, and the

1  projects and/or products that TUMALIUAN worked on, was contemplated to work on,
2  or was involved with.

3        55.    Payments of money or any other item of value, including but not
4  limited to salary, wages, bonuses, perks, and gifts, that YOU, including but not limited
5  to MGA's executives, employees, licensees, agents, contacts, and acquaintances, have
6  made to, for or on behalf of TUMALIUAN including, without limitation, (a) the
7  amounts of each such payment and the equivalent dollar value of each item of value, (b)
8  the timing of each such payment, (c) the IDENTITY of each payor and payee of each
9  such payment, (d) the IDENTITY of each bank or financial institution account to which
10 such payment was made, and (e) the reasons for each such payment.

11       56.    TUMALIUAN's performance as an employee of MGA, including
12 but not limited to evaluations or other measures of his performance, comparisons of his
13 performance with respect to expectations or goals for his position, and reviews of his
14 work.

15       57.    The circumstances and events surrounding the resignation,
16 termination and departure of TUMALIUAN from MGA, including but not limited to
17 the timing and reason(s) for his resignation, termination and departure; the selection,
18 hiring, and training of a replacement to handle TUMALIUAN'S position or job duties,
19 or any portion thereof, after his resignation or departure; and any
20 COMMUNICATIONS between YOU and ANY PERSON RELATING TO the
21 resignation, termination or departure of TUMALIUAN.

22       58.    The circumstances and events surrounding the resignation,
23 termination and departure of TUMALIUAN from MATTEL, including but not limited
24 to the timing and reason(s) for his resignation, termination and departure and any
25 COMMUNICATIONS between YOU and ANY PERSON RELATING TO the
26 resignation, termination or departure of TUMALIUAN from MATTEL.

27       59.    The content, meaning, and authenticity of TUMALIUAN's
28 personnel file maintained or created by YOU.

60. Any investigation REFERRING OR RELATING TO TUMALIUAN, including the IDENTITY of any PERSON who conducted any such investigation, the witnesses interviewed, and any work product, reports, notes, transcripts, recordings, or other DOCUMENTS prepared by or for the benefit of any PERSON who conducted such an investigation.

61. YOUR knowledge of TUMALIUAN's contemplated, planned or actual simultaneous employment at MGA and Mattel, including his role as MGA's "double agent," as referenced in MGA2 1756419.

62. MGA's work after April 3, 2006, on projects identified as performed, completed, advanced, contributed to, participated in, led, organized, or managed, in whole or in part, by CASTILLA, as referred to in Deposition Exhibit 7555, including:

(a) MGA's work on the design and development of the forecast portal, including but not limited to the creation, design, and development of the business and technical requirements, official project plan, and timeline for the forecast portal.

(b) MGA's work on its demand planning process.

(c) The effects that MGA's lack of MIS and/or IT resources and MGA's hiring freeze had on its work.

(d) MGA's work on its inventory management systems and processes

(e) MGA's work on its forecast changes reporting.

(f) MGA's work on its product allocation process.

(g) MGA's work on its DATA WAREHOUSE.

(h) MGA's work on the Forecast Reporting System 1 (FRS1).

(i) MGA's work on the Forecast Reporting System 2 (FRS2).

(j) MGA's work on the Axapta Item Master and Axapta Customer Master.

(k) MGA's work on the automation of manual Excel reports using Access.

1         (l)    MGA's work on integrating Little Tikes and Zapf into MGA's processes and reporting, including but not limited to the problems or road blocks encountered during that process.

        (m)    MGA's work on its new "open-to-buy" process.

        (n)    MGA's work on its Access database.

        (o)    MGA's work on the design, development, and anticipated benefits of any processes, systems, and reports RELATING OR REFERRING TO the items in the bulleted list at the top of MGA2 0048983.

63. MGA's average weekly fill rates at Toys R' Us from 2001 until the present.

64. MGA's average weekly fill rates at Walmart from 2001 until the present.

65. MGA's average weekly fill rates at Target from 2001 until the present.

66. MGA's average weekly fill rates at Kmart from 2001 until the present.

67. MGA's average weekly instock percentages at Toys R' Us from 2001 until the present.

68. MGA's average weekly instock percentages at Walmart from 2001 until the present.

69. MGA's average weekly instock percentages at Target from 2001 until the present.

70. MGA's average weekly instock percentages at Kmart from 2001 until the present.

71. MGA's average weekly "weeks of supply" at Toys R' Us from 2001 until the present.

72. MGA's average weekly "weeks of supply" at Walmart from 2001 until the present.

73. MGA's average weekly "weeks of supply" at Target from 2001 until the present.

74. MGA's average weekly "weeks of supply" at Kmart from 2001 until the present.