UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATTEL, INC., <br>         Plaintiff(s), <br>     v. <br> MGA ENTERTAINMENT, INC., <br>         Defendant(s). | CASE NO. CV 04-9049 DOC (RNBx) <br><br> **O R D E R SUSTAINING OBJECTIONS TO DISCOVERY MATTER ORDER NO. 90** |

Before the Court are MGA Entertainment, Inc. and Isaac Larian (collectively "MGA")'s objections to Discovery Matter No. 90 (the "Objections"). After considering the moving, opposing, replying papers, and supplementary papers, as well as the parties' oral argument and the testimony rendered at the *in camera* hearings on this matter, the Court SUSTAINS the Objections, VACATES Discovery Matter Order No. 90, and REMANDS Mattel's Motion to the Discovery Master for further consideration in light of the instant Order.

**I.   Background**

MGA objects to Mattel, Inc. ("Mattel")'s attempt to obtain discovery into the

1  circumstances in which a two emails was withheld as privileged by MGA.  The withheld emails
2  were the final two correspondence in an email "string" between Larian and fellow MGA
3  executive, Victoria O'Connor.  Mattel's Fourth Amended Answer and Counterclaims alleges
4  that MGA's withholding of the email is an act indictable under federal statutes that proscribe
5  obstruction of justice and mail fraud.
6        The email string at issue began with an October 18, 2002 email from Nathalie
7  Villard, a journalist for a French publication named "Capital," to MGA employee Sandrine de
8  Raspide, seeking information about the birth of Bratz, the variations of Bratz, Bratz's
9  competition with Mattel's products, and Bratz's licenses.  *See* MGA2 0070270.  Raspide
10 responded to Villard that "[p]er company policy, all interviews need to be conducted through
11 Isaac Larian, our CEO."  *See* MGA2 0070269.  Villard carbon copied Larian and another MGA
12 employee named Dave Malacrida to her response, which also included the following message to
13 Larian: "Isaac, Capital is a business magazine . . . that will do a special report on the toy industry
14 worldwide."  *See* MGA2 0070269-0070270.
15       A little more than two hours later, Larian responded to Villard and Raspide
16 informing Villard that he would "be happy to do an interview" upon his return from Hong Kong
17 on October 22, 2010.  *See* MGA2 0070269.  Larian requested "the list of questions" in advance
18 of the interview.  *Id.*  Malacrida was carbon copied on Larian's email to Villard and Raspide.
19       Three days later, on October 21, 2002, Villard responded to only Larian asking to
20 schedule a time for a phone interview.  *See* MGA2 0070268.  Villard also informed Larian that
21 she intended to interview Larian about the following topics: (1) the ingredients of the success of
22 the Bratz; (2) the birth of the Bratz concept; (3) whether there is a "Mr." or "Mrs." Bratz; (4) the
23 number of people involved in the Bratz business at MGA; (5) the extent of any difference
24 between Bratz and Barbie; and (6) Bratz's sales and market share in the United States and
25 overseas.  *See id.*  Larian responded by scheduling the phone interview for October 22, 2010 at
26 10:00 a.m.  *Id.*  On October 23, 2010 at 2:49 a.m., Larian emailed Villard informing her that he
27 enjoyed speaking with her.  Larian carbon copied Malacride to his email to Villard and
28 instructed Malacrida to "send [Villard] [MGA's] recent news clippings by e mail ASAP."  *See*

2

MGA2 070267.

On October 23, 2002 at 12:42 a.m., Villard emailed Larian with a list of follow-up questions, including in relevant part a request for information about the "[d]ate of birth of the Bratz, time of development, [and date of] first launch in the US." *See* MGA2 0070266. Larian responded less than an hour later, on October 23, 2002 at 1:25 a.m., with interlineated responses to Villard's questions. In response to Villard's question about the birth of Bratz, Larian stated, in all capital letters, "BORN SEPTEMBER 2000; 9 MONTHS TO DEVELOP (LIKE A BABY!); LAUNCHED IN THE USA IN JULY 2001 AND IN SPAIN JUNE 2001 (BEFORE USA)." *See* MGA2 0070266.

Larian forwarded his email exchange with Villard to Raspide, as well as fellow MGA executive Victoria O'Connor, with the letters "FYI." *See* MGA2 0070266. A little more than seven hours later, on October 23, 2002 at 8:38 a.m., O'Connor questioned Larian (but not Raspide): "don't you think we should say Bratz was born in October when a certain person was no longer with their company?" *Id.* One minute later, on October 23, 2002 at 8:39 a.m., Larian responded to O'Connor: "good point. Thanks." *Id.*

The final two emails – between O'Connor and Larian – were not produced prior to the phase 1 trial, which concerned ownership of the Bratz intellectual property. The emails were not produced even though they were responsive to one or more requests for production propounded on MGA and Larian on March 14, 2005. Indeed, MGA did not formally acknowledge the existence of the two emails until January 25, 2008, when it served a privilege log listing 2,155 entries. The January 25, 2008 privilege log amended a privilege log served on Mattel by MGA only two days earlier, on January 23, 2008, which listed 2,153 entries. The two additional entries were versions of the email chain that reflected O'Connor's question to Larian and Larian's appreciative response to O'Connor's question.

Mattel challenged MGA's January 23, 2008 and January 25, 2008 privilege logs and moved to compel production of the documents withheld as privileged. On June 5, 2008, on the eve of the phase 1 trial, Judge Larson denied Mattel's motion "based on MGA's counsel's representation that the communications at issue (1) have been individually reviewed by counsel

3

and (2) are privileged in their entirety or, to the extent they are only partially privileged, have already been produced in redacted form such that all non-privileged information is revealed." *See* Dkt. 3921 ¶ 3.

During the phase 1 trial, Larian testified that he confirmed through MGA's attorneys that Bryant conceived (and potentially developed) Bratz in 1998, between Bryant's two stints with Mattel. The phase 1(A) jury concluded that Larian's claimed belief was incorrect, finding that "Mattel prove[d] by a preponderance of the evidence that" all but four of the Bratz drawings and sculpts were "conceived or reduced to practice . . . during the period in which [Carter Bryant] was employed by Mattel." Dkt. 4125 ¶¶ 1-4. The jury also found that Mattel proved by a preponderance of the evidence that Bryant conceived the Bratz characters, as well as the Bratz name while employed by Mattel. *Id.* ¶¶ 5-6. On the basis of these findings, the jury found that both MGA and Larian were liable to Mattel for intentional interference with contractual relations, aiding and abetting Bryant's breach of fiduciary duty, aiding and abetting Bryant's breach of duty of loyalty, and conversion. *See id.* ¶¶ 7-15.

Phase 1(B) ensued, in which the jury was asked to (1) assess damages for the torts it found Larian and MGA had committed; (2) determine whether MGA, Larian, and Hong Kong infringed Mattel's copyrights in the "items [the jury found] were created by Carter Bryant . . . while employed by Mattel and which Mattel had registered with the U.S. Copyright Office," *see* Dkt. 4267 ¶ 22; *see also id.* ¶ 24. The jury was also instructed to assess punitive damages, if any, for the four state law violations committed by Larian and MGA. The jury was instructed to consider whether MGA and Larian acted with malice, oppression, or fraud in interfering with Mattel's contractual relations, aiding and abetting Bryant's breaches of fiduciary duty and loyalty, and converting Mattel's property. *Id.* ¶ 45. The jury assessed no punitive damages against MGA and Larian. *See* Dkt. 4279 ¶¶ 12-17.

MGA retained new counsel to (1) appeal certain post-trial equitable relief ordered by the district court after Phase 1 and (2) handle the phase 2 trial. Soon after the resumption of Phase 2 discovery, in early February 2009, Mattel again challenged the privilege designation as to the documents listed on MGA's January 25, 2008 privilege log. After the Discovery Master

4

ordered an *in camera* review of the two iterations of the email thread, MGA (in consultation with its new counsel) produced two previously withheld iterations of the email chain on August 23, 2009, including the email from O'Connor to Larian and Larian's response.

Eight days later, on August 31, 2009, Judge Larson ordered counsel for MGA to "appear and show cause on September 21, 2009, at 1:30 p.m., why sanctions should not be imposed for their repeated failure to produce th[ese] document[s] at an earlier date." *See* Dkt. 6544 at 3. Judge Larson's Order to Show Cause noted that the previously withheld documents "appear[] relevant to the issue of whether certain acts of copyright infringement were wilful acts of infringement." *See id.* at 2. Judge Larson further noted that the phase 1 jury "found that the infringement [by MGA, Larian, and MGA HK] was not willful" on the basis of an evidentiary record that did not include the withheld communications between O'Connor and Larian. *See id.* Judge Larson's Order to Show Cause requested specific information from MGA's counsel, including (1) the identity of all attorneys who participated in the decision to designate the withheld communications as privileged; and (2) the reason(s) why the communications between O'Connor and Larian were withheld as privileged. *See id.* at 3.

MGA submitted a number of *in camera* declarations in response to Judge Larson's Order to Show Cause. At the September 21, 2009, Judge Larson discharged the Order to Show Cause after finding that the conduct of MGA's counsel did not warrant sanctions. Judge Larson also denied Mattel's request to examine the contents of the *in camera* declarations submitted by MGA's counsel in response to the Order to Show Cause.

On September 11, 2009, Mattel propounded two sets of Requests for Admission (RFA) with nearly identical language.[1] Forty-two requests for production were directed to MGA

---

[1] Rule 36 permits a party to "serve . . . a written request to admit, for the purposes of the pending action only, the truth of any matters . . . relating to: (A) facts, the application of law to fact, or opinions about either; and (B) the genuineness of any described documents." Fed. R. Civ. P. 36(a). Rule 36 used to permit only requests for admission as to matters "of fact," but was amended in 1970 to include the application of law to fact, as well as opinions. The Rule was amended due to the "difficult[y] [of] separat[ing] 'fact' from 'opinion'," as well as the fact that "[a]n admission of a matter

5

Entertainment, Inc. and forty-five requests for production were directed to Larian.[2]  On September 13, 2009, MGA filed responses to the RFAs, in which they objected to 78 of the requests in their entirety and issued qualified responses to the remaining 9 requests.  After Mattel moved to compel MGA to fully respond to the RFAs, MGA supplemented its responses to the RFAs on December 7, 2009.  MGA's "supplemental responses contained only objections to 53 of the 87 [RFAs] [and] [t]he responses to the other 34 requests were qualified in various respects."  Order No. 90 at 8.  On January 11, 2010, Mattel moved to compel full responses, without objection, to 70 of the 87 RFAs served on MGA.

In Discovery Matter Order No. 90, which issued on January 27, 2010, the Discovery Master overruled MGA Entertainment, Inc.'s Objections to RFA Nos. 1, 4 through 22, and 31 through 42. Order No. 90 also overruled Larian's Objections to RFA Nos. 4 through 25 and 34 through 45.  The only objections sustained by the Discovery Master were MGA's objections on the ground of vagueness and ambiguity to RFA Nos. 3 and 26 directed to MGA and RFA Nos. 3 and 28 directed to Larian.

MGA objected to Discovery Matter Order No. 90 on January 29, 2010 on the ground that the Discovery Master erred by overruling MGA's objections on grounds of relevance, attorney-client privilege, and work product.

**II.    Discussion**

Since the Court concludes that the Discovery Master's legal analysis was in error, and the Court is unable to determine which (if not all) of the Discovery Master's rulings on MGA's objections were infected by this legal error, the Court remands the issue to the Discovery Master with instructions to re-consider Mattel's Motion on a Request by Request basis in a manner consistent with this Order.

---

involving the application of law to fact may . . . even more clearly narrow the issues."
*See* Advisory Committee Notes to Fed. R. Civ. 36.

[2] The Discovery Master denied Mattel's *ex parte* application to shorten MGA's time to respond to the Requests for Admission.

6

### A. Relevance

Relying upon language in the then-operative Third Amended Answer and Counterclaims (TAAC) that mirrors language in the operative Fourth Amended Answer and Counterclaims (FAAC), the Discovery Master concluded that the RFAs sought discovery relevant to Mattel's claims and defenses. In so concluding, the Discovery Master did not err. The RFAs seek discovery into (1) MGA's belief that the withheld communications between O'Connor and Larian were privileged; and (2) MGA's belief about the meritoriousness of withholding the subject communications between O'Connor and Larian. Both issues are relevant to Mattel's RICO counterclaim, which alleges that MGA conducted the affairs of an associated-in-fact enterprise through a pattern of racketeering activity that, *inter alia* included acts of obstruction of justice, which requires scienter.

MGA argues that Judge Larson's discharge of the Order to Show Cause was predicated upon a finding that no wrongdoing had occurred. This argument is factually unsound and unavailing as a matter of law. Contrary to MGA, Judge Larson did not absolve either MGA Entertainment, Inc or its Chief Executive Officer of any wrongdoing. He actually concluded that MGA's counsel relied upon representations made by MGA in deciding to withhold the document. In any event, Judge Larson could not – and did not purport to – resolve the factual issue of whether MGA committed obstruction of justice by withholding the two communications. That is an issue to be resolved at summary judgment on the basis of the undisputed facts, or at trial by a fact-finder. And even if Judge Larson had concluded that the counsel was solely responsible for withholding the email, MGA can still be held liable for actions taken by its attorneys on its behalf. *See Newman v. Checkrite Calif., Inc.*, 912 F. Supp. 1354 (E.D. Cal. 1995).

### B. Legal Opinion

Though MGA argues that the RFAs impermissibly seek MGA's legal opinion about whether the withheld communications were privileged, Rule 36 expressly permits a party to request another party to admit the truth of any matters relating to the application of law to fact or opinions about either. *See* Fed. R. Civ. P. 36(a). The Discovery Master properly cited several

7

1  cases in support of this proposition. *See* Order No. 90 at 24-25 (citing *Treister v. PNC Bank*,
2  2007 WL 521935, at *2-3 (S.D. Fla. Feb. 15, 2007); *Jacobs v. Scribner*, 2009 WL 3614567, at
3  *10 (E.D. Cal. Oct. 28, 2009); *Bretana v. Int'l Collection Corp.*, 2008 WL 4334710, at *2 (N.D.
4  Cal. Sept. 22, 2008); *Grimes v. United Parcel Servs.*, 2007 WL 2891411, at *2-3 (N.D. Cal.
5  Sept. 28, 2009); *First Options of Chicago, Inc. v. Wallenstein*, 1996 WL 729816 (E.D. Pa. Dec.
6  17, 1996)).

**C.     Privilege**

8   MGA argues that full responses to the RFAs will disclose information protected by
9   the attorney-client privilege and work product doctrines. The Discovery Master rejected this
10  argument for four reasons: (1) yes or no questions "do not require the disclosure of an attorney's
11  work product or the details of his or her analysis"; (2) the type of information sought by the
12  RFAs "is the same as what a privilege log reveals"; (3) MGA waived "any privilege associated
13  with the particular document[s]" by producing them; and (4) RFAs do not permit a party "to
14  create an impenetrable wall between themselves and their counsel." *See* Order No. 90 at 26-27.
15  It was error for the Discovery Master to overrule MGA's privilege and work product objections
16  on these grounds.

17  Yes or no questions can implicate the attorney-client privilege and/or work product
18  doctrine. As one court recently held, if a request for admission requires a party to "divulge
19  communications otherwise protected by the attorney-client privilege," then the responding
20  party's objections to the RFA must be sustained. *See Bergstrom, Inc. v. Glacier Bay, Inc.*, No.
21  08 C 50078, 2010 WL 257253, at *4 (N.D. Ill. Jan. 22, 2010); *see also Chopra v. Townsend,
22  Townsend and Crew LLP*, No. 07-cv-02447-MSK-MEH, 2008 WL 5101571, at *4 (D. Colo.
23  Nov. 25, 2008) (granting protective order as to requests for admission that sought "disclosures of
24  communications otherwise protected by the attorney-client privilege"); *Sorensen v. Black &
25  Decker Corp.*, 06cv1572-BTM (CAB), 2007 WL 1976652, at *6 (S.D. Cal. April 9, 2007)
26  (denying motion to compel response to RFA that sought disclosure of communication between
27  patentee and its counsel); *Cohen v. McDonnell Douglas Corp.*, No. 4:92CV1048 GFG (CDP),
28  1993 WL 835279, at *3 (E.D. Mo. July 12, 1993) (denying motion to compel as to request that

8

1  responding party admit that "[t]he Division and Program Heads at [defendant] receiving the
2  adverse-impact analysis did not have instructions in the RIF Procedure as to what action to take
3  if the analysis disclosed discrimination against protected groups"); *Cohen v. McDonnell Douglas*
4  *Corp.*, (same); *Matter of Interco Inc.*, 137 B.R. 1008, 1010 (E.D. Mo. 1992) (denying motion to
5  compel request for admission about content of attorney-client communication).

6          Similarly, a request that seeks an admission about an attorney's recollection,
7  conclusions, or beliefs, formed in the course of his legal duties, implicates the work product
8  doctrine.  In *United States v. One Tract of Real Property Together With All Bldgs.,*
9  *Improvements, Appurtenances, and Fixtures*, 95 F.3d 422 (6th Cir. 1996), the court affirmed the
10 district court's denial of a civil forfeiture claimant's motion to compel responses to requests for
11 admission that sought "information about [opposing counsel's] intentions with regard to
12 potential federal charges against claimant's relatives." *Id.* at 428.  Rejecting the conclusion
13 reached by the Discovery Master in this case, the court recognized that "[a]lthough courts most
14 commonly apply the work product privilege to documents and things, the Supreme Court in
15 [*Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385 (1947)] made clear that disclosure of the
16 opinions or mental processes of counsel may occur when nontangible work product is sought
17 through depositions, interrogatories, and requests for admission." *Id.* n. 10.  Because the
18 requests for admission would "reveal [the attorney's] mental impressions, opinions, conclusions,
19 and legal strategies formed in anticipation of specific litigation," the district court in that case did
20 not err in denying claimant's motion to compel.  *Id.*

21         It's possible that the Discovery Master did not intend to articulate a *per se* rule that
22 *all* "questions that are yes or no propositions . . . do not require disclosure of an attorney's work
23 product or the details of his or her analysis." *See* Order No. 90.  But even if the Discovery
24 Master's conclusion were restricted to the RFAs at issue, it would be error.  For example, RFA
25 No. 14 to MGA states: "Admit that MGA knew the document attached hereto as Exhibit 1 never
26 was protected by the attorney-client privilege."  The term "MGA" is defined to include MGA's
27 attorneys, thus requiring MGA to disclose its attorneys' prior mental impressions in fully
28 responding to the RFA.  Other RFAs require the disclosure of attorney-client communications.

9

For example, RFA 24 to Larian requires Larian to admit that he "stated, prior to August 21, 2009, that the [O'Connor-Larian communications] reflects legal advice." The RFA presumably extends to "state[ments]" made by Larian to his attorneys. To the extent it does, MGA's objections should have been sustained.

The Discovery Master also erred by overruling MGA's privilege and work product objections on the ground that the RFAs only seek information traditionally found on a privilege log. A privilege log traditionally identifies "the nature of [] documents, communications, or tangible things not produced or disclosed . . . in a manner that, without revealing information itself privileged or protected, [] enable[s] other parties to assess the claim" of privilege or work product. *See* Fed. R. Civ. P. 26(b)(5).

Many of the RFAs require the disclosure of information not ordinarily found on a privilege log. For example, RFA No. 15 to MGA states: "Admit that MGA knew the [O'Connor-Larian communications] never [were] protected by the work product doctrine." Moreover, as discussed earlier, RFA Nos. 21 and 22 to MGA and RFA Nos. 24 and 25 to Larian concern the content of MGA's statements about the O'Connor-Larian communications, including, by definition, communications with MGA's attorneys about both documents.

Even if some of the RFAs seek information about the withheld communications of the variety traditionally found on a privilege log, such discovery may be duplicative of the information on the original privilege log that listed the communications. In such circumstances, the discovery may be limited under Rule 26(b)(2). *See* Fed. R. Civ. P. 26(b)(2) (providing that discovery may be limited if "the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive").

The Discovery Master also erred in overruling MGA's objections on the ground that MGA's production of the document resulted in the waiver of any privilege associated with the document. "[D]isclosure of the content of a privileged attorney communication constitutes waiver of the privilege as to all other such communications on the subject." *Weil v. Investment/Indicators, Rsrch & Mgmt., Inc.*, 647 F.2d 18, 24 (9th Cir. 1981). The subject matter

of the previously withheld emails is the birth of Bratz and Larian's representations about the birth of Bratz. On the other hand, the subject matter of the RFAs is MGA's prior opinion, prior knowledge, and current belief about whether the withheld communications were protected by the attorney-client privilege and/or work product doctrine. The Discovery Master erred by concluding that MGA's waiver extended to all beliefs and communications *about* the previously withheld documents.[3]

Nor does the crime fraud exception to the privilege and work product doctrines apply. The Discovery Master did not need to consider the application of the crime fraud exception, since he found no privilege or work product issues. However, at the initial hearing on MGA's Objections to Order No. 90, Mattel argued that the Court should conduct an *in camera* crime fraud hearing to the extent the Court was inclined to sustain MGA's Objections. In light of the fact that (1) the subject communications were highly probative to the material issues in phase 1 and (2) were first identified on a *revised* privilege log years after they were first requested by Mattel, the Court found "a factual basis adequate to support a good faith belief by a reasonable person . . . that *in camera* review of the [privileged communications and beliefs concerning the withheld documents] may reveal evidence to establish the claim that the crime-fraud exception applies." *See United States v. Zolin*, 491 U.S. 554, 572, 109 S.Ct. 2619 (1989). The Court ordered that the *in camera* examination of MGA's counsel and Larian occur after MGA filed a responsive pleading to Mattel's FAAC.

On the basis of its *in camera* examination of MGA's counsel and Larian, the Court concludes that the privileged communications concerning the withholding of the communications were not made in furtherance of a criminal or fraudulent scheme. *See In re Napster, Inc. Copyright Litig.*, 479 F.3d 1078, 1090 (9th Cir. 2007), *abrogated on other grounds*

---

[3] Mattel argues that MGA waived any privilege associated with its beliefs or communications about the content of the withheld communications when it provided Judge Larson with *in camera* declarations. However, Judge Larson specifically ordered MGA's counsel to prepare the *in camera* declarations, and compelled or otherwise involuntary disclosures of privileged information do not waive the privilege. *See Transamerica Computer Co. v. IBM*, 573 F.2d 646, 651 (9th Cir. 1978).

1    *by Mohawk Indus., Inc. v. Carpenter*, - - - U.S. - - -, 130 S.Ct. 599, - - - L.Ed.2d - - - (2009).
2    The *in camera* examination also revealed that counsel's beliefs about the communications, as
3    well as the beliefs that informed the decision to list the communications on the January 25, 2008
4    revised privilege log, were not formed in furtherance of a criminal or fraudulent scheme.  *See In*
5    *re Grand Jury Proceedings*, 867 F.2d 539 (9th Cir. 1989) (recognizing that crime fraud
6    exception applies to work product doctrine).  These findings are limited to the application of the
7    crime fraud exception to the privileged communications and protected attorney impressions
8    implicated by the RFAs at issue; they do not preclude Mattel from asking a jury to reach
9    contrary findings in the context of its substantive claims.

10            Next, the Discovery Master erred by overruling MGA's objections on the ground
11   that responding to RFAs always requires an attorney's input.  As explained above, RFAs may
12   implicate the attorney-client privilege or work product doctrine to the extent that the relevant
13   matters of fact, or application of law to fact, concern privileged communications or attorney
14   work product.  For example, RFA No. 15 to MGA states: "[a]dmit that MGA knew the [withheld
15   O'Connor-Larian communications] never [were] protected by the work product doctrine."  The
16   RFA seeks purely factual information about the beliefs formed by MGA and its counsel *at a*
17   *prior time*.  Although counsel may be involved in drafting a response to the RFA, that does not
18   mean that the RFA can seek unrestricted access into otherwise protected matter.

19            Finally, the Discovery Master erred by summarily overruling MGA's objections to
20   the RFAs that sought admissions about: (1) whether the previously withheld communications
21   reflect legal advice; (2) whether the previously withheld communications are protected by the
22   attorney-client privilege; and (3) whether the previously withheld communications are protected
23   by the work product doctrine.  These RFAs seek the application of law to fact, which is
24   permissible under Rule 36.  However, the RFAs may nevertheless seek the application of law to
25   privileged facts – *i.e.*, whether MGA received legal advice resembling O'Connor's about the
26   birth of Bratz.  The Discovery Master did not consider the potential for the "application of law to
27   fact" to reveal privileged or work product information – an issue he must consider on remand.
28            The Discovery Master's errors can be attributed to MGA's failure to properly

12

1  support its objections.  Indeed, MGA's briefing before both the Discovery Master and this Court
2  inexplicably failed to address the Requests for Admission on a request-by-basis.  MGA's
3  briefing also ignored the plain text of Rule 36, which allows RFAs to seek the application of law
4  to fact.  These failures by MGA muddled the issues before the Discovery Master and resulted in
5  the errors identified herein.

6  The Court finds it proper to vacate the Discovery Master's Order and remand this
7  issue for re-consideration by the Discovery Master.  It is clear that a number of the RFAs at issue
8  seek the disclosure of material protected by the attorney-client privilege and work product
9  doctrine.  The crime-fraud exception does not apply to those RFAs.  Nor has MGA waived such
10 protections through its production of the previously withheld documents.  The Discovery Master
11 may nevertheless conclude that information protected by the work product doctrine may be
12 discovered as a result of Mattel's compelling need for the materials.  *See Holmgren v. State*
13 *Farm Mut. Auto. Ins. Co.*, 976 F.2d 573, 577 (9th Cir. 1992); *see also Handgards, Inc. v.*
14 *Johnson & Johnson*, 413 F. Supp. 926, 932 (N.D. Cal. 1976) (compelling production of opinion
15 work product when content of attorney's mental impressions was at issue – and was made at
16 issue by party opposing discovery) (citing 4 J. Moore, Federal Practice P26.64(4), at 26-447 (2d
17 ed. 1975) ("[W]hen the activities of counsel are inquired into because they are at issue in the
18 action before the court, there is cause for production of documents that deal with such activities,
19 though they are 'work product.'").  The Discovery Master may also conclude, in a manner
20 consistent with this Order, that some, but not all, of the RFAs at issue, do not require the
21 disclosure of privileged communications or attorney work product.  These issues were not
22 addressed in the parties' briefing or oral argument, and may be raised for the first time with the
23 Discovery Master.
24 //
25 //
26 //
27 //
28 //

13

### III. Disposition

For the foregoing reasons, the Court SUSTAINS the Objections, VACATES Discovery Matter Order No. 90, and REMANDS Mattel's Motion to the Discovery Master for further consideration in light of this Order. The Discovery Master may order further briefing, as well as additional oral argument, in order to assist his disposition of Mattel's Motion, which must be reached on or before September 25, 2010 in order to preserve the parties' right to object to the Discovery Master's Order prior to the discovery cut-off.

IT IS SO ORDERED.

DATED: September 20, 2010

_____
DAVID O. CARTER
United States District Judge