```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3          HONORABLE DAVID O. CARTER, JUDGE PRESIDING

 4                   - - - - - - -

 5

 6   CARTER BRYANT,                )
                                    )
 7            Plaintiff,            )
                                    )
 8        vs.                       ) No. SACV 04-9049-DOC
                                    )        Volume II
 9   MATTEL, INC.,                  )
                                    )
10            Defendant.            )
     _____)

11

12

13

14          REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                      Hearing

16               Santa Ana, California

17           Wednesday, September 1, 2010

18

19

20

21   Jane C.S. Rule, CSR 9316
22   Federal Official Court Reporter
     United States District Court
23   411 West 4th Street, Room 1-053
     Santa Ana, California 92701
24   (714) 558-7755

25   10-09-01 MattelV2
```

```
1    APPEARANCES OF COUNSEL:

2

3    FOR INTERVENOR DEFENDANT MGA ENTERTAINMENT, INC.:

4              ORRICK, HERRINGTON & SUTCLIFFE, LLP
               BY:  THOMAS S. MC CONVILLE
5                   DENISE M. MINGRONE
                    Attorneys at Law
6              4 Park Plaza
               Suite 1600
7              Irvine, California 92614
               (949) 567-6700
8
               - AND -
9
               ORRICK, HERRINGTON & SUTCLIFFE, LLP
10             BY:  ANNETTE L. HURST
                    Attorney at Law
11             405 Howard Street
               San Francisco, California 94105
12             (415) 773-5700

13

14   FOR DEFENDANT MATTEL, INC.:

15             QUINN, EMANUEL, URQUHART, OLIVER & HEDGES
               By:  JOHN B. QUINN
16                  MICHAEL T. ZELLER
                    JOHN GORDON
17                  Attorneys at Law
               865 South Figueroa Street
18             10th Floor
               Los Angeles, California 90017-2543
19             (213) 443-3000

20

21   Also Present:

22             HON. JAMES L. SMITH (Via Teleconference)

23

24

25
```

1                    **I N D E X**

2

3

4   FURTHER EVIDENTIARY HEARING RE: MATTEL'S MOTION TO COMPEL
    PRODUCTION OF ATTORNEY-CLIENT COMMUNICATIONS

5

6   FURTHER HEARING RE: MGA'S OBJECTIONS TO DISCOVERY MATTER
    ORDER NO. 90

7

8   IGWT 826 INVESTMENTS MOTION FOR JUDGMENT ON THE PLEADINGS
    [8581]

9

10  MATTEL'S EX-PARTE APPLICATION TO STRIKE MGA'S AUGUST 10,
    2010 MOTIONS TO COMPEL [8515]

11

12  MATTEL'S EX-PARTE APPLICATION FOR EXPEDITED DISCOVERY ON
    MGA'S PURPORTED "COMPULSORY COUNTERCLAIMS-IN REPLY" [8640]

13

14  MGA PARTIES' EX-PARTE APPLICATION TO STRIKE DOCKET NO. 8486
    [8522]

15

16

17

18

19

20

21

22

23

24

25

SACV 04-9049-DOC - 09/01/2010 - Vol. II

4

```
 1            SANTA ANA, CALIFORNIA, WEDNESDAY, SEPTEMBER 1, 2010

 2                              VOLUME II

 3                            (7:02 p.m.)

 4            (Live reporter switch with Maria Delleneve.)

 5            MS. HURST:  Your Honor, this has gone back into

 6      the annuls of time during 2007 and representation by prior

 7      counsel.  I can't explain exactly what they did.

 8            THE COURT:  Which counsel again?

 9            MS. HURST:  O'Melveny & Myers, your Honor.

10            THE COURT:  Which counsel?

11            MS. HURST:  I don't know exactly who was

12      responsible for this particular production.  Dale Cendali

13      was the lead attorney at that time, along with Diana Torres.

14            THE COURT:  Just a moment.

15            I'm going to find out.  Just a moment.  I'm going

16      to find out, is Mattel satisfied, and if so, why not?

17            MR. QUINN:  No, your Honor.

18            THE COURT:  Why not?

19            MR. QUINN:  We need an order -- we believe we need

20      an order from this Court.  There have been -- this is

21      pursuant to three discovery master orders, and to bring --

22      to get finality on this, we believe we need an order from

23      this Court.

24            THE COURT:  Just a moment.  I want to give you

25      some direction.
```

1          What I'm doing is giving my law clerk directions,

2    because we are going to spin off our conversation this

3    evening so you have it in printed form later on.

4          That request will be granted, Counsel.

5          Ms. Hurst, if you would have a seat.  Thank you.

6          MS. HURST:  Thank you, your Honor.

7          THE COURT:  The 30(b)(6) testimony on the

8    compel -- compel re: trade dress claims, my orders have been

9    clear that either MGA narrows these claims or Mattel gets

10   full discovery, but it tentatively appears that MGA is

11   constantly reserving its right to later clarify the scope of

12   the trade dress claims, but then I'm disturbed by what

13   appears to be refusing to produce the 30(b)(6) witnesses on

14   all possible claims.  And I'm particularly concerned, after

15   reviewing today the communications between counsel in which

16   MGA unilaterally narrowed and chopped up the 30(b)(6)

17   deposition topics, I don't think that that's counsel's job.

18   That's the Court's responsibility.

19          In any event, I want to give MGA an opportunity to

20   respond to these statements that the Court's making and my

21   concerns, so I'll hear from MGA at this time.

22          MS. HURST:  Your Honor, MGA does not intend to

23   make any reservation.  In particular, MGA does not intend to

24   pursue any trade dress claim based on My Scene had been set

25   out in prior correspondence by me in written representation

1    offered to Mr. Zeller in advance of the 30(b)(6) deposition.

2           We have produced three witnesses now, I believe,

3    to testify on trade dress with respect to the claims that

4    MGA intends to pursue regarding We Three Friends and the

5    trapezoidal packaging claims, your Honor, and those

6    witnesses have testified at length and in full on those

7    subjects.

8           I don't -- I don't believe the complaint

9    reasonably encompasses any other theory of trade dress

10   infringement, apart from the My Scene claim, that we have

11   made clear that we are not pursuing.  But we don't intend to

12   offer any other trade dress infringement claim.

13          THE COURT:  Okay.  All right.  Thank you.

14          Counsel on behalf of Mattel, Mr. Zeller, or

15   Mr. Quinn.

16          MR. ZELLER:  The difficulty is, as the Court has

17   seen from the papers, that we get different kinds of

18   representations, and then when we ask questions about

19   exactly what does that mean, we don't get closure.  And the

20   Court is also aware that there are still pleadings out

21   there, and we offered ways of cutting through this that I

22   can get to in a second but I think may still resolve this.

23   But there are any number of additional issues that MGA has

24   interjected from time to time as being ostensibly its trade

25   dress.

7

```
 1              These includes matters such as television
 2    commercials, it involves matters such as Bratz pets
 3    packaging.  It involves matters such as play sets.  There
 4    have been a whole variety of various trade dress allegations
 5    that have been set forth in MGA's interrogatory responses
 6    and other pleadings in this case.
 7              I think the way of dealing with this, and I
 8    certainly welcome, and as the Court is aware, I want
 9    clarification on exactly what is in and what is out and have
10    it binding.  That's really been the problem is, is we have
11    not had a binding way in which that is actually nailed down.
12              THE COURT:  How do we go about accomplishing that?
13    A written statement?
14              MR. ZELLER:  I think one way we offered it -- it
15    would be a written statement, and I think one way we
16    proposed it was, is simply to amend the interrogatory
17    answers describing the trade dress claims, and it could be
18    even as simple as saying what the page and lines are of what
19    MGA is dropping and what's in, and then we don't have an
20    issue about, you know, is a letter good enough, is a
21    representation, is a deposition good enough, but obviously
22    I'm sure the Court appreciates that given the scope of these
23    claims, we need to take them seriously.  And if they are
24    going to proceed on them, we're entitled to discovery.
25              So certainly I have every interest and certainly
```

1    we would welcome having the claims narrowed in a way, but it

2    has to be done in a binding fashion, and that would be my

3    suggestion.  There may be other easier ways of doing it

4    but --

5              THE COURT:  Thank you.  Let's hear from MGA.

6              MR. ZELLER:  Thank you.

7              THE COURT:  How are we going to accomplish this?

8              MS. HURST:  May I confer with co-counsel for a

9    moment, your Honor?

10             THE COURT:  Uh-huh.

11             *(Attorney discussion held off the record.)*

12             THE COURT:  Counsel?

13             MS. HURST:  Your Honor, MGA is willing to make an

14   unequivocal statement about what claims it intends to

15   pursue.  The only concern that we've had is, getting into

16   this, are you pursuing this or that categories of evidence.

17   And we don't -- for example, TV commercials will obviously

18   be offered to prove secondary meaning.

19             And so what I haven't wanted to do is I get into

20   this cross-examinations dynamic to foreclose ourselves on

21   categories of evidence that we'll be offering in support of

22   the claims we do intend to offer.  MGA intends to offer

23   trade dress claims on Forever Best Friends and on

24   trapezoidal packaging.

25             THE COURT:  Now, just a moment.

```
1              Then why can't you clean up the interrogatories?

2              MS. HURST:  I think we can, your Honor.

3              THE COURT:  Okay.  And give me a date that's

4    comfortable but that completes my record, I can close this

5    out.  So why don't you talk to co-counsel and see what's

6    convenient for the MGA team.  I think Mr. Zeller has a

7    good -- a good suggestion.

8              (Attorney discussion held off the record.)

9              THE COURT:  Counsel, can I get a stipulation then

10   with the parties concerning that, that this is the universe

11   in a sense, Forever Best Friends and trapezoidal, and then

12   I'll memorialize that based upon your oral representation

13   tonight.  It's going to save a lot of your time.

14             MS. HURST:  That would be great, your Honor.

15             THE COURT:  Are you stipulating to this?

16             MS. HURST:  We will stipulate, yes, your Honor.

17             THE COURT:  Mr. Zeller?

18             MR. ZELLER:  Yes.

19             THE COURT:  That's fine.

20             Now, let's wait and get a date that's, you know,

21   semi-convenient for you.

22             MS. HURST:  Your Honor, Ms. Mingrone, whose name

23   you may have seen in connection with our papers, has joined

24   us.

25             THE COURT:  Pleasure.
```

SACV 04-9049-DOC - 09/01/2010 - Vol. II

1

2          MS. MINGRONE:  Thank you, your Honor.  Nice seeing

3    you.

4          THE COURT:  Nice to see you.

5          MS. HURST:  One week, your Honor.

6          THE COURT:  You give me the date.

7          MS. HURST:  Today is the 1st.  The 8th?

8          THE COURT:  The 8th is fine.

9          MS. HURST:  Okay.

10          THE COURT:  We have multiple documents due that

11    day.

12          MS. HURST:  Maybe the 10th, then, your Honor.

13          THE COURT:  Any objection, Mr. Zeller?

14          MR. ZELLER:  No objection.

15          THE COURT:  That cleans it up, then.

16    September 10th.

17          Next time I want to take up the motion to compel

18    concerning the unclean hands defense.  The briefing on this

19    motion broke down, from my perspective, into finger-pointing

20    about MGA's new counterclaims and reply.  And unfortunately,

21    I want to admit to you, I didn't get a very clear picture of

22    the issue as a result.  As I understand it, there are 24

23    requests for production, 20 of which MGA claims it has

24    produced responsive documents to.

25          Now, the remaining four have been objected to.

 1    I'm going to start by rejecting Mattel's claims that MGA

 2    somehow waived its objection to these requests by making an

 3    offhand remark about the production down the road.  Seger is

 4    an interesting case, but I think the district judge in

 5    Nebraska wasn't really presented with the sort of ambiguous

 6    statements that have flown back and forth in this case.

 7              In any event, I think that the resolution on these

 8    four requests turns on the scope of MGA's unclean hands

 9    defense.

10              So is MGA willing to respond to the request with

11    respect to the documents that are at issue in this

12    litigation?

13              MS. HURST:  The four disputed requests, your

14    Honor?

15              MR. MC CONVILLE:  Your Honor, part of the

16    difficulty -- sorry.  Part of the difficulty we've had in

17    responding as completely as we can is because we're only

18    recently finding out now about the acts that Mattel has

19    taken to steal information.  So until they produce to us the

20    stolen information, we can't fulsomely respond, but we

21    understand our obligation.  As Mattel produces additional

22    documents or other information that reflect its theft of MGA

23    information, we can then go find whatever information we

24    have related to that theft, so that's why we are continuing

25    to supplement with regard to our productions.

SACV 04-9049-DOC - 09/01/2010 - Vol. II

12

```
 1              With regard to the four remaining, your Honor, we
 2    believe that -- we will stipulate to reasonable, rational
 3    interpretation of these overbroad requests.
 4              THE COURT:  Well, thank you.  Those are fighting
 5    words already.
 6              I'm going to take a recess for a moment.  The two
 7    parties can talk briefly so we don't get into this posturing
 8    this evening.  It's a wonderful statement.  Save it for
 9    trial.
10              So I'll be back in 10 or 15 minutes.  Why don't
11    you enter into an informal discussion.  We'll see how far
12    you get.
13              (Recess.)
14              THE COURT:  All right.  Then we are back on the
15    record.  The counsel are present for MGA and Mattel.
16              And Counsel, we left off concerning the motion to
17    compel concerning unclean hands.  We were discussing the
18    documents.
19              MR. ZELLER:  Yes, your Honor.  There were four
20    requests that were still at issue, and the parties have
21    resolved those four requests, your Honor.
22              MS. HURST:  We've agreed to that one.
23              THE COURT:  Then I can sweep that off without any
24    further concern?
25              MS. HURST:  Yes.
```

SACV 04-9049-DOC - 09/01/2010 - Vol. II

13

```
 1            THE COURT:  I am not going to hear this
 2    regurgitated, though.
 3            MR. ZELLER:  No.
 4            MS. HURST:  No.
 5            THE COURT:  Okay.  Strike it out, then.
 6            The motion to compel responses to third phase two,
 7    I love that, "third phase two" interrogatories, I'm going to
 8    deny Mattel's waiver argument on this, even if its own cases
 9    concede that the outside time to file a motion for a
10    protective order is the reply date on a motion to compel,
11    and that's all the better because a contrary rule would
12    burden courts with dozens of motions for protective orders
13    to every objectionable request for production.  In any
14    event, I didn't get the actual text of the request for
15    production.
16            Mattel offers a sampling in its moving papers.
17    Some of these appear relevant in light of my ruling on the
18    motions to dismiss.  For example, 1, 4, 5, 13 and 10 concern
19    Moxie, which is only at issue in the context of trade secret
20    theft, and investments in Moxie are really irrelevant to
21    that claim.
22            However, the remaining interrogatories, 2, 3, 6,
23    7, 11 and 12 seem even more relevant in light of the Ninth
24    Circuit's ruling that a full constructive trust cannot be
25    imposed.  That means that any subsequent constructive trust,
```

1    if liability is found, will follow a process of carving out

2    the investment MGA has made into Bratz.

3            I really don't know what else to say concerning

4    this dispute, so I'm going to take argument, and I encourage

5    the parties not to just talk to me about how they should be

6    granted in full or denied in full, try and come up with ways

7    to narrow the request.  And I'd like a copy or two of the

8    requests up here while you argue, if you wouldn't mind doing

9    that for me.

10           This is off the record.

11           *(Informal discussion held off the record.)*

12           MS. HURST:  I don't have an extra copy of the

13   interrogatories, your Honor.  I apologize.

14           THE COURT:  What's your docket number?  We can

15   pull them, but it will take us a while.

16           MS. HURST:  It's 8419.

17           THE COURT:  We looked.  Couldn't find it.

18           MR. MC CONVILLE:  Your Honor, I don't know if the

19   interrogatories themselves would have been filed.

20           THE COURT:  That's what we are saying.  We can't

21   find them, so --

22           MS. HURST:  All I have is what's in the brief.

23           THE COURT:  I need copies.

24           MR. QUINN:  They are in the -- they are set forth

25   in the motion, your Honor.  I can give the Court a copy of

272348.

Case 2:04-cv-09049-DOC-RNB   Document 8764   Filed 09/22/10   Page 15 of 103   Page ID #:272348.

1   my -- the pages of the motion.

2          THE COURT:  Why don't you do that, and then we'll

3   go over and Xerox them.

4          Are there any more than these?  In other words,

5   we're concerned that there are others.  We have these.

6          MR. QUINN:  I believe those are the --

7          THE COURT:  Check with Mr. Zeller.  Make sure.

8          MR. QUINN:  These are the only ones on that

9   motion.

10          MR. ZELLER:  Can I borrow that again, your Honor?

11   I need to double-check.

12          THE COURT:  Yeah.

13          Is that it?

14          MR. QUINN:  Those are the only ones we are moving

15   on, your Honor, on this set.

16          THE COURT:  So no more pop-ups?  This is my

17   universe then?

18          MR. QUINN:  On this motion, yes, your Honor.

19          THE COURT:  Okay.  Thank you very much.  Then

20   that's clear.

21          Then I'm just going to provide argument, so

22   Counsel?

23          MR. QUINN:  Yes, your Honor.

24          I -- I heard the Court's admonition to try to not

25   just argue why answers should be provided but to propose

1    limitations.  Interrogatory Number 1, your Honor, "Security

2    interest in Bratz," my understanding is that the answer is

3    no.  It seems like if that's so, it would be simple to say.

4              THE COURT:  Well, let's find out.

5              Your answer to Interrogatory Number 1.

6              MS. HURST:  Your Honor, well, certainly

7    Mr. Gordinier stood up in court and stipulated that Omni

8    doesn't claim any security interest in Bratz as of that

9    time.  That was our position as well.  I don't know -- I

10   mean, there is no constructive trust, so I don't even know

11   how this could be relevant anymore.

12             MR. QUINN:  It's relevant, your Honor, we believe

13   to the obstruction of justice issue aspect of the RICO

14   claim.

15             THE COURT:  Okay.  Four.

16             MR. QUINN:  We're skipping over those in between,

17   your Honor.

18             THE COURT:  Well, if you'd like to, go ahead.  You

19   take me where you'd like me to go in your argument.

20             MR. QUINN:  Your Honor, the second interrogatory

21   relates to the dollar amount of the investment in Bratz,

22   again, seems to be a fairly straightforward number that

23   could be provided simply, number 3, dollar amount of

24   investment by year.

25             THE COURT:  Yeah.

1           MR. QUINN:  Interrogatory Number 4 --

2           THE COURT:  Let's take 2.  Let's see the problem

3   with that.

4           MS. HURST:  Your Honor, MGA does not maintain its

5   financial accounting systems on a product line profitability

6   basis.

7           THE COURT:  So I'm not going to hear that

8   testimony at trial, then, at any time on MGA's behalf?

9           MS. HURST:  If you do, it will be only the subject

10  of expert testimony, it won't be fact testimony.

11          THE COURT:  How are you going to get an expert if

12  you don't have facts?

13          MS. HURST:  We produced all of the financials.  We

14  absolutely have produced all the financials of the company

15  showing all the expenses of the company and so forth.  It's

16  just not calculated, MGA doesn't keep its records on a

17  product line basis.

18          THE COURT:  So if all of the financials are over

19  to MGA, it's moot from your perspective?

20          MS. HURST:  They've got all of the financials, and

21  both sides' experts can offer opinions on that.

22          THE COURT:  Okay.  Mr. Quinn, with that

23  representation, they don't keep it in that form, they don't

24  have to do that work if you have the financials.

25          MR. QUINN:  Your Honor, this gets back to an issue

1    we had in the phase one trial where on the net worth issue,

2    we didn't get an answer to an interrogatory, and then in

3    trial, we were told it's impossible to determine it.  We

4    don't do that calculation.

5         THE COURT:  Well, we are going to find out.

6         Eventually an expert is going to be produced, I

7    would assume, from either MGA or Mattel or both talking

8    about net worth, right?

9         MS. HURST:  Correct.

10        THE COURT:  I'm going to preclude it.

11        MS. HURST:  You are going to preclude expert

12   testimony on that?

13        THE COURT:  On that subject, I am.

14        MS. HURST:  So there's actually other

15   interrogatories regarding net worth, should we go to those

16   now?  We seemed to have switched topics.

17        THE COURT:  I'm going to take a recess, and maybe

18   you can all come up with that figure to satisfy each other.

19        MR. QUINN:  We actually discussed this this

20   evening, your Honor, with counsel.

21        THE COURT:  In other words, what I'm not going to

22   do is have an expert suddenly pop up if I can't determine

23   what those figures are beforehand because there is no basis

24   for the opinion, and I'm not going to sit through that

25   trial, so if you don't have it now, you won't be testifying

1    about it.

2          MS. HURST:  We've produced all of the financials

3    and our fact witnesses, 30(b)(6) and otherwise, have

4    testified MGA does not calculate its own net worth on an

5    ongoing basis.

6          THE COURT:  Then I would expect an expert to be

7    able to do that.

8          MS. HURST:  Well, the expert applies one of three

9    tests that they determine in their expert judgment would be

10   appropriate under the circumstance.

11         THE COURT:  What's the expert's figure?

12         MS. HURST:  We don't know yet.  The experts

13   haven't done that yet.  Those dates for disclosure are

14   several months from now, but all of the financials have been

15   produced.  And with respect to net worth, which is only

16   relevant to punitive damages, the burden will be on Mattel

17   in the first instance, it will produce its report, and then

18   our expert will make a response to that.

19         MR. QUINN:  Your Honor, may I respond to that?

20         THE COURT:  Please.

21         MR. QUINN:  What we really need to know is what is

22   MGA's position.  If -- we can try to interpret their

23   financials and come up with these numbers based upon the

24   documents they provide to us, requires us to interpret them,

25   then we anticipate a debate at trial as to whether we've

 1    interpreted them appropriately.

 2          THE COURT:  Well, I don't understand if there is a

 3    cutoff date for expert disclosure, why it isn't resolved by

 4    that date.  In other words, figures have to become -- we

 5    have to come up with figures or I'm not going to allow the

 6    expert.  So why don't I simply --

 7          MR. QUINN:  On each of these, your Honor, that

 8    would be fine with us.  If they would give us these answers

 9    when they disclose their expert, that would be fine.

10          THE COURT:  If they don't, they're not going to be

11    testified.  There's no basis.  I'll just send out the

12    message right now, in other words, all MGA's saying, I

13    think, is we need more time because we haven't gotten that

14    far with our experts.  That's what I hear you saying.

15          MS. HURST:  Right.  It's premature.  That's all

16    we're saying.

17          THE COURT:  When are we going to have those

18    figures?

19          MS. HURST:  In accordance with the parties, the

20    stipulated schedule that the Court's already ordered for

21    expert disclosures.

22          THE COURT:  Does that take care of it at least for

23    the time being?

24          MR. QUINN:  If what MGA is saying that their

25    expert will, in fact, calculate each of these numbers, that

SACV 04-9049-DOC - 09/01/2010 - Vol. II

1    does take care of it.

2              THE COURT:  They are going to have to.

3              MR. QUINN:  Well, this includes, for example,

4    Interrogatory Number 3, their investment in Bratz.  I

5    haven't heard them say that their expert is going to

6    calculate that.  If their expert is going to calculate that,

7    fine.

8              THE COURT:  I don't know -- there, I agree with

9    you.  I don't know why MGA would be motivated to do that.

10             MR. QUINN:  I'm kind of thinking they wouldn't be,

11   and that's why we would like them to do the calculation and

12   tell us what their position is on these issues.

13             THE COURT:  Well, let's move to number 3, MGA's

14   investment in Bratz, because I think Interrogatory Number 2

15   resolves itself with the cutoff date for the expert.  In

16   other words, at that time there is going to have to be some

17   figure to allow that expert to even testify on MGA's part.

18             So I think I agree with you in the sense of more

19   time.  Certainly you represent that Mattel has the figures,

20   but the experts are going to have to come up and tell us

21   that anyway, so just fair warning, they are not testifying

22   unless they come up with a figure.

23             So I think number 2 is going to resolve itself.

24   Let's go on to number 3.

25             MR. QUINN:  Again, your Honor, if they don't want

1   to put on an expert who cover these issues, for example, and

2   I won't think they would, the expert won't have done that

3   calculation.  These are things that we need for our case.

4           THE COURT:  But if they don't keep it, I can't

5   force that calculation on them.  In other words, the only

6   power that I really have is to preclude somebody from

7   testifying.  I can order it.  You are not getting it.

8           MR. QUINN:  I think I'm hearing something

9   different from MGA's counsel.  I'm hearing they say they do

10  not in the ordinary course do these calculations.  I don't

11  hear them saying it's impossible for them to do it.

12          THE COURT:  I don't know if they are required to

13  do it.  They are only required to hand over their

14  financials.  They are not required to do the work for you.

15          MR. QUINN:  Well, if they can do a calculation in

16  response to an interrogatory, I would have thought that

17  would be kind of a routine use of an interrogatory, to tell

18  us what is your position about what your investment is.

19          THE COURT:  In Bratz?

20          MR. QUINN:  Yes.  I mean, that would be number 3,

21  and number 2 as well, actually.  And then number 4 and 5

22  relate to Moxie.

23          THE COURT:  Well, let's turn to the trial for a

24  moment, and let's assume hypothetically that MGA doesn't

25  come up with a figure, then doesn't that leave you in the

Case 2:04-cv-09049-DOC-RNB   Document 8764   Filed 09/22/10   Page 23 of 103   Page ID #:272356
SACV 04-9049-DOC - 09/01/2010 - Vol. II

23

1    most advantageous position?  What you're really worried

2    about is the surprise, the lateness of that figure because

3    you can't prepare for that, or you don't have enough time to

4    rebut it, but if they don't come up with that figure in a

5    reasonable period of time and the Court doesn't allow MGA to

6    cast a figure about the investment, that really gives you

7    carte blanche in the playing field.

8              It's what your expert decides -- wait.  It's what

9    your expert decides to state the value is.  And they can't

10   do rebuttal to it.  I mean, you can claim a ludicrous claim

11   if you come with an expert, and it blows their defense.  I

12   mean, it's really -- Bratz should be absolutely motivated to

13   come up with an accurate figure or a lower figure from their

14   perspective, because they leave this playing field

15   completely open to you.

16             So I don't really understand how you are being

17   harmed if Bratz wants to take that position, as long as I

18   don't allow the last moment pop-up opinion coming in, and

19   all I have to do is look at that schedule, and if it's not

20   there, Bratz isn't going to have that opinion before the

21   Court.

22             Now, that's devastating, because Bratz might claim

23   it was hypothetically a hundred million dollars, but you

24   might claim it's a far different sum, and if you've got the

25   expert and they don't, they've just precluded a very

```
 1    valuable piece of evidence.  So I just don't understand from

 2    a tactical point why you really care, as long as there is a

 3    cutoff date, which we've set.

 4            MR. QUINN:  I don't care if they are going to give

 5    us these calculations as of some date in the future.

 6            THE COURT:  But they are not going to, because

 7    they are not calculating it.

 8            MR. QUINN:  That's our point, we would like to be

 9    able to prove from their discovery responses that basically

10    they were in the process of tanking this brand to avoid the

11    judgment that they anticipated, avoid the results of the

12    verdict in phase 1A, phase 1B.

13            THE COURT:  So hypothetically they invested

14    $100 million and just canned the brand to avoid the

15    verdict -- or 20 million?

16            MR. QUINN:  Exactly, that they stopped investing

17    in it.

18            THE COURT:  Sure.

19            MR. QUINN:  That they moved their money into

20    Moxie, for example, or to other products.

21            MS. HURST:  That they complied with a federal

22    court's injunction.

23            THE COURT:  Well, let me think about it --

24            MS. HURST:  For example.

25            THE COURT:  Let me think about it a while.
```

1          Number 4?

2          MR. QUINN:  And then, your Honor, Mr. Zeller

3     points out to me that if we have expert testimony on this,

4     they will, I assume, attack our expert's testimony saying

5     it's impossible to make these calculations, it's impossible

6     for you to determine what the investment was in Bratz.

7          THE COURT:  Why would I allow it?

8          MR. QUINN:  I'm sorry?

9          THE COURT:  Why would I allow it?  In other words,

10    they are leaving the playing field wide open to you.  I

11    don't know how to spell suicide, but it's a terrible

12    tactical position.

13          Now, Bratz now would really be gambling upon my

14    ultimate decision in that regard, and if all of a sudden

15    after representations that we can't calculate this and all

16    of a sudden in rebuttal, we have somebody coming trying to

17    either espouse a figure or attack a figure without a basis,

18    and the only way they can do that is on cross examination,

19    and of course, they can cross examine, of course they can

20    call into credence whatever the figure is, but as far as

21    their own independent evidence, they don't have it.  It's

22    completely unbalanced.

23          So I never understood from the beginning of

24    looking at this what the fight is all about, quite frankly.

25    It seems like a tremendous advantage to you, all to do about

 1    nothing, frankly, because I can't force them to do it.  I

 2    can't force them to turn out a product, their representation

 3    would be it's coercive, it's premature.  I've got the

 4    ultimate weapon on the backside.

 5            MR. QUINN:  Well, that does give us some comfort,

 6    your Honor.  Again --

 7            THE COURT:  Sure.  All of this is coming home to

 8    roost for both of you, it's all coming full circle now.  And

 9    up to this time I've been very cautious.  I've just let you

10    go on your way about discovery, but now you are both so far

11    down the line that -- so, we have a schedule, why don't we

12    simply delay this and see what they do?  You are not going

13    to be surprised by it, in other words.

14            MR. QUINN:  All right.

15            THE COURT:  So I think you just shelve this,

16    because even if I order, if they don't do it and continue to

17    claim, and in good faith on their part, that this is not the

18    way we calculate it, I can't force Bratz to come up with a

19    calculation.

20            And it seems to me, once again, that if there is a

21    surprise, the only thing they can do is attack your expert,

22    they can't offer any counter evidence to whatever claim your

23    forensic accountant makes.  I don't think Bratz is going to

24    abandon the field, frankly.  I think all of this is going to

25    resolve very quickly.

         1              MR. QUINN:  If we can defer this then, your Honor,

         2     until the expert cutoff date.

         3              THE COURT:  That's going to tell me very quickly.

         4              MR. QUINN:  I think that will probably take care

         5     of this whole set, your Honor.

         6              Oh, there is one --

         7              THE COURT:  Trust me, Mr. Quinn, you have

         8     excellent counsel on the other side also.  They are not

         9     going to do that.

        10              MR. QUINN:  Okay.  The only one that wouldn't be

        11     dealt with in that fashion, your Honor, is Interrogatory

        12     Number 18 that deals with the mysterious Laredo guy.

        13              THE COURT:  I don't recall it offhand, and I

        14     apologize.

        15              MR. QUINN:  The Laredo guy.  We -- Mr. Larion

        16     wrote an e-mail where he says that he knows somebody in

        17     Laredo who can smuggle -- uses the word "smuggle" -- product

        18     over the border.

        19              THE COURT:  Thank you.  I've got it.

        20              MR. QUINN:  All right.  And I don't need to --

        21              THE COURT:  I don't know the number, but I've got

        22     it.

        23              MR. QUINN:  Okay.  And the last line of it is, no

        24     more e-mails on this subject.  Of course, part of our case

        25     is that there's --

```
 1              THE COURT:  And what are you asking?  Remind me of
 2      the interrogatory.
 3              MR. QUINN:  It's Interrogatory Number 18.
 4              THE COURT:  What are you asking for in that
 5      interrogatory?  I recall the Laredo guy, but I don't recall
 6      the specifics, which is --
 7              MR. QUINN:  It's 16 through 18.  Sixteen asks for
 8      the identification of the Laredo guy.
 9              THE COURT:  Mr. Larion should know, shouldn't he?
10              MR. QUINN:  At his deposition, he wasn't permitted
11      to answer the question.
12              THE COURT:  By whom?
13              MR. QUINN:  By his counsel.
14              THE COURT:  Why?
15              MS. HURST:  That's not correct.
16              THE COURT:  Well, I'm sure he'd be happy to answer
17      it, won't he?
18              MS. HURST:  He answered he didn't know who it was.
19              THE COURT:  Is he E-mailing somebody about the
20      Laredo guy, but he doesn't know who that is?
21              MS. HURST:  Yeah, that's why he -- he didn't
22      identify him by name in the first place, because he didn't
23      know who it was.
24              THE COURT:  Now, let me ask you something.  I'm
25      just looking ahead, remember, I don't know much about trial
```

1    work.  Wouldn't you hope, from Mattel's perspective, that

2    the Laredo guy is unknown and that Mr. Larion testifies to

3    that?  That's more -- that's more detrimental because it

4    looks like consciousness of guilt to a jury, not to the

5    Court certainly, but to a jury.

6             And the Laredo guy that he talks about and what

7    the jury might perceive to be code, I would think if I was

8    in Mattel's position, I would be more appreciative if he was

9    never found, but a lot to do about nothing, and if he wants

10   to take that position, fine.  Maybe he doesn't know who the

11   Laredo guy is.

12            MR. QUINN:  Well, if he said it in

13   interrogatory -- what we are concerned about is being

14   sandbagged.

15            THE COURT:  Well, I know, but here is the benefit.

16            MR. QUINN:  Back end?

17            THE COURT:  No, somebody just testifies, and we

18   are coming up with all sorts of new answers at trial from

19   Mr. Eckert to Mr. Larion, I would just send them away for a

20   while.  Trial's going to go on a long time.  Nobody's going

21   to get sandbagged, because you get to invite them back.

22            MS. HURST:  Your Honor, if I may, this is

23   completely irrelevant.  They deposed both -- everybody on

24   this e-mail chain.

25            THE COURT:  That doesn't mean they got the answer.

1    That doesn't mean that Mr. Larion either knows or doesn't

2    know, I don't know, and I'm not testing his credibility, so

3    from my perspective, a lot of this is silly.

4           MS. HURST:  It doesn't have anything to do with

5    any allegation in the case.  There is no allegation of

6    smuggling in this case.  They had the e-mail before they

7    amended their last pleading, they didn't plead anything

8    related to smuggling, it's completely irrelevant.

9           THE COURT:  If RICO survives.

10          MS. HURST:  It's not in RICO.  They didn't put it

11   in there.  They made a deliberate choice not to put it in

12   there.  They had the e-mail thread before the last pleading

13   amendment, they didn't put it in there.

14          THE COURT:  Regardless, what would you like me to

15   do, order them to answer who the Laredo guy is?  I think the

16   interrogatory somewhat already does that, doesn't it?

17          *(Laughter.)*

18          THE COURT:  Do you want me to reorder it?  That's

19   the answer you got.

20          MR. QUINN:  We would like answers to 16.

21          THE COURT:  Well, thank you.  You'd like it, and

22   you are not getting him, apparently.  Does that leave you in

23   a tactical disadvantage?  I don't think so.

24          Now, if he suddenly comes up with the Laredo guy

25   is Joe Jones who lives down in Laredo, Texas, you are

 1    probably going to have a field day.  If you really want to

 2    press it, I'll order Mr. Larion, if he knows, to answer who

 3    the Laredo guy is.  There.

 4                MR. QUINN:  It's also 18 that asks for some

 5    information about the shipments, the smuggling.

 6                THE COURT:  We'll have him answer that also, so

 7    ordered.

 8                *(Laughter.)*

 9                THE COURT:  And who knows what he's going to say.

10    I don't know.

11                MR. QUINN:  Well, I would think in an answer to an

12    interrogatory, there might be more information available

13    than the deposition.

14                THE COURT:  But that's the answer you got.

15                MR. QUINN:  At the deposition.

16                THE COURT:  That's the answer you got.  And on the

17    stand?

18                MR. QUINN:  Well, I think in response to these

19    interrogatories at this point, we only have objections.  We

20    didn't get any --

21                THE COURT:  But see, here is what's going to

22    happen.  Let's just assume, so I'm fair to both sides,

23    Mr. Eckert takes the same position about something, because

24    I don't want to keep focusing on Mr. Larion.  We come up

25    with a brand new answer of a substantive person, you are

Case 2:04-cv-09049-DOC-RNB   Document 8764   Filed 09/22/10   Page 32 of 103   Page ID #:272365
SACV 04-9049-DOC - 09/01/2010 - Vol. II

32

 1    going to have time to go find him.  You are going to see if

 2    that's fictitious or not.

 3          And I just can't imagine after all these

 4    depositions and all these answers and the positions that

 5    various people have taken, what a field day esteemed counsel

 6    for both sides would have with a sudden change in a sudden

 7    recalled memory.

 8          So Mr. Zeller has a note for you.

 9          MR. QUINN:  He does.

10          THE COURT:  But I can't go out and force --

11          (Interruption in the proceedings.)

12          THE COURT:  Interrogatory Number 18, "Identify and

13    describe in detail all shipments from you to the Laredo

14    guy," which is the e-mail, "identified in response to

15    Interrogatory Number 12, including but not limited to the

16    dates of such shipments, prices and description of items

17    shipped."

18          Then it goes on, "MGA continues to refuse to even

19    identify the Laredo guy, yet based on its unfounded

20    allegations of bribery of officials in Mexico and Canada,

21    MGA previously compelled Mattel to not only identify all

22    potentially relevant individuals, but submit to extensive

23    deposition questioning as well."  Okay?

24          So what I don't want to do, frankly, is make

25    orders that then can be used to browbeat in front of the

SACV 04-9049-DOC - 09/01/2010 - Vol. II

33

 1    jury.  For instance, right now you have an interrogatory.

 2    That's an acceptable form.  But if the Court steps in with

 3    specificity and starts ordering Mr. Larion, Mr. Eckert, any

 4    of these parties to specifically answer key questions, this

 5    is what the question will sound like at trial, "Well,

 6    besides answering that you didn't know who the Laredo guy

 7    was in your deposition, didn't Judge Carter and this Court

 8    specifically order you to do it?"  Now you've drawn me into

 9    that lawsuit.  Now you've got the judge presiding over the

10    case as a party to the action.  There's my consistent

11    reluctance to enter into that minutia.

12              MR. QUINN:  We wouldn't do that, your Honor.

13              THE COURT:  Oh, sure you would, but it's okay.

14    I'm just kidding you.  I would, just a slip of the tongue.

15    So we won't do that.  And the only reason I would is a

16    couple of times I probably have, I've probably made a

17    mistake.  It was just a lapse of memory in the heat of

18    combat, so I don't think I want to start making those

19    orders.  This is the interrogatory, and then ask him at the

20    depo.

21              MR. QUINN:  I -- I had this conversation with the

22    Court before, and I wasn't persuasive before.

23              THE COURT:  It was good argument.

24              MR. QUINN:  In responding to an interrogatory, of

25    course, they've got to use whatever information is available

1    to them to answer the interrogatory.  I have reason to think

2    that in responding to an interrogatory, I won't get "I don't

3    know" or "I don't remember."  It's more likely we'll get a

4    response.  And that interrogatory and the answer, if it's

5    relevant, I assume could be read to the jury, just without a

6    witness on the stand, with the Court's permission.

7              THE COURT:  Interrogatories could always be read

8    to the jury.

9              MR. QUINN:  Yes.

10             THE COURT:  But it's just as effective if you

11   also, for both parties and different witnesses that MGA or

12   Mattel has problems with, to ask at a deposition also.

13             MR. QUINN:  Sure.

14             THE COURT:  You can't take one position at an

15   interrogatory and another at the deposition.  And let me

16   tell you the valuelessness of an interrogatory.  It always

17   goes this way.  You know, my attorney helped me with that,

18   yes, I did sign the form, but my attorney helped me prepare

19   that, and, you know, I was wrong.  That's what you always

20   hear.

21             Now the attorney is drawn into that, whereas a

22   deposition is a one-on-one.  A deposition, if you follow up

23   for either side with different witnesses that MGA and Mattel

24   have problems with, takes this interrogatory one step

25   further.  Now you've got a direct conversation, and the

 1    attorney isn't standing in the way.  What do attorneys do?

 2    They always object.

 3           So are you harmed by this?  I would think that

 4    this particular position, you are in the driver's seat.

 5           MR. QUINN:  The one thing I know is that I can't

 6    read objections to an interrogatory response to a jury, I

 7    know that.

 8           THE COURT:  That's right.  That's right.  All you

 9    can do is read the interrogatory.  You can read the answer.

10    Has he ever answered number 18?

11           MR. QUINN:  No, we only got objections in response

12    to these three interrogatories.

13           THE COURT:  But why aren't these being answered?

14           MS. HURST:  You mean in deposition?

15           THE COURT:  No.  In interrogatory.  Why aren't

16    these interrogatories being answered?

17           MS. HURST:  Because they are completely

18    irrelevant.  There is no allegation in the case regarding

19    smuggling.  This is not relevant to anything.  And they've

20    deposed three --

21           THE COURT:  Why is it relevant?

22           MR. QUINN:  It's relevant because it relates to

23    concealment of evidence.  He says no more e-mails on this

24    subject.

25           THE COURT:  Just a moment.  Does that go to your

1    RICO?

2                    MR. QUINN:  Yes.

3                    THE COURT:  Because that's the only thing it could

4    go to.

5                    MR. QUINN:  Yes.

6                    THE COURT:  Okay.

7                    MR. QUINN:  They are also accusing Mattel of

8    misconduct in Mexico, and we've had -- we need to respond to

9    extensive discovery on that subject.

10                    THE COURT:  Uh-huh.

11                    MR. QUINN:  I'm not saying we would offer this at

12    trial, but one thing we would have to consider is if we have

13    evidence of MGA engaging in misconduct in Mexico, maybe we

14    would consider offering that evidence.

15                    THE COURT:  Okay.  And so once again, what would

16    you like the Court to do?

17                    MR. QUINN:  Just order that these three

18    interrogatories be responded to.

19                    THE COURT:  Okay.  Take it under submission.  I

20    think I know each of your positions, then, okay.

21                    And so that's 16 through 18?

22                    MR. QUINN:  Yes, those three.

23                    THE COURT:  I think the rest somewhat resolves

24    itself, and we can come back and visit it.

25                    MR. QUINN:  Yes, I think that's right.

```
 1              THE COURT:  Okay.  So let's take Interrogatory 16

 2    through --

 3              MS. HURST:  And just for the record, your Honor,

 4    Mr. Larion did answer questions about the e-mail thread as

 5    did one or two other witnesses including Ms. Kummerle who

 6    testified as a 30(b)(6) that there was no smuggling into

 7    Mexico.

 8              THE COURT:  Okay.  And where did he answer that?

 9              MS. HURST:  Ms. Kummerle did in her deposition,

10    Mr. Larion answered specifically about the no more e-mail on

11    this issue.

12              THE COURT:  Mr. Larion answered?

13              MS. HURST:  Mr. Larion answered about the

14    no-more-e-mail-on-this-issue point.

15              THE COURT:  Just a moment.

16              MS. HURST:  Yes.

17              THE COURT:  What did he say?

18              MS. HURST:  He said, "I get about a million

19    e-mails a day.  I was tired of arguing about this."  That's

20    my -- that's what I wrote.  It speaks for itself.

21              THE COURT:  Okay.  Next, the motion to compel the

22    first phase second interrogatories.  Again, Mattel failed to

23    file a copy of the actual interrogatory text, but it

24    provides a sampling again, and I think I got the gist of the

25    motion from that.
```

1           First, there's the issue of whether the

2    interrogatories concerning payments to Larion family trust

3    as well as creditors or lenders.  Second, there's an issue

4    of evidence of spoliation.  I'm tentatively concluding that

5    this spoliation interrogatory is unreasonably broad, it

6    forces MGA to prove a negative.  I think a more reasonable

7    construction requires MGA to share its knowledge about

8    spoliation of relevant evidence.

9           Obviously Mattel's argument is that MGA will play

10   dumb, but maybe Mattel can set forth a protocol that MGA can

11   follow in an hour or two, like represent that you have

12   called that following 10 people and asked them about their

13   knowledge.

14          As to the creditor payments, I am just not sure

15   how this is relevant to the creditor claims, which in their

16   present form constitute predicate mail fraud and wire fraud

17   schemes, but the amounts of payment seem marginally relevant

18   given the volume of documents that need to be produced.

19          It's not that this isn't potentially relevant, but

20   the burden is tremendous, the cost oppressive, and I tend to

21   think I'm prepared to deny the motion as to these four

22   interrogatories, but of course, once again, I want to hear

23   after I give you that initial thought.

24          MR. QUINN:  Thank you, your Honor.

25          The Court has in its order on the motion to

1    dismiss, the Court held that Mattel's allegation that the

2    concealment of assets further the scheme to defraud Mattel

3    of its property formed a proper basis for establishing RICO

4    liability.  These interrogatories are addressed to just

5    that.  The siphoning of assets from MGA first by

6    shareholders, that's Interrogatory Number 1, to identify

7    shareholders.  Interrogatory Number 2, payments made to

8    creditors or lenders including Omni 808, and then

9    Interrogatory Number 3, Larion family members or affiliates,

10   and 5, payments in excess of $50 million -- or I'm sorry,

11   $50,000 that have been made since January 1, 2006.

12            THE COURT:  Why are the amounts relevant?

13            MR. QUINN:  Why are the amounts relevant?

14            Because it's a question of are they making -- are

15   they taking assets out of MGA in order to make them

16   unavailable for creditors.  We sort of have to know how much

17   is being removed, how much is being taken out of the

18   enterprise.

19            I mean, we could establish, you know, thresholds

20   like 50,000 or 25,000 if that minimizes the burden in terms

21   of pay, but I would certainly think that all distributions

22   to shareholders, certainly, this is a privately held company

23   that is owned by Mr. Larion, family members trust controlled

24   by him.

25            Certainly those would be assets that are being

SACV 04-9049-DOC - 09/01/2010 - Vol. II

40

```
 1   directly taken out of the company and distributed to the
 2   owner of the company.  That's got to be a very simple thing
 3   for them to come up with.  In terms of payments made to
 4   creditors, we can come up with a $50,000 limitation on that
 5   one as well, Interrogatory Number 2.
 6            THE COURT:  Okay.
 7            Counsel?  MGA?
 8            MS. HURST:  Your Honor, on Interrogatory Number 1,
 9   "Payments to shareholders," the distributions to
10   shareholders have all been identified and documents produced
11   on that, including the company's due to, due from accounts
12   that it used to keep track of payments in kind to
13   shareholders and so forth.  In fact, I think those were even
14   attached to the last pleading.
15            THE COURT:  Now, let me find out from Mattel if
16   that's true.
17            (Attorney discussion held off the record.)
18            MR. QUINN:  Your Honor, MGA's counsel is correct,
19   that some documents have been produced that have entries on
20   them for shareholder distributions.
21            THE COURT:  Well, just a moment.  Is this
22   everything that MGA has?
23            Let's find out.  In other words, if this is the
24   universe, then that's what you work from.
25            MS. HURST:  Yes, we've covered the time period
```

1   covered by the interrogatory with our document production.

2           THE COURT:  That's your representation?

3           MS. HURST:  Yes.

4           THE COURT:  Okay.  Counsel?

5           MR. QUINN:  The difficulty we have, your Honor, is

6   when we put these documents in front of witnesses at

7   deposition, like Mr. Larion --

8           THE COURT:  Well, just a moment.  That doesn't

9   mean different witnesses are going to give you what you

10  want.  Some may have the ability to and decide not to.

11  Others may not know.  And I am not going to use Mr. Larion's

12  name again because it becomes repetitive, but once again,

13  you can't get answers that somebody doesn't want to give

14  you.

15          MR. QUINN:  Understood, your Honor.

16          THE COURT:  My question is, do you have the

17  information, the foundation that's necessary to narrow your

18  universe and to get accurate information?  It's not

19  Mr. Larion.  It's the documents.  And if counsel for MGA

20  represents that they've given you all these documents, and

21  that's the answer you are getting, that's left for trial.

22          MR. QUINN:  Your Honor, we have some documents.

23  The problem is that witnesses, when confronted with them,

24  say they don't know.

25          THE COURT:  Well, confronted, Mr. Larion?

```
 1              MR. QUINN:  Yes.

 2              THE COURT:  Who else?

 3              MR. QUINN:  Who besides Larion?

 4              MR. ZELLER:  I would have to double-check on the

 5    witnesses.  I know that we -- I participated in a number of

 6    witnesses.

 7              THE COURT:  No, too many words.  Who else?  Name?

 8              MR. ZELLER:  I don't recall everyone else offhand.

 9    I believe that there was some of the financial people

10    they've had.

11              THE COURT:  What's amazing to me is if your theory

12    is correct, that fraudulent activity, for lack of a better

13    word, is taking place, then why do you expect you are going

14    to get credible answers?  I mean, you are not that naive.

15              MR. QUINN:  Your Honor, because, and this is --

16              THE COURT:  You just need information.  In other

17    words, you need to get what MGA's got, and however witnesses

18    want to respond, that's it.  And counsel's just responded on

19    the record, and I'm going to put it in the minute order,

20    that she has said Interrogatory Number 1 has been fully

21    complied with.

22              MR. QUINN:  Well, they said they had given us

23    documents which reflect that information.  You know, in the

24    federal rules, there is a procedure under which --

25              THE COURT:  Well, while you're mincing words,
```

1    directly or indirectly, I don't know what "indirectly"

2    means.  I mean, these are artfully drafted.

3              MR. QUINN:  They may be poorly artfully drafted.

4              THE COURT:  But the point is that they're games of

5    semantics, and it's not worth my time, frankly.  It's not

6    something I am too concerned about, Interrogatory Number 2.

7    We are just moving on.

8              MR. QUINN:  Your Honor, can we ask that they give

9    us the Bates numbers of the documents which they say this

10   information can be derived from?

11             THE COURT:  Sure.  Give them the Bates numbers.

12             MS. HURST:  We'll do, your Honor.

13             THE COURT:  When?

14             MS. HURST:  Well --

15             THE COURT:  You don't want to spend the weekend

16   with me.  That's where we're headed.  I'm telling you that

17   right now.

18             So when?

19             Before we recess for the weekend, you'll have the

20   Bates numbers.

21             MS. HURST:  Okay, your Honor.

22             THE COURT:  Okay.  So everybody is coming back

23   tomorrow at 1:30.  Hopefully I can save you the weekend.  If

24   not, that's the way we're spending Labor Day.

25             Okay.  Interrogatory Number 2.

SACV 04-9049-DOC - 09/01/2010 - Vol. II

44

```
 1              MR. QUINN:  I propose to limit this to payments in
 2    excess of $50,000, your Honor.
 3              THE COURT:  Okay.  Do you want to redraft that?
 4              MS. HURST:  Your Honor, this is all creditors of
 5    the company.  It's crazy.  These are competitors.  They're
 6    our creditors, our suppliers, our vendors --
 7              THE COURT:  Just overly broad?
 8              MS. HURST:  Yeah.
 9              THE COURT:  Where does it go?
10              MS. HURST:  Yeah, and it's totally burdensome.
11              THE COURT:  Let's find out.
12              MS. HURST:  I mean, they are trying to get our
13    general ledger here.  This is crazy.
14              THE COURT:  Let's find out.
15              MR. QUINN:  Your Honor, we are trying to find out
16    if there has been fraudulent concealment of assets.
17    There's --
18              THE COURT:  Wasn't this the first evening we spent
19    together?  Aren't we back at the same place?  This is our
20    first discussion nine months ago.
21              MR. QUINN:  It may well have been.  I remember
22    Mr. Gordinier being here, and an easel, that's my vaguest
23    memory.
24              (Laughter.)
25              MR. QUINN:  But, your Honor, the Court has already
```

1    indicated that in an effort to -- in response to our RICO

2    claim, the concealment of assets, you know, furthering the

3    scheme to defraud Mattel, part of that includes essentially

4    siphoning assets out of the company.  We've already seen

5    here --

6            THE COURT:  I've never had a satisfactory answer

7    to that either.  In other words, I heard your constant

8    complaint.  It seems like we are right back in the same

9    position, and quite frankly, if it didn't occur, so be it.

10   If it did, I don't know what else the Court does.  If you

11   have a better suggestion.  You've got interrogatories,

12   you've got depositions, those are the answers you are

13   getting.

14           MR. QUINN:  Well, we are not getting answers to

15   these interrogatories.

16           THE COURT:  I know that, but I'm not going to

17   conduct the interrogatory for you.  And I'm not --

18   Mr. Larion or whoever you're examining, those are the

19   answers you are getting.

20           So I think you expect that somebody is going to

21   give you a definite answer, right?

22           MR. QUINN:  I'm used to it in response to

23   interrogatories, candidly, your Honor.

24           THE COURT:  Not in this case, you are not.

25           MR. QUINN:  That much is true.

 1              THE COURT:  Then there's the other side, from

 2    their perspective, they're not used to it either.

 3              So the frustration is high on both sides.

 4              MR. QUINN:  That's not a question of frustration,

 5    your Honor.

 6              THE COURT:  Well, we are going to cease the

 7    discussion because I don't know what else the Court can do.

 8    I can do certain things at the time of trial depending upon

 9    how I observe the evidence coming in, but you have been

10    conducting the depositions.  I certainly haven't been there.

11              I've only heard from Robert O'Brien and the other

12    young man, Drew, how they've been going.  I've read certain

13    transcripts, but they've been rather limited compared to the

14    days you've spent.  I think now it just becomes the art of

15    skillful lawyering.  Those are the answers you're getting.

16    As far as being harmed, from your perspective, I hear the

17    constant complaint.  I've heard complaints from MGA's side.

18    But that's the nice thing about litigation.

19              So I hope you've asked these questions at

20    deposition, because that's one-on-one.  Remember the way the

21    game gets played, it always gets played the same way, "My

22    lawyer helped me draft these.  I didn't really understand

23    them," but when asked directly at deposition, you've got a

24    lot of statements from a lot of different people, and if

25    they are obfuscating, they come in.

1          MR. QUINN:  If you ask these questions at

2     deposition, of course the answer is going to be, "I don't

3     know, I don't remember."

4          THE COURT:  Why should they --

5          MR. QUINN:  They wouldn't be expected to, these

6     types of questions.

7          THE COURT:  Okay.  All right.  Well, I am still

8     not getting an answer.  What is your request?

9          MR. QUINN:  We request that the objections be

10    overruled, and they would be ordered to answer the

11    interrogatories.

12         THE COURT:  Okay.  Let me turn one more time to

13    MGA.

14         MS. HURST:  Your Honor, with respect to

15    Interrogatories 2, 3 and 5, it is incredibly burdensome to

16    try to compile lists of every payment the company has ever

17    made in a certain period of time.

18         THE COURT:  Okay.

19         MS. HURST:  It is marginally relevant at best.

20    And your Honor, furthermore, we have a concern because these

21    all relate to the dismissed claims which Mattel has now

22    decided to pursue in state court and filed a whole big new

23    lawsuit today against all the Larion family members and all

24    of the trust and everybody else after this Court dismissed

25    the claims here, and now here they are moving to compel

1   their interrogatories on dismissed claims that they just

2   refiled in state court.

3           Your Honor, with all due respect to Mattel's

4   counsel, this is a side show, this stuff.  It's not the core

5   of this case.

6           THE COURT:  Okay.  Thank you very much, Counsel.

7   Save it for argument.  I'm sure they feel the same way about

8   the claims you recently made also, so --

9           Now, I've read the briefs on --

10          MS. HURST:  Your Honor, if I may make one more

11   point on Interrogatory 5.

12          THE COURT:  No, you may not.  Thank you.  We're

13   done with it.  I'll simply decide it now.  I know your

14   arguments, I've got your thoughts and briefings.  We're

15   done.  It's minutia.

16          Concerning -- why is it burdensome to have the

17   discovery master review MGA's e-mail chains?

18          MS. HURST:  We're talking about the R and R?

19          THE COURT:  Just a moment.

20          Sid just pointed out to me it's the 728 R and R.

21          MS. HURST:  728 R and R.  So on that one, your

22   Honor, Mr. O'Brien had set a deadline by which all items on

23   the privilege log that were going to be reviewed in camera

24   had to be identified.

25          THE COURT:  Okay.

1          MS. HURST:  And Mattel did not identify any of

2    these log entries, okay?  By that point, we had re-logged

3    and we spent about a half a million dollars in December

4    doing this and served a new log with 13,500 lines on it, and

5    they had not identified any of this.

6          And the reason they had not identified it was

7    because they wanted to take the position that they didn't

8    have to log e-mail chains after they had already taken the

9    position that we did.  And so then they missed the deadline

10   for identifying any of this stuff because they wanted to

11   preserve the right to argue that they didn't have to log

12   e-mail chains on their own, after we had already spent half

13   a million dollars logging 13,500 lines of e-mail, and then

14   they don't make the deadline, and they don't do it.  And

15   then they send a letter a couple of days later asking for

16   another brand new re-logging and review of something that is

17   as much as the original one that we already did.

18          THE COURT:  Why is it burdensome to have the

19   discovery master review these chains?

20          MS. HURST:  Your Honor, in order for us to compile

21   another 4,000 privileged documents for the discovery master,

22   submit numerous additional declarations to satisfy burdens

23   on claims of privilege, to -- I mean, it's -- it's hundreds

24   of hours of attorney time.  It's incredibly disruptive to do

25   it now in this last month of discovery.  This issue was

1   outstanding all the way back in January.  That's when the

2   deadline was.  It's burdensome.  It requires hundreds of

3   hours of attorney work.  It's disruptive to our efforts to

4   complete --

5           THE COURT:  That's enough.

6           Okay.  Counsel?

7           MR. ZELLER:  First of all, I think there is a

8   disconnect completely between MGA's arguments here.

9           THE COURT:  Pull the microphone closer.

10          MR. ZELLER:  The microphone?

11          THE COURT:  Yeah, just pull it down.  Thank you.

12          MR. ZELLER:  There is a disconnect between MGA's

13  two arguments here.  On the one hand, they are saying that

14  Mattel missed the deadline, which we obviously don't agree

15  with, but the time period we're talking about is a five-day

16  time period in January.  How it is that MGA somehow

17  reconstituted itself to be in a position where it basically

18  has now said that it should be all but immune from having

19  its privileged documents reviewed because it spent all this

20  money is completely unexplained, and I don't think it makes

21  any sense at all.

22          We've also -- the timing of it, while obviously I

23  understand the argument being made that we're further into

24  the year, the fact is we've been asking for this to be done

25  since January, so I don't see how MGA can play that card at

1    this point either.  We've been asking for this.  And we are

2    asking for the same rule to be applied to MGA that's applied

3    to us.

4            And I think the Court's question answers itself,

5    of course it's not burdensome for the discovery master to

6    review these e-mail chains.  I certainly don't have to

7    belabor the point with this Court as to the issues that have

8    existed in this case concerning privilege logs.  We are

9    talking about e-mail chains that have not been specifically

10   and separately logged.

11           We, Mattel, have no way of even testing this by

12   looking at a privilege log.  That as -- that fact was part

13   of the rationale as to how the discovery master got to the

14   point of reviewing e-mail chains in the first place.

15           THE COURT:  Thank you.

16           MR. ZELLER:  Thank you.

17           THE COURT:  The --

18           MS. HURST:  Your Honor, may I --

19           THE COURT:  No.  It's not your briefing and I've

20   heard the arguments.

21           Concerning the motion to compel documents

22   regarding former Mattel employees, the stipulation informs

23   me or tells me that you lodged the documents I requested for

24   in camera review, but we never received those documents in

25   chambers.  So I can even review those this evening, but

1    maybe MGA needs to give me a new set of electronically sent

2    documents, a new set into chambers, so I'm not quite

3    certain.  Is that possible or how am I supposed to conduct

4    myself?

5              *(Attorney discussion held off the record.)*

6              MS. HURST:  We can resubmit them tomorrow, your

7    Honor.

8              THE COURT:  Okay.  Why don't you just bring them

9    with you when you come down.

10             MS. HURST:  I think we were on for Friday, your

11   Honor.

12             THE COURT:  Well, what I'm doing is I'm trying to

13   save you this weekend.  This is going to be done now.  I'm

14   not horsing around with this.

15             MS. HURST:  May I --

16             THE COURT:  No, you may not.  Hear my clearly.

17   Too much time, too much verbiage from all the parties.  We

18   are done now.  Simple statements, that's it.

19             MS. HURST:  I'm going to be taking a deposition

20   tomorrow.  May Mr. Molinski be substitute counsel in my

21   absence?

22             THE COURT:  Where is your deposition?

23             MS. HURST:  Across the street.  Mr. Turetzky, a

24   third-party witness, former Mattel employee.

25             THE COURT:  Where is it going to be conducted?

Case 2:04-cv-09049-DOC-RNB   Document 8764   Filed 09/22/10   Page 53 of 103   Page ID #:272386
SACV 04-9049-DOC - 09/01/2010 - Vol. II

53

 1            MS. HURST:  Across the street.

 2            THE COURT:  Okay.  Come on over at 5:00.

 3            MS. HURST:  Okay.  Thank you, your Honor.

 4            THE COURT:  There is no other appearances except

 5   lead counsel.  You have a chance to substitute out, I'm

 6   giving that to you, that's it, two and two.

 7            MS. HURST:  Thank you, your Honor.

 8            THE COURT:  Concerning the motion to compel

 9   communications concerning Mattel employees.  The request of

10   the motion aren't numbered.  MGA's basic argument has been

11   that the requests are overbroad.  I think I tentatively

12   agree with MGA, but I don't agree that MGA doesn't have to

13   respond to these requests in some form.

14            On one hand, MGA shouldn't have to produce all

15   communications its ever had internally about Mattel employee

16   or employees.  I can only imagine the millions of

17   communications about Mr. Eckert that would have to be

18   produced or the vast majority of which would be irrelevant.

19   I think that the request for production involving Contreras

20   are reasonable.  But I recall seeing these types of requests

21   before in compelling production of such documents.

22            I'm also not sure why Mattel needs discovery into

23   whether MGA is recruiting current Mattel employees, and I

24   question how this relates to any of the allegations in the

25   fourth amended pleading.  So I'll take argument this evening

 1    on these requests at a time, and see if I can offer ways or

 2    you can offer ways in which they can be narrowed.  So I

 3    don't care which side starts.

 4            MR. ZELLER:  Your Honor, what I would suggest in

 5    terms of narrowing, and we certainly have attempted to be

 6    mindful of ways of dealing with this, and some of these

 7    we've addressed in the papers, but certainly one way for

 8    this to be done is to find communications that have the

 9    Mattel.com e-mail address, as well as the home addresses of

10    those who are known by MGA -- the home e-mail addresses as

11    to those who are known participants in the events that are

12    material to this lawsuit by MGA.

13            The other aspect, and this is where I think is

14    probably even more critical is to how it is that MGA can

15    frankly respond to these -- these RFPs is to focus on their

16    human resources function.  It frankly cannot be that large,

17    and particularly over the years, MGA clearly must have human

18    resources records where it is engaged in communications with

19    people that it has been -- where it's discussed hiring or

20    potentially hiring them.

21            And the reason why, in response to the Court's

22    query as to how is this relevant, it is relevant to, in

23    particular, to show that MGA went after Mattel employees,

24    people who were then current Mattel employees and offered

25    them terms of employment, including above-market pay and

 1    other kinds of benefits and other inducements that are

 2    properly considered by a jury to point to trade secret

 3    theft.

 4          We've cited these kinds of cases in prior briefing

 5    to the Court where courts have recognized that it is a fair

 6    inference from above-market pay and other kind of

 7    irregularities or deviations, we'll say, from normal hiring,

 8    and that can be inferential evidence of trade secret

 9    misappropriation.

10          So what we are looking for is to establish a

11    pattern by MGA of targeting then current Mattel employees,

12    offering them terms of employment that are beyond and above

13    what the market is.  That, in conjunction with the other

14    evidence that we have or the people who they did hire or at

15    least, you know, the people we know that they hired, would

16    show the pattern.

17          THE COURT:  Thank you.  Now, let me ask you

18    something.  I don't know that it's relevant concerning

19    numbers.  I think that the position might be relevant.  I

20    don't know how much normal movement takes place, certainly

21    in California, there is a tremendous amount of movement of

22    employees.

23          So I -- I'm prepared to narrow it, but I'm giving

24    you the first opportunity.  I don't think I'm too interested

25    or I think that the volume of people trading around in the

1   toy business is of any value.  I think key employees are.

2   And so I'm a little concerned that if I can narrow it, I

3   think it may be relevant, but what's the time period you're

4   requesting?

5          I -- I thought -- my memory is coming back.  When

6   I read this, I didn't know if you were asking for current

7   employees as of the date of this request who were former

8   Mattel -- I'm sorry, who were former Mattel employees moving

9   to MGA, or if you were asking for the universe employees who

10  moved to MGA who may not still be employed by MGA, that they

11  could have moved on.

12         For instance, you could have had a critical person

13  move on an earlier date, and they get a more lucrative offer

14  hypothetically in another business.  And I don't mean a --

15  what I call a creator, but somebody who's versed in either

16  marketing or product management, those could be every bit as

17  valuable for either MGA or Mattel.  And if I undertook that

18  with the claims now that are being made potentially by MGA,

19  why isn't that reciprocal?  I just don't know enough about

20  the business yet to know how large a universe I'm dealing

21  with and whether this is a finite universe with finite

22  numbers of companies, and that's my own inability.

23         So it seemed this came to my attention to be if

24  you have a human resources department, a wholesale search

25  through every new hiree from some period of time, and it's

1   redundant, all communications or documents, and then it goes

2   on, any current Mattel employees.  I'm not sure what you're

3   asking for.  That's what's perplexing to me.

4           MR. ZELLER:  We're basically looking for those who

5   are at the time current employees.  That's why it's a

6   defined term.  It's not that they are current today.  I'm

7   sorry.

8           THE COURT:  Let's do that again.  At what time?

9   It says current.  I would read that as current as of 2000

10  whenever this was served.

11          MR. ZELLER:  It is -- no.  It's whatever time the

12  communication was, so if the communication with MGA was in

13  2005, that person was at the time a then current Mattel

14  employee.

15          And the reason it's phrased this way is to avoid

16  an issue of us saying, we want communications with Mattel

17  employees, because obviously some of those people went over

18  to MGA, so that's why this distinction is made.

19          THE COURT:  Let me see if I can understand this.

20  Let's just take the first bullet point, "All communications

21  between you and any person including without limitation

22  internal MGA communications referring or relating to any

23  current Mattel employee."  Translate that for me.

24          MR. ZELLER:  Sorry, your Honor, you're reading

25  from which numbers?

```
 1              THE COURT:  Line 1, page 4.  Translate that for
 2   me.
 3              MR. ZELLER:  Number 41, it looks like.
 4              THE COURT:  One.  First bullet point, page 4.
 5              MR. ZELLER:  All right.
 6              THE COURT:  Translate that for me.
 7              MR. ZELLER:  And this is one where --
 8              THE COURT:  Translate that for me.
 9              MR. ZELLER:  I'm sorry?
10              THE COURT:  Translate that for me.  What does it
11   mean?
12              MR. ZELLER:  It's trying to find out about
13   internal communications within MGA where one person at MGA
14   says, hey, by the way, I used to work at Mattel and you
15   should go and find person X to do job Y.
16              THE COURT:  So this is a wholesale search through
17   human resources.  Wouldn't it require a check of every
18   single employee to see over a large period of time if they
19   had come from Mattel to MGA and/or any communications?  I
20   don't know what that means.
21              For instance, what happens if I'm a competitive
22   salesperson, and I communicate with another competitive
23   salesperson -- well, I'm dreaming up hypotheticals right
24   now.  I don't know what I'm talking about.  I'll just wait.
25   You explain it to me because I don't understand it.
```

SACV 04-9049-DOC - 09/01/2010 - Vol. II

59

```
 1              MR. ZELLER:  Here is the way --

 2              THE COURT:  It's awfully burdensome, frankly.

 3              MR. ZELLER:  We have certainly offered and

 4    suggested, and still do, ways of trying to define it so it's

 5    not the whole company.

 6              THE COURT:  Give it back to me in written form at

 7    2:00 tomorrow, okay?  I'll give you the first choice to

 8    knock it down or I'm going to knock it out.

 9              MR. ZELLER:  Okay.

10              THE COURT:  Make it as narrow as you possibly can

11    because it's the last opportunity.  Right now I'm prepared

12    to quash this.

13              MR. ZELLER:  Thank you.

14              THE COURT:  It's too burdensome, okay?

15              All right.  The -- I didn't rule on a number of

16    topics that we'll hear argument on tonight in the original

17    motion to compel concerning MGA's 30(b)(6) testimony.  Those

18    topic numbers are 6, 22 and 25.

19              First, I'm going to grant on topic 6 in light of

20    the Ninth Circuit's ruling.  I'm going to deny on topic 22

21    because it's marginal relevance, and it's marginally

22    relevant in light of the order on the motions to dismiss.

23    Those are final rulings by the Court, and I'm not going to

24    allow further argument.

25              But what is topic number 25?
```

SACV 04-9049-DOC - 09/01/2010 - Vol. II

60

```
 1              MR. ZELLER:  Your Honor, topic 25 goes to the
 2    Laredo guy, who we discussed.  It's the smuggling of the
 3    Laredo guy --
 4              THE COURT:  Yeah, I got it.  Thank you.
 5              Now, come up with another scheme rather than a
 6    complaint for a moment, because now I'm looking for
 7    solutions.  I hear your pain, or I feel your pain.  I don't
 8    want to be drawn into the lawsuit and have any possibility
 9    of making an order from the bench that can be used at the
10    time of trial; do you hear my fear?  "Well, didn't this
11    Court order such and such?"  In the heat of battle, things
12    slip.  I'm not going to put myself in that position.  What
13    else would you like me to do?
14              Mr. Quinn, you said repeatedly, order Mr. Larion
15    to answer the interrogatory, but my response is, you've got
16    him at the time of deposition, ask him the question.  So I
17    don't know in terms of ordering him to answer the
18    interrogatory how that's a benefit to you, so I'm tracing
19    back to an argument in a discussion we just had.
20              MR. QUINN:  Right.  Your Honor, we've discussed
21    this issue several times over several hearings, and I think
22    perhaps I have a different understanding of the usefulness
23    of an interrogatory than the Court does.  I agree as a
24    general proposition interrogatories are absolutely useless,
25    but they do -- can put on a responding party, obligations.
```

1          THE COURT:  But they haven't in this case.  When I

2     came into this case, my frustration was watching what had

3     happened before.  No criticism.  But the interrogatories

4     were going no place.  The paperwork going on for motions for

5     reconsideration were going no place.  That's why I have put

6     you in a deposition schedule.  That's one of the reasons I

7     granted 25 depositions to you, because you can directly ask

8     the question.

9          If a person gave you an equivocal answer, you

10    couldn't hide behind paperwork for either side.  You'd have

11    this equivocal answer or nonconforming answer or an answer

12    that was non-uniform.  That's why I changed the whole view

13    of this case, because this was going nowhere.

14         You're right in a general sense, but you probably

15    had gotten as good an answer and the best position

16    tactically for both parties in a lawsuit through the

17    depositions.

18         MR. QUINN:  I -- I --

19         THE COURT:  And to go back and start this -- I

20    mean, I'm not going to order him specifically to answer

21    that.  It's there.  It's been served on him.  You don't need

22    the Court's strength on that.

23         MR. QUINN:  Well, the "it's" that's there are

24    objections, and the difference is, your Honor, with

25    respect --

```
 1            THE COURT:  Just a moment.  Did you get objections
 2   at the deposition?  If you didn't get objections at the
 3   deposition, he's supposed to answer them.  If you did get
 4   objections at the deposition, then they need to be brought
 5   to my attention and he will answer them or they will be
 6   answers that have equivocation, but that's his choice and
 7   all of the other witnesses' choices, and once again, I don't
 8   want to focus on Mr. Larion, it's become the mantra.
 9            MR. QUINN:  Let's use Eckert.
10            THE COURT:  Okay.  Let's use both.
11            MR. QUINN:  Your Honor, I haven't done a very good
12   job, I suspect, of explaining this, but it's the difference
13   between, we can all sort of think of some information, a
14   question that would call for information that none of us
15   would think it's really fair to ask a deponent to remember
16   on the spot, that opponent's -- deponent's response that, I
17   just don't know, I would have to look that up, whatever, in
18   context --
19            THE COURT:  No, I don't mean to be rude, but if I
20   had given you seven hours and two days with Mr. Larion or
21   Mr. Eckert, I haven't done that, I've given you 11 days or
22   12 days, in other words, there is no reason he's not
23   prepared, and as long as you ask the question, I've given
24   you this incredible amount of time.
25            MR. QUINN:  No, you absolutely have, your Honor.
```

1    It's -- when you direct an interrogatory to an entity party,

2    like a corporation, they then have to come -- if they've

3    got -- well, your Honor, I have actually gotten some answers

4    to interrogatories over the years and introduced some of

5    them into evidence.

6              THE COURT:  Well, you're a far better attorney

7    than I am, but let me repeat this to you, this will not come

8    down, I know you don't believe it, to MGA versus Mattel.

9    This will come down, when all of this is done, to Eckert and

10   Larion on the stand.  I know you don't know that yet, but

11   this case is going to rise and fall over two people, and we

12   can talk about MGA and we can talk about Mattel.

13             MR. QUINN:  You know, if it comes down to that,

14   I'm very comfortable.

15             (Laughter.)

16             MR. QUINN:  I think we all operate under the

17   assumption, your Honor, that we are not wasting our time

18   here.

19             THE COURT:  You're wasting your time.

20             (Laughter.)

21             THE COURT:  Because you're not getting answers,

22   you've been tied up in the hog bound, quite frankly, in

23   interrogatories that weren't working and motions to

24   reconsider and discovery motions, if you are not getting the

25   answers, one of the reasons for both parties, I turned you

SACV 04-9049-DOC - 09/01/2010 - Vol. II

64

```
 1     to depositions, and I'll repeat it, is that's the closest to
 2     the adversarial proceeding you can get without being in
 3     trial and allows you to hear the answer and ask another
 4     question on the spot, that's what interrogatories don't do.
 5            So I'm not going to -- there's objections to
 6     these.  Let me go back and consider them.  Some of them are
 7     unduly burdensome and I'm giving you the chance to narrow
 8     those, and I've spoken to you about them.  Some of those, I
 9     may strike the objections and order answers to them, but let
10     me see, okay?  Let me go back and thoughtfully look at them
11     again.  That's not going to be hard to do this weekend.
12            As far as the Laredo guy, I think you are just
13     stuck with that answer.  That's what's going to be testified
14     to at trial, and if that's true and he doesn't know, so be
15     it, so yeah.
16            The next motion to compel regarding Mr. Machado.
17     Is Mr. Machado's counsel here?
18            MR. QUINN:  No, sir.
19            MS. HURST:  He's not, your Honor.
20            THE COURT:  Okay.  Well, there, Machado raises a
21     number of objection to Mattel's discovery request on the
22     grounds that they are overbroad and burdensome.  I'm not
23     going to get into a parsing game.  I'm just simply going to
24     order Machado to produce the responsive documents, and
25     you'll see those -- that come out in an order, there and
```

SACV 04-9049-DOC - 09/01/2010 - Vol. II

65

```
 1   reading the transcripts, I'm very concerned, they can easily
 2   be resolved and answered.
 3            Well, listen, we are only partway through cleaning
 4   up the discovery requests, but my thought is that we go back
 5   to this tentative order granting IGWT 826's motion for
 6   judgment on the pleadings, and then I'm going to order you
 7   back tomorrow at 2:00.  I'm going to let you work quietly,
 8   but I want you here initially from two to about five.  You
 9   go on with your deposition, okay?  But that's why you're
10   here.
11            MS. HURST:  Your Honor, there is a deposition --
12            THE COURT:  No, I'm speaking, and you are
13   listening now.
14            And when that occurs, maybe we can make some
15   progress in the three hours, so it will only require one
16   counsel from Mattel, because there is only one, and whoever
17   else chooses to join me then at 5:00, you'll be here?
18            MS. HURST:  Yes, your Honor.
19            THE COURT:  You'll be here at five?
20            MR. QUINN:  Yes, your Honor.
21            THE COURT:  Do you want to come in at 2:00?
22            MR. ZELLER:  Yes, your Honor.
23            THE COURT:  You are ordered in also,
24   Mr. McConville.
25            MR. MC CONVILLE:  Yes, your Honor.
```

 1          THE COURT:  Now, that will give you a chance, if

 2    you don't want to work on it tonight, to work until other

 3    counsel get here, but if you can narrow them, I'm just

 4    encouraging you to, because the overbroad -- what's going to

 5    happen is I'm just going to start denying it.  I am giving

 6    you every opportunity to narrow this down to make it

 7    workable, and then if we don't get responses, maybe it's a

 8    little bit -- allay some of the concerns that it's overbroad

 9    and unduly costly and burdensome for what we are getting.

10          Well, Counsel, I think that I'd like to hear from

11    Mattel first on this motion.

12          MR. ZELLER:  Your Honor, we -- we submit on the --

13    on the papers and on the tentative.  The one point I would

14    make, your Honor, is that Mattel -- and we can do this as an

15    administrative matter -- is dismiss the dec relief claim as

16    to IGWT under Rule 41(a)1.  There hasn't been an answer or

17    other kind of pleading that would prohibit us from doing

18    that voluntarily.  It takes that issue off the table, and we

19    don't have to argue about it further.

20          THE COURT:  Counsel?

21          MR. MC CONVILLE:  Your Honor, IGWT did answer,

22    which is why this was a motion on the pleadings, because the

23    pleadings had closed, so there is an actual answer, but

24    second --

25          THE COURT:  Well, just a moment.  Let's check

```
 1   that, let's see if we have agreement.  I thought there was

 2   an answer also.  In fact, I read it.

 3              MR. MC CONVILLE:  Yes.

 4              MR. ZELLER:  I may stand corrected, your Honor.

 5              THE COURT:  Hold on.  Let's make sure the record

 6   is clear.  The circuit someday gets to look at this.

 7              MR. ZELLER:  I apologize.  I apparently was

 8   mistaken.

 9              THE COURT:  Not a problem, but there is an answer.

10              MR. ZELLER:  What I would --

11              THE COURT:  Just a moment.  Mr. Quinn wants to

12   talk to you.

13              MR. ZELLER:  I know what he's going to say.

14              (Attorney discussion held off the record.)

15              MR. ZELLER:  Your Honor, I would ask that the

16   Court grant us leave to dismiss the dec relief claim as to

17   IGWT, and that it resolves any issues on that claim, a

18   voluntary dismissal without prejudice.

19              THE COURT:  Why, so you could refile in state

20   court?

21              MR. ZELLER:  It is because -- that is certainly

22   part of it, but what the Court is also ruling is that there

23   is no actual controversy before it, which basically means

24   there is no subject matter jurisdiction.  Then if that's the

25   case, it wouldn't have any effect in state court in any
```

1    event by our likes, but it obviously leaves a live issue in

2    this case that would, you know, subsequently be a point of

3    contention.

4           THE COURT:  You see, what concerns me is that the

5    one court, whether state or federal, isn't resolving these

6    issues, and frankly, just because the Court's holding on the

7    808 and the 826 IGWT, if you noticed in the footnote, it's

8    still wide open in terms of evidence, so a lot of this is

9    just silly.

10          And it seems to me that if this is relevant, there

11   is going to be arguments concerning whether this is

12   consciousness of guilt and whether it comes in or not at the

13   time of trial, so this doesn't relieve necessarily, and I

14   haven't made that ruling or determination.  I'm waiting for,

15   you know, MGA and you to argue that in the future, but

16   that's going to be upon us very quickly.

17          So these pleadings just seem unduly consumptive.

18   I don't really think that you should be going back.  I am

19   not too sure that MGA should be filing at this late date, by

20   the way, and I am not too certain you ought be going back to

21   state court, and I think that this is the very place to

22   clean this place up, quite frankly.

23          So why am I going to, once again, allow you to

24   voluntarily dismiss after an answer?

25          MR. ZELLER:  Because it will leave for the state

 1    court to resolve the issues.  The state court does have in

 2    front of it as a result of us having to file the fraudulent

 3    transfer act claims in state court.  That was in accordance

 4    with the Court's ruling.  It didn't have supplemental

 5    jurisdiction.

 6              THE COURT:  Sure.

 7              MR. ZELLER:  So those issues, one way or another,

 8    are in state court.  What I'm focused on and the only thing

 9    I'm talking about with respect to the dec relief as to IGWT

10    is the dec relief portion that says, "There were no valid

11    transfers.  There are transfers" -- "any transfers that were

12    made with respect to IGWT are not valid."  The Court has

13    said, "That's a hypothetical dispute, at this point," which,

14    of course, translates into, "It's not an actual controversy;

15    therefore, there is no subject matter jurisdiction of the

16    Court."

17              I'm simply saying that I think it's better to

18    leave that same issue.  If we voluntarily dismiss it, then

19    it's no longer an issue in this case, and the state court

20    has a claim stake, as it should, to resolve this, along with

21    the other related issues that are going to be in front of it

22    by necessity.

23              And, of course, we had to file this action, as the

24    Court is aware, because there are statute of limitations

25    that continues to run.  And so we -- we don't want an

1    argument that by not pursuing our fraudulent transfer claims

2    in state court as the venue that we are left with doing

3    that, that we would be time barred, and that is the reason

4    we are now in state court, but I think it's frankly --

5    frankly, I think it's really in the best interest of

6    administration of justice that the state court judge be

7    permitted to make that determination.

8            THE COURT:  I would think that the counter

9    argument would be if I wasn't going to eventually allow, and

10   I don't know yet, this information to come in concerning

11   consciousness of guilt, et cetera, which has direct bearing

12   on this, you know, what I call the main case, that might be

13   a good equitable argument, I don't know, I haven't

14   considered it yet.  But if I did allow it to come in, it has

15   a direct bearing on this case, and this is the main stage

16   case, quite frankly.  This is the case where most of the

17   damages flow.

18           Now, that isn't a good legal basis for a reason --

19   or for a ruling, but I would think that the Court would be

20   ruling on the merits and I would be ruling here.

21           Let me hear from Mr. McConville.

22           MR. MC CONVILLE:  Your Honor, absolutely, if they

23   wanted -- they saw how the Court handled the Omni matter,

24   which we said was similar to the IGWT situation.  They did

25   not choose at that time, understanding what the issues were,

 1   to withdraw their case before the Court's tentative.

 2           And my sense is the reason is because they want to

 3   get a bite of the apple here, and when the Court finds

 4   out -- when they see that the Court's going to dismiss it,

 5   they say, "We want to voluntarily withdraw so that the

 6   effect that they can go to state court and say there is no

 7   matter pending and, in fact, we voluntarily withdrew it, so

 8   there would be no adjudication."  So they want it both ways,

 9   your Honor.

10           And, you know, just to spend a little time on the

11   fact that they were forced to do anything.  They weren't

12   forced to do anything, your Honor.  They chose to file here,

13   and then they chose to file in state court.  And now they're

14   trying to follow a similar path, and for strategic reasons,

15   they want to try and voluntarily dismiss now that they see

16   where the Court is going to go.

17           THE COURT:  Okay.  You'll have a response and an

18   answer by the Court tomorrow.

19           Now, let's give Judge Smith a call.

20           MR. MC CONVILLE:  Your Honor, there is one issue

21   that is on -- that affects tomorrow's deposition, which is a

22   motion for a protective order that we filed for a 30(b)(6),

23   and I understand that the -- that the Court wants to call

24   Judge Smith, but I wanted to bring it to the Court's

25   attention that --

SACV 04-9049-DOC - 09/01/2010 - Vol. II

72

```
 1              THE COURT:  I'm calling Judge Smith.

 2

 3              (Hon. James L. Smith present via

 4         teleconference.)

 5              THE COURT:  Hi, Jim, this is Dave.  I'm in court

 6    with esteemed counsel.

 7              Did you get that, Jane?  It's a compliment to

 8    them.

 9              You and I had a conversation about narrowing,

10    and -- just a moment.  I want to get my notes from the back,

11    Jim.  Hang on for a second.

12              Jim, can you hang on for a moment?

13              JUDGE SMITH:  No problem.

14              THE COURT:  I left some notes on my desk.  They're

15    on the back on a piece of paper, handwritten.  And I want to

16    make certain that I retrace our conversation accurately for

17    Mattel and MGA.

18              So Jim, just give me one second, okay?

19              JUDGE SMITH:  Take your time.

20              THE COURT:  Thanks a lot.

21              MR. QUINN:  Your Honor, may I step down the hall

22    and come right back?

23              THE COURT:  Sure.  I probably will have made a

24    ruling by that time, but go ahead.

25              (Pause in proceedings.)
```

Case 2:04-cv-09049-DOC-RNB   Document 8764   Filed 09/22/10   Page 73 of 103   Page ID
#:272406
SACV 04-9049-DOC - 09/01/2010 - Vol. II

73

1          THE COURT:  All right.  We are back on the record.

2     All counsel are present, Jane.  And Judge Smith is on the

3     phone.

4          I'm going to repeat a portion of the conversation

5     I had with Judge Smith.  He is much more articulate and

6     he'll -- has a much better understanding, which is why the

7     court appointed him as the special master in this matter.

8          First, Judge Smith has informed me in a prior

9     phone call that concerning the e-mail on the Archive One,

10    that about 20 or 25 percent, someplace in that range, has

11    been retrieved, that they've retrieved 196 gigabytes, but it

12    has not been deduped, and there's lots of dupes.

13         Now, I don't believe that we can possibly complete

14    that with the discovery deadlines that the court set, and

15    I'm going to stay with those discovery deadlines, but Judge

16    Smith informs me that he had produced what I thought was a

17    rather astounding and commonsense approach, and that was not

18    a modification so much of a reduction in the search terms,

19    but I thought that he had suggested, and now we are going to

20    see for a moment what the link is with MGA and Mattel to

21    those surrogates or excellent and esteemed other counsel

22    that you've launched on the electronic front.  So let's see

23    how well your law firms are communicating.

24         What was Judge Smith's suggestion, Ms. Hurst?

25         MS. HURST:  (No audible response.)

```
1              THE COURT:  Silence.
2              Mr. McConville, what was Judge Smith's suggestion?
3              MR. MC CONVILLE:  I don't know, your Honor.
4              THE COURT:  Then how -- just a moment, before I
5    pounce.
6              Mr. Quinn, what was Judge Smith's suggestion?
7              MR. QUINN:  I don't know.
8              THE COURT:  Mr. Zeller?
9              MR. ZELLER:  I would only have a guess.
10             THE COURT:  Then how can you come in front of this
11   Court and make an intelligent decision if you don't know
12   what the other attorneys in your offices are doing in terms
13   of electronic discovery?
14             Mr. Zeller, can you explain that to me?
15             MR. ZELLER:  I -- I actually do have information
16   about this.
17             THE COURT:  What was Judge Smith's suggestion?
18             MR. ZELLER:  Well --
19             THE COURT:  What was Judge Smith's suggestion?
20             MR. ZELLER:  He's had more than one, so I --
21             THE COURT:  Tell me what his first suggestion was.
22             MR. ZELLER:  The one suggestion that I thought we
23   had --
24             THE COURT:  What was his first suggestion?
25             MR. ZELLER:  The suggestion that I thought we
```

1    resolved, or the one that was first, was that we were going

2    to figure out what accounts to look at first, that basically

3    we were going to make an order of the accounts in Archive

4    One to search and try and search them in that order.  Then

5    we were told by ILS that these could actually be mounted,

6    and that they could be mounted and they could all be

7    searched together much more quickly.  That's the information

8    that I had.

9            THE COURT:  Mr. Quinn, I don't want to embarrass

10   you, but do you have any additional information about his

11   suggestion?

12           MR. QUINN:  I am as ignorant now as I was moments

13   ago.

14           THE COURT:  Ms. Hurst, can you add clarity to

15   this?

16           MS. HURST:  I cannot, your Honor.  I'm sorry.

17           THE COURT:  Mr. McConville?

18           MR. MC CONVILLE:  No, your Honor.

19           THE COURT:  Jim, what we have is a failure to

20   communicate here, or Judge Smith.  What's apparent to this

21   Court now is that we're not getting -- in other words,

22   counsel are coming in front of me arguing and taking up my

23   time, and there's no communication between the law firm and

24   the -- not surrogate, but let's say esteemed co-counsel who

25   are appearing in front of you, they are not communicating

 1    back and forth, so they are wasting my time.

 2            Well, his suggestion was that the search protocol

 3    be drastically modified, that there be a focus on individual

 4    custodians, which is just a technical term for a custodian,

 5    that since Archive One is MGA's archive server, most of the

 6    employees had their e-mail transferred to Archive One,

 7    obviously, and if we took a finite number of custodians,

 8    which is what we've been doing all night, trying to get a

 9    narrowing, if you will, and getting relevant information and

10    we took some number and then the Court gave you -- which was

11    not his, now, I'm going to expand on the last part, because

12    it was absolutely brilliant, one additional or one-year time

13    period for each one of the custodians selected, that we

14    could get this information within the next month, probably,

15    to meet with the Court's discovery cutoff guidelines.

16            JUDGE SMITH:  Sorry for interrupting, but sooner.

17            THE COURT:  We could probably get it sooner.

18            JUDGE SMITH:  Yes.

19            THE COURT:  And what that would do is give the

20    advantage to Mattel of those custodians that you think are

21    truly relevant and the time period, because the way it's

22    going now, it's not going to be completed and it couldn't be

23    completed before trial.

24            And what it would do is give the advantage to MGA

25    of not having what you perceive is a laborious, expensive

Case 2:04-cv-09049-DOC-RNB  Document 8764  Filed 09/22/10  Page 77 of 103  Page ID #:272410
SACV 04-9049-DOC - 09/01/2010 - Vol. II

77

1    and overbroad request that, quite frankly, would take us up

2    to the time of trial, and perhaps we would still be laboring

3    under.

4          Now, I was rather astounded at the suggestion

5    because I haven't thought of it, and I want to hear and have

6    Judge Smith for a moment just speak to what I've said, and

7    if you have anything to add or if I've been incorrect,

8    please talk to the counsel.  I've got you on a speaker phone

9    and we are in session, Jim.

10         JUDGE SMITH:  Well, first of all, I would like

11   nothing better than to take full credit for the alternative

12   procedure that Judge Carter has just outlined to you.  I

13   would love to do that.  If I thought I could get away with

14   it, I would, but frankly, it was a suggestion that was made

15   by Diane Berry of ILS when she and ILS staff got involved in

16   the retrieving data from the Archive One server, and they

17   had all kinds of problem with that thing, and as time goes

18   on, you've been exposed to most of them.

19         And it was her suggestion that this would be a

20   much more simpler and much more expeditious and much quicker

21   process if we could -- first of all, she suggested that we

22   take all of the custodians and extract the information on a

23   custodian-by-custodian basis because the Archive One

24   software facilitates that process much better and it

25   supports that process much better than it does a wholesale

Case 2:04-cv-09049-DOC-RNB   Document 8764   Filed 09/22/10   Page 78 of 103   Page ID #:272411
SACV 04-9049-DOC - 09/01/2010 - Vol. II

78

 1    exporting of the data.  And that makes sense when you stop

 2    and think about it.

 3         I mean, I didn't figure this out.  Like so many

 4    things, it makes sense when you look at it in retrospect.

 5    It makes sense because basically that's what the Archive One

 6    archiving system was for, to archive e-mail so it would be

 7    available to custodians or account holders, or whatever you

 8    want to call them, if and when they needed to recover

 9    information or e-mails within the archive.

10         So Diane's suggestion was that it would facilitate

11    the process a great deal if we would -- if we would retrieve

12    the information on a custodian-by-custodian basis.  My

13    thought was that I -- I am going to get to a point where I

14    take some credit for something here.

15         My thought was, well, it seems to me like that's a

16    natural mechanism for expediting the search under conditions

17    of limitation on time to complete it.  The Court has been

18    suggesting, at least I've heard on several occasions the

19    suggestion that we -- and we don't have an infinite amount

20    of time to complete this process and that there are going to

21    be some significant limits placed on discovery, and the

22    discovery cutoff is imminent.

23         And I thought, well, it seems to me that we ought

24    to do a triage here.  We ought to look at the custodians

25    that are thought to be -- likely to be the most fruitful.  I

```
 1    mean, Mr. Larion, of course, comes to mind, Mr. Wing comes
 2    to mind.  You folks -- I bet if you folks separately,
 3    counsel for both sides, sat down and made a list of the top
 4    five names that you think would be on Mattel's list, in
 5    other words, Mattel makes a list and MGA make a list of the
 6    top five that they thought would be on Mattel's list, they
 7    would probably be identical.
 8            So you select a number of accounts --
 9            THE COURT:  Jim, Jim, Jim, just a little bit
10    slower.  Jane is taking down your words.
11            JUDGE SMITH:  My apologies.  I should be
12    sensitized to that.  I've had that happen to me on a number
13    of conference calls, and I apologize.
14            So if we take a limited number of -- of custodians
15    and retrieve the information for each of those custodians,
16    then put in a -- in a database that can be searched
17    efficiently and effectively, I think we are home free.  The
18    last part of that process, the search of the information
19    against the search terms that are utilized is relatively
20    easy compared with this first process, you know, of pulling
21    teeth on the Archive One server to get the data out, and
22    so --
23            THE COURT:  Jim?  Jim?  Jim?
24            JUDGE SMITH:  Yeah.
25            THE COURT:  Let me ask a question.  The
```

1    representation to me is that there are over 700 search

2    terms; is that true?

3                JUDGE SMITH:  I know there are a lot of search

4    terms that were proposed, but of course, we are not to the

5    point where we're really talking about search terms --

6                *(Dropped call.)*

7                THE COURT:  I may have run out of battery.  No, I

8    haven't.

9                *(Interruption in the proceedings.)*

10               THE COURT:  We'll go back on the record.  It just

11   cut out.

12               So we'll go back on the record, Jane.

13               And I think we were discussing the number of

14   search terms.  You told the Court that there --

15               JUDGE SMITH:  Custodians, I think.

16               THE COURT:  No.  I moved custodians to search

17   terms, and I heard that there was, I thought, over 700, you

18   said there was a large number.

19               JUDGE SMITH:  Yeah, there is.  There's a large

20   number of search terms, and what I indicated then is that

21   we're -- that's not the critical path right now, we're not

22   to the search terms, we're really still trying to retrieve

23   the information, and if we can do that for a selected

24   limited finite number of custodians, then it's going to

25   substantially shorten the time necessary to complete the

```
 1    Archive One -- the retrieval information from the Archive

 2    One database.  That's the long and short of it right there.

 3              That's the checkpoint in the supply chain -- in

 4    the supply line right now, is retrieving that data from

 5    Archive One.  It's being done, as I said, it's 20,

 6    25 percent done right now.  They've got 196 gigabytes.  We

 7    are talking about roughly 800, 900 gigabytes by the time we

 8    get done, which is --

 9              THE COURT:  Slower, Jim.

10              JUDGE SMITH:  That's a lot of information, that's

11    a lot of data.  If we could reduce that down, I don't know

12    how many employees MGA had, but if they had a hundred

13    employees, just for example, if there were a hundred

14    employees that were being served by that e-mail server in

15    the Archive One e-mail archive server, if they had a hundred

16    of them, they are all producing the same number of e-mails

17    and we selected five of them, we would, by definition, only

18    be retrieving 5 percent of the data on there.

19              THE COURT:  Let me ask you something, Jim.  Off

20    the record, counsel has been very helpful to the Court,

21    exceedingly helpful after my initial concerns.  They are

22    going to bring down the persons you've been involved with to

23    make certain that there is absolute communication, because

24    lead counsel in my court driving the case, and is there any

25    benefit or how can I support you as the special master?
```

SACV 04-9049-DOC - 09/01/2010 - Vol. II

```
 1              One suggestion I have to Mr. Zeller and to Mattel

 2     is that they get the first opportunity of narrowing this,

 3     and they tell me those critical people, and I mean critical

 4     people because I'm thinking five, you know, four, three,

 5     two, Mr. Zeller, one, just joking, but we're down to about

 6     five, and --

 7              JUDGE SMITH:  If I might interrupt.

 8              It doesn't necessarily have to be a decision

 9     that's made right now.  What we can do is, we can say, "Give

10     us the first two."  I mean, if we assume that it's going to

11     be two or more, which is probably a safe assumption, if it's

12     going to have any utility at all, then give us those first

13     two and let -- it's going to take about a day -- it's going

14     to take the better part of a day to retrieve each

15     custodian's data.

16              So if you give us two names, tomorrow morning, ILS

17     can start retrieving data on those two names, and that will

18     take us to Friday.  And then if by Friday, they can give us

19     the balance of the names, whatever number that is, whether

20     it's three more or 10 more or a hundred more, obviously

21     don't anticipate that, but whatever it is, if they can give

22     us the balance of the names or even another name or two

23     names, then we'll have enough to work on for the next two

24     days.

25              We can do a little more than one custodian a day.
```

1    And by the way, folks, I don't mean to aggrandize my

2    contribution to this, when I say "we can do," I am not

3    giving you the impression that I'm there with my sleeves

4    rolled up and reaching down into those drives with my

5    fingers and extracting data.  When I'm saying "we," I mean

6    ILS can do one or more custodians a day, somewhat depending

7    on volume, but at least one a day, let's put it that way.

8              So my suggestion to the Court would be to

9    precipitate a decision on the part of the parties, and this

10   would probably be, frankly, Mattel's decision because it's

11   Mattel's discovery, and they are the ones that can best

12   identify what they feel the custodians that present the

13   highest likelihood of discoverable information or critical

14   information, have Mattel give us two names, whatever two

15   names they want, and let ILS start on those two names with

16   the new procedures, the new protocol in place, and I think

17   we can probably wrap this up in two or three weeks including

18   the search, and then we can -- at that point, we can also,

19   when we start retrieving the data, we can then start working

20   on refining the search terms, and --

21             THE COURT:  Jim.  Judge Smith.  Jim.

22             JUDGE SMITH:  Yeah.

23             THE COURT:  Yeah, okay.  I was prepared to give

24   about 10 more days to this project, and if I give 10 more

25   days to this project, assuming that those are working days,

1   I probably have Thursday, Friday, and then four days next

2   week, because after that, it's going take some period of

3   time with privileged logs, et cetera, et cetera.

4           I'm not going to be satisfied, and I'm talking to

5   counsel now, with simply tossing Archive One aside because

6   it's too burdensome, counsel, but I also know that because

7   of the amount of information, that it's becoming unduly

8   expensive and time consumptive.  So we're going to come up

9   with some names for you right now, and we're going to take a

10  run at one or two of those, Jim, tomorrow, we are not going

11  to waste any time.

12          JUDGE SMITH:  Okay.

13          THE COURT:  And Mr. Zeller, you can pick -- I

14  wouldn't suggest you pick Mr. Larion to begin with.  There

15  may be greater latitude in terms of time than one year, but

16  I'm going to initially have you take a test run with two

17  people, as Judge Smith suggests, and I'm going to give you a

18  one-year time period, so if you want, for instance, 2000,

19  2001, you've got it.  If you want to name a particular

20  witness, and you think that the time frame of 2003, 2004 is

21  valuable, you've got it, but give me two names.

22          Jim, hold on for just a second.

23          JUDGE SMITH:  I'm standing by.

24          THE COURT:  Okay.

25          MR. ZELLER:  One thing, your Honor --

```
1              THE COURT:  Give me two names.

2              MR. ZELLER:  We provided a list, your Honor.  We

3     provided it on August 17th.

4              THE COURT:  What two names are you going to give

5     me tonight?  I want Judge Smith rolling tomorrow on this.

6              MR. ZELLER:  Isaac Larion is one.

7              THE COURT:  Now, I was going to give you a greater

8     time frame than Isaac Larion of one year, so we'll expand

9     that with Isaac Larion, okay?

10             Who is the second one you'd like?

11             MR. ZELLER:  Brian Wing.

12             THE COURT:  And what time period would you like

13    for Mr. Wing?

14             MR. ZELLER:  It needs to be more than one year.  I

15    would propose from 2004 until the time he left.

16             THE COURT:  And that would be 2006, 2000 -- I

17    don't recall.

18             MR. ZELLER:  He had two stints, but I believe it

19    would be basically through the current time, whatever, 2008,

20    2009, but that shouldn't be -- that shouldn't be overly

21    burdensome, because just another point to make on this, your

22    Honor, just to fill it in a bit, if I may, we did go through

23    that process.  That's what I was referring to before.

24             We did narrow down the custodians.  We sent a list

25    to Judge Smith as well as to MGA on August 12th, and we
```

SACV 04-9049-DOC - 09/01/2010 - Vol. II

86

1    narrowed it down to 17 people we had in that order.  MGA

2    ignored it.  And part of the frustration I want to register

3    at this point is that MGA has done two things:  Number one,

4    it shunted off its e-mails, its working e-mails after 90

5    days into the system, and now basically argues it's too

6    burdensome to look at, and Mattel shouldn't get discovery

7    from it for that reason.

8            The second thing it's done is, is that this is

9    something that's been going on since January.

10           THE COURT:  Now, just a moment.  I keep hearing

11   the complaint, and the difficulty is going to be regardless

12   of that, I don't think it's going to be physically possible

13   to get that done and get to trial.  And knowing that, I hear

14   what you are saying, I'm not ruling against you and I'm not

15   shutting down Archive One, but if you maintain that

16   position, and you don't tell the Court, that's exactly

17   what's going to happen, not because of an order, because

18   it's just not going to be done, and we are going to be

19   sitting here going through privileged logs, et cetera, that

20   we can't possibly master by that time.  I'm giving you an

21   opportunity, take it as that and cut off this argument now.

22           MR. ZELLER:  I understand, your Honor.

23           THE COURT:  We're going to take Brian Wing.

24           Jim, can you make a run and let's just see how

25   burdensome that is with Mr. Wing from 2004 to 2008.

1          JUDGE SMITH:  2004 to 2008, Brian Wing.

2          THE COURT:  Just a moment.  I think Isaac Larion

3    is going to be obviously one of the five, and whether we do

4    that now or later on, we certainly ought to start with that,

5    so --

6          JUDGE SMITH:  I would suggest we go with Larion.

7          THE COURT:  Yeah.  So just a moment.  Larion is

8    somebody who I want to give Mattel, you know, a real

9    expansive opportunity on Archive One, so I would think that

10   you would want, what, a year before -- well, you tell me,

11   Mr. Zeller.

12         MS. HURST:  Your Honor, may I --

13         THE COURT:  No.  Mr. Zeller.

14         MR. ZELLER:  I think that for Mr. Larion, it

15   should go from the beginning of 2000, January 1st of 2000.

16         THE COURT:  Okay.

17         MR. ZELLER:  Up until, the minimum, the filing of

18   this lawsuit, the end of April 2004.

19         THE COURT:  Okay, Jim, can you make a run.

20         And what date do you want in August -- or in 2000?

21         MR. ZELLER:  I would -- out of an abundance of

22   caution, I would start on January 1st, 2000.

23         THE COURT:  Do you know of any contact between

24   Carter Bryant in January?  In other words, if I can cut out

25   even a couple of months, it saves me a lot of effort.  I'm

 1    thinking March, April to be safe.

 2            MR. ZELLER:  I wouldn't want to go much back

 3    before March, and one reason is because another key player

 4    in this, Paula Treantafelles, began at MGA in the spring of

 5    2000.

 6            THE COURT:  So why don't we take March.

 7            MR. ZELLER:  March 1st.

 8            THE COURT:  March 1st.

 9            Jim, can you make a run from March 1st, 2001

10    concerning Isaac Larion through -- well, let's just say

11    through December of 2004, and that will be the most

12    extensive run probably along with Brian Wing.  Everything

13    else I'm going to limit in the future.

14            MR. ZELLER:  Just a question, your Honor, you said

15    2001, I think you meant 2000.

16            THE COURT:  I did.

17            Jim, Isaac Larion, March 2000 through, let's say,

18    December 1st, 2004.

19            JUDGE SMITH:  December 1st, 2004.

20            THE COURT:  Yeah, Brian Wing, take me through the

21    rough time period of 2004 through 2008.  He's another

22    four-year run, but those would be the two most extensive,

23    everything else I'm probably going to limit to a year.

24            JUDGE SMITH:  So I'm going to go 01/01/04 through

25    12/31/08 for Wing.

1              THE COURT:  That's fine.

2              JUDGE SMITH:  And we're going to go

3     March -- 03/01/2000 through 12/31/04 for Isaac Larion.

4              THE COURT:  That's fine.  Now, just a moment.

5          When these runs are being made, if we had all five

6     names for you this evening, does that save us some time?  In

7     other words, can they be run consec- -- strike that --

8     sequentially rather than consecutively?

9              JUDGE SMITH:  I'm sorry, your connection is

10    cutting out.  I don't know what's happening.

11             THE COURT:  Can you hear me?

12             JUDGE SMITH:  I can hear you now, yes.

13             THE COURT:  Can they be run at the same time or do

14    they have to be run consecutively?

15             JUDGE SMITH:  The custodians would have to be run

16    sequentially, but they will take less than a day each, so if

17    we had two or three names, we could -- in a couple of days,

18    we could probably get three of them done.

19          I would suggest, they have to immobilize and get

20    things set up to run this type of a retrieval, but that

21    shouldn't take too long, but once they start, they should be

22    able to have these two done in two days at the most.

23          The thing that we have to keep in mind is that we

24    are talking about volume of e-mail, and although Mr. Larion

25    is obviously a very significant key part of this, his e-mail

1    volume, I know it was large, but it wasn't necessarily that

2    large.  There's probably other employees at MGA that had a

3    larger volume of e-mail that were --

4                THE COURT:  But Jim, I'll decrease the time with

5    those.  In other words, those employees --

6                JUDGE SMITH:  Okay.  As I understand it, the

7    marching orders are that we will -- ILS will start with the

8    time frames you just gave me for Brian Wing and Isaac

9    Larion.

10               May I request one more thing of the Court?

11               THE COURT:  Just one more moment.  Annette Hurst

12   is trying to say something, and I didn't want to interrupt,

13   but now I want to give her the lectern.

14               MS. HURST:  Two things, your Honor.

15               THE COURT:  Can you hear her?

16               JUDGE SMITH:  I can just barely, but I think I can

17   hear.

18               MS. HURST:  The first thing, in terms of the

19   privilege review, if we have all of the custodians extracted

20   and the search terms run before we start the privilege

21   review, it will go immensely faster than if we try to do it

22   one by one by one, because we are going to put all the

23   privilege documents together.

24               THE COURT:  I think that's your burden now.  In

25   other words, I think I've been very gracious in terms of

1    cutting back what the original order was.  We spent so long

2    haggling over terms and it was wasteful time.  The pressure

3    is on you now.

4              MS. HURST:  Your Honor, please.

5              THE COURT:  Thank you.  No, Ms. Hurst, no.

6              And second, the quicker you can get the names to

7    me on Mattel's part, the better opportunity you have for the

8    Court to expand.

9              Now, I understand that you believe that it's more

10   economical, and I subscribe to that also, but remember,

11   there's been abuse of these privilege logs.  They've taken

12   entirely too long, and without castigating one party, both

13   of you have been in that position.  And I've said before, I

14   could have issued terminal sanctions a long time ago.

15             So I'm very distrustful of the length of time and

16   that process.  Now I've set trial dates.  You're going to

17   have to expend the resources, and these are minimal

18   resources compared to the resources that were being expended

19   on Archive One and all of this material that was about to

20   flow, so you are the beneficiary of this, and you are not

21   being punished by this.

22             Now, if we can get all five names to Judge Smith

23   to begin with, I would agree that that would be helpful.  So

24   if we could have Mr. Zeller give those to us tomorrow, my

25   question to Judge Smith is, do these folks that you've

1    employed work on Saturday, Judge Smith?

2              JUDGE SMITH:  These folks will work 24/7 if it's

3    necessary.  They don't normally try to do, but I've never

4    seen them slow down.  The entire industry, by the way, Judge

5    Carter, is one that's sort of a feast and famine industry,

6    and when they have work, they do it, because there are times

7    when they don't have work, and that applies to almost every

8    E discovery provider out there that I'm aware of.

9              It's -- it's very much -- it's a rat race or it's

10   sitting around waiting for the phone to ring.

11             THE COURT:  Okay.  How about this, then.

12             Ms. Hurst, will this alleviate your concern and

13   work that we have two names for Judge Smith now, two

14   essential names, and we have -- I don't want them working on

15   Labor Day, for goodness sakes, or Sunday, it's a religious

16   holiday for many people, but certainly Tuesday, Wednesday,

17   Thursday, Friday, and Saturday of next week, there ought to

18   be, you know, five plus two, it seems to me that's rather

19   expansive on my part, because I started with five or less,

20   and if I put a cutoff date next Sunday, I --

21             JUDGE SMITH:  I can state to the Court with a

22   great deal of confidence that they are in a service

23   industry, and they want to perform a service that, you know,

24   when given the opportunity, that's their living, and if

25   advised that this is a process that needs to be expedited as

1    much as possible, they will put the resources to it, the

2    time resources and the people resources to get it done as

3    soon as possible.

4              THE COURT:  The reason why I think that that would

5    be reasonable is, minimally, I was prepared to go 10 more

6    days with Archive One, because I initially believed that we

7    were about 35 percent done or more and I thought, for some

8    reason, we might be done within about 10 more days.

9              I see no reason not to give counsel, you know, 10

10   days counting weekends to work this, and that would

11   alleviate the problem for Ms. Hurst, because if -- if you

12   didn't start the privilege log then until the following

13   Monday, wouldn't that alleviate your concern?

14             MS. HURST:  That would, your Honor.

15             THE COURT:  Then you'd have them together.  By the

16   same token, I'm trying to be expansive in terms of Mattel

17   and move that up in numbers from five to seven, if we can,

18   okay.

19             So I would expect then, initially, five to seven

20   people, but that means that I need to get, Judge Smith, back

21   from you any problems that your experts are running into.

22   In other words, if I've made a mistake in judgment, which

23   wouldn't be the first, but it's been so expansive and so

24   burdensome concerning Larion, and so expansive or burden

25   concerning Wing, those will be the two most prolific, I

1    think, because I'm giving four years.

2          From this point forward, it's one year, you pick

3    the five people, Mr. Zeller, Mr. Quinn, and I'll give you

4    those five additional people.  Instead of cutting it at

5    five, you'll have a total of seven, surrounded by a year.

6          So Jim, I think that ought to cut down on it and

7    give us seven people, five of which will have a one-year

8    term surrounding the Archive One search, the two most

9    expansive you're starting on, okay?

10         JUDGE SMITH:  That sounds great.  And if the folks

11   would communicate that directly to me by e-mail, as you have

12   in the past, that would be very much appreciated.

13         I would also appreciate encouragement from the

14   Court to the parties to be encouraged to cooperate in any

15   additional information that ILS may need in order to

16   implement the custodian search.  I don't think there will be

17   any, but if there is something, I want Ms. Berry or someone

18   from ILS to be able to contact one of the parties and ask

19   them a question and get a response.

20         THE COURT:  No, lead counsel -- Judge Smith, lead

21   counsel will be right here in court.  You'll have a response

22   immediately.

23         I'm finishing off a trial, and I won't be done

24   until 2:00 tomorrow, but lead counsel are ordered back at

25   2:00, and they will be here tomorrow evening and also

SACV 04-9049-DOC - 09/01/2010 - Vol. II

95

1   Friday, I don't think they need to be here Saturday, but

2   that way we'll know problems before the weekend begins.

3         JUDGE SMITH:  Let me say that I will take -- make

4   available time whatever is necessary to deal with any of

5   these problems on a priority basis.  I have other cases

6   scheduled, but I'm not going to -- I'm not going to let

7   myself be the choke point in this process.

8         So I may be calling you folks, I may be e-mailing

9   you, I may be asking things of you, and I'd appreciate your

10  cooperation if that happens.

11        THE COURT:  You don't have to.  Just come on down

12  to court anytime because they will be here because --

13        JUDGE SMITH:  I know where to find you, right?

14        THE COURT:  Because I don't want any possibility

15  of any time wasted between lead counsel, who would have to

16  make the ultimate decision, and associate counsel, who have

17  undertaken this.

18        So if you want to come down tomorrow night, in

19  fact, they will be here.  We are going to start at 5:00.  So

20  that's up to you, but the five names will be here, and in

21  fact, if you need any further direction, why don't you come

22  on down at five.

23        JUDGE SMITH:  Well, if I feel the need for, I

24  appreciate the invitation, I will come on down.  I have no

25  problem with that, but, however, if things are going well,

Case 2:04-cv-09049-DOC-RNB   Document 8764   Filed 09/22/10   Page 96 of 103   Page ID #:272429
SACV 04-9049-DOC - 09/01/2010 - Vol. II

96

1    and you don't -- you folks don't need me, I won't be there,

2    but if you want me there, let me know and I'll make myself

3    available and I'll be there.

4            THE COURT:  Mainly I would like the input, if you

5    can come down here at 5:00 tomorrow night, I would like to

6    know on the record that this is a successful attempt, in

7    other words, I'd like to know the problems just immediately

8    if they are occurring because I don't have time to turn

9    around, and I think Mattel has a very good position here,

10   and that is, we started with this broad search, and without

11   castigating either party, I would think from Mattel's

12   perspective, it's a little unfair, as they argue, but from

13   MGA's perspective, it was always overly broad, so it's kind

14   of a compromise to get the most essential, you know, people

15   out there, and --

16           JUDGE SMITH:  I will then be there tomorrow

17   evening at 5:00 to give you an in-person status report of

18   what's happening.

19           THE COURT:  And by the way, they will be here

20   Friday also, because if we run into problems, I want to

21   know, and then they are with me on Saturday, okay, Jim?

22           JUDGE SMITH:  I'm sure we will have a good handle

23   on how things are going tomorrow at 5:00.

24           THE COURT:  Thank you very much, Jim.

25           JUDGE SMITH:  Thank you.

1           MS. HURST:  Your Honor, may I?

2           THE COURT:  You may.

3           MS. HURST:  Two points, your Honor.  First, I

4   would just ask the Court to keep an open mind on the burden

5   associated with this until we see the search terms run

6   against the extracted e-mail and see what the total gigabyte

7   volume of data is, because it still could be a massive

8   amount, so that's point 1, your Honor.

9           THE COURT:  Obviously open mind, but I'm also

10  sensitive to Mattel's position as well, so as you raise

11  these problems, these are not problems.  These are

12  consistent obstacles from my perspective.

13          MS. HURST:  And if --

14          THE COURT:  Sorry, I'm speaking.  Start again.

15  I'll keep an open mind but not until I see the problem.

16  There's no problem yet.

17          MS. HURST:  Understood.

18          THE COURT:  No problem yet.  I'll know tomorrow

19  night at 5:00.

20          MS. HURST:  Your Honor, with respect to the Larion

21  e-mail, this is duplicative of what we've already done on

22  the Larion hard drives.  There is nothing in Archive One

23  that we haven't already extracted from the Larion hard

24  drives.

25          THE COURT:  Excellent.  Then they just burned up

1    one of the people, they only have six left, don't they?

2            MS. HURST:  Well, but, your Honor, we are going to

3    have to review it again.  We already reviewed it.  We've

4    been spending hundreds of thousands of dollars doing this

5    for the last few months.  We've produced substantial amounts

6    from the Larion hard drives, we are almost done with that

7    production, and now this will be starting over again.

8            THE COURT:  If you have a better suggestion, I

9    can't determine where they are concerning Larion.

10           In other words, I don't know where they are.  I

11   don't if they are that close, and I don't think you do

12   either.

13           MS. HURST:  I'm pretty up to speed on the facts,

14   yes, your Honor.  I apologize for not being able to answer

15   the question earlier, but I am pretty up to speed on the

16   facts on this.

17           THE COURT:  You understand that I'm distrustful?

18           MS. HURST:  I do.

19           THE COURT:  I'm distrustful of counsel for both

20   sides not being up to speed on this.  So why am I accepting

21   that tonight?

22           You bring your expert down tomorrow night and

23   maybe we can head this off, but they are starting on Larion

24   now.  I think it's a good idea.  I think it's a way to

25   complete that, and I wish I would have known this earlier

1   because the custodian makes a lot of sense, it's stored that

2   way.  I didn't know that.

3          And quite frankly, it would have saved a lot of

4   money because I might have decided to make Mattel pick 15

5   people back at the very beginning or 10 or 12, but since we

6   started the wholesale search, this isn't going to be an

7   excuse.

8          Now, I'll see you tomorrow at 2:00, okay?  Have a

9   nice evening.

10         MR. ZELLER:  If I may, your Honor.  There is a

11  issue concerning depositions tomorrow.

12         THE COURT:  And the issue is?

13         MR. ZELLER:  Well, MGA is proceeding on the

14  assumption that it has more than 25 depositions, which was,

15  of course, the limit that the Court set.  Obviously there --

16         THE COURT:  I've been gracious, I think.

17         Do you need more than 25 depositions?

18         MS. HURST:  Your Honor, Discovery Master O'Brien

19  ordered 29 for both sides, and we are happy with that.

20         THE COURT:  He informed me of that.

21         MS. HURST:  And that's what we think is fair, and

22  we are happy to abide by that.

23         THE COURT:  I'll take you right up to the deadline

24  on the date.  It's the date that concerns me, not the number

25  of depos, and I don't know how it's not fair to expand that

```
 1   somewhat because originally the moving party was Mattel who
 2   wanted the depos, and not MGA.  And if you're requesting
 3   four additional and if the discovery master thinks that
 4   appropriate, I have no difficulty.
 5          It's just that I'm not weighing it by depos
 6   anymore because some of the persons, like Larion, are taking
 7   a tremendous amount of time, so I don't know how you measure
 8   that against one depo or five depos.  And I think I've been
 9   very gracious in making him come back.
10          MR. ZELLER:  Then the other issue had to do, is
11   the fact that one of these -- a number of these depositions
12   that MGA wants to take beyond the limit go to their no
13   claims, which the Court, of course, when we've asked for
14   that discovery, is saying is being held in abeyance.
15          I think it's only fair that both sides be held in
16   abeyance on those issues, but these individual witnesses who
17   they want to take go to those claims.  Again, I think it
18   would be particularly unfair for Mattel, which from our
19   perspective, we're being sandbagged, and we are not getting
20   discovery, and MGA nevertheless is proceeding with it.
21          THE COURT:  Okay.  And where are we deciding this
22   issue concerning whether these claims are going to be
23   allowed?
24          MR. ZELLER:  We are preparing our motions.
25          THE COURT:  And what date is -- am I going to
```

1    decide it?

2           MR. ZELLER:  If I may, your Honor.

3           THE COURT:  In other words, this may not be a

4    problem, but it's not before the Court, and therefore, I'm

5    not going to stop discovery.  The ball is in your park, you

6    get it to me, and then I'll decide it.

7           MR. ZELLER:  It appears that we are planning and

8    prepared to file our motions on Tuesday.

9           THE COURT:  Okay.  The ball is in your court.

10   It's not before me yet.  I'll rule on it when I get it.  You

11   may have a good position and maybe they shouldn't go

12   forward, but right now, they are.  So get it to me.

13          MR. ZELLER:  Your Honor, they are saying that

14   these depositions are going to take place tomorrow in the

15   time period before that is due.

16          MS. HURST:  Your Honor, the witness tomorrow is

17   not exclusively related to those issues.  He's -- was a

18   senior vice president of strategic planning.  He's related

19   to a lot of issues in the case.

20          MR. ZELLER:  He is a third party who hasn't had

21   notice of this, but, your Honor, the fundamental problem is,

22   is we are not getting this discovery, and MGA is proceeding

23   as though it continue to take it.

24          MS. HURST:  Your Honor, we are providing

25   discovery.  We have collected many documents, we've produced

Case 2:04-cv-09049-DOC-RNB   Document 8764   Filed 09/22/10   Page 102 of 103   Page ID
#:272435
SACV 04-9049-DOC - 09/01/2010 - Vol. II

102

```
 1    them.  We've produced 30(b)(6) witnesses.  Mr. Larion

 2    testified at length today on issues related to this.  We are

 3    producing another witness tomorrow to testify about our

 4    showroom practices and confidentiality procedures.  We've

 5    gathered up documents regarding the 54 products.  We are in

 6    the process of producing them.  We absolutely are proceeding

 7    with discovery.  We have not in any way, shape or form

 8    curtailed discovery on this.

 9            We understand the Court's deadline.  We absolutely

10    are going to make that deadline and produce everything

11    reasonably anybody can want on those claims within the

12    deadlines already set by the Court.

13            THE COURT:  Okay.  Deposition proceeds tomorrow.

14            I hope this motion gets in front of the Court

15    quickly because it may be absolutely unnecessary and

16    redundant and wasteful, but you get it to me.

17            Good night, now.

18            MS. HURST:  Good night, your Honor.

19            MR. QUINN:  Thank you, your Honor.

20            (Recess.)

21                            -oOo-

22

23

24

25
```

SACV 04-9049-DOC - 09/01/2010 - Vol. II

103

```
 1                        -oOo-

 2                     CERTIFICATE

 3

 4        I hereby certify that pursuant to Section 753,

 5   Title 28, United States Code, the foregoing is a true and

 6   correct transcript of the stenographically reported

 7   proceedings held in the above-entitled matter and that the

 8   transcript page format is in conformance with the

 9   regulations of the Judicial Conference of the United States.

10

11   Date:  September 13, 2010

12

13

14        _____

15        JANE C.S. RULE, U.S. COURT REPORTER
          CSR NO. 9316

16

17

18

19

20

21

22

23

24

25
```