1

1          **UNITED STATES DISTRICT COURT**

2          **CENTRAL DISTRICT OF CALIFORNIA**

3       **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4                    - - - - - - -

5

6   CARTER BRYANT,                      )
                                        )
7            Plaintiff,                 )
                                        )
8        vs.                            ) No. SACV 04-9049-DOC
                                        )      Volume II
9   MATTEL, INC.,                       )
                                        )
10           Defendant.                 )
    _____)

11

12

13

14          REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                       Hearing

16                Santa Ana, California

17            Friday, September 3, 2010

18

19

20

21   Jane C.S. Rule, CSR 9316
22   Federal Official Court Reporter
     United States District Court
23   411 West 4th Street, Room 1-053
     Santa Ana, California 92701
24   (714) 558-7755

25   10-09-03 MattelV2

1    **APPEARANCES OF COUNSEL:**

2

3    FOR INTERVENOR DEFENDANT MGA ENTERTAINMENT, INC.:

4            ORRICK, HERRINGTON & SUTCLIFFE, LLP
             BY:  THOMAS S. MC CONVILLE
5                 Attorney at Law
             4 Park Plaza
6            Suite 1600
             Irvine, California 92614
7            (949) 567-6700

8            - AND -

9            ORRICK, HERRINGTON & SUTCLIFFE, LLP
             BY:  ANNETTE L. HURST
10               Attorney at Law
             405 Howard Street
11           San Francisco, California 94105
             (415) 773-5700

12

13   FOR DEFENDANT MATTEL, INC.:

14           QUINN, EMANUEL, URQUHART, OLIVER & HEDGES
             By:  JOHN B. QUINN
15                MICHAEL T. ZELLER
                  JOHN GORDON
16                Attorneys at Law
             865 South Figueroa Street
17           10th Floor
             Los Angeles, California 90017-2543
18           (213) 443-3000

19

20

21

22

23

24

25

1                        **I N D E X**

2

3

4              MGA'S MOTION FOR NEW TRIAL

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              SANTA ANA, CALIFORNIA, FRIDAY, SEPTEMBER 3, 2010

 2                             VOLUME II

 3                            (7:02 p.m.)

 4          (Live reporter switch with Maria Delleneve.)

 5          THE COURT:  First, I've gone back, and I've paid

 6    particular attention -- by the way, all counsel are present

 7    on the MGA/Mattel matter.

 8          Judge Trott was especially incensed with the -- or

 9    concerned, and his comments are vociferous in terms of the

10    inability to find or look at the Carter Bryant documents,

11    the agreement.

12          I'm going to grant your motion to compel, Mattel

13    to produce those documents, but you are under strict orders

14    from this Court that there is to be no mention that that

15    motion to compel was brought by this Court in front of the

16    jury; is that understood?

17          MS. HURST:  Understood.

18          THE COURT:  And that would be contemptuous, and it

19    would cause immediate sanctions and an immediate instruction

20    from this Court that would be devastating to MGA; do you

21    understand that?

22          MS. HURST:  Yes, sir.

23          THE COURT:  And my greatest fear is my distrust of

24    both parties and anything said in front of the jury.

25          MS. HURST:  Understood.
```

```
 1              THE COURT:  All right.  Thank you.

 2              Now, you'll get that in written form sometime this

 3     weekend.

 4              Now, last evening, Judge Smith told me that he had

 5     taken it upon himself to speak to each of you privately at

 6     one point, and that he was going to have the parties contact

 7     him with a memorialized agreement about the conversations

 8     that we had last evening, and the witnesses -- or

 9     custodians, I'm sorry, and the dates, and he assured me that

10     that would be to me this morning so I could put that in the

11     master memo that I'm wrapped in to keep track so that the

12     Circuit has our decisions, at least, in order form.

13              I haven't seen that.

14              MS. HURST:  That's our fault, your Honor.

15              THE COURT:  I'm going to take a recess.  I'm not

16     doing anything else until I have it, so you tell me when to

17     reconvene, today, tonight, tomorrow, I don't care, but

18     nobody is going anyplace until I have that.  And I'm not

19     even tackling the hour or five hours of -- worth of work we

20     have to do, depending upon your arguments, until I have

21     that.  And I warned Judge Smith last evening that it

22     wouldn't be forthcoming, and that I wish that I was not

23     intruding on his, you know, decision, but that the parties

24     hadn't been performing for this Court.

25              So you tell me what time to reconvene.  I've got a
```

```
 1    lot to do, so --

 2              (Attorney discussion held off the record.)

 3              MS. HURST:  Fifteen minutes, your Honor.

 4              THE COURT:  Fifteen minutes, okay.

 5              (Recess.)

 6              THE COURT:  All right.  We are on the record.

 7    Carter Bryant/Mattel.  It's 04-9049, and counsel is still

 8    present.

 9              The Court now has a signed stipulation -- or a

10    stipulation by the parties.

11              Cathy, do I have the original?  I want to affix my

12    signature to it.

13              THE CLERK:  I believe the parties have to sign off

14    on it.

15              THE COURT:  Then wait until they sign it and --

16              MS. HURST:  Do you want to sign it and pass it my

17    way or the other way around?

18              MR. ZELLER:  I'll sign it.

19              THE COURT:  Great, thank you.  I appreciate it.

20              Okay.  Unfortunately that took about an hour or

21    over an hour of the planned time that I thought we would be

22    in argument, but so be it.  That's counsel's choice.

23              If Judge Smith calls, tell him I finally have the

24    stipulation counsel promised him this morning.  It's not

25    necessary to come down to court tonight, but I may need him
```

1    tomorrow, though.

2            All right.  Counsel, the next matter is the motion

3    for new trial.  I've expressed some tentative thoughts which

4    may not have changed much since I delivered them to you, but

5    there are two big issues as far as the Court is concerned.

6            Whether the jury's special findings should be

7    preserved, and whether the verdicts on the three state

8    claims should be preserved.  I don't need argument on the

9    remaining issues, and I'm not inviting it.

10           On the second claim, which was Jury Instruction

11   Number 22 at the phase one trial, the -- Mattel contended

12   that MGA and Isaac Larion intentionally interfered with the

13   inventions agreement between Mattel and Carter Bryant.  And

14   my concern on page 24 of that instruction, lines 16 through

15   18, if you have those instructions in front of you.

16           And there, it states that MGA and/or Mr. Larion

17   intended to disrupt the performance of this contract.  The

18   problem I'm having that I need to have addressed, and the

19   quandary I'm in is, how does this Court know what the

20   performance of the contract is?  I don't know what the

21   performance of the contract is after the Ninth Circuit's

22   ruling.

23           Now, I could joke with you a little bit, but one

24   of my reasons is not because we can't get a decent copy of

25   the contract, but, you know, it could be argued; we don't

```
1    even have a decent copy of the contract.  I know Judge Trott
2    was quite concerned about that, so I think I would like to
3    hear from Mattel because you're seeking to substantiate the
4    state law claim.
5           So Mr. Zeller, please.
6           MR. ZELLER:  Addressing the Court's comments about
7    at least the issue of the contract itself that was presented
8    at trial, MGA stipulated to its authenticity and
9    admissibility, but portions of it are quoted in the
10   instructions.  No one disputes that those are the terms of
11   the agreement.
12          I would also note that, of course, throughout the
13   trial, the parties put the language and blew it up in front
14   of the jury and discussed those terms of the contract, you
15   know, this was in openings, closings, throughout the course
16   of the testimony.  Mr. Bryant confirmed, as well as Mattel
17   witnesses confirmed, that that was, in fact, his agreement.
18          The other thing I would point out is, is that, in
19   fact, the agreement that Mr. Bryant signed was a form
20   agreement, as MGA and Bryant themselves repeatedly talked
21   about.  We have originals of that form.  People can read the
22   terms of it and the like.  Part of the problem that occurred
23   with a copy, and I'm not making excuses of what occurred in
24   the copy that was given to the Court of Appeals, but what
25   happened is, is that, as the Court is aware, you are
```

1    required to continue to reuse the same exhibit once it's

2    been marked and particularly from a deposition, so it

3    literally was one of these copies that was multiple

4    generations, it was shrunk down because it had to have an

5    exhibit sticker and then other numbers and the like.

6              THE COURT:  Who shrunk it?

7              MR. ZELLER:  I presume that originally it was done

8    by the court reporter, who photocopied it, because, of

9    course, you take the contract or a copy of the contract, you

10   put an exhibit sticker on it and then it continues to get

11   reused and photocopied and those copies get copied.

12             THE COURT:  Where is the original?

13             MR. ZELLER:  I'm sorry?

14             THE COURT:  Where is the original?

15             MR. ZELLER:  Well, the original, I don't recall

16   all the details.  We looked at this years ago.

17             THE COURT:  Can you check with the court reporter?

18   Sometimes -- maybe she's got it.  Has anybody asked her?

19             MS. HURST:  There was never an original that even

20   was marked as an exhibit.

21             MR. ZELLER:  Right, right.

22             THE COURT:  Okay.  Please continue.  Thank you.

23             MR. ZELLER:  So while I would, in fact,

24   respectfully submit that this argument about not being able

25   to read it, again, I'm not trying to dismiss Judge Trott's

1    concerns, based on what he had in front of him, that's not

2    really consistent -- I don't think that's a position MGA can

3    take at this point, given the, in fact, lengthy history of

4    the litigation.

5         I would also note --

6         THE COURT:  You did not infer that Judge Trott

7    cannot read?

8         MR. ZELLER:  Right, definitely.

9         (Laughter.)

10        THE COURT:  What you're saying, so it's very clear

11   for this record, is that he reads very well.  He just

12   couldn't read the copy in front of him.

13        MR. ZELLER:  Correct.

14        THE COURT:  Okay.

15        MR. ZELLER:  I was not trying to make excuses for

16   the copy that Judge Trott was provided.  All I'm saying is

17   that that's -- that that's not the state of, of course, the

18   full story of the record of what the parties have and know

19   about that contract.

20        And what I would also note, your Honor, is that

21   MGA itself moved for summary judgment on the terms of the

22   agreement.  They never came back, and I mean, during

23   literally years of litigation on this, never said, "We

24   can't" -- "we don't understand this.  We don't understand

25   the terms.  We can't read it."  I mean, they took positions

1    in front of the Court saying, "Here is the language of the

2    agreement.  This is what we think it means."  They made

3    arguments, for example, that the assignment was only for

4    patentable inventions.

5          I mean, this has been literally something that is

6    being raised for the first time in many years about the

7    legibility of the agreement.  And again, I see those are

8    very different issues between what it is that MGA is now

9    arguing about it and what was going on with Judge Trott.

10         Judge Trott may -- again, is talking about a

11   particular copy he had in front of him, but that's not the

12   entirety of the record, and that certainly I don't think at

13   this point justifies MGA's attempt now to completely change

14   positions and say, "Well, we can't even read the thing now.

15   We have no idea what this says."  I mean, I don't think

16   that's borne out by the record.  In fact, I think the record

17   is to the contrary.

18         In terms of the particular question that the Court

19   has about what the performance of the contract is or refers

20   to in the context of this -- the context of the instruction.

21   In our view, because what the standard is, is not, do we

22   have to discern exactly what the jury found or what the jury

23   decided in order to uphold the verdict, but rather it's

24   MGA's burden to show that there is no possible set of

25   circumstances under which the jury verdict could be

Case 2:04-cv-09049-DOC-RNB   Document 8765   Filed 09/22/10   Page 12 of 41   Page ID #:272448
SACV 04-9049-DOC - 09/03/2010 - Vol. II

12

1  sustained.

2          And there are, as we've explained in our papers,

3  and this is certainly supported by the record, there were

4  many instances in which -- in many actions that MGA

5  undertook that, in fact, disrupted Carter Bryant's

6  performance of the agreement, namely his obligations under

7  the agreement.  And those had nothing to do with who owned

8  Bratz or not.  He could have been pitching the Halloween

9  costume and the same type of result could have been obtained

10  by the jury.

11          And when we -- when we look -- what we view as the

12  proper standard for new trial, that's all that's required,

13  is that there is some set of facts that were established at

14  trial that could substantiate the jury's verdict.

15          THE COURT:  Thank you.  I'll come back to you.  I

16  want to provide two opportunities to each side.

17          MR. ZELLER:  Thank you.

18          THE COURT:  Counsel on behalf of MGA, Ms. Hurst.

19          MS. HURST:  Thank you, your Honor.

20          Your Honor, Mattel has the standard wrong.  The

21  standard here is not a sufficiency of the Evidence Rule 50

22  standard.  It is -- we know a new trial has to be ordered.

23  And the question is whether a partial new trial or an entire

24  new trial is appropriate.

25          Under those circumstances, the Gasoline Products

1   case, as articulated in other Ninth Circuit cases, Gallom

2   (phonetic), as in others, is whether -- and the burden is on

3   Mattel, here, because we know that some claims have to be

4   retried.  Whether the other claims are so distinct and

5   separable, that's the standard.  They have to show that the

6   claims are distinct and separable.  That's the proper legal

7   standard here.  And unless they are distinct and separable,

8   it has to be a complete new trial under the Gasoline

9   Products v. Champlin case.

10      Now, I'm going to address the special findings first,

11  if that's all right with the Court, or did the Court want me

12  to address the state law claims first?

13          THE COURT:  I'm going to guide you.  The only

14  claim you are addressing right now is the second claim.

15          MS. HURST:  Interference?

16          THE COURT:  That's it.

17          MS. HURST:  Thank you, your Honor.

18          THE COURT:  In other words, I'm going to take you

19  through my order this evening.

20          MS. HURST:  Understood, your Honor.

21          THE COURT:  And of course it's the intentional

22  interference claim.

23          MS. HURST:  Understood.

24          Your Honor, on this point, the jury cannot have

25  evaluated the third element -- the second or the third

1   element, knew of the contract, intended to disrupt the

2   performance of the contract, without knowing what the terms

3   were that were at issue.

4           And we now know that the jury did not have the

5   opportunity to -- it should have had to evaluate what the

6   terms were.  You can't possibly evaluate intentional

7   interference with contract without knowing what the contract

8   terms are.  It's a core element of the claim.  And in the

9   intent standard here in California law under the Quelimane

10  case is there has to be a substantial certainty.

11          THE COURT:  Just a moment.

12          Cathy, go home.  Good night.

13          THE CLERK:  Okay.

14          THE COURT:  I'll handle the jury.

15          MS. HURST:  There has to be a substantial

16  certainty that there will be a disruption in the accused

17  party.

18          THE COURT:  Just one moment.

19          Off the record.

20          (Informal discussion held off the record.)

21          THE COURT:  Counsel?

22          MS. HURST:  Okay.  And this is reflected in

23  Instruction Number 24 as well, your Honor.  So it's not just

24  22, as the Court pointed out, but 24 as well.  In deciding

25  whether MGA or Isaac Larion acted intentionally, you may

1    consider whether they knew that a disruption in the

2    performance of a contract or contracts was substantially

3    certain a result from their conduct.

4            You can't evaluate substantial certainty to cause

5    a disruption without knowing what the obligation was that

6    was allegedly disrupted.  And so there is just -- the

7    intentional interference claim cannot be divorced from the

8    meaning of the contract.  The meaning of the contract is at

9    the core of any intentional interference claim, your Honor.

10           THE COURT:  Okay.  All right.  Thank you.

11           Mr. Zeller, this is your opportunity for rebuttal,

12   then we'll move on to the next claim.

13           MR. ZELLER:  Yes, your Honor.

14           This argument about the jury not having the

15   opportunity to evaluate the terms of the agreement, I --

16   although MGA wasn't explicit about it, I assume that this is

17   based upon the copy of the agreement.

18           The fact is, is that MGA never raised that

19   objection at any time during the first trial.  To the

20   contrary, it stipulated to the authenticity and the

21   admissibility of the agreement.  There is literally no

22   argument that was made during the entire three months of

23   trial that the jury, the Court, MGA or anyone else could not

24   read the terms of the contract.  There were also other

25   copies of it.

SACV 04-9049-DOC - 09/03/2010 - Vol. II

16

```
1            I'll also note, your Honor, that there was also
2    evidence of the 1995 agreement that was put in for
3    Mr. Bryant.  Mr. Bryant signed, in fact, two inventions
4    agreements as well as contracts that were introduced into
5    evidence.  The 1995 agreement that he signed, which no one
6    disputes the legibility of either, is identical in its
7    terms.  It's set out slightly differently in terms of it's
8    on two pages instead of one, but it's identical terms.
9            So again, this idea that somehow the jury didn't
10   know what the terms were is new, it's late, it's not a basis
11   for a new trial at this point, and it's not substantiated by
12   the record.
13           Thank you.
14           THE COURT:  Ms. Hurst.
15           MS. HURST:  Your Honor, with all due respect, that
16   just completely misses the point.  The appearance of the
17   contract is relevant to the question of whether it's an
18   adhesion agreement.
19           In the first trial, MGA had no ability to contest
20   that point at all, but I'm not arguing about the appearance
21   of the agreement with respect to this intentional
22   interference issue.  I'm arguing about the meaning of it.
23   I'm assuming we can all understand and see it and read the
24   words, even though Mattel's 30(b)(6) witness, Mr. Kaye,
25   couldn't tell me which were specially defined terms, which
```

1    were capitalized and which weren't.  It's him who was having

2    the problem.  That's not even what we are talking about

3    here.

4            The Ninth Circuit said the contract is at least

5    ambiguous, if not in MGA's favor, in two material respects.

6    The jury never got to consider the meaning of the contract.

7    It can't -- you can't evaluate disruption of performance

8    without knowing what the meaning was and therefore the

9    required performance.  It's just not possible.

10           So this -- the issue of the appearance of the

11   contract is a red herring in this context.  It's relevant,

12   certainly, to the adhesion issue, but that's not even what

13   I'm talking about.  I'm saying you can't have a claim for

14   tortious interference of a contract unless the Court --

15   either the jury decides what the contract means and then

16   evaluates disruption of performance with respect to its

17   decision as to the meaning or the Court instructs the

18   meaning, and then the jury must evaluate disruption with

19   respect to that.

20           Here, the Court instructed as to the meaning.  The

21   jury evaluated disruption with respect to that.  Mattel

22   argued that disruption must be measured with respect to the

23   conveyance of the Bratz ideas and drawings under the

24   Medtronic case.  Their argument as well as the instruction

25   must be taken into account.  And that was error.  There is

1    no way this interference claim can survive that Ninth

2    Circuit opinion.

3              THE COURT:  All right.  Isn't Mr. Larion intending

4    to interfere with the agreement wrongful regardless of the

5    meaning?

6              MS. HURST:  No.  You can't, especially in

7    California where there is free mobility of labor and you can

8    hire an employee away and you can consult freely with

9    people, his actions were to acquire intellectual property

10   and to hire a consultant.  He acquired intellectual property

11   and hired a consultant.

12             His contract was not to, you know, give an

13   example, I want you to sneak into Mattel and steal their

14   hair rooter.  The object of the contract was not directed at

15   Mattel.  The object of the contract was acquisition of

16   intellectual property and engagement of a consultant.

17             If a side effect of that was disruption of

18   performance between Bryant and Mattel, then that may be

19   interference, but only if Mr. Larion and MGA had substantial

20   certainty that there would be such a side effect that would

21   disrupt an obligation that Bryant had.  As we sit here

22   today, we don't know whether Bryant breached any obligation

23   under the Ninth Circuit's opinion.  We don't know as we sit

24   here today whether Bryant even breached an obligation, and

25   therefore, the intentional interference claim cannot

1    possibly stand.

2           THE COURT:  Concerning the third and fourth claims

3    which was originally set forth in Jury Instruction

4    Number 5 -- strike that, 25 in the phase one trial, Mattel

5    contended that MGA and Isaac Larion aided and abetted Carter

6    Bryant's breaches of, first, his fiduciary duty to Mattel,

7    and second, his duty of loyalty to Mattel.

8           Judge Larson had instructed the jury that

9    Mr. Bryant breached his fiduciary duty as a matter of law

10   because he failed to keep his proprietary information

11   confidential.  And concerning the duty of loyalty by way of

12   example as found on page 32 of Instruction Number 28 where

13   the Court, on line 11 through 16 in the instructions,

14   stated, "As a matter of law, Mr. Bryant breached his duty of

15   loyalty to Mattel when he entered into a contract with MGA,

16   Mattel's competitor, while still employed by Mattel to

17   produce a line of fashion dolls to be marked in direct

18   competition with Mattel's products."

19          The duty of loyalty, which was claim four, and the

20   fiduciary duty were conflated into the series of

21   instructions running 25 at least through 28.  I can start

22   with either claim 3 or 4, but let me express concerning the

23   third claim, the fiduciary duty claim, that I'm concerned

24   that the Ninth Circuit has sent a relatively clear directive

25   to this Court that the extent of the confidentiality is

1    dependent upon a jury determination of what is to be

2    protected.

3           And concerning the duty of loyalty, the -- well,

4    I'll wait for that.  I'll take comment on -- on either of

5    these claims 3 or 4.  So counsel, once again, two rounds.

6    So let me start with Mr. Zeller.

7           MR. ZELLER:  Thank you, your Honor.

8           In fact, I think that this somewhat picks up on

9    the point that MGA was making where it says, we don't know

10   if Bryant breached an obligation, and I think the

11   implication was, is tying it to this notion that somehow the

12   jury necessarily had to have found that the breach that

13   Mr. Bryant engaged in was one that the Ninth Circuit or

14   provision of the contract that the Ninth Circuit has said

15   was ambiguous or needs to be, you know, potentially the

16   subject of further proceedings, but that simply doesn't

17   follow.

18          And, in fact, from our perspective, the language

19   that the Court has cited with respect to Jury Instruction

20   Number 28 makes this very starkly clear with respect to the

21   breach of the duty of loyalty.

22          What the instruction was, is, as a matter of law,

23   Mr. Bryant breached his duty to loyalty to Mattel when he

24   entered into a contract with MGA, Mattel's competitor, while

25   still employed by Mattel to produce a line of fashion dolls

Case 2:04-cv-09049-DOC-RNB   Document 8765   Filed 09/22/10   Page 21 of 41   Page ID
#:272457
SACV 04-9049-DOC - 09/03/2010 - Vol. II

21

1    to be marketed in direct competition with Mattel's products.

2    What this stemmed from was from the conflict of interest

3    provisions and Mr. Bryant's obligations under the law, this

4    duty of loyalty where he, by virtue of working for a

5    competitor under the terms of the MGA contract on a top

6    priority basis while he was still a Mattel employee, that's

7    what was clearly a breach.

8             It is because we don't -- obviously can't look

9    into the black box of what the jury determined.  The fact

10   is, is that that could very well itself and, in fact, would

11   sustain the jury's verdict on this point.

12            It appears that we actually have some agreement

13   now with MGA on what the legal standard is, in other words,

14   separable and apart from some other claim or instruction

15   where there was -- whatever the matter is infected by

16   something that would require a retrial.  We do, of course,

17   disagree that the burden of proof shifts.  I mean, the law

18   is very clear, it's on -- it's on the move in, and I think,

19   frankly, that would be required because of respect that's

20   entitled to a jury finding based upon the seventh amendment.

21            But in my view, the -- that very language that is

22   set forth in Instruction Number 28 actually makes it very

23   clear that the jury did not necessarily base its finding

24   that there was a breach or there was aiding and abetting,

25   the breach of the duty of loyalty by MGA based upon any

Case 2:04-cv-09049-DOC-RNB   Document 8765   Filed 09/22/10   Page 22 of 41   Page ID #:272458
SACV 04-9049-DOC - 09/03/2010 - Vol. II

22

1    issue that had to do with the ownership of Bratz, it was

2    because -- and certainly the evidence would sustain a

3    finding or a verdict by the jury that that aiding and

4    abetting occurred because MGA entered into an agreement with

5    Mr. Bryant in which he was obligated to work on a top

6    priority basis on a line of dolls.

7            It wouldn't have mattered who owned it and whether

8    it was MGA's dolls, Mattel's dolls or somebody else's, he

9    was working for a competitor while also drawing a Mattel

10   salary, not telling Mattel about it.  And, in fact, there

11   was evidence during trial that Mr. Bryant lied to people at

12   Mattel about it and that MGA aided and abetted this in a

13   whole variety of ways, including by knowing very well he was

14   continuing to work as a Mattel employee and paying him

15   money, entering into contracts, watching him use resources

16   from Mattel, and there was abundant evidence of this at

17   trial.

18           THE COURT:  Ms. Hurst, on behalf of MGA.

19           MS. HURST:  Thank you, your Honor.  It's a fantasy

20   that the case was tried in the fashion just described.

21   First of all, Instruction Number 28, the first two-thirds of

22   it are the propriety information definition in the contract

23   which is infected by the very ambiguity identified by the

24   Circuit.

25           But more than that, Mattel argued repeatedly in

 1    closing on every state law claim, that the ownership issue

 2    was the basis for meeting its required elements.  Each time

 3    they came to a new state law claim, they argued in closing

 4    that there was harm to Mattel because Bratz was stolen by

 5    Bryant and brought to MGA.  They argued it on interference,

 6    on conversion, on duty of loyalty and on fiduciary duty.

 7            So the case was argued to the jury by Mattel in

 8    the fashion designed to maximally exploit the error that the

 9    Circuit has found, and they can't now go back and say,

10    "Well, really it was only the one possible theory that

11    justified a $30 million verdict on this claim," okay?

12            I mean, putting aside whether under 16600 that you

13    can possibly have an instruction that somebody violates

14    their employment obligation by signing a contract to go work

15    for a competitor, putting that issue aside, which is not

16    consistent with California law.  I mean, there's independent

17    instructional error here, your Honor.  And this Court should

18    not repeat that error.

19            It should not, because this issue is going to come

20    up again with respect to the phase two claims and those

21    contracts, and then what are we going to do?  We are going

22    to have some claims that carry over, and they are going to

23    be under wrong instructions, and the Court is going to

24    correct the situation with respect to the new phase two

25    claims, but the jury is going to have to accept a verdict

1    from before, that it has no idea what it means and it's

2    hearing things under different instructions, that would be a

3    total miscarriage of justice, your Honor.

4              THE COURT:  Well, I've got a question.  Would it

5    also potentially infect the jury, because they would be

6    hearing claims of liability that I would be instructing on;

7    therefore, in a trial of claims that the Court is upholding,

8    while they are deciding new claims under RICO potentially or

9    even some of these claims, it seems to me that's a very

10   dangerous way to try a lawsuit.

11             Now, that doesn't have anything to do with the

12   legal realm, I can always bifurcate those claims, but I

13   would think that the prejudice there in an actual trial

14   situation, not in the academic world of sorting out, this

15   would be extremely prejudicial to MGA.

16             MS. HURST:  Yes, your Honor.

17             THE COURT:  What they would be hearing basically

18   is, go out and decide these other claims uninfluenced by the

19   claims that the Court's instructing you that MGA is already

20   liable for.

21             Now, I think Mattel's position is going to be, we

22   wouldn't mention those, but we'll find out.

23             MR. ZELLER:  I think that would be a very simple

24   cure.  I don't know.  Frankly, I would assume, and perhaps

25   MGA has a different view, but I would assume that if the

1    verdict on one of those tort claims is sustained, we're done

2    on that claim.  I mean, obviously I would like to think of a

3    reason why I'd be able to go back and ask for more money on

4    other breaches, but I would assume that that would be the

5    end of the story.  And so it really seems it's more a

6    mechanical issue, and I think the Court also has noted it

7    could be bifurcated, I suppose, if there was some absolute

8    need that the other jury need to know, but I don't see how

9    that would happen.

10            THE COURT:  What you've really got to do is

11   search, and so does MGA search, how, if at all, each of you

12   or one of you might be making an offer of proof that you

13   wanted one of these already decided claims to come in front

14   of the jury.

15            And, of course, Mattel would always want the jury

16   to know that there was prior liability from a tactical

17   standpoint.  Of course you would.  And MGA would never want

18   Mattel to know.  This doesn't have anything to do with the

19   ruling, but I mean, trial judges need to sort out when they

20   make a ruling where that leads to a couple of months from

21   now.

22            So your position really is, Judge, if these are

23   decided in Mattel's favor, that's the end of the discussion.

24            MR. ZELLER:  Right.

25            THE COURT:  Why would they be mentioned?

1           MR. ZELLER:  Right.

2           THE COURT:  Would they be mentioned in any way,

3     shape or form, would there be a request at any time during

4     the trial, Mr. Zeller?

5           MR. ZELLER:  No, your Honor.

6           THE COURT:  Okay.

7           Counsel on behalf of MGA.

8           MS. HURST:  Two issues, your Honor.  First,

9     completely unrealistic because the Court and the jury have

10    an obligation to guard against duplicative recovery, and we

11    have no idea what that $30 million is for at this point.

12          THE COURT:  In other words, your position is even

13    though the jury wouldn't decide that and the Court would

14    decide that issue outside, of course, the presence of the

15    jury, that offsets in those kinds of discussions but still

16    in some way have to come before a jury?

17          MS. HURST:  Well, your Honor, the jury is going to

18    have to be instructed no duplicative recovery, and how can

19    they possibly evaluate whether they're duplicating something

20    that a prior jury has already found, especially when we have

21    no idea whether the basis for that was an ownership theory

22    that the Circuit has now rejected.

23          In addition, your Honor, remember, what MGA and

24    Larion were held liable here for was not themselves

25    breaching a duty, but was aiding and abetting someone else's

1    breach of duty.  Again, that has a knowledge element the

2    same way that the intentional interference claim does.

3            And in order to have a knowledge in participation,

4    you have to know what the nature of the duty is that

5    somebody has and how they're disrupting it, in other words,

6    in order to induce that breach of their duty, you've got to

7    know what it is that you're inducing them to do that's

8    disrupting an obligation, but this is, again, premised on

9    the propriety information and ownership issue.  And that was

10   the way it was instructed in 28, it's two-thirds of the

11   instruction, and it was absolutely the way it was argued by

12   Mattel.

13           So we're going to come into this and to invoke --

14   I mean, first of all, legally it's instructional error, it's

15   error the way it was argued under Medtronic, there's

16   additional errors in these instructions under City of Hope,

17   your Honor.  This fiduciary duty instruction cannot stand.

18           THE COURT:  All of which the Circuit never

19   addressed, and for good reason.  They referred a lot of

20   these questions back to the trial court, and of course,

21   depending upon my ruling, back it goes to the Circuit.

22           MS. HURST:  And with the Circuit not addressing

23   it, your Honor, I do want to take this opportunity to say a

24   lot of the case does not apply on this.  The Court is free

25   to revisit the determinations.

 1          THE COURT:  Mr. Zeller.

 2          MR. ZELLER:  I think it's pretty clear that MGA's

 3   claim here that there was independent instructional error

 4   with respect to Carter Bryant's activities constituting a

 5   breach of his duty of loyalty is -- it was obviously not

 6   adopted by the Court of Appeals.

 7          In fact, it wasn't -- I don't know how it's even

 8   material at this point with respect to the standard that

 9   everyone agrees is what governs here.  I mean, we're talking

10   about the seventh amendment rights, and the seventh

11   amendment prohibition against reexamining facts already

12   determined by a jury.  I don't see how that is trumped by

13   what MGA is now saying it should be considered some

14   additional instructional error.  That ship has sailed, as

15   far as I'm concerned.

16          The only issue that we're talking about here is,

17   is there is a verdict.  I mean, no one disputes that.  There

18   are verdicts that this jury reached.  And the other issue

19   is, is of the ones that everyone -- the two that everyone

20   concedes needs to be retried, copyright infringement and

21   conversion, do the rest of it go with it?

22          But this isn't a matter of us just saying --

23   simply looking at the situation and saying, "Well, you know,

24   would people prefer to have a retrial of certain issues that

25   have already been determined by a jury?"  There is a jury

1    verdict that's in place, and it's entitled to the same

2    deference and protection of the Seventh Amendment that any

3    other jury verdict is.  You know, obviously if it meets the

4    standards where a new trial should be ordered on those

5    claims as well, well, then, you know, so be it.  That's the

6    standard that applies.  But it simply can't be because MGA

7    now is claiming that there is additional errors that should

8    warrant that.  I think that -- that's just too late in the

9    day to be making those arguments, from my perspective.

10            In terms of the duplicative recovery argument,

11   much of that has already been rejected by Judge Larson.

12   There was a motion that was made at the end of the case.

13   Judge Larson ruled on that.  There is not really a basis

14   that MGA has provided for revisiting that.

15            And under Ninth Circuit law, it's very clear that

16   even if it's same or similar conduct, but there are

17   different wrongs that are attached to -- or the statute or

18   the laws attempting to remedy these different wrongs, it's

19   not duplicative recovery.

20            So there is -- if we're not asking the second jury

21   to make a determination of aiding and abetting the breach of

22   loyalty or one or more of the other tort claims, duplication

23   is a complete red herring.  And of course, also, as the

24   Court was mentioning, I mean the Court has power to correct

25   duplication of damages.

```
 1              THE COURT:  MGA.

 2              MS. HURST:  Your Honor, the seventh amendment is

 3   no proof against instructional error.  The way it's worded,

 4   and the Court noted this, I believe, last week under

 5   Gasoline Products, the Court is entitled to reexamine on any

 6   basis that was available at common law.  That standard is

 7   incorporated in Rule 59 and it's elaborated by the Supreme

 8   Court in the Gasoline Products case.

 9              The Gasoline Products case implements the distinct

10   and separable requirement as a reflection of resolution of

11   the seventh amendment issues that could lurk in a situation

12   like this.  But it's not even close here.  We're not even

13   close.

14              This is clearly instructional error, and it was

15   error that was exploited in closing, which is an independent

16   basis under Medtronic, and it would be inconsistent with the

17   Ninth Circuit's opinion to allow Mattel to exploit the

18   ownership issue in support of an element of each one of

19   these state law claims as it did in closing and as the

20   instructions reflect, and on top of that, then, we have a

21   duplicative recovery problem because we have no idea what

22   the first jury really meant by the $30 million at this

23   point.

24              Can anybody really believe that they meant

25   $30 million because Carter Bryant didn't resign when he said
```

1   he was going to?  I mean, come on, that's crazy.

2   $30 million because the guy gave two weeks' notice?  I mean,

3   talk about a miscarriage of justice.  This doesn't make

4   sense.  And it's a nightmare to come in in a real practical

5   terms and try to retry pieces of this and leave other pieces

6   intact.  We'll be constantly -- you know, it's just ripe for

7   error.  We will be constantly policing, "Well, is this issue

8   in or is this issue out?"  The case will be so much more

9   unmanageable and difficult to try, and those are all

10  absolutely proper and relevant considerations for the

11  Court's analysis under Rule 59.

12          THE COURT:  Okay.

13          Just a moment.

14          I want to turn to the final verdict form as given.

15  And on page 1, we answered the questions submitted to us as

16  follows:  Timing of tangible items, let's turn to that for

17  just a moment.

18          Now, I don't want to look through substance to

19  form or form to substance, but I start with a basic

20  proposition that you can't have special findings unless you

21  have a substantiated claim, and the difficulty for me in

22  reading these verdicts is, without any criticism to the

23  prior court, it seems that, if my memory is correct, this

24  Court would have suggested to counsel if I had this verdict

25  form, that we start with question number 5 or question

 1    number 6, and in reading this, it's confusing to the Court,

 2    so I'd like some explanation.  It almost appears that we

 3    start with special verdict forms or special finding forms in

 4    question number 1.

 5            Now, I expect Mattel to argue against that, of

 6    course, that these are substantiated findings, et cetera,

 7    and regardless of the order, Judge, it's consistent with 5

 8    and 6 and later on, so what difference does it make?

 9    From -- in other words, Judge, don't throw out the substance

10    because of the form.  It's all there.

11            From MGA's perspective, I would think that you

12    would be arguing if you don't have a substantiated claim,

13    how can you have a special verdict form?

14            So I'm only anticipating that -- those arguments.

15    I know that you have much better arguments, but I'm going to

16    begin with Mattel.

17            MR. ZELLER:  All right.  I actually liked your

18    argument on behalf of Mattel, your Honor.  I think that's

19    right.  I mean, these were -- by the way, one thing I think

20    to factor into this situation is that these interrogatories,

21    the special verdict, these questions that were presented to

22    the jury, it was done jointly with MGA.  This wasn't a

23    harebrained scheme that was come up with by one person and

24    it wasn't agreed to by the parties.  I mean, everyone agreed

25    that this is the way of proceeding.

```
 1              So I think in some respects there also has been a

 2      waiver that to the extent that MGA is going to argue that

 3      somehow this was improper to do.  I mean, everyone, during

 4      the course of the first trial, understood -- of course, I'm

 5      talking about the Court, the parties, understood that the

 6      timing of the creation of these elements, Bratz, were

 7      material to -- in a variety of ways, just the very fact was

 8      material, and that's why these were fashioned this way,

 9      because -- and part of this was also driven by the fact that

10      the case was bifurcated, but -- but the reality is, is that

11      these are discrete factual findings, six of them, of which

12      the jury was asked is the fact -- is fact X true, or is it

13      false?

14              And the jury, sitting and listening to literally

15      weeks of evidence about these particular issues, about when

16      matters were created, MGA presented its 1998 story, Mattel

17      is saying no, it was during the time period when Carter

18      Bryant was employed by Mattel from January 1999 to

19      October 19, 2000, and the jury made factual determinations.

20      And there is absolutely no reason to upset those, from our

21      perspective.

22              The Ninth Circuit didn't question those factual

23      findings.  MGA has -- I think would have to concede that

24      these factual findings continue to be relevant.  In fact,

25      they could very well be dispositive depending, obviously,
```

Case 2:04-cv-09049-DOC-RNB   Document 8765   Filed 09/22/10   Page 34 of 41   Page ID #:272470
SACV 04-9049-DOC - 09/03/2010 - Vol. II

34

1    where they land on the contract interpretation issue.

2    Obviously if the contract ends up being what we think the

3    contract is, these would be absolutely dispositive.

4            But even setting aside the contract interpretation

5    issue, still relevant to the fact that just as a matter of

6    factual matter, MGA's 1998 story was rejected, a story they

7    are clearly going to try and tell again during the second --

8    the second trial.  And for us, that falls really within the

9    heart of the seventh amendment.  We would literally have a

10   second jury reexamining the same facts that were found in

11   these six sets of factual findings or special verdicts by

12   the first jury.

13           THE COURT:  Just a moment.

14           Why did MGA stipulate to this contract in the

15   first trial?  I mean, I'm maybe not as concerned as Judge

16   Trott, but Judge Trott raised a lot of concern, and I -- I

17   just wonder coming in as the second judge and not having the

18   wisdom of the first court or certainly the Circuit, how

19   we're interpreting a contract when we don't have the

20   contract, and you are going to argue lack of foundation, I

21   don't know.

22           In other words, I don't know how the parties ended

23   up relying upon these documents.  I'm sure that you did that

24   in good faith.  I -- I -- but I can't trace this back.  In

25   other words, at this late date, I don't know what Judge

SACV 04-9049-DOC - 09/03/2010 - Vol. II

35

```
 1    Larson did to find that there was an authenticated contract
 2    that could be relied upon, and I don't question his wisdom.
 3              MR. QUINN:  Your Honor, may I respond to that?
 4              THE COURT:  My question was to MGA.  My belief
 5    was, and correct me if I'm wrong, that you basically
 6    stipulated to this at the first trial.
 7              MS. HURST:  No, no.  So here is what happened.
 8    First, Judge Larson ruled on a motion to dismiss, not even
 9    on summary judgment, but on a 12(b)(6) motion, very early in
10    the case.
11              THE COURT:  Just a moment.
12              Was an original contract ever put in front of him?
13              MS. HURST:  Absolutely not.
14              THE COURT:  Was it ever put in front of him at the
15    12(b)(6)?
16              MS. HURST:  No.
17              THE COURT:  At the summary judgment phase?
18              MS. HURST:  No.
19              THE COURT:  At trial?
20              MS. HURST:  No.
21              THE COURT:  Continue.
22              MS. HURST:  Early on in the 12(b)(6) phase, Judge
23    Larson ruled that the defenses of unconscionability were out
24    of the case as a matter of law.  Then later he ruled that
25    the contract would be interpreted as a matter of law in a
```

 1   particular way.

 2        At that point, the only reason to contest the

 3   originality of the contract and that it was a duplicate and

 4   a proper contract and what the effect of it being an

 5   illegible adhesion agreement would be were gone.  The only

 6   two relevant reasons to argue about the contract at that

 7   point were out.

 8        THE COURT:  How do you interpret performance if

 9   you don't have a contract?

10        MS. HURST:  You can't.

11        THE COURT:  Well, let me talk to Mattel.

12        Help me.  I don't understand yet what happened in

13   this.  Now, Mr. Quinn.

14        MR. QUINN:  Your Honor, the authenticity -- we

15   don't have the original contract with the ink on it and

16   never did.  We have the later one, which is identical.  So

17   Mr. Bryant signed --

18        THE COURT:  Let's stop there.  That's what you

19   need to educate me on.  Let's slow down and go back.

20        Listen to my question, you don't know what I'm

21   going to ask yet.

22        I don't have a good understanding when the

23   original contract was signed, who took the original

24   contract, if it was retained by Mattel or if Carter Bryant

25   got the ink copy.  I don't understand if there -- if it was

Case 2:04-cv-09049-DOC-RNB   Document 8765   Filed 09/22/10   Page 37 of 41   Page ID #:272473
SACV 04-9049-DOC - 09/03/2010 - Vol. II

37

 1    in duplicate, for instance, with carbon paper.  I don't

 2    understand if the original was signed or duplicate originals

 3    were signed on that date.  I don't understand if just one

 4    original was signed and xeroxed copies were signed.

 5            What happened, and how do I verify it?  Because

 6    you weren't there and I wasn't there.

 7            MR. QUINN:  I wasn't there when either of them

 8    were signed.

 9            THE COURT:  All right.

10            MR. QUINN:  Two periods of employment --

11            THE COURT:  First, was just one contract page

12    signed?

13            MR. QUINN:  Maybe Mr. Zeller recalls.  I don't

14    recall the answer to that.

15            THE COURT:  Was Mr. Zeller there?

16            MR. ZELLER:  I would have --

17            THE COURT:  I'm sorry.  Were you there?

18            MR. ZELLER:  No, certainly not.

19            THE COURT:  So then you don't know.

20            Now, we're going to come back, just a explanation,

21    because Mr. Zeller wasn't there, okay, because you still

22    want to be the law firm on the case, and if he was there,

23    maybe there's a conflict and we'll get a new law firm, okay.

24            So now that Mr. Zeller wasn't there, what's your

25    understanding at least of what happened?  Was one contract

1  signed, or do we know?

2         MR. QUINN:  I have no understanding on that.

3         THE COURT:  Okay.  Now, just a moment.

4         MR. QUINN:  There were two contracts signed on two

5  different occasions, whether on either occasion two

6  documents were signed.

7         THE COURT:  Now, let's just assume that one

8  document was signed, then that means that Carter Bryant must

9  have gotten a copy or copies, okay.  Do we know if Carter

10  Bryant got a copy or copies?

11         MR. QUINN:  We don't know the answer to that.

12         THE COURT:  Just a moment.

13         Then how does this small-print contract that the

14  Circuit's trying to look at -- you know, what's my chain of

15  authenticity back to that document?

16         MR. QUINN:  Your Honor, there was a copy that was

17  maintained in the ordinary course, which was in his

18  personnel file, which Mr. Bryant was shown the document, and

19  he says, yes, I signed this, yes, this is my signature, yes,

20  I signed that.

21         THE COURT:  Did he do that at the time of trial,

22  because I understood he wasn't called?

23         MR. QUINN:  He was called.  He did that at -- he

24  certainly did it in his deposition, and I assume he also did

25  it at trial.

Case 2:04-cv-09049-DOC-RNB  Document 8765  Filed 09/22/10  Page 39 of 41  Page ID #:272475
SACV 04-9049-DOC - 09/03/2010 - Vol. II

39

 1              THE COURT:  So that's what Judge Larson based his

 2    ruling on?

 3              MR. QUINN:  Well, not only that, your Honor.

 4              THE COURT:  Yes or no?

 5              MR. QUINN:  Yes.

 6              THE COURT:  Now --

 7              MR. QUINN:  Your Honor, but MGA put this in

 8    evidence -- they moved for summary judgment with an

 9    affidavit saying, "Here is the true and correct copy of the

10    contract."

11              THE COURT:  Uh-huh.

12              MR. QUINN:  I can tell the Court that this issue

13    that we're now discussing, the authenticity of that, was

14    never questioned by anybody in the trial or in the pretrial

15    proceedings.

16              THE COURT:  Judge Trott is certainly concerned

17    about it.

18              MS. HURST:  Your Honor, if I may.  They are

19    conflating the issue of the authenticity --

20              THE COURT:  No, you may not.  I'm not done with

21    Mattel yet.  Thank you.  You've interrupted.

22              Mr. Quinn, I want you to finish your argument.

23              MR. QUINN:  On the issue of the authenticity, your

24    Honor, everybody agreed that the signatures on the contract

25    were what they appeared to be and that this was the

1    agreement the man signed.

2              THE COURT:  No, this is a new trial, now,

3    potentially.

4              MR. QUINN:  I understand.

5              THE COURT:  And if I rule against Mattel on this,

6    we're off on a new trial.

7              Now, I want to go ahead three months, and we're in

8    this new trial --

9              *(Interruption in the proceedings.)*

10             THE COURT:  This is off the record.

11             *(Another matter held.)*

12             *(Volume III is reported by Deborah Parker.)*

13                             -oOo-

14

15

16

17

18

19

20

21

22

23

24

25

SACV 04-9049-DOC - 09/03/2010 - Vol. II

41

1                              -oOo-

2                           **CERTIFICATE**

3

4          I hereby certify that pursuant to Section 753,

5    Title 28, United States Code, the foregoing is a true and

6    correct transcript of the stenographically reported

7    proceedings held in the above-entitled matter and that the

8    transcript page format is in conformance with the

9    regulations of the Judicial Conference of the United States.

10

11   Date:  September 13, 2010

12

13

14        _____

15        JANE C.S. RULE, U.S. COURT REPORTER
          CSR NO. 9316

16

17

18

19

20

21

22

23

24

25