# UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATTEL, INC., | CASE NO. CV 04-9049 DOC (RNBx) |
| Plaintiff(s), | |
| v. | **O R D E R GRANTING IN PART AND DENYING IN PART MOTION TO COMPEL** |
| MGA ENTERTAINMENT, INC., | |
| Defendant(s). | |

Before the Court is Mattel, Inc. ("Mattel")'s Motion for Order Compelling Production of Communications Made in Furtherance of Crimes and Frauds and as to Which MGA has Waived Attorney-Client Privilege (the "Motion"). After considering the moving, opposing, replying, and supplementary papers, as well as the parties' oral argument, the Court GRANTS IN PART AND DENIES IN PART the Motion.

**I.    Background**

Between 2000 and 2001, Isaac Larian ("Larian") and other MGA Entertainment, Inc. ("MGA") executives communicated with the company's attorneys about the origins of Bratz, a

1  fashion doll concept developed by defecting Mattel employee Carter Bryant ("Bryant").  MGA
2  had just decided to hire Bryant and produce the Bratz line of dolls.  In anticipation of Bryant's
3  hire, MGA dispatched its attorneys to determine whether Bryant's soon-to-be-former employer
4  Mattel could ever claim an ownership interest in the Bratz concept.  On September 28, 2000 at
5  11:55 a.m., MGA's attorney sent an email to O'Connor that stated as follows:

> I spoke with Carter's lawyer this AM and e-mailed her a copy of the
> draft agreement for her review.  I asked her specifically about the
> Mattel issue and she said she has reviewed the chronology of the
> creation of this design and is satisfied that Carter created this outside
> the scope of his employment at Mattel.  She says she understands the
> concerns here.  Apparently, he conceived this product in 1998 so I
> recommend that your patent attorney(s) review this project as soon
> as possible to avoid any time limitations in the patent laws.

*See* Appendix A to Dkt. 6284 at 9.[1]

Rosenbaum, Anne Wang (Bryant's attorney) and Bryant were deposed prior to the phase 1 trial.  Rosenbaum testified at his deposition that he recalled Bryant's attorney "telling [him] that [the Bratz concept] was done prior to [Bryant] commencing his employment with Mattel." *See* Ex. J to MGA's August 31, 2010 Submission, at 181.  Rosenbaum further testified that Bryant's attorney did not tell him that "[Bryant] was continuing to work on the Bratz concept while he was at Mattel."  *See id.* at 191.  Bryant's attorney, Anne Wang, likewise testified that she informed Rosenbaum that "Bryant had created [the Bratz doll] in the time period separate from his employment at Mattel."  Ex. V, to *id.*, at 366.  Bryant corroborated his attorney's representation to Rosenbaum by testifying at deposition that he created approximately 13 master drawings within a matter of weeks in 1998.  *See* Ex. K to *id.*, at 203-13.  Bryant testified in deposition and at trial that he enhanced the initial Bratz drawings while employed by Mattel.

---

[1] This email, as well as numerous other emails between Rosenbaum and O'Connor, were produced by MGA on June 3, 2008 on the eve of the phase 1 trial.  The prior presiding judge sustained Mattel's objection to admission of the late-produced evidence.

1 Ex. P to *id.*, at 300; *see also* Ex. R to *id.*, at 310-15; Ex. S; Ex. U.  Bryant's partner, Richard
2 Irmen, largely corroborated Bryant's account.  *See* Ex. BB to *id.*

The phase 1 jury was asked to decide whether Bryant (1) conceived Bratz; and (2) created certain Bratz sketches, as well as a rudimentary Bratz sculpt, during his employment with Mattel.[2]  The jury heard testimony from Isaac Larian, who recalled that "Bryant told [him] that he [created the initial Bratz drawings] in 1998, when he was in Missouri on nights and weekends." Ex. 3(A) to Mattel's August 31, 2010 Submission, at 1675.  Larian's testimony was consistent with his earlier admission, in response to Mattel's discovery request, that "no one told [him] that Bryant created or improved any Bratz work while employed by Mattel when or before MGA entered into the Bryant/MGA agreement."  *See* Ex. 2 to *id.*, at 30.

Larian testified that he directed fellow MGA executive Victoria O'Connor to confirm Bryant's representation that he created the Bratz drawings in 1998.  *See* Ex. 3(A) to *id.*, at 1682.  According to Larian, O'Connor "verifi[ed] that [Bryant's representations] [were] true."  *Id.*  Larian recalled that Bryant's lawyer confirmed to MGA's lawyer that Bryant created the Bratz drawings in 1998.  *See id.* at 1685-87.  MGA's lawyer relayed Bryant's lawyer's representation to O'Connor and/or Larian.  *See id.* at 1692.  When pressed about whether MGA merely "took [Bryant's] word" about the creation date of Bratz, Larian testified:

> I took his word.  But as a prudent businessman, I also directed our
> head of licensing to check with our attorney and his attorney to make
> sure what he was telling me was true.  And they did.  And he came
> back and said it is true.  His attorney came back in writing saying
> that he [created the Bratz drawings] in 1998.

*Id.* at 1690.

Larian testified that he was satisfied in the veracity of Bryant's representations when MGA "got confirmation back from [O'Connor] that [Bryant's] lawyer . . . had sent confirmation

---

[2] The Ninth Circuit has since held that the jury should have also been asked to determine whether it was sufficient for Bryant to have conceived and created Bratz at any time during his employment with Mattel (including nights and weekends).

that [Bryant]" created the Bratz drawings in 1998. *Id.* at 1694; *see also id.* at 1696 ("If my attorney and his attorney, as officers of the court, came back in writing and said that they had investigated – his attorney has investigated and his story is true, I believe that."). However, Larian testified that he lacked knowledge about the type of investigation undertaken by Bryant's counsel, if any. *See id.* at 1699 ("I have no personal knowledge what Carter Bryant's attorney directly did."). Larian only recalled seeing an email in which Bryant's attorney represented that "she has proof, she knows [that the initial drawings were] done in 1998." *Id.* at 1705. Notwithstanding Larian's testimony that Bryant assured MGA and its lawyers that he created Bratz in 1998, the phase 1(A) jury found that Bryant conceived Bratz and created Bratz drawings and a sculpt while he was employed by Mattel. *See* Dkt. 4125. On the basis of this finding, as well as erroneous instruction from the district court, the jury found MGA and Larian liable for conversion. *Id.*

In phase 1(B), the same jury was asked to determine whether MGA and Larian acted with malice, oppression, or fraud when they converted Mattel's property. *See* Dkt. 4279. The jury heard testimony from Larian about his knowledge prior to hiring Bryant. Larian conceded that the phase 1(A) jury had come "to a verdict" that was at odds with the story Bryant had told Larian. *See* Ex. 3(E) to Mattel's August 31, 2010 Submission, at 6125. Larian continued to testify – as he had before – that "[i]n 2000, when [Bryant] came to show [MGA] [the Bratz] drawings, [MGA] did not know that [Bryant] had done [the drawings] at Mattel, and [MGA] went further to verify, through [Bryant's] lawyer and [MGA's] lawyers, that [Bryant] had not done that." Ex. F. to *id.*, at 7613. However, consistent with earlier deposition and trial testimony, Larian testified that he had believed that Bryant "work[ed] on the weekends and in the evenings [while employed by Mattel] enhancing what he was doing." *Id.* at 7619. In conclusion, Larian testified that (1) Bryant claimed to have created the concept drawings for Bratz in 1998; (2) Bryant claimed to have enhanced the Bratz drawings on evenings and weekends while employed by Mattel; and (3) MGA received assurances from Bryant's attorney that Bryant was telling the truth. *See id.* On the basis of this due diligence, MGA entered into an employment contract with Bryant.

4

Larian's testimony left the prior presiding judge uneasy. During an *in camera* hearing that followed Larian's testimony, the presiding judge surmised that Larian "just lied to the jury and lied to the Court by saying that his information was that [the Bratz concept drawings] [were] done in 1998 and that his attorneys checked this out." *See* Ex. 1 to Proctor Decl. at 5:15-17. The prior presiding judge apparently reached this conclusion after reviewing the communications that are the subject of this Order; indeed, he went so far as to quote portions of the communications verbatim into the record. *See id.* at 10. On the basis of the prior presiding judge's conclusion that Larian's testimony contradicted the selection of privileged communications before the Court, the prior presiding judge instructed the phase 1(B) jury to not consider Larian's testimony.[3] The phase 1(B) jury found that Larian and MGA did not act with malice, oppression and/or fraud in converting the Bratz drawings and sculpt.

Mattel has repeatedly moved to compel the production of Larian's communications with MGA's attorneys about the date of Bratz's conception. The motion that is the subject of the instant order was filed on December 7, 2009 and held in abeyance on December 14, 2009. Following the Ninth Circuit's July 22, 2010 decision, the Court ordered the parties to submit supplemental briefing and appear for a hearing on August 25, 2010.

**II.    Discussion[4]**

This parties dispute the scope of the attorney-client privilege, the waiver of that privilege,

---

[3] Because the communications were privileged, they were not produced to Mattel and not admitted into evidence.

[4] The parties do not grapple with the issue of whether this Court must look to state law or federal common law as to the attorney-client privilege. This issue has not yet come up since the transfer of this case, since the privilege issues decided by this Court have always pertained to Mattel's RICO counterclaims. Both parties appear content to apply federal common law in the context of the instant dispute. Although Larian's phase 1(A) testimony was rendered in connection with only state law claims, his phase 1(B) testimony was rendered in connection with both the state law claims and the federal copyright claim. Where the privilege concern pertains to both state and federal claims, there is authority for the proposition that federal privilege law governs. *See, e.g.*, *von Bulow by Auersperg v. von Bulow*, 811 F.2d 136, 141 (2d Cir. 1987).

and the potential application of the crime-fraud exception to the attorney-client privilege.

MGA argues its communications with its attorney, Rosenbaum, aren't protected by the attorney-client privilege because such communications were made "for purpose[] of business advice, or for purposes of conveying factual information for the purpose of making a business decision." *See* Opp. at 16-17. Thus, according to MGA, its June 3, 2008 production of the Rosenbaum email did not constitute a waiver of the attorney-client privilege.

The attorney-client privilege "only protects disclosure of [the] communications [themselves]; it does not protect disclosure of the underlying facts" contained therein. *See Upjohn Co. v. U.S.*, 449 U.S. 383, 395, 101 S.Ct. 677 (1981). Although the privilege cannot curtail discovery into relevant factual matter, a party may not expedite the discovery process by seeking the attorney-client communications that convey that factual matter. *Id.* at 396 ("While it would probably be more convenient for the Government to secure the [protected matter] by simply subpoenaing [the protected matter], such considerations of convenience do not overcome the policies served by the attorney-client privilege."). Those attorney-client communications, though purely factual, are still privileged. *See id.*

But not all attorney-client communications are privileged. The Ninth Circuit typically applies an eight part test to determine whether material is protected by the attorney-client privilege:

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection be waived.

*In re Grand Jury Investigation*, 974 F.2d 1068, 1071 n. 2 (9th Cir. 1982) (quoting *United States v. Margolis (In re Fischer)*, 557 F.2d 209, 211 (9th Cir. 1977)).

Rosenbaum's September 28, 2000 email responded to MGA's request for more information about the conception and development of Bratz. MGA instructed Rosenbaum, who acted in his capacity as MGA's outside counsel, to investigate Bryant's representations about

6

1 Bratz prior to drafting Bryant's employment agreement with MGA.  The request was made in
2 confidence, and Rosenbaum likewise directed his response to MGA executive Victoria
3 O'Connor.  No third parties received Rosenbaum's email.  And although the September 28, 2000
4 email was sent from Rosenbaum to MGA, "[t]he attorney-client privilege [also protects] an
5 attorney's advice in response" to a client's request for legal advice.  *United States v. Bauer*, 132
6 F.3d 504, 507 (9th Cir. 1997) (quoting *United States v. Chen*, 99 F.3d 1495, 1501 (9th Cir.
7 1996)) (emphasis omitted).

8       The plain text of Rosenbaum's September 28, 2000 email reveals its privileged nature.
9 The email begins with the phrase: "PRIVILEGED AND CONFIDENTIAL ATTORNEY-
10 CLIENT COMMUNICATION."  Such disclaimers may not, without more, trigger the
11 protections of the attorney-client privilege.  They nevertheless evidence "the client's intent to
12 seek legal advice and the client's belief that he is consulting an attorney, *i.e.*, someone who will
13 keep the communications confidential."  *EEOC v. Johnson & Higgins, Inc.*, 1998 U.S. Dist.
14 LEXIS17612, at *11 (S.D.N.Y. 1998) (citation omitted).

15       Following the disclaimer, Rosenbaum proceeded to not only corroborate Bryant's factual
16 account, but also provide legal advice in connection with those facts.  For example, Rosenbaum
17 referenced Bryant's attorney's conclusion that Bratz was created outside "the scope of [Bryant's]
18 employment at Mattel" – an undoubtedly legal conclusion.  Rosenbaum also alerted MGA to
19 potential "time limitations on the patent laws" implicated by the date of Bratz's conception.
20 Finally, Rosenbaum confirmed that Bratz's date of conception (and development) was relevant
21 to the text of Bryant's employment agreement with MGA.  Though MGA now attempts to
22 characterize Rosenbaum's advice as "business advice," the email suggests the contrary.  And
23 even if Rosenbaum rendered advice that benefitted MGA in its business, the privilege extends to
24 "legal advice regarding the client's business affairs." *United States v. Chen*, 99 F.3d 1495, 1501
25 (9th Cir. 1996) (holding that attorney's communications with the client are privileged if "[he]
26 was employed with . . . reference to his knowledge and discretion in the law, to give the
27
28

1 advice.") (internal citations and quotation marks omitted).[5]

2 MGA's production of Rosenbaum's September 28, 2000 email constituted a waiver of the attorney-client privilege. "[V]oluntary disclosure of the content of a privileged attorney communication constitutes a waiver of the privilege as to all other such communications on the same subject." *Weil v. Investment/Indicators, Rsrch. & Mgmt., Inc.*, 647 F.2d 18, 24 (9th Cir. 1981). Although MGA's counsel argued before the prior presiding judge that MGA did not intend to waive the privilege by producing the document, Dkt. 5556 at 3911, the law is clear that the producing party's "subjective intent is not dispositive" to whether a waiver has occurred. *See Aristocrat Technologies v. Int'l Game Tech.*, No. C-06-3717 RMW, 2010 WL 3060298, at *2 (N.D. Cal. Aug. 3, 2010) (citing *Phoenix Solutions Inc. v. Wells Fargo Bank, N.A.*, 254 F.R.D. 568, 577 (N.D. Cal. 2008)); *see also Tennenbaum v. Deloitte & Touche*, 77 F.3d 337, 340-41 (9th Cir. 1996); *United States v. Mendelsohn*, 896 F.2d 1183, 1188-89 (9th Cir. 1990).

Larian's testimony during the phase 1 trial also constituted a waiver of the attorney-client privilege.[6] "[A] litigant waives the attorney-client privilege by putting the lawyer's performance at issue during the course of the litigation." *Bittaker v. Woodford*, 331 F.3d 715, 718-19 (9th Cir. 2003). The examples of Larian putting counsel's advice at issue are legion. For example, when challenged about his due diligence in confirming the accuracy of Bryant's representations, Larian testified: "If my attorney and his attorney, as officers of the court, came back in writing and said that they had investigated – his attorney has investigated and his story is true, I believe that." Dkt. 4736 at 1696:18-21.[7] Because MGA continued to withhold the written statements by

---

[5] MGA's claim that Larian's trial testimony "concerned the same information disclosed in the e-mails – the information supplied by Mr. Bryant's attorney to MGA's attorney regarding the conception date" is flawed for the same reasons. Larian testified about legal advice.

[6] MGA argues that Mattel's counsel agreed during Larian's deposition that he had not waived the privilege. But this stipulation did not extend to trial testimony, as made clear by Mattel's counsel's comments during pretrial hearings.

[7] MGA notes that Larian invoked counsel's advice only when cross-examined, and not on direct examination. No authority, of which the Court is aware, considers this

8

MGA's counsel to Larian, Mattel was unable to test Larian's claim in front of the jury. And by relying upon MGA's counsel's representations, while nevertheless refusing to disclose the contents of those communications, MGA impermissibly used the privilege "both as a sword and a shield." *Bittaker*, 331 F.3d at 719 (quoting *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992)).

In addition to invoking counsel's advice with respect to his knowledge about Bratz's conception, Larian repeatedly referenced counsel's correspondence as proof that MGA diligently investigated Bryant's representations. For example, Larian testified that MGA "investigate[d] [Bryant's claim that he developed Bratz in 1998 in Missouri]." Dkt. 4736 at 1703:14-16. But MGA never revealed the nature of its investigation, the scope of that investigation, and the good faith of its investigation into Bryant's claims. All of this information was withheld as privileged and Larian disclaimed knowledge of the contents of his counsel's investigation. In so doing, Larian "affirmatively raise[d] an inference of reliance on counsel for [MGA's] benefit" and in response to Mattel's allegation that MGA insufficiently investigated the date of Bratz's conception and development. *See In re Broadcom Corp. Sec. Litig.*, 2005 WL 1403516, at *1 (C.D. Cal. Feb. 10, 2005) ("The privilege is waived when a litigant puts protected information in issue through some affirmative act for its own benefit."). Even after the phase 1 trial, Larian has continued to invoke Rosenbaum's advice when testifying at deposition in his capacity as MGA's 30(b)(6) designee. *See* Ex. D to Mattel's August 31, 2010 Submission, at 2621.

Measuring the scope of MGA and Larian's waiver proves the more challenging task. The Ninth Circuit has admonished district courts that "[d]isclosure constitutes a waiver of the

---

distinction material. Larian's statements during cross-examination were neither inadvertent nor compelled. *See Transamerica Comp. Co., Inc. v. Int'l Bus. Machines Corp.*, 573 F.2d 646, 651 (9th Cir. 1978). MGA apparently relied almost exclusively on its counsel to investigate Bryant's claims, and thereby manufactured the circumstances that left Larian without any real choice but to invoke counsel's investigation at trial. However, his testimony still "evinc[ed] a clear intent to waive the attorney-client privilege by placing at issue reliance on the advice of counsel." *Glenmede Trust Co. v. Thompson*, 56 F.3d 476, 486-87 (3d Cir. 1995). And MGA should not be excused from producing the privileged communications that informed Larian's belief.

9

1  attorney-client privilege . . . 'only as to communications about the matter actually disclosed.'"
2  *Hernandez*, 604 F.3d at 1100 (quoting *Chevron Corp.*, 974 F.2d at 1162)).  Contrary to Mattel,
3  the "matter" disclosed in the September 28, 2000 Rosenbaum email and Larian's phase 1
4  testimony was not "what MGA knew about when and where Bryant created Bratz."  The email
5  *evidences* "what MGA knew about when and where Bryant created Bratz," but it does not speak
6  to that particular issue.  Since Larian's disclosure of attorney-client communications was no
7  broader than the subject matter of the email, the scope of the waiver that results from his
8  testimony parallels the scope of the waiver caused by the Rosenbaum email's disclosure.

9       As the D.C. Circuit recognized, "the 'subject matter' of [a] waiver could . . . be defined in
10 a number of different ways."  *In re Sealed Case*, 877 F.2d 976, 981 (D.C. Cir. 1989).  In that
11 case, the court applied an abuse of discretion standard in reviewing the district court's findings
12 regarding waiver.  *See id.* (noting that "such determinations properly depend heavily on the
13 factual context in which the privilege is asserted").  District courts have remained cognizant of
14 this "factual context" by considering "the circumstances of the disclosure, the nature of the legal
15 advice sought and the prejudice to the parties of permitting or prohibiting further disclosures."
16 *Stanford v. Roche*, 237 F.R.D. 618, 625 (N.D. Cal. 2006).

17      The September 28, 2000 Rosenbaum email, as well as the communications disclosed by
18 Larian implicate a variety of subject matters.  The disclosed communications concern the date of
19 Bratz's creation.  They also reflect advice received by Larian and MGA prior to October 4, 2000
20 about the date of Bratz's creation.  More narrowly, they reflect advice MGA received from
21 Bryant's attorney about the date of Bratz's creation.  And finally, they can be read to describe
22 the product of Rosenbaum's investigation that was supposedly conducted at MGA's behest.

23      MGA and Larian's use of the disclosed communications should be considered, since "too
24 broad an application of the rule of waiver requiring unlimited disclosure could very well destroy
25 the purpose of the privilege itself."  *See Phoenix Solutions Inc. v. Wells Fargo, N.A.*, 254 F.R.D.
26 568, 578 (N.D. Cal. 2008).  Though courts are divided on whether the waiver should be
27 temporally limited, *see Intex Recreation Corp. v. Team Worldwide Corp.*, 439 F. Supp. 2d 46, 52
28 (D.D.C. 2006), the peculiar factual context in this case suggests that a temporal waiver is not

only appropriate, but necessary.

Though counsel's communication was privileged for the reasons discussed above, it was only meaningfully put at issue by Larian and MGA to the extent it relayed factual information discovered in the course of investigating Bryant's claims. The content of that factual matter was highly probative to Larian's knowledge (and state of mind) at or before the time Bryant was hired by MGA, but it had marginal probative value to the underlying issue of *whether* Bryant indeed conceived and developed Bratz in 1998.

The latter issue – the actual date of Bratz's conception – always depended upon the jury's evaluation of (1) the credibility of individuals who witnessed Bratz's creation first hand and (2) the drawings and sculpts admitted into evidence. Nothing in the record suggests that MGA and Larian used Rosenbaum's second-hand communications to prove that Bratz was conceived and developed in 1998, prior to Bryant's employment with Mattel. It would therefore be inequitable, and tremendously burdensome, to require MGA to produce all attorney-client communications that reference the birth of Bratz, which is the central issue in this case and the likely subject of thousands, if not tens of thousands, of privileged correspondence.

By contrast, Larian's testimony about Rosenbaum's communications, Bryant's representations, and the indirect statements of Bryant's counsel, almost exclusively informed the jury of Larian's knowledge at or before the time MGA entered into an employment agreement with Bryant. It's only fair that Mattel determine the full scope of Larian's knowledge, as well as the reasonableness of his claimed reliance on Rosenbaum's due diligence, by examining *all* communications, including privileged communications, that MGA received prior to Bryant's employment with MGA. The scope of the waiver should also extend to later communications that refer to the earlier privileged communications concerning the birth of Bratz, since they (1) reflect the underlying privileged communications that Larian put at issue and (2) reflect Larian's interpretation of the underlying privileged communications that Larian put at issue.

As the prior presiding judge recognized, defining the scope of waiver is no easy task in a case like this, where privileged communications are relayed in other privileged communications. Since the doctrine of waiver grows from equitable principles, courts have latitude to exclude

11

1  from waiver "any redundant evidence . . . as unnecessarily duplicative." *LifeNet, Inc. v.*
2  *Musculoskeltal Transplant Foundation, Inc.*, 490 F. Supp. 2d 681, 689 (E.D. Va. 2007). MGA's
3  waiver was limited to communications received prior to 2000, and Larian put the advice at issue
4  to evidence his state of mind. Though fairness dictates that Mattel discover the full extent of the
5  pre-2000 communications, including later representations about those communications, the
6  Court sees no equitable basis on which to allow full-throated discovery into all communications
7  between MGA, Larian, and counsel concerning Bratz's birth.

8        The scope of the waiver extends to the first two entries at issue – 662 Rev. Aug. 2007 Log
9  and 661 Rev. Aug. 2007 log. The first document is a complete email chain between Victoria
10 O'Connor, David Rosenbaum, and Dennis Medici, in which O'Connor directs Rosenbaum to
11 draft Bryant's employment agreement and Rosenbaum queries O'Connor about legal obstacles
12 that MGA could face in staking ownership to Bratz. Larian put this communication at issue by
13 testifying that O'Connor acted on Larian's behalf and directed Rosenbaum to investigate
14 Bryant's claims about the birth of Bratz. *See FMT Corp. v. Nessei ASB Co.*, 24 U.S.P.Q.2d
15 1073, 1074 (N.D. Ga. 1992) (holding advice of counsel defense waived privilege as to "all
16 documents relied upon or considered by counsel at the time and in conjunction with rendering
17 that opinion"). The second log entry contains a less complete version of the first email chain,
18 and the same reasons compel disclosure of this entry.

19       The scope of the waiver also extends to the next six entries at issue – 90 Larian Jan. 15,
20 2008 Log; 2338 MGA Nov. 16, 2007 Log; 657 MGA Aug. 14, 2007 Rev. Log; 657 MGA Aug.
21 14, 2007 Supp. Log; 55 MGA Jan. 23, 2008 Log; and 55 MGA Jan. 23, 2008 Rev. Log. All six
22 entries are substantively identical. They reflect an email communication between Larian and
23 MGA's outside counsel in anticipation of litigation and reflect the contents of advice Larian
24 received from MGA's attorney before MGA entered into an employment agreement with Bryant
25 – *i.e.*, the subject matter of Larian and MGA's waiver. Although the communication reflected in
26 the six entries is one sent by Larian to counsel, it must be produced because it "relat[es] to the
27 legal advice" that MGA and Larian put at issue through the production of the September 28,
28 2000 Rosenbaum email and Larian's testimony. *See Handgards, Inc. v. Johnson & Johnson*,

12

413 F. Supp. 926, 929 (N.D. Cal. 1976). However, not all of the communication reflected in the six entries falls within the scope of this waiver. Because Larian's communication with counsel covered several topics, only one of which was the legal advice he received about the date and location of Bratz's conception and development. MGA may therefore redact the communication to include only (1) the information concerning the sender, recipient, date, and subject of the communication; and (2) the fifth, seventh, and ninth lines of the body of the communication.

The scope of the waiver likewise extends to the next thirteen entries at issue – 374 MGA Jan. 23, 2008 Log; 548 MGA Jan. 23, 2008 Log; 89 Larian Jan. 15, 2008 Log; 2337 MGA Nov. 16, 2007 Log; 656 MGA Aug. 14, 2007 Rev. Log; 660 MGA Aug. 14, 2007 Rev. Log; 656 MGA Aug. 14, 2007 Supp. Log; 54 MGA Jan. 23, 2008 Log; 54 MGA Jan. 23, 2008 Rev. Log; 374 MGA Jan. 23, 2008 Rev. Log; 549 MGA Jan. 23, 2008 Rev. Log; 548 MGA Jan. 23, 2008 Log; and 660 MGA Aug. 14, 2007 Supp. Log. All thirteen entries are substantively identical. They reflect an email communication between Larian and MGA's outside counsel concerning Bryant's development of the Bratz line of dolls. The Court examined Larian *in camera* to determine whether this email fell within the scope of MGA and Larian's waiver. Larian testified that the communication did not refer to knowledge he obtained prior to entering into the employment agreement with Bryant, but his *in camera* testimony contradicts recent depositional testimony. The *in camera* testimony also included a factual account that appears in no other trial or deposition transcript of which this Court is aware.

More importantly, the communication contained in the thirteen entries was sandwiched between several other communications (including the communication described in the previous paragraph), in which Larian focused on the content of Rosenbaum's year 2000 communications with MGA. The evidence before the Court suggests that this communication, like those around it, refers to MGA's due diligence prior to entering into an employment agreement with Bryant.[8]

Larian and MGA's waiver further extends to the following sixteen log entries: 375 MGA

---

[8] This Court does not credit the prior judge's conclusion that this communication contradicts Larian's phase 1 testimony.

Jan. 23, 2008 Rev. Log; 375 MGA Jan. 23, 2008 Log; 549 MGA Jan. 23, 2008 Log; 1325 MGA Jan. 23, 2008 Log; 69 Larian Jan. 15, 2008 Log; 63 Larian Jan. 15, 2008 Log; 655 MGA Aug. 14, 2007 Rev. Log; 734 MGA Aug. 14, 2007 Rev. Log; 655 MGA Aug. 14, 2007 Supp. Log; 734 MGA Aug. 14, 2007 Supp. Log; 637 MGA Jan. 23, 2008 Log; 550 MGA Jan. 23, 2008 Rev. Log; 639 MGA Jan. 23, 2008 Rev. Log; 1327 MGA Jan. 23, 2008 Rev. Log; 1325 MGA Jan. 23, 2008 Log; and 637 MGA Jan. 23, 2008 Log. All sixteen entries are substantively identical. They all contain a communication between Larian, outside counsel, and Rosenbaum that was made in anticipation of litigation. The communication reflects Rosenbaum's advice to MGA prior to MGA entering into an employment agreement with Bryant. As with other communications between Larian and counsel, however, the communication contains a number of other statements that do not fall within the scope of Larian and MGA's waiver. MGA may therefore redact the communication to display only (1) the author, recipients, and date of the communication; and (2) the ninth through fourteenth lines of the body of the communication.

Relying upon *In re Seagate Tech., LLC*, 497 F.3d 1360 (Fed. Cir. 2007), MGA argues that Larian and MGA's waiver should not extend to communications with "trial counsel," like Ms. Glaser. *See id.* at 1372-73 (holding that "significantly different functions of trial counsel and opinion counsel advise against extending waiver to trial counsel" in order to protect trial counsel's ability to "focus[] on litigation strategy"). However, the practical concerns considered in *Seagate* are not present here. Quite simply, MGA and Larian's waiver does not extend to all communications with counsel that concern the birth of Bratz. Rather, the waiver extends to pre-2000 communications that concern the birth of Bratz, as well as subsequent regurgitations of those communications. Not only is this a purely factual matter, unlike *Seagate*, but this Order does not require MGA to disclose subsequent privileged communications that encompass legal strategy or factual determinations reached after 2000.

**IV.    Disposition**

For the foregoing reasons, the Court ORDERS MGA to produce, within three days of the filing of this Order, all identified communications in the form discussed herein. MGA is further ORDERED TO SHOW CAUSE, in writing, within 3 days of the filing of this Order as to why

1  Entry 3237 on the first tab of the Spreadsheet entitled "Exhibit A" to MGA's electronic
2  submission of the Larian Hard Drives should not be produced in redacted form, in a manner that
3  displays only the eighth through thirteenth lines of the body of the first email in the string.
4  MGA may submit its response to the Court's OSC *in camera*.

5        The Motion is DENIED as to the remaining documents sought by the Motion, none of
6  which fall within the scope of the waiver described herein. Mattel's arguments as to crime fraud
7  are unavailing with respect to these communications.

8        Mattel may not conduct any further discovery into this subject matter without first
9  obtaining leave of Court.

11  IT IS SO ORDERED.
12  DATED: September 22, 2010

                                        _____
                                          DAVID O. CARTER
                                        United States District Judge