1      **UNITED STATES DISTRICT COURT**

2      **CENTRAL DISTRICT OF CALIFORNIA**

3      **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4                     - - - - - - -

5

6   CARTER BRYANT,                 )
                                   )
7           Plaintiff,             )
                                   )
8       vs.                        ) No. SACV 04-9049-DOC
                                   )
9   MATTEL, INC.,                  )
                                   )
10          Defendant.             )
    _____)

11

12

13

14            REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                      Hearing

16               Santa Ana, California

17            Saturday, September 4, 2010

18

19

20

21   Jane C.S. Rule, CSR 9316
22   Federal Official Court Reporter
     United States District Court
23   411 West 4th Street, Room 1-053
     Santa Ana, California 92701
24   (714) 558-7755

25   10-09-04 Mattel

**APPEARANCES OF COUNSEL:**

FOR INTERVENOR DEFENDANT MGA ENTERTAINMENT, INC.:

           ORRICK, HERRINGTON & SUTCLIFFE, LLP
           BY:  THOMAS S. MC CONVILLE
              Attorney at Law
           4 Park Plaza
           Suite 1600
           Irvine, California 92614
           (949) 567-6700

           - AND -

           ORRICK, HERRINGTON & SUTCLIFFE, LLP
           BY:  ANNETTE L. HURST
              Attorney at Law
           405 Howard Street
           San Francisco, California 94105
           (415) 773-5700

FOR DEFENDANT MATTEL, INC.:

           QUINN, EMANUEL, URQUHART, OLIVER & HEDGES
           By:  JOHN B. QUINN
              MICHAEL T. ZELLER
              JOHN GORDON
              Attorneys at Law
           865 South Figueroa Street
           10th Floor
           Los Angeles, California 90017-2543
           (213) 443-3000

FOR COUNTER-DEFENDANT GUSTAVO MACHADO:

           SCHEPER, KIM & OVERLAND, LLP
           BY:  ALEXANDER H. COTE
              Attorney at Law
           601 West Fifth Street
           12th Floor
           Los Angeles, California 90071
           (213) 613-4660

ALSO PRESENT:

           HON. JAMES L. SMITH

SACV 04-9049-DOC - 09/04/2010

3

1

**I N D E X**

2

3

4                    MOTION HEARING

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          SANTA ANA, CALIFORNIA, SATURDAY, SEPTEMBER 4, 2010

2                          (9:45 a.m.)

3          THE COURT:  Okay.  We are on the record.  Both MGA

4     and Mattel are present.

5              And counsel, good morning.

6              And I want to take the Machado matter first,

7     counsel.  I appreciate your presence.

8              I had made an indication last evening and realized

9     that you weren't present, and I had excused you, so I didn't

10    think that that was appropriate.

11             Your objections to Mattel's discovery requests are

12    overruled, but that doesn't mean that I'm going to subject

13    you to every impossible discovery obligation, because the

14    parties seem to have a non-ending reservoir of requests.

15             You know what the claims are against your client.

16    If you have relevant documents, produce them.  If you made a

17    representation -- you've already made a representation in

18    your brief that you produced all relevant documents.  Now,

19    the word "relevant" becomes subject to equivocation and

20    interpretation.

21             So if you feel comfortable and you want to repeat

22    that on the record now, then I'll take your representation

23    and credit you with that, which means I'll take it into

24    consideration when future motions flow through the door.  If

25    you don't want to take a position, then I'll see you either

1     tomorrow or on Monday.  And make sure what you say, you are

2     willing to live by.

3              MR. COTE:  I would be happy to repeat my

4     representation, your Honor.

5              Mr. Machado has produced all of the responsive

6     documents that he has in his possession.

7              THE COURT:  Okay.

8              MR. COTE:  The one point of clarification I would

9     ask for --

10             THE COURT:  I don't need clarification.

11             MR. COTE:  Well, some of our objections were

12    attorney-client privilege.  I just want to make sure that's

13    not being overruled.  If that's -- that's the only point I

14    wanted to get clarification.

15             THE COURT:  That's not being overruled.

16             MR. COTE:  Okay.  Thank you, your Honor.

17             THE COURT:  And I want you to go back through

18    those attorney-client representations.

19             MR. COTE:  I'm sorry?

20             THE COURT:  I want you to go back through those

21    attorney-client representations, because some of the things

22    I'm writing, unless I tone it down, are going to be very

23    interesting.  And I'm just warning you, take another look at

24    them.

25             MR. COTE:  Thank you, your Honor.

```
1            THE COURT:  Now, have you produced all relevant
2   documents with the exception of the attorney-client
3   representations?
4            MR. COTE:  Yes, we have, your Honor.
5            THE COURT:  And when will you go back over those
6   attorney-client representations one more time?
7            MR. COTE:  Go over my communications with my
8   client?
9            THE COURT:  Your attorney-client representations
10  that you believe are privileged, when will you go back over
11  those?  By Monday?  Excellent.  By Monday at what time?
12           MR. COTE:  Is the Court looking for a report, just
13  a reconfirmation that I've reviewed them?
14           THE COURT:  I'm looking for you back in my court
15  with not only a report, I'm looking for you back in my
16  court, because apparently we are going to be here --
17           MR. COTE:  Monday is fine.
18           THE COURT:  What time?
19           MR. COTE:  Whatever is convenient for the Court.
20           THE COURT:  Well, why don't you talk privately
21  with counsel and see what time they want to gather, okay?
22  Because only they know their time schedule and how long they
23  want to spend with me, so I'll take a recess, you discuss
24  with them when you want to reconvene.
25           Thank you.
```

```
 1              MR. COTE:  Thank you.
 2              (Recess.)
 3              THE COURT:  Back on the record.
 4              And Mr. Machado's counsel is present, I know who
 5    you are, but please state your name for the record.
 6              MR. COTE:  Sure.  Alexander Cote representing
 7    Gustavo Machado.
 8              THE COURT:  And your representation is?
 9              MR. COTE:  My representation is that the
10    privileged communications I'm contemplating, which are my
11    communications with my client, Mr. Overland's communications
12    with my client and his Mexico counsel's communications with
13    his client are privileged.
14              THE COURT:  Okay.  Now, just a moment.
15              (Interruption in the proceedings.)
16              THE COURT:  Let's do this.  I don't know
17    Mr. Overland's whereabouts, but I think we spent nine months
18    together in a trial.
19              MR. COTE:  He's out of the country right now, but
20    I think he's back next week or the week after, your Honor.
21              THE COURT:  Is he?  I want him to look at that
22    also.  In other words, I want to afford you that
23    opportunity, and there is no reason for me to bring you back
24    Monday if he doesn't have an opportunity to jointly look at
25    that.  So we are going to be back in session some nights
```

1   next week.  What about Wednesday night?

2            MR. COTE:  I don't have his calendar at my

3   fingertips.  I believe he's back the following week, the

4   week after Labor Day.

5            THE COURT:  But you're able to make those

6   representations, then, without Mr. Overland coming in here

7   and saying, "Oops, I didn't see that" --

8            MR. COTE:  Yes.

9            THE COURT:  -- "and golly gosh, you know, we made

10  a little mistake."

11           MR. COTE:  They are my communications with my

12  client about the case, for the most part, is what we are

13  talking about here.  And I'm copied on, I believe, all of

14  Mr. Overland's communications.

15           THE COURT:  Well, I think that will resolve

16  Ms. Hurst's concerns about Monday, and Mattel's concern, and

17  I'll simply order you back at 5:00 Wednesday evening.

18           MR. COTE:  5:00 p.m. Wednesday.

19           THE COURT:  We will be in session that evening.

20  That will give you time to relook at those.

21           MR. COTE:  Very good, your Honor.

22           THE COURT:  All right.  Now, do you have any

23  questions of me?

24           MR. COTE:  No, I don't.

25           THE COURT:  Do you need any clarification?

```
 1                MR. COTE:  No, I don't.

 2                THE COURT:  Any motion for reconsideration?

 3                MR. COTE:  No, your Honor.

 4                THE COURT:  Okay.  Thank you very much.

 5                MR. COTE:  Thank you.

 6                Your Honor, I'm excused, right?

 7                THE COURT:  Yes.  Have a good day.

 8                From now on, Saturday sessions or Sunday sessions,

 9     whatever we're doing, you are more than welcome to dress

10     informally.

11                MR. COTE:  Okay.

12                THE COURT:  I've been reading a little bit about

13     the state court filing last night, and I thought I had held

14     these claims were meritless, but we'll let the parties

15     decide that with the state court judge out of deference to

16     the state.

17                Third issue today is I'd like to address MGA's

18     counterclaims and reply.  I'm eager to read the briefing on

19     this issue, the schedule to be filed on Tuesday, and I have

20     a preliminary question for MGA.  Do the types of allegations

21     made in your counterclaims in reply fall into any of the

22     affirmative claims in your original complaint?

23                Now, think about that for a moment before you just

24     respond, and I'm going to give you another chance to revisit

25     that, but you might want to consult with your co-counsel.
```

1              (Attorney discussion held off the record.)

2              MS. HURST:  Your Honor, the factual allegations of

3       the counterclaims and reply were not made in the original

4       complaint, but the legal theory of the original complaint of

5       unfair competition encompasses the new evidence.

6              THE COURT:  Wondering whether I am required to

7       allow discovery on these allegations regardless of whether

8       the counterclaims and reply survive.

9              MS. HURST:  Yes.

10             THE COURT:  Why?

11             MS. HURST:  Well, for numerous reasons.  First of

12      all, let me take the legal defenses that this is relevant

13      to.  On the statute of limitations and the fraudulent

14      concealment rebuttal thereto, what Mattel knew about Bratz

15      and what has always been an important issue in the case, and

16      the spying stuff, now, we've determined that they knew about

17      Bratz before it came out.  They had pictures of it before it

18      came out.  There were multiple reports about it before it

19      came out.  They were in our showroom looking at it, and it's

20      directly relevant to statute of limitations and fraudulent

21      concealment.

22             Additionally, your Honor, it's relevant to our

23      defenses of Mattel's trade secret misappropriation claim.

24      The fashion in which Mattel treated the confidential

25      information of competitors and taught its employees to

1    behave with respect to this type of information is relevant

2    as to what constitutes a trade secret and whether departing

3    employees had any understanding they were doing anything

4    wrong in light of Mattel's consistent behavior with respect

5    to the confidential information.  So it's directly relevant

6    to our defense of their trade secret claims.

7            Additionally, it is encompassed, as I noted, by

8    the legal theory of our original pleading.  Additionally,

9    it's relevant to the set-off defense, which is a legal

10   defense that the jury hears, because we now have these

11   claims against them by which we were harmed, and that's a

12   set-off.

13           Additionally, it's relevant to the unclean hands

14   defense, which the Court may decide to submit to the jury on

15   an advisory basis.  It's relevant to numerous issues even

16   without the counterclaims and reply, and of course, we

17   certainly contend it will be in the case, and there is no

18   point, then, in not letting us make our affirmative damages

19   claims on top of that.

20           THE COURT:  Well, of course I want to be

21   courteous, Mr. Zeller.

22           MR. ZELLER:  I would begin by noting that

23   Mr. Molinski made a different representation to the

24   discovery master during Isaac Larian's most recent 30(b)(6)

25   deposition.  He acknowledged, as was obvious, that the

1    counterclaims and reply were not part of the claims that

2    were of the original complaint that MGA filed.  That much is

3    obvious.

4            Number two, the notion that the facts that are

5    alleged here are somehow inevitably tied to a variety of

6    defenses and issues in the case, really also doesn't

7    withstand scrutiny.  It has been a fact that's been well

8    known throughout the case.  It is also something that MGA

9    previously argued on the statute of limitations defense that

10   Mattel knew about Bratz when it was being shown at these toy

11   fairs.  This was, in fact, something that was repeatedly

12   argued.

13           Judge Larson has granted summary judgment on the

14   statute of limitations, and specifically, of course,

15   considered all of that same evidence.  So the fact is, is

16   that simply knowing, too, about Bratz existing is not the

17   salient inquiry for purposes of statute of limitations.

18           In terms of the other arguments about how it has

19   some bearing on whether it's a trade secret or not, the

20   information is, and this is as a result of multiple

21   admissions now by MGA's own witnesses as well as, frankly,

22   just common sense.

23           Information provided to retailers at these toy

24   fairs is not confidential.  It is certainly not trade

25   secret.  This is information that is public.  And, in fact,

 1    MGA's CFO repeatedly acknowledged that products, information

 2    and the like that are provided to toy fair -- provided at

 3    toy fairs are, quote, "public knowledge," end quote.  So the

 4    idea that MGA is trying to spin these into being comparable

 5    to stealing massive amounts of information directly out of

 6    Mattel, I don't think it's going to withstand scrutiny at

 7    all.

 8              THE COURT:  Just a moment.

 9              (Interruption in the proceedings.)

10              THE COURT:  Thank you very much.

11              MS. HURST:  Your Honor, I believe Mr. Machado's

12    counsel also wanted to answer the Court's question.

13              THE COURT:  Mr. Machado's counsel is back with us?

14              MR. COTE:  I didn't leave, your Honor, during the

15    Court's questioning.  It peaked my interest, so I stuck

16    around and listened to what the Court asked MGA's counsel.

17              I would reiterate Ms. Hurst's points about the

18    affirmative defenses, and I believe that some of those

19    affirmative defenses are available to my client as well.

20              THE COURT:  The special master has allowed some

21    additional depositions, but I want you to know that that's

22    not without conversation with this Court.  I've taken him

23    out of, quote-unquote, "the decision-making business," and

24    he's been out of that business ever since this case came to

25    this Court.

1        Whatever happened before, he's a wonderful counsel

2   and he's assumed tremendous responsibility, but those

3   options coming from the special master are because he's had

4   a conversation with this court.  He doesn't go out on his

5   own and make decisions that affect any depositional

6   schedule, so when he's speaking to you, he's speaking

7   because we've had a conversation and he has the authority.

8        I don't know what's going to occur with these

9   counterclaims at this point, but I also don't want to catch

10  MGA in a box because of the briefing schedule where you're

11  right up against a discovery cutoff deadline where I'm not

12  budging.  And I thought that the fairest way to proceed on

13  that is to give you a limited number of additional

14  discovery, so while you've been -- of depositions, so while

15  up to this point, you've been resisting the 25, here, that

16  balance should swing equitably back to MGA for a limited

17  number.  I thought four was the correct limited number.  I

18  thought it gave you enough latitude and it gave you enough

19  ability to start.

20       Now, the briefing schedule has been set by all of

21  you.  If I can decide that issue, I would decide it

22  tomorrow.  And if I decided it favorably for Mattel, then

23  this briefing schedule or these depositions might not

24  matter, but they might.

25       The same issue that will come before the Court

1    again, from Mattel's perspective, about, well, Judge, on 808

2    and IL -- or IGWT, you've ruled X, what about consciousness

3    of guilt or what about damages, that doesn't close the door.

4            You may have the same vehicle, depending upon how

5    I rule, and assuming for a moment just hypothetically it was

6    against MGA, there are other vehicles which may allow this

7    to come into evidence, although I may not find that this is

8    properly pled.  And so therefore, I want to afford you the

9    same courtesy and I don't want you up against that week

10   deadline by the time the motion.

11           So the scheme I drew up in my mind trying to think

12   how would this be equitable and not put all of the parties

13   in a bickering position or the nights that you'd have to

14   keep in the last week because of the briefing schedule

15   because the cutoff is right -- pretty close to that ruling,

16   I thought that the additional four would be fair, and that's

17   why that's occurring.

18           Now, we're, of course, going to get into a debate,

19   because we should, about how you define those four.  So we

20   need to get to that next week, probably by next Wednesday,

21   and I want to hear who those four people are from you, okay?

22   You can meet and confer silently and try to reach an

23   agreement about who and when, and if you don't, then that's

24   the way we spend our nights and weekends together.  So all

25   of this you control.  The time frames are really up to you.

1          I have unlimited resources, and you'll find that

2    out, because I enjoy it here, and I enjoy your company on

3    the weekends and at nights.

4          So now we are going to go to your motion to

5    confirm.  You now have a final order on the motion to

6    confirm, it's not subject to further discussion.  We've been

7    back and forth about that, your briefing has been before the

8    Court and your arguments.

9          Both parties stated on the record that MGA would

10   reserve all affirmative defense and raise all dispositive

11   arguments at the summary judgment.  Mattel would limit its

12   trade secret claims to works created by Bryant.  I've

13   decided to orally rule on the request for leave to amend,

14   which was denied in the tentative.  I think the parties

15   should include in their stipulation that Mattel's pleading

16   will not be amended but will be deemed to incorporate the

17   Bratz and Jade trade secret allegations.  That seemed to be

18   a solution agreeable to all parties.

19          Now, I want you to think about that statement for

20   a moment, you're going to talk to each other, and if you

21   have a disagreement, you can come back and argue later

22   today.

23          I want to continue on the motion for new trial.

24   Your argument, counsel.

25          MS. HURST:  Yes, your Honor.  I believe we left

```
 1   off with the special verdicts findings, and I'll go directly

 2   to that point now.

 3           First, I want to set the stage for what we'll be

 4   doing in January.  And then I want to go back to what

 5   happened in the summer of 2008.

 6           THE COURT:  You go to trial in January.

 7           MS. HURST:  Correct.

 8           THE COURT:  And I've advanced it a week from

 9   January 11th to January 4th.

10           MS. HURST:  Okay.

11           THE COURT:  Just now.

12           MS. HURST:  Did I say something to offend the

13   Court?

14           THE COURT:  No, no.  It's part of our informal

15   discussion about getting a jury that week, starting the

16   evidence on January 11th.

17           MS. HURST:  I understand, your Honor.

18           THE COURT:  And I'm more and more inclined to make

19   certain that each party gets the maximum amount of

20   information, and I think with a case of this complexity and

21   this duration, you are looking for certain jurors on both

22   sides.

23           MS. HURST:  Understood.

24           THE COURT:  And I think the fairest thing,

25   although you'll perceive it's a punishment, is that I'm
```

1    going to use that five-page jury questionnaire that you

2    originally drew but give you a chance to redraft that after

3    the summary judgment motions.

4          I'm going to call for a pool of about 110 jurors

5    to come down.  I'm going to put six jurors in a

6    decision-making mode in the box, and I'll have 10

7    alternates, and if you two agree on anything else, I'm going

8    to accept your agreement.

9          MS. HURST:  Thank you, your Honor.

10         THE COURT:  And I need to start that process

11   sometime in November, so I need to tell the jury

12   commissioner if our informal discussions still meet with

13   your consent, because each of you thought that that was fair

14   because you really wanted a whole set of questions answered

15   by a jury or potential juror, and if I put you on in an oral

16   position of asking you those questions, I'll only give you

17   15 or 20 minutes, and that would be with a panel, or ask the

18   questions myself, and I don't think that's going to leave

19   either party satisfied.

20         So I want to make sure, Mr. Quinn, is that still

21   what you want to do?  Do you still want a questionnaire?

22         MR. QUINN:  Yes, your Honor.

23         THE COURT:  Okay.  Mr. Zeller?

24         MR. ZELLER:  Yes.

25         THE COURT:  Mr. McConville?

```
 1              MR. MC CONVILLE:  Yes, sir.

 2              THE COURT:  And Ms. Flynn -- I'm sorry, you're

 3    starting to look like Ms. Flynn.

 4              Ms. Hurst?

 5              MS. HURST:  Yes, your Honor.

 6              THE COURT:  Then we have to start January 4th or

 7    5th, and I don't have to decide the exact date, I just want

 8    to finalize that on the record.

 9              Now, do you want six or more in the box as

10    decision-makers?

11              MS. HURST:  More.

12              THE COURT:  How many more?  Of course it's always

13    to the defense side to have more because more people have to

14    agree.  From the plaintiff's side, they always want less,

15    they want six.  But how many?

16              MS. HURST:  Your Honor, I'd like an opportunity

17    before making a final position on that to consult with my

18    client.  I think that's a significant issue that requires

19    client consultation.

20              THE COURT:  Tentatively, I'm not holding you to

21    it, how many do you want as the, quote-unquote,

22    "decision-makers"?

23              MR. QUINN:  Six.

24              THE COURT:  Amazing that I knew that.

25              You're going to want 25.  I'm just joking.
```

```
 1              MS. HURST:  Probably 10.

 2              THE COURT:  No.  I usually have gone with 8

 3    because you've got all the alternates.  You've got

 4    alternate, alternate, alternate, alternate, you're going to

 5    have 10 alternates.  But then if I go with 8, I'm going to

 6    have 8 alternates, not 10.  So you talk to your client, but

 7    it's not going to be 12.

 8              MS. HURST:  Understood.

 9              THE COURT:  Okay.  Counsel, continue with your

10    motion.

11              MS. HURST:  Thank you, your Honor.  So where we

12    are going to be in January is that the jury is going to be

13    asked to look at all of these drawings of Carter Bryant and

14    decide whether they were created on nights and weekends.  I

15    mean, assuming, you know, summary judgment, your Honor, but

16    we are going to have a jury in the box.  They are going to

17    be looking at all these drawings, and they are going to have

18    to answer the question whether this was done on a night or a

19    weekend but not be able to consider whether it was done in

20    1998 when Carter Bryant said or 1999 when Mattel said.  It's

21    ridiculous.

22              They are going to have to consider all the same

23    evidence, and they are going to have to answer in their own

24    minds, if not on the form, questions about the timing of its

25    creation, but they are not going to be allowed to consider
```

1    the whole picture as to the timing of its creation?

2            Your Honor, this is the Union Pacific case, which

3    we cited in both our opening and our reply, 219 F.2d 825.

4    It's exactly on point.  And here, I want to note, and let me

5    go back to where we were in the summer of 2008, because I

6    think it's extremely significant.

7            The jury did not check off answers on the four

8    original drawings.  The jury hung on the 1998 issue.  These

9    four lines they didn't fill out are the ones Mr. Price told

10   them in closing, Mattel's counsel, Mr. Price, told them in

11   closing were the original drawings.

12           So when they hung on that issue, they were hanging

13   on the 1998 issue, and then what happened, Judge Larson

14   comes out and says, we've got a problem, and the parties

15   stipulated to an Allen charge.  They got an Allen charge

16   with additional language saying, the parties have spent a

17   ton of money on this case, and the jury has spent all this

18   time on this case, can you please reach a unanimous verdict.

19   I mean, this was compulsion.  And this goes into the jury

20   room on a form, the Supplemental Instruction Number 2, and,

21   your Honor, now, for the Court's benefit and the transcript,

22   I'm looking at the transcript of proceedings jury trial day

23   26, July 17, 2008, pages 5069 through 5075.  They give this

24   modified Allen charge, this incredible charge, and then

25   notes come back.

 1           Notes come back, and one of the jurors -- and the

 2     notes are sealed, we don't know what they say, but the Court

 3     should certainly inquire and look at them if it has any

 4     hesitation to keep these special findings which have to go

 5     under these circumstances.

 6           A note comes back and a juror says, look, I feel

 7     compelled, I'm coerced, I don't feel good about this, this

 8     is not good, I believe in the 1998, and I'm not going to

 9     change my mind on that.  And the other note is from the

10     foreperson and says, we are hung on the 1998 issue,

11     basically.

12           So there was a -- I mean, your Honor, there should

13     have been a mistrial at that point, frankly, and it was the

14     Court's obligation to consider the significance of this and

15     declare a mistrial.  It should have been done.  That was the

16     core issue of the case.  Was this done in 1998 or not?

17           And now -- now what failed to occur after the jury

18     hung on the original conception timing of this, I can't even

19     believe, in having realized this problem and gone back and

20     looked at all of the subsequent errors that occurred as a

21     result of this.  Let me start with this.  The jury never got

22     the opportunity to consider the significance of the

23     expressed terms of the written agreement in light of its

24     possible belief that the original conception and reduction

25     to practice was in 1998.

```
 1              In other words, the contract doesn't say,
 2    conceived and reduced to practice before you came to
 3    employment but then augmented during your employment,
 4    doesn't say anything like that.  And also the copyright
 5    infringement instructions were wrong because of this,
 6    because if Mattel didn't own the original four drawings,
 7    even if they did own some of the other stuff by virtue of
 8    this special finding, all they owned was the incremental
 9    additional work, at best they owned derivative works at that
10    point.
11              The jury wasn't instructed that they should make a
12    derivative work comparison, which is by definition much more
13    limited and requires a higher finding of similarity only on
14    the new material.  This was an error -- well, it wasn't an
15    error at that point.  I mean, it was a failure to grapple
16    with the central issue of the case.
17              And Union Pacific case and the Altus case are
18    right on point here, your Honor.  I've already mentioned the
19    Union Pacific cite.  The Altus case is 540 F.3d 992.
20              In Altus, there was a Allen charge same as there
21    was here.  Jury comes back and can't complete one of the
22    verdict forms, same thing here.  The court holds in both
23    Union Pacific and in Altus, you can't waive this issue.
24    When there is a gaping hole in the verdict and it should
25    have been a mistrial, you can't waive it, you've got -- the
```

1    court has to step in and fix the problem, and that is really

2    what we had here.

3            We had a failure -- the special findings -- and

4    let me just add one more point on the special findings, your

5    Honor.

6            In addition to the fact that it makes no sense to

7    have a new jury come in and hear all this evidence again to

8    answer one question but not the other, in addition to the

9    fact that the jury hung, the court has now granted the

10   motion to confirm.

11           Now, I heard Mr. Zeller say, and we don't agree

12   with this, but respectfully, I'm going to argue on the basis

13   of it.  I heard Mr. Zeller say in court here the other night

14   after Mr. Quinn said, you know, "We're just confirming that

15   we are going on the expressed contract theory but again

16   ownership."  Mr. Zeller said, "No, no, there are other legal

17   doctrines, now, we are going to bring in to play."

18           We have no idea what that means, just so the Court

19   knows.  They are changing their legal theory of ownership

20   because of this motion to confirm.  They are going to change

21   their legal theory of ownership completely.  We have no idea

22   what that is.  It's never been disclosed in interrogatory

23   responses or anywhere else, and at the same time, they are

24   trying to hold on to a special verdict when we don't know

25   what their legal theory ownership is, the core legal theory

1   of the case?

2          This is a total miscarriage of justice.  The

3   instructions can't even be evaluated anymore.  The verdict

4   form can't even be evaluated anymore in light of this

5   apparent new legal theory now that they are intending to

6   bring.  It's not even based on the contract anymore.

7          THE COURT:  Well, obviously Judge Kozinski's

8   concerned and the Circuit is concerned as well.  You can't

9   take that as a directive to the Court, but I don't believe

10  Judge Kozinski writes dicta.  And when a judge raises the

11  possibility of the entire proceeding starting over again,

12  while it's not a directive, it's certainly a thought.

13          MS. HURST:  I understand.

14          THE COURT:  I don't believe that Judge Kozinski or

15  the Circuit puts in spurious thoughts in their opinions, so

16  that's not a direction to the Court.  It's left it to my

17  discretion and whatever wisdom I have, but it's an

18  interesting comment, and it certainly alerted this Court,

19  but...

20          Mr. Zeller.

21          Thank you.

22          MS. HURST:  Thank you, your Honor.

23          THE COURT:  Mr. Zeller.

24          MR. ZELLER:  The issue that somehow the jury's

25  inability to reach a resolution or decision on four drawings

```
 1    is really based on both factual misunderstanding of the

 2    situation, and -- as well as really a waived mistrial

 3    argument that's obviously far too late at this point.

 4            On the factual aspect, Ms. Hurst says that

 5    effectively the jury hung on the 1998 issue, that's just

 6    simply demonstratively incorrect under the plain terms of

 7    the findings that the jury did make.  For example --

 8            THE COURT:  And there is nothing that precludes an

 9    Allen or Baumgartner instruction in a civil case.

10            MR. ZELLER:  And here, this was done with the

11    consent of both parties.  This isn't simply waiver.  Waiver

12    is certainly one doctrine by which one could examine this,

13    but this was something affirmatively sought and agreed to by

14    MGA.  This wasn't just simply passively failing to make a

15    mistrial motion.  This was MGA affirmatively stating, yes,

16    this is the way to proceed.

17            THE COURT:  I don't think my ruling is going to be

18    based on the last issue.  It's an appropriate procedure.

19    It's discretionary with the Court.  I understand the

20    potential taint that if the parties did consent.

21            MR. ZELLER:  Thank you, your Honor.  That

22    certainly cuts that issue short, I think.

23            THE COURT:  I think it does, but I want to hear

24    from MGA one more time.  I just wouldn't spend a long time

25    on that issue.
```

SACV 04-9049-DOC - 09/04/2010

```
 1              MR. ZELLER:  Sure.

 2              THE COURT:  Let me hear from MGA one more time on

 3      that issue, Mr. Zeller.  Thank you.

 4              MR. ZELLER:  Oh, I'm sorry.  I wasn't going to go

 5      further, your Honor, unless the Court had questions on that.

 6      I think the record is very, very clear from the trial

 7      transcript that Mr. Nolan on behalf of MGA, MGA's lead

 8      counsel, affirmatively consented that this would be done,

 9      and that was a way of proceeding, and with that, I'll stop

10      unless the Court has questions.

11              THE COURT:  Any further argument on this motion?

12              MR. ZELLER:  Nothing further, your Honor.

13              THE COURT:  Okay.  Let me turn to MGA now.

14      Ms. Hurst.

15              MS. HURST:  Your Honor, just to be clear, I'm not

16      arguing that the Allen charge itself is the error -- was the

17      error.

18              THE COURT:  And you are not arguing that the

19      procedure itself either by consent or discretion of the

20      Court is the error.

21              MS. HURST:  No.

22              THE COURT:  You're pointing out to the Court the

23      infection that occurred --

24              MS. HURST:  Exactly.

25              THE COURT:  -- the taint in a sense that permeates
```

1    and overlaps the legal issue.

2              MS. HURST:  Exactly.

3              THE COURT:  I got it.

4              MS. HURST:  Thank you, your Honor.  And I would be

5    remiss if I didn't also note that the climate at that point

6    in the jury room included juror number 8, whom the Court

7    later called a cancer on the jury for her racist remarks.

8              So you have the Allen charge, you have the holdout

9    on the 1998 issue, and on top of all that, you have your

10   number 8 in the mix, your Honor, and that's in addition to

11   all of the legal issues that we've already discussed.

12             THE COURT:  And I can't speculate, but perhaps

13   that was also part of Judge Kozinski's concern in looking at

14   this record, and the Circuit chose not to state it, but I

15   can't speculate on that.  I need to look at this on a legal

16   basis, frankly.

17             MS. HURST:  Your Honor, the other thing I wanted

18   to address on the special findings was the fraudulent

19   concealment, because there were special findings on that as

20   well.

21             THE COURT:  Sure.

22             MS. HURST:  And obviously all of our arguments

23   about the legal error go to the fraudulent concealment point

24   because you have to know what it was that was supposedly

25   concealed in some improper way, and you can't know that

SACV 04-9049-DOC - 09/04/2010

29

 1    unless you know what the contractual obligations were that

 2    led to the tort -- alleged tort violations, but in addition

 3    to that, your Honor, on the fraudulent concealment point, I

 4    mean, we really have the new evidence issue here because we

 5    had asked for this stuff, we didn't get it, we finally got

 6    it, and it shows directly actual knowledge of Mattel.

 7            And the legal instruction on fraudulent

 8    concealment is, you know, point to instruction number 35,

 9    Mattel was not aware of facts or with reasonable diligence,

10    you know, would not have been aware.  All this new evidence

11    on the spying and going in and actually seeing the products

12    and everything else, let me just tell the Court, we took

13    Mr. Turetzky's deposition on Thursday.

14            This new evidence led to him saying that by late

15    October 2002 at the latest, these were his exact words, "It

16    was a widespread belief," quote-unquote, "within Mattel at

17    all levels of the company including," and this was his word

18    "the executive level," that Carter Bryant had taken -- as

19    inspiration for Bratz -- that Carter Bryant was the creator

20    of Bratz and that he had taken as inspiration for Bratz one

21    or more Mattel products.

22            The witness testified that they had developed new

23    security procedures because of this.  By late 2001, they

24    started the process of developing new security procedures

25    because they believed there was something improper about

1    Bratz.

2          Now, this is all new evidence that came out of

3    this -- this spying thing, and it is absolutely relevant to

4    these fraudulent concealment findings.  We had diligence

5    before.  We certainly propounded document requests.  We had

6    a court order in September of 2007 to produce anything

7    related to the statute of limitations issue.  It's not that

8    MGA failed in its diligence to obtain this new evidence.

9    And so, your Honor, new trial would be proper on that ground

10   as well as the instructional error that is now revealed as a

11   result of the Ninth Circuit's opinion.

12          Your Honor, because of instructional error,

13   because of the way Mattel argued the case under Medtronic,

14   because the jury hung on the core 1998 issue, because of new

15   evidence, because of the racist juror issue, all of these

16   reasons point all in the same direction, and that is clean

17   slate.

18          THE COURT:  As well as the factual overlap, et

19   cetera.

20          MS. HURST:  Absolutely.

21          THE COURT:  Now, Mattel.

22          MR. ZELLER:  With respect to the point where it

23   was recharacterized or at least perhaps I understood it for

24   the first time, this argument about the hung jury and the

25   atmosphere and everything is being a taint.  The fact is, is

1    that what MGA is relying on with respect to the Allen

2    charge, with respect to accepting the verdict, even though

3    the jury cannot reach a unanimous verdict with respect to

4    those four drawings, MGA affirmatively consented to that.

5    It cannot now turn around and say what it consented to was a

6    taint that warrants a new trial.  I think that's perfectly

7    clear.  And that's under, say, for example, the induced

8    error doctrine, if anything else.

9            I mean, the idea that where both parties consent

10   to something, the judge is supposed to say, no, wait a

11   minute, particularly in a civil trial, I need to do

12   something completely different.  I think is really not -- it

13   really isn't justified here.

14           With respect to the fraudulent concealment

15   argument, what Ms. Hurst just described is exactly the same

16   set of facts, with respect to Mr. Turetzky deposition, that

17   people have testified about repeatedly in this case, and

18   that has been crystal clear.  No one has denied that people

19   certainly knew Bratz was out, it was a product.  People knew

20   it was there at the toy fair.  They knew that Carter

21   Bryant -- or there were rumors that Carter Bryant was

22   involved, and also, of course, there was the belief that he

23   borrowed "Two Teens," and we've been down this road with

24   literally reams and reams and reams of briefing.  And Judge

25   Larson made a determination on that.

1    I certainly don't think that regardless of what

2    happens with the fraudulent concealment verdict, that it

3    should be set aside on any basis that would call into

4    question the summary judgment ruling that Judge Larson has

5    already made.  That's certainly not -- this is not an

6    appropriate vehicle in any sense to then basically undue the

7    summary judgment ruling.

8         If MGA wants to attack that ruling, they obviously

9    have mechanisms by which they could do it.  We'd be afforded

10   a full opportunity to brief it.  But right here, they've

11   simply pointed to a couple of pieces of so-called new

12   evidence which, in fact, is old news.  It's simply a repeat

13   of what MGA has, in fact, argued and known for, I mean,

14   literally years, now.

15        What I'd also point out is, is that this sort of

16   notion, too, that's floating around MGA's brief on this

17   particular issue that -- somehow that MGA, you know, didn't

18   have documents like the Bratz brief, I mean, they are just

19   simply wrong as to when it was produced.  That document was

20   produced in 2007.  It was not produced, as MGA said, five

21   months before trial.  That was something that had been

22   produced at least a year or approximately a year before that

23   time.  It's something that MGA took depositions on well in

24   advance of the phase 1 trial.

25        So again, this sort of portrayal of by -- this

1  effort by MGA to portray all this as being new is simply not

2  correct, and to the extent the Court has any concern on

3  that, we are happy to make a full, complete, factual showing

4  on that to rebut each and every one of those points.  Thank

5  you.

6       THE COURT:  All right.  I want you to talk to your

7  respective counsel, we've been around twice, but talk to

8  Mr. Zeller -- I mean, Mr. Zeller will talk to Mr. Zeller who

9  will talk to Mr. Quinn, I'm just kidding you.

10       And Ms. Hurst, you will talk to Mr. McConville and

11  make sure that your arguments are complete, and then we'll

12  close these down and that will be the conclusion of the

13  argument.  If you have anything else that you think is

14  persuasive, I want you to have that opportunity as a

15  courtesy of the Court.

16       *(Attorney-client discussion held off the*

17       *record.)*

18       THE COURT:  Let me say to Mattel as you're

19  considering this, it's a brilliant argument, and you're

20  picking the low-hanging fruit.  You really haven't responded

21  yet, and I want to give you that opportunity, to MGA's

22  argument that the jury is going to be confused.

23       And remember this, it's not only the past, it's --

24  or it's going to be the future.  I mean, how does this play

25  out in front of the jury, and that's one of MGA's primary

1  arguments, so because that thought has entered my mind, I

2  just want to cast that out to you and give you an

3  opportunity to respond.

4          MR. ZELLER:  And I appreciate that, your Honor.  I

5  think I did address it to some degree previously, perhaps

6  obliquely.

7          THE COURT:  You did, it was brilliant.  Do it

8  again.

9          MR. ZELLER:  Thank you.  From our perspective,

10  this is not as complicated as perhaps it looks in the sense

11  that the jury can be instructed that it was found as a fact

12  that this is the time period.

13          I mean, as the Court is well aware, many, many

14  trials proceed on the basis found facts, stipulated facts

15  that are read to the jury at the outset.  Obviously parties

16  are even encouraged to stipulate to the facts to try and

17  reduce the number of disputes that are, you know, what the

18  jury needs to consider at trial.

19          I don't think that this is any more complex or

20  difficult than what would be reading factual findings or

21  stipulations or like type facts to a jury, and it can simply

22  say it has been found by -- it has been found as a factual

23  matter that this is when these drawings and these other

24  items were created.

25          THE COURT:  I understand that.  I'm asking you to

1   address their broad allegation of confusion going forward.

2   It's really the same argument that MGA has propounded, and

3   that is, Judge, these are intermixed issues, and then MGA

4   really came back and artfully argued, and besides, Judge, in

5   a practical sense, this is going to cause confusion and you

6   need to be aware of that.  You need to look ahead and rebut

7   the fact that this may, from MGA's perspective but not the

8   Court's ruling at this time, cause confusion.  I understand

9   that we can have this as a stipulated fact or directive by

10  the court.  Do that with a stroke of the pen.

11              MR. ZELLER:  Right.

12              THE COURT:  You haven't answered the question yet,

13  and I want to give you one opportunity why this isn't going

14  to cause jury confusion.

15              MR. ZELLER:  I apologize.  I thought that's what I

16  was addressing.

17              THE COURT:  Hold on.  It was brilliant.  I

18  understood that argument.  Why don't you talk to Mr. Quinn

19  again, one more time, and make sure that you're resting on

20  that argument.

21              MR. ZELLER:  I can certainly say more, your Honor,

22  but just a moment.

23              THE COURT:  Well, as long as it's not redundant.

24              (Attorney discussion held off the record.)

25              THE COURT:  All right.  Mr. Zeller.

```
 1            MR. ZELLER:  Thank you, your Honor.
 2            I think another sort of way of talking about this
 3    is, is that there's no conflict between this -- these
 4    factual statements that this is -- that these -- that these
 5    were created during the time period of Carter Bryant's
 6    employment, and then the further facts that the jury will
 7    need to find, which will presumably include, depending
 8    obviously on how the contract is interpreted, was it nights
 9    and weekends or these are just simply additional further
10    factual findings.
11            And, in fact, I think that an argument is actually
12    or -- or some things are more likely is that this will
13    actually make it less confusing to the jury because the jury
14    will have a factual issue that's eliminated, and it can
15    focus on the two issues that presumably, at least currently,
16    do remain, which is, was it nights and weekends, as well as
17    the -- the other interpretation issue dealing -- pertaining
18    to the contract.
19            So it allows the jury to focus on those factual
20    issues rather than have the what we could call the
21    distraction of having to go through all the evidence yet
22    again that the first jury went through about the 1998 story.
23            THE COURT:  Okay.  I want to provide the same
24    opportunity to MGA.  Do you have any further issues that you
25    think you -- I'm sorry, arguments that you think you've
```

1   missed or any other comments?

2           MS. HURST:  I'm just going to -- I'll respond just

3   briefly to that last point, your Honor.  The Circuit said

4   three times this case needs to be retried, in their opinion.

5           THE COURT:  Oh, no.  They didn't exactly say that.

6           MS. HURST:  Understood, your Honor.

7           The wording of the special verdict form "conceived

8   or reduced to practice," in quotes, that is created has a

9   legal meaning.  That legal meaning was addressed by the

10  Ninth Circuit, and it no longer pertains.  This is not just

11  a factual finding.  It's a legal application based on

12  erroneous instructions.  And, in fact, even without the

13  instructions, the way it's worded incorporates the error

14  that was found by the Ninth Circuit, your Honor.

15          THE COURT:  Let me see.  One, two, three, four,

16  five.  Mr. Eckert.

17          MR. ZELLER:  The -- the Ninth Circuit didn't call

18  in to question that the agreement assigned to Mattel works,

19  such as drawings, that is simply not the question at all.

20  And, in fact, the language that's associated with the

21  special findings, these factual findings, conceived or

22  reduced to practice, that is created, that's what -- that's

23  what the verdict form says.  That part of the agreement --

24  that's not disputed.  That is not even something that the

25  Ninth Circuit called in to question as to the meaning of

 1    those -- of those terms.

 2              Now, obviously, there is the issue of the scope,

 3    does it extend to ideas?  There is the timing issue of

 4    whether it includes nights and weekends during the term of

 5    Bryant's employment, but that doesn't call in to question

 6    the specific factual findings that this jury made.

 7              And we've relied on this case in the brief, which

 8    is the Green case in particular, that there was a situation,

 9    the general verdict, wiped away, factual, the specific

10    factual answers by the jury, response to interrogatories

11    survived, and the Court made it very clear that that was the

12    case.

13              And I'm certainly not telling the Court anything

14    that it doesn't know with respect to MGA's argument about

15    the Ninth Circuit has somehow dictated a retrial on all

16    issues, I mean, that's just clearly not the case, and

17    specifically, it never even had before it the issue of

18    whether or not these specific factual findings would be

19    called in to question as a result of even undoing all the

20    general verdicts.

21              THE COURT:  And I can hear MGA's response now, and

22    that is, they didn't have to go there, they were already so

23    dissatisfied that they reversed it for the reasons that they

24    stated, feeling that they didn't have to get to the merits

25    of that, and then they refer, of course, back to the court,

1    and then they put in not dicta, not advisory, I don't know

2    quite what to call it, but certainly a warning shot from

3    across the bow, so I'll resolve that.

4            I want to thank both of you for your arguments.

5            Now, concerning MGA's motion to compel a witness

6    regarding Topic Number 11.  Topic Number 11, this relates to

7    Mattel's competitive practice, some of which form the basis

8    for the new counterclaims and reply.  We didn't resolve

9    this.

10            While you're thinking about that, this is off the

11    record.

12            (Interruption in the proceedings.)

13            THE COURT:  All right.  Topic 11.

14            MR. QUINN:  Your Honor, we had some discussion of

15    this deposition the other night relating to --

16            THE COURT:  And we never resolved it.

17            MR. QUINN:  We didn't resolve it.  They challenged

18    the scope of the adequacy of Mr. Story's preparation.  They

19    say that it was scripted, you know, the man conducted an

20    investigation.  He actually went out and interviewed

21    witnesses, we're bound by the scope of his testimony, it's

22    the testimony of Mattel.

23            I mean, we've indicated in our papers, the lengths

24    that it went to be prepared.  I mean, we think he did

25    conduct a full investigation.  After the fact, it's always

```
 1    possible to say, "Well, you didn't do this, or you didn't do

 2    that."

 3              THE COURT:  Okay.

 4              MR. QUINN:  But we think it was adequately

 5    prepared, your Honor.

 6              THE COURT:  All right.  I just want to give

 7    courtesy to both parties one more round.

 8              Ms. Hurst.

 9              MS. HURST:  Your Honor, I just want to make clear

10    that for the reasons I stated in response to the Court's

11    question earlier, this is at issue irrespective of the

12    counterclaims and reply.  And a Mattel "I don't know" on

13    this, this is not where -- one of those situations where

14    taking the "I don't know" benefits us.  We actually need to

15    know if they used improper means to get this information.

16    It's relevant for all of the reasons that I previously

17    articulated.

18              THE COURT:  All right.  Concerning MGA's motion to

19    produce Eckert concerning this licensing e-mail, I'm

20    inclined to allow limited discovery under the circumstances

21    of this e-mail.  The question is how long we believe we need

22    Mr. Eckert.  So, counsel?

23              Certainly Mr. Larian's visited us -- I'm sure

24    Mr. Larian would like to visit with us?  The question is how

25    long, how long do we need?
```

```
1              MS. HURST:  Your Honor, I had this, and then the
2    Bratz brief issues as well, we were about half a day down,
3    so I'm asking for half a day.
4              THE COURT:  Okay.  Half day.  Order will be for
5    one-half day, counsel, four hours.
6              MS. HURST:  Thank you, your Honor.
7              THE COURT:  Actually I define half a day as 10
8    hours.  But I'm just kidding you.
9              Four hours.  Four hours, that will conclude it.
10             Concerning IGWT's motion for protective order,
11   first of all, how relevant is this discovery in light of
12   IGWT's dismissal?
13             MR. ZELLER:  On behalf of Mattel, it's the same
14   reasons we talked about in these -- these hearings in the
15   past few days, which is that those financial issues are not
16   off the table.  It will come in with respect to --
17             THE COURT:  I'm not sure yet.  I haven't made a
18   ruling concerning that.
19             MR. ZELLER:  Right.
20             THE COURT:  I mean, I hear your argument about
21   damages, and I hear your argument about consciousness of
22   guilt.  Remember, I never won a case when I was practicing,
23   but I heard consciousness of guilt someplace.
24             MR. ZELLER:  Yes.
25             THE COURT:  And I can anticipate that that's going
```

1    to be, if he's secreting funds, it's for a reason.

2            MR. ZELLER:  Right.

3            THE COURT:  I'm kind of anticipating that.

4            Now, I haven't made a dispositive ruling.  The

5    question is, if I'm going to allow that, I might as well get

6    to it now rather than the same courtesy I've afforded -- and

7    afford the same courtesy as I've afforded to MGA concerning

8    their counterclaims.

9            I don't know what I'm going to do with those

10   counterclaims yet, but I'm allowing you to start down the

11   road concerning depositional testimony, Ms. Hurst, with

12   those four depositions, and I may, in fact, rule against

13   you, but I recognize that's not wasted time.  And even if

14   that doesn't come in, at least it's not wasted time.

15           If it does come in, whether I rule for you or

16   against you on that issue, it may still come in through

17   another claim that already exists.  The -- the same issue

18   sits with Mattel.  And since I'm going to hold tight to the

19   discovery date, why don't we go through this just topic by

20   topic quickly and then I'll make a decision.

21           Topic 1 concerns the identity of IGWT's officers,

22   directors and shareholders.  Isn't this duplicative of

23   already completed discovery?  Also marginally relevant, and

24   quite frankly telling you, I'm inclined to grant the

25   protective order on that.

```
 1              MR. QUINN:  It's not duplicative, your Honor.  And

 2      let me start with this, which is IGWT 826.  826 stands for

 3      the date of the damages verdict.  That is the name of this

 4      company.  Isaac Larian set it up specifically in order to

 5      deal with the consequences of the jury verdict and the

 6      court's proceedings in Mattel's case.  So that's part 1.

 7              Part 2 is, is that it's not duplicative for the

 8      simple fact that there is -- no one has been of a record

 9      under binding testimony stating who IGWT is, who is running

10      it and these other topics that are -- that are in there.

11              Now, it is true that certainly we would expect

12      that MGA and IGWT would readily agree to some of the answers

13      to these questions, who are the shareholders and the like.

14      And we've had an opportunity to depose Mr. Larian on these

15      issues, but there are critical points that he has never

16      confirmed and, in fact, he -- he was not forthcoming about.

17              THE COURT:  Thank you.

18              MGA.

19              MR. MC CONVILLE:  To answer your question

20      directly, your Honor, yes, it is duplicative.  We've

21      produced all the documents.  We've produced anything they

22      can possibly imagine that was related.  They have the

23      formation documents for the company.  They have the list of

24      the shareholders of the company.  They have a list of the

25      officers for the company.  They have a list of the employees
```

SACV 04-9049-DOC - 09/04/2010

44

 1   for the company.  So the answer to your question, your

 2   Honor, is, yes, it is duplicative.

 3              THE COURT:  Thank you.

 4              Topic 2 concerns the identity of all persons who

 5   have ever funded IGWT.  I want you to know I'm again

 6   inclined to grant the protective order on this topic since

 7   none of the claims concern other investments by IGWT, but I

 8   want Mattel to have one final opportunity.

 9              Counsel?

10              MR. ZELLER:  IGWT, as we understand it, is a

11   single-purpose entity.

12              THE COURT:  Okay.

13              MR. ZELLER:  I mean, by definition, it was for

14   this purpose that we believe was -- was illicit, and

15   certainly to the extent that MGA or IGWT or Mr. Larian are

16   going to claim it has other businesses, I think certainly as

17   a general matter, we should be entitled to inquire as to

18   what those are, but my understanding is that it is a

19   single-purpose vehicle.

20              THE COURT:  Thank you.

21              MGA?

22              MR. MC CONVILLE:  Yes, your Honor, it's

23   duplicative.  We produced all the financial information

24   demonstrating where the loans came to and from.  So, yes, it

25   is duplicative.

1          THE COURT:  Thank you.

2          Concerning Topic 3, it concerns the formation and

3   governance of IGWT.  It seems like the RICO claims encompass

4   IGWT's actions, not its formation and governance.  I'm

5   granting the protective order on this topic without further

6   argument by the counsel.

7          Topic 4 concerns the timing of Mr. Larian's

8   relationship with IGWT.  This topic is completely

9   duplicative.  I'm granting the protective order on this

10  topic without final argument by counsel based upon the

11  papers.

12         Topic 5 concerns the timing of Makabi's

13  relationship to IGWT.  This concern again is that RICO

14  claims don't encompass Makabi's actions, and this appears to

15  be duplicative.  Why don't counsel submit argument to me at

16  this time and allow that, but I'm tentatively inclined to

17  grant the protective order as to that topic.

18         Counsel on behalf of Mattel.

19         MR. ZELLER:  Your Honor, this is -- these topics

20  seek information we do not have definitive answers to from

21  anybody on behalf of IGWT.  That's just, by definition,

22  cannot be duplicative because we have not had a binding

23  corporate designee from IGWT.

24         THE COURT:  Has there been a binding corporate

25  designee from IGWT to anybody's knowledge?

 1          MR. MC CONVILLE:  That's what this 30(b)(6) is

 2    seeking, your Honor.  What we're saying is the information

 3    is duplicative of the documents that have already been

 4    produced which reflect the timing, nature and extent of

 5    Makabi's relationship to the entity.

 6          THE COURT:  Okay.

 7          MR. MC CONVILLE:  So, you know, what they are --

 8    not to put too fine a point on it, but this Court excoriated

 9    everybody the other day -- I'm sorry, admonished about using

10    information from this case in another proceeding.

11          Oddly enough, another proceeding has recently been

12    filed in which IGWT 826 is named as a defendant.  Now we're

13    going to go down the road of conducting discovery on IGWT

14    826 which may be used to violate the protective order.  I'm

15    not saying it's going happen, but it has happened, and we

16    are going down that road again, your Honor.

17          THE COURT:  You're getting into a whole series of

18    state and federal questions.  I hope the state courts

19    carefully examine some of the comments this Court's made

20    concerning this refiling, but I'll deal with it in a

21    different way concerns of contempt citations in this court.

22    So we'll take that up at a later time.

23          We'll just sit and watch for a while and see what

24    happens over the state court proceedings, but I've got some

25    ultimate power.

1          Topic 6 concerns IGWT sources of funding.  My

2     concern here is that the existing claims concern IGWT's

3     actions, not its genesis.

4          And by the way, concerning that final comment,

5     because of that state, federal relationship, obviously the

6     Court has some thoughts about that, but I'll leave that to

7     my state court colleagues.  Hopefully they will be able to

8     see the -- or understand this Court's concerns about lack of

9     finality.  But it's an ultimate courtesy, and it has a lot

10    to do with the relationship between state and federal

11    courts.  But I'm going to watch very carefully if there is a

12    disobedience of my non-needed clarification order and lack

13    of need to reconsider.

14          And so I'm sitting here watching very carefully

15    the way Mattel conducts itself, but I understand your

16    frustration because of what you perceive the grandstanding,

17    of course, on counterclaims that MGA filed.  I mean, you two

18    are bound to try this in the press, but I've got the

19    ultimate ability to curtail this kind of nonsense.

20          Now, my concern about Topic Number 6 is that the

21    existing claims concern IGWT's claims, not its genesis, but

22    as I submit that tentative thought to you, I'll receive

23    argument by both parties, once again, and then this topic

24    will be closed out with my final rulings.

25          Counsel on behalf of Mattel?

SACV 04-9049-DOC - 09/04/2010

48

1          MR. ZELLER:  Your Honor, the purpose of IGWT 826

2     is part of the RICO claims.  It was set up for the expressed

3     purpose to circumvent the Court's rulings and the jury's

4     verdict.  That is alleged in this case as part of the RICO

5     enterprise including the obstruction of justice.

6               Obviously, too, in terms of the information that

7     we are seeking here, I -- I would note that neither MGA, nor

8     IGWT 826 have conceded that what are in IGWT documents are,

9     in fact, true.

10              I mean, we are facing the prospect, and I would be

11     interested to know whether IGWT 826 attorneys are going to

12     represent whether there is any dispute as to the

13     truthfulness, accuracy, authenticity of the documents that

14     have been produced.  We have raised that issue with them,

15     and we have not received a satisfactory answer.

16          THE COURT:  Okay.

17          MR. ZELLER:  So the Court is going to be facing a

18     dispute during the middle of trial over these issues.

19          THE COURT:  All right.  Thank you.

20          Counsel?

21          MR. MC CONVILLE:  Your Honor, with regard to this

22     particular topic, we have again produced all the documents

23     that reflect exactly what happened in this transaction.

24     This harkens back to being dissatisfied with whatever

25     information they've gotten.  There's nothing nefarious.

```
 1    IGWT 826 wasn't set up to thwart some judgment and conceal
 2    some information from Mattel.  It was set up to assist MGA
 3    to survive, which despite Mattel's critical efforts to try
 4    and drive it out of business, MGA has survived.  That's what
 5    IGWT 826 was doing.
 6            THE COURT:  All right.  Now, the benefit of what's
 7    occurred, although you think it's not complete from Mattel's
 8    point, is what I pointed out to you informally the other
 9    evening.  This case was a case based upon interrogatories
10    until a transfer to this court.  And these interrogatories
11    only spawned, if you will, issues and more problems because
12    there hadn't been the depositions granted that Mattel
13    needed.
14            And part of the reasons of granting the
15    depositions early on by this Court was because not only were
16    the interrogatories not leading anyplace, the discovery
17    issues weren't.  It was a complete circle from Mr. O'Brien
18    making definitive rulings that then would have to be
19    reconsidered by Judge Larson, and then the parties, quite
20    frankly, from either side in most cases acted upon them.
21    Probably because of busy and heavy caseload and all the
22    issues presented to both parties.
23            But I turned this to depositions for one reason.
24    There, in the adversarial process, you are able to ask the
25    questions that you need, and you are able to tie that
```

1    witness to a specific statement.

2              Now, from your standpoint, that's been frustrating

3    concerning Mr. Larian, but those are the best answers that

4    you are going to get, and those are the answers that

5    Mr. Larian will live with not only in -- at the trial but

6    some of the statements made that the Court's ruling on

7    concerning other issues.  That's a tremendous benefit for

8    both parties because that depositional work really does tie

9    a prospective witness to a statement.

10             This causes me no concern with your concern that

11   this is faced by the Court in the middle of trial, because

12   now you have in front of the trier of fact, a statement.

13   There is no place else the witness can go with that

14   statement.  Your only complaint can be that we didn't have

15   time to prepare; nonsense, I've been very gracious, those

16   are the answers you got.  And if I see inequity here, I will

17   simply have the witness stop at the end of direct

18   examination and send him home.  And because the trial is

19   long, you now have a statement that that witness can't back

20   away from.

21             Now, at the deposition, games can be played by

22   witnesses for both sides, there can be equivocation, but

23   once that's made in front of the jury.  So therefore, I'll

24   turn to Mattel and turn to MGA at different times and have

25   you raise some of these issues where you feel you didn't get

SACV 04-9049-DOC - 09/04/2010

51

```
 1    a fair opportunity, but I don't see this as an issue for the
 2    Court, quite frankly, and I'll decide that now or some time
 3    this weekend and hand down a final ruling.
 4              Concerning Topic 7, it concerns the completed
 5    transactions regarding Omni 808 and the senior promissory
 6    note.  Again, neither Omni, nor IGWT are parties to this
 7    action.  I'm granting the perspective order as to this
 8    topic.  It's a final ruling.
 9              Concerning Topic 8, the contemplated transactions
10    regarding MGA, I think this is probably the only relevant
11    topic so far.  I'm inclined to grant Mattel limited
12    discovery on.  And I'll hear argument now from MGA.
13              MR. MC CONVILLE:  Your Honor, this proposed or
14    contemplated transactions involving MGA just loops back to
15    the same transaction that we've been talking about.  It's
16    the Wachovia transaction, your Honor.  As Mr. Zeller said,
17    IGWT 826 was set up as a single-purpose entity.  The
18    information that is called for in this topic has been
19    provided.
20              THE COURT:  Okay.  Thank you.
21              Mattel.
22              MR. ZELLER:  It has not been provided.  There are
23    transactions including the payment of money in the form of
24    interest on these loans that have not been accounted for.
25              THE COURT:  How long do you need?
```

```
 1              MR. ZELLER:  I think that I would -- I would say
 2    two hours.
 3              THE COURT:  Who will the witness be?
 4              MR. ZELLER:  It needs to either be Mr. Larian
 5    prepared or Shirin Makabi prepared.
 6              THE COURT:  Well, I think you've gotten about
 7    where you're going to get with Mr. Larian, and all I'm going
 8    to hear from you is that it's not complete.  Get Makabi,
 9    okay?  Shirin Makabi, two hours, that's your limitation.
10              MR. ZELLER:  Thank you.
11              THE COURT:  The protective order is granted as to
12    all the remaining topics concerning the -- MGA's motion for
13    a protective order -- I'm sorry, IGWT's motion for
14    protective order.
15              The next issue is MGA's motion to compel responses
16    to requests for production concerning Jeanine Brisbois.
17    Ms. Brisbois is alleged to be Mattel Canada -- the Mattel
18    Canada employee who defected and went to MGA.  She allegedly
19    stole trade secrets from Mattel, including trade secrets
20    directly addressed by the request for production.  Those
21    requests for production will be argued at this time on the
22    topic-by-topic basis.  And I want you to turn to Request
23    Number 309.
24              To refresh your recollection, this concerns
25    documents and communications that refer or relate to Mattel
```

1   candidate's participation in the Children's Miracle Network

2   from 2004 to 2006.  I'll receive argument on that, and

3   counsel, I don't care which party starts.

4           *(Recess.)*

5           THE COURT:  Okay.  We are back on the record with

6   MGA and Mattel.

7           Mr. Quinn.

8           MR. QUINN:  The other night, your Honor, we were

9   discussing the issue of Mattel's third set of

10  interrogatories, phase 2, numbers 2 to 11, and this related

11  to the issue about whether MGA has the ability to extract

12  financial information by product or brand.

13          THE COURT:  Right.

14          MR. QUINN:  And we advised the Court about some

15  testimony that had been given by the CFO of MGA that day.

16  The Court instructed us to lodge that testimony with the

17  Court.  I want to report to the Court that we have done

18  that.  The court has that testimony.

19          THE COURT:  Thank you.

20          And did you lodge it downstairs or is it with the

21  clerk?

22          MR. QUINN:  I think it's with the clerk, your

23  Honor.

24          THE COURT:  Right here.

25          MR. QUINN:  We -- we e-mailed it per the Court's

SACV 04-9049-DOC - 09/04/2010

54

```
1    procedure with -- on a caption and obviously served on the

2    other side.

3              THE COURT:  I hadn't seen it yet, but now I'll

4    look for it.  I appreciate that, Mr. Quinn.

5              MR. QUINN:  The second issue that the Court asked

6    us to do that I can report that we have done, Mattel's first

7    set of interrogatories, phase 2, interrogatory number 9, we

8    came up with some proposed adjustments to the language of

9    that interrogatory.  The Court didn't say that it was

10   accepting it, but requested that we redraft it.  We have

11   done that, your Honor.  We typed it up, we've redrafted it.

12             THE COURT:  Excellent.  Thank you very, very much.

13             (Recess.)

14             THE COURT:  All right then.  We are back on the

15   record and counsel had informed the Court during the recess

16   that concerning the last questions concerning MGA's motion

17   to compel responses to request for production concerning

18   Jeanine Brisbois, specifically requests 309, 311, 312 and

19   313.  These are subject to the briefing schedule that had

20   previously been stipulated and agreed to, and I want to

21   apologize to the parties.  The Court had, quite frankly, not

22   realized that, and I appreciate your input.

23             Concerning MGA's motion to compel requests for

24   production to Mattel Mexico regarding the trade secret

25   claims, these are also subject to the briefing schedule.
```

SACV 04-9049-DOC - 09/04/2010

55

1    That completes the Court's list of the pending discovery

2    issues before the Court.  And I want to ask the parties,

3    beginning with Mattel, if there are any other pending

4    discovery issues that the Court's overlooked?

5            MR. ZELLER:  Your Honor, the one that we have on

6    our list that remains pertains to MGA's objections to Item

7    No. 3 of the July 9th --

8            MS. HURST:  5th.

9            MR. ZELLER:  I'm sorry, July 5th, 2010 report and

10   recommendation of Electronic Discovery Master Smith, and I

11   can report that the parties have on that motion or set of

12   objections have reached a stipulation to resolve it.

13           THE COURT:  Okay.  And what is that stipulation?

14           MR. ZELLER:  We -- we have it here, and it's

15   actually --

16           THE COURT:  Get up and move towards each other and

17   you should take your pen in hand.

18           MS. HURST:  Should we read it into the record?

19           THE COURT:  Read it into the record.

20           MS. HURST:  Okay.

21           THE COURT:  And then memorialize it in writing and

22   you can submit it electronically to me.

23           MS. HURST:  All right.

24           THE COURT:  This will be the stipulation between

25   the parties.

1          MS. HURST:  On July 5th, 2010, the electronic

2    special discovery master issued a report and recommendation,

3    docket 8239-1.  The MGA parties filed objections, docket

4    8255, to paragraph 3 of that report and recommendation.  The

5    parties fully briefed the issue and the Court scheduled

6    argument on the objections for the week of August 30th,

7    2010.

8          In order to resolve the MGA party's objections,

9    the parties hereby stipulate and agree as follows:

10          "One, the MGA parties hereby certify that they

11    have made a good faith, reasonable and diligent search for

12    and based thereon have produced nonprivileged documents

13    including electronic documents covered by paragraphs 3,

14    sub 1 and 3, sub 3 of the July 5th R and R.

15          "Two, the MGA parties hereby certify that they

16    have made a good faith, reasonable and diligent search for

17    and based thereon have produced nonprivileged documents

18    including electronic documents responsive to Mattel's

19    document requests concerning each of the persons listed in

20    paragraph 3, sub 2 of the July 5th R and R.  Additionally,

21    the MGA parties have agreed to conduct additional searches

22    and produce nonprivileged responsive documents in response

23    to Mattel, Inc.'s, revised requests for documents and

24    things, numbers 39 to 49 of Mattel's fifth set of requests

25    for documents and things to MGA Entertainment, Inc., paren

 1    phase two, period.

 2              "Three, the procedure set forth in the stipulation

 3    and order of September 4th, 2010, docket 8690, resolves

 4    paragraph 3, sub 4 of the July 5th R and R.

 5              "Four, this stipulation resolves all outstanding

 6    issues concerning paragraph 3 of the July 5th R and R and

 7    the MGA party's compliance therewith."

 8              And then our proposed order language on that

 9    stipulation is, "Based on the foregoing, the Court hereby

10    resolves MGA's objections to paragraph 3 of the July 5th,

11    2010 report and recommendation consistent with the terms of

12    the above stipulation and the stipulation and order

13    supersedes that paragraph of the R and R."

14              THE COURT:  Stipulated to by Mattel?

15              MR. ZELLER:  So stipulated.

16              THE COURT:  Stipulated to by MGA?

17              MS. HURST:  Yes, your Honor.

18              THE COURT:  And this is binding language and this

19    will be submitted to me by --

20              MR. ZELLER:  Tuesday.

21              THE COURT:  By Tuesday.  There is no reason to

22    prepare that once I have the stipulation on the record.

23              MS. HURST:  Thank you, your Honor.

24              THE COURT:  Could I get an e-mail so I can give

25    that to Judge Smith?  Could you just.

```
 1                MS. HURST:  I'm not online here right now.

 2                THE COURT:  We can do it later on.

 3                (Interruption in the proceedings.)

 4                THE COURT:  All right.  Now, on behalf of Mattel,

 5     any further discovery issues outstanding?

 6                MR. ZELLER:  Yes, your Honor.  There is one more.

 7                THE COURT:  Okay.

 8                MR. QUINN:  Your Honor, this relates to docket

 9     number 6476.  It's Mr. Larian's objections to the discovery

10     master order number 46 regarding responses to phase two

11     interrogatories.  The -- there are two interrogatories at

12     issue that are covered by the discovery master's order which

13     were additional responses were ordered.  It's relating to

14     ownership interest that Mr. Larian has in entities.  I don't

15     know if the Court would remember this.  We discussed this

16     last December.

17                THE COURT:  What time frame?

18                MR. QUINN:  Anytime since January 1, 2005.

19                THE COURT:  And why is that a relevant date?

20                MR. QUINN:  (No audible response.)

21                THE COURT:  What's significant about January 2005

22     or thereafter?  Is it the secreting of funds again?

23                MR. QUINN:  Yes, your Honor.

24                THE COURT:  The concealment obviously --

25                MR. QUINN:  Exactly.
```

1              THE COURT:  Okay.

2              MR. QUINN:  Now, we discussed this last December,

3       and the Court said Mr. Larian's deposition is coming up, ask

4       him at his deposition.  We asked him, he didn't know, didn't

5       give us answers.  So we are back asking that the discovery

6       master's report be enforced.

7              THE COURT:  Okay.  Thank you.

8              MR. MC CONVILLE:  Your Honor, this, to quote --

9       attempt to quote Mr. Zeller last night, this is not

10      narrowed, tailored, focused or targeted for discovery.  The

11      definitions -- I mean, when Mr. Quinn summarized them, it

12      sounds reasonable enough, you know, give us the information.

13      The devil is in the details, your Honor.  The definition of

14      what Larian is is incomprehensible and overbroad.  The

15      definition of trust --

16             THE COURT:  I'll go back and look at that

17      deposition one more time.

18             MR. MC CONVILLE:  And since that time, we've

19      produced the responsive documents that would permit them to

20      make an assessment for Mr. Larian's ownership interest.

21             THE COURT:  I'll look at that.  I, quite frankly,

22      recall that vaguely, and so I need to not just make a

23      flippant order, you know, off, but I want to thank you.

24             MR. QUINN:  Thank you.

25             THE COURT:  Now, what else?

 1              MR. QUINN:  Your Honor, can I add, your Honor, if

 2    they are going to say they've produced the documents, they

 3    can specify the Bates numbers, and if the answers can be

 4    found there, we're done.

 5              THE COURT:  Bates numbers?

 6              MS. HURST:  I don't think we have them off the top

 7    of our head, your Honor, but we --

 8              THE COURT:  By Tuesday?

 9              MR. QUINN:  That's fine, your Honor.

10              THE COURT:  By Tuesday?  Better yet, you're back

11    Wednesday, so by Wednesday.

12              MR. QUINN:  That's fine.

13              THE COURT:  All right.  What else?

14              MR. ZELLER:  There is a medical issue concerning a

15    witness that I would like to either discuss further on the

16    record.  I would like to discuss first off the record or, at

17    a bare minimum, have this portion of the transcript sealed

18    if we are going to do it on the record first.

19              MS. HURST:  We are stipulated to go off the record

20    for the discussion.

21              THE COURT:  Off the record.

22              *(Discussion held off the record.)*

23              THE COURT:  All right.  We are back on the record.

24              Is there anything further, Mr. Quinn, Mr. Zeller,

25    concerning discovery issues that are -- or that the Court

SACV 04-9049-DOC - 09/04/2010

61

```
1    hasn't discussed with you or raised?

2              MR. ZELLER:  Not that are currently pending, no.

3              (Laughter.)

4              THE COURT:  You are going to spend the rest of

5    your life with me, Mr. Zeller.

6              (Laughter.)

7              THE COURT:  On behalf of MGA, what has the Court

8    neglected to raise on the record for discussion?

9              MS. HURST:  Nothing.

10             THE COURT:  Okay.  Then finally --

11             MS. HURST:  Do we need to address this revised --

12   I just want to make it clear, we did not agree to this

13   revised interrogatory.

14             THE COURT:  You don't need to address it because

15   I'm simply going to decide.  I gave Mattel one opportunity,

16   if it's not narrowed, not appropriate, I'm moving on.

17             MS. HURST:  Got it.

18             THE COURT:  But I wanted to afford that courtesy,

19   if it is narrowed enough, of course I'd like to provide it.

20             Okay.  Judge Smith, can you give me an update in

21   light of the stipulation of the parties where we stand with

22   the runs on the seven custodians?

23             JUDGE SMITH:  Yes, I can, your Honor.

24   Yesterday --

25             (Interruption in the proceedings.)
```

SACV 04-9049-DOC - 09/04/2010

62

```
 1              THE COURT:  Thank you.

 2              JUDGE SMITH:  Thank you.

 3              Yesterday after the discussions in chambers, or in

 4    the courtroom, between the parties regarding the seven

 5    custodians that were going to be -- whose data was going to

 6    be abstracted from the archive one database, I advised ILS

 7    to proceed with that process in reliance upon receiving the

 8    stipulation that I've now been provided with.  I appreciate

 9    that.  I had dreams that I'd end up having to pay for that,

10    which would be unfortunate.

11              The stipulation is precisely what I instructed ILS

12    to do yesterday, so there is no variation at all between the

13    stipulation and the instructions that have been given to

14    ILS.  I've also advised ILS now, here in court today, I

15    e-mailed ILS and told him that I had in my possession the

16    written stipulation, and I PDF'd that to them as soon as I

17    had the ability to do so.

18              THE COURT:  I want to thank you.  My greatest

19    concern was without having that written stipulation, it

20    would delay the process.  It hasn't.

21              JUDGE SMITH:  No.

22              THE COURT:  So that's been allayed as of one

23    minute ago.  Thank you very much.

24              JUDGE SMITH:  When I talked with Mr. Zeller and

25    Mr. Parker -- not talked, when I shared e-mail with them
```

1    yesterday morning in regard to the process, I don't know if

2    I told them that I had gone ahead and instructed ILS or not,

3    but by that time, I had instructed ILS.  I apologize if I

4    failed to disclose that to you.

5          THE COURT:  Okay.  Now, Mr. Parker and Mr. --

6    who's your other tech guy?

7          MS. HURST:  It's a woman.

8          THE COURT:  Diane Hutton (phonetic) has done an

9    excellent, excellent job, and I want to thank you publicly,

10   Mr. Parker, and Diane Hutton, who's not here, I want to pay

11   the Court's respects concerning her abilities.

12         It's through no fault of these two parties, but

13   the Court is going to require lead counsel to work with

14   Judge Smith.  Mr. Parker, you're still obviously involved,

15   you'll be involved, of course, from the firm's basis, but

16   your choice, all appearances will be by one of the lead

17   counsel, but I don't need two lead counsel, so talk to him.

18         MR. ZELLER:  Hearing no objection from Mr. Quinn,

19   I'll be the designee.

20         MS. HURST:  I'm available, your Honor.

21         THE COURT:  Pick him.

22         MS. HURST:  I can't, your Honor, he had a

23   preexisting obligation.

24         THE COURT:  Okay.  I don't want to hear about it.

25   All right.

SACV 04-9049-DOC - 09/04/2010

64

```
 1              Then, Judge Smith, there is going to be another
 2    meeting at this weekend sometime, and only one counsel need
 3    to be present, but they need to work with you, they can do
 4    it by telephone.
 5              MS. HURST:  Thank you.
 6              JUDGE SMITH:  May I have the Court's permission
 7    and authority to consult with counsel at some time as soon
 8    as you finish here and work out the details on that?
 9              THE COURT:  As long as it's back on the record.
10              JUDGE SMITH:  Okay.
11              THE COURT:  Because I want to make certain --
12              JUDGE SMITH:  Have an opportunity to retire with
13    the two attorneys who will be participating in that process,
14    we'll talk about it in the hallway, wherever you want to
15    talk about it.
16              THE COURT:  In fact, I'll leave, and I'll be back
17    in five minutes.
18              (Recess.)
19              THE COURT:  All right.  Then we are back on the
20    record.  Counsel are present, along with Judge Smith.
21              And counsel, what's the agreement?
22              JUDGE SMITH:  Would you like me to summarize it,
23    folks?  I'd be happy to if you'd like me to.
24              We've established a protocol whereby we are going
25    to be in e-mail communication, and I will be able to
```

1    schedule a conference call hearing on short notice simply by

2    use of e-mail, that will be the service.

3            They have requested that I copy other members of

4    their staff so that they will be advised, but the primary

5    participants will be the two lead counsel that the Court

6    designated.  And I've indicated to counsel and I'll indicate

7    to the Court, that the Court will be receiving a daily

8    written report, and by writing, I mean it will be PDF'd,

9    forwarded to chambers so that you'll have it available on a

10   real time basis if you need to refer to it.

11           THE COURT:  Okay.

12           JUDGE SMITH:  And I'll do that, as I said, on a

13   daily basis.

14           THE COURT:  My only concern is that it's lead

15   counsels' primary responsibility to get this information to

16   associate counsel.  I want the record clear.  Once that's

17   sent to lead counsel, that fulfills the stipulation and the

18   obligation.

19           JUDGE SMITH:  That was the understanding, and both

20   counsel indicated their agreement to that in my discussions

21   with them.

22           THE COURT:  Stipulated to, Mr. Zeller and

23   Mr. Quinn on behalf of Mattel?

24           MR. QUINN:  Yes.

25           MR. ZELLER:  Yes, your Honor.

1           THE COURT:  Mr. McConville and Ms. Hurst, on

2    behalf of MGA?

3           MS. HURST:  Yes, your Honor.

4           MR. MC CONVILLE:  Yes, your Honor.

5           THE COURT:  Anything further today?

6           Mr. Quinn?  Mr. McConville?

7           MR. QUINN:  No, your Honor.

8           MS. HURST:  No, your Honor.

9           MR. MC CONVILLE:  No, your Honor.

10          THE COURT:  Then we'll see you Wednesday.

11          Thank you very much.  Have a nice evening.  Thank

12   you for your courtesy.

13          *(Recess.)*

14                              -oOo-

15

16

17

18

19

20

21

22

23

24

25

1                          -oOo-

2                       **CERTIFICATE**

3

4          I hereby certify that pursuant to Section 753,

5    Title 28, United States Code, the foregoing is a true and

6    correct transcript of the stenographically reported

7    proceedings held in the above-entitled matter and that the

8    transcript page format is in conformance with the

9    regulations of the Judicial Conference of the United States.

10

11   Date:  September 18, 2010

12

13

14   _____

15   JANE C.S. RULE, U.S. COURT REPORTER
     CSR NO. 9316

16

17

18

19

20

21

22

23

24

25