# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

Case No.    CV 04-9049 DOC (RNBx)                         Date    October 1, 2010

Title    CARTER BRYANT -V- MATTEL INC.

Present: The Honorable    David O. Carter, U.S. District Judge

| Kathy Peterson | Deborah Parker | N/A |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| John Quinn | Annette Hurst |
| Michael Zeller | Thomas McConville |

Proceedings:    STATUS CONFERENCE

      Tentative ruling issued to parties; copy of tentative is attached to this minute order.  Case is called, counsel state their appearances and a status conference is held.  This matter is continued to October 4, 2010 at 5:00 p.m.

                                             :    25

Initials of Preparer    kp

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| CARTER BRYANT, | ) | CASE NO. CV 04-9049 DOC (RNBx) |
| Plaintiff(s), | ) | |
| | ) | [TENTATIVE] O R D E R |
| v. | ) | GRANTING IN PART AND |
| | ) | DENYING IN PART MOTION TO |
| MATTEL, INC., | ) | DISMISS; STRIKING AS MOOT |
| | ) | CROSS-MOTION FOR LEAVE TO |
| Defendant(s). | ) | AMEND |
| | ) | |
| _____ | ) | |
| | ) | |
| AND CONSOLIDATED ACTIONS. | ) | |
| | ) | |
| _____ | ) | |

Before the Court are Mattel, Inc. ("Mattel")'s Motion to Dismiss and/or Strike and MGA

Entertainment, Inc. ("MGA")'s Cross-Motion for Leave to Amend.  After considering the

moving, opposing, and replying papers, as well as the parties' oral argument, the Court

GRANTS IN PART AND DENIES IN PART the Mattel's Motion to Dismiss and STRIKES AS

MOOT the MGA's Motion.

### I.    Background

Mattel's Fourth Amended Answer and Counterclaims (FAAC) brings seventeen

counterclaims arising under federal law and the laws of the state of California.  Filed on April

12, 2010, Mattel's FAAC alleges in relevant part that MGA conducted the affairs of an

enterprise through a pattern of racketeering activity, misappropriated Mattel's trade secrets, infringed Mattel's copyrights, aided and abetted Mattel's employees' breaches of fiduciary duty and duty of loyalty to Mattel, and unlawfully converted Mattel's property.  On August 2, 2010, the Court granted in part and denied in part counter-defendants' motions to dismiss certain claims asserted by the FAAC.

MGA filed its reply to Mattel's FAAC on August 16, 2010.  In addition to denying most of Mattel's allegations, MGA asserted three "counterclaims-in-reply" for trade secret misappropriation, violation of the Racketeering Influenced and Corrupt Organizations (RICO) Act, and wrongful injunction.  The counterclaims-in-reply arise out of certain activities alleged to have been taken by Mattel's "Market Intelligence" department.

MGA alleges that Mattel directed its employees to obtain competitors' "trade secrets and other confidential information" under false pretenses.  Dkt. 8583 ¶ 1.  Specifically, certain members of Mattel's market intelligence group allegedly posed as retailers in order to gain access to restricted showrooms operated by other toy companies, including MGA.  *Id.* ¶¶ 1-2.[1] In addition to using cameras and video recorders to document the events and images in competitors' showrooms, Mattel's employees allegedly extracted the following documents from competitors' showrooms: (1) documents related to the "appearance, operation and intended play pattern of toys not yet on the market"; (2) price lists; and (3) advertising plans and strategies.[2] *Id.* ¶ 1.  MGA alleges that Mattel's employees obtained information about dozens of MGA products that MGA made available to retailers who visited its showrooms.  *Id.* ¶ 3.

Information obtained from these toy showrooms was allegedly disseminated throughout

---

[1] These toy showrooms were maintained by manufacturers at a yearly New York toy fair "where all of the major toy manufacturers come together on a worldwide basis to meet with retailers in order to demonstrate their wares."  Dkt. 8583 ¶ 7.  Access to the toy showrooms is restricted and manufacturers require attending retailers to sign non-disclosure agreements and otherwise limit the type of information that retailers may take away from the showrooms.  *Id.* ¶ 8.

[2] It's unclear whether MGA made its advertising plans and strategies available to retailers.

1   Mattel in reports and in a yearly presentation to hundreds of Mattel employees.  *Id.* ¶ 15.  The

2   information was also allegedly archived in a library in Mattel's El Segundo, California

3   headquarters.  *Id.* ¶ 17.  MGA alleges that numerous high level executives at Mattel, including

4   Matt Turetzsky, Drew Vollero, Matt Bousquette, and even Chief Executive Officer Robert

5   Eckert, ratified and potentially directed the market intelligence group's conduct.  *Id.* ¶ 20.

6           Concerned that its employees would be recognized in MGA's showrooms, Mattel

7   allegedly hired an employee with the express, and exclusive, task of gaining access to MGA's

8   toy showrooms and retrieving confidential information about MGA's future products.  *Id.* ¶ 24.

9   Mattel is also alleged to have retained the consulting firm of Bain & Company ("Bain") to

10  contact MGA's licensees, distributors, and production companies, among others, to solicit

11  "confidential information about MGA" without "disclos[ing] that the research was being

12  conducted for Mattel."  *Id.* ¶ 25.  Acting at the direction of its in-house counsel, Mattel has

13  allegedly "sanitized" or otherwise destroyed the reports generated by Bain.  *Id.* ¶ 27.  Mattel's

14  outside counsel, the law firm of Quinn Emanuel Urquhart & Sullivan ("QE"), is also alleged to

15  have destroyed evidence about Mattel's market intelligence group, and otherwise failed to

16  disclose the group's activity during discovery in this litigation.  *Id.* ¶¶ 28-30; ¶¶ 38-39 (alleging

17  that QE partner and Mattel's in-house counsel negotiated settlement with Villasenor and

18  thereafter withheld information concerning market intelligence group).

19          MGA alleges that Mattel also concealed other relevant evidence.  Such evidence includes

20  a "Bratz Brief" "commissioned" by CEO Eckert in October or November of 2003 and drafted by

21  two Mattel employees named Jerome Bossick and Sujata Luther.  *Id.* ¶ 32.  The Bratz Brief

22  apparently concluded that Bratz's sales did not diminish the market for Mattel's products and

23  that the Bratz's success was unrelated to Carter Bryant's original work.  *Id.*  Eckert is alleged to

24  have discussed the themes raised in the Bratz brief in subsequent emails, which were allegedly

25  spoliated in order to avoid production in this lawsuit.  *Id.* ¶¶ 33-34.  At least one email was first

26  produced by Mattel after the phase 1 trial, on March 8, 2010.  *Id.*

27          MGA further alleges, presumably on the basis of information and belief, that Mattel's

28  litigation strategy in this case has been crafted in light of Villasenor's activities.  *See id.* ¶¶ 45-

3

47.  Specifically, MGA suggests that Mattel filed its claim for trade secret misappropriation against MGA in order to blunt the eventual public revelation of the market intelligence group's activities.  *Id.*  Mattel also allegedly concealed the group's activities in a number of ways.  First, Mattel allegedly failed to produce the group's 2001 report, which summarized competing manufacturers' future product lines.  *Id.* ¶ 48.  Second, a number of Mattel witness deposed during this litigation have disclaimed knowledge of the market intelligence group's activities.  *Id.* ¶ 53.  Third, a QE attorney allegedly "bowed out" of monitoring a Mattel 30(b)(6) deposition "so that a new lawyer could watch, with a straight face, as [the 30(b)(6) designee] denied that Mattel employees have ever sneaked into showrooms."  *Id.* ¶ 54.  Mattel allegedly engaged in other discovery misconduct, including taking an uncooperative witness "out to the woodshed" — unless the deposition was conducted in the country, MGA's allegation is presumably a metaphor for Mattel's efforts to suborn favorable testimony.  *Id.* ¶ 56.

MGA alleges that Mattel's conduct has generated a number of market related benefits.  *Id.* ¶ 57.  Mattel's conduct has also allegedly allowed Mattel to "seize . . . the 'white hat' in this litigation, convincing Judge Larson to enter a permanent injunction whereby Mattel effectively stole Bratz from MGA."[3]  *Id.*  Specifically, "former District Judge Larson"[4] was prevented from considering "critical evidence" about Mattel's misconduct in determining whether to grant a permanent injunction, which has since been vacated by the Ninth Circuit, in Mattel's favor.  *Id.* ¶¶ 59-60 (alleging that "[a]ny judicial officer would have felt differently about entering sweeping injunctive relief, particularly when the jury had already rejected sweeping liability").

## II.  Discussion

Mattel moves to dismiss MGA's counterclaims-in-reply on the ground that such counterclaims-in-reply are procedurally barred.  Mattel also moves to strike MGA's claim for

---

[3] The "white hat" ordinarily refers to the heroine herself and not an item seized by a party seeking to achieve hero status.

[4] "[F]ormer District Judge Larson" is presumably a reference to the Honorable Stephen G. Larson (Ret.), United States District Court for the Central District of California, who previously presided over this lawsuit.

1   wrongful injunction, as well as the factual allegations related to that claim.  In response, MGA

2   cross-moves for leave to amend its original complaint to add its new claims.

3           **A.    Motion to Strike Counterclaims in Reply as Non-Compulsory**

4           "While not expressly authorized by the Federal Rules of Civil Procedure, the Ninth

5   Circuit permits counterclaims in reply to an opposing party's counterclaims if they are

6   compulsory in nature." *Conceptus, Inc. v. Hologic, Inc.*, No. C 09-02280 WHA, 2010 WL

7   1460162, at *1 (N.D. Cal. April 12, 2010) (citing *Davis & Cox v. Summa Corp.*, 751 F.2d 1507,

8   1525 (9th Cir. 1985)).  A plaintiff may not assert a counterclaim in reply that is merely

9   permissive, but must instead "seek leave to amend [its] complaint to add the permissive

10  counterclaims." *Id.* (citing Wright & Miller, Federal Practice and Procedure: Civil 3d § 1188).

11          Like any other counterclaim, a "counterclaim in reply" is compulsory if it "arise[s] from

12  the same transaction or occurrence as the [defendant's] counterclaim." *Davis & Cox*, 751 F.2d

13  at 1525.  The Ninth Circuit applies a "logical relationship" standard to determine whether a

14  claim and counterclaim (or counterclaim and counterclaim-in-reply) arise out of the same

15  transaction or occurrence.[5]  "A logical relationship exists when the counterclaim arises from the

16  same aggregate set of operative facts as the initial claim." *See In re Pinkstaff*, 974 F.2d 113, 115

17  (9th Cir. 1992).  Two claims may be logically related even though they do not arise out of the

18  same nucleus of facts.  *Pochiro v. Prudential Ins. Co. of Am.*, 827 F.2d 1246, 1249 (9th Cir.

19  1987); *see also MRW, Inc. v. Big-O Tires, LLC*, 2008 WL 5113782, at *9 (E.D. Cal. Nov. 26,

20  2009) (noting that "[c]ourts applying this test have found a logical relationship between claims

21  sharing only a few facts").  The Ninth Circuit has characterized as "generous" the standard for

22  whether a counterclaim is compulsory.  *See In re Marshall*, 600 F.3d 1037, 1058-59 (9th Cir.

23  2010) (holding that counterclaim could be compulsory even though it did not need to "be

24

25          [5] This test is applied in the context of Rule 13(a), which concerns counterclaims to

26  a plaintiff's complaint and not, as here, counterclaims-in-reply to a defendant's
    counterclaims.  It is nevertheless apparent that the Ninth Circuit has incorporated Rule

27  13(a) by reference when analyzing the vigor of counterclaims-in-reply.  *See Davis & Cox*,

28  751 F.2d at 1525.

resolved in order to determine" the underlying claim).

MGA's counterclaims in reply for violation of 18 U.S.C. § 1962(c), misappropriation of trade secrets, and wrongful injunction arise out of the activities of Mattel's market intelligence group and the concealment of that group's activities. These counterclaims in reply share a logical relationship with Mattel's expansive counterclaims and are therefore compulsory.

First, both sets of claims arise out of the parties' conduct in the context of *this* litigation. For example, Mattel alleges that "MGA [has] . . . withheld and destroyed critical evidence to avoid facing the consequences of their actions," which encompasses the alleged use of computer "wiping" software to effectuate spoliation, *see* FAAC ¶ 95, the "withhold[ing] [of] critical document[s] from these proceedings," *id.* ¶ 96, the "submission of false statements in this action," *id.*, and other misconduct related to Omni 808 Investors, LLC's alleged purchase of the Wachovia debt, *see id.* ¶¶ 118-121. MGA's counterclaims-in-reply likewise arise out of litigation-related conduct, including Mattel's alleged concealment of documents related to the "Bratz Brief" commissioned by Eckert, *see* Dkt. 8583 ¶¶ 35-36, the alleged spoliation of an Eckert email concerning the decline of Barbie sales, *id.*, and QE's suppression of evidence concerning Mattel's market intelligence group, *id.* ¶¶ 38-40 (alleging *inter alia* that Mattel failed to produce relevant documents). The counterclaims-in-reply also arise out of Mattel's pursuit, in this litigation, of injunctive relief that was later vacated by the Ninth Circuit. A fact-finder tasked with analyzing the two sets of claims will necessarily hear the same evidence about the parties' discovery obligations, the scope of the lawsuit, and the reasonableness of each party's alleged withholding of relevant evidence. "[C]onsiderations of judicial economy and fairness" therefore suggest that the claims be tried in a single lawsuit. *See Pochiro*, 827 F.2d at 1249.

Second, Mattel alleges that MGA directed defecting Mattel employees to misappropriate Mattel's trade secrets for MGA's benefit. FAAC ¶¶ 124, 133-142. MGA challenges Mattel's claim that the documents misappropriated by its former employees enjoyed trade secret status. Opp. at 11. MGA contends that the documents allegedly stolen by Mattel's former employees were documents that Mattel itself stole from its competitors, including MGA. *Id.* Though Mattel disputes the veracity of MGA's argument, *see* Opp. at 2, that is an issue ill-fit for

resolution on the pleadings.  Given Mattel's expansive trade secret misappropriation claims, it is certainly feasible that some (if not most) of the alleged trade secrets misappropriated by former employees borrowed from information that Mattel itself had allegedly stolen.  For example, MGA alleges, and Mattel at least acknowledges, that former Mattel employees Machado and Brawer not only had knowledge of the market intelligence group's activities, but may have received presentations prepared by the market intelligence group.  *See, e.g.*, Dkt. 8583 ¶ 14 (alleging that Machado was "one of the recipients" of presentations "assembled" by "Mattel thieves").  And Mattel in turn alleges that Machado "stole virtually every document a competitor would need to enter the Mexican market [including] global internal future line lists[,] production and shipping costs[,] daily sales data[,] consumer data[,] sales [data,] marketing projections[,] . . . strategic research . . . and other similar materials."  FAAC ¶ 49.  Not only do the named categories of material identified in Mattel's pleading likely encompass material Machado allegedly obtained from the marketing intelligence group, but Mattel's vague reference to "other similar materials" almost certainly does.  Mattel's allegations concerning Brawer's theft of trade secrets can be read to encompass a similarly broad range of document-theft.  *See* FAAC ¶¶ 64-67 (alleging that Brawer was allowed expansive access to Mattel's "sensitive and confidential" information and that he "did not return that information [to Mattel] and used that information at MGA").[6]  Both Mattel's counterclaims and MGA's counterclaims in reply minimally share a logical relationship concerning the genesis of the "trade secrets" alleged to have been stolen by Machado and Brawer.

Mattel characterizes the relationship between Mattel's counterclaims and MGA's counterclaims-in-reply as merely "thematic" and therefore insufficient to satisfy the standard set

---

[6] MGA also argues that its counterclaims in reply arise out of the same transaction or occurrence as its affirmative defense of unclean hands.  Courts are divided on the viability of MGA's argument.  *See Lockheed Martin Corp. v. RFI Supply, Inc.*, 2006 WL 1525719, at *8 (N.D. Cal. May 30, 2006) (comparing cases).

1  forth in *Pochiro*. *See* Mot. at 10-11.[7]  That argument fails for the two reasons discussed above.

2  The argument also fails because it relies upon inapposite authorities.  In *Conceptus*, for example,

3  the two parties "accuse[d] [each] other of misrepresenting clinical data about each other's

4  products."  2010 WL 1460162, at *1.  Unlike here, the fora — *i.e.*, this litigation — in which

5  such misrepresentations were aired were not identical, and no efficiency would have been

6  achieved by trying all the claims in the same proceeding.  *See id.*[8]  In addition, there was no

7  allegation in *Conceptus* that the viability of the counterclaims was potentially predicated upon

8  the viability of the counterclaims in reply.  *See id.*  In essence, counterclaims can share both

9  thematic and logical relationships; the two are not mutually exclusive.

10       Mattel's FAAC is expansive.  It encompasses almost every economic and legal

11  interaction between Mattel and MGA over the last decade.  Hundreds of transactions or

12  occurrences are put at issue by the FAAC, including the relationship between every former

13  Mattel employee and MGA, the development of MGA's foreign subsidiaries, and MGA's

14  conduct during this very litigation, including its efforts to comply with the post-phase 1

15  injunctive relief.  Under any reasonable reading of the transactions or occurrences covered by

16  the FAAC, MGA's counterclaims in reply are compulsory.  Allowing MGA's counterclaims in

17  reply to be tried in a separate proceeding would eviscerate Rule 13's concern with the prudent

18  use of limited judicial resources.

19       **B.    Motion to Strike Counterclaims in Reply on Ground that Leave to**

20                **Amend Is Required and Should be Denied**

21       Mattel argues that MGA must seek leave to amend in order to assert its new

22

23       [7] Claims that relate to the same "factual setting" do not necessarily arise out of the

24  same "transaction or occurrence."  *See Biomet, Inc. v. Fields*, 2008 WL 5191496, at *14-15 (N.D. Ind. Dec. 9, 2008).

25       [8] Although Mattel may consider its alleged misconduct "separate" from MGA's,

26  just like the defendant's and plaintiff's alleged misconduct in *Conceptus* occurred on

27  "separate occasions," the common thread of this litigation changes the calculus.  MGA complains that the parties' litigation misconduct, when considered in the aggregate,

28  affected the narrow outcome of the phase 1 trial: the verdicts and the post-trial relief.

counterclaims in reply for two reasons: (1) the counterclaims in reply are, in effect, new claims asserted by MGA against Mattel; and (2) MGA should have raised its counterclaims in reply in response to Mattel's earlier pleadings in this lawsuit.

Mattel's first argument lacks merit.  A counterclaim in reply is not considered an "amendment to the complaint" since the impetus for its filing is the filing of defendant's counterclaims.  *See Natomas Gardens Inv. Group v. Sinadinos*, 2010 WL 1558961, at *3 (E.D. Cal. Apr. 19, 2010).  Mattel errs in concluding that *Fujitsu Ltd. v. Nanya Tech. Corp.*, 2007 WL 1660694 (N.D. Cal. June 6, 2007) compels a conclusion to the contrary.  That case, as well as the case it relied upon, elected to treat counterclaims in reply as amendments to the complaint as a matter of administrative convenience.  *See id.* at *2 (citing *Electroglas, Inc. v. Dynatex Corp.*, 473 F. Supp. 1167, 1171 (N.D. Cal. 1979) (treating counterclaims in reply as amendments "[f]or reasons of clarity and particularity")).[9]

Mattel's second argument raises a more difficult issue.  No appellate authority, of which this Court is aware, has addressed whether a previously waived counterclaim may be asserted as a matter of right against an amended pleading.  District courts have struggled with this question for decades.  One of the earliest cases to address the question was *Bancroft & Sons Co. v. M. Lowenstein & Sons, Inc.*, 50 F.R.D. 415 (D. Del. 1970), which concluded that a party need not seek leave to amend to assert counterclaims in response to an amended pleading, even though it had not previously raised such counterclaims.  *Id.* at 418-19.  A variety of district courts have interpreted *Bancroft* narrowly to allow the insertion of new counterclaims only if the amended pleading "changes the theory or scope of the case" and/or the insertion of new counterclaims would not result in undue prejudice.  *See Tralon Corp. v. Cedarapids, Inc.*, 966 F. Supp. 812, 832 (N.D. Iowa 1997) (quoting *Brown v. E.F. Hutton & Co., Inc.*, 610 F. Supp. 76, 78 (S.D. Fla. 1985)); *see also Chrysler Corp. v. Fedders Corp.*, 540 F. Supp. 706, 713 (S.D.N.Y. 1982)

---

[9] A narrow but presently inapplicable exception may apply where the counterclaims in reply respond to counterclaims that are themselves compulsory, because they arise out of the same transaction or occurrence as the original complaint, which remains operative at the time the counterclaims in reply are filed.

1    (tempering *Bancroft* by suggesting that new counterclaim may not be asserted as a matter of

2    right where it would result in "prejudice to defendant [or] surprise").

3          The decisions that narrow *Bancroft* appear to be motivated by an understandable but

4    impermissible desire to do equity.  Rule 13(a) does not preserve the district court's ability to

5    strike such a counterclaim when equitable.  A counterclaim that in relevant part "arises out of the

6    transaction or occurrence that is the subject matter of the opposing party's claim," "***must*** be

7    stated."  *Id.* (emphasis added).  Failure to assert the counterclaim "waive[s] such claim and

8    preclude[s] [the responding party] by res judicata from bringing suit upon" those claims in the

9    future.  *See Dragor Shipping Corp. v. Union Tank Car Co.*, 378 F.2d 241, 245 (9th Cir. 1967).

10   District courts lack the type of discretion exercised by the courts in *Tralon* and *Fedders*.

11         Limiting the scope of a party's response to an amended pleading also fails to adhere to the

12   well-established principle that "an amended complaint supersedes the original complaint."  *See*

13   *Pac. Bell Telephone Co. v. Linkline Comm's, Inc.*, 129 S.Ct. 1109, 1123 n. 4 (2009).  Its filing

14   therefore renders the original complaint of "no legal effect."  *Fitzpatrick v. Potter*, 2005 WL

15   2622024, at *2 (S.D. Ohio Oct. 14, 2005).  The amended complaint also voids the opposing

16   party's answer to the original complaint, including any counterclaims.  *See Johnson v. Berry*,

17   228 F. Supp. 2d 1071, 1079 (E.D. Mo. 2002).  Those counterclaims must be repled in a new

18   responsive pleading, or otherwise forfeited.  *Id.*; *see also Designing Health, Inc. v. Erasmus*,

19   2001 WL 36239751, at *3 (C.D. Cal. April 23, 2001) (quoting and interpreting earlier holding

20   that "counterclaims brought in the answer to the [amended complaint] superceded counterclaims

21   asserted in previous answers"); *Wagner v. Choice Home Lending*, 266 F.R.D. 354, 358 (D. Ariz.

22   2009 (similar); *Bremer Bank, Nat. Ass'n v. John Hancock Life Ins. Co.*, 2009 WL 702009, at *12

23   (D. Minn. 2009) (citing *Berry* with approval); *General Mills, Inc. v. Kraft Foods Global, Inc.*,

24   495 F.3d 1378, 1380-81 (8th Cir. 2007); *but see Dunkin Donuts, Inc. v. Romanias*, 2002 WL

25   32955942, at *2 (W.D. Pa. May 29, 2002).  The legal inoperability of the responding party's

26   earlier responsive pleadings precludes it from relying upon earlier pled counterclaims.  It is basic

27   symmetry that the earlier responsive pleadings' legal inoperability also does not constrain the

28   responding party, a point discussed in great detail by the court in *Bancroft*.

1         Courts have used this reasoning to allow a party to assert *new* affirmative defenses in

2   response to an amended complaint, even when those new affirmative defenses are raised against

3   claims that appeared in the original complaint.  *See Massey v. Helman*, 196 F.3d 727, 735 (7th

4   Cir. 1999) (recognizing that the supersessive effect of an amended complaint "wipes away prior

5   pleadings and opens the door for defendants to raise new and previously unmentioned

6   affirmative defenses") (citing *Harris v. Secretary, U.S. Dep't of Veterans Affairs*, 126 F.3d 339,

7   343 n. 2 (D.C. Cir. 1997)); *see also Diesel Props S.r.L. v. Greystone Business Credit II LLC*,

8   2008 WL 4833001, at *5 (S.D.N.Y. Nov. 5, 2008) (citing *Plon Realty Corp. v. Travelers Ins.

9   Co.*, 533 F. Supp. 2d 391 (S.D.N.Y. 2008) and *Sidari v. Orleans County*, 174 F.R.D. 275

10  (W.D.N.Y. 2008)).  Mattel cites some case law to the contrary, but the district court cases cited

11  by Mattel either ignored *Massey*'s reasoning[10] or misconstrued *Massey*'s holding[11].  These courts

12  held that a party may only raise new affirmative defenses in response to an amended pleading if

13  that amended pleading changes the scope or theory of the case.  But this changed scope or theory

14  standard appears nowhere in the Federal Rules, ignores the supersessive effect of amended

15  pleadings, and is likely unworkable in practice.  This Court does not share the equitable concerns

16  cited by these district court opinions, which focus on the unfairness of the responding party's

17  dilatory addition of new affirmative defenses, but disregard the fact that the party that sought

18  amendment (in this case Mattel) should have balanced the risks of amendment against its

19  benefits, which include the ability to perfect its pleading and add new claims of its own.

20        Finally, even if MGA needed to seek leave to amend in order to assert its new

21  counterclaims in reply, the facts here support granting leave to amend.  Rule 15 permits the

22  liberal amendment of pleadings.  *See State of Nebraska v. State of Wyoming*, 515 U.S. 1, 8, 115

23  

24      [10] *See, e.g.*, *Kreidler v. Pixler*, 2009 WL 5295590 (W.D. Wash. Mar. 2, 2009); *GSI

25  Group, Inc. v. Sukup Mfg. Co.*, 2007 WL 757819 (C.D. Ill. Mar. 8, 2007); *E.E.O.C. v. Morgan Stanley & Co., Inc.*, 2111 F.R.D. 225 (S.D.N.Y. 2002); *Tensor Group, Inc. v.

26  Global Web Systems, Inc.*, 1999 WL 617618 (N.D. Ill. Aug. 11, 1999).  These cases also rely upon

27      [11] *See Fausset v. Mortgage First, LLC*, 2010 WL 1212085 (N.D. Ind. Mar. 23,

28  2010).

S.Ct. 1933 (1995) (citing *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227 (1962)).  The court must consider the following factors in determining whether to grant leave to amend: (1) prejudice; (2) bad faith; (3) undue delay; and (4) futility.  *See Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 607 (9th Cir. 1992).  Mattel argues that MGA already knew about the market intelligence group's conduct, but the counterclaims in reply encompass conduct broader Mattel's alleged effort to conceal wrongdoing, as well as its discovery conduct. Moreover, the wrongful injunction counterclaim in reply has little to do with the activities of Mattel's market intelligence group.  The claim did not even exist until July 22, 2010.

The prejudice cited by Mattel—insufficient time to conduct discovery on the counterclaims in reply—can be easily cured.  A one-month extension of the discovery cut off for the limited purpose of allowing Mattel to conduct discovery into the counterclaims in reply is more than reasonable.  Mattel may file a second summary judgment motion limited to the counterclaims in reply on or before November 15, 2010.

Finally, Mattel argues that MGA acted in bad faith by advocating an early discovery cut-off, only to file its counterclaims in reply.  But MGA would have suffered just as much as Mattel from an early discovery cut off, since MGA also seeks discovery into the counterclaims in reply. Mattel already possesses most of the evidence about these counterclaims in reply anyway.

MGA was not required to seek leave to amend before filing its counterclaims in reply because (1) the counterclaims in reply are compulsory; and (2) Mattel's FAAC superceded earlier pleadings, including MGA's earlier responsive pleadings.  Regardless, the facts support granting leave to amend.

### C.   Motion to Dismiss and/or Strike Counterclaim in Reply for Wrongful Injunction

Mattel moves to strike and/or dismiss MGA's wrongful injunction counterclaim in reply. MGA alleges that "[a]t the behest of Mattel, on December 3, 2008, the Court entered a sweeping set of equitable orders against MGA that had the effect of destroying all or a substantial part of MGA's value in the Bratz brand."  Dkt. 8583 ¶ 319.  MGA seeks to recover from Mattel "the damages caused by these wrongful equitable orders, and to have restored to it the benefits it lost

1  as a result of these wrongful equitable orders, and to have disgorged from Mattel the benefits it

2  received from these wrongful equitable orders." *Id.* ¶ 321.

3        Mattel preliminarily argues that this claim must be brought in a separate action.  This

4  argument is partially obviated by the Court's earlier determination that the counterclaims in

5  reply, including the wrongful injunction counterclaim in reply, are compulsory.  In addition, at

6  least two cases cited by MGA show that a party may seek equitable relief from the issuance of a

7  wrongful injunction in the same suit in which the injunction was issued.  *See, e.g.*, *Nintendo of*

8  *Am., Inc. v. Lewis Galoob Toys, Inc.*, 16 F.3d 1032 (9th Cir. 1994); *Dornan v. Sheet Metal*

9  *Workers' Intern. Ass'n*, 810 F. Supp. 856 (E.D. Pa. 1992).  Although a wrongful injunction

10  claim may nevertheless be asserted in a separate action, *see, e.g.*, *Buddy Sys. Inc. v. Exer-Genie,*

11  *Inc.*, 545 F.2d 1164 (9th Cir. 1976); *Monolith Portland Midwest Co. v. RFC*, 128 F. Supp. 824

12  (S.D. Cal. 1955), "it is unlikely that a court that would permit a damage award in a separate

13  action would preclude the enjoining court from awarding those damages in the original action."

14  *Factors Etc., Inc. v. Pro Arts, Inc.*, 562 F. Supp. 304, 307 n. 2 (S.D.N.Y. 1983).

15        Mattel also argues that MGA lacks standing to bring its claim for wrongful injunction

16  because the prior district court stayed much of the injunctive relief entered on December 3,

17  2008.  On that date, the district court entered three equitable orders, all of which have since been

18  vacated by the Ninth Circuit's July 22, 2010 Order.  The first order entered "[a] constructive

19  trust in favor of Mattel on all rights to trademarks, service marks and domain names held by

20  MGA or Larian . . . anywhere in the world that include the terms 'Bratz' or 'Jade."  Docket 4441

21  ¶ 1.  The second order entered a constructive trust in favor of Mattel over all works the phase 1

22  jury found to have been conceived or reduced to practice by Bryant at any time during his

23  employment with Mattel, including all copyright registrations MGA had obtained in and for such

24  works.  Docket 4442.  The third order entered a permanent injunction on the basis of the district

25  court's independent "fact-finding" concerning the scope of MGA's infringement of the Bratz

26  drawings and sculpts owned by Mattel.  *See* Docket 4443.  This order enjoined MGA from

27  manufacturing and/or selling dolls, products, packaging, and other copyrighted works depicted

28  in a number of exhibits identified by the order.  *Id.*

The three December 3, 2008 equitable orders were immediately stayed by the district court.  Docket 4439 at 16.  The stay of the permanent injunction was narrowed by two subsequent orders, which restricted MGA from manufacturing new lines of dolls but permitted "retailers and distributors . . . to purchase the Spring and Fall 2009 lines of Bratz and Bratz-related products from MGA and MGA licensees, up to and including December 31, 2009."  *See* Docket 4657; Docket 5273.  MGA's profits from the sale of Bratz related products were held in escrow by the Temporary Receiver, Patrick A. Fraioli, Jr.  *Id.*  On December 9, 2009, the Ninth Circuit stayed all of the December 3, 2009 equitable relief, which was later vacated on July 22, 2010.  MGA's profits were returned to MGA on August 31, 2010.  Docket 8670.

A claim for wrongful injunction ordinarily seeks to recover the bond posted pursuant to Rule 65(c) prior to the entry of a preliminary injunction.  *See Continuum Co., Inc. v. Incepts, Inc.*, 873 F.2d 801, 803 (5th Cir. 1989).  No other damages are recoverable on a claim for wrongful injunction, unless the enjoined party "can make out a case of malicious prosecution."  *See In re Ladner*, 799 F.2d 1023, 1025 (5th Cir. 1986); *see also W.R. Grace and Co. v. Local Union 759*, 461 U.S. 757, 770 n. 14 (1983) ("A party injured by the issuance of an injunction later determined to be erroneous has no action for damages in the absence of a bond."); *Factors*, 562 F. Supp. at 308 ("Absent a claim of malicious prosecution, damages for wrongful injunction are limited to the amount of the bond.").[12]

Although precluded from recovering damages in the absence of a bond, a party subject to a wrongful injunction may nevertheless be entitled to "equitable relief."  *See Dornan v. Sheet Metal Workers' Intern. Ass'n*, 810 F. Supp. 856, 858-59 (E.D. Mich. 1992).  This equitable relief is limited to "'restitution' [from] a party who obtains benefits from an improperly issued injunction [] that he would not have received but for the injunction."  *Littell v. Morton*, 369 F.

---

[12] MGA argues that these cases involved preliminary injunctions and not permanent injunctions, but that is a distinction without a difference.

14

Supp. 411, 419 (D. Md. 1974), *aff'd*, 519 F.2d 1399 (4th Cir. 1975).[13]  The limited case law on this issue appears to award restitution both for amounts paid directly by the enjoined party to the prevailing party and for other "unjust enrichment" sustained by another as a result of the wrongfully issued injunction.  *See Middlewest Motor Freight Bureau v. United States*, 433 F.2d 212, 228 (8th Cir. 1970) ("[A] party who obtains a benefit from an improperly issued injunction has the duty to restore that benefit to those who have been injured by the injunction."), *cert. denied*, 402 U.S. 999, 91 S.Ct. 2169 (1971); *Arkadelphia Milling Co. v. St. Louis S.W. Ry. Co.*, 249 U.S. 134, 145-46, 39 S.Ct. 237 (1919); *see also Community Care Ctrs., Inc. v. Sullivan*, 701 N.E. 2d 1234, 1239-40 (Ind. App. 1998) (applying federal precedent to conclude that a wrongfully enjoined party is entitled to recover unjust enrichment).  The power to grant such equitable relief rests in the sound discretion of the district court.  *See Public Service Comm'n of Missouri v. Brashear Freight Lines, Inc.*, 312 U.S. 621, 629, 61 S.Ct. 784 (1941).

The district court's post-phase 1 equitable relief was stayed and therefore ineffectual between December 3, 2008 and April 7, 2009, when only the stay of the permanent injunction was partially lifted.  Between April 7, 2009 and December 9, 2009, when the Ninth Circuit stayed the permanent injunction in its entirety, MGA was barred from manufacturing, marketing and selling new lines of dolls, though it could continue selling its Spring and Fall 2009 lines.  It is undisputed that the injunction did not mandate that MGA make any payments to Mattel or deliver anything of value to Mattel (or anyone else) that has not since been returned to MGA.

MGA instead seeks to recover several categories of damages that are unavailable as a matter of law.  First, relying on *Nintendo*, MGA seeks to recover "lost profits based on lost sales" as a result of the injunction.  Opp. at 25; *see also* Dkt. 8583 ¶ 321 (seeking recovery for "the damages caused by these wrongful equitable orders [and] the benefits [MGA] lost as a result of these wrongful equitable orders").  But *Nintendo* calculated damages suffered by the

---

[13] *Littell* involved facts inverse to this case.  There, the party that *obtained* an injunction that was vacated on appeal had performed services for the enjoined party while the appeal was pending.  The district court awarded restitution *against* the previously enjoined party.

1   enjoined party in order to determine the amount of the security bond to which the enjoined party

2   was entitled.  *See* 16 F.3d at 1035-36.  The prior district judge did not require Mattel to post a

3   bond; thus, MGA is not entitled to recover the damages it sustained as a result of the wrongfully

4   imposed injunction.  *See W.R. Grace and Co. v. Local Union 759*, 461 U.S. at 770 n. 14.

5        Second, MGA seeks to "disgorge[] from Mattel the benefits it received from these

6   wrongful equitable orders."  Dkt. 8583 ¶ 321; *see also* Opp. at 25 (seeking to recover from

7   Mattel the value it obtained from temporarily enjoying "a marketplace that it could exploit

8   without Bratz").  No injunctive order granted to Mattel a "marketplace . . . without Bratz."

9   According to MGA, that "benefit" was a collateral benefit of the mere specter of the injunctive

10  orders, since the mere entry of the injunctive relief "disincentivize[d] sales."  Opp. at 24.[14]  To

11  allow MGA to proceed on this attenuated causation theory would allow MGA to seek recovery

12  from *every other market participant*, including the many other toy manufacturers identified in

13  MGA's Reply to the FAAC.  *See* Dkt. 8583 ¶ 2 ("Bandai, B-Bel, Inc., Binney & Smith, Blue

14  Box, Cadaco, Ceaco, Chicco, Crayola, Creativity for Kids," et. al.).  All of these manufacturers

15  arguably benefitted from a "marketplace . . . without Bratz" after December 3, 2008.  Other

16  beneficiaries of the injunctive relief may include past and present shareholders of these

17  companies, and even the since-dismissed Omni 808 Investors, LLC ("Omni").

18       Not surprisingly, the case law does not provide for the recovery of "unjust enrichment"

19  from every individual and entity who generated collateral profits from a wrongful injunction.  A

20  party is entitled to restitutionary relief for a wrongful injunction in accord with the old and well-

21  established principle "money paid on an erroneous judgment, afterwards reversed, is recoverable

22  in an action for money had and received, against the person receiving it."  *See Bank of United*

23  *States v. Bank of Washington*, 31 U.S. 8, 13 (1832).  The injunctions at issue did not compel the

24  transfer of money or property that MGA has not already recovered.

25

26

27
_____

28       [14] MGA argues that it was the "Court's design" to disincentivize sales.  Opp. at 24.

1    The Motion is GRANTED as to MGA's wrongful injunction counterclaim in reply.[15]

2    **D.    RICO and Misappropriation of Trade Secret Counterclaims in Reply**

3        Mattel also moves to dismiss MGA's counterclaims in reply for (1) violation of 18 U.S.C.

4    § 1962(c); and (2) misappropriation of trade secrets.  Mattel argues that both counterclaims are

5    barred by the applicable statutes of limitations.

6    **1.    Relation Back**

7        The parties first dispute the applicability of the relation back doctrine.  A compulsory

8    counterclaim relates back to the date of the complaint, though a permissive counterclaim does

9    not.  *Employers Ins. of Wausau v. United States*, 764 F.2d 1572, 1576 (Fed. Cir. 1985); *see also*

10   *Kirkpatrick v. Lenoir County Bd. of Educ.*, 216 F.3d 380, 388 (4th Cir. 2000) ("In this circuit, a

11   compulsory counterclaim relates back to the time of the filing of the plaintiff's complaint.").[16]

12       MGA's compulsory RICO and trade secret misappropriation counterclaims in reply relate

13   back to the date of Mattel's FAAC, which, except for a few counterclaims, arises "out of the

14   conduct, transaction, or occurrence set out" in, and therefore relates back to, Mattel's first

15   Answer and Counterclaims.  *See* Fed. R. Civ. P. 15(c); *see also Eli Lilly and Co. v. Am.*

16   *Cyanamid Co.*, 2001 WL 30191, at *8-9 (S.D. Ind. Jan. 8, 2001) ("Because the new facts alleged

17   in [defendant's] amended counterclaim merely expand upon and add detail to the allegations in

18   the original counterclaim, the amended counterclaim relates back to the original").

19   **2.    Trade Secret Misappropriation: Statute of Limitations**

20       MGA's first counterclaim in reply alleges that Mattel"illegally obtained" MGA's trade

21   secret materials, which include "documents, photographs, catalogs, and other information . . .

22   related to MGA's products."  Dkt. 8583 ¶¶ 305, 308. In California, a claim for trade secret

23   _____

24       [15] Mattel's Anti-Slapp argument is moot and otherwise DENIED to the extent
     Mattel seeks to recover attorneys' fees from MGA.

25

26       [16] The Ninth Circuit has not addressed the issue in a published decision, but
     *Religious Tech. Ctr. v. Scott*, 82 F.3d 423 (9th Cir. 1996), an unpublished decision,
     incorporated the Federal Circuit's standard.  Thus, *Katherine G. ex rel. Cynthia G. v.*

27   *Kentfield School Dist.*, 261 F. Supp. 2d 1159 (N.D. Cal. 2003), which relied on the
     absence of a Ninth Circuit "analogue," does not compel a contrary outcome.

28

misappropriation "must be brought within three years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered."  Cal. Civ. Code § 3426.6.

MGA argues that Mattel's market intelligence group commenced its alleged activities in "at least" 1992, by sneaking into competitors' showrooms.  Dkt. ¶ 77.  The allegation leaves unclear whether Mattel's alleged misappropriation of *MGA*'s trade secrets commenced in 1992, or on some later date.  *See id.*  It is more than reasonable to infer, especially at the pleadings stage, that Mattel's alleged intrusion into MGA's toy showrooms did not occur until "1999 or early 2000," when "MGA decided to compete directly with Mattel by launching a fashion doll line."  FAAC ¶ 23; *see also* Dkt. 8583 ¶ 83 (limiting denial of paragraph 23 of FAAC to its definition of "Mattel").

Mattel's alleged misappropriation of MGA's trade secrets nevertheless occurred at least prior to 2004, since Machado, who was hired away from Mattel's Mexican subsidiary by MGAE de Mexico ("MGA Mexico") on or about April 19, 2005, was allegedly "one of the recipients of such presentations," which included "page after page of unauthorized reproductions of photos and catalog pages depicting the competitor products."  Dkt. 8583 ¶ 14.  Ron Brawer, who likewise left Mattel for Mexico on October 1, 2004, was allegedly "aware of the practices" of Mattel's market intelligence group.  *Id.* ¶ 20.  Mattel argues that the knowledge possessed by Brawer and Machado is imputed to MGA as a matter of law.  MGA disagrees and, in addition, argues that since its "counterclaims-in-reply . . . relate back to the filing of Mattel's complaint [which was filed on] January 2007," its claims fall within "the three year statute of limitations." Opp. at 27.  Both arguments are flawed.

The statute of limitations on a claim for trade secret misappropriation does not run with each act of misappropriation, but begins to run "at the time the defendant makes its first adverse use of the trade secret in violation of the alleged confidential relationship."  *Security People, Inc. v. Medeco Security Locks, Inc.*, 59 F. Supp. 2d 1040, 1043 (N.D. Cal. 1999) (citing *Monolith Portland Midwest Co. v. Kaiser Aluminum & Chem. Corp.*, 407 F.2d 288, 292-93 (9th Cir. 1969)); *see also Cypress Semiconductor Corp. v. Superior Court*, 163 Cal. App. 4th 575, 582 (2008) (noting that CUTSA adopted the theory that "a continuing misappropriation constitutes a

single claim").  The focus is on when the confidential relationship is breached.  *See Glue-Fold, Inc. v. Slautterback Corp.*, 82 Cal. App. 4th 1018, 1024-25 (2000) (rejecting theory that two different "periods of misappropriation" by the same party each trigger a separate statute of limitations).

The statute of limitations for MGA's counterclaim in reply was triggered the first time MGA discovered or should have discovered of Mattel's alleged misappropriation of trade secret materials from MGA's showrooms.  Mattel argues that MGA knew of the conduct at the time it hired Machado and Brawer, because an employee's knowledge is imputed to the employer.  However, both individuals came to MGA less than three years before the January 12, 2007 filing of Mattel's Answer and Counterclaims, which is the pleading to which the FAAC and MGA's counterclaims in reply relate back.[17]  Mattel's statute of limitations argument is unpersuasive.

### 3.    RICO: Statute of Limitations

MGA's second counterclaim in reply alleges that Mattel is "associated-in-fact [] with [] the Mattel Racketeering Enterprise, which has conducted its affairs through a pattern of racketeering activity."  Dkt. 8583 ¶ 314.  Construing the allegation in the light most favorable to MGA, *see Scheuer v. Rhodes*, 416 U.S. 232, 236, 1974,[18] the Court reads MGA's counterclaim in reply to allege that (1) Mattel was employed by or associated with (whether "in-fact" or not) an enterprise; and (2) *Mattel* (not the "Racketeering Enterprise") conducted the affairs of the enterprise through a pattern of racketeering activity.[19]  The alleged "pattern" was marked by Mattel's violations of 18 U.S.C. §§ 1343, 1503, 1512, 1952, 2319, and 17 U.S.C. § 506(a)(1)(A).

---

[17] The Court need not resolve the parties' dispute about whether an employee's knowledge is always imputed to the employer.  At least one case has recognized that this rule is not without its exceptions.  *See Santillan v. Roman Catholic Bishop of Fresno*, 163 Cal. App. 4th 4, 10 (2008).

[18] MGA can't avail itself of the more liberal standard that applies to *pro se* litigants.  *See Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969).

[19] Paragraph 316 of MGA's counterclaims in reply contains an allegation that the Court has already determined to be legally irrelevant.  *See* Dkt. 8523 at 5 n. 6.

1   Dkt. 8583 ¶ 314.  MGA alleges that Mattel's violation of 18 U.S.C. § 1962(c) caused injury to

2   MGA's business or property because the alleged "concealment of evidence" about the market

3   intelligence group "result[ed] in a wrongful injunction in this action" by preventing the prior

4   presiding judge from "be[ing] scandalized by [sic] such evidence" and "fe[eling] differently

5   about entering sweeping injunctive relief."  *See id.* ¶¶ 60, 317.

6        Mattel only challenges these allegations on statute of limitations grounds, and with the

7   narrow argument that Brawer and Machado's admitted knowledge about the market intelligence

8   group.  These arguments are unavailing for the reasons discussed above.  The RICO

9   counterclaim in reply relates back to Mattel's original Answer and Counterclaims, which was

10  filed less than four years[20] after Machado and Brawer defected to MGA Mexico and MGA.

11              **E.    Motion to Strike Paragraphs 41, 46, 47**

12        Mattel moves to strike paragraphs 41, 46, 47 of MGA's counterclaims in reply, which

13  seek to explain Mattel's alleged concealment of evidence:

14        41.    Instead, Mattel and its attorneys embarked on a brilliant

15              strategy to ensure that its long term scheme to defraud either

16              would never see the light of day, or when it did, the impact

17              would be severely diminished.  The cornerstone of that

18              strategy was the filing of Mattel's counterclaims in this

19              action.

20        46.    In fact, it was not until November of 2006—in some cases

21              nearly three years after these employees had left and allegedly

22              taken with them Mattel trade secrets—that Mattel finally filed

23              its trade secret misappropriation and RICO claims.  No new

24              evidence had been uncovered in late 2006 to strengthen those

26        [20] As Mattel recognizes, "the statute of limitations for a RICO claim accrues when

27  the plaintiff knew or should have known of the injury that formed the basis for the cause of action, not from the date of the last alleged predicate act."  *See* Mot. at 31 (citing

28  *Grimmett v. Brown*, 75 F.3d 506, 512 (9th Cir. 1996)).

1          claims.  In fact, the passage of time had weakened Mattel's

2          claims as the information became stale.  Nothing had

3          happened in the marketplace to signal to Mattel that any

4          information was being used by MGA, thus necessitating

5          action where none had been taken before.  No new evidence

6          had just been uncovered to establish MGA or Larian's

7          involvement in the removal of any information by these

8          employees.  Instead, the counterclaims were motivated by the

9          deterioration of the Machado situation.

10       47.    It was a concededly brilliant strategy.  Mattel and its lawyers

11          figured out exactly what Mattel could be accused of based on

12          Mattel's own criminal conduct, then turned those claims on

13          MGA, while at the same time concealing all evidence of

14          Mattel's wrongdoing.  This strategy had many benefits.  If

15          MGA took legal positions attacking the claims, or got them

16          dismissed, then those arguments could be turned against

17          MGA if and when it ever found out about Mattel's conduct.

18          If the claims succeeded to taint MGA, then once Mattel's

19          conduct came out, the impact would be substantially

20          diminished.  The claims were so vast that Mattel was able to

21          distract and tie-up the much smaller MGA in litigation for

22          years.  Mattel succeeded beyond its wildest dreams in

23          pursuing this strategy.  Mattel successfully concealed the

24          evidence of its own criminal conduct for years, all the while

25          claiming that MGA was evil incarnate.

26  *See* Dkt. 8583 ¶¶ 41, 46, 47.

27      "A pleading that states a claim for relief must contain a short and plain statement of the

28  claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a).  Irrelevant

1   inflammatory language has no place in a pleading.  *C.f. Harnden v. Cal.*, 2010 WL 3489379, at

2   *1 (N.D. Cal. Sept. 2, 2010) (discussing dismissal of complaint containing allegations that "a

3   former judge of this court is both a 'liar' and an 'anarchist.'").  Nor should a pleading contain

4   idle screeds, such as this one, untethered from the claims in the pleading.  *See Molus v. Swan*,

5   2007 WL 2326132, at *5 (S.D. Cal. Aug. 13, 2007) (discussing earlier dismissal of "19 rambling

6   long-winded, introductory pages").  Such material "may properly be stricken from the

7   [pleading]."  *See Everage v. Ford Motor Co.*, 2005 WL 1176095, at *2 (E.D. Ky. May 12, 2005)

8   (citing Fed. R. Civ. P. 12(f)).  MGA claims that these allegations "support [its] RICO claims

9   [sic]" but, in fact, the allegations have nothing to do with the viability of its RICO claim, which

10  rests on Mattel's alleged commission of a pattern of racketeering activity and not the "many

11  benefits" to Mattel of its "concededly brilliant strategy."

12          Even if the allegations were somehow relevant to MGA's RICO counterclaim in reply,

13  the *Noerr-Pennington* doctrine protects Mattel from liability for the "filing of its counterclaims

14  in this action," *see* Dkt. 8583 ¶ 41, for which MGA seeks to hold Mattel accountable.  *See*

15  *Empress LLC v. City and County of S.F.*, 419 F.3d 1052, 1056 (9th Cir. 2005) ("Under the

16  *Noerr-Pennington* doctrine, those who petition any department of the government for redress are

17  generally immune from liability.") (citing *Manistee Town Ctr. v. City of Glendale*, 227 F.3d

18  1090, 1092 (9th Cir. 2000)); *see also White v. Lee*, 227 F.3d 1214, 1231 (9th Cir. 2000) ("The

19  *Noerr-Pennington* doctrine ensures that those who petition the government for redress of their

20  grievances remain immune from liability for statutory violations, notwithstanding the fact that

21  their activity might otherwise be proscribed by the statute involved.").

22          Paragraphs 41, 46, and 47 of MGA's responsive pleading contain rhetoric that not only

23  runs afoul of Rule 8(a) but is also irrelevant to Mattel's liability.  Mattel's motion to strike these

24  paragraphs is therefore GRANTED.

25          **IV.    Disposition**

26          For the foregoing reasons, the Motion to Strike and/or Dismiss is GRANTED IN PART

27  AND DENIED IN PART:

28          1.      MGA's Third Counterclaim in Reply is DISMISSED WITH PREJUDICE.

1         2.       Paragraphs 41, 46, 47 of Docket 8583 are STRICKEN.

2         3.       The Motion is DENIED as to MGA's First and Second Counterclaims in Reply.

3   MGA's Cross-Motion for Leave to Amend is STRICKEN AS MOOT.

4       The Discovery cut-off is extended to November 1, 2010 for the limited purpose of

5   allowing discovery on MGA's counterclaims in reply.  Mattel is granted leave to move for

6   summary judgment on the counterclaims in reply on or before November 15, 2010, with further

7   briefing schedules to be set by the Court.

8       Mattel shall file a pleading in response to MGA's counterclaims in reply within seven (7)

9   days of the filing of this Order.

12   IT IS SO ORDERED.

13   DATED: October 1, 2010

16                        _____
                              DAVID O. CARTER
                        United States District Judge