1
2
3
4
5
6
7
8             UNITED  STATES  DISTRICT  COURT
9         FOR  THE  CENTRAL  DISTRICT  OF  CALIFORNIA
10

11   CARTER BRYANT,                    )        CASE NO. CV 04-9049 DOC (RNBx)
                                       )
12                  Plaintiff,         )
                                       )        O R D E R GRANTING IN PART
13            v.                       )        AND DENYING IN PART MOTION
                                       )        TO DISMISS; STRIKING AS MOOT
14   MATTEL, INC.,                     )        CROSS-MOTION FOR LEAVE TO
                                       )        AMEND
15                  Defendant.         )
                                       )
16                                     )
_____       )
17                                     )
                                       )
18   AND CONSOLIDATED ACTIONS.         )
                                       )
19   _____  )

20        Before the Court are Mattel, Inc. ("Mattel")'s Motion to Dismiss and/or Strike and MGA

21   Entertainment, Inc. ("MGA")'s Cross-Motion for Leave to Amend.  After considering the

22   moving, opposing, and replying papers, as well as the parties' oral argument, the Court

23   GRANTS IN PART AND DENIES IN PART Mattel's Motion to Dismiss and STRIKES AS

24   MOOT MGA's Motion for Leave to Amend.

25        I.      Background

26        Mattel's Fourth Amended Answer and Counterclaims (FAAC) asserts seventeen

27   counterclaims arising under federal law and the laws of the state of California.  Mattel alleges

28   that MGA conducted the affairs of an enterprise through a pattern of racketeering activity,

misappropriated Mattel's trade secrets, infringed Mattel's copyrights, aided and abetted Mattel's employees' breaches of fiduciary duty and duty of loyalty to Mattel, and unlawfully converted Mattel's property.  The Court granted in part and denied in part counter-defendants' motions to dismiss certain counterclaims asserted by the FAAC.  MGA's timely filed reply to the FAAC denies the majority of Mattel's allegations.  MGA also asserts three "counterclaims-in-reply" for trade secret misappropriation, violation of the Racketeer Influenced and Corrupt Organizations (RICO) Act, and wrongful injunction.  MGA's counterclaims-in-reply arise out of the activities of Mattel's market intelligence department, as well as the district court's entry of injunctive relief after phase 1 of this proceeding.

MGA alleges that Mattel directed its employees to obtain competitors' "trade secrets and other confidential information" under false pretenses.  Dkt. 8583 ¶ 1.  Certain members of Mattel's market intelligence group allegedly posed as retailers in order to gain access to restricted showrooms operated by other toy companies, including MGA.  *Id.* ¶¶ 1-2.[1]  These employees allegedly used cameras to photograph and videotape the events inside competitors' — including MGA's — showrooms.  *Id.*  They also allegedly obtained and made away with documents that MGA shared with retailers subject to Non-Disclosure Agreements.  *Id.*  This information allegedly encompassed MGA's future product lines, which MGA marketed to retailers, but hoped to keep out of the hands of its competitors.  *See id.*  The documents allegedly misappropriated by Mattel's employees also included price lists and advertising plans.  *Id.*

Members of Mattel's market intelligence team allegedly shared this information with other Mattel employees in intra-company reports and an annual presentation to hundreds of employees, including members of Mattel's executive team.  *Id.* ¶ 15.  Mattel allegedly archived the information in a ninth floor library maintained at Mattel's El Segundo, California

---

[1] These toy showrooms were maintained by manufacturers at a yearly New York toy fair "where all of the major toy manufacturers come together on a worldwide basis to meet with retailers in order to demonstrate their wares."  Dkt. 8583 ¶ 7.  Access to the toy showrooms is restricted and manufacturers require attending retailers to sign non-disclosure agreements and otherwise limit the type of information that retailers may take away from the showrooms.  *Id.* ¶ 8.

headquarters.  *Id.* ¶ 17.  Numerous high level executives at Mattel, including Matt Turetzsky, Drew Vollero, Matt Bousquette, and Chief Executive Officer Robert Eckert, allegedly ratified and directed the market intelligence group's conduct.  *Id.* ¶ 20.

Concerned that its employees would be recognized in MGA's showrooms, Mattel allegedly hired an employee with the express, and exclusive, task of gaining access to MGA's toy showrooms and retrieving confidential information about MGA's future products.  *Id.* ¶ 24. Mattel is also alleged to have retained the consulting firm of Bain & Company ("Bain") to contact MGA's licensees, distributors, and production companies, among others, to solicit "confidential information about MGA" without "disclos[ing] that the research was being conducted for Mattel."  *Id.* ¶ 25.  Acting at the direction of its in-house counsel, Mattel has allegedly "sanitized" or otherwise destroyed the reports generated by Bain.  *Id.* ¶ 27.  Mattel's outside counsel, the law firm of Quinn Emanuel Urquhart & Sullivan ("QE"), is also alleged to have destroyed evidence about Mattel's market intelligence group, and otherwise failed to disclose the group's activity during discovery in this litigation.  *Id.* ¶¶ 28-30; ¶¶ 38-39 (alleging that QE partner and Mattel's in-house counsel negotiated settlement with Villasenor and thereafter withheld information concerning market intelligence group).

MGA alleges that Mattel also concealed other relevant evidence.  Such evidence includes a "Bratz Brief" "commissioned" by CEO Eckert in October or November of 2003 and drafted by two Mattel employees named Jerome Bossick and Sujata Luther.  *Id.* ¶ 32.  The Bratz Brief apparently concluded that Bratz's sales did not negatively affect the market for Mattel's products and that the Bratz's success was unrelated to Carter Bryant's original work.  *Id.*  Eckert is alleged to have discussed the themes raised in the Bratz Brief in subsequent emails, which were allegedly spoliated in order to avoid production in this lawsuit.  *Id.* ¶¶ 33-34.  At least one email was first produced by Mattel after the phase 1 trial, on March 8, 2010.  *Id.*

MGA further alleges that Mattel has crafted its litigation strategy to conceal and diminish the activities of the market intelligence department.  *Id.* ¶¶ 45-47.  Mattel and its employees have allegedly shielded relevant evidence from discovery, *id.* ¶ 48, and feigned ignorance of the market intelligence group's conduct during discovery, *id.* ¶¶ 53-54.  Mattel is also alleged to

1   have suborned the provision of favorable testimony by witnesses.  *Id.* ¶ 56.

2        Mattel's alleged discovery abuses yielded market-related benefits.  *Id.* ¶ 57.  MGA also

3   alleges that Mattel's alleged suppression of evidence about the market intelligence group

4   materially affected the prior presiding judge's decision to enter injunctive relief after the phase 1

5   proceedings, since "[a]ny judicial officer would have felt differently about entering sweeping

6   injunctive relief," upon learning about the market intelligence group's alleged misconduct.

7   **II.    Discussion**

8        Mattel moves to dismiss and/or strike MGA's counterclaims-in-reply as procedurally

9   barred and time-barred.  Mattel also moves to strike MGA's claim for wrongful injunction, as

10  well as the factual allegations related to that claim.  MGA moves for leave to amend its original

11  complaint to add its new claims.

12       **A.    Motion to Strike Counterclaims in Reply as Non-Compulsory**

13       "[T]he Ninth Circuit permits counterclaims in reply to an opposing party's counterclaims

14  if they are compulsory in nature."  *Conceptus, Inc. v. Hologic, Inc.*, No. C 09-02280 WHA, 2010

15  WL 1460162, at *1 (N.D. Cal. April 12, 2010) (citing *Davis & Cox v. Summa Corp.*, 751 F.2d

16  1507, 1525 (9th Cir. 1985)).  Like any other counterclaim, a "counterclaim in reply" is

17  compulsory if it "arise[s] from the same transaction or occurrence as the [defendant's]

18  counterclaim."  *Davis & Cox*, 751 F.2d at 1525.

19       The Ninth Circuit applies a "logical relationship" standard to determine whether a claim

20  and counterclaim (or counterclaim and counterclaim-in-reply) arise out of the same transaction

21  or occurrence.[2]  "A logical relationship exists when the counterclaim arises from the same

22  aggregate set of operative facts as the initial claim."  *See In re Pinkstaff*, 974 F.2d 113, 115 (9th

23  Cir. 1992).  Two claims may be logically related even though they do not arise out of the same

24  nucleus of facts.  *Pochiro v. Prudential Ins. Co. of Am.*, 827 F.2d 1246, 1249 (9th Cir. 1987);

25  _____

26       [2] This test is applied in the context of Rule 13(a), which concerns counterclaims to
a plaintiff's complaint and not, as here, counterclaims-in-reply to a defendant's
27  counterclaims.  It is nevertheless clear that the Ninth Circuit has incorporated Rule 13(a)
by reference when analyzing counterclaims-in-reply.  *See Davis & Cox*, 751 F.2d at 1525.
28

4

*Jones v. Ford Motor Credit Co.*, 358 F.3d 205, 210-13 (2d Cir. 2004) ("Although the 'logical relationship' test does not require 'an absolute identity of factual backgrounds,' . . . the 'essential facts of the claims must be so logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit."). A logical relationship may exist even if the counterclaim's allegations need not be resolved in order to dispose of the underlying claim. *In re Marshall*, 600 F.3d 1037, 1058-59 (9th Cir. 2010) (holding that compulsory counterclaim did not need to "be resolved in order to determine" the underlying claim).

MGA's counterclaims in reply for violation of 18 U.S.C. § 1962(c), misappropriation of trade secrets, and wrongful injunction share a logical relationship with Mattel's expansive counterclaims, and are therefore compulsory.

First, both Mattel's RICO counterclaims and MGA's RICO counterclaim-in-reply arise out of the same nucleus of facts — *i.e.*, the parties' conduct in the context of *this* litigation. For example, Mattel alleges that "MGA [has] . . . withheld and destroyed critical evidence to avoid facing the consequences of their actions," which encompasses the alleged use of computer "wiping" software to effectuate spoliation, *see* FAAC ¶ 95, the "withhold[ing] [of] critical document[s] from these proceedings," *id.* ¶ 96, the "submission of false statements in this action," *id.*, and other misconduct related to Omni 808 Investors, LLC's alleged purchase of the Wachovia debt, *see id.* ¶¶ 118-121. MGA's RICO counterclaim-in-reply arises out of litigation-related conduct, including Mattel's alleged concealment of documents related to the "Bratz Brief" commissioned by Eckert, *see* Dkt. 8583 ¶¶ 35-36, the alleged spoliation of an Eckert email concerning the decline of Barbie sales, *id.*, and QE's suppression of evidence concerning Mattel's market intelligence group, *id.* ¶¶ 38-40 (alleging *inter alia* that Mattel failed to produce relevant documents). A fact-finder will consider identical evidence about the parties' discovery obligations, the scope of the lawsuit, and the reasonableness of each party's alleged withholding of relevant evidence. The claims are also logically related because MGA alleges that Mattel's discovery conduct spurred the imposition of a wrongful injunction after the phase 1 proceedings, while Mattel alleges that MGA's discovery conduct prevented the jury from finding that Larian knowingly infringed Mattel's copyrights. Both RICO claims in part "arise[] from the same

aggregate set of facts," *United States v. Bulson (In re Bulson)*, 117 B.R. 537, 541 (Bankr. 9th Cir. 1990), and "considerations of judicial economy and fairness" compel their resolution in a single proceeding, s*ee Pochiro*, 827 F.2d at 1249.

Second, Mattel's trade secret misappropriation counterclaim and MGA's trade secret misappropriation counterclaim-in-reply are logically related.  Mattel alleges that MGA directed defecting Mattel employees to misappropriate Mattel's trade secrets for MGA's benefit.  FAAC ¶¶ 124, 133-142.  MGA contends that the documents allegedly stolen by Mattel's former employees were documents that Mattel stole from its competitors, including MGA.  *Id.*  It is more than reasonable to conclude *at least* some of the trade secret information allegedly misappropriated by Machado and Brawer incorporated trade secret information obtained by Mattel's market intelligence group.  For example, MGA alleges, and Mattel at least acknowledges, that former Mattel employees Machado and Brawer not only had knowledge of the market intelligence group's activities, but may have received presentations prepared by the market intelligence group.  *See, e.g.*, Dkt. 8583 ¶ 14 (alleging that Machado was "one of the recipients" of presentations "assembled" by "Mattel thieves").  Mattel in turn alleges that Machado "stole virtually every document a competitor would need to enter the Mexican market [including] global internal future line lists[,] production and shipping costs[,] daily sales data[,] consumer data[,] sales [data,] marketing projections[,] . . . strategic research . . . and other similar materials."  FAAC ¶ 49.  Mattel's allegations concerning Brawer's theft of trade secrets can be read to encompass a similarly broad range of document-theft.  *See* FAAC ¶¶ 64-67 (alleging that Brawer accessed Mattel's "sensitive and confidential" information and that he "did not return that information [to Mattel] and used that information at MGA").[3]  While MGA does not expressly allege that Machado and/or Brawer brought market intelligence group information to MGA from Mattel, it would be impossible to make such an allegation without more discovery

---

[3] MGA also argues that its counterclaims in reply arise out of the same transaction or occurrence as its affirmative defense of unclean hands.  Courts are divided on the viability of MGA's argument.  *See Lockheed Martin Corp. v. RFI Supply, Inc.*, 2006 WL 1525719, at *8 (N.D. Cal. May 30, 2006) (comparing cases).

1  into the identity of the documents and information allegedly obtained from MGA's showrooms.

2      Third, MGA's counterclaim in reply for wrongful injunction and Mattel's RICO

3  counterclaims share a logical relationship.  Mattel's RICO counterclaims arise, in part, out of

4  MGA's failure to adequately comply with the post-phase 1 equitable relief.  A fact-finder asked

5  to evaluate the counterclaims will hear evidence about the scope and purpose of the post-phase 1

6  obligations imposed by the district court, as well as the reasonableness of MGA's efforts at

7  compliance with those obligations.

8      Mattel responds that the relationship between Mattel's counterclaims and MGA's

9  counterclaims in reply is "thematic," which it undoubtedly is, since Mattel and MGA accuse

10 each other of engaging in similar types of misconduct.  A "thematic" connection between claims

11 and counterclaims is insufficient, without more, to establish a logical relationship between the

12 two.  *Conceptus*, 2010 WL 1460162, at *1 (finding no logical relationship where parties

13 "accuse[d] [each] other of misrepresenting clinical data about each other's products").  Here,

14 however, the allegations central to Mattel's counterclaims and MGA's counterclaims in reply

15 share *both* a thematic *and* a logical relationship.  The two sets of claims arise out of a common

16 nucleus of facts — this litigation — and may be contingent, since the trade secrets allegedly

17 misappropriated by Machado and Brawer may have incorporated the trade secrets allegedly

18 misappropriated by members of Mattel's market intelligence group.

19     Mattel's expansive FAAC encompasses hundreds of economic and legal interactions

20 between MGA and Mattel over the last decade, including the "transaction" of this litigation.  The

21 allegations central to MGA's counterclaims in reply share a logical relationship with Mattel's

22 allegations.  Trying the two parties' claims in separate proceedings would duplicate the already

23 tremendous burden on judicial resources caused by this litigation, and prevent a fact-finder from

24 evaluating evidence arising out of a common factual background.  Under the Ninth Circuit's

25 standard, the Court finds that MGA's counterclaims in reply are compulsory.

26                     **B.    Leave to Amend**

27     Mattel argues that whether or not MGA's counterclaims in reply are compulsory, MGA

28 cannot bring the counterclaims in reply without first obtaining leave to amend its original

1    complaint.  MGA responds by moving for leave to amend.

2          A counterclaim in reply is not considered an "amendment to the complaint" since the

3    impetus for its filing is the filing of defendant's counterclaims.  *See Natomas Gardens Inv.*

4    *Group v. Sinadinos*, 2010 WL 1558961, at *3 (E.D. Cal. Apr. 19, 2010).  Indeed, *Conceptus*

5    distinguished permissive counterclaims in reply, which a party may not assert without "seek[ing]

6    leave to amend" its original complaint.  *Conceptus*, 2010 WL 1460162, at *1 (citing Wright &

7    Miller, Federal Practice and Procedure: Civil 3d § 1188).  Mattel cites a Northern District of

8    California case in which the court treated counterclaims in reply as amendments to the plaintiff's

9    original complaint, *even though* such counterclaims in reply were compulsory.  *Fujitsu Ltd. v.*

10   *Nanya Tech. Corp.*, 2007 WL 1660694 (N.D. Cal. June 6, 2007).  However, both *Fujitsu* and the

11   authority relied upon by *Fujitsu*, *Electroglas, Inc. v. Dynatex Corp.*, 473 F. Supp. 1167, 1171

12   (N.D. Cal. 1979), treated the proposed counterclaims in reply as amendments to the plaintiffs'

13   original complaints as a matter of administrative convenience.  *See id.*  Critically, neither case

14   denied leave to amend to the party asserting the counterclaims in reply.[4]

15         Nor must MGA seek leave to amend due to its failure to allege these counterclaims in

16   reply in its earlier responsive pleadings to Mattel's earlier amended answers and counterclaims.

17   Each of Mattel's amended pleadings superseded both its prior pleading and MGA's responsive

18   pleading.  *See Pac. Bell Telephone Co. v. Linkline Comm's, Inc.*, 129 S.Ct. 1109, 1123 n. 4

19   (2009).  Any affirmative defenses or counterclaims in reply asserted in MGA's prior responsive

20   pleadings were rendered without legal effect, and MGA was required to either re-assert these

21   affirmative defenses and counterclaims in reply or forfeit them.  *See Johnson v. Berry*, 228 F.

22   Supp. 2d 1071, 1079 (E.D. Mo. 2002); *Designing Health, Inc. v. Erasmus*, 2001 WL 36239751,

23   at *3 (C.D. Cal. April 23, 2001) (quoting and interpreting earlier holding that "counterclaims

24   brought in the answer to the [amended complaint] superceded counterclaims asserted in previous

25

26         [4] A narrow but presently inapplicable exception may apply where the
     counterclaims in reply respond to counterclaims that are themselves compulsory, because
27   they arise out of the same transaction or occurrence as the original complaint, which
28   remains operative at the time the counterclaims in reply are filed.

1  answers"); *Wagner v. Choice Home Lending*, 266 F.R.D. 354, 358 (D. Ariz. 2009) (similar);

2  *Bremer Bank, Nat. Ass'n v. John Hancock Life Ins. Co.*, 2009 WL 702009, at *12 (D. Minn.

3  2009) (citing *Berry* with approval); *General Mills, Inc. v. Kraft Foods Global, Inc.*, 495 F.3d

4  1378, 1380-81 (8th Cir. 2007); *but see Dunkin Donuts, Inc. v. Romanias*, 2002 WL 32955942, at

5  *2 (W.D. Pa. May 29, 2002).  Failure to assert compulsory counterclaims in reply would have

6  barred MGA by res judicata from bringing those claims in the future.  *Dragor Shipping Corp. v.*

7  *Union Tank Car Co.*, 378 F.2d 241, 245 (9th Cir. 1967); *see also* Fed. R. Civ. P. 13(a)

8  (compulsory counterclaims "must" be asserted).

9         The only court to address whether new counterclaims in reply may be asserted in

10  response to an amended pleading has held that leave of court is not required.  *See, e.g.*, *Bancroft*

11  *& Sons Co. v. M. Lowenstein & Sons, Inc.*, 50 F.R.D. 415, 418-19 (D. Del. 1970).  Courts have

12  likewise allowed the insertion of new affirmative defenses — as a matter of right — in a

13  responsive pleading.  *Massey v. Helman*, 196 F.3d 727, 735 (7th Cir. 1999) (recognizing that the

14  supersessive effect of an amended complaint "wipes away prior pleadings and opens the door for

15  defendants to raise new and previously unmentioned affirmative defenses") (citing *Harris v.*

16  *Secretary, U.S. Dep't of Veterans Affairs*, 126 F.3d 339, 343 n. 2 (D.C. Cir. 1997)); *see also*

17  *Diesel Props S.r.L. v. Greystone Business Credit II LLC*, 2008 WL 4833001, at *5 (S.D.N.Y.

18  Nov. 5, 2008) (citing *Plon Realty Corp. v. Travelers Ins. Co.*, 533 F. Supp. 2d 391 (S.D.N.Y.

19  2008) and *Sidari v. Orleans County*, 174 F.R.D. 275 (W.D.N.Y. 2008)).  Though some courts

20  have only allowed the insertion of new counterclaims or affirmative defenses if the amended

21  pleading changes the "scope or theory" of the case,[5] this equitable rule finds no place in the

22

23         [5] Some courts have allowed new counterclaims only when the amended pleading
24  changes the scope or theory of the case and the insertion of new counterclaims would not
   prejudice the other party.  *See, e.g.*, *Tralon Corp. v. Cedarapids, Inc.*, 966 F. Supp. 812,
25  832 (N.D. Iowa 1997) (quoting *Brown v. E.F. Hutton & Co., Inc.*, 610 F. Supp. 76, 78
   (S.D. Fla. 1985)); *see also Chrysler Corp. v. Fedders Corp.*, 540 F. Supp. 706, 713
26  (S.D.N.Y. 1982).  Others have similarly restricted the insertion of new affirmative
   defenses.  *See, e.g.*, *Kreidler v. Pixler*, 2009 WL 5295590 (W.D. Wash. Mar. 2, 2009);
27  *GSI Group, Inc. v. Sukup Mfg. Co.*, 2007 WL 757819 (C.D. Ill. Mar. 8, 2007); *E.E.O.C. v.*
   *Morgan Stanley & Co., Inc.*, 2111 F.R.D. 225 (S.D.N.Y. 2002); *Tensor Group, Inc. v.*
28

1  Federal Rules of Civil Procedure, and ignore the fact that amended pleadings completely

2  supersede their predecessor(s).  These courts focus on the unfairness of the responding party's

3  dilatory addition of new affirmative defenses, but disregard the fact that the party that sought

4  amendment (in this case Mattel) should have balanced the risks of amendment against the

5  benefits, which include the ability to perfect its pleading and add new claims of its own.

6       Even if leave to amend were required, it would be granted.  Rule 15 permits the liberal

7  amendment of pleadings.  *See State of Nebraska v. State of Wyoming*, 515 U.S. 1, 8, 115 S.Ct.

8  1933 (1995) (citing *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227 (1962)).  The court must

9  consider the following factors in determining whether to grant leave to amend: (1) prejudice;

10 (2) bad faith; (3) undue delay; and (4) futility.  *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d

11 604, 607 (9th Cir. 1992).  Mattel will suffer little prejudice through the addition of these

12 counterclaims in reply, which involve allegations that are relevant to MGA's existing unclean

13 hands defense, about which MGA has sought discovery for months.  Any remaining prejudice

14 can be minimized by a one month extension to the discovery cut off for the limited purpose of

15 conducting discovery into these claims.  MGA has shown neither bad faith nor undue delay in

16 filing these counterclaims in reply since (1) the wrongful injunction claim was triggered by the

17 Ninth Circuit's recent decision; and (2) recently produced evidence about the market intelligence

18 group gives rise to MGA's counterclaims in reply.  Finally, the futility of the counterclaims in

19 reply, or lack thereof, is addressed below.

20      MGA was not required to seek leave to amend before filing its counterclaims in reply

21 because (1) the counterclaims in reply are compulsory; and (2) Mattel's FAAC superceded

22 earlier pleadings, including MGA's earlier responsive pleadings.  Regardless, the facts support

23 granting leave to amend.

24           **C.    Motion to Dismiss and/or Strike Counterclaim in Reply for Wrongful**

25                 **Injunction**

26

27 _____

*Global Web Systems, Inc.*, 1999 WL 617618 (N.D. Ill. Aug. 11, 1999); *Fausset v.*

28 *Mortgage First, LLC*, 2010 WL 1212085 (N.D. Ind. Mar. 23, 2010).

1    Mattel moves to strike and/or dismiss MGA's wrongful injunction counterclaim in reply.
2    MGA alleges that "[a]t the behest of Mattel, on December 3, 2008, the Court entered a sweeping
3    set of equitable orders against MGA that had the effect of destroying all or a substantial part of
4    MGA's value in the Bratz brand."  Dkt. 8583 ¶ 319.  MGA seeks to recover from Mattel "the
5    damages caused by these wrongful equitable orders, and to have restored to it the benefits it lost
6    as a result of these wrongful equitable orders, and to have disgorged from Mattel the benefits it
7    received from these wrongful equitable orders."  *Id.* ¶ 321.

8    Mattel preliminarily argues that this claim must be brought in a separate action.  This
9    argument is partially obviated by the Court's earlier determination that the counterclaims in
10   reply, including the wrongful injunction counterclaim in reply, are compulsory.  In addition, at
11   least two cases cited by MGA show that a party may seek equitable relief from the issuance of a
12   wrongful injunction in the same suit in which the injunction was issued.  *See, e.g.*, *Nintendo of*
13   *Am., Inc. v. Lewis Galoob Toys, Inc.*, 16 F.3d 1032 (9th Cir. 1994); *Dornan v. Sheet Metal*
14   *Workers' Intern. Ass'n*, 810 F. Supp. 856 (E.D. Pa. 1992).  Although a wrongful injunction
15   claim may nevertheless be asserted in a separate action, *see, e.g.*, *Buddy Sys. Inc. v. Exer-Genie,*
16   *Inc.*, 545 F.2d 1164 (9th Cir. 1976); *Monolith Portland Midwest Co. v. RFC*, 128 F. Supp. 824
17   (S.D. Cal. 1955), "it is unlikely that a court that would permit a damage award in a separate
18   action would preclude the enjoining court from awarding those damages in the original action."
19   *Factors Etc., Inc. v. Pro Arts, Inc.*, 562 F. Supp. 304, 307 n. 2 (S.D.N.Y. 1983).

20   Mattel also argues that MGA lacks standing to bring its claim for wrongful injunction
21   because the prior district court stayed much of the injunctive relief entered on December 3,
22   2008.  On that date, the district court entered three equitable orders, all of which have since been
23   vacated by the Ninth Circuit's July 22, 2010 Order.  The first order entered "[a] constructive
24   trust in favor of Mattel on all rights to trademarks, service marks and domain names held by
25   MGA or Larian . . . anywhere in the world that include the terms 'Bratz' or 'Jade'."  Dkt. 4441
26   ¶ 1.  The second order entered a constructive trust in favor of Mattel over all works the phase 1
27   jury found to have been conceived or reduced to practice by Bryant at any time during his
28   employment with Mattel, including all copyright registrations MGA had obtained in and for such

1   works.  Dkt. 4442.  The third order entered a permanent injunction on the basis of the district
2   court's independent "fact-finding" concerning the scope of MGA's infringement of the Bratz
3   drawings and sculpts owned by Mattel.  *See* Docket 4443.  This order enjoined MGA from
4   manufacturing and/or selling dolls, products, packaging, and other copyrighted works depicted
5   in a number of exhibits identified by the order.  *Id.*

6        The three December 3, 2008 equitable orders were immediately stayed by the district
7   court.  Docket 4439 at 16.  The stay of the permanent injunction was narrowed by two
8   subsequent orders, which restricted MGA from manufacturing new lines of dolls but permitted
9   "retailers and distributors . . . to purchase the Spring and Fall 2009 lines of Bratz and Bratz-
10  related products from MGA and MGA licensees, up to and including December 31, 2009."  *See*
11  Docket 4657; Docket 5273.  MGA's profits from the sale of Bratz related products were held in
12  escrow by the Temporary Receiver, Patrick A. Fraioli, Jr.  *Id.*  On December 9, 2009, the Ninth
13  Circuit stayed all of the December 3, 2008 equitable relief, which was later vacated on July 22,
14  2010.  MGA's profits were returned to MGA on August 31, 2010.  Docket 8670.

15       A claim for wrongful injunction ordinarily seeks to recover the bond posted pursuant to
16  Rule 65(c) prior to the entry of a preliminary injunction.  *See Continuum Co., Inc. v. Incepts,*
17  *Inc.*, 873 F.2d 801, 803 (5th Cir. 1989).  No other damages are recoverable on a claim for
18  wrongful injunction, unless the enjoined party "can make out a case of malicious prosecution."
19  *See In re Ladner*, 799 F.2d 1023, 1025 (5th Cir. 1986); *see also W.R. Grace and Co. v. Local*
20  *Union 759*, 461 U.S. 757, 770 n. 14 (1983) ("A party injured by the issuance of an injunction
21  later determined to be erroneous has no action for damages in the absence of a bond."); *Factors*,
22  562 F. Supp. at 308 ("Absent a claim of malicious prosecution, damages for wrongful injunction
23  are limited to the amount of the bond.").[6]

24  _____

25       [6] MGA argues that these cases involved preliminary injunctions and not permanent
     injunctions.  That Rule 65(c) only requires the posting of a bond prior to the issuance of a
26   restraining order or preliminary injunction does not mean that a plaintiff who successfully
     obtains a permanent injunction should be subject to unbounded liability.  Courts limit
27   recovery to the amount of the bond because "the bond serves to inform the plaintiff of the
     price they can expect to pay if the injunction was wrongfully issued."  *Instant Air Freight*

1    Although precluded from recovering damages in the absence of a bond, a party subject to

2    a wrongful injunction may nevertheless be entitled to "equitable relief." *See Dornan v. Sheet*

3    *Metal Workers' Intern. Ass'n*, 810 F. Supp. 856, 858-59 (E.D. Mich. 1992).  This equitable relief

4    is limited to "'restitution' [from] a party who obtains benefits from an improperly issued

5    injunction [] that he would not have received but for the injunction." *Littell v. Morton*, 369 F.

6    Supp. 411, 419 (D. Md. 1974), *aff'd*, 519 F.2d 1399 (4th Cir. 1975).[7]  Such restitution is

7    typically limited to transfers of assets ordered by the wrongfully issued injunction.  *See*

8    *Middlewest Motor Freight Bureau v. United States*, 433 F.2d 212, 228 (8th Cir. 1970) ("[A]

9    party who obtains a benefit from an improperly issued injunction has the duty to restore that

10   benefit to those who have been injured by the injunction."), *cert. denied*, 402 U.S. 999, 91 S.Ct.

11   2169 (1971); *Arkadelphia Milling Co. v. St. Louis S.W. Ry. Co.*, 249 U.S. 134, 145-46, 39 S.Ct.

12   237 (1919); *see also Community Care Ctrs., Inc. v. Sullivan*, 701 N.E. 2d 1234, 1239-40 (Ind.

13   App. 1998) (applying federal precedent to conclude that a wrongfully enjoined party is entitled

14   to recover unjust enrichment).  The power to grant such equitable relief rests in the sound

15   discretion of the district court.  *See Public Service Comm'n of Missouri v. Brashear Freight*

16   *Lines, Inc.*, 312 U.S. 621, 629, 61 S.Ct. 784 (1941).

17       The district court's post-phase 1 equitable relief was stayed and therefore ineffectual

18   between December 3, 2008 and April 7, 2009, when only the stay of the permanent injunction

19   was partially lifted.  Between April 7, 2009 and December 9, 2009, when the Ninth Circuit

20   stayed the permanent injunction in its entirety, MGA was barred from manufacturing, marketing

21   and selling new lines of dolls, though it could continue selling its Spring and Fall 2009 lines.  It

22   is undisputed that the injunction did not mandate that MGA make any payments to Mattel or

23

24   *Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 804-05 (3d Cir. 1989).  The prior presiding
     judge neither required Mattel to post a bond nor otherwise put Mattel on notice of its
25   potential liability for MGA's damages suffered as a result of the permanent injunction.

26       [7] *Littell* involved facts inverse to this case.  There, the party that *obtained* an
     injunction that was vacated on appeal had performed services for the enjoined party while
27   the appeal was pending.  The district court awarded restitution *against* the previously
28   enjoined party.

1   deliver anything of value to Mattel (or anyone else) that has not since been returned to MGA.

2       MGA seeks to recover two categories of damages that are unavailable as a matter of law.

3   First, relying on *Nintendo*, MGA seeks to recover "lost profits based on lost sales" as a result of

4   the injunction.  Opp. at 25; *see also* Dkt. 8583 ¶ 321 (seeking recovery for "the damages caused

5   by these wrongful equitable orders [and] the benefits [MGA] lost as a result of these wrongful

6   equitable orders").  But *Nintendo* calculated damages suffered by the enjoined party in order to

7   determine the amount of the security bond to which the enjoined party was entitled.  *See* 16 F.3d

8   at 1035-36.  The prior district judge did not require Mattel to post a bond; thus, MGA is not

9   entitled to recover the damages it sustained as a result of the wrongfully imposed injunction.  *See*

10  *W.R. Grace and Co. v. Local Union 759*, 461 U.S. at 770 n. 14.

11      Second, MGA seeks to "disgorge[] from Mattel the benefits it received from these

12  wrongful equitable orders."  Dkt. 8583 ¶ 321; *see also* Opp. at 25 (seeking to recover from

13  Mattel the value it obtained from temporarily enjoying "a marketplace that it could exploit

14  without Bratz").  No injunctive order granted to Mattel a "marketplace . . . without Bratz."

15  According to MGA, that "benefit" was a collateral benefit of the mere specter of the injunctive

16  orders, since the mere entry of the injunctive relief "disincentivize[d] sales."  Opp. at 24.[8]  To

17  allow MGA to proceed on this attenuated causation theory would allow MGA to seek recovery

18  from *every other market participant*, including the many other toy manufacturers identified in

19  MGA's Reply to the FAAC.  *See* Dkt. 8583 ¶ 2 ("Bandai, B-Bel, Inc., Binney & Smith, Blue

20  Box, Cadaco, Ceaco, Chicco, Crayola, Creativity for Kids," et. al.).  All of these manufacturers

21  arguably benefitted from a "marketplace . . . without Bratz" after December 3, 2008.  Other

22  beneficiaries of the injunctive relief may include past and present shareholders of these

23  companies, the since-dismissed Omni 808 Investors, LLC ("Omni"), the entities MGA

24  contracted with to effectuate the Court-ordered recall, and Patrick J. Fraoili, Jr., who received

25  payment for his services as the Court-appointed arbiter of the post-trial equitable relief.

26      In response to the Court's concern about its expansive theory of liability on its wrongful

27  

28      [8] MGA argues that it was the "Court's design" to disincentivize sales.  Opp. at 24.

injunction claim, MGA requested leave to amend to further clarify the facts establishing causation between the wrongful injunction and Mattel's unjust enrichment.  None of the case law on this issue allows a wrongfully enjoined party to recover all "unjust enrichment" caused by the injunction.  Most of the cases instead limit recovery to amounts *compelled* to be transferred by the injunction itself.  *See, e.g.*, *Middlewest*, 433 F.2d at 219 (harm caused by higher rates sustained by wrongfully issued injunction); *Arkadelphia Milling*, 249 U.S. at 145 (restitution of excess charges sustained by wrongfully issued injunction).  A claim for wrongful injunction may seek the recovery of amounts ordered to be transferred by the injunction because "money paid on an erroneous judgment, afterwards reversed, is recoverable in an action for money had and received, against the person receiving it."  *Bank of United States v. Bank of Washington*, 31 U.S. 8, 13 (1832).  The Court looks no farther than the text of the wrongfully issued injunction, which did not compel the transfer of any money or property to Mattel that has not already been returned to MGA.  MGA cannot circumvent the text of the injunction by pleading additional facts and its proposed amendment would be futile.

The Motion is GRANTED as to MGA's wrongful injunction counterclaim in reply.[9]

## D.     RICO and Misappropriation of Trade Secret Counterclaims in Reply

Mattel also moves to dismiss MGA's counterclaims in reply for (1) violation of 18 U.S.C. § 1962(c); and (2) misappropriation of trade secrets.  Mattel argues that both counterclaims in reply are barred by the applicable statutes of limitations.

### 1.     Relation Back

The parties first dispute the applicability of the relation back doctrine.  A compulsory counterclaim relates back to the date of the complaint, though a permissive counterclaim does not.  *Employers Ins. of Wausau v. United States*, 764 F.2d 1572, 1576 (Fed. Cir. 1985); *see also Kirkpatrick v. Lenoir County Bd. of Educ.*, 216 F.3d 380, 388 (4th Cir. 2000) ("In this circuit, a

---

[9] Mattel's litigation privilege argument is moot and otherwise DENIED to the extent Mattel seeks to recover attorneys' fees from MGA.

1    compulsory counterclaim relates back to the time of the filing of the plaintiff's complaint.").[10]

2          MGA's compulsory RICO and trade secret misappropriation counterclaims in reply relate

3    back to the date of Mattel's FAAC, which, except for a few counterclaims, arises "out of the

4    conduct, transaction, or occurrence set out" in, and therefore relates back to, Mattel's first

5    Answer and Counterclaims.  *See* Fed. R. Civ. P. 15(c); *see also Eli Lilly and Co. v. Am.*

6    *Cyanamid Co.*, 2001 WL 30191, at *8-9 (S.D. Ind. Jan. 8, 2001) ("Because the new facts alleged

7    in [defendant's] amended counterclaim merely expand upon and add detail to the allegations in

8    the original counterclaim, the amended counterclaim relates back to the original").

9                          **2.      Trade Secret Misappropriation: Statute of Limitations**

10         MGA's first counterclaim in reply alleges that Mattel "illegally obtained" MGA's trade

11   secret materials, which include "documents, photographs, catalogs, and other information . . .

12   related to MGA's products."  Dkt. 8583 ¶¶ 305, 308.  In California, a claim for trade secret

13   misappropriation "must be brought within three years after the misappropriation is discovered or

14   by the exercise of reasonable diligence should have been discovered."  Cal. Civ. Code § 3426.6.

15         MGA argues that Mattel's market intelligence group commenced its alleged activities in

16   "at least" 1992, by sneaking into competitors' showrooms. Dkt. ¶ 77.  The allegation leaves

17   unclear whether Mattel's alleged misappropriation of *MGA*'s trade secrets commenced in 1992,

18   or on some later date.  *See id.*  It is more than reasonable to infer, especially at the pleadings

19   stage, that Mattel's alleged intrusion into MGA's toy showrooms did not occur until "1999 or

20   early 2000," when "MGA decided to compete directly with Mattel by launching a fashion doll

21   line."  FAAC ¶ 23; *see also* Dkt. 8583 ¶ 83 (limiting denial of paragraph 23 of FAAC to its

22   definition of "Mattel").

23         Mattel's alleged misappropriation of MGA's trade secrets nevertheless occurred at least

24

25

26   _____

         [10] The Ninth Circuit has not addressed the issue in a published decision, but
     *Religious Tech. Ctr. v. Scott*, 82 F.3d 423 (9th Cir. 1996), an unpublished decision,
     incorporated the Federal Circuit's standard.  Thus, *Katherine G. ex rel. Cynthia G. v.*
27   *Kentfield School Dist.*, 261 F. Supp. 2d 1159 (N.D. Cal. 2003), which relied on the
     absence of a Ninth Circuit "analogue," does not compel a contrary outcome.

28

1    prior to 2005, since Machado, who was hired away from Mattel's Mexican subsidiary by MGAE
2    de Mexico ("MGA Mexico") on or about April 19, 2005, was allegedly "one of the recipients of
3    such presentations," which included "page after page of unauthorized reproductions of photos
4    and catalog pages depicting the competitor products." Dkt. 8583 ¶ 14.  Ron Brawer, who
5    likewise left Mattel for MGA on October 1, 2004, was allegedly "aware of the practices" of
6    Mattel's market intelligence group.  *Id.* ¶ 20.  Mattel argues that the knowledge possessed by
7    Brawer and Machado is imputed to MGA as a matter of law.  MGA disagrees and, in addition,
8    argues that since its "counterclaims-in-reply . . . relate back to the filing of Mattel's complaint
9    [which was filed on] January 2007," its claims fall within "the three year statute of limitations."
10   Opp. at 27.

11           The statute of limitations on a claim for trade secret misappropriation does not run with
12   each act of misappropriation, but begins to run "at the time the defendant makes its first adverse
13   use of the trade secret in violation of the alleged confidential relationship."  *Security People, Inc.*
14   *v. Medeco Security Locks, Inc.*, 59 F. Supp. 2d 1040, 1043 (N.D. Cal. 1999) (citing *Monolith*
15   *Portland Midwest Co. v. Kaiser Aluminum & Chem. Corp.*, 407 F.2d 288, 292-93 (9th Cir.
16   1969)); *see also Cypress Semiconductor Corp. v. Superior Court*, 163 Cal. App. 4th 575, 582
17   (2008) (noting that CUTSA adopted the theory that "a continuing misappropriation constitutes a
18   single claim").  The focus is on when the confidential relationship is breached. *See Glue-Fold,*
19   *Inc. v. Slautterback Corp.*, 82 Cal. App. 4th 1018, 1024-25 (2000) (rejecting theory that two
20   different "periods of misappropriation" by the same party each trigger a separate statute of
21   limitations).

22           The statute of limitations for MGA's counterclaim in reply was triggered the first time
23   MGA discovered or should have discovered Mattel's alleged misappropriation of trade secret
24   materials from MGA's showrooms.  Mattel argues that MGA knew of the conduct at the time it
25   hired Machado and Brawer, because an employee's knowledge is imputed to the employer.
26   However, both individuals came to MGA less than three years before the January 12, 2007 filing
27   of Mattel's Answer and Counterclaims, which is the pleading to which the FAAC and MGA's
28

1  counterclaims in reply relate back.[11]  Mattel's statute of limitations argument is unpersuasive.

2                    **3.      RICO: Statute of Limitations**

3          MGA's second counterclaim in reply alleges that Mattel is "associated-in-fact [] with []

4  the Mattel Racketeering Enterprise, which has conducted its affairs through a pattern of

5  racketeering activity."  Dkt. 8583 ¶ 314.  Construing the allegation in the light most favorable to

6  MGA, *see Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), the Court reads MGA's counterclaim in

7  reply to allege that (1) Mattel was employed by or associated with an enterprise; and (2) Mattel

8  conducted the affairs of the enterprise through a pattern of racketeering activity.  The alleged

9  "pattern" was marked by Mattel's violations of 18 U.S.C. §§ 1343, 1503, 1512, 1952, 2319, and

10  17 U.S.C. § 506(a)(1)(A).  Dkt. 8583 ¶ 314.  MGA alleges that Mattel's violation of 18 U.S.C.

11  § 1962(c) caused injury to MGA's business or property because the alleged "concealment of

12  evidence" about the market intelligence group "result[ed] in a wrongful injunction in this action"

13  by preventing the prior presiding judge from "be[ing] scandalized by such evidence" and

14  "fe[eling] differently about entering sweeping injunctive relief."  *See id.* ¶¶ 60, 317.

15         Mattel challenges these allegations on statute of limitations grounds, and with the narrow

16  argument that Brawer and Machado's admitted knowledge about the market intelligence group

17  should be imputed to MGA.  These arguments are unavailing for the reasons discussed above.

18  The RICO counterclaim in reply relates back to Mattel's original Answer and Counterclaims,

19  which was filed less than four years[12] after Machado and Brawer defected to MGA Mexico and

20  MGA.

21                    **E.      Motion to Strike Paragraphs 41, 46, 47**

22  _____

23         [11] The Court need not resolve the parties' dispute about whether an employee's
24  knowledge is always imputed to the employer.  At least one case has recognized that this
     rule is not without its exceptions.  *See Santillan v. Roman Catholic Bishop of Fresno*, 163
25  Cal. App. 4th 4, 10 (2008).

26         [12] As Mattel recognizes, "the statute of limitations for a RICO claim accrues when
27  the plaintiff knew or should have known of the injury that formed the basis for the cause
     of action, not from the date of the last alleged predicate act."  *See* Mot. at 31 (citing
28  *Grimmett v. Brown*, 75 F.3d 506, 512 (9th Cir. 1996)).

Mattel moves to strike paragraphs 41, 46, and 47 of MGA's counterclaims in reply, which seek to explain Mattel's alleged concealment of evidence:

41.   Instead, Mattel and its attorneys embarked on a brilliant strategy to ensure that its long term scheme to defraud either would never see the light of day, or when it did, the impact would be severely diminished.  The cornerstone of that strategy was the filing of Mattel's counterclaims in this action.

46.   In fact, it was not until November of 2006—in some cases nearly three years after these employees had left and allegedly taken with them Mattel trade secrets—that Mattel finally filed its trade secret misappropriation and RICO claims.  No new evidence had been uncovered in late 2006 to strengthen those claims.  In fact, the passage of time had weakened Mattel's claims as the information became stale.  Nothing had happened in the marketplace to signal to Mattel that any information was being used by MGA, thus necessitating action where none had been taken before.  No new evidence had just been uncovered to establish MGA or Larian's involvement in the removal of any information by these employees.  Instead, the counterclaims were motivated by the deterioration of the Villasenor situation.

47.   It was a concededly brilliant strategy.  Mattel and its lawyers figured out exactly what Mattel could be accused of based on Mattel's own criminal conduct, then turned those claims on MGA, while at the same time concealing all evidence of Mattel's wrongdoing.  This strategy had many benefits.  If MGA took legal positions attacking the claims, or got them

1                     dismissed, then those arguments could be turned against

2                     MGA if and when it ever found out about Mattel's conduct.

3                     If the claims succeeded to taint MGA, then once Mattel's

4                     conduct came out, the impact would be substantially

5                     diminished.  The claims were so vast that Mattel was able to

6                     distract and tie-up the much smaller MGA in litigation for

7                     years.  Mattel succeeded beyond its wildest dreams in

8                     pursuing this strategy.  Mattel successfully concealed the

9                     evidence of its own criminal conduct for years, all the while

10                    claiming that MGA was evil incarnate.

11  *See* Dkt. 8583 ¶¶ 41, 46, 47.

12      "A pleading that states a claim for relief must contain a short and plain statement of the

13  claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a).  Irrelevant

14  inflammatory language has no place in a pleading.  *C.f. Harnden v. Cal.*, 2010 WL 3489379, at

15  *1 (N.D. Cal. Sept. 2, 2010) (discussing dismissal of complaint containing allegations that "a

16  former judge of this court is both a 'liar' and an 'anarchist.'").  Nor should a pleading contain

17  idle screeds, such as this one, untethered from the claims in the pleading.  *See Molus v. Swan*,

18  2007 WL 2326132, at *5 (S.D. Cal. Aug. 13, 2007) (discussing earlier dismissal of "19 rambling

19  long-winded, introductory pages").  Such material "may properly be stricken from the

20  [pleading]."  *See Everage v. Ford Motor Co.*, 2005 WL 1176095, at *2 (E.D. Ky. May 12, 2005)

21  (citing Fed. R. Civ. P. 12(f)).  MGA claims that these allegations "support [its] RICO claims

22  [sic]" but, in fact, the allegations have nothing to do with the viability of its RICO claim, which

23  rests on Mattel's alleged commission of a pattern of racketeering activity and not the "many

24  benefits" to Mattel of its "concededly brilliant strategy."

25      Even if the allegations were somehow relevant to MGA's RICO counterclaim in reply,

26  the *Noerr-Pennington* doctrine protects Mattel from liability for the "filing of its counterclaims

27  in this action," *see* Dkt. 8583 ¶ 41, for which MGA seeks to hold Mattel accountable.  *See*

28  *Empress LLC v. City and County of S.F.*, 419 F.3d 1052, 1056 (9th Cir. 2005) ("Under the

*Noerr-Pennington* doctrine, those who petition any department of the government for redress are generally immune from liability.") (citing *Manistee Town Ctr. v. City of Glendale*, 227 F.3d 1090, 1092 (9th Cir. 2000)); *see also White v. Lee*, 227 F.3d 1214, 1231 (9th Cir. 2000) ("The *Noerr-Pennington* doctrine ensures that those who petition the government for redress of their grievances remain immune from liability for statutory violations, notwithstanding the fact that their activity might otherwise be proscribed by the statute involved.").

Paragraphs 41, 46, and 47 of MGA's responsive pleading contain rhetoric that not only runs afoul of Rule 8(a) but is also irrelevant to Mattel's liability. Mattel's motion to strike these paragraphs is therefore GRANTED.

**IV.    Disposition**

For the foregoing reasons, the Court ORDERS as follows:

1.    MGA's Third Counterclaim in Reply is DISMISSED WITH PREJUDICE.

2.    Paragraphs 41, 46, 47 of Docket 8583 are STRICKEN.

3.    The Motion is DENIED as to MGA's First and Second Counterclaims in Reply.

4.    MGA's Cross-Motion for Leave to Amend is STRICKEN AS MOOT.

The Discovery cut-off is extended to November 1, 2010 for the limited purpose of allowing discovery on MGA's counterclaims in reply. The parties may move for summary judgment on the counterclaims in reply on or before November 15, 2010, with further briefing schedules to be set by the Court.

Mattel shall file a pleading in response to MGA's counterclaims in reply within seven (7) days of the filing of this Order.

IT IS SO ORDERED.

DATED: October 5, 2010

_____
DAVID O. CARTER
United States District Judge