**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Case No. CV 04-9049 DOC (RNBx)                                               Date: October 21, 2010

Title: MATTEL, INC. v. MGA ENTERTAINMENT, INC.

PRESENT:

THE HONORABLE DAVID O. CARTER, JUDGE

| Kathy Peterson | Not Present |
|---|---|
| Courtroom Clerk | Court Reporter |

ATTORNEYS PRESENT FOR PLAINTIFFS:   ATTORNEYS PRESENT FOR DEFENDANTS:

NONE PRESENT                                                                   NONE PRESENT

PROCEEDING (IN CHAMBERS): ORDER ON PENDING DISCOVERY DISPUTES

      This Order disposes of a number of pending discovery disputes that have arisen since the Court's Order on the parties' Omnibus Discovery Motions.

**I.      Mattel, Inc.'s Response to the Court's October 7, 2010 Order to Show Cause**

      On October 7, 2010, the Court ordered Mattel to show cause as to why certain documents withheld by Mattel enjoyed the protections of the attorney-client privilege and/or work product doctrine. The Court has reviewed Mattel's response, in which Mattel informs the Court that a number of the documents identified in the Court's Order have already been produced pursuant to separate orders by the Discovery Master. Mattel nevertheless argues that the privilege applies to the remaining documents identified by the Court's Order. Indeed, counter-defendants had previously challenged the privilege designation as to all but one of these documents, and the Discovery Master and/or the Court had upheld Mattel's invocation of the privilege. On the basis of these prior rulings, as well as Mattel's arguments in support of its invocation of the privilege, the Court DISCHARGES the Order as to the documents identified in paragraphs 1, 3, 4, 5, 6 and 7 of the Order.

      But the Court remains unsatisfied with Mattel's response to the Court's Order with regard to the document identified in paragraph 2 of the Court's Order: "[t]he first email in the email chain found between 02-299 Priv. 0019 and 02-299 Priv. 0020 in ''Mattel Investigation Case #02-299'.'' Mattel claims that this potentially unprivileged document was "forwarded by a subsequent, privileged

email, rendering the entire chain privileged." Dkt. 8937 at 2. This rule has, as Mattel notes, been used by the Discovery Master to sustain MGA's designation of a number of email chains as privileged, and the Court has overruled Mattel's objections to these Discovery Master rulings.

However, the Court has still expressly recognized that an independent duty exists to produce any computer-generated file that contains *only* the unprivileged email communication. As explained by MGA's counsel at the first hearing on Mattel's objections to Discovery Matter Order No. 90, a user's computer generates an independent file for each email communication, such that there are n+1 distinct files that contain an email communication forwarded n number of times. Any file that only contains the email communication discussed in paragraph 2 of the Court's Order cannot be withheld as privileged, since Mattel has failed to shoulder its burden of showing that the communication is protected by the privilege. Accordingly, Mattel is ORDERED to produce all not-yet-produced documents that contain only the first email communication found between 02-299 Priv. 0019 and 02-299 Priv. 0020 in "Mattel Investigation Case #02-299" within five days of the filing of this Order.

II. **Mattel's Motion to Compel Discovery in Response to Mattel's Requests for Discovery Concerning MGA's Reply Counterclaims [Docket 8775]**

Mattel filed the instant Motion on September 24, 2010. On October 9, 2010, the parties entered into a stipulation that resolved a vast majority of the issues raised by Mattel's September 24 Motion. The Stipulation requests that the Court rule on the remaining issues, which concern Mattel's 16th through 26th Requests for Admission and Mattel's Interrogatories.

According to Mattel, **Requests for Admission 16 through 26** "focus on [] what Mr. Villasenor told Mr. Brawer and when" and therefore seek discovery relevant to "MGA's express allegations [as well as] Mattel's statute of limitations and laches defenses." It appears that Mattel's summary of the eleven RFAs is slightly overbroad, albeit to Mattel's benefit, since RFAs 23 and 24 concern *MGA*'s knowledge, whether or not informed by Brawer, about the alleged activities of Mattel's market intelligence group. Nevertheless, MGA's only objection to these RFAs is that "MGA lacks the requisite knowledge with respect to those requests directed to information outside the scope of Mr. Brawer's job responsibilities while at MGA."

Even if MGA could claim lack of knowledge, such lack of knowledge should be asserted *and explained with detail* in an actual response to the RFAs. *See* Fed. R. Civ. P. 36(a)(4) ("The answering party may assert lack of knowledge or information as a reason for failing to admit or deny only if the party states that it has made reasonable inquiry and that the information it knows or can readily obtain is insufficient to enable it to admit or deny."). MGA's sweeping claim of lack of knowledge about any and all communications between Villasenor and Brawer is unsubstantiated, at least in MGA's Opposition to the Motion to Compel. MGA's actual response to the RFAs, attached as Exhibit 3 to the Mingrone Declaration, shows that MGA "objected" to the RFAs, which is improper since (1) lack of knowledge doesn't form the basis for an objection, *see id.*, and (2) MGA failed to state

that it made reasonable inquiry and could not obtain sufficient information to provide a substantive response.

In any event, MGA is simply incorrect that it need not investigate information obtained by its employees prior to their term of employment. A far more rigorous inquiry must ordinarily precede a party's denial on the basis of lack of knowledge. *C.f. Morreale v. Willcox & Gibbs DN, Inc.*, 1991 WL 107441, at *1 (S.D.N.Y. June 7, 1991) (lifting burden of responding to RFAs only after corporation unsuccessfully contacted a non-party in an attempt to obtain information about the non-party's activities). Here, there is no reason why MGA cannot minimally request from Brawer, an MGA employee, information about conversations he had prior to coming to MGA. If Brawer refuses to respond, like the third-party in *Morreale*, then MGA can predicate its eventual denial of the subject RFAs on Brawer's unwillingness to respond. The Court expresses no opinion on the propriety of such response, except to note that MGA's response to Interrogatory No. 3 suggests that MGA indeed has information about Brawer's prior knowledge of the market intelligence group's activities. *See* Mingrone Decl., Ex. 2 p. 114 ("Other former senior executives who have been willing to admit that they were aware . . . are . . . Ron Brawer.").

Mattel's Motion is GRANTED as to RFAs 16 through 26, to which MGA shall submit a response within seven (7) days of the filing of this Order.

The parties dispute whether MGA's responses to **Interrogatory Nos. 1-20** are sufficient. The interrogatories probe MGA's counterclaims-in-reply and encompass the following categories of information: (1) all MGA trade secrets allegedly stolen by Mattel's market intelligence group, including the basis for MGA's knowledge of the alleged theft of such trade secrets; (2) the value of the trade secrets allegedly stolen by Mattel's market intelligence group, including injury suffered by MGA and benefits obtained by Mattel as a result of the alleged misappropriation of the same; (3) other individuals to whom such alleged trade secrets were disclosed; (4) secrecy, and efforts to maintain secrecy, of the alleged trade secrets; (5) the basis for MGA's claim that Mattel suborned favorable testimony from Vargas during Vargas' deposition; (6) the basis for MGA's claim that Mattel "criminally infringed" MGA's copyrights in the material distributed at its trade shows; (7) the basis for MGA's claim that Mattel concealed the alleged wrongdoing by its market intelligence group; and (8) the factual basis for MGA's RICO counterclaim in reply.

It is first worth addressing MGA's unwillingness to respond to Interrogatory Nos. 5 and 8, which MGA claims are "overbroad and burdensome." Even if the interrogatories were burdensome, MGA would not be absolved of its duty under the Federal Rules to faithfully respond to the interrogatory to the extent relevant information is in its possession. Moreover, the interrogatories are not burdensome, though they may be overbroad and capable of easy narrowing:

Interrogatory No. 5 reads as follows: "For each trade secret that YOU contend that MATTEL misappropriated from YOU, IDENTIFY all PERSONS outside of MGA . . . to whom it was

disclosed by YOU or who otherwise obtained access to it, and when the disclosure or initial access occurred." MGA responds that it would be a "massive undertaking" to "assemble a list of all [] persons or entities" to whom "MGA disclosed images or samples of its unreleased products since 1999." But the necessity for such discovery arises out of MGA's pleading, which alleges that Mattel's market intelligence group misappropriated information available at MGA's toy fairs. The extent to which such information was already disclosed is directly relevant to MGA's efforts to maintain the secrecy of this information. For example, MGA argues that "[t]he retailers are invited to showrooms to see products and are expected not to disclose this information." If MGA merely "expected," but did not require, retailers to keep its information private, but nevertheless disclosed the information to thousands (and not dozens) of retailers, that would be relevant to whether it took reasonable efforts to maintain the secrecy of its trade secret information, since it would be unable to monitor the thousands of retailers that entered its showrooms. The identity of the individuals and entities to whom the alleged trade secrets were disclosed is also relevant, since, for example, disclosure to a "member[] of the press" would suggest that MGA reasonably expected its information to become public. Nevertheless, to the extent the Interrogatory encompasses the disclosure of information about unreleased products (which it does), it should be temporally limited to the **period of time prior to the product's release**. Mattel's Motion is GRANTED as to Interrogatory No. 5 as modified herein.[1]

Interrogatory No. 8 reads as follows: "For each trade secret that YOU contend that MATTEL misappropriated from YOU, state, with particularity, any and all costs incurred by YOU to create each trade secret." MGA argues that it would be a massive undertaking to "cull through" documents describing the costs incurred to create unreleased products. But MGA does not allege that Mattel stole unreleased products — it alleges that Mattel stole sales pitches made to retailers about unreleased products, and the costs of the uniform packets distributed to retailers at MGA's trade shows should be easy to calculate. Finally, MGA's claim that this information is better suited for discovery through expert testimony and expert reports is unsubstantiated: unlike other instances in which the Court has relieved MGA of its burden of performing such calculations, MGA has notably failed to argue that it does not keep records of the requested information in the ordinary course of its business. The Motion is GRANTED as to Interrogatory No. 8.

MGA has also failed to adequately respond to some, though not all, of Mattel's interrogatories:

Interrogatory No. 1 requests that MGA identify the trade secrets allegedly stolen from its

---

[1] MGA argues that "MGA is lacking a witness available so the very same issue in the 30(b)(6) deposition or MGA's new claims and this request is more suitable for this mechanism." MGA offers no explanation for why a deposition is a more suitable mechanism, and the nature of the interrogatory suggests the contrary. Moreover, MGA's argument is internally contradictory, since MGA admits that it "lack[s] a witness" that can testify about the topic.

showrooms. MGA's response identifies a 114 item long product list and claims that information about those products is "described, embodied and/or duplicated" within 15 reports, presentations, or other documents that Mattel's market intelligence group created and/or accessed. Those documents have been produced by Mattel. MGA should identify, with specificity, where in each of the 15 documents each of the 114 products at issue is referenced. In order to ensure compliance with this requirement, the Court ORDERS that MGA file with the Court its supplemental response to Interrogatory No. 1. MGA shall perform the same task with respect to Interrogatory No. 2, which requests such specificity from MGA.

Interrogatory No. 4 requests that MGA explain the basis for its claim that the material allegedly stolen from its showrooms "has independent value from not being generally known to the public." MGA responded that it was "still investigating this topic," but MGA is not absolved of its duty to respond to the interrogatory with the information available, notwithstanding the fact that further investigation may reveal more information responsive to the interrogatory. To the extent that MGA currently has *no* basis on which to conclude that the materials had independent value, its allegation to that effect in the counterclaims in reply would have been made in violation of Fed. R. Civ. P. 11. The Motion is GRANTED as to Interrogatory No. 4.

Interrogatory No. 12 seeks information about MGA's practices or policies to limit access to its showrooms. MGA objects to the request as "unduly burdensome," but the burden posed by the request is not undue, since the extent to which MGA's showrooms were readily accessible to members of the public is directly relevant to MGA's attempts to maintain the secrecy of the alleged trade secret materials. The Motion is GRANTED as to Interrogatory No. 12.

Interrogatory No. 19 seeks the basis for MGA's belief that it has suffered injury as a result of the alleged conduct of Mattel's market intelligence group. MGA objected to the request as "premature damages discovery," which it is not, since the interrogatory does not ask MGA to substantiate its claimed damages. Mattel only asks MGA to identify the basis of its belief that it suffered damages, which is relevant to, *inter alia*, whether MGA suffered a harm recoverable under 18 U.S.C. § 1964(c). Even if this interrogatory did constitute "damages discovery," such discovery is clearly not premature, since both sides have been engaged in probing into the other's claimed damages for months. Finally, MGA's incorporation of its responses to the other interrogatories is insufficient, since none of those interrogatory responses identify the basis for MGA's belief that it suffered injury. The Motion is GRANTED as to Interrogatory No. 19.

Interrogatory No. 20 is comprehensive, since it asks MGA to supply the factual basis for its RICO counterclaim in reply. Since this Order requires MGA to supplement its responses to the other interrogatory requests, the Court concludes that MGA's supplemental responses will likely cure the insufficiency of its response to this interrogatory. The Motion is DENIED as to Interrogatory No. 20 WITHOUT PREJUDICE to Mattel's ability to later move to compel a response to the interrogatory after receiving MGA's supplemental responses.

The Motion is DENIED as to the remaining interrogatories.

MGA shall serve Mattel with a copy of its supplemental responses on or before October 25, 2010. MGA shall also file a copy of its supplemental responses with the Court.

### III. MGA Parties' Motion for an Order Finding Waiver of Privilege With Respect to Materials Relevant to MGA's Statute of Limitations Defense and Compelling Production; Mattel's ex parte Application to Strike.

MGA requests that the Court find that Mattel has waived the privilege as to attorney client communications that concern Mattel's prior knowledge, by way of investigation or otherwise, of Bryant's alleged connection to the Bratz line of dolls. MGA argues that such discovery is relevant to its statute of limitations defense, since it may show that Mattel knew or should have known of its ability to bring a claim for ownership over the Bratz line at a time prior to November 2003, when Mattel contends it first obtained such information and the statute of limitations began to run.

Mattel applies *ex parte* to strike MGA's Motion as untimely, since it was filed well after the October 4, 2010 discovery cut off. MGA responds that its Motion is not a "Motion to Compel," but that argument is directly refuted by the title of the Motion. MGA also implies that it could not have brought this Motion earlier, in light of the fact that Mattel only put fraudulent concealment at issue in its summary judgment motion, but that is also false, since Mattel has long raised fraudulent concealment — indeed, it was one of the issues tried to the phase 1 jury. Finally, MGA's suggestion that the recently discovered activities of Mattel's market intelligence group give rise to this Motion is wrong because (1) the motion has nothing to do with the market intelligence group's conduct; and (2) MGA *admits in the Motion itself* that the events that give rise to the Motion — *i.e.*, Mattel's alleged waiver of the attorney-client privilege — occurred months and years ago. Mattel's *ex parte* Application to strike is GRANTED and MGA's Motion is STRICKEN AS UNTIMELY.

Even if the Motion were not stricken, MGA would not prevail. MGA claims that Mattel has put privileged communications at issue by repeatedly testifying that it lacked knowledge prior to 2003 that Bryant had conceived and created the Bratz drawings and idea while employed by Mattel. Attorney-client communications that discuss Mattel's knowledge are obviously relevant to Mattel's argument, but as MGA has successfully argued before, "[r]elevance is not the standard for determining whether or not evidence should be protected from disclosure." *Rhone-Poulenc Rorer Inc. v. Home Indemnity Co.*, 32 F.3d 851, 864 (3d Cir. 1994).[2]

---

[2] MGA cites a number of district court opinions for the proposition that a fraudulent concealment allegation waives the attorney-client privilege. These courts appear to have simply found waiver on the impermissible basis that it would be fair to allow discovery into the attorney-client communications. *See, e.g.*, *Bohack Corp. v. Iowa Beef Processors, Inc.*, 1981 WL 2018, at *2 (E.D.N.Y. Jan. 13, 1981) (holding that a

### IV. MGA Parties' Expedited Motion to Allow Service of Deposition Subpoena Via Electronic Mail and/or Post Office Box Address

MGA seeks leave to serve former Mattel employee Michelle McShane a/k/a Shelly Liebovitz with a deposition subpoena by electronic mail and/or by letter mailed to a Post Office box registered in McShane's name at a United Parcel Service store located at 5842 Wilshire Boulevard, #399 in Los Angeles, California. Though the Motion does not itself explain the relevance of McShane's deposition testimony, MGA's papers submitted in connection with its motion for a finding of waiver suggest that McShane possesses relevant information about *when* and *how* Mattel came to learn that Bryant may have created and developed Bratz while employed by Mattel. In its reply brief in support of the instant Motion, MGA also argues that McShane possesses information relevant to "MGA's compulsory counterclaims [sic] relating to Mattel's scheme to conceal relevant evidence."

The Motion is moot because Ms. McShane's deposition would (1) contravene the October 4, 2010 fact discovery cut off; and (2) contravene this Court's prior deposition limits, as clarified and partially amended by Discovery Matter Order No. 99. MGA seeks to depose McShane in connection with its statute of limitations defense to Mattel's counterclaims. Such discovery would run afoul of the October 4, 2010 discovery cut off.

MGA nevertheless argues that McShane may testify about facts not previously disclosed by Mattel, and that evidence of such prior non-disclosure may establish Mattel's "scheme to conceal relevant evidence," the existence of which MGA alleges in its RICO counterclaim in reply. This pretextual attempt by MGA to re-characterize discovery about its statute of limitations defense as "counterclaims in reply" discovery is unconvincing for two reasons. First, if deposition testimony about Mattel's prior knowledge is relevant to MGA's "concealment of evidence" allegation, then fact discovery would need to be reopened in full, since Mattel has raised the affirmative defense of unclean hands. Under MGA's expansive theory, discovery should be permitted into every fact relevant to every claim — past or present — so that both parties can go on fishing expeditions to identify information not previously obtained during discovery. Second, if the purpose of the deposition is to obtain discovery into MGA's concealment of evidence allegation, there are a number of less burdensome ways to obtain this discovery, not the least of which is deposing Mattel's corporate designee, which MGA has already done. Though MGA no doubt considers McShane's testimony important, it has had years to obtain that testimony and only now, on the eve of trial and after the filing of summary judgment motions, does it seek the Court's leave to do so. Any deposition of McShane would be untimely, burdensome, and unduly disruptive to the Court's consideration of the voluminous dispositive motions, which raise the

---

party "may not take advantage of fraudulent concealment . . . and at the same time preclude its adversary's discovery of the very evidence which pertains to the application of the doctrine"). The Court has previously rejected "fairness" and "relevance" as a grounds on which to discover protected material. *See, e.g.*, Order Sustaining Objections to Discovery Matter Order No. 90.

*very issues* about which MGA seeks to depose McShane.  Since the deposition would not be allowed, the Court need not consider whether MGA's request for alternative service is proper.

>The Motion is STRICKEN.

V. **Mattel's Objections to the Discovery Master's Privilege Rulings During the September 26, 2010 Deposition of Ron Brawer**

This dispute is new in name, but not in content.  Throughout the last twelve months of discovery, the parties have found themselves on both sides of a difficult issue: must the subject matter of an attorney-client communication be disclosed and, if the fact of the attorney client communication is itself relevant, does the doctrine of waiver apply?

Mattel argues that the Discovery Master's rulings during Sal Villasenor's recent deposition contradicted the Discovery Master's earlier ruling during Ron Brawer's recent deposition.  In the Villasenor deposition, the Discovery Master allowed MGA to inquire into the subject matter of a discussion Villasenor had with Mattel's counsel.  The Discovery Master held that such inquiry was proper in order to determine whether the attorney-client communication was, in fact, privileged.  However, during Ron Brawer's deposition, the Discovery Master restricted Mattel from inquiring into the subject matter of Brawer's conversation with MGA's counsel.  Mattel objects.

Mattel first argues that the subject matter of an attorney-client communication does not enjoy the protections of the privilege.  In support of this argument, Mattel notes that Rule 26(b)(5) requires a party to "describe the nature of [] documents, communications, or tangible things not produced or disclosed . . . in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim."  Fed. R. Civ. P. 26(b)(5).  But the Rule's text offers little guidance into what information constitutes "privileged or protected" information, including in relevant part, the "subject matter" of a communication.  The common law offers little assistance, since most courts have summarily required the disclosure of a withheld communication's "subject matter" without grappling with (1) how to define the "subject matter" of a privileged communication; and (2) whether the "subject matter" is itself privileged.  *See, e.g.*, *Southern California Hous. Rights Ctr v. Los Feliz Towers Homeowners Ass'n*, 2005 WL 3954720, at *4 (C.D. Cal. Apr. 25, 2005).

Since the privilege is a creation of common law, it is worth revisiting its purpose, which is to ensure "full and frank" disclosures between a client and its attorney, such that the attorney can "provide candid advice and effective representation." *Mohawk Indus., Inc. v. Carpenter*, 130 S.Ct. 599, 606 (2009) (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S.Ct. 677 (1981)).  Assuming, for the moment, that the "subject matter" of an attorney-client communication is conceptually separable from the content of that communication, there is no good reason why a client has a lesser interest in the confidentiality of the "subject matter" of the communication than the client does in the confidentiality of the "content" of the communication.  Indeed, since the disclosure of the "subject matter" of an

attorney-client communication has the potential to expose the client to the same consequences as the disclosure of the "content" of the communication, the "apprehension of disclosure" of the subject matter chills the client from seeking the attorney's advice. *See Hunt v. Blackburn*, 128 U.S. 464, 470, 9 S.Ct. 125 (1888).

      This chilling effect is exacerbated by the fact that the "subject matter" of a privileged communication is nearly impossible to define. This "subject matter" can be described vaguely — *e.g.*, "legal advice" — or with great specificity, such that a description of the "subject matter" effectively captures all of the content of the attorney-client communication. Not surprisingly, courts have long struggled to identify the "subject matter" of attorney-client communications as to which the privilege has been waived. *See, e.g.*, *In re Sealed Case*, 877 F.2d 976, 981 (D.C. Cir. 1989) (holding that the subject matter of a waiver can be defined in myriad ways). It is reasonable for a client to conclude that any future disclosure of the "subject matter" of its communications with its attorney will inevitably disclose "damaging information" shared with the attorney in confidence, in light of the practical inseparability between "subject matter" and "content." *See Fisher v. United States*, 425 U.S. 391, 403-04, 96 S.Ct. 1569 (1976).

      Mattel makes three unconvincing arguments in response. First, Mattel argues that privilege logs prepared pursuant to Fed. R. Civ. P. 26(b)(5) routinely list the "subject matter" of withheld communications, which indicates a common law understanding that "subject matter" is not protected by the privilege. As discussed above, the Court is unconvinced that any material distinction exists between subject matter and content, both as a matter of practicality and as a matter of policy. Moreover, the facts of this case suggest that Mattel's claimed interest in "testing" Brawer and MGA's invocation of the attorney-client privilege was pretextual. As Mattel itself argues, information about the "subject matter" of Brawer's conversations with MGA's counsel is highly relevant to "Mattel's defense" to MGA's counterclaims-in-reply that "MGA—and its attorneys—have known about Mr. Villasenor's activities since at least 2004 when Mr. Brawer joined MGA" for the purposes of calculating the relevant statute of limitations period. The parties have cited no case, nor has the Court found any authority, for the proposition that a privilege log may be admitted into evidence as relevant to one of the claims in the lawsuit. Such use of a privilege log would not only betray, but potentially do injury to the interests protected by Rule 26(b)(5).[3]

      Second, Mattel cites *Murdoch v. Castro*, 609 F.3d 983 (9th Cir. 2010) for the proposition

---

[3] The evolution of this litigation renders Mattel's claimed need to test Brawer's invocation of the attorney-client privilege particularly shallow. None of the parties have shown restraint in requesting *in camera* reviews of documents withheld by another party, and the Court has liberally conducted such reviews in order to ensure that materials are properly designated as privileged. That Mattel now believes it has no option but to ask questions about "subject matter" during depositions in order to test an assertion of the attorney-client privilege does not square with the parties' prior conduct.

that "the attorney-client privilege does not 'create a broad 'zone of silence' over' the subject matter of the communication," and that Mattel is therefore entitled to "seek the substance of . . . the subject [of the communication]."  (Dkt. 8864 at 7 (citing *Castro*, 609 F.3d at 995).)  However, Mattel neglects to quote surrounding language in the paragraph at issue in *Castro*.  An examination of that language establishes that *Castro* is inapposite here but, more importantly, demonstrates the irrelevance of Mattel's attempted distinction between "subject matter" and "content."  As the Ninth Circuit held:

> Because the attorney-client privilege protects only a communication between an attorney and a client, not the facts that are communicated, a defendant would remain free to question the witness about the underlying facts, just as happened here. . . . As the Supreme Court has explained, the attorney-client privilege does not 'create a broad 'zone of silence' over' the subject matter of the communication.  'The privilege only protects disclosure of [the] communications [themselves]; it does not protect disclosure of the underlying facts.' ***so long as the underlying facts can be proven without resort to the privileged materials***.

*Castro*, 609 F.3d at 995 (emphasis added) (quoting *Upjohn*, 449 U.S. at 395).

Notably, the Ninth Circuit spoke interchangeably of "underlying facts" and "subject matter," deeming that both are subject to discovery "without resort to the privileged materials." *Id.* *Castro* does not support Mattel's argument for a distinction between "subject matter" and "content."

Nor does *Castro* endorse Mattel's theory that it is entitled to seek discovery into, essentially, what the attorney-client communication was about.  The "subject matter" into which Mattel sought discovery was not "Villasenor's activities" — *i.e.*, the subject matter of the attorney-client communication.  Rather, the "subject matter" into which Mattel sought discovery was the topic of conversation between Brawer and MGA's counsel.  The Court has recognized this distinction before, when it granted in part and denied in part Mattel's Motion to Compel Further Deposition of Isaac Larian.  (Dkt. 7590 at 4 n.1 (distinguishing "subject matter of the communication" from "the fact of the communication about a particular subject matter") (quoting *Anderson v. Montgomery Ward & Co., Inc.*, No. 82 C 7277, 1987 WL 5682, at *1 (N.D. Ill. Jan. 16, 1987) ("Allowing specific inquiry into the subject matter of privileged communications inevitably would erode the privilege and hinder the free exchange of information and ideas that is vital to the attorney-client relationship.").)  Mattel has recognized this distinction as well.  *See* Mattel's Motion for Protective Order from MGA's Fifth Phase 2 Notice of Deposition at 10 n. 21 ("[S]eeking the substance of attorney-client communications invades the privilege, even if done in the guise of asking for what facts were conveyed during the attorney-client communication.").

Third, Mattel implies that even if the Discovery Master's ruling during the Brawer deposition was proper, it should be reversed in light of the fact that the Discovery Master made a

contrary ruling during the Villasenor deposition. (Dkt. 8864 at 7.) The Court is aware of no authority for the proposition that review under Fed. R. Civ. P. 72 is limited to circumstances in which the Magistrate Judge (or in this case, the Discovery Master)'s order is consistent with prior orders. The Rule itself only requires a review of the "disposition that has been *properly objected to*." Fed. R. Civ. P. 72(b)(3) (emphasis added). Mattel readily concedes that it failed to timely object to the Discovery Master's rulings during the Villasenor deposition, which prevented the Court from reviewing, and potentially sustaining any objection to, the rulings made during that deposition. Had Mattel timely objected, then the "manifest[] unfairn[ess]" of which it now complains could have been rectified. (*See* Dkt. 8864 at 7.)

Nevertheless, Mattel argues that any privilege that attached to either the subject matter or the content of Brawer's conversations with MGA's counsel has since been waived. Mattel argues that MGA and Brawer waived the privilege in two ways: (1) Brawer testifying that "he could not recall" any pre-2010 conversation with MGA's counsel about Villasenor's activities; and (2) MGA premising its counterclaims in reply on the fact that MGA "did not become aware" of Villasenor's activities before this year. (Dkt. 8864 at 8.) As to the first point, it's worth noting the contradiction between (a) Mattel's claim that Brawer's testimony about "subject matter" *not* discussed with counsel constitutes a disclosure of a privileged communication; and (b) Mattel's earlier claim (discussed above) that the subject matter that Brawer *did* discuss with counsel would not constitute a disclosure of a privileged communication. It is also unclear whether Brawer, as an MGA employee, even possessed the ability to waive a privilege that belongs to MGA. *See Wrench LLC v. Taco Bell Corp.*, 212 F.R.D. 514, 517 (W.D. Mich. 2002). In all events, the Discovery Master properly rejected Mattel's argument for waiver, noting that Brawer was a "lay witness" whose isolated and fleeting reference to the *absence* of a conversation about a particular topic could not have been voluntary. *See* Brawer Depo. Tr. at 2015-2017. Notably, Brawer committed the claimed waiver after a long colloquy between the attorneys and the Discovery Master in which the Discovery Master repeatedly sustained MGA's counsel's repeated attorney-client privilege instructions. *C.f. United States ex rel. Bagley v. TRW, Inc.*, 204 F.R.D. 170, 177 n. 10 (C.D. Cal. 2001) (declining to credit "gotcha" theory of waiver "in which an underlying's slip-up . . . becomes the equivalent of actual consent"). As to the second argument, the Court has already discussed — in denying MGA's Motion for a Finding of Waiver — why a party does not waive the privilege by alleging that it lacked knowledge about particular facts at a particular time. While MGA's privileged materials would no doubt be relevant to the veracity of its allegation, "[r]elevance is not the standard for determining whether or not evidence should be protected from disclosure." *Rhone-Poulenc Rorer Inc. v. Home Indemnity Co.*, 32 F.3d 851, 864 (3d Cir. 1994).

For the foregoing reasons, Mattel's Objections are OVERRULED.

VI. **MGA Parties' ex parte Application to Modify Stipulated Protective Order to Permit Access to Attorneys' Eyes Only Materials in Summary Judgment Filings**

MGA applies *ex parte* for a modification of the Stipulated Protective Order to allow

counter-defendants MGA Entertainment, Inc. ("MGAE") and Isaac Larian ("Larian") to review materials designated Attorneys' Eyes Only and filed in support of Mattel's Motion for Summary Judgment. MGA argues that a modification is required for certain reasons, none of which are convincing. First, MGA argues that Judge Larson previously ordered the unsealing of summary judgment motions and related filings during the phase 1 proceedings. However, Judge Larson only allowed the partial unsealing of documents on the basis of the parties' stipulation and, notably, trade secret documents remained under seal. There is no such stipulation here, and the Court is not inclined to parse through the summary judgment filings and make determinations, on the basis of last minute briefing, about what documents should be unsealed. Second, MGA argues that the First Amendment requires civil proceedings to be public. This argument errs as a matter of law. *See Millwrights' Local 1102 Supplemental Pension Fund v. Merrill Lynch*, 2010 WL 2772443 (E.D. Mich. July 13, 2010). Indeed, the parties have filed hundreds of discovery motions — all of which are "public proceedings" — under seal, and MGA has never before raised these First Amendment concerns. As Mattel notes, it is well-established that submissions may be filed under seal in order to preserve the confidentiality of sensitive materials contained therein. *See Biovail Laboratories, Inc. v. Anchen Pharma., Inc.*, 463 F. Supp. 2d 1073, 1082-84 (C.D. Cal. 2006). Third, MGA argues that the filings are a part of the Court record and, pursuant to a California state court case entitled *NBC Subsidiary (KNBC-TV), Inc. v. The Superior Court of Los Angeles County*, 20 Cal.4th 1178 (1999), the public has a right to access such materials. However, *NBC Subsidiary* is inapposite, since it referred to public *trials* and it applied California law. Furthermore, as explained above, MGA's argument would call into question its own filing of dozens of discovery motions (which are also part of the public record) under seal. Finally, MGA does not argue for the *public's* right to access the under seal materials; it requests that MGAE and Larian be able to access such materials. MGA's reliance on *NBC Subsidiary* is therefore unavailing.

        MGA next claims that Larian and MGAE have a specific need to review the Attorneys' Eyes Only materials in order to provide input to their outside counsel, the law firm of Orrick Herrington & Sutcliffe. MGA offers several unconvincing arguments in support of this proposition.[4] First, MGA argues that it has lost many employees since the start of this litigation, and that Larian and MGAE must "fill in the gaps" left by these departed employees. But even if those individuals still worked for MGA, they would not be able to access the Attorneys' Eyes Only documents, so it's unclear what "gaps" were created by their departure. Second, MGA argues that Larian is "most knowledgeable" about the allegations against him, but there is no basis on which to conclude that Larian possesses the ability to perform legal research and evaluate the merits of the claims in this litigation. Even if MGA's outside counsel requires Larian's analysis of the factual merit of Mattel's claims, it is free to review his extensive deposition testimony in this action or ask him about his evaluation of non-Attorneys' Eyes

---

[4] The Court does not expressly address the first argument that Larian and MGAE's input is necessary in advance of trial, since MGA offers no independent argument in support of this claim. The Court's disposition of MGA's remaining arguments is sufficient to dispose of this argument as well.

Only materials. Finally, no one disputes that Mattel's executives, including Bob Eckert, have extensive knowledge about the claims pending against Mattel, but MGA notably does not offer any reciprocity, such as allowing Mattel's outside counsel to share Attorneys' Eyes Only documents with its client.

Third, MGA argues that Larian and MGAE must review Mattel's alleged trade secrets to determine whether those materials "ever ma[d]e it to MGA." The time for such concessions is long since past. MGA must now look to the *evidence in the record*, including the hundreds of deposition transcripts, and other discovery responses, to determine whether Mattel's allegations are true. It cannot simply rest on Larian's (a counter-defendant's) claim that he did not commit the wrongdoing of which he is accused.

Fourth, MGA argues that Larian and MGAE must review discovery concerning "Mattel's knowledge of Bratz" to assist outside counsel in "defending against claims concerning who owns this intellectual property." Issues of "ownership" are distinctly legal. MGA's outside counsel does not explain the basis on which it requires Larian's analysis of the applicable law. To the extent MGA's outside counsel seeks to mine Larian's thoughts about the factual discovery in this case, the Court notes that Mattel's outside counsel operate under the same constraints — even though Mattel's executives and employees could probably offer some input, they are restricted from viewing the under seal materials.

Fifth, MGA argues that Larian and MGAE must review fact discovery regarding the "movement of employees between Mattel and MGA" in order to assist outside counsel in determining whether "this was part of a scheme to defraud." MGA offers no particularized showing, or even an example, of how Larian could possibly do this. Nor is the Court able to independently conceive of a reason why Larian might need access to more than the publicly redacted documents in order to effectively assist outside counsel as to this issue.

Sixth, MGA argues that Larian and MGAE must review "filings concerning Mattel's perception of the market place for fashion dolls to defend against claimed harm." However, as explained earlier: (1) Larian's non-expert testimony about these issues is no substitute for the facts in the record; (2) Mattel is constrained by the same disadvantage since it cannot consult with its outside counsel on these issues; and (3) the cognizability of harms alleged to have been suffered by Mattel is a distinctly legal issue.

MGA bemoans the restrictiveness of the Stipulated Protective Order in this late filing, but it is worth noting that ***MGA sought the Protective Order to begin with***. Since the transfer of this lawsuit, this Court has repeatedly requested that counsel attempt to reach an accommodation that allows greater transparency, but both Mattel and MGA have failed to do so. MGA has itself utilized the Stipulated Protective Order in several curious respects, including designating entire deposition transcripts Attorneys' Eyes Only, not because they contained trade secrets or business sensitive information, but because they contained brief testimony about the personal lives of the deponents.

CIVIL - GEN                                                                                                    Page 13 of 19

Indeed, when ordered to show cause as to why the Protective Order should not be vacated in its entirety, MGA argued that certain categories of documents should continue to enjoy protected status. MGA cannot now request that the Court grant eleventh hour, non-reciprocal relief from a Protective Order that MGA negotiated, entered into, used, and defended time and again. The Application is DENIED.

### VII. Mattel's Motion to Compel Further Deposition of MGA 30(b)(6) Re: Remaining Counterclaims-in-Reply

On October 5, 2010, MGA Entertainment, Inc. ("MGA") produced fellow counter-defendant Isaac Larian ("Larian") as its 30(b)(6) designee on 22 topics in Mattel's Notice of Deposition concerning MGA's counterclaims-in-reply. MGA also designated Larian to serve as its designee and provide testimony on four deposition topics on which the Court has ordered MGA to re-appear for deposition. The October 5, 2010 deposition commenced at approximately 9 a.m. and concluded at 6:30 p.m. Mattel now moves to compel further deposition testimony on the grounds that (1) MGA's 30(b)(6) designee was unprepared; and (2) MGA's 30(b)(6) designee did not provide responsive testimony as to the four topics of deposition unrelated to the counterclaims-in-reply.

MGA commits a fundamental error in its Opposition to the Motion. It apparently concludes that Mattel has moved to compel *Larian* to appear for further deposition, since it spends several pages of its briefing criticizing Mattel's counsel's supposed desire to harass Larian with irrelevant questions and distract Larian from his management of MGA's business affairs. However, Mattel does not move to compel Larian's deposition; it moves to compel *MGA*'s deposition pursuant to Fed. R. Civ. P. 30(b)(6). The Court's September 17, 2010 Order expressly noted that MGA could designate another individual as its designee, so as to limit the burden to Mr. Larian of continuing to travel to Santa Ana, California for time-intensive and stressful depositions. Notwithstanding the Court's invitation, MGA proceeded to designate Larian again. As the briefing makes clear, this designation was unsuccessful, as Larian had not reviewed entire boxes of relevant documents, admitted he lacked knowledge about MGA's efforts to maintain the secrecy of its alleged trade secret materials, and could not identify the individuals and entities to whom MGA had previously disclosed its alleged trade secret materials.

MGA responds with a few unconvincing arguments. First, MGA argues that Larian "came prepared to the deposition with boxes of documents" responsive to topics 1, 2, 6, 8, and 10 of Mattel's Notice of Deposition. However, a 30(b)(6) deponent's job is to provide testimony, not hand-deliver responses to requests for production and interrogatories. This written discovery, especially when it is first produced *on the day of the deposition*, is no substitute for live deposition testimony.

Second, MGA suggests that Larian is the only person who would have knowledge about MGA's practice of regulating access to its toy fairs and that his lack of knowledge therefore renders it "unlikely that anyone else would." As discussed in the context of Mattel's Motion to Compel Written

Discovery on the Counterclaims-in-Reply, MGA has expressly alleged that it maintained the confidentiality of the information available at its trade show showrooms. Its present admission that nobody has knowledge about the procedures taken to maintain the confidentiality of such information is either false or, if true, calls into question the veracity of MGA's allegations.

Third, MGA argues that Larian rendered some responsive testimony, but this testimony was limited and did not address the vast majority of the topics in Mattel's Notice.

Fourth, MGA argues that its claims — unlike Mattel's — are based on "narrowly and clearly identified [] trade secrets." There are two problems with this argument. First, MGA's list of alleged trade secret materials is 114 products long, and MGA claims it suffered billions of dollars in damages as a result of the alleged theft of this trade secret material. The damages allegation alone warrants 30(b)(6) deposition testimony, if only out of an interest in reciprocal discovery, since Mattel's expansive damages claims have spawned dozens of days of Mattel 30(b)(6) deposition testimony at MGA's request. Moreover, 114 products is no small number, especially since the development, marketing, and distribution of each product was extensive. Just as the Court has repeatedly ordered Mattel and Mattel Mexico to provide deposition testimony on their expansive trade secret claims, so too must MGA provide such testimony. Second, MGA's claim that its allegations are limited flatly contradicts its explanation for its 30(b)(6) designee's lack of preparation — namely, that "no witness could commit to memory the information being asked" about MGA's counterclaims-in-reply. MGA cannot argue that its counterclaims in reply involve facts too expansive to commit to memory and at the same time argue that its counterclaims in reply are so limited as to warrant limited discovery.

Finally, MGA argues that Mattel waived its opportunity to depose MGA's 30(b)(6) designee on the four topics of deposition that do not concern MGA's counterclaims in reply. Mattel objects that it never had the opportunity to depose MGA's 30(b)(6) designee about these topics, but Mattel's counsel could have commenced the October 5 deposition with these topics and the Court's Orders have been very clear that fact discovery about all issues other than the counterclaims in reply is now closed.

The Motion is GRANTED as to the topics in Mattel's August 25, 2010 Notice of Deposition and DENIED as to the topics in Mattel's March 2, 2010 Notice of Deposition. MGA may designate an individual other than Isaac Larian to serve as its 30(b)(6) designee.

> **VIII. Mattel's Motion for a Protective Order From the MGA Parties' Amended Notice of Deposition (Fifth Phase 2 Notice)**

Mattel seeks a protective order from MGA's Fifth Phase 2 Notice of Deposition. The Notice lists 26 topics related to MGA's counterclaims-in-reply. The Court may curtail, limit, or otherwise alter discovery that subjects a person to "annoyance, embarrassment, oppression, or undue burden or expense" pursuant to Rule 26(c) of the Federal Rules of Civil Procedure.

Mattel's Motion argues that a protective order should be granted because MGA's Notice was untimely. However, Mattel appears to abandon this argument by failing to counter MGA's response, which contends that the original Notice of Deposition was served on September 1, 2010 and only later amended *after* Mattel made clear its intention of seeking a protective order from the Court. The Court therefore ignores Mattel's request that a protective order be granted on the grounds that the Notice of Deposition is untimely.

Topics 1 through 4 are essentially the same topic: the conduct of Mattel's market intelligence group in obtaining competitors' proprietary information from a variety of sources, including (1) international toy fairs; (2) trade shows or conventions; and (3) other non-public sources. These topics should be limited to exclude information about competitors other than MGA. Even though Mattel has produced such information during written discovery, MGA has failed to even defend the relevance of Mattel's market intelligence group activities with respect to Mattel's other "competitors," other than a fleeting suggestion that such evidence may be admissible under Rule 404 of the Federal Rules of Evidence. But, as the Court has noted, basic reciprocity demands a limitation, since MGA has previously successfully petitioned to limit Mattel's discovery into conduct that relates to the relationship between the two parties, and not other third parties. Accordingly, the Motion is GRANTED IN PART AND DENIED IN PART as to Topics 1 through 4, which are limited to exclude information about the acquisition of non-MGA competitors' products.

Topic 5 concerns "MATTEL'S acquisition of competitive information from any source using false pretenses, false names, false credentials or false business cards." It is unclear whether the term "source" signifies the forum in which Mattel obtained such information — *e.g.*, a showroom — or the entity whose information Mattel obtained — *e.g.*, a competitor. Assuming the former, the topic should be limited to information obtained from any source about MGA through the use of such false names, credentials or business cards. Assuming the latter, the term "source" should be modified to "MGA." Such restrictions are consistent with the Court's long-standing management of the discovery process, and ensure reciprocity, since MGA has never had to produce discovery concerning, for example, its theft of trade secrets from competitors other than Mattel. The Motion is GRANTED IN PART AND DENIED IN PART as to Topic 5.

Topic 6 concerns a library maintained at Mattel's El Segundo headquarters in which some or all of the market intelligence group reports may be housed. MGA does not defend the relevance of this topic, nor is it apparent that the topic is relevant. For example, Mattel has not obtained discovery into MGA's storage sites for the allegedly misappropriated Bratz intellectual property. Further, this topic is duplicative of other testimony already provided by Mattel. The Motion is GRANTED as to Topic 6.

Topic 7 relates to the preparation, dissemination and use of the reports created by Villasenor and/or other members of Mattel's market intelligence group on the basis of information obtained at toy fairs. For reasons discussed above, the topic should be limited to information obtained

about MGA, and not every other Mattel competitor. Since Topic 8 is derivative of Topic 7, it too should be so limited. The Motion is GRANTED IN PART AND DENIED IN PART as to topics 7 and 8.

Topic 9 concerns "[a]ll facts and circumstances relating to the ANNUAL TOY FAIR PRESENTATION, including the contents of those presentations, the attendees and the existence of all DOCUMENTS relating to the presentations." The annual toy fair presentation is presumably the presentation alleged to have been delivered by members of the market intelligence group to Mattel's employees and corporate hierarchy. The Motion is GRANTED IN PART AND DENIED IN PART as to this topic, which is limited to encompass only the content of presentations regarding information obtained from MGA's showrooms.

Topic 10 concerns Matte's use of the information obtained from toy fairs. The Motion is GRANTED IN PART AND DENIED IN PART as to this topic, which is limited to information about MGA obtained in the toy fairs or maintained by Mattel.

Topics 11 through 13 ask Mattel to identify Mattel's operation of its showrooms at toy fairs, the individuals from Mattel who attended toy fairs on behalf of Mattel, and the individuals who accessed the library maintained in El Segundo. These topics are overbroad. MGA has not explained why it needs information about every Mattel employee who attended a toy fair for 13 years. Mattel is toy company and it is reasonable to conclude that hundreds of its employees were dispatched to toy fairs worldwide. Topic 11 should be limited to encompass only Mattel's procedures to maintain the confidentiality of its own information at toy fairs. Topics 12 and 13 are facially overbroad and incapable of reasonable narrowing. Indeed, MGA doesn't even offer any explanation for why these topics are relevant in its briefing. The Motion is GRANTED as to Topics 12 and 13 and GRANTED IN PART AND DENIED IN PART as to Topic 11, which is modified to exclude information about Mattel's attendance at global toy fairs, which is information already reasonably covered by other topics on which Mattel has, and will be, deposed.

Topic 14 concerns the "removal, destruction, alteration, deletion, purging, relocation or concealment" of documents in Mattel's corporate library. On its face, this topic is overbroad: Mattel is a global company that probably "deletes" or "removes" items from its corporate library on a daily basis. The topic should be limited to information generated or originally obtained by Mattel's market intelligence group and/or Villasenor. The Motion is GRANTED IN PART AND DENIED IN PART as to Topic 14, which will be modified as set forth herein.

Topic 15 concerns "[a]ll facts conveyed by VILLASENOR to Jon Corey or any other Quinn Emmanuel lawyer." The Court has rejected almost identical deposition topics in the past. Although well-established that facts conveyed to an attorney are not privileged, "a party may not expedite the discovery process by seeking the attorney-client communications that convey that factual matter." *Mattel, Inc. v. MGA Entertainment, Inc.*, 2010 WL 3705902, at *3 (C.D. Cal. Sept. 22, 2010)

(Carter, J.) (citing *Upjohn Co. v. U.S.*, 449 U.S. 383, 396, 101 S.Ct. 677 (1981)). To the extent that MGA merely wishes to discover underlying facts that may have also been facts conveyed by Villasenor to Quinn Emmanuel attorneys, the remaining deposition topics clearly encompass such categories of facts. The Motion is GRANTED as to Topic 15.

Topics 16, 17, 18, 20, 22, 23, and 26 essentially concern Mattel's knowledge about the activities of its market intelligence group and/or Villasenor. The topics encompass the following categories of knowledge: (1) Mattel's executives' knowledge; (2) pervasive knowledge within Mattel as a result of the dissemination of documents from the market intelligence group; (3) the preservation of such documents; (4) Mattel's internal communications about the activities of the market intelligence group and/or Villasenor; (5) Mattel's internal communications about Villasenor's departure from Mattel; (6) any investigation conducted by Mattel into Villasenor's confession; and (7) Mattel employees' complaints or concerns about the legality of the practices allegedly committed by Mattel's market intelligence group. Topic 20 — which concerns "all" communications about the market intelligence group — is duplicative of other topics. Topic 22 — which encompasses communications about Villasenor's departure from Mattel — is extremely overbroad, and this Court has previously restricted Mattel's requests for unlimited discovery into the employment records of certain former Mattel employees who worked for MGA and its subsidiaries. The remaining topics seek relevant information and Mattel's arguments as to these topics are either cursory or unconvincing. The Motion is GRANTED as to topics 20 and 22 and DENIED as to topics 16-18, and 23.

Topic 19 concerns Mattel's search for documents responsive to eight requests for production served on Mattel earlier in this litigation. MGA has successfully objected to identical discovery before on work product grounds. (Mot. at 11 n. 22 .) The Motion is GRANTED as to Topic 19.

Topic 21 concerns "[t]he facts and circumstances involving the resignation and/or departure from MATTEL of VILLASENOR." This topic is hopelessly overbroad. It does not even delineate between "facts and circumstances" relevant to Villasenor's work for Mattel and other "facts and circumstances" like Villasenor's personal reasons for wanting to resign from Mattel. This topic can certainly yield relevant factual information, such as Villasenor's concerns (if any) about the activities of the market intelligence group and/or Villasenor's own conduct, by the topic itself if imprecise and a poor vehicle for the discovery of relevant information. Remaining topics in the Notice of Deposition can yield relevant testimony without posing the same undue burden as this topic. The Motion is GRANTED as to Topic 21.

Topic 24 concerns communications between Mattel and Villasenor and his agents about his resignation and severance agreement. This topic is once again the wrong vehicle for relevant discovery, which the other topics already obtain. MGA offers no targeted argument in support of this topic. The Motion is GRANTED as to Topic 24.

Topic 25 concerns "MATTEL's hiring of Sharon Rahimi as an independent contractor to MATTEL." MGA offers no argument at all in support of this topic, which the Court presumes to relate to MGA's counterclaim-in-reply allegation that Rahimi was hired by Mattel because her ethnic background is similar to Larian's. The topic should be limited to Mattel's hiring of Rahimi with respect to MGA, and not extraneous issues, including the sundry administrative issues that arise when a major corporation retains a new independent contractor. The Motion is GRANTED IN PART AND DENIED IN PART as to Topic 25 as modified herein.

The deposition of Mattel's 30(b)(6) designee shall take place on or before October 27, 2010 in the presence of the Discovery Master.

The Clerk shall serve this minute order on all parties to the action.