ANNETTE L. HURST (State Bar No. 148738)
ahurst@orrick.com
WARRINGTON S. PARKER III (State Bar No. 148003)
wparker@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building, 405 Howard Street
San Francisco, CA 94105
Tel. (415) 773-5700/ Fax: (415) 773-5759

WILLIAM A. MOLINSKI (State Bar No. 145186)
wmolinski@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
777 South Figueroa Street, Suite 3200
Los Angeles, CA  90017
Tel. (213) 629-2020/Fax: (213) 612-2499

THOMAS S. McCONVILLE (State Bar No. 155905)
tmcconville@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
4 Park Plaza, Suite 1600
Irvine, CA 92614-2258
Tel: (949) 567-6700/Fax: (949) 567-6710

Attorneys for MGA Parties

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an individual,<br><br>        Plaintiff,<br><br>     v.<br><br>MATTEL, INC., a Delaware corporation,<br><br>        Defendant.<br><br>AND CONSOLIDATED ACTIONS | Case No.  CV 04-9049-DOC (RNBx)<br>Consolidated with Nos. CV 04-9059 and CV 05-2727<br><br>Hon. David O. Carter<br><br>**MGA PARTIES' RESPONSE TO MATTEL'S CONCLUSIONS OF LAW FILED IN SUPPORT OF OPPOSITION TO MATTEL'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Date:  November 16, 2010<br>Time: 1:30 p.m.<br>Dept.: Courtroom 9D<br><br>Trial Date:  January 11, 2011 |

## MGA PARTIES' RESPONSE TO CONCLUSIONS OF LAW

1.	Determinations previously made by the Court during Phase 1 that are unaffected by an appellate order are law of the case.  See Moore v. James H. Matthews & Co., 682 F.2d 830, 833-34 (9th Cir. 1982).

CONTESTED. Law of the case is not a doctrine that binds this Court.  Prior orders "remain[] subject to reconsideration and revision either by the same judge, a successor judge or a different judge to whom the case might be assigned." *United States v. Desert Gold Mining Co.*, 433 F.2d 713, 715 (9th Cir. 1970).  In other words, "a court may revisit prior decisions in a case and correct errors while the case is still pending." *Lahiri v. Universal Music and Video Distrib. Co.*, 606 F.3d 1216, 1222 (9th Cir. 2010).  In addition, for the reasons given in response to Conclusion of Law No. 2, *infra*, were the doctrine to apply, it still would not preclude this Court from granting MGA relief.

2. Previous rulings by a district court should be followed unless: "'(1) the decision is clearly erroneous and its enforcement would work a manifest injustice, (2) intervening controlling authority makes reconsideration appropriate, or (3) substantially different evidence was adduced at a subsequent trial.'"  In re Rainbow, 77 F.3d at 281 (quoting Hegler v. Borg, 50 F.3d 1472, 1475 (9th Cir. 1995), cert. denied, 516 U.S. 1029); see Leslie Salt Co. v. United States, 55 F.3d 1388, 1393 (9th Cir. 1995); Merritt v. Mackey, 932 F.2d 1317, 1320 (9th Cir. 1991); Kimball v. Callahan, 590 F.2d 768, 771-72 (9th Cir. 1979); Thomas v. Bible, 983 F.2d 152, 155 (9th Cir. 1993) ("While courts have some discretion not to apply the doctrine of law of the case, that discretion is limited.")

CONTESTED.  Each of the cases cited by Mattel either represent instances where a district court is considered bound by an appellate court decision or the Ninth Circuit has announced its rule that one appellate panel must apply the law of the case doctrine to a prior appellate panel's decisions.  *In re Rainbow Magazine,*

1    *Inc.*, 77 F.3d 278, 281 (9th Cir. 1996) (bankruptcy court bound by appellate court

2    decision); *Thomas v. Bible*, 983 F.2d 152, 155 (9th Cir. 1993) (same); *Leslie Salt*

3    *Co. v. United States*, 55 F.3d 1388, 1393 (9th Cir. 1995) (appellate panel applying

4    doctrine to prior appellate panel decision); *Hegler v. Borg*, 50 F.3d 1472, 1475 (9th

5    Cir. 1995) (same); *Merritt v. Mackey*, 932 F.2d 1317, 1320 (9th Cir. 1991) (same);

6    *Kimball v. Callahan*, 590 F.2d 768, 771-72 (9th Cir. 1979) (same).  And the fact

7    remains that a district court "may revisit prior decisions in a case and correct errors

8    while the case is still pending." *Lahiri v. Universal Music and Video Distrib. Co.*,

9    606 F.3d 1216, 1222 (9th Cir. 2010).

10          Moreover, each of the elements set forth in the cases cited by Mattel are met

11   here.  The prior decisions on which Mattel relies, and that MGA challenges, are

12   clearly erroneous and enforcement would work a manifest injustice.  There has

13   been intervening authority, specifically, the Ninth Circuit opinion.  Finally, as for

14   the third prong, Mattel claims that the law of the case binds this Court unless there

15   has been another trial where substantially different evidence has been adduced.  *In*

16   *re Rainbow Magazine, Inc*, 77 F.3d at 281 (noting that the third prong is that there

17   is "substantially different evidence was adduced at a subsequent trial").  However,

18   the Ninth Circuit has made clear a court need not await a new trial and then

19   determine whether there is new evidence.   Rather, it is sufficient that there is

20   new evidence, which, as reflected in MGA's Motion for Summary Judgment, there

21   is.  *See Pyramid Lake Paiute Tribe of Indians v. Hodel*, 882 F.2d 364, 369 n. 5 (9th

22   Cir. 1989).

23   3.The Ninth Circuit recognized the enforceability of Carter Bryant's Employee

24   Confidential Information and Inventions Agreement ("Inventions Agreement"). <u>See</u>

25   Opinion 10538-9.

26      **CONTESTED.** The Ninth Circuit did not make any determinations regarding the

27   enforceability of Carter Bryant's Employee Confidential Information and

28

Inventions Agreement.  At the pages cited, the Ninth Circuit concluded that the District Court erred in granting summary judgment in Mattel's favor concerning its interpretation of the Inventions Agreement.

4. With certain exceptions, interpretation of a written contract is a question of law for the court, even though it may involve "what might properly be called questions of fact." Parsons v. Bristol Dev. Co., 62 Cal. 2d 861, 865-66 (1965); Kitty-Anne Music Co. v. Swan, 112 Cal. App. 4th 30, 37 (2003) (noting that "questions regarding the parties' intent . . . are legal issues for the court to resolve") (citing Parsons).

**UNCONTESTED** that *Parsons v. Bristol Dev. Co.*, 62 Cal. 2d 861, 865-66 (1965), establishes the correct standard of contract interpretation.

5. To determine if a triable issue concerning interpretation of a contract remains, the Court should consider only evidence relevant to determining the parties' intent at the time of contracting.  See Bionghi v. Met. Water Dist. of So. Cal., 70 Cal. App. 4th 1358, 1365 (1999) ("[T]he rule of Pacific Gas & Electric must be restricted to its stated bounds; it does no more than allow extrinsic evidence of the parties' understanding and intended meaning of the words used in their written agreement.").

**CONTESTED.**  The object of contract interpretation is to ascertain and give effect to the mutual intent of the parties.  Cal. Civ. Code § 1636; *Wolf v. Superior Court*, 114 Cal. App. 4th 1343, 1356 (2004).  Accordingly, the Court must undertake a preliminary review of all credible evidence offered to prove the parties' intent.  *Pac. Gas & Elec. Co. v. Go W. Thomas Drayage & Rigging Co.*, 69 Cal. 2d 33, 3940 (1968); *Wolf  v. Superior Court*, 114 Cal. App. 4th 1343, 1351 & 1356 (2004).  "The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a

meaning to which the language of the instrument is reasonably susceptible." *Pac. Gas & Elec.*, 69 Cal. 2d at 37 (citations omitted).  The rule of *Pacific Gas & Electric* is "not a cloak under which a party can smuggle extrinsic evidence to add to a term to an integrated contract, in defeat of the parol evidence role." *Bionghi v. Met. Water Dist. of So. Cal.*, 70 Cal. App. 4th 1358, 1365 (1999).

6. Where a party cannot offer any relevant extrinsic evidence—whether in the form of statements made during negotiations, draft versions of the contract, actions taken by the parties after signing the contract, or any other type of traditionally recognized evidence of contractual intent—a party's post-hoc, subjective interpretation will be disregarded.  See New Haven Unified School Dist. v. Taco Bell Corp., 24 Cal. App. 4th 1473, 1483 (1994) ("[I]t was of little interest that [the witness] could remember nothing about the amendment to the condemnation clause. Even if we indulge in every reasonable inference that can be drawn from this evidence, the waiver issue cannot be reasonably construed as turning on the credibility of such insubstantial evidence.").

**CONTESTED.**  MGA agrees that a party's subjective, uncommunicated interpretation of the agreement is irrelevant.  *Reigelsperger v. Siller*, 40 Cal. 4th 574, 579 (2007).  However, the above articulated rule in *New Haven Unified School Dist. v. Taco Bell Corp.*, is inapplicable because *New Haven* applies to a non-adhesive contract wherein both parties negotiated and initialed a specific term to an agreement.  24 Cal. App. 4th 1473, 1483 (1994).  If a contract is adhesive, provisions in the contract will be denied enforceability if (1) the provision does not fall within the reasonable expectations of the weaker party, or (2) if the provision is unduly oppressive or unconscionable.  *Bruni v. Didion*, 160 Cal. App. 4th 1272, 1291 (2008); *Graham v. Scissor-Tail, Inc.*, 28 Cal. 3d 807, 820 (1981).

7. Custom and usage evidence is not admissible unless the parties "had actual knowledge thereof, or it is so general or well-known in the community as to give

rise to the presumption of such knowledge."  Roberts Distrib. Co. v. Kaye-Halbert Corp., 126 Cal. App. 4th 664, 676 (1954).

**UNCONTESTED.**  Furthermore, this rule of construction may not be used to alter or vary the terms of the contract.  *See, e.g.*, *Cal. Lettuce Growers v. Union Sugar Co.*, 45 Cal. 2d 474, 482 (1955).

8. "[W]hen there is a custom in a certain industry, those engaged in that industry are deemed to have contracted in reference to that practice unless the contrary appears." Midwest Television, Inc. v. Scott, Lancaster, Mills & Atha, Inc., 205 Cal. App. 3d 442, 451 (1988).

**CONTESTED** to the extent that the above articulation of the rule of construction omits that this rule of construction requires evidence and proof of a custom in an industry that is generally known to the parties.  It must be established as a matter of fact and not opinion.  *Wise v. Reeve Elecs., Inc.*, 183 Cal. App. 2d 4, 9 (1960).  Furthermore, this rule of construction may not be used to alter or vary the terms of the contract.  *See, e.g.*, *Cal. Lettuce Growers v. Union Sugar Co.*, 45 Cal. 2d 474, 482 (1955).

9. In order to create a genuine issue of fact, "[t]he inquiry [is] whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law….  The mere existence of a scintilla of evidence in support of [one party']s position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-252 (1986).

**UNCONTESTED** that *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986), articulates the standard governing summary judgment motions. *See also Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)

10.    The one circumstance where subjective intent is relevant to contract *construction* is where both parties to the contract *agree* how it should be

interpreted.  See Heston v. Farmers Ins. Group, 160 Cal. App. 3d 402, 414-415 (1984) (evidence of one party's subjective intent admissible to show the parties shared the same understanding); City of Anaheim v. Angels Baseball, L.P, 2008 WL 5274631, at *7 (Cal. App. 4th Dist., 2008).

**CONTESTED.**  The general rule of contract interpretation is that a party's subjective, uncommunicated interpretation of an agreement is irrelevant. *Reigelsperger v. Siller*, 40 Cal. 4th 574, 579 (2007).  However, evidence of intent *may be used to interpret* an ambiguity, is when the subjective intent is a mutual declaration of intent.  *See Heston v. Farmers Ins. Group*, 160 Cal. App. 3d 402, 414-15 (1984).  Nonetheless, regardless of this rule, parties cannot agree to interpret a contract so as to render it unenforceable. However, if the effect of a contract accomplishes an unlawful purpose, it will be deemed unenforceable regardless of the parties intent.  *Stockton Morris Plan Co. v. California Tractor & Equipment Corp.*, 112 Cal. App. 2d 684, 689-690 (1952).  A contract must be interpreted as will make it "lawful, operative, definite, reasonable, and capable of being carried into effect…."  Cal. Civ. Code. 1643; *Edwards v. Arthur Andersen LLP*, 44 Cal. 4th 937, 953-54 (2008).

11.    Where the original contracting parties agree, that shared intent prevails over a challenge by a third party.  See Meadows v. Lee, 175 Cal. App. 3d 475, 483 (1985).

**UNCONTESTED** to the extent that this statement is meant to convey that the object of contract interpretation is to ascertain the intent of the parties to the contract.  Cal. Civ. Code § 1636; *Waddy v. Sears, Roebuck & Co.*, 1994 WL 392483 (N.D. Cal. July 8, 1994).  MGA is uncertain what is meant by the "shared intent prevails over a *challenge* by a third party."

12.    To prevail on its trade dress claim, a party must establish that (1) its trade dress is nonfunctional, (2) its trade dress is inherently distinctive or acquired distinctiveness through a secondary meaning, and (3) there is a likelihood that the

consuming public will confuse Mattel's products with MGA's products.  Disc Golf Ass'n v. Champion Discs, Inc., 158 F.3d 1002, 1005 (9th Cir. 1998).

**CONTESTED.**  MGA has trade dress registrations for its trapezoidal packaging, which are "*prima facie* evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the registration."  15 U.S.C. §1115.  Moreover, determinations of the USPTO "must be accepted as controlling by the district court unless the contrary is 'established by testimony which in character and amount carries thorough conviction.'"  *Wells Fargo & Co. v. Stagecoach Properties, Inc.*, 685 F.2d 302, 306 (9th Cir 1982) (extending proposition to trademark cases); *Morgan v. Daniels*, 153 U.S. 120, 125 (1984).  Registrations shift the burden of proof to the defendant, here Mattel, to show that MGA's trade dress is not protectable through evidence carrying thorough conviction.  *Vuitton et Fils S.A. v. J. Young Enters., Inc.*, 644 F.2d 769 (9th Cir. 1981) (if plaintiff has a federal registration, burden of proof on functionality shifts to defendant).

13.     A party bears the burden of proving its asserted trade dress is not functional. 15 U.S.C. § 1125(a)(3).

**CONTESTED.**  MGA has trade dress registrations for its trapezoidal packaging, which are "*prima facie* evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the registration."  15 U.S.C. §1115.  Moreover, determinations of the USPTO "must be accepted as controlling by the district court unless the contrary is 'established by testimony which in character and amount carries thorough conviction.'"  *Wells Fargo & Co. v.*

*Stagecoach Properties, Inc.*, 685 F.2d 302, 306 (9th 9th Cir 1982) (extending proposition to trademark cases); *Morgan v. Daniels*, 153 U.S. 120, 125 (1984). Registrations shift the burden of proof to the defendant, here Mattel, to show that MGA's trade dress is not protectable through evidence carrying thorough conviction.  *Vuitton et Fils S.A. v. J. Young Enters., Inc.*, 644 F.2d 769 (9th Cir. 1981) (if plaintiff has a federal registration, burden of proof on functionality shifts to defendant).

14.    "The functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature."  Qualitex Co. v. Jacobson Prods. Co., 514 U.S. 159, 164-65 (1995); see TrafFix Devices, Inc. v. Mktg. Displays, Inc., 532 U.S. 23, 34 (2001) (trade dress protection "does not exist to reward manufacturers for their innovation in creating a particular device").

**CONTESTED**.  Mattel cites language regarding "a useful *product feature*" and "a *particular device*," which is distinguishable from *packaging*.  Courts have long distinguished *between* trade dress rights in product configuration versus packaging: "[T]he law which permits one to market an identical copy of his competitor's product does not give him freecom to imitate the appearance of the packaging in which the article is sold… [T]he public policiy which permits the imitation of an article of commercie is without relevance to the dress in which the article is marketed."  *Fabrica Inc. v. El Dorado Corp.*, 697 F.2d 890, 895 (9th Cir. 1983).  Moreover, the Supreme Court in the *Qualitex* case cited by Mattel notes that 15 U.S.C. §1127 allows "any word, name, symbol, or device" to achieve trademark status.  *Qualitex Co. v. Jacobson Products Prods. Co., Inc.*, 514 U.S. 159, 172-73 (1995).

15.    This Circuit uses a two-step test to determine functionality.  "In the first step, courts inquire whether the alleged 'significant non-trademark function' satisfies the

1 | Inwood Laboratories definition of functionality—'essential to the use or purpose of
2 | the article [or] affects [its] cost or quality.'" Au-Tomotive Gold, Inc. v.
3 | Volkswagen of Am., Inc., 457 F.3d 1062, 1072 (9th Cir. 2006) (brackets in
4 | original) (quoting TrafFix Devices, 532 U.S. at 32-33) (citing Inwood Labs. v. Ives
5 | Labs., Inc., 456 U.S. 844, 850 n.10 (1982)).  If the feature is essential to the use or
6 | purpose of the article *or* affects its cost or quality, "the inquiry is over—the feature
7 | is functional and not protected." Id.

8 | **CONTESTED.**  Mattel references a "two step test" but does not set forth
9 | two steps.  The relevant question in assessing functionality is whether defendant
10 | would be placed at a "significant disadvantage because the feature is 'essential to
11 | the use or purpose of the article' or 'affects its cost or quality.'" *Qualitex Co. v.*
12 | *Jacobson Products Prods. Co., Inc.*, 514 U.S. 159, 169 (1995) (quoting *Inwood*
13 | *Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 850 n.10 (1982)).  Registrations shift
14 | the burden of proof to the defendant to show that the trade dress is not functional
15 | through evidence carrying thorough conviction. *Vuitton et Fils S.A. v. J. Young*
16 | *Enters., Inc.*, 644 F.2d 769 (9th Cir. 1981) (if plaintiff has a federal registration,
17 | burden of proof on functionality shifts to defendant).

18 | 16.     A product feature or combination of features "need only have *some*
19 | utilitarian advantage to be considered functional," not necessarily "*superior*
20 | utilitarian advantages." Disc Golf, 158 F.3d at 1007 (emphasis added).  As a matter
21 | of law, where a "product is in its particular shape because it works better in this
22 | shape," it is functional and not protectable. Leatherman Tool Group, Inc. v. Cooper
23 | Indus., Inc., 199 F.3d 1009, 1012 (9th Cir. 1999).  Even if this utilitarian
24 | functionality test hurdle is cleared, the product must also pass the second step—the
25 | "aesthetic functionality" test, which "inquires whether protection of the feature as a
26 | trademark would impose a significant non-reputation-related competitive
27 | disadvantage." Au-tomotive Gold, 457 F.3d at 1072.

28 |

1   **CONTESTED.**  In this case, *Disc Golf* and *Leatherman* are not applicable

2   because they consider the functionality of the *product configuration* not the

3   *packaging*.  Courts have long distinguished between trade dress rights in product

4   configuration versus packaging: "[T]he law which permits one to market an

5   identical copy of his competitor's product does not give him freecom to imitate the

6   appearance of the packaging in which the article is sold… [T]he public policiy

7   which permits the imitation of an article of commercie is without relevance to the

8   dress in which the article is marketed."  *Fabrica Inc. v. El Dorado Corp.*, 697 F.2d

9   890, 895 (9th Cir. 1983).  Moreover, as courts have explained since *Au-tomotive*,

10   aesthetic functionality is a very limited doctrine that applies in narrow cases to

11   product features that serve an aesthetic purpose *wholly independent* of any source-

12   identifying function.  *Walker & Zanger, Inc. v. Paragon IndustriesIndus., Inc.*, 549

13   F. Supp. 2d 1168, 1178 (N.D. Cal. 2007) (concluding tile design not essential to use

14   or purpose of the product but finding factual questions on summary judgment

15   regarding the absence of significant competitive disadvantage).  *Accord, Autodesk,*

16   *Inc. v. Dassault Systemes SolidWorks Corporation.*, 685 F. Supp. 2d 1001, 1010

17   (N.D. Cal. 2009) (noting claim of aesthetic functionality in the case makes no sense

18   given doctrine is used to find visually attractive and aesthetically pleasing designs

19   as functional when goods are largely bought for those aesthetic values).  *See*

20   *Qualitex Co. v. Jacobson Products Prods. Co., Inc.*, 514 U.S. 159, 172-73 (1995)

21   (interpreting 15 U.S.C. §1127, the Supreme Court noted that the statute allows "any

22   word, name, symbol, or device" to achieve trademark status**)**.

23   17.    A product that "*is in its particular shape because it works better in this*

24   *shape*" is "de jure functional," and not protectable.  Leatherman Tool Group, Inc. v.

25   Cooper Indus., Inc., 199 F.3d 1009, 1012 (9th Cir. 1999).

26   **CONTESTED.**  In this case, *Leatherman* is not applicable because it

27   considers the functionality of the *product configuration* not the *packaging*.  Courts

28

- 11 -

have long distinguished between trade dress rights in product configuration versus packaging: "[T]he law which permits one to market an identical copy of his competitor's product does not give him freecom to imitate the appearance of the packaging in which the article is sold… [T]he public policiy which permits the imitation of an article of commercie is without relevance to the dress in which the article is marketed." *Fabrica Inc. v. El Dorado Corp.*, 697 F.2d 890, 895 (9th Cir. 1983). *See also Qualitex Co. v. Jacobson Products Prods. Co., Inc.*, 514 U.S. 159, 172-73 (1995) (interpreting 15 U.S.C. §1127, the Supreme Court noted that the statute allows "any word, name, symbol, or device" to achieve trademark status).

18.     A "trade dress" claim based on product packaging that spans numerous different products and product lines presents a "'particularly difficult challenge' of proving the validity of a broadly defined trade dress which is common to all items in the series or line.'" McCarthy, § 8:5.50 (quoting Landscape Forms, Inc. v. Columbia Cascade Co., 113 F.3d 373 (2d Cir. 1997)).  As the Second Circuit has warned, "when protection is sought for an entire line of products, our concern for protecting competition is acute." Landscape Forms, 113 F.3d at 380.  In such cases, it is critical that the plaintiff be held to "an articulation of the specific elements which comprise its distinct dress." Yurman Design, Inc. v. PAJ, Inc., 262 F.3d 101, 117 (2d Cir. 2001); Tie Tech, Inc. v. Kinedyne Corp., 296 F.3d 778, 786 (9th Cir. 2002) (rejecting as "semantic trickery" plaintiff's argument that "there is still some sort of separate 'overall appearance' which is non-functional" despite the functionality of each identified element of the trade dress).

        **CONTESTED**. *Landscape Forms, Yurman Design* and *Tie Tech* all deal with "product designs or configurations" not product packaging, and these cases recognize that a plaintiff in a product configuration case must mke a "more difficult showing" than in a packaging case. *Yurman Design*, 262 F.3d at 115 ("Where the mark is… product packaging, the plaintiff may prove distinctiveness by showing

either that the "intrinsic nature" of the mark serves to identify a particular source … or that 'in the minds of the public, the primary significance of [the mark] is to identify the source of the product rather than the product itself' … The product design plaintiff, however, must always make the second, more difficult showing."); *Landscape Forms,* 113 F.3d at 379-380 ("consumers are more likely to rely on the packaging of a produc than on the product's design as an indication of source"); *Tie Tech*, 296 F.3d at 780.

19.   That a design is innovative and unique is not relevant to functionality.  Once functionality is established, "[t]here is no need ... to engage ... in speculation about other design possibilities...."  TrafFix, 532 U.S. at 33.  "[T]he existence of alternative designs cannot negate a trademark's functionality."  Talking Rain Bev. Co., Inc. v. South Beach Bev. Co., 349 F.3d 601, 603 (9th Cir. 2003).

**CONTESTED.**  *TrafFix* deals with product configuration, not packaging, and only in a narrow scenario: "[t]he principal question in this case is the effect of an expired [utility] patent on a claim of trade dress infringement… A utility patent is strong evidence that the features therein claimed are fuctional."  *TrafFix*, 532 U.S. at 29.  Likewise, *Talking Rain* deals with product configuration of bottles for beverages where the advertising touted functionality.  *Talking Rain*, 349 F.3d at 602 (finding that a water bottle shape with a grip area, marketed with the slogan "Get a grip!", is functional).

20.   The shape of a product box is one of two paradigms of aesthetical functionality specifically identified by the Ninth Circuit.  Au-Tomotive Gold, 457 F.3d at 1073-74 (distinguishing "cases involving *a true aesthetically functional feature, like a box shap*e or certain uses of color" from cases involving "well-known registered logos and company names, which generally have no function apart from their association with the trademark holder") (emphasis added).

1       **CONTESTED.**  Interpreting 15 U.S.C. §1127, the Supreme Court  in

2   *Qualitex* noted that the statute allows "any word, name, symbol, or device" to

3   achieve trademark status.  *Qualitex Co. v. Jacobson Prods. Co., Inc.*, 514 U.S. 159,

4   172-173 (1995) ("the Ninth Circuit erred in barring Qualitex's use of color as a

5   trademark").  The accompanying Senate Report "intentionally retains . . . the words

6   'symbol or device' so as not to preclude the registration of colors, *shapes*, sounds or

7   configurations where they function as trademarks."  *Id*. (quoting S. Rep. No. 100-

8   515, at 44 (1988), *reprinted in* 1988 U.S.C.C.A.N. 5557, 5607) (emphasis added).

9   21.    In Alchemy II, Inc. v. Yes! Entm't Corp., the court denied trade dress

10  protection to toy product packaging since allowing plaintiff to "protect all of the

11  colors it has used would be tantamount to requiring [defendant] to package [its

12  competing toy] in a brown paper bag."  844 F. Supp. 560, 571 (C.D. Cal. 1994).

13      **CONTESTED.**  Mattel misrepresents the case cited.  The statement about color

14  is referring to the protectability of "the color of a Teddy Ruxpin book" as one of

15  may elements of trade dress.  *Alchemy II, Inc.*, 844 F. Supp. 570-571.  The court

16  continued that "even *granting that Teddy Ruxpin's overall trade dress is distinctive

17  and has acquired strong secondary meaning*, Yes! has not adopted confusingly

18  similar trade dress."  *Id*. (emphasis added).

19  22.    Seabrook Foods, Inc. v. Bar-Well Foods, Ltd., 568 F.2d 1342 (C.C.P.A.

20  1977), adopted a three-part test, which is relied upon in this Circuit, to gauge the

21  inherent distinctiveness of non-verbal symbols such as trade dress: (1) whether the

22  design or shape is a common, basic shape or design; (2) whether the design or

23  shape is unique or unusual in a particular field; and (3) whether the design or shape

24  is a mere refinement of a commonly-adopted and well-known form of

25  ornamentation for a particular class of goods which consumers view as mere

26  ornamentation.  See DCNL Inc. v. Almar Sales Co., 1997 WL 913949 (N.D. Cal.

27  Dec. 22, 1997), aff'd, 178 F.3d 1308 (9th Cir. 1998) (hair brush design held not

28

- 14 -

1  inherently distinctive under <u>Seabrook</u>); 1 <u>McCarthy on Trademarks and Unfair</u>

2  <u>Competition</u> § 8:13 (4th ed. 2010) ("The <u>Seabrook</u> test is preferred.").

3   **CONTESTED.**  The court's analysis in *Seabrook* was with respect to a

4  design mark (a drawing), not product packaging.  *Seabrook Foods*, 568 F.2d at

5  1343.  The unreported case, *DCNL*, cited by Mattel, dealt with product

6  configuration (a hairbrush), not packaging, and distinguished packaging as being

7  subject to greater protection.  *DCNL*, 1997 WL 913949 at *5 ("the competitive

8  interest in copying product designs is more substantial than in the case of

9  packaging, containers, labels, and related subject matter. Product designs are thus

10  normally protected only upon proof of secondary meaning.").

11  23.  "To establish secondary meaning, a manufacturer must show that, in the

12  minds of the public, *the primary significance* of a product feature . . . is to identify

13  [a single] source of the product . . . ."  <u>Inwood Labs.</u>, 456 U.S. at 851 n.11

14  (emphasis added).

15   **CONTESTED**.  Mattel inserts the words "a single" into the quote that states

16  in full: "To establish secondary meaning, a manufacturer must show that, in the

17  minds of the public, the primary significance of a product feature or term is to

18  identify the source of the product rather than the product itself."  *Inwood Labs.*, 456

19  U.S. at 851.

20  24.  "Most common geometric shapes such as circles, squares and ovals are

21  regarded as not being inherently distinctive.  If such common designs are not

22  proven to have acquired a secondary meaning, then they are not trademarks and

23  serve as merely ornamental embellishments."  <u>McCarthy</u> § 8:13 (citations omitted);

24  <u>see also</u> <u>Autodesk, Inc. v. Dassault Systemes SolidWorks Corp.</u>, 685 F. Supp. 2d

25  1001, 1013-14 (N.D. Cal. 2009) ("Most common geometric shapes are regarded as

26  not being inherently distinctive, in view of the common use of such shapes in all

27  areas of advertising.") (quoting <u>McCarthy</u>); <u>Wiley v. Am. Greetings Corp.</u>, 762

1  F.2d 139, 142 (1st Cir. 1985) ("It is hornbook law that ordinary geometric shapes

2  such as circles, ovals, squares, etc., . . . are regarded as non-distinctive and

3  protectable only upon proof of secondary meaning.").  See also  Ideal Toy Corp. v.

4  Kenner Prods. Div. of General Mills Food Group, Inc., 443 F. Supp. 291, 297

5  (S.D.N.Y. 1977) (denying preliminary injunction concerning toys sold in a

6  "trapezoidal box [that] contains an arch-like opening through which the full figure

7  may be viewed").

8       **CONTESTED.**  Interpreting 15 U.S.C. §1127, the Supreme Court  in

9  *Qualitex* noted that the statute allows "any word, name, symbol, or device" to

10  achieve trademark status.  *Qualitex Co. v. Jacobson Prods. Co., Inc.*, 514 U.S. 159,

11  172-173 (1995) ("the Ninth Circuit erred in barring Qualitex's use of color as a

12  trademark").  The accompanying Senate Report "intentionally retains . . . the words

13  'symbol or device' so as not to preclude the registration of colors, *shapes*, sounds or

14  configurations where they function as trademarks." *Id*. (quoting S. Rep. No. 100-

15  515, at 44 (1988), *reprinted in* 1988 U.S.C.C.A.N. 5557, 5607) (emphasis added).

16  Niether *Autodesk*, nor *Wiley* deals with product packaging as the asserted trade

17  dress.  *Ideal Toy* is completely inapplicable, as there was no claim of trade dress

18  infringement in the case, and the plaintiff was neither claiming rights in trapezoidal

19  boxes, nor does the opinion indicate that the plaintiff was selling products in

20  trapezoidal boxes.

21  25.    "[T]he combination of an ordinary geometric shape, a rectangle, and a

22  primary color, orange, [cannot] be inherently distinctive."  Autodesk, 685 F. Supp.

23  2d at 1014 (granting motion for summary judgment on trade dress claim).

24       **CONTESTED.**  Interpreting 15 U.S.C. §1127, the Supreme Court  in

25  *Qualitex* noted that the statute allows "any word, name, symbol, or device" to

26  achieve trademark status.  *Qualitex Co. v. Jacobson Prods. Co., Inc.*, 514 U.S. 159,

27  172-173 (1995) ("the Ninth Circuit erred in barring Qualitex's use of color as a

28

trademark").  The accompanying Senate Report "intentionally retains . . . the words 'symbol or device' so as not to preclude the registration of colors, *shapes*, sounds or configurations where they function as trademarks." *Id*. (quoting S. Rep. No. 100-515, at 44 (1988), *reprinted in* 1988 U.S.C.C.A.N. 5557, 5607) (emphasis added). *Autodesk* does not deal with product packaging as the asserted trade dress.

26.   "Secondary meaning is not easily established: 'proof of secondary meaning entails vigorous evidentiary requirements.'"  Express LLC v. Forever 21, Inc., 2010 WL 3489308, at *7 (C. D. Cal. Sept. 2, 2010) (quoting Yankee Candle Co., Inc. v. Bridgewater Candle Co., 259 F.3d 25, 43 (1st Cir. 2001)).  It can be proven by direct evidence, such as consumer surveys, or circumstantial evidence, "such as exclusivity, manner, and length of use, amount and manner of advertising, amount of sales and the number of customers, and plaintiff's established place in the market." Express, LLC, 2010 WL 3489308, at *8 (citation omitted).

**UNCONTESTED.**

27.   Circumstantial evidence such as advertising and sales figures are insufficient to establish secondary meaning: "evidence of the pervasiveness of the trade dress . . . cannot stand alone.  To find otherwise would provide trade dress protection for any successful product, or for the packaging of any successful product." Yankee Candle, 259 F.3d at 44 (1st Cir. 2001) (affirming summary judgment for defendant on trade dress claim notwithstanding substantial sales and advertising).

**UNCONTESTED.**

28.   A "large expenditure of money [does not] in itself create legally protectable rights." First Brands Corp. v. Fred Meyer, Inc., 809 F.2d 1378, 1383 (9th Cir. 1987).

**UNCONTESTED.**

29.   To serve as circumstantial proof of secondary meaning, the advertising at issue "must involve 'image advertising,' that is the ads must feature in some way

the trade dress itself.  Otherwise, even evidence of extensive advertising or other promotional efforts would not necessarily indicate that prospective buyers would associate the trade dress with a particular source."  <u>First Brands</u>, 809 F.2d at 1383 (advertisements featuring a product as a whole did not result in secondary meaning when the advertisements did not focus on the asserted non-functional trade dress; plaintiff "did not, for example, urge customers to 'look for the familiar yellow jug'"); <u>see also</u> <u>Textron, Inc. v. U. S. Int'l Trade Comm'n</u>, 753 F.2d 1019, 1025 (Fed. Cir. 1985); <u>San Francisco Mercantile Co. v. Beeba's Creations, Inc.</u>, 704 F. Supp. 1005 (C.D. Cal. 1988).

**UNCONTESTED.**

30.     Irrespective of its strength and non-functionality, "a product's trade dress will not be protected from an imitator that is sufficiently different in its features to avoid such confusion."  <u>Id.</u> (citation omitted).  A plaintiff must show "a substantial likelihood of confusion between the plaintiff's and defendant's products."  <u>Art Attacks Ink, LLC v. MGA Entm't Inc.</u>, 581 F.3d 1138, 145 (9th Cir. 2009).

**CONTESTED.**  To prove trade dress infringement, a plaintiff must demonstrate that: (1) the trade dress is nonfunctional; (2) the trade dress has acquired secondary meaning; and (3) there is a substantial likelihood of confusion between the plaintiff's and defendant's products.  *Art Attacks Ink, LLC v. MGA Entm't*, *Inc.*, 581 F.3d 1138 (9th Cir. 2009).  This is the proper test to apply in a trade dress infringement suit, not the single element set forth by Mattel.

31.     This Circuit recognizes eight factors for consideration in assessing likelihood of confusion: (1) the strength of the mark; (2) the proximity or relatedness of the goods; (3) the marks' similarity in appearance, sound, and meaning; (4) evidence of actual confusion; (5) the degree to which the parties' marketing channels converge; (6) the type of goods and the degree of care customers are likely to exercise in purchasing them; (7) evidence of defendants' intention in selecting and using the

1    allegedly infringing mark; and (8) the likelihood that the parties will expand their

2    product lines.  AMF Inc. v. Sleekcraft Boats, 599 F.2d 341, 348-49 (9th Cir. 1979).

3    "[S]ome Sleekcraft factors are more important in certain contexts than others . . .

4    and the relative importance of each individual factor will be case-specific."  Aurora

5    World, Inc. v. Ty, Inc., 2009 WL 6617192, at *28 (C.D. Cal. Dec. 15, 2009)

6    (internal quotations and citations omitted).  Consideration of the Ninth Circuit's

7    eight Sleekcraft factors confirms that summary judgment is appropriate.  Surfvivor

8    Media, Inc. v. Survivor Prods., 406 F.3d 625, 634 (9th Cir. 2005) (affirming

9    summary judgment where "[t]he distribution of the Sleekcraft factors does not raise

10   a material issue of fact regarding likelihood of confusion.").

11        **UNCONTESTED** as to the statement of law in the first and second

12   sentences. **CONTESTED** as to the ultimate conclusion that Mattel seeks to draw in

13   the third sentence.  This is not a statement of law, but an ultimate conclusion that is

14   not supported by the disputed facts.

15   32.    "[T]here is hardly likelihood of confusion . . . when the name of the

16   manufacturer is clearly displayed."  Aurora World, Inc. v. Ty, Inc., 2009 WL

17   6617192, at *33 (C.D. Cal. Dec. 15, 2009) (quoting Bose Corp. v. Linear Design

18   Labs., Inc., 467 F.2d 304, 310 (2d Cir. 1972)).  The defendant's display of its logo

19   on the accused products is particularly effective in "negat[ing]" a claim of

20   confusion."  Aurora World, 2009 WL 6617192 at *33; see also Conopco, Inc. v.

21   May Dep't Stores Co., 46 F.3d 1556, 1567-71 (Fed. Cir. 1994) (reversing a finding

22   of likelihood of confusion, relying heavily on the prominent placement of plaintiff's

23   "Vaseline Intensive Care" mark on packaging that was otherwise virtually identical

24   to defendant's containers); Bristol-Meyers Squibb Co. v. McNeil-P.P.C. Inc., 973

25   F.2d 1033, 1047 (2d Cir. 1992) (vacating injunction in light of placement of

26   Tylenol PM and Excedrin PM marks on parties' respective packages

27   notwithstanding intentional copying of color layout, font, and image placement).

28

1
2
3
4
5

**CONTESTED.**  The Ninth Circuit has found that the "use of another's trademark in a manner calculated 'to capture initial consumer attention, even though no actual sale is finally completed as a result of the confusion, may be still an infringement.'"  *Brookfield Commc'ns v. West Coast Entm't Corp.*, 174 F.3d 1036, 1062 (9th Cir. 1999).

6
7
8
9
10
11
12
13

33.    When there is only "scant evidence of actual confusion in the record," that lack of evidence weighs in favor of the defendant.  <u>Surfvivor Media</u>, 406 F.3d at 633.  Further, the lack of evidence of actual confusion is even more probative where the parties have already used the trade dresses at issue to market their goods in the same locations for a period of years.  <u>Cohn v. Petsmart, Inc.</u>, 281 F.3d 837, 842 (9th Cir. 2002) ("[S]ome evidence of actual confusion should have become available if [defendant's] coexisting use had created a genuine likelihood of confusion.") (citations omitted).

14
15
16
17
18
19
20
21
22
23
24
25
26

**CONTESTED.**  Evidence of actual confusion is irrelevant when the products only co-existed for a short time, and in any event, the absence of evidence of actual confusion need not give rise to an inference of likelihood of confusion. *Academy of Motion Picture Arts & Sciences v. Creative House Promotions, Inc.*, 944 F.2d 1446, 1456 (9th Cir. 1991)("[A]ctual confusion is not necessary to a finding of likelihood of confusion under the Lanham Act"); *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1360 (9th Cir. 1985) ("The absence of evidence of actual confusion need not give rise to an inference of no likelihood of confusion"); *Centaur Communications, Ltd. v. A/S/M Communications, Inc.*, 830 F.2d 1217, 1227 (2d Cir. 1987) (absence of actual confusion not significant when goods competing for a short time); *TriMark USA, Inc. v. Performance Food Group, LLC*, 667 F.Supp.2d 155, 167 (D.Mass. 2009) (finding lack of evidence of consumer confusion irrelevant where logos had only coexisted for several months).

27
28

34.     Summary judgment can be granted in a trade dress case where the parties are competitors.  See, e.g., One Indus., LLC v. Jim O'Neal Distrib., Inc., 578 F.3d 1154, 1165 (9th Cir. 2009) (affirming summary judgment where parties were direct competitors because "the marks do not look alike, [the senior user] has not produced evidence of actual confusion, [and] no reasonable jury could infer that [the junior user] deliberately appropriated the goodwill associated with the 'O' mark."); Aurora World, 2009 WL 6617192, at *34 (denying injunction even though parties were direct competitors).

        **IMMATERIAL.**  The facts in the current action are different than the cases cited.

35.     Purchasers of products not insignificantly priced can be expected to exercise care in their selections.  Aurora World, 2009 WL 6617192, at *33 (although the "parties' plush toys are not overly expensive, they are not consumable or disposable as are very cheap items, such as cookies" and the "clarity of labeling in packaging and advertising will suffice to preclude almost all possibility of consumer confusion as to source"), see also Barbeque Marx, Inc. v. 551 Ogden, Inc., 235 F.3d 1041, 1045 (7th Cir. 2000) (district court committed clear error in ruling that consumers would not exercise care in choosing a restaurant for a $20 meal).

        **CONTESTED.**  When dealing with inexpensive products, consumers are likely to exercise less care, thus making confusion more likely.  *See, e.g.*, *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1293 (9th Cir. 1992) (wine and cheese are inexpensive products); *Playboy Enters., Inc. v. Nestcape*, 354 F.3d 1020, 1028 (9th Cir. 2004) ("Consumer care for inexpensive products is expected to be quite low.  Low consumer care, in turn, increases the likelihood of confusion.").

36.     "[A] prior-created work cannot infringe a later-created one." Christian v. Mattel, Inc., 286 F.3d 1118, 1128 (9th Cir. 2002).

**IMMATERIAL.**  The case cited deals with copyright law, not trade dress law.

37.     In trade dress cases, it is critical that the plaintiff be held to "an articulation of the specific elements which comprise its distinct dress."  <u>Yurman Design, Inc. v. PAJ, Inc.</u>, 262 F.3d 101, 117 (2d Cir. 2001); <u>Tie Tech, Inc. v. Kinedyne Corp.</u>, 296 F.3d 778, 786 (9th Cir. 2002) (rejecting as "semantic trickery" plaintiff's argument that "there is still some sort of separate 'overall appearance' which is non-functional" despite the functionality of each identified element of the trade dress).

**UNCONTESTED AND IMMATERIAL.**  MGA has identified specific elements of its packaging which comprise its distinctive trade dress, including the trapezoidal packaging of Bratz and the distinctive heart-shaped packaging, window, brand name, display of the brand name, and the decorative handle of MGA's 4-Ever Best Friends packaging.

38.     Distinctively shaped packaging is both de jure functional, <u>Leatherman Tool Group</u>, 199 F.3d at 1012, and aesthetically functional, <u>Au-Tomotive Gold</u>, 457 F.3d at 1073-74 (describing a "box shape or certain uses of color" as "a true aesthetically functional feature"); <u>see also</u> <u>Tie Tech</u>, 296 F.3d at 786-87 (noting that "closed-grip handle" was a functional aspect of the claimed trade dress).

**CONTESTED.**  *Leatherman* is not applicable because it deals with the functionality of the *product configuration* not the *packaging*.  Courts have long distinguished between trade dress rights in product configuration versus packaging: "[T]he law which permits one to market an identical copy of his competitor's product does not give him freecom to imitate the appearance of the packaging in which the article is sold… [T]he public policy which permits the imitation of an article of commerce is without relevance to the dress in which the article is marketed."  *Fabrica Inc. v. El Dorado Corp*., 697 F.2d 890, 895 (9th Cir. 1983). Moreover, as courts have explained since *Au-tomotive*, aesthetic functionality is a

very limited doctrine that applies in narrow cases to product features that serve an aesthetic purpose *wholly independent* of any source-identifying function. *Walker & Zanger, Inc. v. Paragon IndustriesIndus., Inc.*, 549 F. Supp. 2d 1168, 1178 (N.D. Cal. 2007) (concluding tile design not essential to use or purpose of the product but finding factual questions on summary judgment regarding the absence of significant competitive disadvantage). *Accord, Autodesk, Inc. v. Dassault Systemes SolidWorks Corporation.*, 685 F. Supp. 2d 1001, 1010 (N.D. Cal. 2009) (noting claim of aesthetic functionality in the case makes no sense given doctrine is used to find visually attractive and aesthetically pleasing designs as functional when goods are largely bought for those aesthetic values). *See also Qualitex Co. v. Jacobson Products Prods. Co., Inc.*, 514 U.S. 159, 172-73 (1995) (interpreting 15 U.S.C. §1127, the Supreme Court noted that the statute allows "any word, name, symbol, or device" to achieve trademark status).

39.     A feature is functional if it is "essential to the use or purpose of the article [or] affects [its] cost or quality.'" <u>Au-Tomotive Gold</u>, 457 F.3d at 1072; <u>Disc Golf</u>, 158 F.3d at 1007 (a product feature or combination of features "need only have *some* utilitarian advantage to be considered functional").

**CONTESTED.**   The relevant question in assessing functionality of colors or shapes is whether without its use one would be placed at a "significant disadvantage because the feature is 'essential to the use or purpose of the article' or 'affects its cost or quality.'" *Qualitex Co. v. Jacobson Prods. Co., Inc.*, 514 U.S. 159, 169 (1995) (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 850 n.10 (1982)).   As courts have explained since *Au-tomotive Gold*, aesthetic functionality is a very limited doctrine that applies in narrow cases to product features that serve an aesthetic purpose *wholly independent* of any source-identifying function. *Walker & Zanger, Inc. v. Paragon Indus., Inc.*, 549 F. Supp. 2d 1168, 1178 (N.D. Cal. 2007) (concluding tile design not essential to use or purpose of the product but

- 23 -

finding factual questions on summary judgment regarding the absence of significant competitive disadvantage).  *Accord Autodesk, Inc. v. Dassault Systemes SolidWorks Corp.*, 685 F. Supp. 2d 1001, 1010 (N.D. Cal. 2009) (noting claim of aesthetic functionality in the case makes no sense given doctrine is used to find visually attractive and aesthetically pleasing designs as functional when goods are largely bought for those aesthetic values).

40.    It is hornbook law that '[o]rdinary geometric shapes such as circles, ovals, squares, etc. . . . are regarded as non distinctive and protectable only upon proof of secondary meaning."  Wiley v. Am. Greetings Corp., 762 F.2d 139, 142 (1st Cir. 1985) ) (quoting McCarthy, § 7:12); see also Autodesk, Inc. v. Dassault Sys. SolidWorks Corp., 685 F. Supp. 2d 1001, 1013-14 (N.D. Cal. 2009) (quoting same).  Far from being distinct, a "trade dress" concept consisting of heart shapes is generic in the field of toys sold to girls.  See, e.g., Kendall-Jackson Winery, Ltd. v. E & J Gallo Winery, 150 F.3d 1042, 1048 (9th Cir. 1998) (use of any grape leaf on a bottle of wine was generic).

**CONTESTED.**  Interpreting 15 U.S.C. §1127, the Supreme Court  in *Qualitex* noted that the statute allows "any word, name, symbol, or device" to achieve trademark status.  *Qualitex Co. v. Jacobson Prods. Co., Inc.*, 514 U.S. 159, 172-173 (1995) ("the Ninth Circuit erred in barring Qualitex's use of color as a trademark").  The accompanying Senate Report "intentionally retains . . . the words 'symbol or device' so as not to preclude the registration of colors, *shapes*, sounds or configurations where they function as trademarks."  *Id*. (quoting S. Rep. No. 100-515, at 44 (1988), *reprinted in* 1988 U.S.C.C.A.N. 5557, 5607) (emphasis added).  Niether *Autodesk*, nor *Wiley* deals with product packaging as the asserted trade dress.  The statement "Far from being distinct, a 'trade dress' concept consisting of heart shapes is generic in the field of toys sold to girls" is attorney argument and not supported by any cases cited.

41.     "[T]here is hardly likelihood of confusion . . . when the name of the manufacturer is clearly displayed." Aurora World, 2009 WL 6617192, at *33; see First Brands, 809 F.2d at 1384; "[W]e cannot comprehend that even a careless purchaser, having in mind the catchwords 'Three in One,' having in mind the white letter '3' superimposed upon the red figure '1,' could be confused or deceived by the package bearing the catchwords 'Big Four,' and the figure '4' in blue superimposed upon a red rectangle, with all the other differences in the makeup of the label." G.W. Cole Co. v. Am. Cement & Oil Co., 130 F. 703, 706 (7th Cir. 1904) (finding "no similarity" between marks at issue).

**CONTESTED**.  The Ninth Circuit has found that the "use of another's trademark in a manner calculated 'to capture initial consumer attention, even though no actual sale is finally completed as a result of the confusion, may be still an infringement.'" *Brookfield Commc'ns v. West Coast Entm't Corp.*, 174 F.3d 1036, 1062 (9th Cir. 1999).

42.     The absence of evidence of actual confusion suggests no genuine likelihood of confusion.  Cohn v. Petsmart, Inc., 281 F.3d 837, 842 (9th Cir. 2002).

**CONTESTED**.  Evidence of actual confusion is irrelevant when the products only cooexisted for a short time, and in any event, the absence of evidence of actual confusion need not give rise to an inference of likelihood of confusion. *Academy of Motion Picture Arts & Sciences v. Creative House Promotions, Inc.*, 944 F.2d 1446, 1456 (9th Cir. 1991)("[A]ctual confusion is not necessary to a finding of likelihood of confusion under the Lanham Act"); *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1360 (9th Cir. 1985) ("The absence of evidence of actual confusion need not give rise to an inference of no likelihood of confusion"); *Centaur Communications, Ltd. v. A/S/M Communications, Inc.*, 830 F.2d 1217, 1227 (2d Cir. 1987) (absence of actual confusion not significant when goods competing for a short time); *TriMark USA, Inc. v. Performance Food Group, LLC*,

667 F.Supp.2d 155, 167 (D.Mass. 2009) (finding lack of evidence of consumer confusion irrelevant where logos had only coexisted for several months).

43.    "[A] cause of action or remedy dependent on a statute falls with the repeal of the statute." People v. Acosta, 48 Cal. App. 4th 411, 418 (1996) (citing Callet v. Alioto, 210 Cal. 65, 67-68 (1930)); see also Penpower Tech. v. S.P.C. Tech., 627 F. Supp. 2d 1083, 1090 ("'The repeal of a statute creating a penalty, running either to an individual or the state, at any time before final judgment, extinguishes the right to recover the penalty.'") (quoting People v. One 1986 Toyota Pickup, 31 Cal. App. 4th 254, 262 (1995)); Capcom Co. v. MKR Group, Inc., 2008 WL 4661479, at *2 n.2 (N.D. Cal. Oct. 20, 2008) (dismissing § 14330 claim with prejudice based on repeal of the statute).

**IMMATERIAL.**

44.    "To succeed under both the federal and common law, plaintiff must establish that its mark is 'famous.'" Genovese Drug Stores, Inc. v. TGC Stores, Inc., 939 F. Supp. 340, 349 n.4 (D. N.J. 1996).

**UNCONTESTED**

45.    "Because protection from dilution comes close to being a right in gross, it is a cause of action reserved for a select class of marks—those marks with such powerful consumer associations that even non-competing uses can impinge on their value." Nissan Motor Co. v. Nissan Computer Corp., 378 F.3d 1002, 1011 (9th Cir. 2004) (reversing injunction and remanding) (citation omitted); see also 15 U.S.C. § 1125(c)(1) ("[S]ubject to the principles of equity, [for] the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, . . . against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the

presence or absence of actual or likely confusion, of competition, or of actual economic injury.").

**UNCONTESTED.**

46.     The Lanham Act extends dilution protection only to those whose marks are "*widely* recognized by the *general consuming public* of the United States as a designation of source of the goods or services of the mark's owner."  15 U.S.C. 1125(c)(2)(A) (emphasis added).  "In short, for purposes of § 1125(c), a mark usually will achieve broad-based fame only if a large portion of the general consuming public recognizes that Mark.  In other words, *the mark must be a household name*."  Thane Int'l v. Trek Bicycle Corp., 305 F.3d 894, 911 (9th Cir. 2002) ("[F]amousness is . . . a hard standard to achieve.") (citation omitted); see Avery Dennison Corp. v. Sumpton, 189 F.3d 868, 877-78 (9th Cir. 1999) (rejecting fame for "Avery Dennison" mark "as a matter of law," despite its use for "large fractions of a century").

**UNCONTESTED.**

47.     For a dilution claim to succeed in this Circuit, the "mark used by the alleged diluter must be identical, or nearly identical, to the protected mark."  Nissan Motor Co., 378 F.3d at 1011 (citation omitted).

**UNCONTESTED.**

48.     "This Circuit has consistently held that state common law claims of unfair competition and actions pursuant to California Business and Professions Code §17200 are 'substantially congruent' to claims made under the Lanham Act." Cleary v. News Corp., 30 F.3d 1255, 1262-63 (9th Cir. 2004) (ruling that "the district court properly dismissed" the common law and statutory unfair competition claims "[f]or all the same reasons" it dismissed the Lanham Act claim); Express, LLC v. Forever 21, Inc., 2010 WL 3489308 (C.D. Cal. Sept. 2, 2010) (granting

summary judgment on a §17200 claim because trade dress infringement claim failed).

**CONTESTED.** Section 17200 "covers a wide range of conduct" and "embraces anything that can properly be called a business practice and that at the same time is forbidden by law." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1143 (2003). Furthermore, "under section 17200, a practice may be deemed unfair even if not specifically proscribed by some other law." *Id.* The cases Mattel cites involved Section 17200 claims based specifically on alleged violations of the Lanham Act or trade dress infringement, and so both claims were dismissed for identical reasons. They do not hold that Section 17200 covers *only* such claims.

49.     A private litigant "has standing to assert a claim under the UCL only if he or she 'has suffered injury in fact *and* has lost money or property as a result of such unfair competition.'" Buckland v. Threshold Enter., Ltd., 155 Cal. App. 4th 798, 812 (2007) (emphasis added) (quoting Californians for Disability Rights v. Mervyn's, LLC, 39 Cal. 4th 223, 227 (2006)).

**UNCONTESTED.**

50.     "To establish 'loss of money or property' a plaintiff must have 'prior possession or a vested legal interest in the money or property lost.'" Pom Wonderful LLC , v. Welch Foods, Inc., 2009 WL 5184422, at *2 (C.D. Cal. Dec. 21, 2009) (citing Walker v. Geico Gen. Ins. Co., 558 F.3d 1025 (9th Cir. 2009) (affirming ruling that plaintiff lacked standing under the UCL because "he cannot establish the requisite 'lost money or property'")).

**CONTESTED.** *Pom Wonderful LLC* does not hold that one must have prior possession or a vested legal interest. In fact, the court noted that the complaint was deficient because, for among other reasons Pom did not "point[] to any money that

it has been required to expend as a result of [defendant's] unfair business practices or false advertising."  2009 WL 5184422, at *3.

51.    A plaintiff who cannot establish standing under the UCL is not entitled to injunctive relief.  See Walker, 558 F.3d 1025; Citizens of Humanity, 171 Cal. App. 4th at 22 (failure to show cognizable loss under the UCL prevents standing to pursue either restitution or injunctive relief).

**UNCONTESTED**.

52.    Restitution under the UCL is limited to "classic restitution;" that is, "money or property that defendants took directly from plaintiff" or money or property in which [plaintiff] has a vested interest."  Korea Supply Co. v Lockheed Martin Corp., 29 Cal. 4th 1134, 1149 (2003).  There is no right to recover non-restitutionary disgorgement of profits.  Id.  Restitution under § 17203 must be "unconditional," "absolute," and "not contingent."  Nat. Rural Telecm'ns Co-op v. DirecTV, 319 F. Supp. 2d 1059, 1080 (C.D. Cal. 2003).

**CONTESTED.**  The *Korea Supply* court noted that disgorgement is a broad remedy that may compel a defendant to surrender all money obtained through an unfair business practice, even if the plaintiff did not have an ownership interest in those profits.  *Korea Supply Co*, 29 Cal. 4th at 1145.

53.    Unspecified losses of sales, profits, and goodwill, and other similar alleged harms, which are not restitutionary.  See Citizens of Humanity, 171 Cal. App. 4th 1, 22 (harm to goodwill not capable of restitution); Inline, Inc. v. A.V.L. Holding Co., 125 Cal. App. 4th 895, 904-905 (2005) (rejecting various forms of requested recovery because not restitutionary, including consequential losses and fair market value of property sold); Pegasus Satellite Television, Inc. v. DirecTV, Inc., 318 F. Supp. 2d 968, 979 (C.D. Cal. 2004) (one competitor does not have a vested interest in the profits of another).

1      **CONTESTED.**  This statement does not make sense.  But in any case, the

2    cases do not hold that "unspecified losses of sales or profits" or "other similar

3    alleged harms" are not restitutionary.  *Citizens of Humanity*, 171 Cal. App. 4th at 22

4    only holds that the alleged harm to goodwill in that case is not recoverable.  *Inline,*

5    *Inc.* and *Pegasus* both concern the recovery of contingent sales profits and are,

6    therefore, not instructive in this instance.

7    54.    Cal. Bus. & Prof. Code § 17200 "establishes three varieties of unfair

8    competition – acts or practices which are unlawful, or unfair or fraudulent."  <u>Cel-</u>

9    <u>Tech Commc'ns Inc. v. Los Angeles Cellular Tel. Co.</u>, 20 Cal. 4th 163, 180 (1999).

10   MGA does not have evidence sufficient to prove any prong of the UCL.

11      **UNCONTESTED** on the statement of law.  **CONTESTED** on the factual

12   statement for the reasons set forth in MGA's Opposition to Mattel's Motion for

13   Partial Summary Judgment.

14
15   55.    For purposes of the UCL, "fraudulent" conduct means a business practice

16   that is likely to deceive members of the public.  <u>Buena Vista, LLC v. New Res.</u>

17   <u>Bank</u>, 2010 WL 3448561, at *6 (N.D. Cal. Aug. 31, 2010) ("A fraudulent business

18   practice [under the UCL] is one that is likely to deceive members of the public.")

19   (quoting  <u>Morgan v. AT&T Wireless Servs.</u>, Inc., 177 Cal. App. 4th 1235, 1254

20   (2009)); <u>Weinstat v. Dentsply Int'l, Inc.</u>, 180 Cal. App. 4th 1213, 1223 n.8 ("To

21   sustain a UCL cause of action based on such fraudulent or deceptive practices, a

22   plaintiff must show that 'members of the public are likely to be deceived.'").

23      **UNCONTESTED.**

24   56.    An unlawful business practice under the UCL is one that is "forbidden by

25   law."  <u>Klein v. Earth Elements, Inc.</u>, 59 Cal. App. 4th 965, 969 (1997).

26      **UNCONTESTED.**

27   57.    Cal. Bus. & Prof. Code Section 16600 provides: "Except as provided in this

28   chapter, every contract by which anyone is restrained from engaging in a lawful

profession, trade, or business of any kind is to that extent void." This statute "invalidates provisions in employment agreements prohibiting an employee from working for a competitor after completion of his employment . . . ." Muggill v. Reuben H. Donnelley Corp., 62 Cal. 2d 239, 242 (1965); Loral Corp. v. Moyes, 174 Cal. App. 3d 268, 275-76 (1985).

**CONTESTED.** The case law Mattel cites is not an exclusive list of Section 16600's function. Section 16600 invalidates any agreement that would restrain an employee's lawful pursuit of his or her profession, and is to be interpreted broadly. *Edwards v. Arthur Andersen LLP*, 44 Cal. 4th 937, 949-50 (2008).

58. Invention disclosure agreements are widely employed in California and do not violate § 16600. See Board of Trustees of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc., 583 F.3d 832, 845-46 (Fed. Cir. 2009) (holding that invention disclosure agreements are not within the purview of § 16600, which applies to "employment restrictions on departing employees, not to patent assignments"). By contrast, § 16600 is limited to "contracts precluding a *former* employee *from obtaining new employment with a competitor*." Loral Corp, 174 Cal.App.3d at 275-76 (emphasis added).

**CONTESTED.** Section 16600 precludes enforcement of inventions agreements to the extent they extend beyond the protection of the employer's confidential information, including by purporting to cover ideas not reduced to practice as work made for hire during the time of employment, because such agreements would restrain an employee's lawful pursuit of his or her profession after completion of his or her employement. *Rigging International Maintenance Company v. Gwin*, 128 Cal. App. 3d 594, 614 (1982) ("[S]ection 16600 precludes enforceability of the [inventions] agreement ... beyond the protection of confidential information.); *Litton Sys. v. Honeywell, Inc.*, 1995 WL 366468, at *49 (C.D. Cal. 1995) (finding licensing agreement for invalid patent where no trade secrets were

1   misappropriated unenforceable based on *Rigging* and holding that "to allow the

2   enforcement of a restraint on trade without proof that a trade secret was actually

3   used . . . would, in effect, violate the proscription of section 16600"), *rev'd on other*

4   *grounds*, 87 F.3d 1559 (Fed. Cir. 1996) (vacated at 520 U.S. 1111 (1997)); *Applied*

5   *Materials Inc. v. Advanced Micro-Fabrication Equipment*, 630 F. Supp. 2d 1084,

6   1090 (N.D. Cal. 2009) (agreement requiring employees to assign any invention

7   disclosed within one year of terminating employment violated §16600 because it

8   was "not limited to inventions that are based on Plaintiff's confidential

9   information").

10      To the extent *Board of Trustees* is to the contrary, it is contrary to established

11   California law.

12   59.   "When a plaintiff who claims to have suffered from a direct competitors'

13   "unfair" act or practice invokes section 17200, the word "unfair" in that section

14   means conduct that threatens an incipient violation of an antitrust law, or violates

15   the policy or spirit of one of those laws because its effects are comparable to or the

16   same as a violation of the law or otherwise significantly threatens or harms

17   competition." <u>Cel-Tech</u>, 20 Cal. 4th at 187; <u>see also</u> <u>Carter v. Variflex, Inc.</u>, 101 F.

18   Supp. 2d 1261, 1270 (C.D. Cal. 2000) (dismissing § 17200 claim because conduct

19   did not rise to the level of a Sherman Act violation); <u>Sun Microsystems, Inc. v.</u>

20   <u>Microsoft Corp.</u>, 87 F. Supp. 2d 992, 1001 (N.D. Cal. 2000).  "Injury to a

21   competitor is not equivalent to injury to competition; only the latter is the proper

22   focus of the antitrust laws." <u>Cel-Tech</u>, 20 Cal.4th at 186.  <u>se</u> [sic]

23      **CONTESTED.**  The California Supreme Court has explained that common

24   law misappropriation "extended to situations other than classic 'passing off,' [and]

25   deceptive conduct has remained at the heart of unfair competition."  *Cel-Tech*

26   *Commc'ns Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 193 (1999)

27   (concurring and dissenting opinion); *see also Schechter Corp. v. United States*, 295

28

- 32 -

1   U.S. 495, 531-32 (1935) ("Unfairness in competition has been predicated on acts

2   which lie outside the ordinary course of business and are tainted by fraud, coercion,

3   or conduct otherwise prohibited by law"); *Weinstock, Lubin & Co. v. Marks*, 109

4   Cal. 529, 541 (1895) (explaining that unfair competition "appl[ies] to all cases

5   where fraud is practiced by one in securing the trade of a rival dealer").  Courts

6   developed this common law claim to include all fraudulent methods employed by

7   competing businesses, recognizing that the methods that could be used "are as

8   many and as various as the ingenuity of the dishonest schemer can invent."

9   *Weinstock, Lubin & Co.*, 109 Cal. at 541.

10   60.   Sending letters reminding employees of their existing obligations cannot, as a

11   matter of law, constitute "an incipient violation of an antitrust law" or anything

12   approaching it.  Cel-Tech, 20 Cal. 4th at 187.  Such communications are privileged.

13   See Rubin v. Green, 4 Cal. 4th 1187, 1194 (1993) ("[I]t is late in the day to contend

14   that communications with 'some relation to an *anticipated* lawsuit are not within

15   the privilege.") (emphasis in original);  Kashian v. Harriman, 98 Cal. App. 4th 892,

16   913 (2002); Rubin, 4 Cal. 4th at 1203 ("immunity should not evaporate merely

17   because the plaintiff discovers a conveniently different label for pleading what is in

18   substance an identical grievance arising from identical conduct as that protected by

19   [Cal. Civil Code] § 47(b)").

20   **CONTESTED.**  Both the inclusion of unenforceable terms in contracts and

21   misrepresentation of contractual rights are bases for unfair competition liability.

22   *See People v. McKale*, 25 Cal. 3d 626, 634-35 (1979);  *People v. Custom Craft*

23   *Carpets, Inc.*, 159 Cal. App. 3d 676, 683-84 (1984).

24   61.   The Noerr-Pennington doctrine extends to all "conduct incidental to the

25   prosecution of the suit." Columbia Pictures Indus., Inc. v. Prof. Real Estate Inv.,

26   Inc., 944 F.2d 1525, 1528 (9th Cir. 1991), aff'd 508 U.S. 49 (1993); see also

27   Aronson v. Kinsella, 58 Cal. App. 4th 254, 270 (1997) (demand letters protected as

28

pre-litigation exercise of right to petition); <u>Leegin Creative Leather Prods. v. M.N. Rogers</u>, 33 U.S.P.Q.2d 1158, 1159-60 (C.D. Cal. 1994) (dismissing, under Cal. Civ. Code § 47(2), claims based on cease and desist letters: "The privilege extends to communications preliminary to a judicial proceeding" and "is absolute.").

**CONTESTED.** Not all conduct incidental to the prosecution of a suit falls within the ambit of the *Noerr-Pennington* doctrine. For example, there is the well-accepted exceptions noted in *Kearny v. Foley & Lardner, LLP*, 590 F.3d 638, 646-47 (9th Cir. 2009).

62. Common law unfair competition is a tort sounding in fraud. <u>See</u> <u>Cel-Tech Commc'ns Inc. v. Los Angeles Cellular Tel. Co.</u>, 20 Cal. 4th 163, 192-93 (1999).

**UNCONTESTED.** The California Supreme Court has explained that common law misappropriation "extended to situations other than classic 'passing off,' [and] deceptive conduct has remained at the heart of unfair competition." *Cel-Tech Commc'ns Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 193 (1999) (concurring and dissenting opinion); *see also Schechter Corp. v. United States*, 295 U.S. 495, 531-32 (1935) ("Unfairness in competition has been predicated on acts which lie outside the ordinary course of business and are tainted by fraud, coercion, or conduct otherwise prohibited by law"); *Weignstock, Lubin & Co. v. Marks*, 109 Cal. 529, 541 (1895) (explaining that unfair competition "appl[ies] to all cases where fraud is practiced by one in securing the trade of a rival dealer"). Courts developed this common law claim to include all fraudulent methods employed by competing businesses, recognizing that the methods that could be used "are as many and as various as the ingenuity of the dishonest schemer can invent." *Weinstock, Lubin & Co.*, 109 Cal. at 541.

63. Courts are divided over whether a claim for unjust enrichment even exists. <u>See</u> <u>Nordberg v. Trilegiant Corp.</u>, 445 F. Supp. 2d 1082, 1100-01 (N.D. Cal. 2006) (collecting cases); <u>see, e.g.</u>, <u>McBride v. Boughton</u>, 123 Cal.App.4th 379, 387

1  (2004) ("Unjust enrichment is not a cause of action, however, or even a remedy, but

2  rather a general principle, underlying various legal doctrines and remedies.  It is

3  synonymous with restitution.") (internal quotations omitted).

4       **CONTESTED.** California courts permit claims for unjust enrichment. *See,*

5  *e.g., Villager Franchise Sys. v. Dhami, Dhami & Virk*, 2006 WL 224425 (E.D. Cal.

6  2006) ("California law recognizes a cause of action for unjust enrichment") (citing

7  *Ghirardo v. Antonioli*, 14 Cal. 4th 39, 51 (1996)); *Gerlinger v. Amazon.com, Inc.*,

8  311 F.Supp.2d 838, 856 (N.D. Cal. 2004) (recognizing unjust enrichment under

9  California law). The Ninth Circuit concurs. *See Paracor Fin. v. Gen. Elec. Capital*

10  *Corp.*, 96 F.3d 1151, 1167 (9th Cir. 1996); *Western Pac. R. Corp. v. Western Pac.*

11  *R. Co.*, 206 F.2d 495, 498 (9th Cir. 1953) (noting California recognizes a cause of

12  action based on unjust enrichment).

13  64.    Courts that permit unjust enrichment claims require a plaintiff to show it

14  conferred a benefit on defendant that the defendant may not justly retain.  See

15  Peterson v. Cellco P'ship, 164 Cal. App. 4th 1583, 1593 (2008) (elements of claim

16  for unjust enrichment include receipt of benefit and unjust retention of the benefit at

17  the expense of the plaintiff); Ghirardo v. Antonioli, 14 Cal. 4th 39, 51 (1996)

18  (noting that "an individual may be required to make restitution if he is unjustly

19  enriched at the expense of another," but "only if the circumstances of [defendant's]

20  receipt and retention [of the benefit] are such that, as between the two persons, it is

21  unjust for him to retain it.").

22       **UNCONTESTED.**

23  65.    Disgorgement as a remedy for unjust enrichment is typically used where a

24  fiduciary relationship exists between plaintiff and defendant.  See Peterson, 164 Cal.

25  App. 4th at 1594 (distinguishing cases permitting disgorgement on the grounds that

26  they involved fiduciary relationship).

27

28

1        **CONTESTED.** California law permits MGA to seek disgorgement of

2  Mattel's illicit profits gained through its unlawful behavior because the courts

3  recognize that, "[m]any instances of liability based on unjust enrichment…do not

4  involve the restoration of anything the claimant previously possessed...including

5  cases involving the disgorgement of profits…wrongfully obtained…" *County of*

6  *San Bernardino v. Walsh*, 158 Cal. App. 4th 533, 542 (2007) (citing *Dunkin v.*

7  *Boskey*, 82 Cal.App.4th 171, 198 (2000)).  Thus, disgorgement is permitted as a

8  matter of public policy because the state of California "does not permit one to 'take

9  advantage of his own wrong' regardless of whether the other party suffers actual

10  damage." *Id.* (quoting *Ward v. Taggart*, 51 Cal.2d 736, 741-42 (1959)).

11  66.    Under California law, information is a trade secret if it derives independent

12  economic value from not being generally known and is the subject of reasonable

13  efforts to keep secret. <u>Cal. Civ. Code</u> §3426.1(d).

14        **UNCONTESTED**.

15  67.    Having employees sign confidentiality agreements constitutes reasonable

16  efforts as a matter of law. <u>MAI Systems Corp. v. Peak Computer, Inc.</u>, 991 F.2d

17  511, 521 (9th Cir. 1993); <u>Bridge Publications, Inc. v. Vien</u>, 827 F.Supp. 629 (S.D.

18  Cal. 1993).

19        **CONTESTED.**  Requiring employees to sign confidentiality agreements

20  does not in itself constitute reasonable efforts as a matter of law as demonstrated by

21  the cases that Mattel cites.  In *Mai*, for example, while the Court ruled that the

22  plaintiff had taken reasonable efforts to protect its Consumer Database, the signing

23  of confidentiality agreements was merely one effort among many. *Mai Systems*

24  *Corp. v. Peak Computer, Inc.*, 1992 WL 159803, at \*7 (finding reasonable efforts

25  because, in addition to requiring confidentiality agreements, "only the District

26  Managers, their superiors, and MAI employees with security clearance and a

27  security password have access to the file.  Particularly important information such

28

1   as the customer database can be accessed only by the District Manager and their

2   superiors. Employees are also precluded from removing the customer database from

3   the office and may not disclose such information to anyone outside the office."").

4   Similarly, the existence of a confidentiality agreement was just one of many factors

5   listed in *Bridge*.  *See Bridge Publications, Inc. v. Vien,* 827 F.Supp. 629, 633 (S.D.

6   Cal. 1993).

7           Indeed, the mere signing of confidentiality agreements does not constitute

8   reasonable efforts.  *Electro-Craft Corp. v. Controlled Motion*, 332 N.W.2d 890,

9   902-03 (Minn. 1983) (vague language in employment agreements of need to protect

10  confidential information was inadequate where employer did not define what it

11  considered to be confidential); *Webster Eng'g & Mfg. Co. v. Francis*, 1993 WL

12  406025, at *4 (D. Kan. Oct. 12, 1993) ("it is necessary to inform employees what

13  information is considered confidential"); *Dynamics Research Corp. v. Analytic Sci.*

14  *Corp*., 400 N.E.2d 1274, 1287-88 (Mass. 1980) (employment agreement vaguely

15  defining trade secrets as all business and customer information did not put

16  employee on notice of what was trade secrets, particularly where contract could

17  restrain employee from using general skill and knowledge).

18  68.    Reasonable efforts to protect include reminding employees about their

19  obligation to preserve the confidentiality of employer's trade secrets.  Vermont

20  Microsystems, Inc. v. Autodesk, Inc., 88 F.3d 142, 150 (2d Cir. 1996).

21          **CONTESTED.**  Reminding employees that there is an obligation to keep

22  confidential trade secrets is not a reasonable effort to preserve the confidentiality of

23  trade secrets when there is no effort to define for an employee what is and is not a

24  trade secret.  In *Vermont Microsystems, Inc. v. Autodesk, Inc.*, 88 F.3d 142, 150 (2d

25  Cir. 1996), such reminders were considered reasonable because the employee "was

26  reminded of his confidentiality obligations under the Invention and Nondisclosure

27  Agreement" regarding "the architechture of the display list driver."  Moreover, the

28

employee "had every reason to know what [his employer] considered its proprietary

technology." *Id*.; *see also CVD, Inc. v. Raytheon Co.*, 769 F.2d 842, 853 (1st

Cir. 1985) (company's failure to abide by its own written policy to stamp

confidential documents with a restrictive legend was significant to whether

information was a trade secret); *Hoffman v. Impact Confections, Inc.*, 544 F.Supp.

2d 1121, 1126 (S.D. Cal. 2008) (granting summary judgment on reasonable

measures element based on failure to designate as confidential the materials at

issue); *Gemisys Corp. v. Phoenix American, Inc.*, 186 F.R.D. 551, 558-60 (N.D.

Cal. 1999) (plaintiff failed to place confidentiality markings on materials claimed to

be trade secrets); *Electro-Craft Corp. v. Controlled Motion*, 332 N.W.2d 890, 902-

03 (Minn. 1983) (vague language in employment agreements of need to protect

confidential information was inadequate where employer did not define what it

considered to be confidential); *Webster Eng'g & Mfg. Co. v. Francis*, 1993 WL

406025, at *4 (D. Kan. Oct. 12, 1993) ("it is necessary to inform employees what

information is considered confidential"); *Dynamics Research Corp. v. Analytic Sci.

Corp.*, 400 N.E.2d 1274, 1287-88 (Mass. 1980) (employment agreement vaguely

defining trade secrets as all business and customer information did not put

employee on notice of what was trade secrets, particularly where contract could

restrain employee from using general skill and knowledge).

69.     Reasonable efforts to protect include physically securing trade secrets.

Courtesy Temporary Service, Inc., v. Camacho, 222 Cal. App. 3d 1278 (1990).

**CONTESTED.**  Reasonable efforts to protect include allowing employees

access to trade secrets "only as is necessary for them to effectively carry out their

specific duties," and upon doing so ensuring that "the employees are told of the

confidential and proprietary nature of such information." *Courtesy Temporary

Service, Inc., v. Camacho*, 222 Cal. App. 3d 1278, 1288 (1990).  However, such

efforts are not reasonable when employees are not informed of what is and is not a trade secret.  *CVD, Inc. v. Raytheon Co.*, 769 F.2d 842, 853 (1st Cir. 1985) (company's failure to abide by its own written policy to stamp confidential documents with a restrictive legend was significant to whether information was a trade secret); *Hoffman v. Impact Confections, Inc.*, 544 F.Supp. 2d 1121, 1126 (S.D. Cal. 2008) (granting summary judgment on reasonable measures element based on failure to designate as confidential the materials at issue); *Gemisys Corp. v. Phoenix American, Inc.*, 186 F.R.D. 551, 558-60 (N.D. Cal. 1999) (plaintiff failed to place confidentiality markings on materials claimed to be trade secrets); *Electro-Craft Corp. v. Controlled Motion*, 332 N.W.2d 890, 902-03 (Minn. 1983) (vague language in employment agreements of need to protect confidential information was inadequate where employer did not define what it considered to be confidential); *Webster Eng'g & Mfg. Co. v. Francis*, 1993 WL 406025, at \*4 (D. Kan. Oct. 12, 1993) ("it is necessary to inform employees what information is considered confidential"); *Dynamics Research Corp. v. Analytic Sci. Corp.*, 400 N.E.2d 1274, 1287-88 (Mass. 1980) (employment agreement vaguely defining trade secrets as all business and customer information did not put employee on notice of what was trade secrets, particularly where contract could restrain employee from using general skill and knowledge).

70.     Reasonable efforts to protect include procedures to control access to electronically stored confidential information.  Morlife, Inc. v. Perry, 56 Cal. App. 4th 1514, 1523 (Cal. App. 1997); Citizens of Humanity, LLC v. Costco Wholesale Corp., 171 Cal. App. 4th 1, 14 (2009).

          **CONTESTED.** Reasonable efforts to protect may include sufficiently rigorous procedures to control access to electronically stored confidential information that is specifically identified to employees as being confidential.  In *Morlife*, the fact that "customer information was stored on a computer with

restricted access," was not the sole basis for this court's finding that there were reasonable efforts taken. The court further noted that the employees had signed a confidentiality agreement that "included a confidentiality provision expressly referring to its customer names and telephone numbers," *and* that the company's "employee handbook contained an express statement that employees shall not use or disclose … 'lists of present and future customers'" was sufficient to support a reasonable efforts finding. *Morlife, Inc.*, 56 Cal. App. 4th at 1523. In *Citizens of Humanity, LLC*, the fact that there was "controlled access" also was not the sole basis for the court's conclusion that reasonable efforts were taken to maintain secrecy. 171 Cal. App. 4th at 14 (noting that the efforts to maintain secrecy "include not disclosing vendor information to the media or sources outside Costco; delegating the secondary market purchases of apparel to a subsidiary, which keeps its employees separate from other Costco buyers and employees; and keeping all purchase orders and related documents on a separate software system with access restricted to only specific employees").

71.    A trade secret has independent economic value as a matter of law if it has potential value to a competitor. <u>MAI Systems Corp. v. Peak Computer, Inc.</u>, 991 F.2d 511, 521 (9th Cir. 1993); <u>Bridge Publications, Inc. v. Vien</u>, 827 F.Supp. 629 (S.D. Cal. 1993).

**CONTESTED.**  A trade secret must have economic value from not being generally known *and* even if not generally known, it must still have economic value. *Vacco Indus., Inc. v. Van Den Berg*, 5 Cal. App. 4th 34, 50 (1992); *GAB Business Servs., Inc. v. Lindsey & Newsom Claim Servs., Inc.*, 83 Cal. App. 4th 409, 427-28 (2000), *overruled on other grounds*, *Reeves v. Hanlon*, 33 Cal. 4th 1140 (2004).   As to value, "the core inquiry" is "the value to the owner in keeping the information secret from persons who could exploit it to the relative

1   disadvantage of the original owner."  *Yield Dynamics, Inc. v. TEA Sys. Corp.*, 154
2   Cal. App. 4th 547, 568 (2007).

3   72.     In addition to direct evidence, the value of information can be shown by
4   evidence of "the resources invested in producing the information." <u>Rel. Tech. Ctr.</u>
5   <u>v. Netcom On-line Comm'n Serv., Inc.</u>, 923 F.Supp. 1231, 1253 (N.D. Cal. 1995).

6           **CONTESTED.**  It is not clear what Mattel means by the term "direct
7   evidence."  The case cited holds that value can be proven by "direct evidence of the
8   impact of the information on the business or by circumstantial evidence of the
9   resources invested in producing the information, the precautions taken to protect its
10  secrecy, and the willingness of others to pay for its access." *Religious Tech. Ctr.*,
11  923 F.Supp. at 1253.  Thus, "the resources invested in producing the information"
12  is simply one of many factors that may be considered when determining whether
13  information derives value from remaining secret and is not identified as a specific
14  dispositive factor.

15  73.     "[T]he more difficult information is to obtain, and the more time and
16  resources expended by an employer in gathering it, the more likely a court will find
17  such information constitutes a trade secret." <u>San Jose Const., Inc. v. S.B.C.C., Inc.</u>,
18  155 Cal. App. 4th 1528 (2007).

19          **CONTESTED.**  The above-stated principle was articulated in the context of
20  customer lists that California courts have been called on to determine whether and
21  under what circumstances they constitute trade secrets.  In *San Jose Construction,*
22  *Inc.*, 155 Cal. App. 4th at 1539, the court contrasted customer lists that were
23  compiled from readily ascertainable information with customer lists "where the
24  employer has expended time and effort identifying customers with particular needs
25  or characteristics . . . ."  The former is typically not a trade secret.  The latter is
26  typically a trade secret.  In other words, and with regard to customer lists, the time
27  and effort necessary to obtaining the information serves as a proxy and one means

28

1   for determining whether a customer list is or is not a trade secret.  *See San Jose*

2   *Construction, Inc.*, 155 Cal. App. 4th at 1539; *see also Morlife Inc. v. Perry*, 56

3   Cal. App. 4th 1514, 1522 (1997)).

4   74.    The elements of an intentional interference with contract claim are: "(1) the

5   existence of a valid contract between [plaintiff] and a third party, (2) [defendant's]

6   knowledge of the contract, (3) intentional acts designed to induce a breach or to

7   disrupt a contractual relationship, (4) actual breach or disruption of the contractual

8   relationship, and (5) resulting damage."  <u>Bank of N. Y. v. Fremont Gen. Corp.</u>, 523

9   F.3d 902, 909 (9th Cir. 2008).

10       **CONTESTED.**  The elements set forth by above are incomplete insofar as

11  they fail to adequately account for the additional causation hurdle that must be

12  proven before a claim for intentional interference with contract may lie.  For

13  completeness sake, "[t]he third element require[s] [plaintiff] to show that

14  [defendant] knew the interference was certain or substantially certain to occur as a

15  result of its action, and no liability can arise unless [defendant's] alleged wrong or

16  unjustified conduct *caused the breach*."  *Bank of N.Y. v. Fremont Gen. Corp.,* 523

17  F.3d 902, 909 (9th Cir. 2008) (emphasis added).  "It is not enough that the actor

18  intended to perform the acts which cause the result—he or she must have intended

19  to cause the result itself."  *Kasparian v. County of Los Angeles*, 38 Cal. App. 4th

20  242, 261 (1995).  For interference with an at-will contract, a plaintiff must prove an

21  additional element, that the defendant engaged in an independently wrongful act,

22  i.e., an act "'proscribed by some constitutional, statutory, regulatory, common law

23  or other determinable legal standard.'"  *Reeves v. Hanlon*, 33 Cal. 4th 1140, 1152-

24  53 (2004) (quoting *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134,

25  1158 (2003)).

26  75.    Confidentiality provisions in employment agreements prohibiting employees

27  from taking, disclosing or using proprietary information are valid and enforceable.

28  <u>See</u> <u>Loral Corp. v. Moyes</u>, 174 Cal. App. 3d 268, 276 (1985) ("Section 16600 does

1   not invalidate an employee's agreement not to disclose his former employer's

2   confidential customer lists or other trade secrets or not to solicit those customers.");

3   Hollingsworth Solderless Terminal Co. v. Turley, 622 F.2d 1324, 1338 (9th Cir.

4   1980); see also ViChip Corp. v. Lee, 483 F. Supp. 2d 1087, 1100 (N.D. Cal. 2006)

5   (enforcing contractual provision requiring employee to promptly return all

6   proprietary or confidential information of the employer upon termination of his

7   employment).

8       **CONTESTED.**  Unlike the affirmative determination Mattel seeks, the cited

9   law does not bind this Court to make that determination.  For example, in *Loral*

10  *Corp.*, the court properly framed the issue as follows:  "Our question then is

11  whether a noninterference agreement not to solicit former coworkers to leave the

12  employer is more like a noncompetition agreement which is invalid, or a

13  nondisclosure or nonsolicitation agreement which *may* be valid."  *Loral Corp. v.*

14  *Moyes*, 174 Cal. App. 3d 268 (1985) (emphasis added).  Accordingly, the *Loral*

15  decision is distinguishable for at least the following two points:  (1) it analyzed the

16  validity of a "noninterference agreement"; and (2) it opined simply that a

17  "nondisclosure agreement" may be valid, not that it must be valid and enforceable,

18  as Mattel suggests.

19  76.   All employees, regardless of their rank, owe an undivided duty of loyalty to

20  their employer.  Cal. Labor Code § 2863; Otsuka v. Polo Ralph Lauren Corp., 2007

21  WL 3342721, at * 3 (N.D. Cal. Nov. 9, 2007) (applying California law); Hangar

22  Prosthetics & Orthotics, Inc. v. Capstone Orthopedic, Inc., 556 F. Supp. 2d 1122

23  (E.D. Cal. 2008) (applying California law).

24      **CONTESTED.**  Labor Code Section 2863 does not compel employees to

25  give an "undivided" duty of loyalty to their employers.  Rather, Labor Code Section

26  2863 provides as follows: "An employee who has any business to transact on his

27  own account, similar to that intrusted to him by his employer, shall always give the

28  preference to the business of the employer."  All an employee must do is give

1  "preference" to the employer.  A preference gives priority, but is not an exclusion.

2  This is the antithesis of requiring an undivided duty of loyalty.  Rather, it is a

3  statement that there is no such duty.

4       Moreover, *Otsuka v. Polo Ralph Luaren Corp.,* confirms that no California

5  court has ever held that each and every employee, regardless of rank, owes their

6  employer a duty of loyalty. 2007 WL 3342721, at * 2 (N.D. Cal. Nov. 9, 2007)

7  (inferring a rank and file duty of loyalty from "broad language" and the 9th

8  Circuit's treatment of Hawaii's law).  MGA is aware of no case, and Mattel does

9  not identify any, which prohibits rank and file employees from having a second job.

10  77.    Generally, the duty of loyalty exists during the term of the employment.

11  <u>Barney v. Burrow</u>, 558 F. Supp. 2d 1066, 1082 (E.D. Cal. 2008).  But an employee

12  may breach the duty of loyalty even after termination of the employment

13  relationship by disclosing or using his former employer's confidential information.

14  Restatement (Third) of Employment § 8.01 (2010) ("Employees breach the duty of

15  loyalty by such conduct as . . . disclosing or using the employer's confidential

16  information to serve other than the employer's interest, including after termination

17  of the employment relationship . . . .").

18      **CONTESTED.**  California has not adopted § 8.01 of the Restatement

19  (Third) of Employment, either statutorily or through the courts.  Moreoever, even if

20  such a claim did exist at common law, it has been superseded and preempted by

21  California's Uniform Trade Secrets Act ("CUTSA").

22      A breach of loyalty may not be predicated on an employee's disclosure of her

23  employer's confidential information.   CUTSA contains a savings clause that

24  "preempt[s] claims based on the same nucleus of facts as trade secret

25  misappropriation." *K.C. Multimedia, Inc. v. Bank of Am. Tech. & Operations, Inc.*,

26  171 Cal. App. 4th 939, 962 (2009); Cal. Civ. Code §3426.7. As the Court

27  previously recognized in its August 2 Order (Dkt. #8423), the recent decision in

28  *Silvaco Data Sys. v. Intel Corp.*, 184 Cal. App. 4th 210, 233 (2010), *review denied*,

- 44 -

Aug. 18, 2010, rejected the notion that a party can plead around preemption by asserting claims premised on an alleged theft of confidential information, even if that information was not a trade secret:

> We emphatically reject the . . . suggestion that the uniform act was not intended to preempt 'common law conversion claims based on the taking of information that, though not a trade secret, was nonetheless of value to the claimant.' On the contrary, a prime purpose of the law was to sweep away the adopting states' bewildering web of rules and rationales and replace it with a uniform set of principles for determining when one is – and is not – liable for acquiring, disclosing, or using 'information . . . of value.' Central to the effort was the act's definition of a trade secret. Information that does not fit this definition, and is not otherwise made property by some provision of positive law, belongs to no one, and cannot be converted or stolen. [P]ermitting the conversion claim to proceed on a contrary rationale . . . impliedly *create[s]* a new category of intellectual property far beyond the contemplation of the Act, subsuming its definition of 'trade secret' and effectively obliterating the uniform system it seeks to generate.

184 Cal. App. 4th at 239 n.22 (citations omitted) (emphasis in original).

78.     An employee breaches the duty of loyalty, and the breach "may give rise to a cause of action in the employer, when the employee takes action which is inimical to the best interests of the employer." Stokes v. Dole Nut Co., 41 Cal. App. 4th 285, 295 (1995). "Indeed, by statute, '[a]n employee who has any business to transact on his own account, similar to that intrusted to him by his employer, shall always give the preference to the business of the employer.'" Huong Que, Inc. v. Luu, 150 Cal. App. 4th 400, 414 (2007).

1          **CONTESTED.**  *Stokes v. Dole Nut Co*., was addressed to whether an

2     employer has good cause to terminate employees who had made preparations to

3     establish a competing business, not to whether such actions give rise to a cause of

4     action in tort, much less against a third party. 41 Cal. App. 4th 285, 287 (1995).  In

5     fact, only *fiduciaries* have been held to account for violating a duty of loyalty under

6     California law. *See*, *e.g., Daniel Orifice Fitting Co. v. Whalen*, 198 Cal. App. 2d

7     791, 800 (1962) (discussing "an officer in charge of an important part of the

8     respondent's business").  Moreover, a claim for breach of duty of loyalty requires a

9     showing that the employee's breach was the proximate cause of harm to the

10    employer. *Huong Que, Inc. v. Luu*, 150 Cal. App. 4th 400, 410 (2007).

11    79.     The duty of loyalty includes "the duty to refrain from competing with the

12    principal and from taking action on behalf of or otherwise assisting the principal's

13    competitors, the duty not to acquire a material benefit from a third party in

14    connection with ... actions taken ... through the agent's use of the agent's position

15    and the duty not to use or communicate confidential information of the principal for

16    the agent's own purposes or those of a third party." Huong Que, 150 Cal. App. 4th

17    at 416.  "While California law does permit an employee to seek other employment

18    and even to make some 'preparations to compete' before resigning, California law

19    does not authorize an employee to transfer his loyalty to a competitor." Fowler v.

20    Varian Assocs., Inc., 196 Cal. App. 3d 34, 41 (1987).

21         **CONTESTED.**  For the reasons set forth in responses to Conclusion of Law

22    Nos. 76, 77, and 78 this is an inaccurate statement of law.

23    80.     A fiduciary relationship generally is established by law or agreement.

24    Richelle L. v. Roman Catholic Archbishop, 106 Cal. App. 4th 257, 271 (2003).  A

25    fiduciary relationship also may be established where one party is entrusted with the

26    confidential or valuable property of the other.  See Stevens v. Marco, 147 Cal.

27    App. 2d 357 (1956) (fiduciary relationship existed because one party confidentially

28

entrusted another with "a new and valuable idea"); <u>Michelson v. Hamada</u>, 29 Cal. App. 4th 1566, 1581 (1994) ("Confidential and fiduciary relations are, in law, synonymous, and may be said to exist whenever trust and confidence is reposed by one person in the integrity and fidelity of another."). Under California law, "an officer who participates in management of the corporation, exercising some discretionary authority, is a fiduciary of the corporation as a matter of law." <u>Iconix, Inc. v. Tokuda</u>, 457 F. Supp. 2d 969, 981 (N.D. Cal. 2006) (applying California law).

**CONTESTED.** A fiduciary relationship is an extraordinary position of trust in which the fiduciary undertakes to act completely selflessly and only for the benefit of another. *Oakland Raiders v. Nat'l Football League*, 131 Cal. App. 4th 621, 631-634 (2005). The employer-employee relationship does not normally impose a duty of selflessness. Labor Code § 2854 ("ordinary care and diligence"); *id.* §2863 ("preference to the business of the employer" ); *see Calvao v. Superior Court*, 201 Cal. App. 3d 921, 923 (1988); *Odorizzi v. Bloomfield Sch. Dist.*, 246 Cal. App. 2d 123, 129 (1966). For an employee to be a fiduciary,  (1) the employee must be an officer, (2) the employee must participate in management, and (3) the employee must have discretionary authority in that managerial capacity. *GAB Bus. Servs., Inc. v. Lindsey & Newsom Claim Servs., Inc.,* 83 Cal. App. 409, 420-21 (2004). Not all agreements, especially employment agreements, give rise to fiduciary duties. *Waverly Prods., Inc. v. RKO Gen. Inc.*, 217 Cal. App. 2d 721, 732 (1963) ("A mere contract . . . does not constitute a trust or create a fiduciary relationship."). In order for the contract to suffice to create a fiduciary, the counterparty must have "knowingly" undertaken "the obligations of a fiduciary." *City of Hope Nat'l Med. Ctr. v. Genentech, Inc.*, 43 Cal. 4th 375, 386 (2008). The fact an employment agreement contains a confidentiality obligation is not enough to support a finding that the employee voluntarily agreed to accept a fiduciary duty. *Rita Med. Sys. Inc. v. Resect Med., Inc.,* 2007 WL 161049, at *6 (N.D. Cal. Jan 17,

2007) (no fiduciary duty simply because an employment contract "required [defendant] to keep trade secrets confidential").

*Stevens v. Marco*, 147 Cal. App. 2d 357 (1956), has been overruled by the California Supreme Court in *City of Hope Nat'l Med. Ctr. v. Genentech, Inc.*, 43 Cal. 4th 375 (2008).  *Michelson v. Hamada*, 29 Cal. App. 4th 1566, 1581 (1994), involved an accountant and doctor, which creates a fiduciary relationship by operation of law.

81.    A contractual fiduciary relationship arises "whenever confidence is reposed by persons in the integrity and good faith of another.   If the latter voluntarily accepts or assumes that confidence, he or she may not act so as to take advantage of the others' interest without their knowledge or consent."  City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 68 Cal. App. 4th 445, 483 (1998).  A fiduciary relationship can arise out of an employment or confidentiality agreement where, by the plain terms of the agreement, the contracting parties repose trust or confidence in each other.  See City Solutions, Inc. v. Clear Channel Commc'ns, Inc., 201 F. Supp. 2d 1048, 1050 (N.D. Cal. 2002) (finding that the specific contract at issue did not create fiduciary duties but emphasizing that, "[b]y way of contrast, an otherwise similar confidentiality agreement entered into by [plaintiff] and another party for a different proposal expressly provided that it *did* create a fiduciary duty on the part of the disclosee . . . not to disclose confidential information").  Cf. Women's Fed. Sav. & Loan Assoc. v. Nevada Nat'l Bank, 811 F.2d 1255, 1258 (9th Cir. 1987) (finding that a fiduciary duty arose from the plain terms of the parties' agreement).

**CONTESTED.**  Not all agreements, especially employment agreements, give rise to fiduciary duties. *Waverly Prods., Inc. v. RKO Gen. Inc.*, 217 Cal. App. 2d 721, 732 (1963) ("A mere contract . . . does not constitute a trust or create a fiduciary relationship.").  In order for the contract to suffice to create a fiduciary,

the counterparty must have "knowingly" undertaken "the obligations of a fiduciary." *City of Hope Nat'l Med. Ctr. v. Genentech, Inc.*, 43 Cal. 4th 375, 386 (2008). The fact an employment agreement contains a confidentiality obligation is not enough to support a finding that the employee voluntarily agreed to accept a fiduciary duty. *Rita Med. Sys. Inc. v. Resect Med., Inc.*, 2007 WL 161049, at *6 (N.D. Cal. Jan 17, 2007)(no fiduciary duty simply because an employment contract "required [defendant] to keep trade secrets confidential"). Fiduciary obligations are not imposed simply because two parties to a contract reposed trust and confidence in each other. *City Solutions, Inc. v. Clear Channel Communications, Inc.* 201 F.Supp.2d 1048, 1049 (N.D.Cal. 2002). Parties to a confidentiality agreement do not stand in fiduciary relationship simply by virtues of the confidentiality agreement. *Id.* A fiduciary relationship is created only if the agreement "expressly provided that it did create a fiduciary duty" on the part of the disclosee. *Id.* at 1050.

82.     Nondisclosure agreements, and by extension, other policies are evidence "of the employee's fiduciary duty not to disclose trade secrets or proprietary information to anyone not so designated by the company." <u>Weightman v. State of Texas</u>, 1996 WL 718465, at *3 (Tex. App. Ct. Dec. 12, 1996).

        **CONTESTED.**  Non-disclosure agreements are not evidence of a fiduciary duty.  Under California law, whether or not an employee has a non-disclosure agreement, an employee can be liable for misappropriating trade secrets of an employer.  Moreover, a contract does not create a fiduciary duty.  *See* Response to Conclusion of Law No. 81.  Moreover, the unpublished Texas state court case cited does not support the proposition.

83.     An employee breaches his fiduciary duty where his actions "constitute a breach under the general principles applicable to the performance of his trust." <u>Bancroft-Whitney Co. v. Glen</u>, 64 Cal. 2d 327, 347 (1966).  A broad variety of conduct can breach an employee's fiduciary duty: "[n]o ironclad rules as to the

1  type of conduct which is permissible can be stated, since the spectrum of activities

2  in this regard is as broad as the ingenuity of man itself." Id. at 346.  See also

3  Thomas Weisel Partners LLC v. BNP Paribas, 2010 WL 1267744, at *6-8 (N.D.

4  Cal. Apr. 1, 2010) (granting partial summary judgment on breach of fiduciary duty

5  claim where "undisputed evidence show[ed] a consistent course of conduct by

6  [employee] designed to obtain for a competitor those of plaintiff's employees

7  whom the competitor could afford to employ and would find useful," and also

8  showed that employee gave his former employer's information (even though not

9  confidential) to his new employer); ViChip Corp. v. Lee, 483 F. Supp. 2d 1087,

10  1100 (N.D. Cal. 2006) (defendant breached fiduciary duty as a matter of law by

11  taking proprietary information and deleting files upon termination of his

12  employment).  "[I]n the absence of authority, express or implied, [an agent] cannot

13  transfer his principal's property, and such authority will not be presumed." Palo

14  Alto Mut. Bldg. & Loan Ass'n v. First Nat'l Bank, 33 Cal. App. 214, 221 (1917).

15        **IMMATERIAL.** All employees do not bear fiduciary duties. Even if they

16  did, a breach of fiduciary duty may not be predicated on an employee's disclosure

17  of her employer's confidential information.  California's Uniform Trade Secrets

18  Act ("CUTSA").  CUTSA contains a savings clause that "preempt[s] claims based

19  on the same nucleus of facts as trade secret misappropriation." *K.C. Multimedia,*

20  *Inc. v. Bank of Am. Tech. & Operations, Inc.*, 171 Cal. App. 4th 939, 962 (2009);

21  Cal. Civ. Code §3426.7.

22  84.    The fact of theft is an element of a claim for trade secret theft. Cal. Civ.

23  Code § 3426.1(a) (defining improper means to include theft).

24        **CONTESTED. "**Acquisition of a trade secret of another by a person who

25  knows or has reason to know that the trade secret was acquired by improper

26  means," is an element. Cal. Civ. Code § 3426.1(b)(1).

27

28

85.    "Nothing said here should be taken to suggest that a defendant cannot be liable for misappropriation unless he personally possessed knowledge of the trade secret.  He can of course acquire such knowledge, and indeed can conduct the entire misappropriation, *vicariously*, e.g., through an agent."  <u>Silvaco</u>, 184 Cal. App. 4th at 225 n.7 (emphasis in original).

**CONTESTED.**  Mattel cites dicta that is unsupported by the statute and contrary to settled law when applied in this context.  "Misappropriation means: Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means."  <u>Cal. Civ. Code</u> § 3426.1(b)(1) (emphasis added); *see also PMC, Inc. v. Kadisha*, 78 Cal. App. 4th 1368, 1389 (2000) ("corporate director or officer must have known or had reason to know of the misappropriation and then unreasonably participated in the unlawful conduct" to be liable for trade secret misappropriation.).

86.    "An agency may be created, and an authority may be conferred, by a precedent authorization or a subsequent ratification."  <u>Cal. Civ. Code</u> § 2307; <u>see id.</u> § 2339.

**UNCONTESTED**.

87.    "Ratification is the voluntary election by a person to adopt in some manner as his own an act which was purportedly done on his behalf by another person, the effect of which, as to some or all persons, is to treat the act as if originally authorized by him."  <u>Rakestraw v. Rodriguez</u>, 8 Cal. 3d at 60-61 (holding that principal may adopt agent's act expressly or by implication based on conduct that reflects an intention to consent to or adopt the act, or may be inferred from conduct that is "inconsistent with any reasonable intention on his part, other than that he intended approving and adopting it"); <u>see Bancroft-Whitney</u>, 64 Cal. 2d 327, 353 (1966) (where evidence indicated that company's president was aware of or ratified breach of fiduciary duty by employee of competitor company, and company

1  received benefits of breach, liability would attach to company and personal liability

2  would attach to its president).  "[T]he effect of a ratification is that the authority

3  which is given to the purported agent relates back to the time when he performed

4  the act."  <u>Rakestraw,</u> 8 Cal. 3d at 61.

5      **CONTESTED.**  Within the context of CUTSA, an employer is not liable for

6  trade secret misappropriation merely because an employee possesses trade secrets

7  of a former employer.  Applying ratification principles in this context and under

8  these facts would run contrary to CUTSA.  *See, e.g.*, *JustMed, Inc. v. Byce*, 600

9  F.3d 1118, 1131-32 (9th Cir. 2010) (mere possession of confidential information by

10  employee, without proof that new employer used or benefited from trade secret, is

11  not enough to support a claim); *Gibson-Homans Co. v. Wall-Tite, Inc.*, 1992 U.S.

12  Dist. LEXIS 21909 at *10 (C.D. Cal. Oct. 27, 1992) (company not liable for

13  misappropriation just because employee retained trade secret document from

14  former employer).

15  88.    In <u>Hanger Prosthetics & Orthotics, Inc. v. Capstone Orthopedic, Inc.</u>, court

16  found ratification where principal "failed to investigate why it happened" and

17  "'turned a blind eye' to what was happening" 556 F. Supp. 2d 1122, 1134 (E.D.

18  Cal. 2008).

19      **CONTESTED.**  The words Mattel places in quotes appear nowhere in the

20  text of *Hanger*.  Mattel also mischaracterizes *Hanger's* holding is also misguided.

21  *Hanger* involved the denial of a defensive (not the granting of an offensive) motion

22  for summary judgment where there was ample evidence that a departing employee

23  had been asked to bring a list of accounts to his new employer.  Ratification there

24  had nothing to do with any "failure to investigate" or "turning a blind eye" to the

25  conduct of the departing employee.

26

27

28

89.   In <u>Roberts v. Ford Aerospace and Commc'ns Corp.</u>, court found ratification because principal "fail[ed] to take remedial action upon becoming aware of the act" 224 Cal. App. 3d 793, 802 (1990).

**CONTESTED.**  Mattel mischaracterizes the holding of *Roberts*.  *Roberts* involved a decision to uphold an award of punitive damages against an employer in an employee discrimination suit.  Ratification there was based on California Civil Code section 3294 (not 3207), and the language cited by Mattel is really a quote from *Fisher v. San Pedro Peninsula Hospital*—another wrongful employee discrimination case.  224 Cal. App. 3d at 801.  *Roberts* has absolutely nothing to do with the ratification of unauthorized employee conduct in a trade secrets case.

90.   It is well established that, for the purpose of calculating the statute of limitations, an amended pleading is effectively filed when the motion to amend is filed" because "when a motion to amend is accompanied by the proposed amended pleading, the motion to amend notifies the defendant of the impending claim."  <u>In re Metro. Sec. Litig.</u>, 532 F. Supp. 2d 1260, 1282 (E.D. Wash. 2007).

**UNCONTESTED.**

91.   Trade secret misappropriation claims are subject to a three-year limitations period.  <u>Cal. Civ. Code</u> § 3426.6 (claim "must be brought within three years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered").

**UNCONTESTED.**  However, the statute of limitations for trade secret misappropriation begins to run when a party has "reason at least to suspect a factual basis" of what California courts term the "generic elements" of a claim.  *Cypress Semiconductor Corp. v. Superior Court*, 163 Cal. App. 4th 575, 586 (2008) (quoting *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 807 (2005)).  A plaintiff need not suspect facts that support the legal elements of a trade secret misappropriation claim.  Rather, the generic elements are: wrongdoing, causation

1  and harm.  *Cypress Semiconductor Corp.*, 163 Cal. App. 4th at 586 (citing *Norgart*

2  *v. Upjohn Co.*, 21 Cal. 4th 383, 397 (1999)).

3  92.    "[I]f a plaintiff's reasonable and diligent investigation discloses only one

4  kind of wrongdoing when the injury was actually caused by tortious conduct of a

5  wholly different sort, the discovery rule postpones accrual of the statute of

6  limitations on the newly discovered claim."  Fox v. Ethicon Endo-Surgery, Inc., 35

7  Cal. 4th 797, 813 (2005).

8      **CONTESTED.** When the causes of an injury are completely distinct and

9  could not be discovered by a reasonable and diligent investigation, the above stated

10  rule applies.  Therefore, in *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797

11  (2005), the fact that plaintiff had sufficient information to bring a medical

12  malpractice claim based on a botched surgery did not mean that plaintiff had

13  sufficient information that the additional cause of her injury was the malfunction of

14  a medical device during the course of that surgery.  However, in making the

15  assessment whether the standard articulated above applies, the first inquiry is

16  whether a plaintiff—having knowledge of an injury—would have discovered facts

17  sufficient to bring any and all claims.   If a reasonable investigation would have

18  disclosed information sufficient to satisfy the accrual rules of *Fox*, the claim is

19  time-barred even if "the injury was actually caused by tortuous conduct of a wholly

20  different sort . . . ."  *Fox*, 35 Cal. 4th at 813.  The second inquiry in this case is

21  whether, in fact, Mattel's claimed injury did arise from "tortuous conduct of a

22  wholly different sort," which it did not.  Mattel's injury, and what it believed in

23  2001 and 2002, is based on Carter Bryant's taking of Mattel information and using

24  it at MGA.   The injury claimed by Mattel is now no different from what it was

25  back in 2001 and 2002.  This is revealed no less than by Mattel's August 21, 2001

26  email from VP Turetzky to SVP Bossick claiming that "product information" was

27  leaking out and pointing to the similarity of Bratz as one example.  WSP Decl. Ex.

28

- 54 -

47.  It is further revealed by Mattel's March 2002 Incident Report filed under the category "Theft" and subcategory "Proprietary Information" that links Larian, MGA and Bryant to the use and taking of Mattel's unpublished product information.  Ex. 1195RS at 1195RS-066; Ex. 286.

That fact renders this case distinguishable from *Fox*.  There, the cause of the injury was first considered to be solely malpractice and then plaintiff discovered the additional, and completely different, cause of the injury—product defect.  Here, the cause of the injury has always remained one thing—Bryant's taking of information that belonged to Mattel. *See also Rambus Inc. v. Samsung Elec. Co.*, 2008 WL 4108054 * 6 (N.D. Cal. Aug. 18, 2008) (noting that the claims must be "qualitatively different" for the statute of limitations not to run).

Finally, because the statute of limitations inquiry does not turn on Mattel's knowledge of the specific elements of the causes of action alleged, Mattel cannot argue that it was investigating one form of cause of action and not another.  It is enough that Mattel knew of at least one of the generic elements necessary to trigger the statute of limitations—wrongdoing, causation and harm—and suspected the other two.  Here, Mattel knew of its harm and suspected wrongdoing and tied that wrongdoing to Bryant and MGA.

93.    Relation back applies if "the [state] law that provides the applicable statute of limitations allows relation back."  Fed. R. Civ. P. 15(c).  See also Amaral v. Cintas Corp. No. 2, 163 Cal. App. 4th 1157, 1199 (2008) ("the amended complaint will be deemed filed as of the date of the original complaint provided recovery is sought in both pleadings on the same general set of facts"); Lamont v. Wolfe, 142 Cal. App. 3d 375, 379 (1983) ("it is the sameness of the facts rather than the rights or obligations arising from those facts that is determinative.").

**CONTESTED.**  When it filed its counterclaims, Mattel sought to add MGA, Larian, MGA HK, Machado and MGA Mexico.  For Mattel's copyright

infringement claim, Mattel is required to satisfy Rule 15(c)(1)(C).  *G.F. Co. v. Pan Ocean Shipping Co.*, 23 F.3d 1498, 1501 (9th Cir. 1994) (Rule 15(c)(1)(C) "'is the only vehicle through which a plaintiff may amend his complaint, after a statute of limitation period has run,'" to name a new defendant.) (quoting *Korn v.  Royal Caribbean Cruise Line, Inc.*, 724 F.2d 1397, 1399 (9th Cir. 1984) (federal seaman's claim); *Wilson v. United States*, 23 F.3d 559, 562 (1st Cir. 1994) ("When a plaintiff amends a complaint to add a defendant, but the plaintiff does so *subsequent* to the running of the relevant statute of limitations, then Rule [15(c)(1)(C)] controls whether the amended complaint may 'relate back' to the filing of the original complaint and thereby escape a timeliness objection.") (same); *see also Garrett v. Fleming*, 362 F.3d 692, 696-97 (10th Cir. 2004) (plaintiff's "substitution of named defendants for the original unknown 'John Doe' defendants amounted to adding a new party" such that "all requirements of [Rule 15(c)(1)(C)] must be met in order for [the plaintiff's] amended pleadings to relate back to the date of the original.") (§1983 claim); *Powers v. Graff*, 148 F.3d 1223, 1225-26 (11th Cir. 1998) (quoting *Garrett*, 362 F.3d 692, and affirming district court's finding that Rule 15(c)(1)(C) was not met where plaintiffs knew the identity of the proposed new defendants before the statute of limitations expired and should have known they would be "persons arguably liable for the alleged wrongdoing.") (federal securities law claim); *Barrow v. Wethersfield Police Dept.*, 66 F.3d 466, 468-69 (2d Cir. 1995) (Rule 15(c)(1)(C) is the only means by which a plaintiff can replace a "John Doe" with a named party) (§1983 claim); *Worthington v. Wilson*, 8 F.3d 1253 (7th Cir. 1993) (no relation back under Rule 15(c)(1)(C) where proposed new defendants were unknown to plaintiff when original complaint was filed) (same).

The result does not change for Mattel's state law claims subject to California procedural law governing relation back.  Generally, under California law "a complaint may not be amended to add a new defendant after the statute of limitations has run."  *McGee St. Prods. v. Workers' Comp. Appeals Bd.*, 108 Cal.

App. 4th 717, 724, 25 (2003). "The only exception to this rule is when the original complaint states a cause of action against a Doe defendant and the plaintiff is unaware of the true identity of that party at the inception of the suit." *Id.*; Cal. Code Civ. P. § 474 (pleading of Doe defendants permissible when the plaintiff is "ignorant of the name of a defendant."). In determining whether plaintiff is "ignorant of the name of the defendant," courts look at two things: (1) ignorance of the identity of the defendant; (2) ignorance of the facts giving rise to the cause of action against defendant. A plaintiff is (1) ignorant of the identity of the defendant if she lacks "actual knowledge" of the name of the defendant. *Grinnell Fire Protection Sys. Co. v. American Sav. & Loan Assn.*, 183 Cal. App. 3d 352, 359 (1986). A plaintiff is (2) ignorant of the facts giving rise to the cause of action against defendant if she knows the identity of the person but is ignorant of the facts giving him a cause of action against such person. *McOwen v. Grossman*, 153 Cal. App. 4th 937, 942 (2007).

A plaintiff is *not* ignorant of the facts giving a cause of action where she knows the identity and facts giving rise to liability when the complaint is filed. *Scherer v. Mark*, 64 Cal. App. 3d 834, 840-41 (1976); *Dover v. Sadowinski*, 147 Cal. App. 3d 113 (1983) (no relation back where the plaintiff knew that the proposed defendant was involved in the underlying controversy, even if he did not know "how deeply" involved); *cf. Woo v. Superior Court*, 75 Cal. App. 4th 169, 180 (1999) (plaintiff cannot meet "good faith, bona fide ignorance as required" where the information concerning the additional defendants is readily available to the plaintiff). "The pivotal question in this regard is 'did plaintiff know *facts*?' not 'did plaintiff know or believe that she had a cause of action based on those facts?'" *Scherer*. 64 Cal. App. 3d at 841 (emphasis original).

94.    An intervenor occupies the status of an original party for purposes of the relation back doctrine. <u>U.S. v. Oregon</u>, 657 F.2d 1009, 1014 (9th Cir. 1981) (under

Fed. R. Civ. P. 24(a)(2) "enters suit with the status of original parties and are fully bound by all court orders"); DePinto v. Provident Sec. Life Ins. Co., 323 F.2d 826, 831-32 (9th Cir. 1963) (intervention of party plaintiff that shared interests with the original plaintiff related back for statute of limitations purposes).

**CONTESTED.**  While MGA intervened in the case in December 2004 "as a procedural matter," there were no claims asserted against it by Mattel.  04-9059 Dkt. #36; *see also Mattel, Inc. v. Bryant*, 446 F.3d 1011, 1013 (9th Cir. 2006).  When Mattel dismissed all of its claims of its 04-9059 Complaint against Bryant, that action ended as against MGA as well.  Dkt. #8922; *Golconda Petroleum Corp. v. Petrol Corp.*, 46 F. Supp. 23, 25 (C.D. Cal. 1942) (intervention fails when an action is dismissed); *Henry v. Vineland Irrigation Dist.*, 140 Cal. 376 (1903) (when plaintiffs dismissed claims, defendant-in-intervention no longer had any right to pursue the litigation).  Since the 2004 Complaint ended, Mattel cannot relate back to it. *O'Donnell v. Vencor Inc.*, 466 F.3d 1104, 1111 (9th Cir. 2006) (second complaint does not relate back to a dismissed complaint); *Benge v. United States*, 17 F.3d 1286, 1288 (10th Cir. 1994) (untimely second complaint did not relate back to a separate timely complaint); *Bailey v. Northern Ind. Pub. Serv. Co.*, 910 F.2d 406, 413 (7th Cir. 1990) (rejecting argument that an untimely complaint related back to an earlier lawsuit filed against the same defendant because Rule 15(c) "by its terms, only applies to amended pleadings in the same action as the original, timely pleading."); *Eng v. County of Los Angeles*, 2010 WL 3368130, at *13-14 (C.D. Cal. Aug. 24, 2010) (a Federal complaint cannot relate back to earlier filed state court complaint); *Lamon v. Stiles*, 2009 WL 230833, at *4 (E.D. Cal. Jan. 30, 2009) (new complaint did not relate back to earlier complaint in separate, but related, action because it was not an amendment to the earlier complaint).

95.    "When the plaintiff is ignorant of the name of a defendant, he must state that fact in the complaint, or the affidavit if the action is commenced by affidavit, and

1  such defendant may be designated in any pleading or proceeding by any name, and

2  when his true name is discovered, the pleading or proceeding must be amended

3  accordingly . . . ." <u>Cal. Code Civ. Proc.</u> § 474; <u>see also</u> <u>Miller v. Thomas</u>, 121 Cal.

4  App. 3d 440, 445-46 (1981) ("The words 'ignorant of the name of a defendant' are

5  construed broadly to include other kinds of ignorance which explain the failure to

6  name a person as a defendant until sometime later.  ***Even a person whose identity***

7  ***was known to the plaintiff when the action was filed may be brought in under***

8  ***section 474 as a 'Doe' defendant if the plaintiff was initially unaware of that***

9  ***person's true relationship to the injuries upon which the action was based***.")

10 (emphasis added).

11       **CONTESTED**.  Generally, under California law "a complaint may not be

12 amended to add a new defendant after the statute of limitations has run." *McGee St.*

13 *Prods. v. Workers' Comp. Appeals Bd.*, 108 Cal. App. 4th 717, 724, 25 (2003).

14 "The only exception to this rule is when the original complaint states a cause of

15 action against a Doe defendant and the plaintiff is unaware of the true identity of

16 that party at the inception of the suit." *Id.*; Cal. Code Civ. P. 474 (pleading of Doe

17 defendants permissible when the plaintiff is  "ignorant of the name of a

18 defendant.").  In determining whether plaintiff is "ignorant of the name of the

19 defendant," courts look at two things: (1) ignorance of the identity of the defendant;

20 (2) ignorance of the facts giving rise to the cause of action against defendant.  A

21 plaintiff is (1) ignorant of the identity of the defendant if she lacks "actual

22 knowledge" of the name of the defendant.  *Grinnell Fire Protection Sys. Co. v.*

23 *American Sav. & Loan Assn.*, 183 Cal. App. 3d 352, 359 (1986).  A plaintiff is (2)

24 ignorant of the facts giving rise to the cause of action against defendant if she

25 knows the identity of the person but is ignorant of the facts giving him a cause of

26 action against such person.  *McOwen v. Grossman*, 153 Cal. App. 4th 937, 942

27 (2007).

28

A plaintiff is *not* ignorant of the facts giving a cause of action where she knows the identity and facts giving rise to liability when the complaint is filed. *Scherer v. Mark*, 64 Cal. App. 3d 834, 840-41 (1976); *Dover v. Sadowinski*, 147 Cal. App. 3d 113 (1983) (no relation back where the plaintiff knew that the proposed defendant was involved in the underlying controversy, even if he did not know "how deeply" involved); *cf. Woo v. Superior Court*, 75 Cal. App. 4th 169, 180 (1999) (plaintiff cannot meet "good faith, bona fide ignorance as required" where the information concerning the additional defendants is readily available to the plaintiff). "The pivotal question in this regard is 'did plaintiff know *facts*?' not 'did plaintiff know or believe that she had a cause of action based on those facts?'" *Scherer*. 64 Cal. App. 3d at 841 (emphasis original).

96.     A trade secret misappropriation claim requires, among other things, a showing of the defendant's ***wrongful*** possession, use or disclosure of the trade secrets.  Cal. Civ. Code. § 3426.1.

**CONTESTED**.  Trade secret misappropriation requires, among other things, a showing of the defendant's acquisition, use or disclosure of the trade secrets through "improper means," or with knowledge that they were originally obtained by "improper means."  "Improper means includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." Cal. Civ. Code. § 3426.1.

97.     A claim relates back if it arises from the "same general set of facts" as original pleading.  Amaral, 163 Cal. App. 4th at 1199; Oregon, 657 F.2d at 1014 (intervenors occupy status of original parties).

**CONTESTED.**  While MGA intervened in the case in December 2004 "as a procedural matter," there were no claims asserted against it by Mattel.  04-9059 Dkt. #36; *see also Mattel, Inc. v. Bryant*, 446 F.3d 1011, 1013 (9th Cir. 2006).

1    When it filed its counterclaims, Mattel sought to add MGA, Larian, MGA

2    HK, Machado and MGA Mexico.  Generally, under California law "a complaint

3    may not be amended to add a new defendant after the statute of limitations has

4    run." *McGee St. Prods. v. Workers' Comp. Appeals Bd.*, 108 Cal. App. 4th 717,

5    724, 25 (2003).  "The only exception to this rule is when the original complaint

6    states a cause of action against a Doe defendant and the plaintiff is unaware of the

7    true identity of that party at the inception of the suit."  *Id.*; Cal. Code Civ. Proc.

8    § 474 (pleading of doe defendants permissible when the plaintiff is  "ignorant of the

9    name of a defendant.").  In determining whether plaintiff is "ignorant of the name

10   of the defendant," courts look at two things: (1) ignorance of the identity of the

11   defendant; (2) ignorance of the facts giving rise to the cause of action against

12   defendant.  A plaintiff is (1) ignorant of the identity of the defendant only if she

13   lacks "actual knowledge" of the name of the defendant.  *Grinnel v. American Sav.*

14   *& Loan Assn.*, 183 Cal. App. 3d 352, 359 (1986).  A plaintiff is (2) ignorant of the

15   facts giving rise to the cause of action against defendant if she knows the identity of

16   the person but is ignorant of the facts giving a cause of action against such person.

17   *McOwen v. Grossman*, 153 Cal. App. 4th 937, 942 (2007).

18   A plaintiff is *not* ignorant of the facts giving a cause of action where she

19   knows the identity and facts giving rise to liability when the complaint is filed.

20   *Scherer v. Mark*, 64 Cal. App. 3d 834, 840-41 (1976); *Dover v. Sadowinski*, 147

21   Cal. App. 3d 113 (1983) (no relation back where the plaintiff knew that the

22   proposed defendant was involved in the underlying controversy, even if he did not

23   know "how deeply" involved); *cf. Woo v. Superior Court*, 75 Cal. App. 4th 169,

24   180 (1999) (plaintiff cannot meet "good faith, bona fide ignorance as required"

25   where the information concerning the additional defendants is readily available to

26   the plaintiff).  "The pivotal question in this regard is 'did plaintiff know *facts*?' not

27   'did plaintiff know or believe that she had a cause of action based on those facts?"

28   *Scherer*. 64 Cal. App. 3d at 841 (emphasis original).

For Mattel's federal copyright claim, Rule 15(c)(1)(C) is the exclusive means to apply the relation back doctrine where new parties are added.  *G.F. Co. v. Pan Ocean Shipping Co.*, 23 F.3d 1498, 1501 (9th Cir. 1994) (Rule 15(c)(1)(C) "'is the only vehicle through which a plaintiff may amend his complaint, after a statute of limitation period has run,'" to name a new defendant.) (quoting *Korn v.  Royal Caribbean Cruise Line, Inc.*, 724 F.2d 1397, 1399 (9th Cir. 1984) (federal seaman's claim); *Wilson v. United States*, 23 F.3d 559, 562 (1st Cir. 1994) ("When a plaintiff amends a complaint to add a defendant, but the plaintiff does so *subsequent* to the running of the relevant statute of limitations, then Rule [15(c)(1)(C)] controls whether the amended complaint may 'relate back' to the filing of the original complaint and thereby escape a timeliness objection.") (same); *see also Garrett v. Fleming*, 362 F.3d 692, 696-97 (10th Cir. 2004) (plaintiff's "substitution of named defendants for the original unknown 'John Doe' defendants amounted to adding a new party" such that "all requirements of [Rule 15(c)(1)(C)] must be met in order for [the plaintiff's] amended pleadings to relate back to the date of the original.") (§1983 claim); *Powers v. Graff*, 148 F.3d 1223, 1225-26 (11th Cir. 1998) (quoting *Garrett*, 362 F.3d 692, and affirming district court's finding that Rule 15(c)(1)(C) was not met where plaintiffs knew the identity of the proposed new defendants before the statute of limitations expired and should have known they would be "persons arguably liable for the alleged wrongdoing.") (federal securities law claim); *Barrow v. Wethersfield Police Dept.*, 66 F.3d 466, 468-69 (2d Cir. 1995) (Rule 15(c)(1)(C) is the only means by which a plaintiff can replace a "John Doe" with a named party) (§1983 claim); *Worthington v. Wilson*, 8 F.3d 1253 (7th Cir. 1993) (no relation back under Rule 15(c)(1)(C) where proposed new defendants were unknown to plaintiff when original complaint was filed) (same).

98.     The statute of limitations for conversion is three years and accrues upon the wrongful taking of the property.  Cal. Code Civ. Proc. § 338(c).

**UNCONTESTED.**

99.    The common law unfair competition claim is also governed by a three year limitations period.  <u>Cal. Code Civ. Proc.</u> § 338(d).

     **CONTESTED.**   A common law unfair competition claim is a tort claim. *Aloha Pac., Inc. v. Cal. Ins. Guarantee Ass'n*, 79 Cal. App. 4th 297, 319 (2000). Tort claims are governed by the two year statute of limitation of California Code of Civil Procedure § 339(1), unless there is some more specific provision that applies, which there is not for common law unfair competition claims.  *See Davies v. Krasna*, 14 Cal. 3d 502, 510 n. 6 (1975).

100.    The statutory unfair competition is subject to a four-year limitations period. <u>Cal. Bus. & Prof. Code</u> § 17208.

     **UNCONTESTED.**

101.    RICO and RICO conspiracy claims are subject to a four-year statute of limitations.  <u>Pincay v. Andrews</u>, 238 F.3d 1106, 1108-09 (9th Cir. 2001); <u>see</u> <u>also</u> <u>World Wrestling Entm't, Inc. v. Jakks Pacific, Inc.</u>, 530 F. Supp. 2d 486, 530 (S.D.N.Y. 2007) ("Like the statute of limitations under the other civil RICO provisions, the statute of limitations for civil RICO conspiracy claims is four years.").

     **UNCONTESTED.**  RICO and RICO conspiracy claims are subject to a four-year statute of limitations which "begins to run when a plaintiff knows or should know of the injury that underlies his cause of action."  *Pinacy v. Andrews*, 238 F.3d 1106, 1109 (9th Cir. 2001) (quoting *Grimmett v. Brown*, 75 F.3d 506, 511 (9th Cir. 1996)).

102.    A four-year limitations period applies to a claim for breach of contract.  <u>Cal. Code Civ. Proc.</u> § 337(1).

     **CONTESTED.** A breach of contract for a written contract is governed by a four year statute of limitations.  A breach of an oral contract is governed by a two

year statute of limitations.  Cal. Code Civ. Pro. § 339(1); *Barton v. New United Motor Mfg., Inc.*, 43 Cal. App. 4th 1200, 1207 (1996).

103.   A three-year limitations period applies to claims for breach of fiduciary duty, breach of the duty of loyalty. City of Vista v. Robert Thomas Sec., Inc., 84 Cal. App. 4th 882, 889 (2000) (breach of fiduciary duty if gravamen of the claim is fraud).

**IMMATERIAL.**  The MGA Parties are not claimed to have breached a fiduciary duty or duty of loyalty.  They are alleged to have aided and abetted a breach of fiduciary duty and duty of loyalty.  These latter causes of action are governed by a two year statute of limitation.  *Rambus, Inc. v. Samsung Elecs. Co.*, 2007 WL 39374, *3 n. 4 (N.D. Cal. Jan. 4, 2007) (citing Cal. Code Civ. Proc. § 339).  Moreover, the breach of fiduciary duty and duty of loyalty claims do not arise from claims of fraud.

104.   A three-year limitations period applies to claims for conversion. Cal. Code Civ. Proc. § 338(c).

**UNCONTESTED.**

105.   A two-year limitations period applies to claims for intentional interference with contract, aiding and abetting breach of fiduciary duty, and aiding and abetting breach of the duty of loyalty.  Cal. Code Civ. Proc. § 339(1) (intentional interference with contract); Rambus, Inc. v. Samsung Elec. Co., 2007 WL 39374, at *3 n.4 (N.D. Cal. Jan. 4, 2007) (aiding and abetting claims).

**UNCONTESTED.**

106.   Claims for intentional interference with contract, aiding and abetting breach of fiduciary duty, and aiding and abetting breach of the duty of loyalty do not accrue until, at a minimum, plaintiff discovered or had reason to discover "a factual basis for [their] elements."  Fox, 35 Cal. 4th at 807 (accrual standard); see also Tuchscher Dev. Enters., Inc. v. San Diego Unified Port Dist., 106 Cal.App.4th

1219, 1239 (2003) (noting that elements of intentional interference claim includes "actual breach or disruption of the contractual relationship" and "defendants' intentional acts designed to induce a breach or disruption of the contractual relationship"); Casey v. U.S. Bank Nat'l Assn., 127 Cal. App. 4th 1138, 1144 (2005) (aiding and abetting liability requires that the defendant "knows the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act or (b) gives substantial assistance to the other in accomplishing a tortious result and the person's own conduct, separately considered, constitutes a breach of duty to the third person.").

**CONTESTED AND IMMATERIAL.** The statute of limitations for intentional interference with contract, aiding and abetting breach of fiduciary duty, and aiding and abetting breach of the duty of loyalty begins to run, i.e., "accrues," when the wrongful act is done or the wrongful result occurs and the liability arises. *Norgart v. Upjohn Co.*, 21 Cal. 4th 383, 397 (1999). The discovery rule articulated in *Fox* and referenced by Mattel is an exception to this accrual rule. *See id.* It postpones the running of the statute of limitations until such time as a party "has reason to suspect a factual basis" for the "generic elements" of the claim. *Fox*, 35 Cal. 4th at 807; *Cypress Semiconductor Corp. v. Superior Court*, 163 Cal. App. 4th 575, 586 (2008). The "generic elements" are not the legal elements of the specific causes of actions alleged. Rather, the generic elements are "wrongdoing," "causation," and "harm." *Cypress Semiconductor Corp.*, 163 Cal. App. 4th at 586; *see also Norgart v. Upjohn Co.*, 21 Cal. 4th 383, 397 (1999). "'[S]uspicion of one or more [of the generic] elements of a cause of action coupled with knowledge of the remaining elements" triggers the statute of limitations.'" *Cypress Semiconductor Corp.*, 163 Cal. App. 4th at 586 (quoting *Fox*, 35 Cal. 4th at 807). In applying this standard, "wrongdoing," "causation," and "harm" are not to be defined in a hypertechnical sense. *Id.*; *see also Fox*, 35 Cal. 4th at 807; *Jolly v. Eli Lilly & Co.*, 44 Cal. 3d 1103, 1110 n. 7 (1988). Instead, "'[r]ather than examining

whether the plaintiffs suspect facts supporting each specific legal element of a particular cause of action, we look to whether the plaintiffs have reason to at least suspect that a type of wrongdoing has injured them.'" *Cypress Semiconductor Corp.*, 163 Cal. App. 4th at 586 (quoting *Fox*, 35 Cal. 4th at 807).  For this reason, the element of the claims mentioned above are immaterial for the purposes of the statute of limitations.

107.   Claims relate back to the filing of a claim with which they share a logical relationship.  Pochiro v. Prudential Ins. Co. of Am., 827 F.2d 1246, 1249 (9th Cir. 1987); Sidney v. Superior Court, 198 Cal. App. 3d 710, 714 (1988).

**CONTESTED.**  When it filed its counterclaims, Mattel sought to add MGA, Larian, MGA HK, Machado and MGA Mexico.  Generally, under California law "a complaint may not be amended to add a new defendant after the statute of limitations has run." *McGee St. Prods. v. Workers' Comp. Appeals Bd.*, 108 Cal. App. 4th 717, 724, 25 (2003).  "The only exception to this rule is when the original complaint states a cause of action against a Doe defendant and the plaintiff is unaware of the true identity of that party at the inception of the suit." *Id.*; Cal. Code Civ. P. §474 (pleading of doe defendants permissible when the plaintiff is "ignorant of the name of a defendant.").  In determining whether plaintiff is "ignorant of the name of the defendant," courts look at two things: (1) ignorance of the identity of the defendant; (2) ignorance of the facts giving rise to the cause of action against defendant.  A plaintiff is (1) ignorant of the identity of the defendant only if she lacks "actual knowledge" of the name of the defendant. *Grinnell v. American Sav. & Loan Assn.*, 183 Cal. App. 3d 352, 359 (1986).  A plaintiff is (2) ignorant of the facts giving rise to the cause of action against defendant if she knows the identity of the person but is ignorant of the facts giving a cause of action against such person. *McOwen v. Grossman*, 153 Cal. App. 4th 937, 942 (2007).

A plaintiff is *not* ignorant of the facts giving a cause of action where she knows the identity and facts giving rise to liability when the complaint is filed. *Scherer v. Mark*, 64 Cal. App. 3d 834, 840-41 (1976); *Dover v. Sadowinski*, 147 Cal. App. 3d 113 (1983) (no relation back where the plaintiff knew that the proposed defendant was involved in the underlying controversy, even if he did not know "how deeply" involved); *cf. Woo v. Superior Court*, 75 Cal. App. 4th 169, 180 (1999) (plaintiff cannot meet "good faith, bona fide ignorance as required" where the information concerning the additional defendants is readily available to the plaintiff).  "The pivotal question in this regard is 'did plaintiff know *facts*?' not 'did plaintiff know or believe that she had a cause of action based on those facts?" *Scherer*. 64 Cal. App. 3d at 841 (emphasis original).

For Mattel's federal copyright claim, Rule 15(c)(1)(C) is the exclusive means to apply the relation back doctrine where new parties are added.  *G.F. Co. v. Pan Ocean Shipping Co.*, 23 F.3d 1498, 1501 (9th Cir. 1994) (Rule 15(c)(1)(C) "'is the only vehicle through which a plaintiff may amend his complaint, after a statute of limitation period has run,'" to name a new defendant.) (quoting *Korn v. Royal Caribbean Cruise Line, Inc.*, 724 F.2d 1397, 1399 (9th Cir. 1984) (federal seaman's claim); *Wilson v. United States*, 23 F.3d 559, 562 (1st Cir. 1994) ("When a plaintiff amends a complaint to add a defendant, but the plaintiff does so *subsequent* to the running of the relevant statute of limitations, then Rule [15(c)(1)(C)] controls whether the amended complaint may 'relate back' to the filing of the original complaint and thereby escape a timeliness objection.") (same); *see also Garrett v. Fleming*, 362 F.3d 692, 696-97 (10th Cir. 2004) (plaintiff's "substitution of named defendants for the original unknown 'John Doe' defendants amounted to adding a new party" such that "all requirements of [Rule 15(c)(1)(C)] must be met in order for [the plaintiff's] amended pleadings to relate back to the date of the original.") (§1983 claim); *Powers v. Graff*, 148 F.3d 1223, 1225-26 (11th Cir. 1998) (quoting *Garrett*, 362 F.3d 692, and affirming district court's finding that Rule 15(c)(1)(C)

was not met where plaintiffs knew the identity of the proposed new defendants
before the statute of limitations expired and should have known they would be
"persons arguably liable for the alleged wrongdoing.") (federal securities law
claim); *Barrow v. Wethersfield Police Dept.*, 66 F.3d 466, 468-69 (2d Cir. 1995)
(Rule 15(c)(1)(C) is the only means by which a plaintiff can replace a "John Doe"
with a named party) (§1983 claim); *Worthington v. Wilson*, 8 F.3d 1253 (7th Cir.
1993) (no relation back under Rule 15(c)(1)(C) where proposed new defendants
were unknown to plaintiff when original complaint was filed) (same)

108.   Defendant's stipulation of liability and resulting waiver of affirmative
defense is binding on retrial.  See Waldorf v. Shuta, 142 F.3d 601, 612, 616-19 (3d
Cir. 1998) (affirming ruling that defendant's stipulation of liability and resulting
waiver of affirmative defense was binding on retrial).

**CONTESTED AND IMMATERIAL.**  MGA has not stipulated to liability
and therefore has not waived a defense that would be binding on retrial.  Indeed,
*Waldorf v. Shuta,* 142 F.3d 601 (3d Cir. 1998), has no application to this case at all.
In *Waldorf*, following a remand from the Court of Appeals, one of the defendants
stipulated to liability and the case proceeded to trial solely on the issue of damages
as to that defendant.  When the issue of damages went up on appeal, the case was
remanded solely for the purpose of a trial on damages.  Following this second
remand, the same defendant sought to withdraw its stipulation and impose an
affirmative defense that was directed to the issue of liability.  The Court held that
defendant could not in light of defendant's stipulation to the issue of liability,
including because the defendant could not establish that there was new evidence
justifying its change of position.  142 F.3d at 607, 612, 616-19.  The facts of
*Waldorf* bear no resemblance to this case.

109.   Failure to raise affirmative defenses in the pre-trial order results in a waiver
of such defenses.  See Nw. Acceptance Corp. v. Lynnwood Equip., Inc., 841 F.2d

918, 924 (9th Cir. 1988); <u>S. Cal. Retail Clerks Union and Food Emp'rs Joint Pension Trust Fund v. Bjorklund</u>, 728 F.2d 1262, 1264 (9th Cir. 1984) ("issues not preserved in the pretrial order have been eliminated from the action"); <u>Union Oil Co.</u>, 411 F.2d at 900 n.2.

**CONTESTED AND IMMATERIAL.** The issue of what affirmative defenses to pursue were made in light of the bifurcation of the trial and, at most, could have solely pertained to the issues of Phase 1. Affirmative defenses pertaining to any issue in Phase 2 could not have been waived. Additionally, any decision concerning which affirmative defenses to pursue were made in the context of the bifurcated trial and were made in the context of different evidence and evidence that Mattel did not produce until after the Phase 1 trial. Therefore, MGA cannot be bound by decisions made in light of these facts. Mattel also has amended its pleading since the Phase 1 trial. Therefore any waiver of affirmative defenses prior to that point cannot be binding. *See, e.g.*, *Massy v. Helman*, 196 F.3d 727, 735 (7th Cir. 2000) ("Because a plaintiff's new complaint wipes away prior pleadings, the amended complaint opens the door for defendants to raise new and previously unmentioned affirmative defense."). Finally, in the event that this Court grants MGA's pending Motion for New Trial, failure to mention an affirmative defense in a pre-trial order does not preclude MGA from raising it in a new trial. As stated by the United States Supreme Court, "[t]here is no reason why a defense pleaded, but not urged at an earlier trial, may not be insisted upon at a new trial." *Davis v. O'Hara*, 266 U.S. 314, 321 (1924).

110.   "[T]he question whether a particular affirmative defense is sufficiently supported by testimony to go to the jury may often be resolved on a motion for summary judgment." <u>U.S. v. Bailey</u>, 444 U.S. 394, 413 n.9 (1980); <u>Applied Elastometrics, Inc. v. Z-Man Fishing Prods., Inc.</u>, 521 F. Supp. 2d 1031, 1040 (N.D. Cal. 2007) (granting partial summary judgment against affirmative defense).

Understood properly, "a defense is an affirmative defense if it will defeat a plaintiff's claim even when the plaintiff has stated a prima facie case for recovery under the applicable law."  See Quintana v. Baca, 233 F.R.D. 562, 564 (C.D. Cal. 2005).

**CONTESTED.** *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986), articulates the standard governing summary judgment motions. *See also Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)

111.   17 U.S.C. § 205(d) provides, in part, that "[a]s between two conflicting transfers . . . the later transfer prevails *if recorded first* . . . and if taken in good faith for valuable consideration or on the basis of a binding promise to pay royalties, and without notice of the earlier transfer."  17 U.S.C. § 205(d); see also 3 Nimmer on Copyright § 10.07[A][4] (under Section 205(d), "the prior transferee will be defeated only if the subsequent transfer is not only first recorded, but, further, the contents of such recorded transfer meet the specificity requirements of Section 205(c)(1), and at the time of such recordation there is a registration of the work which is the subject of transfer, as required by Section 205(c)(2)").

**UNCONTESTED.**

112.   A *subsequent* transferee who *never* recorded its purported copyright assignment document cannot have superior rights to a prior transferee under § 205(d).  See Peer Int'l Corp. v. Latin Am. Music Corp., 161 F. Supp. 2d 38, 48 (D.P.R. 2001) ("subsequent transferee must clear several hurdles to prevail," including duly recording transfer before prior transfer is recorded).  MGA's bona fide purchaser for value defense also fails as a matter of law because there is no such defense beyond 17 U.S.C. § 205(d).  See, e.g., ISC-Bunker Ramo Corp., v. Altech, Inc., 765 F. Supp. 1310, 1331 (N.D. Ill. 1990) ("Simply put, there is no such thing as a bona fide purchase for value in copyright law.").

**CONTESTED.** Constructive notice under Section 205(c) is effective if "(1) the document, or material attached to it, specifically identifies the work to which it pertains so that, after the document is indexed by the Register of Copyrights, it would be revealed by a reasonable search under the title or registration number of the work; and (2) registration has been made for the work."  17 U.S.C. §205(c).

113.   Joint authorship turns on whether the copyrighted work itself was jointly authored, and not on any subsequent improvements or exploitation of the work.  A "joint work" is "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole."  17 U.S.C. § 101; see also Ashton-Tate Corp. v. Ross, 916 F.2d 516, 521 (9th Cir. 1990) ("joint authorship requires each author to make an independently copyrightable contribution").

**IMMATERIAL AND CONTESTED.** Immaterial as conclusion mischaracterizes MGA's defense.  Contested as the cited authorities do not determine any subsequent improvements or exploitation of the copyrighted work are not jointly authored.

114.   "Federal Rule of Civil Procedure 37 allows a court to preclude a party from introducing evidence at trial, at a hearing, or on a motion where that party has, without substantial justification, failed to disclose required information in discovery or to amend a prior discovery response as required by Rule 26(e)(2)."  Dey, L.P. v. Ivax Pharmaceuticals, Inc., 233 F.R.D. 567, 571 (C.D. Cal. 2005); see also Cambridge Electronics Corp. v. MGA Electronics, Inc., 227 F.R.D. 313, 325 (C.D. Cal. 2004) ("Given that all of the evidence plaintiff has proffered in opposition to . . . summary judgment . . . was not previously disclosed, and must therefore be disregarded, plaintiff has failed to discharge its affirmative burden of pointing to "specific facts showing that there is a genuine issue for trial").

**UNCONTESTED** that under appropriate circumstances and on appropriate showing a court may preclude evidence at trial, at a hearing or on a motion.

115.   Whether "a fact is 'readily ascertainable' is not part of the definition of a trade secret in California."  <u>ABBA Rubber Co. v. Seaquist</u>, 235 Cal. App. 3d 1, 21 (1991); <u>see also</u> <u>Imax Corp. v. Cinema Techs. Inc.</u>, 152 F.3d 1161, 1168 n.10 (9th Cir. 1998) (same); <u>Cal. Civ. Code</u> § 3426.1(d) (trade secrets "(1) [d]erive independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from [their] disclosure or use; and (2) [are] the subject of efforts that are reasonable under the circumstances to maintain [their] secrecy").

**CONTESTED.**  *ABBA Rubber* held that "information can be a trade secret even though it is readily ascertainable, so long as it has not yet been ascertained by others in the industry."  In doing so, it created a split in the California appellate courts.  For example, in *American Paper & Packaging Products, Inc. v. Kirgan*, 183 Cal. App. 3d 1318, 1326 (1986), the court found that customer lists were not a trade secret where it "certainly would be known or readily ascertainable to other persons in the [industry]."   In *San Jose Construction, Inc. v. S.B.C.C., Inc.*, 155 Cal. App. 4th 1528, 1539 (2007), and *Morlife Inc. v. Perry*, 56 Cal. App. 4th 1514, 1521 (1997), one fact the courts considered was whether the claimed trade secret information was readily ascertainable.  In the words of the *Morlife, Inc.* court, "courts are reluctant to protect customer lists [as trade secrets] to the extent they embody information which is 'readily ascertainable' through public sources . . . ."  56 Cal. App. 4th at 1521.  Finally, whether something is readily ascertainable is part of the definition of a trade secret because at the least something that is readily ascertainable is not a trade secret, i.e., it is not generally unknown.

116.   A defense that "the plaintiff caused the injuries he sustained by his own negligence and omissions" is not a viable affirmative defense.  See <u>Quintana</u>, 233

F.R.D. at 565; <u>Moore v. King Cnty. Fire Prot. Dist. No. 26</u>, 2006 WL 2061196, at *14 (W.D. Wash. July 21, 2006) ("Defendants' fault-based affirmative defenses are an attack on the sufficiency of Plaintiff's allegations, and are not properly cognizable as affirmative defenses.").

**CONTESTED.**  Contributory negligence, which can be based on the acts or omissions of the party asserting a claim, is an affirmative defense.  *See. e.g.*, *Exxon Co. v. Sofec, Inc.*, 54 F.3d 570, 576 (9th Cir. 1995); *Taylor v. Burlington Northern R.. Co.*, 787 F.2d 1309, 1316 (9th Cir. 1986).  Indeed, it is listed as an affirmative defense that a party waives if not alleged in response to a pleading.  *See* Fed. R. Civ. P. 8(c)(1).

117.   <u>Rule</u> 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986); <u>see also</u> <u>See</u> <u>Cambridge Electronics Corp. v. MGA Electronics, Inc.</u>, 227 F.R.D. at 325.

**UNCONTESTED.**

118.   Delay alone is insufficient to establish the defenses of waiver, estoppel, acquiescence, failure to mitigate and abandonment.  <u>See, e.g.</u>, <u>Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.</u>, 518 F. Supp. 2d 1197, 1225 (C.D. Cal. 2007) (for ***estoppel*** to apply, the party sought to be estopped (1) "must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury"); <u>U.S. v. King Features Entm't, Inc.</u>, 843 F.2d 394, 399 (9th Cir. 1988) (citation omitted) (***waiver*** is the "intentional relinquishment of a known right with knowledge of its existence and the intent to relinquish it"); <u>Seller Agency Council,</u>

Inc. v. Kennedy Ctr. for Real Estate Educ., Inc., --- F.3d ---, 2010 WL 3448107, at *5 (9th Cir. Sept. 3, 2010) (*acquiescence* "limits a party's right to bring suit following an *affirmative* act by word or deed by the party that conveys implied consent to another"); Hernandez v. Balakian, 2007 WL 1649911, at *8 (E.D. Cal. June 1, 2007) (*failure to mitigate* "requires that the claimant not act or omit to unjustifiably increase damages"); A&M Records, Inc. v. Napster, Inc., 239 F.3d 1004, 1026 (9th Cir. 2001) (*abandonment* "occurs only if there is an intent by the copyright proprietor to surrender rights in his work").

**UNCONTESTED as to affirmative defenses of waiver and abandonment; CONTESTED as to remainder.** Mattel cites to four elements that must be present to establish the defense of estoppel—yet, immediately preceding the court's pronouncement is that these "elements of estoppel [apply to] *copyright cases . . . .*" *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1225 (C.D. Cal 2007). As noted in MGA's Opposition to Mattel's Motion for Partial Summary Judgment, judicial estoppel is an altogether distinct affirmative defense that requires different considerations. The doctrine of judicial estoppel "should apply" whenever: (1) the same party has taken two positions; (2) the positions were taken in judicial or quasi-judicial administrative proceedings; (3) the party was successful in asserting the first position (*i.e.*, the tribunal adopted the position or accepted it as true); (4) the two positions are totally inconsistent; and (5) the first position was not taken as a result of ignorance, fraud, or mistake. *Jackson v. County of Los Angeles*, 60 Cal. App. 4th 171, 183 (1997).

California Civil Code Section 3515 provides that "he who consents to an act is not wronged by it." It is a complete defense to tort liability. Accordingly, damage resulting from plaintiff's own inaction cannot be charged to defendant. *Edward Brown & Sons v. San Francisco*, 36 Cal. 2d 272 (1950).

119.   Laches is an equitable defense that may bar a claim where a defendant establishes "(1) lack of diligence by the plaintiff, and (2) prejudice to the defendant."  Grand Canyon Trust v. Tucson Elec. Power Co., 391 F.3d 979, 987 (9th Cir. 2004).

**UNCONTESTED.**

120.   Laches is not a defense to timely RICO claims seeking money damages.  See Abbott v. City of Los Angeles, 50 Cal. 2d 438, 462 (1958) (laches is not available as affirmative defense to action for money damages).; see also U.S. v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc., 793 F. Supp. 1114, 1152 (E.D.N.Y. 1992); State Farm Mut. Auto. Ins. Co. v. Valery Kalika, 2006 WL 6176152, at *7 (E.D.N.Y. March 16, 2006) (because laches is an equitable defense, the "plaintiff's laches, if any, is not a bar to plaintiff's fraud claims or claims for damages under RICO, both which actions are at law").

**IMMATERIAL.**  Laches is not sought as a defense to RICO claims seeking money damages.

121.   Laches is not a defense to timely state law claims, such as trade secret misappropriation.  Unilogic, Inc. v. Burroughs Corp., 10 Cal. App. 4th 612, 619 (1992) ("The equitable doctrine of laches has a legal equivalent in the statute of limitations.  To allow a laches defense in a legal action would be to override a time limit mandated by the Legislature.").

**CONTESTED.** *Unilogic* involved the defense of unclean hands not laches. The case mentions that laches is not available as an affirmative defense to a contract action for money damages and is, therefore, immaterial and unrelated.

122.   Laches "is primarily concerned with prejudice.  A lengthy delay, even if unexcused, that does not result in prejudice does not support a laches defense." Grand Canyon Trust, 391 F.3d at 988 (citation omitted).

**UNCONTESTED.**

123.   To show expectations-based prejudice, a party must prove it "took actions or suffered consequences that [it] would not have, had the plaintiff brought suit promptly." Grand Canyon Trust, 391 F.3d at 988.  Also, there is no prejudice where "delay worked to the benefit of [defendant] because it allowed [it] the opportunity to recover some or all of its investment . . . before this suit was filed." Id. at 988-89.

       **UNCONTESTED.**

124.   Comparative fault defense has no application to intentional tort.  See Logan v. City of Pullman Police Dept., 2006 WL 994759, at *2 (E.D. Wash. Apr. 14, 2006) ("[C]omparative fault is inapplicable in the context of an intentional tort"); see also Am. Exp. Travel Related Servs. Co., Inc. v. D & A Corp., 2007 WL 3217565, *36-39 (E.D. Cal. Oct. 29, 2007) (granting summary judgment in favor of plaintiff on comparative fault defense asserted in response to claims of intentional misconduct); Heiner v. Kmart Corp., 84 Cal. App. 4th  335, 349 (2000) (comparative fault does not diminish an intentional tortfeasor's liability and "[c]ontributory negligence never has been considered a good defense to an intentional tort").

       **CONTESTED.**  California law expressly recognizes the defense of comparative fault, CACI 405 ("Comparitive Fault of Plaintiff"), and the doctrine of avoidable consequences.  6 B. Witkin, *Summary of California Law*, Torts § 1624 (10th ed. 2005).  Under California law, the doctrine of avoidable consequences applies to any pertinent circumstance.  *Thrifty-Tel, Inc. v. Bezenek*, 46 Cal. App. 4th 1559, 1568-69 (1996).  Accordingly, the doctrine applies to "willful as well as negligent torts."  Witkin, Torts § 1624, at 1138 (citing *Green v. Smith*, 261 Cal. App. 2d 392 (1968)).

125.   Spoliation is not a cognizable affirmative defense.  See, e.g., Vodusek v. Bayliner Marine Corp., 71 F.3d 148, 155 (4th Cir. 1995) ("Under the spoliation of

evidence rule, an adverse inference may be drawn against a party who destroys relevant evidence.  Even though application of the rule could prove to be critical to a party's recovery on a claim, it is not an affirmative defense, but a rule of evidence, to be administered at the discretion of the trial court."); see also Tenet Healthsystem Desert, Inc. v. Fortis Ins. Co., Inc., 520 F. Supp. 2d 1184, 1198 (C.D. Cal. 2007) (defendant was not required to "plead an affirmative defense for spoliation" because "[u]nder California law, spoliation by a party to an action is not a separate tort or claim and the parties are limited to evidentiary and discovery remedies") (citing Cedars-Sinai Med. Ctr. v. Superior Court, 18 Cal. 4th 1, 17-18 (1998)); Tucker v. Ohtsu Tire & Rubber Co., Ltd., 49 F. Supp. 2d 456, 463 (D. Md. 1999) ("the spoliation of evidence doctrine is a rule of evidence, not an affirmative defense").

**CONTESTED**.  Although spoliation is not an affirmative defense *per se*, it is a matter for the jury to be instructed upon and to consider in evaluating the evidence.  Mattel has suffered no harm from MGA's advance warning that it intends to seek the strong CACI instruction based upon, *inter alia*, Eckert's "double-deletion" since the outset of Mattel's initiation of this litigation.  *See Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148 (4th Cir. 1995) ("Vodusek benefitted from the defendants' advance notice of their intent to invoke the spoliation rule"); CACI 204 ("Willful suppression of evidence").

126.   "[U]nclean hands does not constitute misconduct in the abstract, unrelated to the claim to which it is asserted as a defense." Jarrow Formulas, Inc. v. Nutrition Now, Inc., 304 F.3d 829, 841 (9th Cir. 2002) (citation omitted).  The doctrine of unclean hands "demands that a plaintiff act fairly *in the matter for which he seeks a remedy.*"  Kendall-Jackson Winery, Ltd. v. Superior Court, 76 Cal. App. 4th 970, 978 (1999) (emphasis added).  "It is fundamental to the operation of the doctrine that the alleged misconduct by the plaintiff *relate directly to the transaction*

1  concerning which the complaint is made." <u>Dollar Systems, Inc. v. Avcar Leasing</u>

2  <u>Systems, Inc.</u>, 890 F.2d 165, 173 (9th Cir. 1989) (quoting <u>Arthur v. Davis</u>, 126 Cal.

3  App. 3d 684, 693-94 (1981)) (emphasis added).

4       **CONTESTED.**  Unclean hands is a defense to both legal and equitable

5  claims under California law.  *Unilogic v. Burroughs Corp.*, 10 Cal. App. 4th 612

6  (1992); *Fibreboard Paper Prods. Corp. v. East Bay Union of Machinists*, 227 Cal.

7  App. 2d 675, 728 (1964) ("We are satisfied that the equitable defense of unclean

8  hands is available in this state as a defense to a legal action").  Whether the unclean

9  hands doctrine applies is a question of fact.  *Kendall-Jackson Winery Ltd. v..*

10 *Superior Court*, 76 Cal. App. 4th 970, 985 (1999) (granting mandamus to vacate

11 summary adjudication of unclean hands defense).  The doctrine provides that the

12 plaintiff must act fairly in the matter before the court, and any evidence of a

13 plaintiff's unclean hands in relation to that transaction before the court should be

14 available to the court.  *Id.*  Additionally, any evidence "which affects the equitable

15 relations between the litigants in the manner before the court" is also relevant.  *Id.*;

16 *see also Unilogic, Inc. v. Burroughs Corp.*, 10 Cal. App. 4th 612, 620 (1992)

17 (plaintiff's unauthorized retention and use of defendant's software sufficiently

18 related to constitute defense to claim for failure to pay for that software).

19 127.   Duplicative affirmative defenses should be dismissed.  <u>See, e.g.</u>, <u>KEMA, Inc.</u>

20 <u>v. Koperwhats</u>, 2010 WL 3464708, at *9 (N.D. Cal. Sept. 1, 2010) (dismissing

21 trademark misuse affirmative defense because it was duplicative of unclean hands);

22 <u>Kreidler v. Pixler</u>, 2009 WL 529590, at *4 (W.D. Wash. Mar. 2, 2009) (striking

23 affirmative defense as redundant); <u>Microsoft Corp. v. BEC Computer Co., Inc.</u>, 818

24 F. Supp. 1313, 1316 (C.D. Cal. 1992) (dismissing duplicative affirmative defenses).

25 These defenses also fail for independent reasons.

26      **IMMATERIAL.**  MGA's asserted affirmative defenses are not duplicative.

27

28

128.   The "competition privilege" in California "protects one from liability for inducing a third person not to enter into a prospective contractual relation with a business competitor."  Gemini Aluminum Corp. v. Cal. Custom Shapes, Inc., 95 Cal. App. 4th 1249, 1256 (2002).

**CONTESTED.**  *Gemini Aluminum Corp. v. Cal. Custom Shapes, Inc.* relates to the tort of  interference with *prospective economic relations*, not intentional interference with contract.  95 Cal. App. 4th 1249, 1256 (2002).  For intentional interference with contract and the breach of duty torts, privilege is an affirmative defense.  *San Francisco Design Ctr. Assoc. v. Portman Cos.*, 41 Cal. App. 4th 29 (1995); *see* 5 B. Witkin, *Summary of California Law*, Torts §759 (10th ed. 2005).  Further, this defense, or privilege, is deeply ingrained in California tort law.  *Envtl. Planning & Info. Council v. Superior Court*, 36 Cal. 3d 188 (1984); *Greenberg v. Hollywood Turf Club*, 7 Cal App. 3d 968, 977 (1970).  "As reflected in our decisional and statutory law, [] it has long been the policy of our state that '[a] former employee has the right to engage in a competitive business for himself and to enter into competition with his former employer, even for the business of … his former employer, provided such competition is fairly and legally conducted."  *Reeves v. Hanlon*, 33 Cal. 4th 1140, 1149 (2004).

129.   Cal. Civ. Code § 3426.4 is not an affirmative defense; it simply provides that "[i]f a claim of misappropriation is made in bad faith, . . . the court may award reasonable attorney's fees and costs to the prevailing party."  Id.; see also Cargill Inc. v. Progressive Dairy Solutions, Inc., 362 Fed. Appx. 731, 734 (9th Cir. 2010) (only if the jury rejected the misappropriation claim on its merits would it consider Cargill's putative bad faith).

**UNCONTESTED.**

130.   To establish an "illegal conduct/fraud" defense, a party must prove "the following elements:  misrepresentation, scienter, intent to defraud, justifiable

reliance and resulting damage." <u>Applied Elastometrics, Inc. v. Z-Man Fishing Products, Inc.</u>, 2007 WL 703606, *3 (N.D. Cal. Mar. 5, 2007).

**IMMATERIAL.**  Mattel's illegal conduct and fraud are part of MGA's unclean hands defense.

131.   A purported affirmative defense that attacks a prima facie case but "would not defeat the claim [if] the plaintiff has stated a prima facie case" is not an affirmative defense and should be dismissed. <u>See</u> <u>Quintana</u>, 233 F.R.D. at 564; <u>U.S. v. Hempfling</u>, 2007 WL 1299262, *5 (E.D. Cal. May 1, 2007) (dismissing purported affirmative defense that "is attacking the Government's prima facie case" but "would not defeat the claim [if] the plaintiff has stated a prima facie case").

**CONTESTED.**  The above "quote," and reliance, on *Quintana* is in error—stated in the converse to suit Mattel's needs.  The actual quote is as follows: "[A] defense is an affirmative defense if it will defeat the plaintiff's claim even where the plaintiff has stated a prima facie case for recovery under the applicable law. *See* Black's Law Dictionary 451 (8th ed. 2004)." *Quintana v. Baca*, 233 F.R.D. 562 (C.D. Cal. 2005).  Similarly, *United States  v. Hempfling* is equally inapposite.  In *Hempfling*, the court struck defendant's first affirmative defense because it was merely a restatement of grounds for dismissal under FRCP 12(b)(6)—a clear "attempt to shirk the Federal Rules of Procedure."  2007 WL 1299262 at *5 (E.D. Cal. May 1, 2007).

132.   "Because the tort of conversion is a species of strict liability, defendant's good faith, ignorance, mistake or motive is irrelevant and does not constitute a defense." <u>Enter. Leasing Corp. v. Shugart Corp.</u>, 231 Cal. App. 3d 737, 747-48 (1991).

**UNCONTESTED.**

133.   "[E]ven where the defendant believes in good faith that he is not infringing a copyright, he may be found liable."  Pye v. Mitchell, 574 F.2d 476, 481 (9th Cir. 1978).

**UNCONTESTED.**

134.   "Direct infringement does not require intent or any particular state of mind." L.A. News Serv. v. Conus Commc'n Co., 969 F. Supp. 579, 584 (C.D. Cal. 1997).

**UNCONTESTED.**

135.   "A defense which demonstrates that plaintiff has not met its burden of proof [as to an element] is not an affirmative defense."  Zivkovic, 302 F.3d at 1088 ); Bank of the Sierra, 2006 WL 3513568, at *10.  See also Sec. People, Inc. v. Classic Woodworking, LLC, 2005 WL 645592, at *5 (N.D. Cal. Mar. 4, 2005) (defense in which defendant denied "that it engaged in any fraudulent business practice . . . is a denial, not an affirmative defense")

**UNCONTESTED.**

136.   Authorization is not necessary for employer to be liable for its employees' tortious acts.  Rather, under principles of respondeat superior, "the employer is indirectly or vicariously liable for torts committed by its employees within the scope of their employment."  Myers v. Trendwest Resorts, Inc., 148 Cal. App. 4th 1403, 1427 (2007).

**CONTESTED.**  Mattel bears the burden of establishing liability under principles of *respondeat superior*, assuming it applies.  California court's articulation of the doctrine can be found in *Yamaguchi v. Harnsmut*, 106 Cal. App. 4th 472 (2003).

137.   "[C]ontributory infringement requires proof that a defendant '(1) has knowledge of a third party's infringing activity, and (2) induces, causes, or materially contributes to the infringing conduct' . . . .  Vicarious infringement requires proof that 'that the defendant exercises the requisite control over the direct

infringer and that the defendant derives a direct financial benefit from the direct infringement.'"  <u>Dream Games of Ariz., Inc. v. PC Onsite</u>, 561 F.3d 983, 995 (9th Cir. 2009) (citations omitted).

**UNCONTESTED.**

138.   To prove standing for trade secret misappropriation, plaintiff must show a right to "possession . . . of a trade secret."  <u>Silvaco Data Sys. v. Intel Corp.</u>, 184 Cal. App. 4th 210, 220 (2010); <u>see</u> <u>Durney v. Wavecrest Labs., LLC</u>, 441 F. Supp. 2d 1055, 1062 (N.D. Cal. 2005).  "The *sine qua non* of a trade secret, then, is the plaintiff's possession of information of a type that can, at the possessor's option, be made known to others, or withheld from them, <u>i.e.</u>, kept secret."  <u>Silvaco</u>, 184 Cal. App. 4th at 220.

**UNCONTESTED**.

139.   A parent has standing to sue for trade secrets of a subsidiary that the parent has the right to use and possess.  <u>SI Handling Systems, Inc. v. Heisley</u>, 658 F. Supp. 362, 370 (E.D. Pa. 1986) (rejecting argument that plaintiff lacked standing to sue for theft of trade secrets created by subsidiary despite lack of any assignment agreement between parent and subsidiary) (citing <u>Copperweld Corp. v. Independence Tube Corp.</u>, 467 U.S. 752, 771 (1984)); <u>Johns-Mansville Corp. v. Guardian Indus. Corp.</u>, 586 F. Supp. 1034, 1040 (D. Mich. 1983) (rejecting argument that parent corporation lacked standing to sue for theft of trade secrets created by various subsidiaries and holding that parent was the only party "necessary to pursue all the claims before the Court").

**UNCONTESTED.**

140.   Exercise of general jurisdiction is appropriate where party's activities within the district are "substantial, continuous and systematic." <u>Perkins v. Benguet Consolidated Mining Co.</u>, 342 U.S. 437, 445 (1952).

**CONTESTED.** General jurisdiction requires "substantial" or "continuous and systematic" contacts with California, *and* that those contacts approximate a "physical presence" in California. *Helicopteros Nacionales de Colombia*, *S.A. v. Hall*, 466 U.S. 408, 415 (1984); *Bancroft & Master Inc. v. Augusta Nat'l, Inc.*, 223 F.3d 1082, 1086 (9th Cir. 2000). This is an "exacting" standard that the Ninth Circuit has rarely applied because it allows a defendant to be haled into court on any claim—even one unrelated to its contacts with the forum state. *Brand v. Menlove Dodge*, 796 F.2d 1070, 1073 (9th Cir. 1986); *Amoco Egypt Oil Co. v. Leonis Navigation Co.*, 1 F.3d 848, 851 n.3 (9th Cir. 1993); *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 801 (9th Cir. 2004). *Perkins* has been limited to its "unusual" facts, which involved a Philippine corporation physically relocating to Ohio due to Japanese occupation during WWII. *See Congoleum Corp. v. DLW Aktiengesellschaft*, 729 F.2d 1240, 1242 (9th Cir. 1984); *L.D. Reeder Contractors v. Higgins Indus., Inc.*, 265 F.2d 768, 775 (9th Cir. 1959).

141. "In applying the 'substantial' or 'continuous and systematic' contacts test, courts have focused primarily on two areas. First, they look for some kind of deliberate 'presence' in the forum state, including physical facilities, bank accounts, agents, registration, or incorporation. . . . In addition, courts have looked at whether the company has engaged in active solicitation toward and participation in the state's markets, i.e., the economic reality of the defendant's activities in the state." Gator.Com Corp. v. L.L. Bean, Inc., 341 F.3d 1072, 1077 (9th Cir. 2003) (quotations omitted).

**CONTESTED.** *Gator.Com Corp. v. L.L. Bean, Inc.*, 341 F.3d 1072, 1077 (9th Cir. 2003), is a case that cannot be cited as precedent. *See Gator.Com Corp. v. L.L. Bean, Inc.*, 366 F.3d 789 (9th Cir. 2004).

General jurisdiction requires "substantial" or "continuous and systematic" contacts with California, *and* that those contacts approximate a "physical presence"

in California.  *Helicopteros Nacionales de Colombia*, *S.A. v. Hall*, 466 U.S. 408, 415 (1984); *Bancroft & Master Inc. v. Augusta Nat'l, Inc.*, 223 F.3d 1082, 1086 (9th Cir. 2000).  This is an "exacting" standard that the Ninth Circuit has rarely applied because it allows a defendant to be haled into court on any claim—even one unrelated to its contacts with the forum state.  *Brand v. Menlove Dodge*, 796 F.2d 1070, 1073 (9th Cir. 1986); *Amoco Egypt Oil Co. v. Leonis Navigation Co.*, 1 F.3d 848, 851 n.3 (9th Cir. 1993); *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 801 (9th Cir. 2004).

    For example, payments to vendors in a forum state does not confer general jurisdiction.  *Helicopteros,* 466 U.S. at 415 (purchasing helicopters, equipment, and training services for substantial sums in Texas did not subject defendant to general jurisdiction in Texas); *Rosenberg Bros. & Co. v. Curtis Brown Co.*, 260 U.S. 516, 518 (1923) (retailer in Oklahoma who purchased merchandise on a regular basis from wholesalers in New York was not subject to personal jurisdiction in New York).  And importing goods through California ports also does not confer general jurisdiction over a non-resident defendant.  *See Brand*, 796 F.2d at 1073 (fact that defendant imported cars through California did not support jurisdiction); *Schwarzenegger*, 374 F.3d at 801 (fact that cars were imported through California did not establish defendant's "physical presence" there).  Nor will the fact that a parent company is located in California confer jurisdiction over a non-resident subsidiary.  *See Fields v. Sedgwick Associated Risks, Ltd.*, 796 F.2d 299, 302 (9th Cir. 1986) (parent corporation's ties to a forum do not create personal jurisdiction over subsidiary); *Uston v. Hilton Casinos, Inc.*, 564 F.2d 1218 (9th Cir. 1977); *Ingram Micro, Inc. v. Tessco Commc'ns, Inc.*, 2002 U.S. Dist. LEXIS 14368, at *4-5 (C.D. Cal. 2002) (each defendant's contacts with forum must be analyzed separately; subsidiary was independent from parent's contacts); *Holland Am. Line Inc. v. Wartsila N. Am. Inc.*, 485 F.3d 450, 459 (9th Cir. 2007) (where parent and subsidiary are separate and distinct entities, the presence of one in a forum state

may not be attributed to the other); *United States v. Bestfoods*, 524 U.S. 51, 69 (1998) (it is "entirely appropriate" for directors of a parent corporation to serve as directors of its subsidiary); *Lumiere v. Mae Edna Wilder Inc*., 261 U.S. 174, 177 (1923) (presence of executive in forum state does not confer general jurisdiction over nonresident corporation); *Kendall v. Am. Automatic Loom Co*., 198 U.S. 477, 482 (1905) (service of process on treasurer in forum state did not confer personal jurisdiction over nonresident corporation).

142.   The Court has specific jurisdiction over a party if: (1) it purposefully directed its activities at the forum state; (2) opposing party's claims relate to party's forum-related activities; and (3) the exercise of jurisdiction is not unreasonable. Panavision Int'l, L.P. v. Toeppen, 141 F.3d 1316, 1320 (9th Cir. 1998).

   **UNCONTESTED.**

143.   The "purposeful availment" requirement protects against a nonresident being hailed into the forum court solely as a result "random, fortuitous or attenuated" contacts over which it has no control.  Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985); Panavision, 141 F.3d at 1320.  A defendant does not need to be physically present within, or have physical contacts with, the forum, if his efforts "are purposefully directed" toward forum residents.  Burger King, 471 U.S. at 475-76; see also Haisten v. Grass Valley Med. Reimbursement Fund, Ltd., 784 F.2d 1392, 1399 (9th Cir. 1986) (holding that an out-of-state act having an effect within the forum is sufficient to constitute purposeful direction).

   **UNCONTESTED.**

144.   Personal jurisdiction attaches if the defendant committed an intentional act, expressly aimed at the forum state, causing harm that the defendant knows is likely to be suffered in the forum state.  Panavision, 141 F. 3d at 1321; see also Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme, 433 F.3d 1199, 1206-07 (9th Cir. 2006) (en banc) (holding that as long as a "jurisdictionally sufficient

1    amount of harm is suffered in the forum state, it does not matter that even more

2    harm might have been suffered in another state."); <u>Calder v. Jones</u>, 465 U.S. 783,

3    789 (1984) (affirming appellate court's reversal of district court's grant of motion

4    to quash service of process for lack of jurisdiction and upholding the exercise of

5    personal jurisdiction because defendants' intentionally tortious acts were not "mere

6    untargeted negligence," but were "expressly aimed at California).

7         **UNCONTESTED.**

8    145.   If a party asserting existence of jurisdiction proves the first two requirements

9    for specific jurisdiction, a rebuttable presumption arises that the exercise of

10   jurisdiction by the Court is reasonable.  <u>Haisten</u>, 784 F.2d at 1397.  The burden

11   shifts to opposing party to present "a compelling case that jurisdiction would be

12   unreasonable."  <u>Id</u>. at 1397 (citing <u>Burger King Corp. v. Rudzewicz</u>, 471 U.S. 462,

13   477-78 (1985)).

14        **UNCONTESTED.**

15   Dated:    October 12, 2010            Respectfully submitted,

16                                        ANNETTE L. HURST
17                                        Orrick, Herrington & Sutcliffe LLP

18

19                                        By:    <u>s/ Annette L. Hurst</u>
                                          ANNETTE L. HURST
20                                        Attorneys for MGA Parties

21

22

23

24

25

26

27

28

- 86 -