1    UNITED STATES DISTRICT COURT

2    **CENTRAL DISTRICT OF CALIFORNIA**

3    **SOUTHERN DIVISION AT SANTA ANA**

4    HONORABLE DAVID O. CARTER, JUDGE PRESIDING

5

6

     CARTER BRYANT, an individual,      )
7                                        )
                    PLAINTIFF,           )
8                                        )
            vs.                          ) SACV NO. 04-9049-DOC
9                                        ) VOLUME II
     MATTEL, INC., a Delaware            )
10   corporation,                        )
                                         )
11                  DEFENDANT.           )
     _____)
12   CONSOLIDATED WITH MATTEL, INC., vs.)
     BRYANT and MGA ENTERTAINMENT, INC. )
13   vs. MATTEL, INC._____)

14

15

16              REPORTER'S TRANSCRIPT OF PROCEEDINGS

17                   SANTA ANA, CALIFORNIA

18                  FRIDAY, MAY 28, 2010

19                      1:30 P.M.

20

21              **DEBORAH D. PARKER, CSR 10342**
                   **OFFICIAL COURT REPORTER**
22              **UNITED STATES DISTRICT COURT**
                  **411 WEST FOURTH STREET**
23                    **SUITE 1-053**
               **SANTA ANA, CALIFORNIA 92701**
24                   **(714) 542-8409**
                 **D.PARKER@IX.NETCOM.COM**

25

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
1   APPEARANCES OF COUNSEL:

2        FOR THE DEFENDANT, MATTEL, INC.:

3                              MICHAEL ZELLER
                               SUSAN ESTRICH
4                              BRETT DYLAN PROCTOR
                               QUINN EMANUEL URQUHART
5                              865 SOUTH FIGUEROA STREET
                               10TH FLOOR
6                              LOS ANGELES, CALIFORNIA 90017
                               (213) 443-3000
7

8        FOR THE INTERVENOR, MGA ENTERTAINMENT, INC.:

9                              ANNETTE I. HURST
                               WARRINGTON S. PARKER, III
10                             ORRICK, HERRINGTON & SUTCLIFFE, LLP
                               THE ORRICK BUILDING
11                             405 HOWARD STREET
                               SAN FRANCISCO, CALIFORNIA 94105
12                             (415) 773-5740

13                             THOMAS S. MC CONVILLE
                               ORRICK, HERRINGTON & SUTCLIFFE, LLP
14                             4 PARK PLAZA
                               SUITE 1600
15                             IRVINE, CALIFORNIA 92614
                               (949) 567-6700
16
                               ANTHONY A. DE CORSO
17                             WILLIAM MOLINSKI
                               ORRICK, HERRINGTON & SUTCLIFFE, LLP
18                             777 SOUTH FIGUEROA STREET
                               SUITE 3200
19                             LOS ANGELES, CALIFORNIA 90017
                               (213) 612-2346
20

21

22

23

24

25
```

```
 1   APPEARANCES OF COUNSEL:

 2        FOR THE DEFENDANT, CARLOS GUSTAVO MACHADO GOMEZ:

 3                          ALEXANDER H. COTE
                           ANGELA M. MACHALA
 4                          MARK OVERLAND
                           DAVID C. SCHEPER
 5                          SCHEPER KIM & HARRIS LLP
                           601 WEST 5TH STREET
 6                          12TH FLOOR
                           LOS ANGELES, CALIFORNIA 90071
 7                          (213) 613-4660

 8
          FOR THE MOVANT, OMNI 808 INVESTORS, LLC, INC.:
 9
                           TODD E. GORDINIER
10                          BINGHAM MC CUTCHEN LLP
                           600 ANTON BOULEVARD
11                          PLAZA TOWER, 18TH FLOOR
                           COSTA MESA, CALIFORNIA 92626
12                          (714) 830-0622

13

14

15

16

17

18

19

20

21

22

23

24

25
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
 1        SANTA ANA, CALIFORNIA; FRIDAY, MAY 28, 2010; 1:30 P.M.

 2                              -oOo-

 3            THE COURT:  We're back on the record.

 4            All counsel are present.

 5            And Ms. Estrich, if you would like to continue and

 6     you can pick up your argument any place you would like to.

 7     So you want to go back and retrace, I'm not concerned at

 8     all.

 9            MS. ESTRICH:  I'm extremely organized.  That's

10     really a joke.

11            Who needs notes, your Honor?

12            To recap, our points were simply that our scheme

13     alleged here was not simply a scheme to take but a scheme to

14     take, to use, to exploit and ultimately to obstruct and

15     conceal; that under the authority of Carpenter, the scheme

16     was by no means over when the taking was over.  And that

17     there were additional predicate acts here beyond mail fraud

18     and wire fraud.  Those additional predicate acts were

19     criminal copyright infringement as to which we are still

20     developing evidence, but we do have evidence that

21     Mr. Machado took files from Mattel, copyrighted information,

22     we're alleging, consistent with Sony.  It need not be

23     registered.  That he copied them onto a laptop, copied them

24     onto a DVD in January of 2005.  Copied them again in October

25     2005 when the MGA offices in Mexico were searched and that
```

 1   that is a pattern of continuing infringement.  And according

 2   to the allegations of our complaint, he continued throughout

 3   his tenure at MGA to use and access those documents,

 4   infringing our rights.  And, finally, we pled obstruction of

 5   justice as a separate predicate act.  And as I think

 6   Mr. Cote referred, there was evidence in the complaint that

 7   he had obstructed justice by running various programs or

 8   damaging his hard drive in such a way that his Mattel

 9   computer would no longer be able to show or demonstrate what

10   he had taken.

11          Now, as the court well knows, Mr. Machado invoked

12   his Fifth Amendment rights.  We came to court.  We had

13   argument.  It was not until after we filed our complaint

14   that we were first able to depose Mr. Machado.  We are still

15   waiting on his hard drive from MGA.  But we do have

16   additional evidence referenced in our brief that subsequent

17   to leaving Mattel, this laptop on which we believe and have

18   alleged that there was critical copyrighted information, was

19   taken by Mr. Machado and subsequently in 2005 and 2006, he

20   gave the laptop to his father, who in 2006, according to his

21   deposition, supposedly dropped it and then sold it for spare

22   parts.

23          Now, we believe this laptop would have and would

24   contain evidence going directly to Mattel's claims here.

25   And the only answer offered by Mr. Cote in his argument is

1    that Mr. Machado was certainly not on notice that anybody

2    would be interested in his laptop.

3            And I would simply point out, your Honor, that in

4    October 2005, MGA Mexico's offices were searched and

5    criminal proceedings initiated in Mexico.  In 2004, believe

6    it or not, this lawsuit actually commenced and by 2006,

7    Mr. Machado had been named as a defendant.  So the notion

8    that we don't have continuity here, we only have allegations

9    that begin three months before he left Mattel in January

10   2004 and continue right up through 2006, at the very latest

11   when he gave his laptop to his father, who, quote, dropped

12   it and sold it for spare parts, notwithstanding an ongoing

13   investigation of MGA Mexico in which he, himself, made

14   copies of the relevant copyrighted materials, suggest that

15   whether this court's test is open-ended continuity or

16   closed-ended continuity, as to Mr. Machado we have pled

17   enough.

18           I would finally submit, your Honor, that given the

19   delays in securing Mr. Machado's testimony and given the

20   pending motions, including the motion for Mr. Machado's

21   laptop that is currently pending before Judge Smith, should

22   this court be inclined to believe that further allegations

23   or further detail is necessary, we stand ready to provide

24   it.

25           Thank you very much, your Honor, and I'm happy to

1    rest on that argument.

2          THE COURT:  Thank you very much, Counsel.

3          Mr. Cote.

4          MR. COTE:  Thank you, your Honor.

5          Mr. Machado doesn't dispute that Mattel alleges

6    use and exploitation of the trade secrets.  Of course, they

7    allege it.  They have to for the trade secret cause of

8    action.  That's kind of the whole point.  It's only relevant

9    for trade secrets.  Use of the trade secrets doesn't give

10   rise to wire fraud.

11         The authorities relied on by Mattel are simply not

12   apposite.  The first one they point to is the *Carpenter*

13   case.  *Carpenter*, of course, is not a RICO case.  The

14   question in front of the *Carpenter* court was:  What is

15   property for purposes of wire fraud, or mail fraud?

16         It was not a case considering when a wire fraud

17   scheme to defraud begins and ends.  There are Supreme Court

18   cases that answer that question.  They are *Parr* and *Kann* and

19   *Maze*.  And those cases make it very clear that mailings or

20   in this case e-mails that take place after the consummation

21   of the scheme to take the property, after that -- after that

22   scheme is done and the property has been taken, that's the

23   end of the fraud.  Mailings that take place after that do

24   not amount to mail fraud under the statute.

25         One other point to distinguish *Carpenter*, your

1   Honor, that's a case where the alleged mailing took place

2   the very next day after the alleged sharing of the column

3   that was used for the insider trading.  This is the case

4   where the purported acts, the wire fraud, took place six

5   months, eight months, a year, after Mr. Machado left his

6   employment at Mattel.  It's a different factual situation.

7          Finally, *Carpenter* was not faced with the notion

8   that Mattel raises, which is that the scheme to defraud

9   under RICO, apparently, can last in perpetuity, so long as

10  the perpetrator e-mails somebody about something later.

11  That's really the essence of what Mattel is trying to allege

12  here, and that's simply not what the law says.

13         With respect to -- with respect to *Bro-Tech* and

14  the other -- and the two cases that Ms. Estrich raised right

15  before we broke for lunch, it was convenient timing, because

16  I had a chance to read those cases over lunch.  And, you

17  know, like *Bro-Tech*, they're merely persuasive to this court

18  and they do reach a slightly different conclusion than the

19  *Bro-Tech* case does.

20         We didn't cite *Bro-Tech* because we thought it was

21  controlling.  We cited it, because it was the most

22  persuasive analysis of this issue.

23         *Bro-Tech* is a brand new case, just decided in

24  2009.  Within its pages, it cites a legion of authority

25  supporting the propositions about when the mail fraud

1  concludes, or the wire fraud in that case concludes.  The

2  cases cited by Ms. Estrich, the *GM* and the *Gould* case,

3  G-O-U-L-D, are older cases and they are contradicted by the

4  cases that come after it.  For example, both *GM* and *Gould*

5  are contradicted by a binary *Semantics* case, 2008 WL 763575.

6  That's another district court case from the Middle District

7  of Pennsylvania -- different district than *Bro-Tech* -- and

8  it finds that *GM* and *Gould* are not persuasive.  They are

9  wrongly decided.  We think that *Bro-Tech* is the better case

10  for this court to look at.

11         And just one final point on *Bro-Tech*.  I thought I

12  understood Ms. Estrich to say that we don't really know what

13  the allegations were in *Bro-Tech* and it's hard to decipher

14  what's going on in that case.  I don't think that's right.

15  The opinion is 45 pages long in the Federal Supplement.  It

16  lays out the facts in great, great detail, far more detail

17  than is alleged in the complaint here.  And even with that

18  detail, mail fraud and wire fraud allegations are not

19  adequately pled.

20         I want to turn to the last two predicate acts that

21  we just heard about.  It's, apparently, Mattel's view that a

22  copyright doesn't need to be registered to give rise to

23  criminal copyright infringement.  Apparently, they are

24  proceeding on some sort of common law copyright.  That may

25  be their theory.  It's still not alleged anywhere in the

1    complaint, or in the counterclaims.  There is nowhere in the

2    allegations where they say that the documents that

3    Mr. Machado purportedly took are protected by copyright.

4    They cite two paragraphs in their counterclaims.  In the

5    opposition, they cite two perhaps.  I think it's 55 and 56.

6    I've read them a 1,000 times.  The word "copyright" doesn't

7    appear.  Maybe they're proprietary, or they're confidential,

8    or they're trade secrets.  Those words appear all over the

9    place.  "Copyright" does not appear in any paragraph talking

10   about what Mr. Machado took.

11            And I'm not sure I follow the argument that more

12   discovery is needed on this point.  Three or four months

13   ago, at the deposition of Mattel's 30(b)(6) witness, they

14   gave us a list of all the documents, all the trade secret

15   documents that they contend were taken by Mr. Machado and

16   the other Mexican employees.  That list is closed.  We have

17   a finite list.  They should be able to know now whether any

18   of them are subject to copyright.

19            The final point about the copyright.  Mr. Overland

20   reminded me of this.  It was the Mexican police that copied

21   the documents in October of 2005.  It wasn't Mr. Machado.

22   Mr. Machado wasn't even in the office that day.  That's just

23   one more minor point.

24            Turning finally to the spoliation allegations.

25   Mr. Machado concedes only that Mattel alleged that he

1    damaged his computer when he left Mattel, not that it

2    actually happened.  That allegation is not sufficient to

3    establish the pattern here, because that occurred within the

4    same three-month period as all the other acts.  So even

5    assuming that that's an adequately pled predicate act, it

6    doesn't solve the timing problem which is at the root of

7    Mr. Machado's motion.

8            The recitation we just heard by Ms. Estrich, I

9    think establishes the point.  Mr. Machado wasn't named in

10   the case until January of 2007, but he is held to have --

11   had knowledge and an intent to disrupt this proceeding two

12   years earlier when we gave his laptop to his father.  This

13   just doesn't make any sense.

14           In reference to the criminal activity, or the

15   criminal case in Mexico, it doesn't save the claim, unless

16   there is some argument that Mr. Machado was obligated to

17   keep the laptop pursuant to Mexican law.  I haven't heard

18   that argument.  I doubt there is such a law.

19           But in any event, he didn't have any obligation

20   under U.S. law to keep the laptop at the time he allegedly

21   spoliated it.

22           But I think I want to come back to where I began.

23   I think these later predicate acts -- the supposed

24   copyright, the supposed spoliation -- are somewhat beside

25   the point under *Turner*.  *Turner* makes it clear, even if you

1  have predicate acts that take place months and years

2  earlier, but only a few and they are only sporadic, which is

3  the best that Mattel has alleged so far -- it's not good

4  enough under RICO.  The facts in *Turner* are clear.  You have

5  the majority of the predicate acts in a two-month period.

6  We have a three-month period here.  The fact that you can

7  point to three or four later acts that happened at some

8  other time does not make a RICO case, and that's the point

9  that I would leave the court with.

10           Thank you.

11           MS. ESTRICH:  Your Honor, we have one point.

12           May I stand right here?

13           THE COURT:  Wherever you like.

14           MS. ESTRICH:  Great.  In Paragraph No. 124,

15  subsection F of its complaint, in language that has been

16  there for a very long time:  *Mattel alleges that*

17  *counterdefendants MGA Larian, MGA Hong Kong, MGA de Mexico,*

18  *Bryant Machado and certain of the Doe counterdefendants*

19  *wilfully infringed and continue to willfully infringe*

20  *Mattel's copyrights, including, without limitation, with*

21  *respect to documents containing Mattel trade secrets and*

22  *confidential information, et cetera, including, without*

23  *limitation, the paragraphs specifically related to*

24  *Mr. Machado.*

25           That allegation which is not subject to Rule 9(b)

1   but Rule 8 has been there since the outset.  These exact

2   allegations were at issue in 2007.  Judge Larson addressed

3   them.  He said, and I quote:  *Here, there are two types of*

4   *works allegedly infringed.  The first type is the*

5   *Bratz-related and Bratz-derivative works.  The second type*

6   *is Mattel's other trade secrets and confidential*

7   *information.  Both types are alleged with particularity.*

8   *Mattel has sufficiently alleged predicate acts pled,*

9   *criminal copyright infringement by alleging that MGA and*

10  *other counterdefendants willfully infringed its copyright*

11  *for purposes of gaining commercial advantage and private*

12  *financial gain.*

13          If the allegations were sufficient to defeat a

14  12(b)(6) motion in 2007, we would submit they are sufficient

15  today.

16          Finally, simply as a matter of correction,

17  Mr. Zeller informs me the way this case transpired

18  Mr. Machado was, in fact, on notice that Mattel planned to

19  name him as a defendant in 2006, although he was not

20  officially added until 2007.  Spoliation does not require or

21  turn to an obligation to preserve, but rather, it's the

22  crime of intentionally destroying evidence, knowing that it

23  is evidence, or could be used as evidence in a pending

24  proceeding, or a future proceeding.  Obviously, Mr. Cote and

25  I have an issue of fact here as to what really happened in

1    connection with that laptop:  Why did he give it to his

2    father?  Did his father actually know when he, quote,

3    dropped it and sold it for spare parts that there was,

4    indeed, a proceeding that was pending that might include his

5    son?

6            I would submit, your Honor, that those are issues

7    of fact which are not appropriately dealt with at the

8    pleading stage.  And in any event, the obstruction

9    spoliation claim is a Rule 8 claim, not a Rule 9 claim.

10           We're happy to amend again.

11           Thank you, your Honor.

12           THE COURT:  Thank you very much.

13           Where would we like to go from here?

14           MS. HURST:  Your Honor, I believe that takes us

15    next to the personal jurisdiction for *non conveniens* and

16    preemption issues.

17       *(Pause.)*

18           MS. HURST:  Mr. Zeller has kindly agreed that I

19    can just address it all at once -- preemption, plus personal

20    jurisdiction -- all of it.

21           THE COURT:  All right.  This is Annette Hurst, on

22    behalf of MGA.

23           MS. HURST:  Thank you, your Honor.  I apologize

24    for that oversight.

25           I'm just going to start with preemption and be

1    very brief.

2            I would urge the court to take a look at the

3    *Silvaco* case which was very recently decided, 2010, WL

4    1713241, California Appellate, intermediate appellate

5    decision.

6            *Silvaco* basically confirms every contention that

7    we've made with respect to the fashion in which the trade

8    secret claims preempt the other common law tort claims of

9    the fourth amended answer and counterclaims.  Six through 12

10   all rely in some part on trade secret, alleged trade secret

11   misappropriation.

12           Fourth amended answer and counterclaims does not

13   define some universe of information that's less than a trade

14   secret.  It says everything that was taken is a trade

15   secret.  All of those tort claims are premised on that trade

16   secret information in some way, and that means they satisfy

17   the common nucleus of operative fact test for purposes of

18   preemption by California Uniform Trade Secrets Act.

19           Now, the two main points that they make in

20   response to this is:  Well, there's some other stuff alleged

21   in those claims, too.  That's one.  And two is:  Well, if

22   it's not a trade secret but it's confidential information,

23   we should still get to sue on.

24           As to the first point, you can't lump your claims

25   together in order to defeat preemption.  It's seriously

```
 1   doubtful that they pled anything, other than possibly the
 2   seamstress moonlighting claim.  It's really independent of
 3   the trade secret misappropriation.  But if they had pled
 4   something that's independently wrongful and not part of the
 5   common nucleus of facts with respect to the trade secret,
 6   then their remedy for that is to hold that all the trade
 7   secret related stuff is preempted and if they've got
 8   something that's not premised on the taking of confidential
 9   information, then that claim goes forward subject to
10   whatever the legal requirements may be.  This is exactly
11   what the court said in Silvaco, quote:  A plaintiff cannot
12   avoid dismissal of one deficient claim by wedding it to
13   another deficient claim, or for that matter to a sufficient
14   claim.
15           The preemption still applies.
16           Now, the other thing they say is:  Well, maybe
17   we'll -- we won't prove all the elements of trade secret
18   misappropriation, but it's still confidential information.
19   So to be clear, this is a theory that they fail in their
20   proof and then under tort law are entitled to greater
21   remedies than they would be under the Uniform Trade Secrets
22   Act.  Again, a contention that to state is to refute, as was
23   done by the court in Silvaco.  That these rules do not --
24           I quote:  That these rules do not permit recovery
25   in a particular case hardly means that the statute ceases to
```

1    *apply.  If the prescribed conditions are present but no*

2    *remedy is available, then the logical effect of the*

3    *exclusive remedy provision is to deny any relief.*

4         To take another example, still quoting *Silvaco*:

5    *No one would suggest to the point of whose trade secret*

6    *claim is found barred by the statute of limitations is*

7    *nonetheless free to sue under another law.*

8         Finally, there was some suggestion that this is

9    somehow a premature argument at the pleadings stage.

10   *Silvaco* again addressed that point.  *The time to do this --*

11   quote:  *The time to do this is in the pleadings, not at*

12   *trial.  It is never premature to require that the plaintiff*

13   *alleged facts sufficient to constitute a viable cause of*

14   *action.*

15        The six through 12 claims are all premised on the

16   alleged misappropriation of trade secrets and are,

17   therefore, preempted.

18        I think that brings me to personal jurisdiction

19   and *forum non conveniens* concerning the trade secret

20   misappropriation claim brought now by Mattel Mexico, as well

21   as Mattel against MGA de Mexico and other defendants.  And

22   now, here, we're talking just about the claims that really

23   concerned what happened in Mexico.

24        The standard on a 12(b)(2) motion where evidence

25   has been offered is very similar to the summary judgment

 1    standard.  The plaintiff may not rely on pleading

 2    allegations where the defendant has come forward with

 3    evidence on the point.  The plaintiff is obligated to come

 4    forward with evidence itself.  If there are conflicts in the

 5    evidence, based on reasonable inferences permitted under the

 6    substantive law, then the plaintiff gets the benefit of the

 7    doubt.  And the standard here is not the ultimate burden of

 8    proof.  It's *prima facie*.  But it's not good enough to just

 9    fall back on the pleading allegations.

10            When MGA de Mexico made its motion, it argued a

11    variety of factors, one of which included choice of law.  In

12    response, Mattel conceded that Mexican law does not have a

13    claim, civil claim for trade secret misappropriation.  This

14    concession entitles the defendants to dismissal on the

15    merits of the claim, concerning alleged misappropriation of

16    trade secrets in Mexico because a substantive claim cannot

17    be stated as Mattel now concedes and because Mexican law

18    clearly applies to govern the conduct that occurred in

19    Mexico.

20            Now, how do we know Mexican law applies?

21            The *Abogrados* case is one that I would urge the

22    court to look at in that regard.  *Abogrados versus AT&T* was

23    cited in our papers.  California applies the governmental

24    interest test, the situs of the conduct still gets a very

25    strong measure of deference.  The situs of the conduct here

```
 1    is all alleged to be in Mexico.  The misappropriation is

 2    Machado, Vargas and Trueba, leaving Mattel Mexico and taking

 3    it with them in Mexico to another location in Mexico.

 4          Not only that, but all the effects were felt in

 5    Mexico by Mattel's admission.  That's both -- that's in the

 6    pleading now.  This is for 12(b)(6) purposes, so we're just

 7    talking about the pleading.  In the pleading, they allege in

 8    paragraph 53, that the harm from that alleged

 9    misappropriation of trade secrets was lost market share in

10    Mexico.

11          The governmental interest of Mexico is strong.

12    Mexico has adopted limitations in this area.  Specific

13    limitations.  This is what the court said in *Abogrados* when

14    it recognized as Dr. Herod O'Bleck (phonetic) said in his

15    declaration*:  There's no intentional interference claim*

16    *either under Mexican law.*  The Ninth Circuit said that's

17    right in *Abogrados*.  And because the Mexicans have adopted

18    this specific scheme here with limitations, they have a

19    strong interest in that.  They have entered their own

20    interests in the alienability of labor and fair competition

21    which are always the downside.  Those are all potentially

22    impaired in allowing claims like this that are too broad.

23          In contrast, California's interest is weak at

24    best.  It's just the generalized interest in protecting its

25    citizens.
```

1           So what we have -- what has developed as a result

2     of the jurisdictional and *forum non* motion is a set of legal

3     circumstances now that demonstrate that all of the defense

4     to the third claim arising from the alleged conduct of

5     Machado, Vargas and Trueba, in Mexico, are entitled to

6     12(b)(6) dismissal on the merits, because the substantive

7     law does not provide for the claim for relief that is

8     sought.  And by the way, just imagine what that means for

9     the RICO claim.

10          Now, it's a mail and wire fraud, based on trade

11    secret misappropriation that under the relevant country's

12    laws isn't a claim either.

13          That brings us next to personal jurisdiction over

14    MGA de Mexico.  It's a foreign defendant.  It's a higher

15    burden, higher standard under NEC and Amoco.  This is not a

16    case of general jurisdiction in the State of California,

17    over MGA de Mexico.  Even Judge Larson did not find that in

18    the earlier order.

19          They cite *Perkins*.  Philippine Mining Corporation

20    comes to Ohio during World War II.  It's a *sui generis* set

21    of facts.  The contacts between -- you can't impute the

22    contacts of the parent to the sub for these purposes.  *Field*

23    says that.

24          There are allegations of coming to California for

25    training, having the parent conduct -- supply certain

business services to the sub in California.  No different

than Helicopter (rows) where they purchase things.  They

come to the forum for training.  Not held to find general

jurisdiction.

So really the contest here is specific

jurisdiction.  And here I really want to emphasize this,

but-for causation requirement that they just completely

elided in their opposition brief given in only one sentence.

The but-for requirement requires a relationship between the

contact, the forum and the claims.

There is really no relationship alleged between

any of the trade secret misappropriation contacts and the

forum here and the claims.  Everything is alleged to have

happened in Mexico.  The only thing that has anything to do

with the United States, with the State of California, is the

conclusory allegation that Mr. Larian and others induced

this misappropriation.

Here we come to the evidence.  Mr. Machado

testified -- this is the Kieckhefer declaration, Exhibit 20

at page 2117:

*During the time that you were meeting with*

*Mr. Larian, Ms. Park (sic) and Ms. Kummerle, did they ask*

*you to bring information with you from Mattel MGA?*

*No.*

*Did they tell you not to bring information from*

1   *Mattel?*

2           *Yes.*

3           *Who said that?*

4           *Isaac did.*

5           Ms. Trueba testified.  This was in the Chaudoir

6   declaration, the supplemental declaration, Exhibit 2 at,

7   page 16:

8           *Did anyone from MGA ever ask you to take*

9   *information from Mattel?*

10          *Never.  Nobody.*

11          *Did you ever tell anyone from MGA that you had*

12  *transferred Mattel documents to a USB drive before leaving?*

13          *No.*

14          At page 6:  *There's something very important that*

15  *Mr. Larian did say, for us not to take anything from Mattel,*

16  *anything.  Just our minds.*

17          *When did he say that?*

18          *During the meeting at the W.*

19          And in the appendix of exhibits, Exhibit 6486, at

20  page 3372 is the certified English translation of the

21  provision in the contract that Mr. Machado, Ms. Trueba and

22  Mr. Vargas all signed in which they certified they would not

23  bring any industrial secrets from their prior employer,

24  Clause I, of the written agreement.  So we have an objective

25  documentary piece of evidence in the record, showing that

1    they were instructed not to bring anything in writing.  Not

2    just orally, but in writing.

3            Quote:  *The employee undertakes not to use for the*

4    *performance of the work to be developed in the company any*

5    *privileged information that he knows by virtue of the work,*

6    *job, or position, exercise of profession, or business*

7    *relationship of which he may have knowledge from another*

8    *moral or physical person and that is considered to be an*

9    *industrial secret pursuant to the law by virtue of contract,*

10   *convention or agreement that he may have signed.*

11           Don't bring it.

12           Now, in response to this, Mattel relies on its

13   pleading allegation which cannot be considered for these

14   purposes.  And it relies on -- I don't know -- a couple of

15   other things that they had meetings before they took the

16   stuff and that they took it.  If that evidence were

17   sufficient to establish inducement, that were sufficient to

18   have a reasonable inference of inducement, then the law --

19   substantive trade secret law that you cannot impute the

20   actions of the departing employees to the new employers

21   would be abrogated.  That substantive law would have no

22   longer any force and effect.  Because that's true in every

23   case.  How do they get a job with the new employer if it's

24   without interviewing, being made offers, agreeing on the

25   terms and conditions of employment and then departed?

```
1          Any departing employee trade secret case will
2    follow that pattern.  So if it's enough to say that that
3    gives rise to a reasonable inference of inducement, then the
4    substantive law is no more.
5          THE COURT:  Wasn't that alluded to in the Ninth
6    Circuit by either Judge Kozinski or Judge Trott?  Hadn't
7    they made the comment which is not relevant for my purposes,
8    because it's dicta about -- well, I'll wait.  Why don't you
9    keep going.
10         I'll wait.
11         MS. HURST:  I'm almost finished, your Honor.
12         THE COURT:  I'll wait.
13         MS. HURST:  In this regard, I commend to the court
14   the *Spring Patent*, Hawaii case.  Very similar.  Where the
15   departing employee associates itself with the sub.  They
16   allege jurisdiction over the sub in the foreign parent's
17   forum.  The allegation is that an employee at the foreign
18   parent communicated with the employee at the sub; and then,
19   the tortious behavior occurred after that and so there must
20   have been an inducement of the tortious behavior.  It's the
21   evil mastermind parent theory.  *Spring Patent* rejects it out
22   of hand.  It says, *You can't do that for purposes of*
23   *jurisdiction.*  It's quite apposite.  It's persuasive.  I
24   commend it to the court's attention.
25         I want to touch, briefly, on the issue of
```

1    reasonableness.  Having these claims here is a one-way

2    ratchet against MGAE de Mexico.  We have absolutely done our

3    best to faithfully comply with the court's order regarding

4    30(b)(6) preparation and the result of that has been we have

5    gone out to interview a bunch of former employees and

6    anything bad they say is an admission against MGAE de

7    Mexico; but anything good they say is hearsay and

8    inadmissible.  We can't get them here.  It's a one-way

9    ratchet for Mattel to continue conducting these claims in

10   this forum, and that is especially unfair where you have a

11   situation here where the claims are pending as a criminal

12   matter in Mexico and Mr. Larian was dismissed for

13   insufficient evidence.  MGAE de Mexico is dismissed for

14   insufficient evidence.  This is the worst case of forum

15   shopping ever.

16        They come in here with Mattel Mexico now making a

17   claim in this court against MGAE de Mexico about lost market

18   share in Mexico.  Now, I know this court has never seen an

19   amount of work that is too hard, so I'm not going to bother

20   arguing efficiency and hard work and wasting the court's

21   resources.  But this is just forum shopping at its worst.

22   It's offensive.

23        If there is anything that offends traditional

24   notions of fair play and substantial justice, it's allowing

25   this proceeding to be turned into a one-way ratchet where

1  MGA can't get the witnesses here to defend itself, but

2  Mattel is constantly forcing us to look for evidence against

3  us.  That's just not right.

4          I think that brings me to *forum non conveniens*.

5  That unreasonableness argument, plus choice of law under

6  *Piper*, put all that together, ought to be dismissed.

7          THE COURT:  *Forum non conveniens* grounds?

8          MS. HURST:  Yes, your Honor.

9          Thank you.

10         THE COURT:  Thank you, Counsel.

11         Just a moment.

12      *(Pause.)*

13         THE COURT:  All right.  Now, you know, I can't

14  resist myself, so I've been very good for almost an hour.

15  That's extraordinary, so -- why shouldn't, when you get to

16  your portion, Mr. Zeller, why shouldn't the court seriously

17  consider that the proper forum for MGA Mexico is in fact

18  Mexico?

19         After all, Mattel has attached great credence to

20  MGA Mexico by suing MGA Mexico, in Mexico.  Now, you've been

21  accused of doing that for nefarious reasons by MGA.  But

22  it's kind of like that phrase, *What happens in Las Vegas,*

23  *stays in Las Vegas.*  So what happens in Mexico, stays in

24  Mexico.

25         So the lectern is yours.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
 1              MR. ZELLER:  I think the most direct response to

 2    the court's question is that, number one, in fact, MGA

 3    Mexico is not a defendant to a proceeding in Mexico.

 4              What is ongoing in Mexico, currently, is not even

 5    a civil action.  It is a criminal action against

 6    Mr. Machado, Mr. Vargas and Ms. Trueba, so there is no --

 7    there is no proceeding.  There is no civil proceeding in

 8    Mexico that involves MGA as a defendant, for which one could

 9    simply say, Well, let's have that court take the laboring

10    oar, or handle those claims.

11              So I think that's the most direct response.  I

12    would also say as to a further point -- and I think this is

13    dispositve -- which is, MGA Mexico has been a defendant in

14    this case for three years.  More than three years.

15    Discovery has been taken.  The only plausible basis for a

16    dismissal would be on forum non conveniens grounds, which I

17    only say that very loosely, not on jurisdiction, for reasons

18    I'll get to in a second.

19              But to the extent that the court is looking for --

20    to drive efficiency, I would say that perhaps three and a

21    half years ago, perhaps that would have been a fair inquiry.

22    But now we have already gone through the discovery process.

23    We obviously are -- and I'm sure in the court's view --

24    hopefully, substantially completed.  There is plenty more to

25    do, obviously, but we have been litigating this and taking
```

 1  discovery pretty heavily, certainly the court's guidance as
 2  well.
 3          So *forum non conveniens*, of course, is meant to
 4  ultimately find a more efficient, more convenient *forum.  It*
 5  *doesn't make any sense and* there's not really any
 6  counterargument by MGA.  And I'll underscore that.  There is
 7  no response to this from MGA in its papers as to why it
 8  waited three and a half years to raise the convenience of
 9  MGA Mexico for the first time now.
10          We have literally had them in prior versions of
11  the complaint.  They have been a litigant to this case.  So,
12  in our view that alone is dispositive, and it is completely
13  contrary to the notions of convenience and efficiency after
14  all that has happened to then dismiss on *forum non*
15  *conveniens* grounds.
16          THE COURT:  How can MGA be faulted when I've given
17  you the opportunity for -- at least since you have come into
18  my court in October -- increased depositions that MGA
19  resisted?  In other words, at least for that time period
20  before the case transferred to this court, it's hard for the
21  court to find fault with MGA on a *forum non conveniens*
22  rationale, or for not bringing these motions earlier
23  concerning jurisdiction, because I paid you the courtesy of
24  opening up depositions and waiting for your fourth filing?
25          MR. ZELLER:  Well, I would say -- not to dispute

1    the court's courtesy, of course, but what I would say, your

2    Honor, is that discovery had been going on before.  I mean,

3    that was going on even before the phase one trial.  So, I

4    mean, discovery was not in the main bifurcated per se.

5    There was substantial --

6              THE COURT:  No, no, no.  So then you didn't have

7    to come to me and ask for 25 additional depositions.  That

8    was just a wasted ruling on my part.

9              MR. ZELLER:  No, your Honor.  That's not at all

10   what I'm saying.

11             THE COURT:  I know.  But come on.

12             MR. ZELLER:  But my point is that that litigation

13   had been going on.  Then, of course, we had additional

14   claims.  We found out new things.  I mean, there are a whole

15   variety of other reasons why, of course, the court did grant

16   us that courtesy at the initial discovery.  But that's not

17   to say that that is when the discovery started insofar as it

18   pertained to MGA Mexico.  That had been going on even before

19   the phase one trial.  It went on before the matter was

20   transferred to your Honor in 2009.

21             THE COURT:  And there's a real point; and that is,

22   it may be extremely unfair.  Because I don't know what the

23   statute of limitations would be in Mexico, for instance.  I

24   don't know if there is one.  I don't know what that time

25   period is.  I don't know if you went back and tried to

1    revamp this at this point that you wouldn't be out of court,

2    frankly.

3           MR. ZELLER:  And the other point I would say that

4    I think is dispositive on this, which is, the court knows

5    that our point of view on *forum non conveniens* is, is that

6    it's not something where you can just start splitting up

7    claims and shipping them off to various jurisdictions.  It

8    needs to be sent to a forum.

9           But what I would say, even apart from that --

10          THE COURT:  In other words, that it ties to your

11   RICO claim.  In other words, a large part of this depends

12   upon what happens to RICO.  Isolated in and of itself, I

13   think MGA might have a pretty good argument.  Coupled with

14   the RICO claims, I think you have a fairly good argument.

15          MR. ZELLER:  Well, I think that certainly if this

16   case were postured as MGA would have it, which is that all

17   that really involves MGA Mexico were thefts that occurred by

18   Mexican citizens in Mexico, governed by Mexican law, yes, I

19   would certainly concede that that starts to look like a more

20   compelling case but, of course, setting aside delay.

21          But let me say this:  That's not our case.  Not

22   only because of RICO, but we also allege -- and we have put

23   in evidence and we can certainly -- under the court's

24   standards here, we can certainly make proffers and provide

25   additional evidence if the court is interested in showing

1  that, in fact, these thefts included thefts that occurred in

2  the United States.  As we pointed out from U.S. servers in

3  El Segundo, in Arizona, they called people in the

4  United States to obtain and have information sent to them.

5  They downloaded stuff from U.S. computers.  I mean, there is

6  a nexus.  Some of the trade secrets as well, as we pointed

7  out -- I don't think it's disputed -- are U.S. trade

8  secrets, and they apply to Mattel's U.S. and worldwide

9  business outside of Mexico.

10            So it's not as straightforward as MGA would have

11  it, in terms of how they perceive the allegations.  But the

12  other thing I would say is dispositive of *forum*

13  *non conveniens* is, is that nowhere does Mr. Larian say that

14  he would submit to personal jurisdiction in Mexico, or in

15  Canada.  The notion that somehow these claims could simply

16  be carved up, which again we disputed.  But even if one

17  could reach that conclusion and say, *Okay, let's carve off*

18  *specific trade secret thefts, or, particularly, trade secret*

19  *documents and let's have them adjudicated in Mexico,* even

20  assuming all that were possible, Mr. Larian has made no

21  representation that he would submit to jurisdiction in

22  Mexico.  That is fatal alone to *forum non conveniens* because

23  that either means that those claims are going to have to

24  remain against him here, in which case that completely

25  defeats any kind of efficiency notion on top of all the

1    other reasons why we don't think it's efficient.  But the
2    courts do treat that as being in itself dispositive.
3           I will say one thing, too, in terms of choice of
4    law, because -- and I don't want to sound like I'm
5    complaining too much, but certainly the number of pages that
6    were expended by the other side dwarfed what we understood
7    the rules to allow.  Choice of law was talked about at some
8    length in MGA's papers, particularly its reply papers, which
9    I think is particularly questionable.  But let me say this:
10   We have certainly never conceded that Mexico law is what
11   governs and, in fact, that determination is premature at
12   best.  And one reason I say that is, is that because we have
13   to know about where the conduct occurred, and that we do not
14   have as much yet.  We know that some of it occurred in the
15   United States.  We know some occurred in Mexico.
16          As to getting down into the granular details, that
17   is something that is a subject of discovery, as the court is
18   well aware.  We don't even know still today, after multiple
19   rounds of MGA 30(b)(6) witnesses, as to how the documents
20   that were found at MGA Mexico by the authorities got there.
21   There may be U.S. conduct involved in that.  We don't know.
22          So for MGA to prejudge the issue and say, Well,
23   because everything by their light occurred in Mexico, I
24   think is very premature.  Certainly, there are cases in
25   which courts -- because, of course, it is one of the many

1   factors that courts can consider as part of the *forum*

2   *non conveniens* analysis.  But many, many courts have

3   certainly in the similar circumstances said, *Well, I don't*

4   *have to actually make that determination right now.*

5           THE COURT:  *Forum non conveniens* doesn't concern

6   me as much.  It's something I can actually delay upon, I

7   agree on.  I'm almost concerned about jurisdiction, because

8   if I lack jurisdiction, everything we do is fatal.

9           MR. ZELLER:  That's -- I think, certainly, if

10  again one takes their interpretation of our complaint, I

11  would agree.  But the problem for them is, is that we still

12  have the RICO claims.  Personal jurisdiction really cannot

13  be challenged as to RICO.  I don't even read their personal

14  jurisdiction motion here as challenging personal

15  jurisdiction over RICO.

16          In my view, your Honor, I will say it this way:  I

17  actually think that's fatal.  And the reason is, is because

18  you don't have to show personal jurisdiction as to

19  individual claims.  They are either in the case, or they're

20  not.  There is either jurisdiction over them in this forum,

21  or there's not.  For them to say that somehow you have to

22  show personal jurisdiction as each and every claim, there is

23  no authority for that.  And, in fact, that's completely

24  contrary to anything that I know about how personal

25  jurisdiction works.

1      Once someone is reasonably held into a forum based

2  on a claim, there -- of course, they are there.  They can be

3  sued on other claims as well.  It doesn't -- it's not part

4  of the calculus in my view, and I'm unaware of any

5  authority, and certainly MGA hasn't provided it.

6      The other thing -- and I don't know that this is

7  in the court's view actually even before it, but let me just

8  point out that in some ways these motions have been

9  dramatically recast.  MGA, on the personal jurisdiction and

10  *forum non conveniens* motion, did not move to dismiss based

11  on Rule 12(b)(6).  It moved on 12(b)(2).  In reply, to go

12  back to my theme, for the first time MGA says, *Well, because*

13  *Mexican choice of law -- Mexican law should govern under*

14  *choice of law principles and because Mattel concedes that it*

15  *has no claims under Mexican law, that means you dispose of*

16  *it on the merits.*

17      The idea that somehow a 12(b)(6) motion could be

18  raised for the first time not even in the motion itself but

19  in reply where we have never had an opportunity is in my

20  view really extraordinary.  That goes also to my point about

21  choice of law.  To make that determination, that kind of

22  predicate at this point, is premature.  There is -- it's a

23  factual determination in terms of -- really, it is probably

24  going to have to be almost with batches of trade secrets as

25  to potentially what law would apply or what wouldn't.  And

the court can make the determination at that point how certain matters are handled.  But to say it's dealt at this stage of the proceeding strikes me as not very efficient and certainly not very appropriate.

The other thing I would say about personal jurisdiction is that -- this is, I think, along the lines of what Judge Larson ruled initially on personal jurisdiction as to Mexico.  The effects doctrine under Ninth Circuit law, of course, holds that where one intentionally aims its conduct or wrongdoing at a forum resident is sufficient to establish personal jurisdiction.  MGA wants to, I think, try and argue, again, on the merits as to a particular aspect, saying, *Well, there's no evidence that Isaac Larian induced any of these individuals in Mexico to steal the trade secrets.*

Even if that were true -- and I'll get to it in a second -- but even if that were true, it has nothing to do with whether or not the effects doctrine by MGA Mexico operating even in Mexico satisfies personal jurisdiction. It targeted Mattel.  Its activities targeted Mattel in this district.  It purposefully availed itself.

And MGA argues about how, whether or not the but-for test has been satisfied.  But, of course, these are the very acts of trade secret misappropriation that are in front of the court.  By definition, they are the same.  So

1    by definition, the but-for test has to be satisfied.

2         Insofar as this argument goes, well, Mr. Machado

3    and Ms. Kummerle denied that Isaac Larian had any

4    involvement.  Obviously, there is evidence to the contrary.

5    We have not only made allegations, but there is -- of

6    course, the court is well aware there's other evidence that

7    certainly would allow a jury to infer that Mr. Larian, in

8    fact, did induce these employees to steal the trade secrets,

9    not the least of which is, is that there is a pattern of

10   this.  The common thread, in fact, in all these various

11   misappropriations is that Mr. Larian either himself or

12   others who were acting at Mr. Larian's direction meet with

13   these MGA employees.  They are offered -- excuse me, Mattel

14   employees at the time, they are offered above market

15   salaries.  There are circumstances in which, then, they

16   start to take Mattel information, often following the same

17   MO:  Thumb drives and other kinds of activities.  And I can

18   lay this out further in terms of the circumstances that

19   parallel one another.  But certainly there is more than

20   enough, under these circumstances, to reasonably infer that

21   Mr. Larian was in fact inducing or otherwise acting in

22   concert, or responsible.

23        I would also say just at least in terms of these

24   particular allegations, again, MGA seems to be getting ahead

25   of itself and it does in many respects, which is to say,

basically, *Judge, because we deny these allegations, just dispose of the case on the merits before things really play out.*

And I would submit to your Honor that under the standards that apply under 12(b)(2) that we have more than met our burden of establishing personal jurisdiction over MGA Mexico, not the least of which is, is because, of course, Judge Larson has certainly found that already. There is no real basis for reconsideration here of that ruling.

I will note that one factor that MGA seems to point to is that the court allowed leave for Mattel Mexico to be a plaintiff. But, obviously, that can have nothing to do with whether or not personal jurisdiction exists over MGA Mexico as a defendant. So the circumstances that they are pointing to are not relevant. And so, we view this as not being an appropriate motion for reconsideration in the first instance.

What I would -- briefly on this reasonableness point, which I think MGA sort of translated, not only to the third element of personal jurisdiction but also an aspect of *forum non conveniens*, which is the one-way ratchet that they're talking about. Well, that's just an evidentiary matter. That's true of almost any defendant regardless, or any plaintiff. Employee statements can be admissions

1   against the corporation, but they are hearsay when the

2   corporation tries to admit them.  That's not new, and that

3   has very little to do with what forum we are in.

4          I also note that nowhere does MGA actually

5   establish that even if all this were transferred, or part of

6   the case were transferred to Mexico, that any of these

7   evidentiary problems would be resolved.  There is no showing

8   that Mexico has procedures that would allow for the

9   compulsion of witnesses or somehow this one-way ratchet

10  wouldn't apply.  The law is very clear on this point, which

11  is that MGA must show that there are special evidentiary

12  problems that exist in this district that wouldn't exist

13  elsewhere.

14         But also I would just simply say that this kind

15  of, quote, unfairness, end quote, aspect of it when they are

16  trying to argue it about being -- this particular

17  evidentiary issue, really doesn't go to reasonableness.

18  Reasonableness is looking at burden.  Is it too burdensome

19  for MGA Mexico to litigate in this forum for other practical

20  reasons?

21         Which by the way, MGA Mexico bears the burden of

22  proof on this element.  That, too, is black letter law.  MGA

23  Mexico did not even argue in its motion, in its opening

24  motion that it satisfied that element on which it bore the

25  burden of proof.  Yet, again, that was first raised in reply

1    on their motion.  And again, I would suggest to the court

2    that such arguments raised for the first time in reply

3    should be disregarded.  That alone is fatal to the

4    reasonableness argument.

5         With respect to the preemption argument, MGA

6    relies principally on this *Silvaco* case.  But as the court

7    is aware and we've cited in our papers, there is the *Bourns*

8    case from the Ninth Circuit 2003, and it held that CUTSA did

9    not preempt the cause of action for intentional interference

10   with contracts.  That case that Ninth Circuit case is never

11   addressed by MGA in its papers.  Not once.  Hasn't been

12   addressed here in arguments, either.  That case, alone is

13   completely contrary to MGA's effort to spin out a theory,

14   which is actually unsupported by any law.  That CUTSA

15   presumption occupies the field.  Because understand their

16   argument about preemption is so expansive, it goes up beyond

17   even between copyright act preemption.  It goes beyond

18   preemption that is based upon federal jurisdiction

19   exclusivity.  That is how broad this is.  They literally say

20   anything, including confidential information, that simply

21   cannot be made the basis for the claim because of this

22   preemption.  That is literally how broad their argument is.

23   And we know that that cannot be the law because *Bourns* says

24   so.  If that were the case, the tortious interference with

25   contract claim, which is indisputably a tort, would have

1    been preempted.

2           So the intermediary or intermediate Court of

3    Appeals decision, California State Court of Appeals

4    decision, *Silvaco*, that they rely on really isn't the

5    authority that it governs here.

6           I also note -- and Ms. Hurst actually, sort of,

7    emphasized this, which I found puzzling -- is that *Silvaco*

8    urged that somehow this is something to be determined at the

9    pleading stage and not at trial.  Well, of course, that's a

10   state court case.  Statements about procedure can,

11   obviously, have no bearing, let alone persuasive or binding

12   effect on a federal court.  We are operating under Rule 8

13   here, and that is important because there is a line of

14   cases -- there's actually three lines of cases dealing with

15   the CUTSA of preemption that I think are relevant here.  But

16   one of them is that it is really, in fact, premature to be

17   making a determination like this at the outset of the case.

18          We do in fact, notwithstanding what MGA says but

19   we plead throughout our pleading, we allege in the

20   alternative trade secret and/or confidential information.

21   Courts have said that it is proper to make that kind of

22   alternative allegation.  And when you have something like

23   that, it is premature to be basically saying, *Well, what I'm*

24   *going to do is at the outset of the case, I'm going to*

25   *preempt anything that is not trade secret,* so that the

1    defendant can come back and argue, *Well, what you have left*

2    *is trade secret.  None of it meets that standard, so now*

3    *you're completely out of luck.*

4            In fact, what I would like to do is direct the

5    court to the *Think Village* case, which we cite.  I'm sorry,

6    *Think Village.*  It's T-H-I-N-K Village.

7            There, what the court said:  *Defendants cannot*

8    *have it both ways.*

9            And then they go on to say:  *The defendants'*

10   *argument that the trade secret allegations are preempted by*

11   *CUTSA contradicts their primary defense that plaintiff's*

12   *information does not constitute trade secrets.*

13           *Ali versus Fasteners* case -- that's

14   F-A-S-T-E-N-E-R-S -- also found that it was premature, since

15   it was unclear how much of the appropriated or

16   misappropriated information in fact was trade secret versus

17   confidential information.

18           So MGA, in fact, in its papers also neither

19   discusses nor distinguishes this line of cases.

20           Another line of cases that I would like to bring

21   to the court's attention is that courts have held that the

22   theft of confidential nontrade secret information is not

23   preempted.  As a matter of fact, interestingly enough, CUTSA

24   does not have an express preemption provision at all.  It

25   actually has some carve-outs.  One of those two carve-outs

```
 1   is where it says that if it's not trade secret, courts have

 2   reasonably interpreted that to mean that the theft of

 3   confidential nontrade secret information is in itself not

 4   preempted.  And we cited Interserve and some other cases in

 5   our papers along those lines.

 6          Unless the court has any further questions on

 7   anything so far, I'm happy to sit down.

 8          Thank you.

 9          THE COURT:  Ms. Hurst.

10          MS. HURST:  Where to start?

11          Your Honor, Data Disc says personal jurisdiction

12   has to be measured as to each claim, Data Disc, 557 F2d

13   1280, Ninth Circuit.  It does have to be measured with

14   respect to each claim.  I'm sorry, your Honor.

15          It does have to be measured with respect to each

16   claim, personal jurisdiction, Data Disc.  Data Disc also

17   says that you get to go to trial on this issue.  So the

18   notion that we are somehow late in making a personal

19   jurisdiction argument is meritless.

20          THE COURT:  Do you know who one of the authors of

21   Data Disc was?

22          Judge Kelleher.  Did it by designation.

23          MS. HURST:  So there is no way it's premature --

24   pardon me, there's no way it's late.  And it does have to be

25   measured with respect to every claim.
```

1          Now, where does that take us next?

2          The reason there is no action pending in Mexico

3     against MGA to Mexico, is because the court found there was

4     insufficient evidence for a claim against MGAE de Mexico, in

5     Mexico.  Your Honor, that is at Exhibit 95 to the Kieckhefer

6     declaration, pages 5897 and 5898.  It's the certified

7     translation of the court's proceeding.

8          Now, you don't get to argue that the reason there

9     is no remedy in the alternative forum, is because around the

10    problem that it's meritless.  We don't have a remedy in the

11    foreign forum.  If they don't have a remedy in the foreign

12    forum, it's because they sought one and lost.

13         We went on the RICO claims, too.  Because the same

14    allegations form the basis for jurisdiction over both:

15    Inducement of misappropriation of trade secrets.  And the

16    predicate act is defective for the reasons already

17    discussed.  I won't belabor that point.  But even if you

18    assume it's not, we put in the evidence showing specifically

19    no inducement.  They can't just rest on the pleading

20    allegation then of a pattern, or whatever.  They can't rest

21    on the pleading allegation at that point.  We put in the

22    evidence.  They are required to come forward with evidence

23    at that point.

24         I guess their evidence, based on Mr. Zeller's

25    statements, is offered above market compensation.  That does

44

1    not give rise to an inference, a *prima facie* case in the

2    face of the evidence that we submitted.  Just doesn't.

3           Now, that's not a dismissal on the merits.  It's a

4    dismissal for lack of jurisdiction.  So Mr. Zeller's parade

5    of horribles that we prematurely disposed of the case on the

6    merits is -- there's no horrible law.  This is the right

7    time to decide this.  When we get to trial he'll say, *Well,*

8    *now it's too late.*

9           It's prejudicial to force MGA de Mexico to

10   continue in this case.  It's expensive.  It cannot procure

11   witnesses from Mexico using the auspices of this forum's

12   powers.  As to reasonableness, if we meet the first two

13   elements of the test, we are entitled to a presumption in

14   our favor on that -- in that regard.

15          Now, Mr. Zeller argues that using a pure effects

16   test, a pure effects test, not the purposeful direction test

17   under *Schwarzenegger* in the Ninth Circuit, but he's going

18   all the way out there to the edge, *Calder* now.  Even if all

19   the conduct occurred in Mexico, it was expressly aiming at

20   Mattel here in California.  Don't see an allegation of

21   express aiming in the pleadings, but it doesn't matter

22   because we put in evidence on this point, too.  Our

23   compendium of trade secrets, at 201 to 271 is all the

24   documents that were allegedly stolen.  And on their face, 67

25   of them concern exclusively Mexico, a couple more worldwide

1    in nature and a third includes the United States.

2            Now, what do the cases say, as cited in our reply

3    at 17?

4            In situations like that, you get the foreign law.

5    First of all, the effects are felt more than one place.  And

6    second of all, for jurisdictional purposes, the substance of

7    the jurisdictional test that defeats express aiming at

8    Mattel in California.  In fact, the fact that they joined

9    Mattel Mexico as a plaintiff now defeats an inference of

10   express aiming at Mattel in the United States.  Not to

11   mention why they did that, is because they had problems with

12   the ownership of the trade secrets.  That's in the part of

13   the motion that the court struck, so I won't go there today.

14           Are there things that people in Mexico would say

15   to defend this case here?

16           You bet.  Former MGA employees would come and say

17   they never used any Mattel trade secrets, never observed

18   these guys using any Mattel trade secrets.  It wasn't

19   important to them in the conduct of MGAE de Mexico's

20   business.  Former Mattel Mexico employees, if we could get

21   them here, would come and say, the day after these three

22   left, the head of Mattel Mexico stood up and said, *I'm going*

23   *to get these guys, no matter how we do it.*

24           We can't prove that in this court.  And that is

25   not the one way ratchet in every case.

1           They have got no evidence under a pure effects

2    test that this was express aiming by MGAE de Mexico.

3           *Silvaco* and *K.C. Multimedia* both say that

4    interference with contract claims are preempted.  They have

5    to be preempted.  I'm sorry, but this just doesn't make any

6    sense.  You prove less than a trade secret misappropriation

7    claim, and the result is you get exemplary damages up to

8    maybe nine times under *BMW* when the statute would limit you

9    to one compensatory, plus two times.  It just doesn't make

10   any sense at all.

11          And *Silvaco* specifically criticized the *Ali* case,

12   the one Mr. Zeller says, *Wait, wait, wait.  Wait, wait,*

13   *wait.*  It says:  *If the claim is defective, there is no time*

14   *like the present.*

15          *Twombly* and *Iqbal* say that, too, by the way.

16          I'll stop there, your Honor.  You had some

17   questions for Mr. Zeller.  I'm happy to start answering

18   questions now, or however you want to do it.

19          THE COURT:  Thank you.

20          Mr. Zeller.

21          MR. ZELLER:  Thank you, your Honor.

22          *Data Disc* -- I was just looking at it now --

23   actually doesn't say anything about personal jurisdiction

24   being determined on a claim-by-claim basis.  It says subject

25   matter jurisdiction, which is obviously a very different

*DEBORAH D. PARKER, U.S. COURT REPORTER*

47

proposition.

But I did note, actually -- and it reminded me of a couple of things that I think are salient here today, which is *Data Disc* does, of course, also mention that *where a plaintiff* -- and we think we're in such a position -- *at a bear minimum has come forward with evidence but the court thinks that a more satisfactory showing of the facts is necessary, discovery is what's warranted.*

And if I hear MGA, itself, correctly, they want this decided on the evidence.  So let's finish taking the evidence and the determination can be made.

And by the way --

THE COURT:  *Data Disc* gives that as an alternative.  *Data Disc* suggests early and expeditious discovery.

MR. ZELLER:  Oh, I agree with that, your Honor.

But what I'm saying is, we can continue -- we can finish up with whatever else needs to be done on jurisdiction, if MGA really truly wants to dispose upon the evidence, is what I'm saying.  I didn't mean to talk about discovery at large.

But what I also would note, I think in that -- in that regard, is that our argument is not that personal jurisdiction is too late.  The *forum non conveniens* argument is what was tardy, what was late.  We have not said personal

1    jurisdiction was late.  There's no question that the

2    procedure, as I understand it, is that MGA, when it was

3    raised, for the first time raised the 12(b)(2) motion, it

4    was denied; and then, of course, ultimately some

5    determination is reserved on the actual question.  But I

6    don't think that day is today.

7           And so the argument is not that they're too late.

8    It's rather, this is just a particularly inopportune time.

9    They have already had it determined on 12(b)(2), and they

10   lost.

11          Now, what needs to complete is the rest of the

12   evidence.  If we want to somehow have a particular special

13   fast track to finish up the jurisdictional discovery, we can

14   do that.  I mean, that would be something worth discussing.

15   But to say that somehow in midstream, essentially, you

16   should just cut off everything and say, *Let's make the*

17   *determination now,* that's what I think is wrong.  Whether

18   you call it premature or just simply, kind of, out of order,

19   we are not done with that process.  And that's what I think

20   would be -- would complete it -- should be completed.

21          Ms. Hurst repeats MGA's argument that there are

22   former MGA employees who would exonerate MGA, or MGA Mexico.

23   They have never identified a single such person.  They have

24   not identified such a person who is outside the reach of

25   this court's process.  They have not identified such a

```
 1   person who could actually be reached better in Mexico, or
 2   could be subject to compulsory process there.  That's the
 3   kind of evidence that they must come forward with, in order
 4   to establish that they are somehow so hamstrung in this
 5   jurisdiction, that it is unfair to them under that test, and
 6   they don't meet it.  We just have literally --
 7            And in reply what they did is basically cited
 8   Susan Kummerle, who just simply said something vague to what
 9   Ms. Hurst said, which is with identification of who they
10   were, where they are, what they say exactly, why they
11   couldn't get them under this court's process, or any of the
12   other defects that I mentioned.
13            The notion -- and I'll just finish up on this
14   preemption point that was raised, which is that somehow it
15   is inappropriate that if we don't have a trade secret claim,
16   we should have no alternative claims.  That's simply the way
17   of the world.  There is nothing surprising that a plaintiff
18   could have multiple claims, based upon the same conduct.  It
19   happens all the time.
20            And, in fact, let's just take an *IP* case as an
21   example.  There is the *Nintendo* case where in fact the same
22   conduct was determined to be a violation of the Lanham Act,
23   as well as the Copyright Act.
24            And the court said you could get actual damages
25   for one, statutory damages for another.  It's not even
```

1   double counting, let alone somehow a conflict between two

2   different statutes.

3            So the idea that somehow if information is not a

4   trade secret that MGA could simply then tortiously interfere

5   with a contract, or tortiously interfere with the duty of

6   loyalty, or fiduciary duty simply does not follow.  In some

7   ways, it's a red hearing to even talk about whether or not

8   it was trade secret that was the underlying conduct.  If

9   they meet the elements for tortious interference with

10  contract, they must pay the price for it.  But somehow the

11  idea that trade secret, the Trade Secret Act was meant to

12  completely occupy and be the only sole remedy for any kind

13  of claim that touches upon information of any kind, that

14  is -- that's extraordinary.  That would be the kind of

15  preemption that doesn't exist for any other claim, or any

16  other statute that I'm even aware of.

17            Thank you.

18            THE COURT:  Thank you.

19            Where would you like to go from here?

20            MS. HURST:  I think that's it, your Honor.  Your

21  questions.

22            THE COURT:  Check with the team.  You check with

23  your team and make sure you are satisfied with the

24  arguments.  Check with each other as a courtesy to one

25  another; and if you've missed something that you think is so

1    dispositive that will turn the case, tell me.

2            But talk to each other first before you talk --

3            MS. ESTRICH:  With your permission, the prior

4    court reporter had asked me to give a list of all --

5            THE COURT:  Well, we will during the recess.

6            We'll get that to you during the recess.  This is

7    the time you spend with your team here.

8            Talk to each other.  Because once I start, then

9    there's no interruption.  You will answer my questions

10   succinctly.  Most of those will be with a yes or a no.

11       (*Recess taken*.)

12            THE COURT:  We are back on the record.

13            MR. COTE:  Alex Cote.

14            My one point is brief that we are joining the MGA

15   parties in the motions you just heard argued by Ms. Hurst.

16            It comes to a point, only because there was the

17   argument about whether MGA De Mexico could be pursued in

18   Mexico for the activity.  And as you know, Mr. Machado, is,

19   of course, a criminal defendant presently in Mexico.

20            THE COURT:  Thank you, very much.

21            MS. HURST:  I wanted to address the point that

22   came up during the argument of Mr. Machado's motion

23   regarding the allegation of criminal copyright infringement

24   premised upon the trademark information.

25            THE COURT:  By the way, I think you're right on

1    *Data Disc*.  It's claim by claim.

2              MS. HURST:  Thank you, your Honor.

3              THE COURT:  Keep going.  I'll go back and reread

4    it, but my memory is it's claim by claim.

5              MS. HURST:  It actually says with respect to each

6    cause of action.

7              THE COURT:  I'm sorry.  Each cause of action.

8              MS. HURST:  I mean, it's the same thing.

9              THE COURT:  I'll have to go back and look at it

10   again.

11             MS. HURST:  Okay.  Addressing this point that came

12   up during the argument on behalf of Mr. Machado, regarding

13   whether criminal copyright infringement is pled, I believe

14   Ms. Estrich is correct that registration is not an element

15   of criminal copyright infringement.  That's my -- I misspoke

16   on that.  I apologize, your Honor.

17             It's kind of a nice problem, because 411 does say

18   in any civil action claiming infringement and, ultimately,

19   this is a civil action claiming infringement.

20             But assuming the test is you just measure it with

21   respect to the predicate act, and you ignore Section 411,

22   and the fact that this is a civil action alleging

23   infringement, then Ms. Estrich is correct.

24             But what she's not correct about is if there's any

25   allegation in the complaint that would show any infringement

```
 1    of any of the trade secret information.  It's simply not
 2    there.  There's no allegation of ownership of a copyright in
 3    the trade secret information.  And that is significant here,
 4    because we're talking about business documents.  This is not
 5    the kind of stuff that usually has any measurable degree of
 6    copyright protection.  I mean, spreadsheets, no.  Fax, no
 7    copyright protection.  Data, no copyright protection.  It
 8    matters that they have an alleged ownership of a copyright,
 9    let alone ownership of a U.S. copyright.  Let's not forget
10    Suba Films, en banc Ninth Circuit decision, U.S. Copyright
11    Law is not extraterritorial.
12            And the court will recall -- well, that's beyond
13    the record.  My apologies, your Honor.
14            So, under Iqbal and Twombly, I mean, they don't
15    even identify which of the supposed secret works were
16    infringed.  They don't allege facts to show that Machado
17    knew he was violating U.S. copyright law.  Remember, this is
18    the criminal willfulness standard here.  This is like the
19    tax standard.  You've got to know you're violating a
20    statute.  Same with respect to, of course, the other
21    defendants.
22            This is really where it makes a difference what's
23    happened in the case since Judge Larson, because the verdict
24    is incorporated by reference.  They're not alleging
25    ownership of any copyrightable information or criminal
```

1    willfulness with respect to this trade secret stuff.  So

2    that was the point I wanted to address, your Honor.

3            THE COURT:  Sounds fine.

4            Mattel.

5            MR. ZELLER:  On this personal jurisdiction point,

6    I think I do see the language.  This is Footnote 8 from

7    *Data Disc*.  Which by the way, I'll note that at the

8    beginning *Data Disc* actually points out that Rule 12(b)(2)

9    allows for dismissal of the complaint.  That's how it's

10   first phrased.  Then, in Footnote 8, it goes on and I think

11   it's probably worth raising the entire point.  It says:

12   *Whereas here a plaintiff raises two separate causes of*

13   *action, the court must have in personam jurisdiction over*

14   *the defendant with respect to each claim.*

15           And then it cites, *Wright & Miller*:  *However, if*

16   *the court determines that there has been a sufficient*

17   *showing of personal jurisdiction to reach trial with regard*

18   *to one claim but not the other, it may or may not be*

19   *appropriate to assume jurisdiction over the other claim*

20   *under principles analogous to the doctrine of pendant*

21   *jurisdiction.  We reserve judgment on this issue until it is*

22   *properly before us.*

23           That's just to be precise about what *Data Disc* is.

24           But interestingly enough, actually, in that case

25   when it looked at the contract claim, we'll call it the

1    contract base claim and then the tort claim, it basically

2    used the same facts to say there's jurisdiction over both.

3    And here, of course, what we have are the same basic facts

4    replete throughout all of these different claims.

5              And so, I would submit that that is consistent

6    with the notion of jurisdiction over every claim if that's

7    ultimately what is determined to be needed.

8              One thing I would point out specific in terms of

9    the discovery point on personal jurisdiction is, is that

10   Mr. Vargas has not been deposed yet, so MGA is clearly

11   getting ahead of itself in basically arguing that somehow

12   Mr. Larian has been exonerated.  So there may very well be

13   facts that go specifically to jurisdiction.  And, of course,

14   the court has given permission that Mr. Vargas' deposition

15   can proceed in Mexico, and we would expect that it will.

16   So, again, that's why we don't think that the timing of this

17   is just right.

18             The last thing I would make about this point about

19   *Data Disc*, is, actually, *Data Disc* also points out, it says:

20   *Where the jurisdictional facts are intertwined with the*

21   *merits, a decision on the jurisdictional issues is dependent*

22   *on the decision of the merits.  In such a case, the District*

23   *Court can determine its jurisdiction in a plenary pretrial*

24   *proceeding.*

25             So I think once we get into that procedure, if

56

```
 1    that's what really MGA is talking about, obviously, that is

 2    not the procedure or the posture we're currently in.

 3                Thank you.

 4                THE COURT:  Satisfied.

 5                MS. ESTRICH:  Yes, your Honor.

 6                THE COURT:  Satisfied.

 7                MS. HURST:  I just need to get my questions and

 8    answers.

 9                Yes.  Thank you, your Honor.

10                THE COURT:  You're okay?

11                MS. HURST:  Yes.

12                MS. ESTRICH:  Yes, your Honor.

13                THE COURT:  Concerning whether Mattel has pled an

14    enterprise -- and I think Ms. Estrich, you spoke to that

15    issue and Ms. Hurst, you spoke to this issue, so you'll be

16    the only ones that respond.  Strike that.

17                You can choose any worthy other person.  But since

18    you argued it, I wouldn't give it to Mr. Zeller, or your

19    co-counsel.  I'd argue it myself, if I was each of you.

20                I have some tentative thoughts.  The *King* case

21    does not hold that a corporation and its officer are

22    distinct entities, which is good as far as it goes.

23                But Ms. Hurst, on behalf of MGA, you cited a

24    portion of that case in which the court declined to rule on

25    whether the corporation could be a person, if it was also a
```

1    member of the associated in fact enterprise.

2          Now, you're aware and you have read the *Mear* case

3    during the break and probably before.  I expect that Mattel

4    will argue that the agents in that case were direct

5    employees and contractors, while here Machado, Trueba and

6    Vargas were still Mattel employees.  But the allegations in

7    the complaint clearly state that Machado, et al., were

8    working at the behest of and for the benefit of MGA.  Maybe

9    you can fill in the gaps with regard to principles of

10   agency, but the formality of their employment with Mattel

11   seems inconsequential.  The point is that you allege they

12   acted in their official capacity for MGA's benefit.  Even

13   the *Living* case involved law firms, and the Ninth Circuit

14   was adamant in that case that the law firms had independent

15   control over their actions.

16         What I'm getting at is this:  How do you reconcile

17   your position with the well-established law that a

18   corporation acts through its agents?  Are you now saying

19   that some agents don't count?  Or are you asking the court

20   to cast aside the law on this issue entirely and hold that a

21   corporation is distinct?

22         As Mattel, you have to accept that some of the

23   case law on this is unfriendly to your position.  And I need

24   you to tell me why your alleged enterprise does not fly in

25   the face of established law.

1          I want you to sit for a moment.  I want you to

2     write down your answers so you'll look at it, because I'm

3     going to give you a very limited answer, okay?

4          So just sit and talk to Mr. Zeller for a moment.

5     *(Pause.)*

6          THE COURT:  Ms. Estrich.

7          MS. ESTRICH:  I would quote from the language of

8     Judge Sobel in the *Mear* case to which you have referred us:

9     The factual basis for her claim, which the court must accept

10    as true, describes Sun Life's agents as acting as puppets

11    under its control without autonomous decision-making power.

12    The lawyers in *Living Design* may have had independent

13    decision-making power, but they were certainly acting as

14    agents of their client.

15         The cases have drawn a clear distinction, as I

16    read them, and certainly *Mear* does between an outside agent,

17    who is beyond the immediate control of the corporation and

18    does not act on behalf of the corporation as an inside

19    agent.

20         We have never alleged that Carter Bryant was the,

21    quote, puppet under the control of MGA without autonomous

22    decision-making power.  I would, indeed, point out that not

23    only did he work for Mattel when he joined the enterprise

24    but he was never an employee of MGA.  He operated under a

25    contract with MGA which expressly provided for these

1    purposes that he was not their agent, quote.

2           I would certainly argue that under general

3    standards of agency, there were occasions where Mr. Bryant,

4    or Mr. Machado may have acted in general terms as an agent.

5    But to suggest, I think, that Mr. Bryant, who is never

6    employed by MGA, Mr. Machado who reached, perhaps --

7    certainly, Ms. Hurst has suggested -- an independent and

8    autonomous decision to leave Mattel, take certain products

9    with him.  Mr. Bryant certainly reached an autonomous

10   decision to pitch his Bratz drawings to somebody else and

11   was then put in touch with MGA.

12          In neither of those cases, your Honor, as

13   Judge Sobel was careful to point out, this distinction,

14   acting as puppets under its controlling with no autonomous

15   decision-making power simply doesn't apply to Mr. Bryant, or

16   Mr. Machado.

17          I would add, your Honor, that what Kushner does

18   make clear, is that if all we have here, contrary to

19   Ms. Hurst's argument as to personal jurisdiction, is MGA

20   entities, then it would be entirely appropriate for us to

21   amend our complaint to simply allege that Larian was the

22   person conducting the business of MGA in violation of the

23   RICO statute.  Alternatively, it would be entirely

24   appropriate if the court wishes for us to amend our

25   complaint to add more outside agents who are clearly outside

```
 1   agents, such as the Marlows; such as the skilled sample

 2   makers, two or three of whom never worked for MGA at all.

 3   So that if the court is inclined to view this enterprise

 4   pleading as deficient, we would respectfully request

 5   permission, given that Judge Larson had upheld it on just

 6   these grounds, to amend it in one of two ways:  To follow

 7   the precedent of Kushner and allege Mr. Larian conducted the

 8   business of MGA as an enterprise; or to follow the

 9   suggestion of Ms. Hurst earlier and add more outside

10   entities, including perhaps Omni 808, which is certainly

11   another outside entity; the Marlows; the sample makers, or

12   others.

13           THE COURT:  Thank you.

14           I wanted to look at the questions for just a

15   moment.

16           Mear threw out the enterprise entirely, but it's

17   notable that the corporation was the only named defendant in

18   the case.  Here, MGA is one named defendant but Larian, MGA

19   Mexico and the employees are all so named.

20           Under King, it tentatively seems clear that the

21   individuals are subsidiaries and are distinct from the

22   corporation.  But Mear argues the corporation may not be

23   distinct from an enterprise composed of the corporation and

24   its subsidiaries.

25           From your perspective representing MGA, does that
```

1    mean that I dismiss MGA as an individual defendant and keep

2    the other defendants on in the lawsuit?

3              MS. ESTRICH:  No.

4              THE COURT:  And with that succinct and brilliant

5    answer, which I appreciate why --

6              MS. ESTRICH:  Because the defects in the

7    enterprise pleading show the ad hoc nature of the claim.

8    You can't just cobble it together.  And, in fact, what we

9    are doing is conflating the pattern with the enterprise

10   which the court knows are distinct elements.

11             So what we are doing when somebody participates in

12   something that becomes part of the pattern and somehow that

13   automatically makes them part of the enterprise and then

14   that's sufficient to treat them as part of the enterprise at

15   that point, but that's not right.

16             THE COURT:  I wanted to discuss a statutory issue

17   that really wasn't addressed, and I don't find any fault

18   with counsel.

19             As I read it, RICO does not allow me to name the

20   enterprise as a separate defendant.  Courts used to

21   interpret this to mean that the enterprise must be an

22   innocuous entity corrupted by the individual defendants.

23   But the Supreme Court seems to reject that theory.  So

24   imagine a situation where a gang enterprise --

25             Mr. Overland.  Mr. Overland.

1          MR. OVERLAND:  I'm here.

2          THE COURT:  -- the Mexican Mafia incorporates and

3    becomes our legal entity and it commits a pattern of

4    racketeering activity, but the statute does not allow you to

5    name the Mexican Mafia as an individual defendant, because

6    the person and the enterprise must be distinct.

7          I want a better explanation for me and for this

8    record why you think Congress did that?

9          Is it because existing laws would have covered the

10   enterprise entity itself?

11         The significance of my question is this:  If

12   Congress really did intend that the enterprise, itself,

13   could not be independently liable, then Mattel's manner of

14   pleading could be construed to be an end around

15   congressional intent.  I'm going to have both of you comment

16   on that, so I don't really care who starts.  But caudle with

17   your group.

18         And let me make a further comment while you are

19   talking.  You have to remember that while you are here on a

20   potential civil RICO and while you believe that that was the

21   paramount importance of RICO, it wasn't.  It came literally

22   on the criminal side.  It came from a professor, I believe,

23   from Notre Dame, if I'm not mistaken.

24         And you have to remember, as Mr. Overland is

25   aware, we are historically used to having a pattern and a

1    criminal enterprise, but the criminal enterprise is the

2    target, and it's the individuals that have to be named,

3    historically:  Garcia, Smith, Jones, whomever.  And that

4    then drove, historically, Congress, in breaking up the

5    East Coast Mafia to not allow the enterprise to be, quote,

6    unquote, one of these named entities.

7            And what's happened is that on the civil side --

8    and you know there's a lot of consternation and discussion.

9    There's a minority of the courts that don't believe the

10   civil RICO should have ever evolved.  There's still quite a

11   discussion about that.  But this idea that the entity itself

12   can be one of the named individuals and construed as such,

13   it can be argued by many as far beyond the original

14   construction even on the criminal side.  And it's only the

15   transition to the civil side that finds us in this unique

16   position of corporate entities being put in the place of

17   individuals.

18           So I'm open to any suggestion.  If I wasn't asking

19   it and if I knew the answer -- if I wasn't asking it, I

20   wouldn't -- well, I'm asking it, because I don't know and

21   I'm interested in your thoughts.

22           MS. HURST:  All right.  Your Honor, we have, I

23   think, a two- or three-fold answer:  First, if the entity is

24   a corrupt entity, it can be indicted for crimes irrespective

25   of RICO.

64

```
 1            But second, with respect to RICO --

 2            THE COURT:  Let's stop there.  Let's freeze on

 3    that.

 4            MS. HURST:  I was going with your hypothetical,

 5    your Honor.

 6            THE COURT:  No.  Let's back up on that.  I

 7    disagree.

 8            I can't just indict the Mexican Mafia.  I can

 9    indict individuals separately under VICAR, or whatever; but

10    I can't just name an organization.  So, historically, that's

11    what gave RICO its teeth.

12            I think of it this way.  I used to have aiding and

13    abetting, which was a little narrowing concept than

14    conspiracy and then we moved to RICO.  Big.  I have also

15    shared the thought -- well, never mind.  We'll share that

16    thought with you, right now.

17            Counsel.

18            MS. HURST:  Your Honor, I thought you said "formed

19    a corporate entity," and that's what I was referring to.

20            THE COURT:  Okay.

21            MS. HURST:  Okay.

22            THE COURT:  I think the civil world thinks that

23    they've swallowed RICO, and it's quite the opposite.

24            MS. HURST:  So, your Honor, but even more -- so

25    under RICO, you could get each of the individuals who had
```

1    associated together in that corrupt corporate entity by

2    naming them as the person who was controlling the entity for

3    whatever their parts were in connection with the pattern of

4    racketeering.

5            THE COURT:  I agree with you.  What's

6    disconcerting to me, what I am having a hard time

7    conceptualizing from all the criminal RICOs to now this

8    civil RICO is, I'm used to individuals.  I find it a strange

9    word and land where you can charge a corporate entity as an

10   individual and string together corporate entities.

11           MS. HURST:  And that really brings to my point of

12   statutory construction in the opening session.  19614 does

13   not support for that an association in fact.  19614 says:

14   An association in fact is a collection of individuals.  A

15   person is defined by the statute to be individuals or

16   entities.  So it's clear that an individual used in the

17   statute is not the same thing as entity.  It's a natural

18   person.  "Individual" in the parlance of 19614 and the rest

19   of 1961 means a person.  And so the court is exactly right.

20   That reflects the original statutory intent and association

21   in fact was supposed to be a gang.  A collection of

22   individuals.

23           THE COURT:  So "entity" as it's used in that

24   context from your perspective does mean an individual?

25           MS. HURST:  "Entity" is not used in the last

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    clause of 19614, the association of fact clause.  It's

2    union, or collection of individuals.

3              THE COURT:  Okay.  Okay.  Thank you.

4              Counsel.  Take your time with these answers.

5              MS. ESTRICH:  Because I understand your problem,

6    and it is a separate issue, I think.

7              THE COURT:  You're going to site *Odom*; and if you

8    do, it's two corporations.  It's not one corporation.

9              MS. ESTRICH:  It's two corporations, but it makes

10   clear, your Honor, that the definition of "person" for the

11   purposes of who can be associated in fact in an enterprise

12   includes a corporation.

13             THE COURT:  Not one corporation.

14             MS. ESTRICH:  It includes, we have alleged, a

15   corporation and its subsidiaries can be associated in fact.

16             THE COURT:  But *Odom* is a corporation and

17   employees.

18             MS. ESTRICH:  Actually*, Odom* was two corporations.

19             THE COURT:  That's right.

20             MS. ESTRICH:  And the court says --

21             THE COURT:  But the language, I thought, pertains

22   to -- I think they go on and they talk about the potential

23   corporation and its employees.

24             I'll look at it again.

25             MS. ESTRICH:  The language I'm looking at here

1   makes absolutely clear that the definition of "enterprise"

2   in the text of RICO is fairly straightforward.  The

3   definition is:  *An enterprise includes any individual,*

4   *partnership, corporation, association, or other legal entity*

5   *and any union or group of individuals associated in fact*

6   *although not a single entity.*

7               THE COURT:  Okay.

8               MS. ESTRICH:  We are not alleging here that MGA,

9   itself, is the RICO enterprise.  We are alleging that MGA,

10  the corporation MGA, is a constituent member of an

11  enterprise that includes others with whom it has associated

12  in fact.

13              Now, the larger answer, I would also cite to *River*

14  *City Markets versus Fleming Foods West*:  *Logically, one can*

15  *associate with a group of which he is a member with the*

16  *member and the group remaining distinct entities.*

17              All the circuits that have considered the question

18  have concluded that a plaintiff is free to name all members

19  of an associated in fact enterprise as individual

20  defendants.

21              I think the answer to your Honor's question,

22  because it's one, I think I understand from the criminal law

23  point of view, is why if he have the Mexican Mafia and if

24  the whole goal of RICO was enterprise liability, don't we

25  name the enterprise as the defendant in a RICO case?  That

 1    would, after all, make sense.  And in a sense, it makes no

 2    sense.

 3           If Congress' goal, as it was, was not thinking

 4    civilly, at this time, it was thinking criminally.  The

 5    early RICO cases, as you know and I know, were all mostly

 6    criminal cases.  The answer to the way it was drafted, I

 7    believe, is that RICO was intended to cure the problem that

 8    often came up in criminal prosecutions of conspiracy where

 9    individual defendants or entities and others would come in

10    and say, *I am not part of his conspiracy.  I am just one of*

11    *the spokes out here and I didn't know Smith and Smith didn't*

12    *know me.  And I'm Cody Ahcus.*

13           THE COURT:  And I joined when all of the prior

14    predicate acts may have even been completed.

15           MS. ESTRICH:  Right.  Or I'm late -- or I'm --

16           Let's take the case *Bruno*, for instance, where you

17    had liquor distribution and one guy is importer of the

18    liquor, one guy is the middleman on the liquor; and then,

19    you got local distributors and they come in and they say,

20    *What are we doing in the same conspiracy with this guy?  I*

21    *only knew this one.  I didn't know that one.  He didn't know*

22    *me.  I'm only in this little conspiracy.*

23           And after the Supreme Court's decision in *Bruno*,

24    the lower courts struggled for years to figure out what's

25    the difference between a single conspiracy where everybody

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1  gets tried together and these multiple conspiracies?  When

2  does the wheel -- is it attached on the outside and when is

3  it separate spokes where I don't have to sit in the same

4  courtroom here with these big fish?

5          Congress came along -- and the idea of the

6  Notre Dame professor was to create something new, an

7  enterprise.  And it was not that they imagined that the

8  enterprise existed and we're not going to hold it liable.

9  It was that under existing conspiracy law, there was no such

10  thing of an enterprise.  There were wheels and chains.

11          The decision of the Third Circuit, which we teach

12  regularly in this area, *United States versus Elliott*,

13  explains the history of RICO and says the history of RICO

14  was intended to create a new entity that would make it

15  unnecessary -- and we are in criminal prosecutions here --

16  for courts to decide who came in when and who was the wheel

17  and who was the chain for it to create this new entity

18  called enterprise liability.

19          And I would submit to you that the reason the

20  enterprise, itself, is not under the RICO statute clearly

21  identified as a named defendant is because it itself was the

22  creature of Congress in putting together all the separate

23  persons and entities who might otherwise claim that I had

24  nothing to do with Smith and Smith.  I'm the distributor,

25  and he's the middleman.

```
 1              So the enterprise, your Honor, is a -- if you
 2   will, a legal fiction.  It is creation of Congress in an
 3   effort to extend liability to all of those individuals,
 4   entities, corporations and partnerships that have come
 5   together to engage in criminal activity.
 6              THE COURT:  I agree with everything you said, with
 7   one addition:  Congress was wise in understanding that they
 8   couldn't name an organization as a defendant in a criminal
 9   action, because if they did, they had tremendous due process
10   concerns.  They had to name individuals and construct this
11   organization, this enterprise and to dampen the argument,
12   they had to create a minimum of two predicate acts.  And the
13   reason I think that they did that was to narrow what could
14   be easily construed by any court as an amorphous -- let me
15   say an expansion.  Because if I simply labeled you as a
16   member of the Mexican Mafia without any further safeguard
17   and I attached you and the Mexican Mafia together as a
18   targeted defendant, I can imagine the un-Constitutionality
19   of that with the first district court that got ahold of it.
20              So that's why individuals have always been named.
21   And that's why the organization, I've always thought of as
22   the target in a sense conceptually, but the individuals are
23   named on the criminal side.  That's what we struggle with on
24   the civil side.  We struggle with this oddity of
25   corporations having the same status as persons.  And when we
```

```
 1    move to the civil side, it becomes very confusing, because
 2    now corporations from your standpoint or entities can be
 3    strung together as if they are a person, and that is a
 4    tremendous expansion on the civil side and primarily the
 5    court created it.
 6              I'll bet you we can both go back through the
 7    record of alleged congressional intent and the debate -- and
 8    there was very little debate and very little foreseen of --
 9    not the expansion.  That's a bad word.  But the use of
10    corporations on the civil side becoming persons and being
11    strung together.
12              And that's what courts are struggling with.
13              MS. ESTRICH:  But I would give two responses to
14    that, your Honor.  As you are well familiar, certainly
15    during the period that I'm discussing, there was -- there
16    had been a broad expansion of corporate criminal liability.
17    So there is nothing truly unusual about treating a
18    corporation as a person for purposes of criminal liability.
19              THE COURT:  Not when RICO was drafted, there was
20    not a broad expansion.
21              MS. ESTRICH:  Well, later on, the Federal Food and
22    Drug Act had done it.  There were other acts that were
23    pushed through during the New Deal that did it.  Direct
24    Sales did it.  Some of the key conspiracy cases I used to
25    teach were conspiracies with named corporate defendants.
```

1          THE COURT:  You can argue that.  I'll reject it.

2          MS. ESTRICH:  Then I won't keep going.

3          THE COURT:  No, no, I want you to, because it's a

4    great argument.  I can construe a lot of acts, which I value

5    your wisdom on that.  But I do believe that this was

6    primarily and specifically aimed at the East Coast crime

7    families.

8          MS. ESTRICH:  But the horse is out of the barn on

9    that, your Honor.  Precisely the argument, because the

10   United States Supreme Court, as you know, there were

11   numerous circuit courts that said, *This was aimed at*

12   *organized crime.  It should not apply outside the area of*

13   *organized crime.  Loose.*

14         There were cases that said, This was aimed really

15   at criminal conduct.  It should not apply when there's been

16   no crime charged.  *Loose.*

17         This was aimed at criminal conduct.  It should not

18   apply except where plaintiffs need a burden of proof that is

19   in effect the criminal standard.  *Loose.*

20         And the Supreme Court -- I think it was in 1985

21   that this came to a head and Justice Marshall -- I referred

22   to it in my argument -- wrote a very strong opinion saying,

23   You, Justice White, have acknowledged that civil RICO has

24   expanded beyond what Congress may well have contemplated.

25   Indeed, Justice Marshall in his dissent cited statistics

showing in the early years of RICO, it was, even though the
civil remedy was included primarily, a criminal statute.
But the court in that decision and in every decision
subsequently, as has the Ninth Circuit in the case like
*Odom*, has said:  *RICO is intended to be liberally construed
consistent with its remedial purpose.*

Now, the civil RICO provisions were much debated
in the House and Senate.  And as I recall, the Senate bill
didn't even have a civil RICO provision.  The House bill
did.  There were many people in the House who say, you know,
*This is going to be carte blanche and, indeed, its going to
be carte blanche, because private plaintiffs unlike
prosecutors are not limited by prosecutorial discretion,
which hopefully is exercised properly in terms of when they
bring actions for wire fraud and mail fraud.*

Indeed, that was the argument in *Sedima*:  *You're
giving private plaintiff the right to bring wire and mail
fraud actions as civil RICO unconstrained by prosecutorial
discretion.*

And the court said, *Yes, we are doing that.  We
have done that.  The remedial purpose of RICO is served.*

So I think with all due respect, your Honor, while
you and I might debate academically whether Congress should
have passed civil RICO or whether it should reform it, the
controlling authority is absolutely clear here.

1          I would add just one more point.

2          THE COURT:  Controlling authority, and I agree

3     with you --

4          MS. ESTRICH:  Sedima Salinas, Supreme Court.

5          THE COURT:  Controlling authority by Congress, or

6     by the courts?

7          As I look at the history of this, the courts

8     have -- and I'm not finding fault with that.  I follow the

9     Ninth Circuit.

10         But the courts have been the expansionists in

11    terms of civil RICO.  Congress hasn't.

12         MS. ESTRICH:  Well, your Honor, the last time I

13    checked, we're all bound by what the Supreme Court says.

14         THE COURT:  I'm conceding.  Get my comments for a

15    moment.

16         I'm conceding, and I'm conceding that you're

17    right.  All I'm pointing out is, this was not a

18    congressional mandate.  It's court-spawned on the civil

19    side.  I'm not finding fault with it.  I'm bound by the

20    Supreme Court.

21         MS. ESTRICH:  One can certainly debate that.

22         I actually last night went back and was looking at

23    some of these materials, because it interested me that the

24    predicate act limitation to which you refer as the arguably

25    limit on this expansive concept doesn't, of course, apply to

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    the conspiracy provision.  The conspiracy provision, you

2    think, you know, that the courts have gone forward in

3    interpreting the substantive RICO enterprise.

4            THE COURT:  No, I think conspiracy to commit RICO

5    is the true explosion.

6            MS. ESTRICH:  That's where I'm going.  All right.

7    The conspiracy provision -- and, again, the law is

8    completely clear.  These issues were raised by some in the

9    House.  The Senate ended up going along with the House bill

10   on RICO, which was much broader and included a civil

11   provision, and there's some legislative history on this.  If

12   you ask me, do I think the members of Congress in 1970

13   understood that we would be sitting here in 2010 with this

14   kind of case, I have no idea.  I had the pleasure or

15   displeasure of working in the Senate.  And I'm not at all

16   sure on some of the bills I worked on that some of the

17   members of the Senate had any idea what was going to happen

18   in the future.  But, nonetheless, the civil conspiracy

19   provision of RICO has been authoritatively construed to,

20   basically, require only that there be evidence of an

21   agreement to further or facilitate a RICO enterprise and the

22   enterprise requirement has been authoritatively construed to

23   allow corporations to associate with -- at least without

24   outside agents.

25            And I would submit here, your Honor, that for --

1    we do have -- we have pled an enterprise that is distinct

2    from MGA, Inc. that includes individuals and entities that

3    are outside of the autonomous puppet control that

4    Judge Sobel referred to.  And to reiterate, we can certainly

5    amend our complaint to bring it within the clear authority

6    of *Kushner*, which maybe is wrongly decided.

7            I mean, I understood RICO in its inception to say

8    that it was aimed at the problem of collective crime.  In

9    the *Kushner* case, you had Don King and Don King Productions.

10   And I think a fairly strong case could be made that there

11   was no collectivity there.  There was no group.  It was just

12   Mr. *King*.  And, you know, Mr. *King* was associating,

13   basically, with himself.

14           As if I were Susan Estrich, running the Susan

15   Estrich Company through a pattern of racketeering, and I

16   think a very good argument can be made, that if I were

17   running my own company, of which I'm the sole shareholder,

18   through a pattern of racketeering -- that is, if I have

19   committed two predicate acts -- that really wasn't exactly

20   what Congress had in mind in 1970.

21           But *Kushner* absolutely holds that Susan Estrich

22   running the Susan Estrich Company, or Isaac Larian, running

23   MGA through a pattern of racketeering, meets the enterprise

24   requirement; and if we disagree, we have to go back to

25   Congress and urge them to reform it, but it is not ours, I

1    would submit, to change here.

2           THE COURT:  I disagree that we have to go back to

3    Congress.  I think that the explosion has taken place

4    through the courts.  But I note that a corporation,

5    obviously, predates RICO, but still RICO doesn't extend

6    liability.  At least, the statutory wording of RICO doesn't

7    extend liability to an enterprise.

8           MS. ESTRICH:  I can only continue to refer -- my

9    co-counsel gives me *Microsoft versus Odom*.

10          THE COURT:  Just a moment.  You will always go

11   back to case law, and I'll agree with you.  In other words,

12   we're both saying the same thing.

13          MS. ESTRICH:  If I weren't sitting at this table,

14   if I were sitting at some other table as a law professor and

15   you asked me did Congress -- did the courts make law, in

16   quotes, in their interpretation of RICO, you and I might

17   find ourselves on the same side of that argument.  But

18   sitting where I am today with controlling precedent that

19   says *It is undisputed that a corporation can be an*

20   *individual for purposes of associated in fact enterprise,*

21   there it is.

22          MS. HURST:  I would love to address that, your

23   Honor.

24          THE COURT:  Just a moment.

25          And I agree with you.  I agree with you.  Follow

*DEBORAH D. PARKER, U.S. COURT REPORTER*

78

1   the circuit.  Follow the courts.  But this is a court

2   progeny.  It is not a congressional progeny, and I'm fairly

3   well convinced of that.

4          Counsel.

5          MS. HURST:  Your Honor, briefly.

6          1962(c) makes it unlawful for the person, not for

7   the enterprise.

8          Second, that passage of *Odom* that Ms. Estrich just

9   quoted is in the background, first paragraph, describing

10  what the parties' contention are.  In other words, nobody

11  raised the issue in *Odom*.  And *en banc* or not, a case is not

12  law for a proposition that was not decided.

13         *Turkette* is the case that is the source of all

14  evil for purposes of the court's present discussion with

15  Professor Estrich.

16         THE COURT:  No, with more enthusiasm.

17         MS. HURST:  Well, I mean, I don't understand why

18  they need leave to amend with Professor Estrich on their

19  team.  I mean, she knew all this when they wrote the last

20  pleading, your Honor.

21         THE COURT:  The record knows that that was said

22  with great respect by opposing counsel.

23         MS. HURST:  Your Honor, this point of *Turkette* is,

24  we don't make a legitimate, illegitimate distinction,

25  because those words aren't in the statute, okay?

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1          Here, the words are plain on the face of the

2     statute and *Odom* did not address this, your Honor.  19614

3     says:  *Enterprise includes any individual, partnership,*

4     *corporation, association, or other legal entity.*

5          And so, let's just start with that first clause:

6     *An individual is not an entity.*

7          It is clear from that first clause an individual

8     and an entity are not the same thing.  An individual is not

9     a partnership.  It's not a corporation.  It's not an

10    association.  It's not another legal entity.  The only

11    reasonable reading of that language is that an individual is

12    a natural person.  That's the first clause.

13         Now, we come to the association in fact clause.

14    And it says:  *Any union or group of individuals.*

15         It doesn't say "group of persons."  And here's the

16    definition of person right in 19613:  *Person includes any*

17    *individual or entity capable of holding a legal or*

18    *beneficial interest in property.*  Again, individual or

19    entity.  An individual is not an entity.  In other words, an

20    individual is a natural person.

21         Now, that definition is clear as a bell that

22    Congress knew how to chose the broader term "person."

23         THE COURT:  Now, just a moment.

24         Assume you're right.  Why wouldn't I let Mattel

25    amend?

```
 1              In other words, Larian, this comes as no great
 2    surprise.  This isn't the type of concern that the court
 3    would have.  I would think from Mattel's position, they
 4    would think it was a little harsh and, probably,
 5    inappropriate when everybody has been on notice concerning
 6    the allegations about Mr. Larian to have the court negate
 7    this and you are precluded from proceeding forward because
 8    I'm concerned about entity.
 9              So why wouldn't I let them simply interlineate
10    Mr. Larian.
11              MS. HURST:  It's hard to know where to start.
12    Well, your Honor --
13              THE COURT:  Well, start.
14              MS. HURST:  -- this is the fifth --
15              THE COURT:  Oh, no, no.  Don't hide about that.
16    This isn't new discovery.  This isn't time-consuming.  This
17    doesn't cause more depositions.  The world is not coming to
18    an end.
19              Why wouldn't I allow them to include Mr. Larian?
20    In other words, why am I so technocratic that I then strike
21    this when everybody has been on notice that Mr. Larian could
22    easily be included?
23              In other words, if that's true, my concern.  It
24    may not be.  But from Ms. Estrich's standpoint, I think he
25    would simply ask, because you did interlineate Mr. Larian,
```

1    and I forgot the other individual.

2              Anyway --

3              MS. HURST:  Your Honor --

4              THE COURT:  Just note that you object.

5              MS. HURST:  I mean --

6              THE COURT:  Too late in the game and it would

7    cause undue burden and it's prejudicial.

8              MS. HURST:  Oh, no, it's prejudicial because we

9    just spent how many hundreds of millions of dollars

10   litigating it the other way through seven pleadings.  I

11   mean, that is prejudicial, your Honor.

12             THE COURT:  Okay.  Good.  Now, the Senate

13   question -- everybody okay so far?

14             MS. ESTRICH:  I just wanted to apologize, your

15   Honor.

16             Ms. Zeller suggested I may have cut you off in

17   that discussion.  And I sometimes get enthusiastic when I

18   talk about issues of great interest to me.  So if I in any

19   way cut you off, please accept my apologies.

20             THE COURT:  Please accept mine.  I think I cut you

21   off.  I'm not concerned.  So please put that away.

22             Concerning whether Mattel has suffered injury to

23   business or property, I don't know that I'm satisfied that

24   Mattel has addressed this issue, even though it is found

25   throughout the Omni and MGA's briefing.

 1          All of us have read the Supreme Court's recent

 2    holding in *Hemi Group*, LLC.  We know that the narrow

 3    majority in that case held that no intervening events, even

 4    if they are foreseeable, can separate the pattern of

 5    racketeering activity from the injury.

 6          So let's assume just for argument sake that the

 7    Omni purchase does not cause injury to Mattel's business or

 8    property absent intervening events.  In that case, first,

 9    does each one of the predicate acts need to satisfy the

10    *Hemi Group* proximate causation standard?  In other words,

11    does each and every predicate act need to cause a direct

12    injury?

13          Second -- I'm going to take a break in a moment.

14    I'm going to give you a couple things over the recess just

15    to think about.

16          Maybe I can conceptualize and look at it another

17    way:  Does each defendant's acts need to cause a predicate

18    injury, or is it sufficient that some other defendant caused

19    the direct injury?

20          My strong suspicion is that 1964(c) requires that

21    each defendant have engaged in conduct that caused the

22    injury, but I'm not certain so I'm asking.

23          Third, I would like to explore whether Mattel has

24    alleged direct injury.  First, Mattel's argument is that

25    this issue must wait until a Rule 56 stage stands at odds

1    with *Hemi Group* which involved a 12(b)(6) dismissal.

2          Second, Judge Larson's orders as to this issue

3    were filed before *Hemi Group*.

4          Third -- I want to give you time, so I want to

5    make sure you're absorbing this.

6          Third, I can understand how the theft of trade

7    secrets arguably caused directed injury to Mattel.  But the

8    purchase of Wacovia debt, even the auditor fees were caused

9    by an order issued by Judge Larson.

10          And fourth, does or is Mattel arguing that the

11    defendant's intent to defraud is relevant to the proximate

12    causation analysis under *Hemi Group*, *LLC*?

13          I'm going to take a recess at this point, because

14    I think the rest of the four or five pages of questions I

15    have will go much quicker, frankly.  But I would really like

16    you to think out an answer to that.  And maybe as a

17    courtesy, I can tell you the next section during the recess,

18    because when we come back, maybe we can get you on the

19    midnight plane.

20          MS. HURST:  8:45 is the last one out, your Honor.

21          THE COURT:  Well, Orange County needs the

22    resources.  You'll have the -- no, I'm just kidding you.

23          It concerns the trade secret misappropriation and

24    whether it can form the basis for mail and wire fraud.  Do

25    you want to absorb that section also during the recess so we

1    have time; because if you don't, I can come back to it?

2         Okay.  My question to MGA is going to be as

3    follows when we come back.  You argue that Section 1832

4    overruled *Carpenter*.  So are you saying that unless a

5    federal statute is specifically enumerated in the list of

6    acts under Section 1961, it cannot form the basis for mail

7    or wire fraud?

8         And depending upon your answer, my question may

9    be:  Didn't Congress express its displeasure with that kind

10   of logic when it passed the Honest Services Fraud Statute in

11   response to the Supreme Court's holding in *McNally*?

12        And to Mattel, I want you to look and I want to

13   look at an argument MGA doesn't make.  Section 1832

14   prohibits, quote:  *Stealing or unauthorized appropriation,*

15   *taking, carrying away, or concealment, or by fraud,*

16   *artifice, or deception obtain such information.*

17        I want you to notice and look closely at the word

18   "or."  That's a disjunctive.  It seems to suggest that not

19   all acts of trade secret misappropriation are fraudulent and

20   does that contradict *Carpenter*?

21        Now, it may be that the answer to that question is

22   very simple; and that is, that *Carpenter* did not consider

23   all trade secret misappropriation to be fraudulent, and

24   we'll discuss that.  I'm not giving you the answer.  I'll

25   just tell you how far my thought processes have gone, but I

1    would appreciate the responses from both MGA and Mattel.

2            Now, depending upon the length of the recess, I

3    can give you another section, if you want; or do you want

4    just stop there and absorb those two and come back and

5    respond to those?

6            I can see you're anxious to go.  All right.

7            MS. HURST:  I was going to say something, but

8    apparently I have been overruled.

9            THE COURT:  I would like to also get --

10           MS. HURST:  I want to get out of here as much as

11   the next guy.

12           THE COURT:  No, you don't.  You like it here.

13           MS. HURST:  You're right.  I do.

14           THE COURT:  It concerns honest services fraud and

15   whether that can be a RICO predicate.  You are all aware of

16   the oral argument -- and I will mispronounce -- *Weyrauch*,

17   W-E-Y-R-A-U-C-H, Supreme Court case.  The oral argument

18   occurred in December and the court is considering whether

19   the honest services fraud statute is unConstitutionally

20   vague.  What should I do in light of that?  Should I draw

21   back and wait, hoping that the court hands this down in,

22   what period of time?

23           MS. HURST:  June.

24           THE COURT:  In June, which is pretty close.  And,

25   therefore, you wouldn't expect a response from me until, you

1    know, early July when I had a chance to absorb that.  In

2    other words, why get it potentially wrong when I'm going to

3    get guidance from the court?

4            Secondly, MGA argues -- in fact, I'm doing that on

5    the *MEK* case.  I'm waiting *for Humanitarian Project* and some

6    other progeny to come down before I decide what to do with

7    the *MEK* case.

8            Separately, MGA has argued that (ph) armed

9    services fraud cannot serve as the basis for a civil RICO

10   violation, because it does result in injury to tangible

11   business, or property.

12           My first question is:  Isn't the Supreme Court

13   precedent clear that intangible opportunity interests can

14   constitute business or property under civil RICO?

15           And second, more importantly, doesn't your

16   argument go to whether Mattel suffered injury and not

17   whether the honest services fraud can be a predicate act.

18           Now, I'm almost with you on Omni.  I think I'm

19   going to take a break for just a moment, and Mr. Gordinier,

20   after we conclude those three sections, Omni is up next, and

21   I'll take a break if I need to when I go through a series of

22   questions, because they're quite long about Omni, okay?

23           So why don't you take until, oh, gosh, let's say,

24   4:30.  Take a good long break.  Go use the restroom.  Go get

25   a cup of coffee and think out your answers, okay?

1           Thank you very much.

2       *(At 4:00 p.m., proceedings were adjourned.)*

3

4                       -oOo-

5

6                    CERTIFICATE

7       I hereby certify that pursuant to Section 753,

8   Title 28, United States Code, the foregoing is a true and

9   correct transcript of the stenographically reported

10  proceedings held in the above-entitled matter and that the

11  transcript page format is in conformance with the

12  regulations of the Judicial Conference of the United States.

13

14  Date:  June 3, 2010

15

16

17      _____

18                  Deborah D. Parker, Official Reporter

19

20

21

22

23

24

25