**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION AT SANTA ANA**

HONORABLE DAVID O. CARTER, JUDGE PRESIDING

CARTER BRYANT, an individual, )
)
PLAINTIFF, )
)
vs. ) SACV NO. 04-9049-DOC
)
MATTEL, INC., a Delaware )
corporation, )
)
DEFENDANT. )
)
CONSOLIDATED WITH MATTEL, INC., vs.)
BRYANT and MGA ENTERTAINMENT, INC. )
vs. MATTEL, INC. )

REPORTER'S TRANSCRIPT OF PROCEEDINGS

SANTA ANA, CALIFORNIA

THURSDAY, SEPTEMBER 9, 2010

6:19 P.M.

**DEBORAH D. PARKER, CSR 10342**
**OFFICIAL COURT REPORTER**
**UNITED STATES DISTRICT COURT**
**411 WEST FOURTH STREET**
**SUITE 1-053**
**SANTA ANA, CALIFORNIA 92701**
**(714) 542-8409**
**D.PARKER@IX.NETCOM.COM**

APPEARANCES OF COUNSEL:

FOR THE DEFENDANT, MATTEL, INC.:

MICHAEL ZELLER
SUSAN ESTRICH
DIANE CAFFERATA HUTNYAN
SCOTT W. WATSON
QUINN EMANUEL URQUHART
865 SOUTH FIGUEROA STREET
10TH FLOOR
LOS ANGELES, CALIFORNIA 90017
(213) 443-3000

FOR THE INTERVENOR, MGA ENTERTAINMENT, INC.:

ANNETTE L. HURST
WARRINGTON PARKER
ORRICK, HERRINGTON & SUTCLIFFE, LLP
THE ORRICK BUILDING
405 HOWARD STREET
SAN FRANCISCO, CALIFORNIA 94105
(415) 773-5740

THOMAS S. MCCONVILLE
ORRICK, HERRINGTON & SUTCLIFFE, LLP
4 PARK PLAZA
SUITE 1600
IRVINE, CALIFORNIA 92614
(949) 567-6700

APPEARANCES OF COUNSEL:

FOR THE DEFENDANT, CARLOS GUSTAVO MACHADO GOMEZ:

ALEXANDER H. COTE
SCHEPER KIM & HARRIS LLP
601 WEST 5TH STREET
12TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 613-4660

SANTA ANA, CALIFORNIA; WEDNESDAY, SEPTEMBER 9, 2010;

6:19 P.M.

-oOo-

THE COURT: We're on the record.

And on behalf of Mattel.

Counsel.

MR. ZELLER: Yes, sir.

I believe where we are, that this is a MGA motion to compel, so I think --

THE COURT: No, I just want your appearance.

MR. ZELLER: Oh, yes. I apologize, your Honor.

This is Michael Zeller for Mattel.

THE COURT: And counsel is here also. I would like you to make your appearance on the record.

MS. ESTRICH: Susan Estrich for Mattel.

THE COURT: Pleasure to have you here this evening.

And once again.

MS. HUTNYAN: Diane Hutnyan.

THE COURT: Pleasure to see you.

MR. WATSON: Scott Watson, your Honor.

THE COURT: And on behalf of MGA.

MR. MCCONVILLE: Thank you, your Honor.

Tom McConville.

THE COURT: And?

MS. HURST: Annette Hurst, your Honor.

THE COURT: Just for my record.

And?

MR. PARKER: Warrington Parker.

THE COURT: And then on behalf of Mr. Machado.

MR. COTE: Alexander Cote, your Honor.

THE COURT: Then, would you like to proceed?

MR. MCCONVILLE: Yes, sir.

So, your Honor, there are two motions that we have filed that relate to our request for documents that reflect Mattel's theft of the competitor's confidential information.

THE COURT: Those motions, let me state them back to you: That's the motion to compel production of documents concerning the Mexico possession of the competitor's information?

MR. MCCONVILLE: Yes, sir.

THE COURT: And the motion to compel documents from Mattel concerning Mattel's theft of competitor's confidential information.

MR. MCCONVILLE: Yes, sir.

I would suggest, if it's okay with the court, to deal with them together.

THE COURT: And that's Mr. Villasenor supposedly sneaking into MGA and the other toy company's showroom.

Counsel?

MR. MCCONVILLE: Yes, sir.

So for contextual purposes, your Honor, I want to let you know that after Mr. Villasenor testified, Mattel produced in discovery a document, which you've attached as Exhibit 34 -- and I'm happy to hand it up to the court, if you would like it -- which says that -- it's from Mr. Villasenor and it says, *I no longer wish to engage in misrepresentations and undercover assignments in which I'm paid by Mattel to attend trade shows and events to engage in misrepresentations and undercover assignments. I fear my actions may expose me to personal criminal liability.*

And he goes on to say, *These actions, these sneaking in and undercover assignments, have given Mattel superior competitive advantage.*

So this is the context, your Honor. And Mr. Villasenor's testimony where he says for 14 years he engaged with others in his department to, essentially, go to competitor showrooms and steal their confidential information, that's the context in which these requests were made, your Honor.

And our very serious concern is that discovery is about to close, is this document which is redacted because it's purportedly privileged in some way, shape, or form, although it's on no privilege log.

THE COURT: Just repeat that whole statement

again.

MR. MCCONVILLE: Sure. Our concern, your Honor, is that this document, which relates to trade secrets, which on its face indicates that Mr. Moore, from Mattel, who has testified for the court before, along with an attorney for the Quinn Emanuel firm, conducted an investigation, found out about Mattel's -- the allegations raised by Mr. Villasenor that indicated that there was a pattern and practice of going into competitors' showrooms to steal information. And we didn't get this information until a month ago.

THE COURT: Was it on a privilege log?

MR. MCCONVILLE: No, your Honor. The privileged information, which has been redacted from this document, which is Exhibit 34 to our declaration, it has not -- it has not been -- we don't know what it is, because it's not on the privilege log anywhere.

What we do know from other documents that have been produced around this e-mail from Mr. Villasenor saying, *I'm committing criminal acts on behalf of Mattel to give them a competitive advantage*, what we do know is, there was some sort of investigation conducted and we haven't seen the investigative report as well.

So that's the context in which we filed this motion to compel and the information that we seek is all

information that evidences the serial theft of competitors' trade secrets.

Now, those are the requests. They are relevant to what is a trade secret. They are relevant to what the Mattel employees understood was a trade secret. They are relevant to unclean hands. They are relevant to our statute of limitations, your Honor.

THE COURT: Unfair competition?

MR. MCCONVILLE: Unfair competition. They are relevant to all the preexisting claims in the case prior to our filing our counterclaim and reply. And they are responsive to discovery requests which have been pending for years, and we literally got the document, this one particular document that says, *I'm engaged in criminal acts, stealing from competitor showrooms to give Mattel a competitive advantage* a month ago.

Another part of my concern, your Honor, is in Mattel's response, they say that they have produced the appropriate documents. Now, I don't want to stand in judgment of what's "appropriate," but I believe if the court compelled the production of the documents that we have requested, which are narrowly tailored to get the information that reflects serial criminal acts, I think that would be very productive from our perspective, your Honor.

THE COURT: Let me hear from Mattel.

MR. ZELLER: Thank you, your Honor.

First, I think it's important to note -- and MGA actually has no response for this, which is the kind of overheated false rhetoric that is wrapped around this. Ron Brawer, an MGA executive who went over to MGA in October of 2004, said at deposition -- and we quote this in our papers -- this is unrefuted -- knew about it and claimed to have participated in these activities with Mr. Sal Villasenor. This is something that has been known to MGA for literally years. So somehow the argument that they're shocked and astonished or surprised and this is belated is simply false.

THE COURT: Let me ask you something.

MR. ZELLER: Yes.

THE COURT: Then, in your opinion, Mr. Brawer going over to MGA in 2004 is sufficient for Mattel not to disclose the statement of Mr. Villasenor.

I find that an interesting argument because the jury might believe that Mr. Villasenor, who is still connected with Mattel and not over in the MGA camp and, therefore, a strong argument on Mattel's part in front of jury, that he is biased. But that shouldn't have been disclosed?

MR. ZELLER: No, this is separate from disclosure, your Honor.

MGA is conflating a number of things here. Number one, which is: When did they know about this?

And they are pretending as though they are surprised and that this is something they haven't known for years, these kinds of allegation.

THE COURT: Now, let's assume that they weren't surprised. Why shouldn't the information concerning Mr. Villasenor not -- why shouldn't that have been disclosed?

MR. ZELLER: Because Mr. Villasenor said he did not go into an MGA showroom. This is not MGA. That's the simple reason why. Mr. Brawer confirmed that at his deposition. Mr. Villasenor so testified. So this idea that somehow this was connected to MGA through Mr. Villasenor is also incorrect.

Mattel objected to these overbroad requests and we still object to them for reasons I'll get to in a moment. But I think it's important to strip away kind of this overheated rhetoric that MGA tries to wrap around this that Mr. Villasenor was sneaking in repeatedly into MGA showrooms. That is not his testimony. And there are no facts to substantiate that, the idea that somehow he was going into MGA showrooms.

So I do want to make sure that that's very clear. We have objected, because we think that it's overbroad. If

it's not connected to MGA, it's irrelevant. And it's irrelevant for a variety of reasons: Number one, unclean hands, which was what was asserted previously by its terms, has to deal with the relationship between the parties, can have nothing to do with whether it's Hasbro showroom or some other third party showroom. Simply cannot have any bearing on MGA's unclean hands defense.

Number two, MGA now, of course, asserted these new claims. But, of course, they haven't passed, I don't think, obviously, the scrutiny of this court yet. There is a motion to dismiss.

And number three -- in fact, I would point out these kinds of arguments that they're making shows all the more reason why what MGA is doing with the new claims is horrific sandbagging. What they are literally now saying is that, basically, they want from Mattel and from third parties something in the vicinity of 45 third parties to now be dragged into this. That's how they intend to prove this so-called pattern, and that is new. That is something that's new in terms of their argument. But it is also something that, frankly, MGA has known since at least 2004.

Mr. Brawer testified that what Sal Villasenor was doing was sneaking into these other showrooms but not MGA showrooms. So that's why I'm saying is, I think, your Honor, they're conflating a number of different points. But

what they ultimately add up to is that we objected, because these requests that are now being pressed with respect to non-MGA parties are overbroad and they are horrifically so.

Also, bear in mind even, these RFPs are not even tailored just simply finding out what MGA -- excuse me, these non-MGA parties' trade secret information is. It is literally *give us all the competitive information that Mattel has ever gathered about all of these other third parties in the industry.* That is what these RFPs request. Not limited to trade secrets.

I also point out, your Honor, just to show how far all this goes into, essentially, a new whole lawsuit, is that there is no evidence that these other toy companies treat all their showrooms or all the information, their catalogs, their price lists as being trade secret. We are going to have to go through 45 different parties, how did they treat their showrooms, how did they treat their price list, in order to even come to this conclusion that MGA kind of blithely puts out that somehow there is a pattern and practice of Mattel stealing this competitor trade secret information. There are multiple assumptions embedded in that that are simply unproven and that will frankly require massive amounts of discovery and frankly should not be done at this point.

THE COURT: Could I ask a question?

MR. ZELLER: Sure.

THE COURT: It's a naive question. So Mr. Villasenor in this alleged activity would say to himself, I'm going to go into this toy showroom, this toy showroom, this toy showroom, this toy showroom, but I'm not going to go into MGA's; is that right?

MR. ZELLER: It's because he would be recognized. This makes sense, too. Mr. Brawer pointed this out, too. Of course, he wouldn't because MGA for a long time was taking all manner of people from Mattel. Paula Garcia, for example, who I'll get to in a second, also knows him. These are people who were at MGA showroom. It would make no sense for him to try and go in there.

Interestingly enough, Mr. Larian tried to throw at this deposition that, supposedly, Paula Garcia had seen him at some toy fair in an MGA showroom and chased him out. Never alleged in this case. Not included in any interrogatories. Zero documents to substantiate it. And, of course, it ultimately -- she never testified to that effect.

THE COURT: At Mr. Villasenor's deposition, did he say that he went into MGA facilities or showrooms?

MR. ZELLER: He said he never went into an MGA showroom. He said that he went to a distributor, I guess, we'll call it kind of trade show in Pomona, which is not an

MGA showroom, and that he did pick up MGA information there that was publicly available. But he was very clear that he never went to an MGA showroom, which again was substantiated by Mr. Brawer, who worked with him.

THE COURT: Okay. Ms. Estrich, how did he do?

MS. ESTRICH: Excellent.

THE COURT: Thank you.

Counsel on behalf of MGA.

MR. MCCONVILLE: Yes, sir.

A few points. So we have to defend a theft of trade secret case. It's going to require them to prove it's a trade secret.

Now, can Mattel claim that they have a trade secret when they've snuck into competitor showrooms and stolen it? This is the discovery portion of the program from what I understand, your Honor. We get discovery to find out the depth and breadth of the stealing.

So if they stole it all, that seems -- I'm a simple man, your Honor, but I think that would help me prove to the jury that is not a trade secret. That's information that we're entitled to.

The second step, of course, is the allegation, as Mr. Zeller put it so eloquently, that we go around stealing all the Mattel employees. In fact, in their complaint, they allege that we took these Mattel employees and they took

with them Mattel trade secrets.

Now, we dispute -- MGA disputes that we told anybody to take any trade secrets. However, one could perceive that there might be some discoverable evidence relevant to this case that they were trained by Mattel that you just take other people's price lists. You take their unreleased product. You take whatever information you want, because in Mattel's eyes and how they've been trained by Mattel, it's not a trade secret.

We're trying to defend a case where they allege we have stolen their trade secrets and we would like the documents we have requested that go to not only those portions but also, you know, how long have they known -- you know, in fact, what we do know is that in -- and only recently produced, because I guess those wouldn't be appropriate documents to be produced --

THE COURT: What drove this production, in your opinion? Was it Mr. Villasenor's deposition?

MR. MCCONVILLE: Yes, your Honor. We believe that they knew that --

THE COURT: Just a moment. Is this the first deposition taken of Mr. Villasenor?

MR. MCCONVILLE: Yes.

THE COURT: Why wasn't his deposition taken at phase one? Was it because Judge Larson had bifurcated and

the RICO was coming later so this wasn't an appropriate discovery?

MR. MCCONVILLE: Yes, sir. And part of it, your Honor -- I mean, I want to hand up this letter to you. This is dated --

THE COURT: Looks like you would like to give me that.

MR. MCCONVILLE: Yes, I do. It's December 22nd, 2005.

THE COURT: Okay. Just a moment. Just a minute.

*(Pause.)*

THE COURT: Okay. Thank you.

Please continue.

MR. MCCONVILLE: So to answer -- to answer a few of your Honor's points: One, since Mr. Villasenor's testimony, we have taken the testimony of additional employees who have verified that people were going into MGA showrooms and taking MGA information.

THE COURT: Who?

MR. MCCONVILLE: Ms. Osier who -- and indicated that Sharon Rahimi was another person who went into MGA showrooms -- and Ms. Rahimi's deposition is set for next week -- a fellow named Matt Teresky who confirmed that the sneaking into showrooms was routine practice and, in fact, one step he took to avoid detection was to provide the

people who were running the showrooms, the Mattel competitors, with his home address because, as he said, *If he gave them my Mattel address, they wouldn't provide me with the confidential information.*

So we've had other people corroborate what Mr. Villasenor said. And we've gotten documents that they have now produced that indicate that they do have, in fact, MGA unreleased product information back to 2001 which will relate to a statute of limitations defense, which is also in the case.

And the final point, your Honor, as much as we would like to speak to people about what it is -- their pattern and practice was when they were at Mattel stealing this information from competitors, each of these people signed a confidentiality agreement with Mattel, so it turns out they won't talk to us.

In fact, Ms. Osier, O-s-i-e-r, who testified on Monday, told us that she actually didn't sign a confidentiality agreement with Mattel until last week. In other words, had we wanted to talk to her, she got locked up at the last minute and so these people won't talk to us in any event.

So here we are requesting documents to help us prove or disprove the case and advance in our defense.

That's the goal, your Honor.

THE COURT: Ms. Hurst, satisfied?

MS. HURST: Absolutely, your Honor.

MR. ZELLER: One point I wanted to address, your Honor, was MGA also raising the point about there's a portion of the resignation letter that is being redacted and not being on the privilege log. As the court is aware and certainly MGA is aware, the parties agreed that the general rule is is that post-litigation communications are not put on the log. Obviously, if we're going to go through and the court is going to require us to start logging anything that is redacted or both held post-litigation, that has to be applied to MGA, and I think --

Of course, the reason why the parties agree to that in the first instance is, is that there are, I mean, literally hundreds of thousands of communications that would then have to be put on those logs. So I don't think it's fair for MGA at this stage to be harping on something that is a post-litigation communication and not being on the log and somehow that being sinister. That's not fair and that's not right.

THE COURT: Let me ask the same question of you that I just asked of MGA's counsel; and that is, if Mr. Villasenor's activities were relevant, why didn't Mattel produce the document just a month ago?

MR. ZELLER: Because MGA did not pursue that

discovery. That's why.

And let me, in fact, point out a number of things on this front. MGA was the one that repeatedly advocated the stay of phase two discovery, prior to phase one trial. They were the ones who did not want that discovery. MGA did not ask for the deposition of Sal Villasenor until this year. They could have gone at any time, noticed his, asked Judge Larson for permission to take his deposition. They did not do it, and they didn't do it because they did not want to engage in phase two discovery.

Mattel was the one trying to pursue it. They were the ones constantly trying to block it. I can put into the record, your Honor -- I can get all the various times in the docket where MGA sought and in many occasions obtained a stay of phase two discovery. And so, MGA is the one that did not pursue that. When MGA did raise those kinds of requests and the like, we made very clear -- and this is in the record -- we objected to them. And we, again, still continue to object to these, because they relate, as Mr. McConville keeps on going back to, other competitors, not to MGA. We don't think that's relevant.

THE COURT: Why don't you consult with the Mattel team for just a moment -- and you consult with the MGA team -- see if there's any additional arguments without repeating what I just heard. I heard you. And then, if

there is something else you want to call to my attention, I'll call upon MGA first; and then, Mattel. And that will close out this discussion.

MR. ZELLER: Thank you.

*(Pause.)*

MR. MCCONVILLE: One other request, your Honor.

To the extent the court is inclined to grant our motion to compel, and there will -- and to the extent that there will be documents that are withheld as privileged, we would request that the court review those documents in camera. There is precedent in this case, your Honor, for creating privilege logs for smaller portions of documents. For example, the omni-transaction, you will recall and the IGTW transaction, you will recall there was a similar situation with Mr. Wing where he had to create a privilege log. I don't know that given the close of discovery that we're going to have time for privilege log to be generated and reviewed and contested. But to the extent that there are any documents that are going to be withheld on the basis of privilege, we would request an in-camera review of those documents.

THE COURT: Now, are you satisfied now with your arguments?

MR. MCCONVILLE: Yes.

THE COURT: I'll turn to Mattel.

MR. ZELLER: First of all, the idea that that's going to be tacked on at this point where -- I mean, presumably, it would include communications between me and my team dealing with this motion, I think is really inappropriate. For us to have to gather those would be burdensome in itself and it wouldn't lead to, frankly, anything.

The other point I would make, your Honor, is, is that if the court is going to go down the road of now requiring the logging of post-litigation communications, what I will say is, your Honor, that I make a motion that it be reciprocal. I would ask that for everything that MGA has been compelled to do this year, any instance in which they have been compelled to do it, they be required to log it, anything that's withheld on privilege grounds. We will do the same. We will do the same if MGA is compelled to do it. This simply cannot be one of these instances where it's nothing but a burden on us and not a burden on MGA.

Frankly, if they are going to make such a burdensome request at this stage of, what, three weeks before the close of discovery, it ought to be applied to both.

THE COURT: Now, can you consult your team and make sure that you are satisfied?

MR. ZELLER: There was one other point I wanted to

make, your Honor, which was that we are --

As we said in our papers, we are willing and have been producing information as it pertains to MGA. The fight here is over what we consider to be the overbroad aspects of these requests, where they literally are at all the information about all other competitors that Mattel has gathered.

THE COURT: I'm going to joke with you for a moment. Nine months ago that was the opposite argument. You sound like MGA when you first came into the court about overbroad, too cumbersome. The roles seemed to have switched.

MR. ZELLER: I have certainly learned my lesson over the last few hearings, your Honor. And I do think -- and in all seriousness, I do think, your Honor, that that standard which the court has been applying to our requests, I think in fairness need to be applied to theirs.

We have gone through this exercise and the court is fully aware of Mattel targeting its request to what it is that it really wants, and we're going to get to some more of those in these motions here today which are virtually identical requests that MGA has propounded that when Mattel narrowed, and narrowed in the context of these hearings and now, of course, MGA is the one that says, *Oh, by the way, they are not overbroad now. Compel all of it.*

I don't think that's, of course, fair or right. The one point I did want to make, just to finish up on that, is that the overbroad aspect of this is what we have a problem with, which is all competitor information. It not only relates more generally to, literally, anything related to any competitor, whether or not trade secret. But the problem is for MGA, even where it's targeted to so-called trade secret information of competitors, there is absolutely no evidence of record as to what that is. That's just an assumption by MGA. There is no evidence of record of all of that how Hasbro treats information it gives to retailers.

MGA has said, including its CFO at deposition, information that's shared with retailers is not confidential as far as MGA is concerned.

Thank you.

THE COURT: Check with your team and make sure you're satisfied.

*(Pause.)*

MR. ZELLER: Yes, your Honor.

THE COURT: Mr. Machado's counsel.

I'll give Mattel one more opportunity after your argument.

MR. COTE: I'll be very brief.

Alexander Cote for Gustavo Machado.

Although Mr. Machado doesn't have any affirmative

claims in this case, I just wanted to echo the relevance arguments that Mr. McConville made with respect to the affirmative defenses. I think they apply equally to Mr. Machado. He may take advantage of the information that is learned from this discovery as well.

THE COURT: Thank you.

And just to balance out the sides, in response to his argument, Mr. Zeller.

MR. ZELLER: I submit at this point, your Honor.

THE COURT: The next motion is your motion to compel production of documents concerning the Mattel Mexico trade secret claims. Mattel sought to add its Mexican subsidiary as a plaintiff late in this litigation.

At the time I had granted that request, I had informed the parties that I would allow expansive discovery by MGA in the Mattel Mexico new claims. How much discovery has Mattel Mexico already provided to MGA?

MS. HURST: This was the set of document requests that we propounded after the court made that order and to use the term colloquially, your Honor, it was a stiffing.

THE COURT: Mattel.

MR. ZELLER: Well, your Honor, that's misleading at best.

We have been producing documents out of MGA Mexico and producing witnesses about MGA Mexico for the entirety of

phase two discovery. So it's hardly a surprise that there is not an avalanche of further documents because we have been producing those. And, in fact, we point out in our opposition papers, particular instances of where MGA claims that it has been, quote, stiffed, end quote, of documents where Mattel has, in fact, produced them and, in fact, produced witnesses to testify about them. Those include, for example, the agreements between the various Mattel entities that include Mattel Mexico. In fact, one reason why this court granted the addition of Mattel Mexico is because that is something that has been going on literally for months and years prior to it. This was not something that was new. It was something to simply bring into conformity what it is that was already being litigated in the case.

So for MGA to come in here and literally say to you with a straight face that somehow they have been stiffed in discovery is simply false and misleading. What I didn't hear MGA's counsel say was that they hadn't received discovery before. I mean, that was a deliberate, calculated statement to the court about this discovery. And I'm happy to go through the various things that they say and that they claim that they're entitled to relating to MGA Mexico and give the court chapter and verse about what it is that we produced.

And the other thing that I will say is that the few requests that are at issue that have not already been dealt with as a matter of historical discovery and what it is that we've produced are requests like No. 46 where it wants all communications ever made between Mattel Mexico and any advertising agency, marketing consultant, or PR firm, which unbounded by any subject, unbounded by any claim or defense in this action.

So the ones that are at issue in this case are ones that are not even remotely tailored or targeted to the allegations in this case.

THE COURT: Okay. MGA.

MS. HURST: Just to be clear on the sequence of events here, they only had Mattel as a plaintiff. Mattel was trying to claim a trade secret misappropriation based on stuff done down in Mexico.

We took discovery and developed a complete hole in their case. That is, *Oh, my, we have the wrong party. We don't own the trade secrets we sued on. Goodness gracious.* Here we come with our 27th request for leave to amend to fix the hole that they developed in discovery and we added a new party to the case. That is what happened.

Was there a little bit of discovery before? Yeah. What we drummed out of them to develop a hole in their case, which they then amended in response to. And then, we served

one set of document requests. We didn't even serve a 30(b)(6), and they stiff us.

Now, if it's so true that they're perfectly willing to produce all these documents, then why didn't they just serve a response that says, *Okay, we'll produce it* and then produce it. I can go through one by one and explain why these document requests are important to the defense of claims by Mattel Mexico and why they're pertinent.

Now, I will agree with Mr. Zeller that that last request, 46, is overbroad. I agree that it is, especially given the standard the court has set previously for these things. If we knew exactly what the names of these people were, we would give them search terms that they could run for this. Our problem is the witnesses won't talk. We have had witness after witness, even our own side of the case, who are afraid to name names. They know these things have happened. They say they have happened, and they are afraid to name names, so that's a little bit of a problem for us in pursuing discovery, but it is what it is.

If we could have named names in that request to give them search terms we would have done so, but our witnesses have been extremely reluctant. Because, frankly, we know they have a criminal proceeding down there in Mexico and people are afraid. So we have been extremely, frankly, circumspect in this discovery we pursued of Mattel Mexico

despite the court's order. These things are directly relevant to the claims.

I mean here, Request No. 8: *Communications amongst the three who departed for about six months before they left.*

They got a year after they came to us. All the communications amongst them for a whole year, they got way more than we ask for. And why did we ask for six months before they left?

Because their argument in their interrogatory responses is: *Anything these two people communicated with each other two months before they left was part of their scheme to steal trade secrets.*

So the only way we could possibly show that it was part of their ordinary course of business activity is to show what their prior communications had been for a period of time. Did we go crazy and say all the communications over the whole period of time they had been with Mattel, no. We went for six months. Based on what they have gotten from us, that was completely reasonable.

THE COURT: Why don't you check with your team for just a moment. This is the second round. Make sure you have covered all the points. And then, counsel on behalf of Mr. Machado, if you have anything to say, why don't you do it now.

MR. COTE: Thank you, your Honor.

Alexander Cote for Gustavo Machado again.

Again, just to echo the points made by MGA's counsel, anything having to do with Mattel Mexico is going to impact on my client, obviously. My client worked for a Mattel entity in Mexico. Not either one of the plaintiffs in this case but a Mattel entity in Mexico. Those entities are the ones that are bringing claims against him directly. Any of this requested information is most critical to his defenses.

Thank you.

*(Pause.)*

MS. HURST: Submitted, your Honor.

MR. ZELLER: 618 requests from MGA are scarcely circumspect. That is what MGA propounded. And this is in the context of where discovery had been going on for years, including a number of things that they had received and clearly received from MGA Mexico. That is hardly the actions of somebody looking for targeted circumscribed discovery.

I will give an example here, which are Request Nos. 11 and 16. I'll talk about the ones that aren't necessarily overbroad. I mean, the overbroad ones it appears MGA is now conceding on. But then there are a host of other requests where Mattel has already complied, and we

point this out in the paper. I mean, MGA professes now to be surprised about, well, they could have met and confirmed and found about this in advance.

But with respect to Request Nos. 11 and 16, these are requests that generally are looking for documents relating to the investigation of the theft of the trade secrets and also what it is that the three people in question -- Machado, Trueba and Vargas -- accessed on their computers.

Your Honor, we offered to them over a year ago their hard drives. They can go and look to their hearts' content to see exactly what it is that they did on those computers. MGA has never taken us up on that. Also, we produced what was an almost 800-page report that reflects what it is that was done in the investigation, and we produced a 30(b)(6) witness who talked about that for days.

So the idea that somehow -- and, again, MGA is talking in these levels of generalities somehow they have been stiffed when, in fact, they have the discovery for actually the proper request that they have made.

THE COURT: Consult your group and make sure you're satisfied.

*(Pause.)*

MR. ZELLER: They are all satisfied, your Honor. Thank you.

THE COURT: Thank you. Then concerning the motion to compel production of the documents concerning Jeanine Brisbois. Of course, Ms. Brisbois is allegedly the Canadian employee who defected to MGA and she allegedly stole an USB drive that was named "Backpack." And in that drive there are allegedly lots and lots of documents.

MGA, your argument.

MS. HURST: Your Honor, in this motion, we've moved to compel on four requests only that pertain, specifically, to trade secrets that were identified in Mattel's interrogatory responses. The requests 309, 311, 312 and 313 are narrowly tailored. They are limited by time. Each one of them is limited to a specific year or years in no instance longer than a three-year period of time.

I can't even understand what the objection is, as your Honor also --

THE COURT: Well, let's find out.

MS. HURST: I'll submit.

THE COURT: Mattel.

MR. ZELLER: They are overbroad, because they aren't targeted to the trade secrets that are at issue. These are the entire subject matter dealing with -- I mean, this is Request No. 309: *All documents and communications that refer or relate to Mattel Canada's participation in the*

*Children's Miracle Network from 2004 through 2006.*

So it's a three-year period. Limitation on subject. Anything that refers or relates to this Children's Miracle Network.

And the specific trade secrets that are at issue in this case, we have produced those documents. We have produced those communications. We have produced those particular documents. Now they are asking for literally every subject, or every communication and document on the entire subject matter. And that is overbroad. And it is certainly overbroad by MGA's likes, in terms of the discovery and the various hearings we have had in the last several days and weeks. There is no tailoring to anything that would be pertinent to the trade secrets specifically.

That is also true of Request No. 312 where it's talking about documents about the B2B site from Mattel Canada. No other restriction. There is no restriction at all on this.

And then, same for 313. So that's why these are still at issue, your Honor, is because they are not focused and tailored to the particular trade secrets at issue. Also note that the time period of three years, I think the court will recall well, we've had many fights and many debates and discussions over the length of time period that MGA would produce concerning even the subject -- not just the subject

matter but the specific information about trade secrets. Certainly, three years is well beyond anything that MGA has ever agreed to produce and, in fact, in most instances has not produced. We've talked about six-month time periods, for example I'm sure, as the court will recall, in dealing with MGA's communications and information as it pertains to stolen trade secrets.

So now, of course, they aren't even applying that same standard to their own request.

THE COURT: MGA. Ms. Hurst.

MS. HURST: Okay. They are claiming that their participation in the Children's Miracle Network is a trade secret. I find that hard to believe, but that's what they did. Now, my guess is Mattel Canada touts to everyone it sees that -- touts, you know, proclaims, advertises --

THE COURT: Tout, T-O-U-T.

MS. HURST: T-O-U-T -- to everyone it sees that their participation in the Children's Miracle Network is a reflection of their good corporate citizenship and the reason why people should be their customer, or their business partner. I'm guessing that if we got all the communications related to their participation in the Children's Miracle Network, we'd probably get advertising literature about that.

It's not a trade secret. They should withdraw it

as a trade secret; but if they are not going to, then we're entitled to the discovery to demonstrate it's not a trade secret. They didn't maintain reasonable efforts to maintain its secrecy, and so forth. That's what that's all about.

Same for each one of these requests: Green Friday. "Green Friday" is the Friday after Thanksgiving. That's what they call it up in Canada. Down here it's sometimes called "Black Friday."

Now, is the idea to have a promotion on the day after Thanksgiving with one of your significant customers a trade secret? No, it's not. But they have claimed that it is. And having claimed that it is, they can't just produce one piece of paper that says, *We were in Green Friday promotion. And that's our trade secret.*

They have to give us the discovery sufficient for us to defend the assertion that it's a trade secret by, for example, showing that was actually a public promotion. Anybody in the business would know that you do a promotion with a flyer on the day after Thanksgiving. Look, if they want to claim this stuff is trade secrets, they got to put up or shut up.

Submitted.

THE COURT: That's the put-up-or-shut-up argument. Thank you, counsel.

Counsel on behalf of Mattel.

MR. ZELLER: Well, I think I'll choose to put up.

I'll say this, your Honor. MGA's characterization of our trade secrets are not correct. We have never said that our mere participation in the Children's Miracle Network in itself is the trade secret. We have in fact claimed a particular promotion. And this is the problem. And, in fact, the same thing applies also with this Green Friday promotion. It's the specific internal details of a specific promotion. It is not all manner of things relating to the promotion for over a two-year or three-year time period. And, in fact, what I'll point out to your Honor is that all the other requests that relate to the trade secrets that were taken out of Canada by, you know, or wherever she took them from Ms. Brisbois, we have said that we are producing and we have produced to a whole host of them that are tailored to the trade secrets that are at issue. The problem is that these requests are not and that's why they're still at issue.

Thank you.

THE COURT: Mr. Machado's counsel.

MR. COTE: I'll submit.

THE COURT: One more time, just on these four motions. Talk to your teams one more time.

The record should reflect all the teams are high-fiving each other. Just kidding. Just joking,

counsel.

But take a few moments, but just make sure on any one of these four motions, if there's just something that you want to add; and then, we'll conclude these motions.

*(Pause.)*

THE COURT: All right. Counsel, on behalf of MGA?

MS. HURST: Submitted.

THE COURT: On behalf of Mattel?

MR. ZELLER: Nothing further, your Honor.

THE COURT: Well, I want to thank all of you for your extraordinary arguments this evening. It's much appreciated.

The Special Master has been kind enough to delay his report this evening because of the four discovery motions before the court.

I just wanted to --

*(Pause.)*

THE COURT: All right, counsel.

Judge Smith has informally made a report to me, along with Diane.

Judge Smith, would you remind repeating back to counsel what you had informed me of about an hour and a half ago.

JUDGE SMITH: Your Honor, would you like it on the record, or off the record?

THE COURT: Well, counsel, I'll give you your choice.

Would you like it off the record, first, or on the record?

JUDGE SMITH: I think, it might facilitate communications if it were off the record, initially, your Honor. Then, if necessary, we can always put something on the record later.

THE COURT: Why don't we get consent of counsel.

MGA?

MS. HURST: That's fine. We'll follow Judge Smith's recommendation.

THE COURT: Mattel?

MR. ZELLER: Agreed.

THE COURT: Off the record, Deborah. Rest your hands.

*(Pause.)*

*(At 7:10 p.m., proceedings were adjourned.)*

-oOo-

CERTIFICATE

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date: September 16, 2010

____________________________________

Deborah D. Parker, Official Reporter