1    **UNITED STATES DISTRICT COURT**

2    **CENTRAL DISTRICT OF CALIFORNIA**

3    **SOUTHERN DIVISION AT SANTA ANA**

4    HONORABLE DAVID O. CARTER, JUDGE PRESIDING

5

6

       CARTER BRYANT, an individual,        )
7                                           )
                PLAINTIFF,                   )
8                                           )
            vs.                             ) SACV NO. 04-9049-DOC
9                                           )
       MATTEL, INC., a Delaware             )
10     corporation,                         )
                                            )
11              DEFENDANT.                   )
       _____   )
12     CONSOLIDATED WITH MATTEL, INC., vs.  )
       BRYANT and MGA ENTERTAINMENT, INC.   )
13     vs. MATTEL, INC._____     )

14

15

16              REPORTER'S TRANSCRIPT OF PROCEEDINGS

17                    SANTA ANA, CALIFORNIA

18                  WEDNESDAY, OCTOBER 6, 2010

19                         7:32 P.M.

20

21              **DEBORAH D. PARKER, CSR 10342**
                **OFFICIAL COURT REPORTER**
22              **UNITED STATES DISTRICT COURT**
                **411 WEST FOURTH STREET**
23                    **SUITE 1-053**
                **SANTA ANA, CALIFORNIA 92701**
24                  **(714) 542-8409**
                **D.PARKER@IX.NETCOM.COM**

25

```
1    APPEARANCES OF COUNSEL:

2         FOR THE DEFENDANT, MATTEL, INC.:

3                              MICHAEL ZELLER
                               JOHN QUINN
4                              QUINN EMANUEL URQUHART
                               865 SOUTH FIGUEROA STREET
5                              10TH FLOOR
                               LOS ANGELES, CALIFORNIA 90017
6                              (213) 443-3000

7
          FOR THE INTERVENOR, MGA ENTERTAINMENT, INC.:
8
                               ANNETTE L. HURST
9                              ORRICK, HERRINGTON & SUTCLIFFE, LLP
                               THE ORRICK BUILDING
10                             405 HOWARD STREET
                               SAN FRANCISCO, CALIFORNIA 94105
11                             (415) 773-5740

12                             THOMAS S. MCCONVILLE
                               ORRICK, HERRINGTON & SUTCLIFFE, LLP
13                             4 PARK PLAZA
                               SUITE 1600
14                             IRVINE, CALIFORNIA 92614
                               (949) 567-6700
15
                               WILLIAM A. MOLINSKI
16                             ORRICK, HERRINGTON & SUTCLIFFE, LLP
                               777 SOUTH FIGUEROA STREET
17                             SUITE 3200
                               LOS ANGELES, CALIFORNIA 90017
18                             (213) 612-2256

19

20

21

22

23

24

25
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
 1   SANTA ANA, CALIFORNIA; WEDNESDAY, OCTOBER 6, 2010; 7:32 P.M.

 2                              -oOo-

 3             THE COURT:  We are on the record.

 4             Counsel, if you would be kind enough to make your

 5   appearances this evening.

 6             MR. QUINN:  Good evening, your Honor.

 7             John Quinn for Mattel.

 8             THE COURT:  Pleasure to see you, Mr. Quinn.

 9             MR. ZELLER:  Good evening, your Honor.

10             Mike Zeller for Mattel.

11             THE COURT:  Mr. Zeller, it's a pleasure.

12             MR. MCCONVILLE:  Your Honor, Tom McConville for

13   the MGA parties.

14             MS. HURST:  And Annette Hurst, your Honor.

15             THE COURT:  A coequal pleasure.

16             I want to go through just a number of things.

17             First of all, the status of the Archive One

18   production.

19             MGA informed the court that ILS did not produce

20   the documents obtained from Archive One in a form that MGA

21   can decipher.  But following the parties' meet and confer

22   with Judge Smith and ILS, who have been kind enough to come

23   in this evening, where are we on the Archive One issue?

24             I've been told by the Special Master and by IGS

25   that MGA has approximately 154,000 documents, but their
```

1    belief that once you de-dup, it will be less than 90,000,

2    someplace in that range, a rough guesstimate and that some

3    were already produced and it could be at least another

4    25 percent off.  I'm thinking about rolling production

5    concerning these, but setting a date so I make certain that

6    it's completed by November 10th.  I don't want to get you

7    tied up in Thanksgiving week.

8              If we did that, would that be acceptable?

9              MS. HURST:  That would, your Honor.

10             THE COURT:  So rolling production, cut-off

11   November 10th, so I know you're devoting resources to it.

12   154,000 is a scary number, but it's not with the duping.  We

13   think you're actually going to cut it in half.

14             MS. HURST:  We're hopeful as well.

15             THE COURT:  Is that acceptable, Mr. McConville and

16   Ms. Hurst?

17             MS. HURST:  Yes, your Honor.

18             THE COURT:  Is that -- Mr. Zeller, does this work

19   for you?

20             MR. ZELLER:  Yes, sir.

21             THE COURT:  Mr. Quinn?

22             MR. QUINN:  Yes, your Honor.

23             THE COURT:  Concerning the Larian deposition, I

24   understand that there is an issue during the Larian

25   deposition that came up yesterday.  The parties submitted

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1   briefing regarding Mattel's ability to ask Larian questions
2   about the recently disclosed e-mail communication between
3   Patty Glaser and Isaac Larian.
4           I had ordered a formal briefing, because the way
5   it came to the court was administratively improper.  I would
6   like to see an actual motion, but Mattel needs to file that
7   motion by tomorrow.  You need to identify the questions you
8   want to ask Mr. Larian.  Those questions can be submitted to
9   me in camera if you choose, Mr. Zeller.  And I would like to
10  move on this topic.  It's just in the interest of
11  efficiency, so I look forward to your briefing on this issue
12  by tomorrow at?
13          MR. ZELLER:  5:00 p.m.
14          THE COURT:  5:00 p.m.  And then I'll get that back
15  to you by midnight.
16          Now, concerning the discovery process and a lot of
17  the boxes we have been collecting, some of those the court
18  doesn't need but may need in the future.  So over the
19  discovery process, you submitted dozens of binders of
20  documents for in-camera review.  I have completed those
21  in-camera reviews.  As you've seen, the orders roll out of
22  the court, and I see no need to custodianship of these
23  binders which have accumulated in my chambers and are
24  causing unnecessary clutter.  I can't get from one side of
25  my chambers to the other.

```
 1              So I'm considering asking you to retrieve these
 2    materials which were never filed on the docket, but were
 3    merely lodged with the court.  Now, obviously, these lodged
 4    materials are part of the record.  So, perhaps -- and I'm
 5    suggesting this -- the parties could take an accounting of
 6    the returned documents and file something on the docket that
 7    memorializes the return of these materials.
 8              In addition, I have taken the liberty, I would
 9    like to just, on the record, include a word of praise for
10    the paralegal staff of both firms, and I hope some of you
11    are here this evening.
12              Good.  Excellent.  I personally know that you have
13    worked really hard hours to get these documents to the
14    court -- in fact, all hours of the day and night.  Counsel
15    sometimes, but usually weren't the ones waiting downstairs
16    at 10:00 p.m. in the evening with these boxes, and you were.
17    So I think you rarely receive any kind of public recognition
18    from the court.  This is coequal with both parties, but I
19    want to recognize your willingness to work with this court
20    and some of these insane hours that we are keeping and about
21    to keep.  And I think you have been exemplary throughout the
22    discovery process, so I want that on the record and I want
23    to pay you that compliment.
24              Would you convey that back to your paralegal staff
25    and maybe get a copy for them today?
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
 1              MR. MCCONVILLE:  Yes, sir.

 2              THE COURT:  I appreciate that.

 3              Now, in a moment, we are going to carry out those

 4   boxes, because I have a lot of help this evening.  We are

 5   going to put them in the hallway, and you're going to get

 6   them downstairs, but we're going to come up with an

 7   accounting system -- and you'll be here until we do --

 8   something on the record that helps Kathy and the court keep

 9   track of them.

10              The fourth item this evening, there are few

11   documents that I viewed in camera that Mattel had withheld

12   as privileged.  An order to show cause will issue later this

13   evening that requires Mattel to explain why those documents

14   should not be produced and Mattel can submit its response in

15   camera.  So I need you either available or just start

16   checking your e-mail tonight.  It will come to you before

17   midnight.

18              Pablo Vargas, this was the only issue that the

19   court held in abeyance in its ruling on the omnibus

20   discovery motions.  MGA has sought discovery into the

21   content of Mattel's settlement discussions with Vargas,

22   including Mattel's prior offers to Vargas and the terms of

23   Mattel's settlement with Vargas.  Ordinarily, the court

24   would conclude that the actual text of Mattel's settlement

25   agreement with Vargas was sufficient to put MGA on notice of
```

1    Vargas' potential bias.

2           Otherwise, the court would effectively allow

3    unfettered discovery into every settlement negotiation,

4    indemnification agreement, negotiation and other issues

5    relevant to witness bias.

6           I'm, therefore, tentatively inclined to deny MGA's

7    motion.

8           You have the settlement documents.  You're going

9    to have Vargas.  You're going to have him on the stand.

10           Concerning the discovery into the counterclaims

11    and reply, in the order on the omnibus discovery motions,

12    this court stayed discovery on the counterclaims and reply

13    pending the resolution of Mattel's motion to dismiss the

14    counterclaims and reply.

15           This morning I issued an order granting in part

16    and denying in part Mattel's motion.

17           In fact, actually, it was issued last evening, but

18    you wouldn't have received it until this morning.

19           The order allows MGA to move forward with two of

20    its counterclaims in reply for a violation of RICO and trade

21    secret misappropriation, but the order dismisses MGA's

22    counterclaim for wrongful injunction.  Therefore, it seems

23    appropriate to lift the stay at this time, which I'm doing.

24           However, at the last hearing, I instructed counsel

25    to explain the scope of discovery into the counter claims

```
 1   reply.  In fact, that was the primary reason you were

 2   invited back this evening, Ms. Hurst.

 3           So, specifically, we should reach a full

 4   deposition schedule that provides for a minimal number of

 5   depositions with some document production deadlines, and the

 6   goals is to conduct discovery with expedience and in

 7   anticipation of the November 15th deadline for the filing of

 8   summary judgment motions on the counterclaims and reply.

 9           Now, let me be clear.  I should have given you

10   better guidance.  I need a specific date that this second,

11   if you will, or ancillary discovery motion is going to be

12   heard.  And, therefore, with the briefing schedule, if we

13   were four weeks out, it puts a lot of pressure on all of us.

14   But the November 15th date may only concern the

15   counterclaims and reply.

16           That's the beginning and end of our discussion.

17   You are not going to get a second chance at summary judgment

18   motions that are due to be filed by next Tuesday.

19           Is that clear, Mr. Zeller?

20           MR. ZELLER:  Yes, your Honor.

21           THE COURT:  Mr. Quinn?

22           MR. QUINN:  Yes, sir.

23           THE COURT:  Any miscommunication, Mr. McConville?

24           MR. MCCONVILLE:  No, sir.

25           THE COURT:  Ms. Hurst?
```

1          MS. HURST:  No, sir.

2          THE COURT:  How about December 20th, 2010?  That's

3   a Monday.  It's Christmas week, but I'm trying to get you in

4   the early part of that week and I'm trying to avoid the

5   Jewish holidays or the Christian holidays and that's the

6   only time I can come up with that looks available.

7          Excellent.  Hearing a resounding yes, that will be

8   the date.

9          Thank you.

10          MS. HURST:  Did you mean for hearing on the --

11          THE COURT:  I mean for hearing.  That's the

12   hearing date.

13          It will be set for December 20th.  That way I'm

14   avoiding all the religious holidays.  Nobody is affronted.

15   Nobody at the last moment hasn't observed --

16          I think that concludes it.  I want to thank both

17   of you for coming in tonight.  I thank you very much.  Very

18   helpful.

19          Now, pending discovery disputes, we have a number

20   this evening, and I'm going to start with Mattel's

21   objections to discovery matter Order No. 103.  This concerns

22   the Victoria O'Connor e-mail.  The court has had a

23   consistent concern that allowing discovery into whether a

24   particular document is privileged can set a terrible

25   precedent.  It would effectively allow a litigant to ask the

1   other side whether every single document produced in

2   discovery was a privileged document.

3           Mattel has yet to provide me with a way to limit

4   the precedential impact of such discovery, and I'll allow

5   for Mattel one last chance to do so right now.  Otherwise,

6   the court is ready to overrule the objections.  And for what

7   it's worth, I find that the parties have done a

8   particular --

9           Let's say I'm not as satisfied as I would like to

10  be concerning the briefing of the issue before the Discovery

11  Master in which, frankly, was the reason why I reversed his

12  earlier order.  His errors were directly attributed to the

13  briefing he received, in my opinion.

14          So, Mattel?

15          MR. QUINN:  Your Honor, we're prepared to submit.

16          THE COURT:  MGA?

17          MS. HURST:  Submitted, your Honor.

18          THE COURT:  All right.  Concerning Mattel's

19  objections to Discovery Master's rulings during the Ron

20  Brawer deposition, B-R-A-W-E-R, Mattel argued that the

21  Discovery Master's rulings in the Villasenor deposition were

22  inconsistent with his rulings in the Ron Brawer deposition.

23  However, tentatively, it seems like the difference between

24  the two depositions is that there was a better foundation

25  for the implication of the attorney-client privilege in the

 1   Brawer deposition than there was in the Villasenor

 2   deposition.

 3            So I'll hear comments from either party at this

 4   time.

 5            MR. ZELLER:  Yes, your Honor.

 6            On the particular issue that the court raises,

 7   number one, in fact, there was not an issue regarding the

 8   foundation for the assertion of the attorney-client

 9   privilege in the Sal Villasenor deposition.  Those

10   conversations, in fact, were between company counsel and

11   Mr. Villasenor while he was a Mattel employee.  And,

12   in fact, in all the other places where MGA made efforts to

13   inquire into the substance of those communications, the

14   Discovery Master sustained the instruction not to answer and

15   MGA did not, in accordance with the rules, bring an

16   objection to your Honor.  So those are now final binding

17   instructions, so that's I think point one.

18            Point two is, specifically, in terms of the ruling

19   as to what the subject matter was of those conversations,

20   the Discovery Master said, explicitly, that asking about the

21   general subject matter did not invade the attorney-client

22   privilege itself, because it did not review the contents of

23   the communication.  That's why we thought we were within our

24   rights to inquire, at least, generally speaking, was

25   Mr. Villasenor mentioned.

1          This is in our view a mirror image of what was

2     asked of the Sal Villasenor deposition.  And beyond that, as

3     we point out in the papers, we don't think that that level

4     of inquiry is intrusive of the attorney-client

5     communication.  And as a further point, we made in our

6     papers is, is that Mr. Brawer then later on volunteered and

7     he said, *Well, in any event, I didn't talk with people until*

8     *a certain time about it,* so I think I am entitled to, at

9     least, challenge him on that and ask more pointed questions

10    to examine the veracity of that statement.

11          THE COURT:  Mr. Zeller, thank you very much.

12          Ms. Hurst.

13          MS. HURST:  They got the answer from Mr. Brawer.

14    It was an answer in the negative.  That's not a disclosure

15    of a privileged communication.  And they got the answer, in

16    addition.  So even though there had been privilege

17    assertions ultimately let got an answer.  An attorney was

18    present, capable of cross-examining.

19          There is no inconsistency here with Mr. Villasenor

20    because he had a demonstrated adversity of interest in

21    addition to the other issues.  But, moreover, they didn't

22    appeal or anything else on that.  So, you know, I think the

23    Discovery Masters have done an extraordinary job trying to

24    remain even-handed in all these deposition.  There is a

25    distinction here.

```
 1              And I would finally note, your Honor, that with
 2     respect to the implied waiver argument, it really is MGA's
 3     knowledge that matters and knowledge that was acquired in
 4     the course and scope of employment for MGA.  All this
 5     examination was regarding information Mr. Brawer received in
 6     the course and scope of his employment as a Mattel employee,
 7     not a MGA employee.  And so, it's mixing apples and oranges
 8     here.
 9              I'll submit on that.
10              THE COURT:  Okay.  Anything further by either
11     counsel?
12              MR. ZELLER:  So it's clear, we are not attempting
13     to make an issue out of the Discovery Master rulings per se
14     as being inconsistent.  The point is is that MGA took a
15     position in the Sal Villasenor deposition on which it
16     pervailed.  That is judicial estoppel of MGA.  It's not
17     intended as a criticism at all of the Discovery Masters and
18     certainly we believe that they have acted appropriately.
19     That is not the issue here.  This is MGA, in our view,
20     taking different positions and we think we are entitled
21     under the law to a different ruling.
22              I would also point out that with respect to the
23     idea that Mr. Brawer, because he acquired the knowledge as a
24     Mattel employee, that that, obviously, goes to the substance
25     of the merits of the case.  But we're certainly entitled to
```

1    know what the facts are before we get to that argument in

2    the first place.  But, obviously, I would even submit this

3    way which is, of course, the fact that MGA is trying to make

4    that argument; namely, that what Mr. Brawer himself had

5    actually knowledge of should not be imputed to MGA.  It

6    makes it all the more imperative that I would be allowed to

7    actually fully cross-examine Mr. Brawer as to when he

8    disclosed those facts to MGA.

9                THE COURT:  Ms. Hurst?  Mr. McConville?

10               MR. MCCONVILLE:  Submitted, your Honor.

11               THE COURT:  Okay.  Before I move back to the

12   critical question this evening concerning what additional

13   depositions and what the time frame is, I have one -- well,

14   maybe two matters:  Concerning Mattel's motion for

15   protective order as to MGA's fifth notice of deposition, I'm

16   tentatively inclined to grant this protective order in its

17   entirety.

18               The September 17, 2010 order by this court I

19   thought was very clear that MGA could not seek discovery

20   about every single incident in which a Mattel employee

21   entered a competitor's showroom.  I issued that ruling out

22   of an interest in maintaining some symmetry since I had

23   restricted Mattel's earlier attempts to retain discovery

24   into MGA's relationship with non-Mattel employees.

25               MGA's notice of deposition seeks discovery into

1    all acts by Mattel's market intelligence group, so let me

2    hear one more time from each of the parties on that, and why

3    don't I begin with MGA.

4            MS. HURST:  I understand we haven't filed a brief

5    on this yet, your Honor; but if you want, we'll address it

6    this evening.

7            THE COURT:  You might as well start.

8            MS. HURST:  Your Honor, the notice was served

9    before the court's order of September 17th, just to be

10   clear.  But here's the main concern we've got.  And I want

11   to hand up a document to the court, if it's all right.  I've

12   previously provided this to Mr. Zeller.

13           THE COURT:  Great.  Thank you.

14           MS. HURST:  The document I've handled up is

15   M1A26834 through 6846.

16           You didn't keep a copy?  Do you need another one?

17           MR. ZELLER:  I believe I gave you that document

18   back.  This is what we were talking about in the conference

19   room?

20           MS. HURST:  It was.

21           So here's the problem that we have.  This is a

22   document that was first produced by Mr. Villasenor.  And

23   after Mr. Villasenor produced it, we got a copy from Mattel.

24           Now, this is a document that is basically a how to

25   manual on how to sneak your way into showrooms and the

17

```
 1    various sorts of things that you need to do in order to

 2    accomplish this effectively.

 3              So on the page ending 836 --

 4              THE COURT:  Just a moment.

 5        (Pause.)

 6              THE COURT:  Thank you.

 7              MS. HURST:  Under "Nuremberg Toy Fair":  It's best

 8    to go as a U.S. retailer, since you will not be asked as

 9    many questions.

10              And under E-3, they recommend go as media, and --

11              THE COURT:  Just a moment.  I see "Nuremberg Toy

12    Fair."

13              MS. HURST:  Then, there's the line "other."

14              THE COURT:  It's best to go as a U.S. retailer.

15              Now, you refer to -- after that?

16              MS. HURST:  And then, down below E-3, again

17    there's an "other" line.

18              THE COURT:  Oh, thank you.

19              MS. HURST:  It's best that you go to E-3 as media.

20              THE COURT:  Okay.

21              MS. HURST:  And then, if you turn to the next

22    page, your Honor, the page ending 837, What you need --

23              THE COURT:  Okay.

24              MS. HURST:  Get your business cards.

25              THE COURT:  Okay.
```

1          MS. HURST:   *A carrying case for all the catalogs*

2     *and price lists.  Proof of your business.*

3          Now, this is the fake business that they've made

4     up, going in and representing themselves -- misrepresenting

5     themselves as retailers.

6          *Here are the documents you need:  A resale tax*

7     *certificate or business license for an industry-related*

8     *business.  Industry-related business advertisement.*

9     *Invoices.*

10         And, now, this is truly remarkable:  *Invoices.*

11    And in the last paragraph:  *Contact someone in the accounts*

12    *payable retailer invoicing department to have them proctor*

13    *an invoice with your company name on it.*

14         I guess that was supposed to be "doctor."  And it

15    goes on:  *How to build up your profile of your fake*

16    *retailers so that you can succeed in getting this*

17    *information.*

18         THE COURT:  Where are you reading from now?

19         MS. HURST:  The next page, your Honor.

20         THE COURT:  838?

21         MS. HURST:  Yeah.  *What to know*.

22         THE COURT:  Okay.

23         MS. HURST:  *Think about what you are going to say*

24    *your fake business is about before you get there.  Size of*

25    *your store.  What do you sell?  How many employees?  Where*

*is it located?  How many stores you have?  Get it all*

*planned out in advance.*

And then, your Honor, at the page ending 840:  *How*

*to handle the business cards.  Use your home address.  Put*

*down your home phone or make up a fake number.  Don't put*

*down your Mattel number.*

THE COURT:  Okay.

MS. HURST:  So the problem that we have is that

this is one of many documents of general application

regarding this problem.  It doesn't say anything about MGA

on it, but is clearly relevant to MGA's claim.  And the

distinction that the court has drawn, you can only go after

if it concerns MGA, we're concerned has been used by Mattel

to withhold documents of general application, such as this

one that I've been showing the court.  For example, we did

not receive this until Mr. Villasenor produced it.

And so, we understand the court's concern that it

doesn't want to let us get into wholesale discovery

regarding the whole industry and we'll agree to disagree

about that.  But somehow we have to get at these documents

and instructions of general application, both because they

are directly pertinent to MGA, but, frankly, your Honor,

also because under Federal Rule of Evidence 406, the pattern

proves -- assists us in proving particular instances with

respect to MGA.

1           THE COURT:  Okay.  Mr. Zeller?  Mr. Quinn?

2           MR. QUINN:  Mr. Zeller.

3           MR. MCCONVILLE:  First, what, of course, MGA is

4    complaining about is a document that they have.  They have

5    tried to suggest that somehow Mattel was withholding it and

6    didn't disclose it until Mr. Villasenor did.  In fact, they

7    were produced more or less contemporaneously.  So that's

8    just simply an exaggeration to suggest that somehow these

9    documents were being withheld.

10          Number two, we have investigated as to whether

11   these other circumstances exist, like invoices and the like,

12   and we have not found anything.  If we find such things, we

13   will certainly produce that.  We have made that very clear

14   to MGA.  So the idea that this is a conspiracy in which

15   things are being withheld is simply incorrect and it does

16   not in any event suggest that the court was wrong in

17   uncapping everything which MGA appears to be essentially

18   suggesting.  Because while Ms. Hurst says that that's not

19   what they want, or at least they are not challenging that,

20   she doesn't offer anything that's really an actual

21   principled distinction.

22          Number two, what I would point out, your Honor,

23   is, is that in some ways I almost feel like I'm undermining

24   myself by making these arguments and trying to restrict

25   discovery on this.  And the reason is, is that while you've,

1    of course, heard a fair amount of rhetoric from MGA over the

2    past weeks about how there is this horrific plot of stealing

3    information from Toy fairs and the like, actually, MGA

4    recently produced documents showing that it did so as well.

5              And what's also remarkable about that --

6              THE COURT:  This will be a remarkable trial.

7              MR. ZELLER:  It absolutely will be.

8              What's particularly amazing about it is, is that,

9    well, MGA, of course, has pointed out about how supposedly

10   Mattel which, of course, consistently objected and said,

11   *We're not going to produce this stuff.*  And they never moved

12   to compel.  MGA, of course, says this has been at issue for

13   years.  Well, they produced a document from February 2008,

14   and they produced it only in the last month or so, along

15   with a million other pages.  And it shows that MGA personnel

16   got into Mattel's booth at Nuremberg Toy Fair in 2008 and

17   took a bunch of information and wrote a report.  It uses

18   code.  It uses all the kinds of nefarious things that MGA

19   has been up here complaining about now for weeks.

20             What is also fascinating about this episode is, is

21   that not only was this belatedly produced but MGA refuses to

22   produce other documents relating to this episode.

23   Mr. Larian, who is on this e-mail, when I asked him about it

24   yesterday, said he had no idea, and he was the 30(b)(6).

25             So MGA, apparently, has been engaged in this

1    conduct as well.  So to the extent that MGA is really making

2    some argument about it should be uncapped and applies to all

3    instances of sneaking into toy fairs with competitors, that

4    obviously should apply to MGA as well.

5          I also point out something else, which is probably

6    another reason why the competitors, which MGA professes to

7    be acting on behalf of for this, are not complaining, is

8    that there is another document that was recently produced of

9    MGA and Hasbro acting together to steal information out of a

10   Mattel showroom at Paris Toy Fair.

11         So, you know, your Honor, this is a situation

12   where -- I mean, frankly, the rhetoric that MGA has been

13   using in this circumstance is pretty remarkable, given the

14   fact that MGA, itself, is now being revealed to have engaged

15   in the same behavior and has not produced in the discovery

16   that we should be getting on these episodes which, you know,

17   I'll obviously at some point, I hope, have an opportunity to

18   talk about the discovery that we propounded as well as the

19   deficiencies of Mr. Larian's testimony from yesterday.  But

20   I think that these are interrelated.

21         I do think -- just to go back to the original

22   point, I do think the court was right in saying, *Why open it

23   up for every other competitor, Hasbro, Leapfrog and the 35,

24   45* -- of whatever that number is -- *of what it is that MGA*

25   *claims should be at issue?*

```
 1              But, again, to the extent the court is even
 2     inclined to do that, it should obviously be two ways.
 3              THE COURT:  Counsel, Ms. Hurst?
 4              MS. HURST:  May I have the document you were
 5     quoting from?
 6              THE COURT:  The one you were waving in the air.
 7              MR. MCCONVILLE:  Oh, sure.  They already have
 8     this.
 9              I asked Mr. Larian about it for 45 minutes
10     yesterday.
11              MS. HURST:  May I hand this up to the court?
12              THE COURT:  Sure.
13         (Pause.)
14              THE COURT:  Go ahead.
15              MS. HURST:  Given that Mr. Zeller's comments are
16     on the record and that this case is widely --
17              THE COURT:  We are back on the record.
18              MS. HURST:  Your Honor, I've handed up the first
19     document that Mr. Zeller referred to.  The court will notice
20     it.  It is actually from an employee of a company called
21     Zapf.  Zapf is a German public company.  It is not MGA.
22              THE COURT:  Why is it addressed to Mr. Larian?
23              MS. HURST:  Because Mr. Larian -- because MGA and
24     Zapf have a distribution relationship and Mr. Larian owns
25     shares in Zapf.
```

1          THE COURT:  So it says:  *Two of our colleagues*?

2          MS. HURST:  Right.  At Zapf; right?

3          And Mr. Larian was asked about this.  And he said,

4   *I don't know who these people are at Zapf, and I don't know*

5   *what they did.*

6          That is not a refusal to provide discovery.  Nor

7   is it a refusal to provide any documents.  We haven't

8   refused to provide any documents.

9          When we get to the discovery on the counterclaims

10  and reply, we've resolved the document issues.  So it's very

11  canny of Mr. Zeller to find one piece of paper in the

12  haystack sent by somebody outside of MGA to MGA, which is

13  what this Hasbro thing is as well and try to make that the

14  equivalent of Mattel systematically defrauding the entire

15  industry out of their confidential information for a period

16  of 18 to 20 years.  Well, it's not the equivalent.  And just

17  because he throws something up against the wall like this

18  does not mean that we are not entitled to the discovery on

19  these allegations.

20          It is going to be an interesting trial.  There are

21  a number of topics in the notice that are pertinent to MGA

22  that are topics of general application.  And they don't have

23  anything to do with specific other competitors.  Who got

24  into the library and assessed this stuff and what did they

25  use it for?

 1            There is no way that we can show the use of our

 2    trade secret information without finding out these topics.

 3    We know they had it.  We know they widely distributed it.

 4    They have certainly taken enormous amounts of discovery on

 5    how we purportedly used their so-called trade secrets, and

 6    now we're just looking to do the same.

 7            Use?  What did they do after they found out about

 8    this?  Did they have an investigation?  Did they stop it?

 9    Are they going to rely on some kind of an investigation in

10    defense of their trade secrets claims?

11            If so, we are entitled to that.  These are topics

12    directly pertinent to MGA's claims.

13            Your Honor --

14            THE COURT:  Just a moment.  Off the record for a

15    moment.

16        *(Discussion held off the record.)*

17            MS. HURST:  So, your Honor, for example, a topic

18    of general application that is pertinent directly to MGA's

19    claim is 16, Mattel's knowledge of the practices of the

20    market intelligence group, including the knowledge of the

21    senior executives.

22            Now, you've heard Mr. Quinn.  We have had a couple

23    of arguments on this already, and he has come in and said,

24    *Low-level employees acting without authorization.*

25            MR. ZELLER:  I never said that.

1          MS. HURST:  I'm quite sure he did, but the

2     transcripts will bear us out on that.

3          You know, if they are going to come in here and

4     claim that this spy ring was low-level employees acting

5     without the knowledge of any executives and they shouldn't

6     be held responsible for it, then this is directly relevant.

7     It's not, you know, some topic related to Hasbro or other

8     competitors, or anything like that.

9          So there are topics in the notice.  They are not

10     directed to other competitors and are topics of general

11     application directly related to MGA's claims.

12          Thank you, your Honor.

13          THE COURT:  Okay.  Mr. Zeller.

14          MR. ZELLER:  I would note that she didn't even

15     attempt to mount any defense about the theft from Paris Toy

16     Fair by MGA and Hasbro.  But, also, I would note that it's

17     kind of funny about how tempting to distance MGA from this

18     e-mail which Mr. Larian received.  He tried to point out

19     that he was merely a cc on this.

20          THE COURT:  Remember this.  I'm not going to be

21     able to help either one of you with the answers you get.

22     Your positions have already been, *Judge, we didn't get an*

23     *answer so we need more.*

24          My response is:  *No, you don't.*  That's the answer

25     you got.

1          And Mr. Larian or Mr. Eckert can get up in front

2    of the jury and explain their answers to the jury.  It will

3    be hilarious.  I'm not concerned about giving you any more

4    time on that.

5          MR. ZELLER:  That's not what -- I'm just pointing

6    out that it's somewhat analogous.

7          The other people on this e-mail, though, are

8    people like Thomas Pfau.  He was the head of MGA Germany.

9    Angelica Sternberg, the one who sent the e-mail, was the

10   head of marketing for MGA Germany.  So these are not

11   strangers.  They are not people unaffiliated.

12         THE COURT:  And, of course, what do you want to do

13   with them?

14         Depose them?

15         MR. ZELLER:  Yes.  I'm absolutely getting to that.

16         THE COURT:  I'm not concerned, quite frankly.

17   Because MGA or Mattel is going to look awfully idiotic in

18   not bringing those people to court.  You've got damaging

19   information on both sides and you both could have lived with

20   it.

21         MR. ZELLER:  Right.  And one reason I would say

22   is, is that, of course, MGA has been permitted to depose a

23   number of people on these exact issues.  I have been given

24   Mr. Larian for part of a day.  That's really the extent of

25   the depositions we have been afforded this.

1    Mr. Larian went out of his way to speculate about

2  things like, *Well, we don't know exactly how they got in*

3  *there,* as if somehow Mattel would be warmly inviting MGA

4  personnel --

5    THE COURT:  I can see we're going to need a lot of

6  time on depositions and designating, aren't we?

7    Aren't we going to need a lot of time designating

8  different depositions and going through impeachments, so I'm

9  prepared so that when you say, *The deposition of January*

10  *18th of 2008*, or -9, or -7, or whatever, that I'm able to

11  make a ruling?

12    Okay.  What do you want to do with all this?

13    MR. ZELLER:  Well, first, of course, I want to

14  point out, as I was saying, to the extent that they are

15  going to make successfully an argument, that discovery ought

16  to be broadened into this then, obviously, it needs to be

17  broadened against them.

18    Going on to the deposition issue, yes, I have

19  provided some names to MGA of people who we believe, based

20  on their de minimis document production so far, revealing

21  for the first time --

22    THE COURT:  Let's short-circuit this.  That's what

23  the evening is all about.  Each of you were supposed to give

24  me concrete --

25    So let me see them.  In other words, we are

1   wasting time.

2          MR. MCCONVILLE:  Your Honor, with regard to the

3   depositions, what we had discussed was a limitation of 25

4   hours to be used by the parties as --

5          THE COURT:  How many people?

6          MR. MCCONVILLE:  Up to four people.

7          THE COURT:  Four people, 25 hours.

8          MR. MCCONVILLE:  Total.

9          THE COURT:  Now, had you reached that agreement?

10          MS. HURST:  We're not sure.

11          THE COURT:  Well, go over in the corner and talk.

12   Let's find out.

13      *(Pause.)*

14          MR. MCCONVILLE:  Your Honor, there was one -- that

15   is the agreement with the following understanding.  There

16   were depositions that had been conducted during the prior --

17   prior to the close of discovery in the other -- as of

18   October 4.  The parties, you know, for example, they may

19   seek additional time with the 30(b)(6) related to a notice

20   that applied prior to October 4th.

21          THE COURT:  Let's make this very simple.  You two

22   are both agreeing to 25 depositions.

23          MR. MCCONVILLE:  No.

24          THE COURT:  No, I'm sorry.  25 hours, up to four

25   people to be deposed?

1        MR. MCCONVILLE:  Within those 25 hours.

2        THE COURT:  Within those 25 hours on this new

3   issue or old issue, new/old issue involving sneaking into

4   each other's showrooms.

5        MR. MCCONVILLE:  Correct.

6        THE COURT:  Simple as that; right?

7        MR. ZELLER:  With the understanding that the

8   30(b)(6) issues which already exist are separate from that

9   understanding.

10        THE COURT:  I've got that.  Now, write that down

11   on a piece of paper.

12        MR. MCCONVILLE:  I'm sorry, your Honor.  One --

13        THE COURT:  Write that down on a piece of paper.

14        *(Pause.)*

15        THE COURT:  Off the record for a moment.

16        *(Pause.)*

17        THE COURT:  We are back on the record.

18        Counsel.

19        MR. ZELLER:  So the agreement that the parties

20   have reached as reduced to writing reads that *The parties*

21   *agree to an additional four fact depositions and any new*

22   *30(b)(6) deposition for a total of no more than 25 hours.*

23        THE COURT:  Does that include the new 30(b)(6)

24   deposition?

25        MR. MCCONVILLE:  Yes.

1          MR. ZELLER:  Yes.  *On the counterclaims and reply*
2  *with the understanding that this does not apply to the*
3  *previously served 30(b)(6) notices or any remaining number*
4  *that the parties may have of unused depositions from*
5  *Discovery Order No. 99.*
6          THE COURT:  Mr. McConville, stipulated to by and
7  on behalf of MGA?
8          MR. MCCONVILLE:  Yes, sir.
9          THE COURT:  On behalf of Ms. Hurst of MGA?
10         MS. HURST:  Agreed.
11         THE COURT:  Mr. Quinn?
12         MR. QUINN:  Yes, your Honor.
13         THE COURT:  Mr. Zeller?
14         MR. ZELLER:  Yes, sir.
15         THE COURT:  Would you be kind enough to bring that
16  up to Kathy.
17         We don't even need that in proper form.
18         MR. ZELLER:  More or less illegible, but --
19         THE COURT:  All right.  What's the next order of
20  business tonight?
21         MS. HURST:  Can we say which depos we want and
22  make that as part of the record as well?
23         THE COURT:  Certainly.  Because we need to get
24  this up to Special Master Robert O'Brien, so I would
25  appreciate knowing.  By the way, he indicated to me Monday

```
 1   evening when we were enjoying each other's company that he

 2   was going to hold a meeting in Los Angeles amongst all of

 3   you and work out at least the schedule for the experts.

 4              Has that occurred yet?

 5              MS. HURST:  We worked it out on our own, I think.

 6              THE COURT:  Well, you might inform --

 7              MS. HURST:  Actually, no, wait.  I'm sorry.

 8              MR. ZELLER:  Where it was the further discussion

 9   yesterday with Mr. O'Brien is that the parties are compiling

10   their lists and we will provide a joint schedule to the

11   Discovery Master for his, you know, review, inputs,

12   comments, whatever one wants to call it.

13              THE COURT:  When?

14              MR. ZELLER:  I don't know that we had a firm

15   deadline for Mr. O'Brien.  Right now, the parties are trying

16   to figure out which experts they are going to be relying on.

17   But I think if we discuss it with MGA, we can come up with a

18   date certain by which that can be provided.  But I think

19   because, of course, everyone is still figuring out what

20   experts they want to rely on, it's not entirely set yet.

21              MS. HURST:  We have -- our view is, we don't need

22   Discovery Master O'Brien at the expert depositions.  I don't

23   know if that's Mattel's view as well.  But if that's our

24   view, I think that was the reason he wanted the schedule is

25   just for his own purposes.
```

1      THE COURT:  I'm not requiring it.  But what I

2 don't want is a last moment hiccup, because that's --

3      MS. HURST:  I just can't imagine we need it for

4 expert depositions, your Honor.

5      *(Telephonic discussion.)*

6      THE COURT:  Robert, how are you doing?

7      Listen, I'm in court tonight with my favorite

8 attorneys in the whole world, and --

9      You don't have to put this on the record.

10      *(Pause.)*

11      THE COURT:  Listen, I've already put this on the

12 record; and that is, I had stated that I wanted a word of

13 praise for the paralegal staff of both law firms.  I know

14 how hard counsel are working, but I personally know how hard

15 it is to get these documents to the court at all hours of

16 the day and night.

17      And you've been waiting downstairs at 10:00 p.m.,

18 more evenings than you could probably count with these

19 boxes.  I think we're up over 200 now.  In fact,

20 Judge Kozinski, I think, was rather floored when he called

21 for briefing and backed off very quickly, just wanted

22 summary judgment motions for phase one.

23      I don't think you received enough public

24 recognition as the staff for counsel.  And I put on the

25 record that I really appreciated your willingness to work

1    these hours with the court.  It's been exemplary throughout

2    this discovery process.

3            I think things will calm down a little bit once we

4    get into trial for you, but I don't think it will for the

5    attorneys.  I think that they are going to be very, very

6    tired.  Right now, they feel pretty good.  But for you, I

7    think things will get a little bit better for the paralegal

8    staff.

9            But that's on the record.  I made that for both

10   sides, and I didn't see you here, but the record reflects

11   that.

12           All right.  Now, is that signed by all parties?

13   Now, at some point, I'll let you go, just because of the

14   briefing.  You've got 100 pages on the summary judgment.

15   That's where your focus should be.  That's critical.

16           Signed?

17           MS. HURST:  Yes.

18           THE COURT:  How many attorneys signed it?

19           MS. HURST:  Two.  Is that okay?

20           THE COURT:  That's fine.

21           Give that to Kathy.

22           Okay.  Then, why don't we do this:  Finally, tell

23   me this evening, how we are going to set up a tracking

24   system so I can return the in-camera materials to the

25   respective sides and you can pick them up tomorrow?

1      I think we are going to unload about what?  About
2 25, 30 boxes.
3      MS. HURST:  I think we should have evidence
4 receipts and that we should tape the boxes and put the
5 evidence receipts on the top.
6      THE COURT:  And then, keep them in the respective
7 offices.
8      MS. HURST:  And keep them in our respective
9 offices intact.
10      THE COURT:  Mr. Quinn?
11      MR. QUINN:  Sounds good, your Honor.
12      THE COURT:  Come up with a procedure.  Write it
13 down on a piece of paper.  Sign and give it to me.
14      Unless you have anything further, I'll let you go
15 this evening because those summary judgment motions are
16 looming.
17      I've got a matter with a couple other counsel that
18 may take anywhere from five minutes to a couple of hours.
19 But when I'm done with them, I'll get this out before
20 midnight, or after midnight tonight.
21      MR. MCCONVILLE:  Your Honor, there was a couple of
22 other issues.
23      One of them was you had suggested a tentative on
24 the draft settlement agreements of Vargas.  I didn't know if
25 you wanted to hear any argument on that, or no.

 1          THE COURT:  Certainly.  I would be glad to.

 2          MS. HURST:  I also, your Honor, as one other

 3  matter to put our deponents on the record and ask for

 4  special permission regarding service of one of them.

 5          THE COURT:  Why don't I just throw the lectern

 6  open to you in a few moments, as soon as you get signed off

 7  on the process and procedure.

 8          One thing is, I want the boxes carried down or

 9  taken down in small groups.  The elevator tiles get broken

10  when we bring up too many.  I normally wouldn't care, but

11  it's part the courthouse.

12          MR. MCCONVILLE:  Did you envision we get them from

13  your chambers?

14          THE COURT:  No, I'm just going to dump them in the

15  hallway when it's time.  I want you here at the same time.

16  It's going to be sitting right out in the hallway.

17          Counsel, are there remaining matters on behalf of

18  MGA?

19          MS. HURST:  Yes, your Honor.  We just wanted to

20  put on the record the names of the witnesses that we

21  intended to depose pursuant to the stipulation and make a

22  special request with respect to one of those witnesses:  Joe

23  Franke.  "Frank" with an "E."

24          THE COURT:  Joe Franke.  Okay.

25          MS. HURST:  A 30(b)(6) to authenticate the

1    document that I handed up during tonight's argument and ask

2    appropriate follow-up questions regarding its use and so

3    forth.

4                THE COURT:  Regarding?

5                MS. HURST:  Its use.

6                THE COURT:  Okay.

7                MS. HURST:  Carey Plunkett, C-A-R-E-Y

8    P-L-U-N-K-E-T-T.

9                THE COURT:  Thank you.

10               MS. HURST:  Shelley Leibovitz, formerly known as

11   Michelle McShane.  That's the one that has the special

12   request, and I'll make it as soon as I finish my --

13               THE COURT:  How do I spell "Leibovitz"?

14               MS. HURST:  I believe it's L-E-I-B-O-V-I-T-Z.

15               THE COURT:  And those are your four?

16               MS. HURST:  One more because the 30(b)(6) didn't

17   count pursuant to the stipulation.  Brian Stockton.

18               THE COURT:  Okay.  The special request from

19   Shelley Leibovitz, also known as Michelle McShane?

20               MS. HURST:  Our understanding is based on our

21   private investigator's activity and reports is that

22   Ms. Leibovitz has no permanent residence address.  She, we

23   understand, changed her name in order to avoid creditors,

24   and she has a para pathetic existence house-sitting for

25   people on Facebook.

1        We have made many efforts to serve her with a

2    subpoena over the course of the last six months.  She is a

3    person who is first involved in the investigation of Bratz

4    in the early 2002 time period within Mattel.

5        THE COURT:  Okay.

6        MS. HURST:  And we learned on Monday night that

7    her hard drive was not preserved and we really we need to

8    depose her.

9        THE COURT:  Okay.  What's the request?

10       MS. HURST:  So I would like to request

11   authorization to serve the subpoena on her by electronic

12   means.  I would like to -- I don't know exactly what those

13   are going to be yet.  I don't know if we have a verified --

14   reasonably verified e-mail address, or if we're going to use

15   her Facebook account, or some other --

16       THE COURT:  Why don't you get that request to me

17   in written form so I can look at it and do the research

18   sometime today or tomorrow.

19       MS. HURST:  All right.  We will.

20       THE COURT:  Get it to me by tomorrow.  By tomorrow

21   at 4:00 o'clock.

22       Counsel -- any other arguments on any other issues

23   on behalf of MGA?

24       MR. MCCONVILLE:  Yes, sir.

25       With regard to the Vargas settlement, to be clear,

```
1    your Honor, we aren't seeking drafts of settlements back and
2    forth.  What we are seeking are draft statements that were
3    exchanged between Vargas on one side and the statements with
4    Mattel.  So we aren't seeking settlement drafts back and
5    forth.  We are seeking what would be potentially the
6    testimony of someone, which has been shaped over the course
7    of the negotiation, who was charged with a crime down in
8    Mexico, who then had his Mexican charges dropped because of
9    the statement he was willing to make.
10            So we believe that that evidence would be critical
11   for all sorts of purposes at trial, as it relates to
12   Mr. Vargas to prove that the shaping of his testimony, not
13   the final version, but the shaping of his testimony over
14   time.  That's why we want those documents.
15            THE COURT:  Any other issues that MGA wants to
16   bring up this evening?
17            MS. HURST:  Let me check with Mr. Zeller whether
18   we have an agreement on something.
19        (Pause.)
20            MS. HURST:  We have one additional issue, your
21   Honor.
22            THE COURT:  Okay.  Counsel.
23            MS. HURST:  Your Honor, we learned for the first
24   time on Monday night that Mattel is employing an e-mail
25   archiving system called the Enterprise Vault.
```

```
 1              Judge Smith had previously issued an order for

 2    identification of all sources of e-mail for Mr. Eckert and

 3    despite the testimony of Mr. Mattel's 30(b)(6) witness on

 4    Monday night that Enterprise Vault contains Eckert e-mail,

 5    that source was not identified in response to that

 6    certification.

 7              THE COURT:  I'm going to hear from Mr. Zeller.

 8              Mr. Zeller.

 9              MR. ZELLER:  Your Honor, in fact, what

10    Judge Smith's order required was the disclosure of all

11    sources of archived or backed-up e-mail.  The Enterprise

12    system that is being referenced here is a live system.  It

13    is not -- there was a list of archive materials.  The live

14    system is the live system.  And, in fact, while MGA says

15    that it didn't know, the fact is that this has been

16    mentioned in prior discovery, the existence of this system.

17              I also will point out, of course, that we, Mattel,

18    have been trying to get the Archive One discovery since

19    January.  It's been ordered since January.  That somehow MGA

20    should be allowed then to mine new areas of e-mails where,

21    first of all, we have done searches on them and have

22    produced from it and number two, basically, extend the

23    discovery one way --

24         (Telephonic discussion.)

25              THE COURT:  Dave, hold on a second.  I want you to
```

 1    listen to this argument about the archive system, Enterprise

 2    Vault, for a moment.

 3              Okay.  Hold on.

 4              MS. HURST:  So, your Honor, I had a request or

 5    proposal.

 6              THE COURT:  Just a minute.  Jim, can you hear me?

 7        *(Telephonic discussion.)*

 8              THE COURT:  Ms. Hurst, would you repeat your

 9    argument to me so Judge Smith, my Special Electronic Master,

10    can hear this?

11              MS. HURST:  Yes.  We actually discussed this --

12              THE COURT:  Can I hear your argument again,

13    please?

14              MS. HURST:  Your Honor, for the first time on

15    Monday night and Mattel's 30(b)(6) deposition --

16              THE COURT:  Jim, can you hear this?

17              MS. HURST:  -- of topics three to five regarding

18    the search for collection and preservation of documents in

19    the case, we learned that Mattel is employing a system

20    called the Enterprise Vault.  It is some kind of an e-mail

21    storage system.  And as a result of learning this for the

22    first time on Monday night, we have concerns.  One of the

23    concerns is that this system was not identified as a source

24    of e-mail for Eckert in response to the court's order that

25    sources of e-mails for Mr. Eckert be identified.  We are

1    concerned about whether it's been adequately searched.  And

2    we have a request that we would like to make in that regard.

3              We would like is a certification -- well,

4    actually, what we would like for ILS to supervise a search

5    to ensure that Carter Bryant has been searched on in this

6    e-mail archive.  That's the only archive-wide search that we

7    are requesting.  And then, we would like the opportunity to

8    do something similar to what Mattel did with respect to

9    Archive One.  We would like to have a certain number of

10   custodians.  We would like Mattel to tell us what the date

11   ranges of media are in the archive with respect to those

12   custodians.  And then, if it appears to us that that is a

13   pertinent date range for the subject matter of the case, we

14   would like an opportunity to have search terms run with

15   respect to those custodians.

16             THE COURT:  Thank you.  Mr. Zeller.

17             MR. ZELLER:  First of all, the system was

18   disclosed to MGA literally years ago.  It was mentioned in

19   prior depositions.

20             Number two, the order that Ms. Hurst is

21   referencing as for the identification of archives sources of

22   Bob Eckert's e-mails, this system is a live system for

23   Mr. Eckert.  So the idea that somehow it was only recently

24   revealed is simply incorrect.

25             Number three, this is effectively an argument or a

1    motion on MGA's part to reopen discovery.  Discovery is

2    closed.  The court is well aware of the travails that we

3    have had to suffer getting MGA's electronic documents,

4    including, in particular, Archive One, which was ordered to

5    be produced back in January and which we still don't have.

6    And the court, in the interest of, obviously, economy, time

7    constraints and a variety of other things, narrowed what it

8    is that is being provided to us with respect to Archive One.

9    The idea that somehow this should now be opened up one way

10   against Mattel is, I think, completely unwarranted.

11   Moreover, what Ms. Hurst fails to disclose to the court is,

12   in fact, we did search and produce documents out of this

13   system.

14            So, again, this is literally something where MGA

15   is now asking for entirely -- to basically reopen discovery.

16            The last point I would make is, is that the idea

17   that we are supposed to run a search after the close of

18   discovery for Carter Bryant, the court will recall that just

19   a few days ago when Mattel came and complained to the court

20   that MGA had not searched and used the search terms "Carter"

21   or "Bryant" for people like Paula Garcia, the people who

22   were actually involved in Carter Bryant going over to MGA,

23   that they never even ran that search against their

24   electronic media and now Mattel is supposed to run it?

25            I mean, frankly, again, your Honor, we are in a

```
 1   situation that if this is -- if this is granted, it needs to
 2   be two ways.
 3            I mean, I honestly think that, really, the way
 4   that this needs to be dealt with is for MGA to make a formal
 5   motion to reopen discovery so we can make a cross motion.
 6            THE COURT:  Jim, I'll talk to you, okay?
 7            I wanted you to hear that.  Thanks a lot.
 8            SPECIAL MASTER:  Do you want me to hang on?
 9            MS. HURST:  Your Honor, may I respond to a couple
10   of --
11            THE COURT:  Just a moment.  I'm going to hear a
12   response and then our conversation will make sense.
13            I'll give you a call later tonight or tomorrow.
14            Hold on.  We got one more argument.
15            MS. HURST:  It is not true that this system was
16   identified as having been implemented in prior testimony.
17            THE COURT:  Can you hear that, Jim?
18            SPECIAL MASTER:  I cannot hear this one.
19            THE COURT:  Speak up now.
20            MS. HURST:  It is not true that this system was
21   identified as having been implemented in prior testimony.
22   In the 2007 deposition of Kawashima as a 30(b)(6) witness,
23   he discussed the possibility that Mattel might implement
24   this system.  He said it cost $900,000, and they didn't have
25   it in their budgetary authority, and he didn't know whether
```

1    it would be implemented.

2           In no discovery response since 2007 has this thing

3    been identified.

4           Now, we have, as well be addressing in motions to

5    compel relating to that deposition for Monday night, before

6    the court at least a *prima facie* case of suppression of

7    evidence.  There is no way, reasonable way to explain what

8    has happened with respect to this Villasenor evidence in

9    this case.

10          Now, is "Carter Bryant" the right search to run?

11   We ran "Bratz."  That's what you would expect to find in the

12   right time frame in MGA's archives.  You wouldn't expect to

13   find "Bratz" prior in the early period in their archive.

14   What you would expect to find is "Carter Bryant."

15          So that is the equivalent search to what we ran on

16   an archive-wide basis.

17          Now, I mean, I'm trying not to be hyperbolic about

18   the fact that there is an entire media source in their

19   custody that we never previously been apprised of, but this

20   is a very disturbing development.

21          THE COURT:  Thank you.  Counsel, on behalf of

22   Mattel?

23          Last argument.

24          MR. ZELLER:  Your Honor, I make a motion to reopen

25   discovery, electronic discovery in which the "Carter Bryant"

1    terms will be applied across the board to all media by all

2    parties.  This nonsense really needs to end.  This is

3    one-way discovery.

4            MGA has come into this court repeatedly and

5    basically stonewalled us for years, years on getting basic

6    discovery out of the Larian hard drives, out of their

7    Archive One system and their e-mails.  I mean, the court is

8    well aware, we have order compelling them to produce

9    documents from Isaac Larian's e-mails, going back to 2007,

10   and we are only now getting those documents.  And they

11   aren't even done.

12           So somehow the notion that Mattel has been

13   suppressing things I think is quite absurd, this needs to be

14   a two-way street.

15           THE COURT:  Thank you.

16           Now, anything further on behalf of MGA?  Anything

17   that requires the Discovery Master or needs the Discovery

18   Master's attention this evening?

19           MS. HURST:  No, your Honor.  No.

20           MR. MCCONVILLE:  No, sir.

21           THE COURT:  Jim, thanks a lot.  I'll talk to you

22   later.

23           How late will you be up?  Midnight?

24           SPECIAL MASTER:  Good night.

25           THE COURT:  Counsel, anything further?

1           MS. HURST:  Your Honor, the discovery cutoff for

2    the counterclaims and reply is November 1st, which does not

3    permit service in the ordinary course of documents.  We had

4    discussed with counsel off the record an exchange and some

5    requests for documents, you know, very specific requests.

6           The court had said it wanted to allow --

7           THE COURT:  Doesn't mean anything to me.  What do

8    you want to do about this?

9           What's the agreement?

10       *(Pause.)*

11          THE COURT:  Counsel, I'm going to go back to the

12   other counsel.  They have been patient waiting for you.

13          What time do you want to meet again?

14          How long will you need then, Counsel?  An hour?

15   How long will you need with me, an hour?

16          Counsel, 10:00 o'clock?  How much more time do you

17   need?

18          MS. HURST:  Do we need?  Oh, I misunderstood you.

19   I thought you were talking to the other counsel.

20          Half an hour.

21          THE COURT:  Okay.  It's up to you.

22          All right.  Carter Bryant.

23       *(Pause.)*

24          THE COURT:  We are on the record, Deborah.

25          Counsel.

1          MS. HURST:  We have agreed to a briefing schedule

2     for Mattel's motion to compel further 30(b)(6) deposition

3     for Mr. Larian.  Mattel will file on Tuesday and MGA will

4     oppose on Friday.

5          THE COURT:  Of next week?

6          MS. HURST:  Yes.

7          THE COURT:  Repeat that to me.  I missed it.

8          MS. HURST:  Mattel will file its motion to compel

9     on Tuesday, and we will file our opposition on Friday.

10         THE COURT:  That's fair enough.  Okay.

11         MS. HURST:  That's it.

12         THE COURT:  Now, what else do we need to do

13    tonight?

14         MR. ZELLER:  There was just that one thing about

15    format, really, which is what the court preference is on

16    evidentiary objections on summary judgment.  You know, some

17    judges want it as part of a separate statement, other judges

18    want it as a separate document.  I wasn't sure there was any

19    preference.

20         THE COURT:  Let me think about it.  I'll send it

21    out by e-mail.  I hadn't thought about that.

22         Thank you.

23         Okay.  Now, who will be here and what process do

24    we go through to get these boxes back?

25         In other words, you bring empty boxes, but they

 1    have to be sealed.  They have to kept track of.  We need to

 2    get the right boxes back, so I need one attorney for each

 3    side that's going to check this off and be responsible.

 4              The paralegals shouldn't be in that position.

 5              MR. MCCONVILLE:  We will agree to a form.  Your

 6    courtroom deputy gave us a --

 7              THE COURT:  Mr. McConville and Mr. Zeller, you two

 8    gentlemen will be here?

 9              MR. ZELLER:  Yes, sir.

10              THE COURT:  Excellent.  You two will be here to

11    supervise this and sign off on this.

12              Mr. Quinn, you are excused tomorrow night.

13    Ms. Hurst, good night.

14              MS. HURST:  Thank you.

15              THE COURT:  Good night.

16              MR. MCCONVILLE:  Good night.

17         *(At 9:15 p.m., proceedings were adjourned.)*

18

19                              -oOo-

20

21

22

23

24

25

```
1                          CERTIFICATE

2            I hereby certify that pursuant to Section 753,

3    Title 28, United States Code, the foregoing is a true and

4    correct transcript of the stenographically reported

5    proceedings held in the above-entitled matter and that the

6    transcript page format is in conformance with the

7    regulations of the Judicial Conference of the United States.

8

9    Date:  October 13, 2010

10

11

12                        _____

13                        Deborah D. Parker, Official Reporter

14

15

16

17

18

19

20

21

22

23

24

25
```