1          **UNITED STATES DISTRICT COURT**

2          **CENTRAL DISTRICT OF CALIFORNIA**

3          **SOUTHERN DIVISION AT SANTA ANA**

4          HONORABLE DAVID O. CARTER, JUDGE PRESIDING

5

6

CARTER BRYANT, an individual,      )

7                                     )

              PLAINTIFF,              )

8                                     )

          vs.                        ) SACV NO. 04-9049-DOC

9                                     )

MATTEL, INC., a Delaware            )

10  corporation,                     )

                                     )

11            DEFENDANT.             )

_____)

12  CONSOLIDATED WITH MATTEL, INC., vs.)

BRYANT and MGA ENTERTAINMENT, INC. )

13  vs. MATTEL, INC._____ )

14

15

16          REPORTER'S TRANSCRIPT OF PROCEEDINGS

17               SANTA ANA, CALIFORNIA

18              MONDAY, OCTOBER 4, 2010

19                    5:56 P.M.

20

21          **DEBORAH D. PARKER, CSR 10342**
            **OFFICIAL COURT REPORTER**

22          **UNITED STATES DISTRICT COURT**
            **411 WEST FOURTH STREET**

23                **SUITE 1-053**
            **SANTA ANA, CALIFORNIA 92701**

24              **(714) 542-8409**
            **D.PARKER@IX.NETCOM.COM**

25

2

```
 1    APPEARANCES OF COUNSEL:

 2        FOR THE DEFENDANT, MATTEL, INC.:

 3                            MICHAEL ZELLER
                             JOHN QUINN
 4                           QUINN EMANUEL URQUHART
                             865 SOUTH FIGUEROA STREET
 5                           10TH FLOOR
                             LOS ANGELES, CALIFORNIA 90017
 6                           (213) 443-3000

 7

          FOR THE INTERVENOR, MGA ENTERTAINMENT, INC.:
 8
                             ANNETTE L. HURST
 9                           ORRICK, HERRINGTON & SUTCLIFFE, LLP
                             THE ORRICK BUILDING
10                           405 HOWARD STREET
                             SAN FRANCISCO, CALIFORNIA 94105
11                           (415) 773-5740

12                           THOMAS S. MCCONVILLE
                             ORRICK, HERRINGTON & SUTCLIFFE, LLP
13                           4 PARK PLAZA
                             SUITE 1600
14                           IRVINE, CALIFORNIA 92614
                             (949) 567-6700
15
                             WILLIAM A. MOLINSKI
16                           ORRICK, HERRINGTON & SUTCLIFFE, LLP
                             777 SOUTH FIGUEROA STREET
17                           SUITE 3200
                             LOS ANGELES, CALIFORNIA 90017
18                           (213) 612-2256

19

20

21

22

23

24

25
```

 1      SANTA ANA, CALIFORNIA; MONDAY, OCTOBER 4, 2010; 5:56 P.M.

 2                              -oOo-

 3              THE COURT:  All counsel are present.

 4              The Special Master just told me -- and you don't

 5      need coats this evening -- that you had completed with

 6      Mr. Eckert.

 7              Is that true?  Or do you need to go back later

 8      tonight?

 9              MS. HURST:  We actually have another deposition

10      scheduled for later tonight, your Honor, and then --

11              THE COURT:  I know you do, a 30(b)(6).  That's not

12      my question.

13              Here is my question:  Are you done with

14      Mr. Eckert, or not?

15              MS. HURST:  Yes.

16              MR. QUINN:  I'm not going to argue with that, your

17      Honor.

18              THE COURT:  Okay.

19              MS. HURST:  Your Honor, I had something I want to

20      address with the court off the record, if it would be

21      appropriate at some point this evening.

22              THE COURT:  Is that okay, counsel?

23              MR. QUINN:  Yes, your Honor, certainly.

24          *(Discussion held off the record.)*

25              THE COURT:  We are back on the record now.

```
 1              I'm going to read into the record something that
 2    I've been trying to formulate about the briefing for both
 3    sides, because you're limited to 100 pages.  And I really
 4    want to get your input.  I'm not going to expand the 100
 5    pages.  But the order on the motions to dismiss, I think,
 6    recognize that certain issues would probably be visited at
 7    summary judgment, and you saw that delay on the court's
 8    part, including the distinctiveness issue under RICO; the
 9    standing issue under RICO and the -- what I call Cutsa --
10    but it's C-U-T-S-A -- preemption issues.
11              I'm going to encourage the parties to approach
12    these issues by weighing into statutory analysis and
13    appellate authority.  I'm going to encourage you not just to
14    string cite a lot of other district court opinions that
15    support your position.  It's just taking space, and it's
16    taking away from your analysis.
17              Each of you will be able to find lots of authority
18    on either side, but I'm not going to find standing under
19    civil RICO, simply because a district court on the other
20    side of the country reached the same conclusion.  I want you
21    to show me why your respective positions are consistent with
22    the statute and consistent with Supreme Court authority.  In
23    short, you might start thinking theoretically.
24              Let me repeat that.  I'm merely looking for some
25    good argument.  String cites I don't need.  And, frankly, I
```

1    don't care what other district courts think on this issue.

2              Now, I want to move to two motions that I'm deeply

3    concerned about.  Mr. Corey is in --

4              Well, let me just start.  I'm inclined to grant

5    the motion to quash the subpoena directed to John Corey,

6    first, because there are other mechanisms for discovery of

7    relevant information and, second, the potential for

8    overwhelming, overwhelming and literally unmanageable

9    assertions of privilege and case law since I denied Mattel's

10   attempt to obtain discovery under the same circumstances,

11   concerning the Victoria O'Connor e-mail.  But I'm going to

12   hear argument with that synonymous with the motion to squash

13   the subpoena directed to O'Melveny & Myers.  I'm

14   tentatively inclined to grant that motion to quash on the

15   grounds that the discovery sought is duplicative of the

16   e-mails that were ordered to be produced by MGA and, second,

17   that the court's order sustaining MGA's objections to

18   discovery matter Order No. 90 already held that a law firm's

19   communication and work product concerning its discovery

20   obligations.

21              So I can have you argue either one or both at the

22   same time.  But, as you can see, I'm really reluctant to

23   wade into that morass, if you will, of attorneys and

24   privileges and I think you can accomplish it in a number of

25   ways.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

 1              Now, take a moment.  That's simply a tentative

 2       thought on my part.  And then, counsel, the lectern is yours

 3       for as long as you like.

 4              Then, we are going to move after that concerning

 5       the motion to dismiss and/or strike.  And then, based upon

 6       those arguments, I want to talk to you about any expedited

 7       discovery if it's needed concerning the counterclaims,

 8       depending upon what I finally resolve concerning this issue

 9       tonight.

10       *(Pause.)*

11              THE COURT:  Counsel, Mr. Quinn is behind you.  He

12       wanted to help you with your discussions tonight.

13       *(Pause.)*

14              MR. QUINN:  Your Honor, I rise to speak regarding

15       the motion to squash the subpoena directed to my partner,

16       John Corey.

17              Your Honor, this is kind of an unusual case.  This

18       is actual litigation counsel that they seek to take the

19       deposition of who, as the court knows, has been very

20       actively involved in the case.  To be sure, he's not one of

21       the two lead counsel, but he has been involved in this case

22       from the very beginning.

23              I submit, your Honor, even though the Ninth

24       Circuit has not explicitly adopted the *Shelton* rule, that

25       the considerations outlined in that opinion are worthy of

1    this court's consideration.  That is to say, is the

2    information absolutely necessary?

3              Are there other means to get the information?  Is

4    it relevant and nonprivileged?

5              And without repeating what we've said in our

6    papers, your Honor, I think that this is a circumstance

7    where there are transactions particularly with respect to

8    Mexico, the Mexican criminal proceedings and the Vargas

9    settlement.  There are three other individuals, including

10   two Mexican lawyers who MGA has deposed.  There is

11   alternative and other sources of information.  There really

12   is no showing that there's anything that Mr. Corey has

13   unique knowledge of.  Instead, there is some speculation, I

14   submit, that's offered on some subjects, such as that

15   perhaps Mr. Corey had some conversations with the prosecutor

16   regarding the case; that he may have some information that

17   we can't get somewhere else that we won't know unless we

18   depose him.  I don't think that's the kind of showing that

19   the court, I submit, should be satisfied with before

20   litigation counsel is deposed.

21             The two cases cited by MGA -- the *Johnson

22   Development* case and the *American Casualty* case where

23   counsel were deposed in both cases -- in both cases, they

24   were not litigation counsel as of the time -- in the case,

25   as of the time the deposition was sought to be taken.  In

1    one case, they were labor counsel, a lawyer who acted as

2    labor counsel who had attended some meetings at issue; in

3    the other case, the attorney was not litigation counsel as

4    of the time of the deposition.  And that person that

5    actually -- that lawyer had taken --

6          THE COURT:  -- that lawyer had taken a position in

7    the underlying dispute, he had taken an assignment --

8          MR. QUINN:  Yes.

9          -- of one of the claims at issue.  So I think that

10   those are very different circumstances.  We do believe that

11   there are ample grounds to quash the subpoena.

12         Thank you, your Honor.

13         THE COURT:  Counsel, on behalf of MGA.

14         MS. HURST:  Your Honor, when I first came into

15   this case, one of the initial motions was a motion to quash

16   a subpoena to an attorney involved in the Omni matters.  At

17   that time, I argued that it should not be a routine -- a

18   matter of routine for attorneys to be deposed in connection

19   with this case.

20         Mr. Zeller strenuously argued that that had never

21   been the rule in the case and that attorneys had been

22   routinely deposed and, in fact, a number of attorneys have

23   been routinely deposed.  And in that instance, in connection

24   with that argument, Mattel obtained the right to depose one

25   of the partners at the Bingham McCutchen firm, which at the

1    time was litigation counsel for Omni 808 in this action.

2           Now, this court previously noted in Docket

3    No. 8459 that the court would consider allowing Machado and

4    the MGA parties to depose Mattel's counsel to determine

5    whether Mattel is complying with the terms of the protective

6    order, including using materials for purpose of litigation

7    and not otherwise using designated materials in an improper

8    attempt to encourage the issuance of arrest warrants in

9    Mexico.

10          Since the court issued that order and subsequently

11   clarified the protective order to make clear that materials

12   absolutely cannot be used for initiating new actions, Mattel

13   has taken the further step of filing the state court actions

14   based on materials produced in this litigation.  Another

15   violation of the protective order.

16          We don't have any way to get this information,

17   other than deposing Mr. Corey.  The court has denied a

18   further deposition with Mr. Moore who might have been a

19   source -- I emphasize "might" -- of some of the other

20   information.  Mr. Corey is the one who negotiated with

21   Mr. Villasenor's counsel.  Mr. Corey is the one who

22   interviewed Mr. Villasenor, resulting in the December 22nd,

23   2005 e-mail, wherein Mr. Villasenor said, *I'm engaged in*

24   *criminal conduct for Mattel's superior competitive*

25   *advantage.*

1          Mr. Corey is the one who after --

2          THE COURT:  Now, why aren't you able to get that

3     piece of evidence in front of the jury?

4          MS. HURST:  We can, your Honor.  But it's the

5     subsequent artificial distinction that Mattel and its

6     counsel made in not pursuing discovery on this market

7     intelligence matter and producing the documents in

8     litigation.  We can't prove the intentional suppression of

9     the evidence without the lawyers.

10         We've alleged the intentional suppression of the

11    evidence.  And with all due respect to learned counsel, we

12    have got a reasonable inference that there was intentional

13    suppression, and it was Mr. Corey who was the architect of

14    it.

15         Mr. Corey is the one who wrote the letter to

16    Mr. Barrera saying, *Now, we're going to treat the MGA*

17    *litigation as completely separate from this investigation*

18    *over here.*

19         THE COURT:  Let's explore that.  It's not falling

20    on deaf ears.  But your ability to get that in,

21    circumstantially, seems to offer a real opportunity.  I

22    can't imagine that you believe that in front of a jury

23    you're going to have Mr. Corey up on the stand, who is an

24    accomplished lawyer, who suddenly throws up his hands and

25    says, *I did it.*

1    Your strongest position probably at trial will be

2    pointing to Mr. Corey, who you're not probably going to be

3    able to call.  You're going to have a lot of circumstantial

4    evidence surrounding that.  And you're telling the court

5    that you need Mr. Corey at a deposition or at the time of

6    trial to make that inference.  I disagree with that.

7        Probably, your strongest piece of evidence is just

8    what I pointed out to Mr. Quinn the other day on another

9    matter.  Some of this actually places you in a better

10   position pointing to Mr. Corey.  You can tell us that you're

11   not going to call him, but you've got a lot of inferences.

12   You're not precluded from the area.  You're not precluded

13   from making the insinuation.  You've got strong

14   circumstantial evidence, and you can argue it.  In fact,

15   you're probably in a better position, quite frankly, to be

16   calling Mr. Corey.

17       MS. HURST:  I appreciate the court's view in that

18   regard.  I don't think, with respect to the Mexican

19   materials, in addition to the Villasenor issue, that there

20   is any other way we're going to find out about

21   communications with judges in Mexico, for example.

22       It's just -- you know, we have pursued these

23   things.  You know, Mr. Tiburcio doesn't remember.  He

24   doesn't know.  You know, communications with law enforcement

25   in Mexico, he doesn't remember any specific communication.

1    Communications with Vargas and Vargas' counsel, he never

2    wrote anything down.  He never drafted anything.  He doesn't

3    remember specifically anything that was said.

4            You know, that was it.  It was a total -- it was a

5    runaround.  I mean, it's not like we haven't tried.  And I

6    want to say to the court, this was the last resort.  This

7    was not a decision that was taken lightly.  And I know there

8    was some reference in the reply papers to a joke that

9    Mr. Molinski made and that was inappropriate.  Mr. Molinski

10   called me up afterwards and said, *I did something wrong.*

11           And I said, *You're darn right you did.  And you go*

12   *apologize.*

13           And he did.  And I'm taking this deposition, not

14   anybody else.  And we absolutely take this extremely

15   seriously.  And I realize that may not be sufficient for the

16   court, but we do think we've made a showing here that

17   there's just no other way to get the information.

18           So, with all due respect, with respect to those

19   matters -- and they're not privileged, either.  Mr. Corey's

20   communications with law enforcement in Mexico, that's not

21   privilege.  His communication with judicial officers

22   *ex parte* in Mexico, that's not privilege.  His

23   communications with Mr. Vargas' counsel, that's not

24   privilege.

25           They wrote up a declaration in advance that is

```
 1   supposed to be the truthful testimony that he would give.
 2   And if he didn't give testimony consistent with that, then
 3   he wouldn't get his pardon.  And then --
 4           That was just, you know, more the same after what
 5   they did with Villasenor.  We don't have any other way to
 6   find out what were the settlement discussions and the
 7   mediation and all of that with Mr. Villasenor.  Mr. Corey
 8   had a number of meetings with Mr. Villasenor's counsel.
 9           We're out of depositions.  We've tried other ways
10   of getting the information.  Mr. Villasenor wasn't permitted
11   to testify to these things because his knowledge came from
12   counsel and he wasn't in the room during the mediation, so
13   the privilege instructions were made.
14           So, with all due respect, your Honor, we have
15   tried every other means.  There's a lot of information here
16   to get that's not privileged.  The presence of the Discovery
17   Master will certainly, you know, enable us to deal with
18   difficult questions of privilege.  It's not my intention to
19   go in there and ask a bunch of questions to draw
20   instructions and then try to play that to the jury.  That is
21   not what this is about.  This is about our desire to prove
22   elements of suppression of evidence, intent, the
23   racketeering enterprise element of the RICO claim.  All of
24   these things are --
25           Mr. Corey, unfortunately, given the allegation
```

1    that Quinn Emanuel, was the one who was part of the

2    enterprise.  Mr. Corey is the only one that we can depose to

3    show that.  We can't show anybody else's intent to be part

4    of the enterprise.

5            So I agree with the court, certainly, that we have

6    a lot of strong inferences given these documents.  I'm not

7    going to say we don't.  But I don't want hear sometime later

8    them saying, *Well, you know, Deliberate ignorance isn't*

9    *enough.  You had to prove intent,* after we didn't get the

10   deposition of Mr. Corey to show exactly what meetings

11   occurred, what nonprivileged communications occurred and

12   what we can reasonably show Quinn Emanuel knew about and

13   when.

14            Submit, your Honor.

15            THE COURT:  All right.  Counsel, anything further

16   on that issue?

17            MR. QUINN:  I'm prepared to submit, your Honor.

18            THE COURT:  Counsel.

19            All right then.  Concerning the motion to quash

20   the subpoena directed towards O'Melveney & Myers.

21            Counsel.

22            MR. MCCONVILLE:  Your Honor, the subpoena on its

23   face seeks privilege communications.  It goes beyond just

24   the privilege documents themselves.  It actually seeks by

25   its terms any analysis that the O'Melveney firm would have

1    done concerning a privilege analysis.  I mean, it sweeps so

2    broadly, your Honor, that every document called for at the

3    O'Melveny firm that is privilege would have to be produced

4    under terms of the subpoena.

5             As a fallback position, they say, *Well, the court*

6    *can always review everything in camera.*  And then, we go

7    back down the road of in-camera review and privilege logs

8    all for the purpose, your Honor, of trying to figure out

9    what happened with the Larian/O'Connor e-mail.  What are the

10   facts that we know about the Larian/O'Connor e-mail?

11            We know that the law firm Skadden put it on

12   privilege log and that the document was later produced.  The

13   court has held numerous hearings about the Larian/O'Connor

14   e-mail.  The court conducted a lengthy crime fraud analysis.

15   And at the end of the day, the court concluded there was no

16   crime fraud exception to the privilege but in any and all

17   events, the law firm that was at issue at this time was the

18   Skadden law firm.  Not O'Melveny, which left this case in

19   October 2007.

20            Your Honor, we agree with the tentative that the

21   court has expressed that this subpoena should be quashed

22   because it seeks directly privileged communications related

23   to the O'Melveny law firm.

24            THE COURT:  Counsel.  Mr. Zeller.

25            MR. ZELLER:  Yes, your Honor.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1              To the extent -- and I'm certainly mindful of the

2      court's comments that the court is inclined to grant the

3      motion based upon duplicativeness.  I think that's probably

4      fair enough.  But what we don't have, I don't think, is a

5      representation from MGA, an assurance, that there isn't

6      anything else that the O'Melveny firm has that isn't being

7      produced that otherwise should have been produced.  I don't

8      think it's well taken, and I think it's quite clear from the

9      subpoena that we are not asking for materials that are

10     privileged.  The subpoena is specifically asking for

11     documents that are either not privileged or fall within the

12     ambit of what it is that the court has already ruled was

13     waived.  That was in which the -- the manner in which the

14     subpoena was drafted.  And that is certainly its intent and

15     I would offer that to the extent it is going to be

16     construed, that it be construed in that light.

17             But what we don't have and what we're really

18     trying to assure ourselves is that O'Melveny doesn't have

19     some document.  We don't have a game about whether or not

20     it's really in MGA's position or not.  We're not looking for

21     its work product analysis.  We're not looking for any such

22     thing, and I think that's pretty clear from the subpoena

23     itself.

24             I will add by way of a little bit of background,

25     MGA has, including very recently, been sending subpoenas to

```
 1   Mattel's law firm.  I don't think that MGA can come in here
 2   and sort of take the position that somehow it is
 3   categorically improper to do this.  And, in fact, they were
 4   taking the position with the Paul Hasting's firm, for
 5   example, that Paul Hastings had to do a privilege log of
 6   everything that they had that they were withholding on
 7   privilege grounds.  We're certainly not taking a position
 8   that it's anywhere near that extreme, but the court, I
 9   believe, should be aware that this is MGA's position and has
10   been.
11              But I do think that to the extent that we cannot
12   have an assurance here that O'Melveney & Myers has nothing
13   further in its possession that would fall within the ambit
14   of what we're discussing that anything in addition that
15   falls within it be provided to the court and the court look
16   at it.
17              Thank you.
18              THE COURT:  Counsel.  Anything further?
19              MR. MCCONVILLE:  No, your Honor.
20              THE COURT:  Submitted?
21              All right.
22              MR. ZELLER:  Yes, sir.
23              THE COURT:  I'll go back this evening after you
24   leave for your 30(b)(6) and rethink of these -- or each of
25   these, but I'm inclined to quash.
```

```
 1              MS. HURST:  Your Honor, if I may.

 2              I just wanted to add Patty Glasser was deposed in

 3    this case, so there is certainly precedent for opposing

 4    trial counsel.

 5              THE COURT:  Thank you.

 6              Concerning the tentative order granting in part

 7    and denying in part Mattel's motion to dismiss and strike, I

 8    think that's the essence of why we're here this evening.

 9              Counsel.

10              This is Mr. Quinn on behalf of Mattel.

11              MR. QUINN:  Yes, your Honor.

12              Thank you, your Honor, for providing us with

13    tentative and giving us a chance to respond to the court's

14    thoughts set forth in that tentative.

15              If I can turn, first, your Honor, to the issue

16    about whether these counterclaims and reply are compulsory.

17    The tentative does recite the standard, the applicable

18    standard whether there is a nucleus of operative fact that's

19    in common, which is the standard of the Ninth Circuit under

20    the Pinkerstaff opinion.  But after reciting that standard,

21    the common nucleus of operative fact, the tentative goes on

22    to sort of embrace a looser standard of logical relationship

23    which doesn't incorporate the concept of common nucleus of

24    operative fact.

25              There is a logical relationship between apples and
```

1   oranges, but that doesn't make them the same or similar in

2   every relevant way.  They may be -- it's true that claims

3   may be logically related, even if they don't --

4            The court recites two cases for the proposition

5   that *claims may be logically related even if they do not*

6   *arise out of the same facts,* the *Porturo* decision and the

7   *Big O* decision.

8            Now, the *Porturo* decision, actually, your Honor,

9   in that case, the court said what the court needs to do is

10  to analyze -- this is under the rule -- the old Rule 13 --

11  *is to analyze whether the essential facts,* quote, unquote,

12  *the various claims are so logically connected that they*

13  *really should be tried together.*

14           And the court goes on to find that these really

15  need to be tried together, because if they weren't, the

16  resolution of the first claim would collaterally estop the

17  party, potentially, in the second claim.  Now, that's a very

18  tight standard of connectedness if you have the potential

19  for collateral estoppel.

20           So I think if you actually look at that decision

21  which was decided under a different rule and particularly

22  that long regarding collateral estoppel and whether the

23  essential facts are close enough, they were really talking

24  something much narrower than a logical relationship which

25  is, I submit, a looser standard which is embraced in the

1    tentative.  The court --

2             The second case relied on for the concept that,

3    you know, a logical relationship can arise, even if you

4    don't have the same set of facts, is the *Big O*, *Big O Tires*

5    case.  That's an unpublished case.  And there the court said

6    that *Courts have found a logical relationship between claims*

7    *sharing only a few facts.*

8             THE COURT:  Does Judge Kozinsky appreciate

9    unpublished cases?

10            MR. QUINN:  Does he appreciate them?

11            THE COURT:  Yes.  He does not.

12            MR. QUINN:  He does not.

13            THE COURT:  He has taken a very strong position on

14   behalf of the Ninth Circuit.

15            MR. QUINN:  All right.  This is a case wherein the

16   court still has a chance to salvage the situation here,

17   since it's a tentative and can purge the opinion of the

18   citation.

19            THE COURT:  I'm glad you're making that record,

20   and I'm not.

21            MR. QUINN:  In the tentative, starting at page 6,

22   the court then analyzes both sets of claims and puts the

23   question, both of them -- the RICO and the trade secrets

24   claim -- are they logically related -- and sort of addresses

25   them together.  I submit that's -- that isn't the way it

1   should be.  Each of them should be addressed separately.

2   And this, it turns out, I submit, under the tentative, kind

3   of led the court down or leads us down the wrong path.

4   Because it says in the tentative that both sets of claims --

5   the trade secrets and the RICO -- arise out of conduct in

6   this litigation.

7          Your Honor, not so.  That's true of the RICO

8   claims.  They arise out of conduct in this litigation.  It's

9   definitely not true of the trade secrets claims.

10          THE COURT:  You might have an excellent argument,

11   except your RICO is rather expansive.  In other words,

12   control your own fate.

13          MR. QUINN:  Yes, your Honor.

14          THE COURT:  This is time that is coming around the

15   backside of you, right now.

16          MR. QUINN:  Sure.  And I don't have a problem with

17   that, your Honor.  I think we need to look at those claims

18   individually and see, all right, is there a nucleus of

19   shared operative fact, which I submit is the applicable

20   standard.  If you just say they both concern conduct in this

21   litigation, period, full stop, I submit that's thematic

22   similarity and that's not enough to reach the conclusion

23   that it's a compulsory counterclaim.

24          Let me give the court an example.  Suppose on one

25   side the alleged predicate RICO act is the destruction of a

1    document, destruction of evidence on subject X.  On the

2    other side, the alleged predicate act -- let's make this

3    easy -- let's say, both concern conduct in the litigation

4    suborning perjury of some other witness on another subject.

5    Do those two share operative facts?

6              Is there a potential for collateral estoppel, for

7    example?  If one side proves that a document was, in fact,

8    destroyed, is there a potential for collateral estoppel on

9    the other issue of suborning perjury?  Obviously not.

10             That's an example, I submit, of thematic overlap

11   which in itself is relevant.  I think we do have to look at

12   it claim by claim to decide whether or not this was, in

13   fact, a compulsory counterclaim.

14             With respect to the trade secrets, what the

15   tentative says is that, *Well, there's overlap here because*

16   *MGA pleads that what Mr. Machado stole is what Mattel stole*

17   *from the showrooms.*  Not so.  Not a claim ever made in their

18   pleading.  That appears for the first time in their

19   opposition brief on this motion.  That is not a claim that

20   is anywhere in the pleading.  There is no reason, nothing

21   whatsoever, no indication at all, nothing to support that.

22   I mean, there is a paragraph there, pages 6 to 7 of the

23   tentative, where it says, you know -- the tentative says

24   something like, *Well, it's logical to assume.*  In Mattel's

25   claim, we say, *And they took other documents, it's logical*

1  *to assume, or it seems like those are the kinds of documents*

2  *that they might have seen in showrooms.*

3          There's a bunch of logical leaps in that

4  paragraph, I submit, your Honor.  In fact, there's nothing

5  that's pled that indicates there is an overlap in facts

6  relating to the thefts in Mexico, or in LA, or in Canada on

7  the one hand and the alleged thefts out of poking around in

8  toy fair showrooms that people shouldn't have been doing.

9          On the face of it, there's no overlap alleged.

10  And, you know, unfortunately, I think this is a decision

11  that this court has to make at the pleadings stage as a

12  matter of law, looking at the pleadings.

13          So let me turn, now, let's assume -- let's set

14  that aside.  I hope I've persuaded the court that there's

15  grounds, maybe, to rethink the issue about whether these are

16  compulsory --

17          THE COURT:  I'll certainly look at it.

18          MR. QUINN:  Thank you, your Honor.

19          THE COURT:  You haven't persuaded me so far.

20          MR. QUINN:  All right.  So let's assume that it is

21  compulsory.  Where does that leave us in terms of their

22  ability on their own without leave of court to amend their

23  pleading?

24          The tentative embraces the standards set forth in

25  the *Bancroft* decision, which is a much more liberal approach

1    where -- which I was actually kind of surprised that this is

2    something that this court in particular would endorse,

3    because it really gives the litigant more power to decide

4    for themselves at any time:  *Do I want to assert some more*

5    *claims without the court having a chance to look at that?*

6              That I submit --

7              THE COURT:  Well, just a moment.  That's

8    interesting.  I'm not arguing with you, but you control the

9    counterclaim.  When you filed, you controlled the universe.

10   So it's a little hard to hear an argument that the litigants

11   are controlling.  You really are the driving force in how

12   you shaped that Fourth Amendment.

13             MR. QUINN:  Yes, your Honor.  And we sought leave

14   of court.

15             THE COURT:  Granted.

16             MR. QUINN:  We came to court and said, *Your Honor,*

17   *can we do this, very relatively small changes?*

18             But here, this is my point, your Honor.  Under the

19   majority view in the Ninth Circuit and elsewhere -- and

20   endorsed, by the way of *Morris Federal Practice* -- unless

21   the counterclaim and reply responds to new matter in the

22   last pleading, it can't be done without leave of court.

23   Shouldn't be done.  So, on the *Bancroft*, we have this other

24   looser standard under the *Bancroft* decision, which the

25   tentative follows that parties can as of right in response

1    to a counterclaim assert new claims without leave of court,

2    that's a minority view.  The majority view --

3              THE COURT:  What issue would this court take, if

4    you voluntarily dismissed your RICO claims?

5              MR. QUINN:  If we voluntarily dismissed our RICO

6    claims?

7              THE COURT:  Yes.  A large part of this is caused

8    by your RICO.

9              Just assume for a moment you voluntarily decided

10   to dismiss your RICO claims and put us back to phase one, or

11   1-A, or wherever we were.  That would resolve a lot of these

12   issues, wouldn't it?

13             MR. QUINN:  Yes.  But I'm sure the court is

14   interested in grappling with this from an intellectual

15   standpoint.

16             THE COURT:  I am.  I got, I think, 23 pages of

17   grappling with it.

18             MR. QUINN:  Indeed.  We read that carefully, your

19   Honor.

20             THE COURT:  And I'm not encouraging you to,

21   because it's going to be a much more expansive trial with

22   all the RICOs in.  But, you see, you've created your own

23   Pandora's box.  By putting that RICO in there, if I hold to

24   this tentative --

25             MR. QUINN:  Right.

1          THE COURT:  -- you've created your own nightmare.

2          MR. QUINN:  Well, if the court does that and then,

3     under the *Bancroft* decision, I can understand why the court

4     is saying that.

5          My argument, your Honor, is:  The court should not

6     follow the *Bancroft* decision.  That the court, instead,

7     should follow what we submit is the majority view and the

8     view in the Ninth Circuit, which is expressed in the

9     *Synopsis* case, the *St. Paul Fire and Marine* case, the

10    *Chrysler* case, the *Brewbau* case and Dean Moore's *Federal*

11    *Practice Treatise* that unless you're responding to new

12    matter in the last pleading -- I don't mean thematic new

13    matter but new matter -- that leave of court should be

14    sought.

15         Finally, your Honor -- and the last point I'll

16    make.  I know there's a lot of other material in the

17    tentative, which I won't burden the court with further

18    discussion on -- the Rule 15 analysis, I submit, ignores the

19    really substantial burden to Mattel of having to face these

20    claims literally the eleventh hour.

21         The court's tentative contemplates at least the

22    possibility of extending the discovery cutoff for one month,

23    but let's think for a moment what that means.

24         THE COURT:  No, just a moment.  That's only an

25    option.  I think both parties are prepared for trial now.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
1              MR. QUINN:  Your Honor, with all due respect --
2              THE COURT:  With all due respect.  I think both
3    parties are prepared for trial now.  I'm tossing that out.
4    I'm not suggesting it.  I'll see what MGA's position is, if
5    I hold to this tentative, if they want additional discovery,
6    but that's an option.  That's not a direct order.
7              MR. QUINN:  Understood, your Honor.
8              THE COURT:  You can do both.
9              MR. QUINN:  Your Honor, there is preparing --
10             THE COURT:  You can do both.
11             MR. QUINN:  I'm sorry.  Doing both?  I don't
12   follow.
13             THE COURT:  Summary judgment and depositions.
14             MR. QUINN:  Right.  Obviously, that may be what we
15   end up doing.
16             THE COURT:  You can do both.
17             MR. QUINN:  Your Honor, what that leaves and
18   doesn't leave us with, if I can just lay it -- my view of
19   this out before the court, it really doesn't leave us time
20   to move to compel further discovery or to do any follow-up
21   discovery.
22             THE COURT:  I reject that argument.
23             MR. QUINN:  All right.  We are unable to make any
24   meaningful use of any discovery that we get at the last
25   minute.
```

1            THE COURT:  You're not working hard enough then.

2     I reject that argument also.

3            MR. QUINN:  Right.  We are prepared to work very

4     hard, your Honor.

5            THE COURT:  Then start working hard.

6            Counsel, on behalf of MGA.

7            MS. HURST:  Your Honor, if the court holds the

8     conclusion of the tentative that these are compulsory

9     counterclaims, then it's the *Davis & Cox versus Summa* case

10    that controls here.  And it says that *compulsory*

11    *counterclaims in reply can be brought.*

12            And if one considers it for a moment, that's the

13    only thing that would be fair, because otherwise the right

14    to bring those claims would be lost forever.  And that

15    wouldn't be fair at all.  And it certainly wouldn't be fair

16    where, as here, we didn't get the evidence until moments

17    before the close of discovery and just at the time when

18    Mattel was amending its pleading for the sixth time when MGA

19    has never sought leave to amend any pleading in this case.

20            So, it's a use it or lose it situation, your

21    Honor, and *Davis & Cox versus Summa* says we can do that.

22    And if we hadn't done it, they would be here claiming:  It's

23    not compulsory, and we couldn't amend.  And later claiming,

24    well, it was compulsory, and it's barred.

25            So I certainly am respectful of the court's desire

*DEBORAH D. PARKER, U.S. COURT REPORTER*

29

to control this docket and we did bring an alternative
cross-motion for leave to amend.  And if for one moment the
court thinks these are not compulsory, then certainly we
view it that that leave to amend should be granted, given
that this evidence was literally suppressed for years.

Now, let me just say I know the court said it
wasn't persuaded, but let me add a couple of points on this
compulsory counterclaim.

THE COURT:  Just a moment.

*(Pause.)*

THE COURT:  Thank you very much, counsel.  Please
continue.

MS. HURST:  Thank you, your Honor.

Mr. Quinn posits an essential fax being the same
or connected test.  Here are the same facts, what will be
part of our trade secret misappropriation claims and the
defenses to Mattel's claim.

On the statute of limitations and their assertion
of fraudulent concealment and not knowing about Bratz,
here's what we've learned now as a result of finally getting
this Villasenor evidence:  That they went, snuck into the
toy fair in 2001, knew about Bratz before it was ever
released.

In 2002, we got a document on Friday night at
9:00 p.m. that says Tyler Snyder and Carey Plunkett walked

1    the MGA showroom.  Never produced before.  Friday night, at

2    9:00 p.m., from the custody of Mr. Franke, one of the 38

3    custodians that the court ordered in the omnibus.  There it

4    is right there:  Walked the MGA showroom.  In February 2002,

5    the same Mr. Franke sent a resume of Mercedes Ward to

6    Mattel's in-house counsel Michelle McShane that shows

7    Mercedes Ward working on a new doll product line for MGA in

8    October of 2000.

9          Now, Mr. Zeller always says that on the statute of

10   limitations, the one thing we never had was knowing that

11   there was overlap.  Well, these Joe Franke documents that

12   just came off the privilege log, pursuant to the court's

13   order, various orders -- and which were finally produced

14   last Friday night at 9:00 p.m. -- show that Mattel did know

15   about an overlap.  Because they knew that MGA had been

16   working on Bratz, in October of 2000.  This is what we

17   finally got after six years of litigation, because of the

18   Villasenor evidence.

19         There is a direct overlap with statute of

20   limitations, fraudulent concealment, unclean hands and a

21   variety of other subsidiary issues lurking in Mattel's trade

22   secret claims such as the status of confidential

23   information, what constitutes a trade secret and in the case

24   of Mr. Machado's documents, one of which I referenced at the

25   last hearing -- it's a list of competitive products and

1    pricing.  That's exactly what's in the Villasenor documents.

2         Let me move on to the meat of our concerns from

3    the perspective of the tentative.

4         Your Honor, with respect to the wrongful

5    injunction claim, the court has indicated that it believes

6    there is no claim for damages relying on the various

7    preliminary injunction cases.  And the court has indicated

8    that it does not believe there is a material difference

9    between preliminary and permanent injunctions for these

10   purposes.

11        Your Honor, we've searched high and low, as I'm

12   sure the court has as well, for permanent injunction cases,

13   anything like this.  There isn't one.  But what I do know is

14   that Rule 65(c) only requires a security for the issuance of

15   a TRO, or a preliminary injunction.  There is no rule or

16   statute requiring the issuance of a bond for permanent

17   injunctions.  Your Honor, frankly -- and searching high and

18   low -- we found almost no cases where that issue was ever

19   even remotely considered, and it's not clear whether the

20   court has an inherent authority to even order a bond on a

21   permanent injunction.  Perhaps, it does; perhaps, not.  That

22   is a material distinction.

23        Secondly, your Honor, with all -- pardon me.

24        THE COURT:  With all due respect?

25        MS. HURST:  I know you don't like that phrase and

1    I stopped right there.

2              THE COURT:  With all due respect.

3              MS. HURST:  Your Honor, the causation standard

4    applied in the tentative for the wrongful injunction claim

5    is the RICO causation standard.  It's not the common law

6    proximate causation standard.  I'm delighted the court has

7    internalized the RICO causation standard for our summary

8    judgment motions in process.  But for determining

9    restitution or unjust enrichment, an unjust enrichment

10   clearly is available.  Even in buddy systems it says you can

11   make a claim for unjust enrichment -- malicious prosecution

12   or unjust enrichment.  For determining causation on that,

13   your Honor, 12(b)(6) is not the right time.

14             Let me give you -- we drafted this pleading very

15   quickly, as the court might imagine.  And we did not throw

16   in every single fact that we have on this.  But let me give

17   you an example, and let me make clear also -- I'm not sure

18   if it's clear to the court what exactly happened to MGA as a

19   result of the injunctions and the only limited stay.

20             MGA was never able to bring a Spring 2010 Bratz

21   product to market.  There was no new product in the market

22   for the entire -- for nearly this entire year.  It was only

23   leftover, old inventory.  And it's not until -- let's see,

24   what is today? -- Bratz is relaunching on 10/10/10.  And it

25   was this entire year that any new Bratz product was out in

1    the marketplace.  Meanwhile, Mattel's document shows

2    significant increases in market share for Mattel.

3            Not only that, your Honor -- and I submit,

4    respectfully, this will be subject of expert testimony on

5    both sides; and then, the court can determine at summary

6    judgment, or on a *Daubert* motion, or whatever, whether

7    that's over the hump, or not.

8            Another example is the Monster High product.  Now,

9    that's a product that Mr. Eckert admitted today is targeted

10   to the upper end of the age range of girls who play with

11   fashion dolls, just like Bratz.  And Mattel had the whole

12   field open for that upper edge of the age range, market

13   launch during 2010 with no Bratz in sight.  That was a

14   material advantage for Mattel's Monster High launch.  We

15   believe we can get over the hump for purposes of showing

16   unjust enrichment to Mattel on this claim.

17           Your Honor, in that regard, if the court thinks

18   that the pleading is insufficient in terms of specific facts

19   regarding causation to meet these requirements, then we

20   would ask for leave to amend.  This is the first and only

21   time we've ever pled these claims.  And Mattel has pled, you

22   know, six whatever times it is.

23           In that respect, your Honor, I would also add:

24   First, on the Rule 12 standard, it's the court's duty to

25   search the pleading to see whether any claim is made.  Your

1    Honor, having had some reflection and time to analyze all

2    this, we believe the pleading also states an abusive process

3    claim on which damages are available and which would not

4    fall within the Section 47 litigation privilege under

5    California law, because there's a variety of

6    noncommunicative conduct that's alleged which procured the

7    ultimately abusive process, including suppression of

8    evidence, spoliation, perjury -- actually, perjury, I guess,

9    is communicative conduct.  But we have alleged a variety of

10   noncommunicative conduct that would not fall within the

11   Section 47 privilege and which demonstrates the injunction

12   to be an abusive process.

13        The suppression of the Villasenor evidence is

14   material in this regard both to the statute of limitations

15   defense and the unclean hands defense.

16        Your Honor, given the very expansive nature of

17   Mattel's RICO claim and the many opportunities that Mattel

18   has had to plead and the very late circumstances under which

19   we've got this evidence, if the court believes there are

20   insufficiencies in the pleading, then we would request an

21   opportunity to cure those within a reasonable period of time

22   after the court issues its order -- at least, an attempt to

23   cure them.

24        Your Honor, with respect to the issue of

25   additional discovery, we agree with the court that we should

 1    cut it off and focus on summary judgment.

 2           THE COURT:  I want to conclude this argument,

 3    first.  We will discuss any additional discovery after your

 4    argument of this issue -- of this motion, okay?

 5           MS. HURST:  Your Honor, just because that was

 6    addressed in the tentative, I'll just say this:  We don't

 7    think it should be.  But if it is, it should be two ways,

 8    not just one way.

 9           Your Honor, it's hard for me to find fault with

10    anything else in the tentative, so I'll submit.

11           THE COURT:  Mr. Quinn will be able to.

12           MR. QUINN:  Your Honor, with respect to the

13    so-called late production of Villasenor evidence, you know,

14    it's pled in support of, as the court knows, in 2005, of

15    their unclean hands defense that counsel just refers to

16    getting into a toy fair under false presentences.  This is

17    outside the pleadings.  But the court considered this on a

18    motion to amend.  The irony here is, they have produced

19    e-mails between Brawer and others at MGA saying, *You got to

20    hire that guy Villasenor.  He's really good at getting

21    information at toy fairs.*

22           The more he gets into this, the more interesting

23    it is.  They definitely knew about Villasenor.  They tried

24    to recruit him.  Brawer did when he came over, as did

25    Machado.

```
 1              The other defense counsel refers to is this being

 2      relevant to, in any event, the statute of limitations that

 3      supposedly we did not know or claimed we didn't know what

 4      Bratz looked like where Villasenor had gotten pictures.

 5      That's never been an issue.  We knew what Bratz looked like.

 6      We knew what Bratz looked like in 2001.  That isn't the

 7      point.  The statute of limitations issue is:  When did we

 8      learn that Carter Bryant had created Bratz while he was

 9      employed by Mattel?  It's not when we learned what Bratz

10      looked at, so that's -- that's really irrelevant, the fact

11      that they can now prove for statute of limitations purposes

12      that we knew in 2001 or that Mr. Villasenor had a picture of

13      Bratz.  We had pictures of Bratz in phase one.  That was

14      never in dispute.

15              On the injunction issue, your Honor, again, we

16      have found no case where a court has -- and I take it MGA

17      has found no case where a court has given cognizance to a

18      claim for wrongful issuance of injunction, the same case.

19      It never went into effect.  The court -- Judge Larson

20      specifically allowed MGA to proceed with their 2009 line

21      when MGA came into court and said that it had already been

22      sold to retailers and they were ready to ship it.  So Judge

23      Larson said Okay and extended the deadline.

24              THE COURT:  Why doesn't that come in regardless of

25      the court's tentative ruling at trial, concerning damages?
```

1          In other words, what precludes MGA from getting

2     that piece of evidence in in front of the jury, that the new

3     line didn't come out in 2010?

4          I'm going to have that question for Ms. Hurst in

5     just a moment.

6          MR. QUINN:  It never went into effect.  We had the

7     decision last week about chilling effect.  Litigation

8     potentially has a chilling effect.

9          That's it, your Honor.

10         THE COURT:  Check with Mr. Zeller now and make

11    sure you're satisfied, because this is the last round.

12         *(Pause.)*

13         MR. QUINN:  Satisfied, your Honor.

14         THE COURT:  Ms. Hurst.

15         MS. HURST:  Your Honor, on the court's last

16    question, it will come in as part of the setoff defense, but

17    it's whether we collect damages for it, your Honor.  I mean,

18    that's material.  The company was nearly extinguished and it

19    continues to have lasting problems with retailers, licensees

20    and distributors all around the world because of this

21    injunction.  It is not just a setoff defense.  It should be

22    an affirmative claim for damages.  There's just --

23         Mattel availed itself of the tremendous power of

24    this court which MGA took very seriously and then the

25    consequences harmed MGA.  There's just something wrong with

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    the answer:  You got no remedy for that.  There's something

2    wrong with the answer:  Your competitor is able to use the

3    weapons of litigation by suppressing evidence and nearly

4    drive you out of business and then there is nothing you can

5    do about it.  It's just not right.

6           I'm not sure I need to respond to this.  It's a

7    factual issue, but the effort by Mr. Villasenor to get hired

8    and MGA when he was leaving Mattel did not produce anything

9    like e-mails saying, *This guy was good in getting*

10   *information from toy fairs.*  Here's what the e-mail that

11   Mr. Quinn is referring to says, quote:  *I remember this guy.*

12   *Had a lot of insights about the competitive environment,* end

13   quote.

14          And, by the way, MGA didn't hire him.

15          I'm going to check with my counsel to see if I

16   have anything else to say.

17          THE COURT:  Why don't you talk with both your

18   co-counsel and make sure you're satisfied with your

19   argument.

20       *(Pause.)*

21          MS. HURST:  Submitted, your Honor.

22          THE COURT:  Does the fourth amended counterclaim

23   and answer relate back to Mattel's original pleading,

24   Mr. Quinn?

25          Then, I'll address that to you also, Ms. Hurst.

1          Or Mr. Zeller?

2          MR. QUINN:  Your Honor, our view is that they

3    cannot relate back to our complaint, because we did not have

4    any claims in that complaint that bear any resemblance to

5    this -- to the claims that ultimately were in their own

6    counterclaims and reply.  And the argument, as I understand

7    it that they have made, is it relates back to their previous

8    pleading.  But there, your Honor, again, we would submit

9    that that previous pleading is unrelated to these.  It does

10   not give us fair notice that we might be on -- you know,

11   there may be these claims coming down the pike, or that

12   these claims arise out of the same set of facts.

13         These issues about entry into toy fair and the

14   like are not in that pleading.

15         THE COURT:  Ms. Hurst.

16         MS. HURST:  Your Honor, our view is that it does

17   not relate back -- that Mattel's Fourth Amended Answer and

18   Counterclaims -- to the original complaint against Carter

19   Bryant filed in April 2004, for the reasons that Mr. Quinn

20   stated.  But also because they knew they had a claim, if

21   any, against MGA at that point and they chose not to bring

22   it.  And you're not allowed to play games with relations

23   back like that.

24         We would say that it relates back to the original

25   counterclaims and the motion for leave to amend to add those

*DEBORAH D. PARKER, U.S. COURT REPORTER*

counterclaims was made in November of 2006.  I believe there
is case law saying that the motion for leave to amend holds
the statute of limitations.  And so, if they get the benefit
of relating back to November 2006, then we would say that we
do as well, your Honor.

I understand the court has at least tentatively
rejected our position that we relate back to MGA's complaint
filed in 2005 and Mr. Quinn has just argued that they were
not on fair notice at that time.  However, the fact that
they talked to Mr. Villasenor in the course of investigating
the collection of materials in connection with that very
complaint demonstrates otherwise.

THE COURT:  Okay.  All right.  Now, when you leave
this evening, you got a 30(b)(6) schedule at what time?

MS. HURST:  8:00 p.m.

THE COURT:  8:00 p.m.  You'll make it.  And,
hopefully, you'll be able to get some dinner also.

I'm not going to sign this tentative, yet.  I'm
going to go back and rethink it while you're gone.  I'll get
back to it this evening.  That's my normal habit and custom.
But if I continue and this becomes a final order, Mattel has
a motion for expedited discovery on the counterclaims and
reply, and I'm assuming for a moment that if this becomes a
final order that, possibly, MGA would be seeking additional
discovery.  I don't know, because I'm not involved in any of

1    the depositions; the Special Master is.

2          I think I'd prefer argument on a

3    request-by-request basis concerning Mattel's motion for

4    expedited discovery.  But I really like to know by Wednesday

5    night if I make this a final order, which will come out this

6    morning -- everything looks good to me at 3:00 o'clock in

7    the morning -- what your position is going to be, and I want

8    you all back at 4:30 on Friday -- I'm sorry, on Wednesday.

9    If this does become a final order, that's a very serious

10   discussion, if you need additional depos, how long they are

11   and who they are.

12         So, I know you can do both, because you're -- the

13   court is blessed by having outstanding counsel on both sides

14   representing MGA and Mattel.  And I know you can prepare

15   your summary judgment motions, and you can take additional

16   depos at the same time.

17         Is there anything further this evening?

18         Mr. Zeller.

19         MR. ZELLER:  There is one issue that I would like

20   to discuss with the court in camera.  It is, basically, on

21   the same basis in which MGA the other day successfully asked

22   for such a discussion concerning questioning of Mr. Eckert.

23   I have a similar point regarding the questioning of

24   Mr. Larian tomorrow.

25         THE COURT:  Okay.  Let's take that up in camera,

1    so your strategy is not disclosed.

2            Would you like Mr. Quinn to be with you?

3            MR. ZELLER:  Yes.

4            THE COURT:  How about your co-counsel, or your sub

5    co-counsel?

6            MR. ZELLER:  Yes, sir.

7            THE COURT:  Would you be kind enough to meet out

8    in the hallway for just a moment.

9            Then, I want you to make a record of who's

10   present, just like MGA did the other evening.

11           I have two law clerks present.  The Special Master

12   will remain.

13           THE COURT:  Why don't you set the record for who

14   is present, Mr. Seller.

15           MR. ZELLER:  Yes, sir.

16           For Mattel present are John Quinn, Scott Watson

17   and Mike Zeller.

18                   * * SEALED PROCEEDINGS FOLLOW * *

19           *(Written Court approval required to view.)*

20

21

22

23

24

25

47

```
 1    SANTA ANA, CALIFORNIA; MONDAY, OCTOBER 4, 20010; 6:06 P.M.

 2                              -oOo-

 3         (The following proceedings were held in open

 4         court:)

 5              THE COURT:  All right.  The record now will be

 6    open, Deborah.  The in-camera part, of course, is sealed.

 7              Is there anything further this evening?

 8              Mr. Zeller?

 9              MR. ZELLER:  No, your Honor.

10              THE COURT:  Mr. Quinn?

11              MR. QUINN:  No, your Honor.

12              THE COURT:  Ms. Hurst?

13              MS. HURST:  Yes, your Honor.  A couple of issues:

14    First, there is a witness in Atlanta.  Her name is Tyler

15    Snyder.  She is the person whom we believed went to the MGA

16    showroom in 2001.

17              THE COURT:  She's one of the two people who walked

18    the MGA showroom?

19              MS. HURST:  In 2002; that's correct.

20              THE COURT:  Joe Franke and it's Tyler Snyder.

21    Now, who is the other person?

22              MS. HURST:  Carey Plunkett.  And, actually, today

23    Mattel's 30(b)(6) witness called Ms. Plunkett to get

24    information and she declined to cooperate because she had to

25    consult with her criminal counsel.
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1          THE COURT:  Where is she located?

2          MS. HURST:  She's still a Mattel employee.

3          THE COURT:  And where is she located?

4          MS. HURST:  El Segundo was her business address.

5          THE COURT:  El Segundo.  And your request is?

6          MS. HURST:  So Tyler Snyder is in Atlanta, and

7   she's the one that we believe based on all the information

8   that we have gotten went in in 2001, which is the critical

9   year for statute of limitations purposes.

10          THE COURT:  I'm sorry.  I misheard.  My apologies.

11          MS. HURST:  She also went in in 2002.

12          THE COURT:  Thank you very much.

13      *(Pause.)*

14          THE COURT:  I want to retrace that for just a

15   moment.

16          Tyler Snyder is Atlanta?

17          MS. HURST:  Correct.

18          THE COURT:  Carey Plunkett is in?

19          MS. HURST:  California.

20          THE COURT:  El Segundo?

21          MS. HURST:  Correct.

22          THE COURT:  And, now, what's your request?

23          MS. HURST:  So, for 2001, Tyler Snyder is the

24   person who everybody pointed to as having gone into the MGA

25   showroom.

1          We subpoenaed her -- well, first, we spoke with

2     her.

3               THE COURT:  In Atlanta?

4               MS. HURST:  In Atlanta -- well, by telephone.

5               THE COURT:  You subpoenaed her by telephone.

6               MS. HURST:  We spoke with her by telephone.

7               THE COURT:  You spoke to her by telephone, because

8     I don't have jurisdiction down in Atlanta. I wish I did, but

9     I don't.

10              MS. HURST:  Whether she should cooperate with us.

11    And she, initially, talked to us.  But then, after we

12    started to ask her some questions, she said, *I'm going to*

13    *have to talk to Mattel and see whether I should talk to you*

14    *or not.*

15              THE COURT:  There is a process.  You can go

16    through the Atlanta court.

17              MS. HURST:  And we did.  We subpoenaed her, and

18    then her lawyer moved to quash.

19              The problem that we have is that it's apparent

20    that Mattel is paying for her representation.  Only Mattel

21    has refused to tell us that and her lawyer has refused to

22    tell us that.  But we believe it to be true.  And under the

23    court's prior rules, if Mattel is paying for her

24    representation and they are refusing to produce her --

25              THE COURT:  Just a moment.  Are you paying for her

 1    representation?

 2            MR. ZELLER:  I presume we will.  But, by the way,

 3    your Honor, what we have also told them --

 4            THE COURT:  They are paying for her

 5    representation.

 6            MR. ZELLER:  We haven't been charged yet.  We

 7    presume we will.

 8            THE COURT:  They are on a billable hour rate.

 9            MR. ZELLER:  I presume so.

10            MS. HURST:  So we would like her either to be

11    brought here for deposition the way we did with Marianna

12    Trueba, or at an minimum that they withdraw the motion to

13    quash and let us get this deposition done.  We're past the

14    close of discovery now.

15            THE COURT:  I understand that.

16            MS. HURST:  So that's -- we need help.  By the

17    way, we tried to subpoena her for weeks and she evaded

18    service.  And then, we finally subpoenaed her and then she

19    moves to quash with Mattel's representation.

20            THE COURT:  Okay.

21            MR. ZELLER:  I'm actually delighted that MGA has

22    brought this up.

23            What Ms. Hurst omits are some rather important

24    facts.  Number one, MGA, apparently -- in fact, more than

25    apparently, has admitted that they were talking to Tyler

1    Snyder for weeks, weeks without disclosing it to Mattel.  It

2    was only after she said, *Well, I better tell Mattel about*

3    *this,* that then subpoenaed her with only a few days left of

4    discovery.  Obviously, Ms. Snyder -- who is a mother, she

5    lives across the country -- hasn't worked for Mattel in

6    eight years, has a problem with MGA's counsel demanding she

7    fly across the country at their whim.  That's hardly a

8    surprise.  This is, unfortunately, as the court is aware,

9    not exactly the first time in which MGA has taken this

10   position concerning witnesses.

11            Insofar as what the court orders, it has not been

12   the court's prior decisions that merely paying for the fees

13   requires the person to travel across the country.  In fact,

14   we never really advocated that position.  But, of course,

15   the court will remember --

16            THE COURT:  Thank you very much.  You're done now.

17            Now, these are the many issues that we want to

18   take up Wednesday night.

19            MS. HURST:  All right.

20            THE COURT:  And instead of piecemealing this from

21   both sides, I want to know exactly what you believe this

22   newly found evidence leads you to request.

23            MS. HURST:  Understood.

24            THE COURT:  So, first of all, there's no reason

25   each of you can't go to Atlanta, is there, if we run into

1    this problem?

2              Mr. Zeller.

3              MR. ZELLER:  No, your Honor.

4              THE COURT:  Ms. Hurst?

5              MS. HURST:  We can go.

6              THE COURT:  So that's not a problem about the poor

7    mother flying all the way across the country, is it?

8              But I want to get an indication Wednesday night

9    and it's really somewhat in MGA's hands now.  I certainly

10   granted 25 depositions that you complained about at the

11   time.  But now, I expect Mattel's going to complain.  I

12   don't think I'm going to give you 25 depositions, but you

13   might have two to four, depending upon who they are.  But

14   you have to let me know who they are and then we'll struggle

15   with whether they're within our jurisdiction, or we have to

16   go find these people, or if they're taking the fifth, or

17   whatever.

18             But I'm not going to make a ruling tonight.  I

19   just -- I've heard the information.  It's only one witness.

20   I haven't even gotten to Harry Plunkett yet.

21             MS. HURST:  We'll add Plunkett to the list.

22             THE COURT:  So I want to hear that Wednesday night

23   at 4:30, okay?

24             What else?

25             MS. HURST:  In omnibus you had asked us to address

```
 1    tonight what could be done by the end of the week and what
 2    couldn't.  Did you want to talk about that tonight, or did
 3    you want to wait until Wednesday on that as well?
 4              THE COURT:  I thought everything was going to be
 5    completed, other than any additional discovery, if I hold to
 6    this tentative.
 7              MS. HURST:  Your Honor, I believe the court's
 8    order was:  Come on October 4th and tell me if there's any
 9    of this that I've just ordered that you can't get done by
10    October 7th.
11              THE COURT:  Perhaps I did.  I thought that each of
12    you wanted to extend your depositions by agreement
13    throughout this week and that was the end of it.
14              But if that's your memory --
15              MS. HURST:  Your Honor, referring to last sentence
16    of the court's order:  Should the parties require additional
17    time to complete the obligations imposed by the instant
18    order, they may orally inform the court of their request at
19    the October 4th, 2010 hearing.
20              THE COURT:  Well, what else?  What can't you get
21    done?
22              MS. HURST:  We've got two categories covered by
23    the order that we need more time for:  The Larian hard
24    drive.  It was 320,000 documents to start.  We have been
25    diligently reviewing everything.  We produced 183,000
```

1    documents, somewhat more than that.  And of the remainder,

2    we've reviewed approximately a third for privilege, but

3    we're still -- we have to do this on a document-by-document

4    basis and it requires people who are knowledgeable about the

5    case in order to get the privilege calls right so we don't

6    over-withhold.  Strangers come in and they make cautious

7    decisions.  We are trying to do this with people who are

8    knowledgeable about the case and the court's requirements so

9    that we make sure that we are consistent with the guidance

10   that we have gotten from Discovery Master O'Brien and the

11   court -- sorry.

12            THE COURT:  We're trying to come in with people

13   who are knowledgeable.  We have done this with Discovery

14   Master O'Brien in the past.

15            MS. HURST:  So we need more time on that.

16            The only other one, your Honor, was No. 4,

17   discovery related to contract interpretation.

18            THE COURT:  How much more time do you need?

19            MS. HURST:  Your Honor, while we are on the

20   subject, there is one other issue --

21            THE COURT:  How much more time do you need?

22            MS. HURST:  October 15th, your Honor.

23            THE COURT:  Let me consider that this evening.

24            Now, your next issue.

25            MS. HURST:  We just got the Archive One documents

 1    from ILS on Saturday.  We still don't have the ILS, the

 2    documents from ILS in usable form, your Honor.

 3            We do know this:  It's 166,000 documents, based on

 4    the search terms applied -- Mattel's search terms that were

 5    applied to the seven custodians and we still doesn't have

 6    the documents in usable form.

 7            THE COURT:  I don't understand why they are not in

 8    usable form.

 9            MS. HURST:  We need them in their original form

10    with meta data intact so that we can de-duplicate them

11    against the existing document production and the existing

12    withheld documents so that we can more efficiently and

13    quickly produce what needs to be produced and review for

14    privilege what needs to be reviewed.  So, for example, say,

15    half of these documents have already been produced.  If we

16    don't get them in their original form with meta data intact,

17    there's no way for us to know that.

18            THE COURT:  Have you had contact with Judge Smith?

19            MS. HURST:  We have had regular communication with

20    ILS.

21            THE COURT:  Have you had contact with Judge Smith?

22            MS. HURST:  Only in the form of the status report.

23            THE COURT:  Why haven't you called him?

24            Both of you go get on the phone and call

25    Judge Smith.

1          MS. HURST:  I think we're going to get it, your

2     Honor.

3          THE COURT:  Go call him.  That's who you're

4     dealing with and then you deal with the entity.  But you

5     deal with Judge Smith first.

6          MS. HURST:  Understood.

7          THE COURT:  Okay.  Do you want me to call him?

8          MS. HURST:  I just want to get a reasonable time

9     to review the documents once we finally get them.  Or,

10    actually, what I would like is to renew our motion for

11    protective order that Mattel's search terms are overbroad:

12    The 166,000 documents that are Archive One is too much.

13         THE COURT:  Thank you very much.

14         Now, do you want to call?

15         MS. HURST:  Your Honor, we would like a month

16    after ILS gives us the documents.

17         THE COURT:  I'm not going to give that to you.

18         Do you want to call Judge Smith?

19         MS. HURST:  I'm not sure what it would accomplish,

20    your Honor.  I mean, I will certainly take the court's

21    invitation, but I mean, we're going to get the documents at

22    some point and then we need some time to review.

23         I'm happy to do so, if the court wishes us to, but

24    we don't have them yet.  And we can't really review them

25    efficiently until we get them, so I just need a reasonable

1  amount of time after we get them to review another 166,000

2  documents.

3          THE COURT:  All right.  Let me talk to --

4          Now, the Special Master Robert O'Brien is here.

5  He wants to raise a couple of questions concerning your

6  experts that he approached me with.

7          So you had a couple of inquiries you wanted to

8  make of counsel so that they are as well prepared for trial

9  as they can be.

10          SPECIAL MASTER O'BRIEN:  And that's the -- just

11  the question of expert discovery, and I don't know if you

12  designated --

13          THE COURT:  Pull the microphone just a little

14  closer.

15          SPECIAL MASTER O'BRIEN:  Thank you, your Honor.

16          On expert discovery, I want to get an idea of how

17  many experts both sides had and if both sides expected to

18  meet me at the depositions for the expert discovery.  I'm

19  happy to be there.  I just wanted to get an idea of the

20  number and the possible scheduling so we can get those on

21  calendar.

22          THE COURT:  We'll go off the record for a minute.

23      *(Discussion held off the record.)*

24          THE COURT:  Okay.  Now, I want you to help Robert

25  O'Brien with the question he asked you.  Because what he

1    doesn't want is a last-moment logjam and the inability to

2    service you.

3              MR. ZELLER:  If I may make a suggestion on that.

4    What we have been doing in the past with Mr. O'Brien is

5    coming up with a schedule jointly and sharing it with him

6    and jointly, of course, among the parties and then working

7    with Mr. O'Brien.

8              THE COURT:  If he's concerned --

9              SPECIAL MASTER O'BRIEN:  No, your Honor, I wasn't

10   concerned.  I just raise that with you if you wanted me to

11   be involved in the expert discovery, so I can work with the

12   parties.  That's not a problem.

13             THE COURT:  I would kind of like to know also by

14   Wednesday night.

15             SPECIAL MASTER O'BRIEN:  Okay, your Honor.

16             THE COURT:  That is going to save a special

17   session, and I want to check it out with some degree of

18   certainty, because you may be going to Atlanta.  It's

19   beautiful this time of the year.

20             MR. ZELLER:  If we are going to talk about the

21   discovery extensions, then I'm going to need to ask for it

22   as well, but I thought we were going to table that until

23   Wednesday.

24             THE COURT:  We are.

25             MR. ZELLER:  It's on the 38 new custodians that

59

1    we're supposed to be looking at.  I mean, they're talking

2    about 160,000 documents as being some, you know, huge

3    production even before they're de-duped.  I suspect with the

4    38 people we're looking at a lot more than that.  So I'm

5    thinking that we're probably going to be requesting an

6    extension of about 10 business days in order to complete it.

7           We'll be doing it on a rolling basis, of course,

8    as it's done but, you know, the deadline would be

9    challenging, or impossible.

10          THE COURT:  Okay.  Anything else?

11          MS. HURST:  Could we start earlier on Wednesday?

12          THE COURT:  No, I've got another matter.  We are

13   going to be in a jury trial tomorrow, and I'll recess them

14   at 5:00, and we are going to finish the court trial between

15   5:00 and 6:00.

16          MR. MCCONVILLE:  Is Wednesday 4:30 or 6:00?

17          THE COURT:  6:00.  Anything else?

18          MR. QUINN:  No, thank you.

19          THE COURT:  No.  Annette?

20          MS. HURST:  Can I be excused on Wednesday?

21          THE COURT:  Sure.  In fact, either one of you can

22   be here, if you want.

23          MS. HURST:  Could I have Mr. Molinski sit in my

24   place on Wednesday?

25          THE COURT:  No.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1          John, if you want to come down, fine.  I just need

2     one counsel, but that counsel makes the final decision.

3     That's it.  Okay.  Good night.

4          MS. HURST:  Thank you.

5       *(At 7:30 p.m., proceedings were adjourned.)*

6

7                              -oOo-

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        CERTIFICATE

 2          I hereby certify that pursuant to Section 753,

 3   Title 28, United States Code, the foregoing is a true and

 4   correct transcript of the stenographically reported

 5   proceedings held in the above-entitled matter and that the

 6   transcript page format is in conformance with the

 7   regulations of the Judicial Conference of the United States.

 8

 9   Date:  October 14, 2010

10

11

12                    _____

13                    Deborah D. Parker, Official Reporter

14

15

16

17

18

19

20

21

22

23

24

25
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*