**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Case No. CV 04-9049 DOC (RNBx)                          Date: November 15, 2010

Title: MATTEL, INC. v. MGA ENTERTAINMENT, INC.

PRESENT:

THE HONORABLE DAVID O. CARTER, JUDGE

<u>Kathy Peterson</u>                                      <u>Not Present</u>
Courtroom Clerk                                      Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFFS: ATTORNEYS PRESENT FOR DEFENDANTS:

NONE PRESENT                            NONE PRESENT

PROCEEDING (IN CHAMBERS): ADVANCING HEARING TIME ON NOVEMBER 16, 2010
                        AND IDENTIFICATION OF ISSUES IN ANTICIPATION OF
                        HEARING ON PENDING MOTIONS FOR SUMMARY
                        JUDGMENT

      The Court advances the hearing time on the summary judgment motions on November 16, 2010 to begin at 10:00 a.m.  The Court will also take up the issue of the juror letter/questionnaire with counsel at that time; Frank Galvan, Manager of the Jury and Naturalization Department, will be present.

      The Court finds it prudent to identify the issues that counsel should prepare to discuss at the upcoming hearing on the motions for summary judgment filed by Mattel, the MGA Parties (hereinafter "MGA"), and Machado.  Each party will be afforded approximately four hours of argument (including opening and rebuttal on each of the topics identified herein).  Since Machado's briefing does not directly address the majority of these issues, his counsel need not address all of them at the hearing.

      **A.      MGA's Objections to Mattel's Identification of Bratz and Jade as Trade Secrets**

      1.      In is moving and replying papers, MGA "renews" its objections to the Court's Order Granting Mattel's Renewed Motion to Confirm Pendency of Mattel's Counterclaim Predicated Upon the Misappropriation of Trade Secrets; the names Bratz and Jade.  **How is this a change in legal theory**? Where in Mattel's discovery responses, or any other filings, does the assertion of these trade secret

counterclaims indicate a "change in legal theory"?

2.    How was MGA prejudiced?  Even if amendment were denied, wouldn't Mattel have simply been entitled to file an entirely new lawsuit for misappropriation of the Bratz and Jade trade secrets?  And absent amendment, wouldn't MGA's counterclaims in reply have been partially barred as non-compulsory?

3.    Why is the Court's failure to permit Mattel to formally amend its pleading to expressly identify the Bratz and Jade trade secrets even relevant?  Isn't a Motion to Confirm **not** a Motion for Leave to Amend?  Isn't MGA's counterclaim in reply for trade secret misappropriation predicated upon trade secret protection enjoyed by information about 114 products, even though all 114 products (or the documents that reference them) are not expressly identified in the counterclaims in reply?

4.    How does the assertion of Bratz/Jade trade secret counterclaims "violate[] the mandate"?

**B.    MGA and Machado's Motion for Summary Judgment on Mattel's First and Second Counterclaims Alleging Violations of the Racketeer Influenced and Corrupt Organizations Act**

1.    Must the person and enterprise *always* be distinct?

(a)    Isn't MGA's position bolstered by the rule that the person and enterprise must be "sufficiently distinct . . . *at the time* that the alleged RICO violations occurred?" *Bessette v. Avco Fin. Svcs., Inc.*, 230 F.3d 439, 449 (1st Cir. 2000) (emphasis added); *see also Jacobson v. Cooper*, 882 F.2d 717, 719-20 (2d Cir. 1989); *LSC Assoc. v. Lomas & Nettleton Fin. Corp.*, 629 F. Supp. 979 (E.D. Pa. 1986).

(b)    Mattel argues that temporal limits incentivize corporations to absorb members of the associated-in-fact enterprise to avoid liability.  But isn't any benefit to the corporation limited by the fact that 18 U.S.C. § 1962(b) does not require distinctness, preventing the corporation from evading liability (note: this is an argument frequently made by courts explaining why it is equitable to exempt the *enterprise* from liability under sub-section c)?

(c)    Absent temporal restriction, liability could extend to acts committed by a person no longer "employed by or associated with" the enterprise in whose conduct he continues to participate through a pattern of racketeering

activity.  Is this concern irrelevant due to the logical impossibility that a person participates in the conduct of an enterprise's affairs even if he is not employed by or associated with that enterprise?  Is there applicable case law?

(d) Mattel argues the enterprise includes "Veronica Marlow, Peter Marlow, Maria Elena Salazar, Isabel Cabrera and Beatriz Morales."  These individuals were first identified as members of the enterprise in a Second Supplemental Interrogatory Response served by Mattel in October 2010 at the close of discovery.  Can Mattel clarify its theory of the RICO claim at this late stage in the litigation?  Assuming Mattel can, doesn't its pleading foreclose such a clarification, since the alleged members of the enterprise are limited to the MGA Parties, Bryant, Machado, and Does 6 through 10, who are also defendants to the first counterclaim, and Mattel has not identified the Marlows, Salazar, Cabrera and Morales as the Doe Defendants?

(e) Mattel argues that Bryant was an independent contractor and not an employee.  Is this formal distinction material, or should the Court examine the facts concerning Bryant's relationship with MGA (his duties and conduct) to determine whether the distinctness requirement has been satisfied?  *See Dirt Hogs, Inc. v. Natural Gas Pipeline Co. of America*, 210 F.3d 389, at \*2-\*3 (10th Cir. Apr. 10, 2000) (holding that enterprise composed of corporation and its employees, officers, and independent contractors was indistinct from corporation); *compare Allstate Ins. Co. v. Etienne*, 2010 WL 4338333, at \*7 (E.D.N.Y. Oct. 26, 2010) (finding non-exclusivity relevant); *Conte v. Newsday, Inc.*, 703 F. Supp. 2d 126, 136 n. 6 (E.D.N.Y. 2010) (similar); *Migliaccio v. Midland Nat. Ins. Co.*, 2007 WL 316873, at \*3 & n. 1 (C.D. Cal. Jan. 30, 2007).

(f) Quoting *Living Designs, Inc. v. E.I. Dupont de Nemours and Co.*, 431 F.3d 353 (9th Cir. 2005), Mattel argues that because Larian is distinct from MGA, *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158 (2001), the enterprise composed of Larian and MGA is distinct from MGA (Opp. at 85.)  How can the quoted portion of *Living Designs* be reconciled with *King*'s observation that "it is less natural to speak of a corporation as 'employed by' or 'associated with'" an enterprise composed of "the corporation, together with all its employees and agents," even though the agents and employees are distinct from the corporation?  *See* 533 U.S. at 164 (emphasis added).

2. Was Mattel injured in its business or property by reason of a violation of Section 1962?

    (a) Can the categories of injury be summarized as follows: (1) injury to profits/market share of Mattel's existing product lines cannibalized by MGA's products; (2) injury to profits of Mattel's hypothetical line of Bratz dolls; (3) injury to Mattel's opportunity to market the Bratz line; (4) injury to the exclusive right to use misappropriated information; and (5) salaries?

    (b) Much has been made of the Ninth Circuit's holding in *Oscar v. University Students Coop. Ass'n* that a civil plaintiff may not sue to recover injury to "valuable intangible property interests." 965 F.2d 783, 785 (9th Cir. 1992) (en banc).  This has since become settled law in this Circuit, *see Chaset v. Fleer/Skybox Intern., LP*, 300 F.3d 1083, 1086-87 (9th Cir. 2002), and others, *see, e.g.*, *Maio v. Aetna, Inc.*, 221 F.3d 472, 484 (3d Cir. 2000).

        (i) Given expert witness' ability to assign a fixed value to an intangible interest (e.g., emotional well-being), how can courts systematically and consistently distinguish between "concrete financial loss" and "intangible property interests"?

        (ii) Is the "concrete financial loss" rule an *additional* hurdle, and not a mere application of the "business or property" limitation?  *See Price v. Pinnacle Brands, Inc.*, 138 F.3d 602, 607 (5th Cir. 1998) ("[I]t does not follow that any injury for which a plaintiff might assert a state law claim is necessarily sufficient to establish a claim under RICO.") (cited with approval in *Chasset*, 300 F.3d at 1087).

        (iii) How can the cases recognizing a claim for lost opportunity, *see, e.g.*, *Phoenix Bond & Indem. Co. v. Bridge*, 477 F.3d 928, 930 (7th Cir. 2007) ("[L]oss of (valuable) *chance* is real injury."); *see Chasset*, 300 F.3d at 1087 (loss of chance cognizable but plaintiffs suffered no lost chance) be reconciled with those that don't, *see In re Taxable Mun. Bond Sec. Litig.*, 51 F.3d 518, 523 (5th Cir. 1995) (lost opportunity claim too "speculative" for standing)?  How are the injuries caused by Mattel's "lost opportunity" *not* speculative in light of the near impossibility of measuring the value of that opportunity to Mattel?  Does it even matter if Mattel's injuries are speculative? *See Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1055 (9th Cir. 2008) (remanding to district court and implying that *en banc* decision in *Diaz* allowed for recovery of speculative injuries).

(iv)     When do the concepts of "business" and "property" overlap (if ever)?  *See Reiter v. Sonotone Corp.*, 442 U.S. 330 (1979).  Is business opportunity recognized as "property" under California law as a categorical matter, or are only certain species of lost opportunity recognized?  *See Guerrero v. Gates*, 442 F.3d 697 (9th Cir. 2006); *Couch v. Wan*, 2010 WL 3582519, at *20 (E.D. Cal. Sept. 10, 2010) (holding, on remand, that "lost seniority, lost opportunities for transfer to other positions, promotions, and career advancement" constitute "interference with contractual relations," which is a state law property interest).  Are future profits (that are lost) a property interest or measure of damages?  *C.f. Pom Wonderful LLC v. Welch Foods, Inc.*, 2009 WL 5184422, at *4 (C.D. Cal. Dec. 21, 2009).

(c)     Proximate Cause

(i)     *Hemi Group*, *Anza*, and *Holmes* are certainly distinguishable because, in all three cases, there was a person more directly harmed by the wrongdoing that did not bring a claim.  But isn't the issue of whether there is a more "direct victim" only dispositive in favor of dismissal and not against it, since none of the three factors considered by the Ninth Circuit, *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1055 (9th Cir. 2008) turn on the issue?

(ii)     The Wagner Declaration: How do we know that Bratz sales and Mattel sales share a causal relationship, and that an external force is not responsible for both?  How does the methodology in paragraph 42 of his declaration segment out harm caused by the actual predicate acts, only one of which (criminal copyright infringement) is the mere sale of Bratz dolls?  Moreover, how does the methodology in paragraph 42 account for the potential that the market would have shrunk absent Bratz dolls?  Toys are not a necessity, like articles of clothing or food; why wouldn't consumers who preferred bratty-looking dolls simply hold on to their money?

(iii)     Mattel argues that "it was the appearance of the Bratz dolls . . . that drove Bratz sales." (Opp. at 97.)  But doesn't this speak to MGA's unjust enrichment as a result of the racketeering acts and not, as required, the extent to which Mattel was injured in its business or property?  *See Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479 (1985) (RICO plaintiff "only has standing if, and can only recover to the extent that, he has been injured").  In any event, how is this argument

consistent with Mattel's claim that trapezoidal packaging affected the value of the product (Mot. at 15-19)?  And how does it square with the failure of the Flavas line, which closely resembled Bratz?

(iv)    If Mattel is foreclosed from recovering injury to future profits or market share, but is nevertheless allowed to recover injury to business opportunity, should its damages be capped at the amount awarded (if any) for the intentional interference with contractual relations claim?

3.    *Boyle*:  MGA and Mattel do battle over whether the members of the alleged enterprise shared a common purpose to engage in the acts of racketeering.  (Mot. at 84-86.)  But, in light of RICO's attempt to prevent infiltration of *legitimate* enterprise, why can't the members of the enterprise be bound by a legitimate purpose — *e.g.*, an unofficial sports league doesn't have an illicit purpose but its affairs can still be conducted through a pattern of racketeering?  Weren't the members of the enterprise bound by the common purpose of selling MGA's products?

4.    Pattern/Evidence of Predicate Acts

a)    Mattel argues that the "scheme to defraud" was effectuated through the "use" of the alleged trade secret materials.  Although *Carpenter* shows that the *taking* of materials includes a fraudulent element, how does *use* require any fraud at all?  As noted in the dismissal order, isn't section 1832's silence as to whether use can be effectuated through fraud dispositive of this issue?  How convincing is *Gen. Motors Corp. v. Ignacio Lopez de Arriortua*, 948 F. Supp. 670 (E.D. Mich. 1996)'s attempt to distinguish *Management Computers Services, Inc. v. Hawkins, Ash, Baptie and Co.*, 883 F.2d 48 (7th Cir. 1989) — why is or isn't *Gen Motors* a better reading of the mail/wire fraud statutes than *Brotech*?

b)    Even if Machado wasn't a Mattel or Mattel de Mexico employee, why couldn't his alleged theft of trade secrets from those two entities be actionable, since *Carpenter* does not require an employment relationship?

c)    Criminal Copyright Infringement: Under what authority did the allegedly misappropriated trade secrets enjoy the protections of the copyright laws?  If Machado is liable for criminal copyright infringement by working for a company that manufactured allegedly infringing products, is every employee of MGA and/or its subsidiaries liable for copyright infringement?

      d)     Travel Act:  How were Mattel's employees induced to use "their position" for the benefit of MGA?

      e)     Where can the arguments in pages 43:23 to 44:14 of MGA's Reply brief be found in MGA's Motion?

**C.**    **Supersession of Mattel's State Law Counterclaims by the California Uniform Trade Secret Act**

1.    Assuming MGA prevails *only* on this argument and none of the other arguments made in its Motion, why shouldn't the Court leave the issue of "partial" supersession for a motion for judgment as a matter of law made after the trial?  In the alternative, why shouldn't the jury be simply instructed that liability for Mattel's state law counterclaims in reply cannot rest upon the misappropriation of trade secret information?  More broadly, how would a grant of *partial* summary judgment on the state law counterclaims in reply operate at the time of trial?  The parties are encouraged to research jury instructions given in cases in which a state law claim is "partially" dismissed on UTSA grounds at an earlier stage in the litigation.

2.    The only-on point federal appellate court case concluded that "it is unimaginable that someone who steals property, business opportunities, and the labor of the firm's staff would get a free pass just because none of what he filched is a trade secret."  *Hecny Transp., Inc. v. Chu*, 430 F.3d 402, 404 (7th Cir. 2005).  Wouldn't MGA's theory result in the supersession of claims for conversion of plainly non-trade secret property, like office equipment (*e.g.*, a simple pad of paper with confidential non-trade secret notes) or, in this case, physical drawings and sculpts?

3.    Mattel's approach requires a court to first determine whether the information was a trade secret, but if the question of trade secret status is left to the jury, wouldn't the viability of the potentially superseded state law claims be left until after the trial; how would that operate in practice?

4.    Does a more statutorily sound approach prevent Mattel from recovering *"remedies,"* *see* Cal. Civ. Code § 3426.7(b)(2), that flow from the loss of secrecy or exclusive use of the information?  Mattel's brief provides one answer to this question, which is that allegedly stolen information "was valuable, regardless of its confidentiality, simply because it was costly to create and acquire it," (Opp. at 27), but aren't the costs of acquisition (and sometimes the costs of creation) often related to the value the material obtains from its secrecy?  And don't *Mortgage Specialists, Inc. v. Davey*, 153 N.H. 764 (2006) and the other cases listed in

footnote 3 of MGA's Reply offer a compelling argument against Mattel's position?

5.      MGA responds that Mattel was not deprived of the continued use of data allegedly copied by departing Mattel employees, but how does this argument square with the recent trend recognizing property rights in intangibles?  *See Kremen v. Cohen*, 337 F.3d 1024, 1030 (9th Cir. 2003) (conversion claim); *but see Harper & Row Publishers, Inc. v. Nation Enters.*, 723 F.2d 195, 201 (2d Cir. 1983) ("Merely removing one of a number of a copies of a manuscript (with or without permission) for a short time, copying parts of it, and returning it undamaged, constitutes far too insubstantial an interference with property rights to demonstrate conversion.").

**D.      Preemption of Mattel's State Law Counterclaims by the Copyright Act**

1.      How does the grant of "partial summary judgment" on preemption grounds operate at the time of trial?  Should the issue be left until after trial?

2.      MGA argues that the intentional interference with contractual relations counterclaim is preempted to the extent predicated on MGA's alleged inducement of Bryant to disclose the Bratz drawings and sculpt to MGA instead of Mattel, as his contract allegedly required.  This argument is connected with MGA's argument that "Mattel is trying to gain ownership using . . . tort theories of interference with contract."  (Reply at 3.)  What case law supports this theory of ownership and **where** does Mattel link ownership with its intentional interference counterclaim?

3.      If MGA's theory is that every claim based upon the conveyance of a copyrightable work is preempted, doesn't this eviscerate the vast majority of state law claims based on property transfers, including the uniform trade secret act in its entirety?  Mattel distinguishes *Del Madera* and disputes its precedential value, but is there any more recent Ninth Circuit decision that supports Mattel's argument?

4.      Assuming MGA prevails on its CUTSA arguments in full, are the only remaining grounds for the state law counterclaims that MGA induced Mattel employees to work for MGA's benefit while still employed by Mattel?

**E.      Copyright Infringement**

1.      Shouldn't the "facial features, facial expression, size [and] body" be filtered out?  *See* Ninth Circuit Op. at 17344-17345 (holding that Funk 'N' Glow Jade and Bratz Wild Wild West Fianna did not share "fashions and hair styles" with Bryant's

drawings) Don't the Jade and Fianna dolls share facial features, facial expression, size and body type with Bryant's drawings?

2.    MGA argues that differences in the hairstyles or clothing (elements expressly considered by the Ninth Circuit) defeat infringement.  How is this analysis transformed by the apparently modern trend towards creating dolls with interchangeable heads and clothing, such that the consumer *can* but does not necessarily construct an infringing work?  Is there analogue for this — *e.g.*, puzzles that depict copyrighted works?  And how do the answers to these questions affect the Ninth Circuit's conclusion that "[u]nlike the limited range of expression for the sculpt, there's a wide range of expression for complete young, hip female fashion dolls with exaggerated features"?

3.    Aren't Mattel's "compilations of elements" and "overall similar appearance" (Opp. at 39) arguments invitations to commit the same type of error identified by the Ninth Circuit, because Mattel's approach does not properly filter out unprotectable elements that are necessary to the expression of the "bratty" doll idea?  What does "compilation of elements" even mean in the context of this case?

## F.    Ownership

1.    Should "rights and title" to ideas be assignable?

a)    The Agreement assigns all "right, title and interest" in certain things, which Mattel contends include "ideas."  Assuming Mattel's argument is valid, did Bryant even have any "right, title and interest" to ideas that could be assigned to Mattel?  *See Interserve, Inc. v. Fusion Garage PTE. LTD.*, 2010 WL 3339520 (N.D. Cal. Aug. 24, 2010).  Even if Bryant had some kind of property interest in his "ideas," what would that property interest entitle him to?  How did the finding of the idea's assignment in phase 1 warrant the entry of the constructive trust?  Finally, don't Mattel's "contract" cases simply stand for the proposition that an idea's "disclosure may be of substantial benefit to the person to whom it is disclosed," thus entitling Mattel to nothing more than a breach of contract claim predicated not on Bryant's failure to assign but on his failure to disclose?

b)    Doesn't the assignment of ideas under the Inventions Agreement allow a former employer to almost always create a genuine issue of material fact about whether a former employee conceived a successful idea during his term of employment?  Wouldn't every one of these cases necessarily survive the motion to dismiss stage and, since they would almost always

turn on questions of credibility, summary judgment as well?

    c)    Why shouldn't the consuming public be entitled to ideas that Mattel's corporate hierarchy rejects, but a competitor is willing to manufacture?  On the other hand, isn't the assignment of ideas necessary for the creative field to flourish: aren't small companies, like start-ups, operating at a significant disadvantage if their few employees can walk away with good ideas to a better funded competitor?

2.    Did the Inventions Agreement assign ideas?

    a)    Has any witness, other than Kaye who disclaimed knowledge, explained the removal of the term "ideas" from later drafts of the Agreement?

    b)    Is Bryant's statement that he "think[s] [he] was aware of" the assignment of ideas under the contract even relevant, given its ambivalence and the fact that it was made in response to a question that **presumed** that the Agreement covered "ideas"?  Is Morales' testimony (Mot. at 12) reliable in light of the fact that the question posed to her was compound?

3.    The "Bratz Design"

    a)    Even if Bryant's right, title and interest to the Bratz design, as inked, were assignable under the Inventions Agreement, what rights did Bryant even have in the design?  Was the design trademarkable at the time it was created?

4.    Work for Hire

    a)    Isn't *Matter of Beverly Hills Bancorp*, 752 F.2d 1334 (9th Cir. 1984) restricted to its facts, since the appellate court in that case "denied the petition" by plaintiff to "amend his pleadings," thus indicating a clear intent that the plaintiff could not change his theory of the case?

    b)    How could this have been work made for hire if Bryant worked in the Barbie Collectibles group, which *did not* produce non-Barbie lines of dolls?

**G.**    **Aiding and Abetting Breach of Fiduciary Duty and Duty of Loyalty**

1.    Existence of a Fiduciary Duty: Is it Mattel's position that the mere inclusion of the word "trust" turns this from a situation in which summary judgment would be

granted *for* MGA to one in which summary judgment would be granted for Mattel, since that is the only fact that distinguishes this case from *Rita Med. Sys., Inc. v. Resect Med. Inc.*, 2007 WL 161049 (N.D. Cal. Jan. 17, 2007) in Mattel's favor? (Note: The employee in *Rita* was even more embedded in plaintiff's corporate hierarchy than Bryant, or any other employee, was in Mattel's).

2.  How does treating the former Mattel employees as fiduciaries hew to (or betray) the purpose of the doctrine, which was born in equity?  Relatedly, when the employment contract specifically obligates the employee to maintain the confidentiality of materials, why isn't a simple claim for breach of contract sufficient?

3.  Mattel argues that the facts raise an inference of aiding and abetting, the elements of which are "substantial assistance or encouragement."  What facts show "substantial assistance"?  What facts show "encouragement" that is "substantial"?  What would *in*substantial encouragement look like?  What facts show MGA's knowledge of the existence of a fiduciary duty — did MGA see the Mattel employees' contracts?  And if the contracts do not unambiguously create a fiduciary duty, how could MGA reasonably have knowledge of that duty?

## H.   Trade Secrets

1.  Categories of Trade Secret Documents

    a)   Forecasting: Is the argument here that a company manufactures its inventory of toy products prior to receiving orders from retailers, and that an accurate forecasting system solves the problem?  When do retailers traditionally order stock from manufacturers, and when do manufacturers make the product?

    b)   How can product names be characterized by trade secrets in light of the fact that, once used, they are "evident" to anyone using the finished product? *See Silvaco Data Systems v. Intel Corp.*, 184 Cal. App. 4th 210, 221-22 (2010); *see also Medtech Prods. Inc. v. Ranir, LLC*, 596 F. Supp. 2d 778, 804 (S.D.N.Y. 2008) ("[M]arketing concepts, *new product ideas*, and business possibilities and goals have likewise been found not to constitute trade secrets") (emphasis added) (citing *LinkCo, Inc. v. Fujitsu, Ltd.*, 230 F. Supp. 2d 492, 498-99 (S.D.N.Y. 2002)).

    c)   Why is the formula depicted in Exhibit 1 to the Cooney declaration particularly unique, given the intuitive understanding that, prices being

equal, retailers prefer products that occupy less shelf space while generating the same profit?

2.   Efforts to Maintain Secrecy

a)   MGA focuses on the fact that Mattel did not consistently mark documents as confidential.  Even if this were true, how could the departing Mattel employees (or any employee of any corporation) reasonably conclude that they could take documents prepared by *others* at the company?  Furthermore, in a company as large as Mattel, how is it reasonable to require the employer to inform its employee about whether each and every document available on the shared company server was a trade secret?

b)   MGA also argues that employees' "varied" expectations about the materials that enjoyed trade secret status demonstrates the insufficiency of Mattel's efforts to maintain the secrecy of its materials.  But how is the testimony about business contacts (Cooney), unreleased products (Osier), pricing information (Arons), relevant to whether forecasting and inventory management are trade secrets?  Doesn't MGA's argument suffer as a result of Cooney's admission that he believed he was allowed to take contacts because he was so informed at a training session?

c)   Does applicable case law recognize distinctions between the misappropriating employee's level in the corporate hierarchy?  For example, is Mattel's burden to maintain the secrecy of its trade secret information decreased with respect to an employee like Brawer, who occupied a senior position at Mattel?

3.   MGA's Participation in the Alleged Misappropriation

a)   Is there evidence that Mattel employees who left for *non*-MGA competitors downloaded, or did not download, Mattel's materials prior to their departure?

b)   As to the issue of ratification, does "acquisition by improper means" require knowledge by the new employer?

4.   Acts by Machado, Trueba and/or Vargas

a)   Is the presentation delivered to Larian at the W Hotel contained in Exhibit 33 to the Isaias Declaration?  What is the relevance of the reference to

Infobasic, Mindshare, and ANTAS?

b) What good were the "line lists" allegedly downloaded by the three employees if the entire industry had trouble forecasting sales even one year ahead of time?

c) What was the *specific* marketing information that the three departing employees allegedly stole?  Was this information intuitive to anyone engaged in the sale of consumer goods, let alone others engaged in the sale of toys?

d) Where in the exhibits is the business plan allegedly created by the three employees and Kuemmerle?  What information in the business plan borrowed from Mattel's trade secret materials?  What evidence is there that MGA de Mexico implemented the business plan?  Why would it be *materially* different if a departing employee developed a business plan for his new employer using lessons learned in his prior employment?  What benefit could have flowed from the business plan, in light of the argument that MGA's financial success was almost entirely predicated on the sale of the allegedly infringing Bratz dolls?

e) What material difference did the allegedly misappropriated line lists make with respect to Machado's decision to lower MGA de Mexico's prices to match Mattel's prices?  Even absent the trade secret materials, wouldn't Machado have known about Mattel's prices from his experience as a Mattel employee?  Did the line lists purport to permanently set Mattel's prices anyway?  And wouldn't retailers share Mattel's prices with MGA de Mexico in order to induce MGA de Mexico to lower its prices?

f) Why weren't Machado, Vargas and Trueba asked to sign non-compete agreements?

g) Who employed Gustavo Machado; Mattel de Mexico or Mattel Servicios (what is the precise relationship between the two entities and why was Mattel Servicios created)?  Mattel de Mexico — a party to this lawsuit — is presumably able to identify its former employees; is Machado a former employee of Mattel de Mexico or not?  Don't Mattel's arguments in opposition to Mattel's claims about lack of consideration presume the existence of such an employment relationship between Machado and Mattel de Mexico, such that if no employment relationship exists, Mattel de Mexico's attempt to impose obligations on Machado fails?

**I.     Statute of Limitations**

1.      MGA "does not concede" but assumes that Mattel's counterclaims relate back to the date of MGA's Complaint.  Why does MGA even need to assume this?  Where is this holding in the Court's order granting in part and denying in part Mattel's Motion to Dismiss the Counterclaims in Reply?

2.      Investigation File 02-115 (M0074372) states that Ivy Ross informed Mattel's investigator that Bryant may have "created 'Bratz' dolls for MGA."  Do principles of judicial estoppel bind Mattel to the rule that an employee's knowledge is imputable to the employer in all circumstances?  And aren't there two reasonable interpretations of this statement: (1) Mattel (Ivy Ross) knew that Bryant created Bratz dolls for MGA while still at Mattel; or (2) Mattel knew that Bryant created Bratz dolls for MGA *after* leaving Mattel?

3.      MGA argues that the statute of limitations on the Bratz trade secret claim began to run as soon as Mattel learned that MGA was using the Bratz name.  Doesn't this argument only work if the "trade secret" was the name "Brats" previously rejected by Mattel?  And how is MGA's "Brats" argument (Reply at 36) consistent with its argument that names that are found in the dictionary are unremarkable?  Not only did Mattel know that "Bryant had been exposed at Mattel to the name 'Brats'," but Mattel could probably reason that every other literate employee was aware of the word "brats."

4.      Is there case law for the proposition that a company can unknowingly maintain the secrecy of information, thereby entitling the information to trade secret status unbeknownst to the company?

5.      <u>Fraudulent Concealment</u>: Footnote 16 of MGA's Reply brief attempts to revive an issue previously addressed by the Court's Order on pending discovery disputes. Both parties have unsuccessfully argued that a fraudulent concealment allegation waives the attorney-client privilege.  Is MGA now conceding that it has waived the privilege that protects its counsel's communications with Brawer?

6.      What evidence supports the variety of arguments made on page 39, lines 2 through 15 of MGA's Reply brief, including:

        (a)     Mattel should have "talked to its own employees" (in addition to talking to Ivy Ross?)?

        (b)     Mattel could have "gone ahead and sued" and thereby "learned of the so-

called ownership claim"?

    (c)    Mattel "couldn't decide which" Mattel IP "MGA and Bratz misused"?

    (d)    Mattel would have known that Bratz was Bryant's "work for hire" when Mattel first learned of Bratz in February 2001 [even though, as MGA elsewhere argues, Mattel does not have "an indefinite right to claim its employees' work" (Opp. at 19)]?

## J.    Choice of Law

1.    Mattel's first argument is that the breach of fiduciary duty and breach of duty of loyalty claims may arise "out of contract," which means that Mexico's ten year statute of limitations for breach of contract claims must apply. What authority in Mexico (or even in California) stands for the proposition that a tort claim, one of whose elements is the existence of a contract (*e.g.*, intentional interference with contractual relations or breach of fiduciary duty), is governed by the statute of limitations that applies to breach of contract claims?

2.    Why shouldn't California law apply to the theft of trade secrets owned by Mattel and Mexican law apply to the thefts of trade secrets owned by Mattel de Mexico and/or Mattel Servicios?

3.    If (1) California law governs the dispute between Mattel de Mexico/Mattel and Machado; and (2) Machado was only an employee of Mattel Servicios; is there any authority for the proposition that California's statutorily imposed duty of loyalty applies only to the relationship between a California corporation and its employees? Is there authority to the contrary?

## K.    MGA's Claim for Trade Dress Infringement

**[During argument, the parties are instructed to ignore the decision by the USPTO. The Court is aware of that decision and the presumption it carries. ]**

1.    MGA points to Mattel's half century of market dominance as evidence that Mattel will not "suffer any non-reputation-related competitive disadvantage from not being able to use MGA's" purported trade dress. But what of the dozens of small toy manufacturers foreclosed from using a basic packaging shape that, for example, more efficiently fits a toy with a trapezoidal shape (like a toy house)?

2.    MGA notes that trapezoidal shaped packaging is distinctive to MGA. But doesn't

this argument confuse correlation for causation, since the Bratz dolls are sold in
trapezoidal packaging, and the Bratz dolls obviously cause consumers to recall
MGA?  Under MGA's theory, wouldn't every manufacturer of a market-dominant
product be able to claim that even the plainest of packages are entitled to full trade
dress protection, so long as those packages house its product?

3.      How is the argument in paragraph 11 of Garcia's declaration (that the trapezoidal
        packaging lets in less light because of the narrow top) consistent with MGA's
        argument that "a trapezoidal package creates a larger footprint"?  Wouldn't a
        rectangular package used in lieu of a trapezoidal package have the same width at
        the base as the trapezoid did at the top?  On a related note, what is the basis for
        Mattel's hearsay objection to this paragraph?  How does this paragraph contain
        expert opinion?

4.      As to the initial interest confusion argument, how applicable is this logic to the toy
        retail context, where dolls sold by competing manufacturers are located mere feet
        apart from each other?

5.      How prominently are the names of the manufacturers displayed on the packages?
        The images in Exhibits A through K to the Pembleton Declaration suggest that
        consumers can easily tell from afar whether a particular product is sold by MGA or
        Mattel regardless of the packaging, but are there other images that demonstrate a
        more subtle display of a manufacturer's logo?

6.      Consumers may be children, but the purchasers are most often adults.  What are
        the odds that a child that directs its parent to purchase a Bratz doll refers to the
        packaging instead of the actual name of the doll?  *See, e.g.*, Ex. A to Pembleton
        Decl. (newspaper article discussing child's identification of specific Bratz
        products).  On a related point, how can MGA characterize its goods as
        "inexpensive" when, as Ex. A to the Pembleton Declaration observes, Bratz dolls
        cost as much as 77 dollars and a Bratz doll house cost as much as 250 dollars
        (indeed, the author suggested that, for the steep price, his daughter should be
        allowed to actually *live* in the Bratz doll house)?

7.      At bottom, doesn't the evidence show that the trapezoidal packaging has
        independent value (if any) because it's "unique" and "innovative" and not because
        it's associated with MGA?

8.      As to the proximity issue, it appears that Mattel deliberately placed MyScene dolls
        near Bratz on the shelves in order to associate the MyScene product with the
        massively successful Bratz product.  But would it even matter if the dolls were

sold in trapezoidal packaging if that were the case, since impetus for consumer confusion (if any) was that the dolls were on MGA's shelf, not that they were packaged in trapezoidal boxes?  Isn't "shelf exclusivity" a perk that MGA can contract for with the retailer(s)?

9.      As to the 4-Ever Best Friends trade dress, the only *Sleekcraft* factor that goes unaddressed in MGA's Opposition is the first (strength of mark).  How could an unreleased product have built a strong association in the mind of consumers?

## L.      MGA's Unfair Competition Claims

1.      MGA's Opposition identifies the activities of the market intelligence group.  Why isn't MGA foreclosed from using these facts as the basis for its claim, in light of counsel's representation at the Larian deposition, as well as counsel's representation at the hearing on Mattel's motion to dismiss and/or strike the counterclaims in reply?

2.      Standing/Recoverable Damages: If it is the "money or property" language that restricts a UCL plaintiff to restitutionary relief, then why should the term "property" in section 1964 be read expansively to encompass future business, including future profits, that may be recovered by civil RICO plaintiffs (like Mattel)?  In any event, why can't MGA's *existing* business relationships (not the same as goodwill) be considered "property" that was lost by reason of Mattel's alleged interference with MGA's licensing relationships?

## M.      Unjust Enrichment

1.      Why is the "better view" the one adopted by courts that permit a claim for unjust enrichment?  Is there any circumstance in which an unjust enrichment claim would not be entirely duplicative of the underlying claim that supports the unjust enrichment theory?  What would such a hypothetical circumstance look like and why does the need to protect the right of the hypothetical plaintiff outweigh the tremendous confusion caused to the jury by the duplication of claims?

2.      MGA seeks damages caused by the entry of the injunction.  How is this claim cognizable, especially insofar as it alleges that a judge would have been influenced in his application of a list of factors (whether there was infringement) by facts (market intelligence group) that are entirely extrinsic to the factors that he was considering?  In addition, isn't the tactical decision *by MGA's counsel*, to seek a bifurcation of the lawsuit a dispositive intervening cause between the alleged suppression of evidence the entry of the injunction — *i.e.*, if MGA is making the

argument that the jury would have nullified on the issue of
infringement/breach/interference/conversion upon hearing lots of bad facts about
Mattel, then why did MGA's prior counsel agree to bifurcate the case in a manner
that delayed trial of all of MGA's affirmative claims against Mattel?  Finally, how
does MGA's claim not ultimately invade the decision-making process used by the
prior district judge?

N.    **MGA's Affirmative Defenses**:  Is there any authority distinguishing *Massey* from a
situation in which an affirmative defense has been affirmatively "waived" prior to the
filing of an amended complaint?  How does such a distinction comport with *Massey*'s
reasoning?

The Clerk shall serve this minute order on all parties to the action.