**Nos. 09-55673, 09-55812**

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———————

MGA ENTERTAINMENT, INC.,
MGA ENTERTAINMENT HK LTD., and ISAAC LARIAN,

*Appellants,*

vs.

MATTEL, INC., a Delaware Corporation,

*Appellee.*

———————

On Appeal from the United States District Court
for the Central District of California, DC No. 04-cv-9049 SGL (RNBx)
(Honorable Stephen G. Larson, Presiding)

———————

**EXPEDITED APPEAL**

**OPENING BRIEF FOR APPELLANTS MGA ENTERTAINMENT, INC.,
MGA ENTERTAINMENT HK LTD., AND ISAAC LARIAN**

———————

Annette L. Hurst
Warrington S. Parker III
ORRICK, HERRINGTON & SUTCLIFFE LLP
405 Howard Street
San Francisco, CA 94105-2669
Telephone: (415) 773 5700
Facsimile: (415) 773-5759

Thomas J. Nolan
Jason D. Russell
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
300 South Grand Avenue, Suite 3400
Los Angeles, CA 90071-3144
Telephone: (213) 687-5000
Facsimile: (213) 687-5600

E. Joshua Rosenkranz
Lisa A. Simpson
ORRICK, HERRINGTON & SUTCLIFFE LLP
666 Fifth Avenue
New York, NY 10103-0001
Telephone: (212) 506-5000
Facsimile: (212) 506-5151

*Counsel for Appellants*

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ...................................................... ix

INTRODUCTION .................................................................................................... 1

JURISDICTIONAL STATEMENT ......................................................................... 3

STATEMENT OF THE ISSUES FOR REVIEW ..................................................... 3

STATEMENT OF THE CASE .................................................................................. 6

STATEMENT OF FACTS ........................................................................................ 7

      Carter Bryant Approaches MGA with the Bratz Concept .............................. 7

      Bryant Represents and Warrants that He Owns the Bratz Concept and
      Designs ............................................................................................................ 8

      Meanwhile MGA Devises a Bratz Sculpt Based on Bryant's Concept ......... 9

      The Bratz Sculpt Continues to Evolve ........................................................ 10

      MGA Acquires the Bratz Trademark, and Bratz Becomes a
      Phenomenon .................................................................................................. 12

      Mattel Sues MGA ......................................................................................... 13

      The District Court Directs Verdicts Against MGA ...................................... 16

      The Phase 1 Verdicts ................................................................................... 17

      The District Court Orders Unprecedented Equitable Relief ........................ 20

SUMMARY OF ARGUMENT ............................................................................... 21

STANDARD OF REVIEW ..................................................................................... 26

ARGUMENT ........................................................................................................... 27

I.    ALL EQUITABLE RELIEF MUST BE VACATED BECAUSE THE
      DISTRICT COURT ERRED IN HOLDING, AS A MATTER OF
      LAW, THAT MATTEL OWNED BOTH BRYANT'S DESIGNS
      AND HIS IDEAS JUST BECAUSE BRYANT CAME UP WITH
      THEM WHILE EMPLOYED BY MATTEL. ............................................. 27

      A. The District Court Erred in Concluding That "Ideas" Were
      Unambiguously Within the Scope of the Inventions Agreement. ................. 29

# TABLE OF CONTENTS
## (CONT'D)

Page

B. The District Court Erred in Concluding That the Inventions
Agreement Unambiguously Covers Designs and Ideas Even if They
Are Outside the Scope of the Employment. .................................................30

II. THE CONSTRUCTIVE TRUST MUST BE VACATED BECAUSE
THE STATE LAW VERDICTS ON WHICH IT IS BASED ARE
INVALID. ...................................................................................................33

A. The District Court Erred in Directing, as a Matter of Law, That
Bryant Became a Fiduciary Merely by Signing a Boilerplate
Confidentiality Agreement. ..........................................................................33

B. The District Court Erred by Directing, as a Matter of Law, that
Bryant Breached His Duty of Loyalty (and Therefore His Fiduciary
Duty) Merely by Signing a Contract with MGA. .........................................39

C. The District Court Erred in Allowing the Jury to Find That MGA
Tortiously Interfered with Bryant's Contract Merely by Signing a
Contract with Mattel .....................................................................................43

III. THE COPYRIGHT INJUNCTION AND RECALL SHOULD BE
VACATED BECAUSE THE DISTRICT COURT APPLIED, AND
INSTRUCTED THE JURY ON, THE WRONG STANDARD FOR
COPYRIGHT INFRINGEMENT. ..............................................................45

A. To Determine the Degree of Copyright Protection, the District
Court Was Required to Isolate, and Filter Out, Unprotectable
Elements. ......................................................................................................45

B. Because the District Court Followed the Wrong Approach, It
Incorrectly Adopted The "Substantial Similarity" Standard. .......................45

1. The District Court ignored this Court's prescribed
protocol. ..............................................................................................53

2. A correct application of the extrinsic test would have
resulted in thin copyright protection. ..................................................55

3. The relevant precedents confirm that Bryant's designs
were subject to only thin copyright protection. ...................................59

# TABLE OF CONTENTS
## (CONT'D)

Page

IV.   THE CONSTRUCTIVE TRUST MUST BE VACATED, EVEN IF
      THE UNDERLYING STATE LAW CLAIMS ARE VALID. ....................63

      B. An Idea for the Name of a Product Is Not a *Res* and Mattel Did Not
      Prove That The Idea Was Wrongfully Acquired. .........................................69

      B. Even If Mattel Owned the Idea for the Name "Bratz," It Was Not
      Entitled to Own the Entire Worldwide Trademark Portfolio .......................69

V.    THE DISTRICT COURT'S EQUITABLE ORDERS MUST BE
      VACATED BECAUSE THEY ALL REST ON A JURY VERDICT
      TAINTED BY BLATANT ETHNIC BIAS. ................................................72

CONCLUSION ........................................................................................................75

CERTIFICATE OF COMPLIANCE PURSUANT TO CIRCUIT RULE 32........76

# TABLE OF AUTHORITIES

Page(s)

## FEDERAL CASES

*Apple Computer, Inc.* v. *Microsoft Corp.*,
  35 F.3d 1435 (9th Cir. 1994) .................................................. 23, 46, 47, 49, 50

*Aliotti* v. *R. Dakin & Co.*,
  831 F.2d 898 (9th Cir. 1987) ................................................... 26, 48, 52, 56

*Avtec Sys., Inc. v. Pfeiffer*,
  21 F.3d 568 (4th Cir. 2004) ................................................................. 31

*Batjac Prods. Inc.* v. *Goodtimes Home Video Corp.*,
  160 F.3d 1223 (9th Cir. 1998) ................................................................. 58

*Berkic* v. *Crichton*,
  761 F.2d 1289 (9th Cir. 1985) ................................................................. 46

*Berkla* v. *Corel Corp.*,
  302 F.3d 909 (9th Cir. 2002) ................................................................. 26

*Brookfield Commc'ns, Inc.* v. *West Coast Entm't Corp.*,
  174 F.3d 1036 (9th Cir. 1999) ................................................................. 67

*Carol Barnhardt Inc.* v. *Economy Cover Corp.*,
  773 F.2d 411 (2d Cir. 1985) ................................................................. 55

*Cavalier* v. *Random House, Inc.*,
  297 F.3d 815 (9th Cir. 2002) ................................................................. 47, 50

*Chosun Int'l Inc.* v. *Chrisha Creations, Ltd.*,
  413 F.3d 324 (2d Cir. 2005) ................................................................. 58, 59

*City Solutions* v. *Clear Channel Commc'ns, Inc.*
  201 F. Supp. 2d 1048 (N.D. Cal. 2002) .................................................. 37, 38, 39

*Community for Creative Non-Violence* v. *Reid*,
  490 U.S. 730 (1989) ................................................................. 31

## TABLE OF AUTHORITIES
### (CONT'D)

Page(s)

*Data East USA, Inc.* v. *Epyx, Inc.*,
862 F.2d 204 (9th Cir. 1988) ............................................... 48, 49, 52

*Eckard Brandes, Inc.* v. *Riley*,
338 F.3d 1082 (9th Cir. 2003) ................................................... 40, 41

*Ets-Hokin* v. *Skyy Spirits Inc.*,
225 F.3d 1068 (9th Cir. 2000) ...................................................... 49

*Feist Pubs. Inc.* v. *Rural Tel. Servs. Co.*,
499 U.S. 340 (1991) ..................................................................... 49

*Frybarger* v. *Int'l Bus. Mach. Corp.*,
812 F.2d 525 (9th Cir. 1987) ....................................................... 49

*Funky Films, Inc.* v. *Time Warner Entm't Co.*,
462 F.3d 1072 (9th Cir. 2006) ................................................. 46, 47

*Galiano* v. *Harrah's Operating Co.*,
416 F.3d 411 (5th Cir. 2005) ....................................................... 59

*Harper House, Inc.* v. *Thomas Nelson, Inc.*,
889 F.2d 197 (9th Cir. 1989) ....................................................... 63

*Herbert Rosenthal Jewelry Corp.* v. *Kalpakian*,
446 F.2d 738 (9th Cir. 1971) ............................................. 47, 48, 50

*Ideal Toy Corp.* v. *Fab-Lu Ltd.*,
360 F.2d 1021 (2d Cir. 1966) ...................................................... 60

*Idema* v. *Dreamworks, Inc.*,
162 F. Supp. 2d 1129 (C.D. Cal. 2000) ........................................ 46

*Janigan* v. *Taylor*,
344 F.2d 781 (1st Cir. 1965) .................................................... 71-72

ii

# TABLE OF AUTHORITIES
(CONT'D)

Page(s)

*L.K. Comstock & Co.* v. *United Eng'rs & Constructors Inc.*,
880 F.2d 219 (9th Cir. 1989) ............................................................. 26

*Marshak* v. *Green*,
746 F.2d 927 (2d Cir. 1984) ............................................................. 70

*Martha Graham School & Dance Found'n, Inc.* v. *Martha Graham Ctr. of Contemporary Dance, Inc.*,
380 F.3d 624 (2d Cir. 2004) ............................................................. 31

*Mattel, Inc.* v. *Azrak-Hamway Int'l, Inc.*,
724 F.2d 357 (2d Cir. 1983) ........................................................ 50, 60, 61

*Mattel, Inc.* v. *Goldberger Doll Mfg. Co.*,
365 F.3d 133 (2d Cir. 2004) ......................................................... *passim*

*McCoy* v. *Goldston*,
652 F.2d 654 (6th Cir. 1981) ............................................................. 74

*Medrano* v. *City of Los Angeles*,
973 F.2d 1499 (9th Cir. 1992) ............................................................. 74

*Medtronic, Inc.* v. *White*,
526 F.3d 487 (9th Cir. 2008) ......................................................... 26, 27

*Mishawaka Rubber & Woolen Mfg. Co.* v. *S.S. Kresge Co.*,
316 U.S. 203 (1942) ............................................................. 70

*Mister Donut of Am., Inc.* v. *Mr. Donut, Inc.*,
418 F.2d 838 (9th Cir. 1969) ............................................................. 70

*Murray* v. *Laborers Union Local No. 324*,
55 F.3d 1445 (9th Cir. 1995) ............................................................. 75

*Nichols* v. *Universal Pictures Corp.*,
45 F.2d 119 (2d Cir. 1930) ............................................................. 46

# TABLE OF AUTHORITIES
## (CONT'D)

Page(s)

*Paige* v. *California*,
102 F.3d 1035 (9th Cir. 1996) ............................................................3

*Pelsue Co.* v. *Grand Enters., Inc.*,
782 F. Supp. 1476 (D. Colo. 1991)......................................................41

*Public Affairs Assocs., Inc.* v. *Rickover*,
177 F. Supp. 601 (D.D.C. 1959).........................................................27

*Rinker* v. *County of Napa*,
724 F.2d 1352 (9th Cir. 1983) ............................................................75

*Satava* v. *Lowry*,
323 F.3d 805 (9th Cir. 2003) ..................................................... *passim*

*Sengoku Works Ltd.* v. *RMC Int'l, Ltd.*,
96 F.3d 1217 (9th Cir. 1996) .......................................................67, 69

*Sid & Marty Krofft Television Prods., Inc.* v. *McDonald's Corp.*,
562 F.2d 1157 (9th Cir. 1977) .....................................................46, 61

*Thompson* v. *Altheimer & Gray*,
248 F.3d 621 (7th Cir. 2001) .............................................................75

*Ting* v. *AT&T*,
319 F.3d 1126 (9th Cir. 2003) ...........................................................26

*United Drug Co.* v. *Theodore Rectanus Co.*,
248 U.S. 90 (1918)..............................................................................70

*United States* v. *Click*,
807 F.2d 847 (9th Cir. 1987) .............................................................74

*United States* v. *Gonzalez*,
214 F.3d 1109 (9th Cir. 2000) ...........................................................27

# TABLE OF AUTHORITIES
## (CONT'D)

Page(s)

*United States* v. *Henley*,
238 F.3d 1111 (9th Cir. 2001) ..................................................73, 74

*United States* v. *Shapiro*,
669 F.2d 593 (9th Cir. 1982) ...........................................................74

*Whitfield* v. *Lear*,
751 F.2d 90 (2d Cir. 1984) .........................................................25, 67

## STATE CASES

*Auxton Computer Enters., Inc.* v. *Parker*,
416 A.2d 952 (N.J. Supr. 1980) .......................................................42

*Bancroft-Whitney Co.* v. *Glen*,
411 P.2d 921 (Cal. 1966) .............................................23, 40, 41, 42

*Buxbon* v. *Smith*,
145 P.2d 305 (Cal. 1944) ................................................................44

*Campbell v. Superior Court*,
34 Cal. Rptr. 3d 68 (Cal. App. 2005) ..............................................72

*City of Hope Nat'l Med. Ctr.* v. *Genentech, Inc.*,
181 P.3d 142 (Cal. 2008) ......................................... 22, 35, 36, 37, 38

*Committee on Children's Television, Inc.* v. *Gen. Foods Corp.*,
673 P.2d 660 (Cal. 1983) ...........................................................33, 34

*Communist Party* v. *522 Valencia, Inc.*,
41 Cal. Rptr. 2d 618 (Cal. App. 1995) ............................................65

*Daniel Orifice Fitting Co.* v. *Whalen*,
18 Cal. Rptr. 659 (Cal. App. 1962) .................................................40

*Desny* v. *Wilder*,
299 P.2d 257 (Cal. 1956) .......................................................29, 64, 67

## TABLE OF AUTHORITIES
### (CONT'D)

Page(s)

*GAB Bus. Servs., Inc.* v. *Lindsey & Newsom Claim Servs., Inc.*,
99 Cal. Rptr. 2d 665 (Cal. App. 2000)....................................34, 38, 39

*Girard* v. *Delta Towers Joint Ventures*,
26 Cal. Rptr. 2d 102 (Cal. App. 1993)................................................39

*Graham* v. *Scissor-Tail, Inc.*,
623 P.2d 165 (Cal. 1981)..................................................................32

*Haskel Eng'g & Supply Co.* v. *Hartford Acc. & Indem. Co.*,
144 Cal. Rptr. 189 (Cal. App. 1978)...................................................71

*Los Angeles City Employees Union* v. *City of El Monte*,
220 Cal. Rptr. 411 (Cal. App. 1985)...................................................33

*Mamou* v. *Trendwest Resorts, Inc.*,
81 Cal. Rptr. 3d 406 (Cal. App. 2008)................................................41

*Oakland Raiders* v. *Nat'l Football League*,
32 Cal. Rptr. 3d 266 (Cal. App. 2005)................................................33

*Odorizzi* v. *Bloomfield Sch. Dist.*,
54 Cal. Rptr. 533 (Cal. App. 1966)....................................................34

*Paige* v. *California*,
102 F.3d 1035 (9th Cir. 1996) ............................................................3

*People ex rel. Lungren* v. *Superior Court*,
926 P.2d 1042 (Cal. 1996)...............................................................30

*Reeves* v. *Hanlon*,
95 P.3d 513 (Cal. 2004)...................................................................44

*Rickel* v. *Schwinn Bicycle Co.*,
192 Cal. Rptr. 732 (Cal. App. 1983)...................................................35

# TABLE OF AUTHORITIES
## (CONT'D)

Page(s)

*Rokos* v. *Peck*,
  227 Cal. Rptr. 480 (Cal. App. 1986)............................................29, 67

*Sequoia Vacuum System* v. *Stransky*,
  40 Cal. Rptr. 203 (Cal. App. 1964)............................................40, 42

*Waverly Prods., Inc.* v. *RKO Gen., Inc.*,
  32 Cal. Rptr. 73 (Cal. App. 1963)....................................................35

*Whyte* v. *Schlage Lock Co.*,
  125 Cal. Rptr. 2d 277 (Cal. App. 2002).............................................36

*Wolf* v. *Superior Court*,
  130 Cal. Rptr. 2d 860 (Cal. App. 2003)........................................35, 38

*Worldvision Enters., Inc.* v. *Am. Broad. Cos., Inc.*,
  191 Cal. Rptr.148 (Cal. App. 1983)............................................37, 39

## STATUTES

15 U.S.C.
  § 1051 ...........................................................................................66
  § 1125............................................................................................66

17 U.S.C.
  § 101................................................................................3, 31, 59
  § 102.......................................................................................45, 46

28 U.S.C.
  § 1292.............................................................................................3
  § 1331.............................................................................................3
  § 2107.............................................................................................3

Cal. Bus. & Prof. Code § 16600 ............................................................41

# TABLE OF AUTHORITIES
## (CONT'D)

Page(s)

**Cal. Civ. Code**
   § 980............................................................................................................29
   § 1654..........................................................................................................32
   § 2223....................................................................................................65, 69
   § 2224....................................................................................................65, 72
   § 3426.1..................................................................................................36, 69

**Cal. Lab. Code**
   § 2854..........................................................................................................34
   § 2870..........................................................................................................30
   § 2872....................................................................................................30, 31

**Fed. R. App. P.**
   4....................................................................................................................3
   32................................................................................................................76

## MISCELLANEOUS

D. Dobbs, DOBBS LAW OF REMEDIES § 6.6(3) (2d ed. 1993) ............................25, 71

R. Lind, COPYRIGHT LAW (3d ed. 2006) ................................................................50

3 J. McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION
   §18:2 (4th ed. 2008) ............................................................................70

Rest.2d Agency § 228 (1958) ................................................................................31

Rest.3d Agency § 8.04 (2007) ...............................................................................42

Rest. Restitution § 206 (1937) ..............................................................................72

19 WILLISTON ON CONTRACTS § 54.27 (4th ed. 2008) ...........................................41

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellants represent as follows:

Appellant MGA Entertainment, Inc. is a privately held corporation. There is no publicly held corporation that owns 10% or more of its stock.

Appellant MGA Entertainment HK Ltd. is a subsidiary of MGA Entertainment, Inc. It too is a privately held corporation. There is no publicly held corporation that owns 10% or more of its stock.

Appellant Isaac Larian is a private individual.

Dated: July 10, 2009      Respectfully submitted,

ORRICK, HERRINGTON & SUTCLIFFE LLP

By:    */s/ E. Joshua Rosenkranz (by ALH)*
           E. Joshua Rosenkranz

# INTRODUCTION

Appellant MGA Entertainment, Inc. is the creator of the wildly successful Bratz brand of fashion dolls and accessories. Bratz is the only brand ever to have threatened the market dominance of the behemoth Mattel and its iconic Barbie brand. After brash Bratz dethroned princess Barbie, Mattel responded with a strategy to "litigate MGA to death." 10ER 2168.[1] The injunctive relief at issue in this appeal, if upheld, will be the coup de grace.

In the fall of 2000, a young fashion designer named Carter Bryant approached MGA with the idea of creating a hip clique of multiethnic urban fashion dolls called "Bratz." He showed MGA several sketches of four characters. MGA committed to bring the concept to life and retained Bryant as a consultant. In 2001, after numerous redesigns, MGA brought the first generation of four Bratz dolls to market.

Over time, MGA expanded that first generation of four dolls into a veritable gaggle of Bratz, of all sizes, ages, and genders. MGA has also designed a universe of accessories—over 14,000 Bratz products in all. MGA has poured hundreds of

---

[1] Appellants' Excerpts of Record are cited as "ER," with a number preceding it to indicate the volume, docket entries in the District Court as "CR," and trial exhibits that are physical objects as "TX." MGA Entertainment, Inc. ("MGAE"), its subsidiary MGA Entertainment HK, Ltd. ("MGA HK"), and founder and CEO Isaac Larian are referred to collectively as "MGA."

millions of dollars into product development and marketing to make Bratz a household name.

Five years after Bratz burst onto the scene, Mattel sued MGA alleging copyright infringement and various state law torts. What followed was a series of rulings that practically directed a verdict against MGA on every claim, including: a ruling that Mattel owned every idea that popped into Bryant's head and every design he drew, even if they had nothing to do with his job; a ruling that Bryant, a low-level designer, was a fiduciary; and a ruling that Bryant breached his duty of loyalty by taking a better job.

Based upon the resulting verdicts, the District Court ordered injunctive relief that amounts to the corporate equivalent of a death sentence. Early in 2010, MGA must recall all the full-sized female dolls currently on the shelves, and stop making any female Bratz doll—regardless of her facial features, coloring, or makeup—using the basic mold common to all the female figures. The District Court also issued an unprecedented injunctive order requiring MGA to transfer ownership of the entire worldwide portfolio of Bratz trademarks to Mattel.

Come the new year, *Mattel* will have the exclusive right either to reap the benefit of the Bratz trademarks MGA spent a fortune and several years nurturing— or simply to "kill BRATZ," 13ER 2626, as Mattel plotted to do, and restore Barbie to her perch of unrivaled hegemony in the market for fashion dolls.

# JURISDICTIONAL STATEMENT

This appeal is from interlocutory orders granting injunctive and other equitable relief against MGA, made final by order dated April 27, 2009. 1ER 16. MGA timely filed a notice of Appeal on May 4, 2009, and an Amended Notice of Appeal on May 26, 2009. *See* 28 U.S.C. § 2107(a); Fed. R. App. Proc. 4(a)(1)(B); 27ER 6208, 6488.

The District Court had jurisdiction under 28 U.S.C. § 1331 and 17 U.S.C. §§ 101, *et seq.*, and 28 U.S.C. § 1367(a). This Court has jurisdiction of an appeal of the injunctive orders under 28 U.S.C. § 1292(a)(1), and of several other inextricably linked rulings under the doctrine of pendent appellate jurisdiction. *See Paige v. California*, 102 F.3d 1035, 1040 (9th Cir. 1996).

# STATEMENT OF THE ISSUES FOR REVIEW

*1. Ownership.* Mattel required employees to sign a boilerplate agreement assigning to Mattel any inventions, including "all discoveries, improvements, processes, developments, designs, know-how, data computer programs and formulae" that any employee "conceived or reduced to practice ... at any time during [his] employment." Did the District Court err in concluding that the agreement unambiguously assigned to Mattel (a) an employee's ideas; and (b) both ideas and designs that such employee comes up with during his tenure, even if outside the scope of his employment?

3

*2. State law claims.* The District Court granted an injunction and ordered MGA to transfer the entire worldwide portfolio of Bratz trademarks to Mattel, based upon jury verdicts finding MGA liable for aiding and abetting a breach of fiduciary duty and breach of duty of loyalty of a low-level Mattel designer, as well as tortiously interfering with his contract with Mattel.

*a. Fiduciary duty.* No employment contract could create a fiduciary relationship unless it expresses the employee's knowing undertaking to elevate his interests over Mattel's. The designer, who had no managerial responsibilities, signed a boilerplate agreement that used the word "trust" in connection with a promise of confidentiality. Did the District Court err in ruling as a matter of law (and instructing the jury) that the employee had thereby unambiguously undertaken a fiduciary duty?

*b. Duty of loyalty.* An employee does not violate the duty of loyalty by merely preparing to compete with his employer. Did the District Court err in instructing the jury that the designer violated the duty of loyalty and his fiduciary duty as a matter of law simply because he signed a consulting agreement with a competitor while still employed at Mattel?

*c. Tortious interference with contract.* MGA cannot be liable for tortious interference with Mattel's contract with the designer, unless MGA prevented him from performing the contract. The at-will employee had no

contractual obligation to refrain from taking a better offer. Did the District Court err in instructing the jury that it could hold MGA liable simply for encouraging the employee to sign an agreement with MGA while he was still employed?

*3. Copyright.* When most of the elements of a work, considered in isolation, are unprotectable under copyright law, only *virtually identical* works can be found to infringe. Most elements of the designer's original doll sketches and prototype were unprotectable. Did the District Court err in issuing an injunction (and instructing the jury) based upon the standard that any work was infringed if it was only *substantially similar* to the original drawings and prototype?

*4. Constructive trust.* A constructive trust is impermissible unless (a) there is a *res*, a piece of property, to put in a trust; (b) MGA wrongly acquired the property; and (c) Mattel has a superior right to it. The District Court held that the *res* is the idea for the name "Bratz," but it put the whole worldwide portfolio of trademarks in a constructive trust. An idea is not property, and Mattel did not prove that MGA wrongfully acquired it. Moreover, MGA legally acquired the right to use the trademark from another, used it in trade, and invested hundreds of millions of dollars in generating the goodwill associated with the name. Did the District Court err in ordering a constructive trust?

**5.** *Juror bias.* This case was about whether MGA president Isaac Larian, who happens to be an Iranian-American, stole ideas from Mattel. A juror, who cast a critical vote, announced during deliberations that she knows of Iranians "who have stolen other people's ideas." Did the District Court err in denying a mistrial based on juror bias?

## STATEMENT OF THE CASE

This litigation originated on April 27, 2004, when Mattel filed a complaint against Carter Bryant in California Superior Court, alleging that Bryant had improperly acquired and infringed Mattel's copyright in creating the Bratz line of fashion dolls with an unnamed competitor. 6ER 1100. Bryant removed the case to the Central District of California, and then filed a suit against Mattel for a declaration of non-infringement on November 2, 2004. 6ER 1114. On April 13, 2005, MGA filed a complaint against Mattel, alleging, among other things, that Mattel had copied MGA's Bratz line of dolls. 7ER 1148. The District Court consolidated these three cases. CR 46. Mattel filed counterclaims against MGA and Isaac Larian on January 12, 2007, which Mattel amended on July 12, 2007. 6ER 1206, 7ER 1296. This appeal arises from those counterclaims, which were tried in part as Phase 1 of the consolidated proceedings. 6ER 1291; CR 560 at 8-9.

Phase 1 resulted in jury verdicts in Mattel's favor under copyright law and various state law claims. 20ER 4377, 22ER 4954. The jury awarded damages of

$10 million on the copyright claim, and $30 million on each of three state law claims.

On December 3, 2008, the District Court issued orders granting Mattel equitable relief. 1ER 51, 5ER 998, 1003, 1006. The District Court modified these orders and made the relief final on April 27, 2009. 1ER 16.

## STATEMENT OF FACTS

### *Carter Bryant Approaches MGA with the Bratz Concept*

MGA had never heard of Carter Bryant until August 2000, when a mutual acquaintance reached out to MGA with an introduction. 15ER 3236. At the time, Bryant was a low-level "fashion designer" at Mattel—an at-will employee. 16ER 3270, 3276, 3987. His job was to design clothes and accessories for Barbie Collectibles, a line of higher-end dolls for the discriminating adult collector. 16ER 3276, 18ER 3979.

In late August 2000, Bryant met with MGA product manager Paula Garcia and licensing head Victoria O'Connor to pitch a concept for a new line of fashion dolls. 15ER 3233, 3236, 3286-88, 18ER 3980. He showed them sketches and descriptions of four edgy, hip, multiethnic dolls called "Bratz." He named them Jade, Hallidae, Lupe, and Zöe. 16ER 3305. He described them as a "group of friends who are very … cool, maybe kind of popular." 16ER 3304. They "wore … clothing that was trendy but not necessarily fancy." 16ER 3304-05. They

exuded the attitude, "'We're best friends, we can do anything, we've got a lot of power, we believe in ourselves.'" 16ER 3304-05. They were very, well, non-Barbie.

The MGA executives scheduled a follow-up pitch with MGA president Isaac Larian. 16ER 3290-91. In preparation for the pitch, Bryant assembled his concept drawings and crafted a primitive Bratz "dummy doll" (not preserved for posterity). 16ER 3282. He mocked it up, with help from friends at Mattel, by appointing a Barbie body with a discarded plastic head he retrieved from the trash at Mattel and Ken army boots. 16ER 3282-83, 3284-85, 18ER 3981-82, 3983.

That second meeting occurred on September 1, 2000. 16ER 3289. Larian was enthusiastic. 16ER 3292-95.

### Bryant Represents and Warrants that He Owns the Bratz Concept and Designs

Conversation immediately turned to verifying that Bryant had full rights to the Bratz sketches and concept. 15ER 3238, 16ER 3291. Larian "asked ... are these something that you came up with on your own and ... on your own time." 16ER 3291. Bryant assured Larian and the other MGA personnel that they were. 15ER 3238. Bryant explained that "he did [the drawings] in 1998," before taking his current job at Mattel, while he was freelancing back home in Missouri. 15ER 3238-39.

8

MGA insisted on, and Bryant made, a contractual warranty that Bryant was
not violating any contractual obligation by conveying the drawings to MGA.
23ER 5409-10. Bryant agreed to indemnify MGA should anyone claim ownership
of the Bratz concept or Bryant's drawings. 23ER 5411-12.

Bryant signed the contract with MGA on October 4, 2000, just a month after
meeting with Larian. 18ER 3988, 23ER 5414. Larian insisted that Bryant quit his
job at Mattel the moment he signed and work fulltime on Bratz. 15ER 3242, 3264-
66. Bryant assured Larian he would. 15ER 3234-35, 3266. Instead, that day he
gave Mattel the standard two weeks' notice, and continued to work at Mattel until
October 19. 18ER 3989.

### *Meanwhile MGA Devises a Bratz Sculpt Based on Bryant's Concept*

Even before the deal was inked, MGA got started on converting Bryant's
sketches into a preliminary three-dimensional draft, called a "sculpt." 16ER 3299-
3300. On Bryant's recommendation, MGA hired freelance sculptor Margaret
Leahy to do the job. 21ER 4667B. Leahy had two meetings with Bryant in the
course of sculpting that first prototype while Bryant was still at Mattel.
18ER 3984, 3985, 4055-56, 4059-60. Both Leahy and Bryant testified that Bryant
told her: "Here's my idea. Just take it and run with it." 18ER 4058. He also
shared a Steve Madden ad published in the August 1998 Seventeen Magazine,
featuring figures with oversized heads and feet, on which Bryant had based his

9

sketches. 18ER 4057, 24ER 5508, 5622. He "said this is the basic trend we're going for." *Id.*[2]

Leahy testified that Bryant's "concept drawings were really basic and not very practical" from a "sculpting standpoint." 18ER 4061. She "couldn't really use [the drawings] to come up with something in the three-dimensional world." *Id.* She drew inspiration from other sources, "most notably, the Steve Madden ad." *Id.*

Leahy crafted one sculpt in the period in which Bryant was still at Mattel. It came to be known as Trial Exhibit 1136. TX1136, 23ER 5450-54. The sculpt was a blank brown clay doll, without any colored facial features. When product manager Garcia unveiled this initial sculpt to him, Bryant made one suggestion—to make the ankles skinnier, as in his drawings. 18ER 4062-63. Leahy rejected the suggestion as impractical. 18ER 4064, 4066-67.

### The Bratz Sculpt Continues to Evolve

Over the next several months, Leahy and other designers crafted several more sculpts, introducing dozens of successive changes. With each successive sculpt, the dolls morphed farther and farther away from the images depicted in Bryant's initial drawings and the first clay sculpt. *See, e.g.,* 21ER 4805-13, 4817-30. Among the most significant changes were the following:

---

[2] Bryant also found hair samples for MGA, 16ER 3296, 3298, attended a marketing meeting, 16ER 3303, and worked on fabrics, 16ER 3302.

- *Age:* The Bratz body morphed from the young woman, aged 19 or 20, depicted in Bryant's drawings and the preliminary sculpt to a "tween"— aged 11 to 13. 21ER 4792-94, 4796, 4817.

- *Body structure:* Consequently, the breasts had to be higher, the neck and arms thinner, shoulders more sloped and less square, with higher hips and a higher, wider waist, with more tummy below the belly button. The legs were made slimmer and more muscular, and the bottom less voluptuous, resulting in an "almost boyish" body. 21ER 4792-93, 4802-04, 4809-12, 4817-19, 4825-30, 4835.

- *Head shape:* The first sculpt was "a super ball with eyes dug in." 21ER 4794. It evolved over time to a smaller, more "humanistic," less cartoonish face. 21ER 4792, 4815.

- *Facial features:* The facial features, particularly the eyes and lips, were designed to look more natural in later iterations, more "modest" and "appropriate" for younger girls. 21ER 4796-98, 4806-07, 4816.

- *Facial structure:* Leahy added a chin and temples, and emphasized the brow, jaw, and defined and raised the cheekbones. 21ER 4794-95, 4795A, 4799-4800, 4807, 4815, 4823, 4831-32.

- *Ears:* Leahy shrank the ears and moved them closer to the head. 21ER 4798-99, 4807.

- *Nose:* Whereas Bryant gave his sketches "a little dot" for a nose, yielding a "weird kind of alien" look, Leahy added a more substantial nose. 21ER 4945B-45C. Later the nose became rounded and less triangular and the nose bridge was pushed in. 21ER 4945A, 4805-06, 4808, 4824.

- *Eyes:* The evolving sculpt lost all eye detail over time, leaving just an area where an eye socket should be. 21ER 4796-97, 4806, 4823-24.

- *Lips:* The lips were made smaller but given more definition over time while the corners of the mouth were rounded to give a smiling appearance. 21ER 4800, 4808-09, 4824.

- ○ *Face color:* The colors on the dolls' faces, eyebrows, eyes, eye shadow, and lips were muted to create a "softer, younger ... character" and to provide a touch of sweetness without losing the Bratz edginess. 21ER 4838-45.

- ○ *Hair:* Bryant's drawings contemplated removable hair. The hair on the ultimate Bratz dolls was firmly rooted in their scalps. 21ER 4836-37.

None of these changes were disputed.

### *MGA Acquires the Bratz Trademark, and Bratz Becomes a Phenomenon*

Step one in proceeding to market was to register the Bratz trademark. This proved more difficult than anticipated. A company called Lovins, Inc. had registered the mark "Bratz" and had been using it in connection with the sale of children's clothing since 1994. 15ER 3268, 22ER 5068-109. To secure its rights to freely use the name Bratz for its products, MGA acquired the mark from Lovins. *Id.*

In June 2001, more than half a year after Bryant began working for MGA, the first generation of Bratz dolls hit the U.S. market. 21ER 4766. They were four girls named Yasmin (after CEO Larian's daughter), Cloe, Jade, and Sasha. *Id.* Only one of them, Jade, bore the name Bryant had assigned her.

Bratz had a modest start. 23ER 5506. But with perseverance, great energy, and more investment in marketing, it became a blockbuster. Bratz was named Toy of the Year in 2002. 15ER 3240. From then on, the demand for Bratz was insatiable. MGA added more characters to the Bratz line each year. 21ER 4766-

12

67.  MGA also produced, under the Bratz moniker, a line of "Bratz Boyz" and of younger dolls, including "L'il Bratz," "Bratz Kidz," "Itsy Bitsy Bratz," and "Bratz Babyz." 21ER 4907-11.  And, of course, no Bratz family can be complete without a line of "Bratz Petz."  21ER 4910.  MGA complemented the dolls with a universe of accessories of all sorts, from clothes to furniture to cars.  21ER 4769-70.  Over the years, MGA has manufactured about 14,000 accessories, all bearing the Bratz trademark—none bearing any relationship to Bryant's original drawings and sculpt.  21ER 4790B-4790C, 25ER 5795-862.

MGA presented copious evidence of how the dolls continued to evolve from the first generation.  They differed in their facial features, fashions, accessories, and characters.  *See, e.g.*, 21ER 4917-25, 4913-16.  By the time of trial, MGA had developed 77 themes and dozens of female dolls, each with her own distinctive look and personality.  21ER 4947, 25ER 5863-66.

### Mattel Sues MGA

As Bratz thrived, Mattel panicked.  By 2003, the head of Mattel's Girls Division sounded the alarm that Barbie was a "Brand in Crisis."  15ER 2629.  By the next year, with Barbie's sales taking a nosedive, an internal report screamed, "The House is on Fire."  13ER 2595.  Despondent Mattel executives confessed, "We have been out-thought and out-executed."  13ER 2623.  Barbie just could not beat Bratz in the marketplace.  So Mattel resorted to a plan to "kill BRATZ."

13

13ER 2626.  In the words of one Mattel executive, "[o]ne of the strategies for trying to defeat Bratz was to litigate them to death."  10ER 2168.[3]

And so it nearly has.  Within weeks after declaring the "Brand in Crisis," and three years after Bratz hit the scene, Mattel sued Bryant, and then (two years later) MGA, for copyright infringement and a variety of state law claims. 6ER 1206.  Mattel did not claim that it had ever marketed any product named "Bratz" or any dolls that looked like Bryant's sketches.  In fact, before Bryant ever approached MGA, Mattel had considered, but rejected, the name "Brats," upon discovering a similar registered trademark.  15ER 3208-11.

The crux of Mattel's suit was that it owned Bryant's drawings and MGA's original sculpt and the *idea* for the name "Bratz"—because Bryant was a Mattel employee when he developed them.  6ER 1206, 7ER 1296.  Mattel based these ownership claims on an "Inventions Agreement."  7ER 1329-30.  The Inventions Agreement was a pre-printed document.  Every one of the *thousands* of employees who worked in the El Segundo Design Center where Bryant worked was required to sign it on their first day at work.  10ER 2150, 15ER 3192-93.

---

[3] While the District Court excluded these facts from trial, in part because they were too prejudicial, they do form a more complete context for a less impressionable judicial audience.

Within the pages of the blurred eight-point font were two provisions that have taken center stage in this case—one on confidentiality and the other on ownership. 23ER 5415. In Paragraph 1, entitled "Provisions Related to Trade Secrets," every employee "acknowledge[s] that the Company possesses" trade secrets (which the agreement refers to as "Proprietary Information") whose "value ... depends on it remaining confidential." *Id.*; *see infra* at 34-35 (quoting provision more fully, along with definition of "Proprietary Information"). Then comes the sentence on which the District Court's ruling so heavily relies: "The Company depends on me to maintain that confidentiality, and I accept that position of trust." 23ER 5415; *see infra* at 34 (quoting ¶1 more fully).

In Paragraph 2, entitled "Ownership of Inventions," the employee "agree[s] to communicate to the Company ... all inventions" he comes up with "at any time during my employment by the Company." 23ER 5414. The other sentence on which Mattel's case depends proves as follows: "I hereby assign to the Company ... all my right, title and interest in such inventions." *Id.*; *see also id.* ¶2(b) (defining "inventions"); *infra* at 28 (quoting ¶2 more fully).

Bryant testified that he understood the Inventions Agreement to assign to Mattel only those "designs that I had been assigned by Mattel, any drawings that I had been assigned to work on"—and not work, like Bratz, done on his own initiative and his own time. 15ER 3271-75, 16ER 3279-81.

What is not disputed is that no one at Mattel had ever assigned Bryant the
Bratz project—and that creating a new line of dolls was above his paygrade.
16ER 3276-77.  He was a worker bee in a hive of several dozen employees under a
single supervisor.  29ER 6874.  Bryant did not control or initiate the projects he
worked on at Mattel.  29ER 6797, 6862-63.  Bratz was simply not a Mattel project.

### *The District Court Directs Verdicts Against MGA*

Beyond claiming copyright ownership over Bryant's drawings and the
preliminary sculpt, Mattel also alleged several state law claims:  that MGA aided
and abetted Bryant's purported breach of his fiduciary duty and of his duty of
loyalty to Mattel; tortiously interfered with Mattel's contract with Bryant;
converted Mattel's property; and engaged in unfair competition.  7ER 1348-70.
On the eve of trial, Bryant settled with Mattel and was dismissed from the case.
CR 3708.

The District Court issued a series of summary judgment orders that
effectively directed verdicts in Mattel's favor as to numerous issues:

- *Ownership of ideas.*  The District Court held—and instructed the jury—that
  the Inventions Agreement unambiguously meant that Mattel owned "any
  Bratz-related 'inventions' (including any designs, improvements, *ideas,
  concepts* and copyrightable subject matter), that Bryant created while
  employed with Mattel." 5ER 1073-74 (emphasis added), 20ER 4362-63.
  The word "idea" appeared nowhere in the agreement.  23ER 5415.

- *Ownership beyond job duties.*  The District Court also found, and instructed
  the jury, that Mattel owned any design Bryant made and any idea Bryant

16

had—so long as he was employed by Mattel—even if the idea or the work had nothing to do with his job responsibilities. 5ER 1074, 20ER 4366.

- **Fiduciary duty.** In two orders, the District Court concluded that Bryant was a fiduciary as a matter of law, merely because the Inventions Agreement said that Bryant accepted a "position of trust" not to disclose Mattel's "proprietary information." 5ER 1062-63, 1074-75. The District Court so instructed the jury. 20ER 4367.

- **Duty of loyalty.** The District Court held, and instructed the jury, that Bryant breached his duty of loyalty to Mattel as a matter of law simply "by entering into a contract with Mattel's competitor, while still employed by Mattel, to produce a line of fashion dolls to be marketed in direct competition with Mattel's products." 5ER 1075.

- **Copyright on dolls.** The District Court also rejected MGA's contention that the dolls themselves should be subject to thin copyright protection. 5ER 1040. The court reflected these holdings in its jury instructions and in its subsequent injunction. 5ER 1016, 22ER 5023-26.

- **Copyright on dolls' clothing.** The District Court rejected MGA's argument that the dolls' clothing was not subject to copyright protection. 5ER 1041.

## The Phase 1 Verdicts

The District Court bifurcated the consolidated cases into two phases: Phase 1, the subject of this appeal, covering the claims relating to Bryant's drawings, and Phase 2 covering all other aspects of the case. Phase 2 is ongoing.

The Phase 1 trial was bifurcated. In Phase 1A, the jury heard evidence on liability for the state law claims. In light of the court's instructions, it was not at all surprising that the jury found MGA liable on all the state law claims. 20ER 4383-84. The jury also held that 74 of the 78 contested Bratz drawings, as well as Leahy's preliminary doll sculpt and the dummy doll Bryant made for the pitch,

17

were "'conceived or reduced to practice'—that is, created—by Carter Bryant,

alone or jointly with others, during the period in which he was employed by

Mattel." 20ER 4378-82, 25ER 5873-6003, 26ER 6004-27; *see* 20ER 4363 (jury

instruction). The jury could not reach a verdict on the remaining four, which

means at least some of them believed that Bryant began working on the Bratz

concept before he started working at Mattel. 20ER 4378.

Phase 1B was about the extent to which the Bratz dolls infringed the Bryant

sketches and original sculpt, and about damages. MGA sculptor Leahy described

how she departed from Bryant's drawings in making the original sculpt. *See supra*

at 9-10. Both she and product manager Garcia testified about the many changes

that she made to the dolls' facial and anatomical features as Bratz evolved from the

preliminary sculpt to the final Bratz sculpt. *See supra* at 11-12. MGA also

presented ample evidence distinguishing the first four Bratz dolls from the later

generations of full-sized female Bratz dolls. *See supra* at 13.

For the most part, Mattel did not contest this testimony. Instead, capitalizing

on the District Court's ruling that doll clothes, shoes, and accessories were

protected by copyright, Mattel directed most of its attention at emphasizing the

similarities between the *fashions* depicted in Bryant's drawings and those worn by

the first generation Bratz dolls. *See, e.g.,* 20ER 4386-89, 4390-93, 22ER 5050A-

5150B. The overwhelming majority of visual comparisons made in Mattel's

opening statement and closing argument compared clothed versions of the Bryant

drawings and first generation Bratz dolls, repeatedly emphasizing similarities in

the clothes, shoes, and accessories. *See, e.g.,* 20ER 4386-89, 4390-93,

22ER 5050A-5050B.

The jury found MGA liable for copyright infringement, but it concluded that

the infringement was not willful. 22ER 5057-58. Because the District Court

denied MGA's request for a special verdict form listing each doll separately, *see*

21ER 4926, there was no way to know which dolls were found infringing and

which were not. 22ER 5203. Mattel had persuaded the court to dispense with

precision, because "[y]ou're going to be able to discern from the damages award

what the jury finds." 21ER 4952-53. The jury awarded a relative pittance of $10

million in damages on the copyright claims—or less than 1% of the $1.4 billion

dollar damages figure Mattel demanded. 22ER 5049-60.[4]  So by Mattel's logic,

one can "discern from the damages award" that the jury considered very few of the

dolls infringing—and certainly did not believe every female Bratz doll that MGA

had produced over the years infringed. As if to underscore that inference, just

before returning its copyright verdict, the jury sent a note inquiring: "Can we find

---

[4] On each of the two aiding and abetting claims and the interference claim,
the jury verdict form appears to reflect an award of $30 million against Larian and
MGA Entertainment on each claim for a total of $90 million in combined damages.
It also awarded $31,500 for conversion of the physical drawings.  22ER 5054.

that the first generation dolls violate the copyright of Mattel but that subsequent

generations of dolls do not violate the copyright?" 22ER 5050E. The answer, of

course, was "yes." 22ER 5050F.

### The District Court Orders Unprecedented Equitable Relief

The District Court fashioned two categories of equitable relief—a copyright

injunction (covering the female Bratz *products*) and an injunction and constructive

trust for the state law claims (covering the use of the *name* Bratz).

**Copyright injunction.** The court concluded it could not discern from the

size of the jury's *de minimis* damages award how many dolls the jury found to

infringe, and in what ways. 5ER 1014-15. So the court independently conducted

its own infringement analysis, and found that every single full-length female doll

in every generation was "substantially similar" to Bryant's original drawings.

5ER 1016. Beyond that, it issued a sweeping injunction against any other product

"that embodies or depicts *in whole or in part*, or incorporates or uses *in any*

*manner*, the head and/or body sculpt"—*i.e.*, the blank plastic doll to which the face

paint is applied to produce the dozens of different Bratz characters. 1ER 52.

**Constructive trust and other equitable remedies under state law.** For the

state law claims, the District Court issued a declaratory judgment, a UCL

injunction, and a constructive trust order. 1ER 51, 5ER 998, 1003, 1006.

Collectively, these remedies transferred the entire Bratz trademark portfolio from

MGA to Mattel—worldwide—not just for the female dolls, but for the thousands of concededly non-infringing dolls and accessories that MGA produced.

## SUMMARY OF ARGUMENT

**I. Ownership.** The notion that Mattel owns all of Bryant's ideas and designs is the keystone for all the equitable relief the District Court ordered. The District Court erred in concluding that the Inventions Agreement *unambiguously* meant that Mattel owned "any Bratz-related 'inventions' (including any designs, improvements, *ideas, concepts* and copyrightable subject matter), that Bryant created *while employed with Mattel*." 5ER 1074 (emphasis added).

First, the Inventions Agreement says nothing about owning Bryant's "ideas" or "concepts." If Mattel wanted to claim broad ownership over every idea that pops into an employee's head, it knew how to do that. Second, the District Court erred in concluding that the Inventions Agreement unambiguously covers any idea or copyrightable subject matter created by an employee, so long as the employee came up with them at any point during his tenure, without regard to whether they bear any relationship to the employee's job. *Id.* The very notion would be antithetical to the Copyright Act's norms of ownership of employees' works. If Mattel wanted to depart from these norms, it should have done so clearly.

**II. State Law Verdicts.** The UCL injunction and constructive trust must be vacated, because each of the state law verdicts on which it is based is invalid.

**A. Fiduciary duty.** The District Court erred in ruling, as a matter of law, that the Inventions Agreement was a knowing commitment by Bryant to assume an obligation to act completely selflessly, and purely in Mattel's interests. The stated purpose of the paragraph in question was to protect trade secrets. In this paragraph, the employee acknowledges "the Company depends on me to maintain ... confidentiality," and the employee agrees that "I accept *that* position of trust." 23ER 5414 ¶1(a) (emphasis added). Those last three words—on which the District Court based its entire analysis—merely acknowledge the confidentiality specified in the previous clause, and "accept *that*" responsibility.

Those three words do not use the word "fiduciary," and they do not indicate that this standard employer-employee relationship was "primarily for the benefit of" Mattel and not a "mutually beneficial arrangement." *City of Hope Nat'l Med. Ctr. v. Genentech, Inc.*, 181 P.3d 142, 150 (Cal. 2008). For these reasons, the District Court should have granted judgment as a matter of law to *MGA*, not to Mattel, on the existence of a fiduciary relationship.

**B. Duty of loyalty.** The District Court erred in directing a verdict that Bryant breached his duty of loyalty to Mattel simply "*by entering into a contract with Mattel's competitor, while still employed by Mattel.*" 5ER 1075 (emphasis added), 19ER 4345-46. Bryant was free to make "preparations to compete" while still employed; it is only when an employee *actually* engages in "*direct*

*competition*" with the employer that there might be a breach of the duty of loyalty. *Bancroft-Whitney Co. v. Glen*, 411 P.2d 921, 935 (Cal. 1966). The absolute minimum that an employee is allowed to do in preparation to compete is to sign an agreement to start a collaboration with a competitor.

*C. Tortious interference with contract.* The District Court erred when it instructed the jury that it could hold MGA liable simply for encouraging Bryant to sign a consulting agreement. Bryant was an employee at will. In California, as a matter of law, a competitor *cannot* be held liable for interfering with an at-will employment relationship by making a better offer.

**III. Copyright Injunction.** The copyright injunction teeters precariously on a single legal proposition: that the Bratz dolls infringe Mattel's copyright as long as they are *substantially similar* to Bryant's drawings and the preliminary sculpt, as opposed to being *virtually identical*. The District Court reached this conclusion only by rejecting this Court's oft-repeated instructions on how to determine the scope of copyright protection. The District Court was required to engage in a filtering analysis, which calls for isolating each element of the Bratz design that was claimed to be similar and assessing whether each specific element is separately protectable. *See, e.g., Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1442-43 (9th Cir. 1994). It was required to grant no protection to any element for which the expression merges into the idea—*e.g.*, the very concept of a

large almond-shaped eye or luscious lips—or to any standard or unoriginal features. Then, based upon what proportion of elements survived filtering, the District Court was required to decide whether the work was entitled to full copyright protection (where infringement is assessed under a substantial similarity standard) or thin copyright protection (where infringement is assessed under a virtual identity standard).

The District Court skipped this filtering analysis. The District Court granted full copyright protection to a "human form and anatomy" because it "expresses a unique style and conveys a distinct look or attitude"—which is the very definition of impermissibly protecting an *idea* for a particular sort of doll.

If the District Court had followed this Court's instructions, it would have concluded that every one of the features, considered *in isolation*, was not protectable. The facial and anatomical features are all portrayals of natural phenomena, which are unprotectable. As to the clothes, the Copyright Office has held that doll clothes—specifically, Bratz clothes—begin with virtually no copyright protection. That ruling was entitled to deference.

Under the correct standard, none of the dolls was infringing, as a matter of law, for none was virtually identical to Bryant's drawings or the preliminary sculpt.

**IV. Injunction and Constructive Trust.** Mattel is not entitled to a constructive trust over the trademark because it could not establish that "MGA ... wrongfully acquired" a *res*. "[T]he idea for the name 'Bratz,'" 5ER 1012, is not a *res*, contrary to the District Court's conclusion. "Under California law ... an idea is not recognized as a property right" and cannot support claims "actionable only to vindicate legally protected property interests." *Whitfield v. Lear*, 751 F.2d 90, 92 (2d Cir. 1984). Further, the District Court incorrectly held that MGA "*wrongfully acquired* the idea for the name 'Bratz.'" 5ER 1012 (emphasis added). Even if Mattel owned Bryant's idea, that does not mean that it was wrongful of Bryant to share the idea. Nothing in the Inventions Agreement prohibited Bryant from sharing the idea unless the idea was a trade secret—which Mattel has conceded it was not. Finally, even if Mattel owned the idea for the name "Bratz," Mattel was not entitled to own the trademark. MGA did not wrongfully acquire the trademark; it secured the trademark by acquiring the right to use a conflicting mark from another business and using the name in commerce. While the District Court held that equity required it to award Mattel the windfall "to prevent [MGA's] unjust enrichment," *id.*, equity does not allow a plaintiff to capture "the fruits of the defendant's own labors or legitimate efforts." D. Dobbs, DOBBS LAW OF REMEDIES § 6.6(3) (2d ed. 1993).

**V. Juror Bias.** The question before the jury in this case was whether MGA president Isaac Larian, who happens to be Iranian-American, stole Mattel's ideas. On the eve of issuing the first verdict in the case, a juror declared to her fellow jurors, in the throes of deliberation, she knew of "Persian[s] … who have stolen other people's ideas." 5ER 1028. The District Court erred in denying a mistrial. The juror was plainly biased, for the use of racial slurs ordinarily is a reflection of one's own personal beliefs. The Seventh Amendment guaranteed Larian and the company he built the right to an unbiased jury.

## STANDARD OF REVIEW

Any determination underlying the grant of a permanent injunction is reviewed by the standard that applies to that determination. *Ting v. AT&T*, 319 F.3d 1126, 1134-35 (9th Cir. 2003). The grant and denial of summary judgment are reviewed *de novo. Aliotti v. R. Dakin & Co.*, 831 F.2d 898, 900 (9th Cir. 1987). "[P]rinciples of contract interpretation applied to the facts are reviewed de novo." *L.K. Comstock & Co. v. United Eng'rs & Constructors Inc.*, 880 F.2d 219, 221 (9th Cir. 1989). The scope of copyright protection is a legal issue subject to *de novo* review. *See Berkla v. Corel Corp.*, 302 F.3d 909, 917 (9th Cir. 2002). This Court reviews *de novo* whether a jury instruction misstates the law. *Medtronic, Inc. v. White*, 526 F.3d 487, 493 (9th Cir. 2008). Where it does, prejudice is presumed and the burden shifts to appellee to establish that it is more probable than

not that the jury would have reached the same verdict had it been properly instructed. *Id.* The District Court's decision on whether to declare a mistrial when there is a biased juror is reviewed *de novo. United States v. Gonzalez*, 214 F.3d 1109, 1112 (9th Cir. 2000).

## ARGUMENT

I.  **ALL EQUITABLE RELIEF MUST BE VACATED BECAUSE THE DISTRICT COURT ERRED IN HOLDING, AS A MATTER OF LAW, THAT MATTEL OWNED BOTH BRYANT'S DESIGNS AND HIS IDEAS JUST BECAUSE BRYANT CAME UP WITH THEM WHILE EMPLOYED BY MATTEL.**

Albert Einstein would have been shocked to learn that his employer was claiming ownership over every idea he had while employed at the patent office. Dickens would have been infuriated if the *Morning Chronicle* had laid claim to *The Pickwick Papers* just because he wrote the novel while employed as a journalist. So, too, a low-level employee in Bryant's position would be justified in assuming that Mattel was not laying claim to every idea that pops into his head— every doodle he makes, and every word he writes—even if he came up with the idea in the shower, and even if it bears no relation to his job. As one court famously put it, "no one sells or mortgages all the products of his brain to his employer by the mere fact of employment." *Public Affairs Assocs., Inc. v. Rickover*, 177 F. Supp. 601, 604 (D.D.C. 1959), *rev'd on other grounds*, 284 F.2d 262 (D.C. Cir. 1960), *vacated*, 369 U.S. 111 (1962).

Yet, the notion that Mattel owns all Bryant's ideas and designs is the keystone for all the equitable relief the District Court ordered. The District Court based this ruling on the following provision of the Inventions Agreement:

> 2. Ownership of Inventions: (a) I agree to communicate to the Company as promptly and fully as practicable all inventions (as defined below) conceived or reduced to practice by me (alone or jointly by others) at any time during my employment by the Company. I hereby assign to the Company and/or its nominees all my right, title and interest in such inventions, and all my right, title and interest in any patents, copyrights, patent applications or copyright applications based thereon….

23ER 5415. The next clause defines "inventions" as a term that "includes, but is not limited to, all discoveries, improvements, processes, developments, designs, know-how, data computer programs and formulae, whether patentable or unpatentable." *Id.* ¶2(b). The District Court concluded that the Inventions Agreement *unambiguously* meant that Mattel owned "any Bratz-related 'inventions' (including any designs, improvements, *ideas, concepts* and copyrightable subject matter), that Bryant created *while employed with Mattel*." 5ER 1074 (emphasis added). The District Court so instructed the jury. 19ER 4336-37. Without this foundational ruling, the District Court could not have ordered the constructive trust (based on Mattel's ownership of the "idea for the name 'Bratz,'"), 5ER 1012, or the copyright injunction (based on Mattel's ownership of Bryant's sketches and preliminary sculpt). The District Court was doubly wrong.

28

### A. The District Court Erred in Concluding That "Ideas" Were Unambiguously Within the Scope of the Inventions Agreement.

The first error defeats the injunction and constructive trust over the "idea for the name 'Bratz'": the Inventions Agreement says nothing about owning Bryant's "ideas" or "concepts"—nor about owning his "ideas for a name[]." 23ER 5415. It grants Mattel ownership only over "inventions," *id.*, which are defined to include several innovations, none of which so much as suggests that the employee assigns to Mattel every "idea" that happens to pop into his head.

If that is what Mattel had intended to communicate, it knew exactly how to do it. An *earlier* Mattel form agreement explicitly assigned to Mattel all its employees' "ideas," 26ER 6207A, and a *later* Mattel form agreement tacked onto the list "*original works of authorship, ideas,* [etc.] that I (alone or jointly with others) conceive," 12ER 2581M (emphasis added).

Moreover, there are strong legal reasons not to insert the words "ideas" and "concepts" into the agreement, as the District Court did. First, because ideas and concepts are not property under California law, *see Desny v. Wilder*, 299 P.2d 257, 265 (Cal. 1956); Cal. Civ. Code § 980, they are not assignable, *see Rokos v. Peck*, 227 Cal. Rptr. 480, 486 (Cal. App. 1986). Second, in that respect, the elements the District Court insinuated into the list are different from the items actually listed. Unlike ideas, all the elements that are actually listed *are* capable of receiving legal treatment as property. Thus, insinuating "ideas" into the list would run afoul of the

29

California Supreme Court's admonition that it is inappropriate to "accept[] ... a more expansive meaning" if that "would make ... the item markedly dissimilar to the other items in the list." *People ex rel. Lungren v. Superior Court*, 926 P.2d 1042, 1050 (Cal. 1996). Third, in ordinary parlance, one might say, "I invented 'improvements, processes, developments, [etc.],'" but a native speaker would never say, "I *invented* the idea to name my daughter 'Jade.'"

### B. The District Court Erred in Concluding That the Inventions Agreement Unambiguously Covers Designs and Ideas Even if They Are Outside the Scope of the Employment.

The District Court's second, independent interpretive error undermines *all* the equitable relief granted—both the constructive trust and the copyright injunction: the District Court concluded that the Inventions Agreement unambiguously covers any idea or copyrightable subject matter created by an employee, so long as the employee came up with it at any point during his tenure, without regard to whether they bear any relationship to the employee's job. 5ER 1073-74. That would mean Mattel owns every designer's thoughts, personal diary, blog, and Facebook page, plus all family photographs—so long as they were created during the period of employment.[5]

---

[5] The agreement has a provision that is mandatory under California law: "Any provision in this agreement requiring me to assign my rights in any invention does not apply to an invention which qualifies under the provision of Section 2870 of the California Labor Code." 23ER 5415; *see* Cal. Lab. Code § 2872 (mandating

Any such employer mind-meld would be antithetical to established legal norms of ownership of employees' works. The Copyright Act provides that an employer owns an employee's work only when that work was "prepared by an employee *within the scope of his or her employment*." 17 U.S.C. § 101 (emphasis added). The Restatement (Second) of Agency informs interpretation of this statutory provision. *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 740 (1989). The Restatement explains that a work is prepared within the scope of employment "only if (a) it is of the kind [the employee] is employed to perform; (b) it occurs substantially within the authorized time and space limits; [and] (c) it is actuated, at least in part, by a purpose to serve the master." Rest.2d Agency § 228 (1958) (quoted in *Avtec Sys., Inc. v. Pfeiffer*, 21 F.3d 568, 571 (4th Cir. 2004)); *see also Martha Graham School & Dance Found'n, Inc. v. Martha Graham Ctr. of Contemporary Dance, Inc.*, 380 F.3d 624, 635-36 (2d Cir. 2004) (adopting same test).

---

"notification to the employee" of the limits imposed by § 2870). Section 2870 limits an employer's ability to demand assignment of an employee's "inventions," as that term is used in the statute (and in normal parlance) to refer to technical and scientific inventions. *See* Cal. Lab. Code § 2870. This statutory exclusion has no bearing here—and therefore imposes no meaningful limit on the copyrightable works covered by the Inventions Agreement—because Bryant's creative drawings are not encompassed by the ordinary meaning of "inventions," and because, consistent with preemption principles, the California statute does not purport to cover copyrightable material.

Once again, Mattel provides the best evidence that the Inventions Agreement does not extend beyond these customary limits. In the later agreement that is quoted above, Mattel purported to cover "ideas ... that I ... conceive ... during my *period of employment* with Mattel, *whether or not in the course of my employment with Mattel*." 12ER 2581M (emphasis added). The omission of such expansive language in Bryant's Inventions Agreement confirms that Mattel did not intend to depart from the norm here.

\* \* \*

The very least that can be said about both propositions is that the District Court erred in concluding that its reading was free from ambiguity. That is enough to require reversal for two reasons. First, the "contract should be interpreted most strongly against" Mattel, which is "the party who caused the uncertainty to exist." Cal. Civ. Code § 1654. This is especially so, since the Inventions Agreement was a barely legible preprinted form agreement signed as a condition of Bryant's employment, which made it a contract of adhesion under California law, and subject to an especially harsh form of *contra proferendum. See Graham v. Scissor-Tail, Inc.*, 623 P.2d 165, 170-71 (Cal. 1981). Second, the District Court had before it reams of extrinsic evidence supporting the interpretation that designs did not encompass doll drawings. 29ER 6818, 6893-95, 6910, 6913, 6935. But the District Court refused to consider any of it, 5ER 1073-74, as it was required to do

whenever there is a facial ambiguity or a party argues that there is a latent

ambiguity. *See Los Angeles City Employees Union v. City of El Monte*, 220 Cal.

Rptr. 411, 415 (Cal. App. 1985).

## II. THE CONSTRUCTIVE TRUST MUST BE VACATED BECAUSE THE STATE LAW VERDICTS ON WHICH IT IS BASED ARE INVALID.

The District Court's unprecedented decision to transfer the worldwide

portfolio of Bratz and Jade trademarks to Mattel rests on three intertwined state-

law verdicts: aiding and abetting Bryant's breach of fiduciary duty and duty of

loyalty, and tortious interference with contract. The constructive trust and related

equitable relief must be vacated because each of these verdicts is invalid.

### A. The District Court Erred in Directing, as a Matter of Law, That Bryant Became a Fiduciary Merely by Signing a Boilerplate Confidentiality Agreement.

If Bryant had been a fiduciary, he would have been obliged, at all times, to

behave selflessly, elevating Mattel's interests above his own—much as a lawyer

does with a client. *See Committee on Children's Television, Inc. v. Gen. Foods

Corp.*, 673 P.2d 660, 676 (Cal. 1983); *Oakland Raiders v. Nat'l Football League*,

32 Cal. Rptr. 3d 266, 273-75 (Cal. App. 2005). Under California law, Bryant owed

no fiduciary duty to Mattel unless Mattel could prove either: (1) that Bryant

"entered into a relationship which imposes that undertaking as a matter of law"; or

(2) that Bryant signed an agreement "knowingly undertak[ing] to act on behalf of

33

and for the benefit of [Mattel]." *Committee on Children's Television*, 673 P.2d at

676; *see GAB Bus. Servs., Inc. v. Lindsey & Newsom Claim Servs., Inc.*, 99 Cal.

Rptr. 2d 665, 669 (Cal. App. 2000).

As the District Court understood, Bryant could not have become a fiduciary

just by virtue of his position as a low-level designer. 5ER 1063. Steadfastly

fending off all efforts by employers to cast helpless employees in the role of

selfless fiduciaries, California law has long adhered to the rule that only officers

who participate in the company's management are fiduciaries. *See, e.g., Odorizzi*

*v. Bloomfield Sch. Dist.*, 54 Cal. Rptr. 533, 539 (Cal. App. 1966); Cal. Lab. Code

§ 2854 (rank-and-file employees subject only to a duty of "ordinary care and

diligence").

Instead, the District Court found, as a matter of law, that Bryant assumed a

fiduciary relationship by contract. 5ER 1074. This ruling depended upon three

words in the very same Inventions Agreement discussed above. Those words

(italicized below) are in another provision which reads as follows:

1. Provisions Related to Trade Secrets

(a)    I acknowledge that the Company possesses and will
continue to develop and acquire valuable Proprietary Information (as
defined below), including information that I may develop or discover
as a result of my employment with the Company. The value of that
Proprietary Information depends on it remaining confidential. The
Company depends on me to maintain that confidentiality, and I accept
that *position of trust*.

34

23ER 5415 (emphasis added).  The next clause defines "Proprietary Information"

as:

> any information (including formula, pattern, compilation, device,
> method, technique or process) that derives independent economic
> value, actual or potential, from not being generally known to the
> public or to other persons who can obtain economic value from its
> disclosure or use ….

*Id.* ¶1(b).  The District Court erred in erecting such an extraordinary obligation for

thousands of employees on the quicksand foundation of those three words.

Just as California law resists inferring fiduciary duties from ordinary

employee relationships, it resists inferring a fiduciary relationship from a contract,

much less from a boilerplate agreement like Mattel's Inventions Agreement.  *See*

*Rickel v. Schwinn Bicycle Co.*, 192 Cal. Rptr. 732, 735-36 (Cal. App. 1983);

*Waverly Prods, Inc. v. RKO Gen., Inc.*, 32 Cal. Rptr. 73, 78-80 (Cal. App. 1963).

Mattel could not establish that Bryant—and each of the thousands of employees

who signed this preprinted form on orientation day—became contractual

fiduciaries unless it proved:  (1) that by signing this agreement, every employee

"'knowingly' undertook the obligations of a fiduciary" to Mattel, *City of Hope*,

181 P.3d at 150; (2) that Mattel *actually* reposed the requisite level of trust and

confidence in these rank-and-file employees, *see Wolf v. Superior Court*, 130 Cal.

Rptr. 2d 860, 863 (Cal. App. 2003); and (3) that the agreement was "primarily for

the benefit of" Mattel as opposed to a "mutually beneficial arrangement" for both

employer and employee, *City of Hope*, 181 P.3d at 150. The three words on which the District Court rested its entire analysis do not even come close to satisfying this demanding test.

Let us start with what this paragraph *does*. As the title indicates, the purpose of this paragraph is to protect "Trade Secrets." It cribs the definition of "Proprietary Information" verbatim from the statutory definition of a "trade secret" under California's Uniform Trade Secrets Act. *See* Cal. Civ. Code § 3426.1(d). In keeping with its stated purpose, this provision is a step toward what Mattel (and any other business) must do to demonstrate that it made "efforts that are reasonable … to maintain secrecy," an element of any claim for trade secret misappropriation. *Id.*; *see Whyte v. Schlage Lock Co.*, 125 Cal. Rptr. 2d 277, 285 (Cal. App. 2002).

The Inventions Agreement supplements the acknowledgment that "the Company depends on me to maintain that confidentiality," with the commitment that "I accept *that* position of trust." 23ER 5415 ¶1(a) (emphasis added). Those last three words, then, merely acknowledge the confidentiality specified in the previous clause, and "accept *that*" responsibility.

Not by any stretch of the imagination was the Inventions Agreement's reference to "*that* position of trust" a declaration that thousands of employees were thereby knowingly assuming the *ultimate* position of trust, to act primarily for Mattel's benefit—like a board member, a trustee, a lawyer, or a foster parent—and

suppressing all thought of their own benefit. Those three words do not use the word "fiduciary." They do not indicate that this standard employer-employee relationship was "primarily for the benefit of" Mattel and not a "mutually beneficial arrangement." *City of Hope*, 181 P.3d at 150. All that can be gleaned from the agreement is that "the parties' common goal was to achieve a mutually beneficial arrangement," *id.*, as the parties do in most any employer-employee relationship.

In concluding otherwise, the District Court reasoned that "[u]nder California law, a confidential relationship that gives rise to a fiduciary duty is created 'where a confidence is reposed by one person in the integrity of another, and … the party in whom the confidence is reposed … voluntarily accepts … the confidence." 5ER 1074 (quoting *City Solutions, Inc. v. Clear Channel Commc'ns, Inc.*, 201 F. Supp. 2d 1048, 1050-51 (N.D. Cal. 2002)). This logic incorrectly equates "a confidential relationship"—which is a synonym for a fiduciary relationship—with any relationship in which parties agree to maintain confidentiality. As is confirmed by the case the District Court cited, "[a] 'confidential relationship' imposing fiduciary duties does not arise every time two parties share confidences with one another" or trust one another. *City Solutions*, 201 F. Supp. 2d at 1050 (citing *Worldvision Enters., Inc. v. Am. Broad. Cos., Inc.*, 191 Cal. Rptr. 148, 151 (Cal. App. 1983)). If anything, "the existence of a detailed confidentiality

37

agreement suggests arm's-length dealings between co-equals" and that "it makes great sense *not to impose fiduciary duties concomitantly with confidentiality agreements." Id.* at 1049 (emphasis added). Simply put, an employee does not assume fiduciary duties merely because he says—or signs a contract that communicates—"You can trust me."

The California Supreme Court, in *City of Hope*, authoritatively rejected the very equation the District Court drew. There, City of Hope entered into a contract under which it entrusted Genentech with its "secret scientific discovery" so that Genentech could develop it commercially and share the proceeds with City of Hope. 181 P.3d at 146. The court observed that "[e]*very contract* requires one party to repose an element of trust and confidence in the other to perform." *Id.* at 152 (citations omitted); *Wolf*, 130 Cal. Rptr. 2d at 864 (trust and confidence in a party to a contract does not create a fiduciary relationship). But that does not mean that the party making the promise "undertak[es] a fiduciary obligation 'to act on behalf of and for the benefit of another.'" *City of Hope*, 181 P.3d at 150. Accordingly, the court rejected, as a matter of law, the claim that Genentech knowingly undertook the obligations of a fiduciary. *Id.*

To hold otherwise is to override the decades of California employment law resisting employers' efforts to impose unwanted and unexpected fiduciary obligations on rank-and-file employees. *See GAB Business Servs.*, 99 Cal. Rptr. 2d

at 672-73.  Just as "a corporation cannot make a mail clerk its fiduciary by simply bestowing upon the clerk the title of an officer," *id.* at 672, Mattel cannot achieve the same result simply by forcing the mail clerk to sign a document promising to retain confidences and labeling this promise a "position of trust."

For these reasons, the District Court should have granted judgment as a matter of law to *MGA*, not to Mattel, on the existence of a fiduciary relationship. *City Solutions*, 201 F. Supp. 2d at 1051 (granting summary judgment in similar circumstances) (citing *Girard v. Delta Towers Joint Ventures*, 26 Cal. Rptr. 2d 102, 106-07 (Cal. App. 1993)); *Worldvision Enters.*, 191 Cal. Rptr. at 151.  At a minimum, it was improper for the District Court to decide the issue as a matter of law, without affording MGA the opportunity to demonstrate to the jury that Bryant did not knowingly undertake a fiduciary obligation and that Mattel did not, in fact, repose the requisite level of trust and confidence in him and all the other rank-and-file signatories to that barely legible document.

**B.      The District Court Erred by Directing, as a Matter of Law, that Bryant Breached His Duty of Loyalty (and Therefore His Fiduciary Duty) Merely by Signing a Contract with MGA.**

*ATTENTION ALL EMPLOYEES:  You are legally prohibited from accepting a job with a competitor while you are still employed.  That is a violation of your duty of loyalty, as a matter of law.*

The District Court essentially made this pronouncement when it held, as a matter of law—and directed the jury—that Bryant breached his duty of loyalty

(and *a fortiori*, any fiduciary duty) to Mattel simply "*by entering into a contract
with Mattel's competitor, while still employed by Mattel.*" 5ER 1074 (emphasis
added).  With this ruling, the District Court put millions of individuals and
businesses in peril of financial ruin for doing what at-will employees and
employers have been doing since the dawn of commerce.  Even Mattel could not
bring itself to advance such a revolutionary position.  *See* CR 2504.

Whenever an employee resigns, an employer is apt to mutter, "You disloyal
so and so."  All the more so when the employee absconds to a competitor.  But an
employee does not violate his *legal* duty of loyalty to an employer just by
"enter[ing] into a contract with [a] ... competitor."  The law distinguishes between
two distinct degrees of (what might colloquially be called) disloyalty:  On the one
hand, making "preparations to compete" while still employed is permissible; on the
other hand, only when an employee *actually* engages in "*direct competition*" with
the employer is there a possible breach of the duty of loyalty.  *Bancroft-Whitney
Co. v. Glen*, 411 P.2d 921, 935 (Cal. 1966); *see Sequoia Vacuum Sys. v. Stransky*,
40 Cal. Rptr. 203, 206 (Cal. App. 1964); *Daniel Orifice Fitting Co. v. Whalen*, 18
Cal. Rptr. 659, 667 (Cal. App. 1962); *accord Eckard Brandes, Inc. v. Riley*, 338
F.3d 1082, 1086 (9th Cir. 2003).

To illustrate:  a jury might conceivably have been able to find Bryant liable
for breaching his duty of loyalty (although certainly not as a matter of law) if he

40

had secretly formed a competing company and, while still drawing a Mattel paycheck, bid directly against Mattel for shelf space at K-Mart. *See Eckard Brandes*, 338 F.3d at 1086; *Pelsue Co. v. Grand Enters., Inc.*, 782 F. Supp. 1476, 1486 (D. Colo. 1991). On the other hand, when California law blesses "preparations to compete," *Bancroft-Whitney Co.*, 411 P.2d at 935, it plainly authorizes discussions, collaborations, and even full-throttle planning—anything short of direct competition *in the marketplace*. *See Mamou v. Trendwest Resorts, Inc.*, 81 Cal. Rptr. 3d 406, 433-34 (Cal. App. 2008) (formation of a competing company does not breach duty of loyalty).

The absolute minimum that an employee is allowed to do in "preparation[] to compete" is to sign an agreement to start a collaboration with a competitor. 19 WILLISTON ON CONTRACTS § 54.27 at 467 (4th ed. 2008) (at-will employees may plan and prepare to create a competitive enterprise). The District Court cited no precedent—and we are aware of none—requiring an employee to quit and clear out his desk *before* accepting a new job, or holding the employee liable for giving two weeks' notice after accepting a job, rather than leaving the employer in the lurch. Indeed, to prohibit this activity would run afoul of California's strong policy favoring employee mobility. *See* Cal. Bus. & Prof. Code § 16600. To sign a contract with a competitor is not "direct competition," and it is not a breach. *Bancroft-Whitney*, 411 P.2d at 935. This is true for fiduciaries, and it is certainly

41

true for low-level employees like Bryant. *Sequoia Vacuum Sys.*, 40 Cal. Rptr. 203 at 206.

Finally, even were it *possible* for a jury to find that Bryant's conduct amounted to "direct competition" with Mattel, in violation of his duty of loyalty, rather than permissible "preparations to compete," the District Court erred in directing a verdict on the question. Whether an employee has breached his duty of loyalty is a question for the trier of fact. "No ironclad rules as to the type of conduct which is permissible can be stated." *Bancroft-Whitney Co.*, 411 P.2d at 935; *Auxton Computer Enters., Inc. v. Parker*, 416 A.2d 952, 955 (N.J. Supr. 1980) ("Obviously, each case must be decided upon its own facts; because of the competing interests in the actionable wrong is a matter of degree."). The record contained sufficient evidence from which a jury could have concluded—if the question had been posed to it—that Bryant took steps to ensure that he did not breach his duty of loyalty, including immediately tendering his resignation and his testimony that he did not do any work for MGA during his work hours at Mattel. 18ER 3989-92. These facts created a genuine issue regarding loyalty or disloyalty, which revolves around issues of intent. *See* Rest.3d Agency § 8.04 cmt. c (2007).

If, as we have demonstrated, the duty of loyalty verdict must be vacated, the fiduciary duty verdict deserves the same fate, because the two are inextricably intertwined. By improperly directing a verdict for Mattel on the duty of loyalty,

the District Court necessarily directed a verdict also on the fiduciary duty. After all, any act the law condemns as disloyal necessarily also violates any fiduciary obligation. Indeed, the instructions affirmatively encouraged the linkage by intertwining the two duties at every step. *See* 20ER 4364-68.

**C.**   **The District Court Erred in Allowing the Jury to Find That MGA Tortiously Interfered with Bryant's Contract Merely by Signing a Contract with Mattel.**

*ATTENTION ALL EMPLOYERS: Never sign a contract with a competitor's employee. That can be aiding and abetting a breach of the duty of loyalty.*

So ruled the District Court when it instructed the jury that it could hold MGA liable simply for encouraging Bryant to sign a consulting agreement. The District Court got there in two steps. First, it instructed the jury that the tortious interference claim depends on six elements, including "1. [t]hat there was a contract ... between Mattel and Carter Bryant"; and "4. [t]hat the conduct of MGA ... prevented performance or made performance more difficult." 20ER 4363-64. The District Court directed the jury that: (a) "[a]s a matter of law, there was a valid contract between Mattel and Mr. Bryant, namely the Inventions Agreement," thereby satisfying element 1; and (b) "[a]s a matter of law, Mr. Bryant directly competed with Mattel by entering into a contract with MGA, Mattel's competitor, to produce a competing product while he was still employed at Mattel," thereby purportedly satisfying element 4. The District Court confirmed that it was

43

directing a verdict as to these two elements by instructing, in the next sentence, "[w]hether *the remaining requirements* of Mattel's claim for intentional interference with contractual relations have been satisfied or not is for you to decide." 20ER 4364 (emphasis added).[6]  This directed verdict was wrong.

Bryant was an employee at will, not an indentured servant.  He had no contractual obligation to stay at Mattel.  The California Supreme Court has held that a competitor *cannot* be held liable for unlawfully interfering with an at-will employment agreement simply by inducing its termination with a better offer. *Reeves v. Hanlon*, 95 P.3d 513, 520 (Cal. 2004); *Buxbon v. Smith*, 145 P.2d 305, 311 (Cal. 1944).  The District Court thus got the instruction exactly backwards.

This Court should conclude that judgment as a matter of law should have been granted against Mattel on the tortious interference claim, or at a minimum that the verdict is premised on an impermissible theory of liability.  Either way, the claim cannot serve as a foundation for the constructive trust.

---

[6] The District Court later said, "It is also a matter of law that MGA['s] … mere *offering of* employment to Carter Bryant would not be sufficient, by itself, to establish an intentional interference with contract between Mattel and Mr. Bryant." 20ER 4364.  The clear import of that sentence was to distinguish "mere offering of employment" with the act described two sentences earlier, inducing Bryant to "enter[] into a contract with MGA … while he was still employed by Mattel." *Id.*

## III. THE COPYRIGHT INJUNCTION AND RECALL SHOULD BE VACATED BECAUSE THE DISTRICT COURT APPLIED, AND INSTRUCTED THE JURY ON, THE WRONG STANDARD FOR COPYRIGHT INFRINGEMENT.

The copyright verdict, and all relief erected on it, teeters precariously on a single legal proposition—that MGA's Bratz dolls infringe Mattel's copyright as long as they are *substantially similar* to Bryant's drawings and the first sculpt. The District Court reached this conclusion only by rejecting this Court's oft-repeated instructions on how to determine the scope of copyright protection. Had the District Court applied the correct analysis, it would have concluded that a doll deserves only thin copyright protection. This means that a doll does not infringe unless it is *virtually identical* to a copyrighted design—which the Bratz dolls are not. The copyright injunction and the recall order—and the verdict on which they are based—must be vacated.

### A. To Determine the Degree of Copyright Protection, the District Court Was Required to Isolate, and Filter Out, Unprotectable Elements.

The Copyright Act embodies an exquisite balance. In the interest of encouraging innovation, the Act "granted artists the exclusive right to the original *expression* in their works." *Satava v. Lowry*, 323 F.3d 805, 807 (9th Cir. 2003) (emphasis added); *see* 17 U.S.C. § 102(a) (distinguishing protected "expression" from uprotectable "idea"). But "it denie[s] artists the exclusive right to *ideas* and *standard elements* in their works, thereby preventing them from monopolizing

45

what rightfully belongs to the public." *Id.* (emphasis added). This Court effects

the balance with a test that proceeds in two phases: (i) an "extrinsic" analysis and

(ii) an "intrinsic" analysis. *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435,

1442-43 (9th Cir. 1994) (explaining each phase of updated test); *Sid & Marty*

*Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1162 (9th Cir.

1977) (original version of test).

 **Phase I: Extrinsic test.** As the District Court and the parties agreed below,

5ER 1026, before a copyright case ever goes to the jury, the court must conduct the

extrinsic test, which entails filtering protectable from nonprotectable elements in

the subject work. *See Apple Computer*, 35 F.3d at 1443; *Funky Films, Inc. v. Time*

*Warner Entm't Co.*, 462 F.3d 1072, 1077 (9th Cir. 2006); 5ER 1039-42. The

premise behind the extrinsic test is that "nearly any two (or more) works" will

show a certain similarity "at a sufficient level of abstraction," but the requisite

similarity "must be measured at the level of the concrete 'elements' of each work."

*Idema v. Dreamworks, Inc.*, 162 F. Supp. 2d 1129, 1178-79 (C.D. Cal. 2000)

(citing *Berkic v. Crichton*, 761 F.2d 1289, 1293 (9th Cir. 1985)); *see also Nichols*

*v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir. 1930).

 As this Court has explained, the extrinsic analysis proceeds in three steps.

First, "[t]he plaintiff must identify the *source(s)* of the alleged similarity between

his work and the defendant's work"—*i.e.*, what specific elements are claimed to be

similar. *Apple Computer*, 35 F.3d at 1443.  Second, the court must conduct an

"analytic dissection" of the copyrighted work—isolating, and studying, each

element. *Id.*  Third, the "court must filter out and disregard the non-protectible

elements." *Cavalier v. Random House, Inc.*, 297 F.3d 815, 822 (9th Cir. 2002).

Filtration is an apt metaphor, since the exercise is like running each element

through a battery of filters, and considering only the elements that survive *all* the

filters. *Funky Films*, 462 F.3d at 1077 (explaining that the court must "take care to

inquire only whether 'the *protectable elements, standing alone,* are substantially

similar" (emphasis added)).

   Among the numerous filters that can trap an element, three complementary

filters bear particular emphasis here:  (1) merger doctrine; (2) standard features;

and (3) originality.

   The merger doctrine holds that "[w]hen the 'idea' and its 'expression' are …

inseparable, copying the 'expression' will not be barred, since protecting the

'expression' in such circumstances would confer a monopoly of the 'idea'"—

which cannot be allowed. *Herbert Rosenthal Jewelry Corp. v. Kalpakian*, 446

F.2d 738, 740-42 (9th Cir. 1971).  Thus, for example, a plaintiff cannot claim to

own the whole idea of making a jewel-encrusted bee pin, *Rosenthal Jewelry*, 446

F.2d at 740-42, a glass sculpture of a jellyfish, *Satava*, 323 F.3d at 810, a doll with

"an upturned nose, bow lips, and widely spaced eyes," *Mattel, Inc. v. Goldberger*

*Doll Mfg. Co.*, 365 F.3d 133, 136 (2d Cir. 2004), or a martial arts video game,

*Data East USA, Inc. v. Epyx, Inc.*, 862 F.2d 204, 209 (9th Cir. 1988). Each of

these works reflects an object or a phenomenon that exists in the real world for all

to observe. As such, any attribute that is part and parcel of the very idea of

creating such a work—a bee's wings, a jellyfish's tentacles, a doll's upturned nose,

a particular karate move—is unprotectable. *Rosenthal Jewelry*, 446 F.2d at 742;

*Satava*, 323 F.3d at 811; *Goldberger*, 365 F.3d at 136; *Data East*, 862 F.2d at 209.

Expression is especially limited where either the medium has limitations or

the object being depicted shows scant variability. When similarities are

"inevitable," copyright protection is especially thin. *Rosenthal Jewelry*, 446 F.2d

at 742. For example, in the context of jewel-encrusted bee pins, copyright

protection was especially thin because "[t]here is no greater similarity between the

pins of plaintiff and defendants than is inevitable from the use of jewel-encrusted

bee forms in both." *Id.* at 740, 742; *see Data East*, 862 F.2d at 209 (computer on

which karate game would be played created certain constraints on expression of

the karate game idea). When limited options are available, "[o]thers are free to

utilize the 'idea' so long as they do not plagiarize its expression," *Rosenthal*

*Jewelry*, 446 F.2d at 741, which is to say that they cannot copy the exact same

attributes in the exact same way. *See, e.g., Aliotti*, 831 F.2d 898 at 901.

The court must also filter out standard features, or "scènes à faire." *Ets-Hokin v. Skyy Spirits Inc.*, 225 F.3d 1068, 1082 n.17 (9th Cir. 2000). Standard features are "expressions that are standard, stock, or common to a particular subject matter or medium." *Satava*, 323 F.3d at 810; *see, e.g., Data East*, 862 F.2d at 209; *Frybarger v. Int'l Bus. Mach. Corp.*, 812 F.2d 525, 530 (9th Cir. 1987).

As to originality, it goes without saying that Mattel cannot claim copyright protection for any element of Bryant's sketches or of the preliminary sculpt that was unoriginal. *See Feist Pubs. Inc. v. Rural Tel. Servs. Co.*, 499 U.S. 340, 347 (1991). Even if the work *as a whole* meets the very minimal threshold to qualify as original—as the parties agreed was that case here, *see* 21ER 4785-86—the extrinsic test requires Mattel to show that each *element* is original *in isolation*. To the extent that any particular element was unoriginal, or was explicitly cribbed from existing materials (such as the Steve Madden ad), that element is not original to the author and cannot be protected.

Once a court has run each element through the battery of filters—merger doctrine, standard features, originality, authorized elements, etc.—the court assesses which elements, if any, have survived all the filters. Based upon that distillation, "the court must define the scope of the plaintiff's copyright—that is, decide whether the work is entitled to 'broad' or 'thin' protection." *Apple Computer*, 35 F.3d at 1443. If most elements are unprotectable, "the range of

49

protectable and unauthorized expression is narrow," *id.* at 1439, and copyright

protection is "thin," *id.* at 1442-43.  If a work merits only thin protection, the

traditional test of "substantial similarity" is set aside and the accused product does

not infringe unless it is "virtually identical" to the original.  *Id.* at 1442-43, 1446.

The subtlest of differences defeat an infringement claim when protection is thin.

*See, e.g., Mattel, Inc. v. Azrak-Hamway Int'l, Inc.*, 724 F.2d 357, 360 (2d Cir.

1983) (*per curiam*) (torso of musclebound action figure not virtually identical

where it emphasized different "muscle groups"); *Rosenthal Jewelry*, 446 F.2d at

741 (despite "obvious similarity" of two bee pins "there were differences ... in the

veining on the wings").

    *Phase II:  Intrinsic test.*  The extrinsic test's output—the level of copyright

protection—is an input for the intrinsic test.  In the intrinsic test, the two works are

subjectively compared as a whole, according to the standard dictated by the

extrinsic test ("substantially similar" or "virtually identical").  The intrinsic test is

an evaluation of the "total concept and feel" of the works, *Cavalier*, 297 F.3d at

822, but "the party claiming infringement may place *no* reliance upon any

similarity in expression resulting from unprotectable elements."  *Apple Computer*,

35 F.3d at 1446 (internal quote and citation omitted); *see* R. Lind, COPYRIGHT LAW

169, 173 (3d ed. 2006).

*Illustrations of filtering.* In its most recent application of the filtering analysis, *Satava v. Lowry*, this Court furnished a roadmap on how it must be done. 323 F.3d at 812-13. The case involved "jellyfish sculptures in … glass-in-glass medium." *Id.* at 807. In describing his design, the plaintiff sculptor enumerated numerous elements: "[1] vertically oriented, [2] colorful, fanciful jellyfish with [3] tendril-like tentacles and [4] a rounded bell [5] encased … at the top and tapering toward the bottom to form a roughly bullet shape, [6] with the jellyfish portion of the sculpture filling almost the entire volume of [7] the outer clear-glass shroud." *Id.* at 807. The defendant's sculptures had each of the same elements and—as is evident from the two photos appended to the opinion—they were extremely similar. *Id.* at 808-09.

In faithfully executing its filtering function, this Court examined each of these elements one by one, and concluded that each in isolation was not protectable. Thus, for elements [1] and [2], the Court held that the plaintiff "may not prevent others from depicting jellyfish *swimming vertically*, because jellyfish swim vertically in nature and often are depicted swimming vertically"; and "may not prevent others from depicting jellyfish in *bright colors*, because many jellyfish are brightly colored." *Id.* at 811 (emphasis added). Same for elements [3] and [4], because "many jellyfish possess those body parts." *Id.* As to elements [5], [6], and [7], this Court addressed each in isolation, and concluded that each "is standard in

51

glass-in-glass sculpture," or is "the most appropriate setting for an aquatic animal." *Id.*

Putting it all together, this Court acknowledged that the plaintiff "ha[d] made some copyrightable contributions: the distinctive curls of particular tendrils; the arrangement of certain hues; the unique shape of jellyfishes' bells." *Id.* at 812. But as to the whole work, he had only "a thin copyright that protects against only virtually identical copying." *Id.* Applying this standard to facts, the District Court concluded that the accused sculptures, though exceedingly similar, were not identical—and therefore not infringing. *Id.*

Even closer to the subject matter at hand, this Court has applied the same filtering analysis to dolls—specifically cuddly stuffed dinosaurs. *Aliotti*, 831 F.2d at 901. Following the same approach, the Court addressed each element in isolation—the dolls' "similar postures," the "body designs," the Tyrannosaurus's open mouth, the "gentle and cuddly" feel—and found them all unprotected. *Id.* at 901. Because there were very few protected elements left once the unprotected ones were filtered out, this Court granted thin copyright protection and held that the defendant was entitled to summary judgment of non-infringement, as a matter of law. *Id.*; *see also Data East*, 862 F.2d at 209 (same approach with karate video game).

**B.    Because the District Court Followed the Wrong Approach, It Incorrectly Adopted the "Substantial Similarity" Standard.**

**1.    The District Court ignored this Court's prescribed protocol.**

The District Court's analysis is reflected in two summary judgment opinions 5ER 1023, 1038, which reverberate in its jury instructions, 22ER 5023-25, its opinion denying MGA's motion for judgment as a matter of law, 1ER 20-21, and its remedy order, 1ER 51. The approach reflected in these opinions bears no resemblance to the analysis this Court has prescribed.

The District Court skipped all three steps of the extrinsic test. It never listed the elements that were claimed to be similar. It never considered any single element in isolation. It never ran any one element—nor, for that matter, any combination of elements—through a single filter, much less through all the relevant filters. It, therefore, never assessed what proportion of the elements were protectable in isolation. In the absence of such an assessment, there was no valid basis on which the court could have decided whether Bryant's sketches were entitled to broad or thin copyright protection.

Instead, the District Court simply declared, without analysis, what it considered protectable in the overall drawings:

1.    The particularized synergistic compilation and expression of the human form and anatomy that expresses a unique style and conveys a distinct look or attitude;

2.    The particularized expression of a doll's head, lips, eyes, eyebrows, eye features, nose, chin, hair style and breasts,

including the accentuation or exaggeration of certain anatomical features relative to others (doll lips, eyes, eyebrows, and eye features) and de-emphasis of certain anatomical features relative to others (doll nose and thin, small doll bodies);

3.  The particularized doll, clothes, doll shoes, and doll accessories that express aggressive, contemporary, youthful style.

5ER 1024, 22ER 5023-24.  Putting aside the flawed process by which the District Court reached this pronouncement, the end product of this extrinsic analysis is wrong on at least three levels.

First, rather than itemizing elements and stating whether each is protectable, as the extrinsic test requires, the District Court granted full copyright protection to (A) a "synergistic compilation"; (B) a montage of nine elements that are presented in a "particularized" way; and (C) unspecified doll clothes and accessories that are presented in a "particularized" way. *Id.*

Second, protecting a "human form and anatomy" because it "expresses a unique style and conveys a distinct look or attitude" is the antithesis of the objective approach prescribed by the extrinsic test.  It is the very definition of protecting an *idea* for a particular sort of doll.  So is granting copyright protection to a category of "doll[s], clothes, doll shoes, and doll accessories that express *aggressive, contemporary, youthful style.*"

At the end of the day, the only concrete limitation that resulted from the
District Court's version of filtering was an acknowledgment that Mattel could not
seek a monopoly over dolls *simply because* the dolls had "hair, heads, two eyes,
eyebrows, lips, nose, chin, mouth, and other features that track human anatomy and
physiology," or "[h]uman clothes, shoes, and accessories." 22ER 5024. So the
filtering yielded nothing but the unedifying conclusion that Mattel cannot claim a
monopoly in (1) the very concept of a human doll or (2) the market for one-eyed,
one-armed, bald, double-headed dolls, and devoid of facial features and human
clothes.[7]

### 2. A correct application of the extrinsic test would have resulted in thin copyright protection.

If the District Court had followed this Court's instructions, it would have
considered, *in isolation*: "the doll's head, lips, eyes, eyebrows, eye features, nose,
chin, hair style and breasts," the legs, arms, torso, etc. 22ER 5024. It would also
have considered what protection the clothes deserve. It would have concluded, as

---

[7] The expansiveness of the District Court's approach to copyright protection
is especially evident from the District Court's injunction against MGA's use of the
doll sculpts. 1ER 52-53. A sculpt is a *blank plastic body*—essentially a doll
mannequin—to which MGA applies skin coloring, face paint, hair, and fashions to
yield 30 different Bratz characters. The District Court should have afforded these
blank plastic bodies little, if any, copyright protection. *See Carol Barnhardt Inc. v.
Economy Cover Corp.*, 773 F.2d 411, 418 (2d Cir. 1985) (holding that mannequin
sculptural forms, whose purpose it was to display articles of clothing, were
"inseparable" from their use as utilitarian articles and thus were not entitled to
copyright protection).

MGA's experts did, that very few of these items—if any—were protectable. *See* 11ER 2180, 2283, 29ER 6940-95. And then, it would have granted only thin copyright protection.

**Facial and anatomical features.** Take, for starters, the large almond-shaped eyes. Several filters would eliminate copyright protection for this element. Just as nature has made jellyfish with "tendril-like tentacles," *Satava*, 323 F.3d at 811, and Tyrannosauruses with mouths agape, *see Aliotti*, 831 F.2d at 901 n.1, nature has made girls with large almond-shaped eyes. The *idea* of a large almond-shaped eye merges into the *expression*. Moreover, if the goal is to produce a breed of ethnic dolls with hip urban personalities, big eyes are both standard features and unoriginal. The record is teaming with examples of virtually identical eyes in popular culture used in exactly that way. They date as far back as Betty Boop, *see* 11ER 2300, through the 1960s in the form of Japanese anime, *see* 11ER 2300-01, to the Blythe dolls, *see* 11ER 2301, and the images of the renowned Margaret Keane, in the 1970s and 1980s, *see* 11ER 2302, to contemporary times in the form of the Paris Blues ad campaign, *see* 11ER 2303. As illustrated by one expert, the eyes of the Bratz dolls more closely resemble those in the public domain—most notably, Angelina Jolie's, Paris Blues's, and the anime Speed Racer's—than they do Bryant's drawing. 11ER 2300-03.

What's more, the expression of an almond-shaped eye is severely constrained—especially when working in the small available space of an article that is to be manufactured in inexpensive plastic. Once an artist decides that the eye is going to be disproportionately large and almond-shaped, she has very few further choices to make. Because the doll simulates a human form, the shape, color and orientation of the pupil and iris must be that close to human, rather than say a goat, ostrich, or red-eyed tree frog. The whites of their eyes will probably be white. The eye color will probably be minor variants on brown, hazel, blue, or green. And so forth. To be sure, there will be some variation, but this limited range of available expression given the constraints of the human form and the size and materials of the medium translates into diminished copyright protection.

The same analysis applies almost verbatim to any rendering of luscious lips, eyebrows of a particular shape, the tiny doll nose, the skin coloring and makeup, the anatomical features, and any attributes that were either minimized or accentuated relative to others. 11ER 2303, 29ER 6947-49, 6951-52, 6965.

***Clothes, shoes & accessories.*** The same analysis *would* apply with equal force to each element of clothing, shoes, and accessories—if these elements were entitled to any copyright protection at all. But the Copyright Office has held that each of these elements begins with virtually no copyright protection—in a ruling focused specifically on Bratz clothes. 29ER 7043. In rejecting MGA's application

to register the Bratz clothing, the agency concluded that doll clothing is not protectable, either "as a miniaturized model of real clothing" or as "intrinsically useful, as are full-sized clothing items for people." *Id.* The District Court gave no deference to the Copyright Office's reasonable interpretation, as it was required to do. *See Batjac Prods. Inc. v. Goodtimes Home Video Corp.*, 160 F.3d 1223, 1230 (9th Cir. 1998).

In overruling the Copyright Office, the District Court rejected the obvious analogy to human clothing and reasoned that doll clothing serves no useful function. 5ER 1041. The District based this finding on precedents holding that *toys generally* are not "useful articles." *Id.* But even if *toys* are not useful, that does not mean that clothing for human-shaped dolls has a legal status that is different from human clothing.

As the Copyright Office has explained, clothing for fashion dolls serves the same basic function, and must have the same basic features, as human clothing. 29ER 7043. It needs to come off and on without being destroyed; to accommodate movement such as bending, walking, sitting and other activities used in the fantasy play children engage in with fashion dolls; to appear fashionable in order to appeal to children's tastes just same as does human clothing; and to cover and protect anatomical features. The Copyright Office's conclusion is correct—and certainly not clearly wrong. *Chosun Int'l Inc. v. Chrisha Creations, Ltd.*, 413 F.3d 324, 328

(2d Cir. 2005) (articles of clothing for humans have long "been identified as

'useful' items and, hence, excluded from copyright eligibility"); *Galiano v.*

*Harrah's Operating Co.*, 416 F.3d 411 (5th Cir. 2005) (copyright protections

limited to non-functional or decorative items); 17 U.S.C. § 101.

Because the District Court misapprehended this point, it allowed Mattel to

build its case mostly around fashion similarities. *See supra* at 18-19. And for this

reason alone the copyright verdict is fatally flawed.

### 3. The relevant precedents confirm that Bryant's designs were subject to only thin copyright protection.

The District Court's sole justification for departing from the procedure this

Court has prescribed was that "we regularly take notice of a vast number of

particularized differences in facial features, ethnicity, size, shape, proportions, hair

color, and hair texture and, of course, various particularized combinations and

permutations thereof." 5ER 1041. That variability led the District Court to reject

this Court's analysis in *Satava* in favor of the substantial similarity test, merely

because "[j]ellyfish anatomy is much simpler than human anatomy." *Id.* But

neither this Court nor any other has ever suggested any such complexity-of-human-

anatomy exception to the rules governing filtering.[8]

---

[8] In fact, the District Court's failure to follow the correct process for
filtering—and cabin the jury's determination—requires reversal of the jury's

To the contrary, Mattel has already twice tried to extend full copyright protection to this thinly protected arena—and failed both times. Strike one was *Mattel, Inc. v. Goldberger Doll Mfg. Co.*, 365 F.3d 133 (2d Cir. 2004), where Mattel challenged a doll whose face was "quite similar to the Barbie dolls." *Id.* at 133. The court held that the "central expressive features of Barbie's face" were entitled to copyright protection, but that "[t]he protection that flows from such a copyright is, of course, quite limited." *Id.* at 135-36. Specifically, the court held that "[a]n upturned nose, bow lips, and wide eyes are the 'idea' of a certain type of doll face. That idea belongs not to Mattel but to the public domain." *Id.* at 136; *see also Ideal Toy Corp. v. Fab-Lu Ltd.*, 360 F.2d 1021, 1023 (2d Cir. 1966) (same). Consequently, "Mattel's copyright will protect its own particularized expression of that idea"—which is to say that the only dolls that infringe are exact *replicas* of Mattel's expressions. 365 F.3d at 135-36.

Strike two was *Mattel, Inc. v. Azrak-Hamway Int'l, Inc.*, where Mattel argued for expansive copyright protection for the torsos of a series of musclebound dolls. 724 F.2d at 360. The "torso ... [wa]s a sculptor's exaggerated rendering of a bodybuilder's body with shortened legs." *Id.* The dolls accused of infringement had the same features, with only "minor" differences in musculature. *Id.* Both

---

infringement findings in and of itself, irrespective of whether the standard of substantial similarity or virtual identity is applied to determine infringement.

"dolls are posed in a similar crouching position which may be likened to the fighting stance of a Neanderthal man." *Id.* The Second Circuit flatly rejected Mattel's allegation of copyright infringement. It held that "nearly all of the similarity can be attributed to the fact that both [dolls] are artist's renderings of the same *unprotectable idea*—a superhuman muscleman crouching in what since Neanderthal times has been a tradition[al] fighting pose." *Id.* (emphasis added). The court held that Mattel could seek protection only against replicas of its own exact dolls, mimicking, for example, Mattel's "decision to accentuate certain muscle groups relative to others." *Id.*

These cases are both in keeping with the conclusion this Court long ago reached, that "the idea of a plaster statue of a nude will probably coincide with the expression of that idea when an inexpensive manufacturing process is used." *Sid & Marty Krofft*, 562 F.2d at 1168 (dictum).

If Mattel cannot win full copyright protection for "a doll visage with an upturned nose, bow lips, and widely spaced eyes," *Goldberger*, 365 F.3d at 136, or a doll with "exaggerated rendering of a bodybuilder's body with shortened legs" in a "Neanderthal ... fighting pose," *Azrak-Hamway*, 724 F.2d at 360, and if the idea of particular body shape mergers with its expression, especially in mass production, then Mattel is not entitled to full copyright protection for a mass-produced doll that combines the ubiquitous features of large almond-shaped eyes,

61

luscious lips, small nose, and thin, small bodies.  Here, as in each of these other

cases, the "idea" for a doll with that combination of features "belongs not to Mattel

but to the public domain."  *Goldberger*, 365 F.3d at 136.

As a result, Mattel is entitled to protection only against exact replicas of its

rendering.  And, even small differences between the original designs and any

particular later doll will be enough to defeat Mattel's effort to monopolize the idea.

To apply the Second Circuit's teaching here:  "[t]he law of copyright guarantees

the designer of the successful version," here MGA, the freedom to use an "*idea,*"

so long as he is not copying the exact expression embodied in Bryant's original

drawings.  *Id.*  Mattel is entitled, at most, "not to have its [precise] design copied

by competitors."  *Id.* at 136-37.  It is not entitled to prevent MGA from trying to

use the idea of a doll with those features to try "getting the doll's face and

expression exactly right."  *Id.* at 136.

This is strike three.

\* \* \*

If the District Court had applied the correct legal standard, it would have

concluded, as a matter of law, that none of the dolls before it was virtually identical

to the early Bryant sketches or to the preliminary sculpt.  It could not have

concluded that *every* female Bratz doll was virtually identical to Bryant's works—

much less that the very use of a *blank* Bratz doll sculpt was impermissible.  As is

explained more fully above, MGA developed dolls that were sweeter, softer, younger, and less edgy than the characters reflected in Bryant's drawings, and it made numerous changes in developing its dolls to get their expression "exactly right." *Goldberger*, 365 F.3d at 136; *see supra* at 10-12. For a vivid illustration of how the dolls evolved over time, we urge the Court to compare a handful of Bryant's first drawings, *see* TX 302-1, 302-3, 302-6, 302-8, 302-10, and the photo of the preliminary sculpt, 23ER 5247, with both the first generation dolls, TX 12286, 17551, 17558, 17561, and dolls in the later generations, TX 14047, 14186, 14203, 18661, 18668. Even if it were possible to conclude that every single one of the current products still on the shelves were virtually identical—a position Mattel has not taken—MGA was entitled to have the jury, and the judge, assess each doll under the correct standard. *See Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197, 207-08 (9th Cir. 1989).

## IV. THE CONSTRUCTIVE TRUST MUST BE VACATED, EVEN IF THE UNDERLYING STATE LAW CLAIMS ARE VALID.

For the state law claims, the District Court fashioned three complementary remedies—which collectively add up to the single largest transfer of trademark rights in history. First, relying on its summary judgment orders, the District Court issued a declaratory judgment that Mattel "owns" the "Bratz-related works, ideas, and concepts" that Bryant created while at Mattel, "including the idea for the name 'Bratz' and the idea for the 'Bratz' characters"—all of which, the District Court

63

concluded, "are protectable property interests as a matter of California state law." 5ER 999 ¶1; *see also* 5ER 1010 n. 2; *cf.* 5ER 1072 (citing *Desny*, 299 P.2d at 266). Second, building on that order, the District Court granted Mattel's motion for constructive trust requiring MGA to assign to Mattel all of its trademarks that included the words "Bratz" or "Jade." 5ER 1004 ¶¶1-2, 1012. The court found this remedy appropriate on the theory that MGA "wrongfully acquired" the "idea for the Bratz name" and the trademarks were merely an "enhancement" in the "value of the names" owned by Mattel. 5ER 1012; *see also* 5ER 1004-05. Third, the District Court found issued a UCL injunction against MGA's "using the terms 'Bratz' and 'Jade'" in the form of trademark or otherwise. 5ER 1005.

Collectively, these orders mean that MGA may no longer use the name Bratz on any product—including thousands of products that Bryant had nothing to do with. The relief covers not just the female dolls that Bryant conceived, but all Bratz dolls, from Bratz Boyz to L'il Bratz to Bratz Kidz to Bratz Babies to Itsy Bitsy Bratz, and Bratz Petz. It also covers the entire universe of Bratz clothes and accessories. The District Court ordered this sweeping transfer of the entire trademark portfolio—including trademarks registered in jurisdictions around the world where registration, not use, is the sole measure of ownership—even though Mattel has conceded that none of these products infringe Mattel's copyright. CR 4441.

This breathtaking remedy was "something which [was] bothering the
Court." 23ER 5237. As well it should have. The District Court's decision to
transfer ownership of the trademark portfolio was unprecedented. Literally.
Neither Mattel nor the District Court could find a single case that had ever imposed
a constructive trust over a single trademark, let alone an entire worldwide
portfolio. And neither could point to a single case so much as suggesting that a
trademark owner could lose the mark just because someone else had the idea for
the name first.

In imposing the constructive trust, the District Court invoked two provisions
of the California Civil Code. The first provides that "[o]ne who wrongfully detains
a thing is an involuntary trustee thereof, for the benefit of the owner." Cal. Civ.
Code § 2223. The second provides: "One who gains a thing by fraud, accident,
mistake, undue influence, the violation of a trust, or other wrongful act, is, unless
he or she has some other and better right thereto, an involuntary trustee of the thing
gained, for the benefit of the person who would otherwise have had it." *Id.* § 2224.
As the District Court observed, Mattel is not entitled to a constructive trust over the
trademark unless it proved three elements: "(1) the existence of a *res* (property or
some interest in property); (2) the right of [Mattel] to that *res*; and (3) some
wrongful acquisition or detention of the *res* by [MGA] who is not entitled to it."
*Communist Party v. 522 Valencia, Inc.*, 41 Cal. Rptr. 2d 618, 623-24 (Cal. App.

1995); 5ER 1012. We have already demonstrated that Mattel fails the second element, because Mattel had no right to own Bryant's "idea for the name." *See supra* Point I. Mattel fails the other two prongs as well. *See infra* Point IV.A. And even if it satisfied these elements, it would not be entitled to a constructive trust over the *trademark* merely on the basis of a purported wrongful acquisition of the *idea for the name. See infra* Point IV.B.

### A.   An Idea for the Name of a Product Is Not a *Res* and Mattel Did Not Prove That the Idea Was Wrongfully Acquired.

*No res.* As to the first element, in the District Court's view, the "*res*" that "MGA ... wrongfully acquired" was "*the idea* for the name 'Bratz.'" 5ER 1012 (emphasis added).[9] The District Court was careful not to hold that MGA wrongfully acquired the *trademark*. The District Court understood that a trademark is not the same as an "idea" for a name. A trademark is acquired in the United States when "used in commerce"—which Mattel never did. 15 U.S.C. §§ 1051, 1125. "To acquire ownership of a trademark it is not enough to have invented the mark first or even to have registered it first; the party claiming ownership must have been the first to actually use the mark in the sale of goods or

---

[9] The District Court held that "[t]he same is true for the one Bratz character who retained the name given her by Carter Bryant: 'Jade.'" 5ER 1012. For simplicity, in the discussion that follows, we refer only to the name "Bratz," with the proviso that everything that is said about the name "Bratz" applies with equal force to "Jade."

services." *E.g., Sengoku Works Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217, 1219 (9th Cir. 1996); *Brookfield Commc'ns, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1046 (9th Cir. 1999) (same).

Mattel did not own the "Bratz" trademark—and had no right to the trademark—when Bryant and MGA first started talking. Indeed, since "Bratz" was being used at the time by another entity entirely, Mattel could not have used the trademark even if it had wanted to (at least not without a dispute from Lovins). Conversely, there was nothing at all wrongful about how MGA acquired the trademark, by acquiring the rights to the name and investing hundreds of millions in the marketing of products bearing the name Bratz—and the District Court did not hold that there was.

Even assuming the Inventions Agreement assigned Mattel ownership of the "idea for the name 'Bratz,'" *but see supra* Point I.A., it was improper for the District Court to impose a constructive trust on the "idea for the name," because an "idea" is not a "res." It is not property at all. "Under California law … an idea is not recognized as a property right" and cannot support claims "actionable only to vindicate legally protected property interests." *Whitfield v. Lear*, 751 F.2d 90, 92 (2d Cir. 1984); *see Desny*, 299 P.2d at 265-67; *Rokos v. Peck*, 227 Cal. Rptr. 480, 487-88 (Cal. App. 1986). Since there is no res—no protectable "thing," in the statutory parlance—there can be no valid trust.

*No wrongful acquisition of the idea.* As to the third element, the District Court held that "the jury found that the MGA parties *wrongfully acquired* the idea for the name 'Bratz.'" 5ER 1012 (emphasis added). The jury found no such thing. The District Court directed the jury that, by virtue of ¶2(a) of the Inventions Agreement (entitled "Ownership of Inventions"), Mattel owned any idea that Bryant came up with while he was employed at Mattel. The jury found that Bryant came up with the idea for the names while at Mattel, which meant that Mattel *owned* the idea for the names. But so far, that satisfies only element 2. Just because Mattel owned Bryant's idea does not mean that it was wrongful of Bryant to share the idea, much less that it was wrongful of MGA to "acquire" the idea or use it. The jury was never asked *that* question.

There is a good reason that the jury was not asked the question—for Mattel has conceded that it could not have proven it. Whether it was wrongful for Bryant to disclose the name "Bratz" to MGA depends on whether Bryant's revelation of the name violated a different provision—¶1 of the Inventions Agreement, entitled "Provisions Related To *Trade Secrets*." 23ER 5415 (emphasis added). This provision does not prohibit Bryant from disclosing any idea at all. It prohibits

Bryant only from disclosing "Trade Secrets."[10]  Mattel disclaimed any intention to

argue "that the name BRATZ is, quote, proprietary, end quote, to Mattel.  That is

not the basis of our theory."  15ER 3117.  Since there is no basis for the conclusion

that Bryant engaged in a wrongful act by sharing the "idea for the name 'Bratz,'"

there can obviously be no basis for concluding that MGA did anything wrongful by

listening to the idea and using it.

But even if this element were satisfied *as to Bryant*, it would not be satisfied

as to MGA.  It is simply not wrongful to use someone else's idea for a name, when

that name has not yet acquired trademark status.  *See Sengoku Works*, 96 F.3d at

1219.

### B.    Even If Mattel Owned the Idea for the Name "Bratz," It Was Not Entitled to Own the Entire Worldwide Trademark Portfolio.

The District Court was authorized to put in constructive trust only the

"*thing*" that MGA "wrongfully detain[ed]."  Cal. Civ. Code § 2223.  If "the thing"

MGA wrongfully detained was "the idea for the name 'Bratz,'" that is the most

that the District Court was authorized to put in trust.  Having an "idea for the name

'Bratz'" may be a first step toward creating a Bratz trademark, but it is not the

same as the trademark—not even close.  Only once a name is used in commerce,

---

[10] More accurately, it prohibits Bryant from sharing "Proprietary Information," 23ER 5415 ¶1(a), which, as noted, tracks the definition of "trade secret" under California's Uniform Trade Secrets Act.  Cal. Civ. Code § 3426.1.

and acquires goodwill, does the trademark owner have "something of value."

*Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*, 316 U.S. 203, 205

(1942); *see Mister Donut of Am., Inc. v. Mr. Donut, Inc.*, 418 F.2d 838, 842 (9th

Cir. 1969). Only when the business invests in generating the goodwill that

customers associate with that name does the trademark's value increase. *See*

*United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 97-98 (1918); *Marshak v.*

*Green*, 746 F.2d 927, 929 (2d Cir. 1984); 3 J. McCarthy, McCARTHY ON

TRADEMARKS AND UNFAIR COMPETITION § 18:2 (4th ed. 2008).

MGA's Bratz trademark is a case in point. On the one hand, Mattel had the

idea for the name "Brats" and did nothing with it. 15ER 3208-11. The name,

alone, was virtually valueless. The Bratz product took off after a sluggish start—

and the trademark increased in value—because MGA invested several hundred

million dollars in making the Bratz *brand* what it is today, nurturing the brand by

marketing it to scores of licensees, distributors, and retailers and spending millions

on advertising. The District Court observed, "[T]he measurable value of Bratz …

is so much a function of what Isaac Larian and his team at MGA put into it.…

[T]o take everything of value … that's quite a leap." 22ER 5118, 5170-71.

In taking the leap, the District Court reasoned that equity required it to

award Mattel the windfall "to prevent [MGA's] unjust enrichment." 5ER 1012. It

relied on a case holding that "enhancement of value is given to the beneficiary of

the constructive trust." *Id.* (citing *Haskel Eng'g & Supply Co. v. Hartford Acc. & Indem. Co.*, 144 Cal. Rptr. 189, 193 (Cal. App. 1978)). That proposition makes sense when the "thing" that was "wrongfully detain[ed]" increases in value. That is what happened in *Haskell*, the case the District Court cited: the defendant embezzled some funds and used the funds to purchase a piece of property, which appreciated in value. *Id.* at 190. The constructive trust "remedy reached the enhanced value of the real property acquired by the embezzler to the extent the enhanced value was necessary to [the plaintiff's] recoupment." *Id.* at 192.

But that is not what happened here. The "thing" the District Court placed in constructive trust—the "idea for the name 'Bratz'"—did not appreciate in value. The *trademark* increased in value. And the reason it increased in value was not because the "idea for the name 'Bratz'" appreciated, but because MGA invested its own money—and applied its own marketing genius and sweat equity—to build the brand into a wildly popular product with steadfast goodwill worldwide. To grant Mattel the benefit of MGA's enormous investment in Bratz is like granting a serf the deed to the Taj Mahal simply because he came up with the "idea for the name."

This case is controlled by a different rule—that equity does not allow a plaintiff to capture "the fruits of the defendant's own labors or legitimate efforts." DAN B. DOBBS, DOBBS LAW OF REMEDIES § 6.6(3) (2d ed. 1993). As the First Circuit put it, "If an artist acquired paints by fraud and used them in producing a

valuable portrait we would not suggest that the defrauded party would be entitled

to the portrait, or to the proceeds of its sale." *Janigan v. Taylor*, 344 F.2d 781, 787

(1st Cir. 1965). Similarly, "the imposition of a constructive trust is not an

appropriate remedy when a defendant improperly uses the property of another to

make improvements *on property that is not initially owned by the plaintiff*."

*Campbell v. Superior Court*, 34 Cal. Rptr. 3d 68, 81 (Cal. App. 2005) (citing

Restatement of Restitution § 206, cmt. b (1937)).

So, too, here: since the trademark was never "initially owned by the

plaintiff," and the value of the trademark was a function largely of MGA's

investment of its own independently owned property and its own energies, it was

improper for the District Court to impose a constructive trust on the entire

trademark. In the statutory parlance, Mattel is not entitled to a constructive trust

because MGA "has some other and better right thereto." Cal. Civ. Code § 2224.

## V.    THE DISTRICT COURT'S EQUITABLE ORDERS MUST BE VACATED BECAUSE THEY ALL REST ON A JURY VERDICT TAINTED BY BLATANT ETHNIC BIAS.

The question before the jury in this case was whether MGA president Isaac

Larian, who happens to be Persian-American, stole Mattel's ideas. On the eve of

issuing the first verdict in the case—the foundational verdict about whether or not

the ideas at issue in this case were stolen—Juror No. 8 declared to her fellow

jurors, in the throes of deliberation, "that her husband, an attorney, has told her

about a client or clients who are Persian and/or Iranian and who are stubborn, rude, and who have stolen other people's ideas." 5ER 1029.

The District Court found that Juror No. 8 "made an inappropriate statement [during Phase 1A] concerning Mr. Larian based on his ethnicity." 20ER 4395. On that basis, the District Court correctly condemned Juror No. 8 as a "cancer" on the jury, 20ER 4396-98, and dismissed her. But condemnation and dismissal were not enough. The law required a mistrial, because a blatantly biased juror cast a critical vote.

In rejecting the mistrial motion, the District Court repeated several times that "that Juror No 8 was not biased *in the legal sense*." 5ER 1036 (emphasis added). The District Court did not appear to mean that the juror did not, in fact, share her husband's view. The court vilified her for "harbor[ing] such a feeling." 20ER 4396-97. Besides, this Court has noted that use of racial slurs ordinarily are a reflection of one's own personal beliefs. *United States v. Henley*, 238 F.3d 1111, 1121 (9th Cir. 2001). That wisdom certainly applies here, for there was no reason for Juror No. 8—in the heat of deliberations about whether Larian stole Mattel's ideas—to spread the venomous slur about Iranians stealing ideas, if she did not believe it applicable to *this* Iranian.

The District Court evidently meant that Juror No. 8's bias can be ignored because (1) she had *said* on voir dire that she would be able to "'lay aside' her

biases or her prejudicial personal experiences" and (2) she was not asked

specifically about her views on Iranians and Persians. 5ER 1029. As to the juror's

voir dire assurances, "even a juror's good faith belief in [her] own impartiality is

not dispositive." *United States v. Shapiro*, 669 F.2d 593, 601 (9th Cir. 1982).

And, in any event, her actions spoke louder than her empty assurances.

Nor can the bias be excused merely because Juror No. 8 was not asked

*specifically* about anti-Iranian bias. *See* 5ER 1032-33. Before being empaneled,

Juror No. 8 was treated to an overview of the case, and knew that Larian was an

immigrant from the Middle East. 14ER 2953-61, 2968. The court asked her

whether she could be fair and impartial. 14ER 2966. She answered yes. As this

Court has held, this general question about biases or prejudices was enough to

demand a response that would uncover racial bias once the District Court gave an

overview of the case. *See Medrano v. City of Los Angeles*, 973 F.2d 1499, 1507-

08 (9th Cir. 1992); *United States v. Click*, 807 F.2d 847, 850 (9th Cir. 1987).

Finally, the District Court erred in concluding that one biased juror was not

enough to invalidate a civil verdict. *See* 5ER 1033-35. The Seventh Amendment

guaranteed Larian and the company he built the right to an unbiased jury, just as

the Sixth Amdendment guarantees an accused the right to an unbiased jury in a

criminal case. *See, e.g., McCoy v. Goldston*, 652 F.2d 654, 657 (6th Cir. 1981).

Just as "[o]ne racist juror [is] enough" in a criminal case, *Henley*, 238 F.3d at 1120,

74

the same must be true in a civil case. This Court has held that "the integrity of the jury system is no less to be desired in civil cases." *Rinker v. County of Napa*, 724 F.2d 1352, 1354 (9th Cir. 1983). And in a civil cases, too, "[t]he Seventh Amendment requires jury verdicts to be unanimous." *Murray v. Laborers Union Local No. 324*, 55 F.3d 1445, 1451 (9th Cir. 1995). "Denial of the right to an unbiased tribunal is one of those trial errors that is not excused by being shown to have been harmless." *Thompson v. Altheimer & Gray*, 248 F.3d 621, 625 (7th Cir. 2001).

## CONCLUSION

For the foregoing reasons, the injunctive orders and other equitable relief should be reversed, and the Court should remand for such further proceedings as may be needed under the correct legal standards. Meanwhile, the January 21 deadline for transferring MGA's trademark, abandoning the Bratz dolls, and instituting a very expensive recall is fast approaching. MGA urges this Court to decide this appeal expeditiously or, alternatively, to grant a stay pending the issuance of the Court's opinion.

Dated: July 10, 2009        Respectfully submitted,

ORRICK, HERRINGTON & SUTCLIFFE LLP

By: _/s/ E. Joshua Rosenkranz (by ALH)_
       E. Joshua Rosenkranz

## CERTIFICATE OF COMPLIANCE
## PURSUANT TO CIRCUIT RULE 32

Pursuant to Fed. R. App. P. 32 (a)(7)(C) and Ninth Circuit Rule 32-1, I

certify that the attached opening brief is proportionately spaced, has a typeface of

14 points or more, and contains 18,414 words.

Dated: July 10, 2009        ORRICK, HERRINGTON & SUTCLIFFE LLP


By:    */s/ E. Joshua Rosenkranz (by ALH)*
            E. Joshua Rosenkranz
            Attorneys for Appellants

## CERTIFICATE OF SERVICE

I hereby certify that on July 10, 2009, I electronically filed the foregoing **OPENING BRIEF FOR APPELLANTS MGA ENTERTAINMENT, INC., MGA ENTERTAINMENT HK LTD., AND ISAAC LARIAN** with the Clerk of the Court for the United States Court of Appeals by using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have caused to be mailed the foregoing document by Federal Express, to the following non-CM/ECF participants:

John B. Quinn
Michael Zeller
Brett Dylan Proctor
Jon D. Corey
**QUINN EMANUAL URGUHART OLIVER & HEDGES LLP**
10th Floor
865 S. Figueroa Street
Los Angeles, CA 90017

Todd E. Gordinier
**BINGHAM MCCUTCHEN LLP**
18th Floor
600 Anton Blvd.
Costa Mesa, CA 92626

Ronald L. Olson
Daniel P. Collins
**MUNGER TOLLES & OLSON LLP**
355 South Grand Avenue
35th Floor
Los Angeles, CA 90071-1506

*/s/ Annette L. Hurst*
Annette L. Hurst