CV 04-9049 DOC - 9/27/10/ - Item No. 20

1

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

- - - - - - -

CARTER BRYANT,                      )
                                    )
          Plaintiff,                )
                                    )
     vs.                            ) No. CV 04-9049 DOC
                                    )    Item No. 20
MATTEL, INC.,                       )
                                    )
          Defendant.                )
_____)


REPORTER'S TRANSCRIPT OF PROCEEDINGS

Hearing on Motions

Santa Ana, California

Monday, September 27, 2010


Debbie Gale, CSR 9472, RPR
Federal Official Court Reporter
United States District Court
411 West 4th Street, Room 1-053
Santa Ana, California 92701
(714) 558-8141

04cv9049 Mattel 2010-08-27 Item 20

CV 04-9049 DOC - 9/27/10/ - Item No. 20

2

```
 1   APPEARANCES OF COUNSEL:

 2

     FOR INTERVENER DEFENDANT MGA ENTERTAINMENT, INC.:
 3
             ORRICK, HERRINGTON & SUTCLIFFE, LLP
 4           BY:  THOMAS S. McCONVILLE
                   Attorney at Law
 5           4 Park Plaza
             Suite 1600
 6           Irvine, California 92614
             (949) 567-6700
 7
             - AND -
 8
             ORRICK, HERRINGTON & SUTCLIFFE, LLP
 9           BY:  ANNETTE L. HURST
                   Attorney at Law
10           405 Howard Street
             San Francisco, California 94105
11           (415)773-5700

12

13
     FOR DEFENDANT MATTEL, INC.:
14
             QUINN EMANUEL URQUHART OLIVER & HEDGES LLP
15           BY:  MICHAEL T. ZELLER
                   JOHN QUINN
16                 Attorneys at Law
             865 South Figueroa Street
17           10th Floor
             Los Angeles, California 90017
18           (213) 443-3000

19

20   ALSO PRESENT:

21           Mark Overland, Attorney at Law

22           Alexander Cote, Attorney at Law

23

24

25
```

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 9/27/10/ - Item No. 20

3

**I N D E X**

**PROCEEDINGS**                                          **PAGE**

Hearing on motions                                        4

Sealed proceedings in camera                             11

Open court proceedings resumed                           12

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 9/27/10/ - Item No. 20

4

| | |
|---|---|
| 1 | **SANTA ANA, CALIFORNIA, MONDAY, SEPTEMBER 27, 2010** |
| 2 | **Item No. 20** |
| 3 | (5:41 p.m.) |
| 4 | THE COURT:  We're on the record.  Lead counsel are |
| 5 | here for Bratz and Mattel.  And counsel on behalf -- or MGA. |
| 6 | I'm sorry. |
| 7 | On behalf of Mattel, Counsel. |
| 8 | MR. QUINN:  John Quinn and Mike Zeller, |
| 9 | Your Honor. |
| 10 | THE COURT:  Thank you.  On behalf of MGA? |
| 11 | MS. HURST:  Annette Hurst, Your Honor. |
| 12 | MR. McCONVILLE:  Tom McConville. |
| 13 | THE COURT:  Thank you. |
| 14 | Counsel, the first and easiest one we're going to |
| 15 | take is the statement of compliance regarding electronic |
| 16 | discovery.  On, I think, it's September 17th -- |
| 17 | September 17th -- the Court issued an order, and |
| 18 | paragraph 12 of that order required MGA to specify that they |
| 19 | had searched certain hard drives for the search term |
| 20 | "Bratz."  There was a certification of compliance that was |
| 21 | filed by MGA, but Mattel disputes whether MGA actually, I |
| 22 | believe, ran the search term. |
| 23 | So I'm not quite certain I understand the totality |
| 24 | of this issue yet. |
| 25 | MR. ZELLER:  This is based on the information that |

CV 04-9049 DOC - 9/27/10/ - Item No. 20

5

1   we had received by way of Judge Smith.  There was motion

2   practice in front of Judge Smith, as the electronic

3   discovery master concerning --

4               THE COURT:  Counsel, put away your BlackBerry.

5               Have a seat in the audience.  Have a nice evening.

6                *(Unknown associate counsel complies.)*

7               MR. ZELLER:  Thank you, Your Honor.

8               The information we had received as a result of the

9   motion practice in front of Judge Smith was that MGA had not

10  run "Bratz" as a search term on the electronic media that's

11  at issue.  Then, of course, we got the certificate of

12  compliance.  These are roughly close in time.  So as far as

13  we're aware, based on the specific information that was

14  provided and found by Judge Smith, "Bratz," "Bryant,"

15  "Carter" were not among terms that were used for these

16  critical media.

17              THE COURT:  Okay.

18              Counsel.

19              MS. HURST:  It was done before, and we did it

20  again.

21              THE COURT:  And that's the certification before

22  the Court?

23              MS. HURST:  Yes.

24              THE COURT:  Counsel, are you disputing that

25  certification?

CV 04-9049 DOC - 9/27/10/ - Item No. 20

6

```
1              MR. ZELLER:  Well, what we're -- well, we
2    obviously have limited visabilityvisibility into this.  I
3    mean, as the Court knows, we don't have transparency as to
4    what MGA has done.  She said "this" and she doesn't say that
5    they used the word "Bryant," "Carter" or "Bratz" for those
6    drives.
7              THE COURT:  Just a moment.
8              What words did you use, Counsel?
9              MS. HURST:  We used the words specified in the
10   Court's order.
11             THE COURT:  No.  I'm sorry.  What words did you
12   use?
13             MS. HURST:  Your Honor, I need a copy of the order
14   to refresh myself as to what was specified.
15             THE COURT:  Sure.
16             MS. HURST:  If you'll give me a moment.
17             THE COURT:  Certainly.  Take your time.
18             MR. OVERLAND:  Your Honor, while they're doing
19   that, may we make our appearances?
20             THE COURT:  Certainly, Mr. Overland.
21             MR. OVERLAND:  Mark Overland and Alexander Cote on
22   behalf of Carlos Machado.
23             THE COURT:  Pleasure to see both of you gentlemen.
24             MR. OVERLAND:  Thank you, Your Honor.
25             MR. COTE:  Thank you, Your Honor.
```

CV 04-9049 DOC - 9/27/10/ - Item No. 20

7

```
 1              THE COURT:  Counsel.
 2              MS. HURST:  Your Honor, we used the search that
 3    Mattel had specified.
 4              THE COURT:  I understand that.  What are the
 5    search terms that you used?  Did you use "Bryant"?  Yes or
 6    no?
 7              MS. HURST:  Yes.
 8              THE COURT:  Did you use "Carter"?  Yes or no?
 9              MS. HURST:  Wait.  Hold on.  We used "Bratz."
10              THE COURT:  I understand that.  Did you use
11    "Bryant"?  Yes or no?
12              MS. HURST:  No.
13              THE COURT:  Okay.  Did you use "Carter"?  Yes or
14    no?
15              MS. HURST:  No.
16              THE COURT:  Did you use "Bratz"?
17              MS. HURST:  Yes.
18              THE COURT:  Okay.  Okay.  Why didn't you use
19    "Bryant"?
20              MS. HURST:  We used the search that they had
21    constructed for Archive One regarding the origins of Bratz.
22    We used the same search.
23              THE COURT:  Mr. Zeller?
24              MR. ZELLER:  I'm astonished to hear that MGA
25    construes the search through Archive One as to exclude
```

Case 2:04-cv-09049-DOC-RNB   Document 9298   Filed 11/24/10   Page 8 of 102   Page ID #:280262
CV 04-9049 DOC - 9/27/10/ - Item No. 20

8

1    "Bryant" and "Carter."  That clearly is not correct.  It is

2    not, in fact, terms -- they are in, in fact, terms that are

3    among those that are required to be run on Archive One.

4              This not only, of course, shows that they have not

5    complied with the Court's order to find those early

6    communications, but this also makes the Archive One issue --

7    clearly, that search is now apparently going to be at issue,

8    as well.

9              But, fundamentally, to suggest that somehow they

10   have done a proper search into the origins of Bratz without

11   using Carter Bryant's name as part of those search terms, I

12   don't think really requires much elaboration.  It's plainly

13   deficient.

14             THE COURT:  Counsel.

15             MS. HURST:  There was one search that was

16   constructed to run across all of Archive One, and it was

17   designed to find anything about Bratz before a certain

18   period of time.  That is exactly what we used on this.

19             THE COURT:  Wasn't that 2001?

20             MS. HURST:  I believe it was October 2000,

21   Your Honor.

22             THE COURT:  That's right.

23             MS. HURST:  And we used it on all the media, and

24   we went back to the exchange server, and we went back to the

25   file server.

CV 04-9049 DOC = 9/27/10/ - Item No. 20

9

```
 1              THE COURT:  Okay.  Thank you.
 2              The -- I need to have an in camera discussion with
 3    MGA, and exclude Mattel for the moment, concerning a certain
 4    Larian e-mail and whether it should be produced.  And it's
 5    Entry No. 7352.  This would be a good time to take that up,
 6    so if I could exclude all of the other parties.
 7              MS. HURST:  3752, Your Honor?
 8              THE COURT:  Is it 3752?
 9              MS. HURST:  3237?
10              THE COURT:  Yeah, 3237.  Thank you.
11               (Courtroom cleared.)
12              THE COURT:  Now, I want MGA to look around and
13    identify who's here.  In fact, I don't see why all the
14    support staff is here unless they're directly involved for
15    MGA.  I think unless they're directly involved, they should
16    be out.
17              MS. HURST:  All right.
18              Thank you, Your Honor.
19              THE COURT:  You can keep the support directly
20    involved, but let's cut down the number so we've got a clear
21    record of who's here.  So you can keep all the relevant
22    people you need, Ms. Hurst.
23              MS. HURST:  Thank you, Your Honor.
24              THE COURT:  And identify who's here for the
25    record.
```

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 9/27/10/ - Item No. 20

1              MS. HURST:  Your Honor, Mr. McConville and

2     Mr. Warrington Parker are present with me.

3              THE COURT:  All right.  This is *in camera*.  This

4     record will be sealed from this point forward, Debbie.

5              **\* \* <u>SEALED PROCEEDINGS FOLLOW</u> \* \***

6              *(Written Court approval required to view.)*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DEBBIE GALE, U.S. COURT REPORTER

1          SANTA ANA, CALIFORNIA, MONDAY, SEPTEMBER 27, 2010

2             * * OPEN COURT PROCEEDINGS RESUMED * *

3          THE COURT:  All right.  We're on record.  Both MGA

4    and Mattel are present.  All counsel are present who have

5    previously identified themselves on the record.

6          First, concerning Mattel's challenge to the

7    sufficiency of MGA's certification of compliance with

8    Paragraph 12 of the Court's September 17, 2010 order:  It's

9    denied.  MGA has complied with the search term requirements

10   laid out by the special master for electronic discovery and

11   incorporated by the September 17th order.

12          That's a final ruling by the Court, not subject to

13   further argument.

14          Second, MGA has provided now for the Court's *in

15   camera* review proposed redactions of the e-mails addressed

16   by the Court's order granting in part and denying in part

17   Mattel's motion to compel withheld communications.

18          The redactions comport with the Court's order.

19   Moreover, MGA has agreed to produce a redacted version of

20   Entry 3237 on its Larian hard drive submission.  The

21   proposed redaction complies with the Court's order.

22          Counsel, you gave me also copies for the Court to

23   consider during the last *in camera* proceeding, which I've

24   done now in chambers.

25          The Court Order to Show Cause why the document

CV 04-9049 DOC = 9/27/10/ - Item No. 20

13

1    should not be produced is therefore stricken as moot.

2           Now, the third issue is this:  MGA's motion for

3    new trial -- or concerning MGA's motion for new trial, this

4    Court recognizes the parties' need for finality on the scope

5    of the claims in this lawsuit prior to the October 12, 2010

6    summary judgment deadline.

7           So let me be clear because, Mr. Zeller, you raised

8    this earlier:  The January 2011 trial date will not be

9    continued.  In fact, we'll being starting January 4th.

10          But Mattel has exercised its procedural rights

11   before the Circuit by petitioning for rehearing or rehearing

12   *en banc*.  I understand Mattel's petition seeks rehearing on

13   a rather limited basis.  Indeed, MGA described Mattel's

14   position as, quote, "exalting the Ninth Circuit's decision

15   with faint criticism," end of quote.  So none of the

16   arguments raised by the motion appear to be implicated by

17   the petition.

18          Nevertheless, I'm fairly certain, in doing my

19   research, that I lack jurisdiction to decide the motion for

20   new trial.  I've read MGA's authorities in which a Ninth

21   Circuit's decision was cited as controlling authority even

22   before the issuance of the mandate.  But those don't appear

23   to be relevant since they didn't involve a district court

24   ceding authority over the case to the circuit court pending

25   the issuance of the mandate.

```
 1          However, my own research reveals that district
 2   courts may seek leave from the Court of Appeals to alter a
 3   judgment under Rule 60, even when an appeal is pending.
 4   This procedure falls under Federal Rule of Appellate
 5   Procedure 12.1, which governs remands after indicated
 6   rulings.
 7          I'd like to hear from counsel in a few moments
 8   about whether you think this provision applies, which is, of
 9   course, 12.1 of the appellate procedure.  I'll give you time
10   to look at it.
11          Counsel, I'd suggest you pay attention to what I'm
12   saying.
13          My concern about that procedural option is
14   three-fold.
15          First, it's clear that the, quote, "seek leave,"
16   end of quote, provision is most often applicable in cases
17   where a clerical error has occurred.  And here, granting
18   some part or an entire new trial would be a rather sweeping
19   decision that would moot the Ninth Circuit's review in a
20   number of ways.
21          Second, here, I'd be seeking leave to grant a new
22   trial, or a part of a new trial, or no new trial on the
23   basis of the Ninth Circuit's decision, which seems to result
24   in a confusing situation where I end up mooting the very
25   appellate decision upon which I'm relying.
```

CV 04-9049 DOC - 9/27/10/ - Item No. 20

15

```
 1              Third, I just don't know if, as a matter of trial
 2     administration, that's something we need to do.  So I'm
 3     going to ask counsel, first, if they have any ideas about
 4     how to handle this issue.
 5              I want to indicate to you that I've made my
 6     decision.  It's 31 pages in length.  And I won't indicate to
 7     you what it is at the present time.  But it's simply your
 8     option as to how and when that gets handed down.
 9              Now, Counsel, if you want to discuss this matter,
10     please do so.  And if you can abstain from your BlackBerry
11     for a moment, you can come back to the table.  Next time, I
12     want you out of my court.  Okay?
13              UNIDENTIFIED SPEAKER:  Thank you, Your Honor.
14              THE COURT:  Take your time with this.
15              MS. HURST:  Thank you, Your Honor.
16               (Pause in the proceedings at 6:11 p.m.)
17               (Proceedings resumed at 6:16 p.m.)
18              THE COURT:  All right.  We're back on the record.
19              The next matter we'll take is MGA's motion for a
20     protective order, which relates to a 30(b)(6) witness that
21     Mattel noticed in the discovery, and the discovery master
22     apparently scheduled a hearing.  It relates to 74 topics
23     that the Court just relooked at in chambers on just a number
24     of different issues.
25              First, let me comment to you that I've already
```

CV 04-9049 DOC = 9/27/10/ - Item No. 20

16

```
 1   talked to the discovery master about this.  There was one

 2   occasion about 10:45 or 11:00 o'clock where, apparently, on

 3   your own or the discovery master's initiative, that you

 4   moved your deposition back to Los Angeles and finished it at

 5   2:00 or 3:00 o'clock in the morning.  Now, I want to commend

 6   you on that.

 7             Don't do it again.

 8             Judge O'Brien -- I'm kidding you -- but Special

 9   Master O'Brien has been talked to about that.  You don't

10   have discretion to move out of the Santa Ana area unless I

11   say so.  So, although it may have worked that evening don't

12   do that again.  I'm not standing out there at 11:45 or 10:45

13   looking at buildings.  When I walk over there, you're there.

14   And Robert O'Brien and I have had a discussion about that.

15             Understood?

16             MR. QUINN:  Yes, Your Honor.

17             THE COURT:  Any mixed message about that at all?

18             MR. QUINN:  No, Your Honor.

19             THE COURT:  Understood?

20             MR. ZELLER:  Yes.

21             THE COURT:  Understood?

22             MS. HURST:  Yes.

23             THE COURT:  Don't do that again.

24             Understood?

25             MR. McCONVILLE:  Yes, sir.
```

```
 1              THE COURT:  All right.  You may have my consent,
 2    but it's because I give you consent to drive to Los Angeles.
 3    It's not because you take it on your own.  These are carried
 4    out across the street.
 5              All right.  Now, you've got ten minutes argument
 6    on this.  Let's begin with -- I don't care -- MGA or Mattel.
 7    It doesn't matter.
 8              Counsel, who wants to start?
 9              MR. McCONVILLE:  Thank you, Your Honor.
10              THE COURT:  I know this is "litigation to death."
11    I've heard that.  But now let's get to your argument.
12              MR. McCONVILLE:  Yes, sir.
13              THE COURT:  What's inappropriate about this?
14              MR. McCONVILLE:  The vast majority of the topics,
15    Your Honor, have already been covered by other witnesses.
16              THE COURT:  Why is the discovery master then
17    scheduling more?
18              MR. McCONVILLE:  The way the protocol was set up,
19    Your Honor, is we had to meet and confer, at which the
20    discovery master said, "I'm gonna schedule depositions so
21    that we can get done by October 4" -- that's the discovery
22    cutoff -- "However, if you believe that a particular
23    deposition should not go forward, it's incumbent upon you,
24    the party who does not want to go forward with the
25    deposition, to file a motion for protective order."
```

1          So that's what we did.  We filed a motion for

2    protective order.  And I don't want to speak for Discovery

3    Master O'Brien, but I don't believe he feels that he has

4    authority to make rulings on protective order motions.  So

5    that's why the procedure has come to the Court this way.

6               THE COURT:  When is it scheduled for?

7               MR. McCONVILLE:  It's already started today.

8               THE COURT:  Who is the person being deposed?

9               MR. McCONVILLE:  There were multiple different

10   deponents, Your Honor, on the 74 topics.

11              Today, it was Leon Marks and Leon Dejaris.

12              THE COURT:  Okay.

13              MR. McCONVILLE:  "Dejarian."  I'm sorry.

14              THE COURT:  Are they here, or did you recess

15   today?

16              MR. McCONVILLE:  No.  We went forward.  Because

17   as -- as the protocol is set out, we don't have a protective

18   order in place.  So those topics went forward.

19              THE COURT:  Where's Robert O'Brien?

20              MR. McCONVILLE:  I don't believe -- he was at the

21   deposition in L.A.

22              THE COURT:  Where was this deposition taking

23   place?

24              MR. McCONVILLE:  In Los Angeles, Your Honor.

25              THE COURT:  Why?

```
 1              MR. McCONVILLE:  As a convenience to the parties,

 2    Your Honor.

 3              THE COURT:  Why?

 4              MR. McCONVILLE:  As a convenience to the parties.

 5              THE COURT:  Why?

 6              MR. McCONVILLE:  The witnesses are from

 7    Los Angeles.

 8              THE COURT:  You disobeyed my order, didn't you?

 9              MR. McCONVILLE:  Yes, sir.

10              THE COURT:  Why?

11              MR. McCONVILLE:  Attempting to accommodate the

12    witnesses, Your Honor.

13              THE COURT:  Nonsense.

14              MR. McCONVILLE:  Although I believe the

15    deposition's concluded now, Your Honor.

16              THE COURT:  Has it concluded?

17              MR. McCONVILLE:  Yes.

18              THE COURT:  Has it concluded from Mattel's

19    standpoint?

20              MR. ZELLER:  No, Your Honor.

21              THE COURT:  Why?

22              Now I want to hear from Mattel.  What remains?

23              MR. ZELLER:  Because Leon Dejarian, who was the

24    30(b)(6) witness on topics such as the origins of products

25    that MGA itself has put at issue, admitted he had no
```

1    knowledge of it.

2           THE COURT:  All right.  I'm going to go call

3    Robert O'Brien right now, Counsel.  We'll be in recess for

4    just a moment.

5           MR. McCONVILLE:  I believe it's Mr. Hansen, who

6    sat in on the deposition today, Your Honor, in Los Angeles.

7           THE COURT:  Hansen did?

8           MR. McCONVILLE:  Your Honor, just so you know, the

9    deposition is scheduled to go on tomorrow and the following

10   day also.

11          THE COURT:  And it will be here.  Is that

12   understood by the parties?

13          MR. McCONVILLE:  Yes, Your Honor.

14          THE COURT:  You can notify the discovery master.

15          How much longer do they think that this is going

16   to take place?

17          MR. McCONVILLE:  The parties agreed that it would

18   be a three-day process, so 21 hours on the record.  So

19   today, I believe, it was scheduled to be five or six hours

20   on the record.  So roughly 16 hours remaining, on the

21   remaining topics.

22          THE COURT:  Leon Dejarian, you say that he was

23   prepared or unprepared?

24          MR. McCONVILLE:  He was --

25          THE COURT:  I'm going to call Mr. Hansen in just a

 1    moment.  So you tell me your perspective.  Prepared or
 2    unprepared?
 3              MR. McCONVILLE:  He was prepared to a degree, but
 4    not to a degree we would have liked.
 5              THE COURT:  When will he be prepared, or is
 6    somebody else going to be prepared?  In other words,
 7    16 hours means nothing to me if there's nothing being
 8    accomplished.
 9              MR. McCONVILLE:  I believe Mr. Janarian (sic) was
10    not prepared on a particular topic.
11              THE COURT:  What was the topic?
12              MS. HURST:  May I?
13              MR. McCONVILLE:  Sure.
14              MS. HURST:  He was prepared, Your Honor.  With all
15    candor, he just wasn't a good witness.  We gave him the
16    binders.  He studied the binders carefully.  He just came in
17    and didn't do a good job.  We provided the binders to him.
18    And he was knowledgeable about the subject matter, too.
19    This was not an empty vessel.  He just was intimidated by
20    proceedings.
21              We've found a new witness.  She's in the process
22    of being prepared, and we recognize that we need to provide
23    further testimony.
24              THE COURT:  So then there's no reason to call Drew
25    Hansen if we've reached that point, is there?

1          MS. HURST:  Not on that.

2          THE COURT:  I'd rather have you tell me first, and

3    then I'm going to go to my special master and have them tell

4    me their perspective.

5          MR. McCONVILLE:  I believe what we told the

6    discovery master was that we understood that he needed to be

7    either better prepared or put a different witness in there.

8          THE COURT:  All right.  Now, I'm cutting you off.

9    I'm cutting you off.  It's going to get down to a reasonable

10   period of time.  But you haven't had an adequate time with

11   this witness yet.  I understand that.  You've got 16 more

12   hours.  But I want to see you tomorrow at 4:00 o'clock.  I

13   want to hear exactly where you are, and I want the special

14   master across the street reporting to me.

15         And the only reason I'm not calling tonight is I

16   don't want Drew Hansen, with young kids, driving down here,

17   or Robert O'Brien.  Otherwise, I'd have an update right now.

18         That's why they're taking place here.  I want you

19   checking in, and I want to hear from my special master from

20   now on, before they go home, exactly what's happening.

21   Because 16 hours may not be enough, if they're stalling.

22         But you're getting over the top now.  Okay.  Not

23   on this one.

24         All right.  Counsel, the motion for the protective

25   order concerning -- I'm sorry -- MGA's motion for protective

DEBBIE GALE, U.S. COURT REPORTER

1   order for the 30(b)(6) is denied.  I'm going to set this for

2   16 more hours, but I'm going to have a report at

3   4:00 o'clock tomorrow afternoon from the special master in

4   person in court.

5           Okay.  Now, let's go back to --

6           MR. McCONVILLE:  I just wanted to make sure that I

7   was clear with the Court.  The topics that went today, those

8   are -- there are 70 additional topics that are going to go

9   over the 16 hours.  So the protective order covered not just

10  the topics for today but serial other topics as well.

11          THE COURT:  Tonight.

12          MR. McCONVILLE:  All right.  Thank you,

13  Your Honor.

14          THE COURT:  I'll hear more tomorrow at

15  4:00 o'clock.  We'll see how that's proceeding.

16          MR. McCONVILLE:  Can I ask one more question,

17  Your Honor?

18          So there were topics that you had already ruled on

19  that you granted us a protective order on?

20          THE COURT:  That's right.  That hasn't changed,

21  Counsel.

22          MR. McCONVILLE:  Okay.  Thank you.

23          THE COURT:  In other words, I'm not backtracking.

24  But when people aren't prepared, et cetera, this can go from

25  16 hours to 30 hours very easily.

```
 1                Just get 'em prepared.

 2                MR. McCONVILLE:  Okay.  Thank you, Your Honor.

 3                THE COURT:  Okay.  All right.

 4                Now, Counsel, let's go back to the motion

 5      concerning the appellate procedure 12.1 and what your

 6      thoughts are.

 7                MS. HURST:  Your Honor, for MGA, our thought is

 8      that would not be the correct procedure, and that a motion

 9      to the Circuit to shorten time for issuance of the mandate

10      under Rule 41(b) may be the more correct procedure.

11                And, Your Honor --

12                THE COURT:  Under 41(b)?

13                MS. HURST:  Yeah.  That's Federal Rule of

14      Appellate Procedure.

15                THE COURT:  All right.

16                MS. HURST:  Your Honor, here's our concern:  Our

17      concern is that it's a petition for *en banc*, and then they

18      can move to stay the mandate when they do the cert petition,

19      and that's gonna be an automatic stay also under 41 for some

20      period of time.  And we, you know, put our best calendaring

21      minds on this, and it got all the way out to February if,

22      for some reason, the Circuit doesn't act right away on the

23      motion to stay the mandate, which we would have the right to

24      oppose.

25                So our best thought, at this point, Your Honor, is
```

DEBBIE GALE, U.S. COURT REPORTER

1   to make a motion to shorten time for issuance of the mandate

2   so that it issues immediately upon any denial of petition

3   for rehearing *en banc*, and Mattel is ordered that it can't

4   bring a motion to stay the mandate to further delay the

5   issuance.  They could still bring their cert petition in the

6   meantime.  And then we, hopefully, would be off and running

7   at that point.

8              THE COURT:  Well, let me talk to Mattel for a

9   moment.

10             I don't understand, whether the ruling is

11  favorable or unfavorable, why you're placing yourself in

12  this position.  In other words, you can take whatever your

13  requests are concerning *en banc*, but somehow your concern is

14  "Judge, we don't know what to do."

15             You're creating that problem for yourselves.

16             MR. QUINN:  Your Honor, I don't think we're saying

17  we don't know what to do.

18             THE COURT:  No, you are.  Mr. Zeller just said

19  that to me informally.  In other words, "Judge, we don't

20  know what to do in terms of our summary judgment motion.  We

21  don't know what's left."

22             I mean, you don't know what my ruling is right

23  now.  If you knew, it would be very helpful, I think, for

24  both parties concerning the motion for new trial.

25             MR. QUINN:  Well, one thing we're clear on,

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 9298   Filed 11/24/10   Page 25 of 102   Page ID #:280279
CV 04-9049 DOC = 9727/10/ - Item No. 20

26

1  Your Honor, is that the motion for new trial, which is

2  basically predicated on the idea that the Court of Appeals'

3  opinion indicates that the prior judgment was completely

4  infected with error -- from the jury instructions on down --

5  that is the basis for this motion.  And it really doesn't

6  make sense, it seems to us, to invoke a procedure -- I'm

7  referring to this Rule 12.1 procedure -- which is used

8  mostly, as we understand it, to correct errors after the

9  entry of judgment, you know, when there's an appeal on file.

10        This is -- the new trial motion is a --

11  presupposes a wholesale undermining of the prior proceeding,

12  basically.  And I think that it's really putting the cart

13  before the horse for this Court to entertain some type of

14  motion that, in a back-door kind of way, might get in front

15  of the Ninth Circuit by invoking this process.

16        THE COURT:  Okay.

17        MR. QUINN:  If that's helpful, Your Honor.

18        THE COURT:  It most certainly is.

19        All right.  So, once again, there's no agreement,

20  other than you don't think 12.1 is appropriate procedure

21  from either party.  I think that's what I'm hearing.

22        MR. QUINN:  I think that's right, Your Honor.  And

23  Mr. Zeller's uncertainty about the summary judgment briefing

24  was a much more prosaic uncertainty.  It relates to --

25        THE COURT:  It's prosaic.

Case 2:04-cv-09049-DOC-RNB   Document 9298   Filed 11/24/10   Page 26 of 102   Page ID #:280280
CV 04-9049 DOC = 9/27/10/ - Item No. 20

27

1        MR. QUINN:  -- page limits, which presumably even

2   the Ninth Circuit is not going to pronounce on.

3        THE COURT:  Well, right now, I don't want to

4   indicate what the page limits are because, in some way, that

5   might indicate what the Court's ruling was, you know, large

6   or small.  You're going to have to sit wondering what the

7   Court's doing concerning the motion for new trial and the

8   special verdicts.  But it's ready to go.  In other words,

9   there's no delay on the Court's part.  It was actually

10  written and completed last week.  So I've been waiting for

11  you to come in tonight.

12        So we're simply waiting on Circuit again.

13        Okay.  We'll take that under consideration.

14        Where would you like to go with the next motion?

15        MR. QUINN:  The motion to dismiss, Your Honor?

16        THE COURT:  Why don't you two get up and decide in

17  unison which way you'd like to go.

18        MS. HURST:  That's fine with us, Your Honor.

19        THE COURT:  Mr. Overland, Counsel, is there any

20  reason you're here tonight?

21        MR. OVERLAND:  Is there is some reason?

22        THE COURT:  Which motion -- maybe we could hear

23  the motions you're directly involved in.

24        MR. OVERLAND:  No, no.  There is a reason we're

25  here, but it doesn't have anything to do with us saying

CV 04-9049 DOC - 9/27/10/ - Item No. 20

28

```
 1   anything intelligent.
 2            THE COURT:  Okay.  So you're here.  But if anytime
 3   you need to leave, just indicate for the record, or if
 4   there's a motion that would get you out of here earlier, let
 5   me know on the record.
 6            MR. OVERLAND:  We don't have any independent
 7   motions.
 8            THE COURT:  Okay.
 9            Counsel, as you two get up out of your chairs and
10   move towards each other at the lectern and informally
11   discuss which motion you'd like to take next...
12            MR. QUINN:  Your Honor, I think we're in
13   agreement:  Mattel's motion to dismiss and to strike.
14            MS. HURST:  There's one point, if I may,
15   Your Honor, I'd like to add on this jurisdictional issue.
16            THE COURT:  Uh-huh.
17            MS. HURST:  Your Honor, in Mattel's supplemental
18   filing regarding jurisdiction, they took the view that the
19   Court is without jurisdiction pertaining to any matter
20   related to the claims that were on appeal.
21            Your Honor, that would mean that their amendment
22   to change their theory of ownership of Bratz would also have
23   been without jurisdiction and inappropriate based on their
24   own theory of jurisdiction.
25            Now, they did that -- they served that
```

1    interrogatory response -- and I saw that they provided it

2    with the Court -- wholesale changing their theory of

3    ownership, which, as the Court will recall, we objected to

4    anyway on the grounds that it was improper under Ninth

5    Circuit precedent to allow an amendment after losing an

6    appeal.

7            But now we've got an issue where they've tried to

8    amend on something that they concede now the Court is

9    without jurisdiction to hear.  And I would just respectfully

10   suggest, Your Honor, that that amendment is out of order in

11   light of the position that Mattel has taken.

12           THE COURT:  Counsel?

13           MR. QUINN:  Your Honor, I think that represents a

14   misreading of Mattel's position on the jurisdictional issue.

15   I don't think our filing on that issue takes that position

16   at all.

17           Indeed, we think there has always been a separate

18   set of claims, a separate set of issues, which has been

19   pending before this Court for, what, a year now.  And there

20   are many issues, many claims which are not implicated by

21   what's on appeal before the Ninth Circuit right now.

22           So I respectfully have to disagree with

23   Ms. Hurst's characterization of Mattel's position in that

24   regard.

25           THE COURT:  Okay.

CV 04-9049 DOC - 9/27/10/ - Item No. 20

30

```
 1            Okay.  After we hear the motion -- Mattel's motion
 2    to dismiss and to strike, what would you like to take up
 3    next?
 4            MS. HURST:  Your Honor, we agreed -- we would
 5    agree to go in the following order, if it's acceptable to
 6    the Court.
 7            THE COURT:  Well, it may not be.  I just want to
 8    hear your order first.
 9            MS. HURST:  Okay.
10            THE COURT:  I'll probably change it.
11            MS. HURST:  First, their motion to dismiss the
12    counterclaims and reply.  Then MGA's omnibus motion to
13    compel.  And then Mattel's --
14            THE COURT:  No, no.  Just a moment.  Just a
15    moment.
16            And then?
17            MS. HURST:  Mattel's omnibus motion to compel.
18            THE COURT:  Okay.  And then?
19            MS. HURST:  Mattel's motion for expedited
20    discovery on the counterclaims and reply.
21            THE COURT:  Okay.
22            MS. HURST:  Those are all the pending motions that
23    have been fully briefed.
24            And they had their issue they wanted to raise, as
25    well, regarding some difficulty they're having getting some
```

1    third-party witnesses in to sit for deposition.

2           THE COURT:  Okay.  Now that finishes the evening,

3    as far as motions that have been briefed for argument

4    tonight?

5           MS. HURST:  Correct.

6           THE COURT:  Now, just a moment.  What else can I

7    expect?  In other words, I'm trying to set aside time for

8    you.  So when do you need me again this week?

9           MR. ZELLER:  We know that there are two other

10   motions that are in process.  One is O'Melveny's motion.

11   It's a protective order motion concerning the O'Melveny

12   subpoena.  We anticipate that we'll file our opposition

13   tomorrow.  And then I think we're really at the Court's

14   convenience in terms of arguing.  We can obviously do that

15   at any time.

16          THE COURT:  It will be filed by tomorrow?

17          MR. ZELLER:  Yes, sir.

18          THE COURT:  Does there need to be a response to

19   that?

20          MS. HURST:  There does need to be a reply on that,

21   given the privilege issues, Your Honor.

22          THE COURT:  When will that take place?

23          MS. HURST:  Friday.

24          THE COURT:  Okay.  When would you like this heard?

25          Next Monday at 5:00 o'clock?  Okay.  That's when

CV 04-9049 DOC - 9/27/10/ - Item No. 20

32

1    it will be heard.

2         MR. ZELLER:  And then we anticipate filing within

3    the next 24 hours or so a motion for protective order for

4    the notice of deposition that MGA has served for Jon Corey.

5         THE COURT:  Okay.  What else?

6         MR. ZELLER:  That's what I'm aware of.

7         THE COURT:  Those resolve the two issues or three

8    issues that you had?

9         MR. ZELLER:  No.  There was a separate one

10   concerning the depositions of Cabrera and Morales.  The

11   Court may recall that they were Mattel employees, sample

12   makers, who Veronica Marlow, an MGA vendor, used to work on

13   a multitude of Bratz products while they were still employed

14   by Mattel.

15        They had previously been deposed.  They invoked

16   the Fifth Amendment as to some questions.  We wanted them to

17   come back.  It appears that there was certainly now no

18   reason as to why there should be any invocation of the Fifth

19   Amendment.  But the Court did grant us the opportunity

20   for -- I believe it was four hours of depositions.  We have

21   communicated with them.  And the response we've gotten back

22   basically is, is that they're refusing to appear.

23        THE COURT:  Now, where are they located?

24        MR. ZELLER:  They're local, Your Honor.

25        THE COURT:  So Cabrera is local?

DEBBIE GALE, U.S. COURT REPORTER

```
 1              MR. ZELLER:  Yes.

 2              THE COURT:  Morales is local?

 3              MR. ZELLER:  Yes.

 4              THE COURT:  Who are their counsel?  They invoked

 5    the Fifth.  They had to have counsel.

 6              MR. ZELLER:  They did.

 7              THE COURT:  Who's their counsel?

 8              MR. ZELLER:  They do not have counsel now, I

 9    understand.  That's, at least, their representation to us.

10              THE COURT:  Who was their counsel at the time?

11              MR. ZELLER:  Previously, it was the Gloria Allred

12    firm.

13              THE COURT:  Okay.  Well, we've got every other

14    attorney in the county here.  We might as well get her here.

15              What else do you believe, after the invocation of

16    the Fifth Amendment, you're going to get?  In other words,

17    you're going to be able to call them at trial.  In all

18    likelihood, they're going to take the Fifth Amendment.  Now

19    I'm starting to sort out, you know, what this looks like in

20    terms of a trial posture -- not all the fun and games we've

21    been having concerning discovery.  Okay?

22              I don't see what Mattel has to gain.  So explain

23    this to me.  Now we're in front of the jury:  "Hi, I'm

24    Mr. Cabrera, and I'm taking the Fifth Amendment."

25              Hello?  That can be done in front of the jury.  So
```

CV 04-9049 DOC - 9/27/10/ - Item No. 20

34

1   what do you think you're going to get?  In other words,

2   you're right, I've given you more hours, but if we're just

3   running them in here, what's the purpose?

4           MR. ZELLER:  Fundamentally, the purpose is to

5   address the Fifth Amendment issue.  The fact is, Your Honor,

6   when they invoked, it was obviously some time ago.  I don't

7   think that there is any realistic argument that could be

8   made at this point of any risk of prosecution.

9           THE COURT:  No.  Just a moment.  That's not your

10  determination.  That's counsel's determination in advising

11  them.

12          Now, they're in a deposition, and you say to them

13  "I'm Mattel's counsel.  And I want to tell you that I don't

14  think that there's any risk of substantial prosecution at

15  this time."  I don't know how much hilarity that's gonna

16  get.

17          MR. ZELLER:  I wouldn't imagine we will say that

18  to them, Your Honor.

19          THE COURT:  I don't think so either.

20          So why should they believe what you're saying?

21          MR. ZELLER:  Well, I don't intend to make that

22  representation.  The point is, is that circumstances have

23  changed.  We wanted the opportunity to ask the questions.

24  They can obviously -- if they're going to still invoke,

25  they're going to invoke.  And then we'll have to raise that

DEBBIE GALE, U.S. COURT REPORTER

35

1    with the Court.

2              THE COURT:  What are the changed circumstances?

3              MR. ZELLER:  Well, it's really, principally,

4    passage of time.

5              THE COURT:  Just a moment.  Lots of words meaning

6    nothing so far.

7              "Passage of time."  You mean I take the Fifth but

8    the facts haven't changed, new facts haven't developed

9    and -- I don't understand what you get out of this still.

10             MR. ZELLER:  They haven't been prosecuted.

11             THE COURT:  So what?  That isn't conducive to

12   anything.  I don't know what the statute of limitations is.

13   I don't know if it's run.  And if it hasn't run, Fifth

14   Amendment still applies.

15             MR. ZELLER:  Well, I'm obviously not going to make

16   a determination for them on the statute of limitations.

17             What I can say is, is that, when they invoked --

18   obviously, they had -- they had particular counsel; they

19   were, in fact -- the counsel was being paid for by interests

20   aligned with MGA; namely, Veronica Marlow.  That is no

21   longer the circumstance.  They may or may not --

22             THE COURT:  Well, does that mean that -- I'm going

23   to come back to the same question I asked.  You have them on

24   the witness stand at the time of trial, or you don't, and

25   the testimony comes in that they've invoked.  I don't

 1    understand the changed circumstances or facts that cause me

 2    at this point -- although I've allowed you to bring them

 3    back -- to now run them into court and to cause them to get

 4    new counsel and pay money.

 5            Now, they're eventually going to have to do that

 6    anyway when they come into court, or they're not going to be

 7    around and decide to disappear, and that's going to have a

 8    devastating consequence.

 9            So I don't understand, once again, what you think

10    you're going to gain by this.

11            MR. ZELLER:  As a practical matter, Your Honor, we

12    don't want to be surprised.  We don't want to show up at

13    trial, call them as witnesses, have them then start to give

14    substantive testimony, and say, "Well, yes, I invoked, but

15    that's because I was concerned then and I'm not now."

16            THE COURT:  Now, that's the first answer with

17    clarity I've gotten.

18            MR. ZELLER:  I apologize.

19            THE COURT:  No.  That makes sense to me.

20            But why are you doing that in September?  The

21    response is, "Because, Judge, you've set a discovery cutoff

22    date.  And if we don't do it in September, we can't do it in

23    November or December."  Actually your preference would be to

24    do this on January 5th or 6th, wouldn't it?

25            MR. ZELLER:  It is.  That's correct.

1           THE COURT:  Why aren't we calling them in at

2    night?  Why aren't we calling them in on the weekend right

3    before trial?

4           MR. ZELLER:  I think, with the caveat that, again,

5    if there were some new information that we received that

6    would require follow-up -- you know, we wouldn't want to be

7    supplied in that way either.

8           THE COURT:  You don't have any new information.

9    It's really that you don't want to be surprised.  I

10   understand that argument.  The other one makes no sense.

11          MR. ZELLER:  The closer in time we are to trial,

12   obviously, the more --

13          THE COURT:  Now, what's going to happen -- so I

14   give you both a preview -- is that, since you're leading

15   off, you're going to eventually start preparing a witness

16   list.  I'm would suggest to you that I'm going to have that

17   right after Thanksgiving, including the order that you're

18   going to be calling people in.  And Mattel's gonna shortly

19   follow, probably within one week.  So I'm just alerting you.

20          And on that witness list, believe it or not, I'm

21   going to want to see the substance of what the witness is

22   testifying to in a short paragraph form, and I want to see

23   every evidentiary problem that you anticipate.  So I know

24   that you're going to call Cabrera, and I know that you're

25   going to call Morales.  And I know that that person is going

CV 04-9049 DOC - 9/27/10/ - Item No. 20

38

1    to be Witness No. 23 and 24, hypothetically.  And I know,

2    right next to their names, that there are Fifth Amendment

3    issues that you're concerned about, and you're going to

4    write that you're concerned about surprise.  And it's not

5    going to be more than three or four lines.  Okay?  That will

6    tell me to have an *in camera* hearing the night before.  If

7    there's a surprise, then they'll just come back.  But I'm

8    going to be doing that for both parties.

9           You're going to be spending as much time out of

10   the presence of the jury in hearings and doing evidentiary

11   motions than you are in the presence of the jury.  So all

12   these aren't problems to me right now.

13          Mr. McConville, is that true?

14          MR. McCONVILLE:  Yes, Your Honor.

15          THE COURT:  It's true.  There aren't going to be

16   any surprises.

17          MR. McCONVILLE:  Or sidebars.

18          THE COURT:  Or sidebars.

19          So I still don't understand the problem with

20   Cabrera and Morales.  They've taken the Fifth.

21          MR. ZELLER:  Well, it is the practical concern of

22   not being surprised.  And we didn't, obviously, want to be

23   criticized if the Court were to find out in November or

24   December or January, and have the Court say, "Well, you

25   should have raised it."

Case 2:04-cv-09049-DOC-RNB   Document 9298   Filed 11/24/10   Page 38 of 102   Page ID
#:280292
CV 04-9049 DOC - 9/27/10/ - Item No. 20

39

1          THE COURT:  Now I'm on notice.  I understand that.

2     Thank you.  That makes a lot of sense from a tactical

3     standpoint.  It make no sense from a depositional

4     standpoint.  And, in fact, you're not in any better

5     position, frankly, in September having them come in and tell

6     you again that they're taking the Fifth as you are when we

7     get off the ground in January.  Because the jury is not

8     going to understand that they really took the Fifth a year

9     ago but somehow they're taking the Fifth in September.  And

10    therefore, the Fifth means more or less.

11         So you've got my nights and weekends.

12         MR. ZELLER:  Sure.

13         THE COURT:  Okay.  There won't be surprises for

14    either side.  But it will require a lot of back-breaking

15    work.  Okay?  That's why I had pictures taken of all of you

16    before, to see what you look like.  So we can compare what

17    you look like after the trial.

18         Okay.  I don't see any reason I'm going to do

19    that.  But I think that they're going to have to end up

20    retaining counsel again.  What I'm trying to avoid is them

21    retaining counsel on two occasions, paying for attorneys

22    twice, running them in here, and getting nothing except more

23    of the same questions.  Okay?

24         MR. ZELLER:  Thank you, Your Honor.

25         THE COURT:  Now, why don't you write out for me

1   the 15 questions, which is no more than I'm going to give

2   you, that you want to ask them.

3         Sit down with Mr. Quinn.  Write out 15 questions

4   that you want to ask of Cabrera and Morales.  Do it now.

5         MR. ZELLER:  Yes, sir.

6         THE COURT:  And I'll preserve those so that, when

7   they come in on January 4th or whenever, I have those 15

8   questions.

9         All right.  Counsel, listen very carefully.  I

10  want to know where the interrogatory response by Mattel

11  concerning the motion to confirm is.  I allowed Mattel to

12  add a trade secret appropriation theory relating to Bratz.

13        And something caught my ear this evening that

14  Ms. Hurst said, and that is that Mattel used -- or I'm

15  hearing that you believe that Mattel has used that addition

16  to sidestep all the problems identified by the Ninth

17  Circuit.  I don't know if that's true or not because I don't

18  have the interrogatory.  But it was represented that I would

19  have the interrogatory.  And there was a specific statement

20  by Mr. Quinn on the record that the theory would not change

21  if I allowed this amendment.

22        So where's the interrogatory?

23        MR. ZELLER:  We e-mailed it to chambers on that

24  day, Your Honor.

25        THE COURT:  E-mailed?  Okay.  So I should have it;

CV 04-9049 DOC - 9/27/10/ - Item No. 20

41

1    is that correct?

2              MR. ZELLER:  That's correct, Your Honor.  I saw

3    it.

4              THE COURT:  Okay.  On what date?  We'll go back

5    and check.

6              Ms. Hurst, if you can help me also with the date.

7              MR. QUINN:  I think it's the 10th, Your Honor.

8              THE COURT:  September 10th?  Okay.

9              MS. HURST:  It might be the 17th, but I think it's

10   the 10th.

11             THE COURT:  We don't have it in back.  Kathy's got

12   it.

13             MR. McCONVILLE:  She's out in the hallway,

14   Your Honor.  Should we get her?

15             THE COURT:  Yeah.  Can you ask her to come in.

16             Hi, Kathy.  I need your help for a moment.  Sid's

17   going to step down and talk to you.  I need something from

18   September 10th.  I need the interrogatory that was e-mailed

19   to the Court.

20             THE CLERK:  Okay.

21             THE COURT:  Thank you, Mr. Zeller.  Just show that

22   to Kathy.  I appreciate it.

23             MR. ZELLER:  *(Complies.)*

24             MS. HURST:  4:55 p.m. on the 10th.

25             THE CLERK:  Thank you.

CV 04-9049 DOC = 9/27/10/ - Item No. 20

42

```
 1                    (Pause in the proceedings at 6:51 p.m.)

 2                     (Proceedings resumed at 7:02 p.m.)

 3              THE COURT:  All right.  We're back on the record.

 4              On behalf of MGA, I want you to identify for me in

 5      earlier interrogatories where you believe that Mattel has

 6      changed their theories.  I want to get that printed out so I

 7      can compare this interrogatory with the earlier

 8      interrogatories with specificity.  Okay?

 9              MS. HURST:  All right.  Do you want that tonight,

10      Your Honor?

11              THE COURT:  Tonight.  It can be 7:00 o'clock.  It

12      to be midnight.  It doesn't matter.  Let's see if that

13      accusation is true or not.  Let's set that aside or do

14      something about it immediately.

15              All right.  Counsel, concerning the motion to

16      dismiss, I'm going to give the lectern to you for argument.

17      I'm really concerned most about the transaction theory.

18              MR. QUINN:  Okay.  Your Honor, by the "transaction

19      theory," are you referring to the single transaction,

20      whether it's compulsory?  That issue?

21              THE COURT:  Uh-huh.

22              MR. QUINN:  Your Honor, we're discussing the kind

23      of unusual device of counterclaims in reply, which is not

24      specifically authorized in the Federal Rules of Civil

25      Procedure, but yet courts have recognized -- many courts,
```

Case 2:04-cv-09049-DOC-RNB  Document 9298  Filed 11/24/10  Page 42 of 102  Page ID #:280296
CV 04-9049 DOC - 9/27/10/ - Item No. 20

43

1    including the Ninth Circuit, have recognized that

2    counterclaims in reply can be asserted unless they are

3    compulsory -- they're not permitted unless they are

4    compulsory.

5            And, Your Honor, the cases we would cite to the

6    course are the *Davis* and *Cox v. Summa* case, and the *Fujitsu*

7    *v. Nanya* case, both -- the first case being a Ninth Circuit

8    case, and the *Nanya* case being a Northern District of

9    California case.

10           Your Honor, these are not compulsory counterclaims

11   in the sense that they do not arise out of the same nucleus

12   of operative facts.  The thrust of the counterclaims in

13   reply asserted by MGA is that once Sal Villasenor snuck into

14   MGA's showrooms and obtained confidential trade secret

15   information, that has nothing to do with the allegations

16   made in Mattel's complaint that an -- individuals in Mexico

17   left Mattel and went to work for MGA, and took with them

18   vast amounts of data owned by Mattel.

19           THE COURT:  What about the assertion that -- well,

20   continue, Counsel.

21           MR. QUINN:  Each of the transactions which is the

22   subject of a Mattel claim is entirely a separate

23   transaction, factually different and distinct.  There is no

24   claim by Mattel that relates in any way to invasion of these

25   occasions when MGA's showrooms at toy fairs were

```
 1    allegedly -- when Mr. Villasenor, without authority,

 2    allegedly got into these showrooms.  The proof, the facts,

 3    everything relating to those events is entirely separate

 4    from the events in Mexico, the events in Canada, the events

 5    here in Los Angeles, where we allege that former -- that

 6    Mattel employees were bribed and induced to leave Mattel's

 7    employment and take with them Mattel confidential data.

 8            In response, MGA says, "Well, there is an overlap

 9    here.  They both concern trade secrets.  They both concern

10    thefts.  They are two sides of the same coin" -- these types

11    of arguments.

12            But, Your Honor, this comes down to nothing more

13    than saying this is other bad conduct of the same type, that

14    involves the same legal theory, that involves the same legal

15    types of considerations.  And that is not sufficient to make

16    these compulsory counterclaims.  These are not -- do not

17    arise out of the same transactions or facts.

18            And the case we would cite the Court to is the

19    Conceptus case, Northern District of California case, which

20    is very similar, where you had two competitors that were

21    accusing each other of engaging in improper marketing

22    practices.  And basically, it was one side saying, you know,

23    "You misused clinical data," and the other side said, "Well,

24    look over here.  You've misused clinical data, too."  And

25    the Court said that is not -- these are not compulsory
```

 1    counterclaims in reply.  They were not properly pled.

 2          And I'll quote the Court.  It says, "In other

 3    words, while each wants to accuse the other of very similar

 4    bad marketing acts, each relied on different transactions.

 5    As such, Conceptus' counterclaims in reply are not

 6    compulsory counterclaims and were improperly pled."  So for

 7    that reason, we submit, Your Honor, that these are not

 8    compulsory claims.

 9          But I'd like to move now to -- let's assume, for

10    sake of argument, that they are compulsory claims.  They

11    should -- it would be entirely inappropriate for MGA to be

12    permitted at the stroke of midnight or five minutes before

13    the stroke of midnight to be able to assert these claims

14    now, after they have known about this conduct for years and

15    years.

16          MGA's position seems to be that a party is

17    entitled to add claims years after it has known about them,

18    without leave to amend, so long as they are compulsory --

19    which I'm assuming, for the sake of argument, that they

20    are -- that argument cannot be right.  If that were

21    accepted, it would mean that litigants could unilaterally

22    assert dilatory claims at any point in the case.  And that

23    simply, obviously, would give the Court -- the Court would

24    have the -- would be unable to exercise its authority and

25    power and need, really, to be able to shape a case and

1    prepare it for trial, if a party at the eleventh hour could

2    spring new affirmative claims.

3           I refer the Court to pages 1 to 8 of our moving

4    papers where we set forth in specific detail the basis for

5    my assertion that these are claims or facts that MGA has

6    literally known about for years and years, at least since

7    2004.

8           Numerous MGA employees plainly had knowledge of

9    MGA's claims years ago.  In fact, they concede as much.

10   Mr. Brawer and Mr. Machado, who went from Mattel to MGA,

11   brought that knowledge with them back in 2004.

12          THE COURT:  Now, just one moment, Counsel.  I

13   don't want to disturb your argument.  I want to examine

14   something you just said, and I'll be right with you.

15          Going back to your first argument, then, I'm

16   hearing that the theory of latches has no relevance, as far

17   as you're concerned.  What I'm hearing from your argument is

18   that because you're arguing that these are not compulsory,

19   that there's no viable theory that you feel that MGA has to

20   assert these counterclaims because they don't have any

21   relevance concerning the guarding, if you will, of a trade

22   secret.  They are just, in a sense, other bad acts.  They

23   are of a nature involving character or dressed up in the

24   prior case law that they're noncompulsory.

25          But now your position is, "In case, Judge, you

1    find that they're compulsory, then it's inappropriate

2    because they've had substantial knowledge about these

3    actions or activities over some period of time."

4            I anticipate that Mattel's going to argue, besides

5    the merits in a few moments, that they -- that MGA asked

6    Mattel about this in prior discovery motions.

7            And whether it was relevant or not, were these

8    disclosed, and were you asked about the activities of Mattel

9    in these showrooms in these prior discovery motions brought

10   by MGA, either in front of Judge Larson or this Court?

11           MR. QUINN:  I cannot specifically answer that

12   question, Your Honor.

13           THE COURT:  Then don't for a moment.

14           Counsel, that's just a "yes" or "no" to begin

15   with.  "Yes" or "no."  Now think very carefully about your

16   answer.  Don't just spring into action here.  I'll hold you

17   accountable.

18           And if you did, be candid now, before I have to go

19   through the record.  Okay?  And if you were asked and you

20   didn't respond, then I want to know why.

21           MR. ZELLER:  The difficulty is, it can't be

22   answered "yes" or "no" as it's been framed.

23           THE COURT:  Okay.  Go ahead with your explanation.

24   More than a "yes" or "no."

25           MR. ZELLER:  MGA asked questions of particular

CV 04-9049 DOC - 9/27/10/ - Item No. 20

48

1    witnesses in deposition, such as, "Did Sal Villasenor use

2    fake business cards?"

3              THE COURT:  And the answer was?

4              MR. ZELLER:  And the answer of these witnesses --

5    they were like the former president of Mattel, Adrianne

6    Fontanella.

7              THE COURT:  I'm sorry.  The answer was?

8              MR. ZELLER:  That they did not know.

9              THE COURT:  They did not know?

10             MR. ZELLER:  Right.  So these were of individual

11   particular witnesses.

12             MGA did not pursue discovery that was asking about

13   the toy fair episodes in Phase I.

14             THE COURT:  Now, MGA is not stupid.  MGA is going

15   to ask a broad question.  They're going to say something

16   like, "Well, golly gosh.  We're not smart enough to know

17   about the toy fair" with that specificity.  But I bet you

18   MGA might have asked a question like this:  "Do you have any

19   knowledge about" -- you know, the broad questions that

20   Mattel's asked.  'Cause you're excellent counsel also.

21             So do we have that kind of broad-sweeping question

22   about, "Do you have any activities?" or "Do you have any

23   knowledge about Mattel or any employee of Mattel, or any

24   contracted person, or anyone to your knowledge on behalf of

25   Mattel entering into MGA's showrooms or any other

1   showrooms?"  See, that's the way I'd ask a really broad

2   question.

3           MR. ZELLER:  Those are not the kinds of questions

4   that were asked, Your Honor.

5           THE COURT:  All right.  We'll wait.  Thank you

6   very much, Counsel.

7           MR. QUINN:  Your Honor, in fact, not only did

8   Mr. Brawer and Mr. Machado come over to MGA -- and

9   Mr. Brawer testified that he knew Mr. Villasenor was

10  supposedly using fake business cards and getting into MGA's

11  showrooms.  MGA is chargeable with that notice.  California

12  and Ninth Circuit law recognize that, if an employee has

13  actual knowledge, it will be imputed to the employer,

14  regardless of when the employee gained that knowledge, so

15  long as the knowledge relates to the employee's duties at

16  the new employer.

17          And I would cite to the Court, *All Steel Engines,*

18  88 F.Supp. 745, and the O'Riordan case, 36 Cal.4th 281.

19          So it doesn't matter -- as long as it relates to

20  their job duties, it doesn't matter when they acquired that

21  knowledge.  They clearly knew.  Because in MGA's answer to

22  Mattel's second amended answer and counterclaim, they refer

23  specifically -- they referred specifically in their

24  pleading -- and I'm quoting now -- to, quote, "monitoring,

25  spying on, and gaining access, or attempts to gain access to

```
 1    MGA's showrooms," closed quote -- and referred to thefts of

 2    MGA of trade secrets.

 3            And, as Mr. Zeller indicated, then, in

 4    depositions, they showed that they had this knowledge

 5    because they asked.  And I assume these cannot have been

 6    random questions.  "Do you have information about

 7    Mr. Villasenor using fake business cards?" -- and

 8    information such as that.

 9            THE COURT:  And what was the response?

10            MR. QUINN:  The response --

11            THE COURT:  Was confusion?

12            MR. QUINN:  No.  I think Mr. Zeller just indicated

13    the response, at least, from Ms. Fontanella was, no, she had

14    no such knowledge.

15            THE COURT:  Well, how about other deponents?

16            MR. QUINN:  I'll have to defer to my more

17    knowledgeable colleague.

18            THE COURT:  Mr. Zeller is now joining you to give

19    a specific response.  It just requires a "yes" or "no."

20            MR. ZELLER:  Your Honor, the witness who I know

21    gave that answer -- because I was there -- was Adrianne

22    Fontanella.  They did not ask it of most witnesses.  This is

23    what it is that showed they already knew about this.  But

24    they did not go around asking every single witness.  What I

25    remember is -- I know we wrote this up, as well, Your Honor.
```

1    I can get the briefing.  I can double check.  We gave

2    citations where we looked up and we found those kinds of

3    questions.  But, Your Honor, this is not something where MGA

4    made efforts -- substantial efforts to get discovery on

5    this.

6            Adrianne Fontanella was the president of the

7    Barbie brand.  She is not somebody who would -- even had

8    Mr. Villasenor reporting it to her.  So they did make, you

9    know, these half-hearted efforts that, ultimately, all it

10   revealed was that they already knew about these claims.  But

11   they were not pursuing this in Phase I discovery.

12           THE COURT:  I'm going to repeat back to you what

13   I'm hearing, so that you know that I'm either absorbing or

14   not.

15           MR. ZELLER:  Uh-huh.

16           THE COURT:  Judge, because these persons came over

17   to MGA, minimally, there should be constructive knowledge,

18   but probably explicit knowledge because of the questions

19   that were asked at the depositions.

20           MR. ZELLER:  Right.

21           THE COURT:  Is that an accurate summary?

22           MR. ZELLER:  Yes.

23           THE COURT:  One sentence.  Excellent.

24           Counsel?

25           MR. QUINN:  Your Honor, so what does this tell us?

1    If they -- their knowledge, what that means -- let's suppose

2    they allege -- part of their response is fraudulent

3    concealment on the part of Mattel; we weren't forthcoming,

4    which is where the Court was going.

5              THE COURT:  I haven't accused you of that yet.

6              MR. QUINN:  Maybe I'm being a little anticipatory,

7    Your Honor.

8              But the point is, fraudulent concealment -- I

9    mean, their actual knowledge renders fraudulent concealment

10   irrelevant.  They knew.  They knew.  They had the employees

11   who knew and testified that they knew.

12             THE COURT:  What happens if I'm presented with a

13   habit and practice in this industry involving dolls, where

14   your position ends up being well-taken that maybe Mr. Larian

15   and MGA acquired these improperly -- "improper" is a big

16   word.  It's not a legal term -- but Mattel is just entering

17   into a different avenue; that they're sending people around

18   showrooms to improperly acquire.

19             The argument is really a legal argument, and that

20   is, "Judge, this is not compulsory because it's filed so

21   late."  If it would have been filed earlier, maybe we

22   wouldn't have this issue.

23             MR. QUINN:  Your Honor, I'm not asking this Court

24   to rule that, on the face of this, there's no theft of trade

25   secrets.  Although, I'll tell you Mr. Larian has testified

Case 2:04-cv-09049-DOC-RNB   Document 9298   Filed 11/24/10   Page 52 of 102   Page ID #:280306
CV 04-9049 DOC - 9/27/10/ - Item No. 20

53

1  under oath that, if it's in the toy fair showroom, it's not

2  secret.  He said that.

3          THE COURT:  Just a moment.  It depends upon what

4  kind of a showroom.  There's all sorts of showrooms.

5  There's showrooms over in Las Vegas, you know, where

6  everybody walks around.  And then there's the kind of a

7  showroom where only explicit people are invited, and they've

8  got passes.

9          MR. QUINN:  I'm talking about toy fair showrooms,

10  what Mr. Larian was asked about -- you know, New York toy

11  fair.

12          THE COURT:  I haven't been to it.

13          MR. QUINN:  I haven't either, Your Honor.

14          So what we have here, this is a case of actual

15  knowledge.  But I'm not asking the Court to rule that there

16  couldn't be a claim here.  And the Court is exactly right --

17          THE COURT:  Why wouldn't I want to try to resolve

18  all these claims at one time, since you like to file over in

19  state court after I've made rulings?

20          MR. QUINN:  Well, because you might not want to

21  set a precedent that a party could sit on a claim for

22  years --

23          THE COURT:  Why?

24          MR. QUINN:  -- and wait until August --

25          THE COURT:  No.  Hear me:  Why?

1          This case is going to come to an end at some

2    point.  Apparently, in this litigation between the parties,

3    I don't see why the federal courts aren't taking on all

4    these issues.  This is just gonna pop up someplace.  You've

5    already demonstrated that you like state court.

6          MR. QUINN:  Because -- you wouldn't want to do it,

7    Your Honor, because you would want both sides to have fair

8    opportunities to conduct discovery concerning the claims

9    asserted against them.

10          THE COURT:  After three years, why don't you have

11    fair discovery?

12          MR. QUINN:  Because these sprang up on

13    August 16th, after -- the week before, MGA told Your Honor,

14    "We must stop discovery now."  Now, I can't --

15          THE COURT:  But if Mattel knew about this for two

16    or three years, or a year and a half, how are you caught

17    unawares?

18          MR. QUINN:  Your Honor, it's one thing to know

19    that they think that provides the basis, or some type of

20    defense, to claims that we've asserted.  And we can then

21    exercise our own judgment that that doesn't properly join

22    issue with our claims and is not a proper unclean hands

23    defense.  That's one judgment we can make.

24          THE COURT:  So you're caught unaware and

25    unprepared?

CV 04-9049 DOC - 9/27/10/ - Item No. 20

55

1          MR. QUINN:  And that's to pay a billion dollars,

2     Your Honor.  A billion dollars.  And then, now there are

3     over 40, third-party subpoenas that have been served, trying

4     to create some type of --

5          THE COURT:  Explain to me again -- because I

6     didn't understand, and I apologize -- how you're unprepared

7     if these allegations are true.

8          How would these employees allegedly come over to

9     Mattel?

10          You could claim at this point that you're not

11     prepared, if you've had knowledge? -- which is why I

12     originally asked that really naive question, you know, "What

13     was Mattel's response if a broad question was asked that

14     encompassed Mattel's knowledge of going into showrooms?" --

15     which you didn't respond to.

16          MR. QUINN:  Your Honor, there are many new

17     elements in these claims which were not part -- part of the

18     affirmative defenses that were on the table before.  For

19     example, causation, damages.  Damages aren't put in issue

20     by -- you know, you don't get damages if you prevail on an

21     affirmative defense.

22          We're now facing a claim for a billion dollars.

23          THE COURT:  Both sides would be then.

24          MR. QUINN:  I'm sorry?

25          THE COURT:  Kind of, both sides would be in that

Case 2:04-cv-09049-DOC-RNB  Document 9298  Filed 11/24/10  Page 55 of 102  Page ID #:280309
CV 04-9049 DOC - 9/27/10/ - Item No. 20

56

```
 1   position.  In other words, you'd be -- as you're suing them
 2   for a billion, now they're suing you for a billion.  In
 3   other words, it's a risk to both sides.
 4           MR. QUINN:  Our claims have been on the table,
 5   front and center, and the subject of discovery.
 6           They have -- Your Honor, if the Court -- well, we
 7   actually did some calculations here.  On trade secrets
 8   discovery, on our claims, they have taken 17 days of
 9   30(b)(6) deposition on trade secrets for 94 hours.
10           Do you know what they've offered us on these
11   eleventh-hour claims?  They've offered us one day of
12   30(b)(6) deposition on this.  So it's an entirely different
13   circumstance.
14           It's just -- it's too late, we'd submit,
15   Your Honor.  And it's incredibly prejudicial to Mattel at
16   this hour, given that -- you know, we didn't have a chance
17   to tee up anything for this omnibus motion that each side
18   was given the opportunity to file, and that we'll hear
19   tonight.  We didn't have the chance to pursue any discovery,
20   get it, or not get it, and then include that in this motion
21   tonight.
22           They, on the other hand, the Court's soon gonna
23   see -- and the Court may already be aware of this, having
24   read the papers -- that about half of their omnibus
25   discovery motion concerns these claims that were asserted
```

CV 04-9049 DOC - 9/27/10/ - Item No. 20

57

```
 1    for the first time on August 16th.

 2              Your Honor, I submit the unfairness of that is

 3    palpable, Your Honor.  And we've known -- we learned --

 4    just, you know, scrambling within the last week to try to

 5    get what discovery we can, we've learned that there's a

 6    whole boatload of documents relating to this they haven't

 7    produced.  We learned, Your Honor, just a couple of days ago

 8    that they have videos and photographs of their displays at

 9    all the toy fairs, which presumably would show these

10    billion-dollar trade secrets.

11              Never been produced.  Never been produced.

12    Obviously, we need to get our hands on those.

13              We've learned that they have -- you know, they

14    invited press into their showroom, and that there were

15    displays made for the press, and presentations made for the

16    press.  We have none of those.

17              We've learned, just within the last couple of

18    days, that they had logbooks and sign-in sheets as to who

19    went there.  We haven't seen any of those.

20              THE COURT:  I'm going to joke with you for a

21    moment.  And you can ask Robert O'Brien this.  I told Robert

22    O'Brien, when he first came in here, about nine months

23    ago -- and both of you have my permission to ask -- I said,

24    "Most of the discovery that is relevant or a substantial

25    portion will come out two weeks before the discovery cutoff
```

1    date."

2            MR. QUINN:  I've had that experience.

3            THE COURT:  And here we are.

4            MR. QUINN:  Well, what none of us would have

5    anticipated, Your Honor, I suspect, is that, you know, with

6    days to go before the discovery cutoff and with counsel

7    urging the Court to cut off discovery even sooner, that

8    whole new claims -- wholesale new claims concerning new

9    facts, new transactions -- you know, "You owe us a billion

10   dollars for having somebody go into our showrooms" would be

11   surfaced for the first time -- that's different.  That I

12   don't think I've seen before.

13           And then, obviously, I guess the last point I

14   would make about -- I mean, really, this should be reviewed

15   as a request for permission by -- or leave to amend, since

16   these are not compulsory counterclaims.  I guess the last

17   thing I would suggest the Court can fairly consider is

18   that -- whether there is bad faith here in holding these

19   back, and on August 9th urging the Court to immediately halt

20   further interrogatories and requests for admissions, and to

21   request that all requests for production be served by

22   August 16th, which is what these counsel did, knowing, we

23   all know now, what they were cooking up.  So that's our view

24   on -- on that issue, Your Honor.

25           Separate issue.  If I can move now to the motion

1    to strike Paragraphs 41, 46 and 47.

2           THE COURT:  Just a moment.

3           Okay.

4           MR. QUINN:  Your Honor, I'm turning now from the

5    motion --

6           THE COURT:  41, 46 and 47.  Let me go down my

7    checklist.  We've got all night.  Thank you.

8           MR. QUINN:  Your Honor, these allegations -- these

9    paragraphs set forth a somewhat strident but creative theory

10   or account of Mattel's motivations in bringing this case,

11   and nothing more, and they should be stricken because

12   they're completely irrelevant.  Under the Noerr-Pennington

13   doctrine, Mattel can come to this Court -- I mean, short of

14   tortious activity, malicious prosecution, which nobody has

15   suggested here -- Mattel's reasons for coming to court and

16   petitioning the Court are completely irrelevant.

17          THE COURT:  Okay.

18          MR. QUINN:  And it would be improper to inject

19   into this trial for the jury's consideration Mattel's

20   alleged motivations.

21          THE COURT:  Which is nothing more than argument

22   for the jury, from your perspective.

23          MR. QUINN:  Yes, Your Honor, exactly.

24          THE COURT:  Inflammatory.

25          MR. QUINN:  And I would argue improper argument to

1   the jury about what the motivations are.  But that's an

2   issue for another day.

3            THE COURT:  Who says that this is ever going to be

4   read to the jury?  Your chances of having both your

5   allegations read to the jury are almost zero.  You're going

6   to come up with a statement of this case eventually, or I'll

7   write it for you.  It's going to be short and succinct.  If

8   you want to control your own future, you will.  I doubt

9   these allegations are ever going to be read to the jury.

10           MR. QUINN:  Well, I take some comfort in that,

11  Your Honor.  But I think they have no place in the

12  pleadings.  And to the extent the pleadings frame the

13  issues, to the extent they have any utility at all, we think

14  they're appropriately out of the case -- the litigation

15  privilege, as well.

16           THE COURT:  And, legally, if they shouldn't be

17  there, they'll be stricken, Counsel.

18           MR. QUINN:  Yes.

19           THE COURT:  We'll see.

20           MR. QUINN:  Then, Your Honor, I'm not going to go

21  into detail on the statute of limitations issues.  This

22  relates to -- if this is viewed as an effort to amend the

23  complaint, as we think it should be, or amend the pleadings,

24  the Court has to consider whether it's futile.

25           And for the same reasons -- and on that,

CV 04-9049 DOC - 9/27/10/ - Item No. 20

61

```
 1    Your Honor, the Court can properly consider a matter outside
 2    the proceedings.  And I'll just incorporate by reference my
 3    comments and argument in your brief concerning the statute
 4    of limitations issues and when MGA knew this.  They clearly
 5    knew it earlier than August 16, 2007, and August 16, 2006,
 6    which would be the three-year and the four-year statute of
 7    limitations for the misappropriation of trade secrets and
 8    RICO claims.
 9             And now I'll turn, Your Honor, finally to the
10    claim for wrongful issuance of an injunction.
11             We are not aware of a case where there was -- a
12    party was permitted within the same case -- we're talking
13    about the same case -- to add a claim for wrongful issuance
14    of an injunction.  Again, this smacks of something akin to
15    abuse of process or malicious prosecution and should
16    appropriately be viewed as such.  If anything, it should be
17    the subject of a separate action.  And the case I'd cite to
18    the Court for that proposition is *Buddy Systems*, which is in
19    our brief.
20             But we don't even have to get that far,
21    Your Honor, because, in the federal courts, it's clear there
22    can be no claim for wrongful issuance of an injunction for
23    damages except where there is a bond.  And, obviously, you
24    have an action, then, on the bond.  That is the purpose of a
25    bond.  We haven't found any case where there's an action for
```

Case 2:04-cv-09049-DOC-RNB   Document 9298   Filed 11/24/10   Page 61 of 102   Page ID #:280315
CV 04-9049 DOC - 9/27/10/ - Item No. 20

62

1    damages, as opposed to restitution -- a restitutionary

2    remedy, where there is not -- there is not a bond.

3            In fact, the cases -- the U.S. Supreme Court has

4    indicated that you can't have an action for damages for

5    wrongful issuance of an injunction absent a bond.  They

6    reply -- MGA relies on the *Arkadelphia* case, a U.S. Supreme

7    Court case.  If Your Honor reads that, it will be absolutely

8    clear that's a case involving restitution, a restitutionary

9    remedy.  The Court says it three or four times.  And that

10   case was interpreted by the Ninth Circuit case, the *Dornan*

11   case, as saying that, in fact, *Arkadelphia* foreclosed a

12   claim for damages for wrongful issuance of an junction.  In

13   other words, they interpreted it exactly the way that I've

14   represented to the Court that -- the opinion of the Court

15   indicates.

16           So we then get down to the question, is the relief

17   that MGA is seeking here, is it restitution or is it

18   damages?  If it's damages, given that there's no bond, there

19   can be no claim, whether in a separate case or in this case.

20   And clearly, what they are seeking here is damages, not

21   restitution.

22           MGA -- or Mattel did not get anything, does not

23   have anything that is MGA's.  There is nothing to give to --

24   to give back to -- to turn over as part of a restitutionary

25   remedy.  There's nothing to disgorge, in other words.

Case 2:04-cv-09049-DOC-RNB   Document 9298   Filed 11/24/10   Page 62 of 102   Page ID #:280316
CV 04-9049 DOC - 9/27/10/ - Item No. 20

63

 1           Now, they've gotten very creative about how to
 2      characterize this.  Well, what you've really got to disgorge
 3      is market share.  Now, that's a lawyer's answer, I submit,
 4      Your Honor.  That's another way -- that's a creative way of
 5      recharacterizing what are damages, i.e., lost profits --
 6      'cause you've got a larger market share -- as restitution.
 7      We have nothing of theirs -- no res, no property, nothing.
 8           The final point I'd say on this, Your Honor, is
 9      there is no standing and there's no injury.  This is an
10      injunction that never went into effect.  This is an
11      injunction that was stayed, and then stayed, and then
12      narrowed, and then before it could ever go into effect was
13      vacated by the Ninth Circuit.
14           Now, they've tried to spin out -- MGA has tried to
15      spin out different theories under which they were damaged by
16      that.
17           THE COURT:  Why aren't there lost profits or
18      damages in the period of time from those persons who might
19      have purchased from MGA who, quite frankly, were chilled in
20      this process?
21           This was a widely published case.  The injunctive
22      relief that Judge Larson issues was well-known.  I would
23      think, if I was in the industry and I was a potential
24      supplier or buyer, I'd have trouble dealing with that entity
25      believing that they're not going to be in business any

 1    longer.

 2              MR. QUINN:  Indeed, Your Honor.  That might well

 3    be the case.  But that is not a direct damage resulting from

 4    injunction.  Damages is not at issue here.  But -- for

 5    example, the mere filing of a motion for an injunction might

 6    have had a chilling effect.  Litigation, the pendency of

 7    this lawsuit, might have had a chilling effect.

 8              Let's assume it does.  That is not compensable,

 9    you know, even if a bond is in place.  The law -- and we're

10    now in the area of where there's claims for damages, and

11    they're appropriate because there's a bond, it's clear it's

12    got to be what is directly occasioned by the injunction.

13              Those are -- I'd be happy to answer any questions,

14    Your Honor.

15              THE COURT:  No.  That was an excellent argument,

16    and perhaps you'll prevail; and perhaps you won't.

17              Come back to the lectern.  I've got a question for

18    you.

19              Mr. Zeller, why don't you join Mr. Quinn at the

20    lectern since sometimes he looks to you and you look to him

21    for advice.

22              I want to assume for a moment that your arguments

23    are well-taken and that these claims aren't compulsory.  Why

24    shouldn't they be allowed to be incorporated into the

25    existing unfair competition claim?

65

```
 1              Take a few moments with that.  You might talk to

 2    each other about it.  Think out your answer carefully.

 3              In other words, you may be right:  Compulsory.

 4    You might be wrong.  Who knows.  The Circuit will eventually

 5    decide, or the Supreme Court.

 6              But let's assume that you prevail on this

 7    argument.  I mean, once again, looking forward to

 8    litigation -- so what?  Why -- I mean, we're having a lot of

 9    fun, but why aren't these incorporated into the unfair

10    competition claims?  Why don't these come rolling in any

11    way?

12              MR. QUINN:  Two answers to that, Your Honor.  And

13    the first is that MGA has represented on the record that

14    they are not.

15              THE COURT:  They are not what?

16              MR. QUINN:  That they are not part of their

17    pre-existing unfair competition.

18              THE COURT:  Well, both sides have represented a

19    few things.

20              MR. QUINN:  Well, No.  I've got the record,

21    Your Honor.  And it was Mr. Molinski, who, in answer to the

22    discovery master's question -- 'cause Mr. Larian was being

23    deposed, and this issue came up, and Mr. Zeller, ever

24    vigilant, trying to clarify the record, said the

25    following --
```

1           THE COURT:  Just a moment.

2           "Judge" MOLENSKI?  Is that -- Judge MOLENSKI?  Is

3   that who made this ruling?  I didn't know he was deciding

4   these issues.

5           MR. QUINN:  No.  He was making a representation.

6           THE COURT:  So what?  Representations have flown

7   around by both sides that the parties have gone back on.  I

8   mean, I couldn't even start with this record on both sides

9   with Mattel and MGA concerning backtracking on

10  representations.  I don't think you want me to start on the

11  record with that argument.

12          You might want to talk to Mr. Zeller before you go

13  down that road.

14          MR. QUINN:  This was something that was said in

15  order to avoid discovery.

16          THE COURT:  Let's hear it, then.

17          MR. QUINN:  All right.  I'm referring to

18  Mr. Larian's deposition, transcript page 4205, line 1 to 16,

19  "And seeking to avoid a finding by the discovery master that

20  it was in violation of a Court order regarding a requirement

21  to produce a 30(b)(6) testimony on its unfair comp

22  claims" --

23          THE COURT:  What date was that?

24          MR. QUINN:  September 1st, 2010.

25          THE COURT:  Recently.

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB  Document 9298  Filed 11/24/10  Page 66 of 102  Page ID
#:280320
CV 04-9049 DOC - 9/27/10/ - Item No. 20

67

1          MR. QUINN:  So what they're facing is the

2     discovery master is questioning whether the witness has been

3     adequately prepared, the 30(b)(6) witness, on the unfair

4     competition claim.  Mr. Molinski seems to indicate that,

5     "Wait, no, no.  Those unfair comp claims do not include any

6     of this new stuff."

7          THE COURT:  Why would that be made?  I've inferred

8     on a number of times after this was filed that a lot of this

9     information may be coming in, regardless of the

10    counterclaim.  And I've indicated to Mattel in some of the

11    rulings that have been adverse to you that you still have an

12    opportunity of getting that evidence in.

13         MR. QUINN:  You know, it might be.  It might,

14    Your Honor.  But what I'm saying is it shouldn't be the

15    subject of affirmative claims that we have to respond to.  I

16    still think there's a big difference between -- something

17    comes as being probative on some issue, as opposed to our

18    having to mount a defense.

19         THE COURT:  It's your greatest weakness.  It's

20    your greatest weakness right now, and I'm paying you a

21    tremendous courtesy.  So listen to me.  You may prevail on

22    the compulsory claim issue.  You may not prevail concerning

23    the unfair competition.  Okay.  That's your weakness.  So if

24    I was you, I'd drive to the heart of that for a moment.

25    Because right now, your argument is not persuasive.

1          MR. QUINN:  If I can read to the Court --

2          THE COURT:  Read slowly.

3          MR. QUINN:  Mr. Zeller, seeking clarification, and

4    I quote, "So MGA is taking the position that the new

5    counterclaims in reply were not previously part of MGA's

6    affirmative claim such that it would be within the scope of

7    30(b)(6) Topic 26," which was at issue then.

8          The discovery master said, "Basically, I think

9    that's what they're saying.  But they're also saying that

10   they may have arguments regarding unclean hands that -- that

11   would relate to corporate espionage and other types of

12   allegations; is that --

13         "MR. MOLINSKI:  That's correct."

14         So, Your Honor, it really is a rabbit out of the

15   hat.  And at this point, at this late date, to say these

16   unfair comp claims all along did incorporate this massive

17   RICO claim and trade secrets claim, which they sat on -- I

18   mean, what's the fairness and equity in that? -- which we

19   have not been able to address in discovery.

20         THE COURT:  I can understand that argument

21   concerning -- the issue concerning whether this is a

22   compulsory claim.  I can't understand your unpreparedness

23   concerning unfair competition.

24         And as far as "it seems to indicate," that's an

25   interesting phrase.  That's pretty ambiguous.

1          Now, Mr. Zeller.

2          MR. ZELLER:  Your Honor, there are no facts, not a

3     single fact, alleged in MGA's extensive unfair competition

4     complaint that was filed in 2005 that refers to this new set

5     of allegations that they are now basing their claims on.

6          MGA has not asserted that there are such facts

7     that have been alleged in their complaint.  The Court can

8     look at what they have alleged.  They alleged, at great

9     length, a number of supposed complaints set forth in their

10    2005 complaint -- everything from packaging, to ribbons, to

11    moving things on shelves, to a whole variety of things.  Not

12    a single allegation was made, factual allegation --

13         THE COURT:  Okay.  I've heard that argument.  It's

14    redundant.  Move on.  I've heard it.  I've got it.

15         Your next argument.

16         MR. ZELLER:  It's not redundant simply because --

17         THE COURT:  No, no.  You're repeating yourself.

18    Move on to another argument.

19         MR. ZELLER:  The further point on this is,

20    Your Honor, is it cannot be a compulsory counterclaim

21    without those factual allegations in the original complaint.

22         THE COURT:  I understand.

23         Thank you.

24         MR. ZELLER:  That's it.

25         THE COURT:  That's it.  Thank you.

Case 2:04-cv-09049-DOC-RNB   Document 9298   Filed 11/24/10   Page 69 of 102   Page ID #:280323
CV 04-9049 DOC - 9/27/10/ - Item No. 20

70

 1              Now, I want to hear from MGA.

 2              Now, let's start off our discussion:  Why didn't

 3     you ask leave to amend to the Court?  Why the drama?  And

 4     let's be candid:  To get the press.  To get the press's

 5     attention.  You're fighting a press battle.  Come on.  Why

 6     didn't you ask leave to amend of this Court?

 7              MS. HURST:  Because it was not required.

 8              THE COURT:  Okay.

 9              MS. HURST:  But also, because we didn't know about

10     the claims until this point in time.

11              THE COURT:  So you still could have asked leave to

12     amend from the Court.

13              MS. HURST:  Simultaneously with the filing of the

14     counterclaims in reply -- and we did on the cross motion,

15     Your Honor.  We did as an alternative.  But we don't want to

16     concede they're noncompulsory, obviously.

17              So, you know, honestly, we'll get accused of

18     conceding they're noncompulsory if we move for leave to

19     amend, of course.

20              The Court's inability to understand why they would

21     be unprepared on the unfair competition claim is easy to

22     understand, because on December -- sometime in November or

23     December of 2005, John Corey and Michael Moore met with Sal

24     Villasenor about this case, and they discussed the unfair

25     competition claim.  And what they got in response was an

CV 04-9049 DOC - 9/27/10/ - Item No. 20

71

1    e-mail to the general counsel of Mattel saying, "I've been

2    engaging in criminal conduct and I'm worried about it from

3    the perspective of this litigation.  And I met with Michael

4    Moore --

5           THE COURT:  Slow down.

6           MS. HURST:  Sorry.  "I met with John Corey and

7    Michael Moore, and now I'm very concerned about this, this

8    conduct that I've been engaging in for years, giving Mattel

9    a, quote, superior competitive advantage."

10          At that moment in time, if Mattel and Quinn

11   Emanuel did not fully apprise themselves of what they could

12   be facing in an unfair competition claim, the one MGA had

13   then filed, it was because of willful, deliberate burying

14   their head in the sand and hiding this evidence.  Ignorance.

15          And it was not ignorance.  It was knowing.  They

16   knew exactly what they were gonna find, because Mr. Quinn

17   has unfairly characterized the allegations of the

18   counterclaims in reply as if this was only about Sal

19   Villasenor.

20          They were operating an entire group of people

21   doing this.  And we have numerous witnesses now who have

22   testified confirming this since we filed the counterclaims

23   in reply.  Numerous witnesses.

24          Now, did they conceal the evidence?  The Court

25   asked about this.  You better believe it.

DEBBIE GALE, U.S. COURT REPORTER

```
 1            THE COURT:  I don't know, in the long run, that
 2    that makes a difference, but -- in terms of the legal
 3    issue -- but I'm kind of curious since we spent a long time
 4    in discovery.
 5            MS. HURST:  I can hand a copy of this up to the
 6    Court.  It's our response to interrogatory that we filed
 7    late on Friday night in response to their expedited
 8    discovery on the counterclaims in reply.
 9            One of the questions was --
10            THE COURT:  No.  Let's be more specific.  Where do
11    I find this?
12            MS. HURST:  Can I hand it up to the Court?
13            THE COURT:  No.  Just make a record of it and I'll
14    look it up.
15            MS. HURST:  All right.  Your Honor, this is MGA
16    Entertainment's Corrected Responses to Mattel, Inc.'s First
17    Set of Interrogatories on the MGA Counterclaims in Reply.
18            And I'm reading from Response to Interrogatory
19    No. 18.
20            THE COURT:  Number 18.
21            MS. HURST:  "Russel AronsS.
22            "QUESTION:  Did you ever become aware of anyone
23    from Mattel going to an MGA showroom in conjunction with any
24    toy fair?
25            "ANSWER:  No.
```

CV 04-9049 DOC - 9/27/10/ - Item No. 20

73

```
 1          "QUESTION:  Did you ever hear any kind of a rumor

 2   or statement or information to the effect that Mattel

 3   employees had used, say, misleading credentials to gain

 4   access to MGA's showrooms?

 5          "No, I didn't hear anything like that.

 6          "You've never heard from any source within Mattel

 7   that anyone from Mattel or acting on behalf of Mattel used

 8   misleading credentials to gain access to toy fair showrooms?

 9          "No, I didn't hear that."

10          THE COURT:  Once again, who is this person?

11          MS. HURST:  Russell Arons.

12          THE COURT:  Was he designated 30(b)(6)?

13          MS. HURST:  She was not.

14          THE COURT:  Well, just a moment.  Who was he?

15          MS. HURST:  She was the head of Barbie marketing

16   during key, relevant time frame and --

17          THE COURT:  Just a moment.  Why do you think that

18   he'd have this knowledge if he's not a 30(b)(6) witness?

19          MS. HURST:  Because she was the -- responsible for

20   Barbie marketing and competing with Bratz from 2003 to 2005,

21   received Mr. Villasenor's reports --

22          THE COURT:  Just a moment.  That takes a leap.

23          Now, I want another witness.  Who else?

24          Do you have a 30(b)(6) that was asked these

25   questions?
```

DEBBIE GALE, U.S. COURT REPORTER

 1              MS. HURST:  Yes.

 2              THE COURT:  Who?

 3              MS. HURST:  Mr. Ward was designated to testify on

 4    Topic 11 -- Topic 8.

 5              THE COURT:  Now, Counsel, I recognize that these

 6    don't have a lot to do with some of the legal issues before

 7    the Court, but --

 8              MS. HURST:  I understand.

 9              THE COURT:  -- but I want to find out who's

10    playing games.

11              MS. HURST:  Your Honor, Mr. Ward testified on

12    Topic 8 and Mr. Storie testified on Topic 11.

13              THE COURT:  And Mr. Storie testified as a

14    30(b)(6)?

15              MS. HURST:  He was, Your Honor.

16              THE COURT:  Okay.  And Topic 8 is?

17              MS. HURST:  Your Honor, Topic 8 was the receipt by

18    Mattel of any nonpublic or confidential information about

19    competitors' products and so forth.

20              THE COURT:  Okay.  Just a moment.  And that was

21    Mr. Ward?

22              MS. HURST:  Yes.

23              THE COURT:  Mr. Storie on Topic 11?

24              MS. HURST:  Mr. Storie on Topic 11, a complete

25    explanation of the precise circumstances in which Mattel

Case 2:04-cv-09049-DOC-RNB   Document 9298   Filed 11/24/10   Page 74 of 102   Page ID #:280328
CV 04-9049 DOC - 9/27/10/ - Item No. 20

75

1   acquired information concerning MGA and its products found

2   in the following documents.

3          And then there was a big stack attached to the

4   notice.

5          THE COURT:  That doesn't help me.  I'm not clear

6   about what you just said.

7          MS. HURST:  It was "testify about where you got

8   the information in these documents."  The documents attached

9   to the notice included documents that reflected unreleased

10  product information about MGA.

11         THE COURT:  Just a moment.  Give me a Bates

12  number.  In other words, I want a better record for the

13  Circuit.

14         MS. HURST:  Your Honor, we're getting the notice.

15         THE COURT:  All right.

16         MS. HURST:  I don't have it right here.

17         THE COURT:  Go ahead with your argument.

18         MS. HURST:  One of the documents about which Topic

19  11 was noticed was one of Mr. Villasenor's toy fair reports.

20  We'll get the Bates number for the Court.

21         Now, Mr. Storie, testifying as a 30(b)(6):

22         "QUESTION:  Are you aware of anyone at Mattel ever

23  being reprimanded for gaining access to a competitor's

24  showroom improperly?"

25         THE COURT:  Now, just a moment.  That's

CV 04-9049 DOC - 9/27/10/ - Item No. 20

76

1    "reprimanded."  That doesn't have anything to do with the

2    topic.  I'd respond "no" to that.

3              MS. HURST:  "So you don't know whether

4    Mr. Villasenor obtained the text on pages 415 through 417

5    through public sources or through confidential sources?"

6              THE COURT:  What's on page 415 through 417?

7              MS. HURST:  Pictures of unreleased MGA products.

8              THE COURT:  How do we know that those are the same

9    products?  In other words, it allows the witness, once

10   again, to answer "no."

11             MS. HURST:  He says he doesn't know where the

12   information came from.

13             In fact, they did know where the information came

14   from.  They had all the files and records available to them

15   to know that their people had gone into our showrooms.

16             THE COURT:  Okay.

17             MS. HURST:  "QUESTION:  Are you aware that

18   Mr. Villasenor would use fake identification to gain access

19   to competitor's showrooms?"

20             "I've never heard of any instances of that."

21             THE COURT:  Okay.  Now, just a moment.

22             And, once again, this is of Mr. --

23             MS. HURST:  Storie.

24             THE COURT:  I had "Ward" down for some reason.  Is

25   this Mr. Storie?

1          MS. HURST:  This is Mr. Storie.

2          THE COURT:  All right.  Just a moment.  And this

3     would be Topic 11.

4          Now, what happens if the claim of Mattel is, "We

5     didn't have to use fake ID.  We had an open toy fair in

6     Hong Kong" or some other location," and we could just walk

7     in without a pass and view this information."

8          How do I know that this is truly a transgression

9     by Mattel?

10         MS. HURST:  That's a factual question, Your Honor,

11    that isn't properly considered on a 12(b)(6) motion.

12         THE COURT:  No, no.  We're not talking about that

13    now.  We're talking who's lying.

14         MS. HURST:  You mean, was Mr. Storie lying?

15         THE COURT:  Uh-huh.

16         In other words, after all, we've gone through

17    these mounds of discovery and, you know, millions and

18    millions of dollars in attorneys fees, I'm kind of curious.

19         MS. HURST:  The question and answer that I just

20    read to the Court -- "Did Mr. Villasenor use fake

21    identifications to gain access to competitor showrooms?" --

22    there is no doubt that occurred.

23         Mr. Villasenor said it occurred.

24         Ms. Rahimi said it occurred.

25         Ms. Osier said it occurred.

DEBBIE GALE, U.S. COURT REPORTER

1          Ron Brawer testified that it occurred.

2          Sujata Luther testified that it occurred.

3          Here's a copy of one of the fake ID's with a false

4   name on it.

5          THE COURT:  Let the record reflect you've held up

6   a document.

7          MS. HURST:  Bates numbered V-I-L-S.  Note that it

8   was produced by Mr. Villasenor, not Mattel.

9          THE COURT:  You can put that down.  It's dramatic,

10  but it doesn't mean anything.

11         MS. HURST:  Your Honor, I want to get back to the

12  compulsory counterclaim.

13         Your Honor, in this Response to Interrogatory

14  No. 18, there are, just so the Court knows, 12 pages of

15  testimony quoted from numerous different witnesses who were

16  asked about this, and all disclaimed any knowledge of it

17  whatsoever -- numerous witnesses, all of whom were

18  absolutely in a position to know, including two 30(b)(6)

19  witnesses.

20         THE COURT:  Now, the argument Mr. Quinn started

21  with about an hour ago, when I had given him ten minutes,

22  was "Well, you know, under case law, constructively you

23  should have knowledge of this."  These employees came over

24  to your side of the yard, and you're held accountable.

25         Why wouldn't you have had knowledge of this a long

1    time ago, and why wouldn't you bring this issue before the

2    Court?  Then we could have had more discovery.  Because we

3    have had time to have discovery.

4            What they're complaining about is this:  That it's

5    unfair because they don't have time to prepare -- and we'll

6    think that one through, but --

7            MS. HURST:  That's just wrong.

8            THE COURT:  Tell me why.  No.  Just a moment.

9    Tell me why.

10           MS. HURST:  Because the knowledge they've acquired

11   was acquired in the course and scope of their employment for

12   Mattel.  And as Mattel has argued, at length, on many prior

13   occasions, everything they knew about how Mattel did

14   business was subject to their confidentiality agreements

15   with Mattel.  And we certainly know that Mattel sent

16   threatening letters, and cease and desist letters and, in

17   fact, sued many of these employees for breaching their

18   confidentiality agreements to Mattel.  So on top of the fact

19   that the information was acquired in the course and scope of

20   their employment at Mattel, not MGA, they were also subject

21   to constant threats of suit and, in fact, actual suit, about

22   the revelation of such information.

23           THE COURT:  So the suit in Mexico, for example,

24   would be an example of this?

25           MS. HURST:  Correct.  Criminal prosecution.  And

1    they sued Mr. Brawer before they made him the subject of

2    claims in this lawsuit -- in a case that was later

3    dismissed.

4            Now, the way Mr. Quinn quoted it, even he conceded

5    that this imputation works only when, and I quote, "the

6    knowledge is imputable so long as it relates to their job

7    duties."

8            Well, none of these people came over with duties

9    to prosecute claims for trade secret misappropriation or

10   unfair competition on behalf of MGA.  They came over to do

11   their jobs, which, by the way, didn't include using fake

12   credentials to spy on their competitors.

13           THE COURT:  All right.  Now, just a moment.

14           All right.  Counsel, thank you.

15           MS. HURST:  Thank you, Your Honor.

16           Your Honor, with respect to the accusation that

17   Mr. Brawer told MGA, and therefore MGA knew, here is what

18   Mr. Zeller said in testimony on Sunday evening at -- well,

19   Sunday afternoon at 4:30 in a deposition that Mr. Zeller

20   insisted be taken on Sunday so he could elicit this

21   testimony in advance of this hearing.

22           "QUESTION:  So based on your knowledge of what it

23   is that you have and have not told others at MGA, please

24   tell me is it true or is it false that you were the one who

25   made MGA aware that Sal Villasenor had used false

CV 04-9049 DOC - 9/27/10/ - Item No. 20

81

 1    credentials to gain access to competitors showrooms?"

 2         "ANSWER:  To the best of my recollection, the only

 3    time that I have spoken of Sal Villasenor in the presence of

 4    MGA counsel or employees is in the testimony that I gave

 5    during my depositions in January."

 6         Now, in a broader way -- and by the way, that

 7    testimony, at the time, Your Honor, Mr. Brawer testified

 8    that he had heard things about Sal Villasenor using fake

 9    credentials but not in association with MGA -- didn't know

10    whether he had done it in connection with MGA or not.

11         So the first time that we knew that this operated

12    with respect to MGA was when we got documents shortly before

13    the Villasenor deposition.  Prior to that, they could have

14    misrepresented themselves and gone into Hasbro or Connex or

15    LeapFrog or Lego or the many others that they stole from,

16    and there's no way for MGA to know that it's got standing to

17    bring any kind of a claim here, Your Honor.

18         And it didn't know.  And it brought the claims as

19    soon as it could.  And, in this regard, Your Honor, it may

20    be an rhetorical flourish, but it's an apt one:  Occam's

21    Razor.

22         If we had known about this -- you've got to be

23    kidding me -- we wouldn't have been riding the horrors

24    through Phase I and trying to prevent the absolute, you

25    know, excoriation of MGA that occurred in that proceeding.

CV 04-9049 DOC - 9/27/10/ - Item No. 20

82

```
 1              THE COURT:  Let me repeat back to you in one
 2    sentence what I'm hearing.  We'd be absolutely idiotic not
 3    to bring this into Phase I because we're fighting a
 4    notorious ballot in the press also.  If we knew that, why
 5    wouldn't we bring in that Mattel is sneaking into
 6    competitors' showrooms?
 7              MS. HURST:  Absolutely, Your Honor.  You said it
 8    better than I did.  I appreciate that.  Mr. Larian does,
 9    too.
10              Your Honor, going back to the legal issues,
11    Mr. Quinn, in his argument, characterized the wrongful
12    injunction claim as akin to an abuse of process claim.  In
13    doing so, he brought that claim squarely within the Pochiro
14    case.  In the Pochiro case, 827 F.2d 1246, the Court held
15    that an abuse of process claim is a compulsory counterclaim.
16    The Court reviewed the recent and not so recent Supreme
17    Court authority on liberalizing the transaction test, and
18    held that despite earlier lack of clarify in the precedence,
19    an abuse of process claim is compulsory.
20              The Court also reviewed a Second Circuit case, the
21    United Artist case, which is of similar holding, a copyright
22    infringement case there, and then counterclaims for
23    harassment and abuse based on the copyright infringement
24    claims.  The Second Circuit in that case held that was a
25    compulsory counterclaim.  221 F.2d 213.  And that United
```

1    *Artist* case was specifically approved in *Baker v. Gold Seal*

2    *Liquors,* U.S. Supreme Court, 417 U.S. 467, at page 469-01.

3            Transaction and occurrence doesn't mean that the

4    compulsory counterclaim is limited to the very same facts

5    and no more and no less in order to be compulsory.  And the

6    *Pochiro* case shows that our claim for wrongful injunction

7    and our RICO claim, which also alleges as harm the wrongful

8    injunction procured by the suppression of evidence in

9    connection with this case, are compulsory.

10           The trade secret allegations also are compulsory.

11   They're compulsory for at least three reasons.  The first

12   reason is that the very information upon which Mattel relies

13   in asserting its trade secret claims in this case may well

14   have been stolen by them from others.

15           We've just learned about this.  We're in the

16   course of trying to figure that out.  But they're claiming

17   their product information -- products that were designed

18   with 20 years of knowledge of competitors' unreleased

19   products -- there's a direct relationship there.

20           Second, there's a direct relationship, Your Honor,

21   because --

22           THE COURT:  Explain that direct relationship

23   again.

24           MS. HURST:  From 1992 to the present -- and I use

25   the word "present" advisedly, because over the weekend --

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 9/27/10/ - Item No. 20

84

```
 1              THE COURT:  Don't belabor that.  I'm sorry.  "Over
 2     the weekend" --
 3              MS. HURST:  Over the weekend, they produced a
 4     document showing they were still going into our showrooms in
 5     2009.
 6              THE COURT:  I'm sorry.  I thought they were going
 7     in over the weekend.
 8              MS. HURST:  No.  I don't think we had a toy fair.
 9              THE COURT:  All right.
10              MS. HURST:  All these products they've designed
11     and marketed, and all their marketing plans and their price
12     lists, and all that other stuff that they say the employees
13     walked out with -- they did all that after having stolen all
14     this data from everybody else.
15              THE COURT:  And the direct relationship again?
16              MS. HURST:  Because -- and we're still working on
17     this.
18              THE COURT:  The direct relationship again?
19              MS. HURST:  Because what the departing employees
20     took is information that Mattel, in turn, took from others.
21              THE COURT:  Let's stop right there.
22              Concerning what line?  I'm going to read back to
23     you:  "because what the departing employees took is
24     information that Mattel, in turn, took from others."  That's
25     a broad statement.
```

DEBBIE GALE, U.S. COURT REPORTER

```
1              What did they take?

2              MS. HURST:  Which?

3              THE COURT:  Well, I'm asking you.  You gave me a

4    broad statement.  My question is what did they take?

5              MS. HURST:  Mattel alleges that the departing

6    employees pilfered every type of business information that

7    Mattel had at its disposal:  Marketing plans, advertising

8    plans, product plans, price lists -- all of it.

9              THE COURT:  Assume for a moment that Mattel

10   prevailed in this lawsuit.  Would that somehow affect

11   damages?

12             MS. HURST:  Would their trade secret

13   misappropriation? -- yes.

14             THE COURT:  What about your counterclaims?

15             MS. HURST:  I'm not sure I understand the

16   question, Your Honor.  I apologize.

17             THE COURT:  I'll let you continue.

18             MS. HURST:  Your Honor, the counterclaims -- let

19   me say this:  If the Court is going to find that the

20   counterclaims are not compulsory and can't be brought, then

21   MGA prefers to be the master of its own claims and decide

22   how and when and where they should be brought.

23             THE COURT:  You mean, in what -- I don't

24   understand.  In State court?  Federal court?  What?

25             MS. HURST:  Perhaps, yes.
```

1          THE COURT:  These are federal claims.  You're out

2     of court.

3          MS. HURST:  No.  There could be a separate filing,

4     and they could be prosecuted in a separate filing.

5          THE COURT:  Explain that.

6          MS. HURST:  Your Honor, if the Court decides

7     they're not compulsory, it just means they're not brought in

8     this case.  Doesn't mean they can't be brought in another

9     one.

10          THE COURT:  In State Court?

11          MS. HURST:  Or federal court.

12          The fact that it's not the same transaction or

13     occurrence is not a decision on the merits.

14          Respectfully, Your Honor, if the court's gonna

15     find that it's not the same transaction or occurrence, then

16     it should not reach the merits, and MGA should be permitted

17     to prosecute its claims on the merits.

18          But, Your Honor, compulsory counterclaim -- let me

19     say this:  First of all, let me start back at first

20     principles.  Rule 7 and Rule 13 allow a counterclaim in

21     reply.  They place no limitation on the scope of such a

22     counterclaim, whether compulsory or permissive.  The Ninth

23     Circuit has interpreted it only to permit compulsory

24     counterclaims.  Other circuits have not.  So by deciding

25     this on the ground of compulsory counterclaim, the Court is

1    already deciding on a ground with respect to which there is

2    a Circuit split.

3            And, Your Honor, this evidence needs to, and will,

4    come into this case as part of MGA's defense of Mattel's

5    trade secret misappropriating claims, as part of its unclean

6    hands defense.

7            Now, when we defend those trade secret claims, and

8    they're coming into court arguing that they maintained the

9    confidentiality of all their data, and they instructed

10   people properly on what were trade secrets, but at the same

11   time, they were sending a group out to steal from others,

12   that just doesn't work.  We're entitled to defend.

13           When they come into court and say the reason these

14   employees left and took those documents is because MGA

15   bribed them by paying over-market salaries, and Mr. Larian

16   somehow induced them to bring documents -- that's been their

17   theory all along -- we're entitled to present the

18   alternative theory, which is that they were taught

19   systematically, while they were at Mattel, that it was okay

20   to take this kind of information from competitors.

21           Now, that's not just -- that is the same

22   transaction.  It's what constitutes a trade secret in this

23   industry.  It's what are the business practices in this

24   industry.  It's what is the reason why Mr. Machado left with

25   information when he knew about what Mr. Villasenor and the

1   others were doing.  Is it because he was induced somehow to

2   do it by MGA?  Or is it because he thought that was the way

3   the business worked?  Having worked at Mattel for years,

4   that's what it learned.

5           THE COURT:  Mr. Machado?

6           MS. HURST:  Mr. Machado.  I think Mr. Overland

7   will confirm.

8           THE COURT:  I don't think he will.

9           MS. HURST:  Not with those criminal claims still

10  pending.

11          In all events, Your Honor, it is the same set of

12  transactions and occurrences because what Mattel was doing

13  relates directly to what its employees did upon their

14  departure.

15          THE COURT:  Just a moment.

16          If these come in, are you sitting on the right

17  side of the table?

18          MR. OVERLAND:  I might switch back and forth.  I'm

19  not sure.

20          THE COURT:  Mr. Machado might be a hybrid.  I'm

21  just kidding you, Counsel.

22          MS. HURST:  Let me say this, as well, Your Honor:

23  The compulsory nature of the counterclaim is measured with

24  respect to the Fourth Amended answer in counterclaims.

25          That's the last pleading.  That's the pleading to

1    which we responded.

2              THE COURT:  Okay.

3              MS. HURST:  The Fourth Amended answer and

4    counterclaims makes this litigation a transaction that is

5    the subject of this lawsuit.  By pleading at length

6    regarding alleged circumvention of verdicts and transactions

7    and the omni and everything else, the litigation spoliation,

8    all of it --

9              THE COURT:  What happens if RICO doesn't survive?

10   In other words, is this motion premature?

11             MS. HURST:  No.  It already did.  We said to the

12   Court, "We don't want the litigation to be the subject of

13   this lawsuit."  The Court overruled us.  The claim is in.

14             This has to be measured as of right now, not

15   later.  They've made the litigation the subject of the

16   lawsuit.  Our compulsory counterclaims similarly rely on the

17   very same transaction.  The litigation itself:  The wrongful

18   injunction claim, the perjury, predicate acts related to

19   obstruction of justice --

20             THE COURT:  If the RICO claim doesn't survive, do

21   these counterclaims survive?

22             MS. HURST:  Yes.

23             THE COURT:  Why?

24             MS. HURST:  Because under *Pochiro*, the wrongful

25   injunction claim is clearly compulsory.

CV 04-9049 DOC - 9/27/10/ - Item No. 20

90

```
 1            THE COURT:  Because your argument would be it
 2    certainly applies to the unfair competition claim?
 3            MS. HURST:  That is -- you know, that is not my
 4    argument.  And that is where we -- I mean, look, in terms
 5    of -- if you were talking about statute of limitations or
 6    something like that, then we would certainly say it relates
 7    back to the filing of the original complaint.
 8            But MGA does not want to be limited in its legal
 9    theories about these facts to a State law unfair competition
10    claim.  And that is my point, really, Your Honor, that, if
11    the Court's gonna decide these are not compulsory, then MGA
12    should be permitted to choose how it wishes to bring these
13    claims, not be limited to an unfair competition claim.
14            Your Honor, even if the RICO claim was out, which
15    it shouldn't be -- and here, they didn't really move to
16    dismiss.  They didn't say we haven't adequately pled a RICO
17    claim, because they'd be hoist on their own petard.
18            THE COURT:  I'm talking about their RICO claim.
19            MS. HURST:  If, at summary judgment, both RICO
20    claims go out, or their RICO claim goes out and ours is
21    still in, then that's all fine.  Because the compulsoriness
22    as to the counterclaim is measured as of now.
23            THE COURT:  I would think if one RICO claim went
24    out, the other might also.
25            MS. HURST:  Ya think?
```

DEBBIE GALE, U.S. COURT REPORTER

1        I think our causation theory is much stronger than

2  theirs, Your Honor.

3        Your Honor -- so the compulsoriness is measured

4  now.  And even with the RICO claims out of the case, which

5  they shouldn't be -- the only argument they've made on this

6  for 12(b)(6) purposes is Noerr-Pennington.  But under that

7  *Kearney v. Foley & Lardner* case, we've clearly come within

8  the sham exception based on all manner of pleading,

9  misrepresentation on the Court, that procured an adverse

10  result.  That's right within that *Foley v. Kearney* -- *Kearny*

11  *v. Foley & Lardner* case, Your Honor.

12        So wrongful injunction under *Pochiro*, RICO under

13  *Pochiro* -- because it includes that procuring the adverse

14  result of the Court -- the trade secret piece is compulsory

15  because it's directly related to what are trade secrets in

16  this industry, what's proper behavior for the employees in

17  this industry, because their -- all of the things that they

18  say they developed that people stole over a 25-year period

19  of time were informed by what they were doing in the

20  industry with respect to everyone else.

21        They can't come in and claim this type of

22  information is a trade secret in light of their own conduct.

23  And it's the same series -- that makes it the same series.

24  The test is logical relationship.

25        It's not did somebody run the red light on the

CV 04-9049 DOC - 9/27/10/ - Item No. 20

92

```
 1    corner and, you know, claiming back that, you know, "You're
 2    the one who ran the red light."  That's not the test.  The
 3    logical relationship test is more flexible than that.
 4              Now, Your Honor, if this is a compulsory
 5    counterclaim, and the Court were wrong about this, finding
 6    it's not a compulsory counterclaim, then we would go all the
 7    way through the litigation of this case without these
 8    claims.  They'd have to be brought separately, despite the
 9    clear relationship.  And it would be an enormous waste of
10    judicial resources and the resources of the parties.
11              THE COURT:  Okay.  Counsel, I need to take a
12    recess.  We've been at it for a couple of hours.
13              I'll meet you back here at 9:30.
14              You're ordered back at 9:30 this evening.
15               (Proceedings recessed at 8:21 p.m.)
16               (Proceedings resumed at 9:27 p.m.)
17              THE COURT:  All right.  We're back on the record.
18              Ms. Hurst.
19              MS. HURST:  Thank you, Your Honor.
20              THE COURT:  Now, I've heard all the prior times
21    you've said those things -- okay -- four or five times now.
22              Can we go on to something new?  Not another
23    motion, just another argument.
24              MS. HURST:  Yes.
25              THE COURT:  Okay.  Good.
```

```
 1                MS. HURST:  Can I give an example on one of the
 2     preceding arguments?
 3                THE COURT:  Absolutely.
 4                MS. HURST:  All right.  Very quickly.
 5                When I was saying that there's a direct factual
 6     relationship -- if what Mattel alleges MGA stole through the
 7     former employees, it, in turn, stole itself, let me give an
 8     example of that.  There's a document on the CD that
 9     Mr. Machado allegedly took from Mattel that is a comparative
10     summary of products and prices of a bunch of Mattel
11     competitors.  Now, this is exactly the kind of information
12     that Mr. Villasenor's group would go to toy fairs every year
13     and steal.
14                THE COURT:  So you believe that the information --
15     let me repeat this back to you -- on Machado's hard drive --
16                MS. HURST:  CD.
17                THE COURT:  -- CD is information from those people
18     in Mattel who were going into toy fairs?
19                MS. HURST:  I don't know.
20                THE COURT:  But, from you, it's a logical
21     inference?
22                MS. HURST:  Yes.
23                THE COURT:  'Cause it's so similar?
24                MS. HURST:  Yes.
25                THE COURT:  Okay.
```

 1            MS. HURST:  Now, I'll move on.

 2            On the 12(b)(6) arguments, other than whether

 3     leave was required, Your Honor, the substantive pleading

 4     allegations, I think I mentioned the Noerr-Pennington

 5     argument earlier and the key case on that.

 6            On the wrongful injunction claim, it sounds that

 7     Mattel now concedes that there's a claim for restitution,

 8     but what they want to argue is, well, there's no claim for

 9     damages.

10            That is premature.  That is a completely premature

11     determination at this point.  And there's gonna be damages

12     experts, and they're gonna put forth their theories.  And

13     the deadlines for that haven't even come yet.  And when all

14     that shakes out in the wash, Mattel will be able to make its

15     motions in limine and argue that certain types of damages

16     are within the scope of this allowed claim and certain types

17     are not.

18            At that point in time, Your Honor, we'll be saying

19     we've got both a legal and equitable claim, and under

20     federal law we're entitled to ride both of those horses all

21     the way to post-judgment proceedings.  That's our view.

22            But it is certainly premature to be arguing at a

23     12(b)(6) stage about what types of damages may ultimately be

24     shown and what would be allowable and what wouldn't.  It's

25     completely premature.  And the Court was absolutely correct

1    in its earlier comments that MGA was harmed.

2          And MGA continues to be harmed to this day.  For

3    example, right now, with the new trial motion pending and a

4    hundred million dollar verdict still hanging over its head,

5    which may still be hanging over its head after the motion --

6    but we certainly hope not -- MGA cannot get access to credit

7    from other sources.  Retailers are still reluctant to

8    purchase, thinking that Mattel will pull a rabbit out of the

9    hat the second time around.  The harm continues to be felt

10   to this day, Your Honor.  And Mattel continues prolonging it

11   with their appellate proceedings on limited technical

12   issues.

13         THE COURT:  But you're going to do something about

14   that.

15         MS. HURST:  I am -- or I'm going to try, anyway.

16         We will file a Rule 41(b) motion, Your Honor.

17         THE COURT:  I'm not going to indicate to you

18   what's happening on either side, but we've got a 31-page

19   position that spells out our position very quickly to both

20   of you.

21         MS. HURST:  Thank you, Your Honor.

22         The Supreme Court said, in the *Arkadelphia* case,

23   "It is one of the equitable powers inherent in every court

24   of justice so long as it retains control of the subject

25   matter and of the parties to correct that which has been

CV 04-9049 DOC - 9/27/10/ - Item No. 20

96

1    wrongfully done by virtue of its process."

2            THE COURT:  You dropped your voice.

3            MS. HURST:  "By virtue of its process."

4            "To correct that which has been wrongfully done by

5    virtue of its process."

6            The distinction between law and equity has long

7    since been abolished.  And the cases involving bond

8    requirements all pertain to Rule 65, which is a preliminary

9    injunction rule.  It's got a requirement for a bond for

10   preliminary injunctions.

11           There is no rule or statute requiring a bond for

12   permanent injunctions, which is what this was.  Although

13   interlocutory, it was nonetheless permanent.

14           To say MGA has no remedy for the harm that it has

15   suffered as a result of that wrongful injunction, it

16   offends -- it really does offend justice.

17           Absolutely, the retailers were reluctant to buy.

18           For Mattel -- for Mr. Quinn to stand here and say

19   with a straight face that injunction is not going into

20   effect is offensive.

21           The Court may recall the very first night we met,

22   and I was here in the unfortunate position of moving to

23   vacate that recall order.  And it was -- I don't -- one of

24   the less pleasant legal experiences.  Because the Court was

25   rightfully skeptical that we were seeking a second bite at

CV 04-9049 DOC = 9/27/10/ – Item No. 20

97

1     the apple, with respect to Judge Larsen's orders, and

2     confirmed that the order would go into effect.  And we sent

3     out recall notices.  And we spent money hiring logistics

4     officers, who were former Marines.  And we paid monitor fees

5     to Mr. Fraoli that ran into the millions of dollars, and

6     participated in many legal proceedings, and were constantly

7     forced to tell the retailers, "I can't answer your questions

8     about whether I'll have a 2010 product line" -- in the most

9     fickle market there is:  Children and toys.  You're out of

10    that market for a short period of time, you're often out of

11    it forever.

12            They prevented us from exploiting our property.

13    It damaged the value of the property.  And now we've got it

14    back in "used" condition.  And the Court absolutely has the

15    power to remedy that wrong.

16            THE COURT:  All right.  Now, what would you like

17    to do the rest of the evening?

18            MS. HURST:  We're prepared to proceed with the

19    discovery motions, Your Honor.

20            THE COURT:  Okay.  I have enough now between your

21    arguments and the papers.

22            The O'Melveny issues we're going to hear next

23    Monday night at 5:00.  Just to confirm that, is that

24    acceptable to everybody?

25            MS. HURST:  Yes, Your Honor.

CV 04-9049 DOC - 9/27/10/ - Item No. 20

98

```
 1              MR. ZELLER:  Yes, sir.

 2              THE COURT:  That will give you time for filing.

 3     So if I don't have to tie up your weekend, I don't want to.

 4              Which one?  Where do you want to go?

 5              MS. HURST:  I think we agreed the MGA omnibus

 6     motion would go first.

 7              THE COURT:  Okay.  MGA omnibus.

 8              MR. OVERLAND:  Excuse me, Your Honor.  May

 9     Mr. Cote and I be excused? -- unless the Court wants

10     something from us.

11              THE COURT:  Sure.  Anytime you want to be excused,

12     it's fine.  I didn't know why you were here.

13              MR. OVERLAND:  Thank you very much.  I appreciate

14     that.

15              THE COURT:  Let the record reflect you were

16     extremely helpful tonight.  And your presence is always

17     appreciated.

18              MR. OVERLAND:  Thank you very much.

19               (Mr. Overland and Mr. Cote exit the

20          courtroom.)

21              THE COURT:  All right.

22              Let's get on with this then, Counsel.

23              MR. McCONVILLE:  Yes, Your Honor.

24              MGA's motion, in large part, Your Honor, deals

25     with discovery related to its counterclaims in reply; that
```

1   is, documents concerning the activities of Mr. Villasenor

2   and those in his group.

3           THE COURT:  Better yet, before we go on -- you

4   know what, Counsel?  We're going to recess this evening and

5   come back because I don't have two court reporters tonight.

6   Debbie has a four-hour limitation on her hands.

7           How long will your argument be?

8           MR. McCONVILLE:  I don't know, Your Honor.  15

9   minutes.  It depends if the Court has questions.  But, I

10  understand.

11          THE COURT:  7:00 o'clock tomorrow?

12          MR. McCONVILLE:  Tomorrow morning?

13          THE COURT:  Wait a minute.  Hold on.  I've got 50

14  or 60 defendants coming in on the check-in tomorrow.

15          This is brief.  Do you want to submit it on the

16  papers?

17          MR. McCONVILLE:  That's fine, Your Honor.

18          THE COURT:  Do you want to submit that on the

19  papers?

20          MR. ZELLER:  Yes, Your Honor.

21          THE COURT:  Counsel?

22          MR. McCONVILLE:  That's fine, Your Honor.

23          THE COURT:  Okay.  We can resolve that on the

24  papers.

25          MR. McCONVILLE:  Okay.

Case 2:04-cv-09049-DOC-RNB   Document 9298   Filed 11/24/10   Page 99 of 102   Page ID #:280353
CV 04-9049 DOC - 9/27/10/ - Item No. 20

100

```
 1              THE COURT:  What else is left?

 2              MR. McCONVILLE:  There was their omnibus motion,

 3    as well; and then next, their motion for expedited discovery

 4    as it relates to the counterclaims.

 5              THE COURT:  Let's talk informally.

 6               (Discussion off the record.)

 7              THE COURT:  Let's go back on the record.  And

 8    let's make sure that's still agreeable.

 9              On the omnibus motion for Mattel, are you willing

10    to submit on the papers?

11              MR. ZELLER:  Yes, Your Honor.

12              THE COURT:  On behalf of MGA?

13              MR. McCONVILLE:  Yes, Your Honor.

14              THE COURT:  Then what's left tonight?

15              MR. ZELLER:  There is the motion for expedited

16    discovery so far as it pertains to MGA's new claims.  And so

17    that --

18              THE COURT:  That needs some time.

19              MR. ZELLER:  That, I believe, the Court does need

20    to be brought up to speed in terms of some of the more

21    recent events that are not reflected in the papers.

22              THE COURT:  Let's do that Wednesday or Thursday

23    and see if I can fit you in.  Okay?

24              You need an answer soon, but I'm trying to keep

25    you away from Saturday, if I can, 'cause you'll be spending
```

CV 04-9049 DOC - 9/27/10/ - Item No. 20

101

1    every Saturday with me once the trial starts.

2            What else do we need to do that night?  We're

3    going to start turning out orders.  Literally, you'll have

4    orders this week.  Anything else?  Tell me Wednesday if

5    there is.

6            MR. ZELLER:  Okay.

7            THE COURT:  If not -- if so, why don't you make

8    plans on going home to your families on Saturday and Sunday.

9    But if there is an issue that we can't get resolved, then

10   give me from 4:00 to 8:00 or 9:00 on Friday night.  Okay?

11   Be courteous to each other so your families aren't

12   disturbed, and just say, no, we've got other issues,

13   et cetera.  That way, if you need to go home, great.  Handle

14   it.

15           Mike or John, if you need to -- that's fine.

16   Okay.

17           MR. ZELLER:  Okay.

18           THE COURT:  So you can divide out on Friday, as

19   long as I've got one counsel here to finish off anything.

20   So I think, hopefully, we can get it done Wednesday.  That

21   will be it.  If not, then Friday, but I only need one

22   counsel.  Fair enough?

23           MS. HURST:  Thank you.

24           THE COURT:  Then is there anything else this

25   evening?

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 9/27/10/ - Item No. 20

102

```
 1          MR. ZELLER:  The only thing I would suggest is
 2   perhaps we schedule at least a hearing time for the motion
 3   to quash on the Jon Corey deposition notice.
 4          THE COURT:  Why don't we just do that Wednesday?
 5          MS. HURST:  I haven't even filed it yet.  They
 6   haven't filed the motion, let alone our opposition.
 7          THE COURT:  How about Monday?  Next Monday?
 8   You're coming back next Monday anyway.  I'm trying to save
 9   you multiple trips for small things.
10          MR. McCONVILLE:  The close of discovery is Monday,
11   and the deposition is set that Monday.
12          THE COURT:  With Corey, we can put him on Tuesday,
13   if we need to.  Okay.  We can vary that by one day, if we
14   need to -- or two days.  Generally, it's coming to an end.
15   Okay?
16          Listen, I'll just sit here and wait for you until
17   Wednesday, then.  Why don't you go home.  I'll see you on
18   Wednesday.
19          (At 9:42 p.m., proceedings were adjourned.)
20                          -oOo-
21
22
23
24
25
```

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 9/27/10/ - Item No. 20

103

1                              -oOo-

2

3                           CERTIFICATE

4

5          I hereby certify that pursuant to Section 753,

6    Title 28, United States Code, the foregoing is a true and

7    correct transcript of the stenographically reported

8    proceedings held in the above-entitled matter and that the

9    transcript page format is in conformance with the

10   regulations of the Judicial Conference of the United States.

11

12   Date:  October 1, 2010

13

14

15                    _____
                      DEBBIE GALE, U.S. COURT REPORTER
16                    CSR NO. 9472, RPR

17

18

19

20

21

22

23

24

25

DEBBIE GALE, U.S. COURT REPORTER