1

1        **UNITED STATES DISTRICT COURT**

2        **CENTRAL DISTRICT OF CALIFORNIA**

3        **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4                    – – – – – – –

5

6    CARTER BRYANT,                    )
                                       )
7            Plaintiff,                )
                                       )
8        vs.                           ) No. SACV 04-9049-DOC
                                       )      Volume I
9    MATTEL, INC.,                     )
                                       )
10           Defendant.                )
     _____ )

11

12

13

14              REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                      Hearing/Motions

16                  Santa Ana, California

17             Wednesday, November 17, 2010

18

19

20

21   Jane C.S. Rule, CSR 9316
22   Federal Official Court Reporter
     United States District Court
23   411 West 4th Street, Room 1-053
     Santa Ana, California 92701
24   (714) 558-7755

25   10-11-10 MattelV1

1    **APPEARANCES OF COUNSEL:**

2

3    FOR INTERVENOR DEFENDANT MGA ENTERTAINMENT, INC.:

4              ORRICK, HERRINGTON & SUTCLIFFE, LLP
               BY:  THOMAS S. MC CONVILLE
5                  Attorney at Law
               4 Park Plaza
6              Suite 1600
               Irvine, California 92614
7              (949) 567-6700

8              - AND -

9              ORRICK, HERRINGTON & SUTCLIFFE, LLP
               BY:  ANNETTE L. HURST
10                 Attorney at Law
               405 Howard Street
11             San Francisco, California 94105
               (415) 773-5700

12

13   FOR DEFENDANT MATTEL, INC.:

14             QUINN, EMANUEL, URQUHART, OLIVER & HEDGES
               By:  JOHN B. QUINN
15                 MICHAEL T. ZELLER
                   SUSAN ESTRICH
16                 BRENT DYLAN PROCTOR
                   SCOTT WATSON
17                 MICHAEL MOORE
                   Attorneys at Law
18             865 South Figueroa Street
               10th Floor
19             Los Angeles, California 90017-2543
               (213) 443-3000

20

21

22

23

24

25

1    APPEARANCES OF COUNSEL (Continued):

2

3    FOR COUNTER-DEFENDANT CARLOS GUSTAVO MACHADO GOMEZ:

4              SCHEPER, KIM & OVERLAND, LLP
               BY:  ALEXANDER H. COTE
5                  Attorney at Law
               601 West Fifth Street
6              12th Floor
               Los Angeles, California 90071
7              (213) 613-4660

8              - AND -

9              LAW OFFICES OF MARK E. OVERLAND
               BY:  MARK E. OVERLAND
10                 Attorney at Law
               100 Wilshire Boulevard
11             Suite 950
               Santa Monica, California 90401
12             (310) 459-2830

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           **I N D E X**

2

3

4                      HEARING/MOTIONS

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1              SANTA ANA, CALIFORNIA, WEDNESDAY, NOVEMBER 17, 2010

2                               VOLUME I

3                             (12:19 p.m.)

4              THE COURT:  This is Mattel.

5                   For the record, I cautioned you the last part of

6      the day yesterday, and because the representation has been

7      made you had about a half hour, I don't want you pressed for

8      time.  So if there is something you want to reiterate, go

9      over again, take that time, okay?  Make certain that you are

10     satisfied with your argument, and don't -- don't be pressed

11     by any time constraints.

12                  All the parties are present on behalf of Mattel

13     and MGA, and counsel for Mr. Machado is now addressing the

14     Court.

15                  MR. COTE:  Thank you, your Honor.  Alexander Cote

16     on behalf of Mr. Machado.

17                  I'm going to pick up at the last question that I

18     was going to address from the Court.  It's in the Court's

19     minute order on page 58, it's question A2 --

20                  THE COURT:  Just a moment.  Let's do this.

21                  Mattel, you've got the first row.  Come up here

22     and be seated.

23                  You've got the first row, Susan.

24                  Mike, you have the first row.

25                  MGA, you have the second row.  Come on up and be
```

1  seated.

2           Okay.  Counsel?

3           MR. COTE:  Thank you, your Honor.

4           The question the Court was asking is why shouldn't

5  California law apply to the trade secrets of Mattel, Inc.,

6  when Mexico law apply to the trade secrets of Mattel de

7  Mexico and/or Mattel Servicio?  That's the question the

8  Court raised.

9           Yesterday, I pointed out that California Civil

10  Procedure Code Section 361, which govern Mattel Mexico or

11  Mattel Servicio's trade secret claims in that case, and

12  that's the borrowing statute under California law, which

13  says that when a cause of action arises in another

14  jurisdiction but it's time-barred in that jurisdiction,

15  the -- the would-be plaintiff can't bring the claim in

16  another jurisdiction to evade, in this case in California,

17  to evade the statute of limitations defense.  It's CCP361.

18  The only exception to that is if the plaintiff is a citizen

19  of California.

20           Mattel de Mexico and Mattel Servicios are not

21  California citizens, so they wouldn't be able to take

22  advantage of that exception.  And under CCP361, Mattel de

23  Mexico's claims would be barred by the borrowing statute

24  because de Mexico statute of limitations would apply.

25           And that's where I left off, your Honor.  The only

1    point I wanted to make is that there is no doubt

2    that with -- at least with respect to de Mexico trade

3    secrets, that that claim arose in Mexico under Mexico law.

4    All of the actors are in Mexico; Mr. Machado, Mr. Vargas,

5    Ms. Trueba, MGA de Mexico, which allegedly received the

6    trade secrets, and Mattel de Mexico, which is allegedly the

7    victim.  Every act of trade secret theft or alleged trade

8    secret theft occurred in Mexico.

9              As I said, the victim is Mattel de Mexico.

10   They're in Mexico, and the injury is in Mexico.  In some of

11   the papers, Mattel kind of quibbles on this point, but in

12   their opposition, they make it very clear.  Page 5 to 6,

13   they describe their injuries as follows:

14             "Using the information stolen from Mattel, MGA

15   Mexico was able to increase sales three-fold in the span of

16   seven months, and gain a 90 percent increase in Mexico

17   market share."  That comes right out of their brief.

18             "This increase came at the expense of Mattel,

19   which lost market share during 2004 in Mexico."  And they go

20   on to talk about other losses they suffered in Mexico.  It

21   increased their spending in Mexico and other actions they

22   claim they took in response to the reported theft of trade

23   secrets.

24             I raise this paragraph from their opposition only

25   to illustrate that the cause of action with respect to the

1    Mexico documents arose in Mexico, and, therefore, the

2    borrowing statute would apply to the claims of Mattel de

3    Mexico.

4            That's the last point I wanted to leave the Court

5    with, your Honor.  Thank you for giving me the chance to

6    finish.

7            THE COURT:  Go over your notes, because if I knew

8    you were that close last night, I would have pressed on for

9    another 5 or 10 minutes.  But make certain that you are

10   satisfied, so just take a moment and talk with Mr. Overland.

11           *(Attorney discussion held off the record.)*

12           THE COURT:  Now, from Mattel in terms of time,

13   approximately three and a half hours, not three hours, in

14   terms of any comments you have to MGA.  And another half

15   hour to 45 minutes on any comments you have concerning

16   Machado, so that would add up to 20 hours.

17           *(Laughter.)*

18           THE COURT:  I'm just joking, okay?  But about five

19   hours plus, okay?  That should be a sufficient amount of

20   time.

21           MR. COTE:  Thank you, your Honor.  I appreciate

22   the opportunity to go over a couple of points.

23           I did speak briefly yesterday about why Mattel

24   Servicios was established.  It's one of the questions the

25   Court had in the order.  And I believe I explained yesterday

```
 1    that the reason why Servicios was established is because
 2    under Mexico law, it's required that the employers share
 3    their profits with their employees.  It's a set percentage,
 4    I believe.  This is described more fully in the declaration
 5    of Mr. Huerta-Bleck, which we attached to our reply papers,
 6    H-u-e-r-t-a dash B-l-e-c-k.
 7              But by having two different companies doing
 8    business in Mexico, Mattel can avoid sharing its profits
 9    with its employees.  They have one company that sells the
10    products to Mattel de Mexico, and they make all of the
11    money.  You have another company, Mattel Servicios, which
12    has all of the employees but doesn't have any money, it
13    doesn't have any profits.  So, you know, 8 percent or
14    10 percent, or whatever it is, of zero is still zero, and
15    Mattel de Mexico doesn't have to pay any of that money out
16    in profit sharing.
17              That same arrangement is also why Servicios isn't
18    and can't be a party.  Servicios doesn't do any business in
19    Mexico.  All they do is provide the employer services or
20    employment services for Mattel de Mexico, so Mattel
21    Servicios wouldn't have a claim for damages.  And that's why
22    they are not here.
23              Now, Mattel wants to disregard the separateness,
24    the distinction between those two corporations in this case
25    so that they can bring contract claims and other claims
```

Case 2:04-cv-09049-DOC-RNB   Document 9405   Filed 12/13/10   Page 10 of 32   Page ID #:283265
SACV 04-9049-DOC - 11/17/2010 - Vol. I

10

```
 1    against parties like my client, who never worked for Mattel
 2    de Mexico, or at least weren't employees of Mattel de
 3    Mexico.  It strikes us as unconscionable that they can
 4    assert the separateness of the two corporations when it's to
 5    their advantage, when they can build their employees out of
 6    their profit sharing, and then they ignore it up here in
 7    California when it's to their advantage because they can
 8    bring some more claims against Mr. Machado, and then the
 9    derivative claims, like the interference claims, against
10    MGA.
11            If any court is going to decide whether that sort
12    of reverse alter-ego argument -- that's what I called it
13    yesterday -- if any court is going to decide whether that
14    should be permitted or that should go forward, it really
15    should be a Mexico court that decides that question in the
16    first instance.  Mexico has a policy of requiring its
17    corporations, its employers to share their profits with
18    their employees, and Mattel has apparently evaded that
19    requirement by setting up two different corporations.  It
20    really should be up to a Mexico court to decide in the first
21    instance whether that's permitted, whether they can assert
22    the two separate corporations to evade Mexico law, Mexico
23    policy, and then disregard it when it's no longer convenient
24    when they're the aggressor in the lawsuit, as they are here.
25            So that would be our suggestion, is that, you
```

Case 2:04-cv-09049-DOC-RNB   Document 9405   Filed 12/13/10   Page 11 of 32   Page ID #:283266
SACV 04-9049-DOC - 11/17/2010 - Vol. I

11

```
 1   know, to the extent that the Court is inclined to defer that

 2   question to a Mexico court, I think that would be the wise

 3   course, because it involves a balancing of Mexico policies

 4   that may be better handled by a court in that country.

 5             But in any event, under California law, to the

 6   extent that California law would apply, the case law is

 7   clear and the equities are clear that the plaintiff in a

 8   case such as this can't simultaneously assert two different

 9   corporations and, at the same time, retreat from that

10   assertion.  They'd be stopped from doing that under

11   California law if the Court were to decide the question in

12   that law.

13             Thank you.

14             THE COURT:  All right.  Just a moment.

15             MR. COTE:  Sure.

16             THE COURT:  While that ruling is made concerning

17   Machado was forthcoming from the Court, how would that

18   ruling affect the RICO allegations if they survived?

19   Because I can understand what I call the substantive counts.

20   I've asked repeatedly, and I've been ignored so far to tell

21   me what jury instructions would look like, who are going to

22   come back to MGA and their rebuttal and force that question

23   upon them, but for you, I still might have Machado involved

24   in the RICO allegations.  In other words, if he wasn't a

25   party to this lawsuit in terms of substantive counts, he
```

1   certainly would be named in the conspiratorial counts in

2   some of the overt activity.

3           I haven't thought enough about how that would be

4   presented to the jury, but I'm assuming that there is a good

5   chance that Mr. Machado wouldn't appear.

6           MR. COTE:  Would appear here in trial?

7           THE COURT:  Would not appear.

8           MR. COTE:  Would not appear?

9           THE COURT:  Would not appear, because initially,

10  remember, he claimed to have resolved that, and I don't

11  intend to be left with depositional transcripts and putting

12  all parties on notice that the witnesses are going to appear

13  first.  There aren't going to be depositions in this case.

14          MR. COTE:  I don't believe we have any intention

15  of not presenting Mr. Machado if the Court requires his

16  attendance in trial.

17          THE COURT:  What authority would I have to require

18  that if the substantive counts are gone, and he's simply an

19  overt act in a conspiracy?

20          MR. COTE:  As a non-party.

21          THE COURT:  Yeah.

22          MR. COTE:  As a non-party, it might be a different

23  situation.  As a party, of course the Court has

24  jurisdiction.

25          THE COURT:  Okay.  It's just a practical question.

1    I'm trying to see what this case is going to look like in a

2    practical sense to the jury.

3             Okay.  Thank you very much.

4             MR. COTE:  Can I -- you asked me slightly earlier

5    a question on that, and I wanted to address that one point

6    in case I wasn't clear.

7             The argument with Mexico law I don't think has

8    anything to do with RICO.  The fact that Mr. Machado worked

9    for Servicios I don't think had anything to do with RICO at

10   all.  I think it has to do with the fiduciary claims, the

11   duty of loyalty claims and conversion claims and the

12   contract claims.  I think that's where that particular

13   issue, that factual issue is a barrier for Mattel.  I don't

14   think it has anything to do with RICO because, of course,

15   you can steal something if the Court finds wire fraud, or at

16   least enough wire fraud to go forward, you can steal

17   something through wire fraud even if you don't work for that

18   company.  That's not a requirement.

19            THE COURT:  All right.  Let me think that through

20   more fully.  I'm not certain that I've really thought that

21   through, Counsel.

22            Thank you very much.

23            MR. COTE:  Thank you.

24            THE COURT:  Okay.  Counsel on behalf of Mattel?

25            MR. QUINN:  Good afternoon, your Honor, John Quinn

 1    appearing for Mattel.

 2            THE COURT:  Thank you.

 3            MR. QUINN:  Your Honor, we propose to walk right

 4    through the Court's questions in the order in which the

 5    Court posed them.  So I'm beginning, then, with the

 6    questions under, A, relating to MGA's objections to Mattel's

 7    identification of Bratz as trade secrets.

 8            Your Honor, we submit that this is a motion for

 9    reconsideration, which is governed by Local Rule 718, which

10    has very particular requirements which have not been met

11    here, specifically, no material difference in the fact or

12    law that could not in the exercise of reasonable diligence

13    have been discovered.  The emergents of new material fact or

14    law since the Court's last ruling are a manifest showing of

15    the Court's failure to consider material facts presented to

16    the Court before.  No effort has been made to address that,

17    your Honor, so we don't think that that standard has been

18    met here.

19            But very briefly, in no sense has Mattel changed

20    its legal theory.  The Court found before that Mattel had

21    put the Bratz trade secrets issues in issue in the case and

22    given MGA notice of that.  We summarized that evidence in

23    the briefing on that subject for the Court.  That's document

24    Number 7801 at 2 through 7.  We -- MGA actually successfully

25    opposed our efforts to put the Mattel trade secret issues in

Case 2:04-cv-09049-DOC-RNB   Document 9405   Filed 12/13/10   Page 15 of 32   Page ID #:283270
SACV 04-9049-DOC - 11/17/2010 - Vol. I

15

1    phase one because, as they stated at the time, they regarded

2    that as a more properly a phase two issue, and they were

3    successful on that.

4            I'll just refer the Court to the discussion at the

5    pretrial conference where MGA, on April 14th, 2008, filed a

6    motion in limine to preclude evidence on -- with respect to

7    trade secrets and objecting to proposed jury instructions

8    that we have submitted with respect to Mattel -- or to Bratz

9    trade secrets.  And in that motion in limine filed on

10   April 14th, MGA said that they understood that those trade

11   secrets claims would not be tried -- I'm quoting now --

12   until phase two, and they succeeded on that.  The Court

13   said, "Okay, that's not part of this case."

14           Ms. Hurst quoted from a statement that Mr. Zeller

15   made, the Court may recall yesterday.  The statement was to

16   the effect that "We are not claiming any proprietary

17   interest in the name Bratz."  Unfortunately, that was not a

18   complete quote that she made.  That took place -- that

19   discussion took place on May 23rd, 2008, and the discussion

20   in context was about adding a trademark claim relating to

21   the ownership of the name "Bratz," and Mr. Nolan was seeking

22   reassurance that Mattel was not asserting such a claim.  And

23   in response to that, Mr. Zeller said, "Just as Mr. Nolan

24   continues to characterize our claims and what they are, we

25   have not said that the name 'Bratz' is, quote,

1    'proprietary,' unquote, to Mattel."

2              And that's where Ms. Hurst stopped reading, but

3    actually Mr. Zeller went on to say, "That is not the basis

4    of our theory.  The name is part of the concept.  It is part

5    of the idea.  It is part of what it is that Carter Bryant

6    created when he was employed by Mattel that relates to

7    Bratz.  That is among the inventions that he created and,

8    therefore, we own it."

9              So your Honor, we think that the Court's ruling

10   that the Bratz trade secret issues in this case at this

11   point is proper and should not be changed.

12             Thank you, your Honor.

13             MS. ESTRICH:  Good afternoon, your Honor.  Susan

14   Estrich for Mattel.

15             I'm not going to go back to the basics on RICO

16   again.  I'm just going to run through these questions and,

17   to the best of my ability, try to answer them.

18             So beginning with the first question under RICO,

19   "Must the person, an enterprise, always be distinct?"  I

20   think it must always be distinct at the time you are

21   committing a predicate act or the predicate act is not

22   committed by the enterprise.  Indeed, I think that is

23   included at the time that the alleged RICO violations

24   occurred, I think almost by definition.  If at the time a

25   predicate act takes place you don't have an enterprise

 1    that's distinct from the person, you don't have a RICO

 2    violation.

 3           I think the one caveat I would add, or two

 4    caveats, is first, we think the position of Bryant has

 5    always been distinct.  Bryant is an independent contractor,

 6    so it's, therefore, our position that we really don't have a

 7    distinctiveness problem.  And the second caveat, I would

 8    simply add, is that the Supreme Court had made it clear that

 9    the fact that an enterprise has some moments of quiet along

10    the way, that it's active in spurts, doesn't end the

11    enterprise.  And, in fact, the quote from Boyle is, "While

12    the group must function as a continuing unit and remain in

13    existence long enough to pursue a course of conduct, nothing

14    in RICO exempts an enterprise from associates engaging in

15    spurts of activity punctuated by periods of quiescence," and

16    that's Boyle.

17           So that would be our position on the first

18    question, that Bryant was always distinct, that the

19    enterprise and the person must be distinct at the time of

20    commission of any predicate act, but that there may

21    obviously be periods in which the enterprise is more active

22    than at other periods, and periods in which its membership

23    is more clearly distinct.

24           The Court's second question, if I may go on.  The

25    Court's second question asks whether the provisions of

Case 2:04-cv-09049-DOC-RNB   Document 9405   Filed 12/13/10   Page 18 of 32   Page ID #:283273
SACV 04-9049-DOC - 11/17/2010 - Vol. I

18

```
 1    Section 1962(b), which makes it unlawful for anyone to take

 2    over or assume or purchase control of an enterprise that's

 3    engaged in a pattern of RICO violations, doesn't that

 4    prevent the corporation from evading liability by hiring the

 5    wrongdoer?  In other words, the argument was made that if

 6    you are engaged in a pattern of wrongful conduct, and you

 7    have someone working with you, you wouldn't want to set up a

 8    system where it says, "Great, if you hire the person who is

 9    doing the bad deeds, he's no longer" --

10              Thank you very much.  Allergies.  Thank you.

11              -- "He's no longer distinct, and therefore, you

12    can defeat your enterprise by hiring that person."  I think

13    the answer on Section B is that 1962(b) refers to purchasing

14    an enterprise, but it doesn't refer to hiring an individual.

15    So to the extent that you've got an incentive problem here,

16    and, frankly, I don't know how much, you know, would be RICO

17    defendants checked the statute book before they act, but to

18    the extent you've got an incentive problem here, it is not

19    solved by 1962(b) because 1962(b) doesn't apply when you

20    hire an individual.  For instance, you go to Carter Bryant,

21    he does something for you, if you were to turn around and

22    hire after he committed the illegal acts, that would not

23    violate 1962(b).

24              Question C, again on the temporal restrictions,

25    the Court asks, "Absent temporal restrictions, could
```

1    liability extend to an act committed by a person no longer

2    employed by or associated with the enterprise?"  And I think

3    the short answer to that is it wouldn't be a predicate act

4    of the enterprise.  It wouldn't be -- if I'm an individual

5    and I go commit a crime, that's just a crime.  If I'm not

6    employed by or associated with your enterprise, then my

7    crime is not a predicate act for purposes of enterprise

8    liability under RICO.  So that the short answer to how you

9    avoid the enterprise being liable for somebody's wrongdoing

10   who is no longer a part of it is -- that would not be --

11   that would not meet the statutory definition of a RICO

12   violation.

13            Interestingly enough, the law of conspiracy, as

14   the Court well knows, has detailed requirements of what a

15   person must do to pull out of a conspiracy and to no longer

16   be liable for the conspiracy and --

17            THE COURT:  You are arguing now that the

18   conspiracy -- here is what I'm hearing.  That the conspiracy

19   actually narrows liability, but I thought historically RICO

20   is much more expansive, that it was actually -- although

21   they have different requirements in RICO, a more expanding

22   doctrine.  And at least on the criminal side, there have

23   been arguments proposed to this Court that taking the old

24   foreseeability consequences, that you could potentially be

25   liable even though you, quote-unquote, had left the

1     employment because you may have set in through your actions

2     a whole course of conduct.  And so the old foreseeability

3     arguments that we used to have -- I'm a robber.  I come in

4     with my cohort.  There is a clerk.  The clerk goes for a gun

5     and shoots my co-robber.  I'm charged with murder.

6           Historically, first of all, you have felony

7     murder, but you also, on the criminal side, have the natural

8     and foreseeable consequences doctrine that basically says

9     that my cohort was killed could have been foreseen by me,

10    and therefore, I was placed him -- now, that's what I don't

11    understand in the question how the argument is by -- in C by

12    the ending of my employment and my association, I still

13    couldn't be held liable for those activities.  And I

14    understand we are arguing in a vacuum.  We can create all

15    sorts of factual situations.

16          MS. ESTRICH:  I understand your point.

17          THE COURT:  So why don't you continue.

18          MS. ESTRICH:  My only point would be -- I mean, I

19    don't think RICO suspends the usual rules of law.  So if I

20    could prove -- if I were the prosecutor, it --

21          THE COURT:  It does.

22          MS. ESTRICH:  It does, you're right.  But if I

23    were the prosecutor and I can prove, I think, that the act

24    at issue here for which you are being charged was something

25    you did, indeed, set in motion, perhaps, taught the skills,

1    did the reconnaissance, whatever it is, then my argument

2    would be very simply that you were -- for purposes of this

3    act, you were, in fact, still employed by or associated with

4    the enterprise at the time that you did the acts necessary

5    to set in motion, and therefore, you'd be responsible.  On

6    the other hand, if you've been in Timbuktu for two years,

7    and this is an entirely new act --

8         THE COURT:  Why?  Is it the fact -- and I'll give

9    you additional time.

10        MS. ESTRICH:  No, no, no.  That's fine.

11        THE COURT:  I don't know the fact that I

12   terminated my employment or my termination is dispositive

13   because if I'm in Timbuktu two years from now, what's the

14   difference in being voluntarily terminated if I set in

15   action a whole set of money laundering or, you know,

16   contract and have somebody killed?

17        MS. ESTRICH:  You are right.  You are absolutely

18   right.  I think the function of the words "employed by" or

19   "associated with," it's, in a sense, to remind us that you

20   still must be part of this enterprise for you to be -- you

21   know, for your actions to be imposing liability on the

22   enterprise and others in it as well as yourself, so that it

23   would be a factual question in your hypothetical.  I mean,

24   we are familiar on the conspiracy side, for instance, of

25   criminal law in circumstances where conspirators say, "I had

1  nothing to do with this.  I was out of that by then."  And

2  then we go back through the proof and say, "Actually, you

3  were not out of it by then.  This was a drug deal that you

4  set up, and even if you got out, you didn't get out until

5  later, and you are still responsible for what happened

6  before."

7          THE COURT:  Do you realize what we are both left

8  with, and that's very loose language between civil RICO and

9  criminal RICO, and the verbiage in a lot of the cases then

10  say, "Oh, golly gosh, we've got a criminal RICO, and civil

11  RICO, there is no difference."

12          MS. ESTRICH:  Right.

13          THE COURT:  But think about this.  I bet you we've

14  got five members of this of this present supreme court who

15  would disagree, five to four in this regard.  Well, we can

16  see.  Maybe it is --

17          MS. ESTRICH:  And they probably should.

18          THE COURT:  And here is why.  If we take this to

19  its logical conclusion, RICO is so expansive in a

20  capitalistic society and so broadening that we can do

21  substantial corporate harm in at least a capital system by

22  the expansiveness of the lawsuit.  I mean, we can literally

23  litigate ourselves to death.  On the criminal side, quite

24  frankly, there is a different motivation.  There is a much

25  different motivation.  On the criminal side, the unsaid rule

Case 2:04-cv-09049-DOC-RNB   Document 9405   Filed 12/13/10   Page 23 of 32   Page ID #:283278
SACV 04-9049-DOC - 11/17/2010 - Vol. I

23

1    is of course you want expansiveness, and that's why RICO was

2    set up.  It's the slopover, and I mean that in a delicate

3    sense, to the civil side without much good case law being

4    written.  It's all on the criminal side.

5                MS. ESTRICH:  I agree.

6                THE COURT:  And then this loose verbiage, "Gosh,

7    it applies to civil."  And they've got two different

8    policies.  That's why a lot of members of the bench don't

9    think that civil RICO should even exist.  We can't do

10   anything about that.  We agree.  And then we've got the

11   verbiage, and some of the stuff that this Court has written

12   is going to be thrown back in the Fernandez case, for

13   instance; absolutely.

14               MS. ESTRICH:  Right.

15               THE COURT:  So it's two different policies, and it

16   can be very harmful to at least a capitalistic system

17   allowing lawsuits to be so expansive under the RICO

18   verbiage.

19               Now, I tell you right to begin with, I see RICO as

20   an expansion of conspiracy.  Not synonymous with --

21               MS. ESTRICH:  Oh, I agree.

22               THE COURT:  -- but a broad expansion.  And I agree

23   that conspiracy, in and of itself, has different rules.  To

24   me, what the conspiracy did, the simplistic way I think

25   about it is they took conspiracy, it took that natural

1  foreseeable consequences doctrine and it mushed it together,

2  okay?

3          Now that's a very childish way to think of it, but

4  it's about that expansive.

5          MS. ESTRICH:  Oh, at least that expansive.  I

6  mean, some people would argue that unforeseeability is not

7  even built in that much.  I mean --

8          THE COURT:  And on the criminal side, it does.

9  The question is, does it need that expansiveness on the

10  civil side?  And you've got good case law that says that

11  they basically should be applied.

12          MS. ESTRICH:  The case law is absolutely clear.

13          THE COURT:  Yeah.

14          MS. ESTRICH:  One can certainly take the

15  perspective that what's happened in RICO is that the law has

16  been developed on the criminal side where you've oftentimes

17  got very guilty people sitting in front of you, and courts,

18  quite frankly, will engage in whatever machination they have

19  to to, on occasion, insure that justice is done, and they

20  are not about to get reversed from a technicality.  So you

21  get RICO conditions affirmed, very broad language --

22          THE COURT:  Right.

23          MS. ESTRICH:  -- and then that broad language is

24  as a matter of law, equally applicable on the civil side.

25          Now, what I will say about our case is I don't

Case 2:04-cv-09049-DOC-RNB   Document 9405   Filed 12/13/10   Page 25 of 32   Page ID #:283280
SACV 04-9049-DOC - 11/17/2010 - Vol. I

25

1    think we are, in fact, pushing the limits of RICO.

2            THE COURT:  That's what I'm interested in.

3            MS. ESTRICH:  I really don't.  I mean, we can all

4    come back in December and discuss the limits of RICO in the

5    context of the counterclaim, but I don't think that these

6    claims that we've raised today are pushing the limits.

7            THE COURT:  That's where I want you to go.  Why

8    isn't it pushing the limit because, quite frankly, if I felt

9    the other way, I'm glad to write the great American opinion

10   and send it up to the court, because I really think this

11   Court, five to four, has a substantial chance of curtailing

12   RICO on the civil side.

13           Now, I don't know that I want to do that just to

14   write that opinion.  So I need to make certain that this

15   isn't pushing the limit, because if it is pushing the limit,

16   then I may be willing to test it.  And I think the Ninth

17   Circuit, I don't think I have the vote.

18           MS. ESTRICH:  I don't think you do either, but I'm

19   going to come back in a month and convince you that it's

20   worth it to test the limits on our complaint.

21           THE COURT:  Okay.

22           (Laughter.)

23           MS. ESTRICH:  I'm smiling.  That was intended with

24   great good humor.

25           THE COURT:  All right.

Case 2:04-cv-09049-DOC-RNB  Document 9405  Filed 12/13/10  Page 26 of 32  Page ID #:283281
SACV 04-9049-DOC - 11/17/2010 - Vol. I

26

 1          MS. ESTRICH:  I don't think we're anywhere near

 2    the limits, particularly, you know, given the Court has

 3    already ruled on our motion to dismiss, you already narrowed

 4    our RICO claim.  I think, you know, in good faith, I thought

 5    we had a broader claim, but the Court has already narrowed

 6    it down.  You know, each of our named defendants, we have

 7    more than enough predicate acts.  I think we have a -- at

 8    least for purposes of our allegation, and I think we will

 9    prove it at trial, a clear common illicit purpose.  So

10    unlike yesterday, for instance, when you were talking about,

11    "Do you need a bad purpose, and we have a bad purpose" --

12          THE COURT:  So let me interrupt you again.

13          MS. ESTRICH:  Sure.

14          THE COURT:  That's why if you continue to argue

15    theory, and they do also on RICO, we go nowhere.

16          MS. ESTRICH:  Yes.

17          THE COURT:  Unless -- because the argument will

18    be, "Judge, you allowed Mattel to go forward on their RICO

19    allegations, but you didn't allow MGA; why?"  Because you

20    have to differentiate why you have a good RICO, and they

21    have to tell me -- and you have to tell me why they don't,

22    because if we just do it on the broad -- like Brady, you

23    complied, "No, I didn't."  Yes, you did.

24          What happens is it will become an issue of

25    material fact, and therefore, the Court, you know, precluded

 1    one of the parties from going forward, and the other side

 2    will come back on appeal and say, "Judge, here are the

 3    material facts."  Now, the Circuit is going to be very

 4    cautious with that.  They are going to take a look at that

 5    and say, "Maybe Judge Carter shouldn't have let that go to

 6    the jury."  In other words, no harm, no foul.  So you've got

 7    to set a really good record for me today about why you have

 8    a good RICO and why they don't.  And if you speak to me in

 9    generalities, then the easiest thing for the Court to do is

10    just -- both RICOs; have a great time.

11             MS. ESTRICH:  I'm happy to jump the gun, here,

12    because I think it's very clear that there were enormous

13    differences, enormous differences between our RICO

14    allegations, which has been in this case since the getgo.

15    We're from the beginning.  If you go back to RICO and the

16    problems of collective criminality and the greater problems

17    of groups we have here, the stories we told about Isaac

18    Larion and MGA who, in turn, selectively and strategically

19    targeted Mattel employees, stole the product that made the

20    company from Mattel, developed a relationship with that

21    individual in which there were coverups, we allege,

22    obstruction and the like.  What we have here is what I would

23    call classic RICO.  We have a group of individual,

24    independent, all wrongdoers.  I mean, if you compare the

25    Mattel -- the complaint against Mattel in their RICO, they

Case 2:04-cv-09049-DOC-RNB   Document 9405   Filed 12/13/10   Page 28 of 32   Page ID #:283283
SACV 04-9049-DOC - 11/17/2010 - Vol. I

28

1    name exactly one defendant; Mattel.

2         So Mattel is this entity, which from most of the

3    period of their complaint in most of the time period

4    involved in their allegation of RICO, you just have Mattel

5    being Mattel, you know?  Quinn Emanuel shows up.  There is

6    no allegation in their RICO complaint that Quinn Emanuel had

7    an illicit purpose.  There is no allegation that Quinn

8    Emanuel committed any predicate acts.

9         THE COURT:  Until Mexico?

10        MS. ESTRICH:  Ditto.  No indication that there are

11   others supposed independent persons, this Bain (phonetic)

12   Company that comes in and does the management consulting

13   report.  No.  Long term relationship.  We've got continuity

14   problems on that, you know, Quinn Emanuel and Bain is what

15   makes it an enterprise.  Well, neither of them are charged

16   as defendants.  Indeed, it's not clear to me.  If it were a

17   conspiracy case, I'd be sitting here telling you --

18        THE COURT:  Let me repeat back to you what I just

19   heard.

20        MS. ESTRICH:  Pardon?

21        THE COURT:  Let me repeat back to you what I just

22   heard.

23        MS. ESTRICH:  Okay.

24        THE COURT:  "Judge, on our side we are alleging

25   that" -- MGA -- "New Mexico, Canada, United States,

Case 2:04-cv-09049-DOC-RNB   Document 9405   Filed 12/13/10   Page 29 of 32   Page ID #:283284
SACV 04-9049-DOC - 11/17/2010 - Vol. I

29

1    Hong Kong, different players in different localities."

2    That's one of the strengths of your RICO.

3              On MGA's side, it's simply Mattel.

4              MS. ESTRICH:  Just Mattel, it's Mattel and their

5    advisors, and they have not done anything wrong.  In other

6    words, if I look at their RICO, what did Mattel do?  Mattel

7    hired a law firm and a management consultant firm, neither

8    of which have been accused of any wrongdoing, okay?  And to

9    be very honest, I was shocked they could do a RICO

10   enterprise in which there was only one entity, only one

11   defendant and nobody else, and it wasn't like they have

12   named defendants.  They had no one else that committed

13   predicate acts.  So when I look at their RICO, to be

14   perfectly honest, what I see is Mattel.  That's not group

15   criminality.  We clarified in our responses --

16             THE COURT:  What about -- what about when they

17   bring in the allegations of going through showrooms, et

18   cetera, that's --

19             MS. ESTRICH:  They have absolutely no injury.  I

20   mean, you focused in, and I can get you it, but I'm happy to

21   respond to your questions, but one of the key elements of

22   RICO, as the Court well knows, is standing.  I mean, the

23   only restriction on civil RICO that has any meaning and that

24   has developed independent of criminal law, because obviously

25   in criminal cases you don't have standing issues, is RICO

1    standing.  That's the only, you know, uniquely civil piece,

2    really, under the damages.  And the RICO standing and the

3    RICO injury law, which is obviously civil in nature, in

4    large part in this circumstance, clearly establishes why

5    there is only one obstacle getting an injury.

6           Now, I would admit that the Court has broadened

7    construed injury.  I mean, they say, you know, particularly

8    Diaz, you know, "If I'm in prison, and I might have gotten a

9    job," that's RICO injury, okay?  So you don't need a lot to

10   have RICO injury because my right to contract uninhibited

11   and do business uninhibited is protected in California, but

12   you need some direct approximate injury.  And as the Court

13   has focused on before, causation is real tight in RICO, one

14   of the few things that is real tight.

15          And when you compare our RICO claim, which says,

16   "You stole, you know, the crown jewels, you stole our this,

17   you stole that, you stole" -- "you targeted people, you had

18   to bring trade secrets, Bratz," et cetera, the injury is

19   clear, your Honor.  I mean, I can go through that long list,

20   but there is any number of injuries, including the fact that

21   our property was stolen, our right to do business, our

22   contracts, et cetera.  Go through their RICO injuries, and I

23   believe it is the case that 114 trade secrets they

24   identified, 111 has been out in public already, and the

25   other 3 we, you know, had information from publically

1    available sources.

2            THE COURT:  Assuming I grant summary judgment on

3    RICO, why wouldn't that same information come in in a jury

4    trial and trade secrets, et cetera, could survive?

5            MS. ESTRICH:  Some of it might.  You know, you

6    made this point yesterday, your Honor.

7            THE COURT:  On the opposite side of Mattel.

8            *(Interruption in the proceedings.)*

9            THE COURT:  Just stop for a moment.  We are

10   switching court reporters.

11           *(Live reporter switch with Debbie Gale.)*

12           *(Volume II is reported by Debbie Gale.)*

13                          -oOo-

14

15

16

17

18

19

20

21

22

23

24

25

1                              -oOo-

2                         **CERTIFICATE**

3

4          I hereby certify that pursuant to Section 753,

5    Title 28, United States Code, the foregoing is a true and

6    correct transcript of the stenographically reported

7    proceedings held in the above-entitled matter and that the

8    transcript page format is in conformance with the

9    regulations of the Judicial Conference of the United States.

10

11   Date:  December 10, 2010

12

13

14          _____

15          JANE C.S. RULE, U.S. COURT REPORTER
            CSR NO. 9316

16

17

18

19

20

21

22

23

24

25