LACV 04-9049 DOC - 11/16/2010 - Volume I

1

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

- - - - - - -

CARTER BRYANT,                          )
                                        )
          Plaintiff,                    )
                                        )
     vs.                                ) No. LACV 04-9049 DOC
                                        )      Volume I
MATTEL, INC.,                           )
                                        )
          Defendant.                    )
_____)


REPORTER'S TRANSCRIPT OF PROCEEDINGS

Hearing on Motions

Santa Ana, California

Tuesday, November 16, 2010


Debbie Gale, CSR 9472, RPR
Federal Official Court Reporter
United States District Court
411 West 4th Street, Room 1-053
Santa Ana, California 92701
(714) 558-8141

09cv9049 Mattel 2010-11-16 V1

1   **APPEARANCES OF COUNSEL:**

2

    FOR INTERVENER DEFENDANT MGA ENTERTAINMENT, INC.:

3
            ORRICK, HERRINGTON & SUTCLIFFE, LLP (Irvine)
4           BY:  THOMAS S. McCONVILLE
                 Attorney at Law
5           4 Park Plaza
            Suite 1600
6           Irvine, California 92614
            (949) 567-6700
7
            - AND -
8
            ORRICK, HERRINGTON & SUTCLIFFE, LLP (SF)
9           BY:  ANNETTE L. HURST
                 Attorney at Law
10          405 Howard Street
            San Francisco, California 94105
11          (415)773-5700

12

13

    FOR DEFENDANT MATTEL, INC.:
14
            QUINN EMANUEL URQUHART OLIVER & HEDGES LLP
15          BY:  JOHN QUINN
                 MICHAEL T. ZELLER
16               SUSAN ESTRICH
                 Attorneys at Law
17          865 South Figueroa Street
            10th Floor
18          Los Angeles, California 90017
            (213) 443-3000
19

20

21

22

23

24

25

1    **APPEARANCES OF COUNSEL (Continued):**

2

3    FOR COUNTER DFENDANT CARLOS GUSTAVO MACHADO GOMEZ:

4
             LAW OFFICES OF MARK E. OVERLAND
5            BY:  MARK E. OVERLAND
                  Attorney at Law
6            100 Wilshire Boulevard
             Suite 950
7            Santa Monica, California 90401
             (310) 459-2830
8
             -and-
9
             SCHEPER KIM AND HARRIS LLP
10           BY:  ALEXANDER H. COTE
                  Attorney at Law
11           601 West Fifth Street
             12th Floor
12           Los Angeles, California 90071-2025
             (213) 613-4655
13

14

15

16

17

18

19

20

21

22

23

24

25

**<u>I N D E X</u>**

**PROCEEDINGS**                                              **PAGE**

Hearing on motions                                           5

LACV 04-9049 DOC - 11/16/2010 - Volume I

5

|  |  |  |
|---|---|---|
|  | 1 | **SANTA ANA, CALIFORNIA, TUESDAY, NOVEMBER 16, 2010** |
|  | 2 | **Volume I** |
|  | 3 | (11:55 a.m.) |
| 11:57 | 4 | THE COURT:  All right.  We're on the record. |
| 11:57 | 5 | Counsel on behalf of MGA and Mattel are present. |
| 11:57 | 6 | And just for the record, although we've had an |
| 11:57 | 7 | informal discussion, Mr. Quinn, would you make your |
| 11:57 | 8 | appearance. |
| 11:58 | 9 | MR. QUINN:  John Quinn for Mattel, Your Honor. |
| 11:58 | 10 | MR. ZELLER:  Mike Zeller for Mattel. |
| 11:58 | 11 | MS. HURST:  Annette Hurst for MGA and Mr. Larian. |
| 11:58 | 12 | MR. McCONVILLE:  Tom McConville, Your Honor. |
| 11:58 | 13 | MR. COTE:  Alexander Cote for Mr. Machado. |
| 11:58 | 14 | THE COURT:  And Mr. Overland. |
| 11:58 | 15 | MR. OVERLAND:  Mark Overland. |
| 11:58 | 16 | THE COURT:  Thank you. |
| 11:58 | 17 | And arguing on behalf of Mattel today will be |
| 11:58 | 18 | Susan Estrich. |
| 11:58 | 19 | And any other persons arguing today? |
| 11:58 | 20 | MR. QUINN:  Myself and Mr. Zeller, Your Honor. |
| 11:58 | 21 | THE COURT:  Any other additional persons or |
| 11:58 | 22 | parties? |
| 11:58 | 23 | On behalf of MGA, who else is arguing? |
| 11:58 | 24 | MS. HURST:  Your Honor, we also have Mr. Molinski. |
| 11:58 | 25 | THE COURT:  Okay.  Anybody else? |

DEBBIE GALE, U.S. COURT REPORTER

LACV 04-9049 DOC - 11/16/2010 - Volume I

6

| | | |
|--|--|--|
| 11:59 | 1 | MS. HURST:  No. |
| 11:59 | 2 | THE COURT:  All right.  Thank you. |
| 11:59 | 3 | First, before we get to the jury commissioner, who |
| 11:59 | 4 | the Court's requested be present and who's had an informal |
| 11:59 | 5 | discussion with counsel this morning -- concerning MGA's |
| 11:59 | 6 | motion to confirm dismissal of CV 04-9059 action, for the |
| 11:59 | 7 | Circuit's record, the background is that Mattel had filed a |
| 11:59 | 8 | complaint against Carter Bryant and several Doe defendants. |
| 11:59 | 9 | MGA successfully intervened as a party defendant to that |
| 11:59 | 10 | lawsuit. |
| 11:59 | 11 | After MGA intervened, Mattel tried to file an |
| 11:59 | 12 | amended pleading, but Judge Larson denied the amendment and |
| 11:59 | 13 | instead required Mattel to file its new claims as |
| 11:59 | 14 | counterclaims to MGA's separate action against Mattel.  This |
| 11:59 | 15 | was a decision made for administrative reasons only, and for |
| 11:59 | 16 | that reason, Judge Larson held that Mattel's counterclaims |
| 11:59 | 17 | would relate back to the date of its original complaint |
| 11:59 | 18 | against Bryant, even though the counterclaims were filed |
| 12:00 | 19 | under a separate docket number. |
| 12:00 | 20 | MGA now challenges the validity of that ruling. |
| 12:00 | 21 | Therefore, the argument at this point should focus on two |
| 12:00 | 22 | issues: |
| 12:00 | 23 | First, this comes down to a battle between the |
| 12:00 | 24 | *Bailey* case out of the Seventh Circuit and the *Marcoux* case |
| 12:00 | 25 | out of the First Circuit.  And it seems that the *Marcoux* |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 12:00 | 1 | case actually acknowledges that it violated the letter of |
| 12:00 | 2 | Rule 15(c) for the District Court to have allowed a new |
| 12:00 | 3 | pleading to relate back to a prior case.  However, the |
| 12:00 | 4 | Circuit found no prejudice, which is presumably why there |
| 12:00 | 5 | was no reversal. |
| 12:00 | 6 | Is this a fair reading of the *Marcoux* case by this |
| 12:00 | 7 | Court?  And if not, why not? |
| 12:00 | 8 | Who wants to address that first on behalf of |
| 12:00 | 9 | Mattel? |
| 12:00 | 10 | MR. QUINN:  I think that that is a reading of |
| 12:00 | 11 | *Marcoux* that does comport with it.  It is certainly true in |
| 12:01 | 12 | the sense -- well, one thing I would say that I think is |
| 12:01 | 13 | somewhat of a different situation here is, of course, that |
| 12:01 | 14 | we have, in our current situation, the fact that |
| 12:01 | 15 | Judge Larson expressly stated what he was doing.  There was |
| 12:01 | 16 | no challenge to it by MGA now for some period of time -- |
| 12:01 | 17 | years, as a matter of fact. |
| 12:01 | 18 | And we do certainly think that there's not only no |
| 12:01 | 19 | prejudice, but to the extent that there even could be some |
| 12:01 | 20 | sort of argument on MGA's part of prejudice based upon what |
| 12:01 | 21 | it is that Judge Larson did, the Court can simply at this |
| 12:01 | 22 | point grant the request that Mattel, in fact, made, which is |
| 12:01 | 23 | that it be permitted to amend its original complaint. |
| 12:01 | 24 | And that -- there's no question that there would |
| 12:01 | 25 | be no prejudice to MGA for doing that.  Those issues have |

LACV 04-9049 DOC - 11/16/2010 - Volume I

8

| | | |
|---|---|---|
| 12:01 | 1 | been in the case for years.  There's no question that MGA's |
| 12:02 | 2 | been on notice of it.  They, in fact, tried them to a jury. |
| 12:02 | 3 | So I think that, at a very minimum, as we also lay out in |
| 12:02 | 4 | our papers, including in the surreply that the Court |
| 12:02 | 5 | requested, that simply the Court can grant our motion to |
| 12:02 | 6 | amend at this point and obviate the question altogether. |
| 12:02 | 7 | THE COURT:  All right. |
| 12:02 | 8 | Counsel on behalf of MGA. |
| 12:02 | 9 | MS. HURST:  Thank you, Your Honor. |
| 12:02 | 10 | Your Honor, the question of relation back is |
| 12:02 | 11 | completely independent of the present status of the 9059 |
| 12:02 | 12 | action.  These are not the same questions.  And the answer |
| 12:02 | 13 | about relation back will be whatever it is, whether or not |
| 12:02 | 14 | the Court dismisses the 9059 action.  It is dependent on |
| 12:02 | 15 | Judge Larson's orders, the case law, and so forth -- and the |
| 12:03 | 16 | rule, obviously. |
| 12:03 | 17 | This is just a red herring, this relation-back |
| 12:03 | 18 | issue, in the context of this dismissal order.  What we have |
| 12:03 | 19 | here was a claim that was filed only against Carter Bryant |
| 12:03 | 20 | in State Court.  In State Court.  It was then removed by |
| 12:03 | 21 | Carter Bryant, and that pleading was never amended to state |
| 12:03 | 22 | a claim against MGA in that action. |
| 12:03 | 23 | When there was a motion for leave to amend, |
| 12:03 | 24 | Judge Larson wrote six pages about undue delay.  And he |
| 12:03 | 25 | concluded that, on the basis of the evidentiary record at |

DEBBIE GALE, U.S. COURT REPORTER

12:03   1   that time, he could not see whether it was gonna affect the

12:03   2   relation-back issue or not, and went ahead and made his

12:03   3   ruling on that basis.

12:03   4         Now, based on the record today, we know the facts

12:03   5   are very different from what the Court had available to it

12:04   6   at that time.  But, meanwhile, there's never been a claim

12:04   7   against MGA in the 9059 action.  And there's nothing that

12:04   8   can change that as we sit here today.

12:04   9         Carter Bryant was dismissed.  When he was

12:04   10  dismissed, under the applicable case law, the intervention

12:04   11  failed.  And all we're trying to do is make sure that we

12:04   12  don't need to move for summary judgment against those

12:04   13  claims, and that they're not gonna come back later and claim

12:04   14  that those claims are somehow still pending and have to be

12:04   15  adjudicated.

12:04   16        There was no claim against MGA.  The intervention

12:04   17  failed.  They reserved their claims.  The release did not

12:04   18  cover MGA; and so under the federal common law rule, the

12:04   19  release of Bryant did not extend to MGA, but that's all that

12:04   20  means.  And so that case should be dismissed.

12:04   21        The question of relation back -- let me put it to

12:04   22  you this way:  We're not gonna argue that the dismissal of

12:05   23  the 9059 action has anything to do with relation back.  We

12:05   24  haven't argued that.  If the Court is gonna allow this all

12:05   25  to be bound up together, then the question is whether they

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 12:05 | 1 | made a tactical choice.  And that's the same question under |
| 12:05 | 2 | Rule 15C and under the Doe defendant substitution rule under |
| 12:05 | 3 | California law and 474. |
| 12:05 | 4 | If they made a tactical choice not to name MGA, |
| 12:05 | 5 | MGA Hong Kong, and Larian, then they can't substitute under |
| 12:05 | 6 | the California Doe substitution rule; they can't get a 15(c) |
| 12:05 | 7 | relation back.  And that's why I say, Your Honor, that is |
| 12:05 | 8 | all independent of this "whether the intervention failed" |
| 12:05 | 9 | issue. |
| 12:05 | 10 | So the Court asked is this a fair reading of the |
| 12:06 | 11 | *Marcoux* case that -- basically, it acknowledges it would |
| 12:06 | 12 | violate Rule 15(c).  The rule -- the general rule definitely |
| 12:06 | 13 | is you don't relate back to another case.  Okay?  But what |
| 12:06 | 14 | the Court does now in dismissing the 9059 action is not |
| 12:06 | 15 | gonna have any effect on the application of that rule, |
| 12:06 | 16 | because it's either another case or it isn't.  And |
| 12:06 | 17 | dismissing that now is not gonna change that one way or |
| 12:06 | 18 | another. |
| 12:06 | 19 | So, to be clear, we are not trying to get some |
| 12:06 | 20 | advantage on the relation-back argument by seeking dismissal |
| 12:06 | 21 | of the 9059 action.  We're just trying to make clear that |
| 12:06 | 22 | judgment's been entered on that case and we face no further |
| 12:06 | 23 | jeopardy there. |
| 12:06 | 24 | And then the relation-back argument will proceed |
| 12:06 | 25 | as it should in the context of the summary judgment motions |

12:06   1   with an analysis of what 15(c) means, what 474 means in the

12:06   2   Doe defendant substitution rule, whether the undisputed

12:06   3   facts show that there was a tactical decision by Mattel, or

12:07   4   whether there's a dispute as to whether there was a tactical

12:07   5   decision by Mattel, and whether, then, the statute of

12:07   6   limitations would have expired but for the relation-back

12:07   7   doctrine.

12:07   8          Of course, the Court has raised a number of other

12:07   9   questions in its order that are relevant to that

12:07   10  consideration, like whether their counterclaims were

12:07   11  compulsory or permissive and they would have the right to

12:07   12  relate back anyway.  And certainly those questions should be

12:07   13  answered, but in the context of this dismissal motion, which

12:07   14  is really just directed to the pure procedural status of

12:07   15  those claims against Carter Bryant and MGA not needing to

12:07   16  clean this up and worry about those claims hanging out

12:07   17  against it somewhere.

12:07   18         THE COURT:  All right.

12:07   19         Counsel.

12:07   20         MR. ZELLER:  The fact is that these cases were

12:07   21  consolidated.  It isn't a matter of whether the Court is

12:07   22  going to -- I think, as MGA's counsel just put it, the Court

12:07   23  is going to allow them to proceed that way.  They were

12:08   24  consolidated a long time ago, in fact, consolidated with

12:08   25  MGA's consent and urging.  So we are talking about one case

12:08  1   at this point.

12:08  2          The -- so in many respects this whole idea that

12:08  3   this is being done for purposes apart from relation back and

12:08  4   being done simply to ensure no further jeopardy, I mean,

12:08  5   really doesn't make any sense, and it doesn't stand up.

12:08  6          The other thing I would say is that, as MGA's

12:08  7   counsel is conceding at this point, that, obviously, the

12:08  8   dismissal as to Bryant was not as against MGA.  MGA

12:08  9   intervened in the original case.  It was a defendant.  It

12:08  10  was a party to those claims.  It always has been, at least

12:08  11  since the time of intervention.

12:08  12         The cases have since been consolidated.  So the

12:08  13  fact is, is that there is -- it would just simply be

12:08  14  inappropriate to dismiss the original action, in any event.

12:08  15  Those claims do still pend.  They are, of course, now

12:09  16  flushed out in more complete pleadings that we have filed

12:09  17  since that time in the consolidated action.  But there is

12:09  18  simply no basis for somehow suggesting that the very claims

12:09  19  that continue -- have been there from the beginning and

12:09  20  continue on in this case should somehow be dismissed.

12:09  21         The logic of it really doesn't make any sense, and

12:09  22  we think, for that reason, it should be denied.

12:09  23         MS. HURST:  Your Honor, may I?

12:09  24         Your Honor, the stipulation for intervention says

12:09  25  on its face it's for procedural purposes only.  And that did

| | | |
|---|---|---|
| 12:09 | 1 | not make MGA a party to those claims. |
| 12:09 | 2 | If Mattel wanted to make MGA a party to those |
| 12:09 | 3 | claims, it had to amend them and serve summonses in that -- |
| 12:09 | 4 | based on that pleading. |
| 12:09 | 5 | Now, if what they're asking for *nunc pro tunc* is |
| 12:09 | 6 | to go back and amend that pleading, then the result of that |
| 12:10 | 7 | would be that pleading is superseded and no longer valid |
| 12:10 | 8 | anyway.  That pleading is superseded even under their |
| 12:10 | 9 | alternative theory of *nunc pro tunc*. |
| 12:10 | 10 | Are we prejudiced?  Okay.  At the time they moved |
| 12:10 | 11 | for leave to amend, the Court suggested the whole |
| 12:10 | 12 | bifurcation rubric as a solution to their undue delay in |
| 12:10 | 13 | amending.  MGA agreed to that in the context of their motion |
| 12:10 | 14 | for leave to amend. |
| 12:10 | 15 | It was at the hearing on the motion for leave to |
| 12:10 | 16 | amend when the Court first suggested the bifurcation rubric |
| 12:10 | 17 | for this whole case. |
| 12:10 | 18 | So they got their amendment. |
| 12:10 | 19 | THE COURT:  When you say "the Court," |
| 12:10 | 20 | Judge Larson? |
| 12:10 | 21 | MS. HURST:  Yes, Your Honor.  Thank you. |
| 12:10 | 22 | THE COURT:  All right.  Let's be clear. |
| 12:10 | 23 | MS. HURST:  Thank you. |
| 12:10 | 24 | Judge Larson suggested the bifurcation.  So they |
| 12:11 | 25 | got their amendment based on Court's perception that it |

DEBBIE GALE, U.S. COURT REPORTER

| 12:11 | 1 | could ameliorate the delay and everything else with a |
|-------|---|-------|

could ameliorate the delay and everything else with a
bifurcation.

And, you know, frankly, that was a devil's bargain
for MGA, because MGA agreed to it -- staring down the barrel
of this amendment, did agree to the bifurcation.  And now
there's been enormous prejudice that has ensued.  Right?
Because they tried an entire case.  And we go up to the
Circuit and we win on reversal, and now they're trying to
change their legal theories after reversal and claim that
they can *nunc pro tunc* amend all at the same time.  That's
probably a hundred million dollars legal fees worth of
prejudice.  It's a whole appeal worth of prejudice.

If they had made their theories clear from the
outset, this entire case would have proceeded in a different
way.  The Court has repeatedly noted in its orders that they
try to maintain the maximum flexibility in their pleadings
for tactical advantage.  And this is another example of
that:  A *nunc pro tunc* request to go back to a January 2007
order.

Of course, there's prejudice from that.  The
entire structure of the case proceeded from the assumptions
made by Judge Larson in that order.

As I've said, we are not relying on the dismissal
of that action in connection with the relation-back
argument.  It's either a separate action or it's not, and it

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 12:12 | 1 | was either a tactical decision by them or it was not.  And |
| 12:12 | 2 | those are the pertinent issues. |
| 12:12 | 3 | But the intervention failed when they dismissed |
| 12:12 | 4 | Carter Bryant.  That is what the California Supreme Court |
| 12:12 | 5 | case that we cited, which is on point, said.  And none of |
| 12:12 | 6 | the cases that they have cited are on point for this |
| 12:12 | 7 | situation. |
| 12:13 | 8 | THE COURT:  All right.  Thank you. |
| 12:13 | 9 | Now, Mr. Zeller, that's it.  That concludes the |
| 12:13 | 10 | argument.  Thank you.  You've each had two opportunities |
| 12:13 | 11 | now.  Sit down, please. |
| 12:13 | 12 | Then how, in specific terms, should these |
| 12:13 | 13 | outstanding claims on the 9059 action be tried? |
| 12:13 | 14 | In other words, what should the jury instructions |
| 12:13 | 15 | look like on claims that overlap with Mattel's |
| 12:13 | 16 | counterclaims?  What claims do not overlap with Mattel's |
| 12:13 | 17 | counterclaims?  And what should the jury instructions look |
| 12:13 | 18 | like on those? |
| 12:13 | 19 | Mr. Zeller. |
| 12:13 | 20 | MR. ZELLER:  I think the short answer is -- |
| 12:13 | 21 | Your Honor, is I don't think that the jury instructions need |
| 12:13 | 22 | to specify that.  I think that we're back to the point of |
| 12:13 | 23 | just simply -- as these are presented to the jury, that |
| 12:14 | 24 | these are just simply claims. |
| 12:14 | 25 | We're dealing with consolidated action.  And I |

12:14  1   think to try and explain the procedural history, some of

12:14  2   which might call "tortured" -- behind all of this, at this

12:14  3   juncture, would simply -- wouldn't really be worth any

12:14  4   advantage to the jury.

12:14  5          THE COURT:  Okay.  Thank you.

12:14  6          Ms. Hurst.

12:14  7          MS. HURST:  If we assume that those claims are

12:14  8   interposed against MGA, they're preempted -- the ones that

12:14  9   could be interposed against MGA.  For example, the breach of

12:14  10  contract claim is in that complaint.  That's, obviously, not

12:14  11  a claim against MGA.  MGA never had a direct contractual

12:14  12  relationship with Mattel pertinent to the Carter Bryant

12:14  13  claim.

12:14  14         The direct claim for breach of fiduciary duty,

12:14  15  same thing:  That's pled only against Carter Bryant.

12:14  16         Direct claim for duty of loyalty:  Only against

12:14  17  Carter Bryant.  If you look at that pleading, it's obvious

12:15  18  it's not meant to be interposed against MGA.

12:15  19         To the extent that any of those claims overlap

12:15  20  with the counterclaims, they're subject to the same

12:15  21  preemption analysis.  And if anything is left after that,

12:15  22  then the instructions would be charged -- I agree with

12:15  23  Mr. Zeller on this -- simultaneously on those claims.

12:15  24         THE COURT:  Okay.

12:15  25         Mr. Zeller, anything further?

DEBBIE GALE, U.S. COURT REPORTER

LACV 04-9049 DOC - 11/16/2010 - Volume I

17

| | | |
|---|---|---|
| 12:15 | 1 | MR. ZELLER:  Nothing further, Your Honor. |
| 12:15 | 2 | THE COURT:  Okay.  Thank you. |
| 12:15 | 3 | Concerning the jury selection issue, which is why |
| 12:15 | 4 | the jury commissioner is here, the record should reflect the |
| 12:15 | 5 | Court had requested Mr. Galvan, who's the jury commissioner |
| 12:15 | 6 | for the entire district, who was kind enough to join the |
| 12:15 | 7 | Court today.  The record should also reflect that the Court |
| 12:15 | 8 | took the extraordinary precaution and courtesy of allowing |
| 12:15 | 9 | counsel to speak to Mr. Galvan informally for well over an |
| 12:15 | 10 | hour in the jury room to answer any of the counsel's |
| 12:15 | 11 | questions. |
| 12:15 | 12 | The first objection that the Court notes that was |
| 12:15 | 13 | filed was that MGA had objected that the small jury pool and |
| 12:15 | 14 | the large time estimate will exclude racial and ethnic |
| 12:16 | 15 | minorities.  As an initial matter, I don't know that there's |
| 12:16 | 16 | any evidence of this at all.  Or is this just speculation on |
| 12:16 | 17 | MGA's part? |
| 12:16 | 18 | And second, it's the concern about MGA concerning |
| 12:16 | 19 | the time estimate about the trial length.  And, therefore, |
| 12:16 | 20 | I'm going to ask MGA, when they address the Court in just a |
| 12:16 | 21 | few moments:  What is MGA's time estimate?  And how do they |
| 12:16 | 22 | substantiate whatever their time estimate is, assuming that |
| 12:16 | 23 | the RICO allegations involving both sides potentially go |
| 12:16 | 24 | forward, and also taking into account that the first trial |
| 12:16 | 25 | in front of Judge Larson, just on Phase I, without RICO |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 9523   Filed 12/22/10   Page 18 of 98   Page ID #:284651
LACV 04-9049 DOC - 11/16/2010 - Volume I

18

12:16  1    allegations and the aiding and abetting allegations on

12:16  2    Counterclaims 6, 8, and 10, by way of example, were not

12:16  3    before the jury?

12:16  4             So I'm going to have, on this occasion, MGA

12:16  5    address the Court first.  And the Court's well-aware, so we

12:17  6    set the record, and I do understand your concern, apparently

12:17  7    in the first trial, one of the jurors had made a derogatory

12:17  8    comment concerning Mr. Larian's either religious and/or

12:17  9    race, if -- I believe.  And my reading disclosed that that

12:17  10   inquiry by Judge Larson was stipulated to be between the

12:17  11   Court and that juror, as well as subsequent jurors.  And

12:17  12   apparently the parties weren't present at that time, which I

12:17  13   don't criticize but find rather extraordinary.

12:17  14            In addition, I understand your concern about a

12:17  15   smaller jury pool versus a larger jury pool.  And the reason

12:17  16   I've had counsel do the following calculations is to try to

12:17  17   come up with some reasonable jury pool.  So far Ms. Estrich

12:17  18   has been helpful in terms of her mathematics.  So we'll do

12:18  19   this on the record now.

12:18  20            Six jurors in the box, ten alternates.  How many

12:18  21   is that, Ms. Estrich?

12:18  22            MS. ESTRICH:  That's 16.

12:18  23            THE COURT:  Excellent.  And assuming that there's

12:18  24   six peremptories per side, how many would that be?

12:18  25            MS. ESTRICH:  28.

12:18  1          THE COURT:  Now we're at 28.

12:18  2          Now, the reason the Court initially is selecting

12:18  3   six peremptories per side is that I'm concerned that MGA and

12:18  4   Machado, although they're a defendant party, in a sense,

12:18  5   will have synonymous interests throughout the case.  They

12:18  6   may or may not.  There may be a divergence at some point.  I

12:18  7   thought the fairest way to proceed was in granting six,

12:18  8   because that, in a sense, gave the party six.

12:18  9          Now, Mr. Overland, if you are taking the position

12:18  10  that three is the appropriate number, on behalf of Machado,

12:18  11  and that has been MGA's position up to this point -- in

12:18  12  other words, MGA has taken the position that they only want

12:18  13  three, the feeling being that Mattel might take advantage of

12:18  14  any more peremptories to exclude people of either Jewish

12:19  15  faith or Iranian faith, because of those derogatory comments

12:19  16  that were made out in the Riverside proceeding.

12:19  17         What's Machado's position?  Do you want to limit

12:19  18  this to three as a side, or do you want six?

12:19  19         MR. OVERLAND:  Are these three jointly exercised

12:19  20  peremptories?

12:19  21         THE COURT:  They would be jointly exercised,

12:19  22  because you would be a side.  In other words, I tried to be

12:19  23  gracious and gave six, because I really didn't know where

12:19  24  Machado stood.  Those six are still joint peremptories.

12:19  25  They're not three and three.  They're six.  But I would

LACV 04-9049 DOC - 11/16/2010 - Volume I

20

| | | |
|---|---|---|
| 12:19 | 1 | expect cooperation, and I wanted to account for Machado's |
| 12:19 | 2 | unique position and not treat him as an MGA entity, |
| 12:19 | 3 | necessarily. |
| 12:19 | 4 | I thought it was discourteous to Machado, and it |
| 12:19 | 5 | may not be appropriate.  That's why I'm with six. |
| 12:19 | 6 | MR. OVERLAND:  Our position is three would be |
| 12:19 | 7 | sufficient. |
| 12:19 | 8 | THE COURT:  Three is sufficient.  Okay.  Then |
| 12:19 | 9 | you're synonymous.  Thank you. |
| 12:19 | 10 | Ms. Hurst. |
| 12:20 | 11 | MS. HURST:  Your Honor, I don't want to belabor |
| 12:20 | 12 | the record on this. |
| 12:20 | 13 | THE COURT:  Well, I may go for three now.  Up to |
| 12:20 | 14 | this point, I thought the six was a courtesy to Machado.  As |
| 12:20 | 15 | long as I have that stipulation, we may be cutting this to |
| 12:20 | 16 | three. |
| 12:20 | 17 | MS. HURST:  Thank you, Your Honor. |
| 12:20 | 18 | THE COURT:  Which now cut your jury pool down. |
| 12:20 | 19 | MS. HURST:  Understood. |
| 12:20 | 20 | Your Honor, we very much thank the Court and |
| 12:20 | 21 | appreciate the opportunity to meet with the jury |
| 12:20 | 22 | commissioner. |
| 12:20 | 23 | Your Honor has asked about the estimate.  And, of |
| 12:20 | 24 | course, this puts me in a dire position because the last |
| 12:20 | 25 | thing I want to do is suggest an estimate that's too short |

| | | |
|---|---|---|
| 12:20 | 1 | and come up on the long end -- |
| 12:20 | 2 | THE COURT:  Nonsense. |
| 12:20 | 3 | MS. HURST:  -- or on the short end of a summary |
| 12:20 | 4 | judgment rule. |
| 12:20 | 5 | THE COURT:  Excuse me, Counsel.  Nonsense.  Of |
| 12:20 | 6 | course, you want a short estimate because, of course, by |
| 12:20 | 7 | condensing the trial, you believe that would be a tactical |
| 12:20 | 8 | advantage.  Let's get that straight between the two of us -- |
| 12:21 | 9 | MS. HURST:  Thank you, Your Honor. |
| 12:21 | 10 | THE COURT:  -- right to begin with. |
| 12:21 | 11 | Don't give me that kind of argument. |
| 12:21 | 12 | MS. HURST:  Thank you, Your Honor. |
| 12:21 | 13 | THE COURT:  Number two, I don't want the Court to |
| 12:21 | 14 | be in a position where I promised the jury a month or two, |
| 12:21 | 15 | and then have a jury reluctant to serve. |
| 12:21 | 16 | That starts the case all over again.  And I don't |
| 12:21 | 17 | think your client nor Mattel at some point can afford it. |
| 12:21 | 18 | MS. HURST:  No. |
| 12:21 | 19 | THE COURT:  So be very careful about this.  What |
| 12:21 | 20 | you ask for you may get. |
| 12:21 | 21 | MS. HURST:  So -- |
| 12:21 | 22 | THE COURT:  The second thing is, how can you, I |
| 12:21 | 23 | mean, frankly, state to this Court, when Phase I alone took |
| 12:21 | 24 | nine weeks, that this is a month-long case? |
| 12:21 | 25 | MS. HURST:  Your Honor -- |

Case 2:04-cv-09049-DOC-RNB   Document 9523   Filed 12/22/10   Page 22 of 98   Page ID #:284655
LACV 04-9049 DOC - 11/16/2010 - Volume I

22

| 12:21 | 1 | THE COURT:  In other words, you're losing |
| 12:21 | 2 | credibility quickly. |
| 12:21 | 3 | MS. HURST:  Your Honor, I can say, having read |
| 12:21 | 4 | that Phase I record many times now, that there were an |
| 12:21 | 5 | enormous number of sidebars in that case.  And we have |
| 12:21 | 6 | absolutely taken this Court's admonition for no sidebars, |
| 12:21 | 7 | and to resolve all evidentiary issues and everything in |
| 12:22 | 8 | advance. |
| 12:22 | 9 | This Court is well-known as the hardest-working |
| 12:22 | 10 | court in the business, and we just think that -- |
| 12:22 | 11 | THE COURT:  Just a moment. |
| 12:22 | 12 | *(To the reporter:)*  Did you get a record of that? |
| 12:22 | 13 | *(Laughter.)* |
| 12:22 | 14 | Counsel. |
| 12:22 | 15 | MS. HURST:  With the efficiency of this Court and |
| 12:22 | 16 | the measures that this Court has described to us as to how |
| 12:22 | 17 | the case is gonna be run, and our belief about the |
| 12:22 | 18 | simplification of the claims that should result from the |
| 12:22 | 19 | summary judgment proceedings, that we think a month is a |
| 12:22 | 20 | reasonable estimate. |
| 12:22 | 21 | The real issue here, though, Your Honor, with all |
| 12:22 | 22 | due respect, is that we're setting up a false dichotomy. |
| 12:22 | 23 | We're forcing ourselves to send the questionnaire now in |
| 12:22 | 24 | order to hew to a trial date that the Court has set.  And |
| 12:22 | 25 | we're not asking for an extension.  We understand why the |

| | | |
|---|---|---|
| 12:22 | 1 | Court is doing that.  But if we waited either until the |
| 12:22 | 2 | summary judgment rulings were available or until the time we |
| 12:22 | 3 | were actually picking the jury, and we were right about the |
| 12:23 | 4 | one-month estimate at that time, then it's our belief that |
| 12:23 | 5 | the composition of the venire would be, in a statistical |
| 12:23 | 6 | sense, materially different, from a racial and ethic |
| 12:23 | 7 | perspective, than it will be by sending out the |
| 12:23 | 8 | questionnaires now with a four-month estimate. |
| 12:23 | 9 | THE COURT:  What do you base that on?  In other |
| 12:23 | 10 | words, my experience isn't that.  My experience is quite the |
| 12:23 | 11 | opposite.  That is, anytime I get a jury over a month -- I |
| 12:23 | 12 | haven't seen a statistical difference from the Aryan |
| 12:23 | 13 | Brotherhood case to the Mexican Mafia about racial or ethnic |
| 12:23 | 14 | disparity. |
| 12:23 | 15 | In other words, in the Aryan Brotherhood case, if |
| 12:23 | 16 | the Circuit or you go back and check the record, you'll see |
| 12:23 | 17 | that we had two-month, four-month and six-month periods of |
| 12:23 | 18 | time.  We saw very little variance between those jurors who |
| 12:23 | 19 | could sit.  There was some, but it was so *de minimis* as to |
| 12:23 | 20 | be almost nonsensical.  In other words, those people who are |
| 12:23 | 21 | inconvenienced with a month, typically are inconvenienced |
| 12:23 | 22 | with four. |
| 12:24 | 23 | What we normally get are a lot of state employees, |
| 12:24 | 24 | government employees, people who are retired.  We frankly |
| 12:24 | 25 | get -- I was amazed, though, at the cross section that we |

| | | |
|---|---|---|
| 12:24 | 1 | had in the last F13 case, which was four months.  You could |
| 12:24 | 2 | have walked in and it looked like a four-day jury:  Young, |
| 12:24 | 3 | old, different working groups, et cetera. |
| 12:24 | 4 | MS. HURST:  Your Honor, based on our looking at |
| 12:24 | 5 | the statistical analysis of the jury pool and ethic groups |
| 12:24 | 6 | and racial groups available in the county, and our |
| 12:24 | 7 | understanding of that and the current economic conditions, |
| 12:24 | 8 | the likely presence of a disproportionate number of racial |
| 12:24 | 9 | and ethnic minorities in the lower socioeconomic classes -- |
| 12:24 | 10 | even a small number difference in the venire would be |
| 12:24 | 11 | statistically significant in this context. |
| 12:24 | 12 | Your Honor, may I go off the record to further |
| 12:24 | 13 | answer your question? |
| 12:24 | 14 | I don't want to put the -- I don't want to -- let |
| 12:24 | 15 | me put it to you this way, Your Honor. |
| 12:24 | 16 | THE COURT:  No.  I don't want to go off the record |
| 12:25 | 17 | from this point forward.  I'll tell you why. |
| 12:25 | 18 | MS. HURST:  Understood. |
| 12:25 | 19 | THE COURT:  I've paid you the courtesy of being |
| 12:25 | 20 | off the record this morning.  From now on, I'm on the |
| 12:25 | 21 | record.  The only courtesy I paid to counsel is having that |
| 12:25 | 22 | off-the-record discussion, getting the jury commissioner in |
| 12:25 | 23 | here to talk to you -- so, believe me, whatever you tell me |
| 12:25 | 24 | will be well-taken, even if it's criticism.  But my response |
| 12:25 | 25 | I hope is well-taken also. |

12:25   1          MS. HURST:  Let me put it to you this way,

12:25   2   Your Honor:  After the meeting with Mr. Galvan, our beliefs

12:25   3   in this -- we did not feel we should withdraw our objection

12:25   4   on this basis, but rather felt that our concern about a

12:25   5   potential difference between one-month and four-month was

12:25   6   potentially well-taken.

12:25   7          THE COURT:  All right.

12:25   8          MS. HURST:  And I didn't want to put the Court in

12:25   9   a position of trying to confirm something that was said off

12:25   10  the record.  So that's not what I'm doing.

12:25   11          I'm just saying that, after the meeting -- which

12:25   12  we very much appreciate and thank the Court -- we continued

12:25   13  to have the concern that we had previously expressed.

12:25   14          THE COURT:  Okay.  All right.

12:25   15          Counsel.

12:26   16          MR. QUINN:  Your Honor, it's kind of hard to

12:26   17  respond to the comments about how the length of trial might

12:26   18  affect the ethnic composition of the venire.  We don't --

12:26   19  the Court doesn't have any evidence on the point that MGA is

12:26   20  trying to make there.

12:26   21          In terms of the length of the trial, Your Honor,

12:26   22  we don't think this case can -- I mean, anything is

12:26   23  possible, I suppose -- but we don't think a good job can be

12:26   24  done, trying and presenting this case in only one month.

12:26   25          This Court is hard-working, but Judge Larson was

12:26   1   no slouch, though.  I thought we worked pretty hard in that

12:26   2   case.  We were on a clock and, frankly, we ran out of time

12:26   3   to call all the witnesses we had hoped to call.  So I think

12:26   4   what has been said, up to this point, of a trial of up to

12:26   5   four months is much more realistic.  I simply do not believe

12:27   6   this case can be tried properly in one month.

12:27   7           In terms of the number of challenges, Your Honor,

12:27   8   it's our view that there are two sides here.  There are not

12:27   9   three sides.  Hypothetically, potentially, at some point, as

12:27   10  the Court has pointed out, it's conceivable Mr. Machado's

12:27   11  interest could diverge from the other defendants.  I

12:27   12  understand that.  Up to that point, where we sit now, after

12:27   13  a lot of litigation here, there is only one side.  That

12:27   14  divergence has not surfaced.  And it would just be purely

12:27   15  speculation to say that it might happen.

12:27   16          THE COURT:  Then, if there's only one side, then

12:27   17  part of my tentative thought of giving six peremptories was

12:27   18  because I was concerned about the divergence.  Now hearing

12:27   19  Machado's position on the record that they're also

12:27   20  stipulating to three peremptories, why wouldn't I simply

12:27   21  allow only three peremptories instead of six?

12:27   22          MR. QUINN:  Well, your Honor, they've always

12:28   23  wanted only three.

12:28   24          THE COURT:  That doesn't matter.  Why wouldn't I

12:28   25  give that now?

| | | |
|---|---|---|
| 12:28 | 1 | MR. QUINN:  Because I don't -- their stated |
| 12:28 | 2 | concern is that we will use peremptories in a discriminatory |
| 12:28 | 3 | way.  The Court has a way of dealing with that:  *Batson* |
| 12:28 | 4 | challenges. |
| 12:28 | 5 | THE COURT:  Just a moment. |
| 12:28 | 6 | I'm not even going that far.  In other words, to |
| 12:28 | 7 | go to six, the only reason I was going to six was my concern |
| 12:28 | 8 | about Machado potentially having a divergence with MGA, and |
| 12:28 | 9 | not wanting to have a record where later on Machado or MGA |
| 12:28 | 10 | stated to the Circuit that they thought that that was an |
| 12:28 | 11 | unfair number. |
| 12:28 | 12 | Now hearing Mr. Overland's statement on the record |
| 12:28 | 13 | that he also wants three peremptories, I tentatively don't |
| 12:28 | 14 | know why I'm simply not giving three peremptories. |
| 12:28 | 15 | MR. QUINN:  Your Honor, I had not understood -- |
| 12:28 | 16 | this is a subject that we had discussed with the Court |
| 12:28 | 17 | before.  I had not understood until just now that that was |
| 12:28 | 18 | the basis for the Court's, what was tentative, preliminary |
| 12:28 | 19 | indication that six would be the appropriate number. |
| 12:29 | 20 | THE COURT:  It wasn't simply to give six or |
| 12:29 | 21 | nine -- give an additional number because of the complexity |
| 12:29 | 22 | of the case.  It was my concern about a potential |
| 12:29 | 23 | divergence, and later on the claim that this wasn't a |
| 12:29 | 24 | unified party. |
| 12:29 | 25 | Whether it's unified or not now makes no |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 9523   Filed 12/22/10   Page 28 of 98   Page ID #:284661
LACV 04-9049 DOC - 11/16/2010 - Volume I

28

| | | |
|---|---|---|
| 12:29 | 1 | difference to me with Mr. Overland's representation.  And |
| 12:29 | 2 | that's the first time I've gotten that representation on the |
| 12:29 | 3 | record. |
| 12:29 | 4 | Now I'm inclined, and I'm switching my position |
| 12:29 | 5 | hearing that, to give three per side. |
| 12:29 | 6 | MR. QUINN:  Right.  Your Honor, I guess what I |
| 12:29 | 7 | would say in response to that is selecting the number of |
| 12:29 | 8 | jurors and alternates that we're talking about selecting, |
| 12:29 | 9 | given the number of issues involved, given the publicity |
| 12:29 | 10 | that the case has received, I think six is a more |
| 12:29 | 11 | appropriate number for the parties to get a fair jury. |
| 12:29 | 12 | THE COURT:  How does that change in terms of |
| 12:29 | 13 | notoriety or publicity?  In other words, whether I give six |
| 12:29 | 14 | or three, I'm going to ferret out those people.  And it |
| 12:30 | 15 | doesn't take into account -- we haven't discussed how many |
| 12:30 | 16 | peremptories yet for the alternates.  I'm only talking about |
| 12:30 | 17 | the six that we put in the box. |
| 12:30 | 18 | MR. QUINN:  Right.  Your Honor, it's -- there are |
| 12:30 | 19 | gray areas.  There may be cases where it's been known to |
| 12:30 | 20 | happen, where the Court sees a juror and doesn't think a |
| 12:30 | 21 | case has been made for cause or exposure to information that |
| 12:30 | 22 | makes the person inappropriate to be a juror, but yet the |
| 12:30 | 23 | attorney, in his or her gut, thinks it is somebody they're |
| 12:30 | 24 | not really comfortable with.  I guess that would be my |
| 12:30 | 25 | point, Your Honor. |

29

| | | |
|---|---|---|
| 12:30 | 1 | THE COURT:  Okay. |
| 12:30 | 2 | MR. QUINN:  Again, the only reason it's been |
| 12:30 | 3 | offered from the other side, as to why to hold the number |
| 12:30 | 4 | down, is that we would somehow use peremptories in a way to |
| 12:30 | 5 | try to be -- make discriminatory decisions.  Nobody |
| 12:30 | 6 | suggested that we did that in the previous trial. |
| 12:30 | 7 | THE COURT:  I think MGA goes at its own risk.  I |
| 12:30 | 8 | think it would be the opposite.  I would have thought that |
| 12:30 | 9 | MGA wanted the greater number of potential jurors, because |
| 12:31 | 10 | the greater number of potential jurors actually expands the |
| 12:31 | 11 | jury panel.  But so be it. |
| 12:31 | 12 | Counsel, thank you very much.  You may be seated. |
| 12:31 | 13 | MR. QUINN:  Thank you, Your Honor. |
| 12:31 | 14 | THE COURT:  It will be three per side.  MGA will |
| 12:31 | 15 | prevail on that issue, but you'll live with that decision, |
| 12:31 | 16 | also; therefore, if you get down to the fourth juror -- so |
| 12:31 | 17 | it's three per side. |
| 12:31 | 18 | All right.  Mr. Galvan, we'll decrease our numbers |
| 12:31 | 19 | in just a moment -- or raise them. |
| 12:31 | 20 | Now, Counsel, how many peremptories for the |
| 12:31 | 21 | alternates?  Why don't you two discuss that informally. |
| 12:31 | 22 | I'll let you see if you can work that out quickly with |
| 12:31 | 23 | Mattel and MGA.  If not, I'll make a ruling very quickly. |
| 12:32 | 24 | Counsel, on the alternates? |
| 12:32 | 25 | MR. QUINN:  Four per side for ten alternates, |

12:32   1   Your Honor.

12:32   2               THE COURT:  Acceptable?

12:32   3               MR. McCONVILLE:  Yes, sir.

12:32   4               THE COURT:  All right.  Four.

12:32   5               Frank, that's an additional eight.

12:32   6               So, Ms. Estrich?

12:32   7               MS. ESTRICH:  Where are we?

12:32   8               THE COURT:  Six plus ten.

12:32   9               MS. ESTRICH:  Sixteen.

12:32  10               THE COURT:  Plus three and three.

12:32  11               MS. ESTRICH:  Twenty-two.

12:32  12               THE COURT:  Plus four and four.

12:32  13               MS. ESTRICH:  Thirty.

12:32  14               THE COURT:  Excellent.

12:32  15               Okay.  Frank, thirty.

12:32  16               Now, what that does to MGA, though, is cuts down

12:32  17   the potential number of your jury pool.

12:32  18               You see the ramification?  As you've been arguing

12:32  19   now to the Court that the jury pool should be larger, having

12:32  20   not exercised or requested those additional peremptories, it

12:32  21   cuts down the number that the Court's going to bring in.

12:32  22               Now, let's talk about the total number.  It seems

12:32  23   to me that if we have 30 potential jurors, alternates and

12:33  24   preempts that could be exercised, we ought to plan on 10 to

12:33  25   15 people who simply have heard something about the case, or

| 12:33 | 1 | we see something in the questionnaire that is for cause.  So |
| 12:33 | 2 | let's just be really cautious.  Instead of 10 to 15, move |
| 12:33 | 3 | that to 20. |
| 12:33 | 4 | Does that sounds like a reasonable number, |
| 12:33 | 5 | Mr. Overland? |
| 12:33 | 6 | MR. OVERLAND:  Yes. |
| 12:33 | 7 | THE COURT:  Okay.  Ms. Hurst? |
| 12:33 | 8 | MS. HURST:  Yes, Your Honor. |
| 12:33 | 9 | THE COURT:  Mr. Zeller? |
| 12:33 | 10 | MR. ZELLER:  Yes, sir. |
| 12:33 | 11 | THE COURT:  Mr. Quinn? |
| 12:33 | 12 | MR. QUINN:  Yes, sir. |
| 12:33 | 13 | THE COURT:  All right.  Now, Ms. Estrich, 20 plus |
| 12:33 | 14 | 30. |
| 12:33 | 15 | MS. ESTRICH:  Fifty. |
| 12:33 | 16 | THE COURT:  Excellent.  Now, let's assume that of |
| 12:33 | 17 | the 60 people that we have allegedly coming in, 10 simply |
| 12:33 | 18 | don't show, or after filling out the questionnaire, simply |
| 12:33 | 19 | don't come back.  So, minimally, we're at 60. |
| 12:33 | 20 | Now you've requested a hundred from MGA's side.  I |
| 12:33 | 21 | think Mattel had been "any reasonable number."  My thought |
| 12:33 | 22 | is this:  Let's just split the difference, basically, and |
| 12:34 | 23 | get 75.  That gives us another 15 extra.  It should be |
| 12:34 | 24 | adequate.  And I think that's a reasonable number. |
| 12:34 | 25 | Let me see if Mr. Quinn wants to correct me on |

| | | |
|---|---|---|
| 12:34 | 1 | that. |
| 12:34 | 2 | MR. QUINN:  Seems reasonable, Your Honor. |
| 12:34 | 3 | THE COURT:  Mr. Zeller? |
| 12:34 | 4 | MR. ZELLER:  Seems reasonable. |
| 12:34 | 5 | THE COURT:  Okay.  Mr. Overland? |
| 12:34 | 6 | MR. OVERLAND:  Yes, Your Honor. |
| 12:34 | 7 | THE COURT:  Ms. Hurst? |
| 12:34 | 8 | MS. HURST:  Yes, Your Honor. |
| 12:34 | 9 | THE COURT:  All right.  Then, Frank, 75. |
| 12:34 | 10 | Now, for 75 jurors, the jury commissioner is going |
| 12:34 | 11 | to send out approximately -- you told me informally 3,000 to |
| 12:34 | 12 | 3,500 jury summonses? |
| 12:34 | 13 | JURY COMMISSIONER:  We will probably mail out |
| 12:34 | 14 | 3,500. |
| 12:34 | 15 | THE COURT:  About 3500 jury summonses. |
| 12:34 | 16 | On the Aryan Brotherhood case -- on the Mexican |
| 12:34 | 17 | Mafia case, we sent out 8,000; 4,000 for the next trial; |
| 12:34 | 18 | another 6,000 -- we sent out almost 18,000. |
| 12:34 | 19 | For the Aryan Brotherhood we sent out 12,000? |
| 12:34 | 20 | JURY COMMISSIONER:  Yes. |
| 12:34 | 21 | THE COURT:  Yeah, almost 12,000.  So 3,500 we can |
| 12:34 | 22 | do. |
| 12:34 | 23 | I'm going to instruct you, though, when you get to |
| 12:34 | 24 | the number 75, to stop. |
| 12:35 | 25 | JURY COMMISSIONER:  Yes, Your Honor. |

Case 2:04-cv-09049-DOC-RNB   Document 9523   Filed 12/22/10   Page 33 of 98   Page ID #:284666
LACV 04-9049 DOC - 11/16/2010 - Volume I

33

| | | |
|---|---|---|
| 12:35 | 1 | THE COURT:  All right.  Now, just a moment. |
| 12:35 | 2 | Now, second, I'm going to find, at least at this |
| 12:35 | 3 | point, that the argument that this is a one-month trial is |
| 12:35 | 4 | unreasonable; that, minimally, the trial took nine weeks in |
| 12:35 | 5 | Judge Larson's court; that there appears to the Court, at |
| 12:36 | 6 | least at this juncture, subject to argument, a real |
| 12:36 | 7 | possibility that there will be additional claims in this |
| 12:36 | 8 | matter. |
| 12:36 | 9 | In addition to that, I don't think counsel |
| 12:36 | 10 | recognizes that, although MGA, in a sense, prevailed on the |
| 12:36 | 11 | conversion claim, et cetera, and some of the allegations |
| 12:36 | 12 | concerning 826, and some of these other entities, that |
| 12:36 | 13 | there's a real possibility all of that evidence is still |
| 12:36 | 14 | coming into this trial, subject to motions by both parties. |
| 12:36 | 15 | And there's also a real opportunity on the reverse side, |
| 12:36 | 16 | regardless of what the Court rules concerning RICO on behalf |
| 12:36 | 17 | of Mattel or RICO on behalf of MGA, that you're still going |
| 12:36 | 18 | to get in, regardless of my rulings, substantive evidence |
| 12:36 | 19 | concerning Mattel's pilfering and spying in terms of |
| 12:36 | 20 | showrooms. |
| 12:36 | 21 | So, therefore, you're really harming yourselves, |
| 12:36 | 22 | quite frankly -- although I know you're setting a record on |
| 12:36 | 23 | behalf of your counsel to shorten trial -- where all this |
| 12:36 | 24 | evidence may come in for different reasons unconnected to |
| 12:36 | 25 | the legal rulings.  This is going to be quite an interesting |

12:37   1   trial.

12:37   2          And, therefore, regardless of the legal rulings

12:37   3   that the Court's made, that doesn't preclude Mattel on

12:37   4   "consciousness of guilt" concerning the 826 claims, and

12:37   5   conversion claims, and regardless of the rulings that the

12:37   6   Court may or may not make concerning RICO, bringing in this

12:37   7   alleged spying on behalf of Mattel.

12:37   8          So you can see that this evidence, I have to

12:37   9   remain flexible, and I haven't made predeterminations.  But

12:37   10  I'm trying to look down the road, seeing, regardless of the

12:37   11  rulings in the next couple weeks, what really plays out in

12:37   12  terms of trial.  This is minimally, including jury

12:37   13  deliberations, a potential four-month trial.

12:37   14         Now, also, because of the complexity, I think

12:37   15  Mr. Overland can bear out, in complex criminal cases -- I

12:37   16  think on the Martinez portion, wasn't the jury out 27 days,

12:37   17  including the dog that had to be cared for, in the guilt

12:37   18  phase?  On the death penalty phase, Mr. Overland, weren't

12:38   19  they out, I think, nine days?

12:38   20         MR. OVERLAND:  I think on the guilt phase, they

12:38   21  were out 27 days.

12:38   22         THE COURT:  Yeah, 27 days in deliberation.  I

12:38   23  don't know why -- with some of the questions the Court may

12:38   24  be asking, in terms of special findings in this matter and

12:38   25  the complexity of this -- why you're going to have a jury

DEBBIE GALE, U.S. COURT REPORTER

12:38    1   that's going to deliberate any less than 10, 15, 20 days on

12:38    2   this, potentially, because I'm going to be asking for a lot

12:38    3   of decisions by the jury unless I dispose of them pretrial.

12:38    4   So I think that four months is a reasonable estimate.

12:38    5           Now, we're going to say "up to four months."

12:38    6   We're not going to say "four months."  But I'm not gonna

12:38    7   lose jurors who are now complaining because your first

12:38    8   motion will be "Judge, you shouldn't let that juror go."

12:38    9   And they're going to have a balance of hardships.

12:38   10           Number two, I think that counsel are going to want

12:38   11   some period of time off during the middle of the trial,

12:38   12   unless you're stipulating that you can go straight through.

12:38   13   So let's resolve that right now.

12:38   14           Pay very close attention to this, because you're

12:39   15   going to live with this:  Do you want a straight-through

12:39   16   trial?

12:39   17           And if you do, you've got it.  In other words, we

12:39   18   will go either 30 days or 120 days or whatever without a

12:39   19   break.  Think about that.  And I want to ask the same

12:39   20   question to Mattel.  Because if you want that, that's

12:39   21   exactly what's going to happen for MGA also.  No break.  And

12:39   22   that puts tremendous pressure on you to get your witnesses

12:39   23   in here whenever Mattel finishes.

12:39   24           I want you to talk about that.  If you want a

12:39   25   straight trial, without any break, that's what I'm going to

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 12:39 | 1 | order.  Now, if you have a break, that break should be for |
| 12:39 | 2 | one-to-two weeks, some period of time that we can work out, |
| 12:39 | 3 | after we talk to the jury that's been selected, and maybe |
| 12:39 | 4 | between the end of the plaintiff's case and the beginning of |
| 12:39 | 5 | the defense case. |
| 12:39 | 6 | So you caucus for a moment.  And I'm going to give |
| 12:39 | 7 | you the first option on both sides:  Straight-through trial, |
| 12:39 | 8 | or do you want a break at some point in between? |
| 12:39 | 9 | And remember, I promise you that you will |
| 12:39 | 10 | minimally keep twelve-hour days here, and I promise you that |
| 12:40 | 11 | you'll learn to love Saturdays with me. |
| 12:40 | 12 | (Counsel confer.) |
| 12:40 | 13 | THE COURT:  And don't worry about when the break |
| 12:40 | 14 | would come.  It's just if you want a break.  Otherwise, it's |
| 12:40 | 15 | straight through.  We'll work that out with the jury.  In |
| 12:40 | 16 | other words, let's get the jury first and talk with them |
| 12:40 | 17 | also, or we can decide beforehand. |
| 12:40 | 18 | I would suggest, if we're gonna have a break, that |
| 12:40 | 19 | we literally take it for a two-week period of time, 'cause |
| 12:40 | 20 | it lets me do two consecutive calendars on Monday.  It gives |
| 12:40 | 21 | you a chance to get in the witnesses on the defense side. |
| 12:40 | 22 | Otherwise, you've got 'em on call.  And there's nothing |
| 12:41 | 23 | worse than the Court saying, "Proceed," and you don't have |
| 12:41 | 24 | somebody available.  It makes the defense -- and the defense |
| 12:41 | 25 | is always at the disadvantage on that. |

Case 2:04-cv-09049-DOC-RNB   Document 9523   Filed 12/22/10   Page 37 of 98   Page ID #:284670
LACV 04-9049 DOC - 11/16/2010 - Volume I

37

| | | |
|---|---|---|
| 12:41 | 1 | But I'll take my guidance from you, so let me |
| 12:41 | 2 | start with MGA. |
| 12:41 | 3 | MS. HURST:  Your Honor, we would -- the suggestion |
| 12:41 | 4 | of a two-week break between the plaintiff and the defense |
| 12:41 | 5 | case is not something we would be particularly interested |
| 12:41 | 6 | in, just for the reasons of letting the plaintiff's case sit |
| 12:41 | 7 | in the jury's mind for some extended period of time. |
| 12:41 | 8 | However, it's hard to tell right now, given what the |
| 12:41 | 9 | ultimate length of the trial might be.  But certainly we |
| 12:41 | 10 | would be amenable to a break of a few days, or whatever the |
| 12:41 | 11 | Court wishes. |
| 12:41 | 12 | THE COURT:  I would probably take, I don't know, |
| 12:41 | 13 | Easter week.  I don't know yet.  But I'm going to tell you |
| 12:41 | 14 | there will probably be about a two-week break, which is |
| 12:41 | 15 | really eight days.  It's not two weeks.  It's about eight |
| 12:42 | 16 | days.  That seems to work out in lengthy litigation.  I |
| 12:42 | 17 | think Mr. Overland will confirm we did that on the AB case. |
| 12:42 | 18 | And we did that between the penalty phase and the death |
| 12:42 | 19 | penalty phase for almost three weeks I believe -- well, it |
| 12:42 | 20 | was the AB case.  We went three weeks. |
| 12:42 | 21 | But, up to you, if you want to go straight |
| 12:42 | 22 | through, but I'm not going to promise you that it's two |
| 12:42 | 23 | weeks or even a week.  I don't know yet.  I haven't talked |
| 12:42 | 24 | to the jury.  But if it's two weeks, that's -- so be it. |
| 12:42 | 25 | Otherwise, let's go straight through; there's nothing wrong |

LACV 04-9049 DOC - 11/16/2010 - Volume I

| | | |
|---|---|---|
| 12:42 | 1 | with that. |
| 12:42 | 2 | But, remember, once you're going straight through, |
| 12:42 | 3 | you are truly going straight through, so be absolutely |
| 12:42 | 4 | certain. |
| 12:42 | 5 | MS. HURST:  We're agreeing to a break, the |
| 12:42 | 6 | composition and contours of which remain to be determined. |
| 12:42 | 7 | THE COURT:  Okay.  I'll talk to the jury. |
| 12:42 | 8 | Counsel on behalf of Mattel. |
| 12:42 | 9 | MR. QUINN:  We're always in favor of breaks, |
| 12:43 | 10 | Your Honor. |
| 12:43 | 11 | THE COURT:  Okay.  There will be some break and |
| 12:43 | 12 | we'll talk about that.  But it will be reasonable, I promise |
| 12:43 | 13 | you.  We're not gonna let the plaintiff's case get old, |
| 12:43 | 14 | although I would think you would want it to get old on MGA's |
| 12:43 | 15 | part, but so be it. |
| 12:43 | 16 | All right.  Then there will be a break of some |
| 12:43 | 17 | type. |
| 12:43 | 18 | Now, finally concerning the letter, Mr. Overland |
| 12:43 | 19 | made a good suggestion today.  We've stricken that last |
| 12:43 | 20 | portion.  Look at the letter one more time that the |
| 12:43 | 21 | commissioner has.  And I'm going to instruct the |
| 12:43 | 22 | commissioner, otherwise, to send out that letter today or |
| 12:43 | 23 | tomorrow. |
| 12:43 | 24 | Any other suggestions concerning that letter? |
| 12:43 | 25 | Mattel? |

| | | |
|---|---|---|
| 12:43 | 1 | MR. QUINN:  No, Your Honor. |
| 12:43 | 2 | THE COURT:  MGA? |
| 12:43 | 3 | MS. HURST:  No, Your Honor. |
| 12:43 | 4 | THE COURT:  Frank, you're ordered to send out the |
| 12:43 | 5 | letter at your convenience today or tomorrow. |
| 12:43 | 6 | JURY COMMISSIONER:  We'll get started right away. |
| 12:43 | 7 | THE COURT:  Between 3,000 and 3,500. |
| 12:43 | 8 | Let's make absolutely certain that we set this |
| 12:43 | 9 | record:  If we reconvene on January 3rd, which is a Monday, |
| 12:44 | 10 | I'm concerned because you're going to get jurors who are |
| 12:44 | 11 | taking the New Year's recess.  Some have plane flights or |
| 12:44 | 12 | are driving back to avoid the traffic.  So it increases the |
| 12:44 | 13 | number of summonses the commissioner has to send out. |
| 12:44 | 14 | Although, I'd like to start on January 3rd. |
| 12:44 | 15 | Tuesday, I don't want to flood the courthouse with |
| 12:44 | 16 | jurors on this case, and jurors in Judge Selna, Carney, |
| 12:44 | 17 | Judge Guilford's -- because they're intermixing. |
| 12:44 | 18 | So it seems to me the first day we should bring in |
| 12:44 | 19 | jurors would be January 5th. |
| 12:44 | 20 | Now, on that date there's no reason for counsel to |
| 12:44 | 21 | be here because the Court's not going to address the jurors. |
| 12:44 | 22 | I'm simply going to have them fill out the questionnaire, if |
| 12:44 | 23 | there is a questionnaire.  If there's no questionnaire, then |
| 12:44 | 24 | we're simply going to start on January 5th. |
| 12:44 | 25 | And is there going to be a questionnaire? |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 12:45 | 1 | MR. QUINN:  I know we need to -- if there's going |
| 12:45 | 2 | to be one, we have to get it to the Court by 10:00 o'clock |
| 12:45 | 3 | tomorrow.  The indications are, I believe, that there will |
| 12:45 | 4 | be one. |
| 12:45 | 5 | THE COURT:  You two discuss that because, |
| 12:45 | 6 | otherwise, I don't want to waste time.  In other words, |
| 12:45 | 7 | everything the Court does from now on is for Counsel's |
| 12:45 | 8 | benefit in terms of litigation.  I don't have to give a |
| 12:45 | 9 | questionnaire.  I'm not concerned.  Each of you decide |
| 12:45 | 10 | quickly:  Questionnaire, yes or no, by tomorrow at 10:00 |
| 12:45 | 11 | o'clock. |
| 12:45 | 12 | Ms. -- Annette, as you get up out of your seat and |
| 12:45 | 13 | approach Mr. Quinn, and as he gets out of his seat -- |
| 12:45 | 14 | Mr. McConville, Mr. Zeller, yes or no, by 10:00 o'clock. |
| 12:45 | 15 | Mr. Overland, I don't want to neglect you. |
| 12:45 | 16 | MR. QUINN:  Affirmative nods all around, |
| 12:45 | 17 | Your Honor. |
| 12:45 | 18 | THE COURT:  Okay.  Affirmative nods.  Then, by |
| 12:45 | 19 | 10:00 o'clock tomorrow, we'll have a questionnaire.  It will |
| 12:45 | 20 | be no more than five pages in length. |
| 12:46 | 21 | The commissioner has asked a couple questions |
| 12:46 | 22 | about things I was about to cover. |
| 12:46 | 23 | I want to assume that that questionnaire is filled |
| 12:46 | 24 | out on January 5th, which it would be, in the morning.  Five |
| 12:46 | 25 | pages won't take long.  But I don't want the parties |

```
12:46    1   producing that.  The Court will produce that.  That will
12:46    2   take about a day, day and a half.  So let's discuss, later
12:46    3   on, when they're coming back.
12:46    4           And, Frank, I'll direct them on January 5th what
12:46    5   day to come back.  I don't want to do that in the letter.
12:46    6           JURY COMMISSIONER:  Okay.
12:46    7           THE COURT:  'Cause I want to have some
12:46    8   flexibility.  Okay?
12:46    9           The commissioner was asking, "Judge, after they
12:46   10   fill out the questionnaire, what date should they come
12:46   11   back?"
12:46   12           Let me instruct them that day, through the jury
12:46   13   commissioner, what day we want them to return.  Because that
12:46   14   depends on us getting -- 75 jurors, we're gonna need five
12:47   15   pages times 75, times, you know, counsel, the Court -- it
12:47   16   will take a day or two just to get those xeroxed off.  And I
12:47   17   want to give you time to read those.
12:47   18           Now, finally, for litigation purposes, you're
12:47   19   going to have a stack of 75 questionnaires.  Picture that in
12:47   20   front of you for just a moment.
12:47   21           On the past complex cases, we've actually not only
12:47   22   given the first twelve by stipulation of counsel, so you
12:47   23   knew those that would be selected, but by agreement of
12:47   24   counsel, we've also, on occasion, given you any number that
12:47   25   you've stipulated to up to, you know, 10, 15 or 20.
```

Case 2:04-cv-09049-DOC-RNB   Document 9523   Filed 12/22/10   Page 42 of 98   Page ID
#:284675
LACV 04-9049 DOC - 11/16/2010 - Volume I

42

| 12:47 | 1 | So let me give you a technique that might make |
|-------|---|--------|
| 12:47 | 2 | your lives easier.  If you have 75 potential jurors, and we |
| 12:47 | 3 | call Juror No. 15, and Juror No. 15 takes Seat No. 1, and |
| 12:47 | 4 | then Juror No. 2, 3, 4, 5 and 6, you're scrambling through |
| 12:47 | 5 | 75 questionnaires and trying to make snap decisions.  It |
| 12:48 | 6 | means you have to memorize all 75.  If you reach an |
| 12:48 | 7 | agreement that the Court can give you the first six that |
| 12:48 | 8 | will be called, I'll accept that, and we'll give that to you |
| 12:48 | 9 | a day or two -- in fact, I'll even do better than that.  If |
| 12:48 | 10 | you agree that you want the first ten or twelve, I'll do |
| 12:48 | 11 | that, but it has to be by stipulation. |
| 12:48 | 12 | What it means is that you can, at least, |
| 12:48 | 13 | thoughtfully peruse through the 75 and you know the first |
| 12:48 | 14 | 10.  You already know if you want a peremptory, if the Court |
| 12:48 | 15 | doesn't grant a motion for cause, for litigation purposes, |
| 12:48 | 16 | it's a dream come true if the courts will do that.  Normally |
| 12:48 | 17 | we don't.  But that's up to you. |
| 12:48 | 18 | So as you two get up out of your seats again and |
| 12:48 | 19 | approach each other, and make a decision at this time, since |
| 12:48 | 20 | we're done with all the legal work now and we're finally |
| 12:48 | 21 | starting litigation -- by the way, I won't give you all 75. |
| 12:49 | 22 | I'll give you some number between ten and twelve.  That's |
| 12:49 | 23 | the maximum.  From then on, you start going through the |
| 12:49 | 24 | pack. |
| 12:51 | 25 | MGA, what do you want to do?  Machado? |

| | | |
|---|---|---|
| 12:51 | 1 | MS. HURST:  We would like to think about it. |
| 12:51 | 2 | THE COURT:  No.  Make a decision. |
| 12:51 | 3 | MS. HURST:  Well, Your Honor, we appreciate the |
| 12:51 | 4 | opportunity to reach an agreement on this.  I'm not sure I |
| 12:51 | 5 | can do that right now.  I want to think about it. |
| 12:51 | 6 | THE COURT:  Okay.  How long do you need to think |
| 12:51 | 7 | about it? |
| 12:51 | 8 | MS. HURST:  A day.  We're going to be here |
| 12:51 | 9 | tomorrow.  Would tomorrow be all right? |
| 12:51 | 10 | THE COURT:  Tomorrow's fine. |
| 12:51 | 11 | MS. HURST:  Thank you. |
| 12:51 | 12 | THE COURT:  Now, are you going to each be able to |
| 12:51 | 13 | use documents during your opening statement or not?  In |
| 12:51 | 14 | other words, I'm not going to wade through a series of |
| 12:51 | 15 | disagreements about what's being presented during an opening |
| 12:51 | 16 | statement.  And that requires the two of you to share openly |
| 12:52 | 17 | and honestly with one another your PowerPoints or what you |
| 12:52 | 18 | think you're going to present in some kind of opening |
| 12:52 | 19 | statement. |
| 12:52 | 20 | Otherwise, no documents, no exhibits.  The Court's |
| 12:52 | 21 | not going to waste time pre-trying this case for days and |
| 12:52 | 22 | weeks and bickering between the counsel. |
| 12:52 | 23 | So once again, Ms. Hurst. |
| 12:52 | 24 | MS. HURST:  Your Honor -- do you want us to -- why |
| 12:52 | 25 | don't we... |

LACV 04-9049 DOC - 11/16/2010 - Volume I

44

| | | |
|---|---|---|
| 12:52 | 1 | THE COURT: Yeah.  I know you can't answer that |
| 12:52 | 2 | until you see what each other has to present. |
| 12:52 | 3 | MS. HURST: Exactly. |
| 12:52 | 4 | THE COURT: When will that be to me?  By |
| 12:52 | 5 | November 29th?  By December 5th?  Otherwise, just assume |
| 12:52 | 6 | that nothing goes up on the ELMO, nothing goes up on the |
| 12:52 | 7 | screen.  You just barebones give your opening statements, |
| 12:52 | 8 | which will be scintillating. |
| 12:53 | 9 | MR. QUINN: Your Honor, in principle, we do want |
| 12:53 | 10 | to use documents in opening statement, both sides do. |
| 12:53 | 11 | THE COURT: Do you agree? |
| 12:53 | 12 | MS. HURST: Yes. |
| 12:53 | 13 | THE COURT: Then the devil will always be in the |
| 12:53 | 14 | details.  Here's the problem you'll run into -- by the way, |
| 12:53 | 15 | this is very gracious on the Court's behalf. |
| 12:53 | 16 | MR. QUINN: It is. |
| 12:53 | 17 | THE COURT: "Thank you, Judge Carter." |
| 12:53 | 18 | MR. QUINN: Thank you, Your Honor. |
| 12:53 | 19 | MS. HURST: Thank you, Judge Carter. |
| 12:53 | 20 | THE COURT: You're welcome. |
| 12:53 | 21 | All right.  Now, the reason it's gracious is |
| 12:53 | 22 | because, if it's contentious and I have to spend hours and |
| 12:53 | 23 | hours of bickering between a statement, there's no reason |
| 12:53 | 24 | for the Court to even allow this.  And there's no reason for |
| 12:53 | 25 | me to give you that courtesy.  But I truly want you to |

Case 2:04-cv-09049-DOC-RNB   Document 9523   Filed 12/22/10   Page 45 of 98   Page ID
#:284678
LACV 04-9049 DOC - 11/16/2010 - Volume I

45

12:53  1    present your best case.

12:53  2           So I know that you'll come down to, "Well, gee,

12:53  3    this is an e-mail and it's hearsay" on one or the other

12:53  4    side.  I'm just suggesting to you:  Don't do that.  Because

12:53  5    this is an opening statement.  And if you get into that kind

12:54  6    of bickering -- it's the first opportunity that you both

12:54  7    have to work together, if you chose, to get a full

12:54  8    presentation to the jury.  And if you don't, it's gonna be a

12:54  9    fair trial without those documents.

12:54  10          In fact, I don't even have to let the jury see

12:54  11   documents during the trial.  So I'm really encouraging you

12:54  12   two to work together -- not to accede to its admission, but

12:54  13   to give each other some latitude to develop your case.

12:54  14   Okay?  So It's a full trial as far as you're concerned.  But

12:54  15   if you don't, then the opposite side of that is, I think the

12:54  16   jury will be asleep by the time you give an opening

12:54  17   statement without some kind of presentation of what you

12:54  18   want to show.  But that's your case.

12:54  19          So this is one time that the bickering has to stop

12:54  20   between the sides.  It's in both of your self-interests to

12:54  21   cooperate.  I'll leave that to you.

12:54  22          And the decision will be to me, Ms. Hurst and

12:54  23   Mr. Quinn, by what date?

12:54  24          MR. QUINN:  Your Honor, what we had agreed to,

12:54  25   subject to the Court's approval, was actually to exchange

| | | |
|---|---|---|
| 12:55 | 1 | the complete opening, whatever documents that we wanted to |
| 12:55 | 2 | show the jury, in the last week of December. |
| 12:55 | 3 | MS. HURST:  And then we'll meet and confer. |
| 12:55 | 4 | THE COURT:  Too late.  Too late.  Third week of |
| 12:55 | 5 | December, so that I'm not tied up and you're not tied up.  I |
| 12:55 | 6 | want your holiday season relatively free. |
| 12:55 | 7 | So by December 18th or something. |
| 12:55 | 8 | MR. QUINN:  All right. |
| 12:55 | 9 | THE COURT:  Pick a date.  December -- how about |
| 12:55 | 10 | December 17th.  That somewhat frees up that week for you |
| 12:55 | 11 | with family.  Is that okay? |
| 12:55 | 12 | MR. McCONVILLE:  Is there a calendar still here, |
| 12:55 | 13 | Your Honor, or is it gone? |
| 12:55 | 14 | THE COURT:  December 17th is a Friday.  The other |
| 12:55 | 15 | benefit of this is I'm going to put tremendous pressure on |
| 12:55 | 16 | you -- Ms. Hurst, listen.  Are you -- who is she? |
| 12:55 | 17 | MS. HURST:  My partner, Denise. |
| 12:56 | 18 | THE COURT:  Well, come on up.  You're more than |
| 12:56 | 19 | welcome to participate.  It's nice seeing you. |
| 12:56 | 20 | You're already going to have a list of witnesses |
| 12:56 | 21 | to me by November 29th. |
| 12:56 | 22 | MR. QUINN:  Right. |
| 12:56 | 23 | THE COURT:  You're going to have -- Ms. Hurst, by |
| 12:56 | 24 | one week later, you're going to have your list of witnesses |
| 12:56 | 25 | to me.  You see, you've already given me your list of |

12:56    1   witnesses.  So by the end of the first week, I already know
12:56    2   the order and who you're calling.
12:56    3         Now that make it really easy concerning your
12:56    4   presentation 'cause you're already having to do the hard
12:56    5   work.  You've been working hard.  Now, it's gonna even get
12:56    6   harder.  It's gonna speed up on you.
12:56    7         So it seems to me that that gives you plenty of
12:56    8   time for your PowerPoint, et cetera.  I think that's very
12:56    9   gracious.
12:56   10         MR. QUINN:  We appreciate that, Your Honor.
12:56   11         We have -- I guess expert discovery closes the
12:56   12   17th.  On the 20th, we have the hearing on the summary
12:56   13   judgment motion on the counterclaims and reply.
12:56   14         THE COURT:  On December 20th.
12:56   15         MR. QUINN:  On December 20th.
12:56   16         Is there any chance that we could slip that date
12:56   17   to the next day, that is to say, the 21st?
12:57   18         THE COURT:  No.
12:57   19         MS. HURST:  I believe on the 20th our *motions in*
12:57   20   *limine* are also due.
12:57   21         THE COURT:  They are.
12:57   22         No.  I'm going to hold to those dates, just
12:57   23   because I don't want the court staff to get tied up in the
12:57   24   last part of the week.
12:57   25         MR. QUINN:  We are just talking about our

DEBBIE GALE, U.S. COURT REPORTER

LACV 04-9049 DOC - 11/16/2010 - Volume I

48

| | | |
|---|---|---|
| 12:57 | 1 | exchange. |
| 12:57 | 2 | MS. HURST:  Our understanding is, if we don't |
| 12:57 | 3 | agree, then it doesn't happen. |
| 12:57 | 4 | THE COURT:  That's fine.  I'm wrong.  I |
| 12:57 | 5 | misunderstood. |
| 12:57 | 6 | Certainly, I can do that.  So you want to slide |
| 12:57 | 7 | that to? |
| 12:57 | 8 | MR. QUINN:  We'll exchange on the 21st. |
| 12:57 | 9 | THE COURT:  And if there's no agreement? |
| 12:57 | 10 | MS. HURST:  Then there's no presentation. |
| 12:57 | 11 | THE COURT:  That's fair.  I misunderstood.  I'm |
| 12:57 | 12 | sorry.  That's fair.  21st.  Okay. |
| 12:57 | 13 | All right.  Then, I think that that completes |
| 12:57 | 14 | everything I need with the jury commissioner. |
| 12:57 | 15 | Any other questions by Mr. Zeller or Mr. Quinn? |
| 12:57 | 16 | MR. ZELLER:  No, sir. |
| 12:57 | 17 | MR. QUINN:  No, Your Honor. |
| 12:57 | 18 | THE COURT:  Can I let Mr. Galvan go? |
| 12:57 | 19 | Mr. Overland? |
| 12:57 | 20 | MR. OVERLAND:  I do have a question with respect |
| 12:57 | 21 | to that.  Will we have the opportunity to review the |
| 12:58 | 22 | questionnaires of jurors that have been excused for |
| 12:58 | 23 | hardship? |
| 12:58 | 24 | THE COURT:  If you would like to. |
| 12:58 | 25 | MR. OVERLAND:  Yes. |

| | | |
|---|---|---|
| 12:58 | 1 | THE COURT:  But what I don't want is this:  I |
| 12:58 | 2 | really abhor what I have seen on occasion -- you haven't |
| 12:58 | 3 | done this -- but at the last moment, people rush in with |
| 12:58 | 4 | last-moment complaints that one juror was excluded that |
| 12:58 | 5 | should have been properly seated.  That becomes a tactical |
| 12:58 | 6 | ploy.  In other words, it's a way to select yourselves on |
| 12:58 | 7 | the back side.  So I'm really not -- |
| 12:58 | 8 | MR. OVERLAND:  Well, that never crossed my mind. |
| 12:58 | 9 | THE COURT:  I know it hasn't.  But I've seen it on |
| 12:58 | 10 | a number of occasions. |
| 12:58 | 11 | MR. OVERLAND:  No, no.  I'd just like to see, if |
| 12:58 | 12 | it's all right with the Court -- and I don't know what the |
| 12:58 | 13 | process would be. |
| 12:58 | 14 | THE COURT:  Why don't you talk to Mr. Galvan |
| 12:58 | 15 | informally.  He's right there.  Go over and talk to him. |
| 12:58 | 16 | MR. OVERLAND:  Where? |
| 12:58 | 17 | JURY COMMISSIONER:  Right here.  Over here. |
| 12:58 | 18 | THE COURT:  Go and have a conversation with him, |
| 12:59 | 19 | all of you.  Tell me how that would look.  I'm not going to |
| 12:59 | 20 | have last-moment tactical decisions.  It's easier just bring |
| 12:59 | 21 | in the jurors if I have to. |
| 01:00 | 22 | Counsel, let me repeat for the record, what's not |
| 01:00 | 23 | going to happen is 2,000 jurors have been rejected by the |
| 01:00 | 24 | jury commissioner, and then what I've seen historically in |
| 01:00 | 25 | my court with less reputable counsel is, you go down to the |

50

01:00    1   jury commissioner, you pick the 185 for one side that you

01:00    2   think is favorable to your position, based upon -- and come

01:00    3   back into court literally two days before the jury is to be

01:01    4   selected.

01:01    5           Mr. Overland, you wouldn't know what I'm talking

01:01    6   about because you haven't done that.  But, trust me, the

01:01    7   Court's seen it on complex litigation.  It's nonsense.

01:01    8           MR. OVERLAND:  I can tell the Court that's not

01:01    9   gonna happen.

01:01   10           THE COURT:  I know that.  But I want to set my

01:01   11   record that it's not going to happen.

01:02   12           Okay.  Counsel, what are your thoughts?

01:02   13           MR. OVERLAND:  We've agreed to a procedure,

01:02   14   Your Honor, what I think is agreeable.

01:02   15           THE COURT:  Tell me what that is so I have a clear

01:02   16   record.

01:02   17           MR. OVERLAND:  That is, after the jurors have been

01:02   18   excused for hardship, and it leaves a lesser number than

01:02   19   3,000, because the Court has said once there's 75 jurors,

01:03   20   then the process stops, that we will be notified to come

01:03   21   down and take a look at those that have been excused -- the

01:03   22   questionnaires of those that have been excused for hardship.

01:03   23   It will be made available to us.

01:03   24           MR. QUINN:  Your Honor, I don't understand what

01:03   25   the point of this is, unless it's -- I thought we all had

01:03 1    agreement that the procedure, as described by Mr. Galvan,

01:03 2    was acceptable to both sides.  I'm a little concerned about

01:03 3    why they now want to review these questionnaires or whether

01:03 4    there's a potential objection process that somebody's

01:03 5    thinking about.

01:03 6                THE COURT:  Yeah, it leads right back --

01:03 7                MR. QUINN:  What's the point of this?

01:03 8                THE COURT:  It leads back into the same process,

01:03 9    and that is, the Court getting flooded with the accusation

01:03 10   that a number of jurors were unfairly excused by the

01:03 11   commissioner.  And usually those are raised at the last

01:03 12   moment.

01:04 13               MR. OVERLAND:  And I'm telling the Court that's

01:04 14   not gonna happen.

01:04 15               THE COURT:  Then you have to set up some

01:04 16   parameters to make certain because it's too costly.  You

01:04 17   decide how that's gonna work.  You give me the time frame

01:04 18   for the examination.

01:04 19               One way you can do that simply, and make certain

01:04 20   that the Court's comfortable, is limit it to 20.  In other

01:04 21   words, of this vast pool of 2,000 that might be excused for

01:04 22   hardship, if you see any number up to 20 that you disagree

01:04 23   with, that that would be an arbitrary number that you could

01:04 24   call to the Court's attention.

01:04 25               What I don't want is literally a hundred or 200

01:04  1    requests at the last moment by one of the parties who sought

01:04  2    an advantage saying that this person should have been

01:04  3    seated.  I understand your representation, and I accept it.

01:04  4    But it's happened to the Court.

01:04  5         We spent a full four days on this on the Aryan

01:04  6    Brotherhood because of this exact same issue.

01:04  7         MR. OVERLAND:  All that I would like to do is have

01:04  8    a chance to review the questionnaires of those that have

01:05  9    been excused for cause.  And there's not gonna be any action

01:05  10   taken as a result of that in this Court.  That's all.

01:05  11        THE COURT:  Then what's the purpose?

01:05  12        MR. OVERLAND:  The purpose is to determine whether

01:05  13   or not there are any appellate issues as a result of that.

01:05  14        THE COURT:  Let's restate it.  That means that

01:05  15   what you're really requesting, "Judge, this juror should be

01:05  16   seated, out of the 2,000 because this juror was improperly

01:05  17   excused by the jury commissioner."

01:05  18        MR. OVERLAND:  No.

01:05  19        THE COURT:  Then I don't understand.

01:05  20        MR. OVERLAND:  There could be ethnics consequences

01:05  21   as a result of it, which could have an appellate issue.

01:05  22        THE COURT:  And then, is that -- in other words,

01:05  23   let's be blunt, are you primarily concerned that somebody of

01:05  24   Persian or Iranian descent is being excused?

01:05  25        MR. OVERLAND:  Let's be blunt about it.

| | | |
|---|---|---|
| 01:05 | 1 | THE COURT:  I'm trying to be. |
| 01:06 | 2 | MR. OVERLAND:  We've said there's a correlation |
| 01:06 | 3 | between economic hardship and ethnic -- ethnicity.  And, |
| 01:06 | 4 | therefore, if, in fact, we have -- let's say because of |
| 01:06 | 5 | economic hardship, 90 percent of Hispanics are excluded, or |
| 01:06 | 6 | 80 percent of African-Americans are excluded, that may have |
| 01:06 | 7 | some consequence in terms of the selection of the jury |
| 01:06 | 8 | venire. |
| 01:06 | 9 | THE COURT:  And what correlation backs that up? |
| 01:06 | 10 | Because it seems to me, regardless of race, a tremendous |
| 01:06 | 11 | number of people are government employees, and that cuts |
| 01:06 | 12 | across all racial lines. |
| 01:06 | 13 | MR. OVERLAND:  I think that remains to be seen. |
| 01:06 | 14 | The questionnaire itself has a check box for "race" and |
| 01:06 | 15 | "ethnicity." |
| 01:06 | 16 | THE COURT:  And, therefore, you see, I'll never |
| 01:06 | 17 | know, then.  You might have X number of African-Americans or |
| 01:07 | 18 | persons of Hispanic heritage, and your claim then to the |
| 01:07 | 19 | Circuit is that these people were excluded.  And I never |
| 01:07 | 20 | have a basis for comparison.  In other words, I don't know |
| 01:07 | 21 | in relation to Caucasians or Vietnamese, or let's say Asian |
| 01:07 | 22 | heritage.  There's no correlation.  All the Circuit gets is |
| 01:07 | 23 | a complaint. |
| 01:07 | 24 | MR. OVERLAND:  There would be a correlation in |
| 01:07 | 25 | terms of the group that had been accepted. |

01:07  1      JURY COMMISSIONER:  Judge, the questionnaires that
01:07  2  counsel wants to review are those that have been excused for
01:07  3  business, financial, or employment reasons.  And those
01:07  4  questionnaires are being reviewed by a magistrate judge, so
01:07  5  the magistrate judge's reviewing these based on the
01:07  6  information that's on there.  He or she will make a
01:07  7  determination whether or not they should be excused or not.
01:07  8  So they're not being reviewed by a jury clerk.  They're
01:07  9  being reviewed by a magistrate judge, and it's only a
01:07  10  certain percentage:  Those requesting excuse for business,
01:08  11  financial, or employment reasons only.
01:08  12      And counsel is willing to look at these after the
01:08  13  magistrate judge has made his decision and we've notified
01:08  14  the individual as to whether or not he's been excused or
01:08  15  not.
01:08  16      THE COURT:  Frank, does that put any additional
01:08  17  strain on the clerk's office?
01:08  18      JURY COMMISSIONER:  No.  'Cause counsel has agreed
01:08  19  that they will come down to Los Angeles to review them.  We
01:08  20  can set them aside, tell them to go review them.
01:08  21      THE COURT:  Let's set a date that's to be
01:08  22  completed by.  The magistrate judges, it will be referred
01:08  23  out to them for their independent determination.  But I
01:08  24  don't want to start the jury, and on the last day, there's
01:08  25  five complaints about five different jurors.  I know you're

01:08   1   not thinking in those terms.  But if it hasn't happened to

01:08   2   you, you wouldn't understand.  It's happened to this Court.

01:08   3           And in the past, I've undertaken that myself.  And

01:08   4   after four days and nights, I think counsel finally acceded

01:08   5   it was very fair.  That doesn't mean it's fair in your case.

01:09   6   But this is a civil case.  That was a death penalty case.

01:09   7           I'm not going to be burdened by that at the last

01:09   8   moment.  That's an unfair place to be.  So you just need to

01:09   9   set a date that this will be completed by.  I would assume

01:09   10  that would be completed by Monday, December -- I'll set the

01:09   11  date for you.

01:09   12          That is to be completed by you by December 19th.

01:09   13  And if you have any complaints, raise it with me on the

01:09   14  20th.

01:09   15          MR. OVERLAND:  If that's within the time period

01:09   16  when the letters will be sent out.

01:09   17          JURY COMMISSIONER:  The letters will be sent out,

01:09   18  and they'll be returned on an ongoing basis.  So on the

01:09   19  19th, there may still be more questionnaires coming in on

01:09   20  the 20th, 21st -- all the way up to January 4th.

01:09   21          THE COURT:  Maybe that's not a fair date, then.

01:09   22          How are we going to resolve that?

01:09   23          MR. OVERLAND:  Whatever date Mr. Galvan tells me I

01:09   24  can come down and look at it or somebody can come down and

01:10   25  look at 'em, that will be the date.

LACV 04-9049 DOC - 11/16/2010 - Volume I

56

01:10   1          THE COURT:  I think you need to look at 'em as we
01:10   2   go, because we keep filtering people in until we get to that
01:10   3   75.
01:10   4          MR. OVERLAND:  Once that 75 number is reached,
01:10   5   then that's it.
01:10   6          THE COURT:  But you can do this piecemeal, also.
01:10   7   In other words, you can go down there on a weekly basis and
01:10   8   look at this as well.  That's what I'm going to require you
01:10   9   to do.  You're ordered to report specifically to the jury
01:10   10  commissioner -- you and Mr. Quinn together.  They'll be --
01:10   11         MR. QUINN:  Your Honor, this is not an issue I
01:10   12  care about.
01:10   13         THE COURT:  But you're still going to be present
01:10   14  to make certain it's fair.
01:10   15         All right.  Frank, let's start someplace in the
01:10   16  middle of December.  In other words, you'll have the first
01:10   17  20 or 30 probably.  They can just come and visit.
01:11   18         All right.  December 3rd.  I'm going to order you
01:11   19  in on consecutive days at 3:00 o'clock each day, and you'll
01:11   20  report on each and every day until we have that pool that's
01:11   21  satisfactory.
01:11   22         Ms. Hurst, choose between you and Mr. McConville.
01:11   23  One of you will be there also.
01:11   24         Mr. McConville, you're designated.  Thank you.
01:11   25  Let the record reflect he just passed out.

01:11   1          All right.  Mr. McConville specifically,

01:11   2   Mr. Overland specifically, Mr. Zeller specifically, you'll

01:11   3   report beginning December 3rd each consecutive day until

01:11   4   we've reached 75.  And that way, we'll raise the problems as

01:11   5   we go.  There won't be any last moment surprises.

01:11   6          MR. QUINN:  Your Honor, if counsel changes his

01:11   7   mind about his interest in this?

01:11   8          THE COURT:  No.  This is a good lesson to start

01:11   9   with.  I will always give you the opportunity first, and I

01:12   10  will always ask you to reach a stipulation.  And when you

01:12   11  don't, the backside is exactly what's going to happen.  So

01:12   12  let's set the tone now.

01:12   13         This is a non-changeable order:  Every day

01:12   14  starting December 3rd at 3:00 o'clock, those counsel will

01:12   15  report to the jury commissioner.

01:12   16         And by setting that tone, I'll always be courteous

01:12   17  and ask you first.  And when you can't reach an agreement, I

01:12   18  want to demonstrate very quickly:  No nonsense.  This is the

01:12   19  back side of it.  End of the order.

01:12   20         All right.  Now, Mr. Galvan, I don't know if

01:12   21  there's anything further.

01:12   22         Is there anything you need from Mr. Galvan,

01:12   23  Mr. Zeller?

01:12   24         MR. ZELLER:  No, sir.

01:12   25         THE COURT:  Mr. Quinn?

01:12   1           MR. QUINN:  I don't, Your Honor.

01:12   2           THE COURT:  Ms. Hurst?

01:12   3           MS. HURST:  No.  Thank you, Your Honor.

01:12   4           THE COURT:  Mr. Overland?

01:12   5           MR. OVERLAND:  No.  I've done enough, I think.

01:12   6           (Laughter.)

01:12   7           THE COURT:  Do you want to change with Ms. Hurst,

01:12   8   Mr. McConville?

01:12   9           MR. McCONVILLE:  No, sir.

01:12   10          THE COURT:  As you sure?

01:12   11          MR. McCONVILLE:  Absolutely.

01:12   12          THE COURT:  Thank you very much.

01:12   13          JURY COMMISSIONER:  Your Honor, I'll leave my card

01:12   14  here with the courtroom deputy so they'll know where to

01:13   15  report.

01:13   16          THE COURT:  Let's designate where they're to

01:13   17  report into the record.  These parties have been at it a

01:13   18  long time.  Sometimes they don't take direction well.

01:13   19          JURY COMMISSIONER:  The U.S. District Court at 312

01:13   20  North Spring Street, Room 329.

01:13   21          THE COURT:  3:00 o'clock starting December 3rd

01:13   22  promptly, on consecutive days until we reach the 75 jurors.

01:13   23          All right.  Thank you, Counsel.

01:13   24          Now, the next issue concerns -- Frank, thank you

01:13   25  very much for coming all the way down -- MGA's motion for

LACV 04-9049 DOC - 11/16/2010 - Volume I

59

```
01:13    1    protective order.  This was filed yesterday, and I really
01:13    2    don't want to hear arguments on this issue today.  But I
01:13    3    would like a timeline when Mattel's opposition will be
01:13    4    filed.
01:13    5               MR. ZELLER:  We were planning on Thursday,
01:13    6    Your Honor.  After the hearing's done, and I would like to
01:13    7    have an opportunity to read it.
01:13    8               THE COURT:  Thursday what time?
01:13    9               MR. ZELLER:  I would think by 1:00 o'clock.
01:13   10               THE COURT:  Okay.  So November 18th by
01:14   11    1:00 o'clock.
01:14   12               MR. ZELLER:  Yes.
01:14   13               THE COURT:  Does there need to be a reply to that?
01:14   14               MS. HURST:  If there is, Friday at noon.
01:14   15               THE COURT:  November 19th.  Acceptable?
01:14   16               MS. HURST:  Yes.
01:14   17               THE COURT:  Okay.  Thank you very much.
01:14   18               Concerning the last housekeeping issue before we
01:14   19    start the summary judgment motions, I have a few stray
01:14   20    discovery issues that might not have been resolved.  Some of
01:14   21    them might have been left in abeyance by the order on the
01:14   22    omnibus discovery.
01:14   23               And I want to make certain -- we were up over 150
01:14   24    discovery issues that we put out in printed form.  And I
01:14   25    want to make certain we're not overlooking any of them.
```

LACV 04-9049 DOC - 11/16/2010 - Volume I

60

| | | |
|---|---|---|
| 01:14 | 1 | Another one may have included Pablo Vargas.  I'm |
| 01:14 | 2 | asking if the parties will submit a joint stipulation by the |
| 01:14 | 3 | end of this week that lists those remaining issues so that |
| 01:15 | 4 | we can get them out the way by this weekend. |
| 01:15 | 5 | Can with say that that would be Friday, again by |
| 01:15 | 6 | 12:00 noon?  Would that be acceptable? |
| 01:15 | 7 | MR. ZELLER:  Yes, Your Honor. |
| 01:15 | 8 | THE COURT:  I just want to make sure that we |
| 01:15 | 9 | haven't left anything astray. |
| 01:15 | 10 | All right.  Now, you'll have to do a live switch, |
| 01:15 | 11 | Debbie, 'cause we're just going to work straight through. |
| 01:15 | 12 | Well, this is the summary judgment motion time. |
| 01:15 | 13 | I'm giving three hours to each side; but that, depending |
| 01:15 | 14 | upon any additional arguments by Mr. Overland, will be |
| 01:15 | 15 | extended to Mattel.  So if Mr. Overland wants an hour, |
| 01:15 | 16 | that's fine.  Mattel will have four hours. |
| 01:15 | 17 | But right now it's three hours per side. |
| 01:15 | 18 | Ms. Hurst. |
| 01:15 | 19 | MS. HURST:  May we have a brief recess before we |
| 01:15 | 20 | start? |
| 01:15 | 21 | THE COURT:  That's a good idea.  Okay.  1:30, |
| 01:15 | 22 | then.  Thank you. |
| 01:15 | 23 | *(Recess held at 1:15 p.m.)* |
| 01:16 | 24 | *(Proceedings resumed at 1:34 p.m.)* |
| 01:34 | 25 | THE COURT:  All right.  We're on the record. |

DEBBIE GALE, U.S. COURT REPORTER

01:34   1   Mr. Zeller is present, Mr. Quinn, Ms. Hurst, Mr. McConville,

01:34   2   Mr. Molinski and Susan Estrich.

01:34   3        Concerning Mattel's motion to consolidate the

01:35   4   motions, I want to bring up two other concerns.

01:35   5        I've reviewed Mattel's motion to consolidate the

01:35   6   pending motions for summary judgment.  But can Mattel

01:35   7   explain what this motion even means or requires, assuming

01:35   8   it's granted?  What would the difference be between a Court

01:35   9   considering the motions in consolidated form versus the

01:35   10  Court considering the motions in nonconsolidated form?  In

01:35   11  other words, I don't understand.

01:35   12       MR. ZELLER:  It's simply to avoid any argument

01:35   13  that evidence that's submitted on one motion that was not

01:35   14  separately submitted on the second motion.

01:35   15       THE COURT:  In other words, carryover.  Your

01:35   16  arguments pertain to all the motions?

01:35   17       MR. ZELLER:  Correct.

01:35   18       THE COURT:  Let me repeat that so I'm certain I've

01:35   19  got that.  Your arguments pertain to all the motions.

01:35   20       MR. ZELLER:  Yes.

01:35   21       THE COURT:  Okay.  Fine.

01:35   22       You should have received a minute order that

01:35   23  outlined a number of questions the Court would like the

01:35   24  parties to address at the hearing.  And I want to make

01:35   25  certain that all parties are in receipt of that minute

DEBBIE GALE, U.S. COURT REPORTER

01:35  1   order.

01:36  2          Ms. Estrich, are you?

01:36  3          MS. ESTRICH:  *(No audible response.)*

01:36  4          THE COURT:  Mr. Quinn?

01:36  5          MR. QUINN:  Yes.

01:36  6          THE COURT:  Mr. Zeller?

01:36  7          MR. ZELLER:  Yes.

01:36  8          THE COURT:  Mr. Overland, are you?

01:36  9          MR. OVERLAND:  Yes, Your Honor.

01:36 10          THE COURT:  Mr. Molinski?

01:36 11          MR. MOLINSKI:  Yes, Your Honor.

01:36 12          THE COURT:  Ms. Hurst?

01:36 13          MS. HURST:  Yes, Your Honor.

01:36 14          THE COURT:  Mr. McConville?

01:36 15          MR. McCONVILLE:  Yes, Your Honor.

01:36 16          THE COURT:  Each issue is signified on the minute

01:36 17   order by a bolded letter on the left-hand side.  You're not

01:36 18   restricted to questions raised in the minute order, but I'm

01:36 19   really, really encouraging you to frame your argument around

01:36 20   those questions.

01:36 21          If you want to explain to me again RICO and the

01:36 22   predicate acts, please be my guest and use your three hours,

01:36 23   but it's nonsensical.  And I really believe the best way for

01:36 24   you to handle this is on the issue-by-issues basis, because

01:36 25   that's the way the Court prepared its notes.

LACV 04-9049 DOC - 11/16/2010 - Volume I

63

01:36    1          When I set out these questions, these 19 pages of
01:36    2    questions, I prepared my notes that way.
01:37    3          Now, Ms. Hurst, you're not restricted.
01:37    4          Mr. Zeller, you can bounce around.
01:37    5          But what I'm not going to do is start bouncing
01:37    6    around in documents and pages.  In other words, I've got it
01:37    7    organized this way because I expected to hear argument in
01:37    8    this form.
01:37    9          So, Ms. Hurst, the three hours are yours.
01:37   10          MS. HURST:  So, Your Honor, with the Court's
01:37   11    permission, what we'd like to do is follow the order of
01:37   12    issues addressed by the Court, except for RICO, which we
01:37   13    would like to put to the end.
01:37   14          THE COURT:  That's fine.
01:37   15          MS. HURST:  Because that will mean the discussion
01:37   16    of the various claims that form the predicate contacts will
01:37   17    come first.  And then we'll hit RICO after that discussion.
01:37   18          THE COURT:  Whichever way you want to proceed.
01:37   19    Just remember my notes are organized in that fashion.
01:38   20          MS. HURST:  I'm going to go for an hour and a
01:38   21    half, and then Mr. Molinski is going to address trade
01:38   22    secrets.  And then I'm going to come back, and that will be
01:39   23    our three-hour opening.
01:39   24          THE COURT:  Okay.
01:39   25          MS. HURST:  Your Honor, to set the stage, and not

01:39    1    to repeat arguments that have been made before, these

01:39    2    motions require the Court to make a series of decisions,

01:39    3    legal decisions balancing consumer welfare in the form of

01:39    4    competition and employee welfare against property rights.

01:39    5            And Congress and the California legislature have

01:39    6    made some carefully calibrated decisions reflecting

01:39    7    important policy choices regarding these balances, when to

01:40    8    look at the immediate circumstances and the possibility of a

01:40    9    property claim, versus whether to look at the larger

01:40   10    circumstances and the societal value served by the free flow

01:40   11    of information in support of both capitalism and, little D,

01:40   12    democracy.

01:40   13            What Mattel does in this case and in its motions

01:40   14    and in its responses to MGA's motions is to seek to

01:40   15    systematically abrogate those carefully drawn Congressional

01:40   16    and California legislature lines.  In short, they

01:40   17    systematically seek to overreach their property claims at

01:40   18    the expense of consumer welfare and employee welfare.

01:40   19            And the Court is called upon to make this choice

01:41   20    again and again with respect to the claims and the legal

01:41   21    doctrines to be applied in connection with these motions.

01:41   22    This tension is most apparent in the preemptions and

01:41   23    supersession issues, which I know were not first on the

01:41   24    Court's list, so I will defer them in favor of the Court's

01:41   25    list.

01:41   1          But the significance of addressing those issues

01:41   2   now versus later -- and I will answer the Court's specific

01:41   3   questions on that -- are the difference between choosing to

01:42   4   uphold and enact those important policy choices made by

01:42   5   Congress and the California legislature versus simply

01:42   6   throwing them out the window, which is, obviously, MGA and

01:42   7   Mr. Larian's position the Court should not do.

01:42   8          Now, one thing I want to emphasize, as I start, I

01:42   9   represent here today several different parties.  MGA

01:42  10   Entertainment, MGA Hong Kong, MGA de Mexico, and Isaac

01:42  11   Larian, who is an individually named counter-defendant to

01:42  12   many of these claims.

01:42  13          Summary judgment must be evaluated independently

01:42  14   as to each one of these individual counterdefendants.  And

01:42  15   the evidence is very different in some respects as to them.

01:43  16   I will try, as I'm going through, to point out where there's

01:43  17   a significant difference.  But it is important to note

01:43  18   throughout that there is an individual defendant here, and

01:43  19   each element of every claim must be established as to

01:43  20   Mr. Larian, as well as to the entities.  And in many cases,

01:43  21   MGA simply conflates the two or three or four, as the case

01:43  22   may be.

01:43  23          Now, the Court's first series of questions in its

01:43  24   minute order from yesterday is concerning the issue of

01:43  25   identification of the Bratz and Jade as trade secrets.  In

01:43   1   Question A-1, the Court has asked how was this a change in

01:43   2   legal theory.

01:44   3          In all of the pleadings prior to the Fourth

01:44   4   Amended Answer and Counterclaims, Carter Bryant was never

01:44   5   named as a defendant to a trade secret misappropriation

01:44   6   claim.  There was no trade secret misappropriation claim in

01:44   7   the original State court filing against Carter Bryant.

01:44   8          In the proposed amended complaint that Mattel

01:44   9   submitted, there was not a trade secret claim against Carter

01:44   10  Bryant.  And the way the trade secret claims were worded in

01:44   11  all of those pleadings was related solely to the

01:44   12  subsequently departing employees beginning in 2004.  That

01:44   13  this was the scope of Mattel's trade secret claim up until

01:45   14  earlier this year and after the Ninth Circuit opinion is

01:45   15  confirmed by the following documents of record:

01:45   16         In Docket No. 7691, Exhibit 1 -- it's Mattel's

01:45   17  March 2007 letter identifying its trade secrets --

01:45   18  essentially this was their 2019-210, if you will,

01:45   19  designation.  It does not identify Bratz or Jade names as

01:45   20  trade secrets.

01:45   21         In the same Docket No. 7691, Exhibit 2 at 12,

01:45   22  that's a March 19, 2007 discovery hearing before

01:45   23  then-discovery master Judge Infante.  Mr. Zeller said that

01:46   24  the trade secrets claimed were misappropriated in 2004, 2005

01:46   25  and 2006.  That is in connection with the departing

DEBBIE GALE, U.S. COURT REPORTER

01:46  1    employees.  Obviously, Mr. Bryant did what he did in 2000

01:46  2    and 2001.

01:46  3           In Docket No. 7850, Exhibit 1, at page 79,

01:46  4    lines 20 to 22, this is the hearing transcript of the

01:46  5    May 23rd, 2008 pretrial conference, Mr. Zeller said, and I

01:46  6    quote, "We have not said that the name Bratz is, quote,

01:46  7    'proprietary,' unquote, to Mattel."

01:46  8           THE COURT:  Just one moment.

01:46  9             (Brief pause in the proceedings.)

01:49  10          THE COURT:  Please continue, Counsel.

01:49  11          MS. HURST:  Thank you, Your Honor.

01:49  12          In that pretrial conference transcript, it

01:49  13   reflects Mr. Zeller's statement, quote, "We have not said

01:49  14   that the name 'Bratz' is, quote, 'proprietary,' unquote, to

01:49  15   Mattel.  That is not the basis of our theory."

01:49  16          Now, that was quite significant because that was a

01:50  17   reference to the word -- the definition of "proprietary

01:50  18   information" in the Carter Bryant inventions agreement.  And

01:50  19   that definition of proprietary information exactly tracks

01:50  20   the definition of a trade secret under the Uniform Trade

01:50  21   Secrets Act.

01:50  22          So the disclaimer at the pretrial conference that

01:50  23   they were claiming the name "Bratz" as proprietary is the

01:50  24   same thing as disclaiming it as a trade secret.  The

01:50  25   definitions are synonymous under the statute and under the

DEBBIE GALE, U.S. COURT REPORTER

01:50  1    contract.  So they never sued Carter Bryant for trade secret

01:50  2    misappropriation.  They never identified the "Bratz" and

01:50  3    "Jade" names or the Bratz materials as part of the trade

01:50  4    secret claim.

01:50  5         There were -- the March 2007 letter identifying

01:50  6    trade secret did not identify "Bratz" or "Jade" names as

01:50  7    trade secret.  It was said at least twice on the record by

01:51  8    Mr. Zeller that either those claims related to the departing

01:51  9    employees, or the name "Bratz" is not proprietary.  And in

01:51  10   light of all of that, this Court, with Your Honor sitting,

01:51  11   twice ruled that Bratz and Jade were not part of the trade

01:51  12   secret claims in granting in part and denying in part

01:51  13   Mattel's motion for leave to amend to file the Fourth

01:51  14   Amended Answer and Counterclaims, in Docket No. 7712, at

01:51  15   pages 9 to 10, and again in the first order denying the

01:51  16   motion to confirm, in Docket No. 7853, at 1 to 2.  In both

01:51  17   of those prior orders, the Court recognized this was a

01:51  18   change in theory of their trade secret misappropriation

01:51  19   claim.

01:52  20        The Court's next question is, was MGA prejudiced

01:52  21   by this?  Yes.  The statute of limitations ran on a trade

01:52  22   secret claim related to Bratz and Jade as a trade secret, I

01:52  23   mean, a long time ago.  Obviously, our view is it ran before

01:52  24   they filed the trade secret claims they did file.  But it

01:52  25   certainly ran before March 2010.  So could they have just

01:52  1   filed a new lawsuit in March of 2010 for misappropriation of

01:52  2   Bratz and Jade as trade secrets?  No way.

01:52  3          The statute of limitations is longer on the trade

01:52  4   secret claim.  So they get a longer statute than on the

01:53  5   common law tort claims.  They get a three-year versus a

01:53  6   two-year statute.  That's prejudicial.

01:53  7          MGA suffered an entire trial and an injunction

01:53  8   based upon claims that were, in fact, preempted, now we

01:53  9   know, but Mattel's tactical pleading obscured -- let me use

01:53  10  the word the Court carefully chose in its order -- the

01:53  11  supersession by the Uniform Trade Secrets Act of the common

01:53  12  law tort claims.

01:53  13         The whole Phase I trial should have been a trade

01:53  14  secret case, assuming that claim had been timely pled and

01:53  15  they were allowed to bring it, and it wasn't barred by the

01:53  16  statute of limitations, rather than all those other

01:53  17  theories.  The whole case proceeded on the wrong premise

01:53  18  with different standards of proof.  That's prejudicial.  An

01:54  19  injunction was entered as a result.

01:54  20         An injunction never could have been entered on the

01:54  21  name "Bratz" by the time of trial in December of 2008 or --

01:54  22  December 2008.  It's no longer a trade secret.  You can't

01:54  23  enter an injunction at that point.

01:54  24         Mattel -- Mattel had the benefit of, and MGA had

01:54  25  the detriment of, that injunctive order because of these

01:54   1    tactical pleading choices by Mattel.

01:54   2           The Court next asks, absent amendment, wouldn't

01:54   3    MGA's counterclaims and reply have been personally barred as

01:54   4    noncompulsory.  Not based on our reading of the Court's

01:55   5    order in Docket 8892.  None of the three reasons given for

01:55   6    finding the counterclaims in reply compulsory rested in any

01:55   7    way on "Bratz" and "Jade" names as a trade secret.

01:55   8           Rather, the Court's rationale, expressed in pages

01:55   9    5 to 7 of that order, concerned a transaction which was the

01:55   10   litigation itself and a logical relationship between the

01:55   11   trade secret misappropriation claims, more generally, the

01:55   12   departing employee trade secret misappropriation claims and

01:55   13   the "Mattel snuck their way into everybody's showroom" trade

01:55   14   secret misappropriation claims.

01:55   15          "Why is the Court's failure to permit Mattel to

01:55   16   formally amend" -- and now I'm on A-3, Your Honor --

01:55   17   "relevant?"

01:56   18          Well, certainly, if it's not reasonably

01:56   19   encompassed by the pleading and the statute of limitations

01:56   20   has run for some reason, then that would be relevant.

01:56   21          "Isn't a motion to confirm not a motion for leave

01:56   22   to amend?"

01:56   23          Mattel made both, as the Court will recall.  Even

01:56   24   they recognize they had a problem here.  They made the

01:56   25   motion for a leave to amend.

01:56  1          "Isn't MGA's counterclaim in reply for trade

01:56  2   secret misappropriation predicated upon trade secret

01:56  3   protection enjoyed by information about 114 products, even

01:56  4   though all 114 products are not expressly identified in the

01:56  5   counterclaims in reply?"

01:57  6          Yes.  And a party is not required to plead and

01:57  7   disclose every trade secret in a pleading.  But here we have

01:57  8   a different situation.  We have a situation where, at the

01:57  9   time the lawsuit was filed, the trade secret had already

01:57  10  been disclosed.  There was no need to keep it secret

01:57  11  anymore.  There was no need to describe it in only vague or

01:57  12  general terms in order to continue protecting it.

01:57  13         There was every ability or incentive to be

01:57  14  specific, "I'm claiming 'Bratz' as a name is a trade

01:57  15  secret," because it had already been disclosed at that

01:57  16  point.  Moreover, even with notice, pleading for a trade

01:57  17  secret misappropriation claim, you still have to say what

01:57  18  your factual theory is.  And the factual theory up until --

01:58  19  in the pleadings up until spring of this year was departing

01:58  20  employees trade secret misappropriation.  A scheme to

01:58  21  defraud related to that in the RICO claim.

01:58  22         So this is a tactical change by Mattel.  It's a

01:58  23  response to the Ninth Circuit's ruling.  And a change in the

01:58  24  theory of liability for a tactical reason in response to the

01:59  25  Ninth Circuit is inappropriate.

| | | |
|---|---|---|
| 01:59 | 1 | Under the *Bancorp* case, it's certainly |
| 01:59 | 2 | inappropriate under Rule 15, but respectfully, Your Honor, |
| 01:59 | 3 | we submit that the differences in the legal standards under |
| 01:59 | 4 | trade secret misappropriation would require the Court to |
| 01:59 | 5 | adjudicate new claims of misuse in a way that would be |
| 01:59 | 6 | inconsistent with the order from the Ninth Circuit "all |
| 01:59 | 7 | further proceedings must be consistent with this opinion." |
| 01:59 | 8 | In other words, to be specific, I don't think that when it |
| 01:59 | 9 | elucidated at some length the proper copyright infringement |
| 01:59 | 10 | standards to be applied to misuse of the Bratz -- Carter |
| 01:59 | 11 | Bryant Bratz drawings in this case, that the Ninth Circuit |
| 02:00 | 12 | thought they were gonna get to back door and not be subject |
| 02:00 | 13 | to those copyright infringement standards, virtual identity |
| 02:00 | 14 | on the scopes, and which elements are protected on the |
| 02:00 | 15 | drawings and the dolls by instead claiming some trade secret |
| 02:00 | 16 | misappropriation claim related to use of those things. |
| 02:00 | 17 | I don't think the Ninth Circuit thought they were |
| 02:00 | 18 | gonna get to back door some claim for equitable relief or |
| 02:00 | 19 | damages or whatever related to the ideas for the names after |
| 02:00 | 20 | the Court carefully assessed whether a constructive trust |
| 02:00 | 21 | was properly imposed in a situation like this. |
| 02:00 | 22 | The Court said go back and do it under the legal |
| 02:00 | 23 | framework, keeping these -- adhering to these rules.  And |
| 02:00 | 24 | what they're trying to do is make those rules irrelevant. |
| 02:01 | 25 | Your Honor, there's another of the Court's |

DEBBIE GALE, U.S. COURT REPORTER

LACV 04-9049 DOC - 11/16/2010 - Volume I

02:01  1    questions that pertain to the status of "Bratz" and "Jade"

02:01  2    names as trade secrets.  That's the Court's question in

02:01  3    H-1(b) on page 11 of its outline.

02:01  4         Your Honor, there, the Court asked how can the

02:01  5    product names be characterized as a trade secret in light of

02:01  6    the fact that once disclosed, it's evident to anyone using

02:02  7    the finished product.

02:02  8         It is not a trade secret once disclosed, clearly.

02:02  9    And that is what the cases cited by the Court stand for,

02:02 10    that once something is disclosed, it's no longer a trade

02:02 11    secret.  Whether it can be a trade secret prior to

02:02 12    disclosure depends on the circumstances.  And in California,

02:02 13    it depends on the legal test under the Uniform Trade Secrets

02:02 14    Act.

02:02 15         Now, here, I would caution the Court that the

02:02 16    cases cited by the Court in its Question H-1(b), New York

02:02 17    cases, New York actually follows the Restatement of Unfair

02:02 18    Competition still, Your Honor, rather than the Uniform Trade

02:02 19    Secret Act.

02:02 20         THE COURT:  Okay.

02:02 21         MS. HURST:  And there is a different definition

02:02 22    there.  So one has to be cautious in following the Second

02:02 23    Circuit in New York cases on trade secrets.

02:03 24         But in this instance, certainly we argue and agree

02:03 25    with the result that a common word from a dictionary --

02:03  1    "brats," "jade," "moxie" -- that they have no intention
02:03  2    whatsoever of using the name applied to a fashion doll --
02:03  3    this is what they claim the trade secret is:  The name
02:03  4    applied to a fashion doll.  That's the claim of trade
02:03  5    secret:  The name "Bratz" applied to a fashion doll.  The
02:03  6    name "Jade" as applied to a fashion doll.  The name "Moxie"
02:03  7    as applied to a fashion doll -- when they have no intention
02:03  8    of using it, that thing is not of value to them either from
02:03  9    secrecy or otherwise.  It's not a trade secret.  It's not
02:03  10   property.  It's not a thing of value.  It's their cast off.
02:03  11   It's like they threw it in the garbage.
02:04  12          And they certainly cannot argue that when there's
02:04  13   a common name in a dictionary applied to a fashion doll that
02:04  14   they have no intention of using that they are nonetheless
02:04  15   entitled to take a word out of circulation.  That is simply
02:04  16   not the law.  And in *Silvaco*, the Court said pure ideas are
02:04  17   not trade secret under the Uniform Trade Secret Act.
02:04  18          And I think that brings us nicely, Your Honor, to
02:04  19   Point C in the Court's outline of questions -- as I
02:04  20   indicated I will skip over RICO until later -- Trade Secret
02:05  21   Supersession.
02:05  22          On page 7 of the Court's minute order, question
02:05  23   C-1:  "Why shouldn't the Court leave this issue of
02:05  24   partial" -- actually, let me back up, Your Honor.
02:05  25          I think that D-4 also concerns the trade secret

02:05  1    supersession issue.  And it is the question:  Assuming we

02:05  2    prevail on supersession, what claims are left.  With the

02:06  3    Court's indulgence, I'll answer that question first because

02:06  4    I think it then frames the rest of the discussion.

02:06  5          The Court asks in D-4, "Assuming MGA prevails on

02:06  6    its CUTSA" -- that's C-U-T-S-A, all caps -- "arguments in

02:06  7    full, are the only remaining grounds for the state law

02:06  8    counterclaims that MGA induced Mattel employees to work for

02:06  9    MGA's benefit while still employed by Mattel?"

02:06  10         Yes, and the conversion claim based on tangible

02:06  11   property.

02:06  12         There would be left the duty of

02:06  13   loyalty/intentional interference claim as to the

02:06  14   seamstresses, as to Bryant to the extent it's not about the

02:06  15   ownership of Bratz, but rather simply about whether he

02:07  16   transferred his loyalty through other acts, and then

02:07  17   conversion based on the tangible property.

02:07  18         Now, "Why not wait?" the Court says.

02:07  19         Let me start with this:  Mattel has conceded, in

02:07  20   response to our motion, 122 of its 267 previously claimed

02:07  21   trade secrets are not.  Nearly half.  You decide

02:07  22   supersession now, and those go out the window, which is

02:07  23   exactly what should happen.

02:08  24         Even without those 122 trade secrets, trying to

02:08  25   administer the trial with all of the theories in the case

02:08    1    will require a special verdict form that runs to a thousand

02:08    2    pages.  Court's gonna have to ask with respect to everything

02:08    3    they claim whether it meets the definition of trade secret,

02:08    4    or whether it's simply confidential business information, or

02:08    5    whether it's actually in the public domain every single time

02:08    6    in order -- if they're allowed to preserve their

02:08    7    lesser-included offenses theory, if the Court wants to

02:08    8    decide the issue after trial.

02:08    9          Additionally -- and this is no small factor -- it

02:08   10    is simply prejudicial to permit them to argue using multiple

02:09   11    different theories that the same conduct is a legal wrong.

02:09   12    It's the "big lie" strategy.  If you keep repeating it in

02:09   13    multiple different ways, it gets traction, it gets effect,

02:09   14    the jury must think there's something there.  And there's

02:09   15    not.

02:09   16          So the Court asks, conversely, how does the grant

02:09   17    of partial summary judgment work if it is made in advance.

02:09   18    And we haven't actually called it "partial summary

02:09   19    judgment."  It does dispose of the entirety of claims in

02:09   20    many respects.  That's probably partial summary judgment.

02:09   21          What happens is, the Court gives the trade secret

02:09   22    misappropriation instructions as to the things they're still

02:09   23    claiming are trade secret misappropriation, and it gives --

02:10   24    assuming the duty of loyalty claim and the conversion claims

02:10   25    survive summary judgment -- appropriate instructions as to

02:10  1   that.  The Court doesn't, then, try to give multiple types

02:10  2   of instructions based on the same fact -- common nucleus of

02:10  3   facts.  The Court doesn't try to give an instruction as to

02:10  4   trade secret "Castilla, No. 56":  Well, first, you consider

02:10  5   whether this is a trade secret, then you consider whether it

02:10  6   was confidential business information under the contract,

02:10  7   then you consider whether it was related to some duty of

02:10  8   loyalty, then you consider whether it was related to some

02:10  9   fiduciary duty.

02:10  10          The Court gives one set of instructions and that

02:10  11  is exactly what the supersession clause of the Uniform Trade

02:10  12  Secrets Act was designed to implement.

02:11  13          Here, Your Honor, I would commend to the Court the

02:11  14  decision of the highest court in the State of Hawaii, a very

02:11  15  recent one, surveying the law in this area, summarizing it,

02:11  16  summarizing the majority rule that is reflected in *Silvaco*

02:11  17  and *K.C. Multimedia* and the numerous other cases, including

02:11  18  the *New Hampshire* case that the Court noted in the *Mortgage*

02:11  19  *Specialist* case that the Court noted in the minute order.

02:11  20          Here's what the highest Court of Hawaii said --

02:11  21  and this is 235 Pacific Reporter 3d at 322:

02:11  22          "The UTSA" -- U-T-S-A, all caps -- "creates a

02:12  23  two-tiered approach to protection of commercial knowledge

02:12  24  under which information is classified only as either a

02:12  25  protected trade secret or unprotected general skill and

02:12  1  knowledge."  And that's the same quote, by the way, that the

02:12  2  *Mortgage Specialist* case uses:  Two-tiered approach.

02:12  3       In a case like this against MGA, against MGA

02:12  4  Entertainment, MGA de Mexico, Mr. Larian, it's just that

02:12  5  two-tiered approach.  None of those defendants had a direct

02:12  6  contractual obligation that is sought to be enforced in the

02:13  7  claims against them.

02:13  8       Now, the Court in C-2 asks isn't the only on-point

02:13  9  federal appellate court case in *Hecny* applicable? -- the

02:13  10 "free pass" case.

02:13  11      No.  *Hecny* was a case where the general manager of

02:13  12 a business diverted sales -- someone who was a clear

02:13  13 fiduciary, by the way -- diverted sales while still

02:13  14 employed, stole physical property, as the Court noted.

02:13  15      Now, apart from that, however, both before and

02:14  16 after *Hecny*, in the Seventh Circuit, the Court has said that

02:14  17 the rule in Illinois is for supersession under the Uniform

02:14  18 Trade Secrets Act.  So in 1992, in *Composite Marine*

02:14  19 *Propellers v. Van Der Woude*, 962 F.2d 1263, the Seventh

02:14  20 Circuit *per curium* Judge Easterbrook on the panel said,

02:14  21 "Illinois has abolished all common law theories of misuse of

02:14  22 such information.  Unless defendants misappropriated a

02:14  23 statutory trade secret, they did no legal wrong."

02:14  24      After *Hecny*, the Court said that again in the

02:15  25 *Confold* case, 433 F.3d 952:  "In general, if information is

02:15  1    not a trade secret and is not protected by patent,

02:15  2    copyright, or some other body of law that creates a broader

02:15  3    intellectual right than trade secrecy does, anyone is free

02:15  4    to use the information without liability.  If the

02:15  5    information is not secret and not protected by any of the

02:15  6    laws that create property rights and information, it is in

02:15  7    the public domain and freely usable without need to commit a

02:15  8    tort or breach of contract to obtain it."

02:15  9          So, Your Honor, in short, the Seventh Circuit

02:15  10   appears to have multiple personality disorder when it comes

02:16  11   to Illinois Trade Secret Supersession.  But, as we've

02:16  12   demonstrated in our papers, the most important thing for the

02:16  13   Court to consider is that there are two published California

02:16  14   Appellate Court authorities that say this is the law of

02:16  15   California.  And under the -- I think it's *Six Counties*

02:16  16   *(sic) v. Joint Highway District No. 13*, Supreme Court case,

02:16  17   the Court is not simply free to disregard that published

02:16  18   appellate authority of California.  There must be a good

02:16  19   reason to do so, a thorough conviction to do so.

02:16  20         And certainly, Mattel has not demonstrated where

02:16  21   here that is the majority rule.  And this is one of those

02:16  22   carefully chosen balances by the California legislature, by

02:16  23   many states, in enacting a uniform set of laws that is

02:16  24   designed, was created by this set of commissioners to have a

02:17  25   uniformity of requirements for when information is protected

02:17   1    and when it is not so that unprotected information is freely

02:17   2    available to make efficient competition a goal for consumer

02:17   3    welfare.

02:17   4            Your Honor, I think I've probably answered C-3 in

02:17   5    my comments about how the trial would work if the Court

02:17   6    waited.  And I interpret that question to be more directed

02:17   7    to Mattel, so I'll skip it until rebuttal, if necessary.

02:17   8            Your Honor, in C-4, simply superseding remedies is

02:18   9    in the answer here for the reasons that I've already

02:18   10   discussed.  It's not property unless it meets the trade

02:18   11   secret definition.  It's got to be the claim, as well as the

02:18   12   remedy.  The claim elements also have to be met.

02:18   13           Now, aren't the costs of acquisition, the Court

02:18   14   says, and sometimes the costs of creation often related to

02:18   15   the value of the material obtained from its secrecy?

02:18   16           Maybe.  Or it could be that they're just the least

02:18   17   efficient producer of information, in which case the Court

02:18   18   is doing nobody any favors by protecting the least efficient

02:18   19   producer of information.  And that's why the UTSA creates

02:18   20   the two-tiered approach.  It doesn't protect the least

02:18   21   efficient producer of information simply because it slaps a

02:18   22   "confidential" label on it, or in this case, where it

02:18   23   doesn't -- as Mr. Molinski will be discussing in greater

02:18   24   detail.

02:19   25           Now, the Court expresses some concern that our

02:19  1    supersession argument -- and this is, I think, in both

02:19  2    C-2 and C-5 -- will go so far as to obliterate a conversion

02:19  3    claim.

02:19  4          No.  The intangible right in the information is

02:19  5    not the same thing as the piece of paper it may be printed

02:19  6    on; or more pertinently, it's certainly not the same thing

02:19  7    as office equipment, or, as the Court notes, physical

02:19  8    drawings and sculpts.

02:19  9          Now, in that case, the Copyright Act is more

02:19  10   pertinent.  But the Court has asked the same question in its

02:19  11   copyright section.  And I think the Copyright Act supplies a

02:19  12   really good and helpful answer here, which is logical for

02:20  13   both understanding the answer to this question in both the

02:20  14   Copyright Act and the trade secret.  So what I'm gonna do is

02:20  15   point the Court to Section 202 of the Copyright Act -- which

02:20  16   somehow I didn't have printed.

02:20  17          Section 202:  Ownership of Copyright as Distinct

02:20  18   from Ownership of Material Object.

02:20  19          "Ownership of a copyright or of any of the

02:20  20   exclusive rights under a copyright is distinct from

02:21  21   ownership of any material object in which the work is

02:21  22   embodied.  Transfer of ownership of any material object,

02:21  23   including the copy or phono record in which the work is

02:21  24   first fixed, does not, of itself, convey any rights in the

02:21  25   copyrighted work embodied in the object.  Nor, in the

02:21    1    absence of an agreement, does transfer of ownership of

02:21    2    copyright or of any exclusive rights under a copyright

02:21    3    convey property rights in the material object."

02:21    4         So there's a difference between this theoretical

02:21    5    intellectual property bundle, which is the copyright or the

02:21    6    trade secret, and any material object in which it may be

02:21    7    embodied, or in some cases, any electronic stream of data or

02:21    8    optical disk or thumb drive in which it may be embodied.

02:21    9         There's a difference between the intellectual

02:22   10    property right and the tangible object.  And so, in this

02:22   11    regard, neither Copyright Act preemption nor trade secret

02:22   12    supersession go too far in displacing the law of transfer of

02:22   13    title with respect to physical objects.

02:22   14         And that brings us neatly to the Court's question

02:22   15    in C-5.  Now, I've made that distinction about material

02:22   16    objects, the Court asks, What about the intangibles?

02:22   17         Your Honor, the intangibles have been limited to

02:22   18    very specific, concrete, identifiable things.  So, for

02:22   19    example, in the *Kremen*, it's a domain name.  Now, the

02:22   20    reality is, while in *Kremen*, the Court said a domain name

02:23   21    can be a property right.  Other courts have taken a

02:23   22    different view.  Other states have taken a different view.

02:23   23    In Virginia, it's a contract right, not a property right.

02:23   24         But to the extent there have been cases saying

02:23   25    intangibles can be property -- which, by the way, is

Case 2:04-cv-09049-DOC-RNB   Document 9523   Filed 12/22/10   Page 83 of 98   Page ID #:284716
LACV 04-9049 DOC - 11/16/2010 - Volume I

83

02:23   1   contrary to the *Melchor (phonetic)* case, which we've cited,

02:23   2   which remains good law and is most apposite here because

02:23   3   it's talking about underlying copyrightable subject matter,

02:23   4   as is *Harper & Row*, which the Court cites -- it's only where

02:23   5   it's a really specifically identifiable thing over which

02:23   6   dominion can be deprived -- so domain names, stock, shares,

02:23   7   those sorts of things -- specifically identifiable things,

02:23   8   not abstract marketing data, you know, strategic plan

02:23   9   analysis, not that kind of stuff.

02:24   10          So I think Mr. Molinski will address this further.

02:24   11   But in terms of supersession, there's no inconsistency with

02:24   12   the case law recognizing some limited property rights and

02:24   13   intangibles 'cause that's just not what's at issue here,

02:24   14   those sorts of things:  Stock shares, domain names.  What we

02:24   15   have at issue here is general business information.

02:24   16          And that brings us, in the Court's outline, to

02:24   17   Section D, Copyright Preemption.

02:25   18          As we pointed out, the Court must consider both

02:25   19   Section 301 express preemption, using the extra elements

02:25   20   test, but the Court also must consider conflict preemption,

02:25   21   which is, a clearly expressed copyright policy will be

02:25   22   frustrated by the claim that Mattel seeks to interpose.

02:25   23          When those two concepts are considered, all of the

02:25   24   Bryant-related claims, other than the pure ideas for "Bratz"

02:25   25   and "Jade" as trademarks -- to become trademarks, if you

Case 2:04-cv-09049-DOC-RNB   Document 9523   Filed 12/22/10   Page 84 of 98   Page ID #:284717
LACV 04-9049 DOC - 11/16/2010 - Volume I

84

02:25   1   will -- the other kind of property right at issue, to use

02:25   2   the Court's analysis from the motion to dismiss -- asks, is

02:26   3   there some other kind of property right reasonably at

02:26   4   issue -- exclude that.  I think that works here as well in

02:26   5   this particular context.

02:26   6          There's nothing left of the Bryant-related Bratz

02:26   7   claims, other than the claims for "Bratz" and "Jade" names,

02:26   8   once copyright preemption, both Section 301 preemption and

02:26   9   conflict preemption, are applied.

02:26   10          Now, one significance of this is, as I noted

02:26   11   earlier, the careful line drawing of Congress.

02:26   12   Non-protection of ideas, in particular, will be frustrated.

02:26   13   And the Ninth Circuit's opinion about what can be protected

02:26   14   here by Mattel and what can't will be frustrated, if

02:27   15   Mattel's now allowed to back door some kind of trade secret

02:27   16   claim based on the Bryant drawings.

02:27   17          The same is true of an interference of contractual

02:27   18   relations claim.  The same is true with a duty of loyalty

02:27   19   claim.  Any claim you want to interpose based on MGA's

02:27   20   acquisition and subsequent use of those drawings all ends up

02:27   21   right back at the copyright infringement standards.

02:27   22          Should the issue be left until after trial?  No.

02:27   23   Because it frustrates that line drawing -- in this case, to

02:27   24   the opportunity of a billion dollars damages claim.  That's

02:27   25   right.  They want to claim lost opportunity based on all

DEBBIE GALE, U.S. COURT REPORTER

02:28   1    those tort theories, the lost opportunity to exploit Bratz,

02:28   2    which, as we've shown in our motion, would not be available

02:28   3    to them under the Copyright Act.

02:28   4           Frankly, we think it's not available under the

02:28   5    tort theories either.  If they survive preemption, we'll get

02:28   6    to that, I suppose.  But clearly, not available under

02:28   7    *Polar Bear* and *Mackie v. Riser*, and that stringent causal

02:28   8    requirement under the Copyright Act.

02:28   9           You can't testify that you rejected something, and

02:28   10   you wouldn't have used it, and it was inconsistent with your

02:28   11   corporate image, and it was the anti-Barbie, not the Barbie,

02:28   12   and therefore they never would have marketed it, and

02:28   13   preserve a claim for lost opportunity under the Copyright

02:28   14   Act.  That's a $1.125 billion claim in their latest

02:28   15   1-of-20 expert reports.

02:28   16          Now, if the jury gets to hear about that, that

02:29   17   cannot be cured by instructions.  Any compromised verdict is

02:29   18   tainted by them getting to put that billion dollars on the

02:29   19   table, which they never should have gotten to put on the

02:29   20   table because copyright preempts all those claims, and that

02:29   21   theory of recovery is not available under the Copyright Act,

02:29   22   given the undisputed facts in this case.

02:29   23          Additionally, as I previously noted, it's the big

02:29   24   lie.  When they get so many bites at the apple, so many

02:29   25   opportunities to argue that some legal wrong must have

02:29  1   occurred, when Congress has said otherwise, specifically --

02:29  2   and here to presage my argument on the copyright standards a

02:29  3   bit, they've conceded the copyright case.  They've got

02:29  4   nothing left.  They've got one first-generation doll left --

02:29  5   maybe -- if it can survive this summary judgment argument.

02:30  6   They literally have no claim for copyright infringement left

02:30  7   by their own concession in their Response to

02:30  8   Interrogatory 31.

02:30  9          And Congress drew that line for purposes of

02:30  10  consumer welfare so that MGA can come along and market those

02:30  11  products.

02:30  12         Now, the Court has said in the past, and we

02:30  13  certainly agree, this is not the cure for cancer.  But it

02:30  14  was significant to little girls who did not see themselves

02:30  15  in Barbie.  It was significant to those little girls -- the

02:30  16  Hispanic little girls, the African-American little girls,

02:30  17  the Indian little girls who could see themselves in Bratz in

02:31  18  a way they never could see in Barbie.

02:31  19         Does it make a difference to let them stand up and

02:31  20  say, "Well, it was an interference of contract"?

02:31  21         "Well, it was an interference with" some duty,

02:31  22  undefined, not consistent with state law, not in the

02:31  23  contract.

02:31  24         "It was a breach of this."

02:31  25         "It was a breach of this."

02:31    1          "It was a breach of this."

02:31    2          "It was a breach of this."

02:31    3          Yes.  After they repeat it ten thousand times a

02:31    4   day for nine weeks, it has an effect.

02:31    5          But if the jury only hears about it from the

02:31    6   proper legal construct from the outset, then the policies

02:31    7   that Congress sought to enact are preserved.

02:32    8          The Court says in D-2, "Where does Mattel link

02:32    9   ownership with its intentional interference counterclaim?"

02:32   10          Your Honor, in its prayer for relief, Mattel

02:32   11   sought specific relief against Bryant on the intentional

02:32   12   interference -- on the contract, and it sought a declaration

02:32   13   of transfer against MGA.  And at trial, in Phase I,

02:32   14   Mr. Quinn argued in closing that the harm on the intentional

02:32   15   interference with contract claim was the ownership, loss of

02:32   16   ownership rights in Bratz.

02:32   17          And that -- it was clear that this is Mattel's

02:32   18   theory is reflected in Judge Larson's order for an

02:32   19   injunction, which relies, in granting the constructive trust

02:33   20   and the injunctive relief, in part, on the interference with

02:33   21   contractual relations claim.  It's clear that was Mattel's

02:33   22   case.  That was the Base 1 of the three prongs that were the

02:33   23   basis for injunctive relief:  The interference with contract

02:33   24   claim, the aiding and abetting/breach of fiduciary duty

02:33   25   claim, and aiding and abetting/duty of loyalty claim.

02:33    1          That's it -- the Court's -- Judge Larson's order
02:33    2   is at Docket 4439.  And I was looking at page 6, Your Honor.
02:33    3          So, Your Honor -- and this goes a little bit to
02:33    4   all their fancy new theories that they disclosed on
02:34    5   September 10th.  The Copyright Act has a carefully
02:34    6   prescribed set of conditions for ownership of copyright.
02:34    7   The entire Chapter 2 of the Act is about ownership and
02:34    8   conveyance.
02:34    9          In the situation presented here, you either had a
02:34   10   "work made for hire" or you had an express writing.  That's
02:34   11   it.  Under *Effix (phonetic) Associate*, you can't do some
02:34   12   fancy dancing and claim there was some implied-in-fact
02:34   13   transfer.
02:34   14          You don't get some duty doctrines.  You get a
02:34   15   writing or "within the scope of employment."  And if you
02:35   16   don't get those, you don't get the copyright.  That's what
02:35   17   Congress said.
02:35   18          And the Supreme Court recognized the significance
02:35   19   of that careful policy choice that Congress made in the 1976
02:35   20   Copyright Act in the *CCNV v. Reid* case, where the Court
02:35   21   recounts a basically twelve-year history of negotiation of
02:35   22   all the major intellectual property industries and labor
02:35   23   unions and everybody else leading to this "work made for
02:35   24   hire" definition in Section 101 of the act.
02:35   25          Never a more carefully crafted Congressional

02:35  1  compromise -- you know, it's hard to imagine -- and the

02:35  2  Court says, for that reason, in *CCNV*, we should enforce

02:35  3  that, and we should be extremely careful to do anything to

02:35  4  disrupt it, which is basically what Mattel seeks to do here

02:35  5  with their goofy theories of Shop Right Doctrine and all

02:36  6  this other stuff they're trying to bring in, which plainly

02:36  7  have no application under the Copyright Act.

02:36  8          The Court asks in D-3, "If MGA's theory is that

02:36  9  every claim based upon the conveyance of a copyrightable

02:36  10  work is preempted, doesn't this eviscerate the vast majority

02:36  11  of state law claims based on property transfers?"

02:36  12          No.  Because -- and that's the one I just read to

02:36  13  the Court, 202.  We're not claiming preemption of material

02:36  14  objects here.  We're talking about preemption of the rules

02:36  15  of transfer of the copyright bundle of rights.

02:36  16          "Would there be some preemption of the Uniform

02:36  17  Trade Secrets Act?"

02:36  18          Yes.  Yes, there is.  As we've argued, and the

02:36  19  *Just Met (phonetic)* case noted -- in that case there was a

02:36  20  trade secret claim, but the ownership had to be analyzed

02:37  21  under the Copyright Act's Work Made for Hire Doctrine before

02:37  22  the trade secret claim could be further assessed.  In that

02:37  23  case, the procedural posture was, is this "arising under"

02:37  24  for purposes of federal jurisdiction.

02:37  25          But the question who owns the software that was at

LACV 04-9049 DOC - 11/16/2010 - Volume I

02:37   1    issue in the trade secret misappropriation claim, the Court

02:37   2    said must be answered under the Copyright Act.

02:37   3          And, Your Honor, on this point, the *Harper & Row*

02:37   4    case is really the closest out of the Second Circuit in

02:37   5    terms of analyzing the bundle of rights that are at issue

02:37   6    here and explaining why preemption pertains to any tort

02:37   7    theories.  It's not a trade secret misappropriation case.

02:37   8    But it explains why the first publication and subsequent use

02:37   9    are all wrapped up into one equivalent of the Section 106

02:37   10   bundle of rights and, therefore, preempted.

02:38   11         Your Honor, it appears that the remainder of

02:38   12   question D-3 is directed to Mattel's attempt to distinguish

02:38   13   *Del Madera*, so I'll reserve on that.

02:38   14         That brings us in the Court's outline to Copyright

02:38   15   Infringement.

02:39   16         Mattel has no virtual identity analysis related to

02:39   17   the sculpts.  It's not in its Response to Interrogatory 31.

02:39   18   Mattel has no infringement analysis of anything after the

02:39   19   first generation in its Response to Interrogatory No. 31.

02:40   20   Mattel has no analysis of how two of the four

02:40   21   first-generation dolls infringe in its Response to

02:40   22   Interrogatory No. 31 -- Cloe and Yasmin.

02:40   23         The only comparison Mattel makes in response in

02:40   24   its Response to Interrogatory 31 is the first-generation

02:40   25   Jade doll to the "Jade Drawing" by Carter Bryant, and the

02:40   1    first generation Sasha doll to the "Holiday Drawing" by

02:40   2    Carter Bryant.

02:40   3           That's the end of the story with respect to most

02:40   4    of Mattel's copyright claim.  And the *Berkla v. Corel* case

02:40   5    is a really good one.  I commend it to the Court's

02:40   6    attention.  It says the burden is on the plaintiff, in its

02:41   7    discovery responses, to conduct the extrinsic comparison

02:41   8    using the applicable principles and to explain, having done

02:41   9    so, why it can prevail under the intrinsic test.

02:41   10          Mattel didn't do that for the sculpts, anything

02:41   11   after the first generation or Cloe and Yasmin.  That's it.

02:41   12   They're done.

02:41   13          Now, they say, "Well, we served a supplemental

02:41   14   interrogatory response.  After MGA moved to compel, we

02:41   15   represented we gave a complete response, and the Court

02:41   16   denied the order to compel on that basis.  Now, we're

02:41   17   allowed to come along and change our theory right before

02:41   18   summary judgment."

02:41   19          No.  When you make a representation to the Court

02:41   20   that your interrogatory response is complete, obtain a

02:41   21   denial of a motion to compel on that basis, you don't get to

02:41   22   then change the response.  But, frankly, Your Honor, even if

02:42   23   they did get to include their 2010 Loetz report as part of

02:42   24   their infringement comparison analysis, they still fail.

02:42   25          And that brings us, I think, to the Court's

Case 2:04-cv-09049-DOC-RNB   Document 9523   Filed 12/22/10   Page 92 of 98   Page ID #:284725
LACV 04-9049 DOC - 11/16/2010 - Volume I

92

02:42  1    questions.

02:42  2           E-1, "Shouldn't the facial features, facial

02:42  3    expression, size and body be filtered out?"

02:42  4           Yes.  Facial features, facial expressions, size

02:42  5    and body do need to be filtered out.

02:42  6           But, Your Honor, if the Court does consider facial

02:42  7    expression, for example, there's an enormous difference

02:42  8    between the Bryant drawings and the Bratz dolls.  In fact,

02:42  9    this is one of the most significant drawings -- differences.

02:43  10   The expression of the drawings are much older persons

02:43  11   represented in the drawing.  Where as the dolls are

02:43  12   teenagers.

02:43  13          THE COURT:  The expression by Mattel is much

02:43  14   older.  The 20 to -- I'm sorry -- 18-to-24, whereas Bratz

02:43  15   brought that expression much earlier.

02:43  16          MS. HURST:  Right.  The Bryant -- yes.  Obviously,

02:43  17   we're not concealing Mattel -- but, yes, the Bryant drawing

02:43  18   was older.  And MGA brought it younger.

02:43  19          So even if you considered it, it would be an

02:43  20   important point of distinction, not a point of similarity.

02:43  21          Now, Court's next question is, "Don't the Jade and

02:43  22   Fianna dolls share facial features, facial expression, size

02:43  23   and body type with Bryant's drawings?"

02:43  24          You know, for the reason I just indicated, there's

02:43  25   actually a material difference between them.  But generally,

02:44   1   do they share the same features, size and body type with the

02:44   2   drawings?  Yes.  In the sense that the ideas of the

02:44   3   disproportionate head and feet, the particular relative

02:44   4   proportions, the pose and the postures -- those sort of

02:44   5   things that the Ninth Circuit has expressly said are

02:44   6   unprotectable, things that cannot be taken into account, in

02:44   7   other words.

02:44   8        What the Court said can be considered:  Face,

02:44   9   paint, hair color and style, hair -- pardon me -- clothing

02:44   10   and accessories.  This is not something Mattel ever makes an

02:45   11   extrinsic level comparison of in any discovery response.

02:45   12   Nowhere.

02:45   13        Now, the Court asks an interesting question for a

02:45   14   copyright lawyer in question E-2.  I like that one, not that

02:45   15   it's here nor there to the Court.  But the Court asks how is

02:45   16   the interchangeability relevant here if at all.

02:45   17        Well, it's not like a puzzle, Your Honor, because

02:45   18   a puzzle can only be put together one way.  And if, at the

02:45   19   end of putting it together, and only one way, it depicts an

02:45   20   infringing work, then that was a copy.  And it shouldn't

02:45   21   have been distributed without authorization by whoever made

02:45   22   it in the first place.  There's a direct correlation between

02:46   23   the intended use and -- actually, I mean, just distributing

02:46   24   it even probably in cut-up form is a distribution of the

02:46   25   copyrighted work.

02:46  1          That's not what we have here.  What we have here

02:46  2    are a lot of different things sold separately, which maybe

02:46  3    could be put together to look something like the Bryant

02:46  4    drawings, but would be, in all events, neither a

02:46  5    reproduction or a distribution by the consumer when doing

02:46  6    so.  That would just be a private, noncommercial use by the

02:46  7    consumer of those goods for which it paid -- for which "she"

02:46  8    probably paid.

02:46  9          So there's no direct infringement by the end user

02:46  10   when "she" puts things together that way.

02:46  11         So if she sees a photograph in a magazine of some

02:46  12   famous star on the red carpet at the Oscars, and she decides

02:46  13   to try to make her doll dress up that way, that's not

02:47  14   infringing anything.  Even if there was some remote

02:47  15   possibility that somebody could buy Mattel doll fashions and

02:47  16   MGA doll fashions and Spin Master doll fashions, and put 'em

02:47  17   all together in a way that somehow looked like a Carter

02:47  18   Bryant drawing -- assuming somebody would ever want to do

02:47  19   that for any reason -- that would still be substantial

02:47  20   non-infringing uses and purveying it in the form that MGA

02:47  21   purveyed it.

02:47  22         So under the *Sony* case and under the *Glu* case

02:47  23   and -- *Sony* in the United States Supreme Court, and the *Glu*

02:47  24   case in the Ninth Circuit -- when you have substantial

02:47  25   non-infringing uses -- now, I'm even assuming the end users

02:47    1    putting the doll together with fashions to look like a

02:47    2    drawing -- even assuming that, there would be substantial

02:47    3    non-infringing uses.

02:48    4           Next, the Court asks, in E-3, "Aren't Mattel's

02:48    5    'compilations of elements' and 'overall similar appearance'

02:48    6    arguments invitations to error?"

02:48    7           Yes.  Yes, they are.  That is, they are basically

02:48    8    saying, "You know what?  Let's look at these differences

02:48    9    that MGA's identified, and let's ignore them because we've

02:48   10    ascribed some complete *non sequitur* label to them, like

02:48   11    "functional."  If there's one thing you cannot do under the

02:48   12    extrinsic test, it's analyze the dissimilarities and explain

02:48   13    them away.  And *Apple v. Microsoft* says that.

02:48   14           *Apple v. Microsoft* says exactly that, and it says

02:49   15    that's what *Croft* stands for.  That was the concern in *Croft*

02:49   16    in developing the two-tier test.  There's one thing you

02:49   17    can't do is try to dissect the dissimilarities, as opposed

02:49   18    to the similarities.

02:49   19           So what does it mean if they were right that this

02:49   20    was an overall compilation of unprotectable elements case?

02:49   21    Then you would get the overall virtual identity standard,

02:49   22    which is exactly what we got here, because a compilation is

02:49   23    a thin copyright, and get only the virtual identity

02:49   24    intrinsic standard.  And that's -- the *Harper House v.*

02:49   25    *Thomas Nelson* said that most directly in the Ninth Circuit.

02:49  1   *Apple v. Microsoft* says it, as well.

02:49  2          *Harper House* is at 889 F.2d 197 at 205.

02:49  3          I'm concerned by the Court's puzzled look that

02:50  4   maybe that wasn't the way the Court wanted the question

02:50  5   answered.

02:50  6          THE COURT:  No.

02:50  7          MS. HURST:  Okay.  So I think that's the answer to

02:50  8   the copyright questions as expressed by the Court.

02:50  9          As I noted a moment ago, copyright damages only

02:50  10  exist where there's that causal relationship between the

02:50  11  claim for damages and the infringement.

02:50  12         Mattel wants to claim all of MGA's profits ever

02:50  13  earned on Bratz under a lost opportunity theory.  That is

02:50  14  not consistent with the infringement analysis that we've

02:50  15  just walked through.  You can't do that.  Those things don't

02:50  16  infringe.  You can't get every penny MGA ever made on

02:51  17  something that doesn't infringe.  It's not invading any

02:51  18  property right of Mattel at all.  They had no intention of

02:51  19  using this.  And you don't get the billion dollars when you

02:51  20  had no intention of using it and it doesn't infringe.  That

02:51  21  consumer welfare has to kick in there.  That is where it

02:51  22  does matter -- these choices that have been made.

02:51  23         All of that, of course, was assuming they own it,

02:51  24  which they don't.  And that brings us to Point F in the

02:51  25  Court's outline.

LACV 04-9049 DOC - 11/16/2010 - Volume I

97

02:51    1              You want me to stop for a minute so you guys can

02:51    2      switch?

02:52    3                     *(Live reporter switch at 2:52 p.m.)*

02:52    4                     *(Further proceedings reported by Deborah*

02:52    5          *Parker in Volume II.)*

02:52    6                              -oOo-

02:52    7

         8

         9

        10

        11

        12

        13

        14

        15

        16

        17

        18

        19

        20

        21

        22

        23

        24

        25

```
02:52    1                              -oOo-

02:52    2

02:52    3                           CERTIFICATE

02:52    4

02:52    5         I hereby certify that pursuant to Section 753,

02:52    6    Title 28, United States Code, the foregoing is a true and

02:52    7    correct transcript of the stenographically reported

02:52    8    proceedings held in the above-entitled matter and that the

02:52    9    transcript page format is in conformance with the

02:52   10    regulations of the Judicial Conference of the United States.

02:52   11

02:52   12    Date:  November 22, 2010

02:52   13

02:52   14
02:52
02:52   15    _____
02:52
02:52   16          DEBBIE GALE, U.S. COURT REPORTER
                    CSR NO. 9472, RPR
02:52   17

        18

        19

        20

        21

        22

        23

        24

        25
```

DEBBIE GALE, U.S. COURT REPORTER