1           **UNITED STATES DISTRICT COURT**

2           **CENTRAL DISTRICT OF CALIFORNIA**

3        **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4                   - - - - - - -

5   CARTER BRYANT,                    )
                                      )
6            Plaintiff,               )
                                      )
7        vs.                          ) No. SACV 04-9049 DOC
                                      )         Volume II
8   MATTEL, INC.,                     )
                                      )
9            Defendant.               )
    _____)

10

11

12

13         REPORTER'S TRANSCRIPT OF PROCEEDINGS

14                  Hearing on Motions

15                Santa Ana, California

16             Wednesday, November 17, 2010

17

18

19

20  Debbie Gale, CSR 9472, RPR
    Federal Official Court Reporter
21  United States District Court
    411 West 4th Street, Room 1-053
22  Santa Ana, California 92701
    (714) 558-8141

23

24  04cv9040 Mattel 2010-11-17 V2

25

Case 2:04-cv-09049-DOC -RNB   Document 9524   Filed 12/22/10   Page 2 of 63   Page ID #:284733
SACV 04-9049 DOC - 11/17/2010 – Volume II

2

**APPEARANCES OF COUNSEL:**


FOR INTERVENER DEFENDANT MGA ENTERTAINMENT, INC.:

  ORRICK, HERRINGTON & SUTCLIFFE, LLP (Irvine)
  BY:  THOMAS S. McCONVILLE
    Attorney at Law
  4 Park Plaza
  Suite 1600
  Irvine, California 92614
  (949) 567-6700

  - AND -

  ORRICK, HERRINGTON & SUTCLIFFE, LLP (SF)
  BY:  ANNETTE L. HURST
    Attorney at Law
  405 Howard Street
  San Francisco, California 94105
  (415)773-5700



FOR DEFENDANT MATTEL, INC.:

  QUINN EMANUEL URQUHART OLIVER & HEDGES LLP
  BY:  JOHN QUINN
    MICHAEL T. ZELLER
    BRENT DYLAN PROCTOR
    SCOTT WATSON
    MICHAEL MOORE
    Attorneys at Law
  865 South Figueroa Street
  10th Floor
  Los Angeles, California 90017
  (213) 443-3000

1    **APPEARANCES OF COUNSEL (Continued):**

2

3    FOR COUNTER DFENDANT CARLOS GUSTAVO MACHADO GOMEZ:

4
              LAW OFFICES OF MARK E. OVERLAND
5             BY:  MARK E. OVERLAND
                   Attorney at Law
6             100 Wilshire Boulevard
              Suite 950
7             Santa Monica, California 90401
              (310) 459-2830
8
              -and-
9
              SCHEPER KIM AND HARRIS LLP
10            BY:  ALEXANDER H. COTE
                   Attorney at Law
11            601 West Fifth Street
              12th Floor
12            Los Angeles, California 90071-2025
              (213) 613-4655
13

14

15

16

17

18

19

20

21

22

23

24

25

1                           **I N D E X**

2      **PROCEEDINGS**                              **PAGE**

3      Hearing on motions                            5

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 2:04-cv-09049-DOC -RNB   Document 9524   Filed 12/22/10   Page 5 of 63   Page ID #:284736
SACV 04-9049 DOC - 11/17/2010 - Volume II

5

1          SANTA ANA, CALIFORNIA, WEDNESDAY, NOVEMBER 17, 2010

2                              **Volume II**

3                          (12:58 p.m.)

4              *(Previous proceedings reported by Jane*

5          *Sutton in Volume I.)*

6              THE COURT:  Okay.  Back on the record.

7              MS. ESTRICH:  But there is obviously a difference,

8     Your Honor, between what might be relevant evidence and what

9     is a claim.  And we're here today to discuss what claims we

10    should be allowed to pursue and ultimately what claims they

11    shall be allowed to pursue.  And, obviously, down the road,

12    the Court will, depending what claims are at issue, decide

13    what evidence might be relevant to those claims.

14              And, obviously, they will make a case that -- they

15    will try to make a case that that toy fair information is

16    relevant, and the Court will decide what it's relevant to

17    and the like.

18              THE COURT:  Okay.  Now, I'm done with my

19    questions.

20              MS. ESTRICH:  Okay.  I'm going to keep going with

21    your questions.

22              The next question you asked was why did we name

23    the Marlows and Maria Elena Salazar as Doe defendants, and

24    did we, in a sense, plead out our right to expand the

25    enterprise.  I would say -- and I hope this won't conflict

```
 1    with the briefing -- that the reason we didn't name them as
 2    Doe defendants is they're not defendants.  They are
 3    additional members of the enterprise.
 4            What we did in your rog responses was, in response
 5    to the concerns raised by the Court during our arguments on
 6    the motion to dismiss, we expanded our rog responses for
 7    which there was some substantial authority to clarify the
 8    claims that were already there.  We didn't add new claims.
 9    We simply clarified the claims that were there.  And we
10    suggested in those interrogatories that they were indeed
11    additional members of the enterprise.
12            THE COURT:  The seamstresses?
13            MS. ESTRICH:  Skilled patternmakers, yes.
14            Look, they sat, being paid cash illegally, took
15    phony social security numbers -- we did not name them as a
16    defendant.  We don't want to demonize them here or have them
17    sitting here.  But MGA took advantage of these women.
18            They -- yes, they paid them, but they put them in
19    a very compromised situation.  They knew what they were
20    doing.  They worked for years on these dolls.  I have been
21    educated by my clients that when I call them "seamstresses,"
22    they say, "You don't understand.  To be able to make a
23    fashion doll -- this isn't like me sitting at my sewing
24    machine.  These are highly skilled workers."  The Marlows
25    were involved in funneling the money to them and the whole
```

1    business.

2         You know, our original RICO complaint was drawn

3    very narrow -- not our original, but Fourth Amended

4    Complaint was drawn very narrowly.  We didn't name

5    additional people.

6         The Court did express concern about whether we had

7    enough distinctiveness, and that is the sole reason for the

8    amendment in the rog responses.  Should the Court come to

9    the conclusion that it is significant that we have

10   additional people, we have additional people.  Also, we

11   amended the rog responses --

12        THE COURT:  No, no, no.  I'm going to take this as

13   your best effort.  So the argument you have additional

14   people falls on deaf ears.

15        MS. ESTRICH:  Okay.  Fine.

16        THE COURT:  This is your Grade A attempt.  You

17   were given a warning.  I take this as the very best you can

18   produce.

19        MS. ESTRICH:  I don't think we have a deficiency,

20   to be honest.  I mean, I understand you're saying that

21   Bryant was affiliated with MGA.  But he is an independent

22   contractor.  We're talking about Machado, who was our

23   employee.  But we did revise our rog responses.  We also

24   revised the rog response to make clear that, if the Court

25   was of the view that this did not qualify as an

1    associated-in-fact enterprise -- for reasons which I can't

2    articulate, but might be -- that we are also claiming, in

3    the alternative, that Larian conducted the affairs of MGA

4    through a pattern of racketeering.

5           Now, as the Court notes, that provision of RICO

6    doesn't allow us MGA as a defendant.  So I think our best

7    shot and our correct shot is this is an associated-in-fact

8    enterprise.

9           And, indeed, if you look at the language of *Living*

10   *Designs*, a case could even be made that, under the current

11   law of this Circuit, Larian and MGA might well be enough for

12   an enterprise.  Because *Living Designs* seems to say that,

13   even though it's a little more unnatural to think of the

14   enterprise being associated with the individual as opposed

15   to vice versa or the entity, that it may well be the logical

16   extension of the *King* decision to allow distinctness in that

17   context as well.  But we did amend those rog responses, and

18   I did want to bring that to the Court's attention, in an

19   effort to, if nothing else, provide, if possible, some

20   insurance.

21          As for the last piece of that Question D, we never

22   say in our complaint that the only members of the enterprise

23   would be Bryant, Machado, Does 6 through 10.  We simply say,

24   "Here are members of the enterprise at this point in time."

25          And the authority for RICO claims can be clarified

1    through interrogatories would be cases such as *American*
2    *Independent Insurance Company v. Lederman*, 2000 WL 1209371,
3    that says you can use RICO answers to -- interrogatory
4    answers to clarify your claim.  *U.S. v. Phillip Morris is*
5    *the same.*
6            The next question was whether Bryant was an
7    independent contractor and not an employee and whether that
8    should be decided based on the formalities of the contract
9    or based on his actual duties.  I think you would look at
10   both.  And the formalities of the contract say very clearly
11   that he is not an employee, that he is an independent
12   contractor.  But I think the realities of his relationship
13   with MGA, where he made as much as, what, $30 million in
14   royalties, suggest a nonemployer-employee relationship.
15   And, at the very least, it's a factual issue, which the jury
16   would have to obviously decide, if there were open questions
17   as to it.
18           The next question you had asked was *Living Designs*
19   and *King* and how to reconcile them, because *Living Designs*,
20   which we quoted, seemed to be suggesting that it might be
21   possible to have a corporation and an individual as distinct
22   entities who could associate in fact.
23           And I think our point is simply, again, that
24   *Kushner* did not reach the question.  If you go back to the
25   *Kushner* case, they say, "We're not gonna reach the question

1    of whether we would come up with this same ruling where

2    we're dealing within an associated-in-fact enterprise.  And

3    Justice Brier was very clear about leaving that question

4    open.

5            And one could argue that *Living Designs* suggests

6    that the answer to that question may well be that the courts

7    in this circuit will eventually find that the corporation

8    and the CEO were sufficiently distinct to be associated in

9    fact, as well as sufficiently distinct to meet the *Kushner*

10   test for operating an enterprise through a pattern of

11   racketeering activity.

12           I think that's all the enterprise questions,

13   Your Honor, unless I've missed one, which brings me to the

14   injury questions, I believe.

15           And I can be very fast.  "Was Mattel injured in

16   its business or property by reason of a violation of 1962?"

17           Yes.  The Court suggested five categories of

18   injury.  I'm not sure -- I'm not sure 3, 4, 5, exactly what

19   the differences are -- or 3, 4 -- exactly what the

20   differences are.  But we do believe that we were injured in

21   our business or property because, one, our property was

22   stolen.  All these things that belonged to us were stolen.

23           Second, we have criminal copyright infringement.

24           Third, we have lost future property legal

25   entitlement to business relations unhampered by schemes

Case 2:04-cv-09049-DOC -RNB   Document 9524   Filed 12/22/10   Page 11 of 63   Page ID #:284742
SACV 04-9049 DOC   11/17/2010 - Volume II

11

1    prohibited by the RICO predicate statutes.  That's the very

2    broad language of *Mendoza v. Zirkle Fruit*, Ninth Circuit.

3    Z-I-R-K-L-E, was a group of agricultural laborers who

4    claimed that their employer had depressed market wages by

5    hiring illegal immigrants.

6              Now, they didn't have any job offers at higher

7    wages.  They didn't even have offers on the table.  The

8    agricultural workers, and I'm now quoting, "could not show a

9    property right in the lost wages by showing that they were

10   promised or contracted for higher wages, but they did allege

11   an injury to a property interest, the legal entitlement to

12   business relations, unhampered by schemes protected by the

13   RICO statutes."

14             If prisoners are injured by their wrongful

15   imprisonment, which represents the hypothetical possibility

16   that they would have a job and that's the injury for

17   purposes of RICO, that's *Diaz*.

18             If that's injury, for purposes of RICO, I would

19   submit that we have unquestioned injury in this case.  It is

20   far more direct, and it is far more substantial.  And the

21   issue at summary judgment is not the amount of injury, but

22   the fact of it.  And I would suggest that the fact of injury

23   really is undisputed here.

24             And while we will have many debates, I'm sure, at

25   trial, in terms of damage estimates, et cetera, I think we

1   more than fulfill the RICO predicate -- the RICO threshold

2   for injury.

3          The Court asks, given expert's willingness/ability

4   to assign fixed value to an intangible interest, how could

5   courts systematically and consistently distinguish between

6   concrete financial loss and intangible property interest?

7          Damned if I know.  I don't think it can be done.

8          I think the reality is it might be a false

9   distinction anyway because, while the Supreme Court and the

10  Ninth Circuit keep talking about this distinction between

11  concrete financial loss and intangible property interests, I

12  don't know what you call the agricultural workers potential

13  higher paying jobs, much less the prison inmates' potential

14  jobs, period, that they don't even have yet, except a, you

15  know, sort of intangible property interest.

16         So I think the Court's have been less than honest

17  in even pretending that you should try to enforce this line,

18  'cause it isn't a line.  The only line I could find in the

19  cases that made any sense at all was the line between

20  arguably purely personal losses, like the gal with the

21  rental apartment, who didn't sublet the apartment.  She just

22  said, "Well, I've lost enjoyment and pleasure of my

23  apartment."  And they said, "Ah-ha!  That's not a RICO

24  injury."  But if you had said you were going to sublease the

25  apartment, then that might have been.

```
 1              So about the best I can come up with, myself, is
 2       that, obviously, there's some difference between business
 3       and property losses and, for instance, pain and suffering or
 4       emotional losses or personal losses; but I don't think the
 5       courts have drawn a line that is capable of being easily
 6       understood and enforced here, not when you've got cases like
 7       Diaz, which makes clear -- I mean, that's an intangible.
 8       You know, "my future employment opportunity" looks pretty
 9       intangible to me.
10              THE COURT:  How do I instruct?
11              MS. ESTRICH:  Pardon?
12              THE COURT:  How do I instruct a jury?  And then,
13       when we come back for the determination of how a rational
14       jury reached that amount, subject to a new trial, how does
15       the Court substantiate that?
16              MS. ESTRICH:  Well, I think there would be many
17       cases in which it would be difficult.  Okay?  But I don't
18       think this is one because Mattel is a business.  Okay?  And
19       there's nothing personal in this case, I'd like to say.
20              This is Mattel suing for losses to its business.
21       Now, we're gonna have to define the kinds of losses, whether
22       it's lost profits or, you know, injury to your business from
23       their success.  But we are, at least in this case, dealing
24       with a business relationship in which all the injury is
25       business related.
```

1      And I really don't think -- I think the Court put

2    its finger on a huge problem in the law, but I'm not sure

3    it's a huge problem in this particular case, at least at the

4    threshold level.  I think it's gonna be challenging to do

5    instructions but, you know, that's why the big bucks.

6      But I do think that, in terms of is this

7    business -- has Mattel been injured in its business or

8    property?  Presumably, they wouldn't spend five years in

9    litigation just on a grudge match.  I mean, this is really

10   about, as the Court has said many times, the financial

11   interests of the parties.

12      As to whether Mattel's lost-opportunity injuries

13   are too speculative, again, I go back to *Diaz*.  I don't know

14   how the jury in *Diaz* was supposed to figure out how much

15   money a person, who's currently in prison, could have been

16   making if they weren't in prison and were employed.

17      But however it is that one does that exercise,

18   it's certainly no more difficult here, because we are

19   dealing with a competitive situation in which we have

20   competitors who have challenged each other claiming business

21   injuries and the like.

22      "When do concepts of business and property

23   overlap?"

24      "Is business opportunity recognized as property

25   under California law?"

```
 1            "Are future profits that are lost a property

 2    interest or measure of damages?"

 3            Well, I think that the short answer is they do

 4    overlap.  No one has said very clearly what the differences

 5    are.  You have language in Supreme Court opinions saying,

 6    "any property interest recognized by state law."

 7            THE COURT:  How do I instruct?

 8            MS. ESTRICH:  Pardon?

 9            THE COURT:  How do I instruct?  And how do I

10    determine what is being awarded for, and what category?

11            MS. ESTRICH:  Well, you know, how you instruct

12    depends on which claim we're on.  And, you know, you'll

13    instruct, I assume, telling them what the issues of

14    liability are, obviously, and how to calculate damages.

15            And they will have had evidence from both sides,

16    and the damages under RICO are done predicate act by

17    predicate act, looking at the damage caused to you by the

18    enterprise and its predicate acts, and the damage to

19    business or property.

20            I don't really think here we have danger of a kind

21    of emotional overlap.  I mean, we don't have a pain and

22    suffering element here.  We don't have any of the sort of

23    human stuff you have in some of these other cases, where

24    you're really dealing with personal situations and bringing

25    RICO in.
```

1          "Prospective business relations."  I think you are

2     stuck with *Diaz*, Your Honor.  The Ninth Circuit, in *Diaz*,

3     recognized that interference with prospective business

4     relations is a property interest in California law that is

5     protected, and that is sufficient to give rise to RICO

6     standing.  So these are issues, obviously, for the experts

7     and the jury.

8          The Court's next question was about *Hemi* and this

9     problem that one faces of multiple wrongdoers, and in some

10    cases, multiple victims.  And the Court asked what about

11    this consideration of whether there's a more direct victim,

12    which is the first consideration in *Newcal*.  And I would

13    simply say that literally every Supreme Court case we've

14    found where a RICO plaintiff was found to lack standing by

15    virtue of a break in the causal chain, in every one of those

16    cases, the court identified a more direct victim.

17         Here, we have a case where there is no more direct

18    victim.  We also have a case where there aren't three or

19    four people on the other side we might selectively go after.

20    So I think most of the problems addressed in *Newcal*, and the

21    risk of multiple recoveries on the one hand, the risk of

22    determining who the right victim is and whether there are

23    more direct victims, we just don't have those problems in

24    this case.  We have a lot of problems in this case, but that

25    one we don't have.

Case 2:04-cv-09049-DOC -RNB  Document 9524  Filed 12/22/10  Page 17 of 63  Page ID #:284748
SACV 04-9049 DOC - 11/17/2010 - Volume II

17

```
 1              There isn't a more direct victim than Mattel, nor
 2    do we have a problem of multiple recoveries from, you know,
 3    forum shopping and defendant shopping.
 4              I'm almost done.  I'm up to Mr. Wagner's
 5    declaration, and how does Mr. Wagner come up with his
 6    numbers.
 7              I think a good deal of this is the appropriate
 8    stuff of trial and cross-examination.  What are --
 9    yesterday, Ms. Hurst raised questions:  Is he qualified to
10    do this?  Is he an expert?
11              Obviously, she can do a Daubert on him.  But, nah,
12    I can tell you this man has done hundreds of regression
13    analyses in lots of cases, and that the basic methodology
14    reflected in his declaration and in his report, which
15    they've now received, is standard regression analysis where
16    you try to control for all the factors you can control for
17    in order to determine whether there is an independently
18    significant correlation.
19              And what he did was he tried to test out this
20    theory that Bratz sales had hurt Barbie.  And he collected
21    all kinds of indiscreet data and our internal data, and
22    presented in his expert report the basis for his conclusions
23    as to how much harm, for instance, how much of Barbie's lost
24    sales were attributable to Bratz versus how much
25    attributable to other factors.
```

Case 2:04-cv-09049-DOC -RNB   Document 9524   Filed 12/22/10   Page 18 of 63   Page ID
#:284749
SACV 04-9049 DOC - 11/17/2010 - Volume II

18

         1          And in doing that, he took into account,

         2    obviously, the age differences in terms of demand for Barbie

         3    and Bratz that we discussed yesterday.

         4          MS. HURST:  Your Honor, this is not in the record

         5    at all what's being discussed right now.

         6          THE COURT:  Thank you.

         7          MS. ESTRICH:  I'm happy to stop there and simply

         8    leave it to be done at trial or during the *Daubert* hearings.

         9          But if you're asking me do we have evidence of

        10    damages and is the jury gonna be capable of making these

        11    calculations, I would simply say that we will produce our

        12    experts.  I trust they will present their experts.  You will

        13    brilliantly instruct the jury, and they will figure their

        14    way through.  But it's certainly not any more impossible

        15    than in many such cases where experts are relied on to do

        16    these analyses.

        17          The Court's next question was we keep saying that

        18    it was the appearance of the Bratz dolls that drove Bratz

        19    sales.  Why are we saying this?  Why does it matter?

        20          I think it's Mr. Kinrich who does those surveys.

        21    And that's not about an unjust enrichment.  That is going to

        22    causation elements, because we're gonna be trying to argue

        23    to the jury that the reason little girls wanted Bratz dolls

        24    is 'cause they looked like Bratz dolls.  And that would go

        25    to our argument that what was stolen from us was incredibly

1    valuable 'cause it was that very look that has drawn

2    customers in and continued to have them buy these dolls.

3                THE COURT:  Why was it valuable when Mattel didn't

4    pursue it?

5                MS. ESTRICH:  Mattel never had the opportunity to

6    present it.

7                MR. QUINN:  It was never presented to Mattel,

8    Your Honor.

9                MS. ESTRICH:  It was never -- Mattel never had the

10   opportunity to pursue it.  My co-counsel --

11               MR. QUINN:  I will address that, Your Honor.  I

12   can now, if the Court wishes.

13               THE COURT:  Sure.

14               MR. QUINN:  Mr. Bryant testified -- I took his

15   deposition -- on the first day of his deposition, "Why

16   didn't you present this?" or "Did you ever present Bratz to

17   Mattel?"  His answer was "No."

18               THE COURT:  Thank you.

19               MS. ESTRICH:  So we don't know.  I mean, I don't

20   know that anybody can be a mind reader and say, "Here's what

21   you would have done if you had an opportunity that you

22   didn't have years ago."  But even if that's speculative and,

23   you know, I'll leave that to you folks in the trial stage to

24   determine -- even if that's speculative, there were other

25   possible measures of damages.

```
 1           For instance, the one we keep coming back to is,
 2    you know, in copyright, the reasonable royalty negotiation,
 3    which doesn't actually require that you would have been
 4    willing to grant a license, nor does it require that you
 5    would have asked for that license, but simply is a method of
 6    ascertaining damages by doing a hypothetical negotiation and
 7    saying, "Okay" -- just to follow up, if we assume arguendo
 8    that they wouldn't have made Bratz themselves, that Mattel
 9    wouldn't have, what would it have been worth to MGA, and
10    what it would have been worth to Mattel, if they had sat
11    down together in 2000 or 2001 and said, "We want to make
12    this doll.  What's our deal gonna be?"  And that's a
13    potentially appropriate measure of damages.
14           THE COURT:  Are you saying using the
15    Georgia-Pacific factors?
16           MS. ESTRICH:  Yes.
17           MR. QUINN:  Yes.
18           MS. ESTRICH:  "Yes" would be the answer.
19           Should Mattel's damages be capped at the amount
20    awarded, if any, for the intentional interference with
21    contractor relations claim?
22           I assume the Court's thinking here was that, since
23    the property interest and protection is this underlying
24    state law property interest at issue in these claims, why
25    isn't that the max on my award?
```

Case 2:04-cv-09049-DOC -RNB   Document 9524   Filed 12/22/10   Page 21 of 63   Page ID
#:284752
SACV 04-9049 DOC   11/17/2010 - Volume II

21

1          Only because the law says otherwise.  I've got a

2     lot of cases for you, Your Honor, talking about a full

3     recovery.  And there is simply no authority for restricting

4     that we have been able to find -- I understand the idea, but

5     we have found no authority for the proposition that the RICO

6     damage provisions, as set forth in federal law and enforced

7     can be *sub silentio* limited by the property interest

8     protected by state law.

9          Quite the contrary.  "Where the plaintiff has

10    already suffered injury and will continue to suffer injury

11    in the future, an award of past and future damages may be

12    entirely appropriate, subject, of course, to the normal

13    standards."  That's *Bankers Trust v. Rhodes.*  But there are

14    lots of cases in which various defendants have come up with

15    different ideas for how to cap RICO damages.

16         By reference to, in this case, conversion damages

17    under state law, *Liquid Air Corporation v. Rogers*, 834 F.2d

18    1297, in that case, the defendant said they wanted to limit

19    it to the conversion damages 'cause they said this is mail

20    and wire fraud, but underlying the mail and wire fraud is

21    the property interest protected by state conversion law, so

22    we'd like to limit your damages to conversion.  And the

23    Seventh Circuit says, no.  The harm -- the measure of

24    damages under civil RICO is the harm occasioned as a result

25    of predicate acts.  A plaintiff injured by civil RICO

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC -RNB  Document 9524  Filed 12/22/10  Page 22 of 63  Page ID
#:284753
SACV 04-9049 DOC - 11/17/2010 - Volume II

22

1   violations deserves a complete recovery.  And that is the

2   language that you see in a lot of these cases.

3           I'm just checking to make sure I'm reaching the

4   end of my road here.

5           Okay.  *Boyle*:  "In light of RICO's attempt to

6   prevent infiltration of legitimate enterprises, why can't

7   members of the enterprise be bound by a legitimate purpose?"

8           I don't know if they can or not.  But they aren't

9   in this case.  I think the problem of having them bound by a

10  legitimate purpose would be you'd still -- you'd then have a

11  *mens rea* problem to find them guilty of criminal intent,

12  which maybe you could do as to the individual act.  But

13  whether or not you could have a RICO enterprise with a

14  legitimate purpose, we don't have one.

15          And most of the case law -- while nobody has said

16  you can't have a legitimate purpose, most of the case law

17  talks about a bad purpose, probably to deal with the

18  *mens rea* problem right there.  If you've got a bad purpose,

19  you're taken care of.

20          In any event, we are not -- the purpose of this

21  enterprise was not to simply sell MGA products.  It was, by

22  our allegations, to compete unfairly with Mattel --

23          The Court's next question goes to this whole use

24  issue.  And I think we've discussed that at length.  Our

25  view is three-fold.  First of all, our view is, under

Case 2:04-cv-09049-DOC -RNB   Document 9524   Filed 12/22/10   Page 23 of 63   Page ID #:284754
SACV 04-9049 DOC - 11/17/2010 - Volume II

23

1    *Carpenter*, the mailing the next day is still part of the

2    scheme.  But even if it isn't part of the scheme in this

3    case, the cover-up was certainly part of the scheme.  And in

4    no sense did the cover-up end at the time of the taking of

5    the underlying trade secrets.  The cover-up was only just

6    beginning, and it was through the cover-up that the use was

7    allowed to go undetected.

8             So even buying into the Court's ruling that the

9    purpose of the fraud was not the use, or not necessarily the

10   use, the fact that you have a whole cover-up scheme that was

11   effectuated here, in part through the mails, through the

12   wires, through obstruction, et cetera, I think addresses

13   your use problem.

14            "Even if Machado wasn't a Mattel or Mattel

15   de Mexico employee, why couldn't his alleged theft of trade

16   secrets be actionable?"

17            I think it could.  I think Mr. Cote acknowledged

18   that you're not allowed to steal from people, even if they

19   are not technically your employer.

20            The question of copyright protection for -- not

21   all of the documents that we're alleging Mr. Machado took

22   were copyright protected, but there were a number that

23   contained original expressions that are deserving of

24   protection.  And as we discussed at the motion to dismiss

25   hearing, criminal copyright protection does not require that

 1    they be registered.  And I think Ms. Hurst and I had a

 2    go-back-and-forth about this the last time around, and it's

 3    the only time in recorded history that she recognized that I

 4    was right.  So that's why I remember it -- about not

 5    requiring a registration for criminal copyright

 6    infringement.

 7           "How were Mattel's employees induced to use their

 8    position for the benefit of MGA?"

 9           I would just say simply they used their position

10    because their position gave them unparalleled access to, in

11    Bryant's case, the resources of the Mattel design center; in

12    Machado's case, all of the, you know, confidential

13    proprietary information.  They used their positions to

14    determine what was valuable information, to find, in

15    Bryant's case, other employees to work with him.

16           THE COURT:  Let's stop on that point.

17           Bryant, you're arguably correct about.  Machado,

18    let's hypothetically say you're correct about.

19           I come back to the question I asked MGA yesterday.

20    Of the 100 employees -- when I look at Trueba, and Vargas,

21    Castilla, I still don't have a good perspective of whether

22    other employees were of much higher pay grade or position,

23    if they were approached.  In other words, it seems to me in

24    a RICO conspiracy that if this conspiracy exists, I'm going

25    after, you know, the ultimate dog.  That's why RICO exists:

1    To get the pyramid that normally is insulated.

2            The quandary I keep finding myself in is I have no

3    basis of comparison.  It's argued that Bryant's important;

4    certainly.  Machado down in Mexico; probably.  Vargas and

5    Trueba; not sure.  The rest of the minnows in the pond, I'm

6    having trouble with.  They may have taken documents; but if

7    they come from something that they worked on, perceived to

8    be part of a toolbox, excised out a portion, it doesn't seem

9    the kind of pursuit that I'm used to in terms of somebody

10   like Mr. Larian allegedly approaching all sorts of people to

11   gain an advantage.

12           I mean, if I want to really gain an advantage, I'm

13   going after, you know, Mr. Quinn at Quinn And Emanuel, not

14   Mr. Zeller, no degradation intended, or Ms. Hurst, no

15   degradation intended, but maybe not Mr. McConville.

16           That's the quandary that the Court keeps finding

17   itself in.  And I understand that, if I grant summary

18   judgment on the RICO, that the argument could be made,

19   "Judge, these were issues of material fact."  By the same

20   token, I don't want to let a specious RICO go forward.

21           So I repeat to you, as I did MGA, I have -- when

22   these hundred people are tossed out, on one hand, that's a

23   very strong argument for MGA that this just isn't the kind

24   of "passing the smell test" that RICO has.  On the other

25   hand, you know, given Bryant, Machado are key people, and

1   how the rest of them flow in terms of taking information --

2   most of them seem to be related to the intellectual toolbox

3   that they worked on.  Now, they didn't bring that to Mattel.

4           I usually have, you know, noncompete agreements

5   and employees flowing freely through California, at least,

6   and they're allowed to take a certain amount of this

7   intellectual toolbox to the company and out of the company.

8   The real question is where the line's drawn.  That's always

9   the difficult part in summary judgment.

10          I'm not sure where the line's drawn yet.  And I'm

11  not -- I'm aware of the characters.  What I'm not aware of

12  are the other 92 characters, let's say, who left to join

13  MGA.

14          MS. ESTRICH:  I can give you two answers, but my

15  colleagues may be better at answering this because they are

16  closer to some of these facts as to the employees -- maybe

17  three.

18          The first answer is, for better or for worse, RICO

19  is not restricted to big shots.  The court --

20          THE COURT:  I'm sorry.  RICO is not restricted to?

21          MS. ESTRICH:  Big shots.

22          I mean, one of the criticisms, especially on the

23  criminal side of RICO, is that what it does allow you to do

24  and explicitly was intended, is you got the top guy who

25  would have escaped, but you got the bottom guy, too.

```
 1              THE COURT:  It's organization, I agree.
 2         MS. ESTRICH:  And the whole idea was, you know, a
 3    lot of fire power on the problem with groups.  Throw
 4    everybody in there together, knowing that you're gonna have
 5    minnows and big fish, and you're gonna, frankly, increase
 6    the power of the prosecution in those circumstances to get
 7    the minnows to turn against the big fish.
 8              So my first answer would be, for better or for
 9    worse, it is not a deficiency in a RICO complaint that it
10    mixes higher-ups and lower-downs.  That's the very nature of
11    a RICO allegation.
12              And the special problem of criminality in groups
13    is that when we say:  When you hook up -- even if your role
14    is smaller, when you hook up with a crowd, knowing they're
15    into really bad stuff, then you share that purpose.  You're
16    in bed with the bad guys.
17              So whether some of those individuals we've been
18    talking about -- Vargas, Trueba, et cetera -- were big shots
19    or littler shots -- and I'll leave it to those who have
20    taken their depos to answer that -- but for RICO purposes,
21    it doesn't matter.
22              THE COURT:  I think that's a good answer.
23         MS. ESTRICH:  I believe the final question was,
24    "Where can the arguments in pages 43 to 44 of MGA's reply
25    brief be found in MGA's motion?"
```

```
 1              And, Annette, I'll let you answer that one since I
 2    didn't file them.
 3              MS. HURST:  I already did.
 4              MS. ESTRICH:  Thank you, Your Honor.
 5              THE COURT:  Give me a couple minutes.  I need to
 6    go next door on the MEK case, because we've got people out
 7    on a SCIF from Washington DC, for a moment.  And they've got
 8    to get back.  We're dealing with some classified
 9    information.
10              So why don't you take about 20 minutes.  We'll
11    resume about five to the hour.
12              MS. ESTRICH:  Thank you, Your Honor.
13                (Pause in the proceedings at 1:36 p.m.)
14                (Proceedings resumed at 3:03 p.m.)
15              THE COURT:  We're on record.  All counsel and the
16    parties are present.
17              This is Mr. Zeller on behalf of Mattel.
18              Counsel, one of the concerns is that, if you have
19    a chance to focus on all the questions asked in each of the
20    paragraphs of the minute order, and not just the first
21    question of the paragraph, it would be appreciated.  If you
22    don't want to, that's fine, but it would be helpful.
23              MR. ZELLER:  Understood, Your Honor.  And that is
24    the structure I plan on following, is the Court's order
25    here.  And where we are currently is Section C on page 7 of
```

1    the Court's order.

2         In response to Question 1, we do, of course

3    believe that an appropriate outcome here is that the Court

4    would deal with this on JMOL; in the alternative, to

5    instruct the jury in the manner described by the Court.

6    And, in fact, there is some authority that I'll get to in a

7    moment for exactly that proposition that that is the way

8    that it should be handled.

9         "More broadly, how would the grant of partial

10   summary judgment operate at the time of trial?"

11        I will submit, again, it's by way of jury

12   instruction.  That's probably the simplest way, really, of

13   dealing with this.  In fact, in some respects, I think it's

14   inevitable that the Court is going to, in any event, have to

15   instruct simply because there's -- I don't think it can be

16   realistically disputed that at least some of Mattel's state

17   law claims are going to a jury, even under, really, the most

18   extravagant of MGA's theories, with perhaps the exception of

19   conflict preemption or copyright, which I'll talk about in a

20   little bit.

21        And we did, in fact, research to determine whether

22   or not we could find instructions where a state law claim

23   was partially dismissed on so-called copyright -- excuse

24   me -- so-called trade secret preemption grounds.  And we

25   couldn't find any authority that referred to it as a

1    dismissal.  But what we did do is we found indications of

2    limiting instructions.  And one was in the *Cenveo* case,

3    C-E-N-V-E-O, which is from the Eastern District of

4    Pennsylvania, 2007.  It can be found at 2007 US District,

5    Lexus 9966, at pages 13 through 14.  And there the court

6    discussed instructing as follows, and it says, quote, "A

7    court could charge a jury to award liability in tort if it

8    finds the information is not a statutely *(sic)* protected

9    trade secret and" -- under the equivalent of their Uniform

10   Trade Secret Act -- "if it finds that the information is a

11   trade secret."  So certainly the legal construct can be

12   instructed by the Court.

13          We found something of a hint of it.  It's a little

14   bit more elliptical, but it's in a case from the Southern

15   District of California, from 2007.  And it's the *El Dorado*

16   *Stone v. Renaissance Stone* case, which is Case No. 04CV2562.

17   And what the Court did was, is basically said, as part of

18   this jury instruction, that in order to prevail on its

19   claim, the plaintiff would have to show, among other things,

20   that the defendant engaged in wrongful conduct separate and

21   apart from the misappropriation and use of trade secrets or

22   copyright infringement.

23          With respect to the second question, we do agree

24   that MGA's theory is overbroad.  And, in fact, it quite

25   clearly is overbroad because of the extent to which it would

Case 2:04-cv-09049-DOC -RNB   Document 9524   Filed 12/22/10   Page 31 of 63   Page ID #:284762
SACV 04-9049 DOC 11/17/2010 - Volume II

31

1    destroy claims or supersede claims for conversion of even

2    plainly nontrade secret property, even tangibles.  And that

3    simply cannot be the law.

4              In fact, in the *Hecny* case, which, as the Court

5    notes, is the only on-point appellate authority, it notes

6    that such a result would be unimaginable and absurd.

7              Yesterday MGA's counsel attempted to distinguish

8    *Hecny* in various ways, most notably on the fact there was a

9    fiduciary duty that was involved or a fiduciary relationship

10   that was involved in the case.  But that had nothing to do

11   with the Court's ruling on this issue that the Court has

12   called out in its question.

13             The Seventh Circuit, rather, was interpreting the

14   meaning of the so-called preemptions section of the Illinois

15   equivalent of the Uniform Trade Secret Act.  It did not rely

16   on the fiduciary relationship, and it just says Illinois

17   courts have had very little to say about the effect of

18   Section 8A, which is the one that deals with conflicting

19   laws, perhaps because *(reading)* "It is unimaginable that

20   someone who steals property, business opportunities, and the

21   labor of the firm's staff would get a free pass just because

22   none of what he filched is a trade secret."  In any event,

23   as in *Hecny*, here we do have allegations of breach of

24   fiduciary duty, as well as the duty of loyalty.  So that

25   doesn't seem to be a distinction that holds up.

```
 1              Yesterday, for the first time, also in response to
 2     these questions, MGA cited to the *BlueEarth Biofuels* case
 3     which is out of Hawaii.  It's a state court decision in
 4     Hawaii.  I can certainly talk about the particulars of that
 5     case; but at the end of the day, it's unremarkable.
 6     Everyone recognizes that there is a split in authority.  And
 7     this Hawaii case -- this Hawaii state court case doesn't
 8     really add anything new to the debate.
 9              I could, frankly, rattle off another dozen cases
10     going our way on this preemption issue.  I just don't think
11     that there's really any real dispute here.  And everyone
12     recognizes there is simply a conflict in the authority.
13              Our view is, of course, that the better-reasoned
14     one is, that it would not preempt where there is not a trade
15     secret that is actually involved.  But also I would note
16     that it -- that the cases -- that the California District
17     Court cases, as a majority, go the way of Mattel.
18              Now, that's not --
19              THE COURT:  Go the way of?
20              MR. ZELLER:  Mattel.
21              THE COURT:  Mattel.
22              MR. ZELLER:  They support Mattel's position.
23              That's probably not true nationwide.  I don't want
24     to suggest that.  But if the Court is focusing on other
25     District Court's here in California interpreting the
```

Case 2:04-cv-09049-DOC -RNB   Document 9524   Filed 12/22/10   Page 33 of 63   Page ID #:284764
SACV 04-9049 DOC   11/17/2010 - Volume II

33

1    California Uniform Trade Secrets Act, they are coming out --
2    majority -- Mattel's way.
3            With respect to Question No. 3, I think it's
4    really the same answer, which is, How would this operate in
5    practice?  It would be by jury instruction.  I just think
6    that's the way of dealing with it.  And the Court is going
7    to, at some level, have to explain this to the jury, what
8    can and cannot be relied upon.  Because, certainly, we
9    recognize that -- and I think it's quite apparent that one
10   would say that, if it's trade secret information, that,
11   obviously, we're not going to be seeking, you know,
12   additional torts based on that.
13           I think there is, at least, some agreement there.
14   So the Court's going to have to instruct, in any event.  And
15   it would seem the wiser course is to simply instruct the
16   jury on this.
17           In response to Question No. 4, "Does a more
18   statutorily sound approach prevent Mattel from recovering
19   remedies that flow from the loss of secrecy or exclusive use
20   of the information?"  We think that's, yes, that's correct,
21   as a statutory construction matter.
22           Section 3426.7(b)(2) is explicit on that point,
23   where it says, "This title does not affect other civil
24   remedies that are not based upon misappropriation of trade
25   secrets."

```
 1          With respect to the Court's next question about
 2   the value of information, where it says, you know, "Aren't
 3   the costs of acquisition, and sometimes the cost of
 4   creation, often related to the value the material obtains
 5   from its secrecy?"
 6          The answer is that depends on the specific
 7   information.  In this case, Mattel has asserted trade
 8   secrets such as non-Bratz trade secrets that cost a great
 9   deal to create where the creation costs were separate and
10   independent from the fact that the information was
11   confidential.  So there can certainly be -- and we think
12   that there are -- is evidence in this case that they are
13   separate and distinct.
14          Next portion of the Court's question on No. 4
15   raises the Mortgage Specialists case.  And these are the
16   ones cited in Footnote 3 of MGA's reply.
17          We don't think it's compelling.  This goes back to
18   the point earlier, which is that there is a split of
19   authority.  Obviously, the Mortgage Specialists case comes
20   out on one side.  But again, we think that the
21   better-reasoned approach, including because of the
22   over-breadth point, as well as the majority of California
23   District Court cases support Mattel's position.  And at the
24   end of the day, MGA's overbroad view would essentially leave
25   parties without a remedy for even clear intentional thefts
```

Case 2:04-cv-09049-DOC -RNB  Document 9524  Filed 12/22/10  Page 35 of 63  Page ID #:284766
SACV 04-9049 DOC - 11/17/2010 - Volume II

35

1    of valuable information just because the particular

2    requirements, statutory requirements, for trade secret theft

3    cannot be met.

4           And that that then actually goes, I think, into

5    the next point -- or the next question, which is No. 5.

6           "MGA responds that Mattel was not deprived of the

7    continued use of data," and then goes on to say, "but how

8    does this argument square with the recent trend recognizing

9    property rights and intangibles?"  This is a further point

10   as to why we think that we have the better position on this,

11   which is that cases like *Kremen* show that Mattel has

12   protectable interest in its business information and

13   intangible information, even if it doesn't rise to the level

14   of trade secret status.

15          In *Kremen*, for example, among the list of

16   protectable property interests that the Court recognized

17   were consumer lists and confidential information.  And then

18   the Court went on to explain, and took pains to explain,

19   that that was true, even if it was not merged into some sort

20   of document or reduced to a tangible form.  The court says,

21   quote, "Courts routinely apply the tort to intangibles

22   without inquiring whether they are merged in a document."

23          Other cases where intangibles were found to be

24   protectable include the *Ali v. Fasteners* case, and there was

25   cost data, as an example, that was found to be protectable

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC -RNB   Document 9524   Filed 12/22/10   Page 36 of 63   Page ID #:284767
SACV 04-9049 DOC - 11/17/2010 - Volume II

36

1    information.  And also *TeraRecon*, T-E-R-A-R-E-C-O-N.  And

2    then there among the various categories of information that

3    the Court found to be protectable as intangibles were

4    confidential information concerning contracts with

5    customers, business plans, and product plans.

6            Then moving to Section D, which involves copyright

7    preemption, with respect to Question No. 1, "How does the

8    grant of partial summary judgment operate at the time of

9    trial?"  And, "Should the issue be left until after trial?"

10           We think it should be.  In fact, in some ways,

11   it's a little hard to even disentangle exactly what summary

12   judgment means in this context.  Some aspects of the claims

13   undeniably are going to continue to exist.  The jury's gonna

14   have to be instructed in any event.  So it doesn't seem to

15   me that, really, the instrument of summary judgment is the

16   right way of dealing with this.  It's to instruct the jury

17   what the law is, because they're going to hear all this

18   evidence, and then they're gonna have to be told how can

19   they use this evidence in evaluating particular claims that

20   Mattel has brought.  I mean, that's just inevitable.

21           With respect to No. 2, this is the point about

22   MGA's argument on potential interference with contract, and

23   that is predicated on MGA's alleged inducement of Bryant to

24   disclose the Bratz drawings and sculpt to MGA instead of

25   Mattel.

```
 1            Mattel has not found any case law that supports
 2     MGA's theory of ownership, if this is what they are
 3     attempting to assert; but more importantly, Mattel's claim
 4     concerning intentional interference with contract isn't
 5     linked to its ownership claims.  Our theory of ownership is
 6     predicated on other bases, including that through the
 7     constructive trust, that are not predicated on tortious
 8     interference.
 9            In other words, we aren't saying that that's a
10     basis on which Mattel owns property.  It may very well, to
11     be clear, form a basis for an junction against MGA
12     conducting certain activities in the future.  But it's not
13     an affirmative basis that we've asserted that says this is
14     why we own particular property.
15            With respect to Question No. 3, which is, "If
16     MGA's theory is that every claim based upon the conveyance
17     of a copyrighted (sic) work is preempted, doesn't this
18     eviscerate the vast majority of state law claims based on
19     property transfers, including the Uniform Trade Secret Act
20     in its entirety?"
21            And that's absolutely correct.  And that is
22     exactly what shows what is wrong with MGA's theory.  And if
23     I understood it correctly yesterday -- I think it's actually
24     this extravagant, at this point, which is that they
25     basically say CUTSA preempts everything else under state
```

DEBBIE GALE, U.S. COURT REPORTER

 1    law.  Copyright preempts CUTSA.  And we're done.  All that's

 2    left would be a copyright claim, which we know is not the

 3    law and could not be the law.

 4            For example, *SOS, Inc. v. Payday*, the Ninth

 5    Circuit held explicitly that the copyright act does not

 6    preempt a misappropriation of trade secrets claim.  *Nimmer*

 7    *(phonetic)* points out and says, "Actions for disclosure and

 8    exploitation of trade secrets require a status of secrecy

 9    not required for copyright.  This conclusion follows whether

10    or not the material subject to the trade secret is itself

11    copyrightable."

12            MGA never explains why this Court should be the

13    first one to find that the copyright act preempts a CUTSA

14    claim in light of the extra element test.  Now, for the

15    first time yesterday, MGA posited this theory we'll call

16    "conflicts preemption."  Those were the words that they

17    used.  This new theory doesn't stand up either.  It's

18    unsupported by authority.  And the reasoning behind it

19    really doesn't make any sense, because it would ultimately

20    mean that this Court is essentially, completely contrary to

21    the *SOS-Payday* case saying that copyright act preempts trade

22    secret misappropriation claims.

23            No court has held that.  It's just not the law.

24    And, in fact, what MGA's theory, this conflicts theory, is

25    basically saying is, is they are inherently incompatible,

1  which means that that would always be the case.  And we

2  again know that simply cannot be the law.

3          The Court next asks about -- it says, "Mattel

4  distinguishes *Del Madera*, disputes its precedential value,

5  but is there any more recent Ninth Circuit decision that

6  supports Mattel's argument?"

7          And the answer to that question is yes.  There

8  have been decisions since *Del Madera* that are relevant here.

9  *Grosso*, G-R-O-S-S-O, *v. Miramax Film,* which is a Ninth

10 Circuit 2004 case.  There, it was, in fact, directly, quite

11 unlike *Del Madera*, found that the plaintiff's claim for

12 breach of implied contract was not preempted by the

13 copyright act because it contained the requisite extra

14 element.  And, in fact, there what happened was the

15 plaintiff sought compensation, not for the actual written

16 script that was taken, but for the idea that was allegedly

17 embodied in the script and shared with Miramax.

18         Another example of this is the *Altera Corp.* case,

19 A-L-T-E-R-A, which can be found at 424 F.3d 1079, and that's

20 a 2005 Ninth Circuit case.  And there the plaintiff was --

21 the plaintiff alleged that defendant caused the plaintiff's

22 customers to use its software in violation of its software

23 licensing agreement.  And the court held that that was not

24 preempted by the copyright act and, in fact, reversed the

25 District Court in doing so.  And the court said that the

1  right of use is qualitatively different than the right

2  protected by federal copyright.

3  Another case since *Del Madera* is the *Summit*

4  *Machine* case, which is found at 7 F.3d 1344.  That's a 1993

5  case.  And there, it was an interference claim.  That the

6  defendant appropriated property, which plaintiff had the

7  exclusive right, was -- was sufficient to meet the extra

8  element test.

9  With respect to Question No. 4, "Assuming MGA

10  prevails on its CUTSA arguments in full, are the only

11  remaining grounds for the state law counterclaims that MGA

12  induced Mattel employees to work for MGA's benefit while

13  still employed by Mattel?" the answer is that more will

14  survive than that.  There are others.

15  Counsel for MGA and Mr. Machado mentioned some of

16  the additional ones yesterday.  There are some further ones.

17  And that would include the fact that the former Mattel

18  employees failed to disclose information, such as the Bratz

19  inventions, that they were required to disclose under their

20  agreements with Mattel.

21  There would also be the inducement of Mattel

22  employees to use Mattel's physical materials and resources

23  of like for MGA's benefit as well, just simply beyond the

24  work that was being done for MGA's benefit.

25  Turning to Section E, Copyright Infringement.

Case 2:04-cv-09049-DOC -RNB   Document 9524   Filed 12/22/10   Page 41 of 63   Page ID #:284772
SACV 04-9049 DOC  11/17/2010 - Volume II

41

```
 1              With respect to the first question, and the first

 2    part of Question 1 about the facial features, facial

 3    expression, size and body being filtered out, we don't agree

 4    that that's -- that that would be appropriate.  And we don't

 5    think that that's what the Ninth Circuit said.  No court has

 6    gone so far as to say that facial features, facial

 7    expression and the like are unprotectable by copyright

 8    matter of law.

 9              We're not, of course, saying that we have generic

10    protection in the elements of a face, eyes, nose, or

11    whatever, but we do certainly have rights to the

12    particularized expression of the facial features, for

13    example.  And I would point the Court, of course, whereas it

14    notes later on in its questions, that the Ninth Circuit

15    pointed out that, of course, there's a broad range of

16    expression for complete young, hip female fashion dolls with

17    exaggerated features.

18              The other cases that I would point the Court to

19    are several other ones where the courts have expressly

20    considered facial features and facial expression as being

21    protectable and being properly asserted as part of a

22    copyright infringement case -- or claim.  And that would

23    include the *Goldberger* doll case, where the court held that

24    Barbie's face was protected by copyright.  In particular,

25    the particularized expression of an upturned nose, bow lips,
```

Case 2:04-cv-09049-DOC -RNB  Document 9524  Filed 12/22/10  Page 42 of 63  Page ID
#:284773
SACV 04-9049 DOC - 11/17/2010 - Volume II

42

 1    and widely spaced eyes.  The *Fisher-Price v. Well-Made Toy*

 2    case, a Second Circuit case.  There, the court pointed out

 3    that they had bright-painted eyes, a skyward gaze, the same

 4    knobby nose, and cherubic smile.  And those were the kinds

 5    of features the courts look at in order to say that they are

 6    protectable and there's infringement.

 7            MGA -- really, I think, the main argument that

 8    they made here was, is that somehow Mattel -- I think they

 9    have to make this argument, recognizing that there's ample

10    authority showing that doll features and the like are

11    protectable, which, by the way, in the trial record are

12    statements by MGA itself asserting that the Bryant drawings

13    and these features in the Bryant drawings and the dolls

14    themselves are protectable.  MGA has a track record here.

15    MGA has been out, and over the years has sued others, and

16    has asserted exactly the Bryant drawings and said that they

17    have protectable elements in it.

18            So, I mean, what it -- ultimately, where MGA

19    seemed to head yesterday in the argument was -- is to say,

20    "Well, Mattel's answer to interrogatories" -- where it

21    didn't mention any of this.  And, in particular, they were

22    relying on our answer to interrogatory No. 31.

23            THE COURT:  Just a moment.  Slow down.

24            MR. ZELLER:  And it was stated a couple of times

25    that the interrogatory -- or that we represented that it was

1     complete.  Quite the opposite.

2          What occurred with that interrogatory response,

3     Your Honor, is -- is that we actually said it was premature

4     to fully answer it until we understood and knew what the

5     Ninth Circuit's standards were going to be.

6          And MGA moved to compel on that.  And again, we

7     told the Court it's premature.  We will -- we will respond

8     and we will fully disclose once the Ninth Circuit rules.

9     And the Court denied MGA's motion on that.

10         Three days after the mandate was issued, we gave

11    them -- in fact, early -- we gave them a disclosure that

12    laid out further what it was that we are claiming as the

13    elements, and really laying out our copyright infringement

14    claims further.

15         Now, I'd also hasten to add, Your Honor, that --

16         THE COURT:  You want a record, don't you?

17         MR. ZELLER:  I'm sorry?

18         THE COURT:  You want a record?

19         MR. ZELLER:  Yes.

20         THE COURT:  Slow down.

21         MR. ZELLER:  Absolutely.

22         THE COURT:  Slow down.

23         MR. ZELLER:  Thank you.

24         We have a complete trial record here of, of

25    course, extensive descriptions and comparisons and

Case 2:04-cv-09049-DOC -RNB   Document 9524   Filed 12/22/10   Page 44 of 63   Page ID #:284775
SACV 04-9049 DOC - 11/17/2010 - Volume II

44

1    everything else that were made over the course of a

2    three-month trial.  So for MGA to somehow suggest that they

3    were only -- they haven't been given information as to what

4    it is we're claiming are similarities, including as to

5    subsequent generation dolls is -- is really, in many

6    respects, absurd.

7          With respect to the further question that the

8    Court asked as part of 1:  "Don't the Jade and Fianna dolls

9    share facial features, facial expression, size and body type

10   with Bryant's drawings?"

11         And the answer is yes.  And we believe that those

12   are among the protectable features that show that there is

13   infringement.  And, of course, Fianna is a doll that is a

14   subsequent generation doll.

15         And, ultimately, what we're really dealing with

16   here on this, in terms of the subsequent generations, is the

17   jury's gonna have to make the comparison.  The Court is

18   gonna have to instruct, and the jury's gonna have to make

19   that comparison.

20         Question No. 2 focuses on MGA's argument, the

21   differences in the hairstyle or clothing defeat

22   infringement.  And the first part of the Court's question

23   is, "How is this analysis transformed by the apparently

24   modern trend toward creating dolls with interchangeable

25   heads and clothing?"

Case 2:04-cv-09049-DOC -RNB   Document 9524   Filed 12/22/10   Page 45 of 63   Page ID #:284776
SACV 04-9049 DOC - 11/17/2010 - Volume II

45

```
 1              I would actually break this up a little bit.  I
 2     don't think that you can say that there's a modern trend
 3     towards creating dolls with interchangeable heads.  There
 4     is -- by the way, there are such dolls.  And there are
 5     actually such dolls involved in the case.  But that's not
 6     really mainly what we're dealing with.  But even as to those
 7     dolls, where the heads are interchangeable, it's still
 8     infringement because it's the head.  MGA manufactures the
 9     infringing head.
10              So even if they, the consumer, can take the doll
11     and -- or take the head and put it on a different doll body,
12     the head still infringes.  And that would be our -- our
13     theory.  Of course, if the body also infringes, then it
14     fringes, as well.
15              The part about the fashions, Your Honor, is -- I
16     would -- I would say this, which is that simply dressing up
17     a doll in different clothing does not inherently change it
18     such that there can be no infringement.  And I -- I don't
19     think that's what the Ninth Circuit said.  The Ninth Circuit
20     certainly pointed out that that might be a difference, but
21     it didn't rule that it was.  And it certainly did not say
22     that -- that the -- was -- was foreclosed as part of
23     Mattel's infringement claim or any subsequent generation
24     dolls.
25              What it was positing was the question of -- of,
```

1    "Well, if you put perhaps different fashions or

2    hairstyles" -- those are differences that MGA pointed to as

3    being, um, reasons why perhaps they don't look substantially

4    similar.  But -- but no one suggested, and I don't think can

5    fairly suggest on this record, that that means as a matter

6    of law any dolls with different fashions or a different

7    hairstyle, um, are not infringing.

8             And part of the reason I would say that,

9    Your Honor, is -- is, you know, look at it this way.

10            THE COURT:  Let me stop for just a moment.  Just a

11   minute.

12            If I have a number of apparel items for a doll --

13   shirt, dress, gloves, scarf -- in different colors and

14   combinations, and my daughter or son -- let's just say

15   daughter -- decides to dress this doll, are you saying that

16   there's a protectable copyright in the way that this doll is

17   dressed?  In other words, the creative ability of this child

18   to mix and match somehow causes some uniqueness?

19            MR. ZELLER:  No.  That's not our theory.

20            THE COURT:  Okay.  Hold on.  Bear with me.

21            MR. ZELLER:  Sure.

22            THE COURT:  I want to be very clear about this.

23            I understand your argument so far about

24   expression, et cetera; that it's not to be discounted.  It

25   may be a nonfavored factor, let's say, but not discounted.

DEBBIE GALE, U.S. COURT REPORTER

1           I want to make certain that you're not contending

2      that the uniqueness of a child's imagination in terms of

3      combination of wearing apparel is a protectable interest.

4           MR. ZELLER:  That's true.  We are not.

5           THE COURT:  Okay.  Thank you.

6           MR. ZELLER:  And the way I would -- I would break

7      it down kind of along these lines.  And one could probably

8      go into more detail, but I'll just give it sort of at a

9      higher level right now.

10          The fashions themselves, those can be infringing,

11     the actual construction of the fashions.

12          THE COURT:  Now, just a moment.  That's just my

13     point.  The "construction of the fashion," does that mean

14     the combination or choice that appears on a doll concerning

15     this apparel is a protectable interest, copyright interest?

16          MR. ZELLER:  No.

17          THE COURT:  Then I don't understand your argument.

18          MR. ZELLER:  It's the -- it's the fashion divorced

19     from the doll.  Just imagine the clothes themselves.  And

20     this is actually in a footnote in the Ninth Circuit

21     decision, by the way.  Because MGA had argued --

22          THE COURT:  No, no.  You're straying now.  You're

23     straying.  Come right back to the point.

24          Just the apparel, the shirt is a protectable

25     interest?

```
 1              MR. ZELLER:  Yes.

 2              THE COURT:  Blouse is a protectable interest?

 3              MR. ZELLER:  Correct.

 4              THE COURT:  The pants are a protectable interest?

 5              MR. ZELLER:  Yes.

 6              THE COURT:  Okay.

 7              MR. ZELLER:  It isn't -- it doesn't become

 8   infringing simply because, one, a child has taken the pants

 9   and put it on a doll.  The fact is, is MGA manufactured

10   clothing that can be infringing if they are substantially

11   similar to fashions depicted in the Bryant drawings.

12              THE COURT:  But not the combination of the

13   clothing put on the doll?

14              MR. ZELLER:  Correct.

15              THE COURT:  Okay.

16              MR. ZELLER:  What I would point out, Your Honor,

17   is that we -- we -- this argument was actually in front of

18   the Ninth Circuit in some respects.  MGA argued that the

19   fashions could not -- and I'm just focused on the fashions

20   alone, independent of the doll, which I'll talk about

21   separately in a second -- that those fashions were not

22   protectable because they were utilitarian.  And the reason

23   why is, is that, generally, it's understood that adult human

24   clothing, because it warms and covers and the like, is

25   utilitarian.  And MGA said, "Just like that, doll clothing
```

1    is."  We said, "Well, dolls don't get embarrassed if they're

2    naked.  Dolls don't need them for warmth."  You know, it --

3    that rationale doesn't hold up.  And the Ninth Circuit

4    agreed with us.

5           So there's no question that the Ninth Circuit has

6    already held that the designs for doll clothing can be

7    copyright protected.

8           THE COURT:  Okay.

9           MR. ZELLER:  The other part -- and this is why I

10   wanted to sort of break out the part about the head versus

11   the part about the clothing that was posited in the Court's

12   question.

13          Now, the other aspect, of course, is the doll

14   itself.  We'll -- we can talk about it for present purposes

15   without any clothing on it at all, just the naked doll.  You

16   have the head.  Then you have a sculpt that includes the

17   body.  The point about changing, say, for example, the

18   hairstyle, that has not -- been found not to be sufficient

19   to, in itself, as a matter of law, mean that there's no

20   infringement.

21          There's the *Fleischer Studios* case -- and this is

22   a bit of an old case -- from 1934, Southern District of

23   New York, 5 F.Supp. 808.  And what it found was, is that it

24   was the same character.  And it said -- it gave the same

25   impression, and it was infringement -- "because there's

1  really no essential difference between the plaintiff's

2  drawing and the defendant's doll except that the hair is

3  somewhat differently arranged."

4        And the other analogy I would make here -- and

5  this is where I was heading earlier -- is the same for

6  clothing, putting different clothing on the doll, or

7  rearranging its hairstyle doesn't change the fact that there

8  are still -- there's still similarity of expression in the

9  facial features, for example.

10        You can't say, "I didn't infringe Mickey Mouse

11  because I put a jacket on him."  I mean, that wouldn't make

12  any sense.  You still -- as long it's still recognizable,

13  it's substantially similar in the protectable expression,

14  it's still an infringement.  And the corollary to what I

15  would also -- and this is a very often, kind of, quoted

16  concept in copyright infringement, is, you can't defeat

17  infringement by showing how much did you not take.  So

18  adding new stuff, adding new things around what was taken

19  and what's infringing doesn't change the fact that it's

20  still infringing.

21        And, then, the further part about how do the

22  answers to these questions affect the Ninth Circuit's

23  conclusion that, unlike the limited range of expression for

24  the sculpt, there's a wide range of expression for complete,

25  young, fit, female fashion dolls with exaggerated features.

1   And our view is, is that it's entirely consistent with that

2   point.  And this is part of, in fact, what I'm relying on

3   for -- for my answers here.

4            Question No. 3 -- and this asks about whether or

5   not we are committing an error by relying on compilation of

6   elements and overall similar appearance.  And these are

7   actually -- the answer to that is no, but they are somewhat

8   very different concepts.

9            "Overall similar appearance" references the

10  intrinsic test for copyright infringement.  The

11  "compilations of elements" is saying that there is something

12  that is protectable there.  And in the copyright context, a

13  complication -- the copyright in the compilation extends to

14  the selection, arrangement, and coordination of the elements

15  of the work, not the elements themselves.

16           So it's -- put differently, it's the contribution

17  that is brought together that receives protection, even if

18  the elements themselves, individually, cannot be protected.

19           So it's -- it's that, if it meets the minimal

20  threshold for creativity, then the similarities and the

21  selection arrangement and coordination of elements can be

22  infringing.  But that's not the same thing as saying that

23  you're finding infringement based on unprotected elements,

24  because there is still something that's copyrightable that

25  is being protected, but it's separate and apart from the

Case 2:04-cv-09049-DOC -RNB   Document 9524   Filed 12/22/10   Page 52 of 63   Page ID #:284783
SACV 04-9049 DOC  11/17/2010 - Volume II

52

 1   unprotected elements.

 2          And in the cases of dolls, courts have, in fact,

 3   specifically focused on a combination of elements to resolve

 4   questions of protectability and infringement.  One case is

 5   the *JCW* case.  And that pointed out that the infringement

 6   was based upon the execution and combination of features on

 7   both dolls that led -- that would lead an objective observer

 8   to think that they were one and the same.

 9          And so it's -- it's really the selection of what

10   would be otherwise unprotected elements and combining them

11   together into the work.  And it's that creativity that goes

12   into combining them that is protectable.

13          Another example of that is the *Fisher-Price Toys*

14   *v. My-Toy Company* case.  And there, what the Court said was,

15   "That plaintiff's dolls contained features separately found

16   on other dolls, does not render their copyrights invalid.

17   Rather, the original combination of these features into new

18   dolls makes the dolls copyrightable."

19          Also, the *Goldberger* case, as part of this

20   conclusion that the Second Circuit reached, that the facial

21   features and expression and the like of the Barbie doll were

22   protectable, also relied upon the fact that it was the

23   particularized combination of these features.  And the Court

24   actually said this was true, even though the elements such

25   as a nose and eyes and the like are the idea of a certain

1    type of doll face that's otherwise in the public domain.

2            THE COURT:  But assume for a moment -- and this is

3    MGA's argument -- that even if there's a copyright

4    violation, that it's *de minimis*; that two things from their

5    perspective occurred.  The first is that the Carter Bryant

6    sculpt -- let's just say "doll," to make it simple -- came

7    to them in this form but, because of the designers, that

8    that doll morphed into a substantially different sculpt or

9    doll than Carter Bryant initially brought to MGA.

10           What I hear in their argument is two things:

11   First, we're not liable because Mattel only looked at the

12   first generation that Carter Bryant brought.  And second,

13   what they haven't really argued is, "If we get in front of a

14   jury and we are liable, we're liable for limited damages for

15   whatever the first two dolls" -- I think it was Jade, and I

16   forget the other -- "were put on the market."  Okay?

17           If I have a further modification of an initial

18   doll that MGA produces that infringes upon Mattel, how do

19   you claim that the additional sculpts and dolls -- let's say

20   "dolls" -- that don't have the same similarity as the

21   original doll is infringing?

22           MR. ZELLER:  Well --

23           THE COURT:  'Cause there we get into the idea

24   concept.

25           MR. ZELLER:  Well, I think ultimately there are a

1    couple of -- couple of points on this.  Number one is, is

2    that -- the argument that the Court is expressing here is,

3    in fact, the argument MGA made throughout first trial to the

4    jury.  Presumably, that's the argument they're going to make

5    again.  I mean, we're really clearly in an area of disputed

6    fact.

7                THE COURT:  "We didn't infringe.  But if we did

8    infringe, the damages against us should be very narrow

9    concerning the doll or the first two dolls."

10                MR. ZELLER:  You know, Doll 100 doesn't look

11   enough like the drawings to be infringing.

12                THE COURT:  All right.  Dolls that went to the

13   market.

14                MR. ZELLER:  Right.

15                THE COURT:  That doesn't have anything to do with

16   misappropriation or trade secret misappropriation or

17   anything else.  I'm just talking now about copyright

18   infringement.

19                MR. ZELLER:  Correct.  And there's no question

20   that that is going to be MGA's position.

21                Our position -- and this goes back to a point I

22   was saying earlier -- we had weeks, of course, of

23   discussions about -- about these dolls.

24                THE COURT:  You're drifting on me.  That doesn't

25   matter.  Answer my question.

 1            MR. ZELLER:  Well, it's just that we will, of

 2    course, say there are sufficient similarities between the

 3    drawings and Doll 100 or Doll 500.

 4            THE COURT:  Okay.

 5            MR. ZELLER:  Because, fundamentally, there are a

 6    couple things, Your Honor, about these dolls that are common

 7    elements.  The head sculpt that is used for the dolls, for

 8    Bratz dolls, substantially stayed the same.  I mean, those

 9    have been the same since the beginning.  So the fact is, is

10    that the appearance of that doll, the facial features and

11    the like, both as painted and unpainted, have been -- are

12    common throughout the doll line.

13            So our point of view is, is that that's -- that's

14    the same face.  That's the same infringing element.  And the

15    Court was asking earlier why do we take the position that

16    the doll, the -- you know, the look of the doll drives the

17    sales.  That's because this is an apportionment argument,

18    too.  And an apportionment argument that MGA made at the

19    first trial and we responded to, which is, well, you know,

20    the driving feature -- the driving force behind children,

21    you know, wanting these dolls -- certainly the look of the

22    doll.

23            And that is what Mattel owns:  The particularized

24    expression of these.  And the jury's simply gonna have to

25    make a comparison.  Maybe they will find, for whatever

1    reason, you know, a doll, because of what MGA will point to

2    as being all these other different elements, and how it's

3    been put together, that doesn't really look like the

4    drawings.  And they're gonna, of course, say that very

5    generally about everything after the first generation.

6            But I think, if the Court looks at the subsequent

7    generation dolls, there are still lots of similarities.  In

8    fact, our view is, is they're really not different at all.

9    And merely changing things -- like, I put it in a different

10   dress, or I changed its hairstyle, or I changed its eyes

11   from green to blue, doesn't really change the fact that

12   these are the same dolls, and also the same characters.

13           One thing that is really uncontested at this point

14   on summary judgment is that part of what Mattel owns as its

15   copyright are the Bratz characters.  And irrespective of the

16   various kind of variations that are made on it, that can

17   still be found to be substantially similar and, therefore,

18   infringing.

19           You know, analogy would be a Barbie character.  I

20   mean, there, of course, can be many different iterations of

21   Barbie, but people recognize it as being Barbie.  And that

22   can be a copyright infringement for that reason.

23           So, kind of fundamentally, another way I guess I

24   would approach this is, is that, you know, we're looking at

25   different aspects of the dolls -- the fashions, the

```
 1    characters, and also the sculpt itself -- as being the
 2    subject of the infringement claims.  And whether or not --
 3              THE COURT:  And is that what you mean by
 4    "compilation of elements"?
 5              MR. ZELLER:  Well --
 6              THE COURT:  The question I have on 3, the bottom
 7    sentence.
 8              MR. ZELLER:  The compilation of elements that I'm
 9    referring to is, is that, even if one were to say that the
10    particularized expression of the eyes or the nose or the
11    mouth of a sculpt is unprotectable, when they're taken
12    together and put together in that way, that's protectable.
13    That's the compilation.  That's taking unprotected elements,
14    and once you combine them in a certain way, they can still
15    be protected.
16              THE COURT:  And you're only referring to the
17    features of the doll itself, not the combination of
18    clothing?
19              MR. ZELLER:  Correct.
20              THE COURT:  Okay.
21              MR. ZELLER:  Correct.
22              THE COURT:  All right.
23              MR. ZELLER:  Absolutely.
24              THE COURT:  And you do agree, though, that, while
25    not to be ignored, that the facial features, expression,
```

Case 2:04-cv-09049-DOC -RNB   Document 9524   Filed 12/22/10   Page 58 of 63   Page ID #:284789
SACV 04-9049 DOC - 11/17/2010 - Volume II

58

```
 1    size and body shouldn't be filtered out, but they're not
 2    favored -- they don't seem to be favored under the case
 3    laws.  In other words, you're best argument seems to be that
 4    the combination should lead this to become a jury decision.
 5            MR. ZELLER:  Well, I certainly agree that it --
 6    that the compilation alone gets us to a jury.  But I do
 7    actually disagree with the notion that the facial features
 8    aren't -- I mean, to me, that's actually the core of it.  I
 9    mean, to say that the facial expression -- and this goes
10    back to like the Goldberger case -- that's exactly what the
11    court was focused on.
12            Maybe one other thing I should point out,
13    Your Honor --
14            THE COURT:  If that's the case, MGA argues that
15    there's a significant difference when they get a
16    disproportionality on their doll; in other words, that
17    they're the genesis, as I read this, of -- I forget --
18    thinner hips or thinner legs, or I forget the combination
19    that MGA was arguing, got lost in some of that.  It sounded
20    like -- never mind.  But thinner hips, thinner legs compared
21    to thicker hips or thicker legs.  And that they had
22    downsized the doll by a significant amount, showing a
23    smaller doll body, a bigger head, you know, all those
24    factors MGA is going to argue are -- and your point is it
25    should be left to the jury.
```

Case 2:04-cv-09049-DOC -RNB   Document 9524   Filed 12/22/10   Page 59 of 63   Page ID #:284790
SACV 04-9049 DOC - 11/17/2010 - Volume II

59

```
 1            MR. ZELLER:  I think it's -- absolutely.  I mean,
 2    those are arguments they made before.  Our point is, is it
 3    doesn't real change.
 4            THE COURT:  What's significant is, as I read the
 5    first Phase I trial, that judge Larson decided that issue,
 6    and did --
 7            MR. ZELLER:  Well --
 8            THE COURT:  Just a moment.  Slow down.  Let me get
 9    some input from both sides.
10            I thought that Judge Larson had basically gone to
11    chambers, and had made those determination in chambers.
12            MR. QUINN:  The sculptress that MGA engaged,
13    Margaret Leahy, took the stand, and she was questioned by
14    MGA in an effort to show that she made changes, that she
15    made a new sculpt and that there were significant
16    departures.
17            THE COURT:  And that's the argument I'm reading in
18    the briefing before me, that there were significant changes.
19            MR. QUINN:  She testified on examination by MGA as
20    to the changes that she made and the departures, and it was
21    her idea, and it was -- "here are the differences from the
22    drawings."  And she was cross-examined on that.
23            THE COURT:  Okay.
24            MR. ZELLER:  And one thing I should also point
25    out, Your Honor, is, is that, there are different kinds of
```

 1   works that are at issue in terms of what it is that Mattel

 2   is saying we own that are copyright protected.  There are

 3   the drawings that Carter Bryant created, actual fixed-design

 4   drawings of various kinds, including of the sculpts.  Then

 5   we have the sculpts, themselves, the actual

 6   three-dimensional renditions, one of which Carter Bryant

 7   called a "dummy," and that he took to MGA and used it as

 8   part of his pitch.  There's separate testimony on that from

 9   a former MGA executive who said, "Looked just like a Bratz

10   doll."  That's the one he actually created at Mattel.

11        Then, on top of that, there are other sculpts that

12   were created.  And this is the one that Mr. -- or among

13   them -- the ones that Mr. Quinn was referring to that was

14   sculpted with the participation of Margaret Leahy.  And, you

15   know, our view is, is that she was doing what Carter Bryant

16   told her.  So, therefore, he was creating it.  He was the

17   author, and he was the creator.

18        But the fact is, is that, then, there are

19   additional three-dimensional sculpts of Bratz that were

20   created that we say were done as part of the time when

21   Carter Bryant was working there at Mattel and, therefore,

22   subject to his contract and, therefore, are owned by Mattel.

23   So there are multiple kinds of works that are involved.

24        And our point is, is that the MGA dolls are

25   substantially similar to the drawings, the sculpt, and it

1    will be, of course, under the standards that the Ninth

2    Circuit has articulated for the drawings in the sculpt.  And

3    that we say that they are infringing.

4              And that -- I don't think that there can be really

5    any issue that that's a jury issue at this point.  I mean,

6    they are close enough, we can obviously show the Court.  And

7    what I would also say is, is that, when Judge Larson made

8    the determination that he thought that they were all, or

9    virtually all -- I mean, he did make distinction.  When

10   Judge Larson made the determination about infringement, he

11   wasn't doing it based on the jury trial.  He made his own

12   independent assessment, we'll call it, what he thought was

13   certainly consistent with the jury verdict.  But he did it

14   as part of the equitable relief.  He didn't take that jury

15   away from the Court -- excuse me -- he didn't take that

16   issue away from the jury.

17             THE COURT:  Thank you.  Thank you.

18             MR. ZELLER:  So the jury actually got charged and

19   made a determination of infringement based on the kinds of

20   works that I just described.

21             THE COURT:  I see.

22             MR. ZELLER:  And then, post trial, we put all the

23   dolls in front of Judge Larson and said, "We think that

24   they're substantially similar," and he agreed.

25             THE COURT:  I see.  So you had the independent

1    jury determination first?

2              MR. ZELLER:  Correct.

3              THE COURT:  Thank you.

4              MR. ZELLER:  Correct.  And so that's -- that, I

5    think, is -- I think that answers, hopefully, the Court's

6    questions on copyright.

7              THE COURT:  Okay.

8              MR. ZELLER:  And at this point, I think the

9    ownership issues will be addressed by Mr. Quinn.

10                  *(Live reporter switch at 3:53 p.m.)*

11                  *(Further proceedings reported by Deborah*

12          *Parker in Volume III.)*

13                              -oOo-

14

15

16

17

18

19

20

21

22

23

24

25

1                              -oOo-

2

3                           CERTIFICATE

4

5           I hereby certify that pursuant to Section 753,

6    Title 28, United States Code, the foregoing is a true and

7    correct transcript of the stenographically reported

8    proceedings held in the above-entitled matter and that the

9    transcript page format is in conformance with the

10   regulations of the Judicial Conference of the United States.

11

12   Date:  November 22, 2010

13

14

15        _____

                DEBBIE GALE, U.S. COURT REPORTER
16              CSR NO. 9472, RPR

17

18

19

20

21

22

23

24

25

DEBBIE GALE, U.S. COURT REPORTER