O

UNITED  STATES  DISTRICT  COURT

FOR  THE  CENTRAL  DISTRICT  OF  CALIFORNIA

| | | |
|---|---|---|
| MATTEL, INC., | ) | CASE NO. CV 04-9049 DOC (RNBx) |
| | ) | |
| | ) | |
| | ) | **O R D E R** ON MGA'S MOTION |
| v. | ) | **FOR SUMMARY JUDGMENT;** |
| | ) | **MATTEL'S MOTION FOR** |
| MGA ENTERTAINMENT, INC., | ) | **PARTIAL SUMMARY JUDGMENT;** |
| | ) | **MACHADO'S MOTION FOR** |
| | ) | **SUMMARY JUDGMENT** |
| _____ | ) | |
| | ) | |
| **AND CONSOLIDATED ACTIONS.** | ) | |
| | ) | |
| _____ | ) | |

Before the Court[1] are the following Motions:

(1)     MGA Entertainment, Inc. ("MGAE"), MGA de Mexico, S.R.L. de CV ("MGA Mexico"), MGA Entertainment (HK) Ltd. ("MGA HK"), and Isaac Larian ("Larian")'s (collectively "MGA") Motion for Summary Judgment;

(2)     Mattel, Inc. ("Mattel") and Mattel de Mexico, S.R.L. de CV ("Mattel Mexico")'s joint Motion for Partial Summary Judgment; and

(3)     Carlos Gustavo Machado Gomez ("Machado")'s Motion for Summary Judgment.

_____

[1] This Order has been modified slightly from the version distributed to counsel on December 22, 2010.

A hearing on these motions was held on November 16, 2010 and November 17, 2010, in advance of which the Court issued a minute order directing counsel for the parties to focus on certain issues in their argument to the Court.  (Dkt. 9273.)

### Background

On April 27, 2004, Mattel filed a state court complaint against former employee Carter Bryant ("Bryant") alleging that Bryant breached his contractual and common law duties to Mattel by failing to disclose his concept sketches and sculpts of the Bratz dolls prior to leaving Mattel for MGA Entertainment, Inc. ("MGAE") on or about October 4, 2000.  Bryant filed a counter-claim against Mattel in state court and filed a separate action for declaratory relief in federal court on November 2, 2004, on which date Bryant also removed Mattel's state court lawsuit to federal court.  MGAE intervened in Mattel's suit against Bryant on December 7, 2004 and, four months later, filed a stand-alone complaint in federal court against Mattel for trade dress infringement, dilution, unfair competition, and unjust enrichment, alleging that Mattel infringed MGAE's distinctive packaging and interfered with MGAE's business relationships. On June 19, 2006, the Honorable Stephen G. Larson consolidated the three cases for all purposes upon finding that "the[] actions involve a number of common issues of law and fact."

Bryant was the only defendant named by Mattel's state court complaint.  On November 20, 2006, Mattel sought leave to file an amended complaint that would "substitute [MGAE] for Defendant Doe 1, [MGA HK] for Defendant Doe 2, and [Larian] for Defendant Doe 3" and add MGA Mexico and Machado as defendants to a pleading that asserted a host of new claims unrelated to Bryant's conduct.  (Dkt. 89.)  Mattel's request was denied but only as a procedural matter; the court permitted Mattel to plead its proposed amendments "in the form of an amended answer and counterclaim in" MGAE's case against Mattel.  (Dkt. 142.)  Mattel filed its First Amended Answer and Counterclaims (FAAC) on January 1, 2007 (Dkt. 143) bringing the same claims that are now pending against MGA and Machado, though the substance of those claims and the detail with which they are alleged has changed considerably.  Following the filing of Mattel's counter-claims against MGA and Machado, the court ordered claims related to the ownership of the Bratz line of dolls — raised in Mattel's complaint against Bryant and Mattel's

1 FAAC — to be tried separately from, and prior to, MGAE's affirmative claims and Mattel's

2 counter-claims arising out of conduct unrelated to the ownership of Bratz.

3       Mattel entered into a settlement with Bryant on the eve of the "phase 1" trial, leaving the

4 following claims to be tried to the jury: (1) Mattel's claim for intentional interference with

5 contract against Larian and MGAE; (2) Mattel's claim for aiding and abetting breach of

6 fiduciary duty against Larian and MGAE; (3) Mattel's claim for aiding and abetting breach of

7 duty of loyalty against Larian and MGAE; (4) Mattel's claim for conversion against MGAE,

8 MGA HK, and Larian; (5) Mattel's claim for statutory unfair competition against Larian,

9 MGAE, and MGA HK; (6) Mattel's claim for declaratory relief against Larian, MGAE, and

10 MGA HK; and (7) Mattel's claim for copyright infringement against Larian, MGAE, and MGA

11 HK.  (Dkt. 3917 at 11.)  Mattel prevailed on each of its claims and the jury found that Bryant

12 conceived the idea for the name Bratz and created the concept drawings and sculpt for the Bratz

13 dolls during his second term of employment with Mattel (January 4, 1999 to October 4, 2000).

14 On the basis of the jury's special and general verdicts, and after independently examining the

15 similarity between the concept sketches/sculpts and MGA's Bratz dolls, the district court placed

16 the Bratz trademarks in a constructive trust and enjoined MGA from continuing to sell dolls that

17 were substantially similar to Bryant's initial works.  MGA appealed.

18       During the pendency of MGA's appeal of the phase 1 orders, discovery proceeded on the

19 claims not tried in the phase 1 trial.  Mattel amended its responsive pleading three times and

20 joined Mattel Mexico as a plaintiff to its operative Fourth Amended Answer and Counterclaims

21 ("4AAC"), which brings claims arising out of MGA's relationships with Bryant and other

22 former Mattel employees who allegedly stole Mattel's confidential information before leaving

23 Mattel.  The 4AAC's claims also arise out of MGA's alleged litigation misconduct and

24 unwillingness to comply with the phase 1 jury's verdicts, though many of these allegations were

25 dismissed on August 2, 2010.  MGA narrowed its trade dress infringement allegation to the two-

26 pronged claim that Mattel copied MGA's trapezoidal and heart-shaped packaging.  MGA also

27 filed counterclaims-in-reply that arise out of Mattel's alleged market research tactics.

28       On July 22, 2010, MGA prevailed on its appeal.  In vacating the constructive trust and

injunction, the Ninth Circuit held that the equitable relief was impermissibly broad and predicated upon jury verdicts tainted by erroneous instruction.  On October 22, 2010, this Court granted MGA's motion for a new trial on all claims and issues tried to the jury in phase 1, finding that the indistinct and inseparable claims were all infected by instructional error.  The Court separately discarded with the earlier bifurcation of claims, and ordered that all pending claims between the parties be tried in a single proceeding to commence on January 11, 2011.

## Standard

Rule 56 of the Federal Rules of Civil Procedure provides that "[a] party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought."  Fed. R. Civ. P. 56(a).  Summary judgment should be granted "when, viewing the evidence in the light most favorable to the non-moving party, there are no genuine issues of material fact" and the moving party is entitled to judgment as a matter of law.  *Avery v. First Resolution Mgmt. Corp.*, 568 F.3d 1018, 1021 (9th Cir. 2009); *see also* Fed. R. Civ. P. 56(a).  In adjudicating cross-motions for summary judgment, the Ninth Circuit "evaluate[s] each motion separately, giving the nonmoving party in each instance the benefit of all reasonable inferences."  *ACLU of Nevada v. City of Las Vegas*, 466 F.3d 784, 790-91 (9th Cir. 2006) (citations omitted); *see also Friends of Columbia George, Inc. v. Schafer*, 624 F. Supp. 2d 1253, 1263 (D. Or. 2008).[2]

## Discussion

### I.      Bryant's Inventions Agreement

As explained in the order granting MGA's Motion for New Trial, Mattel's counter-claims for conversion, intentional interference with contractual relations, aiding and abetting breach of fiduciary duty, copyright infringement, and declaratory relief require the interpretation of Mattel's Employee Confidential and Inventions Agreement (the "Inventions Agreement") that Bryant signed on January 4, 1999.  By paragraph 2 of the Inventions Agreement Bryant agreed

---

[2] Mattel's unopposed motion to consolidate the summary judgment motions is granted subject to the general rule set forth in *City of Las Vegas*.

to "communicate to [Mattel] as promptly and fully as practicable all inventions . . . conceived or reduced to practice by me (alone or jointly with others) at any time during my employment with [Mattel]." (Declaration of Dylan Proctor, Ex. 124.)  Bryant also assigned to Mattel any "right, title and interest" in such inventions, which the Inventions Agreement defined as "includ[ing], but [] not limited to, all discoveries, improvements, processes, developments, designs, know-how, data computer programs, and formulae, whether patentable or unpatentable." *Id.*

## A.      Inventions[3]

Prior to the phase 1 trial, Mattel successfully argued that the terms of the Inventions Agreement assigned to Mattel Bryant's right, title, and interest in his ideas for the names Bratz and Jade, leaving for the jury the question of whether Bryant's ideas were conceived at any time during his employment with Mattel.  On appeal, the Ninth Circuit held that "the agreement could be interpreted to cover ideas, but the text doesn't compel that reading," and suggested that this Court evaluate whether the ambiguity "could be resolved by extrinsic evidence."

### 1.      Extrinsic Evidence

Mattel argues that Bryant and Mattel mutually intended for the Inventions Agreement to assign to Mattel Bryant's right, title, and interest in the ideas he conceived or reduced to practice at any time during his employment with Mattel.  Because "[t]he fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties," the Court may consider extrinsic evidence of the parties' intent when the contract is ambiguous.  *Morey v. Vannucci*, 64 Cal. App. 4th 904, 912 (1998) (quoting *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1264 (1992)) (quotation marks omitted).[4]  Admissible extrinsic evidence includes "surrounding

---

[3] Mattel argues that it does not matter whether the Inventions Agreement encompasses ideas because the Bratz name was contained in a stylized logo and the Inventions Agreement indisputably assigned Bryant's right, title and interest in his designs.  But owning the idea is distinct from owning the design, since Mattel seeks to capture the enhancement in value of the former and not the latter.

[4] Extrinsic evidence is also provisionally accepted to determine whether the contract is reasonably susceptible to the parties' competing interpretations and, if it is, "extrinsic evidence relevant to prove either of such meanings is admissible."  *Pacific Gas*

1  circumstances under which the parties negotiated or entered into the contract; the object, nature,
2  and subject matter of the contract; and the subsequent conduct of the parties." *Id.*

3        Mattel cites Bryant's testimony from an unrelated lawsuit and the deposition testimony of
4  Mattel's corporate designee to show that both Bryant and Mattel understood the Inventions
5  Agreement to assign Bryant's right, title, and interest in his ideas. As a general rule, evidence of
6  the contracting parties' "undisclosed intent or understanding" is irrelevant to the contract's
7  interpretation. *Cedars-Sinai Medical Ctr. v. Shewry*, 137 Cal. App. 4th 964, 980 (2006).
8  However, evidence of the parties' subjective intent may be used "in interpreting an ambiguity,
9  although in the case of contracts, it is a mutual declaration of intention which is sought to be
10  found." *Heston v. Farmers Ins. Group*, 160 Cal. App. 3d 402, 414 (1984) (finding prior
11  representations about similar agreement relevant to whether parties shared intent).

12        During a 2007 trial between MGA and Art Attacks Ink, LLC, Bryant testified about his
13  relationship with Mattel:

14      Q    And part of your job [at Mattel] was to come up with new ideas, right?
15      A    Yeah, that was part of my job.
16      . . .
17      Q    I'm not asking you whether it was fair or whether [Mattel] explained [the
18          Inventions Agreement] to you. I'm just asking what your understanding of the
19          agreement was.
20      A    I really don't remember.
21      . . .
22      Q    Sir, [Exhibit 3074 is] a proprietary information checkout from Mattel that you
23          signed on October 19th, 2000, your last day of employment there, correct?
24      A    Yes.
25      . . .

26
27  *& Elec. Co. v. G.W. Thomas Drayage & Rigging Co., Inc.*, 69 Cal.2d 33, 40 (1968); *Cf. Dore v. Arnold Worldwide, Inc.*, 139 P.3d 56, 60 (2006); *see also Trident Ctr. v.*
28  *Connecticut General Life Ins. Co.*, 847 F.2d 564, 569 (9th Cir. 1988).

1  Q    Okay.  And scroll up.  Mattel wanted to make sure that you were aware that each

2       terminating employee should be aware that in his employment agreement he has

3       agreed to transfer all inventions made or conceived during the period of his

4       employment at Mattel.  *By this time* did not you understand that condition?

5  A    I'm sorry.  I'm not exactly sure what you're asking me.

6  Q    Did you understand what this first sentence meant, by October 19th, 2000?

7  A    This is the first time I'd ever seen that contract.

8       THE COURT: Today is?

9       THE WITNESS: No.  On my exiting day this was the first time I'd ever seen this

10  particular contract.  And, again, it was a contract that was not explained to me.

11  BY MR. GRINNELL:

12  Q    Did you not understand that your interest in any and all inventions, improvements

13       and ideas which you made or conceived during your employment at the company

14       was the exclusive property of Mattel?  Did you not understand that?

15  A    You know, I think I was aware of that.  It wasn't pointed out to me when I left.

16       Nothing on this contract was pointed out to me specifically.

17  Declaration of Jon Corey In Support of Mattel's Motion for Partial Summary Judgment, Exh. 84

18  (*Art Attacks v. MGA* May 2, 2007 Trial Tr. (Carter Bryant) at 115:25 to 123:15).

19       Bryant's ambivalent testimony about a distinct agreement, as well as his understanding at

20  the time of his resignation, does not evidence "the mutual intention of the parties as it existed *at*

21  *the time of contracting*."  Cal. Civ. Code § 1636 (emphasis added).  The October 19, 2000

22  proprietary information checkout form referenced in Bryant's testimony is a document he was

23  asked to sign on his last day at Mattel. (Ex. 43 to MGA's MSJ.)  As a reminder to Bryant, the

24  checkout form purported to quote the assignment provision in the Inventions Agreement:

25       My interest in (a) any and all inventions, improvements and ideas

26       (whether or not patentable) which I have made or conceived, or may

27       make or conceive at any time during the period of my employment

28       with the Company, either solely or jointly with others and in (b) any

7

1      suggestions, designs, trademarks, copyrightable subject matter,
2      literary works, artistic works, and computer software which I have
3      made or conceived, or may make or conceive at any time during the
4      period of my employment which relate or are applicable directly or
5      indirectly to any phase of the Company's business shall be the
6      exclusive property of the Company, its successors, assignees or
7      nominees.

8  Ex. 43 to MGA MSJ.

9        The checkout form misquoted Bryant's Inventions Agreement, which did not expressly
10 assign to Mattel Bryant's interest in his ideas.  This error may be attributable to the fact that
11 prior versions of Mattel's Inventions Agreement expressly assigned the contracting employee's
12 interest in his ideas.  *Compare id. and* Exs. 9077, *with* Proctor Decl., Ex. 124.  The minimal
13 overlap between these prior versions and the version signed by Bryant — for example, Bryant's
14 agreement identifies "discoveries, improvements, processes, developments, designs, know-how,
15 data computer programs and formulae, whether patentable or unpatentable," many of which do
16 not appear in prior versions — shows a genuine issue of material fact as to whether Bryant's
17 understanding about the checkout form paralleled his prior understanding about the scope of the
18 Inventions Agreement.

19       Mattel's evidence of its *own* intent is also undermined by the dissimilarity between the
20 Inventions Agreement and checkout form.  For example, Mattel's Vice President for Human
21 Resources, Alan Kaye, submitted a declaration stating that:

22      Although the version of the Inventions Agreement signed by Mr.
23      Bryant did not specifically identify 'ideas' among the categories of
24      property to be assigned, it was Mattel's intent and understanding that
25      ideas related to Mattel's line of business were included among the
26      intellectual property assigned to Mattel.  Invention is a fluid concept,
27      and Mattel considers 'ideas' part and parcel with the creation of
28      designs and inventions that are assigned to Mattel.

1   Declaration of Alan Kaye in Support of Mattel's Motion for Partial Summary Judgment ¶ 8.

2        Kaye's claim that Mattel considers ideas "part and parcel" with inventions is belied by the

3 fact that the checkout form and earlier versions of the agreement treated inventions and ideas as

4 distinct.  Ninth Circuit Op. at 10534.  Though he claims familiarity with "Mattel's understanding

5 of and position with respect to ownership of ideas and concepts developed off-site," Kaye could

6 not explain at his deposition why the Inventions Agreement signed by Bryant omitted the word

7 "ideas."  Deposition of Alan Kaye, Vol. I, June 19, 2010, 127:2 to 130:3.  Nor could Kaye define

8 the phrase "includes but is not limited to" in Bryant's agreement, even though his declaration

9 claims a "familiar[ity] with the Inventions Agreement that Bryant signed in 1999."  *Compare id.*

10 at 127:23 *with* Kaye Decl. ¶ 4.

11        The fact that prior versions of the agreement used the word ideas may undermine the

12 credibility of Mattel's witness.  *Travis v. Southern Pacific Co.*, 210 Cal. App. 2d 410, 421

13 (1962).  However, contrary to MGA's argument, the evolution of the Inventions Agreement does

14 not entitle MGA to judgment as a matter of law on this issue, since a reasonable fact-finder

15 could conclude that Bryant intended for the agreement to encompass ideas.  Both motions for

16 summary judgment are denied on this issue.

17               **2.**     **Assignability**

18        MGA argues that Bryant lacked an assignable right, title, or interest in his ideas because

19 ideas are not property under California law.  The Ninth Circuit rejected this argument, which

20 MGA made in its opening brief on appeal, by holding that a narrower constructive trust may be

21 imposed after re-trial.  MGA's argument is thus precluded by the law of the case doctrine.

22 *United States v. Houser*, 804 F.2d 565, 567 (9th Cir.1986) ("A trial court may not [on remand]

23 reconsider a question decided by an appellate court.").  Given the broad and variable rights in

24 intangibles, the Ninth Circuit's conclusion was not error, let alone clear error, which is the only

25 applicable exception to the law of the case doctrine.  *See Kremen v. Cohen*, 337 F.3d 1024, 1030

26 (9th Cir. 2003); *cf. Painton & Co. v. Bourns, Inc.*, 442 F.2d 216, 223 (2d Cir. 1971) (finding that

27 commercially valuable ideas may be licensed); *Armorlite Lens Co. v. Campbell*, 340 F. Supp.

28 273, 275 (S.D. Cal. 1972) (similar).

1   MGA also claims the assignment of ideas is (1) contrary to a reasonable employee's

2   expectations and (2) unconscionable.  These factors preclude the assignment of ideas if Mattel

3   imposed and drafted the agreement and offered Bryant "only the opportunity to adhere to the

4   contract or reject it."  *Neal v. State Farm Ins. Cos.*, 188 Cal. App. 2d 690, 694 (1961).  Whether

5   Bryant was forced to accept the agreement as drafted turns on his credibility.  For example, a

6   more senior Mattel employee declares that he negotiated a more limited assignment with Mattel.

7   Declaration of Robert Hudnut in Support of Mattel's Opp. to MGA's MSJ ¶ 4.  The fact-finder

8   must also resolve whether the assignment of ideas was contrary to a reasonable employee's

9   expectations, given Bryant's testimony acknowledging the assignment of ideas in his other

10   agreements with Mattel.  *Graham v. Scissor-Tail, Inc.*, 28 Cal.3d 807, 820 (1981) ("[Graham]

11   had been a party to literally thousands of . . . contracts containing a similar provision . . . .").

12   There is likewise a genuine issue of material fact as to whether the assignment of Bryant's

13   interest in his ideas would have been unconscionable, since paragraph 2(a) of the Inventions

14   Agreement similarly requires the non-disclosure of employee ideas.  Contrary to MGA's

15   argument, the assignment of ideas is no more offensive to employee mobility than the

16   assignment of inventions, which MGA requires of its employees.  Proctor Dec., Ex. 179 at 4604.

17   As long the assignment does not extend to post-employment work, it is generally enforceable.

18   *See Patent & Licensing Corp. v. Olsen*, 188 F.2d 522, 525 (2d Cir. 1951).

19        Both motions for summary judgment are denied on this issue of contract interpretation.

20        **B.    Timing**

21        Bryant's Inventions Agreement assigned his rights, title, and interest in inventions

22   "conceived or reduced to practice by me (alone or jointly by others) at any time during my

23   employment with the Company."  Proctor Dec., Ex. 124.  Prior to the phase 1 trial, Mattel

24   successfully argued that the phrase "at any time during my employment" extends to nights and

25   weekends.  (Dkt. 3285 at 5.)  On appeal, the Ninth Circuit held that the term "at any time during

26   my employment" was ambiguous.  The parties' exclusion of inventions defined by Cal. Labor

27

28

1   Code § 2870[5] did not necessarily evidence a mutual intent to capture everything else.

2          The Ninth Circuit's mandate forecloses this Court from deciding the issue at summary

3   judgment.  Concluding that "[e]xtrinsic evidence doesn't resolve the ambiguity," the court held

4   that "[t]he issue should have been submitted to the jury."  Ninth Circuit Op. at 10539; *see also*

5   *id.* at 10540 (explaining that "Mattel might well convince a properly instructed jury that the

6   agreement assigns works created outside the scope of employment" on remand); *id.* at 10548

7   (same).

8          No exception to the law of the case doctrine applies, because the Ninth Circuit's

9   consideration of the extrinsic evidence was not erroneous, let alone "unreasonable," as MGA

10  argues.  For example, the Ninth Circuit cited the deposition testimony of Veronica Marlow, an

11  independent contractor who both introduced Bryant to MGA and developed the Bratz fashions

12  with three moonlighting Mattel employees.  (*See* TX 05-0091-TX 05-0120; Proctor Dec., Ex.

13  67.)  She testified "it was common knowledge" that Mattel employees did work on their own

14  time, though she hesitated to name the employees who "worked for other companies."

15  Deposition of Veronica Marlow, at 51:21-25.  The fact-finder must measure the credibility of her

16  testimony, possibly after determining whether her unwillingness to name names was reasonable.

17         Regardless, the additional extrinsic evidence cited by the parties does not resolve the

18  ambiguity anyway.  Bryant expressed concern that selling his sketches could interfere with his

19  Mattel employment, but as Mattel elsewhere argues, his alleged breaches "are not limited to

20  assigning rights to MGA that Mattel owns."  (Dkt. 8679 at 16:4-7.)  Indeed, Bryant testified at

21  deposition that he thought he owned inventions he created on nights and weekends, though other

22

23  _____

24         [5] Labor Code § 2870 bars the assignment of inventions developed on an
    employee's own time, unless (1) the employee used the employer's materials or
25  information; (2) the invention relates at the time of conception or practice to the
    employer's business, or actual or demonstrably anticipated research or development of
26  the employer; or (3) the invention results from any work performed by the employee for
    the employer.  The Inventions Agreement acknowledged that its assignment "does not
27  apply to an invention which qualifies under the provision of Section 2870."  Proctor Dec.,
    Ex. 124.
28

Mattel employees felt otherwise.  Bryant's intent is relevant to the extent it evidences the parties' mutual understanding, and Mattel's understanding turns on Kaye's credibility, which is undermined by his inability to explain why earlier versions of Mattel's inventions agreement used the phrase "at any time during the period of my employment" while Bryant's version only used the time "at any time during my employment."

Both motions for summary judgment on this issue of contract interpretation are denied.

## II.   Copyright Infringement

Mattel registered copyrights in Bryant's concept sketches, as well as two concept sculpts that Bryant allegedly created while working for Mattel.  Declaration of Michael Moore, Exs. 1-28.  Mattel claims that MGA, MGA HK, Larian, and Bryant "have reproduced, created derivative works from and otherwise infringed upon the exclusive rights of Mattel in its protected works without Mattel's authorization."  4AAC ¶ 145.  MGA moves for summary judgment on two issues: (1) MGA's production sculpts, which served as the template for the dolls sold to market, did not infringe on Bryant's concept sculpts or sculpt sketches; and (2) MGA's Bratz doll products did not infringe on Bryant's concept sketches.

To prove copyright infringement, Mattel must establish that: (1) it owns copyrights in the concept sketches and sculpt; (2) MGA copied original elements of the copyrighted work.  *Funky Films, Inc. v. Time Warner Entm't Co., L.P.*, 462 F.3d 1072, 1076 (9th Cir. 2006) (internal citation and quotation marks omitted).  Copying may be established by (1) direct evidence of the copying of original elements of the copyrighted work; or (2) access and substantial similarity "not only of the general ideas but of the expressions of those ideas as well."  *Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1164 (9th Cir. 1977); *see also Feist Pubs., Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361, 111, S.Ct. 1282 (1991)).  Mattel's ownership of copyrights in the sketches and sculpt, as well as MGA's access to those works, are assumed for the purposes of this section.

### A.   There is No Direct Evidence of Infringement

Mattel claims there is a genuine issue of material fact as to whether MGA directly copied from Bryant's sketches and sculpt.  It cites an MGA business plan stating that "[t]he Bratz[] are

1   unique in many ways; their eyes are big with a hint of animé style; their lips are more

2   pronounced, their feet and heads are oversized."  A sculptor retained to work on the Bratz line

3   testified that "Bryant's drawings have the factors that MGA say[s] are unique to the dolls, which

4   is the oversized eyes, protrusive lips, and the diminished nose."  MGA also conceded that

5   Bryant's works inspired the dolls released to market.

6        Mattel's evidence of infringement is hardly direct.  Testimony about MGA deriving

7   inspiration from Bryant's sketches is prototypically circumstantial, and is incapable of rebutting

8   evidence in the record that shows MGA's significant, independent investment in the design and

9   development of the Bratz dolls.  For example, it was MGAE's designers, not just Bryant, sent

10  input to MGA's doll production team in Hong Kong.  MGA also assigned the tasks of sculpt

11  design, packaging, facial design, and fashions to individuals other than Bryant.  All of these

12  individuals participated in the production process and submitted input to MGA HK, which

13  manufactured the dolls.  *See, e.g.*, Proctor Decl., Exs. 50-51, 66.

14        Mattel's evidence does not establish the copying of *original* elements.  The oversized

15  head, protrusive lips, and diminished nose found in Bryant's sketches are not original elements.

16  Ninth Circuit Op. at 10543-10544 ("[M]any fashion dolls have exaggerated features . . .

17  Moreover, women have often been depicted with exaggerated proportions similar to those of the

18  Bratz dolls . . . The concept of depicting a young, fashion-forward female with exaggerated

19  features, including an oversized head and feet, is therefore unoriginal as well as an unprotectable

20  idea.").  Evidence that MGA copied the unoriginal, exaggerated features found in Bryant's

21  sketches does not establish infringement.  *Cf. Roth Greeting Cards v. United Card Co.*, 429 F.2d

22  1106, 1109 n. 3 (9th Cir. 1970) ("Thus, if United had copied only the textual materials, which

23  were not independently copyrightable, United might have been able to do so with impunity.");

24  *see also Narell v. Freeman*, 872 F.2d 907, 910 (9th Cir. 1989) ("A finding that a defendant

25  copied a plaintiff's work, without application of a substantial similarity analysis, has been made

26  only when the defendant has engaged in a virtual duplication of a plaintiff's entire work.");

27  *Situation Management Systems, Inc. v. ASP Consulting LLC*, 560 F.3d 53, 58 (1st Cir. 2009)

28  (requiring evidence of both factual copying and infringement of protected elements).

## B.   Substantial Similarity

Summary judgment must be granted where "no reasonable juror could find substantial similarity of ideas and expression viewing the evidence in the light most favorable to the nonmoving party." *Id.*  A two part extrinsic/intrinsic test determines whether two works are substantially similar. *See Shaw v. Lindheim*, 919 F.2d 1353, 1357 (9th Cir. 1990).  The extrinsic test requires an objective examination of concrete manifestations of the ideas and expression in the two works, while the intrinsic test requires a subjective evaluation, most often by the fact-finder, of the "'total concept and feel of the works.'" *Cavalier v. Random House*, 297 F.3d 815, 822 (9th Cir. 2002) (quoting *Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1045 (9th Cir. 1994)).

The "extrinsic" test originally required a comparison of only the ideas expressed by the two works, but has since been augmented to include an objective examination of articulable similarities in both ideas and expression. *Funky Films*, 462 F.3d at 1077 (quoting *Kouf*, 16 F.3d at 1044).[6]  This inquiry focuses on whether "the specific details of an author's rendering of ideas . . . standing alone, are substantially similar." *Funky Films*, 462 F.3d at 1078 (quoting *Metcalf v. Bochco*, 294 F.3d 1069, 1074 (9th Cir. 2002) and *Cavalier*, 297 F.3d at 822).[7]  Specific details, or "protectable elements," do not include (1) *scenes a faire* that "necessarily result from the

---

[6]  A comparison of protectable elements, as opposed to the work as a whole, ensures that unprotectable expression does not form the basis for a determination of substantial similarity, thereby "confer[ring] a monopoly of the idea upon the copyright owner." *Aliotti v. R. Dakin & Co.*, 831 F.2d 898, 901 (9th Cir. 1987).  Because the intrinsic test was designed to compare expression, the Ninth Circuit initially held that an analytical dissection of similarities "properly may be assimilated within the analytical framework of the intrinsic test." *Id.*  However, the Ninth Circuit now requires that the analytical dissection take place at the extrinsic stage.

[7]  At the extrinsic stage, the court determines the standard for infringement that will be "applied at the 'intrinsic' stage." Ninth Circuit Op. at 10541.  "If there's a wide range of expression . . . then copyright protection is 'broad' and a work will infringe if it's 'substantially similar' to the copyrighted work.  If there's only a narrow range of expression . . . then copyright protection is 'thin' and a work must be 'virtually identical' to infringe." *Id.*

1   choice of a setting or situation,"; (2) purely utilitarian elements; and (3) elements of expression

2   merged with the underlying idea.  *See Well-Made Toy Mfg. Corp. v. Goffa Intern. Corp.*, 210 F.

3   Supp. 2d 147, 160-161 (E.D.N.Y. 2002); *see also Apple Computer, Inc. v. Microsoft Corp.*, 35

4   F.3d 1435, 1444 (9th Cir. 1994).  Because both the extrinsic and intrinsic tests must be satisfied

5   in order to prove substantial similarity, a "plaintiff who cannot satisfy the extrinsic test

6   necessarily loses on summary judgment."  *Kouf*, 16 F.3d at 1045.

7                              ### 1.      The Sculpt[8]

8          A genuine issue of material fact exists as to whether MGA's Bratz Production Sculpt (TX

9   17733) infringed Bryant's sculpt (TX 1136), in which Mattel registered a copyright.  Since

10  "[t]he expression of an attractive young, female fashion doll with exaggerated proportions is []

11  highly constrained," the protectable elements subject to an extrinsic analysis are few, and the

12  standard to be applied at the intrinsic stage is virtual identity overall.  Am. Ninth Cir. Op. at

13  10544 & n.9 ("When there are few protectable features not required by the underlying idea,

14  applying the substantial similarity test to them is effectively the same as determining whether the

15  dolls or doll sculpts are virtually identical overall.").

16         Both the Bratz production sculpt and Bryant's sculpt depict a young, female fashion doll

17  with exaggerated proportions — an unprotectable idea.  The Bratz production sculpt and

18  Bryant's sculpt also share large heads, thick lips, high cheekbones, slim arms, long legs, and

19  slim torsos, all of which are unprotectable features as they are required by the underlying idea.

20         A reasonable fact-finder could conclude that the protectable expression of the Bryant

21  sculpt is substantially similar to the Bratz production sculpt.  For instance, a reasonable jury

22  could find that the precise shape, size, and placement of the ears on the Bratz Sculpt and the

23  Bryant Sculpt are substantially similar.  In particular, a jury could find that the inner ear cochlea

24  separates from the outer ear in an identical manner on both sculpts.  A jury could further find

25  _____

26         [8] MGA's statement of uncontroverted facts asserts that Bryant's sculpt did not
    infringe certain sculpt drawings.  However, MGA does not identify the specific sculpt
27  drawings that are the subject of its motion, and the Court declines to visit the issue *sua*
28  *sponte*.

                                          15

that the precise design of the nose is substantially similar, noting that both sculpts almost completely lack a nasal bridge.  With respect to overall face shape, a reasonable jury could find that the rear-most point of the scalp on both sculpts similarly slopes down to the jaw at about a fifteen degree angle before immediately curving forward at about a five degree angle.

A reasonable jury could also find substantial similarity in the precise angles, measurements, and shapes of the sculpts' midsections.  For example, although the sculpts have very small, defined waists, both have a slightly protruding, rounded lower stomach.   Both sculpts also lack the roundness in the breast area that is common to many other fashion dolls with exaggerated, idealized proportions.  Likewise, a reasonable jury could note substantial similarity in the uniquely rounded shoulders of both sculpts, as well as the way in which both sets of lower arms flare out from the body in an unnatural and unrelaxed state.  Looking at the back of the sculpts, a reasonable jury could find substantial similarity in noticeable indentation that exists between both sculpts' shoulder blades.  A view of the sculpts' profile reveals the dramatic S-shaped curve in both sculpts' spines.

Both on this illustrative list of substantial similarities in protectable elements of the sculpt, a genuine issue of material fact remains as to whether the Bratz Sculpt infringes Bryant's Sculpt.[9]  MGA's request for summary judgment is therefore denied.[10]

## 2.    First Generation Dolls[11]

MGA contends the first generation of Bratz dolls are not substantially similar to any of

---

[9] By the same token, a reasonable jury could find that the sculpts are virtually identical overall.

[10] This does not constitute a finding that subsequent generation dolls infringe.  The grant of summary judgment on that issue is absolute.

[11] The Court has considered TX 1107, TX 1108, TX 1109, and TX 1110, since MGA's motion moves for summary judgment as to all sketches that were the subject of the jury's phase 1 verdict.  In its reply brief in support of its motion, MGA states that these drawings were jointly authored by MGA and Bryant, even though the phase 1 jury never made a finding of joint authorship.  Having reviewed the testimony cited by MGA's reply brief, the Court finds a genuine issue of material fact as to the joint authorship of these sketches.

Bryant's sketches.

(a).    First Generation Jade

There is a genuine issue of material fact as to whether there are articulable similarities between the first generation Jade doll and Bryant's Jade sketches.  Both the doll and the sketches express the idea of a complete, young, hip female fashion doll who wears trendy clothing and exhibits a bratty look or attitude.  The doll and sketches use exaggerated physical proportions to express this idea, including larger eyes, heads, lips and feet, longer legs, and skinnier torsos and limbs than found in nature; however, the mere fact of these exaggerated features is both unoriginal and an unprotectable idea.  *See* Ninth Circuit Op. at 10546-10547; *cf. Mattel, Inc. v. Goldberger Doll Mfg. Co.*, 365 F.3d 133, 136 (2d Cir. 2004) ("An upturned nose, bow lips, and wide eyes are the 'idea' of a certain type of doll face.  That idea belongs not to Mattel but to the public domain.").

The dolls and sketches nevertheless share many protectable features, including "fashions and hairstyles."  Ninth Circuit Op. at 10547.  Both the doll and the girl in the sketch don pink, midriff-baring, short sleeved t-shirts.  On the center of the t-shirts is an emblem of a creature that appears to be a pink Cheshire-like cat with green eyes.  *Compare* TX 1107 *with* TX 17551.  The t-shirts are worn over a long-sleeved, off-pink shirt adorned with dark pink, light pink, and white polka dots.  *See id.*  The doll and the girl in the sketch wear olive-green, flared, non-denim pants with off-pink vertical piping that runs down the outer seam.  *See id.*  Both the doll and the girl in the sketch sport red sneakers decorated with pink accenting and a lip on the front of the shoe that curls upwards, and, to complete the look, shoelaces untied.  *See id.*  Both accessorize with a silver satchel with quilted accenting.  The doll and the girl in the sketch complete their look with light-colored lipstick and lip liner, pinkish eyeshadow, and dark bangs that protrude from a flat-topped, pink-based, multi-colored hat with horizontal stripes and two pink thread-braid tassels dangling from the uppermost corners.

The doll and the girls in the sketches also share anatomical similarities unrelated to standard features of the underlying idea, especially with respect to the eyes.  For example, the doll and sketches both depict three equidistant and identically shaped eyelashes, having an equal

and triangular girth, on each doll eye, with each of the eyelashes protruding from the eyelid at identical angles.  *Compare* Ex. 302 at MGA 006463 *with* TX 17551-001.  Although the upper eyelid in Bryant's Jade sketches droops a little lower than on the doll, the dolls and sketches all lack a lower eyelid and the surface area between the top of the upper eyelid and the bottom of the upper eyelid is consistent across the eyelid between the sketches and doll.  *See id.*  The doll is also substantially similar to the sketches' particular expression of the eyes: the pupils are dilated in a nearly identical manner, with the pupils situated at the top center of the iris (these sketches apparently depict young female fashion dolls with defective vision), and the inner corner where the upper and lower eye lids meet sits at the center of the nose.  *Id.*

To be sure, there are dissimilarities between the doll and sketches.  For example, the doll wears rolled up pants made of a shiny fabric that resembles an alligator's skin. By contrast, the pants worn by the doll depicted in the sketch appear to be made of cotton, and fall over the shoes depicted in the sketch; the pants drawn in the sketch also feature prominent orange piping.  The doll's shoes reveal more white cushioning on the outside of the shoe than the shoes depicted in the sketch.  The satchel depicted in the sketch bears the word "Purrfect" and the doll's satchel has no lettering or otherwise narcissistic terms incorporating sounds commonly made by animals.  The doll's lips are darker than the lips depicted in the sketch, and the doll's eyeshadow is two-toned and more dramatic than the eyeshadow depicted in the sketch.  Finally, the girl depicted in the sketch has rosier cheeks and shorter hair (in pigtails) than the doll.[12]

A reasonable fact-finder could easily conclude that there are articulable and substantial similarities between the protectable expression of the Jade sketch (Trial Exhibit 1107, 10638) and sculpt (Trial Exhibit 17551).  MGA's request for summary judgment as to the first generation Jade doll is therefore denied.

### (b).    First Generation Cloe

There is likewise a genuine issue of material fact as to whether the first generation Cloe

---

[12]The Court notes that the different cheek tones may simply be a consequence of the fact that the mass production of the dolls did not allow for the intensity of cheek color in Bryant's drawings.

doll and Bryant's sketches are substantially similar in their expression of the underlying idea. *Compare* TX 1109, 771 *with* TX 13903-001.  Both the doll and the sketches express the idea of a complete, young, hip female fashion doll who wears trendy clothing and exhibits a bratty look or attitude.  The doll and sketches share exaggerated physical proportions, including larger eyes, heads, lips and feet, longer legs, and skinnier torsos and limbs than found in nature; however, the mere fact of these exaggerated features is both unoriginal and an unprotectable idea.  *See* Ninth Circuit Op. at 10546-10547; *cf. Goldberger Doll Mfg. Co.*, 365 F.3d at 136 ("An upturned nose, bow lips, and wide eyes are the 'idea' of a certain type of doll face.  That idea belongs not to Mattel but to the public domain.").

A reasonable fact-finder could nevertheless conclude that the doll and sketches are substantially similar in their particular expression of these anatomical features.  *See id.* ("But Mattel's copyright will protect its own particularized expression of that idea and bar a competitor from copying Mattel's realization of the Barbie features.").  For example, both the girl depicted in the sketch and the doll have bright, cerulean eyes with dilated pupils centered on the upper half of the iris.  Unlike the eye lids depicted on the Jade doll and in the Jade sketches, which maintain a consistent inward gradient where the upper and lower eye lids meet, both the Cloe doll and Bryant's Zöe sketch depict lower eye lids that drop at a steep gradient and then immediately flatten for the latter half of their approach to the center of the face.  Moreover, in addition to the three eye lashes located on the outside corner of the upper eyelid (as found on the Jade doll and in the Jade sketches), the Cloe doll and Zöe sketch depict a patch of much smaller eye lashes that protrude from the outside corner of the lower eye lid (the doll's three eye lashes are evenly spaced but the eyelashes in the sketch appear to merge together).

The doll and the girls in the sketches also share non-anatomical features, including hairstyle and fashions.  Both the sketch and doll depict a baby-blue, midriff-baring t-shirt adorned with sequined studding along the collar and the word "Angel" in cursive font in the center of the shirt; sparkling bell-bottom jeans with a fringe on the outer seams and a slit on the bottom outer ankle, which fall over the boots worn in the sketch and on the doll; and a baby-blue, bumpy, rubbery-textured belt with a square buckle.  The doll is sold with a jacket worn in

the sketch and both three button jackets have fold-over collars, rolled up sleeves, and fringes around the lower seam.  Both jackets appear to be composed of the same sparkly denim fabric as the jean pants.  The doll is sold with a pair of boots that, like the boots depicted in the sketch, are weighty and white, with an orange and brown buckle that falls on top of the foot.  The sketch and the doll share a one-shouldered bag with a white base, teal piping, and a leopard-print flap that covers most of the front of the bag.  The sketch and the doll share light blonde, long hair parted to the side and pulled back with a wide headband made of teal and gold fabric.  Both have metallic-pinkish lip color, with noticeably contrasting, darker lip liner.

There are nevertheless certain differences between the doll and sketches.  In the sketches, the lips are slightly parted, though the doll's lips remain closed.  The doll's eyes are surrounded by blue eyeshadow, whereas the sketch's eyeshadow appears to be more grayish in color.  The sketch's cheeks are more flushed than the doll's.  The doll's attire also differs from the sketch's: the leopard-print flap on the doll's bag overlays a white background whereas the sketch's leopard-print bag overlays a tan background; the doll's buttons appear to be more metallic than the sketch's; the doll's shirt exposes more of her stomach; and the sketch's jacket displays more noticeable, defined stitching.  In addition, the buckle on the Doll's belt is silver, and the buckle on the sketch's belt is baby-blue, like the rest of the belt.

A reasonable fact-finder could easily conclude that the Cloe doll and Bryant's Zoe sketches share many protectable features.  MGA's motion for summary judgment is therefore denied as to the first generation of Cloe dolls.

### (c).   First Generation Yasmin

There is a genuine issue of material fact as to whether there are substantial similarities between the protectable elements of Bryant's Lupe sketch and the first generation Yasmin doll.  *Compare* TX 1110 *with* TX 13901.  Both the doll and the sketches express the idea of a complete, young, hip female fashion doll who wears trendy clothing and exhibits a bratty look or attitude.  The doll and sketches share exaggerated physical proportions, including larger eyes, heads, lips and feet, longer legs, and skinnier torsos and limbs than found in nature; however, the mere fact of these exaggerated features is both unoriginal and an unprotectable idea.  *See* Ninth

1   Circuit Op. at 10546-10547; *c.f. Mattel, Inc. v. Goldberger Doll Mfg. Co.*, 365 F.3d 133, 136 (2d
2   Cir. 2004) ("An upturned nose, bow lips, and wide eyes are the 'idea' of a certain type of doll
3   face. That idea belongs not to Mattel but to the public domain.").

4       The doll also depicts certain non-anatomical features found in the sketch, including
5   fashions and certain elements of the hair style. For instance, the doll and the girl in the sketch
6   don a purple, midriff-baring tube top as well as flared, light-colored pants that fall over pure
7   platform shoes. Both pairs of pants feature prominent stitching along the sides of the outer leg
8   and a pattern at the very bottom of each leg. Both accessorize with a tan satchel cinched at the
9   top with a drawstring bow and decorated with a purple-themed, intricate, geometric pattern.
10  Both sport a suede, maroon/brown bandana with fashion-keyhole designs along the edge that is
11  threaded with an exposed drawstring tied into a bow at the nape. Both wear their hair with two
12  small braids featured towards the front of their heads amongst their flowing locks. And both
13  wear a similar smoky-purple eye makeup and identical lipstick surrounded by dark brown lip
14  liner.

15      The Yasmin doll also parallels Bryant's particularized expression of Lupe's anatomical
16  features. Like the other first generation Bratz dolls and sketches, the Yasmin doll and the girl in
17  the sketch share dilated pupils located in eyes partially covered by upper eyelids. The Yasmin
18  doll and the girl in the sketch both have hazel eyes with a speck of blue, accentuated by four
19  upper eye lashes, as well as eye lashes on the bottom corner of the bottom eye lid of only the left
20  eye. And both have an identically located small dark mole below the left eye.

21      There are ways in which a fact-finder could nevertheless find that there relevant
22  similarities between the Lupe sketch and Yasmin doll are not substantial. The speck of blue in
23  the doll's eye is much smaller than in the sketch. Though the doll's upper lip is smaller than its
24  lower lip, the opposite is true in the sketch. The sketch depicts a large necklace, though the doll
25  wears no such accessory. Moreover, the doll's eyeshadow contains more shades of brown than
26  the eyeshadow depicted in the sketch. Whereas the doll uses her brown bandana as a headband,
27  with the exposed tan drawstring tied into a bow at the nape of the neck, the sketch wears the
28  bandana as a sarong tied diagonally across the hips in the sketch. The doll's hair is longer and

1   darker than the almost blonde hair depicted in the sketch, though the drawings on the back of the

2   packaging for the Yasmin doll depict the character with lighter hair than the doll itself.  The hair

3   in the sketch is pulled back by a pair of barrettes, which the doll does not appear to own.  The

4   tube top worn by the doll is a pure magenta color, whereas the tube top depicted in the sketch is

5   a darker purple with subtle pink striping.  The doll's pants are khaki-colored, whereas the pants

6   depicted in the sketch are white.  The pattern on the bottom of the pants depicted in the sketch is

7   geometric, with red orange, blue and yellow color themes.  By contrast, the embroidery at the

8   bottom of the doll's pants have two orange stripes and a floral pink and blue pattern.  The

9   platform clogs depicted in the sketch are open-toed, whereas the doll's platform clogs are

10   closed-toed.

11   A reasonable fact-finder could easily conclude that the protectable details of the rendering

12   of the underlying idea expressed by the sketch (Trial Exhibit 1110) and sculpt (Trial Exhibit

13   13901) are substantially similar.  MGA's request for summary judgment as to the first generation

14   Yasmin doll is therefore denied.

15   (d).   First Generation Sasha

16   There is a genuine issue of material fact as to whether the first generation Sasha doll

17   shares protectable elements of Bryant's Hallidae sketches.  *Compare* TX 1108 *and* TX 3-5 *with*

18   TX 17558.  Both the doll and the sketches express the idea of a complete, young, hip female

19   fashion doll who wears trendy clothing and exhibits a bratty look or attitude.  The doll and

20   sketches share exaggerated physical proportions, including larger eyes, heads, lips and feet,

21   longer legs, and skinnier torsos and limbs than found in nature; however, the mere fact of these

22   exaggerated features is both unoriginal and an unprotectable idea.  *See* Ninth Circuit Op. at

23   10546-10547; *cf. Mattel, Inc. v. Goldberger Doll Mfg. Co.*, 365 F.3d 133, 136 (2d Cir. 2004)

24   ("An upturned nose, bow lips, and wide eyes are the 'idea' of a certain type of doll face.  That

25   idea belongs not to Mattel but to the public domain.").

26   The doll nevertheless depicts protectable expression found in the sketch, including

27   fashions and hair style.  Both the sketches and the doll depict long-sleeved t-shirts with

28   horizontal stripes on the sleeves with a burst of orange in the center.  In another Bryant sketch,

22

TX 3-5, Hallidae wears a similar ensemble comprised of a multicolored, striped, long-sleeved shirt overlaid with an orange puffy vest.  Both the doll and sketch also depict long, oversized, flared denim skirts with cargo pockets, which fall over remarkably similar white, orange, and blue sneakers with oversized soles and untied white laces.  Both also depict blue and orange backpacks that bear the term "hip hop" and, in a display of wit, pictures of bunny rabbits.  Both depict long, kinky, black hair trapped underneath silver triangular hats made of a ribbed knitted material and topped with a poof ball.  Both depict dramatically defined eyebrows and eyes covered in two-toned eyeshadow, and makeup that includes purple-toned lip liner and loud cheek paint.

There are some elemental differences between the doll and sketches, though the differences between TX 17558 and TX 3-5 are more defined than the differences between TX 17558 and TX 1108, which are minimal.  TX 3-5 depicts brown-toned eyeshadow, whereas TX 1108 and the doll share purple-toned eyeshadow.  The bunny rabbit on the backpack depicted in TX 3-5 is more cartoonish than the more realistic bunny rabbit on the backpacks depicted in TX 1108 and the doll (though the doll packaging depicts a bunny that is very similar to the bunny rabbit on TX 3-5's backpack).  The hat depicted in TX 3-5 is orange with stripes, and covers the ears, whereas the hats worn in TX 1108 and on the doll are silver.  The hair depicted in TX 3-5 is dredlocked, whereas the hair depicted in TX 1108 and on the doll is smoother and straight.  With respect to differences in clothing, the t-shirt depicted in TX 1108's t-shirt shows the word "YUM", whereas the doll's shirt contains no words, images, or exclamations of satisfaction after a tasty treat.  The pocket attached to the skirt depicted in TX 3-5 is located near the thigh, whereas the pockets depicted in TX 1108 and the doll are located near the calf.  The pocket in sketch 3-5 is near the thigh, whereas the pocket in sketch 1108 is lower on the skirt, near the calf.  Both TX 1108 and the doll depict a stitching indicating that the lower portion of the skirt can be removed to transform the skirt into a mini-skirt, but TX 3-5 does not appear to have that design.  The shoes depicted in TX 3-5 differ from the shoes shared by TX 1108 and the doll, because the TX 3-5 depicts Timberland boots, whereas sneakers are worn by both TX 1108 and the doll.

1   A reasonable fact-finder could conclude that the Hallidae sketches and Sasha doll are

2   substantially similar in not just the ideas depicted, but in the expression of those ideas as well.

3   *See Kouf*, 16 F.3d at 1045 (summary judgment only appropriate if no reasonable fact-finder

4   could find substantial similarity of ideas and expression).  MGA's motion is therefore denied as

5   to the first generation Sasha doll.

6   ### 3.   Subsequent Generation Dolls[13]

7       In addressing the district court's errors, the Ninth Circuit stated that it "fail[ed] to see how

8   the district court could have found the vast majority of Bratz dolls, such as 'Bratz Funk N' Glow

9   Jade' or 'Bratz Wild Wild West Fianna,' substantially similar—even though their fashions are

10  hair styles are nothing like anything Bryant drew—unless it was relying on similarities in ideas."

11  Ninth Circuit Op. at 10547.  Since the court must determine at the extrinsic stage whether "no

12  reasonable juror could find substantial similarity of ideas *and* expression," *Kouf*, 16 F.3d at 1045

13  (emphasis added), the Ninth Circuit's inability to identify a basis for substantial similarity

14  determination for dolls with distinct fashions and hair styles from Bryant's sketches disposes of

15  the vast majority of Mattel's counter-claim as to the later generations of Bratz dolls.

16      Not only do the vast majority of the subsequent generations of Bratz dolls differ in their

17

18  _____

19  [13] Mattel attempts to construct another support for its copyright infringement
    counter-claim by arguing that all generations of the Bratz dolls infringe the "character" in

20  Bryant's original sketches.  "In determining whether the characters are similar, a court
    looks at the 'totality of [the characters'] attributes and traits as well as the extent to which

21  the defendants' characters capture the 'total concept and feel' of figures in [plaintiff's
    work]."  *Hogan v. DC Comics*, 48 F. Supp. 2d 298, 309-10 (S.D.N.Y. 1999).  "No

22  character infringement claim can succeed unless plaintiff's original conception
    sufficiently developed the character, and defendants have copied this development, and

23  not merely the broader outlines."  *Smith v. Weinstein*, 578 F. Supp. 1297, 1303 (S.D.N.Y.

24  1984), *aff'd mem.*, 738 F.2d 419 (2d Cir. 1984).  Similarity between characters cannot
    "exist[] only at a level of abstraction too basic to permit any inference that defendant[]

25  wrongfully appropriated any 'expression' of plaintiff's ideas."  *Arden v. Columbia

26  Pictures Indus., Inc.*, 1248, 1261 (S.D.N.Y. 1995).  Mattel thus cannot claim a coypright
    in the Bratz character circumvent the rule that the copying of the idea and expression

27  required by the idea does not constitute infringement.  If no reasonable fact-finder could

28  find substantial similarity in the *protectable expression*, Mattel fails the extrinsic test.

1   hair styles and fashions (the two elements identified by the Ninth Circuit), but they lack any

2   meaningful similarities outside of ideas.  Like Bryant's sketches, all of the subsequent

3   generation Bratz dolls express the idea of a complete, young, hip female fashion doll who wears

4   trendy clothing and exhibits a bratty look or attitude.  The dolls also depict exaggerated physical

5   proportions, including larger eyes, heads, lips and feet, longer legs, and skinnier torsos and limbs

6   than found in nature; however, the mere fact of these exaggerated features is both unoriginal and

7   an unprotectable idea.  *See* Ninth Circuit Op. at 10546-10547; *cf. Goldberger*, 365 F.3d at 136

8   (2d Cir. 2004) ("An upturned nose, bow lips, and wide eyes are the 'idea' of a certain type of

9   doll face.  That idea belongs not to Mattel but to the public domain.").  The similarities end

10  there: with the exception of two subsequent generation dolls (identified below), the dolls sport

11  distinct fashions; make up; jewelry; accessories; hair styles, colors, and sheens; eye colors and

12  shapes; and eye lash shape, size, and texture; from Bryant's sketches.  In its subsequent

13  generation Bratz dolls, MGA unmistakably abandoned Bryant's particular expressions of the

14  underlying idea.

15      Mattel nonetheless argues that "the proof of infringement is substantial" as to these

16  subsequent generation dolls, relying upon a report prepared by its expert.  *See* Declaration of Lee

17  Loetz in Opposition to MGA MSJ.  Mr. Loetz does not analyze the subsequent generation dolls

18  on a doll by doll basis, but instead purports to provide exemplar comparisons of the placement

19  and proportions of body parts, (*id.*, Ex. B at 7), poses, (*id.*, Ex. B at 9), facial elements, (*id.*, Ex.

20  B at 10), and clothing/accessories, (*id.*, Ex. B at 12).

21      Mr. Loetz's report commits a number of logical errors that corrode the foundation for his

22  analysis.  First, Mr. Loetz attempts, on numerous occasions in his report, to show that "parallels

23  between the drawings and doll faces are not coincidental, but the result of executing the

24  drawings in the dolls."  *See, e.g.*, *id.*, Ex. B at 12.  Mr. Loetz confuses evidence of factual

25  copying—which is relevant to a defense of inadvertent infringement—with copying of *original*

26  elements of Bryant's works that are protectable.  *See Goffa Intern. Corp.*, 210 F. Supp. 2d at

27  159.  So long as the parallels between the drawings and the subsequent generations of dolls were

28  parallels in ideas or unprotectable expression, MGA was free to execute the drawings with

1    impunity.  *Narell*, 872 F.2d at 910.

2         Second, Mr. Loetz bases almost all of his conclusions about the subsequent generation

3    dolls on the express basis of similarity between ideas and unprotectable elements.  For example,

4    Mr. Loetz states that the placement of the body landmarks in the subsequent generation dolls in

5    similar to the placement of such landmarks in Bryant's sketches, a conclusion that is both

6    factually wrong and irrelevant.  The placement of anatomical features is, as Mr. Loetz admits,

7    relevant to making a doll "look older or younger."  Loetz Dec., Ex. B at 7.  Elongating the body

8    expresses a different idea about the "age and gender," since "[a]s the human body grows from

9    child to adult, the body proportions lengthen from top to bottom."  *Id.*  Just as "slightly larger

10   heads, eyes and lips; slightly smaller noses and waists; and slightly longer limbs" are elements

11   that necessarily result from the idea of a young, fashion forward female, so too does the idea

12   require "proportionally shorter bodies."  A body with compressed proportions is not a

13   protectable element of Bryant's sketches and Mr. Loetz admits as much.

14        Mr. Loetz commits this error again when he states that the manner in which the facial

15   features are situated in the subsequent generation dolls is substantially similar to Bryant's

16   drawings.  He argues:

17              The proportional placement of features on the face of a doll design is

18              a key factor in how the design develops its look.  *To vary the*

19              *placement of features on a face is to change who the character will*

20              *be.*  Think of the compressed features of a cute baby, and then think

21              of the elongated features in a traditional 'evil witch' character face.

22              There are endless variations in between.

23   *Id.* at 11 (emphasis added).

24        Each of the endless variations of facial features to which Mr. Loetz refers can express a

25   different idea.  Working within Mr. Loetz's "cute baby" to "evil witch" spectrum, different

26   variations of facial features can express different ideas — *e.g.*, a cute witch, an evil baby, a

27   toddler, or an old woman.  Mr. Loetz concedes, however, that the compacted features in Bryant's

28   drawings were necessary to "create a pleasing attractive look," which is an unprotectable idea

that is distinct from the other ideas expressed by the "endless variations" in the placement of facial features discussed in Mr. Loetz's report.  Allowing Mattel to prevent others from depicting the placement of facial features that necessarily result from the idea of a young, fashion forward female with exaggerated features is tantamount to giving Mattel a monopoly over the idea itself. *See* Am. Ninth Circuit Op. at 17341 ("[F]ashion dolls that look like Patty and Selma Bouvier don't express the idea behind Bratz.").

Mr. Loetz also argues that the dolls are substantially similar to specific facial features found in Bryant's sketches, like lips that curve, "the look of a girl who has too much eye makeup on," oversized almond eyes, and angular eyebrows.  Loetz Dec., Ex. B at 11-12.  But these unoriginal features are all unprotectable elements of Bryant's work, because they belong to the underlying idea of a young, fashion-forward doll with exaggerated features and a bratty look or attitude.  *Cf. Ideal Toy Corp. v. Sayco Doll Corp.*, 302 F.2d 623, 627 (2d Cir. 1962) (Clark, J., dissenting) ("But is it so that one gets a 56-year copyright in normal arms and legs of a doll or in a hidden smile?  This gives plaintiff a destructive power against competitors of unexplored extent.  For a grin or a smirk in their otherwise dissimilar product may turn out to make them accountable as infringers.").  The features discussed by Mr. Loetz (*e.g.*, a heavily made-up young female) are unprotectable ideas and, for the reasons discussed below, the subsequent generation dolls are not substantially similar to Bryant's particular expression of these ideas. *See Goldberger Doll Mfg. Co.*, 365 F.3d at 136 ("Mattel's copyright will protect its own particularized expression" of the idea of a certain type of doll face composed of "[a]n upturned nose, bow lips, and wide eyes").

The vast majority of Mr. Loetz's actual comparisons (*see* Loetz Dec., Ex. B, Ex. 1-25) concern the first generation of Bratz dolls.  Those comparisons that attempt to compare the second generation Bratz dolls reveal the lack of similarity between the dolls and the protectable elements of Bryant's sketches.  For example, exhibit 20 to Mr. Loetz's report includes a side-by-side comparison of the head of a subsequent generation Cloe doll with Bryant's Lupe sketch.  Both the doll and sketch share large eyes, large parted lips, light colored hair, and heavily made up eyes, none of which are protectable elements.  The particularized expression of each of these

1    elements is not similar, let alone substantially similar: the lips are of a different shape and color,

2    the eyes rounder, the eye lashes more numerous and spaced differently, the faces shaped

3    differently, and the hair of a different color, sheen, and style.  The comparison between a

4    subsequent generation Sasha doll and Bryant's Hallidae sketch located at exhibit 21 of Mr.

5    Loetz's report reveals even more dissimilarities in Bryant's particular expression of the

6    unprotectable idea: the hairstyles, lips, eye lashes, and face shape, and skin tone are all different.

7        Mattel attempts to remedy these defects by pointing to Mr. Loetz's conclusion that the

8    dolls have "a visual consistency from Carter Bryant's sketches, to the first wave of dolls, and

9    through the later waves of Bratz dolls, even including the most recent 2010 Bratz dolls."  Mattel

10   Mot. at 40.  Mr. Loetz's observation may have be relevant to an intrinsic examination, which

11   involves "mere subjective judgment as to whether two [] works are or are not similar."  *Shaw*,

12   919 F.2d at 1357.  Since "objective manifestations of creativity" must be examined in the

13   "extrinsic" test, the absence of any similarity in protectable expression, from fashions, to hair

14   styles, to facial features, make up, and the eyes, means that Mattel cannot show a genuine issue

15   of material fact on the extrinsic test for the subsequent generation Bratz dolls.

16       Nevertheless, there are two subsequent generation dolls as to which an **"indicia of

17   sufficient disagreement concerning the substantial similarity of [the] two works" remains.

18   *Swirsky v. Carey*, 376 F.3d 841, 846 (9th Cir. 2004) (internal citations omitted).  First, a

19   reasonable fact-finder could conclude that Ooh La La Cloe is substantially similar to the

20   protectable elements of the sketch depicted in TX 5.051, TX 11810.001.  Ooh La La Cloe likes

21   to shop til she drops at "the world's most chic boutiques" and wears a fashion ensemble that

22   resembles the ensemble depicted in the sketches:  a plaid, short, A-line skirt with a ribbon

23   around it; a midriff-baring, slightly scoop-necked shift worn underneath a cropped jacket with a

24   flared collar, chest-level pockets, and exposed stitching; (differently adorned and shaped) knee-

25   high boots; and a distinctively-shaped, pleated, somewhat floppy hat that falls to the middle of

26   the forehead and tilts to one side in a loose manner.  Second, a reasonable fact-finder could

27   conclude that Formal Funk Dana is substantially similar to protectable elements to TX 3-4.

28   Formal Funk Dana is dressed for the ball and, like the doll in the sketch, wears a midriff-baring,

1   two-pieced gown that is cinched at the waist with a bow, a sequined top held up by two thin

2   shoulder straps, and, to finish her look, a beaded, dangling, choker and drop-earrings, as well as

3   a triangle, sequined tiara.

4        For the foregoing reasons, MGA's Motion is granted as to all subsequent generation Bratz

5   dolls with the exception of Ooh La La Cloe and Formal Funk Dana.

6   **III.    Misappropriation of Trade Secrets**

7        Mattel's third counter-claim seeks to hold MGA, MGA Mexico, Larian and Machado

8   liable for misappropriating Mattel's trade secrets.  Mattel alleges the illegal acquisition, use and

9   disclosure of its trade secret materials, which include "documents, materials, designs, names, and

10   other information stolen by Machado, Trueba, Vargas, Brisbois, Castilla, Cooney, Contreras,

11   Brawer, other former Mattel employees, and other persons acting for, on behalf of or at the

12   direction of MGA and/or Larian."  4AAC ¶ 134.

13        California's Uniform Trade Secrets Act proscribes the improper disclosure, acquisition or

14   use of a trade secret.  Cal. Civ. Code § 3426.1.  The term "trade secret" is defined by the Act as:

15        [I]nformation, including a formula, pattern, compilation, program,

16        device, method, technique, or process, that:

17        (1) Derives independent economic value, actual or potential, from

18        not being generally known to the public or to other persons who can

19        obtain economic value from its disclosure; and

20        (2) Is the subject of efforts that are reasonable under the

21        circumstances to maintain its secrecy.

22   *Id.*, § 3426.1(d).

23        Information derives independent economic value from not being generally known when

24   its secrecy "provides a business with a 'substantial business advantage.'"  *Morlife, Inc. v. Perry*,

25   56 Cal. App. 4th 1514, 1522 (1997) (quoting *Klamath-Orleans Lumber, Inc. v. Miller*, 87 Cal.

26   App. 3d 458, 465 (1978)).  Both parties request broad summary judgment rulings on the issue of

27   whether Mattel's alleged trade secrets derived independent economic value from not being

28   generally known.  The arguments in the parties' briefs failed to discuss each identified trade

1    secret with particularity, but the Court nevertheless did so.  For the reasons that follow, the Court

2    finds genuine issues of material fact as to independent economic value that the vast majority of

3    Mattel's alleged trade secrets derived from not being generally known.

4         The determination of whether information is the subject of efforts that are reasonable

5    under the circumstances to maintain its secrecy is fact specific.  *See Rockwell Graphic Sys., Inc.*

6    *v. DEV Indus., Inc.*, 925 F.2d 174, 176-77 (7th Cir. 1991).  It is relevant whether an employer

7    "required its employees to sign confidentiality agreements respecting its trade secrets."  *See Mai*

8    *Sys. Corp. v. Peak Comp., Inc.*, 991 F.2d 511, 521 (9th Cir. 1993).  However, an employer's

9    vague descriptions of exactly what it is that constitutes a trade secret renders the confidentiality

10   agreement largely meaningless.  Moreover, an employer's failure to mark documents as

11   confidential or trade secret "precludes in many cases trade secret protection for those materials."

12   *Gemisys Corp. v. Phoenix Am., Inc.*, 186 F.R.D. 551, 559 (N.D. Cal. 1999) (citing *Jensen v.*

13   *Redevlopment Agency of Sandy City*, 998 F.2d 1550, 1557 (10th Cir. 1993)).  At the same time,

14   it makes no sense to hold, as a matter of law, that the failure to mark documents as confidential

15   precludes a finding of reasonable efforts, since the very employee that creates the trade secret at

16   the employer's direction may be the individual who misappropriates it.  On the basis of these

17   principles, the Court finds genuine issues of material fact as to whether Mattel took reasonable

18   efforts to maintain the secrecy of its trade secret materials.  Although Mattel conducted

19   extensive employee training, had its employees sign agreements, and controlled access to its

20   databases, it often provided vague direction to its employees and in many circumstances failed to

21   mark proprietary documents, including the documents that are at issue in this case, as

22   confidential.

23             **A.    Bratz**

24        Mattel claims that the Bratz fashion doll concept is a trade secret, to which Mattel claims

25   ownership under the assignment clause of the Inventions Agreement.  The concept includes the

26   group name Bratz, the four doll names Jade, Hallidae, Lupe, and Zöe, as well as the doll designs,

27   fashions, themes, and marketing slogans in Bryant's pitch book.  It is undisputed that Bryant

28   disclosed the Bratz concept to MGA and shared his pitch book and concept sculpts with MGA

while he was still employed by Mattel.  (Bryant Tr. 2481:18-2482:5.)  It is also undisputed that the dolls eventually released to market by MGA used the names Bratz and Jade.

### 1.    MGA's Procedural Objection

On the grounds that a trade secret counter-claim predicated upon the acquisition, disclosure, and use of the Bratz concept implicated phase 1 issues, the Court refused to allow Mattel to allege the Bratz concept was a trade secret until the Ninth Circuit ruled on MGA's appeal from the post-phase 1 equitable relief.  Following the Ninth Circuit ruling, Mattel timely moved to confirm the pendency of a trade secret misappropriation counter-claim predicated upon the disclosure, acquisition, and use of the Bratz fashion doll concept.  On the basis of extensive briefing and oral argument, the Court granted Mattel's request.  MGA "reiterates its objection to amendment of Mattel's pleading," and claims to have suffered prejudice as a result of Mattel's "change [in] legal theory," which MGA claims "violated the [Ninth Circuit's] mandate."  (MGA MSJ at 25 & MGA Reply at n. 2.)

MGA's request for reconsideration of the two-month old order granting Mattel's motion to confirm is denied as untimely.  *United States v. Comprehensive Drug Testing, Inc.*, 473 F.3d 915, 928-29 (9th Cir. 2006).  MGA's request for reconsideration is also denied because no "new material facts or a change of law occurring after the time" of the court's order compel a different outcome.  Local Rule 7-18.  To the contrary, the Court has since granted MGA a new trial on all phase 1 issues, eliminating the potential that Mattel's Bratz trade secret counter-claim will undermine the phase 1 jury's findings.

MGA's arguments are not just procedurally defective but predicated upon a paranoid misreading of trade secret law.  MGA is specifically concerned that identifying the Bratz concept as a trade secret allows Mattel to (1) lose the contractual assignment issues discussed above and still capture the Bratz line; and (2) avoid the supersessive effect of California's Uniform Trade Secret Act.  Neither concern is valid.

Mattel cannot prevail on a trade secret misappropriation counter-claim predicated upon the acquisition, disclosure, or use of the Bratz concept unless it proves it owned the concept.  *See Cytodyn, Inc. v. Amerimmune Pharmaceuticals, Inc.*, 160 Cal. App. 4th 288, 297 (2008) ("[A]

prima facie claim for misappropriation of trade secrets 'requires the plaintiff to demonstrate [that it] owned [the] trade secret") (citation omitted).[14]  Identifying the Bratz concept as a trade secret does not diminish, or even affect, Mattel's burden to prove that Bryant assigned his rights to the ideas and creative works that composed the Bratz concept.  Of course, by proving the doll names Bratz and Jade are trade secrets, Mattel may defeat MGA's challenge to the existence of a property right in an idea.  *See Silvaco Data Sys. v. Intel Corp.*, 184 Cal. App. 4th 210, 239 (2010) ("Information is not property unless some law makes it so.").  But MGA already failed to convince the Ninth Circuit that ideas are not property.  Section IA2, *supra*.  More importantly, information (or an idea) does not become a trade secret only when it is so alleged; whether the ideas behind the Bratz concept were or were not trade secrets is unrelated to Mattel's pleading.

MGA commits a similar error when it argues that Mattel's dilatory identification of the Bratz and Jade names as trade secrets prevented MGA from arguing during phase 1 that the Uniform Trade Secrets Act superseded the constructive trust remedy for Mattel's conversion claim or the claim itself.  An allegation of trade secret misappropriation is not a prerequisite to UTSA supersession.  (Dkt. 8705 at 5.)  To the extent the formal assertion of a trade secret misappropriation allegation predicated upon the acquisition, disclosure, and use of the Bratz concept reminded MGA to argue that UTSA supersedes Mattel's claim(s), MGA may have actually *benefitted* from Mattel's identification of the Bratz concept as a trade secret.

MGA also argues that Mattel's identification of the Bratz concept as a trade secret is untimely.  As discussed in greater depth in the Court's Order granting Mattel's motion to confirm, the parties' have long operated under the understanding that Mattel's trade secret misappropriation counter-claim encompassed the Bratz and Jade names.  MGA's counsel remarked at a deposition in early 2010:

> Well, let me say this. It's part of Phase 2. They have made a trade

---

[14] Other jurisdictions have concluded that possession of a trade secret is all that is required. *See Metso Minerals Indus., Inc. v. FLSmidth-Excel LLC*, ___ F. Supp. 2d ___, 2010 WL 1850139, at *2 (E.D. Wis. May 7, 2010).  However, Mattel's possession of the Bratz concept is likewise conditioned on the assignment of Bryant's ideas and inventions.

1        secret misappropriation claim based on Bratz. Let me say that again.

2        There is a trade secret misappropriation claim in Phase 2 with an

3        allegation of willful misappropriation of trade secrets against MGA

4        Entertainment and Mr. Larian based on Bratz.

5  (Dkt. 8705 at 3-4.)

6      Finally, MGA claims that it "continue[s] to dispute that the [4]AAC contains a Bratz and

7  Jade trade secret misappropriation claim," noting that the Court never ruled on Mattel's request

8  to formally amend its pleading to expressly allege the misappropriation of the Bratz and Jade

9  doll names.  (MGA MSJ at 61 n. 10.)  Mattel's failure to expressly allege the predicate facts for

10  each of its counter-claims is unremarkable; the parties have long accepted that each other's

11  pleadings need not specifically enumerate all the factual predicates for each claim.  For example,

12  MGA's claim for trade dress infringement does not identify the specific trade dress allegedly

13  infringed by Mattel, which MGA only definitively identified a few months ago, more than five

14  years after filing its Complaint.  Mattel's request for leave to amend was immaterial and

15  irrelevant to its motion to confirm, and the Court's failure to rule on Mattel's request does not

16  undermine the force of its Order granting the motion to confirm.

17         **2.**      **The Bratz Concept as a Trade Secret**

18      MGA argues that, even assuming Bryant's Inventions Agreement assigned to Mattel

19  some right, title, and interest in the idea for the Bratz fashion doll concept, Bryant's disclosure

20  and MGA's acquisition and use of those doll names did not constitute misappropriation

21  because a doll concept and doll names are not trade secrets.

22      Concepts can have value independent from the product they eventually inspire.  *Cf.*

23  *Learning Curve Toys, Inc. v. Playwood Toys, Inc.*, 342 F.3d 714, 726 (7th Cir. 2003) (finding

24  issue of fact as to whether "concept for noise-producing toy railroad track" was trade secret); *see*

25  *also* 2 Roger M. Milgrim, *Milgrim on Trade Secrets* § 9.05[4], at 9-487-9-488.2 & n. 36 (Eric E.

26  Benson, ed., 2003 rev. ed. & 2009 supp.) (explaining that trade secrets may reside in

27  "confidential disclosures of concepts, or as yet-untested, ideas for a new product or new

28  process").  Mattel, for instance, invests a tremendous amount of material and human resources

1  into the development of product concepts and ideas, including product names.  Mattel's Design

2  Center houses hundreds of employees who experiment with doll names, fashions, and

3  accessories.  Internal correspondence exhibits a compulsion with getting the doll names exactly

4  right.  *See* Ex. 314 to MGA MSJ.  For example, an internal memoranda to all Mattel employees

5  concedes:

6            Consider Barbie for example.  A Barbie doll is made up of plastic,

7            fabric, paint, synthetic hair, as well as cardboard and cellophane for

8            the box, which combined is worth only a few dollars.  Why then will

9            a consumer pay $10, $20, $30 or more for this particular mix of raw

10            materials?  A primary reason is the name "Barbie."  This name

11            means something special to little girls all over the world; it inspires

12            fashion, friendship, association, dreams, fun.

13  *See* Declaration of Richard DeAnda, Ex. A.

14      MGA argues that a product name or concept lacks independent economic value from the

15  product with which it is associated, but this is a chicken and egg dilemma appropriate for

16  resolution by a fact-finder.  MGA's own witness, and a key member of the Bratz team,

17  previously recognized that "a toy manufacturer's unreleased toy concepts . . . are among its most

18  highly valuable trade secrets."  Declaration of Paula Garcia in support of Carter Bryant and

19  MGA's Motion for Clarification (Zeller Dec., Ex. 13) ¶ 4.  Larian similarly conceded that MGA

20  considered a product name to be a trade secret while the product was still in development.

21  Deposition of Isaac Larian, Vol. VII, dated January 20, 2010 (Buchakjian Dec., Ex. 74), at

22  1799:5-15.  A reasonable fact-finder could certainly conclude that the Bratz concepts, including

23  the names Bratz and Jade, derived no independent economic value from not being generally

24  known.  However, MGA's failure to cite any evidence supportive of its position, as well as the

25  wealth of evidence discussing the value independently generated by doll concepts in the toy

26  industry, precludes the entry of summary judgment.

27      MGA also argues that the easy accessibility of the names Bratz and Jade (both are words

28  that can be found in the dictionary) means the names lack novelty and therefore aren't trade

secrets.  But Mattel does not allege that the words Bratz and Jade are trade secrets in a vacuum just as the developer of a formula can't claim that the numbers and variables that compose the formula are trade secrets.  *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 420 F. Supp. 2d 1070, 1089-1090 (N.D. Cal. 2006) ("It does not matter if a portion of the trade secret is generally known, or even that every individual portion of the trade secret is generally known, so long as the combination of all such information is not generally known.").  Mattel argues that doll names Bratz and Jade are novel — an argument MGA does not challenge with, for example, evidence that any doll sold in the course of toy history used the name Bratz or Jade.

MGA instead responds that treating easily discoverable product ideas as trade secrets will incentivize Mattel (or any other corporation) to "giv[e] each of its employees a dictionary and inform[] them that every name has been or will be considered a product name."  However, MGA's concern is misplaced because the UTSA does not prevent a person from using independently developed or properly obtained trade secret information already in the possession of another.  *See* Cal. Civ. Code § 3426.1(a); *Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1265-66 (7th Cir.1992) (finding that plaintiff "must establish" that the trade secrets were "misappropriated (that is, stolen from it rather than developed independently or obtained from a third source)"); *see also E.I. Du Pont de Nemours & Co. v. U.S.*, 288 F.2d 904, 911 (Ct. Cl. 1961) ("A plurality of individual discoverers may have protectible, wholly separate rights in the same trade secret.").  "Trade secret law, in short, protects only the right to control the dissemination" by Mattel employees of their ideas for doll names.  *Silvaco Data Sys. v. Intel Corp.*, 184 Cal. App. 4th 210, 221 (2010).

MGA's arguments are better addressed to a fact-finder tasked with determining whether the doll names Bratz and Jade qualify as trade secrets; in particular, whether the names derive independent value from not being generally known.  Though MGA challenges this basis for Mattel's counter-claim, it cites no material evidence to aid the Court's evaluation of the issue.

### B.    Misappropriation of Other Mattel Information

Due to the commercial success of the Bratz dolls, MGA expanded its corporate operations between 2001 and 2006.  Part of MGA's expansion involved the recruitment of employees from

35

1   Mattel.  Mattel's third counter-claim alleges that MGA should be held liable for alleged acts of

2   misappropriation committed by nine of these former Mattel employees, three of whom —

3   Machado, Mariana Trueba, and Pablo Vargas — were recruited away from Mattel Servicios,

4   S.A. (Mattel Mexico's subsidiary) to be founding members of MGA Mexico.  Machado is also a

5   named counter-defendant to this counter-claim.  Mattel, MGA, and Machado move for summary

6   judgment on various elements of this counter-claim.

### 1.    Ron Brawer

8   Former Tyco Toys, Inc. employee Ron Brawer ("Brawer") was retained when Mattel

9   acquired Tyco in 1997.  Between 1997 and his September 17, 2004 resignation, Brawer held the

10  posts of Marketing Director and Senior Vice President/General Manager, in which he directed

11  teams of employees who worked with Mattel's retailer accounts.  MGA recruited him away from

12  Mattel with a competitive salary package but, more importantly, equity in MGA in anticipation

13  of an Initial Public Offering.  Mattel responded by escorting Brawer from the premises about 20

14  minutes after he tendered his letter of resignation.  Deposition of Ron Brawer, dated February 5,

15  2008, Vol. I, at 127:11-24; *see also* Ex. 4252 to MGA MSJ.  Mattel also directed a team of

16  private investigators to shadow Brawer, Brawer's wife, and Brawer's young children, whose

17  activities the investigators recorded via videotape and shared with Mattel's legal department.

18  Brawer attempted to re-negotiate Mattel's confidentiality agreements prior to his

19  departure, and even before he accepted an offer with MGA.  For example, in response to a

20  March 5, 2004 request from the Director of Barbie Brands that all Mattel executives sign a

21  revised Code of Conduct, (Webster Dec., Ex. 487), Brawer complained that "[t]here is one

22  section of the document that contains new and fairly broad language" regarding confidentiality

23  obligations, and expressed an intent to subject the language to an outside review (*id.*, Ex. 488).

24  On August 13, 2004, and while his employment negotiations with MGA were ongoing (*see id.*,

25  Ex. 480), Brawer asked to re-negotiate paragraph 6 of his employment agreement, which

26  concerned his confidentiality obligations (*id.*, Ex. 486).  During his post-resignation exit

27  interview, Brawer did not sign Mattel's standard Exit Interview and Checkout Form for

28  Executives, which also addressed Brawer's obligation to not disclose or use Mattel's

1   confidential information after his departure (*id.*, Ex. 490).[15]

2          Brawer's September 17, 2004 employment agreement with MGA also emphasized that he

3   keep his contractual obligations to Mattel.  (Ex. 4240 to MGA MSJ.)  MGA reminded Brawer to

4   "not retain any of Mattel's property or confidential and proprietary information . . . nor should

5   you use or disclose Mattel's property and/or confidential and proprietary information in

6   connection with your employment at MGA."  (*Id.*)  Mattel alleges that Brawer disregarded the

7   instructions from both Mattel and MGA by disclosing Mattel's "ideas, designs, and conception

8   for a fashion doll theme" called "Swappin' Styles" that MGA thereafter used for a line of Bratz

9   dolls.  (Webster Dec., Ex. 305 at 189.)[16]

10         There is a genuine issue of material fact as to whether Mattel's unreleased product idea

11  for a line of dolls with interchangeable heads and fashions derived independent value from not

12  being generally known to the public.  MGA moves for summary judgment on this issue but cites

13  no evidence or law, resting its argument on two appellate cases that discuss the parties' burdens

14  on a motion for summary judgment.  (MGA SF ¶ 102(d) (citing *Celotex Corp. v. Catrett*, 477

15  U.S. 317 (1986) and *Devereaux v. Abbey*, 263 F.3d 1070 (9th Cir. 2001) (en banc)).)  However,

16  as discussed earlier, one of MGA's employees submitted a declaration in this lawsuit claiming

17  that "a toy manufacturer's unreleased toy concepts . . . are among its most valuable trade

18  secrets."  Garcia Dec. ¶ 4.  The disclosure of certain forthcoming product lines well before they

19  hit the market, especially in the toy industry in which the product concept arguably requires

20  more effort than its execution, may prevent a manufacturer from enjoying the potential benefits

21

22         [15] The Court will not consider the notes from that meeting, which are hearsay.

23

24         [16] Mattel actually claims that the Swappin' Styles theme contains "one or more
    trade secrets," with no more specificity than that.  Mattel's Statement of Genuine Issues
25  ¶ 102.  Mattel's lack of specificity forecloses it from claiming as a trade secret anything
    more than the unreleased product idea for swappable fashions and heads.  *See Silvaco*
26  *Data Sys. v. Intel Corp.*, 184 Cal. App. 4th 210, 221 (2010).  Mattel has also abandoned
    its counter-claim to the extent predicated upon other information allegedly
27  misappropriated by Brawer and MGA's motion is granted as unopposed as to this
28  information.

1    of primacy.  *See Sikes v. McGraw-Edison Co.*, 665 F.2d 731, 733-34 (5th Cir.), *cert. denied*, 458

2    U.S. 1108 (1982); *but see Richter v. Westab, Inc.*, 529 F.2d 896, 900 (6th Cir. 1976) (holding

3    that any product idea that would be obvious upon the product's release is not a trade secret); *see

4    also Hudson Hotel Corps. v. Choice Hotels Intern.*, 995 F.2d 1173, 1178 (2d Cir. 1993)

5    (comparing cases and noting that "[i]n the pre-marketing stage, the question whether a marketing

6    concept or new product idea can constitute a trade secret is murkier.").  Not all product plans

7    derive independent economic value from not being generally known to the public, but some

8    may.  Given MGA's failure to present any evidence as to the economic value Mattel obtained

9    from keeping MyScene Swappin' Styles secret prior to its release,[17] the Court finds the issue

10   appropriate for resolution by a fact-finder.[18]

11       There is also a genuine issue of material fact as to whether the MyScene Swappin' Styles

12   product plan was subject to reasonable efforts under the circumstances to maintain its secrecy.

13   MGA argues that Mattel failed to either inform Brawer of his obligation to not misappropriate

14   information after he resigned or warn MGA about Brawer's potential misappropriation.  MGA

15   UF ¶ 102(c).  However, Mattel's efforts to bind and remind its employees to keep business

16   information confidential is well documented.  *See, e.g.*, Declaration of Kimberly Graham in

17   support of Mattel's MSJ ¶¶ 3-25 (discussing efforts to encourage employee secrecy from

18   beginning to end of employment relationship).  Brawer acknowledged receiving a notice

19

20   _____

21       [17] For instance, other than the self-serving testimony of its own employee, MGA
     has presented no evidence as to whether the concept for a doll with interchangeable heads
22   and fashions was well-known or had been attempted before MyScene Swappin' Styles.
     Nor has MGA presented evidence about the value a manufacturer obtains from being
23   "first to market" with a doll concept.  *ABBA Rubber Co. v. Seaquist*, 235 Cal. App. 3d 1,
     21 (1991) ("[I]nformation can be a trade secret even if it is readily ascertainable, so long
24   as it has not yet been ascertained").

25       [18] Mattel argues that its efforts to maintain the secrecy of the Swappin' Styles
26   product plan proves the information was valuable.  Though efforts to maintain secrecy
     may sometimes be a relevant to the value of the information, Mattel has not shown that
27   these materials enjoyed any special protections unique from the protections Mattel
     provided to every other document in its database.
28

1   reminding him of these obligations while he was in the process of participating in company-wide

2   discussions about the release of MyScene Swappin' Styles.  (Webster Dec., Ex. 488.)  On the

3   other hand, Mattel's company-wide circulars did not discriminate between categories of business

4   information or illustrate confidential information.  *See, e.g.*, Graham Dec., Ex. 16.  Neither

5   Mattel nor MGA cites any evidence specific to Mattel's efforts to maintain the secrecy of

6   Swappin' Styles — *e.g.*, Mattel's communications with retailers.

7          Finally, there is a genuine issue of material fact as to whether Brawer disclosed and MGA

8   improperly acquired knowledge about Mattel's MyScene Swappin' Styles doll.  On the one

9   hand, MGA deliberately created a line of dolls sporting interchangeable heads and clothing on

10  the heels of MyScene Swappin' Styles' release, acting with urgency and with apparent

11  knowledge of Swappin' Styles' impending release to market.  *See* Webster Dec., Ex. 8 (stating

12  that project for interchangeable heads "back on" in apparent bid to beat Mattel to market).  On

13  the other hand, MGA's 30(b)(6) designee testified that the company had long planned for the

14  release of a product with interchangeable heads — *i.e.*, the fact that it was released at the same

15  time as Mattel's product was purely coincidental and not the consequence of any improperly

16  acquired knowledge of Mattel's upcoming product lines.  MGA 30(b)(6) Depo. Vol. XXV, dated

17  October 4, 2010, at 6123.  The same witness, however, claimed that the genesis for this product

18  could be found in Bryant's portfolio, (*id.* at 6123:4-6), even though Bryant's portfolio only

19  discusses interchangeable fashions, and not heads.  Since a reasonable fact-finder could either

20  conclude that the evidence shows improper acquisition, disclosure and/or use or that it doesn't,

21  summary judgment cannot be granted on this element of Mattel's third counter-claim.

22                    **2.    Nick Contreras**

23          Nick Contreras ("Contreras") served as a Manager on Mattel's Customer Business Team

24  for a retailer named Target.  He started at Mattel in 1994, earning a salary of approximately

25  $2,760.00 per month.  (Ex. 1913 to MGA MSJ.)  Ten years later, and after ascending Mattel's

26  hierarchy, he accepted a position with MGA, where he officially started work on November 29,

27  2004.  (Deposition of Nick Contreras, dated January 28, 2008, at 204:22-24.)  In a January 11,

28  2009 interrogatory response, Mattel identified twenty-four Mattel trade secrets allegedly

1   misappropriated by Contreras and MGA.  (MGA SUF ¶ 110.)  On October 26, 2010, after the

2   deadline for the filing of motions for summary judgment, Mattel abandoned the claim that any of

3   these 24 categories of information constituted trade secrets.  (Webster Dec., Ex. 305.)[19]  To the

4   extent Mattel's third counter-claim arises out of Contreras' conduct, it's now predicated upon

5   Contreras' alleged attempt to recruit a subordinate from his time at Mattel to join MGA and to

6   ask that the subordinate download documents to a thumb drive.

7          Contreras resigned from Mattel by a letter dated October 29, 2004 and was escorted out

8   of the building.  (Ex. 1917 to MGA MSJ.)  During a short break in employment before he started

9   working at MGA, Contreras allegedly met with Yoon Jung Kim ("Susan Kim"), who worked for

10  him at Mattel, and has since left Mattel to pursue a graduate degree in business administration.

11  (Deposition of Susan Kim, dated January 18, 2010, at 44-45.)  Kim claims that Contreras

12  "indicated that he would want me to come and work for him at MGA, and he [] also [] asked me

13  to take a thumb drive [] that he gave me at this meeting and download certain files from our

14  network for his use for what he said was formatting reasons."  *Id.* at 43-44; *see also* Declaration

15  of Susan Kim ¶ 4 (same).  Contreras denies ever asking Kim to download documents or even

16  recruiting Kim to join MGA, although an email sent by Brawer to Larian while MGA was

17  recruiting Contreras predicted that "he will want to bring an analyst who works for him named

18  Susan Kim (she is fantastic) . . . a real work horse who gets the numbers right."  (Webster Dec.,

19  Ex. 191.)

20         Even though there is an issue of fact as to whether Contreras induced Kim to download

21  materials from Mattel's servers, that fact is immaterial to Mattel's third counter-claim.  Although

22  Kim claims she initially agreed to download the requested materials, she ultimately "didn't think

23  it was the right thing to do, and [] felt very awkward about the request."  Kim Depo. at 64:17-19.

24  The undisputed evidence establishes that, whether or not Contreras intended to misappropriate

25  Mattel trade secrets, his alleged efforts failed.

26

27         [19] MGA's motion is granted as unopposed as to these categories of alleged trade

28  secrets.

40

1    Mattel concedes that Contreras did not misappropriate trade secrets, but maintains that

2    Contreras' "attempt shows that the other multiple thefts by persons departing for MGA were

3    deliberately orchestrated by MGA, rather than mere coincidence as MGA would have it."

4    (Mattel Opp. at 15.)  While Mattel's arguments about the probative value of Contreras' conduct

5    may certainly prove interesting in the context of a motion in limine to exclude evidence of the

6    conduct, they have no bearing on whether Mattel's third counter-claim can arise out of conduct

7    that Mattel concedes does not give rise to liability under UTSA.  Mattel cannot ignore that its

8    operative pleading defines the allegedly stolen trade secret material to include "documents,

9    materials, designs, names, and other information stolen by . . . Contreras."  4AAC ¶ 134.  Mattel

10   now concedes that it can prove no portion of this allegation and MGA's motion is accordingly

11   granted as to Mattel's third counter-claim to the extent predicated upon Contreras' conduct.

12                    **3.       Jorge Castilla**

13   Jorge Castilla ("Castilla") was Mattel's Planning Specialist for Operations, Planning &

14   Finance, a position he ascended to over his seven years at the company.  FAAC ¶¶ 68-69.

15   Castilla worked on sales forecasting and inventory management.  *Id.* ¶ 70.  He helped develop

16   the Electronic Data Warehouse, "a proprietary database containing highly confidential business

17   information, such as sales, future/pending orders, product availability and sales forecasts at the

18   stock keeping unit level."  *Id.*  Mattel alleges Castilla "created [by two days before his

19   resignation] a folder on his Mattel network share[d] drive that he labeled 'To Take.'"  *Id.* ¶ 74.

20   This "To Take" folder allegedly included "documents [to] describe the function, method and

21   manner of operation of Mattel's inventory management and forecasting processes, as well as a

22   highly confidential document prepared by Mattel's senior executives that laid out Mattel's future

23   international business strategies and marketing."  *Id.*  Castilla transferred the files to a personal

24   email address and deleted the folder from his shared drive before leaving Mattel.  *Id.* ¶ 75.

25   Mattel discovered the activity through computer forensics and contacted the Federal Bureau of

26   Investigation (FBI), which dispatched agents to visit Castilla at his home and retrieve a digital

27   storage device that Castilla used to store the files.  *Id.* ¶ 76; *see also* Proctor Dec., Ex. 281.  All

28   of this happened before Castilla's first day of work at MGA.

41

Mattel alleges that seven categories of trade secrets misappropriated by Castilla encompassed his knowledge about Mattel's proprietary processes. Such information may be considered a trade secret because "to afford protection to the employer, the information need not be in writing but may be in the employees' memory." *Greenly v. Cooper*, 77 Cal. App. 3d 382, 392 (1978); *see also Klamath-Orleans Lumber, Inc. v. Miller*, 87 Cal. App. 3d 458, 465 (1978) ("[W]here, in order to do business the employer is forced to impart such select information to certain key employees, the information hardly becomes part of the employees' knowledge which they may freely use at some later time. Rather, it remains the exclusive property of the employer which must be appropriately protected."). The departing employee must "expend their own resources in uncovering the information" learned during their prior employment, instead of riding their prior employer's "coattails." *Id.* at 465 n. 3.

To prevent employers from using trade secret law as a weapon against employee mobility, California requires that "a party seeking to protect trade secrets [] 'describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons who are skilled in the trade, and to permit defendant to ascertain at least the boundaries within which the secret lies.'" *Whyte v. Schlage Lock Co.*, 101 Cal. App. 4th 1443, 1453 (2002) (quoting *Diodes, Inc. v. Franzen*, 260 Cal. App. 2d 244, 253 (1968)). Though a plaintiff need not "spell out the details of the trade secret," it must minimally provide "reasonable notice of the issues which must be met at the time of trial and [] provide reasonable guidance in ascertaining the scope of appropriate discovery." *Id.* at 252-53. For example, a vague claim that a former employee misappropriated "business models and implementations" is insufficient to describe a trade secret with particularity. *See, e.g.*, *Farhang v. Indian Institute of Tech., Kharagpur*, 2010 WL 2228936, at *14 (N.D. Cal. June 1, 2010). "A plaintiff must do more than just identify a kind of technology and then invite the court to hunt through the details in search of items meeting the statutory definition [of a trade secret]." *Imax Corp. v. Cinema Technologies, Inc.*, 152 F.3d 1161, 1163-64 (9th Cir. 1998). Mattel's vague and self-congratulatory descriptions of the first seven categories of trade secret information allegedly misappropriated by Castilla force the Court into exactly this sort of "hunt."

Mattel claims that Castilla made away with the information in his head about Mattel's forecasting process, which "ensure[s] the right product is in the right place at the right time, to ensure that inventory costs and supply and days of supply are kept at appropriate levels, and to ensure the right amounts of products are made to fill demand."  *See* Declaration of Laura Owens in Support of Mattel's MSJ ¶¶ 5-39.  Though Mattel concedes that its forecasting process has undergone tremendous evolution over the last several decades, it does not identify the specific systems misappropriated by Castilla.  Mattel instead claims that Castilla misappropriated information about a process that consists of measuring the market viability of a particular product through customer focus groups, communicating that information to the company's marketing and pricing teams, and attempting to produce the optimal number of goods.  *Id.* ¶¶ 7-15.  This vague description of the process does not provide the Court with *any* basis on which to conclude that the information obtains value from secrecy or was the subject of reasonable efforts to maintain its secrecy.  *See id.* ¶ 10 ("Mattel's forecasting process begins with planning and development of the product line.").  As described, the concept of projecting sales through market research and communication within the company is general, intuitive, and without dispute derives no independent economic value from its secrecy.  *Cf. Metro Traffic Control, Inc. v. Shadow Traffic Network*, 22 Cal. App. 4th 853, 862 (1994) ("[A] stable of trained and talented at-will employees does not constitute an employer's trade secret.").

The second category of trade secrets allegedly misappropriated by Castilla is even more nebulous.  Mattel identifies this category as its "demand planning process," which entails, to use Mattel's words, "a series of inputs and outputs."  Owens Dec. ¶ 18; *see also id.* ¶ 19 (same).  Mattel does not identify these "inputs and outputs" or explain how this process gives "Mattel insights into how to most efficiently meet demand."  *See id.*  Mattel concedes that its demand planning has evolved over time, but does not explain Castilla's specific involvement in the process, or any specific knowledge that Castilla could have gained from the process.  This category of trade secret fails for lack of particularity.  And there is no genuine issue of material fact that this category of trade secret, as described by Mattel, does not derive economic value from not being generally known, for using "inputs and outputs" to project demand for a

1    manufacturers' products isn't valuable.  *Cf. Western Medical Consultants*, 835 F. Supp. 554, 557

2    (D. Or. 1993) ("An employee may use [knowledge from general know-how, skill and

3    experience] in later competition with a former employer.").

4         The third category of secrets allegedly misappropriated by Castilla is information

5    concerning "Mattel's Enhanced Sales Forecasting Process."  Owens Dec. ¶¶ 22-26.  Mattel's

6    witness claims that Mattel enhanced its forecasting process between 2005 and 2006 by

7    "identif[ying] [] elements" like "[p]ast quotas, historical marketing, promotional and sales

8    information . . ., marketing strategy, distribution information, financial target information,

9    availability information, media promotion, feedback from customers, product profiles and

10   history, and historical level of customer support" that helped Mattel meet "the projected demand

11   for its products . . ."  *Id.* ¶¶ 23-24.  It is unclear whether Mattel alleges that the mere use of these

12   elements is a trade secret, or whether the company developed some unique process to synthesize

13   these otherwise common elements.  Assuming the latter, the Court finds genuine issues of

14   material fact as to whether the information about Mattel's Enhanced Sales Forecasting Process

15   derived economic value from not being generally known, was the subject of reasonable efforts to

16   maintain its secrecy, and was misappropriated by MGA and/or Castilla.

17        The fourth category of secrets allegedly misappropriated by Castilla encompasses

18   "Demand Planning and Sales Planning Modules of Mattel's ISIS Computer System," which is

19   defined as "a customized computer system, made up of both software and hardware" that

20   processes "demand signals, sales forecasts, availability and other outputs of the forecasting

21   system" using "mathematical templates, but not algorithms."  Owens Dec. ¶¶ 27-28.  The Court

22   finds genuine issues of material fact as to whether this category derived independent economic

23   value from not being generally known, was the subject of reasonable efforts to maintain its

24   secrecy, and was misappropriated by MGA and/or Castilla.

25        The fifth category of secrets allegedly misappropriated by Castilla concerns "Mattel's

26   Manugistics Pilot Program."  Owens Dec. ¶¶ 32-33.  In 2003, Mattel began testing an off-the-

27   shelf product called Manugistics and "concluded that the new approach was not a good fit"

28   because the algorithm both required data not compiled by Mattel and failed to incorporate data

1   that Mattel considered important.  *Id.* ¶ 33 (listing other concerns).  Mattel did not conclude that

2   the product was an objective failure; instead, it believed that the Manugistics software "did not

3   work for Mattel."  *See id.* ¶ 34.  Castilla allegedly disclosed to MGA "the elements of

4   [Manugistics] that worked and did not work for Mattel" as well as the "the learnings [sic] that

5   came out of that project."  *Id.*  There is, however, a distinction between disclosing the *fact* that

6   certain elements of Manugistics did or did not work for Mattel, and merely disclosing elements

7   of the program that did or did not work for Mattel.  Manugistics is a commercially available

8   program and the elements it measures easy to determine.  *Cf. IKON Office Solutions v. Am.*

9   *Office Prods., Inc.*, 178 F. Supp. 2d 1154, 1168 (D. Or. 2001) ("Bradley could have gone

10  through the fiction of calling each company to request the names anew, but that exercise would

11  yield no tangible benefit for Ikon").  Mattel argues that it prefers for its former employees to

12  engage in "costly exploration" to software features of which they are already aware.  Even if this

13  were cognizable, there is no genuine issue of material fact that identifying Manugistics' features

14  requires neither exploration nor much cost.

15      The sixth category of trade secret information allegedly misappropriated by Castilla is

16  "Mattel's International Data Warehouse," used to "store and calculate data relating to the

17  business of Mattel's international subsidiaries" and later expanded to include "sales numbers,

18  future and pending orders for product, availability information, SKU-level and other sales

19  forecasts."  Owens Dec. ¶ 37.  This is nothing more than a data processing mechanism, that

20  Castilla is not alleged to have misappropriated, since the data warehouse itself continues to

21  reside at Mattel.  Mattel instead claims that Castilla disclosed trade secrets by enriching MGA's

22  ability to configure and manage sales data in a more efficient way.  *See id.* ¶ 38.  Mattel's claim

23  fails to raise a genuine issue of material fact as to whether Castilla misappropriated information

24  about the International Data Warehouse.  Nor is there a genuine issue of material fact as to

25  whether the storage and calculation of common sales-related variables, like "sales numbers [and]

26  future and pending orders for a product" belong to the catalogue of general knowledge that an

27  employee is allowed to take with him after leaving his employer.  *See Metro Traffic Control, Inc.*

28  *v. Shadow Traffic Network*, 22 Cal. App. 4th 853, 862 (1994).  Mattel's claim as to the

1   International Data Warehouse is impermissibly vague and based upon an inflated approximation

2   of the value obtained from storing and processing common sales-related variables.

3       The seventh category of trade secret information allegedly misappropriated by Castilla is

4   information concerning the "OMNI [] order management system" purchased and customized by

5   Mattel to assist with "processing, allocating and executing orders." *See* Mattel's Corrected

6   Responses to MGA's Second Set of Interrogatories, dated October 26, 2010 (Webster Dec., Ex.

7   305) at 19.  Mattel makes no effort to describe the "trade secret" elements of this commercially

8   available product, other than to summarily claim that the system was customizable and

9   customized by Mattel.  The fact that Mattel's vague description precludes the Court from

10  effectively determining whether information about the OMNI system derives independent

11  economic value from not being generally known is precisely why California requires that a trade

12  secret by alleged with particularity.  Mattel's allegations as to this product fail.

13      The remaining trade secrets allegedly misappropriated by Castilla and MGA are the

14  documents found on a thumb drive he returned to federal authorities after resigning from Mattel

15  but before joining MGA.[20]  The documents summarize Mattel's sales planning, map Mattel's

16  efforts to test its forecasting, describe alterations to sales inputs, sketch promotional and

17  marketing plans, coordinate the interface between Mattel's global operations, and discuss retailer

18  account management (*e.g.*, Toys 'R Us versus Wal-Mart).  *See* Owens Dec., Exs. 1-70.

19      There is a genuine issue of material fact as to whether the documents derived independent

20  economic value from not being generally known to the public.  For instance, Mattel's 30(b)(6)

21

22      [20] The Court denies Mattel's request for an adverse inference from Castilla's

23  invocation of his Fifth Amendment right against self-incrimination during his deposition.

24  Castilla is not a party to Mattel's third counter-claim and Mattel suffered no prejudice as a result of Castilla's failure to substantively respond to questions about whether and to

25  what extent he downloaded Mattel's information prior to his departure.  *See SEC v.*

26  *Collelo*, 139 F.3d 674, 677-78 (9th Cir. 1998) (collecting cases).  Mattel independently discovered and tracked Castilla's wrongdoing through its forensic hardware analysis, and

27  then petitioned federal authorities to get involved.  In all events, Castilla's invocations of his right against self-incrimination were only in response to questions about his conduct

28  prior to starting work at MGA, which is irrelevant to disclosure and use.

designee testified at deposition that "[he] wouldn't consider the fact that Mattel does sale forecasts to be a trade secret."  Deposition of Mattel 30(b)(6) Designee, dated December 16, 2009, at 106.  However, that very witness continued that "the way in which Mattel does those forecasts may be a trade secret."  *Id.*  Mattel's particular method (as found in the documents) may have had some value, due to intense competition between manufacturers for retailer shelf space, as well as retailers' willingness to abandon a manufacturer with deficient forecasting for one with a more accurate ability to deliver the right number of goods at the right time.

There is a genuine issue of material fact as to whether Mattel efforts to maintain the secrecy of the documents were reasonable under the circumstances.  Three days before Castilla resigned, Mattel learned that Castilla had created a "To Take" folder on his shared network drive.  Deposition of Mattel 30(b)(6) Designee, Vol. IV, November 19, 2009 at 772.  It took no action against him and did not restrict access to his files, even though it knew that he was interviewing with MGA at the time.  *Id.*  On the other hand, Castilla likely did not download any information to his "To Take" folder until Sunday, March 12, a fact that Mattel did not learn about until after his resignation.  *Id.* at 774:3.  A reasonable fact-finder could conclude that Mattel's failure to restrict or sanction Castilla, despite knowledge of his access and his overtures towards MGA, shows that the company failed to take reasonable efforts to maintain the secrecy of the documents.[21]  But it could also reasonably conclude that the mere creation of a "To Take" folder should not have triggered alarm bells at Mattel, since Castilla could have been preparing to transfer personal files saved to his work hard drive.  Indeed, Mattel inundated Castilla—like all Mattel employees—with reminders of his obligations to keep confidential Mattel's business materials, and Castilla acknowledged receiving these reminders.  *See, e.g.*, Proctor Dec., Ex. 362; Webster Dec., Ex. 357.

There are also genuine issues of material fact as to whether Castilla disclosed the documents to MGA and/or MGA improperly acquired or used the documents on the thumb

---

[21] For example, Mattel failed to modify generic language in a post-resignation form letter to Castilla.  *See* Ex. 8340 to MGA MSJ.

1   drive.  On the one hand, Castilla returned the thumb drive to federal authorities and claims he

2   had no plan to share the files with MGA.  *See* Declaration of Warrington Parker, Ex. 61.  On the

3   other hand, MGA re-hauled its forecasting systems almost immediately after Castilla's arrival,

4   and in significantly less time than it took Mattel, with its greater human resources, to accomplish

5   the same task.  The fact-finder should also be allowed to evaluate the credibility of Castilla's

6   claim that he made no other electronic copies of the documents initially taken from Mattel; a

7   representation whose veracity can be called into question by evidence that Castilla obfuscated

8   his initial efforts to download documents from Mattel's servers.

9                          **4.     Dan Cooney**

10          Dan Cooney ("Cooney") started serving as Mattel's Director of National Accounts for the

11  Toys 'R Us account soon after he was hired for his second stint of employment at the company

12  in January 2004.  4AAC ¶ 82.  He accepted a position as MGA's Vice President of Sales,

13  National Accounts (Ex. 2157 to MGA MSJ), and announced his resignation on April 28, 2006.

14  4AAC ¶ 83.  In response, Mattel dispatched a member of its "Global Security" force to pay a

15  visit to Cooney's home and require him to surrender "one large box of files, some loose binders

16  and computer equipment."  *Id.*  Unlike Brawer and Contreras, Mattel allowed Cooney to stay on

17  for two weeks after he tendered his resignation, though he was not allowed to perform any work

18  during this period of time.  *See* Deposition of Dan Cooney, dated January 28, 2008, at 183:23-

19  25.  Cooney started work at MGA on May 15, 2006.  *Id.* at 184.

20          Before leaving Mattel, Cooney downloaded some of Mattel's files to a folder called

21  "Dan's Files" located on a personal compact disc owned by Cooney.  *See id.* at 311.  He did not

22  transfer the files from the personal compact disc to his MGA-issued computer until a few days

23  after he started working at MGA.  *Id.*  Mattel identifies only two of those files as trade secrets.

24  Both files contained some portion of a formula embedded in a "Merchant Model Optimization

25  Tool" spread sheet shared by Toys 'R Us with the manufacturers of products sold in its stores.

26  Though Toys 'R Us did not reveal the embedded formula to manufacturers, Cooney and two

27  Mattel employees reverse engineered the formula in order to "identify thresholds for certain

28  financial metrics employed by Toys 'R Us in making purchasing decisions and to determine

                                          48

1   whether products to be offered for sale to Toys 'R Us meet those thresholds." Webster Dec., Ex.

2   305 at 60.  Cooney testified that the purpose of reverse engineering the spread sheet was to

3   determine "how [Toys 'R Us] was looking at [its] business, so that [Mattel] could proactively

4   plan [Toys 'R Us's] business in a similar format." Cooney Depo. at 60.

5          There is a genuine issue of material fact as to whether the formula derived by Cooney

6   derived independent economic value from not being generally known.  Independent economic

7   value can be evidenced by "circumstantial evidence of the resources invested in producing the

8   information." *Religious Tech Ctr. v. Netcom On-Line Commc'n Servs., Inc.*, 923 F. Supp. 1231,

9   1253 (N.D. Cal. 1995). Contrary to MGA's argument, "if reverse engineering is lengthy and

10  expensive, a person who discovers the trade secret through reverse engineering can have a trade

11  secret in the information obtained from reverse engineering." Legis.Com. com. to Civ.Code, §

12  3426.1; *see also Hoffman-LaRouche Inc. v. Yoder*, 950 F. Supp. 1348, 1358 (S.D. Ohio 1997)

13  (same under Ohio law).  Cooney emailed his Mattel colleagues lamenting the difficulty of

14  cracking the formula.  *See* Compendium of Trade Secrets in Support of MGA MSJ, Ex. 182

15  ("my brain hurts . . . Dave, we may need your brainiac math mind!").  However, the formula

16  may have been derived within three and one half weeks, which may not evidence a lengthy and

17  expensive reverse engineering process.  *See* Cooney Depo. at 79-80 (document was updated

18  between April 4, 2006 and Cooney's departure).

19         MGA also argues that the formula embedded in the optimization tool lacked economic

20  value because it was flawed.  Information about customers' preferences can aid in "securing and

21  retaining their business." *Aetna Bldg. Maintenance Co. v. West*, 39 Cal.2d 198, 205 (1952) (pre-

22  UTSA case).  MGA argues that the partial formula derived by Mattel was worthless because

23  Toys 'R Us was in the process of modifying the overarching Merchant Model Optimization

24  Tool. Mattel's former general manager for the Toys 'R Us account, who supervised Cooney,

25  testified at deposition that Toys 'R Us "kept on grooming the tool" because the tool erred by

26  undervaluing "high-margin products with high turnover but high cubes."  *See* Deposition of

27  Eugene Murtha, dated February 25, 2010, at 157-159.  However, he also testified that the

28  evolution of the tool used by Toys 'R Us may have rendered the underlying formula even more

1    valuable since (1) the formula used by Toys 'R Us remained constant through the various

2    iterations of the tool; and/or (2) the formula allowed Mattel to manipulate Toys 'R Us's metrics.

3    *See id.*

4           There is also a genuine issue of material fact as to whether MGA acquired the formula

5    using improper means.  MGA instructed Cooney not to bring Mattel's confidential information

6    with him to MGA (Ex. 2157 to MGA MSJ) and Cooney testified at deposition that he never

7    discussed the formula with anyone at MGA (Cooney Depo. at 83).  However, Cooney testified

8    (somewhat ambiguously) that he may have used the Merchant Model Optimization Tool (and

9    potentially the underlying formula) immediately after starting at MGA. (Cooney Depo. at 36);

10   *but see id.* (testifying he used separate modeling tool supplied by MGA).  And there is evidence

11   that MGA's relationship with Toys 'R Us was suffering soon before Cooney joined MGA,

12   causing Larian to become personally involved in the operation and management of MGA's

13   relationship with the retailer.  Webster Dec., Ex. 193.  A reasonable fact-finder could therefore

14   find Cooney's representation not credible, in light of the possibility that he used the Merchant

15   Model Optimization Tool's formula for the benefit of a retailer relationship in which Larian and

16   other MGA executives were deeply involved.

17          There is also a genuine issue of material fact as to whether MGA had knowledge that the

18   acquisition of the formula was improper.  Since the credibility of the evidence probative of

19   MGA's knowledge is at issue, summary judgment is not proper on this element of Mattel's

20   counter-claim.  For example, Cooney testified that Brawer "was clear that [MGA] didn't want"

21   Cooney to bring Mattel's confidential materials with him.  Cooney Depo. at 334:6-7.[22]  MGA

22   also sent Cooney a letter confirming his employment and instructing him not to bring Mattel's

23   confidential materials with him.  Ex. 2157 to MGA MSJ.  On the other hand, these sterile

24   accounts of MGA's message discipline are not consistent with the more freewheeling style

25   MGA exhibited in dozens of communications concerning the recruitment of Mattel employees.

26   _____

27          [22] MGA's heavy reliance on Cooney's deposition testimony is an independent
     grounds on which to deny summary judgment.  Not only does Cooney still work for

28   MGA but his conduct is at issue.

*See, e.g.*, Webster Dec., Ex. 546 (referring to "double agent" Mattel employee who continued to work for MGA's benefit); Webster Dec., Ex. 446 (discussing targeted recruitment of Mattel employees). Mattel is wrong that MGA engaged in "bad acts" by hiring Mattel employees. However, a fact-finder should be permitted to evaluate the tenor of MGA's internal communications to determine whether MGA informally encouraged the misappropriation of potential trade secret information despite its formal letters to the contrary.

There are also genuine issues of material fact as to whether Mattel suffered harm and/or MGA benefitted as a result of the formula's alleged misappropriation. Cooney's former supervisor at Mattel testified that the formula in the Merchant Model Optimization Tool was very valuable to Mattel. Murtha Depo. at 157. Communications between MGA and Toys 'R Us during the relevant time frame suggest the zero-sum nature of Toys 'R Us's relationships with toy manufacturers. *See, e.g.*, Webster Dec., Ex. 193 ("I am not going to give TRU special pricing, exclusives, etc, etc. and have you stick My Scene right in the middle of Bratz"). Viewing this evidence, a reasonable fact-finder could easily conclude that MGA benefitted at Mattel's expense by effectively marshaling the formula embedded in the Merchant Model Optimization Tool. *See Stuhlbarg Int'l Sales Co. v. John D. Brush and Co., Inc.*, 240 F.3d 832, 841 (9th Cir. 2001) ("Evidence of threatened loss of prospective customers or goodwill . . . supports a finding of the possibility of irreparable harm."). However, a reasonable fact-finder could also conclude that MGA could not meaningfully benefit from a formula derived from a tool that may have been specific to Mattel's business and therefore inapplicable to Mattel's competitors.

### 5.  Machado, Vargas, and Trueba[23]

In late 2003, MGA sought to develop an independent footprint in the Mexican market. Such an expansion would allow MGA to "do direct business" with Mexican retailers, a more

---

[23] Mattel's motion for summary judgment on the issues of whether Machado, Vargas, and Trueba stole information, and whether MGA is chargeable for those thefts, is denied. UTSA applies to trade secrets; the misappropriation of other information is irrelevant to stating a claim under UTSA.

profitable arrangement than distributing MGA products through licensees like Hasbro. *See* Proctor Decl., Ex. 69.  Recognizing that MGA would "need to go after Mattel people in Mexico" to build its foundling subsidiary, Proctor Decl., Ex. 70, Larian delegated the task to an individual named Susana Kuemmerle ("Kuemmerle").  Kuemmerle recruited Machado, who served as Mattel Servicios, S.A.'s ("Mattel Servicios") Senior Marketing Manager, Boys Division.[24] Mattel Servicios is, and was at all relevant times, Mattel Mexico's subsidiary.

Kuemmerle facilitated a meeting between Machado and Larian at the February 2004 New York Toy Fair.  Deposition of Susana Kuemmerle, dated December 8, 2009, at 339.  One month later, Larian, Kuemmerle, and MGA Chief Operating Officer Tom Park traveled to Mexico to interview candidates for the contemplated office in Mexico, almost all of whom had been directed to MGA by a professional recruiter that Kuemmerle met through Machado.  *Id.* at 350-51.  Larian, Kuemmerle and Park also met with Machado, as well as his Mattel Servicios colleagues Mariana Trueba-Almada ("Trueba") and Pablo Vargas-San Jose ("Vargas") who Machado encouraged to attend the meeting with him.  *Id.* at 349; *see also* Declaration of Pablo Vargas at 65 (Proctor Dec., Ex. 1).  Machado, Trueba, and Vargas corresponded with Kuemmerle in the weeks leading up to their meeting with Larian and Park in Mexico City.  *Id.*

Machado and Vargas prepared a power point presentation to show Larian, Park and Kuemmerle at the meeting in Mexico City.  Machado Depo. at 1033.  The presentation borrowed images and language from a report prepared for Mattel Mexico's president by another Mattel executive.  *Compare* Isais Dec., Ex. 34 *with* Isais Dec., Ex. 33.  The report was located on a shared Mattel Mexico server to which Machado had access on his work computer; Machado burned the report to a personal compact disc and/or copied the report to a personal thumb drive. Machado Depo. at 1033-1037.  The presentation prepared for MGA by Machado and Vargas

---

[24] Mattel purports to dispute this fact in its Statement of Genuine Issues in Support of its Opposition to MGA's Motion.  Mattel's Statement of Genuine Issues ¶ 269. However, at oral argument, Mattel's counsel acknowledged that Machado was an employee of Mattel Servicios.  Nevertheless, there is no genuine issue of material fact that Machado was a Mattel Servicios employee.

1   also incorporated data about the Mexican market prepared by outside vendors with whom Mattel

2   had subscriptions.  *See* Isais Dec., Ex. 33.  Machado and Vargas failed to omit the vendors'

3   names, which were located on the bottom left of several of the presentation's slides.  *Id.*  Larian

4   watched the presentation and then interviewed the three Mattel Servicios employees at the

5   March 2004 meeting in Mexico City.

6        On March 19, 2004, Larian sent an email to an email address jointly used by Machado,

7   Vargas, and Trueba with the name plot04@yahoo.com.mx.  *See* Proctor Dec., Ex. 22.  Larian's

8   email directed the three individuals to see offer letters for employment (dated March 18, 2004)

9   attached to the email.  *Id.*  All three Mattel Servicios employees were offered employment with

10   MGA Mexico at a salary of 8,910 U.S. Dollars per month.  *Id.*  Both Machado and Vargas were

11   offered positions as Directors of Marketing and Trueba was offered a position as Director of

12   Marketing, Girls Division.  *Id.*  On April 16, 2004, an attorney representing Machado, Vargas,

13   and Trueba sent an email attaching acceptance of employment letters executed by the three

14   individuals.  *See* Ex. 6436 to MGA MSJ.

15        Prior to leaving Mattel Servicios for MGA Mexico, Machado, Trueba, and Vargas copied

16   some files from the company's shared servers to personal storage devices.  Deposition of

17   Mariana Trueba, dated May 20, 2010, at 230 (stating that she thought the files she downloaded

18   from shared servers would "at some point be useful"); *see also* Vargas Dec. at 7.  Machado

19   collected the storage devices after Trueba and Vargas downloaded and copied files, downloaded

20   the files from the storage devices to his computer, deleted the files from the storage devices, and

21   returned the storage devices to Trueba and Vargas so that they could download more files from

22   the shared servers to which they had access.  Machado Depo. at 218-219.  Trueba separately

23   emailed Machado files that she received from other Mattel Servicios employees in the weeks

24   leading up to her resignation.  *See, e.g.*, Webster Dec., Ex. 287.

25        All three employees formally resigned from Mattel Servicios on April 19, 2004.  *See*

26   Proctor Dec., Exs. 8-10.  The next day Machado emailed Larian from the "plot04" email address

27   stating that "we resigned yesterday and let me tell you 'Rome is on fire'.  We left the office at

28   1:30 PM yesterday and since then they have already made 10 changes in the staff, we are driving

1   them crazy!!!," (Proctor Dec., Ex. 11), to which Larian responded "I am in Ny.  What is your

2   cell?"  *Id.*  On April 23, 2004, Mattel Servicios sent all three employees a post-termination letter

3   in which they would acknowledge receiving a salary from Mattel Servicios and, in relevant part,

4   acknowledge that they "undertook not to [] reveal, exploit, reproduce or publish or otherwise

5   disclose confidential information of which I became aware during my work in service of [Mattel

6   Servicios]."  *See* Proctor Dec., Ex. 141.  None of the three employees signed and returned the

7   letter to Matttel Servicios.  *Id.*

8                              (a)     Choice of Law

9           Machado and MGA argue that Mexican law governs Mattel and Mattel Mexico's counter-

10  claim for trade secret misappropriation to the extent it arises out of the conduct of Machado,

11  Vargas, and Trueba.  Mattel and Mattel Mexico disagree.  In cases such as this one, where the

12  Court exercises supplemental jurisdiction over state law claims, the choice of law rules of the

13  forum state apply to those state claims.  *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d

14  1151, 1164 (9th Cir. 1996).  The Court accordingly considers California's choice of law

15  framework in determining whether the laws of Mexico or California apply.

16          California applies a three part "governmental interest" test to choice of law disputes:

17                  First, the court examines the substantive law of each jurisdiction to

18                  determine whether the laws differ as applied to the relevant

19                  transaction.  Second, if the laws do differ, the court must determine

20                  whether a "true conflict" exists in that each of the relevant

21                  jurisdictions has an interest in having its law applied.  If only one

22                  jurisdiction has a legitimate interest in the application of its

23                  rule of decision, there is a "false conflict" and the law of the

24                  interested jurisdiction is applied.  On the other hand, if more than

25                  one jurisdiction has a legitimate interest, the court must move to the

26                  third stage of the analysis, which focuses on the "comparative

27                  impairment" of the interested jurisdictions.  At this stage, the court

28                  seeks to identify and apply the law of the state whose interest would

1    be the more impaired if its law were not applied.

2    *Abogados v. AT & T, Inc.*, 223 F.3d 932, 934 (9th Cir. 2000) (citations and internal quotation

3    marks omitted).

4         "If distinct claims for relief implicate different alignments of interests among the relevant

5    jurisdictions, separate applications of the governmental interest analysis are required." *McGhee*

6    *v. Arabian American Oil Co.*, 871 F.2d 1412, 1422 (9th Cir. 1989).  It follows, naturally, that

7    "[u]nder both California and New York conflicts rules, a different determination properly is

8    made for each defendant and each claim."  *Lombard v. Economic Development Admin. of Puerto*

9    *Rico*, 1995 WL 447651, at *4 (S.D.N.Y. July 27, 1995); *see also Boxer v. Gottlieb*, 652 F. Supp.

10   1056, 1062 (S.D.N.Y. 1987) ("The issue of which law governs liability must be determined

11   separately for each defendant, since the competing interests involved may differ . . . .").  Since

12   the only conduct alleged to give rise to MGA Mexico and Machado's liability involved the

13   actions of the Mattel Servicios employees, the choice of law analysis for Machado and MGA

14   Mexico is materially different from the choice of law analysis for Larian and MGAE.

15        <u>Choice of Law Analysis as to Machado and MGA Mexico</u>

16        The laws of California and Mexico differ as to the liability of both Machado and MGA

17   Mexico for the conduct alleged in Mattel's third counter-claim.  Contrary to both counter-

18   defendants' arguments, Mexico recognizes a civil action for trade secret misappropriation.  *See*

19   Damon L. Boyd, *Trade Secret Doctrines of the NAFTA Countries*, 14 Az. J. Int'l & Comp. L.

20   879, 883-884 (1997).  That cause of action proscribes disclosure of trade secrets without the

21   consent of the "person keeping said secret or the authorized user thereof."  Declaration of Hector

22   Calatayud ¶ 9.  The Mexican statute does not appear to recognize a claim based on acquisition or

23   use of the wrongfully disclosed trade secret.  *See id.*  MGA Mexico is therefore immune from

24   liability under Mexican law, but not California law.

25        Like any other civil claim not arising out of a breach of contract, Mexico's general statute

26   of limitations requires that a claim for trade secret misappropriation must be brought within two

27   years of the "date in which damages caused by the conduct giving rise to the claim occurred."

28   Dkt. 7869-1 ¶ 5.  California, by contrast, requires that a claim for trade secret misappropriation

be brought "within three years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered." Cal. Civ. Code § 3426.6. Mattel sought leave to file its counter-claim against Machado and MGA Mexico in November 2006, nineteen months after Machado, Trueba and Vargas left Mattel Servicios for MGA Mexico, and Mattel's claim against Machado is therefore untimely under Mexican law. *See* Dkt. 7869-1 ¶ 5 (conceding "[i]t would be unlikely that Mattel could assert a claim for generic liability in Mexico if the United States case is dismissed").

There is a genuine issue of material fact as to whether a "true conflict" exists between California and Mexico. All of the documents stolen by the three employees were accessed on Mattel Servicios computers. Mattel argues that "possession, not ownership, is the *sine qua non* of trade secret standing," but, even assuming this is the case, there is a genuine issue of material fact as to whether the documents resided on Mattel's California servers. It's doubtful that the three Mattel Servicios employees had wide-ranging access to Mattel (the parent)'s documents, because all three individuals were tasked with managing the *Mexican* market, *see* 4AAC ¶¶ 37, 41, 42, and Mattel alleges elsewhere that its subsidiaries' employees "had access rights to only those areas of Mattel's network system . . . needed to do [their] job[s]." Statement of Uncontroverted Facts in Support of Mattel MSJ ¶ 164; *see* Declaration of Richard DeAnda ¶ 6. However, Mattel also alleges that some of the documents misappropriated by the three employees resided on Mattel's California servers and concerned the U.S. market. *See* 4AAC ¶¶ 48-50. California may have some interest in the application of its laws to this dispute if that were the case. Given the foundational dispute about the scope of Mattel's allegations, this is an issue the parties can take up with the fact-finder. *See Marra v. Bushee*, 447 F.2d 1282, 1284-85 (2d Cir. 1971).[25]

---

[25] The Circuits appear to be in dispute as to whether the court should resolve factual issues relevant to the choice of law. *See Nautilus Ins. Co. v. Router*, 537 F.3d 733, 742 (7th Cir. 2008) (comparing cases). This Court simply notes that, in this case, the factual dispute runs to the heart of Mattel's claim against Machado and its resolution would require the examination of evidence not cited by the parties' submissions.

1    Assuming, *arguendo*, that both California and Mexico have an genuine interest in the

2    application of their laws, the Court would proceed to determine which forum would be more

3    impaired if its laws were not applied.  Several factors are relevant to this determination,

4    including (1) each forum's present commitment to the application of its laws; (2) whether one

5    forum's law is more prevalent; (3) whether each forum's law is the exclusive means of achieving

6    a particular policy goal; and (4) the situs of the injury.  *Van Winkle v. Allstate Ins. Co.*, 290 F.

7    Supp. 2d 1158, 1166-1167 (C.D. Cal. 2003) (collecting cases).  There is empirical proof that

8    Mexico is committed to enforcing its trade secrets laws.  After discovering the alleged theft of its

9    trade secret materials, Mattel contacted Mexican law enforcement authorities, who have

10   investigated MGA Mexico and Machado.  None of the parties have discussed the international

11   prevalence of (1) a statute of limitations that incorporates a discovery rule; and/or (2) liability for

12   acquisition and use of improperly disclosed trade secrets.  Neither Mexico nor California appear

13   to have any other laws that relate directly to trade secret misappropriation (indeed, California's

14   statute purports to provide an exclusive remedy for such wrongdoing).  And there is a genuine

15   issue of material fact as to the situs of the injury, since the parties do not agree about (1) which

16   Mattel entity owned the documents; (2) whether MGA Mexico or MGA used the documents;

17   and (3) whether the three employees accessed Mattel's El Segundo servers.  These are also

18   issues the parties can take up with the fact-finder.

19       Choice of Law Analysis as to MGAE and Larian

20   MGA argues that "the Mexico-based trade secret claim fails on choice of law grounds,"

21   (Mot. at 70:19-20).  However, there is no "Mexico-based trade secret claim"; there is only one

22   counter-claim for trade secret misappropriation.  Mattel claims that the acts of former employees

23   located in the U.S., Canada, and Mexico give rise to MGAE and Larian's liability under this

24   counter-claim.  Though choice of law determinations may be made on a claim-by-claim basis,

25   *McGhee*, 871 F.2d at 1422, the Court knows of no California authority for the proposition that

26

27

28

57

1   different states' laws may apply to different factual predicates of the same claim.[26]  The Court

2   therefore proceeds to a choice of law analysis as to MGAE and Larian with a view to *all* conduct

3   alleged in Mattel's third counter-claim and not just the conduct of Machado, Trueba, and

4   Vargas.

5        As explained earlier, the laws of California and Mexico are in conflict with respect to the

6   liability of Larian and MGAE for trade secret misappropriation since (1) Mexico does not attach

7   liability to acquisition or use; and (2) Mexico applies a more restrictive statute of limitations.

8   Both Mexico and California have an interest in the application of their laws to this dispute, as

9   Mexico may seek to shield from liability corporations who had no relationship with the

10   possessor of the trade secret information and California has an interest in protecting its residents

11   from non-consensual acquisition and use of their valuable proprietary information.  However,

12   California would be more impaired if its laws were not applied to the alleged acts of Larian and

13   MGAE because (1) both are residents of California; (2) most of the alleged thefts and associated

14   correspondence took place in California; and (3) most of the harm alleged in the third counter-

15   claim (which includes the harm felt by the alleged misappropriation of the Bratz concept) was

16   also felt in California.  MGAE and Larian offer no argument on any one of these points, as is

17   their burden.  *See CRS Recovery, Inc. v. Laxton*, 600 F.3d 1138, 1142 (9th Cir. 2001).  The Court

18   accordingly concludes that California law must apply to Mattel's *entire* third counter-claim

19   against MGAE and Larian.

20           (b)    Genuine Issues of Material Fact[27]

21        The documents downloaded by Machado, Trueba, and Vargas included a pricing matrix

22   for large dolls, (MGA's Compendium of Trade Secrets, Exs. 201, 202), a pricing comparison for

23

24       [26] Different *issues* may be analyzed under different states' laws.  *See Wash. Mutual*

25   *Bank, FA v. Superior Court*, 24 Cal.4th 906 (2001).  MGA, however, does not seek to

26   apply the laws of different fora to each element of the third counter-claim for misappropriation of trade secrets.

27       [27] Mattel's claim would be time-barred under Mexican law.  The Court examines

28   the third counter-claim under only the UTSA.

products across years, (*id.*, Ex. 203), plans for Mattel's relationships with retailers in Mexico, (*id.*, Exs. 204, 268, 269), sales and pricing data, (*id.*, Exs. 205, 220, 232, 234, 235, 236, 238, 239, 241, 248, 251, 252, 254, 255, 256, 258, 260, 263, 265, 267, 270), projections for pricing, demand and sales (*id.*, Exs. 206, 257, 259), shipment and sell-through data, (*id.*, Exs. 207-18, 223, 224, 225, 226, 227, 231, 242, 245, 246, 261), reports about the Mexican market that tracked inflation, wages, purchasing patterns, market share, and the number of stores per region, (*id.*, Ex. 219, 233, 237, 240, 243, 249, 264, 266), pictures of Mattel Mexico's products in various Mexican stores, (*id.*, Ex. 221), lists of promotions, (*id.*, Exs. 222, 247, 253), a preliminary "line list" that arranges data on projected volume and quota for a variety of doll products, (*id.*, Ex. 228), sales data sorted by media, (*id.*, Exs. 229, 230), a blank spreadsheet, (*id.*, Ex. 244), and allocations for marketing, (*id.*, Ex. 250, 262).  Of these documents, Mattel claims that all but a few were trade secrets.

There is a genuine issue of material fact as to whether Mattel or Mattel Mexico have standing to bring their claims against Machado, Trueba, and Vargas.  Assuming without deciding that possession is all that is required to bring a claim for trade secret misappropriation, Mattel doesn't establish possession of all of the alleged trade secrets misappropriated by Machado, Vargas, and Trueba.  It relies on circumstantial evidence that the three employees had access to Mattel and Mattel Mexico servers as evidence that Mattel Servicios' documents — and specifically the documents allegedly stolen by the three employees — were also located on those servers.  That argument is belied by the fact that at least some of the documents allegedly misappropriated by the three employees were attached to email communications and may not have resided on Mattel's servers.

There are genuine issues of material fact as to whether any of the documents claimed to be trade secrets derived economic value from not being generally known.  The pricing information in the documents may have been shared with retailers by Mattel.  However, Mattel claims that some elements of these alleged trade secrets were not made available to individuals and entities outside Mattel.  *See* Declaration of Isaias ¶¶ 6, 8.  MGA also argues that documents lose value three to four months after their creation.  *See* Kuemmerle Depo. at 66-67.  However,

1   as Mattel points out, Kuemmerle's description is over-generalized and inapposite: many of the

2   documents did not describe Mattel Mexico's *prior* sales, but projected marketing and sales

3   expenditures in advance.

4          There are also genuine issues of material fact as to whether any of the documents claimed

5   to be trade secrets were the subject of reasonable efforts to maintain secrecy.  MGA argues that

6   Mattel did not impose a consistent policy of stamping documents as "confidential."  *See*

7   Deposition of Richard Ibarra at 139.  MGA, however, concedes that pricing information was

8   consistently marked confidential, per company policy.  *See id.*  Moreover, when deposed, Mattel

9   executives testified that each Mattel subsidiary's employees received specific instruction about

10  the non-disclosure of confidential information.  *See* Graham Decl. ¶ 3.  Whether this message

11  was clearly conveyed to Machado, Trueba and Vargas turns on the credibility of those

12  individuals' recollection about the extent of their training, as well as the direct guidance they

13  received about maintaining the confidentiality of documents.

14         There are also genuine issues of material fact as to whether MGA acquired the documents

15  misappropriated by Machado, Trueba, and Vargas with knowledge that the three departing

16  Mattel Servicios employees had improperly acquired the documents.  On the one hand, MGA

17  has disclaimed knowledge of the three employees' thefts; Machado testified that Larian

18  instructed him to not bring documents to MGA Mexico.  *See* Machado Depo. at 363-364.[28]

19  However, Machado could not recall why Larian spontaneously offered that direction at the

20  meeting between the two individuals in Mexico City.  *See id.* at 364.  Moreover, even if Larian

21  initially directed Machado not to misappropriate Mattel's documents, there is evidence that the

22  documents were later found in MGA Mexico's offices, which helps establish acquisition.  The

23  fact-finder must determine whether MGA Mexico was aware that the alleged trade secret

24  documents had found their way into its offices.

25         There are likewise genuine issues of material fact as to whether MGA used the documents

26

27         [28] Mattel's objection is overruled.  Larian's statements to Machado are not being

28  offered for their truth.

1   misappropriated by Machado, Trueba, and Vargas.  MGA cites the deposition testimony of a

2   Mattel Mexico employee who testified that MGA Mexico's promotions were similar to those

3   used within the toy industry as a whole.  *See* Isaias Depo. at 254.  However, the documents at

4   issue did more than merely list Mattel Mexico's promotions; they also identified pricing

5   schemes, retailer discounts, shipping quotas, and marketing budgets.  MGA has cited to no

6   evidence that MGA Mexico's organizational schemes were created independent of the

7   documents taken by Machado, Vargas, and Trueba.  On the other hand, Ms. Kuemmerle testified

8   that MGA Mexico did not use the misappropriated documents, though the credibility of her

9   testimony should be evaluated by a fact-finder.  For instance, a fact-finder may balance Ms.

10  Kuemmerle's statements against the fact that a digital copy of the documents was found in MGA

11  Mexico's offices well after Machado, Vargas, and Trueba left Mattel Servicios.

12         Finally, there is a genuine issue of material fact as to whether Mattel suffered harm and/or

13  MGA benefitted as a result of Machado, Vargas, and Trueba's alleged misappropriation of trade

14  secret documents.  MGA cites to the testimony of two Mattel witnesses who admitted a lack of

15  awareness of any evidence that Mattel suffered harm or MGA benefitted as a result of the

16  alleged misappropriation of trade secret documents.  For example, one Mattel witness could not

17  name any customer relationships harmed by the loss of the documents at issue.  *See* Zalzman

18  Depo. at 315-316.  The same witness, however, expressed confusion at the question posed by

19  MGA's counsel, which asked the witness to distinguish the harm suffered merely because of

20  MGA Mexico's new ability to sell directly to retailers in the Mexican market from the harm

21  suffered as a result of the alleged theft of Mattel's documents.  *Id.*  Though counsel's question is

22  certainly pertinent, a reasonable fact-finder may conclude that MGA Mexico's "direct

23  relationships" with Mexican retailers were developed using the information found in the

24  documents stolen by Machado, Trueba, and Vargas.

25         MGA raises identical challenges to the misappropriation allegations as to each of the

26  documents downloaded by Machado, Vargas, and Trueba.  Mattel similarly relies upon generic

27  assertions about its efforts to maintain the secrecy of its documents.  Because the parties'

28  arguments do not specifically address the alleged trade secrets on a document-by-document

1   basis, and the credibility of the scant evidence offered by the parties is at issue, the Court finds

2   summary judgment inappropriate on all grounds.

3                        **6.        Janine Brisbois**

4          Janine Brisbois ("Brisbois") worked for Mattel Canada, Inc. ("Mattel Canada") in

5   Mississauga, Canada between 1999 and September 2005.  *See* Deposition of Janine Brisbois,

6   Vol. I, dated December 9, 2009, at 36:16-19.  On September 23, 2005, Brisbois received a

7   written offer of employment from MGA Canada, with whom she had been corresponding for at

8   least a few weeks.  *See* Brisbois Depo. at 109-110; *see also* Ex. 6908 to MGA MSJ.  Brisbois

9   resigned from Mattel Canada on September 26, 2005 and was immediately escorted from the

10  premises.  *See* Deposition of Steve Totzke at 231:10-232:18.  She retained a thumb drive

11  containing files relating to Mattel Canada's business, as well as Brisbois' line of work for Mattel

12  Canada.  *See* Brisbois Depo. at 225:11 to 226:5.  When deposed in connection with this lawsuit,

13  she testified that at least some (if not most) of the files on the thumb drive were "work that I was

14  involved with, that you know, that I was proud of, that I put effort into, and I was simply

15  keeping a copy for [] my own personal file of work done."  *Id.* at 242.

16         Mattel identifies twenty one categories of trade secrets that Brisbois and MGA allegedly

17  misappropriated.  Mattel's alleged trade secrets include a power point presentation evaluating

18  advertising for Mattel's doll brands during the 2004 and 2005 calendar years, (Compendium of

19  Trade Secrets, Ex. 3), market analysis that compares Mattel products' market share with shelf

20  space at various retailers, (*id.*, Ex. 4), a chart that visually depicts Mattel's shelf space at one

21  Toys 'R Us store and compares pricing for Mattel's products against pricing for MGA's

22  products at that store, (*id.*, Ex. 5), a comparison of sales in 2005 with projected sales in 2006,

23  (*id.*, Ex. 6), a chart that identifies sales, receipts, margins, and profits with regard to Mattel's

24  relationship with Wal-Mart in 2003 and 2004, (*id.*, Ex. 7), a promotional spread sheet for 2005

25  and 2006 that includes a number of blank or invalid fields, (*id.*, Ex. 8), a September 22, 2005

26  interoffice memorandum from Janine Brisbois and Mattel Canada colleague to members of

27  Mattel Canada's "Girl's [sic] Business Unit" discussing price reductions for various Mattel

28  products, (*id.*, Ex. 11), a March 28, 2003 Canadian Leadership Plan for Mattel's Girls Division

1   that focuses on market threats like Bratz and purports to identify pricing and marketing strategies

2   to improve Mattel sales in the second half of 2003, (*id.*, Ex. 14), a standardized Mattel form that

3   retailers must complete before "marking down" the retail price of a particular Mattel product

4   (the form contains proposed mark down prices), (*id.*, Ex. 20), spread sheets containing data

5   about Mattel's 2003 performance and contemplated performance for 2004 on a retailer-by-

6   retailer basis, (*id.*, Exs. 23-25, 57), a "handbill" spread sheet that lists the retail prices for

7   Mattel's products sold at Wal-Mart stores, (*id.*, Ex. 30), business plans that discuss Mattel's

8   management of its retailer accounts and, for example, concludes that "all things being equal, a

9   consumer will purchase an item connected to a charity over an item that is not," (*id.*, Exs. 42,

10  60), a spread sheet that tracks Mattel's product sales at Wal-Mart by month and product category

11  (*e.g.*, Girls products), (*id.*, Ex. 58), an internal project management form completed by Brisbois

12  that tracked her team's success in achieving particular goals, (*id.*, Ex. 58), a Mattel Canada sales

13  team organization chart attached to an email from Brisbois to her MGA Canada supervisor that

14  identifies the size of Mattel Canada's business and discusses the size of an average team meeting

15  at Mattel, (*id.*, Ex. 63), and a Mattel Canada organization chart attached to an email from

16  Brisbois to her MGA Canada supervisor and in response to an email from the supervisor asking

17  Brisbois to "sketch that org chart . . . I want to take it to Ohio with me on Wednesday to show

18  Ron," (*id.*, Ex. 64).

19       Finally, Mattel alleges that Brisbois disclosed Mattel's mechanism to distribute its

20  products to retailers throughout Canada.  After Brisbois joined MGA Canada, the company

21  received an email from a retailer seeking to purchase MGA Canada's product.  (*Id.*, Ex. 66).  In

22  an email concerning the retailer's request, Brisbois' supervisor asked her to identify a distributor

23  who "would be the best to direct the toy store below to."  *Id.*  The email to Brisbois also stated

24  "Janine, I know that Mattel does a much better job at covering the small retailers.  What are your

25  thoughts?"  *Id.*  Brisbois responded that Mattel

26            invested some money into a B2B site which generates a good amount

27            of the independent business.  They also set up the customer service

28            folks who manage the Key accounts as contacts for the independent[]

1          [retailers] and create monthly specials that get posted on the site.

2          Finally, there is one NAM that manages all of this along with some

3          of the smaller accounts.

4 *Id.*

5      Both parties discuss the documents and information with some generality and with few

6 citations to evidence whose credibility is not at issue.[29]  There is a genuine issue of material fact

7 as to whether the documents and information allegedly misappropriated by Brisbois derived

8 independent economic value from not being generally known.  The majority of documents

9 allegedly misappropriated by Brisbois shared Mattel Canada's actual and projected pricing

10 schemes, calibrated to retailers' space constraints and tailored to maximize profits, categories of

11 information commonly understood to hold value within an industry.  *Cf. Morlife, Inc. v. Perry*,

12 56 Cal. App. 4th 1514, 1521 (1997).  Brisbois herself acknowledged the great amount of time

13 involved in crafting the pricing schemes used to maximize the profit realized by Mattel Canada's

14 products for particular retailers.  *See, e.g.*, Brisbois Depo. at 524-525; *see Morlife*, 56 Cal. App.

15 4th at 1521-1522 ("As a general principle, the more difficult information is to obtain, and the

16 more time and resources expended by an employer in gathering it, the more likely a court will

17 find such information constitutes a trade secret.").  On the other hand, at least some of the

18 pricing information contained in the spread sheets prepared by Brisbois may have been well

19 known throughout the industry, including among Mattel Canada's competitors.

20      Another category of documents allegedly misappropriated by Brisbois described Mattel

21 Canada's marketing schemes, including scheduled promotions for Mattel Canada's products.

22 MGA appears to argue that marketing plans are not trade secrets as a matter of law because the

23 marketing strategies were inevitably revealed to the public.  However, a reasonable fact-finder

24 could conclude that a particular marketing strategy not generally known to the public gave

25 Mattel Canada a competitive advantage over other retailers who, for example, may not have

26

27      [29] Indeed, MGA offers little argument about the documents and information in its
moving papers.  More targeted argument can be found in MGA's Statement of

28 Uncontroverted Facts in support of its motion.

1   known of the relative profitability of a marketing campaign that tied product sales to charitable

2   efforts.  *See Ruckelshaus*, 467 U.S. at 1011 n. 15 ("[T]he value of a trade secret lies in the

3   competitive advantage it gives its owner over competitors.").  For instance, Brisbois testified at

4   deposition that she retained one of the promotional plans presented to Wal-Mart because "[t]his

5   document represents a lot of my work and effort."  Brisbois Depo. at 527.  Her "work and effort"

6   wasn't just expended planning the promotion, in which case MGA could plausibly argue that the

7   document was no longer a trade secret at the time Brisbois left Mattel Canada.  Instead, as

8   Mattel's witness points out, the promotional documents included "Mattel's confidential analysis

9   of and recommendations for continuing [one promotional] program and confidential POS,

10  shipping, sell-thru and promotional information for specific products."  Totzke Dec. ¶ 30.  It is

11  for a fact-finder to determine whether the promotional materials had continuing value to Mattel

12  Canada at the time Brisbois left for MGA.

13         A third category of documents and information allegedly misappropriated by Brisbois

14  concerned Mattel Canada's *internal* processes, including its organizational structure, its progress

15  reviews, and its distribution network.  The economic value derived from the secrecy of Mattel

16  Canada's organizational structure appears to be limited, since Mattel Canada was a public

17  company at the time of Brisbois' departure and its corporate structure was probably well known.

18  However, Mattel has cited evidence to suggest that (1) its Canadian subsidiary's organizational

19  structure wasn't well known; (2) MGA placed a premium on determining Mattel Canada's

20  organizational structure; and (3) a properly structured organization had the potential to help

21  MGA become profitable.  For example, Brisbois' email disclosing Mattel Canada's

22  organizational structure to her supervisor at MGA stated "[t]his should help out with

23  understanding the type of structure we are up against.  This structure supports a business worth

24  about $250MM in CDN in shipments."  Compendium of Trade Secrets, Ex. 63.  Brisbois also

25  stated, in a separate email to her supervisor at MGA, that "[i]f you do some quick math on a $$

26  volume per total head count basis, you may fall off your chair!"  *Id.*, Ex. 64.  Brisbois further

27  disclosed not just Mattel Canada's organizational structure, but also the manner in which Mattel

28  Canada allocated its human resources towards particular projects:

1             The Girls business alone which includes Barbie, Polly, Pixel Chix,

2             etc . . . is about $75MM.  There are a total of 14 cross functional

3             people that compose the Girls Team plus the third party partners

4             from Ryan Partnership (Mktg & Promotions), and Mosaic (in store

5             execution).  A typical team meeting would have 15-20 people in

6             attendance.  The WM Team includes 9 cross functional people plus

7             the same third party partners mentioned above.  A typical team

8             meeting would have 10 people in attendance supporting a business

9             that peaked out at $95MM CDN in shipments.

10  *Id.*, Ex. 63.

11      A reasonable fact-finder could likewise conclude that information about Mattel's retailer

12  network derived value from not being generally known.  The email exchange preceding

13  Brisbois' disclosure of that information reveals its potential value — when MGA Canada was

14  approached by a retailer interested in purchasing its products, the company found itself caught

15  badly off guard.  When asked about Mattel Canada's solution to the same problem, Brisbois

16  revealed her former employer's approach in some detail and with specific reference to the

17  retailers serviced by Mattel Canada's network.

18      There is also a genuine issue of material fact as to whether Mattel took reasonable efforts

19  to maintain the secrecy of documents and information allegedly misappropriated by Brisbois.

20  MGA argues that Mattel Canada did not uniformly and consistently enforce a policy requiring its

21  employees to mark documents as "confidential."  Mattel's witness testified at deposition that

22  Mattel only directed, but did not require, that proprietary information be marked "confidential."

23  *See* Deposition of Keith Storie, Vol. I, dated December 16, 2009, at 63-64.  He also, however,

24  testified that Mattel reminded its employees of their obligation to maintain documents'

25  confidentiality through periodic presentations and circulars.  *See id.* at 64-65.  MGA also points

26  to the testimony of a Mattel witness who admitted that some of Mattel's retailers, including Wal-

27  Mart, were "reluctant to sign" nondisclosure agreements.  *See* Deposition of Steve Totzke, Vol.

28  I, dated January 18, 2010, at 94-95.  But that testimony concerned the nondisclosure of

1   information about products before their release, while the documents allegedly misappropriated

2   by Brisbois included information (including pricing and marketing schemes and expenditures)

3   that may not have been shared with Mattel Canada's retailers in the first place.  Finally, MGA

4   argues that Mattel did not require its employees to encrypt emails that attached trade secret

5   information.  *See* Storie Depo. at 59-60.  However, MGA provides no evidence about the

6   "reasonableness" of widespread email encryption; there is no evidence in the record that any of

7   the corporations at issue in this lawsuit used email encryption, a process that would appear to

8   undermine the very purpose of email communication.

9        There is a genuine issue of material fact as to whether MGA acquired the documents and

10  information allegedly misappropriated by Brisbois with the knowledge that the acquisition was

11  improper.  MGA instructed Brisbois to "not retain and [] not bring to MGA[] any of your former

12  employers' or Current employer's property or confidential and proprietary information,

13  including customer-related information."  *See* Ex. 6909 to MGA MSJ.  On the other hand,

14  Brisbois' supervisor twice asked Brisbois to share information about Mattel in the months after

15  Brisbois started working for MGA.  *See, e.g.*, Compendium of Trade Secrets, Exs. 64, 65.

16       There is a genuine issue of material fact as to whether MGA used the documents and

17  information allegedly misappropriated by Brisbois.  Two Mattel witnesses testified that they

18  lacked knowledge of any specific example of Brisbois disclosing Mattel Canada's information

19  and documents to MGA.  *See* Storie Depo. at 204; Totzke Depo. at 611.  However, the email

20  from Brisbois' supervisor requesting more information about Mattel Canada's organizational

21  structure foreshadowed the use of such materials in a meeting with Ron Brawer.  *See*

22  Compendium of Trade Secrets, Ex. 64.  And Brisbois admitted to using some of the documents

23  on the thumb drive in connection with her employment at MGA.  Brisbois Depo. at 241.

24       Finally, there are genuine issues of material fact as to whether MGA benefitted and/or

25  Mattel suffered any injury as a result of the alleged misappropriation of documents and

26  information by Brisbois.  Mattel's witness was incapable of specifically identifying any injury

27  suffered by the company as a result of Brisbois' alleged misappropriation, though the question

28  posed to the witness was outside the scope of the topics on which he was designated.  *See* Storie

1    Depo. at 200-201.  However, another Mattel witness testified that he "observed what was

2    happening with Toys 'R Us and saw [MGA] move into [] some TV campaigns before the Barbie

3    TV campaign" about which Brisbois gained knowledge while at Mattel.  Totzke Depo. at 405.

4    He testified further that "it certainly was an aggressive late move to tactically mute or block

5    what was a very big initiative for Barbie internally."  *Id.*  Neither MGA nor Mattel has cited to

6    any evidence in the record about the extent to which Brisbois was involved in MGA's

7    preemptive TV campaign and/or whether the impetus for the campaign was wrongfully acquired

8    information about Mattel's own promotional strategy.  The fact-finder can resolve these disputes

9    on the basis of more specific testimony and an expanded factual record.

10                         **C.    Disposition as to Third Counter-Claim**

11            For the foregoing reasons, summary judgment is granted in favor of MGA as to those

12   trade secrets abandoned by Mattel, as well as the Castilla and Contreras allegations discussed

13   herein.  MGA's request for the application of Mexican law to MGAE and Larian is denied.

14   Mattel, MGA, and Machado's requests for summary judgment are otherwise denied.

15              **IV.    Mattel's Other State Law Counter-Claims**

16            Mattel also brings counter-claims for breach of fiduciary duty against Bryant and

17   Machado, aiding and abetting breach of fiduciary duty against MGAE and Larian, breach of duty

18   of loyalty against Bryant and Machado, aiding and abetting breach of duty of loyalty against

19   MGAE and Larian, breach of contract against Bryant and Machado, intentional interference with

20   contractual relations against MGA, conversion against MGA and Machado, and unfair

21   competition against Bryant and MGA.  Before proceeding to examine the arguments as to these

22   counter-claims, the Court sets forth certain foundational principles about the supersessive scope

23   of the California Uniform Trade Secret Act and the preemptive scope of the Copyright Act, since

24   both issues are relevant to the vitality of the state law counter-claims.

25                   **A.    Supersession by the Uniform Trade Secrets Act[30]**

26   _____

27            [30] Contrary to Mattel's argument, MGA did not waive its right to raise a

28   supersession argument by failing to assert the argument prior to the phase 1 trial, because

California's Uniform Trade Secrets Act "occupies the field" of common law claims based on the misappropriation of a trade secret. *K.C. Multimedia, Inc. v. Bank of America Tech. & Operations, Inc.*, 171 Cal. App. 4th 939, 954 (2009). However, the Act does not supersede "(1) contractual remedies, whether or not based upon misappropriation of a trade secret, [and] (2) other civil remedies that are not based upon misappropriation of a trade secret." Cal. Civ. Code § 3426.7(b). The Act's language "implicitly preempts alternative civil remedies based on trade secret misappropriation." *K.C. Multimedia*, 171 Cal. App. 4th at 954 (citation omitted). A claim cannot simply depend on a "different theory of liability" to survive the UTSA's supersessive effect. *See id.* at 957-959 & n. 7 (distinguishing rule set forth in *Powell Prods., Inc. v. Marks*, 948 F. Supp. 1469, 1474 (D. Colo. 1996) (allowing a claim based on trade secret misappropriation to survive if the claim "requires an [element] [] which is not an element of a misappropriation claim")). The claim must be based on more than "the same nucleus of facts as the misappropriation of trade secrets claim for relief." *K.C. Multimedia*, 171 Cal. App. 4th at 958 (quoting *Digital Envoy, Inc. v. Google, Inc.*, 370 F. Supp. 2d 1025, 1035 (N.D. Cal. 2005)).

Before applying these principles to each of Mattel's counter-claims, the Court must resolve whether California's UTSA supersedes claims based upon the misappropriation of information that does not meet the statutory definition of a trade secret. Mattel argues that California UTSA's savings clause, Cal. Civ. Code § 3426.7(b), expressly excepts from the statute's supersessive ambit those claims *not* based upon misappropriation of a trade secret, including claims based upon the misappropriation of information that does not qualify as a trade secret. MGA responds that Mattel's approach eviscerates the statute's purpose to "sweep away the adopting states' bewildering web of rules and rationales and replace it with a uniform set of principles for determining when one is—and is not—liable for acquiring, disclosing, or using 'information . . . of value.'" *Silvaco*, 171 Cal. App. 4th at 239 n. 22. The Supreme Court of California has not addressed this issue. Decisions of the California Court of Appeal do not bind

---

(1) Mattel did not identify the Bratz concept as a trade secret during phase 1; (2) Mattel's broad amendment opened the door to the assertion of new affirmative defenses; and (3) there is on-point intervening California authority.

this Court, though they may be instructive to applying the law as the California Supreme Court would if presented with these facts.  *Wyler Summit P'ship v. Turner Broad. Sys., Inc.*, 135 F.3d 658, 663 (9th Cir. 1988); *Guebara v. Allstate Ins. Co.*, 237 F.3d 987, 993 (9th Cir. 2001).

Courts in other states have reached divergent answers to the question of whether the UTSA supersedes common law claims based upon the misappropriation of information that does not meet the statutory definition of a trade secret.  These decisions, though not binding, are instructive in interpreting the UTSA.  *K.C. Multimedia.*, 171 Cal. App. 4th at 955.  Two state supreme court cases capture the arguments made by courts on either side of this issue.

In *Burbank Grease Servs., LLC v. Sokolowski*, 717 N.W.2d 781, 788-94 (Wis. 2006), the court endorsed the argument that Mattel makes here.  Interpreting a savings clause that materially differs from the one found in California's UTSA, the court concluded that the UTSA's unambiguous language "leaves available all other remaining civil remedies for the protection of confidential information," rendering the statute's purpose irrelevant.  *Id.* at 788-90.

In *Mortgage Specialists, Inc. v. Davey*, a dispute between a mortgage brokerage and its former brokers, the court held that New Hampshire's UTSA superseded state common law claims based upon the misappropriation of information, "regardless of whether that information meets the statutory definition of a trade secret."  904 A.2d 652, 666-668 (N.H. 2006).  The court acknowledged that the UTSA only superseded remedies for a "misappropriation of a trade secret" and thus could be read to leave alone remedies based on the misappropriation of other information.  However, the court rejected this construction as ignorant of both "the overall legislative scheme" to make uniform the remedies available as a result of the theft of confidential information and the "purpose of making uniform the law among States that have adopted the UTSA."  *Id.* at 664.

The approach taken by *Davey* is better aligned with the decisions reached by the two recent California Court of Appeals cases to discuss UTSA's supersessive effect.  *K.C. Multimedia*, for instance, held that UTSA supersedes any claim "based on the same nucleus of facts as the misappropriation of trade secrets claim," even though the superseded claim may seek "something more."  171 Cal. App. 4th at 958.  The court rejected *Powell Prods., Inc. v. Marks*,

1   in which the court stated that UTSA doesn't supersede a conspiracy claim based on the theft of

2   trade secrets because such a claim "requires an agreement [] which is not an element of a

3   misappropriation claim under the UTSA."  948 F. Supp. 1469, 1474 (D. Colo. 1996).  It's no

4   longer the case in California that a claim for breach of fiduciary or breach of duty of loyalty

5   based upon the misappropriation of trade secrets would survive even though both claims require

6   proof of "additional elements" like a relationship of trust or confidence.  *See K.C. Multimedia*,

7   171 Cal. App. 4th at 960.  Allowing civil plaintiffs to nevertheless proceed with such claims on

8   the basis of the theft of confidential information that doesn't meet the statutory definition of a

9   trade secret undermines the California Court of Appeals by "alternatively plead[ing] claims with

10  less burdensome requirements of proof."  *Diamond Power Int'l, Inc. v. Davidson*, 504 F. Supp.

11  2d 1322, 1345 (N.D. Ga. 2007).  Along these lines, a recent California Court of Appeal opinion

12  "emphatically rejected the [] suggestion that the uniform act was not intended to preempt

13  'common law conversion claims based on the taking of information that, though not a trade

14  secret, was nonetheless of value to the claimant.'"  *Silvaco*, 171 Cal. App. 4th at 239 n. 22.

15      Like both *K.C. Multimedia* and *Silvaco*, and unlike *Sokolowski*, *Davey* eschewed a pure

16  application of the statute for an approach that adhered to "the history, purpose, and interpretation

17  of the statutory scheme."  *Compare Davey*, 904 A.2d at 664, *K.C. Multimedia*, 171 Cal. App. 4th

18  at 957, *and Silvaco*, 184 Cal. App. 4th at 239 n. 22, *with Sokolowki*, 717 N.W.2d at 791. In an

19  effort to align with the California courts that have addressed this issue, the Court concludes that

20  UTSA supersedes claims based on the misappropriation of confidential information, whether or

21  not that information meets the statutory definition of a trade secret.

22                          **B.      Copyright Act Preemption**

23      The Copyright Act preempts "all legal or equitable rights that are equivalent to any of the

24  exclusive rights within the general scope of copyright."  17 U.S.C. § 301(a).  "The rights

25  protected under the Copyright Act include the rights of reproduction, preparation of derivative

26  works, distribution and display."  *Altera Corp. v. Clear Logic, Inc.*, 424 F.3d 1079, 1089 (9th

27  Cir. 2005) (citing 17 U.S.C. § 106).  The Copyright Act's preemptive ambit does not extend to

28  state law claims that include an "'extra element' that makes the right asserted qualitatively

71

1  different from those protected under the Copyright Act."  *Id.* (citing *Summit Mach. Tool Mfg. v.*

2  *Victor CNC Sys.*, 7 F.3d 1434, 1439-40 (9th Cir. 1993)).

3        For instance, the Copyright Act doesn't preempt Mattel's claim for misappropriation of

4  the Bratz concept because trade secret law protects the secrecy of valuable confidential

5  information "whether or not the material subject to the trade secret is itself copyrightable."

6  Nimmer on Copyright § 1.01[B][1][h] 1-53; *see also S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081,

7  1090 n. 13 (9th Cir. 1989); *see also Firoozye v. Earthlink Network*, 153 F. Supp. 2d 1115, 1130

8  (N.D. Cal. 2001) (Copyright Act does not preempt UTSA claim for disclosure and exploitation

9  of trade secrets because that claim "require[s] a status of secrecy, not required for copyright").

10  MGA complains that such a rule allows Mattel "to avoid limitations inherent in the copyright

11  analysis," but this argument is unconvincing.  Mattel cannot copyright a work in the public

12  domain and proceed to restrain others from copying the ideas and unprotectable expression in

13  that work.  Once the work is shared with the world, "it enters our minds and becomes ours as

14  well."  Alex Kozinski & Christopher Newman, "What's so Fair about Fair Use?,"  46 J.

15  Copyright Soc. 529 (1999).  But Mattel can still keep its creative works secret either temporarily

16  or permanently in order to regulate their use.  *See id.*  And it is this right that trade secret law

17  seeks to vindicate.  *Gates Rubber Co. v. Bando Chem. Indus.*, 9 F.3d 823, 847-48 (10th

18  Cir.1993) (finding a copyright claim for wrongful use of a computer program does not preempt

19  trade secret claim for misappropriation where defendant gained access to the program through

20  plaintiff's employee who breached his duty to maintain secrecy).[31]

21        **C.**    **Breach of Fiduciary Duty and Aiding and Abetting Breach of Fiduciary**

22              **Duty**

23        Mattel alleges that MGA and Larian aided and abetted breaches of fiduciary duty

24  committed by Bryant, Machado, Brawer, Trueba, Vargas, Castilla, Contreras, and Cooney.

25  Mattel's separate counter-claim for breach of fiduciary duty only names Machado and Bryant as

26  ──────────────

27      [31] MGA argues that a trade secret allegation based upon Bryant's disclosure and MGA's acquisition of the Bratz trade secrets is likewise preempted by Section 106 of the

28  Copyright Act.  But these allegations also depend upon the "extra element" of secrecy.

1  counter-defendants.  To prevail on this counter-claim, Mattel must establish (1) a breach of

2  fiduciary duty by a Mattel employee; and (2) knowledge of the breach and substantial

3  encouragement or assistance by one or both counter-defendants.  *Casey v. U.S. Bank Nat'l Ass'n*,

4  127 Cal. App. 4th 1138, 1144 (2005).  A breach of fiduciary duty requires (1) the existence of a

5  fiduciary duty; (2) its breach; and (3) resulting damages.  *Pellegrini v. Weiss*, 165 Cal. App. 4th

6  515, 524 (2008).

7  UTSA supersedes both the breach of fiduciary duty and aiding and abetting breach of

8  fiduciary duty claims in their entirety.  Both counter-claims also lack merit to the extent they are

9  based upon the conduct of Machado, Vargas, and Trueba, none of whom owed a fiduciary duty

10  to either Mattel, Inc. or Mattel Mexico.

11  ### 1.        Bryant, Castilla, Contreras, Cooney

12  "[B]efore a person can be charged with a fiduciary obligation, he must either knowingly

13  undertake to act on behalf and for the benefit of another, or must enter into a relationship which

14  imposes that undertaking as a matter of law."  *Committee on Children's Television, Inc. v.*

15  *General Foods Corp.*, 35 Cal.3d 197, 221 (1983).  Mattel concedes that Castilla, Contreras,

16  Cooney, and Bryant did not enter into relationships which imposed fiduciary relationships as a

17  matter of law.  Mattel instead argues that its four former employees undertook fiduciary

18  obligations when they signed Confidential Information and Inventions Agreements, which

19  imposed "duties of confidentiality" and required the employees to "accept [] position[s] of trust"

20  with Mattel.  *See* Proctor Dec., Ex. 96 (Castilla Inventions Agreement unsigned by Mattel); *id.*,

21  Ex. 97 (Cooney Inventions Agreement); *id.*, Ex. 124 (Bryant Inventions Agreement); *id.*, Ex.

22  174 (Contreras Inventions Agreement).  These duties of confidentiality and positions of trust

23  were imposed by identical sub-sections of the employment agreements:

24        1.     *Provisions Related to Trade Secrets*

25        (a)     I acknowledge that the Company possesses and will continue to develop

26               and acquire valuable Proprietary Information (as defined below), including

27               information that I may develop or discover as a result of my employment

28               with the Company.  The value of that Proprietary Information depends on it

1   remaining confidential.  The Company depends on me to maintain that

2   confidentiality, and I accept that position of trust.

3   (b)   As used in this Agreement, "Proprietary Information" means any

4   information (including any formula, pattern, compilation, device, method,

5   technique or process) that derives independent economic value, actual or

6   potential, from not being generally known to the public or to other persons

7   who can obtain economic value from its disclosure or use, and includes

8   information of the Company, its customers, suppliers, joint venturers,

9   licensors, licensees, distributors and other entities with whom the Company

10   does business.

11   (c)   I will not disclose or use at any time, either during or after my employment

12   with the Company, any Proprietary Information except for the exclusive

13   benefit of the Company as required by my duties for the Company, or as the

14   Company expressly may consent to in writing.  I will cooperate with the

15   Company and use my best efforts to prevent the unauthorized disclosure,

16   use or reproduction of all Proprietary Information.

17   (d)   Upon leaving employment with the Company for any reason, I immediately

18   will deliver to the Company all tangible, written, graphical, machine

19   readable and other materials (including all copies) in my possession or

20   under my control containing or disclosing Proprietary Information.

21   *See* Proctor Dec., Ex. 96 (Castilla Inventions Agreement unsigned by Mattel); *id.*, Ex. 97

22   (Cooney Inventions Agreement); *id.*, Ex. 124 (Bryant Inventions Agreement); *id.*, Ex. 174

23   (Contreras Inventions Agreement).

24   Any fiduciary duty imposed by the agreement was limited to the employees' obligation to

25   maintain the confidentiality of "proprietary information," the definition of which is identical to

26   the definition of a "trade secret" under the UTSA.  *Compare id.* ¶ 1(b) *with* Cal. Civ. Code

27   § 3426.1(d); *cf. Van de Kamp v. Bank of America*, 204 Cal. App. 3d 819, 860 (1988) (scope of

28   trust relationship defined by the parties' agreement); *Chipser v. Kohlmeyer & Co.*, 600 F.2d

1061, 1066-67 (5th Cir. 1979); *Grynberg v. Dome Petroleum Corp.*, 599 N.W.2d 261, 267 (N.D. 1999) ("The existence and scope of a fiduciary duty depends upon the language of the parties' agreement.").  Mattel's counter-claims for breach of fiduciary duty and aiding and abetting breach of fiduciary duty — to the extent predicated upon the conduct of Bryant, Castilla, Contreras, and Cooney — are by necessity based upon nothing more than the misappropriation of trade secret information.  For MGAE and Larian to aid and abet this conduct, the two counter-defendants would have had to provide "substantial assistance or encouragement" to the departing employees' misappropriation of trade secrets, which Mattel elsewhere argues is a basis for holding MGAE and Larian liable for trade secret misappropriation.  Mattel's Opp'n to MGA MSJ at 70 (arguing that principles of ratification and agency give rise to MGA's liability for trade secret misappropriation committed by departing Mattel employees).  As a result, Mattel's counter-claims for breach of fiduciary duty and aiding and abetting breach of fiduciary duty are superseded to the extent predicated upon the conduct of Bryant, Castilla, Contreras, and Cooney.

## 2.      Remaining Employees

UTSA also supersedes the fiduciary duty counter-claims to the extent predicated upon the conduct of Machado, Vargas, Trueba, and Brawer.  There is no genuine issue of material fact as to whether Brawer, Machado, Vargas, and Trueba engaged in any misconduct other than the misappropriation of Mattel's confidential information and Mattel does not allege otherwise.  *See* 4AAC ¶ 67.  Mattel attempts to re-characterize the thefts as "working for a competitor" and "acting with disloyalty" but these allegations attach new labels to the same nucleus of facts upon which Mattel's third counter-claim is based.  *See K.C. Multimedia*, 171 Cal. App. 4th at 960.  The UTSA supersedes claims based on the misappropriation of information.  Mattel cannot separately recover for breach of fiduciary duty or aiding and abetting breach of fiduciary duty.

Even if UTSA did not supersede claims based on the misappropriation of information that does not meet the statutory definition of a trade secret, Mattel has pled away the ability to bring such a claim.  Mattel identifies its trade secrets as "*the* documents, materials, designs, names, and other information stolen by Machado, Trueba, Vargas, Brisbois, Castilla, Cooney, Contreras, Brawer . . . including but not limited to . . . the confidential information stolen in the United

1  States, Mexico and Canada."  4AAC ¶ 134 (emphasis added).  Mattel's definition of "trade

2  secrets" does not except any of the documents or information allegedly stolen by the departing

3  employees.  Though Mattel has since conceded that much of the allegedly misappropriated

4  information did not meet the statutory definition of a trade secret, California courts look at the

5  allegations as "reflected in the pleading," when determining whether a claim is subject to

6  supersession.  *K.C. Multimedia*, 171 Cal. App. 4th at 960.  The continued designation and de-

7  designation of trade secrets over the course of a litigation undermines its judicial administration.

8       Nor could Mattel predicate its fiduciary duty counter-claims on any conduct unrelated to

9  the misappropriation of information, at least as to Machado, Trueba, and Vargas.[32]  Mattel

10  argues that the three Mattel Servicios employees owed fiduciary obligations to Mattel, Mattel

11  Mexico, and Mattel Servicios by virtue of both their positions and their employment agreements.

12       Machado, Vargas, and Trueba were employed by Mattel Servicios, a Mexican company.

13  Webster Dec., Ex. 421 (company name is "Mattel Mexico Services"); Webster Dec., Ex. 321

14  (organizational chart for "Mexico").  Unlike California, Mexico does not recognize common law

15  claims for breach of fiduciary duty or aiding and abetting breach of fiduciary duty, though such

16  obligations may be assumed by contract and enforced through a claim for breach of contract.

17  Calatayud Dec. ¶¶ 16-17.  However, this is not a "true conflict" of law because only Mexico has

18  an interest in the application of its laws to the obligations that flow between a Mexican

19  corporation and its Mexican-resident employees.  None of the three employees owed a fiduciary

20  duty to Mattel Servicios or Mattel Mexico by operation of law.  Moreover, even if either

21  California law applied or Mexico recognized common law fiduciary obligations arising through

22  employment, all three employees worked for Mattel Servicios, which is not a party to this

23  lawsuit, and whose rights neither Mattel nor Mattel Mexico may enforce. Fed. R. Civ. P. 17(a).

24

25       [32] It is undisputed that Brawer owed a fiduciary duty to Mattel by virtue of his

26  position as an officer of the company.  The scope of that duty was much broader than the
   fiduciary obligations, if any, assumed by Mattel's other employees.  *Daniel Orifice*

27  *Fitting Co. v. Whalen*, 198 Cal. App. 2d 791, 800 (1962).  But Mattel does not allege that

28  Brawer engaged in any misconduct other than the misappropriation of its information.

1    Mattel nevertheless argues that Machado, Vargas, and Trueba assumed fiduciary

2    obligations to Mattel and Mattel Mexico through agreement.  One undertakes a fiduciary

3    obligation when he voluntarily accepts another party's trust and confidence. *Mass. Eye and Ear*

4    *Infirmary v. QLT Phototherapeutics, Inc.*, 412 F.3d 215, 241 (1st Cir. 2005).  However, since (as

5    Mattel concedes) any fiduciary obligation assumed by the three Mattel Servicios employees

6    related to their "access and exposure to Mattel's confidential information," Mattel's fiduciary

7    duty counter-claims are necessarily based upon the misappropriation of Mattel's confidential

8    information, whether through unauthorized acquisition, disclosure, or use.

9    The first agreement cited by Mattel is entitled "Individual Employment Contract" and

10   purports to memorialize an employment relationship with Mattel Servicios—the "employer"

11   under the agreement.  Webster Dec., Ex. 99 (Machado); Proctor Dec., Ex. 233 (Trueba); and

12   Proctor Dec., Ex. 98 (Vargas).  Machado, Vargas, and Trueba agreed to "not [] disclose any of

13   the aspects of [Mattel Servicios'] business and not to provide any information on the systems or

14   activities of any kind to third parties." *Id.* at 2316.  The second agreement is a Mattel "Conflict

15   of Interest Questionnaire" that only Machado and Trueba signed.  4AAC, Ex. C at 103

16   (Machado); Proctor Dec., Ex. 237 (Trueba).  The second sentence of the final paragraph of the

17   agreement states "I agree not to divulge any company information to unauthorized recipients."

18   *Id.* at 106.  The third agreement is a Mattel Servicios technology use manual that only Machado

19   signed.  4AAC, Ex. D.  Mattel does not identify any particular clause in the agreement that

20   creates this fiduciary duty, though the Court presumes that Mattel relies upon two clauses

21   prohibiting access and misuse of the company's intellectual property.  The fourth agreement is a

22   Code of Conduct distributed by Mattel to "employees worldwide" in 2003.  4AAC, Ex. E at 160.

23   There is no evidence that Machado received or signed this document.  *See id.*

24   Any fiduciary obligations imposed by these agreements was an obligation not to disclose

25   the Mattel's confidential information.  Mattel's counter-claim for breach of fiduciary duty

26   against Machado as well as its allegation that MGAE and Larian aided and abetted the Mattel

27   Servicios' employees' breaches of fiduciary duty, is necessarily based upon the disclosure of

28   Mattel's confidential information.  4AAC ¶ 169 ("Machado breached his fiduciary duty [] by []

1 misappropriating Mattel trade secret and proprietary information."). The fiduciary duty counter-

2 claims are accordingly superseded.

3      Moreover, none of the agreements signed by Machado, Vargas, and Trueba imposed

4 fiduciary obligations. An employer's **trust and confidence** in its employee must precede the

5 acceptance of a fiduciary obligation. 26 Richard A. Lord, *Williston on Contracts*, § 69:23 (4th

6 ed. 2004). Mattel and its subsidiaries neither trusted nor confided in their employees. For

7 example, Mattel and its subsidiaries "reserve[d] the right to inspect and search **at any time and**

8 **without prior notice** . . . personal property brought into the workplace (such as bags, portfolios,

9 cars) and monitor electronic communications (for example, voicemail)." 4AAC, Ex. D at 152

10 (emphasis added). Mattel and its subsidiaries also required employees to receive prior

11 permission from a supervisor before sending electronic messages to friends and family on blogs,

12 internet chats, or discussion groups. *Id.* at 150. Employees were told to surrender "any right of

13 privacy in respect to any of the messages or information created or kept by Mattel's

14 Technological Resources, including information or messages that the employee thinks of or

15 regards as personal." *Id.* Considered alongside Mattel's efforts to monitor employees both

16 before and after their terms of employment through computer forensic analysis and personal

17 surveillance, the evidence shows relationships based on neither trust nor confidence.

18      Mattel's counter-claim for breach of fiduciary duty against Bryant is necessarily based

19 upon the same nucleus of conduct as its trade secret misappropriation counter-claim, since any

20 fiduciary obligation assumed by Bryant was limited to the non-disclosure of Mattel's trade secret

21 information. Mattel's counter-claim for aiding and abetting Bryant's breach of fiduciary duty

22 against MGAE and Larian is likewise based upon the same nucleus of inducement conduct that

23 forms the basis for Mattel's counter-claim for trade secret misappropriation.

24      Mattel's counter-claim for breach of fiduciary duty against Machado fails because

25 Mexico doesn't recognize a common law claim for breach of fiduciary duty. It also fails because

26 Machado owed fiduciary obligations to his employer, Mattel Servicios, which is not a party to

27 this lawsuit. Machado did not assume any fiduciary obligations to Mattel and Mattel Mexico

28 because neither party reposed a trust or confidence in him. Even if Machado assumed a

1   fiduciary obligation to one or more of these entities, this obligation was limited to the non-

2   disclosure of Mattel's confidential information.  Mattel's counter-claim for aiding and abetting

3   Machado's breach of fiduciary duty (if any) is necessarily based upon the same nucleus of facts

4   that supports Mattel's trade secret misappropriation counter-claim.

5       Mattel's counter-claim for aiding and abetting Castilla, Contreras, Cooney, Vargas, and

6   Trueba's breaches of fiduciary duty is necessarily based upon the same nucleus of facts as its

7   trade secret misappropriation counter-claim, because any fiduciary obligation accepted by these

8   employees was limited to the non-disclosure of secrets.  Its counter-claim for aiding abetting all

9   non-Bryant employees breaches of fiduciary duty is also expressly based upon nothing more

10  than the misappropriation of information.  Moreover, Mattel's counter-claim for aiding and

11  abetting Vargas and Trueba's breaches of fiduciary duty fails because the two Mattel Servicios

12  employees owed no fiduciary duty to either Mattel or Mattel Mexico.

### 2.   Breach of Contract and Intentional Interference with Contractual Relations

15      Mattel claims that Machado and Bryant breached their employment agreements.  Mattel

16  also claims that MGAE and Larian "induced [Mattel employees] to steal . . . Mattel trade secrets

17  and other proprietary and confidential information and . . . bribed or induced [Mattel employees]

18  to work or assist MGA" while those individuals were still employed by Mattel.  Mattel claims

19  that MGAE and Larian interfered with Mattel's contractual relations with the following

20  employees: "Bryant, Brawer, Machado, Trueba, Vargas, Castilla, Contreras, Cooney, Cabrera,

21  Morales, Salazar, and other former Mattel employees," who are not named in the 4AAC.

22      It is undisputed that UTSA does not supersede Mattel's counter-claim for breach of

23  contract against Bryant and Machado.  UTSA "does not affect [] contractual remedies, whether

24  or not based upon misappropriation of a trade secret."  Cal. Civ. Code § 3426.7(b).

25      Intentional interference with contractual relations is a tort.  *See* 5 Witkin, *Summary of*

26  *California Law* § 731.  It does not count as a contractual remedy and is subject to supersession.

27  *See K.C. Multimedia*, 171 Cal. App. 4th at 960-61.  Mattel's intentional interference with

28  contractual relations counter-claim is in significant part based upon MGAE and Larian's alleged

1   inducement of Mattel employees' theft of "Mattel trade secrets and other proprietary

2   information," which is also a basis for Mattel's counter-claim for trade secret misappropriation

3   against MGAE and Larian.  *See id.* (helping and encouraging employee's trade secret theft "falls

4   within the statutory definition of 'improper means' of acquiring a trade secret, which 'includes . .

5   . breach or inducement of a breach of duty to maintain secrecy . . .'") (quoting Cal. Civ. Code

6   § 3426.1(a)).  UTSA supersedes Mattel's counter-claim to the extent it is based upon such

7   conduct.  *See id.*

8        However, UTSA ***does not*** supersede the intentional interference with contractual relations

9   counter-claim to the extent it arises out of conduct unrelated to the misappropriation of Mattel's

10   information.  Mattel alleges that MGAE and Larian induced Mattel's employees, including

11   Bryant, to "work for [and] assist a[] competitor of Mattel" while still employed by Mattel.

12   4AAC ¶ 161.  The record reveals a genuine issue of material fact as to whether such conduct

13   occurred.  MGA independent contractor Veronica Marlow directed MGA's funds to Mattel

14   employees Cabrera, Morales, and Salazar to create fashions for the Bratz dolls.  MGA argues

15   that Larian and MGAE lacked knowledge of such conduct, but there is circumstantial evidence

16   to the contrary.  For example, when Marlow declined MGA's offer of full-time employment, she

17   and her husband sent MGA a letter explaining that the decision flowed from Marlow's desire to

18   continue her close working relationship with Cabrera, Morales, and Salazar.  In other email

19   communications, MGAE and Larian accepted and encouraged a Mattel employee to work for

20   MGA's benefit on his nights and weekends, which suggests a corporation-wide willingness to

21   engage the services of Mattel employees, even while those individuals continued to be employed

22   by Mattel.  On the other hand, certain email communications evidence a lack of knowledge

23   about the fact that Cabrera, Morales, and Salazar were performing work for MGA's benefit

24   while still employed by Mattel.  In one email, Larian lamented the high salary being paid to

25   Marlow, which may suggest a lack of knowledge about Marlow's subsequent payments to

26   Mattel's employees.

27        There is also evidence that MGA involved Bryant in the Bratz doll design project

28   between September 1, 2000 and October 4, 2000, on which date Bryant signed his employment

1   contract with MGA.  Bryant's non-disclosure of his inventions to Mattel may have violated the

2   section of his Inventions Agreement requiring him to "communicate to the Company as

3   promptly and fully as practicable all inventions."  TX 25.  Bryant's work on behalf of MGA may

4   have violated paragraph 3 of the Inventions Agreement that states "[m]y employment with the

5   Company requires my undivided attention and effort . . . I shall not, without the Company's

6   express written consent, engage in any employment or business other than for the Company, or

7   invest in or assist (in any manner) any business competitive with the business or future business

8   plans of the Company."  *Id.*  There are genuine issues of material fact as to whether MGA

9   suborned the breach of either of these provisions, the performance of which has no relation to

10  the non-disclosure of trade secret information or the reproduction of copyrighted matter.

11      Mattel moves for summary judgment on some elements of the intentional interference

12  with contractual relations counter-claim, which requires: "(1) a valid contract between plaintiff

13  and a third party; (2) defendant's knowledge of the contract; (3) defendant's intentional acts

14  designed to induce a breach or disruption of the contractual relationship; (4) actual breach or

15  disruption of the contractual relationship; and (5) resulting damage."  *Quelimane Co., Inc. v.*

16  *Stewart Title Guaranty Co.*, 19 Cal.4th 26, 55 (1988) (quoting *Pacific Gas & Electric Co. v.*

17  *Bear Stearns & Co.*, 50 Cal.3d 1118, 1126 (1990)).

18      Mattel argues that the undisputed facts establish that it had valid and enforceable

19  contracts with Castilla, Cooney, Brawer, Cabrera, Morales, Salazar, Tumaliuan, and Bryant.

20  MGA does not oppose Mattel's argument that it had valid and enforceable contracts with

21  Cooney, Castilla, Cabrera, Morales, Salazar, and Tumaliuan.  There are genuine issues of

22  material fact as to whether Brawer was bound by Mattel's Code of Conduct, a document that

23  does not contain his signature of other identifying information, and as to which he professed no

24  knowledge during his deposition.  *See* Proctor Dec., Ex. 358; Brawer Depo., Vol. I, at 91-95.

25      Mattel also argues that the undisputed evidence establishes that its former employees

26  breached their contracts.  However, there is a genuine issue of material fact on this issue.

27      First, Mattel argues that Cooney and Castilla failed to comply with a common provision

28  in their Inventions Agreements requiring them to "deliver to the Company all tangible, written,

graphical, machine readable, and other materials (including all copies) in my possession or under

my control containing or disclosing Proprietary Information."  The term "Proprietary

Information" tracked UTSA's definition of a trade secret.  In light of the genuine issues of

material fact as to whether any of the materials taken by Castilla and Cooney constituted trade

secrets, Mattel's motion is denied as to this issue.

Second, Mattel argues that Cabrera, Morales, and Salazar worked for MGA's benefit

while at Mattel.  These employees, according to Mattel, breached their contractual duty to not

"without the Company's express written consent, engage in any employment or business other

than for the Company, or invest in or assist (in any manner) any business competitive with the

business or the future business of the Company."  Cabrera, Morales, and Salazar were not

employed by *anybody* other than Mattel; they received payments from an independent contractor

named Veronica Marlow.  Mattel may argue that these individuals engaged in "business"

competitive with Mattel, but the term "business" is ambiguous.  It could refer to any activity that

generates revenue for the individual, but it could also be read more restrictively to refer to a

competitive enterprise, in which Cabrera, Morales, and Salazar were certainly not engaged.

Neither party has presented extrinsic evidence capable of resolving the ambiguity, leaving this

issue for the fact-finder to resolve.

Third, Mattel argues that its former intern, Tumaliuan, breached his contract with Mattel

by working for MGA.  Tumaliuan's internship at Mattel commenced on May 19, 2003.

However, Tumaliuan did not disclose to Mattel the fact that he had signed an employment

agreement with MGA eleven months earlier, on June 10, 2002, and that his term of employment

at MGA was ongoing; there had been no termination.  Mattel argues that Tumaliuan's conduct

violated the Inventions Agreement's requirement that he not "engage in any employment or

business other than for the Company, or invest in or assist (in any manner) any business

competitive with the business" of Mattel, without first obtaining Mattel's written consent.  The

term "engage" is ambiguous.  It could refer to the mere fact of an ongoing employment

relationship, actively working for another company, or commencing a new employment

relationship.  Tumaliuan did not initiate a new employment relationship with MGA after he

82

started his internship with Mattel, and there is a genuine issue of material fact as to whether he actually worked for MGA while interning at Mattel.  The parties have provided the Court with no extrinsic evidence to resolve the ambiguity, leaving this issue for the fact-finder to resolve.

There is a genuine issue of material fact as to whether MGA intentionally interfered with the Mattel employees' contracts.  As discussed earlier, the evidence is ambiguous as to the alleged misappropriation of Mattel confidential information and MGA's role in such conduct.  Moreover, MGA argues that it lacked knowledge about the contracts that bound Mattel employees, including Bryant, but the fact that MGA used contracts that contained similar forced disclosure, non-disclosure, and loyalty clauses may suggest MGA's recognition that the employees' alleged conduct was wrongful.

### 3.    Conversion

Mattel's counter-claim for conversion alleges that MGA and Machado "wrongfully converted Mattel property and resources by appropriating and using them for their own benefit and gain and for the benefit and gain of others, without the permission of Mattel."  4AAC ¶ 193.  The "property" allegedly converted included "such proper [sic] and materials that were created by Bryant while he was a Mattel product designer," other tangible "Bratz inventory," and finally "the [trade secret] documents, materials, designs, names, and other information" allegedly misappropriated by the departing Mattel employees.  *Id.* ¶¶ 194-96.

UTSA supersedes this counter-claim to the extent it is based upon the misappropriation of Mattel's confidential information, whether or not that information rises to the level of a trade secret.  First, as discussed above, allowing Mattel to claim that MGA and Machado converted non-trade secret confidential information undermines the California Court of Appeals' interest in redeeming UTSA's purpose of "provid[ing] 'unitary definitions of trade secret and trade secret misappropriation.'"  *K.C. Multimedia*, 171 Cal. App. 4th at 957; *see also Silvaco*, 184 Cal. App. 4th at 239 n. 22 ("We emphatically reject the [] suggestion that the uniform act was not intended to preempt 'common law conversion claims based on the taking of information that, though not a trade secret, was nonetheless of value to the claimant.'") (quoting *Cenveo v. Slater*, 2007 WL 527720, at *4 (E.D. Pa. 2007)).  Second, a claim for conversion requires the existence of a

property right, and "information is not property unless some law makes it so." *Silvaco*, 184 Cal. App. 4th at 239.  Mattel cannot "identif[y] any property right" in its confidential information "outside of trade secrets law," because no such property right exists under California law.  *Id.*

MGA concedes that the counter-claim is not superseded to the extent it is based on the misappropriation of "tangible documents and things."  MGA MSJ at 31:2-3.  The value of the documents, stripped of the information they contained, is probably *de minimis* depending on the quality of the paper stock used by Mattel.  The Bratz sketches and sculpt may have more value.[33]

### 4.     Breach of Duty of Loyalty and Aiding and Abetting Breach of Duty of Loyalty

Mattel alleges that Bryant and Machado breached their duties of loyalty to Mattel by "entering into agreements with a Mattel competitor [and] using Mattel property and resources for the benefit of, and to aid and assist, themselves personally and the competitor of Mattel" while still employed by Mattel.  4AAC ¶ 181.  Mattel also alleges that MGAE and Larian aided and abetted Bryant's breach of his duty of loyalty by enabling Bryant to breach his "obligation . . . not to compete with Mattel or assist a competitor of Mattel during the term of his employment [and] give preference to Mattel's business over his own, similar interests or those of Mattel's competitors during the course of his employment with Mattel." *Id.* ¶ 187.  Mattel alleges that MGAE and Larian enabled Mattel employees, including Brawer, Machado, Trueba, Vargas, Castilla, Contreras, Cooney, Cabrera, Morales, and Salazar, to breach their duties of loyalty, which required that they "not [] compete with Mattel or assist a competitor of Mattel during their Mattel employment." *Id.* ¶ 188.  The counter-claims for breach of duty of loyalty against Bryant and Machado, and aiding and abetting breach of duty of loyalty against MGAE and Larian, are based upon these allegations of misconduct.

For reasons discussed above, UTSA supersedes these counter-claims to the extent they are based upon Machado, Vargas, and Trueba's misappropriation of Mattel's information,

---

[33] MGA's Copyright Act preemption argument is accordingly moot.  A claim for conversion cannot recover the intellectual property (copyrights), only the underlying property.

1 whether or not that information qualifies as a trade secret.  Mattel alleges the factual predicate

2 for its counter-claim against Machado with generality, stating that he "aided, assisted and

3 worked for a competitor of Mattel" while still employed by Mattel.  4AAC ¶ 181.  Mattel

4 elsewhere argues that Machado committed the following acts of wrongdoing:

5        stealing trade secrets, stealing other documents and property,

6        misappropriating documents and information used for a presentation

7        made to Larian, Park and Kuemmerle which disclosed confidential

8        information, inducing a Mattel employee [Vargas] to assist him in

9        preparing that presentation, inducing fellow employees [Vargas and

10        Trueba] to joint [sic] him in stealing trade secrets and disclosing

11        confidential information to a competitor of Mattel.

12 Mattel Opp'n to Machado MSJ at 31:14:20.

13      Excluding the improper acquisition, disclosure, or use of Mattel's information from that

14 list leaves behind a counter-claim based upon an allegation that Machado, Vargas, and Trueba

15 misappropriated Mattel's office supplies.  Machado's alleged inducement of Vargas to assist in

16 preparing a presentation, as well as his alleged inducement of Vargas and Trueba to

17 misappropriate Mattel's information, form the basis for Mattel's counter-claim for trade secret

18 misappropriation against Machado.  *See K.C. Multimedia*, 171 Cal. App. 4th at 961 (trade secret

19 misappropriation includes "breach or inducement of a breach of a duty to maintain secrecy").

20 MGAE and Larian's acts of aiding and abetting the misappropriation of Machado, as well as

21 Vargas and Trueba whether independently or indirectly through Machado, forms the basis of

22 Mattel's trade secret misappropriation counter-claim against MGA.  *Id.*  UTSA supersedes the

23 counter-claims for breach of duty of loyalty and aiding and abetting breach of duty of loyalty to

24 the extent they are predicated upon the misappropriation of Mattel information.

25      The counter-claim for aiding and abetting breach of duty of loyalty is also superseded to

26 the extent based upon the conduct of Brawer, Castilla, Contreras, and Cooney.  There is no

27 allegation, nor any evidence in the record, that these employees engaged in wrongdoing

28 unrelated to the misappropriation of Mattel's information.  *See* 4AAC ¶¶ 64-85.  MGAE and

1   Larian's inducement of the employees' disloyalty thus forms the basis for Mattel's trade secret

2   misappropriation counter-claim.  *See K.C. Multimedia*, 171 Cal. App. 4th at 961.

3          UTSA's supersessive effect on both counter-claims is minimal to the extent that the

4   counter-claims concern Bryant's conduct.  Although Bryant's disclosure of the Bratz fashion

5   doll concept to MGA forms the basis of Mattel's counter-claim for trade secret misappropriation,

6   Mattel alleges that Bryant engaged in other misconduct, including, for example, directing the

7   production of the first generation Bratz dolls while still employed by Mattel, engaging other

8   Mattel employees to unknowingly work on the Bratz dolls, using Mattel's physical resources to

9   create a dummy doll for MGA, and working on other side projects for MGA.  *See* Mattel's

10  Statement of Genuine Issues in Response to MGA's Statement of Uncontroverted Facts ¶ 17.

11         Mattel moves for summary judgment on its breach of duty of loyalty counter-claim.  Any

12  Mattel employee "who has business to transact on his own account, similar to that intrusted to

13  him by [Mattel], shall always give the preference to the business of the employer."  Cal. Labor

14  Code § 2863.  California courts refer to the obligation owed by an agent to its principal, or an

15  employee to the employer, as one that requires the employee's "undivided loyalty."  *Fowler v.*

16  *Verizon Associates, Inc.*, 196 Cal. App. 3d 34, 41 (1987).  The evidence concerning Castilla,

17  Cooney, Contreras, Machado, Trueba, and Vargas is limited to the misappropriation of Mattel

18  confidential information, so this counter-claim is superseded by UTSA to the extent predicated

19  upon the conduct of these employees.  Moreover, it is undisputed that Machado, Vargas, and

20  Trueba were not employees of Mattel and Mattel Mexico, as Mattel's counsel seemed to

21  recognize at the hearing on these motions.  These individuals owed no section 2863 duties to

22  either of the counter-claimants.

23         There is a genuine issue of material fact as to whether Tumaliuan was a Mattel employee,

24  since the orientation form he completed identified him as an "intern" making $10 per hour.  And

25  there are genuine issues of material fact as to whether the remaining employees identified by

26  Mattel — Bryant, Salazar, Cabrera, and Morales — breached these duties to Mattel.  MGA is

27  correct that none of these individuals were barred from seeking secondary employment,

28  however, "California law does not authorize an employee to transfer his loyalty to a competitor."

1   *Huong Que, Inc. v. Luu*, 150 Cal. App. 4th 400, 414 (2007).  Not only are there genuine factual

2   disputes about the timing of the employees' work, the extent of their knowledge about their

3   conduct, and the import of their work to the Bratz product released by MGA.

4          There is a genuine issue of material fact as to whether MGA aided and abetted the alleged

5   breaches of the employees' duties of loyalty.  Larian's email to other MGA employees

6   complaining about the amounts paid to Marlow suggests a lack of knowledge about the conduct

7   of Cabrera, Morales, and Salazar.  On the other hand, Marlow's letter to MGA declining to

8   accept a permanent position of employment with the company suggests a shared and long-

9   standing understanding that Cabrera, Morales, and Salazar contributed to the designs of the

10  Bratz fashions.  Moreover, and as to the alleged theft of trade secrets, MGA consistently

11  instructed its incoming employees to honor their commitments to Mattel (and all other former

12  employers), but the frequency of the thefts, Larian's close involvement in the affairs of MGA,

13  and the very targeted recruitment of Mattel employees could lead a reasonable fact-finder to

14  conclude otherwise.  Finally, as to Tumalian, MGA notes that it did not use his resources during

15  his internship at Mattel, however, internal MGA emails recognize his dual loyalties to MGA and

16  Mattel.

17

18              **5.      Unfair Competition**

19          Mattel alleges MGA and Bryant engaged in unfair competition in violation of Cal. Bus. &

20  Prof. Code § 17200, *et seq.*, by committing "commercial bribery of Bryant . . . and

21  misappropriation of trade secrets," though the counter-claim incorporates by reference all earlier

22  allegations.  4AAC ¶¶ 201-204.  The counter-claim is superseded to the extent it is based upon

23  the misappropriation of Mattel's information.  *See K.C. Multimedia*, 171 Cal. App. 4th at 961.

24  MGA does not argue that the UTSA otherwise supersedes this counter-claim.

25          **V.      Statutes of Limitations**

26          Both parties move for summary judgment on the timeliness of Mattel's counter-claims.

27  For the purposes of measuring the statute of limitations, two dates are important: (1) the date on

28  which the statute of limitations for each counter-claim began to run; and (2) the pleading to

1   which Mattel's counter-claims relate back.

2          **A.      Relation Back and Date of Filing**

3          Mattel filed its original pleading against Bryant on April 27, 2004, and moved for leave to

4   file an amended pleading substituting MGAE, Larian, and MGA HK for the Doe defendants on

5   November 20, 2006.  The district court denied Mattel's request, but directed Mattel to file its

6   claims as counter-claims to MGA's complaint, holding that Mattel's counter-claims against

7   MGAE, Larian, and MGA HK related back to the date of its complaint against Bryant.  Though

8   this ruling was erroneous, it caused no prejudice to MGA, since it is clear that Mattel's request

9   for leave to amend its complaint against Bryant would have been granted if the district court had

10  been aware of the general rule that Rule 15(c) "by its terms, only applies to the amended

11  pleadings in the same action as the original, timely, pleading."  *Bailey v. Northern Ind. Pub.*

12  *Serv. Co.*, 910 F.2d 406, 413 (7th Cir. 1990); *cf. Marcoux v. Shell Oil Prods. Co. LLC*, 524 F.3d

13  33, 38 (1st Cir. 2008) (holding that district court did not commit *prejudicial* error by allowing

14  relation back to pleading in separate action), *aff'd in part and rev'd in part on other grounds*,

15  *Mac's Shell Service, Inc. v. Shell Oil Prods. Co. LLC*, 130 S.Ct. 1251 (2010).  The law of the

16  case doctrine demands that the district court's decision be left undisturbed.  *Moore v. James H.*

17  *Matthews & Co.*, 682 F.2d 830, 833-34 (9th Cir. 1982).  Mattel's identification of the Bratz

18  concept as a trade secret must as a matter of basic equity relate back to the original complaint

19  against Bryant as well, since it "arose out of the conduct, transaction, or occurrence," — *i.e.*,

20  Bryant's disclosure of the Bratz concept to MGA — "set out [] in the original pleading."  Fed. R.

21  Civ. P. 15(c).  To the extent Mattel's surviving counter-claims for copyright infringement,

22  breach of contract, intentional interference with contractual relations, misappropriation of trade

23  secrets, breach of duty of loyalty, and aiding and abetting breach of duty of loyalty, concern the

24  Bratz works and Bryant's work for MGA, those counter-claims are deemed to have been filed on

25  April 27, 2004 pursuant to the law of the case doctrine.

26         Neither MGA nor Mattel make any arguments about the filing date of Mattel's allegations

27  concerning the conduct of other employees like Brawer, Cooney, Contreras, Castilla, Machado,

28  Vargas, Trueba, Cabrera, Morales, and Salazar.

### B.    Applicable Statutes of Limitations

Mattel's counter-claim for trade secret misappropriation must have been brought "within three years after the misappropriation is discovered or by exercise of reasonable diligence should have been discovered."  Cal. Civ. Code § 3426.6.  "[A] continuing misappropriation constitutes a single claim."  *Id.*  However, contrary to MGA's argument, subsequent acts of trade secret misappropriation by *other* Mattel employees aren't the type of "continuing misappropriation" contemplated by the statute:

> The underlying principle appears to be that once plaintiff knows or should know that a defendant who once was trusted has shown, by any act of misappropriation, that he cannot be trusted, plaintiff should know that there is a risk that defendant will commit additional acts of misappropriation, whether they involve repeated misappropriations of one trade secret or initial misappropriations of other confidences.

*Intermedics, Inc. v. Ventritex, Inc.*, 822 F. Supp. 634, 653-54 (N.D. Cal. 1993).

"A plaintiff is under a duty to reasonably investigate, and a suspicion of wrongdoing, coupled with a knowledge of the harm and its causes, commences the limitations period."  *Snapp & Associates Insurance Services, Inc. v. Malcolm Bruce Burlingame Robertson*, 96 Cal. App. 4th 884, 891 (2002).

Mattel's counter-claim for copyright infringement must have been brought "within three years after the claim accrued."  17 U.S.C. § 507.  A claim for copyright infringement accrues "when one has knowledge of a violation or is chargeable with such knowledge."  *Roley v. New World Pictures, Ltd.*, 19 F.3d 479, 481 (9th Cir. 1994).

Mattel's counter-claim for conversion must have been brought within three years of the theft, though the statute of limitations period is tolled "'only for that period during which the claim is undiscovered by plaintiff or until such time as plaintiff, by the exercise of reasonable diligence, should have discovered it.'" *Jolly v. Eli Lilly & Co.*, 44 Cal.3d 1103, 1111 (1988). "So long as a suspicion exists, it is clear that the plaintiff must go find the facts; she cannot wait

1  for the facts to find her." *Id.*

2  Mattel's counter-claim for a violations of Cal. Bus. & Prof. Code § 17200 must have been

3  brought "within four years after the cause of action accrued." Cal. Bus. & Prof. Code § 17208.

4  Mattel's state law counter-claims grounded in tort, including its counter-claims for breach

5  of duty of loyalty, aiding and abetting breach of duty of loyalty, and intentional interference with

6  contractual relations must have been brought within two years of the alleged wrongdoing.  Cal.

7  Code Civ. Proc. § 339(1).  Mattel's counter-claim for breach of contract must have been brought

8  within four years of the alleged breach.  Cal. Code Civ. Proc. § 337.

9  Mattel's counter-claim for a violation of the Racketeer Influenced and Corrupt

10  Organizations Act must have been brought within four years.  *Pincay v. Andrews*, 238 F.3d

11  1106, 1108 (9th Cir. 2001).  This limitations period restarts with the commission of "[1] a new

12  and independent act that is not merely a reaffirmation of a previous act" that [2] inflicts "new

13  and accumulating injury on the plaintiff." *Grimmett v. Brown*, 75 F.3d 506, 513 (9th Cir. 1996)

14  (emphasis removed).

15        **D.**　　**Date of Accrual**

16            **1.**　　**Background Facts**

17  Before there was Bratz, there was Diva Starz, a line of big-headed dolls released by

18  Mattel in early 2000, nearly nine months before Bryant left Mattel for MGA.  Mattel considered,

19  but ultimately decided against, the name "Brats" for a miniature version of the Diva Starz doll

20  line, though there is a genuine issue of material fact as to whether Bryant was exposed to the

21  word "Brats."  *See* Deposition of Kislap Ongchanco, dated April 24, 2007, at 232.

22  Before he discussed Bratz with MGA on September 1, 2000, Bryant solicited other Mattel

23  employees to help create the concept Bratz sketches and sculpts.  Bryant continued to use other

24  Mattel employees' resources between the September meeting and his October 19, 2000

25  resignation.  On the date he resigned, Bryant declined to identify his next destination and his exit

26  interview form cryptically stated that an "opportunity arose [and he] had to take it."  MGA UF

27  811.  Mattel's former Marketing Director, with whom Bryant worked, recalls that she didn't

28  believe that Bryant was telling her the full story about the reasons for his resignation from

1  Mattel.  Deposition of Mattel 30(b)(6) Jill Nordquist, dated July 31, 2007, at 133.  She also

2  recalled that "[a]round the time that Bratz launched in [] the summer of 2001" some Mattel

3  employees who worked in the company's Design Center discussed Bryant's "work[] at MGA on

4  Bratz." *Id.* at 186:3-14.  There is no evidence that any of these employees discussed or even

5  suspected that Bryant either conceived Bratz, or created the Bratz concept works, during or

6  before his employment with Mattel.

7        Mattel was initially concerned that MGA's Bratz dolls infringed its line of Diva Starz

8  dolls or another unreleased product line named Toon Teens.  Declaration of Warrington Parker,

9  Ex. 47 (Mattel internal report stating that Bratz "bear[] significant resemblance to Diva Starz in

10  both appearance and attitude").  Mattel never attempted to litigate these claims, though in early

11  2002, the company's legal department opened an official investigation file on the basis of

12  "[i]nformation received from Design Center staff, Evelyn Viohl and Ivy Ross that MGA

13  Entertainment, headed by a person known as Isaac Larian has recently hired a number of former

14  Matel [sic] employees and is manufacturing products that appear to be Mattel designs."  TX

15  1195RS-002.  The opening of the investigation file followed a telephone conference call

16  between the head of Mattel's security department and two Mattel employees, in which he

17  essentially learned that "Bryant while at MGA created Bratz and in doing so infringed on the

18  copyright of . . . Tune [sic] Teens to create Bratz."  Deposition of Richard DeAnda, dated

19  December 19, 2007, at 173.  Mattel looked into the extent of Bryant's exposure to the Toon

20  Teens line during his time as a Mattel employee.

21        On August 5, 2002, Mattel's Chief Executive Officer Robert Eckert received an

22  anonymous letter that stated: "In 2000 a Mattel employee by the name of Carter Bryant was

23  working with Mattel to design dolls.  One of the dolls that he was working on creating was the

24  Bratz dolls.  MGA Entertainment found out about his creation and approached him . . ."  Ex.

25  6302 to MGA MSJ.  The letter found its way to the head of Mattel's security department, who

26  discussed its contents in a subsequent communication to Mattel's Vice President of Human

27  Resources: "I'm aware of this situation and have been working on it for several months.  My

28  frustration in this matter was the genesis of [REDACTED] that is now in the hands of Robert

1    Normile.  The truth of the matter is that Carter Bryant did work for Mattel . . ." Ex. 6302 to

2    MGA MSJ.  Nearly seven months later, on July 18, 2003, Eckert read a Wall Street Journal

3    article that identified Bryant as the creator of the Bratz line of dolls.  At least once prior to that

4    date, Larian had publicly identified himself, and not Bryant, as "the inspiration behind the Bratz

5    dolls."  Proctor Dec., Ex. 127.

### 2.    Prior Rulings

7        Before the phase 1 trial, the district court issued several rulings concerning the timeliness

8    of Mattel's claims and counter-claims.  Following a consideration of some, though not all, of the

9    evidence discussed above, the district court ruled that (1) Mattel's claims against MGA related

10   to Bryant and the theft of the Bratz dolls accrued on July 18, 2003, the date on which the Wall

11   Street Journal article identifying Bryant as the creator of Bratz was published; and (2) Mattel's

12   copyright infringement claim did not accrue prior to November 20, 2003, on which date "Mattel

13   [first] receive[d] copies of the Bratz drawings."  Dkts. 3826 & 3902.

### 3.    Disposition

15       Though MGA raises specific challenges to the timeliness of Mattel's counter-claims to

16   the extent that those counter-claims relate to Bryant's conduct and the disclosure of the Bratz

17   concept to MGA, it makes no specific argument arguments about the timeliness of Mattel's

18   allegations about its *other* former employees.  MGA instead generally argues that (1) counter-

19   claims related to Mattel's other employees are superseded by the UTSA; and (2) Mattel's

20   counter-claim for trade secret misappropriation describes a "continuing misappropriation"

21   subject to a statute of limitations that accrued when Mattel should have known about Bryant's

22   disclosure of the Bratz trade secret.  This argument is both erroneous because, as discussed

23   above, "continuing misappropriation" refers to multiple acts by *one* individual and not, as here,

24   many other employees.  For example, there's no reason that Bryant's alleged misappropriation of

25   the Bratz trade secret would have allowed Mattel to envision Castilla's future conduct.  Mattel's

26   motion for summary judgment as to the timeliness of its non-Bratz allegations is granted.

27       The law of the case doctrine ordinarily requires adherence to the district court's earlier

28   rulings about the timeliness of Mattel's Bratz-related counter-claims.  However, there is no

1   reason why a fact-finder should not be able to evaluate whether new evidence produced after the

2   phase 1 proceedings points to a contrary conclusion.  *See Minidoka Irrigation Dist. v. Dep't of*

3   *Interior of U.S.*, 406 F.3d 567, 573 (9th Cir. 2005) (recognizing exception to law of the case

4   doctrine where "substantially different evidence was adduced at a subsequent trial").  For

5   example, since the phase 1 proceedings, Mattel has produced a redacted version of an outside

6   consultant's report that may suggest Mattel's suspicions about the timing of Bryant's creation of

7   the Bratz sketches and sculpt.  Mattel's selective redaction gives greater context to DeAnda's

8   communication with Kaye, to which the prior district court granted minimal weight.  Moreover,

9   Mattel has left for phase 2 its counter-claim for trade secret misappropriation based on the

10  alleged misappropriation of the Bratz concept.  There is no reason that the prior district court's

11  rulings should bind the fact-finder in this case from evaluating the timeliness of an allegation,

12  especially when the timeliness of that allegation *was not before the prior district court.*

13              **VI.        Trade Dress Infringement and Trade Dress Dilution**

14              MGA claims that Mattel's sale of three doll products in a type of trapezoidal packaging

15  already used by MGA, as well as Mattel's sale of the Wee 3 Friends doll in a heart shaped

16  packaging used by MGA's 4-Ever Best Friends doll, constituted trade dress infringement in

17  violation of 15 U.S.C. § 1125(a); and trade dress dilution in violation of 15 U.S.C. § 1125(c) and

18  Cal. Bus. & Prof. Code § 14330.  MGA is the owner of registered trademarks in (1) a transparent

19  trapezoidal box; and (2) "a three-dimensional configuration of an isosceles trapezoid cardboard

20  box with the top and bottom being parallel to each other and the non-parallel sides being of

21  equal length."  Exs. 10 & 11 to MGA's Request for Judicial Notice.  MGA withstood the

22  USPTO's initial rejection of its trademark applications by arguing that (1) the trade dress was

23  non-functional because it used more surface area; and (2) the trade dress was non-distinctive as

24  it was "a unique innovation in the toy industry in general and the fashion doll category in

25  particular" at the time of its introduction.  *Id.*  Since the evidence contradicts MGA's statements

26  to the USPTO, MGA's registrations are not entitled to the Court's deference.  *Wells Fargo &*

27  *Co. v. Stagecoach Properties, Inc.*, 685 F.2d 302, 306 (9th Cir. 1982).

28              **A.        Trade Dress Infringement**

93

1    To prevail on its claim for trade dress infringement MGA must show that "(1) the trade

2    dress is inherently distinctive or has acquired distinctiveness through secondary meaning;

3    (2) there is a likelihood that the public will be confused by the infringing use; and (3) the trade

4    dress is non-functional." *Stephen W. Boney, Inc. v. Boney Servs., Inc.*, 127 F.3d 821, 828 (9th

5    Cir. 1997).

6                    **1.    Distinctiveness**

7    MGA's asserted trade dress is not inherently distinctive and has not acquired

8    distinctiveness through secondary meaning.  "If a mark is inherently distinctive it need not be

9    shown to also have a secondary meaning." *Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d

10   819, 824 (9th Cir. 1993).  The predominant test for inherent distinctiveness asks whether "(1) the

11   design or shape is a common, basic shape or design; (2) it was unique or unusual in a particular

12   field; and (3) it was a mere refinement of a commonly-adopted and well-known form of

13   ornamentation for a particular class of goods which consumers view as mere ornamentation."  1

14   McCarthy on Trademarks and Unfair Competition § 8:13 (4th ed. 2010) (citing *Seabrook Foods,*

15   *Inc. v. Bar-Well Foods, Ltd.*, 568 F.2d 1342 (C.C.P.A. 1977)).  In other words, if "the trade dress

16   is of such an unusual design that a buyer will immediately rely on it to differentiate the source of

17   the product," then it is inherently distinctive.  *Id.*  "[A] product's trademark or trade dress

18   acquires a secondary meaning when the purchasing public associates the mark or dress with a

19   single producer rather than with the product itself." *Int'l Jensen, Inc.*, 4 F.3d at 823.  Unlike

20   inherent distinctiveness, "secondary meaning is a learned association" between the producer and

21   the packaging, or "an 'acquired distinctiveness.'" *Id.* (quoting *Two Pesos, Inc. v. Taco Cabana,*

22   *Inc.*, 505 U.S. 763, 769, 112 S.Ct. 2753 (1992)).  "While evidence of a manufacturer's sales,

23   advertising and promotional activities may be relevant in determining secondary meaning, the

24   true test of secondary meaning is the effectiveness of this effort to create it." *Id.*

25                    (a)    Trapezoidal Packaging

26   It cannot be disputed that toys, and even dolls, have been sold in trapezoids for decades.

27   *See, e.g.*, *Ideal Toy Corp. v. Kenner Prods. Div. of General Mills Food Group, Inc.*, 443 F. Supp.

28   291, 297 (S.D.N.Y. 1977) (analyzing "action figures . . . sold in virtually identical . . .

94

trapezoidal box contain[ing] an arch-like opening through which the full figure may be viewed").  A trapezoid is the sort of intuitive, "ordinary geometric shape" that courts generally "regard[] as non-distinctive and protectable only upon proof of secondary meaning."  *Wiley v. Am. Greetings Corp.*, 762 F.2d 139, 142 (1st Cir. 1985).  MGA quotes an internal Mattel document that lauds the "unique" and "innovative" "pyramid shape packaging" in which the Bratz dolls are sold, but conveniently omits the rest of the quoted section of the document, which makes clear that the words "unique" and "innovative" do not refer to the "pyramid" shape, but to other aspects of the packaging; specifically: "[1] consistent line look with illustrations [2] embellish collector packaging with soft goods [and 3] color focus: raspberry and dark blue."  Ex. 1812A to MGA MSJ.  MGA does not limit its asserted trade dress to a trapezoidal package with any of the features listed in Mattel's document, or even to a specific color.  Trapezoidal packaging standing alone is not an unusual design and is not inherently distinctive.

Nor has the trapezoidal packaging used to house MGA's Bratz dolls acquired distinctiveness through secondary meaning.  Other than its trademark registrations, which were obtained after it made the representation to the USPTO that trapezoidal packaging was unique in the fashion doll segment of the toy industry, as well as the toy industry in general, MGA cites to a 62 page assortment of advertisements and articles about the Bratz doll, many of which depict the dolls in trapezoidal packaging.  *See* Declaration of Ninette Pembleton, Exs. A-K.  None of these articles or advertisements refer to the dolls' trapezoidal packaging.  *Cf. International Jensen, Inc.*, 4 F.3d at 823 ("Prestone, for instance, perhaps could have created meaning by urging consumers to look for the 'familiar yellow jug.'"); *First Brands Corp. v. Fred Meyer, Inc.*, 809 F.2d 1378, 1383 (9th Cir. 1987) ("Carbide did not attempt to engender consumer identification with the yellow, F-style jug.  It did not, for example, urge consumers to look for the 'familiar yellow jug.'").  In the dozens of articles discussing the innovative qualities of Bratz, not a word appears about the trade dress itself.  One of the article's authors claimed that a 7 year old girl, one of the members of the product's target market, remarked that "Bratz are cool.  I am into fashion."  Pembleton Dec., Ex. A at 7.  Moreover, many of the Bratz dolls sold by MGA *were not* housed in trapezoidal packaging.  *See, e.g.*, *id.* at 5 (displaying rectangular packaging).

1  MGA responds by citing the success of its Bratz line as evidence that the trapezoidal packaging

2  that housed the dolls must have acquired secondary meaning, but this argument "cannot stand

3  alone.  To find otherwise would provide trade dress protection for any successful product or for

4  the packaging of any successful product." *Yankee Candle Co., Inc. v. Bridgewater Candle Co.*,

5  259 F.3d 25, 44 (1st Cir. 2001).  McDonalds can't stop other fast food manufacturers from

6  selling food in paper bags and Scotch can't stop other manufacturers of office products from

7  using circular tape dispensers.  MGA has failed to provide any evidence that its trapezoidal

8  packaging acquired distinctiveness through secondary meaning.

9                           (b)      4-Ever Best Friends

10         MGA's 4-Ever Best Friends packaging, which consists of a window through which

11  multiple dolls can be viewed, the brand name displayed halfway down the middle of the

12  packaging, and a decorative handle, is not inherently distinctive either.  The heart is a "common,

13  basic shape, similar to a geometrical design." *Wiley v. Am. Greetings Corp.*, 762 F.2d 139, 142

14  (1st Cir. 1985) (quotation marks and citation omitted).  The product's use of a handle is

15  unremarkable as well as obviously functional (for reasons discussed below).  MGA responds that

16  its trade dress includes a product name composed of a numeral and the word "friends," citing to

17  a Mattel report that characterized MGA's packaging as a "unique structure that accentuates the

18  two dolls and unique positioning."  TX 15737-001.  It's difficult to know of which elements, or

19  combination of elements, of MGA's trade dress this statement refers, and its relevance to the

20  present inquiry is therefore highly limited.  Moreover, as explained below, the document's

21  reference to the functionality of the packaging evidences the infirmity of MGA's trade dress

22  claim.

23         Nor did MGA's 4-Ever Best Friends packaging acquire distinctiveness through secondary

24  meaning, because it hadn't even been released to market at the time Mattel allegedly began

25  planning the Wee 3 Friends line of dolls.  MGA notes that its advertising of 4-Ever Best Friends

26  started in early to mid 2004, when the product was marketed as a direct alternative to Mattel's

27  line of Barbie dolls.  Ex. 11244 to MGA MSJ.  There is no evidence that MGA was able to build

28  an association in the minds of consumers between any of the elements of its asserted trade dress

— heart shaped packaging, a handle, the use of a number and the word "friends," and "themed accessories and mix-and-match outfits" — through its limited advertising campaign *before the product was even launched.  Cf. Citizens Banking Corp. v. Citizens Fin. Group, Inc.*, 2008 WL 1995104, at *4 (E.D. Mich. May 6, 2008) ("To establish secondary meaning, the duration of a mark's use must be more than 'a relatively short period.' . . . Plaintiff's presence in some of the nine county area is much more recent and of much shorter duration than its general presence in Michigan.") (citing *Burke-Parsons-Bowlby Corp. v. Appalachian Log Homes, Inc.*, 871 F.2d 590, 596 (6th Cir. 1989)).  MGA's heart shaped packaging for dolls with names composed of a number and the word friends did not acquire secondary meaning because it didn't even exist when Mattel started selling its allegedly infringing products.

## 2.    Functionality

"A trademark or trade dress is functional if it is essential to the product's use or purpose or if it affects the cost or quality of the article." *Int'l Jensen, Inc.*, 4 F.3d at 823.  There is a two step test for functionality.  The court must first determine whether the alleged trade dress is "essential to the use or purpose of the article [or] affects [its] cost or quality." *Au-Tomotive Gold, Inc. v. Volkswagen of America, Inc.*, 457 F.3d 1062, 1072 (9th Cir. 2006) (quoting *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 32-33, 121 S.Ct. 1255 (2001)).  The court must alternatively inquire into the "aesthetic functionality" of the alleged trade dress: "whether protection of the feature as a trademark would impose a significant non-reputation-related competitive disadvantage." *Id.*

### (a)    Trapezoidal Packaging

MGA adopted its trapezoidal packaging for an expressly functional purpose.  MGA's 30(b)(6) designee explained that:

> The concept for the trapezoidal packaging started with the idea that, if you've got a doll product, you want to – you want to feature that in some way when it's on the store shelf.  And – one way that you can highlight or – or spotlight something is by putting a light on it.  And, unfortunately, it was explained to me, putting a light in a box that

1              shines down on the product, is rather expensive.  But what does that

2              light really create?  The light shines down, if you imagine a

3              spotlight, just a point of light shining down, it creates that

4              trapezoidal, triangular shape.  And it's that shape that was the

5              inspiration to create a spotlight or a unique way to feature the

6              product that ultimately evolved into the final packaging.

7    Deposition of MGA Entertainment, Inc. (Samir Khare) at 500-503.

8         Larian also admitted that MGA chose its trapezoidal packaging because it, *inter alia*,

9    "had light to show the product, which was inside, which we thought was beautiful, the fashions,

10   the hair, et cetera."  Deposition of Isaac Larian, dated April 12, 2010, Vol. VIII, at 2216-2219.

11   MGA now attempts to disavow its corporate designee and Chief Executive Officer's testimony

12   with self-serving declarations about instances in which the trapezoidal packaging may

13   "typically" fail to achieve its intended purpose of maximizing light flow to the product contained

14   within the package.  *See* Declaration of Paula Garcia in Support of MGA's Opp'n to Mattel MSJ

15   ¶ 11.  Even though the illuminating benefits of a trapezoidal package may not be realized when,

16   for example, the package is located between two shelves, that doesn't reduce the potential

17   functional value of the package.  *Au-Tomotive*, 457 F.3d at 1072 (holding that key question in

18   functionality analysis is whether asserted trade dress "add[s] to the quality of the products").

19   The package's sloped sides allow light to flow outwards and downwards in the direction of the

20   product, and MGA has offered no evidence to rebut its own prior admissions on this point.

21        MGA points to certain disadvantages of trapezoidal packaging, including the fact that it

22   requires "more surface area than a rectangular package," and "creates a larger footprint on store

23   shelves," resting both illogical arguments on its employee's declaration.  No reasonable fact-

24   finder could conclude that MGA would have needed to use *less* packaging material if it sold its

25   products in rectangular boxes: the trapezoidal boxes used by MGA were filled to capacity in

26   order to fit the product and its accessories into the same package.  *See* Pembleton Dec., Ex. A.

27   More importantly, a product feature need not have a "superior utilitarian advantage" in order to

28   be functional.  *Disc Golf Ass'n, Inc. v. Champion Discs, Inc.*, 158 F.3d 1002, 1007 (9th Cir.

1998).  Toy manufacturers may ultimately conclude that the illuminating functions of the trapezoidal package are outweighed by the disadvantages cited by MGA, but the trade dress still has functional qualities.

Trapezoidal packaging is also aesthetically functional.  As the Ninth Circuit has acknowledged, "a box shape or certain uses of color" constitutes a "true aesthetically functional feature."  *Au-Tomotive*, 457 F.3d at 1072.  MGA argues that Mattel has cited to no evidence that consumers are attracted to the trapezoidal packages that house the Bratz dolls, but it is MGA's burden to prove the non-functionality of its asserted trade dress.  *See Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1530 (9th Cir. 1993).

(b)     4-Ever Best Friends

The 4-Ever Best Friends packaging was functional because it allowed consumers to see multiple dolls through the same viewing window.  One of MGA's designers admitted that the 4-Ever Best Friends packaging was tailored to improve "storage and portability," which she characterized as the packaging's "dual *function* . . . it would act as a way to hold your dolls so that you could carry it with you if you went to your friend's house."  Garcia Depo. at 1522.  MGA's witness further testified that the packaging accomplished these functional goals through a front panel that could be lowered to "expose the dolls.  And when done, you would pull the front panel back up to close it."  *Id.* at 1523.

MGA's packaging was also aesthetically functional.  Heart shape was identified as a prototypical example of aesthetically functional packaging by the 1938 Restatement of Torts, to which the doctrine can be traced.  *See Au-Tomotive Gold, Inc.*, 457 F.3d at 1068 ("Two examples of products with aesthetic functional features were offered with very little comment – a heart-shaped candy box and a distinctive printing typeface.").  The fact that the design attracted so much attention *even before the product was released to market* only evidences its aesthetic functionality.  *See Wiley v. American Greetings Corp.*, 762 F.2d 139 (1st Cir. 1985) (heart shape of packaging enhanced value of product independent of its source-identifying function because it was aesthetically pleasing to children).

3.     **Likelihood of Consumer Confusion**

1    The Ninth Circuit examines eight factors to determine the likelihood of confusion: (1) the

2    strength of the trade dress; (2) the proximity or relatedness of the two goods; (3) the marks'

3    similarity in appearance, sound, and meaning; (4) evidence of actual confusion; (5) the degree to

4    which the parties' marketing channels converge; (6) the type of goods and the degree of care

5    customers are likely to exercise in purchasing them; (7) evidence of defendants' intention in

6    selecting and using the allegedly infringing mark; and (8) the likelihood that the parties will

7    expand their product lines. *AMF Inc. v. Sleekcraft Boots*, 599 F.2d 341, 349 (9th Cir. 1979).

8                          (a)      Strength of the Marks

9        The strength of a mark rests on its distinctiveness, which is "related to the question of

10   secondary meaning." *Aurora World, Inc. v. TY Inc.*, CV 09-08463 MMM (Ex), 2009 WL

11   6617192, at *30 (C.D. Cal. Dec. 15, 2009).  MGA has pointed to no evidence that its trapezoidal

12   packaging obtained any distinctiveness and that consumers built an association between MGA

13   and trapezoidal packaging.  Although advertisements for MGA's products featured the products'

14   packaging, MGA did not independently advertise the shape of its packaging, and MGA sold its

15   products in other types of packaging, which diminished any automatic association developed by

16   consumers.  MGA has also failed to point to any evidence that its 4-Ever Best Friends heart

17   shaped packaging built an association in the minds of consumers, an inherently unbelievable

18   proposition in light of the fact that MGA hadn't released its product to market at the time that

19   Mattel allegedly infringed the trade dress.

20                          (b)      Proximity or Relatedness of Goods

21       The proximity or relatedness of goods is relevant to determine whether the products "are

22   likely to be connected in the mind of a prospective purchaser." *Fleischmann Distilling Corp. v.*

23   *Maier Brewing Co.*, 314 F.2d 149, 159 (9th Cir. 1963).  The Bratz doll is a fashion doll and

24   MGA alleges that Mattel sold its fashion dolls in the same type of packaging.  The goods are

25   often sold through the same major retailers, like Toys 'R Us and WalMart and, sometimes, even

26   on the same shelves.  It's possible that the Bratz dolls and Mattel's fashion dolls belong to

27   different sub-categories of the fashion doll market, but neither party has identified any such sub-

28   categories, nor does the evidence show this to be the case.  The Court accordingly finds no

1   genuine issue of material fact as to whether the goods are related and proximate. *Cf. Aurora*

2   *World, Inc.*, 2009 WL 6617192, at *31 ("Both Ty and Aurora market small plush toys . . . It is

3   likely, therefore, that this factor will weigh in favor of a finding of a likelihood of confusion.").

4                               (c)      Similarity of the Marks

5          Mattel's allegedly infringing packaging isn't particularly trapezoidal; the bases are only

6   barely wider than the top.  Mattel's packaging comes in different color schemes, uses different

7   fonts, uses different display windows, and most critically, clearly display the product names in

8   large, prominently placed letters all around the package, including on the front of the package.

9   The presence of these names all over the package "goes far to eliminate confusion of origin."

10  *Bose Corp. v. Linear Design Labs, Inc.*, 467 F.2d 304, 309 (2d Cir. 1972).

11         MGA responds that consumers may still suffer from "initial interest confusion," which

12  occurs when an alleged infringer draws consumers to its products through the use of another's

13  trade dress, "even though no actual sale is finally completed," *Brookfield Comm'ns, Inc. v. West*

14  *Coast Entm't Corp.*, 174 F.3d 1036, 1062 (9th Cir. 1999), as well as "reverse confusion," which

15  occurs when "consumers doing business with the senior user might mistakenly believe they are

16  dealing with the junior user." *Dreamwerks Production Group, Inc. v. SKG Studio*, 142 F.3d

17  1127, 1130 (9th Cir. 1998).  But the *Sleekcraft* test measures this sort of confusion, and the fact

18  that Mattel's product names appear in large, colored lettering that can be viewed from a distance

19  leaves no issue of material fact as to whether the trade dress is similar. *See Sleekcraft*, 599 F.2d

20  at 351 ("Similarity of the marks is tested on three levels; sight, sound, and meaning.").  MGA's

21  30(b)(6) designee in fact admitted "I would be surprised if someone who could read or had

22  knowledge of what a Barbie looked like was holding [Mattel's product] in their hands and

23  mistook it for a Bratz doll."  Pembleton Depo. at 3282-3283.

24         The Wee 3 Friends product sold by Mattel doesn't use a heart shaped package.  The

25  design of the doll name is different, the viewing window is different, the color schemes are

26  different, and the words "Mattel" and "Barbie" appear on the package.  Other than the fact that

27  Mattel's product may be a worse version of the MGA product — dolls sold together as "friends"

28  — there is no genuine issue of material fact as to the similarity to any of the elements, and

101

1    especially not the combination, of MGA's trade dress.

2            (d)    Actual Confusion

3        MGA has not cited to evidence of actual confusion as to either the trapezoidal packaging

4    or heart shaped packaging used in connection with the sale of Wee 3 Friends.  Its failure to do so

5    doesn't weigh against a likelihood of confusion.  *See Academy of Motion Picture Arts &*

6    *Sciences v. Creative House Promotions, Inc.*, 944 F.2d 1446, 1456 (9th Cir. 1991) ("[A]ctual

7    confusion is not necessary to a finding of likelihood of confusion under the Lanham Act.").

8            (e)    Marketing Channels

9        It is undisputed that MGA and Mattel share the same marketing channels, though there

10   may not be direct overlap between the marketing channels used by the two companies.  This

11   factor thus weighs in favor of a likelihood of confusion.

12           (f)    Types of Goods and Consumers

13       "It is generally assumed that consumers with expertise or who are buying expensive

14   products or services exercise a greater degree of care when doing so and are thus less easily

15   confused."  *Edge Wireless, LLC v. U.S. Cellular Corp.*, 312 F. Supp. 2d 1325, 1333 (D. Or.

16   2003) (citing *Brookfield Comm's*, 174 F.3d at 1060 ("What is expected of the reasonably prudent

17   consumer depends on the circumstances.  We expect him to be more discerning-and less easily

18   confused-when he is purchasing expensive items")).

19       Fashion dolls are remarkably expensive.  For example, MGA's Bratz Funk 'N' Glow

20   dolls with "fashion accessories and a poster" can sell for $23.94 *even when on sale*.  Pembleton

21   Dec., Ex. B at 12.  The accessories and play sets that accompany the Bratz dolls were advertised

22   at a cost as high as $249.99.  *Id.*, Ex. A at 5 (discussing costs of "deluxe, three-story apartment

23   [that] comes with real working lights and elevator, plus 60 accessories").  MGA characterizes

24   these prices as "inexpensive," which reveals a lack of perspective about the financial challenges

25   faced by most families in this country.

26       More importantly, this is not a case involving the purchase of "lower cost items like wine

27   and cheese," in which consumers aren't likely to be careful about the products they buy.

28   *Compare E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1293 (9th Cir. 1992).  All the

1   evidence shows that the intended market for these products — young females — are remarkably

2   aware of the differences between Bratz and Barbie.  For example, at the hearing on these

3   motions, counsel for MGA remarked that the Bratz dolls "meant a lot" to the girls who chose to

4   purchase them.  It even cites an internal Mattel memorandum that characterized the Bratz dolls

5   as a product that was "relevant and resonated with older girls."  Ex. 1805 to MGA MSJ at 2, 4.

6   This memorandum recognized that "consumer interest is fueled by [a] strong product" that could

7   be characterized as "ha[ving] a unique tone and manner as bratty teenagers, with a 'passion for

8   fashion.'"  Id. at 4.  MGA contradicts literally six years of its representations when it now argues

9   that "[c]onsumers of fashion doll products are not discriminating."  MGA Opp'n to Mattel MSJ

10   at 30:13.  The undisputed evidence is to the contrary.

### (g)     Mattel's Intent

12         There is no genuine issue of material fact about Mattel's intent in selecting the trapezoidal

13   packaging.  "When an alleged infringer knowingly adopts a mark similar to another's, courts

14   will presume an intent to deceive the public."  *Official Airline Guides*, 6 F.3d 1385, 1395 (9th

15   Cir. 1993).  MGA claims there is circumstantial evidence of Mattel's bad intent, because Mattel

16   has long been on notice of MGA's interest in ensuring the exclusive use of trapezoidal

17   packaging.  However, Mattel copied no other elements of the trade dress other than the

18   trapezoidal shape: it did not select the color schemes, configurations, package window, or

19   lettering used by MGA.  Moreover, Mattel has presented evidence that it used the trapezoidal

20   packaging in compliance with the requirements of its licensor, to which MGA has offered no

21   meaningful response.

22         Nor is there a genuine issue of material fact as to whether Mattel selected the Wee 3

23   Friends packaging in an attempt to benefit from MGA's goodwill.  There is ample evidence that

24   Mattel proceeded with the Wee 3 Friends product line in an attempt to cut MGA's 4-Ever Best

25   Friends product off at the pass, however.  Some of Mattel's internal communications reveal a

26   paranoia about the competitive threat posed by MGA, whose management and product

27   development efforts were surpassing Mattel's at the time that Wee 3 Friends was released.  For

28   example, Mattel obtained "confidential information from a reliable source" about the 4-Ever

1  Best Friends dolls, which "came in a heart-shaped package with the dolls positioned on the left

2  and right side of the package with chotzkas in the middle." Ex. 2114 to MGA MSJ. Mattel

3  rapidly developed the Wee 3 Friends product, Ex. 8754 to MGA MSJ, but failed anyway, when

4  retailers recognized that its product simply "knocked off MGA." Ex. 2105 to MGA MSJ. These

5  emails may prove Mattel's uninventive product development, but they do not show a likelihood

6  of consumer confusion for a simple reason: Mattel's wrongdoing was performed during a period

7  of time in which MGA's 4-Ever Best Friends product had not even been released to market.

8  (g)    Likelihood of Product Expansion

9  Neither party discusses the likelihood of product line expansion.

10  **4.    Disposition**

11  For the foregoing reasons, the Court GRANTS Mattel's Motion as to MGA's trade dress

12  infringement claims related to trapezoidal packaging and the 4-Ever Best Friends product

13  packaging. There is no genuine issue of material fact that neither type of trade dress was

14  distinctive, non-functional, or that Mattel's alleged use of the trade dress created a likelihood

15  of consumer confusion.

16  **B.    Dilution**

17  MGA also claims that Mattel's use of its asserted trade dress constituted trade dress

18  dilution in violation of 15 U.S.C. § 1125.[34] The statute "protects the holder of a trademark from

19  dilution, which is different from, and broader than, infringement in that neither confusion nor

20  competition is required and the protection is nationwide in scope." *Nissan Motor Co. v. Nissan*

21  *Computer Corp.*, 378 F.3d 1002, 1011 (9th Cir. 2004). Its purpose "is to protect famous

22  _____

23  [34] Section 1125 provides that:

The owner of a famous mark shall be entitled, subject to the

24  principles of equity and upon such terms as the court deems

reasonable, to an injunction against another person's

25  commercial use in commerce of a mark or trade name, if such

use begins after the mark has become famous and causes

26  dilution of the distinctive quality of the mark, and to obtain

such other relief as is provided in this subsection.

27

28  15 U.S.C. § 1125(c)(1).

1    trademarks from subsequent uses that blur the distinctiveness of the mark or tarnish or disparage

2    it." *Id.* (quoting *Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418, 431, 123 S.Ct. 1115 (2003)).

3    The asserted mark must have "such powerful consumer associations that even non-competing

4    uses can impinge on their value." *Avery Dennison Corp. v. Sumpton*, 189 F.3d 868, 875 (9th

5    Cir. 1999). "For example, Tylenol snowboards, Netscape sex shops and Harry Potter dry

6    cleaners would all weaken the commercial magnetism of these marks and diminish their ability

7    to evoke their original associations.  These uses dilute the selling power of these trademarks by

8    blurring their uniqueness and singularity, and/or by tarnishing them with negative associations."

9    *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 903 (9th Cir. 2002).

10         There is no genuine issue of material fact that trapezoidal packaging did not have a

11   "powerful consumer association" with MGA.  The Federal Trademark Dilution Act identifies

12   four factors to consider when evaluating the famousness of a mark: "(1) [t]he duration, extent,

13   and geographic reach of advertising and publicity of the mark, whether advertised or publicized

14   by the owner or third parties; (2) [t]he amount, volume, and geographic extent of sales of goods

15   or services offered under the mark; (3) [t]he extent of actual recognition of the mark; [and]

16   (4) [w]hether the mark was registered under the Act of March 3, 1881, or the Act of February

17   20, 1905, or on the principal register."  15 U.S.C. § 1125(c)(2)(A).

18         Other than the fact that MGA registered its trade dress (the Court will not defer to the

19   findings of the USPTO for the reasons discussed above), and the obvious volume of sales of the

20   Bratz dolls, MGA has identified no evidence specific to the trapezoidal packaging itself.  Dozens

21   of Bratz advertisements attached to the Pembleton declaration make no mention of MGA's

22   trapezoidal packaging.  Nor has MGA identified any consumer surveys that indicate an

23   association between the trapezoidal packaging and MGA.  MGA notes that its corporate

24   designee summarily testified that the trapezoidal mark "became" famous, but he was unable to

25   substantiate that assertion and provided no time frame for the fame of the trapezoidal packaging.

26   Contrary to MGA's unsubstantiated assertion, the mere shape of its trapezoidal packaging

27   wasn't inherently distinctive or distinctive by virtue of secondary meaning, let alone famous.

28         To prevail on its dilution claim, MGA would also need to establish that Mattel's mark

105

was "identical, or nearly identical, to the protected mark." *Nissan*, 378 F.3d at 1011.  It's true that Mattel also used trapezoidal packaging, but its trapezoids did not match the dimensions or color schemes of MGA's trapezoids.  In fact, Mattel's trapezoidal packages *didn't even resemble each other*.  *Compare* Declaration of Helena Mills in Support of Mattel MSJ, Ex. 1 *with* Declaration of Jill Nordquist in Support of Mattel MSJ, Ex. 10 *with id.*, Ex. 14.

MGA also asserts a dilution claim pursuant to Cal. Bus. & Prof. Code § 14330, which was repealed during the pendency of this litigation.  *See Penpower Tech. v. S.P.C. Tech.*, 627 F. Supp. 2d 1083, 1090 (N.D. Cal. 2008) ("The repeal of a statute creating a penalty, running either to an individual or the state, at any time before final judgment, extinguishes the right to recover the penalty.").  To the extent MGA seeks to have its claim evaluated under Cal. Bus. & Prof. Code § 14247, this claim also fails because the state statute, like its federal analogue, requires the existence of a famous mark.  Cal. Bus. & Prof. Code § 14247(a) ("Subject to principles of equity, an owner of a mark that is ***famous and distinctive*** . . . shall be entitled to an injunction against another person's commercial use of a mark or trade name, if such use begins after the mark has become famous and is likely to cause dilution of the famous mark.") (emphasis added).

Mattel's motion is granted as to MGA's dilution claim.

## VII.   MGA's Unfair Competition Claim

MGA alleges that Mattel engaged in common law unfair competition, as well as unfair competition in violation of Cal. Bus. & Prof. Code § 17200.  MGA alleged a litany of wrongdoing in its original complaint, though many of those allegations have been abandoned. MGA's operative allegations include: (1) Mattel's use of trapezoidal packaging; (2) Mattel's copying of the 4-Ever Best Friends trade dress; (3) Mattel's delivery of letters to former employees reminding them of their obligation to keep secret Mattel's confidential information; (4) Mattel's threats against licensees, distributors, and retailers who did business with MGA; (5) Mattel's attempts to buy up the supply of doll hair in order to crowd MGA out of the market; and (6) Mattel's manipulation of industry research groups whose ratings are critical to establishing MGA's (and any other manufacturer's) credibility in the toy industry.

### A.   Standing Under Business and Professions Code Section 17200

Mattel argues MGA lacks standing to bring this claim.  To have standing to bring this claim, MGA must establish that it suffered both "injury in fact" and "a loss of money or property caused by unfair competition."  *Peterson v. Cellco P'ship*, 164 Cal. App. 4th 1583, 1590 (2008). A loss of money is ordinarily demonstrated through proof that plaintiff "parted, deliberately or otherwise, with some identifiable sum formerly belonging to him or subject to his control." *Silvaco Data Sys.*, 184 Cal. App. 4th at 244.  A plaintiff suffers a loss of property when it "has parted with some particular item of property" that it "formerly owned or possessed."  *Id.* "Section 17200 does not require that a plaintiff prove that he or she was directly injured by the unfair practice or that the predicate law provides for a private right of action."  *Gregory v. Albertson's, Inc.*, 104 Cal. App. 4th 845, 851 (2002).

There is a genuine issue of material fact as to whether MGA lost money as a result of Mattel's obstruction of its relationships with licensees and distributors.  MGA's licenses with its retailers were themselves "property" of which Mattel's alleged conduct deprived MGA.  MGA also expended tremendous sums to generate new licenses, or paid premiums to other licensees, because of Mattel's conduct, and specifically, the conduct of Mattel's Chief Executive Officer Robert Eckert.  *Cf. Clayworth v. Pfizer, Inc.*, 49 Cal.4th 758, 789 (2010) ("Pharmacies paid more than they otherwise would have because of a price-fixing conspiracy in violation of state law."). These are not simply harm to goodwill, but actual monetary losses suffered as a result of Mattel's alleged interference with MGA's contractual relationships with its licensees and retailers, whose business is the backbone of a toy manufacturers' success.

### B.   Unfair Business Practices

"The term unfair is not precisely defined in the statute, and the courts have struggled to come up with a workable definition."  *Gregory*, 104 Cal.4th at 851.  California courts have eventually settled on a definition of unfair competition that is modeled on the federal antitrust laws; that is, "[w]hen a plaintiff who claims to have suffered injury from a direct competitor's 'unfair' act or practice invokes section 17200, the word 'unfair' in that section means conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or

1  otherwise significantly threatens or harms competition."  *Id.* at 853 (quotation marks and citation

2  omitted).

3        MGA has easily raised a triable issue about Mattel's anti-competitive practices.  For

4  example, Mattel may have routinely conditioned its contracts with retailers on the retailers not

5  carrying MGA's products — this is classic anti-competitive behavior that potentially deprived

6  consumers of valuable products.  Mattel's Chief Executive Officer Robert Eckert also sent an

7  email to fellow executives asking whether he should pressure Mattel's relationship with one of

8  its licensees who also did business with MGA.  Though Eckert has claimed that Mattel's conduct

9  is explained by its unwillingness to be associated with MGA's products, that explanation is

10  dubious in light of Mattel's efforts to produce a line of dolls like Bratz (MyScene) and otherwise

11  alter its product line to be more like MGA's.  This conduct again may have harmed competition

12  by potentially restricting the supply of MGA's products to consumers.  Mattel is simply wrong

13  when it argues that "MGA has no admissible evidence supporting its allegations that Mattel

14  'warned a number of companies' not to license MGA products."

15              **3.    Common Law Unfair Competition**

16        Common law unfair competition extends beyond the mere passing off of one's goods as

17  another's.  *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal.4th

18  163, 192 (1999).  The cornerstone of a claim for common law unfair competition is "fraud . . .

19  practiced by one in securing the trade of a rival dealer."  *Id.* at 193 (quoting *Weinstock, Lubin &*

20  *Co. v. Marks*, 109 Cal. 529, 541 (1895)).

21        Other than its infirm trade dress allegations, MGA has failed to establish that Mattel

22  engaged in fraud directed at securing MGA's business.  MGA notes that Mattel engaged in

23  fraudulent conduct by using false means to obtain access to MGA's advance viewing

24  showrooms, but there has never been a suggestion that the *common law unfair competition* claim

25  encompasses such conduct, which is the subject of MGA's counterclaims-in-reply.  Even if such

26  conduct were part of this claim, it's difficult to see how Mattel's fraudulent conduct was

27  practiced in "securing the trade" of MGA, rather than securing access to knowledge about

28  MGA's business.  Although there is a genuine issue of material fact as to whether Mattel

1   engaged in other anti-competitive conduct, like using its largesse to pressure retailers and

2   licensees to terminate their relationships with MGA, such conduct does not fall under the

3   definition of fraud.

4          Mattel's motion is granted as to MGA's common law unfair competition claim and

5   denied as to MGA's statutory unfair competition claim.

6   **VIII.  Unjust Enrichment**

7          MGA brings a claim for unjust enrichment.  Contrary to Mattel's argument, there have

8   been cases in which courts have allowed causes of action for unjust enrichment to proceed.

9   *Western Pac. R. Corp. v. Western Pac. R. Co.*, 206 F.2d 495, 498 (9th Cir. 1953).  However,

10  California courts appear to be split on whether a stand alone cause of action for unjust

11  enrichment is anything more than "a general principle, underlying various legal doctrines and

12  remedies."  *Herrington v. Johnson & Johnson Consumer Companies, Inc.*, 2010 WL 3448531, at

13  *13 (N.D. Cal. Sept. 1, 2010) (collecting cases).  To the extent a claim for unjust enrichment is

14  available, it generally requires proof of "receipt of a benefit and unjust retention of the benefit at

15  the expense of another."  *Id.* (citing *Lectrodryer v. SeoulBank*, 77 Cal. App. 4th 723, 726

16  (2000)).  The benefits must generally be "conferred by mistake, fraud, coercion, or request;

17  otherwise, though there is enrichment, it is not unjust."  *Nibbi Bros., Inc. v. Home Fed. Sav. &*

18  *Loan Ass'n*, 205 Cal. App. 3d 1415, 1422 (1988) (citation omitted).  The claim is, in essence,

19  quasi-contractual.  *See Digital Envoy, Inc. v. Google, Inc.*, 2005 WL 2999364, at *5 (N.D. Cal.

20  Nov. 8, 2005).

21         This Court is convinced by the view that stand alone claims for unjust enrichment are

22  simply redundant of relief already available under other existing law, and that such claims have

23  the potential to cause needless confusion to the fact-finder and the Court.  Even assuming this

24  claim were allowed to proceed, however, MGA has failed to show any of the "quasi-contractual"

25  elements that courts traditionally look to when evaluating claims for unjust enrichment.  MGA

26  instead relies upon Mattel's alleged conduct towards licensees and retailers — conduct that did

27  not result in MGA conferring a benefit upon Mattel that Mattel unjustly retained.

28         Mattel's motion is granted as to MGA's claim for unjust enrichment.

## IX.    Personal Jurisdiction

Both MGA Mexico and Mattel move for summary judgment on the issue of whether this Court has personal jurisdiction over MGA Mexico.

The district court may exercise jurisdiction to the extent allowed under the law of the state in which it sits.  Fed. R. Civ. P. 4(k)(1).  Under California's long-arm statute, jurisdiction may be exercised in accordance with the Due Process Clause of the United States Constitution.  Cal. Civ. Code § 410.10.  Due process minimally requires that a Court exercise jurisdiction over a defendant that has "at least 'minimum contacts' with the relevant forum such that the exercise of jurisdiction 'does not offend traditional notions of fair play and substantial justice.'" *Schwarzenneger v. Fred Martin Motor Co.*, 374 F.3d 797, 800-01 (9th Cir. 2004) (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154 (1945)).  The district court may exercise either general or specific jurisdiction over a non-resident defendant.

### A.    General Jurisdiction

General jurisdiction exists over a non resident defendant when "the defendant engages in 'continuous and systematic general business contacts' that 'approximate physical presence' in the forum state." *Schwarzenegger*, 374 F.3d at 801.  A non resident defendant subject to general jurisdiction may be "haled into court in that state in any action, even if the action is unrelated to" his contacts with the forum state. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 415, 104 S.Ct. 1868 (1984).  "Factors to be taken into consideration are whether the defendant makes sales, solicits or engages in business in the state, serves the state's markets, designates an agent for service of process, holds a license, or is incorporated there." *Bancroft & Masters, Inc. v. Augusta Nat'l, Inc.*, 223 F.3d 1082, 1086 (9th Cir. 2000).

The Court may not exercise general jurisdiction over MGA Mexico, whose contacts with the California forum have been infrequent.  Mattel cites the fact that MGA Mexico has made the following payments to vendors in California: (1) a $7,193 payment to a law firm; (2) a $4,639,483 payment to a shipping company; (3) a $852,774 payment to a company named Buena Vista Internacional; (4) a $323,612 payment to Summit Logistics International; (5) a $58,165 payment to Walt Disney Internet Group; and (6) $90,847 payment to a shipping agency.

1    These small payments over a five year period are insufficient to establish general jurisdiction.

2    *Cf. Shute v. Carnival Cruise Lines*, 897 F.2d 377, 381 (9th Cir. 1990) (finding no general

3    jurisdiction despite "advertising in the local media, the mailing of brochures and the payment of

4    commissions to travel agents, the conducting of promotional seminars, and the sale of its

5    vacation cruises to residents of Washington"); *Choice Healthcare, Inc. v. Kaiser Found. Health*

6    *Plan*, 615 F.3d 364, (5th Cir. 2010) (holding that fifty-three payments over a three-year period

7    were not continuous and systematic contact with forum state).  Nor is general jurisdiction

8    established by the fact that MGA Mexico ships its products through California.  *See Emery v.*

9    *Bioport Corp.*, 273 Fed. Appx. 694, 696 (9th Cir. 2008) ("Although the fact that a product

10   manufactured by a corporation in State A is shipped to an independent contractor for transfer

11   from bulk tanks into marketable containers in State B may mean that the corporation is 'doing

12   business *with*' State B, it does not mean that the corporation is 'doing business *in*' State B for the

13   purposes of establishing general jurisdiction.").

14        Mattel argues that several MGA Mexico executives, including Larian, reside in California

15   and also serve as MGAE's executives.  This argument alludes to the case of *Perkins v. Benguet*

16   *Consolidated Mining Co.*, in which the Supreme Court affirmed the exercise of jurisdiction over

17   a foreign corporation, whose chief executive had re-located to the forum during a time of war

18   and thereafter "carr[ied] on . . . a continuous and systematic, but limited, part of its general

19   business." 342 U.S. 437, 438, 72 S.Ct. 413 (1952).  Mattel has offered no evidence that MGA

20   Mexico conducts any of its general business in California.  It cites the deposition of Ms.

21   Kuemmerle, who testified that MGA Mexico's accounting is performed in California, but there

22   is no evidence of whether this work is performed by an outside vendor, or even by MGAE.  The

23   abrupt testimony certainly does not reasonably suggest that MGA Mexico maintains any sort of

24   business operation in California dedicated to the performance of an accounting.  The fact that

25   Larian and other MGAE executives reside in California is most relevant to whether the Court

26   can exercise jurisdiction over *those individuals*; it is not dispositive to the propriety of personal

27   jurisdiction over MGA Mexico.

28             **B.     Specific Jurisdiction**

111

1    The Ninth Circuit applies a three part test to determine whether the exercise of specific

2    personal jurisdiction is proper:

3         (1) The non-resident defendant must purposefully direct his activities

4         or consummate some transaction with the forum or resident thereof;

5         or perform some act by which he purposefully avails himself of the

6         privilege of conducting activities in the forum, thereby invoking the

7         benefits and protections of its laws;

8         (2) the claim must be one which arises out of or relates to the

9         defendant's forum-related activities; and

10        (3) the exercise of jurisdiction must comport with fair play and

11        substantial justice, *i.e.*, it must be reasonable.

12   *Schwarzenegger*, 374 F.3d at 802 (quoting *Lake v. Lake*, 817 F.2d 1416, 1421 (9th Cir. 1987)).

13        Either purposeful availment of the forum or the purposeful direction of activities towards

14   the forum can satisfy the first prong.  "A purposeful availment analysis is most often used in

15   suits sounding in contract.  A purposeful direction analysis, on the other hand, is most often used

16   in suits sounding in tort."  *Schwarzenegger*, 374 F.3d at 802 (internal citations omitted).

17        Purposeful availment can be shown by a defendant "doing business in a forum state . . .,

18   such as executing or performing a contract there."  *Id.* at 802.  By availing itself of the forum

19   state's benefits, the non-resident defendant "must—as quid pro quo—'submit to the burdens of

20   litigation in that forum.'"  *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476, 105

21   S.Ct. 2174 (1985) and *Cote v. Wadel*, 796 F.2d 981, 984 (7th Cir. 1986)).  The only evidenced

22   face-to-face interactions between Machado, Vargas, Trueba, and any of MGA Mexico's

23   executives occurred in New York and Mexico.  The only employment relationship between the

24   three defecting Mattel Servicios employees and MGA Mexico was based in Mexico.  Mattel

25   nevertheless argues that MGA Mexico purposefully availed itself of the California forum as a

26   result of (1) Larian and Park's communications via email, phone, and letter with the three Mattel

27   Servicios employees; (2) the three Mattel Servicios employees' attempt to simultaneously

28   execute their MGA Mexico employment agreements over the phone with Park, while Park was

112

1   in California.  There is no evidence that any of this conduct actually took place in California,

2   however.  For example, Larian communicated with Machado while Larian was in New York.

3   Larian interviewed the three Mattel Servicios employees in Mexico City.  And there is no

4   evidence that Park was in California at the time the employment contracts were executed.  Mattel

5   has therefore failed to establish, as is its burden, the absence of a genuine issue of material fact

6   as to whether MGA Mexico purposefully availed itself of the California forum.

7       Purposeful direction is established by evidence that the defendant "(1) committed an

8   intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows

9   is likely to be suffered in the forum state."  *Dole Food Co., Inc. v. Watts*, 303 F.3d 1104, 1111

10   (9th Cir. 2002).  Both parties appear to acknowledge that this issue turns on whether (1) the three

11   Mattel Servicios employees stole Mattel's documents in California; and (2) MGA Mexico,

12   through its agents, directed that conduct.  The Court has already determined that there are

13   genuine issues of material fact on both sub-issues.  Since these issues of fact run to the heart of

14   Mattel's counter-claim for misappropriation of trade secrets, "it is preferable that this

15   determination be made at trial."  *Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1285

16   n. 2 (9th Cir. 1977).

17       The other two prongs of the Ninth Circuit's test have already been addressed by the

18   Court's order on the Motions to Dismiss.

19       Both MGA Mexico and Mattel's motions for summary judgment are denied on this issue.

20   **X.    MGA's Affirmative Defenses**

21       Mattel moves for summary judgment on MGA's affirmative defenses.  Contrary to

22   Mattel's argument, MGA is entitled to reassert previously waived affirmative defenses in

23   response to Mattel's amended pleading.  *See Massey v. Helman*, 196 F.3d 727, 735 (7th Cir.

24   1999) ("[W]hen a plaintiff files an amended complaint, the new complaint supersedes all

25   previous complaints and controls the case from that point forward . . . the amended complaint

26

27

28

1  opens the door for defendants to raise new and previously unmentioned affirmative defenses.").[35]

2      MGA does not oppose Mattel's motion for summary judgment as to the following

3  affirmative defenses: (1) bad faith claim of misappropriation; (2) good faith; (3) lack of

4  authority; (4) lack of standing; (5) spoliation; and (6) no direct infringement.

5      Mattel's motion is granted as to MGA's affirmative defense brought pursuant to 17

6  U.S.C. § 205(d), which provides that "[a]s between two conflicting transfers . . . the later transfer

7  prevails first if recorded first . . . and if taken in good faith for valuable consideration or on the

8  basis of a binding promise to pay royalties, and without notice of the earlier transfer."  Mattel

9  claims that Bryant assigned his copyrights to Mattel via his Inventions Agreement, a document

10 Mattel recorded on August 4, 2008.  MGA, on the other hand, has never recorded its

11 employment agreement with Bryant.

12     Mattel's motion is denied as to MGA's defense of joint authorship.  "[A] joint work is a

13 work prepared by two or more authors with the intention that their contributions be merged into

14 inseparable or interdependent parts of a unitary whole."  *Ashton-Tate Corp. v. Ross*, 916 F.2d

15 516, 520 (9th Cir. 1990) (quoting 17 U.S.C. § 101).  "A collaborator's contribution will not

16 produce a joint work, and a contributor will not obtain a co-ownership interest, unless the

17 contribution represents original expression that could stand on its own as the subject matter of

18 copyright."  *Id.* at 521 (quoting P. Goldstein, *Copyright: Principles, Law and Practice*, § 4.21 p.

19 379 (1989)).  Contrary to Mattel's argument, MGA does not merely argue that it enhanced

20 Bryant's works.  MGA argues — and there is a genuine issue of material fact as to whether —

21 MGA contributed original expression (and perhaps the *only* original expression) to some of the

22 works over which Mattel claims ownership.

23     For the reasons discussed in the portion of this order that addresses the counter-claim for

24 trade secret misappropriation, Mattel's motion is denied as to MGA's defense that Mattel's

25 

26     [35] Contrary to Mattel's argument, the principle discussed in *Massey* — that an
amended pleading washes away prior pleadings — makes no sense if limited to new and

27 unmentioned affirmative defenses, especially where, as here, the amended pleading

28 significantly alters the scope of the case.

1  alleged trade secrets were readily ascertainable.

2      Mattel's motion is denied as to MGA's affirmative defense that "Bryant made the

3  decision not to disclose Bratz to Mattel independent of MGA."  Though this affirmative defense

4  appears to be somewhat redundant of MGA's arguments against Mattel's counter-claim for

5  intentional interference with contractual relations, Mattel does not challenge it on those grounds.

6  Mattel argues there is no evidence of MGA's defense, but the possibility that Bryant sat on the

7  Bratz concept for over a year after re-joining Mattel, and continued to market the concept to

8  other toy manufacturers, suggests that he never had any intention of disclosing it to Mattel.

9      Mattel's motion is granted in part and denied in part as to MGA's defenses of estoppel,

10  waiver, acquiescence, failure to mitigate, and abandonment.  In its opposition brief, MGA

11  fittingly abandons its abandonment and waiver defenses.  Nonetheless, MGA's claim that Mattel

12  is judicially estopped from claiming the Bryant works as works made for hire goes uncontested

13  in Mattel's reply brief.

14      Mattel's motion is denied as to MGA's laches defense for the reasons set forth in the

15  section of this Order discussing the statutes of limitations.  Contrary to Mattel's argument, an

16  unreasonable delay in claiming ownership to the Bratz drawings and sculpt allowed MGA to

17  continue building the brand and enhancing its value through the investment of significant human

18  and material resources.  The prejudice to MGA from Mattel's potential delay is obvious.

19      Mattel's motion is denied as to MGA's comparative fault and failure to mitigate

20  affirmative defenses.  At least some Ninth Circuit courts have allowed this sort of contention to

21  be pled as an affirmative defense, and Mattel concedes their relevance to the fact-finder's

22  calculation of damages.  *See, e.g.*, *J & J Sports Productions, Inc. v. Enedina Soto*, 2010 WL

23  3911467, at *2 (S.D. Cal. Sept. 28, 2010).

24      Mattel's motion is granted as to MGA's unclean hands affirmative defense, but only as it

25  relates to Mattel's counter-claims arising out of Bryant's conduct.  Contrary to MGA's

26  argument, Mattel's alleged theft of post-production Bratz advertising materials from MGA's

27  showrooms has nothing to do with the "matter for which [Mattel] seeks a remedy," which in this

28  case is the Bryant's alleged non-disclosure of the Bratz concept, Bryant's work for MGA while

1   employed by Mattel, and Bryant's disclosure of the Bratz concept to MGA.  *See Kendall-*

2   *Jackson Winery, Ltd. v. Superior Court*, 76 Cal. App. 4th 970, 978 (1999).  Mattel's motion is

3   otherwise denied as to this affirmative defense.

4          Mattel's motion is denied as to MGA's affirmative defense of justification.  Mattel argues

5   that its counter-claims are limited to MGA's inducement of Mattel's employees to "steal[] . . .

6   confidential and trade secret information," but misstates its own pleading in the process.  In fact,

7   the 4AAC dedicates extensive discussion to MGA's recruitment of Mattel's employees, and

8   incorporates these factual allegations in support of the broad and vague counter-claims.

9   **XI.   Declaratory Relief**

10          In light of the genuine issues of material fact identified above, MGA's motion is denied

11   as to Mattel's counter-claim for declaratory relief.

12   *///*

13   ///

14   ///

15   ///

16   ///

17   ///

18   ///

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

1   **XII.    Disposition**

2   For the foregoing reasons, the Court ORDERS as follows:

3   1.      MGA's motion is granted as to Mattel's counter-claims for aiding and abetting

4           breach of fiduciary duty;

5   2.      MGA's motion is granted in part and denied in part as to Mattel's counter-claims

6           for copyright infringement, misappropriation of trade secrets, conversion, aiding

7           and abetting breach of duty of loyalty, and intentional interference with contractual

8           relations;

9   3.      Machado's motion is granted as to Mattel's counter-claims for breach of fiduciary

10          duty and breach of duty of loyalty;

11  4.      Mattel's motion is granted as to MGA's claims for trade dress infringement, trade

12          dress dilution, and common law unfair competition;

13  5.      The motions are otherwise denied subject to paragraph 6;

14  6.      Certain issues, including MGA and Machado's challenges to Mattel's counter-

15          claims for violations of the Racketeer Influenced and Corrupt Organizations Act,

16          as well as Machado's challenge to Mattel's counter-claim for breach of contract,

17          will be addressed in a subsequent order.

18

19  IT IS SO ORDERED.

20  DATED: December 27, 2010

21

22                                          _____

23                                          DAVID O. CARTER
                                            United States District Judge

24

25

26

27

28