1           **UNITED STATES DISTRICT COURT**

2           **CENTRAL DISTRICT OF CALIFORNIA**

3           **SOUTHERN DIVISION AT SANTA ANA**

4        HONORABLE DAVID O. CARTER, JUDGE PRESIDING

5

6
  CARTER BRYANT, an individual,      )
7                                     )
                  PLAINTIFF,          )
8                                     )
             vs.                      ) CV NO. 04-9049-DOC
9                                     ) VOLUME III
  MATTEL, INC., a Delaware           )
10  corporation,                      )
                                      )
11                DEFENDANT.          )
  _____)
12  CONSOLIDATED WITH MATTEL, INC., vs.)
  BRYANT and MGA ENTERTAINMENT, INC. )
13  vs. MATTEL, INC. _____ )

14

15

16           REPORTER'S TRANSCRIPT OF PROCEEDINGS

17                SANTA ANA, CALIFORNIA

18              MONDAY, DECEMBER 20, 2010

19                    4:27 P.M.

20

21           **DEBORAH D. PARKER, CSR 10342**
             **OFFICIAL COURT REPORTER**
22           **UNITED STATES DISTRICT COURT**
             **411 WEST FOURTH STREET**
23                 **SUITE 1-053**
             **SANTA ANA, CALIFORNIA 92701**
24               **(714) 542-8409**
             **D.PARKER@IX.NETCOM.COM**

25

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
1   APPEARANCES OF COUNSEL:

2        FOR THE DEFENDANT, MATTEL, INC.:

3                           JOHN QUINN
                            MICHAEL ZELLER
4                           SUSAN ESTRICH
                            WILLIAM C. PRICE
5                           SCOTT L. WATSON
                            JON COREY
6                           QUINN EMANUEL URQUHART
                            865 SOUTH FIGUEROA STREET
7                           10TH FLOOR
                            LOS ANGELES, CALIFORNIA 90017
8                           (213) 443-3000

9

10       FOR THE INTERVENOR, MGA ENTERTAINMENT, INC.:

                            ANNETTE L. HURST
11                          WARRINGTON PARKER
                            ORRICK, HERRINGTON & SUTCLIFFE, LLP
12                          THE ORRICK BUILDING
                            405 HOWARD STREET
13                          SAN FRANCISCO, CALIFORNIA 94105
                            (415) 773-5740
14
                            THOMAS S. MCCONVILLE
15                          ORRICK, HERRINGTON & SUTCLIFFE, LLP
                            4 PARK PLAZA
16                          SUITE 1600
                            IRVINE, CALIFORNIA 92614
17                          (949) 567-6700

18
         FOR THE DEFENDANT, CARLOS GUSTAVO MACHADO GOMEZ:
19
                            ALEXANDER H. COTE
20                          MARK OVERLAND
                            SCHEPER KIM & HARRIS LLP
21                          601 WEST 5TH STREET
                            12TH FLOOR
22                          LOS ANGELES, CALIFORNIA 90071
                            (213) 613-4660
23

24

25
```

```
 1   APPEARANCES OF COUNSEL:

 2       ALSO PRESENT:       PATRICIA GLASER
                             ANDREW BAUM
 3                           GLASER WEIL FINK JACOBS
                             10250 CONSTELLATION BOULEVARD
 4                           19TH FLOOR
                             LOS ANGELES, CALIFORNIA 90067
 5                           (650) 614-7682

 6
                             JENNIFER L. KELLER
 7                           KELLER RACKAUCKAS, LLP
                             18500 VON KARMAN AVENUE
 8                           SUITE 560
                             IRVINE, CALIFORNIA 92612
 9                           (949) 476-8700

10
                             JAMES I. HAM
11                           PANSKY MARKLE HAM, LLP
                             1010 SYCAMORE AVENUE
12                           SUITE 308
                             SOUTH PASADENA, CALIFORNIA 91030
13                           (213) 687-5252

14

15

16

17

18

19

20

21

22

23

24

25
```

4

 1    SANTA ANA, CALIFORNIA; MONDAY, DECEMBER 20, 2010; 4:27 P.M.

 2                              -oOo-

 3              THE COURT:  We're back on the record.

 4              Mr. Parker.

 5              MR. PARKER:  The odd thing about the argument, the

 6    RICO argument is, many of the same arguments just made cut

 7    against Mattel's own claim.  I'll throw in Bain, for

 8    example.

 9              Now, Bain was involved in this enterprise, Mattel

10    claims, six to eight weeks; and then, off Bain went.  And

11    Mattel even makes an argument that there was a lack of

12    distinctiveness as a result.  Indeed, this was only Mattel,

13    according to Mattel's lawyers.  And if that's true, that's

14    true --

15              Now, understand Bain was involved in getting

16    information about MGA.  Bain was involved, as I'll talk

17    about, at Mattel's request, eliminating information that we

18    were never provided but ultimately had to get from Bain.

19    But if Bain's involvement is too short a period of time for

20    distinctiveness, then so is Machado's.  Then, so is Machado.

21              Mattel was clever, because the distinctiveness

22    argument falls at the end of the RICO argument, instead of

23    at the beginning of the RICO argument where you would expect

24    it to be.

25              Sharon Rahimi, she was at Mattel for three years.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    She went into the 2003 toy fair and stole.  She went to the

2    2004 toy fair and stole.  She went to the 2005 toy fair and

3    stole.  *Odom versus Microsoft* says two years at least is

4    enough.

5              So I'll give Mattel this:  Prior to that 1999 to

6    2002 period, it's a little hard to find it.  We did not get

7    what we expected.  That 2003 time period onward -- I'm

8    sorry, 2002 time period onward, we're solid.

9              Sharon Rahimi, independent contractor.  And you

10   only need to consult every one of the transcripts that

11   you've heard from Mattel on RICO where you know that they

12   believe an independent contractor is not -- is distinct; and

13   therefore, we have that.  Mattel could not begin to argue

14   otherwise.  What they do, as you notice, it was just one off

15   activity for a woman who systematically over a three-year

16   period steals for Mattel.

17             Now, where does Quinn Emanuel fit in?  Because

18   remember -- I want to say something about this common

19   fraudulent purpose, because it sounds -- the more it's

20   repeated, it sounds like it's starting to violate *Turkette*'s

21   teaching, which is the association, in fact, does not have

22   to be illegal.  And that would make sense, because you can

23   have a RICO enterprise that is not fraudulent.  You could

24   have a RICO enterprise where the predicate acts are murder

25   and arson.  And to my mind, that is not a fraudulent

1    enterprise.  It's an enterprise that does criminal activity,

2    but it's not fraudulent.  And I suspect that's why some of

3    the courts have bought off on the idea that it has to be a

4    fraudulent common purpose.

5            So what is the common purpose?

6            We know that Mattel believed that in order to

7    maintain a competitive edge, it had to steal.  It had to

8    sneak in, and it had to steal.  We know that in the 2003

9    time period, they were getting killed by Bratz.

10           We have the Bratz brief.  We have House on Fire.

11   We have the, what happened to Bratz?  And where is Quinn

12   Emanuel in this?

13           They are the lawyers for Mattel.  And what

14   results?  Litigate them to death.

15           Now, I know by saying that Mattel will say, *That's*

16   *a Nora Pennington issue;* and therefore, they are perfectly

17   appropriate in making that decision.

18           And that would be right except for *Kearney versus*

19   *Foley & Lardner* says, *That's fine as long as you do it*

20   *right.*  You can employ fair means.  You cannot employ foul

21   means.  When you employ foul means in litigation, the Nora

22   Pennington Doctrine does not employ.

23           So what was the common purpose?

24           The common purpose was:  We have got to maintain

25   our competitive advantage.  Stealing alone is not going to

1  do it for us.  We need to litigate them to death.  And

2  that's what happened.  And that is the purpose.  Is it

3  fraudulent?

4          I don't know what to call that.

5          Did it create predicate acts?

6          Absolutely.

7          And what do I mean by "foul means"?

8          There was a court order that required Mattel to

9  produce documents that reflected on the statute of

10  limitations.  And you would expect at a minimum that that

11  would require Mattel to produce the 2001 New York toy fair

12  report.  That's Exhibit 9646, and Exhibit 9267.

13          The reason why you would expect that is, you would

14  expect that Mattel would produce a document that reflected

15  when they understood Bratz was on the market.  You would

16  expect it more, because there is a direct link that Mattel

17  has drawn consistently between Diva Starz and Bratz.  This

18  court will remember the name "Bratz" came from "Diva Starz."

19  There must be some correlation.

20          THE COURT:  That's been quite a long time with

21  Diva Starz.

22          MR. PARKER:  Yes, I'm sure you did.

23          THE COURT:  Big head?

24          MR. PARKER:  Yes.  And if you look at nine --

25  Exhibit 9646, you'll see that it's --

```
 1              THE COURT:  Did somebody really buy that doll?
 2              MR. ZELLER:  Believe it or not, the answer is yes.
 3              MR. ESTRICH:  No accounting for taste.
 4              MR. PARKER:  And the answer is truthful, because
 5     someone did.
 6              But you'll see that it's described as "Diva Starz
 7     with a Smarty Attitude."  And that's the correlation.
 8              Now, what we got?  What MGA got is, is
 9     Exhibit 926 -- it's just the cover memo for it.
10              Now, why is that important?
11              We would have known about the toy fairs.
12              Where did you get this information?
13              We would have known that there were internal
14     reports about toy fairs.
15              What else wasn't produced that went to statute of
16     limitations?
17              To the Mingrone declaration, Exhibit 38,
18     M-I-N-G-R-O-N-E.
19              We would have gotten the e-mail that says that MGA
20     products are starting to look similar to ours, and we're
21     actually concerned about things being leaked out.  And
22     that's not produced.
23              Where does this go to?
24              The first jury had to hear about fraudulent
25     concealment.  And remember, the New York toy fair, the
```

 1    fraudulent concealment which has two elements:  The first is

 2    whether or not MGA concealed; and the second is whether or

 3    not Mattel could or should have known the information,

 4    despite any efforts of concealment.

 5          And I think it would have been highly relevant to

 6    any jury to understand what Mattel —— the length Mattel goes

 7    to in order to obtain information in the marketplace.  We're

 8    not just talking about surfing the web, or newspaper

 9    clippings.  This is —— we have a "How to Steal Memo":  This

10    is how you go about doing it.

11          And highly relevant to the jury and highly

12    interesting to the jury, when Mattel claims, for example,

13    that a *Wall Street Journal* article, in 2003, where

14    Mr. Larian said something about Bratz so threw them off the

15    track that they simply could never have known that they

16    actually had a real claim against MGA, or Mr. Larian.

17          What else would we have gotten if Mattel complied

18    with the court order on statute of limitations —— I'm sorry.

19          What else would we have gotten from Mattel?

20          There were document requests, Document Request 31,

21    January 1, 2007.  The response, it asks for documents ——

22          Actually, let me pull that up.  Request 31:  *All*

23    *documents referring and relating to whether Mattel had*

24    *access to any exhibits, displays, or showrooms containing*

25    *any of MGA's Bratz lines, prior to its release to the*

1   *public.*

2          *Subject to and without waiving the foregoing*

3   *general and specific objections and to the extent not*

4   *already produced, Mattel will produce responsive*

5   *nonprivilege documents in its possession, custody, or*

6   *control, if any, that it can locate after a reasonable*

7   *good-faith search, relating to Mattel's access to exhibits,*

8   *displays, or showrooms containing such aspects of the Bratz*

9   *products that MGA has alleged were infringed prior to the*

10  *time that that such aspects of products were disclosed to*

11  *the trade retailers or to the public.*

12          That brings me to the point where Mattel cites the

13  case *Richmark*, which is a district court case out of Oregon,

14  which says that -- where the court says, *I can't find a RICO*

15  *violation, unless there is a court order or subpoena.*

16          Mattel suggests the only time you can have an

17  obstruction at all is if there is a court order, or

18  subpoena.

19          Now, *Richmark* doesn't appear to have been picked

20  up.  But I would also suggest that when someone says they'll

21  produce documents, there is no cause to get a court order.

22  There is no cause to get a subpoena.  And 1503 certainly

23  doesn't require either that court order or subpoena.

24          What else would we have gotten if Mattel had

25  decided to comply with their response that they would

1    produce documents?

2            We would have gotten a Bain & Company report,

3    responsive to a request that said, Can you tell us what your

4    copyright damages are?  And in the same document request, it

5    says:  Could you, please, provide to us any document that

6    disproves any of your allegations in your counterclaims.

7            We would have gotten a Bain & Company that -- and

8    this is the very Bain & Company report that I was talking

9    about earlier, which showed that, in fact, it was clear to

10   Bain & Company that MGA was making money on non-doll

11   accessories; in other words, it's money moving forward was

12   from the noninfringing aspects of the Bratz dolls.

13           We would have gotten what happened to Barbie,

14   which explains why Barbie wasn't doing well at all,

15   independent of MGA.  We would have gotten the Bratz brief.

16           Mattel claims that in the brief -- it wasn't

17   mentioned here that -- the fact:  That Mr. Eckert deletes

18   every single e-mail, or has been routinely deleting e-mails

19   on a systematic basis since before this case was filed is,

20   it doesn't matter because ILS found that there were no

21   unusual deletion patterns and Mattel, of course, had backup

22   tapes of this stuff, they say.

23           But see, in phase one, it did matter because what

24   Mattel was successful in doing in phase one was getting the

25   Bratz brief excluded on authenticity grounds when it

1   actually went to the CEO who literally handwrote and edited.

2   And sure, that's not an unusual deletion pattern.  When you

3   delete it every day, it's not going to pop up as 100 e-mails

4   deleted all at one time, but it is clearly an admitted

5   deletion pattern.

6           And this court recalls, I think, the fight that we

7   had to go through just to get to the backup tapes.  And so,

8   the fact that they may or may not have existed on backup

9   tapes -- but this court will recall, because it was a late

10  night, just the fight that we had to go through to get those

11  backup tapes.  But there is more.  And, again, I'll sound

12  back to *Richmark* which says it requires a court order.

13          What we would never have known from Mattel's

14  production of the Bain report, which is Exhibit 8810, is

15  that Mattel actually received a final version of that report

16  and in Exhibit 9223 Mattel asked for a couple pages to be

17  deleted -- I'm sorry, one page, page 31 of a document which

18  I'll give you.  I'm sorry, let me do it this way.

19          I thought I wrote down the exhibit number.  And I

20  have it, and I'll give it to you in just a moment.

21      *(Pause.)*

22          MR. PARKER:  So Exhibit 8810 is the document that

23  Mattel produced.  It's the Bain document that Mattel

24  produced.

25          Exhibit 9225 is a different document.  In

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    Exhibit 9225, there is no page 31, and there is a line

2    missing on page 7.  And I'll explain the significance.

3            The reason that's true is that in an e-mail that's

4    marked Exhibit 9223, Bain is requested to delete certain

5    items, quote, unquote, because there were a couple final,

6    quote, legal, unquote, comments desired.

7            Now, what are those?

8            Page 7 contains a line, and it's Bain &

9    Mattel 494.  We've not gotten this page 7 from Mattel.  But

10   Bain & Mattel 494 has the following:  Fast to market.  MGA

11   is able to get product from concept to market in

12   approximately seven months.

13           Page 31, Bain & Mattel 518:  *MGA saves design and*

14   *development time through a faster approval process*, and

15   explains how quickly MGA can get product to market.

16           Why is that important?

17           Because in phase one of the case, we had to hear

18   testimony about how it was implausible, how it was

19   implausible that MGA could actually get Bratz from Carter

20   Bryant and get it to market quickly.  And the suggestion was

21   that somehow Carter Bryant and Paula Garcia had hatched some

22   plan, or somebody had hatched some plan at some prior point

23   to get this all up to speed, and that this was one of the

24   reasons why it's all hidden.

25           What else do we have?

1          We do have Villasenor.  Now, understand Villasenor

2     comes at a time in 2005, right?  This is when there's a

3     meeting.  And Villasenor says, *I believe my work conditions*

4     *have become intolerable and I'm writing to complain.*

5          THE COURT:  Slower.

6          MR. PARKER:  I'm quoting from a different line,

7     where it says*:  I fear that my actions may expose me to*

8     *personal criminal liability.*  Exhibit 9484.

9          Now, understand in our timeline, Mattel has now

10    made the decision, in 2005, Rahimi still needs to go about

11    stealing trade secrets.  But it's just not enough.  They've

12    decided to litigate to death, and here is the man who gets

13    in the way of that.  And so, there is an exchange of

14    letters:  Mingrone, M-I-N-G-R-O-N-E, Exhibit 11, on

15    January 10th, 2006; and a letter from Mr. Villasenor's

16    counsel, Exhibit 9525, concerning whether or not there was

17    any relationship to the pending MGA/Mattel case.

18          Mr. Villasenor's counsel took a slightly different

19    view of that.

20          Next, we have testimony.  And I know that Mattel

21    has focused on Pablo Vargas' testimony.  I'm going to

22    mention that, but before we -- I want to get there.

23          MGA served a 30(b)(6) notice on Mattel, on

24    April 22nd, 2010.  The first person to come in and testify

25    was a Mr. Ward, and it was on Topic 8.  And Topic 8,

```
 1   generally, asked him to talk about the receipt by Mattel of
 2   any nonpublic and/or confidential information about
 3   competitors' products or pricing and so on in the toy fairs.
 4           In preparation for that deposition, Mr. Ward was
 5   very -- didn't know much.  But at pages 37 and 38 of his
 6   deposition, Mr. Ward acknowledged that he talked to
 7   Mr. Villasenor's counsel in order to prepare.
 8           A week later, Mr. Story (sic) came in to testify,
 9   Mattel's 30(b)(6) witness.  Mr. Story was asked -- instead
10   of talking about the topic generally, we identified specific
11   documents, specific documents.  Where did you get the
12   information in this document?
13           And in his preparation, no call to Mr. Villasenor.
14   No call to Mr. Villasenor's lawyer.
15           And now we have Vargas.  And we can pooh-pooh
16   that.  But what I want to say about that is the critical
17   testimony was:  Did Ms. Kuemmerle see the information on
18   that USB drive?
19           Day one, I don't know -- "No," I think it was.
20   I'm sorry.  Day two, yes.  And the testimony of the lawyer
21   is -- of his lawyer who we deposed, is:  *I don't recall*
22   *having a conversation about Mr. Vargas' testimony*.  But he
23   also makes clear that Mr. Tiburcio, who is the lawyer for
24   Mattel, in Mexico, made it clear that he was unhappy about
25   some aspects of the testimony.  That was his impression.
```

1          So now, I think we have a RICO enterprise.  I

2    think we have a common purpose.

3          On RICO injury, *Kearney versus Foley & Lardner* --

4    I'm just going to call it *Kearney*, and not rest with the

5    rest.  *Kearney*, you look at that injunction, and it is a

6    remedy.  Just like a jury verdict is a remedy.  It's a

7    result.

8          And if Mattel takes the position that Judge Larson

9    served as the intervening cause, then there is no

10   obstruction that could -- obstruction claim could ever serve

11   as a predicate act in a civil RICO case, because the jury is

12   an intervening cause.

13         Now, I'm assuming that we're not individualizing a

14   judge's decision to that judge and suggesting that that

15   judge is somehow not acting as an objective measure of the

16   truth and of the evidence before him or her.  And I believe

17   that is what the obstruction charge requires a court to

18   consider, because it is not going to be unique.

19         Now -- so the only issue is:  Can we recover for

20   the injunction?

21         Absolutely.  One can recover for a verdict that is

22   wrongfully obtained.  One can recover for remedy wrongfully

23   obtained.  There is no distinction in the case law for that.

24   And if a court is the intervening cause, then again as I

25   said, then a jury verdict is an intervening cause as well.

1    And I don't think that the law does allow for that.

2            Regarding Malackowski and his calculations, what I

3    think is deleted from the conversation is that

4    Mr. Malackowski actually does calculate damages for the

5    taking of the trade secrets and with specificity at least

6    three of them; and, therefore, it is tied to the wire fraud

7    predicate act.

8            Now, if you don't have questions I'm going to go

9    into trade secrets briefly; and then, I have one thing to

10   say about statute of limitations.

11           I'm sorry.  I want to say one other thing, and I

12   just think that -- or two other things.  The first is,

13   Ms. Estrich referred to the hiring of an advertising agency.

14   That is the *Chagby* case, C-H-A-G-B-Y.  And just in reference

15   to that, I would refer the court to *Living Designs* where a

16   RICO claim was predicated on a different and facts were

17   similar to this.

18           The next thing I would suggest is -- trade

19   secrets.  The reason I want to talk about trade secrets is

20   just to say a few things that I want to make sure correctly.

21   But I want to start by saying this:  Mattel might have a

22   more plausible argument about trade secrets, if they didn't

23   have Exhibit 9640 which tells you to go to Kinko's right

24   near, around the corner and create false business cards.  It

25   would be more credible if the same document didn't tell you

1    that dresses -- dress with comfortable shoes, if that was

2    something you needed to know as well; that the MGA -- I'm

3    sorry, that Mattel would create dummy up invoices, $500 or

4    more.  That might be more credible.

5         It might be credible argument if you had Mattel

6    witnesses who said, *We never ever -- we never had to step*

7    *foot out of Mattel.*

8         *What do you mean?*

9         *MGA just kept sending out press releases, and*

10   *that's what we used.*

11        And the reason it's not credible, is because what

12   Mattel needed was to see what the thing looked like, to see

13   how it played.  And I'll just give you an example of that.

14   I want to give you an example of a press release.  It's

15   Exhibit 29 to the --

16        THE COURT:  I'm sorry.  29?

17        MS. HURST:  29 to the Suprenant declaration,

18   S-U-P-R-E-N-A-N-T.

19        Let me tell you how our press release describes

20   something called "Alien Racers."  *Racing into the fast and*

21   *furious boys market with its newest consumer entertainment*

22   *property.  Alien Racers is a high-speed adventure with a*

23   *strong story and amazing characters.  Set in a mythical*

24   *universe, the struggle to win the ultimate power source is*

25   *key.  Speed is power.*

1        *You can just imagine exactly what it looks like,*

2   *can't you.  For the initial release in early fall, Alien*

3   *Racers will debut with some of the most ultra designed*

4   *transforming RC action vehicles and so on and so on.*

5        These were race cars that looked like aliens, but

6   tell me once you had a race car that came from a mythical

7   universe if you understand exactly what that is.  And the

8   reason -- and that's why they kept going to the toy fairs.

9   And that's why they would call -- they would actually call

10  MGA.  And as noted in our brief, one of the e-mails says

11  they were reluctant to provide it to us.  Understandably

12  reluctant to provide it.

13        So they're not.  They are not trade secrets -- I

14  mean, they are trade secrets.  They weren't available to the

15  public.

16        Just one note to correct.  Mattel calls all of the

17  exhibits that we mentioned in E18 -- additional and disputed

18  facts -- and E127, they call them press releases, and

19  they're not.  They are sales sheets and catalogs which are

20  given to retailers, not given to competitors, asked to keep

21  it secret.

22        Planogram rooms, Saunders deposition.  Because

23  Mattel cites Saunders and says, *Listen, everything that they*

24  *put in a toy fair, it was in a planogram room which is open*

25  *to the public a few months before.*

1    And at page 129 of Saunders' deposition, she says,

2    actually, that she doesn't know if that's true.  But they're

3    not.  I mean, you do stock a planogram room sometimes before

4    a toy fair but not with what you're going to show in that

5    toy fair that's new on the market.

6    Readily ascertainable.  I would -- the answer to

7    whether it's readily ascertainable is found in *Abba Rubber*

8    *Company versus Seaquest*.  And it makes sense, Footnote 9.

9    The court says, first, it's an affirmative defense.  That's

10   true.  Second, the court says, *Listen, don't come to us and*

11   *say it's readily ascertainable, if you didn't get it that*

12   *way.  It doesn't mean that it's not a trade secret,* the

13   court says, *It just means you haven't misappropriated.*

14   Statute of limitations.  Now, a lot of the statute

15   of limitations argument was hashed out, up and down, and

16   this court asked for additional briefing on it.  The reason

17   I want to talk about statute of limitations is were called

18   liars.  I think the word, actually, "lie" was used.  We lied

19   to the court.

20   And specifically what Mattel says is:  We lied to

21   the court when we said that -- when we made the argument

22   that there was some kind of overlap between our trade

23   secrets, Mattel's trade secrets.

24   What we said to the court, actually, is:  We think

25   there's an overlap between what Mattel stole from MGA and

1 others.  That's what we said.  Now, we haven't been provided

2 the discovery that would allow us to go -- we're going to --

3 I mean, at trial, Mattel sits up there with the trade

4 secret.  We are entitled to ask them where they got the

5 thing from, which helps prove why this is a compulsory

6 claim, by the way.  But I also want to say that in a 2003 --

7 Let me get my exhibit numbers.  In 2003, New York

8 Toy Fair report, Mattel claims -- Mattel brought back and

9 showed -- Mattel brought back and showed information about

10 MGA's decision to bring out dolls -- Slumber Party dolls,

11 2003.

12 In 2004, Mattel had a Slumber Party doll, Girls

13 Night In.  In their interrogatory response regarding

14 Mr. Machado, Mattel claims that Machado stole the idea for

15 Slumber Party, which is why MGA decided to re-release its

16 Slumber Party.  Not a lie.  Not a lie.

17 Let me check, if you don't mind, unless the court

18 has questions.

19 THE COURT:  Please.

20 MR. PARKER:  Thank you.

21 *(Pause.)*

22 MR. PARKER:  I want to make two points, just to

23 clarify.  One of them I'm forgetting, and I have to --

24 I wanted to go back to the Bain & Company

25 document.  These are the pages we didn't see.  I read to you

```
 1    one of the e-mails.  I'm going to read the second, and this
 2    is produced by Bain & Company.  It's marked Bain &
 3    Mattel 629.
 4             THE COURT:  629?
 5             MR. PARKER:  Yes.  That's the Bates stamp number.
 6             THE COURT:  I've got 9223, 9225, 9484.  You
 7    referred back to 9 --
 8             MR. PARKER:  I apologize, because I'm making it
 9    confusing.  This is Exhibit 9223.
10             THE COURT:  9223.  You referred to page 31 before.
11    It's missing.
12             MS. HURST:  Just so you know, Exhibit 9223 is the
13    e-mail that causes this, and this is where -- this is the
14    impetus for the deletions.
15             E-mail:  I have just wanted to follow -- Mike --
16    this is to Mike at --
17             This is to Bain:  Mike, I just wanted to follow up
18    on my discussion with Michael Moore, who is counsel for
19    Mattel.  He wanted to pull the reference to -- redacted.  I
20    don't think it detracts too much from the story and sounds
21    like it could be potentially important from a litigation
22    standpoint.  I believe he was going to talk to you about
23    this but wanted to follow up prior to sending over the final
24    version.
25             And as I -- as you'll recall from a litigation
```

1  standpoint, it was important, because it certainly did cut

2  against at least the argument that Mattel wanted the jury to

3  accept.

4          THE COURT:  Mattel.

5          MR. ESTRICH:  Your Honor, I'm going to be very

6  brief; and then, Mr. Zeller will use the remainder of our

7  time on trade secrets and statute of limitations.

8          We have serious factual disputes with many of the

9  claims Mr. Parker has made, and Mr. Zeller can respond to

10  them.  But since we're on summary judgment, let me simply

11  say this:  Even if the facts were, as Mr. Parker claimed,

12  which we say they aren't, I still haven't seen any predicate

13  acts here.  I certainly haven't seen any predicate acts by

14  anybody other than Mattel.  The common purpose, if it

15  doesn't have to be a fraudulent purpose, has to be an

16  unlawful purpose.

17          A RICO enterprise cannot be composed of

18  individuals who do nothing wrong and don't have any bad

19  thoughts or purpose.  That's known as a group.  Not an

20  enterprise.  What makes it an enterprise is its criminality.

21  And as I go through each of the points Mr. Parker mentioned,

22  we had the Bain report.  Editing a document in the normal

23  course of business prepared by a management consultant

24  before it is distributed internally to your board of

25  directors and others, where all versions of the documents

1    were produced in discovery by us is not obstruction of

2    justice.

3          Mr. Villasenor, all the documents were produced.

4    An unprepared 30(b)(6) witness, if that were a crime, your

5    Honor, you would have a lot of people in this case who might

6    be vulnerable.

7          The New York toy fair report, the New York toy

8    fair report was irrelevant to phase one issues, because all

9    it said was:  *Here's a new doll.  It's Bratz.*

10         Our statute of limitations argument, accepted by

11   Judge Larson and probably argued to you more times than you

12   care to hear, is that the triggering event is not knowing

13   that MGA is doing a doll named "Bratz."  It's knowing that

14   Carter Bryant designed that doll while he was working for

15   Mattel.  Nothing in the New York toy fair report included an

16   admonition that, guess what, you know, this is proof that

17   Carter Bryant designed this at Mattel.

18         The Vargas deposition, I would recommend on, I

19   believe it's page 22 of our reply brief, goes through the

20   two inconsistent quotes.  On day one, he's asked if

21   Ms. Kuemmerle ever says the USB drive.  He says he doesn't

22   know.

23         On day two he's asked, *But did she know or did you*

24   *tell her that you were using information from Mattel that*

25   *had been on an USB drive?*

1    That she knew.  She said yes.  He said, yes, he

2    knew that, as opposed to that she had seen the information,

3    as opposed to the drive itself.  There is no consistency.

4    The Eckert e-mails, again, we've been through

5    that.  A discovery dispute is not obstruction of justice.

6    Finally, Mr. Parker says, *Well, you can't say that*

7    *there were intervening factors in the grant of this*

8    *injunction, because then you'll never have obstruction.*

9    It's not our claim.  It's not just that the judge

10   made a decision, your Honor.  It's what he made the decision

11   based on.  He did not make his injunction decision based on

12   deciding who was nicer, although I would submit that we are

13   very nice.  I'm happy to concede they are nice also.  But

14   the suggestion that the information about the toy fairs

15   would have somehow changed his evaluation of substantial

16   similarity of thousands of dolls and products which he was

17   doing, based on an examination and his understanding of

18   copyright standards that somehow that decision was directly

19   caused by a toy fair -- a refusal to tell them about the toy

20   fair and had Judge Larson only known the details which were,

21   by the way, in the allegations of the complaint anyway and

22   were irrelevant to phase one and would even fit in an

23   unclean hands defense to phase one, but that somehow if he

24   had known the details, he would have decided differently,

25   that's pure speculation.  I would say that doesn't even meet

1    both for causation, but it certainly doesn't meet RICO

2    injury.

3              So while I will leave it to Mr. Zeller as to the

4    factual disputes, the bottom line is:  You don't have to

5    resolve any factual disputes.  On Mr. Parker's own

6    description -- and indeed dare I quote Mr. Larian's own

7    testimony -- only very recently, Mr. Larian, himself, and

8    MGA, in their suit against O'Melveney & Myers specifically

9    said that the cause of all these damages they suffered as a

10   result of this wrongful injunction and the decimation of the

11   Bratz brand, who was to blame, Mr. Larian said?  Was it

12   Mattel?

13             No, not even Mattel.

14             Was it Judge Larson and the jury?  No.

15             It was only O'Melveney & Myers.

16             Now, I would submit to you, your Honor, that RICO

17   causation does not allow you to pick, for purposes of the

18   motion, or the day of the week, who to blame for your

19   troubles.  I'm sorry for the troubles.  But the damage that

20   MGA has suffered is not RICO injury.  It is not tied

21   specifically on not only a but for but proximate cause basis

22   to any particular predicate act, or to any collection of

23   predicate acts.  Absent injury, absent ongoing organization,

24   absent common unlawful purpose, absent anybody but Mattel,

25   for most of the period of this enterprise, you don't have an

1    enterprise.

2              Thank you very much, your Honor.

3              THE COURT:  Thank you.  Mr. Zeller.

4              MR. ZELLER:  The omitted discovery that MGA now

5    says was so critical, so potent that absolutely was required

6    and should have been produced during phase one, even without

7    a court order and, apparently, even over Mattel's

8    objections, is exactly the evidence MGA itself did not start

9    producing until August of 2010.

10             As this court is aware, we now know that every

11   year, since at least 2006, MGA has snuck into Mattel

12   showrooms.  We know that from documents that MGA began to

13   produce only in August of 2010.  For MGA to stand up here

14   and to say that somehow it knew all along and, apparently,

15   everyone else should have known all along this was a

16   critical issue for phase one, there is no explanation, none,

17   for MGA's withholding of these documents.

18             We asked MGA's witnesses, including Mr. Larian,

19   including Mr. Jolicoeur:  *Why were these documents not*

20   *produced earlier, reflecting that MGA had snuck into Mattel*

21   *showrooms as well?*

22             They have no explanation, whatsoever.

23             I submit, your Honor, it is because, as we have

24   gone through in detail in our briefs as to every piece of

25   this evidence, MGA itself, we objected.  MGA did not move.

```
 1              To the contrary, what did MGA do?

 2              MGA asked for stays of phase two discovery

 3    repeatedly and, in fact, was granted those stays,

 4    repeatedly.  They specifically asked and obtained repeatedly

 5    this kind of bifurcated discovery.  So what this really is,

 6    ultimately, is an attempt, a post hoc attempt by MGA that's

 7    kind of a combination buyer's remorse of what it is that

 8    MGA, itself, was asking for as part of phase one, as well as

 9    something that is completely inconsistent with the factual

10    record, as well as MGA's own conduct.

11              Mr. Potgiesser, an MGA executive, admitted that

12    Mr. Pfau, another MGA executive, told him that he snuck into

13    a Mattel showroom in the middle of the night in 2006.  When

14    was this first disclosed?

15              2010.  The fall of 2010.  Never disclosed by MGA

16    in response, in interrogatory.  Never produced in response

17    to any document request.

18              Likewise, there was the infamous M Booth report

19    from MGA's sneaking into Mattel's toy fair booth at

20    Nuremberg, in 2008.  That document was not produced until

21    after August of 2010.  And, in fact, as I stand here now, we

22    still don't have complete discovery on it.

23              As the court is aware, the court ordered Zapf to

24    produce the documents that relate to this episode.  We do

25    not have them.  They have not been produced, even though
```

1    that has been ordered.

2            So I would say, your Honor, that MGA is somehow --

3    was denied fair discovery and that somehow an inference is

4    even plausible under the circumstances that evidence was

5    withheld or was material to phase one, I submit, is

6    completely belied by the record as well as MGA's own

7    conduct.

8            Turning to some of the specifics of what it is

9    that MGA has asserted as documents it should have had.  It

10   relies upon the New York toy fair report from 2000.  It

11   states:  *Well, we would have known that Mattel was aware of*

12   *Bratz during that time period.*  As a matter of fact, there

13   was abundant evidence produced in phase one disclosing that

14   very fact.  It was never disputed.

15           We produced, for example, a videotape from the

16   Tokyo toy fair also in early 2000.  During phase one, MGA

17   actually made an issue out of it.  It showed, of course,

18   that Bratz was being shown at a toy fair.  Now, of course,

19   significantly, as we've shown on the trade secret claims

20   that MGA now tries to assert, this wasn't confidential.

21   There were no steps than taken to keep it confidential.  But

22   Mattel's knowledge of MGA releasing Bratz dolls, that's

23   never been a disputed fact.  The New York toy fair report

24   from 2001 is of no moment to the issues that MGA attempts to

25   claim that it was.

1          Mr. Parker attempted to hook this specifically

2    into fraudulent concealment and that somehow this would show

3    that there was no fraudulent concealment.  But, of course,

4    the fraudulent concealment that was relevant and the one

5    that was shown was found by the jury is the one pertaining

6    to Bryant's creation of Bratz while employed by Mattel.

7    There is nothing in that toy fair report, or any of the

8    other materials that MGA points to that had any bearing on

9    that.  Nothing.

10         And Mr. Parker does not cite any.  MGA's papers do

11   not identify any.  The same is true of the other documents

12   that were referred to, such as what happened to Barbie, the

13   Bratz brief and the like.  The court is undoubtedly aware

14   that some of these documents actually were produced in phase

15   one that they are now trying to suggest that somehow have

16   been withheld which, of course, is, again, factually

17   unsupportable.

18         MGA relied on this -- what they call the Eckert

19   deletion pattern.  As the court is aware, it is

20   undisputed -- and this is based upon the forensic auditor's

21   report -- excuse me, the computer forensic report.  There is

22   no such pattern with respect to Mr. Eckert's hard drives.

23   MGA specifically asked that Mr. Eckert's hard drives be

24   examined for deletion patterns and wiping software.  None

25   was found.  That is a court-appointed expert that has made

1    that determination.  It is unrebutted.  There is absolutely

2    no evidence and nothing but speculation by MGA to counter

3    that.

4              Now, in contrast, the court-appointed expert ILS

5    also found that, indeed, on MGA's hard drives, there was

6    wiping software, as well as other kinds of deletion software

7    installed on MGA's hard drives.

8              I'm sorry.

9              THE COURT:  I'm just trying to breathe, counsel.

10             MR. ZELLER:  Oh, sure.

11             The reliance on the various drafts of the Bain

12   report, I suppose is supposed to be dressed up in some way

13   to sound sinister that there was a legal commentary given

14   about a draft being done.  Your Honor, ultimately, what is

15   asked -- and this is obviously not proper to be done in

16   front of a jury, but you'll note that what Mr. Parker even

17   is relying on and MGA is relying on is the notion that

18   somehow their sinister intent, sinister language in a

19   redaction for privilege reasons that is not challenged here.

20             Obviously, MGA has to produce admissible evidence

21   to substantiate its claims here.  It certainly cannot go in

22   front of a jury and start to suggest that Mattel's proper

23   assertion, its uncontested proper assertion of the

24   attorney-client privilege somehow should allow the jury to

25   speculate that there was bad intent or other improper

1    conduct behind that.  And that is entirely MGA's argument on

2    this.

3              With respect to Mr. Sal Villasenor, there was this

4    kind of strange story that Mr. Parker attempted to create,

5    which was basically that somehow in 2005, once Mr. Sal

6    Villansenor is leaving Mattel that Mattel had suddenly

7    realized that the stealing wasn't enough, particularly with

8    also Ms. Rahimi.  And so, then Mattel decided to litigate

9    MGA to death.  This is almost a verbatim quote of MGA's

10   argument at this point.

11             This is absolutely supported by the record and in

12   fact it makes literally no sense.  The alleged decision of

13   Mattel to litigate MGA to death is based entirely one thing,

14   which is the testimony of Ron Brawer.  Ron Brawer, of

15   course, a former MGA executive who said this while he was at

16   MGA and, obviously, had a motive to say it.  But even

17   setting aside that issue about what Mr. Brawer -- that

18   Mr. Brawer was a MGA executive saying this, the fact is, is

19   that he left Mattel in October of 2004.

20             The chronology that was laid out is somehow in

21   2005, Mattel suddenly made this decision to litigate them to

22   death.  So this is not consistent even MGA's own allegations

23   and arguments at this point.  There is no connection, no

24   factual connection other than just simply Mr. Parker's

25   say-so where they attempted to knit these various things

1   together.  But chronology, it doesn't even add up.

2           Interestingly enough, too, of course, the notion

3   that somehow Mr. Sal Villansenor, obviously, the most

4   sinister figure who, as MGA attempts to portray it, really

5   can't be reconciled by the fact that MGA tried to hire him

6   and tried to hire him on the strength of the information he

7   could obtain from toy fairs.

8           Now, apart from -- and this was then the next

9   point, I think, that MGA made in the argument, was that

10  somehow the memo that Mr. Villasenor created about wearing

11  comfortable shoes and these other efforts somehow that added

12  up to protectable trade secrets for MGA.  Obviously, that

13  conflates completely different issues and doesn't really

14  stand up.

15          What I would suggest is this, is that we've

16  obviously shown them the papers, a variety of ways of which

17  this information that MGA is claiming as trade secret was

18  not protected.  In fact, it was disclosed to the press and

19  it was disclosed to retailers without obligation of

20  confidentiality.  Mr. Villasenor's memo, which of course

21  doesn't address any of that, cannot change those facts, just

22  simply cannot.  Whether or not Mr. Villasenor thought any of

23  these things were trade secrets is of absolutely no moment.

24  There is no foundation for that and certainly the memo

25  harped upon by MGA does not stand for that proposition.

1              Interestingly enough, MGA portrays our
2    arguments -- well, excuse me, our showing that the
3    information that MGA is claiming as trade secret actually
4    came from MGA press releases.  The phrase that was used is
5    that that is not credible.  But, first of all, your Honor,
6    the comparison is obvious.  We have a chart which is
7    undisputed in our papers showing that the very language that
8    MGA claims was the stolen trade secrets in Mattel's internal
9    documents actually came from MGA press releases and other
10   public sources.  And not only is that obvious and was that
11   shown, but MGA's 30(b)(6) witness admitted it.  This is not
12   an issue of credibility.  This is not a matter of dispute.
13   This is a matter of Mr. Jolicoeur, MGA's 30(b)(6) witness,
14   admitted that these were public matters.  There was no
15   equivocation.  There was no hiding behind this.  He admitted
16   it, because he had to.  He was shown these press releases.
17   He was shown that these press releases had the same
18   information as reports MGA claimed contained trade secret
19   information and predated it.
20              So there is no -- it's not a matter of attorney
21   argument.  This is what the evidence shows.
22              As, I think, further point on this, is that there
23   was the example of Alien Racers given, as somehow being a
24   trade secret and that the information was not disclosed.
25              But here's actually what the MGA 30(b)(6) said:

```
 1              Question:  Isn't it true that all the other
 2  information here reflected --
 3              THE COURT:  Slower.
 4              MR. ZELLER:  Sorry.
 5              Question:  Isn't it true that all the other
 6  information here reflected under the Alien Racers heading,
 7  on page 22 of this 2004 toy fair report is, in fact, from
 8  MGA's own press release dated February 11th, 2004?
 9              Answer:  Yes.  I believe that's correct.
10              Question:  Point to me, sir, where in the 2004
11  New York toy fair report there is any information about
12  Alien Racers that was not already public as a result of
13  MGA's own press releases by the end of February 2004?
14              Answer:  As I already testified, the information
15  as set forth in these lines here is essentially the same
16  information that was included in an MGA press release that
17  was issued in this time frame.
18              The same admissions were also given by
19  Mr. Jolicoeur, the MGA 30(b)(6) witness on this subject
20  about the so-called Bratz Diamondz.  In there he
21  acknowledged that the information that was supposedly trade
22  secret was the fact that these dolls had real gems.  But,
23  in fact, MGA had actually publicly disclosed this in press
24  releases a week before the toy fair ever began.
25              So, again, this is not a matter of -- Mr. Parker
```

1    was trying to portray a matter of credibility.  This is a

2    matter of MGA's own admission under oath by a 30(b)(6)

3    witness confronted with MGA's own press releases showing it

4    was, in fact, public.

5            I'll close on the note, your Honor, that another

6    way in which MGA attempted to sort of conflate these issues

7    about Mr. Villasenor's memo about comfortable shoes as

8    somehow establishing trade secret protectability is that

9    they also attempt to conflate it as being somehow part of a

10   readily ascertainable affirmative defense.  But the fact

11   here is, is that it has nothing to do with it being readily

12   ascertainable.  It has with the fact to do, or to do with

13   the fact that it was already public.  It was public by MGA's

14   own hands.

15           And also, of course, the record is replete with

16   multiple instances where MGA revealed to retailers, to

17   competitors, to the press and a variety of others, literally

18   a parade of people going through their toy fair showrooms

19   without any obligation of confidentiality for each of these

20   years, all the way up until the time period that they are

21   claiming that this information, the supposed trade secrets

22   were taken.

23           Thank you.

24           THE COURT:  Do you want to check with your

25   colleagues to make sure that you've covered all the areas?

```
 1              Ms. Estrich, do you want to make sure you have
 2    covered all the areas?
 3              MR. ZELLER:  Yes.  Thank you.
 4              THE COURT:  Counsel, on behalf of MGA.
 5              MR. PARKER:  I just want to -- I want to orient
 6    the court a little bit about the relevancy of the 2001
 7    New York toy fair report and any document on statute of
 8    limitations and any document that showed what contributed to
 9    the success of Bratz.  Because before the court was not just
10    the question Do I issue an injunction, based on the
11    copyright findings of the jury?, before the court was also
12    whether or not to compose a constructive trust, the
13    constructive trust that essentially, as the Ninth Circuit
14    noted, did not appear to take into account the contribution
15    of MGA to Bratz.
16              And recall those -- well, the New York, 2001
17    New York toy fair report has the second interest in this
18    case, not only because it's tied directly to fraudulent
19    concealment, because a company that could -- would go to the
20    efforts to sneak around is a company that cannot claim
21    extreme ignorance, for example, based upon a statement made
22    in the Wall Street Journal.
23              There is also the connection because it relates to
24    Diva Starz.  And Mattel is drawing that connection between
25    Diva Starz and Bratz.
```

1    We heard it here with Bratz, the name.  And when
2    we're talking about working with Villasenor, in 2005, and
3    the interchange about whether or not Villasenor has
4    information related to MGA and the response back and forth,
5    you have to understand at that time the lawsuit against
6    Carter Bryant had already been filed.  At that time, MGA had
7    intervened in the case.  So at that time, MGA's role in this
8    case was important, and there were those issues that were
9    relevant.  And that is the role that Quinn Emanuel played in
10   connection with this RICO enterprise.
11   Another document that we didn't receive was the
12   new brand cannibalization study, Exhibit 9444 and also
13   marked as Exhibit 9698, which again was relevant to the
14   statute of limitations.  Because as this court knows from
15   all the briefing and prior summary judgment motions, *Fox*
16   *versus Eticon* requires a party to know of the generic
17   elements.  And this new brand cannibalization study tied a
18   harm to Mattel, as a result of Barbie, and it was the
19   causation.  In other words, Barbie was suffering at least in
20   part because of competition from Bratz.
21   On the trade secrets, as I believe I stressed but
22   I'll stress again:  The trade secret is the appearance and
23   intended play pattern of the dolls and the toys.  And Mattel
24   urged how important it was to get that information.  Because
25   recall, it wasn't just that Mattel created New York toy fair

```
 1   reports, or reports.  They had live presentations where
 2   people could interact.  They had video conferences about
 3   what was found.  So it's not just that Mattel might have
 4   written additional words about it, or even the same words
 5   from a press release.  It's they needed to see it.  And it
 6   wouldn't have made sense -- if Mattel did not need to see
 7   it, they wouldn't have made the effort to get in.
 8            I guess there's just a few -- I guess what I'll
 9   call, what I'll call tit-for-tats.  If you will indulge me
10   some tit-for-tats.  What I mean by that is, if
11   Mr. Malackowski's report doesn't break down damages
12   sufficiently for Mattel's liking, then their expert report
13   has to go, because there is no attempt to even break it
14   down.  If Malackowski is wanting, Wagner is definitely
15   wanting.
16            Another tit-for-tat.  We have heard an argument
17   about the enterprise having an unlawful purpose, and you
18   have heard the contrary argument where Mattel was protecting
19   its RICO claims.  You have heard Mattel argue that
20   essentially if anyone -- anything taken by an employee from
21   Mattel, at least until we get down to the brass tacks, it's
22   valuable to trade secret.  And so, if you're going to sneak
23   in, year after year and then look up and say, *I could have*
24   *gotten it from a press release and it wasn't important,* I
25   don't think the argument holds.
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
 1              And, finally, we know it's valuable because in the
 2      record is Mr. Villasenor reviews where Mattel acknowledges
 3      the value to them.
 4              All right.  Now, I'm going to check, if you don't
 5      mind.
 6              THE COURT:  Please.
 7          (Pause.)
 8              MR. PARKER:  Excuse me for a moment.
 9          (Pause.)
10              MR. PARKER:  Thank you, your Honor.
11              THE COURT:  All right.  Thank you.
12              One, two, three, four.  We're done.
13              Okay.  We're going to take a brief recess; and
14      then, I want you, your best efforts, to come up with some
15      solution in light of the Kirk decision.  All or nothing, if
16      that's your position, so be it.
17              Let me hear from Mattel briefly, so we get that
18      portion out of the way.
19              Can you think of a position where Ms. Hurst would
20      exist as counsel of record, or any compromise position that
21      would satisfy Mattel?
22              MR. QUINN:  We don't see any in the case law.
23              THE COURT:  Thank you.  Do you want more time to
24      think about that, Ms. Glaser?
25              MS. GLASER:  No, sir.
```

41

```
 1              THE COURT:  Are you ready to respond?
 2              MS. GLASER:  I am.
 3              THE COURT:  All right.  Please.
 4              MS. GLASER:  We don't see any basis either, your
 5   Honor.
 6              THE COURT:  Okay.  Then give me a few moments.  I
 7   may simply rule from the bench on this, this evening.
 8              Would you like to perfect your record any more?
 9   In other words, would you like to call the gentleman who was
10   in charge of the ethics portion and allegedly setting up the
11   wall, so I hear more information about that?
12              MS. GLASER:  Your Honor, there were two areas,
13   actually:  One is that, of course.  And the other, as you
14   raised the issue about communications that Ms. Basinger may
15   have had with anyone at our firm about anything, not
16   directly whether it was directly to somebody on the team but
17   through somebody else, we thought we needed to respond to
18   that as well.
19              THE COURT:  What witness?
20              MS. GLASER:  That would be me and Mr. Baum.
21              I guess Ms. Basinger, too, but I assume the court
22   has asked that question.
23              THE COURT:  Yes.
24              MS. GLASER:  Our side of it would be, did anybody
25   direct that kind of information to be forthcoming, and we
```

1    are prepared to respond to that.

2             THE COURT:  Do you want that to be in camera, or

3    do you care if it's in open court?

4             MS. GLASER:  I would prefer it be in camera, your

5    Honor.

6             THE COURT:  Okay.  Mr. Baum (sic).

7             MR. KAUS:  There is also the question of the time

8    records and the evidence that we have not been able to see

9    or confront that have been covered with the code of silence,

10   for lack of a better word.

11            THE COURT:  Do you have any objection to them

12   seeing the records?  I think there were certain billings

13   that you thought were confidential, but those could

14   certainly be blocked out.

15            MR. ZELLER:  Given the circumstances here, I think

16   the answer is we do not have an objection, assuming that MGA

17   and whoever else needs to be bound to this, agree that that

18   will be not be asserted as a further -- or a waiver, I

19   should say, of the attorney-client privilege.  That is

20   certainly not our intention.

21            THE COURT:  Well, much of the information are

22   simply billing hours.  I have a hard time seeing what is

23   privileged in those.

24            MR. QUINN:  It's the description.

25            THE COURT:  That could be taken out.  That one

1    column which is the far right column could simply blanked

2    out that.

3            MR. ZELLER:  With that redaction, we believe that

4    that should be sufficient.

5            THE COURT:  Two of those cases are simply cases

6    where it makes no difference, frankly -- well, strike

7    that -- makes no difference if it's deleted.  Simply billing

8    records for the -- strike that, and the *Jakks* case.  It's

9    the two entries on the *Mattel versus MGA*.

10           Those should simply be deleted or blocked out.

11   And if there is no objection, turn those over to the

12   opposition during the recess, okay?

13           MR. ZELLER:  We will do that for all three cases.

14   Blocking out the description.

15           THE COURT:  Sure.  And do you want to give that to

16   us?

17           Do you want to put some paper over that, and we'll

18   Xerox here so that we can do it quickly.  You don't have to

19   waste your resources.  Just hand them to me, and I'll take a

20   piece of paper and delete it.

21           Fold it over.  Watch counsel.  This doesn't

22   require brain surgery.  Give me one of those exhibits.  Give

23   me one of those exhibits.

24           Just one piece of paper.  I'm going to show you

25   how quickly this can be done.  Why don't you bring 10

1    attorneys with you to help you accomplish this on both

2    sides?

3        *(Pause.)*

4            THE COURT:  Give me one piece of paper.  Watch.

5            Amazing.  50 billable hours.

6            Now, go show that to your colleagues.  Go show it

7    to them.  Show it to Mr. Quinn and tell me, what's wrong

8    with it appearing in that form?

9            MR. QUINN:  We are satisfied with this, your

10   Honor.  I should have thought of this.

11           THE COURT:  Mr. Quinn, you did.

12           MR. KAUS:  I raise two issues, your Honor.

13           THE COURT:  Not yet.  Why can't we do that with

14   all of them?

15           MR. QUINN:  We can.

16           MR. KAUS:  Your Honor, I will look at these.  I'm

17   concerned without the descriptions that we're going to have

18   a hard time making an argument.

19           THE COURT:  Thank you very much.  You haven't seen

20   them yet.  It's premature.

21           MR. KAUS:  Fair enough.

22           THE COURT:  Look at it first.  I'll be back in

23   about 15 minutes.

24       (*Recess taken*.)

25       (*At 5:43 p.m., proceedings were adjourned.*)

```
1                              -oOo-

2

3                           CERTIFICATE

4         I hereby certify that pursuant to Section 753,

5   Title 28, United States Code, the foregoing is a true and

6   correct transcript of the stenographically reported

7   proceedings held in the above-entitled matter and that the

8   transcript page format is in conformance with the

9   regulations of the Judicial Conference of the United States.

10

11  Date:  December 24, 2010

12

13

14         _____

15                    Deborah D. Parker, Official Reporter

16

17

18

19

20

21

22

23

24

25
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*