O

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| MATTEL, INC., | ) | CASE NO. CV 04-9049 DOC (RNBx) |
| | ) | |
| v. | ) | AMENDED O R D E R ON MGA'S |
| | ) | MOTION FOR SUMMARY |
| MGA ENTERTAINMENT, INC., | ) | JUDGMENT; MATTEL'S MOTION |
| | ) | FOR PARTIAL SUMMARY |
| | ) | JUDGMENT; MACHADO'S |
| | ) | MOTION FOR SUMMARY |
| _____ | ) | JUDGMENT; MATTEL'S MOTION |
| | ) | FOR PARTIAL SUMMARY |
| AND CONSOLIDATED ACTIONS. | ) | JUDGMENT ON MGA'S |
| | ) | COUNTERCLAIMS-IN-REPLY |
| _____ | ) | |
| | ) | |

Before the Court are the following Motions:

(1)    MGA Entertainment, Inc. ("MGAE"), MGA de Mexico, S.R.L. de CV ("MGA Mexico"), MGA Entertainment (HK) Ltd. ("MGA HK"), and Isaac Larian ("Larian")'s (collectively "MGA") Motion for Summary Judgment;

(2)    Mattel, Inc. ("Mattel") and Mattel de Mexico, S.R.L. de CV ("Mattel Mexico")'s joint Motion for Partial Summary Judgment;

(3)    Carlos Gustavo Machado Gomez ("Machado")'s Motion for Summary Judgment; and

(4)    Mattel's Motion for Partial Summary Judgment on MGAE's Counter-Claims in

1    Reply.

2    **Background**

3    On April 27, 2004, Mattel filed a state court complaint against former employee Carter

4    Bryant ("Bryant") alleging that Bryant breached his contractual and common law duties to

5    Mattel by failing to disclose his concept sketches and sculpts of the Bratz dolls prior to leaving

6    Mattel for MGA Entertainment, Inc. ("MGAE") on or about October 4, 2000.  Bryant filed a

7    counter-claim against Mattel in state court and filed a separate action for declaratory relief in

8    federal court on November 2, 2004, on which date Bryant also removed Mattel's state court

9    lawsuit to federal court.  MGAE intervened in Mattel's suit against Bryant on December 7, 2004

10   and, four months later, filed a stand-alone complaint in federal court against Mattel for trade

11   dress infringement, dilution, unfair competition, and unjust enrichment, alleging that Mattel

12   infringed MGAE's distinctive packaging and interfered with MGAE's business relationships.

13   On June 19, 2006, the Honorable Stephen G. Larson consolidated the three cases for all purposes

14   upon finding that "the[] actions involve a number of common issues of law and fact."

15   Bryant was the only defendant named by Mattel's state court complaint.  On November

16   20, 2006, Mattel sought leave to file an amended complaint that would "substitute [MGAE] for

17   Defendant Doe 1, [MGA HK] for Defendant Doe 2, and [Larian] for Defendant Doe 3" and add

18   MGA Mexico and Machado as defendants to a pleading that asserted a host of new claims

19   unrelated to Bryant's conduct.  (Dkt. 89.)  Mattel's request was denied but only as a procedural

20   matter; the court permitted Mattel to plead its proposed amendments "in the form of an amended

21   answer and counterclaim in" MGAE's case against Mattel.  (Dkt. 142.)  Mattel filed its First

22   Amended Answer and Counterclaims (FAAC) on January 1, 2007 (Dkt. 143) bringing the same

23   claims that are now pending against MGA and Machado, though the substance of those claims

24   and the detail with which they are alleged has changed considerably.  Following the filing of

25   Mattel's counter-claims against MGA and Machado, the court ordered claims related to the

26   ownership of the Bratz line of dolls — raised in Mattel's complaint against Bryant and Mattel's

27   FAAC — to be tried separately from, and prior to, MGAE's affirmative claims and Mattel's

28   counter-claims arising out of conduct unrelated to the ownership of Bratz.

Mattel entered into a settlement with Bryant on the eve of the "phase 1" trial, leaving the following claims to be tried to the jury: (1) Mattel's claim for intentional interference with contract against Larian and MGAE; (2) Mattel's claim for aiding and abetting breach of fiduciary duty against Larian and MGAE; (3) Mattel's claim for aiding and abetting breach of duty of loyalty against Larian and MGAE; (4) Mattel's claim for conversion against MGAE, MGA HK, and Larian; (5) Mattel's claim for statutory unfair competition against Larian, MGAE, and MGA HK; (6) Mattel's claim for declaratory relief against Larian, MGAE, and MGA HK; and (7) Mattel's claim for copyright infringement against Larian, MGAE, and MGA HK.  (Dkt. 3917 at 11.)  Mattel prevailed on each of its claims and the jury found that Bryant conceived the idea for the name Bratz and created the concept drawings and sculpt for the Bratz dolls during his second term of employment with Mattel (January 4, 1999 to October 4, 2000). On the basis of the jury's special and general verdicts, and after independently examining the similarity between the concept sketches/sculpts and MGA's Bratz dolls, the district court placed the Bratz trademarks in a constructive trust and enjoined MGA from continuing to sell dolls that were substantially similar to Bryant's initial works.  MGA appealed.

During the pendency of MGA's appeal of the phase 1 orders, discovery proceeded on the claims not tried in the phase 1 trial.  Mattel amended its responsive pleading three times and joined Mattel Mexico as a plaintiff to its operative Fourth Amended Answer and Counterclaims ("4AAC"), which brings claims arising out of MGA's relationships with Bryant and other former Mattel employees who allegedly stole Mattel's confidential information before leaving Mattel.  The 4AAC's claims also arise out of MGA's alleged litigation misconduct and unwillingness to comply with the phase 1 jury's verdicts, though many of these allegations were dismissed on August 2, 2010.  MGA narrowed its trade dress infringement allegation to the two-pronged claim that Mattel copied MGA's trapezoidal and heart-shaped packaging.  MGA also filed counterclaims-in-reply that arise out of Mattel's alleged market research tactics.

On July 22, 2010, MGA prevailed on its appeal.  In vacating the constructive trust and injunction, the Ninth Circuit held that the equitable relief was impermissibly broad and predicated upon jury verdicts tainted by erroneous instruction.  On October 22, 2010, this Court

granted MGA's motion for a new trial on all claims and issues tried to the jury in phase 1, finding that the indistinct and inseparable claims were all infected by instructional error.  The Court separately discarded with the earlier bifurcation of claims, and ordered that all pending claims between the parties be tried in a single proceeding to commence on January 11, 2011.

### Standard

Rule 56 of the Federal Rules of Civil Procedure provides that "[a] party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought." Fed. R. Civ. P. 56(a).  Summary judgment should be granted "when, viewing the evidence in the light most favorable to the non-moving party, there are no genuine issues of material fact" and the moving party is entitled to judgment as a matter of law.  *Avery v. First Resolution Mgmt. Corp.*, 568 F.3d 1018, 1021 (9th Cir. 2009); *see also* Fed. R. Civ. P. 56(a).  In adjudicating cross-motions for summary judgment, the Ninth Circuit "evaluate[s] each motion separately, giving the nonmoving party in each instance the benefit of all reasonable inferences." *ACLU of Nevada v. City of Las Vegas*, 466 F.3d 784, 790-91 (9th Cir. 2006) (citations omitted); *see also Friends of Columbia George, Inc. v. Schafer*, 624 F. Supp. 2d 1253, 1263 (D. Or. 2008).[1]

### Discussion

### I.      Bryant's Inventions Agreement

As explained in the order granting MGA's Motion for New Trial, Mattel's counter-claims for conversion, intentional interference with contractual relations, aiding and abetting breach of fiduciary duty, copyright infringement, and declaratory relief require the interpretation of Mattel's Employee Confidential and Inventions Agreement (the "Inventions Agreement") that Bryant signed on January 4, 1999.  By paragraph 2 of the Inventions Agreement Bryant agreed to "communicate to [Mattel] as promptly and fully as practicable all inventions . . . conceived or reduced to practice by me (alone or jointly with others) at any time during my employment with

---

[1] Mattel's unopposed motion to consolidate the summary judgment motions is granted subject to the general rule set forth in *City of Las Vegas*.

[Mattel]." (Declaration of Dylan Proctor, Ex. 124.)  Bryant also assigned to Mattel any "right, title and interest" in such inventions, which the Inventions Agreement defined as "includ[ing], but [] not limited to, all discoveries, improvements, processes, developments, designs, know-how, data computer programs, and formulae, whether patentable or unpatentable." *Id.*

## A.    Inventions[2]

Prior to the phase 1 trial, Mattel successfully argued that the terms of the Inventions Agreement assigned to Mattel Bryant's right, title, and interest in his ideas for the names Bratz and Jade, leaving for the jury the question of whether Bryant's ideas were conceived at any time during his employment with Mattel.  On appeal, the Ninth Circuit held that "the agreement could be interpreted to cover ideas, but the text doesn't compel that reading," and suggested that this Court evaluate whether the ambiguity "could be resolved by extrinsic evidence."

### 1.    Extrinsic Evidence

Mattel argues that Bryant and Mattel mutually intended for the Inventions Agreement to assign to Mattel Bryant's right, title, and interest in the ideas he conceived or reduced to practice at any time during his employment with Mattel.  Because "[t]he fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties," the Court may consider extrinsic evidence of the parties' intent when the contract is ambiguous.  *Morey v. Vannucci*, 64 Cal. App. 4th 904, 912 (1998) (quoting *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1264 (1992)) (quotation marks omitted).[3]  Admissible extrinsic evidence includes "surrounding

---

[2] Mattel argues that it does not matter whether the Inventions Agreement encompasses ideas because the Bratz name was contained in a stylized logo and the Inventions Agreement indisputably assigned Bryant's right, title and interest in his designs.  But owning the idea is distinct from owning the design, since Mattel seeks to capture the enhancement in value of the former and not the latter.

[3] Extrinsic evidence is also provisionally accepted to determine whether the contract is reasonably susceptible to the parties' competing interpretations and, if it is, "extrinsic evidence relevant to prove either of such meanings is admissible."  *Pacific Gas & Elec. Co. v.  G.W. Thomas Drayage & Rigging Co., Inc.*, 69 Cal.2d 33, 40 (1968); *Cf. Dore v. Arnold Worldwide, Inc.*, 139 P.3d 56, 60 (2006); *see also Trident Ctr. v. Connecticut General Life Ins. Co.*, 847 F.2d 564, 569 (9th Cir. 1988).

1  circumstances under which the parties negotiated or entered into the contract; the object, nature,

2  and subject matter of the contract; and the subsequent conduct of the  parties." *Id.*

3        Mattel cites Bryant's testimony from an unrelated lawsuit and the deposition testimony of

4  Mattel's corporate designee to show that both Bryant and Mattel understood the Inventions

5  Agreement to assign Bryant's right, title, and interest in his ideas.  As a general rule, evidence of

6  the contracting parties' "undisclosed intent or understanding" is irrelevant to the contract's

7  interpretation.  *Cedars-Sinai Medical Ctr. v. Shewry*, 137 Cal. App. 4th 964, 980 (2006).

8  However, evidence of the parties' subjective intent may be used "in interpreting an ambiguity,

9  although in the case of contracts, it is a mutual declaration of intention which is sought to be

10  found."  *Heston v. Farmers Ins. Group*, 160 Cal. App. 3d 402, 414 (1984) (finding prior

11  representations about similar agreement relevant to whether parties shared intent).

12        During a 2007 trial between MGA and Art Attacks Ink, LLC, Bryant testified about his

13  relationship with Mattel:

14      Q     And part of your job [at Mattel] was to come up with new ideas, right?

15      A     Yeah, that was part of my job.

16      . . .

17      Q     I'm not asking you whether it was fair or whether [Mattel] explained [the

18            Inventions Agreement] to you.  I'm just asking what your understanding of the

19            agreement was.

20      A     I really don't remember.

21      . . .

22      Q     Sir, [Exhibit 3074 is] a proprietary information checkout from Mattel that you

23            signed on October 19th, 2000, your last day of employment there, correct?

24      A     Yes.

25      . . .

26      Q     Okay.  And scroll up.  Mattel wanted to make sure that you were aware that each

27            terminating employee should be aware that in his employment agreement he has

28            agreed to transfer all inventions made or conceived during the period of his

1      employment at Mattel.  By this time did not you understand that condition?

2    A      I'm sorry.  I'm not exactly sure what you're asking me.

3    Q      Did you understand what this first sentence meant, by October 19th, 2000?

4    A      This is the first time I'd ever seen that contract.

5      THE COURT: Today is?

6      THE WITNESS: No.  On my exiting day this was the first time I'd ever seen this

7 particular contract.  And, again, it was a contract that was not explained to me.

8 BY MR. GRINNELL:

9    Q      Did you not understand that your interest in any and all inventions, improvements

10      and ideas which you made or conceived during your employment at the company

11      was the exclusive property of Mattel?  Did you not understand that?

12    A      You know, I think I was aware of that.  It wasn't pointed out to me when I left.

13      Nothing on this contract was pointed out to me specifically.

14 Declaration of Jon Corey In Support of Mattel's Motion for Partial Summary Judgment, Exh. 84

15 (*Art Attacks v. MGA* May 2, 2007 Trial Tr. (Carter Bryant) at 115:25 to 123:15).

16      Bryant's ambiguous testimony about a distinct agreement, as well as his understanding at

17 the time of his resignation, does not evidence "the mutual intention of the parties as it existed *at*

18 *the time of contracting*."  Cal. Civ. Code § 1636 (emphasis added).  The October 19, 2000

19 proprietary information checkout form referenced in Bryant's testimony is a document he was

20 asked to sign on his last day at Mattel. (Ex. 43 to MGA's MSJ.)  As a reminder to Bryant, the

21 checkout form purported to quote the assignment provision in the Inventions Agreement:

22          My interest in (a) any and all inventions, improvements and ideas

23          (whether or not patentable) which I have made or conceived, or may

24          make or conceive at any time during the period of my employment

25          with the Company, either solely or jointly with others and in (b) any

26          suggestions, designs, trademarks, copyrightable subject matter,

27          literary works, artistic works, and computer software which I have

28          made or conceived, or may make or conceive at any time during the

1         period of my employment which relate or are applicable directly or

2         indirectly to any phase of the Company's business shall be the

3         exclusive property of the Company, its successors, assignees or

4         nominees.

5  Ex. 43 to MGA MSJ.

6       The checkout form misquoted Bryant's Inventions Agreement, which did not expressly

7  assign to Mattel Bryant's interest in his ideas.  This error may be attributable to the fact that

8  prior versions of Mattel's Inventions Agreement expressly assigned the contracting employee's

9  interest in his ideas.  *Compare id. and* Exs. 9077, *with* Proctor Decl., Ex. 124.  The minimal

10  overlap between these prior versions and the version signed by Bryant — for example, Bryant's

11  agreement identifies "discoveries, improvements, processes, developments, designs, know-how,

12  data computer programs and formulae, whether patentable or unpatentable," many of which do

13  not appear in prior versions — shows a genuine issue of material fact as to whether Bryant's

14  understanding about the checkout form paralleled his prior understanding about the scope of the

15  Inventions Agreement.

16       Mattel's evidence of its *own* intent is also undermined by the dissimilarity between the

17  Inventions Agreement and checkout form.  For example, Mattel's Vice President for Human

18  Resources, Alan Kaye, submitted a declaration stating that:

19         Although the version of the Inventions Agreement signed by Mr.

20         Bryant did not specifically identify 'ideas' among the categories of

21         property to be assigned, it was Mattel's intent and understanding that

22         ideas related to Mattel's line of business were included among the

23         intellectual property assigned to Mattel.  Invention is a fluid concept,

24         and Mattel considers 'ideas' part and parcel with the creation of

25         designs and inventions that are assigned to Mattel.

26  Declaration of Alan Kaye in Support of Mattel's Motion for Partial Summary Judgment ¶ 8.

27       Kaye's claim that Mattel considers ideas "part and parcel" with inventions is belied by the

28  fact that the checkout form and earlier versions of the agreement treated inventions and ideas as

distinct.  Ninth Circuit Op. at 10534.  Though he claims familiarity with "Mattel's understanding of and position with respect to ownership of ideas and concepts developed off-site," Kaye could not explain at his deposition why the Inventions Agreement signed by Bryant omitted the word "ideas."  Deposition of Alan Kaye, Vol. I, June 19, 2010, 127:2 to 130:3.  Nor could Kaye define the phrase "includes but is not limited to" in Bryant's agreement, even though his declaration claims a "familiar[ity] with the Inventions Agreement that Bryant signed in 1999."  *Compare id.* at 127:23 *with* Kaye Decl. ¶ 4.

The fact that prior versions of the agreement used the word ideas may undermine the credibility of Mattel's witness.  *Travis v. Southern Pacific Co.*, 210 Cal. App. 2d 410, 421 (1962).  However, contrary to MGA's argument, the evolution of the Inventions Agreement does not entitle MGA to judgment as a matter of law on this issue, since a reasonable fact-finder could conclude that Bryant intended for the agreement to encompass ideas.  Both motions for summary judgment are denied on this issue.

## 2.    Assignability

MGA argues that Bryant lacked an assignable right, title, or interest in his ideas because ideas are not property under California law.  The Ninth Circuit rejected this argument, which MGA made in its opening brief on appeal, by holding that a narrower constructive trust may be imposed after re-trial.  MGA's argument is thus precluded by the law of the case doctrine. *United States v. Houser*, 804 F.2d 565, 567 (9th Cir.1986) ("A trial court may not [on remand] reconsider a question decided by an appellate court.").  Given the broad and variable rights in intangibles, the Ninth Circuit's conclusion was not error, let alone clear error, which is the only applicable exception to the law of the case doctrine.  *See Kremen v. Cohen*, 337 F.3d 1024, 1030 (9th Cir. 2003); *cf. Painton & Co. v. Bourns, Inc.*, 442 F.2d 216, 223 (2d Cir. 1971) (finding that commercially valuable ideas may be licensed); *Armorlite Lens Co. v. Campbell*, 340 F. Supp. 273, 275 (S.D. Cal. 1972) (similar).

MGA also claims the assignment of ideas is (1) contrary to a reasonable employee's expectations and (2) unconscionable.  These factors preclude the assignment of ideas if Mattel imposed and drafted the agreement and offered Bryant "only the opportunity to adhere to the

contract or reject it." *Neal v. State Farm Ins. Cos.*, 188 Cal. App. 2d 690, 694 (1961).  Whether Bryant was forced to accept the agreement as drafted turns on his credibility.  For example, a more senior Mattel employee declares that he negotiated a more limited assignment with Mattel.  Declaration of Robert Hudnut in Support of Mattel's Opp. to MGA's MSJ ¶ 4.  The fact-finder must also resolve whether the assignment of ideas was contrary to a reasonable employee's expectations, given Bryant's testimony acknowledging the assignment of ideas in his other agreements with Mattel.  *Graham v. Scissor-Tail, Inc.*, 28 Cal.3d 807, 820 (1981) ("[Graham] had been a party to literally thousands of . . . contracts containing a similar provision . . . .").  There is likewise a genuine issue of material fact as to whether the assignment of Bryant's interest in his ideas would have been unconscionable, since paragraph 2(a) of the Inventions Agreement similarly requires the non-disclosure of employee ideas.  Contrary to MGA's argument, the assignment of ideas is no more offensive to employee mobility than the assignment of inventions, which MGA requires of its employees.  Proctor Dec., Ex. 179 at 4604.  As long the assignment does not extend to post-employment work, it is generally enforceable.  *See Patent & Licensing Corp. v. Olsen*, 188 F.2d 522, 525 (2d Cir. 1951).

Both motions for summary judgment are denied on this issue of contract interpretation.

### B.     Timing

Bryant's Inventions Agreement assigned his right, title, and interest in inventions "conceived or reduced to practice by me (alone or jointly by others) at any time during my employment with the Company."  Proctor Dec., Ex. 124.  Prior to the phase 1 trial, Mattel successfully argued that the phrase "at any time during my employment" extends to nights and weekends.  (Dkt. 3285 at 5.)  On appeal, the Ninth Circuit held that the term "at any time during my employment" was ambiguous.  The parties' exclusion of inventions defined by Cal. Labor Code § 2870[4] did not necessarily evidence a mutual intent to capture everything else.

---

[4] Labor Code § 2870 bars the assignment of inventions developed on an employee's own time, unless (1) the employee used the employer's materials or information; (2) the invention relates at the time of conception or practice to the employer's business, or actual or demonstrably anticipated research or development of

1   The Ninth Circuit's mandate forecloses this Court from deciding the issue at summary

2   judgment.  Concluding that "[e]xtrinsic evidence doesn't resolve the ambiguity," the court held

3   that "[t]he issue should have been submitted to the jury."  Ninth Circuit Op. at 10539; *see also*

4   *id.* at 10540 (explaining that "Mattel might well convince a properly instructed jury that the

5   agreement assigns works created outside the scope of employment" on remand); *id.* at 10548

6   (same).

7   No exception to the law of the case doctrine applies, because the Ninth Circuit's

8   consideration of the extrinsic evidence was not erroneous, let alone "unreasonable," as MGA

9   argues.  For example, the Ninth Circuit cited the deposition testimony of Veronica Marlow, an

10  independent contractor who both introduced Bryant to MGA and developed the Bratz fashions

11  with three moonlighting Mattel employees.  (*See* TX 05-0091-TX 05-0120; Proctor Dec., Ex.

12  67.)  She testified "it was common knowledge" that Mattel employees did work on their own

13  time, though she hesitated to name the employees who "worked for other companies."

14  Deposition of Veronica Marlow, at 51:21-25.  The fact-finder must measure the credibility of her

15  testimony, possibly after determining whether her unwillingness to name names was reasonable.

16  Regardless, the additional extrinsic evidence cited by the parties does not resolve the

17  ambiguity anyway.  Bryant expressed concern that selling his sketches could interfere with his

18  Mattel employment, but as Mattel elsewhere argues, his alleged breaches "are not limited to

19  assigning rights to MGA that Mattel owns."  (Dkt. 8679 at 16:4-7.)  Indeed, Bryant testified at

20  deposition that he thought he owned inventions he created on nights and weekends, though other

21  Mattel employees felt otherwise.  Bryant's intent is relevant to the extent it evidences the parties'

22  mutual understanding, and Mattel's understanding turns on Kaye's credibility, which is

23  undermined by his inability to explain why earlier versions of Mattel's inventions agreement

24  used the phrase "at any time during the period of my employment" while Bryant's version only

25  _____

26  the employer; or (3) the invention results from any work performed by the employee for
    the employer.  The Inventions Agreement acknowledged that its assignment "does not
27  apply to an invention which qualifies under the provision of Section 2870."  Proctor Dec.,
    Ex. 124.
28

1   used the time "at any time during my employment."

2       Both motions for summary judgment on this issue of contract interpretation are denied.

3   **II.**     **Copyright Infringement**

4       Mattel registered copyrights in Bryant's concept sketches, as well as two concept sculpts

5   that Bryant allegedly created while working for Mattel.  Declaration of Michael Moore, Exs. 1-

6   28.  Mattel claims that MGA, MGA HK, Larian, and Bryant "have reproduced, created

7   derivative works from and otherwise infringed upon the exclusive rights of Mattel in its

8   protected works without Mattel's authorization."  4AAC ¶ 145.  MGA moves for summary

9   judgment on two issues: (1) MGA's production sculpts, which served as the template for the

10   dolls sold to market, did not infringe on Bryant's concept sculpts or sculpt sketches; and

11   (2) MGA's Bratz doll products did not infringe on Bryant's concept sketches.

12       To prove copyright infringement, Mattel must establish that: (1) it owns copyrights in the

13   concept sketches and sculpts; (2) MGA copied original elements of the copyrighted works.

14   *Funky Films, Inc. v. Time Warner Entm't Co., L.P.*, 462 F.3d 1072, 1076 (9th Cir. 2006)

15   (internal citation and quotation marks omitted).  Copying may be established by (1) direct

16   evidence of the copying of original elements of the copyrighted work; or (2) access and

17   substantial similarity "not only of the general ideas but of the expressions of those ideas as

18   well." *Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1164

19   (9th Cir. 1977); *see also Feist Pubs., Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361, 111, S.Ct.

20   1282 (1991)).  Mattel's ownership of copyrights in the sketches and sculpts, as well as MGA's

21   access to those works, are assumed for the purposes of this section.

22       **A.**     **There is No Direct Evidence of Infringement**

23       Mattel claims there is a genuine issue of material fact as to whether MGA directly copied

24   from Bryant's works.  It cites an MGA business plan stating that "[t]he Bratz[] are unique in

25   many ways; their eyes are big with a hint of animé style; their lips are more pronounced, their

26   feet and heads are oversized."  A sculptor retained to work on the Bratz line testified that

27   "Bryant's drawings have the factors that MGA say[s] are unique to the dolls, which is the

28   oversized eyes, protrusive lips, and the diminished nose."  MGA also conceded that Bryant's

works inspired the dolls released to market.

Mattel's evidence of infringement is hardly direct.  Testimony about MGA deriving inspiration from Bryant's sketches is prototypically circumstantial, and is incapable of rebutting evidence in the record that shows MGA's significant, independent investment in the design and development of the Bratz dolls.  For example, it was MGAE's designers, not just Bryant, who sent input to MGA's doll production team in Hong Kong.  MGA also assigned the tasks of sculpt design, packaging, facial design, and fashions to individuals other than Bryant.  All of these individuals participated in the production process and submitted input to MGA HK, which manufactured the dolls.  *See, e.g.*, Proctor Dec., Exs. 50-51, 66.

Mattel's evidence does not establish the copying of *original* elements.  The oversized head, protrusive lips, and diminished nose found in Bryant's sketches are not original elements.  Ninth Circuit Op. at 10543-10544 ("[M]any fashion dolls have exaggerated features . . . Moreover, women have often been depicted with exaggerated proportions similar to those of the Bratz dolls . . . The concept of depicting a young, fashion-forward female with exaggerated features, including an oversized head and feet, is therefore unoriginal as well as an unprotectable idea.").  Evidence that MGA copied the unoriginal, exaggerated features found in Bryant's sketches does not establish infringement.  *Cf. Roth Greeting Cards v. United Card Co.*, 429 F.2d 1106, 1109 n. 3 (9th Cir. 1970) ("Thus, if United had copied only the textual materials, which were not independently copyrightable, United might have been able to do so with impunity."); *see also Narell v. Freeman*, 872 F.2d 907, 910 (9th Cir. 1989) ("A finding that a defendant copied a plaintiff's work, without application of a substantial similarity analysis, has been made only when the defendant has engaged in a virtual duplication of a plaintiff's entire work."); *Situation Mgmt. Sys., Inc. v. ASP Consulting LLC*, 560 F.3d 53, 58 (1st Cir. 2009) (requiring evidence of both factual copying and infringement of protected elements).

### B.    Substantial Similarity

Summary judgment must be granted where "no reasonable juror could find substantial similarity of ideas and expression viewing the evidence in the light most favorable to the nonmoving party."  *Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1045 (9th Cir.

1994).  A two part extrinsic/intrinsic test determines whether two works are substantially similar.  *See Shaw v. Lindheim*, 919 F.2d 1353, 1357 (9th Cir. 1990).  The extrinsic test requires an objective examination of concrete manifestations of the ideas and expression in the two works, while the intrinsic test requires a subjective evaluation, most often by the fact-finder, of the "'total concept and feel of the works.'" *Cavalier v. Random House*, 297 F.3d 815, 822 (9th Cir. 2002) (quoting *Kouf*, 16 F.3d at 1045).

The "extrinsic" test originally required a comparison of only the ideas expressed by the two works, but has since been augmented to include an objective examination of articulable similarities in both ideas and expression.  *Funky Films*, 462 F.3d at 1077 (quoting *Kouf*, 16 F.3d at 1044).[5]  This inquiry focuses on whether "the specific details of an author's rendering of ideas . . . standing alone, are substantially similar."  *Funky Films*, 462 F.3d at 1078 (quoting *Metcalf v. Bochco*, 294 F.3d 1069, 1074 (9th Cir. 2002) and *Cavalier*, 297 F.3d at 822).[6]  Specific details, or "protectable elements," do not include (1) *scenes a faire* that "necessarily result from the choice of a setting or situation,"; (2) purely utilitarian elements; and (3) elements of expression merged with the underlying idea.  *See Well-Made Toy Mfg. Corp. v. Goffa Intern. Corp.*, 210 F. Supp. 2d 147, 160-161 (E.D.N.Y. 2002); *see also Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1444 (9th Cir. 1994).  Because both the extrinsic and intrinsic tests must be satisfied

---

[5]  A comparison of protectable elements, as opposed to the works as a whole, ensures that unprotectable expression does not form the basis for a determination of substantial similarity, thereby "confer[ring] a monopoly of the idea upon the copyright owner."  *Aliotti v. R. Dakin & Co.*, 831 F.2d 898, 901 (9th Cir. 1987).  Because the intrinsic test was designed to compare expression, the Ninth Circuit initially held that an analytical dissection of similarities "properly may be assimilated within the analytical framework of the intrinsic test."  *Id.*  However, the Ninth Circuit now requires that the analytical dissection take place at the extrinsic stage.

[6]  At the extrinsic stage, the court determines the standard for infringement that will be "applied at the 'intrinsic' stage."  Ninth Circuit Op. at 10541.  "If there's a wide range of expression . . . then copyright protection is 'broad' and a work will infringe if it's 'substantially similar' to the copyrighted work.  If there's only a narrow range of expression . . . then copyright protection is 'thin' and a work must be 'virtually identical' to infringe."  *Id.*

in order to prove substantial similarity, a "plaintiff who cannot satisfy the extrinsic test necessarily loses on summary judgment." *Kouf*, 16 F.3d at 1045.

### 1.    The Sculpt[7]

A genuine issue of material fact exists as to whether MGA's Bratz Production Sculpt (TX 17733) infringed Bryant's sculpt (TX 1136), in which Mattel registered a copyright.  Since "[t]he expression of an attractive young, female fashion doll with exaggerated proportions is [] highly constrained," the protectable elements subject to an extrinsic analysis are few, and the standard to be applied at the intrinsic stage is virtual identity overall.  Am. Ninth Cir. Op. at 10544 & n.9 ("When there are few protectable features not required by the underlying idea, applying the substantial similarity test to them is effectively the same as determining whether the dolls or doll sculpts are virtually identical overall.").

Both the Bratz production sculpt and Bryant's sculpt depict a young, female fashion doll with exaggerated proportions — an unprotectable idea.  The Bratz production sculpt and Bryant's sculpt also share large heads, thick lips, high cheekbones, slim arms, long legs, and slim torsos, all of which are unprotectable features as they are required by the underlying idea.

A reasonable fact-finder could conclude that the protectable expression of the Bryant sculpt is substantially similar to the Bratz production sculpt.  For instance, a reasonable jury could find that the precise shape, size, and placement of the ears on the Bratz Sculpt and the Bryant Sculpt are substantially similar.  In particular, a jury could find that the inner ear cochlea separates from the outer ear in an identical manner on both sculpts.  A jury could further find that the precise design of the nose is substantially similar, noting that both sculpts almost completely lack a nasal bridge.  With respect to overall face shape, a reasonable jury could find that the rear-most point of the scalp on both sculpts similarly slopes down to the jaw at about a fifteen degree angle before immediately curving forward at about a five degree angle.

---

[7] MGA's statement of uncontroverted facts asserts that Bryant's sculpt did not infringe certain sculpt drawings.  However, MGA does not identify the specific sculpt drawings that are the subject of its motion, and the Court declines to visit the issue *sua sponte*.

A reasonable jury could also find substantial similarity in the precise angles, measurements, and shapes of the sculpts' midsections.  For example, although the sculpts have very small, defined waists, both have a slightly protruding, rounded lower stomach.  Both sculpts also lack the roundness in the breast area that is common to many other fashion dolls with exaggerated, idealized proportions.  Likewise, a reasonable jury could note substantial similarity in the uniquely rounded shoulders of both sculpts, as well as the way in which both sets of lower arms flare out from the body in an unnatural and unrelaxed state.  Looking at the back of the sculpts, a reasonable jury could find substantial similarity in noticeable indentation that exists between both sculpts' shoulder blades.  A view of the sculpts' profile reveals the dramatic S-shaped curve in both sculpts' spines.

Both on this illustrative list of substantial similarities in protectable elements of the sculpt, a genuine issue of material fact remains as to whether the Bratz Sculpt infringes Bryant's Sculpt.[8]  MGA's request for summary judgment is therefore denied.[9]

## 2.    First Generation Dolls[10]

MGA contends the first generation of Bratz dolls are not substantially similar to any of Bryant's sketches.

### (a).    First Generation Jade

There is a genuine issue of material fact as to whether there are articulable similarities between the first generation Jade doll and Bryant's Jade sketches.  Both the doll and the sketches

---

[8] By the same token, a reasonable jury could find that the sculpts are virtually identical overall.

[9] This does not constitute a finding that subsequent generation dolls infringe.  The grant of summary judgment on that issue is absolute.

[10] The Court has considered TX 1107, TX 1108, TX 1109, and TX 1110, since MGA moves for summary judgment as to all sketches that were the subject of the jury's phase 1 verdict.  In its reply, MGA states that these drawings were jointly authored by MGA and Bryant, even though the phase 1 jury never made a finding of joint authorship. Having reviewed the testimony cited by MGA's reply brief, the Court finds a genuine issue of material fact as to the joint authorship of these sketches.

express the idea of a complete, young, hip female fashion doll who wears trendy clothing and exhibits a bratty look or attitude.  The doll and sketches use exaggerated physical proportions to express this idea, including larger eyes, heads, lips and feet, longer legs, and skinnier torsos and limbs than found in nature; however, the mere fact of these exaggerated features is both unoriginal and an unprotectable idea.  *See* Ninth Circuit Op. at 10546-10547; *cf. Mattel, Inc. v. Goldberger Doll Mfg. Co.*, 365 F.3d 133, 136 (2d Cir. 2004) ("An upturned nose, bow lips, and wide eyes are the 'idea' of a certain type of doll face.  That idea belongs not to Mattel but to the public domain.").

The dolls and sketches nevertheless share many protectable features, including "fashions and hairstyles."  Ninth Circuit Op. at 10547.  Both the doll and the girl in the sketch don pink, midriff-baring, short sleeved t-shirts.  On the center of the t-shirts is an emblem of a creature that appears to be a pink Cheshire-like cat with green eyes.  *Compare* TX 1107 *with* TX 17551.  The t-shirts are worn over a long-sleeved, off-pink shirt adorned with dark pink, light pink, and white polka dots.  *See id.*  The doll and the girl in the sketch wear olive-green, flared, non-denim pants with off-pink vertical piping that runs down the outer seam.  *See id.*  Both the doll and the girl in the sketch sport red sneakers decorated with pink accenting and a lip on the front of the shoe that curls upwards, and, to complete the look, shoelaces untied.  *See id.*  Both accessorize with a silver satchel with quilted accenting.  The doll and the girl in the sketch complete their look with light-colored lipstick and lip liner, pinkish eyeshadow, and dark bangs that protrude from a flat-topped, pink-based, multi-colored hat with horizontal stripes and two pink thread-braid tassels dangling from the uppermost corners.

The doll and the girls in the sketches also share anatomical similarities unrelated to standard features of the underlying idea, especially with respect to the eyes.  For example, the doll and sketches both depict three equidistant and identically shaped eyelashes, having an equal and triangular girth, on each doll eye, with each of the eyelashes protruding from the eyelid at identical angles.  *Compare* Ex. 302 at MGA 006463 *with* TX 17551-001.  Although the upper eyelid in Bryant's Jade sketches droops a little lower than on the doll, the dolls and sketches all lack a lower eyelid and the surface area between the top of the upper eyelid and the bottom of

1   the upper eyelid is consistent across the eyelid between the sketches and doll.  *See id.*  The doll

2   is also substantially similar to the sketches' particular expression of the eyes: the pupils are

3   dilated in a nearly identical manner, with the pupils situated at the top center of the iris (these

4   sketches apparently depict young female fashion dolls with defective vision), and the inner

5   corner where the upper and lower eye lids meet sits at the center of the nose.  *Id.*

6       To be sure, there are dissimilarities between the doll and sketches.  For example, the doll

7   wears rolled up pants made of a shiny fabric that resembles an alligator's skin. By contrast, the

8   pants worn by the doll depicted in the sketch appear to be made of cotton, and fall over the shoes

9   depicted in the sketch; the pants drawn in the sketch also feature prominent orange piping.  The

10  doll's shoes reveal more white cushioning on the outside of the shoe than the shoes depicted in

11  the sketch.  The satchel depicted in the sketch bears the word "Purrfect" and the doll's satchel

12  has no lettering or otherwise narcissistic terms incorporating sounds commonly made by

13  animals.  The doll's lips are darker than the lips depicted in the sketch, and the doll's eyeshadow

14  is two-toned and more dramatic than the eyeshadow depicted in the sketch.  Finally, the girl

15  depicted in the sketch has rosier cheeks and shorter hair (in pigtails) than the doll.[11]

16      A reasonable fact-finder could easily conclude that there are articulable and substantial

17  similarities between the protectable expression of the Jade sketch (Trial Exhibit 1107, 10638)

18  and sculpt (Trial Exhibit 17551).  MGA's request for summary judgment as to the first

19  generation Jade doll is therefore denied.

                        (b).    First Generation Cloe

21      There is likewise a genuine issue of material fact as to whether the first generation Cloe

22  doll and Bryant's sketches are substantially similar in their expression of the underlying idea.

23  *Compare* TX 1109, 771 *with* TX 13903-001.  Both the doll and the sketches express the idea of a

24  complete, young, hip female fashion doll who wears trendy clothing and exhibits a bratty look or

25  attitude.  The doll and sketches share exaggerated physical proportions, including larger eyes,

---

27      [11]The Court notes that the different cheek tones may simply be a consequence of
    the fact that the mass production of the dolls did not allow for the intensity of cheek color
28  in Bryant's drawings.

heads, lips and feet, longer legs, and skinnier torsos and limbs than found in nature; however, the mere fact of these exaggerated features is both unoriginal and an unprotectable idea.  *See* Ninth Circuit Op. at 10546-10547; *cf. Goldberger Doll Mfg. Co.*, 365 F.3d at 136 ("An upturned nose, bow lips, and wide eyes are the 'idea' of a certain type of doll face.  That idea belongs not to Mattel but to the public domain.").

A reasonable fact-finder could nevertheless conclude that the doll and sketches are substantially similar in their particular expression of these anatomical features.  *See id.* ("But Mattel's copyright will protect its own particularized expression of that idea and bar a competitor from copying Mattel's realization of the Barbie features.").  For example, both the girl depicted in the sketch and the doll have bright, cerulean eyes with dilated pupils centered on the upper half of the iris.  Unlike the eye lids depicted on the Jade doll and in the Jade sketches, which maintain a consistent inward gradient where the upper and lower eye lids meet, both the Cloe doll and Bryant's Zöe sketch depict lower eye lids that drop at a steep gradient and then immediately flatten for the latter half of their approach to the center of the face.  Moreover, in addition to the three eye lashes located on the outside corner of the upper eyelid (as found on the Jade doll and in the Jade sketches), the Cloe doll and Zöe sketch depict a patch of much smaller eye lashes that protrude from the outside corner of the lower eye lid (the doll's three eye lashes are evenly spaced but the eyelashes in the sketch appear to merge together).

The doll and the girls in the sketches also share non-anatomical features, including hairstyle and fashions.  Both the sketch and doll depict a baby-blue, midriff-baring t-shirt adorned with sequined studding along the collar and the word "Angel" in cursive font in the center of the shirt; sparkling bell-bottom jeans with a fringe on the outer seams and a slit on the bottom outer ankle, which fall over the boots worn in the sketch and on the doll; and a baby-blue, bumpy, rubbery-textured belt with a square buckle.  The doll is sold with a jacket worn in the sketch and both three button jackets have fold-over collars, rolled up sleeves, and fringes around the lower seam.  Both jackets appear to be composed of the same sparkly denim fabric as the jean pants.  The doll is sold with a pair of boots that, like the boots depicted in the sketch, are weighty and white, with an orange and brown buckle that falls on top of the foot.  The sketch

and the doll share a one-shouldered bag with a white base, teal piping, and a leopard-print flap that covers most of the front of the bag. The sketch and the doll share light blonde, long hair parted to the side and pulled back with a wide headband made of teal and gold fabric. Both have metallic-pinkish lip color, with noticeably contrasting, darker lip liner.

There are nevertheless certain differences between the doll and sketches. In the sketches, the lips are slightly parted, though the doll's lips remain closed. The doll's eyes are surrounded by blue eyeshadow, whereas the sketch's eyeshadow appears to be more grayish in color. The sketch's cheeks are more flushed than the doll's. The doll's attire also differs from the sketch's: the leopard-print flap on the doll's bag overlays a white background whereas the sketch's leopard-print bag overlays a tan background; the doll's buttons appear to be more metallic than the sketch's; the doll's shirt exposes more of her stomach; and the sketch's jacket displays more noticeable, defined stitching. In addition, the buckle on the Doll's belt is silver, and the buckle on the sketch's belt is baby-blue, like the rest of the belt.

A reasonable fact-finder could easily conclude that the Cloe doll and Bryant's Zoe sketches share many protectable features. MGA's motion for summary judgment is therefore denied as to the first generation of Cloe dolls.

(c).   First Generation Yasmin

There is a genuine issue of material fact as to whether there are substantial similarities between the protectable elements of Bryant's Lupe sketch and the first generation Yasmin doll. *Compare* TX 1110 *with* TX 13901. Both the doll and the sketches express the idea of a complete, young, hip female fashion doll who wears trendy clothing and exhibits a bratty look or attitude. The doll and sketches share exaggerated physical proportions, including larger eyes, heads, lips and feet, longer legs, and skinnier torsos and limbs than found in nature; however, the mere fact of these exaggerated features is both unoriginal and an unprotectable idea. *See* Ninth Circuit Op. at 10546-10547; *cf. Goldberger Doll Mfg. Co.*, 365 F.3d at 136 ("An upturned nose, bow lips, and wide eyes are the 'idea' of a certain type of doll face. That idea belongs not to Mattel but to the public domain.").

The doll also depicts certain non-anatomical features found in the sketch, including

20

1   fashions and certain elements of the hair style.  For instance, the doll and the girl in the sketch
2   don a purple, midriff-baring tube top as well as flared, light-colored pants that fall over pure
3   platform shoes.  Both pairs of pants feature prominent stitching along the sides of the outer leg
4   and a pattern at the very bottom of each leg.  Both accessorize with a tan satchel cinched at the
5   top with a drawstring bow and decorated with a purple-themed, intricate, geometric pattern.
6   Both sport a suede, maroon/brown bandana with fashion-keyhole designs along the edge that is
7   threaded with an exposed drawstring tied into a bow at the nape.  Both wear their hair with two
8   small braids featured towards the front of their heads amongst their flowing locks.  And both
9   wear a similar smoky-purple eye makeup and identical lipstick surrounded by dark brown lip
10  liner.

11      The Yasmin doll also parallels Bryant's particularized expression of Lupe's anatomical
12  features.  Like the other first generation Bratz dolls and sketches, the Yasmin doll and the girl in
13  the sketch share dilated pupils located in eyes partially covered by upper eyelids.  The Yasmin
14  doll and the girl in the sketch both have hazel eyes with a speck of blue, accentuated by four
15  upper eye lashes, as well as eye lashes on the bottom corner of the bottom eye lid of only the left
16  eye.   And both have an identically located small dark mole below the left eye.

17      There are ways in which a fact-finder could nevertheless find that there relevant
18  similarities between the Lupe sketch and Yasmin doll are not substantial.  The speck of blue in
19  the doll's eye is much smaller than in the sketch.  Though the doll's upper lip is smaller than its
20  lower lip, the opposite is true in the sketch.  The sketch depicts a large necklace, though the doll
21  wears no such accessory.   Moreover, the doll's eyeshadow contains more shades of brown than
22  the eyeshadow depicted in the sketch.  Whereas the doll uses her brown bandana as a headband,
23  with the exposed tan drawstring tied into a bow at the nape of the neck, the sketch wears the
24  bandana as a sarong tied diagonally across the hips in the sketch.  The doll's hair is longer and
25  darker than the almost blonde hair depicted in the sketch, though the drawings on the back of the
26  packaging for the Yasmin doll depict the character with lighter hair than the doll itself.  The hair
27  in the sketch is pulled back by a pair of barrettes, which the doll does not appear to own.  The
28  tube top worn by the doll is a pure magenta color, whereas the tube top depicted in the sketch is

1   a darker purple with subtle pink striping.  The doll's pants are khaki-colored, whereas the pants

2   depicted in the sketch are white.  The pattern on the bottom of the pants depicted in the sketch is

3   geometric, with red orange, blue and yellow color themes.  By contrast, the embroidery at the

4   bottom of the doll's pants have two orange stripes and a floral pink and blue pattern.  The

5   platform clogs depicted in the sketch are open-toed, whereas the doll's platform clogs are

6   closed-toed.

7         A reasonable fact-finder could easily conclude that the protectable details of the rendering

8   of the underlying idea expressed by the sketch (Trial Exhibit 1110) and sculpt (Trial Exhibit

9   13901) are substantially similar.  MGA's request for summary judgment as to the first generation

10  Yasmin doll is therefore denied.

11                    (d).    First Generation Sasha

12        There is a genuine issue of material fact as to whether the first generation Sasha doll

13  shares protectable elements of Bryant's Hallidae sketches.  *Compare* TX 1108 *and* TX 3-5 *with*

14  TX 17558.  Both the doll and the sketches express the idea of a complete, young, hip female

15  fashion doll who wears trendy clothing and exhibits a bratty look or attitude.  The doll and

16  sketches share exaggerated physical proportions, including larger eyes, heads, lips and feet,

17  longer legs, and skinnier torsos and limbs than found in nature; however, the mere fact of these

18  exaggerated features is both unoriginal and an unprotectable idea.  *See* Ninth Circuit Op. at

19  10546-10547; *cf. Goldberger Doll*, 365 F.3d at 136 ("An upturned nose, bow lips, and wide eyes

20  are the 'idea' of a certain type of doll face.  That idea belongs not to Mattel but to the public

21  domain.").

22        The doll nevertheless depicts protectable expression found in the sketch, including

23  fashions and hair style.  Both the sketches and the doll depict long-sleeved t-shirts with

24  horizontal stripes on the sleeves with a burst of orange in the center.  In another Bryant sketch,

25  TX 3-5, Hallidae wears a similar ensemble comprised of a multicolored, striped, long-sleeved

26  shirt overlaid with an orange puffy vest.  Both the doll and sketch also depict long, oversized,

27  flared denim skirts with cargo pockets, which fall over remarkably similar white, orange, and

28  blue sneakers with oversized soles and untied white laces.  Both also depict blue and orange

1  backpacks that bear the term "hip hop" and, in a display of wit, pictures of bunny rabbits.  Both
2  depict long, kinky, black hair trapped underneath silver triangular hats made of a ribbed knitted
3  material and topped with a poof ball.  Both depict dramatically defined eyebrows and eyes
4  covered in two-toned eyeshadow, and makeup that includes purple-toned lip liner and loud
5  cheek paint.

6        There are some elemental differences between the doll and sketches, though the
7  differences between TX 17558 and TX 3-5 are more defined than the differences between TX
8  17558 and TX 1108, which are minimal.  TX 3-5 depicts brown-toned eyeshadow, whereas TX
9  1108 and the doll share purple-toned eyeshadow.  The bunny rabbit on the backpack depicted in
10  TX 3-5 is more cartoonish than the more realistic bunny rabbit on the backpacks depicted in TX
11  1108 and the doll (though the doll packaging depicts a bunny that is very similar to the bunny
12  rabbit on TX 3-5's backpack).  The hat depicted in TX 3-5 is orange with stripes, and covers the
13  ears, whereas the hats worn in TX 1108 and on the doll are silver.  The hair depicted in TX 3-5
14  is dredlocked, whereas the hair depicted in TX 1108 and on the doll is smoother and straight.
15  With respect to differences in clothing, the t-shirt depicted in TX 1108's t-shirt shows the word
16  "YUM", whereas the doll's shirt contains no words, images, or exclamations of satisfaction after
17  a tasty treat.  The pocket attached to the skirt depicted in TX 3-5 is located near the thigh,
18  whereas the pockets depicted in TX 1108 and the doll are located near the calf.  The pocket in
19  sketch 3-5 is near the thigh, whereas the pocket in sketch 1108 is lower on the skirt, near the
20  calf.  Both TX 1108 and the doll depict a stitching indicating that the lower portion of the skirt
21  can be removed to transform the skirt into a mini-skirt, but TX 3-5 does not appear to have that
22  design.  The shoes depicted in TX 3-5 differ from the shoes shared by TX 1108 and the doll,
23  because the TX 3-5 depicts Timberland boots, whereas sneakers are worn by both TX 1108 and
24  the doll.

25        A reasonable fact-finder could conclude that the Hallidae sketches and Sasha doll are
26  substantially similar in not just the ideas depicted, but in the expression of those ideas as well.
27  *See Kouf*, 16 F.3d at 1045 (summary judgment only appropriate if no reasonable fact-finder
28  could find substantial similarity of ideas and expression).  MGA's motion is therefore denied as

1   to the first generation Sasha doll.

2   **3.      Subsequent Generation Dolls[12]**

3   In addressing the district court's errors, the Ninth Circuit stated that it "fail[ed] to see how

4   the district court could have found the vast majority of Bratz dolls, such as 'Bratz Funk N' Glow

5   Jade' or 'Bratz Wild Wild West Fianna,' substantially similar—even though their fashions are

6   hair styles are nothing like anything Bryant drew—unless it was relying on similarities in ideas."

7   Ninth Circuit Op. at 10547.  Since the court must determine at the extrinsic stage whether "no

8   reasonable juror could find substantial similarity of ideas *and* expression," *Kouf*, 16 F.3d at 1045

9   (emphasis added), the Ninth Circuit's inability to identify a basis for a substantial similarity

10  determination for dolls with distinct fashions and hair styles from Bryant's sketches disposes of

11  the vast majority of Mattel's counter-claim as to the later generations of Bratz dolls.

12  Not only do the vast majority of the subsequent generations of Bratz dolls differ in their

13  hair styles and fashions (the two elements identified by the Ninth Circuit), but they lack any

14  meaningful similarities outside of ideas.  Like Bryant's sketches, all of the subsequent

15  generation Bratz dolls express the idea of a complete, young, hip female fashion doll who wears

16  trendy clothing and exhibits a bratty look or attitude.  The dolls also depict exaggerated physical

17

18  ————————————

19  [12] Mattel attempts to construct another support for its copyright infringement
    counter-claim by arguing that all generations of the Bratz dolls infringe the "character" in

20  Bryant's original sketches.  "In determining whether the characters are similar, a court
    looks at the 'totality of [the characters'] attributes and traits as well as the extent to which

21  the defendants' characters capture the 'total concept and feel' of figures in [plaintiff's
    work]."  *Hogan v. DC Comics*, 48 F. Supp. 2d 298, 309-10 (S.D.N.Y. 1999).  "No

22  character infringement claim can succeed unless plaintiff's original conception
    sufficiently developed the character, and defendants have copied this development, and

23  not merely the broader outlines."  *Smith v. Weinstein*, 578 F. Supp. 1297, 1303 (S.D.N.Y.

24  1984), *aff'd mem.*, 738 F.2d 419 (2d Cir. 1984).  Similarity between characters cannot
    "exist[] only at a level of abstraction too basic to permit any inference that defendant[]

25  wrongfully appropriated any 'expression' of plaintiff's ideas."  *Arden v. Columbia

26  Pictures Indus., Inc.*, 1248, 1261 (S.D.N.Y. 1995).  Mattel thus cannot claim a coypright
    in the Bratz character circumvent the rule that the copying of the idea and expression

27  required by the idea does not constitute infringement.  If no reasonable fact-finder could

28  find substantial similarity in the *protectable expression*, Mattel fails the extrinsic test.

proportions, including larger eyes, heads, lips and feet, longer legs, and skinnier torsos and limbs than found in nature; however, the mere fact of these exaggerated features is both unoriginal and an unprotectable idea. *See* Ninth Circuit Op. at 10546-10547; *cf. Goldberger*, 365 F.3d at 136 (2d Cir. 2004) ("An upturned nose, bow lips, and wide eyes are the 'idea' of a certain type of doll face. That idea belongs not to Mattel but to the public domain."). The similarities end there: with the exception of two subsequent generation dolls (identified below), the dolls sport distinct fashions; make up; jewelry; accessories; hair styles, colors, and sheens; eye colors and shapes; and eye lash shape, size, and texture; from Bryant's sketches. In its subsequent generation Bratz dolls, MGA unmistakably abandoned Bryant's particular expressions of the underlying idea.

Mattel nonetheless argues that "the proof of infringement is substantial" as to these subsequent generation dolls, relying upon a report prepared by its expert. *See* Declaration of Lee Loetz in Opposition to MGA MSJ. Mr. Loetz does not analyze the subsequent generation dolls on a doll by doll basis, but instead purports to provide exemplar comparisons of the placement and proportions of body parts, (*id.*, Ex. B at 7), poses, (*id.*, Ex. B at 9), facial elements, (*id.*, Ex. B at 10), and clothing/accessories, (*id.*, Ex. B at 12).

Mr. Loetz's report commits a number of logical errors that corrode the foundation for his analysis. First, Mr. Loetz attempts, on numerous occasions in his report, to show that "parallels between the drawings and doll faces are not coincidental, but the result of executing the drawings in the dolls." *See, e.g.*, *id.*, Ex. B at 12. Mr. Loetz confuses evidence of factual copying—which is relevant to a defense of inadvertent infringement—with copying of *original* elements of Bryant's works that are protectable. *See Goffa Intern. Corp.*, 210 F. Supp. 2d at 159. So long as the parallels between the drawings and the subsequent generations of dolls were parallels in ideas or unprotectable expression, MGA was free to execute the drawings with impunity. *Narell*, 872 F.2d at 910.

Second, Mr. Loetz bases almost all of his conclusions about the subsequent generation dolls on the express basis of similarity between ideas and unprotectable elements. For example, Mr. Loetz states that the placement of the body landmarks in the subsequent generation dolls in

1   similar to the placement of such landmarks in Bryant's sketches, a conclusion that is both

2   factually wrong and irrelevant.  The placement of anatomical features is, as Mr. Loetz admits,

3   relevant to making a doll "look older or younger."  Loetz Dec., Ex. B at 7.  Elongating the body

4   expresses a different idea about the "age and gender," since "[a]s the human body grows from

5   child to adult, the body proportions lengthen from top to bottom."  *Id.*  Just as "slightly larger

6   heads, eyes and lips; slightly smaller noses and waists; and slightly longer limbs" are elements

7   that necessarily result from the idea of a young, fashion forward female, so too does the idea

8   require "proportionally shorter bodies."  A body with compressed proportions is not a

9   protectable element of Bryant's sketches and Mr. Loetz admits as much.

10   Mr. Loetz commits this error again when he states that the manner in which the facial

11   features are situated in the subsequent generation dolls is substantially similar to Bryant's

12   drawings.  He argues:

13   > The proportional placement of features on the face of a doll design is

14   > a key factor in how the design develops its look.  *To vary the*

15   > *placement of features on a face is to change who the character will*

16   > *be.*  Think of the compressed features of a cute baby, and then think

17   > of the elongated features in a traditional 'evil witch' character face.

18   > There are endless variations in between.

19   *Id.* at 11 (emphasis added).

20   Each of the endless variations of facial features to which Mr. Loetz refers can express a

21   different idea.  Working within Mr. Loetz's "cute baby" to "evil witch" spectrum, different

22   variations of facial features can express different ideas — *e.g.*, a cute witch, an evil baby, a

23   toddler, or an old woman.  Mr. Loetz concedes, however, that the compacted features in Bryant's

24   drawings were necessary to "create a pleasing attractive look," which is an unprotectable idea

25   that is distinct from the other ideas expressed by the "endless variations" in the placement of

26   facial features discussed in Mr. Loetz's report.  Allowing Mattel to prevent others from depicting

27   the placement of facial features that necessarily result from the idea of a young, fashion forward

28   female with exaggerated features is tantamount to giving Mattel a monopoly over the idea itself.

1  *See* Am. Ninth Circuit Op. at 17341 ("[F]ashion dolls that look like Patty and Selma Bouvier

2  don't express the idea behind Bratz.").

3       Mr. Loetz also argues that the dolls are substantially similar to specific facial features

4  found in Bryant's sketches, like lips that curve, "the look of a girl who has too much eye makeup

5  on," oversized almond eyes, and angular eyebrows.  Loetz Dec., Ex. B at 11-12.  But these

6  unoriginal features are all unprotectable elements of Bryant's work, because they belong to the

7  underlying idea of a young, fashion-forward doll with exaggerated features and a bratty look or

8  attitude.  *Cf. Ideal Toy Corp. v. Sayco Doll Corp.*, 302 F.2d 623, 627 (2d Cir. 1962) (Clark, J.,

9  dissenting) ("But is it so that one gets a 56-year copyright in normal arms and legs of a doll or in

10  a hidden smile?  This gives plaintiff a destructive power against competitors of unexplored

11  extent.  For a grin or a smirk in their otherwise dissimilar product may turn out to make them

12  accountable as infringers.").  The features discussed by Mr. Loetz (*e.g.*, a heavily made-up

13  young female) are unprotectable ideas and, for the reasons discussed below, the subsequent

14  generation dolls are not substantially similar to Bryant's particular expression of these ideas.

15  *See Goldberger Doll Mfg. Co.*, 365 F.3d at 136 ("Mattel's copyright will protect its own

16  particularized expression" of the idea of a certain type of doll face composed of "[a]n upturned

17  nose, bow lips, and wide eyes").

18       The vast majority of Mr. Loetz's actual comparisons (*see* Loetz Dec., Ex. B, Ex. 1-25)

19  concern the first generation of Bratz dolls.  Those comparisons that concern the subsequent

20  generation Bratz dolls reveal the lack of similarity between the dolls and the protectable

21  elements of Bryant's sketches.  For example, exhibit 20 to Mr. Loetz's report includes a side-by-

22  side comparison of the head of a subsequent generation Cloe doll with Bryant's Lupe sketch.

23  Both the doll and sketch share large eyes, large parted lips, light colored hair, and heavily made

24  up eyes, none of which are protectable elements.  The particularized expression of each of these

25  elements is not similar, let alone substantially similar: the lips are of a different shape and color,

26  the eyes rounder, the eye lashes more numerous and spaced differently, the faces shaped

27  differently, and the hair of a different color, sheen, and style.  The comparison between a

28  subsequent generation Sasha doll and Bryant's Hallidae sketch located at exhibit 21 of Mr.

1    Loetz's report reveals even more dissimilarities in Bryant's particular expression of the

2    unprotectable idea: the hairstyles, lips, eye lashes, and face shape, and skin tone are all different.

3         Mattel attempts to remedy these defects by pointing to Mr. Loetz's conclusion that the

4    dolls have "a visual consistency from Carter Bryant's sketches, to the first wave of dolls, and

5    through the later waves of Bratz dolls, even including the most recent 2010 Bratz dolls."  Mattel

6    Mot. at 40.  Mr. Loetz's observation may have be relevant to an intrinsic examination, which

7    involves "mere subjective judgment as to whether two [] works are or are not similar."  *Shaw*,

8    919 F.2d at 1357.  Since "objective manifestations of creativity" must be examined in the

9    "extrinsic" test, the absence of any similarity in protectable expression, from fashions, to hair

10   styles, to facial features, make up, and the eyes, means that Mattel cannot show a genuine issue

11   of material fact on the extrinsic test for the subsequent generation Bratz dolls.

12        Nevertheless, there are two subsequent generation dolls as to which an **"**indicia of

13   sufficient disagreement concerning the substantial similarity of [the] two works" remains.

14   *Swirsky v. Carey*, 376 F.3d 841, 846 (9th Cir. 2004) (internal citations omitted).  First, a

15   reasonable fact-finder could conclude that Ooh La La Cloe is substantially similar to the

16   protectable elements of the sketch depicted in TX 5.051, TX 11810.001.  Ooh La La Cloe likes

17   to shop til she drops at "the world's most chic boutiques" and wears a fashion ensemble that

18   resembles the ensemble depicted in the sketches:  a plaid, short, A-line skirt with a ribbon

19   around it; a midriff-baring, slightly scoop-necked shift worn underneath a cropped jacket with a

20   flared collar, chest-level pockets, and exposed stitching; (differently adorned and shaped) knee-

21   high boots; and a distinctively-shaped, pleated, somewhat floppy hat that falls to the middle of

22   the forehead and tilts to one side in a loose manner.  Second, a reasonable fact-finder could

23   conclude that Formal Funk Dana is substantially similar to protectable elements of TX 3-4.

24   Formal Funk Dana is dressed for the ball and, like the doll in the sketch, wears a midriff-baring,

25   two-pieced gown that is cinched at the waist with a bow, a sequined top held up by two thin

26   shoulder straps, and, to finish her look, a beaded, dangling, choker and drop-earrings, as well as

27   a triangle, sequined tiara.

28        For the foregoing reasons, MGA's Motion is granted as to all subsequent generation Bratz

dolls with the exception of Ooh La La Cloe and Formal Funk Dana.

### C.    Lost Opportunity Damages

MGA argues that Mattel should be precluded from recovering damages that flowed from a speculative lost opportunity to exploit the Bratz creative works.  The Copyright Act provides for the recovery of "actual damages" and "wrongful profits."  *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 707 (9th Cir. 2004).

Other than asserting in conclusory fashion that Mattel is precluded from recovering "infringer's profits against MGA," MGA does not meaningfully challenge Mattel's ability to recover "wrongfully obtained profits resulting from the infringement."  *Polar Bear*, 384 F.3d at 707.  MGA's challenge is limited to the actual damages that Mattel can recover from MGA under a lost opportunity theory.  To the extent Mattel intends to rely upon such a theory at trial, there is a genuine issue of material fact as to whether Mattel would have exercised the opportunity to use the Bratz works absent MGA's infringement of those works.

### III.    Misappropriation of Trade Secrets

Mattel's third counter-claim seeks to hold MGA, MGA Mexico, Larian and Machado liable for misappropriating Mattel's trade secrets.  Mattel alleges the illegal acquisition, use and disclosure of its trade secret materials, which include "documents, materials, designs, names, and other information stolen by Machado, Trueba, Vargas, Brisbois, Castilla, Cooney, Contreras, Brawer, other former Mattel employees, and other persons acting for, on behalf of or at the direction of MGA and/or Larian."  4AAC ¶ 134.

California's Uniform Trade Secrets Act proscribes the improper disclosure, acquisition or use of a trade secret.  Cal. Civ. Code § 3426.1.  The term "trade secret" is defined by the Act as:

> [I]nformation, including a formula, pattern, compilation, program, device, method, technique, or process, that:
>
> (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure; and
>
> (2) Is the subject of efforts that are reasonable under the

1    circumstances to maintain its secrecy.

2    *Id.*, § 3426.1(d).

3        Information derives independent economic value from not being generally known when

4    its secrecy "provides a business with a 'substantial business advantage.'" *Morlife, Inc. v. Perry*,

5    56 Cal. App. 4th 1514, 1522 (1997) (quoting *Klamath-Orleans Lumber, Inc. v. Miller*, 87 Cal.

6    App. 3d 458, 465 (1978)).  Both parties request broad summary judgment rulings on the issue of

7    whether Mattel's alleged trade secrets derived independent economic value from not being

8    generally known.  The parties' briefs failed to discuss each alleged trade secret with

9    particularity, but the Court nevertheless proceeds to analyze Mattel's counter-claim by

10   considering the evidence as to each trade secret.  For the reasons that follow, the Court finds

11   genuine issues of material fact as to the independent economic value that the vast majority of

12   Mattel's alleged trade secrets derived from not being generally known.

13       The determination of whether information is the subject of efforts that are reasonable

14   under the circumstances to maintain its secrecy is fact specific.  *See Rockwell Graphic Sys., Inc.

15   v. DEV Indus., Inc.*, 925 F.2d 174, 176-77 (7th Cir. 1991).  It is relevant whether an employer

16   "required its employees to sign confidentiality agreements respecting its trade secrets."  *See Mai

17   Sys. Corp. v. Peak Comp., Inc.*, 991 F.2d 511, 521 (9th Cir. 1993).  However, an employer's

18   vague descriptions of exactly what it is that constitutes a trade secret renders the confidentiality

19   agreement largely meaningless.  Moreover, an employer's failure to mark documents as

20   confidential or trade secret "precludes in many cases trade secret protection for those materials."

21   *Gemisys Corp. v. Phoenix Am., Inc.*, 186 F.R.D. 551, 559 (N.D. Cal. 1999) (citing *Jensen v.

22   Redevlopment Agency of Sandy City*, 998 F.2d 1550, 1557 (10th Cir. 1993)).  At the same time,

23   it makes no sense to hold, as a matter of law, that the failure to mark documents as confidential

24   precludes a finding of reasonable efforts, since the very employee directed to create and mark as

25   confidential the trade secret may be the individual who later misappropriates it.  On the basis of

26   these principles, the Court finds genuine issues of material fact as to whether Mattel took

27   reasonable efforts to maintain the secrecy of its trade secret materials.  Although Mattel

28   conducted extensive employee training, had its employees sign agreements, and controlled

access to its databases, it often provided vague direction to its employees and in many

circumstances failed to mark proprietary documents, including the documents that are at issue in

this case, as confidential.

## A.   Bratz

Mattel claims that the Bratz fashion doll concept is a trade secret, to which Mattel claims

ownership under the assignment clause of the Inventions Agreement.  The concept includes the

group name Bratz, the four doll names Jade, Hallidae, Lupe, and Zöe, as well as the doll designs,

fashions, themes, and marketing slogans in Bryant's pitch book.  It is undisputed that Bryant

disclosed the Bratz concept to MGA and shared his pitch book and concept sculpts with MGA

while he was still employed by Mattel.  (Bryant Tr. 2481:18-2482:5.)  It is also undisputed that

the dolls eventually released to market by MGA used the names Bratz and Jade.

## 1.   MGA's Procedural Objection

On the grounds that a trade secret counter-claim predicated upon the acquisition,

disclosure, and use of the Bratz concept implicated phase 1 issues, the Court refused to allow

Mattel to allege the Bratz concept was a trade secret until the Ninth Circuit ruled on MGA's

appeal from the post-phase 1 equitable relief.  Following the Ninth Circuit ruling, Mattel timely

moved to confirm the pendency of a trade secret misappropriation counter-claim predicated upon

the disclosure, acquisition, and use of the Bratz fashion doll concept.  On the basis of extensive

briefing and oral argument, the Court granted Mattel's request.  MGA "reiterates its objection to

amendment of Mattel's pleading," and claims to have suffered prejudice as a result of Mattel's

"change [in] legal theory," which MGA claims "violated the [Ninth Circuit's] mandate."  (MGA

MSJ at 25 & MGA Reply at n. 2.)

MGA's request for reconsideration of the two-month old order granting Mattel's motion

to confirm is denied as untimely.  *United States v. Comprehensive Drug Testing, Inc.*, 473 F.3d

915, 928-29 (9th Cir. 2006).  MGA's request for reconsideration is also denied because no "new

material facts or a change of law occurring after the time" of the court's order compel a different

outcome.  Local Rule 7-18.  To the contrary, the Court has since granted MGA a new trial on all

phase 1 issues, eliminating the potential that Mattel's Bratz trade secret counter-claim will

1    undermine the phase 1 jury's findings.

2         MGA's arguments are not just procedurally defective but predicated upon a paranoid

3    misreading of trade secret law.  MGA is specifically concerned that identifying the Bratz

4    concept as a trade secret allows Mattel to (1) lose the contractual assignment issues discussed

5    above and still capture the Bratz line; and (2) avoid the supersessive effect of California's

6    Uniform Trade Secret Act.  Neither concern is valid.

7         Mattel cannot prevail on a trade secret misappropriation counter-claim predicated upon

8    the acquisition, disclosure, or use of the Bratz concept unless it proves it owned the concept.  *See*

9    *Cytodyn, Inc. v. Amerimmune Pharmaceuticals, Inc.*, 160 Cal. App. 4th 288, 297 (2008) ("[A]

10   prima facie claim for misappropriation of trade secrets 'requires the plaintiff to demonstrate [that

11   it] owned [the] trade secret") (citation omitted).[13]  Identifying the Bratz concept as a trade secret

12   does not diminish, or even affect, Mattel's burden to prove that Bryant assigned his rights to the

13   ideas and creative works that composed the Bratz concept.  Of course, by proving the doll names

14   Bratz and Jade are trade secrets, Mattel may defeat MGA's challenge to the existence of a

15   property right in an idea.  *See Silvaco Data Sys. v. Intel Corp.*, 184 Cal. App. 4th 210, 239

16   (2010) ("Information is not property unless some law makes it so.").  But MGA already failed to

17   convince the Ninth Circuit that ideas are not property.  Section IA2, *supra*.  More importantly,

18   information (or an idea) does not become a trade secret only when it is so alleged; whether the

19   ideas behind the Bratz concept were or were not trade secrets is unrelated to Mattel's pleading.

20        MGA commits a similar error when it argues that Mattel's dilatory identification of the

21   Bratz and Jade names as trade secrets prevented MGA from arguing during phase 1 that the

22   Uniform Trade Secrets Act superseded the constructive trust or Mattel's conversion claim.  An

23   allegation of trade secret misappropriation is not a prerequisite to UTSA supersession.  (Dkt.

24   8705 at 5.)  To the extent the formal assertion of a trade secret misappropriation allegation

25   _____

26        [13] Other jurisdictions have concluded that possession of a trade secret is all that is
     required.  *See Metso Minerals Indus., Inc. v. FLSmidth-Excel LLC*, ___ F. Supp. 2d ___,
27   2010 WL 1850139, at *2 (E.D. Wis. May 7, 2010).  However, Mattel's possession of the
     Bratz concept is likewise conditioned on the assignment of Bryant's ideas and inventions.
28

predicated upon the acquisition, disclosure, and use of the Bratz concept reminded MGA to argue that UTSA supersedes Mattel's claim(s), MGA may have actually *benefitted* from Mattel's identification of the Bratz concept as a trade secret.

MGA also argues that Mattel's identification of the Bratz concept as a trade secret is untimely.  As discussed in greater depth in the Court's Order granting Mattel's motion to confirm, the parties' have long operated under the understanding that Mattel's trade secret misappropriation counter-claim encompassed the Bratz and Jade names.  MGA's counsel remarked at a deposition in early 2010:

> Well, let me say this. It's part of Phase 2. They have made a trade secret misappropriation claim based on Bratz. Let me say that again. There is a trade secret misappropriation claim in Phase 2 with an allegation of willful misappropriation of trade secrets against MGA Entertainment and Mr. Larian based on Bratz.

(Dkt. 8705 at 3-4.)

Finally, MGA claims that it "continue[s] to dispute that the [4]AAC contains a Bratz and Jade trade secret misappropriation claim," noting that the Court never ruled on Mattel's request to formally amend its pleading to expressly allege the misappropriation of the Bratz and Jade doll names.  (MGA MSJ at 61 n. 10.)  Mattel's failure to expressly allege the predicate facts for each of its counter-claims is unremarkable; the parties have long accepted that each other's pleadings need not specifically enumerate all the factual predicates for each claim.  For example, MGA's claim for trade dress infringement does not identify the specific trade dress allegedly infringed by Mattel, which MGA only definitively identified a few months ago, more than five years after filing its Complaint.  Mattel's request for leave to amend was immaterial and irrelevant to its motion to confirm, and the Court's failure to rule on Mattel's request does not undermine the force of its Order granting the motion to confirm.

## 2.    The Bratz Concept as a Trade Secret

MGA argues that, even assuming Bryant's Inventions Agreement assigned to Mattel some right, title, and interest in the idea for the Bratz fashion doll concept, Bryant's disclosure

1  and MGA's acquisition and use of those doll names did not constitute misappropriation

2  because a doll concept and doll names are not trade secrets.

3      Concepts can have value independent from the product they eventually inspire. *Cf.*

4  *Learning Curve Toys, Inc. v. Playwood Toys, Inc.*, 342 F.3d 714, 726 (7th Cir. 2003) (finding

5  issue of fact as to whether "concept for noise-producing toy railroad track" was trade secret); *see*

6  *also* 2 Roger M. Milgrim, *Milgrim on Trade Secrets* § 9.05[4], at 9-487-9-488.2 & n. 36 (Eric E.

7  Benson, ed., 2003 rev. ed. & 2009 supp.) (explaining that trade secrets may reside in

8  "confidential disclosures of concepts, or as yet-untested, ideas for a new product or new

9  process"). Mattel, for instance, invests a tremendous amount of material and human resources

10  into the development of product concepts and ideas, including product names. Mattel's Design

11  Center houses hundreds of employees who experiment with doll names, fashions, and

12  accessories. Internal correspondence exhibits a compulsion with getting the doll names exactly

13  right. *See* Ex. 314 to MGA MSJ. For example, a memoranda to Mattel employees conceded:

14          Consider Barbie for example. A Barbie doll is made up of plastic,

15          fabric, paint, synthetic hair, as well as cardboard and cellophane for

16          the box, which combined is worth only a few dollars. Why then will

17          a consumer pay $10, $20, $30 or more for this particular mix of raw

18          materials? A primary reason is the name "Barbie." This name

19          means something special to little girls all over the world; it inspires

20          fashion, friendship, association, dreams, fun.

21  *See* Declaration of Richard DeAnda, Ex. A.

22      MGA argues that a product name or concept lacks independent economic value from the

23  product with which it is associated, but this is a chicken and egg dilemma appropriate for

24  resolution by a fact-finder. MGA's own witness, and a key member of the Bratz team,

25  previously recognized that "a toy manufacturer's unreleased toy concepts . . . are among its most

26  highly valuable trade secrets." Declaration of Paula Garcia in support of Carter Bryant and

27  MGA's Motion for Clarification (Zeller Dec., Ex. 13) ¶ 4. Larian similarly conceded that MGA

28  considered a product name to be a trade secret while the product was still in development.

1   Deposition of Isaac Larian, Vol. VII, dated January 20, 2010 (Buchakjian Dec., Ex. 74), at
2   1799:5-15.  A reasonable fact-finder could certainly conclude that the Bratz concept, including
3   the names Bratz and Jade, derived no independent economic value from not being generally
4   known.  However, MGA's failure to cite any evidence supportive of its position, as well as the
5   wealth of evidence discussing the value independently generated by doll concepts in the toy
6   industry, precludes the entry of summary judgment.

7        MGA also argues that the easy accessibility of the names Bratz and Jade (both are words
8   that can be found in the dictionary) means the names lack novelty and therefore aren't trade
9   secrets.  But Mattel does not allege that the words Bratz and Jade are trade secrets in a vacuum
10  just as the developer of a formula can't claim that the numbers and variables that compose the
11  formula are trade secrets.  *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 420 F. Supp. 2d
12  1070, 1089-1090 (N.D. Cal. 2006) ("It does not matter if a portion of the trade secret is generally
13  known, or even that every individual portion of the trade secret is generally known, so long as
14  the combination of all such information is not generally known.").  Mattel argues that doll names
15  Bratz and Jade are novel — an argument MGA does not challenge with, for example, evidence
16  that any doll sold in the course of toy history used the name Bratz or Jade.

17       MGA instead responds that treating easily discoverable product ideas as trade secrets will
18  incentivize Mattel (or any other corporation) to "giv[e] each of its employees a dictionary and
19  inform[] them that every name has been or will be considered a product name."  However,
20  MGA's concern is misplaced because the UTSA does not prevent a person from using
21  independently developed or properly obtained trade secret information already in the possession
22  of another.  *See* Cal. Civ. Code § 3426.1(a); *Composite Marine Propellers, Inc. v. Van Der
23  Woude*, 962 F.2d 1263, 1265-66 (7th Cir.1992) (finding that plaintiff "must establish" that the
24  trade secrets were "misappropriated (that is, stolen from it rather than developed independently
25  or obtained from a third source)"); *see also E.I. Du Pont de Nemours & Co. v. U.S.*, 288 F.2d
26  904, 911 (Ct. Cl. 1961) ("A plurality of individual discoverers may have protectible, wholly
27  separate rights in the same trade secret.").  "Trade secret law, in short, protects only the right to
28  control the dissemination" by Mattel employees of their ideas for doll names.  *Silvaco Data Sys.*

1  *v. Intel Corp.*, 184 Cal. App. 4th 210, 221 (2010).

2        MGA's arguments are better addressed to a fact-finder tasked with determining whether

3  the doll names Bratz and Jade qualify as trade secrets; in particular, whether the names derive

4  independent value from not being generally known.  Though MGA challenges this basis for

5  Mattel's counter-claim, it cites no material evidence to aid the Court's evaluation of the issue.

6                     **B.     Misappropriation of Other Mattel Information**

7        Due to the commercial success of the Bratz dolls, MGA expanded its corporate operations

8  between 2001 and 2006.  Part of MGA's expansion involved the recruitment of employees from

9  Mattel.  Mattel's third counter-claim alleges that MGA should be held liable for alleged acts of

10  misappropriation committed by nine of these former Mattel employees, three of whom —

11  Machado, Mariana Trueba, and Pablo Vargas — were recruited away from Mattel Servicios,

12  S.A. (Mattel Mexico's subsidiary) to be founding members of MGA Mexico.  Machado is also a

13  named counter-defendant to this counter-claim.  Mattel, MGA, and Machado move for summary

14  judgment on various elements of this counter-claim.

15                     **1.     Ron Brawer**

16        Former Tyco Toys, Inc. employee Ron Brawer ("Brawer") was retained when Mattel

17  acquired Tyco in 1997.  Between 1997 and his September 17, 2004 resignation, Brawer held the

18  posts of Marketing Director and Senior Vice President/General Manager, in which he directed

19  teams of employees who worked with Mattel's retailer accounts.  MGA recruited him away from

20  Mattel with a competitive salary package but, more importantly, equity in MGA in anticipation

21  of an Initial Public Offering.  Mattel responded by escorting Brawer from the premises about 20

22  minutes after he tendered his letter of resignation.  Deposition of Ron Brawer, dated February 5,

23  2008, Vol. I, at 127:11-24; *see also* Ex. 4252 to MGA MSJ.  Mattel also directed a team of

24  private investigators to shadow Brawer, Brawer's wife, and Brawer's young children, whose

25  activities the investigators recorded via videotape and shared with Mattel's legal department.

26        Brawer attempted to re-negotiate Mattel's confidentiality agreements prior to his

27  departure, and even before he accepted an offer with MGA.  For example, in response to a

28  March 5, 2004 request from the Director of Barbie Brands that all Mattel executives sign a

1   revised Code of Conduct, (Webster Dec., Ex. 487), Brawer complained that "[t]here is one

2   section of the document that contains new and fairly broad language" regarding confidentiality

3   obligations, and expressed an intent to subject the language to an outside review (*id.*, Ex. 488).

4   On August 13, 2004, and while his employment negotiations with MGA were ongoing (*see id.*,

5   Ex. 480), Brawer asked to re-negotiate paragraph 6 of his employment agreement, which

6   concerned his confidentiality obligations (*id.*, Ex. 486).  During his post-resignation exit

7   interview, Brawer did not sign Mattel's standard Exit Interview and Checkout Form for

8   Executives, which also addressed Brawer's obligation to not disclose or use Mattel's

9   confidential information after his departure (*id.*, Ex. 490).[14]

10      Brawer's September 17, 2004 employment agreement with MGA also emphasized that he

11   keep his contractual obligations to Mattel.  (Ex. 4240 to MGA MSJ.)  MGA reminded Brawer to

12   "not retain any of Mattel's property or confidential and proprietary information . . . nor should

13   you use or disclose Mattel's property and/or confidential and proprietary information in

14   connection with your employment at MGA."  (*Id.*)  Mattel alleges that Brawer disregarded the

15   instructions from both Mattel and MGA by disclosing Mattel's "ideas, designs, and conception

16   for a fashion doll theme" called "Swappin' Styles" that MGA thereafter used for a line of Bratz

17   dolls.  (Webster Dec., Ex. 305 at 189.)[15]

18      There is a genuine issue of material fact as to whether Mattel's unreleased product idea

19   for a line of dolls with interchangeable heads and fashions derived independent value from not

20   being generally known to the public.  MGA moves for summary judgment on this issue but cites

21

22      [14] The Court will not consider the notes from that meeting, which are hearsay.

23

24      [15] Mattel actually claims that the Swappin' Styles theme contains "one or more
     trade secrets," with no more specificity than that.  Mattel's Statement of Genuine Issues
25   ¶ 102.  Mattel's lack of specificity forecloses it from claiming as a trade secret anything
     more than the unreleased product idea for swappable fashions and heads.  *See Silvaco*
26   *Data Sys. v. Intel Corp.*, 184 Cal. App. 4th 210, 221 (2010).  Mattel has also abandoned
     its counter-claim to the extent predicated upon other information allegedly
27   misappropriated by Brawer and MGA's motion is granted as unopposed as to this
     information.
28

1  no evidence or law, resting its argument on two appellate cases that discuss the parties' burdens

2  on a motion for summary judgment.  (MGA SF ¶ 102(d) (citing *Celotex Corp. v. Catrett*, 477

3  U.S. 317 (1986) and *Devereaux v. Abbey*, 263 F.3d 1070 (9th Cir. 2001) (en banc)).)  However,

4  as discussed earlier, one of MGA's employees submitted a declaration in this lawsuit claiming

5  that "a toy manufacturer's unreleased toy concepts . . . are among its most valuable trade

6  secrets."  Garcia Dec. ¶ 4.  The disclosure of certain forthcoming product lines well before they

7  hit the market, especially in the toy industry in which the product concept arguably requires

8  more effort than its execution, may prevent a manufacturer from enjoying the potential benefits

9  of primacy.  *See Sikes v. McGraw-Edison Co.*, 665 F.2d 731, 733-34 (5th Cir.), *cert. denied*, 458

10  U.S. 1108 (1982); *but see Richter v. Westab, Inc.*, 529 F.2d 896, 900 (6th Cir. 1976) (holding

11  that any product idea that would be obvious upon the product's release is not a trade secret); *see*

12  *also Hudson Hotel Corps. v. Choice Hotels Intern.*, 995 F.2d 1173, 1178 (2d Cir. 1993)

13  (comparing cases and noting that "[i]n the pre-marketing stage, the question whether a marketing

14  concept or new product idea can constitute a trade secret is murkier.").  Not all product plans

15  derive independent economic value from not being generally known to the public, but some

16  may.  Given MGA's failure to present any evidence as to the economic value Mattel obtained

17  from keeping MyScene Swappin' Styles secret prior to its release,[16] the Court finds the issue

18  appropriate for resolution by a fact-finder.[17]

19

20  _____

21  [16] For instance, other than the self-serving testimony of its own employee, MGA
has presented no evidence as to whether the concept for a doll with interchangeable heads

22  and fashions was well-known or had been attempted before MyScene Swappin' Styles.

23  Nor has MGA presented evidence about the value a manufacturer obtains from being
"first to market" with a doll concept.  *ABBA Rubber Co. v. Seaquist*, 235 Cal. App. 3d 1,

24  21 (1991) ("[I]nformation can be a trade secret even if it is readily ascertainable, so long
as it has not yet been ascertained").

25

26  [17] Mattel argues that its efforts to maintain the secrecy of the Swappin' Styles
product plan proves the information was valuable.  Though efforts to maintain secrecy

27  may sometimes be a relevant to the value of the information, Mattel has not shown that
these materials enjoyed any special protections unique from the protections Mattel

28  provided to every other document in its database.

1    There is also a genuine issue of material fact as to whether the MyScene Swappin' Styles
2    product plan was subject to reasonable efforts under the circumstances to maintain its secrecy.
3    MGA argues that Mattel failed to either inform Brawer of his obligation to not misappropriate
4    information after he resigned or warn MGA about Brawer's potential misappropriation.  MGA
5    UF ¶ 102(c).  However, Mattel's efforts to bind and remind its employees to keep business
6    information confidential is well documented.  *See, e.g.*, Declaration of Kimberly Graham in
7    support of Mattel's MSJ ¶¶ 3-25 (discussing efforts to encourage employee secrecy from
8    beginning to end of employment relationship).  Brawer acknowledged receiving a notice
9    reminding him of these obligations while he was in the process of participating in company-wide
10   discussions about the release of MyScene Swappin' Styles.  (Webster Dec., Ex. 488.)  On the
11   other hand, Mattel's company-wide circulars did not discriminate between categories of business
12   information or illustrate confidential information.  *See, e.g.*, Graham Dec., Ex. 16.  Neither
13   Mattel nor MGA cites any evidence specific to Mattel's efforts to maintain the secrecy of
14   Swappin' Styles — *e.g.*, Mattel's communications with retailers.

15   Finally, there is a genuine issue of material fact as to whether Brawer disclosed and MGA
16   improperly acquired knowledge about Mattel's MyScene Swappin' Styles doll.  On the one
17   hand, MGA deliberately created a line of dolls sporting interchangeable heads and clothing on
18   the heels of MyScene Swappin' Styles' release, acting with urgency and with apparent
19   knowledge of Swappin' Styles' impending release to market.  *See* Webster Dec., Ex. 8 (stating
20   that project for interchangeable heads "back on" in apparent bid to beat Mattel to market).  On
21   the other hand, MGA's 30(b)(6) designee testified that the company had long planned for the
22   release of a product with interchangeable heads — *i.e.*, the fact that it was released at the same
23   time as Mattel's product was purely coincidental and not the consequence of any improperly
24   acquired knowledge of Mattel's upcoming product lines.  MGA 30(b)(6) Depo. Vol. XXV, dated
25   October 4, 2010, at 6123.  The same witness, however, claimed that the genesis for this product
26   could be found in Bryant's portfolio, (*id.* at 6123:4-6), even though Bryant's portfolio only
27   discusses interchangeable fashions, and not heads.  Since a reasonable fact-finder could either
28   conclude that the evidence shows improper acquisition, disclosure and/or use or that it doesn't,

1    summary judgment cannot be granted on this element of Mattel's third counter-claim.

2                            **2.      Nick Contreras**

3          Nick Contreras ("Contreras") served as a Manager on Mattel's Customer Business Team

4    for a retailer named Target.  He started at Mattel in 1994, earning a salary of approximately

5    $2,760.00 per month.  (Ex. 1913 to MGA MSJ.)  Ten years later, and after ascending Mattel's

6    hierarchy, he accepted a position with MGA, where he officially started work on November 29,

7    2004.  (Deposition of Nick Contreras, dated January 28, 2008, at 204:22-24.)  In a January 11,

8    2009 interrogatory response, Mattel identified twenty-four Mattel trade secrets allegedly

9    misappropriated by Contreras and MGA.  (MGA SUF ¶ 110.)  On October 26, 2010, after the

10   deadline for the filing of motions for summary judgment, Mattel abandoned the claim that any of

11   these 24 categories of information constituted trade secrets.  (Webster Dec., Ex. 305.)[18]  To the

12   extent Mattel's third counter-claim arises out of Contreras' conduct, it's now predicated upon

13   Contreras' alleged attempt to recruit a subordinate from his time at Mattel to join MGA and to

14   ask that the subordinate download documents to a thumb drive.

15         Contreras resigned from Mattel by a letter dated October 29, 2004 and was escorted out

16   of the building.  (Ex. 1917 to MGA MSJ.)  During a short break in employment before he started

17   working at MGA, Contreras allegedly met with Yoon Jung Kim ("Susan Kim"), who worked for

18   him at Mattel, and has since left Mattel to pursue a graduate degree in business administration.

19   (Deposition of Susan Kim, dated January 18, 2010, at 44-45.)  Kim claims that Contreras

20   "indicated that he would want me to come and work for him at MGA, and he [] also [] asked me

21   to take a thumb drive [] that he gave me at this meeting and download certain files from our

22   network for his use for what he said was formatting reasons."  *Id.* at 43-44; *see also* Declaration

23   of Susan Kim ¶ 4 (same).  Contreras denies ever asking Kim to download documents or even

24   recruiting Kim to join MGA, although an email sent by Brawer to Larian while MGA was

25   recruiting Contreras predicted that "he will want to bring an analyst who works for him named

26

27         [18] MGA's motion is granted as unopposed as to these categories of alleged trade

28   secrets.

                                          40

Susan Kim (she is fantastic) . . . a real work horse who gets the numbers right." (Webster Dec., Ex. 191.)

Even though there is an issue of fact as to whether Contreras induced Kim to download materials from Mattel's servers, that fact is immaterial to Mattel's third counter-claim. Although Kim claims she initially agreed to download the requested materials, she ultimately "didn't think it was the right thing to do, and [] felt very awkward about the request." Kim Depo. at 64:17-19. The undisputed evidence establishes that, whether or not Contreras intended to misappropriate Mattel trade secrets, his alleged efforts failed.

Mattel concedes that Contreras did not misappropriate trade secrets, but maintains that Contreras' "attempt shows that the other multiple thefts by persons departing for MGA were deliberately orchestrated by MGA, rather than mere coincidence as MGA would have it." (Mattel Opp. at 15.) While Mattel's arguments about the probative value of Contreras' conduct may certainly prove interesting in the context of a motion in limine to exclude evidence of the conduct, they have no bearing on whether Mattel's third counter-claim can arise out of conduct that Mattel concedes does not give rise to liability under UTSA. Mattel cannot ignore that its operative pleading defines the allegedly stolen trade secret material to include "documents, materials, designs, names, and other information stolen by . . . Contreras." 4AAC ¶ 134. Mattel now concedes that it can prove no portion of this allegation and MGA's motion is accordingly granted as to Mattel's third counter-claim to the extent predicated upon Contreras' conduct.

### 3.     Jorge Castilla

Jorge Castilla ("Castilla") was Mattel's Planning Specialist for Operations, Planning & Finance, a position he ascended to over his seven years at the company. FAAC ¶¶ 68-69. Castilla worked on sales forecasting and inventory management. *Id.* ¶ 70. He helped develop the Electronic Data Warehouse, "a proprietary database containing highly confidential business information, such as sales, future/pending orders, product availability and sales forecasts at the stock keeping unit level." *Id.* Mattel alleges Castilla "created [by two days before his resignation] a folder on his Mattel network share[d] drive that he labeled 'To Take.'" *Id.* ¶ 74. This "To Take" folder allegedly included "documents [to] describe the function, method and

manner of operation of Mattel's inventory management and forecasting processes, as well as a highly confidential document prepared by Mattel's senior executives that laid out Mattel's future international business strategies and marketing." *Id.* Castilla transferred the files to a personal email address and deleted the folder from his shared drive before leaving Mattel. *Id.* ¶ 75. Mattel discovered the activity through computer forensics and contacted the Federal Bureau of Investigation (FBI), which dispatched agents to visit Castilla at his home and retrieve a digital storage device that Castilla used to store the files. *Id.* ¶ 76; *see also* Proctor Dec., Ex. 281. All of this happened before Castilla's first day of work at MGA.

Mattel alleges that seven categories of trade secrets misappropriated by Castilla encompassed his knowledge about Mattel's proprietary processes. Such information may be considered a trade secret because "to afford protection to the employer, the information need not be in writing but may be in the employees' memory." *Greenly v. Cooper*, 77 Cal. App. 3d 382, 392 (1978); *see also Klamath-Orleans Lumber, Inc. v. Miller*, 87 Cal. App. 3d 458, 465 (1978) ("[W]here, in order to do business the employer is forced to impart such select information to certain key employees, the information hardly becomes part of the employees' knowledge which they may freely use at some later time. Rather, it remains the exclusive property of the employer which must be appropriately protected."). The departing employee must "expend their own resources in uncovering the information" learned during their prior employment, instead of riding their prior employer's "coattails." *Id.* at 465 n. 3.

To prevent employers from using trade secret law as a weapon against employee mobility, California requires that "a party seeking to protect trade secrets [] 'describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons who are skilled in the trade, and to permit defendant to ascertain at least the boundaries within which the secret lies.'" *Whyte v. Schlage Lock Co.*, 101 Cal. App. 4th 1443, 1453 (2002) (quoting *Diodes, Inc. v. Franzen*, 260 Cal. App. 2d 244, 253 (1968)). Though a plaintiff need not "spell out the details of the trade secret," it must minimally provide "reasonable notice of the issues which must be met at the time of trial and [] provide reasonable guidance in ascertaining the scope of appropriate discovery."

*Id.* at 252-53.  For example, a vague claim that a former employee misappropriated "business models and implementations" is insufficient to describe a trade secret with particularity.  *See, e.g.*, *Farhang v. Indian Institute of Tech., Kharagpur*, 2010 WL 2228936, at *14 (N.D. Cal. June 1, 2010).  "A plaintiff must do more than just identify a kind of technology and then invite the court to hunt through the details in search of items meeting the statutory definition [of a trade secret]."  *Imax Corp. v. Cinema Technologies, Inc.*, 152 F.3d 1161, 1163-64 (9th Cir. 1998).  Mattel's vague and self-congratulatory descriptions of the first seven categories of trade secret information allegedly misappropriated by Castilla force the Court into exactly this sort of "hunt."

Mattel claims that Castilla made away with the information in his head about Mattel's forecasting process, which "ensure[s] the right product is in the right place at the right time, to ensure that inventory costs and supply and days of supply are kept at appropriate levels, and to ensure the right amounts of products are made to fill demand."  *See* Declaration of Laura Owens in Support of Mattel's MSJ ¶¶ 5-39.  Though Mattel concedes that its forecasting process has undergone tremendous evolution over the last several decades, it does not identify the specific systems misappropriated by Castilla.  Mattel instead claims that Castilla misappropriated information about a process that consists of measuring the market viability of a particular product through customer focus groups, communicating that information to the company's marketing and pricing teams, and attempting to produce the optimal number of goods.  *Id.* ¶¶ 7-15.  This vague description of the process does not provide the Court with *any* basis on which to conclude that the information obtains value from secrecy or was the subject of reasonable efforts to maintain its secrecy.  *See id.* ¶ 10 ("Mattel's forecasting process begins with planning and development of the product line.").  As described, the concept of projecting sales through market research and communication within the company is general, intuitive, and without dispute derives no independent economic value from its secrecy.  *Cf. Metro Traffic Control, Inc. v. Shadow Traffic Network*, 22 Cal. App. 4th 853, 862 (1994) ("[A] stable of trained and talented at-will employees does not constitute an employer's trade secret.").

The second category of trade secrets allegedly misappropriated by Castilla is even more nebulous.  Mattel identifies this category as its "demand planning process," which entails, to use

1    Mattel's words, "a series of inputs and outputs."  Owens Dec. ¶ 18; *see also id.* ¶ 19 (same).

2    Mattel does not identify these "inputs and outputs" or explain how this process gives "Mattel

3    insights into how to most efficiently meet demand."  *See id.*  Mattel concedes that its demand

4    planning has evolved over time, but does not explain Castilla's specific involvement in the

5    process, or any specific knowledge that Castilla could have gained from the process.  This

6    category of trade secret fails for lack of particularity.  And there is no genuine issue of material

7    fact that this category of trade secret, as described by Mattel, does not derive economic value

8    from not being generally known, for using "inputs and outputs" to project demand for a

9    manufacturers' products isn't valuable.  *Cf. Western Medical Consultants*, 835 F. Supp. 554, 557

10   (D. Or. 1993) ("An employee may use [knowledge from general know-how, skill and

11   experience] in later competition with a former employer.").

12        The third category of secrets allegedly misappropriated by Castilla is information

13   concerning "Mattel's Enhanced Sales Forecasting Process."  Owens Dec. ¶¶ 22-26.  Mattel's

14   witness claims that Mattel enhanced its forecasting process between 2005 and 2006 by

15   "identif[ying] [] elements" like "[p]ast quotas, historical marketing, promotional and sales

16   information . . ., marketing strategy, distribution information, financial target information,

17   availability information, media promotion, feedback from customers, product profiles and

18   history, and historical level of customer support" that helped Mattel meet "the projected demand

19   for its products . . ." *Id.* ¶¶ 23-24.  It is unclear whether Mattel alleges that the mere use of these

20   elements is a trade secret, or whether the company developed some unique process to synthesize

21   these otherwise common elements.  Assuming the latter, the Court finds genuine issues of

22   material fact as to whether the information about Mattel's Enhanced Sales Forecasting Process

23   derived economic value from not being generally known, was the subject of reasonable efforts to

24   maintain its secrecy, and was misappropriated by MGA and/or Castilla.

25        The fourth category of secrets allegedly misappropriated by Castilla encompasses

26   "Demand Planning and Sales Planning Modules of Mattel's ISIS Computer System," which is

27   defined as "a customized computer system, made up of both software and hardware" that

28   processes "demand signals, sales forecasts, availability and other outputs of the forecasting

1  system" using "mathematical templates, but not algorithms."  Owens Dec. ¶¶ 27-28.  The Court

2  finds genuine issues of material fact as to whether this category derived independent economic

3  value from not being generally known, was the subject of reasonable efforts to maintain its

4  secrecy, and was misappropriated by MGA and/or Castilla.

5       The fifth category of secrets allegedly misappropriated by Castilla concerns "Mattel's

6  Manugistics Pilot Program."  Owens Dec. ¶¶ 32-33.  In 2003, Mattel began testing an off-the-

7  shelf product called Manugistics and "concluded that the new approach was not a good fit"

8  because the algorithm both required data not compiled by Mattel and failed to incorporate data

9  that Mattel considered important.  *Id.* ¶ 33 (listing other concerns).  Mattel did not conclude that

10  the product was an objective failure; instead, it believed that the Manugistics software "did not

11  work for Mattel."  *See id.* ¶ 34.  Castilla allegedly disclosed to MGA "the elements of

12  [Manugistics] that worked and did not work for Mattel" as well as the "the learnings [sic] that

13  came out of that project."  *Id.*  There is, however, a distinction between disclosing the *fact* that

14  certain elements of Manugistics did or did not work for Mattel, and merely disclosing elements

15  of the program that did or did not work for Mattel.  Manugistics is a commercially available

16  program and the elements it measures easy to determine.  *Cf. IKON Office Solutions v. Am.*

17  *Office Prods., Inc.*, 178 F. Supp. 2d 1154, 1168 (D. Or. 2001) ("Bradley could have gone

18  through the fiction of calling each company to request the names anew, but that exercise would

19  yield no tangible benefit for Ikon").  Mattel argues that it prefers for its former employees to

20  engage in "costly exploration" to software features of which they are already aware.  Even if this

21  were cognizable, there is no genuine issue of material fact that identifying Manugistics' features

22  requires neither exploration nor much cost.

23       The sixth category of trade secret information allegedly misappropriated by Castilla is

24  "Mattel's International Data Warehouse," used to "store and calculate data relating to the

25  business of Mattel's international subsidiaries" and later expanded to include "sales numbers,

26  future and pending orders for product, availability information, SKU-level and other sales

27  forecasts."  Owens Dec. ¶ 37.  This is nothing more than a data processing mechanism, that

28  Castilla is not alleged to have misappropriated, since the data warehouse itself continues to

1   reside at Mattel.  Mattel instead claims that Castilla disclosed trade secrets by enriching MGA's

2   ability to configure and manage sales data in a more efficient way.  *See id.* ¶ 38.  Mattel's claim

3   fails to raise a genuine issue of material fact as to whether Castilla misappropriated information

4   about the International Data Warehouse.  Nor is there a genuine issue of material fact as to

5   whether the storage and calculation of common sales-related variables, like "sales numbers [and]

6   future and pending orders for a product" belong to the catalogue of general knowledge that an

7   employee is allowed to take with him after leaving his employer.  *See Metro Traffic Control, Inc.*

8   *v. Shadow Traffic Network*, 22 Cal. App. 4th 853, 862 (1994).  Mattel's claim as to the

9   International Data Warehouse is impermissibly vague and based upon an inflated approximation

10  of the value obtained from storing and processing common sales-related variables.

11      The seventh category of trade secret information allegedly misappropriated by Castilla is

12  information concerning the "OMNI [] order management system" purchased and customized by

13  Mattel to assist with "processing, allocating and executing orders."  *See* Mattel's Corrected

14  Responses to MGA's Second Set of Interrogatories, dated October 26, 2010 (Webster Dec., Ex.

15  305) at 19.  Mattel makes no effort to describe the "trade secret" elements of this commercially

16  available product, other than to summarily claim that the system was customizable and

17  customized by Mattel.  The fact that Mattel's vague description precludes the Court from

18  effectively determining whether information about the OMNI system derives independent

19  economic value from not being generally known is precisely why California requires that a trade

20  secret by alleged with particularity.  Mattel's allegations as to this product fail.

21      The remaining trade secrets allegedly misappropriated by Castilla and MGA are the

22  documents found on a thumb drive he returned to federal authorities after resigning from Mattel

23  but before joining MGA.[19]  The documents summarize Mattel's sales planning, map Mattel's

24  ─────────────────

25      [19] The Court denies Mattel's request for an adverse inference from Castilla's invocation of his Fifth Amendment right against self-incrimination during his deposition.
26  Castilla is not a party to Mattel's third counter-claim and Mattel suffered no prejudice as a result of Castilla's failure to substantively respond to questions about whether and to
27  what extent he downloaded Mattel's information prior to his departure.  *See SEC v.*
    *Collelo*, 139 F.3d 674, 677-78 (9th Cir. 1998) (collecting cases).  Mattel independently

28

46

efforts to test its forecasting, describe alterations to sales inputs, sketch promotional and marketing plans, coordinate the interface between Mattel's global operations, and discuss retailer account management (*e.g.*, Toys 'R Us versus Wal-Mart). *See* Owens Dec., Exs. 1-70.

There is a genuine issue of material fact as to whether the documents derived independent economic value from not being generally known to the public. For instance, Mattel's 30(b)(6) designee testified at deposition that "[he] wouldn't consider the fact that Mattel does sale forecasts to be a trade secret." Deposition of Mattel 30(b)(6) Designee, dated December 16, 2009, at 106. However, that very witness continued that "the way in which Mattel does those forecasts may be a trade secret." *Id.* Mattel's particular method (as found in the documents) may have had some value, due to intense competition between manufacturers for retailer shelf space, as well as retailers' willingness to abandon a manufacturer with deficient forecasting for one with a more accurate ability to deliver the right number of goods at the right time.

There is a genuine issue of material fact as to whether Mattel efforts to maintain the secrecy of the documents were reasonable under the circumstances. Three days before Castilla resigned, Mattel learned that Castilla had created a "To Take" folder on his shared network drive. Deposition of Mattel 30(b)(6) Designee, Vol. IV, November 19, 2009 at 772. It took no action against him and did not restrict access to his files, even though it knew that he was interviewing with MGA at the time. *Id.* On the other hand, Castilla likely did not download any information to his "To Take" folder until Sunday, March 12, a fact that Mattel did not learn about until after his resignation. *Id.* at 774:3. A reasonable fact-finder could conclude that Mattel's failure to restrict or sanction Castilla, despite knowledge of his access and his overtures towards MGA, shows that the company failed to take reasonable efforts to maintain the secrecy

discovered and tracked Castilla's wrongdoing through its forensic hardware analysis, and then petitioned federal authorities to get involved. In all events, Castilla's invocations of his right against self-incrimination were only in response to questions about his conduct prior to starting work at MGA, which is irrelevant to disclosure and use.

of the documents.[20]  But it could also reasonably conclude that the mere creation of a "To Take" folder should not have triggered alarm bells at Mattel, since Castilla could have been preparing to transfer personal files saved to his work hard drive.  Indeed, Mattel inundated Castilla—like all Mattel employees—with reminders of his obligations to keep confidential Mattel's business materials, and Castilla acknowledged receiving these reminders.  *See, e.g.*, Proctor Dec., Ex. 362; Webster Dec., Ex. 357.

There are also genuine issues of material fact as to whether Castilla disclosed the documents to MGA and/or MGA improperly acquired or used the documents on the thumb drive.  On the one hand, Castilla returned the thumb drive to federal authorities and claims he had no plan to share the files with MGA.  *See* Declaration of Warrington Parker, Ex. 61.  On the other hand, MGA re-hauled its forecasting systems almost immediately after Castilla's arrival, and in significantly less time than it took Mattel, with its greater human resources, to accomplish the same task.  The fact-finder should also be allowed to evaluate the credibility of Castilla's claim that he made no other electronic copies of the documents initially taken from Mattel; a representation whose veracity can be called into question by evidence that Castilla obfuscated his initial efforts to download documents from Mattel's servers.

### 4.    Dan Cooney

Dan Cooney ("Cooney") started serving as Mattel's Director of National Accounts for the Toys 'R Us account soon after he was hired for his second stint of employment at the company in January 2004.  4AAC ¶ 82.  He accepted a position as MGA's Vice President of Sales, National Accounts (Ex. 2157 to MGA MSJ), and announced his resignation on April 28, 2006.  4AAC ¶ 83.  In response, Mattel dispatched a member of its "Global Security" force to pay a visit to Cooney's home and require him to surrender "one large box of files, some loose binders and computer equipment."  *Id.*  Unlike Brawer and Contreras, Mattel allowed Cooney to stay on for two weeks after he tendered his resignation, though he was not allowed to perform any work

---

[20] For example, Mattel failed to modify generic language in a post-resignation form letter to Castilla.  *See* Ex. 8340 to MGA MSJ.

1  during this period of time. *See* Deposition of Dan Cooney, dated January 28, 2008, at 183:23-

2  25. Cooney started work at MGA on May 15, 2006. *Id.* at 184.

3      Before leaving Mattel, Cooney downloaded some of Mattel's files to a folder called

4  "Dan's Files" located on a personal compact disc owned by Cooney. *See id.* at 311. He did not

5  transfer the files from the personal compact disc to his MGA-issued computer until a few days

6  after he started working at MGA. *Id.* Mattel identifies only two of those files as trade secrets.

7  Both files contained some portion of a formula embedded in a "Merchant Model Optimization

8  Tool" spread sheet shared by Toys 'R Us with the manufacturers of products sold in its stores.

9  Though Toys 'R Us did not reveal the embedded formula to manufacturers, Cooney and two

10  Mattel employees reverse engineered the formula in order to "identify thresholds for certain

11  financial metrics employed by Toys 'R Us in making purchasing decisions and to determine

12  whether products to be offered for sale to Toys 'R Us meet those thresholds." Webster Dec., Ex.

13  305 at 60. Cooney testified that the purpose of reverse engineering the spread sheet was to

14  determine "how [Toys 'R Us] was looking at [its] business, so that [Mattel] could proactively

15  plan [Toys 'R Us's] business in a similar format." Cooney Depo. at 60.

16      There is a genuine issue of material fact as to whether the formula derived by Cooney

17  derived independent economic value from not being generally known. Independent economic

18  value can be evidenced by "circumstantial evidence of the resources invested in producing the

19  information." *Religious Tech Ctr. v. Netcom On-Line Commc'n Servs., Inc.*, 923 F. Supp. 1231,

20  1253 (N.D. Cal. 1995). Contrary to MGA's argument, "if reverse engineering is lengthy and

21  expensive, a person who discovers the trade secret through reverse engineering can have a trade

22  secret in the information obtained from reverse engineering." Legis.Com. com. to Civ.Code, §

23  3426.1; *see also Hoffman-LaRouche Inc. v. Yoder*, 950 F. Supp. 1348, 1358 (S.D. Ohio 1997)

24  (same under Ohio law). Cooney emailed his Mattel colleagues lamenting the difficulty of

25  cracking the formula. *See* Compendium of Trade Secrets in Support of MGA MSJ, Ex. 182

26  ("my brain hurts . . . Dave, we may need your brainiac math mind!"). However, the formula

27  may have been derived within three and one half weeks, which may not evidence a lengthy and

28  expensive reverse engineering process. *See* Cooney Depo. at 79-80 (document was updated

1    between April 4, 2006 and Cooney's departure).

2        MGA also argues that the formula embedded in the optimization tool lacked economic

3    value because it was flawed.  Information about customers' preferences can aid in "securing and

4    retaining their business." *Aetna Bldg. Maintenance Co. v. West*, 39 Cal.2d 198, 205 (1952) (pre-

5    UTSA case).  MGA argues that the partial formula derived by Mattel was worthless because

6    Toys 'R Us was in the process of modifying the overarching Merchant Model Optimization

7    Tool.  Mattel's former general manager for the Toys 'R Us account, who supervised Cooney,

8    testified at deposition that Toys 'R Us "kept on grooming the tool" because the tool erred by

9    undervaluing "high-margin products with high turnover but high cubes."  *See* Deposition of

10   Eugene Murtha, dated February 25, 2010, at 157-159.  However, he also testified that the

11   evolution of the tool used by Toys 'R Us may have rendered the underlying formula even more

12   valuable since (1) the formula used by Toys 'R Us remained constant through the various

13   iterations of the tool; and/or (2) the formula allowed Mattel to manipulate Toys 'R Us's metrics.

14   *See id.*

15       There is also a genuine issue of material fact as to whether MGA acquired the formula

16   using improper means.  MGA instructed Cooney not to bring Mattel's confidential information

17   with him to MGA (Ex. 2157 to MGA MSJ) and Cooney testified at deposition that he never

18   discussed the formula with anyone at MGA (Cooney Depo. at 83).  However, Cooney testified

19   (somewhat ambiguously) that he may have used the Merchant Model Optimization Tool (and

20   potentially the underlying formula) immediately after starting at MGA. (Cooney Depo. at 36);

21   *but see id.* (testifying he used separate modeling tool supplied by MGA).  And there is evidence

22   that MGA's relationship with Toys 'R Us was suffering soon before Cooney joined MGA,

23   causing Larian to become personally involved in the operation and management of MGA's

24   relationship with the retailer.  Webster Dec., Ex. 193.  A reasonable fact-finder could therefore

25   find Cooney's representation not credible, in light of the possibility that he used the Merchant

26   Model Optimization Tool's formula for the benefit of a retailer relationship in which Larian and

27   other MGA executives were deeply involved.

28       There is also a genuine issue of material fact as to whether MGA had knowledge that the

acquisition of the formula was improper.  Since the credibility of the evidence probative of MGA's knowledge is at issue, summary judgment is not proper on this element of Mattel's counter-claim.  For example, Cooney testified that Brawer "was clear that [MGA] didn't want" Cooney to bring Mattel's confidential materials with him.  Cooney Depo. at 334:6-7.[21]  MGA also sent Cooney a letter confirming his employment and instructing him not to bring Mattel's confidential materials with him.  Ex. 2157 to MGA MSJ.  On the other hand, these sterile accounts of MGA's message discipline are not consistent with the more freewheeling style MGA exhibited in dozens of communications concerning the recruitment of Mattel employees.  *See, e.g.*, Webster Dec., Ex. 546 (referring to "double agent" Mattel employee who continued to work for MGA's benefit); Webster Dec., Ex. 446 (discussing targeted recruitment of Mattel employees).  Mattel is wrong that MGA engaged in "bad acts" by hiring Mattel employees.  However, a fact-finder should be permitted to evaluate the tenor of MGA's internal communications to determine whether MGA informally encouraged the misappropriation of potential trade secret information despite its formal letters to the contrary.

There are also genuine issues of material fact as to whether Mattel suffered harm and/or MGA benefitted as a result of the formula's alleged misappropriation.  Cooney's former supervisor at Mattel testified that the formula in the Merchant Model Optimization Tool was very valuable to Mattel.  Murtha Depo. at 157.  Communications between MGA and Toys 'R Us during the relevant time frame suggest the zero-sum nature of Toys 'R Us's relationships with toy manufacturers.  *See, e.g.*, Webster Dec., Ex. 193 ("I am not going to give TRU special pricing, exclusives, etc, etc. and have you stick My Scene right in the middle of Bratz").  Viewing this evidence, a reasonable fact-finder could easily conclude that MGA benefitted at Mattel's expense by effectively marshaling the formula embedded in the Merchant Model Optimization Tool.  *See Stuhlbarg Int'l Sales Co. v. John D. Brush and Co., Inc.*, 240 F.3d 832, 841 (9th Cir. 2001) ("Evidence of threatened loss of prospective customers or goodwill . . .

---

[21] MGA's heavy reliance on Cooney's deposition testimony is an independent grounds on which to deny summary judgment.  Not only does Cooney still work for MGA but his conduct is at issue.

1  supports a finding of the possibility of irreparable harm.").  However, a reasonable fact-finder

2  could also conclude that MGA could not meaningfully benefit from a formula derived from a

3  tool that may have been specific to Mattel's business and therefore inapplicable to Mattel's

4  competitors.

5              **5.      Machado, Vargas, and Trueba[22]**

6         In late 2003, MGA sought to develop an independent footprint in the Mexican market.

7  Such an expansion would allow MGA to "do direct business" with Mexican retailers, a more

8  profitable arrangement than distributing MGA products through licensees like Hasbro. *See*

9  Proctor Decl., Ex. 69.  Recognizing that MGA would "need to go after Mattel people in Mexico"

10 to build its foundling subsidiary, Proctor Decl., Ex. 70, Larian delegated the task to an individual

11 named Susana Kuemmerle ("Kuemmerle").  Kuemmerle recruited Machado, who served as

12 Mattel Servicios, S.A.'s ("Mattel Servicios") Senior Marketing Manager, Boys Division.[23]

13 Mattel Servicios is, and was at all relevant times, Mattel Mexico's subsidiary.

14        Kuemmerle facilitated a meeting between Machado and Larian at the February 2004 New

15 York Toy Fair.  Deposition of Susana Kuemmerle, dated December 8, 2009, at 339.  One month

16 later, Larian, Kuemmerle, and MGA Chief Operating Officer Tom Park traveled to Mexico to

17 interview candidates for the contemplated office in Mexico, almost all of whom had been

18 directed to MGA by a professional recruiter that Kuemmerle met through Machado.  *Id.* at 350-

19 51.  Larian, Kuemmerle and Park also met with Machado, as well as his Mattel Servicios

20 colleagues Mariana Trueba-Almada ("Trueba") and Pablo Vargas-San Jose ("Vargas") who

21

22        [22] Mattel's motion for summary judgment on the issues of whether Machado,
23 Vargas, and Trueba stole information, and whether MGA is chargeable for those thefts, is
   denied.  UTSA applies to trade secrets; the misappropriation of other information is
24 irrelevant to stating a claim under UTSA.

25        [23] Mattel purports to dispute this fact in its Statement of Genuine Issues in Support
26 of its Opposition to MGA's Motion.  Mattel's Statement of Genuine Issues ¶ 269.
   However, at oral argument, Mattel's counsel acknowledged that Machado was an
27 employee of Mattel Servicios.  Nevertheless, there is no genuine issue of material fact
28 that Machado was a Mattel Servicios employee.

1   Machado encouraged to attend the meeting with him.  *Id.* at 349; *see also* Declaration of Pablo

2   Vargas at 65 (Proctor Dec., Ex. 1).  Machado, Trueba, and Vargas corresponded with

3   Kuemmerle in the weeks leading up to their meeting with Larian and Park in Mexico City.  *Id.*

4         Machado and Vargas prepared a power point presentation to show Larian, Park and

5   Kuemmerle at the meeting in Mexico City.  Machado Depo. at 1033.  The presentation borrowed

6   images and language from a report prepared for Mattel Mexico's president by another Mattel

7   executive.  *Compare* Isais Dec., Ex. 34 *with* Isais Dec., Ex. 33.  The report was located on a

8   shared Mattel Mexico server to which Machado had access on his work computer; Machado

9   burned the report to a personal compact disc and/or copied the report to a personal thumb drive.

10  Machado Depo. at 1033-1037.  The presentation prepared for MGA by Machado and Vargas

11  also incorporated data about the Mexican market prepared by outside vendors with whom Mattel

12  had subscriptions.  *See* Isais Dec., Ex. 33.  Machado and Vargas failed to omit the vendors'

13  names, which were located on the bottom left of several of the presentation's slides.  *Id.*  Larian

14  watched the presentation and then interviewed the three Mattel Servicios employees at the

15  March 2004 meeting in Mexico City.

16        On March 19, 2004, Larian sent an email to an email address jointly used by Machado,

17  Vargas, and Trueba with the name plot04@yahoo.com.mx.  *See* Proctor Dec., Ex. 22.  Larian's

18  email directed the three individuals to see offer letters for employment (dated March 18, 2004)

19  attached to the email.  *Id.*  All three Mattel Servicios employees were offered employment with

20  MGA Mexico at a salary of 8,910 U.S. Dollars per month.  *Id.*  Both Machado and Vargas were

21  offered positions as Directors of Marketing and Trueba was offered a position as Director of

22  Marketing, Girls Division.  *Id.*  On April 16, 2004, an attorney representing Machado, Vargas,

23  and Trueba sent an email attaching acceptance of employment letters executed by the three

24  individuals.  *See* Ex. 6436 to MGA MSJ.

25        Prior to leaving Mattel Servicios for MGA Mexico, Machado, Trueba, and Vargas copied

26  some files from the company's shared servers to personal storage devices.  Deposition of

27  Mariana Trueba, dated May 20, 2010, at 230 (stating that she thought the files she downloaded

28  from shared servers would "at some point be useful"); *see also* Vargas Dec. at 7.  Machado

collected the storage devices after Trueba and Vargas downloaded and copied files, downloaded the files from the storage devices to his computer, deleted the files from the storage devices, and returned the storage devices to Trueba and Vargas so that they could download more files from the shared servers to which they had access.  Machado Depo. at 218-219.  Trueba separately emailed Machado files that she received from other Mattel Servicios employees in the weeks leading up to her resignation.  *See, e.g.*, Webster Dec., Ex. 287.

All three employees formally resigned from Mattel Servicios on April 19, 2004.  *See* Proctor Dec., Exs. 8-10.  The next day Machado emailed Larian from the "plot04" email address stating that "we resigned yesterday and let me tell you 'Rome is on fire'.  We left the office at 1:30 PM yesterday and since then they have already made 10 changes in the staff, we are driving them crazy!!!," (Proctor Dec., Ex. 11), to which Larian responded "I am in Ny.  What is your cell?"  *Id.*  On April 23, 2004, Mattel Servicios sent all three employees a post-termination letter in which they would acknowledge receiving a salary from Mattel Servicios and, in relevant part, acknowledge that they "undertook not to [] reveal, exploit, reproduce or publish or otherwise disclose confidential information of which I became aware during my work in service of [Mattel Servicios]."  *See* Proctor Dec., Ex. 141.  None of the three employees signed and returned the letter to Matttel Servicios.  *Id.*

(a)    Choice of Law

Machado and MGA argue that Mexican law governs Mattel and Mattel Mexico's counter-claim for trade secret misappropriation to the extent it arises out of the conduct of Machado, Vargas, and Trueba.  Mattel and Mattel Mexico disagree.  In cases such as this one, where the Court exercises supplemental jurisdiction over state law claims, the choice of law rules of the forum state apply to those state claims.  *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1164 (9th Cir. 1996).  The Court accordingly considers California's choice of law framework in determining whether the laws of Mexico or California apply.

California applies a three part "governmental interest" test to choice of law disputes:

> First, the court examines the substantive law of each jurisdiction to determine whether the laws differ as applied to the relevant

54

1    transaction.  Second, if the laws do differ, the court must determine

2    whether a "true conflict" exists in that each of the relevant

3    jurisdictions has an interest in having its law applied.  If only one

4    jurisdiction has a legitimate interest in the application of its

5    rule of decision, there is a "false conflict" and the law of the

6    interested jurisdiction is applied.  On the other hand, if more than

7    one jurisdiction has a legitimate interest, the court must move to the

8    third stage of the analysis, which focuses on the "comparative

9    impairment" of the interested jurisdictions.  At this stage, the court

10   seeks to identify and apply the law of the state whose interest would

11   be the more impaired if its law were not applied.

12   *Abogados v. AT & T, Inc.*, 223 F.3d 932, 934 (9th Cir. 2000) (citations and internal quotation

13   marks omitted).

14   "If distinct claims for relief implicate different alignments of interests among the relevant

15   jurisdictions, separate applications of the governmental interest analysis are required." *McGhee*

16   *v. Arabian American Oil Co.*, 871 F.2d 1412, 1422 (9th Cir. 1989).  It follows, naturally, that

17   "[u]nder both California and New York conflicts rules, a different determination properly is

18   made for each defendant and each claim." *Lombard v. Economic Development Admin. of Puerto*

19   *Rico*, 1995 WL 447651, at *4 (S.D.N.Y. July 27, 1995); *see also Boxer v. Gottlieb*, 652 F. Supp.

20   1056, 1062 (S.D.N.Y. 1987) ("The issue of which law governs liability must be determined

21   separately for each defendant, since the competing interests involved may differ . . . .").  Since

22   the only conduct alleged to give rise to MGA Mexico and Machado's liability involved the

23   actions of the Mattel Servicios employees, the choice of law analysis for Machado and MGA

24   Mexico is materially different from the choice of law analysis for Larian and MGAE.

25   Choice of Law Analysis as to Machado and MGA Mexico

26   The laws of California and Mexico differ as to the liability of both Machado and MGA

27   Mexico for the conduct alleged in Mattel's third counter-claim.  Contrary to both counter-

28   defendants' arguments, Mexico recognizes a civil action for trade secret misappropriation. *See*

1  Damon L. Boyd, *Trade Secret Doctrines of the NAFTA Countries*, 14 Az. J. Int'l & Comp. L.

2  879, 883-884 (1997).  That cause of action proscribes disclosure of trade secrets without the

3  consent of the "person keeping said secret or the authorized user thereof."  Declaration of Hector

4  Calatayud ¶ 9.  The Mexican statute does not appear to recognize a claim based on acquisition or

5  use of the wrongfully disclosed trade secret.  *See id.*  MGA Mexico is therefore immune from

6  liability under Mexican law, but not California law.

7  　　　　Like any other civil claim not arising out of a breach of contract, Mexico's general statute

8  of limitations requires that a claim for trade secret misappropriation must be brought within two

9  years of the "date in which damages caused by the conduct giving rise to the claim occurred."

10  Dkt. 7869-1 ¶ 5.  California, by contrast, requires that a claim for trade secret misappropriation

11  be brought "within three years after the misappropriation is discovered or by the exercise of

12  reasonable diligence should have been discovered."  Cal. Civ. Code § 3426.6.  Mattel sought

13  leave to file its counter-claim against Machado and MGA Mexico in November 2006, nineteen

14  months after Machado, Trueba and Vargas left Mattel Servicios for MGA Mexico, and Mattel's

15  claim against Machado is therefore untimely under Mexican law.  *See* Dkt. 7869-1

16  ¶ 5 (conceding "[i]t would be unlikely that Mattel could assert a claim for generic liability in

17  Mexico if the United States case is dismissed").

18  　　　　There is a genuine issue of material fact as to whether a "true conflict" exists between

19  California and Mexico.  All of the documents stolen by the three employees were accessed on

20  Mattel Servicios computers.  Mattel argues that  "possession, not ownership, is the *sine qua non*

21  of trade secret standing," but, even assuming this is the case, there is a genuine issue of material

22  fact as to whether the documents resided on Mattel's California servers.  It's doubtful that the

23  three Mattel Servicios employees had wide-ranging access to Mattel (the parent)'s documents,

24  because all three individuals were tasked with managing the *Mexican* market, *see* 4AAC ¶¶ 37,

25  41, 42, and Mattel alleges elsewhere that its subsidiaries' employees "had access rights to only

26  those areas of Mattel's network system . . . needed to do [their] job[s]."  Statement of

27  Uncontroverted Facts in Support of Mattel MSJ ¶ 164; *see* Declaration of Richard DeAnda ¶ 6.

28  However, Mattel also alleges that some of the documents misappropriated by the three

employees resided on Mattel's California servers and concerned the U.S. market.  *See* 4AAC

¶¶ 48-50.  California may have some interest in the application of its laws to this dispute if that

were the case.  Given the foundational dispute about the scope of Mattel's allegations, this is an

issue the parties can take up with the fact-finder.  *See Marra v. Bushee*, 447 F.2d 1282, 1284-85

(2d Cir. 1971).[24]

Assuming, *arguendo*, that both California and Mexico have an genuine interest in the

application of their laws, the Court would proceed to determine which forum would be more

impaired if its laws were not applied.  Several factors are relevant to this determination,

including (1) each forum's present commitment to the application of its laws; (2) whether one

forum's law is more prevalent; (3) whether each forum's law is the exclusive means of achieving

a particular policy goal; and (4) the situs of the injury.  *Van Winkle v. Allstate Ins. Co.*, 290 F.

Supp. 2d 1158, 1166-1167 (C.D. Cal. 2003) (collecting cases).  There is empirical proof that

Mexico is committed to enforcing its trade secrets laws.  After discovering the alleged theft of its

trade secret materials, Mattel contacted Mexican law enforcement authorities, who have

investigated MGA Mexico and Machado.  None of the parties have discussed the international

prevalence of (1) a statute of limitations that incorporates a discovery rule; and/or (2) liability for

acquisition and use of improperly disclosed trade secrets.  Neither Mexico nor California appear

to have any other laws that relate directly to trade secret misappropriation (indeed, California's

statute purports to provide an exclusive remedy for such wrongdoing).  And there is a genuine

issue of material fact as to the situs of the injury, since the parties do not agree about (1) which

Mattel entity owned the documents; (2) whether MGA Mexico or MGA used the documents;

and (3) whether the three employees accessed Mattel's El Segundo servers.  These are also

issues the parties can take up with the fact-finder.

---

[24] The Circuits appear to be in dispute as to whether the court should resolve factual issues relevant to the choice of law.  *See Nautilus Ins. Co. v. Router*, 537 F.3d 733, 742 (7th Cir. 2008) (comparing cases).  This Court simply notes that, in this case, the factual dispute runs to the heart of Mattel's claim against Machado and its resolution would require the examination of evidence not cited by the parties' submissions.

<u>Choice of Law Analysis as to MGAE and Larian</u>

MGA argues that "the Mexico-based trade secret claim fails on choice of law grounds," (Mot. at 70:19-20).  However, there is no "Mexico-based trade secret claim"; there is only one counter-claim for trade secret misappropriation.  Mattel claims that the acts of former employees located in the U.S., Canada, and Mexico give rise to MGAE and Larian's liability under this counter-claim.  Though choice of law determinations may be made on a claim-by-claim basis, *McGhee*, 871 F.2d at 1422, the Court knows of no California authority for the proposition that different states' laws may apply to different factual predicates of the same claim.[25]  The Court therefore proceeds to a choice of law analysis as to MGAE and Larian with a view to *all* conduct alleged in Mattel's third counter-claim and not just the conduct of Machado, Trueba, and Vargas.

As explained earlier, the laws of California and Mexico are in conflict with respect to the liability of Larian and MGAE for trade secret misappropriation since (1) Mexico does not attach liability to acquisition or use; and (2) Mexico applies a more restrictive statute of limitations.  Both Mexico and California have an interest in the application of their laws to this dispute, as Mexico may seek to shield from liability corporations who had no relationship with the possessor of the trade secret information and California has an interest in protecting its residents from non-consensual acquisition and use of their valuable proprietary information.  However, California would be more impaired if its laws were not applied to the alleged acts of Larian and MGAE because (1) both are residents of California; (2) most of the alleged thefts and associated correspondence took place in California; and (3) most of the harm alleged in the third counter-claim (which includes the harm felt by the alleged misappropriation of the Bratz concept) was also felt in California.  MGAE and Larian offer no argument on any one of these points, as is their burden.  *See CRS Recovery, Inc. v. Laxton*, 600 F.3d 1138, 1142 (9th Cir. 2001).  The Court

---

[25] Different *issues* may be analyzed under different states' laws.  *See Wash. Mutual Bank, FA v. Superior Court*, 24 Cal.4th 906 (2001).  MGA, however, does not seek to apply the laws of different fora to each element of the third counter-claim for misappropriation of trade secrets.

1    accordingly concludes that California law must apply to Mattel's *entire* third counter-claim

2    against MGAE and Larian.

3                    (b)      Genuine Issues of Material Fact[26]

4            The documents downloaded by Machado, Trueba, and Vargas included a pricing matrix

5    for large dolls, (MGA's Compendium of Trade Secrets, Exs. 201, 202), a pricing comparison for

6    products across years, (*id.*, Ex. 203), plans for Mattel's relationships with retailers in Mexico,

7    (*id.*, Exs. 204, 268, 269), sales and pricing data, (*id.*, Exs. 205, 220, 232, 234, 235, 236, 238,

8    239, 241, 248, 251, 252, 254, 255, 256, 258, 260, 263, 265, 267, 270), projections for pricing,

9    demand and sales (*id.*, Exs. 206, 257, 259), shipment and sell-through data, (*id.*, Exs. 207-18,

10   223, 224, 225, 226, 227, 231, 242, 245, 246, 261), reports about the Mexican market that tracked

11   inflation, wages, purchasing patterns, market share, and the number of stores per region, (*id.*, Ex.

12   219, 233, 237, 240, 243, 249, 264, 266), pictures of Mattel Mexico's products in various

13   Mexican stores, (*id.*, Ex. 221), lists of promotions, (*id.*, Exs. 222, 247, 253), a preliminary "line

14   list" that arranges data on projected volume and quota for a variety of doll products, (*id.*, Ex.

15   228), sales data sorted by media, (*id.*, Exs. 229, 230), a blank spreadsheet, (*id.*, Ex. 244), and

16   allocations for marketing, (*id.*, Ex. 250, 262).  Of these documents, Mattel claims that all but a

17   few were trade secrets.

18            There is a genuine issue of material fact as to whether Mattel or Mattel Mexico have

19   standing to bring their claims against Machado, Trueba, and Vargas.  Assuming without

20   deciding that possession is all that is required to bring a claim for trade secret misappropriation,

21   Mattel doesn't establish possession of all of the alleged trade secrets misappropriated by

22   Machado, Vargas, and Trueba.  It relies on circumstantial evidence that the three employees had

23   access to Mattel and Mattel Mexico servers as evidence that Mattel Servicios' documents — and

24   specifically the documents allegedly stolen by the three employees — were also located on those

25   servers.  That argument is belied by the fact that at least some of the documents allegedly

26

27            [26] Mattel's claim would be time-barred under Mexican law.  The Court examines

28   the third counter-claim under only the UTSA.

1    misappropriated by the three employees were attached to email communications and may not

2    have resided on Mattel's servers.

3            There are genuine issues of material fact as to whether any of the documents claimed to

4    be trade secrets derived economic value from not being generally known.  The pricing

5    information in the documents may have been shared with retailers by Mattel.  However, Mattel

6    claims that some elements of these alleged trade secrets were not made available to individuals

7    and entities outside Mattel.  *See* Declaration of Isaias ¶¶ 6, 8.  MGA also argues that documents

8    lose value three to four months after their creation.  *See* Kuemmerle Depo. at 66-67.  However,

9    as Mattel points out, Kuemmerle's description is over-generalized and inapposite: many of the

10   documents did not describe Mattel Mexico's *prior* sales, but projected marketing and sales

11   expenditures in advance.

12           There are also genuine issues of material fact as to whether any of the documents claimed

13   to be trade secrets were the subject of reasonable efforts to maintain secrecy.  MGA argues that

14   Mattel did not impose a consistent policy of stamping documents as "confidential."  *See*

15   Deposition of Richard Ibarra at 139.  MGA, however, concedes that pricing information was

16   consistently marked confidential, per company policy.  *See id.*  Moreover, when deposed, Mattel

17   executives testified that each Mattel subsidiary's employees received specific instruction about

18   the non-disclosure of confidential information.  *See* Graham Decl. ¶ 3.  Whether this message

19   was clearly conveyed to Machado, Trueba and Vargas turns on the credibility of those

20   individuals' recollection about the extent of their training, as well as the direct guidance they

21   received about maintaining the confidentiality of documents.

22           There are also genuine issues of material fact as to whether MGA acquired the documents

23   misappropriated by Machado, Trueba, and Vargas with knowledge that the three departing

24   Mattel Servicios employees had improperly acquired the documents.  On the one hand, MGA

25   has disclaimed knowledge of the three employees' thefts; Machado testified that Larian

26

27

28

1   instructed him to not bring documents to MGA Mexico.  *See* Machado Depo. at 363-364.[27]

2   However, Machado could not recall why Larian spontaneously offered that direction at the

3   meeting between the two individuals in Mexico City.  *See id.* at 364.  Moreover, even if Larian

4   initially directed Machado not to misappropriate Mattel's documents, there is evidence that the

5   documents were later found in MGA Mexico's offices, which helps establish acquisition.  The

6   fact-finder must determine whether MGA Mexico was aware that the alleged trade secret

7   documents had found their way into its offices.

8        There are likewise genuine issues of material fact as to whether MGA used the documents

9   misappropriated by Machado, Trueba, and Vargas.  MGA cites the deposition testimony of a

10  Mattel Mexico employee who testified that MGA Mexico's promotions were similar to those

11  used within the toy industry as a whole.  *See* Isaias Depo. at 254.  However, the documents at

12  issue did more than merely list Mattel Mexico's promotions; they also identified pricing

13  schemes, retailer discounts, shipping quotas, and marketing budgets.  MGA has cited to no

14  evidence that MGA Mexico's organizational schemes were created independent of the

15  documents taken by Machado, Vargas, and Trueba.  On the other hand, Ms. Kuemmerle testified

16  that MGA Mexico did not use the misappropriated documents, though the credibility of her

17  testimony should be evaluated by a fact-finder.  For instance, a fact-finder may balance Ms.

18  Kuemmerle's statements against the fact that a digital copy of the documents was found in MGA

19  Mexico's offices well after Machado, Vargas, and Trueba left Mattel Servicios.[28]

20       Finally, there is a genuine issue of material fact as to whether Mattel suffered harm and/or

21  MGA benefitted as a result of Machado, Vargas, and Trueba's alleged misappropriation of trade

22  secret documents.  MGA cites to the testimony of two Mattel witnesses who admitted a lack of

23  awareness of any evidence that Mattel suffered harm or MGA benefitted as a result of the

24  ──────────────

25       [27] Mattel's objection is overruled.  Larian's statements to Machado are not being

26  offered for their truth.

27       [28] Machado's request for the entry of summary judgment on the issue of use as to a

     vast majority of the documents is likewise denied.  The issue of use can be proved with

28  circumstantial evidence.

alleged misappropriation of trade secret documents.  For example, one Mattel witness could not name any customer relationships harmed by the loss of the documents at issue.  *See* Zalzman Depo. at 315-316.  The same witness, however, expressed confusion at the question posed by MGA's counsel, which asked the witness to distinguish the harm suffered merely because of MGA Mexico's new ability to sell directly to retailers in the Mexican market from the harm suffered as a result of the alleged theft of Mattel's documents.  *Id.*  Though counsel's question is certainly pertinent, a reasonable fact-finder may conclude that MGA Mexico's "direct relationships" with Mexican retailers were developed using the information found in the documents stolen by Machado, Trueba, and Vargas.

MGA raises identical challenges to the misappropriation allegations as to each of the documents downloaded by Machado, Vargas, and Trueba.  Mattel similarly relies upon generic assertions about its efforts to maintain the secrecy of its documents.  Because the parties' arguments do not specifically address the alleged trade secrets on a document-by-document basis, and the credibility of the scant evidence offered by the parties is at issue, the Court finds summary judgment inappropriate on all grounds.

### 6. Janine Brisbois

Janine Brisbois ("Brisbois") worked for Mattel Canada, Inc. ("Mattel Canada") in Mississauga, Canada between 1999 and September 2005.  *See* Deposition of Janine Brisbois, Vol. I, dated December 9, 2009, at 36:16-19.  On September 23, 2005, Brisbois received a written offer of employment from MGA Canada, with whom she had been corresponding for at least a few weeks.  *See* Brisbois Depo. at 109-110; *see also* Ex. 6908 to MGA MSJ.  Brisbois resigned from Mattel Canada on September 26, 2005 and was immediately escorted from the premises.  *See* Deposition of Steve Totzke at 231:10-232:18.  She retained a thumb drive containing files relating to Mattel Canada's business, as well as Brisbois' line of work for Mattel Canada.  *See* Brisbois Depo. at 225:11 to 226:5.  When deposed in connection with this lawsuit, she testified that at least some (if not most) of the files on the thumb drive were "work that I was involved with, that you know, that I was proud of, that I put effort into, and I was simply keeping a copy for [] my own personal file of work done."  *Id.* at 242.

Mattel identifies twenty one categories of trade secrets that Brisbois and MGA allegedly misappropriated.  Mattel's alleged trade secrets include a power point presentation evaluating advertising for Mattel's doll brands during the 2004 and 2005 calendar years, (Compendium of Trade Secrets, Ex. 3), market analysis that compares Mattel products' market share with shelf space at various retailers, (*id.*, Ex. 4), a chart that visually depicts Mattel's shelf space at one Toys 'R Us store and compares pricing for Mattel's products against pricing for MGA's products at that store, (*id.*, Ex. 5), a comparison of sales in 2005 with projected sales in 2006, (*id.*, Ex. 6), a chart that identifies sales, receipts, margins, and profits with regard to Mattel's relationship with Wal-Mart in 2003 and 2004, (*id.*, Ex. 7), a promotional spread sheet for 2005 and 2006 that includes a number of blank or invalid fields, (*id.*, Ex. 8), a September 22, 2005 interoffice memorandum from Janine Brisbois and Mattel Canada colleague to members of Mattel Canada's "Girl's [sic] Business Unit" discussing price reductions for various Mattel products, (*id.*, Ex. 11), a March 28, 2003 Canadian Leadership Plan for Mattel's Girls Division that focuses on market threats like Bratz and purports to identify pricing and marketing strategies to improve Mattel sales in the second half of 2003, (*id.*, Ex. 14), a standardized Mattel form that retailers must complete before "marking down" the retail price of a particular Mattel product (the form contains proposed mark down prices), (*id.*, Ex. 20), spread sheets containing data about Mattel's 2003 performance and contemplated performance for 2004 on a retailer-by-retailer basis, (*id.*, Exs. 23-25, 57), a "handbill" spread sheet that lists the retail prices for Mattel's products sold at Wal-Mart stores, (*id.*, Ex. 30), business plans that discuss Mattel's management of its retailer accounts and, for example, concludes that "all things being equal, a consumer will purchase an item connected to a charity over an item that is not," (*id.*, Exs. 42, 60), a spread sheet that tracks Mattel's product sales at Wal-Mart by month and product category (*e.g.*, Girls products), (*id.*, Ex. 58), an internal project management form completed by Brisbois that tracked her team's success in achieving particular goals, (*id.*, Ex. 58), a Mattel Canada sales team organization chart attached to an email from Brisbois to her MGA Canada supervisor that identifies the size of Mattel Canada's business and discusses the size of an average team meeting at Mattel, (*id.*, Ex. 63), and a Mattel Canada organization chart attached to an email from

1  Brisbois to her MGA Canada supervisor and in response to an email from the supervisor asking

2  Brisbois to "sketch that org chart . . . I want to take it to Ohio with me on Wednesday to show

3  Ron," (*id.*, Ex. 64).

4      Finally, Mattel alleges that Brisbois disclosed Mattel's mechanism to distribute its

5  products to retailers throughout Canada.  After Brisbois joined MGA Canada, the company

6  received an email from a retailer seeking to purchase MGA Canada's product.  (*Id.*, Ex. 66).  In

7  an email concerning the retailer's request, Brisbois' supervisor asked her to identify a distributor

8  who "would be the best to direct the toy store below to."  *Id.*  The email to Brisbois also stated

9  "Janine, I know that Mattel does a much better job at covering the small retailers.  What are your

10  thoughts?"  *Id.*  Brisbois responded that Mattel

11          invested some money into a B2B site which generates a good amount

12          of the independent business.  They also set up the customer service

13          folks who manage the Key accounts as contacts for the independent[]

14          [retailers] and create monthly specials that get posted on the site.

15          Finally, there is one NAM that manages all of this along with some

16          of the smaller accounts.

17  *Id.*

18      Both parties discuss the documents and information with some generality and with few

19  citations to evidence whose credibility is not at issue.[29]  There is a genuine issue of material fact

20  as to whether the documents and information allegedly misappropriated by Brisbois derived

21  independent economic value from not being generally known.  The majority of documents

22  allegedly misappropriated by Brisbois shared Mattel Canada's actual and projected pricing

23  schemes, calibrated to retailers' space constraints and tailored to maximize profits, categories of

24  information commonly understood to hold value within an industry.  *Cf. Morlife, Inc. v. Perry*,

25  56 Cal. App. 4th 1514, 1521 (1997).  Brisbois herself acknowledged the great amount of time

26

27      [29] Indeed, MGA offers little argument about the documents and information in its
    moving papers.  More targeted argument can be found in MGA's Statement of

28  Uncontroverted Facts in support of its motion.

involved in crafting the pricing schemes used to maximize the profit realized by Mattel Canada's products for particular retailers.  *See, e.g.*, Brisbois Depo. at 524-525; *see Morlife*, 56 Cal. App. 4th at 1521-1522 ("As a general principle, the more difficult information is to obtain, and the more time and resources expended by an employer in gathering it, the more likely a court will find such information constitutes a trade secret.").  On the other hand, at least some of the pricing information contained in the spread sheets prepared by Brisbois may have been well known throughout the industry, including among Mattel Canada's competitors.

Another category of documents allegedly misappropriated by Brisbois described Mattel Canada's marketing schemes, including scheduled promotions for Mattel Canada's products. MGA appears to argue that marketing plans are not trade secrets as a matter of law because the marketing strategies were inevitably revealed to the public.  However, a reasonable fact-finder could conclude that a particular marketing strategy not generally known to the public gave Mattel Canada a competitive advantage over other retailers who, for example, may not have known of the relative profitability of a marketing campaign that tied product sales to charitable efforts.  *See Ruckelshaus*, 467 U.S. at 1011 n. 15 ("[T]he value of a trade secret lies in the competitive advantage it gives its owner over competitors.").  For instance, Brisbois testified at deposition that she retained one of the promotional plans presented to Wal-Mart because "[t]his document represents a lot of my work and effort."  Brisbois Depo. at 527.  Her "work and effort" wasn't just expended planning the promotion, in which case MGA could plausibly argue that the document was no longer a trade secret at the time Brisbois left Mattel Canada.  Instead, as Mattel's witness points out, the promotional documents included "Mattel's confidential analysis of and recommendations for continuing [one promotional] program and confidential POS, shipping, sell-thru and promotional information for specific products."  Totzke Dec. ¶ 30.  It is for a fact-finder to determine whether the promotional materials had continuing value to Mattel Canada at the time Brisbois left for MGA.

A third category of documents and information allegedly misappropriated by Brisbois concerned Mattel Canada's *internal* processes, including its organizational structure, its progress reviews, and its distribution network.  The economic value derived from the secrecy of Mattel

1   Canada's organizational structure appears to be limited, since Mattel Canada was a public

2   company at the time of Brisbois' departure and its corporate structure was probably well known.

3   However, Mattel has cited evidence to suggest that (1) its Canadian subsidiary's organizational

4   structure wasn't well known; (2) MGA placed a premium on determining Mattel Canada's

5   organizational structure; and (3) a properly structured organization had the potential to help

6   MGA become profitable.  For example, Brisbois' email disclosing Mattel Canada's

7   organizational structure to her supervisor at MGA stated "[t]his should help out with

8   understanding the type of structure we are up against.  This structure supports a business worth

9   about $250MM in CDN in shipments."  Compendium of Trade Secrets, Ex. 63.  Brisbois also

10  stated, in a separate email to her supervisor at MGA, that "[i]f you do some quick math on a $$

11  volume per total head count basis, you may fall off your chair!"  *Id.*, Ex. 64.  Brisbois further

12  disclosed not just Mattel Canada's organizational structure, but also the manner in which Mattel

13  Canada allocated its human resources towards particular projects:

14          The Girls business alone which includes Barbie, Polly, Pixel Chix,

15          etc . . . is about $75MM.  There are a total of 14 cross functional

16          people that compose the Girls Team plus the third party partners

17          from Ryan Partnership (Mktg & Promotions), and Mosaic (in store

18          execution).  A typical team meeting would have 15-20 people in

19          attendance.  The WM Team includes 9 cross functional people plus

20          the same third party partners mentioned above.  A typical team

21          meeting would have 10 people in attendance supporting a business

22          that peaked out at $95MM CDN in shipments.

23  *Id.*, Ex. 63.

24          A reasonable fact-finder could likewise conclude that information about Mattel's retailer

25  network derived value from not being generally known.  The email exchange preceding

26  Brisbois' disclosure of that information reveals its potential value — when MGA Canada was

27  approached by a retailer interested in purchasing its products, the company found itself caught

28  badly off guard.  When asked about Mattel Canada's solution to the same problem, Brisbois

1  revealed her former employer's approach in some detail and with specific reference to the

2  retailers serviced by Mattel Canada's network.

3          There is also a genuine issue of material fact as to whether Mattel took reasonable efforts

4  to maintain the secrecy of documents and information allegedly misappropriated by Brisbois.

5  MGA argues that Mattel Canada did not uniformly and consistently enforce a policy requiring its

6  employees to mark documents as "confidential."  Mattel's witness testified at deposition that

7  Mattel only directed, but did not require, that proprietary information be marked "confidential."

8  *See* Deposition of Keith Storie, Vol. I, dated December 16, 2009, at 63-64.  He also, however,

9  testified that Mattel reminded its employees of their obligation to maintain documents'

10  confidentiality through periodic presentations and circulars.  *See id.* at 64-65.  MGA also points

11  to the testimony of a Mattel witness who admitted that some of Mattel's retailers, including Wal-

12  Mart, were "reluctant to sign" nondisclosure agreements.  *See* Deposition of Steve Totzke, Vol.

13  I, dated January 18, 2010, at 94-95.  But that testimony concerned the nondisclosure of

14  information about products before their release, while the documents allegedly misappropriated

15  by Brisbois included information (including pricing and marketing schemes and expenditures)

16  that may not have been shared with Mattel Canada's retailers in the first place.  Finally, MGA

17  argues that Mattel did not require its employees to encrypt emails that attached trade secret

18  information.  *See* Storie Depo. at 59-60.  However, MGA provides no evidence about the

19  "reasonableness" of widespread email encryption; there is no evidence in the record that any of

20  the corporations at issue in this lawsuit used email encryption, a process that would appear to

21  undermine the very purpose of email communication.

22          There is a genuine issue of material fact as to whether MGA acquired the documents and

23  information allegedly misappropriated by Brisbois with the knowledge that the acquisition was

24  improper.  MGA instructed Brisbois to "not retain and [] not bring to MGA[] any of your former

25  employers' or Current employer's property or confidential and proprietary information,

26  including customer-related information."  *See* Ex. 6909 to MGA MSJ.  On the other hand,

27  Brisbois' supervisor twice asked Brisbois to share information about Mattel in the months after

28  Brisbois started working for MGA.  *See, e.g.*, Compendium of Trade Secrets, Exs. 64, 65.

1    There is a genuine issue of material fact as to whether MGA used the documents and

2  information allegedly misappropriated by Brisbois.  Two Mattel witnesses testified that they

3  lacked knowledge of any specific example of Brisbois disclosing Mattel Canada's information

4  and documents to MGA.  *See* Storie Depo. at 204; Totzke Depo. at 611.  However, the email

5  from Brisbois' supervisor requesting more information about Mattel Canada's organizational

6  structure foreshadowed the use of such materials in a meeting with Ron Brawer.  *See*

7  Compendium of Trade Secrets, Ex. 64.  And Brisbois admitted to using some of the documents

8  on the thumb drive in connection with her employment at MGA.  Brisbois Depo. at 241.

9    Finally, there are genuine issues of material fact as to whether MGA benefitted and/or

10  Mattel suffered any injury as a result of the alleged misappropriation of documents and

11  information by Brisbois.  Mattel's witness was incapable of specifically identifying any injury

12  suffered by the company as a result of Brisbois' alleged misappropriation, though the question

13  posed to the witness was outside the scope of the topics on which he was designated.  *See* Storie

14  Depo. at 200-201.  However, another Mattel witness testified that he "observed what was

15  happening with Toys 'R Us and saw [MGA] move into [] some TV campaigns before the Barbie

16  TV campaign" about which Brisbois gained knowledge while at Mattel.  Totzke Depo. at 405.

17  He testified further that "it certainly was an aggressive late move to tactically mute or block

18  what was a very big initiative for Barbie internally."  *Id.*  Neither MGA nor Mattel has cited to

19  any evidence in the record about the extent to which Brisbois was involved in MGA's

20  preemptive TV campaign and/or whether the impetus for the campaign was wrongfully acquired

21  information about Mattel's own promotional strategy.  The fact-finder can resolve these disputes

22  on the basis of more specific testimony and an expanded factual record.

23                    **C.    Disposition as to Third Counter-Claim**

24    For the foregoing reasons, summary judgment is granted in favor of MGA as to those

25  trade secrets abandoned by Mattel, as well as the Castilla and Contreras allegations discussed

26  herein.  MGA's request for the application of Mexican law to MGAE and Larian is denied.

27  Mattel, MGA, and Machado's requests for summary judgment are otherwise denied.

28            **IV.    Mattel's Other State Law Counter-Claims**

1    Mattel also brings counter-claims for breach of fiduciary duty against Bryant and

2    Machado, aiding and abetting breach of fiduciary duty against MGAE and Larian, breach of duty

3    of loyalty against Bryant and Machado, aiding and abetting breach of duty of loyalty against

4    MGAE and Larian, breach of contract against Bryant and Machado, intentional interference with

5    contractual relations against MGA, conversion against MGA and Machado, and unfair

6    competition against Bryant and MGA.  Before proceeding to examine the arguments as to these

7    counter-claims, the Court sets forth certain foundational principles about the supersessive scope

8    of the California Uniform Trade Secret Act and the preemptive scope of the Copyright Act, since

9    both issues are relevant to the vitality of the state law counter-claims.

10                   **A.      Supersession by the Uniform Trade Secrets Act[30]**

11    California's Uniform Trade Secrets Act "occupies the field" of common law claims based

12    on the misappropriation of a trade secret.  *K.C. Multimedia, Inc. v. Bank of America Tech. &*

13    *Operations, Inc.*, 171 Cal. App. 4th 939, 954 (2009).  However, the Act does not supersede

14    "(1) contractual remedies, whether or not based upon misappropriation of a trade secret, [and]

15    (2) other civil remedies that are not based upon misappropriation of a trade secret."  Cal. Civ.

16    Code § 3426.7(b).  The Act's language "implicitly preempts alternative civil remedies based on

17    trade secret misappropriation."  *K.C. Multimedia*, 171 Cal. App. 4th at 954 (citation omitted).  A

18    claim cannot simply depend on a "different theory of liability" to survive the UTSA's

19    supersessive effect.  *See id.* at 957-959 & n. 7 (distinguishing rule set forth in *Powell Prods., Inc.*

20    *v. Marks*, 948 F. Supp. 1469, 1474 (D. Colo. 1996) (allowing a claim based on trade secret

21    misappropriation to survive if the claim "requires an [element] [] which is not an element of a

22    misappropriation claim")).  The claim must be based on more than "the same nucleus of facts as

23    the misappropriation of trade secrets claim for relief."  *K.C. Multimedia*, 171 Cal. App. 4th at

24

25

26          [30] Contrary to Mattel's argument, MGA did not waive its right to raise a
      supersession argument by failing to assert the argument prior to the phase 1 trial, because

27    (1) Mattel did not identify the Bratz concept as a trade secret during phase 1; (2) Mattel's
      broad amendment opened the door to the assertion of new affirmative defenses; and

28    (3) there is on-point intervening California authority.

1   958 (quoting *Digital Envoy, Inc. v. Google, Inc.*, 370 F. Supp. 2d 1025, 1035 (N.D. Cal. 2005)).

2   Before applying these principles to each of Mattel's counter-claims, the Court must

3   resolve whether California's UTSA supersedes claims based upon the misappropriation of

4   information that does not meet the statutory definition of a trade secret.  Mattel argues that

5   California UTSA's savings clause, Cal. Civ. Code § 3426.7(b), expressly excepts from the

6   statute's supersessive ambit those claims *not* based upon misappropriation of a trade secret,

7   including claims based upon the misappropriation of information that does not qualify as a trade

8   secret.  MGA responds that Mattel's approach eviscerates the statute's purpose to "sweep away

9   the adopting states' bewildering web of rules and rationales and replace it with a uniform set of

10  principles for determining when one is—and is not—liable for acquiring, disclosing, or using

11  'information . . . of value.'" *Silvaco*, 184 Cal. App. 4th at 239 n. 22.  The Supreme Court of

12  California has not addressed this issue.  Decisions of the California Court of Appeal do not bind

13  this Court, though they may be instructive to applying the law as the California Supreme Court

14  would if presented with these facts.  *Wyler Summit P'ship v. Turner Broad. Sys., Inc.*, 135 F.3d

15  658, 663 (9th Cir. 1988); *Guebara v. Allstate Ins. Co.*, 237 F.3d 987, 993 (9th Cir. 2001).

16  Courts in other states have reached divergent answers to the question of whether the

17  UTSA supersedes common law claims based upon the misappropriation of information that does

18  not meet the statutory definition of a trade secret.  These decisions, though not binding, are

19  instructive in interpreting the UTSA.  *K.C. Multimedia.*, 171 Cal. App. 4th at 955.  Two state

20  supreme court cases capture the arguments made by courts on either side of this issue.

21  In *Burbank Grease Servs., LLC v. Sokolowski*, 717 N.W.2d 781, 788-94 (Wis. 2006), the

22  court endorsed the argument that Mattel makes here.  Interpreting a savings clause that

23  materially differs from the one found in California's UTSA, the court concluded that the

24  UTSA's unambiguous language "leaves available all other remaining civil remedies for the

25  protection of confidential information," rendering the statute's purpose irrelevant.  *Id.* at 788-90.

26  In *Mortgage Specialists, Inc. v. Davey*, a dispute between a mortgage brokerage and its

27  former brokers, the court held that New Hampshire's UTSA superseded state common law

28  claims based upon the misappropriation of information, "regardless of whether that information

70

1    meets the statutory definition of a trade secret."  904 A.2d 652, 666-668 (N.H. 2006).  The court

2    acknowledged that the UTSA only superseded remedies for a "misappropriation[] of a trade

3    secret" and thus could be read to leave alone remedies based on the misappropriation of other

4    information.  However, the court rejected this construction as ignorant of both "the overall

5    legislative scheme" to make uniform the remedies available as a result of the theft of confidential

6    information and the "purpose of making uniform the law among States that have adopted the

7    UTSA."  *Id.* at 664.

8         The approach taken by *Davey* is better aligned with the decisions reached by the two

9    recent California Court of Appeal cases to discuss UTSA's supersessive effect.  *K.C.*

10   *Multimedia*, for instance, held that UTSA supersedes any claim "based on the same nucleus of

11   facts as the misappropriation of trade secrets claim," even though the superseded claim may seek

12   "something more."  171 Cal. App. 4th at 958.  The court rejected *Powell Prods., Inc. v. Marks*,

13   in which the court stated that UTSA doesn't supersede a conspiracy claim based on the theft of

14   trade secrets because such a claim "requires an agreement [] which is not an element of a

15   misappropriation claim under the UTSA."  948 F. Supp. 1469, 1474 (D. Colo. 1996).  It's no

16   longer the case in California that a claim for breach of fiduciary or breach of duty of loyalty

17   based upon the misappropriation of trade secrets would survive even though both claims require

18   proof of "additional elements" like a relationship of trust or confidence.  *See K.C. Multimedia*,

19   171 Cal. App. 4th at 960.  Allowing civil plaintiffs to nevertheless proceed with such claims on

20   the basis of the theft of confidential information that doesn't meet the statutory definition of a

21   trade secret undermines the California Court of Appeal by "alternatively plead[ing] claims with

22   less burdensome requirements of proof."  *Diamond Power Int'l, Inc. v. Davidson*, 504 F. Supp.

23   2d 1322, 1345 (N.D. Ga. 2007).  Along these lines, a recent California Court of Appeal opinion

24   "emphatically rejected the [] suggestion that the uniform act was not intended to preempt

25   'common law conversion claims based on the taking of information that, though not a trade

26   secret, was nonetheless of value to the claimant.'"  *Silvaco*, 184 Cal. App. 4th at 239 n. 22.

27        Like both *K.C. Multimedia* and *Silvaco*, and unlike *Sokolowski*, *Davey* eschewed a pure

28   application of the statute for an approach that adhered to "the history, purpose, and interpretation

71

1  of the statutory scheme." *Compare Davey*, 904 A.2d at 664, *K.C. Multimedia*, 171 Cal. App. 4th

2  at 957, *and Silvaco*, 184 Cal. App. 4th at 239 n. 22, *with Sokolowki*, 717 N.W.2d at 791. In an

3  effort to align with the California courts that have addressed this issue, the Court concludes that

4  UTSA supersedes claims based on the misappropriation of confidential information, whether or

5  not that information meets the statutory definition of a trade secret.

6              **B.    Copyright Act Preemption**

7          The Copyright Act preempts "all legal or equitable rights that are equivalent to any of the

8  exclusive rights within the general scope of copyright." 17 U.S.C. § 301(a).  "The rights

9  protected under the Copyright Act include the rights of reproduction, preparation of derivative

10  works, distribution and display." *Altera Corp. v. Clear Logic, Inc.*, 424 F.3d 1079, 1089 (9th

11  Cir. 2005) (citing 17 U.S.C. § 106).  The Copyright Act's preemptive ambit does not extend to

12  state law claims that include an "'extra element' that makes the right asserted qualitatively

13  different from those protected under the Copyright Act." *Id.* (citing *Summit Mach. Tool Mfg. v.*

14  *Victor CNC Sys.*, 7 F.3d 1434, 1439-40 (9th Cir. 1993)).

15         For instance, the Copyright Act doesn't preempt Mattel's claim for misappropriation of

16  the Bratz concept because trade secret law protects the secrecy of valuable confidential

17  information "whether or not the material subject to the trade secret is itself copyrightable."

18  Nimmer on Copyright § 1.01[B][1][h] 1-53; *see also S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081,

19  1090 n. 13 (9th Cir. 1989); *see also Firoozye v. Earthlink Network*, 153 F. Supp. 2d 1115, 1130

20  (N.D. Cal. 2001) (Copyright Act does not preempt UTSA claim for disclosure and exploitation

21  of trade secrets because that claim "require[s] a status of secrecy, not required for copyright").

22  MGA complains that such a rule allows Mattel "to avoid limitations inherent in the copyright

23  analysis," but this argument is unconvincing.  Mattel cannot copyright a work in the public

24  domain and proceed to restrain others from copying the ideas and unprotectable expression in

25  that work.  Once the work is shared with the world, "it enters our minds and becomes ours as

26  well."  Alex Kozinski & Christopher Newman, "What's so Fair about Fair Use?," 46 J.

27  Copyright Soc. 529 (1999).  But Mattel can still keep its creative works secret either temporarily

28  or permanently in order to regulate their use. *See id.* ("To this I say: It's your creation if you

1   keep it secret.").  It is this right that trade secret law seeks to vindicate.  *Gates Rubber Co. v.*
2   *Bando Chem. Indus.*, 9 F.3d 823, 847-48 (10th Cir.1993) (finding a copyright claim for wrongful
3   use of a computer program does not preempt trade secret claim for misappropriation where
4   defendant gained access to the program through plaintiff's employee who breached his duty to
5   maintain secrecy).[31]

6       **C.    Breach of Fiduciary Duty and Aiding and Abetting Breach of Fiduciary**
7           **Duty**

8       Mattel alleges that MGA and Larian aided and abetted breaches of fiduciary duty
9   committed by Bryant, Machado, Brawer, Trueba, Vargas, Castilla, Contreras, and Cooney.
10  Mattel's separate counter-claim for breach of fiduciary duty only names Machado and Bryant as
11  counter-defendants.  To prevail on this counter-claim, Mattel must establish (1) a breach of
12  fiduciary duty by a Mattel employee; and (2) knowledge of the breach and substantial
13  encouragement or assistance by one or both counter-defendants.  *Casey v. U.S. Bank Nat'l Ass'n*,
14  127 Cal. App. 4th 1138, 1144 (2005).  A breach of fiduciary duty requires (1) the existence of a
15  fiduciary duty; (2) its breach; and (3) resulting damages.  *Pellegrini v. Weiss*, 165 Cal. App. 4th
16  515, 524 (2008).

17      UTSA supersedes both the breach of fiduciary duty and aiding and abetting breach of
18  fiduciary duty counter-claims in their entirety.  Both counter-claims also lack merit to the extent
19  they are based upon the conduct of Machado, Vargas, and Trueba, none of whom owed a
20  fiduciary duty to either Mattel, Inc. or Mattel Mexico.

21      **1.    Bryant, Castilla, Contreras, Cooney**

22      "[B]efore a person can be charged with a fiduciary obligation, he must either knowingly
23  undertake to act on behalf and for the benefit of another, or must enter into a relationship which
24  imposes that undertaking as a matter of law."  *Committee on Children's Television, Inc. v.*
25  *General Foods Corp.*, 35 Cal.3d 197, 221 (1983).  Mattel concedes that Castilla, Contreras,

26  ───────────────

27      [31] MGA argues that a trade secret allegation based upon Bryant's disclosure and
    MGA's acquisition of the Bratz trade secrets is likewise preempted by Section 106 of the
28  Copyright Act.  But these allegations also depend upon the "extra element" of secrecy.

Cooney, and Bryant did not enter into relationships which imposed fiduciary relationships as a matter of law.  Mattel instead argues that its four former employees undertook fiduciary obligations when they signed Confidential Information and Inventions Agreements, which imposed "duties of confidentiality" and required the employees to "accept [] position[s] of trust" with Mattel.  *See* Proctor Dec., Ex. 96 (Castilla Inventions Agreement unsigned by Mattel); *id.*, Ex. 97 (Cooney Inventions Agreement); *id.*, Ex. 124 (Bryant Inventions Agreement); *id.*, Ex. 174 (Contreras Inventions Agreement).  These duties of confidentiality and positions of trust were imposed by identical sub-sections of the employment agreements:

1.   *Provisions Related to Trade Secrets*

(a)   I acknowledge that the Company possesses and will continue to develop and acquire valuable Proprietary Information (as defined below), including information that I may develop or discover as a result of my employment with the Company.  The value of that Proprietary Information depends on it remaining confidential.  The Company depends on me to maintain that confidentiality, and I accept that position of trust.

(b)   As used in this Agreement, "Proprietary Information" means any information (including any formula, pattern, compilation, device, method, technique or process) that derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use, and includes information of the Company, its customers, suppliers, joint venturers, licensors, licensees, distributors and other entities with whom the Company does business.

(c)   I will not disclose or use at any time, either during or after my employment with the Company, any Proprietary Information except for the exclusive benefit of the Company as required by my duties for the Company, or as the Company expressly may consent to in writing.  I will cooperate with the Company and use my best efforts to prevent the unauthorized disclosure,

74

1   use or reproduction of all Proprietary Information.

2       (d)    Upon leaving employment with the Company for any reason, I immediately

3       will deliver to the Company all tangible, written, graphical, machine

4       readable and other materials (including all copies) in my possession or

5       under my control containing or disclosing Proprietary Information.

6   *See* Proctor Dec., Ex. 96 (Castilla Inventions Agreement unsigned by Mattel); *id.*, Ex. 97

7   (Cooney Inventions Agreement); *id.*, Ex. 124 (Bryant Inventions Agreement); *id.*, Ex. 174

8   (Contreras Inventions Agreement).

9       Any fiduciary duty imposed by the agreement was limited to the employees' obligation to

10   maintain the confidentiality of "proprietary information," the definition of which is identical to

11   the definition of a "trade secret" under the UTSA.  *Compare id.* ¶ 1(b) *with* Cal. Civ. Code

12   § 3426.1(d); *cf. Van de Kamp v. Bank of America*, 204 Cal. App. 3d 819, 860 (1988) (scope of

13   trust relationship defined by the parties' agreement); *Chipser v. Kohlmeyer & Co.*, 600 F.2d

14   1061, 1066-67 (5th Cir. 1979); *Grynberg v. Dome Petroleum Corp.*, 599 N.W.2d 261, 267 (N.D.

15   1999) ("The existence and scope of a fiduciary duty depends upon the language of the parties'

16   agreement.").  Mattel's counter-claims for breach of fiduciary duty and aiding and abetting

17   breach of fiduciary duty — to the extent predicated upon the conduct of Bryant, Castilla,

18   Contreras, and Cooney — are by necessity based upon nothing more than the misappropriation

19   of trade secret information.  For MGAE and Larian to aid and abet this conduct, the two counter-

20   defendants would have had to provide "substantial assistance or encouragement" to the departing

21   employees' misappropriation of trade secrets, which Mattel elsewhere argues is a basis for

22   holding MGAE and Larian liable for trade secret misappropriation.  Mattel's Opp'n to MGA

23   MSJ at 70 (arguing that principles of ratification and agency give rise to MGA's liability for

24   trade secret misappropriation committed by departing Mattel employees).  As a result, Mattel's

25   counter-claims for breach of fiduciary duty and aiding and abetting breach of fiduciary duty are

26   superseded to the extent predicated upon the conduct of Bryant, Castilla, Contreras, and Cooney.

27       **2.    Remaining Employees**

28       UTSA also supersedes the fiduciary duty counter-claims to the extent predicated upon the

conduct of Machado, Vargas, Trueba, and Brawer.  There is no genuine issue of material fact as to whether Brawer, Machado, Vargas, and Trueba engaged in any misconduct other than the misappropriation of Mattel's confidential information and Mattel does not allege otherwise.  *See* 4AAC ¶ 67.  Mattel attempts to re-characterize the thefts as "working for a competitor" and "acting with disloyalty" but these allegations attach new labels to the same nucleus of facts upon which Mattel's third counter-claim is based.  *See K.C. Multimedia*, 171 Cal. App. 4th at 960.  The UTSA supersedes claims based on the misappropriation of information.  Mattel cannot separately recover for breach of fiduciary duty or aiding and abetting breach of fiduciary duty.

Even if UTSA did not supersede claims based on the misappropriation of information that does not meet the statutory definition of a trade secret, Mattel has pled away the ability to bring such a claim.  Mattel identifies its trade secrets as "*the* documents, materials, designs, names, and other information stolen by Machado, Trueba, Vargas, Brisbois, Castilla, Cooney, Contreras, Brawer . . . including but not limited to . . . the confidential information stolen in the United States, Mexico and Canada."  4AAC ¶ 134 (emphasis added).  Mattel's definition of "trade secrets" does not except any of the documents or information allegedly stolen by the departing employees.  Though Mattel has since conceded that much of the allegedly misappropriated information did not meet the statutory definition of a trade secret, California courts look at the allegations as "reflected in the pleading," when determining whether a claim is subject to supersession.  *K.C. Multimedia*, 171 Cal. App. 4th at 960.  The continued designation and de-designation of trade secrets over the course of a litigation undermines its judicial administration.

Nor could Mattel predicate its fiduciary duty counter-claims on any conduct unrelated to the misappropriation of information, at least as to Machado, Trueba, and Vargas.[32]  Mattel argues that the three Mattel Servicios employees owed fiduciary obligations to Mattel, Mattel

---

[32] It is undisputed that Brawer owed a fiduciary duty to Mattel by virtue of his position as an officer of the company.  The scope of that duty was much broader than the fiduciary obligations, if any, assumed by Mattel's other employees.  *Daniel Orifice Fitting Co. v. Whalen*, 198 Cal. App. 2d 791, 800 (1962).  But Mattel does not allege that Brawer engaged in any misconduct other than the misappropriation of its information.

Mexico, and Mattel Servicios by virtue of both their positions and their employment agreements.

Machado, Vargas, and Trueba were employed by Mattel Servicios, a Mexican company. Webster Dec., Ex. 421 (company name is "Mattel Mexico Services"); Webster Dec., Ex. 321 (organizational chart for "Mexico").  Unlike California, Mexico does not recognize common law claims for breach of fiduciary duty or aiding and abetting breach of fiduciary duty, though such obligations may be assumed by contract and enforced through a claim for breach of contract. Calatayud Dec. ¶¶ 16-17.  However, this isn't a "true conflict" of law, because only Mexico has an interest in the obligations that flow between a Mexican corporation and its Mexican-resident employees.  Thus, none of the three employees owed a fiduciary duty to Mattel Servicios (or Mattel Mexico) by operation of law.  Moreover, even if either California law applied or Mexico recognized common law fiduciary obligations arising through employment, all three employees worked for Mattel Servicios, which is not a party to this lawsuit, and whose rights neither Mattel nor Mattel Mexico may enforce.  Fed. R. Civ. P. 17(a).

Mattel nevertheless argues that Machado, Vargas, and Trueba assumed fiduciary obligations to Mattel and Mattel Mexico through agreement.  One undertakes a fiduciary obligation when he voluntarily accepts another party's trust and confidence. *Mass. Eye and Ear Infirmary v. QLT Phototherapeutics, Inc.*, 412 F.3d 215, 241 (1st Cir. 2005).  However, since (as Mattel concedes) any fiduciary obligation assumed by the three Mattel Servicios employees related to their "access and exposure to Mattel's confidential information," Mattel's fiduciary duty counter-claims are necessarily based upon the misappropriation of Mattel's confidential information, whether through unauthorized acquisition, disclosure, or use.

The first agreement cited by Mattel is entitled "Individual Employment Contract" and purports to memorialize an employment relationship with Mattel Servicios—the "employer" under the agreement.  Webster Dec., Ex. 99 (Machado); Proctor Dec., Ex. 233 (Trueba); and Proctor Dec., Ex. 98 (Vargas).  Machado, Vargas, and Trueba agreed to "not [] disclose any of the aspects of [Mattel Servicios'] business and not to provide any information on the systems or activities of any kind to third parties."  *Id.* at 2316.  The second agreement is a Mattel "Conflict of Interest Questionnaire" that only Machado and Trueba signed.  4AAC, Ex. C at 103

1   (Machado); Proctor Dec., Ex. 237 (Trueba).  The second sentence of the final paragraph of the

2   agreement states "I agree not to divulge any company information to unauthorized recipients."

3   *Id.* at 106.  The third agreement is a Mattel Servicios technology use manual that only Machado

4   signed.  4AAC, Ex. D.  Mattel does not identify any particular clause in the agreement that

5   creates this fiduciary duty, though the Court presumes that Mattel relies upon two clauses

6   prohibiting access and misuse of the company's intellectual property.  The fourth agreement is a

7   Code of Conduct distributed by Mattel to "employees worldwide" in 2003.  4AAC, Ex. E at 160.

8   There is no evidence that Machado received or signed this document.  *See id.*

9        Any fiduciary obligations imposed by these agreements was an obligation not to disclose

10   the Mattel's confidential information.  Mattel's counter-claim for breach of fiduciary duty

11   against Machado as well as its allegation that MGAE and Larian aided and abetted the Mattel

12   Servicios' employees' breaches of fiduciary duty, is necessarily based upon the disclosure of

13   Mattel's confidential information.  4AAC ¶ 169 ("Machado breached his fiduciary duty [] by []

14   misappropriating Mattel trade secret and proprietary information.").  The fiduciary duty counter-

15   claims are accordingly superseded.

16        Moreover, none of the agreements signed by Machado, Vargas, and Trueba imposed

17   fiduciary obligations.  An employer's ***trust and confidence*** in its employee must precede the

18   acceptance of a fiduciary obligation.  26 Richard A. Lord, *Williston on Contracts*, § 69:23 (4th

19   ed. 2004).  Mattel and its subsidiaries neither trusted nor confided in their employees.  For

20   example, Mattel and its subsidiaries "reserve[d] the right to inspect and search ***at any time and***

21   ***without prior notice*** . . . personal property brought into the workplace (such as bags, portfolios,

22   cars) and monitor electronic communications (for example, voicemail)."  4AAC, Ex. D at 152

23   (emphasis added).  Mattel and its subsidiaries also required employees to receive prior

24   permission from a supervisor before sending electronic messages to friends and family on blogs,

25   internet chats, or discussion groups.  *Id.* at 150.  Employees were told to surrender "any right of

26   privacy in respect to any of the messages or information created or kept by Mattel's

27   Technological Resources, including information or messages that the employee thinks of or

28   regards as personal."  *Id.*  Considered alongside Mattel's efforts to monitor employees both

1  before and after their terms of employment through computer forensic analysis and personal

2  surveillance, the evidence shows relationships based on neither trust nor confidence.

### 3.    Disposition

4      Summary judgment must be entered against Mattel on Mattel's counter-claims for breach

5  of fiduciary duty and aiding and abetting breach of fiduciary duty:

6      Mattel's counter-claim for breach of fiduciary duty against Bryant is necessarily based

7  upon the same nucleus of conduct as its trade secret misappropriation counter-claim, since any

8  fiduciary obligation assumed by Bryant was limited to the non-disclosure of Mattel's trade secret

9  information.  Mattel's counter-claim for aiding and abetting Bryant's breach of fiduciary duty

10  against MGAE and Larian is likewise based upon the same nucleus of conduct that forms the

11  basis for Mattel's counter-claim for trade secret misappropriation.

12      Mattel's counter-claim for breach of fiduciary duty against Machado fails because

13  Mexico doesn't recognize a common law claim for breach of fiduciary duty.  It also fails because

14  Machado owed fiduciary obligations to his employer, Mattel Servicios, which is not a party to

15  this lawsuit.  Machado did not assume any fiduciary obligations to Mattel and Mattel Mexico

16  because neither party reposed a trust or confidence in him.  Even if Machado assumed a

17  fiduciary obligation to one or more of these entities, this obligation was limited to the non-

18  disclosure of Mattel's confidential information.  Mattel's counter-claim for aiding and abetting

19  Machado's breach of fiduciary duty (if any) is necessarily based upon the same nucleus of facts

20  that supports Mattel's trade secret misappropriation counter-claim.

21      Mattel's counter-claim for aiding and abetting Castilla, Contreras, Cooney, Vargas, and

22  Trueba's breaches of fiduciary duty is necessarily based upon the same nucleus of facts as its

23  trade secret misappropriation counter-claim, because any fiduciary obligation accepted by these

24  employees was limited to the non-disclosure of secrets.  Its counter-claim for aiding abetting all

25  non-Bryant employees breaches of fiduciary duty is also expressly based upon nothing more

26  than the misappropriation of information.  Moreover, Mattel's counter-claim for aiding and

27  abetting Vargas and Trueba's breaches of fiduciary duty fails because the two Mattel Servicios

28  employees owed no fiduciary duty to either Mattel or Mattel Mexico.

1
2

### D.   Breach of Contract and Intentional Interference with Contractual Relations

3    Mattel claims that Machado and Bryant breached their employment agreements.  Mattel

4    also claims that MGAE and Larian "induced [Mattel employees] to steal . . . Mattel trade secrets

5    and other proprietary and confidential information and . . . bribed or induced [Mattel employees]

6    to work or assist MGA" while those individuals were still employed by Mattel.  Mattel claims

7    that MGAE and Larian interfered with Mattel's contractual relations with the following

8    employees: "Bryant, Brawer, Machado, Trueba, Vargas, Castilla, Contreras, Cooney, Cabrera,

9    Morales, Salazar, and other former Mattel employees," who are not named in the 4AAC.

10                                    ### 1.   Breach of Contract

11    It is undisputed that UTSA does not supersede Mattel's counter-claim for breach of

12    contract against Bryant and Machado.  UTSA "does not affect [] contractual remedies, whether

13    or not based upon misappropriation of a trade secret."  Cal. Civ. Code § 3426.7(b).

14    However, Machado breached no contractual obligations to either Mattel or Mattel Mexico

15    because he did not enter into a valid contract with either entity.  To prevail on its counter-claim

16    for breach of contract, Mattel must establish (1) the existence of a valid contract; (2) Mattel's

17    performance or excuse for non-performance; (3) Machado's breach; and (4) resulting damage to

18    Mattel.  *Acoustics, Inc. v. Trepte Constr. Co.*, 14 Cal. App. 3d 887, 913 (1971).  Mattel claims

19    that Machado breached three contracts: (1) a Mattel Conflict Questionnaire; (2) a Mattel

20    Servicios Conflict of Interest Manual; and (3) a Mattel Code of Conduct.

21    The Conflict Questionnaire and Code of Conduct weren't supported by adequate

22    consideration.  "A promise is not enforceable unless consideration was given in exchange for the

23    promise."  *US Ecology, Inc. v. State of California*, 92 Cal. App. 4th 113, 128-29 (2001).  In its

24    Conflict Questionnaire and Code of Conduct, Mattel purported to impose dozens of obligations

25    upon Machado without providing him consideration in exchange for his promise of performance.

26    Mattel responds that Machado was employed by Mattel and Mattel Mexico, and that such

27    employment served as the ongoing consideration for Machado's promised performance under

28    the Conflict Questionnaire and Code of Conduct.  This argument contradicts the oral

1   representation by Mattel's counsel that Machado was a Mattel Servicios employee.  It also

2   contradicts the undisputed fact that Machado was an employee of Mattel Servicios, and not an

3   employee of either Mattel or Mattel Mexico.  Webster Dec., Ex. 99.

4          There is also no evidence that Machado accepted the obligations imposed by the Code of

5   Conduct, which was a handbook distributed to the employees of Mattel and its subsidiaries, with

6   no place for the employee's signature.  4AAC, Ex. E.  Mattel responds that Machado accepted

7   the terms of the Code of Conduct by his "perform[ance] [of] services that benefitted Mattel."  A

8   contract may be accepted by "performance of the conditions of a proposal, or the acceptance of

9   the consideration offered with a proposal."  Cal. Civ. Code § 1584.  But Mattel in fact *contests*

10  that Machado performed the obligations imposed by the Code of Conduct.  Moreover, Mattel's

11  argument that Machado accepted any consideration promised in exchange for his compliance

12  with the Code of Conduct (continued employment) is, for the reasons discussed above,

13  disproven by the undisputed evidence that his employment relationship was limited to Mattel

14  Servicios.  Webster Dec., Ex. 99.

15         Machado does not challenge that he accepted the obligations imposed by the Conflict of

16  Interest Manual, which he also concedes was supported by adequate consideration.  Machado

17  instead argues that Mattel and Mattel Mexico lack standing to enforce the Conflict of Interest

18  Manual, which was an agreement between Mattel Servicios and Machado.  Mattel responds that

19  both Mattel and Mattel Mexico were third party beneficiaries to the agreement.  "The test for

20  determining whether a contract was made for the benefit of a third person is whether an intent to

21  benefit a third person appears from the terms of the contract."  *Johnson v. Holmes Tuttle*

22  *Lincoln-Merc.*, 160 Cal. App. 2d 290, 297 (1958); *see also* Cal. Civ. Code § 1559 ("A contract,

23  made expressly for the benefit of a third person, may be enforced by him at any time before the

24  parties thereto rescind it.").  The Manual can be read to discuss an obligation to not disclose

25  "Mattel" confidential information.  But there is no definition of the term "Mattel."  To the

26  contrary, the agreement begins with a reference to "[t]he employees of Mattel Servicios, S.A. de

27  C.V," and then uses the shorthand "Mattel" throughout the remainder of the agreement.  4AAC,

28  Ex. D.  The language used in the Manual's other clauses actually establishes that the term

"Mattel" refers to "Mattel Servicios."  The Manual repeatedly describes obligations owed by "employees" — for example, an obligation to "not to conduct business, within a period of six months after termination" with Mattel.  *Id.* at 136; *see also id.* at 140 ("Mattel provides various Technological Resources to its employees").  As discussed above, and as recognized by the Manual itself, the "employees" upon whom the obligations were imposed were employees of Mattel Servicios and not Mattel or Mattel Mexico.  The Manual's ambiguous use of the term "Mattel" cannot be construed to encompass Mattel, Inc. or Mattel Mexico pursuant to the well-established rule of construction that "[t]he language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist."  Cal. Civ. Code § 1654.

Machado's motion for summary judgment on Mattel's counter-claim for breach of contract is therefore granted.

## 2.    Intentional Interference with Contractual Relations

Intentional interference with contractual relations is a tort.  *See* 5 Witkin, *Summary of California Law* § 731.  It does not count as a contractual remedy and is subject to supersession. *See K.C. Multimedia*, 171 Cal. App. 4th at 960-61.  Mattel's intentional interference with contractual relations counter-claim is in significant part based upon MGAE and Larian's alleged inducement of Mattel employees' theft of "Mattel trade secrets and other proprietary information," which is also a basis for Mattel's counter-claim for trade secret misappropriation against MGAE and Larian.  *See id.* (helping and encouraging employee's trade secret theft "falls within the statutory definition of 'improper means' of acquiring a trade secret, which 'includes . . . breach or inducement of a breach of duty to maintain secrecy . . .'") (quoting Cal. Civ. Code § 3426.1(a)).  UTSA supersedes Mattel's counter-claim to the extent it is based upon such conduct.  *See id.*

However, UTSA ***does not*** supersede the intentional interference with contractual relations counter-claim to the extent it arises out of conduct unrelated to the misappropriation of Mattel's

information.[33]  Mattel alleges that MGAE and Larian induced Mattel's employees, including Bryant, to "work for [and] assist a[] competitor of Mattel" while still employed by Mattel. 4AAC ¶ 161.  The record reveals a genuine issue of material fact as to whether such conduct occurred.  MGA independent contractor Veronica Marlow directed MGA's funds to Mattel employees Cabrera, Morales, and Salazar to create fashions for the Bratz dolls.  MGA argues that Larian and MGAE lacked knowledge of such conduct, but there is circumstantial evidence to the contrary.  For example, when Marlow declined MGA's offer of full-time employment, she and her husband sent MGA a letter explaining that the decision flowed from Marlow's desire to continue her close working relationship with Cabrera, Morales, and Salazar.  In other email communications, MGAE and Larian accepted and encouraged a Mattel employee to work for MGA's benefit on his nights and weekends, which suggests a corporation-wide willingness to engage the services of Mattel employees, even while those individuals continued to be employed by Mattel.  On the other hand, certain email communications evidence a lack of knowledge about the fact that Cabrera, Morales, and Salazar were performing work for MGA's benefit while still employed by Mattel.  In one email, Larian lamented the high salary being paid to Marlow, which may suggest a lack of knowledge about Marlow's subsequent payments to Mattel's employees.

There is also evidence that MGA involved Bryant in the Bratz doll design project between September 1, 2000 and October 4, 2000, on which date Bryant signed his employment contract with MGA.  Bryant's non-disclosure of his inventions to Mattel may have violated the section of his Inventions Agreement requiring him to "communicate to the Company as

---

[33] MGA claims that the Copyright Act preempts this counter-claim to the extent predicated upon MGA inducing Bryant to "convey his drawings and his purported interest in sculpts, and the ideas embodied in those copyrightable works."  Mattel doesn't make this allegation, however.  Instead, Mattel predicates its intentional interference with contractual relations counter-claim on MGA's inducement of Bryant to work for MGA while still employed by Mattel and MGA's inducement to Bryant to not disclose his inventions to Mattel.  4AAC ¶ 161.  Bryant couldn't have "breached" the clause assigning his works to Mattel, since the assignment was automatic; indeed, the immediacy of the assignment is the foundation for Mattel's interpretation of the Inventions Agreement.

1    promptly and fully as practicable all inventions."  TX 25.  Bryant's work on behalf of MGA may
2    have violated paragraph 3 of the Inventions Agreement that states "[m]y employment with the
3    Company requires my undivided attention and effort . . . I shall not, without the Company's
4    express written consent, engage in any employment or business other than for the Company, or
5    invest in or assist (in any manner) any business competitive with the business or future business
6    plans of the Company."  *Id.*  There are genuine issues of material fact as to whether MGA
7    suborned the breach of either of these provisions, the performance of which has no relation to
8    the non-disclosure of trade secret information or the reproduction of copyrighted matter.

9        Mattel moves for summary judgment on some elements of the intentional interference
10   with contractual relations counter-claim, which requires: "(1) a valid contract between plaintiff
11   and a third party; (2) defendant's knowledge of the contract; (3) defendant's intentional acts
12   designed to induce a breach or disruption of the contractual relationship; (4) actual breach or
13   disruption of the contractual relationship; and (5) resulting damage."  *Quelimane Co., Inc. v.*
14   *Stewart Title Guaranty Co.*, 19 Cal.4th 26, 55 (1988) (quoting *Pacific Gas & Electric Co. v.*
15   *Bear Stearns & Co.*, 50 Cal.3d 1118, 1126 (1990)).

16       Mattel argues that the undisputed facts establish that it had valid and enforceable
17   contracts with Castilla, Cooney, Brawer, Cabrera, Morales, Salazar, Tumaliuan, and Bryant.
18   MGA does not oppose Mattel's argument that it had valid and enforceable contracts with
19   Cooney, Castilla, Cabrera, Morales, Salazar, and Tumaliuan.  There are genuine issues of
20   material fact as to whether Brawer was bound by Mattel's Code of Conduct, a document that
21   does not contain his signature of other identifying information, and as to which he professed no
22   knowledge during his deposition.  *See* Proctor Dec., Ex. 358; Brawer Depo., Vol. I, at 91-95.

23       Mattel also argues that the undisputed evidence establishes that its former employees
24   breached their contracts.  However, there is a genuine issue of material fact on this issue.

25       First, Mattel argues that Cooney and Castilla failed to comply with a common provision
26   in their Inventions Agreements requiring them to "deliver to the Company all tangible, written,
27   graphical, machine readable, and other materials (including all copies) in my possession or under
28   my control containing or disclosing Proprietary Information."  The term "Proprietary

Information" tracked UTSA's definition of a trade secret.  In light of the genuine issues of material fact as to whether any of the materials taken by Castilla and Cooney constituted trade secrets, Mattel's motion is denied as to this issue.

Second, Mattel argues that Cabrera, Morales, and Salazar worked for MGA's benefit while at Mattel.  These employees, according to Mattel, breached their contractual duty to not "without the Company's express written consent, engage in any employment or business other than for the Company, or invest in or assist (in any manner) any business competitive with the business or the future business of the Company."  Cabrera, Morales, and Salazar were not employed by *anybody* other than Mattel; they received payments from an independent contractor named Veronica Marlow.  Mattel may argue that these individuals engaged in "business" competitive with Mattel, but the term "business" is ambiguous.  It could refer to any activity that generates revenue for the individual, but it could also be read more restrictively to refer to a competitive enterprise, in which Cabrera, Morales, and Salazar were certainly not engaged. Neither party has presented extrinsic evidence capable of resolving the ambiguity, leaving this issue for the fact-finder to resolve.

Third, Mattel argues that its former intern, Tumaliuan, breached his contract with Mattel by working for MGA.  Tumaliuan's internship at Mattel commenced on May 19, 2003. However, Tumaliuan did not disclose to Mattel the fact that he had signed an employment agreement with MGA eleven months earlier, on June 10, 2002, and that his term of employment at MGA was ongoing; there had been no termination.  Mattel argues that Tumaliuan's conduct violated the Inventions Agreement's requirement that he not "engage in any employment or business other than for the Company, or invest in or assist (in any manner) any business competitive with the business" of Mattel, without first obtaining Mattel's written consent.  The term "engage" is ambiguous.  It could refer to the mere fact of an ongoing employment relationship, actively working for another company, or commencing a new employment relationship.  Tumaliuan did not initiate a new employment relationship with MGA after he started his internship with Mattel, and there is a genuine issue of material fact as to whether he actually worked for MGA while interning at Mattel.  The parties have provided the Court with

1    no extrinsic evidence to resolve the ambiguity, leaving this issue for the fact-finder to resolve.

2    　　　There is a genuine issue of material fact as to whether MGA intentionally interfered with

3    the Mattel employees' contracts.  As discussed earlier, the evidence is ambiguous as to the

4    alleged misappropriation of Mattel confidential information and MGA's role in such conduct.

5    Moreover, MGA argues that it lacked knowledge about the contracts that bound Mattel

6    employees, including Bryant, but the fact that MGA used contracts that contained similar forced

7    disclosure, non-disclosure, and loyalty clauses may suggest MGA's recognition that the

8    employees' alleged conduct was wrongful.

9    　　　　　　　**E.    Conversion**

10   　　　Mattel's counter-claim for conversion alleges that MGA and Machado "wrongfully

11   converted Mattel property and resources by appropriating and using them for their own benefit

12   and gain and for the benefit and gain of others, without the permission of Mattel."  4AAC ¶ 193.

13   The "property" allegedly converted included "such proper [sic] and materials that were created

14   by Bryant while he was a Mattel product designer," other tangible "Bratz inventory," and finally

15   "the [trade secret] documents, materials, designs, names, and other information" allegedly

16   misappropriated by the departing Mattel employees.  *Id.* ¶¶ 194-96.

17   　　　UTSA supersedes this counter-claim to the extent it is based upon the misappropriation of

18   Mattel's confidential information, whether or not that information rises to the level of a trade

19   secret.  First, as discussed above, allowing Mattel to claim that MGA and Machado converted

20   non-trade secret confidential information undermines the California Court of Appeals' interest in

21   redeeming UTSA's purpose of "provid[ing] 'unitary definitions of trade secret and trade secret

22   misappropriation.'" *K.C. Multimedia*, 171 Cal. App. 4th at 957; *see also Silvaco*, 184 Cal. App.

23   4th at 239 n. 22 ("We emphatically reject the [] suggestion that the uniform act was not intended

24   to preempt 'common law conversion claims based on the taking of information that, though not a

25   trade secret, was nonetheless of value to the claimant.'") (quoting *Cenveo v. Slater*, 2007 WL

26   527720, at *4 (E.D. Pa. 2007)).  Second, a claim for conversion requires the existence of a

27   property right, and "information is not property unless some law makes it so." *Silvaco*, 184 Cal.

28   App. 4th at 239.  Mattel cannot "identif[y] any property right" in its confidential information

1  "outside of trade secrets law," because no such property right exists under California law.  *Id.*

2  MGA concedes that the counter-claim is not superseded to the extent it is based on the

3  misappropriation of "tangible documents and things."  MGA MSJ at 31:2-3.  As previously

4  recognized, the Bratz sketches and sculpts had some value apart from the information they

5  embodied and Mattel seeks the return of those items in this litigation.  Thus, the conversion

6  counter-claim survives to the extent predicated upon MGA's exercise of dominion over the

7  physical Bratz-related works.  *See Chicago Show Printing Co. v. Sherwood*, No. 92 C 309, 1992

8  WL 175577, at *3 (N.D. Ill. July 14, 1992).

9  The counter-claim does not, however, survive to the extent predicated upon the physical

10  documents allegedly misappropriated by Mattel's former employees because Mattel cannot show

11  that the documents had any value "apart from the information contained therein."  *See Thomas &*

12  *Betts Corp. v. Panduit Corp.*, 108 F. Supp. 2d 968, 973 (N.D. Ill. 2000).  The Court can ensure

13  the return of such physical materials upon a finding of trade secret misappropriation by the fact-

14  finder.  *See Hauck Mfg. Co. v. Astec Indus., Inc.*, 375 F. Supp. 2d 649, 661 (E.D. Tenn. 2004).

15  For the foregoing reasons, Machado's motion is granted as to Mattel's counter-claim for

16  conversion and MGA's motion is granted in part and denied in part as to Mattel's counter-claim

17  for conversion.

18  **F.**    **Breach of Duty of Loyalty and Aiding and Abetting Breach of Duty of**

19  **Loyalty**

20  Mattel alleges that Bryant and Machado breached their duties of loyalty to Mattel by

21  "entering into agreements with a Mattel competitor [and] using Mattel property and resources for

22  the benefit of, and to aid and assist, themselves personally and the competitor of Mattel" while

23  still employed by Mattel.  4AAC ¶ 181.  Mattel also alleges that MGAE and Larian aided and

24  abetted Bryant's breach of his duty of loyalty by enabling Bryant to breach his "obligation . . .

25  not to compete with Mattel or assist a competitor of Mattel during the term of his employment

26  [and] give preference to Mattel's business over his own, similar interests or those of Mattel's

27  competitors during the course of his employment with Mattel."  *Id.* ¶ 187.  Mattel alleges that

28  MGAE and Larian enabled Mattel employees, including Brawer, Machado, Trueba, Vargas,

Castilla, Contreras, Cooney, Cabrera, Morales, and Salazar, to breach their duties of loyalty, which required that they "not [] compete with Mattel or assist a competitor of Mattel during their Mattel employment." *Id.* ¶ 188.  The counter-claims for breach of duty of loyalty against Bryant and Machado, and aiding and abetting breach of duty of loyalty against MGAE and Larian, are based upon these allegations of misconduct.

### 1.    Machado, Vargas, and Trueba

For reasons discussed above, UTSA supersedes these counter-claims to the extent they are based upon Machado, Vargas, and Trueba's misappropriation of Mattel's information, whether or not that information qualifies as a trade secret.  Mattel alleges the factual predicate for its counter-claim against Machado with generality, stating that he "aided, assisted and worked for a competitor of Mattel" while still employed by Mattel.  4AAC ¶ 181.  Mattel elsewhere argues that Machado committed the following acts of wrongdoing:

> stealing trade secrets, stealing other documents and property, misappropriating documents and information used for a presentation made to Larian, Park and Kuemmerle which disclosed confidential information, inducing a Mattel employee [Vargas] to assist him in preparing that presentation, inducing fellow employees [Vargas and Trueba] to joint [sic] him in stealing trade secrets and disclosing confidential information to a competitor of Mattel.

Mattel Opp'n to Machado MSJ at 31:14:20.

Machado's alleged inducement of Vargas to assist in preparing a presentation, as well as his alleged inducement of Vargas and Trueba to misappropriate Mattel's information, forms the basis for Mattel's counter-claim for trade secret misappropriation against Machado.  *See K.C. Multimedia*, 171 Cal. App. 4th at 961 (trade secret misappropriation includes "breach or inducement of a breach of a duty to maintain secrecy").  MGAE and Larian's acts of aiding and abetting the misappropriation of Machado, as well as Vargas and Trueba whether independently or indirectly through Machado, forms the basis of Mattel's trade secret misappropriation counter-claim against MGA.  *Id.*  The vast majority of both counter-claims are therefore

1  superseded by UTSA to the extent that they concern the Mattel Servicios employees.

2      Mattel's duty of loyalty counter-claims also fail to the extent predicated upon the conduct

3  of the Mattel Servicios employees because none of the employees owed duties of loyalty to

4  Mattel or Mattel Mexico.  A duty of loyalty, if any, is imposed by California Labor Code Section

5  2863, which provides that any employee "who has business to transact on his own account,

6  similar to that intrusted to him . . . shall always give the preference to the business of the

7  employer."  Cal. Labor Code § 2863.  Machado, Vargas, and Trueba were not employees of

8  Mattel and Mattel Mexico and owed no section 2863 duties to either Mattel or Mattel Mexico.

9      Machado's motion is granted as to Mattel's counter-claim for breach of duty of loyalty

10  because (1) the counter-claim is in large part superseded by UTSA; and (2) Machado owed no

11  duty of loyalty to either Mattel or Mattel Mexico.  MGA's motion is granted as to Mattel's

12  counter-claim for aiding and abetting breach of duty of loyalty to the extent the claim is

13  predicated upon the conduct of the Mattel Servicios employees because (1) UTSA supersedes

14  the vast majority of the counter-claim; and (2) the Mattel Servicios employees owed no duties of

15  loyalty to Mattel or Mattel Mexico.

16  ### 2.      Brawer, Castilla, Contreras, and Cooney

17      The counter-claim for aiding and abetting breach of duty of loyalty is also superseded to

18  the extent based upon the conduct of Brawer, Castilla, Contreras, and Cooney.  There is no

19  allegation, nor any evidence in the record, that these employees engaged in wrongdoing

20  unrelated to the misappropriation of Mattel's information.  *See* 4AAC ¶¶ 64-85.  MGAE and

21  Larian's inducement of the employees' disloyalty thus forms the basis for Mattel's trade secret

22  misappropriation counter-claim.  *See K.C. Multimedia*, 171 Cal. App. 4th at 961.

23  ### 3.      Tumaliuan, Bryant, Cabrera, Salazar, and Morales

24      UTSA's supersessive effect on both counter-claims is minimal to the extent that the

25  counter-claims concern the conduct of Bryant, Tumaliuan, Cabrera, Salazar and Morales.

26  Although Bryant's disclosure of the Bratz fashion doll concept to MGA forms the basis of

27  Mattel's counter-claim for trade secret misappropriation, Mattel alleges that Bryant engaged in

28  other misconduct, including, for example, directing the production of the first generation Bratz

dolls while still employed by Mattel, engaging other Mattel employees to unknowingly work on the Bratz dolls, using Mattel's physical resources to create a dummy doll for MGA, and working on other side projects for MGA.  *See* Mattel's Statement of Genuine Issues in Response to MGA's Statement of Uncontroverted Facts ¶ 17.  Mattel also alleges, and there is a genuine issue of material fact as to whether, Tumaliuan, Cabrera, Morales, and Salazar engaged in disloyal unrelated to the misappropriation of Mattel's information.  For example, Tumaliuan may have signed on as a Mattel intern while bound by an existing employment relationship, and the fact-finder will be asked to determine whether Mattel and Tumliuan intended for his internship to constitute "employment" for the purposes of Labor Code Section 2863.  While still employed by Mattel, Cabrera, Morales, and Salazar worked with Marlow to create Bratz fashions, and the fact-finder will be asked to determine whether the employees transferred their "loyalty to a competitor" in light of the fact that MGA may not have been a "competitor" of Mattel's at the time of the employees' work with Marlow.  *See Huong Que, Inc. v. Luu*, 150 Cal. App. 4th 400, 414 (2007).  There is also a genuine issue of material fact as to whether MGA aided and abetted this conduct, in light of the fact that Marlow apprised MGA of her work with the moonlighting Mattel fashion designers, Larian's targeted recruitment of Mattel employees, and evidence of MGA's potential contact with Tumliuan even during the term of his Mattel internship.

### 4.   Disposition

Machado's motion is granted as to Mattel's counter-claim for breach of duty of loyalty because UTSA supersedes the vast majority of the counter-claim and Machado owed no duty of loyalty to Mattel or Mattel Mexico.  MGA's motion is granted as to Mattel's counter-claim for aiding and abetting breach of duty of loyalty to the extent that the counter-claim concerns the conduct of Machado, Vargas, Trueba, Brawer, Castilla, Contreras and Cooney, as well as Bryant's alleged misappropriation of Mattel's information.  MGA's motion is denied as to Mattel's counter-claim for aiding and abetting breach of duty of loyalty to the extent that the counter-claim concerns the conduct of Tumliuan, Cabrera, Morales, Salazar, and the conduct by Bryant that does not form the basis of Mattel's trade secret misappropriation counter-claim.

### G. Unfair Competition

Mattel alleges MGA and Bryant engaged in unfair competition in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*, by committing "commercial bribery of Bryant . . . and misappropriation of trade secrets," though the counter-claim incorporates by reference all earlier allegations. 4AAC ¶¶ 201-204. The counter-claim is superseded to the extent it is based upon the misappropriation of Mattel's information. *See K.C. Multimedia*, 171 Cal. App. 4th at 961. The Copyright Act preempts this counter-claim to the extent predicated upon the infringement of Bryant's works. *See Fisher v. Dees*, 794 F.2d 432 (9th Cir. 1986). The counter-claim is not otherwise preempted by the Copyright Act or superseded by the UTSA. For example, this counter-claim encompasses MGA's inducement of Mattel employees to work against Mattel's interests and for MGA's benefit, while still employed by Mattel. MGA has not challenged this basis for the counter-claim.

### V. Statutes of Limitations

Both parties move for summary judgment on the timeliness of Mattel's counter-claims. For the purposes of measuring the statute of limitations, two dates are important: (1) the date on which the statute of limitations for each counter-claim began to run; and (2) the pleading to which Mattel's counter-claims relate back.

### A. Relation Back and Date of Filing

Mattel filed its original pleading against Bryant on April 27, 2004, and moved for leave to file an amended pleading substituting MGAE, Larian, and MGA HK for the Doe defendants on November 20, 2006. The district court denied Mattel's request, but directed Mattel to file its claims as counter-claims to MGA's complaint, holding that Mattel's counter-claims against MGAE, Larian, and MGA HK related back to the date of its complaint against Bryant. Though this ruling was erroneous, it caused no prejudice to MGA, since it is clear that Mattel's request for leave to amend its complaint against Bryant would have been granted if the district court had been aware of the general rule that Rule 15(c) "by its terms, only applies to the amended pleadings in the same action as the original, timely, pleading." *Bailey v. Northern Ind. Pub. Serv. Co.*, 910 F.2d 406, 413 (7th Cir. 1990); *cf. Marcoux v. Shell Oil Prods. Co. LLC*, 524 F.3d

91

33, 38 (1st Cir. 2008) (holding that district court did not commit *prejudicial* error by allowing relation back to pleading in separate action), *aff'd in part and rev'd in part on other grounds*, *Mac's Shell Service, Inc. v. Shell Oil Prods. Co. LLC*, 130 S.Ct. 1251 (2010).  The law of the case doctrine demands that the district court's decision be left undisturbed.  *Moore v. James H. Matthews & Co.*, 682 F.2d 830, 833-34 (9th Cir. 1982).  Mattel's identification of the Bratz concept as a trade secret must as a matter of basic equity relate back to the original complaint against Bryant as well, since it "arose out of the conduct, transaction, or occurrence," — *i.e.*, Bryant's disclosure of the Bratz concept to MGA — "set out [] in the original pleading."  Fed. R. Civ. P. 15(c).  To the extent Mattel's surviving counter-claims for copyright infringement, breach of contract, intentional interference with contractual relations, misappropriation of trade secrets, breach of duty of loyalty, and aiding and abetting breach of duty of loyalty, concern the Bratz works and Bryant's work for MGA, those counter-claims are deemed to have been filed on April 27, 2004 pursuant to the law of the case doctrine.

Neither MGA nor Mattel make any arguments about the filing date of Mattel's allegations concerning the conduct of other employees like Brawer, Cooney, Contreras, Castilla, Machado, Vargas, Trueba, Cabrera, Morales, and Salazar.

### B.    Applicable Statutes of Limitations

Mattel's counter-claim for trade secret misappropriation must have been brought "within three years after the misappropriation is discovered or by exercise of reasonable diligence should have been discovered."  Cal. Civ. Code § 3426.6.  "[A] continuing misappropriation constitutes a single claim."  *Id.*  However, contrary to MGA's argument, subsequent acts of trade secret misappropriation by *other* Mattel employees aren't the type of "continuing misappropriation" contemplated by the statute:

> The underlying principle appears to be that once plaintiff knows or
> should know that a defendant who once was trusted has shown, by
> any act of misappropriation, that he cannot be trusted, plaintiff
> should know that there is a risk that defendant will commit
> additional acts of misappropriation, whether they involve repeated

1        misappropriations of one trade secret or initial misappropriations of

2        other confidences.

3  *Intermedics, Inc. v. Ventritex, Inc.*, 822 F. Supp. 634, 653-54 (N.D. Cal. 1993).

4        "A plaintiff is under a duty to reasonably investigate, and a suspicion of wrongdoing,

5  coupled with a knowledge of the harm and its causes, commences the limitations period." *Snapp*

6  *& Associates Insurance Services, Inc. v. Malcolm Bruce Burlingame Robertson*, 96 Cal. App.

7  4th 884, 891 (2002).

8        Mattel's counter-claim for copyright infringement must have been brought "within three

9  years after the claim accrued." 17 U.S.C. § 507.  A claim for copyright infringement accrues

10  "when one has knowledge of a violation or is chargeable with such knowledge." *Roley v. New*

11  *World Pictures, Ltd.*, 19 F.3d 479, 481 (9th Cir. 1994).

12        Mattel's counter-claim for conversion must have been brought within three years of the

13  theft, though the statute of limitations period is tolled "'only for that period during which the

14  claim is undiscovered by plaintiff or until such time as plaintiff, by the exercise of reasonable

15  diligence, should have discovered it.'" *Jolly v. Eli Lilly & Co.*, 44 Cal.3d 1103, 1111 (1988).

16  "So long as a suspicion exists, it is clear that the plaintiff must go find the facts; she cannot wait

17  for the facts to find her." *Id.*

18        Mattel's counter-claim for a violations of Cal. Bus. & Prof. Code § 17200 must have been

19  brought "within four years after the cause of action accrued."  Cal. Bus. & Prof. Code § 17208.

20        Mattel's state law counter-claims grounded in tort, including its counter-claims for breach

21  of duty of loyalty, aiding and abetting breach of duty of loyalty, and intentional interference with

22  contractual relations must have been brought within two years of the alleged wrongdoing.  Cal.

23  Code Civ. Proc. § 339(1).  Mattel's counter-claim for breach of contract must have been brought

24  within four years of the alleged breach.  Cal. Code Civ. Proc. § 337.

25        Mattel's counter-claims alleging violations of the Racketeer Influenced and Corrupt

26  Organizations Act must have been brought within four years. *Pincay v. Andrews*, 238 F.3d

27  1106, 1108 (9th Cir. 2001).  This limitations period restarts with the commission of "[1] a new

28  and independent act that is not merely a reaffirmation of a previous act" that [2] inflicts "new

1    and accumulating injury on the plaintiff." *Grimmett v. Brown*, 75 F.3d 506, 513 (9th Cir. 1996)

2    (emphasis removed).

3           C.     **Date of Accrual**

4                  1.     **Background Facts**

5           Before there was Bratz, there was Diva Starz, a line of big-headed dolls released by

6    Mattel in early 2000, nearly nine months before Bryant left Mattel for MGA. Mattel considered,

7    but ultimately decided against, the name "Brats" for a miniature version of the Diva Starz doll

8    line, though there is a genuine issue of material fact as to whether Bryant was exposed to the

9    word "Brats." *See* Deposition of Kislap Ongchanco, dated April 24, 2007, at 232.

10          Before he discussed Bratz with MGA on September 1, 2000, Bryant solicited other Mattel

11   employees to help create the concept Bratz sketches and sculpts. Bryant continued to use other

12   Mattel employees' resources between the September meeting and his October 19, 2000

13   resignation. On the date he resigned, Bryant declined to identify his next destination and his exit

14   interview form cryptically stated that an "opportunity arose [and he] had to take it." MGA UF

15   811. Mattel's former Marketing Director, with whom Bryant worked, recalls that she didn't

16   believe that Bryant was telling her the full story about the reasons for his resignation from

17   Mattel. Deposition of Mattel 30(b)(6) Jill Nordquist, dated July 31, 2007, at 133. She also

18   recalled that "[a]round the time that Bratz launched in [] the summer of 2001" some Mattel

19   employees who worked in the company's Design Center discussed Bryant's "work[] at MGA on

20   Bratz." *Id.* at 186:3-14. There is no evidence that any of these employees discussed or even

21   suspected that Bryant either conceived Bratz, or created the Bratz concept works, during or

22   before his employment with Mattel.

23          Mattel was initially concerned that MGA's Bratz dolls infringed its line of Diva Starz

24   dolls or another unreleased product line named Toon Teens. Declaration of Warrington Parker,

25   Ex. 47 (Mattel internal report stating that Bratz "bear[] significant resemblance to Diva Starz in

26   both appearance and attitude"). Mattel never attempted to litigate these claims, though in early

27   2002, the company's legal department opened an official investigation file on the basis of

28   "[i]nformation received from Design Center staff, Evelyn Viohl and Ivy Ross that MGA

94

1  Entertainment, headed by a person known as Isaac Larian has recently hired a number of former

2  Matel [sic] employees and is manufacturing products that appear to be Mattel designs."  TX

3  1195RS-002.  The opening of the investigation file followed a telephone conference call

4  between the head of Mattel's security department and two Mattel employees, in which he

5  essentially learned that "Bryant while at MGA created Bratz and in doing so infringed on the

6  copyright of . . . Tune [sic] Teens to create Bratz."  Deposition of Richard DeAnda, dated

7  December 19, 2007, at 173.  Mattel looked into the extent of Bryant's exposure to the Toon

8  Teens line during his time as a Mattel employee.

9        On August 5, 2002, Mattel's Chief Executive Officer Robert Eckert received an

10  anonymous letter that stated: "In 2000 a Mattel employee by the name of Carter Bryant was

11  working with Mattel to design dolls.  One of the dolls that he was working on creating was the

12  Bratz dolls.  MGA Entertainment found out about his creation and approached him . . ."  Ex.

13  6302 to MGA MSJ.  The letter found its way to the head of Mattel's security department, who

14  discussed its contents in a subsequent communication to Mattel's Vice President of Human

15  Resources: "I'm aware of this situation and have been working on it for several months.  My

16  frustration in this matter was the genesis of [REDACTED] that is now in the hands of Robert

17  Normile.  The truth of the matter is that Carter Bryant did work for Mattel . . ."  Ex. 6302 to

18  MGA MSJ.  Nearly seven months later, on July 18, 2003, Eckert read a Wall Street Journal

19  article that identified Bryant as the creator of the Bratz line of dolls.  At least once prior to that

20  date, Larian had publicly identified himself, and not Bryant, as "the inspiration behind the Bratz

21  dolls."  Proctor Dec., Ex. 127.

22        **2.**    **Prior Rulings**

23        Before the phase 1 trial, the district court issued several rulings concerning the timeliness

24  of Mattel's claims and counter-claims.  Following a consideration of some, though not all, of the

25  evidence discussed above, the district court ruled that (1) Mattel's claims against MGA related

26  to Bryant and the theft of the Bratz dolls accrued on July 18, 2003, the date on which the Wall

27  Street Journal article identifying Bryant as the creator of Bratz was published; and (2) Mattel's

28  copyright infringement claim did not accrue prior to November 20, 2003, on which date "Mattel

1  [first] receive[d] copies of the Bratz drawings."  Dkts. 3826 & 3902.

2  ### 3.    Disposition

3  Though MGA raises specific challenges to the timeliness of Mattel's counter-claims to

4  the extent that those counter-claims relate to Bryant's conduct and the disclosure of the Bratz

5  concept to MGA, it makes no specific argument arguments about the timeliness of Mattel's

6  allegations about its *other* former employees.  MGA instead generally argues that (1) counter-

7  claims related to Mattel's other employees are superseded by the UTSA; and (2) Mattel's

8  counter-claim for trade secret misappropriation describes a "continuing misappropriation"

9  subject to a statute of limitations that accrued when Mattel should have known about Bryant's

10 disclosure of the Bratz trade secret.  This argument is both erroneous because, as discussed

11 above, "continuing misappropriation" refers to multiple acts by *one* individual and not, as here,

12 many other employees.  For example, there's no reason that Bryant's alleged misappropriation of

13 the Bratz trade secret would have allowed Mattel to envision Castilla's future conduct.  To the

14 extent that California law applies to its counter-claims, Mattel's motion for summary judgment

15 as to the timeliness of its non-Bratz allegations is granted.

16 The law of the case doctrine ordinarily requires adherence to the district court's earlier

17 rulings about the timeliness of Mattel's Bratz-related counter-claims.  However, there is no

18 reason why a fact-finder should not be able to evaluate whether new evidence produced after the

19 phase 1 proceedings points to a contrary conclusion.  *See Minidoka Irrigation Dist. v. Dep't of*

20 *Interior of U.S.*, 406 F.3d 567, 573 (9th Cir. 2005) (recognizing exception to law of the case

21 doctrine where "substantially different evidence was adduced at a subsequent trial").  For

22 example, since the phase 1 proceedings, Mattel has produced a redacted version of an outside

23 consultant's report that may suggest Mattel's suspicions about the timing of Bryant's creation of

24 the Bratz sketches and sculpt.  Mattel's selective redaction gives greater context to DeAnda's

25 communication with Kaye, to which the prior district court granted minimal weight.  Moreover,

26 Mattel has left for phase 2 its counter-claim for trade secret misappropriation based on the

27 alleged misappropriation of the Bratz concept.  There is no reason that the prior district court's

28 rulings should bind the fact-finder in this case from evaluating the timeliness of an allegation,

1    especially when the timeliness of that allegation *was not before the prior district court*.

2    ## VI.    Trade Dress Infringement and Trade Dress Dilution

3    MGA claims that Mattel's sale of three doll products in a type of trapezoidal packaging

4    already used by MGA, as well as Mattel's sale of the Wee 3 Friends doll in a heart shaped

5    packaging used by MGA's 4-Ever Best Friends doll, constituted trade dress infringement in

6    violation of 15 U.S.C. § 1125(a); and trade dress dilution in violation of 15 U.S.C. § 1125(c) and

7    Cal. Bus. & Prof. Code § 14330.  MGA is the owner of registered trademarks in (1) a transparent

8    trapezoidal box; and (2) "a three-dimensional configuration of an isosceles trapezoid cardboard

9    box with the top and bottom being parallel to each other and the non-parallel sides being of

10   equal length."  Exs. 10 & 11 to MGA's Request for Judicial Notice.  MGA withstood the

11   USPTO's initial rejection of its trademark applications by arguing that (1) the trade dress was

12   non-functional because it used more surface area; and (2) the trade dress was non-distinctive as

13   it was "a unique innovation in the toy industry in general and the fashion doll category in

14   particular" at the time of its introduction.  *Id.*  Since the evidence contradicts MGA's statements

15   to the USPTO, MGA's registrations are not entitled to the Court's deference.  *Wells Fargo &*

16   *Co. v. Stagecoach Properties, Inc.*, 685 F.2d 302, 306 (9th Cir. 1982).

17   ### A.    Trade Dress Infringement

18   To prevail on its claim for trade dress infringement MGA must show that "(1) the trade

19   dress is inherently distinctive or has acquired distinctiveness through secondary meaning;

20   (2) there is a likelihood that the public will be confused by the infringing use; and (3) the trade

21   dress is non-functional."  *Stephen W. Boney, Inc. v. Boney Servs., Inc.*, 127 F.3d 821, 828 (9th

22   Cir. 1997).

23   ### 1.    Distinctiveness

24   MGA's asserted trade dress is not inherently distinctive and has not acquired

25   distinctiveness through secondary meaning.  "If a mark is inherently distinctive it need not be

26   shown to also have a secondary meaning."  *Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d

27   819, 824 (9th Cir. 1993).  The predominant test for inherent distinctiveness asks whether "(1) the

28   design or shape is a common, basic shape or design; (2) it was unique or unusual in a particular

1    field; and (3) it was a mere refinement of a commonly-adopted and well-known form of

2    ornamentation for a particular class of goods which consumers view as mere ornamentation." 1

3    McCarthy on Trademarks and Unfair Competition § 8:13 (4th ed. 2010) (citing *Seabrook Foods,*

4    *Inc. v. Bar-Well Foods, Ltd.*, 568 F.2d 1342 (C.C.P.A. 1977)).  In other words, if "the trade dress

5    is of such an unusual design that a buyer will immediately rely on it to differentiate the source of

6    the product," then it is inherently distinctive.  *Id.*  "[A] product's trademark or trade dress

7    acquires a secondary meaning when the purchasing public associates the mark or dress with a

8    single producer rather than with the product itself."  *Int'l Jensen, Inc.*, 4 F.3d at 823.  Unlike

9    inherent distinctiveness, "secondary meaning is a learned association" between the producer and

10    the packaging, or "an 'acquired distinctiveness.'"  *Id.* (quoting *Two Pesos, Inc. v. Taco Cabana,*

11    *Inc.*, 505 U.S. 763, 769, 112 S.Ct. 2753 (1992)).  "While evidence of a manufacturer's sales,

12    advertising and promotional activities may be relevant in determining secondary meaning, the

13    true test of secondary meaning is the effectiveness of this effort to create it."  *Id.*

(a)     Trapezoidal Packaging

14

15       It cannot be disputed that toys, and even dolls, have been sold in trapezoids for decades.

16    *See, e.g.*, *Ideal Toy Corp. v. Kenner Prods. Div. of General Mills Food Group, Inc.*, 443 F. Supp.

17    291, 297 (S.D.N.Y. 1977) (analyzing "action figures . . . sold in virtually identical . . .

18    trapezoidal box contain[ing] an arch-like opening through which the full figure may be

19    viewed").  A trapezoid is the sort of intuitive, "ordinary geometric shape" that courts generally

20    "regard[] as non-distinctive and protectable only upon proof of secondary meaning."  *Wiley v.*

21    *Am. Greetings Corp.*, 762 F.2d 139, 142 (1st Cir. 1985).  MGA quotes an internal Mattel

22    document that lauds the "unique" and "innovative" "pyramid shape packaging" in which the

23    Bratz dolls are sold, but conveniently omits the rest of the quoted section of the document, which

24    makes clear that the words "unique" and "innovative" do not refer to the "pyramid" shape, but to

25    other aspects of the packaging; specifically: "[1] consistent line look with illustrations [2]

26    embellish collector packaging with soft goods [and 3] color focus: raspberry and dark blue."  Ex.

27    1812A to MGA MSJ.  MGA does not limit its asserted trade dress to a trapezoidal package with

28    any of the features listed in Mattel's document, or even to a specific color.  Trapezoidal

1   packaging standing alone is not an unusual design and is not inherently distinctive.

2         Nor has the trapezoidal packaging used to house MGA's Bratz dolls acquired

3   distinctiveness through secondary meaning.  Other than its trademark registrations, which were

4   obtained after it made the representation to the USPTO that trapezoidal packaging was unique in

5   the fashion doll segment of the toy industry, as well as the toy industry in general, MGA cites to

6   a 62 page assortment of advertisements and articles about the Bratz doll, many of which depict

7   the dolls in trapezoidal packaging.  *See* Declaration of Ninette Pembleton, Exs. A-K.  None of

8   these articles or advertisements refer to the dolls' trapezoidal packaging.  *Cf. International*

9   *Jensen, Inc.*, 4 F.3d at 823 ("Prestone, for instance, perhaps could have created meaning by

10  urging consumers to look for the 'familiar yellow jug.'"); *First Brands Corp. v. Fred Meyer,*

11  *Inc.*, 809 F.2d 1378, 1383 (9th Cir. 1987) ("Carbide did not attempt to engender consumer

12  identification with the yellow, F-style jug.  It did not, for example, urge consumers to look for

13  the 'familiar yellow jug.'").  In the dozens of articles discussing the innovative qualities of Bratz,

14  not a word appears about the trade dress itself.  One of the article's authors claimed that a 7 year

15  old girl, one of the members of the product's target market, remarked that "Bratz are cool.  I am

16  into fashion."  Pembleton Dec., Ex. A at 7.  Moreover, many of the Bratz dolls sold by MGA

17  *were not* housed in trapezoidal packaging.  *See, e.g.*, *id.* at 5 (displaying rectangular packaging).

18  MGA responds by citing the success of its Bratz line as evidence that the trapezoidal packaging

19  that housed the dolls must have acquired secondary meaning, but this argument "cannot stand

20  alone.  To find otherwise would provide trade dress protection for any successful product or for

21  the packaging of any successful product."  *Yankee Candle Co., Inc. v. Bridgewater Candle Co.*,

22  259 F.3d 25, 44 (1st Cir. 2001).  McDonalds can't stop other fast food manufacturers from

23  selling food in paper bags and Scotch can't stop other manufacturers of office products from

24  using circular tape dispensers.  MGA has failed to provide any evidence that its trapezoidal

25  packaging acquired distinctiveness through secondary meaning.

26                              (b)      4-Ever Best Friends

27        MGA's 4-Ever Best Friends packaging, which consists of a window through which

28  multiple dolls can be viewed, the brand name displayed halfway down the middle of the

1    packaging, and a decorative handle, is not inherently distinctive either.  The heart is a "common,

2    basic, shape, similar to a geometrical design."  *Wiley v. Am. Greetings Corp.*, 762 F.2d 139, 142

3    (1st Cir. 1985) (quotation marks and citation omitted).  The product's use of a handle is

4    unremarkable as well as obviously functional (for reasons discussed below).  MGA responds that

5    its trade dress includes a product name composed of a numeral and the word "friends," citing to

6    a Mattel report that characterized MGA's packaging as a "unique structure that accentuates the

7    two dolls and unique positioning."  TX 15737-001.  It's difficult to know of which elements, or

8    combination of elements, of MGA's trade dress this statement refers, and its relevance to the

9    present inquiry is therefore highly limited.  Moreover, as explained below, the document's

10   reference to the functionality of the packaging evidences the infirmity of MGA's trade dress

11   claim.

12          Nor did MGA's 4-Ever Best Friends packaging acquire distinctiveness through secondary

13   meaning, because it hadn't even been released to market at the time Mattel allegedly began

14   planning the Wee 3 Friends line of dolls.  MGA notes that its advertising of 4-Ever Best Friends

15   started in early to mid 2004, when the product was marketed as a direct alternative to Mattel's

16   line of Barbie dolls.  Ex. 11244 to MGA MSJ.  There is no evidence that MGA was able to build

17   an association in the minds of consumers between any of the elements of its asserted trade dress

18   — heart shaped packaging, a handle, the use of a number and the word "friends," and "themed

19   accessories and mix-and-match outfits" — through its limited advertising campaign *before the*

20   *product was even launched.  Cf. Citizens Banking Corp. v. Citizens Fin. Group, Inc.*, 2008 WL

21   1995104, at *4 (E.D. Mich. May 6, 2008) ("To establish secondary meaning, the duration of a

22   mark's use must be more than 'a relatively short period.' . . . Plaintiff's presence in some of the

23   nine county area is much more recent and of much shorter duration than its general presence in

24   Michigan.") (citing *Burke-Parsons-Bowlby Corp. v. Appalachian Log Homes, Inc.*, 871 F.2d

25   590, 596 (6th Cir. 1989)).  MGA's heart shaped packaging for dolls with names composed of a

26   number and the word friends did not acquire secondary meaning because it didn't even exist

27   when Mattel started selling its allegedly infringing products.

28                              **2.     Functionality**

1    "A trademark or trade dress is functional if it is essential to the product's use or purpose

2    or if it affects the cost or quality of the article." *Int'l Jensen, Inc.*, 4 F.3d at 823.  There is a two

3    step test for functionality.  The court must first determine whether the alleged trade dress is

4    "essential to the use or purpose of the article [or] affects [its] cost or quality." *Au-Tomotive*

5    *Gold, Inc. v. Volkswagen of America, Inc.*, 457 F.3d 1062, 1072 (9th Cir. 2006) (quoting *TrafFix*

6    *Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 32-33, 121 S.Ct. 1255 (2001)).  The court

7    must alternatively inquire into the "aesthetic functionality" of the alleged trade dress: "whether

8    protection of the feature as a trademark would impose a significant non-reputation-related

9    competitive disadvantage." *Id.*

10                              (a)      Trapezoidal Packaging

11   MGA adopted its trapezoidal packaging for an expressly functional purpose.  MGA's

12   30(b)(6) designee explained that:

13                 The concept for the trapezoidal packaging started with the idea that,

14                 if you've got a doll product, you want to – you want to feature that in

15                 some way when it's on the store shelf.  And – one way that you can

16                 highlight or – or spotlight something is by putting a light on it.  And,

17                 unfortunately, it was explained to me, putting a light in a box that

18                 shines down on the product, is rather expensive.  But what does that

19                 light really create?  The light shines down, if you imagine a

20                 spotlight, just a point of light shining down, it creates that

21                 trapezoidal, triangular shape.  And it's that shape that was the

22                 inspiration to create a spotlight or a unique way to feature the

23                 product that ultimately evolved into the final packaging.

24   Deposition of MGA Entertainment, Inc. (Samir Khare) at 500-503.

25   Larian also admitted that MGA chose its trapezoidal packaging because it, *inter alia*,

26   "had light to show the product, which was inside, which we thought was beautiful, the fashions,

27   the hair, et cetera."  Deposition of Isaac Larian, dated April 12, 2010, Vol. VIII, at 2216-2219.

28   MGA now attempts to disavow its corporate designee and Chief Executive Officer's testimony

1   with self-serving declarations about instances in which the trapezoidal packaging may

2   "typically" fail to achieve its intended purpose of maximizing light flow to the product contained

3   within the package.  *See* Declaration of Paula Garcia in Support of MGA's Opp'n to Mattel MSJ

4   ¶ 11.  Even though the illuminating benefits of a trapezoidal package may not be realized when,

5   for example, the package is located between two shelves, that doesn't reduce the potential

6   functional value of the package.  *Au-Tomotive*, 457 F.3d at 1072 (holding that key question in

7   functionality analysis is whether asserted trade dress "add[s] to the quality of the products").

8   The package's sloped sides allow light to flow outwards and downwards in the direction of the

9   product, and MGA has offered no evidence to rebut its own prior admissions on this point.

10         MGA points to certain disadvantages of trapezoidal packaging, including the fact that it

11   requires "more surface area than a rectangular package," and "creates a larger footprint on store

12   shelves," resting both illogical arguments on its employee's declaration.  No reasonable fact-

13   finder could conclude that MGA would have needed to use *less* packaging material if it sold its

14   products in rectangular boxes: the trapezoidal boxes used by MGA were filled to capacity in

15   order to fit the product and its accessories into the same package.  *See* Pembleton Dec., Ex. A.

16   More importantly, a product feature need not have a "superior utilitarian advantage" in order to

17   be functional.  *Disc Golf Ass'n, Inc. v. Champion Discs, Inc.*, 158 F.3d 1002, 1007 (9th Cir.

18   1998).  Toy manufacturers may ultimately conclude that the illuminating functions of the

19   trapezoidal package are outweighed by the disadvantages cited by MGA, but the trade dress still

20   has functional qualities.

21         Trapezoidal packaging is also aesthetically functional.  As the Ninth Circuit has

22   acknowledged, "a box shape or certain uses of color" constitutes a "true aesthetically functional

23   feature."  *Au-Tomotive*, 457 F.3d at 1072.  MGA argues that Mattel has cited to no evidence that

24   consumers are attracted to the trapezoidal packages that house the Bratz dolls, but it is MGA's

25   burden to prove the non-functionality of its asserted trade dress.  *See Sega Enters. Ltd. v.*

26   *Accolade, Inc.*, 977 F.2d 1510, 1530 (9th Cir. 1993).

27                 (b)    4-Ever Best Friends

28         The 4-Ever Best Friends packaging was functional because it allowed consumers to see

1  multiple dolls through the same viewing window.  One of MGA's designers admitted that the 4-

2  Ever Best Friends packaging was tailored to improve "storage and portability," which she

3  characterized as the packaging's "dual *function* . . . it would act as a way to hold your dolls so

4  that you could carry it with you if you went to your friend's house."  Garcia Depo. at 1522.

5  MGA's witness further testified that the packaging accomplished these functional goals through

6  a front panel that could be lowered to "expose the dolls.  And when done, you would pull the

7  front panel back up to close it."  *Id.* at 1523.

8       MGA's packaging was also aesthetically functional.  Heart shape was identified as a

9  prototypical example of aesthetically functional packaging by the 1938 Restatement of Torts, to

10 which the doctrine can be traced.  *See Au-Tomotive Gold, Inc.*, 457 F.3d at 1068 ("Two

11 examples of products with aesthetic functional features were offered with very little comment –

12 a heart-shaped candy box and a distinctive printing typeface.").  The fact that the design

13 attracted so much attention *even before the product was released to market* only evidences its

14 aesthetic functionality.  *See Wiley v. American Greetings Corp.*, 762 F.2d 139 (1st Cir. 1985)

15 (heart shape of packaging enhanced value of product independent of its source-identifying

16 function because it was aesthetically pleasing to children).

17         **3.**      **Likelihood of Consumer Confusion**

18      The Ninth Circuit examines eight factors to determine the likelihood of confusion: (1) the

19 strength of the trade dress; (2) the proximity or relatedness of the two goods; (3) the marks'

20 similarity in appearance, sound, and meaning; (4) evidence of actual confusion; (5) the degree to

21 which the parties' marketing channels converge; (6) the type of goods and the degree of care

22 customers are likely to exercise in purchasing them; (7) evidence of defendants' intention in

23 selecting and using the allegedly infringing mark; and (8) the likelihood that the parties will

24 expand their product lines.  *AMF Inc. v. Sleekcraft Boots*, 599 F.2d 341, 349 (9th Cir. 1979).

25            (a)     Strength of the Marks

26      The strength of a mark rests on its distinctiveness, which is "related to the question of

27 secondary meaning."  *Aurora World, Inc. v. TY Inc.*, CV 09-08463 MMM (Ex), 2009 WL

28 6617192, at *30 (C.D. Cal. Dec. 15, 2009).  MGA has pointed to no evidence that its trapezoidal

1   packaging obtained any distinctiveness and that consumers built an association between MGA

2   and trapezoidal packaging.  Although advertisements for MGA's products featured the products'

3   packaging, MGA did not independently advertise the shape of its packaging, and MGA sold its

4   products in other types of packaging, which diminished any automatic association developed by

5   consumers.  MGA has also failed to point to any evidence that its 4-Ever Best Friends heart

6   shaped packaging built an association in the minds of consumers, an inherently unbelievable

7   proposition in light of the fact that MGA hadn't released its product to market at the time that

8   Mattel allegedly infringed the trade dress.

9                              (b)       Proximity or Relatedness of Goods

10          The proximity or relatedness of goods is relevant to determine whether the products "are

11  likely to be connected in the mind of a prospective purchaser."  *Fleischmann Distilling Corp. v.*

12  *Maier Brewing Co.*, 314 F.2d 149, 159 (9th Cir. 1963).  The Bratz doll is a fashion doll and

13  MGA alleges that Mattel sold its fashion dolls in the same type of packaging.  The goods are

14  often sold through the same major retailers, like Toys 'R Us and WalMart and, sometimes, even

15  on the same shelves.  It's possible that the Bratz dolls and Mattel's fashion dolls belong to

16  different sub-categories of the fashion doll market, but neither party has identified any such sub-

17  categories, nor does the evidence show this to be the case.  The Court accordingly finds no

18  genuine issue of material fact as to whether the goods are related and proximate.  *Cf. Aurora*

19  *World, Inc.*, 2009 WL 6617192, at *31 ("Both Ty and Aurora market small plush toys . . . It is

20  likely, therefore, that this factor will weigh in favor of a finding of a likelihood of confusion.").

21                              (c)       Similarity of the Marks

22          Mattel's allegedly infringing packaging isn't particularly trapezoidal; the bases are only

23  barely wider than the top.  Mattel's packaging comes in different color schemes, uses different

24  fonts, uses different display windows, and most critically, clearly display the product names in

25  large, prominently placed letters all around the package, including on the front of the package.

26  The presence of these names all over the package "goes far to eliminate confusion of origin."

27  *Bose Corp. v. Linear Design Labs, Inc.*, 467 F.2d 304, 309 (2d Cir. 1972).

28          MGA responds that consumers may still suffer from "initial interest confusion," which

occurs when an alleged infringer draws consumers to its products through the use of another's trade dress, "even though no actual sale is finally completed," *Brookfield Comm'ns, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1062 (9th Cir. 1999), as well as "reverse confusion," which occurs when "consumers doing business with the senior user might mistakenly believe they are dealing with the junior user." *Dreamwerks Production Group, Inc. v. SKG Studio*, 142 F.3d 1127, 1130 (9th Cir. 1998). But the *Sleekcraft* test measures this sort of confusion, and the fact that Mattel's product names appear in large, colored lettering that can be viewed from a distance leaves no issue of material fact as to whether the trade dress is similar. *See Sleekcraft*, 599 F.2d at 351 ("Similarity of the marks is tested on three levels; sight, sound, and meaning."). MGA's 30(b)(6) designee in fact admitted "I would be surprised if someone who could read or had knowledge of what a Barbie looked like was holding [Mattel's product] in their hands and mistook it for a Bratz doll." Pembleton Depo. at 3282-3283.

The Wee 3 Friends product sold by Mattel doesn't use a heart shaped package. The design of the doll name is different, the viewing window is different, the color schemes are different, and the words "Mattel" and "Barbie" appear on the package. Other than the fact that Mattel's product may be a worse version of the MGA product — dolls sold together as "friends" — there is no genuine issue of material fact as to the similarity to any of the elements, and especially not the combination, of MGA's trade dress.

### (d)     Actual Confusion

MGA has not cited to evidence of actual confusion as to either the trapezoidal packaging or heart shaped packaging used in connection with the sale of Wee 3 Friends. Its failure to do so doesn't weigh against a likelihood of confusion. *See Academy of Motion Picture Arts & Sciences v. Creative House Promotions, Inc.*, 944 F.2d 1446, 1456 (9th Cir. 1991) ("[A]ctual confusion is not necessary to a finding of likelihood of confusion under the Lanham Act.").

### (e)     Marketing Channels

It is undisputed that MGA and Mattel share the same marketing channels, though there may not be direct overlap between the marketing channels used by the two companies. This factor thus weighs in favor of a likelihood of confusion.

(f)     Types of Goods and Consumers

"It is generally assumed that consumers with expertise or who are buying expensive products or services exercise a greater degree of care when doing so and are thus less easily confused." *Edge Wireless, LLC v. U.S. Cellular Corp.*, 312 F. Supp. 2d 1325, 1333 (D. Or. 2003) (citing *Brookfield Comm's*, 174 F.3d at 1060 ("What is expected of the reasonably prudent consumer depends on the circumstances.  We expect him to be more discerning-and less easily confused-when he is purchasing expensive items")).

Fashion dolls are remarkably expensive.  For example, MGA's Bratz Funk 'N' Glow dolls with "fashion accessories and a poster" can sell for $23.94 *even when on sale*.  Pembleton Dec., Ex. B at 12.  The accessories and play sets that accompany the Bratz dolls were advertised at a cost as high as $249.99.  *Id.*, Ex. A at 5 (discussing costs of "deluxe, three-story apartment [that] comes with real working lights and elevator, plus 60 accessories").  MGA characterizes these prices as "inexpensive," which reveals a lack of perspective about the financial challenges faced by most families in this country.

More importantly, this is not a case involving the purchase of "lower cost items like wine and cheese," in which consumers aren't likely to be careful about the products they buy. *Compare E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1293 (9th Cir. 1992).  All the evidence shows that the intended market for these products — young females — are remarkably aware of the differences between Bratz and Barbie.  For example, at the hearing on these motions, counsel for MGA remarked that the Bratz dolls "meant a lot" to the girls who chose to purchase them.  It even cites an internal Mattel memorandum that characterized the Bratz dolls as a product that was "relevant and resonated with older girls."  Ex. 1805 to MGA MSJ at 2, 4. This memorandum recognized that "consumer interest is fueled by [a] strong product" that could be characterized as "ha[ving] a unique tone and manner as bratty teenagers, with a 'passion for fashion.'" *Id.* at 4.  MGA contradicts literally six years of its representations when it now argues that "[c]onsumers of fashion doll products are not discriminating."  MGA Opp'n to Mattel MSJ at 30:13.  The undisputed evidence is to the contrary.

(g)     Mattel's Intent

106

1    There is no genuine issue of material fact about Mattel's intent in selecting the trapezoidal

2    packaging. "When an alleged infringer knowingly adopts a mark similar to another's, courts

3    will presume an intent to deceive the public." *Official Airline Guides*, 6 F.3d 1385, 1395 (9th

4    Cir. 1993). MGA claims there is circumstantial evidence of Mattel's bad intent, because Mattel

5    has long been on notice of MGA's interest in ensuring the exclusive use of trapezoidal

6    packaging. However, Mattel copied no other elements of the trade dress other than the

7    trapezoidal shape: it did not select the color schemes, configurations, package window, or

8    lettering used by MGA. Moreover, Mattel has presented evidence that it used the trapezoidal

9    packaging in compliance with the requirements of its licensor, to which MGA has offered no

10   meaningful response.

11   Nor is there a genuine issue of material fact as to whether Mattel selected the Wee 3

12   Friends packaging in an attempt to benefit from MGA's goodwill. There is ample evidence that

13   Mattel proceeded with the Wee 3 Friends product line in an attempt to cut MGA's 4-Ever Best

14   Friends product off at the pass, however. Some of Mattel's internal communications reveal a

15   paranoia about the competitive threat posed by MGA, whose management and product

16   development efforts were surpassing Mattel's at the time that Wee 3 Friends was released. For

17   example, Mattel obtained "confidential information from a reliable source" about the 4-Ever

18   Best Friends dolls, which "came in a heart-shaped package with the dolls positioned on the left

19   and right side of the package with chotzkas in the middle." Ex. 2114 to MGA MSJ. Mattel

20   rapidly developed the Wee 3 Friends product, Ex. 8754 to MGA MSJ, but failed anyway, when

21   retailers recognized that its product simply "knocked off MGA." Ex. 2105 to MGA MSJ. These

22   emails may prove Mattel's uninventive product development, but they do not show a likelihood

23   of consumer confusion for a simple reason: Mattel's wrongdoing was performed during a period

24   of time in which MGA's 4-Ever Best Friends product had not even been released to market.

25                    (h)    Likelihood of Product Expansion

26   Neither party discusses the likelihood of product line expansion.

27              **4.    Disposition**

28   For the foregoing reasons, the Court GRANTS Mattel's Motion as to MGA's trade dress

1    infringement claims related to trapezoidal packaging and the 4-Ever Best Friends product

2    packaging.  There is no genuine issue of material fact that neither type of trade dress was

3    distinctive, non-functional, or that Mattel's alleged use of the trade dress created a likelihood of

4    consumer confusion.

5                    **B.     Dilution**

6            MGA also claims that Mattel's use of its asserted trade dress constituted trade dress

7    dilution in violation of 15 U.S.C. § 1125.[34]  The statute "protects the holder of a trademark from

8    dilution, which is different from, and broader than, infringement in that neither confusion nor

9    competition is required and the protection is nationwide in scope."  *Nissan Motor Co. v. Nissan*

10   *Computer Corp.*, 378 F.3d 1002, 1011 (9th Cir. 2004).  Its purpose "is to protect famous

11   trademarks from subsequent uses that blur the distinctiveness of the mark or tarnish or disparage

12   it."  *Id.* (quoting *Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418, 431, 123 S.Ct. 1115 (2003)).

13   The asserted mark must have "such powerful consumer associations that even non-competing

14   uses can impinge on their value."  *Avery Dennison Corp. v. Sumpton*, 189 F.3d 868, 875 (9th

15   Cir. 1999).  "For example, Tylenol snowboards, Netscape sex shops and Harry Potter dry

16   cleaners would all weaken the commercial magnetism of these marks and diminish their ability

17   to evoke their original associations.  These uses dilute the selling power of these trademarks by

18   blurring their uniqueness and singularity, and/or by tarnishing them with negative associations."

19   *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 903 (9th Cir. 2002).

20           There is no genuine issue of material fact that trapezoidal packaging did not have a

21   "powerful consumer association" with MGA.  The Federal Trademark Dilution Act identifies

22   _____

23           [34] Section 1125 provides that:

24                   The owner of a famous mark shall be entitled, subject to the
                     principles of equity and upon such terms as the court deems

25                   reasonable, to an injunction against another person's
                     commercial use in commerce of a mark or trade name, if such

26                   use begins after the mark has become famous and causes
                     dilution of the distinctive quality of the mark, and to obtain

27                   such other relief as is provided in this subsection.

28           15 U.S.C. § 1125(c)(1).

                                              108

1    four factors to consider when evaluating the famousness of a mark: "(1) [t]he duration, extent,

2    and geographic reach of advertising and publicity of the mark, whether advertised or publicized

3    by the owner or third parties; (2) [t]he amount, volume, and geographic extent of sales of goods

4    or services offered under the mark; (3) [t]he extent of actual recognition of the mark; [and]

5    (4) [w]hether the mark was registered under the Act of March 3, 1881, or the Act of February

6    20, 1905, or on the principal register."  15 U.S.C. § 1125(c)(2)(A).

7         Other than the fact that MGA registered its trade dress (the Court will not defer to the

8    findings of the USPTO for the reasons discussed above), and the obvious volume of sales of the

9    Bratz dolls, MGA has identified no evidence specific to the trapezoidal packaging itself.  Dozens

10   of Bratz advertisements attached to the Pembleton declaration make no mention of MGA's

11   trapezoidal packaging.  Nor has MGA identified any consumer surveys that indicate an

12   association between the trapezoidal packaging and MGA.  MGA notes that its corporate

13   designee summarily testified that the trapezoidal mark "became" famous, but he was unable to

14   substantiate that assertion and provided no time frame for the fame of the trapezoidal packaging.

15   Contrary to MGA's unsubstantiated assertion, the mere shape of its trapezoidal packaging

16   wasn't inherently distinctive or distinctive by virtue of secondary meaning, let alone famous.

17        To prevail on its dilution claim, MGA would also need to establish that Mattel's mark

18   was "identical, or nearly identical, to the protected mark." *Nissan*, 378 F.3d at 1011.  It's true

19   that Mattel also used trapezoidal packaging, but its trapezoids did not match the dimensions or

20   color schemes of MGA's trapezoids.  In fact, Mattel's trapezoidal packages *didn't even resemble*

21   *each other*. *Compare* Declaration of Helena Mills in Support of Mattel MSJ, Ex. 1 *with*

22   Declaration of Jill Nordquist in Support of Mattel MSJ, Ex. 10 *with id.*, Ex. 14.

23        MGA also asserts a dilution claim pursuant to Cal. Bus. & Prof. Code § 14330, which

24   was repealed during the pendency of this litigation. *See Penpower Tech. v. S.P.C. Tech.*, 627 F.

25   Supp. 2d 1083, 1090 (N.D. Cal. 2008) ("The repeal of a statute creating a penalty, running either

26   to an individual or the state, at any time before final judgment, extinguishes the right to recover

27   the penalty.").  To the extent MGA seeks to have its claim evaluated under Cal. Bus. & Prof.

28   Code § 14247, this claim also fails because the state statute, like its federal analogue, requires

1  the existence of a famous mark.  Cal. Bus. & Prof. Code § 14247(a) ("Subject to principles of

2  equity, an owner of a mark that is ***famous and distinctive*** . . . shall be entitled to an injunction

3  against another person's commercial use of a mark or trade name, if such use begins after the

4  mark has become famous and is likely to cause dilution of the famous mark.") (emphasis added).

5      Mattel's motion is granted as to MGA's dilution claim.

6  **VII.   MGA's Unfair Competition Claim**

7      MGA alleges that Mattel engaged in common law unfair competition, as well as unfair

8  competition in violation of Cal. Bus. & Prof. Code § 17200.  MGA alleged a litany of

9  wrongdoing in its original complaint, though many of those allegations have been abandoned.

10 MGA's operative allegations include: (1) Mattel's use of trapezoidal packaging; (2) Mattel's

11 copying of the 4-Ever Best Friends trade dress; (3) Mattel's delivery of letters to former

12 employees reminding them of their obligation to keep secret Mattel's confidential information;

13 (4) Mattel's threats against licensees, distributors, and retailers who did business with MGA;

14 (5) Mattel's attempts to buy up the supply of doll hair in order to crowd MGA out of the market;

15 and (6) Mattel's manipulation of industry research groups whose ratings are critical to

16 establishing MGA's (and any other manufacturer's) credibility in the toy industry.

17      **A.      Standing Under Business and Professions Code Section 17200**

18      Mattel argues MGA lacks standing to bring this claim.  To have standing to bring this

19 claim, MGA must establish that it suffered both "injury in fact" and "a loss of money or property

20 caused by unfair competition."  *Peterson v. Cellco P'ship*, 164 Cal. App. 4th 1583, 1590 (2008).

21 A loss of money is ordinarily demonstrated through proof that plaintiff "parted, deliberately or

22 otherwise, with some identifiable sum formerly belonging to him or subject to his control."

23 *Silvaco Data Sys.*, 184 Cal. App. 4th at 244.  A plaintiff suffers a loss of property when it "has

24 parted with some particular item of property" that it "formerly owned or possessed."  *Id.*

25 "Section 17200 does not require that a plaintiff prove that he or she was directly injured by the

26 unfair practice or that the predicate law provides for a private right of action."  *Gregory v.*

27 *Albertson's, Inc.*, 104 Cal. App. 4th 845, 851 (2002).

28      There is a genuine issue of material fact as to whether MGA lost money as a result of

1   Mattel's obstruction of its relationships with licensees and distributors.  MGA's licenses with its

2   retailers were themselves "property" of which Mattel's alleged conduct deprived MGA.  MGA

3   also expended tremendous sums to generate new licenses, or paid premiums to other licensees,

4   because of Mattel's conduct, and specifically, the conduct of Mattel's Chief Executive Officer

5   Robert Eckert.  *Cf. Clayworth v. Pfizer, Inc.*, 49 Cal.4th 758, 789 (2010) ("Pharmacies paid more

6   than they otherwise would have because of a price-fixing conspiracy in violation of state law.").

7   These are not simply harm to goodwill, but actual monetary losses suffered as a result of

8   Mattel's alleged interference with MGA's contractual relationships with its licensees and

9   retailers, whose business is the backbone of a toy manufacturers' success.

10              **B.      Unfair Business Practices**

11          "The term unfair is not precisely defined in the statute, and the courts have struggled to

12   come up with a workable definition."  *Gregory*, 104 Cal.4th at 851.  California courts have

13   settled on a definition of unfair competition modeled on the federal antitrust laws:

14              When a plaintiff who claims to have suffered injury from a direct

15              competitor's 'unfair' act or practice invokes section 17200, the word

16              'unfair' in that section means conduct that threatens an incipient

17              violation of an antitrust law, or violates the policy or spirit of one of

18              those laws because its effects are comparable to or the same as a

19              violation of the law, or otherwise significantly threatens or harms

20              competition.

21   *Id.* at 853 (quotation marks and citation omitted).

22          MGA has easily raised a triable issue about whether Mattel unfairly competed.  For

23   example, Mattel may have routinely conditioned its contracts with retailers on the retailers not

24   carrying MGA's products — classic anti-competitive behavior that potentially deprived

25   consumers of valuable products.  Mattel's Chief Executive Officer Robert Eckert also sent an

26   email to fellow executives seeking advice about whether to terminate Mattel's business

27   relationship with an MGA licensee.  Though Eckert has claimed that Mattel's conduct is

28   explained by its unwillingness to be associated with MGA's products, that explanation is

1   dubious in light of Mattel's efforts to produce a line of dolls like Bratz (MyScene) and otherwise

2   alter its product line to be more like MGA's.  This conduct again may have harmed competition

3   by potentially restricting the supply of MGA's products to consumers.  Mattel is therefore

4   simply wrong when it argues that "MGA has no admissible evidence supporting its allegations

5   that Mattel 'warned a number of companies' not to license MGA products."

6                    **C.    Common Law Unfair Competition**

7          Common law unfair competition extends beyond the mere passing off of one's goods as

8   another's.  *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal.4th

9   163, 192 (1999).  The cornerstone of a claim for common law unfair competition is "fraud . . .

10  practiced by one in securing the trade of a rival dealer."  *Id.* at 193 (quoting *Weinstock, Lubin &*

11  *Co. v. Marks*, 109 Cal. 529, 541 (1895)).

12         Other than its infirm trade dress allegations, MGA has failed to establish that Mattel

13  engaged in fraud directed at securing MGA's business.  MGA notes that Mattel engaged in

14  fraudulent conduct by using false means to obtain access to MGA's advance viewing

15  showrooms, but there has never been a suggestion that the *common law unfair competition* claim

16  encompasses such conduct, which is the subject of MGA's counterclaims-in-reply.  Even if such

17  conduct were part of this claim, it's difficult to see how Mattel's fraudulent conduct was

18  practiced in "securing the trade" of MGA, rather than securing access to knowledge about

19  MGA's business.  Although there is a genuine issue of material fact as to whether Mattel

20  engaged in other anti-competitive conduct, like using its largesse to pressure retailers and

21  licensees to terminate their relationships with MGA, such conduct does not fall under the

22  definition of fraud.

23         Mattel's motion is granted as to MGA's common law unfair competition claim and

24  denied as to MGA's statutory unfair competition claim.

25     **VIII.   Unjust Enrichment**

26         MGA brings a claim for unjust enrichment.  Contrary to Mattel's argument, there have

27  been cases in which courts have allowed causes of action for unjust enrichment to proceed.

28  *Western Pac. R. Corp. v. Western Pac. R. Co.*, 206 F.2d 495, 498 (9th Cir. 1953).  However,

California courts appear to be split on whether a stand alone cause of action for unjust enrichment is anything more than "a general principle, underlying various legal doctrines and remedies." *Herrington v. Johnson & Johnson Consumer Companies, Inc.*, 2010 WL 3448531, at *13 (N.D. Cal. Sept. 1, 2010) (collecting cases). To the extent a claim for unjust enrichment is available, it generally requires proof of "receipt of a benefit and unjust retention of the benefit at the expense of another." *Id.* (citing *Lectrodryer v. SeoulBank*, 77 Cal. App. 4th 723, 726 (2000)). The benefits must generally be "conferred by mistake, fraud, coercion, or request; otherwise, though there is enrichment, it is not unjust." *Nibbi Bros., Inc. v. Home Fed. Sav. & Loan Ass'n*, 205 Cal. App. 3d 1415, 1422 (1988) (citation omitted). The claim is, in essence, quasi-contractual. *See Digital Envoy, Inc. v. Google, Inc.*, 2005 WL 2999364, at *5 (N.D. Cal. Nov. 8, 2005).

This Court is convinced by the view that stand alone claims for unjust enrichment are simply redundant of relief already available under other existing law, and that such claims have the potential to cause needless confusion to the fact-finder and the Court. Even assuming this claim were allowed to proceed, however, MGA has failed to show any of the "quasi-contractual" elements that courts traditionally look to when evaluating claims for unjust enrichment. MGA instead relies upon Mattel's alleged conduct towards licensees and retailers — conduct that did not result in MGA conferring a benefit upon Mattel that Mattel unjustly retained.

Mattel's motion is granted as to MGA's claim for unjust enrichment.

## IX. Personal Jurisdiction

Both MGA Mexico and Mattel move for summary judgment on the issue of whether this Court has personal jurisdiction over MGA Mexico.

The district court may exercise jurisdiction to the extent allowed under the law of the state in which it sits. Fed. R. Civ. P. 4(k)(1). Under California's long-arm statute, jurisdiction may be exercised in accordance with the Due Process Clause of the United States Constitution. Cal. Civ. Code § 410.10. Due process minimally requires that a Court exercise jurisdiction over a defendant that has "at least 'minimum contacts' with the relevant forum such that the exercise of jurisdiction 'does not offend traditional notions of fair play and substantial justice.'"

1  *Schwarzenneger v. Fred Martin Motor Co.*, 374 F.3d 797, 800-01 (9th Cir. 2004) (citing *Int'l*

2  *Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154 (1945)).   The district court may

3  exercise either general or specific jurisdiction over a non-resident defendant.

4            **A.     General Jurisdiction**

5        General jurisdiction exists over a non resident defendant when "the defendant engages in

6  'continuous and systematic general business contacts' that 'approximate physical presence' in

7  the forum state." *Schwarzenegger*, 374 F.3d at 801.   A non resident defendant subject to general

8  jurisdiction may be "haled into court in that state in any action, even if the action is unrelated to"

9  his contacts with the forum state. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S.

10  408, 415, 104 S.Ct. 1868 (1984).   "Factors to be taken into consideration are whether the

11  defendant makes sales, solicits or engages in business in the state, serves the state's markets,

12  designates an agent for service of process, holds a license, or is incorporated there." *Bancroft &*

13  *Masters, Inc. v. Augusta Nat'l, Inc.*, 223 F.3d 1082, 1086 (9th Cir. 2000).

14        The Court may not exercise general jurisdiction over MGA Mexico, whose contacts with

15  the California forum have been infrequent.   Mattel cites the fact that MGA Mexico has made the

16  following payments to vendors in California: (1) a $7,193 payment to a law firm; (2) a

17  $4,639,483 payment to a shipping company; (3) a $852,774 payment to a company named

18  Buena Vista Internacional; (4) a $323,612 payment to Summit Logistics International; (5) a

19  $58,165 payment to Walt Disney Internet Group; and (6) $90,847 payment to a shipping agency.

20  These small payments over a five year period are insufficient to establish general jurisdiction.

21  *Cf. Shute v. Carnival Cruise Lines*, 897 F.2d 377, 381 (9th Cir. 1990) (finding no general

22  jurisdiction despite "advertising in the local media, the mailing of brochures and the payment of

23  commissions to travel agents, the conducting of promotional seminars, and the sale of its

24  vacation cruises to residents of Washington"); *Choice Healthcare, Inc. v. Kaiser Found. Health*

25  *Plan*, 615 F.3d 364 (5th Cir. 2010) (holding that fifty-three payments over a three-year period

26  were not continuous and systematic contact with forum state).   Nor is general jurisdiction

27  established by the fact that MGA Mexico ships its products through California. *See Emery v.*

28  *Bioport Corp.*, 273 Fed. Appx. 694, 696 (9th Cir. 2008) ("Although the fact that a product

1  manufactured by a corporation in State A is shipped to an independent contractor for transfer

2  from bulk tanks into marketable containers in State B may mean that the corporation is 'doing

3  business *with*' State B, it does not mean that the corporation is 'doing business *in*' State B for the

4  purposes of establishing general jurisdiction.").

5      Mattel argues that several MGA Mexico executives, including Larian, reside in California

6  and also serve as MGAE's executives.  This argument alludes to the case of *Perkins v. Benguet*

7  *Consolidated Mining Co.*, in which the Supreme Court affirmed the exercise of jurisdiction over

8  a foreign corporation, whose chief executive had re-located to the forum during a time of war

9  and thereafter "carr[ied] on . . . a continuous and systematic, but limited, part of its general

10 business."  342 U.S. 437, 438, 72 S.Ct. 413 (1952).  Mattel has offered no evidence that MGA

11 Mexico conducts any of its general business in California.  It cites the deposition of Ms.

12 Kuemmerle, who testified that MGA Mexico's accounting is performed in California, but there

13 is no evidence of whether this work is performed by an outside vendor, or even by MGAE.  The

14 abrupt testimony certainly does not reasonably suggest that MGA Mexico maintains any sort of

15 business operation in California dedicated to the performance of an accounting.  The fact that

16 Larian and other MGAE executives reside in California is most relevant to whether the Court

17 can exercise jurisdiction over *those individuals*; it is not dispositive to the propriety of personal

18 jurisdiction over MGA Mexico.

19      **B.     Specific Jurisdiction**

20     The Ninth Circuit applies a three part test to determine whether the exercise of specific

21 personal jurisdiction is proper:

22          (1) The non-resident defendant must purposefully direct his activities

23          or consummate some transaction with the forum or resident thereof;

24          or perform some act by which he purposefully avails himself of the

25          privilege of conducting activities in the forum, thereby invoking the

26          benefits and protections of its laws;

27          (2) the claim must be one which arises out of or relates to the

28          defendant's forum-related activities; and

1          (3) the exercise of jurisdiction must comport with fair play and

2          substantial justice, *i.e.*, it must be reasonable.

3 *Schwarzenegger*, 374 F.3d at 802 (quoting *Lake v. Lake*, 817 F.2d 1416, 1421 (9th Cir. 1987)).

4       Either purposeful availment of the forum or the purposeful direction of activities towards

5 the forum can satisfy the first prong. "A purposeful availment analysis is most often used in

6 suits sounding in contract. A purposeful direction analysis, on the other hand, is most often used

7 in suits sounding in tort." *Schwarzenegger*, 374 F.3d at 802 (internal citations omitted).

8       Purposeful availment can be shown by a defendant "doing business in a forum state . . .,

9 such as executing or performing a contract there." *Id.* at 802. By availing itself of the forum

10 state's benefits, the non-resident defendant "must—as quid pro quo—'submit to the burdens of

11 litigation in that forum.'" *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476, 105

12 S.Ct. 2174 (1985) and *Cote v. Wadel*, 796 F.2d 981, 984 (7th Cir. 1986)). The only evidenced

13 face-to-face interactions between Machado, Vargas, Trueba, and any of MGA Mexico's

14 executives occurred in New York and Mexico. The only employment relationship between the

15 three defecting Mattel Servicios employees and MGA Mexico was based in Mexico. Mattel

16 nevertheless argues that MGA Mexico purposefully availed itself of the California forum as a

17 result of (1) Larian and Park's communications via email, phone, and letter with the three Mattel

18 Servicios employees; (2) the three Mattel Servicios employees' attempt to simultaneously

19 execute their MGA Mexico employment agreements over the phone with Park, while Park was

20 in California. There is no evidence that any of this conduct actually took place in California,

21 however. For example, Larian communicated with Machado while Larian was in New York.

22 Larian interviewed the three Mattel Servicios employees in Mexico City. And there is no

23 evidence that Park was in California at the time the employment contracts were executed. Mattel

24 has therefore failed to establish, as is its burden, the absence of a genuine issue of material fact

25 as to whether MGA Mexico purposefully availed itself of the California forum.

26       Purposeful direction is established by evidence that the defendant "(1) committed an

27 intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows

28 is likely to be suffered in the forum state." *Dole Food Co., Inc. v. Watts*, 303 F.3d 1104, 1111

1   (9th Cir. 2002).  Both parties appear to acknowledge that this issue turns on whether (1) the three

2   Mattel Servicios employees stole Mattel's documents in California; and (2) MGA Mexico,

3   through its agents, directed that conduct.  The Court has already determined that there are

4   genuine issues of material fact on both sub-issues.  Since these issues of fact run to the heart of

5   Mattel's counter-claim for misappropriation of trade secrets, "it is preferable that this

6   determination be made at trial."  *Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1285

7   n. 2 (9th Cir. 1977).

8       The other two prongs of the Ninth Circuit's test have already been addressed by the

9   Court's order on the Motions to Dismiss.

10      Both MGA Mexico and Mattel's motions for summary judgment are denied on this issue.

11  ## X.   MGA's Affirmative Defenses

12      Mattel moves for summary judgment on MGA's affirmative defenses.  Contrary to

13  Mattel's argument, MGA is entitled to reassert previously waived affirmative defenses in

14  response to Mattel's amended pleading.  *See Massey v. Helman*, 196 F.3d 727, 735 (7th Cir.

15  1999) ("[W]hen a plaintiff files an amended complaint, the new complaint supersedes all

16  previous complaints and controls the case from that point forward . . . the amended complaint

17  opens the door for defendants to raise new and previously unmentioned affirmative defenses.").[35]

18      MGA does not oppose Mattel's motion for summary judgment as to the following

19  affirmative defenses: (1) bad faith claim of misappropriation; (2) good faith; (3) lack of

20  authority; (4) lack of standing; (5) spoliation; and (6) no direct infringement.

21      Mattel's motion is granted as to MGA's affirmative defense brought pursuant to 17

22  U.S.C. § 205(d), which provides that "[a]s between two conflicting transfers . . . the later transfer

23  prevails first if recorded first . . . and if taken in good faith for valuable consideration or on the

24  basis of a binding promise to pay royalties, and without notice of the earlier transfer."  Mattel

25  _____

26      [35] Contrary to Mattel's argument, the principle discussed in *Massey* — that an
    amended pleading washes away prior pleadings — makes no sense if limited to new and
27  unmentioned affirmative defenses, especially where, as here, the amended pleading
    significantly alters the scope of the case.
28

1    claims that Bryant assigned his copyrights to Mattel via his Inventions Agreement, a document

2    Mattel recorded on August 4, 2008.  MGA, on the other hand, has never recorded its

3    employment agreement with Bryant.

4         Mattel's motion is denied as to MGA's defense of joint authorship.  "[A] joint work is a

5    work prepared by two or more authors with the intention that their contributions be merged into

6    inseparable or interdependent parts of a unitary whole."  *Ashton-Tate Corp. v. Ross*, 916 F.2d

7    516, 520 (9th Cir. 1990) (quoting 17 U.S.C. § 101).  "A collaborator's contribution will not

8    produce a joint work, and a contributor will not obtain a co-ownership interest, unless the

9    contribution represents original expression that could stand on its own as the subject matter of

10   copyright."  *Id.* at 521 (quoting P. Goldstein, *Copyright: Principles, Law and Practice*, § 4.21 p.

11   379 (1989)).  Contrary to Mattel's argument, MGA does not merely argue that it enhanced

12   Bryant's works.  MGA argues — and there is a genuine issue of material fact as to whether —

13   MGA contributed original expression (and perhaps the *only* original expression) to some of the

14   works over which Mattel claims ownership.

15        For the reasons discussed in the portion of this order that addresses the counter-claim for

16   trade secret misappropriation, Mattel's motion is denied as to MGA's defense that Mattel's

17   alleged trade secrets were readily ascertainable.

18        Mattel's motion is denied as to MGA's affirmative defense that "Bryant made the

19   decision not to disclose Bratz to Mattel independent of MGA."  Though this affirmative defense

20   appears to be somewhat redundant of MGA's arguments against Mattel's counter-claim for

21   intentional interference with contractual relations, Mattel does not challenge it on those grounds.

22   Mattel argues there is no evidence of MGA's defense, but the possibility that Bryant sat on the

23   Bratz concept for over a year after re-joining Mattel, and continued to market the concept to

24   other toy manufacturers, suggests that he never had any intention of disclosing it to Mattel.

25        Mattel's motion is granted in part and denied in part as to MGA's defenses of estoppel,

26   waiver, acquiescence, failure to mitigate, and abandonment.  In its opposition brief, MGA

27   fittingly abandons its abandonment and waiver defenses.  Nonetheless, MGA's claim that Mattel

28   is judicially estopped from claiming the Bryant works as works made for hire goes uncontested

in Mattel's reply brief.

Mattel's motion is denied as to MGA's laches defense for the reasons set forth in the section of this Order discussing the statutes of limitations.  Contrary to Mattel's argument, an unreasonable delay in claiming ownership to the Bratz drawings and sculpt allowed MGA to continue building the brand and enhancing its value through the investment of significant human and material resources.  The prejudice to MGA from Mattel's potential delay is obvious.

Mattel's motion is denied as to MGA's comparative fault and failure to mitigate affirmative defenses.  At least some Ninth Circuit courts have allowed this sort of contention to be pled as an affirmative defense, and Mattel concedes their relevance to the fact-finder's calculation of damages.  *See, e.g.*, *J & J Sports Productions, Inc. v. Enedina Soto*, 2010 WL 3911467, at *2 (S.D. Cal. Sept. 28, 2010).

Mattel's motion is granted as to MGA's unclean hands affirmative defense, but only as it relates to Mattel's counter-claims arising out of Bryant's conduct.  Contrary to MGA's argument, Mattel's alleged theft of post-production Bratz advertising materials from MGA's showrooms has nothing to do with the "matter for which [Mattel] seeks a remedy," which in this case is the Bryant's alleged non-disclosure of the Bratz concept, Bryant's work for MGA while employed by Mattel, and Bryant's disclosure of the Bratz concept to MGA.  *See Kendall-Jackson Winery, Ltd. v. Superior Court*, 76 Cal. App. 4th 970, 978 (1999).  Mattel's motion is otherwise denied as to this affirmative defense.

Mattel's motion is denied as to MGA's affirmative defense of justification.  Mattel argues that its counter-claims are limited to MGA's inducement of Mattel's employees to "steal[] . . . confidential and trade secret information," but misstates its own pleading in the process.  In fact, the 4AAC dedicates extensive discussion to MGA's recruitment of Mattel's employees, and incorporates these factual allegations in support of the broad and vague counter-claims.

## XI.    Racketeer Influenced and Corrupt Organizations Act

Mattel and MGA accuse each other of violating the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, thereby causing injury to business or property that is recoverable under 18 U.S.C. § 1964(c).

RICO was passed to curb the corruption and misuse of America's enterprises, which include not only the partnerships and corporations that propel the economy forward, but also the "illegal gambling businesses" and "loan sharking operation[s]" that mark the nation's excesses. *United States v. Turkette*, 452 U.S. 576, 580, 101 S.Ct. 2524 (1981) (discussing 18 U.S.C. § 1961(4)).  The statute seeks to protect enterprises from being infiltrated and operated through acts of racketeering like murder, extortion, bribery, fraud, and obstruction of justice.  18 U.S.C. § 1961(1).  A pattern of racketeering (more than one criminal act within a ten year period), or its proceeds, may not be used to obtain any interest in an enterprise.  18 U.S.C. § 1962(a)-(b).  Nor may one conduct, or participate in the conduct, of an enterprise's affairs through a pattern of racketeering.  18 U.S.C. § 1962(c).

### A.     Section 1964(c) Elements  — Mattel's Counter-Claims

The RICO statute creates a private right of action that allows "any person injured in his business or property by reason of a violation" of the statute's substantive provisions to recover treble damages, attorneys' fees, and costs.  18 U.S.C. § 1964(c).  To prevail on its civil RICO claims, Mattel must prove (1) injury to business or property (2) by reason of the alleged violations of RICO's substantive provisions.  *Holmes v. Sec. Investor Protection Corp.*, 503 U.S. 258, 267-68, 112 S.Ct. 1311 (1992).

Mattel alleges that each of the counter-defendants to its first and second counter-claims committed hundreds of predicate acts of racketeering, which can be organized into the following categories of misconduct: (1) mail fraud; (2) wire fraud; (3) spoliation and concealment of evidence; (4) obstruction of justice; (5) violations of the Travel Act; and (6) criminal copyright infringement.  The alleged acts of mail fraud and wire fraud allegedly deprived Mattel of its property rights in its trade secret materials, as well as the honest services of its employees.  Mattel also purports to identify some, but not all, of these acts of racketeering in the 4AAC, as well as the exhibits attached to its summary judgment briefing.

### 1.     Business or Property

Mattel identifies five categories of injury to its business or property caused by these alleged acts: (1) "loss of [] entitlement to business relations unhampered by unlawful schemes";

(2) "lost sales and profits caused by infringing sales based on stolen confidential information"; (3) "loss of the opportunity to exploit Mattel's own property, and loss of the exclusive rights to that property"; (4) "theft and use of Mattel's valuable confidential and proprietary materials and information"; and (5) "salaries Mattel paid to its employees during their periods of wrongful disloyalty."  Mattel Opp'n to MGA MSJ at 92:13-19.[36]

"RICO does not provide a cause of action for all types of injury to property interests, but only for injuries resulting in 'concrete financial loss.'" *Diaz v. Gates*, 420 F.3d 897, 898 (9th Cir. 2005) (quoting *Oscar v. University Students Co-operative Ass'n*, 965 F.2d 783, 785 (9th Cir. 1992) (en banc)).  To make this showing, a plaintiff must first establish the existence of a specific business or property interest, "a categorical inquiry typically determined by reference to state law." *Diaz*, 420 F.3d at 900.  The plaintiff must also substantiate "some tangible financial loss" that corresponds with the loss of that business or property interest. *Id.*  To determine whether Mattel has evidence of injury to business or property, the Court must first determine whether Mattel has alleged injury to a business or property interest recognized under state law and then determine whether Mattel has produced evidence that it sustained a "concrete financial loss" that corresponds with such injury.

(a)      Trade Secret Materials

California recognizes a property interest in the confidentiality and exclusive use of trade secret information. *See Silvaco*, 184 Cal. App. 4th at 236.  To the extent Mattel's trade secret materials were misappropriated, it suffered an injury to business or property.  *See Formax, Inc. v. Hostert*, 841 F.2d 388, 390 (Fed. Cir. 1988) (citing *Carpenter v. United States*, 484 U.S. 19, 25, 108 S.Ct. 316 (1987)); *Ruckelshaus*, 467 U.S. at 1001-04; and *Bd. of Trade of Chicago v. Christie Grain & Stock Co.*, 198 U.S. 236, 250-51, 25 S.Ct. 637 (1905)).  The trade secrets to which Mattel lost its interest in confidentiality and exclusive use encompass the materials allegedly misappropriated by Bryant, Machado, Vargas, Trueba, Brawer, Castilla, Cooney, and Brisbois.

---

[36] Mattel does not specifically allege these injuries in its pleading.

Mattel cannot establish that it suffered any concrete financial loss as a result of the deprivation of its use of the Bratz works.  Mattel has identified no business opportunities, or even categories of business opportunities, that it would have pursued if it had retained exclusive use of the Bratz works.  Nor can Mattel establish that it suffered any "concrete financial loss" as a result of the lost exclusive use or confidentiality of any of the non-Bryant trade secrets.  Unlike the plaintiff in *Diaz*, who "could not fulfill his employment contract or pursue valuable employment opportunities" as a result of his wrongful imprisonment, 420 F.3d at 900, Mattel was not foreclosed from using its materials, like market research and pricing matrices, which continued to reside on Mattel's servers.

Mattel responds with three types of arguments: (1) the loss of exclusive use of confidential materials is *per se* concrete financial injury; (2) Mattel's lost exclusive use of confidential materials resulted in lost market share and lost profits; and (3) Mattel's lost exclusive use of confidential materials resulted in lost opportunity.

First, Mattel cites a portion of *Ruckelshaus* in which the Supreme Court observed that "[t]he economic value of [the property right in the exclusive use of trade secret materials] lies in the competitive advantage over others that [the owner] enjoys by virtue of its exclusive access to the data." 467 U.S. at 1011-12.  But *Ruckelshaus*, a non-RICO case, does not establish a *per se* rule that every trade secret plaintiff has suffered concrete financial loss that gives rise to a claim under section 1964(c); the case merely supports the now-unremarkable proposition that a company has a property interest in the exclusive use of its trade secret materials.  The loss of "competitive advantage" that sometimes flows from the deprivation of exclusive use is nothing more than a non-concrete "injury to a valuable intangible property interest."  *See Berg v. First State Ins. Co.*, 915 F.2d 460, 464 (9th Cir. 1990).

Second, Mattel argues that lost profits flowed from the injury to its business or property interest in the use and confidentiality of its trade secrets.  These lost profits, Mattel contends, resulted from a decline in market share associated with (1) the success of the misappropriated Bratz doll line; (2) MGA's improvements to its infrastructure and systems executed through the use of Mattel's materials; and (3) MGA's use of misappropriated information to beat Mattel's

unreleased products to market.  Mattel's expert submitted a declaration concluding that MGA's Bratz sales caused Mattel to lose "revenues of at least $773.7 million and lost profits of at least $237.7 million" between 2001 and 2009.  Declaration of Michael Wagner ¶ 37.  For reasons discussed below, the causal link between Wagner's loss calculations and the injury to Mattel's property interest is too attenuated to support a civil RICO claim.  However, Wagner is also silent about the specific contracts, relationships, or sales negatively impacted by the alleged misappropriation of Mattel's trade secrets.  *Cf. Imagineering, Inc. v. Kiewit Pacific Co.*, 976 F.2d 1303, 1310-11 (9th Cir. 1992) ("Although plaintiffs assert that if specified contracts had not gone to Kiewit those contracts would have been awarded to the plaintiffs' prime contractors, that cannot be established.").  The evidence is to the contrary: Mattel released the allegedly misappropriated toy concepts (*e.g.*, MyScene Swappin' Styles), and successfully applied its forecasting, marketing, promotional, and pricing strategies even after those materials were allegedly misappropriated.  Though Mattel's expert purports to value the "lost market share" that Mattel allegedly suffered as a result of the lost confidentiality of its trade secret materials, none of the facts in the record substantiate actual concrete losses sustained by Mattel as a result of the misappropriation of its alleged trade secrets.

Third, Mattel argues that the Supreme Court and Ninth Circuit have endorsed section 1964(c) claims based upon the deprivation of future profits or business opportunity.  However, an examination of the decisions cited by Mattel reveals their inapplicability to the present fact situation.  In *Diaz*, the Ninth Circuit held that the civil RICO plaintiff had shown "concrete financial loss" because he lost the ability to fulfill his employment contract and seek other employment as a result of his wrongful imprisonment.  Citing *Diaz*, the panel in *Guerrero v. Gates* concluded that the plaintiff's lost opportunity "to pursue gainful employment" during the period of his wrongful imprisonment constituted an injury to a property interest.  *See Guerrero*, 442 F.3d 697 (2006).  The panel did not separately discuss the "concrete financial loss" requirement, and its earlier (superseded) opinion indicates that the concreteness of the plaintiff's financial loss was not at issue.  *See Guerrero v. Gates*, 357 F.3d 911, 920 (9th Cir. 2004), *superseded by Guerrero*, 442 F.3d 697 (2006).  The Supreme Court case cited by Mattel

1   likewise concluded that the plaintiffs had suffered an injury to business or property when they

2   were deprived of "valuable liens they otherwise *would have been* awarded."  *See Bridge v.*

3   *Phoenix Bond & Indemnity Co.*, 553 U.S. 639, 650, 128 S.Ct. 2131 (2008) (emphasis added).

4          Each of Mattel's cited authorities involved the actual deprivation of the use of property,

5   which resulted in concrete financial loss.  Mattel attempts to take these holdings one step further

6   when it argues that the deprivation of *exclusive* use results in concrete financial loss.  However,

7   the holder of a trade secret does not ordinarily suffer any lost opportunity unless it can provide

8   some concrete example of how it would have exploited its exclusive possession of the trade

9   secret.  *See Litton Sys., Inc. v. Ssangyong Cement Indus. Co., Ltd.*, 107 F.3d 30, at *10 (Fed. Cir.

10  Feb. 13, 1997) (unpublished) (holding that plaintiff deprived of exclusive use of trade secret

11  materials did not suffer concrete financial loss even assuming it lost the ability to license such

12  materials' use).  Just as Mattel cannot identify any relationships or contracts that substantiate the

13  concreteness of its lost profits, so too does Mattel fail to establish the existence of any specific

14  business opportunities that it would have exploited had it retained the exclusive use of its trade

15  secret materials.  Its claimed injury is even less concrete than the plaintiff's in *Litton*.

16         Mattel cannot show that it suffered concrete financial loss, either in the form of lost

17  opportunity or lost profits, as a result of the deprivation of its property interest in the exclusive

18  use of its trade secret materials.  Its opposition and the evidentiary record are silent on the issue,

19  and summary judgment must therefore be granted on Mattel's RICO counter-claims to the extent

20  predicated upon injury to the exclusive use and confidentiality of its trade secrets.

21                            (b)     Employee Salaries

22         Mattel had a statutorily created property interest in the honest services of its employees.

23  *See* 18 U.S.C. § 1346.  However, "the deprivation of 'honest services' does not constitute

24  concrete financial loss sufficient to establish injury to state a RICO claim."  *United States v.*

25  *Kincaid-Chauncey*, 556 F.3d 923, 941 n.14 (9th Cir. 2003) (quoting *Ove v. Gwinn*, 264 F.3d

26

27

28

124

817, 825 (9th Cir. 2001)).[37]  Mattel accordingly re-casts its counter-claim as an attempt to recover "salaries paid to the disloyal employees during the period of their disloyalty," even though Mattel was never actually deprived of these employees' services.  Mattel Opp'n to MGA MSJ at 94:20-21 (citing *City of N.Y. v. Jam Consultants, Inc.*, 889 F. Supp. 103, 105 (S.D.N.Y. 1995) and *Curiale v. Capolino*, 883 F. Supp. 941, 950 (S.D.N.Y. 1995)).

Mattel fails to identify the property interest that corresponds with its claimed loss.  *Diaz*, 420 F.3d at 900 (distinguishing *Doe v. Roe*, 958 F.2d 763 (7th Cir. 1992) on the grounds that "Doe, unlike Oscar, suffered some tangible financial losses as a result of her emotional distress but, like Oscar, failed to allege harm to any property interest valid under state law").  The two non-binding decisions cited by Mattel applied Second Circuit authority for the proposition that an employer that suffers injury to the "commercial relationship" with its employees is entitled to recover the disloyal employees' full salaries.  *See City of N.Y.*, 889 F. Supp. at 105; *see also Curiale*, 883 F. Supp. at 949-50.  This rule does not apply in California or in this Circuit.

Mattel's attempt to circumvent the Ninth Circuit's observation that concrete financial losses don't flow from the deprivation of honest services is unconvincing.  With the possible exception of the loss of exclusive use and confidentiality of the Bratz trade secret materials, Mattel cannot establish concrete financial loss as a result of its employees' disloyalty.

(c)     Other Injuries

Mattel's other claimed injuries to business or property — lost sales and profits, lost opportunity, and "theft of valuable property" — are species of financial loss that resulted from the deprivation of Mattel's trade secrets, as well as the honest services of Mattel's employees. *Pacific Gas & Elec. Co. v. San Mateo County*, 233 Cal. App. 2d 268, 274 (1965) (holding that the "measure of damage to an interest in real property . . . may be the cost of making repairs; [and] the loss of use of the property; lost profits"); *see also Diaz,* 420 F.3d at 900 (identifying property interest as "prospective business relations" and concrete financial loss as plaintiff's lost

---

[37] These Ninth Circuit cases could be read to hold that there's no property interest in honest services to begin with, however, such an interpretation would appear to run afoul of the federal honest services fraud statute.

1    opportunity to "fulfill his employment contract or pursue valuable employment").

2         Mattel claims that future profits and business opportunities are stand alone property

3    interests, since California prohibits interference with "current and prospective contractual

4    relations."  Mattel Opp'n to MGA MSJ at 92:23-24 (citing *Diaz*, 420 F.3d at 900).  However,

5    Mattel cannot prove that the deprivation of its trade secrets and employees' honest services

6    caused concrete financial injury to its business relations.  Unlike the plaintiffs in *Bridge*, *Diaz*,

7    and *Guerrero*, Mattel has no evidence that it lost any concrete opportunities or other "specific

8    identifiable profits" as a result of the loss of exclusive use of its non-Bratz trade secrets.  *See*

9    *Imagineering*, 976 F.2d at 1311 (holding that "speculative injury" is not recoverable under

10   section 1964(c)).

11              2.      **"By Reason Of"**

12        The Supreme Court has noted the "unlikelihood that Congress meant" to provide recovery

13   to every person "factually injured" by a violation of RICO's substantive provisions.  *Holmes*,

14   503 U.S. at 266.[38]  In order to recover under section 1964(c), a civil plaintiff must meet the

15   heavy burden of proving that the violation of RICO "not only was a 'but for' cause of his injury,

16   but was the proximate cause as well.'"  *Hemi Group, LLC v. City of New York*, ___ U.S. ___, 130

17   S.Ct. 983, 989 (2010).  The plaintiff must show that its injury was "'caused by the predicate acts

18   sufficiently related to constitute a pattern, for the essence of the violation is the commission of

19   those acts in connection with the conduct of an enterprise.'"  *Anza v. Ideal Steel Supply Corp.*,

20   547 U.S. 451, 457, 126 S.Ct. 1991 (2006) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479,

21   497, 105 S.Ct. 3275 (1985)).  "At least one of the defendant's predicate acts" must have been

22   "the proximate cause of the plaintiff's injuries."  *Camelio v. American Federation*, 137 F.3d 666,

23   670 (1st Cir. 1998).

24        Mattel does not explain how each alleged act of racketeering caused injury.  Mattel

25   instead asserts that "defendants stole Mattel's confidential, copyrighted, and trade secret

26

27        [38] This citation to *Holmes* was erroneously omitted from the courtesy copy

28   distributed to counsel.

1   materials, used Mattel employees to produce competing products based on and infringing of the

2   stolen materials, and sold those products in direct competition with Mattel for years and to this

3   day." Mattel Opp'n to MGA MSJ at 95:8-12. This assertion does not differentiate between the

4   injury caused by each counter-defendant's alleged pattern of racketeering acts, but considers the

5   acts of racketeering *en masse*. The injuries caused by the combination of all of the alleged

6   predicate acts are potentially recoverable only under Mattel's second counter-claim of a

7   conspiracy to conduct the affairs of an enterprise through a pattern of racketeering. More

8   importantly, and for the reasons discussed below, the vast majority of Mattel's claimed injuries

9   to business or property (including those that aren't cognizable) were not directly caused by the

10  alleged patterns of racketeering, whether considered individually or as a group.

11                    (a)      Injury to Property Interest in Bratz Trade Secret

12          Mattel argues the deprivation of its property interest in the Bratz trade secret corresponds

13  with two species of financial loss: (1) lost opportunity to exploit the concept; and (2) lost profits

14  caused by MGA's eventual sale of the product. The acts of racketeering that allegedly resulted

15  in the loss of Mattel's property interest are the predicate acts of mail fraud and wire fraud that

16  defrauded Mattel of its property interest in the exclusive use and confidentiality of the Bratz

17  trade secret materials. 4AAC ¶ 124(a)-(b); *see also Carpenter*, 484 U.S. at 24-28. Mattel has

18  attached hundreds of alleged uses of the interstate mails and wires that, it claims, furthered this

19  scheme to defraud it of the Bratz concept and works. 4AAC, Exs. O, P, Q, S. To purport to

20  execute the scheme to defraud — *i.e.*, for criminal liability under the mail and wire fraud statutes

21  — these uses of the interstate mails or wires need only have been "incident to an essential part of

22  the scheme." *Schmuck v. United States*, 489 U.S. 705, 710, 109 S.Ct. 1443 (1989).

23          The loose theory of causation inherent in the mail and wire fraud statues cannot, as Mattel

24  attempts, be substituted for the more demanding requirement that a predicate act of racketeering

25  act as both a "but for" and "proximate cause" for a civil plaintiff's injury. For instance, the mail

26  fraud and wire fraud statutes incorporate principles of foreseeability and intent. *Cf. United*

27  *States v. Green*, 786 F.2d 247, 249 (7th Cir. 1986); *United States v. Martin*, 228 F.3d 1, 16 (1st

28  Cir. 2000). However, a civil RICO plaintiff may not obtain recovery on the sole basis that its

                                                    127

1  injuries were the foreseeable, or even the intended, consequence of a violation of substantive

2  RICO. *See Couch v. Cate*, 379 Fed. Appx. 560, 565 (9th Cir. May 14, 2010) (noting that *Hemi*

3  *Group* "explicitly rejected forseeability as a standard for determining proximate causation"); *cf.*

4  *Hemi Group*, 130 S.Ct. at 990-91 ("The dissent would have RICO's proximate cause

5  requirement turn on foreseeability."); *id.* at 991 & n.1 ("But the City cannot escape the

6  proximate cause requirement merely by alleging that the fraudulent scheme embraced all those

7  indirectly harmed by the alleged conduct.") (citing *Anza*, 547 U.S. at 454-55 (holding that

8  plaintiff could not "circumvent the proximate cause requirement simply by claiming that the

9  defendant's aim was to increase market share at a competitor's expense")).  Mattel must show

10 that the predicate acts of racketeering "are the proximate, and not just foreseeable, causes of the

11 [alleged] injuries."  *Couch*, 379 Fed. Appx. at 566.  "A link that is 'too remote,' 'purely

12 contingent,' or 'indirect[t]' is insufficient."  *Hemi Group*, 130 S.Ct. at 989 (quoting *Holmes*, 503

13 U.S. at 271, 274).  "[T]he central question . . . is whether the alleged violation led *directly* to the

14 plaintiff's injuries."  *Anza*, 547 U.S. at 461 (emphasis added).

15 <u>Bryant's Pattern of Racketeering</u>

16     Mattel identifies four acts of mail fraud and seven acts of wire fraud committed by

17 Bryant.  The evidence of Bryant's mail fraud allegedly includes: (1) an October 5, 2000 airborne

18 express bill and invoice for "hollow saran straight hair samples" sent by a Japanese company to

19 MGAE with an "attention to" Carter Bryant; (2) a February 20, 2001 email from an MGA

20 employee to Bryant, *et al.*, directing Bryant to send "Extra Bratz Sewn Samples" to MGA HK;

21 (3) a February 25, 2001 email from an MGA employee to Bryant, *et al.*, concerning Bryant's

22 shipment of "Yarn samples for Sasha's Hat" to MGA HK; and (4) an April 10, 2001 email from

23 an MGA employee to Bryant confirming that "[MGA] HK will be sending the 1 yard of each

24 2001 fabric on 4/17."  *See* 4AAC, Ex. Q.  The evidence of Bryant's wire fraud allegedly

25 includes: (1) a September 18, 2000 fax transmission from Bryant to Kinuyo Shichijyo

26 memorializing a phone conversation regarding "ordering a supply of [] Hollow Saran hair fiber";

27 (2) an October 25, 2000 internal MGA email discussing the shipment of hair samples to Bryant;

28 (3) a September 14, 2000 fax transmission from Bryant to MGA's attorney attaching Bryant's

1  "original offer of employment with Mattel" and expressing concern about "risking suspicion"

2  within Mattel; (4) a September 19, 2000 email from MGA's counsel to Bryant attaching a

3  "consulting agreement"; (5) an October 4, 2000 take-it-or-leave-it email from MGA's attorney to

4  Bryant's attorney attaching an edited "Bryant/MGA Agreement"; (6) an October 4/5, 2000 email

5  exchange between Bryant and Larian expressing shared excitement about the Bratz concept; and

6  (7) an August 11, 2003 fax transmission from an attorney to Bryant discussing a patent

7  application for "changeable doll footgear and feet." *Id.*, Ex. V.

8       No reasonable fact-finder could conclude that any of these interstate mail and wire

9  transmissions, or other communications of their type, were a "but for" cause, let alone a

10  proximate cause, of the injury to Mattel's property interest in the exclusive use and

11  confidentiality of the Bratz trade secret concept.  The vast majority of the communications post-

12  date Bryant's employment with MGA, at which point the Bratz works had indisputably been

13  disclosed.  Moreover, every one of the communications post-date the September 1, 2000 meeting

14  between MGA and Bryant, which *Mattel claims* was the last possible date on which Bryant

15  disclosed the Bratz trade secret materials to MGA.  Even under the *Hemi Group* dissent's less

16  constrained interpretation of section 1964(c)'s language, Mattel cannot show that had Bryant

17  refrained from causing such uses of the interstate mails or wires, Mattel would have retained the

18  exclusive use and confidentiality of its trade secret materials.  *See Hemi Group*, 130 S.Ct. at 996

19  (Breyer, J., dissenting) ("In the absence of the misrepresentation[,] New York City would have

20  written letters to the purchasers and obtained a significant share of the tobacco taxes buyers

21  owed.").

22       Nor did Mattel suffer injury to its property interest in the exclusive use and confidentiality

23  of the Bratz trade secret works by reason of Bryant's other alleged acts of racketeering.  Bryant

24  is alleged to have engaged in acts of spoliation and concealment of evidence, including

25  (1) concealing Bratz's origins from the public and concealing his "future plans" from Mattel

26  supervisors; (2) altering the Bratz sketches to make it appear as if they had been created prior to

27  his time at Mattel; (3) tearing drawings out of his sketchbook to "conceal their creation at

28  Mattel"; and (4) destroying evidence on his MGA-issued computer. 4AAC ¶¶ 29-30, 95, 96.

1   Bryant also allegedly engaged in obstruction of justice through the commission of such acts. *Id.*

2   ¶ 124(d).  However, none of these particular "cover up" activities have a "direct relation" with

3   the injury to Mattel's property interest in the exclusive use and confidentiality of its trade secret

4   materials. *Anza*, 547 U.S. at 457.  The acts of obstruction alleged by Mattel, including Bryant's

5   failure to inform his supervisors of his subsequent employment, post-dated the disclosure of the

6   Bratz trade secret materials and it would be impossible "to ascertain the amount of [Mattel's]

7   damages attributable to" Bryant's allegedly obstructive conduct. *Holmes*, 503 U.S. at 269.

8       Bryant's final act of racketeering was criminal copyright infringement. Mattel alleges, in

9   essence, that Bryant continued to "reproduce[], create derivative works from and otherwise

10  infringe[] upon the exclusive rights of Mattel in its protected works without Mattel's

11  authorization." 4AAC ¶¶ 124(f), 145.  Once more, Mattel has no evidence, nor is it reasonable

12  to conclude, that Bryant's alleged copyright infringement, which was committed *after* he left

13  Mattel, was a but for cause for the injury to Mattel's confidentiality and exclusive use of the

14  Bratz trade secret materials, both of which were disclosed on September 1, 2000 at the latest.

15  <u>MGAE and Larian's Patterns of Racketeering</u>

16      No reasonable fact-finder could conclude that Mattel suffered injury to its property

17  interest in the exclusive use and confidentiality of the Bratz trade secret by reason of MGAE or

18  Larian's alleged pattern of racketeering.  The 4AAC treats the acts of racketeering committed by

19  MGAE and Larian as one and the same. 4AAC ¶¶ 124.  MGAE and Larian are alleged to have

20  committed the following predicate acts: (1) mail fraud; (2) wire fraud; (3) spoliation and

21  concealment of evidence; (4) obstruction of justice; (5) violations of the Travel Act; and

22  (6) criminal copyright infringement.

23      Mattel identifies fifteen exhibits that purport to evidence MGAE and Larian's alleged acts

24  of mail fraud.  The exhibits that bear a relation to Bryant or Bratz can be categorized as follows:

25  (1) representations by Larian to the media and to federal institutions that omit or conceal

26  Bryant's involvement with the Bratz dolls; (2) copyright applications for the four first generation

27  Bratz characters, as well as a group drawing; and (3) shipments of the Bratz production sculpt

28  and a Diva Starz doll from MGAE to MGA HK.  4AAC, Ex. O.  Mattel also identifies ninety-

four exhibits that purport to evidence MGAE and Larian's alleged acts of wire fraud. The exhibits that bear a relation to Bryant or Bratz can be categorized as follows: (1) phone communications between Bryant and Marlow, as well as Bryant and MGA HK; (2) intra-MGA emails discussing the production of the Bratz dolls; (3) Larian and MGAE's communications with Bryant, MGAE employees, and Bryant's attorney concerning Bryant's consulting agreement and expressing excitement about the forthcoming release of the Bratz dolls; and (4) representations by Larian to the media and to federal institutions that omit or conceal Bryant's involvement with the Bratz dolls. *Id.*, Ex. S.

The vast majority of these mail and wire communications post-date the September 1, 2000 meeting between Bryant and Larian at MGAE's offices, which was the final meeting at which the Bratz trade secret materials could have been disclosed. Only one batch of the mail or wire communications pre-dated that September 1, 2000 meeting: the phone calls between Marlow and Bryant, dated August, 2000, reflected in the call logs cited by Mattel. However, no reasonable fact-finder could conclude that these phone communications constituted predicate acts of racketeering that were a "but for" or "proximate" cause of the injury to Mattel's property interest in the exclusive use and/or confidentiality of the Bratz trade secret materials.

First, the phone calls were made from Bryant's telephone in Mattel's California office to Marlow's telephone in Van Nuys, California. *See* 4AAC, Ex. S-1. These were, by definition, intrastate communications and could not have violated the wire fraud statute even if made with the purpose of executing a scheme to defraud. *McCoy v. Goldberg*, 748 F. Supp. 146, 154 (S.D.N.Y. 1990) ("The federal wire fraud statute does not cover telephone communications between persons within the same state.").

Second, Marlow is not the same as Larian and, as Mattel has elsewhere recognized, her independent contractor relationship with MGAE rendered her professionally independent and distinct from MGAE. *See* Mattel Opp'n to MGA MSJ at 85:1-17 (arguing that Bryant was distinct from MGAE by virtue of his independent contractor status).

Third, no reasonable fact-finder could conclude that MGAE or Larian caused Marlow to use the wires in a manner that would serve a "but for" or "proximate" cause for the injury to

Mattel's property interest in the exclusive use and confidentiality of the Bratz trade secret materials. It's worth considering what little information Mattel has discovered (over the last six years) about these phone conversations. Of the five calls from Bryant's phone to Marlow's phone in August 2000, Bryant made all five. The first four, made on August 24, 2000, lasted eighteen, twenty-four, eighteen, and forty-eight seconds. The final call, made on August 29, 2000 lasted three minutes and six seconds. As Mattel's counsel recognized at the hearing on these motions, this is a fundamentally visual case. It is unreasonable to conclude that Bryant described the Bratz trade secret works to Marlow over the phone in a manner that would have caused injury to Mattel's property interest in the exclusive use or confidentiality of the materials.

Nor could a reasonable fact-finder conclude that MGAE and Larian put Marlow up to the task of waiting with baited breath for a phone call from Bryant in which she would induce him to disclose trade secret materials of which MGA was not already aware. Mattel has elsewhere argued precisely the opposite, by claiming that "by early summer of 2000, Bryant was working with MGA." Mattel's Statement of Genuine Issues in Response to MGA Statement of Uncontroverted Facts ¶ 1 (citing 6/3/2008 AM Trial Tr. (Jennifer Maurus) at 1028:16-1029:14). Marlow herself testified that Bryant first disclosed the Bratz concept *and works* to her well before the August 2000 phone calls: "We saw each other in the hallways . . . he goes, okay, well I'm going to bring and show it to you. So he did, and we went to his car in the parking lot, he showed me the project, and I love it, I thought it was very adorable." Marlow Depo. at 116:15-18. Indeed, Marlow testified that Bryant represented he had "showed [his works] to a company in New York" even before the two talked. *Id.* at 117:3-4. She explained that her subsequent phone conversation with Bryant included a suggestion by Marlow that Bryant pitch the Bratz concept to MGA, to whom Marlow claimed to have already disclosed the Bratz concept. *Id.* at 121:9-18 ("I said I'm working [] freelance for M.G.A. . . . I met this awesome person Paula, and I was telling her all about your drawings and she got excited about seeing them. Would you be willing to come up and, you know, set up a meeting with Paula."). In short, the most favorable view of the August 2000 phone calls suggests that Marlow had deprived Mattel of the exclusive use and confidentiality of the Bratz concept even before Bryant's alleged misconduct.

Mattel also cannot establish proximate cause between MGAE and Larian's acts and the ultimate disclosure of the Bratz works, because Bryant's eventual decision to disclose the materials, coupled with Marlow's work in facilitating the meeting, were powerful intervening forces, and Mattel cannot rest its theory of liability on "the independent actions of third and even fourth parties" to its counter-claim against MGAE and Larian. *Hemi Group*, 130 S.Ct. at 992.

The remaining uses of the mails or wires, as noted earlier, occurred after the September 1, 2000 meeting and after Bryant left Mattel for MGA. These alleged interstate uses of the mails and wires temporally correspond with MGAE and Larian's other alleged predicate acts, which are obstruction of justice, spoliation, violations of the Travel Act, and criminal copyright infringement. The acts of obstruction and spoliation include the alleged destruction of evidence and misrepresentations to conceal the origins of Bratz. 4AAC ¶¶ 29-30, 54, 90-121. For reasons discussed above, these post-September 1, 2000 acts cannot constitute "but for" causes of the injury to Mattel's interest in the exclusive use and confidentiality of the Bratz materials. MGAE and Larian's alleged violations of the Travel Act, 18 U.S.C. § 1952 — bribing Mattel employees using interstate facilities — do not include Bryant and, even if they did, cannot constitute a "but for" or "proximate" cause for Bryant's disclosure of the Bratz materials. And the alleged acts of criminal copyright infringement also (obviously) post-date Bryant's disclosure.

No reasonable fact-finder could conclude that Mattel suffered injury to its interest in the exclusive use and confidentiality of the Bratz materials by reason of MGAE and Larian's alleged patterns of racketeering activity.

MGA HK's Pattern of Racketeering

MGA HK is alleged to have engaged in seven acts of mail fraud and four acts of wire fraud, all of which concern the production of the Bratz dolls, and all of which occurred after Bryant disclosed the Bratz works to MGA. 4AAC, Exs. P, T. MGA HK is also alleged to have committed predicate acts of criminal copyright infringement, which necessarily occurred after Bryant's disclosure of the Bratz works. For the reasons discussed above, no reasonable fact-finder could conclude that Mattel suffered injury to its property interest in the confidentiality and exclusive use of the Bratz trade secret materials by reason of MGA HK's alleged pattern of

racketeering activity.

Machado and MGA Mexico's Patterns of Racketeering

Machado and MGA Mexico are not alleged to have caused the deprivation of Mattel's interest in the exclusive use and confidentiality of the Bratz trade secret materials.

(b)     Loss of Exclusive Use and Confidentiality of Other Trade Secret Materials

Mattel also claims that counter-defendants' patterns of racketeering caused injury to its property interest in the exclusive use and confidentiality of non-Bratz trade secret materials. For the reasons discussed above, Mattel did not suffer concrete financial loss from the deprivation of this property interest: Mattel continued to use the subject materials after their misappropriation, and Mattel can identify no contracts or business relationships implicated by the loss of its *exclusive* use and confidentiality of the materials.

Nor can Mattel establish that counter-defendants' patterns of racketeering activity caused the alleged injury to its interest in the exclusive use and confidentiality of the non-Bratz trade secret materials. These trade secret materials include: (1) the MyScene Swappin' Styles concept allegedly misappropriated by Brawer; (2) the documents Castilla downloaded to his thumb drive; (3) the Toys 'R Us spreadsheet and optimization tool Cooney downloaded to a personal disc; (4) the documents and information retained by Brisbois; and (5) the documents Machado, Trueba, and Vargas downloaded to thumb drives. Of these former Mattel employees, only Machado is named a counter-defendant to Mattel's first two RICO counter-claims.

No reasonable fact-finder could conclude that the alleged acts of criminal copyright infringement by MGAE, Larian, MGA HK, and Machado were a "but for" or "proximate" cause of the deprivation of Mattel's property interest in the confidentiality and exclusive use of its trade secret materials. Mattel alleges that such acts of infringement encompassed "documents containing Mattel trade secret and confidential information and Bratz works created by Bryant." 4AAC ¶ 124(f). It is undisputed that the acts of reproduction occurred after the misappropriation of the materials and thus, could not have served as either a "but for" or "proximate" cause of the deprivation of Mattel's interest in the confidentiality and exclusive use of the materials.

134

1   Moreover, there is no evidence that MGA's potential *internal* reproduction of the non-Bratz

2   trade secret works either implicated Mattel's use of the works or detrimentally affected any

3   specific Mattel contracts, like licensing agreements for the subject works.

4   Likewise, no reasonable fact-finder could conclude that the alleged acts of obstruction of

5   justice and spoliation committed by counter-defendants were a "but for" or "proximate" cause of

6   the deprivation of Mattel's property interest in the exclusive use and confidentiality of its trade

7   secret materials.  Mattel alleges that these acts include: (1) Machado's post-resignation use of a

8   program to "scrub" his personal computer's hard drive; and (2) MGA's failure to produce

9   relevant documents during this litigation.  This alleged conduct occurred *after* the alleged

10  misappropriation of Mattel's trade secret materials.  It cannot, therefore, be considered either a

11  "but for" or "proximate" cause for the precipitating injury to Mattel.  And there is no evidence of

12  a direct causal relationship between the alleged concealment and any lost market share in either

13  the United States or Mexico, given the fact that Mattel investigated and/or prosecuted many of

14  the alleged thefts soon after they were suspected to have occurred.

15  There is a nevertheless genuine issue of material fact as to whether Machado's alleged

16  use of the interstate wires was a "but for" cause of the potential injury of Mattel's property

17  interest in the confidentiality and exclusive use of the materials misappropriated by Machado,

18  Trueba, and Vargas.  Mattel has cited no direct evidence that the materials allegedly *downloaded*

19  by Machado and his two Mattel Servicios colleagues resided on Mattel's California servers.  But

20  a reasonable fact-finder could still conclude that Machado directed his colleagues to contact

21  "both a Mattel employee located in El Segundo, California and Mattel's advertising agency to

22  request updated confidential information about advertising plans."  Webster Dec., Ex. 287;

23  4AAC ¶ 48.

24  However, Mattel has no evidence that MGA's alleged racketeering had anything to do

25  with Machado's access and disclosure of such materials.  Mattel identifies the following acts of

26  mail fraud and wire fraud: (1) a shipment of an employment offer letter to Machado, Vargas, and

27  Trueba; (2) emails between MGA and the Mattel Servicios employees discussing their offers for

28  employment; (3) internal MGA emails referring to a strategy of targeting Mattel's employees;

(4) fourteen telephone calls between Machado and Kuemmerle/MGAE; (5) dozens of telephone calls between Machado and Trueba and a fellow employee in Mexico; and (6) Trueba's aforementioned emails to Machado forwarding Mattel's internal communications and attachments. *Id.*, Exs. O, R, S, U, W. Of these communications, only Trueba's emails to Machado[39] could be reasonably considered "but for" and "proximate" causes of the alleged injury to Mattel's interest in the confidentiality and exclusive use of its trade secret materials. However, no reasonable fact-finder could conclude, as it must, that MGA caused Trueba's emails to be transmitted to Machado. *See* 18 U.S.C. § 1343. Trueba in fact forwarded two of the emails to Machado mere hours after their receipt, which demonstrates a lack of awareness by MGA. Moreover, the relationship between these emails between Trueba and Machado and the alleged disclosure of the materials to MGA is by definition remote and contingent: Machado's acts were an intervening cause.

The connection between the alleged patterns of racketeering and the conduct of Mattel's other employees is attenuated. None of these former employees used the interstate mails or wires to acquire the trade secret information at issue. The acts of mail and wire fraud that Mattel identifies as the "proximate" and "but for" cause of the deprivation to its interest in the exclusive use and confidentiality of the allegedly misappropriated materials include: (1) an email exchange between Castilla and an MGA executive about the scope of his duties at MGA; (2) an email from Contreras to an MGA executive congratulating her on MGA's successful recruitment of Castilla; (3) internal MGA emails concerning deficiencies in MGA's forecasting and inventory management; (4) offers of employment sent by MGA to Mattel's employees. *Id.*, Exs. O, S.

---

[39] Mattel has no evidence that Trueba's emails to Machado are "communications in interstate or foreign commerce." 18 U.S.C. § 1343. Both Machado and Trueba resided in Mexico City at the time of the emails. In some cases, "it is possible for a wire communication whose origin and ultimate destination are within a single state to be routed through another state" but Mattel does not so establish here. *See Ideal Steel Supply Corp. v. Anza*, 373 F.3d 251, 265 (2d Cir. 2004), *rev'd on other grounds*, 547 U.S. 451, 126 S.Ct. 1991 (2006). Mattel's theory would require a fact-finder to conclude that Trueba's emails to Machado were routed into the United States and then back to Mexico.

1   These communications did not proximately cause any injury to Mattel's exclusive use and

2   confidentiality of its trade secret materials.  Dozens of intervening factors, including the

3   employee's decision to disclose trade secret materials, break the causal chain between an offer of

4   employment and the misappropriation of a current employer's trade secrets.  Similarly, internal

5   MGA discussions about the deficiencies in forecasting and inventory management did not, under

6   any reasonable reading, compel the eventual disclosure of Mattel's information about these

7   topics.

8       Mattel has simply failed to show how any counter-defendant's pattern of racketeering

9   activity directly caused the alleged injury to any interest in its trade secrets.

10                          (c)      Other Injuries

11      As discussed earlier, Mattel separately claims that "lost profits" caused by Bratz sales and

12  the "lost opportunity" to use Bratz are distinct interests — not just the consequences of the injury

13  to Mattel's interest in the exclusive use and confidentiality of its trade secrets.

14      <u>Opportunity and Use</u>

15      Mattel's loss of access to the Bratz works didn't cause concrete financial injury because it

16  wasn't a specific business opportunity Mattel could have been expected to pursue.  *Compare*

17  *Diaz*, 420 F.3d at 900 ("And his claimed financial loss?  He could not fulfill his employment

18  contract . . .").  Regardless, none of the counter-defendants' patterns of racketeering activity was

19  either a "but for" or "proximate" cause of Mattel's lost opportunity for two reasons.  First,

20  Mattel's lost opportunity was precipitated by Bryant's disclosure of the Bratz materials to MGA

21  and his non-disclosure of those same materials to Mattel.  The predicate acts of racketeering

22  concerning the use of the Bratz works and the concealment of their theft occurred *after* the

23  disclosure was complete and Mattel had unwittingly surrendered its exclusive opportunity to use

24  the works.  Such acts of racketeering cannot serve as the "but for" cause of Mattel's injury

25  because, even absent such acts, Mattel would have lost its opportunity to use the Bratz works.

26  *Compare Bridge*, 533 U.S. at 658 (holding that prevailing bidders of a county tax-lien auction

27  proximately caused injury by submitting "false statements of compliance" that induced county to

28  "permit[] petitioners to participate in the auction").

Mattel also cannot establish a causal relationship, let alone a direct and non-contingent causal relationship, between the acts of racketeering, like the acts of concealment or copyright infringement that post-dated Bryant's disclosure, and Mattel's ability to enforce its rights in the Bratz works or exploit those works.  The evidence is legion that, prior to MGA turning Bratz into a commercial success, Mattel had little interest in exploiting intellectual property that resembled Bratz.  For example, Mattel canned an inchoate doll concept called "Toon Teens" that, according to Mattel, inspired the Bratz works.  *See* MGA MSJ, Ex. 0286 (recommending that Mattel "not pursue development" of the Toon Teens doll line because "many girls did not seem to care for the dolls' proportions, particularly the large size of the head, legs, and feet compared to the body").  Mattel also rejected the name "Brats" for a line of miniature Diva Starz dolls, because a critical member of its product development team "didn't like the idea of what Brat[s] connoted."  *See* Deposition of Adrienne Fontanella, dated January 16, 2008, at 150:6-12.  Doll concepts and names, like Bratz, did not survive the brand development process to the extent they were "counter to" Mattel's "view of the company and how it [was] perceived."  Deposition of Robert Eckert, Vol. VII, dated April 27, 2010, at 1147:14-19.

Mattel's skepticism of the underlying concepts and names for the Bratz dolls precludes a finding of causation between the acts of concealment and Mattel's late attempt to re-capture the intellectual property from Bryant and MGA.  More importantly, Mattel's tepid response to Toon Teens, as well as Mattel's subsequent failure to license Toon Teens to other toy manufacturers, precludes a finding that Mattel would have exploited the Bratz works, whether through direct production or licensing.  Mattel therefore cannot establish the requisite causal relationship between the alleged acts of racketeering and its claimed "lost opportunity" to promptly re-capture and thereafter exploit the Bratz intellectual property.

Profits

As discussed earlier, Mattel's conclusory reference to "lost profits" doesn't support injury to a recognized business or property interest, let alone concrete financial injury.  The cases upon which Mattel relies don't treat future *profits* as property, but instead treat future business relations and contracts as the "business or property" through which future profits can be realized.

1   *See, e.g.*, *Diaz*, 420 F.3d at 900.[40]  Mattel's expert report claims that Bratz sales caused Mattel to

2   suffer hundreds of millions of dollars in lost profits, but the evidence shows no contracts,

3   business relationships, or the like, of which Mattel was deprived.

4        The Court nevertheless considers the possibility that Mattel's retailer-clients pared down

5   their purchases of Mattel's products as a result of Bratz's growing popularity.  This argument

6   should be considered in light of the general rule that a competitor's predicate acts of

7   racketeering, not its legitimate conduct, must cause the alleged injury.  *See Anza*, 547 U.S. at

8   458.  Even assuming the sale of Bratz products was, in itself, an act of racketeering, Mattel still

9   cannot establish direct injury to its future revenues.  An internal Mattel report recognized dozens

10  of intervening factors, including "[a]ge compression accelerat[ion] as video game consumption

11  increases," a market-wide lag in overall consumer spending on toys, "[i]nfluence of

12  media/entertainment prompting girls to grow up and move away from Barbie at an earlier age,"

13  and "[g]irls spend[ing] less time playing with toys and more time on entertainment as they grow

14  older."  Ex. 08677 to MGA MSJ.  Indeed, the same report concluded that Bratz sales actually

15  rescued Mattel's products from an even worse decline: "MGA has captured today's older girls'

16  fashion driven aspirations, creating renewed demand for Fashion dolls within this segment."  *Id.*

17  Though mismanagement of the Barbie brand prevented Mattel from seizing a large share of the

18  new market created by Bratz, Mattel's MyScene product nevertheless benefitted from the

19  goodwill generated by the Bratz concept.  *See* Ex. 1805 to MGA MSJ.  Mattel, in short,

20  "thrive[d] on competition."  Am. Ninth Circuit Op. at 17346.

21        Mattel seeks to stave off this avalanche of evidence with the argument that Bratz eroded

22  Mattel's share of a *growing* market, a claim made in its expert's declaration.  Mattel accordingly

23  argues that a reasonable fact-finder could conclude that some of Mattel's lost profits were caused

24  by Bratz sales and that "Mattel need not precisely quantify its damages at this stage."  Mattel's

25  _____

26        [40] There isn't a consensus on whether future revenues, even when easily calculable,
    constitute "business or property."  *See Hemi Group*, 130 S.Ct. at 988 ("[We] do not

27  decide whether the City's allegations of lost tax revenue constitute an injury to its
    'business or property.'").

28

Statement of Genuine Issues in Response to MGA's Statement of Uncontroverted Facts ¶ 58 (citing *Potomac Elec. Power Co. v. Elec. Motor and Supply, Inc.*, 262 F.3d 260, 265 (4th Cir. 2001); *Williams v. Mohawk Indus., Inc.*, 465 F.3d 1277, 1288 (11th Cir. 2006); and *Bulletin Displays, LLC v. Regency Outdoor Adver., Inc.*, 518 F. Supp. 2d 1182, 1190 (C.D. Cal. 2007)). However, the deficiency in Mattel's claim arises not from its inability to adequately calculate damages, but from the absence of adequate directness between the racketeering and injury, a factor that all three cases cited by Mattel expressly considered.  *See, e.g.*, *Bulletin Displays*, 518 F. Supp. 2d at 1191 ("Bulletin clearly had a reduced, if not nil, chance of receiving a contract if indeed Regency had purchased the ability to exclude all other bidders from the process."); *Williams*, 465 F.3d at 1289 ("[T]he Supreme Court has already recognized a direct correlation between illegal hiring and lower wages."); *Potomac*, 262 F.3d at 265 ("[T]he finder of fact could infer from the fact that the parties bargained for expensive additional procedures that the cost of those procedures influenced the contract price.").

One need only look to Mattel's expansive trade secret misappropriation counter-claim to recognize the variety of ordinary competitive factors that affect a product (like Barbie)'s success or failure: forecasting, inventory management, marketing, retailer relationships, brand development, consumer preferences, demographic shifts, etc.  These factors completely undermine the directness of the relationship between Bratz sales and the sales of Mattel products.  *Cf. Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 542, 544 (1983) (recognizing that injury allegedly caused by violation of antitrust statute "may have been produced by independent factors" and apportioning loss could result in "additional long and complicated proceedings involving massive evidence and complicated theories").  Allowing Mattel to wait until trial to quantify the lost profits allegedly suffered as a result of Bratz sales does not cure the absence of a direct relationship, because the theory of liability is too expansive for civil RICO.  For example, under Mattel's theory, every other toy manufacturer could sue MGA under section 1964(c) claiming lost market share as a result of the

1   sale of Bratz dolls and the other alleged acts of racketeering.[41]

2       *Anza* explains how Mattel's interpretation of 1964(c) can embroil free enterprise in

3   muddled, expensive, and endless litigation.  In that case, a distributor of steel mill products that

4   fraudulently concealed its failure to charge state sales taxes to cash paying customers was sued

5   by its direct competitor.  The plaintiff alleged that defendant's tax evasion enabled it to "reduce

6   its prices without affecting its profit margin," thereby eroding plaintiff's market share and

7   profits.  547 U.S. at 454.  The Supreme Court held that section 1964(c)'s causation requirement

8   could not be satisfied because the plaintiff could not direct relationship between the pattern of

9   racketeering and the injury.  *Id.* at 458.  The Court recognized that, in the absence of such a

10  direct relationship, "intricate, uncertain inquiries [may] overrun[] RICO litigation."  *Id.* at 460.

11  The same is true here, where sorting through the dozens of factors that potentially caused

12  Mattel's alleged lost profits necessarily involves an "intricate, uncertain inquir[y]."

13      Mattel responds that "the issue in *Anza* was the plaintiff's failure to attribute the

14  defendant's ability to lower its prices (the cause of plaintiff's injury) to the defendant's

15  fraudulent conduct, not the failure to attribute the plaintiff's injury to the defendant's lower

16  prices."  Mattel Opp'n to MGA MSJ at 95:22-25.  To the contrary, one of the pillars for the *Anza*

17  decision was the fact that "[b]usinesses lose and gain customers for many reasons, and it would

18  require a complex assessment to establish *what portion of Ideal's lost sales were the product of*

19  *National's decreased prices*."  547 U.S. at 459 (emphasis added).  Such considerations have

20  "particular resonance when applied to claims brought by economic competitors, which if left

21  unchecked, could blur the line between RICO and the antitrust laws."  *Id.* at 460.

22  _____

23      [41] Mattel argues that "Hasbro is not the plaintiff here; Mattel, the direct victim of
    the alleged wrongdoing, is."  Mattel Opp'n to MGA MSJ at 95:19-20.  This argument
24  conflates the different injuries suffered by Mattel, some of which (loss of trade secrets)
    were unique to Mattel and others (loss of profits) were not.  Mattel suggests that MGA's
25  deliberate attempts to eat into Mattel's market share establishes *intent*, which would
    distinguish Mattel's claim from other manufacturers' potential claims.  Intent, however, is
26  immaterial to RICO's proximate cause inquiry.  *See Anza*, 547 U.S. at 460 (holding that
    plaintiff cannot "circumvent the proximate cause requirement simply by claiming that the
27  defendant's aim was to increase market share at a competitor's expense").

28

1   Mattel is nonetheless correct that another, independent, support for the Supreme Court's

2   decision in *Anza* was the absence of a direct relationship between the pattern of racketeering and

3   the conduct that allegedly caused the harm.  *See id.* at 458-49 ("National, however, could have

4   lowered its prices for any number of reasons unconnected to the asserted pattern of fraud.").  The

5   same is true here.  The success of the Bratz brand resulted, in significant part, from MGA's

6   "hard work[,] creativity, . . . [and] legitimate efforts."  Am. Ninth Circuit Op. at 17333.

7   Separating out the impact of MGA's "legitimate efforts" on the success of the Bratz would

8   require the same "intricate" and "uncertain" inquiry that the Supreme Court sought to forestall in

9   the *Anza* case.

10   <u>Monetary and Equitable Relief</u>

11   Mattel also alleges that it had a business or property interest in the judgments, whether

12   potential or actual, realized through the phase 1 proceedings in this case.  4AAC ¶ 124.  The

13   Ninth Circuit and this Court have since vacated the equitable relief and monetary damages

14   awarded to Mattel following the phase 1 trial.  Mattel therefore suffered no concrete financial

15   injury to its business or property as a result of counter-defendants' patterns of racketeering.  To

16   the extent Matttel claims that counter-defendants' patterns of racketeering caused injury to its

17   ability to recover *future* judgments against MGA, its claim fails section 1964(c)'s requirements

18   for concreteness.  *Lincoln House, Inc. v. Dupre*, 903 F.2d 845, 847-48 (1st Cir. 1990).

19   Mattel also cannot establish that any of counter-defendants' patterns of racketeering

20   caused a hypothetical injury to Mattel's ability to recover from MGA.  Mattel specifically

21   alleges that counter-defendants' acts of obstruction of justice and spoliation, as well as a

22   fraudulent transfer of MGA's intellectual property interests to a Larian-controlled entity named

23   Omni 808 Investors, LLC, inhibited Mattel's ability to recover the Bratz intellectual property

24   and a monetary judgment from MGA.  Mattel's claim is not only contingent on the actual

25   recovery of (some portion of) the Bratz intellectual property and monetary relief, but it requires

26   the Court to prospectively apportion the impact of counter-defendants' racketeering acts upon

27   the trial proceedings in this matter, the jury's deliberations, and the Court's decisions.  For these

28   reasons, as well as the reasons identified in the Court's order granting Omni 808 Investors,

1  LLC's motion to dismiss, no reasonable fact-finder could conclude that Mattel suffered injury to

2  a business or property interest in a hypothetical future judgment by reason of counter-

3  defendants' patterns of racketeering activity.

### 3.  Conspiracy to Violate Section 1962(c)

5  Mattel's second counter-claim alleges that Larian, MGAE, Bryant, MGA HK, MGA

6  Mexico, Machado, and two investment vehicles allegedly created by Larian conspired by

7  "furthering, promoting, and facilitating" a criminal enterprise.  The Court previously dismissed

8  this counter-claim as to the two Larian investment vehicles.

9  To prevail on this counter-claim, Mattel must establish that counter-defendants conspired

10  to violate one of RICO's substantive provisions and it suffered injury to business or property by

11  reason of an overt act of racketeering in furtherance of the conspiracy.  *Beck v. Prupis*, 529 U.S.

12  494, 500, 120 S.Ct. 1608 (2000).  Mattel may recover from "co-conspirators who might not

13  themselves have violated one of the substantive provisions of § 1962" because a conspirator can

14  be held "vicariously liable for the underlying tort[s]" committed by his co-conspirators.  *Id.* at

15  500-07 (quoting *Halberstam v. Welch*, 705 F.2d 472, 479 (D.C. Cir. 1983)).

16  For the reasons discussed above, however, Mattel cannot establish that it suffered

17  concrete financial injury to business or property.  Even if it could, Mattel cannot establish that

18  the injury to any property interest, including its property interest in the Bratz works, shared a

19  direct relationship with *any* of counter-defendants' acts of racketeering.  Any lost profits or lost

20  opportunity that Mattel suffered as a result of the loss of its interest in the exclusive use and

21  confidentiality of the Bratz trade secret materials was also not the proximate result of any of the

22  alleged acts of racketeering; dozens of intervening variables, like market forces, consumer

23  preferences, and MGA's legitimate efforts, fueled the success of the Bratz line.

### 4.  Disposition

25  To prevail on its first counter-claim, Mattel would need to establish that a counter-

26  defendant conducted, or participated in the conduct of, the affairs of an enterprise through a

27  pattern of racketeering that (1) was the "but for" cause and (2) the proximate cause of

28  (3) concrete financial injury to (4) a recognized business or property interest.  To prevail on its

1   second counter-claim, Mattel would need to establish that counter-defendants conspired to

2   conduct, or participate in the conduct of, the affairs of an enterprise through a pattern of

3   racketeering activity, and that (1) an act of racketeering in furtherance of the conspiracy was

4   (2) the "but for" cause and (3) the proximate cause of (4) concrete financial injury to (5) a

5   recognized business or property interest.  Both counter-claims fail for the reasons discussed

6   above.

7        Specifically, Mattel cannot establish that the deprivation of its interest in the exclusive

8   use and confidentiality of its trade secret materials corresponded with any concrete financial

9   injury.  Mattel also cannot establish that the loss of its employees' loyalty and honest services

10  corresponded with concrete financial injury.

11       Nor can Mattel establish that *any* of its alleged injuries, including the lost interest in the

12  confidentiality and exclusive use of the Bratz trade secret materials, was suffered by reason of an

13  act of racketeering.  First, Mattel cannot establish that any alleged act of racketeering committed

14  by Bryant, MGAE, Larian, and MGA HK was the "but for" and "proximate" cause of Mattel's

15  lost interest in the confidentiality and exclusive use of the Bratz trade secret materials. Mattel

16  also cannot establish that any act of racketeering was the "but for" and "proximate" cause of the

17  lost opportunity to use the Bratz works or the lost profits allegedly suffered as a result of the

18  works' misappropriation to MGA.  Second, Mattel cannot establish that any act of racketeering

19  was a "but for" and "proximate" cause of any injury to Mattel's interest in the confidentiality

20  and exclusive use of the non-Bratz materials.  Mattel also cannot establish that any of

21  racketeering was the "but for" or "proximate" cause of any unspecified lost profits that resulted

22  from the alleged misappropriation of such materials.

23       Neither the first nor second counter-claims meet section 1964(c)'s requirements.  MGA

24  and Machado's motions are therefore granted as to both counter-claims.

25       **B.       Section 1964(c) Elements — MGA's Counter-Claim in Reply**

26       MGA's RICO counter-claim in reply is similarly deficient.  MGA alleges that Mattel

27  dispatched members of its Market Intelligence group to fraudulently obtain access to MGA's toy

28  fair showrooms, at which MGA advertised forthcoming products to retailers.  MGA claims that

Mattel conducted or participated in the conduct of an enterprise's affairs through a pattern of racketeering activity that consisted of the following predicate acts: (1) wire fraud; (2) copyright infringement; (3) spoliation; and (4) obstruction of justice. MGA claims it suffered an injury to its interest in the confidentiality and exclusive use of the information misappropriated by Mattel, and also suffered corresponding lost profits. MGA also claims that it was the victim of a wrongfully imposed injunction as a result of Mattel's withholding of evidence about its market intelligence group and other issues prior to the phase 1 trial.

MGA cannot establish concrete financial injury to a business or property interest. First, MGA cannot identify any contracts or retailer relationships affected by Mattel's alleged pattern of racketeering activity. Its claimed injury to its interest in the exclusive use and confidentiality of the materials displayed in its toy fair showrooms is anything but "concrete." Second, for the reasons discussed earlier, claimed "lost profits" are merely a measure of loss that flows from the injury to a business or property interest. Even if MGA's "future profits" can be considered "business or property," MGA cannot establish the concreteness of any injury to such interest.

Nor can MGA establish any connection between the acts of racketeering and its alleged injuries. Mattel's alleged pattern of racketeering did not cause direct injury to MGA's interest in the exclusive use of confidentiality of its trade secret materials. First, Mattel's alleged failure to timely produce evidence about the activities of its market intelligence group post-dated the group's actual misconduct, which is alleged to have occurred between 1992 and August 16, 2010, when MGA filed its counter-claims in reply. No reasonable fact-finder could conclude that Mattel's alleged concealment of evidence was either a "but for" or "proximate" cause of the group's members gaining access to Mattel's toy fair showrooms, obtaining information about MGA's future product lines, and disseminating such information to other Mattel employees. Second, the relationship between MGA's alleged injury and Mattel's acts of criminal copyright infringement are even more attenuated, since the theft of such materials was necessarily complete at the time of their re-publication in presentations to Mattel's executives. Third, Mattel's alleged acts of mail and wire fraud, which include emails disseminating the information collected from MGA's toy fair showrooms and emails, necessarily occurred *after* the alleged

1    theft had been completed.  *See* MGA Opp'n to Mattel MSJ re Counterclaims-in-Reply at 46.  No

2    reasonable fact-finder could conclude that these after-the-fact communications proximately

3    caused a theft that had already occurred.

4         Mattel's pattern of racketeering also did not cause direct injury to MGA in this litigation.

5    MGA identifies the following acts of litigation misconduct: (1) failing to produce evidence

6    relevant to MGA's statute of limitations defense prior to the phase 1 proceedings; (2) failing to

7    produce evidence concerning the market intelligence group prior to the phase 1 proceedings; and

8    (3) inducing Vargas to commit perjury during his deposition.  MGA claims that some of these

9    acts resulted in the prior district court's issuance of a equitable relief that, though vacated on

10   appeal, caused significant damage to MGA's business opportunities.  MGA claims that Mattel's

11   abuse of the discovery process "deceive[d] a federal judge into believing that Mattel was good

12   and MGA was evil, thus procuring a wrongful injunction against MGA that deprived MGA of

13   the sales of numerous Bratz products, interfered with MGA's relationships with retailers,

14   interfered with MGA's relationships with licensees, destroyed an estimated one billion dollars []

15   in brand equity, and nearly drove MGA out of business."  Counter-Claims in Reply ¶ 5.

16        These unfocused allegations have no support in the factual record and irresponsibly

17   attempt to attribute a district court's decisions about equitable relief to Mattel's non-production

18   of documents.  The undisputed evidence establishes that the equitable relief awarded by the

19   district court had nothing to do with the activities of the market intelligence group and was the

20   product of a careful and reasoned, albeit incorrect, application of the law by the district court.

21   MGA's suggestion that the district court disregarded its duty to apply the law and simply acted

22   on the basis of its instinct about whether one party was good and the other evil has no support in

23   the record.  And even if the district court made its decisions on the basis of its feelings about the

24   parties, instead of the law, MGA cannot show that the district court would have considered

25   MGA any less "evil" and Mattel any less "good" after reviewing evidence about the market

26   intelligence group's conduct.  *Bridge*, 553 U.S. at 660 ("[T]he plaintiff will not be able to

27   establish even but-for causation if no one relied on the misrepresentation.").

28        MGA's counter-claim in reply fails in all respects to satisfy section 1964(c)'s

146

1  requirements.  MGA cannot establish concrete financial injury to a recognized business or

2  property interest.  MGA also cannot show that any of Mattel's acts of racketeering was a "but

3  for" and "proximate" cause of any injury.  Mattel's motion for summary judgment is therefore

4  granted as to MGA's second counter-claim in reply.

5  **C.  Section 1962(c) Elements — Mattel's First Counter-Claim**

6  Since Mattel cannot establish injury to business or property by reason of a violation of

7  section 1962(c) or 1962(d), the Court need not reach the issue of whether Mattel can prove the

8  underlying violations of those sections of the RICO statute.  MGA has, however, challenged the

9  adequacy of Mattel's proof on these issues.  In an effort to clarify the record in anticipation of an

10  eventual appeal and cross-appeal, the Court turns to MGA's arguments.

11  **1.  Enterprise**

12  The RICO statute makes it illegal for a person associated with or employed by an

13  interstate enterprise to "conduct or participate, directly or indirectly, in the conduct of such

14  enterprise's affairs through a pattern of racketeering activity."  18 U.S.C. § 1962(c).  The statute

15  defines the term enterprise to include "any individual, partnership, corporation, association, or

16  other legal entity, and any union or group of individuals associated in fact although not a legal

17  entity."  *Id.*, § 1961(4).  To prove that a group of individuals associated-in-fact to form an

18  enterprise covered by the RICO statute, a plaintiff must establish that the enterprise formed by

19  the individuals had three attributes: (1) a common purpose; (2) relationships among the

20  members; and (3) continuity.  *Boyle v. United States*, ___ U.S. ___, 129 S.Ct. 2237, 2245-46 n.2

21  (2009); *see also United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524 (1981).  Because

22  an associated-in-fact enterprise can operate with some fluidity and informality, its existence is

23  "oftentimes more readily proven by 'what it does, rather than by abstract analysis of its

24  structure.'" *United States v. Coonan*, 938 F.2d 1553, 1559-60 (2d Cir. 1991) (quoting *United

25  States v. Bagaric*, 706 F.2d 42, 55 (2d Cir.), *cert. denied*, 464 U.S. 840, 104 S.Ct. 133 (1983)).

26  Mattel alleges that the counter-defendants to its first counter-claim conducted, or

27  participated in the conduct of, the affairs of an associated-in-fact enterprise composed of MGAE,

28

MGA Mexico, MGA HK, Larian, Machado, and Bryant.[42]  MGA argues that the enterprise lacked a common purpose because MGA (1) didn't know Bratz belonged to Mattel; (2) didn't know Bryant continued to work for Mattel after entering into a contract with MGA; and (3) didn't know that Machado, Vargas, and Trueba downloaded confidential information prior to their joint resignation from Mattel Servicios.  However, contrary to MGA's arguments, each of these issues is unfit for resolution at summary judgment.  For instance, MGA argues that the ambiguities in the Inventions Agreement preclude a reasonable fact-finder from concluding that Larian "shared an intent with Bryant to steal Bratz."  But, even if this argument were valid, Mattel could *lose* on its theory of contract interpretation and still win by proving that Bryant sculpted and sketched Bratz during his working hours and that Larian knew about it.  And there's no reading of the Inventions Agreement that would permit Bryant to exercise ownership of the drawings and sculpts if a fact-finder concludes that Bryant created these works while at Mattel.  In addition, the Court has already concluded that there are genuine issues of material fact as to whether MGA shared a purpose with Machado, Vargas, and Trueba to misappropriate Mattel's information and deprive Mattel of the honest services of its employees.

### 2.    Distinctness

Mattel must also establish that each counter-defendant to its first counter-claim was distinct from the enterprise.  *See Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161, 121 S.Ct. 2087 (2001).  MGA argues that MGAE was not distinct from an enterprise composed of itself, its subsidiaries, and its employees.  The Court rejected MGA's argument in its Order on the Motions to Dismiss, noting that "Bryant and Machado weren't always employed by MGA."

MGA now argues that the enterprise should be deemed non-distinct from MGAE at all times that Bryant and Machado weren't professionally associated with MGAE or MGA Mexico.  This argument appears to find support in the general rule that the person and enterprise must be "sufficiently distinct . . . at the time that the alleged RICO violations occurred."  *Bessette v. Avco Fin. Svcs., Inc.*, 230 F.3d 439, 449 (1st Cir. 2000); *see also Jacobson v. Cooper*, 882 F.2d 717,

---

[42] Mattel's request to add Cabrera, Morales and Salazar as members is denied.

719-20 (2d Cir. 1989).  However, Bryant worked as an independent contractor for MGAE and was never employed by the company.  The Ninth Circuit has previously held that an associated-in-fact enterprise composed of a corporation and its independent contractors can be sufficiently distinct from the corporation itself.  *See Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 362 (9th Cir. 2005).  The critical question is whether the independent contractor was "professionally independent" from the corporation with which he associated-in-fact.  *Id.*; *see also Allstate Ins. Co. v. Etienne*, 2010 WL 4338333 (E.D.N.Y. Oct. 26, 2010) (finding exclusivity of independent contractor relationship relevant to distinctness).  There is a genuine issue of material fact as to whether Bryant was "professionally independent" from MGAE.  The Court accordingly finds that the issue of whether MGAE was distinct from the enterprise composed of MGAE, its independent contractor, its subsidiaries, and one of its subsidiary's employees fit for resolution by the fact-finder.

### 3.     Pattern of Racketeering Activity

To establish liability under section 1962(c), both Mattel and MGA must prove that the other conducted, or participated in the conduct of, the affairs of the alleged enterprises through a pattern of racketeering activity.  18 U.S.C. § 1962(c).  The commission of at least two acts of racketeering within a ten year period can constitute a "pattern of racketeering activity."  *Id.*, § 1961(5); *see also id.*, § 1961(1) (identifying predicate acts of racketeering).  The acts of racketeering must be related and "amount to or pose a threat of continued criminal activity." *Turner v. Cook*, 362 F.3d 1219, 1229 (9th Cir. 2004) (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239, 109 S.Ct. 2893 (1989)).  Continuity is established by (1) a series of predicate acts "over a substantial period of time" that "threaten[s] . . . future criminal conduct" or (2) "a form of predicate misconduct that 'by its nature projects into the future with a threat of repetition.'" *Turner*, 362 F.3d at 1229 (quoting *Religious Tech. Ctr. v. Wollersheim*, 971 F.2d 364, 366 (9th Cir. 1992)).

MGA argues that no counter-defendant could have engaged in a pattern of racketeering because "the first RICO enterprise lasted for at most 33 days, and the second for at most 78 days."  MGA MSJ at 87:18-19.  However, Mattel doesn't allege two enterprises; it alleges a

1   single enterprise composed of the counter-defendants to its first counter-claim.  4AAC ¶ 123.

2   MGA's argument appears to rest on the faulty premise that MGAE's potential lack of

3   distinctness from the enterprise during the period of time when Bryant and Machado were

4   employed by MGAE affects the cognizability of the enterprise.  The Court has already rejected

5   this argument.  *See* Dkt. 8423 at 6:12-16 ("[T]he manner in which the enterprise must be

6   constituted . . . is unrelated to whether the person must be distinct from the enterprise.").  Even if

7   MGAE wasn't distinct from the alleged enterprise for some period of time, that doesn't mean

8   that the enterprise didn't exist or that the other counter-defendants to the first counter-claim

9   weren't always distinct from the enterprise.

10        Machado, however, did not engage in a pattern of racketeering.  Mattel alleges that

11   Machado committed the following predicate acts of racketeering: (1) using the interstate mails or

12   wires to execute a scheme to defraud Mattel of the confidentiality and exclusive use of its trade

13   secret materials and its employees' honest services; (2) spoliation and obstruction of justice by

14   running system cleaning software; (3) Travel Act violations by accepting MGA's bribes; and

15   (4) criminal copyright infringement by using Mattel's misappropriated trade secrets.  However,

16   "Machado's receipt of bribes, betrayal of Mattel, and misappropriation of trade secrets was

17   concentrated between the start of 2004 when he met Susana Kuemmerle [] and April 19, 2004[,]

18   when he made off with Mattel's trade secret information."  *Id.* (citing 4AAC ¶¶ 43-51).  To this,

19   Mattel offers five unconvincing responses.

20        First, Mattel claims that Machado continued to orchestrate the theft of Mattel's trade

21   secret information even after he started working for MGA Mexico.  Machado's colleague,

22   Vargas, testified at deposition that Machado engaged the services of a "messenger" named

23   "Jorge," who Mattel claims "deliver[ed] additional Mattel documents to [Machado] for months

24   after Machado joined MGA Mexico."  Mattel Opp'n to Machado MSJ at 9:3-5.  However,

25   Mattel has no evidence that Machado used, or caused "Jorge" to use, the interstate mails or wires

26   to execute any scheme to defraud Mattel of these materials.  Such conduct cannot consequently

27   serve as a predicate act in a pattern of racketeering by Machado.

28        Second, Mattel claims that Machado continued to run "wiping software" on his hard drive

1  well after his resignation from Mattel Servicios.  However, the "wiping software" to which

2  Mattel refers was merely standard software meant to enhance hardware performance.  Outside of

3  Mattel's unsubstantiated speculation, there is no evidence that Machado engaged in acts of

4  spoliation or obstruction of justice after joining MGA Mexico.

5      Third, Mattel claims that Machado's use of the misappropriated Mattel materials, which

6  allegedly occurred until at least 2008, also constituted mail or wire fraud because the "scheme

7  was both to take and use the property while evading discovery and judicial intervention."  Mattel

8  Opp'n to MGA MSJ at 10:24-25.  The Court has already held that "[t]he subsequent use of

9  Mattel's trade secret[s] did not execute a scheme to defraud Mattel of its right to maintain the

10  secrecy of its confidential and trade secret information."  Dkt. 8423 at 15:9-10.  To the extent the

11  scheme also aspired to use such information, it was not a scheme to defraud proscribed by the

12  mail and wire fraud statutes, because Mattel only had a property interest in the *exclusive* use, not

13  just any use, of its trade secret materials.  *Id.* ("Mattel's ability to 'decide how to use' its

14  confidential information . . . can be lost but once.") (citing *Carpenter*, 484 U.S. at 25-27).

15      Fourth, Mattel claims that Machado committed acts of criminal copyright infringement

16  for years after joining MGA Mexico.  He allegedly infringed not only the Bratz works, but the

17  other trade secret materials he misappropriated.  However, Machado merely worked for MGA

18  Mexico and distributed Bratz products; there is no allegation that he participated in MGA's

19  alleged acts of infringement of the Bratz works.  Moreover, the other trade secret works

20  allegedly misappropriated by Machado weren't even registered with the Copyright Office, and

21  no reasonable fact-finder could conclude that Machado *willfully* infringed any copyrights in

22  these items.  *Cf. Bischoff v. Waldorf*, 660 F. Supp. 2d 815 (E.D. Mich. 2009).

23      Fifth, Mattel claims that Machado's misconduct is open-ended because it would have

24  extended into the indefinite future absent Mattel's intervention.  To the contrary, Machado's

25  alleged racketeering was prototypically closed-ended: he stopped working for Mattel on April

26  19, 2004, after which date he no longer could have exploited his position of trust with the

27  company to misappropriate its trade secret materials.

28      Mattel therefore cannot establish that Machado conducted a pattern of racketeering

1  activity, although it may have been able to establish that MGAE, Larian, MGA HK, and MGA

2  Mexico conducted patterns of racketeering activity.

### 4. Acts of Racketeering

4  `      MGA also argues that no reasonable fact-finder could conclude that it engaged in each of

5  the individual acts of racketeering alleged in the 4AAC.  Mattel alleges that MGAE and Larian

6  engaged in acts of mail and wire fraud, criminal copyright infringement, spoliation and

7  obstruction of justice, and commercial bribery.  Mattel also alleges that MGA HK and MGA

8  Mexico engaged in acts of mail and wire fraud and criminal copyright infringement.

### (a) Mail and Wire Fraud

10  Mattel alleges that MGAE, Larian, Machado, MGA Mexico, and MGA HK:

11           devised a scheme or artifice to defraud Mattel of its rights to receive

12           honest services from its employees and to maintain the secrecy of its

13           confidential and trade secret information and property; to transfer the

14           ill-gotten gains from such thefts and wrongs, secret MGA assets and

15           purportedly obtain priority over Mattel; and to obstruct the judicial

16           process and thwart the verdicts of the jury and Orders of the Court,

17           including by failing to preserve Mattel's property.

18  4AAC ¶ 124(a)-(b).

19        Each element of this scheme could have involved the acquisition of property by false or

20  fraudulent pretenses, as the mail and wire fraud statutes require.  18 U.S.C. §§ 1341, 1343.  First,

21  an employer has an interest in the honest services of its employees, which may be deprived

22  through the employee's acceptance of a third party's bribes or kickbacks.  18 U.S.C. § 1346; *see*

23  *also Skilling v. United States*, ___ U.S. ___, 130 S.Ct. 2896, 2928 (2010); *United States v.*

24  *Procter & Gamble Co.*, 47 F. Supp. 676, 678 (D. Mass. 1942).  Second, an employer has a

25  property interest in its trade secret information, of which it can be defrauded.  *Carpenter*, 484

26  U.S. at 25.

27        MGA argues that it never "devised or intended to devise any scheme to defraud," and

28  cites its repeated admonitions to departing Mattel employees to not "steal any of Mattel's trade

secret information or property, or [] deny Mattel the benefit of their honest services while employed by Mattel." MGA MSJ at 90:14-22. However, the Court has already found that genuine issues of material fact preclude the entry of summary judgment on the issue of MGA's complicity in the alleged theft of Mattel's trade secret materials.

(b)      Violation of the Travel Act

MGA also argues that Mattel cannot establish a violation of the Travel Act, which can be found at 18 U.S.C. § 1952. To establish that MGAE and Larian violated the Travel Act, Mattel would need to prove (1) interstate travel or use of interstate facilities (2) with intent to promote unlawful activity (3) followed by promotion or attempted promotion of the unlawful activity. 18 U.S.C. § 1952. Such unlawful activity includes "extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States." *Id.* In this case, Mattel alleges a violation of California Penal Code Section 641.3, which makes it unlawful to "offer[] or give[] an employee money or any thing of value" in exchange for "using or agreeing to use his or her position for the benefit" of the person delivering the bribe. Cal. Penal Code § 641.3. The state statute prohibits violations committed "in whole or in part" in California. *Id.*

MGA attempts to cabin its alleged violation of the Travel Act to the issue of whether it bribed Cabrera, Morales, and Salazar. Though the Court's order on the motions to dismiss noted that "[t]he facts upon which Mattel's Travel Act claim is predicated can be found between paragraphs 85 and 90" of the 4AAC, which concern MGA's payments to Marlow, the Court also declined to dismiss Mattel's allegation that "MGA[E] and Larian [] brib[ed] Machado, Vargas, and Trueba in Mexico and Brisbois in Canada." Dkt. 8423 at 13. There are genuine issues of material fact as to whether MGA used money, or more likely the offer of future employment, to induce these employees to misuse their access to Mattel's confidential and trade secret information.

(c)      Criminal Copyright Infringement

MGA argues that it couldn't have engaged in willful infringement of Mattel's copyrights in Bryant's creative works, but the Court has already found genuine issues of material fact as to whether (1) the first generation Bratz dolls and two subsequent generation Bratz dolls infringed

1  Bryant's sketches; (2) MGA's production sculpts infringed Bryant's sculpts; and (3) MGA was

2  aware of Mattel's copyrights in the works at the time of infringement.

3  **D.   Section 1962(c) Elements — MGA's Counter-Claim in Reply**

4  MGA alleges that Mattel conducted the affairs of an associated-in-fact enterprise

5  composed of "Mattel (including various subsidiaries), its independent contractors including at

6  least Sharon Rahimi and Bain & Company, and lawyers from at least two outside law firms[:]

7  Quinn Emanuel Urquhart & Sullivan LLP and [] Basham Ringe Y Correa."  MGA

8  Counterclaims-in-Reply ¶ 4.

9  **1.   Enterprise**

10  The undisputed evidence establishes that the enterprise alleged by MGA neither shared a

11  common purpose nor operated as a continuing unit.  Although the enterprise members were all

12  associated with Mattel, the linkages end there.  Each member was retained in connection with a

13  different project: (1) Rahimi worked for Mattel in 2004 and 2005 and gathered information from

14  competitors' booths at toy fairs; (2) Quinn Emanuel was retained by Mattel in 2003 or 2004 to

15  work on this case; (3) Bain & Company was retained to prepare a report about MGA; and

16  (4) Basham Ringe Y Correa was retained to participate in a deposition.  Indeed, the very fact that

17  Basham, Bain, and Rahimi were each hired for one-off projects (none of which had anything to

18  do with each other) demonstrates the absence of purpose or unity.  No reasonable fact-finder

19  could therefore conclude that Mattel conducted the affairs of an enterprise, because MGA has

20  failed to plead an enterprise to begin with.

21  **2.   Distinctness**

22  Mattel argues that, since the alleged enterprise lacked a common purpose, relationships,

23  and continuity, all that remains of the enterprise is Mattel, which cannot be distinct from itself.

24  This argument conflates the enterprise and distinctness requirements.  If there was no enterprise

25  to begin with, then there was no enterprise from which Mattel could be distinct.

26  **3.   Predicate Acts**

27  MGA alleges that Mattel engaged in acts of wire fraud, criminal copyright infringement,

28  spoliation, and obstruction of justice.

(a)     Wire Fraud

MGA alleges that Mattel "devised a scheme or artifice to defraud MGA . . . from [sic] [its] trade secrets and other confidential information in order to acquire and maintain an unlawful competitive advantage" and used the interstate wires to execute the scheme.  MGA Counterclaims-in-Reply ¶ 315(a).  For this allegation to survive summary judgment, the evidence must show a genuine issue of material fact as to whether Mattel (1) devised or intended to devise a fraudulent scheme; and (2) used the wires for the purpose of executing that scheme. *Miller v. Yokohama Tire Corp.*, 358 F.3d 616, 621 (9th Cir. 2004).

Mattel argues that MGA has no evidence of a wrongful "scheme" because "no element of the scheme necessitated or even incidentally involved use of the wires."  Mattel MSJ re MGA Counterclaims in Reply at 46.  This argument conflates the existence of a wrongful scheme with the use of the interstate wires.  To the extent Mattel argues that it did not use the wires for the purpose of executing the alleged scheme, genuine issues of material fact preclude the entry of summary judgment on this issue.  Internal Mattel emails, for instance, disseminated the market intelligence group's research and a reasonable fact-finder could conclude that such communications, especially those sent by members of the market intelligence group, were made with the purpose of executing the alleged scheme.

(b)     Criminal Copyright Infringement

MGA alleges that Mattel criminally infringed its copyrights in the materials displayed in its toy fair showrooms by re-publishing such works in internal Mattel memoranda and displaying such materials to Mattel employees.  To prevail on its allegation of criminal copyright infringement, MGA must establish "infringement, that the infringement was willful, and that it was engaged in for profit."  *United States v. Billy*, 406 F. Supp. 726, 733 (E.D. Pa. 1975).  MGA cannot establish any of these elements.

Assuming MGA owned valid copyrights in the misappropriated works, Mattel's analysis of the works in company circulars and at company presentations was fair use.  First, Mattel's use of MGA's materials was *de minimis* and rarely did Mattel re-produce images or elements of MGA's works.  *Cf. Elvis Presley Enters., Inc. v. Passport Video*, 349 F.3d 622, 627 (9th Cir.

1    2003) (noting that "the quantity of the work taken and the quality of the importance of the

2    portion taken" are factors relevant to a determination of fair use).  Second, MGA's alleged

3    works contained factual information about MGA's products and "fair use is more likely to be

4    found in factual works than in fictional works."  *Stewart v. Abend*, 495 U.S. 207, 237 (1990).

5    Third, Mattel's use of MGA's copyrighted works "was not in competition with the copyrighted

6    use" and MGA has made no showing that Mattel's "subsequent use lessen[ed] the value of the

7    copyrighted work."  *Italian Book Corp. v. Am. Broadcasting Cos.*, 485 F. Supp. 65, 70

8    (S.D.N.Y. 1978).

9                          (c)      Spoliation and Obstruction of Justice

10          MGA alleges that Mattel engaged in spoliation by redacting evidence produced during

11   discovery, paying a severance package to a former member of its market intelligence group, and

12   disclaiming knowledge about the market intelligence group during depositions in this case.  No

13   reasonable fact-finder could conclude that such conduct occurred on the basis of the evidentiary

14   record.  For instance, MGA has no evidence that the questions it posed to witnesses in this case

15   required the disclosure of information reasonably possessed by the witnesses at the time of the

16   deposition.  MGA also has no witnesses that Mattel engaged any of the legion misconduct

17   alleged in the counterclaims-in-reply, including, for example, suborning false testimony from

18   Vargas.  The idle speculation offered by MGA is certainly insufficient to carry its burden of

19   proving that Mattel willfully destroyed material evidence in its possession that was subject to a

20   preservation obligation.  *In re Napster, Inc. Copyright Litig.*, 462 F. Supp. 2d 1060, 1078 (N.D.

21   Cal. 2006).  Nor can MGA prove that Mattel had a "[s]pecific intent to impede the

22   administration of justice," in light of the fact that all of the evidence allegedly concealed by

23   Mattel wasn't relevant to the phase 1 proceedings *and was subsequently produced.  United

24   States v. Ryan*, 455 F.2d 728, 734 (9th Cir. 1971).  There is no evidence of the serious

25   professional misconduct in which Mattel's outside counsel allegedly engaged.

26          **E.      Disposition**

27          Mattel cannot establish injury to business or property by reason of a violation of sections

28   1962(c) and (d).  MGA cannot establish injury to business or property by reason of a violation of

1  section 1962(c).  Summary judgment is therefore entered on Mattel's first and second counter-

2  claims and MGA's second counter-claim in reply.

3  　　　Mattel also cannot establish that Machado conducted, or participated in the conduct of, an

4  enterprise's affairs through a pattern of racketeering activity.  This is an independent basis on

5  which to grant summary judgment against Mattel on Mattel's first counter-claim against

6  Machado.

7  　　　MGA cannot establish that Mattel conducted, or participated in the conduct of, an

8  enterprise's affairs through a pattern of racketeering activity.  This is an independent basis on

9  which to grant summary judgment against MGA on MGA's second counter-claim in reply.

10  **XII.   MGA's Counter-Claim in Reply for Trade Secret Misappropriation**

11  　　　Since at least 1992, Mattel operated a small "market intelligence group" that, *inter alia*,

12  attended the various international toy fairs held each year, including the Hong Kong Toy Fair,

13  the Nuremberg Toy Fair, the New York Toy Fair, the Pomona Toy Fair, the Tokyo Toy Fair, and

14  the E3 (Electronic Entertainment Expo).  Toy manufacturers operate toy showrooms at these toy

15  fairs and invite retailers and sometimes journalists to come view forthcoming product lines.  The

16  major toy fairs occur between January and May of each year, so that retailers can place orders

17  and manufacturers can produce toys in anticipation of the year-end holiday shopping season.

18  　　　Mattel wanted a window into its competitors' upcoming products.  It accordingly

19  dispatched members of its market intelligence group to these international toy fairs, and directed

20  these employees to pose as retailers or members of the press in order to gain access into

21  competitors' showrooms.  Mattel's gumshoes were directed to claim to belong to "reasonably

22  small" stores and prepare canned responses to questions about "what type of toys you sell,"

23  "how many employees" belonged to the made up retailer, "where exactly your store is located"

24  and "how many stores you have."  MGA Opp'n to Mattel MSJ re Counterclaims in Reply, Ex.

25  9640.  They were cautioned to "either put down your home phone number or make up a fake

26  number" but not to "put down your Mattel number."  *Id.*  To avoid detection, they were directed

27  to make appointments to view competitors' showrooms while at the toy fair, and not beforehand,

28  so as to avoid a "background check on your store."  *Id.*

1    Using these tactics, Mattel learned about its competitors.  For years, members of its

2    market intelligence group returned home from toy fairs with information about competitors'

3    products.  A 2002 internal Mattel memorandum reported on two Mattel employees who "walked

4    the MGA showroom" and learned of a "'refresh' released in June/July that includes one new

5    female character, Sasha" in addition to new fashions and products like Bratz Funk N' Glow,

6    Bratz Boyz, Bratz Mobile, Bratz Funky Fashion Makeover, Bratz Secret Safe, Bratz Spa Playset,

7    Micro Bratz, and various fashion accessories.  MGA Opp'n to Mattel MSJ re Counterclaims in

8    Reply, Ex. 9643.  In 2004, Mattel retained an independent contractor named Sharon Rahimi

9    charged with the assignment of laying bare MGA's future product lines.  Rahimi, who had

10   previously worked for Mattel between 1997 and 2000, gained access to MGA's showrooms at

11   the New York Toy Fair in 2003 and 2004 by claiming to be a freelance writer when, in fact, she

12   was working for Mattel.  Deposition of Sharon Rahimi, dated September 16, 2010, at 53.

13   Rahimi thereafter prepared reports for Mattel that disclosed competitors', including MGA's,

14   forthcoming products.  MGA Opp'n to Mattel MSJ re Counterclaims in Reply, Exs. 9603, 9604,

15   9605, 9606.   The contents of these reports were shared throughout Mattel's corporate hierarchy.

16               **A.       Statute of Limitations**

17       Mattel argues that the statute of limitations has run on MGA's counter-claim in reply for

18   trade secret misappropriation.  MGA needed to have brought this claim within "three years after

19   the misappropriation is discovered or by the exercise of reasonable diligence should have been

20   discovered."  Cal. Civ. Code § 3426.6.

21               **1.       Date of Accrual**

22       The date of accrual depends on whether this counter-claim in reply was compulsory.  "[A]

23   compulsory counterclaim relates back to the time of the filing of the plaintiff's complaint,"

24   which in this case is Mattel's 4AAC.  *See Kirkpatrick v. Lenoir County Bd. of Educ.*, 216 F.3d

25   380, 388 (4th Cir. 2000); *see also Employers Ins. of Wausau v. United States*, 764 F.2d 1572,

26   1576 (Fed. Cir. 1985).  Mattel now argues that the Court's prior conclusion that MGA's counter-

27   claim in reply was compulsory was reached without the benefit of a developed factual record,

28   which, Mattel asserts, reveals the absence of a logical relationship between Mattel's counter-

1   claims and MGA's counter-claim in reply.

2          The Court predicated its conclusion on the logical relationship between Mattel's

3   allegation that Machado "stole virtually every document a competitor would need to enter the

4   Mexican market" and MGA's allegation that Machado received at least some of the internal

5   Mattel memoranda disseminated by the market intelligence group.  The Court also cited Mattel's

6   allegation that Brawer engaged in wide-spread document theft, which bore a logical relationship

7   to MGA's allegation that Brawer (a Mattel executive) received some of the reports prepared by

8   members of Mattel's market intelligence group.  Mattel now claims that discovery has revealed

9   that none of the documents and information misappropriated by Brawer or Machado overlap

10  with the memoranda prepared by the market intelligence group.

11         However, the determination of whether a counter-claim is compulsory is made at the time

12  the pleading is filed, not at the end of discovery or at summary judgment.  *See Albright v. Gates*,

13  362 F.2d 928, 929 (9th Cir. 1987).  A rule allowing perpetual reconsideration of whether

14  discovery has revealed the absence of a logical relationship between a claim and a counter-claim

15  wastes judicial resources, fosters uncertainty, and encourages the strategic use of the discovery

16  process.  If Mattel wanted to limit the scope of MGA's potential counter-claims in reply, it

17  shouldn't have broadly and vaguely pled its own counter-claims.

18         The Court's prior ruling stands.  MGA's counter-claims in reply relate back to the date of

19  Mattel's 4AAC, which itself relates back to Mattel's November 20, 2006 pleading.

                        **2.      Date of Discovery**

21         Mattel argues that "[e]ven assuming MGA's trade secret claim relates back to Mattel's

22  November 20, 2006 pleading, it is time barred if it accrued before November 20, 2003."  Mattel

23  MSJ re Counterclaims in Reply at 76:5-6.  Mattel points to the fact that MGA employee Paula

24  Garcia, who left Mattel for MGA in 2000, claimed to have seen a Mattel employee in an MGA

25  showroom.  Larian Depo. (30(b)(6)), dated August 12, 2010, at 4020 (recalling conversation

26  with Garcia in which she recounted seeing Mattel employee at a *prior* toy fair showroom).  Not

27  only is Larian's testimony about Garcia's statement inadmissible hearsay, but it has little

28  relevance to the timing of Garcia's knowledge.  Mattel has no evidence that Garcia knew about

1  the conduct of Mattel's market intelligence group's infiltration of MGA's showrooms at the time

2  she joined MGA.  Indeed, there is no evidence in the record that MGA even operated

3  showrooms at the major toy fairs before the 2001 release of the Bratz line of dolls.

4      **B. Economic Value**

5    Mattel argues that information MGA disclosed to retailers and some journalists at its toy

6  showrooms did not derive "independent economic value . . . from not being generally known to

7  the public or to other persons who can obtain economic value from its disclosure or use."  *See*

8  Cal. Civ. Code § 3426.1(d)(1).  Mattel contends that the product information shared at MGA's

9  toy fairs actually obtained value "from being known to the public" since "the very purpose of toy

10  fairs . . . is to 'publicize and sell product.'" Mattel MSJ re Counterclaims in Reply at 30-31.

11    However, as explained above, information about forthcoming products can have value

12  prior to the release of such products is valuable because the manufacturer can profit from the

13  primacy of its product.  The mere fact that journalists and retailers received advance notification

14  of forthcoming products, in order to ensure a seamless rollout, doesn't diminish the value MGA

15  may have obtained from keeping the fact of the products' release secret in order to prevent

16  competitors from mimicking MGA's ideas or tailoring their product lines to interfere with

17  MGA's relationships with retailers.

18      **C. Efforts to Maintain Secrecy**

19    Mattel also argues that MGA did not take reasonable efforts to maintain the secrecy of the

20  information shared at its toy fair showrooms.  There is, however, a genuine issue of material fact

21  as to this issue.  On the one hand, MGA occasionally allowed the press to access its toy

22  showrooms in order to view select products, even without imposing a non-disclosure obligation.

23  Information about MGA's products was also occasionally displayed at "planogram" rooms

24  operated by retailers in advance of the shopping season.  However, the very Mattel employees

25  that gained access to MGA's showrooms acknowledged that their surreptitious and deceptive

26  conduct was necessary to gather information about MGA's forthcoming products.  And MGA

27  has produced evidence that it took special precautions to prevent the disclosure of product

28  information displayed in its retailers planogram rooms, including, for example, ensuring that

1   "girl's brand[s] [were] planogramed in a separate planogram room where no other Toy Vendor's

2   [sic] are allowed admittance."  Declaration of Julie Bodden in Support of MGA Opp'n to Mattel

3   MSJ re Counterclaims in Reply, Ex. A.  It is for the fact-finder to resolve whether MGA's efforts

4   to maintain the secrecy of its trade secret information were reasonable under the circumstances,

5   since the disclosure of such information to retailers and journalists could have been accompanied

6   by an "implied obligation to not use or disclose it" for a specified period of time.  *Kewanee Oil*

7   *Co. v. Bicron Corp.*, 416 U.S. 470, 475 (1974).

8        Mattel also argues that information about MGA's forthcoming products was readily

9   ascertainable, noting that MGA occasionally made statements to the press about its products

10   even prior to the toy fairs at which those products were previewed to retailers and journalists.

11   However, the press releases cited by Mattel certainly don't reveal the depth of information

12   available to retailers at toy fairs, including pricing, marketing techniques, and product

13   development information.  A reasonable fact-finder could certainly conclude that the tremendous

14   investment that Mattel made in the development of its market intelligence group belies the

15   suggestion that Mattel could have simply examined MGA's press releases for the information

16   disseminated at toy fairs about MGA's forthcoming products.

17                    **D.    Harm**

18        Mattel argues that MGA cannot prove harm resulting from Mattel's alleged

19   misappropriation of information about at least 111 MGA products.  The California UTSA

20   provides that a plaintiff may recover both "damages for the actual loss" and "the unjust

21   enrichment caused by misappropriation that is not taken into account in computing damages for

22   actual loss."  Cal. Civ. Code § 3426.3.  Mattel argues that MGA's expert has failed to

23   substantiate any specific loss caused by the alleged misappropriation of information about 111 of

24   the 114 products about which Mattel's employees allegedly fraudulently procured information.

25   MGA's expert witness instead provides a global calculation of the harm caused by *all* acts of

26   misappropriation and then purports to provide exemplar calculations of the loss suffered as a

27   result of the misappropriation of information about 3 of the 114 products.  In such

28   circumstances, the proper course of action is to wait and see whether "the jury conclude[s] that

[Mattel] did not misappropriate all of [MGA's] trade secrets" and, if it does, the Court may examine whether "[MGA's] expert testimony regarding damages for misappropriation of all trade secret[s] was useless to the jury." *Monolithic Power Sys.*, 399 F. Supp. 2d at 1077.  This is an issue ill-fit for resolution at this stage.

### E.  Disposition

Mattel's motion for summary judgment as to MGA's first counter-claim in reply is denied.

## XIII.  Declaratory Relief

In light of the genuine issues of material fact identified above, MGA's motion is denied as to Mattel's counter-claim for declaratory relief.

## XIV.  Evidentiary Objections

Evidentiary objections are overruled to the extent they concern evidence cited herein, and are otherwise stricken as moot.  MGA's Request for Judicial Notice is denied as moot.

## XV.   Disposition

For the foregoing reasons, the Court ORDERS as follows:

1.   MGA's motion is granted as to Mattel's counter-claims for aiding and abetting breach of fiduciary duty, violation of 18 U.S.C. § 1962(c), and violation of 18 U.S.C. § 1962(d);

2.   MGA's motion is granted in part and denied in part as to Mattel's counter-claims for copyright infringement, misappropriation of trade secrets, conversion, aiding and abetting breach of duty of loyalty, unfair competition, and intentional interference with contractual relations;

3.   Machado's motion is granted as to Mattel's counter-claims for breach of fiduciary duty, breach of duty of loyalty, breach of contract, conversion, violation of 18 U.S.C. § 1962(c), and violation of 18 U.S.C. § 1962(d);

4.   Mattel's motion is granted as to MGA's claims for trade dress infringement, trade dress dilution, common law unfair competition, and unjust enrichment, and MGA's counter-claim in reply for violation of 18 U.S.C. § 1962(c);

1      5.     Mattel's motion is denied as to MGA's claim for statutory unfair competition and

2      MGA's counter-claim in reply for trade secret misappropriation.

3  IT IS SO ORDERED.

4  DATED: January 5, 2011

DAVID O. CARTER
United States District Judge