UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

THE HON. DAVID O. CARTER, JUDGE PRESIDING

```
MATTEL INC., ET AL              )
                                )
                Plaintiff,      )
                                )
        vs.                     ) No. CV 04-9049-DOC
                                )
MGA ENTERTAINMENT, INC., ET AL  )
                                )
                Defendant.      )
_____ )
```

REPORTER'S TRANSCRIPT OF PROCEEDINGS

SANTA ANA, CALIFORNIA

MONDAY, JANUARY 3, 2011

VOLUME 3 OF 3

Maria Beesley-Dellaneve, RPR, CSR 9132
Official Federal Reporter
Ronald Reagan Federal Building, room 1-053
411 West 4th Street
Santa Ana, California 92701
(714) 564-9259

6c44a4d3-dc84-40cc-8b85-3f0c60c1e274

1   **APPEARANCES OF COUNSEL:**

2   **FOR THE PLAINTIFF:**   QUINN EMANUEL URQUHART OLVER & HEDGES
                             BY:  MICHAEL ZELLER, ESQ.
3                            and  JOHN QUINN, ESQ.
                             865 S. FIGUEROA
4                            10TH FLOOR
                             LOS ANGELES, CALIFORNIA 90017
5                            (213)443-3000

6
    FOR THE DEFENDANTS:   ORRICK, HERRINGTON & SUTCLIFFE
7                          BY:  ANNETTE HURST, ESQ.
                           405 HOWARD STREET
8                          SAN FRANCISCO, CALIFORNIA 94105
                           (415)773-5700
9

10
    FOR THE DEFENDANTS:   ORRICK HERRINGTON & SUTCLIFFE
11                         BY:  THOMAS MCCONVILLE, ESQ.
                           4 PARK PLAZA
12                         SUITE 1600
                           IRVINE, CALIFORNIA 92614
13                         (949)567-6700

14

15
    FOR DEFT MACHADO:   SCHEPER KIM & HARRIS
16                       BY:  ALEXANDER COTE, ESQ.
                         601 WEST FIFTH STREET_12TH FLOOR
17                       LOS ANGELES, CALIFORNIA 90071
                         (213)613-4655

18

19

20

21

22

23

24

25

Page 3

1          SANTA ANA, CALIFORNIA; MONDAY, JANUARY 3, 2011

2                              -OOO-

3          **THE COURT:**  This would be Ms. Hurst and Mr. McConville

4     on behalf of MGA.  I'm going to use the consolidated or pretrial

5     conference order for January 11.  If you would just refer to the

6     page and the motion in that record so I'm certain that I have an

7     accurate record.  And I think MGA's motions begin on page 26.

8          **MS. HURST:**  Your Honor, item four on page 26, MGA's

9     motion in limine number one, we'll submit on the papers.

10         Item five, on page 26 of the pretrial conference order,

11    MGA's motion number two, Mattel, did you want to address that one

12    further?

13         Your Honor, my understanding is Mattel wanted to address

14    that further and I'll reserve any comment for reply.

15         **MR. QUINN:**  Your Honor, Bill Price.

16         Our position on MGA motion in limine number two is

17    fairly easy.  It's a broad motion, but I think what we want to

18    focus on in these other proceedings are MGA's admissions, MGA

19    statements, their contradictory statements in this lawsuit.

20         So I don't know if this is really the time to address

21    all of those, but we have given in our opposition whether the

22    records have been developed sufficiently through that.  But if you

23    look in our opposition, we have pointed out specific statements

24    by, for example, Paula Garcia, by MGA's attorneys which are

25    inconsistent with positions they're taking here.

1          That, for example, the three dimensional Bratz doll is a

2     result of Carter Bryant's two dimensional drawings.

3          **THE COURT:**  Pull that mic closer.

4          **MR. PRICE:**  So I said, for example, the MGA is taking

5     the position in this case that the three dimensional dolls can't

6     be copyright infringement because Mr. Bryant just did a two

7     dimensional work of art.  And so we want to point out MGA's

8     statements or Paula Garcia's statements in other litigation where

9     they have said the opposite.

10         So generally what we want to say about this motion in

11    limine is we were allowed to, should be allowed to use the

12    statements by MGA, its lawyers, its witnesses, in those other

13    proceedings that are inconsistent with its positions in these

14    proceedings.  It's pretty much as simple as that.

15         **THE COURT:**  Okay.  Counsel?

16         **MS. HURST:**  Your Honor, let me start with the Hong Kong

17    problem.  Any factual assertion made by a party is made within the

18    context of the legal framework.  And in the Hong Kong litigation

19    the nature of the intellectual property rights at issue was

20    different and the requirements of proof were different.  And in

21    order for a jury to evaluate what are superficially said to be

22    testimonial assertions, that framework has been to be elaborated.

23         So, for example, design rights, a completely different

24    form of intellectual property were at issue in a number of these

25    other cases.  And Mattel has mischaracterized MGA's position.  MGA

Page 5

1   has never denied that Carter Bryant's drawings were the

2   inspiration for Bratz and has no intention of denying that in the

3   upcoming trial.

4           But to seize upon these purported testimonial assertions

5   without regard to a differing legal context, which is extremely

6   difficult, complicated to explain and requires a lot of extraneous

7   evidence and therefore presents a 403 problem, Your Honor, is

8   unfair.  And for that reason Judge Larson excluded this evidence

9   as well.

10          And so this is not just a simple impeachment with a

11  prior inconsistent statement or asserted testimonial admission.

12  It's much more complicated than that, and because it's complicated

13  and because Mattel is mischaracterizing MGA's position and it has

14  no intention of denying that it was inspired by the Bryant

15  drawings, the 403 analysis here is --

16          **THE COURT:**  Here is my concern.  I haven't heard a

17  stipulation by MGA in front of the jury that that's your position.

18  I hear you in terms of argument.

19          Second, this is way too broad.  What it does is it

20  places a chilling or an umbrella over so many different areas that

21  need much more specific inquiry by the Court and much more

22  specific inquiry and notice by MGA.  So in its present form I'm

23  going to deny the motion.

24          Now, that doesn't mean you can't come back at a later

25  time and argue the relevance, but I'm not going to preclude MGA or

1   Mattel from making a complete opening statement.  The end result

2   though, it may be that that or a particular piece of evidence

3   isn't coming in.  So each party has to tread cautiously.  The jury

4   is going to be warned that this is opening statement, it's subject

5   to proof.  And if the parties don't prove it, they're going to be

6   left, quite frankly, looking a little foolish.

7         So it's going to require some discretion.  Now, in its

8   present form, though, the motion is denied.  Next motion?  Now,

9   that has no chilling effect on MGA coming back in our night

10  sessions or weekend sessions and pointing out, for instance, your

11  position concerning MGA Hong Kong, for instances.  But I need much

12  more specifics.  It's way too broad.

13        So MGA number two denied.  MGA motion in limine number

14  three.

15        **MS. HURST:**  Your Honor, again, we understand Mattel

16  wanted to add -- offer additional argument on this.

17        **MR. PRICE:**  Not on the MGA motion in limine number

18  three.  Submit on the record.

19        **THE COURT:**  Submitted?

20        **MR. PRICE:**  Yes.

21        **THE COURT:**  Submitted.

22        **MR. MCCONVILLE:**  We'll submit on the record on that.

23        **THE COURT:**  Number four is reference to criminal

24  investigations in the United States.

25        **MR. MCCONVILLE:**  I think the parties are submitting on

6c44a4d3-dc84-40cc-8b85-3f0c60c1e274

1    the record on that.

2            **MR. PRICE:**  Submit on the record.

3            **THE COURT:**  Motion in limine number five, references to

4    any purported indemnity agreement between Carter Bryant and the

5    MGA parties.

6            Doesn't this go to credibility?

7            **MS. HURST:**  This is a motion directed to -- no, and here

8    is why.  This is a motion directed to a specific document that was

9    submitted by MGA as part of the tax audit process.  We're not

10   objecting to the agreement between MGA and Bryant coming in, or

11   the retaining agreement relating to the payment of his counsel

12   fees or any of that, but there is just this one specific document.

13           **THE COURT:**  What is the document number again?

14           **MS. HURST:**  Let me refresh my recollection on that.

15           **THE COURT:**  I have got to also.  I have it all in the

16   back laid out on tables.

17           **MR. QUINN:**  We're submitting on this one, Your Honor.

18           **MS. HURST:**  I want to finish my answer to the Court's

19   question.

20           **THE COURT:**  Remember, I'm trying to recall 79 different

21   motions.  It's helpful to me also.  Take your time with it.  There

22   is no rush. I'm going to go back for just a minute because it's

23   going to be helpful to me, and demand a little bit more of myself.

24   I'll be with you in just one moment.  I'm going to have some

25   questions.

1          I wanted to ask Mattel and go back to MGA's in limine

2    motion number three.  This is apparently the request to allow into

3    evidence MGA's legal representation in the past; the number of

4    attorneys or law firms who have represented MGA in this matter,

5    which apparently are extensive; apparently the ongoing lawsuit,

6    who is it with?  Gibson Dunn or O'Melveny?  I forget.  The fees

7    charged or owed; withdrawal of the prior counsel.  Probably even

8    the drama that's going on in this court lately.

9          What is the relevance of this?  Why is Mattel seeking

10   this?

11          MR. PRICE:  We're not.  In our opposition we make pretty

12   clear that we don't think that it is relevant, that the other

13   lawsuits are relevant.  But it may become relevant because of the

14   positions MGA takes.

15          THE COURT:  I'll keep an open door on that then.  Let's

16   say for opening statement purposes we're not going into that.

17          MR. PRICE:  No intention.

18          THE COURT:  Why don't I simply tentatively deny that

19   subject to further argument.  What I'm trying to do is shape

20   enough of the opening statement so that none of you are

21   embarrassed, but I'm trying to provide you the widest access

22   possible.

23          So acceptable if I tentatively deny that, keep an open

24   door?

25          MR. PRICE:  Here is what I ask that you do.  If MGA, in

6c44a4d3-dc84-40cc-8b85-3f0c60c1e274

1    its opening statement, is going to say that the damages incurred

2    here was because Mattel wrongfully got an injunction --

3             THE COURT:  MGA is not going first.  You are.  You have

4    no chance for rebuttal.

5             MR. PRICE:  But if they're going to make that argument,

6    then we would say we should be able to anticipate that in our

7    opening and comment on, really, the defense to that.  So I don't

8    think it's relevant.

9             THE COURT:  Have you asked them?

10            MR. PRICE:  They opposed our --

11            THE COURT:  Ask them.  Let's spend some time with it.

12            MR. PRICE:  Do you plan to do that in opening statement?

13            MR. MCCONVILLE:  First of all, the context of the

14   motion, it was our motion in limine to preclude them.  If you

15   claim to --

16            THE COURT:  Depends what you are going to say in your

17   opening statement.

18            MR. MCCONVILLE:  You said you were going to deny it.  So

19   to the extent you want to stop this evidence from coming in, you

20   would actually have to grant the motion.

21            THE COURT:  You are right.  I understand that.  My

22   apologies.

23            MR. MCCONVILLE:  To be honest with Your Honor, I don't

24   know what our opening is going to look like, but -- I can't tell

25   you.

Page 10

1        **MR. PRICE:**  We made a parallel motion, Your Honor.

2   That's Mattel's motion in limine number five, which is precluding

3   them from talking about our wrongful injunction and the

4   consequences of that.

5        So both are up for play.  It can be easily resolved by

6   both parties agreeing it's not going to be a subject of opening

7   statement.

8        **THE COURT:**  I'm waiting.

9        **MS. HURST:**  We're not going to -- we cannot agree to --

10       **THE COURT:**  It's simply for opening statement purposes.

11  That's the only reason I'm spending this time.

12       **MS. HURST:**  I understand.  But their motion is much

13  broader.  It's an attack on the set-off defense.  And they have

14  not cited any authority.  This is one that we had intended to

15  argue when we get to it on the list.  They have not cited any

16  authority in support of the motion that it can't be part of the

17  set-off defense.  To the contrary, the only extant case on point

18  says it can be; the Dornan case.

19       And so the set-off defense is in the case and will and

20  should include the reverse injunction.  Now, having said that, I

21  have no idea whether this is going to be referenced in our opening

22  statement.  And so I can't tell the Court that now.

23       **MR. QUINN:**  Your Honor, if I may.  On the injunction

24  issue the Court will recall that there was a claim for wrongful

25  injunction in the cross-complaint.  And the Court did dismiss that

Page 11

1    claim.  We have had, I think, extensive argument and briefing on

2    the propriety of any such claim.

3           This Dornan case really does not support this evidence

4    coming in.  The Dornan case merely said that restitutionary

5    set-off is available.  And the Court -- this Court has already

6    dismissed their wrongful injunction claim.  This is not a claim.

7    There is no restitution involved here.  That's a very different

8    circumstance.

9           And I think this is -- I applaud the persistence and the

10   creativity in trying to find ways to get the injunction into --

11   the fact there was an injunction into evidence, but then we're

12   opening the door to all that as to why the injunction was issued,

13   who issued it, and all the rest of it.

14          The Court will recall the discussion we had about

15   whether the injunction even went into effect; whether there was a

16   chilling effect, even though in our view of the chronology and our

17   recollection, the injunction never went into effect.  Judge Larson

18   extended it a couple of times.  We're really reopening that

19   Pandora's Box here if they're permitted to refer to the fact that

20   an injunction was previously issued by this Court.

21          THE COURT:  One of the critical issues eventually will

22   be what the Court's decision will be about whether the jury should

23   know if there was even a prior verdict.  And here is my concern.

24   I don't know how aggressive you're going to try to be, and I can't

25   foresee if, regardless of my ruling, if I rule that that prior

6c44a4d3-dc84-40cc-8b85-3f0c60c1e274

1   verdict was not relevant or probative and was unduly prejudicial.

2   The question I ask myself is, can I protect that ruling, or is

3   that what I call a quicksand ruling?

4           And if I am going to let in the prior verdict and the

5   fact that it did exist, then the consequences of that prior

6   verdict might be relevant in terms of the injunction.  And all

7   that plays, of course, into whether I'm going to allow evidence

8   regardless of what I do or don't do with the RICO concerning Mr.

9   Larian and the 826, etcetera, issues.

10          You see, it all starts spinning and it has some

11  symmetry.  So.

12          **MR. QUINN:**  Your Honor, I think in the briefing the

13  Court will see that both sides have our view, both sides, is that

14  the prior verdict should not come in.  There is no reason to refer

15  to that, or even for that matter that there was a prior trial.

16          **THE COURT:**  No.  Let's make certain of that.  Remember

17  I'm still struggling back in the back with in limine motions.  We

18  have been focusing right now.  So I haven't paid the same

19  attention to the in limine motions as I have had the first portion

20  of the opinion and the second portion will probably be out very

21  shortly concerning RICO, subsequent RICO and conspiracy to commit

22  RICO.

23          But is that really the parties' position, that the prior

24  verdict isn't to be mentioned to the jury?

25          **MS. HURST:**  May I respond, Your Honor?  Both parties

6c44a4d3-dc84-40cc-8b85-3f0c60c1e274

Page 13

1   moved to exclude evidence of the prior verdict; however, Mattel's

2   position is internally inconsistent because it wants to admit

3   evidence of the Omni transaction and everything associated with

4   that despite its exclusion of the evidence regarding the prior

5   verdict.

6           The Omni evidence is irrelevant except as understood --

7   I mean it's irrelevant, period.  But their crazy theory is that it

8   somehow shows concealment or evidence -- knowledge of guilt or

9   whatever they're going to try to argue, but that is --

10          **THE COURT:**  What happens when we get to damages, though,

11  if we get that far?  And the argument becomes -- let me see if I

12  can construct this.  The argument becomes, on MGA's part, that the

13  jury should not award X amount when we know that Omni may take a

14  position potentially in front of Mattel.

15          That's worded poorly, but trying to conceptualize that,

16  you have the ability of MGA to argue don't punish us; don't award

17  a large verdict when, in fact, Omni may be what I call a place

18  holder.  They may be entitled to -- well, I have said enough.  I

19  need to go back and look at that again.

20          **MR. MCCONVILLE:**  But then, Your Honor, that begs the

21  question of -- from our perspective to put the Omni transaction in

22  context, we would have to say why was there an Omni transaction?

23  Why was Wachovia have to be bought out?  Because Wachovia

24  foreclosed on MGA essentially because of the verdict.

25          So it starts with the verdict.  And then whatever

Page 14

1  concealment they allege, the concealment is related to undermining

2  the proceedings that had occurred to avoid the verdict which is no

3  longer in existence.

4          So I mean, if we're going to go down that route of

5  allowing the Omni evidence in, it's going to require us to put on

6  an explanation that isn't, you know -- in order for them to make

7  their showing on Omni, it's going to require us to show why well,

8  were we there.

9          **THE COURT:**  Let me ask you both something.  What do you

10  want to say in your opening statements?

11          **MR. MCCONVILLE:**  We win.  I mean, just to --

12          **THE COURT:**  A large part of that depends on what Mattel

13  wants to say in their opening statement, and some of that is

14  anticipatory.  Now, all of this may be moot at the present time.

15  In other words, it may be issues I decide later down the line.  I

16  just don't know.  Mattel is the driving force in terms of what

17  they need in terms of their opening statement.

18          **MR. QUINN:**  Your Honor, we don't propose to mention

19  anything relating to the Omni transaction.

20          **THE COURT:**  In your opening statement?

21          **MR. QUINN:**  Correct.

22          **MR. MCCONVILLE:**  Neither will we.

23          **THE COURT:**  So doesn't that resolve it?  That leaves it

24  for another day, frankly.  Okay.

25          **MS. HURST:**  I'm not sure we have completed our argument

6c44a4d3-dc84-40cc-8b85-3f0c60c1e274

1    on the reversed injunction issue, but I can hold that until we get

2    to that number.  As far as Omni is concerned, that resolves it.

3          **THE COURT:**  They may not be synonymous.

4          **MS. HURST:**  Your Honor, I think it's extremely unlikely

5    that we'll want to bring up the reversed injunction set-off

6    defense in the opening statement.  I can't absolutely represent to

7    the Court tonight that's the case, but I should be able to by

8    tomorrow.

9          **THE COURT:**  Okay.  I'll wait and let you think about

10   that.  And understand, I'm not trying to take arguments away from

11   either of you in the opening statement.

12          So let me go back to in limine motion number three and

13   try to re-understand this motion.  Once again this involves the

14   legal representation and the number of attorneys and law firms

15   involved.

16          What is the relevance?  Certainly prejudicial because

17   Larian has changed law firms so many times, there have been so

18   many disputes.

19          **MR. PRICE:**  And we agree, that there should not be any

20   evidence on that.

21          **THE COURT:**  That doesn't close the door.  We're waiting

22   for evidence.  But does that preclusion harm your opening

23   statement?

24          **MR. PRICE:**  Not if the injunction issue isn't going to

25   be raised.  Because our only exception is that if they raise the

Page 16

1    injunction issues, we get to put in evidence.

2           THE COURT:  And you want until tomorrow morning to

3    decide that?

4           MS. HURST:  Yes.

5           THE COURT:  I'm going to simply delay then, until

6    tomorrow, number three.

7           I want to apologize to you.  I am going to go back,

8    because it makes my rereading a little bit better, I want to go

9    back to in limine motion number one.

10          This is litigation or arbitration between Mr. Larian's

11   brother and Mr. Larian.  His brother is Farhad or also Fred by

12   name.  Tell me why this would be mentioned in opening statement by

13   Mattel.

14              MR. PRICE:  It won't be.

15              MR. QUINN:  Actually I think Mr. Price misspoke.

16              MR. PRICE:  I may have misspoke.

17              MS. HURST:  I feel better now.

18              MR. QUINN:  Your Honor, Mr. Larian had a dispute with

19   his brother.  His brother was formally an owner of MGA.  He

20   brought a claim against Isaac Larian claiming that, when you

21   bought me out, you did not tell me that you already had Bratz in

22   the works.

23          The timing is such that his understanding, his

24   allegations, Farhad Larian's allegations about when Bratz was

25   actually in the works is consistent with Mattel's view.

1          **THE COURT:** Let me ask you.  When I was struggling with

2     this, when I looked at it initially, why is his opinion relevant?

3     In other words, if he is testifying and he has some document to

4     back that up such as the many invoices I have been shown next

5     door, are you going to call Farhad?

6          **MR. QUINN:** Yes, as we did in the first trial.  And he

7     testified that he had, in fact, collected a large number of

8     documents at MGA.  He was an MGA officer or employee.  And he had

9     collected a number of documents which supported his claim as to

10    the timing of Bratz, and that Isaac had misled him.  And then they

11    made peace and he destroyed all those documents.

12         So it's also relevant to a spoliation claim.

13         **THE COURT:** Okay.  MGA.

14         **MR. MCCONVILLE:** Your Honor, first, I don't believe

15    spoliation is a defense or an affirmative claim of anything.  So I

16    don't know what spoliation has to do with anything, period.

17         Second, whatever it is Farhad Larian alleged, he

18    ultimately stated during that arbitration, you know, obviously I'm

19    wrong.  My allegations aren't true.  And he withdrew all of his

20    claims.

21         And so the motion was designed to stop us having to

22    litigate the Larian versus Larian arbitration in this courtroom,

23    and to stop them from Mattel attempting to admit hearsay, which we

24    saw they have marked a transcript next door.  And in their

25    opposition they actually say that it's permissible to admit a

1    transcript from a prior proceeding in this proceeding.

2            So, in all events it's highly prejudicial under -- even

3    if it's marginally relevant as to withdrawn claims of Farhad

4    Larian relating to issues about which he lacked knowledge.  It's

5    marginal relevance is outweighed by the prejudicial effect on

6    Isaac Larian, who will be in trial and have to explain to a jury

7    that this marginally relevant information which is being used to

8    inflame you actually has nothing to do with anything, but yeah,

9    it's really bad; I got in a fight with my brother.

10           That's the MGA analysis on this.

11           **THE COURT:**  When the evidence was allegedly destroyed,

12   was the evidence -- did Farhad testify in the first trial that he

13   destroyed the evidence, referring to Farhad?

14           **MR. QUINN:**  Yes.

15           **THE COURT:**  Was it at the direction of Isaac Larian?

16   Did he specifically state that?

17           **MR. QUINN:**  I don't believe so, Your Honor.

18           **THE COURT:**  Why did he destroy it?

19           **MR. QUINN:**  Well, I think he and his brother --

20           **THE COURT:**  Why did he testify that he destroyed it in

21   the first trial?

22           **MR. ZELLER:**  If I may, Your Honor.  He testified that he

23   destroyed it to keep it from Mattel.

24           **THE COURT:**  Was it his idea?

25           **MR. ZELLER:**  He said that it was.

1          **THE COURT:**  How does that then carry over to Larian?  In

2     other words, his actions as his brother, if they're independent,

3     and if he has an interest, how and why would I let that in against

4     Larian?  Why wouldn't it be prejudicial?

5          **MR. ZELLER:**  I think there are two answers to that.

6     Number one is that Mr. Farhad Larian was, in fact, still on the

7     MGA payroll when he destroyed those documents.

8          **THE COURT:**  That doesn't mean -- I'm going to be the

9     devil's advocate -- that doesn't mean that that carries over to

10    Larian.  A conversation, for instance, "Farhad, please destroy

11    this," that's an interesting conversation that would probably be

12    relevant.

13          What happens if Farhad has an interest, though, a

14    monetary interest, and he destroys that independent of Larian

15    either knowing about it or condoning it?

16          **MR. ZELLER:**  I would say number two, Your Honor, in

17    response to that, is that there is inferentially a conclusion that

18    can be drawn by a jury that Farhad is not being truthful when he

19    says that his brother was not involved.

20          The sequence of events was, is that he got involved in

21    this dispute.  He then started the arbitration.  There were

22    communications between his father and himself during the

23    arbitration in which Mr. Farhad Larian said that he believed they

24    had a resolution of the dispute.

25          There was a dispute about that as well, but nevertheless

Page 20

1    there is at least a version of events that appears to be that
2    there was some sort of agreement between them.  Immediately after
3    that, Farhad Larian withdrew his claim and immediately after that
4    destroyed several boxes of documents that related to the
5    litigation which he said he did in order to keep them from Mattel.
6              And, of course, as elaboration on the first point I was
7    making is that the acts are still attributable to MGA, of course,
8    because he was -- I don't recall exactly what his role or position
9    was with MGA at the time, but he was still being paid by MGA as an
10   executive.
11             **THE COURT:**  Anything further on MGA's part?
12             **MR. MCCONVILLE:**  Just a few points, Your Honor.
13             One, I think what I heard from a definite answer from
14   the question that you posed was that Farhad Larian said Isaac
15   Larian did not direct him to destroy the information.
16             **THE COURT:**  That's my question at the first trial.  I
17   can't recall --
18             **MR. MCCONVILLE:**  And I believe the response we just
19   heard from Mattel was he said no.  So Isaac Larian did not direct
20   him to do it.
21             Second, there is no evidence that whatever it is that
22   Farhad Larian destroyed hasn't already been produced.  We don't
23   know.  So now we're left to speculate about a thing that Farhad
24   Larian undertook without any direction from Isaac Larian.  We're
25   way down the rabbit hole now.

1     And the third issue, Your Honor, is the arbitration

2   between the Larians preceded the Mattel versus MGA lawsuit.

3          **THE COURT:**  I'm inclined to find that the probative

4   value is -- or the prejudicial effect outweighs the probative

5   value.  But that's tentative.  Let me go back and think about it

6   tonight and I'll write a little bit if I still feel that way in

7   the morning.  So let's move on.  That's not a final ruling.

8          Counsel, in number four are references to his criminal

9   investigations in the United States.  Explain that motion to me.

10         **MR. MCCONVILLE:**  Yes, Your Honor.  The Jorge Castilla --

11  the reason I limited it to the United States is I understood -- I

12  wanted to make it distinct from beyond the United States including

13  Mexico.  Jorge Castilla, while a Mattel employee and before he

14  started at MGA, apparently took information from Mattel which

15  Mattel says are its trade secrets; thereafter, Mattel reported Mr.

16  Castilla the FBI.

17         The FBI visited his house; was interviewed by the FBI,

18  and handed over whatever information he had taken.  Thereafter --

19  which is a subject of a different motion which I think the Court

20  has already ruled that there should not be an adverse inference.

21  That's a footnote in your summary judgment order.  We agreed.  So

22  thereafter, the FBI then interviewed a number of MGA employees

23  including Isaac Larian.

24         So we don't want an examination that includes references

25  to well, weren't you questioned by the FBI about Mr. Castilla's

Page 22

1    theft of trade secrets?

2           You can see how the notion of inserting the FBI into

3    questioning as it results to anybody associated with MGA --

4           **THE COURT:**  Now watch.  A trial strategy I can

5    anticipate is this:

6           Mr. Larian is on the stand.  He answers something that

7    contradicts the FBI's notes, because they cannot afford tape

8    recorders.  And they may have that in a deposition.  In other

9    words, the same answer.  But, of course, Mattel is going to want

10   to get in the fact that the FBI interviewed Isaac Larian.

11          So Mr. Quinn approaches the witness and asks to impeach

12   him with the FBI notes and says, "Didn't the FBI interview you?"

13          You see, there is a number of ways that we can make a

14   ruling and the end result is the counsel can try to undermine

15   that.  Now, Mr. Quinn will have his checkbook in his hand when he

16   says that if I rule adversely.  But I know he won't to that.

17          I don't know what Larian is going to say.  And I don't

18   know if he says something that's contradictory that the FBI asked

19   him about and that's the sole source of that impeachment

20   information.  If it's not the sole source and it comes from

21   another source, I agree that the FBI and the drama of the FBI

22   coming in is extremely prejudicial.  It's not needed.

23          Help me.

24          **MR. MCCONVILLE:**  Here is the help to Your Honor.  So in

25   my experience when law enforcement conducts interviews with

6c44a4d3-dc84-40cc-8b85-3f0c60c1e274

1  witnesses like Mr. Larian, they don't provide them with a copy of

2  302.  So they wouldn't be able to know unless they have gotten

3  information from a source that is other than Larian.

4          THE COURT:  Let's find out.  Do have a copy of the FBI

5  302?

6          MR. PRICE:  I think we have the one from Mr. Castilla

7  but not from Mr. Larian here.

8          MR. MCCONVILLE:  So they could not impeach him with an

9  FBI 302 because one does not exist for them to use.  So the only

10  purpose of questioning him about his contacts with law enforcement

11  is solely for the purpose to prejudice Mr. Larian.

12          THE COURT:  Let me hear from Mattel.

13          MR. PRICE:  Your Honor, as you'll see in our opposition,

14  I think this is the first time there has been suggestion there is

15  a 302 for Mr. Larian.  We know there is a 302 for Mr. Castilla.

16          THE COURT:  I don't know if there is or not.

17          MR. PRICE:  That, we have.  And FBI 302 is admissible

18  under the hearsay rules.  The reason --

19          THE COURT:  It's an oddity.  Police reports are

20  admissible and civil actions.  It's a strange oddity.  They're not

21  in criminal, of course.

22          MR. PRICE:  We're in a position here where MGA is saying

23  we haven't done enough to protect our trade secrets.  That's one

24  of their defenses.  And, of course, when we learned about Mr.

25  Castilla, we went to the FBI.  And then we have the substance of

1   the FBI report from what Mr. Castilla said, which again comes in

2   as an exception to the hearsay rule.

3          **THE COURT:**  Just one moment.  All right.  Please

4   continue.

5          **MR. PRICE:**  In addition, Your Honor, Mr. Castilla gave

6   the chip he stole to the FBI.  That's how -- that was sort of

7   the -- what is the phrase when I was a prosecutor?

8          **THE COURT:**  I'm sorry.  Gave the what?

9          **MR. PRICE:**  Gave the digital memory card.

10         **THE COURT:**  Oh, the digital memory card.  Thank you.

11         **MR. PRICE:**  Basically which had the trade secrets on it.

12  Gave that to the FBI.  So that's relevant obviously to showing

13  where this came from.  He admitted to the FBI that this was

14  something he got from Mattel.

15         **THE COURT:**  MGA?

16         **MR. PRICE:**  While he admitted his theft of trade secrets

17  to the FBI, gave the memory card to the FBI which is recorded in

18  the 302's.  He, in this case, failed to answer questions about

19  where he got things, what he did with them.  So we want to be able

20  to put into evidence what he said to the FBI.

21         **THE COURT:**  Is Castilla going to be called?

22         **MR. PRICE:**  Yes.

23         **THE COURT:**  Back to MGA, your argument.

24         **MR. MCCONVILLE:**  So a couple points.  Again, the notion

25  that a civil jury is going to hear that the FBI began an

6c44a4d3-dc84-40cc-8b85-3f0c60c1e274

1    investigation of Jorge Castilla at the behest of Mattel will

2    require an explanation that goes down the road of well, what

3    happened, Mr. Castilla, and what other law enforcement agents we

4    need to call in order to figure out what was the ultimate

5    conclusion.  The FBI never charged him with anything.

6             So in other words, the facts they want to get out --

7             **THE COURT:**  Why can't that be stipulated to?  Just a

8    moment.

9             Mattel, why can't that be stipulated to?  If I let you

10   go down that road, why aren't I also requiring a stipulation at

11   that there were no charges filed?  Be careful this one.  This is

12   where the grandioseness may get buffered very quickly.

13            **MR. ZELLER:**  The state did charge him.  The federal

14   government did not.  The state prosecutors charged him and that

15   case is pending.

16            **THE COURT:**  Charged Castillo?

17            **MR. ZELLER:**  Right.

18            **THE COURT:**  Just a moment.  How long has the case been

19   pending?

20            **MR. ZELLER:**  I would have to get the exact dates.

21            **THE COURT:**  Years?

22            **MR. ZELLER:**  It's months.

23            **THE COURT:**  What state agency charged him?

24            **MR. ZELLER:**  I'm unfortunately so poorly practiced in

25   criminal law that I'm sure I will misstate it.  My understanding

1   is that there was an indictment.  He was arraigned.  And that

2   there had been -- I believe there is a trial date set for the

3   criminal charges this coming year.  I believe it is, I want to say

4   it's May.  I can get the exact date.

5          THE COURT:  Okay.  MGA?

6          MR. MCCONVILLE:  So a few points.  So it's undisputed

7   that whatever Mr. Castilla took did not make it to MGA.  Because

8   as they just said, Mr. Castilla provided the information to the

9   FBI.

10          It's undisputed that Mr. Castilla testified that MGA, in

11  fact, advised him to not take any information with him.  It's

12  undisputed that based on all the totality of whatever the FBI

13  considered on their investigation they charged no one.  And now

14  we're going down another rabbit hole of well, then the state did

15  something with him.  So how all that gets in front of a jury in a

16  nonprejudicial way, I don't see.

17          But second of all, since none of the information --

18  there is no evidence that the information that was on that disk

19  that the FBI took ever made it to MGA.  So it's irrelevant.

20  Whatever it is, is irrelevant.  And to the extent there is going

21  to be some sort of argument that links the FBI into the

22  irrelevance then that information needs to be --

23          THE COURT:  Why can't an opening statement be made

24  without mention of the FBI?  That doesn't mean it might not become

25  relevant later on.  Why can't an opening statement be made so you

 1    have the fact that information was taken by Castilla; that it was

 2    retrieved; it was retrieved pursuant to an investigation without

 3    mentioning the agency, and that's how we came into --

 4          **MR. QUINN:**  We could do that, Your Honor.  We can do

 5    that.

 6          **THE COURT:**  With a digital memory card.  We leave the

 7    FBI out of it.  Just leave it as an investigation.  Very little

 8    prejudice concerning mentioning the FBI, and then we'll see.

 9    Because there will be a number of evening discussions with

10    different witnesses before they testify.

11          I don't want to preclude you from how you got the

12    information.  I don't want to preclude Mattel from showing the

13    effort that you went to, to protect these trade secrets because,

14    after all, MGA has accused you of not protecting trade secrets

15    adequately.  Now, if they want to stipulate that you are

16    adequately protecting your trade secrets, it is irrelevant.  But

17    they're not stipulating to that.

18          So it's only the agency involved in what they call the

19    rabbit hole of going down that long line-up, well, he is charged

20    in state court.  Well, nothing's pending.  What happens if he gets

21    an acquittal?

22          **MR. QUINN:**  We can do that, Your Honor.  No problem.

23          **THE COURT:**  Okay.  What is the objection then by MGA?

24          **MR. MCCONVILLE:**  Our objection would remain whenever the

25    issue comes up.

Page 28

1          **THE COURT:**  Whenever the issue comes up.  We're talking

2     about opening statement.  What I'm trying not to do is take way

3     from you the flavor of the case.  A lot of this can be sorted out.

4          **MR. MCCONVILLE:**  Your Honor, one of our suggestions to

5     neutralize it was to say something just as you have said.

6          **THE COURT:**  I think Mattel is smart enough to do that.

7          **MR. QUINN:**  Your Honor, can we back up for a moment?

8          We were caught a little bit unprepared because we have

9     an agreement with the other side as to which motions would be

10    argued.  And then the Court, as it sometimes does, decided what it

11    was interested in and addressed that motion in limine, number one,

12    the Larian.

13          Actually, at the time, Fred Larian dismissed his

14    arbitration claims.  He asked his brother if there is anything he

15    could do to help in his case against Mattel.  That case was then

16    pending.  He was then employed by MGA.  We have got that

17    testimony.  He asked his brother if there is anything he could do

18    in that case.

19          At that point, MGA had already received the document

20    preservation notice.  And it's undisputed that while he's on MGA's

21    payroll, he then destroys the 10 to 12 boxes of material he had

22    collected to support his claim that Bratz had been created much

23    earlier.

24          **THE COURT:**  So he had an economic interest because he's

25    still with MGA, and whether his brother put him up or to it or

6c44a4d3-dc84-40cc-8b85-3f0c60c1e274

Page 29

1    not, you have a claim.

2            **MR. QUINN:**  And the record is that the case was pending

3    at the time.  This litigation was already pending.  And he

4    declared that he dismissed his claims in order to reconcile with

5    his brother, but that he still believed his claims were true.

6    That was his testimony.  So contrary to the statement --

7            **THE COURT:**  Does that come out of the first trial?

8            **MR. QUINN:**  Yes.  He actually signed a declaration to

9    that effect.  In 2006, January 20, 2006, declaration, paragraphs 4

10   to 6 he said, "I wanted this family dispute behind me.  I wanted

11   to reconcile with my brother."  Even though he believed these

12   claims were still true.

13           Now, the Court knows we have gone through the documents

14   for the witness Morris, who was a witness in that case in that

15   arbitration.  We have her testimony in that arbitration.  Of

16   course, we want to use that as well.  So I think -- I know the

17   Court said the Court wasn't ruling but was inclined to grant this

18   motion.  I think what was said before in part because we weren't

19   fully ready on our toes to discuss that, really shows -- the facts

20   are actually this should come in.  The man is working for MGA.

21   With this claim on the table and after having asked his brother is

22   there anything I can do to help, he destroys 10 to 12 boxes.

23           **THE COURT:**  Let me look at again after you leave

24   tonight.  I'll have an open mind.  And why don't I not rule on it

25   first thing tomorrow.  You can come back and argue it again.

Page 30

1              We're going to go to -- I'm going to go just down the

2      line.  And I think that's going to be very helpful for me when I

3      reread this.

4              Number five, these are references to any purported

5      indemnity agreement between Carter Bryant and the MGA parties.

6              **MS. HURST:**  Should I start on that one again, Your

7      Honor?

8              **THE COURT:**  Please.

9              **MS. HURST:**  So as I noted, this is about only one

10     specific document which is an IRS protest letter.  We are not

11     seeking to exclude the agreement between MGA and Bryant;

12     correspondence related thereto; the engagement agreement for

13     Mr. Bryant's law firm; the payment of fees to Mr. Bryant's law

14     firm by MGA; and the arrangements between MGA and Mr. Bryant

15     associated with that.

16             None of that is the subject of this motion.  What is the

17     subject of this motion is an IRS protest letter in which MGA

18     described an indemnification agreement to indemnify Bryant for up

19     to 90 percent of legal expenses.  And that document is MGA

20     20540862.  And it's in the record at docket number 8053 at 4, and

21     docket number 7856 at 1 to 2.

22             **THE COURT:**  Just a moment.

23             **MS. HURST:**  Document number 8053 at 4, and 7856 at 1 to

24     2.  So there was this IRS protest letter and presentation -- so

25     actually it's two documents, I apologize -- where there was a tax

Page 31

1   appeal related to the payment of Carter Bryant's legal fees.

2   That's one of the items related to the audit and the appeal.

3   Numerous other items involved.  And in the letter and in the

4   presentation, the representatives of MGA, the accountants referred

5   to this as an indemnification agreement.

6          Obviously there was a mistake by them.  They were

7   referring to the legal fees, not an indemnification against the

8   consequences of a judgment.  And all of the evidence about the

9   payment of the legal fees is going to come in.

10         And so what we have is an error.  It was retracted by

11   MGA and the accountants.  They followed up and sent an e-mail

12   saying there is no indemnification agreement.  There was an

13   agreement for the payment of legal fees.  It was loose language by

14   nonlawyers that Mr. Zeller has, in his zealous way, and always

15   appropriate in discovery seized upon.

16         But now we're at trial and this is going to lead us

17   into, to use Mr. McConville's term, a rabbit hole of an IRS audit

18   and appeal, three extra witnesses, while the two accountants from

19   E & Y and the lawyer come down, from Baker and McKenzie, come down

20   to say we didn't mean an indemnity agreement.  We've never seen an

21   indemnity agreement.  There is no indemnity agreement.  It was

22   about the payment of Carter Bryant's legal fees.

23         **THE COURT:**  Mattel?

24         **MR. PRICE:**  To give you some context, Your Honor, MGA

25   has claimed that Bryant's 2000 contract with MGA was the only

1    agreement with Carter Bryant.  And that agreement has Carter

2    Bryant indemnifying MGA in the event that, for example, the Bratz

3    idea was created.  It doesn't specifically say that, but in the

4    prior trial MGA argued, and Larian testified, that clearly he

5    wasn't trying to do anything wrong because the only agreement was

6    Carter Bryant indemnifying MGA.

7            MGA's former senior vice president of finance, Brian

8    Wing testified that there is, in fact, a highly sensitive

9    indemnification agreement under which MGA is required to indemnify

10   Bryant.  And it was very difficult to get and there was a

11   heightened sensitivity to releasing this to the IRS because of

12   litigation with Mattel.

13           Now obviously if there is indemnification going the

14   other way, it counteracts MGA's suggestion that it's only going

15   from Carter Bryant to them.  It also, of course, goes to

16   Mr. Bryant's credibility, Mr. Larian's credibility.  And although

17   MGA's counsel is now saying this letter was incorrect, it

18   certainly corroborates Mr. Wing's testimony.

19           What we have here is MGA sent a protest letter to the

20   IRS in January 2008 which referred to an indemnification agreement

21   with Bryant whereby they agreed to indemnify Bryant up to 90

22   percent of his legal expenses.  When the IRS took the position

23   that MGA incurred the legal expenses when it had no legal

24   obligation to do so, MGA responded no, that's incorrect.  We had a

25   legal obligation to do so stemming from an indemnification

Page 33

1   agreement.  That was MGA's response.

2           Of course, we have never seen such an agreement.

3   Mr. Wing tells us there was such an agreement.  And the letter to

4   the IRS says there was such an agreement.  This is not getting

5   down a rabbit hole.  If MGA wants to come up with a convoluted

6   explanation which contradicts Mr. Wing and contradicts their

7   letters to the IRS that there really was no such agreement, then

8   they can go down that rabbit hole.  It would be kind of fun if

9   they did.  But it's a question for the jury.  It's not something

10  which we dealt with in a motion in limine.

11          **MS. HURST:**  Your Honor, there is a document that's

12  highly sensitive that was redacted whether it was produced, and

13  was produced in redacted form to the IRS.  And it's a fee

14  agreement with the Kecker law firm.  It's been produced to Mattel.

15  It was given to the IRS.  It's the only document in the IRS file

16  pertaining to this arrangement and it is a contract.  It is a

17  contractual arrangement for the payment of fees that will come

18  into evidence.

19          Now, Mr. Wing and Ms. Tonnu, who were involved in this

20  on behalf of MGA.  Well, Mr. Wing wasn't involved.  We all know

21  Mr. Wing's got his axe to grind, but it is easily understood that

22  the laypeople or the accountants don't know the precise legal

23  description between a contractual agreement to pay his legal fees,

24  which we agree there was and which will come into evidence, and an

25  indemnity against a judgment.

Page 34

1          The word "indemnity" was used loosely and it shouldn't

2     have been, but there is no evidence at all of an indemnity

3     agreement.  There is nothing.  They're just going to argue that

4     the fee agreement is the indemnity agreement when that's coming

5     into evidence anyway.

6          So we're going to get an IRS tax audit, which MGA is

7     going to be prejudiced by the suggestion that it's not paying its

8     taxes?  That's going to reflect unfavorably on Mr. Larian

9     personally given the subchapter S nature of the corporation.

10    We're going to have to bring in the accountants and the tax

11    lawyers all to say no, all we ever meant -- which is what they

12    will; I can make an offer of proof -- all we ever meant was the

13    agreement with the Kecker and Van Nest firm to pay Mr. Bryant's

14    legal fees which has been produced in this litigation.

15         So it is -- there is no indemnity.  There is no evidence

16    of indemnity.  The evidence is readily explained by reference to

17    another agreement that is in action.  It isn't, pardon me,

18    evidence and will come into evidence.  But what we're going to get

19    with this now is an IRS tax audit which is going to be

20    inflammatory and prejudicial to the MGA parties, all of them.

21         MR. PRICE:  We don't have to get into it being a tax

22    audit.  It's A representation by MGA to the IRS, to the federal

23    government that this was the state of affairs.  There doesn't have

24    to be any testimony that Mr. Larian wasn't paying his taxes or MGA

25    wasn't paying its taxes.  And indeed, MGA successfully quashed our

1    subpoena to the IRS so we don't have -- we can't get their files

2    on this.

3            So we have a witness saying there was such an agreement.

4    We have them saying to the IRS there was such an agreement.  This

5    is a question for the jury.

6            **THE COURT:**  All right.  Just a moment.

7            Number six, these are references to criminal charges in

8    Mexico against Isaac Larian and Makabi.

9            **MR. MCCONVILLE:**  I believe there is agreement on that

10   one, Your Honor.

11           **THE COURT:**  I'm sorry?

12           **MR. MCCONVILLE:**  I believe there is agreement.  I

13   believe Mattel has agreed they will not introduce that

14   information.

15           **THE COURT:**  Is that correct?

16           **MR. PRICE:**  Yes.

17           **THE COURT:**  Does that mean for opening statement or

18   trial?

19           **MR. PRICE:**  At this point it means for both, unless

20   somehow the door is opened.

21           **THE COURT:**  Okay.  MGA's motion in limine number seven,

22   Mattel's allegations that MGA parties spoliated the evidence.

23           **MS. HURST:**  Your Honor, we agreed to defer seven and

24   eight until tomorrow because they include also discussion of

25   expert reports and testimony.

1          **MR. PRICE:**  Your Honor, I know you may have questions

2     but the parties have agreed to submit MGA --

3          **THE COURT:**  No.  I'm going to go through them one by

4     one.  I think it's going to be very helpful to me in the back.

5          Number nine is the claimed downloading of software and

6     movies by MGA employees.

7          What exhibit numbers are you referring to?

8          **MS. HURST:**  It's not really an exhibit number, Your

9     Honor, so much as testimony and putting witnesses on the stand

10    simply to invoke the Fifth with respect to these acts by MGA's --

11    certain of MGA's I.T. personnel.

12         **THE COURT:**  I don't understand.

13         **MS. HURST:**  Your Honor, what happened is, and the Court

14    may remember way back to the deposition of Joe Tiongco, who was

15    MGA's I.T. director, and during his deposition it came up that he

16    asserted the Fifth Amendment in response to questions by Mattel

17    about the downloading of software and movies by members of the MGA

18    I.T. department.

19         Now, this has absolutely nothing to do with Mattel and

20    there is no showing anywhere, anyhow that it ever has.

21         **THE COURT:**  What movies were they?  What was he being

22    questioned about?

23         **MR. MCCONVILLE:**  Your Honor, if I may.  So to put it in

24    context, Mr. Tiongco and some of his friends at work decided they

25    would use their work facilities to copy stuff from the internet.

Page 37

1   And so that information somehow came out I believe through our

2   very good friend, Brian Wing; advised Mattel that this had

3   happened internally.  And then Mattel, in a manner that has been

4   consistent throughout the course of discovery, deposed Mr. Tiongco

5   and asked him point blank whether he was criminally engaging in

6   copyright fraud by copying things from the internet, essentially.

7           THE COURT:  Was any of this information Mattel

8   information?

9           MR. MCCONVILLE:  I don't know, Your Honor.

10          THE COURT:  Let me ask Mattel for a moment.

11          Mattel?

12          MR. PRICE:  Well, we don't know because he invoked the

13  Fifth.  The testimony is that Mr. Wing testified that two separate

14  MGA employees told him there was a dedicated computer at MGA's

15  I.T. department that was devoted to downloading and copying movies

16  and software for Isaac Larian and his friends.  So Mr. Tiongco was

17  deposed as the head of MGA's I.T. department.  He was asked things

18  such as, isn't it true you were downloading information that is

19  internal Mattel information?

20          THE COURT:  I couldn't understand you.

21          MR. PRICE:  Isn't it true that you were downloading

22  information that was internal Mattel information.  He invoked the

23  Fifth.

24          THE COURT:  At that point?

25          MR. PRICE:  Yes.

Page 38

1            THE COURT:  Now just a moment.  All right, please

2    continue.

3            MR. PRICE:  And I think there are about 100 questions

4    where he invoked the Fifth.  They were specific and some of them

5    were general such as, isn't it true that this practice of

6    downloading materials without the owner's permission was part of a

7    larger practice and policy at MGA to disregard the intellectual

8    property rights of others?

9            Isn't it true that Mr. Larian instructed you to download

10   materials without the owner's permission?

11           So there are the broader questions as well, and he

12   invoked the Fifth I think as to about -- over 100 questions on

13   MGA's illegal downloading practices.

14           So we have Mr. Wing's testimony.  We have the indication

15   of the Fifth Amendment.  And then there is the question of is that

16   relevant.  And part of that may turn on the Court's rulings on the

17   RICO claims and, of course, its decision as to whether or not

18   invoking the Fifth leads to an adverse inference in the first

19   place.

20           THE COURT:  MGA.

21           MS. HURST:  Your Honor, Mr. Wing testified without

22   foundation of personal knowledge and based on hearsay that people

23   in Mattel's I.T. department were downloading software and movies.

24   So even assuming that testimony was admissible, which it's not, he

25   doesn't allege -- he didn't say he personally participated in

Page 39

1    this.  He doesn't know.  He heard it from somebody else who got

2    fired and then brought a claim against MGA.  That's the whole

3    chain of events here.  But it's software and movies.

4          The last time I checked, Mattel is still in the toy

5    business.  It doesn't have anything to do with Mattel.  But

6    they're great lawyers and they can write up a whole list of

7    questions to make it look like it has something to do with Mattel

8    when somebody takes the Fifth.  That's outrageous.

9          They come into the depo knowing he is taking the Fifth

10   because he has been downloading software and movies off the

11   internet supposedly, based on triple hearsay by Bryant wing.

12        **THE COURT:**  Let me repeat your argument back to you.  He

13   takes the Fifth because he is downloading and he is concerned

14   about either copyright violation or the use of the internet.  But

15   what the questions segue into eventually are what I call loaded

16   questions.  The expansion is Mattel's proprietary information.

17   And by that time he is giving rote answers.  The rote is Fifth

18   Amendment.  Fifth Amendment.

19        **MS. HURST:**  And every one of the questions also has the

20   predicate --

21        **THE COURT:**  Pull that transcript for me please.  I want

22   to see it.  I want to see the series of questions.

23        Mattel, pull that transcript for me tomorrow.  I'll see

24   it first thing tomorrow.

25        **MR. PRICE:**  We'll pull it, Your Honor.

Page 40

 1                THE COURT:  Okay.  Number 10.

 2                MR. MCCONVILLE:  I believe there was agreement on this

 3      one.

 4                THE COURT:  Just a moment.  Let me get my records so the

 5      Circuit can sort this out.  These are alleged improper activities

 6      at MGA's Chatsworth facilities.

 7                Now, if there is an agreement, I won't go into the

 8      particulars, but what is the agreement?

 9                MR. MCCONVILLE:  And, Your Honor, I think I may have

10      misspoken.

11                THE COURT:  Then explain this to me.

12                MR. MCCONVILLE:  So our argument is that whatever was

13      going on at MGA's --

14                THE COURT:  What was going at MGA?

15                MR. MCCONVILLE:  So the person again who testified about

16      this is Brian Wing who said, "I have no personal knowledge

17      whatsoever about what I'm going to tell you, but I'll tell you

18      anyhow.  What I heard from a person who said they saw something at

19      MGA's Chatsworth facility," which is a different building separate

20      and apart from MGA's main location, is that they were selling

21      products that were untested from the Chatsworth facility.

22                So the source of the information once again is Brian

23      Wing who himself had no information personally but heard it from

24      someone else.

25                THE COURT:  They were selling untested products?

1             MR. MCCONVILLE:  So I don't really understand what the

2   allegation is.  I'm repeating to you what Brian Wing has said.  So

3   apparently when -- before you can sell product from a retail

4   market, it has to meet certain standards.  So I'm guessing what

5   Mr. Wing was referring to is --

6             THE COURT:  Lead content in a toy?

7             MR. MCCONVILLE:  I honestly don't know.

8             THE COURT:  Let me hear from --

9             MR. PRICE:  Your Honor, our response was that we don't

10  presently intend to offer such evidence.  But if MGA is planning

11  on offering evidence of unsafe or untested products on Mattel's

12  behalf, we would obviously like to have the same opportunity.

13            THE COURT:  Let's find out.

14            MR. MCCONVILLE:  We are not going to agree to not offer

15  that evidence.

16            THE COURT:  What evidence are you going to be offering

17  concerning untested products by Mattel?

18            MR. MCCONVILLE:  The federal investigation, Your Honor,

19  and their disclosure of it, which is a little bit different from

20  what Mr. Wing has described.

21            THE COURT:  Just a moment.  What is the relevance?

22            MS. HURST:  Your Honor, it's related to damage.  They're

23  claiming lost profits and lost sales on a wide variety of products

24  throughout a period of time when they were engaged in the most

25  massive, notorious and heinous recall of toy -- tainted toy

Page 42

1   products probably in the history of the United States, which --

2       (Counsel confer.)

3       **MS. HURST:**  Mr. Eckert admitted in his testimony that --

4   he admitted that they had almost certainly lost Barbie brand

5   consumers permanently as a result of the notoriety and the

6   problems with the products coming out of China, the lead problem.

7       And if they're going to claim these massive damages and

8   do these regression analyses where they don't take into account

9   the numerous factors effecting their own performance that have

10  nothing to do with MGA, then we're entitled to bring in the

11  evidence of those factors and to show that there were numerous

12  other factors at play including such as this.

13      **THE COURT:**  Just a moment.  Anything further?

14      **MS. HURST:**  No thank you, Your Honor.

15      **THE COURT:**  Mattel?

16      **MR. PRICE:**  Your Honor, first, that's not what Mr.

17  Eckert said.  He was asked is it possible.  He said he guessed it

18  was possible.

19      Second, I think they're saying that because of

20  statements we made in the investigation, that that's relevant.

21  But I don't know how.  Certainly we could argue that MGA, instead

22  of making statements to the federal agency, has simply concealed

23  it, which might even be worse.  But again, you balance those two

24  and, again, I don't see the relevance to this case.

25      **THE COURT:**  Is Brian Wing the only source of this

Page 43

1    information concerning the Chatsworth facility?

2            **MS. HURST:**  Yes.

3            **THE COURT:**  Then why aren't we simply having a

4    foundational hearing with Mr. Wing to see what his opinion is

5    based upon?  Because it's a foundational question.  Simply, how

6    did you get the information, from who, at what point?

7            **MR. MCCONVILLE:**  He was asked those questions, Your

8    Honor.

9            **THE COURT:**  I don't know the answer.

10           **MR. ZELLER:**  He testified that another MGA manager so

11   stated.

12           **THE COURT:**  Who was the manager?

13           **MR. ZELLER:**  I believe it was Ninette Pembleton.

14           **THE COURT:**  Where is she?

15           **MR. ZELLER:**  She is currently still with MGA.

16           **THE COURT:**  Subpoena her.

17           **MR. ZELLER:**  I'm sure she will -- she could be

18   subpoenaed, but we weren't given an opportunity to depose her on

19   these issues.

20           **THE COURT:**  You don't need to depose her.  I'll question

21   her, find out real quick at one of the nighttime proceedings or

22   Saturday proceedings.  We'll come to that.

23           I think I understand the issues.  Thank you.

24           Number 11, the alleged use of phthalates in MGA toys.

25   So lead in Mattel.  And what is that?

Page 44

1    MS. HURST:  This one, I think it's commonly

2    pronounced -- well, not commonly, but uncommonly pronounced

3    thalates, Your Honor.  P-h-t-h-a-l-a-t-e-s.  It's the same issue,

4    Your Honor.

5            THE COURT:  Is it lead?

6            MS. HURST:  No.  It's a chemical compound, Your Honor,

7    which was regulated.  It was regulated and then there was -- so

8    they want to bring in all this bit about the phthalates and the

9    toys.  They had phthalates in their own toys.  As I understand it,

10   their allegation is because the time law was enacted and it went

11   into effect, you sold out your inventory.  I don't know if --

12           THE COURT:  MGA sold out their inventory?

13           MS. HURST:  Yes.  And they did the same based on their

14   witnesses' testimony.

15           THE COURT:  What is the relevant from Mattel's

16   standpoint?

17           MR. PRICE:  Again, we said we don't intend to offer such

18   evidence.  And in fact, suggested a stipulation that they won't

19   offer such evidence and we won't offer such evidence.  Again, if

20   they plan to offer evidence about Mattel products, we believe we

21   should be able to offer evidence about theirs.

22           THE COURT:  MGA's position?

23           MS. HURST:  The public perception of their products is

24   related to their damages.

25           THE COURT:  So you intend to offer it?

Page 45

1           MS. HURST:  I don't know right now but I can't say we

2     don't.  But this is not --

3           THE COURT:  Why don't you make up your mind by tomorrow.

4           MS. HURST:  This is not comparable.  We're not making

5     damages claims where there are claims of lost profits or other

6     sorts of things where the public perception of this, which there

7     is no evidence of that at all by the way, would be relevant.  They

8     are.

9           THE COURT:  Anything else by other parties?  Otherwise,

10    submitted.

11          MR. PRICE:  Submitted.

12          THE COURT:  Number 12 would be the alleged conversations

13    between Nick Contreras and Susan Kim.  Now just a moment.  Be

14    right back.

15               (Brief pause in proceedings.)

16          THE COURT:  All right.  Concerning the Contreras and

17    Susan Kim's conversations, what are you seeking to preclude?

18          MR. MCCONVILLE:  The existence of the conversation.

19          THE COURT:  Why?  If Mr. Contreras is called, he

20    allegedly asks, or gives the thumb drive to Susan Kim to copy the

21    information from Mattel's customer target.

22          MR. MCCONVILLE:  So the sequencing of events was

23    whatever he allegedly did, it was prior to his employment at MGA.

24    So the touchstone for calling this man would be to make -- would

25    make MGA look bad.

6c44a4d3-dc84-40cc-8b85-3f0c60c1e274

Page 46

1           Second, the Court has granted summary judgment on this
2    very issue.  So it's not relevant to an issue in this case.

3           So the only point for which it could be offered, since
4    it relates to evidence, no claims left in the case, is solely to
5    make MGA look bad.  And I believe that's prejudicial, Your Honor.
6    And it would -- it could have the ability to confuse the jury
7    about what issues are remaining in the case and what it is they
8    need to consider as it relates to Mr. Contreras and Ms. Kim on an
9    issue that the Court has already granted summary judgment on,
10   because there is no issue left in the case.

11          And by the way, on the final note of hearsay, Your
12   Honor, in their opposition they essentially say we're offering it
13   for the truth of the matter asserted.  So they're saying it is
14   hearsay.

15          **THE COURT:**  Let me hear from Mattel.

16          **MR. PRICE:**  First of all, Your Honor, Mr. McConville's
17   recitation of the timeline is somewhat incorrect.  What happened
18   was Mr. Contreras was recruited by MGA to become vice president of
19   its customer marketing.  At the time of his departure, he was part
20   of the target customer business team.  The evidence shows that in
21   the days before he left, he printed several Mattel documents
22   containing about 60 files which detail Mattel's relationship with
23   target.

24          During the week of November 1, 2004, the time after he
25   resigned from Mattel, he met with Susan Kim, or invited her to

6c44a4d3-dc84-40cc-8b85-3f0c60c1e274

Page 47

1   join him and expressed an interest in him -- or asked her to

2   assist him in stealing Mattel trade secrets.

3           Now, that did not come to fruition.  So there is no

4   existing claim that they were stolen.

5           **THE COURT:**  Give me the thumb drive.

6           **MR. PRICE:**  A thumb drive.  He said he needed those

7   files from Mattel.  After he became an employ of MGA, he again

8   called her, November or December I believe, and asked her the

9   check up to the status of that.  He said, have you complied with

10  the request?  And she said, in her testimony, she didn't do it

11  because she didn't think it was the right thing to do even though

12  Mr. Contreras had been her mentor when he was at Mattel.

13          The evidence obviously is relevant to Mattel's central

14  trade secret misappropriation charge that MGA lured away Mattel

15  employees with offers of employment and directed them to steal

16  trade secrets in return for that.  Again, she decided not to do

17  it.  But this is fairly specific evidence and relevant evidence

18  under 404(b) to show intent, to show knowledge, to show lack of

19  mistake.

20          That after he goes to MGA, he calls her and says hey,

21  you still got this offer of employment.  I'm just checking up on

22  whether or not you have done what I requested.

23          This is not hearsay because it's a request.  It doesn't

24  matter whether he was being truthful when he said "I want this

25  information."  Instead, he simply says, "Please get it for me."

Page 48

1   That's not hearsay.  It's basically a verbal act.

2            **THE COURT:**  MGA?

3            **MS. HURST:**  So this purported conversation came to light

4   because Mattel, using its e-mail spy filter captured information

5   that Ms. Kim had written in her application to the Harvard

6   Business School.  She wrote in her application a fanciful anecdote

7   about how she was asked to do something that she asked unethical

8   and refused.

9            She never reported this in the ordinary course of

10  business at Mattel.  And the circumstances under which it were

11  discovered make it suspect.  She is caught then because she can't

12  admit that her wrote something down in her Harvard Business School

13  application that's not true, or is a somewhat fanciful anecdote of

14  the events.  And all this now pertains to a claim that is

15  completely out of the case.

16           There is no trade secrets involving Mr. Contreras at

17  all.  There is no claim against MGA concerning anything he did or

18  didn't do, because it's uncontested that he ever got anything.  So

19  now they want to claim this is a pattern.  But it doesn't fit any

20  pattern.  Because every other one of the people who left took

21  things before they left.  There is no evidence at all of any kind

22  anywhere that anybody else who ever came over to MGA then

23  requested something from someone at Mattel.  In fact, it's a

24  remarkable deviation from the facts.

25           And so it wouldn't fit.  It wouldn't show a pattern.  It

Page 49

1  wouldn't show absence of mistake, knowledge, or anything else.

2  And there is no evidence at all that Mr. Contreras' purported

3  request, even assuming it was made which is doubtful, was at the

4  behest or in the instruction of anyone at MGA.

5           So he denies he did it.  He was instructed in writing

6  not to bring anything with him.  The circumstances under which

7  this arose years after the fact were not ordinary business

8  circumstances, but instead as a result of Mattel spying on its

9  employees and going and confronting them about this.  And all of

10  that comes in when this is not a claim in the case under a 404(b)

11  analysis.  That shouldn't happen, Your Honor.

12           **THE COURT:**  Mattel?

13           **MR. PRICE:**  Ms. Hurst apparently has become the jury.

14  She has stated that this is a fanciful account; that's it doubtful

15  it happened, and that obviously isn't a reason to grant a motion

16  in limine.

17           This is not fanciful.  Ms. Kim said it happen.  And MGA

18  has taken the position, is going to argue to the jury, that the

19  pattern is of Mattel employees downloading things, and that was

20  individual acts, and that MGA wasn't involved in any way.  They'll

21  say that about I think virtually ever instance we talk about.

22  This refutes that.

23           **THE COURT:**  I'm sorry?

24           **MR. PRICE:**  This refutes that.  It refutes the idea that

25  Mattel employees were doing this on their own without MGA's

6c44a4d3-dc84-40cc-8b85-3f0c60c1e274

Page 50

1    involvement at all.  This is classic 404(b) evidence.  And just

2    because Ms. Hurst isn't convinced it took place and wants to call

3    it fanciful and wants to say that we use spyware doesn't mean it's

4    not highly relevant to our central charge, which is that MGA lured

5    Mattel employees away with lucrative offers and directed them to

6    steal Mattel trade secrets in return.

7              **THE COURT:**  Okay.

8              **MR. PRICE:**  If I could add one other thing.  It also

9    refutes MGA's theory of the case because Ms. Kim was with Mattel

10   at the time.  She was --

11             **THE COURT:**  I'm sorry?

12             **MR. PRICE:**  This also refutes MGA's theory of the case

13   because Ms. Kim was at Mattel at the time; at the time she got the

14   request to steal the trade secrets.  It directly refutes their

15   defense that all this is just individual action.  Now, of course,

16   Mr. Contreras denies it.  That's an issue for the jury.

17             **THE COURT:**  Number 13, the alleged bad acts that

18   includes the alleged smuggling by the Laredo guy, payments to

19   foreign officials; payments to Chinese workers; and trades by

20   Larian and Mattel stock.

21             MGA?

22             **MR. MCCONVILLE:**  I'll start with the one that I believe

23   we have agreed on, that there will be no reference to bribes being

24   offered.

25             I'll turn now to --

Page 51

1          THE COURT:  Just a moment.  Let's find out.  I didn't

2     hear a response by Mattel.

3          MR. PRICE:  Your Honor, it's correct, we have agreed

4     that there would be no evidence of that if MGA agrees they will

5     not attempt to use evidence of that.

6          MR. MCCONVILLE:  Agreed.

7          THE COURT:  Okay.

8          MR. MCCONVILLE:  Concerning the Laredo -- actually,

9     concerning each of these events Your Honor, as the Court is aware,

10    Mattel has managed to plead this case many, many times, very, very

11    broadly narrowing it down, broadening it up, changing the parties.

12         THE COURT:  Just a moment.  So I want to be certain.

13    Alleged payments to foreign officials are not going to be

14    mentioned?

15         MR. PRICE:  Correct.

16         THE COURT:  Payment to Chinese workers?

17         MR. MCCONVILLE:  That's a different issue.

18         THE COURT:  Still alive.  Trades by Larian in Mattel

19    stock?

20         MR. MCCONVILLE:  Different issue.

21         THE COURT:  Let go back to the Laredo guy.

22         MR. MCCONVILLE:  Basically Mattel has pled this case a

23    million different ways.  None of these allegations are in the

24    complaint.  They try to shoe horn these in by saying well, it's

25    all part of a RICO plan.  Well, then plead it as a RICO plan.

Page 52

1    They didn't.  So you don't get to plead a legal theory and then

2    just try and drop in facts in order to make the other side look

3    bad.  404(b) precludes that, Your Honor.

4            This information is not related to any claim in the

5    case.  Looking at them individually, the issue with regard to the

6    Laredo guy, again, there is no smuggling allegations in this case.

7    And it would require -- I don't know how we would unwind the

8    allegations about smuggling with the Laredo guy, but we would have

9    to.  And I'd have to think through what that would require, but it

10   would require some work, which would require witnesses, which

11   would require additional time for an allegation that is not part

12   of the case.

13           With regard to -- and the same, Your Honor, with regard

14   to the payment to Chinese officials -- I'm sorry, Chinese workers.

15   The facts on that case have nothing to do with this RICO claim

16   that's been alleged, A.  B, in order to explain the context in

17   which that arose, it will require an explanation of Chinese tax

18   law.

19           I don't know which witness we would have to put on to

20   explain China tax law, to explain why it is that the events that

21   MGA undertook as it relates to its transactions in China are

22   clean, but they are And that's what we would have to do in order

23   to disprove a fact that isn't alleged in a complaint that's only

24   being offered to dirty up MGA.

25           Finally, Your Honor, with regard to Mr. Larian's trades,

Page 53

1    this is the second time they have repeated that they need the

2    evidence in order to show that Mr. Larian has a financial interest

3    in the case.  The Court has already considered whether Mr. Larian

4    has a financial interest in the case, and I think it's abundantly

5    clear.  That's not why they're offering it.  They're offering it

6    to try and show something nefarious.

7           So the reality is if it's going to be a securities fraud

8    case, fine, it's a securities fraud case.  They didn't plead a

9    securities fraud case.

10          **THE COURT:**  Okay.

11          **MR. PRICE:**  First, with respect to the overall issue of

12   what was pled, we plead a RICO conspiracy.  You are not required

13   to plead evidence.  It's noticed pleading.  In the RICO context

14   other crimes and wrongs are admissible because they are directly

15   relevant to the issues such as the existence of the enterprise and

16   even the conspiracy itself.  It of course isn't relevant just to

17   RICO.

18          In this particular situation, we have -- there shouldn't

19   be a lot of evidence.  It's an e-mail.  It's not like bringing in

20   a third-party witness to say this is what was done.  We have got

21   documentary evidence of it and evidence of other crimes and wrongs

22   which help establish this enterprise.

23          One other relevance argument, Your Honor, or reason it's

24   relevant is if you look at the e-mail, it also goes to the

25   defendant's spoliation of evidence and obstruction of justice

Page 54

1   claim.  One of the things he instructs his MGA employees in this

2   is basically no more e-mails on this issue.  We're not going to

3   provide evidence on this issue.  It's relevant to the RICO

4   enterprise and defendant's spoliation of evidence, obstruction of

5   justice claim.

6           With respect to the cash payments to workers in China,

7   again, this shouldn't be a lot of evidence.  There has been some

8   suggestion we're going to have to go into China's tax laws,

9   etcetera, but --

10          **THE COURT:**  Why is it being offered?

11          **MR. PRICE:**  It's being offered, Your Honor, to show

12  evidence of unfair competition.  That is, that MGA did this to get

13  a cost advantage on Mattel.  By undertaking this illegal scheme,

14  they had substantial cost savings.  And that's been testified to

15  by Mr. Ma who said once MGA took these steps to legalize their

16  operations, it was more expensive for MGA to operate than it had

17  been in the past when it was not operating legally.

18          As to whether or not it was illegal or not, Mr. Ma,

19  again MGA's Hong Kong's vice president of finance, said it was not

20  legal.  So I don't think we have to go too far into the evidence

21  there.  Obviously by conducting this scheme, which is in violation

22  of the tax and labor laws as MGA's vice president of finance

23  admits, they get a cost advantage.  In fact, Mr. Ma testified that

24  they refused to comply with these laws and the production of Bratz

25  dolls because of cost concerns.

Page 55

1          So this illegal scheme permitted them to compete with

2     Mattel unfairly.

3          **THE COURT:**  MGA?

4          **MR. MCCONVILLE:**  Your Honor, with regard to the

5     smuggling allegation, it was in an earlier version of their

6     pleading, and they dropped it.  And now they're trying to backdoor

7     it in through 404(b), because there is no evidence of it, so let's

8     just a big, giant you-know-what into the jury to infect them.

9          With regard to the Chinese payments.  Mr. Ma didn't

10    testify that it was illegal.  In fact, what we would have to get

11    into is whether or not it is legal, because again, the only reason

12    these allegations are being made is because it doesn't really

13    sound very good in front of a jury to describe cash payments;

14    however, in order to put it in context, we're going to have to

15    have somebody get up and explain well, why were you making the

16    payments that way?

17         Well, let's bring some somebody else who can explain why

18    it was in fact, legal.  Let's bring in the lawyers who provided an

19    opinion to MGA.  Mr. Ma didn't say it was illegal.  He said, "I

20    don't know," and plus he is not a lawyer.  And he wasn't advising

21    MGA on that position anyway.

22         **THE COURT:**  Just a moment.  Try again.

23         **MR. MCCONVILLE:**  There is no way Mr. Ma said that what

24    he was providing to MGA was legal advice, nor did he say it was

25    illegal.  And we would have to bring someone in to provide that

Page 56

1   description.

2          THE COURT:  Okay.  Mattel, you didn't argue it the first

3   time around concerning the trade in Mattel stock by Larian.

4          MR. PRICE:  Yes, we're doing it one at a time, Your

5   Honor.

6          The purpose of this evidence is to show that the timing

7   of Mr. Larian's stock trades show that he was wagering on specific

8   events and outcomes in the litigation.  We don't intend to raise

9   issues of securities fraud, but we're nonetheless entitled to put

10  on evidence of Larian's attempts to manipulate litigation for his

11  financial advantage, including these stocks transactions.  So all

12  this is relevant to both Mattel's RICO claims and to Larian's

13  credibility as a witness.

14         THE COURT:  Let me understand the stock trades again.

15  What is he doing in the stock trade area that's allowing him to

16  manipulate the litigation?

17         MR. PRICE:  The records show, his consolidated form 1099

18  shows that he was making short sales of Mattel stock on dates

19  corresponding to the phase one -- phase 1a and phase 1b jury

20  verdicts.

21         THE COURT:  How much stock?

22         MR. PRICE:  Let me find out.

23         THE COURT:  How much stock?

24         MS. HURST:  Your Honor, if we're going to get into Mr.

25  Larian's private finances, can we --

Page 57

1                    (Counsel confer)

2            MR. PRICE:  I have been told it was millions and he was

3    also doing it later.

4            THE COURT:  I said how much?

5            MR. PRICE:  I don't know, but we have a --

6            THE COURT:  I said how much.

7            MR. PRICE:  We have the 2008 form, 1099.

8            THE COURT:  Look it up.  You have plenty of time.

9            MR. PRICE:  Thank you.

10                   (Brief pause in proceedings.)

11           MR. PRICE:  I don't have a chart with me.  I could read

12   you the amounts on June 18 and June 19.  But if you want to take a

13   break.

14           THE COURT:  Counsel, what time do you want to come back?

15   We're on number 15 of 79.

16           MR. QUINN:  As it suits the Court.  As long as the

17   reporter gets the rest.

18                   (Recess taken, from  7:51 to 8:24.)

19           THE COURT:  Back on the record.  All parties are

20   present.

21                   In limine motion number 14.  This is IGWT's purchase of

22   inventory from MGA.  I'm aware of it obviously.  We have struggled

23   with this from time immemorial and I have already the granted

24   motion, but I have always alluded to the fact there may be the

25   possibility of evidence coming in.  So let's talk about this.

1          MGA, why don't you just restate your position.

2          **MR. MCCONVILLE:**  So, Your Honor, with regard to this

3     particular motion in limine, it relates to an entity called IGWT

4     Group which is separate and apart from IGWT 826.  This relates to

5     a purchase of inventory that was done, I want to say it was June

6     of 2008.  And I can give you more information, but it is not

7     directly related to IGWT 826.

8          **THE COURT:**  My apologies.

9          **MR. MCCONVILLE:**  And I believe Mattel's position is that

10    they agree that they won't offer the evidence.

11         **MR. QUINN:**  That's correct, Your Honor, unless the door

12    is somehow opened.

13         **THE COURT:**  Understood.  These are only issues

14    concerning opening statement.  The door is not closed if something

15    becomes relevant.  So...

16         **MR. MCCONVILLE:**  Your Honor, with regard to number 13

17    which are the insider trading, one point I wanted to make, Your

18    Honor, was whatever inside information Mr. Larian had, it was

19    presented in an open courtroom.  I don't know how that qualifies

20    as inside information.

21         **THE COURT:**  We were going to come back to the gravity of

22    this insider trading and how much was traded, counsel.

23         **MR. PRICE:**  First, we are not saying it's insider

24    trading.

25         **THE COURT:**  I know that.  Short sales.

Page 59

1          MR. PRICE:  This goes to his -- when he took the stand,

2   he had a bias of 500 million, this is extra amount of bias he has

3   when he is sitting here in court.

4          THE COURT:  Thank you.  How much?

5          MR. PRICE:  The amount of -- between June and September

6   of 2008 he purchased 6.8 million, he --

7          THE COURT:  Just a moment.  Purchased 6.8 million of

8   Mattel stock?

9          MR. PRICE:  Yes.  And he had short sales 7.6 million,

10  including about 900,000 on the day that the one juror was kicked

11  off in phase two.

12         THE COURT:  Okay.  What is the impact?  In other words,

13  is there any impact on Mattel?

14         MR. PRICE:  We're not --

15         THE COURT:  What you are saying is he's basically

16  playing a game -- strike that, he is basically playing the trial?

17         MR. PRICE:  Which effects his testimony.  He is biased.

18         THE COURT:  How does that bias him?

19         MR. PRICE:  On a day-to-day basis, when he is on that

20  stand, he has not just the fact that he own 500 million in --

21         THE COURT:  Hold on.  He is dealing with 7 million but

22  he has a company worth X amount, and he has his whole livelihood

23  on the line.  Hello?

24         MR. PRICE:  He is hoping that MGA wins.  His short sales

25  --

6c44a4d3-dc84-40cc-8b85-3f0c60c1e274

1          **THE COURT:**  He's hoping MGA wins and destroys his

2     company.

3          **MR. PRICE:**  No.  He's hoping MGA wins so he wins.  His

4     short sales are betting on MGA winning and that's an additional

5     incentive to --

6          **THE COURT:**  Destroy his company.

7          **MR. PRICE:**  No, no.  He is betting on MGA winning.

8          **THE COURT:**  He is betting on MGA winning?

9          **MR. PRICE:**  Yes.

10         **THE COURT:**  Not Mattel winning?  I'm mistaken.  I

11    apologize.

12         **MR. PRICE:**  He's short selling stock, and then obviously

13    is evidence of bias; that he is actually placing bets that MGA

14    will win.

15         **THE COURT:**  I don't understand it yet.  You are missing

16    me, so I apologize, I'm going to start again.

17         Here is what I'm hearing.  That he is betting on the

18    outcome of the trial, it has no effect on Mattel.  In other words,

19    it doesn't effect your stock price.

20         **MR. PRICE:**  Doesn't effect us.

21         **THE COURT:**  What he is basically doing is delivering a

22    message about who he thinks is going to win.  He thinks he is

23    going to win so he is going to profit by it.

24         **MR. PRICE:**  He's giving himself financial incentive yes,

25    and that goes to bias of his testimony.  If he wins as a result of

1  what he is saying here and he makes an extra 15 million, it goes

2  to his bias.

3          **THE COURT:**  Thank you, counsel.

4          **MR. PRICE:**  If Mattel stock goes down.

5          **MR. MCCONVILLE:**  So I don't fully understand what it is

6  he's saying, but I will offer this, Your Honor.  After the trial

7  and during the course of the appeal, Bob Eckert traded millions of

8  dollars worth of Mattel stock before the appellate decision was

9  handed down.

10          **THE COURT:**  What is good for the goose is good for the

11  gander.

12          **MR. MCCONVILLE:**  Exactly, Your Honor.

13          **THE COURT:**  You both want it in or out.

14          **MR. PRICE:**  Both want it in.

15          **MR. MCCONVILLE:**  We don't want it in.  I'm just pointing

16  out a fact, Your Honor.

17          **THE COURT:**  Why don't you want it in?  It would be

18  hilarious.  I'm just joking with you.

19          **MR. MCCONVILLE:**  Right.

20          **THE COURT:**  Why don't you want it in?

21          **MR. MCCONVILLE:**  The information as it relates to Isaac

22  Larian to show that he has a financial interest in the case, it is

23  cumulative.

24          **THE COURT:**  Thank you, counsel.  We'll move on to the

25  next.  Appreciate it.

Page 62

1              We should be on number 15.  Number 15 is the prior jury

2    verdicts, along with all orders related to, and reports from, the

3    forensic auditor, temporary receiver and monitor, all of whom were

4    put in place after the earlier trial as the basis for their

5    appointment.  It has been subsequently reversed by the Ninth

6    Circuit and this Court.

7              Here is the problem I'm having.  I'm really wondering if

8    I make that ruling, can I protect it from you.  I think I can, but

9    my ultimate question is whether I can protect that ruling or not,

10   if I make it.  I don't understand how a jury cannot be prejudiced

11   by knowledge of a prior verdict even though I instruct them that

12   they're to disregard it.

13             That's what's causing me problems.  I don't know how to

14   unring that bell, and I don't know how to unring the speculation.

15   Now jury instructions are supposed to cure that, but...

16        **MR. QUINN:**  Again, Your Honor, I think both sides are in

17   agreement there should be no reference to the prior verdict or any

18   of these other things that are listed here.  Again, the only issue

19   of this agreement is the injunction, which we believe this Court

20   has already addressed and there is no way that should come in.

21        **THE COURT:**  I'm inclined not to allow that in, but let

22   me hear from MGA for just a moment.

23        Counsel?

24        **MS. HURST:**  I think we're in agreement about that.  The

25   point -- I agree with Mr. Quinn.  The point of disagreement is the

Page 63

1    reversed injunction as part of the set-off defense with I think we

2    need to have a protocol about how we're going to refer to the

3    prior trial testimony so that there is not a reference to the

4    prior trial.

5           I think that Mattel is essentially in agreement with

6    that point, if I read their briefs correctly; that we'll need to

7    refer to it by date, transcript of certain date in a prior

8    proceeding or something, in other words.

9           **THE COURT:**  You want to take a recess and you work that

10   out?  We're going to go one by one so...

11          **MR. QUINN:**  Wouldn't it be simple just to say, when you

12   were under oath before, wasn't your testimony.  We don't have to

13   identify the nature of the proceeding.

14          **MS. HURST:**  We will when we are referring the Court to

15   transcripts in front of the jury and the witness --

16          **THE COURT:**  In a prior proceeding.

17          **MR. QUINN:**  Prior proceeding, give the Court the date.

18   At no point should be it necessary to use the T word.

19          **MS. HURST:**  Agreed.

20          **THE COURT:**  Agreed.  So in other words, the motion in

21   limine number 15 is granted, but granted by stipulation of all

22   parties.

23          **MS. HURST:**  Except to the extent of the injunction

24   issue.

25          **THE COURT:**  We'll get to that in just a moment.

Page 64

1          (Brief pause in proceedings.)

2          **THE COURT:**  Number 16, references to claims and defenses

3    no longer at issue, including those claims related to Mattel's

4    RICO claims against Omni 808 investors L.L.C. and IGWT.  I got

5    that confused with number 13.  My apologies.

6          Counsel.

7          **MR. MCCONVILLE:**  So, Your Honor, as we said before

8    earlier, the issue with regard to IGWT and Omni 808 is that

9    they're not in the case anymore.  It would be unduly consumptive

10   of time to have -- to explain what took nine months of discovery

11   to get the information to Mattel's satisfaction.

12          And most significantly, Your Honor, from MGA and Isaac

13   Larian's perspective, there is no way to explain what happened

14   with regard to the Wachovia sale having to occur to Omni 808

15   without identifying that there was a prior verdict against MGA in

16   favor of Mattel.  Because that's what precipitated Wachovia's

17   foreclosure on MGA which precipitated the need to find new

18   financing, which was done at great haste because of the

19   proceedings that were pending and the available financing options

20   were not there because of the proceedings.

21          So, it's not in the; case.  It's not related to any

22   issue in this case; and so it's not relevant.  But if it were to

23   come in, it would require us to refer the jury to the prior

24   verdict which is extremely prejudicial.  And it can only put be

25   put in context by a reference to the prior verdict against MGA.

1          **THE COURT:**  Mattel?

2          **MR. QUINN:**  In the simplest terms, Your Honor, this

3    evidence is relevant to MGA's and Mr. Larian's net worth.  MGA's

4    and Mr. Larian use of sham entities such as Omni 808 and IGWT 826

5    to conceal assets would create the false appearance that MGA owes

6    hundreds of millions of dollars to Omni 808, thus ostensibly

7    reducing MGA's and Larian's net worth.

8          **THE COURT:**  Just a moment.  Explain that to me one more

9    time.  How would it reduce, once again, Larian's net worth?

10   Because he owed substantial sums to?

11         **MR. QUINN:**  That supposedly he owed substantial sums to

12   these, what we contend and we think the evidence is, sham

13   entities; that they were sham transactions.

14         **THE COURT:**  What happens if these entities weren't

15   allowed into trial?  How would he disclaim --

16         **MR. QUINN:**  Presumably in his net worth we would see

17   some reduction for these ostensible obligations.  Maybe they

18   wouldn't refer to these names.

19         **THE COURT:**  Just a moment.  Let's assume that this

20   evidence was excluded for a moment.  I want to turn back to MGA.

21         Would I see such evidence in his reduction in net worth?

22   In other words, is there an expert that you believe you are going

23   to present that would use this?  Be careful.  Spend just a moment

24   with this.

25         (Counsel confer)

Page 66

1          **THE COURT:**  Response from MGA?

2          **MR. MCCONVILLE:**  Yes, Your Honor.  The direct answer to

3     your question of whether the information will appear in a net

4     worth analysis is I don't know because it hasn't been completed.

5     However --

6          **THE COURT:**  What happens if the ruling by the Court is

7     that your expert wouldn't be allowed nor would you be able to

8     refer to such a reduction?

9          **MR. MCCONVILLE:**  Our belief and hope is when the

10    evidence is concluded, Your Honor, there will be no basis on which

11    to award punitive damages and, therefore, the information would

12    only be relevant if there were a basis to a word "punitive

13    damages" and there will not be because there is not clear and

14    convincing evidence of wrongful conduct.

15         **THE COURT:**  That doesn't respond to the question,

16    though.

17         **MR. MCCONVILLE:**  Right, Your Honor.  So we can't say

18    that we would exclude the information because they are not sham

19    transactions.  Each of the witnesses who testified on this

20    transaction, which were all of the investors in Omni 808, advised

21    under oath that it was not a sham transaction.

22         So I know ever since we got in this case, Your Honor,

23    there has been this is a sham, this is a sham, this is a sham.  We

24    have now concluded all of the discovery related to it.  Each of

25    the investors of Omni 808 have been deposed.  Each states that it

Page 67

1    is not a sham transaction.  Each states that they trust and

2    believe that they will get back the $313 million, which is what

3    was owed to Wachovia.  Omni 808 bought the line of debt from

4    Wachovia at a reduction.

5             So right now Omni 808 is owed, and their witnesses say,

6    $313 million from MGA.

7             THE COURT:  Okay.  Mattel.

8             MR. QUINN:  Well, we never did find Mr. Samouhi.  Mr.

9    Larian did not tell the truth about where the money came from.  We

10   had to dig out the fact that the money, some of the money at least

11   came from him.  There are documents specifically referencing the

12   fact that these entities be being used as fronts.

13            THE COURT:  Given all that is true for a moment, let me

14   ask you the relevance.  How does the Court find that this is

15   relevant in light of, let's say Larian's inappropriate activities

16   from your standpoint, but it turns out that the verdict by the

17   jury is overturned by the Circuit; that this Court grants a new

18   trial.

19            In other words, even if he did all those things, the

20   difficulty is time, a nexus to what turns out to be an act that,

21   or a verdict that is not substantiated.

22            MR. QUINN:  We do -- we have to consider the possibility

23   that net worth may ultimately become an issue in this case.  The

24   Court has denied the motion to bifurcate the punitive damages

25   phase.

1      **THE COURT:**  Now, assume for a moment that I change my

2    mind.  That would resolve this issue for the first trial; correct?

3      **MR. QUINN:**  No.  Because it's also relevant to RICO,

4    Your Honor.  Mail fraud, wire fraud.  The Court has previously

5    said that the transfer of ill-gotten gains from such thefts may

6    support a basis for a RICO violation.  I hadn't gotten to that

7    yet.  But that's the whole second half of it as it relates to

8    RICO.  I started with net worth because it seemed to me that's the

9    easiest to talk about.

10      **THE COURT:**  Do you both take the position that the

11    punitives should be bifurcated?

12      **MR. MCCONVILLE:**  Yes.

13      **MS. HURST:**  Yes.

14      **MR. QUINN:**  Yes.

15      **THE COURT:**  How long would the -- remember, I have

16    always said I would ultimately bow to the wisdom of counsel if you

17    ever stipulated.  My position going in is that shouldn't occur.

18    But how long do you think the punitive phase would take?  Because

19    it's going to be in front of the same jury.  I'm not going to call

20    for a recess.  If we get to that stage, I expect your experts to

21    be in the hallway.

22      **MR. QUINN:**  Less than a day.  A day.

23      **MS. HURST:**  I think we would want to reserve the

24    possibility of bringing character witnesses were that to occur,

25    Your Honor.  So it may be two to three days.

Page 69

1          **THE COURT:**  Okay.  A day to four days?

2          **MS. HURST:**  Right.

3          **THE COURT:**  Okay.  Let me consider that.  I may change

4    my position.  Number 17.

5          **MS. HURST:**  Your Honor, we had agreed to defer 17

6    through 22 until tomorrow.

7          **THE COURT:**  Just a moment.  So 17 through what, counsel?

8          **MS. HURST:**  22.  My mistake, Your Honor.  We had agreed

9    to defer 20 through 22.  I apologize.

10          **THE COURT:**  That's fine.

11          **MS. HURST:**  Your Honor, motion in limine 17 is to

12    enforce -- by MGA is to enforce the parole evidence rule and to

13    limit the extrinsic evidence admissible regarding the

14    interpretation of the agreements to that type of evidence.

15          It is admissible under California law.  In particular,

16    without limitation, Mattel's witness list, and my review of the

17    phase one trial testimony, reveal Mattel's intention to call a

18    parade of witnesses to describe what they characterize as their

19    subjective understanding of Mattel's agreements, and/or their

20    beliefs about industry custom.  None of this evidence is

21    admissible.

22          Now we're going to see this in the very first witness,

23    Ms. Ivy Ross, who testified at the prior trial, I understood it

24    covered X.  That's what everybody understands.  She also testified

25    that she couldn't remember ever having read or signed any

Page 70

1    agreement with Mattel.

2           Now Winet v. Price, which is cited in our papers, Your

3    Honor, is probably the best case here explaining how this is

4    supposed to work under California law.  Once the finding of

5    ambiguity is made, that doesn't mean that subjective intent

6    suddenly becomes relevant.

7           We have an objective theory of contract under California

8    law.  That means only outward manifestations of intent are

9    relevant.  And this is what Winet v. Price says.  So it's gotta be

10   an outward manifestation of intent.  It's gotta be a communication

11   by Mattel to the contracting party.  Otherwise, it can't be a

12   mutual intention, which is what is required under California law.

13          So we're looking here to exclude this parade of

14   witnesses saying, I had understood it to mean X; assertions about

15   custom that are untethered to the language of the agreement.

16   Actually, we're looking under motion 19 which is related here and

17   I think was filed as part of the same document.  To exclude any

18   evidence of custom because Mr. Kaye, as the 30(B)(6) witness,

19   admitted that there was no custom relevant to the interpretation

20   of the Bryant agreement.

21          And finally, a third category here is the MGA contract.

22   They tried to bring in the MGA contracts and testimony of MGA

23   employees about MGA contracts to bear on the Bryant/Mattel

24   agreement.  It's completely irrelevant.

25          So, Your Honor, we're looking, and this is going to come

1    up with the first witness and the first whole succession of

2    witnesses when Mr. Quinn asks them about their understanding of

3    the obligations and so forth, for enforcement of the parole

4    evidence rule as a substantive principle of law and as a principle

5    of evidence, which it is.

6              **THE COURT:**  Counsel on behalf of Mattel.

7              **MR. QUINN:**  We're addressing this issue because the

8    Ninth Circuit said that the previous -- the Court had previously

9    failed to consider extrinsic evidence regarding the meaning of the

10   contract.  And so there are three types of -- these three types of

11   extrinsic evidence are relevant here.  Evidence of what employees

12   at Mattel understood this language to mean, including Mr. Bryant,

13   what he understood this language to mean.  That is to say,

14   similarly situated employees as well as MGA's own agreements and

15   what the custom and practice is.

16             It's all very well to that say we have an objective

17   theory of contract construction and we shouldn't look beyond the

18   four corners, and unexpressed intent is irrelevant, but when you

19   look into extrinsic evidence, the core evidence is what the

20   contracting parties understood; what they understood those terms

21   to mean.

22             The question sorts of eats itself.  In the Winet case

23   that concerned a settlement agreement dispute between an attorney

24   and client to a settlement agreement and what their understanding

25   was.  That concerned unexpressed intent.  The question is, is this

Page 72

1    expression of intent, does it properly represent what the parties

2    understood and intended.  The question kind of swallows itself.

3           We can't really apply the extrinsic evidence in the

4    first instance without considering what Mr. Bryant understood it

5    to mean, what people at Mattel understood it to mean, what other

6    Mattel employees who signed the same contract, what they

7    understood it to mean.

8           That, by the way, Your Honor, does battle with MGA's

9    contention that Mattel didn't properly explain the contract; that

10   the contract, as interpreted by Mattel, is not consistent with the

11   employees' reasonable expectations.  They maintain, they go as far

12   as to maintain that the contract is unconscionable.  The fact that

13   other employees understood it the same way and didn't have a

14   problem with it certainly suggests that it was consistent -- there

15   is a reason to believe it's consistent with employees'

16   understandings, and that it's not something that was the wool was

17   pulled over employees' eyes and they weren't given a proper or

18   adequate explanation, since other employees understood what the

19   language means.

20          MGA's own contract, the fact that they have language

21   which is at least as strong, if not stronger than -- to the same

22   effect than Mattel's contracts certainly goes to the same issues.

23   And it also goes, Your Honor, to the question of what MGA should

24   have expected and understood Mr. Bryant's contract provided.  They

25   were on notice that -- we contend they were on notice that people

6c44a4d3-dc84-40cc-8b85-3f0c60c1e274

Page 73

1    in the toy industry enter into contracts just like this.  And that

2    they knew Mr. Bryant had a contract like that.

3            Ms. Garcia was formerly at Mattel.  She had a contract

4    just like that.  She is the one who dealt with Mr. Bryant.  She

5    had every reason to know what his contract provided because she

6    understood -- she testified she understood that if it was created

7    while he was employed by Mattel, Mattel owned it.

8            And that was the understanding of her own contract.

9    They were on notice.  They have their own -- they impose the same

10   obligations on their employees.  Again, goes to reasonable

11   expectations in the employees; is this unconscionable or not.  I

12   think this is exactly the type of evidence that the Ninth Circuit

13   expected this jury to consider.

14           THE COURT:  I'm going to short-circuit this.  I agree

15   with Mattel.  I think you are going to be allowed tentatively, and

16   I'll write up this and give more thought to it, but you are going

17   to be allowed to introduce extrinsic evidence.  The question is

18   how much.  It's not whether you are going to have the gateway

19   opened.  I certainly think that industry custom, MGA's own

20   contracts, and even a portion of your subjective belief in

21   entering into this type of documents is relevant for the jury.

22           I'm still wading through the exhibits and the number of

23   witnesses you propose to call.  When I'm done with that, I'll have

24   a pretty good idea of what I'm going to allow.  But you can expect

25   that the door is open, and I think the Ninth Circuit was rather

6c44a4d3-dc84-40cc-8b85-3f0c60c1e274

Page 74

1    explicit.

2          **MS. HURST:**  Your Honor, if I may.  I have to -- I

3    understand the Court's tentative inclination but with all due

4    respect to both you and Mr. Quinn, that is just an incorrect

5    understanding of California law.

6          The difference between what is admissible and what is

7    not is this:  The witness cannot say, I understood the contract

8    meant X.  The witness can say Mattel's representative so-and-so

9    instructed me that the contract meant X, or disclosed to me that

10   the contract meant Y, or I received the following documents from

11   Mattel which explained to me that the contract meant this.

12         But just a pure statement of, I understood X, is not

13   applicable extrinsic evidence under the parole evidence rule.  It

14   has got to be a Mattel manifestation of intent that's

15   communicated.  They can testify -- if they have some basis for an

16   understanding that comes from a Mattel communication, they can

17   testify to that.  But to just get up there and say, I understood

18   it meant X, is not consistent with the parole evidence rule even

19   in a situation where the contract has been found ambiguous.

20         **THE COURT:**  What about industry custom?  What about your

21   own contracts?

22         **MS. HURST:**  Custom and usage has to be tethered to the

23   interpretation of a specific term in the contract.  I'll give you

24   an example from the case law.

25         One of the cases, I can't remember the name right now,

6c44a4d3-dc84-40cc-8b85-3f0c60c1e274

Page 75

1   it's one of the movie distribution cases.  And the question was

2   whether a reference to the territory United kingdom and the

3   territories and the distribution agreement included Ireland or

4   not.  And obviously geographically Ireland was not part of the

5   United kingdom, but the testimony was that the custom in the movie

6   industry was to treat the United kingdom as if it included

7   Ireland.

8           Custom and usage testimony has got to be about

9   interpreting a term in the contract.  It can't just be there is a

10  general industry custom.  It has to be about interpreting a

11  specific term.  So with respect to the Bryant --

12          **THE COURT:**  I understand that.

13          **MS. HURST:**  So Mr. Kaye, the senior vice president of

14  human resources at Mattel from 1997 forward, testifying as the

15  30(B)(6) witness at Mattel -- and this is motion 19 -- admitted

16  there was no custom with respect to any term in the Bryant

17  agreement.  No particular usage, no special meaning with respect

18  to any term.

19          Okay.  We're entitled to rely on that 30(B)(6)

20  admission.  So they can't -- who better to make such an admission

21  than the guy who is the head of human resources.  He is

22  responsible for making sure these contracts say what they need to

23  say and that they're correct.  They have got all the lawyers in

24  the world to draft these things.  They prep this guy repeatedly as

25  their 30(B)(6) witness.  He comes in and admits there is no custom

Page 76

1    he can identify as to any of the specific terms.

2            They are not allowed to now come and get around that,

3    which is exactly they are proposing to do, with a parade of other

4    witnesses who are going to testify that there was some now

5    undisclosed custom, which we have had no opportunity to

6    cross-examine or otherwise.

7            **THE COURT:**  And your own contract?  Your own agreements?

8            **MS. HURST:**  The language is different.  It's different

9    language.  It's apples and oranges.  It may involve the same

10   subject matter --

11           **THE COURT:**  Thank you very much, counsel.  You have

12   concluded now.

13           On behalf of Mattel?

14           **MR. QUINN:**  Nothing further, Your Honor.

15           **THE COURT:**  Number 18, the Robert Hudnut and Adrienne

16   Fontanella, modifications to their inventions agreement.  Explain

17   this to me.

18           **MS. HURST:**  Your Honor, the issue here is whether the

19   Bryant -- the Mattel agreement that Bryant signed was an adhesion

20   contract.  And Mattel is trying to prove that it wasn't -- that

21   Bryant was somehow entitled to modify the terms by offering this

22   purported evidence that Hudnut and Fontanella supposedly made

23   modifications to their agreement.

24           So the motion is directed to the exclusion of those

25   purported modifications, one, because they don't bear on whether

**6c44a4d3-dc84-40cc-8b85-3f0c60c1e274**

1   it was a take-it or leave-it agreement for Bryant, because they

2   were not, in fact, modifications, and because in all events what

3   high-ranking executives could negotiate, Ms. Fontanella ultimately

4   became the president of the entire girl's division of Mattel, what

5   they could negotiate does not bear on Mr. Bryant's agreement and

6   whether that was an adhesion contract.

7           **THE COURT:**  Thank you.

8           Mattel?

9           **MR. QUINN:**  Your Honor, it's MGA contention that this is

10  a -- Mr. Bryant's contract was a contract of adhesion; that it was

11  take it or leave it.  That he couldn't have raised his hand and

12  said, by the way, I have these Bratz drawings, or something else.

13  I'd like that to be carved out, or something of that nature.

14          Both Mr. Hudnut and Ms. Fontanella did raise their hand,

15  negotiated side letters carving something out, modifying the

16  terms.  We submit that's some evidence that this isn't necessarily

17  a contract of adhesion.  And that would be the purpose for which

18  this is offered.

19          **THE COURT:**  Okay.  Number 19, the agreements and

20  practices inconsistent with Mr. Kaye's admission as Mattel's

21  30(B)(6) witness.

22          You have already stated part of that, counsel, but why

23  don't you complete your thoughts.

24          **MS. HURST:**  Thank you, Your Honor.

25          In addition to the admission that there was no custom

Page 78

1   and usage with respect to the interpretation, Mr. Kaye made a

2   number of other admissions regarding the agreement.  He admitted

3   there was no explanation for the not deletion of the pertinent

4   terms during the drafting history.  The Court will recall it

5   inquired about that at the summary judgment hearing.

6           He admitted that the term "inventions" in the contract,

7   and this was a spontaneous admission, he admitted that it was

8   indefinite because of the including but not limited to language.

9   He just volunteered that, indefinite.  And he could not say what

10  had been omitted.  So Mattel should be precluded from offering any

11  explanation that something specific has been omitted in light of

12  that testimony.

13          **THE COURT:**  Mattel?

14          **MR. QUINN:**  Your Honor, actually that wasn't his

15  testimony.  What he said was that the phrase, "includes but not

16  limited to" in defining inventions.  He said it was, "not fully

17  defined," which obviously it's not.  There is a list of things

18  that which constitute inventions under the agreement.  And it's

19  preceded by the phrase "including but not limited to."

20          So that's not a statement.  In a sense it's indefinite,

21  but I don't know where that gets us here.

22          He said that -- he did actually offer some explanation

23  with respect to the omission of the word "ideas."  He said he

24  wasn't involved in that change in the contract.  But he said that

25  the new phrase was added "including but not limited to" he thought

6c44a4d3-dc84-40cc-8b85-3f0c60c1e274

1    perhaps made it not necessary to list ideas.

2           Now, we may all not find that explanation entirely

3    satisfactory, but it's not fair to say that he had no explanation

4    for it whatsoever.  I think even though he is a corporate

5    designee, Your Honor, we're entitled to qualify and/or explain the

6    statements that he made in his deposition.  They're perfectly

7    entitled to cross him and say, isn't it true that you were the

8    person that was designated as the 30(B)(6) witness, the person

9    most knowledgeable, and your testimony was XYZ.  But that doesn't

10   mean that we can't offer other testimony as well, and he can't

11   qualify and explain his testimony.

12          **THE COURT:**  Just a moment.

13          **MR. QUINN:**  If I may finally, Your Honor?

14          **THE COURT:**  Certainly.

15          **MR. QUINN:**  It's not true to say that he said he was not

16   aware of any custom.  He said he wasn't aware of any custom which

17   informed the interpretation of any of the specific provisions of

18   the contract.  He did not say he wasn't aware of any custom with

19   respect to the entry of inventions' agreements and ownership by

20   employers in the toy industry of inventions made by the employees.

21          **MS. HURST:**  Your Honor, if I may briefly?

22          **THE COURT:**  Certainly.

23          **MS. HURST:**  Mr. Kaye admitted that he had no factual or

24   actual basis for understanding the reason why the word "ideas" was

25   dropped and that he could only assume that.  That is not competent

Page 80

1    testimony to offer an explanation for the omission of the word.

2            With respect to -- I mean, I don't know what to say

3    about Mr. Quinn's argument that 30(B)(6) testimony isn't binding.

4    Both sides produced an enormous number of 30(B)(6) witnesses who

5    testified for an enormous amount of time on the premise that that

6    testimony was going to mean something and it was going to bind the

7    parties.  And it may be that Mattel is unhappy with the

8    performance of their witness --

9            **THE COURT:**  All right, counsel.

10           **MS. HURST:**  -- but we relied on that.

11           **THE COURT:**  Thank you very much.  We're done with the

12   motion now.

13           Number 20, certain testimony offered by Mattel expert

14   Ginger McRae.

15           **MS. HURST:**  20 to 22 we did agree to do tomorrow, Your

16   Honor.

17           THE COURT:  20?

18           **MS. HURST:**  20 through 22.

19           **THE COURT:**  No, not yet.

20           **MS. HURST:**  Okay.

21           **THE COURT:**  We'll delay 20 until Tuesday morning.

22   Number 21.

23           **MS. HURST:**  Same.  Actually, I believe that witness has

24   been withdrawn.

25           **THE COURT:**  We're going to find out.

6c44a4d3-dc84-40cc-8b85-3f0c60c1e274

Page 81

1          **MR. QUINN:**  Yes, Your Honor.  Withdrawn.

2          **THE COURT:**  Just a moment.

3               (Brief pause in proceedings.)

4          **THE COURT:**  You want to delay number 22.  Then I heard

5     you say concerning the proposed testimony offered by the Mattel

6     expert Angel Gomez until tomorrow.

7          **MS. HURST:**  Yes, please.

8          **THE COURT:**  Until tomorrow morning then.

9               Number 23 is a motion to exclude any evidence or

10    argument or reference at trial relating to insurance as it relates

11    to MGA.

12              MGA?

13         **MR. MCCONVILLE:**  Your Honor, Federal Rule of Evidence

14    411 says that reference to insurance should not be considered by

15    the jury.  That's basically the premise of our argument.  And our

16    concern is that Mattel will attempt through at least Brian Wing,

17    the disgruntled ex-employee who had a lot of allegations but had

18    no basis on which to make -- on which to base his statements, that

19    they will attempt to get into issues related to insurance and we

20    move to exclude.

21         **THE COURT:**  Counsel on behalf of Mattel?

22         **MR. PRICE:**  Your Honor, I think there are a couple of

23    basic issues.  One is I'm actually curious as to the extent of the

24    motion in limine, because in their papers MGA refers to excluding

25    evidence of indemnifications agreements.  And I don't know if they

1    mean by this to include indemnification by MGA to witnesses.

2         MR. MCCONVILLE:  No.

3         **MR. PRICE:**  Because we addressed that in the opposition.

4    If they're talking simply about the insurance coverage they have,

5    then based upon the theories they have advanced in the case

6    including the theory that Mattel is litigating MGA to death.

7    Based upon that theory, we should be able to say no, we're not

8    litigating you to death.  Not only are your litigation costs

9    covered, in fact, you have actually financially benefited from the

10   litigation because you have been over reimbursed by the insurance

11   companies.

12        So that part is sort of a question of where they want to

13   go.  One of the cases, I think it's Kemezy v. Peters, Judge Posner

14   said a defendant can't be allowed to plead poverty and financial

15   ruin if the insurance company is going to pick up the tab.

16        Rule 411 doesn't require exclusion of evidence of

17   insurance against liability when it's offered for a purpose other

18   than showing negligence or wrongful conduct.  You can show it to

19   prove ownership, control, bias, or prejudice of a witness.  And

20   obviously you can use it in response to an argument such as the

21   one MGA is making, which is that, in fact, it has been harmed by

22   Mattel's conduct as a result of its litigation expenses.

23        **THE COURT:**  Thank you.

24        MGA.

25        **MR. MCCONVILLE:**  Your Honor, we absolutely intend to

Page 83

1    argue that Mattel has litigated MGA to death.  The fact that

2    someone else -- it's the equivalent of saying well, this person

3    was harmed, however, somebody else is picking up the bill so it's

4    okay.  That's precisely what rule 411 says you cannot do.

5            **THE COURT:**  Why is that argument relevant?  If there is

6    litigation to death, it may be because the Circuit overturned

7    phase one.  This Court granted a new trial on an all particulars

8    over Mattel's opposition because of -- I don't understand how you

9    prove this allegation that Mattel is litigating you to death,

10   whether that's true or not.  And I don't know why that's relevant

11   in front of the jury.

12           **MR. MCCONVILLE:**  It goes to -- there is a later motion

13   in limine, Your Honor, but in essence, the story that we would

14   suggest goes something along these lines:

15           MGA got the rights to Bratz and was wildly successful.

16   While it was wildly successful, Barbie was falling apart.  It was

17   going down.  And there are documents and testimony from Mattel

18   that have been produced in discovery that say, we need to use

19   litigation as a strategy to defeat Bratz.

20           So the argument would go along the lines of while Bratz

21   was succeeding, Mattel was failing.  And in order -- when it could

22   not compete in the marketplace, it decided to sue MGA and then

23   made the allegations that although hundreds of -- over 100

24   employees left the employ of Mattel, a handful came over and

25   therefore there's a wide-ranging theft plan to steal trade secrets

Page 84

1    despite the fact that each of those witnesses said, in fact, that

2    that they were told not to bring them.

3              So in other words, they're going to keep pushing ahead

4    with the litigation as a way to compete in the marketplace when

5    they can't compete in the marketplace.

6              THE COURT:  If your claim is that Mattel is litigating

7    you to death and you are so harmed by this, why isn't the

8    insurance and the fact that you are not really so harmed thus far

9    by it irrelevant?  Why shouldn't be it received?  Why isn't Posner

10   right?

11             MR. MCCONVILLE:  Because, Your Honor, it's blaming the

12   victim.  Just because we have an insurance policy to protect us

13   from over-litigiousness doesn't mean we're not harmed.

14             THE COURT:  Mattel?

15             MR. PRICE:  It certainly shows they're not being harmed

16   in the way they're saying they're being harmed.

17             THE COURT:  What was the case you have cited where

18   Posner speaks to this issue?

19             MR. PRICE:  The case where Posner speaks to pleading

20   poverty is Kemezy v. Peters, 79 F.3d 33, page 37, Seventh Circuit

21   1996.

22             THE COURT:  Is there a Ninth Circuit case?

23             MR. PRICE:  Let me see, Your Honor.

24             THE COURT:  Well, if it is, it's cited in your brief.

25             MR. PRICE:  We do discuss in our brief, as does MGA, I

6c44a4d3-dc84-40cc-8b85-3f0c60c1e274

Page 85

1    think the Larez case.

2            THE COURT:  Number 24, this is the motion by MGA to

3    exclude any evidence, argument, or other reference at trial

4    relating to me MGA's fraudulent concealment of Brian's involvement

5    in Bratz.

6            Let me hear from MGA.

7            MS. HURST:  So Your Honor, the problem that we have here

8    is that MGA has a statute of limitations defense and Mattel wants

9    to make a rebuttal to that defense with fraudulent -- an

10   allegation of fraudulent concealment.  And by doing that, they are

11   injecting Mattel's actual knowledge and its actual state of mind

12   concerning the events in this litigation while at the same time

13   trying to assert the attorney-client privilege concerning that

14   actual knowledge and state of mind and communications and analysis

15   regarding the claims in the case.

16           This is impermissible under the Hearne Test.  And there

17   are numerous cases which say you cannot maintain a fraudulent

18   concealment rebuttal to the statute of limitations defense while

19   at the same time asserting the attorney-client privilege over

20   investigations and other matters related to the claims.  It

21   directly places it at issue.  It's an implied waiver.  They're

22   using the attorney-client privilege here as a shield and sword by

23   asserting fraudulent concealment but seeking to cloak those

24   communications.  It is grossly unfair.

25           THE COURT:  Thank you.

Page 86

1          Mattel?

2          **MR. PRICE:**  Your Honor, both Judge Lawson and you have

3    already looked at this and decided that Ms. Hurst is wrong.  And

4    so I guess -- of course this is covered in our opposition and I

5    guess the question is whether you want to hear my mellifluous

6    voice at this time?

7          **THE COURT:**  I do.

8          **MR. PRICE:**  Your Honor, under the Hearne Test both you

9    and Judge Larson have said just because something is relevant,

10   doesn't mean that you can get it, and it doesn't preclude from you

11   making claims where there are other areas of information you can

12   inquire about.

13         In this case MGA has been able to inquire as to every

14   Mattel witness they wanted to as to when they learned, not that

15   MGA was selling Bratz, or that even Mr. Bryant was connected with

16   Bratz while at MGA, but whether or not Mattel had any idea that,

17   or had reason to believe that Mr. Bryant, while at Mattel, had

18   developed Bratz.  And there are e-mail strings about this.  There

19   is plenty of evidence about this.  And under the authorities that

20   we have cited many times, we can go forward with that claim even

21   though we're asserting the attorney-client privilege on an

22   investigation as to whether there is copyright infringement

23   concerning Diva Starz and Toon Teens, which, of course, is a

24   completely different issue as to whether or not Mr. Bryant, while

25   he worked at Mattel, created Bratz.

1          **THE COURT:**  Anything further by either party on that?

2          **MS. HURST:**  Yes, Your Honor.  The problem as Mr. Price

3   has just posited it is not the relevant standard in any way,

4   shape, or form based on the claims that we now have in this case.

5   They're not prosecuting, and the value of this case, lies in their

6   Bratz trade secret claim.  The standard that Mr. Price just

7   articulated has nothing to do with that claim.

8          They want to maintain this Bratz trade secret claim

9   despite the fact that they were conducting investigations, and

10  those investigations we don't have the full contents of,

11  undoubtedly disclose information about their knowledge at various

12  dates and time, their suspicions and their beliefs as it bears on

13  the Bratz trade secret claim.

14         Now, let's call the state of fact here.  Mr. Villaseñor

15  snuck into our showroom in February or so of 2001 and

16  disseminated, widely throughout the company, reports calling

17  Bratz, Diva Starz with a smarty attitude.  At the time that

18  occurred, they knew Paula Garcia was working at MGA.  They knew

19  she had been exposed to the name Bratz as part of the Diva Starz

20  naming process.  They knew they had considered Bratz as a name for

21  Diva Starz.  And now, as Mr. Price just confirmed, they were

22  looking into whether it was a Diva Starz infringement.

23         Yet, they want to cloak all of that shield in the

24  attorney-client privilege and at the same time claim, we didn't

25  know we had a claim.  Not only did they want to say, we didn't

1  know that we had a claim, they want to point the finger at Isaac

2  Larian and say, he tricked us into believing we didn't have a

3  claim, while they're sitting on those documents and communications

4  that pertain directly to Diva Starz, this Bratz trade secret

5  theory that they sat on for nine years.  Nine years they sit on

6  this until it's first disclosed as a trade secret, even though

7  they had all of the information at their disposal by the spring of

8  2001.

9           Now, this is unfair.  It is not appropriate.  They have

10  injected their state of mind directly at issue.  We didn't have

11  any other way to discover their state of mind other than these

12  communications; their evaluation of these claims.  Have we been

13  able to ask every relevant witness?  We most certainly have not.

14  Let me give you some names.

15          Michele McShane, the in-house counsel who, in early

16  2002, was running this inquiry, has dropped off the face of earth.

17  We are on our third private investigator trying to find this woman

18  to subpoena her.  She's changed her name.  She has no permanent

19  residence.  We absolutely believe that they're still in

20  communications with her.  We have asked them repeatedly to assist

21  us and they will not.  And we have not been able to depose her.

22          Now, let me tell you, Your Honor, that only leaves one

23  person, and he is sitting in the courtroom at counsel table for

24  Mattel.  It's Michael Zeller.  And we have not gone there.  We

25  have not sought to depose Mr. Zeller.  We have not gone there.

Page 89

1  But they cannot keep asserting the attorney-client privilege over

2  these communications with this Bratz trade secret claim.  It's no

3  longer about whether they knew.  Mr. Bryant was working at MGA

4  while he was still employed by Mattel.

5         That's not what it's about anymore.  In their own

6  interrogatory responses they say that the fact that Bratz was the

7  name of the product and that Paula Garcia was at MGA gives rise to

8  an inference of trade secret misappropriation.  That is an

9  inference that they knew all of the facts about early in 2001, and

10  yet they want to cloak all of their investigative activities in

11  the attorney-client privilege and claim they lack actual knowledge

12  because Isaac Larian tricked them with press statements.

13         It's outrageous.

14         **THE COURT:**  Counsel for Mattel.

15         **MR. ZELLER:**  With the Court's permission, Mr. Price

16  asked me to respond to some of these particularly particular

17  factual claims that are being made.

18         Number one, there is really a judicial estoppel problem

19  here for MGA.  The Court will recall that we made efforts to

20  inquire into Mr. Browers' communications with MGA regarding what

21  was his admitted knowledge regarding Sal Villaseñor's activities

22  for purposes of statute of limitations against their claims.

23         MGA asserted privilege, and they won.  This is exactly

24  the same situation.  It's simply flipped.  And the Court has

25  already commented on that very point and said to the extent that

Page 90

1    obviously that the Court revisits this issue, and we don't think

2    there is any reason to do it, the same would apply to MGA.  At

3    this point it's really just a judicial estoppel for MGA.  They

4    asserted the same position and they won.  They are bound by it.

5            Number two, MGA continues to mischaracterize our trade

6    secret claim.  Our trade secret claim, like our copyright claim,

7    is based upon what Carter Bryant created when he was a Mattel

8    employee.  Mattel owns that by virtue of the contract and by

9    virtue of law.  These are the matters that Carter Bryant created.

10   We are not arguing that he copied or took other materials from

11   other projects.  The point of Toon Teens, the point of Diva Starz

12   is not that that was a separate property interest that we had that

13   was misappropriated or copied or stolen.  It was simply to prove

14   timing.

15           MGA, and the Court will see this when we eventually see

16   exhibits from MGA, but MGA wants to put in front of the jury a

17   wide variety of materials, including ads from magazines and all

18   manner of things to say this is really what inspired Bratz.  And

19   this really shows what the timing was of the creation of Bratz and

20   confirms, in their view, that it was created in 1998 in Missouri.

21           Our point is there are later created materials that, in

22   fact, rebut that inference.  So this is inspiration.  It's not

23   copying.  It's not the basis of our claim.  It's evidence.  So

24   it's a mischaracterization of our trade secret claim.  It is being

25   done by lifting snippets out of context, out of papers, including

Page 91

1    out of our interrogatory responses.

2           Number three, the bottom, this boils down to a complaint

3    that they're not getting attorney-client information.  This is

4    simply a rehash of the same arguments that the Court has already

5    rejected.  The fact -- they're simply arguing this is relevant and

6    we really need it.  It doesn't change the prior decisions and

7    should not change the prior decisions of the Court.

8           Specifically, talking about Michelle McShane who was an

9    attorney is that same very point.  It just simply continues to be

10   a complaint that they're not getting attorney-client privilege

11   communications which, of course, is always true when the

12   attorney-client privilege is asserted.  That is not and cannot be

13   enough to work a waiver or an implied waiver under the law.

14          **THE COURT:**  Okay.  Counsel, anything further?

15   Submitted?

16          **MS. HURST:**  Your Honor, just one point on the Brower

17   point.  That is not the argument we made, but I have consistently

18   stated before this Court that we will absolutely accept even

19   application of the rule.  And if we have to disclose regarding

20   whatever Mr. Brower told counsel regarding the Villaseñor stuff,

21   we will, if it comes to that and we're alleging fraudulent

22   concealment.

23          I have said we weren't alleging it, but if we were, we

24   will absolutely accept evenhanded application of that rule.

25          **THE COURT:**  Okay.

Page 92

1          MR. PRICE:  Nothing further on this, Your Honor.  I

2    would ask the Court to allow me to take my leave for reasons

3    previously --

4          THE COURT:  Certainly.  You are excused this evening

5    counsel.

6          Number 26.

7          MR. MCCONVILLE:  Your Honor, the parties had requested

8    to put over the expert -- the Daubert motions in limine until

9    tomorrow morning.

10         THE COURT:  Let's go through those.  Number 26 would be

11   Bruce Green; number 27 John Alex; number 28, Jeffrey Kinrich.  So

12   that would be 26 through 28?

13         MR. MCCONVILLE:  25 as well, Your Honor.

14         THE COURT:  25, okay.

15         MR. MCCONVILLE:  Oman.

16         THE COURT:  Number 29.

17         MS. HURST:  Your Honor, also 29 through 34 are all

18   expert motions that we agreed we would do tomorrow.

19         MR. MCCONVILLE:  With one exception, Your Honor.  Number

20   33 I believe Mattel has agreed to withdraw that expert.

21         THE COURT:  Just a moment.  What is number 31?  The

22   report by Mattel's expert Lee Loetz, what does that refer to?

23         MS. HURST:  Your Honor, again, that's their expert that

24   they incorporated in their copy infringement interrogatory

25   response.  Our view is that's relevant only to the extrinsic test

6c44a4d3-dc84-40cc-8b85-3f0c60c1e274

Page 93

1    and doesn't come before the jury.  We can address that tomorrow as

2    well.  That issue arises through several of the reports of the

3    various experts they're offering.

4           THE COURT:  Kenneth Hollander, what does his report

5    refer to?

6           MS. HURST:  Your Honor, they have offered him.  He has

7    done a survey, or purported to do a survey, I should say, where he

8    asked a bunch of girls whether they recognize Bryant's drawings.

9    I think it's being offered for the purpose of trying to prove

10   copyright infringement.  It's not admissible for that purpose.

11   And the survey is defective in numerous respects.  This was also

12   excluded by Judge Larson.

13          THE COURT:  Is that true, counsel, Judge Larson

14   previously excluded this witness?

15          MR. QUINN:  No.

16          THE COURT:  Take it up in a moment.

17          Are you withdrawing Nicholas Mirzoeff?

18          MR. MCCONVILLE:  Yes.

19          THE COURT:  Which is number 33?

20          MR. MCCONVILLE:  Yes.

21          THE COURT:  What about Heather McComb?

22          MS. HURST:  Your Honor, I'm not ready on this one.

23          MR. MCCONVILLE:  McComb is also an expert being offered.

24   I believe the opinion is something to the effect that the Bryant

25   drawings were fully developed design drawings from which a product

Page 94

1    could be made.

2            THE COURT:  Okay.  Number 35.

3            MS. HURST:  Your Honor, 35 is an argument to enforce the

4    Ninth Circuit doctrine that they're not allowed to argue about

5    similarities of unprotected elements and confuse the jury by

6    offering a bunch of testimony about similarities and things that

7    the Court has determined can't be protected under copyright.

8            MR. QUINN:  Could we put this one over to tomorrow, Your

9    Honor?  Mr. Price had prepared to argue this.

10           THE COURT:  Certainly.  Number 36, Frank Keiser.

11           MR. MCCONVILLE:  Your Honor, he is another Mattel expert

12    who, I believe, we agreed to take up tomorrow.  But, in essence,

13    he did 3D modeling of a sculpt compared to a doll.

14           THE COURT:  Number 37, to exclude evidence, argument, or

15    other reference at trial relating to testimony that is beyond

16    Mattel's interrogatory response.

17           MR. QUINN:  Mr. Price was to argue the next four, 37

18    through 40.  I'd be grateful if we could put those over until

19    tomorrow.

20           THE COURT:  I'm going to allow him in as counsel, and I

21    understand the situation, but I'm going to do it this evening.  We

22    have got to rectify that somehow.

23           MR. QUINN:  I appreciate that.

24           THE COURT:  I don't know how to do that without being

25    unkind, but I have got to have these evening hours to have things

Page 95

1    resolved.

2           **MR. QUINN:**  I will say, Your Honor, we have a boatload

3    of Mattel ones.

4           **THE COURT:**  We're going to get to those, trust me.

5    We're going through every one of them tonight.

6           All right, 41?

7           **MR. QUINN:**  That's the bifurcated punitive damages, Your

8    Honor.  I think we have discussed that already.

9           **THE COURT:**  I think I'm going to reverse myself,

10   counsel.  So let me have a little bit of time this evening after

11   you leave.

12          All right, Mattel.

13          **MR. QUINN:**  Mattel motion number one, Your Honor?

14          **THE COURT:**  Just a moment.  Number one, counsel,

15   concerning not properly disclosed rule 26 expert opinions, what

16   are those?

17          **MR. QUINN:**  I'm lost, Your Honor.  Mattel number one.

18          **THE COURT:**  Mattel number one.

19          **MR. QUINN:**  Are you on Daubert number one?

20          **THE COURT:**  Daubert number one.

21          **MR. QUINN:**  We would request if we could put the Daubert

22   motions over until tomorrow.

23          **THE COURT:**  Tell me a little bit about this motion.

24          **MR. QUINN:**  The basis for this motion, Your Honor, is

25   that MGA withheld apportionment -- opinions relating to

6c44a4d3-dc84-40cc-8b85-3f0c60c1e274

Page 96

1   apportionment; that is to say, the alleged value attributable to

2   their own efforts independent of the value of the copyrighted work

3   until their rebuttal opinion.

4          So we did not have an opportunity to address that.  And

5   this is something that they bear the burden of proof of

6   apportionment being MGA's responsibility to prove.

7          THE COURT:  Okay.  The Daubert motion, Mattel's MIL to

8   exclude opinions and testimony of James Malackowski.

9          Explain that to me.

10         MR. QUINN:  Mr. Malackowski is the damages expert for

11  MGA.  And for a variety of reasons set forth in the motion, we

12  believe his opinions need to be excluded first, and perhaps most

13  significantly, because his motion is damage theories, and

14  calculations are based on the existence of the injunction which,

15  as we discussed many times, we don't believe should be coming into

16  evidence.

17         THE COURT:  You want to argue that this evening?

18         MR. QUINN:  We had planned to request to argue all the

19  Daubert motions tomorrow, Your Honor.

20         THE COURT:  All right.  Number three, Mattel's MIL

21  motion to exclude opinions and testimony of Yehuda Bassok.

22         Who is that?

23         MR. QUINN:  MGA's expert on the value of Mattel trade

24  secrets.  He basically opines that Mattel trade claim secrets

25  don't have any value at all.

Page 97

1          THE COURT:  But MGA's does?

2          MR. QUINN:  I don't think he gets into that side of

3    things, Your Honor.  But the objection is he lacks foundation.  We

4    also have a pending motion to complete his deposition.

5          THE COURT:  Number four, the motion to exclude the

6    opinions and testimony of D. Jan Duffy.  Who is that?

7          MR. QUINN:  Jan Duffy is an MGA expert.  This is a

8    Daubert motion.  She is basically an employment expert, and she

9    purports to offer a number of opinions about how Mattel's contract

10   procedures with its employees are inappropriate; Mattel doesn't do

11   an adequate job, or did not do an adequate job on explaining

12   things; various shortcomings, and Mattel's human resource and

13   intellectual property practices.

14          I would say her report and opinions were entirely

15   excluded pretrial by Judge Larson and for the same reasons we

16   believe that she ought to be excluded here.

17          THE COURT:  Did Judge Larson exclude her, counsel?

18          MS. HURST:  I don't know.  I didn't believe so.  I do

19   have the cite on Hollander now for the Court, if it wishes it.

20          Your Honor, it may be the case that Judge Larson

21   excluded it, but recall that Judge Larson had decided what the

22   contract meant as a matter of law.  So that would be very

23   different situation.

24          THE COURT:  Motion to exclude testimony by Glenn Vilppu.

25   Who is he?

6c44a4d3-dc84-40cc-8b85-3f0c60c1e274

Page 98

1          **MR. QUINN:**  He is a --

2          **MS. HURST:**  He is an art expert, art and animation.

3          **THE COURT:**  Okay.  Thank you.  Motion number six.

4          **MR. QUINN:**  Mr. Joachimsthaler.

5          **THE COURT:**  Who is he?

6          **MR. QUINN:**  He is an expert in brands and marketing.

7    His opinion goes to -- and this, we think, is probably by the

8    wayside now as we understand it, the importance of trapezoidal

9    packaging to the MGA brand.

10         **THE COURT:**  It doesn't seem to be relevant.

11         **MR. QUINN:**  And the effect of that packaging.

12         **THE COURT:**  We'll find out from MGA real quick why they

13   think he's relevant.

14         **MS. HURST:**  Your Honor, his initial report related to

15   those now dismissed claims is not, but his additional -- he has

16   got additional opinions and reports related to the apportionment

17   issues, related to rebuttal to several of Mattel experts.

18         **THE COURT:**  I'm sorry.  To what issues do you think he

19   is relevant to?

20         **MS. HURST:**  Apportionment, Your Honor.  That is who is

21   responsible for the value in Bratz.  He is offering opinions

22   related to that and also explaining brand valuation, the

23   significance of brands, what it takes to build a brand, where the

24   value comes from, how MGA went about doing that.

25         **THE COURT:**  He is obviously precluded from the

Page 99

1    trapezoidal packaging area.

2              **MS. HURST:**  Right.

3              **THE COURT:**  Daubert number seven.

4              **MR. QUINN:**  This is addressed an MGA expert, Samuel

5    Rubin, who gives certain opinions about the, what we refer to as

6    wiping software that was run on Mr. Bryant's computer,

7    Mr. Machado's computer and various MGA employees computers in many

8    cases the day before or the very day their computers were imaged.

9    It this includes Evidence Eliminator and so-called Beclean.

10             **THE COURT:**  What is he going to say?

11             **MS. HURST:**  He's going to say there is no evidence of

12   any deletion of anything, and is going to explain what Beclean is.

13   Obviously this is subject to our motion in limine that none of

14   this stuff should be coming in.

15             (Recess taken, from  9:59 to 10:21.)

16             **THE COURT:**  Back on the record.  All counsel are

17   present.

18             In limine motion number one, to exclude -- Mattel's

19   motion to exclude evidence, argument or reference to whether

20   Mattel would have marketed Bratz.

21             Mattel?

22             **MR. QUINN:**  Your Honor, it's utterly irrelevant to

23   Mattel's copyright, tort, and other claims whether or not Mattel,

24   in the hypothetical contra-factual world, whether, if Mr. Bryant

25   had brought Bratz to Mattel, whether Bratz -- whether Mattel would

1    have brought it to market.  It just is not relevant to any of

2    those elements.

3          The opposition misunderstands Mattel's damages theory.

4    Mattel does not seek -- and I emphasize this -- does not seek to

5    recover damages based on its lost opportunity to market Bratz.

6    Instead, Mattel seeks to recover, among other things, it's lost

7    profits from sales of Barbie that are attributable to MGA's sales

8    of Bratz.  It's lost market share.

9          It also seeks to recover MGA's incremental profits from

10   Bratz and a reasonable royalty for MGA's use of Mattel property.

11         THE COURT:  I thought that -- I'm sorry.  Please

12   continue.

13         MR. QUINN:  In other words, reasonable royalty, the law

14   is absolutely 100 percent clear, it doesn't require that you prove

15   that the owner of the property would have been willing to license.

16   That's utterly irrelevant.  Reasonable royalty is determined based

17   on a market-based approach as to what a willing buyer would have

18   been reasonably required to pay to a willing seller.  Mackie v.

19   Rieser, Ninth Circuit opinion, 2002, 296, F.3d 909.

20         It's a hypothetical market-based determination.  It has

21   nothing whatsoever to do with whether or not, in fact, this

22   particular licensor would have been willing.

23         THE COURT:  MGA?

24         MS. HURST:  Your Honor, whether Mattel would have

25   marketed Bratz is relevant to whether it had any economic value as

6c44a4d3-dc84-40cc-8b85-3f0c60c1e274

1    a trade secret to Mattel.  It can't have independent economic

2    value to Mattel for not being generally known in the industry if

3    they had no intention of exploiting it, number one.

4            It's economic value that the trade secret measures.  If

5    they had no intention of exploiting it, they had no economic

6    value.

7            Number two, they are claiming lost opportunity damages,

8    whatever they may say.  It was the basis for the damages theories

9    in the entire phase one trial, on the tort claims.  They claimed

10   all of MGA's profit on the tort claims.  Disgorgement is not a

11   remedy.  They claim them as actual damages.  And the only way to

12   do that is if you are claiming lost opportunity.

13           They are seeking, again, on their intentional

14   interference with contract claim.  Their theory is that Mr. Bryant

15   failed to disclose Bratz to Mattel and that MGA somehow induced

16   that failure to disclose.  They're, again, seeking all of MGA's

17   profits on Bratz associated with that interference with contract

18   claim.

19           That is a lost opportunity damages claim.  So it's

20   relevant to numerous points.  Economic value, damages, and others.

21   And absolutely is admissible and should come in.  This is highly

22   relevant evidence.

23           **THE COURT:**  Okay.

24           Mattel?

25           **MR. QUINN:**  Your Honor, under the California trade

Page 102

1    secret version of the Uniform Trade Secrets Act it does not have

2    to have actual economic value based upon present exploitation or

3    use.  What the statute says is that it must derive independent and

4    economic value, actual or potential, from not being generally

5    known.

6            So it's simply not true that it has to be something that

7    we were using or prepared to use.  It can have value, under the

8    statute, if it had potential value.

9            And it is -- we're entitled to recover disgorgement of

10   profits which is different than lost opportunity.  That's the

11   distinction that I submit MGA is missing here.  Yes, we are

12   entitled to recover profits on a disgorgement theory under various

13   of our tort theories, but that is not the same as seeking the lost

14   opportunity of having marketed and sold Bratz ourselves.

15           Not only is that legally deficient, but it's hopelessly

16   speculative about what would have happened, whether Mattel would

17   have exploited Bratz, what profits Mattel would have achieved from

18   exploiting Bratz.

19           **THE COURT:**  MGA?

20           **MS. HURST:**  Your Honor, I think Mr. Quinn's quotation of

21   the Trade Secrets Act just demonstrates precisely why this

22   evidence has to come in; actual or potential economic value.

23   We're entitled to prove it didn't have any.  They need -- they

24   have to stand up and tell the jury, yes, it didn't have any value

25   to us, and this is just a right to kill someone else from using it

Page 103

1   that we are trying to enforce.

2         They don't want to be in that position.  I can

3   understand why not.  But that doesn't mean this isn't highly

4   relevant evidence under the Trade Secret Act.

5         Now, with respect to disgorgement, I don't think

6   disgorgement is available as an equitable remedy.  The only way to

7   understand them seeking all of MGA's profits as compensatory

8   damages, actual compensatory damages, is as a lost opportunity

9   claim.  And when we move for summary judgment on the lost

10  opportunity claim, they opposed that motion.  They objected to

11  that motion.  They put in evidence in opposition to that motion

12  asserting they had a right to maintain the lost opportunity claim.

13        THE COURT:  Thank you.  In limine motion number two

14  brought by Mattel to exclude --

15        MR. QUINN:  Evidence about Mattel's purposes and

16  motives.

17        THE COURT:  The litigation-to-death strategy.

18        MR. QUINN:  Yes, Your Honor.  We have talked about this

19  to some degree.  We think it's well-settled that motive in

20  pursuing litigation is irrelevant.  It's not relevant to any of

21  the elements or claims.  We cited the cases in our moving papers.

22  MGA doesn't really discuss any of our authorities.

23        The Memory case which they referred to, they rely on

24  heavily, is inapposite because there the Court simply deferred a

25  ruling and noted that motive could be relevant for impeachment,

Page 104

1    bias, or other purposes, but there is no discussion in that case

2    that suggests that that case, or the decision in the case is at

3    all analogous to this case.

4          There simply is no basis to get into why a party chooses

5    to pursue its legal rights, Your Honor.  And I will say that there

6    is no document that supports the idea that Mattel pursued

7    litigation as a business strategy or attempted to, or has

8    attempted to litigate MGA to death.  There is no such document.

9          **THE COURT:**  MGA?

10          **MR. MCCONVILLE:**  Your Honor, as we said before, when the

11   issue came up on MGA's motion, it is relevant to show that while

12   the Barbie brand flailed and while Bratz was successful, Mattel

13   waited and waited and waited until the product was beating its

14   pants off in the marketplace and, in response, filed a lawsuit.

15   That's issue one.

16          Issue two, it also goes to address the issue which we

17   have heard will be raised, that is, that somehow MGA fraudulently

18   concealed the information associated with Bratz.  What we intend

19   to offer is evidence to show that Mattel has an ability and, in

20   fact, a very strong practice of investigating anyone associated

21   with it, including e-mail filters, including surveillance of

22   anyone, including sneaking into showrooms, all by way to show that

23   Mattel had the evidence that it needed in order to prosecute this

24   case, and waited until January 2007 in order to file its

25   affirmative claim against MGA.

Page 105

1              And the argument and inference can be that it was

2      litigation as a strategy when it couldn't compete in the

3      marketplace.  And I'll add this same motion was brought to Judge

4      Larson who did not rule in favor of Mattel on it.

5              **MR. QUINN:**  That's not correct.  Judge Larson granted a

6      motion in limine, quite clearly, that motive for bringing the case

7      was irrelevant.

8              **THE COURT:**  Anyone else?  All right.

9              **MR. QUINN:**  Submitted.

10             **THE COURT:**  In limine motion number three.  I think this

11     has already been agreed to, but I want to perfect the record.

12     That is to exclude evidence and argument, reference to the initial

13     trial verdict, judgment and appeal.

14             **MS. HURST:**  The thing that's not agreed, Your Honor, is

15     just the reversed injunction set-off theory.  Other than that,

16     subject to our earlier agreements regarding how we're going to

17     refer to prior testimony and so forth, I think it's agreed.

18             **THE COURT:**  Okay.  Number four.

19             **MS. HURST:**  This is agreed.

20             **THE COURT:**  Agreed by both parties?

21             **MR. QUINN:**  Yes, Your Honor.

22             **THE COURT:**  Finally, down to wrongful injunction with

23     number five.  The request to exclude evidence or reference to

24     wrongful injunction as an element of damages for MGA's affirmative

25     claims and layoffs, harms to consumer or other alleged adverse

Page 106

1    consequences of a verdict for Mattel.

2              Mattel?

3              **MR. QUINN:**  I think we have discussed this, Your Honor.

4              **THE COURT:**  MGA?

5              **MS. HURST:**  Your Honor, Mattel -- I understand the

6    Court's ruling on the wrongful injunction affirmative claim, but

7    what Mattel has not addressed meaningfully at all is the set-off

8    defense.  A set-off defense is available when an affirmative claim

9    is not; when you have been harmed by the actions of the other

10   party, but for some reason you cannot make an affirmative claim.

11   That is what a set-off defense is for.

12             So yes, the Court has ruled that the reversed injunction

13   cannot support an affirmative claim.  We don't -- we made our

14   record on that, but the set-off defense is available when an

15   affirmative claim is not.  And Mattel has cited no case saying the

16   set-off defense is unavailable on this theory.  The only case that

17   either side has found on point is a case that supports our

18   position.  It's a scholarly opinion.  It's a well-reasoned

19   opinion.  The Court was very careful to trace through in this

20   Dornan case 100-some years of Supreme Court precedent supporting

21   this.  The Court held at an absolute minimum it has to be

22   available as a set-off.

23             Now, I know the Court is concerned from its comments

24   this evening, and both parties agree, that other aspects of the

25   prior proceeding should not be in the case.  We proposed an

1    instruction to deal with that in our opposition.  This does not

2    need to be a slippery slope.  The Court had an independent

3    obligation to enter -- to assess and enter the injunction.

4           So this is not a situation where it backs up to the

5    verdict, because the Court always had an independent duty to

6    consider the equitable relief.  And in fact, Judge Larson made

7    clear that he had independently considered it and entered his own

8    orders.

9           So it's a fairly straightforward matter to instruct the

10   jury as to this reversed injunction theory.  Mattel sought and

11   obtained an injunction from another judge at an earlier time in

12   the proceeding.  The injunction was entered on terms as we have

13   discussed in our proposed instruction.  It was later reversed.

14   And MGA claims it was damaged by that.  If the jury finds that MGA

15   was damaged, it may consider that as part of the set-off defense.

16   It's that simple.  It does not need to be super complex.  It does

17   not need to devolve into other things.

18          There are 100 years of Supreme Court precedent saying

19   that parties are entitled to be compensated when they're

20   wrongfully enjoined.  Going back to the Arkadelphia and Brashear

21   cases, these have not been overruled.

22          MGA's damages expert based on factual support from MGA's

23   witnesses will testify regarding disruption in relationships, loss

24   of brand value, lost sales and profits, and other categories of

25   damages attributable to the reversed injunction.  It's about a

1   $250 million swing in the set-off defense.

2          So, Your Honor, respectfully this is a viable and

3   appropriate and legitimate legal theory.  The jury can be charged

4   on it with a minimum of fuss and it's not a slippery slope to the

5   other prior proceedings.

6          **THE COURT:**  Okay.

7          Mattel?

8          **MR. QUINN:**  Even the Dornan case, as the Court knows,

9   only provided that there could be recovery of restitutionary

10  damages when there was a wrongful injunction.  And I don't hear

11  MGA disputing that clear holding of the Dornan case.  They're not

12  seeking restitutionary damages.  There is nothing to be restored

13  to MGA here.  There is no claim that there is something that

14  should be restored to MGA.  So it has no application here.

15         There is no support for this distinction between a

16  wrongful injunction claim and a set-off in these circumstances.

17  The argument we have heard about Arkadelphia case, this is just a

18  rehash of what we heard before.  The Court will recall the

19  authority is, under those line of cases, that you can only have a

20  claim for damage for wrongful injunction in situations where there

21  is a bond.

22         So I think this is a complete rehash of things we have

23  already discussed.  If we get into set-off, we're going to have to

24  get into why did Judge Larson enter the injunction; what were the

25  things that influenced him; did the injunction even go into

1    effect.  Presumably we'll then be litigating that issue.  The

2    timing of orders of the Court, what that meant.

3            As the Court knows under our view of the chronology,

4    that injunction never even went into effect.  We think this is the

5    same old-same old, Your Honor.

6            MS. HURST:  Your Honor, we certainly do not agree that

7    the rationale of Dornan with respect to the set-off defense is

8    limited to restitutionary measure.  But in all events we believe

9    that some or all of the elements described will satisfy that legal

10   test.  We don't have to go behind Judge Larson's decision and what

11   motivated it.  The Nintendo case makes that clear.

12           There is no element of bad faith required in the Ninth

13   Circuit for a reversed injunction.  You just say did they have the

14   right to do what they had been enjoined from doing, and the answer

15   to that question is yes by virtue of the reversal, and that's the

16   end of it.  It doesn't require going behind Judge Larson's

17   deliberative process in any way, shape, or form.

18           The Court previously expressed a concern that Mattel had

19   lacked notice because there wasn't a bond.  But that's not an

20   issue when they're not in jeopardy, because they don't have to pay

21   out of pocket.  It's not an issue when it's not an affirmative

22   claim.  This is simply -- they're looking to get all the value out

23   of Bratz; value including future value for Bratz was lost.  Any

24   logical damages theory puts those two things together.  They're

25   economically related in every way, shape, or form.  They make

1    sense.  They go together.

2           This can be simply instructed.  The notion that

3    injunction did not go into effect is absurd.  I can show you

4    chapter and versus of the pleadings and letters and papers that

5    they filed asserting that MGA was engaging in willful infringement

6    because it was somehow failing to follow the terms of the

7    injunction.  They absolute enforced that injunction to the nth

8    degree.

9           For them to come and claim that it never took effect is

10   silly.  It took effect.  It prohibited MGA from developing new

11   product lines for 2010 during 2009.  It limited MGA to the product

12   lines that were already in the marketplace.  It made everyone in

13   the industry aware that come January 2010 MGA was no going to be

14   able to sell Bratz; an order that was not stayed until literally

15   the eve -- in fact, after it's implementation.

16          As the Court knows, MGA has been sued by numerous

17   licensees because of this.  It has lost relationships and

18   licensing revenue and profits as a result.  It has lost an

19   enormous amount of brand value by being out of a fickle

20   marketplace directed to children who have a high turn-over in

21   relevant consumer population for more than a year's period of time

22   because, given the ordinary product cycles and the timing of when

23   all this occurred, MGA was not able to get back into the market

24   until October of this year.

25          So this had an enormous economic effect.  It's directly

1    pertinent to the damages that they're seeking.  And there is no

2    issue of them not having sufficient notice or reliance interest or

3    whatever because there is no bond.  This is simply offsetting the

4    enormous number they're claiming.  There is no way it goes back

5    into their column.

6            Respectfully, Your Honor, the precedent and the

7    economics and common sense support MGA's position.  And this can

8    be instructed with a minimum of fuss, and we don't need to have

9    ancillary litigation about whether the orders went into effect or

10   not.  That's a matter of judicial notice.  The Court will decide

11   that.

12           **THE COURT:**  Anybody else?

13           **MR. QUINN:**  Your Honor, Judge Larson told them, told MGA

14   on their application, go ahead and make your 2009 line.  You are

15   not limited to what you have already made.  Mr. Larian said, you

16   need to lift this now and he said fine.  Do it.  Now they're

17   telling us they never did it.  But the record will show that he

18   told them to go ahead and do it.

19           The injunction never went into effect.  And by the way,

20   we're hearing now for the first time they have never given us any

21   discovery on problems with licensees, what those damages have

22   been, any quantification of that.  This is the kind of mess that

23   we're going to have to get into if we go down this road.

24           **THE COURT:**  Number six is the bifurcation of the

25   calculation of punitive damages.  You have already asked did I

1    change my opinion concerning that, and I'm inclined to do so.

2            Number seven is the bifurcation, equitable claim and

3    defenses.

4            Counsel?

5            **MR. QUINN:**  Your Honor, just as the title of the motion

6    suggests, Your Honor, we think there are some equitable defenses

7    which MGA has asserted which are really for the Court and should

8    be decided by the Court separately and not submitted to the jury.

9            **THE COURT:**  Which ones?

10           **MR. QUINN:**  Laches.

11           **THE COURT:**  Okay.

12           **MR. QUINN:**  Estoppel.

13           **THE COURT:**  Okay.

14           **MR. QUINN:**  Acquiescence.

15           **THE COURT:**  Okay.

16           **MR. QUINN:**  Unclean hands.

17           **THE COURT:**  Okay.

18           **MR. QUINN:**  Statutory unfair competition.  That's the

19   California code section as to whether there is no right to a jury

20   trial.  Their unjust enrichment claim is really a claim for

21   restitution which is entirely equitable in nature.  These claims

22   are really for the Court.  They're not for the jury.

23           **THE COURT:**  All right.  Counsel, as to laches?

24           **MS. HURST:**  Your Honor, it has issues and facts and

25   intertwined and is in common with the statute of limitations.

6c44a4d3-dc84-40cc-8b85-3f0c60c1e274

Page 113

1    Under all the precedent and the Seventh Amendment we're entitled

2    to have those issues heard by the jury.

3              THE COURT:  Estoppel?

4              MS. HURST:  Same point, Your Honor.

5              THE COURT:  Acquiescence?

6              MS. HURST:  Same point.  In particular, our acquiescence

7    defense -- I think that's actually a legal defense, not an

8    equitable one.

9              THE COURT:  Unclean hands?

10             MS. HURST:  Unclean hands is legal defense.  It

11   extinguishes claims for damages as well as equitable relief, and

12   it has common facts with other legal aspects of the case.

13             THE COURT:  Statutory unfair competition.

14             MS. HURST:  Same issue, Your Honor.  It has same factual

15   predicates as other legal aspects of the case to be heard by the

16   jury.

17             THE COURT:  Unjust enrichment?

18             MS. HURST:  I think the Court already bounced that

19   claim.

20             MR. QUINN:  And the statutory unfair comp claim as well.

21             THE COURT:  They're both gone.

22             MS. HURST:  No, the statutory unfair comp claim is still

23   in.  The common law unfair comp claim is out.  But the statutory

24   claim still has common issues with the legal claim and defenses.

25             THE COURT:  Number eight is to exclude evidence not

Page 114

1    disclosed in discovery.  And you cite the test project.  What is

2    that?

3            MR. ZELLER:  The test project was what Carter Bryant at

4    one point claimed was the work that he did for MGA while a Mattel

5    employee.  So he attempted to explain the drawings and other works

6    that he created during time periods when he admitted he was Mattel

7    employee by saying it was a test project.

8            THE COURT:  Describe that more fully to me.

9            MR. ZELLER:  It's his claim, so I hesitate in some ways

10   to try and make it more fulsome because it was a conclusory

11   assertion.  He stated that the idea was, is that when he went into

12   work with MGA, that he was really going in for what was

13   essentially a job interview, and that somehow that's what

14   justified him creating work for MGA while he was still a Mattel

15   employee.

16           THE COURT:  Just a moment.

17           MGA?

18           MR. MCCONVILLE:  Your Honor, this relates to some of the

19   documents that you saw earlier today concerning Prayer Angels.  As

20   I understand it, Mr. Bryant's belief about the test project

21   related to Prayer Angels.  To the extent they're going to try to

22   establish that Prayer Angels was not a project that existed at

23   MGA, then MGA should be remitted to show whatever evidence it

24   needs that yes, in fact, Prayer Angels was the project it was

25   working on.

Page 115

1           THE COURT:  Mattel?

2           MR. ZELLER:  If I understand what Mr. McConville is

3    saying, there is not going to be a dispute over that issue.  What

4    we're asking about is, what we're raising is something that's

5    slightly different.  First of all, I will simply say that the

6    drawing that Carter Bryant created for what they identified as

7    being Prayer Angels was later in August of 2000.  So it doesn't

8    really have a bearing on what was occurring months earlier.

9           But that said, if what MGA intends to do is put that

10   drawing in front of the jury and say Carter Bryant was working on

11   Prayer Angels for MGA at that time, I mean that's presumably --

12   we're going to say the same thing.  It does show that Carter

13   Bryant was deliberately doing work for MGA while a Mattel

14   employee.  The only issue that is involved here is whether or not

15   this conclusory assertion that somehow what he did when he was

16   working for MGA and still a Mattel employee, where he can just

17   sort of dismiss it as a "test project," should be allowed.

18           It's, frankly, it wasn't properly disclosed, but I would

19   also say it's simply confusing and a waste of time.  We're going

20   to have to get into an issue that, frankly, just has no foundation

21   to it at all.

22           THE COURT:  I want to repeat what I think I'm hearing,

23   and that is Carter Bryant is going to take the stand and he is

24   going to say that because he was undertaking and interviewed, that

25   was simply a test project of some type pursuant to the interview

6c44a4d3-dc84-40cc-8b85-3f0c60c1e274

Page 116

1    process.  That's basically what he is going to say.

2            MR. ZELLER:  Right.

3            THE COURT:  And I'm supposed to instruct Carter Bryant

4    not to make that kind of statement.

5            MR. ZELLER:  I think, yes.  I mean, he shouldn't be

6    allowed to testify to it, because then we're going to have to get

7    into other people coming back to rebut, do you really do these

8    sort of things in interviews, and what that interview process was

9    at MGA.

10           MS. HURST:  On that point, Your Honor, their own

11   witness, their first witness, Ivy Ross, testified that tryouts are

12   common.  She testified at length about how they got Lily Martinez

13   and considered whether she was there for a tryout or not and they

14   thought they should hire her.

15           THE COURT:  That doesn't mean, though, that what -- you

16   prepare for the tryout.  That's a different issue.  You can

17   certainly go try out.  It's what you do pursuant to the tryout.

18   Just a moment.

19           MR. ZELLER:  If I may respond briefly.  In fact, what

20   Ms. Hurst just raised is exactly to my point, is a confusion and

21   waste of time.  Ivy Ross did not say that people were paid in

22   order to create those kinds of works.  That is, in fact, what MGA

23   did here.  So then we'll have to start getting into again what

24   this process is, which really just simply wasn't properly

25   disclosed and is going to lead to a sideshow.

1        **THE COURT:** Number nine, to exclude evidence or argument

2    concerning MGA parties, and obviously including Mr. Larian's

3    testimony concerning reliance on advice of counsel.

4        Mattel?

5        **MR. QUINN:** In a nutshell, Your Honor, a party can't

6    both stand on privilege and defend based on the advice of counsel.

7    That's the basis for this motion.

8        The Court knows there has been motion practice on this

9    and ultimately the Court did find a finding of limited waiver in

10   its September 22, 2010 order.  And six e-mails, three of which

11   were heavily redacted were produced.  But beyond that, we have got

12   no visibility into other privileged e-mails that have been

13   identified on privilege logs.  And we're concerned that they're

14   going to rely on the advice of counsel that supposedly they did a

15   legal investigation concerning Mr. Bryant's ownership at the

16   outset and satisfied themselves, based on that legal

17   investigation, that this property was Mr. Bryant's property and

18   not Mattel's property when we haven't gotten visibility into that.

19       There is still a very substantial amount of material as

20   to which they have claim privilege.  So we don't want to be stuck

21   on this -- on the one hand being told we hired counsel; we relied

22   on what counsel Ms. Glaser, Mr. Rosenbaum, what others told us

23   when we haven't had any visibility into what those communications

24   were other than the very, very limited sense in which the Court

25   ordered production of, in some cases, six redacted e-mails.

1          I would say, by the way, this is an affirmative defense.

2    And the Court will recall we were in the courtroom next door, in a

3    packed courtroom with Mr. Nolan here one night.  And we came down

4    to the point, was MGA going to plead the affirmative defense of

5    advice of counsel or not.  And MGA's counsel said, we'll see when

6    we ultimately file an answer to Mattel's amended pleading.

7          They did not plead the advice of counsel.  They choose

8    deliberately, with that issue squarely teed up, they did not plead

9    that.  And that's an affirmative defense which they have not pled.

10         **MS. HURST:**  That was related to the RICO claim, Your

11   Honor.  And it concerned Mr. Nolan, which is not what we're

12   talking about here.  We're talking about Mr. Rosenbaum.  Now, all

13   of Mr. Rosenbaum's communications with MGA regarding what he did

14   for MGA concerning the Carter Bryant contract at the time had been

15   produced in accordance with the Court's order that there was a

16   waiver.

17         The e-mails that were redacted also concerned litigation

18   counsel.  So they were only redacted because that was the proper

19   scope of the Court's waiver.  Now, for them to say they haven't

20   got visibility after the massive amount of motion practice and

21   litigation that has occurred concerning this issue is simply not

22   credible.

23         **THE COURT:**  Number 10.

24         **MR. QUINN:**  May I just briefly respond to that?

25   Mr. Rosenbaum, at his deposition, asserted the attorney-client

1    privilege.  That was never withdrawn.  He asserted privilege and

2    we didn't get any communications with him until after that.  And

3    the advice of counsel wasn't pleaded -- not only wasn't pleaded

4    with respect to RICO, it wasn't pleaded as an affirmative defense

5    with respect to any claim.

6           **MS. HURST:**  It's not a affirmative defense because it's

7    not a complete defense.  It may negate one or more elements but it

8    doesn't have to be pleaded as an affirmative defense for those

9    purposes.

10          Mattel could have deposed Mr. Rosenbaum again at any

11   time since the Court made its waiver order.  They never put him on

12   a witness list.  They never asked to.  But he is within the

13   subpoena power of the Court.  He is going to appear in person at

14   the trial.  They have not been harmed or prejudiced in any way.

15   They have known and have litigated this issue heavily for two

16   years since Mr. Larian last testified at the prior trial, and they

17   asserted a waiver.

18          So what they're trying to do now is get the benefit of

19   the waiver after litigating this issue to the extreme, but say

20   that MGA is not also entitled to rely on that same ruling.  They

21   want to be able to rely on the ruling while at the same time

22   precluding us from doing so.  It's the same double standard that

23   we see throughout this case.  That's not proper.

24          **THE COURT:**  Thank you.

25          **MR. QUINN:**  The Court ruled that there was a limited

1  waiver.  The Court never reached beyond that, the limited waiver

2  of those six e-mails.

3          **THE COURT:**  Number 10 to exclude evidence or reference

4  to any alleged racial, religious or ethnic bias, but in the

5  pretrial order it simply states MGA filed a qualified

6  non-opposition.

7          What is the qualification?

8          **MS. HURST:**  We're not sure exactly what this thing is

9  looking to exclude because it's very broadly worded.  The

10  qualification is the differences between the products have to be

11  fair game.  In other words, one of the significant pieces of

12  evidence that's going to come in is that Bratz was perceived as

13  trendy and cool and was successful in part because of its

14  multi-ethnic character.

15          And another important piece of evidence that's going to

16  come in is that Mattel was struggling with Barbie independently

17  with that, but that one of the important reasons they were

18  struggling with Barbie is they were not perceived as trendy and

19  cool, and because they could not get the formula right in dealing

20  with our much more diverse society.

21          So we need to be able to discuss the products and market

22  factors related to the ethnic characteristics, perceived ethnic

23  characteristics of the product, but we absolutely agree that

24  nobody should be pandering to bias regarding any witness or person

25  or party.

Page 121

1           THE COURT:  I don't understand the motion.

2           MR. ZELLER:  There are two dimensions to it, Your Honor.

3    Number one is that MGA has said in this case, in writing, made

4    accusations that Barbie is a, "Aryan" icon, and emblematic of

5    "white skinned privilege and white domination."

6           These are their words.  The idea that they should be

7    allowed to go in front of the jury and --

8           MS. HURST:  That is just false.  Okay?

9           THE COURT:  All right.  Thank you.

10    Mattel.

11           MR. ZELLER:  This is from MGA's expert report of Mary

12    Bergstein at page 11.  I'm quoting from it.  These are not -- and

13    by the way, I mean, there certainly are public statements that MGA

14    has made, similar effect, that I'll get to in a moment too.  But

15    the idea that somehow MGA didn't make these statements are

16    perplexing at best.  These are in black and white, in writing, in

17    submissions they had made in this case.

18           THE COURT:  Who was the expert who notes that in her

19    report?

20           MS. HURST:  Mary Bergstein.

21           THE COURT:  She is not included in your Daubert motion,

22    is she?

23           MR. ZELLER:  I don't believe so, Your Honor.

24           MS. HURST:  Because we didn't offer her.

25           MR. ZELLER:  They did a report.

1           MS. HURST:  No.  In 2008, there was a report.  This time

2   there was not.  She wasn't even ever offered.

3           THE COURT:  Is she going to be testifying?

4       MS. HURST:  No.

5           THE COURT:  So what am I supposed to rule on?

6           MR. ZELLER:  That they are not allowed to go and make

7   such inflammatory statements in front of the jury.

8           THE COURT:  We don't know that they're going to.

9           MR. ZELLER:  They don't need an expert to say that.

10  It's clearly MGA was saying it.

11          THE COURT:  Thank you very much.

12          MS. HURST:  The law on when expert statements are

13  attributable parties would not support that assertion apart from

14  the facts in all events.

15          Look, I don't know what this motion means, but I know

16  there are relevant ethic things that need to be discussed in this

17  trial.

18          THE COURT:  What?

19          MS. HURST:  First of all, what I just said.  The

20  differences between the products.

21          THE COURT:  Depends upon how they're discussed.  Depends

22  upon the words that are used.

23          MS. HURST:  Absolutely.

24          THE COURT:  So "Aryan" is certainly a trigger word.  I

25  can think of a lot of trigger words.

Page 123

1          MS. HURST:  I don't have any intention of using any of

2     that.

3          THE COURT:  That's not good enough for me.

4          MS. HURST:  Let me give you an example --

5          THE COURT:  Think of how disquieting it was for Mr.

6     Larian and that juror's participation for a moment.  Then reverse

7     that kind of discussion taking place on Mattel's side.  We want to

8     avoid that.  And I don't want triggering words.

9          So while I believe in the counsel, I don't believe in

10    your experts.  I don't know what is going to happen on the stand.

11    You have got to do better than that.

12         Are words like "Aryan" going to be used?

13         MS. HURST:  No.  We did not offer it.

14         THE COURT:  No.

15         MS. HURST:  No.

16         THE COURT:  Then you need to tell me if there are going

17    to be -- how race is going to come into play in this case

18    concerning these different dolls.

19         MS. HURST:  Yes.

20         THE COURT:  And until you tell me that, you are not

21    going to have an expert take the stand.  So you have got until

22    tomorrow to lay that out to me.

23         MS. HURST:  We don't have an expert on this.  We are not

24    offering any expert on this issue.

25         THE COURT:  So I am still not certain what I'm supposed

Page 124

1   to be ruling on.

2          MS. HURST:  That makes two of us, I'm afraid.

3          THE COURT:  I think it's really simple.  No inflammatory

4   words are to be used.  It's like pornography, I can't define it

5   but I know it when I see it.  You hit Aryan, get out your

6   checkbook.  Understood?  And I'll level you in front of the jury.

7   You hit Iranian Jew, and I'll level you in front of the jury.

8          MS. HURST:  Let me give an example, Your Honor.

9          Sujata Luther, who was Mattel's senior vice president of

10  strategy and consumer research and worked at MGA for more than 20

11  years testified for about a day and a half about why Barbie was

12  failing.  Barbie had failed, was failing.

13         THE COURT:  I don't mind the trendiness.  I don't mind

14  the differences.  I don't even mind and think it's appropriate and

15  legitimate that you get into the fact that it's a more

16  cosmopolitan more ethnically diverse group.  It's the triggering

17  words that occur.

18         And I'm not distrustful of counsel.  I'm distrustful of

19  the experts.  They get on the stand and think that they rule the

20  court, and they run amuck, quite frankly.

21         MS. HURST:  We don't have an expert on this at all.

22  We're not offering any expert on this issue.

23         MR. ZELLER:  My concern, Your Honor, to be clear, is not

24  limited just to experts by MGA.  The second part of this motion

25  pertains to words that Mr. Larian has used.

1        I mean, this is again not something -- these are the

2   kinds of word that they have used.  And regardless of the vehicle

3   they use, they have chosen that particular expert to try and put

4   it in the mouth of an expert.  But clearly these kind of words

5   that they use could be uttered by anybody on their side.  That's

6   why we brought the motion.  This wasn't targeted just as against

7   this one expert report.

8        **THE COURT:**  Here is my ruling.  This is way too broad at

9   the present time.  In other words, I don't know what I'm ruling on

10  so I'm not going to make a ruling.  But all of you are forewarned.

11  I don't mind trendiness; I don't mind diversity; I don't mind

12  race.  It's the triggering words that go into it.

13       We're going to be together every single evening.  We're

14  going to be discussing each witness the night before.  It's just

15  too broad a motion to rule on at the present time.  But everybody

16  is forewarned.  Stay away from those trigger words that cause

17  bias.

18       That's as much protection as Mattel is going to get.

19  What you are not going to get is a preclusion on MGA's part of

20  discussing legitimate ethnic differences that go into the dolls.

21  It's how it's discussed.  So, no ruling on that.  We're done with

22  that discussion now.

23       Number 11.

24       **MR. ZELLER:**  Your Honor, there is --

25       **THE COURT:**  I said we're done with that discussion,

6c44a4d3-dc84-40cc-8b85-3f0c60c1e274

1    thank you.

2         Number 11.

3         **MR. ZELLER:**  Number 11, Your Honor, is MGA's motion to

4    exclude evidence or argument that the inventions agreement was

5    unfair, one-sided, was broad, was oppressive, that Mattel didn't

6    adequately explain it to employees.

7         Arguments about unfairness and oppressiveness would be

8    relevant only to unconscionability or enforceability.  They're not

9    at issue in this case.  Enforceability has been decided in 2006.

10   The Court held the agreement was enforceable and not

11   unconscionable.  The Court so held in connection with Mr. Bryant's

12   claims for declaratory relief to that effect.  Those rulings were

13   never disturbed.

14        In 2008 Mattel won summary judgment on the issue of

15   enforceability, granted summary judgment.

16        MGA, in its appeal to the Ninth Circuit, argued that the

17   contract was unenforceable and that it was oppressive, but the

18   Ninth Circuit implicitly rejected those arguments in sending -- in

19   issuing its opinion and sending it back for a determination as to

20   interpretation of the contract in the light of extrinsic evidence.

21        So we submit there is no issue about enforceability.

22   It's already res judicata in this case.  MGA, in any event, does

23   not have standing to challenge enforceability.  They're not a

24   party to the contract.  Even if they did have standing

25   unconscionability is an affirmative defense.  That was never pled

1    as an affirmative defense.  So any evidence or argument about

2    enforceability is necessarily irrelevant.  So we shouldn't hear

3    anything.  There is no reason for the jury to hear anything about

4    the unfairness or oppressive or enforceability of the contract.

5              **THE COURT:**  Okay.

6              MGA?

7              **MS. HURST:**  I think that the Court has rejected most of

8    these arguments in its recent summary judgment order wherein it

9    held that this issue was a matter of disputed fact for trial.  MGA

10   does have the right to attack this because a valid contract is a

11   prerequisite to Mattel's claims.  It's a prerequisite to every one

12   of their claims.  It's not a matter of standing.  They have to

13   prove a valid contract.  If the contract is not valid, then they

14   don't have an intentional interference with contract claim; they

15   don't have a trade secrets claim.

16             So the enforceability of the contract is directly at

17   issue by them on their claims.

18             The Ninth Circuit did not implicitly reject this.  You

19   don't need to reach the issue of enforceability until you get

20   through interpretation.  You can consider it as part of

21   interpretation.  The Court left open -- left that all wide open.

22   There is no way the Ninth Circuit implicitly rejected the

23   enforceability argument.  We litigated this on summary judgment.

24   Both parties have discussed the effect of section 16-600.  The

25   cases were briefed on this.  The Court issued an order; said it's

6c44a4d3-dc84-40cc-8b85-3f0c60c1e274

Page 128

1    part of the trial, and how trying to re-litigate summary judgment

2    and that's not a proper vehicle for motion in limine.

3              THE COURT:  Mattel?

4              MR. ZELLER:  Your Honor, our recollection is different

5    as to whether this Court has decided already that enforceability

6    is an issue for the jury here.  I don't hear any dispute with my

7    recitation of the chronology about how enforceability has already

8    been decided in 2006, 2008, and those rulings have never been

9    disturbed.

10             The other half of this motion that I didn't get to, Your

11   Honor, is that we seek to exclude evidence regarding other

12   versions of the contract.  There are 14 different versions that

13   were used over time of Mattel's inventions agreement.  The only

14   ones that we're here to interpret, the only ones that are relevant

15   are those that were executed between that form of agreement that

16   was used with Mr. Bryant.

17             So previous versions of the agreement, including

18   previous versions that specifically had the word "ideas" we don't

19   think can contribute to the understanding or interpretation of the

20   agreement that Mr. Bryant signed.  It would be different perhaps

21   if Mr. Bryant had seen an earlier version, or had been party to an

22   earlier version which did specifically include the word "ideas,"

23   but he it wasn't and he didn't.

24             THE COURT:  MGA?

25             MS. HURST:  Well, that's a remarkable position on the

6c44a4d3-dc84-40cc-8b85-3f0c60c1e274

1   parole evidence rule.  All of their evidence of subjective intent

2   comes in, but our objective evidence of their intent as expressed

3   by their prior use of form contract stays out.

4          I guess Mattel's motion in limine practices everything

5   that's good for us comes in and everything that's bad for us stays

6   out.  Fortunately, that's not the law.  The Truck case and the

7   other cases we have cited in the summary judgment context make

8   clear that prior form contracts by a drafter of adhesion

9   agreements are relevant and should be considered.

10         I did contest Mr. Quinn's description of the history by

11  pointing out that this Court had addressed the issue in its most

12  recent summary judgment order.  But apart from that, it was

13  totally inappropriate to decide unconscionability on a 12 (B)(6)

14  motion.  There are disputed facts concerning this issue.  And MGA

15  always adopted whatever defenses that were interposed by Bryant.

16  It says right there in all of the answers "reliance on defenses of

17  other parties."  But most importantly, Mattel has to prove it has

18  a valid contract.

19         So this is at issue.  It is to be tried.  And MGA is

20  absolutely entitled to present the drafting history from Mattel's

21  perspective because it's an illumination of Mattel's intent as

22  objectively expressed in documents that it used on over a nearly

23  20-year period of time.  And moreover, it shows that it was

24  capable of clearly instructing when it chose to do so, which is

25  also relevant to the trade secret claim and the trade secret

1    reasonable efforts.

2          So this evidence absolutely is relevant; it's highly

3    relevant and admissible.

4          **THE COURT:**  Anybody else?  I want to make sure you have

5    had enough time.

6          **MR. QUINN:**  Submitted, Your Honor.

7          **THE COURT:**  Just a moment.  I don't understand number

8    12.  This is to exclude references to actions taken by or against

9    Mattel employees not at issue.

10         I'm assuming that -- well, what is that motion?

11         **MR. QUINN:**  Basically relating to moonlighting;

12   allegations of moonlighting, Your Honor.

13         **THE COURT:**  From that one witness' statement.  Is that

14   your concern?

15         **MR. QUINN:**  Actually, it comes up -- I mean, MGA has a

16   theme that Mattel has tolerated moonlighting by other employees.

17   This is -- what Mr. Bryant did is something that Mattel has

18   countenanced and therefore isn't problematical.

19         **THE COURT:**  There is only one witness I read who made

20   that statement.

21         **MR. QUINN:**  I think they point to several of them,

22   several Mattel employees who they contend have had other jobs

23   while they were employed by MGA.  But there is not a single

24   instance of an employee who was known to Mattel to do competitive

25   work who did not disclose it, but somehow Mattel knew about it and

Page 131

1    countenanced it.

2          You have like, for example, the head of security who had

3    a part-time business, security business.  If they want to bring

4    that up, the evidence is that he called that to the attention of

5    Mattel management and got permission to do that.

6          THE COURT:  Well, my concern to both of you is this.  I

7    don't think it's irrelevant that a person undertakes some, quote,

8    unquote, moonlighting job.  Why it's not relevant to this case.

9    What would only be relevant is that if the person undertook a job

10   known as moonlighting on the side, and it was known to Mattel.

11         So there is a whole foundational issue that I have to be

12   aware of.  In other words, there is the bare motion I think I

13   agree with Mattel on.  But if MGA can show me that persons in

14   authority or management and Mattel knew about these.  And I don't

15   mean hearsay.  I mean, certainly be appropriate.

16         Which of those persons are you going to show me?

17         MS. HURST:  Your Honor, if Mattel --

18         THE COURT:  Which witness are you going to show me?

19         MS. HURST:  Your Honor, there are three or four

20   witnesses --

21         THE COURT:  First witness?

22         MS. HURST:  -- will testify --

23         THE COURT:  I'm sorry, first witness?

24         MS. HURST:  Leahy.

25         THE COURT:  All right.  Leahy, tell me about Leahy.

Page 132

1          MS. HURST:  She was a former Mattel employee and one of

2     the sculptors, or she was the sculptor for the Bratz dolls as an

3     independent contractor working for MGA.

4          THE COURT:  That's an independent contractor.  That's

5     not an employee.

6          MS. HURST:  But at one time she was an employee for

7     Mattel --

8          THE COURT:  Let me stop you.  When she was an employee

9     for Mattel, which is all I'm interested in.  Let's not segue over

10    to independent contractor.

11         MS. HURST:  I was just explaining who she was.

12         THE COURT:  I don't need her.  Okay?  I want to focus.

13    I want you to focus now.  I'm only interested when the person is

14    employed at Mattel.  Is that clear?

15         MS. HURST:  Yes.

16         THE COURT:  Now that you are clear on that, who does she

17    get a competitive job with?

18         MS. HURST:  She discussed with her supervisor her need

19    for additional work and her supervisory suggested to her some jobs

20    that were within the industry.

21         THE COURT:  Who is her supervisor?

22         MS. HURST:  I can't remember right now.

23         THE COURT:  Well, it's in your papers, isn't it?

24         MS. HURST:  Not by name.

25         THE COURT:  Then it's precluded.

6c44a4d3-dc84-40cc-8b85-3f0c60c1e274

Page 133

1          MS. HURST:  Your Honor, if I may --

2          THE COURT:  No, no, listen to me.  Come up with it now.

3   If you lack foundation, you need to show me with specificity.  And

4   if you need some rest tonight, you'll get it for me tomorrow

5   morning.

6          This is what I need from you.  First criteria, they're

7   employed by Mattel.  Second criteria, is there somebody in

8   authority at Mattel that knew about this.  And I want names and I

9   want specificity.

10         MS. HURST:  Okay.

11         THE COURT:  That's my requirement.

12         MS. HURST:  Understood.  But Your Honor, if they're

13  going to parade their witness through on --

14         THE COURT:  Not but, counsel.

15         MS. HURST:  If they're going to --

16         THE COURT:  Take a recess.  Thank you very much.  I'll

17  be back in a while.

18              (Recess taken, from  11:24 to 11:38.)

19         THE COURT:  Going to read you my concern from 10539 of

20  the opinion from the Circuit, then I'm going to require you to

21  answer my questions.

22         For the Circuit purposes they stated, quote, "For

23  example, an employee testified that it was common knowledge that a

24  lot of people were moonlighting and doing other work, which wasn't

25  a problem so long as it was done on their own time and at their

Page 134

1    own house.  She agreed, when asked, quote, was it your

2    understanding that if you designed dolls when you were at home at

3    night that you owned them?  However, another employee testified

4    everything I did for Mattel belonged to Mattel.  Actually,

5    everything I did while I was working for Mattel belonged to

6    Mattel.

7            Because the agreement's language is ambiguous and some

8    extrinsic evidence supports each parties' reading, the district

9    court erred by granting summary judgment to Mattel on this issue

10   and holding that the agreement clearly assigned works made outside

11   the scope of Bryant's employment.  See City of Hope National

12   Medical Center, etcetera.  The issue should have been submitted to

13   the jury which could then have been instructed to determine first

14   whether Bryant's agreement assigned works created outside the

15   scope of his employment at Mattel; and second, whether Bryant's

16   creation of the Bratz sketches and scope was outside the scope of

17   his employment."

18           Now, that doesn't negate, regardless of the Circuit's

19   finding, the requirement for foundation and whether there is a

20   hearsay objection.  And I'm going to ask you one more time to go

21   through each of these witnesses and to specifically tell me who

22   these statements are made to.  And I do not want to hear about an

23   independent contractor status.  That's irrelevant.  So quit

24   segueing over to that.  I want to hear about people who are

25   employed by Mattel.  And we'll start with Leahy.

Page 135

1          MS. HURST:  When Leahy was employed by Mattel, she

2     discussed it with her supervisor Michael Hebden amongst others.

3     H-e-b-d-e-n.

4          THE COURT:  Excellent.  Next witness.

5          MS. HURST:  Elise Cloonan.

6          THE COURT:  C --

7          MS. HURST:  L-o-o-n-a-n.

8          THE COURT:  Employed by Mattel.

9          MS. HURST:  Employed in Mattel's design center.

10    Testified -- actually, she was the once who was quoted by the

11    Ninth Circuit.

12         THE COURT:  I thought it was Marlow.  In 10539 that was

13    Marlow I think.

14         MS. HURST:  It was Cloonan, Your Honor.  That's always

15    been our analysis.

16         THE COURT:  I'll stand corrected then.  I won't quibble.

17    It doesn't matter.  I thought it was Marlow.  Maybe I'm wrong.

18    Regardless.

19         MS. HURST:  Cloonan testified at 101 lines 11 and 12, it

20    was common knowledge in the design center.  She went on in her

21    deposition to name maybe 50 people that she believed had been

22    discussing this or had such positions or were otherwise aware of

23    it.

24         THE COURT:  Were any of these people supervisors that

25    she named?

6c44a4d3-dc84-40cc-8b85-3f0c60c1e274

Page 136

1          MS. HURST:  Yes.

2          THE COURT:  Who?

3          MS. HURST:  Adam Minimum, Cassidy Park.

4          THE COURT:  I'm sorry, Cassidy.

5          MS. HURST:  Cassidy Park.

6          THE COURT:  I couldn't hear the first name.

7          MS. HURST:  Cassidy.

8          THE COURT:  Clark.

9          MS. HURST:  Park.  Ivy Ross.  Joe Franke.  Ann Driscoll.

10         THE COURT:  That's good enough.  I just need a

11    smattering.  All supervisors or supervisory capacity?

12         MS. HURST:  Yes.

13         THE COURT:  Third witness?

14         MS. HURST:  Mr. DeAnda who was himself a vice president

15    testified that he engaged in secondary employment.

16         THE COURT:  Was this with a competitor?

17         MS. HURST:  No.  It was for his own account.  But to the

18    extent it relates to the ownership of inventions, anything that he

19    would come up with, that would be inconsistent with Mattel's

20    interpretation to permit him to do security work on the side.

21         THE COURT:  Anybody else?

22         MS. HURST:  I believe Mr. Eckert commissioned one of the

23    employees to create a wedding dress for his daughter's wedding

24    cake.  Obviously he is a supervisor.

25         THE COURT:  I'm going to put down next to DeAnda

Page 137

 1   noncompetitive situation.  Eckert a noncompetitive situation.

 2           What about Elise Cloonan?

 3           **MS. HURST:**  Competitive situation.

 4           **THE COURT:**  What are the competitors?  Or who?

 5           **MR. QUINN:**  Your Honor, can I address the Cloonan

 6   situation?  I think we're going on a wild-goose chase here.

 7           If you look at the Cloonan testimony, she gives a bunch

 8   of names.  Then she says she misunderstood the question.  Then she

 9   says these are conversations about people who talked about

10   moonlighting.  Not that she had any knowledge or information

11   whatsoever that any of these people actually engaged in

12   moonlighting.

13           This is an instance where I think we really have to look

14   at the testimony.  We closed her out on this.  She didn't have

15   knowledge of anybody who moonlighted.  Leahy testified in her

16   deposition at 186/23 to 185/5, that she knew this doing the work

17   she did for a vendor was a breach of her employment agreement.

18   Her testimony.  There is not a single instance of countenanced

19   work with a competitor that MGA has been able to identify.

20           **THE COURT:**  Staring me in the face is the Circuit's

21   concern and the Circuit considered what you believe is Cloonan's

22   testimony.

23           **MS. HURST:**  Yes, Your Honor.  And I would respectfully

24   disagree with Mr. Quinn's characterization.

25           **MR. QUINN:**  Let's get it out and look at it.

Page 138

1          MS. HURST:  Their state of mind is also relevant here.

2    She testified it was common knowledge and a common practice.  This

3    is exactly what their witnesses are now apparently going to be

4    permitted to come and say it was all common knowledge what the

5    contract meant and what Mattel owned.  It's the same thing.  You

6    can't distinguish between the two.

7          MR. QUINN:  It's not the same thing at all.

8          MS. HURST:  The witnesses are going to come and testify

9    that it was common knowledge.  And Ms. Cloonan named names about

10   the people she had discussed with; discussed the prevalence of the

11   practice of having side jobs; what she called side jobs.

12         MR. QUINN:  We should look at the testimony.

13         THE COURT:  I'm going to.  Let's finish off the round of

14   argument.  I'll get the testimony out.

15         MS. HURST:  Ms. Leahy testified that she did work for

16   Hanna-Barbera and others.  She testified that her supervisor

17   suggested that she do so.  While she may have understood that

18   she -- something about the contract, obviously when a supervisor

19   suggests to you here is how you go make ends meet when you have

20   got a new child, then you think that it's okay.

21         THE COURT:  Let me ask Mattel something.  How do I deal

22   with the Circuit's ruling where, in this case, there is a reversal

23   but one of the issues that they pointedly tell the trial court is

24   that this testimony should have been considered by a jury.

25               Now the Circuit had to know, or had to consider whether

6c44a4d3-dc84-40cc-8b85-3f0c60c1e274

Page 139

1    this was foundational, hearsay objections, because you made those

2    objections at the time.

3         MR. QUINN:  Your Honor, this is an issue that wasn't

4    briefed to the Ninth Circuit.  The Ninth Circuit was interested in

5    it, it fastened on it, but it's not something that was actually

6    briefed.

7         THE COURT:  It wasn't your law firm, was it?  You

8    weren't involved?

9         MR. QUINN:  That's correct, Your Honor.  We were not

10   involved in the appeal.  We were not involved in the appeal.

11        THE COURT:  In case the record missed that --

12        MS. HURST:  I believe they signed the briefs on the

13   cross appeal.  I'm fairly certain.

14        THE COURT:  You want to say it again, that you were not

15   involved in the appeal?

16        MR. QUINN:  But look, if they -- we brought this motion.

17   The premise of our motion is that MGA has been able to identify no

18   evidence at all of any employee engaged in competitive

19   moonlighting.  Period.  And Leahy's testimony was not that Hudnut,

20   her supervisor, knew she was doing this.  Again, I think we have

21   to look at that testimony as well.

22        I don't know exactly what the Ninth Circuit was

23   referring to.  But we're still back to looking at what is the

24   record evidence.  What is it that they want to put in evidence

25   here.  And we welcome the Court's scrutiny of that evidence.  We

1  say there is none.

2          THE COURT:  Okay.  All right.  One more round and then

3  we'll move on to the next motion.  Let me start with MGA.

4          MS. HURST:  It's widespread knowledge and belief in

5  moonlighting practices and discussion of moonlighting practices

6  with supervisors and the direction -- the suggestion by

7  supervisors to get side jobs and the naming of names is sufficient

8  under 104, and otherwise, to show that Mattel was on notice that

9  it's employees were engaging in rampant practices inconsistent

10 with what it says now is its interpretation of the agreement.

11         It's not consistent with their interpretation of the

12 agreement to have anybody working a side job because their

13 position is they own everything that people do, 24 hours a day,

14 from the moment they start to the moment they finish.

15         So this bringing it back down, it's about contract

16 interpretation.  And if they have knowledge that this is going on

17 and they don't act on it, then that's inconsistent with the

18 interpretation that they're offering.  It also goes to reasonable

19 efforts for trade secrets.  They want to claim Bratz is a trade

20 secret.  Well, if everybody is out moonlighting and it's subject

21 of widespread discussion and they don't crack down on it, that's

22 not a reasonable effort to protect their trade secrets.  There is

23 a variety of ways in which this comes in.

24         Now, I apologize to the Court that I did not realize we

25 were going to actually try to script out what the witnesses were

Page 141

1  going to say when they get on the stand and see whether it was

2  going to pass every element of scrutiny.  Respectfully, I

3  suggest -- and these are all people who are going to be here in

4  person -- when they are on the stand is the time to make these

5  decisions.  And we will --

6       THE COURT:  I think you are right about that.  I don't

7  think I'm going to foreclose it in opening statement, especially

8  staring at the Circuit's opinion.  But I'm just forewarning you

9  that I need to hear that foundation and hearsay regardless of what

10 the Circuit found as far as evidence coming into this court.

11      MS. HURST:  Understood.

12      MR. QUINN:  Your Honor, one more round if I can complete

13 the round.

14      THE COURT:  Please.

15      MR. QUINN:  What we have heard now is that counsel said

16 that moonlighting -- implicitly I think she is representing to the

17 Court that moonlighting in competitive situations was rampant.

18 Because the Court has indicated, I think we all agree, if it's not

19 competitive, if it's security business like the head of security

20 has, it's irrelevant.

21      They can't name one instance, not one.  Really, Your

22 Honor, we need to look at Leahy's testimony.  We need to look at

23 Cloonan's testimony.

24      THE COURT:  They're both going to be here, aren't they?

25      MR. QUINN:  Yes.  We don't know about Cloonan.

Page 142

1              MR. ZELLER:  We have not identified --

2              THE COURT:  Cloonan is favorable to MGA.  I would think

3      MGA would have him here.

4              Cloonan coming?

5              MS. HURST:  She is on our witness list.  I believe the

6      subpoenas are out.  I assume so.  I hope she is still here in

7      California.

8              MR. QUINN:  There is a big gap between rampant and can't

9      name a single instance.

10             THE COURT:  Well, Eckert probably isn't going to be in a

11     position of being allowed to testify about a wedding dress being

12     made.  It's going to come down to Cloonan and Leahy.  And I may be

13     getting confused with Marlow, but you get a fair opportunity in

14     that regard.

15             MR. QUINN:  Well, Marlow worked on volleyball and

16     basketball books for children's high school --

17             THE COURT:  Like I said, I don't remember Marlow.  I may

18     have misstated Marlow.  But Leahy, Cloonan.  And I think that's an

19     issue I decide when they get --

20             MR. QUINN:  We have their testimony though.  We have

21     their deposition testimony.  I think we're putting the cart before

22     the horse.  Let's look at what -- they have been asked these

23     questions.  They have been asked what do you know; what you did.

24     Take a look at it.  We can have it hear for Your Honor tomorrow

25     morning.

6c44a4d3-dc84-40cc-8b85-3f0c60c1e274

Page 143

1           THE COURT:  Give it to me.

2           MS. HURST:  Your Honor, with favorable witnesses, people

3    often don't ask every question that they have at the time of

4    deposition.

5           THE COURT:  I understand that.

6           MS. HURST:  And if I may, Mr. Quinn's structure for

7    this, that it only matters if it's a direct competitor, is wrong.

8    Their interpretation of the agreement is that they own everything

9    all the time, 24 hours a day, whether or not it's part of the

10   scope of employment.  It doesn't matter if it's directly

11   competitive.

12           Anybody who is doing anything at any time that they're

13   going to claim they own, which has no boundaries in that contract,

14   there is no boundaries other than what the law requires to be a

15   boundary, 2870.  And these witnesses are testifying that vendors

16   to Mattel are employing them.  And so what is really going on

17   here, which they don't want to come out, which they don't want to

18   talk about, is that their own employees are working for their own

19   vendors, and it's a way for them to avoid the wage and hour laws.

20   And it absolutely violates their conflict of interest policies

21   which say you can't work for a vendor.  You can't work for a

22   supplier.

23           That's one of the things you have to disclose.  And our

24   vendors, people who are in a position to invent things that they

25   would claim they would own, you bet.

6c44a4d3-dc84-40cc-8b85-3f0c60c1e274

Page 144

1          So they're trying to avoid wage and hour laws by calling

2    all these hourly employees salaried employees.  And then when they

3    don't make enough money, they send them to their vendors so people

4    in the budget centers at Mattel don't have to count it as part of

5    their cost center and they can put it as an external expense to a

6    vendor.

7          And it's taken a long time to figure this out.  But

8    we're figuring it out.  This is what they're doing.  And it's a

9    course of conduct inconsistent with their interpretation of the

10   agreement.

11         **THE COURT:**  Okay.

12         Mattel?

13         **MR. QUINN:**  We have Ms. Cloonan's testimony here.  "Do

14   you know for a fact as to whether or not any Mattel designer who

15   was, at the time, employed by Mattel was doing design of any kind

16   for a Mattel competitor?

17   "ANSWER:  Not for a fact."

18         She is asked for names.  She has no names.  There just

19   is no evidence on this.  And it is not our position that it

20   doesn't matter whether it's competitive.  We have never said that.

21   If it's in Mattel line of business, if you create it, yes we own

22   it.  And I can't respond to the wage and hour business because I

23   don't know where that's coming from.

24         **THE COURT:**  Let me make sure you each have exhausted

25   yourselves in this argument.

Page 145

1           Let me turn back to MGA.

2           **MS. HURST:**  I have nothing to add this evening, Your

3     Honor.  Thank you.

4           **MR. QUINN:**  No.  Nothing further.

5           **THE COURT:**  Okay.  14 -- I'm sorry, 13.  This is the

6     effort to exclude evidence concerning the reference to the

7     immateriality of the statute of limitations evidence.  And I

8     thought I was rather explicit in the first opinion, but let's hear

9     your argument, counsel.

10          **MR. ZELLER:**  Certainly some of this has been superseded

11    by the summary judgment decision.  Not all of it, however.  There

12    is at least one issue I would like to -- and fraudulent

13    concealment, some of those issues also been addressed previously

14    during the course of this evening.  So there are additional issues

15    there.

16          But the one I would like to still address really goes to

17    Toon Teens and Diva Starz.  MGA has made the argument many times

18    now that Mattel could have or should have sued or considered or

19    did consider suing on Toon Teens and/or Diva Starz.  And the fact

20    is that that is confusing, it's irrelevant, and should not be

21    allowed to be argued to the jury.

22          The law is very clear on this.  That's for different

23    claims.  These are not the claims we are asserting in this case.

24    To allow MGA to be mischaracterizing our claims in front of the

25    jury wouldn't be appropriate.  And under the Westinghouse Circuit

Page 146

1    Breaker case and other authorities, it's perfectly clear that the

2    statute of limitations is determined by the claim that you are

3    making, not whether you could have brought some other claim.

4           The claims that are at issue in this case -- and I don't

5    think there is any legitimate dispute about them because this is

6    how Mattel has framed them -- is what did Carter Bryant do while

7    he was a Mattel employee.  We have not asserted copyright

8    infringement of Toon Teens or Diva Stars.  We have not asserted

9    trade secret theft of Toon Teens or Diva Starz.

10          As I mentioned earlier this evening, those projects are

11   relevant simply to timing and inspiration.  They are not the basis

12   of our claims, and MGA should not be allowed to suggest to the

13   jury that we could have, or should have sued on those other claims

14   instead, and that that is a proper trigger for the statute of

15   limitations, or that Mattel even considered making such claims.

16   Because again, those claims did not trigger statute of limitations

17   for the claims that are currently be made and are going to be to

18   be tried to this jury.

19          And I would submit, Your Honor, that clearly instructing

20   the jury on this law is the Court's responsibility and not

21   something that MGA should be allowed to fudge or otherwise blur in

22   front of the jury.

23          **THE COURT:**  MGA?

24          **MR. MCCONVILLE:**  Your Honor, this motion is one of

25   several that Mattel has filed where it seeks to foreclose evidence

1    that is not helpful to it and construction argument about why it

2    is not helpful in the context that is not accurate.

3            To be clear, Your Honor, Mattel is now asserting a trade

4    secret theft allegation.  And that trade secret theft isn't

5    related to what Carter Bryant was doing.  The trade secret theft

6    analysis begins with when did they know that the name Bratz was

7    disclosed.  And the name Bratz was disclosed, they knew about it

8    in the beginning of 2001.

9            The issue of Diva Starz and Toon Teens, Your Honor, puts

10   them on duty to inquire.  It's inquiry notice, and they are

11   obligated to inquiry, and it does trigger the statute of

12   limitations as to what they could have learned had they

13   investigated.  So they can't prop up an analysis that says one of

14   our legal theories does not say that we believe that Diva Starz

15   and Toon Teens have been infringed, but we're claiming this

16   massive damage amount of trade secret theft when the issue of

17   disclosure is known to them and then they know who has been

18   exposed to Toon Teens and they know who has been exposed to Diva

19   Starz.

20           That's it, Your Honor.

21           **THE COURT:**  Okay.

22           **MR. ZELLER:**  MGA is doing exactly the type of thing they

23   should not be permitted to do in front of the jury, which is

24   talking vaguely, broadly about some trade secret claim.  He is not

25   talking about the trade secret claim we brought.  Our trade secret

1   claim is based upon what Carter Bryant created while he was a

2   Mattel employee.  That's the same basis for our copyright claims.

3          What he is now attempting to suggest is, by using this

4   very broad, imprecise language, is that Mattel has brought a trade

5   secret claim, and therefore any kind of trade secret theft would

6   be an appropriate trigger for the statute of limitations.

7          Interestingly, MGA cites no authority for this

8   proposition that being on notice of one type of trade secret claim

9   means that you are on notice of another.  And Westinghouse Circuit

10  Breaker case, the other authorities we have cited, and I would

11  also submit, the law of the case based upon Judge Larson's prior

12  rulings -- and I understand that obviously the Court has decided

13  there is a factual issue that needs to go to the jury, but that

14  doesn't change fundamental law of the case as was articulated by

15  Judge Larson and we think supported by ample authority, that what

16  matters here is when MGA knew or should have known about the

17  claims that it has brought.  Otherwise, we end up with a

18  completely promiscuous standard.

19         Mattel could have certainly sued MGA back in 1999 and

20  2000 because, in our view, Isaac Larian was cheating people on

21  royalties that should have been paid.

22         Arguably -- and you have heard these kinds of arguments

23  from MGA previously, judge, which is Mattel could have taken

24  discovery and maybe uncovered any number of other acts, as if

25  somehow that is the standard for discovery, or somehow the

6c44a4d3-dc84-40cc-8b85-3f0c60c1e274

Page 149

1    standard for the statute of limitations.  These are the kinds of

2    arguments we're very concerned about being made in front of the

3    jury, because that bell can't be unrung.  It can't.  It's going to

4    then start having them say, well, Mattel is -- you can also just

5    imagine, and I think more than imagine the arguments that are

6    going to be made here, which is Mattel is a big company, has lots

7    of resources, has a security department.

8             It could have done all manner of things to undertake in

9    Herculean efforts to investigate any number of claims.  And had it

10   brought them, well, Mattel might have sued a couple of years

11   earlier.  This is exactly the kind of thing that is not proper

12   under appropriate legal standards.

13            The only other thing I would add on this point is that

14   when Mr. McConville refers to huge damage amounts for trade secret

15   theft, again, we have made no damages claim for the theft of

16   anything from Diva Starz or from Toon Teens.  That is not our

17   claim.  It has never been our claim.

18            MS. HURST:  So they're going to put in evidence about

19   Toon Teens and Diva Starz.  Okay.  Their first two witnesses,

20   three witnesses, almost all of what they have to say, those first

21   three witnesses is about Toon Teens and Diva Starz.  You want to

22   talk about prejudice.  They don't have a claim based on Toon Teens

23   and Diva Starz.  And we're three witnesses in and the jury is

24   sitting there they copied Toon Teens and Diva Starz, and that's

25   not even a claim.

Page 150

1          They want to get that evidence in any way because they

2    assert it's evidence of timing.  They assert it's evidence of

3    proof that Carter Bryant did this at Mattel.  Well, if it is, then

4    it's also reasonable to infer from that very same evidence that

5    Mattel should have known about it.  They're putting in the

6    evidence, and then they're trying to say we can't argue the

7    reasonable inferences from it.

8          That's ridiculous.  They're introducing this evidence.

9    It's prejudicial.  It's got minimal probative value because this

10   timing thing is ridiculous, frankly, but that's their theory.  But

11   then what they want to do is they want to define their claim so

12   narrowly, that somehow all the inferences that are in MGA's favor

13   just magically evaporate.

14         So Joni Pratte is going to get up there as their second

15   witness and she is going to introduce e-mail, I think it's either

16   314 or 316 -- the Court has been taking good notes, it probably

17   knows -- showing that this guy Steven Linker suggested the name

18   Bratz for Diva Starz.  Okay.  And they're going to put that in and

19   then argue that that's some basis for proving that Carter Bryant

20   stole the name Bratz from Mattel.  Because if they weren't, that

21   document and that testimony would be completely irrelevant.

22         And so then they argue all that.  They put in that

23   evidence and argue that.  And we're not allowed to say, by the

24   way, if it's evidence to that, then it's also evidence they should

25   have known about it.  They should have investigated sooner.  If

6c44a4d3-dc84-40cc-8b85-3f0c60c1e274

Page 151

1  they had done so, they would have figured this out, what their

2  artificially cabined claim now is.

3          That's just not right.

4          **THE COURT:**  Now, just a moment.  Number 14.

5          **MR. QUINN:**  Number 14, Your Honor, relates to the

6  disclosure of MGA's trade secrets that they're suing on at toy

7  fairs to customers in the press.  And we are seeking an order

8  deeming it established that MGA did, in fact, disclose its claim

9  trade secrets to the press and retailers, either before or

10  contemporaneously with the toy fairs, at which they allege that

11  Mattel allegedly misappropriated the trade secrets, or precluding

12  them from denying that they disclosed their trade secrets, the

13  claimed trade secrets to the press and to retailers before or

14  contemporaneously with the toy fairs, at which they allege that

15  Mattel spies supposedly misappropriated them.

16          Background to this.  The Court knows on August 16 this

17  year MGA file its counterclaims in reply in which this contended

18  that some 100-plus, as it turned out, trade secrets had been

19  stolen by Mattel's spies at its toy fairs.  They were ordered to

20  disclose in discovery when they first disclosed these trade

21  secrets to retailers and others.  They didn't do it.

22          They did not produce documents.  They didn't produce the

23  press kits.  They didn't educate their 30(B)(6) designee to be

24  able to testify about these things.  Fail to respond to

25  interrogatories on these issues.  We still have this pending

Page 152

1   motion with respect to Zap and MGA and their violation of Court's

2   orders by refusing to produce documents.  And in effect, they have

3   been hiding this evidence they were ordered to disclose.

4          I mean, it's self-evident.  I think it's undisputed that

5   you have these toy fairs in order to show these to the press and

6   to customers.  They haven't made the -- permitted the discovery to

7   confirm that.

8          They had a corporate designee who was designated to

9   testify on this and he admitted that he didn't have the

10  information he was supposed to have, about when these trade

11  secrets were first disclosed to the press.

12         Sp given this violation of the discovery

13  responsibilities, we're requesting as a sanction that they not be

14  permitted to dispute that these trade secrets were, in fact,

15  disclosed at the toy fairs.

16         **THE COURT:**  MGA?

17         **MR. MCCONVILLE:**  Your Honor, this is a motion for

18  summary judgment to defeat our ability to establish elements of a

19  claim, which is, as I understand the Court, is currently

20  considering.

21         So whether or not something has been publicly disclosed

22  or how it's been publicly disclosed is briefed to the Court and

23  I'm sure Court will decide whether or not this is evidence to get

24  to a jury.

25         With regard to whether we have provided discovery.  We

Page 153

1    have.  I would refer the Court -- I'm not going to read it.  We

2    filed a pretty lengthy opposition that cites all of our documents

3    we've produced.  It cites the testimony of our witness who

4    provided responses that were posed in any and all events.  If you

5    take a look at that, you'll see how much we have done.  And there

6    is no showing of bad faith that would rise to the level of

7    preclusion, which is what Mattel is asking for.

8            **THE COURT:**  Mattel?

9            **MR. ZELLER:**  MGA is under exclusive control of this

10   information.  And their designated witness Dennis Jolicoeur,

11   simply could not identify when any of these trade secrets were

12   first disclosed.  He was woefully unprepared on the very thing he

13   was supposed to be designated to be the expert on.

14           There was testimony about press kits, advertising, press

15   releases, and this information was not produced.  We followed up

16   and attempted to get it.  We never did get it.  We still have some

17   pending discovery motions on these things.  So we think the

18   preclusion order at this late date is appropriate.

19           This is a different issue than the summary judgment

20   motion.  We're saying that because of their misconduct, because of

21   their failure to permit discovery, they should not be permitted to

22   dispute these contentions.  Frankly, I think it's self-evident

23   that this information was disclosed no later than at the toy fairs

24   where they alleged that Mattel was spying.

25           **THE COURT:**  Finally, MGA.

Page 154

1          MR. MCCONVILLE:  Submitted, Your Honor.

2          THE COURT:  All right.  Number 15.  Just a moment.  This

3    is the motion by Mattel to preclude evidence of spoliation and

4    misconduct by Mattel or its counsel.

5          So Mattel.

6          MR. QUINN:  Your Honor, is there any chance we could put

7    this one over to tomorrow?

8          THE COURT:  Sure.

9          MR. QUINN:  Thank you.

10         THE COURT:  Is Mr. Price going to argue that?

11         MR. QUINN:  Price or I will, Your Honor.

12         THE COURT:  Number 16, this is a request to preclude the

13   Fifth Amendment implication by Jorge Castilla.

14         MR. ZELLER:  Precluding him from essentially testifying

15   now that he had invoked.  And furthermore, allowing an adverse

16   inference.

17         I know that the Court has previously suggested that

18   because Mr. Castilla was not a party, that an adverse inference

19   would not be warranted or may not be appropriate.  I don't recall

20   exactly the strength of the language.  But if I may address that

21   point, Your Honor, first on this motion.

22         Mr. Castilla, at the time he invoked, during his

23   deposition in this case was an MGA manager.  His title was

24   manager, sales planning.  So he was in a managerial supervisory

25   position for MGA.  Also his attorney's fees were being paid by

1    MGA.  He had not been disciplined by MGA for his activities.

2            And what I would submit under those circumstances, Your

3    Honor, is that the adverse inference is properly warranted against

4    MGA.  We're not, of course, arguing that Mr. Castilla is an

5    individual party.  He is not an individual party in this case.

6    There is no question about that.  But given his position, at the

7    time he actually invoked, at his deposition with MGA, and that he

8    has continued in that managerial position even notwithstanding the

9    implication, we believe it is appropriate for the jury to consider

10   an adverse inference against MGA based upon his invocation.

11           In our view it's indistinguishable from MGA invoking,

12   given his position and also given the fact that this is someone

13   who is, in many respects, in exclusive control of this

14   information.  And he has, with MGA's participation and consent,

15   blocked discovery in this case in getting -- really allowing us to

16   get into that information by invoking the Fifth Amendment.

17           And by the way, Your Honor, Mr. Castilla also invoked

18   the Fifth Amendment during the course of his deposition not only

19   as to his own activity, but he also invoked it as to questions

20   about what MGA did.

21           And moreover, the other point I would make about this,

22   Your Honor, is that Mr. Castilla was, in fact, acting for MGA.

23   His actions are attributable to MGA.  Mr. Castilla, from time to

24   time, tried to walk this line where he suggested that he would

25   answer questions that he thought exonerated MGA.  There were a

Page 156

1    number of questions he actually invoked as to MGA, but it also

2    fundamentally misses the point, he is MGA.  His actions are

3    attributable to MGA.  He is an agent of MGA.

4           So this kind of artificial distinction between Mr.

5    Castilla and MGA, in this context, we don't think is warranted.

6    And we believe that it is appropriate that the jury be allowed to

7    draw an adverse inference from his invocation which occurred, by

8    the way, more than 500 times during the course of deposition and

9    went to absolutely critical issues including MGA's knowledge and

10   participation, others at MGA in these thefts.

11          **THE COURT:**  MGA.

12          **MR. MCCONVILLE:**  If I understand the argument, if Mr.

13   Castilla goes and robs a bank, gets the money, and then goes to

14   work at MGA, and is deposed while at MGA, because he's now at MGA

15   when asked the questions, the adverse inference about who robbed

16   the bank can float to MGA, as I understand the analysis that's

17   been provided.

18          The Court didn't suggest, the Court didn't meander

19   around the point.  The Court, in its summary judgment order, says

20   the Court denies Mattel's request for an adverse inference from

21   Castilla's invocation of his Fifth Amendment right against

22   self-incrimination.  So I don't know if this is a motion for

23   reconsideration or if this is a way around whatever that statement

24   that the Court made, but it was not a hint, it was not a notion,

25   it's an order.  And it's a principled order, because all of the

Page 157

1    concerted actions that Castilla took about which he invoked were

2    actions that occurred prior to his employment at MGA.

3         **THE COURT:**  Okay.  Thank you.  I don't need to hear

4    another round.

5         Number 17, this is the request for any evidence relating

6    to the creation of MGA Servicios.

7         And what are you asking in this motion, that Mattel

8    Servicios be excluded from the lawsuit?  I'm not sure.

9         **MR. ZELLER:**  That MGA and Mr. Machado not be allowed to

10   say to the jury, as they have to the Court, that Mattel Servicios

11   was created in order to cheat Mattel employees of profit-sharing.

12        **THE COURT:**  All right.  Just one moment.  All right.

13        Mattel.

14        **MR. ZELLER:**  Essentially, Your Honor, it's because it's

15   irrelevant to any claim or defense in the case.  And in addition,

16   it simply is -- we think it's certainly without foundation, but in

17   order to respond to it, it is going to create a confusion and it's

18   simply consumptive of time for no legitimate reason.

19        I mean, to have the jury hearing and deciding whether or

20   not Servicios was set up for a proper purpose, or whether, as we

21   contend, that having profit-sharing would be duplicative of other

22   profit-sharing that Mattel employees already have, I think by

23   simply describing it shows how far afield we are from the real

24   issues in the lawsuit.

25        Nevertheless, MGA and Mr. Machado have -- and I can cite

Page 158

1    instances -- have at least about four different, five different

2    submissions of recent vintage in this court have made that

3    argument.

4              **THE COURT:**  MGA?

5              **MR. COTE:**  This one is mine, Your Honor.  Alexander Cote

6    for Mr. Machado.

7              The motion in limine is to exclude evidence of

8    Servicios' purpose.  In Mattel's summary judgment motion, or

9    rather in their opposition they wrote, the sole purpose of Mattel

10   Servicios and its employees it to provide services for Mattel

11   Mexico.  That's Mattel de Mexico, another one of the subsidiaries

12   in Mexico.  It's Mattel that wants to introduce evidence of

13   Servicios' sole purpose.  They want to exclude the bad evidence

14   underlying the purpose of Servicios.

15             Why do they want to bring in this evidence in the first

16   place?  It appears, and I spoke about this during the summary

17   judgment argument, that Mattel is going to make what I have called

18   a reversal alter ego argument, for lack of a better term.  They're

19   going to say that although Mr. Machado's employer was Servicios,

20   that's who directed his work, that's who paid his salary, that's

21   who --

22             **THE COURT:**  Listen, I'm going to stop you.  I want to

23   hear your arguments tomorrow on the block.  You are going to be

24   here with Mr. Overland.  You requested Mr. Overland to be present,

25   so I'm going to reserve Machado's arguments.  I'm going to put you

6c44a4d3-dc84-40cc-8b85-3f0c60c1e274

Page 159

1    down for Tuesday on number 17.  Okay.

2            **MR. COTE:**  Certainly, Your Honor.

3            **THE COURT:**  I'll hear that motion again tomorrow.

4            **MR. COTE:**  Thank you.

5                    (Whereupon the proceedings were adjourned at 12:25

6    a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 160

1

2                                  -oOo-

3

4                             CERTIFICATE

5

6          I hereby certify that pursuant to Section 753, Title 28,

7   United States Code, the foregoing is a true and correct transcript

8   of the stenographically reported proceedings held in the

9   above-entitled matter.

10

11  Date:  JANUARY 4, 2011

12

13

14  MARIA DELLANEVE, U.S. COURT REPORTER
    CSR NO. 9132

15

16

17

18

19

20

21

22

23

24

25

6c44a4d3-dc84-40cc-8b85-3f0c60c1e274