1                **UNITED STATES DISTRICT COURT**

2                **CENTRAL DISTRICT OF CALIFORNIA**

3         **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4                    - - - - - - -

5    MATTEL, INC., et al.,            )
                                      )
6              Plaintiffs,            )
                                      )
7         vs.                         ) No. CV 04-9049 DOC
                                      )     VOLUME I OF II
8    MGA ENTERTAINMENT, INC., et al., )
                                      )
9              Defendants.            )
     _____ )

10

11

12

13            REPORTER'S TRANSCRIPT OF PROCEEDINGS

14                 Motions in Limine Hearing

15                  Santa Ana, California

16                Tuesday, January 4, 2011

17

18

19

20

21   Debbie Gale, CSR 9472, RPR
     Federal Official Court Reporter
22   United States District Court
     411 West 4th Street, Room 1-053
23   Santa Ana, California 92701
     (714) 558-8141

24

25   04cv9049 Mattel 2011-01-04 V1

1    **APPEARANCES OF COUNSEL:**

2

   FOR PLAINTIFF MATTEL, INC., ET AL.:

3

4             QUINN EMANUEL URQUHART OLIVER & HEDGES LLP
             BY:   JOHN QUINN
                   WILLIAM PRICE

5                   MICHAEL T. ZELLER
                   Attorneys at Law

6             865 South Figueroa Street
             10th Floor

7             Los Angeles, California 90017
             (213) 443-3000

8

9

10

11   FOR DEFENDANT MGA ENTERTAINMENT, INC., ET AL:

12            ORRICK, HERRINGTON & SUTCLIFFE, LLP (Irvine)
             BY:   THOMAS S. McCONVILLE

13               Attorney at Law
            4 Park Plaza

14           Suite 1600
            Irvine, California 92614

15           (949) 567-6700

16           - AND -

17            ORRICK, HERRINGTON & SUTCLIFFE, LLP (SF)
             BY:   ANNETTE L. HURST

18               Attorney at Law
            405 Howard Street

19           San Francisco, California 94105
            (415)773-5700

20

21

22

23

24

25

1    **APPEARANCES OF COUNSEL (Continued):**

2

3    FOR CARLOS GUSTAVO MACHADO GOMEZ:

4

5              SCHEPER KIM & HARRIS LLP
             BY:  ALEXANDER H. COTE
                  Attorney at Law
6            601 West 5th Street
             12th Floor
7            Los Angeles, California 90071
             (213) 613-4660

8

9

10

     ALSO PRESENT:
11

12             KELLER RACKAUCKAS, LLP
             BY:  JENNIFER KELLER
13                Attorney at Law
             18500 Von Karman Avenue
14           Suite 560
             Irvine, California 92612
15           (949)476-8700

16

17

18

19

20

21

22

23

24

25

1                              **I N D E X**

2      **PROCEEDINGS**                                      **PAGE**

3      Hearing on Motions in Limine                          5

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 2:04-cv-09049-DOC-RNB  Document 9606  Filed 01/07/11  Page 5 of 124  Page ID #:285975
CV 04-9049 DOC - 1/4/2011 - VOLUME I OF II

5

1    SANTA ANA, CALIFORNIA, TUESDAY, JANUARY 4, 2011

2              VOLUME I OF II

3                 (9:37 a.m.)

09:37    4         THE COURT:  Okay.  We're on record in the Mattel

09:37    5    matter.  Mattel is present.  MGA is present.  The same

09:37    6    parties who were with us last evening are present.

09:37    7    Mr. Overland's joined us, and Ms. Keller's joined us today.

09:38    8         Counsel, the motion that we're going to go back to

09:38    9    is Number 18.  This was a reference to Mattel's surveillance

09:38   10    or spying on its employees and the use of the e-mail filter

09:38   11    and term "NHB."

09:38   12         So, Mattel.

09:38   13         MR. ZELLER:  Good morning, Your Honor.  Mike

09:38   14    Zeller for Mattel.

09:38   15         This has separate components to it.  Obviously, as

09:38   16    the Court is aware and has heard as recently as yesterday,

09:38   17    MGA frames these various allegations as Mattel is spying and

09:38   18    surveillance and uses typically very inflammatory language

09:38   19    to describe these matters.

09:38   20         Just kind of as an overall point, the real issue

09:38   21    in terms of using that kind of inflammatory language is, is

09:38   22    it implies illegality, and there is no showing of that.  So

09:39   23    this is just simply, to frame it the way that MGA has, and

09:39   24    repeatedly, is simply misleading and is contrary to law and

09:39   25    unsupported by the law.

09:39    1          Breaking this down into the specifics of what it

09:39    2    is that we have referenced here in the motion as examples of

09:39    3    these kinds of -- this kind of rhetoric about spying, one

09:39    4    is, is the surveillance report regarding Ron Brawer.

09:39    5    There's simply no illegality or any other nefarious activity

09:39    6    that's involved with this.  You can see from the report that

09:39    7    he was being followed publicly in order to determine whether

09:39    8    he was gonna go to MGA.  And for us to enter into issues

09:39    9    about whether -- again, there's not even an allegation that

09:39   10    there was anything illegal that was done.  I guess it's

09:39   11    simply that MGA wants to use it as sort of an aura of

09:39   12    badness does not make it admissible; it's simply not

09:40   13    relevant.

09:40   14          Similarly, but even more so, is the allegations

09:40   15    about surveillance of Isaac Larian and/or his family.  I

09:40   16    don't know if the Court has seen this, but the Court may be

09:40   17    aware that during the first trial Mr. Larian came forth with

09:40   18    a supposed anonymous letter, you know, and it made certain

09:40   19    kinds of allegations.  He also claimed his son was somehow

09:40   20    being followed by some black sedan.  These kinds of

09:40   21    allegations crop up continuously from MGA, usually just

09:40   22    simply with absolutely no evidence whatsoever.

09:40   23          And to be interjecting this kind of matter in

09:40   24    front of the jury, and particularly where there's absolutely

09:40   25    no basis whatsoever for connecting any of this to Mattel, is

09:40   1   really not proper.  This is the very purpose of the rules of

09:40   2   evidence.  And in particular, when Mr. Larian attempted to

09:40   3   suggest that somehow Mattel was behind whatever it is that

09:41   4   his son thinks he saw, there has never been any evidence of

09:41   5   that whatsoever.

09:41   6              The next part of this is the e-mail filter.  This

09:41   7   is what MGA even yesterday was calling the spying tool and

09:41   8   the like.  Obviously, it is a technical tool.  It is

09:41   9   disclosed to the employees.  There's nothing illegal about

09:41   10  it, and it's never been shown or alleged that there's

09:41   11  anything illegal or improper about Mattel taking steps to

09:41   12  protect itself.

09:41   13             THE COURT:  It's kind of like a court filter.

09:41   14             MR. ZELLER:  I'm sorry?

09:41   15             THE COURT:  Well, the court has a filter also.

09:41   16             MR. ZELLER:  Sure.  Absolutely.  And what this is

09:41   17  doing is, as part of our obligations, by the way, to ensure

09:41   18  the preservation of evidence.  I mean, there is testimony

09:41   19  already in this case that that is one of the reasons it was

09:41   20  set up.  Key words were selected so that -- and then, of

09:41   21  course, anything that has those key words ends up going into

09:41   22  this bucket of e-mails, and it's all preserved.  So for us

09:41   23  to get into all the various reasons why we have this --

09:41   24             THE COURT:  The Court has a filter to make certain

09:42   25  that e-mail or the network isn't improperly used.

09:42  1    Obviously, I think the main concern would be pornography,
09:42  2    personal usage of mail, things of that type.
09:42  3          But I don't know that the court has what I call a
09:42  4    key word -- well, obviously, it has a key word filter.  It
09:42  5    depends upon what the key words are.
09:42  6          My understanding's that Mattel, though, had a
09:42  7    somewhat different type of filtering system.
09:42  8          MR. ZELLER:  It does.  And -- but one of the
09:42  9    purposes of it is -- in fact, exactly as the Court is
09:42  10   talking about, analogous to the Court's filter -- which is
09:42  11   it runs by key words; and part of the reason is to find out
09:42  12   are people having inappropriate communications in particular
09:42  13   about competitively sensitive information.  Is it going in
09:43  14   and out of the company.
09:43  15         And part of what I would say about this is, is
09:43  16   that it's not necessarily --
09:43  17         THE COURT:  Just a moment.  Are you concerned
09:43  18   about the evidence, or are you concerned about how the
09:43  19   evidence is labeled?  There's -- I think it's relevant that
09:43  20   you have a filtering system because it shows the actions of
09:43  21   on the part of Mattel to protect your trade secrets.
09:43  22         MR. ZELLER:  Right.
09:43  23         THE COURT:  So that's the piece of evidence you
09:43  24   want to get in.  What you're really concerned about is the
09:43  25   vernacular "spying."

09:43    1            MR. ZELLER:  Right.

09:43    2            THE COURT:  It's as simple as that.  So you're not

09:43    3    seeking to exclude the evidence; you're simply requesting

09:43    4    that those inflammatory words not be used.

09:43    5            MR. ZELLER:  That's correct.

09:43    6            THE COURT:  Okay.  Just a moment.

09:43    7            MGA.

09:43    8            MR. McCONVILLE:  A couple things, Your Honor.  We

09:44    9    are not going to use these various issues to argue that

09:44   10    there was something illegal about what Mattel was doing.

09:44   11            THE COURT:  No, we know that.  The inference will

09:44   12    be, though, that there was or that it was a spying system --

09:44   13    because that's what you've referred to throughout the

09:44   14    pretrial motions, you know -- on Mattel employees.  And it's

09:44   15    the word "spying," I think, that's causing the problem.

09:44   16            MR. McCONVILLE:  Well --

09:44   17            THE COURT:  Is there another way you could refer

09:44   18    to that?

09:44   19            MR. McCONVILLE:  "Surreptitious surveillance"

09:44   20    would work, I think.  I mean, Your Honor, a couple --

09:44   21            THE COURT:  "Surveillance."

09:44   22            MR. McCONVILLE:  "Surveillance."

09:44   23            THE COURT:  "Surveillance."  Sure.

09:44   24            MR. McCONVILLE:  I think that would be

09:44   25    appropriate.

CV 04-9049 DOC - 1/4/2011 - VOLUME I OF II

10

09:44   1          THE COURT:  Mattel.

09:44   2          MR. ZELLER:  It's not surveillance, though, that's

09:44   3   not even correct as to the e-mail's filter.  They can call

09:44   4   it the e-mail filter.  They can call it a software tool.

09:44   5   They can call it any number of things that it is properly

09:45   6   labeled.

09:45   7          THE COURT:  Thank you very much.  You can use the

09:45   8   word "surveillance."  It's appropriate.  You can use the

09:45   9   word "e-mail filter."  You can't use the word "spying."

09:45   10  Okay?  It's inflammatory.

09:45   11         MR. McCONVILLE:  Okay.

09:45   12         THE COURT:  All right.

09:45   13         MR. ZELLER:  And then there was one last component

09:45   14  of this motion, which is the letters NHB, which I'm sure the

09:45   15  Court will recall.  At one point MGA stated and, in fact,

09:45   16  more than one time, MGA has claimed that NHB stands for "no

09:45   17  holds barred" and this is part of their evidence that Mattel

09:45   18  is trying to litigate them to death, and the like.

09:45   19         And the reality is -- and this is really quite

09:45   20  surprising when this came out -- is that MGA actually used

09:45   21  the acronym internally for no holds barred.  They had a

09:45   22  project that they called "no holds barred," and it's in

09:45   23  their documents.  This is one of these instances,

09:45   24  apparently, where MGA, knowing that this is what they're

09:46   25  doing, just decided to accuse Mattel first.

09:46    1              THE COURT:  What's the e-mail that Vargas, Machado

09:46    2    and Trueba used?

09:46    3              MR. ZELLER:  It was plot04.

09:46    4              THE COURT:  Yeah.  I'm sure you wouldn't want to

09:46    5    have the inference that "plot" has anything to do with a

09:46    6    bunch of plotters down in, would you?

09:46    7              MR. ZELLER:  We absolutely do want it.

09:46    8              THE COURT:  Of course, you do.  And, of course,

09:46    9    they can argue that NHB has some reference and inference,

09:46   10    and you can rebut it.

09:46   11              MR. ZELLER:  But the difference is there's no

09:46   12    evidence of it.  In fact, the only evidence is that NHB

09:46   13    stands for North Hills Bratz.  It's an acronym used to --

09:46   14    for MGA.  It is not something that means no holds barred,

09:46   15    and they have zero evidence.  They can't, obviously, go in

09:46   16    front of a jury and make claims or argue inferences that are

09:46   17    totally unsupported by the evidence.

09:46   18              THE COURT:  No.  But they can ask the question.

09:46   19    They can ask the question of what NHB means, and the jury

09:47   20    can hear the answer.

09:47   21              MR. ZELLER:  One thing I will say, then,

09:47   22    Your Honor, is we're going to get into MGA's use of it,

09:47   23    including their documents about no holds barred, which, by

09:47   24    the way, was a project that I don't think they don't -- it's

09:47   25    going to take us quite a bit into this other project which

CV 04-9049 DOC - 1/4/2011 - VOLUME I OF II

12

09:47   1   really involved the refinancing, probably unlawfully, by

09:47   2   MGA.

09:47   3           THE COURT:  Well, thank you, Judge Zeller.  I

09:47   4   appreciate that.

09:47   5           MR. ZELLER:  You're welcome.

09:47   6           THE COURT:  Just a moment.

09:47   7           Concerning Mattel's Motion in Limine No. 18, it's

09:47   8   denied, with the exception that there's to be no use of the

09:47   9   word "spying."

09:48   10          MR. McCONVILLE:  Yes, sir.

09:48   11          THE COURT:  "Surveillance," "e-mail filter," those

09:48   12  are appropriate words.

09:48   13          MR. McCONVILLE:  Okay.

09:48   14          THE COURT:  And if you do that, bring your

09:48   15  checkbook.

09:48   16          MR. McCONVILLE:  Yes, sir.

09:48   17          THE COURT:  Okay.

09:49   18          Number 19 is Mattel's motion to exclude evidence

09:49   19  or reference to any mediation or invocation of statutorily

09:49   20  mandated mediation confidentiality.  I don't know why that

09:49   21  wouldn't be granted, but --

09:49   22          Mattel.

09:49   23          MR. ZELLER:  Briefly, Your Honor.  This is tied

09:49   24  to -- as far as we understand it, the only evidence that MGA

09:50   25  points to, to substantiate its claim that somehow Mattel

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 1/4/2011 - VOLUME I OF II

13

| | | |
|---|---|---|
| 09:50 | 1 | tried to cloak, is the word that they use, this relationship |
| 09:50 | 2 | with Sal Villasenor is because of this mediation.  And I |
| 09:50 | 3 | guess the idea on MGA's part is, is that they're going to |
| 09:50 | 4 | point to this mediation that Mattel had and basically point |
| 09:50 | 5 | to the fact that it's a black box, as mediations are, and |
| 09:50 | 6 | then let the jury speculate from there that something must |
| 09:50 | 7 | have happened.  And we believe that runs afoul with the |
| 09:50 | 8 | mediation privilege and is contrary to the policies of |
| 09:50 | 9 | mediation.  And finally, we would also submit it's just |
| 09:50 | 10 | simply not a proper inference. |
| 09:50 | 11 | THE COURT:  All right.  Ms. Hurst. |
| 09:50 | 12 | MR. McCONVILLE:  Can I handle that one, |
| 09:50 | 13 | Your Honor? |
| 09:50 | 14 | THE COURT:  Please, Mr. McConville. |
| 09:50 | 15 | MR. McCONVILLE:  Thank you. |
| 09:50 | 16 | So the motion as written seeks to preclude all |
| 09:51 | 17 | evidence referring or relating to a mediation.  Okay?  So |
| 09:51 | 18 | it's overly broad.  We aren't -- what we would like to point |
| 09:51 | 19 | to is the fact of a mediation that occurred which is not |
| 09:51 | 20 | proscribed by the law. |
| 09:51 | 21 | THE COURT:  Why? |
| 09:51 | 22 | MR. McCONVILLE:  Because there's a statute on |
| 09:51 | 23 | point that says the rule -- California Evidence Code 1120 |
| 09:51 | 24 | says the rule does not preclude reference to the fact that a |
| 09:51 | 25 | mediation took place. |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 1/4/2011 - VOLUME I OF II

14

09:51   1          THE COURT:  Why?  What's the relevance?

09:51   2          MR. McCONVILLE:  The relevance, Your Honor, is

09:51   3   that we would -- we know that the facts will show that Sal

09:51   4   Villasenor in December 2005 advised the general counsel of

09:51   5   Mattel that he was engaging in criminal acts to give Mattel

09:51   6   a superior competitive advantage.

09:51   7          THE COURT:  Okay.

09:51   8          MR. McCONVILLE:  That's his statement.

09:51   9          In response to that and during that time frame, he

09:51   10  met with the lawyers for Quinn Emanuel and for Mattel as

09:51   11  part of the discovery effort in this case.

09:52   12         THE COURT:  Okay.

09:52   13         MR. McCONVILLE:  Thereafter, we received no

09:52   14  discovery related to the events that Mr. Villasenor talked

09:52   15  about until this year.

09:52   16         THE COURT:  Just a moment.  Okay.  How does that

09:52   17  have to do anything with mediation?  I don't understand.

09:52   18         MR. McCONVILLE:  Because they're going to argue,

09:52   19  my assumption is, that the -- that they didn't have access

09:52   20  to the evidence and it's all cloaked in privilege because

09:52   21  there was a mediation.

09:52   22         THE COURT:  No, they're not.

09:52   23         MR. McCONVILLE:  But the way their motion is

09:52   24  written, Your Honor, is so broad as to foreclose our ability

09:52   25  to say, "Well, where is the evidence?"

09:52    1        And, Your Honor, as a result of the mediation,

09:52    2    there was a settlement between Mr. Villasenor, the man who

09:52    3    engaged in criminal conduct to give Mattel a superior

09:53    4    competitive advantage, wherein he was paid money by Mattel

09:53    5    and the -- how ever that evidence comes out, it may

09:53    6    implicate the fact that there was a mediation that resulted

09:53    7    in a settlement.

09:53    8        THE COURT:  Do we have copies of that settlement

09:53    9    that's been made public?

09:53   10        MS. HURST:  We do have copies of it.

09:53   11        MR. McCONVILLE:  Yes.

09:53   12        MS. HURST:  It's been marked "Attorney's Eyes

09:53   13    Only," as Mattel is want to do.  The witness was paid a sum,

09:53   14    a substantial sum, in exchange for a confidentiality

09:53   15    agreement and a release by Mattel of unfair competition

09:53   16    claims and an agreement on his part not to talk about the

09:53   17    events and circumstances about that.

09:53   18        The settlement agreement goes to the witness's

09:53   19    credibility.  It's an extremely important element to show

09:53   20    that Mattel tried to conceal this evidence knowing of MGA's

09:54   21    claims.  They've made a lot of concealment assertions on

09:54   22    their side.  Well, now this is one that's coming back.

09:54   23        This settlement agreement occurred after the

09:54   24    witness sent the e-mail that Mr. McConville has described.

09:54   25    After Mattel's litigation counsel in this case then tried to

09:54  1   set up the relevance wall where they wrote the letter

09:54  2   saying, "Oh, Mr. Villasenor's acts aren't relevant to the

09:54  3   case," Mr. Villasenor's lawyer then wrote back saying,

09:54  4   "That's crazy.  What are you talking about?"  And then they

09:54  5   go into mediation and they come out with this settlement

09:54  6   agreement where they agree to pay them in exchange for

09:54  7   confidentiality, and then he doesn't talk.  We never hear

09:54  8   about it.  The whistle blower is silenced.  They deep-six

09:54  9   all the evidence until July of this year.  So the mediation

09:54  10  is a step in the chain.

09:54  11         THE COURT:  Describe to me the mediation.  Where?

09:55  12  Who's involved?

09:55  13         MS. HURST:  It's not entirely clear, but from what

09:55  14  we know, Mr. Villasenor's attorney, Mr. Barrera, it appears

09:55  15  that a Quinn Emanuel attorney may have attended as well.

09:55  16  Mr. Corey and Ms. Thomas --

09:55  17         THE COURT:  Who was the judge?

09:55  18         MS. HURST:  There was no judge.  It was a private

09:55  19  mediation.

09:55  20         THE COURT:  When mediation -- it's not in front of

09:55  21  JAMS; it's not in front of any former judicial officer.  Is

09:55  22  this an in-house mediation?

09:55  23         MS. HURST:  That I don't know, Your Honor.

09:55  24         THE COURT:  We'll find out.

09:55  25         Mattel.

09:55    1    MR. ZELLER:  I will find out who was the mediator.

09:55    2    We haven't gotten, obviously -- for obvious reasons, we

09:55    3    don't go into the mediation at all.  We think it's improper

09:55    4    to inquire into this.

09:55    5    THE COURT:  Who's the mediator?

09:55    6    MR. ZELLER:  I'm sorry?

09:55    7    THE COURT:  Who's the mediator?

09:55    8    MR. ZELLER:  I'll get that information.

09:55    9    THE COURT:  Is it a judicial officer?  Is it

09:55    10    through AAA or JAMS, or when we use the word "mediation" is

09:55    11    this just in-house bargaining that's going on?  Mediation is

09:56    12    a big word.

09:56    13    MR. ZELLER:  Yes, sir.  I'll find out exactly what

09:56    14    the auspices were.

09:56    15    THE COURT:  Put a question mark.  We'll come back

09:56    16    to that.  We're done with that motion now until I have the

09:56    17    answer.

09:56    18    Number 20.

09:56    19    MR. QUINN:  Your Honor --

09:56    20    THE COURT:  Number 20.  Just a moment.

09:56    21    All right.  Now, Counsel, No. 20 is the request by

09:56    22    Mattel to preclude arguments that MGA's counterclaims and

09:56    23    reply allegations support MGA's 2005 complaint.

09:56    24    Counsel.

09:57    25    MR. ZELLER:  Yes, sir.  What this motion seeks to

CV 04-9049 DOC - 1/4/2011 - VOLUME I OF II

18

09:57   1   do is ensure that MGA does not smuggle before the jury

09:57   2   basically the so-called toy fair allegations by -- once, of

09:57   3   course, the Court disposes of the counterclaims and reply,

09:57   4   by saying, well, it was always embraced by our unfair

09:57   5   competition claims.  At least the Court's decision, of

09:57   6   course, so far is that there is -- that to some extent the

09:57   7   statutory unfair competition claim has survived.

09:57   8          We do submit, as the Court is aware, that that

09:57   9   shouldn't go to the jury.  But we are concerned that in the

09:57   10   event that that issue ends up in front of the jury, that MGA

09:57   11   essentially use it to create a new claim of unfair

09:57   12   competition, even though it disavowed these toy fair

09:57   13   allegations as being part of those same allegations.

09:57   14          THE COURT:  MGA.

09:57   15          MS. HURST:  Your Honor, we did not disavow it as

09:58   16   part of the claim.  We said it was not information known to

09:58   17   us at the time of the original filing.  And the Court has

09:58   18   been extremely liberal in allowing Mattel to bring a Bratz

09:58   19   trade secret claim in after nine years of litigation.  And

09:58   20   certainly that same standard should be applied here to

09:58   21   permit evidence which was not required to be pleaded in

09:58   22   support of unfair competition to come in once it's

09:58   23   discovered in support of the claim.

09:58   24          I mean, using false identification to sneak into

09:58   25   places where their own witnesses, Ms. Luther, for example,

09:58  1    the former senior vice president of strategy and research,

09:58  2    testified they had to sneak in because otherwise they

09:58  3    wouldn't have gotten access.  That's what she said.  And

09:58  4    they wouldn't have gone to such extraordinary lengths to

09:58  5    sneak in, engaging in a pattern of fraudulent acts if the

09:58  6    information wasn't valuable.

09:58  7           So we know the information was valuable.  They

09:59  8    admit they couldn't get access to it without sneaking.  We

09:59  9    have their documents and testimony showing that they did.

09:59  10   This is a pattern of fraudulent behavior that should be

09:59  11   considered both under the statutory unfair competition claim

09:59  12   and, frankly, Your Honor, under the common law unfair

09:59  13   competition claim as well.

09:59  14           But this was evidence that was not known to MGA at

09:59  15   the time of the original pleading.  They went to

09:59  16   extraordinary lengths to hide this evidence as recently as a

09:59  17   few months ago.  Mr. Zeller argued to the Court that these

09:59  18   actions did not concern MGA.  The Court will recall, up

09:59  19   until just a few months ago, they consistently maintained

09:59  20   the argument that although they were doing this, there was

09:59  21   no evidence and, in fact, it wasn't true that they had ever

09:59  22   done it to MGA.

09:59  23           And then we found out that was false.  Just

09:59  24   recently, just recently -- now, if they're, after nine

09:59  25   years, gonna get to bring in Bratz as a trade secret claim,

Case 2:04-cv-09049-DOC-RNB   Document 9606   Filed 01/07/11   Page 20 of 124   Page ID #:285990
CV 04-9049 DOC - 1/4/2011 - VOLUME I OF II

20

10:00  1   then the least we can do is use evidence that's already

10:00  2   coming into one -- into the case in support of other claims

10:00  3   and defenses as part of a properly pled claim.  We weren't

10:00  4   required to plead evidence in support of that claim.  This

10:00  5   evidence does support that claim.  Frankly, the common law

10:00  6   unfair competition claim should also be allowed on the basis

10:00  7   of this evidence, Your Honor.

10:00  8            And if the Court is gonna be even-handed in its

10:00  9   application of the standards and allow them to come in late

10:00  10  with that Bratz trade secret claim, then we should certainly

10:00  11  be allowed to put this evidence in, in support of our unfair

10:00  12  competition claims as well.  Anything else is just uneven

10:00  13  application of the standards, respectfully, Your Honor.

10:00  14            THE COURT:  Okay.  Mattel.

10:00  15            MR. ZELLER:  Your Honor, there's not even a basis

10:00  16  for analogizing Mattel's Bratz trade secret claims with

10:00  17  this.

10:00  18            As the Court is aware from the history, Mattel

10:00  19  attempted and did put into the final pretrial conference

10:00  20  order for Phase I the Bratz trade secret claim.  MGA did not

10:01  21  say anything at that point other than that's a Phase II

10:01  22  issue.  That was in fact the basis.  So there was no

10:01  23  surprise, and the Court has already so ruled.

10:01  24            That's not true here.  MGA has not moved to amend.

10:01  25  It never moved to amend its 2005 complaint to add in the

| | | |
|---|---|---|
| 10:01 | 1 | so-called toy fair allegations. |
| 10:01 | 2 | It was not in interrogatories as being a basis for |
| 10:01 | 3 | the unfair competition claim that they alleged in 2005.  To |
| 10:01 | 4 | the contrary, they've made this argument that they didn't |
| 10:01 | 5 | know about it.  So, of course, they could not meet the |
| 10:01 | 6 | standard that even should they seek to amend, that it would |
| 10:01 | 7 | relate back, because it doesn't encompass the same facts by |
| 10:01 | 8 | their own admission. |
| 10:01 | 9 | The second point I would make is, is that even |
| 10:01 | 10 | allowing this at this point wouldn't do any good for MGA in |
| 10:01 | 11 | any event.  There's no restitution that's available here. |
| 10:01 | 12 | There is absolutely nothing that MGA can point to where |
| 10:01 | 13 | there was a transfer of money or property from MGA to Mattel |
| 10:02 | 14 | that they would be -- that they would be entitled to have |
| 10:02 | 15 | returned.  There's just no showing of that whatsoever. |
| 10:02 | 16 | So the -- to even allow that to be argued to a |
| 10:02 | 17 | jury again is doomed.  Even assuming that they can get past |
| 10:02 | 18 | the hurdle that somehow a statutory unfair competition claim |
| 10:02 | 19 | should be heard by a jury. |
| 10:02 | 20 | In terms of the allegation that somehow Mattel -- |
| 10:02 | 21 | and the Court has heard it in a whole variety of ways about |
| 10:02 | 22 | deep-sixing and that we've lied to the Court, I think, where |
| 10:02 | 23 | Ms. Hurst represents that we said this did not concern MGA, |
| 10:02 | 24 | as the Court is aware, that is not correct. |
| 10:02 | 25 | What the allegation was, is that Sal Villasenor |

10:02  1   had snuck into Mattel -- excuse me, the MGA's showrooms.

10:02  2   Mr. Villasenor's testimony is that he did not.  That is not

10:02  3   contradicted except by one thing, which is the say-so of

10:02  4   Paula Garcia years after the fact.  So for MGA to somehow

10:03  5   now portray that as being conclusively established, what is

10:03  6   at best a disputed issue as to what Mr. Sal Villasenor did,

10:03  7   I don't think is supported by the record.

10:03  8        The last point I would make is, of course, the

10:03  9   Court has already granted summary judgment on the common law

10:03  10  unfair competition claim, and so it's crystal clear that at

10:03  11  that point, certainly, MGA cannot be allowed to resurrect

10:03  12  that claim by now trying to say that its 2005 complaint in

10:03  13  terms of the unfair competition claim should now be

10:03  14  construed as including the toy fair allegations.  That

10:03  15  day -- that day is far too late now.

10:03  16        THE COURT:  Okay.  MGA.

10:03  17        MS. HURST:  One moment please, Your Honor.

10:04  18        In ruling on the summary judgment motions, the

10:04  19  Court noted, "Mattel's failure to expressly allege the

10:04  20  predicate facts for each of its counterclaims is

10:04  21  unremarkable.  The parties have long accepted that each

10:04  22  other's pleadings need not specifically enumerate all the

10:04  23  factual predicates for each claim."

10:04  24        There's no surprise here.  They have gotten

10:04  25  interrogatory responses that run to the hundreds of pages

10:04  1    detailing our allegations about the wrongdoing related to

10:04  2    this market intelligence group.  That's been fully discussed

10:04  3    in the summary judgment papers, so I'm sure the Court is

10:05  4    familiar with it at this point.  It's actually not factually

10:05  5    accurate that we never moved to amend.  We did say in

10:05  6    response to the summary judgment papers if the Court finds

10:05  7    for any reason that this is not reasonably encompassed

10:05  8    within the pleading, then we request leave to amend to

10:05  9    conform the pleadings to proof.  But under the standard as

10:05  10   articulated that Mattel got the benefit of in the summary

10:05  11   judgment order, we don't even need to do that.

10:05  12        So, Your Honor, the question of restitutionary

10:05  13   relief the Court also addressed in its order and said that

10:05  14   we had evidence that would satisfy the standards.  There's

10:05  15   more evidence of that sort in support of these portions of

10:05  16   the claims.  This evidence is coming in in support of other

10:05  17   claims and defenses.  And to say, then, that the jury can't

10:05  18   be charged on one additional claim -- I mean, this doesn't

10:05  19   involve any additional cumulative evidence.  It doesn't

10:05  20   involve any delay, any time-wasting, or anything else.  Here

10:06  21   we are fighting simply about the proposition of whether the

10:06  22   jury can be charged on this evidence after it's already in

10:06  23   the case.

10:06  24        It's not appropriate to exclude it under the

10:06  25   standards that this Court set forth in the summary judgment

10:06   1   order, and it should be a basis for the claims.

10:06   2          They want to -- this is more hair-splitting by

10:06   3   Mattel.  "Well, we never said it didn't involve MGA at all.

10:06   4   We just said that Mr. Villasenor didn't go into MGA's

10:06   5   showroom."

10:06   6          Well, the documents contradict that, frankly, but

10:06   7   moreover that's just totally disingenuous.  They had this

10:06   8   whole market intelligence group operating, and they kept

10:06   9   saying it had nothing to do with MGA.  And then we get a

10:06   10  document that says what?  It's dated February 21, 2002, and

10:06   11  it says, "We just walked the MGA showroom," and it lists out

10:06   12  the information that they saw.  Four days later -- this

10:06   13  thing goes to all the top brass.  Four days later the

10:07   14  president of the girls division, Adrian Fontanella, is

10:07   15  adopting as a corporate goal the Bratz defense plan.  Any

10:07   16  reasonable jury could draw a direct line between them

10:07   17  reporting the information that they stole the adoption of

10:07   18  this plan, which resulted in the introduction of two

10:07   19  additional products, and numerous other acts that are

10:07   20  related to our damages' theories.

10:07   21         And so, Your Honor, it should come in and it

10:07   22  should come in in support of all of the applicable legal

10:07   23  theories.

10:07   24         Thank you.

10:07   25         THE COURT:  Okay.  Number 21, the Mattel's motion

| | | |
|---|---|---|
| 10:07 | 1 | to exclude evidence and argument relating to MGA's |
| 10:07 | 2 | counterclaims in reply. |
| 10:07 | 3 | Mattel. |
| 10:07 | 4 | MR. QUINN:  This motion seeks to prevent the |
| 10:07 | 5 | evidence regarding spying at toy fair and Mattel's so-called |
| 10:08 | 6 | intelligence group from being an open-sesame or free-for-all |
| 10:08 | 7 | to permit MGA to bring in irrelevant evidence concerning |
| 10:08 | 8 | products and parties that are not at issue in this case. |
| 10:08 | 9 | For example, the motion seeks to exclude evidence |
| 10:08 | 10 | concerning spying on parties other than -- or manufacturers, |
| 10:08 | 11 | sellers of toys other than MGA.  Obviously, that's |
| 10:08 | 12 | completely irrelevant to any issue in this case. |
| 10:08 | 13 | THE COURT:  Why doesn't that go to trade secret |
| 10:08 | 14 | misappropriation? |
| 10:08 | 15 | MR. QUINN:  They aren't MGA's trade secrets. |
| 10:08 | 16 | We're not litigating the issue about whether some |
| 10:08 | 17 | hypothetical other company that had a display at a toy |
| 10:08 | 18 | fair -- whether materials in their display were -- |
| 10:08 | 19 | THE COURT:  I misstated.  Why doesn't that go to |
| 10:08 | 20 | the issue of whether this is even a trade secret? |
| 10:09 | 21 | MR. QUINN:  I think the fact is, Your Honor, that |
| 10:09 | 22 | everything has shown that toy fairs are intended to be shown |
| 10:09 | 23 | to the customers and the press.  That's the whole point of |
| 10:09 | 24 | it.  You're selling.  But to the extent we're going to get |
| 10:09 | 25 | into the issue about spying and sneaking into showrooms, |

CV 04-9049 DOC - 1/4/2011 - VOLUME I OF II

26

| 10:09 | 1 | what I'm saying is they shouldn't be able to introduce |
| 10:09 | 2 | evidence that we snuck into the showroom of Hasbro or -- |
| 10:09 | 3 | THE COURT:  Why?  If you're claiming a trade |
| 10:09 | 4 | secret -- well, Hasbro is a good example, of course.  But |
| 10:09 | 5 | let's say it involves another competitor and it's not MGA. |
| 10:09 | 6 | In other words, I don't know how far those allegations take |
| 10:09 | 7 | us yet.  So let's assume it's competitor X and it's not MGA. |
| 10:09 | 8 | If you're claiming a trade secret, why is it relevant that |
| 10:09 | 9 | either you or MGA are going into other competitors' |
| 10:10 | 10 | showrooms and perhaps getting the idea for what you claim is |
| 10:10 | 11 | a trade secret, you know, from that activity?  And MGA's in |
| 10:10 | 12 | the same position, by the way.  I don't know that MGA's not |
| 10:10 | 13 | sneaking in. |
| 10:10 | 14 | MR. QUINN:  There's no evidence of that, |
| 10:10 | 15 | Your Honor.  I mean, if they were claiming -- if the claim |
| 10:10 | 16 | was that what Mattel asserts to be a trade secret is |
| 10:10 | 17 | something that we actually picked up from a theft from a |
| 10:10 | 18 | Hasbro toy room, that would be something that we could |
| 10:10 | 19 | discuss in specifics and in detail. |
| 10:10 | 20 | THE COURT:  Well, how do I know, yet?  Because |
| 10:10 | 21 | Villasenor hasn't really -- I haven't heard him testify. |
| 10:10 | 22 | You know, I don't know the extent of the great American |
| 10:10 | 23 | system in terms of the adversarial proceeding and what |
| 10:10 | 24 | Mr. Villasenor is gonna say on the stand. |
| 10:10 | 25 | MR. QUINN:  Well, we explored this in discovery. |

| | | |
|---|---|---|
| 10:10 | 1 | He has been deposed extensively. |
| 10:10 | 2 | THE COURT:  A lot of people have been deposed, and |
| 10:11 | 3 | a lot of people, frankly, have lied, and a lot of people, |
| 10:11 | 4 | quite frankly, have not given full information so far. |
| 10:11 | 5 | They pull that stunt in front of the jury, and I |
| 10:11 | 6 | imagine what the American jury system is going to do to |
| 10:11 | 7 | them.  It's going to be really interesting. |
| 10:11 | 8 | So I'm not confident yet that I've got full |
| 10:11 | 9 | information about these allegations from some of the key |
| 10:11 | 10 | people, especially Mr. Villasenor.  And I'm not certain in |
| 10:11 | 11 | light of the settlement or his taking of the Fifth or his |
| 10:11 | 12 | advice of counsel.  I just haven't heard the gentleman in |
| 10:11 | 13 | person in a court of law. |
| 10:11 | 14 | And these depositions, quite frankly, I don't have |
| 10:11 | 15 | a lot of faith that you've gotten the answers that Mattel |
| 10:11 | 16 | has been seeking from an awful lot of parties in this |
| 10:11 | 17 | matter, and I'm not certain MGA's gotten, you know, the full |
| 10:11 | 18 | truth from a lot of parties yet. |
| 10:11 | 19 | MR. QUINN:  Your Honor, we bring the motion, |
| 10:11 | 20 | obviously, based on the record that exists at the time the |
| 10:11 | 21 | motion was brought.  Mr. Villasenor has never taken the |
| 10:11 | 22 | Fifth, unlike some other witnesses in this case. |
| 10:11 | 23 | MS. HURST:  Yes, he did. |
| 10:11 | 24 | MR. McCONVILLE:  Yes, he did. |
| 10:11 | 25 | THE COURT:  Yeah, he did take the Fifth. |

| | | |
|---|---|---|
| 10:12 | 1 | Initially, he took the Fifth Amendment.  No? |
| 10:12 | 2 | MR. McCONVILLE:  Yes.  Yes. |
| 10:12 | 3 | THE COURT:  Let's find it. |
| 10:12 | 4 | MR. McCONVILLE:  All right.  But that's -- |
| 10:12 | 5 | THE COURT:  No, no.  Let's find it.  If I'm wrong, |
| 10:12 | 6 | I will certainly apologize.  I recall he took the Fifth, |
| 10:12 | 7 | initially. |
| 10:12 | 8 | MR. ZELLER:  And that -- |
| 10:12 | 9 | THE COURT:  We're not gonna guess.  We're going to |
| 10:12 | 10 | find it. |
| 10:12 | 11 | MR. ZELLER:  We'll go look. |
| 10:12 | 12 | THE COURT:  Yeah, we'll go look.  MGA is going to |
| 10:12 | 13 | look, right? |
| 10:12 | 14 | MS. HURST:  Yeah. |
| 10:12 | 15 | THE COURT:  Okay.  Start looking. |
| 10:12 | 16 | MR. QUINN:  Should we wait, or should I continue |
| 10:12 | 17 | on? |
| 10:12 | 18 | THE COURT:  Why don't you continue on, because |
| 10:12 | 19 | whether he took the Fifth or not isn't going to be the |
| 10:12 | 20 | gravamen. |
| 10:12 | 21 | Let the record reflect five associates are running |
| 10:12 | 22 | out the door to find out if he took the Fifth. |
| 10:12 | 23 | MR. QUINN:  Only five, Your Honor? |
| 10:12 | 24 | THE COURT:  Only five. |
| 10:12 | 25 | MR. QUINN:  But, Your Honor, let's assume for |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 1/4/2011 - VOLUME I OF II

29

| | | |
|---|---|---|
| 10:12 | 1 | purposes of this argument that he took the Fifth.  What are |
| 10:12 | 2 | we talking about now?  What are the dots that we're |
| 10:12 | 3 | connecting that hypothetically some trade secret, Bratz |
| 10:12 | 4 | character, some of the trade secrets that Mattel is suing on |
| 10:12 | 5 | we actually got out of a competitor's showroom booth by |
| 10:12 | 6 | sneaking in.  There is no evidence of that. |
| 10:13 | 7 | THE COURT:  My only concern is this:  So far the |
| 10:13 | 8 | limited knowledge I have about Villasenor, et al., is the |
| 10:13 | 9 | allegation that Mattel is going into MGA's showrooms.  But |
| 10:13 | 10 | also there was the allegation that they're also going into |
| 10:13 | 11 | other competitors' showrooms.  What I'm not certain of is |
| 10:13 | 12 | what's of value in the other competitors' showrooms, what's |
| 10:13 | 13 | not of value, if this was an industry-wide practice, if this |
| 10:13 | 14 | was reciprocated by MGA.  I don't know the industry well |
| 10:13 | 15 | enough yet. |
| 10:13 | 16 | And what I'm concerned about is I -- my memory was |
| 10:13 | 17 | that Villasenor took the Fifth.  Whether he did or not may |
| 10:13 | 18 | be absolutely relevant because if a settlement is reached |
| 10:13 | 19 | and Mr. Villasenor didn't take the Fifth, but refused to |
| 10:13 | 20 | undertake a deposition, for instance, my concern is that I |
| 10:13 | 21 | don't have all of the basis for making a decision until |
| 10:14 | 22 | Villasenor takes the stand.  That's my concern. |
| 10:14 | 23 | So you may be very well taken on this motion.  I'm |
| 10:14 | 24 | just wondering why I'm deciding it now. |
| 10:14 | 25 | MR. QUINN:  Well, as it relates to other -- other |

CV 04-9049 DOC - 1/4/2011 - VOLUME I OF II

30

| 10:14 | 1 | parties' showrooms, Your Honor, I mean, needs to be some |
| 10:14 | 2 | limits to this trial.  I mean -- well, they're not suing; |
| 10:14 | 3 | there is no claim. |
| 10:14 | 4 | THE COURT:  Well, will Mattel stipulate to some |
| 10:14 | 5 | limit? |
| 10:14 | 6 | MR. QUINN:  Well, I'm urging one right now. |
| 10:14 | 7 | MS. HURST:  I think our proposal was a hundred |
| 10:14 | 8 | hours a side, Your Honor. |
| 10:14 | 9 | THE COURT:  I'm just joking with you. |
| 10:14 | 10 | Yeah.  There's always a limitation, depending upon |
| 10:14 | 11 | which side feels that their ruling might go against them. |
| 10:14 | 12 | MR. QUINN:  I mean, suppose that Mr. -- |
| 10:14 | 13 | THE COURT:  If you're going into competitors' |
| 10:14 | 14 | showrooms, the obvious question I would ask is, why?  And if |
| 10:14 | 15 | it relates to a claim for a trade secret and you're claiming |
| 10:15 | 16 | a trade secret, then I want to know what's in that showroom |
| 10:15 | 17 | and if this is truly a trade secret of Mattel or, let's just |
| 10:15 | 18 | say, a borrowed idea.  And that's what I don't know. |
| 10:15 | 19 | So I'm not ready at this juncture to cut that off. |
| 10:15 | 20 | I'm ready to let it develop.  I don't think I'm ready to |
| 10:15 | 21 | limit the opening statements by counsel in that regard at |
| 10:15 | 22 | this point. |
| 10:15 | 23 | And the only reason is I don't have enough |
| 10:15 | 24 | information yet and I don't have a lot of faith.  You're |
| 10:15 | 25 | hearing I don't have a lot of faith in the depositions.  I |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 1/4/2011 - VOLUME I OF II

31

| | | |
|---|---|---|
| 10:15 | 1 | certainly have no faith in the interrogatories that we were |
| 10:15 | 2 | going through with the preceding judge and that endless |
| 10:15 | 3 | quagmire. |
| 10:15 | 4 | So until people are under oath in front of a jury, |
| 10:15 | 5 | I'm a little reluctant to rule in your favor, although your |
| 10:15 | 6 | motion may be very well-taken. |
| 10:15 | 7 | So if you can get the information in front of me, |
| 10:15 | 8 | I'll certainly consider it.  We're going to be in session at |
| 10:16 | 9 | night with many of the witnesses.  Many of these witnesses |
| 10:16 | 10 | are going to be previewed.  Maybe Mr. Villasenor is one of |
| 10:16 | 11 | those witnesses that we take from 5:00 to 10:00 at night. |
| 10:16 | 12 | But at the present time, I'm not inclined to |
| 10:16 | 13 | preclude a discussion in an opening statement by MGA and no |
| 10:16 | 14 | reference to going into other competitors' showroom. |
| 10:16 | 15 | Now, the problem is I don't know how many, who, or |
| 10:16 | 16 | where.  We mentioned Hasbro.  So let me turn to MGA for a |
| 10:16 | 17 | moment, and let's hear part of their opening statement. |
| 10:16 | 18 | Okay? |
| 10:16 | 19 | Mr. McConville, to the lectern, please. |
| 10:16 | 20 | Ms. Keller is now about to join him because she would like |
| 10:16 | 21 | to associate in. |
| 10:16 | 22 | I'm going to hear your opening statement |
| 10:16 | 23 | concerning what you're going to say, and this will be your |
| 10:16 | 24 | opening statement in front of the jury. |
| 10:16 | 25 | MR. McCONVILLE:  Thank you, Your Honor.  As the |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 1/4/2011 - VOLUME I OF II

32

| | | |
|--|--|--|
| 10:16 | 1 | evidence will show throughout this case that this -- the |
| 10:16 | 2 | entire proposition on which Mattel bases its claims have to |
| 10:16 | 3 | be considered when countered with their own actions. |
| 10:17 | 4 | Indeed, they claim trade secret misappropriation, yet the |
| 10:17 | 5 | exact acts which are alleged to be trade secret thefts |
| 10:17 | 6 | don't -- pale in comparison to the efforts at which Mattel |
| 10:17 | 7 | will go in order to steal trade secrets.  In addition, they |
| 10:17 | 8 | claim that they had no way of knowing about Bratz. |
| 10:17 | 9 | THE COURT:  The evidence will show. |
| 10:17 | 10 | MR. McCONVILLE:  I'm sorry.  The evidence will |
| 10:17 | 11 | show and they will put forth that they did not know about |
| 10:17 | 12 | the existence of Bratz.  However, the evidence will show |
| 10:17 | 13 | that Mattel will stop at no end to investigate anything it |
| 10:17 | 14 | wants in order to find out about products, including |
| 10:17 | 15 | sneaking into showrooms. |
| 10:17 | 16 | THE COURT:  Is that kind of like an argument? |
| 10:17 | 17 | MR. McCONVILLE:  No.  The evidence will show that. |
| 10:17 | 18 | THE COURT:  Just a moment.  Back at the lectern. |
| 10:17 | 19 | What evidence?  Sounded more like an argument to me.  What |
| 10:17 | 20 | evidence? |
| 10:17 | 21 | MR. McCONVILLE:  The evidence will show that, one, |
| 10:17 | 22 | Mattel has at its disposal a group of individuals called |
| 10:18 | 23 | "market intelligence;" that the market intelligence people, |
| 10:18 | 24 | armed with a manual on how to steal, then marched into |
| 10:18 | 25 | showrooms with fake business cards. |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 1/4/2011 - VOLUME I OF II

33

| | | |
|---|---|---|
| 10:18 | 1 | THE COURT:  What showrooms? |
| 10:18 | 2 | MR. McCONVILLE:  MGA's and others. |
| 10:18 | 3 | THE COURT:  What others? |
| 10:18 | 4 | MR. McCONVILLE:  Well, I'm just doing the opening |
| 10:18 | 5 | now, Your Honor. |
| 10:18 | 6 | THE COURT:  Not yet, you're not.  What others? |
| 10:18 | 7 | Not until I hear it.  What others? |
| 10:18 | 8 | MR. McCONVILLE:  I don't know right now. |
| 10:18 | 9 | THE COURT:  Go ask Ms. Hurst. |
| 10:18 | 10 | MS. HURST:  Hasbro, Lego.  There's numerous |
| 10:18 | 11 | others. |
| 10:18 | 12 | MR. McCONVILLE:  Hasbro, Lego. |
| 10:18 | 13 | THE COURT:  Hasbro, Lego. |
| 10:18 | 14 | MR. McCONVILLE:  Bandai. |
| 10:18 | 15 | THE COURT:  Who? |
| 10:18 | 16 | MR. McCONVILLE:  Bandai. |
| 10:18 | 17 | THE COURT:  Okay. |
| 10:18 | 18 | MR. McCONVILLE:  The evidence will show that. |
| 10:18 | 19 | MS. HURST:  Spinmaster I think is one. |
| 10:18 | 20 | THE COURT:  Okay. |
| 10:18 | 21 | MS. HURST:  Jakks I think. |
| 10:18 | 22 | THE COURT:  Now, that's what you're, obviously, |
| 10:18 | 23 | trying to exclude, all these ancillary showrooms. |
| 10:18 | 24 | MS. HURST:  Your Honor -- |
| 10:18 | 25 | MR. QUINN:  Yes, Your Honor.  And I would -- their |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 1/4/2011 - VOLUME I OF II

34

| | | |
|---|---|---|
| 10:19 | 1 | 30(b)(6) designated witness on these subjects did not |
| 10:19 | 2 | disclose any of this.  We're hearing this for the first |
| 10:19 | 3 | time.  But what is noteworthy, the question that was teed |
| 10:19 | 4 | up, what did they steal from Hasbro.  They haven't told us |
| 10:19 | 5 | anything, and I would be interested in hearing from |
| 10:19 | 6 | Ms. Hurst what did we steal from Hasbro. |
| 10:19 | 7 | MS. HURST:  The unreleased product ideas, as |
| 10:19 | 8 | disclosed in their documents.  They don't need us to tell |
| 10:19 | 9 | them this.  That's crazy.  They're the ones with the |
| 10:19 | 10 | witnesses going into these showrooms and then producing |
| 10:19 | 11 | 300-page reports with the pictures of the products that they |
| 10:19 | 12 | circulated to their design people and had the big |
| 10:19 | 13 | presentations about.  They don't need this information from |
| 10:19 | 14 | us.  Are you kidding me? |
| 10:19 | 15 | MR. QUINN:  Okay.  So how -- |
| 10:19 | 16 | MS. HURST:  They had a hundred people in the |
| 10:19 | 17 | presentation theater for this presentation.  Now we're |
| 10:19 | 18 | talking about trade secrets, and they want to claim ours are |
| 10:19 | 19 | not trade secrets.  So it certainly goes to industry |
| 10:20 | 20 | practices if they had to sneak into every one of the |
| 10:20 | 21 | showrooms.  It shows that the industry practice is your |
| 10:20 | 22 | competitor doesn't get this information, that it is |
| 10:20 | 23 | confidential, that it is of economic value.  And what they |
| 10:20 | 24 | want to do -- their motion is this stealth motion where they |
| 10:20 | 25 | say you're not allowed to talk about the other showrooms, |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 1/4/2011 - VOLUME I OF II

35

| 10:20 | 1 | but what that does, then, is it excludes all the evidence. |
| 10:20 | 2 | THE COURT:  Just a moment. |
| 10:20 | 3 | Okay.  I'm sorry, Counsel. |
| 10:20 | 4 | MS. HURST:  So anyway, the documents they |
| 10:21 | 5 | generate, then, include information from all of these |
| 10:21 | 6 | showrooms that they snuck into.  So what they want to do |
| 10:21 | 7 | when they make this motion is exclude any of the evidence, |
| 10:21 | 8 | right, because it all pertains to their practices in |
| 10:21 | 9 | general.  And they want to try to say, well, we have a |
| 10:21 | 10 | blanket prohibition on talking about anything else.  So then |
| 10:21 | 11 | the effect of that is that none of the evidence comes in. |
| 10:21 | 12 | That's the real agenda here.  Okay?  The Court can't draw |
| 10:21 | 13 | that line.  We need to get the witnesses on the stand.  They |
| 10:21 | 14 | pay good money for -- |
| 10:21 | 15 | THE COURT:  Describe to me the toy fairs.  Does |
| 10:21 | 16 | each vendor, like Hasbro, set up an independent booth or |
| 10:21 | 17 | facility?  That's been my understanding thus far.  That no |
| 10:21 | 18 | competitors in a sense -- well, strike that. |
| 10:21 | 19 | The evidence has been mixed.  But I've heard on |
| 10:21 | 20 | occasion, though, that there are a multiplicity of vendors |
| 10:22 | 21 | who -- I'm not certain of this.  I thought in Hong Kong, for |
| 10:22 | 22 | instance, that -- I'd formed an opinion that may be |
| 10:22 | 23 | incorrect -- that there was a more public, if you will, |
| 10:22 | 24 | viewing platform for people like Mr. Larian, for instance, |
| 10:22 | 25 | who are there now.  There was also a more confined facility |

CV 04-9049 DOC - 1/4/2011 - VOLUME I OF II

36

| | | |
|---|---|---|
| 10:22 | 1 | that was set up for selected vendors and the more confined |
| 10:22 | 2 | facilities were the facilities that Mr. Villasenor |
| 10:22 | 3 | supposedly entered with false identification, false name, |
| 10:22 | 4 | and false representations about who he was. |
| 10:23 | 5 | If I'm correct that there is or are public |
| 10:23 | 6 | viewings, I don't know why that isn't relevant.  I don't |
| 10:23 | 7 | have a lot of faith in the answers that many of the |
| 10:23 | 8 | witnesses have given in the depositions.  The difficulty, |
| 10:23 | 9 | Mr. McConville, with your excellent argument -- |
| 10:23 | 10 | MR. McCONVILLE:  I wasn't done.  I got more. |
| 10:23 | 11 | THE COURT:  Okay.   -- is that it was argument. |
| 10:23 | 12 | And you're going to have to flush that out with, you know, |
| 10:23 | 13 | facts.  And what Mattel's objecting to is, as I require you |
| 10:23 | 14 | to do that with Hasbro, Lego, Bandai, Jakks, whatever -- |
| 10:24 | 15 | that's their objection, that "Where's the beef?"  "Where's |
| 10:24 | 16 | the evidence?" |
| 10:24 | 17 | My question, though, to Mattel is, why isn't that |
| 10:24 | 18 | burden on you?  If that activity is taking place, why is MGA |
| 10:24 | 19 | precluded because you say that there's no evidence, when, in |
| 10:24 | 20 | fact, there seems to be, from their perspective, a strong |
| 10:24 | 21 | motivation on your part to go into these alleged facilities |
| 10:24 | 22 | that have some modicum of security, just as Mattel has some |
| 10:24 | 23 | modicum of security and their protecting their trade |
| 10:24 | 24 | secrets? |
| 10:24 | 25 | Now, the difficulty I recognize is that if I make |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 1/4/2011 - VOLUME I OF II

37

| | | |
|---|---|---|
| 10:24 | 1 | that ruling -- Mr. Zeller is correct -- it's so broad that |
| 10:24 | 2 | what it allows the jury to assume is that just by virtue of |
| 10:24 | 3 | you going in that you obtained some trade secret.  The |
| 10:24 | 4 | response is that you shouldn't have gone in, in the first |
| 10:25 | 5 | place.  The response is that the burden now falls on you to |
| 10:25 | 6 | disprove, if you will, that negative because you have set |
| 10:25 | 7 | this into action.  That's MGA's best argument, although they |
| 10:25 | 8 | haven't made it yet. |
| 10:25 | 9 | So, Mr. Zeller. |
| 10:25 | 10 | MR. ZELLER:  I would say on that is that there's |
| 10:25 | 11 | kind of a procedural aspect we can talk about second.  But |
| 10:25 | 12 | substantively, a trade secret claim requires proof by MGA |
| 10:25 | 13 | that it was a trade secret.  Just focusing on their products |
| 10:25 | 14 | for a moment -- |
| 10:25 | 15 | THE COURT:  Let me stop you for a moment. |
| 10:25 | 16 | MR. ZELLER:  Yes. |
| 10:25 | 17 | THE COURT:  That's why I need to hear |
| 10:25 | 18 | Mr. Villasenor.  That's why I need to hear what he |
| 10:25 | 19 | explicitly -- hold on -- before the settlement was entered |
| 10:25 | 20 | into a la Carter Bryant, a la Villasenor -- these |
| 10:25 | 21 | settlements are becoming a habit and custom, and they're |
| 10:25 | 22 | interfering with this trial.  So I want to hear from |
| 10:25 | 23 | Mr. Villasenor about if he went into Lego, why.  What was |
| 10:26 | 24 | his motivation.  What was he looking for, or was he just |
| 10:26 | 25 | lookie-looing. |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 1/4/2011 - VOLUME I OF II

38

| | | |
|---|---|---|
| 10:26 | 1 | Was he given a specific directive to look -- I |
| 10:26 | 2 | don't know that information.  So I'm not inclined to deny |
| 10:26 | 3 | your motion outright, but I'm not going to preclude MGA from |
| 10:26 | 4 | making an opening statement.  And if you object to that |
| 10:26 | 5 | argumentive portion, I'm going to allow you to go into the |
| 10:26 | 6 | specifics.  I think your statement, quite frankly, solves |
| 10:26 | 7 | the problem of you not being caught in a box in case you get |
| 10:26 | 8 | the Court -- an adverse ruling and I say that you can't talk |
| 10:26 | 9 | about Lego later on. |
| 10:26 | 10 | The problem is, it is argumentative, and if they |
| 10:26 | 11 | object during opening statement, I might sustain it; but if |
| 10:26 | 12 | I sustain it, I'm going to let you go into Lego in |
| 10:27 | 13 | particular.  So I think I really leave that to the tactics |
| 10:27 | 14 | of both parties. |
| 10:27 | 15 | From my perspective, I like your opening statement |
| 10:27 | 16 | because it gives me room to find out more from |
| 10:27 | 17 | Mr. Villasenor in a Saturday session or nightly session. |
| 10:27 | 18 | You're not tied to a specific statement.  It's countering |
| 10:27 | 19 | Mattel's claim about the trade secret, but if they object, |
| 10:27 | 20 | I'll probably let you get specific because it is |
| 10:27 | 21 | argumentative. |
| 10:27 | 22 | MR. ZELLER:  Can I make one point, Your Honor? |
| 10:27 | 23 | THE COURT:  I think we're almost done.  But this |
| 10:27 | 24 | is the last point. |
| 10:27 | 25 | MR. ZELLER:  Sure.  It's an important one, |

10:27   1   however.

10:27   2           THE COURT:  Well, all your points are important.

10:27   3           MR. ZELLER:  I understand, but in particular.

10:27   4   What Mr. Villasenor thinks in many respects is just simply

10:27   5   not relevant.

10:27   6           THE COURT:  No, I didn't say "thinks."  I also

10:27   7   said "directed."  You missed my point.  I haven't heard from

10:27   8   Mr. Villasenor if he was directed to do something.  And I

10:27   9   really am interested in what he thinks.  If he's got a habit

10:27   10  and custom over some period of time of going into showrooms,

10:27   11  then his thought process is very important, because he's

10:27   12  being rewarded.  He's going back to the company and saying,

10:28   13  "Look what I found."  He doesn't even need a directive.

10:28   14  That's what I don't know.  Now, you're not gonna take that

10:28   15  from the jury in an opening statement.

10:28   16          MR. ZELLER:  That's not necessarily what I'm --

10:28   17  I'm raising an issue with.

10:28   18          THE COURT:  I apologize, Mr. Zeller.

10:28   19          MR. ZELLER:  It's not that, Your Honor.

10:28   20          The predicate is that it has to be a trade secret.

10:28   21  MGA has admitted that these are not trade secrets.  They're

10:28   22  witnesses that have said that these were public.  This was

10:28   23  public information.  It was disseminated by MGA.  We have

10:28   24  public documents showing that it was disseminated by MGA.

10:28   25          THE COURT:  I'm sorry.  There's also the inference

CV 04-9049 DOC - 1/4/2011 - VOLUME I OF II

40

10:28   1   and strong testimony that this was not public information;

10:28   2   it's played both ways, which is why I talked to you about

10:28   3   the Hong Kong toy fair, and I may be wrong about the toy

10:28   4   fair, but it was a hybrid of both.

10:28   5          MR. ZELLER:  There's never been any showing that

10:28   6   anyone made it into the Hong Kong toy fair.  There were

10:28   7   allegations about Europe --

10:28   8          THE COURT:  Europe.  Maybe I'm confused about

10:28   9   Hong Kong.  I used that as an example.  Maybe we will go

10:29   10  back to Germany or wherever or whatever it was.

10:29   11         MR. ZELLER:  Their allegations have been tied

10:29   12  principally to New York toy fair.  They have, in fact, as

10:29   13  far as I recall -- I don't recall any instance of them

10:29   14  arguing or asserting that Nuremberg was such a toy fair.  In

10:29   15  fact, Mr. Jolicoeur's testimony over and over and over was,

10:29   16  is that of the three products that they claim were their

10:29   17  trade secrets, that somehow they were damaged by the theft

10:29   18  of -- as a result -- he admitted two of them.  He admitted

10:29   19  outright two of them were already public when confronted

10:29   20  with the documents showing that they were public, MGA's own

10:29   21  documents showing that they were public as of the time of

10:29   22  the toy fair.

10:29   23         In fact, the toy fair reports that Ms. Hurst

10:29   24  relies on as somehow evidencing the value of this, in fact,

10:29   25  is taken from those public statements.  Mr. Jolicoeur, their

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 1/4/2011 - VOLUME I OF II

41

10:29  1    30(b)(6) witness, admitted that as well.  He had to; the

10:29  2    language is the same.  It's the same substance.

10:30  3           So as to those two -- the third product that they

10:30  4    claim damages on was Bratz Winter Wonderland, which they had

10:30  5    the Mattel samplemakers working on, under no obligation of

10:30  6    confidentiality.  And moreover, when asked questions about

10:30  7    when did that information become public, MGA's 30(b)(6)

10:30  8    witness could not tell us, even though the Court has already

10:30  9    ordered it.  The inference -- and I think, frankly -- should

10:30  10   be precluded from denying, as we've argued before, that that

10:30  11   wasn't already public.

10:30  12          The fact is that the procedural point I was gonna

10:30  13   make, simply, Your Honor, is, is that it is not our burden

10:30  14   and particularly cannot be our burden, given the

10:30  15   circumstances under which this arose.

10:30  16          The Court will recall, and the Court was very

10:30  17   generous to MGA in allowing these claims to come in, in

10:30  18   August.  We were not permitted to go out and take discovery

10:30  19   of the Hasbros and Legos and all these other companies in

10:30  20   order to determine whether or not they even claim that that

10:30  21   information is somehow a secret.

10:31  22          THE COURT:  Okay.  MGA will conclude.

10:31  23          MS. HURST:  Yeah.  I don't want to reargue the

10:31  24   summary judgment motion, Your Honor.  We're satisfied with

10:31  25   the Court's tentative ruling on this.

CV 04-9049 DOC - 1/4/2011 - VOLUME I OF II

42

| | |
|---|---|
| 10:31 | 1 |
| 10:31 | 2 |
| 10:31 | 3 |
| 10:31 | 4 |
| 10:31 | 5 |
| 10:31 | 6 |
| 10:31 | 7 |
| 10:31 | 8 |
| 10:31 | 9 |
| 10:31 | 10 |
| 10:32 | 11 |
| 10:32 | 12 |
| 10:32 | 13 |
| 10:32 | 14 |
| 10:32 | 15 |
| 10:32 | 16 |
| 10:32 | 17 |
| 10:32 | 18 |
| 10:32 | 19 |
| 10:32 | 20 |
| 10:32 | 21 |
| 10:32 | 22 |
| 10:32 | 23 |
| 10:32 | 24 |
| 10:32 | 25 |

1    THE COURT:  Okay.  Just a moment.

2    All right.  Counsel, thank you.

3    MR. QUINN:  Your Honor, this motion actually

4 covered a number of other things which we're prepared to

5 submit on.

6    THE COURT:  Oh, no.

7    MR. QUINN:  Okay.  So I'm also prepared to address

8 them.

9    THE COURT:  Please.

10    MR. QUINN:  Your Honor --

11    THE COURT:  By the way, the transcripts -- the

12 young lady, Maria, who was here last night -- what time did

13 we recess last night?

14    MR. COTE:  About 12:30, Your Honor.

15    THE COURT:  About 12:30.  We would have gone until

16 we finished these last night, but one court reporter can't

17 take it.  She's going to produce that on a daily.  It will

18 be turned out to you tonight, so you're going to be ordered

19 to sit here at the courthouse and get it sometime tonight,

20 8:00 to 12:00.  If we're done with all these motions, just

21 one person stay and pick it up so you've got it.  But it

22 will be dailies on these, and we'll turn those out.

23    Ms. Keller, do you want a copy?

24    MS. KELLER:  I would like one.

25    THE COURT:  Okay.

DEBBIE GALE, U.S. COURT REPORTER

10:32   1         MR. McCONVILLE:  So typically how this happens,

10:32   2    Your Honor, is when Maria gets finished, she emails them to

10:32   3    us and can distribute them.

10:32   4         THE COURT:  Okay.  I'll leave that between Maria

10:32   5    and the parties.  All right.

10:32   6         Now, Mr. Quinn.

10:32   7         MR. QUINN:  In terms of the toy fair free-for-all

10:33   8    which we're trying to prevent.

10:33   9         THE COURT:  I know.

10:33   10        MR. QUINN:  They claim damages only as to three of

10:33   11   the alleged 111 trade secrets that were stolen out of toy

10:33   12   fairs.  Those three are Alien Racers, Bratz Diamonds, and

10:33   13   Bratz Winter Wonderland.  And their expert,

10:33   14   Mr. Malackowski -- and this really relates to a *Daubert*

10:33   15   motion that will be coming up later on this morning -- can

10:33   16   only come up with damage figures for those three.  He has

10:33   17   some lump-sum amount which numbers in the hundreds of

10:33   18   millions of dollars for the other 108 or whatever the number

10:33   19   is.

10:33   20        THE COURT:  251 million.

10:33   21        MR. QUINN:  Something like that.  But it's not

10:33   22   tied in.  There's no causal nexus.  We'll see when they get

10:33   23   to a motion in limine that he just says Mattel did lots of

10:33   24   bad things.  It's impossible to parse this, but there's no

10:34   25   connection made.  It's just a number pulled out of the air.

CV 04-9049 DOC - 1/4/2011 - VOLUME I OF II

44

| | | |
|---|---|---|
| 10:34 | 1 | In our view, they shouldn't be able to introduce |
| 10:34 | 2 | evidence relating to spying on products other than those as |
| 10:34 | 3 | to which they make out a case, even a prima facie case, by |
| 10:34 | 4 | attaching damages numbers to them.  And there's only those |
| 10:34 | 5 | three. |
| 10:34 | 6 | So that's another aspect of this motion relating |
| 10:34 | 7 | to toy fairs. |
| 10:34 | 8 | THE COURT:  Okay. |
| 10:34 | 9 | MR. QUINN:  They claim that they -- everybody who |
| 10:34 | 10 | entered into MGA toy fairs anywhere at any time signed an |
| 10:34 | 11 | NDA, a nondisclosure agreement.  They have not produced a |
| 10:34 | 12 | single such nondisclosure agreement.  They don't have them. |
| 10:34 | 13 | They want to testify, and we think this violates the best |
| 10:34 | 14 | evidence rule as to what their NDA said.  It's another |
| 10:34 | 15 | aspect of this motion as it relates to toy fairs. |
| 10:34 | 16 | THE COURT:  Why doesn't Mr. Villasenor fill in |
| 10:34 | 17 | those blanks? |
| 10:34 | 18 | MR. QUINN:  It's their claim that this is all |
| 10:34 | 19 | confidential because people signed NDAs, but they don't have |
| 10:35 | 20 | any NDAs.  They haven't produced them.  So we're seeking to |
| 10:35 | 21 | preclude oral testimony as to what documents people signed |
| 10:35 | 22 | when they entered toy fairs. |
| 10:35 | 23 | THE COURT:  Okay. |
| 10:35 | 24 | MR. QUINN:  Allegations that we engaged in |
| 10:35 | 25 | criminal copyright infringement as a result of our copying |

DEBBIE GALE, U.S. COURT REPORTER

10:35  1    of things that we saw.  They don't have any copyrights for

10:35  2    any of these things.  They've produced no copyright

10:35  3    certificates for any of these items that they said were

10:35  4    stolen.  They have no evidence of willfulness.  They

10:35  5    shouldn't be able to throw around the words, the phrase

10:35  6    "criminal copyright infringement."

10:35  7            And then there are -- the last section of the

10:35  8    motion relates to allegations about obstruction or

10:35  9    suppression of evidence, not producing documents relevant to

10:36  10   Bain or Bain's final report, not producing documents

10:36  11   relating to Mattel's market intelligence department until

10:36  12   August 7, 2010, paying Mr. Villasenor hush money with a

10:36  13   confidentiality agreement.  If you go through each one of

10:36  14   these things, Your Honor, they have misstated the evidence.

10:36  15           There isn't evidence to support -- for example,

10:36  16   the Bain report -- that we've suppressed anything

10:36  17   whatsoever.  I mean, they cling to that allegation.  There's

10:36  18   no evidence of it.  It seems to be -- the claim is that

10:36  19   there was spoliation because the report was edited in the

10:36  20   process of being created and the fact of nonexistence of

10:36  21   prior drafts is spoliation.  So all these charges relating

10:36  22   to spoliation are unsupported and should be excluded.

10:36  23           THE COURT:  MGA.

10:36  24           MS. HURST:  Most of this, I think, has been

10:36  25   addressed in the summary judgment briefing, Your Honor.

DEBBIE GALE, U.S. COURT REPORTER

10:36   1          Very quickly, it's not true that the report claims

10:37   2   damages on only three products.  It's not true that we

10:37   3   haven't produced any NDAs.  We produced what we could find

10:37   4   after the lengthy period of time during which they concealed

10:37   5   this evidence.

10:37   6          Ms. Estrich argued during the RICO motions, and I

10:37   7   conceded, that registrations were not required for criminal

10:37   8   copyright infringement, but the Court's gonna address that

10:37   9   in the RICO context.

10:37   10         I want to address this Bain thing in particular to

10:37   11  make sure the Court understands how this went.  So they

10:37   12  engaged Bain to go out and talk to all of our, apparently,

10:37   13  licensees and retailers and production companies and people

10:37   14  who were under NDA to MGA and compiled this profile on MGA.

10:37   15  And as part of that process, they had slide decks for the

10:37   16  CEO.  The CEO slide deck is in there.  They've had

10:37   17  presentations to the president of Mattel brands, Matt

10:37   18  Bousquette.

10:37   19         Let me stop right there for a minute.  Matt

10:37   20  Bousquette is a guy who is dodging service of a subpoena in

10:38   21  this case.  They're paying his legal fees and we need the

10:38   22  Court's help to get Mr. Bousquette here in Court by forcing

10:38   23  Mattel with the threat of an adverse inference.  So I want

10:38   24  to put that down as an issue for Court to address; not

10:38   25  necessary this moment.  Our process server walked up to him

CV 04-9049 DOC - 1/4/2011 - VOLUME I OF II

47

| | | |
|---|---|---|
| 10:38 | 1 | the other day, got within 20 yards of him and he ran into |
| 10:38 | 2 | the house screaming, "I haven't been served."  This guy is |
| 10:38 | 3 | evading and ducking service. |
| 10:38 | 4 | THE COURT:  Is he still on Mattel's payroll? |
| 10:38 | 5 | MS. HURST:  I believe they're paying his legal |
| 10:38 | 6 | fees.  They paid for his lawyer to represent him in the |
| 10:38 | 7 | depositions in this case. |
| 10:38 | 8 | THE COURT:  Who's his lawyer? |
| 10:38 | 9 | MS. HURST:  Chris Caldwell, Your Honor. |
| 10:38 | 10 | THE COURT:  Where is he located? |
| 10:38 | 11 | MS. HURST:  He's here. |
| 10:38 | 12 | THE COURT:  Where? |
| 10:38 | 13 | MS. HURST:  Los Angeles. |
| 10:38 | 14 | THE COURT:  Why don't we call him and ask him to |
| 10:38 | 15 | come down. |
| 10:38 | 16 | MS. HURST:  Would love to.  Love to. |
| 10:38 | 17 | All right.  So let me continue on this Bain thing. |
| 10:38 | 18 | THE COURT:  Who wants to call him and ask him to |
| 10:38 | 19 | join us today? |
| 10:38 | 20 | MR. ZELLER:  We can try him, Your Honor. |
| 10:38 | 21 | THE COURT:  This is consumptive of time.  As the |
| 10:39 | 22 | issues come up, I can do it the hard way or the easy way. |
| 10:39 | 23 | You can place a phone call and just tell him I want to see |
| 10:39 | 24 | him at 2:00 o'clock, or we can do it the hard way. |
| 10:39 | 25 | MR. ZELLER:  Can we also have Zapf's counsel down |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 10:39 | 1 | here too.  They have a similar issue. |
| 10:39 | 2 | THE COURT:  Absolutely. |
| 10:39 | 3 | MR. ZELLER:  They're being paid by MGA, and we |
| 10:39 | 4 | have all those issues. |
| 10:39 | 5 | THE COURT:  Well, Mr. Bousquette's running -- it's |
| 10:39 | 6 | time that these witnesses realize that it's not their time; |
| 10:39 | 7 | it's taxpayer money.  It's Court resources that the public |
| 10:39 | 8 | pays for.  And this Court's going to end up throwing a |
| 10:39 | 9 | couple people in jail.  If I need to set that example, I'm |
| 10:39 | 10 | going to do it.  And by the time the Circuit sorts this out, |
| 10:39 | 11 | they will be with me. |
| 10:39 | 12 | So it's not their time and it's not their place to |
| 10:39 | 13 | decide when people are trying to properly serve them on |
| 10:39 | 14 | either side.  And that includes Carter Bryant, who's now |
| 10:39 | 15 | compliant, and Mr. Bousquette, or the problems with |
| 10:40 | 16 | witnesses that Mattel's having, okay, with MGA.  So it will |
| 10:40 | 17 | even out across-the-board. |
| 10:40 | 18 | Now, hopefully by saying that, we never have to do |
| 10:40 | 19 | it, okay?  But somebody needs to just say that on the |
| 10:40 | 20 | record, that the Court's not afraid to use its civil |
| 10:40 | 21 | contempt power, and that goes far beyond just a monetary |
| 10:40 | 22 | find, which, apparently, with the hundreds of millions of |
| 10:40 | 23 | dollars that each firm is being paid is a de minimus amount |
| 10:40 | 24 | in sanctions.  So apparently confinement may have to be the |
| 10:40 | 25 | answer.  I don't want to have to set that example.  Let me |

| | | |
|---|---|---|
| 10:40 | 1 | repeat that on the record. |
| 10:40 | 2 | MS. HURST:  Your Honor, let me finish on the Bain |
| 10:40 | 3 | documents.  So they're creating this thing, that they're |
| 10:40 | 4 | going out and interviewing our people about, and people |
| 10:40 | 5 | under NDA at the time, and they create this report, and it |
| 10:40 | 6 | final.  They deliver a final report.  Okay?  They deliver |
| 10:40 | 7 | the final report to Mattel, and then in-house counsel, |
| 10:40 | 8 | Mr. Moore, Michael Moore, who the Court has met before, and |
| 10:41 | 9 | who we'll see again at the trial, gets ahold of it, and it's |
| 10:41 | 10 | reported back that Michael Moore says it's important to the |
| 10:41 | 11 | litigation, this pending case, to delete one of the slides |
| 10:41 | 12 | and to edit another one of the slides.  Okay?  Now, none of |
| 10:41 | 13 | this to this very day has been produced by Mattel from their |
| 10:41 | 14 | documents, not a bit of it. |
| 10:41 | 15 | It all came from the subpoena to third-party Bain. |
| 10:41 | 16 | Now, the reason we sent that subpoena to third-party Bain |
| 10:41 | 17 | was because we got the final, final report, the one that |
| 10:41 | 18 | they edited after delivering a final report and, then |
| 10:41 | 19 | Mr. Moore sanitizes it because it's important to the |
| 10:41 | 20 | litigation, and they destroy it.  There's an instruction |
| 10:41 | 21 | right in the e-mail, destroy all the copies.  They use Bain |
| 10:41 | 22 | as their agent.  They go out and instruct all the people who |
| 10:41 | 23 | got what we said was final, "No, destroy the copies."  And |
| 10:42 | 24 | to this day, they have never been produced from Mattel's |
| 10:42 | 25 | files. |

DEBBIE GALE, U.S. COURT REPORTER

10:42   1          So we get this final report from Bain pursuant to

10:42   2   subpoena, and we see what did they think they needed to

10:42   3   sanitize.

10:42   4          Here's what it is:  A page and two bullet points

10:42   5   saying MGA is a way more nimble company that can get a

10:42   6   product to market in about seven months time, way faster

10:42   7   than Mattel.

10:42   8          Now, the Court will recall sitting in the room

10:42   9   next door for the last few days, listening to Mr. Zeller

10:42  10   argue with cumulative witnesses *ad naseum* his theory that we

10:42  11   must have been working on Bratz sooner because we couldn't

10:42  12   have gotten to market in the period of time that we said.

10:42  13   This is their central theory on why we must have started

10:42  14   earlier with Bratz in the summer or the spring.  All that

10:42  15   argument about how Prayer Angels is secretly Bratz and all

10:43  16   that other stuff hinges -- hinges on this notion that we

10:43  17   couldn't have gotten the product to market if we had started

10:43  18   when we said we did.  And that's exactly what they sanitized

10:43  19   out of this document that they then deleted every copy of

10:43  20   and have never produced from their own files in this case.

10:43  21          THE COURT:  Okay.  All right.  Thank you very

10:43  22   much.

10:43  23          MS. HURST:  Oh, yeah.  Mr. Villasenor took the

10:43  24   Fifth in his September 13, 2010 transcript, at pages 622 and

10:43  25   628.

CV 04-9049 DOC - 1/4/2011 - VOLUME I OF II

51

10:43   1          MR. McCONVILLE:  And 635.

10:43   2          MS. HURST:  And 635.

10:43   3          THE COURT:  That was my memory also.

10:43   4          MR. ZELLER:  I'm sorry?

10:43   5          THE COURT:  That was my memory also.

10:43   6          MR. ZELLER:  I believe what occurred,

10:43   7   Your Honor -- and we'll check those transcript references

10:43   8   that they're raising -- but my understanding is that in fact

10:44   9   those questions -- he didn't ever refuse to answer a

10:44  10   question.  What was asserted was by his criminal counsel,

10:44  11   and then the discovery master said, "Rephrase the question,"

10:44  12   and then he answered it.  So it was not -- my understanding,

10:44  13   that's my memory.  So we'll look at the transcript pages

10:44  14   they're citing, but I don't --

10:44  15          THE COURT:  I don't think I need to prove the

10:44  16   point.  My memory is he took the Fifth.  I don't know that

10:44  17   it's even that important.  Okay?  But I'm right; you're

10:44  18   wrong.  Simple as that.  Thank you.

10:44  19          Now, Motion No. 22.  This is to exclude reference

10:44  20   to purported bad acts and prejudicial documents.

10:44  21          Mattel.

10:44  22          MR. PRICE:  Thank you, Your Honor.  This is in

10:44  23   some ways parallel to one of MGA's motions.  It's basically

10:44  24   a "you shouldn't be able to dirty up Mattel on things that

10:44  25   are irrelevant" motion.  And there are 14 categories or 14

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 1/4/2011 - VOLUME I OF II

52

| | | |
|---|---|---|
| 10:44 | 1 | areas of communication or a question which we'd like to |
| 10:44 | 2 | preclude.  And we can go by these by number, and we might |
| 10:45 | 3 | learn that MGA has agreed with respect to some of these. |
| 10:45 | 4 | The first is that Mattel products contain lead. |
| 10:45 | 5 | THE COURT:  I can't hear you for some reason. |
| 10:45 | 6 | MR. PRICE:  Let me bring this closer. |
| 10:45 | 7 | The first category is that Mattel products contain |
| 10:45 | 8 | lead.  And as -- again, there was a parallel motion by MGA |
| 10:45 | 9 | concerning whether or not MGA products contain lead. |
| 10:45 | 10 | THE COURT:  Let me ask you something in a very |
| 10:45 | 11 | practical sense. |
| 10:45 | 12 | MR. PRICE:  Sure. |
| 10:45 | 13 | THE COURT:  I'm prepared to let all that in on |
| 10:45 | 14 | both sides.  Do you really want your companies in that |
| 10:45 | 15 | position?  I think Mr. Eckert and Mr. Larian don't want |
| 10:45 | 16 | their companies respectively dirtied up, quite frankly, with |
| 10:45 | 17 | unsafe toys.  So that's a meet and confer between the two of |
| 10:45 | 18 | you. |
| 10:45 | 19 | MR. PRICE:  Your Honor, we have suggested that; |
| 10:45 | 20 | It's been rejected. |
| 10:45 | 21 | THE COURT:  Next category. |
| 10:45 | 22 | MR. PRICE:  The second category was Mattel engaged |
| 10:45 | 23 | in securities fraud and violated the antitrust laws.  Again, |
| 10:45 | 24 | it has nothing to do with any of the allegations in this |
| 10:45 | 25 | case as to whether or not Mr. Bryant created Bratz while he |

CV 04-9049 DOC - 1/4/2011 - VOLUME I OF II

53

| | | |
|---|---|---|
| 10:46 | 1 | was at Mattel or whether or not there was a theft of trade |
| 10:46 | 2 | secrets. |
| 10:46 | 3 | The third, that Mattel engaged in "scorched earth |
| 10:46 | 4 | litigation" -- was litigious.  I think that's been addressed |
| 10:46 | 5 | in Motion in Limine No. 2, Mattel's Motion in Limine No. 2, |
| 10:46 | 6 | which Mr. Quinn argued.  Again, no apparent relevance to |
| 10:46 | 7 | this case.  The question is whether or not MGA did what it |
| 10:46 | 8 | did in this case. |
| 10:46 | 9 | The fourth, that Mattel defends against new |
| 10:46 | 10 | interests in doll business by suing.  Again, not relevant to |
| 10:46 | 11 | whether or not this case has merit.  And goes down -- I |
| 10:46 | 12 | mean, talk about a trial within a trial within a trial. |
| 10:46 | 13 | It's whether or not Mattel's other lawsuits have had merit, |
| 10:46 | 14 | or Mattel thought they had merit or not.  That's both |
| 10:46 | 15 | irrelevant, and also there's obvious 403 issues. |
| 10:46 | 16 | The fifth, Mattel mistreats employees.  And |
| 10:46 | 17 | apparently here MGA wants to offer broad evidence that |
| 10:47 | 18 | Mattel mistreats employees.  Again, no relevance.  I don't |
| 10:47 | 19 | think there's even been any statement by Mattel employees |
| 10:47 | 20 | that have been hired by MGA that Mattel mistreats its |
| 10:47 | 21 | employees.  And whether something's mistreatment or not |
| 10:47 | 22 | would, obviously, then come into issue, and we would get |
| 10:47 | 23 | into MGA's treatment of its employees, its -- its reputation |
| 10:47 | 24 | as to how it treats its employees, because MGA is saying |
| 10:47 | 25 | that's why Mattel employees leave to -- to join MGA.  So |

CV 04-9049 DOC - 1/4/2011 - VOLUME I OF II

54

| | | |
|---|---|---|
| 10:47 | 1 | we'd have to get into evidence, well, what does the market |
| 10:47 | 2 | know about MGA's mistreatment of employees.  So, again, not |
| 10:47 | 3 | relevant, prejudicial, and talk about witness after witness |
| 10:47 | 4 | on matters that are irrelevant. |
| 10:47 | 5 | The sixth was that there was a brothel run out of |
| 10:48 | 6 | Mattel -- |
| 10:48 | 7 | THE COURT:  Brothel, like prostitution. |
| 10:48 | 8 | MR. PRICE:  Prostitution. |
| 10:48 | 9 | THE COURT:  Okay.  Thank you. |
| 10:48 | 10 | MR. PRICE:  Was run out of the Mattel Mexico |
| 10:48 | 11 | facility.  It wasn't a facility -- |
| 10:48 | 12 | THE COURT:  This is getting interesting. |
| 10:48 | 13 | MR. PRICE:  Which is exactly why they want the |
| 10:48 | 14 | jury to hear it. |
| 10:48 | 15 | There is -- as you can see, just on its face, it |
| 10:48 | 16 | really has nothing to do with this case.  MGA asked about a |
| 10:48 | 17 | brothel to certain witnesses, and that's why we think |
| 10:48 | 18 | they're going to try to get into it.  This wasn't -- the |
| 10:48 | 19 | cite of this alleged brothel wasn't where Machado -- |
| 10:48 | 20 | THE COURT:  Just a moment.  Are you going to |
| 10:48 | 21 | make -- |
| 10:48 | 22 | MR. McCONVILLE:  No, no, Your Honor, we're not |
| 10:48 | 23 | going to -- |
| 10:48 | 24 | THE COURT:  In fact, it seems like all of this is |
| 10:48 | 25 | subject to no rule that the Court needs to make at the |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 1/4/2011 - VOLUME I OF II

55

| | | |
|---|---|---|
| 10:48 | 1 | present time.  That this is a witness by witness.  We're |
| 10:48 | 2 | going to be going over every piece of evidence the night |
| 10:48 | 3 | before.  It's overly broad, frankly, Counsel. |
| 10:48 | 4 | MR. PRICE:  But we identified 14 specific areas, |
| 10:48 | 5 | because we don't want it mentioned in opening. |
| 10:48 | 6 | THE COURT:  Have you talked to them about it? |
| 10:48 | 7 | MR. PRICE:  They filed an opposition to our |
| 10:49 | 8 | request.  We met and conferred, and we talked to them again |
| 10:49 | 9 | as to whether or not they plan to -- |
| 10:49 | 10 | THE COURT:  That's no problem.  Let's move on to |
| 10:49 | 11 | the next motion.  You two can go out in the hallway and talk |
| 10:49 | 12 | about this. |
| 10:49 | 13 | MR. PRICE:  All right. |
| 10:49 | 14 | THE COURT:  All right.  Number 23.  This is to |
| 10:49 | 15 | exclude the evidence in reference to MGA's allegations |
| 10:49 | 16 | regarding NPD, CARU, TIA, T-I-A.  And the one before is |
| 10:49 | 17 | CARU, C-A-R-U, and licensing. |
| 10:50 | 18 | Mattel. |
| 10:50 | 19 | MR. ZELLER:  Yes, Your Honor.  With respect to |
| 10:50 | 20 | NPD, MGA has provided no evidence to support allegations |
| 10:50 | 21 | that it's made regarding NPD.  MGA's 30(b)(6) witness -- I'm |
| 10:50 | 22 | sorry -- NPD's 30(b)(6) witness, Esther Han, testified that |
| 10:50 | 23 | MGA was suspended in 2003 due to MGA's own breaches of its |
| 10:50 | 24 | contract with NPD.  In particular, the use of data that it |
| 10:50 | 25 | was not permitted to use and used in improper ways, and that |

10:50   1    there was no connection; there was no conduct by Mattel that

10:50   2    caused that.  There's no other evidence in this case, and

10:50   3    there's no evidence to support MGA's allegations.

10:50   4            So again, we're literally in a situation where MGA

10:50   5    is going to be making allegations that Mattel somehow caused

10:50   6    NPD to terminate a relationship with MGA when, in fact, the

10:51   7    only evidence shows it was decided by NPD as a result of

10:51   8    MGA's own conduct.

10:51   9            Obviously, this is also an issue -- it's a 403

10:51   10   issue, because we're going to have to get into NPD

10:51   11   contracts.  We're going to have to call NPD witnesses.

10:51   12   We're going to have to explain what NPD is.  We're going to

10:51   13   have to get into the fact there was no damage and no harm to

10:51   14   MGA.  So this is also a side show for that reason.

10:51   15           The second agency that's involved here, and this

10:51   16   is CARU, the only evidence that MGA cites to Mattel somehow

10:51   17   being behind CARU were these complaints about CARU's rulings

10:51   18   on MGA advertisements or such matters as a 2002 e-mail from

10:51   19   one person there at MGA to Isaac Larian, where she says

10:51   20   things like, "I think Mattel is at the bottom of this," but

10:52   21   there's simply no foundation for any of these allegations,

10:52   22   and there's no admissible evidence.

10:52   23           With respect to the TIA, it's also the same point,

10:52   24   which is that we are -- there's simply no evidence that

10:52   25   Mattel made or influenced changes that they claim were made

CV 04-9049 DOC - 1/4/2011 - VOLUME I OF II

57

| | |
|---|---|
| 10:52 | 1 |
| 10:52 | 2 |
| 10:52 | 3 |
| 10:52 | 4 |

10:52   1    in these voting procedures for toy of the year.  In fact,

10:52   2    the only evidence of record is that, in fact, the reason why

10:52   3    the TIA changed those rules was because MGA was attempting

10:52   4    to improperly influence the votes.

10:52   5         So again, we are in a situation where MGA is

10:52   6    making very broad-sweeping, slashing allegations of

10:52   7    interference with these relationships for which there is no

10:52   8    admissible evidence.

10:52   9         THE COURT:  MGA.

10:52   10        MS. HURST:  Regarding NPD, the evidence will show

10:52   11   that Mr. Bousquette, that same fellow who's hiding from our

10:53   12   process server, directed Mattel's employees to withhold

10:53   13   Mattel's payments to NPD, because he was dissatisfied with

10:53   14   MGA's press releases regarding market share; that Mattel, in

10:53   15   fact, did threaten NPD to withhold contractual payments;

10:53   16   that as a result of that threat, NPD then terminated its

10:53   17   relationship with MGA.  And all of this occurred when Mattel

10:53   18   was doing exactly the same thing that was supposedly a

10:53   19   violation of NPD's rules by Mr. Larian.  In fact, we have

10:53   20   their draft press releases and their press releases talking

10:53   21   about their market share.

10:53   22        Everything about NPD is coming in anyway, because

10:53   23   the NPD reports are a significant factor in the damages

10:53   24   analysis by both sides.  And so this is not gonna be extra

10:54   25   or cumulative.  It's gonna come through witnesses who are

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 1/4/2011 - VOLUME I OF II

58

10:54    1    already in the case, and the evidence is absolutely gonna

10:54    2    support the allegation of interference with NPD by Mattel.

10:54    3              Regarding CARU, again, the evidence will show that

10:54    4    Mattel would make complaints to CARU, that they're the

10:54    5    biggest paying private industry member of CARU, and that

10:54    6    CARU would come down on MGA for things that Mattel routinely

10:54    7    did.  That it interfered with MGA's business; that it caused

10:54    8    it expenses related to its advertising and otherwise.

10:54    9              THE COURT:  Okay.

10:54   10              MS. HURST:  With respect to TIA, so MGA wins the

10:54   11    toy industry toy of the year award two years in a row now.

10:54   12    This is an extremely valuable award.  You put the little

10:54   13    banner on your products.  The parents look at it.  It's a

10:54   14    real marketing boon, right.  And, then, Mr. Friedman, their

10:55   15    president, assumes the chairmanship and control of the

10:55   16    committee on how they vote these awards in, and immediately

10:55   17    sets this -- now we have the committee notes and the minutes

10:55   18    and the agenda showing it step by step how they then changed

10:55   19    the rules, and then MGA doesn't win anymore.  So we win two

10:55   20    years in a row.  They're unhappy.  They assume control of

10:55   21    the committee.  They change the rules.  Lo and behold we

10:55   22    never get another award.

10:55   23              So I think that there definitely is evidence on

10:55   24    these points contrary to Mr. Zeller's assertions,

10:55   25    Your Honor.

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 1/4/2011 - VOLUME I OF II

59

| 10:55 | 1 | THE COURT:  Mattel. |
| 10:55 | 2 | MR. ZELLER:  Well, Your Honor, first of all, I |
| 10:55 | 3 | didn't hear any response whatsoever that there is no |
| 10:55 | 4 | evidence whatsoever of actual damages or harm to any of |
| 10:55 | 5 | this.  In fact, as Mr. Quinn was commenting earlier, the |
| 10:55 | 6 | only person who's commented about any of these is MGA's |
| 10:55 | 7 | damages expert, who just creates a lump sum of all manner of |
| 10:55 | 8 | acts, many of which, in fact, are -- already have been |
| 10:56 | 9 | adjudicated against MGA and cannot be admitted into |
| 10:56 | 10 | evidence.  So there is absolutely no evidence of -- of that |
| 10:56 | 11 | on that score. |
| 10:56 | 12 | The other aspect about somehow the evidence is |
| 10:56 | 13 | coming in, in a way about NPD data that has nothing to do |
| 10:56 | 14 | with the fact that there's going to be an entire sideshow |
| 10:56 | 15 | about what the relationships have been between NPD and these |
| 10:56 | 16 | other parties -- NPD just simply provides data.  It's a data |
| 10:56 | 17 | description service.  Putting in the evidence about what |
| 10:56 | 18 | that data is, is no different than putting in business |
| 10:56 | 19 | records about sales.  It has nothing -- you don't need to |
| 10:56 | 20 | know what all the details are and all these other issues |
| 10:56 | 21 | about relationships.  So it's simply not correct that that |
| 10:56 | 22 | evidence is coming in anyway. |
| 10:56 | 23 | With respect to the CARU point, and in many |
| 10:56 | 24 | respects, when I hear these arguments, it's exactly what our |
| 10:57 | 25 | concern is.  Literally, MGA is going to say Mattel is a big |

10:57   1   company.  "It must have been just by happenstance when

10:57   2   Mattel complains, CARU does something.  So we want you to

10:57   3   infer that there was some sort of improper influence in

10:57   4   that, even though there's no evidence of that."  It was

10:57   5   literally, "Mattel's a gorilla.  Anything it does

10:57   6   constitutes undue influence."  And that's just simply not

10:57   7   proper.  It's not a proper argument to a jury, and it's not

10:57   8   a proper inference.  And, in fact, I would submit,

10:57   9   Your Honor, it runs afoul of the rules where you're not

10:57  10   supposed to comment on the relative size of the parties.

10:57  11         Then finally, with respect to the TIA, Ms. Hurst

10:57  12   refers to it as a valuable award.  There is, again, simply

10:57  13   no evidence of that whatsoever.  None.  There is no evidence

10:57  14   that MGA has been deprived of anything by not being able to

10:57  15   put a sticker from the TIA on its products going forward.

10:57  16   And I would submit the whole point is inherently

10:58  17   speculative, even as framed now by MGA.  They're literally

10:58  18   suggesting or they are saying, I should say, that MGA lost

10:58  19   some sort of opportunity by not having those stickers on the

10:58  20   packaging.  How that could possibly be calculated is --

10:58  21   is -- is clearly -- um, well, it takes us down a route that

10:58  22   is nothing but speculative by definition.

10:58  23         THE COURT:  MGA.

10:58  24        MS. HURST:  Submitted, Your Honor.

10:58  25        THE COURT:  Okay.

CV 04-9049 DOC – 1/4/2011 – VOLUME I OF II

61

| | | |
|---|---|---|
| 10:58 | 1 | All right.  Motion to exclude testimony of |
| 10:58 | 2 | undisclosed witnesses. |
| 10:58 | 3 | So far, I'll put on the record, Mattel has done an |
| 10:59 | 4 | exemplary job in terms of preparation, and it's been very |
| 10:59 | 5 | helpful to the Court, not only their witnesses, but the |
| 10:59 | 6 | evidence that's been gathered.  You've been very |
| 10:59 | 7 | forthcoming. |
| 10:59 | 8 | MGA, your witness list. |
| 10:59 | 9 | MR. McCONVILLE:  It's their motion, Your Honor. |
| 10:59 | 10 | THE COURT:  I know. |
| 10:59 | 11 | MR. McCONVILLE:  Oh. |
| 10:59 | 12 | THE COURT:  Your witness list. |
| 10:59 | 13 | MR. McCONVILLE:  I'm sorry, Your Honor.  I don't |
| 10:59 | 14 | understand. |
| 10:59 | 15 | THE COURT:  Where is it? |
| 10:59 | 16 | MS. HURST:  The amended witness list, Your Honor? |
| 10:59 | 17 | Our witness list was filed. |
| 10:59 | 18 | THE COURT:  Right. |
| 10:59 | 19 | MS. HURST:  And we have a couple people to add. |
| 10:59 | 20 | THE COURT:  That's what this motion is about. |
| 10:59 | 21 | This motion is about undisclosed witnesses, and I'm prepared |
| 10:59 | 22 | to grant it. |
| 10:59 | 23 | MS. HURST:  It's about people who weren't in the |
| 10:59 | 24 | Rule 26 disclosures, they argue, and we have a similar |
| 10:59 | 25 | motion.  They didn't update their Rule 26 disclosures. |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 1/4/2011 - VOLUME I OF II

62

| | | |
|---|---|---|
| 10:59 | 1 | THE COURT:  My apologies. |
| 10:59 | 2 | Mattel. |
| 10:59 | 3 | MR. PRICE:  Your Honor, this is about witnesses |
| 10:59 | 4 | who weren't identified pursuant to Rule 26, weren't |
| 10:59 | 5 | identified in any written discovery.  These are witnesses |
| 11:00 | 6 | who truly are surprise witnesses.  And I'll go through them. |
| 11:00 | 7 | Oh, and incidentally, MGA doesn't even claim that these are |
| 11:00 | 8 | newly discovered witnesses, and they couldn't say that |
| 11:00 | 9 | because they're people that MGA -- |
| 11:00 | 10 | THE COURT:  Who are they? |
| 11:00 | 11 | MR. PRICE:  One is Ms. Janice Foti, F-O-T-I.  And |
| 11:00 | 12 | she's been listed as a witness who will testify about MGA's |
| 11:00 | 13 | procedures in hiring former Mattel employees, MGA's |
| 11:00 | 14 | instructions to former employees not to take Mattel |
| 11:00 | 15 | documents, and a summary of former Mattel employees hired by |
| 11:00 | 16 | MGA and their positions and status. |
| 11:00 | 17 | THE COURT:  Next witness. |
| 11:00 | 18 | MR. PRICE:  The second witness is Gustavo Machado, |
| 11:00 | 19 | Senior, who's identified as being able to testify regarding |
| 11:00 | 20 | "gift of computer of Gustavo Machado to rebut alleged |
| 11:01 | 21 | spoliation." |
| 11:01 | 22 | THE COURT:  Okay. |
| 11:01 | 23 | MR. PRICE:  There is also identified Mark Oats and |
| 11:01 | 24 | Art Ortega, who are going to testify about the reference to |
| 11:01 | 25 | indemnity obligations to Carter Bryant and MGA's tax appeal |

| | | |
|---|---|---|
| 11:01 | 1 | documents.  And Mark Oats is going to testify about MGA's |
| 11:01 | 2 | communication to the IRS regarding lack of indemnity |
| 11:01 | 3 | obligation to Carter Bryant. |
| 11:01 | 4 | The next witness is Steve Olsen, who is an |
| 11:01 | 5 | O'Melveny attorney, who is going to testify about statements |
| 11:01 | 6 | made by Pablo Vargas regarding lack of misappropriation of |
| 11:01 | 7 | trade secrets. |
| 11:02 | 8 | Two more, Your Honor. |
| 11:02 | 9 | Matthew Dubois, D-U-B-O-I-S, who is going to |
| 11:02 | 10 | testify about -- he's Orrick's litigation support manager -- |
| 11:02 | 11 | to testify about, quote, production of documents in this |
| 11:02 | 12 | litigation, including without limitation the number of |
| 11:02 | 13 | documents produced, production dates, and ESI associated |
| 11:02 | 14 | with particular documents. |
| 11:02 | 15 | And finally Paul Caldera.  MGA claims that |
| 11:02 | 16 | Mr. Caldera is Beacon Media's custodian of record. |
| 11:02 | 17 | THE COURT:  I'm sorry. |
| 11:02 | 18 | MR. PRICE:  That Mr. Caldera is Beacon Media's |
| 11:02 | 19 | custodian of record.  And it intends to offer his testimony |
| 11:02 | 20 | regarding MGA's advertising of Bratz. |
| 11:03 | 21 | THE COURT:  Okay. |
| 11:03 | 22 | MR. PRICE:  Those are the witnesses, Your Honor. |
| 11:03 | 23 | THE COURT:  Thank you. |
| 11:03 | 24 | MGA. |
| 11:03 | 25 | MR. McCONVILLE:  Yes, Your Honor. |

CV 04-9049 DOC - 1/4/2011 - VOLUME I OF II

64

| | | |
|---|---|---|
| 11:03 | 1 | Starting with Mr. Caldera first. |
| 11:03 | 2 | THE COURT:  Let's go with Mr. Foti first. |
| 11:03 | 3 | MR. McCONVILLE:  Janice Foti, Your Honor, has been |
| 11:03 | 4 | on innumerable documents produced in the case so far. |
| 11:03 | 5 | There's no surprise. |
| 11:03 | 6 | THE COURT:  There's no surprise, I agree. |
| 11:03 | 7 | Next one is Gustavo Machado, Senior.  I haven't |
| 11:03 | 8 | seen him on any of the documents I've read so far. |
| 11:03 | 9 | MR. COTE:  Your Honor, I'll address that one, |
| 11:03 | 10 | Your Honor.  Mr. Machado, Senior, was discussed in |
| 11:03 | 11 | Mr. Machado's deposition as the recipient of his personal |
| 11:03 | 12 | laptop.  It was cited in our summary judgment papers, and in |
| 11:03 | 13 | Mattel's summary judgment papers. |
| 11:03 | 14 | THE COURT:  No surprise.  Thank you very much. |
| 11:03 | 15 | Mark Oats. |
| 11:03 | 16 | MR. McCONVILLE:  So Mr. Oats and Mr. Ortega relate |
| 11:03 | 17 | to one of the issues we discussed yesterday, Your Honor, |
| 11:03 | 18 | which was -- |
| 11:03 | 19 | THE COURT:  Depending upon the Court's ruling. |
| 11:04 | 20 | MR. McCONVILLE:  Right.  There is no indemnity |
| 11:04 | 21 | agreement. |
| 11:04 | 22 | THE COURT:  Understood.  Steve Olsen. |
| 11:04 | 23 | MR. McCONVILLE:  Again, that's just in case -- |
| 11:04 | 24 | THE COURT:  I understand. |
| 11:04 | 25 | MR. McCONVILLE:  -- Vargas' testimony goes other |

11:04  1   than what he's testified to before.

11:04  2          THE COURT:  I don't think that's any surprise.

11:04  3          Number 5, Steve Olsen.

11:04  4          MR. McCONVILLE:  That was who we just talked

11:04  5   about, Your Honor, Steve Olsen.

11:04  6          THE COURT:  My apology.  Matthew Dubois.

11:04  7          MS. HURST:  Your Honor, on that one, we need to be

11:04  8   able to prove -- Mr. Dubois is our person who received

11:04  9   Mattel's document productions and downloaded them and can

11:04  10  authenticate the custodial information, document production

11:04  11  dates, and the like.

11:04  12         THE COURT:  So whoever that person is.

11:04  13         MS. HURST:  This is going to go away by

11:04  14  stipulation, or we can name their own paralegal if they want

11:04  15  us to stipulate their paralegal instead.

11:04  16         THE COURT:  Paul Caldron (sic).

11:04  17         MR. McCONVILLE:  Mr. Caldera was the custodian of

11:05  18  records for Beacon Media, and Beacon Media was, in fact,

11:05  19  disclosed in our Rule 26 disclosures, Your Honor.

11:05  20         THE COURT:  Okay.  Mattel.

11:05  21         MR. PRICE:  Going down them one by one, Your

11:05  22  Honor.  Ms. Foti was -- MGA's argument is, one, she was

11:05  23  exposed to relevant information, which isn't enough under

11:05  24  Rule 26; otherwise, anyone at Mattel who was exposed to

11:05  25  relevant information could be listed as a late witness.

11:05   1    MGA concedes that she's not listed in disclosures

11:05   2    and/or any witness discovery responses, but there's a

11:05   3    submission of one declaration which references her, and she

11:05   4    was in a position to know things.

11:05   5    MGA provided a 30(b)(6) witness on its

11:05   6    pre-employment communications with Mattel employees.  Its

11:05   7    designee, which is Ms. Bacon, didn't talk with Ms. Foti to

11:05   8    prepare, nor did she mention Ms. Foti during the deposition.

11:05   9    Ms. Bacon is listed on MGA's disclosures, and her testimony

11:06   10   description is identical to the one offered for Ms. Foti.

11:06   11   So it's an eleventh-hour attempt to use Ms. Foti to testify

11:06   12   on the same issues as Ms. Bacon.

11:06   13          THE COURT:  You're caught by surprise?

11:06   14          MR. PRICE:  Yes.

11:06   15          THE COURT:  The prejudice?

11:06   16          MR. PRICE:  The prejudice is we haven't deposed

11:06   17   her.  We haven't had the chance to confront her, because

11:06   18   during discovery process --

11:06   19          THE COURT:  Move on to your next one.  This is

11:06   20   unduly consumptive of time.  Speed your argument now.

11:06   21          MR. PRICE:  Your Honor, we're willing to submit on

11:06   22   the paper.

11:06   23          THE COURT:  No.  Go down them quickly.  You're

11:06   24   taking too much time with each one.

11:06   25          MR. PRICE:  Sure.  Gustavo Machado, Senior, was

11:06  1   mentioned once in a deposition; that's it.  He was

11:06  2   testifying on an affirmative fact regarding gift of

11:06  3   Gustavo's computer.  We think that's insufficient notice.

11:06  4              Mark Oats and Art Ortega.  This references the tax

11:06  5   appeal documents.  There was one document in millions

11:07  6   produced, which mentions, I believe, Mr. Ortega's name.  MGA

11:07  7   supplements its disclosures on this issue, Your Honor, on

11:07  8   October 4th, 2010; didn't list these two people.  They

11:07  9   produced those tax documents two months before that.

11:07 10              THE COURT:  Okay.

11:07 11              MR. PRICE:  Mr. Olsen, again, not listed in

11:07 12   disclosure or written discovery.  While they claim he is a

11:07 13   rebuttal witness, Your Honor, he supposedly is going to

11:07 14   testify about, quote, the theft of Mattel trade secrets and

11:07 15   MGA's use of the stolen information, which appears to be

11:07 16   affirmative testimony.  We haven't had the opportunity to

11:07 17   really find out.

11:07 18              Mr. -- I understand the pronunciation is Dubois.

11:07 19              THE COURT:  Dubois.  Dubois.

11:07 20              MR. PRICE:  Let's call the whole thing off.

11:08 21              Their justification for including him at the last

11:08 22   minute is that he would be allowed to testify about facts

11:08 23   equally available to Mattel and MGA without any support

11:08 24   concerning that.  Again, he's a last-minute witness.

11:08 25              There may be -- there may be stipulations that we

Case 2:04-cv-09049-DOC-RNB   Document 9606   Filed 01/07/11   Page 68 of 124   Page ID #:286038
CV 04-9049 DOC - 1/4/2011 - VOLUME I OF II

68

11:08   1   can enter into on the facts he wants to testify about.  I

11:08   2   hope so.

11:08   3          THE COURT:  All right.  Mattel's motions are

11:08   4   denied.  These are nonprejudicial.  They don't catch anybody

11:08   5   by surprise.  After extensive discovery, these have been

11:08   6   known to all parties.  That's a final ruling.

11:08   7          Number 25 is the request to exclude evidence and

11:08   8   argument --

11:08   9          MR. PRICE:  Your Honor, this is to include

11:08   10  evidence and argument concerning Mr. Wing.

11:08   11         THE COURT:  I understand that, Counsel -- "to a

11:08   12  prior civil litigation and a bankruptcy proceeding involving

11:09   13  Brian Wing."

11:09   14         Let me hear from Mattel, please.

11:09   15         MR. PRICE:  Your Honor, MGA intends to introduce

11:09   16  evidence that some 17 or 18 years ago Mr. Wing was in a

11:09   17  civil case in which he was convicted, in which there was a

11:09   18  civil judgment against him for slander in connection with an

11:09   19  individual who was suffering from AIDS, died of AIDS, which,

11:09   20  obviously is fairly prejudicial.  And then they want to

11:09   21  argue that he discharged the lien from that action in a

11:10   22  voluntary bankruptcy in 1994.  It's hard to think of

11:10   23  anything more prejudicial.

11:10   24         THE COURT:  MGA.

11:10   25         MR. McCONVILLE:  Your Honor, Brian Wing is, our

CV 04-9049 DOC - 1/4/2011 - VOLUME I OF II

69

| | | |
|---|---|---|
| 11:10 | 1 | position, a disgruntled former -- ex-employee, who's now |
| 11:10 | 2 | making allegations about the company concerning his |
| 11:10 | 3 | finances, which are false.  That's our position.  So the |
| 11:10 | 4 | slander tort against him was that he didn't get what he |
| 11:10 | 5 | wanted.  He accused his employer of financial improprieties. |
| 11:10 | 6 | THE COURT:  17 years ago? |
| 11:10 | 7 | MR. McCONVILLE:  Identical situation. |
| 11:10 | 8 | THE COURT:  And then how long was he subsequently |
| 11:10 | 9 | employed after that accusation? |
| 11:10 | 10 | MR. McCONVILLE:  Um, I'm sorry, I don't understand |
| 11:10 | 11 | the question, Your Honor. |
| 11:10 | 12 | THE COURT:  If he made the accusation 17 years |
| 11:10 | 13 | ago, did he continue on in the employment of MGA for some |
| 11:10 | 14 | period of time after that accusation? |
| 11:10 | 15 | MR. McCONVILLE:  He didn't disclose it.  He failed |
| 11:10 | 16 | to disclose his employment, and he lied on his employment |
| 11:11 | 17 | application to MGA, so MGA didn't know about it, which is a |
| 11:11 | 18 | second instance of bad conduct that Mr. Wing engaged in.  So |
| 11:11 | 19 | the parallel is stark that this is a man who accuses |
| 11:11 | 20 | employers of financial impropriety, and when it goes to |
| 11:11 | 21 | trial, is found by a jury to be a liar, which is relevant; |
| 11:11 | 22 | goes to his character for truthfulness, obviously.  And then |
| 11:11 | 23 | he lies on his employment application to MGA, so MGA doesn't |
| 11:11 | 24 | even know about the prior employment to vet the man |
| 11:11 | 25 | properly. |

CV 04-9049 DOC - 1/4/2011 - VOLUME I OF II

70

| | | |
|---|---|---|
| 11:11 | 1 | Now we're here in a situation where Brian Wing, a |
| 11:11 | 2 | disgruntled ex-employee, is making allegations of financial |
| 11:11 | 3 | impropriety.  In fact, the facts of the prior case is that |
| 11:11 | 4 | he then sued in order to gather money based on the financial |
| 11:11 | 5 | improprieties he alleged, and the AIDS victim countersued |
| 11:11 | 6 | for slander and was vindicated. |
| 11:12 | 7 | THE COURT:  Okay.  Mattel. |
| 11:12 | 8 | MR. PRICE:  I think there's nothing to add. |
| 11:12 | 9 | THE COURT:  Okay.  All right.  Now, just a moment. |
| 11:12 | 10 | All right.  Counsel, let's go back now.  I think |
| 11:12 | 11 | we represented that we would go back to Mr. Machado's |
| 11:12 | 12 | motions.  And, Counsel, if we go clear back, I'm working off |
| 11:12 | 13 | of the pretrial conference order, so at least we have some |
| 11:13 | 14 | reference and some order to the motions that are being |
| 11:13 | 15 | heard, and I think we're clear back now on page 26. |
| 11:13 | 16 | MS. HURST:  Your Honor, would it be all right if |
| 11:13 | 17 | we took a brief recess before we go back to the beginning of |
| 11:13 | 18 | the list? |
| 11:13 | 19 | THE COURT:  How long would you like? |
| 11:13 | 20 | MS. HURST:  A few minutes. |
| 11:13 | 21 | THE COURT:  Go take a recess, and we'll |
| 11:13 | 22 | reassemble. |
| 11:13 | 23 | MR. COTE:  Thank you, Your Honor. |
| 11:13 | 24 | *(Recess held at 11:13 a.m.)* |
| 11:25 | 25 | *(Proceedings resumed at 12:08 p.m.)* |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 12:08 | 1 | THE COURT:  All right.  We're back on the record. |
| 12:08 | 2 | All parties and counsel are present.  And we're going to |
| 12:08 | 3 | start with Mr. Machado.  But let me get one drink of water. |
| 12:08 | 4 | Counsel, I'll be right back. |
| 12:08 | 5 | *(Pause in the proceedings at 12:08 p.m.)* |
| 12:08 | 6 | *(Proceedings resumed at 12:10 p.m.)* |
| 12:10 | 7 | THE COURT:  All right.  We're back on the record. |
| 12:10 | 8 | All counsel are present.  The record should indicate that |
| 12:10 | 9 | I've had an informal discussion with Counsel concerning |
| 12:10 | 10 | using the complex courtroom.  The Court's not going to |
| 12:10 | 11 | change the "sitting" courtroom around in terms of any |
| 12:10 | 12 | additional audio or visual equipment.  It's satisfactory as |
| 12:10 | 13 | is.  Counsel have been offered the complex courtroom, and |
| 12:10 | 14 | there we would change and allow additional visual equipment. |
| 12:10 | 15 | That's been declined by each counsel.  That's probably |
| 12:10 | 16 | because of the tiered seating involved, which this Court |
| 12:10 | 17 | thinks is appropriate, but counsel have rejected that offer. |
| 12:10 | 18 | Second, Ms. Keller is present.  And Ms. Keller is |
| 12:10 | 19 | requesting to substitute in as counsel? |
| 12:10 | 20 | MS. KELLER:  To associate in, Your Honor. |
| 12:10 | 21 | THE COURT:  Associate in.  Is that with the Orrick |
| 12:10 | 22 | firm? |
| 12:10 | 23 | MS. KELLER:  Yes, Your Honor. |
| 12:10 | 24 | THE COURT:  And I'm simply going to delay that |
| 12:10 | 25 | ruling.  I'm going to require you to be present today.  I'll |

12:10  1    make that ruling at the end of the day, so you can

12:10  2    participate.

12:10  3            And, Counsel, we'll continue on with the *in limine*

12:11  4    motions.

12:11  5            Machado's motion, please, number one.

12:11  6            MR. COTE:  Thank you, Your Honor.

12:11  7            The first motion is Mr. Machado's motion related

12:11  8    to his assertion of the Fifth Amendment and, just to

12:11  9    clarify, also Ms. Trueba's assertion of the Fifth Amendment.

12:11  10           The thrust of the motion is that Mr. Machado did

12:11  11   initially assert the Fifth Amendment when he was asked

12:11  12   questions in his deposition back in 2008; but subsequently,

12:11  13   the Court overruled that assertion, and he answered every

12:11  14   single question that was asked of him over five days of

12:11  15   deposition in 2010, April, and another day in November.

12:11  16           Mattel responds that this assertion is relevant,

12:11  17   even though he later answered every single question, because

12:11  18   they take the position that, "Well, there was never a U.S.

12:11  19   criminal investigation."  That's simply not true.  In

12:12  20   January of 2007, after Mattel filed this lawsuit, Mattel

12:12  21   reached out to the United States Attorney's Office in the

12:12  22   Central District of California.  A U.S. Attorney by the name

12:12  23   of Michael Zweibeck contacted my firm and spoke with David

12:12  24   Shepard about the investigation initiated by Mattel.  That

12:12  25   was in the spring of 2007.

12:12   1          September of 2008 Mr. Shepard had another

12:12   2   conversation with the new U.S. Attorney -- or rather with

12:12   3   the existing U.S. -- sorry -- let me strike that.

12:12   4   Mr. Shepard received a call from Jeff Rawitz, a partner at

12:12   5   Jones Day, who introduced himself as Mattel's criminal

12:12   6   counsel.  Told Mr. Shepard that a new U.S. attorney was

12:12   7   handling the case; that it was still ongoing.  That was the

12:12   8   state of affairs that persisted until November of '09, when

12:12   9   we received the letter from that new U.S. Attorney, Sally

12:12   10  Meloch, who said that Mr. Machado was no longer a target.

12:12   11         Until November of 2009, Mr. Machado had a clear

12:12   12  basis for asserting the Fifth Amendment with respect to the

12:13   13  prosecution -- or, rather, the investigation being conducted

12:13   14  by the United States Attorney's Office in this district.

12:13   15  There's not really any dispute on that point -- or, at

12:13   16  least, I didn't think there was.

12:13   17         Now, what happened after November '09 is what's

12:13   18  critical here, because Mattel argues there was some sort of

12:13   19  prejudice or some sort of tactics by Mr. Machado in his

12:13   20  assertion of the Fifth Amendment, and then his answering the

12:13   21  questions later.

12:13   22         And there were no tactics, as the Court may

12:13   23  recall -- and we cited all of this evidence in our summary

12:13   24  judgment reply brief, Your Honor.  That's the document that

12:13   25  has the hyperlinks to the transcripts where all this took

DEBBIE GALE, U.S. COURT REPORTER

12:13    1    place.  Mr. Overland and I stood up repeatedly in December

12:13    2    of 2009, January of 2010, and onward, trying to resolve this

12:13    3    point.  We brought to the Court's attention that there was

12:14    4    no longer any federal investigation that we were aware of,

12:14    5    and we asked for an order overruling Mr. Machado's Fifth

12:14    6    Amendment assertion so that he could testify, so that he

12:14    7    could provide the information that Mattel claimed they

12:14    8    wanted and that they needed.

12:14    9         We tried the stipulation.  It didn't work out.  We

12:14    10    had a false start.  But the Court eventually did enter an

12:14    11    order in March of 2010 that overruled Mr. Machado's

12:14    12    assertion.  And a month later, he was answering questions

12:14    13    under oath, and answered every single question he was asked

12:14    14    for four days in April of 2010 -- did not assert the

12:14    15    Fifth Amendment a single time in that deposition.

12:14    16         So the argument that there was some pretext here

12:14    17    or some tactical maneuver by Mr. Machado is completely

12:14    18    unsupported by the record.

12:14    19         THE COURT:  Okay.

12:14    20         MR. COTE:  One more point on the prejudice?

12:14    21         THE COURT:  Please.

12:14    22         MR. COTE:  Mattel argues that it was somehow

12:15    23    prejudiced -- Mattel argues it doesn't see any prejudice in

12:15    24    bringing in Mr. Machado's invocation of the Fifth Amendment.

12:15    25         THE COURT:  Well, there's a tremendous prejudice.

12:15   1    Let me talk to Mattel now.

12:15   2              Mattel.

12:15   3              MR. PRICE:  Your Honor, the problem is there was

12:15   4    about a three-year delay from the time we first tried to get

12:15   5    Mr. Machado's deposition.  He claimed the Fifth on numerous

12:15   6    occasions.  And then when we did finally get to ask him

12:15   7    about various critical items, three years later, his

12:15   8    testimony was, "I don't remember."  He answered them.  He

12:15   9    didn't invoke the Fifth.  He just couldn't remember anymore.

12:15   10             THE COURT:  Well, that's for the jury to weigh in

12:15   11   terms of credibility.  "I don't remember" is oftentimes

12:15   12   construed to be perjury.

12:15   13             MR. PRICE:  And I think you're right:  The jury

12:15   14   can weigh that.  I think it's important that the jury know

12:15   15   that when we first tried to get the information at a time

12:15   16   closer to when he might remember, he took the Fifth.

12:15   17             THE COURT:  Okay.

12:15   18             MR. McCONVILLE:  Your Honor, before you rule, we

12:15   19   would like to join Mr. Machado's motion.

12:16   20             THE COURT:  All right.  Thank you.

12:16   21             The prejudicial effect of asserting the Fifth

12:16   22   Amendment far outweighs the issues in this matter.  Here,

12:16   23   this is apparently upon advice of counsel.  There were

12:16   24   allegations and concerns about criminal proceedings in this

12:16   25   matter.  Once these rulings were made by the Court, after

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 1/4/2011 - VOLUME I OF II

76

12:16  1    the Court received this matter, Mr. Machado responded after

12:16  2    the Court's ruling.  And whether he fully answered questions

12:16  3    or not is for the jury to determine.

12:16  4           Mr. Machado is not to be punished in front of the

12:16  5    jury, nor is the prejudice to ensue to Mr. Machado because

12:16  6    of his early assertion of the Fifth Amendment with criminal

12:16  7    matters potentially pending.  In fact, it was a very wise

12:16  8    decision on his part.  The quality of those answers, though,

12:16  9    are left for the jury.

12:16  10          So, therefore, the motion *in limine* to exclude

12:16  11   references to Machado's invocation of privilege against

12:16  12   self-incrimination -- this was brought by Machado; is that

12:17  13   correct?

12:17  14          MR. COTE:  That's right, Your Honor -- with

12:17  15   respect to Mr. Machado and Ms. Trueba.  Same issues.

12:17  16          THE COURT:  And Trueba.

12:17  17          Then your motion would be granted, Counsel.

12:17  18          MR. COTE:  Thank you.

12:17  19          THE COURT:  There's to be no mention concerning

12:17  20   the assertion of the Fifth.

12:17  21          Your second motion is the -- just a moment.

12:17  22          Machado's motion in limine is to exclude the

12:17  23   deposition testimony of Pablo Vargas.

12:17  24          And, Counsel, on behalf of Machado.

12:18  25          MR. OVERLAND:  Yes, Your Honor.

CV 04-9049 DOC - 1/4/2011 - VOLUME I OF II

77

| | | |
|---|---|---|
| 12:18 | 1 | Before I get to the history of it, one argument |
| 12:18 | 2 | that Mattel makes is that this is premature because |
| 12:18 | 3 | Mr. Vargas will appear at trial and testify. And I hope he |
| 12:18 | 4 | does, 'cause I look forward to cross-examining him. |
| 12:18 | 5 | But whether he appears at trial or not doesn't |
| 12:18 | 6 | make it premature, because the -- Mattel, I'm sure, if he |
| 12:18 | 7 | testifies contrary to his deposition testimony, will seek to |
| 12:18 | 8 | introduce that as a prior inconsistent statement. And so |
| 12:18 | 9 | the motion goes to preclusion of the use of the deposition, |
| 12:18 | 10 | whether he's here or not. |
| 12:18 | 11 | THE COURT: Just a moment. If there's |
| 12:18 | 12 | impeachment, that deposition would be used. |
| 12:18 | 13 | MR. OVERLAND: Well, but the problem is the |
| 12:18 | 14 | question -- the impeachment testimony is subject to the same |
| 12:18 | 15 | infirmity as the testimony in that deposition where the -- |
| 12:19 | 16 | in term of its truthfulness. And that's what I want to get |
| 12:19 | 17 | to. |
| 12:19 | 18 | THE COURT: I see. Okay. |
| 12:19 | 19 | Counsel on behalf of Mattel. |
| 12:19 | 20 | MR. OVERLAND: Oh, I'm done? |
| 12:19 | 21 | MR. PRICE: Your Honor, I think you're right. For |
| 12:19 | 22 | one thing, Mr. Vargas is going to appear, we've been |
| 12:19 | 23 | assured. |
| 12:19 | 24 | And with respect to impeachment, you can impeach a |
| 12:19 | 25 | witness for statements made under oath, not under oath, |

| | | |
|--|--|--|
| 12:19 | 1 | statements that he wrote in an e-mail. So I don't |
| 12:19 | 2 | understand why a deposition couldn't be used as impeachment, |
| 12:19 | 3 | particularly when the settlement agreement doesn't require |
| 12:19 | 4 | that he testify in a given manner. The cases they've |
| 12:19 | 5 | pointed to are settlement agreements. Actually, I think |
| 12:19 | 6 | they're the plea agreements where the witness says -- stated |
| 12:19 | 7 | they won't change their testimony. That's not the agreement |
| 12:19 | 8 | here. The agreement is that you'll testify truthfully. Of |
| 12:19 | 9 | course, we would have to show that he did not testify |
| 12:20 | 10 | truthfully. |
| 12:20 | 11 | So I think the authorities don't apply. And since |
| 12:20 | 12 | Mr. Vargas is going to be here, we can deal with the |
| 12:20 | 13 | impeachment at that time. |
| 12:20 | 14 | THE COURT: Counsel, I agree with Mattel. It's |
| 12:20 | 15 | premature. The Court simply won't make a ruling other than |
| 12:20 | 16 | I'm not excluding references to deposition testimony. |
| 12:20 | 17 | That's a broad-sweeping ruling. It's premature. We can |
| 12:20 | 18 | bring that up when Mr. Vargas testifies. It's subject to |
| 12:20 | 19 | proper objection at the time depending upon his answers to |
| 12:20 | 20 | the questions given. And it's certainly relevant to |
| 12:20 | 21 | impeachment purposes. |
| 12:20 | 22 | MR. OVERLAND: Your Honor, can I be heard on that? |
| 12:20 | 23 | THE COURT: Certainly. |
| 12:20 | 24 | MR. OVERLAND: Your Honor, the problem is that |
| 12:20 | 25 | this is gonna come in under 804(b)(1), not just for |

12:20   1   impeachment, but as substantive evidence.  And if the

12:20   2   deposition is inadmissible because of the reasons stated in

12:20   3   our motion -- and I can go through those if the Court

12:20   4   doesn't recall --

12:20   5            THE COURT:  Please.

12:21   6            MR. OVERLAND:  Counsel states, well, the agreement

12:21   7   was to tell the truth.

12:21   8            Well, that's just nonsense.  The agreement was the

12:21   9   result of -- we know of at least four different drafts of

12:21   10  Mr. Vargas's version of what he believed the truth to be,

12:21   11  until he got to a version that was acceptable to Mattel and

12:21   12  which then became the litmus test for what the truth would

12:21   13  be.

12:21   14           There was a draft initially in 2007, which

12:21   15  occurred after Mattel first reached out to Vargas, where

12:21   16  Vargas said he did nothing wrong, he didn't use any of the

12:21   17  information that he had taken with him from Mattel to MGA.

12:22   18  Then nothing happened until a second draft, which occurred

12:22   19  in February or March of 2009.  In that, again, Vargas made

12:22   20  no mention of using any documents taken from Mattel to MGA.

12:22   21           Then, Mattel doesn't respond.  Then there's a

12:22   22  third draft.  And in that third draft, again, there was no

12:22   23  mention of any kind of use.  Vargas again said he did

12:22   24  nothing wrong.  This was at a meeting before the draft was

12:22   25  prepared with Mexican counsel.  Mexican counsel stormed out

12:22   1   of the meeting, says, "That's the end of the meeting.  You

12:22   2   say you did nothing wrong."  This is now the third time

12:22   3   Vargas is trying to tell what actually happened.

12:22   4           We finally get to a final draft -- and we don't

12:22   5   know how many drafts came in between, because, at one point,

12:23   6   Mattel's counsel tells Mr. Vargas's counsel, "Don't put

12:23   7   anything in writing anymore."

12:23   8           So the final draft, then, is the version which

12:23   9   becomes the litmus test of what is the truth.  And if you

12:23   10  look at Mr. Vargas's deposition, he testifies sometimes by

12:23   11  reading from this final version of what the truth is

12:23   12  supposed to be.  So, basically, what we're -- and the carrot

12:23   13  for Mr. Vargas is, if he doesn't testify according to this

12:23   14  final version of what the truth is, then he's not gonna get

12:23   15  his pardon.  The truth is gonna be determined on whether

12:23   16  there is a correlation or correspondence between his

12:23   17  deposition testimony and this final version that has been

12:24   18  arrived at, which, finally, is what Mattel considers to be

12:24   19  the truth -- because it keeps sending back all of these

12:24   20  other versions that Vargas has prepared.

12:24   21          So what we have is a deposition which obligates

12:24   22  Mr. Vargas to testify according to that final version which

12:24   23  is acceptable to Mattel.  If he doesn't testify like that,

12:24   24  he's not gonna get his pardon.  So when he comes into court

12:24   25  and he says something different, he's gonna be impeached.

CV 04-9049 DOC - 1/4/2011 - VOLUME I OF II

81

| | | |
|---|---|---|
| 12:24 | 1 | And that deposition testimony is also gonna come in as |
| 12:24 | 2 | substantive evidence.  And that deposition testimony is |
| 12:24 | 3 | based on the fact that it has to conform to the final |
| 12:24 | 4 | version, otherwise, he's got gonna get his pardon. |
| 12:24 | 5 | If this were something a U.S. prosecutor would do, |
| 12:24 | 6 | he'd either lose his job or the Office of Professional |
| 12:25 | 7 | Responsibility would be on him for doing this. |
| 12:25 | 8 | And Mattel is acting as a prosecutor in terms of |
| 12:25 | 9 | the criminal case in Mexico. |
| 12:25 | 10 | THE COURT:  Let me see if I can repeat back what |
| 12:25 | 11 | you just said in two sentences. |
| 12:25 | 12 | Mr. Vargas may have been untruthful, but he was |
| 12:25 | 13 | coerced. |
| 12:25 | 14 | MR. OVERLAND:  Mr. Vargas, correct, was under |
| 12:25 | 15 | compulsion to testify according to the final version of -- |
| 12:25 | 16 | whether it was the truth or not, that was what Mattel |
| 12:25 | 17 | considered to be the truth. |
| 12:25 | 18 | THE COURT:  Mr. Vargas -- |
| 12:25 | 19 | MR. OVERLAND:  And he was under compulsion to |
| 12:25 | 20 | testify to that. |
| 12:25 | 21 | And to allow impeachment with the testimony that |
| 12:25 | 22 | he gave under such compulsion is the same as allowing the |
| 12:25 | 23 | original testimony that was -- into evidence. |
| 12:25 | 24 | THE COURT:  I'm going to repeat back to you what |
| 12:25 | 25 | I'm hearing:  That you're concerned that he made |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 1/4/2011 - VOLUME I OF II

82

| | | |
|---|---|---|
| 12:25 | 1 | statements -- and "untruthful" is a big word -- but |
| 12:26 | 2 | statements that he wouldn't make today because he was |
| 12:26 | 3 | coerced. |
| 12:26 | 4 | MR. OVERLAND:  Exactly.  And if allowed |
| 12:26 | 5 | impeachment, those statements are gonna come in, and the |
| 12:26 | 6 | jury's going to consider it. |
| 12:26 | 7 | THE COURT:  That's subject to cross-examination. |
| 12:26 | 8 | That's subject to direct and cross-examination in an |
| 12:26 | 9 | adversarial system, and Mr. Vargas has the opportunity to |
| 12:26 | 10 | explain what his state of mind was and why he would |
| 12:26 | 11 | eventually agree or make those statements. |
| 12:26 | 12 | That's not to be taken from the jury.  That's for |
| 12:26 | 13 | the jury to consider and I will allow probably deposition |
| 12:26 | 14 | testimony in this regard. |
| 12:26 | 15 | You're not going to be precluded from that. |
| 12:26 | 16 | Okay. |
| 12:26 | 17 | MR. McCONVILLE:  Your Honor, could we join that |
| 12:26 | 18 | motion, please? -- MGA. |
| 12:26 | 19 | THE COURT:  I'm going to assume you've joined all |
| 12:26 | 20 | of Machado's motions. |
| 12:26 | 21 | MR. McCONVILLE:  Thank you. |
| 12:26 | 22 | THE COURT:  All right.  The third motion. |
| 12:27 | 23 | MR. COTE:  Your Honor, this is the first of the -- |
| 12:27 | 24 | THE COURT:  Just a moment, Counsel. |
| 12:27 | 25 | MR. COTE:  Sorry. |

CV 04-9049 DOC - 1/4/2011 - VOLUME I OF II

83

| 12:27 | 1 | THE COURT: All right. This is Machado's noticed |
| 12:27 | 2 | motion concerning the exclusion of the opinions of Michael |
| 12:27 | 3 | Wagner. |
| 12:27 | 4 | And counsel on behalf of Machado. |
| 12:27 | 5 | MR. COTE: Thank you, Your Honor. This is the |
| 12:27 | 6 | first of the *Daubert* motions that we're gonna talk about |
| 12:27 | 7 | today. |
| 12:27 | 8 | Mr. Wagner is Mattel's damages expert. And he was |
| 12:27 | 9 | charged with figuring out what damages or other monetary |
| 12:27 | 10 | relief should be paid by Mr. Machado to Mr. -- to Mattel. I |
| 12:27 | 11 | think the same theory applies to Mr. Larian, so I assume my |
| 12:28 | 12 | friends here are joining in that motion. |
| 12:28 | 13 | And what Mr. Wagner wanted to do was he wanted to |
| 12:28 | 14 | look and see what MGA did that was different than it |
| 12:28 | 15 | otherwise would have done with the information that |
| 12:28 | 16 | Mr. Machado allegedly took. And he asked Mattel's |
| 12:28 | 17 | counsel -- he said, "What did they do different?" And they |
| 12:28 | 18 | refused to answer the question. They wouldn't let him find |
| 12:28 | 19 | out. They wouldn't give him that information. And the |
| 12:28 | 20 | reason is 'cause they didn't do anything with it. There is |
| 12:28 | 21 | no evidence of use. |
| 12:28 | 22 | So he had to come up with a different theory. |
| 12:28 | 23 | This is all in his deposition. It's laid out in our papers. |
| 12:28 | 24 | So his new theory is: Let's figure out how much it cost |
| 12:28 | 25 | Mattel to make these documents, and then have Machado pay |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 12:28 | 1 | that.  That's the theory he uses. |
| 12:28 | 2 | The problem is, as a method it's unreliable.  And |
| 12:28 | 3 | the second point I'll get to in a minute is that the data he |
| 12:28 | 4 | used is also unreliable. |
| 12:28 | 5 | Here's the problem with the method:  Mr. Wagner |
| 12:29 | 6 | admitted in deposition that costs are a poor measure of |
| 12:29 | 7 | value.  He's trying to figure out what Mr. Machado's unjust |
| 12:29 | 8 | enrichment is, and he does that by figuring out how much it |
| 12:29 | 9 | costs to make the documents.  But he admits it's a terrible |
| 12:29 | 10 | way to measure it.  He admits, in deposition, that a |
| 12:29 | 11 | million-dollar document or a million-dollar product or a |
| 12:29 | 12 | million-dollar anything could be worth nothing.  Doesn't |
| 12:29 | 13 | matter how much it costs to make.  What matters is how |
| 12:29 | 14 | useful it is.  He also admits that something that costs $10 |
| 12:29 | 15 | to make could be the crown jewels.  There's no connection |
| 12:29 | 16 | between what it costs to make something and what -- the |
| 12:29 | 17 | person who took it, what their unjust enrichment is -- the |
| 12:29 | 18 | unjust enrichment to the person who allegedly took it. |
| 12:29 | 19 | Now, in response to this point, Mattel claims, and |
| 12:29 | 20 | Mr. Wagner claims, "using costs as a measure of unjust |
| 12:29 | 21 | enrichment is conservative."  So we're doing you a favor by |
| 12:29 | 22 | measuring costs and not value.  The problem is there's no |
| 12:30 | 23 | basis for this assumption that it's conservative. |
| 12:30 | 24 | I asked Mr. Wagner in his deposition, "What did |
| 12:30 | 25 | you do to actually figure out what the value of the |

12:30   1   documents are?"  He says he didn't do anything.  I said,

12:30   2   "You don't know what the value of the documents are?"  And

12:30   3   he says, "No, I don't.  I don't have any quantification of

12:30   4   that.  That's just my opinion that -- if I did have

12:30   5   information, it would be my belief or my -- I could be

12:30   6   wrong, but it would be my expectation, I should say, that

12:30   7   those remedies would be higher."

12:30   8        And by "those remedies," he means that the value

12:30   9   of the documents would be more than the cost to create them.

12:30   10   That's what he's saying there.  But he doesn't have any

12:30   11   basis for that.  He says, "It's my opinion" or "my belief"

12:30   12   or "my expectation."  That's not reliable method.  That's

12:30   13   just him coming up with something that has no basis.  It's

12:30   14   the first problem with his methodology.

12:31   15        The second problem with his methodology is he

12:31   16   imposes or tries to impose what he calls a reasonable

12:31   17   royalty on Mr. Machado.  And when he calculates a reasonable

12:31   18   royalty for every other part of this case, he follows three

12:31   19   steps.  He starts with a baseline royalty rate, which is

12:31   20   some percentage he pulls from another contract.

12:31   21        Now, in one of the cases that he calculated, he

12:31   22   found an MGA licensing agreement that had 11 percent.  And

12:31   23   he said, "That's what I'm gonna use as my baseline."  So you

12:31   24   start with a percentage.  You apply these 14 factors.

12:31   25        THE COURT:  The *Georgia-Pacific* factors?

12:31   1          MR. COTE:  Exactly -- which make that initial

12:31   2   percentage higher or lower.  That's the second step.

12:31   3          And the third step is you multiply that percentage

12:31   4   by some base.

12:31   5          THE COURT:  So, at least, Mr. Wagner understands

12:31   6   the *Georgia-Pacific* factors.

12:31   7          MR. COTE:  He purports to apply them.

12:31   8          THE COURT:  How else is reasonable royalty

12:31   9   calculated, Counsel?

12:31   10          MR. COTE:  Sure.  The problem in this case is, if

12:32   11   he had done that with Mr. Machado, he would have gotten

12:32   12   zero -- or almost zero.  So what he does instead is he just

12:32   13   makes up numbers.  As a baseline, he uses 100 percent of the

12:32   14   costs.  He doesn't look for a real baseline.  He just goes

12:32   15   with a hundred percent.  He uses 11 percent for Bratz -- the

12:32   16   crown jewels of this case, right? -- but he uses 100 percent

12:32   17   for some sales documents in Mexico.

12:32   18          For the royalty base, he doesn't use sales at all.

12:32   19   He doesn't use any base at all.  He just applies -- he just

12:32   20   uses the costs.  He doesn't use a base.

12:32   21          But the most egregious problem is with the

12:32   22   application of the factors.  Mr. Wagner admitted that the

12:32   23   factor analysis has to be different for every different type

12:32   24   of intellectual property that's at issue in the case.  He

12:32   25   did an analysis of some copyrights.  He did some analysis of

CV 04-9049 DOC - 1/4/2011 - VOLUME I OF II

87

| | | |
|---|---|---|
| 12:32 | 1 | some trademarks.  He did some analysis of Bratz v. Moxie. |
| 12:32 | 2 | And he came up with different a application of the factors |
| 12:32 | 3 | in each case.  He didn't apply any factors to Mr. Machado's |
| 12:33 | 4 | case.  He just made up a number:  Two-thirds.  He said, "I |
| 12:33 | 5 | think it's two-thirds." |
| 12:33 | 6 | What's the basis for that?  Well, you know, he |
| 12:33 | 7 | admits, "Oh, I didn't -- I didn't actually do my own |
| 12:33 | 8 | *Georgia-Pacific* analysis on this question.  But its sort of |
| 12:33 | 9 | implied from what came before." |
| 12:33 | 10 | Which part of what came before?  He has different |
| 12:33 | 11 | analyses for the different intellectual property. |
| 12:33 | 12 | What basis does he have to conclude that the |
| 12:33 | 13 | analysis for Bratz -- the *Georgia-Pacific* analysis for Bratz |
| 12:33 | 14 | should be the same or different than the Mexico document? |
| 12:33 | 15 | He has no basis.  He just comes up with two-thirds based on |
| 12:33 | 16 | nothing.  Ipse dixit. |
| 12:33 | 17 | I want to move to the data that Mr. Wagner relied |
| 12:33 | 18 | on.  The way he got this cost information from Mattel -- and |
| 12:33 | 19 | he got it from Mattel Mexico -- is he made a spreadsheet, |
| 12:34 | 20 | and he put some broad categories in the left-hand column. |
| 12:34 | 21 | And then he sent it to Mattel and said, "Fill this out."  He |
| 12:34 | 22 | did that in October of this year.  And he said, "Tell me how |
| 12:34 | 23 | much it costs to make these documents."  He said, "Be |
| 12:34 | 24 | conservative."  But as we just saw, "conservative" just |
| 12:34 | 25 | means make some numbers up.  And that's exactly what they |

12:34  1  did.  They threw some numbers in.

12:34  2  Mattel pretends that this spreadsheet that he got

12:34  3  back -- which, incidentally, has not been produced even

12:34  4  though we've requested it -- the spreadsheet that Mr. Wagner

12:34  5  got back from Mattel Mexico -- Mattel says, "It's financial

12:34  6  documents.  It's a business record.  It's client-supplied

12:34  7  data.  It's what experts rely on all the time."

12:34  8  It's not true.  It was created for this litigation

12:34  9  three months ago.

12:34  10  Mr. Wagner admits -- he says, "I'm relying

12:34  11  entirely on the," quote, "judgment that these were the costs

12:34  12  that were necessary to make these documents.

12:34  13  He didn't do anything to independently verify that

12:35  14  those costs were actually necessary to make the documents,

12:35  15  that the costs were actually incurred, that anyone was

12:35  16  actually paid these sums, or that the spreadsheet even

12:35  17  accurately has the right numbers in it.  He didn't check any

12:35  18  of that.

12:35  19  He's nothing more than -- his testimony is nothing

12:35  20  more than the spreadsheet itself.  He's a calculator.  He

12:35  21  takes numbers from other people.  He doesn't check them, but

12:35  22  he puts his expert stamp of approval on them and wants to

12:35  23  present them to the jury as if they're the result of his

12:35  24  deep analysis.  And they're not.  It's estimates by people

12:35  25  in Mexico who filled out the spreadsheet at the direction of

12:35 1    counsel.  Many of those people will be on the witness stand.

12:35 2         Roberto Isaias "led up" the creation of this

12:35 3    spreadsheet.  He's the manager of Mattel de Mexico now.  And

12:35 4    he's on the witness list.  He'll be here live.  If Mattel

12:35 5    has any basis for any of the numbers in that spreadsheet,

12:36 6    which we haven't seen, he can say what that basis is.  And

12:36 7    we can give the jury a calculator, and they can add up those

12:36 8    numbers.

12:36 9         But Mr. Wagner doesn't add anything to the

12:36 10   analysis 'cause he doesn't do any analysis.  He just takes

12:36 11   the numbers given to him and adds them up.  It's just a

12:36 12   calculation.  It's not an analysis.

12:36 13        Now, Mattel tries to argue that this is okay by

12:36 14   reference to the *McCaleb* case, which is a Ninth Circuit

12:36 15   case.  And that's a case where a DEA scientist was opining

12:36 16   on how much PCP you could make from certain inputs.  And

12:36 17   what the expert did was the expert looked at a pre-existing

12:36 18   DEA database for how to make PCP and got a quantity.  Then

12:36 19   the expert took the quantity and made the PCP and measured

12:36 20   it.  That's actual science.  And then they determined, based

12:36 21   on the comparison of what the database said and the expert's

12:37 22   own independent testing -- the numbers were a little

12:37 23   different, the database was a little less, so they went with

12:37 24   that, 'cause it was conservative.

12:37 25        That's what conservative actually means:

CV 04-9049 DOC - 1/4/2011 - VOLUME I OF II

90

| | | |
|---|---|---|
| 12:37 | 1 | Comparing two numbers and going with the lower one.  It |
| 12:37 | 2 | doesn't mean just making up a number, like Mr. Wagner does. |
| 12:37 | 3 | If -- to make the *McCaleb* case like this case, |
| 12:37 | 4 | that DEA expert would have had to just walk around the |
| 12:37 | 5 | office and say, "How much do you think we could get -- how |
| 12:37 | 6 | much PCP do you think we could get out of these |
| 12:37 | 7 | ingredients?" |
| 12:37 | 8 | That's pretty much all Wagner did.  He didn't do |
| 12:37 | 9 | any testing.  He didn't do any verification.  He didn't look |
| 12:37 | 10 | at any underlying documents.  He just asked other people to |
| 12:37 | 11 | do that for him -- or maybe they did it; maybe they didn't. |
| 12:37 | 12 | That's who we need to get them on the stand to find out |
| 12:37 | 13 | about.  But he didn't do any of that work himself, so he |
| 12:37 | 14 | doesn't add anything to the analysis. |
| 12:38 | 15 | THE COURT:  Experts don't have to do the work |
| 12:38 | 16 | themselves.  They can even rely upon hearsay. |
| 12:38 | 17 | MR. COTE:  They can rely upon hearsay. |
| 12:38 | 18 | The problem with what Mr. Wagner is doing is he's |
| 12:38 | 19 | coming in with an expert -- as an expert, with all of his |
| 12:38 | 20 | titles and degrees and aura of reliability, and he's gonna |
| 12:38 | 21 | say, "These are the numbers."  But he doesn't know that |
| 12:38 | 22 | those are the numbers.  The only people who know that those |
| 12:38 | 23 | are the numbers are the people who put the numbers in the |
| 12:38 | 24 | spreadsheet, who we don't know who they are, because Wagner |
| 12:38 | 25 | doesn't know who they are.  But whoever they are, they |

DEBBIE GALE, U.S. COURT REPORTER

| 12:38 | 1 | should come up on the stand and tell us the basis of those |
| 12:38 | 2 | numbers -- if they have one. |
| 12:38 | 3 | I want to give one example to show that, in fact, |
| 12:38 | 4 | they don't have one.  The largest sum or largest portion of |
| 12:38 | 5 | the $6.5 million they want from my client comes from what |
| 12:38 | 6 | Wagner calls "POS data cost."  "POS" stands for point of |
| 12:39 | 7 | sale. |
| 12:39 | 8 | And the theory is Mattel gives that discount to |
| 12:39 | 9 | some of its retailers in exchange for the retailers |
| 12:39 | 10 | providing their data to Mattel.  And because some of the |
| 12:39 | 11 | retailers' data is in some of the documents that were |
| 12:39 | 12 | allegedly taken, Mr. Wagner includes that discount as a cost |
| 12:39 | 13 | of making the document.  But Wagner admitted in his |
| 12:39 | 14 | deposition he has no idea if Mattel ever actually gave such |
| 12:39 | 15 | discounts.  He has no idea what the actual sales were that |
| 12:39 | 16 | you'd calculate the discount from.  He doesn't know which |
| 12:39 | 17 | years they had the discount. |
| 12:39 | 18 | He said, "I can't tell you who the money was paid |
| 12:39 | 19 | to."  He has no idea where the number came from.  And this |
| 12:39 | 20 | is the problem throughout his report.  If there's a basis |
| 12:39 | 21 | for that number, someone can come in and testify to it.  But |
| 12:39 | 22 | Wagner can't 'cause he doesn't know what the basis is for |
| 12:39 | 23 | that number. |
| 12:39 | 24 | And if this is a real number, it should be really |
| 12:40 | 25 | easy to prove.  You come in and you put on X number of |

CV 04-9049 DOC - 1/4/2011 - VOLUME I OF II

92

12:40   1   sales, Y percentage, multiply the two, and that's the --

12:40   2   that's the number we're looking for.  Wagner didn't do that.

12:40   3   He just took someone's word that that was the number.

12:40   4        Now, that all happened on the first day of his

12:40   5   deposition.  On the second day, he tried to fix it, and he

12:40   6   brought in two new documents that he admitted he had never

12:40   7   seen before to justify his opinion.  And the first one is an

12:40   8   e-mail from a Mattel de Mexico employee, to somebody on --

12:40   9   to a Quinn Emanuel lawyer who forwarded it to someone on

12:40   10  Mr. Wagner's staff.  And that person just says, "Well, we

12:40   11  give about a one percent discount, and the sales were about

12:40   12  $190 million, so it costs about $1.9 million to make the

12:40   13  document."

12:40   14       It's just an e-mail.  There's no basis for any of

12:40   15  that information.  But even if that was enough for him to

12:41   16  rely on, it's only for one year, 2004.  There's nothing

12:41   17  there for 2002.  There's nothing there for 2003.  And Wagner

12:41   18  said, "Oh, I just assumed they were all the same."  There's

12:41   19  no basis for that assumption.  If there's evidence on that

12:41   20  point, it should come in through someone who can testify to

12:41   21  it.  But that's not Wagner.

12:41   22       The second document he tried to fix this with was

12:41   23  a bunch of one-page letter agreements between Mattel

12:41   24  de Mexico and some of the retailers.  They're all from 2004

12:41   25  again, except for one that's from 2005.  So we don't even

DEBBIE GALE, U.S. COURT REPORTER

12:41  1   have a full set for 2004.  And those contracts have

12:41  2   different numbers in them.  Some have 3 percent.  Some have

12:41  3   1 percent.

12:41  4          The Mattel employees just wrote in the spreadsheet

12:41  5   1 percent of $190 million.  They didn't rely on these

12:41  6   documents, 'cause if they had, they would be different.  And

12:42  7   the contracts don't have the sales numbers that you multiply

12:42  8   the percentage by.  There's no basis for those sales

12:42  9   numbers.  If someone knows that number, they need to come in

12:42  10  and testify to it.  But again, that's not Wagner, 'cause he

12:42  11  didn't check.  He doesn't know.

12:42  12         So to sum up, just this "point of sale" data comes

12:42  13  to almost $6 million of the money that they want from

12:42  14  Mr. Machado.  And Mr. Wagner's gonna come in and say, "I'm

12:42  15  an expert and I've decided that this $5.7 million should be

12:42  16  paid by Mr. Machado, even though I didn't -- I didn't check

12:42  17  the percentages.  I didn't check the sales.  I didn't check

12:42  18  if they were actually paid.  I didn't even check if they

12:42  19  were required to be paid.  I have no idea what I'm talking

12:42  20  about, but I am an expert, and you should believe me."  That

12:42  21  does not satisfy *Daubert*, and it certainly runs afoul of

12:43  22  Rule 403.

12:43  23         THE COURT:  Mattel.

12:43  24         MR. QUINN:  Yes, Your Honor.

12:43  25         I think it's commonplace for experts to rely on

12:43  1  data that they do not have first-hand knowledge of.  The

12:43  2  types of information that Mr. Wagner relied on is the type

12:43  3  of information that's usually relied on by damages experts.

12:43  4  It's information supplied by their client.  And this is

12:43  5  routine -- that they routinely rely on financial information

12:43  6  and documents that are collected by the client.

12:43  7          It's not just the *Clint* case, but James E.

12:43  8  O'Connell Co., a Ninth Circuit decision in 1986, said

12:43  9  financial statements -- other data relating to similar

12:43  10  businesses' forecasts are clearly proper grounds for an

12:43  11  expert opinion, even if the expert does not have any

12:43  12  personal knowledge concerning that information.

12:43  13          The measure of unjust enrichment damages of

12:44  14  avoided development costs is a reliable and recognized

12:44  15  measure of unjust enrichment.  That's routinely applied,

12:44  16  *Bourns, Inc. v. Raychem*, Ninth Circuit, 2003, 331 F.3d 704,

12:44  17  affirmed -- in that case, the Ninth Circuit affirmed the

12:44  18  award of unjust enrichment damages for trade secret

12:44  19  misappropriation based on avoided costs; the costs that the

12:44  20  defendant avoided by having trade secret materials.

12:44  21          With respect to Counsel, Mr. Wagner did not

12:44  22  testify that the cost of creation, avoided development

12:44  23  costs, is a, quote/unquote, "poor measure," which is what I

12:44  24  think Counsel said, "of value."  He testified that actually

12:44  25  those costs -- that measure, cost of creation, is usually a

12:44  1   more conservative measure of damages.  That is in his

12:44  2   transcript at page 754.

12:45  3          The royalty -- the reasonable royalty analysis,

12:45  4   there's nothing unremarkable about the royalty analysis he

12:45  5   applied.  He used a royalty base of costs to compute the

12:45  6   royalty, just like other -- the other royalty analyses

12:45  7   contained comparable royalty analysis that he compared his

12:45  8   analysis to and contained in his report.  He further

12:45  9   considered the *Georgia-Pacific* factors as set forth in his

12:45 10   report.  And in connection with the royalty analysis, they

12:45 11   cross-examined him on it.  They'll have a chance to

12:45 12   cross-examine him, and should have a chance to cross-examine

12:45 13   him at trial.

12:45 14          The types of data that were supplied by Mattel

12:45 15   that he relied on -- Mattel's labor costs, third-party data

12:45 16   costs, the IT costs, all the different items which were

12:45 17   spelled out in his report and they had a chance to question

12:46 18   him on -- those -- I mean, his opinion is clearly based

12:46 19   on -- on those costs.  And if they think, you know, he's

12:46 20   standing on feet of clay, they have an opportunity to

12:46 21   cross-examine him about that and call all those things into

12:46 22   question.

12:46 23          These are proper subjects for cross-examination.

12:46 24   They're not proper subjects for excluding his opinion

12:46 25   altogether.

CV 04-9049 DOC - 1/4/2011 - VOLUME I OF II

96

| | | |
|---|---|---|
| 12:46 | 1 | THE COURT: All right. Tentatively, I'm going to |
| 12:46 | 2 | deny the motion by Mr. Machado concerning Michael Wagner. |
| 12:46 | 3 | But I'm going to require a thumb drive. I want to see the |
| 12:46 | 4 | report again and go over it in detail. That's a tentative |
| 12:46 | 5 | ruling at the present time. |
| 12:46 | 6 | MS. HURST: Your Honor -- |
| 12:46 | 7 | THE COURT: Counsel, did you notice I was |
| 12:46 | 8 | speaking. |
| 12:46 | 9 | MS. HURST: I apologize, Your Honor. |
| 12:46 | 10 | THE COURT: Thank you. |
| 12:46 | 11 | And, therefore, I'm going to look at this in more |
| 12:46 | 12 | depth. But tentatively, you can expect to refer to the |
| 12:46 | 13 | damages expert in your opening statement by Mattel. |
| 12:46 | 14 | All right. I'll take a close look at that over |
| 12:46 | 15 | the recess. |
| 12:46 | 16 | Number -- |
| 12:46 | 17 | MS. HURST: Your Honor, may we be heard on that |
| 12:46 | 18 | motion, briefly? |
| 12:47 | 19 | THE COURT: This is Machado's motion. |
| 12:47 | 20 | MS. HURST: I understand, Your Honor. |
| 12:47 | 21 | THE COURT: We'll come back to it at a later time |
| 12:47 | 22 | on your motion. We're going in order now. |
| 12:47 | 23 | MS. HURST: Okay. |
| 12:47 | 24 | THE COURT: Okay. Yesterday I reserved MGA's |
| 12:47 | 25 | Motion No. 1. I'm still reserving that. |

12:47  1          I've denied Motion No. 2 by MGA.

12:47  2          Motion No. 3, we were going to delay a ruling

12:47  3   until today.  This involved MGA's legal representation,

12:47  4   including the number of attorneys or law firms who have

12:47  5   represented MGA in the matter or unrelated matters, the fees

12:47  6   charged/owed to those attorneys or firms, and the withdrawal

12:47  7   of their prior counsel.

12:47  8          And, Counsel, you referred me, of course, to the

12:47  9   *Dornan* case.  Do counsel have any more thoughts concerning

12:47  10  that motion?

12:47  11         MR. QUINN:  On the *Dornan* case, we do, Your Honor.

12:47  12  Thank you.

12:47  13         This is all their -- with respect to the

12:47  14  injunction issue, which I think is addressed in five or six

12:47  15  of the motions in limine, Your Honor, all their eggs are in

12:47  16  the basket of the *Dornan* case.  And that case, I went back

12:48  17  and read it this morning.  The plaintiff union members had

12:48  18  recovered damages for -- against the union because the union

12:48  19  officers had improperly, without a proper election, changed

12:48  20  the amount of the union dues.  And the Court, in a lengthy

12:48  21  analysis, addressed the question about the change in the

12:48  22  union dues was the result of an injunction.  And in a

12:48  23  lengthy analysis, the Court concluded that, because there

12:48  24  was a restitutionary claim that the union had against the

12:48  25  union members, an equitable claim, that would be appropriate

12:48  1   to offset that as a result of -- against the claim for the

12:48  2   wrongful issuance of the injunction.

12:48  3         There is -- and this Court has already determined

12:48  4   there is no such restitution claim in this case.  The Court

12:48  5   determined that on the motion to dismiss the wrongful

12:48  6   injunction claim in its order on the motion to dismiss where

12:49  7   the Court said, and I quote, "The Court looks no further

12:49  8   than the text of the wrongfully issued injunction which did

12:49  9   not compel the transfer of any money or property to Mattel

12:49  10  that has not already been returned to MGA.  MGA cannot

12:49  11  circumvent the text of the injunction by pleading additional

12:49  12  facts and its proposed amendment would be futile," closed

12:49  13  quote.  The Court was specifically addressing, in the

12:49  14  context of the wrongful injunction claim, whether even, in

12:49  15  the absence of a bond -- because they had a restitution

12:49  16  claim, they could still pursue a wrongful injunction claim.

12:49  17  And the Court concluded -- it's already decided -- there is

12:49  18  no restitution claim.  There is no property that Mattel has

12:49  19  that they're seeking to have returned.

12:49  20        So the setoff claim is not a restitution claim.

12:49  21  It's a claim for damages to MGA.  So I think this is an

12:49  22  issue the Court has already decided.

12:50  23        But more importantly, in the *Dornan* case, the

12:50  24  court decided this after there was a jury award of damages

12:50  25  in favor of the union members in a separate equitable

CV 04-9049 DOC - 1/4/2011 - VOLUME I OF II

99

| | | |
|---|---|---|
| 12:50 | 1 | proceeding before the court.  So I think this is an easy way |
| 12:50 | 2 | for the Court to deal with this issue, to the extent there's |
| 12:50 | 3 | any doubt.  This is an issue for the Court, not for the |
| 12:50 | 4 | jury.  The jury shouldn't be hearing, you know, as an |
| 12:50 | 5 | affirmative defense or setoff any sort of equitable claim at |
| 12:50 | 6 | all or anything about the injunction. |
| 12:50 | 7 | If the Court wants to reserve on that issue, it's |
| 12:50 | 8 | properly an issue for Court to decide after there's a |
| 12:50 | 9 | verdict on damages. |
| 12:50 | 10 | THE COURT:  Thank you. |
| 12:50 | 11 | MGA. |
| 12:50 | 12 | MS. HURST:  First, Your Honor, yesterday the Court |
| 12:50 | 13 | asked whether there was any need on our part to refer to |
| 12:50 | 14 | this in opening statement. |
| 12:50 | 15 | THE COURT:  Slower.  Say that again. |
| 12:50 | 16 | MS. HURST:  The Court inquired yesterday whether |
| 12:50 | 17 | there was any need on MGA's part to refer to this in opening |
| 12:50 | 18 | statement, and the answer is no. |
| 12:50 | 19 | THE COURT:  Okay.  Then we'll simply reserve this. |
| 12:51 | 20 | If you're not going to refer to it in opening statement, I |
| 12:51 | 21 | can take my time with it. |
| 12:51 | 22 | MS. HURST:  And will there be an opportunity for |
| 12:51 | 23 | further argument, or should I address Mr. Quinn's comments |
| 12:51 | 24 | now? |
| 12:51 | 25 | THE COURT:  Argument.  You can have further |

CV 04-9049 DOC - 1/4/2011 - VOLUME I OF II

| | | |
|---|---|---|
| 12:51 | 1 | argument. |
| 12:51 | 2 | MS. HURST:  Okay. |
| 12:51 | 3 | THE COURT:  I'm just trying to make sure that you |
| 12:51 | 4 | can shape your opening arguments and you're not embarrassed |
| 12:51 | 5 | later on by not being able to produce evidence on some of |
| 12:51 | 6 | these issues.  Okay?  It's reserved. |
| 12:51 | 7 | MS. HURST:  Thank you. |
| 12:51 | 8 | THE COURT:  On Number 4, it's agreed that Mattel |
| 12:51 | 9 | will not mention the FBI. |
| 12:51 | 10 | Number 5 has been argued adequately. |
| 12:51 | 11 | Number 6, the agreement is that Mattel has agreed |
| 12:51 | 12 | not to produce this evidence. |
| 12:51 | 13 | Number 7 had been deferred until today.  This is |
| 12:51 | 14 | MGA's Motion in Limine No. 7, Mattel's allegations that the |
| 12:51 | 15 | MGA parties spoliated the evidence. |
| 12:51 | 16 | MS. HURST:  Thank you, Your Honor. |
| 12:51 | 17 | I'm going to start with Evidence Eliminator.  The |
| 12:51 | 18 | undisputed facts are that Mr. Bryant installed Evidence |
| 12:51 | 19 | Eliminator on his personal computer in 2002, before this |
| 12:52 | 20 | dispute ever arose.  There's no evidence of any kind that |
| 12:52 | 21 | MGA had anything to do with it. |
| 12:52 | 22 | Now, this was, without a doubt, one of the most |
| 12:52 | 23 | inflammatory aspects of the Phase I proceedings.  Once |
| 12:52 | 24 | Judge Larson permitted testimony regarding Evidence |
| 12:52 | 25 | Eliminator, Mattel referred to it on a near-hourly basis. |

| | | |
|---|---|---|
| 12:52 | 1 | And worse, Your Honor, they perniciously combined it in time |
| 12:52 | 2 | and argument with references to Mr. Bryant's inspiration for |
| 12:52 | 3 | Bratz -- observing students at Kickapoo High School, and |
| 12:52 | 4 | they made it seem like he was a pedophile. |
| 12:52 | 5 | This is probably the worst thing that can happen |
| 12:53 | 6 | in this day and age, is to suggest that somebody's a |
| 12:53 | 7 | pedophile and to be associated with one.  And this had |
| 12:53 | 8 | absolutely nothing to do with MGA.  Now we're in a motion |
| 12:53 | 9 | where it has even less to do with MGA because they've |
| 12:53 | 10 | settled with Mr. Bryant for nothing.  His liability is not |
| 12:53 | 11 | at stake here.  So any concealment that he had, if that was |
| 12:53 | 12 | the rationale, cannot be relevant at a time when there's no |
| 12:53 | 13 | dispute, and there's no litigation, and there's no evidence |
| 12:53 | 14 | that we had anything to do with it. |
| 12:53 | 15 | They have an expert report on this, Mr. Mintz |
| 12:53 | 16 | *(phonetic)*, which Judge Larson, in fact, did exclude during |
| 12:53 | 17 | Phase I, and Mintz has no evidence that Carter Bryant used |
| 12:53 | 18 | Evidence Eliminator to delete anything relevant in this |
| 12:54 | 19 | case. |
| 12:54 | 20 | They can't say that he did.  And, in fact, they've |
| 12:54 | 21 | never pointed to anything that appears to be missing.  And |
| 12:54 | 22 | so what they have is Carter Bryant's unfounded testimony |
| 12:54 | 23 | about the operation of Evidence Eliminator.  It's obvious |
| 12:54 | 24 | he's not a technical guy.  He has no idea how it works.  He |
| 12:54 | 25 | installed it with a standard configuration, and it does what |

| | | |
|---|---|---|
| 12:54 | 1 | it does.  He has no idea how it works.  So then they need to |
| 12:54 | 2 | bring in Mintz to try to construct, using expert testimony, |
| 12:54 | 3 | a fill-in-the-gap suggestion that there was some wrongdoing |
| 12:54 | 4 | when the reality is it's an inflammatory name and the |
| 12:54 | 5 | analysis doesn't get beyond that. |
| 12:54 | 6 | THE COURT:  Mattel. |
| 12:54 | 7 | MR. QUINN:  Your Honor, I -- I -- the pedophile, |
| 12:54 | 8 | frankly, absolutely never occurred to us.  It's Mr. Bryant's |
| 12:55 | 9 | account.  His account of the creation was he drove by the |
| 12:55 | 10 | high school, saw the kids, went home and immediately created |
| 12:55 | 11 | Bratz.  That's his testimony.  There was never any |
| 12:55 | 12 | suggestion that he was a pedophile. |
| 12:55 | 13 | Mr. Bryant testified that he ran that program. |
| 12:55 | 14 | And there was a stipulation.  Mr. Mintz, again, was not |
| 12:55 | 15 | excluded.  I was there.  Hearing transcript, December 23, |
| 12:55 | 16 | 2010, Judge Larson encouraged the parties to reach a |
| 12:55 | 17 | stipulation.  We had competing technical experts. |
| 12:55 | 18 | THE COURT:  Did you reach a stipulation? |
| 12:55 | 19 | MR. QUINN:  Yes, did we.  And we agreed on -- |
| 12:55 | 20 | Mr. Nolan said -- he said -- the Court asked, "Do we have an |
| 12:55 | 21 | agreement on the stipulation concerning Mintz. |
| 12:55 | 22 | "MR. NOLAN:  We do, Your Honor.  We've agreed on |
| 12:55 | 23 | the language that the Court mediated last night." |
| 12:55 | 24 | He was not excluded.  Flat wrong.  About the sixth |
| 12:55 | 25 | time that that's happened in these discussions. |

Case 2:04-cv-09049-DOC-RNB   Document 9606   Filed 01/07/11   Page 103 of 124   Page ID #:286073
CV 04-9049 DOC - 1/4/2011 - VOLUME I OF II

103

| | | |
|---|---|---|
| 12:55 | 1 | There was an agreement where the jury was told |
| 12:55 | 2 | what Evidence Eliminator is.  We stipulated to it.  So |
| 12:56 | 3 | neither side's expert is -- and what -- what it does.  And |
| 12:56 | 4 | there was some 9,000 files that were deleted. |
| 12:56 | 5 | His computer, he ran -- Mr. Bryant ran, and he |
| 12:56 | 6 | testified how it -- how it happens.  He understood he had to |
| 12:56 | 7 | push a button and run a program.  It was run two days before |
| 12:56 | 8 | his computer was imaged.  That was undisputed.  As I recall, |
| 12:56 | 9 | that was part of the stipulation.  We didn't have to call |
| 12:56 | 10 | expert testimony about that. |
| 12:56 | 11 | The -- you know, in some ways, the very name |
| 12:56 | 12 | "Evidence Eliminator," they say it's inflammatory, but in |
| 12:56 | 13 | some ways, the fact that he would choose that -- his |
| 12:56 | 14 | testimony was he chose it.  He went on the Internet. |
| 12:56 | 15 | There's a lot of different -- he said, "I did it to try to |
| 12:56 | 16 | speed up the running of my computer."  There's a lot of |
| 12:56 | 17 | different programs that you can choose to run that |
| 12:56 | 18 | ostensibly do that.  And he chose one called "Evidence |
| 12:56 | 19 | Eliminator."  In some ways, the name is, in itself, very |
| 12:57 | 20 | powerful evidence. |
| 12:57 | 21 | But he testified at length about the operation of |
| 12:57 | 22 | that, and -- and gave different views about different |
| 12:57 | 23 | accounts at different times as to why he was running it. |
| 12:57 | 24 | But what was agreed and stipulated by the parties is that it |
| 12:57 | 25 | does eliminate files, and it did delete files. |

12:57     1          Now, MGA now wants to say, "That's Carter Bryant.

12:57     2    That's not us."  But, look, they're joined at the hip in

12:57     3    this case, even though he's no longer a party.  He made

12:57     4    $30 million.  He was under contract to them.  He was under

12:57     5    contract to them at the time.  He was being indemnified --

12:57     6    or they're providing indemnification to each other on

12:57     7    different issues.  They paid for his attorney.  This

12:57     8    happened during the litigation.  Mr. Bryant's going to be a

12:57     9    witness.  His credibility is in issue.  The documents he

12:57    10    created, or didn't create, or which are no longer available,

12:57    11    are all relevant in this case.  And the jury is entitled to

12:58    12    hear that we can't show the whole picture because he ran

12:58    13    this program.  He ran a program on his computer.

12:58    14          Let him come forward and explain why he did it,

12:58    15    what it was.

12:58    16          THE COURT:  All right.  This motion is tentatively

12:58    17    denied.  I'll go back, of course, and make a final ruling on

12:58    18    this.

12:58    19          No.  Counsel, it's tentatively denied.  I'll look

12:58    20    at it back in chambers.  You were willing to submit

12:58    21    yesterday.  I've afforded that argument.  That's the Court's

12:58    22    ruling.

12:58    23          Number 8, expert testimony of Maryman and

12:58    24    Associates.

12:58    25          MGA.

12:58   1          MS. HURST:  Your Honor, the spoliation motion

12:58   2   covers subject matter other than Evidence Eliminator.

12:58   3   Should we address that, as well?

12:58   4          THE COURT:  Sure.

12:58   5          MS. HURST:  I believe a portion of it concerns

12:58   6   Mr. Machado.  Do you want to -- okay.

12:59   7          Your Honor, with respect to the Machado hard

12:59   8   drive, they want to offer expert opinion that, at Mattel,

12:59   9   the Machado hard drive had a program on it called Internet

12:59   10  Washer Pro.

12:59   11          And this is after they had four different expert

12:59   12  reports saying that that hard drive -- first of all, let me

12:59   13  back up.

12:59   14          They had exclusive custody of that hard drive

12:59   15  after he left.  And they gave it to their internal

12:59   16  IT Department forensic technicians, who performed operations

12:59   17  on it.  And then, after that, they generated three different

12:59   18  conflicting expert reports about what happened to that hard

12:59   19  drive.  Two of the three reports said it was damaged by

12:59   20  normal operation and that that accounted for any purported

12:59   21  overwriting of files.

01:00   22          Now they want to come in with this expert report

01:00   23  and say something that's directly contrary to two prior

01:00   24  forensic reports that they had, after they had exclusive

01:00   25  custody of the drive and their internal IT people performed

Case 2:04-cv-09049-DOC-RNB   Document 9606   Filed 01/07/11   Page 106 of 124   Page ID #:286076
CV 04-9049 DOC - 1/4/2011 - VOLUME I OF II

106

01:00   1   operations on it.

01:00   2           Now, this is really -- it's inflammatory stuff.

01:00   3   There's no evidence that anything's missing.  We've produced

01:00   4   millions of pages.  They were able to extract 14,000 files

01:00   5   from this hard drive.

01:00   6           THE COURT:  I hear you.

01:00   7           MS. HURST:  Okay.

01:00   8           THE COURT:  All right.

01:00   9           Mattel.

01:00   10          MR. QUINN:  The court-appointed experts have

01:00   11  already concluded that so-called scrubber, slash, wipe

01:00   12  software, quote/unquote, was run on Mr. Machado's MGA hard

01:00   13  drives multiple times, including the date his drives were

01:00   14  collected for imaging in this case.  That's the July 12,

01:00   15  2010 ILS.  If they want to tell the jury that --

01:00   16          MS. HURST:  That's a different hard drive.

01:00   17          MR. QUINN:  -- that Mattel ran that.

01:01   18          THE COURT:  Excuse me.

01:01   19          MR. QUINN:  If they want to tell the jury that

01:01   20  Mattel ran that and not Mr. Machado or not MGA, let them do

01:01   21  that.

01:01   22          Despite having had possession of Mr. Machado's

01:01   23  hard drive for over a year, MGA never put forth any expert

01:01   24  report disputing the conclusion that this Internet Washer

01:01   25  Pro was on his hard drive the workday before he even

CV 04-9049 DOC - 1/4/2011 - VOLUME I OF II

107

| | | |
|---|---|---|
| 01:01 | 1 | resigned from Mattel. |
| 01:01 | 2 | Mr. Machado -- the court-appointed experts also |
| 01:01 | 3 | opined that the program was run the very day his hard drive |
| 01:01 | 4 | was collected for imaging.  So this is a program that the |
| 01:01 | 5 | court-appointed experts have concluded that this -- there's |
| 01:01 | 6 | another program, BeClean, that scrubber/wiper software |
| 01:01 | 7 | that -- |
| 01:01 | 8 | THE COURT:  Thank you, Counsel.  The motion's |
| 01:01 | 9 | tentatively denied. |
| 01:01 | 10 | Now, let me speak to both of you.  Because |
| 01:01 | 11 | something just occurred, and if it occurs in front of the |
| 01:01 | 12 | jury, I'm going to forewarn you about something. |
| 01:02 | 13 | I've been very patient with your arguments |
| 01:02 | 14 | throughout the evening hours and the time we've spent |
| 01:02 | 15 | together.  But if I make a ruling in front of the jury, and |
| 01:02 | 16 | either party comes back and starts questioning that ruling, |
| 01:02 | 17 | what am I going to do? |
| 01:02 | 18 | MR. McCONVILLE:  Take their legs out. |
| 01:02 | 19 | THE COURT:  Mr. Quinn, what am I going to do? |
| 01:02 | 20 | MR. QUINN:  I think -- if I did that, I think I'm |
| 01:02 | 21 | going to look very bad. |
| 01:02 | 22 | THE COURT:  What am I going to do? |
| 01:02 | 23 | MR. QUINN:  The Court has sometimes used the |
| 01:02 | 24 | phrase "take you down in front of the jury," or "checkbook," |
| 01:02 | 25 | or both. |

01:02    1          MS. HURST:  Yeah.  Bring my checkbook.

01:02    2          THE COURT:  Mr. McConville, what am I going to do?

01:02    3  You've been here before.

01:02    4          MR. McCONVILLE:  You're going to take our legs out

01:02    5  in front of the jury to make it look like we don't

01:02    6  understand the Court's ruling, and set an example.

01:02    7          THE COURT:  Now, none of those are my words, but

01:02    8  thank you.  I want to dress that up in a legal phrase.

01:03    9          You really put yourself in harm's way because I

01:03   10  think that, with my willingness to hear you repeatedly, that

01:03   11  you need to understand that that complexion is changing

01:03   12  completely in front of the jury.  So for that opportunity

01:03   13  that I'm giving you to argue, reargue, et cetera, and make

01:03   14  your points here, that you have to beware that that changes

01:03   15  in front of a jury, and that the ruling I make is final.

01:03   16  That's the end of it.

01:03   17          And if you argue that in a speaking motion, then

01:03   18  you're giving the Court no opportunity except to respond.

01:03   19  And you don't want to put a Court in that position.  So I

01:03   20  just leave that to you and your wisdom, because I don't want

01:03   21  your clients harmed.  But it's a much different venue in

01:03   22  front of a jury.  And what you don't want is the Court to

01:03   23  respond to counsel who can't accept a ruling by the Court.

01:04   24          And so I just leave that to your wisdom.  I don't

01:04   25  know about "take you down, take your legs out."  It

DEBBIE GALE, U.S. COURT REPORTER

01:04  1   certainly sounds like a very inarticulate judge.  So those

01:04  2   weren't my phrases, at least on this record -- today.  But

01:04  3   you're forewarned.

01:04  4          All right.  Now, number 9 has been adequately

01:04  5   argued.

01:04  6          Number 10 is not being offered.

01:04  7          Number 11, the statement was Mattel does not

01:04  8   intend to offer this into evidence.

01:04  9          Number 12 was adequately argued.

01:04  10         Number 13, it was agreed that the reference to

01:04  11  bribes being offered was not going to be introduced by

01:04  12  either side.

01:04  13         Number 14, Mattel was not going to use this in the

01:04  14  opening statement.

01:04  15         Number 15, both parties have stipulated that the

01:04  16  verdict is not to be mentioned.  We were going to refer to

01:04  17  this as "prior proceedings" when referring to transcripts

01:05  18  and the trial.

01:05  19         Of course, MGA reserved last evening, and will

01:05  20  later argue that the reverse injunction is relevant

01:05  21  concerning damages.  And I understand that.  That's implicit

01:05  22  through the motions.

01:05  23         Number 16, I think your wisdom prevails.  I will

01:05  24  bifurcate the punitives.  I think it's a much wiser position

01:05  25  that the parties have taken than the Court's initial

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 1/4/2011 - VOLUME I OF II

110

01:05    1    position, and I'm persuaded by your wisdom.

01:05    2           Number 17 has been adequately argued.

01:05    3           Number 18 was adequately argued.

01:05    4           Number 19 was adequately argued.

01:05    5           Number 20 had been requested by Mattel to be

01:05    6    reserved until today's date. This is the testimony offered

01:05    7    by Mattel expert, Ginger McRae.

01:05    8           So, Mattel.

01:05    9           MR. QUINN: Actually, I think this is an MGA

01:06   10    motion.

01:06   11           THE COURT: Let me turn to page -- yeah. It is an

01:06   12    MGA motion. My apologies.

01:06   13           MGA.

01:06   14           MS. HURST: Thank you, Your Honor.

01:06   15           Ms. McRae -- well, first let me start by saying

01:06   16    this, and this is a supplement to our Motion No. 17 from

01:06   17    yesterday, and all of these points now. We are not going to

01:06   18    argue unconscionability. So to the extent that any of this

01:06   19    testimony is offered for purposes of unconscionability,

01:06   20    we're going to withdraw that assertion.

01:06   21           THE COURT: Then why does the Court need to make a

01:06   22    ruling on this?

01:06   23           MS. HURST: Well, because it's their expert, and

01:06   24    we're looking to exclude it. And I think one of their --

01:06   25    maybe, principally, the exclusive rationale for the

01:06   1   relevance of these experts who are gonna come and opine

01:07   2   about the meaning of contracts, to say that they're standard

01:07   3   or custom somehow, is to deal with the unconscionability

01:07   4   issue.

01:07   5           So what we have here is an expert who's really

01:07   6   just coming and saying, you know, kind of general things

01:07   7   about how corporations work and that they have contracts.

01:07   8   She's not offering any custom testimony about specific terms

01:07   9   in the agreement, and she's not --

01:07   10          THE COURT:  Just a moment.

01:07   11          I'm concerned about the relevance of this witness.

01:07   12  Let me speak to Mattel.  I'm going to come back to you as a

01:07   13  courtesy.

01:07   14          MS. HURST:  Understood.

01:07   15          THE COURT:  Okay.  But I'm concerned about why

01:07   16  this witness is even relevant.

01:07   17          MR. QUINN:  This is in response, Your Honor, to

01:07   18  the argument that's made as it relates to interpretation of

01:07   19  the Bryant agreement, that the interpretation offered by

01:07   20  Mattel is not consistent with Mr. Bryant's reasonable

01:07   21  expectations, that he wouldn't understand those words to

01:07   22  mean what we --

01:07   23          THE COURT:  This witness doesn't need to be

01:08   24  mentioned in opening statement.

01:08   25          MR. QUINN:  No.

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 1/4/2011 - VOLUME I OF II

112

01:08  1          THE COURT:  It depends what Mr. Bryant says.  So
01:08  2   why don't we simply delay this ruling?
01:08  3          MR. QUINN:  I think we can.
01:08  4          THE COURT:  I'll make a more knowledgeable ruling
01:08  5   after I hear from Mr. Bryant.  Ruling's reserved.
01:08  6          Number 21, this motion was withdrawn by Mattel
01:08  7   yesterday.
01:08  8          Number 22, this is the proposed testimony order by
01:08  9   Mattel expert Angel Gomez.
01:08  10         MGA.
01:08  11         MS. HURST:  Yes, Your Honor.  It's the same issue.
01:08  12  Again, it's irrelevant because we're not gonna pursue
01:08  13  unconscionability.  This has the additional evil of being a
01:08  14  lawyer offering legal opinions.
01:08  15         THE COURT:  Why don't we simply reserve this
01:08  16  again?
01:08  17         MR. QUINN:  We can.
01:08  18         THE COURT:  There's no reason not to.  In other
01:08  19  words, the only reason I'm going through these 879 in limine
01:08  20  motions is to try to make certain that if you make an
01:08  21  opening statement, you're not later embarrassed by a
01:08  22  decision that's made at a later time and counsel can argue
01:08  23  the opening statement, "Did you hear one of the parties
01:09  24  state the following?  And they produced no evidence."
01:09  25         But this depends so much on the evidence that's

CV 04-9049 DOC - 1/4/2011 - VOLUME I OF II

01:09  1   going to be forthcoming from Carter Bryant and other people.

01:09  2   It just seems wise to reserve it.

01:09  3          I'm not precluding you from mentioning it.  But I

01:09  4   don't see why it would be mentioned.

01:09  5          So 22 is reserved.

01:09  6          23, this is the motion to exclude any evidence,

01:09  7   argument or reference at trial relating to the insurance as

01:09  8   it relates to MGA.  This was adequately argued yesterday.

01:09  9          24 was adequately argued.

01:09  10         There were a series of motions of Mr. Bryant,

01:09  11  waiting for your return.  Mr. Bryant was excused last night

01:09  12  about 10:00 o'clock.

01:09  13         MR. PRICE:  Mr. Price, Your Honor.  "Price."  You

01:10  14  said "Bryant" a couple of times.

01:10  15         THE COURT:  I thought it was Price?

01:10  16         MR. PRICE:  It is Price.

01:10  17         THE COURT:  Well, Mr. Bryant-Price.  I'm just

01:10  18  kidding you.

01:10  19         Now, we reserved 25, 26, and 27 at the request

01:10  20  last evening about 10:00 o'clock of Mr. Quinn.

01:10  21         Number 29, 30, 31 and 32.

01:10  22         33 was withdrawn by Mattel.

01:10  23         34, 35 -- 37, 38, 39, 40 -- I want to move through

01:10  24  these quickly.

01:10  25         25 is to exclude the report and testimony of Ralph

01:10  1   Oman.

01:10  2              MGA.

01:10  3              MS. HURST:  Mr. Oman is a former Registrar of

01:10  4   Copyrights.  His opinion concerns legal issues.  It invades

01:10  5   the province of the Court to instruct the jury on legal

01:10  6   issues.

01:10  7              THE COURT:  Now, just a moment.

01:10  8              Before we go any further, why is he even being

01:10  9   mentioned in opening statement?

01:11 10              MR. PRICE:  I don't think he's being mentioned in

01:11 11   opening statement, Your Honor.

01:11 12              THE COURT:  Simply reserved.

01:11 13              We've got plenty of time.  We're gonna be spending

01:11 14   nights and weekends -- is that the phrase, "nights and

01:11 15   weekends" -- together.

01:11 16              MR. QUINN:  You own it all, Your Honor.

01:11 17              THE COURT:  I'm just joking with you.  There's no

01:11 18   reason -- in other words, let's decide the essential things

01:11 19   that you really need.  Let's simply reserve this.

01:11 20              Number 26 is to exclude the report and testimony

01:11 21   of Bruce Green.

01:11 22              MR. QUINN:  Your Honor, this is -- you know, in a

01:11 23   nutshell, we're accused -- this relates to alleged --

01:11 24   allegations that the Quinn Emanuel law firm suppressed

01:11 25   evidence and the like, didn't produce documents, didn't

01:11   1   produce information concerning Villasenor.  We have an

01:11   2   expert who's prepared to testify that what we did was

01:11   3   entirely proper.  We didn't suppress anything.  We objected

01:11   4   where appropriate, and -- and it combats the idea that our

01:12   5   law firm was involved in misconduct.

01:12   6           THE COURT:  This has much to do with the RICO.

01:12   7           MR. McCONVILLE:  Yes, sir.

01:12   8           THE COURT:  Yeah.  This will become self-evident

01:12   9   in a few moments, Counsel.  I just need to go back and do

01:12   10  about another hour's worth of reading and editing.  I'll

01:12   11  simply reserve that; but when the ruling comes out, this

01:12   12  will be resolved.

01:12   13          27 is John Alex.

01:12   14          MR. McCONVILLE:  Yes, Your Honor.

01:12   15          This is an expert offered by Mattel who apparently

01:12   16  used to be a muckety-muck at the patent office, and his

01:12   17  opinion will be directed toward -- he's gonna offer expert

01:12   18  opinion as to the intent and knowledge of MGA and Isaac

01:12   19  Larian, when they submitted patent applications.

01:12   20          THE COURT:  Excuse me.  Did he personally engage

01:12   21  Mr. Larian in conversation?

01:12   22          MR. McCONVILLE:  No.

01:12   23          THE COURT:  Okay.

01:12   24          MR. PRICE:  First, we're not mentioning him in

01:13   25  opening; but second, he's not going to testify about

CV 04-9049 DOC - 1/4/2011 - VOLUME I OF II

116

| | | |
|---|---|---|
| 01:13 | 1 | anyone's intent.  In fact, when he was -- |
| 01:13 | 2 | THE COURT:  Well, if he's not mentioned in |
| 01:13 | 3 | opening, why don't we simply reserve it?  We're just wasting |
| 01:13 | 4 | time.  I mean, all these are nights and weekends, things |
| 01:13 | 5 | that we can do on Saturdays. |
| 01:13 | 6 | MR. PRICE:  That's fine. |
| 01:13 | 7 | THE COURT:  Counsel? |
| 01:13 | 8 | MR. McCONVILLE:  That's fine, Your Honor. |
| 01:13 | 9 | THE COURT:  I mean, let's get onto the *Daubert* |
| 01:13 | 10 | motions.  Let's get to the things that count. |
| 01:13 | 11 | Number 28, this is Tiffany *(sic)* Kinrich or |
| 01:13 | 12 | Kinrich. |
| 01:13 | 13 | MS. HURST:  Why don't we hear first if he needs to |
| 01:13 | 14 | be mentioned in opening. |
| 01:13 | 15 | THE COURT:  Let's find out. |
| 01:13 | 16 | Mattel? |
| 01:13 | 17 | Some of these are peremptory, I understand that. |
| 01:13 | 18 | But if it's no value in opening statement -- |
| 01:13 | 19 | Associate No. 32 is now consulting with lead |
| 01:13 | 20 | counsel.  I'm just kidding you, Counsel. |
| 01:13 | 21 | MR. PRICE:  Partner.  "Partner," Your Honor. |
| 01:14 | 22 | THE COURT:  Pleasure to see you again. |
| 01:14 | 23 | MR. PRICE:  Your Honor, I'm told by one of my |
| 01:14 | 24 | partners we don't intend to mention Mr. Kinrich by name.  We |
| 01:14 | 25 | do intend to mention the fact that, for example, that Mattel |

DEBBIE GALE, U.S. COURT REPORTER

01:14   1   employees who were asked to take information from Mattel

01:14   2   when they joined MGA got a higher salary increase than

01:14   3   others.

01:14   4         THE COURT:  Sure.

01:14   5         MR. PRICE:  Now, there's an issue as to whether or

01:14   6   not you need expert testimony for that.  And that's what

01:14   7   this is -- I think their motion is raising.  But whether you

01:14   8   need it or not, MGA's position is anybody can do that math.

01:14   9         THE COURT:  Well, you're also going to have

01:14  10   Vargas, Trueba -- didn't everybody get a higher salary to

01:14  11   some extent?  In other words, you're not going to be

01:14  12   precluded from that area.

01:14  13         MR. PRICE:  Right.  So we plan to mention the

01:14  14   statistics.  MGA's real objection to Mr. Kinrich is any high

01:14  15   schooler can do that.  So we can delay that issue until

01:14  16   later.  We won't even mention Mr. Kinrich's name.

01:14  17         THE COURT:  That's reserved, Counsel.  And you're

01:15  18   going to be allowed to mention that.

01:15  19         29 is to exclude the expert of report offered by

01:15  20   the market survey expert, Edward Blair, Ph.D.

01:15  21         MS. HURST:  I think this only goes to the

01:15  22   trapezoid packaging claim so they should -- it should be

01:15  23   withdrawn, I would think.

01:15  24         THE COURT:  Should it be withdrawn?

01:15  25         Trapezoid packaging, Counsel?  I think my ruling

CV 04-9049 DOC - 1/4/2011 - VOLUME I OF II

118

01:15    1    was clear in the first 117 pages, and there's about 50 more

01:15    2    pages rolling out in a few minutes.

01:15    3            MR. PRICE:  Your Honor, if we could look at

01:15    4    that -- but certainly, we're not going to mention it in

01:15    5    opening, and we can get back to you.

01:15    6            THE COURT:  Well, look at it for a moment.  It

01:15    7    involves trapezoid packaging.  It should be withdrawn.

01:17    8            MR. ZELLER:  Your Honor, we have no intention of

01:17    9    mentioning the Blair survey in opening.  The one reason not

01:17   10    to withdraw the motion and ask that the Court reserve on it

01:17   11    is simply that MGA may raise issues about trapezoidal

01:17   12    packaging.

01:17   13            THE COURT:  If it comes in at that time, I'll

01:17   14    reconsider it.  Right now, the motion concerning this -- if

01:17   15    you're not going to withdraw it, I'll simply grant it,

01:17   16    Counsel.

01:17   17            MR. ZELLER:  If I -- the reason it might come in

01:17   18    is simply because MGA is going to make apportionment

01:17   19    arguments about why people buy Bratz.

01:17   20            THE COURT:  Okay.  Why don't I do this:  I'll

01:17   21    reserve it, as long as you're not going to mention it.

01:17   22            MR. ZELLER:  Okay.

01:17   23            THE COURT:  I'll reserve it.

01:17   24            MR. ZELLER:  Thank you.

01:17   25            THE COURT:  Number 30 is the exclusion from trial

CV 04-9049 DOC - 1/4/2011 - VOLUME I OF II

01:17  1  concerning all references to the use of the expert damages

01:17  2  testimony from Mattel Incorporated.  The witness is Michael

01:17  3  Wagner.  Now we're back to the same issue again.  This is --

01:17  4       MR. QUINN:  We probably won't mention Wagner by

01:17  5  name.  He's our damages expert.  We would like to, in some

01:17  6  general since, indicate to the jury that they made a lot of

01:18  7  money on Bratz.

01:18  8       THE COURT:  Certainly.

01:18  9       MR. QUINN:  And that we're gonna be asking for a

01:18  10  substantial amount of money, may even mention some figures,

01:18  11  but we won't mention Mr. Wagner specifically.

01:18  12       THE COURT:  You're not precluded from that.

01:18  13  That's entirely appropriate.  And if you're not mentioning

01:18  14  Wagner, maybe I don't need to follow through with my

01:18  15  tentative.  In other words, I'm tentatively denying MGA's

01:18  16  motion on this.  I think Mr. Wagner may be barely skinning

01:18  17  through, but we'll see.  So if it's reserved, why don't we

01:18  18  just wait.

01:18  19       MS. HURST:  Well, so, here's the problem:  They're

01:18  20  gonna talk about the numbers.  And because several of the

01:18  21  numbers are subject to specific legal attacks, which in our

01:18  22  view should be granted, I would like the opportunity to

01:18  23  address at least a couple of issues.

01:18  24       THE COURT:  Do that quickly now, Counsel.

01:18  25       MS. HURST:  All right.

Case 2:04-cv-09049-DOC-RNB   Document 9606   Filed 01/07/11   Page 120 of 124   Page ID #:286090
CV 04-9049 DOC - 1/4/2011 - VOLUME I OF II

120

01:18  1          First of all, the trade secret reasonable royalty

01:18  2  is an equitable issue for the Court.  It's only reached if

01:18  3  proof of actual damages and unjust enrichment fails.  If

01:19  4  those two conditions are met, then the Court may consider

01:19  5  whether to grant a reasonable royalty.  So they shouldn't be

01:19  6  allowed to refer to trade secret reasonable royalty numbers.

01:19  7  And that's important because we're talking about a

01:19  8  $400 million number that gets added in, and it magnifies

01:19  9  everything.  And the risk of duplication and confusion is

01:19  10 enormous, especially when that's only a fall-back

01:19  11 alternative number that should only be considered by the

01:19  12 Court.

01:19  13         So they should be prohibited from talking about

01:19  14 trade secret reasonable royalty numbers, number one.

01:19  15         Number two, the "Barbie lost profits" figure.

01:19  16 Now, this depends on that regression analysis.  There's no

01:19  17 other basis for it.  Without the regression analysis, the

01:19  18 "Barbie lost profits" number goes away.  That's another

01:19  19 enormous number.  I mean, it varies somewhere between 4- and

01:19  20 $600 million.  Okay?

01:19  21         Now, it's a serious problem that they did this

01:19  22 regression analysis, the basis of that, for all the reasons

01:19  23 we've discussed.  The NPD data is not a reliable basis to do

01:20  24 a regression analysis.  They ignored all of the factors that

01:20  25 their own documents admit.  This is a counter-factual model

01:20   1   that cannot be sustained under *Kumho Tire* and *Daubert* and

01:20   2   the other authorities that we've cited.

01:20   3          What's really worse is that they had another way

01:20   4   of doing this, and they had other contemporaneous evidence

01:20   5   that was available to them to look at:  That new brand

01:20   6   cannibalization study that we've talked about so much.

01:20   7          Mattel paid for a statistically valid study to

01:20   8   understand the facts that Bratz was having on its various

01:20   9   products at the time.  They came up with an answer that they

01:20   10  don't like:  19 percent of a few limited product lines.

01:20   11         And so what they want to do instead is just ignore

01:20   12  that.  They want to ignore the evidence in the case and

01:20   13  construct this model, which is not reliable.  It's clearly

01:20   14  not reliable.

01:20   15         So, Your Honor, just, they're gonna put up big

01:21   16  numbers in opening.  And we're talking about maybe a 6-, 7-,

01:21   17  $800 million swing here on just these two, pretty

01:21   18  straightforward issues.

01:21   19         So, you know, at -- first of all, I think, before

01:21   20  we get to the point of putting Mr. Wagner on the stand,

01:21   21  we're gonna want to revisit this and have a real *Daubert*,

01:21   22  where you actually put him on the stand, nights and weekends

01:21   23  or --

01:21   24         THE COURT:  I think I will, also.  But it's your

01:21   25  motion.  And I'm not gonna preclude Mattel, in their

Case 2:04-cv-09049-DOC-RNB   Document 9606   Filed 01/07/11   Page 122 of 124   Page ID #:286092
CV 04-9049 DOC - 1/4/2011 - VOLUME I OF II

122

01:21    1    opening, putting up some numbers.

01:21    2         Now, Wagner may, in the last analysis, not be

01:21    3    testifying.  But at this point, I'm not ready to say that

01:21    4    he's not.  And I'm tentatively saying to you that, if we

01:21    5    push through this motion, I'm going to tentatively deny it.

01:21    6    All right?

01:21    7         Now, I'll give you that opportunity.  I'd love to

01:21    8    have Mr. Wagner in on a Saturday.  Okay?  It would be

01:21    9    thrilling.  But if we're pressing for a decision right now,

01:22   10    it's tentatively denied.

01:22   11         MS. HURST:  All right.  So I understand the

01:22   12    Court's ruling.  And we'll seek to renew the later -- motion

01:22   13    later.  But we -- we do object to them putting up big

01:22   14    numbers in opening that lack foundation.

01:22   15         THE COURT:  Well, you can imagine if Mr. Wagner

01:22   16    doesn't testify what happens.  I mean, the downside of that

01:22   17    is -- do we get down to 150 million, tops?  I can't quite

01:22   18    figure that.  But it's a substantial decrease.  So, you

01:22   19    know -- and what Mattel's really saying is they want to put

01:22   20    up the numbers that they're asking for so they don't shock

01:22   21    the jury later on.  I mean, that's their genuine thought.

01:22   22         The court's not going to take that away from

01:22   23    Mattel.  But by the same token, you know, I would love to

01:22   24    have a full-blown *Daubert* hearing concerning Wagner.  It's

01:22   25    just everybody's asking for decisions this evening.

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 1/4/2011 - VOLUME I OF II

123

01:22  1          Mattel's been very courteous, though.  They've

01:22  2    stated they're not going to mention Mr. Wagner by name.

01:22  3    They're going to come back and mention numbers.  Numbers

01:23  4    that they believe eventually will be substantiated by

01:23  5    Mr. Wagner.

01:23  6          So, it seems to me, that what we really ought to

01:23  7    be doing is simply reserving this.  But I'm not going to

01:23  8    preclude Mattel from putting up your numbers.

01:23  9          Okay?

01:23  10          MS. HURST:  Understood, Your Honor.

01:23  11          THE COURT:  Okay.  Do you want me to simply

01:23  12    reserve this and Machado's motion also?

01:23  13          MR. OVERLAND:  Yes.

01:23  14          MR. COTE:  Yes.

01:23  15          THE COURT:  Okay.  So I'll reserve.  That way we

01:23  16    can take a much closer look at this.  But I'll reserve

01:23  17    Number 30.  And I'll reserve Machado No. 3, I believe.

01:24  18          THE REPORTER:  Your Honor, can we take a break?

01:24  19          THE COURT:  Okay.

01:24  20          *(Pause in the proceedings at 1:24 p.m.)*

01:24  21          *(Further proceedings reported by Jane Sutton*

01:24  22    *Rule in Volume II.)*

11:13  23                    -oOo-

11:13  24

25

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB  Document 9606  Filed 01/07/11  Page 124 of 124  Page ID #:286094
CV 04-9049 DOC – 1/4/2011 – VOLUME I OF II

124

11:13  1                              –oOo–

11:13  2

11:13  3                           CERTIFICATE

11:13  4

11:13  5        I hereby certify that pursuant to Section 753,

11:13  6  Title 28, United States Code, the foregoing is a true and

11:13  7  correct transcript of the stenographically reported

11:13  8  proceedings held in the above-entitled matter and that the

11:13  9  transcript page format is in conformance with the

11:13 10  regulations of the Judicial Conference of the United States.

11:13 11

11:13 12  Date:  January 5, 2011

11:13 13

11:13 14
11:13
11:13 15  _____
11:13
11:13 16         DEBBIE GALE, U.S. COURT REPORTER
          CSR NO. 9472, RPR

11:13 17

      18

      19

      20

      21

      22

      23

      24

      25