SACV 04-9049-DOC - 01/04/2011 - Vol. II of II

1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

HONORABLE DAVID O. CARTER, JUDGE PRESIDING

- - - - - - -


MATTEL, INC., ET AL.,                    )
                                         )
            Plaintiffs,                  )
                                         )
       vs.                               ) No. SACV 04-9049-DOC
                                         )    Volume II of II
MGA ENTERTAINMENT, INC., ET              )
AL.                                      )
                                         )
            Defendants.                  )
_____)


REPORTER'S TRANSCRIPT OF PROCEEDINGS

Status Conference

Santa Ana, California

Tuesday, January 4, 2011


Jane C.S. Rule, CSR 9316
Federal Official Court Reporter
United States District Court
411 West 4th Street, Room 1-053
Santa Ana, California 92701
(714) 558-7755

11-01-04 MattelV2

Case 2:04-cv-09049-DOC-RNB   Document 9607   Filed 01/07/11   Page 2 of 78   Page ID #:286096
SACV 04-9049-DOC - 01/04/2011 - Vol. II of II

2

```
 1    APPEARANCES OF COUNSEL:

 2

 3    FOR PLAINTIFFS MATTEL, INC., ET AL.:

 4            QUINN, EMANUEL, URQUHART, OLIVER & HEDGES
              By:  JOHN B. QUINN
 5                 MICHAEL T. ZELLER
                   WILLIAM PRICE
 6                 Attorneys at Law
              865 South Figueroa Street
 7            10th Floor
              Los Angeles, California 90017-2543
 8            (213) 443-3000

 9

10    FOR DEFENDANTS MGA ENTERTAINMENT, INC., ET AL.:

11            ORRICK, HERRINGTON & SUTCLIFFE, LLP
              BY:  THOMAS S. MC CONVILLE
12                 Attorney at Law
              4 Park Plaza
13            Suite 1600
              Irvine, California 92614
14            (949) 567-6700

15            - AND -

16            ORRICK, HERRINGTON & SUTCLIFFE, LLP
              BY:  ANNETTE L. HURST
17                 Attorney at Law
              405 Howard Street
18            San Francisco, California 94105
              (415) 773-5700
19
              - AND -
20
              KELLER RACKAUCKAS, LLP
21            BY:  JENNIFER L. RACKAUCKAS
                   Attorney at Law
22            18500 Von Karman Avenue
              Suite 560
23            Irvine, California 92612
              (949) 476-8700

24

25
```

```
1    APPEARANCES OF COUNSEL (Continued):

2

3    FOR DEFENDANT CARLOS GUSTAVO MACHADO GOMEZ:

4              SCHEPER, KIM & OVERLAND, LLP
               BY:  ALEXANDER H. COTE
5                   Attorney at Law
               601 West Fifth Street
6              12th Floor
               Los Angeles, California 90071
7              (213) 613-4660

8              - AND -

9              LAW OFFICES OF MARK E. OVERLAND
               BY:  MARK E. OVERLAND
10                  Attorney at Law
               100 Wilshire Boulevard
11             Suite 950
               Santa Monica, California 90401
12             (310) 459-2830

13

14

15

16

17

18

19

20

21

22

23

24

25
```

SACV 04-9049-DOC - 01/04/2011 - Vol. II of II

4

1               **I N D E X**

2

3

4               STATUS CONFERENCE

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SACV 04-9049-DOC - 01/04/2011 - Vol. II of II

5

                    SANTA ANA, CALIFORNIA, TUESDAY, JANUARY 4, 2011

                              VOLUME II OF II

                              (1:29 p.m.)

          THE COURT:  Then we are back on the record.  All

counsel are present.  And we were having an informal

discussion concerning Mr. Bousquette.

          The Court's thought is that I think that counsel

are a little uncertain, and the Court is, whether

Mr. Bousquette has actually been served.  If he did make the

statement that he has not been served, we can resolve that

with Mr. Carpenter.  The -- if there is any difficulty, then

I think the Court will simply bring him down here on the

13th or the 14th as counsel, and we'll get that resolved

quickly.  I just can't imagine that Mr. Bousquette is going

to evade process.

          Well, I think we were on Exhibit Number 23, which

has been adequately argued.  24 was adequately argued last

evening.  But you reserved 25, and 25 has been reserved.  26

you had reserved.  That's been reserved by the Court.  27 is

Alex -- John Alex again, which is reserved.  Number 28 has

been reserved today, Jeff Kinrich.  29 has been reserved.

30 has been reserved.  We had gotten to 31.  Number 31 is

the report by Mattel's expert, Lee Loetz.

          MS. HURST:  And is there any reason to refer to

Mr. Loetz, if I may inquire, your Honor, or his work?

```
1              MR. PRICE:  No.

2              THE COURT:  Okay.  Reserved.

3              Number 32, testimony report by Mattel's expert,

4    Kenneth Hollander.  One of you blurted out yesterday that it

5    was excluded by Judge Larson.  Remember, this is a new

6    proceeding.  Many of the rulings I've made are synonymous,

7    and many of them are not synonymous with Judge Larson's

8    rulings.

9              MR. QUINN:  He was not excluded.  He just wasn't.

10             THE COURT:  So I'm going to cross out "not

11   excluded" and "excluded."  What was he?

12             MR. QUINN:  He was not excluded.

13             THE COURT:  He was not excluded.  He testified?

14             MR. QUINN:  No.  We ran out of time.  We were

15   waiting to call him, and we actually ran out the clock.

16             THE COURT:  What time limit were you given in

17   Phase 1?

18             MR. QUINN:  This was at the end of Phase 2.

19             MR. ZELLER:  Phase 1B.

20             MR. QUINN:  Phase 1B.  Was it 90 hours, 60 hours?

21   I can't remember.

22             MR. ZELLER:  Your Honor, that was reduced to, I

23   want to say, 78 hours.

24             THE COURT:  So it got reduced?

25             MR. ZELLER:  Right, he got reduced at one point.
```

```
 1                MR. QUINN:  We used it all up, whatever it was.

 2                THE COURT:  All right.

 3                Well, tell me about Kenneth Hollander.

 4                MS. HURST:  So, your Honor, he's done a survey

 5     which purports to show that girls recognize the Bryant

 6     drawings --

 7                THE COURT:  I'm sorry?

 8                MS. HURST:  That girls recognize the Bryant

 9     drawings as Bratz.  The only possible relevance this would

10     have would be to the intrinsic test for copyright

11     infringement.  The survey is completely defective because

12     it's suggestive of the results.

13                THE COURT:  Is this going to be mentioned?

14                MR. PRICE:  Not in opening, no.

15                THE COURT:  Let's reserve that.  In other words, I

16     can get him in here, hear his testimony.

17                Number 33 was withdrawn by Mattel.  Number 34,

18     though, which was reserved until today, is the testimony and

19     report by Mattel's expert, Heather McComb.  Help me with

20     her.  Who is she?

21                MS. HURST:  Isn't this the one -- I think this is

22     the one who says that Bryant's drawings were fully formed on

23     this one.

24                MR. MC CONVILLE:  Yeah.

25                THE COURT:  Remember, you can refer to these
```

1    areas.  Mattel is not being excluded in your opening

2    statement by, you know, damages amount that you wish to put

3    forward, that these images were fully formed, and I don't

4    want you in the embarrassing position, unless you choose to,

5    to be in a position of naming who that expert is, because if

6    they don't come in under Daubert, you still have a viable

7    opening argument.

8              But are you going to be referring to her?

9              MR. MC CONVILLE:  No, your Honor.

10             THE COURT:  Ms. Hurst, any reason not to reserve

11    this?

12             MR. MC CONVILLE:  Mr. McConville.  No, your Honor.

13             THE COURT:  Mr. McConville, okay.

14             MR. MC CONVILLE:  I just didn't want there to be

15    any confusion.

16             THE COURT:  Thirty-five is -- this is in an effort

17    to exclude Mattel from seeking to introduce purported

18    similarities of unprotectable elements.  This was reserved

19    until today.

20             MGA?

21             MS. HURST:  Yeah.  So, your Honor, under the Ninth

22    Circuit law, it's clear that when the Court instructs the

23    jury, the Court is going to be instructing the jury to

24    disregard the unprotectable elements.

25             THE COURT:  That's right.

Case 2:04-cv-09049-DOC-RNB Document 9607 Filed 01/07/11 Page 9 of 78 Page ID #:286103
SACV 04-9049-DOC - 01/04/2011 - Vol. II of II

9

1    MS. HURST:  And the problem is it's prejudicial

2  for Mattel to keep referring to similarities that we know

3  ultimately the Court is going to instruct them that they

4  should disregard.

5    THE COURT:  But how does that affect an opening

6  statement?

7    MS. HURST:  Well, I'm assuming they are going to

8  make some comparisons.  They are going to start in opening

9  statement, and they are going to continue through

10  examination of witnesses, and otherwise, to make

11  comparisons, both explicit and implicit.  And if what we

12  have for three months, before we get some instructions, is

13  them -- I mean, frankly, we could probably use some

14  pre-instructions on a couple of these issues --

15    THE COURT:  Well, I've been waiting for the

16  parties, including a brief colloquy about what the Court is

17  supposed to tell the jury.  Right now I'll just tell them

18  it's a criminal matter.

19    Just joking.  I'm just joking with all of you, but

20  unless you are going to give me that, I am just going to put

21  the jury in the box.  I mean, remember, how much information

22  you convey is really up to you.

23    MS. HURST:  So thank you, your Honor, and we will,

24  I think, jointly get back to you quickly with some of those

25  points.

1           THE COURT:  Probably in five minutes, probably.

2           MS. HURST:  Yeah.  In this regard, it's hard to

3    unring the bell after three months when the Court finally

4    instructs, and so we want them to be instructed not to make

5    comparisons about -- and the Court and the Ninth Circuit

6    both have already ruled a long list of things that are

7    unprotectable.

8           THE COURT:  Okay.

9           Mattel?

10          MR. PRICE:  Your Honor, the way this is going to

11   happen is they are going to see Bryant's drawings and they

12   are going to see the dolls.  And obviously we have to

13   compare the two, and it's fairly important to our claim of

14   trade secrets that we can show the comparisons.

15          THE COURT:  Of course you are going to be allowed

16   to do so.  The -- I'm going to tentatively deny MGA's

17   motion, at least as far as the noncomparison in opening

18   statement, you know, statements about the comparative

19   aspects.  Now, certain portions are obviously unprotectable

20   elements, but there are other elements, and I think it's

21   fair that you have the opportunity to alert the jury.

22          Thirty-six, I can't remember if we argued that

23   last evening.  It was striking the report of Frank Keiser

24   and precluding his testimony.  This was a 3D modeling sculpt

25   comparison.

```
 1              MR. QUINN:  I don't think we argued it, your
 2    Honor.
 3              THE COURT:  All right.
 4              MGA?
 5              MR. MC CONVILLE:  Are you going to refer to -- I
 6    don't know if you want to argue it or reserve.
 7              MR. QUINN:  Not opening.
 8              THE COURT:  All right.  Then simply reserved.
 9              Number 37, you did explicitly reserve, according
10    to my notes, till today, 38, 39 and 40, which we'll cover
11    next.  This is the effort in Number 37 to exclude any
12    evidence, arguments or other reference at trial relating to
13    the testimony that's beyond Mattel's interrogatory response
14    in copying.
15              So MGA?
16              MS. HURST:  I think this is resolved by the
17    Court's summary judgment order.  The Court has made clear
18    which dolls are in and which dolls are out.
19              THE COURT:  I thought so, too, but I wanted to --
20              MS. HURST:  Yeah, but this was filed before that,
21    so --
22              THE COURT:  Let's make sure.  I'm trying to make
23    certain that you have an adequate record and so does Mattel.
24              Mattel?
25              MR. PRICE:  Well, obviously we are not going to be
```

SACV 04-9049-DOC - 01/04/2011 - Vol. II of II

12

```
 1    making arguments concerning rulings you've already made.  I
 2    didn't know, reading the motion, whether it went beyond
 3    that.
 4               THE COURT:  My motion -- at least my rulings are
 5    absolutely clear in this regard.
 6               MR. PRICE:  Yes.
 7               THE COURT:  There should be no discussion, no
 8    controversy about that ruling.
 9               MR. PRICE:  And we agree.  I just wasn't sure
10    whether they were seeking more.
11               THE COURT:  Then this is moot, in light of the
12    Court's ruling.
13               Number 38 is the -- this is the motion to exclude,
14    brought by MGA, Mattel from seeking to introduce purported
15    similarities of unprotectable elements.
16               So Counsel?
17               MR. MC CONVILLE:  Your Honor, I believe we are on
18    number --
19               THE COURT:  Number 38.
20               MR. MC CONVILLE:  -- 38, and 38, actually, by my
21    notes, is related to our effort to exclude their ability to
22    call witnesses who are not identified.  So I thought you
23    described it as a --
24               THE COURT:  Oh, I have 38.  If you turn to page
25    29, if you look at -- my apologies.  I'm looking at the
```

```
 1    wrong -- and I'm sorry.  You are absolutely correct.  It's
 2    the order excluding testimony of Mattel's previously
 3    unidentified trial witnesses.
 4            And so let's go over those one by one, just as
 5    Mattel briefly did with their, I believe, seven witnesses,
 6    and my apologies to you for that.
 7            Okay.  So MGA?
 8            MR. MC CONVILLE:  So, your Honor, the Rule 26
 9    disclosures have not been supplemented by Mattel since
10    2000 -- January 2007.
11            THE COURT:  Chris Palmeri, let's find out what the
12    prejudice is here.
13            MR. MC CONVILLE:  Chris Palmeri is a journalist
14    who, I believe, is going to testify about statements Isaac
15    Larian made concerning who developed or who thought of
16    Bratz.
17            THE COURT:  This has been known by the parties
18    forever.  There is no prejudice here.  That's going to be
19    allowed.
20            Allison Willensky.
21            MR. MC CONVILLE:  As I understand it, your Honor,
22    she's going to testify concerning the value of trade secrets
23    taken by -- taken by the folks in Mexico.
24            THE COURT:  Mattel?
25            MR. PRICE:  Your Honor, Ms. Willensky was
```

SACV 04-9049-DOC - 01/04/2011 - Vol. II of II

14

1    identified --

2            THE COURT:  I can't hear you.

3            MR. PRICE:  I'm sorry.

4            Ms. Willensky was identified as a witness four

5    times in the interrogatory responses, and identified

6    numerous, numerous depositions, document productions.  And

7    MGA specifically sought, and was denied by the Court,

8    additional discovery from the witness that she's been --

9            THE COURT:  There is no prejudice here.  She'll be

10   allowed to testify.

11           Omar Cavassuto?

12           MR. MC CONVILLE:  He, likewise, is -- is similarly

13   situated to Ms. Willensky, your Honor, with regard to the

14   issue of whether these people were disclosed.  So in their

15   interrogatory responses, they say, "People who have

16   information concerning trade secrets include the following,"

17   and then they list literally hundreds and hundreds and

18   hundreds of people.  So we don't know -- we didn't know who

19   these people were until we got the witness list.

20           THE COURT:  Okay.  And the prejudice?

21           MR. MC CONVILLE:  Apparently they are going to be

22   testifying about trade secrets.  I don't know exactly what

23   they are going to be saying.

24           THE COURT:  Okay.

25           Counsel for Mattel?

1          MR. PRICE:  This individual was identified as a
2    potential witness five times in interrogatory responses,
3    identified in depositions, document productions.  And they
4    were talking about Omar --
5          MR. MC CONVILLE:  No, no.  I'm sorry, it was
6    Omar --
7          THE COURT:  Omar Cavassuto.
8          MR. PRICE:  Cavassuto, okay.
9          And MGA specifically sought, and was granted,
10   additional discovery from the witness.
11         THE COURT:  I just don't recall.
12         MR. MC CONVILLE:  I honestly don't know who the
13   guy --
14         THE COURT:  We'll look back in the records.
15   That's something we should be able to find.  I just don't
16   recall sitting here today.
17         Alberto Morales?
18         MR. MC CONVILLE:  Same thing, your Honor, witness
19   related to trade secrets, but this one relates to a Canadian
20   person, Jeanine Brisbois, same thing, buried in a huge
21   interrogatory response, so we don't know what issues Alberto
22   Morales is going to be testifying to.
23         MR. PRICE:  She's identified nine times in
24   interrogatory responses, identified in depositions, document
25   productions, and we're going to check.  We believe

1    MGA sought and was granted discovery --

2              THE COURT:  I think the complaint by MGA is this

3    idea of litigation to death and the flood of information

4    coming in.  So on one hand, MGA may have adequate

5    information, but without narrowing it, each side was given a

6    number of limited depositions by this Court, 25 to start

7    with, and later I expanded that while we waited for the

8    Ninth Circuit.

9              So why can't these people be deposed?  There is no

10   reason.

11             MR. PRICE:  Your Honor, I don't think we would

12   have any problem if we can also depose the witnesses that

13   they --

14             THE COURT:  No.  This isn't bargaining, now.  Just

15   a moment.

16             MR. PRICE:  I think it would be fair if both

17   sides had that opportunity if they wanted to.

18             THE COURT:  There's bargaining.  Why can't these

19   people be deposed?

20             MR. PRICE:  I don't know of any reason.

21             THE COURT:  Okay.

22             MR. ZELLER:  We can certainly check.

23             THE COURT:  Sure.

24             And now to be fair to the other side also, why

25   can't these people who are supposedly a surprise and

1   prejudicial be deposed?  This is a four-month trial.

2          MR. MC CONVILLE:  The one issue of prejudice that

3   I see, your Honor, is that we are trying to prepare for

4   trial, and we are going to be diverted --

5          THE COURT:  Well, $140 million to one law firm and

6   $120 million to the other, you have adequate resources.

7   It's ridiculous that you don't have resources.  With three

8   or four associates on one side and three or four associates

9   sitting in the court on the other side, let alone lead

10  counsel, you all have enough resources.

11         Okay.  Why don't you meet and confer on these

12  witnesses.

13         In other words, Mattel, you really do need to

14  decide who, in fact, is going to be called, and I expect

15  that answer by tonight, okay?

16         You really need to decide concerning that other

17  motion, MGA, who of those seven are you really going to

18  call, and then let's get down to a deposition schedule.  If

19  you think one of you have been biased or prejudiced, you can

20  find out what those people are going to say.  We'll limit it

21  to five to seven hours at the most.  We'll get the special

22  master involved again, okay?

23         And that would be fair to both sides.  There is

24  not going to be any prejudice.  It's hard to find prejudice

25  in a case that's taken this long, with this many people,

Case 2:04-cv-09049-DOC-RNB   Document 9607   Filed 01/07/11   Page 18 of 78   Page ID #:286112
SACV 04-9049-DOC - 01/04/2011 - Vol. II of II

18

```
 1   with this many depositions that's going to take four months.
 2   We've got time to sort out these witnesses.  And when I gave
 3   25 depositions, Mattel was asking for many more.
 4            Mr. Zeller, I think you were asking for 5,000.
 5            MR. ZELLER:  I think it was 50, but if I thought I
 6   could get away --
 7            THE COURT:  MGA was asking for zero, and I came up
 8   with about 25.  But to be fair to both sides, if you're
 9   really going to call a couple of additional witnesses, we
10   can get those depositions going.  They are de minimis in
11   number.
12            So why don't you meet and confer and tell me
13   sometime today or tonight who you really think you are going
14   to call for each side, and then we'll get the depositions
15   going with them; fair enough?
16            MR. MC CONVILLE:  Yes, sir.
17            THE COURT:  Okay.  And see, the nice thing is that
18   doesn't have to take place right away.  These people don't
19   have to get on the stand until they are deposed.
20            The other techniques I've used in the criminal
21   matter is we simply let them testify on direct and send them
22   home.  The other side gets to prepare about what they've
23   said on direct, and we call them back in a day or two when
24   you're ready.  It's another technique we can use.  It really
25   speeds things along.
```

1           What you usually find is that most of the

2    witnesses don't say enough important things to be concerned

3    about, and you want to have continuity, so you cross-examine

4    anyway.  In other words, they really haven't been harmful,

5    so it's a tempest in a teapot.

6           So on 38, you are going to meet and confer and

7    tell me sometime today or tonight which witnesses, and that

8    refers back not only to 38 but help me with the prior

9    motion.  What was the number that Mattel had brought?  I've

10   got it here in my notes.  Just a minute.  It would be

11   number --

12           MR. MC CONVILLE:  Number 24, your Honor.

13           THE COURT:  Number 24, yeah.  Thank you.

14           That would be as to Foti, Machado Senior, Oats,

15   Ortega, Olson, Dubois, Caldera, and the simple ruling by the

16   Court that's very effective is they don't take the stand

17   until they've been deposed, so that gets everybody very busy

18   very quickly, and that way there are no surprises.

19           Once again, we know all of the objections, we know

20   the order of witnesses, we know every objection to every

21   piece of evidence, and the jury then is working from 8:00 to

22   5:00.

23           All right.  Number 39.  Number 39 is the motion in

24   limine to exclude certain testimony of Brian Wing.

25           MS. HURST:  Actually, it's they weren't

1    made-for-hire, your Honor.

2              THE COURT:  Okay.

3              MGA?

4              MS. HURST:  Your Honor, the weren't made-for-hire

5    theory of ownership, after six years of litigation, was

6    disclosed for the first time in an interrogatory response

7    served on September 10th.  This is a different theory of

8    ownership.

9              It's never been pled, and by the time it was

10   disclosed on September 10th, it was too late for us to go

11   back and redepose every witness who's pertinent to this

12   issue, and it was too late for us to solve this problem.

13   There is actual prejudice here.  Let me just give you one

14   specific example.

15             There is a guy named Ron Longsdorf, who was

16   Bryant's supervisor for a substantial period of the time

17   during his second stint at Mattel.  He is outside the

18   subpoena power of the Court.  As best we can tell, he lives

19   in Ohio.  He was never deposed.  His computer was not

20   preserved by Mattel as part of their document preservation.

21   Now, a supervisor is obviously a critical person if the

22   theory is going to be that it was within the scope of his

23   job duties.

24             And there are other examples like this, a Heather

25   Fonseca, all of the people who were deposed in Phase 1 were

 1    deposed without regard to the work made-for-hire theory, so

 2    this was an enormous expenditure of resources which were

 3    conducted without benefit of this theory, which they have

 4    always known was available to them if it were true.

 5          So what now we have to do is we're guessing, so

 6    that's prejudicial, but beyond that, we are going to have to

 7    take time and try to reconstruct whatever he worked on with

 8    their witnesses, and we don't know if they have foundation

 9    for it or not because we were never able to depose them on

10    this stuff.

11          So it's going to be -- it's going to take extra

12    time with the Court.  It's going to be -- it's prejudicial

13    to us because it's all a shot in the dark.  We've got

14    missing evidence and witnesses who are outside the trial

15    subpoena power of the Court, and there is no reason why if

16    from day one they thought this was part of his job duties,

17    they couldn't have pled this and made it clear.

18          THE COURT:  Okay.

19          Mattel?

20          MR. PRICE:  Your Honor, first, in your complaint,

21    you're not required to plead theories.  In fact, in a notice

22    pleading, you're supposed to plead facts and a request for

23    relief.

24          THE COURT:  Change to 1938, do you know the

25    history of that?

1         MR. PRICE:  I don't.  Well, I did in law school.

2         THE COURT:  Mr. Zeller does.  Well, the history

3    was that before notice pleading, it was so cumbersome and so

4    finite that litigants were actually being denied access to

5    the Court.  It was so procedural bound, in a sense, up until

6    1938, that there was inequity.  The wealthy, let's say the

7    more well-endowed defendants -- plaintiffs and defendants

8    could really out-resource the other side, and it became a

9    machination and a game of pleading particularity.

10        And in 1938, that substantially changed.  That's

11   why we have notice pleading.  The history is really

12   interesting if you look back through the court system.  And

13   a notice pleading has really provided a balance so that

14   litigants who are not as well financed could get into court

15   on coequal footing.

16        Apparently, the two litigants before the Court are

17   very well financed, but why don't you continue on.  There is

18   your history of notice pleading.

19        MR. PRICE:  With respect to discovery responses,

20   MGA did not ask until August of this year or September of

21   this year what our legal theories were.  They asked what the

22   facts were, and --

23        THE COURT:  Well, they asked quite a while ago.

24   They asked I think literally the first night that they came

25   into my court and we went until about 10:00, and you weren't

1    counsel at that time.

2          MR. PRICE:  I wasn't there.  I'm talking about the

3    interrogatories.

4          THE COURT:  You might defer to Mr. Zeller for a

5    moment on this because you are wrong.

6          MR. ZELLER:  As a matter of fact, Judge --

7          THE COURT:  It happened within a week, I know

8    that.

9          MR. ZELLER:  And we absolutely disclosed that, and

10   this is what they are complaining about.  And one thing

11   about just factually what's occurred here in terms of

12   discovery, and we can provide the transcripts to the Court

13   because these go back to the very beginnings of the case.

14         MGA, in fact, aggressively pursued discovery of

15   Carter Bryant's coworkers and supervisors, his direct

16   supervisors from both stints in order to take discovery on

17   exactly what his scope of his duties were for Mattel.  That

18   has been a theme and an argument of theirs from the very

19   beginning.  It's the same issue here.

20         And as a matter of fact, these were also

21   witnesses, who like Cassidy Park, his supervisor at trial,

22   and this got down, in fact, into the project level, contrary

23   to what MGA is now saying.  There's, in fact, copious

24   testimony by Mr. Bryant, by his supervisors, his coworkers

25   about the projects he worked on when he was at Mattel.

```
 1              The person that they are mentioning, Joe Frankie

 2    was his name, in fact, left Mattel before Carter Bryant even

 3    left, and he was -- he was -- he was levels removed.  I

 4    can't recall exactly how many levels he was removed from

 5    Mr. Bryant, but Mr. Bryant's immediate supervisors were

 6    deposed, so those are the people who would have the actual

 7    knowledge and the facts about the scope of Mr. Bryant's

 8    duties.

 9              And of course, MGA had available to it for years

10    unfettered access to Mr. Bryant to determine exactly what he

11    did and -- while he was working with Mattel with respect to

12    the scope of his duties.

13              So the idea that somehow they were blindsided by

14    this and didn't have access to this information is refuted

15    by a very long record.

16              THE COURT:  Okay.  Number 40 is the motion to

17    exclude certain testimony of -- it's been pointed out to me,

18    maybe this issue is moot if the jury finds ownership under

19    the agreement and does not need to reach work for hire.  In

20    other words, maybe we can defer the issue until the jury

21    verdict.

22              What are your thoughts?

23              MR. PRICE:  Are you asking about Mr. Wing's

24    testimony or --

25              THE COURT:  Yes -- no, no, no.  I'm sorry.
```

1          MR. PRICE:  I thought you were going back to him.

2          MR. ZELLER:  Oh.

3          THE COURT:  This is Number 39 concerning work

4     made-for-hire theory of ownership, it's on page 30.

5          MR. ZELLER:  I think it's a little -- I mean while

6     perhaps the terminology "work made-for-hire" may not be

7     used, I wouldn't expect necessarily that's something that

8     would be thrown out at the jury.  I think certainly talking

9     about the fact that this is something that Mr. Bryant did

10    and what was expected, and it was part of his job.  They,

11    Mattel, were to make dolls and the like, and I would expect

12    is going to be the subject of opening statement.  I mean,

13    the bare minimum, anticipatory of MGA's arguments that the

14    man really didn't perform those kinds of responsibilities

15    while at Mattel.

16         THE COURT:  Let me take two more motions, and

17    then, Ms. Keller, we're going to find out about your

18    representation formally on the record for a moment, and if

19    you're coming into this case or not.

20         I'm sorry, and Counsel, it was my inartfulness, we

21    are now on Motion Number 40 by MGA, and that is to exclude

22    certain testimony of Brian Wing.  And I apologize, I started

23    there and then I backed up to made-for-hire.  That was the

24    confusion.

25         So Mr. Price.

1          MR. MC CONVILLE:  It's our motion, your Honor, if

2    I can --

3          THE COURT:  Well, MGA.  I'm sorry.

4          MR. MC CONVILLE:  Thank you.

5          Briefly, your Honor, essentially this is Brian

6    Wing again, the testimony that we are seeking to exclude is

7    not pled in any allegations in the complaint.  It is -- his

8    testimony is -- lacks foundation because it's speculation

9    because when pressed, he doesn't know that about which he is

10   providing testimony and --

11         THE COURT:  Isn't that a question-and-answer

12   situation, though?

13         MR. MC CONVILLE:  Well --

14         THE COURT:  In other words, it's so overly broad

15   at this point, it's hard for the Court to rule on it.

16         MR. MC CONVILLE:  We did provide specific areas.

17         THE COURT:  Well, you did, but those specifics

18   then become a general ruling and --

19         MR. MC CONVILLE:  I hear what you are saying, your

20   Honor.

21         THE COURT:  I'm going to delay this.  This is

22   going to be moot.  I'm going to not rule against you.  I'm

23   simply going to deem it moot at the present time and rule by

24   question and answer concerning foundation.

25         The -- 41 is the bifurcation of punitives, and

1    that, I think, I'm going to follow the wise advice of

2    counsel and grant, and I think I made a misstatement.  Let's

3    go back to the other bifurcation issue because I may have

4    turned that around with Exhibit 41.  Can you help me with

5    that other bifurcation?  In other words, I think I made a

6    statement and it may be an incorrect statement on this

7    record concerning the wisdom of following counsel's advice.

8    I think it's number 16.

9            MR. MC CONVILLE:  No, your Honor.  16, you

10    actually did state that it related to bifurcation, but 16,

11    in fact, relates to the Omni 808 and whether any evidence

12    concerning the underlying purchase by Omni would be allowed.

13            THE COURT:  You are correct.  So 16 has been

14    adequately argued, and if I did make a statement concerning

15    16 last time, which is my memory, it's an incorrect

16    statement.  I meant to refer to Exhibit 41, so I'll decide

17    16.

18            All right, now, I think that tentatively that's a

19    run through of MGA's motions.  That leaves the Dauberts and

20    some motions brought by Mattel, but before we go any

21    further, Ms. Keller, let me pay you the courtesy.  You've

22    been here all day, and let the record reflect that you've

23    been attentive and observant.  And it's your request now to

24    become counsel of record.

25            MS. KELLER:  Yes, your Honor, it is.

```
1              THE COURT:  Can you come to the lectern for a

2     moment so we can address this issue.

3              Of course you are welcome in the court.  You know

4     that we've had a past discussion about your readiness and

5     your ability to proceed --

6              MS. KELLER:  Yes, your Honor.

7              THE COURT:  -- on jury selection on the 13th and

8     opening statements on the 18th.  I've already made the

9     ruling, and we'll reiterate that ruling in a few moments,

10    that the Court's not going to continue this matter unless

11    the Ninth Circuit stays this Court.

12             Now, under those circumstances, and even objecting

13    to that ruling, are you still coming in as counsel of

14    record?

15             MS. KELLER:  Yes, your Honor, I am.

16             THE COURT:  And knowing that I'm not going to

17    continue this matter, are you still coming in as counsel of

18    record?

19             MS. KELLER:  I am, but --

20             THE COURT:  Okay.

21             MS. KELLER:  -- I would -- if I can just take one

22    moment for the record.

23             THE COURT:  You can in just a moment.  You'll find

24    that I'm very patient but maybe not on your schedule.

25             What's the change between your inability on
```

1    December 21st, 22nd and 23rd and your unwillingness to come

2    in in light of the Court's ruling and your ability to come

3    in today?

4              MS. KELLER:  Well, in either event, your Honor, it

5    was my and is my opinion that --

6              THE COURT:  No.  Just a moment.

7              (Interruption in the proceedings.)

8              THE COURT:  Counsel, I need to take a brief

9    recess.  I've got to take a matter that is an emergency by

10   phone.  If you would just remain for a moment.  Think of the

11   explanation why you are able to come in today and you

12   weren't before.

13             (Recess.)

14             THE COURT:  We are back on the record.  All

15   counsel are present, MGA and Mattel.

16             And Ms. Keller, one of the things I've reflected

17   upon is perhaps my question is inappropriate because that

18   might go into a relationship with you and Mr. Larian, but

19   there's certainly been a change from December 23rd and your

20   inability or unwillingness to come into the case, and your

21   willingness to come into the case even with the Court's

22   forewarning today about the Court proceeding, you know,

23   forward.

24             And a couple disadvantages:  First, the hours.

25             MS. KELLER:  Yes, your Honor.

1          THE COURT:  So you're forewarned about the hours.

2          MS. KELLER:  I'm planning to lose some weight.

3          THE COURT:  I already have.

4          Second, I'm willing to expand the number of

5     attorneys temporarily to accommodate what I call the need

6     for you to catch up.  In other words, Ms. Hurst would

7     remain.  I haven't excused Orrick yet.  Mr. McConville will

8     remain.  You've got esteemed counsel representing

9     Mr. Machado --

10         MS. KELLER:  Your Honor, if I may.  I think maybe

11    there is a misunderstanding.  The difference between now and

12    earlier is I'm not substituting in for Orrick.  We've all

13    agreed to work together.  We have all agreed to

14    cooperatively represent Mr. Larian and MGA.

15         THE COURT:  Let the record reflect the knives have

16    been put away.

17         MS. KELLER:  And I think it was your Honor's

18    exhortations and the fact that Ms. Hurst and I discovered

19    our mutual love of dolls.

20         THE COURT:  All right.

21         MS. KELLER:  But that's a material difference.  I

22    knew that I could not simply substitute into the case

23    without the assistance of Orrick.

24         THE COURT:  I see.

25         MS. KELLER:  And unless we had a substantial

1   continuance, and we had another, for example, Skadden come

2   in.

3           THE COURT:  So you had a meeting anyway with

4   Orrick, there is some accommodation here?

5           MS. KELLER:  Yes.

6           THE COURT:  Because on the last occasion, it was

7   of interest because Orrick was trying to withdraw.  I denied

8   that.  I didn't even know if that was an ethical issue or

9   violation, but I knew that Mr. Larian was not going to

10  remain without counsel.  I was not allowing Orrick to

11  withdraw after this long representation.  Ms. Glaser had

12  been invited to come into this case.

13          MS. KELLER:  Those differences have been resolved.

14          THE COURT:  Okay.

15          MS. KELLER:  And --

16          THE COURT:  So you have the support of Orrick?

17          MS. KELLER:  Absolutely, yes.

18          THE COURT:  Who are my two lead counsel, then?

19          MS. KELLER:  Mr. McConville and I, your Honor.

20          THE COURT:  Okay.

21          MS. KELLER:  But we do need, I think given the

22  complexity of the case, the substantial assistance of

23  Ms. Hurst, which is why I inquired of the Court if the Court

24  would allow each side to have an attorney to handle motions

25  as they arise and to sit at counsel table with us.

Case 2:04-cv-09049-DOC-RNB   Document 9607   Filed 01/07/11   Page 32 of 78   Page ID
#:286126
SACV 04-9049-DOC - 01/04/2011 - Vol. II of II

32

 1            THE COURT:  Yes.

 2            MS. KELLER:  And that sounded like it was also

 3     agreeable to Mattel.

 4            THE COURT:  I'll accommodate both sides.  The only

 5     thing that I was concerned about when I got the case was I

 6     didn't think that there had been case management from the

 7     respective law firms.  That what the partners had basically

 8     done, and I'll say that bluntly -- well, no, let me make

 9     sure -- they've done an excellent job.  Counsel have been

10     absolutely exemplary, but what may have happened is that

11     because there wasn't a strong hand from the litigation

12     attorneys, that numerous associates were given free reign,

13     quite frankly, to go out and with resources from both the

14     law firms, to vigorously pursue these matters.  And what

15     started occurring was that apparently they had been allowed

16     to file literally 800-page motions, interrogatory process

17     had been abused before, the privilege logs for both parties

18     had been abused, quite frankly.  That's no reflection upon

19     present counsel.

20            And it appeared to me when I got this case that

21     there had to be sole responsibility and it had to be

22     centered between two lead counsel for each side, that's why

23     we have these conditions.  Therefore, I know exactly where

24     the responsibility lies.

25            Now, Mr. Quinn has suffered immensely.  He is the

Case 2:04-cv-09049-DOC-RNB   Document 9607   Filed 01/07/11   Page 33 of 78   Page ID #:286127
SACV 04-9049-DOC - 01/04/2011 - Vol. II of II

33

1    partner of a major, major firm, and that's why I was a

2    little astounded that Patty Glaser couldn't come in with

3    120-person firm because she lacked resources or whatever.

4    That's up to Ms. Glaser, she has not been excluded.  She's

5    been invited.  She's made that choice.  But Mr. Quinn has

6    suffered the same detriment.  He has a 400-plus person firm

7    and he's here.

8         I think that the second thing that happened is you

9    know that the demand that I've got, and that is, I want to

10   know each witness, I want to know the order of witnesses, I

11   want to know each piece of evidence before that witness ever

12   takes the stand, and I want to know each objection.  And

13   that's what's going to require and has required these long

14   hours, and that's why I keep saying that you shouldn't

15   expect leaving court until 10:00 at night on any given

16   night, and you should expect to be here every Saturday.

17        Now, I can make bad rulings having all that wisdom

18   imparted to me, but I prefer to make good rulings if I can,

19   and the more you give me, the better my rulings will be.

20        The second thing is, the law firms apparently have

21   gone to war in this matter, and they can pursue each other

22   as long as they want to, but when the jury comes in, that's

23   a hard-working American jury, and they are not to be

24   inconvenienced by side bars and nonpreparedness on my part

25   or counsel's part.

Case 2:04-cv-09049-DOC-RNB   Document 9607   Filed 01/07/11   Page 34 of 78   Page ID #:286128
SACV 04-9049-DOC - 01/04/2011 - Vol. II of II

34

1    When they come in at 8:00 in the morning, they're

2    working at 8:00 and go home at 5:00, and for us to be out in

3    the hallway for an hour or two discussing some unresolved

4    matter or some matter not foreseen by the Court or raised by

5    the parties, that takes the adversarial system and that

6    hard-working jury who are just common folks who literally

7    come into this case for three to four months of their lives

8    and really treats them with discourtesy, and it's a waste of

9    the taxpayer's resources.  So we'll devote as much time as

10   you need, but I just demand that everybody is prepared.

11         And with that, you know, forewarning, you're

12   certainly welcomed on to the case.  So you're counsel of

13   record.

14         MS. KELLER:  I appreciate that, your Honor.  And

15   your Honor, speaking of the jury, since we won't be seeing

16   your Honor again until voir dire, does the Court -- my

17   understanding is the Court does give attorney voir dire.

18   Does the Court want any topics submitted in advance, are

19   there any limitations --

20         THE COURT:  Let's set out the rules again and then

21   we'll take a break for my 3:00 call.  I want to give you as

22   much latitude as possible, but when I have parties who can't

23   reach the simplest of agreements, then what you've taught

24   the Court is to be overbearing and to be a disciplinarian.

25   And these parties, for whatever reason, and I don't think

1    it's the attorneys' faults, haven't been able to reach even

2    the simplest of agreements.

3            So the schedule is this:  There is already a

4    five-page questionnaire that's been prepared that everybody

5    has agreed to.  I think you know this, but let me make sure

6    you do for the record.  That is going to be distributed

7    tomorrow morning to 80 jurors who are coming in.

8            THE CLERK:  I need to talk to you about that.

9            THE COURT:  Well, talk to me now.

10           *(Court clerk discussion held off the record.)*

11           THE COURT:  Well, that questionnaire was decided

12    upon a long time ago, and let's print that out once again

13    for counsel.

14           And Ms. Hurst, you prepared that along with

15    Mr. McConville.

16           MS. HURST:  Yes, your Honor.

17           THE COURT:  Mr. Machado's counsel did.  It was

18    agreed upon by --

19           MR. COTE:  That's right.

20           THE COURT:  -- and also with Mattel, so I'm not

21    going to reinvigorate that now because you're new counsel.

22           MS. KELLER:  No, your Honor.  I'm aware of that.

23           THE COURT:  I want you to see it.

24           MS. KELLER:  I've seen it.

25           THE COURT:  I wanted to get started literally

1    tomorrow, but counsel persuaded me, and I think they are

2    right, that a questionnaire of five pages or so with

3    questions would be very helpful to them.

4            So when we distribute the questionnaire tomorrow,

5    we'll copy those within the court system, and we'll

6    distribute them at 4:00 on Friday.  That way you've got

7    Saturday, Sunday to look at those.

8            Mr. Larian said he was going to the Hong Kong toy

9    fair, which is his livelihood.  I don't know if Mr. Eckert

10   is there, but apparently it's a huge event in the toy

11   industry.  I think it was represented that your client

12   wasn't returning until Monday night or Tuesday, I can't

13   remember, so I thought if you as counsel had Saturday and

14   Sunday --

15           Give this to counsel.  Just show it to them.

16           Saturday and Sunday and then possibly Monday, you

17   could have the participation of Mr. Larian or Mr. Eckert on

18   Tuesday and Wednesday.  And if you had jury consultants, you

19   had time to talk to your jury consultant by Monday, for

20   instance, so I arbitrarily picked next Thursday.  I could

21   have done that on Wednesday, but thought why not make it

22   Thursday?  And why stick counsel with an opening statement

23   on Friday when the jury just goes away for a three-day

24   weekend?

25           And so because of the length of the case, I

1    thought it was courteous to the parties that we selected the

2    jury Thursday, that I literally was going to give you Friday

3    off to make certain that you prepared your opening

4    statements with finality, and that we'd have that opening

5    statement at the beginning of the week on the 18th.  That's

6    why the schedule was set up; it was to accommodate the

7    parties.

8            Second, we never agreed upon a break, but usually

9    counsel start having problems, because of the hours and the

10   pace, about the fourth to the sixth week.  I've got to be

11   careful and watch all of you and make sure you're on your

12   best performance, that the hours I'm keeping aren't causing

13   such a depravation that you can't present a cogent case.

14           We've never decided when a recess would come for a

15   week or two, but there's going to be a week or two recess,

16   and we'll talk to the jury about that.

17           We also decided that there would be six jurors,

18   ten alternates.  I could go with eight jurors and a number

19   of alternates, but the code really prescribes six, and I

20   thought that that was a fair number.

21           Lastly, I think, from your standpoint, each side

22   had three preemptories.  Initially I was going to give six.

23   I thought the Machado's position, although they sat as a

24   party at the present time with MGA, might change during the

25   course of the proceedings, and I could think of a number of

1  scenarios without enunciating them on the record where

2  Machado could be contradictory to MGA's perspective.

3         Mr. Overland assured me that he also subscribed to

4  three preemptories rather than six.  Mattel has always

5  wanted six.

6         What overhangs that decision was the reference by

7  a juror apparently in Phase 1 during a verdict phase,

8  towards the end of the verdict, to Isaac Larian being an

9  Iranian Jew and that he shouldn't be believed because of

10  that ethnicity or heritage.

11         The ruling was made by the prior court that

12  because that came at the late stage of the deliberation

13  process, that the verdicts would be accepted by the court.

14  I have no quarrel with that decision, but I am personally

15  concerned that that juror was obviously so biased, that that

16  juror participated in those deliberations for that entire

17  period of time giving input with that stark bias, and then

18  in a sense, because the statement was made at the end, it

19  just calls into question the whole process, from my

20  standpoint.

21         That had nothing to do with my motion for granting

22  a new trial in its entirety, but that concern by MGA has

23  caused them to always ask for three preemptories believing

24  that six preemptories gave an advantage to Mattel and that

25  they would start weeding out.  Now, I don't believe that on

1    Mattel's part, but since the code calls for three, we've got

2    three preemptories on both sides.

3            That's why I know we are going to get a jury on

4    Thursday.

5            With the alternates, we've got four preemptories

6    by agreement, if my memory is correct.  In other words, for

7    those 10 alternates, we have four preemptories, and we'll

8    call those 10 alternates at the same time, because you and I

9    know as good trial counsel, you are not only looking at who

10   you've got, you're also looking at the audience and who is

11   left.

12           So I think those are the initial decisions that

13   have been made so far.

14           MS. KELLER:  The only question I have, your Honor,

15   is whether the Court was going to, in addition to the

16   questionnaire, allow any follow-up attorney voir dire?

17           THE COURT:  Yes, if I see the questions.

18           MS. KELLER:  Does the Court want us to have a list

19   of questions to give the Court when the Court returns?

20           THE COURT:  Yes.

21           MS. KELLER:  Okay.

22           THE COURT:  And I would expect that each of you

23   might want me to ask the sensitive questions.

24           Now, the problem is all of those questions have

25   already been asked in the questionnaire concerning race,

1    ethnicity, those questions that are of concern to MGA.  And

2    the questions that concern Mattel have already been asked,

3    and so I'll give you a quick story that counsel will

4    remember, like The Rocky Horror Picture Show.

5            Remember in the 19- -- well, you know, you're too

6    young.  But in 1976 or '77, when the Deukmejian death

7    penalty came into effect for nine months, and then the

8    proposition came back, nobody knew what to do with

9    Witt-Witherspoon questions, and the problem is that most us

10   or many of us believed that Hovey voir dire was appropriate

11   on a one-to-one basis, and on a death case, you take a juror

12   one at a time, because of the expressed bias, there was no

13   audience, so if you schedule 15 in the morning and 15 in the

14   afternoon, and somebody said, you know, I'm racist, I don't

15   believe in a particular group, the audience wasn't hearing

16   that.

17           At one point, one of the judges in the court was

18   persuaded by other colleagues to go at a faster pace, and

19   during a selection process with over a hundred jurors in the

20   audience, one of the jurors was asked the question about

21   fairness, and the juror stood up, literally stood in the

22   box, and said, "I'd kill every son of a bitch out there and

23   execute them because my sister was raped and murdered."  How

24   do you unring that?

25           So will I give you time?  I will.  But what I

1    won't do is grant you a new trial giving you that

2    opportunity if you get a response from the jury and the

3    general audience that harms your case, and then you ask the

4    Court to step in.

5            So I believe two things as a trial counsel:

6    First, it's not only the way the jurors respond to you, but

7    you have an innate and intuitive ability as counsel to just

8    make that gut decision of whether you believe their

9    response, and nobody trains us to do that as trial counsel,

10   that's how we make our living.  So it's important that you

11   can ask questions and it's important that they can respond.

12   The question is how long.  You've got about 15 to 20

13   minutes.

14           MS. KELLER:  And I assume that's per side?

15           THE COURT:  Per side.

16           MS. KELLER:  That's all I wanted to know, your

17   Honor.

18           THE COURT:  Yeah, about 15 to 20 minutes, because

19   the questionnaire is so thorough, it answers all of the

20   questions.  So I guess the response is, you can strut a

21   little bit, but you can't ingratiate, and I want the

22   follow-up questions that are really pertinent to the

23   questionnaire, no hypotheticals, no questions about the law.

24   The standard of reasonable doubt, what it means, et cetera,

25   circumstantial evidence, no.

```
 1            MS. KELLER:  I definitely won't ask about
 2   reasonable doubt or anything else.
 3            THE COURT:  Maybe preponderance of the evidence.
 4            MS. KELLER:  Or that.
 5            THE COURT:  Now, lastly, if you want me to
 6   pre-instruct, I haven't seen any requests for
 7   pre-instruction so far.  Counsel need to get together, I
 8   would be happy to pre-instruct, but what I won't do is get
 9   into a debate.  So anytime these counsel have been able to
10   cooperate, you'll probably get a yes, and you saw that
11   today.  I backed off no bifurcation.  Decided to bifurcate.
12            So how this trial proceeds is really in your
13   hands, because everything from this point forward is up to
14   you.
15            Now, one of the initial roadblocks they have
16   already run into is this problem of the exhibits that
17   counsel had hoped to show, at least for Mattel during their
18   opening statement.  I can't afford to go through each one of
19   those exhibits and make an evidentiary ruling on them, so I
20   said to counsel, if you both agree, you can put on a
21   PowerPoint.  If you don't agree, then it's a no exhibit case
22   in terms of opening statement, because I haven't made
23   evidentiary rulings yet.
24            Now, any other questions?
25            MS. KELLER:  No.  Thank you very much.
```

1           THE COURT:  Okay.  Then --

2           MR. QUINN:  Your Honor, can we submit to the Court

3    tomorrow our proposed attorney voir dire?  I understand that

4    the Court wants to see that in advance.

5           THE COURT:  Nope.  You'll both agree upon it.  In

6    other words, you'll exchange that with each side.  I am not

7    going to go through a whole voir dire list of objections by

8    the other side to questions.  It's of no import to me.  I've

9    given you a questionnaire.  Once I give you that

10   questionnaire, that's it.  If you both agree --

11          Sit down.

12          If you both agree and stipulate, so be it.

13          MR. QUINN:  Can we submit that tomorrow?

14          THE COURT:  You can.  Sure.  But get together on

15   it.

16          MR. QUINN:  Will do, your Honor.

17          THE COURT:  What I don't want is this, Mattel

18   asking three questions when you can ask one and the other

19   side is objecting that they are prejudicial.

20          MR. QUINN:  Right.  No.  I understand, your Honor.

21          THE COURT:  And by the way, it cures all of the

22   problems when I've given you 20 minutes of voir dire anyway.

23   So --

24          MR. QUINN:  There's a lot of courts where you

25   don't get any attorney voir dire.  I appreciate that.

```
 1                 THE COURT:  In fact, I can give you more time if
 2       you both agree.  I can give you half an hour per side.  I am
 3       not limited to that.  I just need to get agreements.  You'll
 4       make this case what you want it to be.
 5                 MR. QUINN:  Right.
 6                 THE COURT:  Okay.
 7                 Now, Mr. Overland.
 8                 MR. OVERLAND:  I misunderstood.  I thought that
 9       there were going to be follow-up questions on the
10       questionnaire, which we won't have until next Friday.  Do
11       you want those in writing also?
12                 THE COURT:  I don't understand.
13                 MR. OVERLAND:  Well, we're not going to see the
14       questionnaires until Friday, and there may be some follow-up
15       questions to ask --
16                 THE COURT:  You can ask those during the 20
17       minutes, that's why you've got that 20 to 30 minutes.
18                 MR. OVERLAND:  I understand that, but in terms of
19       you, do you want to look at those also beforehand?
20                 THE COURT:  I am going to look at all of the
21       questionnaires beforehand.
22                 MR. OVERLAND:  The follow-up questions?
23                 THE COURT:  Oh, no, no.  I trust counsel here.
24                 (Laughter.)
25                 THE COURT:  I normally trust counsel here.
```

1          MR. OVERLAND:  So the only questions you want to

2     see beforehand are general questions, general voir dire

3     questions.  That's fine.

4          THE COURT:  Let's say that you want to emphasize

5     the fact that you're so concerned about the comments made in

6     the prior case concerning Mr. Larian's religion or

7     ethnicity, that you want the Court to emphasize that over

8     and above the questionnaire, I don't know if I'm going to do

9     that.  I think the questionnaire is obvious, but you might

10     want to submit that to me, because that's a real concern by

11     MGA.

12          Mattel may have some coequal concerns.  I am not

13     going to ask them any questions, that's why I gave you the

14     questionnaire, but if there is something really important,

15     ask me.  But what I don't want to do after giving you the

16     questionnaire is start asking the same questions and

17     selecting questions because it looks like I'm answering --

18     or asking for one side, that's why you have the

19     questionnaire, and that's why I'm giving you the chance to

20     talk to the jury.

21          Also, let me emphasize that I really believe that

22     it's not what a juror says to us, it's the way they say it

23     that gives us that innate ability to make that decision when

24     we're trying to develop a little bit of rapport, okay?

25          So I can extend that to 30 minutes instead of 20

1    minutes if you both agree per side.  But right now it's 20.

2           MR. QUINN:  Your Honor, to point out the obvious,

3    the consequence of not using any graphics or slides in

4    opening is that documents which definitely are going to come

5    in as to which there is no objection, like Mr. Bryant's

6    contract, are not going to be shown to the jury, we are

7    going to be reading from the documents.  There's a lot of

8    documents, the Court knows, we've gone through nine

9    witnesses, as to which there can be, is no objection, they

10   are going to come into evidence.

11          THE COURT:  All that requires is the two of you

12   getting together with the more obvious documents.

13          MR. QUINN:  You know, I suggest that speed isn't,

14   I think the Court would agree, the only relevant

15   consideration here but communicating effectively to the

16   jury, and I'd ask the Court to take into account that on

17   November 27th, on the record, the Court told Ms. Hurst and I

18   to get up out of our chairs and meet here and tell the Court

19   whether we intended to use slides in opening, and we both

20   answered yes on the record, that that was inconsistent with

21   what we saw this morning where they said not at all.

22          THE COURT:  No.  I disagree with you.  What I said

23   to you was not only exactly that but I also said the part

24   that you are missing and that you're leaving out, is that

25   both parties had to agree, that what I wasn't going to sit

Case 2:04-cv-09049-DOC-RNB   Document 9607   Filed 01/07/11   Page 47 of 78   Page ID #:286141
SACV 04-9049-DOC - 01/04/2011 - Vol. II of II

47

 1    through was a bickering match between the two of you over

 2    which slides were appropriate or not, that's the part that

 3    you're neglecting.

 4                MR. QUINN:  Except we heard today, not at all,

 5    without seeing any slides, so I think if something like an

 6    implied covenant of good faith when an attorney gets up and

 7    tells the Court on the record, yeah, we want to use slides

 8    and then today we heard the exact opposite.

 9                THE COURT:  Well, there is no way I can force

10    those private agreements or not, Counsel.

11                MR. QUINN:  That was on the record before the

12    Court.

13                THE COURT:  Okay.  Thank you very much.

14                I'm going to take a recess because I have to take

15    this phone call, but I want you here in 30 minutes.

16    Hopefully I can conclude this quickly with the AG.

17                Thank you very much.

18                (Recess.)

19                THE COURT:  Okay.  We are back in session.

20                MS. HURST:  We've reached some agreements.

21                THE COURT:  Okay.  Then all counsel are present,

22    and MGA has notified the Court that we've reached some

23    agreements.

24                MS. HURST:  I believe so -- so Mattel's Daubert's

25    1 and 2 --

 1            THE COURT:  Just a moment.  Mattel's Daubert 1 and
 2    2.
 3            MS. HURST:  Both concern issues regarding the
 4    burden of proof on apportionment.
 5            THE COURT:  Uh-huh.
 6            MS. HURST:  We've agreed that the parties are not
 7    going to object to each others damages reports that have
 8    been served to date on the ground that they have been late
 9    served under -- because of some notion of burden of proof
10    about apportionment, and that instead, we're going to serve
11    all of our reports.  Each side is going to agree to have a
12    additional day of deposition of the damages experts without
13    prejudice to asking for more if at the conclusion of that
14    additional day someone feels more is needed.
15            And then we're going to have the Court address
16    this issue of the burden of proof on apportionment and the
17    context where it should be addressed, which is the jury
18    instructions, and not as a discovery fight about expert
19    reports, so --
20            THE COURT:  Just a minute.  Let me make some
21    notes.
22            All right.  Please continue.
23            MS. HURST:  So motions 1 and 2 are withdrawn, and
24    we've stipulated, as we said, regarding reports and for
25    additional deposition.  This also resolves Mattel's motion

1   to compel an additional deposition of Mr. Malackowski.

2           THE COURT:  And what motion is that, by number?

3           MS. HURST:  It's not a motion in limine.  It was a

4   pending discovery motion.

5           THE COURT:  Okay.

6           MR. ZELLER:  Your Honor, the motion that we filed

7   addressed two depositions.  One was of Malackowski, their

8   damages expert.  That has been mooted by this agreement of

9   the parties subject, obviously, to the Court's approval.

10  There was another expert who also raised in that motion, MGA

11  expert named Bassok, and that dispute has not been resolved,

12  just so the Court is aware that that portion of that

13  discovery motion remains alive.

14          THE COURT:  Okay.

15          MS. HURST:  And then the remainder of the

16  agreement, your Honor, is that we don't feel we have any

17  need to reference any of these experts in opening, so the

18  remainder of the Dauberts, 3, 4, 5 and 6 can be reserved,

19  except then with respect to 7 --

20          THE COURT:  Just a moment.

21          Is that acceptable to Mattel also, thus far?

22          MR. ZELLER:  Yes, sir.

23          THE COURT:  All right.  Now, let's turn to 7,

24  which is Mattel's MIL -- or motion in limine to exclude

25  Samuel Rubin regarding BeClean software and Evidence

1    Eliminator software.  This ties right back to Carter Bryant,

2    doesn't it?

3                MS. HURST:  Yes.

4                THE COURT:  Okay.

5                MS. HURST:  So on this one, we haven't reached

6    agreement because it's my understanding that Mattel wants to

7    reserve the right to mention BeClean and Evidence Eliminator

8    in opening.  And so we need to have argument on this one,

9    your Honor, because if they do that, then we are certainly

10   going to want to respond.

11               Your Honor, in that regard, Judge Larson did have

12   a limiting instruction regarding Evidence Eliminator, that

13   there was no evidence that MGA had anything to do with it.

14               And your Honor, if I may, I would really ask the

15   Court to take another look at this issue and reserve it and

16   maybe not allow Evidence Eliminator and BeClean in opening,

17   because this is a really inflammatory issue.  And just to

18   remind the Court, because I don't think I stated it very

19   well earlier, frankly, Mr. Bryant's explanation for why he

20   had Evidence Eliminator on his home personal computer was

21   because he had gay pornography on that computer, so that's a

22   total lose-lose for us.  Let's not kid ourselves here.  The

23   Evidence Eliminator comes in and then the explanation is gay

24   pornography, and then they are talking about him lurking

25   around Kickapoo High School.  I mean, this is really

1    inflammatory stuff.

2              THE COURT:  I'll take a look at it, Counsel.

3              MS. HURST:  Thank you.

4              MR. QUINN:  Your Honor, the gay pornography was

5    about the third explanation that Mr. Bryant provided.  His

6    first explanation in his deposition was he chose to run

7    Evidence Eliminator to make his computer run faster, to get

8    rid of pop-ups.  No mention of gay pornography.  I think

9    that came up like the third explanation when he was already

10   on the stand.

11             So I'm not going to argue that the Court shouldn't

12   look at this anymore, obviously, but I think this is an

13   issue that's been litigated very extensively, there's a very

14   extensive record on it, and what Mr. Bryant's testimony was,

15   and he made a deliberate choice to run this the day before

16   his computer was imaged.

17             THE COURT:  Okay.  I'll take a look at it,

18   obviously.

19             MR. QUINN:  Now, Mr. Rubin, we had brought this

20   motion in limine concerning Mr. Rubin, and he is MGA's

21   expert with respect to BeClean and Evidence Eliminator.  He

22   opines with respect to BeClean that no user-generated files

23   were deleted as a result of the running of that wiping

24   software.  But the information that he had available to him

25   does not permit him to reach that conclusion, and he

1    admitted this, that -- because each time the BeClean is run

2    on a hard drive, it deletes the record of what's been

3    deleted before then.  There is simply no way for him to

4    opine to that -- that nothing -- no user-generated

5    information had been deleted.

6            And he, himself, found that 106 user-created files

7    on Mr. Larian's hard files had, in fact, been deleted, and

8    that was his testimony.  We asked -- he claimed that he

9    created a script that he ran, he wrote a computer program

10   which would search these various hard drives for certain

11   information relating to BeClean.  He claims that the script

12   that he devised collected all of the source files and

13   information regarding the operation BeClean.  His opinion is

14   based exclusively on running that script, and he hasn't

15   provided us with that script.  It's central, it's key to his

16   opinion.

17           He also relied upon information regarding a number

18   of computer hard drives maintained in a particular MGA

19   database.  He opines that that database tracks and logs the

20   installation and operation of the BeClean software; however,

21   we haven't been provided that database.  These are

22   fundamental bases for his opinion.

23           He concedes that running this -- the program

24   covers its tracks.  It deletes any evidence of what has been

25   deleted.  So, you know, it's -- he doesn't have the factual

1    support for the opinions that he reaches.  We haven't been

2    provided with the key tools that he claimed that he used in

3    order to reach those conclusions, so for those reasons, we

4    think his opinion should be excluded altogether.

5              THE COURT:  MGA?

6              MS. HURST:  I think there is a number of factual

7    misstatements there.  They have been provided all of the

8    data upon which he relied in order to form his opinions.

9    All they haven't been provided with is an automated tool

10   used to collect that data, but if the Court has any concern

11   about that, it can simply order us to produce it and we'll

12   do so.

13             This -- the --

14             THE COURT:  Well, just a moment.  Why would I need

15   to do that, why haven't you produced it?

16             MS. HURST:  Your Honor, my understanding is the

17   Stroz Friedberg firm considers this particular software tool

18   to be a trade secret of its firm and did not want to

19   disclose it to the forensic experts on the other side for

20   their potential use in future litigation.

21             THE COURT:  We've been through this issue a dozen

22   times.  There's a number of ways to do it, attorney's eyes

23   only.  I mean, there's a --

24             MS. HURST:  Okay.

25             THE COURT:  You know, I'm going to make that

1    order.  I'd like to just safeguard.  Obviously it's

2    intellectual property, and obviously it has -- but we can

3    get attorney's eyes only, and the question is going to be,

4    how do we get that sealed up and not generally known to the

5    public so we protect that.

6            MS. HURST:  Right.  And they are concerned about

7    it coming in at trial as well, but it sounds like we'll be

8    able to work that out.

9            THE COURT:  How are we going to do that with the

10   modicum of time?

11           MS. HURST:  I think it will be a while before

12   these experts hit the stands.

13           THE COURT:  Well, I do too, but you ought to get

14   Judge Smith involved, this is what he's doing, and give him

15   a call and --

16           MS. HURST:  That's fine.  I mean, they never even

17   served a subpoena for this stuff, so.

18           MR. QUINN:  The expert stipulation and order

19   actually required it, that it be turned over.  And if they

20   are going to use proprietary tools in their business, they

21   shouldn't take expert witness engagements and use those

22   tools.  I think it's fair to expect that those are going to

23   be called for.

24           THE COURT:  Why don't you give Judge Smith a call,

25   okay?  Obviously you are going to get it, it's just how we

1    protect the entity, and I'd like to do that, obviously.  I

2    think we can accomplish that, but let's get his wisdom.

3            MS. HURST:  So in terms of the factual basis for

4    the opinions, they had all of that, because they had all of

5    the log files and everything else, and this description is

6    inaccurate.  The log files show exactly how the software was

7    configured and whether it was configured to delete things.

8            There is clearly inadequate basis for the

9    opinions, this is, you know, stuff for cross-examination.

10   It's he said, she said, you know, there is enough to --

11   certainly as a basis for the opinions, we'll work it out to

12   turn over the script to them, and they can have their

13   experts say whatever they want to about it.

14           THE COURT:  It depends upon your timing.  I think

15   Judge Smith is coming in, he wanted to make a presentation

16   along with the entity that he is working with on behalf of

17   the federal court and wanted to run some ideas by me, on the

18   28th?

19           Call Cathy tomorrow.  She can give you the date.

20   He's going to be here anyway.  Maybe the same day that he is

21   here, if the 28th isn't too late --

22           MS. HURST:  We can probably get it worked out

23   before then, and if we don't, we'll do that.

24           THE COURT:  So who's going to call Judge Smith

25   from Mattel, along with MGA?

```
 1              MR. QUINN:  I will, your Honor.

 2              THE COURT:  Mr. Eckert (sic) and --

 3              MS. HURST:  Me, your Honor.

 4              THE COURT:  Ms. Hurst, thank you for volunteering.

 5         And when will you call him, Judge Smith?

 6              MS. HURST:  Friday?

 7              MR. ZELLER:  Yes.

 8              THE COURT:  What time?

 9              MS. HURST:  11:00 a.m.

10              THE COURT:  By noon?

11              MS. HURST:  By noon.

12              THE COURT:  By noon on Friday.  Okay, excellent.

13              MS. HURST:  I think, your Honor, this issue is

14    fully briefed.  The Court has the reports.  If there -- this

15    is a pernicious problem with this BeClean thing, right.

16    There is no evidence at all that anybody ever deleted any

17    evidence in this case using this BeClean software.  It's

18    standard software used by the IT department to improve the

19    performance of the computers.

20              They get to make this vague allegation, and then

21    we have to spend hundreds of thousands of dollars analyzing

22    500 hard drives to file a report that shows that absolutely

23    nothing wrong happened.  And as the Court knows, we've

24    produced about 8 million or more pages of documents, and

25    they've not identified a single thing that could possibly be
```

1    missing, unlike in contrast, Mr. Eckert's e-mail which is

2    missing in its entirety, and we've been able to get it from

3    other places showing relevant things, and the Bain report,

4    which they still don't produce out of their possession

5    because they deleted it.  There you have specific identified

6    examples.

7            This is a scattershot allegation, and it shouldn't

8    be coming in any way, and if it's not, then we are not going

9    to have all of this ancillary litigation about BeClean.

10           MR. QUINN:  Just a moment.  We all spent a lot of

11   money --

12           THE COURT:  Just a moment, Counsel.

13           Counsel?

14           MS. HURST:  Thank you.  So, but if they are going

15   to make the scattershot allegation, "Oh, BeClean, they must

16   have done something wrong," then we have to go to these

17   extraordinary lengths to try to rebut it.  None of this,

18   frankly, should be coming in.  It's not competent evidence

19   of spoliation, and it's unduly cumulative, it's wasteful of

20   the Court's time, it's highly prejudicial because then we

21   have to parade all these people in to talk about something

22   that never happened and try to prove a negative when they've

23   got no specific document or any other thing that they've

24   identified here.

25           So, your Honor, keeping out BeClean solves the

Case 2:04-cv-09049-DOC-RNB   Document 9607   Filed 01/07/11   Page 58 of 78   Page ID #:286152
SACV 04-9049-DOC - 01/04/2011 - Vol. II of II

58

1    whole problem, but if the Court's not going to keep it out,

2    then, of course, given the inflammatory nature of this, we

3    have to be able to respond to it.

4              THE COURT:  Okay.

5              Now, Mattel.

6              MR. QUINN:  We spent a lot of time and money with

7    the Court's appointed -- I don't know what the exact status

8    was, ILS, that found suspicious deletion patterns.  That was

9    their finding.  Mr. Rubin himself found that 406

10   user-created files on Mr. Larian's hard files had been

11   deleted.

12             With respect to Mr. Eckert, nothing was ever

13   deleted.  It was on the backup tapes.  Remember, we tested

14   the backup tapes.  ILS concluded no suspicious or unusual

15   deletion pattern.

16             Again, Ms. Hurst is -- what she's telling the

17   Court is just simply wrong.  The record is to the contrary.

18   The investigation by ILS showed suspicious deletion patterns

19   on their side, not on our side.

20             THE COURT:  And finally, MGA.

21             MS. HURST:  That's just incorrect.  I mean, if you

22   delete all of your e-mail, every single piece of it every

23   day, then there is no deletion pattern that raises suspicion

24   because you've deleted everything.  So that doesn't absolve

25   Eckert in any way, shape or form.

 1            Mr. Rubin is qualified.  He has a foundation.
 2    He's laid it all out.  We can work out these discovery
 3    issues.  If they are going to be permitted to raise this,
 4    then we have to be permitted to respond to it.
 5            MR. QUINN:  Mr. Eckert didn't -- nothing was
 6    deleted.  It was all on the backup tapes.  His hard drive
 7    had limited capacity.  If you don't delete every day, you
 8    reach a point where you can't save everything so --
 9            MS. HURST:  I'm sorry, your Honor, can you imagine
10    what it would be like from their side if we were sitting
11    here offering the explanation that Mr. Larian's hard drive
12    was all on the backup tapes, and they can just spend
13    $3 trillion to restore them all and find out what was
14    relevant?  Can you even imagine what it would be like?
15            THE COURT:  Just conclude your argument.  Thank
16    you.
17            All right.  Counsel, let's make sure we've covered
18    the remainder.  In-Limine Motion Number 1 was argued
19    satisfactorily.
20            Number 2 is argued satisfactorily.
21            Number 3, it was agreed by the parties except, of
22    course, the -- what I call the reverse injunction.
23            Number 4 was agreed to by both parties.
24            Number 5 was adequately argued.
25            Number 6, both parties agreed to bifurcation,

 1    which was the mirror motion.

 2            Number 7 was argued adequately, the Court hadn't

 3    decided that yet.

 4            Number 8 was argued satisfactorily.

 5            Number 9 was argued satisfactorily.

 6            Number 10 was argued.

 7            Number 11 was argued satisfactorily last evening.

 8            Number 12 was argued satisfactorily --

 9            MR. QUINN:  Your Honor, with respect to number 12,

10    that was the issue about Elise Cloonan and Ms. Leahy and

11    what their testimony was, the Court asked to revisit that

12    today.

13            THE COURT:  Yes, thank you very much.

14            MR. QUINN:  And whether there was any -- we heard

15    from Ms. Hurst that there was testimony about rampant

16    moonlighting by Mattel employees.  We brought the testimony,

17    we have copies for the Court and for counsel.

18            THE COURT:  Okay.  And if you'd just submit those

19    to the Court.

20            MR. QUINN:  To the reporter?

21            THE COURT:  No.  Give them to me.

22            MR. QUINN:  To the clerk.

23            THE COURT:  Thank you very much.

24            Okay.  All right.  Number 13 was argued.

25            Number 14 has been argued.

1            Number 15, you reserved until today.  This is the

2    effort to preclude or reference to the alleged spoliation of

3    evidence in the discovery -- or discovery misconduct by

4    Mattel or counsel.

5            And as a preview, also you'd argued 16

6    satisfactorily and 18, but you wanted to have additional

7    comment.  We started with Mr. Machado on number 17, I'd

8    asked you to cease so you can argue all of your motions

9    together, so I'll hear from counsel on number 15, come back

10   to Mr. Machado on number 17.  And 19, 20, 21, 22, 23, 24 and

11   25 have all been argued satisfactorily.

12           So Counsel, number 15.

13           MR. QUINN:  Yes, your Honor.  This relates to

14   specific identified items which MGA has claimed were

15   destroyed or are evidence of spoliation by Mattel.  They

16   include, for example, Mr. Eckert's practice of deleting all

17   his e-mails.  The court-appointed experts analyzed his hard

18   drives for evidence of spoliation or unusual deletion

19   patterns, and in stark contrast to every MGA hard drive that

20   ILS examined, found no evidence of unusual deletion

21   patterns.  There is limited capacity --

22           THE COURT:  Thank you.  Let me talk to MGA for a

23   moment.

24           What do you seek?  What do you want?

25           MS. HURST:  Your Honor, this should be denied.  I

```
 1    mean, we talked about the Bain report earlier, and why that,

 2    you know, deletion of that is important.  We talked about

 3    Mr. Eckert.  He knew about the lawsuit, knew it was coming.

 4    He was deleting all of his e-mail the whole time and --

 5              THE COURT:  How do you prove he was deleting?

 6              MS. HURST:  Through his testimony.  He admitted it

 7    in deposition, absolutely admitted it.  He admitted it, he

 8    talked about at length, about how he goes and double

 9    deletes.

10              THE COURT:  Uh-huh, okay.

11              MS. HURST:  Your Honor, the -- they want to

12    preclude us from responding to allegations of spoliation

13    against us by proving --

14              THE COURT:  Yeah, I understand that.

15              Now, back to Mattel.

16              MR. QUINN:  Your Honor, those e-mails were all on

17    the backup tapes.  This was the subject of a motion

18    previously before Judge Larson, and Judge Larson found there

19    was nothing inappropriate, nothing had been lost, nothing

20    was gone forever.  The Bain report without --

21              THE COURT:  Are you seeking to delete the fact

22    that Mr. Eckert double deletes, no reference to double

23    deletion?

24              MR. QUINN:  Yes, your Honor.

25              THE COURT:  Okay.
```

1           MR. QUINN:  For the reason that all of the

2    information is there.  It's not gone forever.  It's all on

3    the backup tapes, and we went through that expensive

4    exercise of testing those and looking at those.  Remember,

5    the Court selected periods in tapes, and we checked and

6    produced those.

7           The Bain report without support, without any

8    citation to any supporting evidence, they claim that we

9    destroyed a draft report prepared by a third party.  I mean,

10   there is simply, there's no evidence of any destruction, and

11   MGA hasn't been able to point to any.  There is no authority

12   that editing a document in the normal course of business is

13   tantamount to spoliation.  That's a pretty serious charge,

14   particularly where, as here, both versions were preserved

15   and have been produced.  They've got them both.

16          The motion also concerns documents concerning

17   Mr. Villasenor.  There is no dispute that Mattel produced

18   the relevant documents in his custody.  There is simply no

19   evidence that any of his documents were ever destroyed, or

20   as they like to say, "deep-sixed," you know, to the extent

21   they're actually complaining about the timing of production,

22   we get back to that issue about whether interposing

23   objections, and they didn't move to compel back in Phase 1

24   where this wasn't relevant at all, whether that is somehow

25   evidence of obstruction of justice.

1          Bottom line is they got that all.

2          THE COURT:  All right.

3          MR. QUINN:  And there are some other items in

4     here, your Honor.

5          THE COURT:  MGA.

6          MS. HURST:  It's not true that everything is on

7     the backup tapes, and even if it were, that would not be

8     satisfactory to prove lack of spoliation where they haven't

9     gone to the backup tapes, voluntarily restored them and met

10    their discovery obligations.  They resisted that at every

11    turn.

12         Now, here is why it's not true --

13         THE COURT:  Just one minute.

14         Okay, Counsel.

15         MS. HURST:  The Court will recall that they didn't

16    suspend their recycling of backup tapes until MGA sued

17    Mattel in or about April of 2005.  So the whole time after

18    they had engaged Quinn Emanuel by no later than mid 2002 all

19    the way up through -- they filed suit against Carter Bryant,

20    all the way up through -- they were prosecuting that suit

21    against Carter Bryant, and MGA was an intervening defendant,

22    all the way up through 2005, everything they wrote during

23    that period -- that Mr. Eckert wrote during that period of

24    time, not on any backup tape.  And do you know what's

25    included in there?  The "what happened to Barbie" e-mail,

Case 2:04-cv-09049-DOC-RNB   Document 9607   Filed 01/07/11   Page 65 of 78   Page ID #:286159
SACV 04-9049-DOC - 01/04/2011 - Vol. II of II

65

1    the "what happened to Barbie" e-mail after the Court

2    compelled Mr. Bousquette's hard drive.

3          And that "what happened to Barbie" e-mail

4    absolutely shows that Mr. Eckert had the Bratz brief in his

5    possession.  You can go down point by point and match them

6    up.  And there is no evidence at all from Mr. Eckert that he

7    ever had it in his possession, I can give you specific

8    documents that should be there and are missing.

9          The transmission of the draft Bratz brief to

10   Mr. Eckert.  We have testimony of multiple witnesses

11   including one of their 30(b)(6)s, that he commissioned that

12   document.  Ms. Luther testified that he edited it and

13   transmitted edits to her, and it has never been produced

14   from his custody from backup tape or otherwise.

15         We get an e-mail that he did author that he

16   deleted that we got from somebody else that makes it clear

17   that it was at least once in his possession.  Numerous

18   e-mails like this came from other people.  The "kill the

19   deal or let it slide" e-mail, they didn't produce that off

20   of any backup tape, we got that from somebody else's

21   custody.

22         So this argument that it's all okay because they

23   had a backup tape, it's not factually accurate.  Moreover,

24   if he was deleting every day before the backup tape was

25   triggered, then those things never even hit the backup tape.

```
1              So if he deletes at the conclusion of every

2    business day and then their backup goes into operation at

3    2:00 a.m., that didn't preserve anything.  So they are not

4    allowed to rely on backup tapes as preservation unless they

5    meet their obligation to then go get those things in

6    discovery and show that they were, in fact, preserved.

7              The reality is this witness testified, I double

8    deleted, I deleted everything out of my in box and then I

9    went into the deleted folder and I deleted it again out of

10   there.  And moreover, we know it's worse than that because

11   he deleted his sent file too.  So he actually probably

12   triple deleted everything out of his in box, everything out

13   of his sent file and then everything out of the deleted

14   folder as well.

15             THE COURT:  All right.  Counsel, we'll come back

16   to number 17 with Machado in just a moment.

17                  (Interruption in the proceedings.)

18             THE COURT:  Okay.  Concerning last evening --

19             Mr. Overland, you weren't present --

20             -- counsel started to argue that there were three

21   motions pending with Machado, and I wanted to pay the

22   courtesy of having you present.

23             This is Mattel's motion concerning -- well,

24   Mattel's motion is that MGA not be allowed to state to the

25   jury that Mattel Servicios was created to foreclose Mattel
```

```
1    from allowing employees to profit share under the Mexican
2    laws, and I think that this has been adequately argued by
3    Mattel, and I'm going to give Mattel and MGA another
4    opportunity, but Mr. Machado had started yesterday, so why
5    don't you start again with your thoughts.
6              MR. COTE:  Thank you, your Honor.
7              On summary judgment, your Honor, Mr. Machado
8    argued his sole employer was Mattel Servicios, one of the
9    two subsidiaries in Mexico.  Servicios paid him.  Servicios
10   was the party of his employment contract.  Servicios told
11   him what to do.
12             Mattel responded that that wasn't true, that his
13   real employer -- I'm not sure what that means exactly, but
14   his real employer was one of these other entities in Mexico.
15   In support of that argument, they wrote in their opposition
16   brief, "The sole purpose of Mattel Servicios and its
17   employees is to provide services for Mattel Mexico."
18             Mattel raised the issue of Servicios' purpose in
19   its summary judgment opposition.  If we are going to have
20   that same argument again at trial, we have to be able to
21   rebut that and show that its real true purpose was to evade
22   this mandatory profit sharing compensation, that's its real
23   purpose.  If they are going to introduce evidence of its
24   purpose, we should be entitled to rebut it.
25             THE COURT:  Okay.
```

```
 1              Now, let me turn -- let's see.  We had the
 2    argument from Mattel last night.
 3              MGA?
 4              MS. HURST:  Nothing further, your Honor.
 5              THE COURT:  Mattel?
 6              MR. ZELLER:  Very briefly, your Honor.
 7              What this really does is it seizes upon a single
 8    word used in summary judgment about the "purpose."
 9    Fundamentally and factually, what's important here is the
10    fact that Mattel Servicios provides services to Mattel de
11    Mexico.  We can certainly phrase it that way.  That avoids
12    any issue about the purpose of the -- of the entity, and it
13    avoids what I think is frankly flimsy, at best, rationale
14    for coming back and saying, "Well, no, its real purpose was
15    to," quote, "bilk," end quote, "people under Mexican law,"
16    which we obviously completely disagree with.  But I don't
17    think there's any legitimate debate that that is a complete
18    side show.  So if we simply omit the word "purpose," I think
19    we accomplish and just state factually that it provides
20    services to Mattel de Mexico, because that is what it does,
21    and that's not really subject to reasonable dispute either.
22              THE COURT:  Okay.
23              MR. COTE:  Your Honor, I am not sure I see the
24    relevance of the argument or the facts that Mr. Zeller wants
25    to introduce.
```

1            THE COURT:  Well, thank you.

2            MR. COTE:  Let me explain why.

3            The argument is that we should somehow disregard

4    the fact that Mr. Machado had one employer, Servicios, and

5    somehow attribute his employment relationship to this other

6    entity that he didn't --

7            THE COURT:  Excuse me, Counsel.

8            MR. COTE:  Sure.

9            (Interruption in the proceedings.)

10           THE COURT:  I'm sorry, Counsel.  We're going to

11   show a tape in a moment from Judge Kozinski.

12           MR. COTE:  I appreciate that.

13           THE COURT:  He is being beamed into the courtroom

14   live.  I'm just kidding with you.  He'll answer the motion

15   for reconsideration very quickly.

16           MR. COTE:  Thank you.

17           The argument seems to be that the Court or the

18   jury can disregard the fact that there's two different

19   entities in Mexico and Mr. Machado worked for one of them

20   and not the other.

21           THE COURT:  Right.

22           MR. COTE:  I called it a reverse alter ego

23   argument when we argued summary judgment because that's the

24   closest thing in the law that I could find that it seemed

25   like, and it seems to be an argument that it's somehow fair,

1    equitable to disregard the distinction between the two

2    entities.  Usually that's not brought by the plaintiff who's

3    the entity, but that seems to be the argument.

4            If we are going to get into a discussion about

5    whether or not it's fair, disregard the separation between

6    the two entities, the jury is entitled to know why the two

7    entities exist.

8            THE COURT:  Okay.

9            MR. ZELLER:  Your Honor, the -- this is --

10           THE COURT:  This is the last go-around, by the

11   way.

12           MR. COTE:  So I'm done?

13           THE COURT:  Oh, no.

14           MR. COTE:  I get one more?

15           THE COURT:  Well, no.  You started, so I think --

16   do you have anything else to say because this is --

17           MR. COTE:  Well, let me just finish that last

18   thought, if I could, please.

19           THE COURT:  Okay.

20           MR. COTE:  When you present an alter-ego type

21   question to the jury, the parties are allowed to introduce

22   whatever evidence they have to show the reason behind the

23   separation of the two entities, including whether it was to

24   evade a law or a requirement, and that's what's going on

25   here, and that's right out of California case law.  The

1    cases are cited in our papers, your Honor.

2            THE COURT:  Okay.  Thank you.

3            Now, Mattel.

4            MR. ZELLER:  Your Honor, the theory that Mattel

5    has asserted here is not alter ego or reverse alter ego or

6    however else this has been characterized.  It is simply that

7    Mr. Machado owed duties to more than one entity.  That's

8    hardly a surprising concept, and it's certainly nothing

9    under the law that says Mr. Machado could not owe duties to

10   more than one entity in which he was performing duties for.

11   There is nothing surprising, shocking about it.

12           In fact, to allow Mr. Machado to go up and

13   basically argue this false dichotomy that somehow Mattel has

14   to choose as to the sole entity that Mr. Machado owed duties

15   to is not only factually baseless, it's also legally

16   baseless and he should not be allowed to do that.

17           But as -- you see how this is spun out?  It's

18   becoming quite clear that the only purpose here is to simply

19   create some sort of unfairly prejudicial smear against

20   Mattel by basically saying, well, Mattel is cheating its

21   workers again.  I mean, that couldn't be clearer here, so

22   the bare minimum it's 403 as well.  This doesn't advance the

23   debate at all about Mattel's theory.  It is simply that

24   Mr. Machado owed duties to Servicios, he owed to Mattel, the

25   parent, and other entities in the Mattel family.

```
 1              THE COURT:  Thank you.

 2              Counsel, would you mind that if I -- I'm going to

 3    respond formally to MGA concerning your motion for

 4    reconsideration, but I'm wondering if we can go off the

 5    record and show a YouTube clip for a moment.

 6              (Laughter.)

 7              THE COURT:  Would that be okay?  It would be

 8    lighthearted, a little bit of laughter, but we are off the

 9    record.

10              (Discussion held off the record.)

11              THE COURT:  Okay.  We are on the record in

12    Mr. Machado's matter.

13              MR. OVERLAND:  One of them is with respect to the

14    final pretrial conference order.  There are two issues that

15    are disputed.  I just wanted to call the Court's attention

16    to them on pages 8 and 9 of the proposed order, and that

17    relate to different positions that we have and Mattel has

18    with respect to the Court's summary judgment ruling as to

19    the conversion claim and breach of fiduciary duty claims --

20    breach of duty of loyalty claims, and those are spelled out

21    on pages 8 and 9, and they have to be resolved somehow.

22              THE COURT:  All right.  Do you want to argue them

23    now or do you want to submit them to me?  I just don't -- I

24    am not back up on the bench right now, so I'm not looking at

25    them.
```

1          MR. OVERLAND:  No.  I think it's pretty clear from

2     what's in the papers what the respected positions are, and

3     they just refer back to your ruling on summary judgment, so

4     I don't think there is any need to argue about it.

5          THE COURT:  Okay.

6          MR. OVERLAND:  The other thing is with respect to

7     Mr. Machado's presence at trial, as you may know, he has to

8     check in with the court in Mexico every other Monday --

9     every 14 days on a Monday, and he's only allowed to come

10    here for 14-day period, then he has to go back and

11    reregister again with the court, so that would mean that

12    he'd have to be flying back and forth.

13         THE COURT:  Why can't we get a dispensation from

14    the Mexican court?

15         MR. OVERLAND:  I talked to the Mexican counsel,

16    they won't do it.  The most they will do is the 14-day

17    period.

18         THE COURT:  What about a letter from the court

19    requesting his presence?  Why don't you draft that letter

20    for me and have me sign it.

21         MR. OVERLAND:  If you think they will listen to

22    you, fine.

23         THE COURT:  Here is the problem.  The problem is

24    unless Mr. Machado is here, and I have no problem granting a

25    request, which is what I'm hearing, that he not attend on

1    certain days or he just not attend.

2            MR. OVERLAND:  Well, I don't think that he does

3    not want to attend, he does want to attend, but this is

4    creating a real problem.

5            THE COURT:  You need to be specific.  What do you

6    want?

7            MR. OVERLAND:  What I want is for him to attend

8    the voir dire.

9            THE COURT:  Okay.

10            MR. OVERLAND:  And then attend clearly when he

11    testifies, he's going to be here and maybe a couple other

12    witnesses, but what I also would like is that the jury be

13    given some kind of pre-instruction that they are not to take

14    into account his failure to be here as any kind of evidence.

15            THE COURT:  If he's not here, I'm going to give

16    that instruction, that's an easy instruction.  The question

17    is, do you want to put yourself in the position tactically

18    if he could be here, if the Mexican court approved his being

19    here, of not having him present.  It looks like he's

20    disinterested.

21            And second, I can't imagine if he's supposed to

22    check in every 14 days, why he can't be here for the four

23    days of the week we are in trial.  I don't know why he's not

24    checking in with the Mexican court on a Monday.

25            MR. OVERLAND:  Well, he can do that, but then he

```
 1    has to keep flying back and forth, which poses a financial

 2    hardship on him.

 3              THE COURT:  Let's take that up.  Let's get him

 4    here for the jury voir dire and discuss it, okay?  If you

 5    can draft me a letter and --

 6              MR. OVERLAND:  I'll do the letter.

 7              THE COURT:  And make the request.

 8              MR. OVERLAND:  In Spanish or --

 9              THE COURT:  In Spanish.

10              MR. OVERLAND:  Okay.

11              THE COURT:  Okay.  Let's get it up on the big

12    screen.

13              All right.  Counsel, this is your motion for

14    reconsideration.

15              (Laughter.)

16              (Videotape played.)

17              (Recess.)

18              THE COURT:  We are on the record.  All parties are

19    present.

20              Mr. Zeller?

21              MR. ZELLER:  The parties have reached two

22    stipulations regarding --

23              THE COURT:  Reached two stipulations regarding?

24              MR. ZELLER:  The lodging of deposition

25    transcripts.
```

```
 1              THE COURT:  The lodging of deposition transcripts.

 2              MR. ZELLER:  Subject to the Court's approval.

 3              THE COURT:  Subject to the Court's approval.

 4              MR. ZELLER:  That the parties agree that they need

 5    not lodge on the first day of trial, as required generally

 6    by the local rules, deposition transcripts about the Court.

 7    And the second one is that the parties need not lodge

 8    contemporaneously with the Court deposition transcripts that

 9    are used with witnesses for impeachment or other purposes

10    during the course of the trial.

11              THE COURT:  Stipulated to by Mattel?

12              MR. ZELLER:  Yes.

13              THE COURT:  By MGA?

14              MS. HURST:  Yes.

15              THE COURT:  Your next issue?

16              MR. ZELLER:  That's it.

17              MS. HURST:  We had one more on the timing of the

18    variations of depo testimony.  We just need a little extra

19    time on this, otherwise the deadline was this week.  They

20    designated a lot of testimony from our witnesses, who are

21    going to be present, and, you know, if we are going to cut

22    video on that, we thought we could do it closer in time when

23    the witnesses are appearing to give us a little extra time

24    on that.

25              THE COURT:  That's fine.
```

 1            MR. ZELLER:  One of the considerations is that a

 2   number of witnesses that MGA had asked to show up, they

 3   refused to produce them, which should be a separate motion,

 4   which causes us concern because if they are not going to

 5   show up, we think that we'd be entitled to put in their

 6   testimony.

 7            MS. HURST:  I am not aware of us not producing

 8   anybody, present employee, so I am not sure that's correct.

 9            THE COURT:  And they were employed by MGA?

10            MR. ZELLER:  Yes.

11            THE COURT:  They will produce them voluntarily,

12   okay?  An adverse inference is devastating.

13            MS. HURST:  But we agreed on the time, the depo

14   designations; is that right?

15            MR. ZELLER:  Well, I think the Court corrected it.

16            MS. HURST:  Okay.

17            Thank you, your Honor.

18            THE COURT:  Thank you very much.

19            MR. ZELLER:  Thank you.

20            *(Recess.)*

21                          -oOo-

22

23

24

25

Case 2:04-cv-09049-DOC-RNB   Document 9607   Filed 01/07/11   Page 78 of 78   Page ID #:286172
SACV 04-9049-DOC - 01/04/2011 - Vol. II of II

78

```
 1                            -oOo-

 2                          CERTIFICATE

 3

 4          I hereby certify that pursuant to Section 753,

 5   Title 28, United States Code, the foregoing is a true and

 6   correct transcript of the stenographically reported

 7   proceedings held in the above-entitled matter and that the

 8   transcript page format is in conformance with the

 9   regulations of the Judicial Conference of the United States.

10

11   Date:  January 5, 2011

12

13

14          _____

15          JANE C.S. RULE, U.S. COURT REPORTER
            CSR NO. 9316

16

17

18

19

20

21

22

23

24

25
```