QUINN EMANUEL URQUHART & SULLIVAN, LLP
  John B. Quinn (Bar No. 090378)
  johnquinn@quinnemanuel.com
  William C. Price (Bar No. 108542)
  (williamprice@quinnemanuel.com)
  Michael T. Zeller (Bar No. 196417)
  michaelzeller@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California  90017-2543
Telephone:   (213) 443-3000
Facsimile:   (213) 443-3100

Attorneys for Mattel, Inc. and Mattel de Mexico
S.A. de C.V.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| MATTEL, INC., a Delaware corporation,<br><br>              Plaintiff,<br><br>       vs.<br><br>MGA ENTERTAINMENT, INC., a California corporation, et al.,<br><br>              Defendant.<br><br>AND CONSOLIDATED ACTIONS | CASE NO. CV 04-9049 DOC (RNBx)<br>Consolidated with<br>Case No. CV 04-09059<br>Case No. CV 05-02727<br><br>Hon. David O. Carter<br><br>**MATTEL'S NOTICE OF MOTION AND MOTION TO ENFORCE THE COURT'S NOVEMBER 1, 2010 DISCOVERY ORDER AGAINST ZAPF CREATION AG AND COMPEL A FULLY PREPARED RULE 30(B)(6) WITNESS**<br><br>Date:    TBD<br>Time:    TBD<br>Place:   Courtroom 9D<br><br>**Phase 2**<br>Discovery Cut-off:   October 4, 2010<br>Pre-trial Conference:   January 4, 2011<br>Trial Date:   January 11, 2011 |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that, on a date to be determined by the Court, plaintiffs Mattel, Inc. and Mattel de Mexico, S.A. de C.V. (collectively, "Mattel") will, and hereby do, move the Court for an order: (i) enforcing its November 1, 2010 Order compelling Zapf Creation AG ("Zapf") to produce documents in its possession and control in response to Mattel's October 15, 2010 document request subpoena; (ii) compelling Zapf to produce documents that are not redacted on any grounds other than U.S. privilege laws; (iii) compelling Zapf to produce a fully prepared <u>Rule</u> 30(b)(6) witness; (iv) overruling instructions not to reveal identities of persons on Zapf-produced email; and (v) in the alternative, compelling MGA to produce responsive documents in Zapf's possession.

This Motion is based on this Notice of Motion, the Memorandum of Points and Authorities, the supporting exhibits, the records and files of this Court, and all other matters of which the Court may take judicial notice.

**Statement of Compliance**

Lead counsel for Zapf, Mattel and MGA met and conferred regarding the issues herein on December 28, 2010 and times thereafter but did not reach a resolution.

DATED:  January 7, 2010

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By _____

Michael T. Zeller
Attorneys for Mattel, Inc. and Mattel de Mexico, S.A. de C.V.

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ............................................................................1

FACTUAL BACKGROUND.............................................................................2

ARGUMENT ....................................................................................................7

I.   THE COURT SHOULD ENFORCE ITS NOVEMBER 1, 2010 ORDER AGAINST ZAPF...........................................................................................7

    A.   Zapf's Production Is Deficient..........................................................7

    B.   German Law Does Not Relieve Zapf Of Its Discovery Obligations ..8

        1.   Zapf Has Conceded That U.S. Discovery Rules, Not German Law, Govern ................................................................................8

        2.   Under The Law, U.S. Discovery Rules Govern ..........................9

    C.   Zapf's Nominal Status as a Non-Party Is Immaterial.......................15

II.  ZAPF SHOULD BE COMPELLED TO PROVIDE A FULLY PREPARED RULE 30(B)(6) DESIGNEE .......................................................................16

III. ALTERNATIVELY, MGA SHOULD BE ORDERED TO PRODUCE RESPONSIVE DOCUMENTS ...................................................................17

CONCLUSION.................................................................................................19

1

## <u>TABLE OF AUTHORITIES</u>

2

**<u>Page</u>**

3

### <u>Cases</u>

4

<u>Arthur Andersen & Co. v. Finesilver</u>,
5
    546 F.2d 338 (10th Cir. 1976) ...........................................................................9

6

<u>Dexia Credit Local v. Rogan</u>,
    231 F.R.D. 538 (N.D.Ill. 2004) ..................................................................... 14

7

<u>First American Corp. v. Price Waterhouse LLP</u>,
8
    154 F.3d 16 (2d Cir. 1998) ............................................................................ 15

9

<u>In re Grand Jury Proceedings</u>,
    691 F.2d 1384 (11th Cir. 1982) ..................................................................... 15

10

<u>Hartford Fire Ins. Co. v. California</u>,
11
    509 U.S. 764 (1993)....................................................................................... 12

12

<u>In re Insurance Antitrust Litigation</u>,
    938 F.2d 919 (9th Cir. 1991) ......................................................................... 12

13

<u>Linde v. Arab Bank, PLC</u>,
14
    262 F.R.D. 136 (E.D.N.Y. 2009)................................................................... 15

15

<u>Minpeco, S.A. v. Conticommodity Svcs., Inc.</u>,
    116 F.R.D. 517 (S.D.N.Y. 1987)............................................................. 15, 16
16

17

<u>Richmark Corp. v. Timber Falling Consultants</u>,
    959 F.2d 1468 (9th Cir. 1992) ...............................................9, 11, 12, 14, 15, 18

18

<u>SEC v. Minas de Artemisa</u>,
19
    150 F.2d 215 (9th Cir. 1945) ......................................................................... 11

20

<u>Societe Int'l v. McGranery</u>,
    111 F. Supp. 435 (D.D.C. 1953)................................................................... 18

21

<u>Societe Internationale v. Brownell</u>,
22
    225 F.2d 532 (D.C.Cir. 1955)....................................................................... 18

23

<u>Societe Internationale v. Rogers</u>,
    357 U.S. 197 (1958)....................................................................................... 18

24

<u>Societe Nationale Industrielle Aerospatiale v. U.S. District Court</u>,
25
    482 U.S. 522 (1987).........................................................................................9

26

<u>Synthes (U.S.A.) v. G.M. dos Reis Jr. Ind. Com. De Equip. Medico</u>,
    2008 WL 81111 (S.D. Cal. Jan. 8, 2008) ................................................ 10, 11
27

28

<u>United States v. First Nat'l Bank of Chicago</u>,

1

699 F.2d 341 (7th Cir. 1983) ................................................................. 14

United States v. Int'l Union of Pet. & Indus. Workers,
870 F.2d 1450 (9th Cir. 1989) ............................................................ 18

United States v. Vetco,
691 F.2d 1281 ................................................................................ 10, 11

In re Uranium Antitrust Lit.,
480 F. Supp. 1138 (N.D. Ill. 1979) ...................................................... 18

2

3

4

5

6

7

## **Other Authorities**

8

Restatement (Third) of Foreign Relations Law, § 442(1)(c) ................................ 9, 12

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **Preliminary Statement**

Zapf is a Larian-controlled entity whose employees worked with MGA and its CEO Isaac Larian to infiltrate Mattel toy fair showrooms and take information about Mattel's unreleased products. Despite this Court's prior Order compelling Zapf to produce documents and a Rule 30(b)(6) witness, Zapf continues to conceal evidence about both its own and MGA's sneaking into Mattel toy fair showrooms. Indeed, it refuses to disclose even the identities of the MGA and Zapf employees who accessed Mattel toy fair showrooms – going so far as to redact their names from documents and to instruct its witness not to disclose that information.

More specifically, this Court found that Zapf was properly served at MGA's Van Nuys location and ordered Zapf to produce documents and a corporate witness in response to Mattel's subpoena. Zapf's production, however, is grossly inadequate and improperly sanitized. Zapf refuses to search for and produce any pre-2008 emails in its possession. In fact, Zapf produced a grand total of fifteen documents altogether, and then redacted *all* names on those documents to render them worthless to Mattel. Zapf does not dispute this is non-compliant; it says, instead, that German law requires this obstructionism. This was contrary to Zapf's explicit concessions to the Court and the Discovery Master that U.S. discovery law, and not German law, governs here. And, in any event, the Supreme Court and the Ninth Circuit have held that foreign blocking statutes do not deprive U.S. courts of the power to order a party subject to its jurisdiction, such as Zapf, to produce evidence regardless of whether the act of production supposedly violates foreign law. The balancing test the Ninth Circuit has articulated to determine whether an entity is properly ordered to produce documents located abroad weighs heavily in favor of enforcing the November 1 Order.

Zapf's corporate witness also was unprepared. He admitted he did not investigate the circumstances of *any* of the instances reflected in documents showing that Zapf and MGA personnel had infiltrated Mattel showrooms or had obtained information about unreleased Mattel products. Zapf's designee also admitted that he had failed to undertake any

preparation on multiple other deposition topics and also had failed to produce documents that he was relying upon for his testimony. Moreover, Zapf counsel instructed the witness not to disclose the identities of the MGA and Zapf employees who accessed Mattel toy fair showrooms and instructed him not to even discuss the identities of senders and recipients of emails. Such instructions were improper and should be overruled, and Zapf should be ordered to produce a properly educated witness.

**Factual Background**

Mattel Serves on Zapf Document Requests and a Deposition Subpoena. Zapf personnel, acting with MGA and Larian, directly participated in the infiltration of Mattel's booth at Nuremberg Toy Fair. As one MGA executive admitted, MGA executive Thomas Pfau sneaked into Mattel's booth at Nuremberg Toy Fair in the middle of the night.[1] In an email dated February 13, 2008, Angelika Sternberg, an MGA marketing director, advised Isaac Larian and several other MGA and Zapf managers that: "Two of our colleagues have been able to enter the booth of our competitor and wrote the attached report."[2] It is undisputed that the "competitor" was Mattel, and that the report contained unreleased Mattel product information that was circulated to MGA and Zapf management. As reflected in other emails, Zapf and MGA also received on other occasions what they described as "TOP SECRET" unreleased product information from Mattel toy fair showrooms.[3]

This evidence is directly relevant to MGA's trade secret misappropriation counterclaims and Mattel's unclean hands defense to it, as well as MGA's purported unclean hands defense to Mattel's claims. In addition, Zapf has been operating MGA's showroom at the Nuremberg Toy Fair and displaying MGA's purported trade secrets there.[4] Zapf's

---

[1]  Transcript of Potgiesser Deposition, dated October 26, 2010 (hereafter Potgiesser Depo Tr.) at 165:4 - 7.
[2]  DE 9854 [MGA2 3120922-4].
[3]  See DE 9533 [MGA 3089028], Email from A. Sternberg to I. Larian Cc: R. Brawer, P. Garcia, T. Pfau 2/3/07 Subject Competition. (A. Sternberg discloses price point information and features about the "Get Connected" Barbie, a "TOP Secret theme in a closed room at Toy Fair.")
[4]  Potgiesser Depo Tr. at 67:23-69:15. See also pictures showing a common Zapf/MGA (footnote continued)

disclosure of MGA unreleased product information to retailers, the press and others at Nuremberg without obligation of confidentiality is directly relevant to MGA's claims.

The Court Finds that the Subpoena Was Properly Served and Grants Application to Compel Discovery From Zapf.  On October 15, 2010, Mattel served on Zapf a subpoena requesting the production of documents concerning Zapf's and MGA's access to Mattel displays or showrooms at toy fairs,[5] as well as Zapf's own policies and practices regarding the confidentiality of MGA products at toy fairs.[6]  On October 19, 2010, Mattel also served a deposition subpoena indentifying substantially similar topics.[7]  Mattel served the subpoenas on Zapf at MGA's offices, the U.S. address set forth on Zapf's website.

MGA and Zapf disputed that the subpoena was properly served.  The Court rejected MGA and Zapf's contentions, finding that "MGA's extensive 'strategic partnership' with Zapf, as well as Larian's heavy participation in Zapf's financial affairs, make it fair, reasonable, and just to imply MGA's authority to receive service directed to Zapf." Dkt. 9027 at 2.  The Court further granted Mattel's *Ex Parte* Application to compel discovery against Zapf.  Id. at 3.

The facts indeed overwhelmingly support the Court's finding of close ties between MGA and Larian and their German affiliate Zapf.  Mattel will not repeat the details laid out in its *Ex Parte* Application to compel discovery against Zapf.  See Dkt. 8996 at 3-6.  In short, Larian financially controls Zapf;[8] MGA and Zapf are operated by "one team or one staff,"[9] running consolidated operations; and MGA officers served on the Zapf

showroom [Z000209, Z000210, Z000045].
[5]  Request Nos. 1-8. These requests are attached to this motion as Exhibit A.
[6]  Request Nos. 9-14.
[7]  These topics are attached to this motion as Exhibit B.
[8]  An October 4, 2010 Zapf public release states that "Isaac Larian . . . together with his family—holds a majority stake in Zapf Creation via several trusts." http://www.zapfcreation.com/en/corporate/investor-relations/releases/adhoc-releases/index.php?site=ZAPF_EN_adhoc_releases_detail&udtx_id=13018.  [All URL citations are accurate as of January 7, 2010, 12:00 a.m. GMT].
[9]   Zapf Rule 30(b)(6) Deposition Transcript [Ron Brawer], dated December 30, 2010 (hereafter "Zapf Rule 30(b)(6) Tr. [Brawer]") at 292:9-11; see also Potgiesser Tr. at 41:11-42:10; 159:1-11; 160:7-161:5.

Management Board.[10]  Zapf's 30(b)(6) designee was Ron Brawer, an MGA executive until April 2010.[11]  Brawer was on Zapf's Supervisory Board from 2007 to October 2009,[12] and has been on Zapf's Management Board since October 2009[13] -- including during times when he also served as an MGA executive.

Zapf's designee admitted that MGA over the years has conducted a "pretty broad range" of Zapf's creative function, such as product development, packaging design, and commercial advertisement.[14]  MGA assumed responsibility for Zapf's American operations in 2006.[15]  Zapf and MGA entered into six agreements in 2007, leading to a "close partnership" between Zapf and the MGA.[16]  MGA formally has taken responsibility for the entire process of selecting and monitoring the Asian suppliers of Zapf products, the coordination and handling of shipments to the sales units, and product development.[17]

<u>Zapf Refuses to Produce Documents As Ordered.</u>  Despite its assurances that it would not rely on German law, Zapf has stated that because of purported German privacy laws, it searched and produced only "2008-2010 emails, [and] only with heavy redaction"[18] in response to the Court's Order and Mattel's discovery request.  Zapf's 15-document production three weeks later, on December 22, 2010, thus suffers from egregious deficiencies.[19]

First, Zapf has produced documents dating from a truncated two-year period, 2008-2010.  Not a single pre-2008 document has been produced.  Zapf admits that, with one claimed exception, this is *not* because the documents do not exist but because *they haven't*

---

[10]   Former MGA officers Thomas Pfau and Jens Keil served contemporaneously on the Zapf Management Board, and collectively earned more than €500,000 from Zapf in 2008. Zapf 2008 Annual Report at 128.
[11]   Zapf Rule 30(b)(6) Tr. [Brawer] at 18:2-10.
[12]   Id. at 12:23-13:4.
[13]   Id. at 12:9-22.
[14]   Zapf Rule 30(b)(6) Tr. [Brawer] at 357:9-358:11.
[15]   Zapf 2008 Annual Report at 44 ("The Group subsidiary, Zapf Creation (U.S.) Inc., discontinued operations as of December 31, 2006.  MGA Entertainment Inc., Van Nuys, California, USA, alone has been in charge of the entire American market via a strategic partnership effective January 1, 2007.")
[16]   Zapf 2008 Annual Report at 44.
[17]   Id. at 130.
[18]   Letter from Russ to Watson, dated November 29, 2010, p. 2.
[19]   Email from Meyer to Trebicka, dated December 22, 2010.

1  *searched for them.*[20]  Indeed, even those limited searches were apparently done only of

2  Zapf email; its designee stated that he knew of *no* searches that were conducted for any

3  responsive documents apart from emails, including electronic documents on Zapf's servers,

4  computer drives, or public or shared drives.[21]

5  Second, the 15 documents Zapf has produced are heavily and improperly redacted.

6  Zapf has, for example, redacted *all* names from *every* document, including *all* the names of

7  email authors and recipients, even where it is obvious that one of the email senders was

8  Larian from his U.S. email address.[22]  Zapf also redacted names within its emails, which

9  has made them indecipherable in many cases.  In fact, through these redaction, Zapf

10  continues to conceal the identities of MGA and Zapf employees who infiltrated Mattel's toy

11  fair showrooms.[23]  These redactions seriously interfere with the discovery process and are

12  not justified on any privilege grounds.

13  Third, Zapf's production is incomplete, even by its own parameters.  For example,

14  missing from the production is the February 13, 2008 email from former MGA Germany

15  marketing director Angelika Sternberg to Isaac Larian and numerous other MGA and Zapf

16  managers, attaching the "Report 'M' booth Nuremberg Toy Fair 2008," which described in

17  detail unreleased Mattel product and related strategic information.[24]

18  <u>Zapf Corporate Designee Was Unprepared and Was Instructed Not to Answer Basic</u>

19  <u>Questions</u>.  Ron Brawer's preparation as Zapf's corporate designee was similarly deficient.

20  He admitted he conducted no investigation into the circumstances under which Zapf

21  personnel received the Mattel information reflected in emails.  Brawer did not know and

22  had not investigated how they gained access into Mattel's showrooms and how they

23  obtained Mattel's information.  For example, Brawer testified that he did not even attempt

24  [20]  Letter from Russ to Watson, dated November 29, 2010, p. 2.
[21]  Zapf <u>Rule</u> 30(b)(6) Tr. [Brawer] at 116:10-117:21.

25  [22]  <u>See</u> Email dated February 4, 2008, where sender and recipient are redacted; sender's

26  signature includes the saying "Fortune favors the bold," which is found on Larian emails of the same period.  [Z000030 at Z000034]

27  [23]  <u>See</u> [Z000041] Redacted email dated 2/13/08 Subject report Toy Fair. 2008 with attachment report Mattel TF 2008.doc, which was written after a "visit" to Mattel's toy fair booth.

28  [24]  DE 9854 [MGA2 3120922].

to interview the employees who drafted the February 2008 competitive report after infiltrating Mattel's booth at Nuremberg and who Zapf continues to conceal.  Brawer's explanation for not doing so was that he "did not feel that we needed to go back and directly review that particular case with them."[25]  He also did not attempt to learn who drafted the report[26] or identify which MGA or Zapf computers the report is contained on.[27] Nor did Brawer speak to the recipients of the email regarding the report and the attending circumstances.[28]  As he admitted, Brawer did *nothing* to investigate the surrounding circumstances of the preparation of the report:

> Q    Did you do anything to look into or investigate anything surrounding the circumstances of the preparation of the M booth report?  That's the second and third pages of Exhibit 9854.
> MR. KUYPER:  Asked and answered.
> THE WITNESS:  I did not do anything specifically to look at how this particular report was prepared, no.[29]

Brawer similarly made no investigation into whether there were other documents related to the report, such as further communications about it.[30]

Likewise, Brawer did not investigate the circumstances under which Zapf personnel obtained Mattel information, as evidenced in documents Zapf itself produced.  Specifically, Brawer did not investigate how Zapf personnel: (1) obtained cost and retail prices of dozens of competitors' products (inclusive of Mattel) in June 2009;[31] (2) obtained another 17-page price list of competitors' products (inclusive of Mattel) in France in December 2009;[32] (3) obtained information about Mattel's inventory levels and sales with;[33] (4) obtained information about Mattel's advertising plans of unmarketed products;[34] (5) received pictures

---

[25]   Id. at 250:22-251:23; DE 9854 [MGA2 3120922-24]; Zapf Rule 30(b)(6) Tr. [Brawer] at 250:22-252:1.
[26]   Id. at 114:2-12.
[27]   Id. at 113:8-11.
[28]   Id. at 131:23-132:23.
[29]   Id. at 111:25-112:7.
[30]   Id. at 116:10-118:1.
[31]   Id. at 262:3-263:24 (re DE 9964).
[32]   Id. at 347:7-15 (re DE 9969).
[33]   Id. at 276:9-277:19 (re DE 9965).
[34]   Id. at 293:11-12 (re DE 9966).

of unreleased Mattel products in May 2007;[35] or (6) received information on Mattel's large doll marketing plans in December 2006.[36]  To make matters worse, Zapf counsel, invoking inapposite German data protection laws, instructed Brawer not to answer basic questions regarding the identity of the senders and recipients of the emails produced by Zapf, thus impeding Mattel's deposition of Zapf.[37]

## Argument

### I. THE COURT SHOULD ENFORCE ITS NOVEMBER 1, 2010 ORDER AGAINST ZAPF

#### A. Zapf's Production Is Deficient

Zapf is in violation of the Court's Order granting Mattel's *Ex Parte* Application to compel discovery against Zapf.  Dkt. 9027 at 3.  Zapf argues that the Order did not compel it to produce discovery, but simply to "respond."[38]  Wrong.  The Court granted Mattel's application seeking "discovery from [Zapf], whose employees allegedly gained improper access to Mattel's toy showrooms. . . ."  Id. at 1.  Denying Mattel alternate relief, the Court held that "these alternative forms of discovery are duplicative of the discovery *compelled by the instant Order*."  Id. at 3 (emphasis added).

There is no question that Zapf has not provided the discovery that Mattel sought and the Court ordered.  Most egregious is Zapf's refusal to produce *any* documents for the time period prior to January 1, 2008,[39] even while MGA maintains that the period relevant to its trade secret misappropriation claims includes 1992 – 2006.[40]  Even the fifteen documents that Zapf produced improperly redact *all* names on the documents, including the names of senders and recipients of the emails.  This redaction renders the documents worthless.  For

---

[35]   Id. at 336:8-337:7 (re DE 9989),
[36]   Id. at 304:10-20 (re DE 9967).
[37]   Zapf Rule 30(b)(6) Tr. [Brawer] at 271:3-4 (Deposition Exhibit 9965); id. at 256:16-17 (Deposition Exhibit 9964); id. at 121:12-14; 217:23-24; 218:3-4(Deposition Exhibit 9962).
[38]   Email from B. Kuyper to V. Trebicka, dated December 23, 2010.
[39]   While counsel for Zapf maintains certain of Pfau's pre-2008 emails were searched (see Email from Kuyper to Trebicka, dated December 27, 2010), no pre-2008 documents have been produced to date.
[40]   MGA Entertainment, Inc.'s Corrected Second Supplemental Responses To Mattel, Inc.'s First Set Of Interrogatories Nos. 1-12, 15, 19 (MGA Reply Counterclaims) at 21.

example, Zapf produced an email sent on June 8, 2009, which attaches a document titled "Competitor product review with prices 2009." This document includes at least ten Mattel products and their purchase price, retail price, and margin.[41] Due to the redactions, Mattel does not know the sender or the recipients of this document. They could be MGA employees, Zapf employees, outsiders, or a combination thereof; each of these options has its own relevance to the claims in this case. Yet, because Zapf conceals this information, the Court and Mattel are left to guess.

In any event, even by Zapf's unilateral limitations on discovery, its production is deficient. The most telling example of omission is the February 13, 2008 Sternberg email to eleven MGA and Zapf managers, attaching the notorious "M booth" report which describes unreleased Mattel product information.[42] This email was sent and received during the truncated 2008-2010 time frame, should have been found on Zapf's servers, and is directly responsive to Mattel's document requests. Its absence from Zapf's production – and Zapf's designee's lack of explanation for the absence – only serves to further underscore the production's deficiency.

### B. German Law Does Not Relieve Zapf Of Its Discovery Obligations

Zapf cannot plausibly even try to argue that its production fulfills its discovery obligations. Instead, it has argued that a compliant production is not "permitted" under German data protection statutes and accordingly excused.[43] This is wrong, and Zapf has conceded as much.

#### 1. Zapf Has Conceded That U.S. Discovery Rules, Not German Law, Govern

Zapf has already conceded that "German law does not and cannot govern U.S. discovery."[44] Zapf has waived its right to object to U.S. discovery rules at this juncture and indeed judicial estoppel precludes it from now arguing otherwise. This Court recognized

---

[41]  [Z000020].
[42]  [MGA2 3120922]
[43]  Letter from Russ to Watson, dated November 29, 2010, pp. 1-2.
[44]  Email from Kuyper to Discovery Master O'Brien, dated December 24, 2010. ("Mattel asserts that 'German law does not and cannot govern U.S. discovery.' We agree.")

that "Zapf has promised to observe American discovery rules". Dkt. 9576 at 2. So did Discovery Master O'Brien. DM Order No. 106 at 2. The Court's order allowing a German Consulate observer to attend Zapf's December 30, 2010 <u>Rule</u> 30(b)(6) deposition was based on its finding that Zapf's actions would not "curtail the discovery to which Mattel is *entitled* under the Federal Rules of Civil Procedure." Dkt. 9576 at 2 (emphasis added). Having first represented to the Discovery Master and then this Court that Zapf would follow U.S. discovery rules – just so that it could obtain what it sought, the German Consulate observer's attendance – Zapf may now not turn around and urge that German law governs its discovery obligations here.

## 2.    <u>Under The Law, U.S. Discovery Rules Govern</u>

Even independent of Zapf's dispositive admissions, any assertion by Zapf that German law, and not U.S. law, governs is also wrong: "[i]t is well settled that such [foreign blocking] statutes do not deprive an American court of the power to order a party subject to its jurisdiction to produce evidence even though the act of production may violate that statute." <u>Societe Nationale Industrielle Aerospatiale v. U.S. District Court</u>, 482 U.S. 522, 544 n. 29 (1987) (<u>Aerospatiale</u>). Indeed, "[a]n anomalous situation with great potential effect would result from recognition of the right of a litigant to avoid discovery permitted by local law through the assertion of violation of foreign law. Foreign law may not control local law. It cannot invalidate an order which local law authorizes." <u>Arthur Andersen & Co. v. Finesilver</u>, 546 F.2d 338, 342 (10th Cir. 1976).

In <u>Richmark Corp. v. Timber Falling Consultants</u>, 959 F.2d 1468, 1472, 1482-83 (9th Cir. 1992), the Ninth Circuit adopted the balancing test contained in the <u>Restatement (Third) of Foreign Relations Law</u> § 442(1)(c) and endorsed in <u>Aerospatiale</u>. Under that test, the following factors are relevant in deciding whether to issue a discovery order and whether or not foreign statutes excuse noncompliance with discovery orders:

> the importance to the investigation or litigation of the documents or other information requested; the degree of specificity of the request; whether the information originated in the United States; the availability of alternative means of securing the information; and the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state

-9-

where the information is located.

Richmark, 959 F.2d at 1475 (affirming civil contempt sanction and award of attorney's fees as discovery sanction under Rule 37(b) against Chinese corporation that argued Chinese secrecy laws purportedly justified its refusals to produce ordered discovery). Other factors that the Ninth Circuit has considered relevant are "'the extent and the nature of the hardship that inconsistent enforcement would impose, ... [and] the extent to which enforcement … can reasonably be expected to achieve compliance ….'" Id. (internal quotations omitted). On balance, these factors weigh heavily in favor of compelling Zapf's production.

*The Documents Are Critical To The Claims And Defenses In This Case.* The documents that Zapf is refusing the produce go to the heart of MGA's trade secret misappropriation case and are critical to MGA's unclean hands affirmative defense to Mattel's trade secret misappropriation claims. "Where the evidence is directly relevant … we have found this factor to weigh in favor of disclosure." Id. at 1475 (citing United States v. Vetco, 691 F.2d 1281, 1290 (9th Cir. 1981); see also Synthes (U.S.A.) v. G.M. dos Reis Jr. Ind. Com. De Equip. Medico, 2008 WL 81111, at *5 (S.D. Cal. Jan. 8, 2008) (same). Here the documents sought are critical to two issues relating to the claims and defenses in this case. First, the document requests seek documents concerning Zapf's and MGA's access to Mattel displays or showrooms at toy fairs.[45] Evidence shows that Zapf and MGA employees, acting in concert, infiltrated Mattel showrooms at the Nuremberg toy fair, obtained information about unreleased Mattel products, and circulated this information within Zapf and MGA.[46] MGA executive Patrick Potgiesser corroborated that MGA and Zapf personnel have infiltrated Mattel's toy fair showrooms every year for the past several years, including during 2010.[47] These actions are the same as those actions that MGA contends are Mattel's acts of trade secret misappropriation. The fact that MGA and its affiliates engaged in such acts themselves is highly relevant to Mattel's defense against MGA's counterclaims as well as to MGA's unclean hands defense to Mattel's claims.

---

[45] Request Nos. 1-8.
[46] See *supra*, FN 2.
[47] Potgiesser Depo Tr. at 165:4 - 7.

Second, the requests seek documents regarding Zapf's own policies and practices maintaining the confidentiality of MGA products at toy fairs and disclosure of information regarding any such products.[48]  Neither Zapf nor MGA dispute that Zapf has information about the Nuremberg toy fair showroom where purported MGA trade secrets were displayed.[49]  Thus, Zapf's disclosures of MGA unreleased product information to retailers, the press and others without obligation of confidentiality at the Nuremberg toy fair is directly relevant to MGA's trade secret claims.

*The Document Requests Are Specific And Narrowly-Tailored To Two Important Issues.*  As with the foreign entity in Richmark, Zapf has not objected to the "burdensome nature of the discovery request."  Nor could it.  Richmark, 959 F.2d at 1475.  Mattel's requests for documents focus on only two defined issues: Zapf and MGA's taking of Mattel information concerning unreleased products, and Zapf's policies and practices that concern maintaining the confidentiality of the purported MGA trade secrets.  Even seeking a "great deal of information" does not favor non-disclosure where the information is directed at narrowly-defined issues, as is the case here.  Id.

*Location Of Information.*  Even assuming information may be located exclusively in Germany -- a dubious proposition since at least some of the emails appear to have MGA personnel outside of Germany on them -- an order compelling its production remains proper.  See Richmark, 959 F.2d at 1478 (compelling compliance with U.S. discovery despite the fact that the information sought was located in China); Synthes, 2008 WL 81111 (Richmark factors favored discovery under the Federal Rules even though information sought was located in Brazil).

*Alternative Means of Securing Information.*  In the Ninth Circuit, the alternative means must be "substantially equivalent" to the requested discovery.  Richmark, 959 F.2d at 1475 (citing Vetco, 691 F.2d at 1290 and SEC v. Minas de Artemisa, 150 F.2d 215, 219 (9th Cir. 1945).  Short of compelling MGA to produce documents in Zapf's custody –

---

[48]  Request Nos. 9-14.
[49]  See *supra* FN 4.

which, as explained in Section III, *infra,* the Court has the power to do – there are no alternate means to secure a "substantially equivalent" production.  It is clear that there are documents in the sole possession of Zapf, which MGA has not produced and seemingly has no intention to produce unless compelled.  For example, Zapf produced what appears to be an invitee list for the 2010 Nuremberg toy fair, albeit redacting the names of the invitees, and thus defeating the purpose for seeking such documents in the first place.[50]  In contrast, MGA has produced *no* invitee lists for the Nuremberg toy fair, for any year.  Nor did MGA produce the original, intra-Zapf email concerning infiltration of the Mattel booth at the Nuremberg toy fair.[51]  Unless the Court directs Zapf to produce or compels MGA's production of documents in Zapf's custody, Mattel will be left with no alternative means of securing this highly relevant discovery.

*Noncompliance Undermines U.S. Interests And Does Not Affect Important Substantive Policies of Germany.*  The Ninth Circuit has described this factor as the most important.  Richmark, 959 F.2d at 1476.  Courts engage in an analysis assessing the interests of each nation in requiring or prohibiting disclosure, and determine whether disclosure would "affect important substantive policies or interests" of either the United States or the other nation.  Id. (citing Restatement (Third) of Foreign Relations Law § 442 comment c).  The U.S. interest at issue here implicates the ability of U.S. courts to vindicate the rights of U.S. parties.  This right is considered "*substantial*."  Richmark, 959 F.2d at 1477 (emphasis added); see also In re Insurance Antitrust Litigation, 938 F.2d 919, 933 (9th Cir. 1991) (reversed in part on other grounds in Hartford Fire Ins. Co. v. California, 509 U.S. 764 (1993)).

Germany's interest in prohibiting disclosure of pre-2008 and the redaction of post-2008 corporate communication emails pales in comparison.  A plain reading of the Opinion

---

[50]  See Z000046-207.
[51]  See Z000041-44.  This report, in a slightly modified format, was forwarded on February 13, 2008 by Angelika Sternberg to seven MGA managers (including Isaac Larian) and four Zapf managers.  See MGA2 3120922.

MATTEL'S MOTION TO ENFORCE AND COMPEL ZAPF DISCOVERY

by the Bavarian State Inspectorate for Data Protection ("BSIDP") proves as much.[52]  First, the BSIDP suggested that Zapf not search or disclose pre-2008 emails *without the consent of the data subjects.*[53]  Opinion at 5.  It is not a categorical prohibition against the searching and disclosing of such data.  Indeed, Zapf contends that it *did* receive Thomas Pfau's permission to search his pre-2008 emails.[54]  Inexplicably, Zapf did not even seek the permission of any other Zapf employees, notably the employees who infiltrated Mattel's toy fair showroom and wrote the "M-booth" report disclosing Mattel unreleased product information taken from Mattel's booth at the Nuremberg toy fair.  Thus, what Zapf has attempted to pass off as the decision of the BSIDP is, in fact, Zapf's own decision and Zapf's own deliberate failing.

Second, the BSIDP suggested that even lacking data subjects' consent, Zapf could search and disclose post-2008 emails, but would have to "pseudonymise" the emails by redacting the sender and recipient information before producing to Mattel and the Court.  Opinion at 8.  The reason for this was that "[s]o far, ***it has not been submitted*** that pseudonymisation would be unreasonable due to specific circumstances."  Id.  Of course it was "not submitted" to the BSIDP that it would be unreasonable for Zapf to conceal the identities of those who accessed Mattel showrooms – neither this Court nor Mattel were even advised of, let alone invited to participate in, the *ex parte* BSIDP process that Zapf initiated.  And it is clear that Zapf has not made the slightest effort to educate the BSIDP on the sheer unreasonableness of redacting the names of senders and recipients given the facts of this case.  More importantly, it is clear that the BSIDP is amenable to such arguments.

---

[52]   The BSIDP Opinion was served on Mattel by Zapf on November 29, 2010, and was purportedly relied on by Zapf in deciding not to comply with the Court's November 1, 2010 Order.

[53]   According to the BSIDP Opinion, Zapf submitted that before January 1, 2008, it had not prohibited use of company email for private purposes.  Opinion at 5.  Thus, Zapf is regarded as a "provider of telecommunication services" and falls under the German Telecommunications Act, which contains even stricter data protection provisions.  After January 1, 2008, only the German Data Protection Act applies.  Id.

[54]   Email from Kuyper to Trebicka, dated December 27, 2010 ("Also, contrary to your implication, pre-2008 emails of Thomas Pfau were searched, because Zapf sought and obtained his permission, in accordance with German law.")  Even so, no pre-2008 emails were included in Zapf's production.

1  Thus, its guidance and suggestions are *not* absolutes; they may be refined or qualified given

2  the circumstances of the case.  This can only be so because the substantive German policies

3  are not as substantial as the U.S. interest in vindicating the rights of litigants in its judicial

4  forum.  This weighs heavily in favor of enforcing the discovery order against Zapf.

5      *Hardship to Zapf is Not Substantial.*  Zapf complains that it will be subject to

6  penalties or fines if it produces the documents ordered by the Court.  There is, however, no

7  risk of criminal prosecution.  BSIDP Opinion at 13 (breaches are subject to monetary

8  fines).  Moreover, Zapf has many options available to it.  It could seek the consent of the

9  data subjects, as it has demonstrated it is able to do, and thus not even arguably risk

10  breaching any data protection laws.  Instead of providing a one-sided account that gave it a

11  result that it wanted, Zapf could also have explained to the BSIDP, as the BSIDP noted, that

12  redacting names is unreasonable given the circumstances and that their disclosure has been

13  ordered by a U.S. court.  Producing these corporate emails unredacted will simply not

14  violate the core purpose of the German law, namely, the safeguarding of *personal*

15  information.

16      Zapf is far from making any showing that it is in the position in which courts deem

17  the hardship to be "substantial" -- namely, "between the Scylla of contempt sanctions and

18  the Charybdis of possible criminal prosecution."  <u>Richmark</u>, 959 F.2d at 1477.  In fact,

19  there is no showing of a risk of criminal prosecution at all, and in a case where the foreign

20  law that is being asserted as a bar to production bears "civil rather than criminal sanctions,

21  the case for non-production is less compelling."  <u>Dexia Credit Local v. Rogan</u>, 231 F.R.D.

22  538, 542 (N.D. Ill. 2004) (citing <u>United States v. First Nat'l Bank of Chicago</u>, 699 F.2d 341,

23  345 (7th Cir. 1983)) (finding that on balance, the interests of comity did not warrant

24  relieving respondents of their production obligations).  Thus, this factor also weighs heavily

25  in favor of compelling Zapf to comply with its discovery obligations and enforcing the

26  Court's Order.

27      *Compliance is Likely.*  Lastly, courts are counseled against requiring compliance with

28  a U.S. discovery order if the order is likely "to have no practical effect."  <u>Richmark</u>, 959

-14-

F.2d at 1478.  In this case, an order enforcing the already compelled discovery will likely have full practical effect.  Zapf is vested in this litigation.  Its financial welfare is inextricably linked to that of MGA.  Zapf cannot risk running afoul of the Court's orders, lest it risk sanctions against it and MGA that can and should include dismissal of MGA's remaining claims should Zapf and MGA continue to withhold key evidence relating to its claims and Mattel's defenses to them.

In conclusion, all the relevant factors, with the possible exception of the location of the information, weigh heavily in favor of enforcing compliance.  In <u>Richmark</u>, there were two factors weighing against compelling disclosure: the information was located abroad and compliance was unlikely.  Upholding sanctions against the Chinese entity for refusal to produce the ordered discovery, the Ninth Circuit held that "[w]ere these factors alone sufficient, a foreign corporation could avoid its discovery obligations in almost every instance." <u>Id.</u>  The same logic applies here, and Zapf should be directed to comply with the Court's Order.

### C.    <u>Zapf's Nominal Status as a Non-Party Is Immaterial</u>

That Zapf is not a named party is of no import to whether the Court's Order should be enforced.  Being a party to the proceedings bears upon none of the <u>Richmark</u> factors.  Nor does it bear on the <u>Restatement</u> test.  <u>See</u> <u>Restatement (Third) of Foreign Relations Law</u> § 442(1)(c).  Under the <u>Restatement</u>, the relevant test is jurisdiction of the court, and not status as party.  <u>Id.</u> (a court "may order a person subject to its jurisdiction to produce documents, objects, or other information relevant to an action or investigation, even if the information or the person in possession of the information is outside the United States.").  <u>See also</u> <u>First American Corp. v. Price Waterhouse LLP</u>, 154 F.3d 16, 17, 24 (2d Cir. 1998) (upholding motion to compel and contempt sanction against foreign non-party affiliated with party); <u>In re Grand Jury Proceedings</u>, 691 F.2d 1384, 1389 (11th Cir. 1982) (rejecting third party banks' argument that as an entity not under investigation it should not be required to violate Bahamas laws to comply with subpoena, the court noted that "[i]t is difficult to fashion due process protections recognizing the differential argued by the Bank,

1   i.e., stakeholder vs. participant.").

2        Furthermore, while Zapf is nominally not a defendant or counter-claimant in this

3   action, it is a Larian-controlled entity and its employees and executives have, for years, also

4   been MGA employees and executives.  Thus, the few out-of-circuit decisions holding that

5   status as a "neutral" source of information weighs in favor of non-production are inapposite

6   here.[55]  Zapf is far from being a neutral source or a veritable no-stake third-party.  It was

7   Zapf, acting with MGA and using dual MGA and Zapf personnel, who infiltrated Mattel

8   showrooms to obtain information on Mattel's unreleased products to share with MGA

9   managers.[56]  Zapf also manned the showrooms that displayed MGA's alleged trade

10  secrets.[57]  The financial and operational interconnectedness between Zapf and the MGA

11  Parties is undeniable.  Larian financially controls Zapf; MGA and Zapf are operated by one

12  team or one staff, running consolidated operations; and MGA officers served on the Zapf

13  Management Board.  See supra at 3-4.  As even the BSIDP opinion unilaterally procured by

14  Zapf recognizes, given the interrelatedness of Zapf and MGA, "[t]he fact that Zapf Creation

15  AG is formally not a defendant in this litigation is ultimately irrelevant."  Opinion at 4.

16  **II.   ZAPF SHOULD BE COMPELLED TO PROVIDE A FULLY PREPARED**

17       **RULE 30(B)(6) DESIGNEE**

18       Brawer's preparation as Zapf's corporate designee was deficient.  He had conducted

19  *no* investigation into the circumstances under which Zapf personnel received the Mattel

20  information as reflected in the emails that Zapf itself produced, and whether the means of

---

21  [55]  See, e.g., United States v. First Nat. Bank of Chicago, 699 F.2d 341, 346 (7th Cir. 1983)

22  (reversing order enforcing summons on non-party bank that faced penalties under foreign secrecy law because bank was merely "neutral source[] of information and not [] taxpayers

23  or adverse parties in litigation"); Linde v. Arab Bank, PLC, 262 F.R.D. 136, 140, 151 (E.D.N.Y. 2009) (defendant's subpoenas sought information from non-party Israeli banks

24  regarding whether they had processed similar types of transactions).  The district court in Linde relied on Minpeco, S.A. v. Conticommodity Svcs., Inc., 116 F.R.D. 517, 526-27

25  (S.D.N.Y. 1987) (denying motion to compel former defendant that settled prior to motion to compel based on the decreased importance of the discovery sought, the importance of

26  Swiss banking laws, and on the fact that the bank was not a defendant any longer).  The Court in Minpeco also noted that "[t]his not to say that issuing an order to compel is never

27  appropriate in the case of a witness in a civil suit, only that under the circumstances of these proceedings such an order would not be warranted."

    [56]  See, supra FN 1, 2.
28  [57]  See, supra FN 4.

obtaining the information was wrongful.  See supra at 5.  Illustrative is Zapf's failures to produce a properly prepared designee is its failure to investigate the circumstances into Zapf and MGA employees' infiltration of Mattel's toy fair showroom and the ensuing report widely circulated at Zapf and MGA.  See supra at 6.  Brawer did not ask *any* current or former employees questions about the infamous "M" booth report.  This included the former MGA executive and Zapf CEO Thomas Pfau, despite the fact that Brawer spoke to Pfau in preparation of his deposition on another subject and despite the fact that Pfau was one of the recipients of the report.  Brawer did not investigate how MGA and Zapf personnel obtained access to Mattel's showroom.  He did not attempt to confirm the identities of those involved or investigate whether any related documents resided on Zapf's systems.  See id.  As Brawer admitted, he "did not do anything specifically to look at how this particular report was prepared."[58]

Zapf's counsel also improperly instructed Brawer not to reveal the identities of the persons who had obtained Mattel information, including the identity of the Zapf and MGA employees who accessed Mattel's showroom and the senders and recipients of the redacted emails and their attachments.[59]  The sole basis for these instructions were supposedly German law.  Yet, German law scarcely governs the course of a U.S. deposition being conducted in the U.S. pursuant to a U.S. Court Order with a corporate designee who is a U.S. citizen.  Indeed, these instructions were inconsistent with Zapf's representations and the Court's understanding that "Zapf has promised to observe American discovery rules."  Dkt. 9576 at 2.  Zapf's improper instructions should be overruled.[60]

## III.   **ALTERNATIVELY, MGA SHOULD BE ORDERED TO PRODUCE RESPONSIVE DOCUMENTS**

Should the Court decline to order Zapf to produce all responsive documents in its

---

[58]   Zapf Rule 30(b)(6) Tr. [Brawer] at 111:25-112:7.
[59]   Id. at 271:3-4 (Deposition Exhibit 9965); id. at 256:16-17 (Deposition Exhibit 9964); id. at 121:12-14; 217:23-24; 218:3-4(Deposition Exhibit 9962).
[60]   Specifically, each of the following instructions should be overruled and Zapf should be compelled to answer:  Zapf Rule 30(b)(6) Tr. [Brawer] at 270:22-271:4 (regarding DE 9965); id. at 256:15-17 (regarding DE 9964); id. at 121:11-14; 122:14-15; 217:22-24; 218:2-4 (regarding DE 9962).

1   control, MGA should be ordered to do so under the facts presented here.[61]   The Court

2   should order MGA to respond to each of the Requests for Documents as though they were

3   separately propounded to Zapf, and to produce any responsive documents in Zapf's

4   possession.

5         Control regarding the obligation to produce "rests on a determination of whether the

6   defendant has practical and actual managerial control over, or shares such control with, its

7   affiliate, regardless of the formalities of corporate organization." In re Uranium Antitrust

8   Lit., 480 F. Supp. 1138, 1145 (N.D. Ill. 1979) (compelling production of documents in

9   possession of litigants' foreign affiliates). See also United States v. Int'l Union of Pet. &

10  Indus. Workers, 870 F. 2d 1450, 1452 (9th Cir. 1989) (party obligated to produce documents

11  of affiliates it controls, and defining control as "the legal right to obtain documents upon

12  demand"); Societe Int'l v. McGranery, 111 F.Supp. 435, 440 (D.D.C. 1953) (court

13  concluded that "(t)hrough the interlocked web of corporate organization, management and

14  finance there runs the thread of a fundamental identity of individuals in the pattern of

15  control.").[62]   In this case, it is clear that the thread of a fundamental identity of individuals

16  in the pattern of control runs directly to Isaac Larian, together with other executives who

17  have long worked simultaneously for MGA and Zapf, including on Zapf's Boards.  It would

18  be fundamentally unfair to deny Mattel this highly relevant discovery.  The analysis of the

19  Richmark factors discussed in Section II.A supra applies to MGA's production of

20  documents located abroad, and thus weighs heavily in favor of ordering such production.

---

21

22   [61]   As argued in Mattel's Ex Parte Application to Compel Discovery From Zapf, the
relevant production is already sought by Mattel's Set of Requests for Documents and

23   Things to MGA Entertainment, Inc. Regarding Reply to the Fourth Amended Answer,
served August 25, 2010.  In its requests for discovery into MGA's counterclaims-in-reply,

24   Mattel has defined "YOU" and "MGA" to include affiliates, subsidiaries, partners,
associations, predecessors-in-interest, and persons otherwise acting on its behalf.  Each of

25   these terms describes the relationship between Zapf and MGA.  See also Dkt. 8996 at 8-9.
MGA did not object to the definitions that included its affiliated entities such as Zapf and

26   thus waived any right to do so.  It may now properly be compelled to produce such
discovery.  Richmark, 959 F. 2d at 1473 (failure to object to discovery constituting waiver).

27   [62]   The court's holding on the issue of control issue was accepted both by the Court of
Appeals in Societe Internationale v. Brownell, 225 F.2d 532, 536 (D.C.Cir. 1955), and the

28   seminal Supreme Court decision, Societe Internationale v. Rogers, 357 U.S. 197, 204
(1958).

1

## **Conclusion**

2          For the foregoing reasons, the Court should grant this motion in its entirety.

3

4    DATED:  January 7, 2010                QUINN EMANUEL URQUHART &
                                            SULLIVAN, LLP
5

6

7    By

8    _____

9                                           Michael T. Zeller
                                            Attorneys for Mattel, Inc. and Mattel de
10                                          Mexico, S.A. de C.V.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28