ANNETTE L. HURST (State Bar #148738)
ahurst@orrick.com
WARRINGTON S. PARKER III (State Bar #148003)
wparker@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building, 405 Howard Street
San Francisco, CA 94105
Tel: (415) 773-5700/Fax: (415) 773-5759

WILLIAM A. MOLINSKI (State Bar #145186)
wmolinski@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
777 South Figueroa Street, Suite 3200
Los Angeles, CA  90017
Tel. (213) 629-2020/Fax: (213) 612-2499

THOMAS S. MCCONVILLE (State Bar #155905)
tmcconville@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
4 Park Plaza, Suite 1600
Irvine, CA 92614-2258
Tel: (949) 567-6700/Fax: (949) 567-6710

Attorneys for MGA Parties

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an individual | Case #CV 04-9049 DOC (RNBx) |
| Plaintiff, | Consolidated with:<br>Case #CV 04-09059<br>CASE #CV 05-02727 |
| v. | |
| MATTEL, INC., a Delaware corporation, | **MGA PARTIES' CORRECTED SUPPLEMENTAL BRIEFING FOR A FINDING OF WAIVER OF PRIVILEGE THROUGH ALLEGATIONS OF FRAUDULENT CONCEALMENT** |
| Defendant. | |
| AND CONSOLIDATED ACTIONS | Date:        TBD<br>Time:        TBD<br>Courtroom:  9D |
| | Trial Date: January 18, 2011 |

# TABLE OF CONTENTS

**Page**

INTRODUCTION .......................................................................................... 1

STATEMENT OF FACTS .............................................................................. 2

    A.    The Story Mattel Tells Through Its Litigation Assertions .................. 2

    B.    The Story Told By The Facts ............................................................. 5

        1.    Mattel Claims That Bratz Was Designed And Far Along In Development While Bryant Was At Mattel .......................... 5

        2.    Bryant Leaves Mattel for MGA ................................................ 6

        3.    Bratz Launches And Mattel Takes Notice ................................ 6

        4.    Mattel Opens Investigative File ............................................... 9

        5.    Mattel Receives An Anonymous Letter Alleging That Bryant Created Bratz At Mattel And Took It To MGA; Relevant Documents Appear On Mattel's Privilege Log ........ 11

        6.    Information Regarding Bryant, Bratz and MGA Continues To Pour In Mid-2003; Related Documents Appear On Mattel's Privilege Log ........................................ 12

        7.    By September 2003, Mattel Discusses Whether MGA Owns Bratz With Cityworld ...................................................... 13

    C.    During Litigation, Mattel Discloses The Scope And Results of Its 2002-2003 Investigation But Then Shuts Down Inquiry ............... 14

    D.    MGA Has Tried Exhaustively To Pursue Alternate Sources of Discovery Into Mattel's Investigation To No Avail .......................... 16

ARGUMENT ............................................................................................... 17

I.    THE STATUTE OF LIMITATIONS FOR TORT CLAIMS IS TWO YEARS ................................................................................................... 17

II.    MATTEL HAS IMPLIEDLY WAIVED PRIVILEGE BY ASSERTING FRAUDULENT CONCEALMENT. ...................................... 18

CONCLUSION ........................................................................................... 20

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

*Aloe Vera of Am., Inc. v. United States,*
   2003 WL 22429082 (D. Ariz. 2003) ........................................................ 19, 20

*Bohack Corp. v. Iowa Beef Processors, Inc.,*
No. 1981 WL 2018 (E.D.N.Y. Jan. 13, 1981) .............................................. 19

*Chevron Corp. v. Pennzoil Co.,*
   974 F.2d 1156 (9th Cir. 1992) .......................................................................... 20

*Hearn v. Rhay,*
   68 F.R.D. 574 (E.D. Wash. 1975) ............................................................... 18

*Home Indem. Co. v. Lane Powell Moss and Miller,*
   43 F.3d 1322 (9th Cir. 1995) ...................................................................... 18

*In re Imperial Corp. of Am.,*
   179 F.R.D. 286, 290 (S.D. Cal. 1990) ........................................................ 19

*Rambus Inc. v. Samsung Elec. Co., Ltd.,*
   2007 WL 3444376 (N.D. Cal. Nov. 13, 2007) ............................................ 18

*Rita M. v. Roman Catholic Archbishop,*
   187 Cal. App. 3d 1453 (1986) .................................................................... 18

*Russell v. Curtin Matheson Scientific, Inc.,*
   493 F. Supp. 456 (D. Tex. 1980) ................................................................ 19

*Snapp & Assocs. Ins. Servs., Inc. v. Malcolm Bruce Burlingame Robertson,*
   96 Cal. App. 4th 884 (2002) ....................................................................... 18

*United States v. Amlani,*
   169 F.3d 1189 (9th Cir. 1999) .................................................................... 18

*WLIG-TV, Inc. v. Cablevision Sys. Corp.,*
   879 F. Supp. 229 (E.D.N.Y. 1994) ............................................................ 18

MGA'S CORRECTED SUPP. BRIEFING FOR A FINDING OF
WAIVER OF PRIVILEGE
CASE NO. CV 04 9049-DOC (RNBx)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

Mattel has made clear that it seeks to avoid MGA's statute of limitations defense by trying to establish fraudulent concealment. It so alleged in its Fourth Amended Answer and Counterclaims. Dkt. Nos. 7733, 7766 ("FAAC") ¶ 29. It asserted fraudulent concealment in both its Motion for Partial Summary Judgment and in its opposition to MGA's Motion for Summary Judgment. This is a waiver of privilege. Mattel cannot, on the one hand, assert that MGA concealed facts necessary to put Mattel on notice of its claims, and then on the other hand, avoid production of information showing its actual knowledge under a cloak of privilege. Recognizing this as "inherently unfair," federal courts routinely find that the assertion of a claim of fraudulent concealment, as here, is a waiver of the privilege. Mattel has waived its privilege, and should be required to produce documents relating to its knowledge about and investigation of its claims.

Given this, MGA is entitled to documents that reflect Mattel's knowledge of facts concerning its allegation in this case. MGA is uncertain what all those documents are. MGA has identified in Exhibit A to the Declaration of Diana Rutowski those documents that appear on Mattel's privilege log that appear to be relevant.

The documents that have been identified are premised on the fact that it is undisputed that Mattel opened an investigation concerning Carter Bryant, MGA, and Isaac Larian at least as early as March 2002. Toy fair documents produced just few months ago establish that Mattel knew and was concerned about Bratz and MGA much earlier, at least as early as 2001. Documents and communications related to Mattel's investigation[1] in this time period are critical because they are

---

[1] Although MGA uses the word "investigation," MGA does not intend to narrow the scope of the documents that it requests by use of that word. To state it otherwise, if Mattel internally never used the word "investigation," but called its inquiry just that or a query or a search or a review, those documents would be

1    relevant to MGA's statute of limitations defense.  Similarly, documents and

2    communications that post-date 2001 and 2002, but that reflect Mattel's knowledge

3    during 2001 and 2002 are relevant as well.

4                          **STATEMENT OF FACTS**

5        A.    **The Story Mattel Tells Through Its Litigation Assertions.**

6        *Mattel Claims That Conducted An Investigation Limited To Toon Teens*

7    *And Did Not (And Would Not) Uncover Facts Giving Rise To Its Claims.*  Mattel

8    admits that "Mattel conducted an investigation in Spring 2002 based on allegations

9    that Bryant may have plagiarized 'Toon Teens' and created Bratz dolls for MGA."

10   Russell Decl. Ex. 40 at 608[2].

11           While admitting this investigation, Mattel has also asserted that this

12   investigation was limited in scope.  According to Mattel, any suspicion it had in

13   March 2001 or 2002 was limited to whether Diva Starz or Toon Teens had been

14   misappropriated and whether Bryant's work on Bratz was a copyright infringement

15   of Toon Teens, a claim it purportedly forsook in order to avoid a statute of

16   limitations defense.  Dkt. # 9231 at 81; Dkt. #1297 at 13.

17           Based on these alleged facts, Mattel has affirmatively asserted that it did not

18   learn that Bryant created Bratz was at Mattel and therefore could not (or did not)

19   know or suspect the facts bearing on the claims now before this Court.  In Mattel's

20   own words, "[b]ased on the scope of the investigation, Mattel was not looking for

21   and did not discover that Bryant created Bratz while employed by Mattel."  Dkt.

22   #2767 at 24 (emphasis added); *see also* Dkt. #422  at 2[3] ("the March 2002 matter

23   concerned Bryant's potential misappropriation of Toon Teens after he left Mattel,

24   relevant as well and covered by this motion.
     [2] Dkt. ## 2499, 2576, 2578, 2579 (Declaration of Jason Russell in support of MGA
25   Parties' Motion for Partial Summary Judgment) ("Russell Decl.") Ex. 40 (Mattel's
     Supp. Resp. and Obj. to MGA's First Set of Interrogatories) at 40.
26   [3] Mattel Inc.'s Opposition to MGA and Bryant's Joint Motion to (1) Compel
     Production of Certain Documents Withheld Under Claim of Privilege, (2) Attest to
27   the Completeness of its February 2007 Production of March 2002 Investigation
     Documents, and (3) De-Designate Attorneys' Eyes Only Document.

28

*not for his working for MGA while employed by Mattel or for his creation of Bratz works while employed by Mattel that are owned by Mattel*") (emphasis added); Dkt. #1297 at 13 ("Because [whether Bratz infringed 'Toon Teens'] is not a claim in this case—and neither Bryant nor MGA have a defense to that claim—*any inquiry into whether Mattel had notice of a claim for infringement of the Toon Teens copyrights is irrelevant*.") (emphasis added).

Mattel further maintained that even receipt of a letter in August 2002 stating that *Bryant created Bratz while at Mattel and sold it to MGA* did not broaden the scope of this investigation.  Mattel has stated that the recipient "never understood the letter to suggest that Bryant secretly created Bratz while at Mattel."  Dkt. #2767 at 25.

> On August 5, 2002, Mattel's CEO Robert Eckert received an letter suggesting that *Bryant created Bratz and sold his concept to MGA while a Mattel employee*…. The letter was passed along to Mattel's Worldwide Security, Richard De Anda… he understood the letter to refer, albeit inaccurately, to the pending investigation into whether Bratz infringed Mattel's rights in Toon Teens. Mr. De Anda never understood the letter to suggest that Bryant secretly created Bratz while at Mattel.

Dkt. #2767 at 25 (emphasis added); *see also* 12/10/04 Kaye Depo at 45:5-15 (when asked why he referred the anonymous letter to Global Security and not Legal or H.R., Kaye responded that it was limited to "a charge that there was a breach in intellectual property" and nothing else).

***Mattel Also Alleges Fraudulent Concealment.***  In its counterclaims Mattel alleges that Bryant, Larian and MGA deliberately and intentionally concealed facts from Mattel that would have put it on notice of its claims: "Bryant, Larian and MGA . . . deliberately and intentionally concealed facts from Mattel so that it would not suspect or know that it was the true owner of Bratz." FAAC at ¶ 29.[4]  Mattel again raised fraudulent concealment in its opposition to MGA's Motion for

---

[4] Dkt. Nos. 7733, 7766 at ¶ 29 (Mattel, Inc.'s Fourth Amended Answer In Case #05-2727 And Counterclaims) ("FAAC").

Summary Judgment, stating that with respect to "Bryant's secretive creation of Bratz at Mattel[,] [t]he evidence shows [] that MGA's and Bryant's concealment of this fact was phenomenally thorough." Dkt. # 9231 at 82.

***Due To Claimed Concealment And The Nature Of Its Investigation, Mattel Claims That It Did Not Discover Facts Bearing On Its Claims.*** Because of this alleged fraudulent concealment and the supposedly limited scope of Mattel's investigation, Mattel contends that it could not have been on notice of its claims until November 24, 2003, just less than three years before Mattel moved to bring claims against MGA:

> Because of Bryant's and MGA's acts of concealment and Bryant's misrepresentations to Mattel, *Mattel had no reason to suspect that Bryant had worked with or assisted MGA while he was still employed by Mattel until approximately November 24, 2003*, when Mattel received… copies of Bryant's contract with MGA, which predated Bryant's departure from Mattel….

FAAC at ¶ 30 (emphasis added); *see also*, Dkt. #117 at 7[5] ("the earliest that Mattel's copyright claim could have accrued was November 24, 2003, when Mattel first obtained a copy of Bryant's MGA agreement relating to Bratz").

Mattel's witness on the topic at trial, Michael Moore, said the same.

> Q. Then going back to this meeting that you had with Cityworld in late November of 2003, prior to the time of that meeting, did you know that Carter Bryant had created Bratz during the time he was employed by Mattel?
> A. I did not know that.
> Q. Did anyone at Mattel know that to your knowledge?
> A. Not to my knowledge.

8/7/08 Tr. at 6465 2-8 (Moore); *see also* Dkt. Nos. 2504-4, 2767-10, 3730-2 (Declarations of Michael Moore in connection with Phase 1 Summary Judgment Motions regarding Mattel's receipt of information from Cityworld).

---

[5] Mattel's Reply To Opposition to Motion for Leave to File Amended Complaint.

**B.**     **The Story Told By The Facts.**

By the time Mattel filed the Bryant lawsuit, it had believed for years that it was harmed by the sales of Bratz, as reflected in a January 2002 research report on a cannibalization study.  Ex. 9444.[6]  Many events prior to and after that study had alerted Mattel that it could and should commence litigation, long before it sought to file its first claims against the MGA Parties.

**1.**     **Mattel Claims That Bratz Was Designed And Far Along In Development While Bryant Was At Mattel.**

According to Mattel, Bryant was exposed to Diva Starz while a Mattel employee, including the names and logos for "Brats" and "Chat Brats."  Mattel's Second Supplemental Responses to MGA's First Set of Interrogatories to Mattel, Inc. at 15[7]; *see also* Ex. 314; Ongchangco 30b6 Depo. at 33:2-22, 232:21-233:13; UF ##802-806.[8]

Also according to Mattel, prior to the time that Bryant left Mattel to work for MGA, he enlisted the help of other Mattel employees to create the Bratz dolls and other materials used by him to pitch the doll to MGA.  Mattel's Second Supplemental Responses to MGA's First Set of Interrogatories to Mattel, Inc. at 10. 13.  Further, Mattel claims that the Bratz dolls had been designed and were far along in development during the time Bryant was employed by Mattel and prior to the time that Bryant left Mattel on October 20, 2000.  *Id.* at 13-14.

In September 2000, Bryant made dozens of calls to MGA from his telephone extension at Mattel.  Dkt. # 2504 at 37; Dkt. # 2504-32 at Ex. 1.  Mattel's telephone

---

[6] The exhibits cited herein were provided to the Court in the Corrected Appendix of Previously Marked Exhibits in Support of the MGA Parties' Motion for Summary Judgment, provided on hard drives to the Court.
[7] If not accompanied by a docket number, the discovery responses referenced herein were submitted to the Court in connection with MGA's Motion for Summary Judgment.
[8] "UF" refers to the uncontroverted facts found in the [Corrected] Separate Statement of Uncontroverted Facts and conclusions of Law in Support of the MGA Parties' Motion for Summary Judgment.   Dkt. # 8981 (Notice of Filing).

1  records show that facsimiles were sent to MGA from the Barbie Collectible fax line

2  in 2000.  *Id.*

3  ## 2.  Bryant Leaves Mattel for MGA.

4  On October 4, 2000, the same day that Bryant gave notice of his resignation

5  from Mattel, Jill Nordquist, Mattel's former Marketing Manager for Mattel's

6  Barbie Collectibles, discussed with Ron Longsdorf, Bryant's direct supervisor,

7  Bryant's decision to leave Mattel.  Bryant Depo. at 214:14-21; Nordquist 30b6

8  Depo. at 122:25-135:22.  When asked by Nordquist whether he was going to work

9  for a competitor, Nordquist testified that Bryant denied to her that he was going to

10  work at a competitive doll company.  *Id.* at 124:18-125:8.  Bryant also refused to

11  tell Nordquist where he was going.  *Id.*; also, *id.* at 127:22-128:9.  But as noted in

12  the exit interview form that he said:  "opportunity arose—had to take it."  Ex. 34-

13  0002.

14  Nordquist thought Bryant was lying.  She did not think that Bryant "was

15  telling me everything" and "[a]bsolutely" believed that he was going to work for a

16  competitor.  Nordquist 30b6 Depo. at 133:18-24, 134:4-135-4; *id.* at 128:10-15.

17  She told Longsdorf he should require Bryant to leave immediately.  *Id.* at 135:8-22,

18  138:24-139:2.  Nordquist also shared her feelings and suspicions with Mattel

19  Human Resources, who agreed with Nordquist that it was odd that Bryant would

20  not disclose where he was going and that it was "suspicious that he might be going

21  to a competitor."  *Id.* at 132:20-135:7.  Elise Cloonan had heard that the

22  "competitor" and "opportunity" was at MGA.  Cloonan Depo. at 116:9-21.

23  ## 3.  Bratz Launches And Mattel Takes Notice.

24  Less than three months after Bryant left Mattel, in January 2001, Mattel

25  knew about Bratz.  MGA first showed its Bratz dolls and Bryant's drawings at

26  Hong Kong Toy Fair in January 2001.  Trial Ex. 911.  Mattel saw Bratz prototypes.

27  Dkt. # 2802 ¶ 37.  The next month, in February 2001, MGA showed Bratz at New

28  York Toy Fair.  Someone from Mattel, likely Tyler Snyder, obtained Bratz

1   information from MGA's showroom without authorization.  Villasenor Depo.

2   387:8-14, 535:13-540:4; Ex. 9502.  On February 16, 2001, Villasenor circulated his

3   first memorandum describing Bratz as "'Diva Starz' with a smarty attitude."  Ex.

4   9502 at M 1666021.  While market intelligence spied, Mattel Latin America tried to

5   do deals.  At the NYTF, Mattel Latin America discussed distribution with MGA.

6   Ex. 52 at MGA 0305886-887.  Mattel declined:  "[s]ome products are very similar

7   to our own concepts and this is a very sensitive issue with the brand groups (Bratz

8   and Samantha)."  *Id.* at MGA 0305886; *see also* Ex. 50.  This reflected the

9   widespread belief within Mattel, put in writing a few months later by Strategic

10  Planning VP Matt Turetzky, that MGA had somehow ripped off Mattel with Bratz.

11  Ex. 47.

12      In March 2001, Mattel took video footage of Bratz at the Tokyo toy fair.  Ex.

13  15843.  In April 2001, Villasenor circulated to "Distribution" his complete Toy Fair

14  2001 Competitive Toy Review.  He again described Bratz as "Diva Starz with a

15  smarty attitude," and this time he supplied pictures of Bratz dolls and accessories,

16  and FOB pricing for the items.  Ex. 9461 at M 1680748,  M 1680750.

17      Between Bryant's departure from Mattel in October 2000 and the release of

18  BRATZ in 2001, there were many open discussions among Mattel's employees that

19  Bryant was involved with MGA on BRATZ.  UF # 832-834.  In the summer of

20  2001, Ann Driskill, a Senior Director, and Nordquist confirmed Bryant's

21  involvement with Bratz.  Driskill Depo. at 175:13-176:13, 177:13-18.  By July

22  2001, the Mattel brass thought Bratz looked like Mattel's product Diva Starz or

23  Mattel's rejected and unpublished product Toon Teens.  UF #829.  When he first

24  saw the Bratz doll, Kislap Ongchangco, a designer who worked on Diva Starz,

25  thought that the Bratz doll was so similar to the Diva Starz doll that it must have

26  been copied.  *Id.* at 197:12-198:1.

27      On August 21, 2001, VP Turetzky sent an email to SVP Jerome Bossick

28  attaching a report on MGA.  Ex. 47.  (This report was produced for the first time on

Aug. 14, 2010).  Reflecting Romano's views expressed to Hitch in March when Mattel declined to distribute Bratz in Latin America, the report stated:

> Recently, we have grown increasingly concerned due to the similarity of some of their products to ours (Scooter Samantha, Bratz, and One Man Jam DJ Mixer).  Due to the nearby HQ and the disappearance of an early Scooter Shannen sample, there have been some concerns that product information might be leaking out."*

*Id.* at 837  The report further describes Bratz as "[b]earing significant resemblance to Diva Starz in both appearance and attitude (even website has some similarity)." *Id.* at 838.  The report on MGA identifies Isaac Larian as the President and one of the founders of MGA, and describes MGA-HK as an "affiliate office" of MGA.  *Id.* at 837, 839

Then, sometime in the latter half of 2001, Mattel began working on its New Brand Cannibalization Study.  Ex. 9444.  Dated January 14, 2002 and distributed within Mattel, it reported, "Bratz does appear to cannibalize Barbie, Fashion Polly, and the Fashion Divas among older 8-10 year old girls."  Ex. 9444 at 1665879.

On February 7, 2002, Quinn Emmanuel sent MGA a demand letter regarding references to Mattel's products on Bratz fan websites.  Ex. 17252.  In March, the same Bratz fan website revealed Bryant's role as the Bratz creator.  MGA 3801820 ("However I can't take credit for creating the Bratz Dolls, or even the first Bratz illustrations, for that honor would go to a fellow named Carter Bryant.").

Then, on February 20, 2002, VP of Design Joe Franke, who reported directly to Mattel's head of design Ivy Ross (Ex. 15 at 402), and one of the people with whom Elise Cloonan discussed Bryant's involvement in Bratz (Cloonan Depo. at 314:17-316:7), sent a fax to Mattel's chief IP counsel Michelle McShane, regarding "potential litigation."  Ex. 45 (Feb. 20, 2002 fax from Franke to McShane); Ex. 9633 at Entry No. 257; Michael Moore Depo. at 18-19, 56-68 (discussing McShane).  The fax was a resume of Mercedeh Ward, a former Mattel employee who worked for MGA from October 2000 until February 2001.  Ex. 45 at 832-33.

The handwritten notation in the top right corner of the fax cover page reads, "DIVA/SASSY." *Id.* at 831.  Ward's resume described her work at MGA during the period beginning in October 2000 as

> [w]orking with all aspects of design and development of toys made by MGA.  In charge of communications with MGA's Hong Kong office on a daily basis on design and engineering aspects of dolls, plush and robotics toys . . . Travel to Hong Kong to approve manufacturing source for new product line." *Id.* at 833.

Mattel's market intelligence continued in overdrive with a February 21, 2002 "walked the MGA showroom" report.  Ex. 9543.  The report discloses the planned offerings for Bratz in 2002.  *Id.*  Four days later, on February 25, 2002, Adrienne Fontanella, President of the Girls Division of Mattel, defined her "2002 Goals" to include "Develop and execute Bratz defense plan."  Ex. 100.  The subgoals included:

- Use advertising creative to position products more effectively against Bratz

- Target ad spending against appropriate products

- Manage flow and advertising globally to emphasize Fashion Divas

- Reduce price in Spring

- Develop direct competitor to Bratz as well as alternative older girl doll for Spring 2003*

*Id.*

### 4.    Mattel Opens Investigative File.

In March 2002, Richard De Anda, head of Mattel's Security, had a telephone call with either Ivy Ross or Cassidy Park.  The topic:  "Carter Bryant while at . . . MGA used or copied I should say Lilly Martinez's Tune Teens [sic] to create the

1   Bratz doll." De Anda Depo. at 172:2-178:17.  De Anda believed that his call with

2   either Ross or Park was serious enough that it "required further follow-up." *Id.*

3        On March 15, Mattel opened an "official" security investigation of Bryant

4   and MGA as "a person of interest and a company of interest" for their work on

5   Bratz. DeAnda Depo. at 179:11-180:9.  Mattel filed a formal "Incident Report"

6   under the category "Theft" and subcategory "Proprietary Information."  Ex.

7   1195RS at 1195RS-004.  Referencing the call with De Anda, the Incident Narrative

8   in the Incident Report states:

9   
10  
11  
12  
> Information received from Design Center staff, Evelyn Viohl and Ivy Ross that MGA Entertainment, headed by a person known as Isaac [Larian] has recently hired a number of former Mattel employees and is manufacturing products that appear to be Mattel designs." *Id.*  The Incident Report identifies Isaac Larian as a "Suspect" and as the "Owner of MGA Entertainment." *Id.*

13  This investigation concerned *at least* whether Bryant had "plagiarized" an earlier

14  design by Lily Martinez and created "'Bratz' dolls for MGA."  Ex. 1195RS at

15  1195RS-066.  That design for Toon Teens was *an unpublished and rejected*

16  *product*. Ex. 286.

17       On March 28, 2002, the meetings continued and Park identified Bryant as the

18  "illustrator/former employee who may have plagiarized design of Lilly Martinez

19  and created 'BRATZ' dolls for MGA."  Ex. 1195RS at 1195RS-066.  Simoneau

20  "checked w/HR for Bryant's file" and noted Bryant's termination date was

21  "10/20/00."  Ex. 1195RS at 1195RS-066.  The next portion of the investigation log

22  has been redacted.  *Id.*; entry 51 from Mattel's privilege log.  By this point, Mattel's

23  counsel were actively involved, as McShane, the chief IP attorney in Mattel's Legal

24  Department, attended the meeting in which they discussed "that Bratz potentially

25  had plagiarized this project of Toon Teens of Lillie Martinez."  Simpson-Taylor

26  30b6 Depo. at 187:13-188:5.  De Anda and McShane then agreed that McShane

27  "would take the next step" in the investigation.  De Anda Depo. at 182:3-21,

28  200:21-201:16, 205:12-207:17.  When De Anda followed up with McShane

1    regarding the investigation, De Anda was told that it was in the hands of outside

2    counsel.  De Anda Depo. at 230:15-20, 258:25-259:15.

3                   **5.   Mattel Receives An Anonymous Letter Alleging That Bryant**
                          **Created Bratz At Mattel And Took It To MGA; Relevant**
4                         **Documents Appear On Mattel's Privilege Log.**

5
6            In August 2002, Mattel's CEO, Robert Eckert, received an anonymous letter

7    that again accuses Bryant of having created Bratz while employed by Mattel and

8    taking the Bratz concept to MGA.  Ex. 6302.  Eckert forwarded the letter to Alan

9    Kaye, Senior Vice President of Mattel's Human Resources Department, and Kaye

10   sent it to Richard De Anda, Mattel's' Head of Security, for further investigation.

11   Kaye Depo at 390:19-20; De Anda Depo at 225:9-14.  In an undated email, De

12   Anda wrote to Kaye stating that he had been "aware of this situation and ha[d] been

13   working on it for several months," and that "[t]he truth of the matter is that Carter

14   Bryant did work for Mattel."  Ex. 6302 at M 0074400.  The next portion of the

15   email is redacted.  *Id*.; entry 29 from Mattel's privilege log.

16           As discussed above, Mattel asserts that it viewed this letter in the context of

17   the "pending investigation into whether Bratz infringed Mattel's rights in Toon

18   Teens."  Dkt. #2767 at 24.[9]

19           At least the following entries from Mattel's privilege log appear to

20   correspond to the 2002 investigations of Bryant and the anonymous letter, including

21   authors and recipients such as Michele McShane, her assistant (Anita Kersting),

22   Michael Zeller, Richard De Anda, Alan Kaye and others working on their behalf:

23   29, 51, 73, 85, 257-259, 261-266.  Rutowski Decl. Ex. A.  Mattel describes these

24   entries as "reflecting opinion of legal counsel" and relating to "legal advice."

25
26
27   _____
     [9] Mattel Inc.'s Corrected Opposition to the MGA Parties' and Carter Bryant's
28   Motions for Partial Summary Judgment.

1

2

**6.      Information Regarding Bryant, Bratz and MGA Continues To Pour In Mid-2003; Related Documents Appear On Mattel's Privilege Log.**

3

4

5

6

7

8

9

10

11

12

By mid-2003 the press was picking up the very story that Mattel was investigating internally.  Mattel, in interrogatory responses confirmed that "[t]o Mattel's knowledge, Bryant was first and definitively confirmed as the Bratz designer in the July 18, 2003 *Wall Street Journal* article ("WSJ article"), in which Isaac Larian also indicated that Bryant had been involved in some manner with MGA in or about 'late 1999.'"  Ex. 1.  At trial, Mattel lawyer Michael Moore testified that he had read the WSJ article in July 2003.  Moore Tr. at 6464-6465.  Mattel further confirmed in these responses that "[a]fter Bryant left Mattel, but prior to the July 18, 2003 article, there was rumor and innuendo that Bryant may be working with MGA on Bratz."  Russell Decl. Ex. 40 at 608.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

Meanwhile, Mattel's investigation in connection with Case #02-115 continued after the WSJ article.  The "Chronological Record," produced in partially unredacted form after court order, shows that four days after the WSJ article, on July 22, Richard De Anda "researched Bryant's [illegible word]/addresses for Legal – (Jill Thomas)."  Ex. 1195RS at M 0074372.  This is further reflected by the "7/22/03" print date on pages in the file that include information regarding Carter Bryant's employment from Mattel's PeopleSoft employment verification system.  *See id*. at M 0074315-16.  At this time, Mattel was again actively investigating the dates of Carter Bryant's employment with Mattel including the date of his termination, "10/20/2002."  *Id*. at M 0074372.   This file remained open and active for many years, as it contains documents and chronological record entries stretching through 2004, 2005 and 2006.  *Id*. at M 0074312-18.  Moreover the September 2003 "Date Reported" on the anonymous letter investigation Case #02-1608, which Mattel contends to be an continuation of the earlier investigation, further confirms that Mattel's investigation stretched well into 2003. Ex. 6302 at M 0074398.

28

1      Mattel's privilege log reflects a flood of activity in this time frame that

2   Mattel is withholding on the basis of privilege.  One communication between Zeller

3   and Normile occurred in May 2003 regarding a "personnel issue," and a flurry of

4   allegedly privileged communications, including some with investigator Al

5   Ristuccia, ensued surrounding the WSJ article.  *See, e.g.*, Privilege Log Entry Nos.

6   27, 33, 35, 273-290, 354-361, 364-370, 373-375, 377-382, 384, 724-725, 986,

7   1018, 1022-1024.

8          **7.      By September 2003, Mattel Discusses Whether MGA Owns**
                   **Bratz With Cityworld.**
9

10     By at least September 2003, if not earlier, Mattel became aware of a Writ of

11  Summons issued by MGA against Cityworld and others on June 5, 2002 in Hong

12  Kong High Court ("Hong Kong Action") regarding fashion dolls designed by

13  Carter Bryant, and specifically Bratz.  Dkt. #6590-6 (Writ of Summons).  On July

14  5, 2002 MGA filed a Statement of Claim.  Dkt. #6590-7.  On September 4, 2003

15  counsel for Cityworld sent a letter to Mattel stating that his client was engaged in a

16  lawsuit against MGA "and one of the points of contention is whether MGA owns

17  the copyright of the design of the Bratz dolls."  Dkt. #6590-9.  Mr. Yu further

18  explained that he was writing to Mattel because he understood that drawings for the

19  "Bratz" dolls were made by "one Carter Bryant."  *Id.*

20     Mattel clearly took interest in this letter, because in September 2003, outside

21  counsel Michael Zeller reached out to Mattel's Hong Kong counsel, Bird & Bird,

22  for additional information.  On September 23, 2003, Zeller received one or more

23  facsimile(s) from Bird & Bird, attaching the claim against Cityworld Limited by

24  MGA.  Dkt. Nos. 3730-2, 3730-3; Rutowski Decl. Ex. 1 (privilege log entry nos.

25  1016 and 1017).  The September 4 letter also led to a series of other

26  communications, both written and oral, between Michael Moore and Cityworld's

27  counsel.  *See, e.g.*, Dkt. #6509-10; Dkt. #3733 Ex. 146, 147.  These

28  communications culminated in a meeting with Cityworld's counsel in Hong Kong

1  on November 24, 2003, which is when Mattel claims that it first, and finally,

2  became aware of its claims against MGA.  Dkt. Nos. 2504-4, 2767-10, 3730-2

3  (Declarations from Michael Moore in connection with Phase 1 Summary Judgment

4  Motions regarding Mattel's receipt of information from Cityworld).

5       Mattel cloaks its continuing investigations of "potential litigation" in

6  privilege.  [1] *See, e.g.*, Privilege Log Entry Nos. 12-17, 22, 292-304, 362-363, 371,

7  376, 543, 616, 617, 699, 846, 984-985, 1016-1017, and 1028.  Rutowski Decl. Ex.

8  A. Moreover, within a few days of the purported meeting on November 24, 2003,

9  there are numerous additional entries reflecting emails, memoranda and notes to

10  and from Moore, Normile and Zeller, which are likely to reflect what was

11  communicated before and after the Cityworld meeting, including at least the

12  following privilege log nos. 372, 550, 554, 567, 570-571, 573-574, 581, 756, 776,

13  922-923, 936, and 944.  *Id*. Finally, there are a number of undated privilege log

14  entries that relate to "potential litigation" but lack any further description that

15  would allow MGA to determine their subject matter, including Privilege Log Entry

16  Nos. 335, 337-338, 383, 718-719, 862, 867, 876, 884, 919, 934, 937, 987, 989-990,

17  1026-1027. *Id*.

18  **C.**    **During Litigation, Mattel  Discloses The Scope And Results of Its**
19  **2002-2003 Investigation But Then Shuts Down Inquiry.**

20       Mattel witnesses have in fact disclosed the purported scope and results of

21  Mattel's 2002 investigation.  However, Mattel has refused discovery into the

22  assertions. Mattel's fact witness and former Vice President of Global Security

23  Richard De Anda testified as to the communications he had with in-house counsel

24  regarding the results of the "Toon Teens" investigation:

25         Q. Did McShane tell you what she did to determine if
there was, in fact, a copyright infringement?
26

27         MR. COREY: You can answer that "yes" or "no"

28         THE WITNESS: Well, but I would prefer not.  There was
a --

1    MR. COREY: Well --

2    THE WITNESS: Okay. She may have, however, the take-
     away from the conversation was that it was outside
3    counsel of some sort that came to that conclusion and that
     was my understanding. I don't know the exact words but
4    that was my take-away from it.

5    Q. Now, this conversation that you had with McShane
     where *she gave you the conclusion that there wasn't a*
6    *copyright violation of Tune Teens*, did that conclusion get
     communicated to you before you received a copy of the
7    anonymous letter that had been sent to Bob Eckert, the
     Chairman of Mattel -- the CEO of Mattel?

8    A. *No, it was after because the conclusion had not been --*
9    *as I remember -- no is the answer.*

10   De Anda Depo at 224:3-225:1 (emphasis added, objections omitted).

11        Mattel's 30(b)(6) witness on when Mattel first became aware that Bryant was

12   involved in Bratz, Kathleen Simpson-Taylor, later elaborated on communications

13   with Michael Zeller regarding the investigation and its results:

14   Q.   As part of your investigation today, did you
     determine whether or not Mattel believes that the Bratz
15   doll infringes Toon Teens?

16   THE WITNESS:  My understanding based on the
     information that I have is that our IP lawyer -- former IP
17   lawyer, Michele McShane, looked into that issue of
     potential infringement of the Toon Teens with Bratz in
18   2002 and that working with outside counsel; namely,
     Mike Zeller, that there was some opinion that I have not
19   seen that was issued and I understand *as a result of that*
     *issuance of that opinion that there was no suit or case*
20   *filed.*

21   Q.   Do you know the date of the opinion?

22   A.   I do not -- I have not seen that opinion.

23   Q.   Do you know which law firm authored the opinion?

24   MR. NOLAN:  Sorry.  Let me rephrase that question.

25   Q.   The opinion that you were just referring to, you have
     not reviewed the opinion?
26
     A.   No, I have not.
27
     Q.   Who told you about the opinion?
28

> A.   *Mike Zeller told me about the opinion.*

Simpson-Taylor Depo at 112:10-113:12 (emphasis added, objections omitted). Ms. Simpson-Taylor continued:

> Q.   *How was it that you came to speak to Mike Zeller about these facts?*  Did he volunteer them? Did you ask him "I need to ask you questions about this work that you were doing on Bratz and Toon Teens in 2002"?
>
> A.   As we were preparing for today's testimony, we talked about -- we talked about the potential copyright infringement of the Toon Teens and *I recall asking Mr. Zeller what was the outcome of that.*
>
> Q.   And what did he say when you asked him that question?
>
> THE WITNESS:  *He said that Michelle McShane, the IP attorney, had worked with him as outside counsel to review whether there's some legal – I know there was no case so they were reviewing whether it was something they could have a case about.*

Simpson-Taylor Depo at 117:21-118:14 (objections omitted); Dkt. #439 at 2-3 (Mr. De Anda declared that "in the spring of 2002, I followed up on information that Carter Bryant might have misappropriated 'Toon Teens,' a doll line created by Mattel designer Lily Martinez, after Mr. Bryant left Mattel" and in August of 2002 he made inquiries into an anonymous letter, but that the views on the investigation he obtained from Michele McShane are privileged).

### D.   MGA Has Tried Exhaustively To Pursue Alternate Sources of Discovery Into Mattel's Investigation To No Avail.

MGA has exhausted all alternative sources of discovery, and no others are available.  Mattel has repeatedly objected to discovery relating to MGA's statute of limitations defense and Mattel's investigations as either irrelevant or privileged.[10]  Further, MGA has deposed numerous witnesses, including Robert Eckert, Alan

---

[10] For relevant discovery requests, *see, e.g.*, Dkt. #1350 (Declaration of Marcus R. Mumford In Support Of MGA's Motion To Compel Regarding Mattel's Privilege Waiver By Claim Assertion) ("Mumford Decl.") Exs. 3, 4, 11-15.

1  Kaye, Richard de Anda, Robert Simoneau, Michael Moore and Robert Normile,

2  and many others including those whose deposition testimony is cited above, but has

3  repeatedly been denied discovery on this topic either because the witnesses disclaim

4  any knowledge of the investigations or because Mattel asserts privilege.  Two of the

5  most knowledgeable people, Michele McShane and Michael Zeller have been

6  unavailable to MGA.   MGA has gone to great effort to subpoena Michele

7  McShane, even hiring a private investigator, but succeeded only in issuing a trial

8  subpoena.  Michael Zeller is Mattel's lead counsel.  A finding of privilege waiver is

9  the only means available for MGA to find out what Mattel actually knew or should

10 have known prior to November 20, 2003.

11                          **ARGUMENT**

12 **I.     THE STATUTE OF LIMITATIONS FOR TORT CLAIMS IS TWO**
   **YEARS.**

13

14      In its summary judgment order, this Court found that:

15            To the extent Mattel's surviving counter-claims for
               copyright infringement, breach of contract, intentional
16            interference with contractual relations, misappropriation
               of trade secrets, breach of duty of loyalty, and aiding and
17            abetting breach of duty of loyalty, concern the Bratz
               works and Bryant's work for MGA, those counter-claims
18            are deemed to have been filed on April 27, 2004 pursuant
               to the law of the case doctrine.

19

20 Dkt. # 9600.  With respect to Mattel's tort claims, including breach of duty of

21 loyalty, aiding and abetting breach of duty of loyalty, and intentional interference

22 with contractual relations, the Court found the applicable statute of limitations

23 period to be "within two years of the alleged wrongdoing." Dkt. # 9600 at 93.  This

24 would render the claims untimely if Mattel knew or should have known about

25 MGA's alleged wrongdoing before April 27, 2002.

26

27

28

## II.   **MATTEL HAS IMPLIEDLY WAIVED PRIVILEGE BY ASSERTING FRAUDULENT CONCEALMENT.**

Mattel has waived its privilege and work product protection as to documents and information relevant to MGA's statute of limitations defense.  A party waives the privilege when (1) the party asserts the privilege as a result of some affirmative act, such as filing suit; (2) through this affirmative act, the asserting party puts the privileged information at issue; and (3) allowing the privilege would deny the opposing party access to information vital to its defense.  *Home Indem. Co. v. Lane Powell Moss and Miller*, 43 F.3d 1322, 1326 (9th Cir. 1995) (adopting *Hearn v. Rhay*, 68 F.R.D. 574 (E.D. Wash. 1975)); *see also United States v. Amlani*, 169 F.3d 1189, 1195 (9th Cir. 1999).  In *Hearn,* an overarching consideration is whether allowing the privilege to protect against disclosure of the information would be "manifestly unfair" to the opposing party.

In light of this standard, courts have routinely found that the assertion of a claim of fraudulent concealment, as here, is a waiver of the privilege.  Applying California law, the court in *Rambus Inc. v. Samsung Electronics Co., Ltd.*, 2007 WL 3444376 at *4-5, 7 (N.D. Cal. Nov. 13, 2007), found that the privilege could not bar discovery under the *Hearn* test because "California law clearly considers a plaintiff's subjective knowledge relevant to the fraudulent concealment inquiry".  This stands to reason.  As noted in *Snapp & Assocs. Ins. Servs., Inc. v. Malcolm Bruce Burlingame Robertson*, 96 Cal. App. 4th 884, 890 (2002) (cited by the *Rambus* court), "[t]he fraudulent concealment doctrine 'does not come into play, whatever the lengths to which a defendant has gone to conceal the wrongs, if a plaintiff is on notice of a potential claim'" (quoting *Rita M. v. Roman Catholic Archbishop*, 187 Cal. App. 3d 1453, 1460 (1986)); *see also WLIG-TV, Inc. v. Cablevision Sys. Corp.*, 879 F. Supp. 229, 233, 235 (E.D.N.Y. 1994) (finding implied waiver where plaintiff "put otherwise protected information at issue by raising equitable doctrines to overcome a limitations bar" because the equitable

doctrine of fraudulent concealment requires a showing "that [plaintiff] remained in ignorance of that cause of action until some point within [the statute of limitations period]" ); *Bohack Corp. v. Iowa Beef Processors, Inc.*, No. 1981 WL 2018 at *1-2 (E.D.N.Y. Jan. 13, 1981) ("Because [plaintiff] has created an issue of its knowledge with respect to defendant's activities in order to avoid the statutory protection which would otherwise be afforded its adversary, it has thereby waived its attorney-client privilege as to communications pertinent to that issue"); *Russell v. Curtin Matheson Scientific, Inc.*, 493 F. Supp. 456, 458 (D. Tex. 1980) (finding waiver where plaintiffs "assert the attorney-client privilege" and yet have "by an 'affirmative act for (their) own benefit,' the raising of the equitable tolling issue, 'placed information protected by (the privilege) in issue'") (citations omitted).

Simply put, "[plaintiff] may not take advantage of the assertion of fraudulent concealment, a doctrine which derives from equity… and at the same time preclude its adversary's discovery of the very evidence which pertains to the application of that doctrine." *Bohack Corp.*, 1981 WL 2018 at *2.

Access to Mattel's privileged documents is not only warranted, it is important.  It is the only way for MGA to discover what exactly Mattel learned or knew before the statute of limitations period.  *See Aloe Vera of Am., Inc. v. United States*, 2003 WL 22429082, at *6 (D. Ariz. 2003) (information "that evidences what investigation Plaintiffs' counsel conducted, what information counsel received, and when counsel received it… [and] when Plaintiffs' counsel may have advised Plaintiffs that a cause of action may have accrued" vital to statute of limitations defense); *see also In re Imperial Corp. of Am.*, 179 F.R.D. 286, 290 (S.D. Cal. 1990).

Finally, Mattel has, in fact, asserted that it conducted an investigation and then asserted a lack of knowledge to avoid the statute of limitations.  Indeed, it presented its in-house counsel at trial to do so. *See* Statement of Facts, Parts A, C, *supra*.  Mattel cannot make this assertion concerning its scope and the result of

whatever investigation it conducted and then hide behind the privilege to preclude inquiry.  "The privilege which protects attorney-client communications may not be used both as a sword and a shield"—exactly what Mattel seeks to do here with respect to its early 2002 investigation.  *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992) (finding that the attorney-client privilege may not be invoked to deny the other party access to the very information that it must refute in order to meet its burden); *see also Aloe Vera v. United States*, 2003 WL 22429082 at *3 ("Plaintiff's attorneys' involvement as to Plaintiffs' date of discovery of the allegedly unauthorized disclosures, therefore, is certainly 'at issue' in this case.").  Without access to the purportedly protected materials, MGA simply cannot test Mattel's assertions.

## CONCLUSION

For the foregoing reasons, MGA respectfully requests an order finding waiver of attorney-client privilege with respect to Mattel's investigations and communications that reflect Mattel's knowledge prior to the statute of limitations period.  MGA requests *in camera* review of the privilege log entries identified herein to determine whether they reflect such communications, and production of any documents that fall within the privilege waiver.


Respectfully submitted,


Dated:  January 16, 2011          ORRICK, HERRINGTON & SUTCLIFFE LLP


By:   _____*/s/ Diana M. Rutowski*_____
                    Attorneys for MGA Parties