# EXHIBIT A

SKW
Schwarz
Rechtsanwälte

SKW Schwarz Rechtsanwälte Mörfelder Landstraße 117 60598 Frankfurt/Main

Mr. Larry Russ
Russ August & Kabat
12424 Wilshire Boulevard, 12th Floor

Los Angeles, CA 90025
UNITED STATES
**Fax +1 319 826 6991**

Matthias Götz
Rechtsanwalt
60598 Frankfurt/Main
Mörfelder Landstraße 117

Büro: Gerda Machau
Tel +49 (0)69-63 00 01-47
Fax +49 (0)69-63 55 22

M.Goetz@skwschwarz.de
www.skwschwarz.de

Frankfurt/Main, November 29, 2010

Bankverbindung
Frankfurter Volksbank eG
BLZ 501 900 00
Konto 489 131
IBAN DE 31 501 900000
000 489 131
SWIFT FFVB DE FF

Frankfurter Sparkasse
BLZ 500 502 01
Konto 256 196

Sparkasse Langen-Seligenstadt
BLZ 506 521 24
Konto 36 117 034

Steuernummer 148 234 10124
Ust-IdNr. DE 130746179

**UNITED STATES DISTRICT COURT/CENTRAL DISTRICT OF CALIFORNIA**

Case No. CV 04-9049 DOC (RNBx) Date: November 1, 2010

Title: MATTEL, INC. v. MGA ENTERTAINMENT, INC.

Dear Larry Russ:

**10719 Berlin**
Kurfürstendamm 38/39
T +49 (0) 30 889 26 50-0
F +49 (0) 30 889 26 50-10

**40212 Düsseldorf**
Steinstraße 1/Kö
T +49 (0) 211 82 89 59-0
F +49 (0) 211 82 89 59-60

**60598 Frankfurt/Main**
Mörfelder Landstraße 117
T +49 (0) 69 63 00 01-0
F +49 (0) 69 63 55 22

**20095 Hamburg**
Spitalerstraße 4
T +49 (0) 40 33 40 1-0
F +49 (0) 40 33 40 15 30

**80333 München**
Wittelsbacherplatz 1
T +49 (0) 89 286 40-0
F +49 (0) 89 280 94-32

SKW Schwarz Rechtsanwälte
Steuerberater Wirtschaftsprüfer
Partnerschaft
AG München PR 884

1. I am a German lawyer representing Zapf Creation AG ("Zapf"). I am a partner with SKW Schwarz Rechtsanwälte, a German law firm with almost 100 lawyers. I have been admitted to the bar in 1991 and since then have worked on many national and international transactions, legal disputes and other legal issues. During my career I was an in house lawyer with JP Morgan and Lehman Brothers as well as a partner with a US based law firm. I am only advising with regard to German law and this statement is subject to German law only.

2. Zapf is an *Aktiengesellschaft*, a corporate form analogous to an American public corporation. It was founded in 1932 and is pres-

Seite 1/11

SKW
Schwarz
Rechtsanwälte

ently headquartered in Roedental, in Bavaria, Federal Republic of Germany. Zapf is owned by its shareholders and its shares are traded publically; the company is admitted to the Prime Standard at the Frankfurt stock exchange. Zapf is not a subsidiary of MGA Entertainment, Inc. ("MGA"), nor does MGA control Zapf's day-to-day operations, product development, or manufacturing. Rather, Zapf is indirectly using MGA as its distributor in the US and some American countries. MGA buys Zapf products directly from third parties (manufacturers) and only pays royalties to Zapf for products sold by MGA and a "mark up fee" on products MGA buys from the third parties. MGA uses Zapf's distribution structure and pays a comission fee for distribution in Europe and other countries. Although there are some other agreements in place as outlined in the annual report of Zapf, Zapf and MGA have partly the same shareholders and are very good business partners, the companies are separate entities and all transactions between them are arms-length.

3. We have been forwarded a Document described as "ORDER GRANTING IN PART AND DENYING IN PART MATTEL'S EX PARTE APPLICATION FOR ORDER TO COMPEL DISCOVERY FROM ZAPF CREATION RE: COUNTER-CLAIMS IN REPLY [DOCKET 8996]" in the case Mattel, Inc v. MGA Entertainment, Inc. in the Central District of California.

4. Zapf has not appointed MGA or any of its members of management or employees as agent of process. Neither under the applicable Hague Convention nor under US Law as we understand it, this document has been served on Zapf in a legally effective way. We also

herewith state that a significant number of the statements and facts contained in that document are incorrect. Without waiving any of these challenges (which are not set forth in detail here), the Zapf Management Board has decided to comply with the Court's order to the extent permitted by German law(see below 6).

5. Zapf, as is customary for German AG entities, has a two-tiered board structure, consisting of a Supervisory Board and a Management Board. The Supervisory Board can in general give advice to the management board, elect members of the Management Board for specified terms, and has an overall supervisory function, but does not exert operational or day-to-day control over Zapf. Isaac Larian is an ordinary member of the Supervisory Board, with one vote thereon. Actual control of Zapf rests in the discretion of the Management Board. The Management Board is under a duty to act in the best interest of Zapf AG and all of its shareholders, not in the best interest of individual shareholders or affiliates. Shareholders can in general only influence the company in a Shareholder's Meeting. A Shareholders' Meeting is not in a position to give orders to the Management Board. The Shareholders' Meeting elects the Supervisory Board; the Management Board is appointed by the Supervisory Board. Members of the Supervisory Board can be elected with a 50% majority of the votes present in a Shareholders' Meeting. They can only be recalled with a majority of 75% of the votes present in a Shareholders' Meeting before their term expires. All transactions with Shareholders have to be at arms length. The only way to have a Shareholder intervene in the Management of an AG is by way

of entering into a Domination or Profit and Loss Pooling Agreement which needs the approval of the Shareholders' Meeting; in such a case German law provides for various measures to protect the other Shareholders. Zapf Creation AG has not entered into such kind of agreements with any of its Shareholders.

6. The Management Board of Zapf is attempting in good faith to comply with the Court's November 1, 2010 Order. However, Zapf is a German corporation located in the Federal Republic of Germany (in the state of Bavaria) and therefore is subject to the laws of Germany and of the European Union. The European Union has established a regulatory framework controlling the transfer of personal data within the EU and between member nations and other states. This framework is primarily, but not exclusively, embodied by Directive 95/46/EC of the European Parliament and of the Council of 24 October 1995 on the protection of individuals with regard to the processing of personal data and on the free movement of such data, commonly referred to as "the European Data Protection Directive."

7. Even before the EU framework was established, German law controlled the transfer of personal data. Germany holds an individual's right to privacy and informational self-determination to be a fundamental human right on a par with freedom of speech or freedom of religion (it is my understanding that American law is quite different on this issue, especially as regards electronic communications). Data protection laws have existed in Germany since at least 1970 (Roedental is in the former West Germany), and federal data protection laws have ex-



isted since at least 1977. Presently, numerous German laws restrict the transfer and processing of personal data including the German Telecommunications Act, the German Tele Media Act, and the German Federal Data Protection Act, or "BDSG," which is the general omnibus law governing personal data protection in Germany. The BDSG was amended in 2001 specifically to bring it into accord with the European Data Protection Directive.

8. "Personal data" is defined broadly by these regulations, and includes documents referring or relating to any individual who may be identified directly or indirectly. Documents generated during the course of an individual's employment may comprise personal data, such as email or other electronic documents that identify individuals. Documents responsive to at least Mattel Request Nos. 3, 6, 7, 8, 10, 11, 12, 13, and 14 (Dkt. No. 8996, Ex. A) are highly likely to contain personal data. Documents responsive to Request Nos. 1, 2, 4, and 9 may contain personal data.

9. Under the BDSG, every transfer of personal data from one entity to another requires either the consent of the data subject (the individual whose personal data is being transferred) or a statutory permission. Data transfer to countries that do not have data protection standards that accord with Germany's, including the United States, is particularly disfavoured.

10. As a practical matter, it is impossible for Zapf to procure the permission of every individual whose personal data may be included in Mattel's requests. Mattel appears to request data generated by ex-

employees and data relating to third parties, such as the agents of retailers that Zapf has had contact with. Even with regard to Zapf's current employees, under German law it is doubtful whether Zapf could simply request their consent because the employer-employee relationship renders it doubtful whether such consent can be considered freely given.

11. Additionally, Zapf may not have recourse to the statutory permissions because German civil procedure hardly recognizes pre-trial discovery in any form and does not recognize pre-trial discovery from non-parties at all. Rather, documents generally are produced directly to the court. The difference to American-style discovery was addressed by the 2007 annual report of the Berlin Data Protection Authority. In that document, the Authority reported that the question of pre-trial discovery was raised in the course of the so-called Düsseldorf Kreis, which is a conference of all of the regional German data protection authorities responsible for enforcing privacy laws. The Kreis concluded that Section 4(c) of the BDSG, the derogation that might otherwise allow the transfer of data "for the establishment, exercise, or defense of legal claims," is no basis for data transfer from one company to another in the course of pre-trial discovery because such transfer is not "in court." For these reasons, and especially because the documents are being sought for a civil matter to which Zapf is not even a party, it is unlikely that a statutory permission would shield Zapf from liability should Zapf transfer documents containing personal data to the United States. A copy of that report is attached to this letter as Exhibit A.

12. After determining that compliance with the Court's No-

SKW
Schwarz
Rechtsanwälte

vember 1 Order compelling production according to Mattel's requests as written would violate German law, I contacted the Bavarian Data Protection Authority, the appropriate regional governmental agency that enforces privacy law to determine what steps, if any, Zapf could take to respond. The Authority informed me that any production made by Zapf in response to the Court's November 1, 2010 order is subject to the BDSG, which the Authority will enforce in accord with the Article 29 Data Protection Working Party's recommendations, set out, *inter alia*, in the Article 29 Data Protection Working Party Document 1/2009 On Pre-Trial Discovery For Cross Border Civil Litigation. 00339/09/EN WP 158 (2009). I was warned that Article 38 of the BDSG grants the Authority the power to issue an order prohibiting the transfer of data and that any illegal transfer can result in severe penalties.

13. The Authority informed me that it will contact its sister agencies in other Federal States and would, by November 24, 2010, advise Zapf whether and how the production ordered by the Court may be made in accordance with German law. They informed me that if the transfer is deemed lawful, the Authority likely would impose procedures designed to assure the best possible protection of the rights of Zapf's employees, ex-employees, and third parties whose personal data is implicated by Mattel's requests in a time frame of about two to three weeks from Nov. 24.

14. We contacted the Authority on Nov. 24 again and their first indication was that they are of the view that Zapf may not search or open any emails or transfer any data that contains personal data to the

Court without the prior consent of the individuals whose emails are searched or whose personal data for example in paper documents is forwarded to the court because Zapf is neither a defendant or a plaintiff in the law case before the Court. As the Management of Zapf had decided to follow the Court's November 1 Order we had extensive discussions with the Authority and were able to produce enough arguments to convince the Authority to agree that the consent of all individuals whose personal data might be processed or transferred is not necessary although they clearly stated that this is a borderline decision. Due to the urgency we demonstrated to the Authority, the Authority has announced that they will give us written confirmation as soon as possible. We received such confirmation orally on Nov. 25 and in form of an attachment to an email in the afternoon of Nov. 26. The letter from the Authority is attached to this letter as Exhibit B, and the English translation is attached as Exhibit C.

    15. The Authority has further indicated in general in our discussion and has confirmed this in the letter to us that the following procedure has to be followed:

    a. No emails may be searched or opened which were written before January 1, 2008 as until that time Zapf' s email policy permitted employees to use work e-mail for personal purposes. Any search or opening without the prior consent of the individual person whose data is contained in such an email is a violation of the German Telecommunications Act and the BDSG.

    b. Emails written after January 1, 2008 may be searched and

opened without the prior consent of the individual person.

c. Emails that contain information as requested by the court may only be transferred to the US after the personal data (including of course the name of the individual) has been redacted.

d. Without the prior consent of the individual the identity of each individual may only be revealed to the Court after the Court has given well founded reasons why in the specific case the identity has to be revealed and why the interest of the individual not to reveal its personal data is ranked lower than the interest of the Court to have it revealed.

e. Data in paper or other files may be searched and submitted to the Court but also only after it has been redacted. Section d. above applies as well.

16. Please note that any witness produced by Zapf has to comply with 15. a. to e. above. To the extent the witness has gained his information/knowledge from emails or paper or other electronic files, the witness is not allowed to reveal personal data. However, in general there are no restrictions in case information is contained in emails or letters that were addressed to the witness or facts the witness has seen or heard unrelated to emails or paper files which have been produced for this discovery.

17. The letter from the Authority includes further more detailed descriptions of the process to be followed. They are also asking the Court to issue a protective order in order to find a strict procedure

SKW
Schwarz
Rechtsanwälte

ordering how the parties have to treat the data provided.

18. As it is almost impossible to get all employees, former employees and business partners whose personal data might be contained in the emails stored on Zapf's servers to agree to their data to be processed, and after the Authority had explicitly warned Zapf that non-compliance with the German Telecommunications Act and the BDSG may be severely punished, Zapf was only able to search and open emails after the procedure had been clarified with the Authorities in order not to violate the German Telecommunications Act and the BDSG. Therefore Zapf was only able to start with the search on November 25. In order to comply with the law, Zapf will not process any emails written before the year 2008. As all files that contain data for the time before the year 2009 are stored separately, the technical procedure to transfer the data for 2008 in a system with which they can be searched takes about three days. In addition, once certain emails will have been identified, Zapf has to read them and make them anonymous. Now that it has received permission from the Authority, Zapf is proceeding as fast as possible to transfer these files, search them, and process them. However, because Zapf could not even run searches until it received permission from the Authority, Zapf will not have completed its search until sometime after December 1, 2010. I will keep you informed of Zapf's progress on a regular basis, and ask that you keep the Court in the United States informed of our progress.

We agree that this letter can be submitted to the United States District



Court/Central District of California in relation to the above mentioned case.

Yours sincerely

Matthias Götz
Rechtsanwalt
(Attorney-at-Law)