# EXHIBIT B

# Bayerisches Landesamt für Datenschutzaufsicht
in der Regierung von Mittelfranken



Regierung von Mittelfranken • Postfach 6 06 • 91511 Ansbach

SKW Schwarz Rechtsanwälte
Herrn RA Matthias Götz
Mörfelder Landstraße 117
60598 Frankfurt am Main

| Ihr Zeichen<br>Ihre Nachricht vom | Unser Zeichen (Bitte bei Antwort angeben)<br>Ihre Ansprechpartnerin/Ihr Ansprechpartner | E-Mail: alexander.filip@reg-mfr.bayern.de | | |
|---|---|---|---|---|
| | | Telefon / Fax<br>0981 53- | Erreichbarkeit | Datum |
| | LDA-1085.3-106 | | | |
| 25.11.2010 | Herr Filip | 1419 / 5419 | Zi. Nr. F 284 | 26.11.2010 |

**Bundesdatenschutzgesetz (BDSG);**
**Zapf Creation AG, Mönchrödener Str. 13, 96472 Rödental;**
**Anfrage wegen Umgangs mit personenbezogenen Daten im Zusammenhang mit einem Pre-Trial-Discovery-Ersuchen gegen die Zapf Creation AG**

Sehr geehrter Herr Rechtsanwalt,

hiermit möchten wir auf Ihre namens und im Auftrag der Zapf Creation AG gestellte Anfrage zur datenschutzrechtlichen Zulässigkeit der Sichtung und Übermittlung von betrieblichen Unterlagen der Zapf Creation AG an ein US-Gericht im Zusammenhang mit einem Pre-Trial-Discovery-Ersuchen gegen die Zapf Creation AG antworten.

### I.) Sachverhalt

Sie haben uns mitgeteilt, dass die Zapf Creation AG, Mönchrödener Str. 13, 96472 Rödental, von dem United States District Court Central District of California in einem Klageverfahren Fall No. CV 04-9049 DOC (RNBx) (MATTEL, INC., und andere - Kläger - gegen MGA ENTERTAINMENT, INC, und andere - Beklagte -), ohne Partei, d.h. weder Kläger noch Beklagte dieses Verfahrens zu sein, aufgefordert wurde, im Rahmen einer sogenannten "Discovery" nach amerikanischem Recht eine Vielzahl von Dokumenten vorzulegen, darunter auch von Mitarbeitern geschriebene e-mails, die im Zusammenhang mit Themen mit Bezug auf MATTEL, INC. stehen. Die angeforderten Dokumente sind in einem "Exhibit A" und "Exhibit B" genannten Anhang zu einem Dokument, dass in der Rechtssache wohl als Document 8996 am 27.10.2010 bei Gericht eingereicht wurde und das uns in englischer Sprache vorliegt, enthalten.

Neben e-mails, die entsprechende Angaben enthalten, werden auch weitere Dokumente, die personenbezogene Daten enthalten, angefordert, unter anderem die gesamte Kommunikation mit Mitarbeitern und Vertretern von MGA ENTERTAINMENT, INC. bezüglich gewisser Informationen über MATTEL, Dokumente (z.B. Besucherlisten, Vertraulichkeitserklärungen, Listen von Mitarbeitern, Kalendereintragungen), die die Namen von Personen enthalten, die "Showrooms" der Zapf Creation AG auf Spielwarenmessen besucht bzw. dort gearbeitet haben oder vertrauliche Informationen über Produkte von MGA ENTERTAINMENT INC. oder Zapf Creation AG erhalten haben, Listen von Personen, z.B. Pressevertretern, denen Produkte von MGA ENTERTAINMENT, INC gezeigt wurden, Namen und Aufzeichnungen von derzeitigen und ehemaligen Mitarbeitern von MATTEL INC, und Kommunikation, die mit diesen über MATTEL, INC geführt wurde, Dokumentation über sämtliche Ge-

...

| Briefanschrift | Dienstgebäude | Weiteres Dienstgebäude | Telefon 0981 53-0 | Öffentliche Verkehrsmittel |
|---|---|---|---|---|
| Postfach 6 06, 91511 Ansbach | Promenade 27 | Bischof-Meiser-Str. 2/4 | Telefax 0981 53-1206 und 53-1456 | Bushaltestellen Schlossplatz |
| | Weitere Gebäudeteile | | E-Mail poststelle@reg-mfr.bayern.de | oder Bahnhof der Stadt- und |
| **Frachtanschrift** | F  Flügelbau | | Internet | Regionallinien |
| Promenade 27, 91522 Ansbach | Th  Thörmerhaus | | http://www.regierung.mittelfranken.bayern.de | |

spräche mit Mitarbeitern von MGA ENTERTAINMENT INC., die über bestimmte Informationen über MATTEL INC. geführt wurden.

Die Vorlage der oben genannten Unterlagen durch die Zapf Creation AG soll gemäß Ihren Angaben gegenüber dem US-amerikanischen Gericht und von dort an die Klägerpartei (MATTEL, INC.) erfolgen. Sie haben angegeben, dass das US-amerikanische Gericht angenommen hat, dass das Discovery-Ersuchen der Zapf Creation AG dadurch wirksam zugegangen ist, dass dieses an die MGA ENTERTAINMENT, INC., zugestellt wurde.

Sie haben uns ferner mitgeteilt, dass die Nutzung der betrieblichen Kommunikationsmittel für e-mails für private Zwecke in der Zapf Creation AG nur bis zum 31.12.2007 erlaubt war und seither verboten ist.

Das **Verhältnis zwischen der - im oben genannten Rechtsstreit beklagten - MGA ENTERTAINMENT, INC (einem US-amerikanischen Unternehmen) und der Zapf Creation AG** stellt sich nach Ihren Angaben und aufgrund der uns vorgelegten Unterlagen wie folgt dar:

Zwischen den beiden Unternehmen besteht eine sehr enge wirtschaftliche Zusammenarbeit sowie zu erheblichen Teilen eine Identität der Eigentümer. Die Familie L., die u.a. über verschiedene Trust Eigentümerin von MGA Entertainment, Inc. ist, ist auch über verschiedene Trusts mit ca. 65% an der Zapf Creation AG beteiligt. MGA Entertainment, Inc. hält eine Aktie an der Zapf Creation AG. Im Entwurf des Geschäftsberichts der Zapf Creation AG für das Jahr 2009 werden Unternehmen des MGA-Konzerns als "nahe stehende Unternehmen" eingeordnet. Im Wesentlichen stellt sich die Zusammenarbeit wie folgt dar:

MGA Entertainment, Inc., Van Nuys, Kalifornien, USA, übernimmt seit Beginn des Jahres 2007 in Eigenregie auf Lizenzbasis den Vertrieb von Produkten der Zapf Creation AG in amerikanischen Märkten und garantiert dabei ein Volumen, das um mehr als 50 % über den zuletzt in dieser Region durch die eigene Tochtergesellschaft generierten Erlösen liegt (Vertrag 1; "Distribution Agreement").

Im Gegenzug wurde der Vertrieb von MGA-Produkten in ausgewählten europäischen Märkten durch den Zapf-Creation-Konzern gegen Zahlung einer Vertriebsgebühr vereinbart (Vertrag 2; "Consignment and Services Agreement"); die Zapf Creation Logistics GmbH & Co. KG erbringt hierbei logistische Dienstleistungen für den MGA-Konzern (Vertrag 3; "Logistics Service Agreement"). Weiterhin übernimmt MGA Entertainment, Inc. seit 2007 die Auswahl und Überwachung der asiatischen Lieferanten von Zapf-Creation-Produkten, die Koordination und Abwicklung der Lieferungen der Waren in die Vertriebseinheiten sowie Teile der technischen Produktentwicklung (Vertrag 4; "Hong Kong / China Services Agreement").

Darüber hinaus hat die Zapf Creation AG der MGA Entertainment, Inc., Van Nuys, Kalifornien, USA, gegen Zahlung einer Lizenzgebühr das exklusive Recht und die exklusive Lizenz eingeräumt, die Produkte und das geistige Eigentum der Zapf Creation AG zu nutzen und verwerten, wobei das Recht zur Unterlizenzvergabe eingeschlossen ist (Vertrag 5; "Merchandising License Agreement").

Mit Wirkung zum 1. April 2008 wurde die Partnerschaft im Wege einer weiteren Vereinbarung (Vertrag 6; "UK Services Agreement") erweitert. MGA Entertainment UK Ltd. erbringt seit diesem Zeitpunkt gegen entsprechende Vergütung vollumfänglich die Vertriebsleistung für die Zapf Creation (U.K.) Ltd. in deren Vertriebsgebiet; im Gegenzug übernimmt die Zapf Creation (UK) Ltd. gegen entsprechende Vergütung administrative Funktionen für MGA Entertainment UK Ltd.

Im Geschäftsjahr 2009 wurde die strategische Partnerschaft durch eine weitere Vereinbarung (Vertrag 7; "Inventions License Agreement") erweitert. Der Vertrag, der mit Wirkung zum 1. Januar 2009 in Kraft trat und zunächst unter dem Zustimmungsvorbehalt der die Gesellschaft finanzierenden Banken stand, beinhaltet das Recht der Zapf Creation AG gegen Zahlung einer Lizenzgebühr definiertes geistiges Eigentum der MGA Entertainment, Inc., Van Nuys, Kalifornien, USA, zu nutzen und verwerten.

Neben den aus den genannten Kooperationsverträgen (im engen Sinne) resultierenden Geschäftsvorfällen wurden zwischen den Gesellschaften des Zapf-Creation-Konzerns und den diesen nahe stehenden Unternehmens des MGA-Konzerns in den letzten Jahren so genannte Cross-Charges-Verrechnungen in erheblichem Umfang (im Jahr 2008: ein siebenstelliger Euro-Betrag) vorgenommen. Bei den Cross Charges handelt es sich um Verrechnungen zwischen den Gesellschaften des Zapf Creation-Konzerns und den nahe stehenden Unternehmen des MGA-Konzerns, die aus gegen-

seitiger Leistungserbringung - über die genannten Kooperationsverträge im engen Sinne hinaus - hervorgehen; hierbei handelt es sich im Wesentlichen um Erträge und Aufwendungen im Rahmen gemeinsam genutzter betrieblicher Ressourcen (Personal, Räumlichkeiten etc.).

Wie sich aus den aufgeführten Verträgen ergibt, ist es für die Geschäftsentwicklung der Zapf Creation AG von essentieller Bedeutung, wie sich die wirtschaftliche Situation von MGA Entertainment, Inc. darstellt. Im oben genannten Klageverfahren geht es um so erhebliche Beträge, dass eine Gerichtsentscheidung gravierende Auswirkungen auf die wirtschaftliche Lage von MGA Entertainment, Inc, haben kann.

Sie haben angegeben, dass aufgrund der engen wirtschaftlichen Kooperation zwischen der Beklagten und der Zapf Creation AG letztere ein sehr großes wirtschaftliches Interesse am Ausgang des Rechtsstreits habe, weil sich angesichts der vielfältigen wirtschaftlichen Beziehungen zwischen den beiden Unternehmen eine Verurteilung der MGA Entertainment, Inc., zu einer erheblichen Schadensersatzzahlung auch ganz erheblich auf die wirtschaftlichen Interessen der Zapf Creation AG auswirken würde. Deshalb habe die Zapf Creation AG ein erhebliches Interesse, dem Discovery-Ersuchen nachzukommen, um durch Klärung der darin erhobenen Vorwürfe gegen die MGA Entertainment, Inc., und die Zapf Creation AG seine wirtschaftlichen Interessen im Rechtsstreit zu vertreten.

Aufgrund dieses Sachverhalts stellen wir fest, dass mit Blick auf die dargelegten sehr engen wirtschaftlichen Beziehungen zwischen der beklagten MGA Entertainment, Inc., und der Zapf Creation AG nachvollziehbar ist, dass die Zapf Creation AG ein ganz erhebliches eigenes wirtschaftliches Interesse am Ausgang des Rechtsstreits und damit an der Befolgung des Discovery-Ersuchens hat. Die Tatsache, dass die Zapf Creation AG formal nicht Beklagte des Rechtsstreits ist, ist insoweit letztlich nicht entscheidend, weil hinreichend glaubhaft gemacht wurde, dass aufgrund de vielfältigen geschäftlichen Beziehungen und Vereinbarungen mit der Beklagten die wirtschaftliche Situation der Beklagten einen erheblichen Einfluss auf die wirtschaftliche Situation der Zapf Creation AG hat.

### II.) Umgang der Zapf Creation AG mit personenbezogenen Daten sowie dem Fernmeldegeheimnis unterfallenden Daten zum Zwecke der Erfüllung des Discovery-Ersuchens

Das Discovery-Ersuchen umfasst von seinem inhaltlichen Umfang her eine große Anzahl von Dokumenten der Zapf Creation AG (s.o.). Um zu überprüfen, welche Dokumente überhaupt gemäß dem Ersuchen an das US-amerikanische Gericht vorgelegt werden müssen, müsste die Zapf Creation AG zunächst ihren Bestand an betrieblichen Dokumenten insgesamt durchsuchen und auswerten, um daraus den vom Discovery-Ersuchen umfassten Teil zu selektieren. Sie haben vorgetragen, dass es zu diesem Zweck möglich bzw. beabsichtigt sei, die Dokumente zunächst anhand von Schlüsselbegriffen zu durchsuchen; anschließend sei gegebenenfalls noch eine weitere manuelle Sichtung denkbar, um dann die relevanten Dokumente dem US-Gericht zur Verfügung zu stellen.

Es ist davon auszugehen, dass ein großer Teil der Unterlagen, die gesichtet werden müssen, personenbezogene Daten im Sinne des § 3 Abs. 1 BDSG enthalten. In diesen Fällen stellt bereits die Durchsuchung der Unterlagen mit Schlüsselbegriffen eine <u>Nutzung personenbezogener Daten</u> dar. Jedenfalls gilt dies spätestens für eine anschließende manuelle Sichtung der Dokumente; ferner ist wohl eine gesonderte Speicherung der selektierten Unterlagen, d.h. gemäß § 3 Abs. 4 BDSG eine Verarbeitung personenbezogener Daten vorgesehen. Die Zuleitung der selektierten Unterlagen an das US-Gericht stellt schließlich eine <u>Übermittlung</u> und damit eine weitere Verarbeitung personenbezogener Daten (§ 3 Abs. 4 BDSG) dar.

Ein rechtmäßiger Umgang mit personenbezogenen Daten zur Erfüllung des Discovery-Ersuchens ist nur möglich, wenn bestimmte Voraussetzungen eingehalten werden, die im folgenden beschrieben werden.

### 1.) E-mails bis zum 31.12.2007

Soweit e-mails mit personenbezogenen Daten aus diesem Zeitraum betroffen sind, ist zu berücksichtigen, dass in diesem Zeitraum die Privatnutzung betrieblicher Kommunikationsmittel bei der Zapf Creation AG nicht untersagt war. Bei dieser Sachlage ist die Zapf Creation AG insoweit als Anbieter von Telekommunikationsdiensten im Sinne des § 3 Nr. 6 TKG anzusehen. Daraus folgt, dass diese e-

- 4 -

mails dem Fernmeldegeheimnis nach Art. 10 GG unterfallen. Gemäß § 88 Abs. 3 TKG dürfen sich Diensteanbieter grundsätzlich keine Kenntnis vom Inhalt oder den näheren Umständen der Telekommunikation verschaffen. Ferner dürfen sie Kenntnisse über Tatsachen, die dem Fernmeldegeheimnis unterliegen, nur zum Zwecke der Erbringung der Telekommunikationsdienste einschließlich des Schutzes ihrer technischen Systeme verwenden. Eine Verwendung dieser Kenntnisse für andere Zwecke, insbesondere die Weitergabe an andere, ist nur zulässig, soweit das TKG oder eine andere gesetzliche Vorschrift dies vorsieht und sich dabei ausdrücklich auf Telekommunikationsvorgänge bezieht.

In der Konsequenz bedeutet dies, dass die Zapf Creation AG e-mails aus dem genannten Zeitraum nur dann durchsuchen, sichten, ggf. speichern und übermitteln darf, wenn der jeweilige Betroffene (dessen personenbezogenen Daten in der e-mail einschließlich der e-mail-Adressen enthalten sind) gegenüber der Zapf Creation AG erklärt, insoweit auf den Schutz durch das Fernmeldegeheimnis zu verzichten, d.h. seine Einwilligung erteilt. Die Zwecke des Datenumgangs sind ihm dabei offenzulegen, insbesondere die beabsichtigte Übermittlung an das US-Gericht aufgrund des Discovery-Ersuchens für den dort anhängigen Rechtsstreit. Die Einwilligung wäre bereits für die Durchsuchung (Screening) solcher e-mails mit Schlüsselwörtern sowie für alle anderen nachfolgenden genannten Schritte erforderlich.

Wir weisen in diesem Zusammenhang auf die Entscheidung des Bundesverfassungsgerichts vom 16.06.2009 - 2 BvR 902/06 - hin. Darin hat das Bundesverfassungsgericht entschieden, dass auch e-mails, die noch auf einem Mailserver des Providers gespeichert sind - unabhängig davon, ob sie vom Adressaten bereits zur Kenntnis genommen wurden oder nicht - dem Fernmeldegeheimnis unterliegen. Das Gericht begründet dies vor allem damit, dass während der Speicherung beim Provider dieselbe typische Gefährdungslage für das Fernmeldegeheimnis wie während des eigentlichen "dynamischen" Transports der e-mail besteht, und aus diesem Grunde der Schutz durch das Grundrecht erforderlich ist. Im Wesentlichen ist diese Schutzbedürftigkeit dem Umstand geschuldet, dass der e-mail-Adressat in diesem Zeitraum in technischer Hinsicht nicht beherrschen kann, was mit den e-mails geschieht, insbesondere die Weitergabe der e-mail an andere Personen oder die Einsicht durch andere Personen in die e-mail technisch nicht verhindern kann (BVerfG 2 BvR 902/06, Rn. 46 ff.). Die selbe Gefährdungssituation für das Fernmeldegeheimnis besteht aber nach unserer Bewertung auch im vorliegenden Fall, soweit e-mails aus dem o.g. Zeitraum auf Rechnern der Zapf Creation AG als Arbeitgeber gespeichert werden. Denn bei den Rechnern handelt es sich um Betriebsmittel des Arbeitgebers, über die die Beschäftigten in aller Regel nicht dergestalt verfügen können, dass sie die Kenntnisnahmemöglichkeit des Arbeitgebern bzw. anderer Personen (z.B. Administratoren) von der e-mail in jedem Falle vollständig und zuverlässig ausschließen können. Aus diesem Grunde unterfallen die gespeicherten e-mails aus dem o.g. Zeitraum dem Fernmeldegeheimnis, so dass auch die Durchsuchung und weitere Nutzungen und Verarbeitungen dieser e-mails nur mit Einwilligung der jeweiligen Betroffenen zulässig ist.

### 2.) E-mails ab dem 01.01.2008 sowie sonstige Dokumente mit personenbezogenen Daten

E-mails, die ab dem 01.01.2008 verschickt wurden, unterfallen nicht mehr dem Fernmeldegeheimnis, da insoweit die Privatnutzung der betrieblichen Kommunikationsmittel bei der Zapf Creation AG untersagt war und daher alle angefallene Kommunikation in diesem Zeitraum als betriebliche Kommunikation zu bewerten ist.

Unabhängig davon gelten aber, soweit personenbezogene Daten in diesen e-mails und in sonstigen betrieblichen Dokumenten enthalten sind, hierfür die Vorschriften des BDSG. Daraus ergeben sich im vorliegenden Fall bestimmte Anforderungen.

### 2.1.) Auswahl der Dokumente (Durchsuchung/Screening, Sichtung und Auswertung)

Bereits das - automatisierte - Screening von Dokumenten, die personenbezogene Daten enthalten, mit Schlüsselbegriffen oder eine vergleichbare Maßnahme stellt datenschutzrechtlich eine Nutzung personenbezogener Daten nach § 3 Abs. 5 BDSG dar, da hiernach unter "Nutzung" jede Verwendung personenbezogener Daten zu verstehen ist, die keine "Verarbeitung" im Sinne des § 3 Abs. 4 BDSG darstellt. Wird ein solches Dokument der Suche mit Schlüsselbegriffen unterzogen, so wird das Do-

kument bereits im allgemeinsprachlichen Sinne "verwendet"; bereits diese Verwendung ist als personenbezogen anzusehen, weil sich im Falle eines "Treffers" die Aussage ergibt, dass zumindest der Absender der e-mail in seiner e-mail diesen Begriff verwendet hat. Noch deutlicher wird der Personenbezug, wenn man berücksichtigt, dass das Screening von seinem Zweck her darauf angelegt ist, die "Treffer"-Dokumente weiterzuverwenden und letztlich in einem späteren Schritt bei Bedarf daraus eine Aussage über einen Sachverhalt zu treffen, der bestimmten Personen zugeordnet werden kann - namentlich mindestens dem Absender und Empfänger der e-mail.

Damit unterfällt auch jeder weitere vernünftigerweise denkbare Umgang mit den durchsuchten e-mails sowie weiteren Unterlagen der Zapf Creation AG, soweit darin personenbezogene Daten enthalten sind, dem BDSG.

Gemäß § 4 Abs. 1 BDSG dürfen personenbezogene Daten zur erhoben, verarbeitet oder genutzt werden, wenn der Betroffene eingewilligt hat oder eine Rechtsvorschrift den Datenumgang erlaubt. Unter folgenden Voraussetzungen können die geplanten Datenverwendungen noch auf eine Rechtsvorschrift gestützt werden (zur rechtlichen Bewertung vgl. Nr. II.2.3.):

Zu fordern ist, dass die Zapf Creation AG zunächst eine effektive Filterung dahingehend vornimmt, welche Dokumente mit personenbezogenen Daten überhaupt an das US-Gericht übermittelt werden müssen. Es dürfen von vornherein nur solche Dokumente übermittelt werden, die für den Rechtsstreit erforderlich sind. Daher muss der Bestand an Unterlagen bei der Zapf Creation AG daraufhin durchsucht und gesichtet werden, welche Dokumente überhaupt inhaltlich dem Discovery-Ersuchen unterfallen. Die automatisierte <u>Durchsuchung mit Schlüsselbegriffen</u> kann in diesem Zusammenhang als Filterungsmaßnahme grundsätzlich ein geeigneter erster Schritt sein.

Grundsätzlich müssen aber <u>weitere, zusätzliche Schritte der Filterung</u> gefordert werden, um so weit wie zumutbar sicherzustellen, dass nur personenbezogene Daten im tatsächlich unerlässlichen Umfang an das US-Gericht und weiter an die Klägerpartei bzw. deren Prozessvertreter übermittelt werden. Der Umfang der Unterlagen, die übermittelt werden sollen, ist durch geeignete, grundsätzlich mehrstufige Sichtungsmaßnahmen <u>auf das unerlässliche Mindestmaß zu reduzieren</u>.

Daher ist zusätzlich zu einem Screening mit Schlüsselbegriffen (oder einer vergleichbaren Maßnahme) grundsätzlich - soweit nicht vorgetragen wird, dass dies unzumutbar wäre, was bislang nicht erfolgt ist - eine <u>händische Sichtung</u> der im ersten Schritt als "Treffer" selektierten Dokumente zu fordern, um diese auf ihre Relevanz bezüglich des Discovery-Ersuchens zu überprüfen. Hierfür ist die in der Discovery-Anforderung enthaltenen thematische Umschreibung ihres Umfangs (Exhibits A und B, s.o.) heranzuziehen und kritisch am Maßstab der Erforderlichkeit zur Klärung der vom Kläger erhobenen Vorwürfe zu überprüfen. Diese mehrstufige Filterung der Daten muss <u>vor der Übermittlung in die USA, im Inland</u> stattfinden; es ist nicht vorgetragen worden, dass die Daten erst nach einer Übermittlung in die USA gefiltert werden könnten. Es wurde vorgetragen, dass die Zapf Creation AG oder die von ihr beauftragten Rechtsanwälte in Deutschland eine solche Filterung durchführen könnten; dagegen bestehen keine Bedenken.

Zusätzlich ist zu fordern, dass die als "Treffer" selektierten Dokumente, die später an das US-Gericht übermittelt werden sollen, <u>pseudonymisiert</u> werden. Das bedeutet, dass jedenfalls die Namen natürlicher Personen in den selektierten Dokumenten - einschließlich e-mail-Adressen, soweit darin Personennamen (grundsätzlich: Vor- und Nachname) enthalten sind - durch Platzhalter (Pseudonyme) ersetzt werden. Es wurde bislang nicht vorgetragen, dass aufgrund ganz besonderer Gegebenheiten eine Pseudonymisierung unzumutbar wäre. Die Pseudonymisierung hebt zwar den Personenbezug von Daten nicht auf; jedoch ist sie ein sehr wichtiges Mittel, mit dem die Tiefe des Eingriffs in das Persönlichkeitsrecht reduziert werden kann. Daher messen wir der <u>Pseudonymisierung vor der Übermittlung in die USA besondere Bedeutung</u> bei, um die hier geplanten Datenverwendungen rechtskonform durchführen zu können.

Im Rahmen der händischen Sichtung ist sicherzustellen, dass aufgefundene <u>Dokumente privater Natur ausgeschieden</u> werden; diese dürften ohnehin in aller Regel nicht prozessrelevant sein. Zudem wäre besondere Sorgfalt darauf zu verwenden sicherzustellen, dass <u>besondere Arten personenbezogener Daten</u> im Sinne des § 3 Abs. 9 BDSG (z.B. Gesundheitsdaten, Angaben zur Gewerkschaftszugehörigkeit) aussortiert werden und damit nicht für eine Übermittlung zur Verfügung stehen. Auch hier ist wohl in aller Regel aber bereits keine Erforderlichkeit für eine Einbringung derartiger Daten in den Prozess aufgrund des Discovery-Ersuchens erkennbar.

- 6 -

Soweit ein <u>betrieblicher Datenschutzbeauftragter</u> vorhanden ist, ist dieser in den Prozess der Datenauswahl einzubeziehen. Grundsätzlich sollte auch, soweit vorhanden, der <u>Betriebsrat</u> einbezogen werden (ob etwaige Mitwirkungs- bzw. Mitbestimmungsrechte nach dem BetrVG bestehen, können wir nicht beurteilen; dies müsste gesondert geprüft werden).

### 2.2.) Übermittlung von Dokumenten mit personenbezogenen Daten an das US-Gericht und die Prozessparteien

Nach der mehrstufigen Sichtung und Pseudonymisierung der Daten in der beschriebenen Weise können dann die so selektierten Daten im Rahmen der Erforderlichkeit für das Gerichtsverfahren - in einem ersten Schritt - in pseudonymisierter Form an das US-Gericht und die Prozessparteien <u>übermittelt</u> werden.

Erst und nur dann, wenn sich anschließend im Rechtsstreit im Einzelfall die Notwendigkeit ergibt, zu einem bestimmten Dokument die Pseudonymisierung aufzuheben, wäre insoweit bezogen auf das konkrete Dokument die Übermittlung von Klarnamen (Aufhebung der Pseudonymisierung) an das US-Gericht und die Prozessparteien möglich. Dazu müsste die Prozesspartei, die dies fordert, näher begründen, warum ein solcher Schritt im Einzelfall erforderlich ist.

Die hier dargestellte zweistufige Vorgehensweise (Pseudonymisierung; Aufhebung der Pseudonymisierung nur im Einzelfall bei konkreter Begründung der Erforderlichkeit) sollte gegenüber dem Gericht und den Prozessparteien dargestellt werden. Es sollte versucht werden, ein solches Vorgehen im Prozess verbindlich zu vereinbaren. Insbesondere wäre so weit wie zumutbar möglich darauf zu bestehen, dass die Notwendigkeit für eine spätere Aufhebung der Pseudonymisierung zu bestimmten Dokumenten von den Prozessparteien im Einzelfall nachvollziehbar begründet wird; pauschale Aufforderungen zur Aufhebung der Pseudonymisierung würden dabei grundsätzlich nicht genügen, da sie in der Regel nicht geeignet wären, die Erforderlichkeit der Ent-Pseudonymisierung im Einzelfall darzustellen.

Es sollten zudem Anstrengungen unternommen werden, um eine sog. <u>Protective Order</u> des US-Gerichts zu erwirken, in der verbindliche Regelungen über den Umfang der in den Rechtsstreit eingebrachten personenbezogenen Daten und die Einzelheiten des Umgangs mit diesen Daten - insbesondere etwa die o. g. Zweistufigkeit (Pseudonymisierung; Aufhebung der Pseudonymisierung nur im Einzelfall bei konkreter Begründung der Erforderlichkeit) - getroffen werden.

Die durch die Sichtung selektierten Unterlagen mit personenbezogenen Daten dürfen so lange von der Zapf Creation AG gesondert gespeichert werden, wie dies für Zwecke des Rechtsstreits erforderlich ist. Es ist sicherzustellen, dass sie während dieser Zeit einem Zugriff für andere, außerhalb des Verfahrens liegende Zwecke, entzogen sind. Sobald die Unterlangen für Zwecke des Rechtsstreits nicht mehr erforderlich sind, sind sie zu löschen.

### 2.3.) Datenschutzrechtliche Bewertung des beschriebenen Vorgehens

Aufgrund der oben dargestellten Interessenlage hat die Zapf Creation AG ein ganz erhebliches eigenes wirtschaftliches Interesse, das vorliegende Discovery-Ersuchen zu befolgen, indem sie Unterlagen im erforderlichen Umfang in den Prozess einbringt. Die <u>Durchsuchung und Sichtung</u> (oben Nr. II.2.1.)) von Unterlagen mit personenbezogenen Daten zum Zwecke der Selektierung der Unterlagen, die an das US-Gericht übermittelt werden sollen, kann - soweit die oben dargestellten Voraussetzungen eingehalten werden - auf die Rechtsvorschrift des <u>§ 28 Abs. 1 S. 1 Nr. 2 BDSG</u> gestützt werden. Die hier betroffenen wirtschaftlichen Interessen der Zapf Creation AG sind grundsätzlich taugliche Interessen im Sinne des § 28 Abs. 1 S. 1 Nr. 2 BDSG. Dem stehen die - grundsätzlich immer gegebenen - Interessen der betroffenen Personen (insbesondere Beschäftigten) daran entgegen, dass ihre Daten nicht genutzt und verarbeitet (insbesondere an Dritte übermittelt) werden. Es ist jedoch grundsätzlich kein durchschlagender Grund dafür ersichtlich, dass die Interessen der Betroffenen am Unterbleiben dieser Nutzung und Verarbeitung vorliegend überwiegen. Vielmehr ist - sofern nicht im Einzelfall derartige besonderen Interessen vorgetragen werden -, auch mit Blick auf die arbeitsvertragliche Treuepflicht, dem Beschäftigten grundsätzlich zumutbar, dass die Zapf Creation AG ihre betrieblichen Unterlagen sichtet, um die für die Beantwortung des Discovery-Ersuchens relevanten Unterlagen zu selektieren und damit ihre wirtschaftlichen Interessen im Prozess effektiv wahrnehmen

zu können. Hat die Zapf Creation AG allerdings konkrete Hinweise, dass im Einzelfall besondere Interessen einzelner Betroffenen entgegenstehen, müsste sie den nach der Filterung und vor der Übermittlung an das US-Gericht verbliebenen Datenbestand insoweit noch einmal gesondert daraufhin überprüfen.

Die Anwendung des § 28 Abs. 1 S. 1 Nr. 2 BDSG ist vorliegend auch nicht durch § 32 BDSG ausgeschlossen. § 32 BDSG regelt nur die Datenerhebung, -verarbeitung und -nutzung für Zwecke eines Beschäftigungsverhältnisses. Vorliegend erfolgt die Verarbeitung und Nutzung jedoch nicht für Zwecke des Beschäftigungsverhältnisses, sondern zur Wahrung wirtschaftlicher Interessen der Zapf Creation AG durch Einbringung in den US-Prozess. Damit ist der Anwendungsbereich des § 32 BDSG nicht eröffnet, so dass grundsätzlich Raum für eine Anwendung des § 28 Abs. 1 S. 1 Nr. 2 BDSG verbleibt, der für den Datenumgang zu anderen Zwecken grundsätzlich in Betracht kommt.

Bei der Übermittlung personenbezogener Daten an das US-Gericht bzw. die Prozessparteien in der oben dargestellten Weise (oben Nr. II.2.2.) ist zu berücksichtigen, dass die USA ein Staat sind, in dem nicht durchgängig an angemessenes Niveau des Schutzes personenbezogener Daten im Sinne des § 4b Abs. 2 S. 2 BDSG gewährleistet ist ("Drittstaat"). Damit müssen neben den allgemeinen Voraussetzungen für die Zulässigkeit der Datenübermittlung nach dem BDSG (§§ 28 ff. BDSG, so genannte erste Stufe) auch die besonderen Voraussetzungen für die Übermittlung in Staaten, in denen kein angemessenes Datenschutzniveau gewährleistet ist, erfüllt werden (§ 4c BDSG; so genannte zweite Stufe).

Auf der <u>ersten Stufe</u> kann die Übermittlung an das US-Gericht und die Prozessparteien, soweit das oben dargestellte Verfahren eingehalten wird, im dort dargestellten Umfang ebenso wie die vorangegangene Selektion der Daten auf § 28 Abs. 1 S. 1 Nr. 2 BDSG gestützt werden. Die Übermittlung ist insoweit gerechtfertigt zur Wahrnehmung berechtigter Interessen der Zapf Creation AG im Sinne des § 28 Abs. 1 S. 1 Nr. 2 BDSG.

Die Übermittlung ist insoweit auch auf der <u>zweiten Stufe</u> gerechtfertigt; insoweit greift § 4c Abs. 1 S. 1 Nr. 4 BDSG. Die Übermittlung ist vorliegend zur Verteidigung von Rechtsansprüchen vor Gericht erforderlich. Zwar ist die Zapf Creation AG nicht selbst Prozesspartei im förmlichen Sinne. Jedoch ist diese Vorschrift, schon von ihrem Wortlaut her, nicht auf die Übermittlung durch oder an Prozessparteien beschränkt. Vielmehr versieht das Gesetz insoweit sämtliche, keineswegs auf bestimmte Personen beschränkte - sich also auf Prozessbeteiligte genauso wie auf Zeugen beziehende - Übermittlungen mit der Übermittlungsschranke des § 4c Abs. 1 S. 1 Nr. 4 BDSG (Simitis/Simitis, Kommentar zum BDSG, 6. Aufl., 2006, § 4c, Rn. 21). Die Zapf Creation AG ist im vorliegenden Verfahren zumindest als Zeuge anzusehen; jedenfalls ist sie selbst als Adressatin der gerichtlichen Discovery-Anordnung verpflichtet worden, Unterlagen in den Rechtsstreit einzubringen.

Einzuräumen ist, dass bei einer Übermittlung für Zwecke eines Gerichtsverfahrens durch eine verantwortliche Stelle, die nicht selbst Prozesspartei ist - wie hier -, besonders sorgfältig zu prüfen ist, ob die Übermittlung gerechtfertigt werden kann. Allerdings hat diese Prüfung auf der <u>ersten Stufe</u> stattzufinden. Dort aber ist es im Rahmen der Erforderlichkeitsprüfung und Interessenabwägung (§ 28 Abs. 1 S. 1 Nr. 2 BDSG) nicht zwingend, dass die Übermittlung sowie die vorangegangene Nutzung und Verarbeitung personenbezogener Daten nur dann gerechtfertigt werden könnte, wenn die verantwortliche Stelle selbst Prozesspartei wäre; vielmehr ist auch denkbar, dass diese Datenverwendungen - wie im vorliegenden Fall - zum Zwecke der Einbringung in den Prozess gerechtfertigt sein können zur Wahrnehmung berechtigter Interessen der verantwortlichen Stelle, obwohl diese nicht förmliche Prozesspartei ist. So liegt der Fall angesichts der besonders engen wirtschaftlichen Verflechtungen zwischen der Beklagten und der Zapf Creation AG aber hier (s.o.). Es ist allerdings zu betonen, dass diese Konstellation einen Grenzfall darstellt, und der vorliegende Fall nur aufgrund seiner Besonderheiten, d. h. der besonders engen wirtschaftlichen Verflechtungen zwischen der Fa. Zapf und der Beklagten die hier dargestellte datenschutzrechtliche Beurteilung im Ergebnis rechtfertigt.

Maßstab für die Zulässigkeit der Übermittlung auf der zweiten Stufe nach § 4c Abs. 1 S. 1 Nr. 4 BDSG ist allein, ob die Übermittlung erforderlich ist zur Geltendmachung, Ausübung oder Verteidigung von Rechtsansprüchen in dem Prozess. Insoweit können hier - auf der <u>zweiten Stufe</u> - die Interessen der MGA Entertainment, Inc., als Beklagter, herangezogen werden; denn die Zapf Creation AG möchte durch die Vorlage der durch das Discovery-Ersuchen angeforderten Unterlagen die Beklagte als wirtschaftlich eng verbundenes Unternehmen bei seiner Verteidigung im Prozess unterstützen; würden die Unterlagen - begrenzt auf den konkret erforderlichen Umfang (s.o.) - nicht vorgelegt,

- 8 -

wäre nach den Gepflogenheiten des US-Prozessrechts grundsätzlich damit zu rechnen, dass dies als Beweiserschwerung zu Lasten der Beklagten gewertet würde und damit den Ausgang des Rechtsstreits zum Nachteil der Beklagten und damit zum Nachteil ihrer rechtlichen Positionen beeinflussen könnte. Damit ist die Vorlage erforderlich zur Verteidigung von Rechtsansprüchen der Beklagten vor Gericht im Sinne des § 4c Abs. 1 S 1 Nr. 4 BDSG.

Insgesamt kann damit die Übermittlung <u>bei Einhaltung der hier beschriebenen Voraussetzungen und im hier beschriebenen Umfang</u> datenschutzrechtlich noch gerechtfertigt werden.

Allgemein sollten noch folgende Schritte bedacht und nach soweit wie möglich umgesetzt werden:

Der Kläger sollte darauf hingewiesen werden, vorrangig sämtliche Möglichkeiten der Beweiserhebung in den USA auszuschöpfen. Er sollte ferner darauf hingewiesen werden, dass nach deutschem Datenschutzrecht Schranken für die Übermittlung personenbezogener Daten bestehen und aus diesem Grund Maßnahmen getroffen werden müssen, um sicherzustellen, dass - wenn überhaupt - nur personenbezogene Daten im unerlässlichen Umfang und nur bei Beachtung spezifischer Verfahrensvorkehrungen zum Schutz der Daten übermittelt werden dürfen. Für bestimmte Daten, insbesondere e-mail-Kommunikation, spielt ferner das Fernmeldegeheimnis eine Rolle, so dass in bestimmten Fällen (s.o.) eine Übermittlung nur mit Einwilligung zulässig ist. Es sollte ferner darauf gedrängt werden, mit dem Kläger ein verbindliches Verfahren zum Umgang mit den personenbezogenen Daten im Prozess zu vereinbaren; es sollte versucht werden, diesen vereinbarten Umgang durch eine Protective Order des US-Gerichts verbindlich zu regeln; nach den bisherigen Erfahrungen ist es nicht unwahrscheinlich, dass das US-Gericht eine solche Order unterzeichnet, wenn die Streitfragen zum Umgang mit den Daten vorher zwischen den Parteien abgeklärt wurden.

Insbesondere könnte der Kläger darauf hingewiesen werden, dass die so genannte Sedona-Konferenz (dies ist ein einflussreicher freiwilliger Zusammenschluss von Richtern, Rechtsanwälten und anderen Datenschutz-Experten in den USA, die mit ihren Leitlinien die praktische Arbeit der US-Richter beeinflusst) derzeit im Dialog mit den europäischen Aufsichtsbehörden für Datenschutz steht und dabei das Ziel verfolgt, die Kenntnis und das Verständnis für europäische datenschutzrechtliche Regelungen in den USA zu verbessern. Nach hiesiger Kenntnis erarbeitet die Sedona-Konferenz derzeit als Reaktion auf das Working Paper 158 der Artikel-29-Gruppe ein eigenes Papier, das internationale Prinzipien des Datenschutzes in US-amerikanischen Zivilprozessen aufstellen soll. Nach unserer Kenntnis werden dort derzeit etwa Maßnahmen zur Datensichtung und -filterung zwecks Reduzierung des Umfangs der zu übermittelnden Daten sowie das Bemühen zur Erwirkung einer Protective Orders (s. o.) als Empfehlungen ernsthaft erwogen; damit ist zumindest nach derzeitigem Stand realistisch, dass in absehbarer Zeit die Sedona-Konferenz derartige Empfehlungen verabschieden könnte.

Wichtig ist ferner insbesondere, deutlich darauf hinzuweisen, dass Verstöße gegen datenschutzrechtliche Vorschriften in Deutschland nicht sanktionslos sind. Bei einer unzulässigen Verarbeitung (z.B. Übermittlung oder Speicherung) personenbezogener Daten droht nach § 43 Abs. 3 BDSG eine Geldbuße bis zu 300.000,- Euro. Zudem kann die deutsche Aufsichtsbehörde für den Datenschutz nach § 38 Abs. 5 BDSG bei festgestellten Verstößen gegen datenschutzrechtliche Vorschriften Maßnahmen zur Beseitigung des Verstoßes verbindlich anordnen. Denkbar ist hier z. B., dass in solchen Fällen bestimmte Datenverarbeitungen (etwa Übermittlungen) unter Androhung eines Zwangsgeldes untersagt werden.

Mit freundlichen Grüßen


gez.
F i l i p
Oberregierungsrat