# EXHIBIT C

**Translation of the Opinion as Issued to Attorney Matthias Götz of SKW
Schwarz by the Bavarian State Inspectorate for Data Protection**

Date of the Opinion:  26 November 2010
Official file: LDA-1085.3-106, Mr. Filip
Tel. 0981 53-1419, Fax -5419, E-Mail alexander-filip@reg.mfr.bayern.de

**German Data Protection Act (BDSG)
Zapf Creation AG, Mönchrödener Strasse 13, 96472 Rödental:
Enquiry as to how to handle personal data requested from Zapf Creation AG
in connection with a pre-trial discovery**

Dear Sir,

Below please find our answer to the enquiry you submitted at the request and on behalf of Zapf Creation AG regarding the admissibility of inspecting and transmitting business documents of Zapf Creation AG to a U.S. Court requested from Zapf Creation AG in connection with a pre-trial discovery under data protection aspects.

I.   **Facts of the case**

You have informed us that Zapf Creation AG, Mönchrödener Strasse 13, 96472 Rödental, has received a request from the United States District Court, Central District of California to submit a large number of documents including e-mails written by Zapf employees relating to issues concerning MATTEL, INC., for the purposes of discovery under U.S. law in the complaint, docket No. CV 04-9049 DOC (RNBx) (MATTEL, INC., and others - Plaintiffs - against MGA ENTERTAINMENT, Inc. and others - Defendants) even though Zapf is not a party to the proceedings, i.e. is neither the plaintiff nor the defendant. The requested documents are listed in Exhibit A and Exhibit B to a document apparently submitted to the Court as Document 8996 in this matter and which was forwarded to us in the English language.

In addition to e-mails containing pertinent information, other documents containing personal data are also requested, including the entire communication with employees and representatives of MGA ENTERTAINMENT, INC., relating to specific information about MATTEL, documents (such as visitor lists, declarations of

2

confidentiality, staff lists, diary entries, etc.) containing names of individuals who have visited or worked in the showrooms of Zapf Creation AG at toy fairs or who have received confidential information about products of MGA ENTERTAINMENT, INC. or Zapf Creation AG, lists of individuals such as representatives of the press who were shown products of MGA ENTERTAINMENT, INC., names and notes of present and former employees of MATTEL, INC., and communication regarding MATTEL, INC. conducted with these individuals, documentations of discussions with employees of MGA ENTERTAINMENT, INC., relating to specific information about MATTEL, INC.

As you have stated, the documents described above are to be provided by Zapf Creation AG to the U.S. Court and from there to the Plaintiff (MATTEL, INC.). You have informed us that the U.S. Court assumes that the request for discovery has been effectively served upon Zapf Creation AG by delivery to MGA ENTERTAINMENT, INC.

You have further informed us that the use of company communication means for private e-mails at Zapf Creation AG was permitted only until 31 December 2007 and has been prohibited since.

According to the information you have provided and the documents submitted, **the relationship between MGA ENTERTAINMENT, INC. (a U.S. company) which is the defendant in the present proceedings and Zapf Creation AG** is as follows:

The financial cooperation between the two companies is very close, and the owners are identical to a large extent. The family L. who is an owner of MGA ENTERTAINMENT, INC. via, among other things, various trusts, also holds about 65 % of Zapf Creation AG, again via various trusts. MGA ENTERTAINMENT, INC. holds one share of Zapf Creation AG. The draft financial report of Zapf Creation AG for the year 2009 classifies companies of the MGA Group as "related companies". In essence, the cooperation is as follows:

Since the beginning of 2007, MGA Entertainment, Inc., Van Nuys, California, USA, has been solely responsible as a licensee for selling Zapf Creation's products in the Americas and guarantees that the sales volume exceeds the revenue generated by Zapf Creation's own subsidiaries in this region by more than 50% (Agreement 1: "Distribution Agreement").").

3

In return, the parties agreed that the Zapf Creation Group will sell MGA products in selected European markets in exchange for payment of a distribution fee (Agreement 2: "Consignment and Services Agreement"). Zapf Creation Logistics GmbH & Co. KG provides logistics services for the MGA Group (Agreement 3: "Logistics Service Agreement"). Furthermore, in 2007 MGA took over the entire process of selecting and monitoring the Asian suppliers of Zapf Creation products, the coordination and handling of merchandise shipments to the sales units, and technical product development (Agreement 4: "Hong Kong / China Services Agreement").

Also, Zapf Creation AG granted MGA Entertainment Inc., Van Nuys, California, USA, against payment of a license fee, the exclusive right and the exclusive license to utilise and exploit both the products and the intellectual property of Zapf Creation AG, including the right to grant sublicenses (Agreement 5: "Merchandising License Agreement").

Effective April 1, 2008, the partnership was extended through another agreement (Agreement 6: "UK Services Agreement"). Since this date, MGA Entertainment UK Ltd. has been providing full sales services for Zapf Creation (U.K.) Ltd. in that company's sales areas for an appropriate fee. In return, Zapf Creation (UK) Ltd. provides administrative services to MGA Entertainment UK Ltd. for an appropriate fee.

In the 2009 financial year, the strategic cooperation was expanded through an additional agreement (Agreement 7: "Inventions License Agreement"). The contract, which is effective as of January 1, 2009 and is initially subject to approval by the Company's banks, contains the right of Zapf Creation AG for the payment of license fee to use and exploit defined intellectual property of MGA Entertainment, Inc, Van Nuys, California, USA.

In addition to the business transactions resulting from the above cooperation agreements (in the strict sense), substantial so-called cross charges were conducted in the last few years between the companies of the Zapf Creation Group and associated companies of the MGA Group (a seven-digit Euro amount in 2008). Such cross charges are charges between the companies of the Zapf Creation Group and associated companies of the MGA Group resulting from mutual services provided beyond the cited cooperation agreements in the strict sense.

4

These are essentially earnings and expenditures related to operational resources used jointly (human resources, premises, etc.).

As can be inferred from the cited agreements, the financial situation of MGA Entertainment, Inc., is of essential significance for the business development of Zapf Creation AG. The proceedings cited above involve amounts so large that a court decision may have serious consequences for the financial situation of MGA Entertainment, Inc.

You have informed us that, given the close financial cooperation between the defendant and Zapf Creation AG, the latter has a considerable interest in the outcome of the litigation, because a court sentence imposing high damages upon MGA Entertainment would have a considerable impact on the financial interest of Zapf Creation AG. Therefore, Zapf Creation AG feels it is in its best interests to comply with the request for discovery so as to protect its own financial interests by clearing up the accusations against MGA Entertainment, Inc., raised therein.

Based on these facts, we note that, given the very close financial relationship of the defendant MGA Entertainment, Inc., and Zapf Creation AG, it is understandable that Zapf Creation AG holds a stake in the outcome of the litigation and thus wishes to comply with the request for discovery. The fact that Zapf Creation AG is formally not a defendant in this litigation is ultimately irrelevant, because the financial situation of the defendant has a considerable impact on the financial situation of Zapf Creation AG owing to the various business relations and agreements with the defendant.

## II.  How Zapf Creation AG should handle personal data and data subject to the Secrecy of Telecommunications

With regard to contents, the request for data in connection with discovery includes a large number of documents of Zapf Creation AG (see above). In order to verify which documents must be submitted to the U.S. Court, Zapf Creation AG will first have to inspect and analyse its entire pool of business documents to select those that come under discovery. You have informed us that it is possible or intended, respectively, to first screen the documents for certain key terms, conceivably followed by visual inspection and then to provide relevant documents to the U.S. Court.

It must be assumed that a large number of the documents that have to be inspected will contain personal data as defined in Sec. 3, Subsec. 1, German Data Protection Act (BDSG). In such cases, even screening documents for key words <u>already constitutes a use of personal data</u>. In any case, this will apply to any subsequent visual inspection of the documents; it seems that it is intended to save selected documents separately, i.e. process personal data as defined in Sec. 3, Subsec. 4, BDSG. Finally, passing selected documents on to the U.S. Court constitutes <u>transmission</u> and thus further processing of personal data (Sec. 3, Subsec. 4, BDSG).

Lawful handling of personal data in order to meet the request for discovery will be possible only when certain prerequisites are satisfied which will be described below.

1.  <u>E-mails until 31 December 2007</u>

As far as e-mails from this period containing personal data are concerned, it must be kept in mind that the private use of company communication means was not prohibited at Zapf Creation AG at that time. Given this fact, Zapf Creation AG must be regarded as a provider of telecommunication services as defined in Sec. 3, No. 6, German Telecommunications Act (TKG). This means that such e-mails come under the Secrecy of Telecommunications pursuant to Sec. 10, German Constitution (GG). Pursuant to Sec. 88, Subsec. 3, TKG, providers of services are prohibited as a matter of principle from inspecting the contents or the detailed circumstances of such telecommunication. Moreover, they may use any knowledge of facts subject to the Secrecy of Telecommunications only for the purpose of rendering telecommunication services including the protection of their technical systems. The use of such knowledge for other purposes, especially transmission to others, is admissible only if specifically provided by the TKG or another legal provision and expressly relating to telecommunication operations.

This means that Zapf Creation AG may search, inspect, possibly save and transmit e-mails from the period mentioned above only if the individual concerned (whose personal data are contained in the e-mail including the e-mail address) makes a statement to Zapf Creation AG that he/she waives the protection of the Secrecy of Telecommunications, i.e. gives his/her consent. The purpose of handling such data must be disclosed to such individuals, especially the intended transmission to the U.S. Court as a result of the request for discovery in the pending litigation. Such

consent would already be needed for screening such e-mails for key words and for all subsequent steps.

In this connection, we wish to point out the decision of the German Federal Constitutional Court (BVerfG) dated 16 June 2009 - 2 BvR 902/06 where the BVerfG ruled that even e-mails still stored on a mail server of the provider are subject to the Secrecy of Telecommunications irrespective of whether the recipient has taken note of them or not. The Court primarily substantiates this by the fact that the same typical hazard for the Secrecy of Telecommunications as during the "dynamic" transport exists when data are saved on the server of the provider and that protection by the constitutional right is therefore necessary. This need for protection is substantially due to the fact that the addressee of the e-mail is not capable of technically controlling what happens to e-mails during this time and especially cannot prevent transmission of the e-mail to others or inspection by others (BVerfG 2 BvR 902/06), marginal No. 46 *et seq.*). In our opinion, however, this same hazard for the Secrecy of Telecommunications also exists in the present case to the extent e-mails from the above period are still stored on the servers of Zapf Creation AG as the employer. This is because these servers are resources of the employer which employees can generally not influence to the extent that they can fully and reliably rule out that the employer or other individuals (for example administrators) take note of the contents. For this reason, any stored e-mails from the above period come under the Secrecy of Telecommunications so that any screening and further uses and processing of such e-mails is admissible only with the consent of the individuals concerned.

2.      E-mails after 1 January 2008 and other documents with personal data

E-mails sent after 1 January 2008 are no longer covered by the Secrecy of Telecommunications because private use of means of communication of Zapf Creation AG was prohibited by then and any communication from this period is rated as company communication.

Irrespective of the foregoing, however, the rules of the BDSG apply as far as personal data are contained in such e-mails and other company documents. This results in the following requirements:

### 2.1 Selection of documents (screening, inspection and analysis)

Under the aspects of data protection, even the - automated - screening of documents containing personal data for key words or any comparable measure constitutes a use of personal data pursuant to Sec. 3, Subsec. 5, BDSG, because this provision classifies any use of personal data which is not "processing" as defined in Sec. 3, Subsec. 4, BDSG, as "use". If such a document is screened for key words, the document is being "used" even by the general language definition; even such use must be classified as relating to an individual, because it results from any "hit" that the sender of the e-mail has used this term in his/her e-mail. The personal relation becomes even clearer when one takes into account that it is the purpose of such screening to use the documents containing the "hits" and, if required, gain insight concerning a fact that may be allocated to specific persons in a subsequent step, namely the sender and the recipient of the e-mail.

Thus any reasonably conceivable subsequent handling of screened e-mail and other documents of Zapf Creation AG containing personal data is subject to the provisions of the BDSG.

Pursuant to Sec. 4, Subsec. 1, BDSG, personal data may be collected, processed or used only if the individual concerned has agreed or a legal provision permits handling such data. Under the following prerequisites, the planned uses of data may be based on a legislative provision (for legal evaluation, please refer to No. II.2.3):

It is a must for Zapf Creation AG to first conduct effective filtering which documents containing personal data must even be sent to the U.S. Court. A priori, only those documents required for the court proceedings may be transmitted. Therefore, the pool of documents at Zapf Creation AG must be initially be searched and screened to establish which documents even come under the discovery request with regard to contents. In this connection, automated <u>screening for key words</u> may be a useful first filtering measure.

As a matter of principle, however, <u>further and additional filtering steps</u> are required to ensure to the greatest reasonable extent that only personal data that are really essential are transmitted to the U.S. Court and then to the plaintiff or its legal representatives. The scope of documents to be transmitted must be reduced to the <u>essential minimum</u> by suitable, generally multi-step safety measures.

8

Therefore, visual inspection of the documents selected as a "hit" during the first step to verify their relevance to the request for discovery will be mandatory in addition to a screening for key words (or a comparable measure), unless it is submitted that this would be an unreasonable effort (which has not been the case so far). For this purpose, the thematic description of their scope contained in the request for discovery (Exhibits A and B, *supra*) should be used and examined critically against the standard of necessity for clearing up the accusations raised by the plaintiff. This multi-step filtering of data must take place within Germany before transmission to the United States; there has been no plea that the data can only be filtered after transmission to the United States. It has been stated that Zapf Creation AG or its attorneys in Germany are able to conduct such filtering in Germany; therefore, we have no legal concerns in this respect.

In addition, it is necessary that documents selected as "hits" for subsequent transmission to the U.S. Court are pseudonymised. This means that all the names of individuals in the selected documents including e-mail addresses containing names (generally first name and last name) are replaced by spacers (pseudonyms). So far, it has not been submitted that pseudonymisation would be unreasonable due to specific circumstances. Even though pseudonymisation does not eliminate the reference to individuals in data, it is a significant means to reduce the interference with personal rights to a minimum. Therefore, we consider pseudonymisation before transmission to the United States to be especially important so as to carry out the data uses planned for this purpose in keeping with the law.

In connection with visual inspection, care must be taken to eliminate documents of a private nature; as a rule, such documents are not relevant to the proceedings. In addition, special care must be taken to ensure that specific types of personal data as defined in Sec. 3, Subsec. 9, BDSG (e.g. health data, information about trade union membership, etc.) are eliminated and are thus not available for transmission. Again, it is generally not deemed necessary to introduce such data into the proceedings on the basis of the request for discovery.

To the extent the company has a data protection officer, this individual must be involved in the process of data selection. If there is a works council in place, it should also be involved as a matter of principle (we are unable to assess whether there are any rights of participation or co-determination under the German Works Constitution Act (BetrVG); this would be subject to a separate examination).

Case 2:04-cv-09049-DOC-RNB   Document 9652-4   Filed 01/18/11   Page 10 of 14   Page ID
 #:287778

9

## 2.2 Transmission of documents containing personal data to the U.S. Court and the parties to the proceedings

After the multi-step screening and pseudonymisation of the data as described above, the data thus selected may then be transmitted to the U.S. Court and the parties to the proceedings in pseudonymised form to the extent they are required for the litigation in a first step.

Only if and when it turns out in the course of the proceedings that it is necessary to reverse the pseudonymisation for a specific document, it would be possible to transmit said document with the real name (reversal of pseudonymisation) to the U.S. Court and the parties to the proceedings. When this is the case, the party making this request must substantiate in detail why such a step is necessary.

The two-step approach described here (pseudonymisation; reversal of the pseudonymisation only in a specific case if necessity is established) should be explained to the Court and the parties to the proceedings. It is recommended to attempt to bindingly agree this approach in the proceedings. As far as reasonable, it should be insisted that the necessity for subsequent reversal of the pseudonymisation in specific documents must be substantiated in a manner all concerned will understand; general demands for the reversal of pseudonymisation will not be sufficient, because they are usually unsuitable to substantiate the necessity of a reversal of pseudonymisation.

In addition, an attempt should be made to obtain a so-called Protective Order from the U.S. Court which includes binding provisions regarding the handling of personal data introduced into the proceedings and the details of such handling - especially the two-step approach described above (pseudonymisation; reversal of pseudonymisation only in specific cases when necessity is substantiated).

The documents containing personal data which are selected during the screening process may be saved separately by Zapf Creation AG only for the period of time required for the purposes of the litigation. Care must be taken to ensure that such data will be protected against access for any other purposes outside the instant litigation. As soon as the data are no longer required for the purposes of the litigation they must be deleted.

10

### 2.3 Analysis of the approach described under the aspects of data protection law

Given the situation portrayed above, it is of considerable financial interest for Zapf Creation AG to comply with the present request for discovery by introducing documents in the required scope into the proceedings. <u>Screening and inspecting</u> (para. II.2.1 above) documents containing personal data for the purposes of selecting those documents to be transmitted to the U.S. Court may be based on the provisions of <u>Sec. 28, Subsec. 1, 1st sentence, No. 2, BDSG</u>, provided the prerequisites described above are satisfied. The financial interests of Zapf Creation AG concerned here are generally eligible interests within the meaning of Sec. 28, Subsec. 1, 1st sentence, No. 2, BDSG. These are opposed by the interests of the individuals concerned (especially employees), namely to prevent use and processing of their data (particularly transmission to third parties) - such interests always exist. However, we cannot identify an irrefutable reason why the interests of those concerned to prevent use and processing should prevail in the present case. Unless such special interests are submitted in detail in a specific case, it is generally not unreasonable to expect the individuals concerned to agree to Zapf Creation AG screening business documents so as to select those relevant for complying with the request for discovery and thus to effectively protect its financial interests in the proceedings - also with a view to the duty of allegiance. However, if Zapf Creation AG should have specific information that special interests of certain individuals oppose such an approach, a separate revision of the remaining data pool should take place after filtering and before transmission to the U.S. Court.

Nor is the applicability of Sec. 28, Subsec. 1, No. 2, BDSG, ruled out by Sec. 32, BDSG, in the present case. Sec. 32 BDSG only governs collecting, processing and using data for the purposes of employment. In the present case, however, such processing and use does not serve the purpose of employment but the purpose of protecting financial interests of Zapf Creation AG by introduction into the U.S. proceedings. Therefore, Sec. 32, BDSG, is not applicable so that the application of Sec. 28, Subsec. 1, 1st sentence, No. 2, BDSG, generally governing handling data for other purposes may be considered.

When transmitting personal data to the U.S. Court or the parties, respectively, in the manner described above (No. II.2.2 *supra*) it must be kept in mind that the United States is a country that does not generally guarantee an adequate level of protection of personal data as defined in Sec. 4b, Subsec. 2, 2nd sentence, BDSG

11

("third country"). This means that, in addition to the general requirements for the admissibility of data transmission under the BDSG (Secs. 28 *et seq.*, BDSG, so-called 1st level), the specific prerequisites for transmitting data to countries where no adequate level of data protection is guaranteed must also be satisfied (Sec. 4c, BDSG, so-called 2nd level).

On the 1st level, the transmission to the U.S. Court and the parties in the scope described may be supported by Sec. 28, Subsec. 1, 1st sentence, No. 2, BDSG, provided the above process is adhered to. Transmission is justified to this extent so as to protect the legitimate interests of Zapf Creation AG as defined in Sec. 28, Subsec. 1, 1st sentence, No. 2, BDSG.

In that respect, transmission is also justified on the 2nd level; Sec. 4 c, Subsec. 1, 1st sentence, No. 4, BDSG is applicable here. In the present case, transmission is required to defend legal claims in Court. Even though Zapf Creation AG is not a formal party to the proceedings, this provision - as the wording shows - is not limited to transmission by or to a party to the proceedings. Rather, this law places limits as defined in Sec. 4c, Subsec. 1, 1st sentence, No. 4, BDSG, on the transmission of data which are by no means restricted to certain individuals - i.e. addressing both parties to the proceedings and witnesses (Simitis/Simitis, Commentary on the BDSG, 6th ed., Sec. 4c, marginal No. 21). In the present proceedings, Zapf Creation AG should at least be considered a witness. In any case, it is the addressee of the Court's order to produce documents for discovery in the present proceedings.

It must be conceded, however, that special care must be taken in assessing whether transmission may be justified when data are transmitted for the purposes of court proceedings by an entity that is not a party to the proceedings - as in the present case. However, such an assessment must be made on the 1st level. In such a case, however, it is not mandatory within the scope of the assessment of necessity and consideration of interests (Sec. 28, Subsec. 1, 1st sentence, No. 2, BDSG) that transmission and the prior use and processing of personal data may be justified only if the responsible entity is itself a party to the proceedings; rather, it is also conceivable that - as in the present case - such uses of data may be justified for the purpose of introduction into proceedings in order to protect justified interests of the responsible entity even if said entity is not a formal party to the proceedings. However, this is the case given the particularly close financial ties between the defendant and Zapf Creation AG (see above). It must be emphasised,

however, that this constellation is a borderline case and that the present case justifies the result of the assessment under data protection aspects only because of its specific characteristics, i.e. the especially close financial ties between Zapf and the defendant.

The only criterion for the admissibility of transmission on the 2nd level pursuant to Sec. 4c, Subsec. 1, 1st sentence, No. 4, BDSG, is whether the transmission is necessary to assert, exercise or defend legitimate claims in the proceedings. In that respect, the interests of MGA Entertainment, Inc., as the defendant may be cited here - on the 2nd level, for Zapf Creation AG wishes to support the defendant as a financially closely associated company in its defence in the proceedings by submitting the documents requested for discovery. If these documents should not be submitted in the limited scope specifically necessary (see above), it would have to be expected that this will be interpreted as hampering evidence to the disadvantage of the defendant as is customary under U.S. procedural law so that the outcome of the litigation may be influenced to the detriment of the defendant and thus the detriment of its legal position. Thus submission is necessary to defend legitimate claims of the defendant in court as defined in Sec. 4c, Subsec. 1, 1st sentence, No. 4, BDSG.

On the whole, the transmission can be justified - just - under data protection aspects, provided the prerequisites described here are satisfied and the scope described is adhered to.

In general, the following steps should be taken into account and implemented as far as possible:

The plaintiff should be reminded to primarily exploit all possibilities of collecting evidence in the United States. It should further be pointed out that there are limits to the transmission of personal data under German data protection law and that, for this reason, steps must be taken to ensure that - if at all - personal data may be transmitted only to the extent absolutely necessary and only when specific procedural precautions for data protection are taken. For certain data, for example e-mail exchanges, the Secrecy of Telecommunications also plays a role so that, in specific cases (see above), any transmission requires the consent of the individuals concerned. It is also recommended urgently to agree a binding procedure as to how personal data will be handled during the proceedings with the plaintiff; an attempt should be made to determine this agreed handling by a Protective Order

13

from the U.S. Court. Given our previous experience, it is not unlikely that the U.S. Court will sign such an order if the parties clear up any controversial issues with regard to handling such data in advance.

In particular, the plaintiff could be reminded that the so-called Sedona Conference (an influential voluntary association of judges, attorneys and other data protection experts in the United States the guidelines of which have a practical impact on the work of U.S. judges) is presently engaged in a dialogue with the European supervisory authorities for data protection with the objective of improving the knowledge and understanding of European regulations concerning data protection in the United States. As far as the undersigned is aware, the Sedona Conference is presently drafting a paper in response to the Working Paper 158 of the Article 29 Group for the purpose of establishing international principles of data protection in U.S. civil proceedings. As far as we know, measures of data screening and filtering for the purposes of reducing the scope of data to be transmitted and attempts to obtain protective orders (see above) are being seriously considered for recommendation. At least given the present situation, it is realistic that the Sedona Conference might adopt such recommendations in the foreseeable future.

It is also of particular importance to point out that breaches of data protection regulations are subject to sanctions in Germany. In case of inadmissible processing (e.g. transmission or saving) of personal data a fine of up to EUR 300,000.00 may be imposed pursuant to Sec. 43, Subsec. 3, BDSG. In addition, Sec. 38, Subsec. 5, BDSG, entitles a German supervisory authority for data protection to order elimination of the breach when a violation of data protection regulations has been established. It is conceivable, for instance, that certain types of data processing (such as transmissions) are prohibited in such cases on the penalty of a disciplinary fine.

Yours sincerely,

signed Filip
Ministerial Director