Case 2:04-cv-09049-DOC-RNB   Document 9659   Filed 01/20/11   Page 1 of 173   Page ID #:287877
CV 04-9049 DOC – 1/13/2011 – Day 1, Volume 1 of 3

1

1          **UNITED STATES DISTRICT COURT**

2          **CENTRAL DISTRICT OF CALIFORNIA**

3        **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4                 – – – – – – –

5

   MATTEL, INC., et al.,              )
6                                     )
              Plaintiffs,             )
7                                     )
        vs.                           ) No. CV 04-9049 DOC
8                                     )     Day 1
   MGA ENTERTAINMENT, INC., et al.,   )     Volume 1 of 3
9                                     )
                                      )
10            Defendants.             )
   _____)

11

12

13

14          REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                  Jury Trial

16              Santa Ana, California

17           Thursday, January 13, 2011

18

19

20

21   Debbie Gale, CSR 9472, RPR, CCRR
     Federal Official Court Reporter
22   United States District Court
     411 West 4th Street, Room 1-053
23   Santa Ana, California 92701
     (714) 558-8141
24

25   04cv9049 Mattel 2011-01-13 D1V1

1    **APPEARANCES OF COUNSEL:**

2

    FOR PLAINTIFF MATTEL, INC., ET AL.:

3

            QUINN EMANUEL URQUHART OLIVER & HEDGES LLP
4           BY:  JOHN QUINN
                 WILLIAM PRICE
5                MICHAEL T. ZELLER
                 Attorneys at Law
6           865 South Figueroa Street
            10th Floor
7           Los Angeles, California 90017
            (213) 443-3000

8

9

10   FOR DEFENDANT MGA ENTERTAINMENT, INC., ET AL:

11          ORRICK, HERRINGTON & SUTCLIFFE, LLP (Irvine)
            BY:  THOMAS S. McCONVILLE
12               Attorney at Law
            4 Park Plaza
13          Suite 1600
            Irvine, California 92614
14          (949) 567-6700

15          - AND -

16          ORRICK, HERRINGTON & SUTCLIFFE, LLP (SF)
            BY:  ANNETTE L. HURST
17               Attorney at Law
            405 Howard Street
18          San Francisco, California 94105
            (415)773-5700

19          - AND -

20
            KELLER RACKAUCKAS
21          BY:  JENNIFER KELLER
                 attorney at law
22          18500 Von Karman Avenue
            Suite 560
23          Irvine, California 92612

24

25

Case 2:04-cv-09049-DOC-RNB   Document 9659   Filed 01/20/11   Page 3 of 173   Page ID #:287879
CV 04-9049 DOC - 1/13/2011 - Day 1, Volume 1 of 3

3

1    **APPEARANCES OF COUNSEL (Continued):**

2    FOR CARLOS GUSTAVO MACHADO GOMEZ:

3

4            LAW OFFICES OF MARK E. OVERLAND
             By:  MARK E. OVERLAND
5                   Attorney at Law
             100 Wilshire Boulevard
6            Suite 950
             Santa Monica, California 90401
7            (310) 459-2830

8            - AND -

9            SCHEPER KIM & HARRIS LLP
             BY:  ALEXANDER H. COTE
10                  Attorney at Law
             601 West 5th Street
11           12th Floor
             Los Angeles, California 90071
12           (213) 613-4660

13   ALSO PRESENT:

14           MGA ENTERTAINMENT, INC.
             BY:  JEANINE PISONI
15                  Attorney at Law
             16360 Roscoe Boulevard
16           Suite 105
             Van, Nuys, California 91406
17
             ORRICK HERRINGTON & SUTCLIFFE LLP
18           BY:  WILLIAM A. MOLINSKI
                    Attorney at Law
19           777 South Figueroa Street
             Suite 3200
20           Los Angeles, California 90017

21           Dave Eckert (Mattel)
             Lily Martinez (Mattel)
22           Jill Thomas (Mattel)
             Leigh Mielhs (MGA)
23           Carrie Mason

24

25

DEBBIE GALE, U.S. COURT REPORTER

1                            **I N D E X**

2    **PROCEEDINGS**                                    **PAGE**

3    Jury panel sworn                                    169

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CV 04-9049 DOC - 1/13/2011 - Day 1, Volume 1 of 3

5

| | |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| 08:10 | 4 |
| 08:10 | 5 |
| 08:10 | 6 |
| 08:10 | 7 |
| 08:10 | 8 |
| 08:10 | 9 |
| 08:10 | 10 |
| 08:10 | 11 |
| 08:10 | 12 |
| 08:10 | 13 |
| 08:10 | 14 |
| 08:10 | 15 |
| 08:10 | 16 |
| 08:10 | 17 |
| 08:10 | 18 |
| 08:10 | 19 |
| 08:10 | 20 |
| 08:10 | 21 |
| 08:10 | 22 |
| 08:11 | 23 |
| 08:11 | 24 |
| 08:11 | 25 |

1        SANTA ANA, CALIFORNIA, THURSDAY, JANUARY 13, 2011

2                     Day 1, Volume 1 of 3

3                          (8:10 a.m.)

4              THE COURT:  All right.  We're on the record.  All

5       counsel are present.  Also the jury consultants are present.

6       Mr. Larian's present as well.

7                   Mr. Quinn.

8              MR. QUINN:  John Quinn on behalf of Mattel.

9              Your Honor, this is Lily Martinez, who will be

10      Mattel's table representative during the trial.

11             THE COURT:  Pleasure.  You are more than welcome

12      to be present.

13             And your jury consultant?

14             MR. QUINN:  Yes.  Dave Weinberg.

15             THE COURT:  And, Mr. Eckert, I apologize.  I

16      didn't see you were behind the other consultant.  It's nice

17      to see you here also.

18             And who's with you today, sir?

19             MS. THOMAS:  Your Honor, I'm Jill Thomas, in-house

20      counsel.

21             THE COURT:  It's a pleasure to have you here.

22             And?

23             MS. MASON:  Carrie Mason.

24             THE COURT:  Now, I think as long as you stay in

25      those first rows, you're more than welcome.  I just need to

DEBBIE GALE, U.S. COURT REPORTER

08:11   1    free up all of the excess space for the jurors.

08:11   2                And then counsel on behalf of MGA and Mr. Machado.

08:11   3                Ms. Keller?

08:11   4                MS. KELLER:  Good morning, Your Honor.  Present

08:11   5    with me is Leigh Meihls, who is our trial consultant, and I

08:11   6    understand has been in court before with Your Honor.

08:11   7                THE COURT:  It's nice seeing her again.

08:11   8                MS. KELLER:  And Mr. McConville, Mr. Larian,

08:11   9    Ms. Hurst.  Mr. Molinski is seated in the front row.

08:11   10               THE COURT:  Okay.  And --

08:11   11               MS. MEIHLS:  Good morning, Your Honor.  I'll be

08:11   12   assisting.  Leigh Meihls.

08:11   13               THE COURT:  Thank you.

08:11   14               Then on behalf of Mr. Machado.

08:11   15               MR. OVERLAND:  Good morning, Your Honor.  Mark

08:11   16   Overland.  And I know you kicked my daughter out.

08:11   17               THE COURT:  She's now returned.  And as long as

08:11   18   you're seated in the first row, that's fine.

08:11   19               MR. OVERLAND:  Can she sit here in order to help

08:11   20   me find things?

08:11   21               THE COURT:  Absolutely.  Yes, yes.  If you want to

08:12   22   come up and get a chair for her.

08:12   23               MR. OVERLAND:  Thank you.

08:12   24               THE COURT:  Counsel?

08:12   25               MR. COTE:  Alexander Cote, Your Honor, for

Case 2:04-cv-09049-DOC-RNB   Document 9659   Filed 01/20/11   Page 7 of 173   Page ID #:287883
CV 04-9049 DOC - 1/13/2011 - Day 1, Volume 1 of 3

7

08:12   1   Mr. Machado.

08:12   2           THE COURT:  So we perfect the record, counsel

08:12   3   approached the Court this morning about 7:00 o'clock and

08:12   4   apparently had agreed that Ms. McDowell, who has a husband

08:12   5   who's undergoing surgery, is excused by stipulation.

08:12   6           That was done informally downstairs by the jury

08:12   7   commissioner.

08:12   8           Mr. Quinn, does that meet with your consent?

08:12   9           MR. QUINN:  Yes, Your Honor.

08:12   10          THE COURT:  Ms. Keller?

08:12   11          MS. KELLER:  Yes, Your Honor.

08:12   12          THE COURT:  Counsel?

08:12   13          MR. COTE:  Yes, Your Honor.

08:12   14          THE COURT:  Second, the Court has changed its

08:12   15  position.  We're going to go with eight jurors instead of

08:12   16  six.  That means eight alternates, and I've expanded to four

08:12   17  peremptories for the sitting jury and retained the option of

08:12   18  four peremptories for the alternates.  It just has a nice

08:12   19  symmetry.  It also allows more people to participate, which

08:12   20  means greater wisdom because of their life experiences.

08:13   21          Counsel, you know now that Victoria Riley would be

08:13   22  what I consider the 12th juror that's been given to you.

08:13   23          And you have received that, Mr. Quinn?

08:13   24          MR. QUINN:  Yes, Your Honor.

08:13   25          THE COURT:  And, Ms. Keller?

08:13   1          MS. KELLER:  Yes, Your Honor.  When the Court says

08:13   2   the 12th juror, is the Court putting her in position No. 12?

08:13   3          THE COURT:  She's in 12.  She's sequential.  In

08:13   4   other words, you know she would be called as the 12th juror.

08:13   5   After that, you don't know who the names are.

08:13   6          For the record, that was done by stipulation.  The

08:13   7   Court agreed that the Court would give the first 12 jurors

08:13   8   that would be called to counsel.  Counsel on both sides had

08:13   9   requested substantially more.  The Court declined to do so.

08:13   10          And finally, the statement to the jury's been

08:13   11   prepared.  I've gone over that informally with counsel.

08:13   12   I've modified a number of things after Mr. Zeller's comments

08:13   13   informally this morning.

08:13   14          I'm going to be very short with the jury, after

08:13   15   they've received the questionnaire.  I don't have too many

08:13   16   questions, unless you have questions that you would like the

08:13   17   Court to ask.

08:13   18          So on behalf of you, Mr. Quinn?

08:13   19          MR. QUINN:  No, Your Honor.

08:14   20          THE COURT:  On behalf of the defense, Ms. Keller?

08:14   21          MS. KELLER:  Your Honor, I believe we had

08:14   22   submitted some questions for the Court already in written

08:14   23   form.

08:14   24          THE COURT:  Okay.  Could I see those?  We were

08:14   25   still receiving things as of last evening, so I'm not sure

08:14  1   where in the pile of thousands and thousands of pages they

08:14  2   are.

08:14  3              If you produce them, I'll look at them once again.

08:14  4              Mr. Overland?

08:14  5              MR. OVERLAND:  No, Your Honor.

08:14  6              THE COURT:  I think the time's best spent with

08:14  7   counsel.

08:14  8              Both counsel have stipulated and also agreed that

08:14  9   this would go to 30 minutes per side.

08:14  10             How are you going to divide that between

08:14  11  Mr. Machado and MGA and Mr. Larian?  It's not 30 and 30.

08:14  12  It's 30.

08:14  13             MS. KELLER:  We'll discuss that.

08:14  14             THE COURT:  You work that out.

08:14  15             Okay.  Kathy, if we have that other juror.

08:14  16             And, counsel, by stipulation, we're going to bring

08:14  17  up the first eight, have them seated in order, and then

08:15  18  we'll bring up the rest of the jurors by elevator, which

08:15  19  will take all of the time.

08:15  20             Kathy, do we have the first juror?  If so, let's

08:15  21  get started.

08:15  22             MR. McCONVILLE:  Your Honor, are we off the

08:15  23  record?

08:15  24             THE COURT:  We're off the record now.

08:15  25                  *(Interruption in the proceedings.)*

08:15   1          THE COURT:  Also, I've added either side could sit

08:15   2      in the plaintiff's chair or the defendant's chair for this

08:15   3      opening comment by me so that neither side has an advantage.

08:17   4          So we'll probably move those eight jurors back out

08:17   5      of the box and put those eight up there, because it's more

08:17   6      convenient.

08:16   7          *(Interruption in proceedings.)*

08:21   8          THE COURT:  We'll call the matter to order.

08:21   9      Mr. Paul Gerst, if you would come forward, sir.  And, sir,

08:21  10      if you would be seated in Seat No. 1, please.

08:21  11          And the next juror would be Jennifer Sheehan.  If

08:21  12      you would be seated in Seat No. 2, please.

08:21  13          Cheryl Dyas.  Ms. Dyas, if you would be seated in

08:21  14      Seat No. 3, please.

08:21  15          Hao Nguyen.  Mr. Nguyen, if you would be seated in

08:21  16      Seat No. 4, which is in the top row.  They're numbered.

08:21  17          Bobby Dearinger.  Sir, if you would be seated in

08:22  18      the bottom row in Seat No. 5.

08:22  19          Josh Dresser.  Mr. Dresser, if you would be seated

08:22  20      in the bottom row in Seat No. 6.

08:22  21          Stephen Leong.  Mr. Leong, if you would be seated

08:22  22      in Seat No. 7.

08:22  23          And, Kenneth Cameron.  Sir, if you would be seated

08:22  24      in Seat No. 8.

08:22  25          I'll ask all the remaining persons in the audience

| | | |
|---|---|---|
| 08:22 | 1 | if you would step outside, please. |
| 08:22 | 2 | *(Spectators exit the courtroom.)* |
| 08:22 | 3 | THE COURT:  Good morning.  We already have drawn, |
| 08:22 | 4 | so you know, the names through the computer random system. |
| 08:22 | 5 | So we knew that you were the first eight jurors.  Instead of |
| 08:22 | 6 | having you get up out of the audience with 75 jurors, all |
| 08:22 | 7 | counsel have consented that we could bring you up. |
| 08:22 | 8 | You're not the jury that has been selected yet, |
| 08:22 | 9 | but you're the first eight names that would have been |
| 08:22 | 10 | called. |
| 08:23 | 11 | So bear with us for a moment.  It makes it much |
| 08:23 | 12 | more organized as we bring up the other 75. |
| 08:24 | 13 | THE REPORTER:  Good morning, Your Honor.  This is |
| 08:25 | 14 | a test to confirm realtime is working. |
| 08:25 | 15 | *(Pause in the proceedings at 8:25 a.m.)* |
| 08:29 | 16 | *(Venire enter the courtroom.)* |
| 08:29 | 17 | *(Proceedings resumed at 8:29 a.m.)* |
| 08:30 | 18 | *(In the presence of the venire.)* |
| 08:30 | 19 | THE COURT:  All right.  Now, with the exception of |
| 08:30 | 20 | Mr. Eckert, who I'd like to remain, I would like all the |
| 08:30 | 21 | parties in the first row to wait in the hallway.  Let's see |
| 08:30 | 22 | if we have enough room. |
| 08:30 | 23 | All right.  If all the parties -- Mr. Eckert, |
| 08:30 | 24 | you're more than welcome to remain, along with Mr. Zeller. |
| 08:30 | 25 | But other than that, if every other person in the first row |

08:30  1    would remain in the hallway.

08:30  2            If you'll move to the hallway now.  Thank you.

08:31  3            Ms. Pisoni, you can remain also.  Mr. Zeller,

08:31  4    Mr. Eckert as far as down as possible.

08:31  5            All right.  Ladies and gentlemen, we're going to

08:31  6    have seats for you.  You're our most important product.  If

08:31  7    you would like to come forward and be seated in the first

08:31  8    row of chairs so you're comfortably seated.

08:31  9            All right.  Now, Mr. Zeller, Mr. Eckert, if you

08:31  10   would like to come back within view.  We have enough room

08:31  11   for you.  Have a seat right there.

08:31  12           All right.  We'll call the case to order.

08:31  13           Counsel, if you would be seated for just a moment.

08:31  14           In just a moment, ladies and gentlemen, I'm going

08:31  15   to ask you to stand, and we're going to swear you.  As you

08:31  16   came into Court this morning, you noticed that we took eight

08:32  17   members of your jury pool up earlier, then we brought the

08:32  18   remaining 75 jurors.  The reason for that is that the

08:32  19   computer has already spun out a list of names known only to

08:32  20   the Court Clerk and to the Court in the order in which we're

08:32  21   calling you to be examined by the parties and by the Court.

08:32  22   So you're not the jury yet.

08:32  23           Okay.  And there will be a number of peremptories

08:32  24   that the parties have.  I expect that one or more of you

08:32  25   will be excused by one or more of the parties in this

CV 04-9049 DOC – 1/13/2011 – Day 1, Volume 1 of 3

13

08:32   1    matter.

08:32   2            But we thought it was just an easy and convenient

08:32   3    way to get the first eight jurors up to Court.

08:32   4            What you should know before we begin this case and

08:32   5    we swear you in this matter is that there's going to be --

08:32   6    there will be eight jurors who eventually decide this

08:32   7    matter, and we're going to need eight alternates.  I'll

08:32   8    explain that to you in just a moment.  We expect that

08:32   9    there's going to be 16 of us sitting here as deliberators in

08:32   10   this matter.

08:32   11           So in this matter, I'll call the matter of Mattel

08:32   12   v. MGA Entertainment, Incorporated.  I'll begin with

08:33   13   Mr. Quinn.

08:33   14           Mr. Quinn, would you make your appearance, please.

08:33   15           MR. QUINN:  John Quinn for Mattel, Your Honor.

08:33   16           THE COURT:  And would you be kind enough to

08:33   17   introduce Mr. Zeller, and would you be kind enough to

08:33   18   introduce Mr. Eckert.

08:33   19           MR. QUINN:  This is my partner, Mike Zeller.  Bob

08:33   20   Eckert, who is the CEO of Mattel.

08:33   21           And, Your Honor, if I may introduce Lily Martinez,

08:33   22   a designer who will be Mattel's representative during the

08:33   23   trial.

08:33   24           THE COURT:  You may.  And if you'll stand also,

08:33   25   you and Ms. Martinez.  A pleasure to have you here.  If

DEBBIE GALE, U.S. COURT REPORTER

08:33    1    you'd be seated.

08:33    2           Counsel, let me begin with Ms. Keller on behalf of

08:33    3    MGA.

08:33    4           MS. KELLER:  Good morning, Your Honor, ladies and

08:33    5    gentlemen.  My name's Jennifer Keller.  To my right is

08:33    6    co-counsel, Tom McConville.

08:33    7           At the end of the table is our learned colleague

08:33    8    Annette Hurst.

08:33    9           And this is the CEO of MGA, Isaac Larian, our

08:33   10    client.

08:33   11           THE COURT:  Thank you.  And, Counsel,

08:33   12    Mr. Overland.

08:33   13           MR. OVERLAND:  Good morning.  I am Mark Overland,

08:33   14    and I'm representing Gustavo Machado.  And this is Alexander

08:33   15    Cote, and he is another attorney also representing

08:34   16    Mr. Machado.

08:34   17           THE COURT:  Thank you very much.

08:34   18           Ladies and gentlemen, would you join me.  Would

08:34   19    you stand for just a moment.  If you would raise your right

08:34   20    hand, Kathy will administer an oath to you.

08:34   21                           **VENIRE SWORN**

08:34   22           THE COURT:  Thank you.  If you'd be seated.

08:34   23           Now, if I'm doing my job properly, there's

08:34   24    absolutely no reason we shouldn't have a jury sometime late

08:34   25    this morning or this afternoon.  And that way if you're

CV 04-9049 DOC - 1/13/2011 - Day 1, Volume 1 of 3

15

08:34    1    sitting in this matter, hopefully, you'll know that you'll

08:34    2    be a juror or an alternate.  And we're going to send you

08:34    3    home today, and we'll have the opening statements for the

08:34    4    parties next Tuesday.  So if we accomplish all that today,

08:34    5    we'll accomplish quite a bit.

08:34    6          Let me just start with some general principles and

08:34    7    rules, because we had you fill out a five-page

08:34    8    questionnaire, didn't we?  That told us an awful lot of

08:34    9    information about each of you.

08:35   10          You'll know that the parties have a half hour with

08:35   11    you as a composite group to begin with.  Each side has a

08:35   12    half hour.  After that, they'll start making their

08:35   13    peremptory selections.  If one of you is excused and another

08:35   14    juror comes into the box, each party has about five minutes.

08:35   15          They know an awful lot about you, so I don't want

08:35   16    you indoctrinated.  In fact, the less you know about the

08:35   17    case at the present time, the better.

08:35   18          Because all the evidence we get will come from the

08:35   19    witness stand, from people who are under oath to testify

08:35   20    and, hopefully, are telling us the truth.

08:35   21          Now, let me start with a story for a moment.

08:35   22          There was a man named Alexander de Tocqueville.

08:35   23    He was from France and he came here in 1835.  I met him.  He

08:35   24    was a wonderful man.

08:35   25          And when Alexander came to the United States, he

Case 2:04-cv-09049-DOC-RNB   Document 9659   Filed 01/20/11   Page 16 of 173   Page ID #:287892
CV 04-9049 DOC - 1/13/2011 - Day 1, Volume 1 of 3

16

08:35    1    was writing a book about politics in America.  He was

08:35    2    studying this unique American experience.

08:36    3           And by the way, you are a unique experience in the

08:36    4    world.

08:36    5           And what he was studying was the involvement of

08:36    6    citizens in this great democracy.  Because you see at that

08:36    7    time -- and although we have a British common law system, we

08:36    8    really don't.  We've progressed far beyond even the British.

08:36    9           And it was puzzling that common people, people

08:36   10    from an everyday walk of life, without a title or position,

08:36   11    such as a judge, would decide weighty matters -- criminal

08:36   12    cases, civil cases -- that we, the American public, would be

08:36   13    entrusted with that kind of responsibility.

08:36   14           And after his tour across America, he had two

08:36   15    things to say.  The first was that he believed that because

08:36   16    America, in its uniqueness, allowed citizens to sit as

08:36   17    jurors, that that was a great civics lesson for everybody

08:37   18    who had the privilege as sitting as a juror.

08:37   19           In other words, it gave them an ownership in

08:37   20    democracy.

08:37   21           And the second thing he had to say was that the

08:37   22    community accepted the verdict of a jury much more readily

08:37   23    than a professional person called a judge.

08:37   24           And we believe, at least in this country, that

08:37   25    that's absolutely true, that when we gather eight of you

08:37  1    with common sense experience, with a lifetime of experience,

08:37  2    to sit, that your composite wisdom and knowledge is much

08:37  3    greater than any individual judge.

08:37  4            The second thing it does is it takes away the

08:37  5    accusation that somehow the system is fixed.  If you go to

08:37  6    another country, what you'll always hear is, well, the judge

08:37  7    is either taking a bribe or knows the parties or was unfair.

08:37  8            In other words, by our way of separation of

08:37  9    powers, in a sense by me having a certain role and you

08:37  10   having a role as the decision-maker based upon these facts,

08:38  11   we have a check and balance, if you will, that guarantees

08:38  12   honesty and ethics.

08:38  13           So therefore, let me tell you that you take my

08:38  14   place in the way you conduct yourself throughout the trial.

08:38  15   So I'll start with some unique things that you have to do as

08:38  16   jurors.  Because more cases have started over again because

08:38  17   judges are unclear about what they expect.

08:38  18           Now, first of all, you see these parties, these

08:38  19   attorneys and Mr. Eckert and Mr. Larian and Gustavo Machado,

08:38  20   who we'll eventually meet, they're wonderful people.  The

08:38  21   parties, the attorneys, et cetera, you can't talk to them.

08:38  22   You can't say "Good morning."  You can't say "Good

08:38  23   afternoon" to them.  You can't say anything to them.

08:38  24           Primarily, it will be the attorneys who get on an

08:38  25   elevator, and if somebody says anything to you, I want to

Case 2:04-cv-09049-DOC-RNB   Document 9659   Filed 01/20/11   Page 18 of 173   Page ID #:287894
CV 04-9049 DOC - 1/13/2011 - Day 1, Volume 1 of 3

18

08:38  1    know that right away.  Okay?

08:38  2              And the reason for that is, it's not only the

08:38  3    eventual decision we reach, it's the way we go about it.

08:38  4              If I'm a lawyer and I'm talking to one of you down

08:38  5    the hallway, the other party doesn't know what we're talking

08:39  6    about.  And it gives the perception that we might be talking

08:39  7    about the case.  So there's no inherent trust.

08:39  8              Second, because you like the attorneys in this

08:39  9    matter, the end result would be that one of them might have

08:39  10   an advantage when they got up to argue because you like

08:39  11   them. I assure you, you'd like Mr. Quinn.  Mr. Price is

08:39  12   going to join us.  Mr. Zeller you'll see on occasion.

08:39  13   Ms. Zeller, Ms. Hurst, Mr. McConville, Mr. Overland and

08:39  14   counsel.  They're wonderful people, but you just can't talk

08:39  15   to them.  They're invisible.

08:39  16             The second thing is, waiting at home for you is

08:39  17   somebody who is going to ask you, if you're eventually a

08:39  18   member of this jury, how you finally got selected to sit on

08:39  19   a three- to four-month case.  And I don't want you to tell

08:39  20   them a thing.

08:39  21             I don't want you to tell them a thing about what

08:39  22   happened in Court that day or what witnesses said, because

08:39  23   eventually the parties will put their faith and trust in

08:39  24   eight of you.

08:40  25             Now, if that person at home truly loves you and he

Case 2:04-cv-09049-DOC-RNB   Document 9659   Filed 01/20/11   Page 19 of 173   Page ID #:287895
CV 04-9049 DOC – 1/13/2011 – Day 1, Volume 1 of 3

19

08:40  1    or she can't resist asking you, let me help you with that.

08:40  2    Tell them to call (714) 338-4545 and let me just talk to

08:40  3    them.

08:40  4          Because eventually the parties will put their

08:40  5    faith, remember, in eight of you that they personally select

08:40  6    and believe will be fair in this matter.

08:40  7          The third thing is, the case has received a little

08:40  8    bit of notoriety in the past, and it may receive a little

08:40  9    bit of notoriety both in the Internet and some media

08:40  10   sources.  That may be the L.A. Times, the Register, some of

08:40  11   the more common papers around the county, some of your more

08:40  12   common blogs.  It may even have some news in business

08:40  13   portions or sections of the different papers.

08:40  14         And I'm going to ask you this.  We don't sequester

08:40  15   juries here.  We trust you.  If you start to read something

08:40  16   that you think sounds familiar about this case, just put it

08:40  17   aside.  Don't continue reading it.

08:40  18         After the case is done, if you want to pick up

08:41  19   articles, if there are articles, et cetera, you can do so.

08:41  20   But please don't -- please don't read anything once you

08:41  21   recognize this case.  Or if it's on television, just turn

08:41  22   the channel.

08:41  23         The -- sometimes jurors have actually gone to

08:41  24   dictionaries during jury deliberations to help the Court --

08:41  25   or believe that they've helped the Court.  And sometimes

Case 2:04-cv-09049-DOC-RNB   Document 9659   Filed 01/20/11   Page 20 of 173   Page ID #:287896
CV 04-9049 DOC - 1/13/2011 - Day 1, Volume 1 of 3

20

08:41    1    jurors will even do independent investigation.  If you do

08:41    2    that, I have to start the case all over again.

08:41    3           In other words, at the end of the case, I'm going

08:41    4    to give you a packet of instructions.  It's going to contain

08:41    5    all of the law that you need in deciding this issue.

08:41    6           And when I give that to you, I'll actually give

08:41    7    you my only copy to take back in the jury room.  So I don't

08:41    8    want you going to an Internet blog or to a dictionary.

08:41    9           First of all, if you ever did, you'd find out that

08:41   10    the way we use a word in a legal sense, or a legal term,

08:41   11    might be substantially different than if we went to Websters

08:42   12    dictionary and looked at the same word.

08:42   13           So I'll define the law for you.  That's my job and

08:42   14    my duty.

08:42   15           But you're not to do any independent work or help

08:42   16    the Court in any way in defining terms, and you're not to do

08:42   17    any independent investigation.  If we need to go look at a

08:42   18    scene, either at MGA or Mattel, we'll go by bus.  We'll take

08:42   19    a court reporter.  We'll have testimony there if we need to.

08:42   20    I doubt that we'll have to do that.  But if we do, we'll do

08:42   21    that as a group.  Is that fair enough?  Does that make sense

08:42   22    to everybody, I hope?

08:42   23           If we follow those basic rules, we have not only

08:42   24    justice, but we have the perception of justice, which is

08:42   25    very important that the parties have confidence it's been a

08:42  1     fair trial.

08:42  2              Now, this morning on the way in, on the I-5

08:42  3     freeway, there was an accident.

08:42  4              I want you to pretend that this is the I-5 freeway

08:42  5     over here.

08:42  6              And what we find -- actually, it wasn't this

08:42  7     morning; it was a few days ago that a witness came into

08:43  8     Court and told us that a 1992 green Honda hit the back of a

08:43  9     pickup truck.  It was about 10:00 o'clock at night.  It was

08:43  10    dark.  The green 1992 Honda spun around.  Thank goodness it

08:43  11    didn't roll.  The white pickup truck that the Honda hit spun

08:43  12    around.  No one was seriously hurt.  But the driver of that

08:43  13    green Honda that had rear-ended the pickup truck looked at

08:43  14    the other driver and sped away.

08:43  15             We commonly call that a hit and run, don't we?

08:43  16    And you know that the law requires us to stop, to give

08:43  17    information about our license, who we are, and we do that

08:43  18    for a number of reasons.  Both so it can be decided by --

08:43  19    when the police take a report, what the statements were, and

08:43  20    also, eventually, if there's any accident or liability, who

08:44  21    is at fault.

08:44  22             Now, what we find when that witness comes in to

08:44  23    Court is the following:  That, after he or she testifies,

08:44  24    that it wasn't a 1992 Honda at all; it was a 1993 Honda.

08:44  25    See, the body styles didn't change between the '92 and '93,

08:44   1   because I drive one.  Absolutely the same.  They just

08:44   2   charged you a little bit more for the '93.

08:44   3           And the second thing that we found out, that it

08:44   4   wasn't a green Honda at all.  The witness was mistaken.  It

08:44   5   was red.  Because it was dark, he or she didn't perceive the

08:44   6   color correctly.

08:44   7           And the witness testified in Court also that this

08:44   8   Honda was going at a high rate of speed, that he or she, as

08:44   9   the witness, estimated that it was going about 85 miles an

08:44   10   hour.  But we find that the California Highway Patrol does

08:44   11   an accident reconstruction, and from the skid marks, the

08:44   12   Honda was going well over a hundred miles an hour.

08:45   13           Now, what you may decide as a juror is that this

08:45   14   is an absolutely truthful witness, that this witness is just

08:45   15   misperceived about some of the facts; that it was one year

08:45   16   off in terms of the year of the Honda, that the color,

08:45   17   because of night, was red instead of green, and that the

08:45   18   speed that he/she estimated to be high was much greater than

08:45   19   actually 85 miles an hour.

08:45   20           You may decide that that makes no difference, that

08:45   21   this is a truthful witness who's perceiving the facts

08:45   22   correctly because, actually, she did see or he did see the

08:45   23   hit and run.  Okay?  Or you may decide that that witness

08:45   24   because they misperceived those facts, that may have some

08:45   25   bearing on whether she really saw what she saw or is

08:45  1    credible.

08:46  2            Those are decisions that jurors make.  And no

08:46  3    individual judge has that common sense experience that you

08:46  4    do.

08:46  5            Now, there's another type of witness who will come

08:46  6    into court, and you'll see that witness potentially in any

08:46  7    trial -- I don't know about this trial yet -- they'll lie to

08:46  8    you.  I don't know how to dress that up in fancy legal

08:46  9    terms, but they'll take the stand, they'll raise their hand,

08:46 10    and they'll lie to you.  Or they'll tell you the truth all

08:46 11    the way up to the moment of truth, and then they'll lie to

08:46 12    you.

08:46 13            Now, hopefully, you've been lied to before.

08:46 14    Hopefully, back when we were kids we told a couple lies, we

08:46 15    got punished for it and learned.  Hopefully, you've seen

08:46 16    that in the workplace on occasion, with children or other

08:46 17    people you've associated with.

08:46 18            Nobody takes your place in terms of common

08:46 19    experience.  That's why we have a jury that sits.  Your

08:46 20    wisdom is much greater than any individual judge.

08:46 21            So I hope that that's a good explanation about,

08:46 22    first, the difference between a person who's misperceived in

08:47 23    telling you the truth and a person who may be perjuring

08:47 24    themselves.

08:47 25            Lastly, if President Obama, President Bush -- let

08:47  1  me see if I can get them all right in order -- President

08:47  2  Clinton, President Bush, Senior -- who was before that? --

08:47  3  Reagan, Carter -- how am I doing so far? -- Ford, getting

08:47  4  back there -- if they came into court and raised their right

08:47  5  hand and promised to tell the truth and took the stand, I'd

08:47  6  be pretty impressed, wouldn't you?  The President of the

08:47  7  United States, for goodness' sake, in this humble court.

08:47  8  Until they opened their mouth.  Until they took that witness

08:47  9  stand.  And once they get on that witness stand, folks, they

08:47  10  are absolutely co-equal to you and me.

08:47  11        The older I've grown, the more I've learned about

08:47  12  the following:  The goodness of a person, their ability to

08:47  13  tell the truth comes from the humblest of professions.  It

08:48  14  comes from people who have just had sometimes just a life

08:48  15  experience that doesn't give them a title in front of their

08:48  16  name.  And I don't want you to be swayed by any title, by

08:48  17  any person who takes the witness stand.  Once they take that

08:48  18  witness stand, they are no different than you and me.  And I

08:48  19  will want you to make your individual judgment and

08:48  20  credibility calls based upon what they say and a whole

08:48  21  number of factors that you can take into consideration about

08:48  22  them telling the truth.  And I hope that that makes sense to

08:48  23  you.  That's called a democracy.

08:48  24        Finally, for the 16 of you who are finally picked

08:48  25  in this matter, I really want to thank you for your service

Case 2:04-cv-09049-DOC-RNB   Document 9659   Filed 01/20/11   Page 25 of 173   Page ID #:287901
CV 04-9049 DOC – 1/13/2011 – Day 1, Volume 1 of 3

25

08:48 1    over the next three to four months.  I think the case will

08:48 2    go quicker than that, but we wanted to estimate four months

08:48 3    so you weren't dissatisfied.  It could take that long.

08:48 4              And one of my jobs is to make certain that counsel

08:48 5    are performing at their very best.  These are wonderful

08:48 6    attorneys, who are extraordinarily well prepared.

08:49 7              I want you to take a picture of them now, because

08:49 8    when you see them, they'll look like me.  They'll be very

08:49 9    old.  Their enthusiasm for this case absolutely drives me.

08:49 10   They've asked me to stay late at night, and they've asked me

08:49 11   to stay on the weekends so that when we're in session, we're

08:49 12   working.

08:49 13             You should come in at 8:00 or 8:30, whatever time

08:49 14   we decide, in the morning, and you should be working until

08:49 15   4:30 or 5:00 o'clock.  If we having a bunch of sidebars,

08:49 16   where we are discussing matters in the hallway, and you're

08:49 17   sitting here, I want you to know that I'm an absolute

08:49 18   failure as a judge.  That I should know every objection and

08:49 19   be well prepared, and counsel have promised me that they'll

08:49 20   make me well prepared.  So my compliments to counsel on both

08:49 21   sides.  I'm very pleased with their performance thus far.

08:49 22             Just a couple of things generally, because I'm not

08:49 23   going to get to the merits of this matter.

08:49 24             When counsel get up to discuss this matter with

08:49 25   you in a few moments, they're supposed to be asking

| | | |
|---|---|---|
| 08:49 | 1 | questions that will help them to decide if you'll be a fair |
| 08:50 | 2 | juror.  Sometimes that segues into questions when they're |
| 08:50 | 3 | indoctrinating you about the case.  I know counsel won't do |
| 08:50 | 4 | that in this matter, but they've asked me to read a |
| 08:50 | 5 | statement to you, basically, to tell you a little bit about |
| 08:50 | 6 | the case.  But what I'm about to read to you are not facts. |
| 08:50 | 7 | All of facts will be proven to us. |
| 08:50 | 8 | This is a lawsuit between two toy companies: |
| 08:50 | 9 | Mattel -- and the gentleman, Mr. Eckert, is the president of |
| 08:50 | 10 | Mattel, CEO -- and MGA Entertainment.  Mr. Larian is the |
| 08:50 | 11 | president of MGA Entertainment.  And the lawsuit also |
| 08:50 | 12 | involves an affiliate of Mattel and affiliates of MGA. |
| 08:50 | 13 | Different companies and entities that you'll hear about. |
| 08:50 | 14 | The affiliate of Mattel is called Mattel Mexico, |
| 08:50 | 15 | or Mattel de Mexico.  The affiliates of MGA are MGA |
| 08:50 | 16 | Hong Kong and MGA de Mexico, or Mexico. |
| 08:51 | 17 | They are also two individual parties named.  Isaac |
| 08:51 | 18 | Larian, who's the CEO of MGA, who you met, who's seated at |
| 08:51 | 19 | the counsel table, and Carlos Gustavo Machado Gomez, who |
| 08:51 | 20 | will join us another day shortly.  He couldn't be here with |
| 08:51 | 21 | us today. |
| 08:51 | 22 | The companies on both sides have claims against |
| 08:51 | 23 | each other, and I'll refer to them sometimes as claimants or |
| 08:51 | 24 | sometimes as plaintiffs and defendants.  But don't let that |
| 08:51 | 25 | mislead you.  This could be reversed. |

Case 2:04-cv-09049-DOC-RNB   Document 9659   Filed 01/20/11   Page 27 of 173   Page ID #:287903
CV 04-9049 DOC – 1/13/2011 – Day 1, Volume 1 of 3

27

08:51  1          When I point to plaintiffs being at the Mattel
08:51  2   table and defendants being at the -- MGA being at the
08:51  3   defense table, we could have reversed that.  We could have
08:51  4   reversed that.
08:51  5          So I had to choose which party would sit in the
08:51  6   plaintiff's chair, which party would sit in the defendant's
08:51  7   chair, because there are claims and cross-claims between the
08:51  8   parties that have gone back and forth.
08:52  9          Mattel claims that MGA -- MGA Hong Kong, MGA
08:52 10   Mexico -- I'm sorry -- that MGA, MGA Hong Kong, and Isaac
08:52 11   Larian improperly took the idea and drawings for a doll
08:52 12   product called Bratz through a Mattel employee named Carter
08:52 13   Bryant.  MGA Hong Kong, MGA, and Mr. Larian deny this claim.
08:52 14          Mattel further claims that MGA, MGA Mexico, and
08:52 15   Mr. Larian took certain business trade secrets of Mattel,
08:52 16   using several other Mattel former employees, including
08:52 17   Mr. Machado, MGA, MGA Mexico, Mr. Larian, and Mr. Machado.
08:53 18   And they deny -- I'm sorry.  Let me read that again.
08:53 19          Mattel further claims that MGA, MGA Mexico, and
08:53 20   Mr. Larian took certain business trade secrets of Mattel
08:53 21   using several other Mattel former employees, including
08:53 22   Mr. Machado.  MGA, MGA Mexico, and Mr. Larian and
08:53 23   Mr. Machado deny this claim.
08:53 24          Now, MGA claims that Mattel misappropriated trade
08:53 25   secrets from MGA when Mattel's employees used false

| 08:53 | 1 | pretenses to gain access to private showrooms at toy fairs. |

08:53    1    pretenses to gain access to private showrooms at toy fairs.

08:53    2    And Mattel denies this claim brought by MGA.

08:53    3         And MGA also claims that Mattel tried to drive it

08:53    4    out of the marketplace, disrupting MGA's relationship with

08:53    5    licensees and retailers, and Mattel also denies this claim.

08:53    6         Now, believe me, that is not a complete summary,

08:53    7    but it lets you know that you're going to be involved with

08:54    8    two companies and some individuals in this matter.

08:54    9         Now, there was an extensive witness list given to

08:54   10    you on the questionnaire.  I need to make sure you've read

08:54   11    those witnesses.

08:54   12         The reason we did that is, if you didn't, then I

08:54   13    have to read them in Court.  I have to go over every one of

08:54   14    them with you, and I thought the easiest way is just to

08:54   15    trust that you've read those witnesses in this matter.  If

08:54   16    you recognize one of them, I want you to call that to my

08:54   17    attention.

08:54   18         So for the first eight jurors, have any of you

08:54   19    recognized any of those particular witnesses?

08:54   20         PROSPECTIVE JUROR:  Yes.

08:54   21         THE COURT:  Okay.  And that gentleman would be, of

08:54   22    course, Mr. Paul Gerst.

08:54   23         PROSPECTIVE JUROR:  Yes.

08:54   24         THE COURT:  Mr. Gerst, which witness did you

08:54   25    recognize?

| | | |
|---|---|---|
| 08:54 | 1 | PROSPECTIVE JUROR:  I've been represented by |
| 08:54 | 2 | Orrick, Herrington & Sutcliffe -- my family has. |
| 08:54 | 3 | THE COURT:  You noted that also in your |
| 08:54 | 4 | questionnaire. |
| 08:54 | 5 | PROSPECTIVE JUROR:  Yes, I did. |
| 08:54 | 6 | THE COURT:  I think that was question number forty |
| 08:54 | 7 | something on the fifth page. |
| 08:54 | 8 | Mr. Bobby Dearinger? |
| 08:54 | 9 | PROSPECTIVE JUROR:  Yes.  I recognize the name Sam |
| 08:54 | 10 | Rubin.  It may be a different spelling, but he's a |
| 08:55 | 11 | newscaster on TV. |
| 08:55 | 12 | THE COURT:  Okay.  Thank you. |
| 08:55 | 13 | Any other of the eight of you that recognize any |
| 08:55 | 14 | of these persons or parties? |
| 08:55 | 15 | Now, let me finish my short period of time and |
| 08:55 | 16 | then turn this over to counsel.  I think they're the most |
| 08:55 | 17 | important product in terms of answering questions today, |
| 08:55 | 18 | because we've gotten the questionnaire. |
| 08:55 | 19 | This is a humble trial court.  The Supreme Court |
| 08:55 | 20 | gives me direction; the Ninth Circuit gives me direction. |
| 08:55 | 21 | Sometimes they give me too much direction.  I'm just kidding |
| 08:55 | 22 | you.  But when I need correcting, that's their job.  They |
| 08:55 | 23 | give the trial courts of this great country the law. |
| 08:55 | 24 | Congress gives us law, the senate gives us law, |
| 08:55 | 25 | the president gives us law, and these courts follow the law. |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC – 1/13/2011 – Day 1, Volume 1 of 3

30

08:55  1    It's as simple as that.  Sometimes I agree with it.  Most of

08:55  2    the time I agree with it.  There have been occasions when I

08:55  3    said to myself if I'd been a senator or a congressman, I

08:55  4    might have written another paragraph or changed something or

08:56  5    not found the same, but that's not a concern.  I'm a trial

08:56  6    judge.  I'm not a legislature.  And so are you.

08:56  7         You take my place.  We can agree or disagree with

08:56  8    the law, but that's Congress' prerogative, the President's

08:56  9    prerogative, whoever's in power.  And the Supreme Court's

08:56  10   prerogative to give us direction.

08:56  11        And I want to make certain there's nothing that

08:56  12   involves jury nullification, that at the end of the case

08:56  13   that you're duty-bound and you understand you're bound to

08:56  14   follow the law just as I am.  Is that fair enough as far as

08:56  15   all of you are concerned?  Otherwise, we have an anarchy.

08:56  16        Let me say finally this.  I truly believe I've

08:56  17   been fortunate the last couple of years to do a lot of

08:56  18   rule-of-law training in every place from Pakistan to

08:56  19   Afghanistan to Bosnia, Georgia -- I can't even name the

08:56  20   countries -- Armenia.  And two things I've always done --

08:57  21   and I'll joke with you.  When my mother was still alive, I

08:57  22   came back and every time I passed through customs, I'd call

08:57  23   Mom and say, "Hey, thank you for being geographically

08:57  24   well-situated."  Just by me being born in America, I had

08:57  25   this incredible democracy and this incredible country that I

Case 2:04-cv-09049-DOC-RNB   Document 9659   Filed 01/20/11   Page 31 of 173   Page ID #:287907
CV 04-9049 DOC - 1/13/2011 - Day 1, Volume 1 of 3

31

08:57  1    was literally by birth able to participate in, and/or a

08:57  2    naturalized citizen.

08:57  3            Because I believe so strongly in it, I want you to

08:57  4    know, with all the fervor I can, that I expect the same

08:57  5    ethics from you that I expect of myself.  And I've got to

08:57  6    tell you my standards are really high.

08:57  7            I won't hesitate to start a four-month trial all

08:57  8    over again if either of these parties get out of line or if

08:57  9    you do something or I do something that's misappropriate.

08:57  10   Okay?  And I know that you won't.  I know you won't.

08:57  11           But the parties know it.  They've been told it

08:57  12   directly.  This trial will be absolutely fair to both sides,

08:58  13   and that verdict, you know, based upon the evidence from

08:58  14   you, will be the best in terms of the fairness that the

08:58  15   public can render.  Is that fair enough?

08:58  16           And after all the questions asked, after all the

08:58  17   legal phrases, after sitting through it, that's the bottom

08:58  18   line, just a fair trial.

08:58  19           Now, let me turn for a moment to each of you.

08:58  20           Mr. Gerst, do you have any questions of me, sir?

08:58  21   If so, I'm happy to answer them.

08:58  22           PROSPECTIVE JUROR:  No.

08:58  23           THE COURT:  Are you fairly comfortable at the

08:58  24   present time?

08:58  25           PROSPECTIVE JUROR:  Yes.

Case 2:04-cv-09049-DOC-RNB   Document 9659   Filed 01/20/11   Page 32 of 173   Page ID #:287908
CV 04-9049 DOC - 1/13/2011 - Day 1, Volume 1 of 3

32

08:58  1          THE COURT:  I want to thank you for filling out

08:58  2   the questionnaire.  Are there any answers on that

08:58  3   questionnaire that you wish to change, sir, or any additions

08:58  4   that you would like to make?  I can go through every one of

08:58  5   those five pages.  I'm just joking with you.

08:58  6          PROSPECTIVE JUROR:  No, I'm fine.

08:58  7          THE COURT:  Anything you would like to change?

08:58  8          PROSPECTIVE JUROR:  No.

08:58  9          THE COURT:  Okay.  Let me turn to Jennifer

08:58  10  Sheehan.  Is there anything that you would like to change on

08:58  11  that questionnaire?  Anything that you've rethought on the

08:58  12  questionnaire, or you would like to add to or change?

08:58  13         PROSPECTIVE JUROR:  (No audible response.)

08:58  14         THE COURT:  Pretty satisfied?  It's a pleasure to

08:58  15  meet you.

08:58  16         Cheryl -- is it Dyas?

08:59  17         PROSPECTIVE JUROR:  Yes.

08:59  18         THE COURT:  Anything that you would like to change

08:59  19  or add to?

08:59  20         PROSPECTIVE JUROR:  No.

08:59  21         THE COURT:  Once again, a very complete

08:59  22  questionnaire.  I want to thank you.

08:59  23         Really, this jury selection should take us three

08:59  24  or four days.  Literally, it will take us half a day, I

08:59  25  think, because of your participation.

DEBBIE GALE, U.S. COURT REPORTER

08:59  1          Mr. Hao Nguyen, anything that you would like to
08:59  2  change on your questionnaire, sir, or anything that you
08:59  3  would like to add to that questionnaire?
08:59  4          PROSPECTIVE JUROR:  No, sir.  It's all good.
08:59  5          THE COURT:  Bobby Dearinger, anything that you
08:59  6  would like to change, sir, or add to that questionnaire?
08:59  7          PROSPECTIVE JUROR:  No, I don't think so.
08:59  8  Maybe -- I put on there that I felt that at my age, I
08:59  9  shouldn't be doing this.
08:59  10          THE COURT:  My age, I shouldn't be doing it
08:59  11  either.
08:59  12          PROSPECTIVE JUROR:  That's exactly the way I feel.
08:59  13  And it doesn't matter.
08:59  14          THE COURT:  Okay.
08:59  15          PROSPECTIVE JUROR:  Yeah.
08:59  16          THE COURT:  If you have any problems, let us know
08:59  17  along the way.  You'll find that I'm very formal to begin
08:59  18  with, but there's going to be a lot of laughter at different
08:59  19  times.  There will be some sadness at different times.  But
08:59  20  we'll become a court family in a sense.  And can get pretty
09:00  21  informal, but that's not to detract from the proceedings.
09:00  22  Okay?
09:00  23          PROSPECTIVE JUROR:  Okay.
09:00  24          THE COURT:  If you need to stretch your back, if
09:00  25  you need to stand up, if you need another restroom break,

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 9659   Filed 01/20/11   Page 34 of 173   Page ID #:287910
CV 04-9049 DOC - 1/13/2011 - Day 1, Volume 1 of 3

34

| | | |
|---|---|---|
| 09:00 | 1 | anything of that type, let me know. |
| 09:00 | 2 | PROSPECTIVE JUROR:  Okay.  Thank you. |
| 09:00 | 3 | THE COURT:  Mr. Josh Dresser, anything that you |
| 09:00 | 4 | like to change, sir, or anything you'd like to add to your |
| 09:00 | 5 | questionnaire? |
| 09:00 | 6 | PROSPECTIVE JUROR:  Just in regards to the family |
| 09:00 | 7 | in the legal profession.  I said I have an uncle who's a |
| 09:00 | 8 | lawyer.  He's recently been appointed to a Superior Court |
| 09:00 | 9 | judge. |
| 09:00 | 10 | THE COURT:  What's his name? |
| 09:00 | 11 | PROSPECTIVE JUROR:  Mike Leverson. |
| 09:00 | 12 | THE COURT:  Across the street? |
| 09:00 | 13 | PROSPECTIVE JUROR:  Yeah. |
| 09:00 | 14 | THE COURT:  I spent 17 years over their in state |
| 09:00 | 15 | court, then they kicked me out. |
| 09:00 | 16 | *(Laughter in the courtroom.)* |
| 09:00 | 17 | THE COURT:  Moved me into federal court.  I know |
| 09:00 | 18 | Michael.  Congratulations. |
| 09:00 | 19 | PROSPECTIVE JUROR:  Thank you. |
| 09:00 | 20 | THE COURT:  Obviously, he's got to be really |
| 09:00 | 21 | pleased about that.  That's a recent appointment, and your |
| 09:00 | 22 | family has to be awfully pleased. |
| 09:00 | 23 | PROSPECTIVE JUROR:  Yeah. |
| 09:00 | 24 | THE COURT:  But once again, no discussion between |
| 09:00 | 25 | the two of you about this case. |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 1/13/2011 - Day 1, Volume 1 of 3

35

09:00   1          PROSPECTIVE JUROR:  No.

09:00   2          THE COURT:  Okay.  Stephen Leong.

09:00   3          PROSPECTIVE JUROR:  Leong.

09:00   4          THE COURT:  Thank you, sir.  Anything on the

09:00   5    questionnaire that you would like to change?

09:01   6          PROSPECTIVE JUROR:  The only thing I can think of,

09:01   7    at least for myself, was when I didn't recognize any of the

09:01   8    witnesses, the names.

09:01   9          THE COURT:  Yeah.

09:01   10         PROSPECTIVE JUROR:  However, business-wise, I do

09:01   11   have some involvement with Mattel.

09:01   12         THE COURT:  Tell me about that involvement.

09:01   13         PROSPECTIVE JUROR:  The company -- one of the

09:01   14   companies that I work for, we host events.  One of them

09:01   15   happens to be with the creative side.

09:01   16         THE COURT:  Okay.

09:01   17         PROSPECTIVE JUROR:  Toy manufacturing.

09:01   18         THE COURT:  Are you an independent company that

09:01   19   contracts with Mattel?

09:01   20         PROSPECTIVE JUROR:  Yes.

09:01   21         THE COURT:  Or part of the Mattel family?

09:01   22         PROSPECTIVE JUROR:  No, I'm an independent

09:01   23   company.

09:01   24         THE COURT:  Okay.  Do you have any association

09:01   25   with Mr. Eckert in this matter?

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 9659   Filed 01/20/11   Page 36 of 173   Page ID #:287912
CV 04-9049 DOC - 1/13/2011 - Day 1, Volume 1 of 3

36

09:01   1                    PROSPECTIVE JUROR:  No.

09:01   2                    THE COURT:  Is your livelihood dependent upon

09:01   3    Mattel?

09:01   4                    PROSPECTIVE JUROR:  No.

09:01   5                    THE COURT:  Is your company's well-being dependent

09:01   6    upon Mattel?

09:01   7                    PROSPECTIVE JUROR:  It's part of the business, but

09:01   8    they're not the major -- they're just one of the companies

09:01   9    that comes through.

09:01   10                   THE COURT:  So you have more than one client?

09:01   11                   PROSPECTIVE JUROR:  Yes.

09:01   12                   THE COURT:  Are they a big client or a little

09:01   13   client?

09:01   14                   PROSPECTIVE JUROR:  Mattel, they're a big client.

09:02   15                   THE COURT:  Big client.  Okay.  Well, counsel are

09:02   16   forewarned about that, and we may have a discussion off the

09:02   17   record and break my promise to you already, okay?  But we'll

09:02   18   see.

09:02   19                   PROSPECTIVE JUROR:  All right.

09:02   20                   THE COURT:  I want to thank you.  That's exactly

09:02   21   what we need.

09:02   22                   And Mr. McDowell, any questions that you would

09:02   23   like to change -- or my apologies.  You're Mr. Cameron?

09:02   24                   PROSPECTIVE JUROR:  That's correct.

09:02   25                   THE COURT:  Any questions that you'd like to

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 09:02 | 1 | change -- or any answers to that questionnaire you would |
| 09:02 | 2 | like to change? |
| 09:02 | 3 | PROSPECTIVE JUROR:  No, I don't believe so. |
| 09:02 | 4 | THE COURT:  Okay.  Anything you would like to add |
| 09:02 | 5 | to your questionnaire? |
| 09:02 | 6 | PROSPECTIVE JUROR:  No.  I answered them as |
| 09:02 | 7 | honestly as I could. |
| 09:02 | 8 | THE COURT:  That's fine. |
| 09:02 | 9 | Now, during the jury selection process, there are |
| 09:02 | 10 | a number of you that we will have to speak to privately. |
| 09:02 | 11 | We'll just go in the hallway out of the presence of the |
| 09:02 | 12 | other jurors, because some of you put things on the |
| 09:02 | 13 | questionnaire that we want you to be able to answer without |
| 09:03 | 14 | the other jurors hearing. |
| 09:03 | 15 | So that will be the one exception, but once the |
| 09:03 | 16 | trial gets started, I promise you we're not going to have |
| 09:03 | 17 | very many sidebars. |
| 09:03 | 18 | Now, counsel, I've concluded my general voir dire. |
| 09:03 | 19 | I'm going to pass this matter to Mr. Quinn. |
| 09:03 | 20 | Mr. Quinn, are you ready, sir? |
| 09:03 | 21 | MR. QUINN:  I'm ready, Your Honor.  Thank you. |
| 09:03 | 22 | THE COURT:  Mr. Quinn, it's five after the hour. |
| 09:03 | 23 | If you will conclude at 25 minutes to the hour, sir. |
| 09:03 | 24 | MR. QUINN:  Will do, Your Honor.  You'll remind me |
| 09:03 | 25 | if I start to go over, I'm sure. |

CV 04-9049 DOC – 1/13/2011 – Day 1, Volume 1 of 3

38

09:03   1          Good morning, ladies and gentlemen, as you've

09:03   2   heard, my name is John Quinn.  And I represent Mattel.  And

09:03   3   we'll be representing Mattel in this case with my partner,

09:03   4   Bill Price, who will be here on next Tuesday.

09:03   5          Really do appreciate your completing those

09:03   6   questionnaires.  As His Honor has said, I really think that

09:03   7   will speed up the process here.

09:03   8          I'm going to ask some follow-up questions about

09:03   9   answers you gave in the questionnaire.  My goal here is not

09:03   10  to really pry to try to embarrass anyone.  If I ask

09:04   11  something that you really would rather not talk about in

09:04   12  public, if you would just let me know, and we can take that

09:04   13  up with Judge Carter and see if he would be willing to

09:04   14  discuss that privately.  My goal is to just really kind of

09:04   15  follow up on some of the answers that you gave in the

09:04   16  questionnaires.

09:04   17         I'm going to go through the eight of you up here

09:04   18  who are already seated in the box, starting with Mr. Gerst

09:04   19  in the back.  And I'll go along the back row, and then back

09:04   20  up to the front row.

09:04   21         Mr. Gerst, you're a lawyer, you indicated?

09:04   22         PROSPECTIVE JUROR:  Yes, I am.

09:04   23         MR. QUINN:  And you've spent some time as a

09:04   24  general counsel at a company and also in private practice?

09:04   25         PROSPECTIVE JUROR:  Yes, I have.

Case 2:04-cv-09049-DOC-RNB   Document 9659   Filed 01/20/11   Page 39 of 173   Page ID #:287915
CV 04-9049 DOC - 1/13/2011 - Day 1, Volume 1 of 3

39

09:04  1          MR. QUINN:  Do you have any reflections on the

09:04  2   experience of working as a general counsel in-house versus

09:04  3   in private practice?

09:04  4          PROSPECTIVE JUROR:  I think I prefer general

09:04  5   counsel in-house.  You don't get caught up so much in the

09:05  6   mundane litigation issues.

09:05  7          MR. QUINN:  Get more involved in business things?

09:05  8          PROSPECTIVE JUROR:  Yeah, more business decisions.

09:05  9   It's a little bit more broad.  So I prefer general counsel,

09:05  10  yeah.

09:05  11         MR. QUINN:  Tell us a little bit about what your

09:05  12  private practice was.

09:05  13         PROSPECTIVE JUROR:  My private practice was

09:05  14  basically acting as out-house -- you know, outsource general

09:05  15  counsel to a number of smaller companies that couldn't

09:05  16  afford a general counsel.  Because of my business experience

09:05  17  and prior working as general counsel, I represented three or

09:05  18  four different companies as kind of their general counsel

09:05  19  and did various employment things, a lot of debt collection,

09:05  20  contract drafting, things like that.

09:05  21         MR. QUINN:  So you would do contract and "deal"

09:05  22  work in addition to litigation type of work?

09:05  23         PROSPECTIVE JUROR:  Yes, yes.

09:05  24         MR. QUINN:  Did you get involved actually in

09:05  25  trying cases --

Case 2:04-cv-09049-DOC-RNB  Document 9659  Filed 01/20/11  Page 40 of 173  Page ID #:287916
CV 04-9049 DOC - 1/13/2011 - Day 1, Volume 1 of 3

40

09:05  1          PROSPECTIVE JUROR:  I had tried some cases, yes.
09:05  2    I'd never gone all the way --
09:05  3          THE COURT:  Just one moment.  Just reask the
09:05  4    question, so I get a good record.
09:05  5          MR. QUINN:  Did you actually get involved in
09:05  6    trying cases?
09:05  7          PROSPECTIVE JUROR:  Yes, I have.
09:05  8          MR. QUINN:  Did you tend to be more on plaintiff's
09:06  9    side or defense side?
09:06  10         PROSPECTIVE JUROR:  Little bit of both.
09:06  11         MR. QUINN:  Little bit of both.
09:06  12         PROSPECTIVE JUROR:  Yeah.
09:06  13         MR. QUINN:  You indicated you had some experience
09:06  14   with litigation yourself, personally, as a party, not just
09:06  15   as a lawyer?
09:06  16         PROSPECTIVE JUROR:  Yes, I have.
09:06  17         MR. QUINN:  Tell us a little bit about that.
09:06  18         PROSPECTIVE JUROR:  I've had some business
09:06  19   interests that -- with my family, that we've had some
09:06  20   litigation over, and I have been a party to a very similar
09:06  21   type of a lawsuit.
09:06  22         MR. QUINN:  When you say "similar type of
09:06  23   lawsuit," can you tell us a little bit about that?
09:06  24         PROSPECTIVE JUROR:  Yeah.  I was working for a
09:06  25   company, and they were -- started to have some financial

Case 2:04-cv-09049-DOC-RNB   Document 9659   Filed 01/20/11   Page 41 of 173   Page ID #:287917
CV 04-9049 DOC – 1/13/2011 – Day 1, Volume 1 of 3

41

09:06  1   problems and I was laid off.  And a couple of the other guys

09:06  2   that used to work there and I started a business in the same

09:06  3   industry, and we were sued by our prior employer for

09:06  4   stealing trade secrets and proprietary information and

09:06  5   knowhow and whatnot.

09:06  6            MR. QUINN:  And did that case go on for a while?

09:06  7            PROSPECTIVE JUROR:  About a year.  We settled it.

09:06  8            MR. QUINN:  Now, how did that experience -- as

09:07  9   you've indicated, that has some similarities to the type of

09:07  10  case that His Honor has described here.  How do you feel

09:07  11  about that experience and having that in your background?

09:07  12           PROSPECTIVE JUROR:  Well, I mean, it's an

09:07  13  experience.  I wouldn't say it was necessarily a good

09:07  14  experience, but it was an experience.  One of the things

09:07  15  I've been struggling with is, you know, it is very similar,

09:07  16  and I certainly can probably put that -- all of that aside,

09:07  17  but do I know that for 100 percent that I can put that

09:07  18  experience aside and not have that taint my review and

09:07  19  judgment of this?  I think I can.  I'm going to do my best

09:07  20  to do that, but it is out there.

09:07  21           MR. QUINN:  Right.  No, I absolutely appreciate

09:07  22  your candor on that.  I think you can understand from the

09:07  23  standpoint of Mattel being a plaintiff in this case and

09:07  24  having heard it's what the case is about, it's important for

09:07  25  us to kind of understand how you feel about -- about that

09:07    1    experience.

09:07    2            PROSPECTIVE JUROR:  I mean, I'm currently an

09:07    3    employer of people and have been an employer of people, and

09:07    4    so I have -- you know, I haven't had any reason to pursue

09:07    5    these types of cases against any of my ex-employees.  But if

09:08    6    the reason arose, I would do it.

09:08    7            So I guess I'm looking at it from both sides of

09:08    8    the coin I guess is what I'm trying to say.

09:08    9            MR. QUINN:  In your present business, do you have

09:08   10    any type of information that you would regard as proprietary

09:08   11    or confidential?

09:08   12            PROSPECTIVE JUROR:  Yes, I do.

09:08   13            MR. QUINN:  Is that something that is important to

09:08   14    your business, that that be protected?

09:08   15            PROSPECTIVE JUROR:  Yes, it is.

09:08   16            MR. QUINN:  How would you feel about if any of

09:08   17    your employees took that type of information and went to a

09:08   18    competitor?

09:08   19            PROSPECTIVE JUROR:  I would be unhappy with that.

09:08   20            MR. QUINN:  You indicated that you were

09:08   21    represented by the Orrick, Herrington law firm, which is one

09:08   22    of the law firms for MGA in this case.  Could you tell us a

09:08   23    little bit about that?

09:08   24            PROSPECTIVE JUROR:  Yes.  I -- back in the early

09:08   25    90's, I was in business with my father doing electric power

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 09:08 | 1 | projects, and I believe a gentleman -- his name is Dave |
| 09:08 | 2 | Piggot (phonetic) and he used to be with Orrick in |
| 09:08 | 3 | San Francisco, I believe.  I think that was who it was.  It |
| 09:08 | 4 | might have been one of -- bond counsel or someone.  Because |
| 09:08 | 5 | there was a number of banks and various entities involved |
| 09:09 | 6 | with a number of lawyers.  But I know Orrick represented one |
| 09:09 | 7 | of the parties, and I believe it was us. |
| 09:09 | 8 | MR. QUINN:  Thank you, sir. |
| 09:09 | 9 | PROSPECTIVE JUROR:  Okay. |
| 09:09 | 10 | MR. QUINN:  Ms. Sheehan, if I could ask you a |
| 09:09 | 11 | couple of things. |
| 09:09 | 12 | PROSPECTIVE JUROR:  Yes. |
| 09:09 | 13 | MR. QUINN:  You indicated in your questionnaire |
| 09:09 | 14 | that someone -- you had some experience where someone had |
| 09:09 | 15 | signed a confidentiality agreement or a nondisclosure |
| 09:09 | 16 | agreement? |
| 09:09 | 17 | PROSPECTIVE JUROR:  No, no. |
| 09:09 | 18 | MR. QUINN:  Or that you knew somebody who might |
| 09:09 | 19 | have? |
| 09:09 | 20 | PROSPECTIVE JUROR:  No, I don't believe I |
| 09:09 | 21 | indicated that.  Did I? |
| 09:09 | 22 | MR. QUINN:  Question 20 you checked "yes."  "Have |
| 09:09 | 23 | you or someone close to you ever signed a confidentiality or |
| 09:09 | 24 | nondisclosure agreement?" |
| 09:09 | 25 | PROSPECTIVE JUROR:  General company |

| | | |
|---|---|---|
| 09:09 | 1 | disclosure-type thing. |
| 09:09 | 2 | MR. QUINN:  Okay. |
| 09:09 | 3 | PROSPECTIVE JUROR:  I work for a real estate |
| 09:09 | 4 | company. |
| 09:09 | 5 | MR. QUINN:  Okay.  At that real estate company, |
| 09:09 | 6 | did they have some type of information that was regarded as |
| 09:09 | 7 | confidential or proprietary? |
| 09:09 | 8 | PROSPECTIVE JUROR:  It's -- I think it's just a |
| 09:10 | 9 | general thing we sign from our HR department.  It's -- |
| 09:10 | 10 | MR. QUINN:  Okay. |
| 09:10 | 11 | PROSPECTIVE JUROR:  -- in depth, I guess. |
| 09:10 | 12 | MR. QUINN:  All right.  Do you have any problem or |
| 09:10 | 13 | reaction to the idea that a company, first, has proprietary |
| 09:10 | 14 | information that can be important?  Intangible property.  We |
| 09:10 | 15 | sometimes hear the term "intellectual property." |
| 09:10 | 16 | Do you have any problem with the concept that that |
| 09:10 | 17 | type of intangible property can be valuable and deserving of |
| 09:10 | 18 | protection? |
| 09:10 | 19 | PROSPECTIVE JUROR:  Would you repeat that again? |
| 09:10 | 20 | I mean, I'm not sure I understand that. |
| 09:10 | 21 | MR. QUINN:  We're familiar with property, you |
| 09:10 | 22 | know, tangible things. |
| 09:10 | 23 | PROSPECTIVE JUROR:  Right. |
| 09:10 | 24 | MR. QUINN:  Like this table here. |
| 09:10 | 25 | PROSPECTIVE JUROR:  Right. |

09:10  1        MR. QUINN:  There's also something called -- we

09:10  2   all hear about intellectual property or intangible property.

09:10  3   Do you have any reaction to the idea or any problem with the

09:10  4   idea that that type of intangible property can also be

09:10  5   valuable?

09:10  6        PROSPECTIVE JUROR:  No.

09:11  7        MR. QUINN:  And deserving of protection?

09:11  8        PROSPECTIVE JUROR:  No.

09:11  9        MR. QUINN:  You indicated in response to one of

09:11  10  the questions that you thought that proprietary information

09:11  11  or information that of owned by an employer ought to stay

09:11  12  confidential.  Can you elaborate on that at all?

09:11  13       PROSPECTIVE JUROR:  Well, I believe that if you're

09:11  14  working for a company and you do sign a confidential

09:11  15  agreement, you shouldn't be able to talk about it with

09:11  16  someone else.  Is that clear enough?

09:11  17       MR. QUINN:  I think so.  Let me take it one step

09:11  18  further.  How about -- would you have any problem with the

09:11  19  idea that if an employer entered into an agreement with an

09:11  20  employee that said that anything that the employee creates

09:11  21  during the time the employee is employed by the employer,

09:11  22  that's in the employer's line of business, that that's going

09:11  23  to be owned by the employer?  Do you have any reaction?

09:12  24       PROSPECTIVE JUROR:  I mean, if -- you mean signing

09:12  25  an agreement?

09:12  1          MR. QUINN:  Yes.

09:12  2          PROSPECTIVE JUROR:  No.

09:12  3          MR. QUINN:  There was some questions that were

09:12  4   asked about immigrants, and you indicated you had had some

09:12  5   personal issues with ex-neighbors.  I don't want to get into

09:12  6   the details.

09:12  7          PROSPECTIVE JUROR:  Right.  I'd rather not talk

09:12  8   about that.

09:12  9          MR. QUINN:  Sure.  Is that something that you

09:12  10  think would -- there are people who are immigrants to this

09:12  11  country who I think will be witnesses on both sides of this

09:12  12  case.

09:12  13         PROSPECTIVE JUROR:  Right.

09:12  14         MR. QUINN:  Is that type of experience that you've

09:12  15  had with your ex-neighbor something that you think will

09:12  16  affect you at all in this case?

09:12  17         PROSPECTIVE JUROR:  No.

09:12  18         MR. QUINN:  Do you think you can set those

09:12  19  feelings aside?

09:12  20         PROSPECTIVE JUROR:  I think so, yes.

09:12  21         MR. QUINN:  Thank you.

09:12  22         Ms. Larimore-Dyas?

09:12  23         PROSPECTIVE JUROR:  You can say Dyas.

09:12  24         MR. QUINN:  Dyas.  You're -- can you tell us what

09:12  25  you do as director of finance at the City of Laguna Niguel?

Case 2:04-cv-09049-DOC-RNB   Document 9659   Filed 01/20/11   Page 47 of 173   Page ID #:287923
CV 04-9049 DOC - 1/13/2011 - Day 1, Volume 1 of 3

47

09:13   1          PROSPECTIVE JUROR:  I oversee all the accounting

09:13   2   functions, payroll, payables, receivables.  I am in charge

09:13   3   of the investment portfolio, prepare the budgets, the annual

09:13   4   reports, deal with the auditors every year, deal with

09:13   5   count -- council meetings twice a month and oversee the

09:13   6   investment banking and audit committee.

09:13   7          MR. QUINN:  How many people do you have on your

09:13   8   staff?

09:13   9          PROSPECTIVE JUROR:  I oversee directly four

09:13  10   people.

09:13  11          MR. QUINN:  You indicated that you had collected

09:13  12   Barbie as a child?

09:13  13          PROSPECTIVE JUROR:  I did.

09:13  14          MR. QUINN:  You still have any of your dolls?

09:13  15          PROSPECTIVE JUROR:  I do not.

09:13  16          MR. QUINN:  Do you have any feelings or attitudes

09:13  17   towards Mattel that you'd care to share with us?

09:13  18          PROSPECTIVE JUROR:  I haven't -- no.

09:13  19          MR. QUINN:  Your Honor, Ms. Dyas was one of the

09:13  20   jurors who indicated that she thought she knew something

09:14  21   about this case.  And I don't know whether the Court would

09:14  22   like to do that now or save that until the end?

09:14  23          THE COURT:  Counsel, do you want to discuss this

09:14  24   as we go?

09:14  25          MS. KELLER:  That would be fine, Your Honor.

Case 2:04-cv-09049-DOC-RNB   Document 9659   Filed 01/20/11   Page 48 of 173   Page ID #:287924
CV 04-9049 DOC - 1/13/2011 - Day 1, Volume 1 of 3

48

09:14   1          THE COURT:  Ms. Dyas, could we see you just a

09:14   2   moment.  If you have information about that case, I think we

09:14   3   would like to know that privately.

09:14   4          Ladies and gentlemen, if you will just visit

09:14   5   amongst yourselves for a moment, we'll be right with you.

09:15   6          *(Sidebar proceedings reported as follows:)*

09:15   7          THE COURT:  Ms. Dyas is present at sidebar, along

09:15   8   with all counsel.  What do you remember about the case?

09:15   9          PROSPECTIVE JUROR:  Well, I recall having read

09:15   10  information in some paper -- I can't tell you which one --

09:15   11  that there was an either copyright or some sort of

09:15   12  infringement issue about the Bratz dolls.

09:15   13         THE COURT:  Did you form any opinion based upon

09:15   14  that?

09:15   15         PROSPECTIVE JUROR:  No.  I don't know any specific

09:15   16  details about all of the proceedings that have occurred.  I

09:15   17  know it's been going on for a while.  I know that it's been

09:15   18  awhile since I've read those articles, so I'm not really

09:15   19  sure how old it dates.  I'm not aware of, like I said,

09:15   20  anything of the details.  I know it's a big issue.  I know

09:15   21  that there's probably a lot of money involved, but that's

09:15   22  sort of an assumption that I'm making.

09:15   23         THE COURT:  Counsel, any quick questions?

09:15   24         MR. QUINN:  Do you have any kind of impression

09:15   25  about -- based on what you've read, about whether one side

DEBBIE GALE, U.S. COURT REPORTER

09:15  1   is probably right or wrong or whether there's been any prior

09:15  2   decisions in this case?

09:16  3        PROSPECTIVE JUROR:  I'm aware there's prior

09:16  4   decisions in the case.  I'm probably not aware of all of

09:16  5   them.  I am -- I don't have any opinions about it.  I don't

09:16  6   know any of the details surrounding any of the evidence that

09:16  7   occurred in those cases, so I don't really know, you know,

09:16  8   all the facts, so it's just a general knowledge of it.

09:16  9        But I am aware of that there's been past verdicts

09:16  10  and past awards and -- but I don't really know the

09:16  11  chronological order of all that, and I don't really know the

09:16  12  details about all that.

09:16  13       MR. QUINN:  Do you have some sense that there was

09:16  14  a prior verdict or prior award?

09:16  15       PROSPECTIVE JUROR:  I do have a sense that there

09:16  16  was a prior award, yes.

09:16  17       THE COURT:  Ms. Keller.

09:16  18       MS. KELLER:  Okay.  Good morning.  What's your

09:16  19  understanding of what the situation was with the prior

09:16  20  award?  In other words, who won, who lost?

09:16  21       PROSPECTIVE JUROR:  My recollection is that there

09:17  22  was an award for Mattel.  But again, I don't have -- it's

09:17  23  been awhile.  Don't have any real sense of the magnitude of

09:17  24  that in relationship to what Mattel was actually seeking,

09:17  25  that kind of thing.

Case 2:04-cv-09049-DOC-RNB   Document 9659   Filed 01/20/11   Page 50 of 173   Page ID #:287926
CV 04-9049 DOC - 1/13/2011 - Day 1, Volume 1 of 3

50

| | | |
|---|---|---|
| 09:17 | 1 | MS. KELLER:  Okay. |
| 09:17 | 2 | THE COURT:  If I instructed you that you were to |
| 09:17 | 3 | disregard that, that that would have no bearing upon this |
| 09:17 | 4 | case, or those prior proceedings, would you follow that? |
| 09:17 | 5 | PROSPECTIVE JUROR:  I will. |
| 09:17 | 6 | MR. OVERLAND:  I have a question, Judge. |
| 09:17 | 7 | THE COURT:  Mr. Overland, my apologies. |
| 09:17 | 8 | MR. OVERLAND:  Why do you think there was a lot of |
| 09:17 | 9 | money involved? |
| 09:17 | 10 | PROSPECTIVE JUROR:  Well, it's just I recall in |
| 09:17 | 11 | reading an article that I read that there was an award, and |
| 09:17 | 12 | to me, when you're talking about millions of dollars, that's |
| 09:17 | 13 | a lot of money. |
| 09:18 | 14 | MR. OVERLAND:  Do you recall an award of millions |
| 09:18 | 15 | of dollars? |
| 09:18 | 16 | PROSPECTIVE JUROR:  I think, you know, somewhere |
| 09:18 | 17 | in the possibly hundreds of millions, but I -- I don't -- |
| 09:18 | 18 | you know, it's kind of just a recollection rather than |
| 09:18 | 19 | knowing specific facts and being absolutely sure about those |
| 09:18 | 20 | specific facts. |
| 09:18 | 21 | THE COURT:  If you were instructed to disregard |
| 09:18 | 22 | that, could you truly put that out of your mind? |
| 09:18 | 23 | PROSPECTIVE JUROR:  I think I could. |
| 09:18 | 24 | THE COURT:  Decide this case on the merits? |
| 09:18 | 25 | PROSPECTIVE JUROR:  I think I can. |

CV 04-9049 DOC - 1/13/2011 - Day 1, Volume 1 of 3

51

09:18   1              THE COURT:  Thank you very much.

09:18   2              If you would go back and sit in the jury box for

09:18   3    just a moment.

09:18   4                   (Juror exits sidebar proceedings.)

09:18   5              THE COURT:  Counsel, any other questions?

09:18   6              MR. QUINN:  No.

09:18   7              THE COURT:  Thank you.

09:18   8                   (Sidebar proceedings concluded.)

09:18   9                   (In open court in the presence of the

09:18   10        venire.)

09:19   11             THE COURT:  Ladies and gentlemen, I want to thank

09:19   12   you.  We may do that a couple of times with anybody who's

09:19   13   heard about the case.

09:19   14             We're back in open court.

09:19   15             I want to thank you for answering our questions,

09:19   16   Ms. Dyas.

09:19   17             Counsel, if you would like to continue.

09:19   18             MR. QUINN:  Thank you, Your Honor.

09:19   19             Mr. Nguyen.

09:19   20             PROSPECTIVE JUROR:  Yes, sir.

09:19   21             MR. QUINN:  Good morning, sir.  You work for the

09:19   22   federal government?

09:19   23             PROSPECTIVE JUROR:  That's correct.

09:19   24             MR. QUINN:  Can you tell us what agency or what

09:19   25   part of the federal government you work for?

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 9659   Filed 01/20/11   Page 52 of 173   Page ID #:287928
CV 04-9049 DOC - 1/13/2011 - Day 1, Volume 1 of 3

52

| | | |
|---|---|---|
| 09:19 | 1 | PROSPECTIVE JUROR:  I work for the Navy base at |
| 09:19 | 2 | Corona. |
| 09:19 | 3 | MR. QUINN:  And you're a systems engineer, do I |
| 09:19 | 4 | recall correctly? |
| 09:19 | 5 | PROSPECTIVE JUROR:  I'm the manager for a group of |
| 09:19 | 6 | engineers there. |
| 09:19 | 7 | MR. QUINN:  And this is engineering relating to |
| 09:19 | 8 | what type of activity? |
| 09:19 | 9 | PROSPECTIVE JUROR:  We working on the telecoms, |
| 09:19 | 10 | telecommunication for all the service ship in the Navy. |
| 09:20 | 11 | MR. QUINN:  And how many people do you have on |
| 09:20 | 12 | your staff there? |
| 09:20 | 13 | PROSPECTIVE JUROR:  Thirty-six. |
| 09:20 | 14 | MR. QUINN:  You indicated you had purchased a |
| 09:20 | 15 | Mattel product.  I think you said a Barbie? |
| 09:20 | 16 | PROSPECTIVE JUROR:  For my daughter, yes. |
| 09:20 | 17 | MR. QUINN:  That's what I was going to -- |
| 09:20 | 18 | PROSPECTIVE JUROR:  Not for myself. |
| 09:20 | 19 | MR. QUINN:  I have five daughters. |
| 09:20 | 20 | PROSPECTIVE JUROR:  Okay. |
| 09:20 | 21 | MR. QUINN:  Do you have any kind of feelings about |
| 09:20 | 22 | Mattel one way or another that we ought to know about? |
| 09:20 | 23 | PROSPECTIVE JUROR:  I don't think so. |
| 09:20 | 24 | MR. QUINN:  Or MGA, for that matter? |
| 09:20 | 25 | PROSPECTIVE JUROR:  No. |

| | | |
|---|---|---|
| 09:20 | 1 | MR. QUINN:  Do you have any reaction or problem |
| 09:20 | 2 | with the idea that an employer could enter into an agreement |
| 09:20 | 3 | with an employee that says that anything that employee |
| 09:20 | 4 | creates while he's employed that's in the employer's line of |
| 09:20 | 5 | work would be owned by the employer?  Does that sound |
| 09:20 | 6 | inappropriate or unfair or okay with you? |
| 09:20 | 7 | PROSPECTIVE JUROR:  Sound okay with me. |
| 09:20 | 8 | MR. QUINN:  Okay.  Then Mr. Dearinger, sir. |
| 09:21 | 9 | PROSPECTIVE JUROR:  Yes. |
| 09:21 | 10 | MR. QUINN:  You, in response to one of the |
| 09:21 | 11 | questions, you, on the questionnaire, I think -- I sort of |
| 09:21 | 12 | got the sense that you really had a question about whether |
| 09:21 | 13 | you wanted to be on a jury. |
| 09:21 | 14 | PROSPECTIVE JUROR:  That's true. |
| 09:21 | 15 | MR. QUINN:  All right. |
| 09:21 | 16 | PROSPECTIVE JUROR:  The reason was I -- I've been |
| 09:21 | 17 | on many -- not many juries, but I've been called to service |
| 09:21 | 18 | many times in my life.  And I'm retired now with my wife and |
| 09:21 | 19 | enjoying it.  And I just feel like I'm being called to go |
| 09:21 | 20 | back to work. |
| 09:21 | 21 | MR. QUINN:  This wasn't how you envisioned |
| 09:21 | 22 | spending your retirement, sitting in federal court? |
| 09:21 | 23 | PROSPECTIVE JUROR:  That's true.  However, if I am |
| 09:21 | 24 | recalled to duty, I will perform the best I can. |
| 09:21 | 25 | MR. QUINN:  Your reluctance or hesitation, at |

Case 2:04-cv-09049-DOC-RNB   Document 9659   Filed 01/20/11   Page 54 of 173   Page ID #:287930
CV 04-9049 DOC - 1/13/2011 - Day 1, Volume 1 of 3

54

| | | |
|---|---|---|
| 09:21 | 1 | least initially, as serving on a jury, is that based on any |
| 09:22 | 2 | experience you've had as a juror in the past? |
| 09:22 | 3 | PROSPECTIVE JUROR:  Oh, no, none at all. |
| 09:22 | 4 | MR. QUINN:  How have you felt about your prior |
| 09:22 | 5 | jury service? |
| 09:22 | 6 | PROSPECTIVE JUROR:  Good.  Good.  I was on one |
| 09:22 | 7 | trial that I got really involved in.  It was a good |
| 09:22 | 8 | experience.  Most of the time I didn't get called.  I just |
| 09:22 | 9 | sat in the makeup area. |
| 09:22 | 10 | MR. QUINN:  I mean, here you made it to the box so |
| 09:22 | 11 | far. |
| 09:22 | 12 | PROSPECTIVE JUROR:  This is the third time. |
| 09:22 | 13 | MR. QUINN:  All right.  Thank you. |
| 09:22 | 14 | Mr. Dresser? |
| 09:22 | 15 | PROSPECTIVE JUROR:  Yeah. |
| 09:22 | 16 | MR. QUINN:  You indicated that you're in the |
| 09:22 | 17 | catering business. |
| 09:22 | 18 | PROSPECTIVE JUROR:  Yes. |
| 09:22 | 19 | MR. QUINN:  Tell us about that.  What type of |
| 09:22 | 20 | business is that? |
| 09:22 | 21 | PROSPECTIVE JUROR:  Standard catering.  I mean, we |
| 09:22 | 22 | take food from the restaurant, set it up at events, and |
| 09:22 | 23 | serve it to people. |
| 09:22 | 24 | MR. QUINN:  All right.  Any particular type of |
| 09:22 | 25 | food? |

CV 04-9049 DOC - 1/13/2011 - Day 1, Volume 1 of 3

55

| | | |
|---|---|---|
| 09:22 | 1 | PROSPECTIVE JUROR:  Um, I mean generally chicken, |
| 09:22 | 2 | pasta, ribs and stuff. |
| 09:22 | 3 | MR. QUINN:  Very popular. |
| 09:22 | 4 | PROSPECTIVE JUROR:  Yes. |
| 09:22 | 5 | MR. QUINN:  Do you have any particular likes or |
| 09:22 | 6 | dislikes about that job? |
| 09:23 | 7 | PROSPECTIVE JUROR:  No. |
| 09:23 | 8 | THE COURT:  Catering? |
| 09:23 | 9 | PROSPECTIVE JUROR:  Yes. |
| 09:23 | 10 | THE COURT:  Counsel will stipulate to their |
| 09:23 | 11 | acceptance of this juror? |
| 09:23 | 12 | *(Laughter in the courtroom.)* |
| 09:23 | 13 | THE COURT:  Just joking. |
| 09:23 | 14 | Thank you very much, sir. |
| 09:23 | 15 | MR. QUINN:  Congratulations on -- was it your |
| 09:23 | 16 | uncle who's just been made a -- |
| 09:23 | 17 | PROSPECTIVE JUROR:  Yes, it was. |
| 09:23 | 18 | MR. QUINN:  Do you have other family members who |
| 09:23 | 19 | are in the legal field? |
| 09:23 | 20 | PROSPECTIVE JUROR:  Yeah.  In my nuclear family, |
| 09:23 | 21 | my sister just passed the bar.  She's a lawyer now.  I've |
| 09:23 | 22 | got two aunts that are also attorneys and one cousin who is |
| 09:23 | 23 | an attorney. |
| 09:23 | 24 | MR. QUINN:  What type of work is your sister going |
| 09:23 | 25 | to be doing? |

09:23   1        PROSPECTIVE JUROR:  I'm not too sure.  She had

09:23   2   been working down here for several months, and she's just

09:23   3   relocated to a new practice up North.

09:23   4        MR. QUINN:  Do you know if she's joining a company

09:23   5   being like an in-house job or a law firm or working for the

09:23   6   government?

09:23   7        PROSPECTIVE JUROR:  I think it's a small firm.

09:23   8        MR. QUINN:  Okay.  Do you know if she does

09:23   9   litigation-type work like what we do?

09:23   10        PROSPECTIVE JUROR:  I don't think so.  I think

09:24   11   she's more on the contracts side of things.

09:24   12        MR. QUINN:  All right.  You've heard a little bit

09:24   13   about what this case is about, and from my questions, I'm

09:24   14   sure you can kind of figure out what some of the issues are.

09:24   15   Do you have any reactions to anything that's been said so

09:24   16   far that you think might affect your ability to be a fair

09:24   17   juror?

09:24   18        PROSPECTIVE JUROR:  No.

09:24   19        MR. QUINN:  You indicated that I think it was your

09:24   20   mother who had recently been laid off from employment.

09:24   21   Obviously, that's not -- that's not a happy event.

09:24   22        PROSPECTIVE JUROR:  No.

09:24   23        MR. QUINN:  Do you have any reaction to that other

09:24   24   than the fact that it's unfortunate that your mother doesn't

09:24   25   have her job anymore?

09:24   1          PROSPECTIVE JUROR:  Yeah.  It's a little

09:24   2   frustrating.  She lost her job a few years ago, and she's on

09:24   3   unemployment for a few months and then got another job.

09:24   4   They hit hard times as well, so she was laid off again.

09:24   5          MR. QUINN:  Unfortunately, that's happening to a

09:24   6   lot of people these days.

09:25   7          PROSPECTIVE JUROR:  Yeah.  Seems to be the case.

09:25   8          MR. QUINN:  Thank you.

09:25   9          Mr. Leong, you've indicated that we're one of your

09:25   10  clients?

09:25   11         PROSPECTIVE JUROR:  Yes.

09:25   12         MR. QUINN:  Could you remind me what is it exactly

09:25   13  that you do?  What is the service that you provide?

09:25   14         PROSPECTIVE JUROR:  Well, one of the businesses

09:25   15  that I work with, we host events.  One of the -- well, let's

09:25   16  back up.  The company I helped my friend start is a jet

09:25   17  fighter simulator company.

09:25   18         MR. QUINN:  Okay.

09:25   19         PROSPECTIVE JUROR:  And Mattel brings their

09:25   20  creative personnel down for the whole day as a way of team

09:25   21  building.

09:25   22         MR. QUINN:  Uh-huh.

09:25   23         PROSPECTIVE JUROR:  And comes up with ideas for

09:25   24  toys.  And so I'm -- we hear it.  We see what they do.  But

09:25   25  it's a way for them to have a release to create, have a

CV 04-9049 DOC - 1/13/2011 - Day 1, Volume 1 of 3

58

| | | |
|---|---|---|
| 09:25 | 1 | creative outlet for doing -- just take time away from the |
| 09:25 | 2 | creative part but learn something at the same time. |
| 09:26 | 3 |       MR. QUINN:  And how long have folks at Mattel been |
| 09:26 | 4 | doing this? |
| 09:26 | 5 |       PROSPECTIVE JUROR:  We -- we hosted an event last |
| 09:26 | 6 | year, and actually, they just booked another event with us |
| 09:26 | 7 | coming up. |
| 09:26 | 8 |       MR. QUINN:  All right.  So would this be the |
| 09:26 | 9 | second event you've had? |
| 09:26 | 10 |       PROSPECTIVE JUROR:  Yes. |
| 09:26 | 11 |       MR. QUINN:  So Mattel is one of a number of |
| 09:26 | 12 | clients you have? |
| 09:26 | 13 |       PROSPECTIVE JUROR:  Yes, it is. |
| 09:26 | 14 |       MR. QUINN:  Can you tell us approximately how many |
| 09:26 | 15 | clients you have? |
| 09:26 | 16 |       PROSPECTIVE JUROR:  Well, it's open to the general |
| 09:26 | 17 | public.  But we do a lot of corporate events and team |
| 09:26 | 18 | events, and usually we have a few going through each month. |
| 09:26 | 19 |       MR. QUINN:  All right.  So a few being maybe five |
| 09:26 | 20 | or six or -- |
| 09:26 | 21 |       PROSPECTIVE JUROR:  Uh, yeah, about that. |
| 09:26 | 22 |       MR. QUINN:  Maybe as many as 50 in a year? |
| 09:26 | 23 |       PROSPECTIVE JUROR:  That's about right. |
| 09:26 | 24 |       MR. QUINN:  Okay.  Do you have any reaction to the |
| 09:26 | 25 | idea that creative people at Mattel would see some value in |

Case 2:04-cv-09049-DOC-RNB   Document 9659   Filed 01/20/11   Page 59 of 173   Page ID #:287935
CV 04-9049 DOC - 1/13/2011 - Day 1, Volume 1 of 3

59

09:26    1    coming down and doing a simulation in some type of fighter

09:26    2    simulator?

09:26    3            PROSPECTIVE JUROR:  Well, it's a fun way for them

09:26    4    to get themselves excited and going and -- but at the same

09:27    5    time, you know, it gets them all charged up and start

09:27    6    thinking about what they can come up with.

09:27    7            MR. QUINN:  All right.  You indicated in response

09:27    8    to one of your questions that you thought, you know, taking

09:27    9    proprietary information or taking information from an

09:27   10    employer was stealing.  Do you recall using that word?

09:27   11            PROSPECTIVE JUROR:  Yes, I do.

09:27   12            MR. QUINN:  Do you have any -- can you share with

09:27   13    us what your thought process was on that?

09:27   14            PROSPECTIVE JUROR:  Well, I used to work for Honda

09:27   15    Motors, and I was in their robotics division.  I used to

09:27   16    program, operate their ASIMO robot.  It's a humanoid walking

09:27   17    robot.  And that information at the time is -- and it still

09:27   18    is -- it's proprietary.  Toyota competitors, Sony, they all

09:27   19    started creating robots too.  They would love to have that

09:28   20    information, because the Honda robot is the only one that

09:28   21    can walk.  It can climb up and down stairs, run.

09:28   22            MR. QUINN:  I've seen that robot, yeah.

09:28   23            PROSPECTIVE JUROR:  And if I said anything in

09:28   24    regards to the information -- and I've been approached by

09:28   25    people -- what type of chips, what type of gyros do you

09:28  1    use -- anything like that, I could have been fired easily.

09:28  2    And that's just giving information away that someone else

09:28  3    took the time, that was paid -- who was paid to do -- you

09:28  4    know, to come up with this idea, to help.

09:28  5        MR. QUINN:  Do you have any problem -- you say if

09:28  6    you were to share that information, which, obviously you

09:28  7    wouldn't do, that you would be fired.  Do you think that too

09:28  8    extreme, or do you have any reaction to that?

09:28  9        PROSPECTIVE JUROR:  Well, because I signed off on

09:28  10   a notice saying that, yeah, any information that I share I

09:28  11   would be terminated, I agreed to that.

09:28  12       MR. QUINN:  Okay.  Thank you.

09:28  13       PROSPECTIVE JUROR:  Sure.

09:28  14       MR. QUINN:  Mr. Cameron, you've actually done some

09:29  15   inventing yourself, I gather, in terms of formulated feed

09:29  16   formulas?

09:29  17       PROSPECTIVE JUROR:  That's correct.  I worked as a

09:29  18   large animal nutritionist since '80 out here.

09:29  19       MR. QUINN:  Large animals?  I'm thinking cows,

09:29  20   horses.

09:29  21       PROSPECTIVE JUROR:  Mainly dairy cattle and some

09:29  22   horse work.  Mainly dairy cattle.

09:29  23       MR. QUINN:  All right.  In terms of feed formulas,

09:29  24   is that something that -- you know, not many of us have an

09:29  25   opportunity to deal with feed formulas, obviously, but is

Case 2:04-cv-09049-DOC-RNB   Document 9659   Filed 01/20/11   Page 61 of 173   Page ID #:287937
CV 04-9049 DOC - 1/13/2011 - Day 1, Volume 1 of 3

61

09:29  1    that something in your business, in your background, that

09:29  2    that's something that's extremely valuable and can involve a

09:29  3    lot of money?

09:29  4        PROSPECTIVE JUROR:  Well, if you've got a -- for

09:29  5    instance, a formula on baby calves that works better than

09:29  6    somebody else's, yes.

09:29  7        MR. QUINN:  If -- did you ever have any issues

09:29  8    with the protection of your own intellectual property, your

09:29  9    own formulas?

09:29  10       PROSPECTIVE JUROR:  Oh, nothing extreme, no.

09:30  11       MR. QUINN:  All right.  Let me ask some -- a

09:30  12   question to all of you as a group.  I mean, you've heard

09:30  13   that this is a case involving two toy companies.  The

09:30  14   amounts involved may be very, very large.  I mean, we'll be

09:30  15   asking for a billion dollars.  They are asking for hundreds

09:30  16   of millions of dollars.  Substantial amounts of money, the

09:30  17   kind of money that none of us encounter in our daily lives.

09:30  18       Let me ask whether there's anyone here who has a

09:30  19   feeling in your mind -- let me just perhaps start with

09:30  20   Mr. Gerst.

09:30  21       Just based on your own feelings about lawsuits,

09:30  22   cases, these types of numbers, these types of dollars, do

09:30  23   you have a feeling that under no circumstances could you

09:30  24   award that amount of money?

09:30  25       PROSPECTIVE JUROR:  That I could not award that

Case 2:04-cv-09049-DOC-RNB   Document 9659   Filed 01/20/11   Page 62 of 173   Page ID #:287938
CV 04-9049 DOC – 1/13/2011 – Day 1, Volume 1 of 3

62

| | | |
|---|---|---|
| 09:30 | 1 | amount of money? |
| 09:30 | 2 | MR. QUINN:  That you could not, no matter what. |
| 09:30 | 3 | PROSPECTIVE JUROR:  No.  If the damages were |
| 09:31 | 4 | proved, that's the damages. |
| 09:31 | 5 | MR. QUINN:  You don't have in your mind some upper |
| 09:31 | 6 | limit as to how much could be awarded for either side? |
| 09:31 | 7 | PROSPECTIVE JUROR:  Is it more than the federal |
| 09:31 | 8 | deficit? |
| 09:31 | 9 | *(Laughter in the courtroom.)* |
| 09:31 | 10 | MR. QUINN:  I'm quite certain of that. |
| 09:31 | 11 | PROSPECTIVE JUROR:  No, I don't. |
| 09:31 | 12 | MR. QUINN:  Okay.  That is a very big number. |
| 09:31 | 13 | PROSPECTIVE JUROR:  It is. |
| 09:31 | 14 | MR. QUINN:  Let me ask the question -- that |
| 09:31 | 15 | question to all of you as a group. |
| 09:31 | 16 | Is there anyone here that has in their mind some |
| 09:31 | 17 | predetermined ceiling as to how much they could award?  No |
| 09:31 | 18 | matter what the evidence is, I know I could not return a |
| 09:31 | 19 | verdict, even if it was proven, for an amount of money above |
| 09:31 | 20 | that.  Is there anyone who has that kind of reaction to |
| 09:31 | 21 | those numbers? |
| 09:31 | 22 | I'm not seeing any hands, Your Honor. |
| 09:31 | 23 | And then, finally, before I sit down -- and thank |
| 09:31 | 24 | you very much for answering my questions -- let me ask |
| 09:31 | 25 | whether, you know, since the process -- you came here last |

09:31  1   week -- is it last week we completed the questionnaires or

09:31  2   this week?  Last week.

09:32  3         So we came here last week and completed the

09:32  4   questionnaires, and we've had this small amount of time now

09:32  5   to talk a little bit.  Is there anything that's occurred to

09:32  6   any of you that you think that, in fairness, we all ought to

09:32  7   know on both sides here -- MGA, Mr. Larian, Mattel -- that

09:32  8   you think, in fairness, because obviously, we are looking

09:32  9   for people here who can be fair jurists to both sides, where

09:32  10  the needle points straight up and down and we don't start

09:32  11  out with it leaning one direction or another?  Has anything

09:32  12  occurred to any of you?

09:32  13        PROSPECTIVE JUROR:  No.

09:32  14        MR. QUINN:  You don't all have to answer

09:32  15  individually.  Just raise your hands.  I'm not seeing any

09:32  16  hands, so I thank you very much.

09:32  17        THE COURT:  Mr. Quinn, thank you very much.

09:32  18        Ms. Keller, on behalf of MGA.

09:32  19        MS. KELLER:  Thank you, Your Honor.

09:32  20        THE COURT:  And Mr. Larian.

09:32  21        MS. KELLER:  Good morning, everyone.

09:32  22        We also would like to thank you for being here.  I

09:33  23  know it's a little intimidating to sort of be on the hot

09:33  24  seat, and I can assure you that even for the lawyers

09:33  25  sometimes it's a little intimidating to be in a federal

Case 2:04-cv-09049-DOC-RNB   Document 9659   Filed 01/20/11   Page 64 of 173   Page ID #:287940
CV 04-9049 DOC - 1/13/2011 - Day 1, Volume 1 of 3

64

09:33    1    courtroom and be on our own version of the hot seat.

09:33    2            But I'm going to ask you a few questions that are

09:33    3    a little different from some of the questions that Mr. Quinn

09:33    4    asked, and I hope you'll bear with me.

09:33    5            First of all, can I see a show of hands on the

09:33    6    jury of people who actually know what the Bratz dolls are?

09:33    7            *(Show of hands.)*

09:33    8            MS. KELLER:  Okay.  Okay.  I saw -- I think it was

09:33    9    Ms. Larimore-Dyas.  You said you know what the Bratz dolls

09:33   10    are?

09:33   11            PROSPECTIVE JUROR:  Yes.

09:33   12            MS. KELLER:  Do you have an impression of them?

09:33   13            PROSPECTIVE JUROR:  Not really.  I've never owned

09:33   14    one, haven't spent a lot of time looking at them.  I'm aware

09:34   15    that there was -- I believe there was a cartoon out on them.

09:34   16    I know they're geared towards the, you know, younger girls.

09:34   17            MS. KELLER:  Okay.  Do you have any impression of

09:34   18    Barbie dolls?

09:34   19            PROSPECTIVE JUROR:  I guess I have a -- more of a

09:34   20    fondness towards them because I collected them as a child,

09:34   21    and I had probably every -- you know, every house and

09:34   22    airplane and, you know, motor home you could own with them,

09:34   23    so I have a more fondness for them because I owned them as a

09:34   24    child.

09:34   25            MS. KELLER:  And who else did I see that said they

CV 04-9049 DOC – 1/13/2011 – Day 1, Volume 1 of 3

65

| | | |
|---|---|---|
| 09:34 | 1 | knew what Bratz dolls were? |
| 09:34 | 2 | Okay.  So that would be Mr. Dresser. |
| 09:34 | 3 | PROSPECTIVE JUROR:  Yes. |
| 09:34 | 4 | MS. KELLER:  And how do you happen to know about |
| 09:34 | 5 | Bratz dolls? |
| 09:34 | 6 | PROSPECTIVE JUROR:  My little sister played with |
| 09:34 | 7 | them for years. |
| 09:34 | 8 | MS. KELLER:  What's your impression of Bratz |
| 09:34 | 9 | dolls? |
| 09:34 | 10 | PROSPECTIVE JUROR:  I really don't have one.  She |
| 09:34 | 11 | seems to enjoy them. |
| 09:34 | 12 | MS. KELLER:  It's funny how guys a lot of times |
| 09:34 | 13 | are not that into dolls. |
| 09:35 | 14 | PROSPECTIVE JUROR:  Yeah. |
| 09:35 | 15 | MS. KELLER:  Do you have any kind of impression of |
| 09:35 | 16 | Barbie?  When you hear the word "Barbie," what do you think |
| 09:35 | 17 | of? |
| 09:35 | 18 | PROSPECTIVE JUROR:  I know they've been around a |
| 09:35 | 19 | lot longer, so I think history, you know. |
| 09:35 | 20 | MS. KELLER:  Anybody else here have any impression |
| 09:35 | 21 | of either Bratz or Barbie dolls? |
| 09:35 | 22 | Mr. Dearinger, you know what Barbie dolls are, |
| 09:35 | 23 | right? |
| 09:35 | 24 | PROSPECTIVE JUROR:  Yes, I do. |
| 09:35 | 25 | MS. KELLER:  What do you think of when you think |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 9659   Filed 01/20/11   Page 66 of 173   Page ID #:287942
CV 04-9049 DOC - 1/13/2011 - Day 1, Volume 1 of 3

66

| | | |
|---|---|---|
| 09:35 | 1 | of Barbie dolls? |
| 09:35 | 2 | PROSPECTIVE JUROR:  Little girls' dolls that they |
| 09:35 | 3 | like to keep and play with, also I understand they've gained |
| 09:35 | 4 | in value over time. |
| 09:35 | 5 | MS. KELLER:  Collectibles? |
| 09:35 | 6 | PROSPECTIVE JUROR:  Yes. |
| 09:35 | 7 | MS. KELLER:  Okay.  Now, one of the questions that |
| 09:35 | 8 | I've got, again, for everybody up here.  It's kind of tough |
| 09:35 | 9 | when one side goes first, and it can be for weeks and weeks |
| 09:35 | 10 | that that side goes on, and you're hearing one side of the |
| 09:35 | 11 | story.  Okay?  Very hard to kind of wait for the second half |
| 09:35 | 12 | and try to keep from forming impressions.  It's a tough |
| 09:35 | 13 | thing to do. |
| 09:35 | 14 | Would you agree with me, Mr. Nguyen? |
| 09:35 | 15 | PROSPECTIVE JUROR:  Yes. |
| 09:35 | 16 | MS. KELLER:  And how do you think you would go |
| 09:36 | 17 | about trying to keep yourself from doing that?  It's a tough |
| 09:36 | 18 | question. |
| 09:36 | 19 | PROSPECTIVE JUROR:  Yes, it is.  Well, I just have |
| 09:36 | 20 | to save my mind for the second half. |
| 09:36 | 21 | MS. KELLER:  Okay.  How about Mr. Cameron?  Do you |
| 09:36 | 22 | know what I'm talking about when I say it's tough to keep |
| 09:36 | 23 | from forming an impression, and yet you've only heard one |
| 09:36 | 24 | side of the story?  So how do you make yourself -- how do |
| 09:36 | 25 | you keep an open mind? |

09:36   1              PROSPECTIVE JUROR:  Well, just keep, uh, honest,

09:36   2    the best way you can and -- you know, we're just here to

09:36   3    learn so...

09:36   4              MS. KELLER:  You ever seen a football game where

09:36   5    things look really grim for one side and you switch off the

09:36   6    TV set because it looks so lopsided, and then later on you

09:36   7    hear the team that was down won?

09:36   8              PROSPECTIVE JUROR:  There's a lot of sports like

09:36   9    that.

09:36   10             MS. KELLER:  Okay.  There sure are.

09:37   11             Now, I'm going to ask some questions of the

09:37   12   individual people.  I guess I'll go in order again.

09:37   13             Mr. Gerst, you're number one.

09:37   14             You hold several patents relating to a dock

09:37   15   system?

09:37   16             PROSPECTIVE JUROR:  Yeah.  My family.  My father

09:37   17   and brother and I have developed a Fiberglas boat dock that

09:37   18   we patented.

09:37   19             MS. KELLER:  You've had litigation over that?

09:37   20             PROSPECTIVE JUROR:  No, not over that.  Hopefully,

09:37   21   not over that yet.

09:37   22             MS. KELLER:  What was the nature -- you said there

09:37   23   was some employer litigation over trade secrets?

09:37   24             PROSPECTIVE JUROR:  I worked for a company from

09:37   25   about 1999 'till, I believe, 2004, and they're out of

09:37   1   business now, but I was laid off with a couple other guys

09:37   2   that worked there in 2004.  And we went in and started a

09:37   3   business in the same industry.  It's telecommunications,

09:37   4   actually.  So as a result of that, we ended up in a lawsuit

09:37   5   with our prior employer.

09:37   6           MS. KELLER:  Now, Mr. Quinn asked some questions

09:38   7   about if you sign an agreement and you're working for an

09:38   8   employer and you create something while you were there,

09:38   9   should that belong to the employer.  And I'm going to ask

09:38   10  something a little different.

09:38   11          What about just your whole -- all the knowledge

09:38   12  and the expertise that you acquire on a job.  When you go to

09:38   13  a new job, you can't leave that behind, right?

09:38   14          PROSPECTIVE JUROR:  No, you can't.

09:38   15          MS. KELLER:  It's up here in your head.

09:38   16          PROSPECTIVE JUROR:  It is.

09:38   17          MS. KELLER:  Do you see a distinction in your mind

09:38   18  between taking something that actually belongs to the first

09:38   19  employer versus the ideas that are in your head?

09:38   20          PROSPECTIVE JUROR:  Yes, there is.  Something

09:38   21  physical that they've produced would be something that they

09:38   22  owned.  But, for example, if you were in a situation where

09:38   23  you learn a foreign language on a job, I mean, that's not

09:38   24  something that your employer necessarily has any claim to,

09:38   25  or the fact that you worked as a contractor and can hammer

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 09:38 | 1 | nails much better when you leave your employment. |
| 09:38 | 2 | You know, there may be a technique or some sort of |
| 09:38 | 3 | process that's proprietary and confidential that they can |
| 09:38 | 4 | protect, but I think there is a distinction. |
| 09:39 | 5 | MS. KELLER:  Okay.  Thank you. |
| 09:39 | 6 | And on to Ms. Sheehan.  You were asked before |
| 09:39 | 7 | about an answer that you gave that you had had some negative |
| 09:39 | 8 | experiences with immigrants and specifically with people |
| 09:39 | 9 | from Mexico.  And I know you said you didn't want to talk |
| 09:39 | 10 | about that in public.  Is that still the case? |
| 09:39 | 11 | PROSPECTIVE JUROR:  Yes. |
| 09:39 | 12 | MS. KELLER:  Would you be willing to talk about it |
| 09:39 | 13 | in private with His Honor? |
| 09:39 | 14 | PROSPECTIVE JUROR:  Sure. |
| 09:39 | 15 | MS. KELLER:  Okay.  And, Your Honor, what's the |
| 09:39 | 16 | Court's pleasure? |
| 09:39 | 17 | THE COURT:  This would be a good time.  Why don't |
| 09:39 | 18 | you come back with us for just a moment. |
| 09:39 | 19 | Ladies and gentlemen, visit amongst yourselves. |
| 09:39 | 20 | We'll be right back with you. |
| 09:39 | 21 | *(Sidebar proceedings reported as follows:)* |
| 09:40 | 22 | THE COURT:  All right.  We're at sidebar with |
| 09:40 | 23 | Ms. Sheehan. |
| 09:40 | 24 | What was that information? |
| 09:40 | 25 | PROSPECTIVE JUROR:  It was just I'm not a |

| | | |
|---|---|---|
| 09:40 | 1 | prejudiced person, so I mean putting that remark down -- |
| 09:40 | 2 | it's just that I have had a problem with some neighbors that |
| 09:40 | 3 | were from Mexico, that were illegal, and which are my |
| 09:40 | 4 | ex-neighbors, so it does tend to give you a little bitter |
| 09:40 | 5 | taste in your mouth, but I don't think that would affect me |
| 09:40 | 6 | at all about anything other than my personal -- |
| 09:40 | 7 | THE COURT:  That's the extent of the incident? |
| 09:40 | 8 | Neighbors who were illegal and some personal issue between |
| 09:40 | 9 | you and them? |
| 09:40 | 10 | PROSPECTIVE JUROR:  Right. |
| 09:40 | 11 | THE COURT:  From both sides you may have people |
| 09:40 | 12 | from different countries involved.  Any prejudice or biases |
| 09:41 | 13 | against Hispanics in general? |
| 09:41 | 14 | PROSPECTIVE JUROR:  No. |
| 09:41 | 15 | THE COURT:  Any issues such as any other immigrant |
| 09:41 | 16 | group? |
| 09:41 | 17 | PROSPECTIVE JUROR:  No. |
| 09:41 | 18 | THE COURT:  Counsel?  Mr. Quinn? |
| 09:41 | 19 | MR. QUINN:  Nothing. |
| 09:41 | 20 | THE COURT:  Ms. Keller? |
| 09:41 | 21 | MS. KELLER:  I wanted to ask what was the nature |
| 09:41 | 22 | of the problem. |
| 09:41 | 23 | PROSPECTIVE JUROR:  Well, they couldn't control |
| 09:41 | 24 | their children, and, you know, she didn't have a job.  And I |
| 09:41 | 25 | think there was -- there was a lot of personal problems |

CV 04-9049 DOC – 1/13/2011 – Day 1, Volume 1 of 3

71

| | | |
|---|---|---|
| 09:41 | 1 | with -- as far as neighbors go.  Of course, they're not |
| 09:41 | 2 | there anymore.  Because we were owners; they were renters |
| 09:41 | 3 | and not going through the rules and regulations of the |
| 09:41 | 4 | association.  I mean, there's -- there's a lot of -- were a |
| 09:41 | 5 | lot of problems with them. |
| 09:41 | 6 | MS. KELLER:  Okay.  So it seems like a lot of this |
| 09:41 | 7 | was because they were illegal immigrants.  Do you have a |
| 09:41 | 8 | problem with that? |
| 09:41 | 9 | PROSPECTIVE JUROR:  Well, no, no.  I couldn't -- |
| 09:41 | 10 | basically, I really couldn't say for sure she was an illegal |
| 09:41 | 11 | immigrant.  She didn't speak English. |
| 09:41 | 12 | THE COURT:  Was it because they weren't following |
| 09:41 | 13 | the rules of the association? |
| 09:41 | 14 | PROSPECTIVE JUROR:  Yes, yes. |
| 09:42 | 15 | THE COURT:  Because they were renters? |
| 09:42 | 16 | PROSPECTIVE JUROR:  Right, right. |
| 09:42 | 17 | MS. KELLER:  I don't have anything further. |
| 09:42 | 18 | THE COURT:  Thank you very much. |
| 09:42 | 19 | Mr. Overland had a couple questions. |
| 09:42 | 20 | PROSPECTIVE JUROR:  Okay. |
| 09:42 | 21 | MR. OVERLAND:  How were the problems resolved? |
| 09:42 | 22 | PROSPECTIVE JUROR:  Well, they're not neighbors |
| 09:42 | 23 | any longer.  They were eventually -- we had enough written |
| 09:42 | 24 | complaints against them.  My -- not just myself and my |
| 09:42 | 25 | husband but other neighbors, that the association, you know, |

DEBBIE GALE, U.S. COURT REPORTER

| 09:42 | 1 | they fined them so much for each penalty that, um -- so they |
| 09:42 | 2 | were -- eventually moved out. |
| 09:42 | 3 | MR. OVERLAND:  Were you a member of the |
| 09:42 | 4 | association? |
| 09:42 | 5 | PROSPECTIVE JUROR:  No.  But our good friends are |
| 09:42 | 6 | the president of the association. |
| 09:42 | 7 | MR. OVERLAND:  Was it -- it you that initiated |
| 09:42 | 8 | this, or was it a group thing? |
| 09:42 | 9 | PROSPECTIVE JUROR:  It was more than just myself |
| 09:42 | 10 | and my husband that had a problem. |
| 09:42 | 11 | MR. OVERLAND:  But did you initiate it? |
| 09:42 | 12 | PROSPECTIVE JUROR:  I can't say for sure.  We |
| 09:42 | 13 | ourselves wrote complaints, but I can't say for certain that |
| 09:42 | 14 | was the reason why they moved out. |
| 09:43 | 15 | MR. OVERLAND:  Okay. |
| 09:43 | 16 | THE COURT:  Okay. |
| 09:43 | 17 | MR. OVERLAND:  Thank you. |
| 09:43 | 18 | MR. QUINN:  Nothing. |
| 09:43 | 19 | THE COURT:  Thank you very much. |
| 09:43 | 20 | *(Sidebar proceedings concluded.)* |
| 09:43 | 21 | *(In open court in the presence of the* |
| 09:43 | 22 | *venire.)* |
| 09:43 | 23 | THE COURT:  We're back on the record, then.  Thank |
| 09:43 | 24 | you very much for answering those questions. |
| 09:43 | 25 | Counsel.  Ms. Keller. |

| | | |
|---|---|---|
| 09:43 | 1 | MS. KELLER:  Okay.  Ms. Larimore-Dyas, back to |
| 09:43 | 2 | you.  You said that you had collected Barbies? |
| 09:43 | 3 | PROSPECTIVE JUROR:  Yes. |
| 09:43 | 4 | MS. KELLER:  What happened -- how did your Barbie |
| 09:43 | 5 | collection end up not being owned by you anymore? |
| 09:43 | 6 | PROSPECTIVE JUROR:  I just grew out of them. |
| 09:43 | 7 | MS. KELLER:  I was really hoping you were going to |
| 09:44 | 8 | say, "I got Bratz instead." |
| 09:44 | 9 | PROSPECTIVE JUROR:  No, those came out you after I |
| 09:44 | 10 | was an adult. |
| 09:44 | 11 | MS. KELLER:  Okay. |
| 09:44 | 12 | Mr. Nguyen, when you bought the Barbie doll for |
| 09:44 | 13 | your daughter, how old was your daughter? |
| 09:44 | 14 | PROSPECTIVE JUROR:  She about four. |
| 09:44 | 15 | MS. KELLER:  And how old is she now? |
| 09:44 | 16 | PROSPECTIVE JUROR:  She's ten now. |
| 09:44 | 17 | MS. KELLER:  Have you ever seen the Bratz dolls? |
| 09:44 | 18 | PROSPECTIVE JUROR:  I don't think so. |
| 09:44 | 19 | MS. KELLER:  Okay.  Now, you had, in your |
| 09:44 | 20 | questionnaire, said that an employee -- it's wrong for an |
| 09:44 | 21 | employee to take anything besides personal belongings when |
| 09:44 | 22 | leaving a job.  Do you remember that? |
| 09:44 | 23 | PROSPECTIVE JUROR:  Yes, I do. |
| 09:44 | 24 | MS. KELLER:  But would you agree with me that |
| 09:44 | 25 | ideas, things that are in your head, the employee can't |

Case 2:04-cv-09049-DOC-RNB   Document 9659   Filed 01/20/11   Page 74 of 173   Page ID #:287950
CV 04-9049 DOC – 1/13/2011 – Day 1, Volume 1 of 3

74

| | | |
|---|---|---|
| 09:44 | 1 | leave those behind, right? |
| 09:44 | 2 | PROSPECTIVE JUROR:  I agree, yeah. |
| 09:44 | 3 | MS. KELLER:  And would you have any problem in |
| 09:44 | 4 | deciding this case, in trying to figure out, hey, was |
| 09:44 | 5 | this -- you know, was this something that was produced for |
| 09:44 | 6 | Mattel, or was this an idea that this employee had or |
| 09:44 | 7 | already had?  Would you have any problem with having to |
| 09:44 | 8 | figure that out? |
| 09:44 | 9 | PROSPECTIVE JUROR:  No. |
| 09:45 | 10 | MS. KELLER:  Okay. |
| 09:45 | 11 | Now, Mr. Dearinger. |
| 09:45 | 12 | PROSPECTIVE JUROR:  Yes. |
| 09:45 | 13 | MS. KELLER:  I'm going to ask you a little bit of |
| 09:45 | 14 | the same thing I just asked.  You said it was wrong for a |
| 09:45 | 15 | employee to take anything besides personal belongings when |
| 09:45 | 16 | leaving a job, that you thought that would be stealing. |
| 09:45 | 17 | PROSPECTIVE JUROR:  Yes. |
| 09:45 | 18 | MS. KELLER:  Were you talking about taking stuff, |
| 09:45 | 19 | you know, things like pens and papers? |
| 09:45 | 20 | PROSPECTIVE JUROR:  That's what I had in mind, |
| 09:45 | 21 | yes. |
| 09:45 | 22 | MS. KELLER:  Okay.  So you were thinking of the |
| 09:45 | 23 | physical property that belonged to the employer? |
| 09:45 | 24 | PROSPECTIVE JUROR:  Right. |
| 09:45 | 25 | MS. KELLER:  How about ideas? |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 9659   Filed 01/20/11   Page 75 of 173   Page ID #:287951
CV 04-9049 DOC - 1/13/2011 - Day 1, Volume 1 of 3

75

| | | |
|---|---|---|
| 09:45 | 1 | PROSPECTIVE JUROR:  Ideas, I think that would be |
| 09:45 | 2 | wrong also.  The only thing -- experiences you can take |
| 09:45 | 3 | along with you to help you perform your duties.  I think |
| 09:45 | 4 | that is all right. |
| 09:45 | 5 | MS. KELLER:  Okay.  So when you say ideas would be |
| 09:45 | 6 | wrong also, can you explain that? |
| 09:45 | 7 | PROSPECTIVE JUROR:  Well, it's -- if it's ideas |
| 09:45 | 8 | that another company uses for its product, you -- it would |
| 09:45 | 9 | be wrong to divulge that, I would believe, especially if I |
| 09:46 | 10 | was -- signed something to that effect. |
| 09:46 | 11 | MS. KELLER:  Now, are you thinking about, say, a |
| 09:46 | 12 | scientific development, such as one of our other jurors was |
| 09:46 | 13 | talking about that -- like you learned a scientific process |
| 09:46 | 14 | and then took that to another company?  Is that what you're |
| 09:46 | 15 | thinking of? |
| 09:46 | 16 | PROSPECTIVE JUROR:  That's what I'm thinking of. |
| 09:46 | 17 | I don't think it would be right to take that. |
| 09:46 | 18 | MS. KELLER:  Okay.  What about if it was really an |
| 09:46 | 19 | idea that was in your our own head, not something that had |
| 09:46 | 20 | ever been a scientific property of the company or physical |
| 09:46 | 21 | property of the company or anything else, but it was ideas |
| 09:46 | 22 | in your own head that you had gotten while you were at the |
| 09:46 | 23 | company? |
| 09:46 | 24 | PROSPECTIVE JUROR:  That had not been divulged to |
| 09:46 | 25 | the company I worked for? |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 9659   Filed 01/20/11   Page 76 of 173   Page ID #:287952
CV 04-9049 DOC - 1/13/2011 - Day 1, Volume 1 of 3

76

| | | |
|---|---|---|
| 09:46 | 1 | MS. KELLER:  Yeah. |
| 09:46 | 2 | PROSPECTIVE JUROR:  If it came up where those |
| 09:46 | 3 | would help, I would think it would be all right. |
| 09:46 | 4 | MS. KELLER:  Okay.  Would you agree with me that |
| 09:46 | 5 | when people change jobs, very frequently it's within the |
| 09:46 | 6 | same field? |
| 09:46 | 7 | PROSPECTIVE JUROR:  Yeah, they do. |
| 09:46 | 8 | MS. KELLER:  Do you see anything wrong with that? |
| 09:46 | 9 | Do you see anything wrong with a person leaving one company |
| 09:47 | 10 | and going to another company that makes the same kind of |
| 09:47 | 11 | things? |
| 09:47 | 12 | PROSPECTIVE JUROR:  No.  I did it myself. |
| 09:47 | 13 | MS. KELLER:  When was that? |
| 09:47 | 14 | PROSPECTIVE JUROR:  I started working for one |
| 09:47 | 15 | airline and worked for 'em for a year and a half and quit |
| 09:47 | 16 | and went to work for another airline.  And I took that |
| 09:47 | 17 | experience with me, and it did help me. |
| 09:47 | 18 | MS. KELLER:  So you couldn't just sort of purge |
| 09:47 | 19 | everything that was in your head? |
| 09:47 | 20 | PROSPECTIVE JUROR:  No. |
| 09:47 | 21 | MS. KELLER:  Yeah, sometimes I kind of wish we had |
| 09:47 | 22 | a hard drive, but we don't seem to.  All right. |
| 09:47 | 23 | Mr. Dresser, we already talked to you. |
| 09:47 | 24 | Mr. Leong. |
| 09:47 | 25 | Your Honor, there was an issue with respect to |

Case 2:04-cv-09049-DOC-RNB   Document 9659   Filed 01/20/11   Page 77 of 173   Page ID #:287953
CV 04-9049 DOC - 1/13/2011 - Day 1, Volume 1 of 3

77

09:47  1    knowledge about the case.  I wondered if we could talk to

09:47  2    Mr. Leong privately?

09:47  3                THE COURT:  Just a minute.

09:47  4                Mr. Leong, where did you obtain the information?

09:47  5    From the press?  Did you read something about the case?

09:47  6                PROSPECTIVE JUROR:  Oh, yeah, from the press.  It

09:47  7    was just news.

09:47  8                THE COURT:  Okay.  Counsel.

09:47  9                Could you come with us just a moment?  We just

09:47  10   don't know what that is.  And let's talk to you quietly.

09:48  11               PROSPECTIVE JUROR:  Sure.

09:48  12               THE COURT:  We'll be right back with you, ladies

09:48  13   and gentlemen.

09:48  14                   *(Sidebar proceedings reported as follows:)*

09:48  15               THE COURT:  Mr. Leong, what information did you

09:48  16   get from the press?

09:48  17               PROSPECTIVE JUROR:  Oh, that was, my gosh, when

09:48  18   you're -- when Mattel toys and MGA -- that was the news

09:48  19   articles that I had read.  This was awhile back when you

09:48  20   guys had decided.  I didn't even know that this was still

09:48  21   going on.  But I had heard that Mattel was suing MGA.

09:48  22               THE COURT:  Did you get any other information?

09:48  23               PROSPECTIVE JUROR:  No, I have no other -- I

09:48  24   didn't even know that you guys were -- that they were -- MGA

09:49  25   was appealing.

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 9659   Filed 01/20/11   Page 78 of 173   Page ID #:287954
CV 04-9049 DOC - 1/13/2011 - Day 1, Volume 1 of 3

78

| | | |
|---|---|---|
| 09:49 | 1 | THE COURT:  I see. |
| 09:49 | 2 | Mr. Quinn? |
| 09:49 | 3 | MR. QUINN:  I don't have anything. |
| 09:49 | 4 | THE COURT:  Ms. Keller? |
| 09:49 | 5 | MS. KELLER:  Yes.  In the questionnaire, you said |
| 09:49 | 6 | you had formed an opinion about the case.  What's the nature |
| 09:49 | 7 | of the opinion? |
| 09:49 | 8 | PROSPECTIVE JUROR:  Oh, okay.  Well, you mean |
| 09:49 | 9 | after filling out all that information? |
| 09:49 | 10 | MS. KELLER:  In the questionnaire it said, "Have |
| 09:49 | 11 | you formed an opinion about the case?" and you said, "Yes." |
| 09:49 | 12 | PROSPECTIVE JUROR:  I understood after reading and |
| 09:49 | 13 | filling out the questionnaire -- I understand where it was |
| 09:49 | 14 | going.  You know, I had no idea what it was about, but my |
| 09:49 | 15 | opinion was, oh, okay, obviously this is in regards to |
| 09:49 | 16 | Mattel toys suing MGA and now they're coming back. |
| 09:49 | 17 | MS. KELLER:  Okay.  And -- |
| 09:49 | 18 | THE COURT:  Coming back with another lawsuit? |
| 09:49 | 19 | PROSPECTIVE JUROR:  With another lawsuit.  They're |
| 09:49 | 20 | opening up another. |
| 09:49 | 21 | THE COURT:  MGA is suing Mattel? |
| 09:49 | 22 | MS. KELLER:  When you say "coming back," what was |
| 09:49 | 23 | your understanding of the first lawsuit or whatever it was |
| 09:49 | 24 | that we were coming back from? |
| 09:50 | 25 | PROSPECTIVE JUROR:  All I got was from the |

09:50  1   article, which was, you know, I thought was a lot of money

09:50  2   too.  I thought Mattel Toys won a lawsuit for a hundred

09:50  3   million dollars is what I read.  I thought, "Wow! That's a

09:50  4   lot for dolls."

09:50  5          MS. KELLER:  Okay.

09:50  6          THE COURT:  Mr. Overland?

09:50  7          MR. OVERLAND:  No questions.

09:50  8          THE COURT:  Mr. Quinn?

09:50  9          MR. QUINN:  To follow up on that.

09:50  10         PROSPECTIVE JUROR:  Sure.

09:50  11         MR. QUINN:  You say you had read that Mattel had

09:50  12  won a hundred million dollars in a lawsuit?

09:50  13         PROSPECTIVE JUROR:  Yeah.

09:50  14         MR. QUINN:  Do you have any knowledge or

09:50  15  information about what happened, if that happened -- if that

09:50  16  happened, what you understand happened or why we are here

09:50  17  today?

09:50  18         PROSPECTIVE JUROR:  No.

09:50  19         MR. QUINN:  What you've read, does that affect

09:50  20  your ability at all to assess, if you were on this jury, the

09:50  21  evidence in this case?

09:50  22         PROSPECTIVE JUROR:  In regards to that, no, no.

09:50  23         MR. QUINN:  So you wouldn't be sort of leaning in

09:50  24  favor of Mattel or against Mattel, thinking Mattel's gotten

09:50  25  enough already and why are they here, or MGA must be wrong

CV 04-9049 DOC - 1/13/2011 - Day 1, Volume 1 of 3

80

| | | |
|---|---|---|
| 09:50 | 1 | because of what I read? |
| 09:51 | 2 | PROSPECTIVE JUROR:  No.  And in regards to what |
| 09:51 | 3 | happened prior, no, that doesn't affect me, because I didn't |
| 09:51 | 4 | even know that that had happened until I saw that.  That's |
| 09:51 | 5 | what surprised me. |
| 09:51 | 6 | THE COURT:  Okay.  Thank you very much, sir. |
| 09:51 | 7 | PROSPECTIVE JUROR:  You're welcome. |
| 09:51 | 8 | THE COURT:  You can go back and take your seat. |
| 09:51 | 9 | PROSPECTIVE JUROR:  All right. |
| 09:51 | 10 | (Sidebar proceedings concluded.) |
| 09:51 | 11 | (In open court in the presence of the |
| 09:51 | 12 | venire.) |
| 09:51 | 13 | THE COURT:  We're back in open court. |
| 09:51 | 14 | Counsel, if you like to continue, please. |
| 09:51 | 15 | MS. KELLER:  Mr. Leong, your company, would that |
| 09:51 | 16 | happen to be Fightertown? |
| 09:51 | 17 | PROSPECTIVE JUROR:  No.  That's an older company |
| 09:51 | 18 | that went defunct.  It's call Flight Deck. |
| 09:51 | 19 | MS. KELLER:  Okay.  So it's flight simulated |
| 09:51 | 20 | fighter planes? |
| 09:51 | 21 | PROSPECTIVE JUROR:  Yes. |
| 09:51 | 22 | MS. KELLER:  How did you happen to get the idea to |
| 09:51 | 23 | start that company? |
| 09:52 | 24 | PROSPECTIVE JUROR:  It wasn't my idea.  Actually, |
| 09:52 | 25 | it was my friend who visited, actually, Fighter Town, which |

DEBBIE GALE, U.S. COURT REPORTER

| 09:52 | 1 | was the only company by El Toro marine base.  He thought it |
| 09:52 | 2 | was a great idea, but the way they executed their business, |
| 09:52 | 3 | he saw there was a flaw and they went out of business. |
| 09:52 | 4 | He ended up purchasing all the simulators and |
| 09:52 | 5 | waiting for the right time, opening up his shop, and I |
| 09:52 | 6 | helped him out. |
| 09:52 | 7 | MS. KELLER:  And I take it you don't think there |
| 09:52 | 8 | was anything wrong with him going to that company and |
| 09:52 | 9 | getting an idea to start his own company, but figuring out a |
| 09:52 | 10 | better execution? |
| 09:52 | 11 | PROSPECTIVE JUROR:  No.  I think that was fine, |
| 09:52 | 12 | especially since that company did it poorly and they went |
| 09:52 | 13 | out of business. |
| 09:52 | 14 | MS. KELLER:  Okay. |
| 09:52 | 15 | Mr. Cameron. |
| 09:52 | 16 | PROSPECTIVE JUROR:  Yes. |
| 09:52 | 17 | MS. KELLER:  Okay.  One of the questions -- and |
| 09:52 | 18 | these are sensitive areas for people, and I know it's hard |
| 09:52 | 19 | to have to talk about this in a big courtroom with a bunch |
| 09:53 | 20 | of strangers, but we really appreciate all the candor and |
| 09:53 | 21 | honesty everybody's giving us. |
| 09:53 | 22 | One of the things you were asked about is if you |
| 09:53 | 23 | had positive or negative experiences with various people and |
| 09:53 | 24 | you said you had negative experiences with people who are |
| 09:53 | 25 | homosexual, right? |

09:53  1                PROSPECTIVE JUROR:  Yes.

09:53  2                MS. KELLER:  Okay.  What were those negative

09:53  3       experiences?

09:53  4                PROSPECTIVE JUROR:  Well, just an uneasiness to

09:53  5       work with them.  Years ago, we had our treasurer of the

09:53  6       company was homosexual.

09:53  7                MS. KELLER:  And what was it about that that made

09:53  8       you uneasy?

09:53  9                PROSPECTIVE JUROR:  Well, he was a little hard to

09:53  10      work with, I thought.

09:53  11               MS. KELLER:  Because of that?  Because he was gay?

09:53  12               PROSPECTIVE JUROR:  Yes.

09:53  13               MS. KELLER:  I appreciate you're saying that.  And

09:53  14      I know you said, too, that because of Biblical reasons you

09:53  15      don't think homosexuality is right.  Would that be true?

09:54  16               PROSPECTIVE JUROR:  That's correct.

09:54  17               MS. KELLER:  Now, one of the witnesses in this

09:54  18      case is gonna be a gay man.  Okay?  And I don't know that

09:54  19      he's really a witness for either side, but he is gonna be an

09:54  20      important witness.  Would you be -- because of your beliefs

09:54  21      and your Biblical views, would you tend to give him maybe a

09:54  22      little less credibility than somebody else?  I know that's a

09:54  23      kind of tough question too.  You kind of have to look

09:54  24      inside.

09:54  25               PROSPECTIVE JUROR:  I'd have -- it would be a

CV 04-9049 DOC - 1/13/2011 - Day 1, Volume 1 of 3

83

| | | |
|---|---|---|
| 09:54 | 1 | little uneasy, I think.  I'd try to do the best I could.  I |
| 09:54 | 2 | worked with this gentleman for five or six years, no |
| 09:54 | 3 | problems. |
| 09:54 | 4 | MS. KELLER:  Well, when you say "uneasy," though, |
| 09:54 | 5 | let's say this fella takes the stand and he's clearly gay |
| 09:54 | 6 | and he's -- he lives with another guy, and then somebody |
| 09:54 | 7 | gets on the stand who isn't gay and gives a different story |
| 09:55 | 8 | than he gives.  Would you tend to favor the one who's not |
| 09:55 | 9 | gay just because you kind of look at this guy as having |
| 09:55 | 10 | maybe not the same moral standards that you have? |
| 09:55 | 11 | PROSPECTIVE JUROR:  It would be a tough decision, |
| 09:55 | 12 | but I think, you know, I -- like I say, I've worked with a |
| 09:55 | 13 | gentleman like that in the company, worked quite closely |
| 09:55 | 14 | with him. |
| 09:55 | 15 | MS. KELLER:  Okay.  All right. |
| 09:55 | 16 | Now we have Mr. Conmignon -- no?  No, I've got the |
| 09:55 | 17 | wrong -- I'm sorry -- got the wrong thing here. |
| 09:55 | 18 | Okay.  Let me ask you a couple additional |
| 09:55 | 19 | questions. |
| 09:55 | 20 | And, Your Honor, I don't want to step on |
| 09:55 | 21 | Mr. Overland's time.  Does the Court have an idea of how |
| 09:55 | 22 | much more I have? |
| 09:55 | 23 | THE COURT:  You've got about ten to fifteen |
| 09:55 | 24 | minutes. |
| 09:55 | 25 | MS. KELLER:  Okay.  Great.  Not so great for |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 1/13/2011 - Day 1, Volume 1 of 3

84

09:56   1   everybody else, but great for me.

09:56   2          THE COURT:  About five after, Counsel.

09:56   3          MS. KELLER:  Some people have said, gee, this case

09:56   4   is, quote, only about dolls, and, you know, I don't want to

09:56   5   have to devote so much of my life to a case that's only

09:56   6   about dolls.  Now I see one person smiling in the back row.

09:56   7          I see Mr. Nguyen smiling.  Do you find yourself

09:56   8   kind of having that reaction?

09:56   9          PROSPECTIVE JUROR:  No, I don't think so.

09:56  10          MS. KELLER:  Okay.  Is there anybody else here who

09:56  11   found himself having that reaction, that this is a case

09:56  12   that's only about dolls?  Everybody understands this is

09:56  13   about dolls that generate a lot of income for a lot of

09:56  14   employees.  A lot of people's livelihoods depend on these

09:56  15   dolls.  Right?

09:56  16          Okay.  Now, could I see a show of hands on how

09:56  17   many people here have signed an employment agreement before

09:56  18   in the past?

09:56  19          *(Show of hands.)*

09:56  20          MS. KELLER:  Okay.  Can you tell me, was this a

09:56  21   condition of being employed?  Can I see another show of

09:57  22   hands?  In other words, if you didn't sign it, you weren't

09:57  23   going to be employed?

09:57  24          *(Show of hands.)*

09:57  25          MS. KELLER:  Okay.  Let me see a show of hands of

CV 04-9049 DOC – 1/13/2011 – Day 1, Volume 1 of 3

85

| | | |
|---|---|---|
| 09:57 | 1 | how many of you got a copy of that employment agreement when |
| 09:57 | 2 | you signed it.  Is there anybody here who did not get a copy |
| 09:57 | 3 | of that employment agreement that they signed? |
| 09:57 | 4 | PROSPECTIVE JUROR:  Can't remember.  It's 40 years |
| 09:57 | 5 | ago. |
| 09:57 | 6 | MS. KELLER:  I can't remember what I had for |
| 09:57 | 7 | breakfast yesterday.  So that's okay. |
| 09:57 | 8 | Is there anyone here who disagrees with the |
| 09:57 | 9 | proposition that an employee who signs an employment |
| 09:57 | 10 | agreement ought to get a copy of it?  Is there anybody who |
| 09:57 | 11 | disagrees with that?  Could I see a show of hands of how |
| 09:57 | 12 | many people think it would be unfair to have an employee |
| 09:57 | 13 | sign an employment agreement and not be given a copy of it? |
| 09:57 | 14 | Could I see a show of hands on how many people think that |
| 09:58 | 15 | wouldn't be very fair? |
| 09:58 | 16 | *(Show of hands.)* |
| 09:58 | 17 | MS. KELLER:  Has anybody worked in any aspect of |
| 09:58 | 18 | the creation of new products.  I know Mr. Gerst has. |
| 09:58 | 19 | Anybody worked on creating new products of any kind? |
| 09:58 | 20 | *(Show of hands.)* |
| 09:58 | 21 | MS. KELLER:  Mr. Cameron, what products were |
| 09:58 | 22 | those? |
| 09:58 | 23 | PROSPECTIVE JUROR:  Well, I worked in the feed |
| 09:58 | 24 | industry as a feed nutritionist since '80 out here.  And you |
| 09:58 | 25 | run into the opportunity to put together a new product. |

09:58    1            MS. KELLER:  And did the company you worked for

09:58    2    have the right to own that?

09:58    3            PROSPECTIVE JUROR:  I don't think it was ever

09:58    4    brought up.

09:58    5            MS. KELLER:  Okay.  So it never came up?

09:58    6            PROSPECTIVE JUROR:  No.

09:58    7            MS. KELLER:  Okay.  Who else here had worked on

09:58    8    the creation or design of a new product?

09:58    9            Okay.  Mr. Nguyen, what product was that?

09:58   10            PROSPECTIVE JUROR:  I design two system to help my

09:58   11    line of works, you know, for the Navy.  One system is to put

09:59   12    it on board a ship to collect the data from the combat

09:59   13    system and send it home directly, automatically.  So when

09:59   14    another system is dealing with the classify voice over IP.

09:59   15            MS. KELLER:  Okay.  VOIP?

09:59   16            PROSPECTIVE JUROR:  Yes.  But for the classified,

09:59   17    not for the commercial one.

09:59   18            MS. KELLER:  Okay.  During the time when you were

09:59   19    working on that, if you worked on creating things on your

09:59   20    own time on nights and weekends, did that belong to your

09:59   21    employer or to you?  If you worked on your own time.

09:59   22            PROSPECTIVE JUROR:  Some of it, the Navy pay me to

09:59   23    work on it, and some of it, I work on my own time, like you

09:59   24    said, on the weekend or after hours.  It doesn't matter.

09:59   25    I -- I think it belong to the Navy.

CV 04-9049 DOC - 1/13/2011 - Day 1, Volume 1 of 3

87

10:00   1          MS. KELLER:  What if you were working on something

10:00   2     that wasn't related to what you were doing at your job?  In

10:00   3     other words, on the nights and weekends, you were working on

10:00   4     coming up with some kind of, you know, sonar device.  Would

10:00   5     that belong to the Navy or to you?

10:00   6          PROSPECTIVE JUROR:  It would belong to me.

10:00   7          MS. KELLER:  Okay.  And let me ask another

10:00   8     question here, if I could see a show of hands.  Is there

10:00   9     anybody up here who has ever worked in a workplace in a

10:00   10    cubicle, little cubicle?  Okay.  See a couple hands.

10:00   11          Mr. Gerst, where was that?

10:00   12          PROSPECTIVE JUROR:  I've worked in a cubicle for

10:00   13    about a year or so in the late '90s, when I first started

10:00   14    for the company that I ended up getting in the employment

10:00   15    lawsuit with.  My first position, my first location was a

10:00   16    cubicle, then I went into an office.

10:00   17          MS. KELLER:  Did you have a lot of interaction

10:00   18    with the people who worked nearby you in the other cubicles?

10:01   19          PROSPECTIVE JUROR:  Yeah.  But I wouldn't

10:01   20    necessarily say there's any less or more.  You don't have

10:01   21    any real ability to have any privacy without a private

10:01   22    office, but you still have a lot of interaction with your

10:01   23    coworkers.

10:01   24          MS. KELLER:  Okay.  When you worked at that

10:01   25    company, did your company have a policy about what you could

CV 04-9049 DOC - 1/13/2011 - Day 1, Volume 1 of 3

88

| | | |
|---|---|---|
| 10:01 | 1 | take with you when you went from that employer to a |
| 10:01 | 2 | different employer? |
| 10:01 | 3 | PROSPECTIVE JUROR:  In terms of physical items or |
| 10:01 | 4 | in terms of -- I did sign a -- you know, a confidentiality, |
| 10:01 | 5 | and ultimately it morphed into a noncompete.  But, yeah, |
| 10:01 | 6 | there was a policy.  Obviously, you know, computers and |
| 10:01 | 7 | things like that, I wasn't -- weren't mine. |
| 10:01 | 8 | MS. KELLER:  Okay.  Could I see a show of hands? |
| 10:01 | 9 | Is there anybody here who thinks it's wrong for a company to |
| 10:01 | 10 | hire employees away from a competitor in the same industry? |
| 10:01 | 11 | Is there anybody who thinks it's wrong for a company to go |
| 10:01 | 12 | out and say, hey, I want to hire those people, they're good? |
| 10:01 | 13 | Anybody?  Nobody thinks that's wrong?  Okay. |
| 10:02 | 14 | Does anybody here think that -- have any views on |
| 10:02 | 15 | whether former colleagues or coworkers should be able to |
| 10:02 | 16 | stay in touch with each other after they don't work for the |
| 10:02 | 17 | same employer anymore? |
| 10:02 | 18 | How about Mr. Leong? |
| 10:02 | 19 | PROSPECTIVE JUROR:  I think it's okay. |
| 10:02 | 20 | MS. KELLER:  Okay.  Is there anybody up here who's |
| 10:02 | 21 | ever been accused of treating an employee or coworker |
| 10:02 | 22 | unfairly?  Can I see a show of hands there? |
| 10:02 | 23 | And this is a really broad question.  I want to |
| 10:02 | 24 | know if you or spouse or partner or family member has ever |
| 10:02 | 25 | opened or run a business.  Can I see a show of hands? |

CV 04-9049 DOC – 1/13/2011 – Day 1, Volume 1 of 3

89

| | | |
|---|---|---|
| 10:02 | 1 | *(Show of hands.)* |
| 10:02 | 2 | MS. KELLER:  Okay.  Let's start with |
| 10:02 | 3 | Mr. Dearinger. |
| 10:02 | 4 | THE COURT:  Counsel, after this group of |
| 10:02 | 5 | questions, after these answers, maybe one more question. |
| 10:02 | 6 | MS. KELLER:  Mr. Dearinger? |
| 10:03 | 7 | PROSPECTIVE JUROR:  I became involved in a |
| 10:03 | 8 | work-from-home business that proved to be a scam, and I had |
| 10:03 | 9 | to back out of it and dissolve the business. |
| 10:03 | 10 | MS. KELLER:  And who else has run a business? |
| 10:03 | 11 | Mr. Cameron, what was that? |
| 10:03 | 12 | PROSPECTIVE JUROR:  Well, I owned a farm, and then |
| 10:03 | 13 | I owned part of a feed mill in Missouri. |
| 10:03 | 14 | MS. KELLER:  Okay.  Anybody else? |
| 10:03 | 15 | I know about your business, sir. |
| 10:03 | 16 | Anybody else owned a business?  Anybody in your |
| 10:03 | 17 | family? |
| 10:03 | 18 | PROSPECTIVE JUROR:  My father owned his own sheet |
| 10:03 | 19 | metal business. |
| 10:03 | 20 | MS. KELLER:  Okay.  And my final question is going |
| 10:03 | 21 | to be, has anybody here ever worked for a company, other |
| 10:03 | 22 | than the people who have already told us about it, that |
| 10:03 | 23 | applied for or received patents or trademarks or copyrights? |
| 10:03 | 24 | Can we just see a show of hands? |
| 10:03 | 25 | Finally, is there anybody here who has any kind of |

CV 04-9049 DOC – 1/13/2011 – Day 1, Volume 1 of 3

90

| 10:04 | 1 | opinion about lawsuits in general that might affect your |
| 10:04 | 2 | ability to be fair and impartial? |
| 10:04 | 3 | Okay.  Your Honor, then I would turn it over to my |
| 10:04 | 4 | colleagues. |
| 10:04 | 5 | THE COURT:  Mr. Overland. |
| 10:04 | 6 | MR. OVERLAND:  Good morning. |
| 10:04 | 7 | As you heard, I'm representing Mr. Machado, along |
| 10:04 | 8 | with the gentleman over there, Mr. Cote.  And mercifully, |
| 10:04 | 9 | I'm only gonna have two questions for each of you, except |
| 10:05 | 10 | for you, Mr. Leong, I'm going to have special questions for |
| 10:05 | 11 | you. |
| 10:05 | 12 | But there are ground rules to the questions.  And |
| 10:05 | 13 | unlike what Mr. Quinn said, I do intend to pry.  My goal is |
| 10:05 | 14 | to pry into your innermost thoughts and feelings in |
| 10:05 | 15 | answering these questions. |
| 10:05 | 16 | And here are the ground rules.  I want you to |
| 10:05 | 17 | think, and I'm talking to you eight, but I'm also talking to |
| 10:05 | 18 | out here, because I'm pretty sure that those eight are not |
| 10:05 | 19 | going to be here forever.  So I want you to think about this |
| 10:05 | 20 | too. |
| 10:05 | 21 | And here are the ground rules.  I want you to |
| 10:05 | 22 | think of somebody that knows you better than anybody else in |
| 10:05 | 23 | this world.  And it might be yourself, it might be a spouse |
| 10:05 | 24 | or a significant other.  And in answering these questions, |
| 10:05 | 25 | what would that individual say, and if that individual is |

Case 2:04-cv-09049-DOC-RNB   Document 9659   Filed 01/20/11   Page 91 of 173   Page ID #:287967
CV 04-9049 DOC - 1/13/2011 - Day 1, Volume 1 of 3

91

10:06   1   you, I want you to answer in terms of what you yourself

10:06   2   would be.  And here are the two questions.

10:06   3          First question is you know a little about this

10:06   4   case now; not much, probably very, very little.  But the

10:06   5   first question is, knowing what you know about this case,

10:06   6   why do you think you would be a good juror in this case?

10:06   7          And the second question is, knowing what you know

10:06   8   about this case, is there anything about it that you think

10:06   9   would make you a bad juror in this case?

10:06   10          And in answering that second question,

10:06   11   Mr. Dearinger, I don't want to hear that you're too old or

10:06   12   that you're too tired, because I'm very close to where you

10:06   13   are.  You got to come up with something else.  Okay?  All

10:06   14   right?  Everybody got those two questions in mind?

10:06   15          All right.  We're going to start with you,

10:06   16   Mr. Cameron.

10:07   17          PROSPECTIVE JUROR:  I believe I can be impartial.

10:07   18          MR. OVERLAND:  Okay.  The question is, why do you

10:07   19   think you would be a good juror?

10:07   20          PROSPECTIVE JUROR:  I believe that I can be honest

10:07   21   and impartial with the situation.

10:07   22          MR. OVERLAND:  Okay.  Is there anything that

10:07   23   you -- or if I were to ask that person that knows you best

10:07   24   in the world -- would say that, you know, I don't think he

10:07   25   would be a good juror in this case?

CV 04-9049 DOC - 1/13/2011 - Day 1, Volume 1 of 3

92

| | | |
|---|---|---|
| 10:07 | 1 | PROSPECTIVE JUROR:  (No response.) |
| 10:07 | 2 | MR. OVERLAND:  Anything at all? |
| 10:07 | 3 | PROSPECTIVE JUROR:  I'm not sure. |
| 10:07 | 4 | MR. OVERLAND:  And why do you say that? |
| 10:07 | 5 | PROSPECTIVE JUROR:  Well, I really don't know |
| 10:07 | 6 | where you're coming from, but... |
| 10:07 | 7 | MR. OVERLAND:  I'm not coming from anywhere.  I'm |
| 10:07 | 8 | just asking you what your feelings are. |
| 10:07 | 9 | PROSPECTIVE JUROR:  I believe that I've sat on a |
| 10:07 | 10 | jury before, and I thought I was a good member.  And I've |
| 10:07 | 11 | got a pretty good education, and I think that I can make |
| 10:08 | 12 | good decisions. |
| 10:08 | 13 | MR. OVERLAND:  Okay.  So there's nothing that that |
| 10:08 | 14 | person that knows you best or yourself would tell me about |
| 10:08 | 15 | anything that would make you a bad juror in this case? |
| 10:08 | 16 | PROSPECTIVE JUROR:  I don't believe so. |
| 10:08 | 17 | THE COURT:  Okay.  Pass that on to Mr. Leong. |
| 10:08 | 18 | What about you? |
| 10:08 | 19 | PROSPECTIVE JUROR:  Well, I believe -- |
| 10:08 | 20 | MR. OVERLAND:  Let's take the good first. |
| 10:08 | 21 | Everybody likes to say good stuff. |
| 10:08 | 22 | PROSPECTIVE JUROR:  Positive. |
| 10:08 | 23 | I would say I would be fair, honest, and I would |
| 10:08 | 24 | be patient enough to go through the -- weather this case. |
| 10:08 | 25 | MR. OVERLAND:  Okay.  Now, let's go to the bad |

Case 2:04-cv-09049-DOC-RNB   Document 9659   Filed 01/20/11   Page 93 of 173   Page ID #:287969
CV 04-9049 DOC - 1/13/2011 - Day 1, Volume 1 of 3

93

10:08  1    stuff.

10:08  2                PROSPECTIVE JUROR:  Bad side.  Even though I am an

10:08  3    opportunist -- I mean, I would love to have both these

10:08  4    companies as a client, but Mattel is --

10:08  5                MR. OVERLAND:  Well, you got one.

10:08  6                PROSPECTIVE JUROR:  Mattel is a client, and I

10:08  7    don't know if that would be a conflict of interest or not,

10:09  8    but I -- I wouldn't want to upset them in any way, even

10:09  9    though I'm trying to be fair.

10:09  10                MR. OVERLAND:  Okay.  Let me ask you about that,

10:09  11   and this was a question that I was going to follow up with

10:09  12   you on.

10:09  13                PROSPECTIVE JUROR:  Okay.

10:09  14                MR. OVERLAND:  Mattel is a client.  Your company

10:09  15   makes money from Mattel, correct?

10:09  16                PROSPECTIVE JUROR:  Correct.

10:09  17                MR. OVERLAND:  And I think you said -- and stop if

10:09  18   I misstate anything that you've said.  Okay?  Just interrupt

10:09  19   me.  This is just us talking.  It's a big client, right?

10:09  20                PROSPECTIVE JUROR:  Yes.

10:09  21                MR. OVERLAND:  Now, let's say you heard the

10:09  22   evidence in this case and you feel that MGA had proved its

10:09  23   case against Mattel, so that an award of damages was what

10:09  24   the law required.  And this is at the end of the case --

10:09  25                PROSPECTIVE JUROR:  Sure.

Case 2:04-cv-09049-DOC-RNB   Document 9659   Filed 01/20/11   Page 94 of 173   Page ID #:287970
CV 04-9049 DOC - 1/13/2011 - Day 1, Volume 1 of 3

94

| | | |
|---|---|---|
| 10:09 | 1 | MR. OVERLAND:  -- against Mattel. |
| 10:09 | 2 | Would you be thinking to yourself, gee, if I award |
| 10:10 | 3 | damages against Mattel, they know I'm on this jury, that's |
| 10:10 | 4 | the end of our business relationship? |
| 10:10 | 5 | PROSPECTIVE JUROR:  That's where the conflict |
| 10:10 | 6 | comes from.  And that's where it would be tough.  It would |
| 10:10 | 7 | be very tough.  I want to be fair, of course, but I would |
| 10:10 | 8 | try to, you know, go through it as fairly as I could. |
| 10:10 | 9 | And if I had to award an amount that would -- I'm |
| 10:10 | 10 | here, I'm swearing that I'm going to give it the best that I |
| 10:10 | 11 | can.  Otherwise, if I think that business is going to |
| 10:10 | 12 | interfere, I'll say that right now. |
| 10:10 | 13 | MR. OVERLAND:  And I guess that's what I'm asking |
| 10:10 | 14 | you.  Do you think that the fact that Mattel is one of your |
| 10:10 | 15 | big clients would in any way enter into that decision? |
| 10:10 | 16 | PROSPECTIVE JUROR:  It might. |
| 10:11 | 17 | MR. OVERLAND:  You want to pass that over, please. |
| 10:11 | 18 | All right.  Tell us the good stuff. |
| 10:11 | 19 | PROSPECTIVE JUROR:  Basically I consider myself a |
| 10:11 | 20 | pretty honest, fair person, level-headed.  I think I could |
| 10:11 | 21 | listen to both sides of the story and come up with what I |
| 10:11 | 22 | think is the right choice for what -- who's right. |
| 10:11 | 23 | MR. OVERLAND:  Anything bad? |
| 10:11 | 24 | PROSPECTIVE JUROR:  I mean, other than not really |
| 10:11 | 25 | wanting to sit on a trial for four months, I can't think of |

Case 2:04-cv-09049-DOC-RNB   Document 9659   Filed 01/20/11   Page 95 of 173   Page ID #:287971
CV 04-9049 DOC - 1/13/2011 - Day 1, Volume 1 of 3

95

10:11   1   a reason why I would be a bad juror.

10:11   2              MR. OVERLAND:  All right.  Thank you.

10:11   3        You want to pass it, please, to Mr. Dearinger.

10:11   4              PROSPECTIVE JUROR:  Pretty much the same.  I would

10:11   5   operate with an open mind.  The bad thing is I really don't

10:11   6   have -- know much about the toy industry one way or the

10:11   7   other.

10:11   8              MR. OVERLAND:  That could be good.

10:11   9              PROSPECTIVE JUROR:  Okay.

10:11   10             MR. OVERLAND:  All right.  Other than that?

10:12   11             PROSPECTIVE JUROR:  No.  I've been on a jury

10:12   12  before, and I kept notes and kept my mind open and decided

10:12   13  by the evidence.

10:12   14             MR. OVERLAND:  You want to pass it to Mr. Cameron,

10:12   15  please.  I'm sorry, Mr. Gerst.

10:12   16             PROSPECTIVE JUROR:  It's Mr. Gerst.  That's fine.

10:12   17  There's going to be a lot of people up here.  I'm sure

10:12   18  you'll do it again.

10:12   19             MR. OVERLAND:  Thank you.

10:12   20             PROSPECTIVE JUROR:  Good.  I'll reiterate what a

10:12   21  lot of other people have said.  I'm fair and impartial.  I

10:12   22  look at all the evidence before I make a decision.  I don't

10:12   23  make hasty judgments.

10:12   24        I think that on the downside, I do have a lot of

10:12   25  personal experience in the very topics that this case is

Case 2:04-cv-09049-DOC-RNB   Document 9659   Filed 01/20/11   Page 96 of 173   Page ID #:287972
CV 04-9049 DOC - 1/13/2011 - Day 1, Volume 1 of 3

96

| | | |
|---|---|---|
| 10:12 | 1 | going to revolve around, both as a lawyer and as a person |
| 10:12 | 2 | who has signed these agreements on both sides of them.  I |
| 10:12 | 3 | think I'm going to have -- I will do my best to keep that |
| 10:12 | 4 | out of there, but I think I come in with a lot of baggage. |
| 10:12 | 5 | MR. OVERLAND:  Why do you think that that is a |
| 10:12 | 6 | downside? |
| 10:12 | 7 | PROSPECTIVE JUROR:  I don't know that it is a |
| 10:12 | 8 | downside.  I'm just saying I have a lot of experience with |
| 10:13 | 9 | it, so I have an understanding of the types of issues that |
| 10:13 | 10 | this case is going to be discussing.  I think I do. |
| 10:13 | 11 | Obviously, I haven't read anyone's briefs, but I think I do. |
| 10:13 | 12 | And I don't think that necessarily would be bad.  I'm just |
| 10:13 | 13 | saying I'm going to have that knowledge and experience in |
| 10:13 | 14 | the background. |
| 10:13 | 15 | I mean, if I had sat on a jury of a car accident |
| 10:13 | 16 | or some sort of criminal case and it was the same type of |
| 10:13 | 17 | case, I suspect I would have the same issue. |
| 10:13 | 18 | MR. OVERLAND:  Okay.  Let's assume you're selected |
| 10:13 | 19 | as a juror and you're sitting in that jury room and you're |
| 10:13 | 20 | talking about what the evidence shows to the other jurors. |
| 10:13 | 21 | Would you be able to go by what the evidence is, or would |
| 10:13 | 22 | you say to one of the jurors, "You know, I got experience in |
| 10:13 | 23 | that, and that's not the way it is." |
| 10:13 | 24 | PROSPECTIVE JUROR:  No.  I would go by what the |
| 10:13 | 25 | evidence is as well as the jury instructions.  I know how |

10:13  1   the system works, and I understand the purpose for the

10:13  2   system.

10:13  3            MR. OVERLAND:  All right.  Okay.  Thank you.

10:13  4            *(Microphone handed to next prospective*

10:13  5       *juror.)*

10:14  6            PROSPECTIVE JUROR:  I think I'm good listener and

10:14  7   very impartial.  Can be very impartial.  Downside is it's a

10:14  8   long time to be away from work and my duties at work.

10:14  9            MR. OVERLAND:  And you say that's a downside

10:14 10   because?

10:14 11            PROSPECTIVE JUROR:  My company does pay for jury

10:14 12   duty, but if it's longer than 21 days -- I mean, they make

10:14 13   exceptions, but it could be a hardship at work.

10:14 14            MR. OVERLAND:  Are you concerned about that?

10:14 15            PROSPECTIVE JUROR:  I am.

10:14 16            MR. OVERLAND:  So if we reached Day 21 --

10:14 17            THE COURT:  Well, we will reach Day 21.  I know

10:14 18   that.

10:14 19            PROSPECTIVE JUROR:  Again, I'm not sure.  I mean,

10:14 20   there are exceptions, they said, my HR department.

10:14 21            THE COURT:  Okay.

10:14 22            MR. OVERLAND:  Have you checked as to whether you

10:14 23   are an exception?

10:14 24            PROSPECTIVE JUROR:  I can find out.  I don't know

10:14 25   at this time, but I don't think it would be a problem.

| | | |
|---|---|---|
| 10:14 | 1 | MR. OVERLAND:  All right.  Is that it for the bad? |
| 10:15 | 2 | Are you done with the bad stuff? |
| 10:15 | 3 | PROSPECTIVE JUROR:  Yeah, that's the bad. |
| 10:15 | 4 | MR. OVERLAND:  Okay.  That's bad. |
| 10:15 | 5 | *(Microphone handed to next prospective* |
| 10:15 | 6 | *juror.)* |
| 10:15 | 7 | Okay.  Yes, ma'am. |
| 10:15 | 8 | PROSPECTIVE JUROR:  I think people would say that |
| 10:15 | 9 | I have a pretty high moral and ethical compass, that I'm |
| 10:15 | 10 | always trying to do what's fair and right. |
| 10:15 | 11 | On the bad side, I've been working with money all |
| 10:15 | 12 | my life, and I take it very seriously.  And a lot of my |
| 10:15 | 13 | coworkers would tell me -- or would tell you that I'm very |
| 10:15 | 14 | tightfisted. |
| 10:15 | 15 | MR. OVERLAND:  Does that mean cheap? |
| 10:15 | 16 | PROSPECTIVE JUROR:  Uh, yeah. |
| 10:15 | 17 | MR. OVERLAND:  Okay.  All right.  Thank you. |
| 10:15 | 18 | Yes, sir? |
| 10:15 | 19 | PROSPECTIVE JUROR:  I -- I -- my personal opinion, |
| 10:15 | 20 | I think I'm -- I should be good to do it based on the -- the |
| 10:15 | 21 | knowledge and the background that I have felt, and also, I |
| 10:16 | 22 | don't know much about the case here.  I don't know much |
| 10:16 | 23 | about Mattel.  I don't know much about MGA, so I should be a |
| 10:16 | 24 | fair one to do it.  The best, I don't think -- I hope I have |
| 10:16 | 25 | some so I can get out of the case, but I'm not going to have |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 10:16 | 1 | anything. |
| 10:16 | 2 | MR. OVERLAND:  You better be careful what you say. |
| 10:16 | 3 | There's a judge sitting there. |
| 10:16 | 4 | PROSPECTIVE JUROR:  You want me to tell the truth, |
| 10:16 | 5 | right? |
| 10:16 | 6 | MR. OVERLAND:  Absolutely, absolutely. |
| 10:16 | 7 | PROSPECTIVE JUROR:  That's what I think. |
| 10:16 | 8 | MR. OVERLAND:  So you're hoping for a bad, but you |
| 10:16 | 9 | can't find anything? |
| 10:16 | 10 | PROSPECTIVE JUROR:  No, I don't think so. |
| 10:16 | 11 | MR. OVERLAND:  All right.  Thank you very much.  I |
| 10:16 | 12 | have no further questions. |
| 10:16 | 13 | THE COURT:  Thank you very much. |
| 10:16 | 14 | You should know we had an informal agreement about |
| 10:16 | 15 | a half hour per side, but I didn't want to interrupt that, |
| 10:16 | 16 | because these choices they're making are absolutely critical |
| 10:16 | 17 | for the next three to four months.  So I want to balance |
| 10:16 | 18 | that out. |
| 10:16 | 19 | Mr. Quinn, if you have any additional questions, |
| 10:16 | 20 | you can ask those questions now.  The time got a little |
| 10:17 | 21 | skewed.  I didn't want to interrupt, but you can have |
| 10:17 | 22 | another ten minutes of questions. |
| 10:17 | 23 | MR. QUINN:  Just a couple, Your Honor. |
| 10:17 | 24 | For Mr. Leong. |
| 10:17 | 25 | PROSPECTIVE JUROR:  Sure.  All right. |

Case 2:04-cv-09049-DOC-RNB   Document 9659   Filed 01/20/11   Page 100 of 173   Page ID #:287976
CV 04-9049 DOC - 1/13/2011 - Day 1, Volume 1 of 3

100

| | | |
|---|---|---|
| 10:17 | 1 | MR. QUINN:  Now, you've told us that Mattel's a |
| 10:17 | 2 | client, and you've been candid with us that that's an issue |
| 10:17 | 3 | for you. |
| 10:17 | 4 | PROSPECTIVE JUROR:  Sure. |
| 10:17 | 5 | MR. QUINN:  If we -- if Mattel is unable to |
| 10:17 | 6 | prove -- in your mind, if you are a juror and Mattel is |
| 10:17 | 7 | unable to prove its case for damages, would you vote to |
| 10:17 | 8 | award damages to Mattel just because they're a client? |
| 10:17 | 9 | PROSPECTIVE JUROR:  No, no.  I mean, obviously, if |
| 10:17 | 10 | you're not able to prove your side, I'll go with what I |
| 10:17 | 11 | think is fair. |
| 10:17 | 12 | MR. QUINN:  And by the same token, if MGA is not |
| 10:17 | 13 | able to prove its side, can you go by whatever is fair based |
| 10:17 | 14 | upon the evidence that's presented? |
| 10:17 | 15 | PROSPECTIVE JUROR:  Sure. |
| 10:17 | 16 | MR. QUINN:  Because I'm -- I'm highly confident |
| 10:18 | 17 | that His Honor will instruct the jury in this case to decide |
| 10:18 | 18 | the case based upon the evidence that's presented in this |
| 10:18 | 19 | courtroom and the legal instructions that the judge gives |
| 10:18 | 20 | the jury.  Is that something that you think you could do if |
| 10:18 | 21 | it's asked of you?  Put out of your mind the fact that one |
| 10:18 | 22 | of your clients is Mattel? |
| 10:18 | 23 | PROSPECTIVE JUROR:  Yes. |
| 10:18 | 24 | MR. QUINN:  Thank you. |
| 10:18 | 25 | THE COURT:  Okay.  All right.  Now, you're going |

CV 04-9049 DOC - 1/13/2011 - Day 1, Volume 1 of 3

101

10:18   1   to take a recess for just a moment.

10:18   2           And let me tell you what's happening during that

10:18   3   recess.

10:18   4           Counsel will not be going to the bathroom.  What

10:18   5   they're going to do is they're going to sit here and consult

10:18   6   with their clients.  The first peremptory is going to pass

10:18   7   to the plaintiff, and then you'll hear them interchange, and

10:18   8   the next peremptory will go to the defense when you come

10:18   9   back.

10:18   10          So for the ladies and gentlemen in the audience,

10:18   11  we're not going to reask all of these questions again.

10:19   12  Those questions -- counsel had about a half hour, which

10:19   13  turned into about 45 minutes, and that's fine.

10:19   14          But if one of these jurors is excused, one of you

10:19   15  will be taken from the audience.  Taken, that's like plucked

10:19   16  from the audience, and there will be five minutes of

10:19   17  questions per side.  And then that process will go very

10:19   18  rapidly.  So with a limited number of preempts that they

10:19   19  have, they're making a critical decision about each one of

10:19   20  you right now that they're going to live with for three to

10:19   21  four months, so we want to give them that time just to talk

10:19   22  amongst themselves.

10:19   23          Now, let me say to you that we will probably

10:19   24  really have the eight of you in a very short period of time.

10:19   25  But once we get eight jurors after the peremptories, we're

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 10:19 | 1 | going to select eight alternates.  Let me tell you now what |
| 10:19 | 2 | that's all about. |
| 10:19 | 3 | Because -- you're taxpayers, right?  Okay.  Well, |
| 10:19 | 4 | you should expect of me that I start at 8:00 and I work |
| 10:19 | 5 | until 12:00 midnight.  That's the first thing you should |
| 10:20 | 6 | expect of me.  And counsel will be in here this weekend |
| 10:20 | 7 | because they enjoy my company and their enthusiasm is |
| 10:20 | 8 | driving this case.  They'll be here Monday. |
| 10:20 | 9 | Counsel, how late were you the other night, 12:30? |
| 10:20 | 10 | MR. McCONVILLE:  Yes, Your Honor. |
| 10:20 | 11 | THE COURT:  We'll be on the record sometimes until |
| 10:20 | 12 | 12:30.  There shouldn't be one piece of evidence I don't |
| 10:20 | 13 | know about well before it's ever presented once we get |
| 10:20 | 14 | started. |
| 10:20 | 15 | Those eight alternates, we hope we never get to, |
| 10:20 | 16 | but trust me we will.  Somebody will get the flu, and it |
| 10:20 | 17 | doesn't make sense that we recess for three or four days. |
| 10:20 | 18 | And that person can't continue, and we will thank that |
| 10:20 | 19 | person and we'll go on. |
| 10:20 | 20 | Hopefully, there are no automobile accidents, a |
| 10:20 | 21 | death, or illness or the care of somebody.  But things do |
| 10:20 | 22 | occur.  One of you will need to check with your employer |
| 10:20 | 23 | maybe during the lunchtime, because there's nothing worse |
| 10:20 | 24 | than some financial pressure that you might have.  They're |
| 10:20 | 25 | paying you for 21 days, but they don't pay you for Day 22, |

10:21  1   and you come to us on Day 22.

10:21  2          Now, if they do say, though -- they do give

10:21  3   exceptions.  I will personally write a letter to each one of

10:21  4   your employers at the beginning of the case thanking them

10:21  5   for their service.  What I'm doing is I'm manipulating them.

10:21  6   That letter says thank you for supplying that jury to us, we

10:21  7   appreciate it.  That usually is enough for the employer.

10:21  8   Sometimes it's not, and then we invite them to come to

10:21  9   Court.  They always enjoy that.

10:21  10         Now, because of the number of you trying to use

10:21  11  only one bathroom stall -- I'm just kidding you.  We have

10:21  12  more than that at the end of the hallway, but there are also

10:21  13  bathrooms on the other floors, like the first floor of the

10:21  14  courthouse, et cetera.  Why don't you take about 25 minutes,

10:21  15  and why don't we reconvene at quarter to the hour.  Okay?

10:21  16         Now, in the meantime, you're going to hear this

10:21  17  numerous times.  You're admonished not to discuss this

10:21  18  matter amongst yourselves, nor form or express any opinion

10:22  19  about the case.

10:22  20         Now, that's the legal and technical thing I'm

10:22  21  supposed to say to you.

10:22  22         The blunt thing is:  Don't talk about it.  Because

10:22  23  if you do, then I get to start all over again.  And who's

10:22  24  paying for that?  Taxpayers of America.  All of you.

10:22  25         Okay.  So you can imagine starting over after

| | | |
|---|---|---|
| 10:22 | 1 | three and a half months.  And would I hesitate?  Not one |
| 10:22 | 2 | bit.  Absolutely love litigation, absolutely enjoy counsel's |
| 10:22 | 3 | company.  If I wasn't doing this, I'd do another case, so |
| 10:22 | 4 | we'll just start over again. |
| 10:22 | 5 | So it's just a kind way.  I'll eventually joke |
| 10:22 | 6 | with you.  I'll say something to you like, "Have you talked |
| 10:22 | 7 | to anybody about the case?" so I can start all over again. |
| 10:22 | 8 | Don't do it.  Okay? |
| 10:22 | 9 | Now, finally, be patient with the case.  You know, |
| 10:22 | 10 | you've heard that both sides are going to have a |
| 10:22 | 11 | presentation, but what you may hear is that things are a |
| 10:22 | 12 | little odd in a civil case.  The party going first can call |
| 10:22 | 13 | witnesses from the other side, witnesses that they don't |
| 10:22 | 14 | even have that would be favorable to their position. |
| 10:23 | 15 | So sometimes you'll have Mattel calling people or |
| 10:23 | 16 | MGA calling people that seem to fit on the other side.  And |
| 10:23 | 17 | sometime a party will decide to conduct their |
| 10:23 | 18 | cross-examination as part of their case; other times they'll |
| 10:23 | 19 | reserve that.  But once we get started, it will be clear. |
| 10:23 | 20 | Just don't take for granted that the party calling |
| 10:23 | 21 | the witness is a witness vouching for that side.  It could |
| 10:23 | 22 | be quite the opposite. |
| 10:23 | 23 | Now, you're admonished once again not to discuss |
| 10:23 | 24 | this matter, not to form or express any opinion. |
| 10:23 | 25 | And because of the time and just the number of |

| | | |
|---|---|---|
| 10:23 | 1 | you, I'm going to ask the eight of you to come back into |
| 10:23 | 2 | this box, be seated.  And let's make that one half hour. |
| 10:23 | 3 | Let's make that five minutes to the hour.  Okay?  That will |
| 10:23 | 4 | give you plenty of time to go downstairs, use the restrooms, |
| 10:23 | 5 | but everybody's back, including everybody in the audience, |
| 10:23 | 6 | at five minutes to 11:00.  Okay? |
| 10:23 | 7 | (Venire recesses.) |
| 10:24 | 8 | (Outside the presence of the venire.) |
| 10:24 | 9 | THE COURT:  All right.  If you would be seated, |
| 10:24 | 10 | counsel.  All right.  The jurors are no longer present.  All |
| 10:25 | 11 | counsel are present. |
| 10:25 | 12 | And, Counsel, are there any motions for cause? |
| 10:25 | 13 | MR. QUINN:  Yes, Your Honor. |
| 10:25 | 14 | MS. KELLER:  Yes, Your Honor. |
| 10:25 | 15 | THE COURT:  All right.  And the motion is |
| 10:25 | 16 | concerning which juror? |
| 10:25 | 17 | MR. QUINN:  Juror No. 1, Paul Gerst, said he was |
| 10:25 | 18 | represented by the Orrick, Herrington firm. |
| 10:25 | 19 | THE COURT:  All right.  Thank you. |
| 10:25 | 20 | And, counsel, your arguments on that matter. |
| 10:25 | 21 | MR. QUINN:  Your Honor, I think being represented |
| 10:25 | 22 | by trial counsel in a previous matter on the face of it |
| 10:25 | 23 | establishes a connection with one of the trial lawyers which |
| 10:25 | 24 | is -- at least gets us off to kind of an unfair start, or a |
| 10:25 | 25 | perception of at least an unfair start. |

| | | |
|---|---|---|
| 10:25 | 1 | THE COURT:  And, counsel? |
| 10:25 | 2 | MS. KELLER:  Your Honor, we have actually checked, |
| 10:25 | 3 | and he was not personally represented by Orrick.  Ms. Hurst |
| 10:25 | 4 | informs me that a company was represented by Orrick, for |
| 10:26 | 5 | whom he worked, and he wasn't even himself sure on the stand |
| 10:26 | 6 | who Orrick represented in the litigation he was involved in. |
| 10:26 | 7 | I don't believe that's adequate for cause. |
| 10:26 | 8 | THE COURT:  Thank you.  Any other motions for |
| 10:26 | 9 | cause? |
| 10:26 | 10 | MR. QUINN:  Your Honor, I would also say he also |
| 10:26 | 11 | is involved in a similar kind of trade secrets case, where |
| 10:26 | 12 | he was sued when he left an employer with trade secrets; and |
| 10:26 | 13 | I think it is the perception that he was represented by |
| 10:26 | 14 | Orrick Herrington which is what matters. |
| 10:26 | 15 | THE COURT:  I would not disqualify on the later |
| 10:26 | 16 | ground.  I'm going to consider the Orrick Herrington |
| 10:26 | 17 | connection in just a moment. |
| 10:26 | 18 | Any other matters for cause? |
| 10:26 | 19 | MS. KELLER:  Yes, Your Honor. |
| 10:26 | 20 | Your Honor, Mr. Leong, because of the fact that |
| 10:26 | 21 | Mattel is a client of his, he has a direct financial |
| 10:26 | 22 | interest in this case in a way, and that, as he said, if he |
| 10:26 | 23 | made Mattel upset, he would be worried that he would lose |
| 10:26 | 24 | business.  And while he seems like a nice guy and he |
| 10:26 | 25 | obviously is going to try his best, he was very candid about |

10:27   1    that.

10:27   2                THE COURT:  Okay.

10:27   3                MS. KELLER:  In addition, Your Honor, there is

10:27   4    another problem with that juror, and that is that he's aware

10:27   5    that Mattel previously won a $100 million verdict against

10:27   6    MGA.

10:27   7                But I really think the fact that Mattel is his

10:27   8    client is such a critical issue in this case, and that he

10:27   9    even expressed spontaneously concern that Mattel could be

10:27   10   upset with him and he could lose business if he came in with

10:27   11   a verdict.  It's going to make it much tougher for him.

10:27   12               THE COURT:  The latter reason would not be a

10:27   13   motion for disqualification; the first may.

10:27   14               Counsel?

10:27   15               MR. QUINN:  Your Honor, what he indicated was that

10:27   16   Mattel has just scheduled its second event ever with his

10:27   17   company, and he has, I think he said, five to six events a

10:27   18   month.  So in excess of 50 per year.  So I don't think that

10:27   19   there's enough of a business nexus here that -- he's got a

10:27   20   large number of clients of which Mattel is just one.

10:27   21               THE COURT:  All right.  Thank you, counsel.

10:27   22               The ruling is as follows:  Mr. Gerst is excused

10:27   23   for cause.  There's a prior relationship with the law firm

10:27   24   involved.  It has the perception of unfairness.

10:28   25               Mr. Leong is excused for cause.  He has a direct

10:28  1   financial interest in this matter, which I think caused him

10:28  2   partiality.  He's been very candid.

10:28  3            All right, counsel.

10:28  4            MS. KELLER:  Your Honor, Ms. Hurst just passed me

10:28  5   a note that said Orrick did not represent Mr. Gerst's

10:28  6   company.  It was a public --

10:28  7            MS. HURST:  We represented the public bond agency

10:28  8   in the transaction, Your Honor.  We did not represent

10:28  9   Mr. Gerst.

10:28  10           THE COURT:  Thank you very much.  They're both

10:28  11  disqualified, Counsel.

10:28  12           MS. KELLER:  There's one additional cause, Your

10:28  13  Honor.

10:28  14           THE COURT:  I'm sorry, Counsel, when I ask "for

10:28  15  cause," that means all of them.

10:28  16           MS. KELLER:  I apologize, Your Honor.

10:28  17           THE COURT:  Who's your next one?

10:28  18           MS. KELLER:  Mr. Cameron, who said that it would

10:28  19  be hard for him to accept the testimony of a gay person,

10:28  20  that he would struggle.  He would try.  He would give it his

10:28  21  best, but because of his personal views that homosexuality

10:28  22  is wrong, it conflicts with his morality, and because of his

10:29  23  Biblical views that he thinks that would be difficult.  And

10:29  24  given the fact that a very major, if not the major witness

10:29  25  in the case is gay, I would ask that he be excused for

| | | |
|---|---|---|
| 10:29 | 1 | cause. |
| 10:29 | 2 | THE COURT:  All right.  Thank you, Counsel. |
| 10:29 | 3 | Counsel? |
| 10:29 | 4 | MR. QUINN:  We would agree. |
| 10:29 | 5 | THE COURT:  It's stipulated, then, to by counsel? |
| 10:29 | 6 | MS. KELLER:  Yes, Your Honor. |
| 10:29 | 7 | MR. QUINN:  Yes. |
| 10:29 | 8 | THE COURT:  All right.  Parties are stipulating to |
| 10:29 | 9 | Mr. Cameron, then. |
| 10:29 | 10 | So we're going to replace Jurors No. 1, No. 7, and |
| 10:29 | 11 | No. 8 when we return. |
| 10:29 | 12 | Now, do you want to continue to excuse these |
| 10:29 | 13 | parties out of the presence of the jury? |
| 10:29 | 14 | In other words, we can do that at sidebar if you |
| 10:29 | 15 | want to so that neither party knows or the jurors don't know |
| 10:29 | 16 | which party is disqualified once we get into court. |
| 10:29 | 17 | MR. QUINN:  Yes, outside the presence would be our |
| 10:29 | 18 | preference. |
| 10:29 | 19 | MS. KELLER:  Yes. |
| 10:29 | 20 | THE COURT:  I'll honor that if you both agree.  Up |
| 10:29 | 21 | to this time, I wasn't going to, but since you have such a |
| 10:29 | 22 | limited number of preempts, we'll do that. |
| 10:29 | 23 | All right, then, counsel, in 25 minutes, please. |
| 10:30 | 24 | I'll be sitting right here.  You go have a restroom break. |
| 10:30 | 25 | *(Recess held at 10:30 a.m.)* |

Case 2:04-cv-09049-DOC-RNB   Document 9659   Filed 01/20/11   Page 110 of 173   Page ID #:287986
CV 04-9049 DOC - 1/13/2011 - Day 1, Volume 1 of 3

110

| | | |
|---|---|---|
| 10:45 | 1 | *(Proceedings resumed at 10:53 a.m.)* |
| 10:45 | 2 | *(In the presence of the venire.)* |
| 10:53 | 3 | THE COURT:  All right.  It's five to the hour. |
| 10:53 | 4 | We're back in session.  The prospective jurors are present, |
| 10:53 | 5 | all counsel, the parties, and the prospective jury. |
| 10:53 | 6 | Ladies and gentlemen, in your absence, there have |
| 10:53 | 7 | been three jurors that have been, in fact, excused.  Let me |
| 10:54 | 8 | begin with the jurors -- and I think I left my sheet -- just |
| 10:54 | 9 | one moment.  I left my sheet back on Linda's desk. |
| 10:54 | 10 | All right.  Mr. Gerst, you've been excused, sir. |
| 10:54 | 11 | Thank you very much.  If you would go back to the jury |
| 10:54 | 12 | commissioner.  And thank you for your service. |
| 10:54 | 13 | PROSPECTIVE JUROR:  Thank you. |
| 10:54 | 14 | THE COURT:  Mr. Leong, you've been excused.  Thank |
| 10:54 | 15 | you very much, sir.  If you would go back to the |
| 10:55 | 16 | commissioner.  Thank you for your service, sir. |
| 10:55 | 17 | Mr. Cameron, you've been excused, sir.  If you |
| 10:55 | 18 | would also go back to the jury service with our thanks and |
| 10:55 | 19 | appreciation. |
| 10:55 | 20 | Your service has been exemplary, for each of the |
| 10:55 | 21 | three. |
| 10:55 | 22 | If you would call the next prospective juror. |
| 10:55 | 23 | THE CLERK:  Mohammad Khameneyan. |
| 10:55 | 24 | THE COURT:  Mr. Khameneyan, if you would go up and |
| 10:55 | 25 | take a seat in Seat No. 1, in the top row. |

| | | |
|---|---|---|
| 10:55 | 1 | And before you call the next juror, let everybody |
| 10:55 | 2 | note that for just a moment. |
| 10:55 | 3 | Thank you, sir. |
| 10:55 | 4 | And if you would call the next prospective juror, |
| 10:55 | 5 | please. |
| 10:55 | 6 | THE CLERK:  Deirdre Chapman. |
| 10:55 | 7 | THE COURT:  Ms. Chapman, if you would come up and |
| 10:55 | 8 | take seat No. 7, please. |
| 10:56 | 9 | And if you would call the next prospective juror |
| 10:56 | 10 | please. |
| 10:56 | 11 | THE CLERK:  Isabel Araujo. |
| 10:56 | 12 | THE COURT:  Ms. Araujo, if you'd take Seat No. 8, |
| 10:56 | 13 | please. |
| 10:56 | 14 | Now, Mr. Khameneyan, did you hear all of the prior |
| 10:56 | 15 | questions? |
| 10:56 | 16 | PROSPECTIVE JUROR:  Yes, sir. |
| 10:56 | 17 | THE COURT:  And the explanation by the Court? |
| 10:56 | 18 | PROSPECTIVE JUROR:  Yes, sir. |
| 10:56 | 19 | THE COURT:  Thank you. |
| 10:56 | 20 | Ms. chapman, did you? |
| 10:56 | 21 | PROSPECTIVE JUROR:  Yes, I did. |
| 10:56 | 22 | THE COURT:  And, Ms. Araujo, did you? |
| 10:56 | 23 | PROSPECTIVE JUROR:  Yes, I did. |
| 10:56 | 24 | THE COURT:  Then my questions are very short. |
| 10:56 | 25 | Mr. Khameneyan, would you be fair and impartial to |

| 10:56 | 1 | both sides? |
| 10:56 | 2 | PROSPECTIVE JUROR:  I have to -- on that day I was |
| 10:56 | 3 | here to fill the forms about this jury duty, I wrote |
| 10:57 | 4 | exactly -- I note -- made notice that I have language issue. |
| 10:57 | 5 | I have been here in the "United" since 2003. |
| 10:57 | 6 | THE COURT:  I see. |
| 10:57 | 7 | PROSPECTIVE JUROR:  I can't understand what's |
| 10:57 | 8 | going on here.  What -- sometimes I have this problem to |
| 10:57 | 9 | answer all the questions.  From this reason, I will excuse |
| 10:57 | 10 | me to -- not to answer you -- your questions sometimes.  I |
| 10:57 | 11 | have sometimes problem to understand the question. |
| 10:57 | 12 | THE COURT:  All right.  I'm not going to excuse |
| 10:57 | 13 | you for that reason.  The parties may.  But if you're a |
| 10:57 | 14 | citizen -- |
| 10:57 | 15 | PROSPECTIVE JUROR:  I'm citizen, yes. |
| 10:57 | 16 | THE COURT:  -- then jury service is welcome.  And |
| 10:57 | 17 | I'll let the parties decide that. |
| 10:57 | 18 | PROSPECTIVE JUROR:  Okay. |
| 10:57 | 19 | THE COURT:  Do you believe that you would be fair |
| 10:57 | 20 | and impartial to both sides? |
| 10:57 | 21 | PROSPECTIVE JUROR:  Yes, sir. |
| 10:57 | 22 | THE COURT:  Would you follow the law that I |
| 10:57 | 23 | instruct you about? |
| 10:57 | 24 | PROSPECTIVE JUROR:  Yes, sir. |
| 10:57 | 25 | THE COURT:  Okay.  Now, do you have any questions |

10:57  1   of me? -- other than thanking you for letting us know that

10:57  2   you might have some difficulty understanding.

10:58  3               PROSPECTIVE JUROR:  Right now, nothing.

10:58  4               THE COURT:  And did you hear my example about this

10:58  5   alleged accident out on the freeway?  It's a pretty silly

10:58  6   example, but it illustrates the difference between a person

10:58  7   who's telling you the truth, but their perception may be not

10:58  8   exactly accurate.

10:58  9               PROSPECTIVE JUROR:  Yes, I understand.

10:58  10              THE COURT:  And then you've heard the explanation

10:58  11  that some people may lie to you?

10:58  12              PROSPECTIVE JUROR:  Yeah.

10:58  13              THE COURT:  You obviously understand the

10:58  14  importance of jury service because you've responded to our

10:58  15  request, which is admirable.

10:58  16              PROSPECTIVE JUROR:  Yes, sir.

10:58  17              THE COURT:  I'm going to turn you over to counsel

10:58  18  in just a few moments, then.

10:58  19              Ms. Chapman -- I don't know whether to say Miss or

10:58  20  Mrs. so I always say Ms.  There's no insult intended -- but

10:58  21  tell me if you've heard all of the prior questions.

10:58  22              PROSPECTIVE JUROR:  Yes.

10:58  23              THE COURT:  And do you believe that you would be

10:58  24  fair and impartial to both sides in this case?

10:58  25              PROSPECTIVE JUROR:  Yes.

CV 04-9049 DOC – 1/13/2011 – Day 1, Volume 1 of 3

114

| | | |
|---|---|---|
| 10:58 | 1 | THE COURT:  Would you follow the law that I |
| 10:58 | 2 | instruct you on? |
| 10:58 | 3 | PROSPECTIVE JUROR:  Yes, sir. |
| 10:59 | 4 | THE COURT:  You know the Supreme Court can change |
| 10:59 | 5 | it.  Congress can change it.  I'm a lowly trial Court.  I'll |
| 10:59 | 6 | follow the law, and expect you to. |
| 10:59 | 7 | Do you have any questions of me? |
| 10:59 | 8 | PROSPECTIVE JUROR:  No. |
| 10:59 | 9 | THE COURT:  Okay.  And then let me have the |
| 10:59 | 10 | microphone turned to Ms. Araujo.  I'll let counsel ask the |
| 10:59 | 11 | questions.  They know an awful lot about you because of the |
| 10:59 | 12 | questionnaire. |
| 10:59 | 13 | Okay.  Ms. Araujo, have you heard all of the prior |
| 10:59 | 14 | questions that were asked? |
| 10:59 | 15 | PROSPECTIVE JUROR:  Yes, Your Honor. |
| 10:59 | 16 | THE COURT:  Would you be fair and impartial to |
| 10:59 | 17 | both sides? |
| 10:59 | 18 | PROSPECTIVE JUROR:  Yes, I would. |
| 10:59 | 19 | THE COURT:  I think that's the most important |
| 10:59 | 20 | question we could ask.  We could take days getting to that |
| 10:59 | 21 | point. |
| 10:59 | 22 | And would you follow the law that I instruct you |
| 10:59 | 23 | on at the end of the case? |
| 10:59 | 24 | PROSPECTIVE JUROR:  Yes, I will. |
| 10:59 | 25 | THE COURT:  Then let me turn you over to counsel. |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 10:59 | 1 | Counsel, about ten minutes, because there's three |
| 10:59 | 2 | jurors. |
| 10:59 | 3 | MR. QUINN:  Thank you, Your Honor. |
| 10:59 | 4 | THE COURT:  Thank you. |
| 10:59 | 5 | MR. QUINN:  Good morning, folks. |
| 10:59 | 6 | Mr. Khameneyan -- I hope I got that close -- let |
| 10:59 | 7 | me start with you.  You've been in this country about seven |
| 10:59 | 8 | years? |
| 10:59 | 9 | PROSPECTIVE JUROR:  Yes, sir. |
| 10:59 | 10 | MR. QUINN:  You indicated on your questionnaire |
| 10:59 | 11 | that you were born in Tabriz. |
| 10:59 | 12 | PROSPECTIVE JUROR:  Yes, sir. |
| 10:59 | 13 | MR. QUINN:  That's where they have a famous souk |
| 10:59 | 14 | or bazaar. |
| 11:00 | 15 | PROSPECTIVE JUROR:  Exactly, yes. |
| 11:00 | 16 | MR. QUINN:  And did you -- where did you -- did |
| 11:00 | 17 | you come to this country from Iran? |
| 11:00 | 18 | PROSPECTIVE JUROR:  Yes, I come to this country |
| 11:00 | 19 | from Iran.  I finish my major in architectural field in |
| 11:00 | 20 | Germany. |
| 11:00 | 21 | MR. QUINN:  I see. |
| 11:00 | 22 | PROSPECTIVE JUROR:  And I have been here in |
| 11:00 | 23 | "United" since 2003. |
| 11:00 | 24 | MR. QUINN:  And you work for a company called Ritz |
| 11:00 | 25 | Interior. |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:00 | 1 | PROSPECTIVE JUROR:  Ritz Interior.  This is |
| 11:00 | 2 | construction and remodeling company. |
| 11:00 | 3 | MR. QUINN:  I see.  And what is your position |
| 11:00 | 4 | there? |
| 11:00 | 5 | PROSPECTIVE JUROR:  My position is like a |
| 11:00 | 6 | supervisor and sometimes foreman.  And I'm doing sometimes |
| 11:00 | 7 | designs for company for kitchen cabinets or some additions. |
| 11:00 | 8 | MR. QUINN:  So you're dealing with customers and |
| 11:00 | 9 | people within the company or -- |
| 11:00 | 10 | PROSPECTIVE JUROR:  Not at all.  Sometimes. |
| 11:00 | 11 | MR. QUINN:  Okay.  And I -- obviously, you deal |
| 11:00 | 12 | with them in the English language? |
| 11:00 | 13 | PROSPECTIVE JUROR:  With English language, I can |
| 11:00 | 14 | talk, I can understand, but I'm so afraid to be sometimes -- |
| 11:00 | 15 | not to be aligned with this situation that's what's going in |
| 11:00 | 16 | the courtroom. |
| 11:00 | 17 | MR. QUINN:  Right. |
| 11:01 | 18 | PROSPECTIVE JUROR:  That's my consideration. |
| 11:01 | 19 | That's it. |
| 11:01 | 20 | MR. QUINN:  Right.  Well, we appreciate that.  And |
| 11:01 | 21 | thank you for your help in filling out that questionnaire |
| 11:01 | 22 | and being candid with us about that concern. |
| 11:01 | 23 | PROSPECTIVE JUROR:  Okay. |
| 11:01 | 24 | MR. QUINN:  Ms. Chapman, you indicated on your |
| 11:01 | 25 | questionnaire that at some point you had an idea that |

| | | |
|---|---|---|
| 11:01 | 1 | somebody else had profited from.  Do you recall saying that? |
| 11:01 | 2 | PROSPECTIVE JUROR:  Yes.  It's in regards to a |
| 11:01 | 3 | performance management system. |
| 11:01 | 4 | MR. QUINN:  Can you tell us a little bit about |
| 11:01 | 5 | that. |
| 11:01 | 6 | PROSPECTIVE JUROR:  Well, a performance management |
| 11:01 | 7 | system wouldn't be a tangible product. |
| 11:01 | 8 | MR. QUINN:  Right. |
| 11:01 | 9 | PROSPECTIVE JUROR:  But it's a method of working |
| 11:01 | 10 | with people to achieve greater results. |
| 11:01 | 11 | MR. QUINN:  And what happened here?  You said that |
| 11:01 | 12 | it was your idea, but somebody else profited from it |
| 11:01 | 13 | somehow. |
| 11:01 | 14 | PROSPECTIVE JUROR:  Many people profited from it, |
| 11:01 | 15 | including myself. |
| 11:01 | 16 | MR. QUINN:  Okay.  I may have misunderstood the |
| 11:02 | 17 | answer on your questionnaire. |
| 11:02 | 18 | So we had some -- there was some questions this |
| 11:02 | 19 | morning about ideas.  Do you have any problem with a concept |
| 11:02 | 20 | that ideas, something that somebody has in their head, can |
| 11:02 | 21 | be very valuable? |
| 11:02 | 22 | PROSPECTIVE JUROR:  I have that idea, yes. |
| 11:02 | 23 | MR. QUINN:  Okay.  And do you have any problem |
| 11:02 | 24 | with the idea that an employer can get into -- can enter |
| 11:02 | 25 | into an agreement with an employee, which provides that |

| | | |
|---|---|---|
| 11:02 | 1 | inventions, designs, discoveries, things like that that an |
| 11:02 | 2 | employee makes in that company's line of business, that they |
| 11:02 | 3 | agree that that's owned by the employer? |
| 11:02 | 4 | Do you have any difficulty with that concept? |
| 11:02 | 5 | PROSPECTIVE JUROR: No. If -- if the employee |
| 11:02 | 6 | signed an agreement that intellectual property belonged to |
| 11:02 | 7 | the company, that -- if that was me, I would respect that. |
| 11:02 | 8 | MR. QUINN: Okay. Your Honor, Ms. Chapman, in one |
| 11:03 | 9 | of her answers to her questions, again, showed -- answered |
| 11:03 | 10 | that question the way some other jurors had that we followed |
| 11:03 | 11 | up outside the presence. |
| 11:03 | 12 | THE COURT: Could we see you for just a moment |
| 11:03 | 13 | privately. |
| 11:03 | 14 | We'll be right back with you, ladies and |
| 11:03 | 15 | gentlemen. |
| 11:03 | 16 | Do you want to finish your questions with |
| 11:03 | 17 | Ms. Araujo? |
| 11:03 | 18 | MR. QUINN: I could. |
| 11:03 | 19 | THE COURT: Well, let's take Ms. Chapman for the |
| 11:03 | 20 | time. She's already left her seat. |
| 11:03 | 21 | *(Sidebar proceedings reported as follows:)* |
| 11:03 | 22 | THE COURT: Okay. Counsel, do you have any |
| 11:03 | 23 | questions of Ms. Chapman? |
| 11:03 | 24 | MR. QUINN: I do, Your Honor. You indicated in |
| 11:04 | 25 | response to one of the questions that you'd heard something |

| 11:04 | 1 | about this case before? |
| 11:04 | 2 | PROSPECTIVE JUROR:  Yes.  I had read about this |
| 11:04 | 3 | case previously. |
| 11:04 | 4 | MR. QUINN:  And what is it that you know about the |
| 11:04 | 5 | case? |
| 11:04 | 6 | PROSPECTIVE JUROR:  Exactly what I put down on my |
| 11:04 | 7 | questionnaire:  That I thought there had been a conclusion |
| 11:04 | 8 | to this case in favor of MGA. |
| 11:04 | 9 | MR. QUINN:  Right.  And how did you learn that? |
| 11:04 | 10 | How did you get that? |
| 11:04 | 11 | PROSPECTIVE JUROR:  Through the media. |
| 11:04 | 12 | MR. QUINN:  Okay.  And for how long have you had |
| 11:04 | 13 | this impression? |
| 11:04 | 14 | PROSPECTIVE JUROR:  That's not something that I'd |
| 11:04 | 15 | recall. |
| 11:04 | 16 | MR. QUINN:  Okay.  Is this -- so as you sit here |
| 11:04 | 17 | now, is it kind of your understanding that it's already |
| 11:04 | 18 | been -- there's an issue in this case that's already been |
| 11:04 | 19 | determined? |
| 11:04 | 20 | PROSPECTIVE JUROR:  Yes, that is my understanding. |
| 11:04 | 21 | MR. QUINN:  There's another issue, Your Honor, on |
| 11:04 | 22 | this questionnaire. |
| 11:04 | 23 | THE COURT:  Question 42.  Let me ask that. |
| 11:04 | 24 | MR. QUINN:  Okay. |
| 11:04 | 25 | THE COURT:  I was concerned about Question No. 42, |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:05 | 1 | and I want to make certain that you're physically well |
| 11:05 | 2 | enough to go through the trial. |
| 11:05 | 3 | PROSPECTIVE JUROR:  I appreciate you bringing me |
| 11:05 | 4 | back here. |
| 11:05 | 5 | THE COURT:  Do you want to read that privately? |
| 11:05 | 6 | But -- I knew you were changing medications, so let me ask |
| 11:05 | 7 | you that question. |
| 11:05 | 8 | Are you able to sustain yourself through a three |
| 11:05 | 9 | to four-month trial? |
| 11:05 | 10 | PROSPECTIVE JUROR:  To be honest with you, I'm not |
| 11:05 | 11 | comfortable with doing that. |
| 11:05 | 12 | THE COURT:  Okay.  Thank you. |
| 11:05 | 13 | Counsel, do you have questions? |
| 11:05 | 14 | MS. KELLER:  The only question I had is, you had |
| 11:05 | 15 | mentioned a doctor's appointment or doctor's appointments. |
| 11:05 | 16 | PROSPECTIVE JUROR:  Yes. |
| 11:05 | 17 | MS. KELLER:  And if you did remain on the jury, |
| 11:05 | 18 | would it be possible to schedule those on Mondays, when the |
| 11:05 | 19 | Court's not in session? |
| 11:05 | 20 | PROSPECTIVE JUROR:  I think that might be |
| 11:05 | 21 | difficult for me, given the current situation in my life. |
| 11:05 | 22 | MS. KELLER:  So you think it's too stressful for |
| 11:05 | 23 | you? |
| 11:05 | 24 | PROSPECTIVE JUROR:  Yes, I do. |
| 11:05 | 25 | MS. KELLER:  Okay. |

CV 04-9049 DOC - 1/13/2011 - Day 1, Volume 1 of 3

121

| 11:05 | 1 | THE COURT: Counsel? |
| 11:05 | 2 | MR. QUINN: Nothing, Your Honor. |
| 11:05 | 3 | THE COURT: Thank you very much. I appreciate |
| 11:05 | 4 | your answers. If you would go back. |
| 11:06 | 5 | Mr. Overland, I didn't mean to exclude you. |
| 09:18 | 6 | *(Juror exits sidebar proceedings.)* |
| 11:06 | 7 | THE COURT: Do you want to stipulate? |
| 11:06 | 8 | MR. QUINN: We're prepared to stipulate. |
| 11:06 | 9 | MS. KELLER: Sure. |
| 11:06 | 10 | THE COURT: Let's do it. |
| 11:06 | 11 | Mr. Overland? |
| 11:06 | 12 | MR. OVERLAND: Yes. |
| 11:06 | 13 | THE COURT: There's a stipulation because of |
| 11:06 | 14 | Question No. 42. This would be extraordinarily stressful |
| 11:06 | 15 | for her. Thank you very much, Counsel. |
| 11:06 | 16 | *(Sidebar proceedings concluded.)* |
| 11:06 | 17 | *(In open court in the presence of the* |
| 11:06 | 18 | *venire.)* |
| 11:06 | 19 | THE COURT: Ms. Chapman, thank you very much. |
| 11:06 | 20 | Counsel are going to thank and excuse your attendance by |
| 11:06 | 21 | stipulation. Your attendance is appreciated. |
| 11:06 | 22 | PROSPECTIVE JUROR: Thank you. |
| 11:06 | 23 | THE COURT: Call another juror, please. |
| 11:06 | 24 | THE CLERK: Victoria Riley. |
| 11:07 | 25 | THE COURT: Ms. Riley, have you heard all the |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:07 | 1 | prior questions? |
| 11:07 | 2 | PROSPECTIVE JUROR:  Yes, sir. |
| 11:07 | 3 | THE COURT:  Would you be fair and impartial to |
| 11:07 | 4 | both sides? |
| 11:07 | 5 | PROSPECTIVE JUROR:  Yes, sir. |
| 11:07 | 6 | THE COURT:  Would you follow the law? |
| 11:07 | 7 | PROSPECTIVE JUROR:  Yes. |
| 11:07 | 8 | THE COURT:  Do you have any questions of me at |
| 11:07 | 9 | this time? |
| 11:07 | 10 | PROSPECTIVE JUROR:  No, sir. |
| 11:07 | 11 | THE COURT:  Counsel know an extraordinary amount |
| 11:07 | 12 | because you filled out the questionnaire.  Normally, a case |
| 11:07 | 13 | like this might take a day or two, but we'll have a jury |
| 11:07 | 14 | today. |
| 11:07 | 15 | Counsel, your questions of Ms. Riley, and then |
| 11:07 | 16 | Ms. Araujo. |
| 11:07 | 17 | MR. QUINN:  Thank you, Your Honor. |
| 11:07 | 18 | Good morning. |
| 11:07 | 19 | PROSPECTIVE JUROR:  Good morning. |
| 11:07 | 20 | MR. QUINN:  You work as an accounting clerk in |
| 11:07 | 21 | some type of manufacturing business? |
| 11:07 | 22 | PROSPECTIVE JUROR:  Yes, sir. |
| 11:07 | 23 | MR. QUINN:  Could you share with us what that |
| 11:07 | 24 | business is. |
| 11:07 | 25 | PROSPECTIVE JUROR:  It's a machine shop.  We |

| | | |
|---|---|---|
| 11:07 | 1 | produce tools for precision measuring machines. |
| 11:07 | 2 | MR. QUINN:  All right.  And can you give us some |
| 11:08 | 3 | idea how large it is, maybe in terms of number of employees? |
| 11:08 | 4 | PROSPECTIVE JUROR:  Twelve -- uh, eleven |
| 11:08 | 5 | employees. |
| 11:08 | 6 | MR. QUINN:  Eleven.  Okay.  At this machine shop, |
| 11:08 | 7 | do you have any types of proprietary information that folks |
| 11:08 | 8 | deal with, or confidential information? |
| 11:08 | 9 | PROSPECTIVE JUROR:  Not really. |
| 11:08 | 10 | MR. QUINN:  Not really? |
| 11:08 | 11 | PROSPECTIVE JUROR:  No.  It's a small industry. |
| 11:08 | 12 | MR. QUINN:  Okay.  You indicated, in response to |
| 11:08 | 13 | one of the questions, that an employee leaving and taking |
| 11:08 | 14 | things belonging to the employer or taking information in |
| 11:08 | 15 | with them could be stealing. |
| 11:08 | 16 | Do you recall writing that answer in? |
| 11:08 | 17 | PROSPECTIVE JUROR:  I remember the question. |
| 11:08 | 18 | MR. QUINN:  Okay. |
| 11:08 | 19 | PROSPECTIVE JUROR:  I was thinking of tangible |
| 11:08 | 20 | items. |
| 11:08 | 21 | MR. QUINN:  All right. |
| 11:08 | 22 | THE COURT:  Stapler. |
| 11:08 | 23 | MR. QUINN:  Okay.  So that's exactly where I was |
| 11:08 | 24 | going? |
| 11:08 | 25 | Let me ask you about intangible items.  Do you |

| | | |
|---|---|---|
| 11:08 | 1 | believe or have any problem with the idea that an intangible |
| 11:08 | 2 | item can be valuable and protectable? |
| 11:09 | 3 | PROSPECTIVE JUROR:  I don't have a problem with |
| 11:09 | 4 | that, no.  I believe it can be. |
| 11:09 | 5 | MR. QUINN:  Like intellectual property? |
| 11:09 | 6 | PROSPECTIVE JUROR:  Uh-huh. |
| 11:09 | 7 | MR. QUINN:  Or do you think ideas, for example, |
| 11:09 | 8 | can be valuable things that somebody has in their head? |
| 11:09 | 9 | PROSPECTIVE JUROR:  Of course. |
| 11:09 | 10 | MR. QUINN:  Like a design or formula or something |
| 11:09 | 11 | like that? |
| 11:09 | 12 | PROSPECTIVE JUROR:  Uh-huh, yes. |
| 11:09 | 13 | MR. QUINN:  Thank you. |
| 11:09 | 14 | Ms. Araujo? |
| 11:09 | 15 | PROSPECTIVE JUROR:  Yes. |
| 11:09 | 16 | MR. QUINN:  You're from Peru? |
| 11:09 | 17 | PROSPECTIVE JUROR:  Yes, from Lima. |
| 11:09 | 18 | MR. QUINN:  How long have you been in this |
| 11:09 | 19 | country? |
| 11:09 | 20 | PROSPECTIVE JUROR:  Oh, goodness, for at least 33 |
| 11:09 | 21 | years. |
| 11:09 | 22 | MR. QUINN:  Do you have occasion to go back? |
| 11:09 | 23 | PROSPECTIVE JUROR:  Rarely, but maybe about ten |
| 11:09 | 24 | years ago. |
| 11:09 | 25 | MR. QUINN:  All right.  I'd love to go there some |

| | | |
|---|---|---|
| 11:09 | 1 | day. |
| 11:09 | 2 | You work as a tax specialist? |
| 11:09 | 3 | PROSPECTIVE JUROR:  Yes. |
| 11:09 | 4 | MR. QUINN:  What is it that you do as a tax |
| 11:09 | 5 | specialist? |
| 11:09 | 6 | PROSPECTIVE JUROR:  I'm a business tax specialist, |
| 11:09 | 7 | and handle the larger cases, as far as complaints as far as |
| 11:09 | 8 | sales tax liabilities is concerned. |
| 11:09 | 9 | MR. QUINN:  And this is for? |
| 11:09 | 10 | PROSPECTIVE JUROR:  The California State Board of |
| 11:10 | 11 | Equalization. |
| 11:10 | 12 | MR. QUINN:  Okay.  All right.  And as a tax |
| 11:10 | 13 | specialist, do you work with any types of -- I know there |
| 11:10 | 14 | are these types of proprietary programs where, you know, |
| 11:10 | 15 | from one end, consumers can figure out -- taxpayers can |
| 11:10 | 16 | figure out their taxes, or H&R Block, some of these other |
| 11:10 | 17 | companies.  Do you work with any type of intellectual |
| 11:10 | 18 | property relating to taxes? |
| 11:10 | 19 | PROSPECTIVE JUROR:  No. |
| 11:10 | 20 | MR. QUINN:  Okay. |
| 11:10 | 21 | PROSPECTIVE JUROR:  No. |
| 11:10 | 22 | MR. QUINN:  Do other people in your office? |
| 11:10 | 23 | PROSPECTIVE JUROR:  Um, other programs, you mean? |
| 11:10 | 24 | MR. QUINN:  Yes. |
| 11:10 | 25 | PROSPECTIVE JUROR:  We have our own in-home |

11:10 1    program that is created by the Board that we, as employees,

11:10 2    use.

11:10 3            MR. QUINN:  I see.  That was created by the Board

11:10 4    of Equalization, did you say?

11:10 5            PROSPECTIVE JUROR:  Yes, State Board of

11:10 6    Equalization.

11:10 7            MR. QUINN:  Do you have any -- I've asked the same

11:10 8    question of a number of other jurors.  Do you have any

11:10 9    problem yourself with the idea that an employer would enter

11:10 10   into an agreement with an employee that said, "Anything you

11:10 11   create, any design you come up with, any discovery you make

11:11 12   which is in our line of business, while you're working for

11:11 13   us and we're paying you, is gonna be owned by the employer"?

11:11 14           Do you have any problem with that?

11:11 15           PROSPECTIVE JUROR:  No.  I don't have a problem

11:11 16   with that.

11:11 17           MR. QUINN:  Even if that work is done after hours,

11:11 18   after 5:00 p.m. or on weekends?

11:11 19           MS. KELLER:  Objection.  Your Honor, I think we

11:11 20   are asking her to pre-judge.

11:11 21           THE COURT:  Sustained.

11:11 22           MR. QUINN:  In your own mind, is there -- do you

11:11 23   think that employers -- you know, when you have these types

11:11 24   of agreements, is there some type of idea that you have that

11:11 25   that only applies between the hour of 9:00 and 5:00?

| 11:11 | 1 | PROSPECTIVE JUROR:  As a state worker, I do work |
| 11:11 | 2 | 8:00 to 5:00, so, yes, I believe so. |
| 11:11 | 3 | MR. QUINN:  But you're aware, of course, that |
| 11:11 | 4 | there are other people, other occupations, other |
| 11:11 | 5 | professions, where the hours aren't so limited sometimes? |
| 11:11 | 6 | PROSPECTIVE JUROR:  Right, yes. |
| 11:11 | 7 | MR. QUINN:  All right.  You three new folks, let |
| 11:11 | 8 | me ask a question to all three of you that I asked to the |
| 11:11 | 9 | previous panel.  You've heard that this case potentially |
| 11:12 | 10 | involves very large amounts of money, potentially a billion |
| 11:12 | 11 | dollars, hundreds of millions of dollars.  Both toy |
| 11:12 | 12 | companies are going to be talking about very big numbers. |
| 11:12 | 13 | So I want to ask whether there's any of you that |
| 11:12 | 14 | have some preconception in your mind as to some limit about, |
| 11:12 | 15 | "You know, I could never vote for a verdict over a certain |
| 11:12 | 16 | amount no matter what the evidence is"? |
| 11:12 | 17 | Not seeing any hands. |
| 11:12 | 18 | All right.  Thank you very much. |
| 11:12 | 19 | THE COURT:  All right.  Thank you, Counsel. |
| 11:12 | 20 | Ms. Keller. |
| 11:12 | 21 | MS. KELLER:  Thank you, Your Honor. |
| 11:12 | 22 | Good morning.  Now we can only talk to the three |
| 11:12 | 23 | new people, so I'm not deliberately trying to ignore |
| 11:12 | 24 | everybody else. |
| 11:12 | 25 | Ms. Araujo, you said your job is you're a business |

CV 04-9049 DOC - 1/13/2011 - Day 1, Volume 1 of 3

128

| | | |
|---|---|---|
| 11:12 | 1 | tax specialist, right? |
| 11:12 | 2 | PROSPECTIVE JUROR:  Yes. |
| 11:12 | 3 | MS. KELLER:  Now, if you prepare taxes for other |
| 11:13 | 4 | people at nights and on weekends, is that the property of |
| 11:13 | 5 | your employer under the terms of the contract you have? |
| 11:13 | 6 | MR. QUINN:  Objection, Your Honor. |
| 11:13 | 7 | THE COURT:  Sustained. |
| 11:13 | 8 | MS. KELLER:  Do you have any kind of contract, |
| 11:13 | 9 | yourself, that governs what you can and can't do when you're |
| 11:13 | 10 | not on the job? |
| 11:13 | 11 | PROSPECTIVE JUROR:  No, not while I'm not on the |
| 11:13 | 12 | job. |
| 11:13 | 13 | MS. KELLER:  I see that you bought Barbie dolls at |
| 11:13 | 14 | some point? |
| 11:13 | 15 | PROSPECTIVE JUROR:  Yes. |
| 11:13 | 16 | MS. KELLER:  And was that for your daughter? |
| 11:13 | 17 | PROSPECTIVE JUROR:  Yes, a few times, and as gifts |
| 11:13 | 18 | also. |
| 11:13 | 19 | MS. KELLER:  Do you know what the Bratz dolls are? |
| 11:13 | 20 | PROSPECTIVE JUROR:  I've heard of them, but I've |
| 11:13 | 21 | never purchased one. |
| 11:13 | 22 | MS. KELLER:  Okay.  Do you have any impression of |
| 11:13 | 23 | them? |
| 11:13 | 24 | PROSPECTIVE JUROR:  No. |
| 11:13 | 25 | MS. KELLER:  Okay.  Mr. Khameneyan? |

| 11:13 | 1 | PROSPECTIVE JUROR:  Yes, ma'am. |

11:13   1          PROSPECTIVE JUROR:  Yes, ma'am.

11:13   2          MS. KELLER:  You have two -- looks like two

11:14   3  daughters, 18 and 24?

11:14   4          PROSPECTIVE JUROR:  Yes, ma'am.

11:14   5          MS. KELLER:  Did you ever buy dolls for them, or

11:14   6  did your wife?  Do you know?

11:14   7          PROSPECTIVE JUROR:  My wife, not me.

11:14   8          MS. KELLER:  She was the doll buyer.

11:14   9          PROSPECTIVE JUROR:  I'm not the person.

11:14  10          MS. KELLER:  Do you know if your daughters had

11:14  11  Barbie dolls or Bratz dolls?

11:14  12          PROSPECTIVE JUROR:  Probably.  I'm not sure.

11:14  13          MS. KELLER:  Okay.  I got it.  I saw on your

11:14  14  questionnaire that one of the things you said was that you

11:14  15  had had a negative experience with immigrants.  Can you tell

11:14  16  us about that?

11:14  17          PROSPECTIVE JUROR:  I do not have any negative --

11:14  18  I crossed that one -- I answered -- just I never had any

11:14  19  problem with any immigrants or something.

11:14  20          MS. KELLER:  Oh, okay.  Well then, we just got it

11:14  21  written down wrong, I guess.

11:14  22          And Ms. Riley, Mr. Quinn asked you some questions

11:14  23  about contracts and whether you had any problem with

11:14  24  contracts that provided that things that were created during

11:15  25  somebody's employment belonged to the employer.  You

CV 04-9049 DOC - 1/13/2011 - Day 1, Volume 1 of 3

130

11:15    1    remember that?

11:15    2            PROSPECTIVE JUROR:  Yes.

11:15    3            MS. KELLER:  Would you agree with me that that

11:15    4    would depend on what the contract said?

11:15    5            PROSPECTIVE JUROR:  Of course.

11:15    6            MS. KELLER:  So the wording of the contract would

11:15    7    be important to you, wouldn't it?

11:15    8            PROSPECTIVE JUROR:  Yes.

11:15    9            MS. KELLER:  Same thing with Mr. Khameneyan:

11:15    10    Would the wording of the contract be important?

11:15    11           PROSPECTIVE JUROR:  *(No audible response.)*

11:15    12           MS. KELLER:  I mean, the example Mr. Quinn was

11:15    13    giving earlier is he was talking about nights and weekends

11:15    14    and whether things the employee did on his own time belonged

11:15    15    to the company.

11:15    16           Would it be important to you to see what was in

11:15    17    the contract itself about that?

11:15    18           PROSPECTIVE JUROR:  Yeah, yes.

11:15    19           MS. KELLER:  Okay.  And I know I -- sometimes I

11:15    20    talk too fast, and court reporters don't like it.  There's

11:15    21    some reporters out there with arthritis because of my

11:15    22    fast-talking, so I'm gonna slow it down.

11:15    23           Ms. Araujo, same thing with you:  Would your

11:16    24    decision depend on what the contract actually said about

11:16    25    whether the employee could work nights and weekends and that

Case 2:04-cv-09049-DOC-RNB   Document 9659   Filed 01/20/11   Page 131 of 173   Page ID #:288007
CV 04-9049 DOC - 1/13/2011 - Day 1, Volume 1 of 3

131

11:16   1    sort of thing?

11:16   2             PROSPECTIVE JUROR:  Yes.

11:16   3             MS. KELLER:  Now, I see -- one of your answers,

11:16   4    you were asked about -- about immigrants, and you said that

11:16   5    immigrants add to the United States melting pot and give us

11:16   6    variety and new experiences and new education.

11:16   7             Can you tell us a little bit about your views?

11:16   8             PROSPECTIVE JUROR:  Oh, gosh.  I -- you know,

11:16   9    since I've been here so many years, I've experienced a lot

11:16  10    of different people here in the United States, not just, I

11:16  11    guess, Caucasians, you know.  And I've learned a lot from

11:16  12    other -- other people that have immigrated to the

11:16  13    United States.

11:16  14             MS. KELLER:  And would that be true of even people

11:16  15    who are homosexual:  You know, that's a different group of

11:17  16    people that you can also learn something from?

11:17  17             PROSPECTIVE JUROR:  Yes, that's true.

11:17  18             MS. KELLER:  Thank you, Your Honor.

11:17  19             I don't think I have anything further.

11:17  20             THE COURT:  All right.  The first peremptory would

11:17  21    pass to the plaintiff -- oh, I'm sorry.

11:17  22             Mr. Overland.

11:17  23             MR. OVERLAND:  Thank you.

11:17  24             THE COURT:  Somehow our time's not working out,

11:17  25    though.  I'm going to give more time to Mattel after your

| | | |
|---|---|---|
| 11:17 | 1 | questions. |
| 11:17 | 2 | MR. OVERLAND:  All right. |
| 11:17 | 3 | I'm gonna try to stick to the two questions that I |
| 11:17 | 4 | asked before, and hopefully you were thinking about it.  But |
| 11:17 | 5 | I have one additional question, too. |
| 11:17 | 6 | First, Mr. Khameneyan -- |
| 11:18 | 7 | PROSPECTIVE JUROR:  Yes, sir. |
| 11:18 | 8 | MR. OVERLAND:  -- the two questions that I asked |
| 11:18 | 9 | of the other jurors, do you remember those? |
| 11:18 | 10 | PROSPECTIVE JUROR:  Yes. |
| 11:18 | 11 | MR. OVERLAND:  Okay.  Tell me, if I were to ask |
| 11:18 | 12 | the person that knows you best in this world -- and it could |
| 11:18 | 13 | be yourself or somebody else -- why you would be a good |
| 11:18 | 14 | juror in this case, what would that person say? |
| 11:18 | 15 | PROSPECTIVE JUROR:  I could be good "jury" because |
| 11:18 | 16 | I'm good listener.  I'm patient person. |
| 11:18 | 17 | The bad things about -- that's the negative point |
| 11:18 | 18 | is -- is my language.  I would like to be part of this jury, |
| 11:18 | 19 | but with language knowledge, I'm just afraid to make wrong |
| 11:18 | 20 | decision.  That's it. |
| 11:18 | 21 | MR. OVERLAND:  Have you had so far any trouble not |
| 11:18 | 22 | understanding the questions? |
| 11:18 | 23 | PROSPECTIVE JUROR:  Couple of them.  Not all of |
| 11:18 | 24 | them.  Couple of them. |
| 11:19 | 25 | MR. OVERLAND:  Okay.  On the whole, though, you've |

Case 2:04-cv-09049-DOC-RNB   Document 9659   Filed 01/20/11   Page 133 of 173   Page ID #:288009
CV 04-9049 DOC - 1/13/2011 - Day 1, Volume 1 of 3

133

11:19   1   been able to understand what's going on?

11:19   2          PROSPECTIVE JUROR:  Yeah, I -- I understood what's

11:19   3   going on.

11:19   4          MR. OVERLAND:  Okay.

11:19   5          PROSPECTIVE JUROR:  But just -- I'm just afraid

11:19   6   sometimes I cannot follow the questions or answers that's --

11:19   7   that's coming -- going on the -- in this process.

11:19   8          MR. OVERLAND:  Okay.  And the additional question

11:19   9   that I have, which I'm going to ask of the others also, is,

11:19  10   in the questionnaire as well as the questions that have been

11:19  11   asked by the lawyers here, there were questions -- for

11:19  12   example, Question No. 25 in the questionnaire asked whether

11:19  13   you thought something was wrong, and I got an answer from

11:19  14   you.

11:19  15          Whatever that answer may have been, if you're

11:19  16   selected as a juror in this case, and even though you may

11:19  17   feel something is wrong, if you hear the instructions that

11:19  18   the Court gives you with respect to the claims that Mattel

11:20  19   is bringing against Mr. Machado, even though you may feel

11:20  20   something is wrong but you feel that it's not illegal

11:20  21   according to what the claim is, would you -- do you think

11:20  22   that that would influence you in terms of your decision,

11:20  23   because you felt it was wrong, even though it's not illegal

11:20  24   according to the instructions that the Court gives you?

11:20  25          PROSPECTIVE JUROR:  It's -- it's -- I don't -- I

| | | |
|---|---|---|
| 11:20 | 1 | cannot understand because I don't -- |
| 11:20 | 2 | MR. OVERLAND:  Am I confusing you? |
| 11:20 | 3 | PROSPECTIVE JUROR:  Yes. |
| 11:20 | 4 | MR. OVERLAND:  Then I've done my job. |
| 11:20 | 5 | *(Laughter in the courtroom.)* |
| 11:20 | 6 | MR. OVERLAND:  Let's try again. |
| 11:20 | 7 | The lawyers have asked questions in terms of |
| 11:20 | 8 | whether you feel something is wrong.  Okay?  And let's say |
| 11:20 | 9 | you've answered, "Yeah, I feel if somebody does this, that's |
| 11:20 | 10 | wrong." |
| 11:20 | 11 | Mattel is bringing certain claims against my |
| 11:21 | 12 | client, Mr. Machado.  The claim isn't that he did something |
| 11:21 | 13 | wrong.  The claim is that he violated a certain law.  And |
| 11:21 | 14 | there may or may not be a difference because -- in terms of |
| 11:21 | 15 | what you think is wrong and in terms of what that law |
| 11:21 | 16 | violation is. |
| 11:21 | 17 | Are you with me so far? |
| 11:21 | 18 | PROSPECTIVE JUROR:  Yeah.  Yes, sir. |
| 11:21 | 19 | MR. OVERLAND:  Okay.  So just because you may feel |
| 11:21 | 20 | something is wrong, even though Mattel hasn't proven at the |
| 11:21 | 21 | end of the case that Mr. Machado has violated the law that |
| 11:21 | 22 | they claim he violated, do you think that you would vote for |
| 11:21 | 23 | Mattel just because you felt it was wrong, even though they |
| 11:21 | 24 | hadn't proven that he had violated the law? |
| 11:21 | 25 | PROSPECTIVE JUROR:  Sir, to be honest, we can just |

| 11:21 | 1 | follow acts and all the documents that we can get in this |
|---|---|---|
| 11:21 | 2 | courtroom; otherwise, making any other decision is my |
| 11:22 | 3 | personal decision.  I don't want to, like -- I don't want |
| 11:22 | 4 | like talk about. |
| 11:22 | 5 | MR. OVERLAND:  Okay.  And part of that decision is |
| 11:22 | 6 | to listen to what Judge Carter will tell you at the end as |
| 11:22 | 7 | to what the law is, right? |
| 11:22 | 8 | PROSPECTIVE JUROR:  Yeah. |
| 11:22 | 9 | MR. OVERLAND:  And you would follow that, right? |
| 11:22 | 10 | PROSPECTIVE JUROR:  Yes. |
| 11:22 | 11 | MR. OVERLAND:  Do you want to pass that to |
| 11:22 | 12 | Ms. Riley, please. |
| 11:22 | 13 | PROSPECTIVE JUROR:  It's hard to say what -- good |
| 11:22 | 14 | things about yourself, right? |
| 11:22 | 15 | MR. OVERLAND:  I'm sure. |
| 11:22 | 16 | PROSPECTIVE JUROR:  I think I'm a good listener. |
| 11:22 | 17 | I spent 18 years raising two children as a single mother, so |
| 11:22 | 18 | I've listened to both sides, lots of stories.  And I think |
| 11:22 | 19 | I'm fair.  And I would be impartial. |
| 11:22 | 20 | Bad things.  I can't think of any real negative -- |
| 11:22 | 21 | time isn't a factor, you know, as far as how long the trial |
| 11:22 | 22 | would go.  And I don't remember the other question. |
| 11:22 | 23 | MR. OVERLAND:  I'm sorry? |
| 11:23 | 24 | PROSPECTIVE JUROR:  There was another question or |
| 11:23 | 25 | just those two? |

| | | |
|---|---|---|
| 11:23 | 1 | MR. OVERLAND:  No.  There's a third question about |
| 11:23 | 2 | the difference between something may be wrong, although it |
| 11:23 | 3 | may not be illegal according to the instructions that |
| 11:23 | 4 | Judge Carter gives you, and whether you would be influenced |
| 11:23 | 5 | because you thought, "Well, this is wrong.  I don't care if |
| 11:23 | 6 | it's illegal or not." |
| 11:23 | 7 | PROSPECTIVE JUROR:  No.  You would have to follow |
| 11:23 | 8 | the instructions and what the judge instructed us to look |
| 11:23 | 9 | at. |
| 11:23 | 10 | MR. OVERLAND:  All right. |
| 11:23 | 11 | Ms. Araujo, tell me why you think -- or why, if |
| 11:23 | 12 | you're the person that knows you best -- you would think |
| 11:23 | 13 | that you would be a good juror in this case. |
| 11:23 | 14 | PROSPECTIVE JUROR:  I think I could be impartial |
| 11:23 | 15 | and pay attention to detail.  And I could pull myself back |
| 11:23 | 16 | and try to look at the whole picture and just view it as a |
| 11:23 | 17 | whole, and take my time in considering the facts. |
| 11:23 | 18 | And as far as the third question's concerned, I |
| 11:23 | 19 | can follow the instructions that the Judge will give us. |
| 11:23 | 20 | MR. OVERLAND:  What about the bad stuff? |
| 11:24 | 21 | PROSPECTIVE JUROR:  Oh. |
| 11:24 | 22 | MR. OVERLAND:  No bad stuff? |
| 11:24 | 23 | PROSPECTIVE JUROR:  I can't think of anything |
| 11:24 | 24 | right now. |
| 11:24 | 25 | MR. OVERLAND:  Okay. |

Case 2:04-cv-09049-DOC-RNB   Document 9659   Filed 01/20/11   Page 137 of 173   Page ID #:288013
CV 04-9049 DOC - 1/13/2011 - Day 1, Volume 1 of 3

137

| | | |
|---|---|---|
| 11:24 | 1 | Ms. Riley, one more thing, if I might get back to |
| 11:24 | 2 | you.  You said you've heard something about this case; is |
| 11:24 | 3 | that right? |
| 11:24 | 4 | PROSPECTIVE JUROR:  Um, I can't recall precisely. |
| 11:24 | 5 | I just -- it was in the news.  It's been, over the last few |
| 11:24 | 6 | years, in the news. |
| 11:24 | 7 | MR. OVERLAND:  You read reports about the case? |
| 11:24 | 8 | PROSPECTIVE JUROR:  I don't -- I just remember |
| 11:24 | 9 | hearing in passing.  I don't think I read anything specific |
| 11:24 | 10 | about it.  I couldn't tell you which side is on -- you know, |
| 11:24 | 11 | I don't have any preconceived ideas about it.  I just am |
| 11:24 | 12 | aware of the Bratz dolls and Mattel, in passing -- just in |
| 11:24 | 13 | very general terms. |
| 11:24 | 14 | MR. OVERLAND:  Is that a no? |
| 11:24 | 15 | PROSPECTIVE JUROR:  That's a no.  Nothing |
| 11:24 | 16 | specific. |
| 11:24 | 17 | MR. OVERLAND:  Okay.  Thank you.  That's it. |
| 11:24 | 18 | Thank you. |
| 11:24 | 19 | THE COURT:  All right.  Now let the attorneys talk |
| 11:24 | 20 | to each other for just a moment.  We're going to start the |
| 11:24 | 21 | peremptories and see who they want to keep. |
| 11:25 | 22 | All right.  Counsel, why don't you have your |
| 11:25 | 23 | discussion quickly.  The first peremptory will pass to the |
| 11:25 | 24 | plaintiff. |
| 11:25 | 25 | Over a trial of this length, give them a little |

| | | |
|---|---|---|
| 11:25 | 1 | forbearance and time.  Once we get going with the trial, |
| 11:25 | 2 | believe me, I keep a pretty fast pace.  But they're going to |
| 11:25 | 3 | live with whoever their choices are for a long, long time on |
| 11:25 | 4 | both sides. |
| 11:25 | 5 | All right.  Counsel, I want to compliment you. |
| 11:25 | 6 | That didn't take long at all.  I'll see you at sidebar for |
| 11:25 | 7 | the first peremptory. |
| 11:25 | 8 | And the reason we're doing that is, frankly, |
| 11:25 | 9 | neither side wants you to know who is excusing you.  Okay? |
| 11:26 | 10 | You're not to be influenced by that, regardless. |
| 11:26 | 11 | *(Sidebar proceedings reported as follows:)* |
| 11:26 | 12 | THE COURT:  Okay.  We're at sidebar. |
| 11:26 | 13 | Your first peremptory for the plaintiff? |
| 11:26 | 14 | MR. QUINN:  We pass. |
| 11:26 | 15 | THE COURT:  Pass? |
| 11:26 | 16 | And that does use one peremptory, you understand? |
| 11:26 | 17 | MR. QUINN:  It does? |
| 11:26 | 18 | MR. McCONVILLE:  Yes. |
| 11:26 | 19 | MR. QUINN:  That's new to me. |
| 11:26 | 20 | THE COURT:  That leaves you three.  Okay? |
| 11:26 | 21 | Okay.  That exercises that peremptory. |
| 11:26 | 22 | All right.  Then, is there a peremptory, while |
| 11:26 | 23 | you're at sidebar, for the defense? |
| 11:26 | 24 | MS. KELLER:  Yes, Your Honor.  Ms. Sheehan. |
| 11:26 | 25 | MR. McCONVILLE:  Juror No. 2. |

11:26  1          MS. KELLER:  No, that's number -- yes, she's
11:26  2  No. 2, Sheehan.
11:26  3          THE COURT:  Number 2, Sheehan, exercised by the
11:27  4  defense.  That is one peremptory.  You have three left.  Is
11:27  5  that understood?
11:27  6          MS. KELLER:  Yes, Your Honor.
11:27  7          THE COURT:  All right.  Thank you very much.
11:27  8          *(Sidebar proceedings concluded.)*
11:27  9          *(In open court in the presence of the*
11:27 10      *venire.)*
11:27 11          THE COURT:  Ms. Sheehan, you are excused from
11:27 12  this.  Thank you very much.  If you go back to the jury
11:27 13  room.  I really appreciate your attendance today.
11:27 14          Would you call another juror, please.
11:28 15          THE CLERK:  Casey Lowe.
11:28 16          THE COURT:  Ms. Lowe, if you'd go up and take Seat
11:28 17  No. 2.
11:28 18          Ms. Lowe, have you heard all the other questions
11:28 19  that have been asked by the Court and counsel?
11:28 20          PROSPECTIVE JUROR:  Yes.
11:28 21          THE COURT:  And you understood my silly example of
11:28 22  the I-5 Freeway over here?  It's just trying to illustrate,
11:28 23  very clumsily on my part, the difference between people who
11:28 24  are telling you the truth -- you know, they might be
11:28 25  misperceived -- and whether that's even important or not,

| | | |
|---|---|---|
| 11:28 | 1 | concerning the issue of the hit-and-run.  Okay? |
| 11:28 | 2 | PROSPECTIVE JUROR:  Yes. |
| 11:28 | 3 | THE COURT:  Okay.  Now, would you be fair and |
| 11:28 | 4 | impartial to both sides?  We could ask that, believe it or |
| 11:28 | 5 | not, all day long.  But that's the fundamental thing we're |
| 11:29 | 6 | about.  Would you be? |
| 11:29 | 7 | PROSPECTIVE JUROR:  Yes. |
| 11:29 | 8 | THE COURT:  Test that microphone.  See if that's |
| 11:29 | 9 | on. |
| 11:29 | 10 | Would you be fair and impartial to both sides? |
| 11:29 | 11 | PROSPECTIVE JUROR:  Yes. |
| 11:29 | 12 | THE COURT:  Would you follow the law? |
| 11:29 | 13 | PROSPECTIVE JUROR:  Yes. |
| 11:29 | 14 | THE COURT:  Then I'll turn you over to counsel. |
| 11:29 | 15 | Counsel. |
| 11:29 | 16 | MR. QUINN:  Thank you. |
| 11:29 | 17 | Good morning, Ms. Lowe. |
| 11:29 | 18 | THE COURT:  Counsel, why don't you take 10 |
| 11:29 | 19 | minutes, if you want to, because timewise I'm going to start |
| 11:29 | 20 | giving you rebuttal 'cause the other side's taking more |
| 11:29 | 21 | time.  I want you to have an equal amount of time. |
| 11:29 | 22 | MR. QUINN:  Thanks, Your Honor.  I'm not going to |
| 11:29 | 23 | need that much time.  Thank you. |
| 11:29 | 24 | THE COURT:  You're welcome. |
| 11:29 | 25 | MR. QUINN:  Ms. Lowe, you have candidly told us |

Case 2:04-cv-09049-DOC-RNB   Document 9659   Filed 01/20/11   Page 141 of 173   Page ID #:288017
CV 04-9049 DOC – 1/13/2011 – Day 1, Volume 1 of 3

141

| 11:29 | 1 | that you're not a big fan of the color pink or Barbies. |

11:29  2      *(Laughter in the courtroom.)*

11:29  3      PROSPECTIVE JUROR:  No.

11:29  4      MR. QUINN:  Is there something behind that that we

11:29  5  ought to know?

11:29  6      PROSPECTIVE JUROR:  Just growing up my gramma

11:29  7  forced Barbies and the color pink on me.

11:29  8      *(Laughter in the courtroom.)*

11:29  9      MR. QUINN:  So you had your fill of that?

11:29  10      PROSPECTIVE JUROR:  Yes.

11:30  11      MR. QUINN:  All right.  As a result of your

11:30  12  grandmother being so aggressive with the color pink when you

11:30  13  were younger, does that leave you with any kind of residual

11:30  14  feelings about Mattel or --

11:30  15      PROSPECTIVE JUROR:  No.

11:30  16      MR. QUINN:  You see a day coming where you might

11:30  17  actually be able to where something pink or -- just kidding.

11:30  18      So this is just kind of a -- something that's in

11:30  19  your background, but it's not something that really affects

11:30  20  your attitude towards the folks at Mattel?

11:30  21      PROSPECTIVE JUROR:  Yes.  There's nothing against

11:30  22  the people.

11:30  23      MR. QUINN:  Okay.  Now, you work in a pharmacy?

11:30  24      PROSPECTIVE JUROR:  I work as a cashier at CVS

11:30  25  Pharmacy.

Case 2:04-cv-09049-DOC-RNB   Document 9659   Filed 01/20/11   Page 142 of 173   Page ID #:288018
CV 04-9049 DOC - 1/13/2011 - Day 1, Volume 1 of 3

142

| | | |
|---|---|---|
| 11:30 | 1 | MR. QUINN:  Okay.  And you indicate that you |
| 11:30 | 2 | profile -- as part of your job, you need to profile people. |
| 11:30 | 3 | Can you tell us what you mean by that. |
| 11:30 | 4 | PROSPECTIVE JUROR:  We just have to keep a watch |
| 11:31 | 5 | on who comes in the door and, you know, profile the -- you |
| 11:31 | 6 | know, teenagers, the kids, what they come in the store with, |
| 11:31 | 7 | what sections are they going to, are they gonna be more |
| 11:31 | 8 | likely to steal or not steal. |
| 11:31 | 9 | MR. QUINN:  Right.  Okay.  And you've heard the |
| 11:31 | 10 | questions that we've all asked the other folks who have sat |
| 11:31 | 11 | up in those chairs? |
| 11:31 | 12 | PROSPECTIVE JUROR:  Yes. |
| 11:31 | 13 | MR. QUINN:  Based on anything -- the questions |
| 11:31 | 14 | that you've heard and what you understand this case is |
| 11:31 | 15 | about, is there anything that you think we ought to know |
| 11:31 | 16 | that would go into whether you could be a good juror for |
| 11:31 | 17 | this case? |
| 11:31 | 18 | PROSPECTIVE JUROR:  Not really. |
| 11:31 | 19 | MR. QUINN:  You don't have any kind of feelings |
| 11:31 | 20 | one way or another about the types of issues we've been |
| 11:31 | 21 | talking about:  Employment agreements or intangible |
| 11:31 | 22 | property, or things of that nature? |
| 11:31 | 23 | PROSPECTIVE JUROR:  No, not really. |
| 11:31 | 24 | MR. QUINN:  Or amounts of damages, the size of |
| 11:31 | 25 | jury awards -- that's not something you have any feelings |

Case 2:04-cv-09049-DOC-RNB   Document 9659   Filed 01/20/11   Page 143 of 173   Page ID #:288019
CV 04-9049 DOC - 1/13/2011 – Day 1, Volume 1 of 3

143

| | | |
|---|---|---|
| 11:31 | 1 | about? |
| 11:31 | 2 | PROSPECTIVE JUROR:  No. |
| 11:32 | 3 | MR. QUINN:  Thank you. |
| 11:32 | 4 | THE COURT:  All right.  Counsel on behalf of |
| 11:32 | 5 | Mr. Machado, why don't you start first. |
| 11:32 | 6 | MR. OVERLAND:  Ms. Lowe, good after- -- good |
| 11:32 | 7 | morning. |
| 11:32 | 8 | The two questions that I've been asking, I'm gonna |
| 11:32 | 9 | repeat 'em again.  I'm not very creative. |
| 11:32 | 10 | But tell me what you think the response would be |
| 11:32 | 11 | if I were to ask somebody who knows you very, very well |
| 11:32 | 12 | intimately, and I were to ask that person, "Do you think |
| 11:32 | 13 | that you would be a good juror in this particular case?" |
| 11:33 | 14 | PROSPECTIVE JUROR:  Yes.  I'm a very honest |
| 11:33 | 15 | person, and I do take in consideration both sides, people, |
| 11:33 | 16 | all the time. |
| 11:33 | 17 | MR. OVERLAND:  Anything else? |
| 11:33 | 18 | PROSPECTIVE JUROR:  No. |
| 11:33 | 19 | I'm a very honest person, very trustworthy. |
| 11:33 | 20 | MR. OVERLAND:  Anything bad?  This is always a |
| 11:33 | 21 | tough one, you know. |
| 11:33 | 22 | PROSPECTIVE JUROR:  *(No response.)* |
| 11:33 | 23 | MR. OVERLAND:  Let's just pretend it's just you |
| 11:33 | 24 | and me talking, and there's nobody else here. |
| 11:33 | 25 | PROSPECTIVE JUROR:  I can't think of anything bad |

Case 2:04-cv-09049-DOC-RNB   Document 9659   Filed 01/20/11   Page 144 of 173   Page ID #:288020
CV 04-9049 DOC – 1/13/2011 – Day 1, Volume 1 of 3

144

| | | |
|---|---|---|
| 11:33 | 1 | that would... |
| 11:33 | 2 | MR. OVERLAND:  Okay.  Thank you. |
| 11:33 | 3 | THE COURT:  Thank you. |
| 11:33 | 4 | And, Ms. Keller. |
| 11:34 | 5 | MS. KELLER:  Good morning. |
| 11:34 | 6 | Don't feel bad about the fact that your gramma |
| 11:34 | 7 | forced pink and Barbies on you, because my mother forced |
| 11:34 | 8 | dolls on me, and I traded for BB guns, so not a problem. |
| 11:34 | 9 | Have you ever heard of the Bratz dolls? |
| 11:34 | 10 | PROSPECTIVE JUROR:  Yes, I have. |
| 11:34 | 11 | MS. KELLER:  Do you have any impression of them? |
| 11:34 | 12 | PROSPECTIVE JUROR:  Not really. |
| 11:34 | 13 | MS. KELLER:  Do you have any impression of Barbie |
| 11:34 | 14 | dolls in general? |
| 11:34 | 15 | PROSPECTIVE JUROR:  No. |
| 11:34 | 16 | MS. KELLER:  When you hear the name "Barbie," what |
| 11:34 | 17 | do you think of? |
| 11:34 | 18 | PROSPECTIVE JUROR:  I generally start to think of |
| 11:34 | 19 | my niece 'cause she's a fan of both Barbies and the Bratz |
| 11:34 | 20 | dolls. |
| 11:34 | 21 | MS. KELLER:  So you're at least familiar with the |
| 11:34 | 22 | two of them, that they're two different brands? |
| 11:34 | 23 | PROSPECTIVE JUROR:  Yes. |
| 11:34 | 24 | MS. KELLER:  Have you heard anything about this |
| 11:34 | 25 | case in the news at all? |

| | | |
|---|---|---|
| 11:34 | 1 | PROSPECTIVE JUROR:  I don't have time to watch TV |
| 11:34 | 2 | or read newspapers.  I am a full-time student and I do work |
| 11:34 | 3 | full time, so I'm hardly ever home. |
| 11:34 | 4 | MS. KELLER:  Wow!  Okay.  I have nothing further. |
| 11:34 | 5 | Thank you. |
| 11:35 | 6 | THE COURT:  I want to make sure:  Can you sit on |
| 11:35 | 7 | this case, then? |
| 11:35 | 8 | PROSPECTIVE JUROR:  I do start school next week, |
| 11:35 | 9 | so probably not. |
| 11:35 | 10 | *(Laughter in the courtroom.)* |
| 11:35 | 11 | THE COURT:  Well, that's kind of critical. |
| 11:35 | 12 | All right.  Counsel, do you want to talk about |
| 11:35 | 13 | this?  Because we literally -- why don't each side talk |
| 11:35 | 14 | about this.  You two talk quietly.  As Mr. Quinn rises, and |
| 11:35 | 15 | Mr. McConville, and they meet at the lectern and quietly |
| 11:35 | 16 | discuss this with Mr. Cote.  Thank you. |
| 11:35 | 17 | I think it will go quicker, but I want to estimate |
| 11:35 | 18 | four months just to be certain. |
| 11:35 | 19 | MS. KELLER:  We're just going to ask you a couple |
| 11:35 | 20 | little follow-up questions. |
| 11:35 | 21 | What classes are you taking? |
| 11:35 | 22 | PROSPECTIVE JUROR:  This semester, I would be |
| 11:36 | 23 | taking English 100, Biology 101, and an online math course. |
| 11:36 | 24 | MS. KELLER:  I have nothing further. |
| 11:36 | 25 | THE COURT:  Counsel, what are your thoughts? |

| 11:36 | 1 | MS. KELLER: We'll stipulate, Your Honor. |

11:36   1       MS. KELLER:  We'll stipulate, Your Honor.

11:36   2       MR. QUINN:  We're prepared to stipulate.

11:36   3       THE COURT:  They're going to stipulate.  Thank you

11:36   4   very much.  We're going to send you back to the jury

11:36   5   commissioner.  Good luck to you.  I'm glad we found that out

11:36   6   now.

11:36   7       Okay.  Call another juror, please.

11:36   8       THE CLERK:  Jairo Fernandez.

11:36   9       THE COURT:  Mr. Fernandez, if you'd take Seat

11:36   10  No. 2.  Thank you, sir.  It's in the top row.

11:36   11      Mr. Fernandez, have you heard all of the prior

11:36   12  questions?

11:36   13      PROSPECTIVE JUROR:  Yes, sir.

11:36   14      THE COURT:  All right.  Are there any questions

11:36   15  that you have of me at this time?

11:37   16      PROSPECTIVE JUROR:  No, sir.

11:37   17      THE COURT:  Would you be fair and impartial to

11:37   18  both sides?

11:37   19      PROSPECTIVE JUROR:  Yes.

11:37   20      THE COURT:  Would you follow the law?

11:37   21      PROSPECTIVE JUROR:  Yes, sir.

11:37   22      THE COURT:  Mr. Quinn.

11:37   23      MR. QUINN:  Good morning.

11:37   24      PROSPECTIVE JUROR:  Good morning.

11:37   25      MR. QUINN:  In your questionnaire, Question 39,

| | | |
|---|---|---|
| 11:37 | 1 | you were asked whether -- to describe any ethical, |
| 11:37 | 2 | religious, political, or other beliefs that may prevent you |
| 11:37 | 3 | from serving as a juror.  And you -- in response to that, |
| 11:37 | 4 | you made reference to being a Christian. |
| 11:37 | 5 | PROSPECTIVE JUROR:  Yes, I'm a believer. |
| 11:37 | 6 | MR. QUINN:  And could you explain for us, please, |
| 11:37 | 7 | how that -- how that relates to your ability to serve. |
| 11:37 | 8 | PROSPECTIVE JUROR:  I don't think it will matter, |
| 11:37 | 9 | to be honest. |
| 11:37 | 10 | MR. QUINN:  Okay.  All right.  So there's nothing |
| 11:37 | 11 | there that would affect your ability -- |
| 11:37 | 12 | PROSPECTIVE JUROR:  No. |
| 11:37 | 13 | MR. QUINN:  -- to serve as a juror in this case? |
| 11:37 | 14 | And you were born in Nicaragua? |
| 11:37 | 15 | PROSPECTIVE JUROR:  That's correct. |
| 11:37 | 16 | MR. QUINN:  How long have you been in this |
| 11:38 | 17 | country? |
| 11:38 | 18 | PROSPECTIVE JUROR:  Twenty-two years. |
| 11:38 | 19 | MR. QUINN:  You indicate that you have some |
| 11:38 | 20 | friends who work in marketing and retail management. |
| 11:38 | 21 | PROSPECTIVE JUROR:  Yes.  I used to have a friend |
| 11:38 | 22 | that was a manager of a retail store. |
| 11:38 | 23 | MR. QUINN:  I'm sorry? |
| 11:38 | 24 | PROSPECTIVE JUROR:  He was a manager of a retail |
| 11:38 | 25 | store. |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:38 | 1 | MR. QUINN:  What type of store? |
| 11:38 | 2 | PROSPECTIVE JUROR:  It was Montgomery Wards.  They |
| 11:38 | 3 | went out of business. |
| 11:38 | 4 | MR. QUINN:  Okay.  Sure.  I remember those. |
| 11:38 | 5 | You -- have you had any experience with either of |
| 11:38 | 6 | the toy companies involved in this case, either Mattel or |
| 11:38 | 7 | MGA? |
| 11:38 | 8 | PROSPECTIVE JUROR:  No. |
| 11:38 | 9 | MR. QUINN:  Or any feelings about either one of |
| 11:38 | 10 | them? |
| 11:38 | 11 | PROSPECTIVE JUROR:  No. |
| 11:38 | 12 | MR. QUINN:  How about any of the other questions |
| 11:38 | 13 | I've asked in terms of employment agreements or proprietary |
| 11:38 | 14 | information?  Is that something that you have any views |
| 11:38 | 15 | about that you could share with us? |
| 11:38 | 16 | PROSPECTIVE JUROR:  No. |
| 11:38 | 17 | MR. QUINN:  Not really? |
| 11:38 | 18 | Thank you. |
| 11:38 | 19 | THE COURT:  And this time, MGA, please. |
| 11:38 | 20 | Ms. Keller. |
| 11:39 | 21 | MS. KELLER:  Thank you, Your Honor. |
| 11:39 | 22 | Good morning. |
| 11:39 | 23 | PROSPECTIVE JUROR:  Good morning. |
| 11:39 | 24 | MS. KELLER:  Mr. Fernandez, now that you've heard |
| 11:39 | 25 | a little about the case, how would you feel about serving on |

Case 2:04-cv-09049-DOC-RNB   Document 9659   Filed 01/20/11   Page 149 of 173   Page ID #:288025
CV 04-9049 DOC - 1/13/2011 - Day 1, Volume 1 of 3

149

| 11:39 | 1 | this jury? |
| 11:39 | 2 | PROSPECTIVE JUROR:  I consider myself a -- fair |
| 11:39 | 3 | and balanced.  I try to look at both sides and, you know, |
| 11:39 | 4 | make my own judgment.  Hopefully it's a fair one. |
| 11:39 | 5 | MS. KELLER:  Okay.  Is it -- would serving on this |
| 11:39 | 6 | jury be something that you would look forward to, or |
| 11:39 | 7 | something you would see as a civic duty or -- or what |
| 11:39 | 8 | exactly?  How do you feel about it? |
| 11:39 | 9 | PROSPECTIVE JUROR:  This my first time, so I -- |
| 11:39 | 10 | kind of interesting. |
| 11:39 | 11 | MS. KELLER:  Okay. |
| 11:39 | 12 | PROSPECTIVE JUROR:  Other than the fact that I'm |
| 11:39 | 13 | not getting paid for it, but that's a different story. |
| 11:39 | 14 | *(Laughter in the courtroom.)* |
| 11:39 | 15 | MS. KELLER:  That makes it less interesting. |
| 11:39 | 16 | Have you heard of the Bratz dolls? |
| 11:39 | 17 | PROSPECTIVE JUROR:  No, never. |
| 11:39 | 18 | MS. KELLER:  You've heard of Barbies, I'll bet? |
| 11:39 | 19 | PROSPECTIVE JUROR:  Yeah. |
| 11:39 | 20 | MS. KELLER:  Okay.  Can you think of any reason at |
| 11:39 | 21 | all, anything about yourself that we would want to know, if |
| 11:39 | 22 | you were standing where I'm standing right now?  Anything |
| 11:40 | 23 | about you. |
| 11:40 | 24 | PROSPECTIVE JUROR:  I'm a truck driver.  Really |
| 11:40 | 25 | love to -- I love California.  Other than that, I'm -- what |

Case 2:04-cv-09049-DOC-RNB   Document 9659   Filed 01/20/11   Page 150 of 173   Page ID #:288026
CV 04-9049 DOC – 1/13/2011 – Day 1, Volume 1 of 3

150

| | | |
|---|---|---|
| 11:40 | 1 | else do you want to know? |
| 11:40 | 2 | MS. KELLER:  That's okay.  That's okay.  That's |
| 11:40 | 3 | plenty for me. |
| 11:40 | 4 | Thank you. |
| 11:40 | 5 | THE COURT:  Mr. Overland. |
| 11:40 | 6 | MR. OVERLAND:  I'm gonna cut to the chase here, |
| 11:40 | 7 | 'cause I learned something from the last juror. |
| 11:40 | 8 | You said you're not getting paid? |
| 11:40 | 9 | PROSPECTIVE JUROR:  That's correct, sir. |
| 11:40 | 10 | MR. OVERLAND:  Is that gonna be a problem? |
| 11:40 | 11 | PROSPECTIVE JUROR:  Well, if the trial goes for as |
| 11:40 | 12 | long as it's gonna go for, yeah, it's gonna be a financial |
| 11:40 | 13 | problem. |
| 11:40 | 14 | MR. OVERLAND:  All right.  I take it that you |
| 11:41 | 15 | don't have a trust fund or -- independently wealthy.  You |
| 11:41 | 16 | depend on what you get from being a truck driver, right? |
| 11:41 | 17 | PROSPECTIVE JUROR:  That's correct. |
| 11:41 | 18 | MR. OVERLAND:  All right.  So if you have to sit |
| 11:41 | 19 | here for four months, is that gonna affect your family |
| 11:41 | 20 | financially? |
| 11:41 | 21 | PROSPECTIVE JUROR:  A little bit. |
| 11:41 | 22 | MR. OVERLAND:  Only a little? |
| 11:41 | 23 | PROSPECTIVE JUROR:  Yes. |
| 11:41 | 24 | MR. OVERLAND:  You're okay with it? |
| 11:41 | 25 | PROSPECTIVE JUROR:  I would like to serve.  I |

| | | |
|---|---|---|
| 11:41 | 1 | mean, it would be a nice experience. |
| 11:41 | 2 | MR. OVERLAND:  Okay.  That's admirable, I think. |
| 11:41 | 3 | So I just want to make sure you're okay with it and are not |
| 11:41 | 4 | going to be thinking during the trials, "Geez, I got to get |
| 11:41 | 5 | to work 'cause I really need the money." |
| 11:41 | 6 | PROSPECTIVE JUROR:  I'll try not to. |
| 11:41 | 7 | MR. OVERLAND:  Okay.  All right.  Thank you. |
| 11:41 | 8 | THE COURT:  The peremptory passes to the plaintiff |
| 11:41 | 9 | in this matter. |
| 11:42 | 10 | And counsel for the defense, you might want to |
| 11:42 | 11 | discuss this matter, as well. |
| 11:42 | 12 | Plaintiff's counsel, if you want to gather your |
| 11:42 | 13 | group also and discuss this.  Mr. Zeller, if you want to. |
| 11:42 | 14 | Mr. Eckert. |
| 11:42 | 15 | Mr. Larian. |
| 11:42 | 16 | Now, bear with me.  At the rate we're going, we'll |
| 11:42 | 17 | have a jury.  But we're going to go into the lunch hour just |
| 11:42 | 18 | a little bit for everybody.  'Cause I want to get the eight |
| 11:42 | 19 | jurors, then send you to lunch and bring you back and get |
| 11:42 | 20 | the eight alternates.  Okay?  So we'll take a little bit of |
| 11:42 | 21 | the lunch hour. |
| 11:43 | 22 | All right.  Then, Counsel, if I could see you at |
| 11:43 | 23 | sidebar, please. |
| 11:43 | 24 | Debbie. |
| 11:43 | 25 | *(Sidebar proceedings reported as follows:)* |

DEBBIE GALE, U.S. COURT REPORTER

| 11:44 | 1 | THE COURT:  All right.  The peremptory lies with |
| 11:44 | 2 | the plaintiff. |
| 11:44 | 3 | MR. QUINN:  We will pass, Your Honor. |
| 11:44 | 4 | THE COURT:  The peremptory now passes to the |
| 11:44 | 5 | defendant. |
| 11:44 | 6 | And that uses your second peremptory.  Okay? |
| 11:44 | 7 | Back to the defendant.  I'm sorry. |
| 11:44 | 8 | MS. KELLER:  We would ask the Court to thank and |
| 11:44 | 9 | excuse No. 3, Ms. Dyas. |
| 11:44 | 10 | THE COURT:  Ms. Dyas. |
| 11:44 | 11 | All right.  Thank you. |
| 11:44 | 12 | MS. KELLER:  So, Your Honor, we each have two |
| 11:44 | 13 | left? |
| 11:44 | 14 | THE COURT:  Each side has two left. |
| 11:44 | 15 | Thank you. |
| 11:44 | 16 | *(Sidebar proceedings concluded.)* |
| 11:44 | 17 | *(In open court in the presence of the* |
| 11:45 | 18 | *venire.)* |
| 11:45 | 19 | THE COURT:  We're going to thank and excuse |
| 11:45 | 20 | Ms. Dyas.  Thank you very much.  If you would go back to the |
| 11:45 | 21 | jury room with our thanks and appreciation.  And both sides |
| 11:45 | 22 | appreciate your attendance today. |
| 11:45 | 23 | Call another juror, please. |
| 11:45 | 24 | THE CLERK:  Alexandria Simler. |
| 11:45 | 25 | THE COURT:  Ms. Simler, if you would take |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:45 | 1 | Seat No. 3, please. |
| 11:46 | 2 | How are you today? |
| 11:46 | 3 | PROSPECTIVE JUROR:  I'm good. |
| 11:46 | 4 | THE COURT:  Have you heard all of the other |
| 11:46 | 5 | questions that have been asked by plaintiff's counsel, |
| 11:46 | 6 | defense counsel, and the Court? |
| 11:46 | 7 | PROSPECTIVE JUROR:  Yes, I have. |
| 11:46 | 8 | THE COURT:  All right.  And the most important |
| 11:46 | 9 | question I could ask at the end of the day is, would you be |
| 11:46 | 10 | fair and impartial to both sides? |
| 11:46 | 11 | PROSPECTIVE JUROR:  Yes, I think I can definitely |
| 11:46 | 12 | be fair. |
| 11:46 | 13 | THE COURT:  And would you follow the law? |
| 11:46 | 14 | PROSPECTIVE JUROR:  Yes. |
| 11:46 | 15 | THE COURT:  Now, we know a tremendous amount about |
| 11:46 | 16 | you because of the questionnaire.  That probably would have |
| 11:46 | 17 | taken two or three days, literally, to get the jury.  But |
| 11:46 | 18 | because of that questionnaire, I have no questions. |
| 11:46 | 19 | PROSPECTIVE JUROR:  Okay. |
| 11:46 | 20 | THE COURT:  Counsel.  Mr. Quinn. |
| 11:46 | 21 | MR. QUINN:  Thank you, Your Honor. |
| 11:46 | 22 | Good morning. |
| 11:46 | 23 | PROSPECTIVE JUROR:  Good morning. |
| 11:46 | 24 | MR. QUINN:  You're a part-time substitute teacher? |
| 11:46 | 25 | PROSPECTIVE JUROR:  Yes. |

| | | |
|---|---|---|
| 11:46 | 1 | MR. QUINN:  In the public schools? |
| 11:46 | 2 | PROSPECTIVE JUROR:  Yes. |
| 11:46 | 3 | MR. QUINN:  You enjoy doing that? |
| 11:46 | 4 | PROSPECTIVE JUROR:  I do. |
| 11:46 | 5 | MR. QUINN:  Particular subjects? |
| 11:46 | 6 | PROSPECTIVE JUROR:  Math, science, English, mostly |
| 11:46 | 7 | whatever they call for. |
| 11:46 | 8 | MR. QUINN:  What grades? |
| 11:46 | 9 | PROSPECTIVE JUROR:  Mostly high school, but |
| 11:47 | 10 | K through 12. |
| 11:47 | 11 | MR. QUINN:  And how long have you been doing that? |
| 11:47 | 12 | PROSPECTIVE JUROR:  Seven years. |
| 11:47 | 13 | MR. QUINN:  Okay.  You indicated that you and your |
| 11:47 | 14 | husband have both signed nonsolicitation/noncompete |
| 11:47 | 15 | agreements. |
| 11:47 | 16 | PROSPECTIVE JUROR:  Right. |
| 11:47 | 17 | MR. QUINN:  That was in connection with -- |
| 11:47 | 18 | PROSPECTIVE JUROR:  Not teaching. |
| 11:47 | 19 | MR. QUINN:  Okay. |
| 11:47 | 20 | PROSPECTIVE JUROR:  Previous careers.  Both of us |
| 11:47 | 21 | were in outside sales and service companies, so definitely |
| 11:47 | 22 | intangible products and services. |
| 11:47 | 23 | MR. QUINN:  I'm sorry.  Did you say "tangible"? |
| 11:47 | 24 | PROSPECTIVE JUROR:  "Intangible." |
| 11:47 | 25 | MR. QUINN:  "Intangible."  Various kinds of |

| | | |
|---|---|---|
| 11:47 | 1 | service? |
| 11:47 | 2 | PROSPECTIVE JUROR:  Yes. |
| 11:47 | 3 | MR. QUINN:  So are you familiar with the concept |
| 11:47 | 4 | that an idea itself can be very valuable or -- |
| 11:47 | 5 | PROSPECTIVE JUROR:  Yes. |
| 11:47 | 6 | MR. QUINN:  -- proprietary? |
| 11:47 | 7 | PROSPECTIVE JUROR:  Yes. |
| 11:47 | 8 | MR. QUINN:  Thank you very much. |
| 11:47 | 9 | THE COURT:  Ms. Keller. |
| 11:47 | 10 | MS. KELLER:  Good morning. |
| 11:47 | 11 | PROSPECTIVE JUROR:  Good morning. |
| 11:47 | 12 | MS. KELLER:  Ms. Simler, I want to follow up with |
| 11:48 | 13 | a couple of your answers.  You said that you had family |
| 11:48 | 14 | members in Human Resources.  Could you explain that? |
| 11:48 | 15 | PROSPECTIVE JUROR:  Um, I think that was more on |
| 11:48 | 16 | acquaintances, not family members.  Maybe I marked the wrong |
| 11:48 | 17 | box on that. |
| 11:48 | 18 | MS. KELLER:  Okay.  Who is it that you know who's |
| 11:48 | 19 | in Human Resources? |
| 11:48 | 20 | PROSPECTIVE JUROR:  Oh, just through personal |
| 11:48 | 21 | friends, through companies that both my husband and I worked |
| 11:48 | 22 | for.  Do you want a specific name? |
| 11:48 | 23 | MS. KELLER:  No.  I just wondered what the |
| 11:48 | 24 | relationship was. |
| 11:48 | 25 | PROSPECTIVE JUROR:  Oh. |

| | | |
|---|---|---|
| 11:48 | 1 | MS. KELLER:  And you said you also have |
| 11:48 | 2 | familiarity with product design, development, trade secrets. |
| 11:48 | 3 | PROSPECTIVE JUROR:  Yes. |
| 11:48 | 4 | MS. KELLER:  How does that -- how did that come |
| 11:48 | 5 | about? |
| 11:48 | 6 | PROSPECTIVE JUROR:  Well, the industries that I've |
| 11:48 | 7 | been working for, both computer skill -- or computers and |
| 11:48 | 8 | training skills.  And my husband is, um, a senior vice |
| 11:48 | 9 | president of a major corporation and services computer sales |
| 11:48 | 10 | related.  So, on both, quite a bit.  I don't know where to |
| 11:48 | 11 | start on that one. |
| 11:49 | 12 | MS. KELLER:  Okay.  What's the corporation your |
| 11:49 | 13 | husband works for? |
| 11:49 | 14 | PROSPECTIVE JUROR:  Oracle. |
| 11:49 | 15 | MS. KELLER:  Okay.  And, trying to think, is there |
| 11:49 | 16 | anything else I need to know. |
| 11:49 | 17 | I don't think so.  Thank you. |
| 11:49 | 18 | PROSPECTIVE JUROR:  Okay. |
| 11:49 | 19 | THE COURT:  All right.  Thank you. |
| 11:49 | 20 | Mr. Overland. |
| 11:49 | 21 | MR. OVERLAND:  Good afternoon -- almost -- yeah, |
| 11:49 | 22 | we got a little bit. |
| 11:49 | 23 | Tell me about the two questions that I've been |
| 11:49 | 24 | asking.  First, tell me all the good things about yourself |
| 11:49 | 25 | as to why -- and I ask this question with the understanding |

| | | |
|--|--|--|
| 11:49 | 1 | that you know who's suing who, at least here, and who the |
| 11:49 | 2 | parties are, and you got an idea of what the issues are. |
| 11:50 | 3 | PROSPECTIVE JUROR:  Right.  I think positive |
| 11:50 | 4 | qualities would be -- I think several people have mentioned |
| 11:50 | 5 | it before -- but I'm a, I feel, a good listener, patient, |
| 11:50 | 6 | and feel like -- I have managed people and have been in |
| 11:50 | 7 | different situations where you need to listen to both sides |
| 11:50 | 8 | to make a judgment call. |
| 11:50 | 9 | Um, probably on the negative side, I think there's |
| 11:50 | 10 | a few.  Although I can be patient, I can also be impatient |
| 11:50 | 11 | when dealing with just frivolous kind of information, that |
| 11:50 | 12 | people are just trying to drag things on.  So perhaps I'm a |
| 11:50 | 13 | little bit more sensitive to time management.  But can be |
| 11:50 | 14 | patient for details. |
| 11:50 | 15 | Does that make sense? |
| 11:50 | 16 | MR. OVERLAND:  I understand you completely. |
| 11:50 | 17 | PROSPECTIVE JUROR:  Okay. |
| 11:50 | 18 | MR. OVERLAND:  And have you become impatient |
| 11:50 | 19 | already? |
| 11:50 | 20 | PROSPECTIVE JUROR:  Not yet, no. |
| 11:50 | 21 | MR. OVERLAND:  Not yet.  Then we're okay, then. |
| 11:50 | 22 | Thank you. |
| 11:50 | 23 | PROSPECTIVE JUROR:  Um-hum. |
| 11:51 | 24 | THE COURT:  All right.  Then, Counsel, if you want |
| 11:51 | 25 | to consult for just a moment with the -- your colleagues. |

CV 04-9049 DOC – 1/13/2011 – Day 1, Volume 1 of 3

158

| | | |
|---|---|---|
| 11:52 | 1 | All right.  Then, Counsel, if I could see you at |
| 11:52 | 2 | sidebar for just a moment. |
| 11:52 | 3 | *(Sidebar proceedings reported as follows:)* |
| 11:52 | 4 | THE COURT:  All right.  Then we're back at |
| 11:52 | 5 | sidebar. |
| 11:52 | 6 | Peremptory now passes back to the plaintiff. |
| 11:53 | 7 | MR. QUINN:  We pass, Your Honor. |
| 11:53 | 8 | THE COURT:  Okay.  That's the exercise of the |
| 11:53 | 9 | third peremptory. |
| 11:53 | 10 | The peremptory now passes to the defense. |
| 11:53 | 11 | MS. KELLER:  We would ask the Court to excuse |
| 11:53 | 12 | Ms. Simler, the new juror. |
| 11:53 | 13 | THE COURT:  That would be the exercise of your |
| 11:53 | 14 | third peremptory. |
| 11:53 | 15 | There's one peremptory left for both sides. |
| 11:53 | 16 | MS. KELLER:  Yes, Your Honor. |
| 11:53 | 17 | THE COURT:  Thank you. |
| 11:53 | 18 | *(Sidebar proceedings concluded.)* |
| 11:53 | 19 | *(In open Court in the presence of the* |
| 11:53 | 20 | *venire.)* |
| 11:53 | 21 | THE COURT:  All right.  Ms. Similar, we're going |
| 11:53 | 22 | to thank and excuse you.  Both parties appreciate your |
| 11:53 | 23 | participation, as well as the Court.  Thank you very much. |
| 11:53 | 24 | Another juror, please. |
| 11:53 | 25 | THE CLERK:  Janet Nealon. |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:54 | 1 | THE COURT:  Ms. Nealon, if you would come up and |
| 11:54 | 2 | take Position No. 3, please. |
| 11:54 | 3 | Well, Ms. Nealon, because of the questionnaire, I |
| 11:54 | 4 | have very few questions of you. |
| 11:54 | 5 | PROSPECTIVE JUROR:  Okay. |
| 11:54 | 6 | THE COURT:  First of all, would you be fair and |
| 11:54 | 7 | impartial to both sides? |
| 11:54 | 8 | PROSPECTIVE JUROR:  Yes. |
| 11:54 | 9 | THE COURT:  Would you follow the law? |
| 11:54 | 10 | PROSPECTIVE JUROR:  Yes, I will. |
| 11:54 | 11 | THE COURT:  Do you have any questions of me at |
| 11:54 | 12 | this time? |
| 11:54 | 13 | PROSPECTIVE JUROR:  No questions. |
| 11:54 | 14 | THE COURT:  Let me turn you over to counsel. |
| 11:54 | 15 | PROSPECTIVE JUROR:  Okay. |
| 11:54 | 16 | THE COURT:  Mr. Quinn. |
| 11:54 | 17 | MR. QUINN:  Ms. Nealon, it seems that you're in |
| 11:54 | 18 | the hot seat today. |
| 11:54 | 19 | PROSPECTIVE JUROR:  Okay.  Thank you. |
| 11:54 | 20 | MR. QUINN:  Lot of people going through that |
| 11:54 | 21 | chair. |
| 11:54 | 22 | So you are an operations manager for a bank? |
| 11:54 | 23 | PROSPECTIVE JUROR:  Yes. |
| 11:54 | 24 | MR. QUINN:  And what is it that you do as an |
| 11:54 | 25 | operations manager? |

DEBBIE GALE, U.S. COURT REPORTER

| 11:54 | 1 | PROSPECTIVE JUROR: I audit everyone's work in the |
| 11:54 | 2 | branches. That's why I travel around. And I'm -- they're |
| 11:55 | 3 | supposed to follow all the rules, which they do and they |
| 11:55 | 4 | don't. |
| 11:55 | 5 | MR. QUINN: Okay. |
| 11:55 | 6 | PROSPECTIVE JUROR: So then I have to -- |
| 11:55 | 7 | MR. QUINN: Encourage them? |
| 11:55 | 8 | PROSPECTIVE JUROR: -- encourage them to do the |
| 11:55 | 9 | do's versus the don'ts. |
| 11:55 | 10 | MR. QUINN: And how many different branches do you |
| 11:55 | 11 | have responsibility for? |
| 11:55 | 12 | PROSPECTIVE JUROR: Anywhere between five and |
| 11:55 | 13 | seven at any one time. |
| 11:55 | 14 | MR. QUINN: So does this mean -- entail a lot of |
| 11:55 | 15 | travel? |
| 11:55 | 16 | PROSPECTIVE JUROR: I go from branch to branch in |
| 11:55 | 17 | South Orange County. |
| 11:55 | 18 | MR. QUINN: I see. Okay. You indicated that you |
| 11:55 | 19 | have a partner -- or had a partner that owned an Internet -- |
| 11:55 | 20 | PROSPECTIVE JUROR: He does. |
| 11:55 | 21 | MR. QUINN: -- radio -- |
| 11:55 | 22 | PROSPECTIVE JUROR: Station. |
| 11:55 | 23 | MR. QUINN: -- station? |
| 11:55 | 24 | PROSPECTIVE JUROR: Uh-huh. |
| 11:55 | 25 | MR. QUINN: Can you tell us a little bit about |

11:55  1   that?

11:55  2          PROSPECTIVE JUROR:  He just, um, was in the

11:55  3   consulting business.  And, of course, that's -- consulting

11:55  4   sort of went away.  So he was a DJ many, many years ago, and

11:55  5   always enjoyed talking on the radio, so he sort of started

11:55  6   his own business and went out to get people to talk on the

11:55  7   radio about whatever matter they want to talk about.

11:55  8          First of all, there was all the people that had

11:55  9   been downsized from big corporations -- CEO's and things

11:56  10  like that.  And now they just have groups that talk every

11:56  11  week.  Dentists talk on his radio, City Council people, and

11:56  12  they give their own opinions.  They talk about their

11:56  13  industry.

11:56  14          MR. QUINN:  So it's really kind of any given --

11:56  15  any week, it might be an entirely different subject?

11:56  16          PROSPECTIVE JUROR:  Exactly, uh-huh.

11:56  17          MR. QUINN:  Okay.  And have you been on the show?

11:56  18          PROSPECTIVE JUROR:  No, no.  I'm not -- no.  I

11:56  19  work.

11:56  20          (Laughter in the courtroom.)

11:56  21          MR. QUINN:  Okay.  All right.  You indicated in

11:56  22  response to one of the questions in the questionnaire that

11:56  23  you didn't think it would be wrong to use ideas.

11:56  24          PROSPECTIVE JUROR:  Oh, no.  I'm in an industry

11:56  25  where, you know, banks -- because of the banking industry,

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 9659   Filed 01/20/11   Page 162 of 173   Page ID #:288038
CV 04-9049 DOC - 1/13/2011 - Day 1, Volume 1 of 3

162

| 11:56 | 1 | people go after you a lot.  They have -- um, for your ideas. |
| 11:56 | 2 | And we sign that we work for a company, but that doesn't |
| 11:56 | 3 | mean that my ideas don't go with me to someplace else. |
| 11:56 | 4 | MR. QUINN:  Can you imagine circumstances where |
| 11:56 | 5 | there might be an idea, like an idea for a formula, like a |
| 11:57 | 6 | scientific formula that might be valuable and might be |
| 11:57 | 7 | protectable? |
| 11:57 | 8 | PROSPECTIVE JUROR:  Oh, yes.  But those are real |
| 11:57 | 9 | specifics. |
| 11:57 | 10 | MR. QUINN:  Right. |
| 11:57 | 11 | PROSPECTIVE JUROR:  And that would -- as we were |
| 11:57 | 12 | saying in the form, that would be identified in any kind of |
| 11:57 | 13 | agreement that you sign.  If you don't read the agreement, |
| 11:57 | 14 | then you don't know what you're signing.  And that's very |
| 11:57 | 15 | important. |
| 11:57 | 16 | MR. QUINN:  Right.  But there could be, like in |
| 11:57 | 17 | terms of designs, things that might be valuable?  A design |
| 11:57 | 18 | is something that you think might be valuable, might be |
| 11:57 | 19 | protectable, if your job is creative and your job is to come |
| 11:57 | 20 | up with designs? |
| 11:57 | 21 | PROSPECTIVE JUROR:  It could be.  Circumstances. |
| 11:57 | 22 | It depends on the whole picture. |
| 11:57 | 23 | MR. QUINN:  Right. |
| 11:57 | 24 | PROSPECTIVE JUROR:  You'd have to look at the |
| 11:57 | 25 | whole picture. |

| | | |
|---|---|---|
| 11:57 | 1 | MR. QUINN: Right. Do you have any -- you've |
| 11:57 | 2 | heard the questions I've asked? |
| 11:57 | 3 | PROSPECTIVE JUROR: Uh-huh. |
| 11:57 | 4 | MR. QUINN: Rather than repeating any of 'em, are |
| 11:57 | 5 | there any of 'em that sort of triggered some thought or |
| 11:57 | 6 | feeling in your mind that you think, in fairness, I ought to |
| 11:57 | 7 | know about? |
| 11:57 | 8 | PROSPECTIVE JUROR: No. |
| 11:57 | 9 | MR. QUINN: Any impressions of Mattel? |
| 11:58 | 10 | PROSPECTIVE JUROR: I have two daughters. I've |
| 11:58 | 11 | gone through the Barbies, and I've gone through the Bratz, |
| 11:58 | 12 | and I think they're both wonderful dolls. I'm not a doll |
| 11:58 | 13 | person, myself. But two daughters, they were both -- you |
| 11:58 | 14 | know, different age groups. |
| 11:58 | 15 | MR. QUINN: Right. |
| 11:58 | 16 | PROSPECTIVE JUROR: I have -- I have no opinions |
| 11:58 | 17 | either way on any of 'em. They were great dolls for the |
| 11:58 | 18 | kids. |
| 11:58 | 19 | MR. QUINN: Okay. And then, how about the issue |
| 11:58 | 20 | of damages, the amount of damages? |
| 11:58 | 21 | PROSPECTIVE JUROR: Dollar amounts? |
| 11:58 | 22 | MR. QUINN: I'm sorry? |
| 11:58 | 23 | PROSPECTIVE JUROR: Dollar amounts, you're |
| 11:58 | 24 | talking? |
| 11:58 | 25 | MR. QUINN: Yeah, dollar amounts. |

Case 2:04-cv-09049-DOC-RNB   Document 9659   Filed 01/20/11   Page 164 of 173   Page ID #:288040
CV 04-9049 DOC – 1/13/2011 – Day 1, Volume 1 of 3

164

| | | |
|---|---|---|
| 11:58 | 1 | PROSPECTIVE JUROR:  Yeah.  I don't have any issue |
| 11:58 | 2 | with that. |
| 11:58 | 3 | MR. QUINN:  Okay.  Thanks very much. |
| 11:58 | 4 | PROSPECTIVE JUROR:  Okay. |
| 11:58 | 5 | THE COURT:  Ms. Keller, do you want to start or |
| 11:58 | 6 | have Mr. Overland start? |
| 11:58 | 7 | Ms. Keller? |
| 11:58 | 8 | MS. KELLER:  I would be happy to, Your Honor. |
| 11:58 | 9 | THE COURT:  All right.  Thank you. |
| 11:58 | 10 | MS. KELLER:  Good morning. |
| 11:58 | 11 | PROSPECTIVE JUROR:  Good morning. |
| 11:58 | 12 | MS. KELLER:  Is it still morning?  Barely.  One |
| 11:58 | 13 | minute, two minutes. |
| 11:58 | 14 | I see that you said you have some experience in -- |
| 11:58 | 15 | someone, either you or your family, in advertising, |
| 11:58 | 16 | contracts, that sort of thing? |
| 11:58 | 17 | PROSPECTIVE JUROR:  Not myself.  My partner. |
| 11:59 | 18 | MS. KELLER:  Can you tell us a little bit about |
| 11:59 | 19 | that? |
| 11:59 | 20 | PROSPECTIVE JUROR:  Years ago, he was in public |
| 11:59 | 21 | relations up in Hollywood.  And because he's self-employed |
| 11:59 | 22 | and always has been self-employed, he'd probably been in and |
| 11:59 | 23 | out of every business there is.  Not something I could ever |
| 11:59 | 24 | do, but when you're self-employed, you know, it's a whole |
| 11:59 | 25 | different world. |

11:59  1          MS. KELLER:  It sure is.

11:59  2          Is there any reason it would be any kind of a

11:59  3  problem or hardship for you to serve on the jury, or are you

11:59  4  able to do it?

11:59  5          PROSPECTIVE JUROR:  No, I'm fine.

11:59  6          MS. KELLER:  Great.  Thank you.

11:59  7          THE COURT:  Mr. Overland.

11:59  8          MR. OVERLAND:  I'm gonna make it quick 'cause

11:59  9  everybody's hungry.

11:59  10         PROSPECTIVE JUROR:  It's after noon already.

11:59  11         MR. OVERLAND:  Okay.  Here's your chance.

11:59  12         PROSPECTIVE JUROR:  Uh-huh.

11:59  13         MR. OVERLAND:  Tell me all the good things about

11:59  14  yourself and why you would be a good juror in this case.

11:59  15         PROSPECTIVE JUROR:  Um, I work with a lotta, lotta

12:00  16  people.  So I always give people the chance to give me both

12:00  17  sides of their story.  When you do what I do and what I've

12:00  18  done for many years, I think you -- just, you open your

12:00  19  mind.  Um, there's no -- there can't be any room for

12:00  20  prejudice in the industry that I work in and the job that I

12:00  21  do.  But that's just part of who I am, too.

12:00  22         MR. OVERLAND:  Anything bad?

12:00  23         PROSPECTIVE JUROR:  I mean, we all have something

12:00  24  bad.  I guess maybe the bad things is I like to drink

12:00  25  sometimes more than one glass of wine.

| | | |
|---|---|---|
| 12:00 | 1 | *(Laughter in the courtroom.)* |
| 12:00 | 2 | MR. OVERLAND:  I didn't mean that. |
| 12:00 | 3 | MR. QUINN:  That can't be disqualifying. |
| 12:00 | 4 | PROSPECTIVE JUROR:  Okay. |
| 12:00 | 5 | THE COURT:  We know it's going to be a happy jury. |
| 12:00 | 6 | MR. OVERLAND:  Yeah, that could be good.  Who |
| 12:00 | 7 | knows?  All right.  That's it? |
| 12:00 | 8 | PROSPECTIVE JUROR:  That's it. |
| 12:00 | 9 | MR. OVERLAND:  All right.  Thanks. |
| 12:00 | 10 | THE COURT:  Now, Counsel, why don't you consult |
| 12:00 | 11 | with your respective clients? |
| 12:00 | 12 | MS. KELLER:  Your Honor, we need just a little |
| 12:00 | 13 | more time to talk this through. |
| 12:00 | 14 | THE COURT:  Okay.  Take a little bit more time. |
| 12:00 | 15 | Everybody's watching. |
| 12:02 | 16 | Have you had enough time, both sides? |
| 12:03 | 17 | MS. KELLER:  Yes. |
| 12:03 | 18 | THE COURT:  All right.  Can I see you at sidebar, |
| 12:03 | 19 | then. |
| 12:03 | 20 | *(Sidebar proceedings reported as follows:)* |
| 12:03 | 21 | THE COURT:  Okay.  We're back on the record at |
| 12:03 | 22 | sidebar. |
| 12:03 | 23 | And the peremptory, which would be the last |
| 12:03 | 24 | peremptory, passes back to the plaintiff. |
| 12:04 | 25 | MR. QUINN:  Never done this:  We're going to pass |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 12:04 | 1 | again. |
| 12:04 | 2 | THE COURT:  And you've had time to talk to your |
| 12:04 | 3 | client? |
| 12:04 | 4 | MR. QUINN:  Yes, thank you. |
| 12:04 | 5 | Then that would exercise the fourth peremptory. |
| 12:04 | 6 | Now the peremptory passes back to the defendant. |
| 12:04 | 7 | MR. COTE:  We have a jury. |
| 12:04 | 8 | MS. KELLER:  We'll pass. |
| 12:04 | 9 | MR. McCONVILLE:  We'll pass. |
| 12:04 | 10 | THE COURT:  Have you had enough time to talk to |
| 12:04 | 11 | your client? |
| 12:04 | 12 | MS. KELLER:  We have. |
| 12:04 | 13 | MR. McCONVILLE:  Yes. |
| 12:04 | 14 | THE COURT:  Mr. Machado's not here, but |
| 12:04 | 15 | Mr. Overland? |
| 12:04 | 16 | MR. OVERLAND:  I can speak for him. |
| 12:04 | 17 | THE COURT:  And certainly, Mr. Cote. |
| 12:04 | 18 | MR. COTE:  *(No response.)* |
| 12:04 | 19 | THE COURT:  Would you mind if I, once again, went |
| 12:04 | 20 | through the jury and ask if they could sit for this period |
| 12:04 | 21 | of time, just so we don't have any problems?  Remember, some |
| 12:04 | 22 | people responded just because they're good citizens. |
| 12:04 | 23 | MR. OVERLAND:  Fernandez. |
| 12:04 | 24 | THE COURT:  Fernandez did.  I want to make certain |
| 12:04 | 25 | that they can all serve. |

| | | |
|---|---|---|
| 12:04 | 1 | MR. QUINN:  No problem with that. |
| 12:04 | 2 | MR. COTE:  *(Nods head.)* |
| 12:04 | 3 | THE COURT:  Let's tell 'em it's four days a week. |
| 12:04 | 4 | There may be a day that we switch to a Monday on occasion, |
| 12:04 | 5 | just because of the Court having to keep a schedule, but |
| 12:05 | 6 | most of the time it will be Tuesday through Friday.  And |
| 12:05 | 7 | we'll probably take a break about the fifth week of the |
| 12:05 | 8 | trial.  We'll talk about that.  And let's talk a little bit |
| 12:05 | 9 | about the hours that we'll keep.  And we'll negotiate with |
| 12:05 | 10 | them as soon as we have the alternates.  Not now. |
| 12:05 | 11 | Do you want to send these eight home or have them |
| 12:05 | 12 | return and listen to the questions concerning the |
| 12:05 | 13 | alternates? |
| 12:05 | 14 | I would suggest you bring them back.  There might |
| 12:05 | 15 | be something that sparks something.  And if there's any |
| 12:05 | 16 | issue for cause, you might as well know it now. |
| 12:05 | 17 | MS. KELLER:  I want to make sure on the time issue |
| 12:05 | 18 | we're not discouraging people.  Mr. Fernandez said, "I want |
| 12:05 | 19 | to serve.  I want to be here." |
| 12:05 | 20 | THE COURT:  If you stipulate, I won't ask that |
| 12:05 | 21 | question. |
| 12:05 | 22 | MS. KELLER:  I prefer not to. |
| 12:05 | 23 | THE COURT:  That's fine. |
| 12:05 | 24 | Okay.  All right. |
| 12:05 | 25 | *(Sidebar proceedings concluded.)* |

DEBBIE GALE, U.S. COURT REPORTER

| 12:06 | 1 | *(In open court in the presence of the* |
| 12:06 | 2 | *venire.)* |
| 12:06 | 3 | THE COURT:  All right.  Ladies and gentlemen, |
| 12:06 | 4 | would the eight of you please stand and join me.  Would you |
| 12:06 | 5 | raise your right hand. |
| 12:06 | 6 | And, Kathy, would you administer the oath. |
| 12:06 | 7 | **JURY PANEL SWORN** |
| 12:06 | 8 | MEMBERS OF THE JURY:  I do.  Yes. |
| 12:06 | 9 | THE COURT:  All right.  Be seated. |
| 12:06 | 10 | Now you are the sitting jury.  And since nobody's |
| 12:06 | 11 | gonna get the flu, there's not going to be any problems, we |
| 12:06 | 12 | probably don't need any alternates.  But just in case, let |
| 12:06 | 13 | me get eight alternates. |
| 12:07 | 14 | I've never gone through eight alternates.  But on |
| 12:07 | 15 | one nine-month case, we started with ten alternates, and we |
| 12:07 | 16 | only had two left. |
| 12:07 | 17 | And that just saves starting a case all over |
| 12:07 | 18 | again.  Both of the parties want this case resolved. |
| 12:07 | 19 | Now, it's seven after the hour.  I'm going to ask |
| 12:07 | 20 | all of you to go to lunch, 'cause there's such a large |
| 12:07 | 21 | group, and to come back at 1:30. |
| 12:07 | 22 | What time? |
| 12:07 | 23 | PROSPECTIVE JURORS:  1:30. |
| 12:07 | 24 | THE COURT:  What time? |
| 12:07 | 25 | PROSPECTIVE JURORS:  1:30. |

12:07  1          THE COURT:  That's excellent.  There we go.  1:30.

12:07  2          Now -- not so fast.  Not so fast.  There's always

12:07  3  something else.

12:07  4          I need all of you back here at 1:30, and I need

12:07  5  you back here also just to listen to the questions

12:07  6  concerning the alternates.  But I think that's going to go

12:07  7  much quicker than it did this morning, evening getting you

12:07  8  as a jury.

12:07  9          And I'm probably going to sit you in a different

12:07  10  location, so the eight alternates can be seated where you

12:08  11  are.  It goes very quickly.

12:08  12          Eventually, at the end of the day, I want you to

12:08  13  start thinking, and the eight alternates, eventually

12:08  14  thinking about the following:  If I start at 8:30 every day,

12:08  15  instead of 8:00 o'clock, when most of America goes to

12:08  16  work -- take four days that we're in session, 'cause the

12:08  17  fifth day I need as a calendar day -- and that's two hours.

12:08  18  Right?  If I take an hour and a half for lunch, instead of

12:08  19  an hour, that's two more hours.  Right?  That's about

12:08  20  two-thirds of a day of trial work that we can just waste on

12:08  21  the extra half hour for lunch.

12:08  22          Now, it may be that some of you have childcare

12:08  23  issues, delivering children -- that's fine.  We can start at

12:08  24  8:30.  Then we'll go to 9:00 o'clock at night.  I'm just

12:08  25  kidding you.  I'm just joking.  But I would like to start at

DEBBIE GALE, U.S. COURT REPORTER

| 12:08 | 1 | either 8:00 or 8:30, negotiate out with you.  If any one of |
| 12:08 | 2 | you has problems delivering children or anything like that, |
| 12:08 | 3 | we'll start at 8:30.  But we'll talk about that.  And if |
| 12:08 | 4 | there's just one of you, don't be concerned. |
| 12:08 | 5 | You should be in session, though, the following: |
| 12:09 | 6 | We should get off the ground let's say at 8:30, |
| 12:09 | 7 | hypothetically.  And we should have about a half-hour recess |
| 12:09 | 8 | mid morning and continue to 12:00 o'clock.  We should then |
| 12:09 | 9 | resume at 1:00 o'clock promptly.  And if I can get the lunch |
| 12:09 | 10 | down to 10 minutes -- I'm just joking -- about 1:00 o'clock. |
| 12:09 | 11 | Okay?  And you should be in session until 5:00 o'clock, 4:30 |
| 12:09 | 12 | to 5:00 o'clock. |
| 12:09 | 13 | The rule should basically be that you should |
| 12:09 | 14 | expect to go home at 5:00 o'clock.  Sometimes you'll go home |
| 12:09 | 15 | at 4:00 or 4:30, because we're starting a witness that might |
| 12:09 | 16 | take, you know, three hours, and it just doesn't make sense |
| 12:09 | 17 | that we get into that witness's testimony for 45 minutes. |
| 12:09 | 18 | There's other times, though, we might ask you to stay a |
| 12:09 | 19 | little bit late, like 5:15 or 5:30 so, if we can finish that |
| 12:09 | 20 | witness, you'll have it as a block of time.  But we'll |
| 12:09 | 21 | always negotiate that.  Fair enough? |
| 12:09 | 22 | And then, remember this:  If I'm having a sidebar |
| 12:09 | 23 | over here, as I am today, which is as courtesy to both |
| 12:09 | 24 | counsel, I've failed.  You should be working every minute |
| 12:10 | 25 | that you're here.  If I have to step out in the hallway, |

CV 04-9049 DOC – 1/13/2011 – Day 1, Volume 1 of 3

172

| | | |
|---|---|---|
| 12:10 | 1 | I've done something wrong.  That's my responsibility. |
| 12:10 | 2 | I will see you at 1:30.  You're admonished not to |
| 12:10 | 3 | discuss this matter nor form or express any opinion. |
| 12:10 | 4 | If the eight of you would come back and just be |
| 12:10 | 5 | seated in the seat you occupy. |
| 12:10 | 6 | Have a nice lunch. |
| 12:11 | 7 | *(Lunch recess held at 12:11 p.m.)* |
| 12:11 | 8 | *(Further proceedings reported by Maria* |
| 12:11 | 9 | *Dellaneve in Volume II of III.)* |
| 12:11 | 10 | -oOo- |
| 12:11 | 11 | |
| | 12 | |
| | 13 | |
| | 14 | |
| | 15 | |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

DEBBIE GALE, U.S. COURT REPORTER

-oOo-


CERTIFICATE


        I hereby certify that pursuant to Section 753,

Title 28, United States Code, the foregoing is a true and

correct transcript of the stenographically reported

proceedings held in the above-entitled matter and that the

transcript page format is in conformance with the

regulations of the Judicial Conference of the United States.


Date:  January 13, 2011




_____
                        DEBBIE GALE, U.S. COURT REPORTER
                        CSR NO. 9472, RPR