Page 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

THE HON. DAVID O. CARTER, JUDGE PRESIDING

MATTEL INC., et al.,          )
                              )
              Plaintiff,      )
                              )
         vs.                  ) No. CV 04-9049-DOC
                              )     Day 1
                              )     Volume 2 of 3
MGA ENTERTAINMENT, INC.,      )
                              )
              Defendant.      )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Jury Trial

Santa Ana, California

Thursday, January 13, 2011

Maria Beesley-Dellaneve, RPR, CSR 9132
Official Federal Reporter
Ronald Reagan Federal Building, room 1-053
411 West 4th Street
Santa Ana, California 92701
(714) 564-9259

Page 2

1    **APPEARANCES OF COUNSEL:**

2    **FOR THE PLAINTIFF:**   QUINN EMANUEL URQUHART OLIVER & HEDGES
                              BY:  JOHN QUINN, ESQ.
3                             865 S. FIGUEROA
                              10TH FLOOR
4                             LOS ANGELES, CALIFORNIA 90017
                              (213)443-3000
5

6    **FOR THE DEFENDANTS:**   ORRICK, HERRINGTON & SUTCLIFFE
                               BY:  ANNETTE HURST, ESQ.
7                              405 HOWARD STREET
                               SAN FRANCISCO, CALIFORNIA 94105
8                              (415)773-5700

9                              - AND -

10                             ORRICK HERRINGTON & SUTCLIFFE
                               BY: THOMAS MCCONVILLE, ESQ.
11                             4 PARK PLAZA
                               SUITE 1600
12                             IRVINE, CALIFORNIA 92614
                               (949)567-6700
13
                               - AND -
14
                                KELLER RACKAUCKAS
15                              BY:  JENNIFER KELLER, ESQ.
                                18500 VON KARMAN AVENUE
16                             SUITE 560
                                IRVINE, CALIFORNIA 92612
17

18
     FOR CARLOS MACHADO GOMEZ: LAW OFFICES OF MARK E. OVERLAND
19                             BY:  MARK OVERLAND, ESQ.
                               100 WILSHIRE BLVD
20                             SUITE 950
                               SANTA MONICA, CA. 90401
21                             (310) 459-2830

22

23

24

25

Page 3

1                           - AND -

2                  SCHEPER KIM & HARRIS LLP
                   BY:  ALEXANDER COTE, ESQ.
3                  601 WEST 5TH STREET_12TH FLOOR
                   LOS ANGELES, CA. 90071
4                  (213) 613-4660

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1          SANTA ANA, CALIFORNIA; THURSDAY, JANUARY 13, 2011

2                              -oOo-

3          **THE COURT:**  We're on the record at sidebar.  Kathy,

4    would you relate to counsel what you have just related to me.

5          **THE CLERK:**  During the lunch break, juror number one

6    came up and he was looking for me.  And I went out in the hallway,

7    and he indicated to me that he wanted to talk to the judge about

8    his concern about his language issues.  And he went on to relate

9    that he works for a very small company and he is afraid there are

10   going to be some hardships there for the company as well.

11         **THE COURT:**  I leave this to you.  Right now we have a

12   jury.  And without a stipulation, he remains because I can't do

13   anything about that.  But it's becoming more and more apparent in

14   looking at his questionnaire that he didn't answer the majority of

15   the questionnaire, and apparently now he works for a small company

16   which is sending alerts to me that he may have financial

17   difficulty.  But we have a jury.

18              So if there is a stipulation, fine.  If there is not,

19   let's go on with the alternates.  Why don't you talk for just a

20   moment.  In fact, go to the end of hallway, and you go that way.

21         **MR. MCCONVILLE:**  We need to confer with our clients.

22              (Brief pause in proceedings.)

23         **THE COURT:**  We're on the record.  Counsel reassembled

24   after hopefully speaking with their respective clients.  The Court

25   has no voice in this.  And so I'll turn to counsel.

1          Is everybody satisfied?

2          **MS. KELLER:**  Your Honor, Mr. Larian, particularly

3     because of the last trial and the fact that there were

4     anti-Persian slurs, is unwilling to stipulate.  He has become I

5     think extraordinarily concerned about that, and this is the only

6     Persian person on the panel.

7          **THE COURT:**  Ultimately if there is no stipulation

8     between the parties, his inability to inform us of his prior

9     problems at work is his responsibility.  And of course I'm

10    concerned that he hasn't answered the questions in the

11    questionnaire, but both sides accept the gentleman.  He approached

12    Kathy.  Maybe we'll talk to him after court today.  I choose not

13    to unless both consent.

14          John?  I mean, Mr. Quinn?

15          **MR. QUINN:**  We're comfortable, Your Honor.

16          **THE COURT:**  Everybody is comfortable.  Welcome.

17              (End side-bar.)

18          **THE COURT:**  Would you call the alternate jurors.

19          We're back on the record, all counsel are present.

20          **THE CLERK:**  Judy Liao.

21          **THE COURT:**  Ms. Liao, if you would come forward.  And if

22    you would go up to the top row, Ms. Liao, top row and count four

23    seats in.  It will say number one on the chair.  Thank you.  Next

24    juror, please.

25          **THE CLERK:**  Hongtien Tran.

Page 6

1          **THE COURT:**  Mr. Tran, if you'd go up to the top row and

2    take seat number two.

3          **THE CLERK:**  Amanda Hinton.

4          **THE COURT:**  Seat number three, please.

5          **THE CLERK:**  Alex Gardelle.

6          **THE COURT:**  Mr. Gardelle, seat number four please.

7          **THE CLERK:**  Allan Michelena.

8          **THE COURT:**  Mr. Michelena, if you would take the bottom

9    row at seat number five.

10          **THE CLERK:**  Anh Tran.

11          **THE COURT:**  Mr. Tran, if you would take the bottom row,

12   seat number six.

13          **THE CLERK:**  Nadine Done.

14          **THE COURT:**  Ms. Done, if you would take seat number

15   seven, please.

16          **THE CLERK:**  And Gregory Longbotham.

17          **THE COURT:**  Mr. Longbotham, take seat number eight,

18   please.

19          These are the same basic questions from the court, and

20   let me once again explain to you for just a moment.  In a perfect

21   world, you would never be used as a juror because you sit to

22   guarantee that we don't have to start the case over again.  But in

23   reality, in a three- to four-month trial, flu, good legal cause if

24   it occurs, can cause a juror to be excused.  And so in a sense you

25   are a safety valve.

1          Now, we used to have a method where we picked jurors one

2    through eight.  So typically, Ms. Liao, oftentimes you would be

3    the first juror selected.  But by stipulation of counsel, if one

4    of the sitting jurors cannot continue with the case, and a brief

5    recess doesn't bring that juror back, we have decided that we're

6    going to put all eight names in a hat, stir it up, and we'll pick

7    a name.

8          So for instance, Ms. Done or Mr. Longbotham, you could

9    be just as apt to be picked because it's random.  It's very

10   dramatic if we have to do that.  And we'll do it in your presence.

11         Now, that's a clumsy way of me explaining to you that

12   you really sit.  But believe me, one or more of you will be used.

13   In the last nine-month trial, we had 10 alternates and we used

14   eight of those alternates.  It was a criminal matter, a different

15   matter with 12 jurors, but alternates are used, unfortunately.

16         That means you keep the same hours.  And it also means

17   that you pay attention to the evidence every bit as much as the

18   sitting jury.  And hopefully we don't use you, but I can guarantee

19   you we'll probably end up using anywhere from two to four of you

20   during this trial.  And you'll take the place of a sitting juror

21   potentially.

22         I'm going to start with Ms. Liao.  Ms. Liao, did you

23   hear all of the prior questions that were asked this morning?

24         **PROSPECTIVE JUROR:**  Yes, I did.

25         **THE COURT:**  Did you?

Page 8

1          **THE DEFENDANT:**  Yes.

2          **THE COURT:**  Would you answer out loud?

3          **THE DEFENDANT:**  Yes.

4          **THE COURT:**  We're going to give you a microphone.  There

5   should be a microphone up there someplace.  Say hi.

6          **PROSPECTIVE JUROR:**  Hello.

7          **THE COURT:**  There you go.

8          We have this extensive questionnaire.  Everybody has

9   read it.  We have been reading it, frankly, for about four or five

10  days.  Therefore, we know a tremendous amount of information about

11  you.

12         Do you believe with what little you know of this case,

13  that you would be fair and impartial to both sides in this case?

14         **PROSPECTIVE JUROR:**  Yes, I do.

15         **THE COURT:**  Would you follow the law?

16         **PROSPECTIVE JUROR:**  Yes.

17         **THE COURT:**  Did you understand my attempt to explain the

18  difference between a witness who is truthful but might misperceive

19  an event such as this hit-and-run example I gave you?

20         **PROSPECTIVE JUROR:**  Yes.

21         **THE COURT:**  And you understand that some witnesses may

22  just lie to you?  Do you understand that?

23         **PROSPECTIVE JUROR:**  Yes.

24         **THE COURT:**  Okay.  Would you follow the law that I

25  instruct you on at the end of the case?

1          **PROSPECTIVE JUROR:**  Yes.

2          **THE COURT:**  Let me remind you that the Congress can

3     change the law, the President, the Supreme Court, but I'm

4     duty-bound and took an oath to follow the law, and you are taking

5     the same oath.

6          Do you have any questions of me, Ms. Liao?

7          PROSPECTIVE JUROR:  No.

8          **THE COURT:**  Okay.  Is it Mr. Tran?

9          **PROSPECTIVE JUROR:**  Yes, sir.

10         **THE COURT:**  Mr. Tran, we're going to pass the microphone

11    to you.  The same questions.  We can take days with this, but

12    fundamentally, are you going to be fair and impartial to both

13    sides in this case?

14         **PROSPECTIVE JUROR:**  Yes, sir.

15         **THE COURT:**  Would you follow the law as I instruct you

16    at the end of the case?

17         **PROSPECTIVE JUROR:**  Yes, sir.

18         **THE COURT:**  Do you have any questions?

19         **PROSPECTIVE JUROR:**  Not now.

20         **THE COURT:**  I'm going to turn you over to counsel in

21    just a moment.  I'm going to take Ms. Amanda Hinton.

22         Same question to you.  Would you be fair and impartial

23    to both sides in this case?

24         **PROSPECTIVE JUROR:**  Yes.

25         **THE COURT:**  Will you follow the law at the end of this

Page 10

1    case that I instruct you on?

2              **PROSPECTIVE JUROR:**  Yes.

3              **THE COURT:**  Do you have any questions of me?  If so, I'd

4    be pleased to answer them.

5              PROSPECTIVE JUROR:  No.

6              **THE COURT:**  Mr., is it Gardelli?

7              **PROSPECTIVE JUROR:**  Gardelle.

8              **THE COURT:**  Same question, would you be fair and

9    impartial to both sides in this case?

10             **PROSPECTIVE JUROR:**  Yep.

11             **THE COURT:**  Follow the law?

12             **PROSPECTIVE JUROR:**  Yes.

13             **THE COURT:**  Sir, do you have any questions of me?

14             **PROSPECTIVE JUROR:**  Nope.

15             **THE COURT:**  Mr. Michelena, would you be fair and

16   impartial in this case?

17             **PROSPECTIVE JUROR:**  Yes.

18             **THE COURT:**  To both sides?

19             **PROSPECTIVE JUROR:**  Yes, sir.

20             **THE COURT:**  Would you follow the law?

21             **PROSPECTIVE JUROR:**  Yes.

22             **THE COURT:**  Do you have any questions of me, sir?

23             **PROSPECTIVE JUROR:**  Only one.  Having listened to these

24   other questions, I just wanted to bring out, after filling out

25   questionnaire I did read a news article on this case.

1          **THE COURT:**  That's fine.  Once the trial begins,

2     though -- and counsel, I'm going to -- I could spend 20 minutes

3     just about that news article.  I'm going to have counsel ask you

4     those questions.  I have come to believe that a lot of federal

5     courts don't allow questioning or very brief questioning, but it's

6     not only the questions sometimes counsel ask, it's just that

7     interchange with the jury that gives them a comfort level or not

8     for the next four months.  So I'll let them ask about the article.

9          Mr. Tran?

10          **PROSPECTIVE JUROR:**  Yes, sir.

11          **THE COURT:**  Sir, would you please fair and impartial to

12     both sides?

13          **PROSPECTIVE JUROR:**  Yes, sir.

14          **THE COURT:**  Would you follow the law?

15          **PROSPECTIVE JUROR:**  Yes, sir.

16          **THE COURT:**  Do you have any questions of me?

17          **PROSPECTIVE JUROR:**  No, sir.

18          **THE COURT:**  Thank you.  Ms. Nadine Done, would you fair

19     and impartial to both sides?

20          **PROSPECTIVE JUROR:**  Yes.

21          **THE COURT:**  Would you follow the law?

22          **PROSPECTIVE JUROR:**  Yes.

23          **THE COURT:**  You have any questions of me?

24          PROSPECTIVE JUROR:  No.

25          **THE COURT:**  Okay.  Mr. Longbotham, would you be fair and

Page 12

1    impartial to both sides?

2            PROSPECTIVE JUROR:  Well, on the questionnaire I

3    answered that I would have a really hard time -- I'm sorry --

4    taking seriously a case about the dolls, about dolls.

5            THE COURT:  Let me talk to you about that.  In first

6    impressions you'll hear -- in fact, I'll sometimes banter with

7    counsel about the dolls.  But the end result, it's much more.

8    It's two corporate entities, two businesses, in a sense, and there

9    is a lot at stake here.  So it's okay to make a joke about a doll.

10   Just don't --

11           PROSPECTIVE JUROR:  I just wanted to reiterate that I

12   had put that on my questionnaire.

13           THE COURT:  It's not Barbie and Bratz.  It's a lot more

14   for both sides.

15           PROSPECTIVE JUROR:  I understand.

16           THE COURT:  All right.  Anything else, sir?  Would you

17   be fair and impartial to both sides?

18           PROSPECTIVE JUROR:  Yes, sir.

19           THE COURT:  Would you follow the law?

20           PROSPECTIVE JUROR:  Yes.

21           THE COURT:  Okay.  Do you have any questions of me?

22           PROSPECTIVE JUROR:  No.

23           THE COURT:  Let me go through back through you one more

24   time just to be certain.

25           Ms. Liao, is there anything you would like to add to

1   your questionnaire or something that I answered that you would

2   like to comment upon that you thought about, or is the

3   questionnaire satisfactory as far as you are concerned, the way

4   you filled it out?

5           PROSPECTIVE JUROR:  I don't have anything needs to be

6   added.

7           THE COURT:  Let me talk to Mr. Tran.  Is there anything

8   that you would like to add or detract from this questionnaire or

9   can counsel rely upon it?  Is this everything you wanted to tell

10  us?

11          PROSPECTIVE JUROR:  At the moment when I read the

12  question, based on what I read and understand, I answered the way

13  I know.

14          THE COURT:  Same question, Ms. Hinton, is there anything

15  you would like to add or detract, something you have thought about

16  that you think should be on the questionnaire?

17          PROSPECTIVE JUROR:  No change.

18          THE COURT:  Mr. Gardelle, anything that you would like

19  to add or detract concerning this questionnaire or can counsel

20  rely upon it?

21          PROSPECTIVE JUROR:  It's all good.

22          THE COURT:  Mr. Michelena, anything on this

23  questionnaire that you would like to add or detract?  I know you

24  read an article in the interim period of time.  From now on, if

25  you recognize something about the case, we ask you to turn that

Page 14

1    over.

2           Anything else about this questionnaire you would like to

3    add or detract?

4           PROSPECTIVE JUROR:  No.

5           **THE COURT:**  Mr. Tran, same question to you.  Anything

6    you would like to add or detract?

7           **PROSPECTIVE JUROR:**  Yes, I do.

8           **THE COURT:**  Add or detract.

9           **PROSPECTIVE JUROR:**  Yes, I do, Your Honor.

10          **THE COURT:**  Please.

11          **PROSPECTIVE JUROR:**  My wife, she is a human resource,

12   which questionnaires didn't put in there because I didn't

13   understand clearly.  She is HR.

14          THE COURT:  HR?

15          **PROSPECTIVE JUROR:**  Yes.  Human resource.

16          **THE COURT:**  For one of the companies?

17          **PROSPECTIVE JUROR:**  No, not affiliate.

18          **THE COURT:**  You're pointing over to MGA.  Mattel is

19   having a heart attack.

20          **PROSPECTIVE JUROR:**  My apologies.

21             (LAUGHTER)

22          **THE COURT:**  Thank you very much then.

23          Ms. Done, anything else that you would like to add or

24   detract or can counsel basically rely on this questionnaire?

25          **PROSPECTIVE JUROR:**  Yeah, it's good.

Page 15

1          **THE COURT:**  Mr. Longbotham, anything you would like to

2     add or detract?

3          **PROSPECTIVE JUROR:**  No, sir.

4          **THE COURT:**  Counsel, Mr. Quinn, if you would like half

5     an hour, I could do that.

6          **MR. QUINN:**  Thank you, Your Honor.

7          **THE COURT:**  If that's not enough time for each party,

8     tell me.

9          **MR. QUINN:**  Ms. Liao, if I could start would you, you

10    were born in Taiwan?

11         **PROSPECTIVE JUROR:**  Yes.

12         **MR. QUINN:**  And how long ago did you come to this

13    country?

14         **PROSPECTIVE JUROR:**  I came here in 1982.

15         **MR. QUINN:**  And have you lived in this area since then?

16         **PROSPECTIVE JUROR:**  Yes.

17         **MR. QUINN:**  You indicated that you are a digital signal

18    process engineer?

19         **PROSPECTIVE JUROR:**  Yes.

20         **MR. QUINN:**  Are you an ASIC designer?

21         **PROSPECTIVE JUROR:**  No.  Software design.

22         **MR. QUINN:**  Okay.  Have you ever designed a chip and

23    reduced it to silicon?

24         PROSPECTIVE JUROR:  No.

25         **MR. QUINN:**  That's not what you do.

Page 16

1          **PROSPECTIVE JUROR:**  No.  Program.

2          **MR. QUINN:**  And how long have you been in programming?

3          **PROSPECTIVE JUROR:**  I work in same company for about 14

4    years.

5          **MR. QUINN:**  Do you have exposure to proprietary

6    information, proprietary software programs in your work?

7          **PROSPECTIVE JUROR:**  Yes.  Many of the programs were

8    developed in-house.  So that's considered proprietary.

9          **MR. QUINN:**  You indicated, I think, that you and your

10   husband both have patents?

11         **PROSPECTIVE JUROR:**  Yes.  Being in the high-tech

12   company, we do have to disclose -- I mean, filing innovation

13   disclosures and file patents on things that you develop in the

14   company.

15         **MR. QUINN:**  So both you and your husband are named

16   inventors on some patents?

17         **PROSPECTIVE JUROR:**  I don't have as many, but yeah.  My

18   husband yes, he has quite a few.

19         **MR. QUINN:**  And are these patents on programs or

20   processes or inventions that have been developed in your work?

21         **PROSPECTIVE JUROR:**  Algorithms, yes.

22         **MR. QUINN:**  But developed in the course of your work?

23         **PROSPECTIVE JUROR:**  During the work, yes.

24         **MR. QUINN:**  You made reference to an innovation

25   disclosure.  What do you mean by that?

1      **PROSPECTIVE JUROR:**  Sometimes before you file a patent,

2  you kind of have to disclose what the innovation about this

3  invention that you're trying to do.  And I think the patent lawyer

4  will decide whether it's something worth filing a patent for.

5      **MR. QUINN:**  In your work is that something that when you

6  have an invention, it's something that you are required to

7  disclose to the company?

8      **PROSPECTIVE JUROR:**  Yes.

9      **MR. QUINN:**  And then the lawyers get involved in

10  deciding whether --

11      **PROSPECTIVE JUROR:**  Yes.  I mean, before you decide

12  whether you want to file patents on that particular ideas that you

13  have, that's what you do, the first step.

14      **MR. QUINN:**  I see.  Do you have a type of employment

15  agreement with your company?

16      **PROSPECTIVE JUROR:**  Yeah.  The day you join the company,

17  that's -- you have to sign an agreement that anything that you

18  develop, belongs to the company.

19      **MR. QUINN:**  And does it say anything about if you invent

20  something, you are required to disclose it to the company?

21      **PROSPECTIVE JUROR:**  I don't recall.  I don't recall, but

22  everything that you develop related to work is company property.

23      **MR. QUINN:**  Is that something that you have bad feelings

24  about or good feelings about or any reaction to?

25      **PROSPECTIVE JUROR:**  No.  I mean, that's -- I think

Page 18

1    that's how it is in the industry.  And I really don't -- once I

2    sign the agreement, that's what I agreed to.

3           MR. QUINN:  Thanks very much.

4           Mr. Tran, if I could ask you a couple of questions.  You

5    work -- you're a transportation engineer for CalTrans?

6           PROSPECTIVE JUROR:  Yes, sir.

7           MR. QUINN:  So is that the highways, the freeways?

8           PROSPECTIVE JUROR:  California Department of

9    Transportation.  We take care of the freeway system in California.

10          MR. QUINN:  What is your role as an engineer as, a

11   transportation engineer?

12          PROSPECTIVE JUROR:  I work in the bridge maintenance

13   group.  And our office is bridge maintenance, but our group is

14   doing the design for the repair projects.  So if the bridge have a

15   repair project that need to be designed, then we take care of that

16   part.

17          MR. QUINN:  How do you know when a particular bridge is

18   in need of repair?  Is there a periodic inspection program or --

19          PROSPECTIVE JUROR:  The federal highway authority set

20   the guideline and CalTrans also have the guideline for it.  And

21   typically it's a two-year period cycle.  And we have a bridge --

22   the bridge engineer that will take care of the inspection of the

23   bridge within his or her region.  And whatever deficiency they saw

24   through the inspection, they filed the bridge report.  And based

25   on that, one of the manager will come up with proposal for repair

Page 19

1    project.  Usually it's not one for 1EA.  Usually it's anywhere

2    from one up to 35, 40 bridges.

3         MR. QUINN:  Have you been in this job in a period when

4    there have been either quakes and damage to several bridges?

5         PROSPECTIVE JUROR:  It's not within my working area, but

6    it happened back down in San Diego near the border.  And it

7    happened one of the bridges were unsettled and they couldn't use

8    it.  So we have to have emergency repair.

9         MR. QUINN:  In response to question 22, which was, "what

10   is your reaction, if any, to the statement, an employee can use

11   proprietary or confidential information that was used at a

12   previous job?"  You said, if I read your handwriting correctly, "I

13   would question the circumstances of such statement and any

14   implications regarding the statement, parenthesis, i.e., legal

15   right of the employee versus the employers."

16        Do you recall that answer?

17        PROSPECTIVE JUROR:  Yes.

18        MR. QUINN:  Can you kind of share with us what your

19   thinking was there?

20        PROSPECTIVE JUROR:  Because of my, I guess from a

21   similar question and answer, I brought that my answer -- because

22   when I read the question, my answer was because things that I

23   learned in school and society, that I have to carry through my

24   job.

25        So I mean, I can't say that I own that because someone

Page 20

1  pass it on to me.  But then those are considered -- I will

2  consider those as common knowledge that can be passed and carried

3  on, versus something that I learned at work and I do, because of

4  my interaction, because of the work course allow me to acquire or

5  have that intellectual property.  Then that's belong to that work

6  environment.

7          But if something I bring it into the work, and through

8  that, then it is common, become a common intellectual property.

9  Is not owned by the company.

10         **MR. QUINN:**  Right.  So somebody used an example this

11  morning about learning a foreign language.  If you learned a

12  foreign language on the job, it would be ridiculous to think that

13  the employer owns your foreign language fluency.

14         But you draw a distinction between those types of

15  general knowledge which you might pick up on the job and some

16  other types of information which might be proprietary?

17         **PROSPECTIVE JUROR:**  Yes.  Because like when I work as a

18  transportation engineer within the designing group, then we have

19  our method of working on the project and the procedure on how to

20  handle those and that would belong to the group.

21         If I go to a different group, they might have a

22  different procedure.  And that is a different -- probably you can

23  say probably right, belong to one group versus another.

24         **MR. QUINN:**  Okay.  You indicated in response to one

25  question that at one point, I don't know if it's your present job

Page 21

1   or a previous job, you were involved in a dispute with a coworker.

2         PROSPECTIVE JUROR:  No.  Actually it's not me, but we

3   have -- my coworkers within the group had dispute with the upper

4   management.

5         MR. QUINN:  Is that something that you were close to?

6         PROSPECTIVE JUROR:  No.  It just someone within the big

7   branch office.  We have about 20 people.  So he was at a different

8   branch, different unit.  Because within the office we have like

9   three or four branch.  So I mean, within the whole office we all

10  know about it.  But it's also state investigation.  So besides the

11  fact that we know there is a dispute, we don't know the detail

12  within of it.

13        MR. QUINN:  Sounds like this is not something that would

14  affect your own views about your employer or about employers

15  generally.

16        PROSPECTIVE JUROR:  No.  I don't want to get involved in

17  that, and I don't really matter, because I don't know anything

18  about it besides the fact.

19        MR. QUINN:  You indicated also that you had an idea

20  for -- a simple advertising idea involving tablecloths or

21  restaurant place mats.

22        PROSPECTIVE JUROR:  Well, yeah.  Back when -- about six

23  years ago, I have a friend and we talk about that idea because we

24  go to restaurant we eat at all the time.  And they have a

25  tablecloth which is plain paper.  We thought why don't we just

Page 22

1   start an advertisement where place an ad on to the sheet of paper.

2   So while people ordering food, they read it.  And lo and behold,

3   couple years, like two years ago, everyone doing it.

4           MR. QUINN:  See the movie "The Social Network"?

5           PROSPECTIVE JUROR:  I haven't saw it but I heard about

6   it.

7           MR. QUINN:  Pretty good movie.  Was it your partner or

8   your friend who created this business?

9           PROSPECTIVE JUROR:  No.  Actually we have the website

10  building partnership.  But what we do, we were at the restaurant

11  and we discuss about business, and we talk about advertisement.

12  So that went -- we pop up with the idea, but we didn't follow

13  through.  So now someone else did it.

14          MR. QUINN:  But not somebody who got the idea from you?

15          PROSPECTIVE JUROR:  No.  Because we don't know whoever

16  did that.

17          MR. QUINN:  Thank you.

18          Ms. Hinton, you work as a medical scribe; is that

19  correct?

20          PROSPECTIVE JUROR:  Yes.

21          MR. QUINN:  And you have got the Med Cats.

22          PROSPECTIVE JUROR:  MCATS.

23          MR. QUINN:  MCATS coming up.  That's what you take to

24  apply to medical school?

25          PROSPECTIVE JUROR:  Yes.

Page 23

1          MR. QUINN:  I know what that involves because I have a

2     daughter who went through that a couple years ago.  You indicated

3     in your questionnaire that's coming up from you in March?

4          PROSPECTIVE JUROR:  Correct.

5          MR. QUINN:  Now, it's possible if you get on this jury

6     that this trial could still be going on in March.

7          PROSPECTIVE JUROR:  Correct.

8          MR. QUINN:  And I guess my question to you is whether

9     that's going to be a problem for you, whether that would be a

10    distraction if you were here involved in this trial and you know

11    you have got to take this very important exam.

12         PROSPECTIVE JUROR:  Yes, it would be a distraction.  My

13    entire future rides that one test.  So.

14         MR. QUINN:  So are you involved in -- I assume you are

15    involved and anticipate right up to the exam date being involved

16    in studying and getting ready for that exam?

17         PROSPECTIVE JUROR:  Correct.

18         MR. QUINN:  You indicated you signed a HIPAA agreements,

19    which I only know enough to know that's some type of federal

20    regulation about medical record confidentiality.

21         PROSPECTIVE JUROR:  Patient confidentiality, yes.

22         MR. QUINN:  And what is your understanding of what you

23    can do or can't do under those HIPAA agreements?

24         PROSPECTIVE JUROR:  I have had to sign two because I'm a

25    volunteer in a hospital as well as the scribe.  So I come across

Page 24

1    patient information in two different forms.  As a volunteer it's a

2    need-to-know basis.  What I see and hear in the hospital cannot be

3    shared with anyone else.

4             And as a scribe, I have the privilege of knowing a

5    patient's past medical history in order to compile their record

6    while they're in the ER.  So everything I see and know cannot be

7    shared with anybody.

8             **MR. QUINN:**  So that's something -- confidential

9    information is something that you live with every day?

10            **PROSPECTIVE JUROR:**  Yes.

11            **MR. QUINN:**  In answer to one question about whether it's

12   okay to take things from an employer, as I read your answer, you

13   indicated it's not wrong to take thing besides personal

14   belongings.

15            Do you recall that question?

16            **PROSPECTIVE JUROR:**  Yes.  I was thinking of things that

17   you might learn that are kind of common sense that you get from a

18   job.  So I follow physicians in the ER and I learn how to approach

19   a patient and those kind of intangible concepts that you have to

20   learn to deal with in the medical field.

21            **MR. QUINN:**  Sort of like learning a language?

22            **PROSPECTIVE JUROR:**  Correct.

23            **MR. QUINN:**  But in your own mind are there also some

24   things that you could see you would learn in a job, they're

25   intangible, but really they need to stay at that job; it's not

Page 25

1    something you should be able to use?

2            **PROSPECTIVE JUROR:**  Yes.  As a scribe the specific

3    software that was developed that we use is patented by one of our

4    physicians.  So it can't be shared with anyone else although there

5    are multiple scribe companies to my company.

6            **MR. QUINN:**  Proprietary to the company that you work at?

7            **PROSPECTIVE JUROR:**  Correct.

8            **MR. QUINN:**  Mr. Gardelle.

9            **PROSPECTIVE JUROR:**  Yep.

10           **MR. QUINN:**  All is good.  You indicate your family is

11   from France?

12           **PROSPECTIVE JUROR:**  My dad is.

13           **MR. QUINN:**  Whereabouts in France.

14           **PROSPECTIVE JUROR:**  Southern.  Marseille.

15           **MR. QUINN:**  Marseille.

16           **PROSPECTIVE JUROR:**  Aix-En-Provence.

17           **MR. QUINN:**  You indicated, and I'm not sure whether I'm

18   reading your answer right or whether the question was unclear,

19   question 39, "describe any ethical, religious, political or other

20   belief that may prevent you from serving as a juror."  And you

21   said, "Ethical.  I'm French."

22           **PROSPECTIVE JUROR:**  I thought it was ethnical.

23           **MR. QUINN:**  I think we all agree French people can make

24   fine jurors.

25           **PROSPECTIVE JUROR:**  Sometimes.

1          MR. QUINN:  Based on anything that you have heard,

2     having sat through this process here for a couple of hours, do you

3     have any issues in your mind about whether you could be fair in

4     this case, or whether this is a good, bad, or indifferent case for

5     you to serve on?

6          PROSPECTIVE JUROR:  I don't know anything about it

7     really that could sway my opinion either/or.  I have no feelings

8     towards one or the other.

9          MR. QUINN:  One question that everybody answered is.

10    "What is your reaction, if any, to the statement, 'an employee can

11    use proprietary or confidential information that was used at a

12    previous job.'"  And you wrote "unstartled".

13         PROSPECTIVE JUROR:  You learn something at a job, you

14    should be able to use it in future situations.  So if you gain an

15    idea from somebody else, you don't copy the idea exactly.  But if

16    you modify that idea, then you make it your own.

17         MR. QUINN:  Right.

18         PROSPECTIVE JUROR:  But if you were to copy it word for

19    word, then yeah, that's wrong, in my opinion.

20         MR. QUINN:  All right.  So would you agree that, for

21    example, you could have engineering process methods or

22    transcription methods that really are proprietary to a particular

23    employer and shouldn't be used in a subsequent job?

24         PROSPECTIVE JUROR:  Yeah.

25         MR. QUINN:  Do you have any problem with the idea that

Page 27

1    an idea itself can be very valuable?

2              **PROSPECTIVE JUROR:**  Yeah.  I don't have a problem with

3    that.  I realize that ideas are very valuable.  So.

4              **MR. QUINN:**  Thank you.

5              Mr. Michelena, you enjoying your retirement from the

6    LAPD?

7              **PROSPECTIVE JUROR:**  Yes.  Very much.

8              **MR. QUINN:**  What do you like to do in your retirement?

9              **PROSPECTIVE JUROR:**  Play a lot of golf, racquetball.  Do

10   some traveling.

11             **MR. QUINN:**  Sounds good.  You indicated you have heard

12   of this case?

13             **PROSPECTIVE JUROR:**  Yes.

14             **MR. QUINN:**  And without -- I'm going to see if we can

15   avoid going out in the hallway -- without getting into the details

16   of it, can you tell us, like, roughly how long ago you heard about

17   it?

18             **PROSPECTIVE JUROR:**  Just faintly; probably several

19   months to a year ago some indication of a headline.  But nothing

20   in depth beyond that, other than knowing it existed.

21             **MR. QUINN:**  Are you thinking that you saw something in

22   the newspaper, is that what you recall?

23             **PROSPECTIVE JUROR:**  More than likely was.

24             **MR. QUINN:**  Without getting into the substance of it, do

25   you actually recall what it was that you saw?

1         **PROSPECTIVE JUROR:**  From back then, no.

2         **MR. QUINN:**  Do you, as you sit here now, do you have any

3    impression, based on -- as to whether Mattel has a good case or

4    MGA has a good case, or anything of that nature?  I'm trying to

5    find out whether whatever it was that you read, whether that's

6    something that would influence your thinking if you end up on this

7    jury.

8         **PROSPECTIVE JUROR:**  From what I filled out, that

9    questionnaire, that was very faint in my memory, and nothing --

10   from what I read more recently was more in depth.

11        **MR. QUINN:**  Okay.  And yes, that's right.  You did

12   mention that you saw an article more recently.

13        Do you think that -- again, without getting into the

14   content of that other article that you recently saw, if you are on

15   this jury, do you think that you could make your decisions as a

16   juror based on the evidence that's presented in this courtroom and

17   the instructions of law that the Court gives the jury and not take

18   into account anything that you may have read from these prior news

19   sources?

20        **PROSPECTIVE JUROR:**  Yes.

21        **MR. QUINN:**  Mr. Tran?

22        **PROSPECTIVE JUROR:**  Yes.

23        **MR. QUINN:**  Wonderful, you were born in Saigon.  Like

24   United nations here.

25        How long ago did you come to this country?

1          **PROSPECTIVE JUROR:**  I came here in 1975, which is about

2     35 years ago.

3          **MR. QUINN:**  That makes you 10 years old when you came.

4          **PROSPECTIVE JUROR:**  Yes.

5          **MR. QUINN:**  You look older than 10 now, I was going to

6     say.

7          Have you always lived in Southern California?

8          **PROSPECTIVE JUROR:**  Yes.

9          **MR. QUINN:**  Since you came to this country?

10         **PROSPECTIVE JUROR:**  Yes, that's correct.

11         **MR. QUINN:**  You indicate that you work in the avionics

12    industry?

13         **PROSPECTIVE JUROR:**  Yes.

14         **MR. QUINN:**  Big company, small company?

15         **PROSPECTIVE JUROR:**  Work for Panasonic avionics.

16         **MR. QUINN:**  That sound like a pretty big company.

17         **PROSPECTIVE JUROR:**  Yes.

18         **MR. QUINN:**  Now, you work as a manufacturing engineer.

19    Can you tell us what it is that you do?

20         **PROSPECTIVE JUROR:**  Basically I'm supporting

21    manufacturing to insure that the products goes smoothly and also

22    meet the deadline before the end of the month pay period.

23         **MR. QUINN:**  In your job, do you work with any

24    proprietary information or programs or information that's owned by

25    your employer?

1          **PROSPECTIVE JUROR:**  Yes, all the time.

2          **MR. QUINN:**  Can you tell us a little bit about that?

3          **PROSPECTIVE JUROR:**  Yes.  Basically I deal with the

4    drawings, engineering drawing and designs.  And previously before,

5    I was electrical engineering for that company also.  And then I

6    transferred down as a manufacturing.  And I still deal with the

7    proprietary drawings.

8          **MR. QUINN:**  Drawings can be proprietary?

9          **PROSPECTIVE JUROR:**  Yes.  Basically it's the designs to

10   the products.

11         **MR. QUINN:**  Thanks very much.

12         Ms. Done, are you in school now?

13         **PROSPECTIVE JUROR:**  I'll be starting in two weeks, full

14   time.

15         **MR. QUINN:**  That sound like it might conflict with this

16   trial if you are on the jury.

17         **PROSPECTIVE JUROR:**  Yeah.

18         **MR. QUINN:**  Can you tell us what type of educational

19   institution you'll be starting in?

20         **PROSPECTIVE JUROR:**  Orange Coast College, community

21   college in Costa Mesa.  And I'm taking General Ed because I'm

22   trying to do ultrasound school.  That's what I'm working towards.

23   So I'll be taking English, anatomy, physiology, political science,

24   trying to get into psychology.  I'm trying to get as many classes

25   as I can this semester.

1          MR. QUINN:  You are interested in getting in the medical

2     field from the standpoint of ultrasound, imaging?

3          PROSPECTIVE JUROR:  Yes.

4          MR. QUINN:  How did you get interested in that?

5          PROSPECTIVE JUROR:  Originally I wanted to do nursing,

6     just straight up nursing, but I really get -- I'm not okay with

7     blood and needles.  So it's noninvasive.  And I was just the next

8     best way.

9          MR. QUINN:  And you get to see those babies before

10    they're born.

11         PROSPECTIVE JUROR:  Yeah.  That would be fun.

12         MR. QUINN:  So you won't be looking for work.  You are

13    going to be going to school full time?

14         PROSPECTIVE JUROR:  Yes.

15         MR. QUINN:  In response to one of the questions about

16    taking things, personal belongings from an employer, in your

17    questionnaire you used the word "stealing."  Why did you --

18         PROSPECTIVE JUROR:  Like tangible, like merchandise.

19         MR. QUINN:  Do you think it's possible to steal things

20    that are intangible?

21         PROSPECTIVE JUROR:  Yes.

22         MR. QUINN:  That's -- you don't draw a distinction in

23    your mind between things that are, if they really are proprietary,

24    between things that are tangible and things that are intangible?

25              PROSPECTIVE JUROR:  No.

1          MR. QUINN:  And Mr. Longbotham, sir, you were candid in

2    your questionnaire.  Kind of said, "I'm not sure I can take

3    seriously a case about dolls."  Something which I think on the

4    face it was a reaction a lot of people would understand.

5          But you have heard what the Court said about the stakes

6    in this case.  You have heard me use the "B" word.

7          PROSPECTIVE JUROR:  Yes, I have.

8          MR. QUINN:  And MGA as well, they're going to, if you

9    are on this jury, ask for hundreds of millions of dollars.  Is

10   this a situation where because it involves dolls, you just simply

11   can't get your mind to a point where you could see that there is

12   that much at stake?

13         PROSPECTIVE JUROR:  I purposely left that question until

14   the very last, once I read it.  And I really honestly think that

15   like I said, I believe in the answer.  I know that it's very

16   important to you, I just don't know that I could place that level

17   of importance on what it is that we're talking about.  I mean --

18         MR. QUINN:  Absolutely.

19         PROSPECTIVE JUROR:  Honestly, I mean, you know, pieces

20   of plastic, I just don't know that I could be really serious about

21   that.

22         MR. QUINN:  I absolutely appreciate your candor.  Thank

23   you.  Do you think your views in that regard could -- might be

24   changed if you heard evidence or testimony about the billions of

25   dollars in sales of dolls?  Is that something that you think you

Page 33

1    are open to being -- to learning more about?  Let me put it that

2    way.

3              PROSPECTIVE JUROR:  I don't know that it's a monetary

4    thing, necessarily.  I think we're just spending a lot of time on

5    dolls, plastic dolls.  I know that it's very important to you all.

6    So that's why I'm trying to answer you as honestly as I can.

7    Because if I were on the jury, maybe I would be learn more about

8    it and then it might be important to me.  But it might not.  So.

9              MR. QUINN:  At the end of the day you might still decide

10   that --

11             PROSPECTIVE JUROR:  I might still decide that why were

12   we here; why are we all here.  It's a doll.  I don't know.

13             MR. QUINN:  Well, what I'm trying to ask, not very well

14   probably, is whether if you are on this jury, your mind would be

15   open to at least the possibility of hearing that there really

16   might actually be a lot at stake in terms of people's jobs, in

17   terms of sales, in terms of all the different things that are

18   important to a business?

19             PROSPECTIVE JUROR:  I don't know that I would be swayed.

20             MR. QUINN:  Okay.

21             PROSPECTIVE JUROR:  No.

22             MR. QUINN:  Absolutely do appreciate your candor.

23             You have indicated that you are a computer technician.

24             PROSPECTIVE JUROR:  Yes.

25             MR. QUINN:  What is it that you do?

Page 34

1          **PROSPECTIVE JUROR:**  Computers that are in the classroom

2     or classroom labs, I work for a high school district.  And

3     sometimes the students do things to them that they shouldn't do.

4     Sometimes they just break down, you know.  So I take them, repair

5     them, whatever.

6          **MR. QUINN:**  Get them running again.

7          **PROSPECTIVE JUROR:**  Get them running again, and return

8     them to the classroom or the lab.

9          **MR. QUINN:**  How long have you been doing that kind of

10    work?

11         **PROSPECTIVE JUROR:**  That specific kind of work, probably

12    for the last seven years.

13         **MR. QUINN:**  You also indicated that you had heard

14    something about this case.  And again, without getting into the

15    details --

16         **PROSPECTIVE JUROR:**  It was quite a long time ago and I

17    don't recall where I heard it, but something about the Bratz dolls

18    and the Barbies were competing against each other.  I don't really

19    remember what it was, but I did hear something about it or read

20    something about it, but it was quite a while ago.

21         **MR. QUINN:**  Again, without telling me what you remember

22    specifically, is this something where you recall hearing about

23    some determination or something that would reflect on whether

24    Mattel has a good case or bad case, or whether MGA has a good case

25    or bad case?

Page 35

1              **PROSPECTIVE JUROR:**  No.  I don't recall.  And no, I

2    don't believe that it was that material.

3              **MR. QUINN:**  So from that standpoint, whatever it was

4    that you were exposed to, it wouldn't affect your thinking if you

5    were a juror in this case?

6              **PROSPECTIVE JUROR:**  Specifically, no.

7              **MR. QUINN:**  Thanks very much.

8              Thank you, Your Honor.

9              **THE COURT:**  Counsel, Ms. Keller.

10             **MR. QUINN:**  Your Honor, may I just back up for a second?

11   Sorry.

12             Mr. Tran, in the back row, you also indicated that you

13   had heard something about this case?

14             **PROSPECTIVE JUROR:**  A while back.  I mean, within this

15   year something.  But I think probably I read one article online

16   mention about some dispute.  But I don't particularly know the

17   detail of it.  Just basically like the dispute between two

18   companies.  Mattel is so popular, the name stuck in my head.  But

19   the other party, I don't really remember what it was or what it

20   was in detail.

21             **MR. QUINN:**  Is that about it?  You don't really recall

22   anything else in terms of -- that might affect your view as to

23   which side might have a good case or --

24             **PROSPECTIVE JUROR:**  I don't even know what was the case

25   about.  It just mention about some lawsuit.  And so I left it at

Page 36

 1    that point.  I didn't dig deeply so I wouldn't make any

 2    pre-judgment on that.

 3            MR. QUINN:  Okay.  Let me just ask all you folks, you

 4    have heard me ask this question about whether you have in your

 5    mind -- and, sir, Mr. Longbotham, we have talked a little bit

 6    about this -- whether you have in your mind some predetermined

 7    limit on the amount damages that you could support, no matter what

 8    the evidence is.  The kinds of numbers that we're talking about

 9    here, both sides, are very, very large.  And both sides are

10    interested in knowing whether any of you, just notwithstanding

11    whatever the proof is, could not return a verdict for a very, very

12    large number, if it's a billion dollars or hundreds of millions of

13    dollars.

14            Are there any of you, looking inside yourselves, kind of

15    feel that way, yep, I could never agree to that?

16            Not seeing any hands.  Thanks very much.  Sorry, I

17    overlooked.  Sir?

18            PROSPECTIVE JUROR:  I don't have a problem with it but a

19    billion dollars?

20            MR. QUINN:  Billion dollars.

21            PROSPECTIVE JUROR:  That's a lot of money.

22            MR. QUINN:  It is a lot of money.  It is a lot of money.

23    What we are interested in knowing is whether you could.  If you

24    are on this jury, whether you could listen to the evidence and

25    evaluate it?

1          **PROSPECTIVE JUROR:**  I would.  But a billion dollars?

2          **MR. QUINN:**  My question to you -- and I understand the

3     reaction --

4          **PROSPECTIVE JUROR:**  I would be able to do it.  Just way

5     too much money.  But I would be able to pull myself to do it.

6               (LAUGHTER)

7          **MR. QUINN:**  Well --

8          **PROSPECTIVE JUROR:**  I just didn't know that people just

9     had that money.

10         **MR. QUINN:**  I think we can all agree you haven't heard

11    any of the evidence yet.  And MGA as well will be putting on

12    evidence and talking about some pretty big numbers.  And I think

13    all of our reaction to those kinds of numbers is similar.  But

14    what the jury in this case will be doing is hearing evidence and

15    making judgment based on the evidence that's presented here.  And

16    what we have got to ask people to do, and I appreciate your

17    speaking up and saying a "billion dollars?" what we are asking

18    people to do here is to kind of set aside that initial reaction

19    and say okay, I will listen to the evidence and decide this case

20    on the evidence that's presented and not some -- not a

21    presupposition or assumption about what a right number is or what

22    is too much.

23              That's really what I'm trying to find out.  I recognize

24    the initial reaction.  And so what I'm asking is, is that

25    something that would prevent you from returning a verdict for a

Page 38

1    billion dollars if you heard the evidence and you decided they

2    have proved it?

3              **PROSPECTIVE JUROR:**  It might make me think a little bit

4    harder about it, but I would be able to come up with a conclusion.

5              **MR. QUINN:**  Thanks a lot.

6              **THE COURT:**  Ms. Keller.

7              **MS. KELLER:**  Thank you, Your Honor.

8              Good afternoon, everybody.  Well, my first question is

9    to the whole new group, and it's based on what I have been hearing

10   from everybody.  I've been hearing that everybody has heard of

11   Mattel and nobody has heard of little MGA.  And I'm a little

12   worried about that.  Mattel is kind of a household word; right?

13   Everybody has heard of it.  It's the biggest toy company in the

14   world.  We're little guys.

15             **MR. QUINN:**  Your Honor, I object to these

16   characterizations.

17             **THE COURT:**  Sustained.

18             **MS. KELLER:**  My question is, Mattel being a household

19   word, do you think that you can give us a fair break?  Are we

20   starting out even or are we starting off in the hole with anybody

21   because we're not a household word?

22             Mr. Longbotham, put aside your doll feelings for a

23   minute, and just on that basis, you haven't heard of one and

24   everybody has heard of the other.  Are we restarting out behind?

25             **PROSPECTIVE JUROR:**  Other than the dolls issue, that

Page 39

1    would not make any difference to me.

2          MS. KELLER:  Is there anybody here to whom that would

3    make a difference?  Some people think if you are big, that means

4    you are good.  If you are big, that means you are successful.  If

5    you are big, that means you are the best.

6          And is there anybody who feels that way, can't give the

7    little guy a fair shake?

8          MR. QUINN:  Object, Your Honor.

9          THE COURT:  Sustained.  Counsel, just a minute.

10         There is no big boy pants or little big girl pants here.

11   How do we say this?  You may be more familiar with Mattel as a

12   name than MGA, or you may be more familiar with Barbie or Bratz,

13   but these are, you'll find out, pretty major corporations that

14   familiarity of name doesn't necessarily translate into a

15   disproportionality here.  They're both here in court, well

16   represented.  Now, that's familiarity of name; not big girls and

17   big boys and all that.  Let's strike that.

18         MS. KELLER:  Now, Mr. Longbotham, if we could go back to

19   what you were talking about with Mr. Quinn.  I understand that

20   it's hard for you to take dolls seriously.  I think probably

21   especially a lot of men feel that way, and some women feel that

22   way.  And I know it may seem like this is going to be boring.  All

23   I can tell you is the lawyers are going to try to make it

24   interesting as best we can.

25         We often are maybe a little too talkative, but we're

1    going to try to show you things and show you art, and show you

2    diagrams and show you dolls and try and make it interesting and

3    show you how the process works from beginning to end and all that.

4           You do understand that a lot of jobs depend on this

5    industry; right?

6           PROSPECTIVE JUROR:  I do.

7           MS. KELLER:  And we have a high unemployment throughout

8    the country now and especially here in Southern California and

9    these companies employ thousands of people; right?

10          PROSPECTIVE JUROR:  If you say so.

11          MS. KELLER:  Okay.  Well, I realize I'm asking you to

12   take my word for that, but regardless of whether dolls seem kind

13   of frivolous to you -- and again, like you said, to a lot of

14   people they do, even if they seem sort of frivolous to you, do you

15   still think you can be a fair juror in terms of hearing the

16   evidence and evaluating it, trying to decide who is telling the

17   truth, who is not, interpreting terms of a contract, following

18   law?

19          Can you do those things even if you think the issue is

20   kind of frivolous?

21          PROSPECTIVE JUROR:  I have to tell you I have thought

22   about it quite as bit, as I indicted in Mr. Quinn's questions, and

23   as I said before, I answered that question last on purpose because

24   I was really thinking about it.  And I have to answer that I don't

25   know.  I really don't know whether or not I can take it seriously.

Page 41

1           And yes, I do understand that it's a considerable amount

2    of money, and jobs and other things, but I just don't know whether

3    those things can make me take it as seriously as needs be taken

4    care of.

5           **MS. KELLER:**  Okay.  Will you try?

6           **PROSPECTIVE JUROR:**  If you wish to have me on the jury,

7    then that's kind of up to you guys.  I have given you my answer.

8    And I think you heard my answers to Mr. Quinn's questions.  I'm

9    not trying to evade your question.  I'm trying to answer you as

10   honestly as I can.

11          **MS. KELLER:**  No.  I understand.  And I'm not trying to

12   belabor the point either, which I probably know half the people

13   are saying, why doesn't she move on.  I guess I was wondering if

14   the fact that you think dolls are frivolous would make you unable

15   to sit here as a juror and makes calls about who is telling the

16   truth and who isn't.

17          **PROSPECTIVE JUROR:**  I think my answer continues to be

18   that I don't believe that I could do that.  If you put me on the

19   jury, I will try my best, but I still don't know, at the end of

20   the day or the end of the trial, whatever I would be able to set

21   that aside.  I mean, that's my answer.  I'm sorry.

22          **MS. KELLER:**  Okay.  No need to be sorry, really.  We're

23   happy to have all of you tell us what you really think.  Okay.

24          Ms. Done, it sounds to me like you are going to be full

25   time in school and not available to be on this jury.  Am I right?

Page 42

1          **PROSPECTIVE JUROR:**  That's what I hope to be doing.

2          **MS. KELLER:**  All right.

3          **PROSPECTIVE JUROR:**  This is really interesting and I'm

4     like happy that I made it this far.  So it's not like I'm not

5     enjoying it.

6          **MS. KELLER:**  Can you explain how interesting this is to

7     Mr. Longbotham?

8               (LAUGHTER)

9          **MS. KELLER:**  I'm just kidding.  No one is going to win

10    him over on that point, I don't think.  I'm going to move on then

11    to Mr. Tran.

12         Mr. Tran, you said your wife is in human resources?

13         **PROSPECTIVE JUROR:**  Yes, she is.

14         **MS. KELLER:**  Where does she work?

15         **PROSPECTIVE JUROR:**  Nationwide Insurance, which is

16    dealing with the insurance with cars and home.

17         **MS. KELLER:**  Now, you are an engineer like a couple of

18    the other people that we have.

19         **PROSPECTIVE JUROR:**  Yes, ma'am.

20         **MS. KELLER:**  Engineers are pretty careful people; right?

21         **PROSPECTIVE JUROR:**  We try to.

22         **MS. KELLER:**  Precision is very important in your job?

23         **PROSPECTIVE JUROR:**  That's correct.

24         **MS. KELLER:**  Precision in terms of scientific work, but

25    I assume also precision in terms of following directions?

Page 43

1          PROSPECTIVE JUROR:  That's correct.

2          MS. KELLER:  And in terms of understanding what you

3     read?

4          PROSPECTIVE JUROR:  That's correct.

5          MS. KELLER:  And having what you read be very precise?

6          PROSPECTIVE JUROR:  Yes.

7          MS. KELLER:  Now, again, Mr. Quinn asked some questions

8     about proprietary information.  I assume you would expect to see a

9     level of precision in documents describing employees' obligations

10    about proprietary information, true?

11         PROSPECTIVE JUROR:  That's correct.

12         MS. KELLER:  So until you see those documents, know

13    yourself, and read them for yourself, and hear about them for

14    yourself, you can't really take what either Mr. Quinn says or what

15    I say about what these documents spelled out about Mattel's

16    employees; right?

17         PROSPECTIVE JUROR:  Yes.

18         MS. KELLER:  Okay.  Can you think of any reason why you

19    wouldn't want to sit on this jury?

20         PROSPECTIVE JUROR:  A long time I guess, four months.

21    That's pretty long to me.  But I would try my best to be

22    impartial, understand which is the right direction to go.

23         MS. KELLER:  Your chair is comfortable enough for you?

24         PROSPECTIVE JUROR:  Wonderful.

25         MS. KELLER:  Okay.

Page 44

1          **PROSPECTIVE JUROR:**  Hope it doesn't put me to sleep.

2          **MS. KELLER:**  Is it Mr. Michelena?  Mr. Michelena, you

3     said you know one of the witnesses who was listed or you think you

4     might, Richard De Anda and that was a person you were with at the

5     LAPD?

6          **PROSPECTIVE JUROR:**  Yes.

7          **MS. KELLER:**  Do you know if that person went on to

8     become the head of security at Mattel?

9          **PROSPECTIVE JUROR:**  Yes, he did.  So that is the same

10    person.

11         **MS. KELLER:**  Yes.  Now, in what capacity did you know

12    him in LAPD?

13         **PROSPECTIVE JUROR:**  He was in charge of the homicide

14    unit at West LA division and I was working gangs around that area.

15    So we interacted.

16         **MS. KELLER:**  Gangs have homicides.

17         **PROSPECTIVE JUROR:**  Yeah.  And so I knew him.

18         **MS. KELLER:**  How well did you know him?

19         **PROSPECTIVE JUROR:**  Well, we weren't close friends.  We

20    did not interact outside of the job.  But we interacted

21    professionally and not that much.  But I knew him.

22         **MS. KELLER:**  For how many years did you know him?

23         **PROSPECTIVE JUROR:**  That would have started about 1980

24    and probably through '87.  I'm not sure when he retired, but from

25    '80 to '87.

1          MS. KELLER:  Do you have a positive impression?

2          PROSPECTIVE JUROR:  He is a very good guy.

3          MS. KELLER:  You have a positive impression of his

4     credibility?

5          PROSPECTIVE JUROR:  Absolutely.

6          MS. KELLER:  Think he is an honest guy, straightforward?

7          PROSPECTIVE JUROR:  Yes.

8          MS. KELLER:  Now, you said you read a news article after

9     filling out the questionnaire in this matter?

10         PROSPECTIVE JUROR:  Right.

11         MS. KELLER:  What publication?

12         PROSPECTIVE JUROR:  Orange County Register.

13         MS. KELLER:  Do you remember when you read that?

14         PROSPECTIVE JUROR:  I think I filled out that

15    questionnaire Thursday.  I believe it was Friday, the next day.

16         MS. KELLER:  Was it online you read it?

17         PROSPECTIVE JUROR:  No.  I get the paper delivered.

18         MS. KELLER:  Like old people like me who actually read a

19    real newspaper.

20         PROSPECTIVE JUROR:  That's right.

21         MS. KELLER:  We're a dying breed I think.

22         Now, you said you only had the original article you

23    read.  You said you only had a passing familiarity with it.

24         PROSPECTIVE JUROR:  Right.

25         MS. KELLER:  Again, without going into it because think

Page 46

1   perhaps His Honor is going to want us to do that in private, do

2   you have an opinion, do you find yourself thinking this side of

3   table probably has the best argument or this?

4           PROSPECTIVE JUROR:  Based on the article I read?

5       MS. KELLER:  Or the article and before.

6           PROSPECTIVE JUROR:  That would be hard to speak about in

7   front of all the potential jurors.

8       MS. KELLER:  We don't want you to.  We'll wait and talk

9   about that privately if we can.

10          THE COURT:  You want to talk about that now, counsel,

11  because if -- why don't we just discuss that whatever you read.

12  Come on back for just a moment.

13          Ladies and gentlemen, why don't you visit with

14  yourselves.

15              (The following proceedings were held at sidebar.)

16          THE COURT:  We're on the record at sidebar and, of

17  course, we're trying to keep information or opinions away from the

18  jury, and you were very wise.

19          What have you read about this and what were your

20  thoughts when you read it?

21          PROSPECTIVE JUROR:  Well, I read that article -- it was

22  short -- in the Register, I think the business section, that

23  indicated that the retrial was coming up basically at the end of

24  the month.  And it indicated it was a retrial based on an appeal

25  that was granted, and that Mattel won the first round and got

Page 47

1    $100 million that was overturned now we're in a retrial.

2            That was pretty short and sweet.  That's it.

3            THE COURT:  Thus far I think that we are trying to

4    insulate the jury from that information because a lot of jurors

5    don't know that.  But perhaps sometime during the trial it may

6    become inevitable that there is some discussion about this

7    actually might be a retrial.  But for whatever reasons the jury

8    would be instructed that we're starting all over again.

9            Whatever that first trial was, whatever the issues or

10   problems were, obviously the circuit decided that needs to be

11   retried.  And I would be admonishing you if you would follow that

12   and, in fact, not share any information you read with the jury.

13           Could you do that?

14           PROSPECTIVE JUROR:  Absolutely.

15           THE COURT:  Let counsel continue and have at you.

16           MS. KELLER:  I wouldn't put it that way, "have at you."

17           MR. QUINN:  Is that what you read -- that is something

18   we all ask jurors to do, this intellectual exercise, can you put

19   it out of your mind and decide based on what you hear in the

20   courtroom?  Is that something you could do?

21           PROSPECTIVE JUROR:  I actually think I could.  I've been

22   around enough to know the second time around could be a different

23   set of circumstances and a different ear to hear it.

24           So I mean, part of me says I would like to go play some

25   golf but I really do understand that I could hear it all again and

Page 48

1    come up with a different --

2           **THE COURT:**  You can't even assume -- and I instruct --

3    the same issues are even involved.  This could have additions to

4    it, subtractions from it.  It may look like an entirely different

5    lawsuit for both sides.

6           **PROSPECTIVE JUROR:**  I don't see an issue.

7           **THE COURT:**  Okay.  Not so fast.

8           Ms. Keller, do you have any questions?

9           **MS. KELLER:**  On that issue, no.

10          **THE COURT:**  Mr. Quinn?

11          MR. QUINN:  No.

12          **THE COURT:**  Mr. Overland?

13          MR. QUINN:  No.

14          **THE COURT:**  Sir, thank you very much.

15          **MS. KELLER:**  Your Honor, the biggest problem, I don't

16   know if you want to entertain a for cause challenge or wait.

17          **THE COURT:**  You can entertain a cause challenge if you

18   would like to.  But before you do, let me say something to all of

19   you.  Sometime courts make legal rulings and they're good legal

20   rulings to begin with, and they can be protected.  And this is one

21   of those rulings that I feel strongly that the jury should know

22   even a first trial existed, because then we get into the

23   explanation of why are we trying it a second time.

24          But with the rulings I have made, it doesn't look like

25   the first trial.  We have had additions, we have had phase 2

1    coming to phase 1; certain parts of phase 2 never got off the

2    ground; certain parts of phase 1 don't exist any longer with the

3    success issues.

4           I think over the course of this trial in four months

5    it's going to become known to this jury that there was a prior

6    trial, and that may simply be that we have these jurors wake up

7    some day and say, "I forgot at the time but now I understand, I

8    remember this case because of some question you answered."

9           It didn't mean that he lied to us to begin with.  It

10   just means that they're answering their best and something happens

11   two months down the line when somebody asks a question and they

12   relate that back to this case.

13          I'm going to instruct either this evening, that we're

14   going to prepare an admonishment, if they're trying to protect

15   that ruling, about what the Court would say at that time.

16          **MS. KELLER:**  We have had so many already who have heard

17   about it.

18          **THE COURT:**  I'll tell you it's good legal reason and a

19   ruling that can't be protected.  It's either going to happen

20   through a witness inadvertently blurting that out or intentionally

21   blurting that out and pretended it was inadvertent, or counsel

22   slipping someplace along the way.

23          I'm saying to you in the real world of litigation,

24   unlike the real world of decision-making, that's a very difficult

25   ruling to protect.  And I just caution you in some ways we ought

Page 50

1    to think about that when it occurs, or just come out with

2    something now that was there at trial, that that is an entirely

3    different trial; that these issues are substantially different

4    than the first trial.  But I leave that to you.

5              Until that point, I have made the ruling this is staying

6    out.

7              You have a motion for cause?

8         MS. KELLER:  I was going to make a motion for cause

9    because of this witness's personal knowledge of and having worked

10   with and having already formed a very strong opinion about the

11   credibility of a witness, in this case head of Mattel security.

12        THE COURT:  What is he going to testify to?

13        MR. MCCONVILLE:  He is going to testify, Your Honor -- I

14   think he is on Mattel's witness list, but he would testify about

15   statute of limitations issues, what did Mattel do as it related to

16   investigation of Bratz.

17        MS. KELLER:  Which could be a very substantial part of

18   the case.

19        MR. COTE:  He also was ultimately in charge of the

20   investigation of Mr. Machado.  So we would join in the motion.

21        THE COURT:  Let me hear from Mr. Quinn.

22        MR. QUINN:  I think he is a peripheral witness.  I heard

23   the juror say that he knew him but didn't know him well.  Never

24   socialized with him outside work.

25        THE COURT:  Let's ask him to come back.  We didn't

1   question him on that.  Right now I'm inclined to grant your

2   motion.

3                  (Whereupon the prospective juror was summoned back

4   to sidebar.)

5            THE COURT:  I wanted to talk to you about Mr. De Anda.

6   Let me start for a moment with Mr. De Anda.  How well did you know

7   this person?

8            PROSPECTIVE JUROR:  We were housed in the same building.

9   And to be honest with you, I'll give you the background.  I worked

10  gangs for a whole year.  And so once in a while we would interact.

11  I'd talk to him.  He is a very friendly, nice guy.  And he had a

12  really good reputation.  And I was kind of young at the time

13  learning homicide and gangs, so I would go to him and talk to him,

14  and get a little advice here and there.

15           So we never were, as I recall, involved in a case

16  together.  But because we were in the same building, we would see

17  each other every day, talk and stuff.  Maybe once in a while there

18  might have been some small connection with a case, but nothing big

19  compared to other professional associations.

20           THE COURT:  You were a captain?

21           PROSPECTIVE JUROR:  I retired as a captain.  I was a

22  detective then.

23           THE COURT:  My concern isn't the association.  It's

24  whether Mr. De Anda would be more credible, let's say, just by

25  virtue of his prior knowledge concerning his character when he

Page 52

1    took the stand versus another police officer or a person on the

2    other side who was testifying about an issue that Mr. De Anda

3    might be testifying to.  That's my -- and it's not a concern.

4         **PROSPECTIVE JUROR:**  Well, I think somebody mentioned

5    yeah, and I have to say I am left with a very good impression of

6    him.  So in an honest answer to that, he is on the stand, I will

7    give him good credibility because I had nothing but a very good

8    impression of him.

9         **THE COURT:**  I think that's fair.  That's why we put all

10   the witnesses on that list.

11        Mr. Quinn.

12        **MR. QUINN:**  Nothing further, Your Honor.

13        **MS. KELLER:**  Nothing further, Your Honor.

14        **THE COURT:**  All right, sir.  If you would go back for

15   just a moment, and thank you.

16        From my perspective, the association is not the critical

17   part of the inquiry.  It's his in-depth feeling about this person.

18   And because the prior relationship was strong, because he believes

19   this person has good character, which apparently he does, he comes

20   into the case more apt to believe this person than a counter

21   witness which he has no association with that really unbalances

22   this, and I'm going to grant your motion for cause, and thank you.

23             (End side-bar.)

24        **THE COURT:**  Mr. Michelena, we're going to thank and

25   excuse you, sir.  Your answers were absolutely helpful to us.  You

Page 53

1    have done as much service as if you had served for the next three

2    or four months, frankly.  So thank you very much.

3              If you would call an additional juror, please.

4              **THE CLERK:**  Carolyn Voss.

5              **THE COURT:**  Ms. Voss, have you heard all the prior

6    questions?

7              **PROSPECTIVE JUROR:**  Yes.

8              **THE COURT:**  Now, would you please fair and impartial to

9    both sides?

10             **PROSPECTIVE JUROR:**  Yes.

11             **THE COURT:**  Follow the law?

12             **PROSPECTIVE JUROR:**  Yes.

13             **THE COURT:**  Now counsel, Ms. Voss, do you know who Ms.

14   Voss is?

15             **MR. QUINN:**  I have read it in the questionnaire.

16             **THE COURT:**  Okay.  Now, counsel, Mr. Quinn?

17             **MR. QUINN:**  Your Honor, I don't believe you were just

18   going to instruct this --

19             **THE COURT:**  I was thinking he might start with his

20   question, finish with Ms. Voss.  But if you would like to

21   continue, you want to finish your portion.

22             Mr. Quinn, why don't you wait then and we'll go back.

23             Ms. Keller, why don't you finish your portion with all

24   the questions and we'll come back with rebuttal.

25             **MS. KELLER:**  If I could have one second to find this.

Page 54

1           Ms. Voss, do you have any pre-formed perceptions,

2    concerning this case because of your employment?

3           **PROSPECTIVE JUROR:**  Yes.

4           **THE COURT:**  So you have an opinion about possibly --

5    maybe we should speak to you privately for just a moment.

6           Counsel, would you mind if we do that?  Might save a lot

7    of time.  Excuse us again for just a moment.

8                  (The following proceedings were held at sidebar.)

9           **THE COURT:**  We're on the record and Ms. Voss is present.

10   The Court, if a circuit reviews this record, the circuit, unless

11   we went back to the questionnaire would not know what we're

12   discussing.  So we cannot assume.  So let's set the record.

13          Ms. Voss is the judicial assistant to judge AliceMarie

14   Stotler who was our former chief and therefore she knows

15   everything about this system.  And a colleague of mine.  I don't

16   think -- have I discussed this case with you?

17          PROSPECTIVE JUROR:  No.

18          **THE COURT:**  I don't think I have discussed the case with

19   anybody except my law clerks after it was transferred to me.

20          Do you have any preconceptions about this case?  If so,

21   why don't I let you state what those are.

22          **PROSPECTIVE JUROR:**  I've followed the case since Judge

23   Larson with the first verdict and Kozinski's ruling and discussed

24   it with the law clerks.

25          **THE COURT:**  In your chambers?

Page 55

1          **PROSPECTIVE JUROR:**  In our chambers.

2          **THE COURT:**  Want to make sure it's not my law clerks.

3   And have you discussed it with Judge Stotler?

4          **PROSPECTIVE JUROR:**  Yes.

5          **THE COURT:**  The Court system, of course, is aware of

6   Judge Kozinski's 18-page opinion.  And once again I come back to

7   that problem that I raised over the last occasion.

8          So Mr. Quinn.

9          **MR. QUINN:**  You followed this case when it was out in

10  Riverside?

11         **PROSPECTIVE JUROR:**  Yes.

12         **MR. QUINN:**  How did you stay abreast?

13         **PROSPECTIVE JUROR:**  The docket.

14         **MR. QUINN:**  The docket meaning?

15         **PROSPECTIVE JUROR:**  Orders and so forth.

16         **MR. QUINN:**  But I mean, do you sort of have an

17  understanding of what rulings were made?  And what I'd really like

18  to understand is what level of detail you have an -- you know this

19  case.

20         **PROSPECTIVE JUROR:**  Well, I read the opinion.  I know

21  what the first verdict was.  And I have an opinion what you should

22  do now.

23         **MR. QUINN:**  Did read your questionnaire, and in the

24  abstract a lot of people might share the same view.  But do you

25  have some views on the merits of the case?

Page 56

1          **PROSPECTIVE JUROR:**  No, I didn't hear any testimony

2   whatsoever for the merits.  Simply the legal documents.

3          **MR. QUINN:**  But in terms of maybe some of the issues,

4   the copyright issues, whether or not there was infringement or

5   whether there was theft, whether there was unfair competition, I

6   think we maybe can all form opinions or sort of have views even

7   without reading testimony sometimes.

8          **PROSPECTIVE JUROR:**  Um-hmm.

9          **MR. QUINN:**  You obviously had exposure to a much greater

10  degree probably than anyone else out there and I'm kind of

11  interested to find out whether you are the clean slate on the

12  merits or whether you find yourself, if you look inside yourself,

13  already kind of having some views on some of the --

14         **PROSPECTIVE JUROR:**  I already have some views on it.

15         **THE COURT:**  Let me ask her a question also.

16         This case, it may not like anything like the first case

17  and if you read about this case you know it was in phases.

18         **PROSPECTIVE JUROR:**  Yes.

19         **THE COURT:**  And whether I agree or not with that phase,

20  when it was transferred to me I decided to have one trial.  This

21  case may look significantly different than the first case.  That

22  doesn't mean what the verdict should be, whether the first verdict

23  was virtuous or not, or the correct verdict, or the amounts if you

24  did reach a verdict for either of the parties, because MGA has

25  counterclaims which could have waited until the second phase.

Page 57

1   This coming together of what was phase 1, 1A, 1B, 2, etcetera, is

2   a compilation of a case that may be absolutely unique than the

3   first case.  Understood?

4           **PROSPECTIVE JUROR:**  Yes.

5           **THE COURT:**  I just wanted to make that clear, because

6   people who know about this case may be assuming that this is like

7   the first case.  This is everything together.

8           **MR. QUINN:**  Can I follow up, Your Honor?

9           **THE COURT:**  You can ask as many questions as you like.

10          **MR. QUINN:**  You told me that you sort of have some views

11  on some of the issues in the case.  Is that an accurate statement?

12          **PROSPECTIVE JUROR:**  Yes.

13          **MR. QUINN:**  And what are those views?

14          **PROSPECTIVE JUROR:**  I think that the idea was taken by

15  the artist and the first jury rendered, what, a million dollars?

16  And I think you guys should work this out.

17          **MR. QUINN:**  Are you available this weekend?

18          **THE COURT:**  Let's say for whatever reason it won't be

19  resolved.

20          **MR. QUINN:**  You indicated you also know some of the

21  lawyers.  You indicated have we met before.

22          **PROSPECTIVE JUROR:**  I have not met you.

23          **MR. QUINN:**  Have you dealt with other lawyers at Quinn

24  Emanuel?

25          **PROSPECTIVE JUROR:**  I believe Mr. McConville, and your

Page 58

1    name is very familiar to me.

2              **MS. KELLER:**  I have been around a long time.

3              **PROSPECTIVE JUROR:**  I also was a courtroom deputy for a

4    number of years and I was also the deputy in charge.

5              **MS. KELLER:**  May I ask a follow-up question?

6              **THE COURT:**  When Mr. Quinn is done.

7              **MR. QUINN:**  So in terms of dealings with Quinn Emanuel

8    lawyers, do you recall any of my partners or colleagues?

9              **PROSPECTIVE JUROR:**  No.  Just familiar with the law

10   firms' names.

11             **MR. MCCONVILLE:**  Do you have a good opinion of me as a

12   lawyer.  I think that's the most important question.

13             **MR. QUINN:**  Let's be serious.

14             **THE COURT:**  When they're done, if you have some

15   questions.  So I'll provide Ms. Keller.

16             **MS. KELLER:**  Okay.  You said you read Judge Kozinski's

17   opinion.

18             **PROSPECTIVE JUROR:**  I did.

19             **MS. KELLER:**  His opinion can be pretty entertaining.

20             **PROSPECTIVE JUROR:**  Yes.

21             **MS. KELLER:**  What did you think of his opinion when you

22   read it?

23             **PROSPECTIVE JUROR:**  I didn't like it.

24             **MS. KELLER:**  Why not?

25             **PROSPECTIVE JUROR:**  I can't say specifically why not.  I

Page 59

1  like what the jury wrote the first time.  I believe the trial the

2  first time was correct.

3          MS. KELLER:  So you think Judge Kozinski's opinion was

4  incorrect?

5          PROSPECTIVE JUROR:  I do.

6          MS. KELLER:  You feel that pretty strongly?

7          PROSPECTIVE JUROR:  In my opinion, yes.

8          MS. KELLER:  Okay.

9          THE COURT:  Mr. Overland?

10  MR. OVERLAND:  No.

11          THE COURT:  Mr. Quinn?

12  MR. QUINN:  No.

13          THE COURT:  I want to thank you very much.

14          (Whereupon the prospective juror was excused.)

15          MS. KELLER:  Your Honor, she's prejudged the significant

16  part of the case.  She decided the Ninth Circuit was wrong and the

17  first jury should be restated, at least as to whatever issues they

18  decided.  And I can't imagine a case where somebody is more

19  excusable for bias than here, even though she is great and she's

20  got strong views.

21          THE COURT:  On another case maybe.

22  Mr. Quinn?

23          MR. QUINN:  Counsel is right, Your Honor.

24          THE COURT:  And my concern also she said she spoke to

25  Judge Stotler about the case.  She didn't know she would be a

Page 60

1    juror at the time.  This case has some notoriety in the court

2    system because of the volume of work involved, the motions,

3    etcetera.  And I'm certain that Carolyn and Judge Stotler are very

4    close, which is a good sign.

5             What I'm more worried about is Judge Stotler expressed

6    an opinion not knowing that Carolyn would be a witness because

7    judges and their judicial assistants and law clerks talk.

8    Therefore I think that under these circumstances motion for cause

9    is well taken.

10            **MS. KELLER:**  The most important issue is do I get

11   anymore time?

12               (End side-bar.)

13            **THE COURT:**  Ms. Voss, the Court is going to thank and

14   excuse you.  Thank you very much for your candid answers.  Very

15   much appreciated.

16            **THE CLERK:**  Allen Quintana.

17            **THE COURT:**  Mr. Quintana, you have the seat, seat number

18   five.

19            Ms. Keller, you want to continue on with the new juror

20   as well.

21            **MS. KELLER:**  I'm going to speed read, Your Honor.

22            Mr. Quintana, welcome.

23            **PROSPECTIVE JUROR:**  Thank you.

24            **MS. KELLER:**  Is there any reason that you would be

25   unable to be with us for the next four months?

Page 61

1          PROSPECTIVE JUROR:  No, ma'am.

2          MS. KELLER:  Given what you have heard so far from both

3    of the lawyers, do you have any particular reactions?

4          PROSPECTIVE JUROR:  No, I don't.  I don't know anything

5    about this case so I'm here just to show up and be a

6    representative and listen.

7          MS. KELLER:  All right.  I see on your questionnaire

8    that you have either yourself or family members involved in

9    advertising art or design, contracts, fashion.

10         Can you tell me about that.

11         PROSPECTIVE JUROR:  My brother, my younger brother has

12   his own business in the -- as far as health drinks and stuff like

13   that.

14         MS. KELLER:  What about fashion?

15         PROSPECTIVE JUROR:  As far as fashion, my niece, she is

16   getting into fashion industry as we speak.

17         MS. KELLER:  And I see human resources.

18         PROSPECTIVE JUROR:  Yes.  As far as human resources, I

19   work for different companies.  I also was involved in quality

20   control for Kwikset Keys and I worked for Northrop, and I was

21   involved with a lot of activities towards that.

22         MS. KELLER:  Now you said in your questionnaire also you

23   heard of Mattel.

24         PROSPECTIVE JUROR:  Yes as obviously a child.

25         MS. KELLER:  Not of MGA?

Page 62

1          PROSPECTIVE JUROR:  No, ma'am.

2          MS. KELLER:  Have you heard anything about the case?

3          PROSPECTIVE JUROR:  Absolutely not.

4          MS. KELLER:  You haven't read anything, heard anything

5     on the radio?

6          PROSPECTIVE JUROR:  No, I have not.

7          MS. KELLER:  I'm going to come back to you in a little

8     bit here.

9               It's been a while now, so who else do we have?  We have

10    got Mr. Gardelle.  I haven't talked to you yet.

11              A billion dollars is a lot of money, isn't it?

12         PROSPECTIVE JUROR:  It is.

13         MS. KELLER:  And I think Mr. Quinn's point was no matter

14    how many zeros there are on something, if we prove our case, or if

15    they prove their case, will you have any trouble listening to --

16    we're going to have experts testifying about damages, which means

17    how much money each company says it lost.

18         PROSPECTIVE JUROR:  I won't be able to fathom the

19    damage.

20         MS. KELLER:  I can't either, but nevertheless.

21         PROSPECTIVE JUROR:  If they have the money, yeah, they

22    can do it.  I'll come to a conclusion.

23         MS. KELLER:  Okay.  Now, you are 21.

24         PROSPECTIVE JUROR:  Yep.

25         MS. KELLER:  Just from looking around I would say most

Page 63

1   of the people in this group are a little older than you.

2           PROSPECTIVE JUROR:  Tiny bit.

3           MS. KELLER:  If you end up on the jury, are you going to

4   be able to hold your own with people who may be your parents' age

5   or older?

6           PROSPECTIVE JUROR:  Yeah.

7           MS. KELLER:  You get back in the jury room and people

8   have to talk about things, have to debate things, and are you

9   going to feel like you have to defer to older people?

10          PROSPECTIVE JUROR:  No.

11          MS. KELLER:  I had a feeling that was the case.  But I

12  just wanted to make sure.

13          And Ms. Hinton, I've got the same question.  But before

14  I get to that question, I don't want to waste your time.  You are

15  determined to study for the MCATS, and I know that takes a lot of

16  study.  How many hours a day?

17          PROSPECTIVE JUROR:  At least seven.

18          MS. KELLER:  And are you planning to spend more time as

19  you get closer to the exam itself?

20          PROSPECTIVE JUROR:  Yes.  A practice exam takes five

21  hours by itself, and there was at least 11.  So.

22          MS. KELLER:  That's the 11 recommended that you take and

23  then more if you really prepare.  So would it be fair to say that

24  you don't really believe you have time to serve on this jury and

25  all study for the MCAT?

Page 64

1          PROSPECTIVE JUROR:  That would be correct.

2          MS. KELLER:  Am I also right that the MCAT counts for an

3    enormous amount of points in terms of getting into medical school?

4          PROSPECTIVE JUROR:  First thing they look at.

5          MS. KELLER:  Then I'm going to go on, if it's okay with

6    you.

7          PROSPECTIVE JUROR:  Yes.

8          MS. KELLER:  And Mr. Tran.

9          PROSPECTIVE JUROR:  Yes, ma'am.

10         MS. KELLER:  We have a little thing on here, that you

11   know a little something about the case.  You have heard a little

12   something about it; right?

13         PROSPECTIVE JUROR:  Yes.

14         MS. KELLER:  And what was the source of the information,

15   entity?  Newspaper?

16         PROSPECTIVE JUROR:  I believe it was internet because I

17   don't subscribe to newspaper until recently.  So usually I listen

18   to radio and read news online.  So it was one of those news on

19   line.

20         MS. KELLER:  Has it made a big enough impression on you

21   that you feel one side or the other is starting out a little ahead

22   or behind?

23         PROSPECTIVE JUROR:  I don't believe so.  When I first

24   answered the question, like you say, Mattel is a household name,

25   but besides that, a name like you talk about John and Mary versus

Page 65

1    Jacquelyn, someone else.  I don't remember.  Basically it's just a

2    common name versus a not common.  That's it.

3            MS. KELLER:  All right.

4            And Ms. Liao, is that Dr. Liao?  I guess you have got a

5    Ph.D.?

6            PROSPECTIVE JUROR:  Yes.

7            MS. KELLER:  You are a lot smarter than I am.  You said

8    that you signed employment agreements with the companies that you

9    have worked for in the past?

10           PROSPECTIVE JUROR:  Yes.

11           MS. KELLER:  Did those companies give you a copy of the

12   agreement?

13           PROSPECTIVE JUROR:  I don't remember; 14 years ago.

14   Probably did.

15           MS. KELLER:  But you are not sure.

16           PROSPECTIVE JUROR:  I'm not sure.

17           MS. KELLER:  Would you agree with me until you see the

18   actual contract in this case, you can't decide one way or the

19   other whether it covers, say, ideas on nights and weekends, you

20   don't know until you see the contract and hear the evidence?

21   Would that be true?

22           PROSPECTIVE JUROR:  Right.

23           MS. KELLER:  Even if your contract, you feel, is very

24   broad, can you keep an open mind about what this particular

25   contract said?

Electronically signed by Maria Beesley (501-187-561-9309)                           800bbe38-eaee-4dc6-bada-8b6415218f35

Page 66

1          PROSPECTIVE JUROR:  Yes.

2          MS. KELLER:  What level of precision do you think that a

3   company should be held to in terms of writing those contracts

4   clearly?

5          PROSPECTIVE JUROR:   I think they should be as precise

6   as possible because there is a lot of things up to people's

7   interpretations.  One person can interpret one way and the other.

8   You can't say it's wrong if it's not spelled out precisely.

9          MS. KELLER:  And in the case of the contracts that you

10  have had, do you feel they were spelled out very clearly or do you

11  think that there were things that were ambiguous?

12         PROSPECTIVE JUROR:  I have to be honest, because that

13  was my first job when I came out of school, and I wasn't really

14  reading everything line to line I know that if I don't sign it,

15  I'm probably not going to get the job.

16         MS. KELLER:  So you weren't the one who got to write it;

17  the company wrote it.

18         PROSPECTIVE JUROR:  Yeah.

19         MS. KELLER:  And so has that been the case generally

20  with the contracts that you have signed, that if you didn't sign

21  it, you weren't getting hired?

22         PROSPECTIVE JUROR:  They didn't put it that way.  And I

23  didn't ask them if I don't sign this, does that mean I don't get

24  the job.

25         MS. KELLER:  But you knew.

Page 67

1          PROSPECTIVE JUROR:  I think it's --

2          MS. KELLER:  Now is there anybody on the current group

3     of people who has anything that they think they would -- if you

4     were standing in my shoes now, is there anything you would want to

5     know?  You are standing here and I'm up there, tell me if there is

6     anything I should know about you that we haven't already

7     discussed.  I see one hand.

8          PROSPECTIVE JUROR:  My question is everybody ask me

9     about this country, where I come from, what the Barbies.  Nobody

10    ask me about this income, which financial problem that I have

11    here.  I want to explain.

12         THE COURT:  We'll discuss that later.  Let counsel

13    finish with the alternates.

14         PROSPECTIVE JUROR:  Sorry.

15         MS. KELLER:  Unless there is anything, this is the last

16    call, as they say, in bars.  Is there anything you want to tell

17    me?  Now is the time.  Okay.  Thanks.

18         THE COURT:  Now, there were two other jurors.  Ms.

19    Keller, are you satisfied with you talked to all potential

20    alternates?

21         MS. KELLER:  You are right.

22         THE COURT:  There were two others called.  That's why I

23    wanted to turn it to Mr. Quinn, but I didn't want to interrupt

24    your discussions.  Just make certain you have talked to everybody

25    you want to.

Page 68

1          **MS. KELLER:**  I think that I have.

2          **THE COURT:**  I think you have.  Just make sure.

3          **MS. KELLER:**  I am old, but I think I have talked to

4     everybody.

5          **THE COURT:**  Not old.  Wait until you get to my age.

6          Mr. Overland.

7          And then Mr. Quinn, we'll come back to you and you can

8     start any place you would like to.

9          **MR. OVERLAND:**  Mr. Gardelle, can you pick up that mic,

10    please?

11         **PROSPECTIVE JUROR:**  Yes.

12         **MR. OVERLAND:**  You had some concerns about the billion

13    dollars that Mattel is asking for you.  Do you think that just

14    because Mattel is asking for a billion dollars in damages that

15    they're entitled to anything?

16         **PROSPECTIVE JUROR:**  No.  There should be a reason for

17    that large amount of money.  So I don't know the reason yet.

18         **MR. OVERLAND:**  Let's say that you are selected as a

19    juror in this case -- and by the way, as to Mr. Machado, I think

20    you'll hear that they're asking for $6.5 million.  That's with an

21    M as in Mary, not billion.

22         But at any rate, if you are selected as a juror in this

23    case, and you hear the evidence, and you listen to the Court's

24    instructions, and you decide that not only are they not entitled

25    to a million dollars, they're entitled to nothing; and not only

Page 69

1    are they entitled to nothing, but you have heard the evidence, and

2    you have heard the instructions of the Court, and you've talked it

3    over with your fellow jurors, and you decide that not only are

4    they entitled to nothing, but MGA is entitled to a hundred or

5    $200 million, do you think just because Mattel is asking for a

6    billion dollars that necessarily you have to award them something?

7              PROSPECTIVE JUROR:  No.

8         **MR. OVERLAND:**  So they could get nothing; right?

9         **PROSPECTIVE JUROR:**  Yes.

10        **MR. OVERLAND:**  They could ask for whatever they want,

11   that doesn't mean the evidence is going to justify that?

12        **PROSPECTIVE JUROR:**  Exactly.

13        **MR. OVERLAND:**  You feel strongly about that; right?

14        **PROSPECTIVE JUROR:**  Yes.

15        **MR. OVERLAND:**  Any of the other alternate jurors feel

16   any different?  Yes?  No?

17             I want to get back to the two questions that I have been

18   asking, and I want to clarify something.  These questions aren't

19   meant to ask whether you are a good person or a bad person.  They

20   got nothing to do with that.  They merely have to do with whether

21   or not, in looking within yourself, you feel that you could be a

22   good juror or maybe not.

23             And let me give you some examples of some answers that I

24   have gotten, to maybe help you think about what I'm talking about.

25             For example -- and I think this was broached before --

Electronically signed by Maria Beesley (501-187-561-9309)                                    800bbe38-eaee-4dc6-bada-8b6415218f35

Page 70

1    you may be the kind of juror that can say, "look, I'm relatively

2    young.  Other people have much more experience than I.  So if I'm

3    selected as a juror and I get into that jury room, my vote is

4    probably not as good as the others because they have much more

5    experience."  That -- you may feel that way, you may not feel that

6    way.

7          Or you can say, for example, "you know, I tend to decide

8    things pretty quickly, and the first thing I hear makes the

9    impression on me.  And once I decide something, then it's

10   difficult for me to change my mind."  Or you might say to

11   yourself, "if I come to the conclusion that what one side or the

12   other did is wrong, and I know that's a vague term, but I think I

13   know right from wrong, and if I come to the conclusion that it's

14   wrong, then I'm really not going to pay that much attention to

15   what the judge says about what is legal or illegal; I'm going to

16   base my decision on what I think is wrong or right."

17         Or you might say, "when I look at a witness and I decide

18   whether that witness is being truthful, and by truthful I don't

19   necessarily mean is lying but is able to remember things better,

20   what I look for is what position in life does that witness have?

21   What title does he have?"  You may feel that way.

22         Or finally, you might say to yourself, "when I get into

23   that jury room, I'm much better educated than somebody else and

24   therefore my vote counts more.  Or people should listen to me or

25   defer to me because I have a better education."

Electronically signed by Maria Beesley (501-187-561-9309)                    800bbe38-eaee-4dc6-bada-8b6415218f35

1          Those are the types of things I'm looking for and those

2    are just examples.  There may be other things.

3          So having those in mind -- and I could start with you,

4    sir, Mr. Gardelle, tell me whether you think that -- what would

5    be -- if you are selected as a juror, would you, in your mind, be

6    good; a good juror?  And if so, why?  Or a bad juror?  And if so,

7    why?

8          **PROSPECTIVE JUROR:**  I believe that I would be okay

9    because I'm able to look at situations with a rational and logical

10   point of view, looking at both the good and bad of everything, or

11   try to anyway.

12         And the only reason why I would be bad is because of my

13   age and that I'm not listened to.  I feel I'm outspoken so I can

14   overcome that, but that all depends on everybody else I'm working

15   with.

16         **MR. OVERLAND:**  You want to pass that on next.  And

17   except for the MCATS, let's not talk about.  I'm sure we'll deal

18   with that.  Try answer those two questions, if you could please.

19         **PROSPECTIVE JUROR:**  I think that I don't make judgments

20   based on first impressions.  I'm able to look at the whole story,

21   wait to the end, hear everyone's side.  That's my -- what I live

22   by.  I don't make judgments because I don't want people to pass

23   judgments about me, especially in regards to my age.

24         And in terms of what would make me a bad juror, like he

25   said, our age kind of counts against us.

Page 72

1          MR. OVERLAND:   I think Alexander The Great was 22 when

2     he conquered the world.

3          PROSPECTIVE JUROR:   I know.  But then again, I am

4     educated.  But in terms of what it seems like this case is dealing

5     with, although I have signed confidentiality agreements, it's a

6     completely different spectrum.  So that would be my only, I think,

7     fault, is that I'm not well-educated in terms of like the business

8     side of what the confidentiality agreements entail and involve.

9          MR. OVERLAND:   Thank you.  You want to pass that on.

10         Mr. Tran.

11         PROSPECTIVE JUROR:   Hi.  To answer your first question,

12    I am tend to listen.  Usually when there are discussion or

13    argument, because I work with volunteer as adult leader for Boy

14    Scouts of America, we have multi-unit group, about like 15 adult

15    leaders who work with the kids.  Sometimes we have a lot of

16    discussion and even argument.  I tend to be the one that speak

17    last and try to mitigate or mediate the situation so we can reach

18    a common goal.

19         And I take the similar role at home when my younger

20    brother or my parent, or older brother and parent have issue.  So

21    I feel comfortable that's my advantage.

22         Regarding the bad juror, this is my first time sit in

23    any kind of jury and get involved in such a high-stake profile

24    case like this.  So I feel nervous.  And since both sides mention

25    about job effect and the money value, it made me feel I been -- I

Page 73

1    feel a lot of pressure and it's something that I'm not sure.  I

2    hope to be instructed more on the legal process because I don't

3    know how much of how everything works.  So that can be a

4    disadvantage to me.

5             **MR. OVERLAND:**  Thank you, sir.

6             Ms. Liao.

7             **PROSPECTIVE JUROR:**  Yeah.  I feel like I can be a good

8    juror just because of my analytical skill; that I tend not to talk

9    much.  I'm very quiet.  And most of the time I do is taking in

10   information, process it in my brain.  So that's one advantage,

11   that I think before speak.

12            Bad thing is because I'm not so outspoken, when I speak,

13   sometimes people don't take it seriously and I don't push my way

14   to get my ideas across.  So that's some bad things, that I have

15   problem persuading people.

16            **MR. OVERLAND:**  Thank you, ma'am.

17            Mr. Quintana.

18            **PROSPECTIVE JUROR:**  I believe that I have the capability

19   of being biased on both sides not knowing anything about this case

20   whatsoever.  Due to the responsibilities that I have taken on

21   several jobs qualifies that you have to listen to both sides

22   before you pass judgment.  And I'm not the type of person to point

23   the finger at somebody and pass judgment because of their looks or

24   whatever gender or whoever.

25            I have worked at Disney, I have worked at Northrop.  I

Page 74

1    have worked several different places where it takes patience and

2    understanding.  And for that, I do feel that I'm comfortable with

3    participating towards this settlement of whatever you guys -- it's

4    understandable to me that this is a big case from what you guys

5    are talking about.  I'm glad I don't know anything about it.

6          So I'm very open-minded.

7          MR. OVERLAND:  If I asked you the question about Mattel

8    asking for a billion dollars here, do you feel because they're

9    asking for that much, there must be something there and that they

10   are entitled to something without knowing anything?

11         PROSPECTIVE JUROR:  No, not necessarily because you know

12   what?  There is a lot of different things that we can go as.  And

13   just because somebody says -- just because they have sold they --

14   have been around forever and this new company happens to come

15   along and say, you know what?  We're competitors and we come up

16   with ideas, and we have also sold toys, but you guys been around

17   forever doesn't necessarily mean that they're -- as far as cars or

18   make some better, because like Toyota sold 100,000 cars and BMW

19   only sold 500,000 doesn't necessarily mean that Toyota is a better

20   company without further investigation.

21         I'm very open-minded, I'm very patient, and I'm

22   comfortable with listening and very careful how to represent

23   myself.  And it's the qualifications that have come across in a

24   lot of my jobs that I have carried.

25         MR. OVERLAND:  Thank you, sir.

Page 75

1          Mr. Tran.

2          **PROSPECTIVE JUROR:**  About good thing is I believe in one

3     thing is you can't judge just one person.  You have to understand

4     two sides of the story and understand between the two before you

5     make a judgment.

6          And for the bad side is I hope we don't have to come

7     across reading too much of the documents, legal document term

8     which might jeopardize me of understanding and trying to figure

9     out what does it really mean.  That's the only bad side.

10         **MR. OVERLAND:**  Thank you, sir.

11         **PROSPECTIVE JUROR:**  So I think that I would be a good

12    juror because I'm good at listening to both sides of stories, and

13    I'm honest and patient.  And I have been a juror for my friends'

14    fight many times before.  I'm used to listening to both sides.

15         The bad thing is I come to believe that there is like

16    three sides to every story:  One side, then there is the other

17    side, then there is what really happened, but no one knows that.

18         **MR. OVERLAND:**  And there is school?

19         **PROSPECTIVE JUROR:**  And there is school.  I have been

20    sitting here going back and forth because I just feel like I have

21    gone this far and I'm so excited to fulfill a civic duty and to

22    have it be on such an important thing and stuff.  My school

23    schedule is not set in stone.  I don't work, so coming here for

24    four months and getting paid wouldn't so bad.  So.

25         **MR. OVERLAND:**  You really want to go to school?

Electronically signed by Maria Beesley (501-187-561-9309)                    800bbe38-eaee-4dc6-bada-8b6415218f35

Page 76

1          PROSPECTIVE JUROR:  I mean I do, but I have got years

2     left.  Four months is going to determine too much of my life.

3          MR. OVERLAND:  This is not something that's critical

4     that you have to do right now.

5          PROSPECTIVE JUROR:  No, sir.

6          MR. OVERLAND:  Yes?

7          PROSPECTIVE JUROR:  Yes, it's not critical that I have

8     to do it right this moment.

9          MR. OVERLAND:  Thanks.

10          PROSPECTIVE JUROR:  Well, I feel I could be a good juror

11    maybe not in this case because I try to listen to both sides and

12    not form an opinion right away; listen and hear what both sides

13    have to say.

14          In this case, a bad thing might be that I'm not sure I

15    could take seriously the dolls, but other than that...

16          MR. OVERLAND:  I think that's been made clear.

17          PROSPECTIVE JUROR:  Yes.

18          MR. OVERLAND:  Pretty clear.  Thank you, sir.

19          THE COURT:  Mr. Quinn, you had a couple jurors you

20    hadn't been able to examine.

21          MR. QUINN:  I think Mr. Quintana is the only one who I

22    haven't had a chance to speak with, Your Honor.

23          Good afternoon, sir.

24          PROSPECTIVE JUROR:  Good afternoon, sir.

25          MR. QUINN:  You are working as some type of audio-visual

Page 77

1    tech?

2              **PROSPECTIVE JUROR:**  Yes, sir.

3              **MR. QUINN:**  Tell us a little bit about that.

4              **PROSPECTIVE JUROR:**  I work for different corporations

5    like Turnkey or -- and several, anywhere from about 14, 15

6    different companies.  It's kind of like a freelance company more

7    or less where you go out and different companies will send you an

8    e-mail or call you up and say, hey you know what, you are perfect

9    for the job; you either need to go to San Diego or -- San Diego or

10   to Las Vegas or something like that.

11             What we do is we do the lighting and audio-visual for

12   several different corporations at anywhere from concerts to

13   doctors' conventions to San Diego conventions, Anaheim Convention

14   Center.  The variety of that is responsibilities and knowledge.

15   There is so much involved in that.  And also at the same time

16   there is a lot of things that's confidential that we don't even

17   know until we get there of what we are doing.

18             **MR. QUINN:**  Are you responsible for setting up the

19   presentation?

20             **PROSPECTIVE JUROR:**  Absolutely.  Tearing up and tearing

21   down the electrical.  There is a big part of it.  There is

22   different -- which are qualifications on and your understanding

23   and how well you follow directions where you fall into that.

24             I have been fortunate where I moved up the ladder very

25   fast, very quick.

Page 78

1          **MR. QUINN:**  Do you work with a group of colleagues or is

2     this a business you own?

3          **PROSPECTIVE JUROR:**  No.  I work with a group of

4     colleagues.  Different corporations.  Exactly.  As a matter of

5     fact, like a boss will call us up, electronics and stuff.  And our

6     contractors will go out, make a bid.  If we get the bid that

7     they're looking for, they'll call certain individuals for that.

8     Say, hey you know what?  We only need this many people and you are

9     qualified to go out there and represent our company.

10          And it varies.  Just like I said, I worked different

11     places from here, Santa Barbara to San Diego.

12          **MR. QUINN:**  I think you indicated that you also had done

13     some work at Northrop where you had exposure to proprietary

14     information.

15          **PROSPECTIVE JUROR:**  Absolutely.  And I think that's

16     something that, you know, you do.  It's a responsibility that

17     takes -- there is a lot of privacy and stuff like that and you do

18     have to sign a lot of stuff.  And I'm the type of person who's

19     going to ask a hundred times until I get it stuck in my mind what

20     that question is.  I'm.

21          Not somebody that's going to jump into something and say

22     okay, that's great.  Did everybody understand?  Anybody have any

23     questions?  I'm going to be, please explain to me a different way.

24          But yes, I worked in Y1 and I was like a John Hancock on

25     a lot of things that were going in and coming out.  My

Page 79

 1   responsibility was very -- let's just say really pretty high up

 2   there.

 3              MR. QUINN:  You spent some time with Disney, another

 4   company famous for intellectual property.

 5              PROSPECTIVE JUROR:  Yes, sir.  And a lot of secrets too.

 6   That's another confidential place that you have to -- your

 7   responsibilities and your time and what you share.  And dealing

 8   with thousands of people every single day is a big deal.  And

 9   yeah, absolutely.  There is a confidential ability to that and

10   that takes place.

11              MR. QUINN:  There has been discussion about the amount

12   of potential damages, the amount of sales.  I think it's going to

13   be undisputed that Bratz is -- there have been billions of dollars

14   of sales in Bratz.  If you are on this jury --

15              MR. OVERLAND:  Objection Your Honor, in terms of

16   prejudging the evidence.

17              THE COURT:  Sustained.

18              MR. QUINN:  If the evidence in this case is that we're

19   talking about dolls which have total sales that are in the

20   billions of dollars, are those types of numbers and damages,

21   calculations, based on those numbers, something that you would

22   feel comfortable dealing with if that is the proof in the case?

23              PROSPECTIVE JUROR:  Absolutely.  Absolutely.  I'm

24   familiar with quality control and human resources and stuff like

25   that.  Absolutely.  I think that to be open-minded on variety of

Page 80

1  things is -- you need to pay attention.  And just because one

2  person says something doesn't necessarily mean that it's right, or

3  something you read in the paper or something you look at doesn't

4  necessarily mean that that's the truth.

5          MR. QUINN:  Thank you very much.

6          PROSPECTIVE JUROR:  You are very welcome.

7          THE COURT:  Now, counsel, the peremptories will be

8  exercised in just a moment.  Why don't you take time with your

9  clients for just a moment and discuss.  Once again, just like this

10  morning it will start going very quickly now.  And they're going

11  to want to have a discussion, I think, among their respective

12  groups.

13          MS. KELLER:  Could we approach just on one issue, Your

14  Honor?

15          THE COURT:  You can.

16          MS. KELLER:  Only take a second.

17          THE COURT:  I think you are going to discuss this first,

18  then you can approach.

19          Mr. Quinn, have you been rejected from the group.

20          MR. QUINN:  I have.

21          (Brief pause in proceedings.)

22          THE COURT:  We slated that we believe the jury selection

23  process would take two days.  We'll have it concluded today.

24  You'll know if you are a sitting juror in the audience or an

25  alternate by the time we leave today.  That, I promise.  So if you

Page 81

1   are not sitting, this will conclude it.  If you are sitting, then

2   we'll talk to you about your service obviously with the eight

3   who's already been selected and whoever the alternates are.

4           MS. KELLER:  Your Honor, I wonder if we can approach on

5   one issue.

6           THE COURT:  Just a moment, counsel.  Have both of you

7   have enough time?

8           MR. QUINN:  Yes, Your Honor.

9           MS. KELLER:  Yes.

10          THE COURT:  I'll see you at sidebar.

11               (The following proceedings were held at sidebar.)

12          THE COURT:  Counsel.

13          MS. KELLER:  Your Honor, the only thing I wanted to

14   ask -- and this isn't somebody that I even want to lose; I like

15   her.  I'd like to keep her.  But I think that Ms. Hinton who is

16   going to be taking the MCAT, I'm very familiar with what it

17   requires to get ready for that exam.

18          THE COURT:  I won't excuse her for cause.  She said it

19   wasn't mandatory; that she could sit.  That's this --

20          MS. KELLER:  That's another -- different juror.  That's

21   Ms. Done.  Ms. Hinton said her whole future turns on it.

22          THE COURT:  Counsel, that's up to you.  You have a

23   stipulation.  The whole party can answer it, or you can use a

24   preempt.

25          MS. KELLER:  We would like her.

Page 82

1           **THE COURT:**  That's up to you.

2           **MS. KELLER:**  I just was hoping.  I felt sorry for her.

3           **THE COURT:**  I thought you two were talking.

4           **MR. QUINN:**  We did.  We couldn't reach an agreement.

5           **THE COURT:**  Okay.  All right.  So first peremptory.

6           **MR. QUINN:**  For cause though, Your Honor, we haven't

7     discussed cause.

8           **THE COURT:**  For cause.

9           **MR. QUINN:**  Mr. Longbotham, who is adamant.  He was

10    consistent in his questionnaire, which he filled out on his

11    lonesome, consistent with both counsel that he can't take the

12    dolls seriously.  He was pressed on that by both sides.  Both

13    sides tried to rehabilitate him.

14          **THE COURT:**  His answer may be appropriate as far as not

15    taking dolls seriously or not.  That's not the issue.  It involves

16    corporate entities discussing this infighting with one another

17    over --

18          **MS. KELLER:**  Little piece of plastic.

19          **THE COURT:**  -- misappropriation or not, it's not a

20    reason for cause.

21          First peremptory.

22          **MR. QUINN:**  Your Honor, I'm sorry, can I step back out?

23          **THE COURT:**  Absolutely.  I'm sorry.

24              (Brief pause in proceedings.)

25          **THE COURT:**  Back on the record.  And the first

Page 83

1    peremptory is with the plaintiff.

2              **MR. QUINN:**  Thank and excuse juror number two, Tran.

3              **THE COURT:**  Juror number two would be Hongtien Tran?

4              **MR. QUINN:**  Yes.

5              **THE COURT:**  By the plaintiff.  Thank you.

6                   (End side-bar.)

7              **THE COURT:**  We're going to excuse Mr. Hongtien Tran.

8    Thank you very much, sir.  If you would go back to the jury room,

9    I appreciate you being present.

10             **THE CLERK:**  Julia Cates.

11             **THE COURT:**  Ms. Cates, have you heard all the prior

12   questions?

13             **PROSPECTIVE JUROR:**  Yes.

14             **THE COURT:**  And would you be fair and impartial to both

15   sides?

16             **PROSPECTIVE JUROR:**  Yes.

17             **THE COURT:**  Follow the law?

18             **PROSPECTIVE JUROR:**  Yes.

19             **THE COURT:**  Then I have no more questions for you.  This

20   questionnaire is very complete.  So we know an awful lot about

21   each one of you.

22             Counsel has about five minutes.  Counsel.

23             **MR. QUINN:**  Good afternoon.

24             PROSPECTIVE JUROR:  Hi.

25             **MR. QUINN:**  You are a Trojan, student at USC.

Page 84

1              **PROSPECTIVE JUROR:**  I guess I wrote that wrong.

2              **THE COURT:**  University of South Carolina.

3              **PROSPECTIVE JUROR:**  Fullerton College but I'm a UCLA

4       fan.

5              **MR. QUINN:**  You are a Bruin.

6              **PROSPECTIVE JUROR:**  Yes.

7              **MR. QUINN:**  What are you studying?

8              **PROSPECTIVE JUROR:**  I will be studying -- they're

9       calling it liberal studies, but it's actually child development.

10      Studying to be a preschool teacher.

11             **MR. QUINN:**  Is that a four-year program?

12             **PROSPECTIVE JUROR:**  It's however long it takes me.

13             **MR. QUINN:**  And when will you be enrolling?  When will

14      you be starting your studies?

15             **PROSPECTIVE JUROR:**  I'm going to wait until after this

16      is over.

17             **MR. QUINN:**  So you have been working in the recent past

18      as a host in a restaurant?

19             **PROSPECTIVE JUROR:**  Yes, I was.

20             **MR. QUINN:**  But that was some months ago.

21             **PROSPECTIVE JUROR:**  Yeah.

22             **MR. QUINN:**  And you have also had the experience

23      fortunately or unfortunately, of working, I guess, in a law firm.

24             **PROSPECTIVE JUROR:**  Depends on how you look at it.  It

25      was a good experience even though it was very short-lived.  They

Page 85

1    told me that they would allow me to sit in on a case so I know how

2    this works, which is why I'm actually excited to be on a jury so I

3    could see it for myself now because back then I wasn't able to.

4            MR. QUINN:  Can you tell us what type of firm it was

5    that you were working at?

6            PROSPECTIVE JUROR:  It was a very small law firm.  I

7    honestly can't remember the name of it.  I worked for four

8    lawyers.  Basically receptionist.

9            MR. QUINN:  Did they do this kind of work there?  They

10   do trial work or as opposed to --

11           PROSPECTIVE JUROR:  Yes.

12           MR. QUINN:  -- deal or contract work?

13           PROSPECTIVE JUROR:  Yeah.  They had me type up

14   treasuries and stuff for them.

15           MR. QUINN:  Treasury?

16           PROSPECTIVE JUROR:  And send out faxes.

17           MR. QUINN:  Did they tend to do -- some law firms

18   specialize in different kinds of work, like some specialize in

19   insurance work or personal injury work or --

20           PROSPECTIVE JUROR:  I think it was insurance but I

21   honestly can't remember.

22           MR. QUINN:  Not positive?

23           PROSPECTIVE JUROR:  Yeah.

24           MR. QUINN:  Do you know whether they tend to do more

25   work on the defense or plaintiff's side?

Page 86

1          **PROSPECTIVE JUROR:**  I believe they did a little bit

2     both.

3          **MR. QUINN:**  And you collected teenage fashion model

4     Barbies?

5          **PROSPECTIVE JUROR:**  Well, I'm still trying to.  And

6     they're very hard to find.

7          **MR. QUINN:**  You find them online or EBay?

8          **PROSPECTIVE JUROR:**  Actually they're a gift from

9     grandparents or whatever.

10         **MR. QUINN:**  How large is your collection?

11         **PROSPECTIVE JUROR:**  Right now I only have two Barbies.

12    It's not much of a collection.

13         **MR. QUINN:**  Hard to find.

14         **PROSPECTIVE JUROR:**  Yes.

15         **MR. QUINN:**  This is a particular model Barbie that came

16    out in the past.

17         **PROSPECTIVE JUROR:**  Teenage fashion model; the one with

18    the zebra stripe swimsuit and still in the spotlight.

19         **MR. QUINN:**  All right.  So you have heard all my

20    questions?

21         **PROSPECTIVE JUROR:**  Yes.

22         **MR. QUINN:**  Do you have any reaction to anything that I

23    have asked other folks about or anything that concerns you or

24    should concern me?

25         **PROSPECTIVE JUROR:**  I don't think so.

Page 87

1          **MR. QUINN:**  Thanks very much.

2          **THE COURT:**  Ms. Keller?

3          **MS. KELLER:**  Good afternoon.

4          **PROSPECTIVE JUROR:**  Good afternoon.

5          **MS. KELLER:**  A little bit nervous?

6          **PROSPECTIVE JUROR:**  Little bit.

7          **MS. KELLER:**  This is not a situation most of us find

8  ourselves in every day; sitting in a federal court in front of all

9  these people and answering a bunch of questions.  So we appreciate

10 your being here.

11         Okay.  So you are a Barbie collector or Teenage Fashion

12 Barbie collector.  Obviously you must like Barbies.

13         **PROSPECTIVE JUROR:**  Yeah, I grew up around Barbie.  My

14 parents got me almost every one you could find.

15         **MS. KELLER:**  Have you ever seen Bratz dolls?

16         **PROSPECTIVE JUROR:**  Yes, I have.

17         **MS. KELLER:**  A lot of people who like Barbies, some like

18 Bratz too.  Which camp do you fall into?

19         **PROSPECTIVE JUROR:**  Considering it's been a long time

20 since I actually bought Barbie dolls, to be honest, I'm not really

21 a fan of Bratz, but a lot of little girls like them.

22         **MS. KELLER:**  What is your impression of Bratz dolls?

23         **PROSPECTIVE JUROR:**  Well, it's the same thing like

24 Barbie dolls.  They're good dolls for little girls but also -- I'm

25 sorry, I actually had this planned in my head before --

Page 88

1          MS. KELLER:  Take your time.  Just take a deep breath.

2          PROSPECTIVE JUROR:  Body image.  Little -- some little

3     girls -- and I'm using the word "some" because not all, do try to

4     aspire, try to dress or act like them.  That's when I don't think

5     it's good.  But some little girls can see beyond that and not try

6     to act that way.

7          MS. KELLER:  When you say -- you mean like wearing

8     midriff instead of long blouses, that kind of thing?

9          PROSPECTIVE JUROR:  Yes.

10          MS. KELLER:  Bratz dolls are more an edgy updated kind

11     of doll.

12          PROSPECTIVE JUROR:  Yes.

13          MS. KELLER:  So you are an old-fashioned girl.  You like

14     the Barbies.  Is that pretty much it?

15          PROSPECTIVE JUROR:  Yes.  Not saying they're really that

16     different, though.

17          MS. KELLER:  Well, no.  They're both fashion dolls and

18     little girls like them and some older girls and some grownup women

19     like them.

20          So the issue for me is because you are such a fan of

21     Barbie and not such a fan of Bratz, is MGA starting out just a

22     little bit behind in this case in your mind?  That's something

23     only you know.

24          PROSPECTIVE JUROR:  I don't think so necessarily.

25          MS. KELLER:  Can you explain?

Page 89

 1          **PROSPECTIVE JUROR:**  Well, one, they're both good

 2     companies.  And just because one is more well-known than the other

 3     doesn't mean that the other one is going to either make more money

 4     or, I guess, win in this case.

 5          **MS. KELLER:**  You said they're both good companies.  Can

 6     you tell me what it is that you know about MGA?

 7          **PROSPECTIVE JUROR:**  To be honest, not a lot.  I'm just

 8     not going to be biased in this situation.

 9          **MS. KELLER:**  I understand.  Thanks.  I don't think I

10     have anything further.

11          **THE COURT:**  Mr. Overland.

12          **MR. OVERLAND:**  Yes.  Thank you.  Hello.

13          PROSPECTIVE JUROR:  Hi.

14          **MR. OVERLAND:**  First of all, don't be nervous.  I know

15     you are, but don't be.  Just pretend it's just you and me talking.

16     Forget about everybody else here.

17          I have a couple of questions about your questionnaire.

18     Were you nervous when you were filling out the questionnaire too?

19          **PROSPECTIVE JUROR:**  What exactly makes you say that?

20          **MR. OVERLAND:**  Well, I'm looking here at your answers to

21     question 24, and it says, "have you ever or someone close ever

22     invented something or filed a registration or obtained a

23     copyright, patent or trademark?"  And there's a whole bunch of

24     questions you checked off yes.

25          **PROSPECTIVE JUROR:**  The problem was it only gave you one

Page 90

1   choice.  And some of those questions yeah, I did know somebody.

2   But when it came to the invention question, I couldn't say "yes"

3   or "no."  It only gave me the "yes" choice.  I wasn't really sure.

4           MR. OVERLAND:  "If yes to any, please explain," and you

5   put n/a, meaning not applicable.  I'm trying to figure out what

6   that was about.

7           PROSPECTIVE JUROR:  Well, I believe in one of those

8   questions it also said you or someone you know did something with

9   advertising.

10          THE COURT:  The question -- the answers were "yes,

11  someone else."  It wasn't just "yes."

12          PROSPECTIVE JUROR:  Yeah.

13          MR. OVERLAND:  Then in the explanation section you put

14  n/a, not applicable.  Just help me out here.

15          PROSPECTIVE JUROR:  I'm sorry, I didn't really know --

16  n/a was the best answer I could come up with.  I really didn't

17  know how to answer that because they only say yes, you or someone

18  you know.

19          MR. OVERLAND:  But when you said "yes, someone else,"

20  were you thinking about somebody that, in fact, had, for example,

21  an idea that somebody else profited from?

22          PROSPECTIVE JUROR:  I don't remember names, but I'm

23  pretty sure I had a friend or someone that did something like

24  that.  But it was a while ago.

25          MR. OVERLAND:  Do you remember anything about that?  Or

Page 91

1    were you involved that at all, or something you just heard?

2           PROSPECTIVE JUROR:  Something I just heard.

3           MR. OVERLAND:  So you don't know any specifics?

4           PROSPECTIVE JUROR:  In some of those questions I did.

5    Like my dad, he owns his own business and he was involved in some

6    advertising.

7           MR. OVERLAND:  Involved in a business or contract

8    dispute?

9           PROSPECTIVE JUROR:  Yes.

10          MR. OVERLAND:  That was your dad?

11          PROSPECTIVE JUROR:  It could have been, but my dad

12   didn't really fill me in on all the --

13          MR. OVERLAND:  And drafted or negotiated an employment

14   agreement, who was that?

15          PROSPECTIVE JUROR:  It could have been my dad or someone

16   that worked with him, I believe.

17          MR. OVERLAND:  But you don't know anything specific

18   about that either; correct?

19          PROSPECTIVE JUROR:  I'm sorry, no.

20          MR. OVERLAND:  "Had confidential information stolen by

21   someone or disclosed to another party" and you put, "yes, someone

22   else."  Who were you thinking about?

23          PROSPECTIVE JUROR:  There was a dispute a long time ago

24   with a business I worked for a while back.

25          MR. OVERLAND:  What business was that?

Page 92

1          **PROSPECTIVE JUROR:**  I worked at the theater in

2      Fullerton.

3          **MR. OVERLAND:**  At the theater?

4          **PROSPECTIVE JUROR:**  AMC.

5          **MR. OVERLAND:**  Were you involved in that at all.

6          **PROSPECTIVE JUROR:**  Yes, I was.

7          **MR. OVERLAND:**  What was your involvement?

8          **PROSPECTIVE JUROR:**  I was a witness.

9          **MR. OVERLAND:**  You testified in court?

10         **PROSPECTIVE JUROR:**  I was going to, but at the last

11     minute they decided they had enough witnesses and they didn't need

12     me.

13         **MR. OVERLAND:**  Did you testify in a deposition?

14         **PROSPECTIVE JUROR:**  Yes.

15         **MR. OVERLAND:**  And you know what the outcome of that

16     case was?

17         **PROSPECTIVE JUROR:**  Unfortunately no, because they let

18     me out really early.  And with court, they're not allowed to talk

19     about it.  It's like a need-to-know basis.

20         **MR. OVERLAND:**  Tell me about how good or bad you are in

21     terms of being a juror in this case.

22         **PROSPECTIVE JUROR:**  Well, I believe in this case -- one,

23     I'm very open-minded and I have had friends ask me for a lot of

24     advice going up, and I have learned how to listen to both sides of

25     the story or cases in order to make an adequate efficient

Page 93

1   decision.

2           **MR. OVERLAND:**  That's a good thing.

3           **PROSPECTIVE JUROR:**  Yeah.

4           **MR. OVERLAND:**  Any bad things.

5           **PROSPECTIVE JUROR:**  I'm not sure there is really any

6   point in mentioning this.  I still believe that I could be open

7   enough, but with the whole gay thing, I have a lot of friends that

8   are and I also have a relative.  So I was thinking when you

9   mentioned that earlier, that one of the witnesses was, I was

10  thinking maybe I might be biased because of that because I have

11  friends and, like, relatives that are.  But I still think I could

12  overlook that.  So again, very minor.

13          **MR. OVERLAND:**  So I think the question related to a

14  witness that the evidence would show would be gay.  And the

15  question was, would you treat that particular witness any

16  different than any other witness?

17          PROSPECTIVE JUROR:  No.

18          **MR. OVERLAND:**  In terms of determining his credibility.

19  That's all that was about.

20          **PROSPECTIVE JUROR:**  Yeah.

21          **MR. OVERLAND:**  Your answer to that.

22          **PROSPECTIVE JUROR:**  I guess there is really nothing bad

23  then.

24          **MR. OVERLAND:**  Okay.  Thank you.

25          **THE COURT:**  Counsel want to discuss the next peremptory

Page 94

1    with your group and clients for just a moment.

2                (Brief pause in proceedings.)

3                (The following proceedings were held at sidebar.)

4                THE COURT:  Next peremptory pass to the defense, I

5    believe.

6                MS. KELLER:  Yes, Your Honor.  We would ask the Court to

7    thank and excuse juror Cates, number two.

8                THE COURT:  Thank you.

9                MS. KELLER:  May we have, shortly after that, may we

10   have a bio break?

11               (End side-bar.)

12               THE COURT:  Back in session in open court.

13               And counsel thanks and excuses Julia Cates.  Thank you

14   very much.  Appreciate your answers and appreciate you being here.

15               Now you may need a restroom break.  If you do.  Let's go

16   take one all together before we call -- not together.  Let's go

17   take a restroom break and could we come back, though, at no later

18   than 10 after the hour because I want to get that jury today and

19   we can get the alternates before 5:00 o'clock if we proceed in a

20   timely fashion.  Save you coming back tomorrow, frankly.

21               So we'll see you 10 after the hour.  Have a nice rest.

22               (Recess taken, from  3:51 to 4:05.)

23               THE COURT:  Back on the record.

24               And call an additional juror.

25               THE CLERK:  Paul Stitz.

Page 95

1          **THE COURT:**  Mr. Stitz, if you go up to the top row, sir,

2      take seat number two.

3              This would be Paul Stitz, counsel.

4              Mr. Stitz, my questions once again are very few because

5      of this extensive questionnaire you filled out.  Do you feel you

6      been be fair and impartial to both sides in this case?

7          **PROSPECTIVE JUROR:**  Yes, sir.

8          **THE COURT:**  Would you follow the law that I instruct on

9      at the end of the case?

10          **PROSPECTIVE JUROR:**  Yes, sir.

11          **THE COURT:**  Is there anything you would like to ask me?

12          PROSPECTIVE JUROR:  No.

13          **THE COURT:**  Counsel, Mr. Quinn.

14          **MR. QUINN:**  Good afternoon, Mr. Stitz.

15          **PROSPECTIVE JUROR:**  Good afternoon.

16          **MR. QUINN:**  I gather you are looking for work now.

17          **PROSPECTIVE JUROR:**  Yes, I am.

18          **MR. QUINN:**  Particular type of work that you are looking

19      to do?

20          **PROSPECTIVE JUROR:**  Like in retail.

21          **THE COURT:**  Let me ask you a question.  What happens if

22      you got a job as you continue to look for work during the next

23      three to four months?  I just called you and I said you had a

24      terrific interview with you, I'm hiring you.  By the way, you

25      don't want to get hired in this court, but I'm hiring you.  Are

Page 96

1    you going to say no?  You are going to say yes?

2             **PROSPECTIVE JUROR:**  I'm going to say yes.

3             **THE COURT:**  I need you to start next week.

4             **PROSPECTIVE JUROR:**  I'll say yes.

5             **THE COURT:**  Okay, counsel.  That's good.  I would too,

6    by the way.

7             **PROSPECTIVE JUROR:**  I got bad luck on getting a job.

8             **THE COURT:**  That doesn't mean it will be forever, okay.

9    That's how quickly we can go through alternates.  I'm telling you,

10   the last nine-month trial we started with 10 and we got down to

11   two left.

12            **PROSPECTIVE JUROR:**  I'm a little nervous up here.

13            **THE COURT:**  Me too.  Don't worry about that.

14            **MR. QUINN:**  You know, I have seen psychological studies

15   saying one of the things that people fear the most is getting up

16   in front of people and speaking.  So I understand exactly.  I

17   started out with some butterflies this morning myself.  Still few

18   left.

19            So I understand if you are feeling a little nervous.  So

20   in your questionnaire there are a couple of questions that I

21   wanted to -- your answers I wanted to ask you about.

22            You said in response to the question, "do you believe

23   it's wrong for an employee to take anything besides personal

24   belongings when leaving a place of employment?"  And you said no.

25   You checked the "no" box.

1              **PROSPECTIVE JUROR:**  I put no.

2              **MR. QUINN:**  Do you recall that question and answer?

3              **PROSPECTIVE JUROR:**  Yeah, I do recall.

4              **MR. QUINN:**  Can you recall what you were thinking then?

5      You don't think it's wrong to take anything besides personal

6      belongings?

7              **PROSPECTIVE JUROR:**  I think it is wrong.

8              **MR. QUINN:**  Okay.

9              **PROSPECTIVE JUROR:**  There is a lot of dishonest people

10     out there.

11             **MR. QUINN:**  Have you in your work experience, sir, have

12     you had some experience with --

13             **PROSPECTIVE JUROR:**  My last employer was Walmart.  I saw

14     a lot of people steal.

15             **MR. QUINN:**  Like customers coming in?

16             **PROSPECTIVE JUROR:**  No.  Like other employees, you know,

17     like stealing Ipods.

18             **MR. QUINN:**  So I mean, you have actually had some

19     experience with that?

20             **PROSPECTIVE JUROR:**  Yeah.

21             **MR. QUINN:**  That type of stealing?

22             **PROSPECTIVE JUROR:**  Yes.

23             **MR. QUINN:**  We have been talking today about stealing or

24     theft about things that are not tangible, sort of like designs or

25     ideas or formulas, intangible property that has value.  Is that

Page 98

1    something that you can relate to?

2             **PROSPECTIVE JUROR:**  Yeah.

3             **MR. QUINN:**  Like to pick kind of an example, maybe the

4    formula for Coca-Cola, which supposedly is written on a piece of

5    paper and is in a safe somewhere in Atlanta, Georgia.  That's kind

6    of the example.  I actually don't know if there is actually a

7    formula written on a piece of paper in a safe, but that would be

8    the type of example of intangible personal property, something

9    that you can't pick up and take out of a store.

10            Do you have any kind of thought or reaction to the idea

11   that that type of property would be valuable and protectable as

12   well?

13            PROSPECTIVE JUROR:  No.

14            **MR. QUINN:**  Not one way or the other?

15            PROSPECTIVE JUROR:  No.

16            **MR. QUINN:**  Based on what you have heard, do you have

17   any reaction, do you have any feelings about whether this would be

18   a good case for you to be a juror on?

19            **PROSPECTIVE JUROR:**  Yeah.

20            **MR. QUINN:**  What is your reaction to that?

21            **PROSPECTIVE JUROR:**  I don't know.  Sounds interesting.

22   I wouldn't mind being on the jury.

23            **MR. QUINN:**  Have you been a juror before?

24            **PROSPECTIVE JUROR:**  No, I have been summoned before,

25   like seven years ago.

Page 99

1          MR. QUINN:  What do you think of the jury system, jury

2   service?

3          PROSPECTIVE JUROR:  It's okay.

4          MR. QUINN:  Well, anybody whose favorite movie is Ghost

5   Busters is okay with me.  Thank you.

6          PROSPECTIVE JUROR:  I put that on there?

7          (LAUGHTER)

8          THE COURT:  Ms. Keller.

9          MS. KELLER:  Good afternoon.

10          PROSPECTIVE JUROR:  Good afternoon.

11          MS. KELLER:  So you are in the hot seat.  You are in the

12   nervous chair.  That's the chair that everybody who sits in it

13   gets nervous.  And I bet if I went up there and sat in it I would

14   be nervous.  Can you feel it vibrating or anything?

15          PROSPECTIVE JUROR:  No.  I'm just going to do what he

16   says.  Just pretend it's just you and me.

17          MS. KELLER:  That's perfect.

18          PROSPECTIVE JUROR:  There is no one else in here.

19          MS. KELLER:  That's great.  I wish we could have a beer.

20          PROSPECTIVE JUROR:  I saw him this morning, what's his

21   name with the cane.

22          MS. KELLER:  That was a pretty good question.

23          PROSPECTIVE JUROR:  He said pretend it's you and me.

24          MS. KELLER:  Have you ever seen, when you worked at

25   Walmart, a Bratz doll?

Page 100

1          **PROSPECTIVE JUROR:**  Yeah.  Bratz dolls and Barbie dolls.

2   I used to restock those.

3          **MS. KELLER:**  You did?

4          **PROSPECTIVE JUROR:**  I was a stocker.

5          **MS. KELLER:**  Did you stock a lot of them?  Did they sell

6   pretty well?

7          **PROSPECTIVE JUROR:**  Mainly the Barbie dolls.  Yeah.

8          **MS. KELLER:**  Well --

9          **PROSPECTIVE JUROR:**  Those are the best sellers.

10         **MS. KELLER:**  I'll bet except for stocking them you are

11   probably not a doll guy.

12          PROSPECTIVE JUROR:  No.

13         **MS. KELLER:**  Do you have any sisters or anything?

14         **PROSPECTIVE JUROR:**  I have one sister.  She likes the

15   Bratz.

16         **MS. KELLER:**  How old is your sister?

17          PROSPECTIVE JUROR:  16.

18         **MS. KELLER:**  I like your sister.  Can you think of any

19   reason at all why you wouldn't want to serve as a juror on this

20   case?

21          PROSPECTIVE JUROR:  No.

22         **MS. KELLER:**  I'm not going to steal my colleague's

23   question.  I'm not going to ask you anything more.  Is that okay

24   with you or you want me to ask you more questions?

25         **PROSPECTIVE JUROR:**  No.  Okay.

Page 101

1            **MS. KELLER:**  Something you want to tell me?

2            PROSPECTIVE JUROR:  No.

3            **MS. KELLER:**  Okay.  Thank you.

4            **THE COURT:**  Mr. Overland, do you have questions?

5            **MR. OVERLAND:**  No, Your Honor.

6            **THE COURT:**  Counsel if you would like to talk about the

7    next peremptory in your group.

8                 (The following proceedings were held at sidebar.)

9            **THE COURT:**  We're on the record.  The peremptory passes

10   back to the plaintiff.

11           **MR. QUINN:**  Your Honor, the plaintiff will thank and

12   excuse juror number eight, Mr. Longbotham.

13           **THE COURT:**  Mr. Longbotham.  Okay.  Thank you.

14                 (End side-bar.)

15           **THE COURT:**  Back in open court.

16           And Mr. Longbotham, I'd like to thank and excuse you,

17   sir.  If you would go back to the jury room with our appreciation.

18   Nice meeting you, sir.

19           Kathy, would you call another juror please.

20           Counsel, that next juror I want to report was not here

21   today, so we're going to skip down to the next.

22           **THE CLERK:**  Paul Marshall.

23           **THE COURT:**  Mr. Marshall, have you heard all of the

24   other questions?

25                 **PROSPECTIVE JUROR:**  Yes, I have.

Page 102

1          **THE COURT:**  Just the same questions from me, just to be

2     certain that I talk to each of you, would you please fair and

3     impartial to both sides?

4          **PROSPECTIVE JUROR:**  Absolutely.

5          **THE COURT:**  Would you follow the law?

6          **PROSPECTIVE JUROR:**  Yes, I would.

7          **THE COURT:**  Do you have any questions me, sir?

8          **PROSPECTIVE JUROR:**  No, I do not.

9          **THE COURT:**  Let me turn you over to Mr. Quinn.

10     Mr. Quinn.

11          **MR. QUINN:**  Good afternoon, Mr. Marshall.

12          **PROSPECTIVE JUROR:**  Good afternoon.

13          **MR. QUINN:**  You were born in the fair city of Pasadena.

14          **PROSPECTIVE JUROR:**  Absolutely.

15          **MR. QUINN:**  Did you grow up there?

16          **PROSPECTIVE JUROR:**  Just south of there in Alhambra.

17          **MR. QUINN:**  And you live in this area now?

18          **PROSPECTIVE JUROR:**  We're down in Garden Grove.

19          **MR. QUINN:**  How long have you lived in Garden Grove?

20          **PROSPECTIVE JUROR:**  Little over 20 years.

21          **MR. QUINN:**  You are one of those folks that gets

22     exercise walking house to house delivering mail.

23          **PROSPECTIVE JUROR:**  You couldn't tell by looking at me,

24     but yes.

25          **MR. QUINN:**  You look pretty fit.  You like doing that,

Page 103

1    getting out and delivering the mail?

2            PROSPECTIVE JUROR:  Well, I traded a corporate cubicle

3    for it.  So it was a matter of do I want to die of an ulcer at 40

4    or get into something with a little less stress.  For some reason

5    I showed up at the post office.

6            MR. QUINN:  It was the right decision for you looking

7    back on it?

8            PROSPECTIVE JUROR:  Yeah.  God has a sense of humor.

9            MR. QUINN:  Certainly does.  Are dogs a problem?  One

10   things I have always wondered about.

11           PROSPECTIVE JUROR:  Yes.

12           MR. QUINN:  You must have a way of dealing with those.

13           You indicated that you had been in some type of legal

14   dispute relating to an estate?

15           PROSPECTIVE JUROR:  When my parents estate was settled,

16   my mother had remarried for a short period and her second husband

17   was laying claim to the vast majority of the estate for fraudulent

18   reasons, and we took him to court and we won the case.

19           MR. QUINN:  So your feelings towards the legal system as

20   a result of that are?

21           PROSPECTIVE JUROR:  It's expensive but it works.

22           MR. QUINN:  The result was at least looking back on it

23   you feel good about the result?

24           PROSPECTIVE JUROR:  Absolutely.  It did its job.

25           MR. QUINN:  Have you been on a jury before?

Page 104

1            **PROSPECTIVE JUROR:**  I have been called several times.  I

2    sat in, reached a decision on one jury for a medical malpractice

3    case few years ago.

4            **MR. QUINN:**  And how did you feel about that experience?

5            **PROSPECTIVE JUROR:**  The only thing that was strange is

6    we didn't have any direction as far as any settlement goes and we

7    were like politicians.  We came up with a number that sounded good

8    and it ended up being 20 times what they were actually looking

9    for.  So it was like, boy, that doctor really made a -- he rolled

10   the dice and paid big time for it.

11           **THE COURT:**  This is a good opportunity for me to break

12   in for just a moment.  Was that case that you sat in over in what

13   I call the state court system, superior court?

14           **PROSPECTIVE JUROR:**  I believe it was.

15           **THE COURT:**  It wasn't in federal court?

16           PROSPECTIVE JUROR:  No.

17           **THE COURT:**  I spent 17 years in state court before I

18   came to the federal court 12 years ago.  And let me say this to

19   you and the audience.  If you sat on a state court proceeding

20   involving a civil matter, they always have 12 jurors and there the

21   jurors can actually disagree.  We can have nine finding one way

22   and the other three finding other way, or 10 to 2 or 11 to 1 or 12

23   zero and that's a verdict for whatever way they're deciding the

24   issues.  Here in federal court it's anonymous.  We sit less jurors

25   than 12 but we require unanimity.

Page 105

1          **MR. QUINN:**  What do you think about the jury system?

2          **PROSPECTIVE JUROR:**  I think it's the best alternative.

3    I mean there are flaws in it as much as any other situation you

4    would run into when you are dealing with individuals, but if we

5    haven't found a better way by now, then these are our peers.

6          **MR. QUINN:**  Do you have any problems with the idea that

7    there should be a -- you hear people talking about the right to a

8    jury trial.  Is that something that you have a reaction to one way

9    or the other?

10          **PROSPECTIVE JUROR:**  No.  I'm glad we have it.

11          **MR. QUINN:**  You indicated in response to the question as

12    to what your reaction, if any, to the statement "an employee can

13    use proprietary or confidential information that was used at a

14    previous job," you said "unless prohibited contractually, it would

15    be used as experience."

16          Can you share with us what you meant by that?

17          **PROSPECTIVE JUROR:**  Well, like some of the other people

18    have said before, you learn something on each job.  But if you are

19    taking something that -- if you are on a job and you are getting

20    paid to do research and development or whatever, and you do what

21    they hired you to do, the results of that are an asset of the

22    company because they paid you to develop it.  And for you to take

23    that and go somewhere else with it and call it your own, there may

24    be a case where the other company is defunct and there is nobody

25    there to pick up the pieces; you take it and move on with it,

1   that's one thing.

2          But otherwise, I think the system would be in total

3   chaos if people kept running around like NFL players, changing

4   every team every season trying to be a winner and taking their

5   assets and running around selling them to the highest-priced

6   bidder, that business would be worse off for that.  There has to

7   be some protection for the investment that the employer is putting

8   into the development of the employee.

9          MR. QUINN:  I like that NFL analogy.  Like a distinction

10  between being trained how to make a good block, improve your

11  blocking ability, versus taking the team's playbook with you to

12  the next team.

13         Is that a distinction that makes sense to you?

14         PROSPECTIVE JUROR:  Absolutely.

15         MR. QUINN:  You have heard me ask other folks about

16  damages and big numbers; big numbers in terms of sales; big

17  numbers in terms of lost profits; big numbers in terms of really

18  what both sides are seeking here.

19         Do you have any doubt in your own mind if you end up on

20  this jury, as to whether if you thought the evidence supported it,

21  you could return a verdict for a billion dollars?

22         PROSPECTIVE JUROR:  I believe so, because I'm going to

23  bank on the evidence being there to justify that number.

24         MR. QUINN:  My question assumed that.

25         PROSPECTIVE JUROR:  Sure.

Page 107

1              **MR. QUINN:**  Thank you.

2              **THE COURT:**  Ms. Keller.

3              **MS. KELLER:**  Good afternoon.

4              **PROSPECTIVE JUROR:**  Good afternoon.

5              **MS. KELLER:**  You said you left what sounded like

6      sometimes call a cubicle farm to go work for the federal

7      government as a letter carrier.

8              **PROSPECTIVE JUROR:**  Yes.

9              **MS. KELLER:**  What was the job you were doing in the

10     cubicle?

11             **PROSPECTIVE JUROR:**  I've mainly been in the soft drink

12     industry since I was 20 years old.  And the last position I was a

13     manager for chain store sales for a little company called

14     Coca-Cola.  And there was -- they make a lot of money and there is

15     a bit of stress that goes along with the job.

16             **MS. KELLER:**  When you worked at Coca-Cola, did you see

17     anything wrong with somebody who jumped ship to go work for, say,

18     Pepsi?  Anything wrong with that?

19             **PROSPECTIVE JUROR:**  When I left Coca-Cola to go work for

20     Anheuser-Busch, it was with the full blessing.  Of course, I was

21     strip-searched on the way out and there wasn't anything that I was

22     taking.  In that industry, as much people like to think that there

23     is a secret vault with the formula, everybody knows everything.

24     So it's a moot point.  I don't believe you should be able to stuff

25     your briefcase full of stuff on the way out and then go sell it

1    off to the highest bidder, or go back and contact all of your old

2    contacts and sort of do an end-run around your own employer.

3              I believe in moral absolutes.  Things are right or wrong

4    by their nature.  And I don't play games that way.

5              **MS. KELLER:**  I wasn't talking about stuffing a briefcase

6    full of secrets and dashing out the door.  I was talking about

7    more the American spirit of free enterprise, competition, being

8    able to go and seek a better paying job, go seek a job where you

9    have better opportunity.

10             **PROSPECTIVE JUROR:**  I agree.

11             **MS. KELLER:**  Go seek a job where maybe you have better

12   working conditions.  I mean, you don't think there is anything

13   wrong with that?

14             **PROSPECTIVE JUROR:**  Been there done that.

15             **MS. KELLER:**  In the same industry?

16             **PROSPECTIVE JUROR:**  Yes.

17             **MS. KELLER:**  For a competitor?

18             **PROSPECTIVE JUROR:**  Yes.

19             **MS. KELLER:**  Nothing morally wrong with that; right?

20             **PROSPECTIVE JUROR:**  In my case, no.  I could only speak

21   for myself because there was no funny business when I left.

22   Everybody knew when I was going and it was amicable.

23             **MS. KELLER:**  My question then becomes is there anything

24   that's led you to believe that in this case somebody behaved

25   differently than you did?

 1          **PROSPECTIVE JUROR:**  Except that we're sitting in a

 2    courtroom, no.

 3          **MS. KELLER:**  So the fact that a lawsuit has been filed

 4    makes you believe that somebody behaved badly, inappropriately

 5    stealing secrets?

 6          **PROSPECTIVE JUROR:**  No.  It means there are obviously

 7    two people with different opinions about a situation and there is

 8    a lot of money at stake.

 9          **MS. KELLER:**  Okay.  I don't have anything further.

10    Thank you.

11          **THE COURT:**  Mr. Overland.

12          **MR. OVERLAND:**  Mr. Marshall, again, like Mr. Stitz,

13    let's pretend it's you and me.  Okay.  Mr. Quinn asked you a

14    question about returning a verdict for a billion dollars if the

15    evidence warranted it.  And I think your response was if the

16    evidence warranted, that's what you would do; correct?

17          **PROSPECTIVE JUROR:**  That's correct.

18          **MR. OVERLAND:**  And let's say that you heard all the

19    evidence in this case and you felt Mattel is entitled to zero.

20    Any problem returning a verdict against them?

21          **PROSPECTIVE JUROR:**  No.  Absolutely not.

22          **MR. OVERLAND:**  Whatever the evidence would show;

23    correct?

24          **PROSPECTIVE JUROR:**  It's whatever way it ends up, yeah.

25          **MR. OVERLAND:**  Tell me in your words why you would be a

1    good juror in this case.

2          **PROSPECTIVE JUROR:**  I think I'm a pretty good judge of

3    people.  I'm more -- I think I have more common sense and

4    intelligence, and I can weigh things out and see what the big

5    picture is.  I don't always get caught up in the details as much

6    as gut feeling maybe on where people are coming from.  So that's

7    sort of jumped into your number two question.

8          **MR. OVERLAND:**  Tell me what you meant by that.

9          **PROSPECTIVE JUROR:**  I see a couple of rows of engineers

10   and people that are very detailed-oriented, and I will admit in

11   open court I'm not a detailed-oriented person.  But I'll give you

12   a straight answer.  What you see is what you get.  And I will be

13   fair and equitable based on the evidence that's presented in front

14   of us.

15         **MR. OVERLAND:**  What if the evidence requires you to be

16   detail-oriented?

17         **PROSPECTIVE JUROR:**  For a short period of time I can

18   become analytical.

19         **MR. OVERLAND:**  And then you tune out or what --

20         **PROSPECTIVE JUROR:**  No.  I will do whatever the job

21   needs to have done.  Given the choice between living as a highly

22   analytical person or an expressive, I go expressive.  But this is

23   not what this position called for, is it?

24         **MR. OVERLAND:**  I guess we'll find out.

25         **PROSPECTIVE JUROR:**  Okay.

Page 111

1          MR. OVERLAND:  Thank you, sir.

2          THE COURT:  Counsel, if you want to discuss the next

3   peremptory with your respective parties.

4              (The following proceedings were held at sidebar.)

5          THE COURT:  Peremptory passes to the defenses.

6          MS. KELLER:  We would ask the Court to thank and excuse

7   Mr. Marshall.

8          THE COURT:  Mr. Marshall.  Thank you.

9          MR. QUINN:  Your Honor, I have a question.  Juror on the

10  upper left, Gardelle, has been dozing off and on and rubbing his

11  eyes.  I was wondering if the Court --

12         THE COURT:  We will privately if you decide to select

13  him but I haven't seen that yet.  Now I'll be on the alert.  I

14  have to see that.  So I have to watch that.

15             (End sidebar.)

16         THE COURT:  Mr. Marshall, we're going to thank and

17  excuse you, sir.  Thank you very much for your attendance.

18  Appreciate your answers.  It's been a pleasure, sir.

19         THE CLERK:  George Denney.

20         THE COURT:  Mr. Denney, I know so much from the

21  questionnaire.  Thank you for filling that out.  My questions are

22  going to be the same.  Would you be fair and impartial to both

23  sides?

24         PROSPECTIVE JUROR:  Yes, sir.

25         THE COURT:  Follow the law?

Page 112

1              **PROSPECTIVE JUROR:**  Yes.

2              **THE COURT:**  Any questions for me at this time, sir?

3              **PROSPECTIVE JUROR:**  Well, I mentioned -- two things

4    really.  Number one, is the number of zeros that are brought about

5    in this case and the other is my health.

6              **THE COURT:**  Let's start with your health first.

7              **PROSPECTIVE JUROR:**  All right.  I had a heart attack

8    about five months.

9              **THE COURT:**  Five minutes ago?

10             **PROSPECTIVE JUROR:**  Five months ago.

11             **THE COURT:**  Believe it or not, I had two heart attacks

12   on two consecutive days in this court.  One from counsel, one from

13   a defendant in a criminal matter.  So I'm very sensitive to that.

14   The paramedics know where to come now.

15             How are you doing with your heart?

16             **PROSPECTIVE JUROR:**  Well, I go three days a week to the

17   gym, and I practice there for about two and a half hours.

18             **THE COURT:**  I see.

19             **PROSPECTIVE JUROR:**  And I have been doing this now since

20   I --

21             **THE COURT:**  What time do you go there?

22             **PROSPECTIVE JUROR:**  I leave about 6:00 o'clock in the

23   morning.

24             **THE COURT:**  Exercise until about 8:30?

25             **PROSPECTIVE JUROR:**  Yes, sir.

Page 113

1          **THE COURT:**  What happens if we start at 8:30?  Could you

2     make that if you were selected?  Would that be difficult?

3          **PROSPECTIVE JUROR:**  That would be difficult.

4          **THE COURT:**  I'm going to negotiate with the jury between

5     eight and nine.  If I could get 7:30 I would try to manipulate

6     them.  But that's going to be an issue, okay?  And if that's going

7     to cause you to curtail a health regime that is the basis of your

8     substantial your life --

9          **PROSPECTIVE JUROR:**  I have been doing this, exercising

10    now since I --

11         **THE COURT:**  Counsel, what are your thoughts?

12         **MS. KELLER:**  Stipulated, Your Honor.

13         **MR. QUINN:**  Yes, Your Honor.

14         **THE COURT:**  I know a lot of courts start at 9:00 and

15    9:30, but if I do that, it would probably be a five-month trial.

16    If I start at 7:30, probably a three-month trial.  Okay.  But by

17    stipulation, counsel, we're going to thank and excuse you, sir.

18    Thank you very much.

19         **THE CLERK:**  Philip Beilin.

20         **THE COURT:**  Thank you, Mr. Beilin.  If you would have a

21    seat in seat number eight, please.  We have two people.  Who is

22    Mr. Beiline.  There is a Philip Beilin.  That's you?

23         Sir, who are you?

24         Mr. Beilin, you have a seat.

25         Mr. Sing, we'll be right with you.

Page 114

1          Mr. Beilin, have you heard all of the other questions?

2          **PROSPECTIVE JUROR:**  I have.

3          **THE COURT:**  We know a tremendous amount about you.  Let

4    me remind you from the questionnaire.  Would you be fair and

5    impartial to both sides, sir?

6          **PROSPECTIVE JUROR:**  Yes.

7          **THE COURT:**  Would you follow the law?

8          **PROSPECTIVE JUROR:**  Yes.

9          **THE COURT:**  Do you have any questions of me?  Otherwise,

10   I'm going to turn you over to counsel.

11         PROSPECTIVE JUROR:  No.

12         **THE COURT:**  Mr. Quinn.

13         **MR. QUINN:**  Good afternoon, sir.

14         **PROSPECTIVE JUROR:**  Good afternoon.

15         **MR. QUINN:**  Does that gentleman right there look

16   familiar to you?  His name is Mike Zeller, if Mr. Zeller would

17   stand up.

18         You indicated in response to your -- in the

19   questionnaire that you had a physics student by the name of Mike

20   Zeller.

21         **PROSPECTIVE JUROR:**  At UCLA or Berkeley.  It was someone

22   with that name.

23         **MR. QUINN:**  I think it's probably a different Mike

24   Zeller.

25         **PROSPECTIVE JUROR:**  I have been looking at him all day

Page 115

1    long trying to see if I remember him.  Been over 40 years.

2            MR. QUINN:  How many students in your years of teaching

3    do you think that you have had?  You must have had thousands.

4            PROSPECTIVE JUROR:  I couldn't count that high.

5            MR. QUINN:  You are retired now?

6            PROSPECTIVE JUROR:  Yes, 10 years.

7            MR. QUINN:  And you are enjoying your retirement?

8            PROSPECTIVE JUROR:  Very much.

9            MR. QUINN:  What do you like doing?

10           PROSPECTIVE JUROR:  Surfing the internet and reading.

11           MR. QUINN:  Particular areas that you like to read?

12           PROSPECTIVE JUROR:  My favorite subjects physics and

13   math.

14           MR. QUINN:  And you have a Ph.D in physics but also have

15   a law degree.

16           PROSPECTIVE JUROR:  Yes.

17           MR. QUINN:  We don't see that many lawyers who are also

18   physicists.  How did that happen?

19           PROSPECTIVE JUROR:  I may have been bored during that

20   period of time.

21           MR. QUINN:  Did you ever --

22           PROSPECTIVE JUROR:  I tried the bar and didn't pass.

23           MR. QUINN:  All right.  So.

24           PROSPECTIVE JUROR:  Then I got interested in computers

25   and I let the law go by.

1              MR. QUINN:  So your initial interest was the law but you

2     ended up getting into information technology and computers.

3              PROSPECTIVE JUROR:  Yes.

4              MR. QUINN:  Have you ever done anything with your legal

5     background?

6              PROSPECTIVE JUROR:  Nothing.  Nothing.

7              MR. QUINN:  Ever been useful to you?

8              PROSPECTIVE JUROR:  I donated all my books to one of my

9     nieces.

10             MR. QUINN:  She go to law school?

11             PROSPECTIVE JUROR:  I think she started but didn't

12    continue.

13             MR. QUINN:  You have been on juries before?

14             PROSPECTIVE JUROR:  Yes.

15             MR. QUINN:  What is your feeling about the jury system?

16             PROSPECTIVE JUROR:  Fine.  I sometimes question whether

17    the judge might reach a verdict justifiably more so than a jury

18    does.

19             MR. QUINN:  Did you say more soon?

20             THE COURT:  More so.

21             PROSPECTIVE JUROR:  I might mention that my speech is

22    not very well because not this December, but the previous one I

23    had a stroke.  Pretty much recovered now.

24             MR. QUINN:  Sounds like it.

25             Are you under any type of treatment for that?  Is that

Page 117

1    something that would interfere, do you think, in your ability to

2    be a juror?

3            PROSPECTIVE JUROR:  No.  I take about 10 pills a day,

4    but otherwise...

5            MR. QUINN:  Keep you on even keel?

6            PROSPECTIVE JUROR:  Yes.  I need to exercise more.

7            THE COURT:  By the way, if you are selected, you can

8    stand up.  It will be relatively informal.  You can stand over by

9    the wall if you need to stretch.

10           PROSPECTIVE JUROR:  Enjoying the soft seats.

11           MR. QUINN:  I'll prolong this.  So you know this is

12   about dolls.  Do you have any problem with the concept that there

13   might be billions of dollars in doll sales, might be billions of

14   dollars in doll profits?

15           PROSPECTIVE JUROR:  I'm aware there might be, yes.  I

16   have no opinion about it.

17           MR. QUINN:  And do you think that if you are on this

18   jury and the evidence supports it, you could return a verdict for

19   a very large amount of money on the order of the types of money

20   that we have been talking about?

21           PROSPECTIVE JUROR:  Yes, I believe so.

22           MR. QUINN:  I'll bet that on -- I'm just a stab in the

23   dark, your previous juries probably -- lawyers probably weren't

24   talking about a million dollars.

25           PROSPECTIVE JUROR:  No.

Page 118

1        **MR. QUINN:**  Why is it that you think you could do that

2    if the evidence supported it in this case?

3        **PROSPECTIVE JUROR:**  I think that's what physicists do

4    mostly, is we look at the evidence and then we draw a conclusion.

5        **MR. QUINN:**  And you end up --

6        **PROSPECTIVE JUROR:**  And we follow the law, whatever the

7    judge directs us.

8        **MR. QUINN:**  Thank you very much, sir.

9        **THE COURT:**  Ms. Keller.

10        **MS. KELLER:**  I don't think it's every day we have two

11    Ph.D's sitting on our jury panel.  This is kind of a banner day.

12        Do you go by doctor or mister?

13        **PROSPECTIVE JUROR:**  Now it's just mister.

14        **MS. KELLER:**  Well, okay.  I have got one initial

15    question for you.  When you were in law school, how did you do in

16    contracts?

17        **PROSPECTIVE JUROR:**  I keep wondering where all the

18    doctors came from that sent me the bills.  I was out of it for

19    several days.  I was lucky to survive.

20        **MS. KELLER:**  All right.  Now, I see here on your

21    questionnaire that you said you wear a hearing aid.

22        **PROSPECTIVE JUROR:**  Right now, yes.  One thing I was

23    concerned about, they do beep times when they go bad.  I'm going

24    to have to bring some special batteries.

25        **THE COURT:**  We also have some equipment.  So we have had

1    more than one juror that either had sight or hearing issues, or

2    mobility issues.  We'll accommodate that.

3           MS. KELLER:  I wasn't trying to embarrass you.  My

4    husband wears hearing aids and he's always adjusting them.  And I

5    know there are different levels of utility that those hearing aids

6    have.

7           So far have you heard everything well?

8           PROSPECTIVE JUROR:  Yes.

9           MS. KELLER:  Pretty good sound system.  If you end up on

10   the jury, will you let us know if you have any trouble hearing?

11          PROSPECTIVE JUROR:  Will do.

12          MS. KELLER:  Now, you have heard Mr. Quinn, many, many

13   times, maybe even 10 or more times, talk about this billion-dollar

14   figure.  You understand that the figure could just as easily be

15   zero?

16          PROSPECTIVE JUROR:  Yes.

17          MS. KELLER:  You said as a physicist you want evidence?

18          PROSPECTIVE JUROR:  All of it, yes.

19          MS. KELLER:  And would you describe yourself as a bit of

20   a skeptic in terms of the claims that you have heard the lawyers

21   making today.

22          Are you more of a skeptic or more of a trusting person

23   when it comes to evidence?

24          PROSPECTIVE JUROR:  Probably more of a skeptic.  I

25   prefer looking at the evidence first.

Page 120

1          MS. KELLER:  Now, the evidence in this case is going to

2     resolve around dolls.  I'll bet you as a physicist that dolls are

3     probably not entering too much into your studies.  Right about

4     that?

5          PROSPECTIVE JUROR:  Yes.

6          MS. KELLER:  Do you have any kind of background at all

7     in art or design or anything like that?

8          PROSPECTIVE JUROR:  No.

9          MS. KELLER:  Any exposure to it?

10          PROSPECTIVE JUROR:  No.

11          MS. KELLER:  You got any grandkids?

12          PROSPECTIVE JUROR:  One.

13          MS. KELLER:  How old is your grandchild?

14          PROSPECTIVE JUROR:  Just turned 13.

15          MS. KELLER:  Boy or girl?

16          PROSPECTIVE JUROR:  A girl.

17          MS. KELLER:  Does she have any dolls?

18          PROSPECTIVE JUROR:  The last gift I gave her was

19     called -- a book called "The Math Book."

20              (LAUGHTER)

21          MS. KELLER:  Wow, what a fun grandpa.

22          PROSPECTIVE JUROR:  I was criticized for it.

23          MS. KELLER:  Might come in handy.

24          Is there any reason that it would be a hardship on you

25     to serve on this jury either physically or in any other way?

1      **PROSPECTIVE JUROR:**  Not on myself.  But currently my

2  wife had medical problems and she is trying to regain her driver's

3  license and I have to usually drive her wherever she wants to go.

4  Mostly it's to the church, to have her Bible classes.  I asked her

5  to find some friends who will drive her if I can't be there.  But

6  that's about the only problem I have.

7      **MS. KELLER:**  Does that create a hardship for the two of

8  you?

9      **PROSPECTIVE JUROR:**  Not really not for me.

10     **MS. KELLER:**  She doesn't get to go anywhere, big deal.

11  Well, now I'm going to ask you the reverse of the

12  question that I asked the young man sitting right behind you.  I

13  asked him whether he could hold his own because he is 21 or 22

14  years old.  You are about -- not to give anything away, but 60

15  years older.

16     PROSPECTIVE JUROR:  81.

17     **MS. KELLER:**  And retired professor.  Somewhat of an

18  authority figure.  I'm scared.  Physics professor.  But the

19  opposite question is sometimes somebody who is a retired professor

20  and is an elder, very knowledgeable, could be -- kind of become an

21  authority figure to the younger person.

22  Do you think that -- how will you deal with that when

23  you have somebody so junior serving with the same vote that you

24  have got on the jury?

25     **PROSPECTIVE JUROR:**  Well, if I had a view and there was

Page 122

1   someone with a different type of view, I would try to explain why

2   I believe as I do.  But then they would make up their own mind.

3          MS. KELLER:  Have you ever, in the past, had students

4   who were able to persuade you of things?

5          PROSPECTIVE JUROR:  Not that I recall.

6          (LAUGHTER)

7          MS. KELLER:  This is worrisome, because there are

8   several people who are a lot younger in the current group here.

9   Okay.  Well, anyway, I don't think I'm going to be able to go

10  anywhere with that.

11         One of the answers that you gave on the questionnaire,

12  "any employee can use proprietary or confidential information from

13  previous job" and you wrote "cannot."

14         Would that depend upon the nature of the agreement that

15  the employee and the employer had at the previous job?

16         PROSPECTIVE JUROR:  Yes.

17         MS. KELLER:  Would that depend upon whether the

18  information that the employee had was created before signing that

19  agreement?

20         PROSPECTIVE JUROR:  I'm sorry.

21         MS. KELLER:  Could it depend on whether the information

22  the employee had was created by the employee before signing that

23  agreement with an employer?

24         PROSPECTIVE JUROR:  You mean prior information before he

25  signed?

1          MS. KELLER:  Right.  Would that be something you would

2     have to really look hard at?

3          PROSPECTIVE JUROR:  It would -- I'm not sure how to

4     answer that.  I don't think they can do that to someone who

5     already knows the answer or has some device or something they're

6     interested in before he signs it.  It's after you sign it that it

7     becomes proprietary to the company.

8          MS. KELLER:  And likewise, if an employee comes to a

9     company and says I am not bringing in the confidential information

10    with me, would you require proof to your satisfaction that the

11    company really did know about it before finding that to be true?

12    Are you with me?

13         PROSPECTIVE JUROR:  I don't think so.  I wouldn't -- I'm

14    not really sure that I understand your question.

15         MS. KELLER:  I'm not sure I put it very well.

16         Lawyers have a tendency to ask really confusing

17    questions and I try not to, but I fail sometimes.

18         Let's say that an employee comes to a potential employer

19    and says "I'm not bringing anything with me from my old job.  I'm

20    bringing zero with me from my old job."

21         The new employer, before you could find that the new

22    employer had done anything wrong, wouldn't you want proof that the

23    new employer actually knew the employee actually brought something

24    with him from the old job?  You still not following?  I may give

25    up.

1          **PROSPECTIVE JUROR:**  I don't really see that situation

2    would arise.

3          **MS. KELLER:**  Well, in this case you are going to be

4    asked to decide a whole bunch of different things.  You are going

5    to be asked to decide what happened here; what set of facts are

6    true.  And I could tell you right now the phrase "undisputed" that

7    you have heard from this side of the table, virtually everything

8    is in dispute here.  That's why we're here and that's why we need

9    a jury to decide.

10         You are going to have to decide what the facts are.

11   This idea of somebody stuffing a bunch of secrets into a briefcase

12   and sneaking out the door, you are going to have to decide what

13   the facts are.  That's not what happened.

14         **MR. QUINN:**  Your Honor, I object to that statement.

15         **THE COURT:**  Sustained.  Counsel just withdrew that

16   question.  You can ignore it.  She didn't mean it.

17         Counsel.

18         **MS. KELLER:**  What I'm asking I guess you are a blank

19   slate right now; right?

20         **PROSPECTIVE JUROR:**  Right.

21         **MS. KELLER:**  You don't know any facts.  You haven't

22   heard any evidence.  It's just like in a physics experiment where

23   you haven't done the experiment yet so you have no results.  So no

24   matter what somebody's told you about it from over here or over

25   here, you are a blank slate.

1            And can you wait -- earlier I was asking about the fact

2    that this side, the Mattel side of the table is going to be first

3    with its case and MGA is going to go second.  It could be six

4    weeks before you hear our side of the story.

5            Now, as a scientist you are used to getting all the

6    evidence but as a human being --

7            **PROSPECTIVE JUROR:**  I would be patient.

8            **MS. KELLER:**  As a human being you tend to form opinions

9    along the way, don't you?

10           **PROSPECTIVE JUROR:**  No.  I wait until I get all the

11   evidence.

12           **MS. KELLER:**  All right.  Thank you.

13           **THE COURT:**  Mr. Overland, do you have questions?

14           **MR. OVERLAND:**  No, Your Honor.

15           **THE COURT:**  Discuss the peremptory amongst the

16   respective parties and we'll be right back with you.

17               (The following proceedings were held at sidebar.)

18           **THE COURT:**  The peremptory passes to the plaintiff.

19           **MR. QUINN:**  Did the Court see Mr. Gardelle snoozing?

20           **THE COURT:**  No.  I saw him wide awake.  Every time I

21   looked at him he was awake.  He is back like this (indicating).

22           **MS. KELLER:**  I have been looking at him, too.

23           **THE COURT:**  I didn't see him scratching.  I did not see

24   that.

25           **MR. QUINN:**  We're going to let Mr. Gardelle go.

Page 126

1          **THE COURT:**  Thank and excuse Mr. Gardelle.  Now, let me

2     tell you John, or Mr. Quinn, that jury number one has approached

3     Kathy again.  Juror number one is the gentleman who said he wasn't

4     asked about hardship, etcetera.  Your position is, concerning

5     juror number one?

6          **MS. KELLER:**  We do not have authority allow him to

7     stipulate.

8          **THE COURT:**  I don't have cause to excuse him.  And he

9     answered the call.  But I'm not going to declare a mistrial with

10    everybody aware that he is, frankly, trying to become excused from

11    this trial.  And somehow we have to talk to him because if we

12    don't, Kathy is the brunt of all this information.  He wants to

13    talk to the judge, etcetera.

14          And if there does turn out to be cause after discussion

15    on the record, then I don't want to let this jury go if I have to

16    put somebody else in his place and get another alternate.  I don't

17    know how we're going to resolve that except keep going.

18                (End side-bar.)

19          **THE COURT:**  Mr. Gardelle, thank you.  Excusing you from

20    these proceedings.  Your attendance was appreciated, sir.

21          **THE CLERK:**  Norma Mukda.

22          **THE COURT:**  Ms. Mukda, you take the top seat, seat

23    number four please.

24          Let me say to the perspective jurors I can let you go at

25    5:00 o'clock but I'm going to ask your forbearance.  We can get a

1    jury.  We're very close.  Believe me.  That way you know if you

2    are sitting.  If you are not sitting, you are not having to come

3    back tomorrow.

4              Ms. Mukda, have you heard all the prior questions?

5              **PROSPECTIVE JUROR:**  Yes.

6              **THE COURT:**  Would you be fair and impartial to both

7    sides?

8              **PROSPECTIVE JUROR:**  Yes.

9              **THE COURT:**  Would you follow the law?

10             **PROSPECTIVE JUROR:**  Yes.

11             **THE COURT:**  You have any questions of me?  If so, I'm

12   happy to answer them.

13             Mr. Quinn.

14             **MR. QUINN:**  Good afternoon.  You were born in Bangkok.

15             **PROSPECTIVE JUROR:**  Yes.

16             **MR. QUINN:**  When did you come to this country?

17             **PROSPECTIVE JUROR:**  For the education in nutrition at

18   Pratt and Columbia and New York University.

19             **MR. QUINN:**  You studied at Columbia and NYU.

20             **PROSPECTIVE JUROR:**  The second language.

21             **MR. QUINN:**  Okay.

22             **PROSPECTIVE JUROR:**  English.

23             **MR. QUINN:**  And how long have you lived in the Southern

24   California area?

25             **PROSPECTIVE JUROR:**  '95.  '95, for five, 10, 15.

Page 128

1          MR. QUINN:  And you are a food service supervisor now?

2          PROSPECTIVE JUROR:  No.  I'm retired.

3          MR. QUINN:  You are retired?

4          PROSPECTIVE JUROR:  Yes.

5          MR. QUINN:  How long ago did you retire?

6          PROSPECTIVE JUROR:  Two years ago.

7          MR. QUINN:  Are you enjoying retirement?

8          PROSPECTIVE JUROR:  Yes.

9          MR. QUINN:  What do you like to do in your retirement?

10   What do you enjoy?

11          PROSPECTIVE JUROR:  Just traveling.

12          MR. QUINN:  Have you been back to Thailand?

13          PROSPECTIVE JUROR:  Yes.  Recently I been in Rio.

14          MR. QUINN:  Okay.

15          PROSPECTIVE JUROR:  And.

16          MR. QUINN:  Great city.

17          PROSPECTIVE JUROR:  Italy and Venice.

18          MR. QUINN:  Sounds like retirement is real tough.

19               (LAUGHTER)

20          PROSPECTIVE JUROR:  Good time.

21          MR. QUINN:  You indicated in your questionnaire that you

22   have been involved in a dispute relating to an employment

23   agreement.

24          PROSPECTIVE JUROR:  Yes.

25          MR. QUINN:  Could you tell us about that?

1          **PROSPECTIVE JUROR:**  About the agreement, they have to

2   sign -- I have to sign the contract that the reason that they lay

3   me off.  But we -- on the ground of mismanagement, which I did

4   not.  They just tell me to go home because when you get older and

5   your salary is high, they want to get the younger coming in and

6   then I have the good ground.

7          I say good, good ground.  I don't say anything.  I go

8   home and then I will consult with the lawyer.  And then they give

9   me the agreement to pay me off.

10          **MR. QUINN:**  Okay.  Did you get some legal help in

11   connection --

12          PROSPECTIVE JUROR:  No.

13          **MR. QUINN:**  You didn't need to do that.

14          **PROSPECTIVE JUROR:**  I didn't need to do because I'm 70

15   years and a half.  I don't need that because it's a good ground

16   for me that dispute that they give me.  Let me go free and then I

17   can get the legal agreement.

18          **MR. QUINN:**  So basically you had a settlement with your

19   employer for this wrongful activity.

20          **PROSPECTIVE JUROR:**  Wrongful --

21          **MR. QUINN:**  Termination.

22          **PROSPECTIVE JUROR:**  Yes.

23          **MR. QUINN:**  Were you satisfied with how that ultimately

24   worked out?

25          **PROSPECTIVE JUROR:**  Yes.  And I just took my 401k.  It's

1   not settled yet because they moved out from the company, another

2   company to another company.  And I'm awaiting for that.

3          MR. QUINN:  I see.  So sounds like you are enjoying your

4   retirement since then.

5          PROSPECTIVE JUROR:  Yes.  Because at my age, 72 now.  I

6   born in 10/28/38.  So 72 and a half.

7          MR. QUINN:  So you have heard all the questions that

8   have been asked of other folks who have gotten up in these chairs

9   here.

10          Do you have any problems or issues or questions about

11   the kind of things that we have talked about, either intellectual

12   property, intangible property?  Have you any issue with that?

13          PROSPECTIVE JUROR:  No, because when you go to another

14   company, you have your own right to take with you whatever

15   created.  That's what I believe.

16          MR. QUINN:  What you learned --

17          PROSPECTIVE JUROR:  For your employment, the new

18   employment, yes you have the right.  You a person.  You a creator.

19   You can take it with you.

20          MR. QUINN:  How about --

21          PROSPECTIVE JUROR:  But the contract, that is the

22   drawback.

23          MR. QUINN:  So --

24          PROSPECTIVE JUROR:  Whatever that written, then you have

25   to be aware that's whether to go another way, not directly.  You

1    have to change the word not to use the same label, brand,

2    whatever.

3              MR. QUINN:  Would you be okay with the idea that --

4              PROSPECTIVE JUROR:  No, I'm not okay.

5                  (LAUGHTER)

6              MR. QUINN:  At least let me finish the question.

7              What is it that you are not okay with?

8              PROSPECTIVE JUROR:  Drawback is the language.

9              MR. QUINN:  The language?

10             PROSPECTIVE JUROR:  Yes.

11             MR. QUINN:   The language --

12             PROSPECTIVE JUROR:  The legal language.

13             MR. QUINN:  And if it says that --

14             PROSPECTIVE JUROR:  But for judgment, yes.  Right or

15   right; wrong or wrong.  I have to know it means you have to

16   balance the left and right and be judged in the middle, not to be

17   fair for both sides.  That is what I stand for.  But the language,

18   I don't think that I can go further.

19             MR. QUINN:  All right.  You think it's okay for

20   employers and employees to enter into agreements where the

21   employee agrees that anything I design, anything I create during

22   my employment which is in the employer's line of work, the

23   employer owns?

24             PROSPECTIVE JUROR:  Yes.  But when I go move on in my

25   new company, I have my right to create, but not the legal way, not

Page 132

1    to -- yes, the idea, I have to take it with me, yes.  It's the

2    right.  But not the same brand.

3              MR. QUINN:  Not the same thing.

4              PROSPECTIVE JUROR:  No.

5              MR. QUINN:  You can create new things?

6              PROSPECTIVE JUROR:  Right.  That's why you created it.

7    That's in my career that they use that.

8              MR. QUINN:  People change jobs and you learn things and

9    you know --

10             PROSPECTIVE JUROR:  You create whatever the market need.

11   Not to repeat the whole thing what you have.

12             MR. QUINN:  How about this issue of damages and the size

13   of jury verdicts.  Do you have a concern about that?

14             PROSPECTIVE JUROR:  They can ask for, but whether or

15   not, it's depend on the law, how much they can ask for.  They have

16   the right.

17             MR. QUINN:  But so if you were a juror in this case, you

18   don't have some type of assumption or preconception --

19             PROSPECTIVE JUROR:  No.  Until they come into black and

20   white.

21             MR. QUINN:  Do you have a feeling that jury verdicts in

22   this country, they're just crazy?  They have gotten out of hand?

23   Jurors awarding too much money?

24             PROSPECTIVE JUROR:  No.  It's the fair game.  Left and

25   right, it have to be in the middle.  That's the justice trial.

1            MR. QUINN:  Thank you very much.

2            THE COURT:  Ms. Keller.

3            MS. KELLER:  Good afternoon.

4            PROSPECTIVE JUROR:  Good afternoon.

5            MS. KELLER:  I see on your questionnaire you listed

6     yourself as a doll collector.

7            PROSPECTIVE JUROR:  No.

8            MS. KELLER:  Maybe I read that wrong.  You have bought a

9     My Scene doll.

10           PROSPECTIVE JUROR:  No, I don't think so.

11           MS. KELLER:  No.

12           PROSPECTIVE JUROR:  Maybe it's wrong.

13           MS. KELLER:  I could have the wrong person even though

14     it does say Norma Mukda at the top.  Do you have high blood

15     pressure?

16           PROSPECTIVE JUROR:  Yes.

17           MS. KELLER:  Okay.  And are you on medication?

18           PROSPECTIVE JUROR:  Yes.

19           MS. KELLER:  Is the medication working okay for you?

20           PROSPECTIVE JUROR:  I supposed to go to see the doctor

21     today, this afternoon, but I postpone it.

22           MS. KELLER:  If you have to go to the doctor's

23     appointment, can you go on Mondays?

24           PROSPECTIVE JUROR:  Yes.

25           MS. KELLER:  Would you like to serve on this jury or do

Page 134

1   you not want to?

2          PROSPECTIVE JUROR:  I prefer not to because I am not

3   good in English.

4          MS. KELLER:  You sound pretty good to me so far.  Are

5   you willing to serve?

6          PROSPECTIVE JUROR:  Yes.

7          MS. KELLER:  Can you think of anything that we should

8   know about that you think would be important for us to know other

9   than the fact that you don't think your language is good enough?

10         PROSPECTIVE JUROR:  I don't think of it now.

11         MS. KELLER:  Okay.  Are you concerned that if you have

12  to look at a contract, that you might not understand the language?

13  Was that what you were saying earlier?

14         PROSPECTIVE JUROR:  That's a good question.  Yeah, it

15  is.  Yes.

16         MS. KELLER:  That was something you were worried about?

17         PROSPECTIVE JUROR:  Right.

18         MS. KELLER:  You would have people explaining that to

19  you as part of the evidence in the case.  Do you understand that?

20         PROSPECTIVE JUROR:  Um-hmm.

21         MS. KELLER:  And do you think you would understand what

22  they were saying?

23         PROSPECTIVE JUROR:  I don't think.  I'm not confident.

24         MS. KELLER:  You have been understanding what I was

25  saying; right?

Page 135

1          **PROSPECTIVE JUROR:**  But I'm not confident.

2          **MS. KELLER:**  All right.  I appreciate that, thank you.

3          **THE COURT:**  Mr. Overland, do you have questions?

4          **MR. OVERLAND:**  No, Your Honor.

5          **THE COURT:**  Counsel, if you like to consult with your

6    parties for a moment and then join me.

7                (The following proceedings were held at sidebar.)

8          **THE COURT:**  The peremptory now passes back to the

9    defense.  There will be the third peremptory.

10          **MS. KELLER:**  I know, Your Honor, I'm now paralyzed with

11   indecision.  We would ask the Court to thank and excuse

12   Mr. Quintana.  Number five.

13          **THE COURT:**  Nadine Done -- oh, number five.  I'm sorry.

14   I missed that.  My apologies.  Mr. Quintana.  Thank you.

15                (End side-bar.)

16          **THE COURT:**  Counsel, the peremptory now passes to the

17   defense.

18          **MR. MCCONVILLE:**  We have to thank and excuse the juror?

19          **MS. KELLER:**  We have to thank and excuse the jury, Your

20   Honor?

21          **THE COURT:**  My apologies.  Both parties, thank you.

22          The parties are going to thank and excuse Mr. Quintana.

23   Thank you very much.  If you would go back to the jury room.  My

24   apologies.

25          And if you'd call another juror please.

Page 136

1            **THE CLERK:**  James O'Connor.

2            **THE COURT:**  Mr. O'Connor, we have you clear out in the

3    middle.  I apologize to you.

4            Mr. O'Connor, have you heard all the prior questions,

5    sir?

6            **PROSPECTIVE JUROR:**  Yes, I have.

7            **THE COURT:**  I don't want to take any of those for

8    granted.

9            Would you be fair and impartial to both sides?

10           **PROSPECTIVE JUROR:**  Yes, sir.

11           **THE COURT:**  Will you follow the law?

12           **PROSPECTIVE JUROR:**  Yes, sir.

13           **THE COURT:**  Do you have any questions of me at this

14    time?

15           **PROSPECTIVE JUROR:**  No, sir.

16           **THE COURT:**  Let me turn you over to Mr. Quinn.

17           **MR. QUINN:**  Good afternoon, Mr. O'Connor.

18           **PROSPECTIVE JUROR:**  Good afternoon.

19           **MR. QUINN:**  You are a retired LAPD sergeant?

20           **PROSPECTIVE JUROR:**  That's correct.

21           **MR. QUINN:**  We had a gentleman here earlier from the

22    LAPD also retired.  Did you happen to know each other?

23           **PROSPECTIVE JUROR:**  No, sir.

24           **MR. QUINN:**  You have been retired how long?

25           **PROSPECTIVE JUROR:**  Almost 19 years.

1          **MR. QUINN:**  Have you been enjoying your retirement?

2          **PROSPECTIVE JUROR:**  Yes.

3          **MR. QUINN:**  What do you like to do?

4          **PROSPECTIVE JUROR:**  Just physical fitness.  I run a lot

5     and walk.

6          **MR. QUINN:**  It's always great to see people that are

7     able to keep running.  My age, I know a lot of people my age

8     have -- their knees have gone out and it's gotten hard to run.  It

9     seems like that one of the first things to go is the ability to

10    run.  It's great that you are still able to do that.

11         **PROSPECTIVE JUROR:**  Thank you.

12         **MR. QUINN:**  You run every day?

13         **PROSPECTIVE JUROR:**  I try to.

14         **MR. QUINN:**  You indicated that you had heard something

15    about this case.  Again, I don't want to get into the details in

16    front of everybody, but can you tell us how you learned what it is

17    you learned?

18         **PROSPECTIVE JUROR:**  I just recall reading something in

19    the paper.  This has been two or years ago, some kind of dispute.

20    That's the only thing I can remember.

21         **MR. QUINN:**  Do you recall what it was that you read in

22    terms of whether there had been any developments in the case

23    without telling us?  Do you recall any details?

24         **PROSPECTIVE JUROR:**  No, sir.

25         **MR. QUINN:**  Is that something that's -- is there

1   something from that experience or what you read that sticks in

2   your mind now that you think would color your assessment of the

3   evidence in this case if you got to the jury?

4          **PROSPECTIVE JUROR:**  No, sir.

5          **MR. QUINN:**  Thanks very much.

6          **THE COURT:**  Ms. Keller.

7          **MS. KELLER:**  Good afternoon.  Nice Irish name.

8          **PROSPECTIVE JUROR:**  Thank you.

9          **MS. KELLER:**  The one of the questions, sir, that you

10  answered on your questionnaire, the question was -- the statement,

11  "is it wrong for an employee to take anything besides personal

12  belongings when leaving a job?"  And you wrote "yes."

13         Were you thinking when you wrote that of objects, paper,

14  pens?

15         **PROSPECTIVE JUROR:**  Yes.

16         **MS. KELLER:**  Physical objects.  You weren't thinking of

17  ideas, were you?

18         PROSPECTIVE JUROR:  No.

19         **MS. KELLER:**  And in terms of whether you're allowed to

20  take an idea with you, will you be able to wait until you hear all

21  the evidence in this case?

22         **PROSPECTIVE JUROR:**  Yes.

23         **MS. KELLER:**  The law?

24         **PROSPECTIVE JUROR:**  Yes.

25         **MS. KELLER:**  When you were with LAPD, what type of

Page 139

1    assignments did you have?

2            **PROSPECTIVE JUROR:**  It varied.  I mainly stayed in

3    patrol because I liked uniform and I liked being in the streets.

4    It was mainly patrol.

5            **MS. KELLER:**  You weren't working detective work or

6    anything like that?

7            PROSPECTIVE JUROR:  No.

8            **MS. KELLER:**  Did you ever have any experiences with

9    forensic evidence?

10           PROSPECTIVE JUROR:  No.

11           **MS. KELLER:**  I see you have children.  You have

12   daughters?

13           **PROSPECTIVE JUROR:**  Correct.

14           **MS. KELLER:**  And a son.  Did your daughters play with

15   dolls?

16           **PROSPECTIVE JUROR:**  Yes, they did.

17           **MS. KELLER:**  Ever play with Barbie dolls?

18           **PROSPECTIVE JUROR:**  Yes.

19           **MS. KELLER:**  Do you know anything about the Bratz dolls?

20           **PROSPECTIVE JUROR:**  No, I don't.

21           **MS. KELLER:**  Would you even be vaguely familiar with

22   what they look like?

23           PROSPECTIVE JUROR:  No.

24           **MS. KELLER:**  I'm guessing you are not a doll guy?

25           **PROSPECTIVE JUROR:**  That's correct.

Page 140

1          MS. KELLER:  Is there any reason at all that you would

2     not be able to give your full attention to this case, anything

3     physical, anything going on in your life, any travel plans,

4     anything?

5          PROSPECTIVE JUROR:  No.  I'm just remodeling my house,

6     but other than that...

7          MS. KELLER:  Okay.  Thank you.  I have nothing further,

8     Your Honor.

9          THE COURT:  Mr. Overland.

10         MR. OVERLAND:  Mr. O'Connor, what kind of work did your

11    wife do for the sheriff's department?

12         PROSPECTIVE JUROR:  She was an office supervisor,

13    clerical.

14         MR. OVERLAND:  She was never a deputy?

15         PROSPECTIVE JUROR:  No.

16         MR. OVERLAND:  I'm going to ask you the questions I

17    asked the other people.  Tell me why you think you would be a good

18    juror in this case.

19         PROSPECTIVE JUROR:  I think I agree with everybody else;

20    I'm honest and I would listen and I'm impartial.  I don't have a

21    -- anything, either party to judge anything.

22         MR. OVERLAND:  Any reason why -- again, I want you to

23    just look within yourself and tell me why if there is anything

24    that would make you a bad juror for this case.

25         PROSPECTIVE JUROR:  No.  The only thing I would say is I

1    get impatient after you, I feel, make a point, I get the point.

2    And if you keep laboring on that point, it starts to irritate me.

3    So that would be my biggest.

4            **MR. OVERLAND:**  Talking about me or what.  Impatient with

5    me?

6            **PROSPECTIVE JUROR:**  I will say anyone it applies to.  If

7    you are going to beat up a point, it's going to start bothering

8    me.

9            **MR. OVERLAND:**  Other than that anything else?

10           **PROSPECTIVE JUROR:**  No, sir.

11           **MR. OVERLAND:**  Thank you.

12           **THE COURT:**  Counsel, join me in just a moment and

13   discuss the peremptory, please.

14              (The following proceedings were held at sidebar.)

15           **THE COURT:**  Back on the record.  The peremptory now goes

16   to the plaintiff.  This would be the fourth peremptory.

17           **MR. QUINN:**  Pass, Your Honor.

18           **THE COURT:**  Pass.  Okay.  Peremptory now goes back to

19   the defense.  That would be the last and the fourth peremptory.  I

20   want time to talk about that for a moment.

21              (Brief pause in proceedings.)

22           **THE COURT:**  Concerning the fourth and last peremptory

23   after Mattel had passed, it turns to MGA, which means also Mr.

24   Overland, Mr. Machado.

25           **MS. KELLER:**  Yes, Your Honor.  After conferring we have

Page 142

1    decided to accept this jury.

2            **THE COURT:**  So that's passing.  Now, there has been some

3    discussion on the record concerning juror number one.  When I step

4    into court right now we're going to swear eight alternates.  There

5    has been some discussion about potentially expanding this to a

6    nine alternate depending upon whatever you agree or whatever the

7    juror number one states this evening.

8            I'm not inclined of course to excuse him at the present

9    time, but I haven't heard what his difficulties are although he

10   has tried make that known to the court clerk.

11           How would you like to proceed?

12           **MR. QUINN:**  We're comfortable with this jury, Your

13   Honor, just the jury and the alternates, and we are not in favor

14   of adding another alternate.

15           **THE COURT:**  If that's the case, it's my assumption then

16   that Hinton is going to stay; is that correct?

17           **MR. QUINN:**  Unfortunately, it appears that she is.

18           **THE COURT:**  The MCATS.  And you don't want me to make

19   any inquiry or get any other alternate at the present time?

20           **MR. QUINN:**  Correct.

21           **MS. KELLER:**  On behalf of MGA, we would request that the

22   Court exercise its discretion to do that, because we are

23   concerned, given the number of elderly jurors, the number of

24   jurors with health problems, the number of jurors' other

25   commitments, that we could end up not having a sufficient number

Page 143

1   of jurors to render a verdict and we would ask the Court to

2   exercise its discretion to add an alternate.

3           **THE COURT:**  At the present time I'm worried about Hinton

4   with the MCATS but it's not a good legal excuse.  I'm worried

5   about Mr. Beilin only because of what appears to be his health,

6   but it's not a good legal excuse, to excuse.

7           I'm worried a slight amount about Ms. Muck and her

8   ability to understand English, but she did quite well on the

9   colloquy with both of you.  It's not a good reason or cause as far

10  as the alternates are concerned.  I think that was our agreement.

11          I originally had six and ten and I changed it to eight

12  and eight.  I'm going to honor that.  Eight and eight.  And in

13  addition, I know that we're going to have difficulty because

14  Mr. Khameneyan, number one, has approached my court clerk a number

15  of times.  So we're going to hear whatever difficulties this

16  evening after the jury leaves.

17          We can do one more thing, Kathy.  We could invite back

18  five jurors, the next five in order for Monday.  And in case we

19  run into problems this evening, we could have them return

20  8:00 o'clock Monday just in case.  Would that be a wise decision

21  by the Court?

22          In other words, it's frozen now, Mr. Quinn, but I don't

23  know what they're going to say on the record.

24          And as far as I get with the alternates, I promise you

25  when they stand up to get sworn, you are going to hear excuses

Page 144

1   again just like you heard with the first eight, and they may be

2   good legal excuses.  I'm thinking maybe we invite the next five

3   back.

4           Could you get the next five?

5           And we're going to ask these jurors to return.  Go get

6   me the next five.  Fernando Jimenez, Joy Nemetz, Robert Reckers,

7   Barbara Vega, Paul Bay.  I don't know that we're going to use

8   them.  I don't know that I even want to, but I'm certainly not

9   going to send out jury summons to get people at the last moment.

10          **MR. QUINN:**  I came without anything to write on.

11  Probably ought to jot down those names.

12          **THE COURT:**  I'm going to ask Fernando Jimenez, Joy

13  Nemetz, Robert Reckers, Barbara Vega, Paul Bay.  You want to take

14  one additional just to make certain in case you have the MCATS

15  lady who can't sit?  Let's take the next one, Mr. Pham.  Juror 41.

16          Is that agreeable?

17          **MS. KELLER:**  Yes.

18          **THE COURT:**  That doesn't mean we're going to do this,

19  Mr. Quinn.  It's a safety valve.

20          **MR. QUINN:**  You have got the option if you need to.

21          **THE COURT:**  I have got the option Tuesday if we need it.

22  And that makes certain that we don't have to bring the whole group

23  back.  I agree with you, it should be eight and eight.

24          **MR. MCCONVILLE:**  Is there more than one Pham?  That's a

25  common name.

Page 145

1          **THE COURT:**  His name is Mr. Vanthi Pham.  We now have

2    the alternates, passing.

3          **MR. MCCONVILLE:**  Yes, sir.

4               (End sidebar)

5          **THE COURT:**  Ladies and gentlemen, would the eight of you

6    stand please.  Six and two.

7          Counsel have passed.  If you would raise your right

8    hand, we're going to swear you as the alternates.

9                    (Alternate jurors sworn)

10         **THE COURT:**  Let me talk to all of you in the prospective

11   audience for just a moment.

12         By agreement of counsel; is that correct?  I can call

13   the next six names?

14         **MR. QUINN:**  Yes, sir.

15         **MS. KELLER:**  Yes, Your Honor.

16         **MR. OVERLAND:**  Yes.

17         **THE COURT:**  Fernando Jimenez, are you present?  Thank

18   you.  If you would remain standing, sir.

19         Joy Nemetz, are you present?  Thank you.  If you would

20   remain standing for just a moment.

21         Robert Reckers, thank you.  If you would remain standing

22   for just a moment.

23         Barbara Vega, would you remain standing for just a

24   moment, if Ms. Vega is here.  Thank you very much.

25         Paul Bay.  Mr. Bay, are you present?  Thank you, sir.

Page 146

1    And Vanthi Pham, would you remain for just a moment after I excuse

2    the rest of the perspective jurors.  Would you six jurors or

3    perspective jurors remain for just a moment.

4            Now, we believe that we have got the jury.  In fact, we

5    know that we do, and the alternates.  But out of an abundance of

6    caution I'm going to ask the six of you to remain for just a

7    moment.  I'm going to excuse the rest of you and tell you that I

8    really apologize that you are not serving because if you are not

9    serving, you have spent an entire day.  But I want to thank you

10   for your service and thank you for attending, and I'm going to

11   excuse you at this time.

12           For those other six, if you would be seated in the

13   audience for just a moment.  Once again, Fernando Jimenez, Joy

14   Nemetz, would you come up with Mr. Jimenez for just a moment.

15           Mr. Reckers, Barbara Vega, Paul Bay, would you come up

16   and join us also.

17           Finally Vanthi Pham, would you come up and join us also.

18   First, I'm going to order you back at 8:00 o'clock Tuesday morning

19   which is the date of January 18.

20           What day?  Tuesday.  Now, you are going to leave your

21   phone numbers once again with the court clerk, and if we don't

22   need you on Tuesday, we're going to call you on -- well, Monday is

23   a holiday.  I just want you to come to court at 8:00 o'clock.  You

24   may be needed at that time, you may not be.  We may simply turn

25   you around at 8:05 and send you home.  If we do that, you have my

Page 147

1    apologies.  But if we need you and we need to continue on a little

2    bit with this process, there is no reason by stipulation of all

3    counsel that we need to keep another 70 jurors.

4           Counsel have stipulated and I let it be known you are

5    the next jurors.  In fact, the order that I called you in is the

6    way that we would proceed if we were calling additional jurors

7    into the jury box.

8           Acceptable so far, Mr. Quinn?

9           **MR. QUINN:**  Yes, Your Honor.

10          **THE COURT:**  Acceptable so far, Ms. Keller?

11          **MS. KELLER:**  Yes, Your Honor.

12          **THE COURT:**  Acceptable so far, Mr. Overland?

13          **MR. OVERLAND:**  Yes.

14          **THE COURT:**  Please don't discuss this matter.  We'll see

15   you Tuesday, January 18, 8:00 o'clock.  Fair enough?  Right here.

16   I want you to come right to court at 8:00 o'clock.  And Kathy will

17   get the phone numbers and do that out in the hallway.

18          Now, for the eight sitting jurors and the eight

19   alternates, let's start Tuesday at 8:30.  Not 8:00 o'clock.  I'm

20   not going to try to manipulate you into 8:00.  Just 8:30.

21          Here is what you can all expect as the sitting jury and

22   the alternates.  That day there will be an opening statement by

23   the parties.  And opening statement is not evidence.  It's going

24   to be a summary what have they expect the evidence will slow.  An

25   overview.  Sometimes the evidence will vary from their opening

Page 148

1   statements.  It just a road map, but you are not to construe that

2   as evidence.  It's a summary of what they think the case is going

3   to be about.

4           After that, we're going to get right into witnesses.

5   Probably going to call one or two witnesses the first day and

6   we'll talk about the hours after that.  So you go back to your

7   families this weekend.  If we can start at 8:00 o'clock, I'd like

8   to.  If we can't start at 8:00 o'clock, it's 8:30, but we'll vote

9   on that democratically in the afternoon of Tuesday.  Okay?

10          Now, there is one juror who approached the clerk that I

11  would like to speak to.  And that's juror number one,

12  Mr. Khameneyan.  I'd like you to remain for just a moment.  I'm

13  going to admonish you in the strongest terms.  Please don't

14  discuss this matter with anyone or form or express an opinion on

15  this case until the very end of the case after all the arguments

16  and after I instruct.

17          This case I think will move quicker than the time

18  estimate.  I can't guarantee that, but I think it will.  Any

19  questions of me so far?

20          **PROSPECTIVE JUROR:**  You mentioned about a letter to our

21  employers.  I was wondering if we're going to get that next week.

22          **THE COURT:**  You get it next week.  Bring the person you

23  want it addressed to and I'll send out.  Plus at the end of the

24  service, I always send out letters to all of you anyway.  But I'll

25  do that early on so your employer knows that you are needed.

Page 149

1          Yes, sir, your name?

2          **PROSPECTIVE JUROR:**  Nguyen.  I just want to double check

3    Tuesday when we come back, we just report to this.

4          **THE COURT:**  You come right in here.  In fact, Kathy is

5    going to help you just a moment.  There is a side door right over

6    here at the end of the hallway.  In fact, I'll be right back.  All

7    of you come with me.

8    (Whereupon there was a change in reporters and Denise Paddock

9    reported the 6:00 session.)

10                             -oOo-

11

12                         CERTIFICATE

13

14          I hereby certify that pursuant to Section 753, Title 28,

15   United States Code, the foregoing is a true and correct transcript

16   of the stenographically reported proceedings held in the

17   above-entitled matter.

18

19   Date:  January 13, 2011

20

21   _____

22   MARIA DELLANEVE, U.S. COURT REPORTER
     CSR NO. 9132

23

24

25