UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

Case No. CV 04-9049 DOC (RNBx)                                      Date: January 26, 2011

Title: MATTEL, INC. v. MGA ENTERTAINMENT, INC.

PRESENT:

THE HONORABLE DAVID O. CARTER, JUDGE

| Kathy Peterson | Not Present |
|---|---|
| Courtroom Clerk | Court Reporter |

ATTORNEYS PRESENT FOR PLAINTIFFS: ATTORNEYS PRESENT FOR DEFENDANTS:

NONE PRESENT                                                       NONE PRESENT

PROCEEDING (IN CHAMBERS): ORDER ON PENDING MOTIONS IN LIMINE

The Court rules on the pending motions in limine as follows:

**1.      MGA Motion in Limine Number 25 to Exclude Expert Opinion of Ralph Oman**

A.      Background

MGA seeks to exclude the expert report and testimony of Ralph Oman, who served as the Register of Copyrights in the United States between 1985 and 1993. First, Oman's report describes the process through which a copyright is registered, including the contents of the application that identify the copyright owner and the copyrighted work, the submission of a depiction of the copyrighted work, and the filing fee that must be paid by the applicant. Oman also discusses the "examination process" by which a Registration Specialist at the Copyright Office reviews the contents of the application. He notes that "the Registration Specialist will normally rely solely on the information that the applicant provided in the application form" in determining whether "any portion of the work can reasonably be construed to contain copyrightable authorship."

Second, Oman purports to downplay the significance of Mattel's failure to identify Bryant's sketches and sculpts as "works made for hire." He opines that "[i]f Mattel has more than one legitimate claim to authorship, it can choose any one of them in its application," because the registration certificates do not foreclose Mattel from asserting other claims to authorship; they only

serve to "establish[] the *prima facie* validity of the copyright, and [] put the world on notice that [Mattel] claims copyright in the Bratz-related works." According to Oman, "Mattel can choose any theory of authorship or ownership it wants in filling out the application form, and it can assert all theories of authorship or ownership in subsequent litigation." Mattel, he claims, "is not limited in the legal arguments it raises in court in support of its position."

Third, Oman's report argues that a three-dimensional doll can infringe a two-dimensional copyrighted drawing. He further "note[s] that a three-dimensional version of a two-dimensional drawing *need not be an exact replica*" in order to infringe.

Finally, Oman's report renders extensive opinion about the contents of Mattel and MGA's copyright applications in the Bratz works and products. For example, Oman concludes that "Mattel has not misrepresented any facts in its [copyright] application." Oman also infers that MGA's failure to "identify previously registered or public domain materials" upon which "the Bryant drawings were purportedly based" suggests that MGA "thought that Mr. Bryant's Bratz drawings were wholly original when it registered them." He states that, unlike most copyright owners, MGA submitted several supplementary registrations, from which he infers that MGA attempted to "manipulate the record to gain some legal or competitive advantage." Though the Copyright Office failed to reject MGA's supplementary registrations, Oman explains that the Copyright Office "knows that at that point the matter is in the hands of the court, and the judge and jury will be able to give the proper weight to a hindsightful 'correction' of the record."

B.  Discussion

Oman attempts to play judge and jury in his expert report. His analysis of the legal standard for infringement provides improper instruction about the law. *See United States v. Scholl*, 166 F.3d 964, 973 (9th Cir. 1999); *Aguilar v. Int'l Longshoremen's Union*, 966 F.2d 443, 447 (9th Cir. 1992). Mattel re-characterizes his opinion as an attempt to establish "that the Copyright Office will register claims to copyrights in three-dimensional embodiments based on drawings." Mattel, however, merely summarizes the topic sentence of a section of Oman's report that otherwise contains extensive legal commentary. For example, Oman opines that:

- "The protectable elements of the drawings, when incorporated into the form and appearance of the three-dimensional dolls, must of course be authorized by the copyright owner of the drawings, or they will be infringing."

- "By way of illustration, the Disney company has the right to create three-dimensional Mickey Mouse dolls based on the two-dimensional drawings of the famous cartoon character . . . a Mickey Mouse doll with fatter legs [than a drawing] would nonetheless enjoy full copyright protection based on the copyright registration of the cartoon character."

- "Larian, when he sought to enforce MGA's claimed rights against an accused infringer in the courts of Hong Kong, made the same point in his affidavit to the court. He correctly noted, after consultation with his lawyers, that the creation of the original drawings of the dolls serve as the legal basis for claiming copyright in the dolls themselves . . ."

Oman's report does not, as Mattel argues, discuss three-dimensional depictions of two-dimensional drawings in an attempt to identify the "criteria the U.S. Copyright Office uses." To the contrary, Oman unabashedly opines on whether such depictions *infringe* the underlying copyrighted works as a matter of law.

Furthermore, Mattel all but concedes that Oman's report offers legal opinion about whether Mattel's failure to register Bryant's creative works as "works made for hire" forecloses Mattel from sustaining a claim to authorship pursuant to that theory. Mattel's opposition brief argues that his "testimony directly refutes MGA's argument that, because Mattel indicated on the forms that it owned Bryant's drawings 'by assignment,' Mattel could not have also owned the drawings as works-made-for-hire." As an initial matter, the Court, and not the fact-finder, must resolve whether Mattel can avail itself of the work-made-for-hire doctrine. That issue has already been resolved in Mattel's favor. Moreover, even if the fact-finder were asked to resolve the issue of whether the representations on Mattel's copyright registrations impact the availability of the work-made-for-hire doctrine, the Court, and not Oman, must provide instruction about the legal significance about Mattel's prior representations, including the representations on its copyright registration.

Oman's opinions about the legal significance of Mattel's copyright registration — he claims it is *prima facie* evidence of validity — is yet another example of his attempt to interpret the law. Indeed, he concedes that "[o]nly the court can make that difficult legal judgment" about the significance of Mattel's copyright registration.

In the remainder of his report, Oman improperly reaches conclusions about MGA's intent on the basis of its failure to identify materials that inspired the copyrighted Bratz works, as well as its filing of supplementary registrations. *See Elsayed Mukhtar v. Cal. State Univ.*, 299 F.3d 1053, 1066 n. 10 (9th Cir. 2002), *amended by* 319 F.3d 1073 (9th Cir. 2003); *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 546-47 (S.D.N.Y. 2004). Mattel does not meaningfully explain the relevance of Oman's opinion about the copyright registration process, and the procedures used in Hong Kong. Extricating such opinion from the legal analysis and factual conclusions that pervade Oman's report is, in any event, impracticable.

On the basis of the present record, MGA's motion is granted. If Mattel again seeks to introduce the testimony of Mr. Oman it must provide the Court with such request on at least seven days notice and must identify the manner in which it will cure the deficiencies identified herein.

**2.     MGA's Motion in Limine Number 27 to Exclude Expert Opinion of John Alex**

A.      Background

Mattel expert John Alex is an attorney with decades of experience in the field of patent prosecution. The term "patent prosecution" describes the process through which an inventor or patent applicant explains in a patent application to the United States Patent and Trademark Office (1) whether a subject invention is neither "old" nor "obvious"; and (2) how the invention is made and used. In a process Alex describes as a "negotiation" between the patent applicant and the USPTO, the applicant clarifies and explains certain the "claims" in the patent application that describe the invention and "tell the public exactly what it is that constitutes an infringement of the patent."

MGA filed a patent application with the USPTO on February 24, 2003. The subject matter of the application was a "Doll with Aesthetic Changeable Footgear" and the application identified Larian as the inventor. The application contained seventeen claims. Claim 1 of the patent, which Alex concludes is "representative of the independent claims," states:

> 1.      A doll with changeable footgear comprising:
>
> a torso having a body and legs, said legs having a predetermined skin color and texture;
>
> a pair of foot/shoe assemblies, each including an open shoe with straps, with the shoe being open to expose at least part of the foot, the foot having substantially the same predetermined skin color and texture;
>
> each said assembly being removable secured to one of said legs at the lower leg or ankle or said doll at a separation point;
>
> each said assembly and lower legs having a snap-together joint with a protuberance on one part and a mating recess on the other part; and
>
> a simulated strap forming part of said shoe extending around said assembly at said separation point.

Alex notes that the patent application was initially rejected on the grounds that the Bratz dolls were released more than two years prior to the application and "clearly disclose[d] all of the structural limitations recited in claims 1-17" of MGA's patent application. Alex avers that, in response to the rejection, MGA's attorney "apprised Mr. Bryant of the materiality of the Bratz prior art." Alex claims that MGA's attorney directed Bryant to sign a declaration that in relevant part stated: "I was actively involved with the release of the Bratz dolls of the configuration as set for [sic] in paragraph 3, and this release did not occur until the fall of the year 2002." Bryant's signed declaration was attached to an amendment filed with the USPTO in which MGA's attorney declared that "Bryant . . . confirms

that the release date for the dolls as claimed in this patent application, did not occur until the fall of 2002. Of course, this is only a few months prior to the February 24, 2003 filing date of the present application. Accordingly, it is respectfully requested that the rejection based on the Bratz article be withdrawn." Bryant, of course, later conceded during the phase 1 trial that "the introduction of the Bratz dolls occurred well prior to the one-year critical date." Alex opines that the Bryant declaration filed with the USPTO "can be viewed as a knowing effort to mislead the PTO by a willful false statement made under oath."

Alex also "expect[s] to testify that the inventorship" described in MGA's patent application is "incorrect" and a "knowing effort to mislead the PTO." Alex objects to MGA's failure to identify Bryant as a named inventor even though Bryant shared with MGA "drawings of dolls that squarely fall within the scope of the claims" in MGA's patent application. The patent application's claims describe a "snap-together" mechanism that connects the doll foot/shoe assemblies with the lower leg and ankle; Alex states "these claims literally read on the Bryant drawings" of the Bratz dolls. Alex believes that MGA's patent application "contains material false statements, which could be construed to be in violation of 18 U.S.C. § 1001."

The claims in MGA's patent application were eventually rejected by the USPTO and MGA thereafter abandoned the application on November 26, 2003.

B. Discussion

(i) Relevance

Mattel cannot credibly defend the relevance of Alex's opinion. In conclusory fashion, Mattel argues that Alex's opinion is relevant to (1) the credibility of Bryant and Larian; and (2) the issue of fraudulent concealment.

The first argument is legally unsound. "Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' character for truthfulness . . . ***may not be proved by extrinsic evidence***." Fed. R. Evid. 608(b) (emphasis added). Mattel is restricted to inquiring into specific instances of conduct "on cross-examination" and, even then, only at the court's discretion. *Id.*

The second argument is spurious. No reasonable fact-finder could conclude that Mattel "actual[ly] and reasonabl[y] reli[ed] on" the alleged misrepresentations in MGA's patent application. *See Santa Maria v. Pacific Bell*, 202 F.3d 1170, 1176 (9th Cir. 2003). The patent application was never released to the public let alone reviewed by Mattel or anyone associated with Mattel. Its filing cannot support Mattel's fraudulent concealment allegation.

(ii) Legal Opinion

Even if relevant, Alex's expert report is packed with improper legal opinion. For example, Alex purports to interpret and apply 18 U.S.C. § 1001, which makes it unlawful to conceal or falsify a material fact in connection with certain administrative proceedings or Congressional investigations. His opinion directly invades the Court's province to instruct the fact-finder on the law. *See Aguilar*, 966 F.2d at 447.

Alex's report also gratuitously and improperly opines on MGA's intent. On repeated occasions, Alex suggests that statements by Bryant and MGA were "knowing" and "willful" attempts to mislead the PTO through affirmative misrepresentations. It is improper for expert opinion to be used in an attempt to comment on a party's *mens rea* where, as here, Alex offers no expert analysis to support his conclusions about MGA's intent. *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d at 546-47.

On the basis of the present record, MGA's motion is granted. If Mattel again seeks to introduce the testimony of Mr. Alex it must provide the Court with such request on at least seven days notice and must identify the manner in which it will cure the deficiencies identified herein.

### 3. MGA's Motion in Limine to Exclude the Expert Opinion of Jeffrey Kinrich

#### A. Background

The expert report of Mattel witness Jeffrey Kinrich concludes that "the average percentage change in salaries for the employees who allegedly downloaded confidential and proprietary information from Mattel was 36.8 percentage points higher than the average change in salaries for the other employees" who joined MGA after leaving Mattel. Kinrich reached this conclusion after analyzing the salary changes for employees who joined MGA within 18 months after leaving Mattel. There were 58 such employees, six of whom are alleged to have downloaded Mattel information prior to their departure. Kinrich states that the six employees (Brisbois, Castilla, Cooney, Machado, Trueba, and Vargas, **but not** Brawer) on average earned 49.3 percent more at MGA than they did at Mattel. The remaining fifty-two employees (including Contreras and Brawer) on average earned 12.5 percent more at MGA than they did at Mattel.

Kinrich's methodology is simple. He divided (1) the difference between the aggregate Mattel salaries and the aggregate MGA salaries; into (2) the aggregate Mattel salaries; of (3) each category of employees (*i.e.*, downloaders vs. non-downloaders of Mattel information). He tested his conclusions by using smaller samples of data composed of Mattel employees who joined MGA *six months* after leaving Mattel, Mattel employees who joined MGA *six to twelve* months after leaving Mattel, and Mattel employees who joined MGA *twelve to eighteen* months after leaving Mattel.

#### B. Discussion

Kinrich is a valid summary witness. MGA can test his opinion on cross examination by asking him why he excluded Ron Brawer and Nick Contreras from the group of employees who did not "download[] confidential and proprietary information."

MGA's motion is denied.

### 4. MGA's Motion in Limine to Exclude Expert Opinion of Kenneth Hollander

#### A. Background

The October 2010 expert report of Kenneth Hollander summarizes the results of an internet survey of girls aged 8-13. This "test group" of individuals was asked to view the Bryant sketches and more than 90 percent of the individuals "identified the Bryant drawings as Bratz dolls."[1] In order to account for "going-in knowledge and/or preconceived opinions," Hollander used a "control group" of individuals who were exposed to unrelated "non-contested 'Cherry Merry Muffin' drawings." Only 1 percent of the control group responded that the Cherry Merry Muffin drawings look like Bratz dolls.

#### B. Discussion

Mattel first argues that Hollander's report is relevant to the intrinsic test for copyright infringement, which "focuses on whether the ordinary, reasonable audience would find the works substantially similar in the total concept and feel of the works." *Cavalier*, 297 F.3d at 822. But Hollander's survey did not even show its participants *each* allegedly infringing Bratz dolls, or even an exemplar of each generation of those dolls; the survey instead asked its participants to rely upon their recollection, if any, of the Bratz dolls. This methodology does not remotely resemble the intrinsic test for copyright infringement. Moreover, Hollander failed to ask the survey participants whether the Bryant drawings were "substantially similar in the ***total concept and feel***"; he simply inquired into whether the drawings "look like" the Bratz dolls. Hollander, in short, asked his survey participants the wrong question and failed to show them the relevant creative works. The survey responses are entirely irrelevant to whether the ordinary, reasonable audience would find the Bryant drawings substantially similar to the Bratz dolls in the total concept and feel of the works. The fact that the vast majority of the survey participants stated that the Bryant drawings looked like the Bratz dolls is unduly prejudicial because it misleads the jury about the relevant standard for copyright infringement. The survey must be excluded for this reason alone. *Cf.* J. Thomas McCarthy, 6 McCarthy on Trademarks and Unfair Competition § 32:170 (4th ed. 2008) ("[I]f the survey questions are not congruent with the issues in the case, the results will not only be irrelevant, but may also be prejudicially misleading to the jury.").

---

[1] Hollander's conclusion is obviously wrong. The survey respondents were asked whether the sketches "look like" the dolls, not whether there is absolute identity between the sketches and the dolls.

Mattel also argues that Hollander's survey is relevant to its allegation that Bratz dolls infringe the character(s) expressed in Bryant's works. This argument is even less meritorious than Mattel's first argument. Copyright protection can extend to the character expressed by a particular creative work. *See Walt Disney Prods. v. Air Pirates*, 581 F.2d 751, 754 (9th Cir. 1978). To establish infringement of the copyright in the characters expressed in Bryant's creative works, Mattel must establish, as any other copyright plaintiff must, that the character(s) expressed by the Bratz dolls are substantially similar both in terms of their protectable expression and in terms of their "total concept and feel" to the characters expressed in the Bryant works. Substantial similarity is not evidenced by survey results that concern whether creative works "look like" each other, rather than the pertinent issue of whether there is substantial similarity between the characters expressed by the works. As before, the Hollander report's irrelevant results have the potential to mislead the jury about the applicable standard to determine whether there has been infringement of the copyrights in characters found in creative works.

Given the irrelevance and unduly prejudicial nature of Hollander's report and opinion, the Court need not reach MGA's separate challenge to Hollander's qualifications and the methodology applied by his report.

MGA's motion is granted.

5. **MGA's Motion in Limine Number 36 to Strike and Exclude Expert Report of Frank Keiser**

On or before January 26, 2011 at 4:00 p.m., the parties shall submit the complete transcript of the deposition of Mr. Keiser, his complete report, and all "three-dimensional scans" of the "sculpts, dolls and other items" imaged by Keiser. To the extent specialized technology is necessary to review Mr. Keiser's three-dimensional images, the parties shall contact the Clerk to ensure the Court's prompt access to such technology.

6. **Mattel's Motion in Limine Number 4 to Exclude Rebuttal Expert Report of Jan D. Duffy**

Jan Duffy's expert opinion was excluded from the phase 1 trial by Judge Larson. Mattel asks this Court to keep her out of this trial as well. Unlike the affirmative expert report prepared by Duffy in advance of the phase 1 trial, she has prepared a "rebuttal expert report" in advance of this proceeding, though her rebuttal report purports to incorporate the "initial opinions and the bases or grounds for those opinions [as] set forth in [Duffy's] initial Report . . ., dated February 11, 2008." In both her initial report and her rebuttal report, Duffy purports to rebut the expert opinions contained in the opinions of Jeffrey Breslow, Angel Gomez, and Ginger McRae, all of whom prepared expert reports for Mattel in connection with this action. The Court has already ruled that, absent a change in circumstances, Gomez and McRae will be excluded from trial, and Mattel has withdrawn Breslow's

expert opinion.  MGA has conceded that Duffy "will not testify if . . . Mattel's experts are excluded." Mattel's motion is therefore stricken as moot.  The Court will re-visit this ruling in the event MGA introduces a contract unconscionability defense at trial, and Mattel seeks to admit the expert opinions of Gomez and McRae in response.

### 7. Mattel's Motion in Limine Number 3 to Exclude Expert Opinion of Glenn Vilppu

#### A. Background

MGA expert Glenn Vilppu prepared a report in rebuttal to Mattel expert Lee Loetz. Vilppu disagrees with Loetz's conclusion that the Bratz dolls infringed Mattel's copyrights in Bryant's creative works.  Vilppu specifically concludes that "the 'similarities' identified by Mr. Loetz are at a minimum overstated and in many cases non-existent."  Vilppu reached this conclusion after comparing Bryant's works with the Bratz dolls, and finding that similarities were limited to unprotectable elements of the works.

#### B. Discussion

Mattel does not contest the high relevance of Vilppu's expert opinion, especially because MGA needs Vilppu's opinion to rebut Loetz.  Mattel instead argues that Vilppu's opinion should be excluded for three reasons: (1) Vilppu's lack of experience in the field of toy design; (2) Vilppu's failure to focus on similarities between the creative works; (3) Vilppu's improper rendering of legal opinion about the existence of infringement.  None of these arguments is convincing.

Mattel erroneously suggests that Vilppu's expertise is limited to "'Renaissance drawing' or 'drawing from imagination'."  To the contrary, Vilppu has extensive experience in the field of animation and has used action figure dolls to model two-dimensional creative works, like the ones at issue in this case.  Vilppu spent 16 years as a training program drawing instructor at the Walt Disney Pictures Animation Features and led drawing seminars at the Warner Brothers Feature Animation.  He was the Acting Director of the Character Animation Studio at the California Institute of the Arts.  He has written a book on Figure Drawing, and has performed free lance artistry for a number of animated studios.  Mattel engages in semantics when it accuses him of lacking experience "turning any of the animated characters he has worked on into three-dimensional dolls."  His experience is more than adequate to inform him of that process and, in any event, Mattel fails to explain why his opinion suffers from an inability to conceive of the manner in which two-dimensional drawings are turned into three-dimensional dolls.  The substantial similarity determination requires the fact-finder to compare elements of the creative works at issue; the manufacturing process through which those works are created is (with the possible exception of functionality) irrelevant.

Mattel also misreads Vilppu's report when it faults him for unduly emphasizing differences between Bryant's works and the Bratz dolls.  First, Vilppu failed to find similarities

between the protectable elements of Bryant's sketches and all but two of the subsequent generation Bratz dolls. The Court reached the same conclusion in its order on the motions for summary judgment, which renders Mattel's objection to Vilppu's analysis moot. Second, Vilppu expressly identified a number of similarities between certain Bryant works and the first generation Bratz dolls, but ultimately concluded that these were similarities in unprotectable elements. For instance, Vilppu acknowledges the similarities in fashion "style" between the Bryant works and Bratz dolls but dismisses these similarities as "simply the type of styles being worn by kids at the time." Vilppu also observes that "even if they did line up, the general lining up of facial features is normal and natural." His overarching observation, that mirrors the analysis in the court's summary judgment order, is that "Beyond the anatomical landmarks that make the drawing, preliminary sculpt and doll look human-like, they share no similarities." The dissimilarities identified by Vilppu simply substantiate Vilppu's basic conclusion that the works did not share any similarities in protectable elements. In all events, Mattel's argument is contrary to the law of this case: the Ninth Circuit expressly considered differences in "fashions and hairstyles" relevant to a finding of non-infringement for the "vast majority" of the subsequent generation Bratz dolls.

      Mattel is also incorrect that Vilppu lacks foundation to render an opinion about the process through which a two-dimensional sketch is turned into a three-dimensional product, and also the similarities between the works. Mattel's main objection is that Vilppu admitted to having no experience in the doll production field or with fashions in general. But Mattel does not explain why experience in doll production is even relevant to Vilppu's expertise in identifying similarities between creative works. In fact, Vilppu has extensive experience with sketches and other types of artistic work, including, for example, animated works, which Bryant's creative works resemble. More importantly, Vilppu also has extensive experience with three-dimensional works like the Bratz dolls — *e.g.*, Vilppu worked with a team of artists tasked with converting three-dimensional action figures to images that could be used in comic strips. Mattel does not, and cannot, explain the materiality of Vilppu's lack of experience with *fashion* dolls, as opposed to any other type of doll. Mattel can certainly challenge the weight of Vilppu's testimony on the basis of this distinction, but his opinion is neither unreliable nor irrelevant.

      Mattel is finally mistaken about whether Vilppu renders improper legal opinions. Unlike Mattel's experts, who openly discuss the applicable law on various issues in this case, Vilppu merely observes that certain elements of Bryant's works are *standard* or *normal* elements that are unoriginal. This is neither express nor implied legal commentary. It is relevant expert opinion about standard and unoriginal elements in the artistic field. Indeed, it is precisely the type of opinion offered by Mattel expert Loetz, whose opinion Vilppu's report rebuts.

      Mattel seeks to preclude MGA from offering Vilppu's opinion in response to Loetz's opinion. In so doing, Mattel seeks to protect Loetz's errors from the fact-finder's scrutiny. Mattel's arguments are unconvincing and misconstrue the content of Vilppu's report. Mattel's motion is therefore denied.

    **8.**    **Mattel's Motion in Limine to Exclude Expert Opinion of Sam Rubin**

Mattel seeks to exclude the opinion of MGA expert Sam Rubin. Rubin belongs to the Stroz Friedberg computer forensics firm. He performed an analysis of the hard drives of various MGA employees and prepared four reports that detail his findings. First, Rubin prepared a July 1, 2008 report in response to Examination Reports prepared by Mattel's forensic expert, 42 LLC, which conducted a forensic analysis of seven computer hard drives used by Larian. Rubin's report provides context to Mattel's expert's conclusion that 37,373 files were deleted across the Larian hard drives, by noting that "[t]he delete files . . . include tens of thousands of files that were deleted automatically as part of the normal operation of the Windows operating system installed on each of the seven computers." Mattel's expert, in fact, conceded that only 633 files on Larian's hard drive were user-created files that were deleted; the remaining files were "not . . . relevant based on their extension or . . . the type of file that they are." However, Rubin continues that even of the 633 user-created files, a little more than two hundred files were "[l]ink files [that] do not contain any substantive user-generated content, and their deletion does not affect the files to which they are linked." That left 406 files, of which 397 were located elsewhere on Larian's hard drive. The remaining nine files contained log in information, a rap song, an internal MGA document, and a french language letter from an MGA executive.

These facts should sound familiar to the parties. The Court previously conducted an extensive review of ***thousands of files*** on the Larian hard drives and, upon this examination, agreed with Rubin. Specifically, the Court found that many of the files allegedly deleted by Larian continued to reside on his hard drives. The vast majority of these files were protected by the attorney-client privilege and the Court therefore rejected Mattel's attempts at further discovery into the subject matter.

Mattel nevertheless seeks the exclusion of Rubin's opinion on the grounds that he lacks familiarity with Evidence Eliminator and BeClean the two types of hard drive enhancement programs allegedly used by the counter-defendants in this case. That Rubin lacks specific familiarity with the operation of the software programs is hardly remarkable. The firm with which he is associated "is managed and run largely by former federal prosecutors and federal law enforcement agents from the Federal Bureau of Investigation, among other federal agencies." Rubin has himself performed several prior forensic examinations of computer hard drives, including a project involving the forensic analysis of "computer hard drives used by defendants charged in a federal criminal indictment with material support of terrorism."

Rubin prepared a December 1, 2010 report that provides an extensive analysis of the Evidence Eliminator software and its use on Carter Bryant's computer, thus corroborating Rubin's expertise in the field of hard drive forensic analysis. In that report, he explained the operation of the Evidence Eliminator software (for example, Rubin noted that the software automatically runs on start up). The software "runs continuously in the background when the computer is turned on and has an icon in the system tray." It deletes metadata "from applications such as media players, Internet browers, and instant messengers and empty and clean forensic artifacts from the Recycle Bin" and

leaves behind artifacts of its use, like a log file.  On the basis of this understanding of Evidence Eliminator, Rubin finds several faults with Mattel's expert's analysis.

Rubin also prepared a September 27, 2010 report concerning MGA and Machado's use of a software called BeClean that Mattel's expert refers to as a "wiping" software.  In fact, BeClean is a commonly used computer enhancement software that has been favorably reviewed by technical publications.  Rubin's report describes the software as one that cleans up internet cache (scraps of data picked up from web sites), registry data (scraps of data left behind by applications), the computer's recycle bin, temporary files, and other scrap material and information that slows computer performance.  The program runs automatically, such that the individual using the computer cannot direct the program to delete only certain types of information.

Mattel also faults Rubin for failing to produce or identify the "data, materials, factual or legal assumptions or other information" he considered in forming his opinions.  Mattel specifically claims that Rubin failed to provide a script he created and applied in order to track the use of BeClean.  Mattel also states that Rubin has impermissibly failed to produce information about an MGA computer program called "Kaseya" that is referenced in his expert report.  However, Rubin did not consider either the script or the Kaseya program in forming his conclusions; both were simply vehicles used to gather the data that Rubin eventually analyzed.  Nonetheless, and in an effort to provide Mattel all the materials it needs to effectively test Rubin's opinion, the Court ORDERS Rubin to provide Mattel with information about the script and the Kaseya program within seven days of this order.

Mattel next argues that Rubin's opinions are based upon a flawed methodology.  Mattel specifically argues that Rubin's analysis is inconsistent with the record, which Mattel claims, establishes that "starting in 2006 MGA installed software called 'BeClean' on its hard drives [in order to] delete information from user's hard drives."  This argument is predicated upon the flawed notion that MGA was precluded from making sure its computer systems continued to run efficiently during the pendency of this seven year long litigation.  BeClean is a software that is widely used by businesses and individuals to prevent a slow-down in computer performance that results from the accumulation of useless data on the computer's hard drive.  Rubin's conclusions merely confirm this common sense, and call into question Mattel's attempt to draw inferences from the use of such software.  Mattel's remaining arguments about the usefulness of the computer script used by Rubin, as well as the sufficiency of Rubin's efforts to analyze the individual hard drives, are unconvincing.  Mattel is free to raise such deficiencies with the fact-finder.

In any event, this motion is presently moot.  The Court granted MGA's seventh motion in limine to exclude evidence concerning the use of hard drive enhancement software by Bryant, Machado, and/or MGA.  Mattel's motion for reconsideration of that order is still pending.  Assuming the Court denies Mattel's motion, Rubin's opinion is irrelevant.

For the foregoing reasons, the Court strikes as moot Mattel's motion.  In the event Mattel

prevails on its motion for reconsideration of the order granting MGA's seventh motion in limine, Mattel's motion to exclude Rubin's opinion is denied.

### 9. Mattel's Motion to Exclude Expert Opinion of Yehuda Bassok

#### A. Background

Dr. Yehuda Bassok is a professor of Information and Operations Management at the Marshall School of Business at the University of Southern California. He claims that his "main research areas are: supply chain management, inventory control, forecasting, supply contracts and procurement and negotiations." Applying this expertise, Bassok's report concludes that none of the documents and information allegedly stolen by Jorge Castilla derived independent economic value from not being generally known. Specifically, Bassok concludes that the subject trade secret information and documents consist of knowledge that is applied throughout the toy industry, as well as other industries.

#### B. Discussion

Mattel challenges Bassok's opinion on three grounds: (1) reliability; (2) foundation; and (3) undue prejudice.

Mattel first faults Bassok for evaluating the economic value of the information misappropriated by Castilla in a "vacuum." More specifically, Bassok did not consider the amount of time and money Mattel invested in creating the "trade secret" documents and processes, Castilla's subjective understanding of those documents and processes, Castilla's specific conduct in targeting and downloading the documents, and the difficulties faced by MGA's forecasting system prior to Castilla's hire. Mattel also claims that Bassok failed to examine the specific documents allegedly misappropriated by Castilla, although Basook's supplemental declaration very clearly states that he considered all of the documents. Supp. Dec. of Yehuda Bassok at 26-28 (stating that he considered "Declaration of Laura Owens in Support of Mattel Inc.'s Motion for Partial Summary Judgment (dated October 8, 2010) ***and all exhibits thereto***") (emphasis added). Mattel argues that Bassok's failure to acknowledge factors relevant to whether information meets the statutory definition of a trade secret renders his opinion "contrary to the record" and therefore subject to exclusion under Fed. R. Evid. 702. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591-92 (1993).

Mattel's arguments confuse correlation for causation. The amount of money a company invests in the creation of a document, the efforts to guard the document's secrecy, and the extent of the misappropriating employee's efforts are *circumstantially* relevant to whether the document derives independent economic value from not being generally known. *See Courtesy Temporary Service, Inc. v. Camacho*, 222 Cal. App. 3d 1278, 1287 (1990). These sorts of facts are most relevant when a court lacks direct evidence, like an expert's opinion, about whether the alleged trade secret was well known or valuable because of its secrecy. *Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*, 923

F. Supp. 1231, 1253 (N.D. Cal. 1995). However, information does not become a trade secret merely because a company invests resources in its creation, or a departing employee undertakes great efforts and acts suspiciously in misappropriating the information. *See id.* Credible expert opinion about whether information meets the statutory definition of a trade secret has the potential to overshadow such evidence. Contrary to Mattel's contention, the fact that Bassok failed to consider extrinsic factors like Mattel's investment, Castilla's conduct, and MGA's position actually *adds* to the relevance and credibility of his opinion.

Mattel likewise errs in challenging Bassok's qualifications. Bassok has worked for a software programming company and a textile company. He also regularly consults with a variety of companies to assist their sales forecasts and prepared complex algorithms. In addition to this experience, Bassok has extensively academic experience in the field of sales forecasting, as reflected in his current post as a Professor at the University of Southern California. Mattel argues that Bassok only prepares algorithms designed to effectuate already completed sales forecasts, but this distinction is of dubious relevance. Mattel's own witness, Laura Owens, admits that the company used formulae to process variables like "[p]ast quotas, historical marketing, promotional and sales information . . ., marketing strategy, distribution information, financial trget information, availability information, media promotion, feedback from customers, product profiles and history, and historical levels of customer support." Mattel cites a portion of Bassok's deposition in which he conceded that he may lack expertise in "how to generate a forecast." However, Mattel fails to acknowledge Bassok's testimony that he has written extensively about the process used to "calculate a forecast." Mattel's trade secret misappropriation counter-claim does not distinguish between information about "calculating" a forecast and information about "generating" a forecast. In any event, Mattel cannot meaningfully defend (the counter-intuitive) position that Bassok's relative familiarity with the "product of a forecast," as opposed to the process used to develop the forecast, somehow diminishes his expertise.

Mattel is not entitled to exclude an expert merely because it disagrees with his opinions, many of which match the Court's rulings at summary judgment. Bassok's opinion is relevant, reliable and supported by adequate foundation. Fed. R. Evid. 702. The probative value of his opinion outweighs its prejudicial effect. Fed. R. Evid. 403. Mattel's motion is limine is therefore denied.

   10.   **Mattel's Motion to Exclude Expert Opinions of James Malackowski and Thomas Gruca Concerning Apportionment**

The Ninth Circuit employs a burden shifting analysis to determine the amount of damages recoverable on a claim for copyright infringement. The copyright owner bears the initial burden of presenting proof "of the infringer's gross revenue." *Cream Records, Inc. v. Joseph Schlitz Brewing Co.*, 864 F.2d 668, 669 (9th Cir. 1989) (quoting 17 U.S.C. § 504(b) (1982)). The burden then shifts to the alleged infringer to "prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." *Cream Records*, 864 F.2d at 669. "If the infringing

defendant does not meet its burden of proving costs, the gross figure stands as the defendant's profits." *Frank Music Corp. v. Metro-Goldwin-Mayer, Inc.*, 772 F.2d 505, 514 (9th Cir. 1985) (citing *Russell v. Price*, 612 F.2d 1123, 1130-31 (9th Cir. 1979)), *cert. denied*, 446 U.S. 952, 100 S.Ct. 2919 (1980).

       Mattel's expert Michael Wagner produced a report purporting to calculate MGA's gross revenue as a result of its infringement of the creative works in which Mattel claims a copyright. In response, MGA's experts Thomas Malackowski and Thomas Gruca prepared expert reports purporting to calculate MGA's "deductible expenses and the elements of profit attributable to factors other than" the creative works in which Mattel claims a copyright.

       Mattel argues that MGA was obligated to produce these apportionment figures in its opening expert reports, notwithstanding the fact that Mattel bore the initial burden of proving MGA's gross revenues. Mattel relies upon the following remark by the prior presiding judge, who was confronted with this question:

> It is not incumbent upon the infringer to come forward with apportionment unless the plaintiff has come forward with the requisite showing of gross revenues attributable to the infringement. *But that does not speak to what is required back in the discovery phase in terms of disclosing any expert testimony that any party intends to rely on in their initial disclosure of experts and affording the other side a chance to rebut it.*

Trial Tr., dated July 23, 2008, at 5340:16-18 (emphasis added).

       Despite issuing this admonition, the prior presiding judge permitted MGA to introduce such expert opinion at the time of trial. Mattel argues that MGA has repeated its error, which warrants the exclusion of its expert opinions concerning apportionment. Mattel separately argues that MGA's experts improperly opined on apportionment in their rebuttal reports even though "Mattel's experts do not opine on apportionment" in their opening reports, and rebuttal reports are restricted to "contradict[ing] or rebut[ting] evidence on the same subject matter identified by another party" in its initial disclosures. *See* Fed. R. Civ. P. 26(a)(2)(C). These arguments are unconvincing.

       MGA did not need to submit its apportionment analysis in an initial expert report because it does not bear the initial burden of proof on damages. *Cf. National Envelope Corp. v. American Pad & Paper Co. of Delaware, Inc.*, 2009 WL 5173920, at *9 (S.D.N.Y. Dec. 30, 2009) ("Ampad was correct in submitting its report as a rebuttal because the *burden shifts* to the Defendant once the Plaintiff has proven the amount of infringing sales.") (emphasis in original) (citing *Louis Vuitton S.A. v. Spencer Handbags Corp.*, 765 F.2d 966, 973 (2d Cir. 1985)). The contrary rule suggested by Mattel misses the point of the Ninth Circuit's burden shifting framework, which is designed to determine the damages a copyright plaintiff is potentially entitled to recover. Only after Mattel produced an expert report substantiating the gross revenues that evidence the extent of MGA's unjust enrichment was it necessary

for MGA to produce a rebuttal report disputing this calculation with evidence of apportionment. *Cf. ABB Air Preheater, Inc. v. Regenerative Environmental Equipment Co., Inc* ., 167 F.R.D. 668, 673 (D.N.J. April 29, 1996) ("[T]he presumption requires a patent challenger to bear the initial burden of demonstrating a *prima facie* case of obviousnessness [citations].  Once a *prima facie* case is established, the burden then shifts to the patentee to come forward with rebuttal evidence of non-obviousness . . . Hence, defendant properly submitted its expert's opinions concerning secondary considerations in rebuttal to plaintiff's expert's opinions concerning invalidity.").

  MGA's production of its expert opinions concerning apportionment was therefore "substantially justified."  Fed. R. Civ. P. 37(c)(1).  MGA's conduct was also harmless because Mattel has long been on notice of the fact that MGA intends to prove that the vast majority of its profits were attributable to factors other than infringement.  *Id.*

  Mattel's motion is therefore denied.

  The Clerk shall serve this minute order on all parties to the action.