1              **UNITED STATES DISTRICT COURT**

2             **CENTRAL DISTRICT OF CALIFORNIA**

3            **SOUTHERN DIVISION AT SANTA ANA**

4        HONORABLE DAVID O. CARTER, JUDGE PRESIDING

5

6

MATTEL, INC., et al.,              )

7                                   )
                PLAINTIFFS,         )
8                                   )
          vs.                       ) CV NO. 04-9049-DOC
9                                   ) Day 4
MGA ENTERTAINMENT, INC., ET AL.,    ) Volume 3 of 3
10                                  )
                DEFENDANTS.         )
11 _____ )

12

13

14         REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                    JURY TRIAL

16              SANTA ANA, CALIFORNIA

17           WEDNESDAY, JANUARY 19, 2011

18                    5:03 P.M.

19

20         **DEBORAH D. PARKER, CSR 10342**
              **OFFICIAL COURT REPORTER**
21          **UNITED STATES DISTRICT COURT**
              **411 WEST FOURTH STREET**
22                 **SUITE 1-053**
           **SANTA ANA, CALIFORNIA 92701**
23              **(714) 542-8409**
             **D.PARKER@IX.NETCOM.COM**
24

25

1   APPEARANCES OF COUNSEL:

2       FOR THE PLAINTIFF, MATTEL, INC.:

3                               JOHN QUINN
                                WILLIAM PRICE
4                               MICHAEL T. ZELLER
                                QUINN EMANUEL URQUHART OLIVER &
5                               HEDGES, LLP
                                865 S. FIGUEROA STREET
6                               10TH FLOOR
                                LOS ANGELES, CALIFORNIA 90017
7                               (213) 443-3000

8
        FOR THE DEFENDANT, MGA ENTERTAINMENT, INC.:
9
                                THOMAS S. MC CONVILLE
10                              ORRICK HERRINGTON & SUTCLIFFE, LLP
                                4 PARK PLAZA
11                              SUITE 1600
                                IRVINE, CALIFORNIA 92614
12                              (949) 567-6700

13
                                ANNETTE L. HURST
14                              ORRICK HERRINGTON & SUTCLIFFE, LLP
                                THE ORRICK BUILDING
15                              405 HOWARD STREET
                                SAN FRANCISCO, CALIFORNIA 94105
16                              (415) 773-5700

17
                                JENNIFER L. KELLER
18                              KELLER RACKAUCKAS, LLP
                                18500 VON KARMAN AVENUE
19                              SUITE 560
                                IRVINE, CALIFORNIA 92612
20                              (949) 476-8700

21

22

23

24

25

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
1    APPEARANCES OF COUNSEL:

2         FOR THE DEFENDANT, CARLOS GUSTAVO MACHADO GOMEZ:

3                              MARK E. OVERLAND
                              LAW OFFICES OF MARK E. OVERLAND
4                              100 WILSHIRE BOULEVARD
                              SUITE 950
5                              SANTA MONICA, CALIFORNIA 90401
                              (310) 459-2830
6

7                              ALEXANDER H. COTE
                              SCHEPER KIM & HARRIS, LLP
8                              601 WEST FIFTH STREET
                              12TH FLOOR
9                              LOS ANGELES, CALIFORNIA 90071
                              (213) 613-4660
10

11
     ALSO PRESENT:
12
                              JEANINE PISONI
13                             MGA ENTERTAINMENT, INC.
                              16360 ROSCOE BOULEVARD
14                             SUITE 105
                              VAN NUYS, CALIFORNIA 91406
15

16                             ROBERT ECKERT, MATTEL CEO
                              ISAAC LARIAN, MGA CEO
17                             KEN KOTARSKI, MATTEL TECHNICAL OPERATOR
                              MIKE STOVALL, MGA TECHNICAL OPERATOR
18

19

20

21

22

23

24

25
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    SANTA ANA, CALIFORNIA; WEDNESDAY, JANUARY 19, 2011;

2                      5:03 P.M.

3        *(The following proceedings were had outside the*

4        *presence of the jury:)*

5            THE COURT:  We're on the record.

6            Counsel are present.  The jury and alternates are

7    not present.

8            Just keep working.  I want to inform you of a

9    number of letters that we received from jurors and ask how

10   you would like to deal with them.  I think we've effectively

11   and hopefully dealt with two of those.  One of those is from

12   Victoria Riley –– and you can look at those, of course, any

13   time.  But Ms. Riley is Juror No. 7, and she wrote to the

14   court today that she wanted to make me aware of a commitment

15   that she has in May, that she's leaving the country for two

16   weeks on May 13th.  I don't anticipate this will be a

17   problem, but I wanted to make sure you were aware.

18       *I wanted to be in your court and part of this*

19   *jury.  Sincerely, Victoria Riley.*  So you have a very

20   enthusiastic juror.

21           And the part of what I just did without asking you

22   is just assured them that the Court was responsible for the

23   four-month estimate; that we really believed it would be

24   shorter, but we couldn't anticipate jury deliberation.  So,

25   I think that that resolves that with her, but I want you to

1    know.

2           The other note that we received that you are aware

3    of was from Bob Reckers, and he is juror number -- sitting

4    Juror No. 2.  *I have a scientific conference that I'm*

5    *scheduled to attend late May.  I think it starts May 28th,*

6    *or May 29th.*

7           Now, if the jury is still in deliberation, I don't

8    know how long that conference is.  But if we had to and if

9    he were still a sitting juror, we can recess.  But part of

10   the court's colloquy today was to assure him that in all

11   likelihood so that we're not causing unneeded stress, unless

12   there's really a problem, we're going to get this case to

13   them in a reasonable period of time.

14          You, of course, know about Isabel Araujo, who is

15   sitting Juror No. 8, whose mother passed away.  We all have

16   an agreement that Friday we're not going to be in session

17   because of that.  Very difficult situation for her.

18          Judy Liao is the one I want to talk to you about.

19   She now states:  *It would be extremely difficult for me to*

20   *serve as a juror for three to four months due to my*

21   *employment and job responsibility.  Also, our HR policy pays*

22   *for 25 days for jury duty, which may cause a financial*

23   *burden in the long run.  I respectfully request to be*

24   *excused from jury duty.*

25          I've done nothing about that.  My thought was

1    until the two of you talked informally that she had,

2    basically, said she was capable and able to serve.  You

3    relied upon that.  And unless you tell me to do something

4    about that, I'll wait until the 25th day, or whenever she

5    complains, but I wanted to make you aware of that.

6              MS. KELLER:  May we see that one, your Honor?

7              THE COURT:  In fact, you can see all of them.

8              MS. KELLER:  Your Honor, as I recall, the court

9    has told them now -- told them that the estimate is going to

10   be substantially shorter than.

11             THE COURT:  But not -- but we're going to use 25

12   days.  She specifically sets forth 25 days.  If we take 25

13   days times six, how much is that?  250?

14             MS. KELLER:  25 days would be --

15             THE COURT:  -- times six?

16             MS. KELLER:  A little over five weeks.

17             THE COURT:  How many hours?

18             MR. MCCONVILLE:  150.

19             MS. KELLER:  Which may cause a financial burden in

20   the long run.  The issue is, if you want to do something

21   about it now, fine.  If you want to wait, it may not be the

22   crisis.  Once she's part of the jury, sometimes what's

23   happened, is if we contact the HR person after she's sat for

24   a period of time and bring that HR person in, if it's a

25   major company, they'll oftentimes cooperate:  Disney used

```
 1    to, Boeing when they were here, Hughes.  Those people tended
 2    to stay out of goodwill and a sense of civic duty on the
 3    part of the company.  But I'm not going to take any action
 4    at this time, unless directed by counsel.  I don't think
 5    that that's good legal cause at the present time.  So I'll
 6    let you discuss that privately and let her complain, or
 7    bring that back to our attention when it's time.
 8            Then, finally, the very ruling that I told you we
 9    couldn't protect occurred today.  It occurred with --
10            MS. HURST:  Ms. Ross.
11            THE COURT:  Ivy Ross.  At some point, Ivy Ross
12    referred back to the prior trial, rather than the prior
13    proceeding.  I cautioned all of you that there's absolutely
14    no way -- I find that that's inadvertent, first of all.  I
15    don't believe she was ever coached to say it was a prior
16    trial.  In fact, she's probably been instructed not to say
17    that, but that's going to happen repeatedly.  It's going to
18    happen with Mr. Larian.  It may happen with Mr. Eckert.  And
19    I don't want to be in the position of castigating a witness
20    for saying that on what may be the correct legal ruling, but
21    it's absolutely unprotectable in the real world of
22    litigation.
23            I'm just going to encourage you to come up with
24    something between the two of you that reads something like
25    this -- and I'm not ordering it.  I'm just asking in good
```

```
1    faith that you do this, because I'm not going to step in and
2    start castigating Mr. Larian if he makes a mistake, or
3    Mr. Eckert -- or Ivy Ross could have been the first one that
4    we castigated -- that there has been a prior trial; that the
5    results of that trial, if there were results, are
6    inconsequential and not a part of this proceeding.
7            In other words, what we're trying to say in an
8    artful way is, this isn't the same trial, because it's not.
9    We have additional claims.  We have additional theories this
10   trial isn't close to the first trial.  Now, from Mattel's
11   position it is on certain issues for appellate purposes, of
12   course.  But if you can come up with something, I think that
13   that will just give some transparency to the fact that there
14   has been a prior proceeding and if somebody blurts out a
15   prior trial, so be it.
16           MS. KELLER:  Your Honor, it had been our motion,
17   unopposed by Mattel, and we not only agree with the court
18   but we noted in voir dire that very, very high number of
19   prospective jurors who knew something about the case, which
20   was, frankly, to me, a little surprising.  But they did,
21   and --
22           THE COURT:  But there's a difference.  You were
23   excluding at that time because they didn't know something
24   about the case.  I mean, they had some specifics about the
25   case.  Most of them had an opinion or had read enough that
```

1    it caused one side or the other problems.

2            These are jurors who supposedly don't know about

3    the prior trial, sitting in the box.

4            MS. KELLER:  Several do.  But they just express

5    that it wasn't going to affect them.  So I think between the

6    fact that some of them know and the fact that it's been

7    blurted out and the fact that they probably figured it out

8    anyway if they already know, I agree with the court.  I

9    think it's going to create more problems for us than it's

10   going to solve.

11           THE COURT:  It will make either one or both

12   parties look like they are hiding from the obvious.  And how

13   that falls, so I've said from the very beginning, I'm not

14   going to declare a mistrial over it.  I'm not going to

15   castigate a witness.  And if I would have, it would have

16   been Ivy Ross at the very beginning, and I think that that's

17   detrimental to Mattel.

18           MS. KELLER:  Well, your Honor, we're prepared to

19   withdraw the motion at this point, because we agree with the

20   court.

21           THE COURT:  I want you to get together with

22   Mr. Quinn or Mr. Zeller.  Come up with wording that

23   satisfies both of you before I start drafting it.  And

24   without your direction, I'll just let it go the way it is.

25   And I think that that's dangerous for both parties, quite

1    frankly.

2           Now, two more things:  I know we're trying to take

3    a shortcut, but with depositions what we can't do with a

4    deposition is simply attack the witness by starting to read

5    from a deposition.  I mean, the witness has the right, the

6    first right the witness has is to refresh their

7    recollection.  So we can't get to a position where we simply

8    say, Did you draft such and such on such and such a date?

9           Well, no, I don't think so, because a lot of the

10   answers are equivocal.  They're not even shown or given the

11   opportunity to refresh their recollection.  They're simply,

12   May I read?

13          Now, so far, I've been a little bit generous with

14   that today.  Tomorrow I'm not going to be.  They have the

15   right to refresh their recollection if it's an uncertain

16   answer.  If they say "no," then you got them in impeachment

17   and we'll move on, which was a good part of it today.  But a

18   lot of the witnesses may not be hiding in the future.

19          This witness, Lily Martinez, may not have been

20   hiding anything.  It just makes it appear when you cut out

21   the opportunity refresh recollection with an uncertain

22   answer in the past, it makes it look that they are and that

23   they're being impeached when the prior testimony is read.

24          And, finally, Mr. Quinn, how are you holding up?

25          MR. QUINN:  I'm okay.

```
 1              THE COURT:  Now, I want to talk to the young man
 2      who is operating the projector.
 3              What's your name?
 4              MR. KOTARSKI:  Mr. Kotarski.
 5              THE COURT:  Are you with Mattel or privately
 6      employed?
 7              MR. KOTARSKI:  I'm private employed.
 8              THE COURT:  And who's the other gentleman
 9      operating with MGA?
10              MR. STOVALL:  Mike Stovall.
11              THE COURT:  You know, I want to put this on the
12      record.  I want to publicly pay both of you a compliment
13      from the bench.  I think you are both doing an
14      extraordinarily professional job.  And when I see that, I
15      think you deserve to have a record of that.  I think
16      sometimes when I was litigating, I took things for granted.
17      But I think you have both been exemplary and so I just
18      appreciate that.  And I'm telling you that along the way in
19      terms of your performance, so thank you very much.
20              Now, is there anything further that we need to do
21      this evening on the record, because we're going to start
22      into the off-the-record conversations concerning each
23      exhibit again tonight.
24              MS. HURST:  I owed you an answer on those
25      interrogatories.
```

1            THE COURT:  Yes.

2            MS. HURST:  We supplemented with the Bates range

3       of the documents that we produced for interrogatories

4       numbers 2 through 7.  That left the two net worth

5       interrogatories.

6            THE COURT:  Got it.

7            MS. HURST:  Our expert is preparing a supplemental

8       report on Isaac Larian's personal net worth.  We found out

9       today that the real estate firm that we engaged who has been

10      working on an appraisal for the last three weeks suddenly

11      discovered a conflict of interest, so we have to start over

12      on the real estate appraisals.  We're going to get it done

13      as fast as we humanly can.

14            I'll submit a preliminary supplemental report by

15      the end of the month and then follow on with the real estate

16      appraisals after that.

17            THE COURT:  Let me take one issue that's going to

18      occur, and it got raised by Mr. Quinn the other day and now

19      it's being raised by you.

20            It involved, I think, the O'Connor e-mail, what I

21      call the O'Connor e-mail, that you only recently obtained.

22      The court is not going to be dragged into this proceeding by

23      a prior ruling I made, nor am I going to, you know, protect

24      either one of you in terms of the lateness.  I warned you

25      from the time I got the case that this is where it comes

1   back and hurts the parties.  So I got to work out a way,

2   some method that you let the jury know, if you want to, that

3   there is only recently obtained.  But the court's not going

4   to be a part of that.  In other words, what you're not going

5   to be allowed to say is that *Judge Carter just made a*

6   *ruling*.  And I'm not quite certain how to do that yet,

7   Mr. Quinn, but if that's something that you believe helps in

8   terms -- the same thing with Mr. Larian.

9           You know, all this lateness, et cetera, anything

10  that was on privilege logs that shouldn't be, I'm not sure

11  how to handle that, but I need to talk to you about that

12  along the way.  So the detriment to Mr. Larian, is because

13  it didn't come to you before, you may be able to say, *We*

14  *received this report in the middle of trial.*

15          Now, that creates the inference of hiding, but I

16  don't know that I'll let you argue that it's being hidden.

17  It's just a time frame.  I'm not sure if it's relevant or

18  not, so we'll talk about that.  But it seems to be a

19  continuing problem.

20          If there is anything -- and I'll say this to both

21  of you.  If there is anything on a privilege log, anything

22  that you want to change, do it now, because it's better to

23  be late.

24          MS. HURST:  You got our in-camera submission on

25  the Rosenbaum e-mails; right?

```
 1                  THE COURT:  I do.

 2                  Now, is there anything further, Ms. Keller,

 3       tonight at least on the record?

 4                  MS. KELLER:  No, your Honor.

 5                  THE COURT:  Mr. McConville?

 6                  MR. MCCONVILLE:  No, sir.

 7                  THE COURT:  Ms. Hurst?

 8                  MS. HURST:  No, sir.

 9                  THE COURT:  Mr. Zeller?

10                  MR. ZELLER:  There are two issues.  The first is,

11       is that, well, I cannot be 100 percent sure about -- that

12       these people are shadow jurors, but there are approximately

13       seven people, as far as I can identify.  They are carrying

14       these cushions -- the same cushions.  They come and go

15       together.  They have been disruptive.  And I know that the

16       court personnel have seen it.  I have been sitting right in

17       front of them.  They are commenting about witnesses on

18       testimony, and they are speaking out loud.  I mean, this

19       is -- it's not only very disturbing and distracting but,

20       obviously, they're sitting on our side of the courtroom.

21                  THE COURT:  Just a moment.  I have seen -- I

22       haven't seen or heard that, but I've seen one lady who sits

23       on your side of the courtroom -- and I don't know who she

24       is -- but continually nodding or bobbing her head up and

25       down.  And I'm going to put a stop to that immediately.  But
```

1    I want to know who these shadow jurors are, and I want to

2    know the number of them.  And I think that I had only

3    delayed that because I got a courtesy copy and nothing was

4    formally filed on my docket.  So I don't have a docket copy.

5    But there is one lady in particular I'm concerned about, and

6    it's just --

7              It's not anything that has caused a detriment.

8    The jury hasn't seen it, but I'm aware of it.

9              MR. ZELLER:  I certainly have been aware of it.

10   And I can assure you that they are people not associated

11   with us and, of course, it's very troubling that they are on

12   our side of the courtroom and that the jury --

13             THE COURT:  You make your record.

14             They were nodding in affirmance at the point you

15   were making.

16             MS. HURST:  Exactly.

17             THE COURT:  The lady was nodding in affirmance at

18   the points you were making.  That's what's hilarious about

19   this situation.

20             And so, I know you want to withdraw the motion.

21   I'm just joking with you.

22        (Laughter.)

23             THE COURT:  It was --

24             Just a moment.  It's absolutely hysterical being

25   up here on the bench and having the luxury of not being in

22

```
 1    the arena, because that's tough where all of you are as
 2    litigators.  But I was watching and thinking, Mattel
 3    couldn't ask for anything better.  And I represent to you, I
 4    didn't see any juror pay attention to her.  She only did it
 5    a couple of times.  The danger is, if she does it at the
 6    right time with either Larian, or Eckert, or Carter Bryant,
 7    or some critical witness on the stand, it's detrimental to
 8    one or both of you.  Trust me, MGA, she was not a benefit to
 9    you today.
10             MS. HURST:  She's also not one of our shadow
11    jurors.
12             MS. KELLER:  She's murmuring and sighing at me
13    when I ask questions.  Our shadow jurors have been on this
14    side.
15             MS. HURST:  They were on this side today.
16             MS. KELLER:  There are five.
17             MS. HURST:  She's not one of them.
18             MS. KELLER:  There are five because we need
19    alternate shadows.  They are accompanied by a very, very
20    professional person who I have worked with before from Trial
21    Partners.  They have all had to sign the contract, and I
22    have not seen a peep.  They don't know which side they are
23    working for.
24             THE COURT:  Excuse me.  But I don't know which are
25    the shadow jurors.
```

23

```
 1              MS. HURST:  And we should have the court address
 2     them tomorrow night.
 3              THE COURT:  I'm going to watch them one more day.
 4     But no matter what, I think the court is dutibound to
 5     address them.
 6              MS. KELLER:  We gave the court their signed
 7     contracts the other night, just so the court can see what
 8     they've actually agreed to.  I gave you all five.
 9              THE COURT:  Just a moment.  But I need the filing
10     to go over -- Mattel I don't think has this filing.   In
11     other words, you gave me a courtesy copy, but I don't know
12     that Mattel even has this because it's not on my docket.
13              MS. KELLER:  We will go ahead and file a formal
14     request.  We wanted to do it under seal, because we don't
15     want -- the whole idea will be defeated if it becomes known
16     that we have a shadow jury, and that we're the ones who have
17     it, and it hits the press and they read it.
18              THE COURT:  Maybe that's not such a bad idea.  I'm
19     just joking with you.  Maybe that's not such a bad idea.
20              MR. ZELLER:  And, obviously, I'm disadvantaged,
21     because I don't know for a fact who these people are.  But
22     all I can say is, is that this afternoon what they were
23     is -- it was one group of them.  They were divided.  Some
24     were on that side of the courtroom; some were on theirs.
25              THE COURT:  Let me stop.  Also, the impression is
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    that if they are weighted and sitting on the MGA side --

2    remember, my belief is that 30 percent of what occurs in a

3    court trial is never captured on the record:  The small

4    mannerisms, the gestures, the speaking objections, the

5    adding a comment after a question is asked.  Been there and

6    done that, unfortunately.

7            So when you start getting weighted, it looks like

8    Mattel has nobody here because it's weighted over on this

9    side.  Now, they are entitled to bring different groups of

10   people.  They can sit where they want, and I'm not certain I

11   have the right to deny access, quote, unquote, to even a

12   focused juror, but I do if there's a problem, if there's an

13   issue concerning prejudice.  I haven't seen that yet.  If

14   there's any prejudice so far, it really falls against MGA

15   with the conduct of this one lady back here, which is why

16   I'm asking:  Who is she?

17           MS. HURST:  She's not one of our jurors, your

18   Honor.

19           THE COURT:  See, I didn't know if she's a focus

20   juror or not.

21           MR. QUINN:  Your Honor, if I may.

22           I have tried four or five cases where there are

23   shadow jurors out there.  In every single case, the jurors

24   figure out what was going on.  It's hard not to.  People

25   come together.  They leave together.  Especially over a long

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1   trial, they are going to figure out that there's this group

2   of people that are watching them and watching the evidence.

3          My concern is that they think we have something to

4   do with it.  If they want to have a shadow jury, fine.  But

5   I really do think they shouldn't be on our side, because

6   jurors -- I have had jurors tell me afterwards they resented

7   it.  They figured out what these people were doing.  They

8   held it against who they thought they were affiliated with,

9   because they are going to start thinking, who did it?  They

10  know it's not the court, so --

11         My only request is they stay on that side.

12         THE COURT:  You're right.  Because the portrayal

13  eventually will be, you know, the giant in the industry

14  Mattel and MGA being the lesser entity, although they are

15  both major corporations.  And then that only adds, if you

16  will, if they figure this out and if they incorrectly

17  believe that they're your shadow jurors, the end result is

18  that unsaid prejudice.

19         Well, let me sort that out tomorrow.  Let's make a

20  commitment tomorrow after we get a full day in that these

21  jurors are to be retained.  Now, the problem with that is,

22  how do I make contact?  Because if I have Ms. Keller,

23  McConville, or Ms. Hurst run up to them and say, *Please,*

24  *stay after court* --

25         MS. KELLER:  It would have to be through the Trial

1    Partners representative and she would have to talk to the

2    escort for those people and tell the escort --

3              THE COURT:  Tell the --

4              MS. HURST:  That the court wants to talk to them.

5              THE COURT:  Tonight, you tell the trial partner to

6    tell the escort to tell the five jurors who are focus jurors

7    to remain after court tomorrow and they'll be here probably

8    between 5:00 and 6:30, okay?  They're not to leave court.

9              All right.  Anything else, Mr. Eckert?

10             MR. ZELLER:  "Zeller," hopefully?

11             THE COURT:  Well, that's close enough.

12   Mr. Zeller?

13             MR. ZELLER:  Nothing further.

14             THE COURT:  Mr. Quinn, at least on the record?

15             MR. QUINN:  No, your Honor.

16             THE COURT:  Now, Mr. Overland, I didn't mean to

17   neglect you.

18             You have a letter that you drafted for me.  I

19   wanted you to show those to respective counsel.  That,

20   apparently, the judge in Mexico has taken the position that

21   Mr. Machado is not going to be here.  That causes two

22   problems:  First of all, regardless of Mr. Overland's

23   representation, I don't know the representation of the

24   lawyer.  I don't know if this is good faith.  I don't know

25   what the lawyer in Mexico said to the judge and neither does

1    Mr. Overland.

2            I'm assuming it's good faith, because he's a

3    judicial officer, but I really don't understand why he's not

4    here.  It's also prejudicial to Mr. Overland and Mr. Machado

5    not having him make an appearance.  This is not going to

6    cause any goodwill from the jury.

7            But you are entitled to call him.  We need some

8    date, because we need to get him here for a two-week period

9    of time.  And I instructed Mr. Overland to write a letter in

10   English and translate it into Spanish and that this court

11   would be very respectful to my colleague, and I would

12   request that he come here.  Now, if he doesn't, then I'm

13   going to issue a warrant.

14           But, Mr. Overland, have you shown this letter to

15   both counsel?

16           MR. OVERLAND:  We sent an e-mail to Ms. Hurst and

17   Mr. Zeller, and I gave Mr. Zeller the hard copy that the

18   court --

19           THE COURT:  Let's discuss it tomorrow night.  It

20   gives you have a chance to talk about this with Mr. Quinn to

21   sort out when you think he's here.  I want to bring him here

22   for two weeks.  I'm very concerned because if, in fact, we

23   get him here in a two-week period of time and you are

24   calling him, Mr. Overland thinks he can complete everything

25   that he needs when you call him.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

28

1          And I assume you're calling Mr. Machado?

2          MR. ZELLER:  Yes.

3          THE COURT:  The problem will be getting him back.

4    Let's say he goes back.  Mr. Overland sees something that

5    has come up.  Mr. Overland needs him back.  The judge

6    doesn't have him return from Mexico.  And now the court is

7    caught in the box, *Judge, can we use a deposition?*

8          No.  No.

9          MR. OVERLAND:  What I requested in the letter,

10   your Honor, is for him to come for a two-week period for his

11   testimony and then for another two-week period for the

12   summations to the jury.

13         THE COURT:  And what we need -- what we need are

14   dates certain, and we don't know yet about the other

15   two-week summation because we're not far enough along.  So

16   I'm going to have all you work that out; because if you want

17   Machado in a timely fashion, we'll try to get him here.  But

18   I need to humbly ask that court.  I'm not directing that

19   court.

20         Okay.  Well, then, we're off the record.

21         *(At 5:27 p.m., proceedings were adjourned.)*

22

23                         -oOo-

24

25

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
 1                          CERTIFICATE

 2            I hereby certify that pursuant to Section 753,

 3     Title 28, United States Code, the foregoing is a true and

 4     correct transcript of the stenographically reported

 5     proceedings held in the above-entitled matter and that the

 6     transcript page format is in conformance with the

 7     regulations of the Judicial Conference of the United States.

 8

 9     Date:   January 19, 2011

10

11

12                         _____

13                         Deborah D. Parker, Official Reporter

14

15

16

17

18

19

20

21

22

23

24

25
```