Case 2:04-cv-09049-DOC-RNB   Document 9710   Filed 01/27/11   Page 1 of 121   Page ID #:290408
CV 04-9049-DOC – 01/20/2011 – Day 5, Vol. 2 of 2

1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

HONORABLE DAVID O. CARTER, JUDGE PRESIDING

– – – – – – –


```
MATTEL, INC., ET AL.,           )
                                )
          Plaintiffs,           )
                                )
     vs.                        ) No. CV 04-9049-DOC
                                )    Day 5
MGA ENTERTAINMENT, INC., ET AL.,)    Volume 2 of 2
                                )
          Defendants.           )
_____)
```

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Jury Trial

Santa Ana, California

Thursday, January 20, 2011

Jane C.S. Rule, CSR 9316
Federal Official Court Reporter
United States District Court
411 West 4th Street, Room 1-053
Santa Ana, California 92701
(714) 558-7755

11-01-20 MattelV2

1    **APPEARANCES OF COUNSEL:**

2

3    FOR PLAINTIFFS MATTEL, INC., ET AL.:

4              QUINN, EMANUEL, URQUHART, OLIVER & HEDGES
               By:  JOHN B. QUINN
5                   MICHAEL T. ZELLER
                    WILLIAM PRICE
6                   Attorneys at Law
               865 South Figueroa Street
7              10th Floor
               Los Angeles, California 90017-2543
8              (213) 443-3000

9

10   FOR DEFENDANTS MGA ENTERTAINMENT, INC., ET AL.:

11             ORRICK, HERRINGTON & SUTCLIFFE, LLP
               BY:  THOMAS S. MC CONVILLE
12                  Attorney at Law
               4 Park Plaza
13             Suite 1600
               Irvine, California 92614
14             (949) 567-6700

15             - AND -

16             ORRICK, HERRINGTON & SUTCLIFFE, LLP
               BY:  ANNETTE L. HURST
17                  Attorney at Law
               405 Howard Street
18             San Francisco, California 94105
               (415) 773-5700

19             - AND -

20
               KELLER RACKAUCKAS, LLP
21             BY:  JENNIFER L. RACKAUCKAS
                    Attorney at Law
22             18500 Von Karman Avenue
               Suite 560
23             Irvine, California 92612
               (949) 476-8700

24

25

```
 1    APPEARANCES OF COUNSEL (Continued):

 2

 3    FOR DEFENDANT CARLOS GUSTAVO MACHADO GOMEZ:

 4            SCHEPER, KIM & OVERLAND, LLP
              BY:  ALEXANDER H. COTE
 5                 Attorney at Law
              601 West Fifth Street
 6            12th Floor
              Los Angeles, California 90071
 7            (213) 613-4660

 8            - AND -

 9            LAW OFFICES OF MARK E. OVERLAND
              BY:  MARK E. OVERLAND
10                 Attorney at Law
              100 Wilshire Boulevard
11            Suite 950
              Santa Monica, California 90401
12            (310) 459-2830

13

14    Also Present:

15            ROBERT ECKERT, Mattel CEO

16            ISAAC LARIAN, MGA CEO

17            KEN KOTARSKI, Mattel Technical Operator

18            MIKE STOVALL, MGA Technical Operator

19            RACHEL JUAREZ, Quinn Emanuel Urquhart Oliver &
                            Hedges
20

21

22

23

24

25
```

1                          **I N D E X**

2

3

4                      **EXAMINATION**

5

6   **Witness Name**        **Direct**    **Cross**    **Redirect**    **Recross**

7   GARCIA, PAULA
       By Mr. Price          6

8

9

10                       **EXHIBITS**

11

12  **Exhibit**                    **Identification**    **Evidence**

13  Plaintiffs' No. 18                                      43

14  Plaintiffs' No. 201                                     13

15  Plaintiffs' No. 302                                     71

16  Plaintiffs' No. 323, SL00044                           116

17  Plaintiffs' No. 393                                     12

18  Plaintiffs' No. 402B                                    14

19  Plaintiffs' No. 504                                     79

20  Plaintiffs' No. 606                                     20

21  Plaintiffs' No. 911                                    102

22  Plaintiffs' No. 924                                     95

23  Plaintiffs' No. 1103                                    55

24  Plaintiffs' No. 1107B                                   79

25

1        **I N D E X (Continued)**

2

3

4                    **EXHIBITS**

5

6    <u>**Exhibit**</u>                    <u>**Identification**</u>        <u>**Evidence**</u>

7    Plaintiffs' No. 1108B                              106

8    Plaintiffs' No. 1109B                              64

9    Plaintiffs' No. 1236                               108

10   Plaintiffs' No. 1763                               30

11   Plaintiffs' No. 12286                              66

12   Plaintiffs' No. 13223                              34

13   Plaintiffs' No. 13564                              16

14

15

16

17

18

19

20

21

22

23

24

25

```
 1            SANTA ANA, CALIFORNIA, THURSDAY, JANUARY 20, 2011

 2                      DAY 5, VOLUME 2 OF 2

 3                          (1:05 p.m.)

 4            (The following proceedings is taken in the

 5       presence of the jury.)

 6            THE COURT:  Okay.  The jury is present, all

 7       counsel, the parties.  If you'd please be seated.  Thank you

 8       for your courtesy, the witness.

 9            Counsel, if you'd like to continue with your

10       direct examination.  Mr. Price.

11            PAULA GARCIA, PLAINTIFFS' WITNESS, RESUMED

12                 DIRECT EXAMINATION (Continued)

13       BY MR. PRICE:

14       Q    Good afternoon.

15       A    Good afternoon.

16       Q    Ms. Garcia, when we left, I believe your testimony is

17       that Carter Bryant was not in any form assisting MGA prior

18       to October 19, 2000; is that right?

19       A    I just wanted to be clear about the word "assist."

20       Q    Well, I'm asking you to use your definition, whatever

21       it is.  Was your testimony that Carter Bryant did not in any

22       manner assist MGA prior to October 19, 2000?

23       A    Carter Bryant was present at meetings regarding his

24       portfolio drawings in that time, and he would ask questions

25       when needed.  Excuse me, he would answer questions when
```

1    needed.

2    Q    No matter how you characterize it, you'll agree that

3    Mr. Bryant in September and October of 2000, prior to

4    October 19, was assisting MGA in some manner, right?

5    A    Yes.

6    Q    Excuse me.

7         And I want to go back to earlier today.  I had asked

8    you about the policies of MGA when someone leaves and says

9    they are working for a competitor; do you remember that?

10   A    Yes.

11   Q    And to get some frame of reference, when you left

12   Mattel in April of 2000, you had to leave the same day you

13   gave notice because you told them you were going to work for

14   a competitor?

15   A    Yes.

16   Q    And I think this morning you said you don't recall

17   whether or not MGA had such a policy?

18   A    I can't remember.

19   Q    Okay.

20        MR. PRICE:  Your Honor, I'd like to read from

21   volume 4.

22        MR. MC CONVILLE:  Your Honor, her recollection

23   should be refreshed since she doesn't remember, she should

24   be afforded an opportunity to read that.

25        THE COURT:  All right.

CV 04-9049-DOC - 01/20/2011 - Day 5, Vol. 2 of 2

8

```
1    BY MR. PRICE:

2    Q    Okay.  If you show Ms. Garcia, it's page 1204, line 22,

3    to 1205, line 8.

4         And just let me know when you've had a chance to read

5    that.

6    A    Can you give me the locations again, the particular

7    lines?

8    Q    Sure.  It's 1204, line 22, to 1204, line 8.

9    A    Yes, I'm ready.

10   Q    So having read that, does that refresh your

11   recollection that MGA has a policy or practice where if an

12   employee says that he or she is going to go to a competitive

13   company, they are asked to terminate their work immediately;

14   does that refresh your recollection?

15   A    Especially the word "practice."  It's generally -- it's

16   the practice generally that if someone should advise the

17   information, generally the practice is that the employee is

18   asked to leave.  I am not sure if it's a policy.

19   Q    Okay.  So whether it's in writing or not, the practice

20   is that if an employee says he or she is going to a

21   competitive toy company, they are asked to terminate their

22   work immediately?

23   A    I believe there may be some exceptions, and that would

24   be decided by Isaac, so I don't want to exclude that -- or

25   to confirm that's always the case.
```

1    Q    It's your understanding that if the employee advises

2    that he or she is going to go to a competitive toy company,

3    they are asked to terminate their work immediately, true?

4    A    I believe there have been cases -- generally, that's

5    the case, that's true.

6    Q    Now, I want to go, now, and talk to you about even

7    prior to September 1, 2000.

8         Around that -- prior to September 1, 2000, you were

9    working on something called Prayer Angel?

10   A    Yes.

11   Q    And you were trying to come up with the eyes, you

12   thought the eyes were very important, and you needed some

13   ideas about the eyes, right?

14   A    That's right.

15   Q    And prior to September 1, 2000, Mr. Bryant did some

16   drawings for you to look at to see whether or not you could

17   get any ideas or what the eyes should be on this doll,

18   right?

19   A    Yes.

20   Q    And if you'd look at Exhibit 393, do you have that in

21   front of you?

22   A    Yes, I do.

23   Q    And what do you recognize Exhibit 393 as?

24   A    I recognize it to be a series of sketches of baby faces

25   with eyes.

CV 04-9049-DOC – 01/20/2011 – Day 5, Vol. 2 of 2

1    Q    And this was something that you requested from

2    Mr. Bryant?

3    A    I can't remember if I requested it personally.

4    Q    When you received this, you knew that someone on behalf

5    of MGA had asked Mr. Bryant to do these sketches of angelic,

6    sweet-eyed faces?

7    A    I believe -- it's my memory -- it's my best memory that

8    Veronica Marlow requested this to be completed.

9    Q    Well, you were trying to get this look in your eyes,

10   but to no avail, right?

11   A    Through Carter's submission?

12   Q    Prior to this, you were trying to get a look for eyes

13   for this Prayer Angel, but you had been unsuccessful,

14   correct?

15   A    That's right.

16   Q    And you were frustrated, right?

17   A    Yes.

18   Q    And Veronica Marlow knew of your frustration because

19   she had been working with you on Prayer Angel?

20   A    That's right.

21   Q    And she mentioned Carter Bryant, correct?

22   A    I believe so, yes.

23   Q    She said, why not give Mr. Bryant a shot at it, right?

24   A    I can't remember how she -- how she -- how she

25   suggested Carter.  I mean, I don't -- I don't recall if she

1    like named him or not.

2    Q    You didn't recall if she recommended him?

3    A    I can't remember if she named him.

4    Q    Okay.  Let me see if I can refresh your recollection.

5    If you'd look at -- let me get the date, if I can -- May 29,

6    2008.  I'm going to draw your attention to page 786 --

7    actually let's go to 787, and if you could look briefly at

8    lines 18 on 787 to line 25.

9    A    Yes.

10   Q    Have you read that?

11   A    Yes, I have.

12   Q    That's quick.

13        Okay.  So does that refresh your recollection as to

14   what happened?

15   A    Yes.

16   Q    Okay.  Ms. Marlow, in lieu of your frustration, said,

17   give Mr. Bryant a shot, correct?

18   A    Yes.

19   Q    And at that time, you didn't really have many options

20   at that moment, correct?

21   A    I don't know if I didn't have many options.  I hadn't

22   explored many options at that point.

23   Q    And because you hadn't explored many options, then, you

24   said, yeah, let's give Mr. Bryant a shot, right?

25   A    Sure.

CV 04-9049-DOC - 01/20/2011 - Day 5, Vol. 2 of 2

12

1    Q    And then what you got from that was Exhibit 393?

2    A    That's right.

3           MR. PRICE:  And if we can put -- move Exhibit 393

4    into evidence, your Honor.

5           THE COURT:  It's received.

6           (Plaintiffs' Exhibit No. 393 is received in

7           evidence.)

8    BY MR. PRICE:

9    Q    So here we have these angelic faces with eyes that

10   Mr. Bryant gave to you to give him a shot at creating the

11   eyes for this project that you had, the Prayer Angel?

12   A    Yes.

13   Q    And this was even before September 1 of 2000, right?

14   A    That's right.

15   Q    Okay.  Would you agree with me that in doing this, that

16   is in drawing eyes for you to try to help you come up with

17   the eyes for a doll that you had in mind, that that was

18   Mr. Bryant assisting MGA while he was still a Mattel

19   employee?

20   A    Yes.

21   Q    And it's correct that under your view in the industry

22   and the agreements you've signed, that that's something you

23   are not supposed to do, right?

24   A    Yes.  In this particular example, yes.

25   Q    And it's correct that Mr. Bryant was paid for that?

1      I'm sorry, it's correct that Mr. Bryant was paid for

2   that, right?

3   A    Yes.

4   Q    And do you recall whether or not he was paid by the end

5   of August of 2000?

6   A    I don't remember the exact date he was paid.

7   Q    Do you recall he was paid by the end of September,

8   certainly?

9   A    I can't remember what date he was paid.

10  Q    Now, concerning this Prayer Angel, could you look at

11  Exhibit 201.  Do you have that in front of you?

12  A    Yes, I do.

13  Q    And do you recognize this?

14  A    Yes, I do.

15  Q    Can you tell us what it is?

16  A    This is a -- either a quote or an invoice from Anna

17  Rhee.

18          MR. PRICE:  Your Honor, move Exhibit 201 into

19  evidence.

20          THE COURT:  Received.

21          *(Plaintiffs' Exhibit No. 201 is received in*

22      *evidence.)*

23  BY MR. PRICE:

24  Q    So Ms. Garcia, do you see the date on this, June 12,

25  2000?

1    A    Yes, I do.

2    Q    And it says two angel baby doll heads with a price of

3    $433?

4    A    Yes.

5    Q    Now, as of June 12, 2000, there were no angel doll

6    heads to paint, correct?

7    A    That's right.

8    Q    You didn't have an angel doll head to paint until

9    August of 2000?

10   A    I believe so.

11   Q    And if you could look at 402B.  We'll put that in front

12   of you.  Do you see that?

13   A    Yes, I do.

14   Q    Can you tell us what that is?

15   A    This is a photo of, I believe it's a sculpt of what

16   became the manufactured Prayer Angels doll.

17   Q    And that's dated August 4, 2000, correct?

18   A    That's right.

19          MR. PRICE:  Your honor, I move 402B into evidence.

20          THE COURT:  Received.

21          *(Plaintiffs' Exhibit No. 402B is received in*

22    *evidence.)*

23          MR. PRICE:  Let me show the second page there,

24   Ken.

25

1   BY MR. PRICE:

2   Q    So this is the photo you were talking about?

3   A    Yes.

4   Q    And this is where you were trying to find those sweet

5   baby eyes?

6   A    Yes.

7   Q    The exhibit I showed you earlier, Exhibit 201, the

8   invoice, dated June 2000.  When there was no face to paint,

9   that was a code word for Bratz, wasn't it?

10  A    No, it was not.

11  Q    I believe your testimony is that what you sent to

12  Ms. Rhee was a painted Cabbage Patch doll; is that right?

13  A    Yes.

14  Q    And if you can look at Exhibit 13564.  I think maybe we

15  have the actual -- the actual doll.

16          THE COURT:  That should be a photo.

17          MR. PRICE:  Okay.

18  BY MR. PRICE:

19  Q    Do you recognize 13564?

20  A    Yes.

21  Q    And could you tell us what it is?

22  A    It's a Cabbage Patch -- a Cabbage Patch doll.

23          MR. PRICE:  Move the photo into evidence, your

24  Honor.

25          THE COURT:  Received.

CV 04-9049-DOC - 01/20/2011 - Day 5, Vol. 2 of 2

16

```
 1            (Plaintiffs' Exhibit No. 13564 is received in
 2       evidence.)
 3   BY MR. PRICE:
 4   Q    So what you say that you sent to Ms. Rhee was this
 5   Cabbage Patch doll, correct?
 6   A    I believe I sent her the head, and I don't know if it
 7   was this very particular Cabbage Patch doll.
 8   Q    But those dolls already have paint on them, right?
 9   A    Yeah.
10   Q    And what's that under the -- the right cheek?
11   A    It's a face tattoo, I believe.
12   Q    And they had that face tattoo on it as well?
13   A    Yeah.
14   Q    And your testimony is that what Ms. Rhee was painting
15   in June of 2000, was adding face paint to this Cabbage Patch
16   doll?
17   A    Yes, the process is that Anna would have removed the
18   deco from this manufactured Cabbage Patch doll, along with
19   the face tattoo.  She has some chemicals of sorts that can
20   wipe away manufactured paint.
21   Q    Is it your understanding that -- it's Ms. Brode; is
22   that right?
23   A    Yes.
24   Q    That she's the one who delivered the Cabbage Patch doll
25   to Ms. Rhee?
```

1    A    I don't believe Kerri Brode delivered the Cabbage Patch

2    doll.

3    Q    What happened?

4    A    Do you mean in terms of --

5    Q    How you got that to -- the Cabbage Patch doll, you were

6    going to say how it got there, who would we ask?

7              MR. MC CONVILLE:  Objection, vague.

8              THE COURT:  Do you understand the question?

9              THE WITNESS:  Yes, I do.

10             THE COURT:  Please answer.

11             THE WITNESS:  I don't recall exactly how we got it

12   to Anna Rhee's house, but it could be one of two

13   possibilities.

14   BY MR. PRICE:

15   Q    Tell us how.

16   A    Okay.  It would either be Fed-Exed or shipped to her

17   or -- and probably more likely it was myself or someone who

18   lived in the South Bay area that delivered it or dropped it

19   off at her home.  Kerri Brode doesn't live in the South Bay.

20   Q    Do you have any recollection of you dropping it off?

21   A    I recall dropping off things to Anna Rhee in context to

22   Prayer Angels.  I can't be a hundred percent sure it was

23   this Cabbage Patch head.  It's -- but I'd like to say it's

24   quite possible.

25   Q    And what you asked Ms. Rhee to do was simply change the

1    eyes, right?

2    A    I asked her to use this Cabbage Patch head as a

3    stand-in until my sculpt was done, to explore eye designs.

4    Q    You asked her to change the eyes?

5    A    I asked her to -- yes, to design or explore eye designs

6    in the interim until my sculpt was complete.

7    Q    And it was after this, a few months after this, that

8    you, through Ms. Marlow, asked Mr. Bryant to come up with an

9    actual design for the eyes because you ran out of options?

10   A    It's not that I ran out of options.  It was just an

11   option.  It was another place to explore eyes.  I had -- I

12   could have continued to explore with more people, artists

13   who could have developed more eyes.

14   Q    Ms. Rhee is a painter, correct?

15   A    Yes.

16   Q    So are you saying she designed some --

17        Put that back up, Ken.

18        She designed eyes to replace the Cabbage Patch doll

19   eyes?

20   A    Yeah, she's -- her skill and ability, her expertise is

21   to actually paint doll eyes, so it's not that she's even --

22   her ability in painting is very, very specific to painting

23   doll eyes.  It is what her business is, so what better first

24   way to have eyes be explored than somebody who is in the

25   business and the practice of painting eye designs.

```
1    Q    So if Ms. Rhee believes that she was painting Bratz

2    eyes in June 2000, she's mistaken?

3    A    That's absolutely right.

4    Q    She did eventually paint Bratz dolls' eyes, faces,

5    correct?

6    A    Yes, she did.

7    Q    And in connection with that, she was given the drawings

8    to do it, right?

9    A    Yes, she was.

10   Q    No drawings this time, right?

11   A    No.

12   Q    When was the first time you had drawings for the Prayer

13   Angels?

14   A    I believe it's my memory that the eyes that we went to

15   manufacturing with that we call Prayer Angels ultimately

16   ended up becoming a design that Anna recreated on her own

17   without any drawings.

18   Q    And when was that that you had designs, eventually,

19   when was that?

20   A    I don't recall the exact date.

21   Q    After August 2000?

22   A    Yes.

23   Q    Now, let me ask you about the work that went into this

24   Bratz project.  And we talked about the sculptor, Ms. Leahy,

25   correct?
```

1    A    Yes.

2    Q    And another thing that's important when you are trying

3    to create the doll is the fashions, right?

4    A    Yes.

5    Q    As the -- the clothes?

6    A    Sure.

7    Q    I'd like you to look at Exhibit 606.

8         Do you see that?

9    A    Yes.

10   Q    And do you recognize this as including invoices from

11   Veronica Marlow?

12   A    Yes, I do.

13   Q    And these are invoices relating to the fashions,

14   correct?

15   A    Yes.

16            MR. PRICE:  Your Honor, move Exhibit 606 into

17   evidence.

18            THE COURT:  Received.

19            (Plaintiffs' Exhibit No. 606 is received in

20        evidence.)

21   BY MR. PRICE:

22   Q    If we can go to the second page of that and -- well,

23   the top -- down to the -- there we go.

24        So you recognize this as an invoice from Ms. Marlow.

25   The invoice itself is dated November 14, 2000; do you see

CV 04-9049-DOC - 01/20/2011 - Day 5, Vol. 2 of 2

21

```
 1   that?

 2   A    Yes, I do.

 3   Q    And it was sent to you, correct?

 4   A    Yes.

 5   Q    And if we can scroll down to the rest of that square or

 6   maybe just the -- there we go.

 7        And I know it's difficult to see on this monitor, but

 8   do you see under description, the first line there, it says,

 9   "Bratz dolls research, development and support services from

10   9/29/2000, to October 20, 2000"; do you see that?

11   A    Yes, I do.

12   Q    And did you approve the payment of this invoice?

13   A    I believe so.

14   Q    And in approving the payment, in fact, if we go -- it

15   says, "Only pay 4,400"; do you see that?

16   A    Yes.

17   Q    And so that's the subtotal without sales tax?

18   A    Yes.

19   Q    And you believe that it was justified, reasonable for

20   MGA to pay Ms. Marlow for Bratz dolls' work that took place

21   from September 29 to October 20, 2000, correct?

22   A    Yes.

23   Q    And the bulk of that work certainly was prior to

24   October 19, 2000, which is -- they -- Carter Bryant -- I'll

25   just rephrase.
```

1        The bulk of that work was certainly prior to

2   October 19, 2000?

3   A    I don't recall when all of this work took place.  I

4   can't identify October 19th.

5   Q    Well, you see it says September 29, October 20th,

6   right?

7   A    Yeah.

8   Q    There are 24 hours in a day, right?

9   A    Yes, I see, yes.

10  Q    And you've got 18 hours and 12 hours, 18 hours and 19

11  hours and 21 hours; do you see that?

12  A    Yes.

13  Q    So, looking at that now --

14  A    Yeah.

15  Q    -- it's -- it's your understanding when you paid this,

16  that this was work by Ms. Marlow beginning September 29 and

17  most of which was accomplished prior to October 20th, right?

18  A    Yes.

19  Q    And you knew that before October 20th, that Mr. Bryant

20  was consulting with Ms. Marlow about fashions for the Bratz

21  dolls?

22  A    Yes.

23  Q    And no matter how you characterize it, that's helping,

24  assisting MGA in connection with the, quote, "Bratz dolls"?

25  A    Yes.

1    Q    And your understanding based upon your contract and the

2    two contracts, MGA and Mattel, and your expectations is that

3    would be wrong if Mr. Bryant were an employee at Mattel

4    during that time, right?

5    A    Could you please repeat the question?

6    Q    Sure.

7         You know that Mr. Bryant working with Ms. Leahy in

8    connection with the Bratz dolls while he was still employed

9    at Mattel would be wrong?

10             MR. MC CONVILLE:  Objection, calls for

11   speculation.

12             THE COURT:  Yeah, it does, Counsel.

13             MR. PRICE:  Let me ask it this way.

14   BY MR. PRICE:

15   Q    Based upon the fact that you had a confidentiality

16   agreement with Mattel and you had a confidentiality

17   agreement with MGA, you had an understanding as to what was

18   permitted and not permitted certainly in your two contracts?

19   A    I had my general understanding, yes.

20   Q    And by this time, by October 19, what was your position

21   at MGA?

22   A    I believe I was an associate project manager.

23   Q    And so based upon your experience in the toy industry,

24   and the MGA contract and the Mattel contract, it was your

25   understanding that -- at the time, that would have been

CV 04-9049-DOC - 01/20/2011 - Day 5, Vol. 2 of 2

24

1    inappropriate for Carter Bryant to assist Ms. Marlow in

2    connection with the Bratz project before he left Mattel?

3    A    I don't know.  I don't know what Carter Bryant was

4    doing at Mattel during this time period, so I don't know.

5    Q    Well, you knew that Mattel made toys, correct?

6    A    Yes.

7    Q    And you knew that the idea of the Bratz dolls research,

8    development was to create a toy, correct?

9    A    It was to -- yes, to be -- to be preparing and

10   inspiring, yep.

11   Q    And that was to create a toy that would eventually

12   compete in the marketplace against Mattel, correct?

13   A    Yes.

14   Q    So based upon your understanding of the industry at the

15   time and your contracts, you had an understanding that it

16   would have been wrong for Mr. Bryant to participate in the

17   Bratz project while he was an employee of Mattel, right?

18   A    I don't know how to answer that question because I

19   don't know what Carter Bryant was doing his last two weeks

20   at Mattel.

21   Q    Is it your understanding that Mr. Bryant was doing the

22   work with Ms. Marlow only after October 14 -- 13 of 2000?

23   A    No.

24   Q    So he was assisting her, working with her before he

25   even gave two weeks' notice, right?

CV 04-9049-DOC - 01/20/2011 - Day 5, Vol. 2 of 2

25

1    A    I don't know when Carter Bryant gave his two weeks'

2    notice.

3    Q    Okay.  Let's assume he gave notice -- I'm not sure I

4    have the exact date right.  Let's assume he gave notice

5    October 4th and then he stayed two weeks, until

6    October 19th, okay?

7    A    Okay.

8    Q    You knew that Carter Bryant was working with Ms. Marlow

9    before October 4th?

10   A    No.

11   Q    Your understanding is that based upon, again, your

12   experience in the toy industry?

13   A    Yes.

14   Q    And your contracts?

15   A    Yes.

16   Q    That if you are going to assist a competitor, you can't

17   give two weeks' notice and stay at the company you're

18   working with in the toy industry?

19   A    I don't think that there is a hard, fast rule on that.

20   I believe that's up to the company to decide whether or

21   not -- as mentioned, I believe there are even exceptions

22   that Isaac would approve that happened even at MGA.

23   Q    You did understand that it was the policy at Mattel?

24   A    I understood it was the practice.  I don't know if

25   there is a formal policy.

1    Q     Okay.  Let's use your word.  You understood there was a

2    practice, and you understood the reason for that practice,

3    right?

4    A     Yes.

5    Q     You understood that you shouldn't be in the Mattel

6    building while you're thinking of working for somebody else,

7    after you've given notice that you were working for somebody

8    else?

9    A     I don't know.  I don't know -- on a per case basis, I

10   really don't know.

11   Q     You said you knew the reason for it, so why don't you

12   tell me?

13   A     The reason for what?

14   Q     The reason for the Mattel practice that if you are

15   going to work for a competitor and you give notice of that,

16   you can't stick around for two weeks in the Mattel design

17   center?

18              MR. MC CONVILLE:  This is asked and answered, your

19   Honor.

20              THE COURT:  Overruled.

21              THE WITNESS:  Though I don't know the specific

22   reasons for their practice, I expect if Mattel chooses to

23   ask someone to leave after they've been advised that the

24   employee is quitting and going to a competitive company,

25   then it's maybe their concern that they don't wish or want

CV 04-9049-DOC – 01/20/2011 – Day 5, Vol. 2 of 2

```
 1    that employee to be around any of their products or concepts

 2    or whatnot.  I don't know if that's a policy as hard, fast.

 3    I don't know if exceptions are made.  I just don't know.

 4    BY MR. PRICE:

 5    Q    There was no exception for you when you left Mattel,

 6    right?

 7    A    Correct.

 8    Q    And let's go to the date in August, then, when

 9    Mr. Bryant was sketching these eyes, giving you ideas for

10    these eyes that were going to go on these dolls.  Based on

11    your experience, you certainly agree that's inappropriate?

12            MR. MC CONVILLE:  Objection, vague as to dolls.

13            THE COURT:  Overruled.

14            THE WITNESS:  Yes, I do.

15    BY MR. PRICE:

16    Q    And isn't it true that Mr. Bryant was meeting with

17    Ms. Marlow and doing shopping and all that prior to

18    October 4th?

19    A    No.  It's my understanding that that shopping took

20    place somewhere around October 6th.

21    Q    Prior to October 4th, at least from September 29 to

22    October 4th, Ms. Marlow is doing work on a Bratz project and

23    being paid for it, right?

24    A    Is there a document I can refer to?

25    Q    Look at Exhibit 606.
```

CV 04-9049-DOC – 01/20/2011 – Day 5, Vol. 2 of 2

28

```
 1    A    Okay.
 2    Q    At the top again where it says "Bratz dolls research
 3    and development and support services from 9/29/2000 to
 4    October 20, 2000."
 5    A    Yes.
 6    Q    And so you knew at least she was working on this
 7    between the 29th and the 4th with Mr. Bryant before he gave
 8    notice, right?
 9              MR. MC CONVILLE:  Objection, compound question.
10              THE COURT:  Overruled.
11              THE WITNESS:  Yes, it seems so.
12    BY MR. PRICE:
13    Q    Now --
14    A    And I'm not sure what she was working on or if she was
15    just shopping, buying toy products.  I don't know what was
16    happening in that time between September 29th and
17    October 4th.
18    Q    Whatever was happening, you paid for it?
19    A    Yeah.
20    Q    Now, let me ask you, is it correct that you have,
21    Ms. Garcia, been aware of employees in the Mattel design
22    center who reported back to MGA about what they saw?
23              MR. MC CONVILLE:  Objection, vague.
24              THE COURT:  Overruled.
25              What time period, Counsel?
```

```
 1              MR. PRICE:  Let me find.  That would be, I think,
 2    in 2004.  Let me check.
 3              MR. MC CONVILLE:  And your Honor, this goes beyond
 4    the scope of what we discussed.
 5              THE COURT:  Yeah, sustained.  We'll take it up at
 6    the recess.
 7              MR. PRICE:  I want to check the date, your Honor,
 8    so I make sure I didn't mislead you.
 9    BY MR. PRICE:
10    Q    So we talked about the scope and the fashion.  In order
11    to work on the Bratz doll, you also needed sample makers,
12    right?
13    A    Yes.
14    Q    And the sample makers in this industry, toy industry,
15    are -- is it fair to say they are very skilled?
16    A    Yes.
17    Q    And it's difficult to find good sample makers?
18    A    Yes.
19    Q    And if you'd look at exhibit -- if you'd look at
20    Exhibit 1763, please.
21              THE COURT:  The e-mail of October 17th, 2000?
22              MR. PRICE:  Yes, your Honor.
23    BY MR. PRICE:
24    Q    And Ms. Garcia, can you tell me whether or not that's
25    something you've seen before?
```

CV 04-9049-DOC - 01/20/2011 - Day 5, Vol. 2 of 2

30

```
1    A    Yes.

2    Q    And this is the e-mail chain on which -- you're on the

3    e-mail chain?

4    A    Yes.

5              MR. PRICE:  I move 1763 into evidence, your Honor.

6              THE COURT:  Received.

7              (Plaintiffs' Exhibit No. 1763 is received in

8         evidence.)

9    BY MR. PRICE:

10   Q    And if you look at the first e-mail that's dated

11   October 17 between you and Isaac Larian, Mercedeh Ward,

12   Carter Bryant and Mullenma@earthlink.net; do you see that?

13   A    Yes.

14   Q    Who's "Mullenma"?

15   A    Maureen Mullen.

16   Q    And at the top it says seamstresses, right?

17   A    Yes.

18   Q    And when you refer to seamstresses, what you are

19   talking about here are the pattern makers, right?

20   A    Yep.

21   Q    And you say to Isaac and Mercedeh, "I need to have

22   seamstresses and pattern makers ready and committed to

23   supporting Carter and Veronica the week of October 30 for

24   Bratz fashions"; do you see that?

25   A    Yes.
```

1    Q    And then at the bottom, Maureen, and that's referring

2    to --

3    A    Maureen Mullen.

4    Q    Thank you.

5         "Do you know of any of the little ladies that used to

6    work at Mattel that can support us"; do you see that?

7    A    Yes.

8    Q    Now, for several years, MGA used Veronica Marlow to

9    provide these very skilled seamstresses in connection with

10   the Bratz product, correct?

11   A    Yes.

12   Q    And your testimony was, at least of 2010, that you

13   didn't know that any of these seamstresses --

14            MR. MC CONVILLE:  Objection, this is improper,

15   your Honor.  He is going to ask a question, get an answer,

16   then try to refresh.

17            THE COURT:  Sustained.

18   BY MR. PRICE:

19   Q    Isn't it correct, Ms. Garcia, that throughout this

20   period, the seamstresses who were working for Veronica

21   Marlow in doing these patterns for Bratz were women who were

22   employed by Mattel and moonlighting?

23            MR. MC CONVILLE:  Objection, vague as to when she

24   knew.

25            THE COURT:  Overruled.

Case 2:04-cv-09049-DOC-RNB   Document 9710   Filed 01/27/11   Page 32 of 121   Page ID #:290439
CV 04-9049-DOC - 01/20/2011 - Day 5, Vol. 2 of 2

32

1           THE WITNESS:  It's come to my understanding

2    that -- yes.

3    BY MR. PRICE:

4    Q    Okay.  Now, when you say it's come to your

5    understanding, when exactly did it first come to your

6    understanding that the seamstresses who were working on

7    Bratz were Mattel employees who were moonlighting?

8    A    I recall being advised that the Marlows were working

9    with sample makers who were moonlighting a number of years

10   later.

11   Q    By April 21, 2010, had it come to your attention that

12   the sample makers who Veronica Marlow were using were

13   moonlighting, as of April 21, 2010?

14   A    Can you please repeat the question, I'm sorry?

15   Q    Yes.

16        As of April 21, 2010, had it come to your attention

17   that the sample makers who Veronica Marlow was using were

18   moonlighting?

19   A    Yes, I believe so.

20           MR. PRICE:  Your Honor, I'd like to read from

21   transcript April 21, 2010, lines -- page 1459, lines 2

22   through 5.

23           THE COURT:  You may.

24   BY MR. PRICE:

25   Q    "Question:  Did it ever come to your attention that the

1    sample makers who Veronica Marlow was using were

2    moonlighting?

3         "Answer:  No.

4         "As of April 21, 2010?"

5         Certainly if you had heard from Veronica Marlow that

6    the sample makers she was using for Bratz fashions were

7    moonlighting, that would have been a concern to you, right?

8    A    I was reading the document, I'm sorry.  Can you please

9    repeat the question?

10   Q    Yes.

11        If you had heard from Veronica Marlow that the sample

12   makers she was using for Bratz fashions were moonlighting,

13   that would have been a concern to you, right?

14   A    Yes.

15   Q    And although you said in 2010, that it had never come

16   to your attention, in fact, it did come to your attention

17   years earlier, right?

18   A    No.

19   Q    I'd like you to look at Exhibit 13223.

20   A    I guess, I mean, years earlier, and can you please give

21   a date so that I have an understanding?  Years earlier to

22   this deposition?

23   Q    Years earlier to April 21, 2010, when you first denied

24   you ever heard it?

25   A    Okay.

```
 1              MR. MC CONVILLE:  What's the exhibit number?

 2              MR. PRICE:  It's 13223.

 3   BY MR. PRICE:

 4   Q    And do you recognize 13223?

 5   A    Yes, I do.

 6   Q    And does this include an e-mail to you from Peter

 7   Marlow?

 8   A    Yes, it is.

 9   Q    And that's Ms. Marlow's husband?

10   A    Yes, it is.

11              MR. PRICE:  I move 13223 into evidence.

12              THE COURT:  Received.

13              (Plaintiffs' Exhibit No. 13223 is received in

14        evidence.)

15   BY MR. PRICE:

16   Q    And let me get the context, here.  In August 2005, MGA

17   was talking to Ms. Marlow about actually joining MGA rather

18   than being an independent contractor, right?

19   A    Yes.

20   Q    And this e-mail -- let me go down to the one before

21   that.

22        The one from Mr. Marlow to you dated June 20, 2005 is

23   discussing that subject as to whether or not -- excuse me --

24   whether or not Ms. Marlow would have actually joined MGA as

25   opposed to being an independent contractor?
```

1   A    That's right.

2   Q    And if we go to page 2.  And the bottom, the last two

3   paragraphs.

4        You see -- it's hard to see, let me read it.

5        "Veronica has seriously considered your very generous

6   offer of employment with MGA and regrets that she cannot

7   accept it.  This is her concern"; do you see that?

8   A    Yes.

9   Q    And then it goes on to say, "If Veronica goes to work

10  for MGA, she will no longer be able to offer work with her

11  team of pattern and sample makers.  They have secure day

12  jobs with an outlook of many more years of stability that

13  they are unwilling to leave.  They only moonlight for

14  Veronica"; do you see that?

15  A    Yes, I do.

16  Q    So you understood when you read this that those pattern

17  makers that were working on Bratz, you knew as of 2005, at

18  least, were moonlighting from another job?

19  A    Yes.

20  Q    The next paragraph on page 3 says, "These are older

21  ladies comfortable with the way things are.  They don't want

22  to change.  We pay them very generously because they are

23  risking their day jobs, even a nice retirement, to work for

24  us.  If they were ever discovered, they certainly would be

25  painfully humiliated and fired."

```
 1          So reading this, you understood that the people who

 2     were making fashions for Bratz had day jobs, and if they

 3     were working with MGA, they might be fired from those jobs,

 4     yes?

 5     A    Yes.

 6     Q    If you'd look at the -- as I think the second --

 7     fifth -- fifth paragraph, fifth full paragraph.  "So how do

 8     they get any work done like this?  Maybe it's just that they

 9     are so talented, they have more than 100 years total of

10     doll-making experience between them.  They are extremely

11     fast and accurate."

12          You read that as well, correct?

13     A    Yes.

14     Q    Now, when you read that in 2005, did you have any

15     understanding as to, other than MGA, what company it was in

16     which these women combined could have over 100 years of

17     doll-making experience?

18     A    No.

19     Q    You assumed when you read that, one of the assumptions

20     that came to mind was that these sample makers had day jobs

21     with a competitor of MGA, right?

22     A    Yes.

23     Q    And by the time you read this e-mail, you believed it

24     was possible that while it was -- the place the sample

25     makers were working was Mattel?
```

1          MR. MC CONVILLE:  Objection, relevance as to

2     possibilities.

3          THE COURT:  Overruled.

4          THE WITNESS:  Yes, I certainly considered that a

5     possibility.

6     BY MR. PRICE:

7     Q    And, in fact, you knew, as of 2005, that Veronica

8     Marlow had worked at Mattel?

9     A    Yes.

10    Q    In fact, you thought it was quite likely that these

11    sample makers had secure day jobs at Mattel?

12    A    Yes.

13    Q    And so -- let's go ahead.  But how long had Veronica

14    Marlow been providing sample-making assistance for MGA on

15    Bratz?

16    A    Prior to this date?  As of this date?

17    Q    How long prior to this date had she been doing that?

18    A    Approximately five years.

19    Q    Since sometime in 2000?

20    A    That's right.

21    Q    So in April 21 of 2010, when you were asked, "Did it

22    ever come to your attention that the sample makers who

23    Veronica Marlow was using were moonlighting," and you

24    answered under oath, "No, it had not as of April 21, 2010,"

25    you were inaccurate?

Case 2:04-cv-09049-DOC-RNB   Document 9710   Filed 01/27/11   Page 38 of 121   Page ID #:290445
CV 04-9049-DOC - 01/20/2011 - Day 5, Vol. 2 of 2

38

1    A    No, in fact, I think that that answer's been taken out
2    of context.
3    Q    Did you answer no to, "Did it ever come to your
4    attention that the sample makers who Veronica Marlow was
5    using were moonlighting," in response to that question, did
6    you say no?
7    A    Yes, I did, and if I might clarify.
8    Q    Well, is it correct that you changed that answer only
9    after being shown the e-mail?
10   A    No.  And if --
11   Q    And --
12   A    Mr. Price, I'd just like to be clear.  When I
13   understood that I was being asked this question, and if I
14   might read it, "Did it ever come to your attention that
15   sample makers who Veronica Marlow was using were
16   moonlighting," my answer was no because it was my
17   understanding I was being asked that question prior to the
18   receipt of Peter Marlow's e-mail.  I wasn't under the
19   understanding that they were using sample makers who were
20   moonlighting.
21   Q    I'd like you to look at 1458, line 20 to 25, and then
22   up to 1459, line 1.
23        Those are the questions and answers preceding the
24   question, "Did it ever come to your attention that the
25   sample makers who Veronica Marlow was using were

 1   moonlighting?

 2        "Answer:  No."

 3             THE COURT:  Just a moment, Counsel, until I have

 4   it, there is no question.  Where are you referring?

 5             MR. PRICE:  1458, line 20, your Honor, to 1459,

 6   line 1.

 7             THE COURT:  All right.  Thank you.

 8             You can ask the question now.

 9   BY MR. PRICE:

10   Q    You can look at, Ms. Garcia, those are the questions

11   that preceded the question, "Did it ever come to your

12   attention that the sample makers who Veronica Marlow was

13   using were moonlighting," correct?

14   A    Yes, and again, Mr. Price, I feel that this question is

15   being taken out of context, because if you read further, I

16   believe that it would probably -- I believe this question is

17   being taken out of context.

18   Q    Were you asked, "Has Veronica Marlow ever told you that

19   sample makers who were making the Bratz fashions while they

20   were Mattel employees"; do you recall being asked that?

21   A    Yes, I do.

22   Q    And you said no, correct?

23   A    Correct, but I understood that question was being

24   addressed in the -- within the time that I was designing and

25   developing with Veronica prior to my receipt of Peter

Case 2:04-cv-09049-DOC-RNB   Document 9710   Filed 01/27/11   Page 40 of 121   Page ID #:290447
CV 04-9049-DOC - 01/20/2011 - Day 5, Vol. 2 of 2

40

1    Marlow's e-mail.

2    Q    And then the question, "That never came to your

3    attention?

4         "Answer:  No."

5         Correct?

6    A    Correct.

7    Q    And then, "Did it ever come to your attention that the

8    sample makers who Veronica Marlow was using were

9    moonlighting?

10        "Answer:  No."

11        That's what led up to that, correct?

12   A    That's right, but that was all in relation to the time

13   in which I was working with Veronica Marlow prior to my

14   receipt of Peter Marlow's e-mail.

15   Q    Ma'am, you weren't asked did it ever come to your

16   attention that the sample makers who Veronica Marlow had

17   been using were moonlighting, you were asked had, was,

18   right?

19   A    I --

20              MR. MC CONVILLE:  Objection.

21              MR. PRICE:  I'll withdraw it.  I'll withdraw it.

22   I was spinning when I asked it.

23   BY MR. PRICE:

24   Q    So again, using your experience in the toy industry --

25   and what was your position, by the way, as of 2005 at MGA?

CV 04-9049-DOC – 01/20/2011 – Day 5, Vol. 2 of 2

41

1   A     I was either a director or a vice president.  I can't

2   recall.

3   Q     So given your experience in the toy industry, you do

4   agree that it would have been wrong for MGA to knowingly

5   have used sample makers who were, in their day jobs, working

6   at Mattel, correct?

7               MR. MC CONVILLE:  Objection, inappropriate

8   hypothetical, your Honor.  It assumes facts not in evidence.

9               THE COURT:  Yeah, I'm going to sustain the

10  objection in its present form.  You can ask her opinion,

11  Counsel.

12              MR. PRICE:  Sure.

13              THE COURT:  But the way it's phrased, it's

14  suggestion.

15  BY MR. PRICE:

16  Q     Is it your opinion that it would have been

17  inappropriate for MGA to use sample makers that had day jobs

18  at Mattel and were moonlighting?

19              MR. MC CONVILLE:  Objection, vague.

20              THE COURT:  No, overruled.

21              THE WITNESS:  It would have been inappropriate had

22  MGA been aware that these ladies were moonlighting during

23  that time.

24  BY MR. PRICE:

25  Q     And in your opinion, would it have been inappropriate

CV 04-9049-DOC - 01/20/2011 - Day 5, Vol. 2 of 2

42

```
1    for MGA to have knowingly used sample makers who worked for

2    any competitive doll company during the day and were

3    moonlighting?

4    A    If MGA knew that these ladies, anybody, any competitor

5    sample makers were moonlighting, if they had known, yes.

6    Q    So for how long was MGA using sample makers who were

7    working for a competitive toy company during the day, how

8    long a period of time?

9              MR. MC CONVILLE:  Objection, lacks foundation.

10             THE COURT:  Overruled.

11             THE WITNESS:  I don't -- I don't know.

12   BY MR. PRICE:

13   Q    Well, let's assume that it began when you started using

14   Veronica Marlow for -- for sample makers.  So for how long a

15   period of time would MGA have been using or did they use --

16   let me just phrase it this way.

17        For how long a period of time was MGA using Veronica

18   Marlow and the seamstresses, sample makers who worked for

19   her, for MGA?

20   A    I can tell you that MGA was working with Veronica for

21   five years, and she had her team of sample makers, and I'm

22   not sure how long moonlighting sample makers were working

23   with her because I don't -- didn't know her stuff.

24   Q    I'd like you to look, if you could, at Exhibit 18.

25        Do you have that in front of you, ma'am?
```

```
 1   A    Yes, I do.

 2   Q    And is this e-mail you sent on September 27, 2000, to a

 3   Frank Tsang and Judy Rich?

 4   A    Yes.

 5           MR. PRICE:  I'll move Exhibit 18 into evidence.

 6           THE COURT:  Received.

 7           (Plaintiffs' Exhibit No. 18 is received in

 8        evidence.)

 9   BY MR. PRICE:

10   Q    And if we could pull up the first part first.

11        And the subject of this September 27, 2000 e-mail is

12   Bratz; do you see that?

13   A    Yes.

14   Q    And the first line to Frankie, "Please note that I sent

15   you today a binder describing the new small doll line called

16   Bratz"; do you see that?

17   A    Yes.

18   Q    Okay.  Now, what was in the binder you sent to Frankie

19   Tsang on September 27, 2000?

20   A    I don't recall, but if I might have a minute to read

21   the e-mail.

22   Q    Please.

23   A    Okay.

24   Q    Having read the entire e-mail, can you tell us what was

25   in the binder that you sent?
```

 1    A    In reading this e-mail, I remember that there was --

 2   you know what, I can't remember what the binder included.  I

 3   can --

 4    Q    Can you tell us who Mr. Tsang is?

 5    A    Yes, he was a gentleman who worked in our MGA Hong Kong

 6   offices.

 7         And I just would like to ask, Mr. Price, when I make

 8   reference to the physical sample, do you -- in the later

 9   part of my e-mail, is that inclusive of the binder?

10    Q    I didn't write it.  I'd have to ask.

11              *(Laughter.)*

12              THE WITNESS:  I believe that there were physical

13   pieces that I may have included inside of the binder, and I

14   have a better memory of what those pieces were.

15   BY MR. PRICE:

16    Q    Well, you said this was in your Hong Kong facility?

17    A    My e-mail was being sent to my Hong Kong facility.

18    Q    And what -- why would you send this e-mail to your

19   Hong Kong facility in September 27, 2000?

20    A    It was my intent in September 27 of 2000 was to work

21   with Frankie Tsang to help me generate, and it's notes in my

22   e-mail, approximate hard cost, cost to manufacture a fashion

23   doll.  It was just part of my exploring and putting

24   information together prior to the contract being signed.

25    Q    So Hong Kong would do actual manufacturing?

1    A    Well, we had a Hong Kong office that was full of

2    development engineers and manufacturing engineers.

3    Ultimately the manufacturing was happening in China.

4    Q    So you were getting cost estimates, though, from

5    Hong Kong for Bratz?

6    A    I was getting cost estimates for -- for a fashion doll

7    that may later have become Bratz.

8    Q    When you say later may have become Bratz, look at that

9    first sentence again where it says, "Please note that I sent

10   to you today a binder describing a new small doll line

11   called Bratz."

12   A    Yep.

13   Q    And that word "Bratz," by the way, that was used in

14   Mr. Bryant's first presentation to you, he called them

15   Bratz?

16   A    Yes, he did.

17   Q    And then the second paragraph, you talk about what

18   Bratz is, it's a small doll line made up of four characters,

19   the position of this line is hair and dress play, dolls are

20   sold with one hairstyle and one outfit for daytime look and

21   another hairstyle and outfit for a nighttime look; do you

22   see that?

23   A    Yes, I do.

24   Q    Pretty much comes directly from Mr. Bryant's

25   presentation to you?

Case 2:04-cv-09049-DOC-RNB   Document 9710   Filed 01/27/11   Page 46 of 121   Page ID #:290453
CV 04-9049-DOC - 01/20/2011 - Day 5, Vol. 2 of 2

46

1    A    Yep.

2    Q    And it goes on to continue describing this Bratz line,

3    correct?  Your e-mail.

4    A    Yes.

5    Q    And the fourth paragraph is, "I need you to help me get

6    an idea of what a dress pack would cost."

7         Can you tell us what a dress pack is?

8    A    I believe I was referring to a fashion pack?  I don't

9    recall.  It's been a number of years ago.

10   Q    It says, "I need to make sure that the pieces I am

11   expecting to include support our retail price"; do you see

12   that?

13   A    Yes, I do.

14   Q    So you are saying, tell me how much this will cost us

15   to see whether it will support what we are thinking of

16   charging?

17   A    That's right.

18   Q    Now, it says the very last page of this binder

19   indicates and it says, "Preferred hair vendor, contact name,

20   address and phone number"; do you see that?

21   A    Yes.

22   Q    By September 27, 2000, Mr. Bryant had referred you to a

23   hair vendor, correct?

24   A    Yes, he did.

25   Q    And you relayed that information before the end of

CV 04-9049-DOC – 01/20/2011 – Day 5, Vol. 2 of 2

47

1    September of 2000 to Hong Kong so they can come up with

2    cost, right?

3    A    Yes.

4    Q    And Mr. Bryant was doing this in September of 2000 to

5    help this project along, to help you get estimates, right?

6    A    Yeah.

7    Q    That, any way you cut it, is assisting MGA, who is a

8    competitor of Mattel, right?

9    A    If it's to assist in collecting information that helped

10   me decide whether or not this product was going to be

11   profitable, then in that definition, yes.  He was selling --

12   he was working really hard to help us be comfortable with

13   his concept he presented.

14   Q    It is an important function of a toy company to

15   determine whether or not it's going make a profit on a doll

16   line, right?

17   A    Of course.

18   Q    It's -- I think it's been said, it kind of comes down

19   to whether you are going to make money; it's a business?

20   A    Yep.

21   Q    And so one of the most important things you can do in

22   determining whether or not to put out a doll line is to find

23   out what your costs are going to be, right?

24   A    Yes.

25   Q    And so in September 2000, Mr. Bryant was helping you in

1    connection with one of the most important things MGA could

2    do in connection with this Bratz line?

3    A    Carter Bryant recommended a surround hair material, it

4    was something I asked him about.  If this Bratz ever went to

5    production, what would be your preferred hair material?  He

6    had recommended saran, it's a common hair manufacturing

7    material.  It's not anything new to MGA Hong Kong, it was

8    just his preference.  It wasn't anything that we hadn't

9    already been aware or we could have concluded to.

10   Q    What Mr. Bryant was talking about was hollow saran hair

11   fiber, correct?

12   A    That's right.

13   Q    It's among the most expensive hair fibers you can use

14   on a doll, correct?

15   A    Correct.

16   Q    You got some resistance within MGA of using that type

17   of hair, correct?

18   A    Resistance, I don't recall resistance.

19   Q    Some people wanted to use less expensive hair instead

20   of the hollow saran hair fiber, correct?

21   A    I believe that our Hong Kong office may have been --

22   well, MGA Hong Kong office is always trying to get us to

23   find, in some cases, a cheaper alternative to reach our

24   target cost.

25   Q    And prior to September 27, 2000, Mr. Bryant then

CV 04-9049-DOC – 01/20/2011 – Day 5, Vol. 2 of 2

49

```
 1    contacted a specific vendor about ordering supply of a

 2    hollow saran hair fiber?

 3             MR. MC CONVILLE:  Objection, lack of foundation.

 4             THE COURT:  Overruled.

 5             If she knows.

 6             THE WITNESS:  Could you repeat the question?

 7    BY MR. PRICE:

 8    Q    Sure.

 9         Prior to September 27, 2000, Mr. Bryant had contacted a

10    vendor to see -- to discuss the possibility of ordering a

11    supply of hollow saran hair fiber?

12    A    Yes.

13    Q    And in doing that, he had actually represented himself

14    as working with MGA Entertainment?

15             MR. MC CONVILLE:  Objection, lacks foundation.

16             THE COURT:  Well, it needs to be a question.

17    BY MR. PRICE:

18    Q    Is it true that in doing that, in contacting a vendor

19    about possibly ordering supply for this hair fiber, that he

20    had represented that he was with MGA?

21    A    I don't recall.

22    Q    If you could look at Exhibit 30.

23    A    Sorry.

24    Q    Let me ask you this, you said you don't recall, does

25    Exhibit 30 refresh your recollection that Mr. Bryant
```

Case 2:04-cv-09049-DOC-RNB   Document 9710   Filed 01/27/11   Page 50 of 121   Page ID #:290457
CV 04-9049-DOC - 01/20/2011 - Day 5, Vol. 2 of 2

50

1    contacted a hair supplier saying he was from MGA and asking

2    for samples of the hair?

3            MR. MC CONVILLE:  Objection as to the form of the

4    question.

5            THE COURT:  Well, I'm not sure there is a

6    foundation.  Is she on the string, Counsel?

7            MR. MC CONVILLE:  It's not a string, your Honor.

8            MR. PRICE:  It's not in evidence, your Honor.

9            THE COURT:  I know it's not in evidence.

10           The question is, "Does this refresh your

11   recollection"?

12           MR. PRICE:  Yes.

13           THE WITNESS:  I don't recall receiving this

14   document.

15           THE COURT:  Sustained.

16   BY MR. PRICE:

17   Q    And my question is different.  My question is:  Does

18   this refresh your recollection about whether or not

19   Mr. Bryant contacted the vendor representing he's from MGA,

20   because you said you don't recall?

21   A    Correct.

22   Q    So I'm wondering, does this spur a memory or do you

23   still not recall?

24   A    I still don't recall.

25   Q    He did, however, certainly by September 27th, give you

CV 04-9049-DOC - 01/20/2011 - Day 5, Vol. 2 of 2

51

1   the name of a vendor which you then sent on to Hong Kong?

2   A    Yes, a named vendor Hong Kong was already well aware

3   of.

4   Q    Well, you didn't really have to relay to Hong Kong

5   Mr. Bryant's recommendation, right?

6   A    Right.  And -- and my objective with Frankie Tsang

7   which was to try and arrive at just a first, rough, ballpark

8   hard cost.  And knowing that saran was his preferred hair in

9   the first round of the hard cost, I asked him to include

10  that hair material.

11          MR. PRICE:  Eighteen back up, Ken.

12  BY MR. PRICE:

13  Q    So you mentioned that the very last page of the binder

14  indicated a preferred hair vendor, correct?

15  A    Yes.

16  Q    And Hong Kong didn't know what the preferred hair

17  vendor was for Bratz prior to you sending them this?

18  A    Hong Kong was aware of the hollow saran hair

19  manufacture, but they couldn't have been aware of my

20  preferred -- my preference of all the hair manufacturals

21  until I would have advised them of such.

22  Q    Okay.  So how many hair manufacturers are there?

23  A    I believe -- three come to mind right now.

24  Q    And it was important to you that the right vendor be

25  selected for this Bratz project, correct?

```
 1    A    It was important for me to, in this study, get sort of

 2    the worst-case scenario hard ballpark cost before -- before

 3    Frankie, so he could help me with just a rough estimate.

 4    Q    You use the words "preferred hair vendor" because

 5    that's what you preferred, right?

 6    A    Sure.

 7    Q    And that was a recommendation for the preferred hair

 8    vendor which you got from Mr. Bryant, right?

 9    A    Sure.

10    Q    And you also sent physical samples; is that right?

11    A    Yes.

12    Q    And that was to represent the approximate size?

13    A    May I see the document again?

14    Q    Yes, please.

15         It's 18.

16    A    Okay.

17    Q    You looked at it now?

18    A    Yes.

19    Q    Okay.  So you sent them the physical samples to

20    represent the approximate size or amount of goods and

21    material, right?

22    A    I believe I sent a -- I believe I sent, and especially

23    in the case of outfit, purse and shoes, open market -- open

24    market competitive product just for volume, just for a piece

25    type, yes.
```

```
 1   Q    And you said you are going to -- I'm going to send you
 2   a PDF by the end of next week.  What did you mean by the
 3   PDF?
 4   A    PDF stands for product development form.  It's a form
 5   that MGA -- it's an MGA form.
 6   Q    And what sorts of things do you have on this -- this
 7   product development form?
 8   A    Product development form will identify information
 9   generally for our Hong Kong offices, it will identify
10   whether it needs batteries, it gives a brief overview of the
11   product, and it's kind of -- it's a -- kind of a starting
12   point for what we expect a price point to be, what a package
13   would be, what material types the package would be, that
14   sort of thing.
15   Q    Does the PDF form have things on it like when you got
16   the design drawings, when you expect to meet certain
17   production schedules, things of that nature?
18   A    I believe the PDF form has some -- a few development
19   milestones on it.
20   Q    And the idea is to send that -- to whom do you send
21   that PDF form?
22   A    It's a document that we send to our Hong Kong offices.
23   Q    And I'm sorry, you send it to them so they can kind of
24   understand when certain milestones are supposed to be met or
25   if they've already been met, right?
```

1    A    Really that document is not meant for milestone

2    references.  It's really more to make Hong Kong aware of the

3    coming of a product, the start and kickoff of a product, an

4    official product, and generally that product had to be

5    approved by Isaac Larian.

6    Q    Ma'am, can you look at Exhibit 1103.

7            THE COURT:  Well, that should be 10/16 and

8    10/2/2000?

9            MR. PRICE:  Yes, your Honor.

10            THE COURT:  Thank you.

11   BY MR. PRICE:

12   Q    And if you look at 1103, excuse me, is that a product

13   development form for Bratz doll packs?

14   A    No.

15   Q    Is it some document that has to do with Bratz doll

16   packs?

17   A    Yes.

18   Q    And you've seen this before?

19   A    Yes.

20   Q    Were you involved in its creation?

21   A    Yes.

22            MR. PRICE:  Your Honor, I move Exhibit 1103 into

23   evidence.

24            THE COURT:  Received.

25

Case 2:04-cv-09049-DOC-RNB   Document 9710   Filed 01/27/11   Page 55 of 121   Page ID #:290462
CV 04-9049-DOC - 01/20/2011 - Day 5, Vol. 2 of 2

55

1          *(Plaintiffs' Exhibit No. 1103 is received in*

2          *evidence.)*

3     BY MR. PRICE:

4     Q     Now, the far left under Bratz doll packs, there is a

5     little square which says, "Project start, PDF vendor

6     selected"; do you see that?

7     A     Yes.

8     Q     And it has the date October 16, 2000; do you see that?

9     A     Yes.

10    Q     And then where it has the rotocast sculpting, that's in

11    the middle there.

12          Maybe we can blow up that middle square.

13          Do you see it says, "Control drawings to L.A.

14    designer"; do you see that?

15    A     Yes.

16    Q     And that's on October 2nd, 2000, correct?

17    A     Yes.

18    Q     And what's the point of the control drawings?

19    A     Control drawings, especially in reference to sculpt, is

20    generally a reference drawing, a place for a sculptor to

21    start from, to sculpt from.

22    Q     And the drawings that were given to the sculptor here

23    were Carter Bryant's portfolio?

24              MR. MC CONVILLE:  Is there a question?

25

1    BY MR. PRICE:

2    Q    Correct?

3    A    I don't believe that this date is accurate.

4    Q    I'm not asking you about the date.  I will, but not --

5    I'm asking you whether or not the drawings that were given

6    to Ms. Leahy included Mr. Bryant's portfolio?

7              MR. MC CONVILLE:  Vague as to time.

8              THE COURT:  Overruled.

9              THE WITNESS:  I don't believe that this reference

10   "control drawing to L.A. designer" was referencing Carter

11   Bryant's portfolio.

12   BY MR. PRICE:

13   Q    Well, let me ask you this:  Did you create this?

14   A    I don't recall.

15   Q    Okay.  In a -- in a -- in concept, without referring to

16   this document, what would that line refer to, "control

17   drawings to L.A. designer"?  In fact, let me lay some

18   foundation.

19        This is some kind of format which MGA used internally,

20   correct?

21   A    For a very short period of time, yeah.

22   Q    Apparently in October of 2000?

23   A    Correct.

24   Q    Correct?

25   A    Yes.

CV 04-9049-DOC - 01/20/2011 - Day 5, Vol. 2 of 2

57

1    Q    And so each of these entries meant something, correct?

2    A    Yes.

3    Q    And next to the entries, there are dates, correct?

4    A    Yes.

5    Q    So I want you to look at the entry which has the date

6    on it October 2nd, 2000, okay?

7    A    Yes.

8    Q    Ignore the date for now.

9    A    Okay.

10   Q    What would it mean, "control drawings to L.A.

11   designer"?

12   A    Every project is different.  So -- and it all depends

13   on the design, so in -- in some projects, you are very,

14   very, very controlled about the references you give to your

15   sculptor.  Sometimes the sculpting process is more fluid,

16   like Anna Rhee's Prayer Angels eye exploration, sometimes,

17   like with sculpting, the controls are less controlled, which

18   means that you allow your artist, in this case a sculptor,

19   to create from their instincts.

20        So you are asking me the definition of that.  It just

21   depends on the project.

22   Q    Okay.  So in this document, there is indication that in

23   this case for Bratz, they were control drawings to L.A.

24   designer; do you see that?

25   A    Yes.

1    Q    In this case, Ms. Leahy was the sculptor, correct?

2    A    Yes.

3    Q    She met with Mr. Bryant, correct?

4    A    Yes.

5    Q    On several occasions, correct?

6    A    Yes.

7    Q    She had his drawings with her, correct?

8             MR. MC CONVILLE:  Objection, vague as to drawings.

9             THE COURT:  Do you understand the question?

10            THE WITNESS:  It's difficult to answer because

11   there are --

12            THE COURT:  Reask the question, Counsel.

13   BY MR. PRICE:

14   Q    Mr. Bryant did these amazing, unique drawings of a

15   Bratz doll, correct?

16   A    That's right.

17   Q    And some of those drawings were given to Ms. Leahy?

18   A    Yes, they were.

19   Q    Now, who prepared this document?  Who prepared

20   Exhibit 1103?

21   A    It's possible that I created it.

22   Q    And if you created it, what you are saying is you made

23   a mistake for October 2, 2000, when control drawings were

24   given to the sculptor?

25   A    I don't know if I made a mistake.  I can tell you a few

CV 04-9049-DOC - 01/20/2011 - Day 5, Vol. 2 of 2

59

1    things in relation to drawings and a sculptor, if you don't

2    mind.

3    Q    I think earlier you said this date, October 2nd, 2000,

4    is a mistake?

5    A    Yes, I believe it is a mistake.

6    Q    Now, sitting here today, you understand that Mr. Bryant

7    didn't even give notice to Mattel until October 4th, right?

8              MR. MC CONVILLE:  Objection, lacks foundation.

9              THE COURT:  Overruled.

10             THE WITNESS:  Okay.

11   BY MR. PRICE:

12   Q    And is it true that -- let me rephrase that.

13        When you say October 2nd is a mistake, is it your

14   belief that that date is a mistake and it's actually after

15   Carter Bryant gave his notice to Mattel?

16             MR. MC CONVILLE:  Again, the witness has testified

17   she didn't know when he resigned.

18             THE COURT:  Overruled.

19             THE WITNESS:  Mr. Price, the reason why I find

20   this document to be inaccurate is actually not necessarily

21   even for the date, but even the reference to control

22   drawings to L.A. designer.  And if I might --

23   BY MR. PRICE:

24   Q    Let me ask you about the date, because I thought you

25   told us --

Case 2:04-cv-09049-DOC-RNB   Document 9710   Filed 01/27/11   Page 60 of 121   Page ID #:290467
CV 04-9049-DOC - 01/20/2011 - Day 5, Vol. 2 of 2

60

1    A    Okay.

2    Q    -- when I first showed this to you, you thought the

3    date was wrong?

4    A    They are related to each other.

5    Q    Well, I'm asking about the date, now?

6    A    Okay.

7    Q    Do you believe, now, that the date, which is

8    October 2nd, 2000, should be a date later than October 4,

9    2000?

10   A    A control -- I actually think in my definition that

11   there weren't control drawings provided to Margaret Leahy as

12   it related to the Bratz project, so that's why I'm

13   uncomfortable with confirming that answer.

14       She was provided portfolio drawings much earlier than

15   October 2nd, which is what she used for my exploratory

16   sculpt.  After that, I don't -- I don't recall her being

17   given a control drawing around October 2nd that she

18   referenced in her completion of the scope.  This is why it's

19   difficult to answer.

20   Q    So to the extent that Ms. Leahy was given drawings,

21   Mr. Bryant's drawings, you actually think that the date

22   should be prior to October 2nd, 2000?

23   A    Yeah, if it's in relation to that first sculpt, the

24   exploratory sculpt, I believe that Margaret Leahy referenced

25   drawings even before October 2nd.

CV 04-9049-DOC - 01/20/2011 - Day 5, Vol. 2 of 2

61

1   Q    Is it correct that it was your intention through this

2   entire process to remain true to Carter Bryant's vision and

3   his intent about Bratz, that that was your intention when

4   you met with Ms. Leahy?

5   A    It was my intention, it was -- I tried very hard, but I

6   did not follow the details of Carter Bryant's portfolio

7   drawings.  I couldn't.  We wouldn't have been successful.

8   Q    Well, if you look at the -- I think it's 10,001, which

9   is already in evidence, and if you -- do you have that?

10  A    Yes, I do.

11  Q    And if you look at the second page where there is the

12  question from the reporter, "How did MGA design the four

13  different girls, both inspiration for the overrule design

14  and the look of each girl?"

15       And you wrote, "The four girls were already concepted

16  and presented by the inventor during our first meeting.  I

17  thought they were incredible, and I tried to stay true, this

18  inventor/creator's vision"; do you see that?

19  A    Yes, but it's important to put that note in context.

20  Q    Context, if you look at this, is you were answering

21  questions on May 1, 2001, from -- is it Dolls magazine?

22  A    Yes.

23  Q    And as of April 1, 2001, were there Bratz dolls?

24  A    Yes.

25  Q    And so they were already on the market by that time?

1    A    Sorry, again.

2         Yes.

3    Q    And how was it that this interview came to be, that is

4    this kind of e-mail interview?

5    A    I don't remember.

6    Q    Were you trying to be accurate in your response --

7    responses in this e-mail interview?

8    A    Absolutely.  And if I might put the context, now?

9    Q    Let me ask you this:  I'm going to talk about context,

10   I want you to look at this e-mail, look at it anywhere you'd

11   like, point to me something in this e-mail that you'd like

12   the jury to know about, about the context.

13   A    Okay.

14   Q    Okay?

15   A    If you look at the second question.

16   Q    First page or second, ma'am, which page is that?

17   A    It's I guess the second page of the e-mail.

18   Q    Okay.

19   A    And it says, "What is your involvement with Bratz?"

20   And I write, "I'm a senior brand manager for Bratz.  I found

21   the original concept from the inventor.  In the meantime, I

22   have challenged the inventor in terms of the fashions and

23   the dolls."  And in my e-mail -- or in my answer in my below

24   question --

25   Q    Let's get it up so we can see it.

1    A    Okay.

2    Q    Same one?  Is that the one where "how did MGA design"

3    that you wanted up there?

4    A    Yes.

5    Q    Okay.  So go to that one.

6    A    Okay.  And the question -- in the last line of my

7    answer, I write, I thought they are incredible, and I tried

8    to stay true this vendor -- inventor, back slash, creator's

9    vision, which means that in content, some of that portfolio

10   was wonderful.  However, there were a lot of challenges I

11   imposed on design and on the dolls and their fashions, and I

12   did what I could to stay true in that process to his

13   creative vision.

14   Q    Okay.  I didn't mean to interrupt you.

15        So let's look at one of Mr. Bryant's drawings.

16   A    Okay.

17   Q    And if we can look at 11 -- let's see, 1109B.

18        And do you see that?

19   A    Yes.

20   Q    And is that one of Mr. Bryant's drawings?

21   A    Yes.

22            MR. PRICE:  Your Honor, I move 1109B into

23   evidence.

24            THE COURT:  Where does that appear, Counsel, on

25   the list?

1          MR. PRICE:  1109B in the binder, your Honor.  It's

2     a color photograph.

3          THE COURT:  I'm sorry?

4          MR. PRICE:  1109B.

5          THE COURT:  Have we discussed that?

6          MR. PRICE:  Yes.

7          MR. MC CONVILLE:  Yes, your Honor.

8          THE COURT:  Received.

9          I'm sorry, Counsel, you are absolutely right.  My

10    apologies.

11          *(Plaintiffs' Exhibit No. 1109B is received in*

12          *evidence.)*

13    BY MR. PRICE:

14    Q     This is Cloe?

15    A     Yes.

16    Q     Now, there was a Cloe doll, right?

17    A     Yes.

18    Q     And perhaps we can show you, I believe it's a

19    picture --

20          *(Attorney discussion held off the record.)*

21          MR. PRICE:  It's been pointed out to me that we've

22    been going for a long time, your Honor, and we need to take

23    a break.

24          THE COURT:  Okay.  Ladies and gentlemen, it

25    appears that we're going to take a recess.  You're

 1    admonished not to discuss this matter amongst yourselves,

 2    nor form or express any position in this case.  We'll come

 3    and get you five after the hour.  Have a nice recess.

 4              And counsel, I'll see you five after the hour.

 5    Thank you.

 6              *(Recess.)*

 7              *(The following proceedings is taken in the*

 8        *presence of the jury.)*

 9              THE COURT:  All right, Ms. Garcia.

10              If you'd have a seat, counsel.  Thank you for your

11    courtesy.

12              Ladies and gentlemen, I want to reiterate

13    something because this is the -- well, we've had a couple of

14    witnesses, now.  I want this coequal to all sides.  Let me

15    repeat, this idea of "I don't recall," "to the best of my

16    recollection," "it could have been," we could spend hours.

17    These witnesses are very well-prepared by both sides.

18              They've had plenty of time to talk to each of

19    these witnesses, so we should expect answers from these

20    witnesses.  So this isn't just to Ms. Garcia, it's to all

21    the witnesses who testify.  That's the minimum of what you

22    should expect; understood?  And that applies across the

23    board to Mattel, MGA, Machado and any witness coming into

24    this court, because we could spend hours with "to the best

25    of your recollection," "Well, what does that mean?"  "I'm

Case 2:04-cv-09049-DOC-RNB   Document 9710   Filed 01/27/11   Page 66 of 121   Page ID #:290473
CV 04-9049-DOC - 01/20/2011 - Day 5, Vol. 2 of 2

66

1    not sure."

2           So we'll get down to business.  We are back in

3    session.  I want those comments on the record.  They are

4    coequal to both sides and all parties.

5           Counsel, please resume.

6              **PAULA GARCIA, PLAINTIFFS' WITNESS, RESUMED**

7                 **DIRECT EXAMINATION (Continued)**

8    BY MR. PRICE:

9    Q    Ms. Garcia, I think we were looking at 1109B, and

10   that's Cloe?

11   A    Yes.

12   Q    And I'd like you to look at Exhibit 12286, which is an

13   actual doll, and I think I have the one that actually has

14   the exhibit number on it.

15          Is that the Cloe Bratz doll?

16   A    Yes, it is.

17          MR. PRICE:  Your Honor, it may already be in

18   evidence, but may we have 12286?

19          THE COURT:  Received.

20          And I misheard, Counsel.  I thought it was 11,009.

21   My apologies.  It's 1109.  It's received.

22          MR. PRICE:  Great.

23          *(Plaintiffs' Exhibit No. 12286 is received in*

24       *evidence.)*

25

```
 1    BY MR. PRICE:

 2    Q    So I'm not sure how this is going to work.  I'm going

 3    to see if this will go on the ELMO, and if not, we'll show

 4    the doll.

 5         So this is the Cloe doll that was released in 2001?

 6    A    Yes.

 7    Q    By the way, how many of the Bratz dolls were sold in

 8    2001?

 9    A    I don't know.

10    Q    Do you have any estimate?

11    A    No.

12    Q    Were Bratz dolls sold in the United States in 2001?

13    A    Yes.

14    Q    What was -- was this Exhibit 11286 sold in the United

15    States?

16    A    Yes.

17    Q    And so --

18         I guess I have to switch, Ken, back, unless you can put

19    them --

20              (Interruption in the proceedings.)

21    BY MR. PRICE:

22    Q    And so on the right, Exhibit 1109B, we have a Carter

23    Bryant drawing, and on the left, we have the actual doll,

24    correct, if you look at the screen?

25    A    Yes.
```

1    Q    And let's see, the doll has a bluish shirt; is that

2    right?

3    A    Yes.

4    Q    And there is a name on the shirt that says "Angel,"

5    correct?

6    A    Yes.

7    Q    And does that have something to do with the doll?

8    A    It was her nickname.

9    Q    And if you look at the box, there is a little circle

10   there, and that says -- well, that's a picture of wings and

11   a halo; is that right?

12   A    Oh, yes.

13   Q    Do you see that?

14   A    Sorry, yes.

15   Q    It says "Angel"?

16        And there is like a leopard print bag and skirt; do you

17   see that?

18   A    Yes, I do.

19   Q    And there is some kind of jean-type material with

20   little ruffles that are on the drawing and the doll,

21   correct?

22   A    Yes.

23   Q    And those -- the -- I can hardly see that far.

24        It's kind of a jean-type jacket on the doll that comes

25   with it, right?

1    A    Yes.

2    Q    And that's on Mr. Bryant's drawing?

3    A    Yes.

4    Q    If you'd also look -- oh, actually on the back of

5    12286, it says, "My friends call me 'Angel' because that's

6    what I am"?

7    A    Yes.

8    Q    And that's part of the character?

9    A    Yes.

10        Mr. Price, before the break, we were referring to

11   Carter Bryant's portfolio drawings, and I just wanted to

12   make a note that this drawing that we're referring to is not

13   his portfolio drawing.

14   Q    I'm going to go to his portfolio drawing.

15   A    Okay.

16   Q    This is one of the drawings he did for you, correct?

17   A    Yes, he did, under my direction.

18   Q    We'll go to the time of that.

19   A    Okay.

20   Q    So if you look at the portfolio drawings -- and I just

21   can't see that far, by the way.  On the drawing in the

22   right, is there an angel on the blouse?

23   A    Yes, but again, this is not a portfolio drawing.

24   Q    We'll get to that.

25   A    You'll refer to it.  I just want to clarify.

CV 04-9049-DOC – 01/20/2011 – Day 5, Vol. 2 of 2

70

```
 1   Q    But then if you go to the portfolio, in the portfolio,

 2   this character's name is Zoe, right?

 3              MR. MC CONVILLE:  She needs the exhibit.

 4              MR. PRICE:  Okay.  Well, it's Exhibit 302.

 5   BY MR. PRICE:

 6   Q    Is it right in the -- what you received the first time

 7   you met Carter Bryant was a drawing that had the name Zoe

 8   instead of Cloe?

 9   A    I --

10   Q    Let me give you the page number.  It might help.

11        Look at 302 at pages 3, 4 and 5.

12   A    Okay.  I don't necessarily make a relationship between

13   Zoe and Cloe.

14   Q    Okay.  Well, let's look at 302-3, do you see there is

15   something there that says "Meet Zoe"?

16        You've got 4 -- 5 up there, Ken.  You need 3 first.

17        Do you see that?

18   A    Yes.

19   Q    And then you go to the next page, and it shows how you

20   can change Zoe's hair and her feet?

21   A    Yes.

22   Q    And then it shows on 302-005, this is how Zoe now has a

23   whole new look with a change in the hair and the change in

24   the sandals, right?

25   A    Yes.
```

```
 1              THE COURT:  And 302 is the pitch book; is that
 2    correct, Counsel?
 3              MR. PRICE:  Pardon?
 4              THE COURT:  302 is the pitch book, Counsel?  The
 5    pitch book?
 6              MR. PRICE:  Yes, the pitch book.
 7              THE COURT:  That hasn't been received.  It's
 8    received.
 9              MR. PRICE:  Thank you, your Honor.
10              (Plaintiffs' Exhibit No. 302 is received in
11         evidence.)
12              MR. PRICE:  And if we could, Ken, could you put
13    302-0005 up with 1109B.
14    BY MR. PRICE:
15    Q    So the one on the left that we're seeing right now,
16    that's what was in Mr. Bryant's original pitch book, right?
17    A    Yes.
18    Q    And with respect to Zoe -- I mean, this is her with
19    blonde hair, the one on the left, correct, for Zoe?
20    A    Yes.
21              THE COURT:  And that's Z-o-e?
22              MR. PRICE:  Z-o-e, yes.
23    BY MR. PRICE:
24    Q    And if you look at the one with the brown hair in the
25    picture, that's 302-0003, I want you to look at the bag,
```

1   there.  See the bag on the lower right?

2   A    Yes.

3   Q    Does that say "Angel" with kind of a -- wings and

4   something on top of it?

5   A    Yes, it does.

6   Q    Just as Cloe, here is Angel, and it has an angel as a

7   mascot or a logo, correct?

8   A    Correct.

9   Q    Now, Mr. McConville was nice enough to give me one of

10  these boxes that's already destroyed, or pointed me to one.

11      And I'd like, your Honor, permission, maybe we can mark

12  that as 11286 --

13          MS. HURST:  It's already marked.

14          MR. PRICE:  Oh, it is?

15          Is there a number on that?

16          MS. JUAREZ:  475.

17          MR. PRICE:  Oh, 475.  Thank you.

18          MR. MC CONVILLE:  Look on the back.

19          THE COURT:  Look on the back.

20          MS. JUAREZ:  17549.

21          MR. PRICE:  All right.  Thank you.

22  BY MR. PRICE:

23  Q    And I would like to, if I could, look at 17549; do you

24  have that?

25  A    Yes.

CV 04-9049-DOC – 01/20/2011 – Day 5, Vol. 2 of 2

73

1    Q    And I just want to ask you some questions about it, now

2    that it's outside the box.

3    A    Okay.

4    Q    Again, this was released in 2001 in the United States?

5    A    Yes.

6    Q    And if you can kind of show it to the jury and maybe

7    look at it at the same time, there.

8         So one of the things it has are these kind of

9    strap-type shoes?

10   A    Do you mean in the shoe styling?

11   Q    Yeah.

12   A    Okay.  Yes.

13   Q    Okay.  And one of the things that Mr. Bryant suggested

14   was that you'd be able to take the shoes off at around the

15   ankle, right?

16   A    Yes.

17   Q    And so could you show the jury -- looking at 17549,

18   that 2001 release, can you show how that worked on the doll?

19   A    Is it possible to -- is it okay to pull the vacuum form

20   off the package?

21   Q    For that one.  We have plenty of vacuum forms.

22   A    It's okay?

23   Q    Now, when you do that, there is a little nub that's on

24   the leg that then goes into the shoe so it snaps?

25   A    Yes.

CV 04-9049-DOC – 01/20/2011 – Day 5, Vol. 2 of 2

74

1    Q    And Mr. Bryant's drawing had the nub on the shoe; is

2    that right?

3    A    Yes.

4    Q    So by the release date, 2001, you were selling in

5    United States these dolls with snap-on features at the ankle

6    where the nub was from the leg?

7    A    Right.

8    Q    And is it correct that the color of the skin tone of

9    the -- of the leg matches the skin tone on the shoe, so it

10   looks like the same skin?

11   A    Yes.

12   Q    I mean, not the color of the shoe, but the skin under

13   the shoe?

14   A    Yes.

15   Q    So in 2001, then, there were Bratz dolls being sold

16   that had strap-type shoes, having a snap feature on the doll

17   about the ankle so that different foot gear could be mounted

18   on the doll, and those shoes -- on those shoes, the coloring

19   of the skin tone on the exposed areas of the feet are

20   matched by the coloring of the lower leg of the dolls,

21   correct?  All of that was in the 2001 doll?

22   A    Yes.

23   Q    So then it would be a false statement to say that those

24   features weren't on the doll until the fall of the year of

25   2002, correct?

```
 1                 MR. MC CONVILLE:  Objection.  Vague.

 2                 THE COURT:  Sustained.

 3                 Restate it.

 4       BY MR. PRICE:

 5       Q    Would it be --

 6                 THE COURT:  We can't understand it if she says

 7       "yes" or "no," how that plays with the question, Counsel.

 8                 MR. PRICE:  Well, I'll break it down.

 9                 THE COURT:  Well, you don't have to break it down.

10       Just quit the negatives.

11                 MR. PRICE:  Oh.

12       BY MR. PRICE:

13       Q    Were all those features that we just talked about,

14       which are strap-type shoes, snap-on feature about the ankle

15       so you can put different foot gear on the doll, and the

16       color of the exposed skin on the shoes matching the color of

17       the lower legs of the doll, were all of those features on

18       the 2001 Bratz dolls?

19       A    Not all shoes fit that description.

20       Q    So let me narrow it.  In 2000 -- were there releases of

21       Bratz dolls in 2001 that had the feature of strap-type

22       shoes, snap-on feature about the ankle so that different

23       foot gear could be mounted, and with the guard to the

24       strap-type shoes, the coloring of the skin tone on the

25       exposed area would match the coloring of the lower leg of
```

1    the dolls?

2    A    There were some shoes that fit that description in

3    2001.

4    Q    Some Bratz dolls that were sold?

5    A    Yes, some shoes within -- there are two pairs -- two

6    pairs of shoes within every single doll pack, so of the two,

7    one may fit that description.

8    Q    I see.  One may not be that type of shoe where you'd

9    see the skin?

10   A    Correct.

11   Q    Because you might have a boot?

12   A    Correct.

13   Q    And you have a boot there?

14   A    Right here.

15   Q    Okay.  But with respect to that Bratz doll, for

16   example, Exhibit 17549, which was sold in 2001, with respect

17   to that doll, for example, all of these features we talked

18   about, which is the snapping of the gear, the foot onto the

19   leg, the matching of the skin color, and the strap-type

20   shoes, those were on that doll, 17549?

21   A    If just focusing on this character, it's represented in

22   one of her two shoes.

23   Q    Okay.  So is it true that the features we just talked

24   about are on that Bratz doll?

25   A    Correct.

CV 04-9049-DOC – 01/20/2011 – Day 5, Vol. 2 of 2

1    Q    Now -- and all the Bratz dolls that were released in

2    2001 had that nub on the ankle, right, where you could put

3    the shoe onto the doll?

4    A    Yes.

5    Q    Now, were you ever involved with a patent application

6    in 2003 concerning the Bratz dolls?

7    A    No.

8    Q    Now, in 2001, who within MGA was familiar with the

9    Bratz dolls that were released and those features that we

10   just described?  Who would have known about those features

11   being on the dolls?

12   A    There would be a number of people who were aware of

13   those features.

14   Q    Just give me the top four.

15   A    Myself, Isaac, Cecilia Kwok, Samuel Wong.

16   Q    Will Mr. Bryant have been aware of the features that

17   were on the dolls released in 2001?

18   A    Yes.

19   Q    And how would he have been aware?

20   A    He likely would have seen a production sample or

21   pre-production sample of a manufactured Bratz doll to see

22   our execution.

23   Q    Now, in 2001, was there really anyone in the company

24   more familiar with this product and features than you?

25   A    Well, I was quite familiar with this doll.  Our

1    Hong Kong offices were very aware of all the features as

2    well.

3    Q    So if we're talking about just the United States, if

4    you wanted to -- in 2001 or 2002, if you wanted to go to

5    someone who knew what the features were of these dolls

6    within the MGA and the United States, you probably would

7    have been the best choice?

8    A    Well, myself, Mercedeh Ward would be a good one to

9    start with, Eileen Store was quite involved.  There was a

10   number of us.

11   Q    But in 2001, you weren't -- strike that.

12        Have you ever been approached by anyone at MGA and

13   asked to sign a declaration with the patent office about the

14   features of the 2001 doll?

15   A    No, and do you mean the -- the engineering of how to

16   snap a shoe to the foot, that particular --

17   Q    No.  I just mean the features we just talked about.

18   A    Right, so the way to snap the shoe onto the leg?

19   Q    With skin tone or the fact that you can swap them out,

20   no one approached you to discuss what was in the 2001 Bratz

21   release?

22   A    No.  Do you mean from a -- like from a legal point of

23   view or a trademark point of view?

24   Q    No.  I mean, to say something to the patent office

25   about what features were on the doll such as the ones we

1    discussed.  No one ever approached you for that?

2    A    I don't recall that.

3    Q    Okay.  Now, let's look at a couple more of these dolls

4    and drawings.

5         If you look at 1107B -- do you have that in front of

6    you?

7    A    Yes.

8    Q    And is that a drawing that Carter Bryant did?

9    A    Yes.

10             MR. PRICE:  Move 1107B into evidence, your Honor.

11             THE COURT:  Received.

12             *(Plaintiffs' Exhibit No. 1107B is received in*

13        *evidence.)*

14   BY MR. PRICE:

15   Q    Okay.  1107B, can you tell us what character that is?

16   A    This is Jade.

17   Q    And now I'd like you to look at Exhibit -- I believe

18   it's 504.  I think we have the original up there.

19        So do you have 504 in front of you?

20   A    Yes, I do.

21             MR. PRICE:  Your Honor, may we move that into

22   evidence?

23             THE COURT:  Received.

24             *(Plaintiffs' Exhibit No. 504 is received in*

25        *evidence.)*

```
1    BY MR. PRICE:

2    Q    So on the right on the screen behind you, we have the

3    doll of Jade, and on the left, there is the -- Mr. Bryant's

4    fashion drawing, correct?

5    A    Yes.

6            THE COURT:  So on the right, it's 504; is that

7    correct?

8            MR. PRICE:  Yes.

9            THE COURT:  And on the left would be 1107B?

10           MR. PRICE:  Yes.

11           THE COURT:  Thank you.

12   BY MR. PRICE:

13   Q    And if you look at the drawing that has a cat as her

14   kind of -- on her T-shirt there; is that right?

15   A    Yes.

16   Q    I guess it says on her bag, "Perfect"?

17   A    Yes.

18   Q    And if we can look at page -- Exhibit 302, page 10 --

19   I'm sorry, yeah, 302.

20           Do you see that says "Meet Jade"?

21   A    Yes.

22   Q    And again, she can have different looks, so if you go

23   to 302-11, that is a drawing which was part of the pitch

24   book, the portfolio book, correct?

25   A    Yes.
```

```
 1              MR. PRICE:  And if we could show that in 1107B at
 2   the same time.
 3   BY MR. PRICE:
 4   Q    So the one on the left, 302-11, was in the original
 5   pitch book, and 1107B was one of the fashion drawings that
 6   Mr. Bryant did, correct?
 7   A    Yes.
 8   Q    And if you look at 302-11, you look at the shirt area.
 9   Her mascot or logo is a cat?
10   A    Yes.
11   Q    And if you look at the drawing 1107B, that's also a
12   cat?
13   A    Yes, it is.
14   Q    And if we -- by the way, there is a different name used
15   in the pitch book than Jade, correct?
16   A    Yes -- sorry.
17   Q    Is and the pitch book -- actually it's the same, sorry.
18   A    Yeah.
19   Q    I misspoke.
20        So in the 302 pitch book and the 1107B, and on the
21   doll, they share the same name of Jade?
22   A    (No audible response.)
23   Q    I know it's juggling, isn't it?
24   A    Sorry.  This and this, right?
25   Q    Right.
```

Case 2:04-cv-09049-DOC-RNB   Document 9710   Filed 01/27/11   Page 82 of 121   Page ID #:290489
CV 04-9049-DOC - 01/20/2011 - Day 5, Vol. 2 of 2

82

1    A    The pitch book and the production sample; is that

2    right?

3    Q    Yes, let's do that.

4         And if you look at that production sample -- and when

5    you say "production sample," you mean this is what was sold?

6    A    Correct, this -- this good here.

7    Q    And that -- does that have a -- is there some kind of

8    an insigne/logo, a cat?

9    A    Yes.

10   Q    Now, you don't have any reason to believe, do you, that

11   if you had just gone to Margaret Leahy without any design

12   drawings that she would have, on her own, come up -- come up

13   with this unique exciting look?

14             MR. MC CONVILLE:  Objection.  Vague.  Compound.

15             THE COURT:  Overruled.

16             THE WITNESS:  Do you mean in this final

17   manufactured good?

18   BY MR. PRICE:

19   Q    Either -- well, let's step back.

20        I think your testimony was the pitch book was -- the

21   characters, the drawings were unique and exciting and

22   amazing, correct?

23   A    Yes, they were.

24   Q    And I assume you think 1107B is unique and exciting and

25   amazing?

1    A    This pitch book drawing?

2    Q    Not the pitch book, but the final fashion.  It's on the

3    screen, I think, if everything is hooked up properly.  It's

4    1107B, the one on the right.

5    A    Okay.  Yes, but both have problems.  Both are not --

6    have problems, yeah.

7    Q    Problems but unique, amazing, exciting, correct?

8    A    Yes, with corrections.

9    Q    And then the doll, also unique, amazing, exciting?

10   A    Yes.

11   Q    So you don't have any reason to believe that if you go

12   to a sculptor, like Ms. Leahy, without giving her the

13   guidance of Carter Bryant's drawings that she would have

14   sculpted anything that looked like 504 or 1107B or page

15   302-10?

16            MR. MC CONVILLE:  Objection.  Vague.  Compound.

17            THE COURT:  Overruled.

18            THE WITNESS:  First of all, I need to separate the

19   documents because the pitch book --

20   BY MR. PRICE:

21   Q    I'll ask them separately, then.

22   A    Please.

23   Q    I'll ask them separately.

24        So without going -- without seeing -- let me step back.

25        Which drawing was it that Ms. Leahy saw in September or

CV 04-9049-DOC – 01/20/2011 – Day 5, Vol. 2 of 2

84

1  early October?

2  A    She saw –– she would have seen some contents of the

3  portfolio drawings, which –– and I'm not sure she saw all

4  characters, but the character on the left would have been

5  one piece of material of that material that she would have

6  referenced.

7  Q    Okay.  So without seeing those drawings by Mr. Bryant,

8  they are either pitch drawings or anything else, do you have

9  any reason to believe that Margaret Leahy, the sculptor,

10  would have come up with the doll that you see in

11  Exhibit 504?

12  A    First of all, just in the sculpting, there are big

13  differences between those two, so she arrived at a sculpt ––

14  she arrived at a sculpt by not matching what's in the

15  portfolio drawings, and I ––

16  Q    Excuse me.  I know you are telling us that the sculptor

17  had to make some changes.  My question is different.

18  A    Okay.

19  Q    Without seeing Carter Bryant's drawings, design,

20  concept, do you have any reason to believe that the

21  sculptor, Margaret Leahy, would have ever sculpted a doll

22  that would have looked like the Bratz final product?

23  A    While it may not have looked like the Bratz' final

24  product, it definitely would have been a concept that may

25  have had a disproportioned head and maybe even further

Case 2:04-cv-09049-DOC-RNB   Document 9710   Filed 01/27/11   Page 85 of 121   Page ID #:290492
CV 04-9049-DOC - 01/20/2011 - Day 5, Vol. 2 of 2

85

1    disproportioned length.  It was a cool trend that was

2    happening at that time.

3    Q    It had -- how many toy companies were there competing

4    in the market in 2000 -- in 2000?

5    A    I don't know exactly.

6    Q    How many fashion dolls were there on the market?

7    A    I don't remember.

8    Q    However many there were, none looked like Bratz, right?

9    A    Exactly.

10   Q    So -- but it's your testimony that without showing

11   Ms. Leahy Mr. Bryant's drawings and his concept, she would

12   have come up with a doll that looked like Bratz?

13   A    I'm saying that she absolutely could have.  It was a

14   really cool trend that was happening outside of fashion

15   dolls, which is exactly why we materialized them to put in

16   the fashion doll category.

17   Q    Well, had any sculptor come up, or sculptress, come up

18   with that prior to Ms. Leahy working with you and Mr. Bryant

19   on the Bratz product?

20   A    Prior to working on the Bratz product, there were, I

21   believe, disproportioned dolls that were in the toy market,

22   actually, as I think of it.  Like there were dolls -- I

23   don't know if they were fashion dolls, but there were dolls

24   that had big heads and big feet.

25   Q    But this doll, this concept of Mr. Bryant's designs are

1   more than just big heads and big feet, aren't they?

2   A    Sure.

3   Q    Okay.

4   A    I thought you were talking about the sculpt, so --

5   Q    You are telling us that the look was unique, right?

6   A    The look was unique, the branding was unique, there

7   were a lot of things about the brand that were unique.

8   Q    I'm talking about just what you saw from Mr. Bryant the

9   first time, it was amazing and unique, correct?

10  A    Yes.

11  Q    It's part of what you gave to Ms. Leahy, correct?

12  A    Yes, among other things.

13  Q    So my question is-- let me step back.

14       No one in the world had ever come up with that unique

15  look before, right?

16  A    Certainly within the world, there were dolls that were

17  created with a big head and big feet.  It was unique in the

18  combination of multi-ethnic and the snap-on shoes, and there

19  were a lot of things that made it -- in combination, made it

20  unique.

21  Q    I'm talking about the combination, then.

22  A    Okay.

23  Q    Because the way you use "unique," you mean none like

24  it, right?

25  A    Yeah.

1   Q    Okay.  So do you have any reason to believe that a

2   sculptor who just went and said, "Sculpt something that's

3   hip, young, multi-ethnic, they are friends," I mean, you

4   really think Margaret Leahy would have come up with Bratz

5   with that?

6   A    I believe that she would have come up with a

7   stylized-looking fashion doll.  There's a lot of graphics.

8   Paris Blues were doing things.  Steve Madden were doing

9   things.  There were a lot of disproportioned trend, art,

10  that was happening at that time.

11  Q    I'm talking about something that was unique, like what

12  you saw from Carter Bryant's designs that you said was

13  unique.  Do you have any reason to think that she would have

14  come up with that?

15  A    I think that she would come -- I mean, if we are just

16  isolating the sculpt itself, Mr. Price, I believe that she

17  would have come up with a stylized, disproportioned fashion

18  doll.  I believe that could have been very possible without

19  Carter Bryant's drawings.

20  Q    Okay.  So you were interested in this kind of fashion

21  doll for months, correct?  Since April of 2000, right?

22  A    Uh-huh.

23  Q    Is that a "yes?"

24  A    Yes, sorry.

25  Q    Since before April 2000?

Case 2:04-cv-09049-DOC-RNB   Document 9710   Filed 01/27/11   Page 88 of 121   Page ID #:290495
CV 04-9049-DOC - 01/20/2011 - Day 5, Vol. 2 of 2

88

1    A    Before April 2000, I recognize that there was a

2    potential, but I hadn't formed a particular idea for a

3    fashion doll then.

4    Q    Okay.  So between April 2000 and the time you met

5    Carter Bryant, why didn't you go to a sculptor and say,

6    "Make me something with big heads, large feet, looks unique,

7    multi-ethnic, snap-on shoes"?

8    A    As mentioned earlier, when I came to MGA, I was tasked

9    with projects that were given to me.  I believe there's a My

10   Dream Baby, a Hoppity Bouncy Baby, Prayer Angel dolls.  I

11   came to receive those projects, and there were a lot still

12   to do.  I went to Hong Kong.  I had to make sure it went to

13   production, that things were working.

14        I remember, specifically, My Dream Baby was a highly

15   complicated mechanical doll, so I knew there was an

16   opportunity in the marketplace, but I didn't have the time

17   to go and explore that when I first started working at MGA.

18   I didn't have time.

19   Q    So is it, then, just a coincidence that the first time

20   you got involved in this was after Carter Bryant came to you

21   and showed you his designs?

22   A    No.  Actually, it was the conversation I had with

23   Veronica Marlow where I had articulated sometime in August

24   that, "Wow, when I have a second, I would really love to do

25   a really cool fashion doll for older girls."

1    Q     So -- but you didn't go to any sculptor or anything

2    until after you met Carter Bryant?

3    A     That's right.  I didn't have time.

4    Q     You said Ms. Leahy would have come up with a

5    disproportionate head, eyes, snap-on shoes -- what made you

6    think she'd come up with snap-on shoes?

7    A     I didn't identify necessarily snap-on shoes, and also

8    snap-on shoes is not necessarily an ownable concept at that

9    time, and -- but what I had mentioned was that Veronica

10   Marlow, excuse me, and Margaret Leahy would have sculpted a

11   disproportioned, stylized doll.

12   Q     And by the way, you knew there were some pretty ugly

13   disproportioned stylized dolls out there, right?

14   A     Yes.

15   Q     You didn't want a product that looked like those?

16   A     No.

17   Q     And you, by the way, are aware that MGA, appropriately,

18   you know, tries to protect its copyrighted material, right?

19   A     Yes.

20   Q     I mean, toy companies try to prevent other companies

21   from copying them, right?

22   A     Yes.

23   Q     So for example, you are aware that MGA has brought

24   lawsuits against other toy manufactures where it has said,

25   "You are copying Bratz," right?

1    A    I --

2         MR. MC CONVILLE:  Your Honor, I interpose an

3    objection at this point.  We discussed this topic last night

4    about the relevance of this testimony.

5         THE COURT:  Sustained.

6    BY MR. PRICE:

7    Q    Well, let me ask about your understanding, then, a

8    slightly different topic.

9         MGA, I guess, has -- since you've been there, had some

10   designers come and some designers go?

11   A    Yes.

12   Q    And a designer's job is to design, right?

13   A    Yes.

14   Q    And you hate to see good designers go, right?

15   A    Sure.

16   Q    Have you had good designers leave?

17   A    I'm trying to remember designers who --

18   Q    Well, I don't want you to comment on this.  I'll

19   withdraw.

20   A    Sorry.

21   Q    Okay.  So if a designer leaves MGA and goes to work

22   with a competitor, your expectation would be that they would

23   try to come up with designs, right?

24   A    Sure.

25   Q    And as far as you understand with your opinion in the

CV 04-9049-DOC - 01/20/2011 - Day 5, Vol. 2 of 2

91

```
 1    industry, if a designer leaves MGA who comes up with a

 2    dynamite design at another company, there is nothing wrong

 3    with that, right?

 4    A    Yes.

 5    Q    So if you heard that a former designer of yours was at

 6    another company and had come up with this great design that

 7    was just tearing the market apart, it wouldn't make you

 8    suspicious about anything, would it?

 9    A    No.

10    Q    Because designers are suppose to do that, right?

11    A    Yes.

12    Q    I mean, you wouldn't start being suspicious unless you

13    learned that designer who left your company was working with

14    your company at the same time he was providing designs to

15    the new company, right?

16              MR. MC CONVILLE:  Objection.  Relevance.

17              THE COURT:  Overruled.

18              THE WITNESS:  Can you repeat the question?  I'm

19    sorry.

20    BY MR. PRICE:

21    Q    Sure.  I'll back up.

22         A designer leaves your company, goes to a competitive

23    company, designs a great product, it would not cause you to

24    suspect that there had been any wrongdoing, right?

25    A    Correct.
```

1    Q    Because he's supposed to come up with great designs,

2    right?

3    A    Right.

4    Q    But if you learned that that person who left MGA had

5    been working for this competitive company at the same time

6    he was working for MGA, that would, perhaps, cause you to

7    have some suspicion?

8    A    That he had come up with a concept while he was working

9    at MGA or he was -- I'm sorry.  I'm getting tired.

10   Q    Let's take baby steps, and I apologize.  It's a tough

11   job that you're doing.

12        If you learned that an employee of MGA --

13   A    Yes.

14   Q    -- had left MGA, and then you learned he designed the

15   hottest thing on the market with this new company, no

16   suspicion thus far, right?

17   A    No.

18   Q    Is that right?

19   A    That's right.

20   Q    But then you learn, "He was working with that new

21   company while he was still working for us," let's add that

22   into the mix, okay?

23   A    Okay.

24   Q    Would that cause you to have suspicion?

25   A    It depends, I guess.

1    Q     So -- so even if you learned -- and by the way, I

2    forgot, your current position at MGA is what?

3    A     Vice president of product design and development.

4    Q     And how important is that to the company?

5    A     I hope, very.

6    Q     I mean, you are a well-respected, highly regarded

7    executive?

8    A     I hope so.

9    Q     So the next step, then, you said it depends.  So even

10   if you, as a highly ranked executive at MGA, learned that an

11   MGA designer had gone to another company, that he designed

12   this great product, and then you learned there was an

13   overlap where he was working for this new company while

14   still working for MGA, even all of that wouldn't necessarily

15   make you suspicious or make you think you should

16   investigate?

17   A     Sure, it would make me be interested in investigating.

18   I guess it would have to depend on what was going on, like

19   in -- go on.  I apologize.

20   Q     I just want to make sure, because I have this.

21         So at that point, would you investigate or not?

22   A     Yeah.  I mean, I wouldn't necessarily verify.

23   Q     You would have someone do it for you?

24   A     Maybe, yeah.

25   Q     So why is it that you wouldn't feel suspicious or you

```
 1    wouldn't think you should investigate if all you knew was
 2    that one of your best designers had gone to another company
 3    and had come up with a terrific design that was doing really
 4    well against yours, why wouldn't that, alone, make you
 5    suspicious and make you think you need to investigate?
 6    A    He left my company, and then he went to another
 7    company, and then when starting that company, he created a
 8    new doll?
 9    Q    Yes.
10    A    I don't know.  I guess that wouldn't cause me -- I
11    believe that happens all the time, so I wouldn't -- I
12    wouldn't have suspicion or --
13    Q    Okay.  So if someone came to you at MGA and said, "Hey,
14    we just figured out or we think that this designer who was
15    with us, that he's the one that created this design that's
16    really doing well," if someone said that to you, your
17    response would be, "It happens all the time" --
18    A    Yeah.
19    Q    -- right?
20    A    Yeah.
21    Q    No reason to be suspicious, right?
22    A    Right.
23    Q    Now, do you recall earlier I was talking to about
24    Exhibit 1103, which is in evidence?
25    A    Yes.
```

CV 04-9049-DOC – 01/20/2011 – Day 5, Vol. 2 of 2

95

1   Q     And I believe you said that you weren't sure whether or

2   not you had created that or somebody else?

3   A     Yes.

4   Q     And let's see if this helps you out.

5         Would you look at exhibit -- I believe it's 924.  The

6   first time -- do you recognize that to be one of your

7   e-mails?

8   A     Yes, I do.

9              MR. PRICE:  Your Honor, I move Exhibit 924 into

10  evidence.

11             THE COURT:  Received.  Is it of October 16th,

12  2000?

13             MR. PRICE:  Yes, your Honor.

14             THE COURT:  Received.  Thank you.

15             (Plaintiffs' Exhibit No. 924 is received in

16        evidence.)

17             MR. PRICE:  You can just blow up the first part of

18  that.

19  BY MR. PRICE:

20  Q     Do you see that it's from you to Cecilia Kwok and

21  Samuel Wong and Frankie Tsang?

22  A     Yes.

23  Q     And they are a subset of those folks who were in

24  Hong Kong?

25  A     Yes.

CV 04-9049-DOC - 01/20/2011 - Day 5, Vol. 2 of 2

96

1    Q    And do you see the date of October 16?

2    A    Yes.

3    Q    And it says, "I apologize that I wasn't able to release

4    the attached information on Friday.  These are the PDFs for

5    Bratz"; do you see that?

6    A    Yes.

7    Q    So can you tell us whether or not that is referring to

8    Exhibit 1103?

9    A    I don't believe that those are related.

10   Q    Do you see on Exhibit 924, and the next paragraph,

11   which is Mercedeh -- is it "Mercadah"?

12   A    I pronounce it "Merce-deh."

13   Q    Oh, probably.  Okay.  Mercedeh, Judy and Cecilia said,

14   "These are working schedules that I put together for each of

15   the above"; do you see that?

16   A    Yes.

17   Q    And so does that -- well, what would that have been?

18   What would the "working schedules" have been?

19   A    I believe in now seeing this document, Mr. Price, I

20   believe that's this document here, the 1103.

21   Q    Okay.  So looking at that, do you now believe that you

22   are the one who created Exhibit 1103?

23   A    Yes.

24   Q    Let me ask you something else about the toy industry

25   and your experience.

1        It's correct that the designers you work with get

2   inspiration from various places, correct?

3   A    Yes.

4   Q    I mean, it's your understanding, for example, that

5   there would be nothing wrong with someone being inspired to

6   do a doll because they saw the Bratz doll, right?

7   A    Would that be wrong?  I'm sorry.  Could you please

8   repeat the question.

9   Q    Sure.

10       In your opinion --

11  A    Uh-huh.

12  Q    -- as an executive MBA -- MBGA, there is nothing

13  necessarily wrong with someone seeing a Bratz doll and being

14  inspired to do something?

15  A    No.  I believe that happens.

16  Q    Now, to your understanding, you can't copy it, right?

17  A    Correct.

18  Q    I mean, it's not supposed to look too much like a Bratz

19  doll, right?

20  A    Right.

21  Q    But designers get their inspiration from competitive

22  products, from magazines, from TV, right?

23  A    For sure magazines, TV, music.  Sure.

24  Q    So let me ask you this, and remember when I was talking

25  to you about that designer who leaves MGA for what he/she

1    hopes for greener pastures?

2    A    Yes.

3    Q    Okay.  So if that person leaves MGA and comes up with

4    this dynamite doll, would you look at it and say, "You know,

5    there's some similar features of Bratz, seemed to be

6    inspired by Bratz, but I don't think it's a copy of Bratz"?

7    Would you think there is anything wrong with that?

8    A    I don't know, especially -- I don't know if you are

9    asking me from a legal point of view, but "inspire" is a

10   careful word for me.

11   Q    Okay, and I understand.  I'm not going to ask you for

12   your legal opinion.  But have you see dolls in the

13   marketplace that were inspired by Bratz?

14   A    Yes.

15   Q    Have you seen some that were inspired by Bratz but

16   didn't look close enough for you to think it's a knockoff or

17   anything like that?

18   A    I believe that -- the dolls I remember feeling were

19   inspired from Bratz, I felt that they were close, too close.

20   Q    Okay.  You mentioned earlier that there were lots of

21   dolls out there that had big eyes and big feet,

22   disproportionate, correct?

23   A    Sure.

24   Q    And you can be inspired by that and not create

25   something that really looked like those dolls, right?

CV 04-9049-DOC – 01/20/2011 – Day 5, Vol. 2 of 2

99

1    A    Right.

2    Q    So I guess what I'm asking you is if you thought that

3    someone had left MGA, a designer, and they came up with this

4    great idea, which, you know, seemed to have been inspired by

5    stuff by MGA but you didn't think was too close, you know,

6    you just felt like maybe it was Betty Boop or --

7              UNIDENTIFIED SPEAKER:  Sailor Moon.

8    BY MR. PRICE:

9    Q    -- Sailor Moon, or something like that, I mean, you

10   wouldn't think that there would be anything wrong with that,

11   a designer getting an inspiration from what you guys are

12   doing as long as it wasn't a knockoff or too close, right?

13   A    Right.  I mean, you know, it's -- I guess it's personal

14   judgment on whether something is too close or not, so I

15   think I would have to be given an example to confirm.

16   Q    Okay.  Well -- and I understand that, but it's a

17   personal judgment, so I'm saying your personal judgment --

18   A    Okay.

19   Q    -- is it looks like it's inspired by Jade or Cloe, but

20   it's not a knockoff, it's not that close, if that's your

21   personal judgment, then you would think that's what happens

22   in the toy business, people get inspired, right?

23   A    If you were to be so specific enough as to identify

24   character names, that, to me, suggests that there are

25   qualities about the inspired design that might be too close.

1    Q    Okay.  My mistake.  I didn't mean to use a name.

2         If you saw something in the marketplace from a former

3    designer which seemed to be inspired by some of your

4    products, but in your subjective view wasn't a knockoff or

5    that close and didn't have one of the names, I mean, you

6    would think that's the kind of thing that happens in toy

7    industry, people get inspired, they create things, right?

8    A    Again, Mr. Price, it's difficult to answer.  I guess I

9    need examples or comparisons.

10   Q    Okay.  Let me do it this way.

11   A    Okay.

12   Q    You thought Carter Bryant was inspired from what he saw

13   in the world, right?

14   A    Yes.

15   Q    Your understanding is that he was inspired by, in part,

16   by some ads in magazines?

17   A    Yes.

18   Q    Okay.  But you don't believe that he did anything wrong

19   by being inspired by that, including Bratz?

20   A    Right, especially since those are 2D ads for 2D

21   graphics.

22   Q    But -- I'll get to that.

23        So you believe that if Mr. Bryant had seen a

24   three-dimensional version of, say, the Steve Madden ad, he

25   couldn't be inspired to do Bratz?

Case 2:04-cv-09049-DOC-RNB   Document 9710   Filed 01/27/11   Page 101 of 121   Page ID #:290508
CV 04-9049-DOC - 01/20/2011 - Day 5, Vol. 2 of 2

101

1   A    No, that's not what I'm saying at all.

2   Q    Okay.  Just --

3   A    Okay.

4   Q    Now, I'm going to go through the development in

5   October --

6   A    Okay.

7   Q    -- but first I want to ask you, when was the first toy

8   fair at which MGA showed Bratz?

9   A    I believe the first toy fair was the Hong Kong toy

10  fair.

11  Q    And I'd like you to look, if you could, at Exhibit 911.

12       And could you tell us what that is?

13  A    It seems like this is an e-mail from Sarah Chui to --

14  to myself, Victoria, among others.  Subject is "Hong Kong

15  showroom setup."

16       MR. PRICE:  Your Honor, we would like to move

17  Exhibit 911 into evidence.

18       MR. MC CONVILLE:  Just foundation on the

19  attachment, your Honor.

20       THE COURT:  More foundation, Counsel.

21       MR. PRICE:  Sure.

22  BY MR. PRICE:

23  Q    Who is Sarah Chui?

24  A    She was an MGA Hong Kong team member.

25  Q    Is that who she was on January 8, 2001?

Case 2:04-cv-09049-DOC-RNB   Document 9710   Filed 01/27/11   Page 102 of 121   Page ID #:290509
CV 04-9049-DOC - 01/20/2011 - Day 5, Vol. 2 of 2

102

1    A    Yes.

2    Q    And what is it that she's attaching?

3    A    She is attaching photos of the Hong Kong toy fair

4    showroom.

5    Q    So it's an MGA person e-mailing to you photographs of

6    the MGA showroom and the Hong Kong toy fair?

7    A    That's correct.

8            THE COURT:  Well, is this e-mail to you?  Are you

9    on that string?

10            THE WITNESS:  Yes, sir.

11            THE COURT:  It's received.

12            MR. PRICE:  Thank you.

13            *(Plaintiffs' Exhibit No. 911 is received in*

14        *evidence.)*

15    BY MR. PRICE:

16    Q    Did you go to the toy fair?

17    A    No, I did not.

18    Q    So it was your understanding that she was sending you

19    this so you'd see what the presentation looked like?

20    A    Yes.

21    Q    And let's go to the next page, Exhibit 911-002; do you

22    see that?

23    A    Yes, I do.

24    Q    Now, this shows part of the room, correct?

25    A    Correct.

1   Q    And on that table -- let me ask you, what's on that

2   table there?

3   A    It looks like they are prototype mockups, rough mockups

4   of the Bratz dolls.  It's really hard to see.

5   Q    Well, is that what -- here, let's look at 911-004,

6   which looks like a closer picture of that table.  And

7   911-004, do you recognize that as being a photograph of the

8   prototype Bratz doll?

9   A    Yes, I believe so.

10  Q    So for example, we haven't blown up the one on the far

11  right.

12  A    Yes.

13  Q    It looks like a prototype of Exhibit 12286, Cloe?

14  A    Yes.

15  Q    And I think you may have Jade up there with you?

16  A    I don't.

17  Q    So you have Jade in front of you?

18  A    Yes.

19  Q    And the one second from the right looks like a

20  prototype of Jade?

21  A    Yes.

22          THE COURT:  And once again, the number on Jade?

23          MR. PRICE:  I had that.  Let me get it.

24          THE COURT:  Is that 1107B?

25          MR. PRICE:  I think that's the drawing.

```
 1              Ms. Juarez, can you tell us --

 2              MS. JUAREZ:  17551.

 3              THE COURT:  17551?

 4              MS. JUAREZ:  Yes.

 5              MR. MC CONVILLE:  Is that one in evidence?

 6              MR. PRICE:  Let me look at my list and see.

 7              THE COURT:  We went over that last night, Counsel.

 8              (Attorney discussion held off the record.)

 9              MR. PRICE:  So we are consistent, I think it's

10   Exhibit 504.

11   BY MR. PRICE:

12   Q    Do you have that up there?

13   A    I don't have 504 up here.

14   Q    We had it before.

15        Well, let's just go on, then.  I thought we had that

16   marked.

17              THE COURT:  I think 17551 is the same as 504, and

18   we're going to try not to have duplicate exhibits, so we'll

19   get that assorted out tonight.

20   BY MR. PRICE:

21   Q    So Ms. Garcia, so looking at that, it looks like, in

22   the photograph 911-004, that there is a prototype of that,

23   of the Jade doll?

24   A    Yes.

25   Q    And the others are pretty dark and hard to see?
```

Case 2:04-cv-09049-DOC-RNB   Document 9710   Filed 01/27/11   Page 105 of 121   Page ID #:290512
CV 04-9049-DOC - 01/20/2011 - Day 5, Vol. 2 of 2

105

1    A    I just want to represent that these are prototypes.

2    They are not necessarily exact replicas of what we went to

3    production with.

4    Q    When you go to production, you might have to make some

5    changes from the prototype, right?

6    A    (No audible response.)

7    Q    That happens all the time?

8    A    No.  I'm just not even sure what these dolls represent

9    in terms of the final detailing.  It's really difficult for

10   me to see the images.  It's real my blurry.  So when I say

11   "prototype," I mean to say it's possible that it's not

12   represented by the final sculpt or, you know, that kind of

13   thing.  There may be wigs, hair styles that may have

14   changed, that kind of thing.

15   Q    That's why I asked you to look at the first from the

16   right and the second from the right and then look at the

17   doll -- the dolls.  You can see they are similar, right?

18   A    Sure, they are.  I mean, they are similar for sure, but

19   the image is so grainy that I just can't be sure that --

20   "prototype" is also, in my design world, quite a loose word,

21   and I just want to make sure I represent that I can't tell

22   to what degree or to what development these prototypes are.

23   Q    And what was the purpose of showing these?

24   A    The purpose was to sell them, to show them to buyers.

25   Q    And -- and get orders?

Case 2:04-cv-09049-DOC-RNB   Document 9710   Filed 01/27/11   Page 106 of 121   Page ID #:290513
CV 04-9049-DOC - 01/20/2011 - Day 5, Vol. 2 of 2

106

1   A    Sure.

2   Q    Now, if we look at, say, 911-002, which is a further

3   away view.

4        Maybe we can still blow it up.

5        Do you see there are also displayed these large

6   two-dimensional drawings of the Bratz dolls, correct?

7   A    Yes.

8   Q    And on 911-002, for example, you have Cloe with the

9   angel.  It's on the left; do you see that?

10  A    Yes, I do.

11  Q    And this picture, you have Yasmin and Sasha, correct?

12  A    Yes.

13  Q    And incidentally, Sasha, if I could have you look at

14  1108B.

15       And you recognize that as a fashion drawing by

16  Mr. Bryant?

17  A    Yes, I do.

18           MR. PRICE:  And your Honor, we move that into

19  evidence.

20           THE COURT:  Received.

21           *(Plaintiffs' Exhibit No. 1108B is received in*

22       *evidence.)*

23  BY MR. PRICE:

24  Q    So that's Sasha, right?

25  A    Yes.

1    Q    Okay.  And let me go to 911-002, what you were showing

2    to the folks at Hong Kong.

3        If you blow that up, you can see the far right, there's

4    that picture of Sasha, right?

5    A    Yes.

6    Q    Now -- so at the toy fair, where you're trying to sell

7    these dolls, you put up not just a doll but these big

8    drawings, right?

9    A    Yep.

10   Q    And these drawings had mascots or these little logos,

11   which, in some, ways are the same as Mr. Bryant's.

12   A    Do you mean the icons in his portfolio?

13   Q    That's a better way of putting it, icons in his

14   portfolio.

15   A    Yes.

16   Q    Now, let me ask you about some of these drawings, and

17   I'd like you to look at Exhibit 1763.  And I believe that's

18   already in evidence.  And this is on October 17th where

19   you're saying, "I need to have the seamstresses and the

20   pattern makers ready by October 30th to be committed,"

21   right?

22   A    Yes.

23   Q    And they were going to be committed to creating

24   something, the seamstresses, the pattern makers were going

25   to be creating fashions, right?

Case 2:04-cv-09049-DOC-RNB   Document 9710   Filed 01/27/11   Page 108 of 121   Page ID #:290515
CV 04-9049-DOC - 01/20/2011 - Day 5, Vol. 2 of 2

108

1    A    Yes.

2    Q    And you needed fashion drawings for that?

3    A    Yes.

4    Q    So you'd need these fashion drawings prior to

5    October 30th, right?

6    A    Yes.

7    Q    And now let's go to Exhibit 1236.

8         And is that an e-mail from Mr. Larian to you, which

9    attaches an e-mail from you to Ms. Kwok?

10   A    Yes.

11             MR. PRICE:  Your Honor, I move 1236 into evidence.

12             THE COURT:  Received.

13             *(Plaintiffs' Exhibit No. 1236 is received in*

14        *evidence.)*

15   BY MR. PRICE:

16   Q    And if we'd look at your e-mail dated October 24, 2000;

17   do you see that?

18   A    Yes.

19   Q    And you sent this to Ms. Kwok, right?

20   A    Yes.

21   Q    And tell us who she is?

22   A    Cecilia Kwok was a development designer, Hong Kong

23   counterpart.

24   Q    Okay.  And you wanted Hong Kong to be involved in

25   putting the doll together?

```
 1    A     May I have a moment to read the e-mail, please?

 2    Q     Of course.

 3              THE COURT:  Okay.  Counsel, your question.

 4    BY MR. PRICE:

 5    Q     Have you had a chance to read it, ma'am?

 6    A     Yes.

 7              MR. PRICE:  Your Honor, I forgot.  Can I move this

 8    into evidence?

 9              THE COURT:  Received.

10              (Previously received.)

11    BY MR. PRICE:

12    Q     So the e-mail that you wrote also copied a number of

13    people, correct?

14    A     Yes.

15    Q     And one of the people it copied was Isaac Larian?

16    A     Yes.

17    Q     Because you wanted to keep him in the loop as to what

18    was happening with this Bratz project?

19    A     Yes.

20    Q     In fact, you had a retailer meeting coming up around

21    November 7th of 2000, right?

22    A     Yes.

23    Q     And you wanted something to show them on November 7th,

24    right?

25    A     That's right.
```

Case 2:04-cv-09049-DOC-RNB   Document 9710   Filed 01/27/11   Page 110 of 121   Page ID #:290517
CV 04-9049-DOC – 01/20/2011 – Day 5, Vol. 2 of 2

110

1   Q    And one of the things you wanted to show them were

2   pictures of fashions?

3   A    Yes.

4   Q    So -- and at that meeting, they were shown

5   Exhibit 1107B, right?

6        We'll put that drawing up.

7   A    Yes.

8   Q    And they were shown 1108B, correct?

9   A    Yes.

10  Q    And they were shown 1109B?

11  A    Yes.

12  Q    And 1110B, right?

13  A    Yes.

14  Q    So there had to be this work done to be prepared to

15  show the retailers these fashions, correct?

16  A    Yes.

17  Q    And 1107B, 1108B, 1109B, 1110B were drawn by Carter

18  Bryant?

19  A    Yes.

20  Q    So let's go to your October 24 e-mail, now that you've

21  had a chance to read it.

22       And as of October 24th, the second part of your e-mail

23  that begins with "L.A. will need component cost

24  breakdowns" --

25  A    Yes.

1    Q    It says, "We will need component cost breakdowns,

2    packaging, number, paint ops, yields of fabric, grams of

3    hair, et cetera, for every price point against our final

4    designs"; do you see that?

5    A    Yes.

6    Q    Now, at this retail meeting, were you planning on

7    showing them actual fabrics and accessories and clothes

8    based on the fashion drawings?

9    A    No.

10   Q    And by the way, 1107B and 1108B and 1109B and 1110B,

11   those were all final fashion drawings?

12   A    Yes, they were quite complete for the first outfit of

13   the two.

14   Q    And as of October 24, 2000, you write, "We have

15   finalized the fashion designs, and I'm enclosing the

16   following final design packages to you on our Friday"; do

17   you see that?

18   A    Yes, I do.

19   Q    So as of October 24th, at least, 2000, you had these

20   final fashion designs, 1107B through 1110B?

21   A    The exhibits that you just referenced are only one of

22   the two outfits sold within the manufactured Bratz dolls.

23   So I don't know if by October 24th that I had completed both

24   fashions for what became the manufactured Bratz dolls.  I am

25   not even sure if we swatch released these designs, so I'm

Case 2:04-cv-09049-DOC-RNB   Document 9710   Filed 01/27/11   Page 112 of 121   Page ID #:290519
CV 04-9049-DOC - 01/20/2011 - Day 5, Vol. 2 of 2

112

1    not sure what I sent to her.

2    Q    Exhibits 1107B to 1110B are final fashion drawings,

3    correct?  You told us that?

4    A    Yes.

5    Q    They may not be the only final fashion drawings.  There

6    may be others that were drawn by Carter Bryant, right?

7    A    Eventually, yep.

8    Q    So I'm just talking, then, about the ones that were

9    final fashion drawings that you presented to your retailers.

10   A    Okay.

11   Q    And on October 24, you said, "We had finalized the

12   fashion designs, and I'm releasing the following final

13   design packages to you"; do you see that?

14   A    Yes.

15   Q    Okay.  Now you are saying later, there might have been

16   more, correct?

17   A    Yes.

18   Q    Okay.  Well, let's talk about not later, but as of

19   October 24.

20   A    Okay.

21   Q    So as of October 24, you had 1107, 1108, 1109 and

22   1110Bs?

23   A    I don't know if I had these particular drawings by

24   October 24th of 2000.

25   Q    Well, by October 24, 2000, you did have some finalized

1   fashion designs that were drawn by Mr. Bryant?

2   A    Correct.

3   Q    And you don't know -- whatever -- whatever those words

4   were, because you are not sure, they were done prior to

5   October 24, 2000, right?

6   A    (No audible response.)

7   Q    The ones you are referring to in your e-mail here?

8   A    In the ones that I was referring to in my e-mail, yes.

9   And I just want to represent that the final designs weren't

10  final by October 24.  There was actually, and ultimately,

11  changes, revisions that were happening after October 24th.

12  Maybe that's what I believed at the time were final designs

13  on October 24th.

14  Q    My guess is that prior to doing the prototypes and

15  production, you keep making changes here and there, right;

16  not unusual?

17  A    Sure.

18  Q    But as of October 24, you had what you thought were

19  finalized fashion designs by Mr. Bryant, right?

20  A    Yeah, and at the time of writing this e-mail --

21  Q    I'm just asking you if that's correct.

22  A    The final -- I can tell you what's correct.  The final

23  fashion designs for Bratz happened after October 24th, 2000,

24  all of them, and they are complete, both outfits and all

25  revisions, all fabrication worked out, definitely.

1    Q    But it's true that as of October 24, 2000, you send the

2    e-mail to Hong Kong and to your CEO, Mr. Larian, informing

3    them and him that you had finalized fashion designs that you

4    were releasing to Hong Kong, correct?

5    A    Correct.  At that time, I'm sure that's what I probably

6    thought and -- go on.  I apologize.

7    Q    And you actually released them to Hong Kong, correct?

8    A    I don't know.  It says that I was planning to send them

9    on Friday, but I don't know if I ultimately -- I don't know

10   if I ultimately sent them.

11   Q    It's correct that those drawings we showed you, 1107B,

12   11078B, 1109B and 1110B, they were fashions that were used

13   on the Bratz dolls when they were released, correct?

14   A    Yes.

15   Q    Now, I'd like you to look at -- excuse me --

16   Exhibit 323.

17            THE COURT:  323?

18            MR. PRICE:  Yes, your Honor, 323.

19            THE COURT:  Okay.  Is that dash 0004?

20            MR. PRICE:  No, your Honor.  I think that's

21   definitely the wrong number.  Let me check.

22            THE COURT:  All right.

23            *(Attorney discussion held off the record.)*

24            MR. PRICE:  Actually that is what we are looking

25   at, 323.

1    BY MR. PRICE:

2    Q    And specifically, if you look at 323, there are numbers

3    at the bottom?

4    A    Yes.

5    Q    And there is a number SL44?

6    A    Yes, yes.

7    Q    And you've seen that before, right?

8    A    Yes, I have.

9    Q    And you've seen this compilation before?

10            MR. MC CONVILLE:  Objection.  Vague as to time.

11            THE COURT:  Sustained.

12   BY MR. PRICE:

13   Q    At some point did you see this compilation?

14   A    I don't recall this compilation.

15   Q    Okay.  But you do recall seeing sometime in September,

16   October of 2000, page SL00044?

17            MR. MC CONVILLE:  I'm sorry, can I get the date

18   again?

19            THE COURT:  Sometime in September, October of

20   2000.

21            THE WITNESS:  I don't know when I got this

22   document.

23   BY MR. PRICE:

24   Q    Do you have any estimate of when you got the document?

25   A    I know that it wasn't in September.  I don't believe it

1    was in September.  It could have been November or late

2    October, mid-October.  I don't recall.

3    Q    Sometime in the fall of 2000?

4    A    Yes.

5         MR. PRICE:  Your Honor, I move Exhibit 323, page

6    SL00044, into evidence.

7         THE COURT:  Received.

8         *(Plaintiffs' Exhibit No. 323, SL00044, is*

9    *received in evidence.)*

10   BY MR. PRICE:

11   Q    Is this drawing a proportional drawing that Mr. Bryant

12   created?

13   A    Yes, it is.

14   Q    And you see there is "top of head" at the top; do you

15   see that?

16   A    Yes, I do.

17   Q    There is "rooting line," "separation line"; do you see

18   that?

19   A    Yes, I do.

20   Q    It shows a body with -- it says "actual proportion."

21   A    I see a body and I see a reference that says "actual

22   proportion."

23   Q    And is it correct that you know that this drawing was

24   created at some point between October 4th, 2000, and before

25   October 20, 2000, correct?

1           MR. MC CONVILLE:  Objection.  Asked and answered.

2           THE COURT:  Overruled.

3           THE WITNESS:  I don't know when I got this

4    document.

5    BY MR. PRICE:

6    Q    Okay.  Let me see if we can refresh your memory.

7         If we can place before Ms. Garcia, and show to his

8    Honor, Volume 2, page 589, 25, to 592, line 7.

9           MR. MC CONVILLE:  Which one was that?

10          MR. PRICE:  It's 589, line 25, to 592, line 7.

11          (Interruption in the proceedings.)

12   BY MR. PRICE:

13   Q    And specifically, Ms. Garcia, if you can focus on 591,

14   line 19, to 592, line 1, that might help.

15   A    I'm sorry.  Page 591, line 19; is that it?

16   Q    Pardon?

17   A    Page 591, line 19.

18   Q    Let me focus you on a specific -- so you don't have to

19   read the whole thing, but please feel free to.

20        591, line 19, to 592, line 2; 592, line 2.

21   A    Okay.

22   Q    Okay.  Does it refresh your recollection that

23   Exhibit 323, page SL00044, was created at some point between

24   October 4th, 2000, after -- between October 4th, 2000, and

25   before October 19th, 2000?

1    A    Yes.

2    Q    And this was a drawing that was provided to Margaret

3    Leahy, sculptor, at some point, correct?

4    A    I don't believe -- I'm sure that Margaret Leahy may

5    have received a copy of this.  It wasn't drawn for her

6    purposes.

7    Q    My question was, was this a drawing that was provided

8    to Margaret Leahy at some point?

9    A    I don't -- I don't know.

10   Q    So let's look at 592 again, and just look at 592, lines

11   5 through 7.

12        Does that refresh your memory about that?

13   A    Yes.

14   Q    So let me ask it again.  Was this a drawing that was

15   provided to Margaret Leahy at some point?

16   A    If I may clarify, this drawing --

17   Q    No.  I just want to know, was this drawing -- is this a

18   drawing that's provided to Margaret Leahy at some point?

19   A    Yes.

20   Q    And that would have been sometime between October 4,

21   2000, and October 19, 2000?

22   A    Yes.  I'm not sure Ms. Leahy referenced it.

23            MR. PRICE:  Your Honor, could I request that we

24   end at this time?

25            THE COURT:  Is this a convenient time?

1          MR. PRICE:  A wonderful time.

2          THE COURT:  It's a wonderful time, then.

3          We'll see you next Tuesday at 8:30.  What day?

4          THE JURY:  Tuesday.

5          THE COURT:  At what time?

6          THE JURY:  8:30.

7          THE COURT:  You have a wonderful, wonderful

8     weekend.

9          We'll be here in case you want to drop by the

10    court Saturday or Sunday.

11          *(Laughter.)*

12          THE COURT:  Go home.  Please don't talk to anybody

13    about this case, receive any information, even form or

14    express an opinion in your own mind or I'll have to start

15    over, okay?

16          Go about your business and have a wonderful

17    weekend.

18          Ms. Garcia, you may step down.

19          *(Following proceedings is taken outside the*

20         *presence of the jury.)*

21          THE COURT:  This is off the record, now.

22          *(Discussion held off the record.)*

23          THE COURT:  This is on the record.

24          You are doing a great job.

25          This is off the record.

120

1                    *(Discussion held off the record.)*

2              THE COURT:  You're all doing a fabulous job.

3              Put this on the record.

4                    *(Discussion held off the record.)*

5              THE COURT:  An extraordinary compliment to the

6      support staff.

7                    *(Discussion held off the record.)*

8              *(Recess.)*

9                            -oOo-

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

-oOo-

**CERTIFICATE**

         I hereby certify that pursuant to Section 753,
Title 28, United States Code, the foregoing is a true and
correct transcript of the stenographically reported
proceedings held in the above-entitled matter and that the
transcript page format is in conformance with the
regulations of the Judicial Conference of the United States.


Date:  January 21, 2011




                     _____
                     JANE C.S. RULE, U.S. COURT REPORTER
                     CSR NO. 9316