UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

THE HON. DAVID O. CARTER, JUDGE PRESIDING

MATTEL INC.,                      )
                                  )
            Plaintiff,            )
                                  )
        vs.                       ) No. CV 04-9049-DOC
                                  )     VOLUME 3 OF 3
MGA ENTERTAINMENT, INC.,          )
                                  )
            Defendant.            )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL

SANTA ANA, CALIFORNIA

TUESDAY  , JANUARY 25, 2011

4:30

Maria Beesley-Dellaneve, RPR, CSR 9132
Official Federal Reporter
Ronald Reagan Federal Building, room 1-053
411 West 4th Street
Santa Ana, California 92701
(714) 564-9259

```
 1    APPEARANCES OF COUNSEL:

 2    FOR THE PLAINTIFF:   QUINN EMANUEL URQUHART OLVER & HEDGES
                           BY:  MICHAEL ZELLER, ESQ.
 3                         and  JOHN QUINN, ESQ.
                           865 S. FIGUEROA
 4                         10TH FLOOR
                           LOS ANGELES, CALIFORNIA 90017
 5                         (213)443-3000

 6

 7    FOR THE DEFENDANTS:  ORRICK, HERRINGTON & SUTCLIFFE
                           BY:  ANNETTE HURST, ESQ.
 8                         405 HOWARD STREET
                           SAN FRANCISCO, CALIFORNIA 94105
 9                         (415)773-5700

10

11    FOR THE DEFENDANTS:  ORRICK HERRINGTON & SUTCLIFFE
                           BY:  THOMAS MCCONVILLE, ESQ.
12                         4 PARK PLAZA
                           SUITE 1600
13                         IRVINE, CALIFORNIA 92614
                            (949)567-6700
14

15                          KELLER RACKAUCKAS
                            BY:  JENNIFER KELLER, ESQ.
16                          18500 VON KARMAN AVENUE
                            SUITE 560
17                          IRVINE, CALIFORNIA 92612

18

19    FOR CARLOS MACHADO GOMEZ: LAW OFFICES OF MARK E. OVERLAND
                            BY:  MARK OVERLAND, ESQ.
20                          100 WILSHIRE BLVD
                            SUITE 950
21                          SANTA MONICA, CA. 90401
                            (310) 459-2830
22

23

24

25
```

```
 1                          - AND -

 2                     SCHEPER KIM & HARRIS LLP
                       BY:  ALEXANDER COTE, ESQ.
 3                     601 WEST 5TH STREET_12TH FLOOR
                       LOS ANGELES, CA. 90071
 4                     (213) 613-4660

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
                                                                 Page 4
  1                            I N D E X

  2
     PLAINTIFF'S                                              VOIR
  3  WITNESS                DIRECT   CROSS   REDIRECT   RECROSS  DIRE

  4  PAULA GARCIA                       5

  5

  6

  7

  8

  9

 10

 11

 12

 13

 14

 15

 16

 17

 18

 19

 20

 21

 22

 23

 24

 25
```

1       SANTA ANA, CALIFORNIA; TUESDAY, JANUARY 25, 2011

2    (Whereupon there was a change in reporters and MARIA BEESLEY

3    reported the 4:30 P.M. session.)

4                    CROSS-EXAMINATION (CONTINUED)

5    **BY MR. MCCONVILLE:**

6    **Q**    Let me ask you question.  Could you describe the fashion

7    exchange between you and Carter Bryant?

8    **A**    Yes.  After Carter and I would agree on a concept for the

9    character, or especially for the brand, when Carter would go

10   shopping he would assemble those garments as we discussed.  And

11   generally when there was some good vibes about just the tone of

12   what he purchased, he would put some drawings together borrowing

13   some of the materials he purchased.  And he would put that drawing

14   together into a sketch, and then he would ultimately submit that

15   to me.

16           And then once that drawing was submitted to me, then

17   again I would look at that time it to give comment for my points

18   of view on it.  Sometimes they were great and sometimes they

19   needed revised.

20   **Q**    Okay.  I'm sorry.  So you and he would work together sort of

21   lay out an outfit?  I'm talking so now I'm back from Forever 21.

22   I have got my bags of clothes, and I got them laying on the bed.

23           And you and he would select which ones that might work

24   for the doll you envisioned?

25   **A**    I just want to represent that I wouldn't identify a very --

Page 6

1    sometimes I would, but generally I would look at his collection

2    together and say yeah, this feels good together as a collection.

3             It was -- I want to represent that he would go in there

4    and start grabbing pieces and collect them together on to a

5    drawing, which he would then submit to me, which I would then

6    ultimately from the drawing give comments about my points of view.

7    Q    Okay.  I'm sorry.  I picture sort of real clothes laying on a

8    bed, figuring out when you wanted.  But that's not what you are

9    saying.  As I understand it, you are saying you discussed, in

10   general, the idea?

11   A    Generally all the stuff that he collected.

12   Q    And then he would sketch out something for you to look at;

13   right?

14   A    Yep.

15   Q    And then after that sketch, you would look at it and figure

16   out whether it was consistent with your vision for the concept of

17   this doll; right?

18   A    Yes.

19   Q    Then you would have back and forth with Carter Bryant about

20   what you wanted him to do next with regard to the fashion drawing?

21   A    Yes.  He would revise.

22   Q    Was anyone else from MGA involved in those decisions

23   concerning the fashions that are depicted in Exhibit 1107?

24   A    No.

25   Q    How long of a process that took place that resulted in 1107

Page 7

1   and those fashion drawings, how long did it take to get to that

2   drawing?

3   **A**    To get to this drawing?

4   **Q**    Yes.

5   **A**    I remember that the onset of shopping started around

6   October 6.  And as testified, I believe that these drawings were

7   created at the end of October or the first week of -- or weeks of

8   November.  So about a month.

9   **Q**    And do you recall for this drawing, for the Exhibit 1107, do

10  you recall receiving a draft version of that drawing?

11  **A**    Yes.

12  **Q**    And then there was a modification made after your comment to

13  get to this final version of 1107?

14  **A**    Yes.

15          **MR. MCCONVILLE:**  Your Honor, is this a good breaking

16  place?

17          **THE COURT:**  Is this a good place to place break?

18          **MR. MCCONVILLE:**  Yes.

19          **THE COURT:**  Ladies and gentlemen, we'll send you home

20  tonight.  We'll see you at 8:30 tomorrow morning.

21          Before you leave, don't form or express any opinion

22  about this case, even in your own mind.  Let me just talk to you

23  for a moment about that.  It's natural as you go through in the

24  beginning of the case, we've got a long ways to go.  And that

25  means we remain neutral throughout the case.  We don't have an

1  opinion about this case.  We just sit here and listen.  Don't

2  express an opinion, don't comment upon the witnesses.  Leave this

3  case alone.  Talk about anything else you want to, but not this

4  case.  Okay.  Neutral.

5          See you tomorrow at 8:30.

6                    (Jury out.)

7          THE COURT:  Counsel, is there further any action by the

8  Court today?  Let me speak to Mr. Quinn, Mr. Price.

9          MR. QUINN:  No, Your Honor.

10         THE COURT:  Let me speak to Ms. Keller and

11  Mr. McConville.  Any further action by the Court today?

12         MR. MCCONVILLE:  No, Your Honor.

13         THE COURT:  Let me remind the jury and have you remind

14  me to remind the jury every couple days because it's a long trial,

15  not to form or express any opinion about the case.  I should be

16  doing that at the end of each recess or the beginning of each

17  recess and the end of each session, regardless.

18         The Ninth Circuit in its opinion had spoken about

19  evidence concerning character.  In other words, the import of that

20  opinion warned the Court, and I think warned counsel, about

21  getting into character as not being relevant.  And what I'm

22  concerned about is that MGA may be defending itself against what I

23  call a phantom here.  But there is also the difficulty in the

24  practical world as you point out attributes.  There's always talk

25  about, in a sense, the sassiness of the dolls, which may not have

Page 9

1    the word "character" attached, but you have to understand any time

2    the word "character" is raised, it's going to raise a red flag

3    with the Ninth Circuit.

4            And what we're doing here, though, in terms of trial

5    work, in reality sassy and attitude, you could substitute the word

6    "character" for that.  But you know, and you're forewarned that

7    raises a real problem.  And it's going to be perceived by the

8    circuit that either one of you or both of you is skirting their

9    opinion.

10           And it's not Mattel that opened this door, it's MGA that

11   opened this door, either intentionally or inadvertently.  I think

12   our opinion is very clear also.  At 168 pages we dealt with this

13   very issue.  I'm going to leave that on the table for this evening

14   and encourage you to go back and read our opinion and our thoughts

15   about this; encourage you to look at the Ninth Circuit again and

16   conduct yourself however you are going to.

17           But we have to talk about attitude, obviously.  We have

18   to talk about the pouty lips and the reflection.  We have talk

19   about sexuality, attitude.  I don't know how we stay away from the

20   word "character," but that will be a bell weather mark, I promise

21   you, with the circuit.  And I promise you that's going to raise

22   red flags.  And if it's opened by MGA, I don't think it's fair

23   that Mattel cannot respond when that door has been open.

24           Let's just leave that on the table this evening, and

25   let's just reread that.

Page 10

1              Now, second --

2          **MR. QUINN:**  Your Honor, may I respond just briefly?

3          **THE COURT:**  Certainly.

4          **MR. QUINN:**  I don't think it's a door that -- the door

5   was opened, as I understand it, in the trade secrets area, the

6   motion as to character and trade secret.  That obviously was not

7   before the Ninth Circuit.  And that was left in tact by Your

8   Honor's summary judgment rulings.

9              So I mean, we think that is in play.

10         **THE COURT:**  Okay.  Let's go back and --

11         **MS. HURST:**  May I respond Your Honor, briefly?

12         **THE COURT:**  Certainly.

13         **MS. HURST:**  Your Honor, there is a difference between

14   character as Mr. McConville is using it in the examination with

15   Ms. Garcia -- and we can clear this up -- to represent what is

16   really an ethnicity in this context.  It's difficult to refer to

17   the various dolls, and it can be even offensive to refer to them

18   by reference to their ethnicity, but a character is a

19   constellation of attributes in which ethnicity and attitude are

20   the predominant characteristics for these dolls.  And we can have

21   Ms. Garcia elucidate that.

22              It is not character of the kind that would, as the Court

23   has noted, satisfy the copyright law requirements for a literary

24   character.  It is just a basic set of sort attitudinal and

25   appearance attributes that include ethnicity, which is not

1    something that can be protected under copyright law or, frankly,

2    trade secret law either.

3         **THE COURT:**  I tend to agree with you, but let me go back

4    and look at the Ninth Circuit opinion for the tenth time.  I hope

5    we can stay way from those magic words like "character."

6         **MR. MCCONVILLE:**  Your Honor, if I may, it was not my

7    intention to go that way.  And I will be more mindful going

8    forward.

9         **THE COURT:**  It's a red light for the circuit.  It's

10   going to appear that you are skirting their ruling.

11        **MR. MCCONVILLE:**  Okay.

12        **THE COURT:**  Why don't we take that up at the end of the

13   cross-examination again, Mr. Quinn, and get your arguments at that

14   time.  Let's see how far this goes or doesn't go.  Right now I

15   don't think that they have crossed the line, but it's going to

16   alert the circuit.

17        The second thing is how are you holding up?  Mr. Price?

18   I'm genuinely asking that.  You have to be on your top

19   performance, so does Mr. Quinn.  So I'm going to turn to MGA.  My

20   job is to be prepared but it's not to get you to a point that you

21   are comatose.

22        **MR. PRICE:**  During the trial day, fine, Your Honor.

23        **THE COURT:**  Okay.  Mr. Quinn, how are you holding up?

24        **MR. QUINN:**  This has been a fine day, Your Honor, for

25   me.

1          **THE COURT:**  We haven't heard from Mr. Quinn, so it's

2    been a fine day.

3          Ms. Keller, you got some rest yesterday.  You weren't

4    with us Monday.

5          **MS. KELLER:**  That's right.

6          **THE COURT:**  You were with us Sunday.  How are you

7    holding up?

8          **MS. KELLER:**  This is a better week.  We have been able

9    to sleep.

10          **THE COURT:**  Mr. McConville?

11          **MR. MCCONVILLE:**  Hanging in there.

12          **THE COURT:**  All right.  Counsel?

13          **MR. COTE:**  Fine, Your Honor.

14          **THE COURT:**  The second thing we need to decide is just

15    timing.  We have got Carter Bryant out here without a lot of drama

16    because of really an outstanding counsel in Northern California.

17    He is coming with -- well, he is coming to court on Thursday at

18    8:00 o'clock.  I really think we have to make way somehow in our

19    schedule so we accommodate him in a reasonable period of time.

20          So Mr. McConville, how long do you think, just roughly,

21    you'll be with Ms. Garcia?  Because it looks like the whole trial

22    is going to pass with one witness.  I'm just joking with both of

23    you.

24          **MR. MCCONVILLE:**  I need to go back and look at my notes,

25    Judge.  My estimate, when we started, was that I would have a full

1   day with her, and I didn't get her until after lunch.

2          THE COURT:  However you take.  We're just trying to plan

3   because we really do need to get Carter Bryant on the stand, but I

4   don't want to really disturb Mattel's presentation.  And if, in

5   fact, he is not going to be on the stand Thursday, I think we owe

6   the courtesy of a phone call.  And I think he would appreciate

7   that.  And if we're not going to get to him the following Tuesday,

8   he should know that.

9          I'm just going to warn you, though, I think his idea of

10  spending a weekend here is exactly what he doesn't want to do.

11         MR. QUINN:  Your Honor, if I can maybe preview what is

12  coming up.  We have Steve Linker, who is from Chicago.  I think we

13  have mentioned him to the Court before.  And we prevailed on him

14  to come here.  And he would really like to get on and off the

15  stand tomorrow, which --

16         THE COURT:  I'm not going to spoil your presentation.

17         MR. QUINN:  I think it's probably do-able.  The direct

18  is probably a half hour or 35, 40 minutes.  I expect they'll have

19  something like the same.

20         THE COURT:  Who is next?

21         MR. QUINN:  Then we would have Lucy Arant.  Maybe a

22  little bit longer, but not an hour on direct.  Then we have Nana

23  Ashong.  Shorter than either of those two.  And then we have Anna

24  Rhee, who is probably 40 minutes or so on direct.  And they'll

25  take a little bit longer with her.

Page 14

1        **THE COURT:**  Just average out 45 minutes on direct and

2    then take 45 minutes on cross, and that's a rough guess, you have

3    an hour time times four.

4        **MR. QUINN:**  Hour and a half times four max.

5        **THE COURT:**  Six hours.

6        **MR. QUINN:**  There you go.

7        **THE COURT:**  Which is one day, which takes all of

8    Wednesday even if we hadn't finished Paula Garcia.  All I'm saying

9    is just as a matter of courtesy, if we're not going to get to

10   Carter Bryant, I think he is owed a phone call at least.

11       **MS. HURST:**  He is already here.

12       **MR. QUINN:**  I would expect that if we don't get to him

13   Thursday morning, we'd probably get to him Thursday afternoon.

14   And in any event, we would have Friday with him.

15       **THE COURT:**  He is already here.  That's news to me.  So

16   thank you.  All right.

17       **MS. HURST:**  Since he was going to go on Thursday

18   morning, we didn't want to take any chances, so we got him here by

19   Wednesday midday.

20       **THE COURT:**  Why don't you let me be the judge who is

21   ordering him in and take the pressure off both parties.  Let me

22   play the role of the person who is having that person come to

23   court rather than his being chagrined at either side.

24        There is always the problem that counsel have been

25   calling him, and one of you may bear the brunt of his animosity.

1    It's easier directed towards the Court by a witness than harming

2    either side.

3              I just offer that to you in terms of being, quote, the

4    bad person.  He can take his animosity out on the Court.

5              Now, finally, I'm ready to hand down at least

6    tentatively most of the rulings, if not all the rulings, on the

7    experts that were remaining for Mattel and MGA.  Do you want me to

8    read those into the record this evening and then give you a copy

9    of those with the understanding that I'm always open to hearings

10   during nights and weekends; that you can re-raise these issues

11   constantly?  Because in the real world of trial litigation they

12   change.  They're not final, final, final rulings without comment

13   of counsel.  And it's not meant to chill you.  But it would also

14   let you know some of the concerns I have, so when we have these

15   Daubert hearings or you get witnesses in the night before, you

16   know exactly what I'm concerned about.  Saves a lot of time.

17             So my thought is we can start by either having me start

18   reading this evening so the circuit has the courtesy of a record,

19   or I could just start handing down these tentative rulings and

20   give it to you in written form.  And I really don't care which.

21             So you two -- as Ms. Keller rises to talk to Mr. Quinn,

22   as Mr. Quinn rises to talk to Mr. McConville, as they meet at the

23   lectern, as Mr. Price gets up on his feet, and Mr. Price gets out

24   of his chair and moves towards Mr. McConville who is now moving

25   out of his chair, and as poor counsel are now discussing this

Page 16

1    quietly and reaching a resolution about what they would like to

2    do.

3              (Counsel confer)

4              **MR. QUINN:**  Your Honor, I think all counsel would

5    appreciate the benefits of the Court's thoughts.  If the Court

6    does have written orders already prepared, we would be delighted

7    to receive copies of those and don't really see an additional need

8    to read them into the record.

9              **THE COURT:**  Well, let's start anyway with the first this

10   evening so that -- first, let me begin with MGA's motion in limine

11   number 36 to strike and exclude the expert report of Frank Keiser.

12   On or before January 25, 2011 at 4:00 p.m. -- well, I had to

13   change that because we wrote it so long ago, but I'm going to

14   order by tomorrow the parties shall submit the complete transcript

15   of the depositions of Mr. Keiser by 5:00 p.m. tomorrow.  His

16   complete report and all three-dimensional scans of the sculpts,

17   dolls and other items imaged by Keiser.

18            To the extent the specialized technology is necessary to

19   review Mr. Keiser's three-dimensional images, the parties will

20   contact the clerk and assure that I have access to such technology

21   after the jury recesses.  In other words, I want to visually see

22   what these are.  I don't think a ruling in the abstract is fair.

23   And although I trust the representation of the parties, I would

24   rather see it myself.

25            Concerning Mattel's motion in limine number four to

1    exclude the rebuttal expert report of Jan D. Duffy -- and Sid, you

2    can start putting these out in written form.  I want the circuit

3    to have the record and the courtesy also of the report.

4           Jan Duffy's expert opinion was excluded from the phase

5    one trial by Judge Larson.  And Mattel has asked and argued that

6    this Court keep her out of this trial as well.  Unlike the

7    affirmative expert report prepared by Duffy in advance of the

8    phase one trial, she's prepared a rebuttal expert report in

9    advance of these proceedings through her rebuttal report -- or

10   though her rebuttal report reports to incorporate the initial

11   opinions and bases or grounds for those opinions as set forth in

12   Duffy's initial report dated February 11, 2008.

13          In both her initial report and her rebuttal report,

14   Duffy purports to rebut the expert opinions contained in the

15   opinions of Jeffrey Brislow, Angel Gomez, Ginger McCrae, all of

16   whom prepared expert reports for Mattel in connection with this

17   action.  Now, this Court's already ruled that absent a change in

18   circumstances, Gomez and McCrae will be excluded from trial and

19   Mattel has withdrawn Brislow's expert opinion.  MGA has conceded

20   that had Duffy will not testify if Mattel's experts are excluded.

21   Mattel's motion therefore is stricken at the present time as moot.

22   But the door is always open.  Trial work changes.

23          The Court will revisit this ruling in the event MGA

24   introduces a contract on conscionability defense at trial.  Mattel

25   seeks to admit the expert opinions of Gomez and McCrae in

Page 18

1    response.

2              Is there anything unclear because Mr. McConville always

3    has the habit of -- I'm just joking with Mr. McConville -- of

4    hearing the Court's motion and asking the Court what it just said.

5              Mr. Quinn, anything?

6         **MR. QUINN:**  We think we understand, Your Honor.

7         **THE COURT:**  I'll put that out in written form.  If not,

8    raise it tomorrow.

9              Mr. Price.

10        **MR. PRICE:**  I understand.

11        **THE COURT:**  Without restating, do you understand,

12   Mr. McConville?

13        **MR. MCCONVILLE:**  Yes, sir.

14        **THE COURT:**  Ms. Keller?

15        **MS. KELLER:**  Yes.

16        **THE COURT:**  I'll put that out in written form.  Once

17   again, tomorrow, if there is any confusion at all, let's raise it

18   and I'll get you here at 7:30 and we'll discuss it.

19             Now, Mattel's motion in limine number three to exclude

20   the expert opinion of Glenn Vilppu, how do you pronounce his name?

21        **MS. KELLER:**  Vill-pu.

22        **THE COURT:**  Concerting the background, MGA expert Glenn

23   Vilppu prepared a report and rebuttal to Mattel's expert Lee

24   Loetz.  Vilppu disagrees with Loetz's conclusion that the Bratz

25   doll infringe copyright and Bryant's creative work.  Vilppu

1    specifically concludes that the similarities identified by

2    Mr. Loetz are, at a minimum, overstated and in many cases

3    nonexistent.  Vilppu reached this conclusion after comparing

4    Bryant's works with Bratz dolls and finding that similarities were

5    limited to unprotectable elements of the work.

6          Mattel does not contest the high relevance of Vilppu's

7    expert opinion, especially because MGA needs Vilppu's opinion to

8    rebut Loetz.  Mattel, instead argues that Vilppu's opinion should

9    be excluded for three reasons:  First, Vilppu's lack of experience

10   in the field of toy design.  Second, Vilppu's failure to focus on

11   similarities between the creative works.  Third, Vilppu's improper

12   rendering of the legal opinion about the existence of

13   infringement.  None of these arguments is convincing to the Court

14   at the present time.

15         I think Mattel erroneously suggests -- and I don't mean

16   that maliciously -- but suggests that Vilppu's expertise is

17   limited to renaissance drawing or drawing from imagination.  I

18   think to the contrary.  Vilppu has extensive experience in the

19   field of animation and has used action figure dolls to model two-

20   dimensional creative works like the ones at issue in this case.

21   Vilppu spent 16 years as a training program drawing instructor at

22   the Wall Disney Pictures Animation Features, and led drawing

23   seminars at the Warner Brothers Feature Animation.

24         He was the acting director of the Character Animation

25   Studio at the California Institute of Arts.  He has written a book

1    on figure drawings and has performed freelance artistry for a

2    number of animated studios.

3            Mattel accused him and accuses him of lacking

4    experience, "turning any of the animated characters he has worked

5    on into three-dimensional dolls."  His experience appears to this

6    Court to be more than adequate to inform him of that process.  And

7    in any event, I think Mattel has failed to explain to the Court

8    why this opinion suffers from an inability to conceive of the

9    manner in which two-dimensional drawlings are turned into three-

10   dimensional dolls.

11           The substantial similarity determination requires the

12   factfinder to compare elements of the creative works at issue, the

13   manufacturing process through which those works are created, with

14   the possible exception of functionality -- I'm sorry.  The

15   manufacturing process through which those works are created is

16   with the possible exception of functionality irrelevant.

17           Mattel also I think is incorrect when it faults Vilppu's

18   report for unduly emphasizing differences between Bryant's works

19   and the Bratz dolls.

20           First, Vilppu failed to find similarities between the

21   protectable elements of Bryant's sketches in all but two of the

22   subsequent generation of Bratz dolls.  The Court reached the same

23   conclusion in its order on the motion for summary judgment which

24   renders Mattel's objection to Vilppu's analysis moot.

25           Second, Vilppu expressly identified a number of

Page 21

1    similarities between certain Bryant works and the first generation

2    Bratz dolls, but ultimately concluded that these were similarities

3    in unprotectable elements.  For instance, Vilppu acknowledges the

4    similarity in fashion style between the Bryant works and Bratz

5    dolls but dismisses these similarities as simply the type of

6    styles be worn by kids at the time.

7          Vilppu also observed that even if they did line up, the

8    general lining up of facial features is normal and natural.  His

9    overreaching observation that mirrors the analysis of the Court's

10   summary judgment orders is that, "beyond the anatomical landmarks

11   that make the drawing preliminary sculpt and doll look human-like

12   they share no similarities."

13         The dissimilarities identified by Vilppu simply

14   substantiate Vilppu's basic conclusion that the works did not

15   share any similarities in protectable elements.  In all events, I

16   think Mattel's argument is contrary to the law of this case.  The

17   Ninth Circuit expressly considered differences in fashions and

18   hair styles relevant to a filing of noninfringement for the vast

19   majority of the subsequent generation Bratz dolls.

20         I also disagree with Mattel, I think you are incorrect

21   that Vilppu lacks foundation to render an opinion about the

22   process through which a two-dimensional sketch is turned into a

23   three-dimensional product, and also the similarities between the

24   works.  I think your main action is that Vilppu admitted to having

25   no experience in the doll production field or with fashion in

1    general.  But you have not adequately explained to the Court why

2    experience in doll production is even relevant to Vilppu's

3    expertise in identifying similarities between creative works.

4             In fact, Vilppu has extensive experience with sketches

5    and other types of artistic work, including, for example, animated

6    works which Bryant's creative work resemble.  More importantly,

7    Vilppu also has extensive experience with three-dimensional works

8    like the Bratz dolls.  For example, Vilppu worked with a team of

9    artists tasked with converting three-dimensional action figures to

10   images that could be used in comic strips.

11            I don't think Mattel can, nor does it explain the

12   materiality of Vilppu's lack of experience with fashion dolls as

13   opposed to any other type of doll.  Mattel can certainly challenge

14   the weight of Vilppu's testimony on the basis of this distinction,

15   but his opinion is neither unreliable nor irrelevant.

16            I also disagree, I think Mattel's mistaken about whether

17   Vilppu renders improper legal opinions.  Unlike Mattel's experts

18   who openly discuss the applicable law and various issues in this

19   case, Vilppu merely observes that certain elements of Bryant's

20   works are standard or normal, elements that are unoriginal.  This

21   is neither express or implied legal commentary.  It is relevant

22   that expert opinion about standard and unoriginal elements in the

23   artistic field.  Indeed, it is precisely the type of opinion

24   offered by Mattel expert Loetz whose opinion Vilppu's report

25   rebuts.

Page 23

1       Mattel seeks to preclude MGA from offering Vilppu's

2  opinion and response to Loetz's opinion.  In doing so, Mattel

3  seeks to protects Loetz's errors from the factfinder's scrutiny.

4  I think Mattel's arguments are unconvincing to this Court although

5  they may be to the jury, and they misconstrue the content of

6  Vilppu's report.  Therefore, Mattel's motion is therefore denied.

7       Now, let me stop there.  Of course, having what is

8  perceived by you to have a victory, Vilppu testifying through MGA,

9  I can't imagine why we would have a Daubert hearing on this

10  gentleman.  So I'm trying to alert you as to who to really get in

11  for Mattel, who to really spend your time with from MGA.  And if

12  we do that now laboriously, I think you'll have a nice courtesy

13  about who is really important so you are not wasting your time and

14  you get a little bit of sleep.

15       Now, Mattel's motion in limine to exclude the expert

16  opinion of Sam Rubin.  Mattel is also seeking to exclude the

17  opinion of MGA expert Sam Rubin, and Rubin belongs to the Stroz

18  Friedberg computer forensics firm.  Well, strike that.

19       Mr. Quinn, whether you agree with it or not is

20  irrelevant to me.  Do you understand what I just said about

21  Vilppu?

22            **MR. QUINN:**  Yes.

23            **THE COURT:**  You don't have to agree with it.

24            **MR. QUINN:**  I'd like a little bit of time to absorb it,

25  Your Honor.  That was a lengthy opinion.

1          **THE COURT:**  That's nothing compared to what we have got

2    tonight.

3               Do you understand it, Mr. Price?

4          **MR. PRICE:**  Yes.

5          **THE COURT:**  I can do it in one sentence.  He is

6    testifying.

7               Mr. McConville, is there any misunderstanding?

8          **MR. MCCONVILLE:**  No.  I got it.

9          **THE COURT:**  Ms. Keller?

10         **MS. KELLER:**  I understand.

11         **THE COURT:**  Mr. Overland.

12         **MR. OVERLAND:**  Understood.

13         **THE COURT:**  Mattel's motion in limine to exclude the

14   expert opinion of Sam Rubin.  Let me start again.  Mattel seeks to

15   exclude the opinion of MGA expert Sam Rubin.  Rubin belongs to

16   Stroz Friedberg computer forensics firm.  He performed analysis of

17   the hard drives of various MGA employees and prepared four reports

18   that detail his findings.

19              First, Rubin prepared a July 1, 2008 report in response

20   to examination reports prepared by Mattel's forensic expert which

21   conducted a forensic analysis of seven computer hard drives used

22   by Mr. Larian.  Rubin's report provides context to Mattel's

23   experts' conclusion that 37,373 files were deleted across the

24   Larian hard drives by noting that, "the delete files include tens

25   of thousands of files that were deleted automatically as part of

Page 25

1    the normal operation of the Windows operating system installed on

2    each of the seven computers."

3            Mattel's expert, in fact, conceded that only 633 files

4    on Mr. Larian's hard drive were user created files that were

5    deleted.  The remaining files were, "not relevant based on their

6    extension or the type of file that they are."  However, Rubin

7    continues that even of the 633 user created files, a little bit

8    more than 200 files were, "linked files that do not contain any

9    substantive user-generated content, and their deletion does not

10   affect the files to which they were linked."  That left 406 files

11   of which 397 were located elsewhere on Mr. Larian's hard drive.

12   The remaining nine files contained log information, a rap song,

13   which the Court can't wait to hear -- I'm just kidding you -- an

14   internal MGA document, and a French language letter from an MGA

15   executive.

16           These facts should sound familiar to the parties.  The

17   Court previously conducted an extensive review of thousands of

18   files on the Larian hard drives and upon this examination agreed

19   with Rubin.  Specifically, this Court found that many of the files

20   allegedly deleted by Larian continued to reside on his hard

21   drives.  The vast majority of those files were protected by the

22   attorney-client privilege, and the Court therefore rejected

23   Mattel's attempt at further discovery into the subject matter.

24           Mattel, nevertheless, continues to seek the exclusion of

25   Rubin's opinion on the grounds that he lacks familiarity with

1   Evidence Eliminator and BeClean, the two types of hard drive

2   enhancement programs allegedly used by the counterdefendants in

3   this case.

4          That Rubin lacks familiarity with the operation of

5   software program is hardly remarkable.  The firm with which he is

6   associated, "is managed and run largely by former federal

7   prosecutors and federal law enforcement agencies from the Federal

8   Bureau of Investigation among other federal agencies."

9          Rubin has himself performed several prior forensic

10  examination of computer hard drives, including a project involving

11  the forensic analysis of, "computer hard drives used by defendants

12  charged in a federal criminal indictment with material support of

13  terrorism."

14         Rubin prepared a December 1, 2010 report that provides

15  an extensive analysis of the Evidence Eliminator software and its

16  use on Carter Bryant's computer, thus corroborating Rubin's

17  expertise in the field of hard drive forensic analysis.  In that

18  report he explained the operation of the Evidence Eliminator

19  software.  For example, Rubin noted that the software

20  automatically runs on start up.  The software runs, "continuously

21  in the background when the computer is turned on and has an icon

22  in the system tray."

23         It deletes metadata, "from applications such as media

24  players, internet browsers, and instant messengers, and empty and

25  clean forensic artifacts from the recycle bin," and leaves behind

1   artifacts of its use like a log file.  On the basis of this

2   understanding of Evidence Eliminator, Rubin finds several faults

3   with Mattel's expert analysis.  Rubin also prepared a

4   September 27, 2010 report concerning MGA and Machado's use of

5   software called BeClean that Mattel's expert refers to as "wiping

6   software."

7           In fact, BeClean is a commonly used computer enhancement

8   software that has been favorably reviewed by technical

9   publications.  Rubin's report describes the software as one that

10  cleans up internet cache, scraps of data which are picked up from

11  the websites, registry data which are scraps of data left behind

12  by applications, the computer's recycle bin, temporary files and

13  other scrap material and information that slows computer

14  performance.  The computer runs automatically such that the

15  individual using the computer cannot direct the program to delete

16  only certain types of information.

17          Mattel also finds fault with Rubin for failing to

18  produce or identify the, "data materials, factual or legal

19  assumptions or other information," he considered in forming his

20  opinions.  Mattel specifically claims that Rubin failed to provide

21  a script he created and applied in order to track the use of

22  BeClean.

23          Mattel also states that Rubin has impermissibly failed

24  to produce information about an MGA computer program called Kaseya

25  that is referenced in his expert report.  However, Rubin did not

1    consider either the script or the Kaseya program in forming his

2    conclusions.  Both were simply vehicles used to gather the data

3    that Rubin eventually analyzed.  Nonetheless, in an effort to

4    provide Mattel all the materials it needs to effectively test

5    Rubin's opinion, this Court orders -- I don't know that there is

6    anything unclear about an order -- orders that Rubin is going to

7    provide to Mattel information about the script and Kaseya program

8    within seven days of this order.  And this order goes into effect

9    now.  And that includes nights and weekends.  Seven days.

10         Mattel next argues that Rubin's opinions are based upon

11   a flawed methodology.  Mattel specifically argues that Rubin's

12   analysis is inconsistent with the record which Mattel claims

13   establishes that, "starting in 2006 MGA installed software called

14   BeClean on its hard drives in order to delete information from

15   users' hard drives."  This argument is predicated upon the flawed

16   notion that MGA was precluded from making sure its computer

17   systems continued to run efficiently during the pendency of this

18   seven-year long litigation.

19         BeClean is a software that is widely used by businesses

20   and individuals to prevent a slow-down in computer performance

21   that results from the accumulation of useless data on the

22   computer's hard drive.  Rubin's conclusions merely confirm this

23   common sense and call into question Mattel's attempt to draw

24   inferences in the use of such software.

25         Mattel's remaining arguments about the usefulness of the

1    computer script used by Rubin, as well as the sufficiency of

2    Rubin's efforts to analyze the individual hard drives are

3    unconvincing to this Court, and Mattel is free to raise those such

4    deficiencies with the factfinder, which is our jury.  In any

5    event, this motion is presently moot after having said all that.

6              This Court granted MGA's seventh motion in limine to

7    exclude evidence concerning the use of hard drive enhancement

8    software by Bryant, Machado and/or MGA.  So Mattel's motion for

9    reconsideration of that order is still pending.  Assuming the

10   Court denies Mattel motion, Rubin's opinion is relevant.

11             At the present time I'm going to strike as moot Mattel's

12   motion.  And in the event Mattel prevails on its motion for

13   reconsideration of the MGA seventh motion in limine, Mattel's

14   motion to exclude Rubin's opinion is going to be denied.

15             Now, what did I just say, Mr. McConville?

16             **MR. MCCONVILLE:**  You said that the motion to exclude

17   Rubin is currently moot because the Court has previously ruled

18   under motion in limine number seven that Mattel's efforts to put

19   in information concerning Evidence Eliminator and BeClean is not

20   going to be permitted.

21             **THE COURT:**  Excellent.

22             Ms. Keller, you agree with that?

23             **MS. KELLER:**  I do.

24             **THE COURT:**  You understand that ruling, Mr. Quinn?

25             **MR. QUINN:**  Yes, Your Honor.

1        **THE COURT:**  I don't care whether you agree with it.

2        Mr. Price, you understand that?

3        **MR. PRICE:**  Yes.

4        **THE COURT:**  That will stop the regurgitation of motions

5    for reconsideration and gee, judge, I don't think I understood

6    what you said.  Nonsense.

7        Mattel's motion to conclude expert opinion of, and I

8    think it's Yehuta, Y-e-h-u-t-a, Bassok.  And by way of background,

9    Dr. Yehuta Bassok is a professor of information and operation at

10   the Marshall School of Business at the University of Southern

11   California.  Having gone to UCLA, my ruling has nothing to do with

12   present employment.

13       He claims that, "his main research areas are supply" --

14   that was a joke, for the record -- "his main research areas are

15   supply chain management, inventory control, forecasting supply

16   contracts, and procurement and negotiations."  Applying this

17   expertise, Bassok's report concludes that none of the documents

18   and information allegedly stolen by Jorge Castilla derived

19   independent economic value from not being generally known.

20   Specifically, Bassok concludes that the subject trade secret

21   information and documents consist of knowledge that is applied

22   throughout the toy industry as well as other industries.

23       Mattel challenges Bassok's opinion on three grounds:

24   First, reliability; second, foundation; and third, undue

25   prejudice.

1        Mattel, first faults Bassok for evaluating the economic

2   value of the information misappropriated by Castilla in a vacuum.

3   More specifically, Bassok did not consider the amount of time and

4   money Mattel invested in creating the trade secret documents and

5   processes, Castilla's subjective understanding of those documents

6   and processes, Castilla's specific conduct in targeting and

7   downloading the documents and the difficulties faced by MGA's

8   forecasting system prior to Castilla's hire.

9        Mattel also argues and claims that Bassok failed to

10  examine the specific documents allegedly misappropriated by

11  Castilla, although Bassok's supplement declaration very clearly

12  states that it considered all of the documents.  And you'll find

13  that and the supplement declaration of Bassok at 26 through 28

14  stating that he considered, "declaration of Laura Owens in support

15  of Mattel Inc.'s motion for partial summary judgment dated October

16  8, 2010 and all exhibits thereto."

17       Mattel argues that Bassok's failure to acknowledge

18  factors relevant to whether information meets the statutory

19  definition of trade secret renders his opinion contrary to the

20  report and, therefore, subject to exclusion under Federal Rule of

21  Evidence 702.  Also, the Court sites Daubert versus Merrell Dow

22  Pharmaceuticals Inc.  509 U.S. 579.  The language is found at 591

23  through 592, 1993.

24       Mattel's arguments, I think, confuse correlation for

25  causation.  The amount of money a company invests in the creation

1    of a document, the efforts to guard the document's secrecy, and

2    the extent of misappropriating employees' efforts are

3    circumstantially relevant to whether the document derives

4    independent economic value from not being generally known.

5              And I'm going to cite Courtesy Temporary Service versus

6    Camacho, at 222 Cal.App3d 1278, 1287, 1990.  These sorts of facts

7    are most relevant when a Court lacks direct evidence like an

8    expert's opinion about whether the alleged trade secret was

9    well-known or valuable because of its secrecy, citing Religious

10   Tech versus Netcom On-Line Commercial Services Inc. 923, F.Supp

11   1231, 1253 Northern District of California 1995.  However,

12   information does not become a trade secret merely because a

13   company invests resources in its creation, or a departing employee

14   undertakes great efforts and acts suspiciously in misappropriating

15   the information.

16             And that proposition is cited in Religious Tech.

17   Credible expert opinion about whether information meets the

18   statutory definition of a trade secret has the potential to

19   overshadow such evidence.  Contrary to Mattel's condition, the

20   fact that Bassok failed to consider extrinsic factors like

21   Mattel's investment, Castilla's conduct, and MGA's position

22   actually adds to the relevance and credibility of his opinion.

23             Mattel likewise errs in challenging Bassok's

24   qualifications.  Bassok has worked for a software program company

25   and a textile company.  He also regularly consults with a variety

Page 33

1    of companies to assist their sales forecasts and prepare complex

2    algorithms.  In addition to this experience, Bassok has extensive

3    academic experience in the field of sales forecasting as reflected

4    in his current post as a professor at the University of Southern

5    California.

6           Mattel argues that Bassok only prepares algorithms

7    designed to effectuate already completed sales forecasts, but this

8    distinction of dubious relevance.  I think Mattel's own witness

9    Laura Evans admits that the company used formulae to process

10   variables like, "past quotas, historical marketing, promotional

11   and sales information, marketing strategies, distribution

12   information, financial target information, availability

13   information, media promotion, feedback from customers, product

14   profiles and history, and historical levels of customer report."

15          Mattel cites a portion of Bassok's deposition in which

16   he conceded that he may lack expertise in, "how to generate a

17   forecast," however, I think Mattel fails to acknowledge Bassok's

18   testimony that he has written extensively about the process used

19   to calculate a forecast.

20          Mattel's trade secret misappropriation counterclaim does

21   not distinguish between information about calculating a forecast

22   and information about generating a forecast.  In any event, I

23   don't think Mattel can meaningfully defend the counterintuitive

24   position that Bassok's relative familiarity with the product of a

25   forecast, as opposed to the process used to develop the forecast

Page 34

1    somehow diminishes his expertise.

2            I don't think Mattel is entitled to exclude an expert

3    merely because it disagrees with his opinions, many of which match

4    the Court's rulings and summary judgment, which were absolutely

5    brilliant.  I'm just kidding you, counsel.

6            Therefore, Bassok's opinion is relevant, reliable

7    supported by adequate foundation pursuant to Federal Rule of

8    Evidence 702.  The probative value of his opinion outweighs its

9    prejudicial effect.  Therefore, Mattel's motion in limine is

10   therefore denied.

11           Now, what don't you understand, Mr. Quinn, about what I

12   just said?

13           **MR. QUINN:**  Totally clear.

14           **THE COURT:**  That doesn't mean, once again, you agree

15   with it.  I understand that.  If we're going to go through the

16   motions for reconsideration, etcetera, let's hash that out

17   tonight.  You are more than welcome and you know I'm open.  You

18   are never going to rest and I'm never going to rest until this

19   case is done, no matter what.  We're always open for business.

20           Mr. Price, what don't you understand?

21           **MR. PRICE:**  Understand it all.

22           **THE COURT:**  It just lets you know where to focus your

23   energy.

24           **MR. MCCONVILLE:**  I missed that one, Your Honor.  Can you

25   please repeat it?

1          **THE COURT:**  Ready, Mr. McConville?  Have you absorbed

2    this, Mr. McConville?

3          **MR. MCCONVILLE:**  Yes, I understand it.

4          **MS. KELLER:**  Understood, Your Honor.

5          **THE COURT:**  Mr. Overland, was this --

6          **MR. OVERLAND:**  Yes.

7          **THE COURT:**  Once again, I don't expect agreement, but it

8    does tell you who you want to get in here on these motions in

9    limine and how you want to spend your time.

10          Next is Mattel's motion to exclude expert opinions of

11   James Malackowski and Thomas Gruca concerning apportionment.

12          The Ninth Circuit employs a burden-shifting analysis,

13   according to my reading and my law clerks' research -- all three

14   of them, in fact -- to determine the amount of damages recoverable

15   on a claim for copyright infringement.  The copyright owner bears

16   the initial burden of presenting proof, "of the infringer's gross

17   revenue," citing Cream Records Inc. versus Joseph Schlitz Brewing

18   Company.

19          Are they still in existence?

20          **MR. MCCONVILLE:**  I don't know, Your Honor.

21          **THE COURT:**  Because you are not my age.  It's 864 F.2d

22   668,669, Ninth Circuit, 1989.  And that quote's 17 U.S.C. 504(b),

23   1982.  The burden then shifts to the alleged infringer to, "prove

24   his or her deductible expenses and the elements of profit

25   attributable to factors other than the copyright work."  Once

1    again citing Cream Records.  That language is found at page 669.

2            "If the infringing defendant does not meet its burden of

3    proving costs, the gross figure stands as the defendant's

4    profits."  Citing Frank Music Corporation versus Metro Goldwyn

5    Mayer Inc. 772 F.2d 505 at 5114, Ninth Circuit, 1985.  Citing

6    Russell versus Price, 612 F.2d 1123.  The language is found at

7    1130 through 1131, Ninth Circuit 1979.  And the cert was denied at

8    446 U.S. 952.

9            Mattel's expert Michael Wagner produced a report

10   purporting to calculate MGA's gross revenue as a result of its

11   infringement of the creative works in which Mattel claim a

12   copyright.  In response, MGA's experts Thomas Malackowski and

13   Thomas Gruca prepared expert reports purporting to calculate MGA's

14   deductible expenses and the elements of profit attributable to

15   factors other than the creative works in which Mattel claims

16   copyright.

17           Mattel argues that MGA was obligated to produce these

18   apportionment figures in its opening expert reports,

19   notwithstanding the fact that Mattel bore the initial burden of

20   proving MGA's gross revenues.  Mattel relies upon the following

21   remark by the prior presiding Judge Larson who was confronted with

22   this question.  It is not incumbent upon the infringer to come

23   forward with apportionment unless the plaintiff has come forward

24   with the requisite showing of gross revenues attributable to the

25   infringement.  But that does not speak to what is required back in

Page 37

1    the discovery phase in terms of disclosing any expert testimony

2    that party intends to rely on in their initial disclosure of

3    experts and affording the other side a chance to rebut it.

4            And that's from the trial transcript dated July 28,

5    2008.  You'll find that, according to our records, at 5340, 16

6    through 19.

7            Despite issuing this admonition, the prior presiding

8    judge permitted MGA to introduce such expert opinion at the time

9    of trial.  Mattel argues that MGA has repeated its error which

10   warrants the exclusion of its expert opinions concerning

11   apportionment.  Mattel separately argues that MGA's experts

12   improperly opined on the apportionment in their rebuttal reports

13   even though, "Mattel experts do not opine on apportionment."  And

14   their opening reports and rebuttal reports are restricted to,

15   "contradicting or rebutting evidence on the same subject matter

16   identified by another party," in its initial disclosure.

17           These arguments, I think, are unconvincing to this

18   Court.  MGA did not need to submit its apportionment analysis in

19   an initial expert report because it does not bear the initial

20   burden of proof on damages.  National Envelope Corp versus

21   American Pad and Paper Company of Delaware, 209 West Law, 5173920

22   at footnote 9.  It's Southern District of New York, December 30,

23   2009 case.

24           And it basically stands for the proposition that AmPad

25   was correct in submitting its report as a rebuttal because the

Page 38

1   burden shifts to the defendant once the plaintiff has proven the

2   amount of infringing sales.

3           And that case, of course, cites Louis Vitton SA versus

4   Spencer Handbags Corp. at 765 F.2d 966, 973 Second Circuit 1985.

5           The contrary rule suggested by Mattel misses the point,

6   I think, of the Ninth Circuit's burden-shifting framework which is

7   designed to determine the damages of copyright plaintiff is

8   potentially entitled to recover.  Only after Mattel produced an

9   expert report substantiating the gross revenues that evidenced the

10  extent of MGA's unjust enrichment was it necessary for MGA to

11  produce a rebuttal report disputing this calculation with evidence

12  of apportionment.  ABB Air Preheater Inc. versus Regenerative

13  Environmental Equipment Company, 167 FRD 668 at 663, a district of

14  New Jersey, April 29, 1996 case, citing the following:

15          The presumption requires a patent challenger to bear the

16  initial burden of demonstrating a prima facie case of obviousness.

17  Once a prima facie case is established, the burden then shifts to

18  the patentee to come forward with rebuttal evidence of

19  non-obviousness.  Hence, defendant properly submitted its expert's

20  reports certain secondary considerations in rebuttal to

21  plaintiff's expert's opinion concerning invalidity.

22          MGA's production of its expert opinions concerning

23  apportionment was, therefore, substantially justified pursuant to

24  Federal Rule of Civil Procedure 37C1.  MGA's conduct was also

25  harmless because Mattel has long been on notice of the fact that

Page 39

1    MGA intends to prove the vast majority of its profits were

2    attributable to factor other than infringement.  Therefore, at

3    this time MGA's motion is denied.

4              Now, Mr. McConville, Ms. Keller, what don't you

5    understand about what I just read?

6              **MS. KELLER:**  Your Honor, I understand it.

7              **THE COURT:**  Mr. McConville?

8              **MR. MCCONVILLE:**  Understood.

9              **THE COURT:**  Of course I expect you to agree with it.

10             Mr. Quinn, I don't care whether Mattel agrees or not, do

11   you understand what I just read?

12             **MR. QUINN:**  Yes, Your Honor.

13             **THE COURT:**  Mr. Price, do you?

14             **MR. PRICE:**  Yes.

15             **MS. KELLER:**  Can I have a five-minute bathroom break?

16             **THE COURT:**  Why don't we just take a recess?  Why don't

17   all of us do that.  We'll come back in 15 or 20 minutes.  Go use

18   the bathrooms, don't go outside the buildings.  We're going to

19   continue on.

20                  (Recess taken, from 5:35 to 5:57.)

21             **THE COURT:**  Back on the record.  All counsel are

22   present.

23             Concerning MGA's motion in limine number 25 to exclude

24   the expert opinion of Ralph Almond.  Here, MGA seeks to exclude

25   the expert report and testimony of Ralph Almond who served as the

1   registrar of copyrights in the United States between 1985 and

2   1993.  First, Almond's report describes the process through which

3   a copyright is registered, including the contents of the

4   application that identify the copyright owner and the copyrighted

5   work, the submission of a depiction of the copyrighted work, and

6   the filing fee that must be paid by the applicant.

7          Almond goes on to discuss the examination process by

8   which a registration specialist at the copyright office reviews

9   the contents of the application.  Then he notes that, "the

10  registration specialist will normally rely solely on information

11  that the applicant provided in the application form in determining

12  whether any portion of the work can reasonably be construed to

13  contain copyrightable authorship."

14         Second, Almond purports to downplay the significance of

15  Mattel's failure to identify Bryant's sketches and sculpts as the

16  works made for hire.  He opines that, "If Mattel has more than one

17  legitimate claimed authorship, it can choose any one of them in

18  its application," because the registration certificates do not

19  foreclose Mattel from asserting other claims to authorship.  "They

20  only serve to establish the prima facie validity of the copyright

21  and put the world notice that Mattel claims copyright in the

22  Bratz-related works."

23         According to Almond, "Mattel can chose any theory of

24  authorship or ownership it wants in filling out the application

25  form, and it can assert all theories of authorship or ownership in

Page 41

1    subsequent litigation."

2            Mattel, he claims, is not limited in legal arguments it

3    raises in court in support of its position.

4            Third, Almond's report argues that a three-dimensional

5    doll can infringe a two-dimensional copyrighted drawing.  He

6    further notes that the three-dimensional version of a

7    two-dimensional drawing need not be an exact replica in order to

8    infringe.

9            Finally, in his reports he renders extensive opinions

10   about the contents of Mattel and MGA's copyright application in

11   the Bratz works and products.  For example, Almond concludes that

12   Mattel has not misrepresented any fact in its copyright

13   application.  Almond also infers that MGA's failure to identify

14   previously registered or public domain materials upon which the

15   Bryant drawings were purportedly based suggested MGA thought that

16   Mr. Bryant's Bratz drawings were wholly original when it

17   registered them.

18           He states that unlike most copyright owners, MGA

19   submitted several supplementary registrations from which he infers

20   that MGA attempted to manipulate the record to gain some legal or

21   competitive advantage.  Though the copyright office failed to

22   reject MGA's supplementary registrations, Almond explains that the

23   copyright office, "knows that at that point the matter is in the

24   hands of the Court, and the judge and jury will be able to give

25   the proper weight to a hindsight correction of the record."

Page 42

1          I think his analysis of the legal standard for

2    infringement provides improper instruction about the law.  And I'm

3    going to cite United States versus Scholl 166 F.3d 964, 973, Ninth

4    Circuit, 1999.  And, Aguilar versus International Longshoremen's

5    Union, 966 F.2d 443 at 447, Ninth Circuit, 1992.

6          Mattel recharacterizes his opinion as an attempt to

7    establish, "that the copyright office will register claims to

8    copyrights in three-dimensional embodiments based on drawings.

9    Mattel, however, merely summarizes the topic sentence of a section

10   of Almond's report that otherwise contains extensive legal

11   commentary."

12         Now listen very closely because you may be able to clean

13   this up.  For instance, Almond opines first, the protectable

14   elements of the copyright drawings when incorporated into the form

15   and appearance of the three-dimensional dolls must of course be

16   authorized by the copyright owner of the drawings or they will be

17   infringing.

18         Second, by way of illustration the Disney Company has

19   the right to create three-dimensional Mickey Mouse dolls based on

20   the two-dimensional drawings of the famous cartoon character, a

21   Mickey Mouse dolls with fatter legs than a drawing would

22   nonetheless enjoy full copyright protection based on the copyright

23   registration of the cartoon character.

24         Third, Larian, when he sought to enforce MGA's claimed

25   rights against an accused infringer in the courts of Hong Kong

Page 43

1   made the same point in his affidavit to the Court.  He correctly

2   noted, after consultation with his lawyers, that the creation of

3   the original drawings of the dolls serve as the legal basis for

4   claiming copyrights in the dolls themselves.

5           Almond on his report does not, as Mattel argues, discuss

6   three-dimensional depictions of two-dimensional drawings in an

7   attempt to identify the criteria of the U.S. Copyright Office

8   uses.  To the contrary, I think Mr. Almond unabashedly opines on

9   whether such depictions infringe the underlying copyrighted works

10  as a matter of law.

11          Furthermore, Mattel has all but conceded that Almond's

12  report offers legal opinions about whether Mattel's failure to

13  register Bryant's creative works as works made for hire forecloses

14  Mattel from sustaining a claim to authorship pursuant to that

15  theory.  Mattel's opposition brief argues that his testimony

16  directly refutes MGA's argument that because Mattel indicated on

17  the forums that it owned Bryant drawings by assignment, Mattel

18  could not have also owned the drawings as works made for hire.

19          As an initial matter, this Court, and not the

20  factfinder, must resolve whether Mattel can avail itself of the

21  work-made-for-hire doctrine.  That issue has already been resolved

22  in Mattel's favor.  Moreover, even if the factfinder were asked to

23  resolve the issue of whether the representations on Mattel's

24  copyright registrations impact the availability of the

25  work-made-for-hire doctrine, the Court, not Almond, must provide

Page 44

1   instruction about the legal significance about Mattel's prior

2   representations including the representations on this copyright

3   registration.

4          Almond's opinion about the legal significance of

5   Mattel's copyright registration he claims it is prima facie

6   evidence of validity is yet another example, I think, of his

7   attempt to interpret the law.  Indeed, I think he concedes that,

8   "only the Court can make that difficult legal judgment about the

9   significance of Mattel's copyright registration."

10         In the remainder of his report Almond improperly reaches

11  the conclusion about MGA's intent on the basis of its failure to

12  identify materials that inspire the copyrighted Bratz works as

13  well as its filing of supplementary registration.

14         I'm going to cite Mukhtar versus Cal State University,

15  299 F.3d 1053, 1066, note 10 Ninth Circuit 2002, amended by 319

16  F.3d 1073, Ninth Circuit, 2003.  And Rezulin Products Liability

17  Litigation 309 F.Supp.2d 531, 546 through 547, Southern District

18  of New York, 2004.

19         I don't think Mattel's meaningfully explained to me the

20  relevance of Almond's opinion about the copyright registration

21  process and the procedures used in Hong Kong.

22         Now extraditing such an opinion from the legal analysis

23  and factual conclusions that pervade Almond's report is, I think,

24  impracticable.  Now, for the foregoing reasons, MGA's motion is

25  granted.  Now here is the open door.  Go back and clean it up.

Page 45

1    This is one that we should have a hearing on.  He should come into

2    court.  I should hear exactly what his opinion's going to be.

3           And I could be persuaded to his relevance if the legal

4    opinions were redacted or at least put in an acceptable form which

5    they're not.  They're interwoven.

6           Second, it's incumbent upon Mattel to once again raise

7    how he is relevance, and I'm going to require seven days' notice.

8    I'm happy to hear it, but this isn't going to impact the Court one

9    or two nights before and we're pushing until midnight.

10          So Mike, if you want to get him in here on Saturday or

11   next Monday night, give me seven days, I'm happy to take the time

12   to go through that.  Door is not closed.  Understood?

13          **MR. ZELLER:**  Absolutely.

14          **THE COURT:**  MGA's motion in limine number 27 to exclude

15   the expert opinion of John Alex.  Here, in the background, Mattel

16   expert John Alex is an attorney with legal decades of experience

17   in the field of patent prosecution.  The term "patent prosecution"

18   describes the process through which an inventor or patent

19   applicant explains in a patent application to the United States

20   Patent and Trademark Office, one, whether a subject invention is

21   neither old nor obvious; and second, how the invention is made and

22   used.

23          In the process, Alex describes as a negotiation between

24   the patent applicant and the United States -- well, Patent and

25   Trademark Office, the applicant verifies and explains certain the

Page 46

1   claims in the patent application and describe the invention and

2   tell the public exactly what it is that constitutes an

3   infringement of the patent.

4           MGA filed a patent application with the USPTO on

5   February 24, 2003.  The subject matter of the application was, "a

6   doll with esthetic changeable foot gear," and the application

7   identified Mr. Larian as the inventor.

8           The application contains 17 claims.  Claim one of the

9   patent, which Alex concludes is representative of the independent

10  claims states, one, a doll changeable foot gear compromising a

11  torso having a body and legs, said legs having a predetermined

12  skin color and texture.  A pair of foot shoe assemblies, each

13  including an open shoe with straps with the shoe being open to

14  expose at least part of the foot, the foot having substantially

15  the same predetermined skin color and texture.  Each said assembly

16  being removable, secured to one of said legs at the lower leg or

17  ankle of said doll at a separation point.  Each set assembly and

18  lower legs having a snap-together joint with a protuberance on one

19  part and a mating recess on the other part, and a simulated strap

20  forming part of said shoe extending around said assembly of said

21  separation point.

22          Alex notes that the patent application was initially

23  rejected on the grounds that the Bratz dolls were released more

24  than two years prior to application and clearly disclosed all of

25  the structural limitations recited in claims 1 through 17 of MGA's

Page 47

1    patent application.

2         Alex avers that in response to the rejection, MGA's

3    attorney apprised Mr. Bryant of the materiality of the Bratz prior

4    art.  Alex claims that MGA's attorney directed Bryant to sign a

5    declaration that in relevant part stated, "I was actively involved

6    with the release of the Bratz dolls of the configuration as set

7    forth in paragraph 3, and this release did not occur until the

8    fall of the year 2002.

9         Bryant's signed declaration was attached to an amendment

10   filed with the USPTO in which MGA attorneys declared that Bryant

11   confirms that the release date for the dolls as claimed in its

12   patent application did not occur until fall of 2002.  Of course,

13   this is only a few months prior to the February 24, 2003 filing

14   date, the present application.  Accordingly, it is respectfully

15   requested that the rejection based on the Bratz article be

16   withdrawn."

17        Bryant, of course, later conceded during the phase one

18   trial that, "the introduction of the Bratz dolls occurred well

19   prior to the one year critical date."

20        Alex opines that the Bryant declaration filed with the

21   USPTO, "can be viewed as a knowing effort to mislead the USPTO by

22   a willful false statement made under oath."  Alex also expects to

23   testify that the inventorship described in MGA's patent

24   application is incorrect in a knowing effort to mislead the USPTO.

25   Alex objects to MGA's failure to identify Bryant as a named

Page 48

1    inventor even though Bryant shared with MGA drawings of dolls that

2    squarely fall within the scope of the claims in MGA's patent

3    application.

4           The patent application claims describe a snap-together

5    mechanism that connects the doll foot shoe assemblies with the

6    lower leg and ankle.  Alex states, "These claims literally read on

7    the Bryant drawings," of the Bratz dolls.  Alex believed that

8    MGA's patent application contains material false statements which

9    can be construed to be a violation of 18 U.S.C. section 1001.

10          The claims to MGA's patent application were eventually

11   objected by the United States Patent and Trademark Office and MGA

12   thereafter abandoned the application on November 26, 2003.

13          First, concerning the relevance, I don't think Mattel

14   can credibly defend the relevance of Alex's opinion.  In

15   conclusory fashion I think it's been argued to this Court that

16   Alex's opinion is relevant to, first, the credibility of Bryant

17   and Larian; and second, the issue of fraudulent concealment.  I

18   think the first argument is legally sound.

19          Specific instances of the conduct of a witness for the

20   purpose of attacking or supporting the witness' character for

21   truthfulness may not be proved by extrinsic evidence.  And that's

22   Federal Rule of Evidence 608(b).  Mattel is restricted to

23   inquiring into specific instances of conduct on cross-examination

24   and even then only at the Court's discretion.

25          The second argument I think is spurious.  No reasonable

Page 49

1    factfinder can conclude that Mattel actually and reasonably relied

2    on the alleged misrepresentations in MGA's patent application.

3           I'm going to cite Santa Maria versus Pacific Bell, 202

4    F.3d 1170 and 1176, Ninth Circuit, 2003.  The patent application

5    was never released to the public let alone reviewed by Mattel or

6    anyone associated with Mattel.  It's filing cannot support

7    Mattel's fraudulent concealment allegation.

8           Finally, the legal opinion.  Even if relevant, Alex's

9    expert report is packed with improper legal opinion.  For example,

10   Alex purports to interpret and apply 18 U.S.C. 1001, which makes

11   it unlawful to conceal or falsify a material fact in connection

12   with certain administrative proceedings or congressional

13   investigations.  His opinion directly invades the Court's province

14   to instruct the factfinder on the law.  And I'm going to cite

15   Aguilar at 966 F.2d.  You'll find the language at 447.

16          Alex's report also gratuitously and improperly opines on

17   MGA's intent.  On repeated occasion, Alex suggests that statements

18   by Bryant and MGA were knowing and willful attempts to mislead the

19   PTO through affirmative misrepresentations.  Here, Alex offers no

20   expert analysis to support his conclusions about MGA's intent.

21          I'm going to cite Rezulin Products Liability Litigation,

22   309 F.Supp 2d, 546 through 547 once again.  Therefore, MGA's

23   motion is granted.

24          Listen carefully.  You have a chance to restructure

25   this.  Door is never closed.  First, if you can solve the rule 608

Page 50

1    problems and you desire to bring this before the Court, I'm happy

2    to reconsider this.  Just clean it up.  I don't know how else to

3    say it.  You have got so many improper opinions in here that you

4    are really running up a hill unless you can clean this up to begin

5    with to get some credibility concerning him.

6              So the door is not closed.  I would expect to see him in

7    my Court full-blown evening session or weekend section with both

8    he and the prior witness.

9              Now, concerning MGA's motion in limine to exclude the

10   expert opinion of Jeffrey Kinrich, Kinrich is a valid summary

11   witness.  You can call him an expert, you can call him a summary

12   witness, whatever.  But MGA can challenge his methodology on

13   cross-examination.  You can present him.

14             Finally, I misstated at the end of the initial reading

15   concerning Mattel's motion to exclude expert opinions of James

16   Malackowski.  I think I had stated and substituted MGA.  Mattel's

17   motion is therefore denied.  Not MGA's motion, of course.

18             Finally, there are two other matters.  And I'm going to

19   check with the court reporter to see how she is doing.

20             Isn't in limine motion number 42 moot?

21             **MR. QUINN:**  Your Honor, I don't recognize the number.

22             **THE COURT:**  I'm sorry.  It's the motion to deny the

23   design chart.  And you have got the design chart now.

24             **MS. HURST:**  It was resolved by the stipulation to redact

25   all the names and everything, that's correct.

1          **THE COURT:**  I'm not going to write anything on that.

2    That seems silly.  I'll hand down motion in limine number 43 after

3    you leave tonight.  We're still writing tonight on 43.  You'll

4    have that tomorrow.

5          And on motion number seven, the eliminator, we have got

6    that from MGA.  We'll work on that after you leave tonight also.

7          Sid, I want these put out also.

8          Concerning MGA's motion in limine to exclude expert

9    opinion of Kenneth Hollander.  On October 2010, there's an expert

10   report of Kenneth Hollander which summarizes the result of an

11   internet survey of girls 8 to 13.  This test group of individuals

12   was asked to view the Bryant sketches, and more than 90 percent of

13   the individuals identified the Bryant drawings as Bratz dolls.

14         In order to account for going-in knowledge and/or

15   preconceived opinions, Hollander used a controlled group of

16   individuals who were exposed to unrelated non-tested Cherry Merry

17   Muffin drawings.  Only 1 percent of the control group responded

18   that the Cherry Merry Muffin drawings looked like Bratz dolls.

19         First, Mattel's argued to this Court that the Hollander

20   report is relevant to the intrinsic test for copyright

21   infringement which, "focuses on whether the ordinary reasonable

22   audience would find the work substantially similar in the total

23   concept and feel of the work."

24         Citing Cavalier 297 F.3d.  But Hollander's survey did

25   not even show its participants each allegedly infringing Bratz

Page 52

1    dolls, or even an exemplar of each generation of these dolls, or

2    those dolls.  The survey, instead, asked its participants to rely

3    upon their recollection, if any, of the Bratz dolts.  This

4    methodology does not remotely resemble the intrinsic test for

5    copyright infringement.

6         Moreover, Hollander failed to ask the survey

7    participants whether the Bryant drawings were, "substantially

8    similar in the total concept and feel."  He preliminary inquired

9    into whether the drawings looked like the Bratz dolls.  Hollander,

10   in short, I think asked survey participants the wrong question and

11   failed to show them the relevant creative works.  The survey

12   responses are entirely irrelevant to whether the ordinary

13   reasonable audience would find the Bryant drawings substantially

14   similar to the Bratz dolls in a total concept and feel of the

15   works.

16        The fact that the vast majority of the survey

17   participants stated that the Bryant drawings looked like the Bratz

18   dolls is unduly prejudicial because it misleads the jury about the

19   relevant standard for copyright infringement.  Their survey must

20   be excluded for this reason alone as far as I'm concerned.

21        Now, I have looked extensively at Six McCarthy on

22   trademarks and unfair competition.  You'll find much of this at

23   section 32:170 Fourth Edition 2008.  If the survey questions are

24   not congruent with the issues in the case, the results not only

25   may be irrelevant, but also unduly prejudicial and misleading to

Page 53

1    the jury.

2         Mattel also argues that Hollander's survey is relevant

3    to its allegation that Bratz dolls infringe the character

4    expressed in Bryant's works.  This argument is even less

5    meritorious, I think, than the first one.  Copyright protection

6    can extend to the character expressed by particular creative

7    works.  Citing Walt Disney Production versus Air Pirates, 581 F.2d

8    751, 754, Ninth Circuit, 1978.

9         To establish infringement of the copyright in the

10   characters expressed in Bryant's creative works, Mattel must

11   establish as any other copyright plaintiff must, that the

12   character expressed by the Bratz dolls are substantially similar

13   both in terms of their protectable expression and in terms of

14   their total concept and feel to the characters expressed in the

15   Bryant works.

16        Substantial similarity is not evidence by survey results

17   that concern whether creative works look like each other rather

18   than the pertinent question of whether there is substantial

19   similarity between the characters expressed by the works.  As

20   before, the Hollander report's irrelevant results have the

21   potential to mislead the jury about the applicable standard to

22   determine whether there has been infringement of copyrights and

23   characters found in creative works.

24        Given the, I think, irrelevance and unduly prejudicial

25   nature of Hollander's report and opinion, I don't think the Court

Page 54

1    need reach MGA's separate challenge to Hollander's qualifications

2    and the methodology applied by his report.  The motion is granted.

3              Once again, let me come back to Mattel.  Produce him.

4    Bring him in here.  If you think he really has a good chance of

5    testifying, clean him up as best you can.  But now you know what

6    I'm troubled by.  It's a final ruling but you know it's never

7    final until we conclude the case.  He is really going to need some

8    work by Mattel, though.

9              Now, I have got more but for the time being, Maria, I

10   want to thank you; and counsel, I want to thank you for attending

11   this evening.  And we will go off the record.

12              (Whereupon the proceedings were adjourned at 6:23

13   p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

Page 55

1

2                                    -oOo-

3

4                              CERTIFICATE

5

6          I hereby certify that pursuant to Section 753, Title 28,

7    United States Code, the foregoing is a true and correct transcript

8    of the stenographically reported proceedings held in the

9    above-entitled matter.

10

11   Date:  January 26, 2011

12

13

14   MARIA DELLANEVE, U.S. COURT REPORTER
     CSR NO. 9132
15

16

17

18

19

20

21

22

23

24

25

Electronically signed by Maria Beesley (501-187-561-9309)                    c57a638a-06e3-4661-82aa-dcaa6c59d23c