Case 2:04-cv-09049-DOC-RNB   Document 9729   Filed 01/28/11   Page 1 of 92   Page ID #:291323
CV 04-9049-DOC - 01/26/2011 - Day 7, Vol. 2 of 3

1

1            **UNITED STATES DISTRICT COURT**

2            **CENTRAL DISTRICT OF CALIFORNIA**

3         **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4                    - - - - - - -

5


6   MATTEL, INC., ET AL.,              )
                                       )
7              Plaintiffs,             )
                                       )
8        vs.                           ) No. CV 04-9049-DOC
                                       )    Day 7
9   MGA ENTERTAINMENT, INC., ET AL.,   )    Volume 2 of 3
                                       )
10             Defendants.             )
    _____)

11

12

13

14

15           REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                      Jury Trial

17                 Santa Ana, California

18              Wednesday, January 26, 2011

19

20

21

22   Jane C.S. Rule, CSR 9316
     Federal Official Court Reporter
23   United States District Court
     411 West 4th Street, Room 1-053
24   Santa Ana, California 92701
     (714) 558-7755
25
     11-01-26 MattelV2

1    **APPEARANCES OF COUNSEL:**

2

3    FOR PLAINTIFFS MATTEL, INC., ET AL.:

4              QUINN, EMANUEL, URQUHART, OLIVER & HEDGES
               By:   JOHN B. QUINN
5                    MICHAEL T. ZELLER
                     WILLIAM PRICE
6                    Attorneys at Law
               865 South Figueroa Street
7              10th Floor
               Los Angeles, California 90017-2543
8              (213) 443-3000

9

10   FOR DEFENDANTS MGA ENTERTAINMENT, INC., ET AL.:

11             ORRICK, HERRINGTON & SUTCLIFFE, LLP
               BY:   THOMAS S. MC CONVILLE
12                   Attorney at Law
               4 Park Plaza
13             Suite 1600
               Irvine, California 92614
14             (949) 567-6700

15             - AND -

16             ORRICK, HERRINGTON & SUTCLIFFE, LLP
               BY:   ANNETTE L. HURST
17                   Attorney at Law
               405 Howard Street
18             San Francisco, California 94105
               (415) 773-5700

19             - AND -

20
               KELLER RACKAUCKAS, LLP
21             BY:   JENNIFER L. KELLER
                     Attorney at Law
22             18500 Von Karman Avenue
               Suite 560
23             Irvine, California 92612
               (949) 476-8700

24

25

Case 2:04-cv-09049-DOC-RNB   Document 9729   Filed 01/28/11   Page 3 of 92   Page ID #:291325
CV 04-9049-DOC – 01/26/2011 – Day 7, Vol. 2 of 3

3

1    APPEARANCES OF COUNSEL (Continued):

2

3    FOR DEFENDANT CARLOS GUSTAVO MACHADO GOMEZ:

4              SCHEPER, KIM & OVERLAND, LLP
               BY:  ALEXANDER H. COTE
5                   Attorney at Law
               601 West Fifth Street
6              12th Floor
               Los Angeles, California 90071
7              (213) 613-4660

8              – AND –

9              LAW OFFICES OF MARK E. OVERLAND
               BY:  MARK E. OVERLAND
10                  Attorney at Law
               100 Wilshire Boulevard
11             Suite 950
               Santa Monica, California 90401
12             (310) 459-2830

13

14   Also Present:

15             ROBERT ECKERT, Mattel CEO

16             ISAAC LARIAN, MGA CEO

17             KEN KOTARSKI, Mattel Technical Operator

18             MIKE STOVALL, MGA Technical Operator

19             RACHEL JUAREZ, Quinn Emanuel Urquhart Oliver &
                        Hedges
20

21

22

23

24

25

CV 04-9049-DOC - 01/26/2011 - Day 7, Vol. 2 of 3

4

```
 1                      I N D E X


 2


 3


 4                      EXAMINATION


 5


 6  Witness Name        Direct    Cross    Redirect    Recross

 7  GARCIA, PAULA
       By Mr. McConville            8                    85
 8     By Mr. Price                          9


 9


10


11                       EXHIBITS


12


13  Exhibit                     Identification    Evidence

14  Plaintiffs' No. 13859                            77

15  Plaintiffs' No. 1314                             78

16


17


18


19


20


21


22


23


24


25
```

Case 2:04-cv-09049-DOC-RNB   Document 9729   Filed 01/28/11   Page 5 of 92   Page ID #:291327
CV 04-9049-DOC - 01/26/2011 - Day 7, Vol. 2 of 3

5

```
 1              SANTA ANA, CALIFORNIA, WEDNESDAY, JANUARY 26, 2011

 2                        DAY 7, VOLUME 2 OF 3

 3                            (1:05 p.m.)

 4              (The following proceedings is taken outside

 5         the presence of the jury.)

 6              THE COURT:  All right.  Counsel, we are on the

 7    record, and the Court's thoughts are subject to a very brief

 8    comment.

 9              First of all, Ms. Hurst, have a seat, please.  I

10    am not inviting you to the lectern.  I don't mean that

11    abruptly, but nobody goes to that lectern unless invited.

12              First, because Mattel is pursuing, in a sense,

13    Moxy, then the 2009 time frame minimally becomes important,

14    and that was Mattel's choice, you're seeking lost profits.

15    And because of that, this time frame could be relevant.

16    Also, my notes clearly show, upon going over those, that

17    this was basically a now-and-forever concept.  Now I'm going

18    to invite Ms. Hurst to show me the sections without

19    argument.

20              MS. HURST:  Your Honor, on page 18, lines --

21              THE COURT:  Read it to me, please.

22              MS. HURST:  Oh sure.  Sorry.  I'll give the cite

23    first and then read --

24              THE COURT:  Read it to me, please.

25              MS. HURST:  "Almost the only profitable toy that
```

CV 04-9049-DOC - 01/26/2011 - Day 7, Vol. 2 of 3

6

 1    MGA has had since it introduced Bratz was -- has been the

 2    Bratz franchise itself."

 3              THE COURT:  All right.  Now, second, this is the

 4    improper place for this question to be asked.  When

 5    Mr. Larian has many more factors, another witness could be

 6    produced, but I'm going to let you briefly ask, and I mean

 7    briefly, one question, "Was this profitable?"  She doesn't

 8    know the dollars-and-cents statements, I'm assuming.  She's

 9    not in a position -- I don't think that she's gone over

10    these relevant records, has she?

11              MR. MC CONVILLE:  I don't know.  I can go and find

12    out.

13              THE COURT:  No.  I don't think she's an improper

14    witness, quite frankly.  I don't think she's got the

15    foundation.

16              Mr. Larian can testify to this.  There are going

17    to be numerous other people who can testify about lost

18    profits who are much more qualified than she is.

19              MR. QUINN:  Your Honor, may I --

20              THE COURT:  No, you may not.  I'm trying to speak

21    to Mr. McConville.

22              MR. MC CONVILLE:  Your Honor, the question I asked

23    her was whether she was involved in Lalaloopsy, and she said

24    yes, she was the product developer for Lalaloopsy, and she

25    can testify that it was a wildly successful brand.

Case 2:04-cv-09049-DOC-RNB   Document 9729   Filed 01/28/11   Page 7 of 92   Page ID #:291329
CV 04-9049-DOC - 01/26/2011 - Day 7, Vol. 2 of 3

7

```
1              THE COURT:  Perfectly acceptable.

2              MR. QUINN:  Your Honor, can I respond to that?

3              THE COURT:  Yes, Mr. Quinn.

4              MR. QUINN:  We are talking about a toy which, as I

5    understand the testimony, was -- just this last Christmas

6    was very successful, so we are talking about a holiday

7    season just a month ago.  The passage that Ms. Hurst read, I

8    said not the only profitable toy, I said almost the only

9    profitable toy that MGA has had since it introduced Bratz,

10   so we're really --

11             THE COURT:  Thank you.  We'll have further time to

12   sort that out and the complexities and the nuances, but the

13   impression has basically been made by Mattel in its opening

14   statement, Mr. Quinn, that they didn't have an inventive or

15   creative bone in their body, quite frankly.  That's the

16   impression I'm left with.  The record substantiates it

17   and --

18             MS. HURST:  I have further quotes if the Court

19   wants.

20             THE COURT:  That's the end of the discussion.

21             Get the jury, please.

22             (The following proceedings is taken in the

23        presence of the jury.)

24             THE COURT:  All right.  We are back on the record,

25   all counsel are present, the parties are present.  Thank
```

CV 04-9049-DOC - 01/26/2011 - Day 7, Vol. 2 of 3

8

1    you.

2              If you'd have a seat, Ms. Garcia.

3              And Counsel, if you'd like to continue with your

4    examination.

5              MR. MC CONVILLE:  Thank you.

6              **PAULA GARCIA, PLAINTIFFS' WITNESS, RESUMED**

7                    **CROSS-EXAMINATION (Continued)**

8    BY MR. MC CONVILLE:

9    Q    Ms. Garcia, before the break, we were discussing

10   Lalaloopsy; do you remember that?

11   A    Yes, I do.

12   Q    And what was your role with Lalaloopsy again?

13   A    My role is similar to that described with Bratz.  I'm

14   responsible for the concept, designing, development with my

15   team, seeing it through to packaging, branding, marketing.

16   Q    And I believe you testified that the product came out

17   in December 2010; is that right?

18   A    I -- I know that it was launched for the fall 2010

19   season.

20   Q    And as a result of that launch, how was the Lalaloopsy

21   doll received by the consumers?

22   A    It was -- it was very successful.

23              MR. MC CONVILLE:  No further questions, your

24   Honor.

25              THE COURT:  Okay.  Redirect, Mr. Price.

CV 04-9049-DOC - 01/26/2011 - Day 7, Vol. 2 of 3

9

```
 1              MR. PRICE:  Thank you, sir.
 2                    REDIRECT EXAMINATION
 3    BY MR. PRICE:
 4    Q     Good afternoon.
 5    A     Good afternoon.
 6    Q     Ms. Garcia, you remember that one of the first
 7    questions you were asked was on the September 1st meeting,
 8    when you were shown some drawings, whether or not you
 9    intended to make paper dolls; do you recall that?
10    A     Yes.
11    Q     And you said, no, MGA intended to make real dolls?
12    A     Yes.
13    Q     Carter Bryant intended that, too, right?
14    A     Carter Bryant pitched his portfolio with the hopes of
15    it becoming a fashion doll.
16    Q     He actually brought with him a 3D sort of mockup of a
17    doll, right?
18    A     Yes.
19    Q     And his idea was you were going to make -- use his
20    concepts, use his designs to make a doll.  That's what he
21    was suggesting, correct?
22    A     Correct.
23    Q     And as you've said, when you're making a doll, it all
24    starts with the designs and drawings, right?
25    A     Well, first, before it starts with designs and
```

Case 2:04-cv-09049-DOC-RNB   Document 9729   Filed 01/28/11   Page 10 of 92   Page ID #:291332
CV 04-9049-DOC – 01/26/2011 – Day 7, Vol. 2 of 3

10

1   drawings, it has to start with the concept.  Your drawings

2   are a result of arriving at a concept.

3   Q    And finalizing designs, it all starts with the initial

4   sketch, right?

5   A    In the context of Bratz, do you mean?

6   Q    In the context of Bratz, when you are referring to

7   designs, you remember you said, it all starts with the

8   sketch?

9   A    Yes, in the context of Bratz, it started in a sketch

10  that we created at the end of October for a Kmart meeting.

11  Q    Well, in connection with those fashion designs, it all

12  started with a sketch, right?

13  A    Yes.

14  Q    And when you -- you talked about going to Ms. Leahy as

15  a sculptor and --

16            MR. PRICE:  Is it on now, Ken?

17  BY MR. PRICE:

18  Q    And when you went to Ms. Leahy as a sculptor, you

19  didn't give her what's shown on the ELMO, which is a blank

20  piece -- just a white piece of paper, right?

21  A    That's right.

22  Q    You had to give her designs, drawings, right?

23  A    Among other things.

24  Q    And actually you mentioned that you also -- was it you

25  who gave her the ad for the shoes, the Steve Madden ad?

CV 04-9049-DOC - 01/26/2011 - Day 7, Vol. 2 of 3

11

```
1    A    It was either myself or Carter Bryant.

2    Q    And -- and that ad was from Seventeen magazine in 1999,

3    right?

4    A    I don't know.  I remember seeing that ad on Third

5    Street promenade.

6    Q    And what was the date when you saw the ad?

7    A    I don't remember the exact date.

8    Q    Now, you have referred to Mr. Bryant publicly and

9    within MGA as the creator of Bratz, correct?

10   A    Yes.

11   Q    As the inventor of Bratz, correct?

12   A    Yes.

13   Q    As the designer of Bratz, correct?

14   A    Yes.

15   Q    And you went through in some detail and talked about

16   the process of the sculpt, right?

17   A    Yes.

18   Q    And you talked about getting fashions, right?

19   A    Yes.

20   Q    You talked about getting a face painted?

21   A    Yes.

22   Q    And it had to go into production so you could do that

23   not just on one doll but on many dolls, correct?

24   A    That's right.

25   Q    And you talked about doing the hair?
```

1    A    Yes.

2    Q    Right?

3        You talked about what -- in the production process,

4    there were other steps in the production process.  I don't

5    remember all of them, but there were a number of steps you

6    talked about, right?

7    A    Yes.

8    Q    And what you described, getting the sculpt, getting the

9    fashions, painting the face, making that manufacturable,

10   those are steps you follow with any fashion doll when you go

11   from the design to the end product, right?

12   A    Yes.

13   Q    Now, you said prior to September 1st, that you had an

14   idea for a multiple ethnic doll, right?

15   A    Of course.

16   Q    And of course, there were multi-ethnic dolls in the

17   marketplace at that time, right?

18   A    I can't recall any right now.

19   Q    Mattel had multi-ethnic dolls?

20   A    Yes.

21   Q    Diva Starz, for example?

22   A    Yes.

23   Q    Barbie and Her Friends, for example?

24   A    Yes.  There is a difference in the Barbie scenario,

25   though.

CV 04-9049-DOC - 01/26/2011 - Day 7, Vol. 2 of 3

13

1   Q    Well, there's certainly a difference between the Barbie

2   and the Bratz, correct?

3   A    Yes.

4   Q    And you said you had this idea before September 1st to

5   do a multi-ethnic, hip, trendy doll, correct?

6   A    That's right.

7   Q    But -- and you talked about what a nice working

8   atmosphere it was at MGA?

9   A    Yes.

10  Q    In fact, when you first went to MGA, you sat right

11  outside of Mr. Larian's office?

12  A    Yes.

13  Q    And then you were later kind of promoted to a cubicle;

14  do you remember that?

15  A    Yes.

16  Q    And you had pretty ready access to Mr. Larian?

17  A    Yes.

18  Q    And yet your testimony is the first time you told

19  Mr. Larian that you were interested in a multi-ethnic doll,

20  hip, trendy, was just a couple of days before September 1st,

21  right?

22  A    Yes.

23  Q    And you were good friends with Veronica Marlow; is that

24  correct?

25  A    Yes.

```
 1   Q    And she's the one who gave you the $8,000 wedding gift?

 2   A    Yes.

 3   Q    And if she said she was the one who gave you the idea

 4   for trendy, hip dolls, would she be mistaken?

 5   A    Yes.

 6   Q    Well, by the time of September 1st, when you say a

 7   couple of days earlier, you told Mr. Larian about your idea,

 8   the thing is, by that date, at least as of August 18th, a

 9   couple weeks before, you had seen Mr. Bryant's drawings?

10   A    As confirmed, I don't recall seeing Carter Bryant's

11   drawings prior to September 1st.

12   Q    If you'd look at Exhibit 11328.

13   A    Yes.

14        MR. PRICE:  Can we display it up here or did we

15   switch it back?

16        Yes, it's 11328.

17   BY MR. PRICE:

18   Q    This is the internal e-mail from DeeDee Brown to you

19   and Victoria O'Connor talking about a meeting on August 18,

20   2000, with Carter designer -- Carter Bryant doll designer,

21   correct?

22        MR. MC CONVILLE:  Objection to the

23   characterization of it as an e-mail.

24   BY MR. PRICE:

25   Q    I'll use your characterization, what is it?
```

CV 04-9049-DOC – 01/26/2011 – Day 7, Vol. 2 of 3

15

1    A    It's an invite.

2    Q    So this is an invite that you got, along with Victoria

3    O'Connor, for an August 18, 2000 meeting, correct?

4    A    That's what -- on the face of the document, that's

5    exactly what the invite indicates.

6    Q    Well, let me ask you this:  Isn't it true that on

7    August 18th, 2000, and this is the latest date which Carter

8    Bryant showed you his designs for Bratz?

9    A    The first time I saw Carter Bryant's portfolio drawing

10   is September 1st of 2000.

11   Q    Do you recall on August 18th, 2000, seeing his designs

12   for Bratz except for those final -- I mean those luxurious,

13   elegant fashion designs, evening designs?

14   A    No.

15   Q    So if Victoria O'Connor testified to that, she would be

16   mistaken?

17   A    No.  I don't recall that meeting at all.  It's possible

18   that it took place.  I don't recall it at all.

19   Q    So if we take this on its face, Exhibit 1132A, then it

20   was a week or so after that that you first told Mr. Larian

21   that you were interested in these sorts of dolls?

22   A    I don't understand your question.  Or could you please

23   repeat your question?

24   Q    Sure.  If we take this invite on its face that says

25   there was an invitation to a meeting August 18, 2000.

CV 04-9049-DOC - 01/26/2011 - Day 7, Vol. 2 of 3

16

1    A    Okay.

2    Q    And we assume that such a meeting took place.

3    A    Okay.

4    Q    Then it would have been a week or so after that that

5    you, for the first time, went to Mr. Larian and said that

6    you had this idea for hip, trendy, multi-ethnic dolls?

7    A    Yes.

8    Q    After you had seen Carter Bryant's designs?

9    A    I do not recall seeing Carter Bryant's designs prior to

10   September 1st of 2000.

11   Q    If Carter Bryant said that you had saw his designs as

12   of August 18, 2000, would he be mistaken?

13   A    I don't know.  I don't recall the meeting happening.

14   It's possible the meeting happened.  I don't recall it.

15   Q    Well, on the September 1st meeting, I understand you

16   now acknowledge that Carter Bryant said in the meeting that

17   he was at that time working for Mattel, correct?

18   A    I know that now.

19   Q    And what you've told the jury is that you may not have

20   heard that because you were focusing and excited about these

21   drawings, correct?

22   A    That's right.

23   Q    Now, again, if you had seen the drawings on August 18,

24   2000, do you think you would have been so excited about the

25   same drawings in September that you would have forgotten

1    that Carter Bryant said he was an employee at Mattel at the

2    time?

3    A    Yes, I think that anytime I was present with those

4    drawings, I would have been focusing on the drawings as that

5    was my responsibility, looking at the content and making

6    sure that's something that we think as a company that I

7    would recommend to MGA that we sign up for.

8        It's -- I was focused on that content, not necessarily

9    everything that has been discussed within that meeting.

10   Q    So your testimony is that even if the September 1st

11   meeting was the second time you had seen those drawings,

12   that you would have been so excited, that you wouldn't have

13   heard Carter Bryant tell everyone at that meeting that he

14   was a Mattel employee at the time?

15           MR. MC CONVILLE:  This is an improper

16   hypothetical.

17           THE COURT:  I think it is, too, counsel.

18   Sustained.

19   BY MR. PRICE:

20   Q    You said in your cross-examination that Carter Bryant

21   signed his contract on October 4th; do you recall that?

22   A    Yes.

23   Q    And you told us earlier that you didn't see the

24   contract, right?

25   A    That's right.

Case 2:04-cv-09049-DOC-RNB   Document 9729   Filed 01/28/11   Page 18 of 92   Page ID #:291340
CV 04-9049-DOC – 01/26/2011 – Day 7, Vol. 2 of 3

18

1    Q    And -- and prior to these events we're going through

2    today, you haven't seen the contract, correct?

3    A    That's right.

4    Q    So someone must have told you that the contract was

5    signed on October 4th?

6    A    Yes.

7    Q    Now, did the person who told you that tell you that the

8    contract is dated as of September 18th?

9    A    No.

10   Q    Who was it that told you the contract was signed

11   October 4th but did not tell you the contract was dated as

12   of September 18th?

13              MR. MC CONVILLE:  Objection.  Compound.

14              THE COURT:  Overruled.

15              THE WITNESS:  I don't recall who told me when the

16   contract was signed on October 4th.

17   BY MR. PRICE:

18   Q    Well, you testified that, in your mind, you break

19   September and October into two stages?

20   A    Yes, I did.

21   Q    That is, prior to October 6th and then after

22   October 6th; is that right?

23   A    That's right.

24   Q    The thing is, though, at the time in September and

25   October of 2000, you did not make that distinction, did you?

1    A     Yes, I did.

2    Q     Okay.  If you'd look at Exhibit 305.

3          And you see the -- the middle part of that e-mail

4    string dated October 10, 2000?

5    A     Yes.

6    Q     Where you say, "I would say that Carter has worked an

7    average about four hours a day."

8          You've told us that that number is wrong, correct?

9    A     Especially the reference to hours is actually what I

10   feel is incorrect.

11   Q     And what you are saying is you typed in the wrong

12   number for hours per day?

13   A     I'm sorry, I just want to be clear, it's the reference

14   to a day that I was -- I believe is incorrect.

15   Q     So what you are saying is you typed in two -- three

16   words, if you include that little A, so you typed in three

17   that you didn't mean to type in?

18   A     No, that's not correct.

19   Q     I'm sorry, you typed in "hours a day" when you didn't

20   mean to type it in?

21   A     No, that's not correct.

22   Q     You typed in "a day"?

23   A     "Day" is the incorrect word, sir.

24   Q     So let's move beyond that.

25   A     Okay.

CV 04-9049-DOC – 01/26/2011 – Day 7, Vol. 2 of 3

20

1    Q    And look at the other part of your e-mail, "And we

2    began working on this line the first part of September"; do

3    you see that?

4    A    Yes, I do.

5    Q    And "we" referred to MGA and Carter Bryant, correct?

6    A    Yes, but in this reference to first part of September,

7    I want to make sure to be clear that Carter Bryant was not

8    designing any content during the first part of September.

9    He was pitching his concept to us, he was attending meetings

10   such as the exploratory sculpt because it was his concept

11   that he owned at that time.

12   Q    When you said, "We began working on this line the first

13   part of September," did you mean MGA and Carter Bryant?

14   A    "We" in the context of this e-mail?

15   Q    Yes, "we."

16   A    Sure.  I meant in the context of Carter and MGA.

17   Q    So what you said at the time is that Carter Bryant and

18   MGA began working on this line the first part of September,

19   correct?

20   A    Correct.

21   Q    Now, let's go to Exhibit 924.

22        And this is an e-mail you wrote on October 16, 2000,

23   correct?

24   A    That's correct.

25   Q    And if we look at the third full paragraph, last line,

1    "Please keep in mind that we only started developing this

2    line one month ago"; do you see that?

3    A    Yes, I do.

4    Q    That's what you wrote as of October 16th, correct?

5    A    Correct, and in --

6    Q    And by "we," you meant who?

7    A    MGA.

8    Q    And so if we look at the date of the e-mail, what is a

9    month before October 16, 2000?

10   A    September 16 of 2000.

11   Q    So we've got one e-mail where you say, We began working

12   the first week of September on this, and another saying you

13   been working about October 16th on this, correct?

14   A    I don't know about the first reference that you gave in

15   terms of the September date.  September 1st, I don't --

16   Q    No, the first week of September, I was referring to

17   Exhibit 305.

18   A    Correct.

19   Q    You say, "We began working on this line the first part

20   of September"; do you see that?

21   A    Yes, and that working is the exploratory sculpt that I

22   made reference to before.  It was the exploration, the due

23   diligence that we took to prove out the concept, my

24   suspicions that his portfolio content would be inappropriate

25   if materialized in the way that they were drawn.  We were

CV 04-9049-DOC – 01/26/2011 – Day 7, Vol. 2 of 3

22

1    not --

2    Q    Sorry, didn't mean to interrupt you.

3    A    That's fine.

4    Q    However you characterized it, what you wrote is that

5    MGA started developing this one month ago around

6    September 16th, right?

7    A    That's right.

8    Q    And that's around the same date that Carter Bryant was

9    sending correspondence to a hair vendor, representing to be

10   from MGA, correct?

11   A    Yes.

12   Q    And if you'd look at 11 -- I think it's 1103.  And you

13   recall you spoke about this in your cross-examination?

14   A    That's right.

15   Q    And specifically if we could blow up the far left where

16   I think you were asked about these numbers on the far left

17   and the FEP and PP numbers and PS numbers; do you recall

18   being asked about that?

19   A    Yes.

20   Q    And you testified that obviously those numbers are

21   wrong because they were, you know, when you were still at

22   Mattel, correct?

23   A    They are just -- whether I was at Mattel or not, they

24   are wrong.

25   Q    And you talked about how in this sort of document, you

1    put in a date and -- and -- and the document kind of works

2    back into other dates, correct?

3    A    That's correct.

4    Q    But that's not what happened on the numbers that are in

5    the middle part of this document, is it?

6         MR. PRICE:  And let's show that where it says

7    rotocast sculpting, the middle part, Ken, if we can just

8    focus on the middle right here where -- this part here.

9    BY MR. PRICE:

10   Q    Now, do you see it says, "Control drawings to L.A.

11   designer on October 2nd"; do you see that?

12   A    Yes.

13   Q    Now, that date was not something which the program

14   inputted, correct?

15   A    I'm not sure that that's the case.  It was either

16   inputted or it was a backtrack.  It was in like the rest of

17   the dates.

18   Q    So it wasn't a -- a date that you specifically put in

19   as a past date, that is something that had already occurred?

20   A    It may have been.  I don't remember.

21   Q    Let's see if we can refresh your recollection if we

22   could put before you May 30, 2008, page 972 --

23         THE COURT:  Exhibit number is, I'm sorry?

24         MR. PRICE:  Your Honor, I'm going to put before

25   her her transcript dated May 30, 2008.

1          THE COURT:  Thank you.

2          MR. PRICE:  Starting at 972.

3          THE COURT:  972.  Thank you very much.

4          And what line again, counsel?

5          MR. PRICE:  It's going to be lines 1 to 23 to

6    begin, I'll ask her if she can look at that.

7          THE COURT:  It appears to be lines 1 through 23,

8    counsel?

9          MR. PRICE:  Yes, actually going up to 973,

10   line 15.

11         THE COURT:  Thank you.

12   BY MR. PRICE:

13   Q    Did you have a chance to look that over, Ms. Garcia?

14   A    I'm just finishing.

15        Okay.

16   Q    Now, it's correct that in your cross-examination, you

17   were stating that these dates, including the PDF date of

18   October 16th, and the drawings -- control drawings for the

19   L.A. designer of October 2nd, were not accurate dates or

20   dates that you put into this document, correct?

21   A    I just want to make sure that we are a hundred percent

22   clear.  October 16th, 2000, is a correct date, and you had

23   asked me just a few minutes ago if I had entered in the date

24   control drawing to L.A. designer, and I said I may have, I

25   don't know.

CV 04-9049-DOC – 01/26/2011 – Day 7, Vol. 2 of 3

25

1        I just want to make sure when asked that question, I

2    thought you were asking did I type in 10, backslash 2,

3    backslash 2000, into that cell, and that, I don't recall.

4    Q     In your cross-examination when you were shown this

5    document --

6    A     Yes.

7    Q     -- didn't you tell the jury that the dates here weren't

8    accurate, and you gave as an example the dates that were in

9    the far left that say March 20, 2000 and April 3, 2000 and

10   May 1, 2000, and you said the dates on this document were

11   generated by a computer program of some sort?

12   A     Yes, I did.

13   Q     And that's not true, is it?

14   A     Your Honor -- excuse me.

15   Q     I am not your Honor.

16   A     Excuse me.  I'm sorry.  Mr. Price, if I could see the

17   whole document again.

18        The PDF is a date that I don't believe is linked to the

19   development, because the PDF is not a micro milestone to the

20   activities that are boxed in each one of the categories in

21   this document, so I mean, not in no way to mislead the jury

22   at all, I mean to say that all of the micro milestones

23   within their boxes were wrong because they were calculated

24   from the PS date that was entered incorrectly, but the PDF

25   date is a date that I have to borrow from another document

1    because it's a separate document and enter it into that

2    cell.

3    Q    If you look at that center column, you see there are

4    dates that are grayed out in gray, they are October 16, 2000

5    and they are October 2, 2000, right?

6    A    That's right.

7    Q    And you sat down and you specifically grayed out those

8    dates, correct?

9    A    That's correct.

10   Q    And you did that because those were dates that were

11   already in the past, that is, at the time you created this

12   document, those were the two dates that had already taken

13   place, correct?

14   A    That's correct.  However, at that time, those dates

15   were grayed out; however, the control drawing to the L.A.

16   designer later in our development represents that that date

17   is not a correct date.

18   Q    Well, when you look at this chart and you decided I'm

19   going to take the additional step of graying the dates, that

20   I'm recording things that have already happened, you didn't

21   gray out the -- the incorrect numbers that were on the left,

22   correct, because that wouldn't have made sense?

23   A    That's right.

24   Q    So what you did is you went through and you took this

25   additional step of graying the dates that you knew had

1    happened in the past, correct?

2    A    At that time, yes.

3    Q    And so, for example, you had the PDF date of

4    October 16, 2000.  That happened on October 16, correct?

5    A    That's right.

6    Q    In fact, I think we reviewed the documents that showed

7    that that happened on October 16th, right?

8    A    That's right.

9    Q    And then you specifically grayed this date, "control

10   drawings to L.A. designer," and you grayed that date as of

11   October 2nd, 2007 (sic), correct?

12   A    At that time, yes.  However, the control drawing that

13   was generated for what was the manufactured Bratz doll did

14   not occur on October 2nd of 2000.

15   Q    Whatever it is you are referring to there when you say

16   "control drawings to L.A. designer," you specifically grayed

17   that out because whatever you are referring to there took

18   place on October 2, 2000, correct?

19   A    At that time, yes, but it is not the milestone or the

20   control drawing that generated the manufactured Bratz doll.

21   Q    That date is obviously something that already happened

22   in the past, that you grayed out, correct?

23   A    Yes, at that time, that's correct.

24   Q    And whatever you define as these control drawings,

25   whatever you have in your mind, they were drawings done by

1    Carter Bryant, correct?

2    A    Yes, I believe, in fact, those were the portfolio

3    drawings.

4    Q    So you say that in your mind, you distinguished between

5    October 4th, before and after, but if you look at all of

6    your written documentation, you don't distinguish, do you?

7    A    I don't understand the question.

8    Q    In your written documentation, you say you first

9    started developing this in September, that Carter Bryant and

10   MGA started working on this in the first of September, and

11   that you had control drawings created by Carter Bryant on

12   October 2nd, 2000, right?

13   A    That's right.  All of those activities were not used in

14   the development of what became the manufactured Bratz doll.

15   Q    When you had development, you developed in stages,

16   correct?

17   A    Yes.

18   Q    And the point is that you were trying to develop this

19   doll with Carter Bryant prior to October 4, 2000?

20   A    No.

21   Q    Right?

22        In fact, in September of 2000, you actually paid

23   invoices submitted for Margaret Leahy for work that was done

24   in September of 2000 on this project, right?

25   A    Yes.

```
 1    Q     And I believe you said that you had to approve those
 2    invoices, correct?
 3    A     That's correct.
 4    Q     And in September of 2000, Carter Bryant was set up as a
 5    vendor at MGA, correct?
 6    A     Yes, for the Prayer Angels project.
 7    Q     Well, let's look at 11889, which I believe is already
 8    in evidence, your Honor.
 9              THE COURT:  It is.
10    BY MR. PRICE:
11    Q     And page 11, and you told us who Kerri Legg is -- this
12    is on September 15, 2000?
13    A     Yes, it is.
14    Q     You told us who Kerri Legg is.  Who is Barbara Malcolm?
15    A     She was also one who worked in the like accounts
16    payable or finance department at MGA.
17    Q     This is from Kerri Legg to Barbara Malcolm; do you see
18    that?
19    A     Yes.
20    Q     And it says, "Barbara, please set up the following as a
21    new vendor.  I do not have the social security number yet,
22    but I'll forward it to you as soon as I receive it," and
23    then it has I guess what purports to be Carter Bryant's
24    address and phone number, correct?
25    A     Yes.
```

1    Q     By the way, after October 6th -- between October 6th

2    and October 19th, did you notice that Carter Bryant wasn't

3    coming in to MGA except at lunchtime and on Friday

4    afternoons?

5    A     No.  Actually Carter Bryant came in on the mornings

6    during the weekdays.  We had shopping experiences that were

7    happening at the same time throughout the day.  I remember

8    that, in fact, Carter Bryant was coming throughout the day

9    within the weekdays.

10   Q     So if anyone said you told them that he was coming in

11   only on his lunch hours because he worked for Mattel, then

12   that person would also be mistaken?

13   A     That's correct.

14   Q     Let me show you an exhibit counsel showed you in his

15   cross-examination, Exhibit 551.

16         And you recognize that e-mail was sent to you and

17   others on, it looks like, September 6th, 2001, and this is

18   where it says, "Here are legally relevant dates for Bratz,"

19   and it says, "Date of creation, September 18, 2000"; do you

20   see that?

21   A     Yes, I do.

22   Q     Now, you are aware that MGA believes that the dates of

23   the creation of its intellectual property are important

24   things, correct?

25   A     Yes.

1    Q    I mean, you know these sort of dates are kind of key to

2    MGA maintaining its ownership in intellectual property,

3    correct?

4    A    I expect so.  I am not an expert in legally relevant

5    dates.

6    Q    And when you saw this e-mail, September 18, 2000, which

7    said that's the date of creation of Bratz, did you send out

8    anything saying, no, it wasn't, there is an October 4th

9    contract?

10   A    No, I did not.

11   Q    And is that because you knew that the Carter Bryant

12   contract was effective as of September 18th, 2000?

13   A    No.

14   Q    So you believe this date is incorrect?

15   A    Yes, I do.

16   Q    You believe the October 2nd date that you put in

17   your -- in that Exhibit 1103 is incorrect?

18   A    Yes -- well, I just want to be clear.  It was correct

19   at the time, but in the full evolution of Bratz and what

20   became the manufactured Bratz, that date is then incorrect.

21   Q    So it's correct now that as of October 2nd, MGA was

22   using Carter Bryant's drawings to give to someone to sculpt

23   to try to create the Bratz line?

24   A    Yes, to create an exploratory sculpt that I

25   commissioned because of my concern for Carter Bryant's

CV 04-9049-DOC - 01/26/2011 - Day 7, Vol. 2 of 3

32

1    portfolio drawings.

2    Q    Actually, ma'am, as of October 4th, there had already

3    been two sculpts, right?

4    A    That's not what I remember.

5    Q    Do you recall that there was a sculpt which was done by

6    September 29th?

7    A    I believe if there was a sculpt that was created in the

8    month of September, it's my memory that that's the

9    exploratory sculpt.

10   Q    If Ms. Leahy and Mr. Bryant testified there was a

11   sculpt by September 29th, would you disagree with them?

12           MR. MC CONVILLE:  Your Honor, this is improper

13   questioning, interjecting what other people would say.

14           THE COURT:  Sustained.

15   BY MR. PRICE:

16   Q    Do you recall there was a second sculpt by October 6th?

17   A    I remember generally that the second sculpt happened or

18   began to happen in the early parts of October.

19   Q    Sitting here today, can you tell us for sure that there

20   was no first sculpt done by the end of September?

21   A    I can tell you in my definition of what I refer to as

22   first sculpt, which may be different from what others refer

23   to as first sculpt.  I refer to an exploratory sculpt, which

24   was technically the first sculpt created, but then I refer

25   to a first sculpt as what we -- was the first sculpt that we

1    actually generated and developed the manufactured Bratz

2    from.

3        Now, Mr. Price, others might refer to my exploratory

4    sculpt as a first sculpt, so I just want to make sure that I

5    can only be referencing what I refer to as exploratory

6    first.

7    Q    Okay.  You had a number of e-mails during this time

8    about sculpts, right?

9    A    What time frame, please?

10   Q    September, October of 2000.

11   A    Possible, yes.

12   Q    And in any e-mail, did you ever refer to a sculpt as an

13   exploratory sculpt?

14   A    No.

15   Q    And the first --

16   A    Actually, and to be clear, I did make references to

17   sculpts, especially the exploratory sculpt, as it being

18   incorrect or something just generally for Hong Kong to

19   study, but in terms of the exact wording "exploratory

20   sculpt," no, I did not.

21   Q    You mean using the word "exploratory," you never used

22   that word in an e-mail referring to the sculpts, correct?

23   A    Correct.

24   Q    Is it correct that the third sculpt was done no later

25   than October 23rd?

CV 04-9049-DOC - 01/26/2011 - Day 7, Vol. 2 of 3

34

```
 1              MR. MC CONVILLE:  Objection.  Vague based on the
 2    witness' answer.
 3              THE COURT:  Overruled.
 4              THE WITNESS:  Again, it depends on what you refer
 5    to as third sculpt, so if it's to give my definition of
 6    third sculpt, I don't recall the third sculpt which was
 7    ultimately the final sculpt to happen until way into
 8    November or December of 2000.
 9    BY MR. PRICE:
10    Q    Do you still have 1141 in front of you?
11              MR. PRICE:  May we approach, your Honor?
12              THE COURT:  (No audible response.)
13              (Attorney discussion held off the record.)
14    BY MR. PRICE:
15    Q    While they are searching for it, let me go on to what
16    you, I think, say is the final.
17              THE COURT:  Counsel, that was a photo of a sculpt.
18    I don't know if you call it the tangible, could that be the
19    issue?
20              MR. MC CONVILLE:  It was shown, your Honor, and I
21    don't know if it was moved into evidence at the time I
22    showed it.
23              THE COURT:  Well, has anybody seen a sculpt?
24              (Laughter.)
25
```

```
 1              MR. PRICE:  Well, while we are working that out,
 2    if we can put up the demonstrative 23797-0006.
 3    BY MR. PRICE:
 4    Q    And on the right, you see that's a Bratz doll, the
 5    first generation, correct?
 6    A    Yes, it is.
 7    Q    And on the left, you see a drawing that was done by
 8    Carter Bryant somewhere between October 14th and
 9    October 19th, correct?
10    A    Yes.
11    Q    And if you can -- in terms of dimensions, if we can put
12    up 23797-006.
13              MR. PRICE:  I'm sorry, 005.
14    BY MR. PRICE:
15    Q    So if you look at this, there is a line which shows the
16    chin, correct, it goes across?
17    A    Yes.
18    Q    A line that shows the shoulders and the chest, correct?
19    A    Yes.
20    Q    A line that shows the waist?
21    A    Yes.
22    Q    A line that shows the crotch?
23    A    Yes.
24    Q    And the knees?
25    A    Yes.
```

1   Q    And the ankles?

2   A    Yes.

3   Q    And this drawing which Mr. Bryant created sometime

4   between October 4th and October 19th was given to Ms. Leahy,

5   correct?

6   A    Correct.  However, I think it's important to represent

7   that this drawing that was created by Carter Bryant and

8   provided to Margaret Leahy is a drawing that Carter drew

9   after he saw Margaret Leahy's, what I refer to as the first

10  sculpt for Bratz, not the exploratory sculpt.

11  Q    And that doll on the right, that's the one that

12  actually was sold, correct?

13  A    Yes.

14  Q    And that sculpt was the sculpt that was used on

15  generations of Bratz dolls, correct?

16  A    Yes.

17  Q    And that sculpt was used on all the first generation of

18  Bratz dolls, correct?

19  A    Yes, with the exception of those shoes in particular,

20  they may have been exchanged.

21  Q    And of course the idea was you could exchange the

22  shoes, correct?

23  A    Yes.

24  Q    And that drawing of Mr. Bryant's, whether it was with

25  your assistance or Ms. Leahy's, that drawing was created

Case 2:04-cv-09049-DOC-RNB   Document 9729   Filed 01/28/11   Page 37 of 92   Page ID #:291359
CV 04-9049-DOC - 01/26/2011 - Day 7, Vol. 2 of 3

37

1    while he was still an employee of Mattel, correct?

2              MR. MC CONVILLE:  Objection.  Lacks foundation.

3              THE COURT:  Overruled.

4              THE WITNESS:  I'm not exactly sure on the exact

5    date which Carter left Mattel.

6    BY MR. PRICE:

7    Q    Okay.  Now, how long have you known about this case?

8    A    Since 2004.

9    Q    So you've known about this case for six to seven years?

10   A    Yes.

11   Q    And you still don't know whether or not Carter Bryant

12   was a Mattel employee up through October 19 of 2000?

13             MR. MC CONVILLE:  Objection.  Argumentative.

14             THE COURT:  Overruled.

15             THE WITNESS:  I know that Carter Bryant was a

16   Mattel employee for -- for a time period after our contract

17   was signed.  I just don't know the exact date.

18   BY MR. PRICE:

19   Q    You never heard the date October 19 in the last six or

20   seven years -- well, let me step back.

21        Someone told you that a contract was signed

22   October 4th, right?

23   A    Yes.

24   Q    Someone did not tell you that it was effective as of

25   September 18, right?

1   A    Correct.

2   Q    Did anyone in these last six and a half or seven years

3   tell you that Carter Bryant's last full day at the Mattel

4   design center was October 19?

5   A    I don't recall October 19th.  It's possible that

6   someone told me.  I just don't remember.

7   Q    Now, you spoke during your direct examination about --

8   a little bit about the interchangeable hair, correct?

9   A    Yes.

10  Q    And that you decided not to do that?

11  A    That's right.

12  Q    Well, as of, is it December of that year -- I mean, you

13  still wanted to do it?

14  A    We wanted to do it provided that it looked acceptable

15  when manufactured.

16  Q    I mean, you and Mr. Larian were communicating and

17  saying, this is something we'd like to do if it's --

18  depending upon how it looks in manufacturing, correct?

19  A    Yes.

20  Q    Now, I want to talk to you about the -- those fashion

21  designs, and we'll start with 1107.

22       And 1107 is Jade; is that right?

23  A    Yes, it is.

24  Q    Now, I think you said, and correct me if I'm wrong, in

25  cross-examination, that it took about a month to get to this

CV 04-9049-DOC - 01/26/2011 - Day 7, Vol. 2 of 3

39

1    design; is that right?

2    A    That's right.

3    Q    That is, you said you and Carter Bryant would get

4    together and he would buy fashions and sketch them out and

5    give them to you for your comments, right?

6    A    That's right.

7    Q    And that ultimately led up to what we see here as 1107,

8    correct?

9    A    Correct.

10   Q    And we know that that process was done in preparation

11   for a -- a sales meeting with Kmart around November 7th,

12   correct?

13   A    Correct.

14   Q    And you said that they were certainly done at least a

15   week or so before that, correct?

16   A    I believe that they were created -- yes, within --

17   within the week before their meeting.

18   Q    And if we look at Exhibit 1236, that's an e-mail dated

19   October 24, 2000, and the second e-mail there on the string

20   is from you to Cecilia Kwok, correct?

21   A    Yes.

22   Q    And that's in the second paragraph where you say, "We

23   have finalized the fashion designs, and I'm releasing the

24   following final design packages to you on your Friday"; do

25   you see that?

CV 04-9049-DOC – 01/26/2011 – Day 7, Vol. 2 of 3

40

1   A    Yes.

2   Q    Now, you told us that there were actually two fashions

3   with each doll that was sold, correct?

4   A    Right.

5   Q    But if we look at the dolls themselves, and you see

6   what clothes were on the dolls as sold, for example, for

7   Jade.

8          MR. PRICE:  If we had put up 1107 again, Ken.

9   BY MR. PRICE:

10  Q    For Jade, the fashion that's on the doll is that

11  fashion, correct?

12  A    That's right.

13  Q    And for Sasha, the fashion which is on the doll is the

14  same as in those --

15         MR. PRICE:  We'll show up 1108.

16  BY MR. PRICE:

17  Q    Correct?

18  A    Correct.

19  Q    And the fashion that's on Yasmin is 1110, correct?

20  A    Correct.

21  Q    And the fashion that's actually on Cloe is 1109,

22  correct?

23  A    Correct.

24  Q    So even though there were eventually two fashion

25  designs, the ones that were on the dolls themselves are the

CV 04-9049-DOC – 01/26/2011 – Day 7, Vol. 2 of 3

41

1    ones reflected in 1107 to 1110, correct?

2    A    Correct.  However, it's possible that the fabrics that

3    we worked out that we eventually sent to Hong Kong, it's my

4    memory that those fabrics were not worked out by the time

5    that this drawing was complete.

6    Q    Well, let's look at, then, 1236.

7    A    Okay.

8    Q    And you were asked questions by your counsel about

9    things being aspirational; do you remember that?

10   A    Yes.

11   Q    And if you look at that third paragraph there, it says,

12   "We have finalized the fashion designs, and I'm releasing

13   the following final design packages to you on your Friday";

14   do you see that?

15   A    Yes.

16   Q    So as of that date, October 24, 2000, as of that date,

17   you thought you had designs which were final fashion

18   designs, correct?

19   A    Can I have a second to read the e-mail for a second?

20   Q    Sure.

21   A    Okay.

22   Q    The answer is correct?

23        As of that date, as of October 24, a Tuesday, you had

24   what you thought, then, were finalized fashion designs,

25   correct?

CV 04-9049-DOC - 01/26/2011 - Day 7, Vol. 2 of 3

42

1    A    On the face of this e-mail, it seems that I believed or

2    at least I wrote I believed that I had my final fashions

3    complete, but I know that that is not correct.

4    Q    Well, between October 6th and October 24th, Mr. Bryant

5    was going on shopping excursions, buying fashions and

6    putting outfits together for you to look at, right?

7    A    Yes, he was.  He was shopping and putting his

8    shopping -- shopped goods together in collections for us to

9    review.

10   Q    And if it happened from October 6th to October 24th,

11   say, he was doing most of that work, putting those fashions

12   together, to show you while he was still a Mattel employee,

13   if you assume October 19th was his last full day at the

14   Mattel design center?

15   A    I don't know about -- certainly I'll represent that he

16   was working at Mattel while he was shopping and even

17   potentially sketching some material for us for that first

18   outfit.

19        I want to -- I'm uncomfortable with the word "most"

20   because I believe especially at this point, our second

21   outfit had not been concepted, and the reason I know that is

22   because had it been complete, I would have shown that second

23   outfit to my buyer so I could have shown a more complete

24   concept.

25   Q    Let's talk about just the first fashion concept, which

1    is on 1107 through 1110, the one that appeared on the dolls.

2    A    Okay.

3    Q    So you see it says October 24th, here, is a Tuesday?

4    A    Yes -- oh, I don't know, actually.

5    Q    Let's see if --

6    A    Is that a Tuesday?

7    Q    Do you see that, Tuesday, October 24th?

8    A    Yes.

9    Q    Okay.  So October 19th would have been the Thursday

10   before, correct?

11   A    (No audible response.)

12   Q    I'll give you some time to go through that in your

13   mind.

14   A    Okay.

15   Q    So basically if Carter Bryant's last day was

16   October 19th, you are not saying that on those four days,

17   full days, before October 24th, he did those final designs

18   in a rush, over just that small time period?

19   A    No, I'm not saying that.

20   Q    You believe that these 1107 to 1110 were done before he

21   left Mattel on October 19th?

22   A    No, I can't be sure of that.  And as I've testified, I

23   believe he created these either the last week of October or

24   the first weeks -- first week of November.  I can't remember

25   the exact date.

CV 04-9049-DOC - 01/26/2011 - Day 7, Vol. 2 of 3

44

1    Q    And the last week of October and the first week in

2    November would be after this e-mail of October 24th where

3    you say, "We have finalized the fashion designs," right?

4    A    That's correct.  This e-mail and that reference is not

5    right.

6    Q    So this is another date that's incorrect?

7    A    That's right.

8    Q    How many dates do you think we reviewed that are

9    incorrect, now?

10          MR. MC CONVILLE:  Objection.  Argumentative.

11          THE COURT:  Overruled.

12          THE WITNESS:  How many dates did I have incorrect?

13   BY MR. PRICE:

14   Q    Well, let me --

15          THE COURT:  It is vague, counsel, but --

16          MR. PRICE:  Yeah, let me ask it this way.

17   BY MR. PRICE:

18   Q    The four hours a day that you wrote in your e-mail,

19   that's incorrect?

20   A    Yes.

21   Q    The October 2nd date for control drawings, that's

22   incorrect?

23   A    No, Mr. Price, I already confirmed that when the time

24   of creating that grayed-out cell, it may not have been

25   correct, but I can tell you in the final evolution in the

CV 04-9049-DOC - 01/26/2011 - Day 7, Vol. 2 of 3

45

1    final manufactured Bratz, we did not have the control

2    drawing on October 2nd.

3    Q    What you said in your cross-examination were the dates

4    on that document were incorrect, right?

5    A    There were dates on that document that were correct,

6    because I entered one wrong date.

7    Q    So you said that starting --

8    A    So you have to count --

9    Q    You said that starting the development of the project

10   in the first week of September was incorrect?

11   A    I want to make sure that when we talk about starting

12   the project in the first part of September, that it's taken

13   in the correct context, which means that we did start some

14   work in September, work was attributed to the exploratory

15   sculpt.  The exploratory sculpt I explained we did not use

16   for manufactured Bratz dolls.

17   Q    So we can use your characterization, though, that you

18   were developing the project in September, that was your

19   characterization, right?

20   A    I'm just uncomfortable because in my creative world,

21   development means that we are -- what we create, what we

22   develop is actually what we attribute to our manufactured

23   good, so I'm -- I guess in my creative world, that is an

24   uncomfortable word.

25   Q    Okay.  So what we can say, then, is that when you use

1   the word that we weren't developing this, the way you use

2   the word is attributable to the final product, that's what

3   you just said, right?

4        You just gave us your definition of how you use that

5   phrase, right?

6   A    Yes.

7   Q    So when you use the phrase "developing this project,"

8   you are talking about a time when what you're using is going

9   into the final product?

10  A    I mean, it has to be given within a context, of course.

11  I guess I just want to make again very, very clear, we

12  worked -- we created a exploratory sculpt in September.  It

13  was before the contract was signed.  And we created that

14  work in September because of my concern that if and when

15  this contract were signed, that I wanted to be sure and my

16  suspicions were true that those renderings and those

17  drawings would be inappropriate if translated into 3D.

18  Q    No, I'm asking you about the way you just defined

19  developing a line.

20  A    Okay.

21  Q    I'm just trying to -- because I think you just said,

22  that you said when you use the phrase "developing a line,"

23  you are referring to a time phrase when what you are using

24  is being used in the final product; isn't that what you

25  said?

CV 04-9049-DOC – 01/26/2011 – Day 7, Vol. 2 of 3

47

```
 1    A     I -- I guess I'm just confused by what you are saying.
 2    I don't understand.
 3    Q     Didn't you say that in your special creative world,
 4    that when you say that you were developing a line, you are
 5    saying you were doing work which is attributable to the
 6    final product?
 7    A     It depends on the context.  I'm only giving an example
 8    that development is a word that we all use, and sometimes
 9    used in the creative context may have a different meaning.
10    Q     And the meaning that you say it is given in the
11    creative context is that what you are doing is attributable
12    to the final product?
13    A     Because I use the word "development," and maybe I need
14    to be more clear, because I use the word "development" in
15    the creative context does not mean that that word is always
16    and exclusively an attribution to my final manufactured
17    good.
18    Q     So Exhibit 924, when you say, "Please keep in mind that
19    we only started developing this line one month ago," and you
20    said that in the October 16th e-mail, you were not using
21    developing this line -- you were not using those words to
22    mean what you just said they can mean, which is attributable
23    to the final product?
24    A     I believe when writing this e-mail, that when I used
25    the word "developing," I was making reference to the
```

1    development of that exploratory sculpt.

2    Q    Well, I thought you told us that exploratory sculpt

3    didn't take place until the end of September or early

4    October?

5    A    The exploratory sculpt, as I have testified, took place

6    within the month of September.  I don't remember the exact

7    dates.

8    Q    Okay.  So in Exhibit 305, then, when you were saying we

9    began working on this line the first part of September, I

10   mean certainly then you are not talking about the

11   exploratory sculpt?

12   A    Mr. Bryant -- I mean, sorry.  Mr. Price, I met Carter

13   Bryant on September 1st of 2000, and then sometime in

14   September, we started to work on an exploratory sculpt.

15   Q    Is it your view that the designs that Carter Bryant

16   showed to you in August, September of 2000, that the final

17   product is not attributable to those designs?

18           MR. MC CONVILLE:  Objection.  Vague.

19           THE COURT:  Overruled.

20           THE WITNESS:  I can tell you that the manufactured

21   Bratz dolls were certainly an evolution of the portfolio

22   drawings that Carter Bryant presented, but they are -- they

23   are very -- there are some very big differences between the

24   manufactured Bratz dolls and what was seen in the portfolio.

25

1    BY MR. PRICE:

2    Q    Well, I'm using a word that you used, "attributable."

3    Are you telling us that the final product is not

4    attributable to Carter Bryant's design drawings of Bratz

5    that you saw -- whatever you saw before, I'll say, October

6    of 2000?

7              MR. MC CONVILLE:  Objection to the extent that it

8    calls for a legal conclusion.

9              THE COURT:  Overruled.

10             THE WITNESS:  I'm not sure I understand the

11   question.  I can tell you that the manufactured Bratz dolls

12   were an evolution from Carter Bryant's portfolio drawings.

13   There were big differences between the manufactured Bratz

14   doll and Carter Bryant's portfolio.

15   BY MR. PRICE:

16   Q    Well, I'm just using a word that you used,

17   "attributable."

18   A    Okay.

19   Q    So using the definition that's in your mind, can you

20   give us a yes or no answer, and that is --

21   A    There are --

22   Q    -- were the Bratz dolls that were produced attributable

23   to the designs that you got from Carter Bryant before

24   October of 2000?

25             MR. MC CONVILLE:  Objection.  Asked and answered.

Case 2:04-cv-09049-DOC-RNB   Document 9729   Filed 01/28/11   Page 50 of 92   Page ID #:291372
CV 04-9049-DOC - 01/26/2011 - Day 7, Vol. 2 of 3

50

```
 1              THE COURT:  Overruled.

 2              THE WITNESS:  I don't know how else to answer that

 3    again.  I guess that there are -- there are -- that Bratz is

 4    an evolution of the portfolio, and I just make sure to be

 5    clear that the manufactured Bratz dolls have big differences

 6    from the portfolio.

 7    BY MR. PRICE:

 8    Q    Well, let's look at --

 9              (Attorney discussion held off the record.)

10              MR. PRICE:  -- 23797, start with 16.  If we can

11    show that, Ken.

12              And Ken, can you block out the middle drawing.

13    BY MR. PRICE:

14    Q    So are you saying that the doll, which we have as

15    17558, because it's in the package, is not attributable to

16    the drawing which is in Exhibit 302?

17              MR. MC CONVILLE:  Objection.  Asked and answered.

18              THE COURT:  Overruled.

19              THE WITNESS:  I believe there are some

20    similarities between 17558 and 302.

21    BY MR. PRICE:

22    Q    Now, I noticed on your cross-examination, you did not

23    talk about the similarities, correct?

24    A    No, I did not.

25    Q    And is it your understanding -- well, let me ask,
```

```
 1    what -- excluding Carter Bryant, what was -- what's the pay

 2    range of designers at MGA?

 3    A    I'm sorry, I thought --

 4    Q    What's the pay range of designers at MGA?

 5    A    It depends on their level or their title.

 6    Q    So can you give me a range?

 7    A    An entry level designer with small or minimal design

 8    experience can come in at around maybe $40,000, and a very

 9    senior, probably a director title designer could make maybe

10    as much as $100,000.

11    Q    So it's unusual for designers to make, say, 30 million?

12    A    You mean an employed MGA designer?

13    Q    A designer of a doll?

14    A    I don't know.  I don't understand necessarily the

15    question.  Is it possible --

16    Q    Well, it's your understanding --

17    A    Uh-huh.

18    Q    -- that Carter Bryant in connection with the designs

19    that he did was paid over $30 million?

20            MR. MC CONVILLE:  Objection.  Improper foundation.

21            THE COURT:  Well, it's not a complete question,

22    Counsel, paid -- it needs to be clear, salary and royalties.

23            Sustained.

24    BY MR. PRICE:

25    Q    It's your understanding that Carter Bryant -- actually
```

Case 2:04-cv-09049-DOC-RNB   Document 9729   Filed 01/28/11   Page 52 of 92   Page ID
#:291374
CV 04-9049-DOC - 01/26/2011 - Day 7, Vol. 2 of 3

52

1    let me step back.

2        Do you know if Carter Bryant had a salary?

3    A    No, I do not.

4    Q    Is it your understanding that he had only advances

5    against royalties?

6    A    I'm not sure what Carter Bryant was paid by MGA.

7    Q    Do you have an understanding that combining salary and

8    royalties, that he has been paid tens of millions of

9    dollars?

10   A    I don't know how much money MGA has paid Carter Bryant.

11   Q    You've told us that you've looked at documents showing

12   how much money comes in for certain types of dolls, haven't

13   you?

14   A    No, I don't recall that.

15   Q    So you're unfamiliar with -- have no idea at all how

16   much Carter Bryant has been paid in connection with Bratz?

17            MR. MC CONVILLE:  Objection.  Asked and answered.

18            THE COURT:  Overruled.

19            THE WITNESS:  Correct.

20   BY MR. PRICE:

21   Q    So in the six and a half, seven years that this

22   litigation has been going on, has anyone at MGA told you how

23   much Carter Bryant made in connection with Bratz?

24   A    No.

25   Q    You haven't heard anything about that?

1    A    No.

2    Q    In your position as a Bratz product manager, have you

3    received any information as to how much Carter Bryant has

4    made in connection with Bratz?

5              MR. MC CONVILLE:  Objection.  Asked and answered.

6              THE COURT:  I'll allow this one more question,

7    product manager, and then we'll move on.

8              THE WITNESS:  No.

9              THE COURT:  Now we'll move to the next area.

10   Thank you.

11   BY MR. PRICE:

12   Q    Now, in connection with the fashions -- and, for

13   example, we'll just put in Exhibit 1107, and show that.

14         In connection with creating those fashions, you've got

15   people who have to sew the actual fashions, correct?

16   A    That's right.

17   Q    And in order for them to -- to sew the actual patterns,

18   they have to be given a design to sew and to make the

19   pattern, correct?

20   A    That's correct.

21   Q    And October 20th -- I'm sorry, by October 20th, you

22   already had designs to show the pattern makers so they could

23   start making the fashions, right?

24   A    I don't recall that October 20th I had final designs.

25   Q    If you look at Exhibit 606, which is in evidence, and

1    particularly if you look at exhibit -- I mean, page 5, and

2    you see this is one of the invoices from Veronica Marlow,

3    right?

4    A    Yes.

5          MR. PRICE:  And Ken, if we can blow up a little

6    further the box that says quantity.

7    BY MR. PRICE:

8    Q    And you see this is the invoice, Bratz dolls

9    third-party services from October 13 to October 20, 2000; do

10   you see that?

11   A    Yes, I do.

12   Q    And you see it says 49 hours of third-party sewing and

13   pattern making support; do you see that?

14   A    Yes.

15   Q    And it has 32 hours, third-party sewing and pattern

16   making support; do you see that?

17   A    Yes.

18   Q    So you approved the payment of 81 hours of third-party

19   sewing and pattern making support that took place between

20   October 13, 2000 and October 20, 2000, correct?

21   A    That's correct.

22   Q    And looking at this, you would conclude that most of

23   that work took place before October 19, 2000, correct?

24   A    From the face of this document, it seems that that work

25   took place between October 13th and October 20th.

CV 04-9049-DOC – 01/26/2011 – Day 7, Vol. 2 of 3

55

1    Q    But the face has 81 hours on it, right?

2    A    Yes, and it's important to clarify, Mr. Price, that

3    49 --

4    Q    My question is, it has 81 hours, correct, altogether?

5    A    Yes.

6    Q    You don't really think all of that took place on

7    October 20th, do you?

8    A    No, but I can tell you what I think, and what I think

9    is that 49 hours and 32 hours is a combination of a number

10   of hours that a number of sample makers spent collectively

11   to arrive at that number.

12   Q    Okay.  Saying that, do you think all 81 hours took

13   place on October 20th?

14   A    No, I'm not saying that.

15   Q    Now, in your -- in your examination, you also were

16   asked about -- about packaging and about this trapezoidal

17   design; do you recall that?

18   A    Yes.

19   Q    And again, any fashion doll, when you are going to take

20   it to product, you've got to go from designs and you've got

21   to come up with a package, correct?

22   A    That's right.

23   Q    If you didn't have the fashion doll, you are not going

24   to come up with the package, right?

25   A    I don't know if the fashion doll -- without the fashion

1    doll, we couldn't have arrived at a package.  I think you

2    need a brand.  You need a concept, and the dolls play a part

3    of that concept, and so does the package.

4    Q    You didn't sell empty packages?

5    A    No, we did not.

6    Q    There was always doll in them?  For the dolls?

7    A    Yes.

8    Q    And when you were talking about the doll packages, you

9    were talking about this trapezoidal package, correct?

10   A    Yes.

11   Q    And would it be true to say that Mr. Larian was the

12   inventor of the trapezoidal package?

13   A    If you mean that -- I don't know, especially because

14   I'm concerned that that might be in reference to something

15   that was made from a legal point of view.

16   Q    Well, you told us that it was you and another woman who

17   invented the trapezoidal package, right?

18   A    Ilene Store.

19   Q    And you didn't say Mr. Larian invented this package,

20   correct?

21   A    No, although Mr. Larian, of course, reviewed and made

22   comments to our evolution of that trapezoid package.

23   Q    In your view, Mr. Larian is not the inventor of this

24   trapezoidal packaging, correct?

25              MR. MC CONVILLE:  Objection.  Calls for a legal

Case 2:04-cv-09049-DOC-RNB   Document 9729   Filed 01/28/11   Page 57 of 92   Page ID #:291379
CV 04-9049-DOC - 01/26/2011 - Day 7, Vol. 2 of 3

57

1    conclusion.

2            THE COURT:  Overruled.

3            THE WITNESS:  Carter Bryant -- excuse me, Isaac

4    Larian contributed to the design of the trapezoidal package,

5    but in the concept of inventor, inventorship, I am

6    uncomfortable to make any reference to that because I think

7    it has some reference to something legal.

8    BY MR. PRICE:

9    Q    Let's not talk about anything legal, let's talk about

10   the same context in which you used it on your

11   cross-examination when you were telling us who invented

12   this.

13   A    Okay.

14   Q    And you gave us two names, correct?

15   A    Correct.

16   Q    Mr. Larian was not one of them, correct?

17   A    Correct.

18   Q    So in your mind, in your view, he is not the inventor

19   of the trapezoidal package, correct?

20   A    If we are taking all legal -- legal relations to the

21   inventor, exclude that from just -- then I can just advise

22   that Ilene -- I attribute Ilene to create that structure.

23   And, in fact, Isaac and I gave comments and gave revisions

24   to its ultimate final design.

25   Q    So now your testimony is that Mr. Larian did invent

CV 04-9049-DOC - 01/26/2011 - Day 7, Vol. 2 of 3

58

1   this?

2   A    No, that's not what I'm saying.  And I'm excluding the

3   legal reference to inventor.

4   Q    Sure, I am talking about your view, you were there,

5   your view is that you and -- I'm sorry, I forgot her name.

6   A    Ilene Store.

7   Q    Ilene Store.  Your view is that you and Ilene Store

8   invented the trapezoidal package, not talking about the

9   legal sense but just talking about the everyday sense that

10  you use the word in every day of your life?

11  A    I attribute actually Ilene Store to the creation of the

12  trapezoidal package, and I contributed comments to what

13  became the final trapezoid package, so did Isaac Larian.

14  Q    Then why didn't you mention Isaac Larian in your

15  cross-examination?

16  A    Because I forgot his name.

17  Q    You remember his name now?

18  A    Yes, I do.

19  Q    Now, did you forget his name entirely or just in

20  connection with inventing the package?

21           MR. MC CONVILLE:  Objection.  Argumentative.

22           THE COURT:  No.  Overruled.

23           You can answer the question.

24           THE WITNESS:  In just speaking about the subject

25  of package?

CV 04-9049-DOC – 01/26/2011 – Day 7, Vol. 2 of 3

59

BY MR. PRICE:

1

2    Q    Yes.

3    A    I don't understand the question.  I apologize.

4    Q    So had you forgotten his name entirely when you were

5    testifying on your cross or did you just forget that he

6    assisted with the trapezoidal package?

7              MR. MC CONVILLE:  Same objection.

8              THE COURT:  Overruled.

9              THE WITNESS:  Isaac Larian is the owner of the

10   company, and on things like the structure of our package

11   that defines our brand, he's the final -- he makes the final

12   approval to proceed with a concept such as that.  So I

13   just -- I don't mean to -- solely to suggest that I don't --

14   or to confirm that Ilene created the structure, I gave

15   comments to its evolution, and ultimately Isaac reviewed

16   some of the latter parts of those concepts, made his

17   revisions and gave his ultimate approval to go forward.

18   BY MR. PRICE:

19   Q    Now, the word "invent" in everyday life, that doesn't

20   include approving of something, does it?

21   A    No.

22   Q    And talking about the trapezoidal packaging, you were

23   asked questions about Steve Linker and possible

24   communication with him in October 2000; do you recall that?

25   A    Yes, I do.

CV 04-9049-DOC - 01/26/2011 - Day 7, Vol. 2 of 3

60

1   Q    Do you recall any meetings with Steve Linker at all in
2   October of 2000?
3   A    I don't recall any meetings with Steve Linker.
4   Q    But you do believe that or your recollection may have
5   failed you that, in fact, you did meet with him, correct?
6   A    I think I said that it's possible that I met with him.
7   I don't recall it.
8   Q    Let me show you Exhibit 320.
9        And you see that this is an e-mail -- Ken, if we can
10  blow up the top of that -- from Ms. Hogan and to you on
11  October 12th, that doesn't refresh your recollection, does
12  it?
13  A    No, it does not.
14  Q    Now, do you remember having a meeting with Steve Linker
15  around October 19th, 2000 where he put these sketches on an
16  e-mail he had brought to the meeting?
17  A    No.
18  Q    Do you remember seeing in October of 2000 drawings that
19  look like the ones that are on this e-mail?
20        MR. PRICE:  And maybe, Ken, we can back out and
21  show all of the drawing concepts there.
22        THE WITNESS:  I don't recall drawings like this at
23  all.
24  BY MR. PRICE:
25  Q    And you were testifying that after 2000, that you

CV 04-9049-DOC - 01/26/2011 - Day 7, Vol. 2 of 3

61

1   developed new characters for the Bratz girls, correct?

2   A    Yes.

3   Q    And those characters had the same sculpt for the face?

4   A    Yes.

5   Q    Did they have the same body sculpt?

6   A    Yes.

7   Q    Were trendy and hip and -- correct?

8   A    Yes, and also, just to confirm, at some point, we

9   created new characters, and those characters ended up having

10  their own body sculpt that did not share with the original

11  Bratz.

12  Q    And when was that?

13  A    I can't remember the exact year.  I can tell you which

14  products the -- the new sculpts were in.

15  Q    Can you give us some estimate of the year, was it 2008,

16  2009, 2010, 2003?

17  A    Maybe 2004 or 2005 -- 2005.

18  Q    And on how many characters were there these new body

19  sculpts?

20  A    Well, there were a few body sculpts.  There was --

21  should I break those -- it's difficult.

22  Q    Just tell me.

23  A    Let's see.  I don't know.  Maybe brand new characters

24  associated to brand new bodies, because we also did old

25  characters and brand new bodies, too.

CV 04-9049-DOC - 01/26/2011 - Day 7, Vol. 2 of 3

62

1    Q    So is it 2005 that you started using some new bodies on

2    some characters?

3    A    Correct.

4    Q    And you picked up -- I think you were shown

5    Exhibit 17369, which is a Fiona?

6              MR. PRICE:  And do you still have that up there,

7    Tom?

8              MR. MC CONVILLE:  It should be.

9    BY MR. PRICE:

10   Q    We've got a picture of it up.

11        Do you remember in your cross-examination you held up

12   the box itself, this character, Fiona?

13   A    Fiana.

14   Q    Did I mispronounce it?

15   A    It's okay.

16   Q    And when you first -- there, we've got it right beside

17   you now.

18   A    Thank you.

19   Q    And you can show her to the jury.

20        And so when you first picked her up and showed her to

21   the jury, you thought it was Yasmin?

22   A    Yes, and I should explain why.  Because Fiana and

23   Yasmin share the same skin tone, and then in this particular

24   doll, we rooted the hair with so much different color and

25   also changed the masks of the eyes, that at fast and first

1    glance up here on the witness stand, I mistook her.

2    Q    They were sufficiently similar enough that glancing at

3    them on the witness stand, the president or head of Bratz

4    product development thought that it was Yasmin?

5    A    Yeah.

6    Q    And you've talked about the age of these -- these

7    dolls; do you recall that?

8    A    Yes.

9    Q    That your idea was they should be teenagers?

10   A    Yes.

11   Q    Now, I'd like you to look at 320.  I'm sorry, 302.  I

12   apologize.

13        And you were on the first page?  Just turn to the

14   second page.

15        MR. PRICE:  And if we can blow that up.

16   BY MR. PRICE:

17   Q    This was something that Mr. Bryant gave to you

18   sometime, let's say certainly by the end of September of

19   2000?

20   A    Yes.

21   Q    And if we could look at it, it says, "Meet the Bratz,

22   the totally transformable teenage dolls"; do you see that?

23   A    Yes, I do.

24   Q    And you understood that what Mr. Bryant's goal was, to

25   create four groups of -- four friends who were hip, trendy

CV 04-9049-DOC - 01/26/2011 - Day 7, Vol. 2 of 3

64

1  teenagers, right?

2  A    Yes.  Though his portfolio drawings I didn't believe

3  reflected that.

4  Q    Well, in the meeting that you attended, or at least in

5  one of the meetings you attended, it's true, is it not, that

6  when Mr. Bryant presented his designs, he said that the

7  purpose of this was to design transformable teenage dolls

8  that were girls who were best friends from high school,

9  correct?

10  A    Yes, I believe in that meeting he referred to them as

11  teenagers.

12  Q    And that the idea was that they were all high school

13  friends, right?

14  A    Uh-huh, yes.

15  Q    And they could exchange clothes?

16  A    Yes.

17  Q    Right?

18        And they could exchange shoes?

19  A    Yes.

20  Q    And they could exchange backpacks, right?

21  A    Yes.

22  Q    And based upon that presentation and based upon what

23  you said, MGA entered into an arrangement with him where

24  they were to develop his ideas, right?

25                MR. MC CONVILLE:  Objection.  The witness has said

1   she hasn't seen the contract.

2           THE COURT:  Ask the question one more time,

3   Counsel.

4   BY MR. PRICE:

5   Q    Is it your understanding that as a result of the

6   presentation he did, that MGA and Carter Bryant entered into

7   some sort of arrangement, MGA would try to use his ideas to

8   make dolls?

9           MR. MC CONVILLE:  Same objection.

10          THE COURT:  Yeah, I don't think she has the

11  foundation.  Hasn't she testified she never saw the

12  contract?

13          MR. PRICE:  I didn't ask about the contract

14  itself.

15          THE COURT:  What are you asking?

16          MR. PRICE:  Whether she was aware of there being

17  an arrangement of some sort.

18          THE COURT:  Well, ask her if she's aware.  It's

19  compound, what happens is it assumes that she's aware.

20  BY MR. PRICE:

21  Q    Are you aware that there was some sort of an

22  arrangement between Carter Bryant and MGA?

23  A    Yes, I am.

24  Q    Are you aware that that arrangement took place after he

25  represented to people at MGA his designs, his mockup doll

CV 04-9049-DOC - 01/26/2011 - Day 7, Vol. 2 of 3

66

1    and his drawings?

2    A    Yes.

3    Q    And is it your understanding that as a result of that

4    presentation, that there was an arrangement between him and

5    MGA, Carter Bryant and MGA, where MGA was going to try to

6    develop dolls based upon those designs and concepts?

7    A    I don't know what the details of the arrangements were.

8    I am not comfortable to answer that question.

9    Q    So when you went through with your counsel the

10   comparison of the dolls to the drawings, I mean, for

11   example, 23 -- 23797, 17, and this is Jade.

12       You talked at length about differences, correct?

13   A    Yes, I did.

14   Q    And you didn't talk about similarities, correct?

15           MR. MC CONVILLE:  Objection.  Misstates her

16   testimony.

17           THE COURT:  Overruled.

18           THE WITNESS:  I don't recall speaking of a

19   similarity in this comparison.

20   BY MR. PRICE:

21   Q    And do you think there is some similarity?

22   A    Which drawing should I be -- drawing should I be

23   comparing?

24   Q    You can compare the drawing from 302 to 504, we'll

25   start with that.

CV 04-9049-DOC - 01/26/2011 - Day 7, Vol. 2 of 3

67

1    A    There are some similarities.

2    Q    And compare 1107 to 504.

3    A    I just wanted to confirm what the similarities were.

4    There are cats --

5    Q    Are there similarities between 1107 and 504?

6    A    Yes, there are.

7    Q    And is it your understanding that Mr. Bryant was paid

8    for the ideas that he first represented in Exhibit 302?

9           MR. MC CONVILLE:  Objection.  This, again, goes

10   beyond the state of the witness' knowledge.

11          THE COURT:  Overruled.

12          THE WITNESS:  I am not sure what Carter Bryant was

13   paid for by MGA.

14   BY MR. PRICE:

15   Q    Didn't you have an understanding that Carter Bryant was

16   to get 3 percent royalty on any of the dolls that he

17   personally designed?

18   A    I believe that I understand that he was getting a

19   percentage of royalty.  I don't know how much that is.

20          MR. PRICE:  Your Honor, if we could read from

21   May 29th, 2008, page --

22          Ken, page 669, lines 16 through 24.

23          MR. MC CONVILLE:  What lines?

24          MR. PRICE:  Lines 16 through 24.

25          I'm sorry, we'll do lines 21 through 24.

CV 04-9049-DOC – 01/26/2011 – Day 7, Vol. 2 of 3

68

```
 1              THE COURT:  You may read.
 2    BY MR. PRICE:
 3    Q    Question:  "The only thing you do know is that
 4    Mr. Bryant was going to get a royalty of 3 percent on Bratz
 5    products?"
 6         Answer:  "I understood that Carter Bryant was to get
 7    3 percent royalty on any of the dolls that he personally
 8    designed."
 9         Now, if you could look at -- it's the last -- I think
10    it's the last exhibit your counsel gave you.  I may be
11    wrong.  It was 16682A.  If I can have a moment to get a
12    copy.
13              (Attorney discussion held off the record.)
14              MR. PRICE:  There won't be a copy in the binder.
15    Mr. McConville had the only copy.
16    BY MR. PRICE:
17    Q    Do you remember he asked you about this e-mail from
18    Georgia Manolas?
19    A    Yes.
20    Q    To you dated April 19, 2001; do you see that?
21    A    Yes.
22    Q    She says, "Funny, so I hear MGA sent their product list
23    to Mattel in Latin America and wanted us to distribute the
24    product"; do you see that?
25    A    Yes.
```

CV 04-9049-DOC – 01/26/2011 – Day 7, Vol. 2 of 3

69

1    Q    And it's your understanding that at the time of

2    April 19, 2001, Mattel -- MGA did not have a distribution

3    network in Latin America, correct?

4    A    I really don't know the distribution situations related

5    to Latin America.

6    Q    Okay.  And then she says, Just imagine, you figure she

7    said imagine, "image my surprise when I looked in the system

8    today and saw Bratz and Scooter Samantha"; do you see that?

9    A    Yes.

10   Q    And she says "not"?

11   A    Yes.

12   Q    And who made Scooter Samantha?

13   A    MGA.

14   Q    Now, as of April 19, 2001, you had already had the

15   presentation to Kmart on November 7, 2000, correct?

16   A    Correct.

17   Q    And the Hong Kong toy fair had already taken place,

18   correct?

19   A    Correct.

20   Q    And, in fact, folks from Mattel were invited to see the

21   Bratz display at the Hong Kong toy fair?

22   A    I -- I don't know if they were invited.  I don't recall

23   that.

24   Q    I mean, before you are going to ask someone to

25   distribute a product, you would probably show them the

CV 04-9049-DOC - 01/26/2011 - Day 7, Vol. 2 of 3

1    product, right?

2    A    I don't know.  I really don't know.

3    Q    Well, in any event, when you received this e-mail from

4    Ms. Manolas, did you conclude from this that there was

5    anything suspicious or wrong going on?

6    A    No.

7    Q    And you don't -- at the time, April 19, 2001, do you

8    have any information that Mattel knew that Carter Bryant had

9    designed Bratz?

10    A    I don't know what Mattel knew.

11    Q    As of this time, you tell us that you didn't even know

12    that Carter Bryant worked at Mattel as of September 1st,

13    right?

14    A    This date is April 19th of 2001.

15    Q    Yeah, I mean, you told us that you didn't even know

16    he -- as of September 1st that he worked at Mattel, that you

17    didn't even know that until 2004?

18    A    That he was employed during --

19    Q    Yeah, let me rephrase that.

20        As of this date, you did not know, you claim, that as

21    of September 1st, Carter Bryant was then an employee of

22    Mattel?

23    A    That's correct.

24    Q    And you have no reason to believe that as of April 19,

25    2001, that anyone at Mattel knew that Carter Bryant had

```
 1    signed a contract that was dated as of September 19, 2000, a

 2    date where he still worked at Mattel?

 3              MR. MC CONVILLE:  Objection.  Calls for

 4    speculation.

 5              THE COURT:  Just a moment.

 6              Overruled.

 7              You can answer the question.

 8              THE WITNESS:  I apologize, can you please repeat

 9    the question.

10    BY MR. PRICE:

11    Q    I will, because I actually used the wrong date.

12              THE COURT:  I think it's September 18th, Counsel,

13    and you used September 19?

14              MR. PRICE:  Yes.

15    BY MR. PRICE:

16    Q    As of the date of this e-mail, April 19, 2001, did you

17    have any reason to believe that anyone at Mattel knew that

18    Carter Bryant had a contract with MGA that was effective as

19    of September 18, 2000, the day when he was still working at

20    Mattel?

21    A    I don't know what Mattel knew about Carter Bryant

22    around this time or any time, ever.

23    Q    And that's why I asked if you have any reason to

24    believe that, and your answer then is no, right?

25    A    I -- I guess I just don't know one way or another.
```

1    Q    Well, your testimony is that, I guess even before

2    today, you didn't know that Carter Bryant had signed a

3    contract that was effective as of September 18, 2000?

4    A    I don't know that Carter Bryant signed -- I don't know

5    anything about Carter Bryant's September 18th -- I don't

6    even know if that's true.

7              THE COURT:  Would this be a good time for a

8    recess?

9              MR. PRICE:  It would be, your Honor.

10             THE COURT:  Ladies and gentlemen, you are

11   admonished not to discuss this matter amongst yourselves,

12   nor form or express any opinion concerning the case.  Why

13   don't we come and get you promptly at 3:00.  Have a nice

14   recess.

15             Counsel, if you'd remain for just a moment.

16             *(The following proceedings is taken outside*

17        *the presence of the jury.)*

18             THE COURT:  Thank you, Ms. Garcia.  You may step

19   down.

20             The jury is no longer present, nor the alternates.

21   All counsel, the parties are present.

22             There was a question asked, Mr. Price, by you,

23   about Mattel being invited to the Hong Kong -- the Hong Kong

24   toy fair, and I sustained that objection, but in light of

25   the examination, it now appears that that door has been

CV 04-9049-DOC - 01/26/2011 - Day 7, Vol. 2 of 3

73

1   opened, and apparently the other party now can refer to the

2   exclusion or to the distribution that was offered by

3   allegedly MGA to Mattel, which had previously been

4   irrelevant.

5           The second concern is the ability of the parties

6   to keep track of these exhibits.  Have we found the sculpt?

7           MS. HURST:  Yeah, it was there.

8           THE COURT:  It was there.

9           MS. HURST:  Yeah.

10           THE COURT:  The sculpt has been found.  Then we'll

11   see you at 3:00.

12           MR. PRICE:  Your Honor, two things, one, for the

13   Hong Kong toy fair, I don't think there was any dispute that

14   Mattel was invited, so I don't think we opened up anything

15   beyond that, but two, as a result --

16           THE COURT:  Thank you.

17           MR. PRICE:  As result of the testimony about

18   themes and about how creative they were and how Carter

19   Bryant didn't work on themes, you know, we've got some

20   e-mails on that which we thought were in a different phase,

21   but now they've given the impression that MGA was brilliant

22   about themes and only came up with their own ideas, and I'd

23   like leave to use some of those e-mails that show that the

24   themes were not their ideas.

25           THE COURT:  I am just not certain that this is the

```
 1    appropriate witness to do it with.  It seems to me that we
 2    are getting pretty far afield with this witness in terms of
 3    speculation.  Mr. Larian is going to be testifying.  There
 4    are going to be numerous opportunities.
 5             MR. PRICE:  She's on the e-mails and was the
 6    product manager.
 7             THE COURT:  Okay.  Do you want to show them to me?
 8             MR. PRICE:  I will get them together for you.
 9             THE COURT:  Because that's what we do on nights
10    and weekends.
11             MR. PRICE:  We weren't expecting them to open this
12    door.  We did show them to you --
13             THE COURT:  We are always well prepared.
14             MR. PRICE:  We have shown them to you, which you
15    just said they weren't relevant to this phase.
16             THE COURT:  Okay.  Thank you very much.
17             (Recess.)
18             (The following proceedings is taken outside
19        the presence of the jury )
20             THE COURT:  We are on the record.
21             Before the recess, Mattel had requested whether
22    creative works would become relevant.  I think that the
23    evidence that you are seeking should be excluded for three
24    reasons, and will be.  First, the only relevant issue is
25    whether Carter Bryant's creative works contained the Bratz
```

Case 2:04-cv-09049-DOC-RNB   Document 9729   Filed 01/28/11   Page 75 of 92   Page ID #:291397
CV 04-9049-DOC - 01/26/2011 - Day 7, Vol. 2 of 3

75

1    themes.

2              MR. MC CONVILLE:  Your Honor, the witness is here.

3    I didn't know if that made a difference for your reading of

4    the --

5              THE COURT:  I don't think it does --

6              MR. MC CONVILLE:  Okay.

7              THE COURT:  -- since we are not going to have it

8    come into evidence.

9              It's irrelevant whether MGA got these themes from

10   Mattel because Mattel doesn't have any claim based on the

11   theft of such themes.  Second, and independent of the first

12   point, the themes are unprotectable anyway.  It's very clear

13   in the Ninth Circuit's ruling.  And third, the evidence that

14   Mattel seeks to admit concerns themes reflected in the

15   subsequent generation dolls, and summary judgment was

16   entered against Mattel on those subsequent generation dolls.

17   It's excluded.

18              Now, Cathy, get the jury.

19              (The following proceedings is taken in the

20        presence of the jury.)

21              THE COURT:  All right.  The jury is present, the

22   alternates, all counsel are still present.

23              Counsel, thank you for your courtesy.

24              And the witness is still present.

25              And Counsel, if you'd like to continue with your

CV 04-9049-DOC – 01/26/2011 – Day 7, Vol. 2 of 3

76

1    examination.

2            Once again, this is Mr. Price.

3        **PAULA GARCIA, PLAINTIFFS' WITNESS, RESUMED**

4            **REDIRECT EXAMINATION (Continued)**

5    BY MR. PRICE:

6    Q    Ms. Garcia, on your direct exam you said that

7    Mr. Bryant didn't have anything to do with the Diamondz

8    line, the Diamondz line of doll you showed everyone?

9    A    No.  Carter Bryant actually designed the fashions for

10   the Bratz Diamondz.

11   Q    And I thought I heard you say that he didn't have

12   anything to do with Petz, P-e-t-z.  Do you remember that

13   doll you showed?  Did he have anything to do with that?

14   A    No, he was not the designer for the manufactured Bratz

15   Petz line.

16   Q    Was he asked to design Bratz Petz?

17   A    I don't recall.

18   Q    If you could look at 13859.

19        And do you recognize this as an e-mail chain you are

20   on --

21   A    Yes.

22   Q    -- concerning, in part, Bratz Petz?

23   A    Yes.

24            MR. PRICE:  I move that into evidence, your Honor.

25            THE COURT:  I'm sorry?

```
 1              MR. PRICE:  I move 13859 into evidence.

 2              THE COURT:  It's received.

 3              (Plaintiffs' Exhibit No. 13859 is received in

 4          evidence.)

 5    BY MR. PRICE:

 6    Q    And you see there's an e-mail from Mr. Larian to Carter

 7    Bryant, and you were copied, saying, "Carter, we want the

 8    Petz to look like Bratz, big face, big eyes, fantasy, and

 9    not like the plush in Slumber Party"; do you see that?

10    A    Yes, I do.

11    Q    And you were talking about braids and being

12    uncomfortable with braids and braids being stereotyping; do

13    you recall that?

14    A    Yes.

15    Q    And if you'd look at the same e-mail string, there is

16    an e-mail from Mr. Larian at the bottom of the page to

17    Carter Bryant, copying you, saying, "We should risk and do

18    braids and afro (boys as well).  I think it will do well."

19          That's an e-mail you received from Mr. Larian in 2002,

20    correct?

21    A    Yes.

22    Q    And Mr. Bryant, was he asked to do fashions for the

23    Petz?

24    A    I don't recall.

25    Q    If you'll look at Exhibit 1314.
```

CV 04-9049-DOC – 01/26/2011 – Day 7, Vol. 2 of 3

78

1      And do you recognize that as an e-mail from you to

2   Carter Bryant, among others?

3   A    Yes.

4   Q    And do you see on the second page, it refers to Petz,

5   P-e-t-z?

6   A    Yes.

7           MR. PRICE:  Your Honor, I move Exhibit 1314 into

8   evidence.

9           THE COURT:  And the date of that e-mail?

10          MR. PRICE:  That is October 27, 2005.

11          THE COURT:  Received.

12          *(Plaintiffs' Exhibit No. 1314 is received in*

13      *evidence.)*

14  BY MR. PRICE:

15  Q    And does this refresh your memory that Mr. Carter (sic)

16  was to do the fashions on the Petz?

17  A    Mr. Price, it's very important to clarify that there

18  were many references to Petz.  So the Petz that were made

19  reference for here was actually later what became Bratz

20  Pampered Petz, which is a Bratz fashion doll sold with

21  small -- I believe they were injection-molded, or I guess

22  I'll just say plastic dogs, which is very different than the

23  sub-brand called "Bratz Petz."

24  Q    So the Petz spelled P-e-t-z on this e-mail --

25  A    Yes.

CV 04-9049-DOC - 01/26/2011 - Day 7, Vol. 2 of 3

1   Q    -- is different than the Petz you were talking about on

2   your cross?

3   A    Correct.  These are not the plush, the soft --

4   Q    And Mr. Bryant worked on fashions on these Petz,

5   P-e-t-z, the ones that are mentioned in this e-mail?

6   A    Yeah.  The Z thing is something that, in Bratz, we

7   ended up starting to do often at the end of a word; when it

8   ended with an S, we would exchange that S with a Z.

9   Q    So Carter Bryant worked on what you described as these

10  Petz?

11  A    The Petz that were sold in the Bratz fashion doll

12  called "Pampered Petz."

13  Q    Now, if you look at 9335, and Mr. McConville asked you

14  a couple of questions about this?

15  A    Yes.

16  Q    And if you'd just look at the top part, down to the

17  middle, and the top two e-mails, Mr. McConville pointed out

18  that Mr. Caspi had said to you that they wouldn't

19  recognize -- wouldn't recommend -- he wouldn't recommend

20  using Ryan due to his current --

21           MR. MC CONVILLE:  Your Honor, this e-mail should

22  be redacted by agreement of the parties.

23           THE COURT:  All right.  We'll take the e-mail

24  down.  I think counsel is right.

25           MR. PRICE:  He is.

1            THE COURT:  Yeah.

2            *(Attorney discussion held off the record.)*

3    BY MR. PRICE:

4    Q    I'm sorry, so where it says, "Good morning P"; do you

5    see that?  "P" is you?

6    A    Yes.

7    Q    And it says, "Would not recommend to use him.  Due to

8    his current class at Mattel, you should not risk combat

9    plan.  What about recs with the person Noel recommended?  I

10   forget his last name"; do you see that?

11   A    Yes.

12   Q    And Mr. Caspi had started the e-mail string -- if we'd

13   go to the second page -- by talking about Ryan finishing the

14   semester, "and the school had sent him and others with a

15   teacher to what he called 'boot camp' in Mattel.  I've asked

16   him to keep his mouth closed and, at the same time, keep his

17   eyes and ears opened"; do you see that?

18   A    Yes.

19   Q    So we saw where Mr. Caspi, on the next page --

20            MR. PRICE:  If we can go back to that, Ken.

21   BY MR. PRICE:

22   Q    -- saying he wouldn't recommend using him, but do you

23   see your e-mail prior to that?

24   A    Yes.

25            MR. PRICE:  Maybe we can just put up Ms. Garcia's

Case 2:04-cv-09049-DOC-RNB   Document 9729   Filed 01/28/11   Page 81 of 92   Page ID #:291403
CV 04-9049-DOC - 01/26/2011 - Day 7, Vol. 2 of 3

81

1    e-mail.

2    BY MR. PRICE:

3    Q    The only concern you expressed about using Ryan was

4    that he wouldn't be able to do good work for MGA, right?

5    A    My expression was actually related to the question that

6    was asked by Isaac Larian in the e-mail prior.

7    Q    And that was, "Do you trust him?  Can he design

8    something quick?"

9    A    That's right.

10   Q    So you never responded to Mr. Caspi's idea to have Ryan

11   keep his mouth closed and, at the same time, keep his eyes

12   and ears opened, you never responded to that suggestion in

13   your e-mail, correct?

14   A    That's correct.  In fact, that e-mail wasn't even

15   directed at me.

16   Q    It's on the e-mail chain, it's what started the chain,

17   right?

18   A    Yes.

19   Q    And in your response you said, "He'll work slow now

20   that he works at Mattel, and I'm even more nervous since he

21   won't be able to support us during the day," correct?

22   A    That's what it says.

23   Q    And the way you learned he was working at Mattel is

24   because you read the first e-mail on the string from

25   Mr. Caspi that said Ryan was at, quote, "boot camp in

Case 2:04-cv-09049-DOC-RNB   Document 9729   Filed 01/28/11   Page 82 of 92   Page ID #:291404
CV 04-9049-DOC – 01/26/2011 – Day 7, Vol. 2 of 3

82

1    Mattel, and I asked him to keep his mouth closed and, at the

2    same time, keep his eyes and ears open."  That's how you

3    knew he was at Mattel and could only work at MGA on nights,

4    correct?

5    A    I don't know.  I don't know if that's how I learned of

6    his working at Mattel or if I knew about that earlier.

7    Q    Well, it certainly informs whoever is reading this

8    e-mail string, right?

9    A    Sure.

10   Q    Correct?

11   A    Yes.

12   Q    And your concern was simply that he works slow, and

13   he's going to work slower now that he's at Mattel during the

14   day, correct?

15   A    I just want to be very clear, I had no interest with

16   working with Ryan.  I understood he had a class.  I

17   understood he was with a teacher.  I knew that he was

18   going -- it was related to school, and he was going to be at

19   Mattel.  I expected that took most of his time during the

20   day.  I didn't like Ryan.  I didn't think his designs were

21   good.  I thought he was very slow.  I had no interest in

22   working with him, so much that I offered up to Isaac,

23   "Carter confirms his concept will be done by the end of this

24   week."  I wanted to work with Carter.

25   Q    When you read this at the time, did you think there was

1    anything wrong with Ryan being at Mattel and being asked by

2    someone -- someone at MGA to keep his mouth closed and his

3    eyes and ears opened?

4              MR. MC CONVILLE:  Objection.  Ryan is not on the

5    e-mail.

6              THE COURT:  Counsel?

7              MR. PRICE:  I'll rephrase.

8    BY MR. PRICE:

9    Q    When you received this e-mail, and you saw the last

10   e-mail from Mr. Caspi, did you think there was anything

11   wrong with Ryan working at Mattel in boot camp and being

12   asked to keep his mouth closed and, at the same time, keep

13   his eyes and ears opened?

14   A    I'm -- I'm not sure that I totally understand that

15   language.  I'm not sure that I -- I thought that was strange

16   language from Yuval.

17   Q    And it's your belief that that would be inappropriate?

18   A    Yes.  It also just depends on context, but in just

19   reading the face of this document, it certainly makes me

20   uncertain of his references.

21   Q    Is there something you don't understand about keeping

22   his mouth closed and, at the same time, keeping his eyes and

23   ears opened?

24             MR. MC CONVILLE:  Objection.  Argumentative.

25   Calls for speculation.

Case 2:04-cv-09049-DOC-RNB   Document 9729   Filed 01/28/11   Page 84 of 92   Page ID #:291406
CV 04-9049-DOC - 01/26/2011 - Day 7, Vol. 2 of 3

84

1              THE COURT:  In its present form, it is, Counsel.

2     BY MR. PRICE:

3     Q     I think you said you are not sure you understood it; is

4     that right?

5     A     Right.

6     Q     So at the time, what was it that you didn't understand

7     about Ryan being asked to keep his mouth closed and, at the

8     same time, keep his eyes and ears opened?

9              MR. MC CONVILLE:  Objection.  Foundation.

10             THE COURT:  Overruled.

11             THE WITNESS:  I don't know what conversation Yuval

12    and Ryan had, if they had a conversation at all.  I just

13    want to make clear that I thought his references to his eyes

14    and ears opened seemed -- that language seemed strange to

15    me, but I can't speak to that because I don't know -- I

16    don't know the context, and I am not sure what Yuval meant

17    by that information.

18    BY MR. PRICE:

19    Q     So at the time that language seemed strange to you, but

20    you didn't understand what it meant?

21             MR. MC CONVILLE:  Objection.  Foundation.

22             THE COURT:  Overruled.

23             THE WITNESS:  I didn't know the context.  I didn't

24    write the e-mail.  I don't know of conversations between

25    Ryan and Yuval, so I -- I don't know if that information has

1   something to do with a different conversation I wasn't aware

2   of, but I'm here to say that for sure, in reading that

3   language, I find it strange, but I don't know its context.

4   BY MR. PRICE:

5   Q    And finding it strange, then you didn't say anything

6   about it in your e-mail?

7   A    No, I did not.

8           MR. PRICE:  No further questions, your Honor.

9           THE COURT:  Redirect?

10          Well, strike that.  Recross, technically.

11          MR. MC CONVILLE:  Yes, sir.

12                    **RECROSS-EXAMINATION**

13  BY MR. MC CONVILLE:

14  Q    Ms. Garcia, you were asked some questions by Mr. Price

15  concerning Carter Bryant's agreement with MGA; do you recall

16  that?

17  A    Yes, I do.

18  Q    And I believe your testimony was that you haven't seen

19  that agreement with Carter Bryant, right?

20  A    That's right.

21  Q    And not knowing the dates that are on that agreement,

22  Mr. Price provided you with some dates; do you remember

23  that?

24  A    Yes, he did.

25  Q    And, in fact, he then provided you with different dates

1    because he made mistakes on the dates that he provided you

2    during the course of the question; do you remember that?

3    A    Yes.

4    Q    So is it fair to say that you concluded from

5    Mr. Price's question that he was confused as to the dates?

6              MR. PRICE:  Objection.  Argumentative.

7              THE COURT:  Sustained.

8    BY MR. MC CONVILLE:

9    Q    Ms. Garcia, going to that agreement that you haven't

10   seen, you were shown -- but you were shown testimony that

11   said at some point you understood that Mr. Bryant would

12   receive a 3 percent royalty; do you remember that?

13   A    Yes.

14   Q    Ms. Garcia, I'm going to need you to help me with some

15   high math.  What is 3 percent of zero?

16   A    I think that's zero.

17   Q    Zero.  So to the extent the agreement provided the

18   3 percent royalty, if there was -- if Bratz wasn't

19   profitable, 3 percent of zero is still zero, right?

20   A    Yes, 3 percent of zero is zero.

21   Q    Okay.

22             MR. MC CONVILLE:  Now, could we show -- it's

23   already in evidence, your Honor -- Exhibit 305?

24             THE COURT:  Thank you.

25             MR. MC CONVILLE:  Can you zoom in, please, in the

CV 04-9049-DOC - 01/26/2011 - Day 7, Vol. 2 of 3

87

```
 1    middle part where we've been looking at Ms. Garcia's
 2    statement about four hours a day.
 3    BY MR. MC CONVILLE:
 4    Q    And Ms. Garcia, the e-mail says, "I would say that
 5    Carter has worked an average about four hours a day and
 6    began working on the line the first part of September" --
 7    A    Yes.
 8    Q    -- do you see that?
 9    A    Yes, I do.
10    Q    And I believe your testimony was that's a mistake in
11    there?
12    A    Yes.
13    Q    But in any event -- could you read for me the -- the
14    next e-mail up in the chain?
15    A    Yes.
16    Q    What does it say?
17    A    "Do you want to start his salary for the month of
18    October since he began in September?  Please advise."
19    Q    And then could we go to the final answer from -- well,
20    let me ask you this:  Who is the final answer from there?
21    A    Isaac Larian.
22    Q    And he's the president of the company?
23    A    Yes, he is.
24    Q    And what is his answer in response to the suggestion
25    that Mr. Bryant should be paid for some time in September?
```

1    A    From the date he signed the contract.

2    Q    Okay.  And you understood the date he signed the

3    contract was sometime in October, right?

4    A    That's right.

5    Q    You were shown Exhibit 16682A --

6         MR. MC CONVILLE:  Can we have that displayed,

7    please.

8         Do you have it?

9         And can you highlight that or make it bigger for

10   me, please.

11   BY MR. MC CONVILLE:

12   Q    And Ms. Garcia, this e-mail from a Mattel employee to

13   you says, "In part, that I looked in the system today and

14   saw Bratz and Scooter Samantha," right?

15   A    Yes.

16   Q    And Mr. Price asked you if you concluded that there was

17   anything wrong when you read that sentence; do you remember

18   that?

19   A    Yes.

20   Q    I'm going to ask you a different question.

21   A    Okay.

22   Q    When you read that sentence, do you conclude that

23   Mattel has information on its system on April 19, 2001, that

24   says they have Bratz?

25         MR. PRICE:  Objection.  Ambiguous, "they have

```
 1    Bratz."
 2              THE COURT:  Just restate it.
 3              MR. MC CONVILLE:  Sure.
 4    BY MR. MC CONVILLE:
 5    Q    Do you conclude when you read this e-mail that as of
 6    April 19, 2001, that Mattel had on its system product
 7    information about Bratz?
 8    A    From reading the face of this document, I understand
 9    that she saw at least references of Bratz in her system.
10    Q    And the date of this e-mail is April 19, 2001, correct?
11    A    That's right.
12              MR. MC CONVILLE:  And can we show another exhibit,
13    which is in evidence, which is Exhibit 911?
14              THE COURT:  And the last exhibit you identified
15    that you just --
16              MR. MC CONVILLE:  I'm sorry, your Honor.  That was
17    Exhibit 16682A.
18              THE COURT:  All right.
19    BY MR. MC CONVILLE:
20    Q    You were asked by Mr. Price during his examination of
21    you about whether you were aware that people from Mattel
22    were invited into the Hong Kong toy fair; do you remember
23    that?
24    A    Yes.
25    Q    And I wanted to show this e-mail, which is -- can you
```

CV 04-9049-DOC - 01/26/2011 - Day 7, Vol. 2 of 3

90

 1   tell me the date of that e-mail?

 2   A     January 8th of 2001.

 3   Q     So January 8, 2001, and what's the topic of this

 4   e-mail?

 5   A     Subject notes, "Hong Kong showroom setup."

 6   Q     So you understood this related to the Hong Kong

 7   showroom setup for the Bratz display, correct?

 8   A     That's right.

 9   Q     And if we go to the next page, I believe you were shown

10   this in your examination by Mr. Price during your first

11   exam; do you remember that?

12   A     Yes.

13   Q     So when he asked you about whether Mattel employees had

14   been invited into the Hong Kong showroom, assume that

15   premise is correct, what would they have seen when they

16   walked into the Hong Kong showroom?

17   A     If they walked into this Hong Kong showroom?

18   Q     Yes.

19   A     They would have seen the image that you see above.

20   They would have seen our -- the graphic, our logo, they

21   would have seen big posters of Cloe, Yasmin, Sasha, all of

22   the poster boards on the floor, and our, you know,

23   available -- as of that moment, available dolls that are

24   sitting on the shelf.

25   Q     In essence, they would have seen the Bratz drawings,

CV 04-9049-DOC - 01/26/2011 - Day 7, Vol. 2 of 3

91

1    correct?

2    A     Correct.

3    Q     And some of the prototypes?

4    A     Correct.

5    Q     And then we know from the e-mail we just looked at that

6    Mattel had on its system as of April 19, 2001, so after the

7    January Hong Kong toy fair, they had on their system

8    information related to Bratz, correct?

9    A     That's right.

10             *(Live reporter switch with Deborah Parker.)*

11                          -oOo-

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                    -oOo-

2                              **CERTIFICATE**

3

4          I hereby certify that pursuant to Section 753,

5     Title 28, United States Code, the foregoing is a true and

6     correct transcript of the stenographically reported

7     proceedings held in the above-entitled matter and that the

8     transcript page format is in conformance with the

9     regulations of the Judicial Conference of the United States.

10

11    Date:  January 27, 2011

12

13

14    _____

                JANE C.S. RULE, U.S. COURT REPORTER
15              CSR NO. 9316

16

17

18

19

20

21

22

23

24

25