1            UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3            SOUTHERN DIVISION AT SANTA ANA

4        HONORABLE DAVID O. CARTER, JUDGE PRESIDING

5

6
MATTEL, INC., ET AL.,              )
7                                  )
            PLAINTIFFS,             )
8                                  )
        vs.                        ) CV NO. 04-9049-DOC
9                                  ) Day 7
MGA ENTERTAINMENT, INC., ET AL.,   ) VOLUME 3 of 3
10                                 )
            DEFENDANTS.            )
11  _____)

12

13

14        REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                   JURY TRIAL

16              SANTA ANA, CALIFORNIA

17          WEDNESDAY, JANUARY 26, 2011

18                   3:24 P.M.

19

20
            DEBORAH D. PARKER, CSR 10342
21             OFFICIAL COURT REPORTER
            UNITED STATES DISTRICT COURT
22             411 WEST FOURTH STREET
                    SUITE 1-053
23          SANTA ANA, CALIFORNIA 92701
                  (714) 542-8409
24            D.PARKER@IX.NETCOM.COM

25

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
1    APPEARANCES OF COUNSEL:

2         FOR THE PLAINTIFF, MATTEL, INC.:

3                          JOHN QUINN
                           WILLIAM PRICE
4                          MICHAEL T. ZELLER
                           QUINN EMANUEL URQUHART OLIVER &
5                          HEDGES, LLP
                           865 S. FIGUEROA STREET
6                          10TH FLOOR
                           LOS ANGELES, CALIFORNIA 90017
7                          (213) 443-3000

8
          FOR THE DEFENDANT, MGA ENTERTAINMENT, INC.:
9
                           THOMAS S. MC CONVILLE
10                         ORRICK HERRINGTON & SUTCLIFFE, LLP
                           4 PARK PLAZA
11                         SUITE 1600
                           IRVINE, CALIFORNIA 92614
12                         (949) 567-6700

13
                           ANNETTE L. HURST
14                         ORRICK HERRINGTON & SUTCLIFFE, LLP
                           THE ORRICK BUILDING
15                         405 HOWARD STREET
                           SAN FRANCISCO, CALIFORNIA 94105
16                         (415) 773-5700

17
                           JENNIFER L. KELLER
18                         KELLER RACKAUCKAS, LLP
                           18500 VON KARMAN AVENUE
19                         SUITE 560
                           IRVINE, CALIFORNIA 92612
20                         (949) 476-8700

21

22

23

24

25
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
1    APPEARANCES OF COUNSEL:

2         FOR THE DEFENDANT, CARLOS GUSTAVO MACHADO GOMEZ:

3                              MARK E. OVERLAND
                              LAW OFFICES OF MARK E. OVERLAND
4                              100 WILSHIRE BOULEVARD
                              SUITE 950
5                              SANTA MONICA, CALIFORNIA 90401
                              (310) 459-2830
6

7                              ALEXANDER H. COTE
                              SCHEPER KIM & HARRIS, LLP
8                              601 WEST FIFTH STREET
                              12TH FLOOR
9                              LOS ANGELES, CALIFORNIA 90071
                              (213) 613-4660
10

11
     ALSO PRESENT:
12
                              JEANINE PISONI
13                            MGA ENTERTAINMENT, INC.
                              16360 ROSCOE BOULEVARD
14                            SUITE 105
                              VAN NUYS, CALIFORNIA 91406
15

16                            ROBERT ECKERT, MATTEL CEO
                              ISAAC LARIAN, MGA CEO
17                            KEN KOTARSKI, MATTEL TECHNICAL OPERATOR
                              MIKE STOVALL, MGA TECHNICAL OPERATOR
18

19

20

21

22

23

24

25
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

4

I N D E X

| PLAINTIFFS' WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| PAULA GARCIA | | | | 5 |
| STEVEN LINKER | 8 | 46 | 64 | |

| DEFENDANTS' WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| STEVEN LINKER | | | | 66 |

E X H I B I T S

| PLAINTIFFS' EXHIBITS: | IDENTIFICATION | EVIDENCE |
|---|---|---|
| 316    Logo Designs and drawings | | 14 |
| 320    Email re: Bratz Packaging | | 31 |
| 320, EXCEPT 323-3 Drawings Provided to Linker & Hogan | | 35 |
| 323-A Original Documents Provided by MGA | | 36 |
| 324    Email re: Bratz Packaging | | 32 |
| 326    Email re: Bratz Packaging | | 26 |

*DEBORAH D. PARKER, U.S. COURT REPORTER*

5

```
 1          SANTA ANA, CALIFORNIA; WEDNESDAY, JANUARY 26, 2011;

 2                          3:24 P.M.

 3                     RECROSS-EXAMINATION

 4   BY MR. MCCONVILLE: (Continuing)

 5   Q.   I'm going to show you another exhibit which Mr. Price

 6   showed you.  It's 23797, page 7.

 7            That's not the right page.

 8            Ms. Garcia, do you remember being shown this

 9   slide?

10   A.   Yes.

11   Q.   And can you describe what -- the images on the left?

12            THE COURT:  And what exhibit is that?

13            MR. MCCONVILLE:  I'm sorry, your Honor.

14            This is Exhibit 23797.  And I believe it's page 7

15   of that exhibit.

16            THE COURT:  Thank you.

17   BY MR. MCCONVILLE:

18   Q.   Describe what it is you're looking at right now, in

19   general terms.

20   A.   This is a document that seems to draw lines and line

21   relationships to components of the doll.  It's chin,

22   shoulders, crotch, knees, angle and the comparison as being

23   related to both the drawing created by Carter Bryant and the

24   manufactured Bratz doll.

25            MR. MCCONVILLE:  And, your Honor, this is actually
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    page 5 of that exhibit and not page 7.

2             THE COURT:  Thank you.

3    BY MR. MCCONVILLE:

4    Q.   Ms. Garcia, do you believe it's fair to compare these

5    two -- the drawing on the left with the doll on the right --

6    as it relates to their proportions?

7    A.   No, I don't.

8    Q.   Why is that?

9    A.   Because I think that there are some -- I just don't

10   find this comparison accurate.

11   Q.   Why is that?

12   A.   Well, if I were to just put all of the shapes and the

13   differences of the body shapes aside -- because, for

14   example, in the drawing on the left the torso and arms,

15   where the arms are postured, the shape of the torso, the

16   crotch -- are very different to the manufactured Bratz doll.

17   And you can make those shape comparisons from top to bottom.

18   You can also say that those lines don't line up when you

19   line them together.

20   Q.   What do you mean they "don't line up"?

21   A.   So, for example, if you were to look at the line of the

22   chin, you can see that that red line -- I'll use my pointer.

23             You can see that the line on Exhibit 323, the

24   line, the red line actually crosses through the chin.

25   In fact, it's not lined up underneath the bottom of the

1  chin.  You can actually see the black line underneath the

2  red line, and that is then lined up with what I believe is

3  meant to be the bottom of the Bratz manufactured sculpt.

4  Q.   So the line for the hand-drawn sketch runs through the

5  chin and the line for the doll is below the chin?

6  A.   That's correct.

7  Q.   Okay.  And do you know -- this was an exhibit that

8  Mattel presented to you; correct?

9  A.   That's correct.

10         MR. MCCONVILLE:  No further questions, your Honor.

11         THE COURT:  All right.  Thank you very much.  You

12  may step down.

13         I'm going to ask you to remain available to

14  May 7th.  I think the case will conclude in March, but I

15  want to be cautious, so there won't have to be additional

16  subpoenas.  Providing professional or personal

17  responsibilities you have, if we need, we'll find you.

18         Counsel, your next witness, please.

19         MR. QUINN:  Your Honor, Mattel calls Steve Linker.

20     *(Pause.)*

21         THE COURT:  Mr. Linker, if you will step forward,

22  please.

23         Raise your right hand, sir.

24         STEVEN LINKER, PLAINTIFFS' WITNESS, SWORN

25         THE COURT:  Thank you, sir.

8

```
 1              If you will come along the side of the jury box,
 2   please.
 3              MS. HURST:  You Honor, may we raise something with
 4   the court about witness order?
 5              THE COURT:  Certainly.
 6              MS. HURST:  Thank you.
 7              THE COURT:  But I don't think it's of any import.
 8   If you're thinking he's being called out of order, he's not.
 9   We knew he was available today, the representation was.  So
10   this is not inappropriate.
11              Sir, state your full name for the jury and spell
12   your last name, please.
13              THE WITNESS:  Steven Linker, L-I-N-K-E-R.
14              THE COURT:  Thank you.
15              Direct examination, please.
16         (Pause.)
17              THE COURT:  Now, if we need Mr. Linker back, he'll
18   come back.
19              Counsel, direct examination.
20              MR. QUINN:  Thank you, your Honor.
21                        DIRECT EXAMINATION
22   BY MR. QUINN:
23   Q.   Good afternoon, Mr. Linker.
24              What business are you in?
25   A.   I design toys.
```

1    Q.    And you actually have a degree in toys?

2    A.    Yes, I do.

3    Q.    That's a -- where did you get that degree?

4    A.    FIT, in New York City.

5    Q.    And that's -- F-I-T means what?

6    A.    Fashion Institute of Technology.

7    Q.    And for how long, years, have you worked in the toy

8    business?

9    A.    Since '94.

10   Q.    And you once worked at Mattel?

11   A.    Yes.

12   Q.    What was your position there?

13   A.    I was the associate designer, designer for the

14   activities group.

15   Q.    And were you involved in designing toys at Mattel?

16   A.    Yes.

17   Q.    Can you tell us please what the years were?

18   A.    '94 through '96.

19   Q.    By the way, when you were at Mattel, did you have one

20   of these Inventions Agreements?

21   A.    I had an Agreement, a contract as far as like signing

22   when you go -- when you work for a company.

23   Q.    And did that address the -- did that contract address

24   the issue about who would own any ideas, concepts,

25   inventions that you came up with while in the toy industry

1   while you were employed by Mattel?

2   A.   Yes.

3   Q.   And what did -- in your understanding, what did that

4   contract provide?

5   A.   You're not supposed to work on other products or

6   competitive stuff when you are working for them full time

7   under salary.

8   Q.   In terms of ownership of inventions, ideas and concepts

9   and designs that you came up while you were employed by

10  Mattel, do you recall whether or not the contract addressed

11  that as well?

12  A.   I don't recall specifics but, you know, I mean, I was

13  younger.

14  Q.   Okay.  You're older now?

15  A.   Yes.

16  Q.   Less hair?

17  A.   Thanks.

18       *(Laughter.)*

19  BY MR. QUINN:

20  Q.   You left -- could you just give us a rundown of your

21  employment since you left Mattel?

22  A.   Yeah.  I left Mattel in '96, and I went to a company

23  called Equity Marketing, designed premium toys.  That's what

24  they specialized in.  I did toy design for them.

25           From there, I left in '90 -- the end of '98,

```
 1   beginning of '99 and went on my own freelancing and started
 2   my own company called Penny Arcade which was a creative
 3   services company and had that for about 10 years, or through
 4   2007 and 2008.  But mostly freelancing and servicing a bunch
 5   of companies.
 6            In 2007, I consulted through Penny Arcade for a
 7   company called Spin Master, in Toronto.  I commuted back and
 8   forth to Chicago and Toronto.  And then I left there, did
 9   some work on the side for them there and did some other
10   freelance for about a year.
11            And then, this past year, 2010, I took a job in
12   Chicago for a company called Infantino, and I'm currently
13   there now.
14   Q.   All right.  Is that another toy company?
15   A.   Yes.
16   Q.   Did you do some work for Mattel as a freelancer on a
17   toy called Diva Starz?
18   A.   Yes.
19   Q.   Do you recall approximately when it was that you did
20   that work for Mattel?
21   A.   Yes.
22   Q.   And when was that, roughly?
23   A.   It was when I started freelancing, like around the
24   summer of '99.  1999.
25            MR. QUINN:  And we have in evidence, your Honor,
```

1    Exhibit 17384, which is the tangible.  If we could hand that

2    to the witness and, perhaps, also put up on the screen also

3    in evidence Exhibit 432.

4    BY MR. QUINN:

5    Q.   And is Exhibit 17384 that you're holding, is that an

6    exemplar of a Diva Starz doll?

7             We also have an image of that, Exhibit 432, that's

8    on the screen; correct?

9    A.   Yes.

10   Q.   It's a different doll?

11   A.   Yes.

12   Q.   But both Diva Starz?

13   A.   That's a Diva Starz, yes.

14   Q.   Were you consulted -- as a freelancer when you had your

15   own business, were you consulted on the issue by Mattel on

16   the issue of potential names?

17   A.   Yes.

18   Q.   Diva Starz?

19   A.   Yes.

20   Q.   When the project first began, was the Diva Starz --

21   what became known as Diva Starz, was the name Diva Starz

22   attached to initially?

23   A.   No.

24   Q.   Was the name Brats with an "S," B-R-A-T-S, a name that

25   was considered for Diva Starz?

1  A.   I couldn't say if it was considered, but it was one of

2  the names that was pitched.

3  Q.   And who pitched that?

4  A.   My partner and I, Liz Hogan, we did brainstorms on

5  lists and we provided them with a bunch of names, one

6  including Brats.

7  Q.   So when you say you don't know if it was considered,

8  you know you submitted that -- you were engaged to -- is it

9  true that you were engaged to come up with potential names?

10 A.   Yes.

11 Q.   And if you look at --

12        MR. QUINN:   Exhibit 314 in evidence, your Honor.

13 BY MR. QUINN:

14 Q.   -- can you identify Exhibit 314 for us, please?

15 A.   Yes.  This is an e-mail that my partner Liz Hogan had

16 sent to Joni Pratte and Sue Davis regarding some new names

17 and ideas, tag lines for the CH@T GRRLS, because that was

18 the working name at the time before it was "Diva Starz," so

19 these are some of the names we sent.

20 Q.   There on the first page among the names, do you see

21 @brats being one of the names?

22 A.   Yes, I do.

23 Q.   And then also MallBRATS, was that another name you

24 suggested?

25 A.   Yeah.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1  Q.   And do you recall also developing that you -- as part

2  of this freelance work that you were doing for Mattel at the

3  time, do you also recall developing logos for this doll

4  which ultimately became Diva Starz?

5  A.   Yes.

6  Q.   If you -- if we could take a look at Exhibit 316-2 --

7       MR. QUINN:  Which is already in evidence, your

8  Honor.

9  A.   Which one?

10 Q.   316.  In fact, let me ask you:  Can you identify all of

11 316?

12 A.   Yes.

13 Q.   What is Exhibit 316?  It's three pages?

14 A.   Yes.  It's all, relatively, artwork that I created for

15 Diva Starz line.

16 Q.   Potential logos?

17 A.   Potential logos for this line.

18      MR. QUINN:  Your Honor, the second and third pages

19 are in evidence.  I would offer the first page as well.

20      THE COURT:  It's received.

21      (Plaintiffs' Exhibit 316 received in evidence.)

22 BY MR. QUINN:

23 Q.   Do you see there logos involving the word "Brats"?

24 A.   Yes.

25 Q.   Brats.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
1              MR. QUINN:  If we can enlarge that, Ken.  On the
2    first page there's a couple of places.
3    BY MR. QUINN:
4    Q.   And could you, perhaps, point that out to us.
5    A.   Point out --
6    Q.   We don't have a --
7              MR. QUINN:  With the court's permission, if the
8    witness could turn around, stand and point.
9              THE COURT:  Just stand up and put your back to me.
10   I'm not concerned.  That way the jury can see what you're
11   pointing to.
12             THE WITNESS:  Here is a "Chat Brats" version with
13   a different background.  This one has lines.  I was playing
14   around with some ideas.
15             THE COURT:  Thank you, sir.  If you would be
16   seated now.
17             THE WITNESS:  Thank you.
18   BY MR. QUINN:
19   Q.   On the second page, Mr. Linker, 316-2, do you also see
20   in the upper left just the word "Brats" alone?
21   A.   Yes.
22   Q.   Something that you submitted.
23             And on the third page as well, there's other ideas
24   for logos that include Brats?
25   A.   Yes.
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    Q.    Do you recall when these -- when you created these

2    logos?

3    A.    Yes.

4    Q.    Can you tell us when approximately that was?

5    A.    It was in 1999.  Probably towards the end of '99.

6    Q.    And did you do other work on the Diva Starz project

7    other than --

8    A.    Yes.

9    Q.    Help them come up with names and logos?

10   A.    Yes.

11   Q.    Could you just tell the jury, generally, what some of

12   that other work was that you did?

13   A.    I did packaging support, which is like graphic

14   illustrations for the packaging group; and then, I did some

15   accessory designs, doll character designs, some graphical

16   stuff.  Just a lot of 2D and illustration elements that

17   pertain to some of the products that we were working on.

18   Q.    Were you contacted by MGA about helping MGA with a new

19   fashion doll project that they were working on?

20   A.    I was, yeah.

21   Q.    And can you recall when it was you were first

22   contacted?

23   A.    Well, the first time I was contacted wasn't on a

24   fashion doll.

25   Q.    All right.

```
 1   A.    It was on doing a logo for one of their products.

 2   Q.    Okay.  And do you recall what that product was?

 3   A.    Hoppity.

 4   Q.    Did there come a point where -- did there come a point

 5   where you were contacted by MGA about doing some work for

 6   them on a fashion doll concept?

 7   A.    There was a -- yes.  They did contact me to do

 8   packaging.

 9   Q.    And when were you first contacted about that idea of

10   assisting MGA with respect to a fashion doll project?

11   A.    That was somewhere in September or October of 2000.

12   Q.    Do you recall how it was you were first contacted by

13   MGA?

14   A.    How I was contacted, yeah.  I got a -- I was working on

15   a couple of projects with Paula Treantafelles.

16   Q.    By the way, do you know whether her name is now "Paula

17   Garcia"?

18   A.    I know it's Garcia now.  But at that time, it was Paula

19   Treantafelles, so I don't know which name I'm supposed to

20   use.

21   Q.    I think everybody understands that.

22   A.    I'll just call her Paula.

23   Q.    All right.  Do you recall what Ms. Garcia said to you

24   when she first contacted you with respect to this new

25   fashion doll project?
```

1    A.   Well, when she was talking about this particular

2    project, she had told me that they wanted us to work -- "us"

3    meaning me and my partner, Liz Hogan, at Penny Arcade.  We

4    had a small design creative firm -- wanted us to work on

5    packaging on this new line, that she wanted a rush job.

6    Q.   Did she tell you how she knew about your work, or

7    anything of that nature?

8    A.   Yes.  When I first met her, when she called me before I

9    did the Hoppity logo, she got my number from the girl I

10   worked with at Mattel who is my point person who was --

11   Maureen Mullen was her name -- is her name.  She got her

12   name.  She called me and she got her name from Maureen and

13   said she saw my work.  She loved my work on the Diva Starz

14   and she would love for me to come in for some freelance and,

15   you know, talk about some jobs.

16   Q.   Did you have an understanding as to how it was that

17   Ms. Garcia knew about your work on Diva Starz at Mattel?

18   A.   I believe she was working at Mattel, you know, and

19   that's how she had seen the stuff, yeah.

20   Q.   In the past?

21   A.   In the past.  I don't know, you know, how she saw it.

22   But I know she knew of my work on the Diva Starz.

23   Q.   And you indicated that this was -- she had some type of

24   rush project?

25   A.   Yes.

1  Q.   As a result of that, what did you do?  Did you get

2  together with her?

3  A.   Yeah.  We set up a meeting.  We set up a meeting to

4  meet with her to look at the project and to see if it

5  conflicted with a project that my partner and I wanted to

6  pitch.

7          I had told her that I wanted to pitch a concept to

8  her, like earlier, like a month before.  And when I told her

9  that, she said, *I might have something else going on right*

10  *now; but if it falls through, I would love to see your*

11  *thing.*

12          So basically she called me and said, *This project*

13  *design, I want you to come in and look at it*, so she set up

14  a meeting at a Starbucks.

15  Q.   Do you recall whether you had some discussion about

16  this new project earlier than that -- before the meeting at

17  Starbucks?

18  A.   Yeah.  That was -- I had gone in to deliver the disk

19  for the Hoppity logo and stuff and also had my invoice.  And

20  back then, it was a lot easier to go and these disks because

21  you couldn't e-mail these big files.  And I also wanted to

22  feel her out about a concept that my partner and I had and

23  wanted to see who in her company looks at outside

24  submissions.  So I mention I had something, a small doll

25  idea.  I had a small -- we had a small doll idea.  And I

```
 1   said, I would love to pitch it to her.  She said she was
 2   interested, but she had something else she was working on
 3   and really excited about and that she would look at it, if
 4   that fell through, but she didn't tell me what it was.
 5   Q.   Would you take a look, please, at Exhibit 319 and my
 6   question to you is going to be whether you can identify
 7   this?
 8   A.   Yes.
 9   Q.   What is this?
10   A.   This is a page from my daily planner from October of
11   2000.
12   Q.   The date is October 3, 2000?
13   A.   October 3rd, 2000.
14             MR. QUINN:  We would offer that, your Honor.
15             THE COURT:  Any objection?
16             MR. MCCONVILLE:  Hearsay.
17             THE COURT:  Sustained.
18   BY MR. QUINN:
19   Q.   Is this -- does this refresh your recollection?
20             Does seeing this refresh your recollection the
21   date of the first meeting you had with her there was some
22   mention of Brats?
23   A.   No.  Actually, this -- this particular thing was on --
24   doing packaging for another idea of hers, Scooter Samantha.
25   So this was just a meeting that we had on this project.
```

1  Q.   All right.  And you don't recall any discussion about

2  Brats in this meeting?

3  A.   Not in this meeting, no.

4  Q.   And after that, did you set up a meeting where Brats

5  was the subject of the conversation?

6  A.   Yes.

7  Q.   If we could go back to Exhibit 319.  I've asked you if

8  you could take a look at the second-to-the-last line,

9  without reading it, the second-to-the-last line, without

10 reading it out loud.

11           Do you see that?

12 A.   Uh-huh.

13 Q.   Does that refresh your recollection about whether there

14 was any discussion of what became the Brats project at the

15 October 3 meeting?

16 A.   I might not have the right --

17 Q.   It's what we just looked at.  The planner for

18 October 3.

19 A.   Yeah.

20 Q.   Do you see the second --

21 A.   The second-to-the-last line, yes.

22 Q.   So my question to you is:  Does seeing that --

23 A.   Yes.

24 Q.   -- refresh your recollection as to whether there was

25 any discussion about what became --

1    A.    No.

2    Q.    -- the Brats project on that day?

3    A.    This was not.  This is for the Samantha Scooter.

4    Q.    Did you set up a meeting with Ms. Garcia where you did

5    discuss this new rush project that she wanted you to work

6    on?

7    A.    Yes.

8    Q.    And do you recall when that was?

9    A.    Yes.

10   Q.    When was that meeting?

11   A.    That was about a week or so later after this meeting,

12   and it was October, like, 10th, or 11th.  I believe it was

13   the 11th.

14   Q.    All right.  And if you would look, please, at

15   Exhibit 320.

16            MR. QUINN:  This is in evidence, your Honor.

17   BY MR. QUINN:

18   Q.    And can you identify this document for us?

19   A.    Yes.

20   Q.    What is this?

21   A.    This is an e-mail from my partner Liz Hogan and myself,

22   cc'd to me, sent to Paula Treantafelles -- or Paula

23   Garcia -- regarding questions that we had on the Brats

24   packaging.

25   Q.    And the date of this e-mail is?

1    A.    October 12th, Thursday.

2    Q.    All right.  And there is an Item No. 2 there which

3    says:  *We need the existing art boards that we saw in the*

4    *meeting, or good color copies.*

5              Do you see that?

6    A.    Yes.

7    Q.    Does that phrase mean the -- now, those art boards that

8    you are referring here are art boards for what became the

9    Brats?

10   A.    Eventually.

11   Q.    And does this refresh your recollection -- where you

12   say that *We need the existing art boards that we saw in the*

13   *meeting, or good color copies,* does this refresh your

14   recollection that you must have seen those art boards at a

15   meeting before this one on October 12th?

16   A.    Yes.

17   Q.    So if we can talk about this meeting that -- you,

18   apparently, don't have notes of this earlier meeting?

19   A.    For the meeting at Starbucks?

20   Q.    Yes.  Exactly.

21   A.    No, I don't have the notes.

22   Q.    All right.  Who was present in this meeting?

23   A.    It was myself, Liz Hogan, Paula Treantafelles and

24   Carter Bryant and another woman whose name I don't recall.

25   Q.    You say this took place at a Starbucks?

1    A.    Starbucks in El Segundo and Manhattan Beach.

2    Q.    And what was the subject matter of the meeting?  What

3    in general was discussed?

4    A.    We went in there, because she had said she wanted us to

5    get going on this packaging project.  And we wanted to look

6    at it first to make sure it wasn't -- didn't compete with

7    what we had wanted to pitch her, make sure that it -- you

8    know, that it wasn't similar to what we were looking at

9    doing on our own.

10          My partner and I saw the pitch, which was pitched

11   by Carter Bryant.  It was a portfolio with a bunch of

12   beautiful renderings.  And my partner and I walked outside

13   and said it wasn't similar enough; that we could work on it

14   and that it's just packaging and, you know, they would give

15   us directional -- whatever direction they give us for

16   packaging we'll work on, because we're a service department.

17   We did a lot of packaging.

18   Q.    When you say "it wasn't similar enough," you mean it

19   wasn't similar enough to the project that you and your

20   partner had in mind?

21   A.    Right.

22   Q.    So you didn't think there would be a conflict?

23   A.    Right.

24   Q.    And who presenting what you call these beautiful

25   renderings?

```
1    A.    Carter Bryant.
2    Q.    And did he -- did you know who Carter Bryant was at
3    that time?
4    A.    Yes.  I have known Carter Bryant.
5    Q.    At that point when you're meeting with him at the
6    Starbucks on Rosecrans, did Mr. Bryant say anything about
7    whether or not he was then working at Mattel?
8    A.    Yeah.
9              MR. MCCONVILLE:  Objection.  Hearsay.
10             THE COURT:  Overruled.
11             You can answer the question.
12             THE WITNESS:  Okay.  We said *Hi,* because I hadn't
13   seen him in a while.  And I just said asked him if he still
14   worked at Mattel.  Just friendly question.  And he was like,
15   *No, I just quit.*  Very fake.
16   BY MR. QUINN:
17   Q.    So this is a meeting that's taking place about I think
18   you said October 10th or 11th, approximately?
19   A.    Yeah.
20   Q.    Now, these renderings that he showed you, these
21   drawings, did they have any dates on them?
22   A.    No.
23   Q.    Did they have like a copyright notice, you know, Carter
24   Bryant 1998 --
25   A.    No.
```

1    Q.    -- on them?

2    A.    No.

3    Q.    You're clear on that?

4    A.    Pretty clear.

5    Q.    Were there any notarizations on these documents, like a

6    notary seal --

7    A.    Not that I recall, no.

8    Q.    Were there any notarization seals, signatures on these

9    drawings?

10   A.    No.

11   Q.    How were things left at the conclusion of that meeting?

12   A.    We left that meeting knowing that we had to rush to get

13   some stuff going on this project, because it seemed pretty

14   urgent and there was a tight deadline of what she was

15   asking.  And we wanted to put together an initial quote and

16   get some information from her, more information.  But,

17   basically, you know, we were interested in doing the

18   project.

19   Q.    And did you then proceed to do what you needed to do in

20   order to submit a quote?

21   A.    Yes.

22   Q.    If you would take a look, please, at Exhibit 326, I

23   would ask you to identify this document, please.

24   A.    Yeah.  This is an initial quote that I was working on

25   with Liz Hogan.  We just printed it out for our reference.

27

```
 1              MR. QUINN:  We would offer this, your Honor.

 2              THE COURT:  Received.

 3         (Plaintiffs' Exhibit 326 received in evidence.)

 4              MR. QUINN:  And if we could display that.

 5    BY MR. QUINN:

 6    Q.   It says at the top from Liz Hogan to Liz Hogan, dated

 7    October 12th.

 8              Do you have any understanding about why Ms. Hogan

 9    is sending what appears to be an e-mail to herself?

10    A.   No.  I mean, she probably did that to keep it a record

11    of it before it was sent out, so we just save it.  Sent it

12    to herself.

13    Q.   And if we could blow up that first paragraph --

14    Packaging estimate Brats, small doll line -- you've got some

15    information there:  Four SKUs, 1299 retail, nine-inch dolls.

16              What is a "SKU"?

17    A.   Shelf-keeping unit.

18    Q.   And what does that mean in --

19              For folks who are not in the retail business or

20    toy business, what does it mean?

21    A.   SKU is just like an individual item.  So, like, if it's

22    Diva Starz, it's like the Alexa Diva Starz is one SKU; and

23    then, the other item is Samantha, or the other character is,

24    and they are individuals.  So four SKUs means it's four

25    dolls.
```

1    Q.   And that information would it be true to say you would

2    have to have gotten that information from Mr. Bryant and

3    from Ms. Garcia at that meeting?

4    A.   That was Ms. Garcia.

5    Q.   And it also says:  1299 retail.  Is that an estimated

6    retail price?

7    A.   Yes.

8    Q.   And under that there's some other SKU information and

9    price information.

10            Do you see that?

11   A.   Yes.

12   Q.   That information you all got from Ms. Garcia and

13   Mr. Bryant?

14   A.   Yes.

15   Q.   Below that there's information about dye line?

16   A.   Yes.

17   Q.   What does that mean?  What does that refer to?

18   A.   Dye line is the shape and the structure of the box.  So

19   it's the actual outline of the dye line of cutting the box.

20   Q.   And then below that phase one, there's reference some

21   detail about trade dress exploration, production shots, all

22   that?

23   A.   Yes.

24   Q.   Do you see that?

25   A.   Yes.

1    Q.    So can you tell us is this information that you are

2    putting together in order to come up with a quotation for

3    the work?

4    A.    Correct.  Yes.

5    Q.    If you could turn back to Exhibit 320 in evidence, this

6    says -- this is from your partner Liz Hogan to Paula Garcia

7    with a copy to you, and it says:  *Subject.  Question colon*

8    *Brats.  Paula and Carter please forward to Carter.  I don't*

9    *have his e-mail.*

10           Do you see that?

11   A.    Yes.

12   Q.    And, you know, basically what's -- are you asking for

13   more information here in order to do the quotes?

14   A.    Yes. Liz and I had more questions about doing the --

15   for the project.

16   Q.    Why was this addressed to both Paula Garcia and to

17   Carter, the request that she forward it to Carter?

18   A.    For Paula -- she was the business side, so she had all

19   the information on how to run this out from our

20   understanding and then Carter had all the design material.

21   So he was able to -- we thought he would be able to provide

22   some of the creative stuff.

23   Q.    So did -- your impression was that Ms. Garcia was in

24   charge of the business side and Mr. Bryant the creative

25   side?

```
 1   A.    Yes.   That's our impression.
 2   Q.    You say -- in the fourth numbered item, you say:   Do
 3   you have photos/JPEGS of the sculpts?
 4            Suggests that -- had they shown you sculpts?
 5   A.    No.
 6   Q.    I mean, had they shown you images of sculpts?
 7   A.    No.
 8   Q.    Somehow -- how did you learn that there were sculpts?
 9   A.    It was mentioned at the meeting at Starbucks.
10   Q.    And in Item No. 5, Liz wrote:   Are the renderings of
11   the outfits that we saw, the confirmed outfits that you will
12   be manufacturing?
13            Do you see that?
14   A.    Yes.
15   Q.    Had they shown you outfits at this meeting?
16   A.    Yes.
17   Q.    And then, we see there, there are some drawings.
18            MR. QUINN:   If we could go back, Ken, and maybe
19   look at the entire page.
20   BY MR. QUINN:
21   Q.    There are some drawings of -- are those drawings for
22   packages?
23   A.    Yes.
24   Q.    Who drew those drawings for the packages?   Some of them
25   kind of a trapezoidal shape?
```

1    A.    Yes, I did that.

2    Q.    When did you do that?

3    A.    I did that at a meeting I had with Paula and some other

4    people at MGA.

5          THE COURT:  320 is received for all purposes,

6    Counsel.

7        *(Plaintiffs' Exhibit 320 received in evidence.)*

8    BY MR. QUINN:

9    Q.    So you're the one that's doing these drawings for the

10   packaging that we see here?

11   A.    I was -- we were in a brainstorm, so we were discussing

12   different shapes and ideas, and I was taking notes.  I had

13   printed this particular sheet out to go to the meeting that

14   we had set up --

15   Q.    Right.

16   A.    -- with MGA.

17   Q.    In the meeting you are the guy with the pencil --

18   A.    Yes.

19   Q.    -- that draws these shapes?

20   A.    Yes.  Pen.

21   Q.    Excuse me.

22   A.    I'm sorry.

23   Q.    And then, if we could turn to Exhibit 321, which is in

24   evidence.  This is from Liz Hogan to Paula Garcia with a

25   copy to Steve Linker.  It's dated Saturday, October 14th:

1    *Subject:  Packaging estimate:  Brats.*

2            Can you tell us what this is?

3    A.   Yeah.  This is our initial estimate for the Brats

4    packaging project and illustrations, everything that we set

5    out to offer to do.  To create on the packaging.

6    Q.   Is this the document by which you transmitted your

7    quote to MGA?

8    A.   Yes.

9    Q.   And from looking at this, can you tell whether MGA had

10   already given you SKU and pricing information as of the time

11   that your partner sent this e-mail on October 14th?

12   A.   Yes.

13   Q.   And then, do you recall another meeting after this with

14   the folks at MGA and Mr. Bryant?

15   A.   Excuse me.  Yes, I do.

16   Q.   If you take a look at Exhibit 324, what is this?

17   A.   This is a revised estimate for the same project sent on

18   October 19th.

19            MR. QUINN:  We would offer that, your Honor.

20            THE COURT:  Received.

21       *(Plaintiffs' Exhibit 324 received in evidence.)*

22   BY MR. QUINN:

23   Q.   And do you recall -- this says at the top it's from

24   Liz Hogan to Paula Garcia and you and others.  And it's

25   *Packaging Estimate Brats Revised.*  It's dated -- shows that

1    it was sent on October 19th, at 9:43 a.m.

2              Do you see that?

3    A.   Yes.

4    Q.   And do you recall whether or not you had a meeting

5    about Brats with MGA people on that very day, October 19th?

6    A.   Yes.

7    Q.   If you could take a look at your planner, please,

8    Exhibit 322.

9    A.   *(Witness so complies.)*

10   Q.   Is that reflected in your planner?

11   A.   Yes.

12             MR. QUINN:  We would offer that, your Honor.

13             MR. MCCONVILLE:  Objection.  Hearsay.

14             THE COURT:  Sustained.

15   BY MR. QUINN:

16   Q.   Do you believe that you sent exhibit -- the estimate

17   324, 9:43 a.m. before the time they actually had the meeting

18   that day?

19   A.   Hold on.  What?

20   Q.   Exhibit 324.

21   A.   Yes.

22   Q.   Do you believe that you sent that before the meeting

23   you had that very day?

24   A.   Yes.

25   Q.   So you do recall that you had -- after the Starbucks

1  meeting, you had another meeting with the people at MGA?

2  A.    Yes.

3  Q.    Where did this meeting take place?

4  A.    At MGA.

5  Q.    And who was in attendance at this meeting?

6  A.    It was myself, Paula Treantafelles, Rachel Harris and

7  Kerri Legg.  She came in and out.

8  Q.    What was the purpose of this meeting from your

9  standpoint?

10  A.    This was to go over some of the notes that -- questions

11  that we had but also to brainstorm the packaging and

12  direction and also review the quote.

13  Q.    Were you provided any information concerning Brats at

14  that meeting?

15  A.    Yes, I was.

16  Q.    And what was it that you were provided?

17  A.    I was provided with some of the things that we had

18  requested earlier in that earlier e-mail:  Copies of the

19  illustrations we saw at the meeting, some spec, or item

20  call-outs, as far as like what's in each toy, price points,

21  some specs and kind of rough engineering-type drawings.

22  Q.    When you say -- we looked earlier at a request you had

23  made for the art boards that you had seen earlier.

24        Do you recall that?  You asked --

25  A.    Yes.

1    Q.    Did they provide you with copies of those?

2    A.    Yes, they did.

3    Q.    And if you could please turn to Exhibit 323 in your

4    binder.

5            And my question to you is going to be whether

6    these are copies of those materials that they provided to

7    you in response to your request?

8    A.    Yes.  Except for the 323-0003.

9    Q.    All right.

10           MR. QUINN:  Your Honor, we would offer

11   Exhibit 323, except for 323-3.

12           THE COURT:  Received.

13       *(Plaintiffs' Exhibit 320, except 323-3 received in*

14       *evidence.)*

15           MR. QUINN:  If we can put the first page up on the

16   screen.

17   BY MR. QUINN:

18   Q.    By the way, do you still have those originals?

19           You're holding them in your left hand there.

20   A.    Yes.

21   Q.    Are you dearly attached to them?  Would it be all right

22   with you if we marked them --

23   A.    Take them.  I don't want them.

24           MR. QUINN:  With the court's permission perhaps we

25   can mark that as Exhibit 323-A, the original documents

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    provided by MGA at this meeting.

2              THE COURT:  Thank you.  They'll be marked and

3    received.

4         (Plaintiffs' Exhibit 323-A received in evidence.)

5              THE WITNESS:  Oh, shit.

6         (Pause.)

7              THE COURT:  All right.  Thank you, counsel.

8              MR. QUINN:  Thank you, your Honor.

9    BY MR. QUINN:

10   Q.   So what we're looking at here, the first page of

11   Exhibit 323, is this the image of the outside of the

12   envelope?

13   A.   Yes.

14   Q.   And it says "Brats" and then the other side says Steve

15   and Liz, and it's got Brats.

16             If we can turn to the next page, dash 2, in the

17   upper left-hand corner.

18   A.   Yes.

19   Q.   And just so the jury can get a sense of what's in here,

20   if we can look at -4, 323-4 and then 323-5.

21             By the way, we see some text there on the

22   right-hand side:  "Meet Lupe."

23             Was that text there in the art boards that you had

24   seen previously?

25   A.   Yes.

1    Q.   And if you look at the next page, 323-6, and then

2    323-7, and then finally if we could skip over to -- just so

3    the jury can get an idea of what was provided to you,

4    323-18; and then, 323-19.

5              What is 323-19?

6    A.   That's a pretty rough version of specs of all the piece

7    counts that are going into the item, the 1299 item.

8    Q.   And 323-20?  Similar?

9    A.   Yes.  They only gave us one image for the four.

10   Q.   One for each of the four?

11   A.   It's the same image.  Just four copies of it.

12   Q.   And then, 323-24.

13   A.   Yes.

14   Q.   And what is that?

15   A.   That was the call-out list for the items that were

16   going to go into -- one of the other SKUs, which was 499.

17   Q.   323-31?

18   A.   -31.

19   Q.   What is that?

20   A.   That's just another list of all the pieces that were

21   going to go into the 1299 item.

22   Q.   And then, 323-32.  What is that?

23   A.   That's a rough, kind of, like a sculpt engineering-type

24   spec, showing what the doll's actual size and proportions

25   are.

1    Q.   Based on your experience in the toy industry, would it

2    be possible for a sculptor to do a sculpt from this image?

3    A.   A good supporter, yes.

4    Q.   Have you had sculpts done with even sketchier sketches?

5    A.   I have, yes.

6    Q.   If we could look at Exhibit 323-5.  323-5, please.

7    A.   *(Witness so complies.)*

8    Q.   This is from the package of materials that was given to

9    you in response to requests?

10   A.   Yes.

11   Q.   And if we could also look at Exhibit 10-5.  It's in

12   evidence:  10-5.

13          And do you see that to the lower right there that

14   notarization indication and the date there?

15   A.   Yes.

16   Q.   There is a 8/1988?

17   A.   Yes.

18   Q.   If we could go back to the Exhibit 323-5, is there any

19   date or notarization on that page?

20   A.   No.

21   Q.   And was there any such date or notarization on any of

22   the -- or indication of assignment on any of the pages?

23   A.   No.

24   Q.   Based upon the information that -- based upon your

25   experience in the toy industry and the information, the

1   drawings and SKUs and pricing information that you were

2   given by MGA, did you have an impression as to whether or

3   not this project was very far along?

4              MS. GLASER:  Objection.  Relevance.

5              THE COURT:  Overruled.

6              MR. MCCONVILLE:  Improper opinion.

7              THE COURT:  Overruled.

8              THE WITNESS:  Can you repeat that?  I'm sorry.

9   BY MR. QUINN:

10  Q.   Based on your experience in the toy industry and the

11  information that was given you -- the drawings, the piece

12  counts, the SKUs, the retail pricing, what you referred to

13  as an engineering drawing -- did you have an impression as

14  to whether or not this project was very far along?

15  A.   It was moving pretty quick, so yeah.  I mean, they did

16  a lot of extensive work.

17  Q.   And based upon your experience, how long would it

18  usually take to do this amount of work, what you were

19  presented with?

20             MR. MCCONVILLE:  Same objections, your Honor.

21             THE COURT:  Overruled.

22             THE WITNESS:  You know, it depends on what you're

23  showing me.  But for the stuff that they sent, it could take

24  a couple weeks.  For the artwork, itself, probably take a

25  lot longer.  And sculpting and getting the design of the

1    doll's shape is pretty keen, you know.  It's pretty

2    important to get that right.  So it's not like the first

3    time, and it's good.

4    BY MR. QUINN:

5    Q.   Was it your impression that they had been working on

6    this for some period of time?

7    A.   I was starting to get that impression.

8    Q.   If we could go back to Exhibit 320.

9           Before we do that, the envelope, is there a

10   trapezoidal image drawn on that envelope?

11   A.   Yes.

12   Q.   Do you know who drew that?

13   A.   I did.

14          MR. QUINN:  If we could blow that up on the

15   left-hand side there.

16          THE COURT:  Are these the original documents 323-A

17   that he brought to court, or is -- are you referencing back

18   to --

19          MR. QUINN:  323.

20          THE COURT:  -- 323, the copies you had.

21          MR. QUINN:  What we have on the screen, because

22   it's digitized is the copies that we got.  He has before him

23   the original.

24          THE COURT:  So this is 323 we're looking at?

25          MR. QUINN:  Yes, your Honor.

```
1              THE COURT:  Okay.  Thank you very much.

2    BY MR. QUINN:

3    Q.   Is there a halo there over Brats?

4    A.   Yes.

5    Q.   And who did that halo?

6    A.   I drew this.

7    Q.   Okay.  If we could go back to Exhibit 320, the

8    notations that you made opposite some of these questions and

9    the drawings, can you tell us whether these were done by you

10   in the course of this meeting on October 19th?

11   A.   The handwritten stuff?

12   Q.   Yes.

13   A.   Yes.  I wrote these notes down in the meeting on

14   October 19th.

15   Q.   Okay.  And in the lower left, there is a reference to

16   some deadlines and it says:  12:15 Wal-Mart meeting.  Trade

17   crest (sic).

18              Do you see that?

19   A.   Yes.  Trade dress.

20   Q.   Trade dress.  Is that your handwriting?

21   A.   Yes.

22   Q.   What were you noting there?

23   A.   Some of the notes that I was taking are the deadlines

24   that we had to meet that was given to us by Paula.

25   Q.   Did she -- did Ms. Garcia tell you that there had
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    already been some sales meetings set up with Wal-Mart?

2    A.   Yeah.  I just knew that there was a Target meeting that

3    we needed box whites for planogram.

4              And then on the other note is -- 12:15 was

5    Wal-Mart meeting that they wanted to get the stuff in front

6    of Wal-Mart and have the trade dress ready by then.

7    Q.   This is what she's telling you?

8    A.   Yes.

9    Q.   What is "trade dress"?

10   A.   "Trade dress" is the feel and the look and the

11   graphics, you know, how the packaging is going to look and

12   the color pallets.  Basically, the whole packaging feel with

13   the product.

14   Q.   The second notes says:  *11/20? - Target - White Box for

15   Plan-A-grams.  Box Whites for Planograms.*

16             Did I read that correctly?

17   A.   Yes.

18   Q.   Can you explain that to us, please?

19   A.   My notes are pretty weird backwards, but it's the same

20   thing.  I was just writing that on 11/20, for their Target,

21   they wanted a Target meeting.  We would need to have the box

22   whites completed for their planograms for Target.

23   Q.   Target, meaning?

24   A.   The store.  Retail.

25   Q.   One reference is to a Wal-Mart sales meeting and

43

1    another is for Target?

2    A.    Correct.

3    Q.    What is a "planogram"?

4    A.    "Planogram" is your -- is, basically, what you're

5    pitching to the retailer, the buyer, which is Wal-Mart, or

6    Target, or Toys "R" Us.  The price points and the shape of

7    the boxes and how many can fit on each shelf and for what

8    price points and what you're offering for this particular

9    line.

10   Q.    So what form does a planogram take?  If we had one here

11   in this room, what would be looking at?

12   A.    There's a couple of ways you could do.  You could do it

13   graphically where you just show the dimensions of how it

14   fits a two-foot shelf, or three-foot shelf, or whatever they

15   are pitching.  The other way and the best way is to actually

16   give them the boxes which are box whites so it actually

17   mimics the shape of the box, and shows you how you can do it

18   and shows the display how you would want to -- you're

19   pitching the price points and how much we want to give you,

20   as far as planogram.

21          I'm not really big on the planogram side.  I do

22   mostly product and graphics.

23   Q.    But this is information that was provided to you by the

24   people you are meeting with from MGA?

25   A.    Right.

1    Q.    In terms of how the product would actually fit on the

2    shelf?

3    A.    Correct.

4    Q.    In your wish list, those numbered items on this e-mail

5    that you sent before this meeting, the number -- first item:

6    We need some spec sheets calling out sizes and dimensions on

7    the dolls and accessories.  And you have -- there's a note

8    after, copies today.  Does that refer to the spec sheets or

9    is that the second numbered item?

10            It says copies today after spec sheets?

11   A.    Yes.  We were handed over some of those black and white

12   sketches.

13   Q.    And those -- that's what you're asking for in terms of

14   spec sheets?

15   A.    Correct.

16   Q.    And then the second item you said: *We need the*

17   *existing art boards that we saw in the meeting or good color*

18   *copies.*

19            And you were given those?

20   A.    Yes.

21   Q.    That's the exhibit that we just looked at, Exhibit 323?

22   A.    Yes.

23   Q.    And then, the number four typewritten item, it says:

24   *Do you have photos/JPEGS of the sculpts?*

25            And you've written:  *Casts by next week for*

1    *reference.*

2              Did I read that correctly?

3    A.    Yes.

4    Q.    What did you mean to convey by that?  What did they

5    tell you?

6    A.    We were told that we were going to get casts of the

7    sculpts by the next week to use for reference for putting

8    into designing the package.

9    Q.    So this meeting took place by Thursday, October 12th,

10   so it would be sometime the following week.  Is that what

11   you understood?

12   A.    Say that again?  I'm sorry.

13   Q.    The week of the 16th, would be the next week.  If this

14   is Thursday, October 12th --

15   A.    This note was not written on the 12th.

16   Q.    This note was written at the meeting on the 13th -- on

17   the -- what date?

18   A.    On the 19th.

19   Q.    On the 19th.  So it would have been the next week that

20   you would get the sculpts the week of the 23rd?

21   A.    Yes.

22              MR. QUINN:  Thank you.  Nothing further.

23              THE COURT:  Counsel, would you like to start your

24   cross-examination tomorrow?  Or are you ready to proceed

25   today?

1              Mr. Linker is from Chicago.

2              I think you're from Chicago, and I think he was

3    trying to get back.  I believe we discussed --

4              What the confusion is, is the next witness was

5    going to be a person by the name of Lucy Arant, but this

6    gentleman is being taken out of order.

7              I was informed over the weekend -- I think it was

8    Sunday -- that the gentleman was coming from Chicago, and

9    the parties were trying to get him on today and back to

10   Chicago.  But that may not be possible.  He may be here for

11   the rest of his life.  I'm just kidding you.

12             Counsel, do you want to proceed with

13   cross-examination now, so Mr. Linker might be able to go

14   back, or do you want to proceed --

15             MR. MCCONVILLE:  We'll see if we can get through,

16   your Honor.

17             THE COURT:  Okay.  Could you bear with us and see

18   if we can get Mr. Linker back to Chicago.

19             Counsel, your cross examination.

20                       CROSS-EXAMINATION

21   BY MR. MCCONVILLE:

22   Q.   Mr. Linker, my name is Tom McConville.

23   A.   Hi.

24   Q.   Prior to testifying today, did you meet with the

25   lawyers who represent Mattel?

*DEBORAH D. PARKER, U.S. COURT REPORTER*

47

```
1    A.    Mattel?  Or my lawyer?

2    Q.    The Mattel lawyers.

3    A.    No, I haven't met with them.

4    Q.    And you have your own lawyer for this case?

5    A.    I do.

6    Q.    Who is paying for your lawyer?

7    A.    I believe it's Mattel.

8    Q.    Okay.  Are you still currently doing freelance work for

9    Mattel?

10   A.    No.

11   Q.    Did your lawyer meet with Mattel's lawyers prior to

12   testifying today?

13   A.    I'm not aware if he did.

14   Q.    I think you testified that at some point you had a

15   small doll idea that you were intending to pitch to someone,

16   potentially MGA; right?

17   A.    Yeah.  MGA was one of the people we wanted to show it

18   to.  We were starting to shop it.

19   Q.    And was that the first doll that you had, small doll

20   that you had tried to pitch to a company?

21   A.    I don't know if that's the first one.  We had some

22   other idea.

23   Q.    And since that time, which would have been the 2000

24   time frame, have you pitched other doll ideas to companies?

25   A.    Yes.
```

48

```
 1    Q.    And have you been successful in making some of those
 2    pitches?
 3    A.    Unfortunately, not.  On one or two, we were.
 4    Q.    Are you aware of others who have been successful in
 5    pitching their doll ideas to other companies?
 6    A.    Yes.
 7    Q.    And how many people have you heard about who have
 8    pitched their doll ideas, successfully?
 9    A.    How many have I heard about?  Well, there's some famous
10    inventors out there.  You know, like --
11    Q.    I'll ask a better question.
12    A.    Yeah.
13    Q.    You consider yourself a freelancer when it comes to
14    doll design?
15    A.    Yeah.  Just -- I came upon it.  It wasn't really the
16    niche I wanted to get into, but I enjoyed doing it.  I saw a
17    niche.
18    Q.    And there you are as a freelance doll designer; right?
19    A.    Dolls and other things, yeah.
20    Q.    Freelance toy designer?
21    A.    Toys, yes.
22    Q.    And you've -- have you successfully pitched any toy
23    ideas?
24    A.    A couple.  Small.
25    Q.    Okay.  And for any of the toy ideas you've pitched,
```

```
 1    have you successfully -- has anyone ever offered you
 2    $30 million upfront for your idea?
 3    A.    No.
 4    Q.    Does it make sense to you that someone would offer
 5    $30 million upfront for a concept?
 6    A.    No.
 7    Q.    You testified about working on a project called
 8    Diva Starz?
 9    A.    Yes.
10    Q.    And that was -- that was a Mattel product; correct?
11    A.    Yes.
12    Q.    And I believe you testified that you were working --
13    I'm sorry, did you say you were working on the packaging for
14    Diva Starz?
15    A.    I did some packaging art for them.
16    Q.    What else did you work on for Diva Starz?
17    A.    I did some of the accessories toys, some of the doll
18    accessories that is and a lot of the graphics for the
19    packaging.
20    Q.    And I believe one --
21    A.    And some products --
22    Q.    I'm sorry.
23    A.    And some products for the dolls.
24    Q.    I believe one of the things you said you did was to
25    come up with some names; is that right?
```

```
 1   A.    Yes.
 2   Q.    And I think that was Exhibit 314.
 3            MR. MCCONVILLE:  If we could put up Exhibit 31-4,
 4   please.
 5        (The document was published in open court.)
 6   BY MR. MCCONVILLE:
 7   Q.    Are these some of the names that you came up with for
 8   Diva Starz?
 9   A.    Yeah.
10   Q.    And I believe you said that -- did you say that "Brats"
11   was proposed as a name for Diva Starz?
12   A.    It was on the list, so it was one of the names.
13   Q.    Who created this list?
14   A.    Myself and my partner, Liz Hogan.
15   Q.    So you were the one who actually -- you or your partner
16   actually pitched the idea of Brats to Mattel; right?
17   A.    We were asked for names, and we just gave them some
18   names.  So, you know, we looked at all these different
19   names.
20   Q.    Right.  But this name that you wrote down was
21   transmitted to Mattel; right?
22   A.    It was.
23   Q.    So this was not an idea that Mattel sent to you and
24   said, Confirm this is a cool name; right?
25   A.    No.  We sent this to them.
```

51

1    Q.   Okay.  And you were paid for your work --

2    A.   Yes.

3    Q.   -- right?

4         And let me ask you this:  As far as you know --

5    I'm sorry.  You said you knew Carter Bryant before that

6    October 2000 meeting at Starbucks?

7    A.   Yes.

8    Q.   And as far as you know, you knew that he worked at

9    Mattel; right?

10   A.   The last I saw him was at Mattel.

11   Q.   While you were employed there, too?

12   A.   While I was employed there.

13   Q.   As far as you know Carter Bryant never worked on the

14   Diva Starz project; right?

15   A.   I don't think so.  I don't know.

16   Q.   Can I -- you don't know, or --

17   A.   I don't know what he worked on in-house.

18   Q.   So you don't know --

19   A.   I don't think he did, you know.

20   Q.   Did you also conceive of some of the graphics for the

21   Diva Starz's names that you submitted to Mattel?

22   A.   Yes.

23        MR. MCCONVILLE:  Can we show you Exhibit 317,

24   please.

25   ////

52

```
 1   BY MR. MCCONVILLE:
 2   Q.   Let's look at -- while we're looking for that --
 3   Exhibit 316 you were shown.
 4   A.   Yes.
 5   Q.   And this was artwork that you prepared for Mattel for
 6   Diva Starz; correct?
 7   A.   Yes.
 8   Q.   And who -- and you prepared this and submitted it to
 9   Mattel.  Yes?
10   A.   I'm sorry?
11   Q.   You prepared this and submitted to Mattel.  Yes?
12   A.   Yes.
13   Q.   And the work that you did, the names and the logos you
14   sent to numerous people at Mattel; correct?
15   A.   Yes.
16   Q.   And the time that you sent it to the people at Mattel,
17   at least with regard to the name "Brats," the people that
18   you sent it to were Maureen Mullen?  Yes?
19   A.   Yes.  And on this particular project, I think it was
20   Maureen and Rene Pasko.
21   Q.   And Barbara Miller?
22   A.   Barbara Miller was another person I sent images to.
23   Q.   And Joni Pratte?
24   A.   Joni Pratte for packaging.
25          THE COURT:  Counsel, wait for the answers, please.
```

53

```
 1    Please wait for the question.  It will make it a lot easier
 2    for us.
 3    BY MR. MCCONVILLE:
 4    Q.   And you sent the "Brats" name to Allison Eisenberg?
 5    A.   I don't know if she was still there.  But, yes, I
 6    sent -- I don't know exactly who I sent these to.
 7    Q.   Well, you're sure it was Maureen Mullen, Rene Pasko,
 8    Barbara Miller and Joni Pratte?
 9    A.   They're the principals I work with.
10    Q.   And you sent those names January 7, 2000; correct?
11    A.   Somewhere around that time.
12    Q.   Well, let's look at Exhibit 314.
13            MR. MCCONVILLE:  If we can put 314 up again.  Go
14    to the top.
15        (The document was published in open court.)
16    BY MR. MCCONVILLE:
17    Q.   That's the e-mail where you transmit one of the names
18    for Diva Starz as "Brats"; right?
19    A.   Yes.
20    Q.   And you, obviously -- it appears you sent it to the
21    name Sue Davis as well; correct?
22    A.   Correct.
23    Q.   And I think you said that you may have sent it to a
24    number of people as well, a number of people other than
25    those as well; right?
```

```
 1    A.    This list was sent to Joni Pratte and Sue Davis.  The
 2    artwork was probably sent to the design people with the
 3    products.
 4    Q.    And you worked at Mattel.  Yes?
 5    A.    Did I work there?  Yes.
 6    Q.    And did the design people work with the packaging
 7    people?
 8    A.    Yeah.  They worked together.
 9    Q.    Let's take a look at --
10          MR. MCCONVILLE:  Let's put back up Exhibit 316,
11    I'm sorry.  And if you could zoom in on the blond-haired
12    character in the middle.
13    BY MR. MCCONVILLE:
14    Q.    Okay.  Was this a design that you came up with for
15    Diva Starz?
16    A.    It was collaboration with Mattel.
17    Q.    Okay.  And this would have been in, again, the January
18    2000 time frame?
19    A.    This was done before that, I think.
20    Q.    So even earlier?
21    A.    Yes.
22    Q.    And you'll note the big eyes.  Yes?
23    A.    Yes.
24    Q.    Big feet?
25    A.    Yes.
```

```
1    Q.    Oversized head?

2    A.    Yes.

3    Q.    And you understood that the Diva Starz products came

4    out in 2000; correct?

5    A.    Yes.  I think this is when it came out.

6    Q.    And this work that you did, for example --

7              MR. MCCONVILLE:  Can you zoom out?  Thanks.

8    BY MR. MCCONVILLE:

9    Q.    On Exhibit 316, you were paid -- how were you paid for

10   those?

11   A.    Work-for-hire.  Sorry.

12   Q.    And were you paid on a per-piece basis?

13   A.    I was probably working -- I was working on different

14   elements, so I would just charge per little project hourly

15   rate.

16   Q.    And so for this work that you, did in coming up with

17   the "Brats" name and the Diva Starz logo, how much would you

18   estimate you were paid by Mattel?

19             MR. QUINN:  Misstates the testimony, your Honor.

20             THE COURT:  Do you want to do those one at a time,

21   counsel?

22             MR. MCCONVILLE:  Sure.

23   BY MR. MCCONVILLE:

24   Q.    I'm sorry.  How much were you paid for the work by

25   Mattel that you did on Diva Starz?
```

1    A.    Overall?

2    Q.    Well, let's talk about the names and the logos.

3    A.    I don't recall the actual price.  You know, I don't

4    know the specific number.  It was 10 years ago.

5    Q.    Understood.  Well, you have a good memory of the

6    meeting at Starbucks 10 years ago.

7    A.    Yeah.  I have a lot of good memories of a lot of things

8    but not specifics on exactly how much.  Maybe a couple

9    hours' worth of worth of work, whatever my rate was.

10   Q.    Less than a thousand dollars?

11   A.    Well, you have to be more specific in the question.

12   What exactly are you asking me that I got paid for?  As far

13   as like, is it one image, or all of it together?

14   Q.    Well --

15   A.    This whole page, I don't know if I sent this alone, or

16   with a bunch of stuff.  So if it was this page, it was

17   probably under $1,000.

18   Q.    What about the e-mail that you saw with the list of

19   names?  How much would you have been paid for that?

20   A.    I don't recall.  I don't recall.

21   Q.    A thousand dollars?

22   A.    No.  Not a thousand dollars.  Probably like $200.

23   Q.    Ultimately, I think you described a meeting that you

24   had at a Starbucks with Paula Treantafelles and Carter

25   Bryant.

```
 1            Do you remember that?
 2   A.    Yes.
 3   Q.    And I believe you said at that meeting you were shown
 4   sketches or drawings; is that right?
 5   A.    Color renderings.
 6   Q.    Color renderings, okay.  And these color renderings you
 7   believed indicated that the project was far along.  Yes?
 8   A.    Not at that point, no.
 9   Q.    Not at that point?
10   A.    I just thought the color renderings were far along.
11   They were pretty tight.
12   Q.    And this meeting that you had with Carter Bryant, you
13   said that you recalled being at the meeting and you asked
14   Carter Bryant about whether he was still working at Mattel;
15   right?
16   A.    Yes.
17   Q.    And at the time of that meeting he told you, *No, I'm
18   not working at Mattel*; right?
19   A.    He said he had quit.
20   Q.    He quit Mattel.  And what's the date of that meeting
21   that you recall?
22   A.    It was on the 10th or 11th of October.
23   Q.    And Paula Garcia was at that meeting as well; correct?
24   A.    Yes.
25   Q.    And, ultimately, you submitted an invoice -- I'm sorry,
```

58

```
 1    a bid to MGA for proposed work on the packaging; right?

 2    A.    Yes.

 3    Q.    And if we could look at Exhibit 324, which Mattel

 4    showed you during your exam --

 5              Do you see that?

 6    A.    Yes.

 7    Q.    And under phase one, your estimate for the work was

 8    between 18 and $25,000; right?

 9    A.    Correct.

10    Q.    And under phase two, the work would have been between

11    35 and $45,000; right?

12    A.    Yes.

13    Q.    And under phase three, your bid would have been for

14    9,400 to 12,800; correct?

15    A.    Yes.

16    Q.    So the total work, if that bottom line there -- is that

17    the correct bottom line?

18    A.    Uh-huh.  Yes.

19    Q.    You hope it's accurate.  You hope you added the numbers

20    correctly?

21    A.    Yeah.

22    Q.    So your bid to MGA to do this packaging proposal was

23    for between 65 and $84,000; right?

24    A.    Yes.

25    Q.    So that's a far cry from the few hundred dollars you
```

1    would get from Mattel for doing a few names; right?

2    A.   It was a lot bigger project.

3    Q.   And, ultimately, you understood, or, ultimately, you

4    didn't get the work; right?

5    A.   Yes.

6    Q.   But along the way, you did -- we saw that e-mail where

7    you had drawn some pictures on it; right?

8            THE COURT:  Is that 320, counsel?

9            MR. MCCONVILLE:  320.  Thank you.

10           THE COURT:  October 12th?

11           MR. MCCONVILLE:  Yes, sir.

12   BY MR. MCCONVILLE:

13   Q.   And as I understand what you were saying is that you

14   went to the meeting with this e-mail.  Yes?

15   A.   Printed out the e-mail, yes.

16   Q.   Printed out the e-mail.  And then during the meeting

17   while you were having discussions with -- who was there from

18   MGA?

19   A.   With Paula and Rachel Harris and Kerri Legg.

20   Q.   And during that meeting, you were discussing with them

21   their vision of how this packaging would work?

22   A.   Yeah.  It was a brainstorm.

23   Q.   And you wrote down these images of how you were

24   capturing what it was the brainstorm was leading to?

25   A.   Yes.

1    Q.   Now, during -- hold on.

2           As I understand it, your work -- that e-mail that

3    we looked at that related to Diva Starz was a January 2000

4    e-mail that included the word "Brats" as one of the proposed

5    names; right?

6    A.   Correct.

7    Q.   And then, in October of 2000, you had a meeting with

8    MGA to discuss a product named "Brats"; right?

9    A.   Correct.

10   Q.   Did you see any conflict of interest for you in working

11   on a project for MGA that had the name "Brats"?

12   A.   No.

13   Q.   Now, you were shown -- I'm sorry.  The exhibit, the

14   printed e-mail that had your drawings on it, those drawings

15   were done at the meeting that took place; correct?

16   A.   Yes.

17   Q.   And then we also saw the envelope you held up?

18   A.   Yes.

19   Q.   That was Exhibit 323?

20   A.   Yes.

21          MR. MCCONVILLE:  And if we could zoom in on the

22   drawing on the bottom of that.  Can you zoom in on that?

23   BY MR. MCCONVILLE:

24   Q.   And I believe you said you drew that as well; right?

25   A.   Yes.

```
 1   Q.   You didn't draw that at the time you got the envelope;
 2   right?
 3   A.   Correct.
 4   Q.   When did you draw that?
 5   A.   I drew it after the product came out.
 6   Q.   Long time after the meeting?
 7   A.   This sketch on here is something I drew after the
 8   product came out.
 9   Q.   When you saw it on a shelf, or something?
10   A.   Yeah.  I went and bought one.  I bought it.
11   Q.   That's good to know.
12   A.   Yes.
13   Q.   Consumer purposes that target audience sometimes can go
14   SKU?
15   A.   It helped.
16   Q.   I believe inside Exhibit 323, if you flip to page -4,
17   323-4.
18   A.   Four, yeah.
19   Q.   And that's a picture of a number of drawings of these
20   girls; correct?
21   A.   Yes.
22   Q.   And this was what you were handed I believe you said
23   October 23rd-ish?
24   A.   It was in that package.
25   Q.   And this drawing that you were handed doesn't have the
```

```
 1   logo "Brats" on it, does it?

 2   A.    I didn't have that -- that wasn't handed over to me.

 3   Q.    What you were handed didn't have the Brats logo on it?

 4   A.    Did not have the Brats logo on this one.

 5   Q.    And it didn't have a copyright symbol on it either;

 6   right?

 7   A.    No.

 8   Q.    No?

 9   A.    No.  I'm going to make sure, though.  No.

10   Q.    We discussed that you on occasion pitch ideas for toys

11   to manufacturers.  Yes?

12   A.    Yes.

13   Q.    Do you recall pitching an idea to Mattel in 2002 called

14   Raddies, R-A-D-D-I-E-S?

15   A.    "Raddies," I don't think I pitched the idea.  I worked

16   on a project.  I was commissioned.

17   Q.    By whom?

18   A.    By Mattel.

19         MR. MCCONVILLE:  And one second, please.

20         (Pause.)

21   BY MR. MCCONVILLE:

22   Q.    Mr. Linker, going back to the outside of this envelope,

23   which is Exhibit 323 where you drew that image after the

24   product was on the shelf, do you recall that Mattel lawyers

25   actually asked you about this drawing years ago and you
```

63

```
 1   provided that information to them years ago?
 2   A.    I never showed them this until I was subpoenaed.
 3   Q.    Did you provide testimony in this case?
 4   A.    Deposition?
 5   Q.    Yes.
 6   A.    Yeah.
 7   Q.    And you talked about the fact that this logo was drawn
 8   well after the fact; right?
 9   A.    Yeah, I believe I did.
10   Q.    Now, going back to the meeting that you had at --
11           THE COURT:  That's Judge Smith's cell phone.
12       (Laughter.)
13           THE COURT:  We'll ignore Judge Smith's cell phone.
14           I'll explain it, Judge Smith.  Now, I have got to
15   give back that other cell phone, don't I?
16       (Laughter.)
17   BY MR. MCCONVILLE:
18   Q.    Just to be -- going back to the meeting where
19   Carter Bryant told you that he was no longer employed at
20   Mattel, do you know what time of day that was?
21   A.    When we had the meeting?
22   Q.    Yeah.
23   A.    It was in the morning.
24   Q.    And was it typically in the morning?  Was it crowded at
25   Starbucks?  Do you recall?
```

1   A.   Yeah, it was decent.

2   Q.   And I believe you said that it was -- the Starbucks was

3   fairly near to Mattel; is that right?

4   A.   Yes.

5   Q.   And the meeting that you had, did Carter Bryant -- were

6   the drawings 8 1/2 by 11, or were they full size?

7   A.   They were full size.

8   Q.   So at this meeting at Starbucks, near Mattel,

9   Carter Bryant had with him this pitch book of drawings which

10  are, you know, 11 1/2 by 17-ish?

11  A.   Yes.  It was in a black portfolio.

12  Q.   And it was at that meeting where Carter Bryant told you

13  that he was no longer working at Mattel; right?

14  A.   Correct.

15        MR. MCCONVILLE:  I have nothing further, your

16  Honor.

17        THE COURT:  Redirect?

18        And this will be Mr. Quinn on redirect.

19        MR. QUINN:  Thank you, your Honor.

20                  REDIRECT EXAMINATION

21  BY MR. QUINN:

22  Q.   That Starbucks is not like it's, right, a block from

23  Mattel.  It's some distance, a mile?  A couple of miles?

24  A.   I would say about under two miles.

25  Q.   And Mr. McConville asked you a question about whether

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
 1   this meeting where you actually got those copies of the
 2   drawings was on October 23.
 3           Do you recall him referencing that day?
 4   A.   October 23?
 5   Q.   Yes.
 6   A.   No.  It was October 19th.
 7   Q.   It was October 19th.  Is that consistent with your
 8   planner?
 9   A.   Yes.
10   Q.   When you -- you indicated in Exhibit 320 in your
11   notes --
12           MR. QUINN:  If we could put that up.
13   BY MR. QUINN:
14   Q.   Numbered Item 4, you asked:  *Do you have photos/JPEGs*
15   *of the sculpts?*
16           And you wrote:  *Cast by next week for reference.*
17           What are "casts"?
18           MR. MCCONVILLE:  This is beyond the scope of my
19   exam, your Honor.
20           THE COURT:  Overruled.
21           THE WITNESS:  The casts are -- when you have a
22   sculpt, you have a master sculpt of the doll, or the item,
23   whatever the product is.  And then, you make a mold off of
24   that sculpt.  And that mold is used so that you can pour in
25   a resin to make cast.  That's a sculpting term.  And the
```

```
 1   casts are like one offs of the dolls, so you could have
 2   multiple where you can do painting on it, or just tweak it.
 3   But, basically, they are copies of the master sculpt.
 4   BY MR. QUINN:
 5   Q.   So if you're told on October 19th that you will get
 6   casts the next week, does that mean necessarily the sculpts
 7   must already exist?
 8   A.   Yes.
 9            MR. MCCONVILLE:  Objection.  Calls for
10   speculation.
11            THE COURT:  Overruled.
12            THE WITNESS:  Yes.
13   BY MR. QUINN:
14   Q.   And in your experience, is it pretty extraordinary for
15   a doll designer to be paid over $30 million?
16   A.   Yes.
17   Q.   For designs?
18   A.   Yes.
19            MR. QUINN:  Nothing further.
20            THE COURT:  Recross?
21            And, counsel, you're not confined, because I think
22   technically your objection is correct but it saves the
23   gentleman coming back.
24            So, if you want to ask any questions.
25   ////
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
 1                      RECROSS-EXAMINATION

 2  BY MR. MCCONVILLE:

 3  Q.    In selling an idea of a product to a toy company, is it

 4  typical that the agreement provides for royalty payments?

 5  A.    Yes.

 6             MR. MCCONVILLE:  No further questions.

 7             THE COURT:  All right.  In an abundance of

 8  caution, I'm going to ask you to remain on call, because

 9  we've got jurisdiction until May 7th, but I can't imagine

10  you returning.

11             So go back to professional business.  Take any

12  vacations, et cetera.  If you're ever needed back in

13  court -- we're doing that for all of the witnesses, because

14  they are coming internationally from across the country.  It

15  saves subpoenas going back, and we'll be courteous and

16  polite.  By any stretch of the imagination you're needed

17  back, there will be plenty of notice, okay?

18             Now, if I was you, I would go as quickly as I can.

19      (Laughter.)

20             THE WITNESS:  Thank you.  Thank you, your Honor.

21             THE COURT:  Good night.

22             All right then.  Ladies and gentlemen, you're

23  admonished not to discuss this matter with anyone, nor form,

24  or express any opinion of this case.  Don't make statements

25  about this case.  Don't engage in conversations about the
```

1   witnesses, your opinions, or anything else, because you

2   don't have any right now; right?  Completely neutral.

3            We'll see you 8:30 tomorrow.  Please drive safely.

4        *(Jury out.)*

5        *(The following proceedings were had outside the*

6        *presence of the jury:)*

7            THE COURT:  All right.  The jury is no longer

8   present.  The alternates are no longer present.

9            I thought -- and maybe I'm mistaken, but either

10  Sunday when we were in session, or Monday, I thought it was

11  made known to the court that Steve Linker was a real problem

12  for Mattel from their perception.  And I think I was

13  specifically approached, and I thought it was with either

14  Annette Hurst or Tom McConville.  And that's why when I saw

15  you get up, I was surprised.

16           I thought it was always agreed that Linker was

17  going to go on and off the stand.  And I didn't -- counsel,

18  have a seat.

19           And I didn't understand why there would be a

20  concern.  Because if you have remember -- let's look at our

21  notes -- we decided that Lucy Arant was supposed to be next.

22  She was supposed to be a half hour or so witness; that I

23  postponed calling the next witness, Brian Armstrong, until

24  after I heard Carter Bryant.  So the next witness after

25  that, which only made this person one out of order, was

```
 1   Steve Linker.  And because of the supposed unwillingness or
 2   difficulty getting Mr. Linker, I thought you would approach
 3   me, notify me of that.  And I really didn't have a concern
 4   if we were one witness off or not.  I'm not being that
 5   uptight, quite frankly, about those people that the parties
 6   are having.  But that's causing a concern -- if that's
 7   repetitive problem, so be it, but I can't imagine why there
 8   would be no preparation with a witness who was supposed to
 9   take 45 minutes or half an hour on direct examination, which
10   was Lucy Arant, and we wouldn't be prepared concerning
11   Linker.  So, in abundance of caution, I offered that you
12   could start tomorrow, because Ms. Keller rose to her feet --
13   and she wasn't here at that time.
14          But what I was surprised was that Ms. Hurst rose
15   to her feet.  So if you feel you're disadvantaged in any
16   way, we'll get Mr. Linker back and have him appear tomorrow.
17          MR. MCCONVILLE:  Understood, your Honor, and we
18   don't need Mr. Linker back.
19          THE COURT:  Okay.  Now, we'll have the sacred
20   presenting of the cell phone back to Ms. Pisoni.
21   Ms. Pisoni, if you will come forward.
22      (Pause.)
23          THE COURT:  Here's your cell phone.  And
24   Ms. Pisoni is --
25          Now, we have to do is inform Judge Smith of this.
```

1    Judge Smith, you can completely blew my facade.

2             I'd given a speech to the jury that if I ever

3    heard a cell phone going off, I would take the cell phone

4    and drop it in the trash.

5             Ms. Pisoni was the first --

6             Just a moment.  This is a very formal ceremony,

7    Ms. Pisoni.  Very formal.

8             Not so fast.

9         (Laughter.)

10            THE COURT:  So Ms. Pisoni, unfortunately, had the

11   first cell phone go off.  It was very dramatic.  We

12   confiscated her cell phone and dropped it in the trash with

13   a big loud thud.  Now, she didn't know this, but she was

14   always going to get it back.

15            And then, of course, Judge Smith, you came into

16   court and your cell phone went off.

17            Ms. Pisoni.

18            MS. PISONI:  Thank you, your Honor.

19            JUDGE SMITH:  Your Honor, I qualify for the senile

20   old guy exception.

21            THE COURT:  Well, there's certainly exceptions to

22   exceptions to exceptions.  And the Discovery Referee is one

23   of those, okay?

24            But anyway, once again, Ms. Pisoni, don't blow my

25   cover.  Just kind of keep it out of sight so the jury thinks

```
 1    I have enacted that Draconian pressure.  Because what it

 2    will do is, is will just guarantee in a sense that they

 3    don't see you out there with a cell phone.  Just keep it

 4    outside for a couple of days.  It will look like you bought

 5    a new one.  I saw three jurors flip off their cell phones as

 6    soon as yours went in the trash.

 7            And the second thing is, all kidding aside, the

 8    reason I got to be Draconian is, I can just imagine

 9    Mr. Larian up on the stand at a critical point and a cell

10    phone goes off in the audience with Mattel.  If I was

11    Ms. Keller, I would run over to the Mattel side and take

12    that person with great bodily injury, okay?  In other words,

13    we just can't have.  There's a couple key people -- Eckert,

14    Carter Bryant -- cell phones can't be going off, okay?

15            So I just trust that you will keep the facade up.

16            MS. PISONI:  Yes, your Honor.

17            THE COURT:  You never got it back; right?

18            MS. PISONI:  Right.

19            THE COURT:  At least for the time being.

20            A couple of more things.  Could I have the other

21    opinion?

22            One more, in limine motion No. 45, and this is the

23    order of the motion concerning the evidence regarding

24    non-trade secret information and discredited trade secret

25    categories.
```

I think for years prior to the time the court
received this case as a transfer court and during the period
of time that I've been in your presence, Mattel has claimed
as a trade secret almost every document and category of
information that its former employees allegedly
appropriated.  Little more than one week after the filling
deadline for motions for summary judgment, Mattel abandoned
its trade secret misappropriation claim as to the vast
majority of the documents and information.

Now, Mattel did not explain, nor is Mattel
required to explain to the court the reason for its change
in position.  But from the arguments in your briefing and on
the motions for summary judgment, not this court but
somebody could assume that it appears that Mattel disclaimed
as trade secrets many of its documents in an unsuccessful
bid to shield certain state law counterclaims from the
CUTSA, California Uniform Trade Secrets Act, supersessive
effect.

Now, that I've issued the order on the parties'
motion for summary judgment, MGA argues to this court that
evidence of the appropriation of disclaimed trade secrets is
irrelevant and unduly prejudicial.  And MGA is also arguing
to this court that should the court exclude evidence of
certain categories of information that -- as the court has
previously determine -- do not qualify as trade secrets.

 1          Now, to prevail of its counterclaim for trade

 2   secret misappropriation -- and by the way, this is off the

 3   record.

 4          -- Mattel must prove that counterdefendants,

 5   disclosed, acquired and/or used the following trade secrets

 6   with knowledge that the trade secrets had been obtained

 7   through improper means; bribery, threat, breach of a duty of

 8   secrecy:  First, MyScene Swappin' Styles product concepts;

 9   second, the Toys "R" Us Merchant Model Optimization Tool;

10   third, some categories of information and documents

11   downloaded by Castilla; fourth, some categories of

12   information and documents taken by Brisbois; fifth, some

13   categories of information and documents taken by Machado and

14   sixth, Brats concept and related creative works conceived of

15   by Bryant.

16          Neither MGA nor the former employees deny that the

17   former employees retained or downloaded the materials to

18   portable storage devices.  MGA instead argues that it never

19   acquired or used Mattel's materials.  MGA more importantly

20   argues that Mattel's former employees acted on their own

21   volition and contrary to MGA's instruction.

22          In some cases, evidence of the appropriation of

23   non-trade secret information may be probative of the intent

24   to misappropriate trade secrets.  But the former employees'

25   intent to download information from Mattel's servers is not

1    at issue in this case.  Most of the former employees are not

2    counterdefendants to Mattel's counterclaim for trade secret

3    misappropriation.  Moreover, none of Mattel's former

4    employees have argued that they accidentally downloaded

5    documents from Mattel's servers.  The employees have

6    admitted to the willfulness of their conduct.  The remaining

7    disputes are:  First, whether the materials or trade

8    secrets; second, whether the employees intended to download

9    trade secrets and, third, whether MGA acquired and/or used

10   the materials.  Evidence of the lawful appropriation of

11   non-trade secret information is, on its face, irrelevant to

12   these questions.

13          Mattel responds -- and I'm not being too critical,

14   but I just want to inform you.  It came up on Sunday.  I

15   think you cited the wrong line of case law, and I'm going to

16   really ask both parties to be very careful what you are

17   submitting to this court.

18          In your opposition brief, you identify several

19   cases involving the admission of prior bad act evidence to

20   prove knowledge or intent.  You've argued on behalf of

21   Mattel that its employees' acquistion of non-trade secret

22   information shows that their alleged employees steal all

23   manner of documents and information to suit MGA's needs.

24   Mattel's argument, I think, is predicated upon a gross --

25   well, let's just say misrepresentation and misapplication of

the cases cited in the opposition brief, in which the
evidence of party's prior bad acts was admitted to prove
that the same party's knowledge, intent, wilfulness (one of
the cases concerned a habeas petition). *United States
versus Lozano,* 623 F.3d 1055, 1059, which held evidence of
the defendant's prior possession or sale of narcotics was
material to issues of knowledge and intent with respect to
drug distribution; *Howard Opera House Associates versus
Urban Outfitters,* 322 F.3d 125, 128 through 129, (Second
Circuit 2003), holding that evidence of prior excessive
noise problems in Urban Outfitters' other stores tended to
show that Urban Outfitters knew that its music had a
disruptive effect and insisted on playing it at excessive
levels despite that knowledge; also, *United States versus
Tsinnijinnie*, 91 F.3d 1285 and 1288 (Ninth Circuit 1966),
holding that evidence of prior bad acts may serve as proof
of motive, opportunity, intent, preparation, plan,
knowledge, identity, or absence of mistake, or accident,
quoting *United States versus Hadley*, 918 F.2d 848, 850,
(Ninth Circuit 1990) and *Allstead versus Woodford*, at
2008 WL 5215652 and also found in the Eastern District of
California, dated December 12th, 2008, finding no due
process violation in the state court's admission of evidence
that the defendant had been convicted on two prior occasions
for possession of methamphetamine.

```
 1              But none of these cases concern prior bad acts --
 2     concerning prior bad acts even remotely are applicable to
 3     the instant facts in our case.  First, the download of
 4     non-trade secret information was not a prior act.  It is
 5     undisputed that Mattel's former employees accessed non-trade
 6     secret information at the same time they allegedly accessed
 7     trade secrets.  Second, the download of non-trade secret
 8     information is also not a bad fact.  Mattel had no property
 9     interest in its non-trade secret materials and information.
10     Citing Silvaco Data Systems versus Intel Corp, 184 Cal. App.
11     4th 210, 2010 that stands for proposition, quote: Without
12     the claimed threat of a trade secret, the complaint would
13     set forth no foundation for any of these claims, end of
14     quote.  In the absence of a contractual agreement to the
15     contrary, Mattel's former employees were free to appropriate
16     such information for their own use or even for MGA's use.
17     There was nothing wrongful about this conduct.  Indeed, as
18     the order on the motions for summary judgment recognized,
19     the unrestricted flow of non-trade secret information, like
20     employee knowledge, is critical to employee mobility and
21     free enterprise.  Third, the download of trade secret
22     information was not an act of MGA's.  The fact that Mattel's
23     former employees downloaded non-trade secret information has
24     nothing to do with MGA's knowledge and intent.  And this was
25     resolved, also, in the court's summary judgment motion.
```

1          Now, Mattel seeks to introduce such evidence in

2   order to suggest that the employees did something wrong when

3   they allegedly misappropriated Mattel's non-trade secrets.

4   Using the evidence in this matter would both be improper,

5   erroneous and contrary to the court's ruling on the motions

6   for summary judgment.  However, the evidence may still

7   actually prove beneficial to MGA, because it may corroborate

8   some of its arguments about Mattel's failure to properly

9   mark documents or otherwise instruct its employees about

10  whether particular documents were or were not trade secrets.

11  Such evidence also has the potential to demonstrate both

12  mistake and lack of intent by the employees who may have

13  misappropriated trade secrets.  For example, MGA could

14  possibly argue that the various thefts of non-trade secret

15  information prove that the employees never intended to

16  deprive Mattel of its valuable materials.

17          Therefore, this court is left in a rather strange

18  position of deciding a motion *in limine* that seeks to

19  exclude evidence that is beneficial to the same party that's

20  seeking its exclusion.  This court, therefore, sees two

21  possible resolutions:  First, the exclusion of this

22  evidence; or, second, the admission of the evidence with the

23  limiting instruction that, quote:  *Former employees were*

24  *free to appropriate non-trade secret information because the*

25  *State of California places a value on employee mobility.*

```
 1              MGA's motion is tentatively granted but without

 2     prejudice to the party seeking introduction of such evidence

 3     subject to a limiting instruction concerning former

 4     employees' entitlement to access and appropriate non-trade

 5     secret information.

 6              Now, instead of rearguing that tonight, I'll put

 7     that out in written form as I did the other eight or nine

 8     motions last evening.  And on Saturday and Sunday, we can go

 9     over that.

10              Now, I would like to, once again, compliment your

11     very able stuff, these young people who are working too

12     hard.

13              And who is the young lady who was up here for

14     Mattel?

15              MR. QUINN:  Rachel Vargas.

16              THE COURT:  Could you go get her?

17              MR. QUINN:  Probably gone back to the office, your

18     Honor.

19              THE COURT:  What's her name?

20              MR. QUINN:  Rachel Juarez.

21              THE COURT:  Rachel Juarez?

22              MR. QUINN:  Yes.

23              THE COURT:  Well, I would like, on the record, I

24     think that she was absolutely superb.  Got the documents in

25     a timely fashion and was very professional.
```

```
 1              And on behalf of MGA, there was another young

 2    lady?

 3              MR. MCCONVILLE:  Diane Rutowski.

 4              THE COURT:  Diane Rutowski.

 5              This is, also, a matter of public record.  When

 6    the court sees these young people striving so hard on behalf

 7    of the senior partners and doing such a professional job, I

 8    think they both should be noted in the record, and they both

 9    have the court's compliments for their professionalism.

10              Now, I don't think it can go any smoother, by the

11    way, as a compliment to each of the respective lead counsel

12    in this case than it's going at the present time.  Complex

13    litigation is chaotic.  It's messy.  There is nothing civil

14    about the civil practice of law.

15              So tomorrow we have Arant.

16              MR. QUINN:  Yes.

17              THE COURT:  TMI.  Too much information.

18              How long did you think Arant will be on the stand

19    on direct?

20              MR. QUINN:  I'm thinking 45 minutes.  Half hour to

21    45 minutes.

22              THE COURT:  About three hours?  I'm just kidding

23    you.

24              About 45 minutes, so you can plan tomorrow.

25              And their cross will be about?
```

```
 1                MR. MCCONVILLE:  Half an hour.

 2                THE COURT:  Half an hour.

 3                Then after that, we have Ashong.  And how long do

 4      you think on direct with Ashong?

 5                MR. QUINN:  Half hour.

 6                THE COURT:  And on cross?

 7                MR. MCCONVILLE:  Half hour.

 8                THE COURT:  Okay.  And then Anna Rhee?

 9                MR. QUINN:  45 minutes.

10                THE COURT:  And --

11                MS. HURST:  45 minutes.

12                THE COURT:  Now, it sounds to me like we won't get

13      to Carter Bryant until tomorrow afternoon.  If we really add

14      all that time together, it probably easily fills a morning

15      session, so I'm just wondering if we shouldn't be courteous

16      and notify -- if one of you has contact with Mr. Bryant's

17      counsel, if we have those other three witnesses here,

18      there's no reason for him to be standing in the hallway.

19                MS. HURST:  We'll tell him to come after lunch.

20                THE COURT:  I would say at 1:00 o'clock.  Don't

21      you think that the three witnesses are going to fill the

22      morning, realistically?

23                MR. QUINN:  Yes.

24                MR. MCCONVILLE:  Yes.

25                THE COURT:  Then, there's no reason to have a
```

```
 1    witness standing in the hallway.  He's traveled a long way.
 2              And, finally, do you want me to start taking
 3    judicial notice of any of these documents for either side to
 4    save you time?
 5              Hearing nothing, I'll do nothing until --
 6              MR. MCCONVILLE:  Yes.
 7              THE COURT:  -- until you approach me in that
 8    regard.
 9              MR. MCCONVILLE:  There were a handful that I think
10    are going to be with Ms. Arant which are authenticated
11    certified public records.
12              THE COURT:  I know that.  I have been suggesting
13    that for the fifth time to try to give you some time back,
14    because you will be scrambling even with 120 hours.
15              MR. QUINN:  We have agreements on authenticity on
16    the registrations, your Honor.  We do have objections as to
17    their use, especially with these witnesses.
18              THE COURT:  Why don't we go over those later
19    tonight.
20              Now, with Carter Bryant, of course, you can't
21    anticipate.  In a perfect world, it would be nice to get him
22    on and off the stand and back home by Friday as a courtesy.
23    But how long did he testify in phase one with Judge Larson?
24    How many days?
25              I heard it was a horrendous period of time.  But I
```

82

 1   heard a third of that time was spent a sidebar.

 2           MS. KELLER:  I think, your Honor, as I recall, it

 3   was about three or four days.

 4           THE COURT:  In reading the transcripts, a huge

 5   amount of time was really not spent in litigation.  It was

 6   spent out in the hallway.

 7           All right.  Well, I can't -- I can't judge that.

 8   So, hopefully, we'll get the gentleman on and off just as

 9   quickly as possible.

10           Now, tonight, later on this evening, we're going

11   to cover -- we covered several of them last night.

12           We are going to cover Lloyd Cunningham?

13           MR. QUINN:  Yes, your Honor.

14           THE COURT:  About how many exhibits do you think

15   you have with Lloyd Cunningham?

16           MR. QUINN:  I think it's about 20.

17           THE COURT:  That's it?

18           MR. QUINN:  About 20.

19           THE COURT:  That's it?

20           MR. QUINN:  That's it.

21           THE COURT:  What are they?

22           We'll go off the record for just a moment.

23           I'm sorry.  The record should, once again, so the

24   circuit knows, every single exhibit, every single objection

25   is being made known to the court by both parties

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    substantially in advance of any witness that is called.  So,

2    counsel are putting new meaning to nights and weekends.

3    They are spending most of the weekends with the court, a

4    good portion to their evenings.  My compliments to counsel.

5    Their energy has made this court enthusiastic.

6              Now, off the record.

7         *(At 5:09 p.m., proceedings were adjourned.)*

8

9                          -oOo-

10

11                       CERTIFICATE

12              I hereby certify that pursuant to Section 753,

13   Title 28, United States Code, the foregoing is a true and

14   correct transcript of the stenographically reported

15   proceedings held in the above-entitled matter and that the

16   transcript page format is in conformance with the

17   regulations of the Judicial Conference of the United States.

18

19   Date:  January 27, 2011

20

21

22         _____

23                    Deborah D. Parker, Official Reporter

24

25

*DEBORAH D. PARKER, U.S. COURT REPORTER*