Page 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

THE HON. DAVID O. CARTER, JUDGE PRESIDING


MATTEL INC.,                        )
                                    )
                    Plaintiff,      )
                                    )
          vs.                       ) No. CV 04-9049-DOC
                                    )     VOLUME 2 OF 4
MGA ENTERTAINMENT, INC.,            )
                                    )
                    Defendant.      )
_____ )



REPORTER'S TRANSCRIPT OF PROCEEDINGS

SANTA ANA, CALIFORNIA

THURSDAY, JANUARY 27, 2011

11:30



Maria Beesley-Dellaneve, RPR, CSR 9132
Official Federal Reporter
Ronald Reagan Federal Building, room 1-053
411 West 4th Street
Santa Ana, California 92701
(714) 564-9259

Electronically signed by Maria Beesley (501-187-561-9309)                    862823b8-cd4b-4e8f-b55a-49478b29db5f

1   **APPEARANCES OF COUNSEL:**

2   **FOR THE PLAINTIFF:**  QUINN EMANUEL URQUHART OLIVER & SULLIVAN
                            BY:  MICHAEL ZELLER, ESQ.
3                           and  JOHN QUINN, ESQ.
                            865 S. FIGUEROA
4                           10TH FLOOR
                            LOS ANGELES, CALIFORNIA 90017
5                           (213)443-3000

6

    FOR THE DEFENDANTS:  ORRICK, HERRINGTON & SUTCLIFFE
7                           BY:  ANNETTE HURST, ESQ.
                            405 HOWARD STREET
8                           SAN FRANCISCO, CALIFORNIA 94105
                            (415)773-5700
9

10

    FOR THE DEFENDANTS:  ORRICK HERRINGTON & SUTCLIFFE
11                          BY:  THOMAS MCCONVILLE, ESQ.
                            4 PARK PLAZA
12                          SUITE 1600
                            IRVINE, CALIFORNIA 92614
13                           (949)567-6700

14

                            KELLER RACKAUCKAS
15                          BY:  JENNIFER KELLER, ESQ.
                            18500 VON KARMAN AVENUE
16                          SUITE 560
                            IRVINE, CALIFORNIA 92612

17

18

    FOR CARLOS MACHADO GOMEZ: LAW OFFICES OF MARK E. OVERLAND
19                          BY:  MARK OVERLAND, ESQ.
                            100 WILSHIRE BLVD
20                          SUITE 950
                            SANTA MONICA, CA. 90401
21                          (310) 459-2830

22

23

24

25

Page 3

```
 1                          - AND -

 2                   SCHEPER KIM & HARRIS LLP
                     BY:  ALEXANDER COTE, ESQ.
 3                   601 WEST 5TH STREET_12TH FLOOR
                     LOS ANGELES, CA. 90071
 4                   (213) 613-4660

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Electronically signed by Maria Beesley (501-187-561-9309)                    862823b8-cd4b-4e8f-b55a-49478b29db5f

```
                                                            Page 4

1                          I N D E X

2
   PLAINTIFF'S                                          VOIR
3  WITNESS              DIRECT  CROSS  REDIRECT  RECROSS  DIRE

4  ANNA RHEE             18       5

5

6                          EXHIBITS

7
   DEFENDANT'S                         FOR         IN
8  EXHIBIT  DESCRIPTION          IDENTIFICATION  EVIDENCE

9    201-58                                        6

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          SANTA ANA, CALIFORNIA; THURSDAY, JANUARY 27, 2011

2

3                         CROSS-EXAMINATION

4     **BY MS. KELLER:**

5     **Q**    All right.  But the Redondo Beach dolls -- I'm sorry, what

6     house were you living in, in 1999?

7     **A**    Ford house.

8     **Q**    What about 2000?

9     **A**    Ford house.

10    **Q**    What about 2001?

11    **A**    At one point I did move.  I don't remember what year that

12    was.

13    **Q**    When was it that you lived in the Guadalupe house?

14    **A**    Same thing.  I don't remember what year I moved.

15    **Q**    Okay.  Were you living in the Guadalupe house in 2001?

16    **A**    Possibly.

17    **Q**    But your invoices for 2001 say you were living where?

18    **A**    Whatever it says is where I was living.

19    **Q**    Let's look at Exhibit 201-4?

20    **A**    201-4.  Okay.

21    **Q**    Okay.  201-4 is an invoice dated September 12, 2000.  Still

22    lists you at Ford Avenue?

23    **A**    Yes.

24    **Q**    Let's look at Exhibit 201-11.  That's dated November 29,

25    2000.  Still lists you at Ford Avenue?

Page 6

1   **A**   Yes.

2   **Q**   Let's look at 201-26.  That's an invoice dated January 2005,

3   2001?

4   **A**   Okay.

5   **Q**   Still lists you at Ford Avenue?

6   **A**   Yes.

7   **Q**   Right?

8   **A**   Yes.

9   **Q**   Let's look at Exhibit 201-304.  That's May 13, 2001?

10   **A**   Okay.

11   **Q**   Still lists you at Ford Avenue?

12   **A**   Yes.

13   **Q**   Right?

14   **A**   Uh-huh.

15   **Q**   All your 2001 invoices list you at Ford avenue; right?

16   **A**   Right.

17   **Q**   Let's look at your last invoice for MGA.  2001-58.  I'm

18   sorry, 201-58.

19   **A**   Okay.

20   **Q**   That's an invoice dated December 28, 2001; right?

21   **A**   Yes.

22           **MS. KELLER:**  And, Your Honor, if that's not in evidence,

23   I will move it in.

24           **THE COURT:**  Received.

25               (Exhibit 201-58 received in evidence.)

Page 7

1    **BY MS. KELLER:**

2    **Q**    That also still lists you at Ford Avenue, December 28, 2001;

3    right?

4    **A**    Right.

5    **Q**    And the first project you ever did for MGA as reflected in

6    your first invoice to MGA, was 201-1?

7    **A**    Right.

8    **Q**    That's the first assignment ever for MGA, true?

9    **A**    True.

10   **Q**    If we could blow that up a little bit.

11          You didn't do any work for MGA between December 1, 1999

12   and June of 2000?

13   **A**    Right.

14   **Q**    Now, let's go back to Exhibit 118-48.  Go to the forth page.

15   This is where you signed the agreement?

16   **A**    Yes.

17   **Q**    That's dated January 27, 2004; right?

18   **A**    Yes.

19   **Q**    So the agreement that you signed that gave a date for when

20   you first worked on the Bratz or any dolls for MGA, the inventions

21   agreement that you signed, you didn't sign that until January 27,

22   2004; right?

23   **A**    I suppose.  I don't remember.

24   **Q**    Take a look at it.

25   **A**    Yeah.

Page 8

1    **Q**    The date is January 27, 2004; right?

2    **A**    Right.

3    **Q**    So this date of December 1, 1999, that it went all the way

4    back to there, that anything did you for MGA from December 1,

5    1999, you didn't even do any work for MGA in the year 1999; right?

6    **A**    No.

7    **Q**    Am I correct?

8    **A**    Correct.

9    **Q**    So it wasn't until June of 2000 that you did anything for

10   MGA; correct?

11   **A**    Right.

12   **Q**    And we have gone over the fact that the whole time, that all

13   of 2000 and 2001 you were living at Ford Avenue; right?

14   **A**    Right.

15   **Q**    And the reason that you say you remember working on Bratz

16   dolls as far back as June of 2000 is that's when you were living

17   in the Guadalupe house?

18   **A**    One more time.

19   **Q**    The reason you said you remembered that this had to be June

20   of 2000 that you were working on the Bratz dolls was you

21   remembered you were working on them while you lived in the

22   Guadalupe house; right?

23            **MR. QUINN:**  Vague and ambiguous.

24            **THE COURT:**  You understand the question?  Do you

25   understand the question?

Page 9

1          THE WITNESS:  Not exactly.

2          THE COURT:  Repeat the question.

3  BY MS. KELLER:

4  Q    What house were you living in when you worked on the Bratz

5  dolls for the very first time?

6  A    Ford.

7          MS. KELLER:  If I could have a moment, Your Honor?

8          THE COURT:  Certainly can.

9          MS. KELLER:  Your Honor, just not to waste some time,

10  may I reserve this until after counsel's examination?

11          THE COURT:  Certainly.

12          MS. KELLER:  Thank you.  Just this one topic.

13          THE COURT:  Certainly.

14          MS. KELLER:  With that, Your Honor, I'm concluded.

15          THE COURT:  Was there some area that you were concerned

16  about concerning her testimony, counsel?

17          MR. QUINN:  Yes, Your Honor.

18          THE COURT:  Why don't I do this.  Why don't I send the

19  jury to lunch early.

20          Why don't you take an hour lunch, give us that hour

21  outside your presence so that your time is not taken, and we'll

22  remain in session.  So could you come back, let's just say quarter

23  till one.  Would that be okay?  12:45.  You are admonished not to

24  discuss this matter among yourselves nor form or express any

25  opinion concerning the case.  You go to lunch, have a nice time.

1    We'll stay here.

2                    (Jury out.)

3          **THE COURT:**  First to compliment to all counsel on the

4    record.  I deeply appreciate how you are conducting yourselves,

5    and I want that a part of the record.

6          Ms. Rhee, would you step down for just a moment.  We're

7    going to talk about your testimony.  And can you come back at

8    12:45?  Would you be seated promptly at that time?

9          **THE WITNESS:**  Yes.

10         **THE COURT:**  Thank you very much.  Then outside your

11   presence, counsel, why don't we discuss those areas that you wish

12   to go into and the concerns.  And I'll let you find your notes for

13   the examination.

14         Let's take the first issue concerning Ms. Rhee before we

15   go back to the remaining issues.

16         And what area did you believe that there might be some

17   concern about, Mr. Quinn.

18         **MR. QUINN:**  Your Honor, it concerns a telephone call

19   that Ms. Rhee received from an individual at MGA shortly before

20   Christmas.

21         **THE COURT:**  Christmas of what year?

22         **MR. QUINN:**  This last year.  Of 2010.

23         **THE COURT:**  Okay.  MGA.  And who called her from MGA?

24         **MR. QUINN:**  A Pootipong Phoosopha.

25         **THE COURT:**  Spell that.

Page 11

1           MR. MCCONVILLE:  Common spelling, Your Honor.

2           MR. QUINN:  The usual yes, Your Honor.  I can only do

3    it -- my understanding P-o-o-t-i, Pong, P-o-n-g,

4    P-h-o-o-s-o-p-h-a.

5           THE COURT:  Now, what position, if any, does this person

6    hold at MGA?

7           MR. QUINN:  All I know is this person is involved

8    somehow some face painting at MGA.

9           THE COURT:  Face painting at MGA.  And this was once

10   again, so my notes are correct, sometime in December of 2010.

11          MR. QUINN:  Shortly before Christmas 2010 is what I have

12   been told.

13          THE COURT:  Which is usually December.

14          MR. QUINN:  Yes.

15          THE COURT:  Now, what was stated in the phone call?

16          MR. QUINN:  She would testify that Mr. -- I don't know

17   if it's Mr. or Ms. -- called and said to her, "Isaac asked me to

18   call you because Mattel was going to sue you."  Isaac wants her to

19   know that MGA can help her, and if she needs some help against

20   Mattel, Isaac is prepared to do so.

21          THE COURT:  Now, can we refer to her once again as --

22          MR. QUINN:  Pootipong.

23          THE COURT:  Just Pootipong.  Give me one word.

24          MR. QUINN:  Pootipong.

25          THE COURT:  Is Pootipong employed?  Because this is the

1    first time I have heard about that by MGA.  Whether that's true or

2    not, I would like to simply start with the easy questions.

3              **MR. QUINN:**  Yes.

4              **THE COURT:**  Is Pootipong available here in the United

5    States within the Southern District?

6              **MR. QUINN:**  Yes.

7              **THE COURT:**  Has anybody from MGA talked to Pootipong

8    about this, or is this the first time this has come on the radar

9    screen?

10             **MS. HURST:**  This is the first we have heard about this,

11   this morning.

12             **THE COURT:**  So what we would have is a hearsay

13   objection.

14             **MR. MCCONVILLE:**  Correct.

15             **THE COURT:**  Because Mr. Larian is speaking to -- is it

16   Mr. or Mrs.?

17             **MR. QUINN:**  I don't know the answer to that.

18             **MR. MCCONVILLE:**  Miss.

19             **THE COURT:**  To Ms. Pootipong.

20             **MR. MCCONVILLE:**  Mr., I'm sorry.

21             **THE COURT:**  To Mr.  It changed that quickly.

22             **MR. MCCONVILLE:**  My apologies.

23             **THE COURT:**  Mr. Pootipong.  And let me repeat what I'm

24   hearing.  Sometime in December shortly before Christmas of 2010 an

25   MGA painter employed by MGA phones Anna Rhee.  In that phone call

1   the painter named Pootipong states to Anne Rhee, "Isaac has asked

2   me to call you because MGA or Isaac is going to sue."

3           **MR. QUINN:**  No, no.  Mattel is going to sue you.

4           **THE COURT:**  "Because Mattel is going to sue you because

5   Mattel --" I miswrote that.  I'm sorry.  "Mattel is going to sue

6   you."  And?

7           **MR. QUINN:**  And that Isaac wants you, meaning Ms. Rhee,

8   to know that MGA will help her against Mattel.

9           **THE COURT:**  Could I see if the witness is still

10  available in the hallway?  And if she has a cell phone, perhaps we

11  could reach her.  And ask her to return so I have a very good

12  record of what she would state.  She has probably gone to lunch.

13  I saw her literally run out the door.

14          **MR. QUINN:**  They're calling them right now.  They have

15  left the building but they're calling.

16          **THE COURT:**  She looked pretty anxious to leave frankly.

17  Let's come back to that as soon as she is here.  Obviously that is

18  news to counsel for MGA.  I'd like to hear her statement and I'd

19  certainly like to see if Pootipong is available and have a good

20  foundation for this as it comes as a surprise; nobody has been

21  able to discuss it.  The prejudicial effect could outweigh the

22  probative value.  It could be hearsay, but it could be

23  extraordinarily relevant.  And I would like to have a good record.

24  Let's pass that for the moment.

25              Let's go back to the issues concerning the arguments

1    that you wanted to propound.  And who is the person moving out of

2    the country so we can get to that person next?

3              MR. MCCONVILLE:  Ms. Arant.

4              THE COURT:  Let's deal with Arant immediately.  Now, I

5    want you to refresh my recollection.  Your concerns concerning

6    Arant are as follows:

7              MR. MCCONVILLE:  We would like to elicit from

8    Ms. Arant -- let me back up.  Mr. Quinn solicited on direct

9    examination her familiarity and knowledge, and I think she went so

10   far to say she is an expert on trademark work.  We would like to

11   present to the witness public records to have her state what the

12   public records say, which are that the term the trade terms

13   "Bratz," "Beverly Hills Bratz," had been registered and that the

14   term Jungle Jade had been registered.

15             THE COURT:  How would she know that?

16             MR. MCCONVILLE:  Through the same public documents that

17   she testified about.  I mean, to put it in context, Your Honor,

18   she said she doesn't know anything about copyrights and Mr. Quinn

19   put copyright application --

20             THE COURT:  I'm sorry.  How does she know?

21             MR. MCCONVILLE:  Publicly available documents.

22             THE COURT:  And she has reviewed those?

23             MR. MCCONVILLE:  Yes.  Well, we'll make sure she has

24   reviewed them.

25             THE COURT:  Has she reviewed those?

Page 15

1      **MR. MCCONVILLE:**  She has not yet.

2      **MS. HURST:**  Yes, she has reviewed them.

3      **THE COURT:**  When did she review them?

4      **MS. HURST:**  During preparation yesterday.

5      **THE COURT:**  What would she say?

6      **MS. HURST:**  She would confirm these are publicly

7   available records in this forum.

8      **THE COURT:**  Do those public records show that the trade

9   term "Bratz" goes back to the person who has been mentioned, I

10  think in the 1993 era?

11     **MS. HURST:**  No, this is not the Lovins.  That's a

12  different issue, and we don't intend to offer her on the Lovins

13  issue.  This is just a publicly available trademark filing.

14     **THE COURT:**  Once again, educate me.  What is this going

15  to say?  It's going to say, she is on the stand and telling the

16  jury the following.

17     **MS. HURST:**  She is going to tell the jury that the

18  public has access to the records of the Patent and Trademark

19  Office.  That this is an example of a public record that's

20  available at the Patent and Trademark Office.  That it shows that

21  the mark Beverly Hills Bratz was once sought in connection with

22  dolls and that that was available to the public.

23     **THE COURT:**  Slow down.  Sought in context with dolls.

24  When?

25     **MS. HURST:**  That information was available to the public

Page 16

1    as of 2000.

2              THE COURT:  As of 2000.

3              MS. HURST:  And similarly with respect to Jungle Jade?

4              THE COURT:  Jungle Jade.

5              MS. HURST:  Jungle jade.

6              THE COURT:  Not Jay, Jade, J-a-d-e.

7              THE WITNESS:  J-a-d-e.  The alleged trade secret.  That

8    there was a registration for Jade.  That there is --

9              THE COURT:  A registration by whom?

10             MS. HURST:  By Kenner.

11             THE COURT:  Don't take shortcuts.  Let's start again.

12   By Kenner.

13             MS. HURST:  Pardon me.  CPG Products.

14             THE COURT:  CPG Products.  When?

15             MS. HURST:  That registration existed as of 1983.

16             THE COURT:  Signed by whom?  CPG products or counsel for

17   CPG Products?

18             MS. HURST:  And that it was later canceled, the

19   registration.

20             THE COURT:  And your representation is that this would

21   be available.  Why can't she be called during your case-in-chief?

22             MS. HURST:  She is moving to South America next week.

23   She is unemployed and has been for some time and she is departing

24   to seek fame and fortune on greener shores.

25             THE COURT:  In South America.  Thank you.

1              Now counsel on behalf of Mattel.

2              Ms. Rhee, if you would have a seat for just a moment,

3       we'll be right with you.  You can remain in the courtroom.

4              **MR. QUINN:**  Your Honor, the witness I guess was shown

5       these registrations in preparation for her testimony.  That

6       apparently is her sole connection.  She has no knowledge about any

7       of the facts recited.  She has no involvement in the registrations

8       themselves.  She has no information about whether products were

9       ever, of any kind, were ever offered in commerce.

10             These, as far as she is concerned, are orphan documents.

11      It's putting a witness up on the stand and putting before that

12      witness documents that that witness has no connection with.

13             **THE COURT:**  Was this made known -- I know that during

14      our evening session these exhibits were gone over.  So that

15      shouldn't come as any surprise to Mattel.  It's really foundation

16      because I didn't expect her to, quote, be an expert witness.

17             **MS. HURST:**  These were identified by MGA in our evening

18      session or maybe it was the weekend.  We did voice objections to

19      these third party --

20             **THE COURT:**  We'll come back because Anna Rhee has been

21      kind enough to return.

22             I want to thank you for your courtesy in terms of

23      returning to court so quickly.  That's very gracious of you.

24             You are still under oath.  And both attorneys may ask

25      you a couple of questions outside the presence of the jury.  So

1   you just have a seat.

2          What they're going to ask you about is an alleged phone

3   call that you may have received sometime in December of this last

4   year, 2010.  And they're going to be asking you about a person

5   named Pootipong who may have called you, at least I have been told

6   that.  So let them ask you a couple of questions.

7          Counsel on behalf of Mattel.

8                          EXAMINATION

9   **BY MR. QUINN:**

10  **Q**   Did you receive a phone call shortly before -- do you know a

11  Pootipong Phoosopha?

12  **A**   Yes.  He goes by Pooey.

13          **THE COURT:**  He goes by Pooey.

14  **BY MR. QUINN:**

15  **Q**   Does Mr. Pooey work for MGA?

16  **A**   Yes.

17  **Q**   How long have you known him?

18  **A**   Long time.  I don't remember, but a really long time.

19  **Q**   Do you know what he does at MGA?

20  **A**   Yes.  He's an in-house face painter.

21  **Q**   Do you regard him as a friend?

22  **A**   Yes.

23  **Q**   Did you receive a phone call from him shortly before

24  Christmas?

25  **A**   Yes, I did.

Page 19

1   **Q**    Was there any reference to your testimony in this trial in

2   that phone call?

3   **A**    Yes.

4   **Q**    Can you tell us what Mr. Phoosopha said to you?

5   **A**    Mattel was going to sue me, and that Isaac asked him to ask

6   me if I wanted any help from their lawyer.

7   **Q**    Anything else that he said?

8   **A**    He said that Isaac knows that I lied last time and that he

9   knows I was just scared and that's why; and so that's why he is

10  offering his help.

11          **THE COURT:**  Just a moment.  I want to repeat back to you

12  what I heard because I'm trying to take notes.  Okay?

13          That when Pooey called, he said to you that Mattel was

14  going to sue you and if you wanted any help, that MGA's lawyer

15  would help you.

16          **THE WITNESS:**  Yes.

17          **THE COURT:**  And that Isaac knows that you lied on the

18  last, was it trial or occasion?

19          **THE WITNESS:**  Trial.

20          **THE COURT:**  Did you testify at the last trial?

21          **THE WITNESS:**  I did.

22          **THE COURT:**  Please continue.  What else was said?

23          **THE WITNESS:**  Okay.  He said they're going to sue me.

24  Do I want any help.

25          **THE COURT:**  A little slower.

Page 20

1          **THE WITNESS:**  He says Mattel is going to sue me, so they

2     want to help me.  Do I want any help.  And what else was it?

3     Gosh, I can't remember what else.  Basically that was main

4     conversation.

5          **THE COURT:**  What did you say?  In other words, when

6     Pooey is telling you that allegedly that Mattel was going to sue

7     you -- and I'm sorry, please.

8          **THE WITNESS:**  I said, what?  Are you crazy?  I'm already

9     doing work for them right now.  Why would they sue me?

10          He said, I don't know.  That's what Isaac said.  I said

11    I'm working for them.  I didn't lie.  And he said well, that's

12    just what he said.  I said, all right.

13          Well, if you want help, just call us.  And I said okay.

14    But I didn't think anything of it, and I got kind of worried a

15    little bit.

16          **THE COURT:**  Has Mattel or -- Mattel sits this side, and

17    whether you recognize the attorneys or not is not of great import

18    to me, but has Mattel or anybody connected with Mattel or any

19    employees or contractors that have an association with Mattel come

20    to you and threatened a lawsuit?

21          **THE WITNESS:**  No.  Never.

22          **THE COURT:**  Have you been accused by any parties, by

23    either Mattel or MGA or anybody in their respective companies --

24          **THE WITNESS:**  Never.

25          **THE COURT:**  -- of lying at the first trial other than

Page 21

1    this concern expressed in the phone call by Pooey to you?

2             **THE WITNESS:**  Never.

3             **THE COURT:**  Okay.  Counsel.

4    **BY MR. QUINN:**

5    **Q**    Did Pooey say that Mr. Larian had asked him to call you?

6    **A**    Isaac.

7    **Q**    That Isaac had asked him to call and you convey this message?

8    **A**    Yes.

9             **THE COURT:**  Mr. McConville or Ms. Keller.

10            **MS. KELLER:**  I think before we can have any meaningful

11   cross-examination on this, I would have to investigate it by

12   talking to --

13            **THE COURT:**  I'd like to see Pooey this evening.  And I

14   think 5:00 o'clock would be appropriate.  So if you will be kind

15   enough to call.  And I'm going to admonish you not to have any

16   discussion, any party or person, with Pooey until he is in this

17   courtroom.  And I would have a very dim view of any conversation

18   with him by any person, party, employee, before that time.

19            Is that clearly understood, Ms. Pisone?  Excellent, that

20   is understood.  Because I assume she is placing the phone call

21   because she has been nodding her head.

22            **MS. KELLER:**  Your Honor, apparently Ms. Pisone has

23   already talked to --

24            **THE COURT:**  That's fine, if you have already talked to

25   the person.  That doesn't -- that's not --

1          MS. KELLER:  I just want to give that information to the

2     Court in case the Court --

3          THE COURT:  We can only do our best from this point

4     forward.  It's the first time I have heard the information, Ms.

5     Pisone.  My compliments if you have already talked to that person.

6              Now, would we know, though, that all this was coming up?

7     In other words, my question back to both of you is I'm hearing

8     this for the first time from Mattel.  Ms. Pisone has already

9     talked to Pooey.  Am I the only one who is left out of this?

10         MS. HURST:  I asked Mr. Quinn when he volunteered that

11    there was something he wanted to discuss, even though the Court

12    didn't want to hear about it, I asked Mr. Quinn about it.

13         THE COURT:  I want to hear about it.

14             Ms. Rhee, I want to thank you very much.  If you go to

15    lunch, now we have 47 minutes for lunch.  Okay.  You go have a

16    nice lunch.  So we'll talk to Pooey at 5:00 o'clock promptly,

17    please.

18             Let's go back to any argument we have just we close this

19    out concerning Ms. Arant.  And I'll try to resolve that if I can

20    before you return at 12:45.

21         MS. HURST:  With respect to Ms. Arant, what we're asking

22    her to do with respect to public records is exactly what Mr. Quinn

23    did on his direct examination with respect to the copyright

24    correction form.  She was just describing contents of publicly

25    available documents for which she otherwise had no role or no

Page 23

1    foundation.

2            **THE COURT:**  Let me turn back to Mr. Quinn for a moment.

3            Mr. Quinn, your response.

4            **MR. QUINN:**  Your Honor, she filed and signed herself the

5    copyright registrations that were corrected.

6            **THE COURT:**  So these registrations were appropriate

7    because she had some nexus to them?

8            **MR. QUINN:**  She signed them.  She did not sign as she

9    indicated another law firm did the corrections.  But at the

10   previous trial, MGA put the corrections before her and elicited

11   testimony about the corrections from her.  They put before the

12   jury the fact that they had changed the dates.

13           So that was already out there and fair game.  Let's

14   remember that these registrations relate to the core intellectual

15   property in this case.  This isn't some third-party registrations.

16   So I think it's a different circumstance.  They're the one that

17   made her the witness on those corrections.

18           **THE COURT:**  Let me ask this.  I think the area is

19   relevant as far as MGA is concerned.  My question back to you is

20   why would you want this person who has potentially prepared or

21   maybe not very well-prepared, to be the person who has such a

22   close association with MGA, that she may be discredited just by

23   virtue of that association?

24           In other words, I'm not precluding you from the area.

25   I'm concerned about whether this is the proper person and if it's

1   coming at the proper time.

2          So I'm going to have you, before you decide that, have a

3   little conference together because it's not one of denying.  It's

4   one of a little bewilderment on my part, why somebody so

5   associated with MGA would be called.  First of all, she hasn't

6   been designated as an expert.  I don't know that she needs to be.

7   I may be ruling against Mattel in a few moments on this point.

8   I'm really baffled why this isn't part of your case-in-chief and

9   why this is the person that seems to be so critical.  Now, if she

10  is, so it be.  But I want you to have that conference first, make

11  your decision, and then I'll make my judgment call.

12          **MS. HURST:**  We do want to offer the two Beverly Hills

13  Bratz and Jungle Jade.

14          **THE COURT:**  Jungle Jade and -- just a moment.  And the

15  two Bratz being once again?

16          **MS. HURST:**  Beverly Hills Bratz.  Just one.

17          **THE COURT:**  Beverly Hills Bratz and Jungle Jade.  All

18  right.

19          Now, your objection to Beverly Hills and Jungle Jade

20  once again, counsel?  So you have an excellent record because

21  they're not going beyond that.

22          **MS. HURST:**  The same.  She has no connection with this.

23          **THE COURT:**  Let me have a few moments with that.

24          Now, let's go back to the next problem that we had, and

25  that's Nana Ashong.  There was an issue that arose, not

Page 25

1    surprisingly, with Nana Ashong.  What is the concern?

2            MR. QUINN:  Well, Your Honor, we wanted to introduce

3    some documents, e-mails that she is on; internal MGA

4    communications squarely relating to Bratz development where MGA

5    people are talking to each other and saying we need to do the die

6    cut like you see on the Mattel package.  We need to have the knee

7    mechanism like it is on Barbie, things of that nature.

8            THE COURT:  What is the time period?  You see, in a

9    sense Mattel has controlled this by bringing Moxie into it and

10   it's extended the time period by virtue of that claim and allowed

11   a vehicle for a lot of what I would normally view to be irrelevant

12   information.

13           MR. MCCONVILLE:  2001, Your Honor.

14           MR. QUINN:  These are all 2001, Your Honor.

15           THE COURT:  So at least it's relevant to the time period

16   that I think is primarily in question.  What I'm having difficulty

17   with is any nexus to 2010.  But for the Moxie claims, I think I

18   would have disallowed a significant amount of this evidence as

19   being irrelevant.

20           All right.  I understand the issues.

21           Let me try to be as gracious as possible.  You have got

22   25 minutes for lunch.  I want to see you at 25 back after the hour

23   and seated.  Thank you very much.

24               (at 12:01 a lunch recess was taken)

25   (Whereupon there was a change in reporters and JANE SUTTON RULE

1    reported the 12:25 session.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 27

1

2                                    -oOo-

3

4                              CERTIFICATE

5

6           I hereby certify that pursuant to Section 753, Title 28,

7    United States Code, the foregoing is a true and correct transcript

8    of the stenographically reported proceedings held in the

9    above-entitled matter.

10

11   Date:  JANUARY 27, 2011

12

13

14   MARIA DELLANEVE, U.S. COURT REPORTER
     CSR NO. 9132

15

16

17

18

19

20

21

22

23

24

25

Electronically signed by Maria Beesley (501-187-561-9309)                    862823b8-cd4b-4e8f-b55a-49478b29db5f