CV 04-9049-DOC - 01/27/2011 - Day 8, Vol. 3 of 4

1

1           **UNITED STATES DISTRICT COURT**

2           **CENTRAL DISTRICT OF CALIFORNIA**

3        **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4                    - - - - - - -

5

6    MATTEL, INC., ET AL.,              )
                                        )
7              Plaintiffs,              )
                                        )
8         vs.                           ) No. CV 04-9049-DOC
                                        )    Day 8
9    MGA ENTERTAINMENT, INC., ET AL.,   )    Volume 3 of 4
                                        )
10             Defendants.              )
     _____)

11

12

13

14

15           REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                      Jury Trial

17                 Santa Ana, California

18               Thursday, January 27, 2011

19

20

21

22   Jane C.S. Rule, CSR 9316
     Federal Official Court Reporter
23   United States District Court
     411 West 4th Street, Room 1-053
24   Santa Ana, California 92701
     (714) 558-7755
25
     11-01-27 MattelV3

1    **APPEARANCES OF COUNSEL:**

2

3    FOR PLAINTIFFS MATTEL, INC., ET AL.:

4              QUINN, EMANUEL, URQUHART & SULLIVAN
               By:  JOHN B. QUINN
5                   MICHAEL T. ZELLER
                    WILLIAM PRICE
6                   Attorneys at Law
               865 South Figueroa Street
7              10th Floor
               Los Angeles, California 90017-2543
8              (213) 443-3000

9

10   FOR DEFENDANTS MGA ENTERTAINMENT, INC., ET AL.:

11             ORRICK, HERRINGTON & SUTCLIFFE, LLP
               BY:  THOMAS S. MC CONVILLE
12                  Attorney at Law
               4 Park Plaza
13             Suite 1600
               Irvine, California 92614
14             (949) 567-6700

15             - AND -

16             ORRICK, HERRINGTON & SUTCLIFFE, LLP
               BY:  ANNETTE L. HURST
17                  Attorney at Law
               405 Howard Street
18             San Francisco, California 94105
               (415) 773-5700

19             - AND -

20
               KELLER RACKAUCKAS, LLP
21             BY:  JENNIFER L. KELLER
                    Attorney at Law
22             18500 Von Karman Avenue
               Suite 560
23             Irvine, California 92612
               (949) 476-8700

24

25

CV 04-9049-DOC - 01/27/2011 - Day 8, Vol. 3 of 4

3

```
 1    APPEARANCES OF COUNSEL (Continued):

 2

 3    FOR DEFENDANT CARLOS GUSTAVO MACHADO GOMEZ:

 4            SCHEPER, KIM & OVERLAND, LLP
              BY:  ALEXANDER H. COTE
 5                Attorney at Law
              601 West Fifth Street
 6            12th Floor
              Los Angeles, California 90071
 7            (213) 613-4660

 8            - AND -

 9            LAW OFFICES OF MARK E. OVERLAND
              BY:  MARK E. OVERLAND
10                Attorney at Law
              100 Wilshire Boulevard
11            Suite 950
              Santa Monica, California 90401
12            (310) 459-2830

13

14    Also Present:

15            ROBERT ECKERT, Mattel CEO

16            ISAAC LARIAN, MGA CEO

17            KEN KOTARSKI, Mattel Technical Operator

18            MIKE STOVALL, MGA Technical Operator

19            RACHEL JUAREZ, Quinn Emanuel Urquhart Oliver &
                            Hedges
20

21

22

23

24

25
```

**I N D E X**

**EXAMINATION**

| Witness Name | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| RHEE, ANNA | | | | |
| By Ms. Keller | | 13 | | 27 |
| By Mr. Quinn | | | 17 | |
| ASHONG, NANA | | | | |
| By Mr. McConville | | 32 | | 44 |
| By Mr. Quinn | | | 41 | |
| ARANT, LUCY | | | | |
| By Ms. Hurst | | 45 | | 74 |
| By Mr. Quinn | | | 69 | |
| BRYANT, CARTER | | | | |
| By Mr. Price | 79 | | | |

**EXHIBITS**

| Exhibit | Identification | Evidence |
|---|---|---|
| Defendants' No. 15 | | 38 |
| Defendants' No. 5528 | | 47 |
| Defendants' No. 5529 | | 64 |
| Defendants' No. 18477 | | 63 |
| Defendants' No. 18479 | | 60 |
| Defendants' Nos. 34834 and 34847 | | 55 |

Case 2:04-cv-09049-DOC-RNB   Document 9733   Filed 01/28/11   Page 5 of 133   Page ID #:291686
CV 04-9049-DOC – 01/27/2011 – Day 8, Vol. 3 of 4

5

```
 1                    I N D E X (Continued)

 2

 3

 4                          EXHIBITS

 5

 6    Exhibit                  Identification        Evidence

 7    Plaintiffs' No. 3                                 120

 8    Plaintiffs' No. 23                                 90

 9    Plaintiffs' No. 62                                130

10    Plaintiffs' No. 502                                95

11    Plaintiffs' No. 1327                              117

12    Plaintiffs' No. 11898                              98

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 2:04-cv-09049-DOC-RNB   Document 9733   Filed 01/28/11   Page 6 of 133   Page ID #:291687
CV 04-9049-DOC – 01/27/2011 – Day 8, Vol. 3 of 4

6

```
 1              SANTA ANA, CALIFORNIA, THURSDAY, JANUARY 27, 2011

 2                         DAY 8, VOLUME 3 OF 4

 3                            (12:39 p.m.)

 4              (The following proceedings is taken outside

 5         the presence of the jury.)

 6              THE COURT:  Okay.  We are on the record concerning

 7    Ms. Arant.

 8              Mattel's motion is granted for lack of foundation.

 9    The trademark restrictions, or I'm sorry, registrations are

10    relevant whether or not the trademarks were used, because

11    the mere fact that the names had been conceived through

12    Carter Bryant or before Carter Bryant thought of them proves

13    that they weren't all that secret.

14              The documents may be subject to judicial notice,

15    and I want to clarify that MGA has never requested, nor

16    Mattel up to this point, judicial notice of any of these

17    documents inspite of this Court's invitation to do so

18    previously, both off the record, on Saturdays and Sundays

19    and at nights.  I don't find fault with that, but Ms. Arent

20    still lacks any personal knowledge about the subject matter

21    of the documents and has no nexus to these documents.

22              Secondly, she has not been designated as an

23    expert, and even if she had been, the Court, in my orders

24    excluding -- and listen very carefully to this -- the expert

25    opinion and testimony of Ralph Omen and John Alex, I
```

Case 2:04-cv-09049-DOC-RNB   Document 9733   Filed 01/28/11   Page 7 of 133   Page ID #:291688
CV 04-9049-DOC – 01/27/2011 – Day 8, Vol. 3 of 4

7

1    specifically noted that expert opinion about intellectual

2    property restrictions would constitute impermissible legal

3    opinion.

4            One of the reasons for the restriction was that

5    Mattel had never trimmed that down.  It was replete with

6    improper opinion, so I've warned the parties about this.

7    The only proper use of Ms. Arant's testimony is to establish

8    that these are trademark registrations and that they were

9    filed.  This testimony could be more appropriately brought

10   to the jury through another witness or as a result of the

11   Court taking judicial notice of these documents, although

12   I'm not forcing that on the parties.

13           So MGA, you are not precluded.  I'm going to

14   repeat that.  You are not precluded to proper notice to this

15   Court of pursuing this evidence at a later time.  But I want

16   to say to both of you that this opens up the area concerning

17   Mr. Oman, which I'm glad to go back and look at again, but I

18   think if we get into dueling experts with the PTO, et

19   cetera, what this means is these are easily put in front of

20   the jury, and I want to have notice concerning whether this

21   is an expert or not, not designated as such, and I think you

22   can find your examination enough of a nexus in these

23   documents at the end, and Ms. Arant is not the appropriate

24   witness to bring these before the jury

25           Concerning Ms. Ashong, the evidence that Mattel

1    seeks to admit is not relevant at this time because of the

2    agreement, first of all, of the parties, and MGA may be able

3    to initially decide the scope of its trade counterclaim and

4    reply.  Mattel is going to, once a again, be given the

5    opporunity at rebuttal, but I thought the agreement was that

6    you can shape, you know, initially this concept, and I think

7    that this does intrude into that agreement.

8            In a legal sense, this is an attempted unclean

9    hands affirmative defense that Mattel prematurely seeks to

10   pursue before MGA has submitted its own evidence to the

11   jury, but once again, let me state to Mattel that this may

12   be very relevant, and it may be coming in in rebuttal or

13   even at a later time, but not through Ms. Ashong at the

14   present time.

15           Now, Ms. Arant, maybe if you decide to designate

16   her brought back in your case in chief, that's your choice.

17   I know she's leaving for South America; fine.  Or you may

18   bring another person before the Court, but at least I'll

19   know who that person is.  I'll know that they are properly

20   prepared and everybody will have notice.  But let me

21   foreworn both of you, if I open up this box on one side, I

22   could open it up potentially on the other side.  So I don't

23   know if Oman is coming in, and I don't know if Mr. Alex is

24   coming back to revisit us.  At the present time they are not

25   because of the expansiveness, which I've warned Mattel about

CV 04-9049-DOC - 01/27/2011 - Day 8, Vol. 3 of 4

9

```
 1    in all of the improper opinions.
 2            Now finally, I want to talk to you about Carter
 3    Bryant.  I think that's the most interesting issue that's
 4    going to face us this afternoon, if I find my notes.
 5            (Interruption in the proceedings.)
 6            THE COURT:  Oh, here it is.  I've got it.
 7            All right.  First, Carter Bryant will be
 8    testifying sometime today, and this is a reconsideration of
 9    the order on MGA's Motion in Limine Number 7 and Mattel's
10    motion for reconsideration.
11            Concerning the use of the Evidence Eliminator,
12    Carter Bryant downloaded, installed a program called
13    "Evidence Eliminator" on his computer in 2002.  The most
14    recent version of the software purports to elimate a
15    computer user's internal browsing history, the data a
16    computer user inputs into a website; for instance, credit
17    card information, the computer's logs of files recently
18    accessed, download locations and folder names.  There is no
19    evidence that any version of the software has been -- has
20    the ability to selectively delete user-created files on a
21    particular subject matter, like Bratz.
22            The program ran continuously from the date of its
23    installation, and on July 12th, 2004, two days before his
24    hard drive was forensically imaged by his own attorneys,
25    Bryant interacted with the Evidence Eliminator software.
```

 1    Second, Bryant's use of Evidence Eliminator is somewhat

 2    irrelevant.  It does not evidence consiousness of guilt

 3    because there is no evidence that the program had the

 4    ability to delete relevant material.  The Courts looked

 5    closely as Jinks-Umstead v. England at 2005 Westlaw

 6    3312947.

 7            Moreover, Bryant's consciousness of guilt is

 8    largely irrelevant because he is no longer a

 9    counter-defendant to this lawsuit, although he was at the

10    time and, as Mattel has already argued, was not an agent of

11    MGA's.

12            Finally, Bryant's conduct after the termination of

13    his contract with Mattel does not, contrary to Mattel's

14    contention, evidence his understanding of the inventions

15    agreement at the time he entered into the agreement, citing

16    City of Hope National Medical Center v. Genetech, Inc., 181

17    F.3d 142, 155, 2008.

18            In any event, regardless of the initial ruling, a

19    prejudicial effect of Evidence Eliminator used substantially

20    outweighs the probative evidence pursuant to 403.  The

21    docket does not reflect a court order.  It either required

22    Bryant to preserve his hard drive or prevent Bryant from

23    running Evidence Eliminator.  I repeatedly asked counsel for

24    Mattel to show me that court order and the breadth and

25    expansiveness of it.

1          Bryant has testified that he used the program in

2     order to delete certain explicit material, and examination

3     on this issue will result in obvious prejudice, personal

4     embarrassment and undue invasion of Bryant's privacy.  In

5     fact, I'm rather shocked in reading the transcript that

6     Bryant was asked what his sexual persuasion was, where he

7     was forced into the position, either willingly or not, of

8     having to respond truthfully under oath that he was gay.

9          It will also interfere with the efficient

10    management of this litigation by opening the door to a mini

11    trial about the operation of the software, the discovery

12    obligations imposed by Bryant, and the nature of the

13    explicit material on Bryant's hard drive.  I think 403

14    controls on this, and the prejudicial effect far outweighs

15    the probative value.

16          Finally, introducing evidence of the programs used

17    was also a result in unacceptable inequity.  Both parties

18    have engaged in misconduct far more egregious than Bryant's

19    use of Evidence Eliminator.  It would be unduly consumptive

20    of time to allow a back and forth between the parties about

21    the conduct during discovery.  Now, you can write a book

22    about it.  On the other hand, arbitrarily eliminating

23    evidence to Carter Bryant's use of a computer program would

24    paint an unbalanced and incomplete picture; therefore,

25    evidence is denied as to the use of the Evidence Eliminator.

Case 2:04-cv-09049-DOC-RNB   Document 9733   Filed 01/28/11   Page 12 of 133   Page ID #:291693
CV 04-9049-DOC – 01/27/2011 – Day 8, Vol. 3 of 4

12

1          Now, let me talk to MGA.

2          Sometimes I've seen, and I know you won't be

3    guilty of this, but a favorable ruling, and then the party

4    who has sought the information, who has been disadvantaged,

5    has the other party, you know, kind of introduce that, and I

6    know you won't do that, but let me just talk to you for a

7    moment.

8          Therefore, as Mattel wants this, and if you decide

9    you think it might be relevant at some point to explain, you

10   know, a really good direct examination by Mattel, all of a

11   sudden you are in a box and you decide to bring that out.

12   I've seen that before.  If you do that, I'm going to explain

13   to the jury that Mattel wanted this information first;

14   understood?

15          MS. KELLER:  I do.

16          THE COURT:  That takes away all that tactical

17   gamesmanship.  I know that you are not guilty of that, nor

18   will you be, but don't open the door to this.

19          Okay.  If you'd be kind enough to get the jury,

20   please.

21          (The following proceedings is taken in the

22      presence of the jury.)

23          THE COURT:  All right.  The jury is present, the

24   alternates, all counsel are still present, the parties.

25          Thank you for your courtesy, counsel.  If you'd

1    please be seated.

2            The witness, Ms. Rhee, is present.

3            And Counsel, you are continuing with

4    cross-examination.

5            This is Ms. Keller.

6            MS. KELLER:  Thank you, your Honor.

7            **ANNA RHEE, PLAINTIFFS' WITNESS, RESUMED**

8                **CROSS-EXAMINATION (Continued)**

9    BY MS. KELLER:

10   Q    Ms. Rhee, you said you worked on the Bratz face

11   painting when you lived on Ford Road?

12   A    Avenue.

13   Q    Or Ford Drive, is it?

14   A    Avenue.

15   Q    Ford Avenue, finally got it; is that correct?

16   A    Yes.

17   Q    And you worked on the Prayer Angels dolls when you

18   worked in South Guadalupe, right?

19   A    Yes.

20   Q    And you previously testified that Paula Garcia asked

21   you to paint Prayer Angels when you lived in the Guadalupe

22   house; is that right?

23           MR. QUINN:  Object to the form, your Honor.

24           MS. KELLER:  I'll rephrase, your Honor.

25

1   BY MS. KELLER:

2   Q    Is it true that Paula Garcia asked you to paint the

3   Prayer Angels dolls when you lived in the Guadalupe house?

4   A    Well, she asked me to call it that.

5   Q    Is it true that Paula Garcia asked you to paint the

6   Prayer Angels dolls while you were living in the Guadalupe

7   house?

8   A    She told me to call it that.

9   Q    I'm sorry, what did you say?

10  A    She told me to call it that, but --

11  Q    No.  Here is my question --

12  A    Okay.

13  Q    -- the Prayer Angels dolls that you talked about

14  earlier that are sitting right up on the witness stand,

15  okay?

16  A    Yes, yes.

17  Q    Those dolls that were released in 2000, we've talked

18  about, right?

19  A    Yes.

20  Q    Okay.  You previously testified, did you not, that

21  Paula --

22              MR. QUINN:  Objection as to the form, your Honor.

23              THE COURT:  Well, I'm not sure what the form is

24  yet.

25

1    BY MS. KELLER:

2    Q    Did Paula Garcia ask you to paint the Prayer Angels

3    dolls while you lived in a house on Guadalupe; yes or no?

4    A    Yes.

5    Q    Okay.  And you believed you painted the Prayer Angels

6    in 2003 or 2004, right?

7    A    Right.

8    Q    Is that right?

9    A    I think so.

10   Q    Is that a "yes"?

11   A    Yes.

12   Q    Okay.  But you've told us that those Prayer Angel faces

13   on the dolls that are sitting right in front of you were

14   painted by you before they were released, and they were

15   released in the year 2000, correct?

16   A    According to the -- the thing you showed me, yes.

17   Q    According to the copyright on the bottom of the box?

18   A    Yes.

19   Q    And we had seen in your invoices that you were living

20   in the Ford house all the way through 2000 and 2001, right?

21   A    Right.

22   Q    And again, you painted the Prayer Angels dolls in the

23   year 2000, correct?

24   A    (No audible response.)

25   Q    You know that now from looking at all of the invoices

CV 04-9049-DOC – 01/27/2011 – Day 8, Vol. 3 of 4

16

1    on the dolls, true?

2    A     According to the invoices, yes.

3    Q     Well, according to looking at those doll faces, which

4    you recognize as the Anna Rhee faces, right?

5    A     Yes, it's just that I remember painting them at the

6    Guadalupe house --

7    Q     Well, I know --

8             (Interruption in the proceedings.)

9             THE COURT:  We didn't get the answer.

10            MS. KELLER:  I'm sorry.

11            THE COURT:  Would you repeat your answer?

12            You said, "I know" --

13            THE WITNESS:  When I painted this, I was living in

14    the Guadalupe house.

15            THE COURT:  Okay.

16    BY MS. KELLER:

17    Q     But you didn't move into the Guadalupe house until

18    sometime after 2002, right?

19    A     Yeah, yeah.

20    Q     Is that a "yes"?

21    A     Yes.

22    Q     So you think you painted them in 2003 or 2004, right?

23    A     Yes, that's what I think.

24    Q     And you can't explain why it is that there are these

25    dolls that existed in 2000 and invoices from you for this

1   project in 2000 that are about the Prayer Angels dolls,

2   right?

3   A    Right.

4   Q    Thank you.

5           MS. KELLER:  Nothing further.

6           THE COURT:  Redirect?

7                    **REDIRECT EXAMINATION**

8   BY MR. QUINN:

9   Q    Ms. Rhee, was there more than one release of the Prayer

10  Angels dolls?

11  A    Of these Prayer Angel dolls?

12  Q    Yes, were there more than one release, different Prayer

13  Angels dolls?

14  A    I don't think so.  I don't remember.

15  Q    You are not sure?

16  A    I am not sure.

17  Q    There might have been, there might not have been, you

18  are just not sure?

19  A    Not sure.

20          MS. KELLER:  Objection.  Calls for speculation.

21          THE COURT:  No.  I think your answer is clear, you

22  are not sure.

23  BY MR. QUINN:

24  Q    And do you recall that you painted Prayer Angels dolls

25  in more than -- the work that you did on Prayer Angels

```
 1    dolls, is it your memory you only did it one year or you
 2    worked on those dolls more than one year?
 3    A    It was in one lump sum, so I don't know if it was from
 4    December to January, then would be two years.  I don't know.
 5    All I know is it was one lump.
 6    Q    All right.  But it might have gone over one year?
 7    A    Yeah, it could have.
 8             MS. KELLER:  Objection.  It misstates the
 9    testimony.
10             THE COURT:  Sustained.
11             Just reask the question, Counsel.
12    BY MR. QUINN:
13    Q    You -- your memory doesn't permit you to say that all
14    of the work you did on Prayer Angels dolls was done in one
15    calendar year; is that true?
16    A    True.
17    Q    If we could look at Exhibit 402B.
18             MR. QUINN:  If we can put that on the screen,
19    please.  It's in evidence.
20             If we can look at the next page, the image.
21    BY MR. QUINN:
22    Q    The date there is -- I'm sorry, and the previous page
23    is -- it's a date in -- it's August 4, 2000, correct?
24    A    Correct.
25    Q    And if we could look at the image, you've testified
```

1   that that's the image of a Prayer Angel doll, correct?

2   A    Correct.

3   Q    Isn't it true that there were no Prayer Angel doll

4   heads to paint until this one?

5   A    Correct.

6   Q    In other words, there weren't any of these Prayer Angel

7   dolls back in June, correct?

8   A    Correct.

9   Q    And if Paula Garcia testified to that, you would not

10  disagree?

11          MS. KELLER:  Objection, your Honor.  Improper

12  question.

13          THE COURT:  Sustained.  Sustained.

14  BY MR. QUINN:

15  Q    Well, if you had been asked to paint a Cabbage Patch

16  head --

17  A    Okay.

18  Q    -- that's something you would remember?

19  A    I would.

20  Q    And then you were shown various -- some exhibits.  If

21  we can look at 2071 -- or 2071-7, where you charged, it

22  looks like $50 for repainting some lips?  207-7, it's in

23  evidence.  I'm sorry, 201-7 in evidence.

24          MR. QUINN:  If we would enlarge that.

25

CV 04-9049-DOC – 01/27/2011 – Day 8, Vol. 3 of 4

20

```
1    BY MR. QUINN:

2    Q    You charged -- what's the date there on that invoice?

3    A    9/19/2000.

4    Q    All right.  And you charged $50 for repainting lips

5    there; is that correct?

6    A    Yes, yes.

7    Q    And then 201-9, you charged, it looks like, $10 for a

8    touchup --

9    A    Yes.

10   Q    -- is that right?

11   A    Yes.

12   Q    The work that you did back in June, if we could look at

13   the first invoice.

14   A    Okay.  First invoice?

15   Q    Yeah, that is not -- there is no touchup referred to

16   there, is there?

17   A    No.

18   Q    That's not just a $50 charge?

19   A    No.

20   Q    So you were painting the whole head?

21   A    Yes, for sure.

22   Q    If we could look at -- counsel showed you Exhibit 15228

23   and a whole series.

24        MR. QUINN:  If we can put that on the screen of

25   Bratz eyes.
```

1    BY MR. QUINN:

2    Q    Do you recall looking at these?

3    A    Yes.

4    Q    And there is a date -- there are dates on every one of

5    these.

6    A    Oh, hold on a second.

7    Q    Correct?

8    A    Yes.

9    Q    Is that your handwriting?

10   A    Absolutely not.

11   Q    Did you put the date on that document?

12   A    No.

13   Q    How about 15229 --

14   A    No.

15   Q    -- same thing.

16   A    No.

17   Q    15230 --

18   A    No.

19   Q    -- did you date that?

20        15231?

21   A    No.

22   Q    Did you put that date there?

23   A    No, I didn't.

24   Q    15232?

25   A    No.

CV 04-9049-DOC - 01/27/2011 - Day 8, Vol. 3 of 4

22

```
 1    Q    These documents, all in the lower right-hand corner,

 2    have an indication MGA, correct?

 3    A    Correct.

 4    Q    And then you were asked some questions about

 5    Exhibit 34468, the whole series 34468.  Is this a -- this is

 6    a -- is this a Mattel 3D design preliminary color

 7    specification?

 8    A    Yes, it is.

 9    Q    Have you ever even seen this document before?

10    A    Never.

11    Q    Is this an internal Mattel document?

12              MS. KELLER:  Objection.  Calls for speculation.

13              THE WITNESS:  Yes.

14              THE COURT:  Overruled.

15    BY MR. QUINN:

16    Q    How about the next one counsel showed you, 34469?

17    A    I've never seen it before.

18    Q    Do you know anything about who created it or for what

19    purpose it's created, or anything like that?

20    A    No.

21    Q    Similarly 34470, have you ever seen that document

22    before?

23    A    No.

24    Q    Before counsel asked you questions about it?

25    A    Yes.
```

1   Q    34471, had you ever seen that document before, before

2   counsel showed it to you and asked you questions about it?

3   A    No.

4   Q    Is that a document that you created?

5   A    No.

6   Q    Similarly, 34472?

7   A    No.

8   Q    You were asked some questions about how you came to get

9   your own lawyer --

10  A    Yes.

11  Q    -- how you came to be represented by a lawyer.  Is it

12  true that you initially -- when you heard people were

13  interested in hearing what you recalled, that you initially

14  reached out to MGA?

15  A    Yes.

16         MS. KELLER:  Objection.  Misstates the testimony.

17         THE COURT:  Overruled.

18  BY MR. QUINN:

19  Q    Who did you first reach out to?

20  A    MGA.

21  Q    Were you interested in getting some legal advice about

22  what was this all about?

23  A    Yes.

24  Q    Did you get a response from MGA?

25  A    No.

```
 1   Q    After that, did you reach out to Mattel?

 2   A    No.  They -- they called me.

 3   Q    They called you?

 4   A    Yeah.

 5   Q    And did you tell the folks at Mattel that you were

 6   interested in getting some legal help?

 7   A    Yes.

 8   Q    And did they give you a name?

 9   A    Yes.

10   Q    All right.  And did they tell you to try this person,

11   and if you didn't like -- if you weren't comfortable, they'd

12   help you find somebody else?

13   A    Yes.

14            MS. KELLER:  Objection.  Leading.

15            THE COURT:  It is leading, Counsel.

16   BY MR. QUINN:

17   Q    Well, what did people at Mattel tell you?  First off,

18   who was it that you were talking to?

19   A    Moore.

20   Q    Would that be Michael Moore --

21   A    Yes, yes --

22   Q    -- does that sound right?

23   A    -- yes, yes.

24   Q    And what was the conversation between you and him about

25   getting -- you wanting legal representation?
```

1    A    I don't recall exactly, but just that "Do you want

2    legal representation?"  And I said, "Yes, I would."

3    Q    And did they -- they gave you a name?

4    A    Yes.

5    Q    And can you tell us whether or not they said, "You've

6    got to use this person," or "If you are not comfortable" --

7    A    No.  He said if I -- if I don't like him, I will tell

8    them, and they will get me someone else.

9    Q    And then if we could look at the agreement with MGA,

10   which is Exhibit 11843-1.

11             MR. QUINN:  And if we could blowup the date there

12   at the top.

13   BY MR. QUINN:

14   Q    This is the agreement covering your work for MGA on

15   Bratz, correct?

16   A    Correct.

17   Q    Who put that date up there?

18   A    I don't know.

19   Q    Who chose that date, December 1, 1999, was that you or

20   MGA?

21   A    MGA.

22   Q    And finally, counsel referred to -- asked you if you

23   are the creative -- more of the creative type of person, and

24   you agreed with that, I think.

25   A    Yes.

CV 04-9049-DOC – 01/27/2011 – Day 8, Vol. 3 of 4

26

```
 1   Q    And in -- for how many years have you been involved in
 2   creative activities?
 3   A    My whole life.
 4   Q    You know, in your history as a creative person as a
 5   artist --
 6   A    Oh --
 7   Q    -- are there some projects that stand out more vividly
 8   in your memory than others?
 9   A    Yes.
10   Q    And is the Bratz project one of those?
11   A    It was one of the more important ones.
12   Q    Why is it that you remember so well Carter Bryant
13   coming to you around the June 2000 time frame to give you
14   this assignment for Bratz?
15   A    Well, because he's my friend, and he made it sound --
16   he made it sound it was really special, and, you know, I
17   could tell, and I agreed with him.  And plus, it became a
18   big hit, so of course.
19   Q    So were you proud of the work that you did on Bratz?
20   A    Very proud, very, very proud.
21   Q    The face painting that you did?
22   A    Yes.
23   Q    And did you become aware that it was a great success?
24   A    Yes.  In fact, he let me know even -- after the first
25   meeting how great it was, and I was, like, really happy
```

CV 04-9049-DOC – 01/27/2011 – Day 8, Vol. 3 of 4

27

```
 1    about it.
 2    Q     And did you go to, like, toy stores, Walmart and
 3    Target, and see Bratz dolls with your face painting on the
 4    shelves?
 5              MS. KELLER:  Objection.  Leading.
 6              THE COURT:  Sustained.
 7    BY MR. QUINN:
 8    Q     Did you ever see toys -- Bratz dolls in toy stores?
 9    A     Yes, I have.
10    Q     It made you proud?
11    A     Yes.
12    Q     And you remember that?
13    A     Yes.
14              MR. QUINN:  Nothing further.
15              THE COURT:  And this would be recross.
16              MS. KELLER:  Just a little bit, your Honor.
17                       RECROSS-EXAMINATION
18    BY MS. KELLER:
19    Q     Ms, Rhee, you did all the face painting for the Prayer
20    Angels dolls, right?
21    A     Right.
22    Q     And you said that that altogether, maybe that was about
23    a month's worth of work, roughly?
24    A     One lump -- one lump sum.
25    Q     Yeah.
```

```
 1    A     Yes.

 2    Q     For all of it?

 3    A     Yeah.

 4    Q     About a month?

 5    A     Yes.

 6    Q     Now, one of your invoices, it's Exhibit 2000 -- 200 --

 7    201.

 8    A     201?

 9    Q     201.

10    A     Okay.

11    Q     Page 9, I think.  And I think Mr. Quinn just showed

12    that to you.

13          Do you see the fourth line down, it says, "Touchup,

14    removal of all old face paint"?

15    A     Yes.

16    Q     Now, when you remove old face paint, you can take a

17    doll that already has face paint on it and use -- is it kind

18    of like nail polish remover that you swipe along it and

19    remove all the paint?

20    A     Yes.

21    Q     And then you can repaint it?

22    A     Yes.

23    Q     And so that process of swiping off all the old paint,

24    it doesn't take very long, does it?

25    A     Some do and some don't.  Sometimes the paint is really
```

1    hard to get off there, so you have to scrub it.  Sometimes

2    it takes up to an hour, and sometimes it's like, you know,

3    two minutes.

4    Q    Okay.  Mr. Quinn also asked you a little bit about the

5    dating of some of the documents that -- that -- that you

6    looked at.

7    A    Right, uh-huh.

8    Q    Now, the dating of the documents, for example, where

9    you're sketching the eyes for the Bratz dolls, you said you

10   didn't put those little dates at the bottom, right?

11   A    No, I didn't.

12   Q    But you did handwrite all of the information that's on

13   the invoices that we saw that match up with those, right?

14             MR. QUINN:  Assumes facts not in evidence.

15             THE WITNESS:  I have to see it.

16             MS. KELLER:  I'll rephrase.

17   BY MS. KELLER:

18   Q    All of the invoices of yours that you've seen today,

19   okay?

20   A    Right.

21   Q    There are a lot of them.

22   A    Right.

23   Q    That had your handwriting on it, right?

24   A    Right.

25   Q    And if there is a date on those, you put the date on

CV 04-9049-DOC – 01/27/2011 – Day 8, Vol. 3 of 4

30

1   those, right?

2   A    Right.

3   Q    Now, lastly, you were asked about the fact that you

4   wanted some legal advice.

5   A    Right.

6   Q    You were scared, initially, right?

7   A    Right.

8   Q    And you were scared that maybe you might be sued,

9   right?

10  A    Right.

11  Q    And if you were sued, you didn't know whether you'd

12  even have the resources to fight back, right?

13  A    Right.

14  Q    And the reason that you called MGA so many times trying

15  to see if MGA would provide you a lawyer is you were afraid

16  Mattel was going to sue you?

17  A    No, not back then.  I just didn't know what to do.

18  Q    Right.  So you called MGA a whole bunch of times,

19  right?

20  A    Yeah.

21  Q    And you said you didn't get a call back?

22  A    They didn't call me back.

23  Q    And it was -- and then you got a subpoena, and you

24  tossed it in the trash, right?

25  A    I didn't toss it in the trash.  I threw it in a pile of

1    somewhere, and I didn't know where it went.

2    Q    You through it somewhere?

3    A    Somewhere, yeah.

4    Q    But you didn't respond to it, right?

5    A    I didn't even look at it.  I just threw it somewhere.

6    Q    All right.  And after that, at some point you got a

7    call that the -- one of the people in the general counsel's

8    office within Mattel, one of the lawyers there wanted to see

9    you?

10   A    Right.

11   Q    And then you really got worried and really freaked out,

12   right?

13   A    Right.

14   Q    And it was after that that you told Mattel you wanted a

15   lawyer, right?

16   A    Yeah.

17   Q    You didn't want to be just hauled in and have somebody

18   interrogate you, you wanted representation, true?

19   A    Right, true.

20   Q    So Mattel provided you with a lawyer, so if you had any

21   questions, that would be the person you can go to?

22   A    Yes.

23   Q    And that lawyer is still with you today?

24   A    Yes.

25   Q    Thanks.

```
 1            MS. KELLER:  Nothing further.

 2            THE WITNESS:  You're welcome.

 3            MR. QUINN:  I've got a couple more things, your

 4  Honor.

 5            THE COURT:  No.  We've gone twice, now.

 6            Thank you very much.

 7            I'm going to ask you to return at 5:00 this

 8  evening.  I am going to apologize.  Will you be with us?

 9            THE WITNESS:  Yes.

10            THE COURT:  All right.  Thank you very much.

11            All right.  Counsel, if you'd like to return, now,

12  to whatever witness the parties are choosing.

13            MR. MC CONVILLE:  Ms. Ashong, your Honor.

14            THE COURT:  Ms. Ashong.

15            I'll let the jury recall that Ms. Ashong was

16  previously on the stand.  This is the continued

17  cross-examination by Mr. McConville of Ms. Ashong.

18            Thank you very much.  If you'd retake the stand.

19  The same oath applies.  Thank you for your courtesy.

20            And this is Mr. McConville on cross-examination.

21            NANA ASHONG, PLAINTIFFS' WITNESS, RECALLED

22                    CROSS-EXAMINATION

23  BY MR. MC CONVILLE:

24  Q    Hello, Ms. Ashong.

25  A    Hello.
```

Case 2:04-cv-09049-DOC-RNB   Document 9733   Filed 01/28/11   Page 33 of 133   Page ID #:291714
CV 04-9049-DOC - 01/27/2011 - Day 8, Vol. 3 of 4

33

```
1   Q    Are you represented by an attorney today?

2   A    I'm not.

3   Q    I'd like to show you an exhibit which Mattel showed you

4   during examination, Exhibit 551.

5            MR. MC CONVILLE:  Can we put that up, please?

6            And can you zoom in to the top part of that

7   e-mail, please?

8            Great.

9   BY MR. MC CONVILLE:

10  Q    Do you have that in front of you?

11  A    Yes.

12  Q    The e-mail is dated September 6th, 2000, correct?

13  A    Yes.

14  Q    And --

15  A    2001.

16  Q    I'm sorry, 2001.  Thank you.

17       As of this date, I think you testified on direct that

18  you had started at MGA in around April or May of 2001,

19  correct?

20  A    That's correct.

21  Q    And so by this time, you would have been working at MGA

22  for about five months-ish?

23  A    Yes.

24  Q    Do you recall the -- your departure date from MGA, when

25  you left MGA?
```

CV 04-9049-DOC – 01/27/2011 – Day 8, Vol. 3 of 4

34

1    A    My last day at MGA was -- was, I believe,

2    September 10th.

3    Q    September 10th, so just a few days after this e-mail?

4    A    This e-mail may actually be a June e-mail.  I'm not --

5    I don't quite recall how our dates laid out.  That may be,

6    but it may have been as late as September.  I'm not clear on

7    that.

8    Q    So you are not sure, one way or the other, whether the

9    date of this e-mail is September 6th, 2001, or --

10   A    June 9th.

11   Q    -- or June 9th of 2001?

12   A    Either or, I couldn't stipulate which.

13   Q    Okay.

14           (Attorney discussion held off the record.)

15           MR. MC CONVILLE:  Can we have Exhibit 557 in front

16   of the witness, please.  It may be in a different binder,

17   the binder of Ms. Arant.

18           Could we just publish it up there.

19   BY MR. MC CONVILLE:

20   Q    And I would like you to -- if you look at the upper

21   right-hand corner -- can you read the date on the upper

22   right-hand corner of that document for me, Ms. Ashong?

23   A    June 18th, 2001.

24           MR. MC CONVILLE:  And if we zoom out on the

25   document, please.

CV 04-9049-DOC – 01/27/2011 – Day 8, Vol. 3 of 4

35

1    BY MR. MC CONVILLE:

2    Q    Do you recognize this as a copyright application?

3    A    I've never seen one.

4    Q    So let's -- let's go back to Exhibit 551, and the

5    e-mail reads, "Here are legally relevant dates for Bratz.

6    This is how they appear on our copyright application"; do

7    you see that?

8    A    Yes.

9    Q    And you've never read a copyright application before?

10   A    I have not.

11   Q    But the date that the copyright application we just

12   showed you was dated June 18, 2001, right?

13   A    Yes.

14   Q    So it's fair to say that June 18, 2001, takes place

15   after June 9, 2001, correct?

16   A    That's correct.

17   Q    On the face of this e-mail, though, you say, "This is

18   how they appear on our copyright application," correct?

19   A    Yes.

20   Q    But you did not read the copyright application to

21   complete the information in this e-mail?

22   A    That's correct.

23   Q    And going back to -- you started at MGA in May --

24   A    April.

25   Q    April/May --

1    A    I believe it was April of 2001.

2    Q    April of 2001.

3         So we'll see here, the first line says, "Date of

4    creation, 9/18/2000"?

5    A    Correct.

6    Q    And that's before you were working at MGA?

7    A    Correct.

8    Q    And we see the next date, "Date shown to public,

9    2/12/01," correct?

10   A    Correct.

11   Q    And that would be February 12th, 2001, correct?

12   A    Yes.

13   Q    And you weren't working at MGA at that time either?

14   A    Correct.

15   Q    And then we see, "First in Commerce 5/21/01," correct?

16   A    Correct.

17   Q    And that's May 21, 2001; correct?

18   A    Yes.

19   Q    And you were working at MGA at that time?

20   A    I was.

21   Q    And your boss at this time was Paula Garcia, correct?

22   A    Correct.

23   Q    What was her title; do you recall?

24   A    Product manager.

25   Q    And you were an associate product manager?

CV 04-9049-DOC - 01/27/2011 - Day 8, Vol. 3 of 4

37

1   A     That's correct.

2   Q     And this time frame in 2001, how old were you?

3   A     Twenty-four.

4   Q     And this was your first job out of college, I believe

5   you said?

6   A     Yeah.

7   Q     And so the information -- let's go back to "First in

8   Commerce, 5/21/01," where did that information come from?

9   A     I can't tell you specifically.  It may have been based

10  upon our -- our launch in Spain.  The product was originally

11  launched in Europe prior to appearing in the U.S. market.

12  Q     And the shown-to-public date, it says, "February 12,

13  2001," where did you get that information?

14  A     I don't recall.  Those two dates, the date of creation

15  and shown to public dates, were prior to my tenure there,

16  and I couldn't tell you at this time who provided me with

17  that information, but it wasn't self-generated.

18  Q     So it's fair to say you don't know where that

19  information came from now?

20  A     Yes.

21  Q     And you don't have personal knowledge of where the

22  information came from?

23  A     Not that I can recall, no.

24  Q     Okay.  Can we look -- I want to show you Exhibit 15 and

25  ask you if you recognize it.

Case 2:04-cv-09049-DOC-RNB   Document 9733   Filed 01/28/11   Page 38 of 133   Page ID #:291719
CV 04-9049-DOC – 01/27/2011 – Day 8, Vol. 3 of 4

38

1    A    Yes.

2    Q    That's something you recognize?

3    A    Yes.

4    Q    And could you describe, generally, what it is?

5    A    It seems to be a -- a consultancy contract with Carter

6    Bryant.

7           MR. MC CONVILLE:  Your Honor, I'd move it into

8    evidence.

9           THE COURT:  Received.

10          *(Defendants' Exhibit No. 15 is received in*

11      *evidence.)*

12          MR. MC CONVILLE:  And if we can zoom in on the top

13   part, please.

14   BY MR. MC CONVILLE:

15   Q    And you'll see at the top, it says, "MGA

16   Entertainment," yes?

17   A    Yes.

18   Q    And below that, it says, "Mr. Carter Bryant, Gardena,

19   California"; do you see that?

20   A    Yes.

21   Q    And you'll look at the language that says, "Dated as of

22   September 18, 2000"; do you see that?

23   A    Yes.

24   Q    And if we go back --

25          MR. MC CONVILLE:  If you could put that side by

 1  side, please, with Exhibit 551, and make the date of

 2  creation large for us, please.

 3  BY MR. MC CONVILLE:

 4  Q    And it shows there that the date of creation is

 5  9/18/2000; is that right?

 6  A    Yes.

 7  Q    And so is it fair to conclude that the date of creation

 8  that's reflected in your e-mail of September 6th, 2001, was

 9  information you received from the contract which was signed

10  between MGA and Carter Bryant?

11  A    That may not have been how I got that information, but

12  those two dates obviously have a correlation.

13  Q    I want to show you, now, Exhibit 4916.  It was in

14  evidence, already, I think.

15       Do you see that in front of you?

16  A    Yes.

17  Q    If it's easier, I can get it in hard copy.

18  A    Oh, I have it.

19  Q    Okay.  And this e-mail you were shown -- it's dated

20  April 30, 2001, yes?

21  A    Yes.

22  Q    So I guess you were working at MGA as of April 2001,

23  right?

24  A    Yes.

25  Q    And the e-mail that starts the chains is to Fred

Case 2:04-cv-09049-DOC-RNB   Document 9733   Filed 01/28/11   Page 40 of 133   Page ID #:291721
CV 04-9049-DOC – 01/27/2011 – Day 8, Vol. 3 of 4

40

1    Larian?

2    A    Correct.

3    Q    And you said that Fred Larian was a key person -- the

4    key individual that you would deal with to address trademark

5    dates; is that right?

6    A    Yes.

7    Q    And you'll see the second sentence of the -- of the

8    second paragraph where -- underneath, "Hello Fred," it

9    begins with the words "2001," and it says, "2001 fall Bratz

10   began production on September" -- I'm sorry, "on Saturday,

11   April 28th."  Did I read that correctly?

12   A    Yes.

13   Q    Did you know that information first-hand at the time?

14   A    I would presume so, yes.

15   Q    I guess what -- let me ask a better question.

16        Do you think you were there on April 28th, 2001?

17   A    I was.

18   Q    Okay.  So presumably you knew that first-hand at the

19   time?

20   A    Yes.

21   Q    But here we are, almost 10 years later, and you don't

22   necessarily recall that information?

23   A    It's 10 years later, so I can only speak to it --

24   Q    For a job you held for five months?

25   A    For five months, yes.

1    Q    And you do not work in the toy industry?

2    A    I do not.

3    Q    And after you left MGA, you didn't continue to work in

4    the toy industry?

5    A    I did not.

6    Q    Okay.

7              MR. MC CONVILLE:  One second, please.

8              *(Attorney discussion held off the record.)*

9              MR. MC CONVILLE:  No further questions.

10             THE COURT:  Redirect?

11                       **REDIRECT EXAMINATION**

12   BY MR. QUINN:

13   Q    If we could look again at Exhibit 557 that counsel just

14   showed you, the copyright registration in evidence for the

15   Jade doll configuration, accessories and packaging, and if

16   we could go to page 2.  And in the upper right, counsel just

17   called your attention to the date of June 18, 2001; do you

18   see that?

19   A    Yes.

20   Q    Look at another date, down to the bottom on the left,

21   "Year in which creation of this work was completed"; do you

22   see that?

23   A    Yes.

24   Q    And you see it says the year 2000 there?

25   A    Yes.

1    Q    Now, do you know whether or not a corrected

2    registration was ever filed by MGA changing that date?

3    A    I wouldn't have any knowledge of that.

4    Q    And isn't it -- I know it's been some number of years,

5    and you are not in the toy industry anymore, but isn't it

6    true, ma'am, that you actually thought that your -- the

7    information that you had relating to the date of creation,

8    which you put in Exhibit 551 --

9              MR. QUINN:  If we could put that back up.

10   BY MR. QUINN:

11   Q    -- you actually believed that that came from -- not

12   from Mr. Bryant's contract but from some other source?

13   A    The dates outlined in this e-mail are based on

14   communications with other persons within the MGA framework

15   at that time.

16   Q    Right.

17   A    I have no recollection of specifically where the data

18   came from, but again, I affirmed that it was not

19   self-generated.

20   Q    All right.  But in terms of the date of the contract,

21   isn't it true that you believe that the date of creation

22   would have been prior to this contract?

23   A    I don't have any speculation or position on that either

24   way.  With relation to the details of that contract, I

25   wasn't present for its creation or its revision at any

CV 04-9049-DOC – 01/27/2011 – Day 8, Vol. 3 of 4

43

1    point.

2    Q    Let's see if we can refresh your recollection.  I know

3    it's been a number of years, now, but if I could ask you to

4    please look at your deposition, page 2 -- I'm going to guess

5    this is going to be 281 and ask you to read to yourself from

6    page 281 in your deposition, line 15 -- lines 15 to 22, and

7    just let me know when you finished that.

8         Actually, it goes on to the next page -- I always do

9    that -- 282, line 4.  So it's 281, line 18, to 282, line 4.

10   A    Okay.

11   Q    Does that refresh your recollection that you -- you

12   thought at the time that the date of creation would have

13   been prior to this contract?

14   A    Well, what's -- what I stated in the deposition was

15   seven years after leaving the company --

16   Q    Right.

17   A    -- and I -- I didn't have much clarity.  So that was an

18   extrapolation that perhaps the date was prior to that

19   contract, but I don't have any direct knowledge of one

20   scenario or another --

21   Q    Right.

22   A    -- but --

23   Q    When you testified before --

24   A    In the deposition, I speculated as to a possibility,

25   yes.

Case 2:04-cv-09049-DOC-RNB   Document 9733   Filed 01/28/11   Page 44 of 133   Page ID #:291725
CV 04-9049-DOC - 01/27/2011 - Day 8, Vol. 3 of 4

44

1    Q    What you said was, "I think it's" --

2            MR. MC CONVILLE:  Your Honor, it's improper

3    reading of the transcript.

4            THE COURT:  Sustained.

5    BY MR. QUINN:

6    Q    Do you -- do you think that your memory now about these

7    events is better than it was back a couple years ago?

8    A    No.

9    Q    All right.  Thank you.

10            MR. QUINN:  Nothing further.

11            MR. MC CONVILLE:  One question.

12            THE COURT:  Recross.

13                    **RECROSS-EXAMINATION**

14    BY MR. MC CONVILLE:

15    Q    Is it fair to say that your testimony that you are

16    speculating as to a series of possibilities is because all

17    this stuff happened a long time ago?

18            MR. QUINN:  It assumes facts not in evidence, your

19    Honor.

20            THE COURT:  Overruled.

21            You can answer that question.

22            THE WITNESS:  Yes.

23            MR. MC CONVILLE:  Thank you.

24            THE COURT:  All right.  Now, don't be concerned

25    about what I'm going to say.  I'm going to ask you to remain

Case 2:04-cv-09049-DOC-RNB   Document 9733   Filed 01/28/11   Page 45 of 133   Page ID #:291726
CV 04-9049-DOC – 01/27/2011 – Day 8, Vol. 3 of 4

45

 1    on call until May 7th of 2015.  I'm just kidding you.

 2              *(Laughter.)*

 3              THE COURT:  Of this year, okay?  You go on

 4    whatever vacation, personal responsibilities; believe me, if

 5    we need you, we'll find you, and we'll be courteous.

 6              Thank you.

 7              THE WITNESS:  Thank you.

 8              THE COURT:  Counsel, your next witness -- or the

 9    return of --

10              MS. HURST:  Ms. Arant.

11              THE COURT:  Ms. Arant.  Thank you very much.

12              And this is Ms. Arant, the first witness that was

13    called this morning.  And this will be cross-examination,

14    and then we'll be through with those three witnesses.

15              Ms. Arant, thank you for returning.  I apologize

16    for the length of time.  If you would please retake the

17    stand, and we are going to resume with the cross-examination

18    of you, and this is Ms. Hurst on cross-examination.

19              MS. HURST:  Thank you, your Honor.

20              **LUCY ARANT, PLAINTIFFS' WITNESS, RECALLED**

21                   **CROSS-EXAMINATION (Resumed)**

22    BY MS. HURST:

23    Q    Good afternoon, Ms. Arant?

24    A    Good afternoon.

25              MS. HURST:  If we can please show the witness

Case 2:04-cv-09049-DOC-RNB   Document 9733   Filed 01/28/11   Page 46 of 133   Page ID #:291727
CV 04-9049-DOC – 01/27/2011 – Day 8, Vol. 3 of 4

46

1    Exhibit 5528.

2            Are we missing a binder?

3            *(Attorney discussion held off the record.)*

4            MR. QUINN:  We have no objection to this, your

5    Honor.

6            THE COURT:  Okay.

7            MR. QUINN:  We just don't have it.

8            *(Laughter.)*

9            MS. HURST:  Mike, can you go ahead and show

10   Exhibit 5528, please, and will you turn to the third page of

11   that, please.

12   BY MS. HURST:

13   Q    Ms. Arant, can you see that on the screen in front of

14   you?  It should be on the monitor in front of you, if you'd

15   look forward?  Actually, if you'd look forward, Ms. Arant?

16   A    Yes.

17   Q    Face me.  Face me.

18   A    Yes, okay.

19            *(Laughter.)*

20   BY MS. HURST:

21   Q    Okay.  You see that on the screen?

22   A    Yes, I do.

23   Q    And that's Exhibit 5528, page 3; do you see that?

24   A    I don't see where the exhibit is marked.

25            5528, yeah, okay.

CV 04-9049-DOC – 01/27/2011 – Day 8, Vol. 3 of 4

47

```
1    Q    Great.

2         And do you recognize that document?

3    A    Yes.

4    Q    What is it?

5    A    It's a copy of a U.S. trademark registration.

6    Q    And what is that registration for?

7    A    For the mark "Bratz."

8    Q    And that's the word "Bratz"?

9    A    Yes.

10   Q    And it's with a Z?

11   A    Correct.

12   Q    Now, this is a public document, this registration,

13   correct?

14   A    Correct.

15            MS. HURST:  Thanks, John.

16            Your Honor, I'd offer Exhibit 5528.

17            THE COURT:  Received.

18            (Defendants' Exhibit No. 5528 is received in

19       evidence.)

20   BY MS. HURST:

21   Q    What does the registration indicate about who owned the

22   mark "Bratz"?

23   A    It's owned by MGA Entertainment, Inc., a California

24   Corporation.

25   Q    And what does the registration indicate about when it
```

Case 2:04-cv-09049-DOC-RNB   Document 9733   Filed 01/28/11   Page 48 of 133   Page ID #:291729
CV 04-9049-DOC - 01/27/2011 - Day 8, Vol. 3 of 4

48

1    issued?

2    A    The mark registered on December 2nd, 2003.

3    Q    And that's in the upper right-hand corner?

4    A    Yes.

5    Q    All right.  Now, December 2nd, 2003, that's before this

6    lawsuit was filed in April of 2004, correct?

7    A    Yes.

8    Q    Now, what does the registration indicate about what MGA

9    claimed as the first use date for Bratz?

10   A    It was first used May 21st, 2001.

11   Q    May 21st, 2001, was MGA's claim date of first use for

12   its registration, correct?

13   A    Correct.

14   Q    And that claim date of first use occurred before the

15   registration issued on December 2nd, 2003, correct?

16   A    Correct.

17   Q    Now, you testified on direct that you had been involved

18   in the filing of intent-to-use applications for the word

19   "Bratz," correct?

20   A    Correct.

21   Q    Would you explain to the jury, please, what steps are

22   necessary after you file an ITU application in order to --

23   for it to mature into a registration?

24   A    Yes --

25               THE COURT:  Just explain ITU, let the jury know

Case 2:04-cv-09049-DOC-RNB   Document 9733   Filed 01/28/11   Page 49 of 133   Page ID #:291730
CV 04-9049-DOC — 01/27/2011 — Day 8, Vol. 3 of 4

49

1    what that is.

2            MS. HURST:  Yes, thank you, your Honor.

3    BY MS. HURST:

4    Q    ITU means "intent to use," correct?

5    A    Correct.

6            An application may be filed either as an intent to use

7    or use basis.  If it's filed on an intent-to-use basis

8    before the registration can issue, one must provide evidence

9    of use and first use dates.  If you're filing it based on

10   use, that information is filed with the original

11   application.

12   Q    In this case, you filed an intent-to-use application

13   for Bratz?

14   A    Correct.

15   Q    So that means that sometime between when you filed the

16   ITU application in December of 2000 and when the

17   registration issued three years later in December 2003, MGA

18   filed a statement of use, correct?

19   A    Correct.

20   Q    Now, ordinarily when a trademark attorney files a

21   statement of use, specimens go with that, correct?

22   A    Yes.

23   Q    And you look at the specimens to make sure that they

24   correctly reflect the use that's being claimed in the

25   application before you filed it, correct?

CV 04-9049-DOC – 01/27/2011 – Day 8, Vol. 3 of 4

50

```
 1    A     Correct.

 2    Q     You verify that before you send it to the trademark

 3    office?

 4    A     Yes.

 5    Q     Now, is it true that you don't have to have a

 6    registration in order to own a trademark?

 7    A     Yes.

 8    Q     In fact, you can own a trademark just by adopting the

 9    mark and using it; isn't that right?

10    A     That's true.

11              MS. HURST:  Can we please show the witness

12    Exhibit 558, which was admitted in direct, please, and go to

13    the second page of that exhibit.

14    BY MS. HURST:

15    Q     Do you see there under line 3B, there is the year of

16    publication?

17    A     Yes.

18    Q     And for the year of publication, what does it indicate

19    is the corrected information?

20    A     At least as early as May 21, 2001.

21              MS. HURST:  Mike, can we keep that up there and go

22    back to 5528-3 and put that up there as well, please.

23    BY MS. HURST:

24    Q     So the corrected information in the copyright

25    application is consistent with the first use date in the
```

1    trademark registration; is that correct, Ms. Arant?

2    A    Well, one day difference.

3    Q    At least as early as --

4    A    Yes, it's consistent, uh-huh.

5    Q    All right.  And again, the correct -- the use date for

6    the -- the trademark registration, that was provided long

7    before this lawsuit ever arose, correct?

8    A    Correct.

9    Q    Thank you.

10   A    You are welcome.

11   Q    Now, keeping with Exhibit 558 for a moment, that's the

12   copyright correction form.

13        MS. HURST:  Would you go to the first page of

14   that, please.

15   BY MS. HURST:

16   Q    Do you see there is a box with a big B in there,

17   Ms. Arant?

18   A    Yes.

19   Q    And what is the header in that box?

20   A    "Nature of Authorship."

21        MS. HURST:  Are we in the right place?

22        Oh, I apologize, 558, Mike.

23   BY MS. HURST:

24   Q    All right.  What's the header there in box B of the

25   correction form, Ms. Arant?

1    A    Nature of authorship.

2    Q    "Location" -- and maybe we're not in the same place.

3    Does it say, "Location and nature of incorrect information

4    in basic registration"?

5    A    Oh, okay.  Yes, uh-huh.

6    Q    Okay.  All right.  And that's the language that's

7    preprinted on the form CA that's put out by the copyright

8    office, correct?

9    A    Correct.

10   Q    And that's because mistakes are common enough in these

11   copyright applications that the office actually has a form

12   for correcting things, correct?

13   A    Correct.

14   Q    And in your experience, when pursuing trademark

15   applications and copyright applications, mistakes get made,

16   don't they?

17   A    Yes, they do.

18   Q    You hope they don't, but sometimes it happens?

19   A    Correct.

20   Q    Now, you actually performed a search, an availability

21   search for the mark "Bratz" for MGA before filing the

22   application, correct?

23   A    Yes.

24            MS. HURST:  Can we see Exhibit 34847 again.

25

1   BY MS. HURST:

2   Q    Now, you recognize the e-mail on the bottom of page 1

3   of 34847 as communicating the results of your availability

4   search, correct?

5   A    Correct.

6   Q    And about 10 lines down -- actually 13 lines down,

7   there is a sentence starting with the word "unfortunately";

8   do you see that?

9   A    Yes, I do.

10   Q    Okay.  Could you read that sentence for the jury?

11   A    Yes.  "Unfortunately, we do not recommend filing an

12   application for Bratz due to the presence on the principal

13   register of the earlier filed application for Bratty Babies

14   for many toys, including dolls owned by Fox Family

15   Properties."

16   Q    And would you continue, please, with the next two

17   sentences?

18   A    Yes.  "This application has been allowed by the

19   trademark office and will be published for opposition

20   shortly.  Due to the fact that the dominant portion of

21   'Bratz' and the mark 'Bratty Babies' are nearly identical,

22   and the goods are considered identical for trademark

23   purposes, we do not believe Bratz is available for use and

24   registration at this time."

25   Q    So it was your view in September of 2000, and you

CV 04-9049-DOC – 01/27/2011 – Day 8, Vol. 3 of 4

54

```
 1    communicated to MGA, that it would not be wise to register
 2    the mark "Bratz," correct?
 3    A    Correct.
 4    Q    All right.  Now, but you did eventually seek -- you did
 5    eventually file an application for the mark nonetheless,
 6    correct?
 7    A    Correct.
 8    Q    Would you please look at Exhibit 34834.
 9              MR. MC CONVILLE:  This one?
10              MS. HURST:  34834.
11    BY MS. HURST:
12    Q    Do you recognize that as a trademark office printout of
13    status report regarding the mark "Bratty Babies"?
14    A    Yes.
15    Q    And the mark "Bratty Babies" was the one you had cited
16    to MGA as a problem with the availability of "Bratz,"
17    correct?
18    A    Correct.
19              MS. HURST:  I'd like to offer 34834, your Honor.
20              THE COURT:  Any objection?
21              MR. QUINN:  No, your Honor.
22              THE COURT:  Received.
23              And 3487 -- or 34847, any objection?
24              MS. HURST:  I think that was already in on direct,
25    your Honor.
```

```
 1            THE COURT:  I think that's true.

 2            MR. QUINN:  It is, your Honor.

 3            THE COURT:  If not, it will be received again.

 4            (Defendants' Exhibit Nos. 34834 and 34847 are

 5       received in evidence.)

 6  BY MS. HURST:

 7  Q    Now, will you turn to page 34834.

 8       Now, you referred to your e-mail that the mark has been

 9  published for opposition, correct?

10  A    Correct.

11  Q    And does the status report in 34834 indicate when it

12  was published for opposition?

13  A    Yes, it does.

14  Q    And when was that?

15  A    November 2nd, 1999.

16  Q    Okay.  And then what happened after that?

17  A    After that, a Notice of Allowance was mailed.  That's

18  what the NOA stands for, and the SOU means a "Statement of

19  Use" is required by the applicant.  That means that the

20  trademark office has allowed it.  All they have to do now is

21  prove that they are using it and show how they are using it

22  by filing a Statement of Use.

23  Q    And that was on January 25th when the office said,

24  "Okay, show us the use"?

25  A    Exactly.
```

1    Q    All right.  And then what was the next thing that

2    happened?

3    A    Then the application was abandoned because the

4    Statement of Use was not filed in the six months that you

5    get to file it.

6    Q    So they had a certain amount of time to file that

7    Statement of Use?

8    A    Yes.

9    Q    And they failed to do so?

10   A    Exactly.

11   Q    And then that was it; they lost the rights?

12   A    Exactly.

13   Q    And what was the date as of which the Fox Family

14   Properties lost the rights to Bratty Babies?

15   A    October 17th, 2000.

16   Q    And that was about two months before you filed the ITU

17   application for Bratz on behalf of MGA, correct?

18   A    Correct.

19   Q    Okay.  So you did a search, and Bratty Babies was a

20   problem, and then Bratty Babies got abandoned, and then you

21   filed the application, correct?

22   A    Yes.

23            THE COURT:  Counsel, I'm just going to joke with

24   you.  Do you realize the symmetry of this, Bratty Babies

25   getting abandoned?  Do you realize what the record looks

1    like?

2              (Laughter.)

3              THE COURT:  I'm just joking with you.

4              Counsel?

5              MS. HURST:  Thank you, your Honor.

6    BY MS. HURST:

7    Q    All right.  Now, will you look at, please,

8    Exhibit 18478.

9              THE COURT:  Was it 134 or 184, Counsel?

10             MS. HURST:  18478, your Honor.

11             THE COURT:  Thank you.

12             MS. HURST:  And this is –– your Honor, it's a

13   registration for Sasha.  We'll offer it.  We understand

14   there is no objection.

15             MR. QUINN:  No objection.

16             THE COURT:  Thank you.  We had gone over that

17   also, Counsel.

18             MS. HURST:  Thank you.

19             THE COURT:  That should be 422?

20             Well, please continue.

21             MS. HURST:  All right.  May I see page 3 of that,

22   please.

23   BY MS. HURST:

24   Q    All right.  Ms. Arant, do you recognize this document?

25   A    Yes.

1    Q    And what is it?

2    A    It's a copy of a trademark registration.

3    Q    And what is the registration for?

4    A    It is for the mark "Sasha."

5    Q    And what does the registration indicate about who owns

6    the mark?

7    A    The mark is owned by ABC International Traders, Inc., a

8    California Corporation doing business as MGA Entertainment.

9    Q    And when was the application for the mark filed?

10   A    It was filed on December 11th, 2000.

11   Q    And you filed that, correct?

12   A    Yes, I did.

13   Q    When did the registration issue?

14   A    It issued on April 22nd, 2003.

15   Q    And that was -- that's in the upper right-hand corner?

16   A    Yes.

17   Q    And that was more than a year before the lawsuit was

18   filed, correct?

19   A    Correct.

20   Q    And what does the registration for the mark "Sasha"

21   indicate about the first use date?

22   A    It was first used May 22nd, 2001.

23   Q    So that -- that date of first use, May 22nd, 2001, was

24   supplied by MGA to the trademark office before this

25   registration could issue in April 2003, correct?

1    A    Correct.

2    Q    And that means MGA gave a date of first use of May 2001

3    to the trademark office long before this lawsuit was ever

4    filed, correct?

5    A    Yes.

6    Q    All right.

7         MS. HURST:  Could we look at Exhibit 18479,

8    please.

9    BY MS. HURST:

10   Q    Do you see that?

11   A    Yes.

12   Q    And you recognize it?

13   A    Yes.

14   Q    And what is it?

15   A    We are on page 3?

16   Q    Correct.

17   A    Okay.  It's a trademark registration -- copy of a

18   trademark registration for the mark "Cloe."

19   Q    Okay.

20        MS. HURST:  Mike, could you show page 3 of that,

21   please.

22        Your Honor, I'll offer Exhibit 18479.

23        MR. QUINN:  No objection.

24        THE COURT:  Received.

25

1            (Defendants' Exhibit No. 18479 is received in

2       evidence.)

3   BY MS. HURST:

4   Q    Now, this is another one you filed in December of 2000;

5   is that correct, Ms. Arant?

6   A    Correct.

7   Q    And what does the registration indicate about when it

8   issued?

9   A    It issued on June 17th, 2003.

10  Q    And that's in the upper right-hand corner there?

11  A    Yes, it is.

12  Q    All right.  And what does the registration indicate

13  about who owns the mark?

14  A    It's owned by ABC International Traders, Inc., doing

15  business as MGA Entertainment.

16  Q    And this is the mark "Cloe," right?

17  A    Yes.

18  Q    What does the registration indicate about the first use

19  date?

20  A    The mark was first used on May 21, 2001.

21  Q    Now, what showing does the applicant have to make in

22  order to prove a use in commerce?

23  A    You have to submit a Jpeg or a .pdf showing the use of

24  the mark actually on the goods themselves.  They could be

25  stamped on the doll, on packaging of the goods, on a label

1    attached to the goods, a hand tag attached to the goods,

2    someplace that word "Cloe" has to show up with the product

3    that you are seeking registration.  So you have to show the

4    product, the doll, and then a label/hand tag packaging or

5    stamped on the product itself.

6    Q    And what does the "in commerce" part mean?

7    A    That the mark was not just used at an in-house, at a

8    trade show, for example, but in commerce, between two

9    states, Interstate Commerce.

10   Q    So it basically has to be on the market?

11   A    Exactly.

12   Q    It can't just be a prototype?

13   A    No.

14   Q    It can't be a trade show, you mentioned?

15   A    No.

16   Q    It has to be real bona fide commercial activity?

17   A    Yes.

18   Q    Now, in order for MGA to get this registration for

19   Cloe, as reflected in 18479, before June 17, 2003, it had to

20   file a statement of use showing the -- what you've just

21   described, correct?

22   A    Yes.

23   Q    And it had to do that well before June 17, 2003,

24   correct?

25   A    Yes.

Case 2:04-cv-09049-DOC-RNB   Document 9733   Filed 01/28/11   Page 62 of 133   Page ID #:291743
CV 04-9049-DOC – 01/27/2011 – Day 8, Vol. 3 of 4

62

1   Q    In fact, doesn't it usually take sometime in processing

2   these registrations after you filed the statement of use and

3   before you get the registration?

4   A    Yes.

5   Q    How long does that usually take?

6   A    It's running about 9 to 10 months, now.

7   Q    So it can be close to a year between the time you file

8   a statement of use and when you get the registration?

9   A    That's right.

10   Q    Okay.  So in the case of this mark "Cloe," the

11   statement of use had to have been filed by MGA with the date

12   of May 21st, 2001, long before this lawsuit was ever filed

13   in April of 2004, correct?

14   A    Correct.

15          MS. HURST:  Can we turn to Exhibit 18477, please.

16   BY MS. HURST:

17   Q    Do you recognize that?

18   A    We are on page 3 of the exhibit, correct?

19   Q    Indeed.  Thank you, Ms. Arant.

20   A    Yes.  This is a copy of the U.S. Trademark

21   Registration.

22   Q    And for what mark?

23   A    For the mark "Jade."

24          MS. HURST:  I'd offer 18477.

25          MR. QUINN:  No objection.

Case 2:04-cv-09049-DOC-RNB   Document 9733   Filed 01/28/11   Page 63 of 133   Page ID #:291744
CV 04-9049-DOC – 01/27/2011 – Day 8, Vol. 3 of 4

63

```
 1            THE COURT:  Received.

 2            (Defendants' Exhibit No. 18477 is received in

 3      evidence.)

 4  BY MS. HURST:

 5  Q    And that's for the mark "Jade"?

 6  A    Yes.

 7  Q    And who -- who does the registration indicate owns the

 8  mark?

 9  A    ABC International Traders, Inc., doing business as MGA

10  Entertainment.

11  Q    And when did the registration issue?

12  A    July 30th, 2002.

13  Q    That's in the upper right-hand corner?

14  A    Yes.

15  Q    So July 30th, 2002, was the registration date for this

16  one?

17  A    Yes.

18  Q    This one went faster than the other ones?

19  A    Yes.

20  Q    Okay.  What does the registration indicate about a

21  first use date by MGA for Jade?

22  A    It was first used on May 21st, 2001.

23  Q    All right.  And the proof of that first use had to be

24  filed by MGA before the registration could issue on

25  July 30th, 2002, correct?
```

1    A      Yes.

2    Q      And that was long before this lawsuit ever came about

3    in April of 2004, correct?

4    A      Correct.

5    Q      Would you take a look at Exhibit 5529, please, page 3.

6           Do you recognize that?

7    A      Yes.

8    Q      What is it?

9    A      This is a copy of the United States Trademark

10   Registration.

11   Q      And what mark is indicated?

12   A      Yasmin.

13          MS. HURST:  I'd offer 5529, your Honor.

14          MR. QUINN:  No objection.

15          THE COURT:  Received.

16          (Defendants' Exhibit No. 5529 is received in

17   evidence.)

18   BY MS. HURST:

19   Q      Okay.  And who does the registration indicate owns the

20   mark "Yasmin"?

21   A      ABC International Traders, Inc., doing business as MGA

22   Entertainment.

23   Q      And on what date did that registration issue?

24   A      December 30th, 2003.

25   Q      And this was one of the applications you filed in

1    December 2000, correct?

2    A    Yes.

3    Q    All right.  And what does the registration indicate

4    that MGA claimed as its first use date?

5    A    May 13th, 2001.

6    Q    All right.  And that use -- that statement of use again

7    had to be filed before the registration could issue at the

8    end of 2003, correct?

9    A    Correct.

10    Q    And so that statement of use was filed by MGA long

11    before this lawsuit ever a arose, correct?

12    A    Correct.

13    Q    And let's turn back to Exhibit 557, please.

14         MS. HURST:  Mike, can you show us the first page

15    of that?  Sorry, the second page.

16    BY MS. HURST:

17    Q    This was the copyright application for the Jade doll;

18    is that right, Ms. Arant?

19    A    Yes.

20    Q    Do you see -- I want you to take as much time as you

21    need to examine this and tell me whether you see the date

22    September 18, 2000, anywhere on that copyright application,

23    September 18, 2000.

24    A    No.

25         THE COURT:  Did you say September 18?

CV 04-9049-DOC - 01/27/2011 - Day 8, Vol. 3 of 4

66

```
 1              MS. HURST:  I did.
 2    BY MS. HURST:
 3    Q    September 18 does not appear on the document anywhere,
 4    correct?
 5    A    No.
 6    Q    So if somebody wrote on the e-mail that they looked on
 7    the copyright application and found the date September 18,
 8    2000, that would be a mistake, wouldn't it?
 9              MR. QUINN:  Assumes facts not in evidence.
10              THE COURT:  Sustained.
11              That's for argument, Counsel.
12              So on both sides, we'll stop comparing and
13    contrasting witnesses; is that right?
14              MR. QUINN:  Yes, your Honor.
15              THE COURT:  Correct?
16              MS. HURST:  Yes.
17              THE COURT:  So what counsel won't do is do this:
18    "Witness number one said this, and if you heard from another
19    witness that they said this, that might mean that this
20    witness is in" -- no.  They will just get up and argue what
21    the evidence shows to you and why during their final
22    arguments.
23              Thank you.
24              MS. HURST:  Thank you, your Honor.
25
```

CV 04-9049-DOC – 01/27/2011 – Day 8, Vol. 3 of 4

67

BY MS. HURST:

Q    Would you turn to Exhibit 560, please, Ms. Arant, and I believe that's already in evidence.  Look at page 2.

Do you see there, line 3B, "year of publication"?

A    Yes.

Q    All right.  And what does that indicate as the corrected information for the year of publication?

A    At least as early as May 21st, 2001.

Q    And that's consistent with the trademark registration use date, correct?

A    Yes.

Q    And that trademark registration use date was filed long before this lawsuit ever arose?

A    Yes.

Q    And would you turn to 562 as well, and look at the second page there, like 3B, "year of publication"; do you see that?

A    Yes.

Q    And do you see the corrected information?

A    Yes.

Q    And what is that?

A    As early as May 21st, 2001.

Q    And that's consistent with the trademark registration use date?

A    Yes, it is.

1    Q    Now, when you were a trademark examiner at the

2    trademark office and you got an application to examine, did

3    you do searches to confirm whether it was available or not

4    before you would allow that application to proceed?

5    A    Yes.

6    Q    So you didn't just take the party's word for it that

7    they had the right to use the mark, you would go and examine

8    it, correct?

9    A    Correct.

10   Q    In fact, that's why you were called an examiner because

11   that's what you did, right?

12   A    Right.

13   Q    And when you got statements of use with specimens

14   attached to them, you would examine and look at them and

15   confirm that they showed the right kind of use, correct?

16   A    Correct.

17   Q    You didn't actually take their word for it, you

18   actually looked at it, right?

19   A    Right.

20   Q    Mr. Quinn asked you to look at the 11987.

21        Pardon me, 9 -- 11897; do you remember that?

22   A    Yes.

23   Q    That was the fax?

24   A    Yes.

25   Q    Now, Ms. Arant, Paula Garcia didn't personally tell you

```
 1   anything about the date of first use in connection with this

 2   fax, correct?

 3   A    I don't remember.

 4   Q    Okay.  You don't remember where that date came from

 5   that was reflected on the fax, correct?

 6   A    Yes, right.

 7   Q    The best you know is that your secretary, Sharon, gave

 8   you some information, and you put it in the fax, correct?

 9   A    Correct.

10   Q    So there were at least three people involved in that

11   communication, right?

12   A    Right.

13   Q    And by the time the registration issued long before the

14   lawsuit ever arose, the first use indicated in every one of

15   them was May of 2001, correct?

16   A    Correct.

17           MS. HURST:  No further questions.

18           THE COURT:  Then, Counsel, do you have questions

19   on --

20           MR. QUINN:  Yes, your Honor.

21           THE COURT:  -- redirect?

22           This is Mr. Quinn.

23                  REDIRECT EXAMINATION

24   BY MR. QUINN:

25   Q    So you started doing trademark searches as we've seen
```

CV 04-9049-DOC – 01/27/2011 – Day 8, Vol. 3 of 4

70

```
 1    for MGA back in August of 2000, correct?

 2    A    Yes.

 3    Q    And in terms of the written record we've got as to when

 4    MGA first claimed it was using these various marks, "Bratz"

 5    and the names of the dolls, the earliest date we have is

 6    what, in the documents that we've looked at; June 15, 2000?

 7            THE COURT:  June 15 or June 8?

 8            MR. QUINN:  June 15, 2000.

 9    BY MR. QUINN:

10    Q    That's the earliest date?

11    A    That's the earliest.

12    Q    Right.  And that's Exhibit 11897-2.

13         And actually, you don't recall whether that date was

14    first communicated to you personally by Paula or whether it

15    was first communicated by Paula to your assistant; isn't

16    that true, as you sit here now?

17    A    That's true.

18    Q    You might have spoken to Paula and she might have given

19    you that date, or it might have been your assistant Sharon?

20    A    Right.

21    Q    So we know the first date that MGA claimed first use

22    was June 15, 2000, based on the documents and records we

23    have before us, correct?

24    A    Yes.

25    Q    And then you did some trademark searches starting in
```

CV 04-9049-DOC - 01/27/2011 - Day 8, Vol. 3 of 4

71

```
 1    August, correct?
 2    A    Correct.
 3    Q    And you came up with -- in the search, you found
 4    somebody using "Bratty Babies," right?
 5    A    Right.
 6    Q    And you advised that Bratty Babies may be too close to
 7    Bratz, and it might not be a good idea to try to register
 8    that, right?
 9    A    Right.
10    Q    And by the way, Bratty Babies, I think you said that
11    was abandoned, that trademark application was abandoned?
12    A    Yes, it was.
13    Q    So you don't have any knowledge as to whether any
14    products were ever sold with the Bratty Babies marks on it?
15    A    I have no knowledge.
16    Q    Whether there was anything in commerce called "Bratty
17    Babies"?
18    A    I have no personal knowledge.
19    Q    But in any event, you thought that was an obstacle,
20    right?
21    A    Right.
22    Q    And some time goes by, and then trademark registrations
23    are filed, correct?
24    A    Trademark applications?
25    Q    Yes, trademark applications are filed.
```

CV 04-9049-DOC - 01/27/2011 - Day 8, Vol. 3 of 4

72

```
 1    A    Yes.

 2    Q    You asked a number of questions about whether those

 3    were filed before or after, and I'm the one who started

 4    this, there was a lawsuit.  But do you know whether or not

 5    MGA had already identified that it had a Mattel intellectual

 6    property issue before the lawsuit was filed?

 7    A    No.

 8    Q    You -- you just don't have any knowledge, one way or

 9    the other?

10    A    I don't have any knowledge, one way or the other.

11    Q    And in terms of this Bratty Babies trademark, I think

12    one of the first questions I asked you is whether you regard

13    yourself as an expert on trade secrets; do you recall that?

14    A    Yes.

15    Q    And I think you told us that you really don't regard

16    yourself as an expert on trade secrets, right?

17    A    No.

18    Q    So in terms of what the value of what a -- from a trade

19    secret standpoint, the value of a name for a yet unreleased

20    product in the toy industry, that's not something that

21    you're an expert on?

22    A    Are we talking about a trade secret or a trademark?

23    Q    A trade secret.

24    A    Okay.  I'm not an expert in trade secrets.

25    Q    Okay.  There are other people in the industry that you
```

CV 04-9049-DOC – 01/27/2011 – Day 8, Vol. 3 of 4

73

1    think would have more knowledge than you do, or better

2    knowledge, perhaps, as to the value of unreleased product

3    names, true?

4    A    True.

5    Q    And when you were in -- you were asked questions about

6    when you were in the PTO, the Patent and Trademark Office,

7    you looked at the, what do you call them, exemplars that are

8    submitted?

9    A    The applications?

10   Q    You look at the applications, and if they have those

11   Jpegs or .pdf's, you'd look at those as well, correct?

12   A    Correct.

13   Q    But you don't actually go out in the marketplace and

14   check whether things are on the shelf, for example --

15   A    No.

16   Q    -- or do some type of research about when, in fact,

17   something was offered for sale, that's not something the

18   trademark office does, correct?

19   A    No.

20           MR. QUINN:  Nothing further, thank you.

21           THE COURT:  Recross?

22           MS. HURST:  Your Honor, I believe Mr. Quinn had

23   opened the door on the matter we discussed at the recess.

24           THE COURT:  We'll take that up outside the

25   presence of the jury.  He may have, Counsel.  Do you and

Case 2:04-cv-09049-DOC-RNB   Document 9733   Filed 01/28/11   Page 74 of 133   Page ID #:291755
CV 04-9049-DOC – 01/27/2011 – Day 8, Vol. 3 of 4

74

 1    Mr. Quinn want to talk about that for just a moment?

 2              *(Attorney discussion held off the record.)*

 3                      **RECROSS-EXAMINATION**

 4    BY MS. HURST:

 5    Q    Let's go back.  For you to have concluded that MGA had

 6    a first use in commerce of those marks in December of 2000,

 7    products would have had to be on the market, that is

 8    basically sold to a customer, as of that time?

 9              MR. QUINN:  Your Honor, that assumes facts.

10    Misstates the testimony.

11              THE COURT:  No.  Overruled.

12              You can answer the question.

13              THE WITNESS:  In order to establish use in

14    commerce, you would have to have a specimen that would --

15    dating to that first date of June 15th, 2000.  There would

16    have to have been in existence at that time a package, a

17    doll, a hand tag or a label that was traveling in Interstate

18    Commerce bearing that mark.

19    BY MS. HURST:

20    Q    On June 15, 2000?

21    A    In order for that to be the date of first use in

22    commerce, yes.

23    Q    Have you ever seen anything to suggest that there was a

24    Bratz doll in existence, fully-formed, painted,

25    manufactured, packaged with its accessories and the name on

1    it as of June 15, 2000?

2    A    No.

3    Q    In fact, it's your best understanding as you sit here

4    today that that was a mistake, isn't it?

5    A    It is.

6                 MS. HURST:  Thank you.

7                 THE COURT:  All right.  Now, both counsel had

8    indicated that you are moving out of the country.  I'll

9    sincerely doubt that you'll return to this court, but we've

10   got people coming from literally across the world to

11   testify, and I'm keeping all of the witnesses on call until

12   May 7th, and that shouldn't disturb none of your plans.  You

13   can keep your personal plans, your professional

14   responsibilities.  If we need you, trust me, we'll find you.

15                THE WITNESS:  Thank you.

16                THE COURT:  Thank you, you may step down.

17                Why don't we take a recess for about 20 or 25

18   minutes.

19                You are admonished not to discuss this matter

20   amongst yourselves, nor form or express any opinions

21   concerning this case.  Have a nice recess.

22                Counsel, do you know when you want to come back?

23                MR. MC CONVILLE:  Do you want to deal with the

24   issue?

25                MS. HURST:  We'll deal with it.

```
 1                  (The following proceedings is taken outside
 2           the presence of the jury.)
 3                  THE COURT:  All right.  The jury is no longer
 4      present.  And counsel, why don't you all have a seat.
 5                  Do you want to please speak to the Court?
 6                  MS. HURST:  I didn't go into trade secrets in my
 7      examination, your Honor, and then all I did was go through
 8      the clearance history, and then Mr. Quinn went into trade
 9      secrets on his redirect.
10                  THE COURT:  Well, he asked about whether she was
11      an expert or not on trade secrets, and we got a "no."  We
12      got an expert in trademark.  I don't know how that really
13      opens the door.  I still don't think it's an appropriate
14      place.  I'm not precluding you from it, it's relevant, it's
15      just not the right person and the right time.
16                  MS. HURST:  We'll make a request for judicial
17      notice, as the Court suggested.  Thank you, your Honor.
18                  THE COURT:  You don't have to, but I'm just saying
19      you can present the expert witness if you choose, but it
20      gets into the -- I want to see that balance with the PTO
21      office, and Mattel is going to have to start narrowing their
22      expert, or they are not getting on the stand and -- they may
23      anyway.
24                  So what I'm trying to do is make sure each of you
25      have a fair opportunity.  What happens if Oman does come
```

Case 2:04-cv-09049-DOC-RNB   Document 9733   Filed 01/28/11   Page 77 of 133   Page ID #:291758
CV 04-9049-DOC – 01/27/2011 – Day 8, Vol. 3 of 4

77

 1   back, perhaps that's the time you want an expert and that's

 2   the very topic you want to cover.  So in other words, it has

 3   some balance to it.  That's why this is another reason why,

 4   quite frankly, this isn't the proper time.

 5           MS. HURST:  Got it.  Thank you.

 6           THE COURT:  Thank you.

 7           Now, do you want to take a recess?  I don't have

 8   to, believe it or not.

 9           (Laughter.)

10           (Recess.)

11           (The following proceedings is taken outside

12       the presence of the jury.)

13           THE COURT:  We are on the record.

14           For our record, Mr. Overland is present, along

15   with counsel.

16           And it's been the Court's assumption after

17   informal discussions that Mr. Overland was going to make it

18   be known to the Court and the parties when he actually

19   wanted to participate in cross-examination, or

20   recross-examination, and therefore, if you notice, I haven't

21   been calling upon Mr. Overland, who represents Mr. Machado.

22   Certainly he hasn't been neglected.

23           That's somewhat a choice, literally, to get off

24   the skyline until he thinks it's appropriate, and then he's

25   going to make that known to the parties.  So I want to make

Case 2:04-cv-09049-DOC-RNB   Document 9733   Filed 01/28/11   Page 78 of 133   Page ID #:291759
CV 04-9049-DOC - 01/27/2011 - Day 8, Vol. 3 of 4

78

1    certain that that's acceptable to both Mattel and MGA?

2              MS. KELLER:  Yes, your Honor, on behalf of MGA, it

3    is.

4              MR. QUINN:  Yes.

5              THE COURT:  And Mr. Overland, is that still your

6    desire?

7              MR. OVERLAND:  Yes, your Honor, as well as

8    Mr. Cote.  He will be conducting some of the

9    cross-examination.

10             THE COURT:  So one of you two will notify the

11   Court when you want to become engaged in the

12   cross-examination; otherwise, I won't call on you per

13   agreement until it's appropriate.  The reason for that is

14   your belief that there is a prejudicial effect asking you on

15   each occasion when, so far, the litigation seems to be

16   between Mattel and MGA, and we haven't gotten to your claim;

17   is that correct?

18             MR. OVERLAND:  Yes, your Honor.

19             THE COURT:  All right.  Thank you.

20             *(The following proceedings is taken in the*

21        *presence of the jury.)*

22             THE COURT:  All right.  The jury is present, the

23   alternates, all counsel, the parties.

24             Counsel, thank you for your courtesy.  If you'd be

25   seated, please.

```
1              And counsel, your next witness, please.

2              MR. PRICE:  Mattel calls Carter Bryant.

3              THE COURT:  Thank you.

4              And sir, if you'd please raise your right hand,

5    the clerk will administer an oath to you.

6              She's right here.

7        CARTER BRYANT, PLAINTIFFS' WITNESS, SWORN

8              THE WITNESS:  Yes.

9              THE COURT:  Thank you, sir.  If you'd come along

10   the railing, please.  There is an opening next to the wall,

11   and if you'd be seated.  The chair doesn't move, so you'll

12   have to move the microphone closer.

13             THE WITNESS:  Okay.

14             THE COURT:  So if you'd be seated, sir, in the

15   chair, and then if you face the jury, will you state your

16   full name and spell your last name.

17             THE WITNESS:  Carter Bryant.  Bryant is

18   B-r-y-a-n-t.

19             THE COURT:  Thank you.

20             Direct examination by Mr. Price.

21             MR. PRICE:  Thank you.

22                    DIRECT EXAMINATION

23   BY MR. PRICE:

24   Q    Good afternoon, Mr. Bryant.

25   A    Good afternoon.
```

CV 04-9049-DOC – 01/27/2011 – Day 8, Vol. 3 of 4

80

```
1   Q    It's correct, is it not, that you and I have only
2   spoken to each other when you were under oath?
3   A    Yes.
4   Q    And so you only met me when you've been testifying
5   under penalty of perjury, correct?
6   A    Yes.
7   Q    Now, it's also correct that you've had your deposition
8   taken a number of days, correct?
9   A    Yes.
10  Q    And that's between 2004 and 2008; do you recall that,
11  generally?
12  A    Yes.
13  Q    Okay.  And do you recall you were deposed, oh, about
14  five times?
15  A    I don't remember exactly how many times.  I think it
16  was somewhere around that, maybe even more.
17  Q    And just focusing on your deposition, before each
18  deposition, did you -- let me ask this:  Did you have your
19  own counsel in those depositions?
20  A    I'm trying to remember.
21       I worked with -- I believe I worked with MGA's counsel.
22  Q    Well, do you remember -- do you remember someone named
23  Mr. Wickam (phonetic)?
24  A    Oh, yes.
25  Q    And he was representing you at a deposition, correct?
```

1    A    Yes.

2    Q    And there was another attorney for MGA, correct?

3    A    Yes.

4    Q    And who was paying for your counsel at the time?

5    A    MGA.

6    Q    And then there was a deposition where you were

7    represented by, again, Mr. Wickam?

8    A    Yes.

9    Q    And MGA was represented by their own counsel, correct?

10   A    Yes.

11   Q    So -- but prior to those depositions, did you have

12   discussions with your own counsel?

13   A    I believe so, yes.

14   Q    And you also had discussions with MGA's counsel,

15   correct?

16   A    Yes.

17   Q    And then there was a deposition again where you were

18   represented by Mr. Wickam, correct?

19   A    Yes.

20   Q    And MGA's counsel was there as well?

21   A    To the best of my memory, yes.

22   Q    And there was a deposition where you were represented

23   by the law firm of Keker & Van Nest; do you recall that?

24   A    I recall being represented by them.  I don't remember

25   if it was at a deposition.

1    Q    Do you remember a gentleman named Matthew Werdegar?

2    A    The name is familiar.

3    Q    It's W-e-r-d-e-g-a-r.

4         Well, the crux of it, at all of your depositions, there

5    was counsel for you and counsel for MGA, correct?

6    A    Yes.

7    Q    And your counsel fees were being paid for by MGA,

8    right?

9    A    Yes.

10   Q    And prior to each deposition, you met with counsel for

11   MGA, correct?

12   A    Yes.

13   Q    And you met with your own counsel, right?

14   A    Yes.

15   Q    About -- before each deposition, how much time did you

16   spend meeting with your counsel and meeting with MGA's

17   counsel?

18   A    Oh, I -- I'd be guessing.  I don't remember.

19   Q    Can you give us an estimate at all?

20   A    I don't know, maybe a day.

21        THE COURT:  Could we move the microphone just a

22   little closer.

23        THE WITNESS:  Sure.

24        THE COURT:  Thank you.  And just pull and see if

25   it has a wire -- well, apparently it doesn't.

CV 04-9049-DOC – 01/27/2011 – Day 8, Vol. 3 of 4

83

```
 1              Thank you.  I may move you a little bit closer so
 2   everybody can hear you.
 3              THE WITNESS:  Thank you.
 4   BY MR. PRICE:
 5   Q    And then at some point you settled with Mattel; do you
 6   recall that?
 7   A    Yes.
 8   Q    After that settlement, there was a trial; do you recall
 9   that?
10   A    Yes.
11   Q    And you testified at this trial, correct?
12   A    Yes.
13   Q    In fact, you testified for a number of days; do you
14   remember that?
15   A    Yes.
16   Q    And so during that time, you had your own counsel,
17   right?
18   A    Yes.
19   Q    And during the time of the trial after the settlement
20   with Mattel, who was paying for your counsel?
21   A    MGA paid part of it.
22   Q    And what part of it did MGA?
23   A    I -- I don't recall.
24   Q    Like 90 something, 97 percent, something like that?
25   A    I don't remember exactly.
```

Case 2:04-cv-09049-DOC-RNB   Document 9733   Filed 01/28/11   Page 84 of 133   Page ID #:291765
CV 04-9049-DOC – 01/27/2011 – Day 8, Vol. 3 of 4

84

1    Q    Did you pay any of your fees?

2    A    I -- I don't remember.

3    Q    But you do remember that MGA paid some fees?

4    A    Yes.

5    Q    And during trial, you met with your own counsel,

6    correct?

7    A    Yes.

8    Q    And during trial, you also met with MGA's counsel?

9    A    Yes.

10   Q    And you consulted with both of them -- let me rephrase

11   that.

12        You spoke with both of them throughout the trial,

13   correct?

14   A    Yes.

15   Q    And getting back to your depositions, do you remember

16   the first two days were November 4th and November 5th of

17   2004?

18   A    Yes, I remember they were in 2004, yeah.

19   Q    And in preparing for those depositions, your sessions

20   were -- preparing for those depositions, during some of your

21   preparation, you were videotaped, correct?

22   A    Yes.

23   Q    But when you were asked about that at your deposition,

24   at the time you said they weren't videotaped?

25   A    I -- I don't recall.

```
 1    Q    If you'd look at volume 2 of your deposition.  This is

 2    on November 5th, 2004.  And if you'd look at pages 268, 269.

 3              MR. PRICE:  And your Honor, if I can read into

 4    evidence --

 5              THE COURT:  There is no reason to read into

 6    evidence, counsel.  What lines?

 7              MR. PRICE:  It's 269, the specific question and

 8    answer, without the background, is lines 12 to 13.

 9              THE COURT:  What line, 12 to 13?

10              MR. PRICE:  269, line 12 to 13, yes.

11              THE WITNESS:  Okay.

12    BY MR. PRICE:

13    Q    So originally under oath on November 5, 2004, you said

14    that you were not videotaped in your preparation; do you

15    recall that?

16              MS. KELLER:  Objection.  Irrelevant.

17              THE COURT:  Overruled.

18              THE WITNESS:  I'm sorry, can you ask the question

19    again?

20    BY MR. PRICE:

21    Q    And let's get some background.

22         You were -- you prepared with your and MGA's counsel

23    prior to November 4 and November 5, 2004 meetings for eight

24    hours -- about six hours, right?

25    A    Okay, right.
```

1   Q    And that preparation took just a couple of days before

2   your deposition, right?

3   A    Yes.

4   Q    And so -- and during that preparation, you were

5   videotaped, right?

6   A    I think I misunderstood your question earlier.  I

7   thought you were talking about the actual deposition.

8   Q    So in preparing for your deposition, was the

9   preparation videotaped?

10  A    Well, according to my -- according to this, no.

11  Q    And according to this, we are talking about your

12  testimony on November 5th, 2004, correct?

13  A    Right.

14  Q    Okay.  If you could turn to, it's June 12, 2008, it's

15  page 2439 at 23.

16       And if you look at page 2440.

17  A    Right.

18  Q    And look at lines -- and by the way, this, again, is

19  taking place --

20            THE COURT:  Counsel, is it 2439 or 2440?

21            MR. PRICE:  Specifically, your Honor, 2440, and it

22  is lines 15 to 24.

23            THE WITNESS:  Okay.

24  BY MR. PRICE:

25  Q    Do you have that in front of you?

1    A    Yes.

2    Q    So it's true that in preparing for your first

3    deposition, your counsel videotaped you, that is they

4    actually sat down with you and asked you questions and you

5    gave answers while being videotaped, correct?

6    A    Well, I mean, that's what it says here.

7    Q    That's what you testified to under oath on June 13,

8    2008, correct?

9    A    Well, yeah, that's what it says here.

10   Q    And as part of that -- and by the way, that videotaping

11   went on for a couple of hours?

12   A    Well, I just -- I don't remember.  I don't remember,

13   but that's what it says.

14   Q    So that refreshes your recollection, though, that

15   before you were deposed the first time, that you were

16   videotaped, someone sat down with you, they asked you

17   questions, and that was videotaped, and that happened a few

18   days before your deposition on November 4th, correct?

19   A    I just -- I just really don't remember.

20   Q    You do -- do you recall that on November 4th, though,

21   when you were asked about that, you denied that it took

22   place under oath, you said no --

23             MS. KELLER:  Objection.  Not inconsistent.

24             THE COURT:  Overruled.

25             THE WITNESS:  Well, that's what it says in the

Case 2:04-cv-09049-DOC-RNB   Document 9733   Filed 01/28/11   Page 88 of 133   Page ID #:291769
CV 04-9049-DOC - 01/27/2011 - Day 8, Vol. 3 of 4

88

```
 1    deposition.

 2    BY MR. PRICE:

 3    Q    Well, we talked about your meeting with counsel before

 4    your depositions and trial.  Have you had an opportunity to

 5    meet with MGA's counsel recently?

 6    A    Oh, yes.

 7    Q    And when was that?

 8    A    I spoke with them this morning.

 9    Q    And for about how long did you speak with MGA's

10    counsel?

11    A    Maybe two hours.

12    Q    And you haven't met with us, as Mattel's counsel,

13    correct?

14    A    No.

15    Q    I did a double negative.  I apologize.

16         Have you met with Mattel's counsel?

17    A    No.

18    Q    Now, I'd like to talk to you about some dates --

19    A    Okay.

20    Q    -- of your employment with Mattel, and see if we can

21    get those down on a time line.  Hopefully we will all be in

22    agreement.

23         Do you recall that you first met -- you first started

24    full time at Mattel around November of '95?

25    A    I -- I seem to remember that it was a little sooner
```

Case 2:04-cv-09049-DOC-RNB   Document 9733   Filed 01/28/11   Page 89 of 133   Page ID #:291770
CV 04-9049-DOC – 01/27/2011 – Day 8, Vol. 3 of 4

89

```
 1   than that.  I think it was September '95.

 2   Q    Well, in fact, do you recall that you worked kind of

 3   part time at Mattel from September until about November of

 4   '95?

 5   A    Yes.

 6   Q    And then you began working full time around November of

 7   '95?

 8   A    I'm not exactly sure when I started working full time

 9   there.

10   Q    Okay.  Let me see if I can refresh your recollection.

11        If you'd look at Exhibit 23.  Do you recognize

12   Exhibit 23?

13   A    It's been a long time since I've seen it, but I do seem

14   to remember seeing it.

15   Q    Do you see your signature on Exhibit 23, the second

16   page, there?

17   A    Yes.

18   Q    And could you tell us what that is?

19   A    What the document is?

20   Q    Let me ask it this way:  That's an inventions agreement

21   that you signed sometime in November of 1995, correct?

22   A    Yes.

23        MR. PRICE:  Your Honor, we are going to go ahead

24   and move Exhibit 23 into evidence at this time.

25        THE COURT:  Received.
```

CV 04-9049-DOC – 01/27/2011 – Day 8, Vol. 3 of 4

90

```
 1              (Plaintiffs' Exhibit No. 23 is received in
 2         evidence.)
 3    BY MR. PRICE:
 4    Q    Now, I just at this point gave you that to see, does
 5    that refresh your recollection that you began working with
 6    Mattel full time around November of 1995?
 7    A    Yes.
 8    Q    And if we can put this on a time line.
 9         So around November of 1995, you began working full time
10    with Mattel, right?
11    A    Yes.
12    Q    And then there came a time in around April of 1998 that
13    you left Mattel, correct?
14    A    Yes.
15    Q    And that was around April 29, 1998, sometime around
16    then?
17    A    I don't remember the exact date.
18    Q    In any event, sometime in April of '98, right?
19    A    Yes.
20    Q    So for the time being, I'll scratch out the 29, here.
21         And then there came a time when you went back to work
22    for Mattel, correct?
23    A    Yes.
24    Q    And that was in January of 1999, right?
25    A    Yes.
```

1   Q    And then your last day of employment at Mattel was

2   October 19 of 2000, correct?

3   A    I don't recall the exact date.

4   Q    Do you recall that you gave notice on October 4th or

5   thereabouts?

6   A    I do recall giving notice.  I don't remember the exact

7   date.

8   Q    And do you recall that you continued to work at Mattel

9   between October 4th and October 19th?

10  A    Again, not recollecting the exact dates, I do remember

11  that there was a time period, yeah, that I continued working

12  there.

13  Q    Let's show you your transcript, this is dated -- it's

14  pages 3052.  Let me get the date on that.  I believe that's

15  June 18th, 2008.

16       And if you'll read page 3052, lines 12 to 14.

17  A    Okay.

18  Q    So is it correct that you continued to work at Mattel

19  from the period of October 4th through October 19th of the

20  year 2000?

21  A    According to this, yes.

22  Q    This being your prior sworn testimony?

23  A    Yes.

24  Q    And you certainly have no reason today to think that

25  your prior sworn testimony is inaccurate?

1    A     No, no.

2    Q     Now, you understand that in this case, the date that

3    you created Bratz drawings is critical?

4    A     Is what, now?

5    Q     Is critical, it's an important part of this case?

6    A     Yes.

7    Q     And your understanding is that -- you understand that

8    you've taken the position that because some Bratz drawings

9    were done in 1998, when you weren't working for Mattel, then

10   they don't belong to Mattel, correct?

11   A     I don't remember exactly what I said in that matter.

12   Q     Okay.  If you'd look at page 2594, this is June 13,

13   2008.  If you'd look at lines 20 through 25.

14   A     Of which page?

15   Q     It's 2594.

16   A     Okay.

17   Q     So does that refresh your recollection that the

18   position taken was that because you did some original Bratz

19   drawings in 1998 when you weren't working for Mattel, that

20   those drawings do not belong to Mattel?

21         MS. KELLER:  Objection.  Improper refreshing

22   recollection, reading it out loud.

23         THE COURT:  Well, it's got a hybrid, it's

24   obviously reading, and it should be a question, counsel,

25   so --

1   BY MR. PRICE:

2   Q    Does this refresh your recollection that the position

3   you took was that Bratz doesn't belong to Mattel because

4   some of the Bratz drawings you were doing were created in

5   1998?

6   A    Yes.

7   Q    And you took the position that, therefore, you could

8   assign them to MGA and they belonged to MGA and not Mattel,

9   correct?

10  A    Yes.

11  Q    And so we're talking about the time between April '98

12  and January 1999; is that right?

13  A    Yes.

14  Q    But isn't it correct, sir, that you will testify

15  falsely under penalty of perjury about a date concerning

16  Bratz so that MGA gets intellectual property rights to

17  Bratz?

18          MS. KELLER:  Objection.  Argumentative.  It

19  assumes facts not in evidence.

20          THE COURT:  Overruled.  It's too broad, counsel.

21  You need to be more specific with that.  I think that that

22  may pertain to your allegation concerning your copyright for

23  those dates.

24          MR. PRICE:  Not that.  It's concerning his

25  declaration.

```
 1              THE COURT:  And you have a statement by him to
 2   this effect?
 3              MR. PRICE:  A statement by him that he will
 4   testify to.
 5              THE COURT:  Overruled.
 6              THE WITNESS:  I'm sorry, what was the question
 7   again?
 8   BY MR. PRICE:
 9   Q    Isn't it true that you will testify falsely under
10   penalty of perjury about a date so that MGA can get
11   intellectual property rights pertaining to Bratz?
12   A    No.
13   Q    If you'd look at Exhibit 502.
14        Is Exhibit 502 in front of you?
15   A    Yes.
16   Q    And is that your signature on the second page?
17   A    Yes.
18   Q    And this is a signature to a declaration under penalty
19   of perjury, correct?
20   A    Yes.
21              MR. PRICE:  Your Honor, I move Exhibit 502 into
22   evidence.
23              THE COURT:  Received.
24              (Plaintiffs' Exhibit No. 502 is received in
25         evidence.)
```

1        MR. PRICE:  If we can go to the first page.

2        (Interruption in the proceedings.)

3        MR. PRICE:  Oh, sure.

4   BY MR. PRICE:

5   Q    If you look at the top there --

6        MS. KELLER:  Your Honor, I'm going to object to

7   the declaration as hearsay.

8        THE COURT:  It's not under penalty of perjury, is

9   it?

10        MS. KELLER:  It is, your Honor.  We're not

11   objecting to examination about a statement but the

12   declaration itself --

13        THE COURT:  Well, the whole declaration is not

14   coming in.  It's those limited portions that pertain to this

15   line of inquiry, and we can clean that up this evening after

16   court.

17        MS. KELLER:  Thank you, your Honor.

18        THE COURT:  I'll give counsel latitude to look at

19   that and to go into it.

20        MR. PRICE:  Thank you.

21   BY MR. PRICE:

22   Q    So do you see there's a fax line at the top,

23   "August 11, 2003, Carter"; do you see that?

24   A    Yes.

25   Q    And so what does that indicate?

CV 04-9049-DOC – 01/27/2011 – Day 8, Vol. 3 of 4

96

| | | |
|---|---|---|
| 1 | A | I am not sure what you are asking me. |
| 2 | Q | So that came from your fax machine? |
| 3 | A | I don't remember. |
| 4 | Q | The way that -- you've seen fax headers, right? |
| 5 | A | Yes. |
| 6 | Q | And does that look like a fax header from your fax |
| 7 | | machine? |
| 8 | A | Well, it's got my name on it. |
| 9 | Q | I mean, you believe that this is something you faxed to |
| 10 | | someone, correct? |
| 11 | A | I -- I just -- I don't really recall. |
| 12 | Q | You were asked to fill out this declaration by someone |
| 13 | | associated with MGA, correct? |
| 14 | A | I -- I don't really remember being asked to do that. |
| 15 | Q | Okay.  If you'd look at Exhibit 11898. |
| 16 | | Do you have 11898 in front of you? |
| 17 | A | Yes. |
| 18 | Q | Do you see at the bottom right hand, it says, "Bryant |
| 19 | | 20001"; do you see that? |
| 20 | A | Yes. |
| 21 | Q | This is a document that you produced to us, correct, to |
| 22 | | Mattel? |
| 23 | A | I don't remember. |
| 24 | Q | Is that what it appears like to you? |
| 25 | A | I -- I don't really recall this document. |

```
 1    Q    The document appears to be addressed -- sent to you by
 2    an Alan Rose, correct?
 3    A    I'm trying to find something that says Alan Rose.  Oh,
 4    there it is.
 5    Q    See it at the bottom?
 6    A    Yes, I see it.
 7    Q    And you believe that's a communication you got from
 8    attorney Alan Rose in August of 2003, correct?
 9    A    I don't necessarily remember getting this.  I mean,
10    even though I'm looking at it, I don't necessarily remember
11    it.
12    Q    Okay.  If you'd look at again your testimony.  I'll get
13    you the date here.  June 13, 2008, page 2580, line 22, to
14    2581, line 2.
15            MS. KELLER:  I'm sorry, counsel, what's the pages?
16            MR. PRICE:  It's 2580, line 22, to 2581, line 2.
17            THE WITNESS:  Which lines?
18    BY MR. PRICE:
19    Q    2580, line 22, to 2581, line 2.
20    A    Okay.
21    Q    And does that refresh your recollection that this
22    exhibit, 11898, was a communication you got from attorney
23    Alan Rose in August of 2003?
24    A    Well, that's what it says here.  I still don't remember
25    it right now.
```

1    Q    That's what you testified to under oath previously,

2    correct?

3    A    Yes, yes.

4         MR. PRICE:  Your Honor, I move Exhibit 11898 into

5    evidence.

6         THE COURT:  Received.

7         *(Plaintiffs' Exhibit No. 11898 is received in*

8         *evidence.)*

9    BY MR. PRICE:

10   Q    Now, let's go to the first page of this.  Can you see

11   the re line says MGA Entertainment; do you see that?

12   A    Yes.

13   Q    It was your understanding when you received this that

14   Mr. Rose was the attorney for MGA, correct?

15   A    I don't -- I don't remember.

16   Q    Looking at it right now, does it appear to you to be a

17   letter from you to Mr. Rose, an attorney for MGA?

18   A    I'm sorry, what was your question?

19   Q    Looking at it right now, you can tell this is a letter

20   to you from Alan Rose, who was an attorney for MGA at the

21   time?

22   A    Right.

23   Q    And you see it says, "Thank you for discussing the

24   above matter with me"?

25   A    Yes.

CV 04-9049-DOC – 01/27/2011 – Day 8, Vol. 3 of 4

99

```
 1    Q    "We are enclosing the declaration for your signature,
 2    please sign and fax back"; do you see that?
 3    A    Yes.
 4    Q    Now, certainly in 2003, you were not an engineer,
 5    right?
 6    A    No.
 7    Q    I did a double negative.  I apologize.
 8         In 2003, were you an engineer?
 9    A    No.
10    Q    Were you a technical person?
11    A    Not terribly, no.
12    Q    And it's correct that you could not point out the
13    technical differences between a Bratz doll in 2001 and a
14    Bratz doll in 2003?
15    A    I don't know.
16    Q    Have you ever thought you could point out technical
17    differences between different years of Bratz dolls?
18    A    No, I guess I never thought about that.
19    Q    So you never even considered the question as to whether
20    or not you were qualified to point out technical differences
21    in Bratz dolls by the date of release?
22    A    No.
23    Q    You've never given that thought?
24    A    I don't remember ever really considering it, no.
25    Q    If on August 11, 2003, someone wanted to -- to examine
```

CV 04-9049-DOC - 01/27/2011 - Day 8, Vol. 3 of 4

100

1    the technical differences in Bratz dolls between, say, a

2    2001 doll and a 2002 and a 2003, you would not be the person

3    to go to, right?

4    A    Probably not.

5    Q    And if you look at the fourth -- I guess fourth

6    paragraph if you include single lines, it says, "Our patent

7    application was filed on February 24, 2003, so a release

8    back in 2001 would be anticipatory, while a release in the

9    fall of 2002 would be within the one-year grace period"; do

10   you see that?

11   A    Yes.

12   Q    Okay.  And you understood from this, did you not, that

13   2001 is bad and 2002 is good?

14   A    I don't remember exactly what I thought about that

15   particular paragraph or statement.

16   Q    Okay.  Well, sitting here looking at it now, a grace

17   period sounds like a good thing, right?

18   A    Sure.

19   Q    And in discussions that you had, you see it says,

20   "Thank you for discussing the above matter to me"?

21   A    Yes.

22   Q    Okay.

23        Was it explained to you that you can't get a patent on

24   something if you seek the patent more than a year after it's

25   in the public?

1   A    I'm sorry, I don't understand your question.

2   Q    In the discussion you had, did anyone explain to you

3   that there's a problem with getting a patent if -- if the

4   thing you are trying to patent has already been in the

5   public for over a year?

6   A    I don't remember the discussion.  Like I said, this --

7   this document is just something I don't really recall all

8   that well.

9   Q    Well, you do recognize that this is a letter concerning

10  an attempt by MGA to get intellectual property rights, in

11  this case a patent, concerning Bratz, right?

12  A    I said it's been a long time since I've seen this

13  document.  I really don't remember what this was regarding.

14  Q    When was the last time you saw the document?

15  A    Oh, I don't remember.

16  Q    You saw it in 2008 during the trial, didn't you?

17  A    I don't remember.

18  Q    You were examined about it extensively in 2008 during

19  the trial, weren't you?

20  A    I don't remember.

21  Q    If you'd look at -- remember I said to look at

22  page 2580?

23       Do you have that in front of you?

24  A    Yes.

25  Q    Do you see you were examined about this document and

Case 2:04-cv-09049-DOC-RNB   Document 9733   Filed 01/28/11   Page 102 of 133   Page ID #:291783
CV 04-9049-DOC - 01/27/2011 - Day 8, Vol. 3 of 4

102

 1    about your declaration from page 2580 up through 2600?

 2            MS. KELLER:  Objection.  Improper impeachment.

 3            THE COURT:  Overruled.  It's not impeaching, it's

 4    just refreshing a recollection.

 5            Would somebody like to help him turn to those

 6    pages?

 7            THE WITNESS:  I've got it.  I've got it.

 8            Okay.

 9    BY MR. PRICE:

10    Q    So does that refresh your recollection that you were

11    shown this document in Exhibit 502, your declaration, and

12    examined about it fairly extensively?

13    A    It appears that way, yes.

14    Q    So the last time you saw this document was in 2008,

15    right?

16    A    Yes.

17    Q    And if we look at 11898, let's go to the fifth page,

18    and you see that that attaches a declaration; do you see

19    that?

20    A    Yes.

21    Q    And at the top -- at the top there, it says in the

22    United States Patent and Trademark Office; do you see that?

23    A    Yes.

24    Q    So you knew that this was something that was going to

25    be filed with an agency of the federal government, correct?

CV 04-9049-DOC – 01/27/2011 – Day 8, Vol. 3 of 4

103

```
 1   A    I don't remember what I understood about it at the
 2   time.
 3   Q    Well, you do understand this is something that MGA is
 4   asking you to sign?
 5   A    Yes.
 6   Q    And although you may not be able to remember at the
 7   time thinking back those years, if you look at it right now,
 8   would you agree with me that if you look at this, you could
 9   tell it's something that MGA is asking to be filed with the
10   United States Patent and Trademark Office?
11   A    Yes.
12   Q    And given that you can tell this from the face of the
13   document, it's probably something you realized at the time
14   you signed it?
15   A    Like I said, I don't remember what I remembered
16   about -- or I don't remember what I knew about this document
17   at the time that I signed it.
18   Q    But given the way that you read words in the English
19   language, you believe that at the time you saw this
20   document, you would have believed you were being asked by
21   MGA to file something that was to be given to the United
22   States Patent and Trademark Office?
23   A    I -- I just don't remember what I knew about this
24   document.
25   Q    It's how you read it now, it's something that MGA is
```

CV 04-9049-DOC - 01/27/2011 - Day 8, Vol. 3 of 4

104

```
1   asking you to sign under penalty of perjury to be filed with

2   the United States Patent and Trademark Office?

3   A    Yes.

4   Q    And if you look at Exhibit 502, do you see that that is

5   the declaration that you signed?

6   A    Yes.

7   Q    And if we go to page 3, do you see there are some

8   drawings with that?

9   A    Yes.

10  Q    And it's safe to say that's not something you drew?

11  A    No.

12  Q    I did a double negative again, I apologize.

13       Is that something you drew?

14  A    No.

15  Q    And at the time, did you have the qualifications to

16  look at this and tell what it meant?

17            MS. KELLER:  Objection.  Vague.

18            THE COURT:  Overruled.

19            THE WITNESS:  I mean, I think I probably thought I

20  was fairly qualified to figure out that that was the foot

21  mechanism.

22  BY MR. PRICE:

23  Q    But you had -- looking at this at the time, you had no

24  idea really what this drawing showed mechanically?

25  A    I don't remember what I thought at the time.
```

CV 04-9049-DOC – 01/27/2011 – Day 8, Vol. 3 of 4

105

```
 1   Q    If you look at, again, June 13, page 2585, lines 6

 2   through 13.

 3   A    On which page, I'm sorry?

 4   Q    It's page 2585.

 5   A    Okay.

 6   Q    If you'd look at lines 6 through -- 6 through 18.

 7   A    Okay.

 8   Q    Okay.  So let me ask you these questions.  So do you

 9   see where those little numbers are on Exhibit 502?

10   A    Yes.

11   Q    Okay.  You are not a mechanical person so you don't

12   know what those mean, correct?

13   A    Well, that's what I said in the testimony.

14   Q    That's what you said under oath in 2008?

15   A    Yes.

16   Q    And that's still true?

17   A    Yes.

18   Q    All right.  And looking at these -- this drawing, you

19   don't have any idea what they are showing mechanically,

20   correct?

21   A    Well, I'm just going to go with what I said in the

22   previous testimony.

23   Q    Well, just go with what you know the truth to be.

24            MS. KELLER:  Objection.  Argumentative.

25            THE COURT:  Well, it's equivocal, I mean, on both
```

CV 04-9049-DOC - 01/27/2011 - Day 8, Vol. 3 of 4

106

1    sides, so the accusation is he's not telling the truth, his

2    answer, though, was he was just going to go with whatever it

3    was before, so reask the question.

4    BY MR. PRICE:

5    Q    Is it true that looking at these drawings on page 3 of

6    502, you don't have any idea what they are showing

7    mechanically?

8    A    Well, again, what I said in the past testimony was what

9    I believe to be true.

10   Q    And what you said in your past testimony is that you

11   didn't have any idea what these drawings showed

12   mechanically, correct?

13   A    That's right.

14   Q    I mean, your familiarity with the dolls is you know how

15   they look, right?

16   A    Yes.

17   Q    And -- and you know kind of how they function, correct?

18   A    Yes.

19   Q    But you don't know the details really of how they

20   get -- get the doll to function the way it functions?

21   A    No.

22   Q    So let's look, then, at your declaration, Exhibit 502.

23   And if you'd look at the second paragraph, you see, "I am

24   familiar with the Bratz doll projects of MGA Entertainment,

25   and I've worked with Isaac Larian, the president of MGA

CV 04-9049-DOC - 01/27/2011 - Day 8, Vol. 3 of 4

107

```
1    Entertainment, on the Bratz doll project"; do you see that?

2    A    Yes.

3    Q    And that statement is true, correct?

4    A    Yes.

5    Q    It says, "I'm familiar with the doll designs as shown

6    in the attached drawings from the above identified patent

7    application"; do you see that?

8    A    Yes.

9    Q    And that's referring to the designs we just looked at,

10   correct?

11   A    Yes.

12   Q    Now, if you'd look at, I think we have -- is

13   Exhibit 504 up there, the doll?

14           MS. JUAREZ:  Yes, it is?

15   BY MR. PRICE:

16   Q    And can you tell me which doll is that?  I can't see

17   that far.

18   A    This is the Jade doll.

19   Q    And if you look, there should be a number there, a date

20   on the day doll -- the Jade doll, excuse me?

21   A    A date?

22   Q    Yeah, there was a time and a date that it was released.

23        Do you see 2001 on that box?

24   A    Yes.

25   Q    And it's your understanding that Exhibit 504 is a Bratz
```

CV 04-9049-DOC – 01/27/2011 – Day 8, Vol. 3 of 4

108

```
 1    doll that was released in 2001, correct?

 2    A    Yes.

 3    Q    And looking at that doll, does that doll have

 4    strap-type shoes?

 5    A    Yes.

 6    Q    And does the doll have a snap-on feature around the

 7    ankle of the doll so that different foot gear can be mounted

 8    on the doll?

 9    A    Yes.

10    Q    And about the strap-type shoes, is the coloring of the

11    skin tone on the exposed areas of the feet, are they matched

12    to the coloring of the lower leg of the dolls?

13    A    Yes.

14    Q    And if you could show that -- can you show that to the

15    jury, kind of show the doll, or does the "Bratz" block it

16    out?  It's a big name.

17    A    (Complied.)

18    Q    In fact, does it come with a second pair of shoes?

19    A    Yes.

20    Q    Which can then be -- can be attached to -- the foot

21    gear can be mounted on the doll, correct?

22    A    Yes.

23    Q    So you can switch -- switch shoes, right?

24    A    Yes.

25    Q    So if you'd look at paragraph 3, then, of your
```

1   declaration.  It says, "I am familiar with the doll designs

2   as shown in the attached drawings from the above-identified

3   patent application.  These dolls have strap-type shoes and

4   the dolls have a snap-on feature at about the ankle of the

5   dolls so that different foot gear may be mounted on the doll

6   regarding the strap-type shoes as disclosed in the patent

7   application, the coloring of the skin tone on the exposed

8   area of the feet are matched to the coloring of the lower

9   legs of the doll"; do you see that?

10  A    Yes.

11  Q    Every feature that is described in paragraph 3 of your

12  declaration, every single one of them, is on the 2001 Bratz

13  doll, correct?

14  A    Yes.

15  Q    Let's go to the second page.

16       That's your paragraph on the second page, correct --

17  I'm sorry, that's your signature on the second page,

18  correct?

19  A    Yes.

20  Q    And you knew from MGA's attorney that if you said that

21  dolls with those features didn't come out until 2002, you

22  knew that there was some kind of grace period with respect

23  to the patent application, right?

24  A    I don't remember.

25  Q    Well, if you look at Exhibit 11898, in that third

CV 04-9049-DOC - 01/27/2011 - Day 8, Vol. 3 of 4

110

```
 1   paragraph where it says, the last part, "So a release back

 2   in 2001 would be anticipatory, while the release in the fall

 3   of 2002 would be within the one-year grace period"; do you

 4   see that?

 5   A    Yes.

 6   Q    So you knew when you signed the declaration that dates

 7   were important to MGA, right?

 8   A    Again, I don't remember what I thought of at the time

 9   that this was presented to me.  I don't remember exactly

10   what my thoughts were.

11   Q    Okay.  Sitting here today reading that, reading that,

12   you understand that dates are important to MGA with respect

13   to this patent application?

14   A    Well, I would assume so.

15   Q    When you say you assume so, reading this, that's what

16   someone reading this would assume if they read this,

17   correct?

18            MS. KELLER:  Objection.  Calls for speculation.

19            THE COURT:  Sustained.  Sustained.

20            You can ask him about his thoughts and feelings.

21            MR. PRICE:  Yeah.

22   BY MR. PRICE:

23   Q    Reading this right now, reading this language, your

24   assumption is that dates are important to MGA with respect

25   to this patent application, right?
```

1    A    Yes.

2    Q    Reading this patent -- this letter, you understood that

3    saying the year 2002 was necessary for MGA to get a patent

4    on these interchangeable feet on the Bratz dolls, correct?

5    A    Yes.

6    Q    So let's go to your signed declaration.  On the second

7    page, "I was actively involved with the release of the Bratz

8    dolls of the configuration as set forth in paragraph 3

9    above, and this release did not occur until the fall of the

10   year 2002"; do you see that?

11   A    Yes.

12   Q    And by the year -- by the fall of the year of 2002,

13   what months are you referring to there?

14   A    I'm not sure.

15   Q    What does fall in your mind refer to, what months?

16   A    Somewhere between September and November, maybe.

17   Q    And the truth is that dolls -- Bratz dolls with the

18   configuration that you set forth in paragraph 3 were

19   released at least a year prior to the fall of 2002?

20   A    Yes.

21   Q    So the statement you made to support MGA in getting

22   patent rights on the Bratz dolls, the statement you made in

23   paragraph 4 is false?

24   A    Yes.

25   Q    And you made that false statement because MGA suggested

 1    it was necessary for you to make that statement for them to

 2    get patents on the interchangeable footwear for the Bratz

 3    dolls?

 4    A    Yes.

 5    Q    And you made that statement under penalty of perjury,

 6    right?

 7    A    Yes.

 8    Q    You understand that that penalty of perjury had the

 9    same effect as the oath that you took when you came to this

10    courtroom and took the witness stand, correct?

11    A    I don't know what I was -- what was going through my

12    mind at that time that this was asked to be signed or that

13    it would have the same kind of oath.

14    Q    Well, you see the last paragraph, "I hereby declare

15    that all statements made herein of my own knowledge are

16    true, and that all statements made on information and belief

17    are believed to be true"; do you see that?

18    A    Yes.

19    Q    You didn't state anything in your declaration under

20    information and belief, this was all supposedly your

21    personal knowledge, right?

22    A    I'm not sure I understand your question.

23    Q    In this declaration --

24    A    Yes.

25    Q    -- you were representing that everything you said in it

1   was your personal knowledge based on your personal

2   experience?

3   A    Like I said, when I signed this, I don't really

4   remember what was going through my head.

5   Q    Well, on paragraph 4, there, you said, "I was actively

6   involved with the release of the Bratz dolls of the

7   configuration as set forth in paragraph 3"; do you see that?

8   A    Yes.

9   Q    So you were conveying that you were involved in this,

10  and therefore, you knew what you were saying under penalty

11  of perjury?

12  A    I just -- I don't remember.

13  Q    Well, read the paragraph, doesn't it say that you were

14  involved in this, and that's why you know the release didn't

15  occur until the fall of 2002?

16  A    Yes.

17  Q    And one thing we know is that you will make false

18  statements under penalty of perjury under oath in order to

19  get intellectual property rights in Bratz for MGA?

20          MS. KELLER:  Objection.  Argumentative.

21          THE COURT:  Sustained.

22          You can ask him if he has made such a statement

23  but not future looking.

24  BY MR. PRICE:

25  Q    So you have made false statements under oath in order

Case 2:04-cv-09049-DOC-RNB   Document 9733   Filed 01/28/11   Page 114 of 133   Page ID #:291795
CV 04-9049-DOC – 01/27/2011 – Day 8, Vol. 3 of 4

114

1    to get property rights for MGA and Bratz?

2    A    Well, according to this, apparently.

3    Q    Further in that last paragraph it says, "Further that

4    these statements were made with the knowledge that willful

5    false statements, the like so made, are punishable by fine

6    or imprisonment or both under Section 1001 of Title 18 of

7    the United States Code, and that such willful false

8    statements may jeopardize the validity of the application or

9    any patent application issuing thereon"; do you see that?

10   A    Yes.

11   Q    So you made a false statement under oath in order for

12   MGA to get property rights in Bratz even though you knew

13   that that would be a crime?

14          MS. KELLER:  Objection.  Asked and answered.

15   Badgering the witness.

16          THE COURT:  Overruled.

17          THE WITNESS:  I didn't think about it being a

18   crime.

19   BY MR. PRICE:

20   Q    But that's what the words above your signature say?

21   A    Yes.

22   Q    So you signed the declaration with your signature

23   knowing that the result of a false statement could be

24   punishable by a fine or imprisonment?

25   A    I don't remember at the time thinking about it that

1   way.

2   Q    Do you understand today that if you make false

3   statements under oath, that that is punishable by fine or

4   imprisonment?

5   A    Yes.

6   Q    But when you saw it written down in black and white

7   here, you didn't understand it?

8          MS. KELLER:  Objection, your Honor.  Asked and

9   answered.

10          THE COURT:  Overruled.

11          THE WITNESS:  Again, I don't remember exactly what

12   I was thinking about when this was asked -- or when I was

13   asked to sign this.

14   BY MR. PRICE:

15   Q    In the discussion that you had with MGA's attorney, did

16   you tell him that Bratz dolls with the features that are in

17   paragraph 3 weren't released until the fall of the year

18   2002?

19   A    I don't remember.

20   Q    That's something that was suggested to you, right?

21   A    I don't remember.

22   Q    Well, let me ask you some questions about the date of

23   Bratz drawings.

24          There is a Bratz drawing that has the 2000 date on it,

25   copyright 2000, where that date was put on the drawing in

Case 2:04-cv-09049-DOC-RNB   Document 9733   Filed 01/28/11   Page 116 of 133   Page ID #:291797
CV 04-9049-DOC - 01/27/2011 - Day 8, Vol. 3 of 4

116

1    2000, right?

2    A    I don't remember.

3    Q    Let's show you Exhibit, I think it's 320.

4         302, 302, page 1.

5         Do you see 302, page 1?

6    A    Yes.

7    Q    And do you see -- is that your handwriting where it

8    says "All materials copyright 2000, Carter Bryant"?

9    A    Yes.

10   Q    So there's at least one Bratz drawing that has a 2000

11   date on it where that date was put on it in 2000, correct?

12   A    I don't remember when that date was put on there.

13   Q    Isn't that part of the materials that you gave to MGA

14   in connection with trying to pursue a Bratz doll?

15   A    I don't remember.

16   Q    Well, you know that there are Bratz drawings dated 1999

17   where you put the date on the drawing in 1999?

18   A    I don't remember.

19   Q    Let's have you look at 1327.

20        And do you recognize 1327 as one of your drawings

21   relating to Bratz?

22   A    Yes.

23            MR. PRICE:  Your Honor, I move Exhibit 1327 into

24   evidence.

25            THE COURT:  Received.  I'm sorry, received.

CV 04-9049-DOC – 01/27/2011 – Day 8, Vol. 3 of 4

117

1          (Plaintiffs' No. Exhibit 1327 is received in

2      evidence.)

3    BY MR. PRICE:

4    Q    Do you see on it it says, "Sculptural body drawing,

5    1999"; do you see that?

6    A    Yes.

7    Q    And that's a date that you put on the drawing in 1999,

8    correct?

9    A    I don't remember.

10   Q    By the way, September 19th, '99 is some nine months

11   plus after you rejoined Mattel, correct?

12   A    Yes.

13   Q    And there are Bratz drawings dated 1998, but in not one

14   of those cases was the 1998 date put on a drawing in 1998?

15          MS. KELLER:  Objection.  It assumes facts not in

16   evidence.

17          THE COURT:  It needs to be a question, counsel.

18   Sustained.

19   BY MR. PRICE:

20   Q    Isn't it true that there are Bratz drawing dated 1998,

21   but in not one of those cases, was the date 1998 put on the

22   drawing in 1998?

23   A    I don't remember.

24   Q    Let's look at June 18 transcript, June 18, 2008.

25          I might have the wrong -- I'm sorry.  I'm sorry, it's

CV 04-9049-DOC - 01/27/2011 - Day 8, Vol. 3 of 4

118

1   June 13th, 2008.

2       Thank you.

3       At 2678 -- oh, wait a minute.  Wait a minute.

4       And actually, I may have the wrong page there.  Hold on

5   one second.

6       I'm sorry, I have the date wrong.  It is June 18, 2008.

7   It's page 3124, lines 19 through 21.

8   A   Which page, now?

9   Q   It's page 3124, lines 19 through 21.

10  A   Okay.

11  Q   Does that refresh your recollection that as of

12  January 1999, when you rejoined Mattel, that you had no

13  Bratz-related documents which had any dates on them at all?

14  A   Well, I don't remember it right now, but this is how I

15  remembered it then, I believe that to be.  That's how I

16  remembered it then.

17  Q   Well, how did you remember it then?

18  A   Just how it says here on the transcript.

19  Q   And that is as of January of '99, you had no

20  Bratz-related documents which had any dates on them at all?

21  A   That's the way I remembered it then.

22  Q   And your memory hasn't changed between now and then,

23  that is, you don't know of any Bratz-related documents that

24  have a date on them in 1998 where you put that date on them

25  in 1998?

 1   A    I don't remember.

 2   Q    Let's talk about your employment with Mattel.

 3        Now, before you joined Mattel in November of 1995, you

 4   didn't have any experience at all in the toy industry,

 5   correct?

 6   A    That's correct.

 7   Q    And when you joined in November 1995, you signed some

 8   documents concerning confidentiality and conflict of

 9   interest, right?

10   A    I believe so, yes.

11   Q    And if you can look at Exhibit 23.

12        And before we get to that actually, can you look at

13   Exhibit 3.

14        Do you have that in front of you?

15   A    Yes.

16   Q    And do you recognize the first page of Exhibit 3?

17   A    Yes.

18   Q    Can you tell us what it is?

19   A    It's a drawing of the four characters.

20            MR. PRICE:  And I think, your Honor, we have the

21   original up there as well, or not.

22   BY MR. PRICE:

23   Q    Bryant, the copy you have in front of you, is it black

24   and white or color?

25   A    It's black and white.

Case 2:04-cv-09049-DOC-RNB   Document 9733   Filed 01/28/11   Page 120 of 133   Page ID #:291801
CV 04-9049-DOC – 01/27/2011 – Day 8, Vol. 3 of 4

120

1       And my first name is Carter.

2    Q    I'm sorry.  I did that last time, didn't I?

3    A    I think you did.

4    Q    I apologize.

5    A    Okay.

6    Q    So Mr. Bryant, so you have the original of the first

7    page of Exhibit 3 in front of you?

8    A    Yes.

9    Q    And generally, can you tell us what Exhibit 3 is?

10   A    This is a drawing of the four characters.

11   Q    And if you look at the copy of the full exhibit, could

12   you tell us generally what that is?  That is, what's in your

13   notebook?  The black and white part?

14   A    It's just a copy of the original.

15            MR. PRICE:  Your Honor, I move Exhibit 3 into

16   evidence.

17            THE COURT:  Received.

18            *(Plaintiffs' Exhibit No. 3 is received in*

19        *evidence.)*

20   BY MR. PRICE:

21   Q    And perhaps you can hold it up and show the color

22   version to the jury.

23       Now, there is a date on that that says August 1998,

24   correct?

25   A    Yes.

1    Q    And as you were saying earlier, that date was not put

2    on there in 1998, correct?

3    A    I don't remember when that date was put on there.

4    Q    Well, if your prior testimony is accurate, that you

5    didn't have any dates on any Bratz-related material prior to

6    January 1999, then you would agree that that date,

7    August 1998, was put on some time after 1998, correct?

8    A    I am just not sure when it was put on there.

9    Q    It's fair to say that you have no recollection of that

10   date being put on that drawing in 1998?

11   A    No, I don't.  I don't know when it was put on there.

12   Q    Is it your recollection that you put August 1998 on

13   that drawing some time after you left Mattel in 2000?  Let

14   me rephrase that.

15        Is it accurate that you put that date on that drawing

16   some time after October 19, 2000, when you left Mattel?

17   A    I don't remember.

18   Q    We can go to June 12, 2008, page 2484, lines 24 to

19   line 3.

20   A    Okay.

21   Q    Have you had a chance to read 2484 to 2485, line 3?

22   A    Yes.

23   Q    And does that refresh your recollection that you put

24   the date of August '98 on that drawing some time after you

25   left Mattel?

1    A    Again, I don't remember when I put it on there, but,

2    you know, I agree with what this previous testimony states.

3    Q    Which is that it could have been in 2000 or 2001?

4    A    Yes.

5         MS. KELLER:  Sorry, counsel, can you give me a

6    page reference?

7         MR. PRICE:  Yeah.

8         THE COURT:  He was referring to 2484 but the

9    relevant portion's on 2485.

10        MS. KELLER:  Then I would object that that

11   misstates the testimony on the bottom of that page.

12        THE COURT:  If you both stipulate, you can have

13   the whole thing read in, if you'd like to.

14        MS. KELLER:  I would.

15        MR. PRICE:  What would you like me to read?

16        MS. KELLER:  From 2484, lines 24, 25, through

17   2484 -- 2485, line 5.

18        MR. PRICE:  Okay.

19   BY MR. PRICE:

20   Q    "Question:  So my question is, you added this date,

21   August 1998, some time after January of 1999, correct?

22        "Answer:  I think I added after I left Mattel.

23        "Question:  So it could have been in 2000 or 2001?

24        "Answer:  Yes."

25        MS. KELLER:  The next two.

1    BY MR. PRICE:

2    Q    "Question:  Could it have been 2004?

3         "Answer:  Possibly.  I don't remember it being that

4    late."

5         That was your testimony?

6    A    Yes.

7    Q    So whatever we know, you agree that that date was not

8    put on there in 1998, right?

9    A    I just still, to this day, don't recall when that was

10   put on there.

11            MR. PRICE:  Your Honor, you suggested a short

12   break around this time.

13            THE COURT:  A short break would be good.

14            Ladies and gentlemen, would you take a 15-minute

15   recess.  You're admonished not to discuss this matter

16   amongst yourselves, nor form or express any opinion.  We'll

17   resume at four.  Thank you.

18            *(The following proceedings is taken outside*

19       *the presence of the jury.)*

20            THE COURT:  All right.  Counsel, then 4:00?

21            MS. KELLER:  Your Honor, may we put something on

22   the record either now or when the Court returns about the

23   manner of examination?

24            THE COURT:  Certainly.

25            Mr. Bryant, would you be kind enough to step

1    outside.

2              THE WITNESS:  Sure.

3              THE COURT:  Thank you.

4              We are on the record out of the presence of the

5    jury.  Counsel are present, the parties are present.

6              Ms. Keller?

7              MS. KELLER:  Yes, your Honor.  It has to do with

8    the manner of the refreshing recollection.  The Court had

9    previously -- the Court had previously indicated that it

10   wanted counsel, if we are refreshing a witness'

11   recollection, to put -- it's the time-honored manner of

12   doing so, to put the material in front of the witness, let

13   the witness read it to himself and ask if it refreshes his

14   memory.  If the answer is no, then he can't be impeached.

15   If the answer is yes, then he can answer the question, but

16   what's happening is counsel is saying, does this refresh

17   your recollection that, and then he reads -- essentially

18   reads the prior testimony.

19             And I think that's an improper method of

20   impeachment for two reasons, A, he's reading it, B, the

21   witness has not said it refreshed his memory yet.  He has to

22   be given an opportunity.

23             THE COURT:  Counsel.

24             MR. PRICE:  Tried to do it the right way, if it

25   doesn't refresh his recollection, he's usually saying, this

Case 2:04-cv-09049-DOC-RNB  Document 9733  Filed 01/28/11  Page 125 of 133  Page ID #:291806
CV 04-9049-DOC - 01/27/2011 - Day 8, Vol. 3 of 4

125

1   is what I previously said under oath, and I'm entitled --

2          THE COURT:  That's the problem.  He's continually

3   referring back to what he said under oath, and therefore, it

4   let's counsel go back into what he said under oath, so under

5   the present circumstances, I think that you are absolutely

6   right, there is a more appropriate way to refresh and then

7   impeach, but the witness' answers are leading us down this

8   path of, whatever I said before is what I said, or I'm

9   agreeing with this answer, and it's leaving us in this kind

10  of middle ground, unfortunately.

11         I don't see any prejudice thus far, but if he

12  answers the question explicitly, then I agree, impeach him.

13  And what I need to do, though, is I need to wait for an

14  objection at that time.

15         MS. KELLER:  Well, your Honor, I don't want to be

16  objecting every single time.

17         THE COURT:  I know, and I don't want you to

18  either.  I think it's prejudicial.  It looks like you're

19  hiding, that's the last impression you want to give in a

20  real world of trial tactics.  But it's awfully difficult

21  when the witness simply goes back, and I'm summarizing this,

22  whatever I said is what I said before and I'm staying with

23  my answer.

24         MS. KELLER:  But what's happening is he's asked,

25  does this refresh your memory?  The witness says, no, I

CV 04-9049-DOC - 01/27/2011 - Day 8, Vol. 3 of 4

126

```
 1    still don't remember.  Instead of then saying -- exploring

 2    whether it's a true failure of memory or whether the witness

 3    is giving -- once he says that, then it's time to move on.

 4            THE COURT:  Remember those long line of cases by

 5    Bernie Jefferson?

 6            MS. KELLER:  I do.

 7            THE COURT:  Where you get a series of I don't

 8    recall, I don't recall, I don't recall?  How did Judge

 9    Jefferson or Justice Jefferson deal with that?

10            MS. KELLER:  He said the court had to make a

11    decision as to whether the failure of recollection was

12    innocent or not.

13            THE COURT:  Ah, you don't want me to make that

14    right now?  I think we'll take a recess.  Unless you are

15    asking me to make a ruling now, which I don't think you are.

16            (Recess.)

17            (The following proceedings is taken in the

18        presence of the jury.)

19            THE COURT:  The jury is present, the alternates.

20            If you'd have a seat.  Counsel, if you'd have a

21    seat.  Thank you for your courtesy.

22            And Mr. Price, if you'd like to continue on with

23    your direct examination.

24

25
```

1      **CARTER BRYANT, PLAINTIFFS' WITNESS, RESUMED**

2              **DIRECT EXAMINATION (Continued)**

3   BY MR. PRICE:

4   Q    Mr. Bryant, in 1998, you knew how to get a copyright on

5   something to establish that you did a work in 1998, right?

6   A    I'm not sure if I knew that or not.

7   Q    Well, you had -- you wrote some songs, you were a

8   songwriter?

9   A    Yes.

10  Q    And if you look at Exhibit 13627, did you write a song

11  called "Shiver"?

12  A    Yes.

13  Q    And you applied for a copyright, registered that as a

14  copyright in 1988, correct?

15  A    Going by the document, I guess.  I don't remember,

16  though.  I don't remember applying for it.

17  Q    Do you remember applying for a copyright in 1986 for a

18  song "Slow Down Baby"?

19  A    Vaguely.

20  Q    And what do you do to apply for a copyright?  What do

21  you recall that you did?

22  A    I don't remember exactly.  I believe just there is a

23  form you can fill out.

24  Q    So you knew certainly prior to 1999, that if you wanted

25  to copyright something and say I did it on this particular

CV 04-9049-DOC - 01/27/2011 - Day 8, Vol. 3 of 4

128

```
 1    date, one way to do that was just to fill out a form and
 2    send it in to the copyright office?
 3    A    Yes.
 4    Q    And did you do that in 1987 for the song "Talk is
 5    Cheap"?
 6    A    Again, I don't really remember applying for the
 7    copyright, but it's possible.
 8    Q    You told us that you sort of remember applying for, I
 9    think, the copyright for "Slow Down Baby."  Do you recall
10    applying for more than one copyright?
11    A    Yes.
12    Q    And sitting here today, you just can't remember the
13    specific song titles that you applied for copyright for; is
14    that right?
15    A    Yeah, I just don't remember.
16    Q    But on more than one occasion, you just filled out a
17    form and sent it in to the copyright office so you could
18    establish that you had written certain lyrics at a certain
19    date?
20    A    Yes.
21    Q    And it's true that in 1998, you never tried to apply
22    for copyright on anything relating to a Bratz drawing,
23    correct?
24    A    I don't remember.
25    Q    You don't remember one way or the other or --
```

CV 04-9049-DOC – 01/27/2011 – Day 8, Vol. 3 of 4

129

1    A    No.

2    Q    Put it this way, you have no recollection in 1998 of

3    ever applying for a copyright for any drawing related to

4    Bratz, correct?

5    A    Yeah, I have no recollection.

6    Q    And, in fact, you knew of kind of what's referred to as

7    the poor man's copyright, correct?

8    A    Yes.

9    Q    And the poor man's copyright is when you put something

10   in an envelope, seal it, and send it to yourself and then

11   you have the date on the envelope to show that that's when

12   you created it, right?

13   A    I'm not sure how that goes, but something like that.

14   Q    And you knew about a technique something like that,

15   again, prior to 1999 when you rejoined Mattel, right?

16   A    I don't know if I did before then or not.  I don't

17   remember.

18   Q    When do you recall that you became aware of not only

19   being able to apply for a copyright to establish a date of

20   creation, but also sending something to yourself in a sealed

21   envelope with a date on it?

22   A    I don't remember.

23   Q    Now, you have had documents notarized before, correct?

24   A    Yes.

25   Q    And notarization simply establishes that the document

CV 04-9049-DOC - 01/27/2011 - Day 8, Vol. 3 of 4

130

1   existed at the time of the notarization, correct?

2   A    I believe so, yes.

3   Q    And you had some drawings related to Bratz notarized,

4   correct?

5   A    Yes.

6   Q    And if you'd look at Exhibit 62.  And if you would look

7   at the pages in Exhibit 62, are those copies of

8   Bratz-related documents that you had notarized on

9   August 26th, 1999?

10  A    I believe so, yes.

11         MR. PRICE:  Your Honor, we move Exhibit 62 into

12  evidence.

13         THE COURT:  Received.

14         (Plaintiffs' Exhibit No. 62 is received in

15      evidence.)

16  BY MR. PRICE:

17  Q    Let's look at the first page, for example.  These are

18  heads of Jade, Lupe, Zoe and Hallidae, correct?

19  A    Yes.

20  Q    And you had that notarized on August 26th, 1999,

21  correct?

22  A    Yes.

23  Q    And that establishes definitively that these drawings

24  were in existence some eight months after you joined Mattel

25  in January 1999, correct?

CV 04-9049-DOC – 01/27/2011 – Day 8, Vol. 3 of 4

131

```
1    A    I assume so, yes.

2    Q    And then if we look at the second page, do you see

3    that?  It's a drawing of the four Bratz girls?

4    A    Yes.

5    Q    And again, that's notarized August 26th, 1999, correct?

6    A    Yes.

7    Q    And, in fact, all of these drawings in Exhibit 62, and

8    there are about 15 of them, are notarized August 26th, 1999,

9    correct?

10   A    Yes.

11   Q    If you can look at page 9, Exhibit 62, that's a Bratz

12   boy?

13   A    I think so, yes.

14   Q    And that's a Bratz boy that you drew?

15   A    Yes.

16   Q    The woman who notarized these documents at the end of

17   August of 1999 was a woman named Jacqueline Prince?

18   A    Yes.

19   Q    And she's someone at Mattel with whom you were

20   friend -- you were friendly?

21   A    Yes.

22   Q    And you went to her house and presented her these

23   drawings and asked if she would notarize them, correct?

24   A    Yes.

25   Q    And in connection with that, she just basically put it
```

1    in a notary ledger and stamped her stamp on it saying

2    August 26th, 1999, correct?

3    A    I believe so, yes.

4    Q    And you had been to her house before because you were

5    friends?

6    A    I don't remember.

7    Q    If you'd look at volume 3 of your deposition, let's

8    see.  Let me give you the date, November 8th, 2004,

9    page 692, line 25, through 693, line 7.

10   A    Okay.

11   Q    I'll give you some time to look at it, just tell me

12   when you've had enough time.

13   A    All right.  Okay.

14            *(Live reporter switch with Maria Dellaneve.)*

15                        -oOo-

16

17

18

19

20

21

22

23

24

25

1                          -oOo-

2                      **CERTIFICATE**

3

4           I hereby certify that pursuant to Section 753,

5    Title 28, United States Code, the foregoing is a true and

6    correct transcript of the stenographically reported

7    proceedings held in the above-entitled matter and that the

8    transcript page format is in conformance with the

9    regulations of the Judicial Conference of the United States.

10

11   Date:  January 28, 2011

12

13

14        _____

15        JANE C.S. RULE, U.S. COURT REPORTER
          CSR NO. 9316

16

17

18

19

20

21

22

23

24

25