UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

THE HON. DAVID O. CARTER, JUDGE PRESIDING

```
MATTEL INC.,                      )
                                  )
                Plaintiff,        )
                                  )
        vs.                       ) No. CV 04-9049-DOC
                                  )     VOLUME 4 OF 4
MGA ENTERTAINMENT, INC.,          )
                                  )
                Defendant.        )
_____    )
```

REPORTER'S TRANSCRIPT OF PROCEEDINGS

SANTA ANA, CALIFORNIA

THURSDAY, JANUARY 27, 2011

4:14

Maria Beesley-Dellaneve, RPR, CSR 9132
Official Federal Reporter
Ronald Reagan Federal Building, room 1-053
411 West 4th Street
Santa Ana, California 92701
(714) 564-9259

Page 2

1    **APPEARANCES OF COUNSEL:**

2    **FOR THE PLAINTIFF:**  QUINN EMANUEL URQUHART OLIVER & SULLIVAN
                             BY:  MICHAEL ZELLER, ESQ.
3                            and  JOHN QUINN, ESQ.
                             865 S. FIGUEROA
4                            10TH FLOOR
                             LOS ANGELES, CALIFORNIA 90017
5                            (213)443-3000

6
     FOR THE DEFENDANTS:  ORRICK, HERRINGTON & SUTCLIFFE
7                            BY:  ANNETTE HURST, ESQ.
                             405 HOWARD STREET
8                            SAN FRANCISCO, CALIFORNIA 94105
                             (415)773-5700
9

10
     FOR THE DEFENDANTS:  ORRICK HERRINGTON & SUTCLIFFE
11                           BY:  THOMAS MCCONVILLE, ESQ.
                             4 PARK PLAZA
12                           SUITE 1600
                             IRVINE, CALIFORNIA 92614
13                            (949)567-6700

14
                             KELLER RACKAUCKAS
15                           BY:  JENNIFER KELLER, ESQ.
                             18500 VON KARMAN AVENUE
16                           SUITE 560
                             IRVINE, CALIFORNIA 92612

17

18
     FOR CARLOS MACHADO GOMEZ: LAW OFFICES OF MARK E. OVERLAND
19                           BY:  MARK OVERLAND, ESQ.
                             100 WILSHIRE BLVD
20                           SUITE 950
                             SANTA MONICA, CA. 90401
21                           (310) 459-2830

22

23

24

25

Page 3

```
 1                    - AND -

 2          SCHEPER KIM & HARRIS LLP
            BY:  ALEXANDER COTE, ESQ.
 3          601 WEST 5TH STREET_12TH FLOOR
            LOS ANGELES, CA. 90071
 4          (213) 613-4660

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Electronically signed by Maria Beesley (501-187-561-9309)

Page 4

1                              I N D E X

2
        PLAINTIFF'S                                                  VOIR
3       WITNESS                 DIRECT   CROSS   REDIRECT   RECROSS  DIRE

4       CARTER BRYANT              5

5       POOTTIPONG PHOOSOPHA      30      33        37

6       ANNA RHEE                 39      40

7       FRANK KEISER              50      59        66        67

8

9

10                             EXHIBITS

11
        PLAINTIFF'S                          FOR           IN
12      EXHIBIT  DESCRIPTION             IDENTIFICATION   EVIDENCE

13        19, 20                                             7

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

1          SANTA ANA, CALIFORNIA; THURSDAY, JANUARY 27, 2011

2                   DIRECT EXAMINATION (CONTINUED)

3     **BY MR. PRICE:**

4     **Q**    So you had been to her residence more than once?

5     **A**    That's what I remembered then, but I don't recall it right

6     now.

7     **Q**    This is what you testified to on November 8, 2004 under

8     penalty of perjury?

9     **A**    Yes.

10    **Q**    So the end of August, 1999, puts us -- I'm estimating with my

11    drawing here -- puts us about eight months, the end of August

12    after you have come back to work for Mattel; right?

13    **A**    Yes.

14    **Q**    And at that time you realized that August '99 date is a

15    problem for you?

16    **A**    I don't remember thinking that.

17    **Q**    Well, both in November '95, and in January '99, you signed

18    inventions agreements that said whatever you come up with relating

19    to Mattel's business, belongs to Mattel; right?

20    **A**    I do remember signing some contracts, yes.

21    **Q**    And your understanding of those contracts was that while you

22    were an employee of Mattel, if you come up with designs that

23    relate to the toy business, that those belong to Mattel?

24    **A**    I don't remember exactly what my understanding of those

25    contracts was.

Page 6

1   **Q**   In the ledger, the notary ledger, where Ms. Prince wrote down

2   what she was doing, there was the added, at the end, "drawings

3   done in 1998," wasn't there?

4   **A**   I don't remember.

5   **Q**   I'm going to put in front of you Exhibit 6.  This is a copy.

6           **MR. PRICE:**  Your Honor, we're searching for the

7   original.  We know they exist.  We're having that found as we

8   speak, hopefully.

9   **BY MR. PRICE:**

10   **Q**   But in the meantime, I'll hand you the original as soon as we

11   get it.  If you would look at Exhibit 60.  I'll try to find it,

12   too.  Page number 19.

13           Have you seen this page before, page 19 in the notary's

14   book?

15   **A**   I don't remember if I have seen this before or not.

16   **Q**   Were you present when Ms. Prince filled out the notary book?

17           **MS. KELLER:**  Could we maybe take this down?

18   **BY MR. PRICE:**

19   **Q**   Were you present when she wrote in the book?

20   **A**   I don't remember.

21   **Q**   You know how those notary books open up and entry goes from

22   one page to another?

23   **A**   I'm not familiar with those books.

24   **Q**   Let me show you, if you look at the next page, page 20, and

25   do you see your signature there?

Page 7

1    **A**    Yes.

2    **Q**    So you recognize your signature on page 20?

3    **A**    Yes.

4              **MR. PRICE:**  We move into evidence pages 19 and 20 of the

5    notary book.

6              **THE COURT:**  Received.

7              (Exhibit 19, 20 received in evidence.)

8    **BY MR. PRICE:**

9    **Q**    We're going to try it with this copy.  We'll have the

10   original soon hopefully.  Apparently have a better copy than I

11   have.

12             If we look at the top entry on page 19 of the book, see

13   it has the date August 26, 1999; correct?

14   **A**    Yes.

15   **Q**    And it has your name there on the right, Carter Bryant, and

16   your address; correct?

17   **A**    Yes.

18   **Q**    And the handwriting you see next to the left of Carter

19   Bryant, is that yours or Ms. Prince's?

20   **A**    It's definitely not mine.

21   **Q**    It seems to say, "original sketches of doll idea, characters,

22   six total, and names are Zoe, Lupe, Holiday, Jade, two males."

23             And do you see in teeny, teeny handwriting at the bottom

24   of that that it says, "from 1998 Missouri?"

25   **A**    Yes.

Page 8

1   **Q**   Now, you knew that the only thing a notarized document could

2   show is that it existed on the date it was notarized, August 26,

3   1999; correct?

4   **A**   Again, I don't really remember exactly what my full concept

5   of that was.

6   **Q**   Well, the concept is you take a document in on a certain date

7   and the notary notarizes it on the very date you take it in?

8   **A**   Right.

9   **Q**   A notary can't notarize an August 26, 1999 that you did

10  something in 1998; correct?

11  **A**   I don't know.  I don't know exactly what a notary can do.

12  **Q**   Did you understand what the stamp means on the notary?

13  **A**   I'm not sure.

14  **Q**   One thing you knew she couldn't do is certify you did

15  anything -- did these sketches in 1998?

16  **A**   I don't recall.

17  **Q**   Sitting here today you understand that a notary given

18  documents in August 26, 1999, couldn't certify that you created

19  documents in 1998; correct?

20  **A**   I don't know if that's true or not.  I don't know the full

21  power of a notary.

22  **Q**   How can a notary in August 26, 1999 notarize that you did

23  something in 1998?

24  **A**   I'm not sure I know what you mean.

25  **Q**   How can a notary that you brought documents to on August 26,

Page 9

1    1999, how could they certify were notarized that you did documents

2    in 1998?

3    **A**    I'm sorry.  I just didn't understand your question.  Well, I

4    suppose that they wouldn't be able to.

5    **Q**    And at this time you were sending some of these sketches to a

6    company call Alaska Mama?

7    **A**    Yes.

8    **Q**    Because you wanted them to represent you in connection with

9    perhaps trying to sell this concept; right?

10   **A**    I believe so, yes.

11   **Q**    And so to establish that you own them, these sketches, you

12   wanted to have them notarized so that Alaska Mama couldn't do

13   something with them without your permission?

14   **A**    I don't recall if that's why I had them notarized.

15   **Q**    The chain of events are you had them notarized August 26, '99

16   and then you sent them to Alaska Mama?

17   **A**    I believe so, yes.

18   **Q**    But you knew that by having them notarized in August 26, 1999

19   that proved that you had these drawings almost nine months into

20   your second stint at Mattel?

21   **A**    Yes.

22   **Q**    But you had to get them notarized, or if you sent them to

23   Alaska Mama, Alaska Mama might use them without your permission?

24   **A**    Again, I don't remember exactly if that was why I had them

25   notarized.  I just don't recall.

1    **Q**    If we could go to June 12, 2008, page 2461.  Look at lines 4

2    through 14.

3    **A**    Okay.

4    **Q**    Have you had a chance to read that?

5    **A**    Yes.

6    **Q**    Does that refresh your recollection?

7    **A**    Well, I still really don't remember exactly why I had them

8    notarized, but you know, according to this, I'm going to agree

9    with the prior testimony.

10   **Q**    And that's your prior sworn testimony, that one of the

11   reasons you notarized these was so Alaska Mama couldn't later use

12   the drawings and say they came up with it; right?

13   **A**    Yes.

14   **Q**    So in August 1999 you had a need to notarize these documents

15   to show that they existed some eight months into your employment

16   with Mattel; right?

17                **MS. KELLER:**  Objection.  Asked and answered.

18                **THE COURT:**  Overruled.

19                **THE WITNESS:**  I'm sorry, what was your question?

20   **BY MR. PRICE:**

21   **Q**    So in August 26, 1999, you had a need to have the Bratz-

22   related drawings notarized?

23   **A**    I guess I did.  I don't remember exactly, but again I'm going

24   to go with the previous testimony that I was thinking about

25   sending them to somebody so I felt that I needed to have them

Page 11

1    notarized.

2    **Q**    And the problem with doing that is that if you created these

3    in 1999, you thought they would belong to Mattel?

4    **A**    No.  I don't think that was my understanding.

5    **Q**    In any event, when you had them notarized to show they

6    existed August 26, 1999, you told the notary, at some point told

7    the notary put in from 1998 Missouri?

8              **MS. KELLER:**  Objection.  Assumes facts not in evidence.

9              **THE COURT:**  Overruled.

10             **THE WITNESS:**  I don't remember saying that.

11   **BY MR. PRICE:**

12   **Q**    You don't remember even saying from 1998 Missouri?

13   **A**    No.

14   **Q**    Did you write that in from 1998 Missouri?

15   **A**    No.  Are you talking about me personally?

16   **Q**    Yes.

17   **A**    I personally did not write that in, no.

18   **Q**    Let me talk to you about the agreements that you signed with

19   Mattel.  And if you would look at Exhibit 23, which I think we

20   moved into evidence.  And I'd like you turn your attention to --

21   you already said that is the agreement you signed around November

22   6, 1995?

23   **A**    Yes.

24   **Q**    And if we would go to paragraph 2, ownership of inventions,

25   you see where it says, "I agree to communicate to the company as

Page 12

1    promptly and fully as practicable all inventions as defined below,

2    conceived or reduced to practice."

3              Do you see that?

4    **A**    Yes.

5    **Q**    And the third line says, "I hereby assign to the company and/

6    or its nominees all rights and titles," etcetera, to its

7    inventions; correct?

8    **A**    Yes.

9    **Q**    When you were hired in November of '95 and you became a

10   full-time employee in November of '95, you were coming in to be a

11   designer; correct?

12   **A**    Yes.

13   **Q**    And if we look at paragraph B, it says, "as used in this

14   agreement, the term inventions includes but is not limited to all

15   discoveries, improvements, processes, developments, designs,

16   know-how," etcetera; correct?

17   **A**    Yes.

18   **Q**    So reading this you see the agreement specifically covers

19   designs?

20   **A**    Yes.

21   **Q**    So you knew it covered what you were being employed to do,

22   designs?

23   **A**    I don't remember that I had a real clear understanding of the

24   contract back then.

25   **Q**    Let me ask you, when you are working as a designer, does your

1   mind turn off at 5:00 o'clock?  Do you stop thinking about designs

2   at 5:00 p.m.?

3   **A**    Well, I don't.

4   **Q**    I mean, you are a creative person who thinks of designs and

5   ideas nights, at weekends during the workday; correct?

6   **A**    Generally, yes.

7   **Q**    And maybe even if you're like Paul McCartney, when you are

8   sleeping?

9   **A**    I don't know if I have had any ideas when I'm sleeping.

10  **Q**    And you understood that when you joined Mattel, it was a toy

11  company; right?

12  **A**    Yes.

13  **Q**    So let's look at paragraph C here where it says, "any

14  provisions in this agreement requiring me to assign my rights in

15  any invention does not apply to an invention which qualifies under

16  the provisions of section 2870 of the California Labor Code."

17  That section provides that the requirement to assign, "shall not

18  apply to invention that the employee developed entirely on his or

19  her own time without using the employer's equipment, supplies

20  facilities, or trade secret information except to those inventions

21  that either, one, relate at the time of the conception or

22  reduction to practice of the invention to the employer's

23  business."

24          Do you see that?

25  **A**    Yes.

Page 14

1   **Q**   And again, you understood the employer's business in this

2   time was toys?

3   **A**   Yes.

4   **Q**   And by the way, your understanding of the word "conception"

5   is when you conceive it, when you come up with the design;

6   correct?

7   **A**   I'm sorry.  What was that question?

8   **Q**   When you see the word "conception," that means idea; when I

9   come up with the idea with the design; correct?

10  **A**   Sure.

11  **Q**   And as you said -- strike that.

12          It's fair for Mattel to say, look, if you come up with a

13  design that relates to our business, it belongs to us even if you

14  do it after 5:00 p.m., on the weekends because we're hiring for

15  you that and you can't turn it off then?

16  **A**   Are you asking me if that's my understanding now or then?

17  **Q**   You see how that's fair?

18  **A**   I do.

19  **Q**   And then if you look at paragraph 3, there is a section that

20  says "conflicts with other activities."

21          Do you see that?

22  **A**   Yes.

23  **Q**   And we'll just be looking at A, although I'm not sure we're

24  allowed to blow that up any further.

25          It says, "My employment with the company requires my

Page 15

1    undivided attention and effort.  Therefore, during my employment

2    with the company, I will fully comply with the company's conflict

3    of interest policy as it may be amended from time to time.  I

4    shall not, without the company's express written consent, engage

5    in any employment or business other than for the company, or

6    invest in or assist in any manner, any business competitive with

7    the business or the future business plans of the company."

8    **A**    Yes, I see that.

9    **Q**    That's pretty clear.  That you are not supposed to assist the

10   competitor if you are working for Mattel; correct?

11   **A**    Yes.  It's pretty clear.

12   **Q**    And this is an agreement that you signed before you left

13   Mattel in the April of 1998 and then came back in January of 1999;

14   correct?

15   **A**    Yes.

16   **Q**    So when you went back to Mattel in January of 1999, you knew

17   and thought it was fair that Mattel would own your designs

18   relating to the toy business if you did it during your employment?

19          **MS. KELLER:**  Objection.  Vague as to "during your

20   employment."

21          **THE COURT:**  Restate the question, counsel.

22   **BY MR. PRICE:**

23   **Q**    You knew when you started back at Mattel in January 1999 that

24   Mattel, part of your -- one of the conditions of your employment

25   would be that you would sign your designs relating to Mattel's

Page 16

1    business up until the time you quit Mattel?

2    **A**    I don't think I really had a real clear concept of this

3    contract during my employment.  I don't think it was ever

4    explained to me fully.

5    **Q**    Well, as you said, what is written there is clear?

6    **A**    It's clearer to me now than it was back then.  I didn't

7    understand back then.

8    **Q**    And as someone working for a company like me who hires

9    designers, you recognize that it would be fair for the company to

10   require that; that is, that designs you come up with related to

11   the business of Mattel, before you quit, are going to belong to

12   Mattel?

13              **MS. KELLER:**  Objection.  Asked and answered.

14              **THE COURT:**  Sustained.  I don't know what "fair" means

15   in the context of this trial, counsel.  I certainly do as a judge;

16   fairness prevails for all parties.  But I don't know that that's

17   the standard.

18   **BY MR. PRICE:**

19   **Q**    Let me rephrase.

20              That's what you would expect -- you -- that is, if you

21   join a company where you are a designer, where you can't turn off

22   your conceptions and ideas at 5:00 o'clock or on the weekends, you

23   expect that the company would say, if it relates to our business,

24   it belongs to us?

25              **MS. KELLER:**  Objection.  Same objection, Your Honor.

Page 17

1    It's vague.

2         **THE COURT:**  I'm going to sustain the objection, counsel.

3    Restate it; proper area.  It's vague.

4    **BY MR. PRICE:**

5    **Q**    It would not have been a surprise to you in November 1999 if

6    Mattel required that its designers assigned to Mattel all the

7    designs they come up with relating to the toy business?

8         **MS. KELLER:**  Objection.  Irrelevant.

9         **THE COURT:**  I'm going to sustain it.  I think the

10   problem we keep running into in the last three questions are this.

11   The last part you expect that the company would say if it related

12   to our business, belongs to us.  Would not have been a surprise to

13   you in November if Mattel required.

14        Those are all questions for Mattel to answer.  In other

15   words, you produce witnesses on behalf of Mattel.  They could tell

16   us what their standard is, what they believe was appropriate

17   pursuant to these activities and actions, but I think we're

18   interested in --

19        **MR. PRICE:**  His reasonable expectation is what I'm

20   getting to.

21   **BY MR. PRICE:**

22   **Q**    It was your reasonable expectation in January of 1999 when

23   you went to Mattel for the second time, that anything you designed

24   relating to the toy business would belong to Mattel up through the

25   day you quit, you left?

1          **MS. KELLER:**  Same objection.  And argumentative.

2          **THE COURT:**  Overruled.  You can answer that question.

3          **THE WITNESS:**  I don't think that's -- I don't think that

4    was my thought.  I think I thought my thoughts that I had on my

5    own time were my thoughts and didn't necessarily belong to anybody

6    else.

7    **BY MR. PRICE:**

8    **Q**    Even though you had thoughts on your own time, as you put it,

9    about designs relating to the toy business?

10   **A**    Yes.

11   **Q**    In fact, you had thoughts on your own time about specific

12   designs that you were working on at Mattel during the day?

13   **A**    Sometime, yes.

14   **Q**    And your experience, your expectation is that happens with

15   designers; that is, they just can't turn off the process?

16   **A**    Right.

17   **Q**    There so what you are telling us is if you came up with a

18   design idea relating to what you had been doing at 4:00 p.m. that

19   day, but you thought about it at 8:00 p.m. that your expectation

20   it would not belong to Mattel.

21   **A**    No.  I think what I'm saying is I thought that projects that

22   I was working on specifically for Mattel, you know, if I had

23   thoughts about that after hours or whatever, that, you know, that,

24   yeah, that would be a Mattel thing.  But if I had, you know,

25   original things that I was thinking about, that those weren't

Page 19

1    necessarily that they belonged to Mattel.

2  **Q**    I assume that some of the thoughts you had when you were

3    actually in the Mattel design center were original thoughts?

4            **MS. KELLER:**  Objection.  Argumentative.

5            **THE COURT:**  Overruled.  You can answer the question.

6            **THE WITNESS:**  Yes.

7  **BY MR. PRICE:**

8  **Q**    And if you had an original thought -- strike that.

9            And it was your understanding based upon the contract

10   you signed, that any design you came up with relating to the

11   practice of the employer's business belonged to the employer?

12           **MS. KELLER:**  Objection.  Assumes facts not in evidence.

13           **THE COURT:**  Overruled.

14           **THE WITNESS:**  No.  I don't think that was really my

15   understanding.

16  **BY MR. PRICE:**

17  **Q**    Did you ever -- you knew that to be employed by Mattel you

18   had to agree to certain conditions; right?

19  **A**    Yes.

20  **Q**    And Exhibit 23 that you signed dated November 6, '95, you

21   realized at the time you signed it, it set forth the conditions of

22   your employment; right?

23  **A**    I don't remember.  I don't remember what my understanding

24   was.

25  **Q**    Did you believe at the time that if you didn't agree to what

Page 20

1    is in the employee confidential information and inventions

2    agreement, that employee would allow you to work with them --

3    Mattel would allow you to work with it?

4    **A**    No.  I'm sorry.  Can you re-ask that?

5    **Q**    I don't blame you on that one.

6         Did you think in '95 that if you didn't agree to these

7    conditions that are in Exhibit 23, that Mattel would still hire

8    you?

9    **A**    No.

10   **Q**   So you knew that what is in Exhibit 23, agreeing to that was

11   a condition of you being employed by Mattel?

12   **A**    Yes.

13   **Q**   And it's accurate to say you never told anyone at Mattel that

14   you were unwilling to comply with these provisions; correct?

15   **A**    Yes.

16   **Q**   Let's go to paragraph 3 for a second.  And the last sentence

17   where, "I shall not, without the company's express written

18   consent," and go to the second part, "or assist in any manner, in

19   any business competitive with the business or future business

20   plans of the company."

21        Now, reading that you understand that means you can't

22   assist the competitor in any way; right?

23   **A**    Right.

24   **Q**   And it's correct that you didn't have to sign this agreement

25   to understand that you are not supposed to do that?

Page 21

1          **MS. KELLER:**  Objection.  Argumentative.

2          **THE COURT:**  Just restate the question.

3     **BY MR. PRICE:**

4     **Q**   Did you understand -- before you even saw this agreement, did

5     you have an understanding that it would be inappropriate for you

6     to work with Mattel and assist the competitor at the same time?

7     **A**   I don't really remember exactly what my thoughts were at that

8     time that I signed this.

9     **Q**   Sitting here today, you believe that it would be

10    inappropriate for you to have worked for Mattel and assist a

11    competitor in any manner?

12         **MS. KELLER:**  Objection.  Vague.

13         **THE COURT:**  It may be vague.  Counsel is using different

14    words.  Eventually you'll decide this, among many issues.  So I'll

15    instruct you on the law.

16         Counsel, I'll let you use the word "inappropriate," but

17    that may not be the standard I instruct you on.  Just trying get a

18    mind-set of different witnesses and their subjective thoughts at

19    the time.

20         Counsel.

21    **BY MR. PRICE:**

22    **Q**   Do you remember the question?

23    **A**   No.

24         **MS. KELLER:**  Your Honor, it's also irrelevant.

25         **THE COURT:**  Overruled.

Page 22

1    **BY MR. PRICE:**

2    **Q**    In 1995, even before you received this agreement, you thought

3    it would be inappropriate to work at Mattel and at the same time

4    assist a competitor; right?

5    **A**    I don't know that that thought ever entered my head.

6    **Q**    You signed a similar agreement -- this is November '95 -- you

7    signed a similar agreement when you joined Mattel again in January

8    of '99; correct?

9    **A**    Yes.

10   **Q**    I'm going to switch the time frame for the question I asked

11   you before.  By the fall of -- by the summer of 2000, did you have

12   the belief that it would be inappropriate to work for Mattel and

13   assist a competitor at the same time?

14   **A**    I don't know.  I don't remember ever having that belief.

15   **Q**    In the summer 2000 time frame, you had discussions with

16   people at MGA concerning your idea for a Bratz fashion doll;

17   correct?

18   **A**    Yes.

19   **Q**    And it's correct that the latest that those meetings took

20   place, that is in the summer, the latest time the first meeting

21   took place was in August of 2000; correct?

22   **A**    I don't remember exactly.

23   **Q**    Was there a meeting where you were present, Paula Garcia was

24   present, and Victoria O'Connor was present?

25   **A**    Yes.

1  **Q**   And that's a meeting that Isaac Larian did not attend;

2  correct?

3  **A**   Yes.

4  **Q**   And at that meeting you brought some drawings pertaining to

5  Bratz; right?

6  **A**   Yes.

7  **Q**   And you recall that there was a second meeting after that

8  where Mr. Larian was present; right?

9  **A**   Yes.

10  **Q**   And in connection with that meeting, you brought some

11  drawings pertaining to Bratz; right?

12  **A**   Yes.

13  **Q**   Do you remember the meeting where Mr. Larian was present was

14  around September 1 of 2000?

15  **A**   I think so, yes.

16  **Q**   Now, going to the August meeting -- let me rephrase that

17  because you didn't -- going to the meeting you are talking about

18  where Mr. Larian wasn't present but Paula Garcia was, at that

19  meeting you told the attendees that you were employed by Mattel;

20  correct?

21  **A**   I believe so, yes.

22  **Q**   That's not something you were keeping secret from the people

23  you were meeting with at MGA; right?

24  **A**   No.

25  **Q**   Double negative.  I'm sorry.

Page 24

1          Was that something you were keeping secret from the

2   folks at MGA?

3   **A**    No.

4   **Q**    So the September 1 meeting, not the one where you first said

5   you were at Mattel, the next one, you recall that was at MGA's

6   offices?

7   **A**    Yes.

8   **Q**    And the meeting took place in Isaac Larian's office?

9   **A**    I don't remember whose office it took place in.

10  **Q**    Did you understand that Isaac Larian was the chief executive

11  officer of MGA?

12  **A**    I believe so, yes.

13  **Q**    And is it correct that at that meeting you had Mr. Larian,

14  Paula Garcia, Victoria O'Connor, and Mr. Larian's daughter

15  Jasmine?

16  **A**    Yes.

17  **Q**    And at that meeting you again, at that meeting you said that

18  you were employed by Mattel; correct?

19  **A**    I don't remember exactly.

20  **Q**    Look at volume one, November 4, 2004, page 95, lines 11

21  through 17.

22  **A**    Okay.

23  **Q**    Does that refresh your recollection about telling Mr. Larian

24  about your background and including being employed at the time by

25  Mattel's collector department?

1    **A**    Well, I don't really remember it right this minute, but I'm

2    not going to argue that I didn't say it.

3    **Q**    You did say that before under oath?

4    **A**    Yes.

5    **Q**    So after this meeting that Mr. Larian -- where he was

6    present, you began talks about what the financial terms would be

7    of an agreement between you and MGA; correct?

8    **A**    Yes.

9    **Q**    At the time in September of 2000 there were toy companies

10   other than MGA out there; right?

11   **A**    Yes.

12   **Q**    Hasbro -- can you name some?

13   **A**    Well, like you said Hasbro, Jakks Pacific.  I can't really

14   think of any other specific ones right now.

15   **Q**    And you wanted to get the best deal you could for your design

16   services; right?

17   **A**    I'm not sure I understand what you mean.

18   **Q**    You wanted to get the best financial deal you could for the

19   Bratz designs, the concept, that you were presenting; right?

20   **A**    I don't really remember thinking about that.

21   **Q**    Do you remember negotiating about whether you will get a

22   royalty and whether you wouldn't?

23   **A**    Yes.

24   **Q**    And you wanted to get the best deal you could; right?

25   **A**    Are you talking about the specific deal with MGA?  Is that

Page 26

1   what you mean?

2   **Q**   Let's start there, yes.

3   **A**   Yes.

4   **Q**   Isn't it true you didn't try in any of the other toy

5   companies?

6   **A**   That's true.

7   **Q**   Because you knew that your being an employee at Mattel would

8   scare them off?

9   **A**   No, I don't think I ever thought that.

10   **Q**   What you did do is after meeting with Mr. Larian and telling

11   him that you were from Mattel, you had negotiations only with MGA

12   up to the time you signed a contract with MGA; right?

13   **A**   Yes.

14   **Q**   And you didn't even attempt to go to one of the other toy

15   companies, to established toy companies, and tell them "I work at

16   Mattel, I have toy designs, I want you to make a doll out of

17   these?"

18         **MS. KELLER:**  Objection.  Asked and answered twice.

19         **THE COURT:**  This might be a good time for a recess this

20   evening.

21         Ladies and gentlemen, 8:30 tomorrow.  You are admonished

22   not to discuss this matter among yourselves or form or express an

23   opinion concerning the case.  Have a nice evening.

24                        (Jury out.)

25         **THE COURT:**  Mr. Bryant, would you return at

Page 27

1   8:25 tomorrow and be seated at that time so we can start promptly

2   at 8:30.

3            Counsel, if you would call the gentleman who is in the

4   hallway, Mr. --

5                 (Witness summoned to the courtroom.)

6            THE COURT:  Thank you, sir, if you would be kind enough

7   to step forward.

8            Mr. Bryant, if you would be kind enough to step outside.

9   Thank you.  Would you raise your right hand, please.

10           POOTTIPONG PHOOSOPHA, PLAINTIFF'S WITNESS, SWORN

11           THE COURT:  We're still in session.  Ladies and

12   gentlemen, if you are in the audience, sit down or leave.

13           Sir, would you state your fall name after you are

14   comfortably seated?

15           THE WITNESS:  My name is Poottipong.  Last name is

16   Phoosopha.

17           THE COURT:  First of all, speak into the microphone,

18   sir, so we can hear you.  Would you spell your first name.

19           THE WITNESS:  First name is P-o-o-t-t-i-p-o-n-g.

20           THE COURT:  Pootitong?

21           THE WITNESS:  Pootipong.

22           THE COURT:  P-o-o-t-t-i-t-o-n-g?

23           THE WITNESS:  No.  P-o-o-t-t-i-p-o-n-g.

24           THE COURT:  P-o-o-t-t-i-t-o-n-g.

25           THE WITNESS:  Two T's.

Page 28

1          THE COURT:  P-o-t-t -- we're going to do it together.

2          THE WITNESS:  P-o-o.

3          THE COURT:  Make sure I have it, so listen to me.

4     P-o-o-t-t-i-t-o-n-g?  Two T's?

5          THE WITNESS:  P-o-n-g.

6          THE COURT:  Counsel, get the Elmo for a second.  I want

7     to get the gentleman's correct spelling, and it's my fault.  Let

8     me make sure I have your name correctly.  And I apologize to you.

9     Now we're going to write your first name just so I'm sure we have

10    it for the record.

11         Is that the correct spelling, sir?

12         THE WITNESS:  Yes.

13         THE COURT:  Thank you very much.  I had one too many T's

14    and not the P and I apologize.  And, sir, your last name.

15         THE WITNESS:  Last name P-h-o-o-s-o-p-h-a.

16         THE COURT:  Thank you very much.

17         Thank you, Mr. McConville.  I appreciate that.

18         First of all, thank you for coming to court this

19    evening.  Have you had any conversation with any persons or

20    between I think it was 12 noon today, counsel?

21         MR. MCCONVILLE:  He spoke to me.  I called him.

22         THE COURT:  That's fine.  Besides Mr. McConville, have

23    you had any conversation with any attorney or any other person

24    about this matter in court from noon to 5:00 o'clock?

25         THE WITNESS:  Just one person that called.

1          THE COURT:  Is that that gentleman who just stood up?

2          THE WITNESS:  Yes.

3          THE COURT:  Mr. McConville.

4          THE WITNESS:  I think it's a lady.

5          THE COURT:  A lady.  Is it the lady back here in the

6     purple?

7          THE WITNESS:  I don't know who she is.

8          THE COURT:  We'll find out eventually.

9          THE WITNESS:  I could write it down.

10          MR. MCCONVILLE:  Your Honor, do you want Ms. Rhee here?

11     She is in the courtroom.  I don't know if you wanted her here or

12     not.

13          THE COURT:  I don't know who Ms. Rhee is.  No.  I want

14     her outside in the hallway.  I didn't realize she was present and

15     I want all witnesses excluded and waiting in the hallway in this

16     matter.

17          Who is the person you spoke with?

18          THE WITNESS:  Jeanine.

19          MR. QUINN:  Could we ask that that include Mr. Larian?

20          THE COURT:  Who did you speak with?

21          THE WITNESS:  Jeanine.

22          THE COURT:  I can't hear you.

23          THE WITNESS:  Jeanine.  J-e-a-n-i-n-e.

24          THE COURT:  Who is that, counsel?

25          MS. KELLER:  That's the general counsel for MGA who told

Page 30

1    Your Honor earlier today that she had called this gentleman.

2            **THE COURT:**  Ms. Pisoni.  Thank you very much.  I just

3    know her by her last name.

4            And have you spoken to Mr. Larian today?

5            THE WITNESS:  No.

6            **THE COURT:**  Thank you.

7            Counsel, direct examination.  I want to hear the full

8    and complete statement that's allegedly being brought before the

9    Court.

10                          DIRECT EXAMINATION

11   **BY MR. QUINN:**

12   **Q**    Good afternoon, Mr. Phoosopha.  My name is John Quinn.

13          Do you know Anna Rhee?

14   **A**    Yes.

15   **Q**    She is -- is she a friend of yours?

16   **A**    Yes.

17   **Q**    Did you have a telephone call with her shortly before

18   Christmas?

19   **A**    I don't remember the day, exactly day.

20   **Q**    But you're thinking of a phone call that you had in December

21   with her?

22   **A**    I don't know when, though, but I did have a conversation with

23   her, yes.

24   **Q**    Did was -- this a telephone call?

25   **A**    Yes.

Page 31

1   **Q**   Did you call her or did she call you?

2   **A**   I called her.

3   **Q**   And what did you say when you called her?

4   **A**   The beginning was Paula would call me in her office and ask

5   me that Isaac want to talk to me, and then he was ask me to talk

6   to Anna Rhee.

7   **Q**   So somebody asked you to talk to Anna?

8   **A**   Yes.

9   **Q**   Who asked you to do that?

10   **A**   Isaac.

11   **Q**   Isaac Larian?

12   **A**   Yes.

13   **Q**   And did he tell you what he wanted you to say to Anna Rhee?

14   **A**   Just asked me to ask her something, yes.

15   **Q**   And what was it that he asked you to say?

16   **A**   He said he heard she might be sued, something like that.  And

17   if she does, she have -- just have her to contact him and he will

18   have a lawyer to help her.

19   **Q**   He told you to call Anna Rhee and say she might be sued?

20   **A**   Yes.

21   **Q**   And did he say who you should tell her she might be sued by?

22   **A**   No.

23   **Q**   Did you call -- did Mr. Larian say anything else?

24   **A**   No.  Just say if she need any help, just contact him.

25   **Q**   So did you relate this to Anna Rhee?  Did you call Anna Rhee

1   and tell her what Mr. Larian had asked you to tell her?

2   **A**    I did.  I did.

3   **Q**    Did you tell Anna Rhee that Mr. Larian said that she might

4   be -- she was going to be sued by Mattel?

5   **A**    Partly, yes.

6   **Q**    And that's what Mr. Larian had told you?

7   **A**    Yes.

8   **Q**    And that Mr. Larian was prepared to help her?

9   **A**    Yes.

10  **Q**    Did she make any response?

11  **A**    She just laughing.

12          **MR. QUINN:**  Nothing further, Your Honor.

13          **THE COURT:**  Just a moment.

14          **MR. QUINN:**  Your Honor, may I --

15  **BY MR. QUINN:**

16  **Q**    Did Mr. Larian say something to you about Ms. Rhee lying at

17  the last trial or lying last time?

18  **A**    Didn't say anything about that?

19  **Q**    Did you say anything to Ms. Rhee about that, about you lied

20  at the last trial?

21  **A**    No, I didn't say anything.

22  **Q**    Or didn't tell the truth?

23  **A**    No.

24          **MR. QUINN:**  Thank you, Your Honor.

25          **THE COURT:**  Just a minute.  We'll have

Page 33

1    cross-examination.  I want to look at my notes for a moment.

2              Thank you.  Cross-examination.

3         **MS. KELLER:**  Thank you, Your Honor.

4                        CROSS-EXAMINATION

5    **BY MS. KELLER:**

6    **Q**    Good evening, Mr. Phoosopha.  My name is Jennifer Keller.  We

7    have never met before, have we?

8    **A**    No.

9    **Q**    When you said Anna Rhee, is it Ree or Ray?

10   **A**    Anna Rhee.

11   **Q**    You said she is a friend of yours?

12   **A**    Yes.

13   **Q**    And how long have you been friends?

14   **A**    We friends, but we not close friends.  Because we used to

15   work together.

16   **Q**    Where did you work together?

17   **A**    We used to work for Mattel.

18   **Q**    Okay.

19   **A**    Freelancing.

20   **Q**    And I notice you are not a native speaker of English.

21   English is not your first language?

22   **A**    Yes.

23   **Q**    What is your first language?

24   **A**    Thai.

25   **Q**    Now, the day that you said you were -- did I hear you say

Page 34

1    that it was Paula who called you into the office or Isaac?

2    **A**    Paula called me into her office, say Isaac want to talk to

3    me.

4    **Q**    Okay.  And then you talked with Mr. Larian?

5    **A**    Yes.

6    **Q**    Okay.  Now, did -- do you remember Anna Rhee ever complaining

7    to you?

8    **A**    No.  We don't talk anything about that.

9    **Q**    Okay.  Here is what I'm asking.  Did you remember Anna Rhee

10   ever saying that she was upset that MGA did not give her a lawyer

11   for the trial?  Do you remember that?

12   **A**    No, I don't remember that, no.

13   **Q**    When you talked with Mr. Larian, did he tell you that he

14   wanted -- did he tell you that he thought Ms. Rhee might be sued

15   or there was a trial coming up?  Do you remember which it was, or

16   are they both the same to you?

17   **A**    I think they both the same.  He say he heard she might get

18   sued again.  That's why he say --

19   **Q**    He heard she might get sued again.  You thought she had been

20   sued before?

21   **A**    I don't know.  Because you guys been suing for long time.

22   **Q**    Okay.  There has been suing for a long time.  Okay.  So there

23   was a trial before; right?

24   **A**    Yes.

25   **Q**    And you know that some people had lawyers for the trial?

Page 35

1    **A**    Yes.

2    **Q**    So to you is a trial the same as suing?  When you think of

3    it, it's the same; right?

4    **A**    Yes.  I guess.

5    **Q**    Okay.

6    **A**    But I thought it was end from the last; it already end.  It's

7    already over.  That's what I thought when he said maybe another

8    lawsuit is coming up again to her.  That's why he want me to

9    contact her.

10   **Q**    You thought the suing was over with?

11   **A**    Yes.

12   **Q**    But you thought now the suing might start up again?

13   **A**    Yes.

14   **Q**    And you remember there was some suing that happened before

15   where people had to go and testify?

16   **A**    Yes.

17   **Q**    And now you understood that there was going to be more suing

18   where people were going to have to testify?

19                **MR. QUINN:**  Just leading, Your Honor, especially under

20   the circumstances.

21                **THE COURT:**  It is leading, but it's cross-examination.

22   It just goes to the weight.  If you each want me to absorb the

23   facts, it would be helpful, although counsel is entitled to lead

24   if I got what the witness was testifying to.  But you can lead.

25   Lead as much as you like to.

Page 36

1          **MS. KELLER:**  Well, I'm --

2          **THE COURT:**  No.  Lead.  That's fine.  I like to her from

3     her eventually, but you can lead.

4     **BY MS. KELLER:**

5     **Q**    So if I am following you, you thought there had been some

6     suing before, but you thought it was over with; right?

7     **A**    Yes.

8     **Q**    And now you thought there was maybe more suing that was going

9     to happen; right?

10    **A**    I don't thought because this is what Isaac ask me.  He said

11    he heard she might get sued.  That's why he asked me to call Anna

12    Rhee.  If she need -- she being sued or she need any help.

13    **Q**    Okay.  So to tell her that if she got sued, that he would

14    help her with a lawyer?

15    **A**    Yes.

16    **Q**    And is that all?

17    **A**    That's all.

18    **Q**    Nothing more?

19    **A**    Nothing more.

20    **Q**    And you said that when you talked about that with Anna Rhee,

21    she was laughing?

22    **A**    She was laughing.

23    **Q**    What did she say?

24    **A**    I hope is not suing again.  Just so tired.  And we talk

25    something.

Page 37

1   **Q**    When she said "I hope they're not suing again," what did you

2   think she meant by that?

3   **A**    I don't know.  She just laughing to me, which is kind of

4   like, didn't get serious anything about that.

5   **Q**    Okay.  When she said I hope they're not suing again because

6   she was tired of it, did she tell you what she meant by that?

7   **A**    No.  Just laughing.

8   **Q**    Okay.

9             **MS. KELLER:**  I don't think I have anything further, Your

10  Honor.

11            **THE COURT:**  Counsel, do you have any questions.

12                          REDIRECT EXAMINATION

13  **BY MR. QUINN:**

14  **Q**    Did Mr. Larian say that he had -- he thought Anna Rhee would

15  be sued or that she would be a witness?

16  **A**    I think he said he mean by she might get sued.

17  **Q**    By Mattel?

18  **A**    Yes.

19            **THE COURT:**  Counsel, any further questions?

20            **MS. KELLER:**  No, Your Honor.

21            **THE COURT:**  Will one of you ask once again, why he

22  finally called Anna Rhee?  I want to be certain.  Was this his

23  idea or was he asked to call her?

24  **BY MR. QUINN:**

25  **Q**    You heard the Court's question?

Page 38

1          **THE COURT:** It's not my question.  I'll leave that to

2    you.  I heard Anna Rhee's testimony.  I just want to hear his

3    testimony.

4    **BY MR. QUINN:**

5    **Q**    Why did you make this call to Anna Rhee?

6    **A**    Because Isaac ask me to call.  First of all, I don't have

7    Anna's phone number because I know her even with work, I don't

8    have Anna Rhee phone number with me.  I have to ask my manager to

9    get Anna Rhee's phone number and call her.

10          **THE COURT:** Would you be kind enough, sir, I apologize

11   to you but I appreciate your attendance, would you wait outside

12   for just one moment.

13          Counsel, I'd like to hear once again from Anna Rhee

14   under oath.  In light of this information, I want to give the

15   opportunity to both sides to once again question Anna Rhee so we

16   have this full as record as we can have in close proximity to one

17   another.

18          Ms. Rhee, you are in the courtroom again.  Would you

19   please retake the stand which is just to my left.  And I had heard

20   your prior testimony, but we may be going through that testimony

21   one more time, if you don't mind.  Okay.  If you would be seated,

22   I'm going to have counsel ask questions so I fully have a

23   developed record in this adversarial proceeding.

24          This is Mr. Quinn.

25          And Mr. Quinn, I expect all the same questions that you

Page 39

1    asked before and on cross-examination any questions that MGA wants

2    to ask.

3                              DIRECT EXAMINATION

4    **BY MR. QUINN:**

5    **Q**    Ms. Rhee, last month in December, did you receive a telephone

6    call from Mr. Phoosopha?

7    **A**    Yes.

8    **Q**    He called you?

9    **A**    Yes.

10   **Q**    And what did he say?

11   **A**    He said that Isaac asked him to call me to see if I wanted

12   any help because Mattel plans on suing me.  And I said, what are

13   you talking about?  I'm not getting sued.  I'm doing work for them

14   right now.  Why would they sue me?

15          He said Isaac says he knows you lied last time in court

16   because you were scared and we want to help you, and we're willing

17   to help you.  I said okay, but I didn't lie.

18          And he said okay, talk you to later.  Bye.

19   **Q**    At any time has anybody at Mattel threatened you with any

20   type of lawsuit?

21   **A**    No.

22          **MR. QUINN:**  Nothing further, Your Honor.

23          **THE COURT:**  Questions on cross-examination.

24

25

1          CROSS-EXAMINATION

2     **BY MS. KELLER:**

3     **Q**    Ms. Rhee, before you have testified, not just now, but

4     earlier about this same issue, did you talk with Mr. Berman, your

5     lawyer?

6     **A**    Yes.

7     **Q**    And that's the lawyer that Mattel provided to you?

8     **A**    Yes.

9     **Q**    And was it Mr. Berman you first told about this or someone

10    else?

11    **A**    Mr. Berman.

12    **Q**    Who's the first person you ever told about that?

13    **A**    Mr. Berman.

14    **Q**    Today?

15    **A**    No.

16    **Q**    Who is the first person you ever told about that?

17    **A**    Mr. Berman.

18    **Q**    When?

19    **A**    I think it was sometime after the holidays.

20    **Q**    When after the holidays?

21    **A**    I don't remember.

22    **Q**    Did you tell Mr. Berman the part about Isaac says you were

23    lying at the last trial?

24    **A**    Yes.

25    **Q**    And you understand that Mattel is paying Mr. Berman's fees?

Page 41

1    **A**    I assume so.

2    **Q**    Did you tell Mr. Berman he wasn't allowed to tell Mattel

3    about this?

4    **A**    No.

5    **Q**    In other words, did you tell Mr. Berman, you have to keep

6    this to yourself.  I don't want you tell Mattel lawyers about

7    this?

8    **A**    No.

9    **Q**    And have you seen anything in writing about this?  Did

10   Mr. Berman take any notes when he was talking to you?

11   **A**    No.

12   **Q**    You talk to him over the phone or in person?

13   **A**    Over the phone.

14   **Q**    How many times?

15   **A**    Once.

16   **Q**    About this issue?

17   **A**    Yes.

18   **Q**    After the holidays, are you talking about a week after

19   January, between Christmas and January 1?

20   **A**    No.  It was like, I think it was after January.

21   **Q**    When?

22   **A**    I don't remember.

23   **Q**    Well, okay.  Let's say January 1, between Christmas and

24   January 1?

25              **THE COURT:**  Counsel, she is getting into the

Page 42

1    attorney-client privilege.  I'm certainly willing to open that up,

2    I think it might be beneficial, but I want to forewarn each of

3    you.

4    **BY MS. KELLER:**

5    **Q**    Did you ever tell any of your friends about this?

6    **A**    No.

7    **Q**    Did you ever tell any of the other face painters that you

8    knew, hey, I got this call from this MGA employee?

9    **A**    No.

10   **Q**    Did anybody from Mattel, including Mattel's lawyers,

11   interview you about this ever?

12   **A**    No.

13          **THE COURT:**  Counsel, do you want me to see if she is

14   willing to waive the attorney-client privilege?  She is the

15   holder.  In other words, I can ask her if she is willing to waive

16   the privilege.  She is the one who actually is the holder of that

17   privilege.

18          **MS. KELLER:**  Sure.  Thank you.

19          **THE COURT:**  I want to make certain.

20          **MR. BERMAN:**  May I be heard on that?

21          **THE COURT:**  Are you Mr. Berman?

22          **MR. BERMAN:**  I am.  So I mean, I would have asserted the

23   attorney-client privilege the first time she asked about it.  It's

24   completely improper for her to ask about the communications

25   between me and --

Page 43

1          THE COURT:  Well, of course.

2          MR. BERMAN:  -- my client, and she shouldn't have been

3    allowed to do that.  I would like to assert that privilege on her

4    behalf.

5          THE COURT:  It's been asserted.  Now that privilege is

6    invoked.  It always been has been.  The question is, she is the

7    holder of the privilege, isn't she?

8          MR. BERMAN:  She is, and I am on her behalf.

9          THE COURT:  She is the holder of the privilege, isn't

10   she?

11         MR. BERMAN:  Yes.

12         THE COURT:  You are not the holder of the privilege, are

13   you?

14         MR. BERMAN:  No.

15         THE COURT:  So can we inquire if she would like to waive

16   that privilege or not?  Should we take a recess?

17         MR. BERMAN:  Yes, let's take a recess.  I'd like to talk

18   to her about it.

19         THE COURT:  The real question is if she is willing to

20   waive the privilege, then we would know whatever discussion took

21   place.  And I'm just curious as the holder, why I wouldn't make

22   that inquiry?

23         MR. BERMAN:  I'm sorry?

24         THE COURT:  As the holder why I wouldn't make that

25   inquiry of her.

1           **MR. BERMAN:**  Yes, she would if she waived the privilege.

2           **THE COURT:**  Should I inquire now?

3           **MR. BERMAN:**  No.  You asked me if we wanted to take a

4    recess and I said yes.

5           **THE COURT:**  Why don't we do that because she's certainly

6    represented.  I think that would be appropriate.  And what time

7    would you like to meet back?

8           **MR. BERMAN:**  Five minutes would be enough.

9           **THE COURT:**  Oh, no.  Two hours?  Just kidding you.  How

10   long would you like?

11          **MR. BERMAN:**  Five minutes.

12          **THE COURT:**  I want to give you plenty of time.  Why

13   don't you tell us when you're ready so it doesn't have to be five

14   minutes.

15          But why don't you step down and we'll be back in five or

16   10 minutes on the bench.

17          And counsel, take your time.

18              (Recess taken, from  5:22 to 5:38.)

19          **THE COURT:**  We're back on the record and all counsel are

20   present.

21          And Ms. Rhee, how are you today?  If you would retake

22   the stand.  Thank you for your courtesy.

23          Counsel, what are your thoughts?

24          **MS. KELLER:**  Your Honor --

25          **THE COURT:**  I was speaking to counsel first.  I wanted

Page 45

1    to hear what that his thoughts were.

2         **MR. BERMAN:**  My client wants to keep our communications

3    confidential.

4         **THE COURT:**  Asserting the privilege.

5         **MR. BERMAN:**  Yes.

6         **THE COURT:**  Is that your decision after talking to your

7    counsel?

8         **THE WITNESS:**  Yes.

9         **THE COURT:**  Now counsel.

10        **MS. KELLER:**  Your Honor, it is the communication that is

11   privileged.  And counsel waived the privilege when he told Mattel

12   the substance of the communication.  So there has already been a

13   waiver whether counsel wants to recognize it or not.  And I

14   believe, therefore, we should be allowed to inquire not only of

15   Ms. Rhee but also her counsel.

16        **THE COURT:**  You obviously read Jefferson's book on

17   evidence.  Outstanding, counsel.  Now if, in fact, has been

18   communicated by either you or your client to any lawyer or person

19   affiliated with Mattel, why hasn't the privilege been waived.

20        **MR. BERMAN:**  Because the communication that took place

21   was expressly without -- the communication was conditioned on

22   there not being a waiver.

23         **THE COURT:**  How do you do that?

24        **MR. BERMAN:**  So the --

25        **THE COURT:**  I'm just looking for law on that area.

Page 46

1         **MR. BERMAN:**  So the e-mail that I wrote, which was, I

2    think, this morning, expressly stated that it was not a waiver of

3    the privilege, and you can agree that a communication can be made

4    without waiver.

5         **THE COURT:**  I tentatively disagree with you, but we're

6    going to do some research.  I don't need to decide this, this

7    evening.  I don't need to give a tentative on this, this evening.

8    My only hope was to get as much in terms of what the testimony was

9    after this was dropped on the Court this morning.

10        So we have plenty of time to resolve this.  But

11    unfortunately, I have to copy you in the area now, Ms. Rhee.  So

12    if you have plans, etcetera, you'll need to cancel them.  And I'm

13    going to try to decide this, depending upon your argument and your

14    briefing sometime over the weekend or some time next week.

15    There's no immediate rush to this.  She can always be called back.

16    So can the other gentleman, Mr. Phoosopha.

17        And I apologize to you.  This is news to the Court

18    today.  I had no idea that anything of this type had taken place.

19    And I need some time to look at the case law.  I need to go back

20    to the Enron case and some other cases that the Court has in mind

21    and see how this affects these proceedings.

22        Meanwhile, counsel, if you would like to do any briefing

23    on this.

24        **MR. BERMAN:**  I would.

25        **THE COURT:**  Excellent.  By 5:00 o'clock tomorrow night.

Page 47

1   Excellent.  Good for you.  Counsel, by 5:00 o'clock tomorrow night

2   so we have a weekend.  Counsel we have weekend sessions also.  So

3   I know you are available Saturday and Sunday which is excellent.

4   And we'll try to get this resolved as quickly as possible so we

5   all have a clear understanding of whether this has import or not

6   how to deal with it.  I want to thank you very much.

7        MR. BERMAN:  To add Your Honor in your decision, I will

8   provide you with the date and the time of the communication to

9   Mattel's lawyers.

10       THE COURT:  That's up to you.  I'm not pressing you.  In

11  fact, I called a recess to give you the courtesy of talking to

12  your client.  It seemed to me like she was, quite frankly,

13  initially willing to divulge the information, but she is not a

14  lawyer.  That's why you have been retained.  Of course, MGA takes

15  a different position, that you are being paid by Mattel and from

16  their position this has already been communicated.

17       MR. BERMAN:  Meaning that --

18       THE COURT:  The privilege might waived from their

19  perspective.  And they're going to do some briefing on that at

20  5:00 o'clock tomorrow.  And Mattel is going to do briefing on this

21  by 5:00 o'clock tomorrow.

22       MR. QUINN:  Yes, Your Honor.

23       THE COURT:  Okay.  And I want you to be included in that

24  so your position is well known, and that way the circuit has

25  excellent record regardless of what the Court does.

Page 48

1              MR. BERMAN:  Fair enough.

2              THE COURT:  Now, I don't think this is a matter of

3     sanctions or that the Court would have a chilling effect by

4     addressing Mr. Larian or any of the parties involved.  This is a

5     matter of evidence, whether it goes to the jury or not.  It should

6     simply be resolved in that way, what the import of this is.

7              Now, let me be courtesy to you.  Let me try to do my

8     best in term your personal life.  Do you have any plans?

9              THE WITNESS:  I work every day.

10             THE COURT:  You are going to continue to work.

11             THE WITNESS:  I'll just -- I have to --

12             THE COURT:  You are going to.

13             THE WITNESS:  Work in the middle of the night.

14             THE COURT:  You are going to.  This is not going to

15    affect your work.  So you go home, you go back to work, let the

16    lawyers and the Court worry about how this is going to be

17    resolved.  If you are not called, that will be the end of it.  If

18    you are called, I don't know whether that might be in rebuttal or

19    during the case-in-chief.  I just haven't had time to sort that

20    out.

21             But I wanted to be polite and make sure you are not

22    flying off to Europe or something.  But this is not going to

23    interfere with your work.  Okay?  So let's take that off of your

24    shoulders so you are not concerned.  You get back and be

25    productive and go about your business.  And if and when you are

1    needed, let me deal with the lawyers and we'll try to be

2    courteous.  Maybe instead of this weekend if you are tied up or

3    your counsel is, we can resolve it again on Monday or Tuesday.

4    Okay?

5              THE WITNESS:  Okay.

6              THE COURT:  I just want to go back and look at some case

7    law and sort out my own thoughts.  And I don't want to have

8    precipitously either allowing any evidence or rejecting it the

9    same evening I'm hearing this evidence.

10             Counsel, thank you for your courtesy.  5:00 o'clock I'll

11   meet you here tomorrow.

12             MR. BERMAN:  Fair enough.  The briefs are due tomorrow

13   or we're going to argue it tomorrow?

14             THE COURT:  We're going to have the briefing tomorrow so

15   I can read it, then we're going to decide when to argue it,

16   because you don't want me to have you do this by 12 noon, do you?

17             MR. BERMAN:  No.

18             THE COURT:  I'm trying to give you a day, but I want to

19   see what the briefing looks like.  And 5:00 o'clock doesn't mean

20   anything to the Court.  5:00 o'clock tomorrow I get the briefs,

21   and sometimes my workday starts at 5:00 o'clock in the evening.

22             MR. BERMAN:  Thank you.  I just need to know I'm going

23   to be back here tomorrow at 5:00.

24             THE COURT:  Repeat after me, "I will be back."  I'm just

25   kidding you, Counsel.  We'll see you tomorrow at 5:00 o'clock with

Page 50

1    brief in hand.  Mattel will have their brief and so will MGA.

2            Let's get on with our business.  I had some people

3    coming in with a three-dimensional, and they were here last

4    evening at my request, which I appreciate, but I didn't have all

5    the parties.  We kind of disbanded last evening.  Let's get that

6    set up also.

7            I want to get John and Tom home -- by the way, after

8    we're done with this, John, we're out of here tonight.

9            We're back on the record.

10           Sir, if you would kind enough to step forward.  Would

11   you raise your right hand please.

12                 FRANK KEISER, PLAINTIFF'S WITNESS, SWORN

13           **THE COURT:**  Thank you, sir.  Would you come along the

14   railing where the jury sits.  And there is an entrance near the

15   wall.  Sir, would you have a seat.  Would you state your full

16   name?

17           **THE WITNESS:**  Frank Keiser, K-e-i-s-e-r.

18           **THE COURT:**  Thank you.  Now, Mr. Zeller.

19                        DIRECT EXAMINATION

20   **BY MR. ZELLER:**

21   **Q**   Mr. Keiser, if you could please tell us what's your line of

22   work.

23   **A**   I do 3D scanning.

24   **Q**   Please tell us what is 3D scanning?

25   **A**   3D scanning is taking a physical object with surfaces on it

Page 51

1    and creating surfaces in a digital form in the computer.

2    **Q**    How long have you been involved in 3D scanning?

3    **A**    Approximately 14 years.

4    **Q**    How did you get started in digital or 3D scanning?

5    **A**    I went to work for a company call CTEK.  And while there, I

6    saw the process of scanning and was interested and decided that

7    that was the career path I wanted to take.

8    **Q**    You mention this company.  It was CTEK?

9    **A**    Yes.

10   **Q**    What kind of company is that?

11   **A**    They're no longer in business, but they made prototype cars

12   for the automobile industry.

13   **Q**    And one of the companies you worked for is Capture 3D?

14   **A**    Yes.  That was the company that sells the equipment.

15   **Q**    I'm sorry, what is the equipment called again?

16   **A**    It's called the ATOS scanner.

17   **Q**    A-T-O-S?

18   **A**    Yes.

19   **Q**    And what is it that Capture 3D did?

20   **A**    Capture 3D is a North American distributor of the equipment,

21   and they also do services for sale of equipment.

22   **Q**    When you were working for that company, what was your

23   position there?

24   **A**    I was a scanning technician.

25   **Q**    Did you study 3D scanning when you were there?

Page 52

1    **A**     There was no formal schools for it, but they have classes

2    roughly about a month is what the class over a period of a year

3    was, plus factory training.

4    **Q**     There was some form of classroom training?

5    **A**     Yes.

6    **Q**     And can you tell us generally what the nature was of that

7    classroom training you received?

8    **A**     It was teaching me the software; the software and how to set

9    the hardware up.

10   **Q**     And I think you said there was about a month of classroom

11   training?

12   **A**     Yes, over a period of a year.

13   **Q**     And then on top of that you received on-the-job-training?

14   **A**     Yes.

15   **Q**     And if you could please tell us a little bit about that?

16   **A**     In the on-the-job-training, basically Capture 3D scans many

17   objects from jet engine parts to airplanes, to cars, boats, all

18   kind of objects.

19   **Q**     Have you ever provided training in this technology of 3D

20   scanning?

21   **A**     Yes, I have.

22   **Q**     Can you please tell us a little bit about that kind of

23   training you have provided?

24   **A**     I have provided training for the Department of Energy out of

25   Los Alamos, New Mexico for scanning containment vessels for

1    plutonium capsules.  I trained Boeing on scanning.  I also trained

2    Boeing on the Columbia incident at NASA for reverse engineering

3    the debris from the space shuttle when it blew up.

4    **Q**    I'm sorry, you said from the space shuttle?

5    **A**    Yes.  The Columbia space shuttle accident.

6    **Q**    Which is it you did in connection with that investigation?

7    **A**    I was part of the CAIB, which is the Columbia Accident

8    Investigation Board.  I set up the procedures for reverse

9    engineering the debris so they could identify it in the computer,

10   I guess a computer model.

11             **THE COURT:**  For the purpose of this hearing, I have a

12   résumé.  I'm not concerned.  I'm interested in the methodology.

13   What I want to see is the actual methodology in relation to a doll

14   that can readily be seen by the jury, and why this is helpful and

15   why this is scientific evidence that might help the trier of fact

16   understand.  Now we will get to that.  Thank you.  Immediately.

17   **BY MR. ZELLER:**

18   **Q**    And I take it this technology that you are using, it's been

19   recognized by NASA and others?

20   **A**    Yes.  FAA for reverse engineering jet engine parts.  Many

21   industries use it.  It's very accurate.

22   **Q**    Is it a science?

23   **A**    Yes.

24   **Q**    If you can please tell me, is the scanning process accurate

25   in your view?

Page 54

1    **A**    Extremely accurate.

2    **Q**    How accurate is it?

3          **THE COURT:**  Excuse me.  Could I see it?

4          **THE WITNESS:**  Yes.  On a lap top?

5          **THE COURT:**  Well, any place you would like to show it to

6    me.

7          **THE WITNESS:**  That's the easiest to show you.  I can

8    provide some photographs.

9        (Brief pause in proceedings)

10         **THE COURT:**  We're on the record.  And you are going to

11   take us through the comparative slides that you would like to

12   show.  And explain to us briefly what you are showing us.

13         **THE WITNESS:**  Okay.  This is two of the items that I

14   scanned.  And we just basically put them on a side-by-side

15   comparison that you can roll around.  And I have also provided

16   available to the Court a viewer to view these, so you can view

17   them yourself.  It's very simple software.  Even I can operate it.

18         So any way this just basically is the 3D images.

19         **THE COURT:**  Let me ask you something.  Thus far I

20   haven't seen anything that I can't do without you testifying.

21         **THE WITNESS:**  Okay.

22         **THE COURT:**  Moving the heads around is something that my

23   counsel can do in front of the jury.

24         **THE WITNESS:**  Right.  And I can show them how to do this

25   in minutes.

Page 55

1          **THE COURT:**  I don't care about moving heads around.  I

2    want to know what the relevance is.

3          **THE WITNESS:**  This is for a side-to-side visual for

4    looking at the heads.  So you can look and do comparisons, make

5    decisions.  So this is two bodies, the same heads; same bodies,

6    side-to-side again.  And basically you can look to make

7    comparisons, whatever information you want to look at.  I don't

8    know what you are looking at.

9          **THE COURT:**  What are you testifying to?

10         **THE WITNESS:**  I'm testifying to the accuracy and the

11   fact that I did these.

12         **THE COURT:**  Is another expert going to come in and point

13   out salient points of comparison to me?

14         **THE WITNESS:**  The next image will show that.  This is

15   the heads, one laying over the top of the other.  And basically

16   what I have done is an inspection to show, and let's -- okay.

17   What this is doing is she is showing a comparison as to how

18   accurate these two models are to each other.

19         **THE COURT:**  Are they overlaid?

20         **THE WITNESS:**  They are overlaid.

21         **THE COURT:**  And does the red indicate a high degree of

22   accuracy or inaccuracy?

23         **THE WITNESS:**  No.  The green on the scale over here

24   shows you you're at zero.  So it's real close.  And then the red

25   shows where you are going out further.  As you can look, you can

1    see yellow back here.  Yellow is about .6, starts .6 millimeters.

2    So you are roughly 11,000ths of an inch.

3            THE COURT:  So this scale on the left corresponds to

4    millimeters?

5            THE WITNESS:  Yes, to millimeters.

6            THE COURT:  And that's a measurable quantity of

7    difference or similarity when these two prototypes are overlaid

8    with one another?

9            THE WITNESS:  Yes.

10           THE COURT:  How do I know that this is an accurate

11   overlay?

12           THE WITNESS:  If you want to overlay them, you could.  I

13   can do it but it takes a while to overlay them to get them

14   together.

15           THE COURT:  Show me.  In other words, it's not enough

16   that I accept or that counsel accepts that this is an accurate

17   overlay and you are allowed to simply put up what you believe is a

18   combination.  And I'm not critical of that.  I want to know how

19   you reached the calculation and why the jury should believe that

20   this is an accurate overlay because, listen to me, because

21   everything flows from this.  If this is not an accurate overlay to

22   begin with, then all of your color differentiation means nothing.

23           THE WITNESS:  What I did is I used the software to

24   overlay it.  The algorithm overlays it and brings it in.

25           THE COURT:  My jury doesn't understand that yet.

Page 57

1          **THE WITNESS:**  These are tied to NITS standards for

2    accuracy.

3          **THE COURT:**  That means nothing to me.

4          **THE WITNESS:**  When we scan, the accuracy of this scan is

5    if you have a flat object, perfectly flat, we have, with the white

6    light scanner, no more than four microns of noise on the surface.

7          **THE COURT:**  Tell me why this gives my jury increased

8    knowledge over counsel who is standing behind with you both

9    sculpts.  He is going to show the jury these two sculpts.

10          **THE WITNESS:**  Let me show you something else that --

11          **MS. HURST:**  We'll be able to get this back.

12          **THE WITNESS:**  Yeah.  I'm just going to a different

13    screen.  This is photogrammetry.  This is what we use in order to

14    identify the points before we start scanning.  And I can actually

15    show you the accuracy with scale bars as to how accurate we really

16    are.

17          **THE COURT:**  I want you to show me how you overlay the

18    two sculpts and why -- foundation just to begin with -- I can

19    depend upon the overlay which eventually leads to these different

20    colored zones that you would then attempt to tell the jury have

21    significant similarities or differences.

22          Because what I'm not going to let you do is jump to the

23    conclusion without the foundation and without you being able to

24    show me why this is accurate in terms of sculpt overlay.

25          (Brief pause in proceedings.)

Page 58

1          **THE COURT:**  Back on the record.

2          **THE WITNESS:**  Okay.

3          **MS. HURST:**  Your Honor, before the witness starts to put

4    them together, may I ask a couple of questions?

5          **THE COURT:**  No.  I want to hear from him -- thank you,

6    Counsel -- then you can hear on cross-examination.

7          **THE WITNESS:**  What I'm going to do is best fit the Chloe

8    doll to the gray head sculpt.  And what I have done is I have set

9    the gray head as the reference, and I have left the top one up

10   here, the Chloe so it can float.  And what I do I go to operation

11   registration manual.

12          Now, what I'm going to do is pick points on the doll.

13   And I do first the top one, then the bottom one, then I'll come up

14   and pick a point here, a point here.  And let's do one.

15          **THE COURT:**  The record should reflect you have picked a

16   point near the eye, a point near the lips.

17          **THE WITNESS:**  And now it's going to tell me, okay, I

18   found these points in common on both dolls within .07 millimeters.

19   That's approximately 70 microns.  So it's very accurate as to how

20   I picked them.  And I say, okay, I have got a .701, but let's say

21   I want to play with it and try to get -- looks like that's about

22   as close as I can get.  I'm down to .0681.  If I keep playing with

23   it, I can get it closer, but just for speed.

24          Now, what I do is I put them together, I close it out,

25   and they're overlaid over the top of each other.  And that showed

Page 59

1    my accuracy as how close I got them together.

2              THE COURT:  How close did you get them together?

3              THE WITNESS:  I'm going to do a surface deviation and

4    I'm using .38 millimeters for my window that I'm going out to look

5    for.  And I'll do a preview.  I did pretty good just for the first

6    time without trying too hard.

7              So wherever it's green, a solid green, I'm zero.  It's

8    right on top of the surface.  If I go out towards yellow, it's up

9    to .160 millimeters.

10             THE COURT:  Differentiation in the overlay?

11             THE WITNESS:  Differentiation?  How do you mean now?

12             THE COURT:  You said that you want the jury to

13   understand that the overlay between the two sculpts is as close to

14   identical, or the two sculpts are overlaid so you can eventually

15   display a screen showing the variations and similarities of these

16   overlaid sculpts.

17             THE WITNESS:  Okay.  Where you see this color map, this

18   is a common inspection software for doing this.  The green is at

19   zero.  As you go up, .08, that's less than the thickness of a

20   human hair.  That's how close it is.

21             THE COURT:  Now, counsel, questions on

22   cross-examination.

23                          CROSS-EXAMINATION

24   BY MS. HURST:

25   Q    Mr. Keiser, could you go back to the first screen where you

Page 60

1    had both heads before you overlaid them, please.  Is that the same

2    one?

3    **A**    It's same as.  Just the bodies are off.

4    **Q**    So Mr. Keiser, on the left on your lap top screen, is one of

5    your -- what do you call them, scans?

6    **A**    Um-hmm.

7    **Q**    -- one of your scans of Exhibit 17733, it's the final Bratz

8    doll head and body; correct?

9    **A**    I don't know that number.

10   **Q**    It's a final Bratz doll head and body; right?

11   **A**    I'll assume that you are saying that, yeah.  This is a gray

12   sculpt.

13   **Q**    Hold on.  Let's just stick with the one on the left.  That

14   was a Bratz doll?

15   **A**    Yes.  That was the Chloe.  And let me give you my file

16   number.  That's 0128088 MGA 2001 blonde Chloe.  I think that was

17   Exhibit 70, if I'm not mistaken.  I'm not sure.

18   **Q**    It started out as a 2001 Bratz doll; is that right?

19   **A**    Yes.

20   **Q**    And the one on the right on your screen is Exhibit 1136A, the

21   gray sculpt; correct?

22   **A**    Yes.  Well, A, but we have had the arm, the body, and the

23   sculpt, whether it's A, B or C, I'm not sure exactly.  I think it

24   was B in my pile.

25   **Q**    It's the gray sculpt?

Page 61

1   **A**    Yes.

2   **Q**    Just looking at the heads, I want you to look over here at me

3   at the real-life heads, can you see both of those?

4   **A**    Um-hmm.

5   **Q**    Is that a "yes" for the record?

6   **A**    I see them, yes.

7   **Q**    Can you see a difference in size between those two heads?

8   **A**    We scaled so that you --

9   **Q**    Mr. Keiser, let me just ask you first, can you answer my

10  question?  Looking at the two objects, do you see a difference in

11  size between those two heads?

12  **A**    Yes.

13  **Q**    All right.  And you altered the size of one or both of these

14  in the process in your computer; isn't that right?

15  **A**    We altered the Chloe doll.

16  **Q**    How did you alter it?

17  **A**    The software can scale without changing features.

18  **Q**    So you manipulated the size of the Chloe doll in order to

19  perform your comparison?

20  **A**    Yes.

21  **Q**    So all of the differences that are accounted for by size

22  changes will be eliminated in your comparison process; is that

23  correct?

24  **A**    Say that one more time.

25  **Q**    All of the differences between the two heads out here in the

Page 62

1   real world, they're accounted for by size changes.  Have been

2   eliminated in your comparison process?

3   **A**   I don't really understand what you are trying to say, but to

4   make it more clear to you, when I -- first of all, this is not the

5   same one.  The Chloe, if you notice, had hair.  That's the reason

6   why we didn't pick up the hair.  That's not the same doll.

7   **Q**   I'm just going based on what I understood this was about.

8           Let me ask you another question.  Look over here at the

9   two heads and what is in the real world.  Actually, why don't you

10  give me your overlay now, again, the one that you showed us

11  before.  Look here in the real world at the gray sculpt, 1136, you

12  see that?

13  **A**   Um-hmm.

14  **Q**   Can you say "yes" for the record?

15  **A**   Yes.

16  **Q**   Please don't look at the lap top.  Look at the dolls.  It's

17  got eyelids?

18  **A**   Yes.

19  **Q**   And over here 17733 no eyelids; right?

20  **A**   Yes.

21  **Q**   How did your comparison account for that change?

22  **A**   As you notice, they're red, which is showing you that the

23  eyelids on this item is sticking further out, a plus value up here

24  in the red.  So it's sticking out away from there.

25          So you notice we do not have a match where those are.

Page 63

1   We only have a match in the other areas around the lips.  And

2   there is a little piece of red right there.  There is a little

3   piece of red where it's a little bit different.

4   **Q**   Your first comparison that you showed us did not have red

5   over the eyelids, did it?

6          **THE COURT:**  Go back to the very first comparison you

7   showed us.

8          **THE WITNESS:**  Okay.  Now let me explain this.

9   **BY MS. HURST:**

10  **Q**   Hold on.  That's the first scan you -- the first overlay you

11  showed us?

12  **A**   Yes.

13  **Q**   No red over the eyelids; correct?

14  **A**   Correct.

15  **Q**   Look over here.

16  **A**   Except in this one.

17  **Q**   On the right.  Okay.

18          So over here, if you look at 1136A, the gray head, you

19  are looking at that right now.  Can you see there is some fine

20  detail on the iris in the eyes in the sculpt?

21  **A**   Yes.

22  **Q**   Over 17733, is there an iris?

23  **A**   No.

24  **Q**   Did your comparison account for the difference in the iris as

25  you are displaying it there on your lap top screen right now?

Page 64

1    "Yes" or "no," if you can?

2    **A**    You cannot see it in this rendition.

3    **Q**    Okay.  That's good.  Thank you.  On the 1136 gray head, you

4    see the eyebrows are faintly in size; right?

5    **A**    Yes.

6    **Q**    Over here on 17733, no eyebrows; right?

7    **A**    Yes.

8    **Q**    Is there a red line on your lap top screen right now where

9    the eyebrow differences are found?

10   **A**    No.

11   **Q**    Okay.  Now, over here on 1136A, that's a gray head; right?

12   **A**    Yes.

13   **Q**    And you see that there are two indentations on the upper lip;

14   correct?

15   **A**    Yes.

16   **Q**    Here, 17733, no indentations on the upper lip?

17   **A**    Yes.

18   **Q**    Now, you have got some red areas on your upper lip there on

19   your screen?

20   **A**    Yes.

21   **Q**    So sometimes your overlay picks up the changes and sometimes

22   it doesn't; correct?

23   **A**    Correct, but if you'd like I can explain it to you.  But if

24   you don't want it explained, I won't.

25   **Q**    Not right now.  Thank you.

1           The comparison you are showing is not a complete head of

2    the Bratz doll figure; right?  In other words, it doesn't have the

3    top and the back?

4    **A**    Are you talking about the Chloe?

5    **Q**    Yeah, the Chloe.  It's not a complete head.

6    **A**    Yes, it's a complete head.

7    **Q**    You said it had hair on it?

8    **A**    I said we do not pick up the hair.

9    **Q**    So your image that you overlaid, therefore, did not have the

10   back of the head; correct?

11   **A**    Correct.

12   **Q**    So any changes that occur on the back of the head are not

13   reflected in your comparison?

14   **A**    Correct.

15   **Q**    Let me ask you to look -- turn that around again, please.

16   Looking here at 1136A, the gray head in the real world, you see

17   the width of the bridge of the nose is fairly wide; correct?

18   **A**    Yes, I do.

19   **Q**    Over here 17733, narrow bridge on the nose?

20   **A**    Yes.

21   **Q**    And that change is not reflected there on your comparison on

22   your lap top screen; correct?

23   **A**    That's correct.

24           **MS. HURST:**  No further questions.

25           **THE COURT:**  Do you have questions, Mr. Zeller?

Page 66

1                          REDIRECT EXAMINATION

2    BY MR. ZELLER:

3    Q    Is it correct that the scan overlay that you have here does

4    not, quote, pick up the changes, end quote that Ms. Hurst has

5    described?

6    A    The scan does pick up the changes.  The difference is that we

7    scaled one model to put it over the other so that we could do a

8    comparison.

9            When you are looking at the real object, one is smaller

10   than the other and the features are going to be smaller.

11   Q    The overlay would allow the jury to see and account for how

12   similar objects are without regard to scale?

13   A    Yes.

14   Q    And that would be a comparison that a jury could not normally

15   make by simply looking at the two objects with their naked eyes?

16   A    Correct.

17           THE COURT:  Aren't we supposed to be able to do that?

18           MR. ZELLER:  But that's the argument they're already

19   making; right?  They're able to point out all those differences.

20   The scan shows how trivial those differences are, how small they

21   are, because they show that the deviations that they're talking

22   about are minuscule; changes basically smaller than a human hair.

23           THE COURT:  Anymore questions of the gentleman?

24       MR. ZELLER:  No.

25           THE COURT:  Anymore questions of the gentleman?

Page 67

1                                   RECROSS-EXAMINATION

2    **BY MS. HURST:**

3    **Q**    Mr. Keiser, does your scanning process have any relationship

4    to human perception?

5    **A**    I don't understand your question.

6    **Q**    Did the algorithms in this software account for the

7    psychology of human perception in any way that you are aware of?

8    **A**    The algorithms in the software only take these items and

9    compare them.

10   **Q**    They overlay them?

11   **A**    They overlay and compare.

12   **Q**    And it's up to the human observer to determine the

13   significance of that; is that correct?

14   **A**    It's up to the jury to determine significance, correct.

15            **MS. HURST:**   I have one more question, Your Honor.

16   **BY MS. HURST:**

17   **Q**    What was the distance at which you took the scans of these

18   objects, the distance between the machine and the objects?

19   **A**    These I think were 290 millimeters.

20   **Q**    290 millimeters between the lens and the object?

21   **A**    Yes.   That's the calibrated distance.

22   **Q**    And that was the distance at which you took the image?

23   **A**    I think it was, yes.

24   **Q**    And the closer you get, the better the resolution; correct?

25   **A**    No.   No.

Page 68

1   **Q**   No?

2   **A**   No.  We changed the resolution by lenses.

3   **Q**   So you used the best possible resolution?

4   **A**   I used 250 measurement.

5   **Q**   Is that the best possible resolution?

6   **A**   No.  I could go down to 50 by 40.  Just more shots.

7   **Q**   So it would have been possible to get a better resolution?

8   **A**   Possibly but not that much.

9   **Q**   Did you notice the tool marks in your scan?

10  **A**   Um-hmm.

11  **Q**   You noticed the tool marks on the head?

12  **A**   Yes.

13  **Q**   Were the tool marks in your scan?

14  **A**   No.

15  **Q**   Okay.  No further questions.

16          **MR. ZELLER:**  I think the basic pitch here, Your Honor,

17  is what Ms. Hurst has done is all stuff that she can do and should

18  do in front of the jury.  She can make those arguments and

19  undoubtedly will, not only through this witness but through

20  others.  But we should be able to show the jury in a scientific

21  way how trivial these differences really are because they are

22  exploiting the fact that these things are of slightly different

23  size; that there's tool marks when ultimately, of course, what

24  we're talking about is copyright.  Appearance.

25          And so the Court -- so the jury I think is assisted by

Page 69

1    this scientific technology to see that, in fact, the shape, the

2    design is not materially different.  The fact is, and the Court

3    will hear more testimony about this as the case goes on, but MGA

4    already tried to exploit the fact that the gray sculpt is bigger.

5    But the fact is those sculpts were done in a larger size as part

6    of the process.  They upscale them so when they replicate them,

7    they are the proper size.

8            But right now the jury is frankly being misled on that.

9    We'll clear it up through regular testimony.  But this will assist

10   the jury in understanding how trivial and how small these

11   differences are that MGA is putting in front of them.  It's one

12   more piece of information for them to consider.  MGA is free to

13   make the arguments that they have already made.

14           **THE COURT:**  Thank you.  Counsel.

15           **MS. KELLER:**  Your Honor, based on the hearing, this

16   hearing, it's apparent that the comparison is admittedly

17   unreliable; that the witness has not given the best available

18   information and this really has absolutely nothing to do with how

19   the intrinsic test or extrinsic test or anything else, which is

20   how humans perceive these things, not how some piece of software

21   unreliably, and at less than the best, measures them.

22           **THE COURT:**  What I'll do is let me have the weekend to

23   think about this.  We'll write something on it either admitting or

24   denying.

25           Thank you, sir.  Appreciate the time.

Page 70

1          **MR. QUINN:**  Are we done?

2          **THE COURT:**  I'm sorry.  Good night.

3                (Whereupon the proceedings were adjourned at 6:32

4    p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 71

1

2                                    -oOo-

3

4                                CERTIFICATE

5

6           I hereby certify that pursuant to Section 753, Title 28,

7    United States Code, the foregoing is a true and correct transcript

8    of the stenographically reported proceedings held in the

9    above-entitled matter.

10

11   Date:  JANUARY 28, 2011

12

13

14   MARIA DELLANEVE, U.S. COURT REPORTER
     CSR NO. 9132
15

16

17

18

19

20

21

22

23

24

25