1

1          **UNITED STATES DISTRICT COURT**

2          **CENTRAL DISTRICT OF CALIFORNIA**

3        **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4                    – – – – – – –

5

6   MATTEL, INC., ET AL.,              )
                                       )
7              Plaintiffs,             )
                                       )
8        vs.                           ) No. CV 04-9049-DOC
                                       )    Day 9
9   MGA ENTERTAINMENT, INC., ET AL.,   )    Volume 2 of 3
                                       )
10             Defendants.             )
    _____   )

11

12

13

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                    Jury Trial

17              Santa Ana, California

18           Friday, January 28, 2011

19

20

21

22   Jane C.S. Rule, CSR 9316
     Federal Official Court Reporter
23   United States District Court
     411 West 4th Street, Room 1-053
24   Santa Ana, California 92701
     (714) 558-7755
25
     11-01-28 MattelV2

Case 2:04-cv-09049-DOC-RNB   Document 9750   Filed 01/31/11   Page 2 of 92   Page ID #:292886
CV 04-9049-DOC – 01/28/2011 – Day 9, Vol. 2 of 3

2

```
 1    APPEARANCES OF COUNSEL:

 2


 3    FOR PLAINTIFFS MATTEL, INC., ET AL.:

 4              QUINN, EMANUEL, URQUHART & SULLIVAN
                By:  JOHN B. QUINN
 5                   MICHAEL T. ZELLER
                     WILLIAM PRICE
 6                   Attorneys at Law
                865 South Figueroa Street
 7              10th Floor
                Los Angeles, California 90017-2543
 8              (213) 443-3000

 9


10    FOR DEFENDANTS MGA ENTERTAINMENT, INC., ET AL.:

11              ORRICK, HERRINGTON & SUTCLIFFE, LLP
                BY:  THOMAS S. MC CONVILLE
12                   Attorney at Law
                4 Park Plaza
13              Suite 1600
                Irvine, California 92614
14              (949) 567-6700

15              – AND –

16              ORRICK, HERRINGTON & SUTCLIFFE, LLP
                BY:  ANNETTE L. HURST
17                   Attorney at Law
                405 Howard Street
18              San Francisco, California 94105
                (415) 773-5700
19
                – AND –
20
                KELLER RACKAUCKAS, LLP
21              BY:  JENNIFER L. KELLER
                     Attorney at Law
22              18500 Von Karman Avenue
                Suite 560
23              Irvine, California 92612
                (949) 476-8700
24

25
```

Case 2:04-cv-09049-DOC-RNB   Document 9750   Filed 01/31/11   Page 3 of 92   Page ID #:292887
CV 04-9049-DOC - 01/28/2011 - Day 9, Vol. 2 of 3

3

```
 1    APPEARANCES OF COUNSEL (Continued):

 2

 3    FOR DEFENDANT CARLOS GUSTAVO MACHADO GOMEZ:

 4              SCHEPER, KIM & OVERLAND, LLP
                BY:  ALEXANDER H. COTE
 5                   Attorney at Law
                601 West Fifth Street
 6              12th Floor
                Los Angeles, California 90071
 7              (213) 613-4660

 8              - AND -

 9              LAW OFFICES OF MARK E. OVERLAND
                BY:  MARK E. OVERLAND
10                   Attorney at Law
                100 Wilshire Boulevard
11              Suite 950
                Santa Monica, California 90401
12              (310) 459-2830

13

14    Also Present:

15              ROBERT ECKERT, Mattel CEO

16              ISAAC LARIAN, MGA CEO

17              KEN KOTARSKI, Mattel Technical Operator

18              MIKE STOVALL, MGA Technical Operator

19              RACHEL JUAREZ, Quinn Emanuel Urquhart Oliver &
                      Hedges
20

21

22

23

24

25
```

```
 1                          I N D E X

 2

 3

 4                        EXAMINATION

 5

 6   Witness Name         Direct    Cross    Redirect    Recross

 7   BRYANT, CARTER
        By Mr. Price        5

 8

 9

10                         EXHIBITS

11

12   Exhibit                        Identification    Evidence

13   Plaintiffs' No. 5-88                               16

14   Plaintiffs' No. 27                                 77

15   Plaintiffs' No. 593                                47

16   Plaintiffs' No. 1313C                              37

17   Plaintiffs' No. 1765                               23

18

19

20

21

22

23

24

25
```

Case 2:04-cv-09049-DOC-RNB   Document 9750   Filed 01/31/11   Page 5 of 92   Page ID #:292889
CV 04-9049-DOC – 01/28/2011 – Day 9, Vol. 2 of 3

5

```
 1              SANTA ANA, CALIFORNIA, FRIDAY, JANUARY 28, 2011

 2                       DAY 9, VOLUME 2 OF 3

 3                          (1:02 p.m.)

 4              (The following proceedings is taken in the

 5         presence of the jury.)

 6              THE COURT:  All right.  The jury is present, the

 7    alternates, all counsel, the witness.  If all parties will

 8    be seated.

 9              And counsel, thank you for your courtesy.

10              And Mr. Price, if you'd like to continue on with

11    your examination, please.

12              MR. PRICE:  Thank you.

13              THE COURT:  This is on behalf of Mattel.

14                    DIRECT EXAMINATION (Continued)

15    BY MR. PRICE:

16    Q    Good afternoon.

17    A    Good afternoon.

18    Q    We're talking about the month of September in 2000, and

19    do you recall I was asking you about phone calls that you

20    made to Paula Garcia or Isaac Larian in September; do you

21    recall that?

22    A    Yes.

23    Q    Would you characterize those phone calls as being

24    fairly frequent?

25    A    I don't really recall.
```

CV 04-9049-DOC – 01/28/2011 – Day 9, Vol. 2 of 3

6

```
1    Q    Would you characterize those phone calls as being

2    frequent?

3    A    I don't really remember how often we spoke.

4    Q    In your mind, the way you would use the term

5    "frequent," What would that mean to you?

6    A    "Frequent" would mean "often."

7    Q    From ambiguous to ambiguous.

8         (Laughter.)

9    BY MR. PRICE:

10   Q    What do you mean by "often"?

11        MS. KELLER:  Objection, your Honor.  Vague --

12        THE COURT:  Sustained.  We will strike the comment

13   "ambiguous to ambiguous."  Just disregard it.

14   BY MR. PRICE:

15   Q    So what would you mean by -- "frequent" would be

16   "often," so "often" would be -- could you give us a range

17   within a month, if you say you called somebody often, what

18   you would mean?

19   A    I don't know.  Maybe five or six times.

20   Q    If you'd look at Exhibit 472 -- and do you have 472 in

21   front of you?

22   A    Yes.

23   Q    Now, have you ever seen this before?

24   A    I don't recall.

25   Q    Was your extension at Mattel 6099?
```

CV 04-9049-DOC - 01/28/2011 - Day 9, Vol. 2 of 3

7

```
 1   A    I don't remember.
 2   Q    In the -- in September, from your Mattel extension, did
 3   you have calls to MGA almost every day?
 4   A    I don't remember.
 5   Q    Do you know -- in September of '99, do you know what
 6   the phone numbers were of the main MGA line?
 7   A    I can't recall.
 8   Q    Do you recall a phone number (818)894-2525?
 9   A    No, it's not ringing a bell.
10   Q    How about -- was it your recollection that Mr. Larian
11   had a direct line?
12   A    I believe so, yes.
13   Q    And do you recall the extension (818)894-3150?
14   A    No, I don't recall that.
15   Q    When you called Mr. Larian or Ms. Garcia in the
16   September time frame, did you restrict your calls -- let me
17   rephrase that.
18        In the September time frame, were your calls to
19   Ms. Garcia and Mr. Larian just from your extension at
20   Mattel?
21   A    I don't remember.
22   Q    I mean, do you remember calling them also sometimes
23   from phones other than the Mattel phone?
24   A    It's possible.
25   Q    You have no memory, one way or the other?
```

Case 2:04-cv-09049-DOC-RNB   Document 9750   Filed 01/31/11   Page 8 of 92   Page ID #:292892
CV 04-9049-DOC – 01/28/2011 – Day 9, Vol. 2 of 3

8

1    A    Not really.

2    Q    Well, let me get back to the topic I covered earlier,

3    but I forgot to ask you about Carmen Monteagudo.

4    A    Okay.

5    Q    Do you recognize the name?

6    A    Yes, I think so.

7    Q    And could you tell me what the name is, what her name

8    is?

9    A    I recognize the first name Carmen, I don't know the

10   last name.

11   Q    Actually, do you remember the name Carmen Monteagudo?

12   A    The first name rings a bell.

13   Q    And Carmen was a hair rooter at Mattel, correct?

14   A    Yes.

15   Q    And at some point prior to this August meeting you are

16   talking about, you gave her a head that you wanted her to

17   root hair on, right?

18   A    Yes.

19   Q    And she did that for you?

20   A    Yes.

21   Q    Again, she trusted you, right?

22        MS. KELLER:  Again, argumentative.  Speculation.

23        MR. PRICE:  Let me rephrase.

24   BY MR. PRICE:

25   Q    You asked her to do that because you believe she

```
 1   trusted you, right?
 2          MS. KELLER:  Objection.  Argumentative.
 3          THE COURT:  Well, speculation as to her and what
 4   she thinks, but he can answer concerning his own thoughts
 5   and feelings at the time.
 6          So if you understand the question, you can answer
 7   it.  If not, counsel can reask.
 8          THE WITNESS:  No, I think she trusted me.
 9   BY MR. PRICE:
10   Q    And that's one of the reasons you asked her to do this,
11   right, because you thought that she trusted you?
12   A    I don't really recall.
13   Q    The hair rooting she did was for this 3D,
14   three-dimensional prototype which you planned to show to
15   Ms. Garcia and Mr. Larian and others, correct?
16   A    I think so, yes.
17   Q    And at the time you asked her to do that, you didn't
18   tell her that you were asking to do that for this pitch for
19   Bratz to another company?
20   A    I don't remember.
21   Q    If you look at -- it's a June 12, 2008, page 2497 --
22   actually to get context, 2496, line 19 to 2497, line 5.
23   A    2496, what line?
24   Q    2496, line 19.
25   A    Okay.
```

CV 04-9049-DOC - 01/28/2011 - Day 9, Vol. 2 of 3

10

1    Q    To 2497, line 5.

2    A    Okay.

3    Q    And does that refresh your recollection that you did

4    not tell Carmen that you wanted her to create this -- do

5    this hair rooting because you were going to make a pitch for

6    the project Bratz to another toy company?

7    A    I -- I don't think I said anything to her.

8    Q    She's another person at Mattel that you believe that

9    you betrayed their trust, right?

10            MS. KELLER:  Objection.  Argumentative.

11            THE COURT:  Repeat that, Counsel.  I'm sorry.

12   BY MR. PRICE:

13   Q    Is Ms. Monteagudo, who you know as Carmen, another

14   person at Mattel whose trust you believe you betrayed?

15            THE COURT:  Same objection, overruled.

16            You can answer the question, sir.

17            THE WITNESS:  Yes.

18   BY MR. PRICE:

19   Q    And we were talking about -- again, focusing on

20   September of 2000, we had spoken about Universal and about

21   Ms. Marlow, correct?

22   A    Yes.

23   Q    Did you continue working, by the way, with Ms. Marlow

24   going into October 2000?

25   A    Yes.

CV 04-9049-DOC – 01/28/2011 – Day 9, Vol. 2 of 3

11

```
1    Q    And I'd like you to focus on the time period prior to

2    October 19, 2000, when you left Mattel, okay?

3         So could you tell us what kind of work you did with Ms.

4    Marlow in connection with Bratz prior to your last day of

5    employment at Mattel?

6    A    I -- I don't really remember other than we may have

7    talked about some fashion ideas.

8    Q    Did you go shopping with her?

9    A    I don't remember.

10   Q    Did you select a fashions with her?

11   A    I don't remember.

12   Q    Did you go to stores and buy fashions and -- and kind

13   of put them together and show them to Ms. Marlow?

14   A    I don't remember.

15   Q    Did you go to stores and buy some fashions and put them

16   together to show them to Ms. Garcia between -- prior to

17   October 9 of 2000?

18   A    I -- I don't remember that, either.

19   Q    Do you know anything that Ms. Marlow did between

20   September 29 and October 20th of 2000?

21   A    I -- I don't recall right now.

22   Q    If you'd look back at Exhibit 606.  Do you have that in

23   front of you?

24   A    Yes.

25   Q    And if you'd look at the second page, which you see it
```

CV 04-9049-DOC - 01/28/2011 - Day 9, Vol. 2 of 3

```
1    says, "The Bratz dolls research, development and support

2    services from September 29 to October 20, 2000"; do you see

3    that?

4    A    Yes.

5    Q    Now, I want you to look at the entries below that which

6    has the hours.  And first, let me ask you, did you attend

7    any of the 18 hours of brainstorm and development meetings

8    between September 29th and October 20th, 2000, concerning

9    what Ms. Marlow was to be making?

10   A    I don't remember.

11   Q    By October 20th, you had already worked on fashions for

12   the Bratz dolls that were more than the fashions you had

13   shown them in September, correct?

14   A    I -- I don't recall.

15   Q    Could you tell us, then, what you do recall doing

16   between October 1st, 2000 and October 19, 2000, when you

17   left the Mattel design center?

18   A    I -- I don't remember a lot.  I do remember there were

19   some meetings.  I don't remember what the context of most of

20   those meetings was.

21   Q    Do you recall getting a communication from Mr. Larian

22   in -- within the first week in October 2000 saying that you

23   should be working full time on Bratz?

24   A    Yes.

25   Q    And were you working full time on Bratz between, say,
```

CV 04-9049-DOC – 01/28/2011 – Day 9, Vol. 2 of 3

13

```
1    October 4, 2000 and October 19, 2000?

2    A    No.

3    Q    Did you represent to Mr. Larian that you were working

4    full time on that?

5    A    I don't remember.

6    Q    In those days between October 4, 2000 and October 19,

7    2000, were you going to the design center at Mattel?

8    A    I'm sorry, can you restate your question?

9    Q    Yes.  Between October 4, 2000 and October 19, 2000,

10   were you going to the design center at Mattel?

11   A    Yes.

12   Q    And what would your workday be at the Mattel design

13   center?

14   A    I think we started at around 8:30 and went until about

15   5:00.

16   Q    And how many days a week was that?

17   A    We had a -- let's see, I think we worked four and a

18   half days a week.

19   Q    So on Friday, you worked until about 1:00?

20   A    Yes.

21   Q    Now, during that time frame between October 4 of 2000

22   and October 19, 2000, did you go over to MGA?

23   A    Yes.

24   Q    So you'd visit their facilities, right?

25   A    Yes.
```

1    Q    While you were still working at Mattel, correct?

2    A    Yes.

3    Q    But you wouldn't show up and put in a full day at MGA?

4    A    No.

5    Q    So how long would you stay at MGA when you went over?

6              MS. KELLER:  Objection.  Vague as to time, how

7    many days a week.

8              THE COURT:  Overruled.

9              I assume that this is from the prior questions of

10   October 4th to October 19th --

11             MR. PRICE:  Yes.

12             THE COURT:  -- just to be clear.  That's what I

13   assumed.

14             All right.  Overruled.

15             THE WITNESS:  I'm sorry, what was the question

16   again?

17   BY MR. PRICE:

18   Q    How many hours per day, if you can average them, did

19   you work at MGA's office between October 4 and October 19?

20   A    I just remember going there briefly and not every day.

21   Q    Did anyone at MGA ask you why you weren't showing up at

22   MGA after you signed a contract with MGA?

23   A    I don't remember.

24   Q    Would you go over during your lunch break?

25   A    I don't remember.

```
1    Q    Would you go over on Friday afternoons after 1:00?

2    A    Possibly.

3    Q    When you went to MGA, who would you work with?

4    A    I only remember meeting with Paula.

5    Q    And between October 4th and October 19, 2000, what were

6    you doing in these meetings with Ms. Garcia?

7    A    I don't recall specifically what we were doing.

8    Q    Do you recall generally what you were doing?

9    A    I think we were just talking about the, you know, the

10   project.  I can't think of anything specific.

11   Q    I mean, during this time frame, were product

12   development forms being sent to Hong Kong, to your

13   knowledge?

14   A    I don't know.

15   Q    Were fashions being determined during this time frame,

16   October 4 to October 19?

17   A    I don't remember that either.

18   Q    During October 4 and October 19, were there meetings to

19   prepare for sales meetings to potential customers of MGA?

20   A    I don't remember that either.

21   Q    Do you recall that there was, in November, a sales

22   presentation to Kmart?

23   A    No, I don't.

24   Q    Well, do you remember in this time frame that -- and

25   I'm talking about October 4 to October 19, 2000, that you
```

CV 04-9049-DOC – 01/28/2011 – Day 9, Vol. 2 of 3

16

1   met with the sculptor?

2   A    I believe so, yes.

3   Q    And, in fact, your first contact with the sculptor was

4   prior to October 4th, correct?

5   A    I believe so, yes.

6   Q    And in this meeting prior to October 4, you gave the

7   sculptor drawings to use when doing an initial sculpt of the

8   Bratz characters, correct?

9   A    Yes.

10  Q    And the sculptor's name was Margaret Leahy?

11  A    Yes.

12  Q    And if we'd look at Exhibit 5, page 88.

13  A    Okay.

14  Q    And do you recognize what 5-88 is?

15  A    Yes.

16  Q    What is it?

17  A    This is a drawing that I think that I gave Margaret

18  for -- to use as a sculpting guide.

19          MR. PRICE:  You know, I'm not certain, your Honor,

20  so I move 5-88 into evidence.

21          THE COURT:  Received.

22          (Plaintiffs' Exhibit No. 5-88 is received in

23      evidence.)

24  BY MR. PRICE:

25  Q    So we are looking here at 5-88, and you see there is

Case 2:04-cv-09049-DOC-RNB   Document 9750   Filed 01/31/11   Page 17 of 92   Page ID #:292901
CV 04-9049-DOC - 01/28/2011 - Day 9, Vol. 2 of 3

17

1    handwriting on that.  Is that your handwriting?

2    A    Some of it, I believe.

3    Q    Okay.  Let's -- let's look at it.  Can you tell us what

4    is not your handwriting?

5    A    I don't know about the 9 to 10-inches tall, 14 to 15

6    years old, the removable or -- I am not even sure what that

7    says, something ankles.

8    Q    Removable ankles?

9    A    Something like that.

10         And I don't know about the date.

11   Q    Your -- your belief is this is something you gave to

12   Margaret Leahy to start her first sculpt?

13   A    I think so, yes.

14   Q    And the other writing here, is that your handwriting,

15   the jointed here at shoulders, sculpted fingernails, jointed

16   hips, basic sculpt?

17   A    Yes, I think so.

18   Q    And the reason you gave this to Ms. Leahy was so she

19   could start on a Bratz sculpt, correct?

20   A    Yes.

21   Q    For the creation of a Bratz doll?

22   A    Yes.

23   Q    And this was done prior to even the date you gave

24   notice to Mattel that you were going to leave?

25   A    I don't remember exactly.

1    Q    Do you recall that was prior to October 4th?

2    A    I don't remember.

3    Q    If you'd look at June 13, page --

4         MS. KELLER:  Objection.  Vague as to time, your

5    Honor.

6         THE COURT:  I'm sorry?

7         MS. KELLER:  Vague as to time.

8         THE COURT:  June 13?

9         MS. KELLER:  As to what year.

10        THE COURT:  Oh, 2000, Counsel, 2001, or what --

11        MS. KELLER:  No, we --

12        THE COURT:  Okay.

13        MR. PRICE:  It's June 13, 2008.  It's the

14   transcript.

15   BY MR. PRICE:

16   Q    And if you'd look at 2562, lines 2 through 12 --

17   A    Okay.

18   Q    -- does that refresh your recollection that you met

19   with Ms. Leahy to talk about the sculpt prior to

20   October 4th?

21   A    Yes.

22   Q    So were you keeping your meetings with Ms. Leahy a

23   secret from Ms. Garcia?

24   A    I don't think so, no.

25   Q    And why do you say you don't think so, "no"?

CV 04-9049-DOC – 01/28/2011 – Day 9, Vol. 2 of 3

19

```
1    A     It's just how I remember it.

2    Q     You met Ms. Leahy a second time for another sculpt,

3    right?

4    A     Yes.

5    Q     Now, actually you met with her a second time so that

6    she could show you the sculpt she did?

7    A     Yes.

8    Q     All right.  And in that meeting, when she's showing you

9    the sculpt she's already done for you, Ms. Garcia was part

10   of that meeting, correct?

11   A     I don't remember.

12   Q     If you'd look at 2567, lines 23, to 2568, line 6.

13   A     Okay.

14   Q     Does that refresh your recollection that Ms. Garcia was

15   there with you looking at the second sculpt?

16   A     I don't remember her being there necessarily right now,

17   but I don't disagree with the testimony.

18   Q     And your testimony before was that Ms. Garcia was there

19   looking at the second sculpt, correct?

20   A     Yes.

21   Q     Now, Ms. -- Ms. Leahy, the -- the sculptor incorporated

22   your comments in providing the second sculpt, right?

23   A     Yes.

24   Q     And then -- by the way, the initial sculpt was done

25   sometime in September, right?
```

1    A    I don't remember what I said about that before.  Could

2    I have the transcript read back?

3    Q    Sure.  Look on 2567, line 23 to line 25.

4    A    Okay.  Yes.

5    Q    And again, that's before you even gave Mattel notice

6    that you were going to be leaving Mattel, right?

7    A    I'm not sure about that.

8    Q    Well, is it correct that you didn't give Mattel notice

9    until around October 4th?

10   A    Oh, yes.

11   Q    And so the -- the first sculpt created for -- in this

12   Bratz project was a sculpt that you received before you had

13   even given Mattel notice?

14   A    Yes.

15   Q    And then when you saw Ms. Leahy's sculpt, then you gave

16   other comments, correct?

17   A    Yes.

18   Q    And that meeting took place at Ms. Leahy's house?

19   A    I don't recall that one way or the other.

20   Q    That meeting took place where you gave more comments

21   before your last day at Mattel, right?

22   A    Yes.

23   Q    And was there another sculpt?

24   A    Yes.

25   Q    In fact, was there something called a casting?  Does

CV 04-9049-DOC - 01/28/2011 - Day 9, Vol. 2 of 3

21

1    the word "casting" mean anything to you?

2    A     Yes.

3    Q     Let me see if I have the right word.

4          Okay.  Did you see a casting?

5    A     Yes.

6    Q     And this is where you make a mold from the sculpt and

7    then you create a -- a sculpt by pouring material into the

8    mold?

9    A     Yes.

10   Q     Okay.  And that took place before your last day at

11   Mattel as well, correct?

12   A     I don't remember.

13   Q     You were giving your input to the sculpt throughout the

14   process of creating the sculpt, correct?

15   A     Yes.

16   Q     And you were doing it because you had an interest in

17   how the doll looked, right?

18   A     Yes.

19   Q     You had a vision for that?

20   A     Yes.

21   Q     And you were trying to make the actual doll consistent

22   with your vision, right?

23   A     Yes.

24   Q     By the way, you've seen obviously the Bratz dolls,

25   right?

CV 04-9049-DOC – 01/28/2011 – Day 9, Vol. 2 of 3

22

1    A    Yes.

2    Q    And you have seen them go through -- let me rephrase

3    that.

4         Certainly you saw the original Bratz dolls that came

5    out, right?

6    A    Yes.

7    Q    And you saw dolls that later came out, right?

8    A    Yes.

9    Q    And from your perspective looking at these dolls, you

10   believe they all appear similar, right?

11        MS. KELLER:  Objection.  Calls for an expert

12   opinion and irrelevance as to the substantive generation,

13   your Honor.

14        THE COURT:  Yeah, I'm concerned about the issue we

15   raised before, counsel.

16        Why don't we move on to another area.  Let me talk

17   to each of you at the recess.

18   BY MR. PRICE:

19   Q    Now, I'd like you to look at Exhibit 1765.

20        And do you recognize Exhibit 1765?

21   A    I don't really remember it, no.

22   Q    Does it appear, the top part of this e-mail string, to

23   be an e-mail sent to you from Paula Garcia, then Paula

24   Treantafelles, on October 23, 2000?

25   A    Yes.

CV 04-9049-DOC – 01/28/2011 – Day 9, Vol. 2 of 3

23

1    Q    And attached to that are e-mails to you and Ms. Garcia

2    and from Ms. Garcia to others, correct?

3    A    I'm sorry, what was your question, now?

4    Q    What follows on this string are e-mails from you to

5    Ms. Garcia and from Ms. Garcia to others, right?

6    A    Yes.

7              MR. PRICE:  All right.  I move Exhibit 1765 into

8    evidence.

9              THE COURT:  Received.

10             *(Plaintiffs' Exhibit No. 1765 is received in*

11        *evidence.)*

12   BY MR. PRICE:

13   Q    If you'd look at the third page, 1765-0003; do you see

14   that?

15   A    Yes.

16   Q    And particular, I want you to look at an e-mail --

17   e-mail dated October 19, 2000, from Paula Treantafelles,

18   Ms. Garcia, to Samuel Wong, Mercedeh Ward and you; do you

19   see that?

20   A    Yes.

21   Q    Now, this was the last day you were at the Mattel

22   design center, October 19th, correct?

23   A    I don't remember my last day.

24   Q    Okay.  On your last day, did you have an exit form that

25   you filled out?

1    A    Yes.

2    Q    At this point I'd like you to look at the e-mail, and

3    it says that "Samuel Carter, paren, our designer on Bratz,

4    closed paren, already sought information on this hair; do

5    you see that?

6    A    Yes.

7    Q    Was it your understanding that you were the designer on

8    Bratz?

9    A    Yes.

10   Q    Is it your understanding that you were the inventor on

11   Bratz?

12   A    Yes.

13   Q    And when she's referring to Carter, our designer on

14   Bratz, already sought information on this hair, when you

15   read this, did you have understanding as to what she was

16   referring to?

17   A    I don't remember right now.

18   Q    Well, in September, hadn't you already sought

19   information on hair from Universal?

20   A    Yes.

21   Q    So was it your understanding when you read this, that

22   she was referring to that, that is your effort in September

23   to get the ball rolling on the hair?

24   A    Yes, probably.

25   Q    In fact, you see it says, "In the meantime, we ordered

CV 04-9049-DOC - 01/28/2011 - Day 9, Vol. 2 of 3

25

1    one spool of a few colors in both straight and curly hair";

2    do you see that?

3    A    Yes.

4    Q    And is that what you had done?

5    A    Yes.

6    Q    And you had been representing yourself to be working at

7    MGA, right?

8    A    Yes.

9    Q    And that's something that you told Ms. Garcia around

10   the September time frame, that you were contacting the hair

11   vendor and ordering the hair?

12   A    I don't remember exactly.

13   Q    By October 19, is it your understanding that she knew

14   that you had contacted a hair vendor and, in fact, had

15   ordered hair from them?

16   A    Yes.

17   Q    And by October -- you see it go on, it says, "We just

18   bought a rooting machine and we are hiring a vendor who will

19   work as much as we need him to root heads for Bratz"; do you

20   see that?

21   A    Yes.

22   Q    And so a rooting machine had been bought by

23   October 19th, correct?

24   A    Just going off the document, I'm -- I think it was,

25   yes.

CV 04-9049-DOC - 01/28/2011 - Day 9, Vol. 2 of 3

26

1    Q    And that was ordered by October 19th so you can start

2    making Bratz dolls?

3    A    Yes.

4    Q    By the way, if you look at the e-mail below dated

5    October 18th, see it's from Samuel Wong to Mercedeh Ward,

6    and Ms. Garcia is copied?

7    A    Yes.

8    Q    It says, "For all of our current dolls, we are using

9    local PP hair which the price is lower and lead time is

10   short and easy, controlled by factory the delivery, as the

11   hair supplier is also in China"; do you see that?

12   A    Yes.

13   Q    So was it your understanding that before you went to

14   MGA and -- and recommended the more expensive, is it saran

15   hair?

16   A    Yes.

17   Q    That they had been using a different type of hair on

18   their -- on their dolls?

19          MS. KELLER:  Objection.  No foundation for this

20   witness.

21          THE COURT:  Overruled.

22          THE WITNESS:  I don't know at the time what my

23   understanding was of what kind of hair they were using.

24   BY MR. PRICE:

25   Q    Well, you received the e-mail, correct?

1    A    Yes.

2    Q    Do you have a recollection that there was some push

3    back by MGA on following your recommendation and your

4    pursuit of a vendor for this saran hair?

5    A    I don't recall that right now.

6    Q    Well, if you look at page 4, and at the bottom of the

7    page, the e-mail that was forwarded to you from -- it looks

8    like from Ms. Treantafelles to Cecilia Kwok, although I

9    believe just includes her comments -- well, I'll let you

10   look at it.  Do you see there is a line which says,

11   "Cecilia, here is HK comment for the PDF"?

12   A    Yes.

13   Q    And this is on October 17, 2000, correct?

14   A    Yes.

15   Q    So it was your understanding, was it not, that a

16   product development form by this time had already been sent

17   to Hong Kong?

18   A    I don't recall that.

19   Q    Well, see where it says, "Here is HK comment for PDF";

20   do you understand what PDF is?

21   A    I don't remember.

22   Q    You don't remember product development forms?

23   A    No.

24   Q    You see the comment, I guess it's four lines up, "The

25   hair material will be local PP instead of the, paren, saran

1    hair material"; do you see that?

2    A    Yes.

3    Q    And if you look toward the top of that page, there is

4    an e-mail, and if you look on page 3, you can tell it's from

5    Mercedeh Ward to Cecilia Kwok and Paula Treantafelles,

6    saying, "Could you please explain why we cannot use saran?

7    This toy is to be really special and the hair quality is

8    very important"; do you see that?

9    A    Yes.

10   Q    You were insisting on this particular type of hair,

11   saran hair, correct?

12   A    Yes.

13   Q    And you were the one that hooked up, introduced MGA to

14   Universal, the hair vendor?

15            MS. KELLER:  Objection.  No foundation.

16            THE COURT:  Overruled.

17            You can answer the question, sir.

18            THE WITNESS:  Yes.

19   BY MR. PRICE:

20   Q    And your e-mail of October 23rd -- and do you recall,

21   by the way, that the 23rd was a Monday?

22   A    I -- I don't know.  I don't remember -- excuse me.

23   Remember.

24   Q    It's four days after the 19th, right?

25   A    Okay.

CV 04-9049-DOC - 01/28/2011 - Day 9, Vol. 2 of 3

29

```
1    Q    And it says on October 20 -- on your October 23rd
2    e-mail and around the fourth line, "Secondly, I am working
3    fast and furiously on fabrics and everything for the
4    package, and what I need to know is, are we going to be
5    bound to these fabric choices forever, haha"; do you see
6    that?
7    A    Yes.
8    Q    You had been doing that before you left Mattel,
9    correct?
10   A    Yes.
11   Q    And in working to develop the fabrics and everything
12   for the packages, part of what you were doing was meeting
13   with Veronica Marlow, right?
14   A    Yes.
15   Q    And again, that was before you left Mattel, correct?
16   A    Yes.
17   Q    And you were saying, "Here is a rundown," if you go a
18   little bit further, it lists three things, "of what we plan
19   to have for you by Friday"; do you see that?
20   A    Yes.
21   Q    And by "we," who are you referring to?
22   A    I don't remember.
23   Q    Would that have been Ms. Marlow, since you are talking
24   about swatches and fashions?
25   A    Possibly.
```

CV 04-9049-DOC - 01/28/2011 - Day 9, Vol. 2 of 3

30

```
1    Q    And it says you were going to have all doll fashions

2    designed and swatched including backpacks; do you see that?

3    A    Yes.

4    Q    "All fashion packs designed and swatched as closely as

5    possible"; do you see that?

6    A    Yes.

7    Q    "Backpack accessory design and swatched in four

8    different color ways as closely as possible"?

9    A    Yes.

10   Q    These are things that you had been doing while you were

11   at Mattel, right?

12   A    Yes.

13   Q    And incidentally, in doing that, you had some kind of

14   design in mind, right?

15   A    I believe so, yes.

16   Q    So you had fashion designs from which you were creating

17   the doll fashions and the swatches, right?

18   A    We had some sort of design direction, yes.

19   Q    By the way, at the end of that October 23rd, 2000

20   e-mail, the one you wrote, it says, "That's it, thanks again

21   for meeting with Stephen.  He's a great guy, and I'm looking

22   forward to working with him on our fab doll line"; do you

23   see that?

24   A    Yes.

25   Q    And who are you referring to when you are talking about
```

1    Stephen?

2    A    I think I was referring to Stephen Tarmichael.

3    Q    Had you met with a gentleman named Steven Linker?

4    A    Yes.

5    Q    And could you tell us why you had met with Mr. Linker?

6    A    I believe we met to discuss packaging ideas.

7    Q    Do you recall how many meetings you had with

8    Mr. Linker?

9    A    I don't.

10   Q    Do you recall a meeting at a Starbucks?

11   A    Yes.

12   Q    And I take it you can't give us the precise date,

13   right?

14   A    No, I don't remember that.

15   Q    Can you tell us about when was it that you had this

16   meeting at Starbucks?

17   A    Are you talking to -- are you talking about the date or

18   time of day or?

19   Q    About the date, if you can give us an estimate without

20   giving the precise date.

21         MS. KELLER:  Counsel, are you still on this

22   document?

23         (Attorney discussion held off the record.)

24   BY MR. PRICE:

25   Q    Can you give us a time frame when you saw him?

1    A    I don't remember exactly.

2    Q    Well, it's accurate that you saw him in October before

3    you left Mattel?

4    A    I believe so, yes.

5    Q    But this Stephen is referring to another person?

6    A    I think so, I think this is referring to Stephen

7    Tarmichael.

8    Q    And who is Stephen Carmichael (sic)?

9    A    He was a hair rooter.

10   Q    And again, this is -- is e-mail of October 23rd, right?

11   A    Yes.

12   Q    So why did you introduce Stephen Carmichael (sic) to

13   Ms. Garcia?

14   A    He was an independent hair rooter.

15   Q    And how would you become acquainted with him?

16   A    He had been a former Mattel employee.

17   Q    Was he someone who actually worked on the Bratz dolls?

18   A    Yes.

19   Q    When you told Ms. Garcia -- well, strike that.

20        When you did you tell Ms. Garcia about Stephen

21   Carmichael (sic)?

22   A    I don't recall exactly.

23   Q    Well, from this, it seems like there was an actual

24   meeting with Mr. Carmichael (sic)?

25   A    I don't remember.

CV 04-9049-DOC - 01/28/2011 - Day 9, Vol. 2 of 3

33

1    Q     When you introduced Mr. Carmichael (sic) to Ms. Garcia,

2    did it appear to you that they knew each other previously?

3    A     I don't know.

4    Q     Is it correct that -- that that introduction took place

5    before you left Mattel?

6          MS. KELLER:  Objection as to the characterization

7    of introduction.

8          THE COURT:  Well, he will eventually determine

9    when he left Mattel.  So by October 23rd?

10         MR. PRICE:  By October 19th.

11         THE COURT:  By October 19th.

12         THE WITNESS:  I don't recall.

13   BY MR. PRICE:

14   Q     Okay.  Let's talk, then, about another Steven.

15         MR. PRICE:  We can take that down.

16   BY MR. PRICE:

17   Q     Another Steven, I guess Steven Linker.  Again, you met

18   with him in October before you left Mattel, correct?

19   A     I don't remember the exact time frame that I met with

20   him.

21   Q     Well, I'm not asking about an exact time, but is it

22   some time before you left Mattel?

23   A     I don't remember.

24   Q     If you could look at June 17, 2008, 2749, lines 1

25   through 5.

```
 1   A    Okay.

 2   Q    Does that refresh your recollection as to whether or

 3   not in October you met with Steve Linker before you had left

 4   Mattel?

 5           MS. KELLER:  I'm sorry, Counsel, did you say 2749?

 6           MR. PRICE:  Yes, 2749, lines 1 through 5.

 7           THE WITNESS:  Yes.

 8   BY MR. PRICE:

 9   Q    And in the meeting that you had with Mr. Linker, you

10   showed him some drawings, some designs, right?

11   A    I think so, yes.

12   Q    And if you could look at -- if you'd look at

13   Exhibit 323.

14           MR. PRICE:  And actually, Ms. Juarez, do you have

15   the original?

16           MS. JUAREZ:  I don't believe they are up here.

17           MR. PRICE:  Okay.

18   BY MR. PRICE:

19   Q    If you just look through 323, if you look at the first

20   page, 323-003, 004, 005, and I am just going to flip through

21   those.

22        And do you recognize those as drawings that you gave to

23   Mr. Linker?

24   A    I don't remember what I showed him exactly.

25   Q    So it's correct that when you met with Mr. Linker, you
```

CV 04-9049-DOC - 01/28/2011 - Day 9, Vol. 2 of 3

35

1   gave him some kind of drawings of the Bratz project, right?

2   A    I believe so, yes.

3   Q    You just don't recall which ones they were?

4   A    No.

5   Q    You do recall, though, why you gave him the drawings,

6   right?

7   A    I think so that he would just have a general idea of

8   the project.

9   Q    One of the things he was supposed to do was try to come

10  up with a packaging that would fit the dolls?

11  A    Yes.

12  Q    So at that -- the meeting you had with Mr. Linker, did

13  you talk to him about the size of the dolls, the sculpt?

14  A    I don't remember.

15  Q    Look at 323-0032.

16  A    Okay.

17  Q    And do you recognize that document as a drawing that

18  you did?

19  A    Yes.

20  Q    And is this something you believe you gave Mr. Linker

21  so he could work on the packaging?

22  A    I don't remember.

23  Q    It's a drawing that you did prior to October 19th, when

24  you left Mattel, correct?

25  A    I don't remember.

1    Q    Well, could you tell us what this drawing is?

2    A    I think it was just a drawing of the general look of

3    the doll, the pose, kind of the size.

4    Q    And if we look at the right-hand side, when you say

5    it's -- it's like the size, that's what's written in on the

6    right-hand side there?

7    A    Yes.

8    Q    And so the idea was to give -- the idea was to draw

9    something here, which was actual proportions and kind of

10   some idea of the actual size of the doll?

11   A    Yes.

12   Q    And do you recall why you were doing that, why you were

13   drawing that?

14   A    No.

15   Q    Now, earlier, I had asked you about whether or not you

16   were aware that there was to be a presentation around

17   November 7th to, I think I said Kmart; do you recall that?

18   A    Yes.

19   Q    And you said that you don't recall that particular

20   presentation?

21   A    No.

22   Q    If you could look at Exhibit 1313C.

23        And do you have that in front of you?

24   A    Yes.

25   Q    Actually, we have the original, if we can show you the

CV 04-9049-DOC - 01/28/2011 - Day 9, Vol. 2 of 3

37

```
 1    original.

 2         Do you recognize Exhibit 1313C as a notebook of yours?

 3    A    Yes.

 4    Q    With your comments in it?

 5    A    Yes.

 6              MR. PRICE:  And, your Honor, we move Exhibit 1313C

 7    into evidence.

 8              THE COURT:  Received.

 9              (Plaintiffs' Exhibit No. 1313C is received in

10         evidence.)

11    BY MR. PRICE:

12    Q    And if you'd look at page 27.

13              THE COURT:  Just a moment.  Are these his notes?

14              MR. PRICE:  Yes, I'll ask him that.

15              THE COURT:  All right.

16    BY MR. PRICE:

17    Q    These are your notes, right?

18    A    Yes.

19    Q    And if you look at 1313C, about 27 pages in, you see it

20    says, "By 11/7, presenting to major retailers"?

21    A    Yes.

22    Q    "Final wax date"; do you see that?

23    A    Yes.

24    Q    So does that refresh your recollection that there was

25    to be a presentation to major retailers by November 7th?
```

1    A    Yes.

2    Q    And one of the things -- by November 7th, you had to

3    have a lot of things prepared for presentation to major

4    retailers, correct?

5    A    Yes.

6    Q    It's not the kind of thing you could pull together

7    simply after October 19th through November 7th?

8    A    I'm sorry, what now?

9    Q    You couldn't do the type of work you needed to do to

10   make a presentation to the major retailers in as short a

11   time frame as October 19th to November 7th?

12   A    I -- I don't know.

13   Q    Well, you had to come up with a sculpt, right?

14   A    Yes.

15   Q    And that takes some iterations?

16   A    Yes.

17   Q    And of course, you had to have designs?

18   A    Yes.

19   Q    And you had to have some idea of the fashions?

20   A    Yes.

21   Q    If you are going to show them swatches, you have to

22   have the swatches?

23   A    Yes.

24   Q    And you were working on all of those things prior to

25   October 19th, right?

1    A    Yes.

2    Q    Let me show you Exhibit 1107.

3         And is Exhibit 1107 a drawing you had completed at

4    least as of the time you did the presentation to the

5    retailers?

6    A    I don't remember.

7    Q    Did the first Bratz doll that came out -- for Jade,

8    right?

9    A    Yes.

10   Q    Okay.  Have those fashions on it?

11   A    Yes.

12   Q    If you look at 1108.

13        Isn't this drawing a drawing that had to have been

14   concluded at least as of November 7th?

15   A    I don't remember the day it was completed.

16   Q    What kind of work goes in to producing something like

17   that?

18   A    The drawing?

19   Q    The drawing with the fashions.

20   A    Well, you'd have to have the fashion kind of worked

21   out.  You'd have to have the -- you'd have to do the

22   illustration, color it in.

23   Q    These were fashions that were actually on the Bratz

24   dolls that were released, right?

25   A    Yes.

40

1   Q     So you had to figure out whether the fashions could be

2   done?

3   A     Right.

4   Q     You had to figure out if you could get fabric that kind

5   of looked like that?

6   A     Right.

7   Q     Had to kind of figure out the type of fabric?

8   A     Yes.

9   Q     You had to actually create the design, right?

10  A     Yes.

11  Q     And would you do the design before you -- you checked

12  into whether or not there was fabric or would you do the

13  design after you saw what fabric existed?

14  A     A little bit of back and forth.

15  Q     So there's going to be some back and forth that's going

16  to take some time, right?

17  A     Yes.

18  Q     Would you have to check to see whether or not the

19  sample makers could make something that looked like that?

20  A     I don't know about that.

21  Q     Would there have to be some back and forth with China

22  and Hong Kong?

23  A     I -- I don't know.  I don't remember.

24  Q     Certainly if you are going to be making a presentation

25  to major retailers, you want it to be as -- as good as you

Case 2:04-cv-09049-DOC-RNB   Document 9750   Filed 01/31/11   Page 41 of 92   Page ID
#:292925
CV 04-9049-DOC - 01/28/2011 - Day 9, Vol. 2 of 3

41

1    can get it, right?

2    A    Sure.

3    Q    Because that's -- this is a sales opportunity?

4    A    Yes.

5    Q    And it would be impossible to do that from -- if all

6    the time you had was October 19th to November 7th?

7    A    It would be difficult, yes.

8    Q    Because one of your goals at a meeting with the

9    retailer was to show the retailer what the doll is going to

10   look like in production, right?

11           MS. KELLER:  Assumes facts not in evidence that he

12   dealt with the retailers.

13           THE WITNESS:  I'm sorry, what was the question?

14           THE COURT:  Just a moment.

15           Is it established that the witness is attending

16   any of these retail meetings with Kmart or Walmart?

17           MR. PRICE:  It's not, and I'll ask him, and I

18   don't think he was.

19           THE COURT:  I don't have that foundation yet, so I

20   don't know if that's a goal, and I am not quite certain yet

21   if there's a tie-in with retailers.

22   BY MR. PRICE:

23   Q    You didn't attend these retailer meetings, did you?

24   A    Not that I remember.

25   Q    There were, however, internal discussions about

CV 04-9049-DOC - 01/28/2011 - Day 9, Vol. 2 of 3

42

1   retailer meetings, right?

2   A    I believe so, yes.

3   Q    In fact, we've got your notes talking about a

4   November 7th retailer meeting?

5   A    Yes.

6           THE COURT:  Your objection is overruled.

7   BY MR. PRICE:

8   Q    So you had, then, some understanding as to what you are

9   trying to accomplish here?

10  A    Yes.

11  Q    And one of the things you are trying to accomplish is

12  get the retailers interested in the dolls you are going to

13  produce?

14  A    Yes.

15  Q    And what you want to show the retailer is what you

16  think the dolls are going to look like when they are

17  produced?

18  A    Yes.

19  Q    And there is a -- being part of MGA and seeing these --

20  and seeing the dolls that were produced, it's your view that

21  the dolls that were produced do look like these drawings?

22  A    Yes.

23  Q    With respect to Mr. Linker -- Mr. Linker, in fact,

24  didn't work on -- did not, in fact, work on the actual

25  packaging for the Bratz dolls, correct?

CV 04-9049-DOC – 01/28/2011 – Day 9, Vol. 2 of 3

43

1   A     I don't think he did, no.

2   Q     Were you involved in -- in the look of the packaging on

3   the dolls?

4   A     To some extent, yes.

5   Q     And who did you work with with respect to the look of

6   the packaging?

7   A     I don't remember.

8   Q     Was Ms. Garcia part of that effort?

9   A     I believe so, yes.

10  Q     And do you recall any other names that were part of

11  that effort?

12  A     No.

13  Q     As far as you know, was Isaac Larian the inventor of

14  the packaging for the Bratz dolls?

15          MS. KELLER:  Objection.  Calls for an improper

16  conclusion.  And overbroad.

17          THE COURT:  Without more foundation, counsel, you

18  may -- well, sustained at the present time.

19  BY MR. PRICE:

20  Q     You said that you had some involvement in the

21  packaging?

22  A     Yes.

23  Q     Could you tell us what your involvement was in the

24  design of the packaging?

25  A     I did some of the character art.

1    Q    Did you see the actual packaging?

2    A    Yes.

3    Q    Did you discuss the shape of the packaging within MGA?

4    A    I don't remember.

5    Q    And you said you were responsible for the character

6    art.  If --

7              MR. PRICE:  504?

8              (Attorney discussion held off the record.)

9    BY MR. PRICE:

10   Q    If we could show you one of the packages of the dolls,

11   Exhibit 504.

12             MR. PRICE:  If we can put that on the screen, Ken.

13   BY MR. PRICE:

14   Q    So can you point out what character art you were

15   responsible for?

16   A    I was responsible for the character art on the back and

17   the character art, which is kind of hidden, on the front.

18             THE COURT:  I'm sorry, could you move just a

19   little closer to the microphone.

20             THE WITNESS:  Oh, sure.

21   BY MR. PRICE:

22   Q    There is a sticker that's been placed right over that

23   character art on that original, correct?

24   A    Yes.

25   Q    If you look at the screen, is the character art that we

CV 04-9049-DOC - 01/28/2011 - Day 9, Vol. 2 of 3

45

```
 1    see on the screen the character art that you drew for the

 2    packaging?

 3            MS. KELLER:  Your Honor, I'm going to object and

 4    ask that we define the terms whether the character art

 5    includes both the dolls and the rest of the -- because

 6    what's on the screen is not just characters.  Could we --

 7    BY MR. PRICE:

 8    Q    We are talking about character art, correct?

 9    A    Yes.

10    Q    And you are talking about drawings, right?

11    A    Yes.

12    Q    And you see on the screen, there are drawings of four

13    girls?

14    A    Yes.

15    Q    Is that what you are talking about when you say

16    character art?

17    A    Yes.

18    Q    And you see the general look in the poses of those

19    girls?

20    A    Yes.

21            MR. PRICE:  If we could look at Exhibit 302, the

22    first page.

23    BY MR. PRICE:

24    Q    This is character art that you had created certainly as

25    of September 1, 2000, correct?
```

CV 04-9049-DOC - 01/28/2011 - Day 9, Vol. 2 of 3

46

1   A    Yes.

2   Q    And you see the poses the girls are in?

3   A    Yes.

4   Q    Is the character art that's on the box, in your view,

5   derived from what you presented to MGA in August of 2000?

6   A    Yes.

7   Q    What were you trying to convey with those poses?

8   A    I think just, you know, the attitude and the funkiness

9   of the girls.

10  Q    And do you believe that was expressed in the drawings

11  that you showed MGA in September of 2000?

12  A    Yes.

13  Q    And do you think it was also conveyed in the artwork

14  you did on the boxes, the packaging itself?

15  A    Yes.

16  Q    Now, I want to switch to a different time frame now.

17  We've been talking about September and October of 2000 and

18  the meeting you had in August, so actually I guess I'm going

19  back to that August time frame.

20       The Bratz design is not the only thing that you

21  provided to MGA in August of 2000, correct?

22  A    I'm not sure what you are talking about.

23  Q    Do you recall that in August 2000, you learned that

24  Ms. Garcia had a project at MGA where she was trying to

25  develop a doll called Prayer Angel?

1    A    Yes.

2    Q    And in connection with developing that -- that product,

3    she turned to you to see if you could help on the designs of

4    some faces for a Prayer Angel doll for MGA?

5    A    Yes.

6    Q    And you did such -- such drawings, correct?

7    A    Yes.

8    Q    If you'd look at Exhibit 593.

9         Do you have 593 in front of you?

10   A    Yes.

11   Q    Now, do you recognize this as an invoice concerning the

12   Prayer Angels?

13   A    Yes.

14        MR. PRICE:  Can you put that on the screen, Ken.

15   I think it's already in evidence.

16        Just in case we move it in evidence, I thought we

17   moved it with Ms. Garcia, but we move 593 into evidence.

18        THE COURT:  Received.

19        *(Plaintiffs' Exhibit No. 593 is received in*

20        *evidence.)*

21        MR. PRICE:  If you can blow that up.

22   BY MR. PRICE:

23   Q    Do you see this is an e-mail sent by you to Paula

24   Treantafelles, Ms. Garcia?

25   A    I'm sorry, I am not sure what we are looking at, and

1    I'm not getting anything on my screen.

2    Q    Sorry about that.

3         We are looking, I think, at Exhibit 593.

4    A    Okay.

5    Q    And do you -- is it working now?

6    A    Yeah.

7    Q    So if you are looking at 593, do you recognize that as

8    an invoice that you sent to Ms. Garcia?

9    A    Yes.

10   Q    And you see there's a date, August 31, 2000?

11   A    Yes.

12   Q    And so obviously this was done after you did the work?

13   A    Yes.

14   Q    Do you know how you delivered this to MGA?

15   A    I don't remember.

16   Q    Do you know who wrote "thanks Paula"?

17   A    That was me.

18   Q    And by Paula, you are referring to Ms. Garcia?

19   A    Yes.

20   Q    Had you had conversations with her prior to the end of

21   August of 2000?

22   A    Yes.

23   Q    In fact, you had had this August meeting you were

24   referring to with her and Ms. O'Connor before then, right?

25   A    Yes.

CV 04-9049-DOC – 01/28/2011 – Day 9, Vol. 2 of 3

49

1    Q     And so certainly by the time -- by the time you sent

2    this out on August 31, 2000, you had let her know that you

3    were then working for Mattel?

4    A     Yes.

5    Q     Did she express any concern about you doing angel

6    drawings while you were still working at Mattel?

7    A     I don't remember.

8    Q     These were designs that were to be used on -- or to be

9    considered to be used on an actual doll that was going to be

10   created by MGA, correct?

11   A     Yes.

12              MR. PRICE:  And if we can look at Exhibit 393.

13   BY MR. PRICE:

14   Q     Are these the drawings that you did to assist MGA in

15   creating a Prayer Angel doll?

16   A     Yes.

17   Q     And you understood at the time that you did these, that

18   you weren't supposed to assist a doll manufacturer in any

19   way?

20   A     I don't remember what my understanding was at that

21   time.

22   Q     Didn't you say earlier that you understood you weren't

23   supposed to assist a competitor in any way in '95, '96, '97,

24   '99 and 2000?

25   A     Yes.

CV 04-9049-DOC – 01/28/2011 – Day 9, Vol. 2 of 3

50

```
 1    Q    And that's something you didn't need to have a
 2    contract to understand, right?  You had that understanding
 3    that you were not supposed to assist a competitor while you
 4    were working for another company?
 5              MS. KELLER:  Objection.  Asked and answered.
 6              THE COURT:  Overruled.
 7              THE WITNESS:  I think I had that general
 8    understanding, yes.
 9    BY MR. PRICE:
10    Q    And even with the general understanding that you were
11    not supposed to assist a competitor while you were working
12    for Mattel, you submitted these drawings to Paula Garcia to
13    assist MGA in creating a Prayer Angels doll, right?
14    A    Yes.
15    Q    And Ms. Garcia knew you were doing that, that is
16    assisting MGA, even though you worked at Mattel, because you
17    told her you had worked at Mattel?
18    A    Yes.
19    Q    Were you paid for that invoice?
20    A    I believe so, yes.
21    Q    I want to talk a little bit about your testimony at the
22    other trial.  We've been showing you transcripts, and you
23    recall that you testified on June 11th?  We can show you a
24    transcript to help you out on that.
25    A    Sure.
```

```
 1              MR. PRICE:  Maybe you can put the trial

 2    transcripts in front of Mr. Bryant.

 3              THE WITNESS:  This is it.

 4    BY MR. PRICE:

 5    Q    I think there are multiple binders in there, and do you

 6    see one dated June 11th?

 7    A    Yes.

 8    Q    And prior to testifying on June 11, 2008, you met with

 9    attorneys from MGA, correct?

10    A    Yes.

11    Q    You met with them for a couple of days?

12    A    Yes.

13    Q    And in meeting with them, they kind of went over what

14    questions and answers you might get -- they went over what

15    kind of questions you might get?

16    A    Yes.

17    Q     And in some cases, they suggested how you can phrase

18    answers?

19    A    Yes.

20    Q    And MGA counsel had also helped you prepare for the

21    days you were at deposition, correct?

22    A    Yes.

23    Q    And on -- before June 11, 2008, you had never met with

24    Mattel's counsel to prepare for trial, correct?

25    A    Not that I remember.
```

Case 2:04-cv-09049-DOC-RNB   Document 9750   Filed 01/31/11   Page 52 of 92   Page ID #:292936
CV 04-9049-DOC - 01/28/2011 - Day 9, Vol. 2 of 3

52

1    Q    You certainly never met with me before, did you?

2    A    No.

3    Q    And do you recall that my questioning was less friendly

4    than MGA's counsel?

5              MS. KELLER:  Objection, your Honor.  This is --

6              THE COURT:  Sustained.

7              MS. KELLER:  And your Honor, we need to take up a

8    matter with the Court along these lines.

9              THE COURT:  Ladies and gentlemen, we are going to

10   take a recess.  You're admonished not to discuss this matter

11   amongst yourselves, nor form or express any opinion

12   concerning this case.  We will come get you in about 20

13   minutes.  Have a nice recess.

14             *(The following proceedings is taken outside*

15        *the presence of the jury.)*

16             THE COURT:  All right.  Thank you, Mr. Bryant, if

17   you'd wait outside for just a moment.  Have a nice recess.

18             THE WITNESS:  Yes.

19             THE COURT:  And counsel, if you'd please be seated

20   for just a moment.

21             *(Mr. Bryant exited the proceedings.)*

22             THE COURT:  Let me talk to both parties.  I have a

23   suspicion of what you might be attempting to do, and I'm

24   just kind of guessing ahead, is go down a litany of all the

25   lies that you perceived Mr. Bryant might have stated at the

Case 2:04-cv-09049-DOC-RNB   Document 9750   Filed 01/31/11   Page 53 of 92   Page ID #:292937
CV 04-9049-DOC - 01/28/2011 - Day 9, Vol. 2 of 3

53

1    first trial.  That's --

2              MR. PRICE:  No.

3              THE COURT:  I know you wouldn't do that, but just

4    in an abundance of caution, you can ask him a question,

5    impeach him on the stand based upon his answer here, but I

6    don't think what you can do, and I know you're not doing

7    this, is use the technique of going back, you gave the

8    answer here, you gave the answer here, you gave the answer

9    here at the first trial, you are not going to do that.

10             MR. PRICE:  I am not doing that.

11             THE COURT:  Okay.  Ms. Keller?

12             MS. KELLER:  Your Honor, that's really not what I

13   was objecting to.  I am not objecting to simple impeachment

14   from prior testimony.

15             The Court made it very clear to all parties that

16   while the -- we could mention the prior trial, because we

17   couldn't really conceal it from the jurors and shouldn't,

18   and because we would be using so much information from the

19   prior trial, it would become apparent to them anyway, we

20   could mention it, but the Court made it very clear that we

21   were not to make an issue of the trial itself, number 1.

22   That has just been done.

23             Number two, there was a joint defense privilege as

24   Mattel well knows between Mr. Bryant and MGA in effect at

25   the time.  What has just been done, and it is nowhere to be

1    seen in the transcript in the first trial that I can find,

2    what has just been done is that it was strongly suggested to

3    this jury that MGA's attorneys planted answers in this

4    witness' mouth during his trial preparation.

5           In fact, that was pretty much explicitly said,

6    that MGA's attorney suggested answers to you.  That is so

7    far beyond my understanding of what the Court would permit

8    us to do, and it is such an evasion of the attorney-client

9    privilege and so damaging to MGA, that I would ask the Court

10   to strongly admonish the jury about this.

11          I think this was completely and utterly improper,

12   and I don't take the benign view of it that it was just

13   Mr. Price casually mentioning a few things from the prior

14   trial.  His specific goal here was to -- to try to link MGA

15   to this witness' -- what are claimed to be this witness'

16   false answers or evasive answers at the prior trial, and

17   that is just wrong.

18          THE COURT:  Mr. Price?

19          MR. PRICE:  Your Honor, I can read to you from the

20   transcript of the last trial, and that's when he was being

21   asked about preparation, not by his lawyer, but by MGA's

22   lawyers.  I asked if they would show him documents --

23          MS. HURST:  What's the date?

24          MR. PRICE:  Yeah, it's June 17th, 2008.

25          He said he discussed -- Question --

Case 2:04-cv-09049-DOC-RNB   Document 9750   Filed 01/31/11   Page 55 of 92   Page ID #:292939
CV 04-9049-DOC - 01/28/2011 - Day 9, Vol. 2 of 3

55

```
 1              MS. KELLER:  Page?

 2              MR. PRICE:  2774, line 22.

 3              THE COURT:  Could I see that, please.

 4              MR. PRICE:  And actually start at 2774, line 10 to

 5    get the full context.

 6              2774 and 2775.

 7              And your Honor, it begins with line 10 when we

 8    asked him if his lawyer was present when he was meeting with

 9    Skadden lawyers.  It talks about the time frame.

10              THE COURT:  Now, who's asking these questions?

11              MR. PRICE:  I'm asking these questions at trial.

12              THE COURT:  Okay.

13              MR. PRICE:  At 2775, the question is:  "And did

14    they discuss how you should phrase certain answers?"  He

15    said, "I mean, I suppose they made suggestions."  I went on

16    to ask him how many times.

17              THE COURT:  So you are reading question, line 25

18    at 2774, just to capture a portion of this for the record,

19    "Question:  So they would just show you documents and ask

20    you questions about them?

21              Answer:  "Yes."

22              Question:  "Did they discuss how you should phrase

23    certain answers?"

24              Answer:  "I mean, I suppose they made

25    suggestions."
```

1     Question:  "And when they were asked -- when they

2  were making a suggestion as to how you should phrase certain

3  answers, was any of this videotaped?"

4     Answer:  "Not that I remember."

5     What else would you like me to look at, Counsel?

6     MR. PRICE:  Lines 13 through --

7     THE COURT:  Question:  "Do you know how many times

8  the Skadden lawyers suggested that you phrase an answer a

9  certain way as opposed to the way that you had phrased it?"

10    Answer:  "Oh, I have no idea."

11    Question:  "Like more than a dozen times,

12  perhaps?"

13    Answer:  "I couldn't say one way or the other."

14    Question:  "In the testimony you gave in response

15  to my questions, did you use their suggestions in phrasing

16  your answers?"

17    Answer:  "Well, I can only remember so much, but,

18  you know, I am up here trying to do the best I can."

19    Now, the problem is that there's -- on one hand, I

20  think both counsel are entitled to inquire if a witness has

21  met with attorneys, that's self-evident.

22    The difficulty for MGA is that Mr. Larian has

23  traded counsel a number of times, so this is a direct

24  reflection on present counsel who were not involved in those

25  discussions, apparently.

1           The end result is that your position, then, in

2     contrast to that will be that the Skadden lawyers were -- it

3     doesn't matter, that the Skadden lawyers had already taught

4     him how to answer questions, from your perspective.

5           So -- and the difficulty is -- the issue is

6     Mr. Bryant, it's not the lawyers.  I've been trying to keep

7     that out of the lawsuit.  I said before, if I would have had

8     the case from beginning to end, I am not sure if I wouldn't

9     have granted terminal sanctions at this point against one or

10    both parties, and I never wanted to get into that issue

11    because when the case arrived in this court, I was astounded

12    at some of the things that occurred.  I'll leave that on the

13    table so it's a coequal statement.  But I don't think this

14    is an attack on lawyers.

15           MR. PRICE:  Your Honor, that's not my point.  Let

16    me tell you what my point is.

17           THE COURT:  Well, it has the impression of being

18    the point.  I think you could ask if he met -- your point is

19    that he's phrasing answers from the witness stand because he

20    has been coached by lawyers.

21           MR. PRICE:  Even that's not the point.  The point

22    is --

23           THE COURT:  I can't hear you.

24           MR. PRICE:  The point is that I believe MGA, when

25    they examine him, I think they are going to run from him, I

1    think they are going to attack him.

2            THE COURT:  I'm sorry, now they are going to run

3    from him and attack him.  What are you saying?

4            MR. PRICE:  I think that when I finish questioning

5    Mr. Bryant, that MGA is going to get up here and not embrace

6    him but attack him as a lying person who deceived Isaac

7    Larian.

8            THE COURT:  You think that?

9            MR. PRICE:  I do think that.

10           THE COURT:  Okay.  Walk over there and talk to

11   them for a minute.

12           I'm just kidding you.  Go back to the lectern.

13           *(Laughter.)*

14           MR. PRICE:  What I'm trying to establish is that

15   he has had a close relationship with MGA throughout this

16   time period, he's met with them, not us.  He has met with

17   them for days, not us.  This was an answer given under oath,

18   which I thought I could use, and all I'm trying to establish

19   is they are actually in line.

20           THE COURT:  Well, what you also fear is the

21   cross-examination, and it's obvious to this Court that when

22   MGA starts the cross-examination, they are going to get

23   right into the -- from their perception, the deal cut

24   between the settlement with Mattel and Mr. Bryant.  And

25   that's going to involve lawyers on Mattel's side that are

1   going to be skewered just as much as MGA feels that their

2   lawyers are being skewered.

3          That's s-k-e-w-e-r-e-d.

4          (Laughter.)

5          THE COURT:  And so the difficulty is, the lawyers

6   have become intimately involved in this case.  I don't think

7   the courts have quite seen the number of depositions and

8   redundant questions that have been asked and sometimes

9   answers and lack of answers thereto.  But there is going to

10  be that flavor for both sides about the acts of lawyers.

11         And I assume, Ms. Keller, that you are going to be

12  attacking Mattel for cutting this deal.  In other words,

13  here is the settlement, you must have settled it for one

14  reason, and that is, Mattel is going to gain some benefit

15  from this.

16         MS. KELLER:  Your Honor, that's arguing the facts,

17  which any lawyer is going to do.  What this is doing is this

18  is impugning the integrity of the lawyers.  And Mr. Price

19  cut off in that reading before the question, "Did they ever

20  when they met with you, did they caution you not to say

21  certain things a certain way or to say certain things" --

22         THE COURT:  Could you go just a little slower so I

23  have a record.

24         MS. KELLER:  "Did they ever when they met with

25  you, did they caution you not to say certain things or to

 1    say certain things?"

 2              Answer:  "Not that I remember."

 3              So that this jury has now left the courtroom and

 4    gone into the jury box with the last thing that they heard

 5    is that the lawyers for MGA met with this witness and caused

 6    him to phrase his answers in a certain way.

 7              This witness is now -- if we asked him if today

 8    was Sunday, if Mr. Price asked him 10 times, he'd say it was

 9    Sunday.  He agrees with Mr. Price --

10              THE COURT:  It will be Sunday soon.

11         *(Laughter.)*

12              MS. KELLER:  And I -- you know, there is a big

13    difference in my mind between arguing the facts and arguing

14    that.

15              THE COURT:  I agree.  Now let's resolve it.

16              How do we get that on neutral ground, in other

17    words, what's fair?  Because what would be an appropriate

18    ruling at this part, which I think would be some type of

19    admonishment that the jurors are entitled to, you know, talk

20    to their witnesses, et cetera, it's fair game.

21              The problem begins if the lawyers get involved,

22    but unfortunately, the lawyers have been involved in this

23    case from the beginning.  I wouldn't say it's a

24    lawyer-driven case, I certainly would never say that, but --

25              MS. KELLER:  But he also went out of his way not

Case 2:04-cv-09049-DOC-RNB   Document 9750   Filed 01/31/11   Page 61 of 92   Page ID #:292945
CV 04-9049-DOC - 01/28/2011 - Day 9, Vol. 2 of 3

61

1    to --

2            THE COURT:  Thank you very much, Ms. Keller.  I'm

3    waiting for Mr. Price, who has his hand up.

4            MR. PRICE:  Your Honor, what I would suggest doing

5    and I would --

6            THE COURT:  Let's do this coequal, because you

7    know Mattel is going to get attacked in just a moment with

8    their lawyers being involved in the negotiations and there's

9    going to be other testimony later on about lawyers and their

10   involvement with witnesses and how witnesses suddenly change

11   their mind.  I mean, the case is replete with that.

12           MR. PRICE:  What I think I can do, except I didn't

13   know if I could, because one of the things we're not

14   supposed to talk about is the number of lawyers for MGA, I

15   think there would be nothing wrong with me saying, by the

16   way, when you say that you met with lawyers --

17           THE COURT:  Those were prior counsel.

18           MR. PRICE:  Those weren't these guys.

19           THE COURT:  That was prior counsel.

20           MR. PRICE:  Certainly I'd be willing to do that,

21   but I think --

22           THE COURT:  Just a moment.  That doesn't cure your

23   problem.

24           MS. KELLER:  No, it doesn't.

25           THE COURT:  But there is no other cure unless I do

Case 2:04-cv-09049-DOC-RNB   Document 9750   Filed 01/31/11   Page 62 of 92   Page ID #:292946
CV 04-9049-DOC - 01/28/2011 - Day 9, Vol. 2 of 3

62

1    the following:  I'm happy to not admonishment but correct

2    the impression, but then I'm going to coequally do that, and

3    trust me, this is going to turn around in just a moment, so

4    I'm looking for some neutral solution for both of you,

5    because Mattel is going to be in the same position within a

6    day or so asking for the same admonishment, so I'm going to

7    take a break for a moment.

8            I hear your objection.  I somewhat agree with you,

9    okay, and we're going to see if we can come up with a

10   solution, because I think you've only got seven minutes to

11   use the bathroom.

12           So we'll see you at 20 minutes to the hour.

13           Now, wise counsel would go use the restroom

14   because we are starting again.

15           *(Recess.)*

16           *(The following proceedings is taken outside*

17       *the presence of the jury.)*

18           THE COURT:  On the record.

19           Mr. Price?

20           MR. PRICE:  Your Honor, my thought is it would be

21   inappropriate to tell the jury anything because it would

22   reflect on me, and I haven't done anything wrong.

23           THE COURT:  Yeah.

24           MR. PRICE:  Now, what I said I would do is read

25   the rest of that where he says, "not that I remember,"

Case 2:04-cv-09049-DOC-RNB   Document 9750   Filed 01/31/11   Page 63 of 92   Page ID #:292947
CV 04-9049-DOC - 01/28/2011 - Day 9, Vol. 2 of 3

63

1    and --

2            THE COURT:  You'll read the rest of what?

3            MR. PRICE:  That part of the transcript I gave

4    you.

5            THE COURT:  I don't have that transcript anymore.

6    What page is it?

7            MR. PRICE:  2775 -- I don't know how much they'd

8    like me to read, but I would certainly read lines 19 to

9    2776, line 1, where he says he doesn't remember, "not that I

10   remember," a response to, "did they tell you not to say

11   certain things?"  I actually think that hurts them more.

12           THE COURT:  I don't know the line number.

13           MR. PRICE:  I'm sorry, it's 277- --

14           THE COURT:  Hold on, 2775 --

15           MR. PRICE:  I'm sorry, 2775 --

16           THE COURT:  Line --

17           MR. PRICE:  Line 23 --

18           THE COURT:  Line 23 --

19           MR. PRICE:  To 2776, line 1, if that's what they'd

20   like.

21           THE COURT:  Well, I think the difficulty is I want

22   to dissipate the taint on counsel, so my thought is this:  I

23   should simply state, "Mr. Bryant's discussions with MGA's

24   attorneys in anticipation of a prior trial are irrelevant.

25   It was expected and commonplace for attorneys to prepare

Case 2:04-cv-09049-DOC-RNB   Document 9750   Filed 01/31/11   Page 64 of 92   Page ID
#:292948
CV 04-9049-DOC - 01/28/2011 - Day 9, Vol. 2 of 3

64

1    witnesses prior to that prior trial and this one.

2          "Moreover, things have changed since the prior

3    trial, especially Mr. Bryant's prior trial testimony has

4    nothing do with his testimony at this trial."

5          MR. PRICE:  No, I disagree.  We impeached him.

6    That is certainly not correct.  His prior sworn testimony is

7    very relevant, just as it would be if it were a deposition.

8          THE COURT:  Well, I'm sorry.  I said,

9    "Mr. Bryant's prior trial preparation."

10          MR. PRICE:  Okay.

11          THE COURT:  I left out a word, I'm sorry, "has

12    nothing to do with his testimony here."

13          MR. PRICE:  It does, your Honor, because we want

14    to point out simply that he met with him after the

15    settlement.  Remember, the settlement is a big deal.  So

16    they're going to say, "You settled, you're on our side."  We

17    want to say, "There was a trial, you were prepped by MGA's

18    attorneys, not by us."

19          THE COURT:  Well, I'm wondering, then, if it would

20    be wise, although you are asking for an admonishment at this

21    point, if I simply wait until cross-examination, because

22    what I'm a little afraid of is the attorneys are going to

23    somehow get dragged into this by both sides, that Mattel's

24    attorneys are going to be skewered, also, very shortly for

25    the settlement and how that took place and who it was

Case 2:04-cv-09049-DOC-RNB   Document 9750   Filed 01/31/11   Page 65 of 92   Page ID #:292949
CV 04-9049-DOC – 01/28/2011 – Day 9, Vol. 2 of 3

65

1    between, and that Mr. Quinn's law firm is going to be

2    dragged into this also.

3              MS. KELLER:  Your Honor --

4              THE COURT:  So it really leaves the Court in a

5    back-and-forth situation potentially reacting to the last

6    person who got skewered, and I think at the end I can

7    resolve this, potentially, by listening to what the

8    cross-examination is and then making certain it's fair and

9    not biased to both sides.

10             MS. KELLER:  Your Honor, the cross-examination

11   won't be until next week.  These jurors are going to leave

12   for the weekend with the belief that the lawyers sitting at

13   this table put words in this witness' mouth.  He wasn't just

14   a witness.

15             THE COURT:  Oh, just a moment.  And I agree with

16   you about that.  The main problem that I'd like to resolve

17   is the separation of counsel at the table representing

18   Mr. Larian from any inference --

19             MS. KELLER:  And that's --

20             THE COURT:  -- and then I can cure the remainder

21   of the problems, if there are any, next week, because I

22   know, Ms. Keller, that you've got to attack and attack

23   strongly, and I know the lawyers from Mattel are going to

24   come into this lawsuit also.  So therefore, it's got to be

25   somewhat coequal.  So I think maybe the modification should

Case 2:04-cv-09049-DOC-RNB   Document 9750   Filed 01/31/11   Page 66 of 92   Page ID #:292950
CV 04-9049-DOC - 01/28/2011 - Day 9, Vol. 2 of 3

66

1    be -- just a moment.

2            I don't know why we don't simply tell them the

3    truth; won't that be novel?

4            "Mr. Bryant's discussions with MGA's attorneys in

5    anticipation of a prior trial are irrelevant.  It was

6    expected and commonplace for attorneys to prepare witnesses

7    prior to that trial, and it's commonplace that they're

8    preparing witnesses prior to this trial.  Moreover, things

9    have changed since that prior trial, and present counsel are

10   not involved."

11           MR. PRICE:  Your Honor, my objection to that --

12           MS. KELLER:  When you say --

13           THE COURT:  Do you notice that the two of you are

14   speaking at the same time?

15           Now, good.

16           Ms. Keller?

17           MS. KELLER:  Your Honor, I am not sure the jurors

18   will understand that.  I think if the Court tells them a

19   different law firm now represents Mr. Larian, then they'll

20   understand better.  If you say "present counsel were

21   not involved" --

22           THE COURT:  You know, I'm open to suggestions, but

23   I'm not open to quibbling.  In other words, be part of the

24   solution and not the problem, or I'm just moving on.

25           MS. KELLER:  But -- but I am not quibbling.  It's

1    just that they might think it's the same firm but a

2    different few people, so if you could just say a different

3    law firm, or the same law firm no longer represents

4    Mr. Larian?

5              THE COURT:  As she takes pen in hand.

6              MR. PRICE:  And, your Honor, so I don't talk over

7    Ms. Keller --

8              THE COURT:  And as Mr. Price walks over and gets

9    part to be part of the solution and not the problem.

10              Walk over here.

11              (Interruption in the proceedings.)

12              THE COURT:  Now, I agree about timing, but I don't

13    agree about castigating one counsel in front of the jury and

14    having that pinpointed at the present time.  You've got

15    plenty of time to do that, and I want to see what

16    cross-examination looks like, and then it will be a fair

17    castigation on both sides, probably, but hopefully not.

18              Four scores and seven years ago.

19              I'm just kidding you.

20              (Laughter.)

21              MS. KELLER:  Whatever he says is quibbling, your

22    Honor, and what I say is substantive.

23              (Laughter.)

24              (Attorney discussion held off the record.)

25              THE COURT:  The Court is concerned about

1    castigating counsel for one side because of attorney

2    involvement, because the attorneys are going to become

3    involved, unfortunately, in both direct and

4    cross-examination, but I agree with Ms. Keller.  I think

5    that this needs to be partially cured as best the Court can

6    at the present time by simply indicating that "It's expected

7    and commonplace for attorneys to prepare witnesses prior to

8    the former trial and this trial.  Moreover, things have

9    changed since the prior trial.  Mr. Larian is no longer

10   represented by the same lawyers in this matter."

11            I think that's a fair resolution now, and that way

12   I can listen to cross-examination, because I know the

13   attorneys are going to be skewered once again.  And that's

14   going to cause the Court to go back and forth in potential

15   admonishments, and it's going to be prejudicial to both

16   sides, and, in fact, this can be very prejudicial eventually

17   if the Court follows the suggested framework by MGA to MGA

18   on cross-examination.  I think you are going to bring in the

19   attorneys.

20            MS. KELLER:  Your Honor --

21            MR. PRICE:  I will request that I will be able to

22   ask the questions.  These are not the same lawyers.  This is

23   not the same law firm --

24            THE COURT:  Thank you very much.

25            Get the jury, now.

```
 1              MS. KELLER:  Your Honor, before the jury comes
 2      out --
 3              THE COURT:  Thank you, Ms. Keller.  I appreciate
 4      it.
 5              Well, they are not out yet.
 6              MS. KELLER:  I was going to ask, your Honor, that
 7      it sounds like Mr. Price is about to ask the question that's
 8      apparently going to be along the lines of, "So the lawyers
 9      who" --
10              THE COURT:  Counsel, the jury is coming in.
11              (The following proceedings is taken in the
12          presence of the jury.)
13              THE COURT:  All right.  The jury is present, all
14      counsel are present.  If you'd please be seated.
15              And ladies and gentlemen, let me apologize to you
16      for that excessively long recess.  That's entirely my
17      responsibility, and you have my sincere apologies.
18              It is expected, and it was expected and
19      commonplace for attorneys to prepare witnesses prior to not
20      only the former trial, but also this trial.  Moreover,
21      things have changed since that prior trial.  Mr. Larian is
22      no longer represented by the same lawyers who represented
23      him in that prior trial, all right?
24              Now, Mr. Price, or whomever, will somebody ask
25      Mr. Carter Bryant to come back in, please, and be seated.
```

70

1              Remember, throughout the proceedings, the --

2              Hello, sir.  Mr. Bryant, if you'd retake the

3    stand, please.

4          **CARTER BRYANT, PLAINTIFFS' WITNESS, RESUMED**

5              THE COURT:  All right.  Mr. Price, if you'd like

6    to continue, sir, with your examination.

7              MR. PRICE:  Thank you, sir.

8                  **DIRECT EXAMINATION (Continued)**

9    BY MR. PRICE:

10   Q    Mr. Bryant.

11   A    Yes.

12   Q    So prior to trial, you testified?

13   A    Yes.

14   Q    Prior to then, you had settled with Mattel, correct?

15   A    Yes.

16   Q    After that settlement, though, you did not meet with

17   Mattel's counsel prior to the trial, correct?

18   A    (No audible response.)

19             MS. KELLER:  Objection.  Improper reference to the

20   prior trial, your Honor.

21             THE COURT:  Well, prior to which trial?

22             MR. PRICE:  A trial in June of 2008.

23             THE COURT:  Now, so far I've tried to keep this in

24   terms of proceedings.  I think that "proceeding" is the

25   better word because there are depositions where people are

Case 2:04-cv-09049-DOC-RNB   Document 9750   Filed 01/31/11   Page 71 of 92   Page ID
#:292955
CV 04-9049-DOC - 01/28/2011 - Day 9, Vol. 2 of 3

71

1   under oath, there's trials where people are under oath.  For

2   this limited line of questioning, you all know there was a

3   prior trial, we instructed you, and I'll let counsel

4   specifically go into the fact that there was a trial on such

5   and such a date, so there is no confusion over a deposition

6   in this matter.  But in a sense, people are under oath at

7   both types of proceedings; they are sworn to tell the truth,

8   okay?

9           All right, Counsel.

10  BY MR. PRICE:

11  Q    So Mr. Bryant, to get the time frame correct, prior to

12  June 11, 2008, you had settled with Mattel, correct?

13  A    Yes.

14  Q    And prior to that time, June 11, 2008, you had never

15  met with a Mattel attorney, correct?

16          MS. KELLER:  Objection.  Assumes facts not in

17  evidence, your Honor, as to the propriety of doing so for a

18  party.

19          THE COURT:  I don't understand.  I'm sorry.

20          MS. KELLER:  It assumes facts -- I know the Court

21  doesn't want me to --

22          THE COURT:  Yeah, you can sit down.  You don't

23  have to stand.

24          MS. KELLER:  I went to Catholic schools, your

25  Honor.

1        THE COURT:  All right.  Well, thank you.

2        (Laughter.)

3        MS. KELLER:  It assumes facts not in evidence

4   about whether a party would ever meet with the other side's

5   attorneys, and I --

6        THE COURT:  I don't know if they would or not, so

7   you can ask the question.

8        Overruled.

9   BY MR. PRICE:

10  Q    I'm just trying to get the time frame.  Prior to

11  June 11, 2008, you had never met with an attorney from

12  Mattel except when you are answering questions under oath,

13  correct?

14  A    I don't recall ever meeting with attorneys for Mattel.

15  I was being sued at the time.

16  Q    And then there was a time when you settled with Mattel,

17  correct?

18  A    Yes.

19  Q    Okay.  And after that time, you had a choice as to who

20  you could talk to?

21  A    Yes.

22  Q    I mean, you are no longer a party, correct?

23  A    Right.

24  Q    And after that time, you met with -- chose to meet with

25  MGA's counsel, which is entirely appropriate, but you chose

1    not to meet with Mattel's counsel, correct?

2              MS. KELLER:  Objection to the --

3              THE COURT:  Well, it assumes facts not in

4    evidence.  Let's find out who he met with.  Let's find if he

5    was even called or approached to meet with different

6    parties.  I don't think we know that yet.

7              MR. PRICE:  I'll ask --

8              THE COURT:  Was this after the settlement?

9    BY MR. PRICE:

10   Q    After the settlement -- the settlement is before

11   June 11 of 2008, correct?

12   A    Yes.

13   Q    And is it correct that you met with MGA's counsel

14   before you testified on June 11, 2008?

15   A    Yes.

16   Q    And it's correct you met with them for a couple of

17   days?

18   A    Yes.

19   Q    And were there other times after the settlement where

20   you've met with MGA's counsel?

21   A    I don't recall right now.

22   Q    Well, did you meet with counsel just yesterday for a

23   couple of hours?

24              THE COURT:  Which counsel?

25              MR. PRICE:  MGA's counsel.  I'm sorry.

CV 04-9049-DOC - 01/28/2011 - Day 9, Vol. 2 of 3

74

```
 1              THE WITNESS:  Yes.
 2     BY MR. PRICE:
 3     Q    And all this was after you settled with Mattel,
 4     correct?
 5     A    Yes.
 6     Q    And is it correct that even to this day, you have never
 7     met with Mattel's counsel?
 8              MS. KELLER:  Objection.  Assumes facts not in
 9     evidence.
10              THE COURT:  Sustained.  I don't know if he's ever
11     been invited to, Counsel.
12              MR. PRICE:  That's probably true.
13     BY MR. PRICE:
14     Q    The question is -- well, have you talked to Mattel's
15     counsel at all --
16              MS. KELLER:  Same objection.
17              THE COURT:  Sustained.
18     BY MR. PRICE:
19     Q    Is it your belief that -- well, you thought that you
20     and MGA had a profitable partnership?
21     A    Yes.
22     Q    And in addition to the Bratz dolls, you also worked on
23     Bratz Twinz?
24     A    Yes.
25     Q    Bratz Blind Date?
```

Case 2:04-cv-09049-DOC-RNB   Document 9750   Filed 01/31/11   Page 75 of 92   Page ID #:292959
CV 04-9049-DOC – 01/28/2011 – Day 9, Vol. 2 of 3

75

1    A    Yes.

2    Q    Bratz Babiez with a Z?

3    A    Yes.

4    Q    Bratz Boyz with a Z?

5    A    Yes.

6    Q    Bratz Wintertime Wonderland?

7    A    Yes.

8    Q    Bratz Formal Funk?

9    A    Yes.

10   Q    Bratz Slumber Party?

11   A    Yes.

12   Q    Bratz Salon?

13   A    Yes.

14   Q    Bratz Funk and Glow?

15   A    Yes.

16   Q    Bratz Wild West?

17   A    Yes.

18   Q    Bratz Strut?

19            MS. KELLER:  Objection.  Irrelevant, your Honor.

20            THE COURT:  Overruled.

21            THE WITNESS:  That one, I'm not sure about.

22   BY MR. PRICE:

23   Q    Bratz Sports?

24   A    Yes.

25   Q    Bratz Holiday?

1    A    Yes.

2    Q    Bratz Sunkist summer?

3    A    Yes.

4    Q    Bratz Treasures?

5    A    Yes.

6    Q    Bratz Step Out?

7    A    That one, I am not sure about.

8    Q    Bratz Girlz Night Out?

9    A    Yes.

10   Q    Bratz Wildlife Safari?

11   A    Yes.

12   Q    Bratz Flashback Fever?

13   A    Yes.

14   Q    Bratz Tokyo a Go Go?

15   A    That one, I don't think I worked on.

16   Q    And between 2000 to 2008, at a minimum, you received

17   royalty statements from MGA, correct?

18   A    Yes.

19   Q    And you have received in terms of royalties somewhere

20   in excess of $30 million?

21   A    I believe so, yes.

22   Q    And so even after 2000, you continued to work and

23   create designs for MGA?

24   A    Yes.

25   Q    I'd like you to look, if you would, at Exhibit 27.

1        Do you recognize Exhibit 27?

2   A    Yes.

3   Q    Is that your signature at the bottom?

4   A    Yes.

5   Q    Is this the Mattel Proprietary Information Checkout

6   form which you signed on October 19, 2000?

7   A    Yes.

8           MR. PRICE:  I move Exhibit 27 into evidence.

9           THE COURT:  Received.

10          (Plaintiffs' Exhibit No. 27 is received in

11      evidence.)

12  BY MR. PRICE:

13  Q    And if we could look at the first paragraph, you see it

14  says, "Each terminating employee should be aware that in his

15  employee's agreement, he has agreed to transfer all

16  inventions made or conceived during the period of his

17  employment to Mattel and do all acts necessary to secure

18  patent protection for such inventions for Mattel"; do you

19  see that?

20  A    Yes.

21  Q    And you understood that where it says, "Each

22  terminating employee should be aware that in his employee's

23  agreement, he has agreed to transfer all inventions," that

24  that was referring to the confidential information and

25  inventions agreement that you twice signed with Mattel?

CV 04-9049-DOC – 01/28/2011 – Day 9, Vol. 2 of 3

78

```
 1    A    I am not sure that I really understood everything about
 2    this -- about this contract or this document.
 3    Q    It's a document that you signed on October 19, 2000,
 4    correct?
 5    A    Yes.
 6    Q    And that was the last day that you were at the Mattel
 7    design center, right?
 8    A    Yes.
 9    Q    And if you look at the fourth paragraph, it says, "My
10    interest in, A, any and all inventions, improvements and
11    ideas, paren, whether or not patentable, which I have made
12    or conceived or may make and conceive at any time during the
13    period of my employment with the company, either solely or
14    jointly with others"; do you see that?
15    A    Yes.
16    Q    Now, in your mind, is that any different -- that
17    statement any different than what you signed twice before
18    with Mattel?
19    A    Not terribly.
20    Q    I mean, your -- for example, that sentence has "ideas"
21    in it; do you see that?
22    A    Yes.
23    Q    And your belief is that the designs are your ideas,
24    correct?
25    A    I would agree with that.
```

CV 04-9049-DOC - 01/28/2011 - Day 9, Vol. 2 of 3

79

```
 1    Q    I mean, you don't really distinguish in your mind
 2    between saying, "you own all my ideas" with "you own all my
 3    designs"?
 4    A    I would have to say "designs" might be, I don't know,
 5    somehow not the same as "ideas."
 6    Q    Oh, your designs is the written form of your ideas as a
 7    designer?
 8    A    Yes.
 9    Q    So when you signed the contracts before where it said
10    that "the inventions include my designs," I mean, you
11    understand "designs" includes the work you are doing at
12    Mattel as a designer?
13    A    Yes.
14    Q    And if you'd look at the last paragraph, do you see it
15    says, "all documents, written information and other items,
16    including, not limited to, notes, sketches, manuals,
17    blueprints, notebooks, products, tools, fixtures, records
18    and information relating to the business of the company made
19    or obtained by me while employed by the company shall be the
20    exclusive property of the company and shall be delivered by
21    me to the company on termination of my employment or at any
22    time, as requested by the company."
23         When you signed this on October 19, 2000, were you
24    aware of that provision?
25    A    No, I don't remember this being explained to me.
```

CV 04-9049-DOC - 01/28/2011 - Day 9, Vol. 2 of 3

80

```
1   Q    Did you ever give to Mattel the designs, the drawings

2   that you showed to MGA in the -- what you've said is the

3   August and September 2000 time frame?

4   A    No.

5   Q    Did you ever give to Mattel the drawings you did of

6   the -- the baby angel faces?

7   A    I don't remember.

8   Q    Well, are you suggesting you may have -- you may have

9   given those baby angel sketches/drawings to Mattel?

10            MS. KELLER:  Objection.  Argumentative.

11            THE COURT:  Overruled.

12            THE WITNESS:  No, I am not suggesting that.  I

13   just don't remember.

14   BY MR. PRICE:

15   Q    Can you think of any reason you would do that?

16   A    No.

17   Q    You know you did give them to Paula Garcia to help her

18   develop the -- the Prayer Angel doll, correct?

19   A    Yes.

20   Q    And given that that was your goal or what you did, you

21   don't expect that you would have also given those same

22   sketches to Mattel?

23   A    I -- I just don't remember on that particular issue,

24   one way or the other.

25   Q    Do you have any reason to believe you would have?
```

1    A    No.

2    Q    Now, I want to talk a little bit about what you viewed

3    as your role in your job at Mattel, okay?

4            MR. PRICE:  And Ms. Juarez, if you can hand to

5    Mr. Bryant Exhibit 20.

6    BY MR. PRICE:

7    Q    Do you have Exhibit 20 in front of you?

8    A    Yes.

9    Q    And do you recognize that as a resume?

10   A    It appears to be, yes.

11   Q    All right.  Your resume?

12   A    Yes.

13   Q    Let me ask you some questions.

14        So between September of '95 and April of '98, during

15   that time frame --

16   A    Yes.

17   Q    -- I want to ask you what your role was and what your

18   jobs were at Mattel, okay?

19   A    Uh-huh.

20   Q    So is it correct that one of the things you did was

21   develop doll and toy concepts from the initial idea to the

22   pre-production development stage?

23   A    Yes.

24   Q    And that that included -- included the full range of

25   design from the design of the fashions and accessories, like

Case 2:04-cv-09049-DOC-RNB  Document 9750  Filed 01/31/11  Page 82 of 92  Page ID
#:292966
CV 04-9049-DOC - 01/28/2011 - Day 9, Vol. 2 of 3

82

1   shoes, hats, bags and things like that, to design of play

2   patterns and accessories and things of that nature?

3   A    Yes.

4   Q    And during the time you were there, is it true that the

5   concepts that you came up were first presented in an

6   illustration form?

7   A    Sometimes, yes.

8   Q    And that was the main way that you communicated ideas,

9   was that you put it in writing into a design?

10          MS. KELLER:  Objection.  Overbroad.

11          THE COURT:  Overruled.

12          THE WITNESS:  I believe that's how I usually

13  started off my designs.

14  BY MR. PRICE:

15  Q    And then those sketches and illustrations would then be

16  transferred to a three-dimensional prototype stage?

17  A    Sometimes, yes.

18  Q    If they were approved?

19  A    Yes.

20  Q    And is it correct that in that time frame, between '95

21  and '98, that you were the designer of the Teen Skipper

22  dolls that were marketed in 1997?

23  A    Yes.

24  Q    And were you the designer of the New Barbie Body, which

25  was introduced in 1998?

CV 04-9049-DOC - 01/28/2011 - Day 9, Vol. 2 of 3

1    A    I worked on it for a little while.  My design did not

2    end up being the final product that was released.

3    Q    As of 1998, say the middle part of 1998, was it your

4    belief that Mattel was going to use the Barbie -- Barbie

5    Body which you designed?

6              MS. KELLER:  Objection.  Irrelevant.

7              THE COURT:  Overruled.

8              THE WITNESS:  I don't remember.

9    BY MR. PRICE:

10   Q    Did you produce a copy -- let me rephrase that.

11        Did you create a design for a new Barbie body?

12   A    Yes.

13   Q    And as of the middle of 1998, were there toy designs on

14   the market that were your designs?

15   A    I believe so.

16   Q    And those would include Cool Blue Barbie?

17   A    I don't know if that was still on the market at that

18   time.

19   Q    They were one time on the market?

20   A    Yes.

21   Q    And they were -- it was your design?

22   A    Yes.

23   Q    Extreme Green Teen Skipper?

24   A    Yes.

25   Q    Perfect Pink Teresa?

CV 04-9049-DOC – 01/28/2011 – Day 9, Vol. 2 of 3

84

1    A    Yes.

2    Q    Purple Panic Christie?

3    A    That one doesn't ring a bell.

4    Q    Look at page 20 -- Exhibit 20, page 2, and at about the

5    third paragraph down to see if that refreshes your

6    recollection, under 1998.

7    A    That's -- the Purple Panic one, I just don't remember,

8    but I think it might have been part of that same -- that

9    same line.

10   Q    And in 1997, you had designed a Teen Skipper?

11   A    Yes.

12   Q    Teen Courtney?

13   A    Yes.

14   Q    And a Teen Nikki?

15   A    Yes.

16   Q    Bicycling Stacey?

17   A    Yes.

18   Q    Whitney?

19   A    (No audible response.)

20   Q    Bicycling Whitney?

21   A    Yes.

22   Q    Flower Fun barbie?

23   A    Yes.

24   Q    Clueless dolls?

25   A    Yes.

1    Q    Cher, Amber and Dione?

2    A    Yes.

3    Q    When you went back to Barbie, this is up to 1998, then

4    you started doing collector's dolls?

5    A    Yes.

6    Q    Was it accurate that when you were at Mattel, your

7    experience included all aspects of 2D and 3D design and

8    illustration?

9    A    I'm sorry, what was the questions?

10   Q    Is it correct that when you were at Mattel, your

11   experience included all aspects of 2D and 3D design and

12   illustration?

13   A    Yes.

14   Q    When were you at Mattel, were you featured as a

15   designer on one of the collectible dolls?

16   A    Yes.

17   Q    And by "featured," I mean you have your name on there

18   and kind of a little -- statements about you?

19   A    Yes.

20   Q    If you could look at Exhibit 13656.

21   A    Okay.

22   Q    And can you tell us what that is?

23   A    That is the Grand Entrance Barbie.

24   Q    If you could show it to the jury.  I believe this is

25   already in evidence.

```
 1        Is that part of a specific line?
 2   A    Yes.  This became a line that featured designers in the
 3   collector's department.
 4   Q    And about what time frame did that come out?
 5   A    It's dated 2000.
 6   Q    And could you tell us what's on the back?
 7   A    On the back is one of my illustrations and my picture.
 8   Q    When you are saying "illustrations," you are talking
 9   about --
10   A    This.
11   Q    -- the thing on the right?
12   A    Uh-huh.
13   Q    And that's your signature?
14   A    Yes.
15   Q    And then it has something about you?
16   A    Yes.
17   Q    And that was your picture back in 2000?
18   A    I'm not sure when the picture was taken, but sometime
19   before this product came out, yes.
20   Q    Now, was this sort of a special thing at Mattel to have
21   these designer dolls where a designer would be featured?
22   A    Yes.
23   Q    I guess -- was this considered to be some kind of
24   honor?
25   A    Yeah.
```

Case 2:04-cv-09049-DOC-RNB   Document 9750   Filed 01/31/11   Page 87 of 92   Page ID #:292971
CV 04-9049-DOC - 01/28/2011 - Day 9, Vol. 2 of 3

87

1   Q    Now, Bratz turned out to be a very successful doll,

2   correct?

3   A    Yes.

4   Q    And something about which you were very proud?

5   A    Yes.

6   Q    Your agreement with MGA had an indemnification

7   agreement; do you remember that?

8   A    Yes.

9        MR. PRICE:  If we can look at Exhibit 15.

10  BY MR. PRICE:

11  Q    This is the agreement dated as of September 18, 2000,

12  that you signed around October 14th of 2000, correct?  I'm

13  sorry, October 4th of 2000.

14  A    Yes.

15  Q    And if you first look at the second paragraph, it says,

16  "Term exclusivity," you see it says, "During the term of

17  this agreement, Bryant will not provide consulting services

18  to any person, firm or corporation engaged in the design,

19  development and manufacture and sales of dolls with similar

20  products"; do you see that?

21  A    Yes.

22  Q    And you understood from that that you weren't supposed

23  to be working with any of MGA's competitors while you worked

24  for MGA?

25  A    Yes.

CV 04-9049-DOC – 01/28/2011 – Day 9, Vol. 2 of 3

88

```
1    Q    So your understanding was that MGA required the same
2    thing of you that Mattel required of you also?
3    A    I don't remember exactly what I thought about that, one
4    way or the other.
5    Q    And you told us you had a general understanding that
6    you weren't supposed to assist any Mattel competitor in any
7    way, correct?
8    A    Yes.
9    Q    And your understanding is that MGA's agreement with you
10   as a -- as a consultant had the same type of restriction,
11   that is you are not supposed to be consulting with any
12   person that manufactures, develops or designs dolls or
13   similar products, correct?
14   A    Yes.
15   Q    And did you -- did you do that, that is did you --
16   while you were consulting with MGA, did you comply with this
17   agreement, which is that you weren't to design, develop or
18   help manufacture, provide consulting services in connection
19   with the sales of dolls in similar products?
20   A    Yes.
21   Q    Now, under this agreement, you understood that you were
22   to get royalties, correct?
23   A    Yes.
24   Q    And there was a section here that says, "warranties and
25   indemnity"; do you see that?
```

CV 04-9049-DOC - 01/28/2011 - Day 9, Vol. 2 of 3

1    A    Yes.

2    Q    And at the time, did you understand this paragraph?

3    A    I don't recall my thoughts on that, one way or the

4    other, back then.

5    Q    You see 5A says, "He has the right and is free to

6    execute this agreement to grant the rights granted by him to

7    MGA hereunder and to perform each and every term and

8    provision hereof"; do you see that?

9    A    Yes.

10   Q    And what you were granting to MGA under this was the

11   rights to Bratz, right?

12   A    Yes.

13   Q    In fact, you were retained to provide your services to

14   consult with MGA on the design and development by MGA of a

15   line of dolls presently known as "Bratz"?

16   A    Yes.

17   Q    And by the way, you are the one who told MGA the line

18   of dolls was Bratz?

19   A    Yes.

20   Q    And you've also agreed that you'll provide your

21   services on a, quote, "top priority basis," correct?

22   A    Yes.

23   Q    So between October 4 and October 19, while you were

24   going to the Mattel design center and still an employee of

25   Mattel, you were supposed to be providing to MGA services on

1    a top priority basis, right?

2    A    Yes.

3    Q    But you weren't showing up at MGA to work between 8:00

4    and 5:00, Monday through Thursday, or Friday 8:00 to 1:00

5    because you were working at Mattel?

6    A    That's correct.

7    Q    Now, in connection with the warranties and indemnity,

8    Mr. Larian knew that you worked at Mattel because you told

9    him, correct?

10   A    Yes.

11   Q    You were a Mattel designer when you first met with him,

12   correct?

13   A    Yes.

14   Q    You were working for MGA in September of 2000 to help

15   launch this Bratz doll line, correct?

16   A    Yes.

17   Q    And Mr. Larian and Ms. Garcia knew that?

18   A    Yes.

19   Q    Do you know what the -- do you have any understanding

20   or have any knowledge as to what MGA did to determine

21   whether or not you created Bratz while you were an employee

22   of Mattel?

23          MS. KELLER:  Objection.  No foundation.  Calls for

24   speculation.

25          THE COURT:  This is only --

 1              Ladies and gentlemen, he's just going to answer

 2    concerning whatever knowledge he has, if any.

 3              Overruled.

 4              If you have any knowledge, you can answer the

 5    question.

 6              THE WITNESS:  Can you repeat the question?

 7    BY MR. PRICE:

 8    Q    Sure.  I believe you can just answer this "yes" or

 9    "no."

10        Do you know what, if anything, MGA did to try to

11    determine whether or not you had created the Bratz design,

12    the Bratz dolls, while you were a designer at Mattel?

13    A    I don't know.

14              *(Live reporter switch with Deborah Parker.)*

15                          -oOo-

16

17

18

19

20

21

22

23

24

25

CV 04-9049-DOC - 01/28/2011 - Day 9, Vol. 2 of 3

92

1                              -oOo-

2                          **CERTIFICATE**

3

4          I hereby certify that pursuant to Section 753,

5    Title 28, United States Code, the foregoing is a true and

6    correct transcript of the stenographically reported

7    proceedings held in the above-entitled matter and that the

8    transcript page format is in conformance with the

9    regulations of the Judicial Conference of the United States.

10

11   Date:  January 29, 2011

12

13

14          _____

             JANE C.S. RULE, U.S. COURT REPORTER
15           CSR NO. 9316

16

17

18

19

20

21

22

23

24

25