1

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3          SOUTHERN DIVISION AT SANTA ANA

4       HONORABLE DAVID O. CARTER, JUDGE PRESIDING

5

6
MATTEL, INC., ET AL.,              )
7                                  )
              PLAINTIFFS,          )
8                                  )
          vs.                      ) CV NO. 04-9049-DOC
9                                  ) DAY 9
MGA ENTERTAINMENT, INC., ET AL.,   ) VOLUME 3 of 3
10                                 )
              DEFENDANTS.          )
11   _____)

12

13

14          REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                   JURY TRIAL

16              SANTA ANA, CALIFORNIA

17           FRIDAY, JANUARY 28, 2011

18                   3:28 P.M.

19

20
           DEBORAH D. PARKER, CSR 10342
21            OFFICIAL COURT REPORTER
           UNITED STATES DISTRICT COURT
22            411 WEST FOURTH STREET
                  SUITE 1-053
23         SANTA ANA, CALIFORNIA 92701
               (714) 542-8409
24           D.PARKER@IX.NETCOM.COM

25

```
 1    APPEARANCES OF COUNSEL:

 2        FOR THE PLAINTIFF, MATTEL, INC.:

 3                            JOHN QUINN
                             WILLIAM PRICE
 4                            MICHAEL T. ZELLER
                             QUINN EMANUEL URQUHART
 5                            & SULLIVAN, LLP
                             865 S. FIGUEROA STREET
 6                            10TH FLOOR
                             LOS ANGELES, CALIFORNIA 90017
 7                            (213) 443-3000

 8
          FOR THE DEFENDANT, MGA ENTERTAINMENT, INC.:
 9
                             THOMAS S. MC CONVILLE
10                            ORRICK HERRINGTON & SUTCLIFFE, LLP
                             4 PARK PLAZA
11                            SUITE 1600
                             IRVINE, CALIFORNIA 92614
12                            (949) 567-6700

13
                             ANNETTE L. HURST
14                            ORRICK HERRINGTON & SUTCLIFFE, LLP
                             THE ORRICK BUILDING
15                            405 HOWARD STREET
                             SAN FRANCISCO, CALIFORNIA 94105
16                            (415) 773-5700

17
                             JENNIFER L. KELLER
18                            KELLER RACKAUCKAS, LLP
                             18500 VON KARMAN AVENUE
19                            SUITE 560
                             IRVINE, CALIFORNIA 92612
20                            (949) 476-8700

21

22

23

24

25
```

```
 1   APPEARANCES OF COUNSEL:

 2       FOR THE DEFENDANT, CARLOS GUSTAVO MACHADO GOMEZ:

 3                          MARK E. OVERLAND
                            LAW OFFICES OF MARK E. OVERLAND
 4                          100 WILSHIRE BOULEVARD
                            SUITE 950
 5                          SANTA MONICA, CALIFORNIA 90401
                            (310) 459-2830
 6

 7                          ALEXANDER H. COTE
                            SCHEPER KIM & HARRIS, LLP
 8                          601 WEST FIFTH STREET
                            12TH FLOOR
 9                          LOS ANGELES, CALIFORNIA 90071
                            (213) 613-4660
10

11   ALSO PRESENT:
12
                            JEANINE PISONI
13                          MGA ENTERTAINMENT, INC.
                            16360 ROSCOE BOULEVARD
14                          SUITE 105
                            VAN NUYS, CALIFORNIA 91406
15

16                          ROBERT ECKERT, MATTEL CEO
                            ISAAC LARIAN, MGA CEO
17                          KEN KOTARSKI, MATTEL TECHNICAL OPERATOR
                            MIKE STOVALL, MGA TECHNICAL OPERATOR
18

19

20

21

22

23

24

25
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

4

```
 1                      I N D E X

 2

 3   PLAINTIFFS' WITNESSES:   DIRECT  CROSS  REDIRECT  RECROSS

 4    Carter Bryant               5

 5

 6                    E X H I B I T S

 7   PLAINTIFFS' EXHIBITS:            IDENTIFICATION  EVIDENCE

 8    1127  Steve Madden Advertisement                   15

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1      SANTA ANA, CALIFORNIA; FRIDAY, JANUARY 28, 2011; 3:28 P.M.

 2

 3                          DIRECT EXAMINATION

 4    BY MR. PRICE: (Continuing)

 5    Q.   If you look at Exhibit 15 -- and look at the signature

 6    page -- you faxed a signature page from Mattel Collectibles?

 7    A.   Yes.

 8    Q.   And can you tell us how do you know that?

 9    A.   We looked at it earlier, I think, didn't we?

10    Q.   Do you have a recollection that you faxed this

11    signature page from Mattel?

12    A.   Yes.

13    Q.   Do you know one way or another whether or not that the

14    fax line from Mattel was later whited out?

15    A.   I have no idea.

16    Q.   If you'd look, again, at Exhibit 1309.

17    A.   (Witness so complies.)

18    Q.   By the way, if you look at Exhibit 15, on page 6, on

19    this one, you don't see the "Mattel Collectibles," "Barbie

20    Collectibles" heading, do you?

21    A.   No.

22              THE COURT:  Is that 1309, counsel?

23              MR. PRICE:  I'm sorry.  Now we're on 1309.

24    BY MR. PRICE:

25    Q.   And you looked at this earlier.  You saw this was the
```

1    letter that you sent or faxed over to Mr. Rosenbaum?

2    A.   Yes.

3              THE COURT:  Is that 15?

4              MR. PRICE:  I'm sorry, your Honor.  When I asked

5    him whether the fax --

6              THE COURT:  I think your exhibits are confusing.

7    I'm not getting a record of what exhibit numbers.

8              MR. PRICE:  I was talking about 15-0006 and asking

9    him if the fax header was not there.  Now, I'm talking about

10   1309-002.

11   BY MR. PRICE:

12   Q.   And that's what you faxed to Mr. Rosenbaum; correct?

13   A.   Yes.

14   Q.   And this one still has the Mattel Collectibles fax

15   header; right?

16   A.   Yes.

17   Q.   Now, the letter that you attached, your Mattel offer,

18   if you'd look at the second page of that -- that's page 4

19   and 1309.

20              Do you see it?

21   A.   Yes.

22   Q.   And you look at the second full paragraph there.

23   First, I want to ask you:  Did you do the underlining on

24   this?

25   A.   No.

1    Q.    Do you know whether the underlining was on this before

2    you faxed it?

3    A.    No, I don't.

4    Q.    How did you obtain this document to fax?

5    A.    I don't remember.

6    Q.    Is it correct you didn't go to human resources --

7          Well, let me ask you:  Do you know whether or not

8    you went to human resources to get this?

9    A.    I don't remember.

10   Q.    You were worried about human resources and contacting

11   them about this, because you were afraid you would risk

12   suspicion; right?

13   A.    Yes.

14   Q.    And if you look at this paragraph, you see that the

15   sentence before the underlining, it says:  *Of course, this*

16   *offer is contingent upon satisfactory verification of all*

17   *information as to previous employers and academic*

18   *institutions attended, eligibility to work in the*

19   *United States and the signing of a Confidential Information*

20   *and Inventions Agreement.*

21         Do you see that?

22   A.    Yes.

23   Q.    So the offer letter, itself, says that unless you agree

24   to what's in that Confidential Information and Inventions

25   Agreement that you do not have an offer of employment;

1    right?

2    A.   Yes.

3    Q.   And that's stated in fairly plain language in the

4    letter of offer you got; correct?

5    A.   Yes.

6    Q.   And it was contained in the attachment that you sent to

7    MGA; that is, this provision saying that you had to sign a

8    Confidential Information and Inventions Agreement; right?

9    A.   Yes.

10   Q.   But you weren't providing that Agreement to MGA;

11   correct?

12   A.   I don't think I did, no.

13   Q.   And you weren't doing that because you were afraid of

14   raising suspicions; right?

15            MS. KELLER:  Objection.  Asked and answered.

16            THE COURT:  Overruled.

17            THE WITNESS:  I don't really remember what I was

18   thinking about at that time.

19   BY MR. PRICE:

20   Q.   Now, did Mr. Larian or anyone at MGA contact you and

21   say, you know, *Since you're a Mattel designer and you have*

22   *this Inventions Agreement that we haven't seen, we want to*

23   *be able to check with Mattel and see whether or not Mattel*

24   *has any claims to these designs*?

25   A.   I don't know.

9

Q.   Is that something you think you would recall if you gotten a call like that saying, *Hey, because you are a designer at Mattel and you've executed some sort of Inventions Agreement, we would like your permission to contact Mattel*?

            MS. KELLER:  Objection.  Calls for speculation.

            THE COURT:  Also argumentative, counsel.

            Next question, counsel.

BY MR. PRICE:

Q.   After this communication with Mr. Rosenbaum --

            Let me back up.  At some point, did you hire a lawyer to help you negotiate your agreement?

A.   Yes.

Q.   And that is Anne Wang?

A.   Yes.

Q.   Why did you hire her?

A.   I think I just basically wanted her to look at the contract that was being shown to me from MGA.

Q.   And if you look at -- go back to Exhibit 15, this is a six-page single-space contract; right?

A.   Yes.

Q.   And in this contract, instead of being just an employee, you were agreeing -- entering into an agreement where you would actually get an interest in what was sold; correct?

```
 1    A.   Yes.
 2    Q.   And it was specifically related to Bratz products;
 3    right?
 4    A.   Yes.
 5    Q.   And so, it was your understanding there was a lot of
 6    discussion in the agreement about who would own the Bratz
 7    products?
 8    A.   Yes.
 9    Q.   And also what your compensation and cost reimbursement
10    would be?
11    A.   Yes.
12    Q.   So if we look at, for example, page 2, there is a
13    provision there about 4(a), about what rate you will be
14    paid.
15              Do you see that?
16    A.   Yes.
17    Q.   And, for example, under 4(a), it talks about a rate of
18    $5,000 per month for three months as a nonrefundable advance
19    against royalties?
20    A.   Yes.
21    Q.   And paragraph (b) talks about royalty of 3 percent?
22    A.   Yes.
23    Q.   It goes on to give you some detail about that?
24    A.   Yes.
25    Q.   So one of the things you were doing was trying to
```

1  negotiate, again, the financial terms of the deal with MGA?

2  A.   Yes.

3  Q.   Was that something that you hired Ms. Wang to assist

4  you in?

5  A.   I think so, yes.

6  Q.   And she was also assisting you in the language of the

7  contract?

8  A.   Yes.

9  Q.   Now, do you have any recollection as to whether or not

10  there were any changes between the first draft to the

11  contract that you saw and the one that you signed?

12  A.   I don't really remember.

13  Q.   To your knowledge, did Ms. Wang do any investigation

14  into who owned the Bratz design and concept?

15       MS. KELLER:  Objection.  Calls for a conclusion of

16  the witness.  Speculation.

17       THE COURT:  Reask the question one more time.

18  BY MR. PRICE:

19  Q.   Let me get some foundation here.  Ms. Wang was hired by

20  you to be your lawyer; correct?

21  A.   Yes.

22  Q.   Did you direct her to do an investigation into who

23  owned the designs that you were presenting to MGA when you

24  were a Mattel employee?

25       MS. KELLER:  Same objection.

1              Your Honor, I don't know if it's privilege or not,

2    but it may be.

3              THE COURT:  Overruled.

4              THE WITNESS:  I don't remember.

5    BY MR. PRICE:

6    Q.   Are you aware of Ms. Wang at any time doing any

7    investigation into who owned the Bratz designs that you

8    presented to MGA while you were a Mattel employee?

9    A.   I don't know if she did or not.

10   Q.   You paid for her services?

11   A.   Yes.

12   Q.   Do you recall if you paid for some sort of

13   investigation?

14   A.   I don't know.  I don't recall, one way or the other.

15   Q.   Did you give to Ms. Wang a copy of your Confidentiality

16   and Inventions Agreement?

17   A.   I don't remember.

18   Q.   Well, did you have a copy to give?

19   A.   I don't remember that either.

20   Q.   In your September 14th e-mail to Mr. Rosenbaum,

21   Exhibit 1309, you said you didn't have that contract to send

22   to MGA?

23   A.   Right.

24   Q.   At any time, did you get that contract?  Do you recall?

25   A.   I don't remember.

1   Q.   Did you ever contact human resources and risk raising

2   suspicions?

3              MS. KELLER:  Objection.  Argumentative.

4              THE COURT:  Overruled.

5              THE WITNESS:  I don't remember that either.

6   BY MR. PRICE:

7   Q.   Is it your best recollection that you did not have that

8   contract that you could give to Ms. Wang, or anybody?

9   A.   I don't know if I gave it to anybody at any point.  I

10  can't remember.

11  Q.   During the September and October time frame, did anyone

12  at MGA express concerns to you about whether or not you

13  really owned these Bratz designs?

14  A.   I don't remember if they did or not.

15  Q.   Did anyone at MGA express any concerns about whether or

16  not these designs were owned by Mattel?

17  A.   I don't remember that either.

18  Q.   In September when you were contacting Margaret Leahy,

19  the sculptor and Veronica Marlow and Universal, the hair

20  supplier, at any time did anyone from MGA tell you that you

21  shouldn't be doing this?  It's inappropriate because you are

22  working at Mattel?

23             MS. KELLER:  Objection.  Argumentative.

24             THE COURT:  Overruled.

25             MS. KELLER:  And assumes facts not in evidence.

14

```
 1              THE COURT:  Overruled.
 2              THE WITNESS:  Not that I remember.
 3    BY MR. PRICE:
 4    Q.   Is it correct that you didn't tell Ms. Garcia that you
 5    were a Mattel employee when you first came to these meetings
 6    until 2004?
 7    A.   No.
 8    Q.   And could you tell us, why is that not correct?
 9    A.   Because I'm pretty sure I recall telling her upfront.
10    Q.   And what does "upfront" mean to you?  What time frame
11    are you talking about?
12    A.   That would have been the -- around the time that we met
13    for the first time, and I showed her the drawings.
14    Q.   Veronica Marlow was at that meeting?
15    A.   Yes.
16    Q.   Did Veronica Marlow know that you were an employee at
17    Mattel at that time?
18    A.   Yes.
19    Q.   And how did she know?
20    A.   She just did.  She knew I worked there.
21    Q.   Had she actually been to see you while you were at
22    Mattel?
23    A.   Well, we actually used to work at Mattel together.
24    Q.   After she left, she kept in contact with you?
25    A.   Yes.
```

1   Q.   Did she ever come to the Mattel design center to, say,

2   "Hi" and chat?

3   A.   Not that I remember.

4   Q.   Now, when you talked with Mr. Linker, the package --

5   I'm sorry.

6          When you talked to Ms. Leahy, the sculptor, you

7   gave her, in addition to your drawings, an ad from

8   Steve Madden; is that right?

9   A.   I believe so, yes.

10  Q.   And if you would look at Exhibit 1127.

11  A.   *(Witness so complies.)*

12  Q.   Do you have that in front of you?

13  A.   Yes.

14  Q.   And do you recognize Exhibit 1127 as a Steve Madden ad

15  that you've seen?

16  A.   Yes.

17          MR. PRICE:  I would move Exhibit 1127 into

18  evidence.

19          THE COURT:  Received.

20       *(Plaintiffs' Exhibit 1127 received in evidence.)*

21  BY MR. PRICE:

22  Q.   So what you gave Ms. Leahy was the drawings that -- to

23  the best of your recollection, what you gave Ms. Leahy were

24  some of the drawings you had done on the Bratz dolls;

25  correct?

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
 1    A.    Yes.

 2    Q.    And you also gave her this; is that right?

 3    A.    I think so, yes.

 4    Q.    And is it correct that this was taken from Seventeen

 5    Magazine?

 6    A.    I'm not sure.

 7    Q.    This was something which had inspired you?

 8    A.    I just -- yeah, I liked -- you know, there were certain

 9    things about it I really liked.

10    Q.    Now, it's your belief that your Bratz designs were

11    unique?

12    A.    Yes.

13    Q.    And you gave Ms. Leahy this to show her the kind of

14    things that inspired you?

15    A.    I don't remember exactly why I gave that to her.

16    Q.    This ad is from a 1999 Seventeen Magazine, isn't it?

17    A.    I'm not sure.

18    Q.    Well, at the time you gave the ad to Ms. Leahy, at that

19    time, did you know what year the ad was that inspired you?

20    A.    I don't recall.

21    Q.    Now, you've testified that you came up with the

22    drawings, the basic drawings for Bratz during this time

23    period between April 1998 and January 4, 1999; correct?

24    A.    Yes.

25    Q.    And what you said is that you were inspired when you
```

1   were driving to work and stopped and saw some kids at

2   Kickapoo High School?

3   A.   Yes.

4   Q.   And that's in this time frame between April 1998 and

5   January 4, 1999; correct?

6   A.   Yes.

7   Q.   And is it correct that your testimony is that those

8   first four drawings, the ones that were torn out of a

9   notebook, were drawings that you did after seeing the kids

10  at Kickapoo High School and going home and drawing in your

11  notebook?

12  A.   Yes.

13  Q.   I would like you to look at Exhibit 23805.

14  A.   *(Witness so complies.)*

15  Q.   And could you tell us, Mr. Bryant, whether or not 23805

16  appears to be a yearbook from Kickapoo High School in 1998?

17          MS. KELLER:  Your Honor, we have an objection to

18  this.

19          THE COURT:  It's overruled.

20          THE WITNESS:  Yes.

21  BY MR. PRICE:

22  Q.   Now, Kickapoo High School is located in what city?

23  A.   Springfield, Missouri.

24  Q.   And I think that -- is it correct that you wanted the

25  Bratz to be kind of this trendy, hip, multi-ethnic group of

1    girls?

2    A.    Yes.

3    Q.    And if you look at 23805 and just kind of flip through

4    it, are these the kids that you were looking at when you

5    came up with this idea of an urban, hip, trendy multi-ethnic

6    group of girls?

7    A.    You mean these specific kids, or just in general?

8    Q.    Well, just kids that look like these.

9    A.    Yes.

10   Q.    Now, first, could you tell us, is there a picture there

11   that kind of shows where you were in relation to the

12   building?  That is, if you look through there, you'll see

13   there are pictures of the high school.  If you look at, I

14   think, the third page in, is that a picture of the school

15   campus?

16              MS. KELLER:  Objection.  Irrelevant.

17              THE COURT:  Overruled.

18              THE WITNESS:  Okay.  Yes.

19   BY MR. PRICE:

20   Q.    And -- whoops.  Sorry.

21              Do you see a picture which is, sort of, a picture

22   of the campus?

23   A.    Yes.

24              MR. PRICE:  If you can put that up.

25         *(The exhibit was displayed on the screen.)*

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
 1              MS. KELLER:  Objection.  Not in evidence.

 2              And, your Honor, the campus itself is irrelevant

 3    to this line of questioning.

 4              THE COURT:  Well, viewing the visual point, I'm

 5    not certain.

 6              I'm going to overrule your objection, counsel.

 7              MR. PRICE:  Your Honor, I believe I did move it

 8    into evidence and that it was received.

 9              Is that correct?

10              THE COURT:  No, I don't have it marked, but -- I

11    may have.  I apologize.

12              I don't know that I'm going to receive this yet,

13    counsel.  But you can show certain pages to show the

14    viewpoint, if you want to, at the present time.

15    BY MR. PRICE:

16    Q.   So, does this show kind of where you were viewing this

17    from, or this help refresh your recollection as to where you

18    were looking at this time?

19    A.   Just from the outside of the school.  I don't really

20    recognize, like, this area of the building.

21    Q.   Well, if you look through that, flip through that, do

22    you see anything there that looks, kind of -- looks familiar

23    as to where you might have been located?

24              And I know those pages don't have numbers on them,

25    but I would suggest page 143.
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
 1   A.   Okay.

 2   Q.   Have you found page 143?

 3   A.   Yes.

 4   Q.   Does this kind of ring a bell with respect to what you

 5   saw?

 6   A.   A little bit, yeah.

 7           THE COURT:  Counsel, I'll receive that page, if

 8   you want to try to get the visuals.

 9           MR. PRICE:  Can we get those up?

10           THE COURT:  Of where people were located.

11           MR. PRICE:  I think it's open flat, so it would

12   probably be 142 and 143?

13   BY MR. PRICE:

14   Q.   Okay.  144 and 143.

15   A.   Okay.

16   Q.   So that's sort of the view you had of the high school?

17           THE COURT:  Well, first of all, it's reversed.

18   It's supposed to be on the other page.

19           THE WITNESS:  I just remember that it was some

20   sort of outside view.

21   BY MR. PRICE:

22   Q.   Was this someplace you would drive by on the way to

23   work or going from work to home?

24   A.   Yes, occasionally.

25   Q.   Okay.  It was a little bit out of the way.  It wasn't a
```

1    direct route?

2    A.    Not the most, probably, no.

3    Q.    Not the most direct route to your work?

4    A.    Right.

5    Q.    And so, this is kind of the view you had.  Was it of a

6    field where they were playing, or something?

7    A.    I'm not sure.  I'm not sure exactly what area of the

8    campus that was -- it was from.

9    Q.    If you look at the notebook, there are some casual

10   shots in the notebook as you have in these high school

11   yearbooks, and I'm wondering if you can show me one which

12   you think was the type of thing you saw in Missouri, in

13   1998, that inspired you to do a hip, urban, trendy look for

14   a group of four girls?

15   A.    *(Witness so complies.)*

16          MS. KELLER:  Your Honor, that assumes facts not in

17   evidence.

18          THE COURT:  Overruled.

19          THE WITNESS:  There's a lot of shots of sports.

20   Not a lot of exterior pictures I'm seeing.

21          Sorry, I just found one a second ago that I passed

22   up.

23   BY MR. PRICE:

24   Q.    Well, do you think it would help if you saw yearbooks

25   from '97 and '99?

```
 1              MS. KELLER:  Assumes facts not in evidence, your
 2    Honor.
 3              THE COURT:  Overruled.
 4              THE WITNESS:  I don't know.
 5              THE COURT:  Those will be subject to a motion to
 6    strike.
 7              Do you have somebody coming from Missouri?
 8              MR. PRICE:  Yes.
 9              THE COURT:  When?
10              MR. PRICE:  Yes.
11              THE COURT:  Counsel, subject to a motion to
12    strike.
13              MR. PRICE:  Ms. Juarez, could you tell me the
14    exhibit number again?
15              MS. JUAREZ:  '97 yearbook is 2380-4, and the 1999
16    yearbook is 2380-6.
17    BY MR. PRICE:
18    Q.  Mr. Bryant, let's -- if you could look at 2380-4.  Do
19    you see anything that kind of shows what gave you the idea
20    for a urban, hip, trendy, multi-ethnic look when you were
21    looking at the students at Kickapoo High School?
22              MS. KELLER:  Your Honor, assumes facts not in
23    evidence that he has ever said that.
24              THE COURT:  Counsel?
25              MR. PRICE:  I'll ask him the question again.
```

DEBORAH D. PARKER, U.S. COURT REPORTER

```
 1              THE COURT:  I heard that he had made that

 2   statement, but reask it just to be certain.

 3              THE WITNESS:  It was kind of a fairly good

 4   example.

 5              THE COURT:  Just a moment.  If there is an

 6   objection, you can reask the question to be certain.

 7              MR. PRICE:  I just want to make sure.

 8   BY MR. PRICE:

 9   Q.   Your testimony was after seeing the kids at Kickapoo

10   High School, you went immediately from there and went home

11   and started drawing -- doing some sketches for Bratz

12   characters?

13   A.   I don't remember exactly what my testimony was.

14   Q.   Is that correct that after you drove by a school and

15   saw these kids, you went straight home and immediately began

16   doing some sketches?

17   A.   I don't really recall if I went straight home.

18   Q.   Okay.  If you will look at June 13, 2008, 2633.

19              THE COURT:  Prior clarification.  I think counsel

20   is kind of right.

21              The question was:  What you say is that you were

22   inspired.  When you were driving to work, you stopped and

23   saw some kids at Kickapoo High School?

24              ANSWER:  Yes.

25              QUESTION:  And then, there was a time frame.  That
```

 1  *is the time frame between April 1998 and January 4th, 1999;*
 2  *correct?*
 3           *ANSWER:  Yes.*
 4           *QUESTION:  Is it correct that your testimony is*
 5  *that those first four drawings, the ones that were torn out*
 6  *of the notebook, were drawings that you did after seeing the*
 7  *kids at Kickapoo High School going home and drawing in your*
 8  *notebook?*
 9           *ANSWER:  Yes.*
10           So the objection is lack of foundation?
11           MS. KELLER:  Lack of foundation as to the
12  yearbook, your Honor.  He has never said anything about
13  being inspired by the yearbook.  Only seeing some kids and
14  being inspired by their energy.  That's it.
15           THE COURT:  The objection is overruled.
16           You may continue, counsel.
17  BY MR. PRICE:
18  Q.   And calling your attention, Mr. Bryant, to page 2633,
19  lines 22 to 25.
20  A.   Okay.
21           THE COURT:  And I think one of the jurors is
22  signaling they need a bathroom break.
23           Why don't you take that bathroom break in just a
24  moment.
25       *(Pause.)*

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
1              THE COURT:  The jurors once again are all present.
2              It's been represented to the court outside your
3    presence that there is somebody coming from Missouri to
4    verify whether, in fact, these were yearbooks, or a yearbook
5    from these particular years.
6              So instead of having Mr. Bryant exit the stand and
7    come back at a later time, I'm simply going to reserve
8    whether I'm going to receive these or not into evidence, but
9    it was represented to me that that person would be here
10   shortly after Mr. Bryant testified.  I think that will save
11   a lot of time and a lot of inconvenience in terms of
12   Mr. Bryant coming back.
13             Counsel.
14   BY MR. PRICE:
15   Q.   So directing your attention to 2633, lines 22 to 25 --
16   A.   Yes.
17   Q.   -- does that refresh your recollection that your prior
18   sworn testimony was that when you went by Kickapoo High
19   School, you went home and immediately began doing some --
20             MS. KELLER:  Improper impeachment, your Honor.
21             THE COURT:  Overruled.  You may answer the
22   question.
23             THE WITNESS:  Yes.
24   BY MR. PRICE:
25   Q.   And the sketches we've seen from the notebook,
```

```
 1   1155-C -- strike that.  Strike that.

 2           The four sketches we saw earlier today on notebook

 3   paper, those are the -- those are the first four, quote,

 4   Bratz drawings you did; correct?

 5   A.   Yes.

 6   Q.   So you've -- you've identified a page there that you

 7   said kind of shows the kind of thing that inspired you, and

 8   I would be willing to put on the ELMO so we can all see it.

 9   A.   Okay.

10           MR. PRICE:  I'll show it to Mr. Kotarski, and he

11   might be able to digitize it.

12       (Pause.)

13   BY MR. PRICE:

14   Q.   We're going to display pages 26 and 27, and maybe you

15   can tell us then which of these sorts of pictures inspired

16   you to develop a hip, urban, trendy, multi-ethnic character

17   called Bratz?

18           MS. KELLER:  Objection.  Misstates the testimony.

19           THE COURT:  Overruled.

20           THE WITNESS:  Well --

21           THE COURT:  I'm not sure if it's hip, urban,

22   trendy, but counsel --

23           MS. KELLER:  Your Honor --

24           THE COURT:  Take a look again, if you want.

25           MR. PRICE:  I'll ask again.
```

1    BY MR. PRICE:

2    Q.   Mr. Bryant, the Bratz girls were urban, hip, trendy and

3    multi-ethnic.  That's the way you described them; correct?

4    A.   Yes.

5    Q.   And your testimony is that sitting there at Kickapoo

6    High School, in 1998, you were inspired to do this urban,

7    trendy, hip, multi-ethnic group of dolls?

8    A.   Yes.

9    Q.   So, if --

10        MR. PRICE:  With the court's permission, if you

11   could stand up with your back to the court.

12        THE COURT:  Put your back to me.  I'm not

13   affronted by that.  If you stand up, sir, and face the jury

14   and just --

15        Counsel, your question once again is?

16   BY MR. PRICE:

17   Q.   My question is:  Could you point out to the jury which

18   one of these pictures kind of shows the kind of thing you

19   saw that inspired this urban, hip, multi-ethnic trendy look?

20   A.   I think this kind of this middle picture here, just

21   with the girl with the -- the one girl with the long flowing

22   hair and the boots, and -- I don't know.  Even just like the

23   casualness of the jeans and T-shirt.

24        THE COURT:  Could everybody hear?

25        All right.

1    BY MR. PRICE:

2    Q.   By the way, when you went to Kickapoo, were you there

3    on Crazy Outfits on Spirit Day?

4    A.   I have no idea.

5    Q.   Was it your impression --

6             THE COURT:   Thank you.

7    BY MR. PRICE:

8    Q.   Was it your impression that the outfits you saw were

9    kind of crazy compared to what you would normally see at

10   Kickapoo High School?

11   A.   I don't really remember exactly.  It was a while ago,

12   so I don't remember exactly.

13   Q.   How many times did you go by Kickapoo High School?

14   A.   Oh, I don't know.

15   Q.   How many times did you go and see the students and

16   conclude that they represented kind of an urban, hip,

17   trendy, multi-ethnic group of students?

18            MS. KELLER:   Objection.  Misstates the testimony.

19            THE COURT:   Just restate the question, counsel.

20   BY MR. PRICE:

21   Q.   How many times did you go by Kickapoo High School and

22   park and observe the students?

23   A.   Well, I never parked.  It was just passing by there

24   when I was inspired.

25   ////

BY MR. PRICE:

Q.   Okay.  So you were actually in a moving car driving to work, not stopping, when you saw young girls that inspired you to do the trendy, urban, hip, multi-ethnic Bratz dolls?

A.   I believe so, yes.

Q.   And so, you saw girls with bare midriffs?

A.   I don't remember.

Q.   Short skirts?

A.   I don't remember the exact, like, things that they were wearing.

         MS. KELLER:  Assumes facts not in evidence, that the Bratz dolls had short skirts, your Honor.

         THE COURT:  Overruled.

         THE WITNESS:  I just remember being inspired by kind of the energy and the casualness.  But, you know, a lot of the things that went into the creation of the Bratz idea were, you know, my own ideas.  Not just exactly what I saw.

         MR. PRICE:  Well, if we could put up Exhibit 302.

         *(The document was published in open court.)*

BY MR. PRICE:

Q.   So these are the Bratz characters as they were drawn for you -- drawn by you in preparation for a meeting with MGA in 2000; correct?

A.   Yes.

         MR. PRICE:  If we can go through that, Ken.  Let's

1    go to the second page.

2           Let's go to the second page.

3    BY MR. PRICE:

4    Q.   And this is your description of the concept that you

5    created; correct?

6    A.   Yes.

7    Q.   And you see the last paragraph.  Each doll comes

8    dressed in a trendy, hip outfit with one or two pieces,

9    et cetera?

10   A.   Yes.

11   Q.   Now, just let me ask you:  Is it your testimony that

12   the picture we saw in that notebook -- I'm sorry, in that

13   yearbook represents girls wearing trendy, hip outfits?

14   A.   Well, I mean, as far as the yearbook goes and finding

15   examples, it's probably about the closest one I came across.

16   Q.   And if we go to the next page.

17          And so here we have Zoe.  Does she have a bare

18   midriff?

19   A.   Yes.

20   Q.   Huge shoes?

21   A.   I'm sorry.  What now?

22   Q.   Very large shoes, obviously?

23   A.   Yes.

24   Q.   So this was inspired by driving by Kickapoo High School

25   without even stopping, as you're just driving by?

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1  A.   Yes.

2          MR. PRICE:  If we can go through the next page.

3  I'm sorry, the next page, Ken.  I'm sorry.

4  BY MR. PRICE:

5  Q.   As was Zoe with her blond hair?

6  A.   Yes.

7  Q.   Now, Mr. Bryant, it's true, is it not, that you don't

8  have a single sketch dated 1998 when the date was put on

9  there in 1998; correct?

10          MS. KELLER:  Objection.  Asked and answered.

11          THE COURT:  Overruled.

12          THE WITNESS:  I don't know.

13  BY MR. PRICE:

14  Q.   Well, you do have a lot of drawings for the date was

15  put on them, August 1999, either notarized or dated by you

16  when they were in fact drawn in 1999; correct?

17  A.   I'm sorry.  What now?

18  Q.   You've seen a number of documents that were either

19  notarized in 1999 or have a date put by you on them in 1999

20  where that date was actually put on them in 1999; correct?

21  A.   I'm not sure.

22  Q.   I know you don't remember a lot of what happened with

23  your prior testimony.  Do you remember the documents I

24  showed you yesterday?

25  A.   Some of them, yes.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    Q.   And do you remember there are documents dated 1999

2    where you put the date on them in 1999?

3    A.   Yes.

4    Q.   And you've seen Exhibit 302, which has that copyright

5    date of 2000, which you put on it in 2000; right?

6    A.   Yes.

7    Q.   And prior to January 1999, you never sought or tried to

8    get a copyright on any Bratz dolls; right?

9    A.   No.

10   Q.   Double negative.  Prior to 1999, did you try to get a

11   copyright on Bratz dolls?

12   A.   No.

13   Q.   And you had to get a copyright; correct?

14   A.   I knew how to get copyright on music.

15   Q.   You thought it differed for drawings?

16   A.   I don't remember what I thought.

17   Q.   Did you put an all materials copyright 1998 on any

18   Bratz sketches, as you did here in 2000?

19   A.   I don't remember.

20   Q.   In 1998, did you do, you know, the poor man's copyright

21   and send a sketch to yourself to show that you did it in

22   1998?

23   A.   Again, I don't remember.

24   Q.   But what you do know is that on August 26, 1999,

25   because you wanted to establish a date, you went with the

33

1  Bratz sketches to a notary public; correct?

2  A.    Yes.

3  Q.    And you did that so Alaska Momma couldn't later claim

4  that they had similar drawings prior to August 26th, 1999;

5  right?

6           MS. KELLER:  Objection.  Asked and answered.

7           THE COURT:  Overruled.

8           THE WITNESS:  Yes.

9  BY MR. PRICE:

10  Q.   Mr. Bryant, let me ask you if you could look at

11  Exhibit 502 again.

12          This is the declaration under penalty of perjury

13  that you gave MGA to file with the patent office?

14  A.    Yes.

15  Q.   So my question is this:  Why did you agree to make a

16  false statement under penalty of perjury about the date of

17  the release of the Bratz dolls?  It's paragraph 4.  Why did

18  you agree to do that when MGA asked you to do so?

19          MS. KELLER:  Objection.  Asked and answered.

20  Argumentative.

21          This was gone into extensively, your Honor.

22          THE COURT:  All right.  Overruled.

23          THE WITNESS:  I don't remember.

24          THE COURT:  Now, counsel, I'm giving you -- for my

25  record, I'm giving some latitude, because --

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1          Well, I'll speak to counsel outside the presence

2     of the jury tonight.

3     BY MR. PRICE:

4     Q.   Did you speak to anyone other than MGA's counsel

5     concerning supplying -- making a false statement about a

6     date in connection with the patent application?

7     A.   Not that I remember.

8     Q.   It's your understanding that if the jury finds that the

9     Bratz drawings were done in 1998, on the dates between April

10    and January 4, 1999, it's your understanding that Mattel

11    would not own those drawings; right?

12    A.   Yes.

13    Q.   And it's your understanding that in that case the

14    drawings would be owned by Mattel, because that's who -- by

15    MGA, that's what -- who you assigned them to?

16    A.   Yes.

17          THE COURT:  Because of the way the question was

18    asked, the transcript is going to read incorrectly.  The

19    question that's been recorded is:  *And it's your*

20    *understanding that in that case the drawings would be owned*

21    *by Mattel because that's who -- by MGA, that's what -- who*

22    *you assigned them to?*

23    BY MR. PRICE:

24    Q.   I'll reask.  It's your understanding that you did Bratz

25    drawings between April '98 and January 4, 1999.  If that's

1   when you did them, then you had the right to assign them to

2   MGA and MGA would own them?

3   A.   Yes.

4   Q.   I want to ask you a couple of questions more about your

5   agreement with MGA, Exhibit 15.   Now, under the

6   indemnification provisions -- excuse me.

7            You'll find those on pages 3 and 4.   And,

8   particularly, on page 4, there's a subparagraph E:   *He shall*

9   *indemnify and hold MGA harmless from and against any and all*

10  *claims, losses, costs, judgments, settlements, damages and*

11  *expenses (including reasonable counsel fees) arising from*

12  *any beach by him of any of the warranties, representations*

13  *and agreements made by him hereunder.*

14           Do you see that?

15  A.   Yes.

16  Q.   Now, your understanding of that is that if it was found

17  that you didn't own these drawings and that they were MGA --

18  MGA had to pay on some claim as a result of that, that you

19  would be required to pay MGA?

20  A.   I'm not sure that I had a real clear understanding of

21  that portion of the contract when I signed it.

22  Q.   You had a lawyer representing you at that time?

23  A.   I did.

24  Q.   So under this contract, is it your understanding that

25  if it turns out that Mattel owns these Bratz drawings, the

1    designs, that if there is any judgment against MGA, you are

2    required to indemnify them?

3            MS. KELLER:  Objection, your Honor.  The question

4    assumes facts not in evidence with respect to drawings and

5    designs.

6            THE COURT:  Overruled.

7            You can answer the question about what your

8    understanding is, if any, of this.

9            THE WITNESS:  I don't have -- I didn't have a real

10   clear understanding of that idea.

11   BY MR. PRICE:

12   Q.   Sometime did you develop an understanding?

13   A.   No.

14   Q.   Well, under this agreement, you get 3 percent of Bratz

15   net sales?

16   A.   I did.

17   Q.   Do you believe that you would have enough resources to

18   pay MGA in full for damages from claims when you were only

19   getting 3 percent of the sales?

20           MS. KELLER:  Objection.  Argumentative.

21           THE COURT:  Overruled.

22           THE WITNESS:  No, I wouldn't.

23   BY MR. PRICE:

24   Q.   But a requirement that you indemnify them would give

25   you a reason to say that the Bratz drawings and designs were

37

1    created in 1998?

2    A.    I'm sorry.  Can you restate the question?

3    Q.    Sure.  The requirement that you indemnify MGA against

4    any and all claims, et cetera, do you see that?

5    A.    Uh-huh.

6    Q.    That would give you an incentive in this case to say

7    that the designs, concepts, drawings were created in 1998 so

8    that you wouldn't have to pay anything to MGA?

9    A.    I don't really know that I have a particular feeling

10   about that one way or another.  Like I said, I don't

11   really -- I didn't really understand this portion of the

12   contract.

13   Q.    Without going into details, your attorney, Ms. Wang,

14   explained this contract to you?

15   A.    She told me some about it, but I don't remember

16   particularly discussing this portion of the contract.

17   Q.    You hired her so that you could understand the

18   agreement that you were entering into?

19   A.    I did.  And I also hired her to help me try and get the

20   best financial deal possible.

21   Q.    I'm not asking you about other reasons.  One of the

22   reasons you hired her was that you would have a clear

23   understanding of this agreement; correct?

24   A.    Yes.

25   Q.    And this agreement tied your fortunes to MGA.  You were

1  in the same boat with them; right?

2  A.   Yes.

3  Q.   And, therefore, you have a financial incentive to say

4  that these Bratz drawings, designs, were created in 1998

5  during that period of time between your two Mattel

6  employments?

7  A.   Well, I've been telling the truth.

8  Q.   Which wasn't my question.

9       My question was that you have a financial

10 incentive because your fortunes are tied with MGA to say

11 that the Bratz concept drawings you created were created in

12 that band between April 1998 and January 4th, 1999, that

13 period when you weren't employed by Mattel?

14 A.   Yes.

15 Q.   Mr. Bryant, I need to go over with you some of those

16 designs so that you can confirm those drawings.  You can

17 confirm that you, in fact, did these drawings, okay?

18 A.   Okay.

19      MR. PRICE:  If we look at Exhibit 5, I'm going to

20 start with page 52.

21      MS. KELLER:  Your Honor, I was wondering if we

22 could use originals at this point, since the witness is

23 being asked if this is what he produced.

24      THE COURT:  Is that acceptable to both parties?

25      MR. PRICE:  It would be acceptable to put

1    originals in, but they are all over the place.  We tried to

2    get them together.  They are not in our possession.

3              MS. KELLER:  Your Honor, they are in the

4    courthouse.

5              THE COURT:  Well, they might be, but it's when

6    they arrived, counsel.  I think we should discuss this out

7    of the presence of the jury, don't you?

8              MS. KELLER:  Yes.

9              MR. PRICE:  That's fine, your Honor.

10             THE COURT:  Should we send the jury home then?

11             MR. PRICE:  It would be a good time to go home for

12   the weekend.

13             THE COURT:  You're not going home.

14             MR. PRICE:  I know.

15             THE COURT:  Okay.  You're admonished not to

16   discuss this matter amongst yourselves, nor form or express

17   any opinion concerning the case.

18             Have a nice weekend.  We'll see you on Tuesday;

19   right?  Tuesday at 8:30.

20             You've been exemplary, by the way.  Have a nice

21   weekend.

22        *(Jury out.)*

23        *(The following proceedings were had outside the*

24        *presence of the jury:)*

25             THE COURT:  Mr. Bryant, you may step down.  We'll

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    see you at 8:25.

2          All right, counsel.  Before I retake the bench

3    again, you're going to work with Kathy so she doesn't have

4    to stay.  You're going to be up-to-date with all of the

5    exhibits, and Kathy will knock on the door, or come back,

6    Kathy, and tell me when counsel have either agreed or agreed

7    to disagree.  For those items that they are in disagreement

8    on that haven't been received and they think that they have,

9    we'll get that on the record and make rulings.  I want to

10   make certain that our records are accurate now at the end of

11   every week, so we don't have that last-moment amount of

12   chaos.

13         Second, what's our time?  I was going to indicate

14   to the jury what our time was, but I don't think I'm going

15   to today.  I'll do it next week.

16         MR. ZELLER:  We don't have the official time for

17   yesterday.

18         THE COURT:  You will have it before we leave this

19   evening.  So, Kathy, we'll muster the court reporters and

20   you'll have it.

21         Who are you missing?

22         MR. ZELLER:  I'm missing yesterday.

23         THE COURT:  The whole day?

24         MR. ZELLER:  I believe.

25         THE COURT:  Thank you very much.

1          *(Recess taken from 4:35 p.m. to 4:55 p.m.)*

2          THE COURT:  Counsel, for MGA has repeatedly

3     objected to the repetitive nature of some of the questions

4     by Mattel as having been asked and answered.

5          I would normally sustain those objections, except

6     I'm designating for my record that Carter Bryant is an

7     adverse witness to Mattel; and, therefore, at least in

8     looking at the evidence code -- and I'll invite research,

9     and I'll expect briefing on Sunday limited to five pages on

10    this issue -- my belief is, when the court finds or believes

11    that there's an adverse witness -- which I didn't want to

12    enunciate in front of the jury, because I thought it might

13    be prejudicial and cut myself off from saying, I'll reserve

14    that until a discussion outside the presence.

15         You're normally allowed to ask leading questions.

16    But on occasion, you can ask the same question which I've

17    allowed Mattel to do.  The real issue becoming -- has become

18    for me:  Is Carter Bryant also, potentially, an adverse

19    witness to MGA?

20         I'm designating Carter Bryant an adverse witness

21    to MGA also, giving you the same latitude, one, asking

22    leading questions.  I'm giving you the opportunity also to

23    ask the question more than one time.

24         MS. KELLER:  Thank you.

25         THE COURT:  Second, because the e-mails are so

1    voluminous and because the evidence is so voluminous,

2    there's another reason that the court should be using its

3    discretion on occasion.  In other words, Mr. Price, we're

4    not going to cover this for the third time.  To try to make

5    some semblance out of this, just as MGA does and the

6    evidence is so massive, that asking it one more time, I

7    don't find to be detrimental to MGA.

8            But I want to afford the same courtesy because

9    that was my, I thought, most difficult decision that I

10   reached today.  And I started to make that -- I remind you,

11   I started to make that determination in front of the jury,

12   Ms. Keller; and then, you would know what the ruling was.

13   And I thought on balance that doing that in front of the

14   jury made it look like your questions were -- or your

15   objections were spurious when they're not.  And second, I

16   thought it might be prejudicial, so that's why we waited.

17           But if any of you disagree with that ruling,

18   please do the research and tell me what time Sunday you're

19   going to present me the briefs.

20           MS. KELLER:  Sorry, your Honor, I didn't mean to

21   laugh.

22           THE COURT:  What time?

23           Mr. Price, limited to five pages if you disagree.

24           MR. QUINN:  I'm -- I thought Mr. Price and

25   Ms. Keller were off on Sunday, your Honor.  I'll be here for

1    sure.

2              THE COURT:  Well, Mr. Quinn and Mr. McConville

3    limited to five pages.

4              What time on Sunday?

5              MR. QUINN:  Would 8:00 o'clock be okay, your

6    Honor?

7              THE COURT:  Fine.  We'll gather at 8:00 o'clock.

8              Now, do you disagree with the court's ruling?  And

9    if you do, then I want to give you the opportunity to write

10   a brief on it.  In other words, you've got the benefit so

11   far.  You've been able to ask leading questions and you've

12   asked more than one question, and I've denied MGA's

13   objections.

14             Now, the question is, is Carter Bryant an adverse

15   witness to MGA?

16             I feel that he is.  And I think I'm going to

17   afford them the same courtesy.  I think you're right.  I

18   think MGA is going to run from Carter Bryant in all

19   likelihood.

20             MR. PRICE:  It's too early for us to tell.  He

21   hasn't been examined.

22             THE COURT:  Well, maybe you'll tell by

23   8:00 o'clock on Sunday.

24             MR. PRICE:  I don't think we'll really know until

25   he's been examined whether he's an adverse witness.  He met

1    with them for a couple of hours.

2              THE COURT:  You're almost done with your direct.

3              MR. PRICE:  Never mind.

4              THE COURT:  Did you know that?

5              MR. PRICE:  Yes, I am.

6              THE COURT:  How much longer will you have?

7              MR. PRICE:  I would say an hour to two at most.

8              MS. KELLER:  Your Honor, if I might.

9              I think the -- maybe I think it's true that in the

10   legal sense, Carter Bryant's interests are adverse to both

11   parties.  And I know from Mr. Bonis, who I just met today

12   and talked to, that he has never even been called by Mattel,

13   ever, to see if they wanted to meet with Carter Bryant,

14   ever.

15             So, you know, as far as whether Carter Bryant has

16   met with us today to look at a few dolls and drawings -- and

17   that's what it was -- I don't think that establishes that we

18   are joined at the hip.  But the real --

19             You know, the problem with pining whether we can

20   ask leading questions on this belief that Mr. Price

21   expressed earlier that I'm going to go after Carter Bryant

22   and try to destroy him, you know, I don't know about

23   Mr. Price, but some of us don't really believe that lawsuits

24   should be necessarily tried by trying to destroy people,

25   unless they are drug addicts, drug dealers, pimps, multiple

```
1    murderers.  And what I don't want is the court to assume if
2    I don't go after him, hammer and tong and try to reduce him
3    to rubble, that somehow that means we are all joined at the
4    hip, because it doesn't at all.
5              THE COURT:  I firmly believe that he has an
6    adversarial position to Mattel.  And I'm fairly convinced
7    that there's a strong argument -- although, there is some
8    pecuniary benefit -- that he may have a strong adversarial
9    position to MGA.  I think, therefore, my tentative ruling
10   is -- and I'm giving you both an opportunity to brief it by
11   8:00 o'clock, Sunday morning, if I'm right.
12             MS. KELLER:  We agree with the court's ruling and
13   we don't intend to challenge it.
14             THE COURT:  I don't think Mattel wants to
15   challenge it, because they've been able to ask leading
16   questions and repetitive questions.  But maybe they do.
17             Now, you make a decision today.  Believe it or
18   not, Mr. Price, we can sit here all night.  The would have
19   could have should haves are all done with now.  We can't
20   make a decision.
21             There's Mr. Quinn -- able partner, senior person
22   of your firm -- lean over and talk to him and get
23   Mr. Zeller's help, because he can't resist himself.
24             MR. PRICE:  We will not oppose.
25             THE COURT:  Okay.  Done.
```

```
 1              Now, the second thing is, how many hours do we
 2    have?
 3              MS. HURST:  Your Honor, we don't have today's
 4    official times yet, but I can approximate for the court.
 5    Assuming we get in six hours today --
 6              THE COURT:  I want accuracy, because at the last
 7    portion, I'll wait you out tonight.
 8              MS. HURST:  Okay.  We're just waiting for Jane.
 9              THE COURT:  Jane?
10              MS. HURST:  Yes.
11              THE COURT:  Get her on the phone.  Ask Millie to
12    call Jane.  I want those hours.  From now on, I want to know
13    the court reporter by name so I know where to go.  And thank
14    you.  I know exactly where to go to get the time.
15              MS. HURST:  We just need yesterday afternoon and
16    today before, Deborah.
17              THE COURT:  What we ought to be doing is talking
18    to each court reporter before they leave, but they are
19    switching out partway through the session.  That's the
20    problem.
21              MS. KELLER:  We might need Debbie, too, if she was
22    here this morning.
23              THE COURT:  Okay.  I'll be right back.
24         (Pause.)
25              THE COURT:  Then, the court has now received all
```

47

```
1    the briefing it needs on Anna Rhee.  I see Ms. Rhee's
2    counsel here.  Thank you for returning.
3            We'll hand down an order and that order will be
4    self-explanatory.  Probably over the weekend.
5            MR. BERMAN:  Okay.
6            THE COURT:  Thank you very much, sir.
7            We're going to meet Sunday at 8:00 o'clock.  Lead
8    counsel, associate counsel, if you would like.  And that's
9    all I need.
10           Do we have those witnesses that we think we're
11   going to be calling so we have binders?
12           I know that we've gone through Rachel Harris.  I
13   think we've concluded Rachel Harris.
14           MR. QUINN:  Yes.
15           THE COURT:  I think we have completed Jennifer
16   Maurus.
17           MR. QUINN:  We may have a couple of additional
18   ones for Sunday.
19           THE COURT:  Sarah Odom.  Lloyd Cunningham.  And
20   then, after Cunningham?
21           I want to make sure the exhibits are complete.
22           Now, I don't care if witnesses are switched around
23   within reason.  In other words, I don't want to hear Mattel
24   or MGA complain that you had the next witness and then you
25   flipped one.  That's fine.  As long as it's within reason
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
 1   and the parties have some notice.  So I wasn't too concerned
 2   the other day when Anna Rhee or whoever testified.  MGA
 3   should have been prepared, and they were.  But who is
 4   after --
 5           Who is the next one?
 6           MR. QUINN:  We have Farhad Larian and Victoria
 7   O'Connor.
 8           THE COURT:  Farhad Larian; and then, Victoria
 9   O'Connor.
10           MR. QUINN:  Again, I don't know about the order
11   there, your Honor.
12           THE COURT:  Understood.
13           MR. QUINN:  We're working ahead, too, for people
14   we don't control.
15           THE COURT:  Understood.
16           MR. QUINN:  And then, depending upon the court's
17   ruling, the expert on scanning and 3D imaging, who the court
18   met last night, Mr. Keiser.
19           THE COURT:  Okay.
20           MR. QUINN:  And then, probably Isaac Larian.
21           We also have the journalist issue, your Honor.
22   We're not getting any luck in getting those journalists
23   here.  I'm gathering from comments the court has made that
24   it may be possible to redact their articles and get some
25   portion of those articles in.
```

1          THE COURT:  Some of that will depend on what

2   Mr. Larian says when he testifies.

3          Okay.  Now, that doesn't conclude your case,

4   necessarily.  You'll have damages experts, Wagner.

5          MR. QUINN:  Oh, sure.  We have damages people.  I

6   mean, we have an ink expert who can't be here next week.

7   This relates to the notary book.

8          THE COURT:  Sure.

9          MR. QUINN:  We have -- then, we have the whole

10  Mexico/Canada part of the case.

11         THE COURT:  Now, it sounds to me if we can get

12  through -- I want to check with Ms. Hurst.

13         We already have three witnesses after Carter

14  Bryant.  It seems to me that if we get up to Isaac Larian on

15  Sunday or Monday that that puts us far enough ahead that

16  there shouldn't be any surprises for you.

17         MS. HURST:  Our concern was that Ms. O'Connor had

18  previously been listed as No. 40 on their witness list.

19         THE COURT:  Well, they're moving her up.  She

20  probably isn't on the stand realistically with your

21  cross-examination of Carter Bryant, et cetera.  She's not

22  going to be on the stand until Thursday.

23         MS. HURST:  Could we do Mr. Larian next weekend?

24  Because that's a long way --

25         THE COURT:  I think he's on the stand this week.

50

```
 1              MS. HURST:  Isaac?

 2              No, they are looking for him as their first

 3     witness the following week.

 4              MR. QUINN:  I think it's possible he takes the

 5     stand the end of next week.

 6              THE COURT:  I do, too.

 7              MR. QUINN:  It depends on how long Carter Bryant

 8     goes.

 9              MS. HURST:  Could we have leave to do our exhibits

10     for Mr. Larian during the week -- that week, rather than on

11     Sunday, or Monday?

12              THE COURT:  We'll figure out something, okay?  But

13     I'm going to start on Mr. Larian, I know that.  Try to

14     complete that on Sunday or Monday.

15              And I just suggest, Monday is the kind of a day,

16     Ms. Hurst, I'm going to start looking --

17              MS. HURST:  Does the court have a calendar on

18     Monday?

19              THE COURT:  But I've -- trust me, you'll have the

20     same time you had last Monday, which was quite a bit of

21     time, actually.

22              Now, I want to make sure certain, Kathy, do you

23     have a report back?  How our exhibits doing?  I want to

24     check each week.

25              THE CLERK:  They are still reconciling their list,
```

1  Judge.

2          THE COURT:  Counsel, you'll remain, then.

3          MR. QUINN:  Would it be possible for this to be

4  handled by Ms. Hurst, and Mr. --

5          THE COURT:  Just a minute.  I want lead counsel

6  here for just a moment, because I want to start making a

7  record.  If there's a dispute, I want to know what that is

8  and resolve it at the end of every week.

9          MR. ZELLER:  Could I make a request about this,

10 which is:  One reason, what we're doing is, with the lag

11 time with the transcripts, we go back and the parties meet

12 and we talk and we reconcile our notes with the official

13 transcripts.  And so far, there doesn't appear to be

14 significant areas of dispute.

15         THE COURT:  I'm still going to get the initial

16 report tonight.

17         MR. ZELLER:  What I'm hoping is, if we're going to

18 basically reconcile or give the report every week, that we

19 do it Thursday to Thursday, because that would allow us --

20         THE COURT:  Why?

21         MR. ZELLER:  Wait until Friday.  We get the Friday

22 official transcript.

23         THE COURT:  Fine.  Let's do that.  Do you have up

24 to Thursday?

25         MR. ZELLER:  Yes.

```
 1              THE COURT:  Let's just do Thursday.  I think
 2    that's a great suggestion.  That way you don't have to wait
 3    on Friday.
 4              MR. ZELLER:  Then, you are posting together notes.
 5              THE COURT:  So then, can we make a record as to
 6    where we stand as of Thursday?
 7              MR. ZELLER:  I'll go check.
 8              THE COURT:  He's right here.
 9              Now, off the record.  Rest your hands.
10         (Pause.)
11         (At 5:39 p.m., proceedings were adjourned.)
12
13                            -oOo-
14
15
16
17
18
19
20
21
22
23
24
25
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

53

```
 1                          CERTIFICATE

 2            I hereby certify that pursuant to Section 753,

 3    Title 28, United States Code, the foregoing is a true and

 4    correct transcript of the stenographically reported

 5    proceedings held in the above-entitled matter and that the

 6    transcript page format is in conformance with the

 7    regulations of the Judicial Conference of the United States.

 8

 9    Date:  January 28, 2011

10

11

12                        _____

13                        Deborah D. Parker, Official Reporter

14

15

16

17

18

19

20

21

22

23

24

25
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*