# EXHIBIT A

```
 1                  UNITED STATES COURT OF APPEALS

 2                      FOR THE NINTH CIRCUIT

 3   - - - - - - - - - - - - - - - - -X

 4   MATTEL, INC.,                     :

 5       v.                            :      Nos.  09-55673

 6   MGA ENTERTAINMENT, INC., et al.   :            09-55812

 7                                     :

 8   - - - - - - - - - - - - - - - - -X

 9

10                            Wednesday, December 9, 2009

11

12           MR. ROSENKRANZ:  May it please the Court, Joshua

13   Rosenkranz on behalf of MGA.

14           Your Honors, the District Court in this case imposed

15   a draconian remedy that threatens the imminent demise of a

16   highly successful worldwide enterprise.

17           JUDGE TROTT:  Too big to fail.

18           MR. ROSENKRANZ:  Well, Your Honor, it's on the brink

19   of failure and all because of a series of draconian orders

20   that the District Court imposed:  a worldwide copyright

21   injunction, a worldwide and unprecedented constructive trust

22   that it was infected with multiple legal errors.  This case

23   presents errors that go to the heart of copyright law and tort

24   law and the scope, the permissible scope of equitable remedies.

25   But the appeal logically begins with an ambiguous, barely
```

1

1  legible contract preprinted as an employment agreement that
2  has been aggressively interpreted against the employee in this
3  case in a manner that threatens basic economic freedoms.
4          JUDGE TROTT:  Are you talking about the inventions
5  Agreement?
6          MR. ROSENKRANZ:  Yes, Your Honor, this two page—
7          JUDGE TROTT:  The most important document in the
8  entire case?
9          MR. ROSENKRANZ:  Yes.
10          JUDGE TROTT:  And you can't read it without a
11  magnifying glass.
12          MR. ROSENKRANZ:  Your Honor, neither can I.  This is
13  the best copy in the record.
14          JUDGE WARDLAW:  But we know it doesn't have the word
15  "ideas" in it.
16          MR. ROSENKRANZ:  We know it does not have the word
17  "ideas" in it and this single piece of paper became the engine
18  of economic ruin for MGA.  So, let's talk, Your Honors, about
19  the two ambiguities, one of which goes to the idea for the
20  name Bratz—the "ideas" piece—the other of which goes to all of
21  the economic, excuse me, all of the equitable relief that was
22  granted.
23          Now, to Judge Wardlaw's point, the very notion of an
24  employer laying claim to an employee's ideas is very scary.
25  It means that any time someone succeeds in a business, his

2

1   past employer can, seven years later, come up and say, "I know

2   you had that idea when you worked with me."  If an employer

3   wants to lay claim to ideas—if that's even legal, Your Honors—

4   it has to at least be clearly laid out in the document,

5   especially when we're talking about a contract of adhesion,

6   which this was.  At a bare minimum, Judge Wardlaw, yes, it's

7   got to say the word "ideas."  The agreement here—

8           JUDGE WARDLAW:  Okay, well how do you interpret the

9   word where it talks about ownership of inventions?  "I agree

10  to communicate to the company, as promptly and fully as

11  practicable, all inventions as defined below conceived or

12  reduced…"

13          MR. ROSENKRANZ:  Sure, Your Honor—

14          JUDGE WARDLAW:  Does the word "conceived" imply

15  ideas?

16          MR. ROSENKRANZ:  No, Your Honor, the word

17  "conceived"—first of all, the question is whether it's a clear

18  message to the employee, not whether there is an implication;

19  but conceived, conceived what?  Conceived inventions.  That is,

20  something more concrete than an inchoate idea.  And I hasten

21  to add that the preamble, which I know is illegible as well,

22  tells the employee that this contract covers inventions that

23  the employee "creates."  Which is, of course, what any

24  employee in a creative environment would think.  No employee

25  who is creative would think that my employer owns every one of

3

1   my ideas, even if it's an idea about the toy business.

2        JUDGE WARDLAW:  When, well did, when Mr. Bryant,

3   when he created— when he drew the dolls, is that creating an

4   invention?

5        MR. ROSENKRANZ:  Absolutely not, Your Honor, it's—

6   excuse me—the drawings themselves?

7        JUDGE TROTT:  Right.

8        MR. ROSENKRANZ:  We're not arguing on this appeal

9   that the drawings themselves were not covered, but we had a

10  big argument about that below.

11       JUDGE WARDLAW:  That's a tangible form of expression,

12  at that point.  It's not the pure idea?

13       MR. ROSENKRANZ:  Yes, and also because, Your Honor,

14  the contract refers to "designs."  So we're not disputing for

15  present purposes and, you know, again, two completely

16  different sets of relief that were granted here.  There's the

17  relief of constructive trust over the idea for the name Bratz—

18  and that's what we're talking about now—and then there's the

19  constructive, the worldwide copyright injunction, which goes

20  to the designs.

21       JUDGE WARDLAW:  The constructive trust is over

22  trademarks?

23       MR. ROSENKRANZ:  The constructive trust, yes, Your

24  Honor, is over trademarks and then there's an injunction as

25  well against the use of the trademark.

4

1          JUDGE WARDLAW:  Okay, so let's go back to ideas.

2          JUDGE TROTT:  How does 2870 that's referred to here,

3    which I can barely read, limit this document and allow the

4    employee to come up with ideas on his or her own time etc.,

5    etc.  Is that of any moment, that limitation?

6          MR. ROSENKRANZ:  Your Honor, huge ambiguity there.

7    2870, that provision there, of course, is incorporated into

8    the contract by virtue of law.  By operation of law, it had to

9    be there.  Now Mattel was very careful.  Mattel said, in

10   writing that provision, that it applies only to inventions

11   that "qualify" under 2870.  Well 2870 has always been about

12   technical and scientific innovations.  It was all about the

13   assignment of patent rights.  It wasn't about designs that are

14   created by creative people—visual arts—and it certainly was

15   never about ideas.  No court has ever interpreted 2870 to

16   cover just ideas or creative works, more broadly.

17          And then just one final point on the invention,

18   excuse me, the ideas issue.  There are strong reasons not to

19   read "ideas" into this contract.  First, as I said already,

20   the contract refers to what the employee "created."  Secondly,

21   Mattel actually had versions of this agreement that are in

22   this record that incorporated the word "ideas."

23          CHIEF JUDGE KOZINSKI:  Time is limited and this is

24   in the briefs.  Maybe you could tell us—let's say we give you

25   the point about ideas, just so we can get past it.  What flows

1   from all that?

2           MR. ROSENKRANZ:  The point about ideas, Your Honor?

3           JUDGE TROTT:  If you're right.

4           CHIEF JUDGE KOZINSKI:  Yeah, if you're right?  We

5   understand your argument, I think, and just to go forward.

6           MR. ROSENKRANZ:  Yes, so if we're right about ideas,

7   Your Honor, the entire constructive trust falls because the

8   constructive trust has at its heart the taking of a piece of

9   property that is a res that is owned by Mattel.  If Mattel

10  didn't own the idea, the constructive trust over the trademark

11  that used that idea is gone.  But there is another contract

12  point, I hasten to add.

13          CHIEF JUDGE KOZINSKI:  I'm sorry.  Run that by me

14  one more time?

15          MR. ROSENKRANZ:  Yes, Your Honor.  Two buckets—

16          CHIEF JUDGE KOZINSKI:  The trademarks are the name

17  "Bratz"?

18          MR. ROSENKRANZ:  The name "Bratz" used on 14,000

19  products that Carter Bryant never thought of, but it's just

20  the business "Bratz" and the use of that name in connection

21  with anything.

22          CHIEF JUDGE KOZINSKI:  But Carter Bryant brought the

23  name "Bratz" to MGA, right?  He came up with it?

24          MR. ROSENKRANZ:  He did indeed.  Yes, Your Honor.

25  And by the way, Mattel knew of the name "Bratz" as well and

6

1   rejected the notion of creating a business surrounding the

2   name "Bratz."

3           JUDGE TROTT:  That's of no moment to us.

4           CHIEF JUDGE KOZINSKI:  None, whatsoever.  They're

5   free to discard stuff there.

6           MR. ROSENKRANZ:  Absolutely, Your Honor.  Yes, but…

7           CHIEF JUDGE KOZINSKI:  So, but, the disconnect I'm

8   having is if—it's one thing to have an idea, it's another

9   thing to have an actual name and design and some things of

10  that sort.  So let's say the idea goes out the window, but you

11  still got the name, you've got designs, you've got—wasn't

12  there a mock-up of that….

13          MR. ROSENKRANZ:  Yes, Your Honor.

14          JUDGE TROTT    Made with Mattel stock…

15          MR. ROSENKRANZ:  Again, let me separate out…

16          JUDGE TROTT:  You get to the facts, you're getting

17  way beyond just ideas, in terms of what he took to MGA.

18          MR. ROSENKRANZ:  Agreed as to the designs.  But the

19  idea for the name "Bratz," which is the only basis—that is the

20  name, just the name—the only basis on which Mattel has a

21  constructive trust because it was the name "Bratz," it argues,

22  that matured into the trademark "Bratz," that's asserting

23  ownership over the idea, and that's the only theory that

24  Mattel asserted.  Then there's a completely separate

25  conversation about the creative products.

7

```
1          CHIEF JUDGE KOZINSKI:  It's too fine a point.
2   What's the difference between the idea of a name and the name
3   itself?  If you write it down on a piece of paper?
4          MR. ROSENKRANZ:  No, no Your Honor.  If he writes it
5   down on a piece of paper, it becomes part of a creative work.
6   Copyright law would then control the fair use of that word.
7   But Mattel is laying ownership…
8          CHIEF JUDGE KOZINSKI:  Wait a minute, no; something
9   can be both a trademark and a copyright.  So, I don't—you
10  might also get copyright protections, but…
11         MR. ROSENKRANZ:  The only source of Mattel's claim
12  for the trade name is that Carter Bryant thought of the name
13  while he was at Mattel.  That's the only basis of the
14  assertion of a claim to the ultimate trademark.  But let me
15  then…
16         JUDGE WARDLAW:  Could you just maybe walk me through
17  this one a little bit, because the constructive trust ruling—
18  Judge Larson went through the requirements for the
19  constructive trust and boiled them down to the res and the
20  claim points to that res and some wrongful acquisition or
21  retention of the res.  And then he says the jury found that
22  the MGA parties wrongfully acquired the idea for the name
23  "Bratz."  So, what is he saying is the res here, the idea for
24  the name "Bratz?"
25         MR. ROSENKRANZ:  Yes, Your Honor.  That is what he
```

8

1   says is the res.  And then he says that that res had an

2   accretion of value…

3          JUDGE WARDLAW:  So, the next element is the right of

4   a complaining party to the res.  So your point is that if

5   Judge Larson based the constructive trust on the res of the

6   idea, Mattel who is the complaining party, did not have the

7   right to that?

8          MR. ROSENKRANZ:  That's correct, Your Honor.  Not

9   the right to the idea and certainly not the right to the

10  fruits of MGA's labors and the hundreds of millions of

11  dollars…

12         JUDGE WARDLAW:  You're jumping ahead, cause I just—

13  so, and then the wrongful acquisition…

14         MR. ROSENKRANZ:  Which the jury did not find, Your

15  Honor.  The jury only found that the idea was conceived while

16  at Mattel.  Judge Larson directed a verdict on the notion that

17  anything that was conceived then was owned.

18         JUDGE WARDLAW:  So, what satisfied this third

19  element of the constructive trust?

20         MR. ROSENKRANZ:  The third element being which one,

21  Your Honor?

22         JUDGE WARDLAW:  The wrongful acquisition.

23         MR. ROSENKRANZ:  Nothing, Your Honor.  It was not

24  wrongfully acquired, because in our view, Mattel didn't own it

25  and then Mattel doesn't…

9

1          JUDGE WARDLAW:  But what was Judge Larson's theory

2     for that.

3          MR. ROSENKRANZ:  Oh, I don't know what his theory

4     was, Your Honor, except that—well his theory goes back to

5     contract.

6          But I did have one other observation to make about

7     the contract because there's a second argument, a second

8     ambiguity, which flows from the words "during my employment."

9     So Mattel says, or the employee when he signs says, "Mattel

10    owns all my creative works made—and according to Mattel, all

11    the ideas I came up with—'during my employment.'"  So the

12    ambiguity is, does that mean, "temporally from the time I was

13    hired to the time I left?" or does it mean "in the course of

14    my employment," which any creative person would believe is

15    what it means?  "When you assign me work, you own my ideas."

16    It's what copyright law would say and it's what the law of

17    agency would say under the Restatement.

18         The latter is the much stronger reading, but, of

19    course, we don't have to prevail on which reading is stronger.

20    All we have to do is demonstrate that there's an ambiguity.

21    Because again, on both arguments, this is a contract of

22    adhesion, which has to be construed strictly against Mattel.

23         Let me turn, though to the other piece of this case

24    which is the copyright piece.  And not to mince words, I just

25    want to make sure the Court understands that this is what the

1   District Court enjoined [holds up blank sculpt for Court's
2   view].  Any doll that has either this head or this body.  It
3   doesn't matter what paint Mattel, excuse me MGA painted on it.
4   It doesn't matter what the features are.  I don't know that
5   the Court has had this exhibit, but I'm happy to hand it up to
6   the Court if it wishes.  That's just plain wrong as a matter
7   of copyright law.  Mattel does not own the human form.  Mattel
8   does not own anything that can be done to this mini-mannequin.
9        The District Court reached the wrong conclusion
10  because it applied the wrong copyright analysis.  So first the
11  District Court asked whether the dolls were substantially
12  similar when it should have asked—to the drawings, that is—
13  when it should have asked, whether they were virtually
14  identical.  Every time this Court has ever confronted a case
15  involving a visual image of a human being or an animal, this
16  Court has concluded that only thin protection applies.
17       Secondly, the District Court was supposed to begin
18  by breaking down the overall creative work into its
19  constituent elements—the eyes, the lips, the oversized head,
20  and ask whether each of them was independently protected.
21       JUDGE WARDLAW:  He did that, didn't he?
22       MR. ROSENKRANZ:  He absolutely did not, Your Honor.
23       JUDGE WARDLAW:  In his chart.  What was protectable
24  and what wasn't?
25       MR. ROSENKRANZ:  No, Your Honor.  What he did, if

11

1    you look at the column that says "Not Protected."  What he did

2    was to say basically the human form is not protected, that is

3    anything that has eyes, ears, a mouth, a big head, is not

4    protected.  But he never, ever broke it down into each

5    individual element.  He never said, "Well let's look at these

6    eyes, they're almond shaped eyes.  Well does Mattel own almond

7    shaped eyes?  No, that's not protected."  And, in fact, the

8    District Court did the absolute opposite of that.  What it

9    said is that it believed that "a combination of otherwise non

10   protectable elements gets full copyright protection."  Well,

11   that's the opposite of this Court's teaching, which is that a

12   combination of unprotected elements gets only thin protection.

13          Thirdly, the District Court held that the only thing

14   that was not protectable, as I was just saying, was that right

15   hand column, the human form itself.

16          And finally, the District Court thought that in

17   conducting the objective prong of the analysis, it was

18   permissible to ask whether the compilation "expresses a unique

19   style," whether the clothes "express an aggressive

20   contemporary youthful style" or whether it conveys a "distinct

21   look."  Now that's the second half of the analysis, that's the

22   subjective analysis.

23          Finally, I'd like to—unless there are more questions

24   on copyright ….

25

12

 1          I'd like to turn then to the state law claims that,

 2   along with ownership, form the basis of the constructive trust.

 3   Now, I'll rest on the briefs with respect to fiduciary duty,

 4   that is whether a contract that uses three words "that

 5   position of trust" could possibly communicate to an employee

 6   clearly of rank and file employee, and has now assumed the

 7   ultimate fiduciary duty, as a fiduciary to the company.

 8          JUDGE TROTT:  It didn't say "fiduciary duty."

 9          MR. ROSENKRANZ:  It never said "fiduciary duty" and

10   it…

11          JUDGE TROTT:  Do you think that using that word

12   would convey to the ordinary employee what it does to lawyers?

13          MR. ROSENKRANZ:  No, Your Honor.  The only way—if

14   you…

15          JUDGE TROTT:  "Position of trust" is a little

16   clearer.

17          MR. ROSENKRANZ:  Well, "position of trust" simply

18   means when in conjunction with the first half of that

19   sentence—which is, "I understand that I must be trusted to

20   keep confidential information"—"I accept that position of

21   trust."  That means, "you can trust me to keep the

22   confidential information confidential."  But when I say that

23   it didn't convey that he was a fiduciary, I'm not just saying

24   that it didn't use the words fiduciary.  If you want to

25   impose—an employer wants to impose on a rank and file $60,000-

13

1   a-year employee fiduciary obligations in a contract of

2   adhesion, it has to convey clearly what it means by that,

3   because there is enormous, massive tort liability that can

4   flow from a simple breach of contract.  And this contract

5   didn't do that.

6            But I was saying, I was not going to belabor …

7            CHIEF JUDGE KOZINSKI:  What flows from that?  Let's

8   say we give you that point.  What flows from that?

9            MR. ROSENKRANZ:  The entire constructive trust falls,

10  Your Honor, because although the constructive trust was based

11  on three theories of liability—and I'm going to get to this in

12  a moment—the other two prongs are both prongs that had nothing

13  to do with the sharing of confidential information.  As the

14  jury was instructed, those prongs have to do with nothing but

15  the signing of an agreement to go and take a position as a

16  consultant with a competitor.  And so that's the error that I

17  was going to focus on because it topples all three of the

18  state law claims all at once.

19           CHIEF JUDGE KOZINSKI:  So, what is the "it"?

20           MR. ROSENKRANZ:  The "it" is, the District Court's

21  direction to the jury that it is a breach of the duty of

22  loyalty simply to sign a contract to compete with his current

23  employer in the future.  That's what the District Court told

24  the jury is as a matter of law a violation of the duty of

25  loyalty.  And that's clearly not true…

14

```
 1            CHIEF JUDGE KOZINSKI:  Before we go there, Mr.
 2   Rosenkranz, let's get back to my question.  Let's say we look
 3   at the contract and we wind up agreeing with you that there is
 4   no fiduciary duty created by breach of contract—let's just
 5   accept that fact.  And your answer was—I said what happens
 6   then, and your answer was that knocks out the trust.
 7            MR. ROSENKRANZ:  Yes, Your Honor.
 8            CHIEF JUDGE KOZINSKI:  And then you went on to talk
 9   about the other two theories.  But I'm not quite there yet.
10            MR. ROSENKRANZ:  I'm with you.
11            CHIEF JUDGE KOZINSKI:  Let's put the other two
12   theories aside.
13            MR. ROSENKRANZ:  Let me explain.
14            CHIEF JUDGE KOZINSKI:  Okay, why does—do you need
15   fiduciary duty to set up a constructive trust…
16            MR. ROSENKRANZ:  You do not, Your Honor.  My point
17   is…
18            CHIEF JUDGE KOZINSKI:  If you knock it out, you can
19   still have a constructive trust?
20            MR. ROSENKRANZ:  Absolutely, you can in theory…
21            JUDGE TROTT:  Please wait until Judge Kozinski
22   finishes…
23            MR. ROSENKRANZ:  I'm sorry, Your Honor, absolutely.
24   I apologize.
25            JUDGE TROTT:  We want to understand your answer.
```

15

1          MR. ROSENKRANZ:  I apologize, yes.  And so the
2     answer is this.  When the fiduciary duty is brought, is struck,
3     there then remain only two other theories so, yes, that is a
4     duty of loyalty and tortious interference with the contract.
5          Okay, in theory, those two claims could support a
6     constructive trust.  They can't in this case because the
7     constructive trust is based on the premise that MGA improperly
8     acquired something that belonged to Mattel.  The duty of
9     loyalty theory and the tortious interference theory, as the
10    jury was directed, had nothing to do with the sharing of
11    confidential information.  So there's no basis to conclude
12    that the sharing of confidential information was tortious.
13    The only theories that the jury found were that the signing of
14    the contract was a violation of the duty of loyalty and that
15    it was tortious interference with the contract of an employee
16    at will to induce him or encourage him to sign such a contract.
17         CHIEF JUDGE KOZINSKI:  I'm sorry, let me go back
18    again.  You can't have a constructive trust under California
19    law for a mere breach of contract?
20         MR. ROSENKRANZ:  I think one can have a constructive
21    trust for a mere breach of contract.
22         CHIEF JUDGE KOZINSKI:  Without the case of fiduciary
23    duty, without tortious interference, without having a tort,
24    you keep getting back to this idea that there was no tort.
25    Let's take the torts out of the picture for the time being.

16

1    Let's just focus on the contract itself.  You say there is no

2    fiduciary duty created and we'll give you that point for the

3    purpose of this discussion.  There is still a breach of

4    contract.

5            MR. ROSENKRANZ:  Your Honor, Mattel never proceeded

6    on a breach of contract theory.  The only claims supporting

7    Mattel's constructive trust are the three tort theories.  And

8    the reason that there's no breach of contract theory is that

9    this was not a trade secret and the only thing that Carter

10   Bryant was prohibited under the contract from sharing were

11   trade secrets quote, unquote "proprietary information."

12           Your Honor, I see we're into the time I wanted to

13   reserve for rebuttal, so unless there are further questions,

14   I'd like to…

15           CHIEF JUDGE KOZINSKI:  Why don't you reserve the

16   time.

17           MR. ROSENKRANZ:  Thank you, Your Honor.

18           MR. COLLINS:  Good morning, Your Honors, may it

19   please the Court, Daniel Collins, Munger, Tolles & Olson on

20   behalf of Mattel.

21           With respect to the issue of ideas, in response to

22   one of the questions that the Court asked, I think that even

23   if you were to assume that ideas were not covered by the

24   agreement in the abstract, that nothing follows from that for

25   purposes of the constructive trust.  And that's for two

17

1   reasons:  First, the use of the term "design" already captures

2   it when, as the jury specifically found here, and I'm

3   referring to a drawing that's at ER6105, that Mattel owned

4   designs of dolls—it's a sketch of the dolls on top of the word

5   "Bratz."

6           JUDGE WARDLAW:  Okay, that's a copyright claim,

7   right?  That's ownership of property in the form of copyright

8   ownership.

9           MR. COLLINS:  There  is a copyright in that document,

10  but what it also shows is that factually, they didn't come up

11  with the name "Bratz" on their own.  Factually, they got the

12  name from Carter Bryant in the same course of misconduct that

13  produced the theft of these…

14          JUDGE WARDLAW:  This is one of the problems I had

15  with all of the briefs and the oversize briefs.  Nothing is

16  very really logical because when you're trying to say, okay,

17  what was covered or not covered by this agreement?  What

18  actually existed?  And what of that could possibly form the

19  rest for purposes of a constructive trust?  Because ultimately

20  what we're here about is the two remedies.  Principally the

21  constructive trust over the worldwide trademarks, right?

22          MR. COLLINS:  That's correct

23          JUDGE WARDLAW:  So, what's the logical flow between

24  all of these things?  I mean, the copyright, the fact that

25  Mattel had a copyright in the works that were reduced to a

1   tangible form of expression while Bryant was there does not

2   will not satisfy the requirements for a constructive trust.

3   So what does?

4           MR. COLLINS:  What satisfies it is that the

5   acquisition factually and even apart from the issue of ideas,

6   although I'll get to that in a moment, was wrongfully acquired

7   by MGA and the fruit of that wrongful conduct…

8           JUDGE WARDLAW:  What was wrongfully acquired by MGA?

9           MR. COLLINS:  The name Bratz associated…

10          JUDGE WARDLAW:  How was it wrongfully acquired?

11          MR. COLLINS:  It was wrongfully acquired in two

12  respects.  One is that it's part and parcel of these designs.

13  This isn't…

14          JUDGE WARDLAW:  What did MGA do that was wrongful

15  when it entered into a design contract with Bryant?

16          MR. COLLINS:  It committed the three torts that were

17  found here.  It aided and abetted a breach of fiduciary duty,

18  a duty of loyalty …

19          JUDGE WARDLAW:  We have to find that there was a

20  fiduciary duty beyond keeping the proprietary information

21  confidential and we have to find that there was a duty of

22  loyalty.

23          MR. COLLINS:  You only need to find one of those.

24          JUDGE WARDLAW:  There was no contract other than

25  this inventions and the confidentiality contract.  Bryant was

19

Exhibit A, Page 20

1    an at will employee, so I don't know how you could

2    intentionally interfere with that.

3            MR. COLLINS:  They intentionally interfered with the

4    inventions agreement.  That's the contract with which they

5    interfered.  That's correct.  And they interfered with that

6    because he was supposed to assign to Mattel the drawings that

7    were created during the time that he was a Mattel employee and

8    then also the idea for the name Bratz that went with that

9    entire design of dolls, and instead, through the misconduct

10   that was found by the District Court, which was fraudulently

11   concealed also as found by the jury and by the District Court,

12   they instead acquired the rights to the dolls and then ripened

13   the name that was with those created by Carter Bryant during

14   that as part of the same parcel of conduct into a trademark.

15   It's the fruit of one…

16           JUDGE WARDLAW:  But they didn't really do that.

17   Bratz was already a trademark owned by someone else.  What

18   they did was they purchased the rights to that trademark from

19   that other person.  I don't see how that's wrongful.

20           MR. COLLINS:  That's not correct, Your Honor.  They

21   got the name factually from Carter Bryant.  They then got into

22   litigation with someone else who claimed…

23           JUDGE WARDLAW:  They went to register it and found

24   out that it belonged to someone else.

25           MR. COLLINS:  And then they settled that dispute…

20

1          JUDGE WARDLAW:  They got the idea of the name,

2    right?  We're still back to the idea?

3          MR. COLLINS:  They got the idea for the name Bratz

4    from Carter Bryant.  They settled with the other party.  They

5    never conceded that they acquired the rights from them.

6    Indeed, they've always taken the position that their rights

7    existed and predated and stood apart from that acquisition in

8    connection with the settlement of that litigation.  But the

9    ideas are covered because, even without the word idea being in

10   there, they're part of a design, they're part of an invention.

11   You can use in common parlance, as we indicated in the papers

12   inventing a name.

13          It makes particular sense when you're talking about

14   the product line, inventing a product line, the idea of

15   referring to that is inventing the name is not at all unusual

16   and the use of the term conceived in the contract also

17   reinforces that.

18          You have to also understand, the presentation of

19   this issue in the—when Bryant claimed on summary judgment that

20   it did not reach the drawings because the name was not really

21   the issue, the core issue, in the interpretation at summary

22   judgment.  The argument is that it was limited to

23   technological matters.  That's an argument they've hinted at

24   when they refer to the Labor Code provision as having a

25   similar restriction which it does not.  The case law, the

21

1  Iconix case we've cited also indicates that it goes well

2  beyond technological matters and can extend to other property.

3  So that covers the idea.

4         They also raise a second argument with respect to

5  what is the meaning of—"at any time during my employment by

6  the company."  And with respect to that, they really ignore

7  the phrase "at any time."  A phrase that doesn't make any

8  sense if you read the phrase "during my employment at the

9  company" to mean only between 9 and 5.  At any time

10 underscores that it's at any time during the employment.  The

11 Labor Code reference…

12         CHIEF JUDGE KOZINSKI:  [Inaudible]

13         DANIEL COLLINS I think it tilts in that direction.

14 If there's any residual ambiguity, I think it's resolved by

15 the Labor Code reference and the entire recitation of that.

16         CHIEF JUDGE KOZINSKI:  You've got the other part

17 that deals with the employer's business on the Labor Code, but

18 "at any time" could just mean at any time I'm at work, right?

19 It doesn't mean whether you're asleep or whether you are

20 vacationing, Bermuda, whatever.

21         MR. COLLINS:  I think that "at any time during my

22 employment," as opposed to saying during my employment, I

23 think it tilts in the direction of saying "at any time," but I

24 also think the Labor Code reference…

25         CHIEF JUDGE KOZINSKI:  Does it cover when he goes to

22

1    the bathroom, I mean, take lunch, you know, if you are at

2    work?  I don't think I buy much of that, Mr. Collins.

3              MR. COLLINS:  I think the Labor Code reference,

4    though, is dispositive because the Labor Code reference

5    expressly discusses the concept of inventions developed

6    "entirely on his or her own time."  That's exactly what it

7    refers to but it says that they're only excluded if certain

8    conditions are met.  If you read the rule…

9              CHIEF JUDGE KOZINSKI:  That is more helpful to you

10   and I thought that's where you were focused, but you know it's

11   so curious that your client's contract, which is not written

12   in the most legible or visible way, or intuitive way, but

13   that's neither here nor there, I suppose, but it does not say—

14   does it say when you're at home, when you're sleeping, when

15   you're showering?  It doesn't make any, does it make allusion

16   to…maybe I missed it because…let me find it again.  I got it,

17   it's not a…

18             MR. COLLINS:  The copy that's in the record, you can

19   tell it has been reduced, as it has been copied into an

20   exhibit.

21             JUDGE TROTT:  I can't tell that. I mean

22             MR. COLLINS:  I put a clearer copy of SER-652—it's

23   still, the print is still small.

24             JUDGE TROTT:  652?  SER-652?

25             MR. COLLINS:  Yes.

23

1          JUDGE TROTT:  This is the one I can't read without a
2    magnifying glass.
3          MR. COLLINS:  I apologize, that's the size of the
4    print in the copy in the record, but Mr. Bryant, the evidence
5    was clear that he understood…
6          JUDGE TROTT:  I'm sort of distracted about this, and
7    I shouldn't be, but I can't believe you put this in front of
8    somebody and say sign it.
9          MR. COLLINS:  Again, you can tell that I'm not…
10         JUDGE TROTT:  I have magnifying glasses on and I
11   have a hell of a hard time reading this thing.
12         MR. COLLINS:  You can tell from the amount of white
13   space around it, it has been reduced from the original but the
14   evidence also was clear that…
15         CHIEF JUDGE KOZINSKI:  Where's the original?  Is the
16   original not?  This is SER-652, is this the size of the
17   original?
18         MR. COLLINS:  It looked to me—I could be wrong in my
19   assumption—it looked to me like it had been reduced, but the…
20         JUDGE WARDLAW:  But this is SER-650.  Is this the
21   original?
22         MR. COLLINS:  That may be a different—that appears
23   to be, Your Honor, a different document.  It's 652, that's the
24   copy we have in the record.  But Mr. Bryant—the evidence was
25   clear that he understood his obligations.  His mother's

24

1    deposition testimony, which was also read at a trial, he

2    indicated when he was referring to an earlier contract that he

3    had with Mattel that he understood that creating and then

4    selling drawings to another company would interfere with his

5    contract.  And he also said at the trial that he did not have

6    the understanding that his contract would allow him to give—

7    come up with ideas and give them directly to a competitor

8    while he was employed by Mattel.

9          JUDGE WARDLAW:  His language—I tend to agree that

10   the incorporation of this Labor Code language more supports

11   your argument, and it has a limitation to it.  It says, relate

12   at the time of conception and reduction to practice of the

13   invention to the employer's business.  So are you saying when

14   you read that, do you read that to mean the employer's

15   business of making Barbies, or the employer's business of

16   making any doll or the employer's business of making toys?  I

17   mean, what does that language mean?

18         MR. COLLINS:  Its statutory language means the line

19   of business that the company is in.

20         JUDGE WARDLAW:  So Mr. Bryant worked in the sort of

21   high fashion collectible Barbie area?

22         MR. COLLINS:  He was a doll designer and that's…

23         JUDGE WARDLAW:  When he was hired back in 1999, what

24   was he hired to do?

25         MR. COLLINS:  He was hired to be a doll designer.

25

1          JUDGE WARDLAW:  What area did he work in?

2          MR. COLLINS:  He worked in Barbie collectibles, but

3  I don't…

4          JUDGE WARDLAW:  Wasn't that Barbie line of business?

5          MR. COLLINS:  Yes, but I don't…

6          JUDGE WARDLAW:  Or was he working at another doll

7  line?  Are there other doll lines of business at Mattel?

8          MR. COLLINS:  There are other doll lines, but I

9  don't think there's any authority that indicates the statute

10  applies only to the specific branded line.  It would have

11  almost no application if the exception were read that narrowly.

12  The idea is to capture that, you know, if you work for a

13  computer company and you make furniture, that isn't

14  necessarily captured by this.  That's what it is and there's

15  an additional clause that says that if you go…

16          CHIEF JUDGE KOZINSKI:  Can we get back to the

17  language of the contract, which I'm having difficulty reading,

18  so maybe you could just point out to me, read to me the

19  language you rely on to cover his work that he did when he

20  wasn't at work, when he wasn't at the office.  Stuff that that

21  he had done on his own time, at home, on vacation or the like—

22  what specific language in the contract do you rely on?

23          MR. COLLINS:  The language that we rely on are

24  primarily the two clauses to which I referred.

25          CHIEF JUDGE KOZINSKI:  I'm asking for actual words.

Exhibit A, Page 27

1          MR. COLLINS:  The "at any time during my employment
2   by the company."  And then in paragraph 2C the language of the
3   Labor Code indicating that the assignment does not apply to an
4   invention that the employee developed entirely on his or her
5   own time without using the employment's equipments, supplies,
6   facilities—except for those inventions that relate at the time
7   of conception and reduction to practice in the employer's
8   business.  That exception would never apply…
9          CHIEF JUDGE KOZINSKI:  I'm sorry, that language that
10  you just said is, specifically, those words are in the
11  contract?
12          MR. COLLINS:  Yes, they are.  They are in paragraph
13  2C.
14          CHIEF JUDGE KOZINSKI:  I'm trying to read paragraph
15  2C and I see a reference to Section 2870 but, is the language
16  like you just said relates to the business?
17          MR. COLLINS:  Yes, they have a quote in the second
18  sentence of 2C from the language of the statute.
19          CHIEF JUDGE KOZINSKI:  I see a 1 and I see a 2.
20          MR. COLLINS:  Yes, it's before the 1, the clause
21  marked 1 says "related to the time of conception or reduction
22  to practice of the inventions to the employer's business," but
23  all of that is within quotes and it's a quote from the actual
24  text of 2870.
25          CHIEF JUDGE KOZINSKI:  I see, that's an accurate

27

1    quote, right?

2              MR. COLLINS:  Right, and it's an untenable reading

3    of a rule when the reading of the rule would render the

4    exception never applicable.  And where the exception talks

5    specifically in terms of the limited conditions in which when

6    you create something on your own time it will not be covered,

7    to then say that anything created on your own time is never

8    covered by the agreement is just inconsistent with the text of

9    that provision.  It just makes no sense on the face of the

10   language of the contract to read it that way so it can't

11   reasonably bear that reading.

12             JUDGE TROTT:  Don't you then get back at some point

13   to the idea problem?  There's no, nothing in here that says

14   idea.

15             MR. COLLINS:  There's nothing in there that says

16   idea.

17             JUDGE TROTT:  Is that of any moment?

18             MR. COLLINS:  I don't think it's of any moment

19   because I do think that here it's reached by both the general

20   concept of inventions, the name for a doll line, when you're

21   talking about a case involving the drawings for designs.  And

22   when—I mean, I think that would be true, even if they were

23   just—you have those two facts, he came up with a name and that

24   he developed the name…

25             JUDGE TROTT:  So if he just walked over to MGA and

28

1   said "I've got an idea," that's covered?

2          MR. COLLINS:  I think that would present a different

3   case.  I think you would need to know exactly what the idea

4   was.  Nut I think where the idea is the name for a product

5   line that is developed in designs that he has, and the name is

6   actually on the designs itself, I think it's very difficult to

7   argue that the name is not part of the design in those

8   circumstances.  And even if it were not part of the design in

9   those circumstances, the fact that it is still the fruit of

10  the wrongful conduct, that it was acquired in the same course

11  of wrongful conduct by which the drawings themselves were

12  designed and then exploited, his this entire line of property

13  that he came up with and that was…

14         JUDGE WARDLAW:  What was the wrongful conduct again?

15         MR. COLLINS:  Again, the wrongful conduct was…

16         JUDGE WARDLAW:  To separate out Bryant from MGA,

17  because MGA has got this constructive trust, Bryant's got a

18  nice settlement, so…

19         MR. COLLINS:  There are two aspects to the wrongful

20  conduct:  There's the acquisition of the drawings and then

21  there's the acquisition of the name, because we have argued

22  that the name, despite the fact that the word idea does not

23  occur within the contract, that the name is still covered by

24  the general meaning of the term invention, particularly as

25  applied in the contract.

29

1          JUDGE TROTT:  So why was the acquisition of the

2     drawings wrongful?

3          MR. COLLINS:  The acquisition of the drawings was

4     wrongful because the drawings were created while he was

5     employed by Mattel.  They were therefore inventions because

6     they do not contest that the drawings are inventions.  Their

7     only argument on that is this at the time of, during the term

8     of employment, which I think the Labor Code section is

9     dispositive of…

10         JUDGE WARDLAW:  Can we just focus on one question?

11    Because we keep going back and back and back—answer Judge

12    Trott's question.

13         MR. COLLINS:  I think that I just did answer the

14    question.

15         JUDGE TROTT:  Wrongful in the sense that it violated

16    the agreement?

17         MR. COLLINS:  Exactly, the agreement assigned these

18    rights to Mattel in the drawings and instead he assigned them

19    to MGA, they were complicit…

20         JUDGE WARDLAW:  Okay, so who did the wrongful

21    conduct here?

22         MR. COLLINS:  In this case, because the verdict was

23    returned against MGA, it's MGA…

24         JUDGE WARDLAW:  I understand the verdict, I

25    understand what ensued.  There were certain jury instructions

30

1    that were given that almost ensured that would be what ensued,

2    so what I'm trying to figure it out from you is:  You say they

3    were wrongfully acquired by MGA?

4         MR. COLLINS:  That is correct.

5         JUDGE WARDLAW:  How did, what did MGA do wrong?

6         MR. COLLINS:  MGA interfered…

7         JUDGE WARDLAW:  Did it know that Bryant—did it have

8    any idea that Bryant had this idea and that it was covered by

9    this invention agreement when it made its deal with Bryant?

10        MR. COLLINS:  Yes, the District Court made findings

11   and the jury found that the misconduct had been fraudulently

12   concealed by MGA.  The District Court made findings that they

13   knew—they had to find intentional, in the jury instructions,

14   they had to find that the conduct was intentional in order to

15   find the tortious…

16        JUDGE WARDLAW:  Wasn't that the interference with

17   the contract conduct?

18        MR. COLLINS:  No, I believe that the instructions

19   have an intention element with respect to all of the torts

20   that are at issue here and there was not a directed verdict on

21   any of those.  For example, on the breach of contract, there's

22   merely a statement that as to what Bryant did and it leaves

23   the element of MGA's conduct and whether it crossed the line

24   open for the jury.  With respect to the breach of duty of

25   loyalty, there was an instruction that Bryant had breached his

31

1   duty of loyalty, but the question of whether or not the aiding

2   and abetting by MGA of that breach of the duty of loyalty had

3   been done was left for the jury and was found by the jury.

4   And there's ample evidence in this record of MGA's misconduct,

5   their concealment, both in terms of their payments that were

6   made to Bryant and to others before he left MGA and then the

7   concealment that incurred afterwards in terms of let's keep

8   him under wraps, don't ask in terms of what his dates of

9   employment were.  There's an ample record factually to support

10  the finding that MGA intentionally caused the aided and

11  abetted breach of fiduciary duty and loyalty.

12          JUDGE TROTT:  What's Exhibit 11?  Where did this

13  come from?

14          MR. COLLINS:  That's the same document, I believe,

15  that I refer to as being 6105.  It's a better copy of 6105,

16  it's in color and it's larger.

17          JUDGE TROTT:  Yeah and you still can't read it

18  underneath anyway, so that—who created that drawing?

19          MR. COLLINS:  That's Carter Bryant, the jury found

20  at the end that…

21          JUDGE TROTT:  And what did he do with it?

22          MR. COLLINS:  He gave that to MGA.

23          JUDGE TROTT:  And was the second—was this on the

24  back of it or a second copy, "meet the Bratz?"

25          MR. COLLINS:  I don't know the particular document

32

1    that you're referring to.  I recognize the other one as being

2    6105.

3              JUDGE TROTT:  It says "Meet the Bratz," and then it

4    talks about the four girls: Zoë, Lupe, Holliday and Jade—

5    Attorney's Eyes only.  That's Bryant's writing?

6              MR. COLLINS:  I assume.  I believe that that's

7    correct, it's further factual support for the jury's specific

8    finding, which they said in a particular question that he came

9    up with this idea during the time that he was at Mattel.

10             JUDGE TROTT:  Which is the document that he

11   supposedly falsified the date on?

12             MR. COLLINS:  There was a—there was a notary.  He

13   had notarized certain of the drawings in August of 1999.  At a

14   later point after that, the notary book was changed and

15   someone put in from 1998 afterwards.  That was shown for

16   forensic analysis that that had been added.  Again, it's fully

17   factual support that this was a—the whole story of it being

18   created in 1998 was a fraudulent story that was made up

19   afterwards.

20             CHIEF JUDGE KOZINSKI:  You are referring to

21   inferences or things that the jury found.  There was a special

22   verdict form?

23             MR. COLLINS:  That's correct, Your Honor.

24             CHIEF JUDGE KOZINSKI:  And so, what do we make of

25   the hundred million dollar damages award?  They didn't give

33

1   Mattel everything.  They gave it, in fact, a small fraction of

2   what Mattel—so the jury must have not thought that whatever

3   the breach was meant that Mattel owned everything that MGA had

4   produced.  Why isn't that binding in a sense on the injunction

5   on the District Court?

6          MR. COLLINS:  Your Honor may recall, they raised the

7   Seventh Amendment issue at the stay stage but they have

8   dropped the issue and have not raised it in their merits brief

9   on appeal.  And as we indicated in our opposition at the stay

10  stage, the standard for finding an inconsistency as a

11  violation of the Seventh Amendment is quite strict.  It has to

12  be that there's no conceivable way to read the verdict so that

13  it would be consistent with the injunctive relief.  and there

14  were any number of ways, which we articulated in our

15  opposition and cited portions of the stay opposition, that

16  indicated how you could read that and make it consistent.

17  They even suggested—you know both—two different theories—they

18  suggested a theory that the jury could have found that some of

19  the—that all of the dolls infringe but not all in the same

20  degree, the jury could have found a factor that they

21  emphasized that there was a contribution to the improvement of

22  the brand and marketing that accounted for some reduction in

23  the damages while the product still infringed and that the

24  jury felt that that should be accounted in the numbers.  That

25  was an argument they had made to the jury and it was a fact or

34

1   the District Court considered very seriously at the equitable

2   phase.

3          CHIEF JUDGE KOZINSKI:  Why have—I mean, putting

4   aside that inconsistency argument, I'm still somewhat

5   impressed by the fact that the jury who listened to everything

6   and didn't think that everything, or even most of what MGA

7   produced, should go to Mattel, and then along comes a district

8   judge and says everything.  I mean, all the money you spent on

9   advertising, promotion, additional effort, I mean there was a

10  lot built on Bryant's ideas and assuming giving you everything

11  he took it out, he should have turned over to Mattel, giving

12  you all those things, there's still a great deal that went

13  into what is MGA's current business that is not of Mattel's

14  origin—it was added.  And why isn't it an abuse of discretion

15  for the district court to say all of that, all of that effort,

16  all of that goes to Mattel?

17         MR. COLLINS:  I don't think it's an abuse of

18  discretion.  It's not something he took lightly.  He said in

19  his written order that it was the factor he had struggled with

20  it.

21         CHIEF JUDGE KOZINSKI:  I assume that he didn't take

22  it lightly.  You don't have to flack for the district judge

23  here.  I'm assuming that it was a serious decision.

24  Nevertheless people or judges make serious decisions that are

25  wrong on occasion and sometimes are abuse of discretion.  So I

35

1   want to know, assuming that the district judge did his job as

2   best he knew how and faithfully try to apply the law himself.

3   Why isn't that an abuse of discretion when this is obviously

4   when you compare what Bryant brought out of, brought to MGA

5   and what they built into, why isn't it abuse of discretion to

6   give all of that and just hand over to Mattel?

7          MR. COLLINS:   I don't think it's an abuse of

8   discretion because I think the District Court correctly

9   concluded, or acted in its discretion in concluding, that

10  really there was no other way to ensure that the fruits of the

11  misconduct were…

12         CHIEF JUDGE KOZINSKI:   Why wasn't the royalty enough,

13  or a piece of the business or payment of additional damages?

14  Why on those things why—I mean, it just seems quite drastic

15  and somewhat unprecedented to simply say, "because you took a

16  nugget out"—and I'm now giving you everything that's the

17  opposing counsel describing and giving you all those points,

18  and let's say you win on all those points.   There was a

19  contract, there was a breach of contract there maybe was

20  trust—I'm giving you all those things.   Still in all, when

21  you're done, what Bryant came out with that belonged to Mattel,

22  because I'm giving you all of this for purposes of this

23  analysis, is really just a kernel and much more went into it

24  that seems to be now is destroyed or sort of handed over to

25  somebody without any regards to the effort or time, the

36

1   creative genius and all those things that went into building

2   up this enterprise.

3        MR. COLLINS:  The District Court gave two reasons

4   for rejecting a royalty theory and I think that those reasons

5   are not an abuse of discretion; the first is that he said that

6   the idea of the royalty was based on the idea that the ongoing

7   infringement was minute and something…

8        JUDGE TROTT:  What was the word?

9        MR. COLLINS:  It was minute, that was the word that

10  he used and he rejected that premise.  He said I'm not bound

11  by the Seventh Amendment implications of the verdict to accept

12  and he did not accept it.  And then the second factor is that

13  he said that the hostility between the parties that he had

14  witnessed in the case made that remedy unworkable.  I don't

15  think its an abuse of his discretion in light of those two

16  factors.

17       JUDGE TROTT:  Why is it unworkable to order a

18  royalty?  You just order it and then anybody breaches it, it's

19  a contempt.

20       CHIEF JUDGE KOZINSKI:  Yeah, I mean so I don't cash

21  checks if they come from somebody I don't like?

22       JUDGE WARDLAW:  Either checks wouldn't be cashed.

23       MR. COLLINS:  It's a serious matter when at one

24  point he placed MGA temporarily in receivership and then later

25  converted it to a monitor because he found that MGA—there was

37

```
1   reason to believe that they were engaging in efforts to
2   obstruct his orders.
3           JUDGE TROTT:  So he found that they would somehow
4   cheat on the royalty?
5           MR. COLLINS:  No, that's not what he said, he just
6   said that the hostility between the parties and the lack of
7   trust, and I think that that's based in part on, certainly
8   from our perspective, the fraudulent behavior that's amply
9   demonstrated in this record.
10          JUDGE TROTT:  So they'd be back over and over and
11  over again complaining that they were playing games with the
12  royalty figures?
13          MR. COLLINS:  He did not elaborate but perhaps
14  that's the basis of the concern.  I think it's very hard.
15          CHIEF JUDGE KOZINSKI:  I don't find that very
16  persuasive.  So, why don't you try to persuade me why that's a
17  good reason.  The courts says, "you're going to pay 15% or
18  20%"—you know, I'm just coming up with a figure—of your gross
19  receipts, or whatever, picks the formula and says, "you are
20  ordered and enjoined to provide this," and that doesn't work?
21  Because the parties don't like each other?  I mean, I don't
22  get it, I find that—they never have to meet again.  All they
23  have to do is once in a while get a bank transfer, a check, or
24  the lawyers meet and hand each other a bundle of cash.  You'd
25  be willing to do this?  Take the money?
```

38

1          MR. COLLINS:  Your Honor, he certainly had the

2     equitable discretion having sat…

3          CHIEF JUDGE KOZINSKI:  I understand that, do you

4     understand my question?  You are trying to justify—you're

5     saying it's not an abuse of discretion because of these two

6     reasons.  We're now analyzing the second of these two reasons

7     and I'm telling you.  I don't get it.  I don't find it

8     persuasive.  Now, can you say anything else to make it

9     persuasive?  I mean, the fact that they don't like each other?

10    I mean, do you know a lot of litigants, do a lot of your

11    clients who litigate against other litigants love the other

12    side?  I mean, really?  Do they?

13         MR. COLLINS:  I do think that what he was suggesting

14    is the fact that it would be in his view logistically

15    unworkable, would require a degree of ongoing supervision…

16         JUDGE TROTT:  Exactly what did he say?

17         MR. COLLINS:  All that he said…

18         JUDGE TROTT:  Did he say I'm making a finding based

19    on demonstrable conduct in addition to the jury's verdict in

20    this case, that they can't be trusted to send royalty checks,

21    and all I think we're going to do is to be back here over, and

22    over, and over again fighting about whether they're coming up

23    with . . . He didn't say anything like that?  Or did he?

24         MR. COLLINS:  No, he didn't.  He said one sentence.

25         CHIEF JUDGE KOZINSKI:  If he doesn't trust them to

                                   39

1  pay over royalty checks, why isn't he then commanding Mattel

2  to pay over royalty checks to them to make up for their

3  contribution?  Why isn't that a fair, a more equitable

4  solution.  Say, "okay, you get Bratz, then you guys send the

5  checks over for what they contributed to it."

6          JUDGE WARDLAW  Or why couldn't there could have been

7  an apportionment?  He talks about this, about apportioning

8  between the first generation Bratz dolls which were more

9  clearly owned by Mattel, and later generations where it was

10  obvious that MGA had put a lot of work and money and

11  investment into creating those.  Why couldn't there be an

12  apportionment along those lines?  Even the jury obviously

13  thought there was some way to apportion that.

14          MR. COLLINS    I think for two reasons.  First, he

15  did not accept a demarcation at the end of the first…

16          JUDGE WARDLAW:  Why?

17          MR. COLLINS:  Because he examined all of the dolls.

18  He indicated he had them in a particular courtroom set aside

19  in Riverside and found that they were all substantially

20  similar.  They all infringed.

21          JUDGE WARDLAW:  To some people, all dolls look alike.

22          MR. COLLINS:  But that's…

23          CHIEF JUDGE KOZINSKI:  Some guys.

24          MR. COLLINS:  He went through the appropriate

25  filtering analysis and concluded that all of them were

40

1    substantially similar.  He went through them all individually

2    and made that conclusion.

3         But the other thing which I think we can't lose

4    sight of—this is something where the misconduct is there from

5    day one.  They knew from day one that these were someone

6    else's property, they knew from day one as they developed it

7    forward, and they concealed it at every step.  It is certainly

8    within his discretion to say that, you know, when you take an

9    idea and you've stolen it from day one, that everything you

10   add to it, goes with it.  That's essentially what he concluded

11   on the equities of this case and that I think is not an abuse.

12        JUDGE WARDLAW:  Do you think, counsel, that his

13   judgment and exercise of discretion was at all affected by the

14   very litigious nature and rancorous nature of this litigation?

15        MR. COLLINS:  I think that the judge did his level

16   best to treat the parties as fairly as he could.

17        JUDGE WARDLAW:  He seemed to take some of the

18   comments about himself quite personally and wrote full orders

19   about—I don't know who made what comments about him.  I can't

20   even remember right now, but in reading through all the orders,

21   there seemed to be a lot of, kind of, hostility and ugliness.

22   Some of which found its way to us in these briefs.  And I'm

23   wondering if that didn't have an impact in coloring his

24   discretion?  Because it is kind of a draconian remedy.

25        MR. COLLINS:  I think it's—to the extent that the

41

1   remedy is severe—its because the misconduct was severe and as

2   I indicated from day one.  This was not something that it came

3   in later in the process after they had substantially invested,

4   they made the decision from the beginning to invest in

5   something they knew was stolen and he concluded that that

6   meant that entire thing…

7          JUDGE TROTT:  It harkens back to Hammurabi.  An eye

8   for an eye, a tooth for a tooth.

9          DANIEL COLLIN:  It's within his— I think all these

10  facts, it's not an abuse of discretion to make that conclusion.

11  I see that I'm…

12         CHIEF JUDGE KOZINSKI:  You said you had second

13  reason.  There were two reasons, one of them had to do with

14  the difficulty of enforcement.  The other one …

15         MR. COLLINS:  Oh, the other one was essentially the

16  one that I've just said about, the circumstances of the case.

17  Exactly.  I see that I'm well over my time.  There's quite a

18  number of issues.

19         JUDGE WARDLAW:  You said that there was another

20  reason having to do with any royalty would be minute?

21         MR. COLLINS:  Oh, no.  What I was saying is he gave

22  two reasons why he rejected a royalty.  He viewed the royalty

23  theory as being the preference for royalty remedy as being

24  based on the assumption that the infringement was only minute.

25  In other words, that all the dolls infringed but only in small

42

1   degrees.  Again, this was based on the same, as this was

2   presented to him, it was based on the same argument that the

3   jury and verdict for $10 million should be read in that way.

4          CHIEF JUDGE KOZINSKI:  Is there any public interest

5   involved here at all?

6          MR. COLLINS:  There is a public interest involved,

7   and he considered the public interest factor as a paragraph on

8   page 1019 of the excerpt where he considered that.  Here the

9   public interest in preventing the kind of misconduct that

10  occurred here, he found to be prevailing.

11         CHIEF JUDGE KOZINSKI:  What about the public

12  interest in maintaining what is a highly popular and sought

13  after line of products which I guess Mattel does not promise

14  to maintain at all?

15         MR. COLLINS:  No, in the District Court, we've

16  indicated our plans to produce a line of dolls that would be

17  released next year.

18         JUDGE TROTT:  A line of Bratz dolls?

19         MR. COLLINS:  A line of Bratz dolls, yes.  And,

20  indeed, in the stay litigation there was quite a bit of back

21  and forth over which side was really going to be more faithful

22  to maintaining the health of the Bratz brand.  So, I think,

23  within the public interest, his remedy is unassailable in that

24  respect.

25         JUDGE WARDLAW:  [Inaudible] he said in these

43

1   troubled economic times, there's a strong public interest in

2   maintaining a profitable enterprise is a growing concern and

3   then you weighed that against the interest in, of course, in

4   copyright laws in a uniform manner, but didn't the other

5   remedy, the damages for the copyright infringement, take care

6   of that one?

7          MR. COLLINS:  No, I don't think that the respect for

8   the law and enforcement of the rules and undoing and punishing

9   and not allowing to be rewarded, misconduct and tortious

10  conduct was fully remedied simply by…

11         JUDGE WARDLAW:  Well, he didn't say that.

12         MR. COLLINS:  damages.

13         JUDGE WARDLAW:  Well, he didn't say that.

14         MR. COLLINS:  Well, he did find that it was

15  irreparable injury that, you know, monetary remedies were

16  inadequate and in analyzing the public interest, he looked at

17  the importance of enforcing the law and ensuring that property

18  rights were respected

19         CHIEF JUDGE KOZINSKI:  I'm reading the brief that I

20  have where there's the court's discussion of public interest,

21  I don't see anything about little girls and dolls.  It talks

22  about employment, it talks about strong public interest and

23  copyrights and all that, but what about all those children out

24  there who use the dolls and like the dolls and would suffer

25  disappointment if the dolls were discontinued?

44

1        MR. COLLINS:  But they've not contended on appeal

2   that he abused his discretion because the brand was going to

3   be killed.  And there's no evidence to say…

4        CHIEF JUDGE KOZINSKI:  I'm asking you about whether

5   the district judge said in his order, I said what about the

6   public interest and you said that he took it into account.

7   And you pointed me to a page, and I found a page and I'm

8   reading it and there's nothing about it there.  You said they

9   made some, your client made a similar presentation in District

10  Court.  I don't see it embodied in here and I'm not sure how,

11  I'm asking whether or not in coming up with this remedy, the

12  district judge should not have considered the effect on the

13  consuming public.

14       MR. COLLINS:  He didn't recite that specifically the

15  effects…

16       CHIEF JUDGE KOZINSKI:  Specifically, there's a word,

17  there's a word.

18       MR. COLLINS:  He didn't.  But, I think, …

19       CHIEF JUDGE KOZINSKI:  Did he do it generally?  He

20  did it in French?

21       MR. COLLINS:  The issue about whether or not the

22  brand was going to be killed and who would harm it more really

23  was litigated more after the order in the context of the stay

24  was actually a significant part of the stay papers in this

25  Court because they contended we would kill the brand.  We

1   contended they were killing brand so that it would be dead

2   before we got it.  And there were factual disputes over who

3   was going to, but…

4           CHIEF JUDGE KOZINSKI:  I remember that, I remember

5   that.  But, if you know, we were to affirm this and the

6   litigation were over, is there anything that prevents Mattel

7   from killing the brand six months from now?

8           MR. COLLINS:  I think that given the representations

9   that we've made to the court, if we had a successful brand

10  that, you know, that would be something I don't expect we

11  would do.  So, we have…

12          JUDGE WARDLAW:  That wasn't a yes or a no.

13          CHIEF JUDGE KOZINSKI:  Yeah, I keep listening for

14  the yes or the no.

15          MR. COLLINS:  I don't, well – they're our rights.

16  And so at the end of the day if it's economically not viable,

17  and we have the rights .

18          CHIEF JUDGE KOZINSKI:  Did you hear my question?

19          MR. COLLINS:  Yes.

20          CHIEF JUDGE KOZINSKI:  I wasn't asking you does

21  Mattel have a good reason for doing it.  Did you hear my

22  question?  Is there anything here, in this litigation, that

23  prevents Mattel from killing the brand in six months?  For

24  whatever reason, because good reasons or bad reasons or

25  economic reasons, or you know whatever reasons, is there

46

1    anything in this litigation that if its concluded favorably to

2    Mattel, it is concluded as of this portion favorable to Mattel,

3    that would keep it from saying six months from now, you know

4    what, we don't, you know, we're going to kill this?  Anything

5    that prevents that?

6         MR. COLLINS:  There's nothing we did in the four

7    corners of the order that does.  I think if we were to, you

8    know, proceed in a way that the District Court or certainly

9    the other side, perceived to be bad faith in terms of how we

10   had represented  what we would do, they would be in there with

11   a 60(b) or some kind of a motion for relief.  But within the

12   four corners, no, it assigns the rights, the rights are ours.

13        JUDGE TROTT:  What's still going on in the District

14   Court?

15        MR. COLLINS:  There were several things going on and

16   actually some of what's happened in the last even hundred

17   hours could affect both the cross appeal and in camera motion.

18   The District Court accelerated its in-camera review of the

19   documents that are at issue in the Phase 2 motion and reviewed

20   them in camera on Friday.  Ordered briefing which was

21   essentially completed within a four day period between the 4th

22   and the 8th; a reply was filed yesterday.  If he proceeds and

23   actually decides the Phase 2 motion, that would moot the

24   Crateo motion.  If in deciding that motion, he grants it and

25   gives us the documents, it would moot the cross appeal

47

1  entirely.   So, but we do not have any order from the District
2  Court at this time.
3          JUDGE WARDLAW:  Does Carter, did Judge Carter
4  inherit this or is it Judge
5          MR. COLLINS:  That's correct, Your Honor.   So,
6  Judge Carter has conducted those proceedings.
7          JUDGE WARDLAW:  Is that all that's left of this
8  litigation?  I know we've had 1A, 1B, 1C.  Do we have Phase 2?
9          MR. COLLINS:  There's a Phase 2 which has the
10 remaining claims.
11         JUDGE WARDLAW:  Okay.
12         MR. COLLINS:  That's correct.
13         CHIEF JUDGE KOZINSKI:  What other remaining claims?
14         MR. COLLINS:  Primarily RICO claims is the
15 significant, the principal part of that.
16         CHIEF JUDGE KOZINSKI:  And who's suing who in RICO?
17         MR. COLLINS:  That—our RICO claims and there's a
18 third amended complaint.
19         JUDGE WARDLAW:  Then if we let this constructive
20 trust go, who are you going to be suing?
21         MR. COLLINS:  Excuse me?
22         JUDGE WARDLAW:  If we affirm on the constructive
23 trust, who are you going to be suing and for what?
24         MR. COLLINS:  We have a further complaint, with
25 respect to other acts of misconduct against MGA that are the

48

1   subject of the RICO claim and related claims that were severed

2   off from the Bratz related claims.

3           JUDGE WARDLAW:  Nothing to do with Bratz?

4           MR. COLLINS:  I can't say that there's nothing to do

5   with it because it does involve other thefts, alleged thefts,

6   acts of thefts of intellectual property and some of the acts

7   of predicate acts are related to things from Phase 1.

8           CHIEF JUDGE KOZINSKI:  Okay.

9           MR. COLLINS:  Okay.  Thank you.

10          CHIEF JUDGE KOZINSKI:  No further questions?  We'll

11  hear back from Mr. Rosenkranz.

12          CHIEF JUDGE KOZINSKI:  You have an eternity left.

13          MR. ROSENKRANZ:  Thank you, Your Honor.

14          CHIEF JUDGE KOZINSKI:  Eight minutes and thirty

15  seconds.

16          MR. ROSENKRANZ:  Your Honors, let me just go through

17  the issues in order.  First, on the contract claim.  Mattel's

18  argument is that we waived.  I just want to point the court to

19  the record in two spots where there actually, there absolutely

20  was no waiver.  We preserved twice on the ideas question.  The

21  first is quoted in our brief in reply pages 11-13.  And

22  Bryant's opposition to the summary judgment motion on contract

23  interpretation, that was preserved.  We joined that, but more

24  importantly, in the course of arguing the motion, I would

25  point the court to pages 124-130 of our supplemental excerpts

49

1   of record.  A long, six-page colloquy that was essentially the

2   same conversation that we've been having about why is the word

3   "ideas" not in the contract.  I'm quoting here, "what is

4   missing is the term, the word idea."  "The point is, if Mattel

5   wants the idea, why don't they simply put it in there and

6   alert the Mattel employee sitting in the room?"  "If Mattel

7   wanted to protect Carter Bryant's ideas, they could have

8   clearly said so."

9        JUDGE TROTT:  Well, it seems Judge Larson was more

10  convinced by the design itself that had the name on it, am I

11  wrong about that?

12        MR. ROSENKRANZ:  No, Your Honor.  Judge Larson never

13  said that.  Judge Larson insinuated the word "idea" into his

14  summary judgment ruling and never said a thing about the

15  notion that ideas are part of trade names.

16        But let me turn to that.  This contract could not

17  possibly cover the idea for a trade name, so this is the

18  inventions agreement.  The inventions agreement covers

19  copyrights, and applications for copyrights.  It covers

20  patents and application for patents.  It doesn't even cover a

21  trade name.  So, the notion that it covers— or by the way an

22  application for a trade name.  the motion, the notion that it

23  covers the idea for a trade name is really a stretch.

24        Which brings me to the interplay on the two sides as

25  to the contract interpretation issues.  Now, the very fact

50

1    they were parsing, fine tuned—finely parsing the words of an

2    inventions agreement that's barely legible and asking, "well,

3    what does 2870 cover?"— just demonstrates that someone in

4    Carter Bryant's position couldn't possibly have believed that

5    this was an unambiguous conveyance of his ideas or that in

6    unambiguously covers everything that he does even within the

7    line of business when it comes to creative works, much less

8    that he believes that the contract communicates that clearly.

9            As to the torts, just one point to make.  There was

10   a lot of discussion on tortious interference with contract.

11   Now, the jury did not find that MGA tortiously interfered with

12   this contract by inducing Carter Bryant to convey IP.  The

13   District Court directed the jury that it was entitled, they

14   could find tortious interference with contract from one act

15   and one act only—and that was that Carter Bryant interfered

16   with, disrupted his at-will employment by signing this

17   agreement, during—while he was still employed by Mattel.  That

18   is, while he was still employed.  Now, an assignment of IP

19   would be without regard to whether he was still employed or

20   not.  And secondly, Mattel disclaimed any intention to pursue

21   a trade secret theory.  It did it explicitly on the record and

22   specifically with respect to the idea for the name Bratz.

23           JUDGE WARDLAW:  Trade secret or trade mark?

24           MR. ROSENKRANZ:  Trade secret, Your Honor.  My point

25   is, if Mattel was after the intellectual property in the idea

51

1   for the name Bratz, the only way that becomes protected

2   property is if the disclosure of that idea is a violation of

3   the contract.  Let me say that more clearly.  Sorry.  Mattel's

4   whole claim is that this tortious interference with contract

5   depends upon the tortious disclosure to MGA of the idea for

6   the name Bratz.  Well, if the contract does not prohibit the

7   disclosure of the idea for the name Bratz, it couldn't be

8   tortious for MGA to encourage Carter Bryant to disclose that.

9        CHIEF JUDGE KOZINSKI:  The reality, though, is that

10  Carter Bryant did exactly what Mattel was trying to prevent

11  him from doing when it had him sign the contract.  This is not

12  the computer programmer who does—working at home.

13        JUDGE TROTT:  He didn't cure cancer on his own time.

14        CHIEF JUDGE KOZINSKI:  I mean, it wasn't even on his

15  own time.  I mean, we've got lots of evidence of phone calls

16  and faxes from work.  We have co-workers being enlisted to

17  help.

18        JUDGE TROTT:  Parts of dolls being used.

19        MR. ROSENKRANZ:  So, Your Honor, all of that was

20  hotly disputed.  Both those facts and the inferences to be

21  drawn from them.  The District Court gave the jury a short-cut

22  to finding both disloyalty and breach of fiduciary duty by

23  directing the jury that it is disloyal as a matter of law

24  simply to sign a contract to go into business with a

25  competitor while you're still an employee.  Now, that's dead

1    wrong as a matter of California law.  It is not a breach of

2    the duty of loyalty to be at a job while you're negotiating a

3    deal.  You don't, under California, have to vacate your…

4          CHIEF JUDGE KOZINSKI:  Let's give you that.  What

5    flows from that?

6          MR. ROSENKRANZ:  Well, what flows from that was that

7    was the basis on which the jury delivered its verdict.  The

8    verdict has to be eliminated if there still remains a question

9    of fact as to whether this is a breach of the duty of loyalty,

10   there would have to be a retrial on that.  That is, the whole

11   argument that Mattel has made.  Now, Mattel has presented in

12   its brief…

13         CHIEF JUDGE KOZINSKI:  What did the jury find

14   specifically?

15         MR. ROSENKRANZ:  The jury was asked to find whether

16   there was a breach of the duty of loyalty and the jury was

17   directed that there is a breach of the duty of loyalty when a

18   employee, when Carter Bryant signed the inventions agreement

19   while still employed.  So, the jury's finding was what the

20   Judge told them to find.  That was not just a shortcut, it was

21   a direction to find a breach of the duty of loyalty.  And, of

22   course, if the duty of loyalty is breached then the fiduciary

23   duty has to be breached.

24         CHIEF JUDGE KOZINSKI:  This is an argument that you

25   will be able to raise in an appeal from the jury verdict.  But,

1   we now have a Judge who sat down and watched the entire trial

2   and he enters injunctive relief.  If he thought the evidence

3   didn't support a finding that in fact your client did this on

4   work time and; which part of those facts, by the way, are

5   really disputed?  Is it disputed that he, your client used a

6   mock-up doll using Ken's boots and stuff he got out of the

7   trash, and I forget about it, it was a whole list of things

8   that he got from Mattel.  Is there any dispute as to that?

9           MR. ROSENKRANZ:  There are disputes as to most of

10   the facts that Mattel recites on pages 9-12 of their brief

11   about the extent of the breach.  Some of the facts are not

12   disputed, but there are huge disputes about the inferences…

13           JUDGE TROTT:  For example, which of the facts are

14   not disputed?

15           MR. ROSENKRANZ:  Let me give you MGA's – I mean

16   Mattel presented essentially the summation in its brief.

17   MGA's version of the summation goes something like this.  MGA

18   never saw this contract and got assurances from Carter Bryant

19   that he owned the IP.  In fact, that he created it before this

20   contract, excuse me, before he was even at Mattel.  Virtually

21   everything blame-worthy that Mattel tries to pin on Carter

22   Bryant was in his last couple of weeks on the job after he had

23   already given notice and after Mattel, excuse me, MGA had

24   directed him to leave.  So MGA was not even aware that he was

25   still working at Mattel.  Carter Bryant drew all of these

1   drawings on his own time in his own space.  There is no

2   dispute about that.  After handing over the drawings, he had

3   virtually no interaction with the design team while he was

4   still at Mattel.  It was just two meetings and he basically

5   gave them the direction, "here's the idea, here's an ad I want

6   you to mimic for the general style, have at it."  The designs

7   were nowhere near done when he left Mattel.  The only company

8   resources he used, apropos of the direct question that was

9   asked, was not in connection with the designs, it was in

10  connection with a Frankenstein of a doll that he used in the

11  pitch, that MGA found so horrible that it actually directed

12  him to throw it out.  And the resources were pulling a head of

13  a Barbie out of a trash can and then going to a couple of his

14  colleagues to ask them for favors.  One of whom he paid, the

15  other of whom did a favor for him that took twenty minutes.

16          JUDGE TROTT:  This was still while he was still

17  working for Mattel?

18          MR. ROSENKRANZ:  Yes, Your Honor.  And so…

19          JUDGE TROTT:  See, that is what I was getting at.

20  You sort of drowned everything that I was interested in in

21  other stuff, but thanks.

22          MR. ROSENKRANZ:  But, Your Honor, but…

23          JUDGE TROTT:  I got you.

24          MR. ROSENKRANZ:  I hear you, okay.  But, the

25  question…

55

1        JUDGE TROTT:   No one ever answers the question asked,

2    they always answer the question they wish they'd been asked.

3        JUDGE WARDLAW:   Was all that activity, was that

4    after he contracted with MGA, or before he contracted with

5    MGA?

6        JUDGE TROTT:   After.

7        MR. ROSENKRANZ:   A lot of the activity was after the

8    signing of the contract.   The prototype doll was part of the

9    pitch.   But it had nothing to do with the IP that MGA got.

10   MGA got the designs, not this Frankenstein doll, they didn't

11   care about that doll.   Their dolls look nothing like the doll

12   that Carter Bryant brought to show the proportions, that was

13   all he was doing.

14       So, just turning then to the copyright point, Chief

15   Judge Kozinski is right, the District Court did go far beyond

16   the scope of what the jury had found.   Bear in mind that

17   Mattel was seeking disgorgement of profits—$1.4 billion

18   dollars worth of profits for these female Bratz dolls.   The

19   jury awarded $10 million, 1%.   That was a victory for MGA.   It

20   did so after asking…

21       CHIEF JUDGE KOZINSKI:   10?

22       MR. ROSENKRANZ:   Excuse me, your honor?  $10 million,

23   yes, 1%, $10 million, 1% of what Mattel had described…

24       CHIEF JUDGE KOZINSKI:   Wasn't it $100 million?

25       MR. ROSENKRANZ:   For the copyright piece, Your Honor.

1    I'm just talking about…

2              JUDGE TROTT:  Copyright, what ever it is.

3              MR. ROSENKRANZ:  The copyright verdict was $10

4    million, Your Honor.  So, if we're talking about…

5              CHIEF JUDGE KOZINSKI:  I'm sorry, I'd like to ask a

6    question.  The copyright part was 10%?

7              MR. ROSENKRANZ:  Was 1%, Your Honor.

8              CHIEF JUDGE KOZINSKI:  I'm sorry, was it $10 million.

9              MR. ROSENKRANZ:  $10 million, 1%.  Yes, Your Honor.

10   The jury made that award after asking the Judge, "is it okay

11   if we find infringement only as to the first generation," and

12   that was with a jury that was instructed on the wrong standard,

13   substantial similarity.  There's no question under a virtual

14   identity standard, the jury would not have reached that

15   verdict, or even properly instructed to call out some of the

16   elements, the jury would not have reached that verdict.

17             Finally, let me just close with this.  This has been

18   the quintessential American nightmare.  And I don't just mean

19   for Isaac Larian who came to this country to build a business,

20   lived the American dream, and now to have it all taken away.

21   It's a nightmare for the American employee, who believes that

22   there is a possibility that he can go out and take his ideas

23   somewhere else, that his employer doesn't own those ideas.

24   Who's now being told that there's always an employer looking

25   over his shoulder who can claim that he owned that idea or

1   owned the concepts.  It's a nightmare for free expression

2   because Mattel has been trying for decades to own the image of

3   the human body and keeps getting turned down by the courts,

4   until now.  It's a nightmare for competition if a worldwide

5   business can be sunk on the basis of an employment contract

6   that the company never even saw.

7           The remedy, the court was talking to Mr. Collins

8   about that, is an absolute nightmare.  And there is absolutely

9   no promise that Mattel is going to keep the Bratz name alive.

10  Mattel's agenda was, and I quote, "to kill Bratz."  Every time

11  it's been asked the answer to the question, "Are you going to

12  maintain Bratz?," it has always left wiggle room to say, "Well,

13  only if the Bratz brand is not already decimated" and the

14  Bratz brand is decimated.  There will be no Bratz on the

15  shelves coming up in the next season.  The Bratz will all be

16  taken off the shelves and Mattel has never said anything other

17  than that it will be prepared to send Bratz to licensors

18  between then and April.

19          And, so finally, let me just end with a plea.  The

20  equitable relief that has been granted has absolutely

21  decimated MGA.  It is hobbling right now.  The recall is

22  currently under way.  And every single day that goes by,

23  continues the march over the cliff.  So, if this Court has any

24  doubt about the validity of the relief that's been granted, I

25  just beg the court to act as quickly as possible with an order

58

1    at least staying the injunctive relief.  And so, MGA can

2    survive while the court is ultimately issuing its opinion.

3    But the bottom line is, I just asked this court to end this

4    nightmare that is not just a nightmare for MGA, but I think

5    for American law.  Thank you, Your Honors.

6              CHIEF JUDGE KOZINSKI:  Thank you.  Case argued will

7    stand as submitted.  I thank counsel for a very thorough

8    argument.  We are adjourned.

9

10   OHS West:260796393.2

11   22161-2006 EJR/EJR

59