1

1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3         HONORABLE DAVID O. CARTER, JUDGE PRESIDING

4                     - - - - - - -

5

6    MATTEL, INC., ET AL.,            )
                                      )
7              Plaintiffs,            )
                                      )
8         vs.                         ) No. CV 04-9049-DOC
                                      )     Day 10
9    MGA ENTERTAINMENT, INC., ET AL., )     Volume 2 of 4
                                      )
10             Defendants.            )
     _____)

11

12

13

14

15            REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                      Jury Trial

17                  Santa Ana, California

18              Tuesday, February 1, 2011

19

20

21

22   Jane C.S. Rule, CSR 9316
     Federal Official Court Reporter
23   United States District Court
     411 West 4th Street, Room 1-053
24   Santa Ana, California 92701
     (714) 558-7755
25
     11-02-01 MattelV2

Case 2:04-cv-09049-DOC-RNB   Document 9772   Filed 02/03/11   Page 2 of 139   Page ID #:293304
CV 04-9049-DOC - 02/01/2011 - Day 10, Vol. 2 of 4

2

```
1    APPEARANCES OF COUNSEL:

2

3    FOR PLAINTIFFS MATTEL, INC., ET AL.:

4              QUINN, EMANUEL, URQUHART & SULLIVAN
               By:  JOHN B. QUINN
5                   MICHAEL T. ZELLER
                    WILLIAM PRICE
6                   Attorneys at Law
               865 South Figueroa Street
7              10th Floor
               Los Angeles, California 90017-2543
8              (213) 443-3000

9

10   FOR DEFENDANTS MGA ENTERTAINMENT, INC., ET AL.:

11             ORRICK, HERRINGTON & SUTCLIFFE, LLP
               BY:  THOMAS S. MC CONVILLE
12                  Attorney at Law
               4 Park Plaza
13             Suite 1600
               Irvine, California 92614
14             (949) 567-6700

15             - AND -

16             ORRICK, HERRINGTON & SUTCLIFFE, LLP
               BY:  ANNETTE L. HURST
17                  Attorney at Law
               405 Howard Street
18             San Francisco, California 94105
               (415) 773-5700
19
               - AND -
20
               KELLER RACKAUCKAS, LLP
21             BY:  JENNIFER L. KELLER
                    Attorney at Law
22             18500 Von Karman Avenue
               Suite 560
23             Irvine, California 92612
               (949) 476-8700

24

25
```

Case 2:04-cv-09049-DOC-RNB   Document 9772   Filed 02/03/11   Page 3 of 139   Page ID #:293305
CV 04-9049-DOC – 02/01/2011 – Day 10, Vol. 2 of 4

3

```
 1   APPEARANCES OF COUNSEL (Continued):

 2

 3   FOR DEFENDANT CARLOS GUSTAVO MACHADO GOMEZ:

 4           SCHEPER, KIM & OVERLAND, LLP
             BY:  ALEXANDER H. COTE
 5               Attorney at Law
             601 West Fifth Street
 6           12th Floor
             Los Angeles, California 90071
 7           (213) 613-4660

 8           – AND –

 9           LAW OFFICES OF MARK E. OVERLAND
             BY:  MARK E. OVERLAND
10               Attorney at Law
             100 Wilshire Boulevard
11           Suite 950
             Santa Monica, California 90401
12           (310) 459-2830

13

14   Also Present:

15           ROBERT ECKERT, Mattel CEO

16           ISAAC LARIAN, MGA CEO

17           KEN KOTARSKI, Mattel Technical Operator

18           MIKE STOVALL, MGA Technical Operator

19           RACHEL JUAREZ, Quinn Emanuel Urquhart Oliver &
                             Hedges
20

21

22

23

24

25
```

1                            **I N D E X**

2

3

4                      **SEALED PROCEEDINGS**

5                        Pages 84 - 89

6

7

8                        **EXAMINATION**

9

10   <u>**Witness Name**</u>        <u>**Direct**</u>      <u>**Cross**</u>      <u>**Redirect**</u>      <u>**Recross**</u>

11   BRYANT, CARTER
        By Mr. Price          5
12      BY Ms. Keller                      16

13

14

15                          **EXHIBITS**

16

17   <u>**Exhibit**</u>                        <u>**Identification**</u>    <u>**Evidence**</u>

18   Defendants' No. 1                                          58

19   Defendants' No. 302B-12                                    94

20   Defendants' No. 302B-13                                    95

21   Defendants' No. 302B-14                                    95

22   Defendants' No. 302B-15                                    95

23   Defendants' No. 1310                                       90

24   Defendants' No. 1762                                      138

25

 1            SANTA ANA, CALIFORNIA, TUESDAY, FEBRUARY 1, 2011

 2                     DAY 10, VOLUME 2 OF 4

 3                          (12:45 p.m.)

 4            (The following proceedings is taken in the

 5       presence of the jury.)

 6            THE COURT:  All right.  The jury is present.  I

 7   apologize, and it was my responsibility, I was a little late

 8   today.  Counsel, I appreciate your courtesy.

 9            If you'd be seated, please.

10            And Mr. Bryant, if you'd be seated.

11            We are back in session.  The jury is present.  The

12   alternates.

13            And Mr. Price, if you'd continue, please.

14            CARTER BRYANT, PLAINTIFFS' WITNESS, RESUMED

15                 DIRECT EXAMINATION (Continued)

16   BY MR. PRICE:

17   Q    Mr. Bryant, this weekend, both parties had the

18   opportunity to give you some documents to let you review

19   them so we might be able to save time, correct?

20   A    Yes.

21   Q    And one of the things you got was a binder of drawings,

22   right?

23   A    Yes.

24   Q    And did you review that binder of drawings?

25   A    Yes.

Case 2:04-cv-09049-DOC-RNB   Document 9772   Filed 02/03/11   Page 6 of 139   Page ID #:293308
CV 04-9049-DOC - 02/01/2011 - Day 10, Vol. 2 of 4

6

1   Q    Were you able to determine that that binder was a

2   collection of drawings you did in connection with Bratz?

3   A    Yes.

4             MR. PRICE:  Your Honor, does that save us --

5             THE COURT:  That's satisfactory.

6             Mr. Bryant was given some items over the weekend

7   to save time.  They are contained in this binder, and

8   they've got about probably 100 tabs in them.  Instead of

9   taking the time to call out each of those tabs, I'll work

10  with counsel this evening.  You'll have a record of what

11  items are received, and it will be in this binder, which are

12  the drawings that have been referred to, which would be

13  exhibits --

14            Are these the drawings for what time period,

15  though?  Just let the jury know what you are referring to,

16  generally.

17            MR. PRICE:  Well, that's in dispute.

18            THE COURT:  Well, the time periods are in dispute,

19  but are these allegedly originals or are they both originals

20  and sketches?  I mean, are they colored or are they original

21  pencil sketches?

22            MR. PRICE:  They are both.

23            THE COURT:  They are both.

24            MR. PRICE:  And the originals themselves are not

25  in the binder because they are too big, but they are the

1    color copies of the originals, or the sketches.

2            THE COURT:  And the jury will have the originals

3    also?

4            MR. PRICE:  Yes.

5            THE COURT:  All right.  Thank you.

6            Now, can we have that binder set aside and give

7    them to Cathy so this evening we can go over each of those

8    items.

9            All right, Mr. Price.

10   BY MR. PRICE:

11   Q    Mr. Bryant, at some point, you entered into a

12   settlement with Mattel, correct?

13   A    Yes.

14   Q    And let me show you Exhibit 7520.

15        Do you recognize that as the settlement agreement that

16   you entered into with Mattel?

17   A    Yes.

18            MS. KELLER:  I'm sorry, Counsel.

19            MR. PRICE:  It's 7520.

20            THE COURT:  Okay.  Counsel, 7520?

21            MR. PRICE:  Yes.

22            THE COURT:  Received.

23            MR. PRICE:  We move Exhibit 7520.

24            *(Plaintiffs' Exhibit No. 7520 is received in*

25        *evidence.)*

Case 2:04-cv-09049-DOC-RNB   Document 9772   Filed 02/03/11   Page 8 of 139   Page ID #:293310
CV 04-9049-DOC - 02/01/2011 - Day 10, Vol. 2 of 4

8

1    BY MR. PRICE:

2    Q    And Mr. Bryant, if you look at -- see there are Bates

3    numbers at the bottom where it says M; do you see that?

4    A    Yes.

5    Q    Beginning with M0932044?

6    A    Yes.

7    Q    If you'd look at M0932056.

8         And do you see your signature there dated May 18, 2008?

9    A    Yes.

10   Q    This agreement was negotiated between your counsel and

11   counsel for Mattel, correct?

12   A    Yes.

13   Q    And by your counsel, we're talking about the counsel

14   you had at that time, right?

15   A    Yes.

16   Q    And those were folks from the Keker Van Nest firm?

17   A    Yes.

18   Q    They were the ones who represented you up until that

19   date?

20   A    They had represented me on part of the -- part of the

21   trial.

22   Q    And these were attorneys -- counsel who were -- whose

23   fees were being paid by MGA?

24   A    Yes.

25   Q    And if you'd look at the bottom, it says 0932045.

1    And the second paragraph, "Whereas Bryant has

2  represented to Mattel that he is substantially financially

3  insolvent, that MGA has paid him no royalties since those

4  due for the third quarter of 2007 and that he would be

5  unable to satisfy the monetary judgment Mattel seeks"; do

6  you see that?

7  A    Yes.

8  Q    And is it your understanding that that information

9  about your financial situation was communicated by your

10  attorneys to Mattel's attorneys?

11  A    I believe so, yes.

12  Q    I mean, you weren't personally involved with Mattel

13  attorneys in those discussions, correct?

14  A    I don't remember.

15  Q    Do you remember that there was a forensic investigation

16  conducted in connection with the representation about your

17  financial situation?

18  A    I don't remember that.

19  Q    What happened to all the -- what happened to the money

20  you received?

21  A    Well, a lot of it got spent, a lot of it was put into

22  investments that went bad.  I did some real estate investing

23  that went sour, so yeah.

24  Q    If you'd look at the next page, 0932046, and 4B where

25  it says, "Bryant currently has $40,000 in liquid assets in

1    the form of cash in the bank.  Exclusive of his interest of

2    BT Associates, Bryant has assets in the amount of 7,419,000

3    and liabilities in the amount of 5,906,000 for a net worth

4    of 1,513,000."

5         Was that accurate as of the time you executed the

6    agreement?

7    A    I believe so, yes.

8    Q    What has happened since then with respect to your net

9    worth?

10   A    Well, a lot of it has been used, you know, savings.  I

11   basically have no income right now, so yeah, it's just --

12   it's dwindled.

13   Q    Your worth less than 1.5 million?

14   A    Yes.

15   Q    Substantially less?

16   A    Yes.

17   Q    Are you underwater, or I mean, do you have a positive

18   net worth?

19   A    Yeah, I have a positive net worth.

20   Q    What is BT Associates?

21   A    That was one of the real estate investments that I was

22   telling you about.

23   Q    What has happened with BT Associates?

24   A    It's been dissolved.

25   Q    And why?

1   A    I -- I don't remember a whole lot of the circumstances

2   that went into the dissolvement of that.

3   Q    Let me call your attention to -- back to the page

4   before, 9032045.  There is a paragraph 2 under the "Now

5   therefore"; do you see that?

6   A    Yes.

7   Q    It says, "Bryant shall pay to Mattel the sum of

8   $2 million," paren, "(two million dollars)," paren, "the

9   settlement amount which shall be due and payable only as

10  provided by this paragraph"; do you see that?

11  A    Yes.

12  Q    And by the way, in connection with that under, A, it

13  says, "All moneys received by BT Associates that is owed or

14  due to Carter Bryant and/or Richard Irmen"; do you see that?

15  A    Yes.

16  Q    Now, did -- did Mr. Irmen reside with you in 1998?

17  A    1998 -- I think maybe at the very end of 1998.

18  Q    And by the very end, you mean -- you mean when?

19  A    I think after I came back to California.

20  Q    So there was a period in '98, from April '98 until

21  when, that you lived in Missouri with your parents?

22  A    I'm sorry, what, now?

23  Q    There was a time period between April '98 and some time

24  when you lived in Missouri with your parents, correct?

25  A    Yes.

CV 04-9049-DOC - 02/01/2011 - Day 10, Vol. 2 of 4

12

1    Q    And what's that date range?

2    A    I believe I was there from the end of 1997 until right

3    after Christmas of '98.

4    Q    So the time you were in Missouri was December '97,

5    thereabouts?

6    A    Uh-huh, yes.

7    Q    And you lived there until after Christmas of 1998?

8    A    Yes.

9    Q    And so the only time Mr. Irmen resided with you was

10   after Christmas of 1998?

11   A    I believe so, yes.

12   Q    Now, from time to time has -- have you been contacted

13   by correspondence by Mattel's counsel to ask for updates

14   about your financial situation?

15   A    I can't recall if I have or not.

16   Q    If you could look at Exhibit 23789.  Is that

17   correspondence from Quinn Emanuel to you concerning

18   information under the settlement agreement?

19   A    I don't really recognize this.

20   Q    Look at 23789-0004.

21   A    Okay.

22   Q    Do you recognize that as a letter sent to you around

23   November of 2009 concerning updating your financial

24   information?

25   A    That's what it appears to be, but I don't recall ever

1   having seen this.

2   Q    Who was -- at the bottom of the page where it has CC,

3   who is Christa Anderson?

4   A    She was one of my attorneys from Keker Van Nest.

5   Q    And who is Peter Bonis?

6   A    He is my current attorney.

7   Q    Let me have you look at 23790; do you have that in

8   front of you?

9   A    Yes.

10  Q    And do you recognize that as a letter that you received

11  from Mattel's counsel around August 24, 2010?

12  A    That's what it appears to be, but again, I don't recall

13  having seen this.

14  Q    Is it correct that you -- you did pay some amount under

15  the settlement agreement?

16  A    Yes.

17  Q    And if you could look at 23793.  And do you have that

18  in front of you?

19  A    Yes.

20  Q    And is this a check you made out to Mattel around

21  June 26th, 2008?

22  A    Yes.

23          MR. PRICE:  I move Exhibit 23793 into evidence.

24          THE COURT:  Received.

25

Case 2:04-cv-09049-DOC-RNB   Document 9772   Filed 02/03/11   Page 14 of 139   Page ID #:293316
CV 04-9049-DOC - 02/01/2011 - Day 10, Vol. 2 of 4

14

```
 1              (Plaintiffs' Exhibit No. 23793 is received in

 2       evidence.)

 3  BY MR. PRICE:

 4  Q    And this is a check for $50,000 made out to Mattel as a

 5  partial settlement payment on June 26th, 2008?

 6  A    Yes.

 7  Q    At the time was that a lot of money for you?

 8  A    Yes.

 9  Q    Would it be a lot of money for you now?

10  A    Yes.

11  Q    You currently have the understanding that if MGA loses

12  any sums in this case, that they are going to seek

13  reimbursement from you?

14  A    I --

15            MS. KELLER:  Objection.  Calls for speculation and

16  a legal conclusion.

17            THE COURT:  You can ask him if there is any

18  conversation with anybody about that, but it's sustained in

19  its present form.

20  BY MR. PRICE:

21  Q    Have you had any conversation or communication from MGA

22  that would lead you to believe that they are going to seek

23  reimbursement from you for any sums lost in this case?

24  A    No.

25  Q    Have you received any communications or had any
```

Case 2:04-cv-09049-DOC-RNB   Document 9772   Filed 02/03/11   Page 15 of 139   Page ID #:293317
CV 04-9049-DOC – 02/01/2011 – Day 10, Vol. 2 of 4

15

```
 1    conversations with MGA saying, in general, that they hold
 2    you financially responsible for any sums that would be doing
 3    as a result -- would be due as a result of their losing a
 4    case with Mattel?
 5               MS. KELLER:  Objection, your Honor.  The Court's
 6    previously ruling.
 7               THE COURT:  Sustained.
 8               Move on, now.
 9    BY MR. PRICE:
10    Q    Do you have a belief, sitting here today, that your
11    financial interest is in MGA winning this trial?
12    A    I -- I wouldn't have an opinion one way or another.
13    Q    Well, you understand that your contract, Exhibit 15,
14    says that MGA may come after you for indemnification, right?
15               MS. KELLER:  Objection.  Asked and answered four
16    times.
17               THE COURT:  No.  Overruled.
18               You can answer the question.
19               THE WITNESS:  I'm sorry, what was the question?
20    BY MR. PRICE:
21    Q    Your understanding is that under your contract with
22    MGA, that MGA has the right to seek reimbursement from you
23    for any damages in the amount that is adjudicated against
24    them, correct?
25    A    I understand that from the contract, but I haven't been
```

1    given any indication that that would happen.

2    Q    Well, if you'd look at 21776.

3            MS. KELLER:  Same objection, your Honor, as

4    previously lodged.  Court's previous ruling.

5            THE COURT:  Yeah, I don't know what -- that's not

6    right in front of me at the moment, Counsel, with the volume

7    of documents, I apologize, but I think we've gone over this

8    also.  I think this is unduly consumptive of time, frankly.

9    And I'm going to preclude you at this point.

10           I think you've established and asked questions of

11   his perception of a bias in this regard.  I think we've

12   concluded this area.  Thank you.  Move on, Counsel.  It's

13   unduly consumptive of time under 403.  It's already been

14   covered, it's repeated, it's redundant.

15           MR. PRICE:  I have no further questions at this

16   time.

17           THE COURT:  Thank you very much.

18           Cross-examination.

19           MS. KELLER:  Thank you, your Honor.

20           *(Attorney discussion held off the record.)*

21           MS. KELLER:  Quite the changing of the guard up

22   here.

23                    **CROSS-EXAMINATION**

24   BY MS. KELLER:

25   Q    Good afternoon, Mr. Bryant.

1    A    Good afternoon.

2    Q    You and I met long enough to say "hello" and shake

3    hands for the first time earlier today, right?

4    A    Yes.

5    Q    And you were -- you were asked by Mr. Price about

6    whether you had met with the attorneys for MGA; is that

7    right?

8    A    Yes.

9    Q    Before this trial?

10   A    Yes.

11   Q    And you said you had spent a couple of hours with one

12   or more of the attorneys?

13   A    Yes.

14   Q    And was that Ms. Zolinski, who is sitting back here,

15   was she just going over drawings and showing you some of

16   your own work product that you haven't seen for years?

17   A    Yes.

18   Q    Did she tell you what questions to expect or suggest

19   any answers to you whatsoever?

20   A    Not that I remember.

21   Q    So you just remember going over the drawings?

22   A    Yes.

23   Q    Now, Mr. Price showed you a photocopy of the back of

24   the Grand Entrance Barbie collection; do you remember that?

25   A    Yes.

1    Q      Okay.

2             MS. KELLER:  If we could have Exhibit 1356002.

3             Everybody knows these numbers better than I do.

4             13656.

5    BY MS. KELLER:

6    Q      And is that -- when you were working in Barbie

7    collectibles, is that the special doll that you worked on

8    that Mr. Price talked about with you a while back?

9    A      Yes, yes.

10   Q      And there is a photograph of you on the back of the box

11   that we can see up here on the screen.

12          Now, is that what you looked like back in 2000?

13   A      Well, yeah.

14   Q      Throughout Mr. Price's cross-examination, you've had a

15   lot of trouble remembering things that you've said even a

16   couple of years ago, right?

17   A      Yes.

18   Q      And there was an implication in some of the questions

19   that you were lying about not remembering or faking it; do

20   you understand that?

21   A      Yes.

22   Q      But your memory problems are real, aren't they?

23   A      Yes.

24   Q      Now, this lawsuit was filed in 2004, right?

25   A      Yes.

Case 2:04-cv-09049-DOC-RNB   Document 9772   Filed 02/03/11   Page 19 of 139   Page ID #:293321
CV 04-9049-DOC - 02/01/2011 - Day 10, Vol. 2 of 4

19

1   Q    And since that time, have you suffered from depression?

2   A    Yes.

3   Q    You've been -- I don't want to invade your privacy, but

4   you've been treated for that?

5   A    Yes.

6   Q    And you've taken medication for that?

7   A    Yes.

8   Q    And you've been physically ill off and on during that

9   period; am I right about that as well?

10  A    Yes.

11  Q    Now, let's talk about before 2004.  Bratz was released

12  in 2001, right?

13  A    Yes.

14  Q    And in the beginning of 2002, it really took off, and

15  we could see that in some of the royalty statements that

16  were shown, right?

17  A    Yes.

18  Q    So all of a sudden you went from being a salaried

19  employee working in a cubicle to kind of having your dream

20  come true; didn't you?

21  A    Yes.

22  Q    And all of a sudden, it seemed like you maybe had an

23  unlimited future?

24  A    Yes.

25  Q    For all the creative things that you like to do?

1    A    Yes.

2    Q    Okay.  You were, what, 33 or 34, right around then?

3    A    Yeah, I think so.

4    Q    And had your own doll line, and you had become a multi

5    millionaire overnight, right?

6    A    Well, not overnight.

7    Q    Okay.  Over a period of, say, five or six years?

8    A    Yes.

9    Q    And you had a pretty good life, didn't you?

10    A    Yes.

11    Q    And you had become well known in the industry, true?

12    A    Yes.

13    Q    And the way you looked at it was that maybe as a result

14    of your art and your efforts, that maybe for the rest of

15    your life, you would be able to do pretty much what you

16    wanted and pursue creative interests and not have to worry

17    about money all the time, right?

18    A    I think I thought that, yes.

19    Q    And you had a relationship at the time that you valued,

20    true?

21    A    Yes.

22    Q    Now, you were sued by Mattel in April of 2004; is that

23    right?

24    A    Yes.

25    Q    And your understanding was that Mattel wanted to get

```
 1    hundreds of millions of dollars from you, right, or
 2    billions?
 3    A    I don't remember exactly what my understanding was at
 4    the time, but I just knew that I was being sued.
 5    Q    You knew that it was a number that was bigger than any
 6    number you could handle, right?
 7    A    Yes.
 8    Q    And did that cause you to feel some fear?
 9    A    Oh, yeah, of course.
10    Q    Now, at the time, you were the only one sued at the
11    beginning, MGA hadn't been sued yet, right?
12    A    That's correct, yes.
13    Q    And after all the discussions that you had, was it your
14    understanding that if a judgment was recovered against you
15    by MGA, if they got money from you, they got the kind of
16    money they were asking for, that you might never even be
17    able to -- even if you declared bankruptcy, you never might
18    be able to get out from under that debt?
19    A    I'm sorry, can you reask that question?
20    Q    I will.  You know what bankruptcy is?
21    A    Yeah, of course.
22    Q    Okay.  You know some debts, you can go into bankruptcy
23    and you can discharge those debts, you can get rid of those
24    debts, right?
25    A    Yes.
```

1   Q    And it was your understanding, wasn't it, that if

2   Mattel prevailed in some of the things they wanted to get

3   from you, you were never going to be able to get out from

4   under that debt, you wouldn't be able to discharge that kind

5   of debt in bankruptcy, true?

6            MR. PRICE:  Object.  Lack of foundation.

7            THE COURT:  Sustained.

8   BY MS. KELLER:

9   Q    Well, was that your understanding?

10  A    Yes.

11  Q    So you thought that you might be hit with a huge amount

12  of debt that might follow you for the rest of your life,

13  right?

14  A    I --

15  Q    Conceivably?

16  A    I don't know exactly if I thought that or not.

17  Q    Were you, in the course of this lawsuit, subjected to

18  what seemed to you like an endless series of depositions?

19           MR. PRICE:  Objection.  Argumentative.

20           THE COURT:  Sustained.

21  BY MS. KELLER:

22  Q    Were you deposed numerous times?

23           MR. PRICE:  Objection.  Vague.

24           THE COURT:  Overruled.

25           You can answer that question.

Case 2:04-cv-09049-DOC-RNB   Document 9772   Filed 02/03/11   Page 23 of 139   Page ID #:293325
CV 04-9049-DOC – 02/01/2011 – Day 10, Vol. 2 of 4

23

```
 1            THE WITNESS:  I believe I was deposed eight times.

 2   BY MS. KELLER:

 3   Q    And you were asked questions about very small details,

 4   were you not, as well as larger details?

 5   A    Yes.

 6            MR. PRICE:  Vague and ambiguous.

 7            THE COURT:  I'm going to sustain the objection.

 8            Let me caution you, the number of occasions a

 9   person is deposed is not relevant.  There may be answers

10   that were forthcoming, there may be other reasons why the

11   deposition occurred, and you are going to hear numerous

12   witnesses, including Mr. Bryant, who were deposed a number

13   of times for both sides in this matter.

14            Counsel, please continue.

15            Also, I'm allowing counsel on both sides to ask

16   leading questions, but remember, it's the answer that you're

17   getting.

18            So Counsel, I don't know if he's in an adversarial

19   position yet.  I'm allowing you some leeway, but you might

20   let him testify a little bit.

21   BY MS. KELLER:

22   Q    How many depositions do you recall sitting for?

23            MR. PRICE:  Objection.  Relevance.

24            THE COURT:  Overruled.

25            THE WITNESS:  I remember sitting for eight days of
```

1    depositions total.

2              THE COURT:  Remember, you are not to be affected

3    by the number of depositions.  There's going to be numerous

4    witnesses who have been deposed maybe even more times for

5    both sides in this matter.

6              All right, Counsel.

7    BY MS. KELLER:

8    Q    Well, I'm asking you this as it pertains to your

9    memory, okay?

10             THE COURT:  And that's why it's being allowed, for

11   memory.

12             Thank you, Counsel.

13   BY MS. KELLER:

14   Q    In those depositions, were you sometimes asked the same

15   question many, many, many times, over and over?

16             MR. PRICE:  Objection.  Argumentative.

17             THE COURT:  No.  Overruled.

18             You can answer that question.

19             THE WITNESS:  Yes.

20   BY MS. KELLER:

21   Q    And maybe in slightly different ways?

22   A    Yes.

23   Q    And you also testified to a number of dates as best you

24   could remember them, didn't you?

25   A    Yes.

Case 2:04-cv-09049-DOC-RNB   Document 9772   Filed 02/03/11   Page 25 of 139   Page ID #:293327
CV 04-9049-DOC - 02/01/2011 - Day 10, Vol. 2 of 4

25

1   Q    At the end of those days of being asked questions all
2   day, were you sometimes tired?
3   A    Yes.
4   Q    Did you dread going back for the next day?
5   A    Yes.
6   Q    And then you said you also testified at the trial in
7   2008?
8   A    Yes.
9   Q    And the same thing happened then, you were asked many
10  questions, sometimes the same one over and over; is that
11  right?
12  A    Yes.
13  Q    And in slightly different ways, true?
14  A    Yes.
15  Q    And would you sometimes be exhausted by the end of the
16  day?
17  A    Yes.
18  Q    And can you tell us -- since his honor would like you
19  to put it in your own words, can you tell us what that
20  experience was like for you?
21            MR. PRICE:  Objection.  Relevance.
22            THE COURT:  Overruled, but which experience, the
23  deposition, the trial?
24            MS. KELLER:  Trial.
25            THE COURT:  Okay.

```
 1              THE WITNESS:  It was -- it was really rough on me.
 2    Yeah, it was very exhausting.  A lot of like things that
 3    were hard to remember.  It was scary.  Yeah, it was pretty
 4    tough.
 5    BY MS. KELLER:
 6    Q    Stressful?
 7    A    Very stressful.
 8    Q    How did it affect your sleep?
 9    A    Greatly.
10    Q    Can you explain?
11    A    Yeah, I basically had to start relying on sleeping
12    medications, Ambien, Lunesta.
13    Q    And how about now, have you had to rely on those
14    medications again?
15    A    I've tried not to, but I -- I definitely have been
16    suffering from a lack of sleep.
17    Q    And you had these big binders delivered to your hotel,
18    when was that?  Was that Saturday or Sunday?
19    A    I think that was Sunday.
20    Q    And how did it feel having to go back through all
21    those?
22    A    Exhausting.
23    Q    Did it bring back some bad memories?
24    A    Yes.
25    Q    Of what?
```

```
 1    A    I'm sorry?

 2    Q    Of what?

 3    A    Of just the whole experience, all the past few years of

 4    meeting with lawyers and being in court.

 5    Q    Now, your creative friends who helped you in your Bratz

 6    project, all your artist friends, were you -- you were asked

 7    by Mr. Price a lot of questions about betraying their trust.

 8    Were they dragged into this whole lawsuit also?

 9              MR. PRICE:  Objection.  Argumentative.  Not

10    relevant.

11              MS. KELLER:  I'll rephrase, your Honor.

12              THE COURT:  I'm going to sustain the objection,

13    Counsel.

14    BY MS. KELLER:

15    Q    Your artist friends who helped you, were they also

16    subpoenaed by Mattel?

17              MR. PRICE:  Objection.  Not relevant.

18              THE COURT:  Sustained.

19    BY MS. KELLER:

20    Q    The route that you took home to your parents' home from

21    work, remember being asked about that by Mr. Price?

22    A    Yes.

23    Q    And that's been scrutinized over the years as well,

24    hasn't it?

25    A    Yes.
```

1    Q    The drawings that brought you so much fame, you haven't

2    even been allowed to see except for in a courtroom all these

3    years, right?

4                MR. PRICE:  Objection.  Not relevant.

5                THE COURT:  Sustained.

6    BY MS. KELLER:

7    Q    Do you -- are you afraid here today that if you are

8    slightly off on your dates or details, that you are going to

9    be called a perjurer, as you have been?

10               MR. PRICE:  Objection.  That assumes facts not in

11   evidence.

12               THE COURT:  Sustained.

13   BY MS. KELLER:

14   Q    You remember when Mr. Price accused you earlier of

15   lying under oath in a declaration under penalty of perjury?

16               MR. PRICE:  Objection.  It's not an accusation.

17   It's a question.

18               THE COURT:  I'm going to sustain it, Counsel.

19   BY MS. KELLER:

20   Q    Do you recall when Mr. Price questioned you earlier

21   about lying under oath under penalty of perjury?

22   A    Yes.

23   Q    In your mind, is that -- is it your belief that that

24   equals an accusation of being accused of perjury?

25               MR. PRICE:  Objection.  Irrelevant.

1           THE COURT:  No, overruled.  This is a state of

2    mind and it pertains to this proceeding.

3           You can answer that, sir.

4           THE WITNESS:  It's pretty scary.  I mean, yeah.

5    BY MS. KELLER:

6    Q    Now, would I be right that at this point, you would

7    just like this whole proceeding to be over?

8    A    Oh, absolutely.

9    Q    And would I be right that at this point, you don't have

10   any particular love for Mattel or for MGA?

11   A    Yes, that's correct.

12   Q    And you just want to go home, right?

13   A    That would be really great.

14   Q    Do you actually ever think you are going to see any

15   money again, no matter what happens here?

16          MR. PRICE:  Objection.  That's vague.

17          THE COURT:  Is this from the sale of the Bratz

18   products and accessories?

19          MS. KELLER:  That's right.

20          THE COURT:  Yeah, overruled.

21          THE WITNESS:  I have no idea whether I would or

22   not.

23   BY MS. KELLER:

24   Q    And Mr. Price asked you about your financial condition.

25   Mattel does have the right under your settlement agreement

1    to audit you every year and find out exactly what your

2    financial condition is, right?

3    A    I am actually not sure on that.

4    Q    Okay.  You don't remember that from the settlement

5    agreement?

6    A    No.

7    Q    All right.  You do remember getting letters from -- I'm

8    sorry, you don't remember getting letters from Mr. Zeller

9    over here asking about that?

10   A    No, I don't.

11   Q    Right now as -- as you sit here, you really pretty much

12   have lost everything because of this case, right?

13   A    Most everything, yes.

14   Q    Still have your talent?

15   A    Who knows.

16   Q    And one reason you don't know is because at this point,

17   no other toy maker wants to hire you, you're kind of

18   radioactive, right?

19            MR. PRICE:  Objection.  Argumentative.  Lack of

20   foundation.

21            THE COURT:  Overruled.

22            You can answer that question.

23            THE WITNESS:  It seems that way.  I mean, it feels

24   that way.

25

Case 2:04-cv-09049-DOC-RNB   Document 9772   Filed 02/03/11   Page 31 of 139   Page ID #:293333
CV 04-9049-DOC - 02/01/2011 - Day 10, Vol. 2 of 4

31

1    BY MS. KELLER:

2    Q    And all you ever wanted to be was a designer, right?

3    A    Yes.

4    Q    You were proud of the work that you did on Bratz,

5    weren't you?

6    A    Yes, I was.

7    Q    And you are the one who came up with the idea for Bratz

8    in the first place, true?

9    A    Yes.

10   Q    Now, in addition to the times that you were deposed,

11   you were cross-examined by Mr. Price at the trial on, what,

12   seven different days?

13   A    I don't remember exactly how many days it was, but it

14   was multiple days.

15   Q    Okay.  Tell me if this date sounds familiar to you,

16   okay?  June 11th, June 12th?

17            THE COURT:  All in 2008, Counsel?

18            MS. KELLER:  All in 2008.

19   BY MS. KELLER:

20   Q    Does June 11th sound familiar?

21   A    Yes.

22   Q    June 12th?

23   A    Yes.

24   Q    June 13th?

25   A    Yes.

Case 2:04-cv-09049-DOC-RNB   Document 9772   Filed 02/03/11   Page 32 of 139   Page ID #:293334
CV 04-9049-DOC - 02/01/2011 - Day 10, Vol. 2 of 4

32

1   Q     June 17th?

2   A     Yes.

3   Q     June 18th?

4   A     Yes.

5   Q     June 20th?

6   A     (No audible response.)

7   Q     And those were all days Mr. Price cross-examined you

8   all day?

9   A     I believe so, yes.

10  Q     And then MGA's lawyer, Mr. Nolan, also examined you on

11  June 17th and part of June 18th; is that right?

12  A     I'm sorry, what, now?

13  Q     Did MGA's lawyer at the time, whose name was Tom Nolan;

14  do you remember him?

15  A     Yes.

16  Q     Did he also examine you on June 17th and June 18th?

17  A     I don't remember who the lawyer was.

18  Q     Now, are you trying as hard as you can to remember what

19  you can?

20  A     Yes.

21  Q     Are you trying as hard as you can to be truthful?

22  A     Yes.

23  Q     Have you actually tried in the past to forget all about

24  this, tried to forget this and put it in the past?

25  A     Yes.

```
1    Q    Did you think after 2008, that this whole ordeal was

2    over with?

3    A    I --

4              MR. PRICE:  Objection.  This is irrelevant.  It

5    may open the door.

6              THE COURT:  Yeah, I'm going to sustain the

7    objection.

8    BY MS. KELLER:

9    Q    Okay.  Now, Mr. Price talked you to about the fact that

10   you had been represented by lawyers when you had your

11   deposition taken each of the times that we've talked about

12   and when you testified at trial; do you remember that?

13   A    I'm sorry, what, now?

14   Q    Mr. Price, when he questioned you, questioned you about

15   the fact that you had had lawyers represent you when you had

16   your deposition taken; do you remember that?

17   A    Yes.

18   Q    And at the time you had your deposition taken, you

19   weren't just a witness, you were actually a defendant who

20   was being sued, right?

21   A    Sorry, what was the question again?

22   Q    Okay.  You -- when you sat down for your deposition,

23   not the trial, but when you are sitting in a little room

24   with a bunch of lawyers questioning you, okay?  At that time

25   you had a lawyer representing you, right?
```

1   A    Yes.

2   Q    But you weren't just a witness, were you?

3   A    No.

4   Q    You were a Defendant who Mattel was suing, right?

5   A    Yes.

6   Q    And did you think it was important for you to have a

7   lawyer?

8   A    Yes.

9   Q    And Mr. Price also asked you about the fact that MGA

10  paid for most of your attorney fees; do you remember that?

11  A    Yes.

12  Q    Now, Mattel sued you over the Bratz concept claiming

13  that Mattel owned it, right?

14  A    Yes.

15  Q    And so did you expect that MGA, because of that, would,

16  of course, pay your attorneys' fees since MGA was claiming

17  that it owned the concept?

18  A    I don't really recall what my expectations were.

19  Q    Okay.  Now, you also talked about with Mr. Price the

20  fact that MGA lawyers spoke with you before the last trial;

21  do you remember that?

22  A    I'm sorry, what, now?

23  Q    Do you remember Mr. Price asking you last week about

24  the fact that MGA lawyers spoke with you before the trial?

25  A    Oh, yes.

1    Q    And you also had your own lawyer, correct?

2    A    Yes.

3    Q    And even though MGA was paying your lawyer, was it your

4    belief that your lawyer was a pretty independent person?

5    A    I'm sorry, I don't understand your question.

6    Q    Okay.  Even though MGA was paying your attorneys' fees,

7    was it your belief that your lawyer was giving you pretty

8    independent legal advice?

9    A    I don't remember exactly how I felt about that.

10   Q    When the MGA lawyer talked to you, Mr. Nolan, did he

11   suggest to you that you keep your voice up when you spoke?

12   A    I don't remember that.

13   Q    Did he put words in your mouth and tell you what to

14   say?

15   A    No.

16   Q    Now, the lawyer that you have in court with you here

17   today is not being paid by MGA, correct?

18   A    That's correct.

19   Q    And that's Mr. Bonis who is seated in the back of the

20   room?

21   A    Yes.

22   Q    And is that somebody you found yourself?

23   A    I believe I came into contact with him through the last

24   set of lawyers that represented me.

25   Q    Okay.  And the -- when you last week, you said, spent a

Case 2:04-cv-09049-DOC-RNB   Document 9772   Filed 02/03/11   Page 36 of 139   Page ID #:293338
CV 04-9049-DOC - 02/01/2011 - Day 10, Vol. 2 of 4

36

1   couple of hours reviewing things with MGA's lawyers, and I

2   think that was last Thursday; is that right?

3   A    Yes.

4   Q    In addition to the drawings that you reviewed, you

5   reviewed some items of yours that Mattel still has in its

6   possession today, correct?  Some files, some magazine

7   articles?

8   A    I don't remember if we did or not.

9   Q    Do you remember going through things that you had left

10  in your cubicle at Mattel when you quit?

11  A    Yes.

12  Q    And this is last Thursday, right?

13  A    Yes.

14  Q    Now, I want to talk again about whether your lawyer was

15  independently representing you.  Do you remember that the

16  last trial was supposed to start May 19th, 2008, true?  Or

17  do you remember?

18  A    I don't remember that.

19          THE COURT:  Counsel, so it's not reflective on

20  counsel here, it should be clear that that last trial took

21  place at a different court.

22          MS. KELLER:  Yes.

23          THE COURT:  This trial that's being referred to

24  did not occur in front of this court.  It was with a

25  different court.

Case 2:04-cv-09049-DOC-RNB   Document 9772   Filed 02/03/11   Page 37 of 139   Page ID #:293339
CV 04-9049-DOC - 02/01/2011 - Day 10, Vol. 2 of 4

37

1    BY MS. KELLER:

2    Q    On the eve of that trial starting, is when you entered

3    into the settlement agreement with Mr. Mattel that Mr. Price

4    has shown you, right?

5    A    I believe so, yes.

6    Q    And you didn't let MGA know in advance that you were

7    settling out with Mattel, true?

8    A    I don't remember.

9    Q    Do you remember it being a complete surprise to MGA and

10   its lawyers when you settled out with Mattel?

11             MR. PRICE:  Assumes facts not in evidence.

12             THE COURT:  Sustained.

13   BY MS. KELLER:

14   Q    Was it your understanding that MGA was surprised when

15   you settled?

16             MR. PRICE:  Object.  Relevance.

17             THE COURT:  Sustained.  It's also speculative,

18   Counsel.

19             Now, if somebody said something to him, he can

20   testify about that; otherwise, it's just speculation.

21             MS. KELLER:  I will ask, your Honor.

22   BY MS. KELLER:

23   Q    Do you remember the lawyers talking to you and to your

24   lawyer, expressing their surprise, I mean MGA lawyers, their

25   surprise that you had settled out and they didn't know

1    anything about it?

2    A    I somewhat remember one of the lawyers from MGA saying

3    that it might actually be a good idea.

4    Q    That you did?

5    A    Yes.

6    Q    That you had or that you did?

7    A    That I -- that I would settle.

8    Q    And who was that; do you remember?

9    A    I don't remember which lawyer that was.

10   Q    Now, when you settled out, were you -- was your state

11   of mind at that time that you were pretty upset?  Let's say

12   right before you settled, were you pretty upset about the

13   fact that the trial was about to start, stressed?

14   A    Yes, yes.

15   Q    Were you worried?

16   A    Yes.

17   Q    Having trouble sleeping?

18   A    Yes.

19   Q    Out of work?

20   A    Yes.

21   Q    You didn't make any admission of wrongdoing when you

22   settled, did you?

23   A    No.

24   Q    And were you pretty adamant about that, that you were

25   not going to admit that you did anything wrong?

1    A    Yes.

2            MR. PRICE:  I object.  That assumes facts not in

3    evidence that he was asked.

4            THE COURT:  No, you can answer that.  Your answer

5    was yes?

6            THE WITNESS:  Yes.

7            THE COURT:  Thank you.

8    BY MS. KELLER:

9    Q    And you were asked by Mr. Price about the fact that in

10   the settlement agreement, it said that you were, quote,

11   "substantially financially insolvent," which is lawyer-use

12   for "broke"; do you remember that?

13   A    Yes.

14   Q    And you did still have some money left at that time, at

15   least about a million and a half dollars worth of net worth;

16   is that right?

17   A    I don't remember exactly how much I had.

18   Q    Okay.  Have you taken a look at that settlement

19   agreement in the last day or so?

20   A    No.

21   Q    Was that in the group of documents that was provided to

22   you?

23   A    I'm not sure.

24   Q    Is that -- again, that's not something you want to

25   think about?

1   A    Yeah, not really.

2   Q    And can you tell us why?

3   A    Again, it's just a stressful -- it's just a reminder of

4   a very long, bad stretch of time in my life.

5        MS. KELLER:  If we could see Exhibit 7520.

6   BY MS. KELLER:

7   Q    This is a copy of that settlement agreement.  And I'm

8   not going to go over the financially insolvent part again,

9   but if we can go to paragraph 12, that would be 7520-2,

10  paragraph number 2, and if you can't find it, it should be

11  on the screen in front of you.

12  A    I can't read it on the screen.  It's --

13  Q    Okay.

14  A    There we go.

15  Q    Maybe we can -- if you can't read it, take your time

16  and look at the paper.

17  A    No, I can read it now.

18  Q    So what that says is that you are going to owe Mattel

19  $2 million if you're paid any royalties for the Bratz dolls.

20  I'm translating all this, okay?

21       Can you understand, just reading this yourself, what it

22  says or what it means, legally?

23  A    Well, I understand the, you know, the part that, yes, I

24  would owe them $2 million if I was paid any royalties.

25  Q    And your lawyer who negotiated this for you, that was

1    John Keker?

2    A    Yes.

3    Q    And he's from a San Francisco firm called Keker & Van

4    Nest?

5    A    Yes.

6    Q    And did he explain all this to you at the time, what it

7    really meant, and I'm not going to ask what he told you, but

8    did he explain it to you?

9    A    I -- I think we went over it fairly thoroughly.  I

10   don't really remember.

11   Q    Is it your understanding of this paragraph that we were

12   just talking about, this paragraph 12, that if you get any

13   royalties from MGA on the --

14              MS. KELLER:  Pardon?

15              MR. MC CONVILLE:  Paragraph 2.

16              MS. KELLER:  I'm sorry.

17   BY MS. KELLER:

18   Q    Paragraph 2, if you get any royalties from MGA on the

19   Bratz dolls, that you have to give 50 percent of that to

20   Mattel until that 2 million is paid off; is that your

21   understanding?

22   A    Yes.

23   Q    And is it also your understanding -- it also talks

24   about this, any money that you get from BT Associates.  BT

25   Associates you put together with your partner?

Case 2:04-cv-09049-DOC-RNB   Document 9772   Filed 02/03/11   Page 42 of 139   Page ID #:293344
CV 04-9049-DOC – 02/01/2011 – Day 10, Vol. 2 of 4

42

1  A    Yes.

2  Q    And you were going to invest in real estate

3  development?

4  A    Yes.

5  Q    And the real estate development investment was made, as

6  I understand it, at exactly the wrong time, and it just went

7  the way the rest of the real estate market; is that true?

8  A    Yes, that's true, and we had some partners in the

9  business who cheated us out of quite a bit of money as well.

10  Q    Okay.  And is that where you lost most of your money?

11  A    I lost a lot of it through that, yeah.

12  Q    So that -- at least at this point, that doesn't exist

13  anymore, right?  BT Associates has been closed down?

14  A    Yes.

15  Q    And so that 2 million, you still owe the vast majority

16  of that; is that right?

17  A    Yes.

18  Q    Now, if we can go to the bottom of that paragraph where

19  it starts "not more than once annually."  I want you to take

20  a look at that, and we're going to put that on the screen

21  for you, too.

22      Do you see it says, "Not more than once annually within

23  30 days following Mattel's written request, that you have to

24  provide Mattel with a balance sheet and an income statement

25  for BT Associates," et cetera; is that right?

1    A    Yes.

2    Q    I just don't want to read all of this, but that's the

3    gist of it as far as you understand it?

4    A    Yes.

5    Q    So basically under this agreement, you still owe Mattel

6    $2 million, right?

7    A    Yes.

8    Q    And you were supposed to pay them 50 percent of

9    anything BT Associates earned, but BT Associates is dead,

10   closed, right?

11   A    Yes.

12   Q    And you're supposed to pay them 50 percent of any

13   royalties that you get from the Bratz dolls, but you don't

14   know if you'll ever see any royalties again, true?

15   A    Yes, that's true.

16   Q    And the settlement agreement was also conditioned on

17   your testifying at trial, in other words, Mattel had the

18   right to call you, and you had to show up; is that right?

19   A    Yes.

20   Q    And if you didn't show up, the whole settlement could

21   be unwound and you would be right back where you started as

22   a Defendant in this case, true?

23   A    I don't really recall if I understood that exactly, but

24   I know it was part of the settlement.

25   Q    Do you understand it now?

1    A    Yes.

2    Q    Let me ask you a more general question about lawyers

3    that you hire to help you.

4         When you hire a lawyer to help you with something like

5    this, do you expect the lawyer to teach you every line and

6    what every line means, or do you trust the lawyer to

7    understand it?

8    A    Yeah, I trust the lawyer to hope -- yeah, to understand

9    it.

10   Q    Or to kind of translate it for you?

11   A    Yeah, in laymen's terms.

12   Q    In regular people's language, without all of the

13   whereases and the wheretofores?

14   A    Right.

15   Q    And at the time you did the settlement agreement, was

16   that what happened, that you trusted Mr. Keker to try to

17   negotiate the best deal that he could for you?

18   A    Yes.

19   Q    But you, yourself, didn't really understand every last

20   word of this, did you?

21   A    No.

22   Q    And it's -- how many pages have you got up there in

23   front of you with that agreement?  It's pretty thick?

24        MR. PRICE:  Object.  It's ambiguous as to whether

25   or not it includes the exhibits.

Case 2:04-cv-09049-DOC-RNB   Document 9772   Filed 02/03/11   Page 45 of 139   Page ID #:293347
CV 04-9049-DOC – 02/01/2011 – Day 10, Vol. 2 of 4

45

```
 1              THE COURT:  He has a binder.
 2              MS. KELLER:  I'm talking about the settlement
 3    agreement itself.
 4              THE COURT:  Can someone show him?
 5              Do you have that settlement agreement in front of
 6    you?
 7              Do you want to count the pages?
 8              MS. KELLER:  No, just an approximation.
 9    BY MS. KELLER:
10    Q    I mean, it's not a one or two-page document, right?
11    A    No, it looks like it's about 13 pages.
12    Q    Okay.  And then you've got a bunch of attachments to
13    that?
14    A    Yes.
15    Q    And was it also your understanding that if you ever
16    tried to declare bankruptcy, this $2 million settlement with
17    Mattel wasn't included; did you know that?
18    A    I don't recollect that.
19    Q    Okay.  Let's go to 7520, page 7, and look at the last
20    paragraph on the page where it says "Bankruptcy of Bryant."
21    And it says, "In the event that Bryant becomes a party to
22    any insolvency proceeding pursuant to the United States
23    Bankruptcy Code, which such proceeding is voluntary or
24    involuntary, and this agreement or any provision hereof is
25    determined to be a preference or is otherwise set aside,
```

```
 1    found to be void or voidable or otherwise unenforceable,
 2    then the agreement shall, at Mattel's option, be deemed
 3    rescinded and shall be of no force and effect."
 4         Does that sound like language that you use in your
 5    everyday life?
 6    A    No.
 7    Q    Okay.  Do you understand what it means, do you think?
 8    A    I have a pretty good general understanding.
 9    Q    Okay.  And after speaking with your lawyer about this,
10    was it your understanding that what this meant was that you
11    could -- if you declare bankruptcy, this could not be
12    included, and if you tried to include it, Mattel could undo
13    the whole deal and say you're back as a defendant in the
14    lawsuit?
15    A    I actually don't even recall this paragraph.
16    Q    So you know in general your lawyer explained the
17    document, but you don't even remember this?
18    A    No.
19    Q    And do you know, though, that -- forgetting about this
20    paragraph for a moment, do you understand that if you try to
21    declare bankruptcy and try to get out from under that debt,
22    that Mattel could unwind the settlement and put you back
23    right where you started, sitting over here with us?
24    A    Well, I understand it now from -- from looking at this,
25    yes.
```

Case 2:04-cv-09049-DOC-RNB   Document 9772   Filed 02/03/11   Page 47 of 139   Page ID #:293349
CV 04-9049-DOC - 02/01/2011 - Day 10, Vol. 2 of 4

47

1    Q    Just from what I've said?

2    A    Yes.

3    Q    And what I just explained?

4    A    Yes.

5    Q    But you didn't remember this yourself?

6    A    No.

7    Q    Now, you're agreeing with me that that's what it says,

8    right?

9    A    Yes.

10   Q    So you're kind of trusting me to be honest with you?

11   A    Yes.

12   Q    But you really don't know what this says, do you,

13   yourself?  I mean, you really don't, you haven't deciphered

14   all the legalese?

15   A    No.  And like I said before, I have no recollection of

16   this paragraph.

17   Q    So if I asked you a whole series of questions like, you

18   know, is it your understanding that that's what this means,

19   you would probably answer yes, that's my understanding,

20   right?  That it means that they can come after you if you

21   declare bankruptcy?  I am not trying to trick you here at

22   all, but do you understand what I mean?

23   A    Yes.

24         MR. PRICE:  Objection.  That's ambiguous.

25         THE COURT:  Did you understand the question?

Case 2:04-cv-09049-DOC-RNB   Document 9772   Filed 02/03/11   Page 48 of 139   Page ID #:293350
CV 04-9049-DOC - 02/01/2011 - Day 10, Vol. 2 of 4

48

1          THE WITNESS:  I think I did.

2          THE COURT:  Overruled.

3    BY MS. KELLER:

4    Q    So you're kind of trusting me to have explained it to

5    you correctly here in court, right?

6    A    Yes.

7    Q    And have you been trusting Mr. Price to explain things

8    in a way that was honest?

9          MR. PRICE:  Objection.  I don't think I explained

10   things.  It assumes facts not in evidence.

11         THE COURT:  I'll sustain the objection.  It's

12   comparing the two counsel and the different questions.  It's

13   ambiguous, Counsel.

14   BY MS. KELLER:

15   Q    Now, in addition to the fact that the settlement

16   agreement says you can never get out from under it in

17   bankruptcy, is it also your understanding that if you don't

18   testify -- if you didn't testify for Mattel, not only could

19   they unwind the agreement but that Mattel could come after

20   you for attorneys' fees; do you remember seeing that in the

21   agreement?

22   A    I remember seeing some of that recently, yes.

23   Q    And you understand that the attorneys' fees here would

24   be far more than you could afford to pay; is that right?

25   A    Yes.

```
 1   Q    Even if there were no judgment against you, you'd be
 2   crushed by those attorneys' fees, wouldn't you?
 3              MR. PRICE:  Objection.  Argumentative.
 4              THE COURT:  Crushed.
 5              MS. KELLER:  I'll rephrase, your Honor.
 6              Should I proceed, your Honor, or is the Court --
 7              THE COURT:  Please.
 8              MS. KELLER:  Oh, I thought you were considering
 9   it.
10   BY MS. KELLER:
11   Q    Even if you won, even if Mattel didn't get any money
12   from you in a lawsuit, you understand, don't you, that the
13   attorneys' fees alone would overwhelm your financial
14   abilities?
15   A    Yes.
16   Q    In fact, you wouldn't even be able to come up with them
17   to begin with, true?
18   A    Yes, that's true.
19   Q    Now, Mr. Price also asked you about the fact that you
20   haven't met with the Mattel lawyers to prepare for your
21   testimony; do you remember that from the other day?
22   A    Yes.
23   Q    But you weren't asked if Mattel's lawyers have
24   contacted you before this trial to see if you'd talk to
25   them, true?
```

```
 1              MR. PRICE:  Objection as to time frame.  Any time?
 2              THE COURT:  Before this trial?
 3    BY MS. KELLER:
 4    Q    Between 2008 and now, have Mattel's lawyers ever once
 5    contacted you to try to sit down with you and talk about the
 6    case?
 7    A    Not that I can remember.
 8    Q    And Mr. Bonis, sitting here in the back of the room, to
 9    your knowledge, they haven't tried to contact you through
10    him?
11    A    I don't know if they have or not.
12    Q    Have you seen anything in writing from Mattel asking to
13    speak to you?
14    A    Not that I can recall.
15    Q    Have you had any voice mails from Mattel asking to
16    speak with you?
17    A    No, not that I remember.
18    Q    Now, I want to talk to you a little bit less about
19    lawyers and a little more about some of what you remember of
20    the time that you were pitching your idea to MGA, okay?
21    A    Uh-huh.
22    Q    Okay.  You said you first heard of MGA through your
23    friend, Veronica Marlow; is that right?
24    A    Yes.
25    Q    And that was around July of 2000, mid to late summer,
```

1    somewhere in there?

2    A    I don't remember exactly what -- what time period.

3    Q    Do you remember it being that year, 2000?

4    A    I -- I don't remember right -- right at this minute.

5    Q    Okay.  If we could -- and I know this is laborious, but

6    we kind of have to do this.  If I can show you your

7    deposition transcript from November 4th, 2004, it's page 5,

8    lines 13 to 17, and I just ask you to read those to

9    yourself?

10   A    I'm sorry, which lines?

11   Q    It's deposition November 4th, 2004, page 5, 13 through

12   17.  Actually you can start at line 10, that will put the

13   context to it.

14        Does that remind you at all of when it was that you

15   first heard of MGA?

16   A    I -- I don't remember right this minute, but I don't

17   dispute the testimony.

18   Q    Okay.  And the testimony that you don't dispute was

19   that you first heard of MGA through Victoria Marlow around

20   July of 2000?

21   A    Yes.

22   Q    Was your memory a little fresher about some of these

23   things back in 2004 than it is in 2011?

24   A    Probably, yes.

25   Q    Now, Miss Marlow had been a coworker at Mattel during

```
 1    your first time there, hadn't she?

 2    A    Yes.

 3    Q    And she had become a friend?

 4    A    Yes.

 5    Q    And by this point that we're talking about, July of

 6    2000, she had left Mattel, hadn't she?

 7    A    Yes.

 8    Q    And what did you tell Miss Marlow about this project

 9    that you had that you were interested in possibly doing

10    something with?

11    A    I don't recall the exact conversation, but I think I

12    just remember saying something that I had an idea for a new

13    doll line.

14    Q    Okay.  And did you ask her if she had any leads or if

15    she could help you pitch the idea?

16    A    I think I may have, yes.

17    Q    And you were looking at that point to pitch your Bratz

18    doll idea to somebody who might be interested, true?

19    A    I believe so, yes.

20    Q    Would it help if you took another look at your

21    deposition just to kind of jog your memory, that same one we

22    just looked at?

23    A    Sure.

24    Q    Okay.  It would be page 8, lines 15 through 21.

25    A    Okay.
```

1    Q    So you asked Miss Marlow if she had any leads or could

2    help you pitch the idea to someone, right?

3    A    Yes.

4    Q    And you were looking to find someone who could help you

5    kind of get an in with a toy company, right?

6    A    Sitting here today, I don't really recall exactly what

7    I was thinking of, but again, I don't dispute the former

8    testimony.

9    Q    All right.  I understand.

10        Now, Miss Marlow, she was freelancing at the time,

11   wasn't she?

12   A    Yes.

13   Q    And she was freelancing in the toy industry?

14   A    Yes.

15   Q    When you spoke to her, she was doing freelance work for

16   MGA specifically, right?

17   A    Yes.

18   Q    And she told you that MGA was on the lookout for new

19   doll projects?

20   A    I think so, yes.

21   Q    Did you know that she, herself, was working on a

22   couple -- one or two doll projects at the time for MGA, a

23   baby doll project and an angel doll baby project?

24   A    Yes.

25   Q    And both of those things became MGA products, right, as

Case 2:04-cv-09049-DOC-RNB   Document 9772   Filed 02/03/11   Page 54 of 139   Page ID #:293356
CV 04-9049-DOC - 02/01/2011 - Day 10, Vol. 2 of 4

54

1   far as you know?

2   A    I believe so, yes.

3   Q    The angel doll type project was called Prayer Angels?

4   A    Yes.

5   Q    And when you talked with Miss Marlow, is it true that

6   you had never even heard of MGA before?

7   A    Yes.

8   Q    And had you ever heard of Isaac Larian before?

9   A    No.

10  Q    When you told her you had a project you were interested

11  in pitching, the project you were talking about was Bratz,

12  wasn't it?

13  A    Yes.

14  Q    And did you tell Miss Marlow something to the effect

15  that this was a group of teen dolls with funky clothes and

16  disproportionate features?

17  A    I think so, yes.

18  Q    Did she put you in touch with one of the project

19  managers at MGA who I guess if we put her married name on

20  the end, it's Paula Treantafelles Garcia?

21  A    Yes.

22  Q    And you didn't know Paula Garcia at the time either,

23  did you?

24  A    No.

25  Q    Now, around the end of August was when you had this

```
 1   meeting to try to sell your doll idea, meeting at MGA?

 2   A    Yes.

 3   Q    How often had you ever been to MGA before that, if

 4   ever?

 5   A    Never.

 6   Q    And how did you find it; do you remember?  Did you use

 7   a map or ask for directions?

 8   A    I -- I don't remember.

 9   Q    Was it a fairly long drive from Mattel to MGA, if you

10   remember?

11   A    I think it was a fairly long drive, yes.

12   Q    MGA is up in the Van Nuys area, right?

13   A    Yes.

14   Q    Mattel is down in El Segundo?

15   A    Yes.

16   Q    And for those of us who live in Orange County, we may

17   not know how tough a drive that is on the 405 during the

18   day, can you tell us?

19   A    It can be kind of brutal.

20   Q    A lot of traffic?

21   A    Yes.

22   Q    Now, is it about 30, 31 miles?

23   A    I have no idea.

24   Q    Okay.  So back to the meeting, you said that Veronica

25   Marlow, Paula Garcia and this woman named Veronica O'Connor
```

Case 2:04-cv-09049-DOC-RNB   Document 9772   Filed 02/03/11   Page 56 of 139   Page ID #:293358
CV 04-9049-DOC – 02/01/2011 – Day 10, Vol. 2 of 4

56

1   were all there, right?

2   A    Yes.

3   Q    And you hadn't -- you hadn't spoken to Paula Garcia or

4   met her before this meeting, but had you had any contact

5   with her in writing at all; do you remember?

6   A    No.

7            MS. KELLER:  And your Honor, I wonder if this

8   could be a time to take a break.

9            THE COURT:  Certainly.

10            MS. KELLER:  Thank you.

11            THE COURT:  You are admonished not to discuss this

12   matter amongst yourselves, nor form or express any opinions

13   about the case.  We will come get you in 20 minutes, okay?

14            Thank you.

15            *(The following proceedings is taken outside*

16        *the presence of the jury.)*

17            THE COURT:  All right.  Counsel, 20 minutes.

18   We'll open the doors at a quarter after the hour.

19            *(Recess.)*

20            THE COURT:  Counsel, if you'd like to continue

21   your cross-examination of Mr. Bryant.

22            MS. KELLER:  Thank you.

23

24

25

Case 2:04-cv-09049-DOC-RNB   Document 9772   Filed 02/03/11   Page 57 of 139   Page ID #:293359
CV 04-9049-DOC - 02/01/2011 - Day 10, Vol. 2 of 4

57

|    | **CARTER BRYANT, PLAINTIFFS' WITNESS, RESUMED** |
|----|------------------------------------------------|
| 1  |                                                |
| 2  | **CROSS-EXAMINATION (Continued)** |

BY MS. KELLER:

Q    Mr. Bryant, before we broke, we were talking about your
first meeting at MGA towards the end of August 2000 when you
went there to try to pitch your doll idea, okay?

And you said it was your first time ever at MGA and
that Victoria -- Veronica Marlow, Paula Garcia and Veronica
O'Connor were all there; do you remember that?

A    Yes.

Q    Now, Victoria O'Connor was the director of licensing at
MGA, the person responsible for bringing in outside
projects; was that your understanding?

A    I think so, yes.

Q    And your meeting with all of them lasted about 45
minutes?

A    I don't really remember exactly how long.

Q    Okay.  Again, let's take a look at your November 4th
deposition transcript on page 11, line 6 and 7, and see if
that reminds you.

A    Okay.

Q    So about 45 minutes; would that be right?

A    I don't really remember it right now, but yes, I don't
dispute what this says here.

Q    And what this says is it was around 45 minutes?

Case 2:04-cv-09049-DOC-RNB   Document 9772   Filed 02/03/11   Page 58 of 139   Page ID #:293360
CV 04-9049-DOC - 02/01/2011 - Day 10, Vol. 2 of 4

58

1    A    Yes.

2    Q    And you brought with them your Bratz drawing in a

3    portfolio encased in plastic sleeves; is that right?

4    A    Yes.

5    Q    And have you got that up somewhere, just so we can kind

6    of show how it looked when you brought it?  Do you have the

7    actual portfolio up there?  If not, we'll move on.

8    A    No, I don't.

9    Q    Okay.  Now, if we can look at Exhibit 1.  You recognize

10   these drawings of the Bratz, right?

11   A    Yes.

12        MS. KELLER:  And your Honor, I believe these are

13   already in, are they not?

14        THE COURT:  They are, but I'm not certain of the

15   exhibit number on it.

16        MS. KELLER:  Okay.  So we'll just use Exhibit 1,

17   to be on the safe side, and maybe we can consolidate these

18   later.

19        THE COURT:  If not, it's just received again,

20   Counsel.

21        MS. KELLER:  Thank you, your Honor.

22        (Defendants' Exhibit No. 1 is received in

23        evidence.)

24   BY MS. KELLER:

25   Q    These are the drawings that you showed to the people at

Case 2:04-cv-09049-DOC-RNB   Document 9772   Filed 02/03/11   Page 59 of 139   Page ID #:293361
CV 04-9049-DOC - 02/01/2011 - Day 10, Vol. 2 of 4

59

1    MGA?

2    A    Yeah, I only see one drawing right now.

3    Q    Let's put some color on here -- a color one on here,

4    because you showed them color drawings, didn't you?

5    A    Yes.

6    Q    Not black and whites.

7         And can you see it on the screen?

8    A    Yes.

9    Q    It's reflecting a little bit because it's in plastic.

10        All right.  And --

11             MS. KELLER:  No.  Let's look at this.

12             There we go.  Here is one without the plastic so

13   it doesn't reflect.

14   BY MS. KELLER:

15   Q    These are the four characters in their kind of

16   promotional pose?

17   A    Yes.

18   Q    And underneath is the logo that you had your friend and

19   roommate, Elise Cloonan, do, right?

20   A    Yes.

21   Q    And you said she was a Mattel employee, wasn't she?

22   A    Yes.

23   Q    And that was done what, at night at your home?

24   A    I don't remember.

25   Q    Or on a weekend?

1    A    I don't remember exactly.

2    Q    Was it done at Mattel?

3    A    No.

4    Q    And if we could see the -- when you -- when you put the

5    promotional blurb out that was talked about about Bratz, you

6    called them the four best friends from high school.

7         There we go again.

8         Remember that?

9    A    Yes.

10   Q    And the first one was -- okay.  The first one said

11   "Meet Zoe," right?

12             MS. KELLER:  Do we have that?

13             Okay.  Here we go.  I'm brain dead.

14             Okay.  Let's go 1-3, "Meet Zoe."

15   BY MS. KELLER:

16   Q    Was that in the -- that was in the group that you

17   showed them, right?

18   A    Yes.

19   Q    She's the queen of cool at school, and all that?

20   A    Yes.

21             MS. KELLER:  And if we could see 1-4.

22   BY MS. KELLER:

23   Q    This illustrates the idea the transformable hairstyles,

24   right, and this one was for Zoe?

25   A    Yes.

1   Q    And that was a big part of your idea, wasn't it, the

2   transformable hairstyles?

3   A    Yes.

4   Q    Do you know where you came up with that, by the way?

5   A    I don't remember -- I don't remember right now.

6   Q    And if we could look at 1-5, and that's Zoe's nighttime

7   look where she's going to be going out with the rest of the

8   Bratz gang?

9   A    Yes.

10  Q    And if we could see 1-6, this says, "Meet Lupe"?

11  A    Yes.

12  Q    She is the princess of pretty in her casual wear of

13  tank top and wide-leg khakis.

14       And if we look at 1-7, this is the party time look for

15  Lupe.  For party time, change her into a short skirt, braids

16  and silver stompers?

17  A    Yes.

18  Q    And then 1-8 was "Meet Hallidae"?

19  A    Yes.

20  Q    She's got the bead, ultra trendy street wear and braids

21  for hitting the books.

22       All these that we're talking about were in the plastic

23  sleeve that you took to MGA, right?

24  A    I believe so, yes.

25  Q    Let's see 1-9, here is date night for Hallidae in a

1   sassy short dress, platforms and a totally new do.

2       And then 1-10 -- all these ones -- all the 1 dash

3   number afterwards, those were all in the packet that you

4   brought to MBA -- MGA, right?

5   A    I believe so, yes.

6   Q    Okay.  Let's go to 1-10, "Meet Jade.  Jade loves

7   far-out fashion."

8       Now, it was during this meeting that you told the

9   people there that you thought that it would fun to call them

10  the Bratz, right?

11  A    I think so, yes.

12  Q    And you remember opening up your portfolio and letting

13  Ms. Garcia look through the drawings?

14  A    Yes.

15  Q    She was pretty excited, right?

16  A    She seemed pretty excited.

17  Q    And she said words to the effect that this is exactly

18  what I'm looking for or what I've been looking for, rather?

19  A    I don't know if she said that or not.

20  Q    Okay.  Let's look at your November 4th deposition again

21  at page 160, lines 3 to 11, and see if that reminds you.

22  A    Okay.

23  Q    So she said something along the lines of this is

24  exactly what I've been looking for?

25  A    Again, just sitting here right now, I don't really

1    recall it, but I don't dispute the testimony.

2    Q    Okay.  And that's what you testified to in November of

3    1984?  I'm sorry, November of 2004?

4    A    Yes.

5    Q    Now, at the time you had this meeting, you told

6    everybody there that you had come up with this doll idea in

7    1998, right?

8    A    I believe so, yes.

9    Q    And do you want to just confirm that by looking at that

10   same deposition transcript, page 160, lines 8 (sic) through

11   21?

12   A    I'm sorry, what page?

13   Q    Page 160, lines 18 through 21.

14   A    Okay.  Again, I don't remember it right now, but I

15   don't dispute the former testimony.

16   Q    Okay.  And just so -- because the court reporter has to

17   take all this down, and you and I know what it is but the

18   jurors don't, the prior testimony was that you told

19   everybody -- you told everybody there that you had

20   created -- you had come up with this doll idea in 1998.  Let

21   me just find the exact -- make sure I don't misquote you at

22   all.

23        Okay.  So you told them this was a doll idea you had

24   come up with in 1998; is that right?

25   A    Yes.

1    Q    And could you also take a look at your deposition the

2    next day, November 5th, 2004.  I'm going to ask you to look

3    at page 267 and 268, okay, that would be 267, line 18

4    through 268, line 1.

5         Have you had a chance to read that?

6    A    I'm still reading it.

7    Q    Okay.

8              MR. PRICE:  Your Honor, I object.  He said his

9    memory has been refreshed.

10             THE COURT:  His memory has been refreshed.

11   BY MS. KELLER:

12   Q    So you remember telling Victoria O'Connor and Paula

13   Garcia at the first meeting at the end of August, that you

14   had created the idea back in 1998?

15   A    I'm sorry, what was the question, now?  I'm a little

16   bit confused about what just happened.

17             THE COURT:  Let them reask it.

18             THE WITNESS:  Okay.

19             THE COURT:  Just reask the question.

20   BY MS. KELLER:

21   Q    So you told both Victoria O'Connor and Paula Garcia at

22   that very first MGA meeting around the end of August, that

23   you had created the idea for the Bratz back in 1998, right?

24   A    Yes.

25   Q    Okay.  And you described the Bratz characters to them,

1  told them they were going to be very different from anything

2  that had been done with a fashion doll before, right?

3  A    I believe so, yes.

4  Q    And part of that was because they were going to be

5  disproportionate and have funky outfits that might not make

6  sense to them but were the kind of things kids were wearing

7  then; do you remember that?

8  A    I think so, yes.

9  Q    And you wanted the characters to have a little bit of

10  attitude, right?

11  A    Yes.

12  Q    And now, this first meeting, you didn't bring any dummy

13  doll to that meeting, right?

14  A    No.

15  Q    Just your drawings?

16  A    Yes.

17  Q    And these are the drawings you told everybody you made

18  in 1998, true?

19  A    Yes.

20  Q    And that was when Miss O'Connor and Ms. Garcia asked if

21  you could come back for a second meeting so they could show

22  your drawings to the CEO, Isaac Larian, who owned the

23  company, right?

24  A    Yes.

25  Q    And was it your understanding that Mr. Larian was out

```
 1   of town at the time and so they wanted to wait 'till he
 2   returned for your meeting with him?
 3   A    I believe so, yes.
 4   Q    And you were pretty excited about it, weren't you,
 5   having a chance to actually pitch the concept directly to
 6   the CEO?
 7   A    Yes.
 8   Q    Now, in addition to wanting to create your own doll
 9   line, you really wanted to have some independence, right?
10   A    Yes.
11   Q    And have some artistic freedom?
12   A    Yes.
13   Q    Not just take assignments, do this, do that, but
14   actually come up with your own concepts, true?
15   A    Yes.
16   Q    And not just that, but actually profit from your own
17   work and your own art as opposed to being on a salary,
18   right?
19   A    Yes.
20   Q    So the pitch meeting that you had with Mr. Larian was
21   September 1st, 2000, true?
22   A    Yes.
23   Q    Had you ever met him before then?
24   A    No.
25   Q    Had you ever even seen him before then?
```

1   A    No.

2   Q    Would I be right that you knew that this was the person

3   you really had to convince, you had to sell Mr. Larian

4   himself on the idea?

5   A    I think I knew that, yes.

6   Q    And at the second meeting at MGA, Mr. Larian was there

7   and Victoria O'Connor, who you had met with before, Veronica

8   Marlow, who had kind of suggested that you meet with the MGA

9   people, Paula Garcia, and a little girl named Jasmin Larian,

10  Mr. Larian's daughter, they were all there, right?

11  A    Yes.

12  Q    Jasmin Larian was what, 9 or 10 or something like that?

13  A    I -- I don't remember.

14  Q    Now, at the September meeting, the subject of when you

15  created the drawings came up again, right?

16  A    I -- I don't remember.

17  Q    Okay.  Let's see if you can be reminded by taking a

18  look at your deposition from November 5th, 2004, page 268,

19  lines 2 through 4.

20       Actually, look all the way back to -- down to line 10.

21  A    Okay.

22  Q    So the subject of when you created it came up again,

23  right?

24  A    Yes.

25  Q    And Mr. Larian asked you when you had created this

1   idea; am I right?

2   A    Yes.

3   Q    So -- so just to clarify, then, at both the August and

4   the September meetings, you were asked when you came up with

5   the Bratz idea, and both times you told them 1998, right?

6   A    Yes.

7   Q    Now, at this meeting, because this was a bigger

8   opportunity for you with the CEO there, you didn't bring

9   just sketches, you brought something else, right?

10  A    Yes.

11  Q    That was the dummy doll that we heard about?

12  A    Yes.

13  Q    And why -- why in particular did you think you had to

14  bring a mockup?

15  A    I don't remember exactly what I thought, but I think --

16  I think I just kind of felt that maybe some sort of like

17  three-dimensional representation would maybe give a better

18  idea.

19  Q    Kind of show the disproportionate nature of what you

20  planned?

21  A    Yes.

22  Q    Now, Mr. Price asked you whether you were trying to

23  build a Frankenstein when you made the dummy doll, remember

24  that?

25  A    Yes.

1    Q    But the fact of the matter is, the dummy you created to

2    help sell the idea was badly pulled together, kind of

3    crudely pieced together, right?

4    A    Yes.

5    Q    And the doll that you brought was over a foot tall,

6    right?

7    A    I believe so, yes.

8    Q    And the Bratz dolls are smaller than that, aren't they,

9    about 9 inches?

10   A    Yes.

11   Q    And it wasn't so much that you wanted to show

12   Mr. Larian this is going to be the completed doll, but you

13   wanted to show him that this didn't have the traditional

14   proportions of a typical -- say a Barbie, right?

15   A    Yes.

16   Q    A fashion doll?

17   A    Right.

18   Q    And this particular dummy doll had small body, large

19   feet and a large head?

20   A    Yes.

21   Q    The head came from -- of the dummy came from a bin

22   of -- at Mattel that was in a hallway with a sign over it

23   that said "basura"?

24   A    Yes.

25   Q    And do you know basura is the Spanish word for trash?

1    A    Yes.

2    Q    So you thought it was trash, it was going to be thrown

3    out?

4    A    I believe so, yes.

5    Q    And the rest of the dummy doll was made from a Barbie

6    body and Ken boots that you had at home?

7    A    I think so, yes.

8    Q    And are you absolutely sure whether you brought those

9    from home, I mean, today, looking back on it, are you

10   absolutely sure, or do you think your memory was better back

11   in 2004?

12   A    Yeah, I -- I don't remember right this minute, but

13   yeah, I'm not sure.

14   Q    Okay.  So back in 2004, you thought that it had been

15   made with spare parts you had at home?  If you could take a

16   look at November 4th, page 165.  And that's lines 1 through

17   3.  And if you look down to 165, just tell me when you

18   finish reading that.

19   A    I'm sorry, which lines, now?

20   Q    164 and 165, there's quite a bit about that.

21   A    Okay.

22   Q    So you used a Barbie body that you had from home, as

23   best as you remember, right?

24   A    Yes.

25   Q    And Ken boots that you had at home, as best you

1   remember?

2   A     Yes.

3   Q     And at trial, did you -- at the trial, did you think --

4   the trial in 2008, did you remember it a little differently

5   and think that maybe you had visited various trash bins at

6   Mattel; do you remember?

7   A     I don't remember.

8   Q     Okay.  Well, at any rate, by trial it had already been

9   close to 10 years since the events, right?

10  A     Yes.

11  Q     And in the meantime, you had given all the depositions

12  that you talked about?

13  A     Yes.

14  Q     And I think you told us before, at the time of that

15  trial, you were also depressed, true?

16  A     Yes.

17  Q     Memory was fading?

18  A     Yes.

19  Q     So wherever you got them, whether you got the parts

20  from Mattel trash bins or you had a couple of the parts at

21  home, bottom line is, you put those together and you decided

22  that they needed to be painted and needed hair, right?

23  A     Yes.

24  Q     So you asked two of your coworkers at Mattel to help

25  you?

1    A    Yes.

2    Q    And who were they?

3    A    Are you talking about the head?

4    Q    Yes.

5    A    Sheila Kyaw and Carmen --

6    Q    Monteagudo?

7    A    Yes.

8    Q    So this was -- okay.  This -- just to get our time

9    frame, this was between the first meeting you had with MGA

10   and the second meeting with MGA, right?

11   A    Yes.

12   Q    Because the first meeting, there was no doll, and

13   second meeting, you brought a doll?

14   A    Yes.

15   Q    So Sheila -- Sheila and Carmen, did you tell them --

16   did you tell them why you wanted them to do it for you?

17   A    I don't remember exactly what I said to them.

18   Q    Do you remember saying it was a personal favor, just a

19   personal favor?

20   A    I think I may have, yes.

21   Q    Okay.  Just take a look at November 4th, page 169,

22   lines 18 to 24.

23   A    Okay.

24   Q    Okay.  You remember that, then, that you just made it

25   clear that it was a personal favor?

1    A    Yes.

2    Q    Now, in your experience, do creative people do things

3    like that for each other, just do each other a favor of that

4    nature?

5    A    (No audible response.)

6    Q    If asked?

7    A    Sure.

8    Q    And you asked Carmen Monteagudo to root the hair in the

9    dummy doll's head?

10   A    Yes.

11   Q    And what does rooting mean again?

12   A    That is where the hair is applied to the head with a

13   rooting machine.

14   Q    They have to poke little holes in the head?

15   A    Yes.

16   Q    And -- okay.  So she did that.  Sheila Kyaw painted the

17   face or you had her paint the dummy's eyes, right?

18   A    Yes.

19   Q    And you didn't tell Carmen Monteagudo that this was for

20   a pitch you were doing, right?

21   A    Not that I remember.

22   Q    And you didn't think it was -- at the time, you really

23   didn't think it was really a big deal, did you?

24   A    I -- I don't remember exactly what I was thinking back

25   then.

1   Q    Okay.  Take a look at your deposition -- I'm sorry,

2   your trial transcript, June 12th, 2008, 2497.

3        Okay, take a look at page 2497, lines 6 through 9.

4   A    Okay.

5   Q    So does that kind of remind you that you didn't think

6   it was that big of a deal?

7   A    Yes.

8   Q    And at the time -- you know, now that this whole

9   litigation has been ongoing all these years, now you know it

10  turned into a big deal, all these things, but at the time

11  when you said, hey, could you root some hair for me, were

12  you thinking that this was something that could lead you to

13  where you are today?

14  A    I don't think so, no.

15  Q    Did you think it was something that was going to get

16  your friend in trouble or sued?

17  A    (No audible response.)

18       MR. PRICE:  Objection, assumes facts not in

19  evidence.

20       THE COURT:  Sustained.

21  BY MS. KELLER:

22  Q    Was it in your mind at the time that you were asking

23  her to do something that in some way was dangerous for her?

24  A    No.

25  Q    Now you realize that she could have been in and was

Case 2:04-cv-09049-DOC-RNB   Document 9772   Filed 02/03/11   Page 75 of 139   Page ID #:293377
CV 04-9049-DOC - 02/01/2011 - Day 10, Vol. 2 of 4

75

```
 1   entangled in some respect in the case, right?

 2   A     (No audible response.)

 3   Q     True?

 4           MR. PRICE:  Objection.  Vague.

 5           MS. KELLER:  Okay, I'll rephrase.

 6   BY MS. KELLER:

 7   Q     Your various friends who helped you, they've all been

 8   deposed or had to testify in some way, right?

 9           MR. PRICE:  Objection.  Irrelevant I think subject

10   to the motion, discovery.

11           THE COURT:  It partially is, but it goes to state

12   of mind.

13           You can -- you can answer that question.

14           THE WITNESS:  Okay.  I had forgotten it now.

15   BY MS. KELLER:

16   Q     Let me just simplify it.  Now you know that it could

17   have caused problems for them to help you, right?

18   A     Yes.

19   Q     At the time, though, you didn't think that it was

20   anything that was going to cause anybody problems, did you?

21   A     No.

22   Q     You've been asked by Mr. Price all about your contract

23   and the inventions agreement and all that.  Was that in your

24   mind at the time, or were you just excited that you were

25   going to make this pitch and they could help you?
```

Case 2:04-cv-09049-DOC-RNB   Document 9772   Filed 02/03/11   Page 76 of 139   Page ID #:293378
CV 04-9049-DOC – 02/01/2011 – Day 10, Vol. 2 of 4

76

1    A    Yes, I was just excited about making the pitch.

2    Q    And you've been asked about -- all these questions

3    about betrayal of trust of your coworkers.  At the time,

4    were you thinking, if I ask them to help me, I'm betraying

5    their trust in me as their friend, but I'm going to do so

6    anyway?

7    A    I don't think so at the time, no.

8    Q    Now, you didn't tell them exactly what the project was

9    about because you wanted to keep it a secret, right, or

10   not -- you know, confidential, you didn't want to be telling

11   everybody what you were going to be working on for some

12   other company, true?

13   A    I don't remember exactly what I was thinking about.

14   Q    Well, you didn't have a deal yet, with MGA, true?

15   A    That's true.

16   Q    And if you didn't pitch your idea and sell it to MGA,

17   you were going to have to go look for someone else to sell

18   it to, pitch it to, right?

19   A    Yes.

20   Q    And you didn't think you were doing anything wrong,

21   true?

22   A    (No audible response.)

23        MR. PRICE:  Object.  Ambiguous as to --

24        THE COURT:  Overruled.

25        THE WITNESS:  No.

Case 2:04-cv-09049-DOC-RNB   Document 9772   Filed 02/03/11   Page 77 of 139   Page ID #:293379
CV 04-9049-DOC - 02/01/2011 - Day 10, Vol. 2 of 4

77

1    BY MS. KELLER:

2    Q    You just thought that you didn't exactly want your idea

3    all over the place because this was your idea and you wanted

4    to see if you could pitch it and make some money with it,

5    right?

6    A    I think so, yes.

7    Q    And same thing with Miss Kyaw who did the painting for

8    you, you didn't think it was a huge deal to ask her to help

9    out with a little painting on that face, right?

10   A    I don't remember exactly what I thought about that.

11   Q    Now, you did tell them it was an independent project

12   for you, not a project for Mattel, true?

13   A    I think so, yes.

14   Q    And so even though they were being asked to paint faces

15   and root hair on a doll and that's -- that's part of

16   Mattel's business, right?

17   A    Yes.

18   Q    But did either of them say to you, I can't do that for

19   you, Carter, because, you know, hey, I've got this contract

20   with Mattel, and there is this inventions agreement and I'm

21   precluded on working on anything that doesn't belong to

22   Mattel, did either one of them say that to you?

23   A    I don't recall anybody saying that to me.

24   Q    And they were Mattel employees, too, true?

25   A    Yes.

1    Q    And you don't think they were trying to do anything

2    underhanded or shady, right?  They were just trying to help

3    you?

4    A    Yes, exactly.

5    Q    Had they asked you to draw a little sketch for them for

6    a project they were working on for themselves, would you

7    have done it?

8    A    (No audible response.)

9              MR. PRICE:  Objection.  Irrelevant.

10             MS. KELLER:  It goes to state of mind, your Honor.

11             THE COURT:  Overruled.

12             You can answer the question.

13             THE WITNESS:  Probably, yes.

14   BY MS. KELLER:

15   Q    It wasn't that uncommon for people to help each other

16   out, right?

17             MR. PRICE:  Objection.  Vague.

18             THE COURT:  Well, as to what portion?

19   BY MS. KELLER:

20   Q    It wasn't that uncommon for creative types who worked

21   in the industry you worked in to help each other out once in

22   a while on something relating to a doll, true?

23             THE COURT:  Is this -- the reason it's ambiguous

24   is relating to a doll that employees are working at at

25   Mattel or outside of the employment.

```
 1              MS. KELLER:  I understand.

 2              THE COURT:  Okay.  So just clarify that.

 3              MS. KELLER:  Okay.

 4   BY MS. KELLER:

 5   Q   Well, I'll go back to my question, then.  Nobody --

 6   neither of them said to you, well, since this isn't Mattel

 7   business and this looks like a doll, I can't do any work on

 8   it, right?

 9   A   No, not that I remember.

10   Q   Now, you didn't really think that MGA was even a

11   competition for Mattel when it came to the Bratz, true?

12   A   I -- I don't recall thinking they were competition.  I

13   really didn't know much about MGA.

14   Q   Let me back up a second, then.  You didn't think Mattel

15   would ever be willing to do a Bratz type doll, right?

16              MR. PRICE:  Objection.  Irrelevant.

17              MS. KELLER:  Again, it goes to his state of mind

18   as to whether this is a competitor.

19              THE COURT:  Overruled.

20              You can answer that question.

21              THE WITNESS:  No, I didn't think Mattel would want

22   to do that kind of a doll.

23   BY MS. KELLER:

24   Q   And why not?

25   A   Well, their -- their brand was Barbie, and I just
```

 1   didn't think that they'd be interested in something so

 2   extremely different.

 3   Q    Okay.  And Bratz was kind of the anti-Barbie, right?

 4              MR. PRICE:  Objection.  Argumentative.

 5              THE COURT:  Sustained.

 6   BY MS. KELLER:

 7   Q    Was Bratz very different from Barbie in attitude, looks

 8   and the personality you were trying to infuse the dolls

 9   with?

10   A    Yes.

11   Q    Now, when you talked to Carmen Monteagudo, the hair

12   rooter, about rooting some hair on the dummy, you were

13   actually talking to her in her cubicle at the Mattel design

14   center, right?

15   A    Yes.

16   Q    And you weren't -- you weren't fearful that someone

17   would overhear and say, oh, my gosh, Carter is working on

18   some project that's not for Mattel, right?

19   A    I don't remember.

20   Q    You actually showed Sheila Kyaw, the face painter, one

21   of your Bratz drawings that you drew in 1998 so she could do

22   the face painting, right?

23   A    Yes.

24   Q    And she was also a Mattel employee, right?

25   A    Yes.

1   Q    And you actually gave her a copy of one of your

2   drawings so she could paint the face on the doll from the

3   drawing?

4   A    (No audible response.)

5   Q    Get an idea of where you were going?

6   A    I believe so, yes.

7   Q    And you asked her to paint the face on the head and

8   kind of follow the drawing you did, right?

9   A    Yes.

10  Q    And you think you were actually in Miss Kyaw's cubicle

11  in the Mattel design center when you showed her the Bratz

12  drawing?

13  A    I -- I believe so, yes.

14  Q    Now, we've heard that the Mattel design center has

15  very, very tight security; would you agree with that?

16  A    Yes.

17  Q    Armed guards, cameras in the front, right?

18  A    I don't know about the armed guards, but I think they

19  have cameras.

20  Q    Okay.  It's clear that Mattel wants to keep its own

21  trade secrets and proprietary information confidential,

22  that's pretty clear from the way the security is set up,

23  isn't it?

24  A    Yes.

25  Q    And -- but yet you were -- you were asking both

1  Miss Kyaw and Miss Monteagudo in their cubicles in the

2  design center to paint this face of the dummy and root this

3  hair, right?

4  A    Yes.

5  Q    And again, you didn't think there was anything wrong

6  with it or worry about being caught, right?

7  A    No, not that I remember.

8  Q    Am I correct in that?

9  A    Yes.

10  Q    And is the reason, Mr. Bryant, that you felt you owned

11  these drawings that you had done in 1998?

12  A    I'm sorry, what was the question?

13         MR. PRICE:  I object.  The question assumes facts

14  not in evidence.

15         THE COURT:  I'm sorry, I didn't --

16         MR. PRICE:  I object.  The question assumes facts

17  not in evidence.

18         THE COURT:  Well, this is his own personal mind

19  set, apparently.  The issue is going to be really, amongst

20  many issues, when these drawings were actually drawn, and

21  the question assumes a fact, but I'll allow the question

22  because this is his belief.

23         So Counsel, overruled.

24         MS. KELLER:  Thank you, your Honor.

25

1    BY MS. KELLER:

2    Q    I bet you forgot my question, haven't you?

3    A    I have.

4    Q    You weren't worried about getting, quote, "caught,"

5    unquote, or getting in trouble being in the Mattel design

6    center with your drawings because you believed you owned

7    those drawings, right?

8    A    Yes.

9    Q    And you believed -- you weren't worried because you

10   had -- you felt you had done them in 1998 and they belonged

11   to you, right?

12   A    Yes.

13   Q    Now, you actually paid Miss Kyaw yourself, I think

14   counsel has gone into that before, right?

15           MS. KELLER:  I'm sorry, your Honor?

16           THE COURT:  Oh, please.

17           Would you excuse us for just a moment.  This will

18   be the first -- no, no.  You don't have to leave.  We'll

19   leave for just a moment.

20           Can I speak to both counsel for a moment?

21           Mr. Price?

22           *(The following proceeding is taken outside*

23       *the presence of the jury and is sealed.)*

24           **\* \* <u>SEALED PROCEEDINGS FOLLOW</u> \* \***

25           *(Written Court approval required to view.)*











Case 2:04-cv-09049-DOC-RNB   Document 9772   Filed 02/03/11   Page 89 of 139   Page ID #:293391
CV 04-9049-DOC - 02/01/2011 - Day 10, Vol. 2 of 4

89

```
 1              SANTA ANA, CALIFORNIA, TUESDAY, FEBRUARY 1, 2011

 2                     DAY 10, VOLUME 2 OF 4

 3                        (3:01 p.m.)

 4           * * OPEN COURT PROCEEDINGS RESUMED * *

 5           (The following proceedings is taken in the

 6       presence of the jury.)

 7           THE COURT:  Counsel, we are back in session.

 8  Thank you.

 9           This is Ms. Keller on behalf of MGA and

10  Mr. Larian.

11           MS. KELLER:  Thank you.

12         CARTER BRYANT, PLAINTIFFS' WITNESS, RESUMED

13               CROSS-EXAMINATION (Continued)

14  BY MS. KELLER:

15  Q   Mr. Bryant, it was brought up by Mr. Price in his

16  examination of you that you didn't pay Sheila Kyaw in cash

17  but with a check; do you remember that?

18           MR. PRICE:  Objection.  That assumes facts not in

19  evidence.

20           THE COURT:  No.  Overruled.

21           You may answer that question.

22           THE WITNESS:  I do remember that, yes.

23  BY MS. KELLER:

24  Q   Okay.  And Exhibit 1310 is actually a copy of that

25  check.  I believe that's in evidence.
```

1       Do you recognize -- do you recognize 1310?

2   A   Yes.

3   Q   And that's a copy of the check that you wrote to

4   Ms. Kyaw, right?

5   A   Yes.

6   Q   And she was the person who did the face painting for

7   you on the dummy doll, right?

8   A   Yes.

9   Q   And the date of that check is August 25th, 2000?

10  A   Yes.

11  Q   It's $150?

12  A   Yes.

13  Q   And this check is written on your Mattel federal credit

14  union bank account, right?

15  A   Yes.

16          MS. KELLER:  Your Honor, I'd ask that that be

17  admitted, 1310.

18          THE COURT:  Received.

19          *(Defendants' Exhibit No. 1310 is received in*

20      *evidence.)*

21          MS. KELLER:  And if we can take a look at it.

22  BY MS. KELLER:

23  Q   Now, why is it that you wrote this check to Ms. Kyaw

24  rather than giving her cash under the table?

25  A   I don't really remember why I did that.

```
1    Q    Were you worried that if you wrote her a check there
2    would be a paper trail?
3    A    I don't recall, no.
4    Q    Did you think you were doing anything wrong?
5    A    No.
6    Q    Now, the coming up with the dummy doll for the pitch to
7    Mr. Larian, that was completely your own idea, true?
8    A    Yes.
9    Q    Nobody at MGA asked you to come up with a dummy doll,
10   right?
11   A    No.
12   Q    And nobody at MGA asked you to get some parts at a
13   trash bin at Mattel and put something together, true?
14   A    I guess that's true.
15   Q    And you didn't tell people at MGA in advance, even,
16   that you were bringing a doll, did you?
17   A    I don't think so, no.
18   Q    So would I be right that the first time anybody at MGA
19   ever knew you were bringing a dummy doll was when you
20   actually did bring it?
21   A    I believe so, yes.
22   Q    Now, what happened to the dummy doll after the
23   September 1st meeting?
24   A    I don't remember exactly.  I think it was just kind of
25   thrown out or --
```

 1    Q    Well, let's just take a look, just to be sure, at your

 2    transcript from the trial on June 18th, 2008, and I'm going

 3    to ask you to look at page 3,023, lines 8 through 10.

 4              THE COURT:  Did you say after the first meeting,

 5    which would be the September -- allegedly the September

 6    meeting?

 7              MS. KELLER:  (No audible response.)

 8              THE COURT:  Okay.

 9              MS. KELLER:  The first meeting was in August.

10              THE COURT:  Allegedly August with Mr. Larian not

11    present.  The second meeting is allegedly September 1st with

12    Mr. Larian allegedly present, so I want to make sure when we

13    say first meeting and second meeting, that the jury has a

14    clear indication.

15              MS. KELLER:  Yes.

16    BY MS. KELLER:

17    Q    So between that first meeting where Mr. Larian was not

18    present and the second meeting where he was going to attend,

19    that's when the dummy doll was created, right?

20    A    I'm sorry, I was reading while you were talking.

21    Sorry.

22    Q    I know, I'm just kind of retreading things a little bit

23    here, but just to set the time frame, it was between the

24    first meeting in August where Mr. Larian was not there, and

25    the second pitch meeting where Mr. Larian was going to be

1   present, that's when you made the dummy doll, right?

2   A    Yes.

3   Q    Okay.  Now, take a look at transcript page 3023.

4   A    Okay.

5   Q    And take a look at lines 8 through 17 -- actually, take

6   a look all the way to the end of the page and on to line 1

7   of the next page.

8   A    Okay.

9   Q    Okay.  So what happened to the doll?

10  A    It was just thrown out.

11  Q    And why was the doll thrown out?

12  A    We didn't -- we didn't need it.

13  Q    No more use for it?

14  A    No.

15  Q    And that's because you had already made your sale,

16  right?

17  A    (No audible response.)

18  Q    In other words, you had already sold Mr. Larian on the

19  concept, so you didn't need the dummy doll anymore?

20  A    Yes.

21  Q    Okay.  Now, in the two week period of time before the

22  August meeting and the September 1st meeting, you did some

23  evening-wear dresses for the Bratz concept, which Mr. Price

24  has referred to; do you remember that?

25  A    Yes.

Case 2:04-cv-09049-DOC-RNB   Document 9772   Filed 02/03/11   Page 94 of 139   Page ID #:293396
CV 04-9049-DOC - 02/01/2011 - Day 10, Vol. 2 of 4

94

```
 1   Q    And Exhibit 302B, if you could take a look at that.

 2        Can you see that?

 3   A    (No audible response.)

 4   Q    Let's look at 302B-12.

 5   A    I'm not finding the document here.

 6        302 what, now?

 7        Oh, page 12.

 8   Q    Okay.  Do you recognize that?

 9   A    Yes.

10   Q    And what is that?

11   A    That was the drawing that I did of one of the

12   characters in the evening fashion.

13             MS. KELLER:  And your Honor, I ask that 302B,

14   page 13 -- or I'm sorry, page 12 be admitted.

15             THE COURT:  Received.

16             (Defendants' Exhibit No. 302B-12 is received

17        in evidence.)

18   BY MS. KELLER:

19   Q    And before we go on, that was Zoe in evening wear?

20   A    I believe so, yes.

21   Q    Okay.  Now take a look at 302B, page 13, and tell me if

22   you recognize it.

23   A    Yes.

24             MS. KELLER:  I ask that that be admitted, your

25   Honor.
```

```
 1              THE COURT:  Received.

 2              (Defendants' Exhibit No. 302B-13 is received

 3         in evidence.)

 4    BY MS. KELLER:

 5    Q    And let's go to 302B-14.  Do you recognize that?

 6    A    Yes.

 7              MS. KELLER:  And I ask that that be admitted, your

 8    Honor.

 9              THE COURT:  Received.

10              (Defendants' Exhibit No. 302B-14 is received

11         in evidence.)

12    BY MS. KELLER:

13    Q    And that's Hallidae in evening wear?

14    A    Yes.

15    Q    And 302B-15, that's something you also recognize?

16    A    Yes.

17              MS. KELLER:  And your Honor, I'd ask that that be

18    admitted.

19              THE COURT:  Received.

20              (Defendants' Exhibit No. 302B-15 is received

21         in evidence.)

22    BY MS. KELLER:

23    Q    Is that Jade in evening wear?

24    A    Yes.

25    Q    Now, nobody at MGA had told you before that second
```

1    meeting that they wanted to see the Bratz dolls in evening

2    wear, right?

3    A    No.

4    Q    Am I correct in that?

5    A    Yes, you are correct.

6    Q    The idea that you created in 1998 was for

7    high-school-age dolls?

8    A    Yes.

9    Q    Wearing trendy, fashion-forward, kind of funky clothes?

10   A    Yes.

11   Q    Were any -- did any of them feature beauty queens or

12   dolls in formal gowns?

13   A    No.

14   Q    So can you tell us why you came up with the

15   evening-wear fashions for the Bratz concept before you met

16   with Mr. Larian on September 1st?

17   A    I don't really remember right now.

18   Q    Was it something that you just thought would help you

19   pitch the idea?

20   A    It might have been.

21   Q    Now, when MGA released the dolls in 2001, the Bratz

22   dolls, they never used those evening-wear designs; am I

23   right about that?

24   A    Not to my knowledge.

25   Q    Okay.  So the evening-wear designs were just produced

1   by you in that two-week period to try to help you make the

2   sale, then, true?

3   A    I think so, yes.

4   Q    Now, Mr. Price also showed you -- I want to turn a

5   little bit to the issue of doll hair.

6        Mr. Price showed you Exhibit 30, which was a letter you

7   wrote to Kinuyo Shichijyo of the Universal Commerce

8   Corporation dated September 18, 2000; do you remember that?

9   A    Yes.

10  Q    Now, Mr. Quinn asked you, "Wasn't it true that you

11  introduced MGA to Universal?"  And you said "Yes"; do you

12  remember that?

13  A    Yes.

14  Q    Now, you contacted Universal entirely on your own,

15  didn't you?

16  A    I believe so, yes.

17  Q    And you said, "The company I'm working with is called

18  MGA Entertainment, and we are located in Los Angeles,

19  California"; is that in the letter?

20  A    Yes.

21  Q    Did you want to be taken seriously by Universal when

22  you made your request?

23  A    I don't remember exactly what my thoughts were on that.

24  Q    Well, at any rate, you did contact Universal on your

25  own without telling MGA you were going to do it, right?

```
1    A    Yes.

2    Q    And can you look at this letter and tell me if MGA is

3    cc'd on it anywhere?

4    A    No.

5    Q    Now, do you now know that Universal Commerce

6    Corporation is not even a hair vendor, it's an agent for a

7    hair vendor, Asahi?

8    A    I did not know that, no.

9    Q    Did you know that MGA factories had used Asahi for

10   years and dealt with them directly?

11         MR. PRICE:  Objection.  It assumes facts not in

12   evidence and lack of foundation.

13         MS. KELLER:  I'm asking if he knew, your Honor.

14         THE COURT:  You can answer the question, if you

15   know.

16         THE WITNESS:  No, I did not know that.

17   BY MS. KELLER:

18   Q    Did you become aware that MGA factories in China had

19   contracted with that hair maker in the past before your

20   idea?

21         MR. PRICE:  Objection.  It assumes facts.

22         THE COURT:  Yeah, the -- I'll let the questions be

23   asked to find out what the witness knows, but the questions

24   are not evidence.  You are not to assume that, in fact, this

25   is true.  Now, if the witness knows, he can tell us.
```

```
 1              THE WITNESS:  Can you ask the question again?
 2    BY MS. KELLER:
 3    Q    Yeah.  Did you later find out that MGA had actually
 4    used that hair maker, Asahi, for years?
 5    A    No, I did not know that.
 6    Q    Were you involved at all in MGA's dealings with
 7    procuring hair for the Bratz dolls?
 8    A    No.
 9    Q    So you don't know one way or the other?
10    A    No.
11    Q    So when you said you introduced MGA to Universal, you
12    don't know whether you did or not, right, because you don't
13    know if they had already been using the company for which
14    Universal was an agent?  You really don't know, true?
15    A    That's true.
16    Q    Even today?
17    A    That's true.
18    Q    Now, do you understand -- is it your understanding that
19    there really are only about three doll hair-makers in the
20    world?
21    A    I have no idea about that.
22    Q    Still don't?
23    A    No.
24    Q    Now, you say in your letter, "You can e-mail with any
25    questions at Sophiesays@hotmail.com"; do you see that?
```

Case 2:04-cv-09049-DOC-RNB   Document 9772   Filed 02/03/11   Page 100 of 139   Page ID #:293402
CV 04-9049-DOC - 02/01/2011 - Day 10, Vol. 2 of 4

100

1    A     Yes.

2    Q     That's not an MGA e-mail account, is it?

3    A     No.

4    Q     That's your personal account?

5    A     Yes.

6    Q     And by the way, Sophie is actually -- was your dog?

7    A     Yes.

8    Q     Is Sophie still with us?

9    A     No.

10   Q     I'm sorry.

11         So "Sophiesays," any particular reason that you came up

12   with that e-mail address?

13   A     She was my basset hound, and she was pretty barky and

14   bossy.

15   Q     So she got her way?

16   A     She got her way.

17         (Laughter.)

18   BY MS. KELLER:

19   Q     Okay.  And in 1998, while you were in Missouri, you

20   actually set up a d.b.a., a doing business as "Sophie Says,"

21   right?

22   A     I don't remember if I did or not.

23   Q     Do you remember freelancing, trying to get into the

24   greeting card business?

25   A     Yes.

1    Q    Okay.  And the name you came up with for that was

2    "Sophie Says"?

3    A    I think so, yes.

4    Q    Now, you also wrote in this same letter that's up here,

5    "Please send the sample cards along with price information

6    to the following address:  MGA Entertainment, Attention:

7    Carter Bryant, 1319 West 160th Street, Gardena, California

8    90247, U.S.A."

9         Now, that was your personal home address?

10   A    Yes.

11   Q    Not MGA's address?

12   A    No.

13   Q    If we can go back to the hair issue, again.

14        Did you know that MGA actually used a different type of

15   hair than the hair you were requesting from Universal?  They

16   actually used a different kind of hair, Filo and PP for the

17   Bratz dolls in 2001, PP Italian?

18   A    No, I did not know that.

19   Q    Now, the address that you used here, nobody at MGA

20   authorized you to use that address because you hadn't signed

21   a deal with MGA yet, right?

22   A    That's right.

23        MR. PRICE:  Objection.  Compound.

24        MS. KELLER:  All right.  I'll break it down.

25

Case 2:04-cv-09049-DOC-RNB   Document 9772   Filed 02/03/11   Page 102 of 139   Page ID #:293404
CV 04-9049-DOC – 02/01/2011 – Day 10, Vol. 2 of 4

102

```
 1   BY MS. KELLER:

 2   Q    Nobody at MGA authorized you to use the address that we

 3   see on this exhibit, correct?

 4   A    That's correct.

 5   Q    And nobody authorized you to use your home address as

 6   an address for MGA, true?

 7   A    That's true.

 8   Q    And Isaac Larian didn't ask you to write to have

 9   samples of saran hair sent to you under the name of MGA

10   Entertainment at your home address, right?

11   A    That's right.

12   Q    In fact, nobody at MGA asked for that, right?

13   A    That's right.

14   Q    And your phone number is in here, (310) 538-3615?

15   A    Oh, yes.

16   Q    And that was your personal phone number, not MGA's?

17   A    I believe so, yes.

18   Q    And again, nobody at MGA authorized this either,

19   correct?

20   A    That's correct.

21   Q    Now, the second page of Exhibit 30 shows that you faxed

22   this letter, right?

23   A    Yes.

24   Q    And if you can now look at the third page,

25   Exhibit 30-3; do you see that?
```

1   A     Yes.

2   Q     This is an e-mail from Mr. Shichijyo to you at

3   Sophiesays@hotmail.com?

4   A     Yes.

5   Q     And no cc's on this either, right?

6   A     No.

7   Q     Now, let's look at the fourth page, 30-4.  This is

8   Mr. Shichijyo faxing you a letter on September 21st, 2000;

9   again, no cc to MGA, right?

10  A     No.

11  Q     And Mr. Shichijyo writes to you, "Thank you very much

12  for your call this morning.  As per telephone

13  conversation" –– or "tel conversation, I learned that you

14  are going to make dolls in Hong Kong.  We have a

15  representative in HK, and they have curling facility in

16  China.  If your vendor in Hong Kong does not have curling

17  facility, we will supply curl hair to your HK vendor through

18  our representative"; do you see that?

19  A     Yes.

20  Q     But you later came to know that MGA doesn't manufacture

21  dolls in Hong Kong but in mainland China, right?

22  A     Yes.

23  Q     So that was just a detail you were off on?

24  A     Yes.

25  Q     So as of September 21st, 2000, you didn't know that MGA

Case 2:04-cv-09049-DOC-RNB   Document 9772   Filed 02/03/11   Page 104 of 139   Page ID #:293406
CV 04-9049-DOC - 02/01/2011 - Day 10, Vol. 2 of 4

104

1    manufactured its dolls in mainland China yet, right?

2    A    No.

3    Q    Okay.  Again, am I correct in that?

4    A    Yes, you are correct.

5    Q    Now, again, on that communication, as well as the other

6    two that are part of this exhibit, you were not working with

7    MGA's authorization or knowledge, right?

8              MR. PRICE:  Objection.  Vague as to time and

9    knowledge.

10             THE COURT:  Is this the date of the September 18th

11   through September 21st, because those are the two

12   references?

13             MS. KELLER:  Yes, as of September 21st --

14             THE COURT:  No.  Let's find out what the answer to

15   the question is.  I want to make sure of the dates.  The

16   18th through the 21st, or is there a different time?

17             MS. KELLER:  No.  I was specifically saying --

18   BY MS. KELLER:

19   Q    Let's say as late as September 21st, 2000, you were not

20   working with MGA's authorization or knowledge, right?

21   A    That's correct.

22   Q    And you, yourself, did not know what MGA would do if it

23   did try to proceed with working with you on your 1998 idea,

24   right?

25   A    I'm sorry, I don't think I understand your question.

1    Q    You weren't exactly sure what steps MGA would take

2    next, if it decided to work with you on your idea?

3    A    I don't remember.

4    Q    Okay.  This -- this -- this period that we're talking

5    about in September, your goal throughout that entire time

6    frame was make the pitch, get MGA to buy the idea, right?

7    A    Something like that, yeah.

8    Q    Now, let's look at Exhibit 11905, and this is something

9    Mr. Price had also shown you.

10        Okay.  This is an air bill from Airborne Express from

11   United Commerce Corporation -- that's the entity we were

12   just talking about -- and it's addressed to MGA

13   Entertainment, but it's your home address, right?

14   A    Yes.

15   Q    Same one we just talked about?

16   A    Yes.

17   Q    It's got your name on it, right?

18   A    Yes.

19   Q    Now, let's also look at Exhibit 11904, page 1; do you

20   see that?

21   A    Yes.

22   Q    And this is an invoice from Universal Commerce

23   Corporation, right?

24   A    Yes.

25   Q    And in handwriting to the left, and just above the

1    invoice, it says, "Attention:  Carter Bryant"; do you see
2    that?
3    A    Yes.
4    Q    And just below it's got -- it's got MGA Entertainment,
5    but it's got your address?
6    A    Yes.
7    Q    And right below this, it says it shipped October 6th,
8    2000?
9    A    Yes.
10   Q    Now, this is after you signed your consulting agreement
11   with MGA on October 4th, correct?
12   A    Yes.
13   Q    And you remember when Mr. Price showed you this, he
14   asked you whether you paid the invoice; do you remember that
15   question?
16   A    Yes.
17   Q    And you said you didn't recall, right?
18   A    Right.
19   Q    But let's look at the part of the document that you
20   were not shown.  Let's look at the bottom of the document,
21   and this says, "free samples for evaluation purpose"?
22   A    Yes.
23   Q    So the fact that you didn't pay that bill doesn't mean
24   that MGA paid it, does it?
25   A    No.

1    Q    It was free, right?

2    A    According to this, yes.

3    Q    Now, when you contacted Universal, you were trying to

4    get a toy company again?  It was -- it was in the pursuit of

5    this idea that you had of getting a toy company, MGA or

6    somebody else, to buy your idea, right?

7    A    Yes.

8    Q    And you were looking into how and whether you could get

9    hair for the dolls that you hoped to create, true?

10   A    Yes.

11   Q    And so if the contract negotiations with MGA fell

12   through, you'd at least have -- you'd be a little further

13   down the road in terms of being able to take your pitch to

14   some other toy company, right?

15   A    I don't really remember thinking that, one way or

16   another.

17   Q    Okay.  Well, at any rate, the things that you did in

18   here, in between the first meeting and the second, where you

19   tried to -- tried to get your pitch prepared, you were

20   assisting not MGA but you, right?

21            MR. PRICE:  I object.  Vague as to time.

22            MS. KELLER:  I'll clarify it.

23   BY MS. KELLER:

24   Q    Between the first meeting in August and the second

25   meeting, you wanted to make a strong pitch to Mr. Larian,

 1   right?

 2   A    Yes.

 3   Q    And between the meeting with Mr. Larian and when you

 4   ultimately signed the contract in October, you were also

 5   trying to kind of develop your idea a little more, right?

 6   A    Yes.

 7   Q    And if you didn't manage to sell MGA on it, you were

 8   hoping you could sell it to someone, true?

 9   A    Yes.

10   Q    So when you sent away for this hair sample, you weren't

11   assisting MGA, you were assisting yourself in pursuit of

12   your idea, right?

13   A    You could say that, yes.

14   Q    There wasn't any contract with MGA yet, correct?

15   A    That's correct.

16   Q    Now, the pitch was a successful pitch, as we all know,

17   right?

18   A    Yes.

19   Q    Do you remember -- do you remember Mr. Larian's little

20   girl, Jasmin, being present at the meeting with Mr. Larian

21   where you made your presentation?

22   A    Yes.

23   Q    And what do you remember about her?

24   A    I think she was fairly young, dark hair, cute.

25   Q    Was she excited about your drawings?

Case 2:04-cv-09049-DOC-RNB   Document 9772   Filed 02/03/11   Page 109 of 139   Page ID #:293411
CV 04-9049-DOC - 02/01/2011 - Day 10, Vol. 2 of 4

109

1    A    Yeah, she was.

2    Q    And is it your understanding that Mr. Larian decided to

3    give your concept a try after seeing how excited his

4    daughter became?

5              MR. PRICE:  Objection.  Lack of foundation.

6              THE COURT:  Overruled.

7              You can answer the question.

8              THE WITNESS:  I think I remember him being

9    influenced by her excitement.

10   BY MS. KELLER:

11   Q    Okay.  Now, let's talk --

12             THE COURT:  Let me reverse that.  I think that's

13   the wrong ruling on my part.

14             I think the jury needs to hear more specific

15   information about what he recalls, if anything.  I'm going

16   to sustain your objection, Counsel.  I'm going to ask you to

17   strike the last question and answer.  You can reask it,

18   though.  It's a proper field.  Well, what does he recall?

19             MS. KELLER:  Okay.

20   BY MS. KELLER:

21   Q    In addition to what you've already told us, that

22   Jasmin Larian seemed excited --

23             THE COURT:  Well, I've stricken that, Counsel.

24             MS. KELLER:  Oh.

25             THE COURT:  I'm going to let you go back through

1    that whole area again.

2              MS. KELLER:  Okay.

3    BY MS. KELLER:

4    Q    What do you remember about Jasmin Larian at that

5    meeting?

6    A    Well, again, just that she was young and kind of cute

7    and bubbly, and she seemed pretty excited about the

8    drawings.

9              THE COURT:  My apologies, Counsel.  Please.

10   BY MS. KELLER:

11   Q    And do you remember -- was it your understanding that

12   her dad was affected by that in terms of buying your pitch?

13             MR. PRICE:  Same objection.  Calls for

14   speculation.

15             THE COURT:  Yeah, I'm going to sustain the

16   objection.  It's pretty vague, pretty general.  Let's find

17   out what he recalls.

18   BY MS. KELLER:

19   Q    What did Mr. Larian say in response to seeing his

20   daughter's excitement, if anything?

21   A    I don't remember him saying anything specifically.

22   Q    Do you remember him telling you that he wanted to buy

23   the idea at that point, buy the concept?

24   A    I don't remember exactly when he told me that.

25   Q    Okay.  Let's move on to a new area.

```
 1        I want to talk with you about your obtaining an

 2   attorney to work with you in your dealings with MGA, okay?

 3        Now, what was the name of the attorney that you

 4   retained for that?

 5   A    I think her name was Anne -- Anne Hwang.

 6   Q    Okay.  And before you ever met with anybody from MGA,

 7   you already had consulted with her, right?

 8   A    I don't remember.

 9   Q    If you could take a look at your deposition transcript,

10   November 4th, 2004, page 41 -- we'll see if that helps you

11   remember -- page 41, lines 2 through 4.

12   A    Okay.

13   Q    So does that jog your memory that you hired her even

14   before you showed your Bratz idea to MGA in the first

15   meeting?

16   A    Yes.

17   Q    Okay.  So before the first meeting at the end of

18   August, you had already retained attorney Anne Hwang,

19   right?

20   A    I believe so, yes.

21   Q    And why was it that you believed you needed to consult

22   an attorney in that -- you know, for that purpose?

23   A    I don't remember exactly what my thoughts were at the

24   time.

25   Q    Okay.  Would it help you to take another look at your
```

Case 2:04-cv-09049-DOC-RNB   Document 9772   Filed 02/03/11   Page 112 of 139   Page ID #:293414
CV 04-9049-DOC - 02/01/2011 - Day 10, Vol. 2 of 4

112

1    deposition, page 40, lines 4 through 10?

2    A    Okay.

3    Q    And does that refresh your memory about why you

4    consulted her?

5    A    Yes.

6    Q    And what was the reason?

7    A    Basically just to see if there was anything extra I

8    needed to do to protect myself.

9    Q    Okay.  Did you suspect that there might be some

10   contracts involved that an attorney might need to review?

11   A    I think so, yes.

12   Q    And did you -- did you have some concern that MGA -- if

13   you didn't get an agreement with MGA, that MGA might just

14   kind of take your idea and use it?

15   A    I think I may have, yes.

16   Q    Okay.  Take a look at your transcript of November 4th,

17   page 67.

18   A    Okay.

19   Q    And that's 20 -- line 22, through 68, line 2.

20   A    Through line what, now?

21   Q    Through line 2 on page 68.

22   A    Oh, okay.  I'm sorry.

23        Yes, okay.

24   Q    Does that refresh your memory a little bit?

25   A    A little bit, yes.

1   Q    All right.  So one reason for you to get a lawyer was

2   that you were afraid, "Hey, what if I take this idea at MGA

3   and don't have an agreement with them, they might take it

4   and use it," right?

5   A    Right.

6   Q    And you were not a lawyer yourself, needless to say,

7   right?

8   A    No.

9   Q    Never want to be near one again?

10  A    That would be good.

11       (Laughter.)

12  BY MS. KELLER:

13  Q    Okay.  So you hired her because you knew you weren't a

14  lawyer and you weren't necessarily going to understand the

15  contract, true?

16  A    Yes.

17  Q    You didn't hire her to help you understand the

18  contracts, you hired her because you wanted to make sure you

19  were protected, right?

20  A    I believe that was part of it, yes.

21  Q    Did you plan to rely on her to negotiate the financial

22  deal for you, too?

23  A    I believe so, yes.

24  Q    Do you remember her doing that?

25  A    I do.

CV 04-9049-DOC - 02/01/2011 - Day 10, Vol. 2 of 4

114

1    Q    Okay.  Can you tell us about that?

2    A    I think she just went through the contract and made

3    suggestions to, you know, amend the contract here and there.

4    Q    Was she the go-between between MGA and you in terms of

5    negotiating the actual terms, how much you would get and

6    when, and all that?

7    A    No.

8    Q    Okay.  Who did that?

9    A    I -- I don't remember.

10   Q    So she took the contract that was submitted to you, is

11   that what happened, and then she went over it with you, or

12   she went over it herself?

13   A    I -- I don't remember if we went over it together, but

14   she must have gone over it.

15   Q    Well, after the September 1st, 2000 meeting, you began

16   having discussions with MGA about being a consultant, right?

17   A    Yes.

18   Q    And Anne Hwang was representing you in all those

19   discussions, true?

20   A    Yes.

21   Q    Mr. Larian originally wanted you to come to work as an

22   employee at MGA, didn't he?

23   A    I -- I don't remember that.

24   Q    Okay.  If you could take a look at same deposition,

25   November 4th, and take a look at page 184, lines 19 through

Case 2:04-cv-09049-DOC-RNB   Document 9772   Filed 02/03/11   Page 115 of 139   Page ID #:293417
CV 04-9049-DOC - 02/01/2011 - Day 10, Vol. 2 of 4

115

1    24.

2    A    Okay.

3    Q    Okay.  So originally, he wanted you to be an employee?

4    A    Yes.

5    Q    But you -- did you tell Mr. Larian you weren't

6    interested in being an employee, that you wanted to work on

7    a freelance basis?

8    A    Yes.

9    Q    And tell us about why -- what were all of the factors

10   of you wanting to be a freelancer and not an employee?

11   A    I just didn't really want to have to go into the

12   building every day and really just wanted to work from home

13   and, you know, not necessarily on a regular 8:00 to 5:00

14   type of schedule.

15   Q    If you worked at home, what kind of schedule were you

16   planning to keep, if any?

17   A    Yeah, there are no schedules when you work at home.

18   Q    So if you want to work all night, you can?

19   A    Yeah.

20   Q    Sleep all day?

21   A    Exactly.

22   Q    And what about the degree of freedom you thought you'd

23   have artistically, did that enter into it?

24   A    I don't remember if it did or not.

25   Q    The royalty part entered into it, didn't it, that you

1    wanted to be able to profit from anything you made that

2    really took off?

3    A    Yes.

4    Q    Now, MGA submitted the first draft of a proposed

5    written consulting agreement on September 18th, 2000; do you

6    recall that?

7    A    Yes.

8    Q    And you actually got it on September 19th, the next

9    day; do you remember that?

10   A    I don't remember which day I got it on.

11   Q    Okay.  If you could take a look at Exhibit 15493, does

12   that refresh your memory with respect to the fact that you

13   actually got the agreement on September 19th?

14   A    I don't really remember it, sitting here right now, but

15   I don't disagree with it.

16   Q    Okay.  Now, so this wasn't an employment agreement, it

17   was a consulting agreement that -- just as you had asked,

18   right?

19   A    Yes.

20   Q    And you gave the con- -- the proposed consulting

21   agreement to Anne Hwang, your attorney?

22   A    Yes.

23   Q    You provided the draft so she could advise you, right?

24   A    Yes.

25   Q    And you knew you weren't going to be able to really

Case 2:04-cv-09049-DOC-RNB   Document 9772   Filed 02/03/11   Page 117 of 139   Page ID #:293419
CV 04-9049-DOC - 02/01/2011 - Day 10, Vol. 2 of 4

117

 1    understand or evaluate it yourself alone, right?

 2    A    That's right.

 3    Q    Now, let's turn to another topic.  Before you even got

 4    the first draft of the proposed agreement, MGA was asking

 5    you about making sure you owned the Bratz idea, right?

 6    A    Yes.

 7    Q    And you told everybody at MGA and, for that matter,

 8    everybody in the world that has asked you up until today

 9    that you created the idea of Bratz in 1998, right?

10    A    Yes.

11              MR. PRICE:  Object.  Compound and irrelevant, in

12    part.

13              MS. KELLER:  I'll rephrase it, your Honor.

14              THE COURT:  I'm going to sustain the objection,

15    Counsel.

16    BY MS. KELLER:

17    Q    Have you consistently maintained whenever you were

18    asked by anybody in this litigation that you created the

19    idea of Bratz in 1998?

20    A    Yes.

21    Q    And during the pitch meeting with Mr. Larian on

22    September 1st, 2000, you told him that you were employed by

23    Mattel at the time, right?

24    A    Yes.

25    Q    You weren't hiding it?

1    A    No.

2    Q    You told Victoria O'Connor -- she asked you if you had

3    any agreements with Mattel, right, at the same pitch

4    meeting?

5    A    I don't remember if she did or not.

6    Q    Okay.  Take a look at your deposition transcript of

7    November 4th, 2004, page 96, lines 17 through 20.

8    A    Okay.

9    Q    So does that refresh your memory a bit?

10   A    I don't remember, but I don't dispute the testimony.

11   Q    And the prior testimony was that you thought Victoria

12   O'Connor had asked you if you had any agreement with Mattel

13   at that pitch meeting, right?

14   A    Yes.

15   Q    And you told her that you thought you had some kind of

16   confidentiality agreement, but that was all you remembered;

17   is that correct?

18   A    Yes.

19   Q    And did Ms. O'Connor tell you that she wanted to have

20   MGA's attorney take a look at your agreement with Mattel to

21   see if there were any potential problems?

22   A    I don't recall if she did or not.

23   Q    Okay.  Look at the same volume you have, page 110,

24   lines 12 through 17.

25   A    Okay.

Case 2:04-cv-09049-DOC-RNB   Document 9772   Filed 02/03/11   Page 119 of 139   Page ID #:293421
CV 04-9049-DOC - 02/01/2011 - Day 10, Vol. 2 of 4

119

1   Q    Now, do you remember that issue, or was this another

2   one where you don't really remember but you don't disagree

3   with your deposition?

4   A    Yes.

5   Q    So you don't have any memory of it today?

6   A    I don't remember it right now, but yeah, I don't

7   disagree with this.

8   Q    Okay.  And what you testified to before was that

9   Victoria O'Connor told you that she wanted to have MGA's

10  attorneys take a look at your Mattel agreement to see if

11  there would be any potential problems, right?

12  A    Yes.

13  Q    And she was, again, the MGA director of licensing?

14  A    Yes.

15  Q    And she asked you if you had a copy of your Mattel

16  agreement, right, your confidentiality agreement?

17  A    Again, I don't remember if she did or not.

18  Q    All right.  Take a look at page 97 of that same volume,

19  line 10.

20  A    Okay.

21  Q    And lines 14 through 17.

22  A    Okay.

23  Q    So she asked you if you had a copy of your Mattel

24  confidentiality agreement?

25  A    Again, I don't remember it right now, but I don't

Case 2:04-cv-09049-DOC-RNB   Document 9772   Filed 02/03/11   Page 120 of 139   Page ID #:293422
CV 04-9049-DOC - 02/01/2011 - Day 10, Vol. 2 of 4

120

1    dispute the testimony.

2    Q    And your previous testimony was that she did -- you

3    told her that you didn't -- she asked for it, and you told

4    her you didn't have a copy of it in your possession, right?

5    A    Yes.

6    Q    And is that because Mattel never gave you a copy?

7    A    I don't know.  I don't remember right now.

8    Q    Now, MGA, though, had asked to see any contracts you

9    had with Mattel, right?

10   A    Yes.

11   Q    And did you go ahead and send MGA what you had in your

12   files?

13   A    Yes.

14   Q    And what -- all you found in your files was your offer

15   of employment with Mattel?

16   A    I think so, yes.

17   Q    You didn't find any confidentiality and inventions

18   agreements in your files?

19   A    I don't remember.

20   Q    Did you send a copy of your Mattel offer of employment

21   to MGA's lawyer, David Rosenbaum?

22   A    Yes.

23   Q    And you didn't think you were violating your agreement

24   with Mattel at that time, did you?

25   A    No.

1   Q    You just thought it was kind of a routine matter that

2   they wanted to see a copy, and you sent it, right, or had

3   your lawyer send it?

4   A    I don't remember exactly what I thought, one way or the

5   other.

6   Q    Okay.  Let's look at Exhibit 1309, and if we could go

7   to the first page.

8        Okay.  The first page is a cover sheet to David

9   Rosenbaum, MGA's lawyer, from Carter Bryant.

10       Let's go to the next page, 1309-2, and this is the

11  September 14th, 2000 note from you to Mr. Rosenbaum

12  enclosing your original offer of employment with Mattel; do

13  you see that?

14  A    Yes.

15  Q    Now, this went to Mr. Rosenbaum even before you

16  received the draft from MGA of the proposed consulting

17  agreement, right?

18  A    I believe so, yes.

19  Q    And this was weeks before you actually signed the

20  consulting agreement with MGA, right?

21  A    Yes.

22  Q    Okay.  Let's look at this where it says, "Enclosed is a

23  copy of my original offer of employment with Mattel.  To the

24  best of my knowledge, other than an agreement of

25  confidentiality, there are no other expressed agreements

 1    that have been signed.  I am unable to look into this much

 2    further with our human resources director without risking

 3    suspicion, but I am quite certain this should suffice.

 4         "Thank you very much.  Sincerely, Carter Bryant."

 5         And you enclosed your offer of employment from Mattel

 6    dated December 11th, 1998, right?

 7    A    Yes.

 8    Q    Now, you were asked a lot of questions about that by

 9    Mr. Price, and I want to explore that with you a little bit.

10         You didn't -- you didn't make that statement because

11    you feared that you were violating your contract with Mattel

12    and you didn't want them to find out, did you?

13    A    I don't believe so, no.

14    Q    You were worried that you didn't want Mattel knowing

15    that you were thinking about quitting, right?

16    A    Yes.

17    Q    You were looking to start a new career, weren't you?

18    A    Yes.

19    Q    But you didn't want human resources at Mattel to think

20    you were going to quit unless the MGA thing was actually

21    going to come together for you; am I right?

22    A    Yes.

23    Q    So you didn't want to burn your bridges with Mattel?

24    A    True.

25    Q    If something happened to your deal with MGA and it

1   didn't go through, Mattel was going to be none the wiser,

2   and you would just stay on the Barbie collectibles, right?

3   A    I think so, yes.

4   Q    And look around for some other toy company to pitch

5   your idea to, and hopefully somebody would eventually by it,

6   right?

7   A    Yes.

8   Q    And you knew that MGA couldn't very well call up Mattel

9   and say, "Hey, we're thinking of inking a deal with Carter

10  Bryant.  Can you send over a copy of his confidentiality

11  agreement?"  That couldn't happen, right?

12  A    True.

13  Q    And so you told MGA's lawyer you couldn't get a copy of

14  it because of the burning bridges thing, right?

15  A    Yes, yes.

16  Q    Now, did you understand that your attorney was, at the

17  same time, telling -- your attorney Anne Hwang, was telling

18  Mr. Rosenbaum, MGA's lawyer, that you created the Bratz idea

19  in 1998; was that your understanding?

20  A    I am not sure.

21  Q    And let's -- if you could take a look, see if this

22  refreshes your memory, at Exhibit 18463, at the bottom, as

23  soon as we have it dug out.

24       Look at the bottom of page 1 and the top of page 2,

25  and tell me when you've had a chance to read that to

Case 2:04-cv-09049-DOC-RNB   Document 9772   Filed 02/03/11   Page 124 of 139   Page ID #:293426
CV 04-9049-DOC - 02/01/2011 - Day 10, Vol. 2 of 4

124

1    yourself.

2    A    Okay.

3    Q    Okay.  So you understood your lawyer at the same time

4    was telling MGA's lawyer that you created the Bratz idea in

5    1998, right?

6    A    Yes.

7    Q    And that's exactly what you told Victoria O'Connor and

8    Paula Garcia at the August 2000 meeting, that you created

9    the idea in 1998, right?

10   A    Yes.

11   Q    And it's what you told Mr. Larian, Ms. O'Connor, Paula

12   Garcia and Veronica Marlow in the September 1st, 2000 pitch

13   meeting, right?

14   A    Yes.

15   Q    Now, Victoria O'Connor left you a message on

16   September 19th, 2000, asking you to have your lawyer call

17   David Rosenbaum to discuss the Mattel issue, right?

18   A    I'm sorry, what now?

19   Q    Victoria O'Connor left you a message on September 19th,

20   2000, asking you to have your lawyer call David Rosenbaum,

21   Mattel's lawyer -- I mean, MGA's lawyer, to discuss the

22   Mattel issue, right?

23   A    I don't remember if I did or not.

24   Q    Okay.  But you did know that MGA wanted to be able to

25   address whatever warranties you could make regarding the

Case 2:04-cv-09049-DOC-RNB   Document 9772   Filed 02/03/11   Page 125 of 139   Page ID #:293427
CV 04-9049-DOC - 02/01/2011 - Day 10, Vol. 2 of 4

125

```
 1    ownership on your part and originality of your drawings?

 2    A    (No audible response.)

 3    Q    Do you understand my question?

 4    A    I am not sure I do.

 5    Q    Okay.  You knew MGA wanted to be able to address the

 6    warranties that you were going to make, the representations,

 7    the assurances that you were going to give MGA about the

 8    ownership of those drawings, right?

 9              MR. PRICE:  Object.  It's vague.

10              THE COURT:  Restate the question, Counsel.

11    BY MS. KELLER:

12    Q    During this whole process where Anne Hwang, your

13    lawyer, was contacting David Rosenbaum, MGA's lawyer, back

14    and forth, you knew that MGA wanted to be able to address

15    the warranties you were going to make about the fact that

16    these were your original drawings, right?

17              MR. PRICE:  Same objection, expect to address.

18              THE COURT:  Well --

19              MS. KELLER:  Okay.  I'll get rid of "address."

20    BY MS. KELLER:

21    Q    You knew that MGA wanted to be able to get your

22    assurance that these drawings belonged to you --

23    A    Yes.

24    Q    -- and not to Mattel?

25    A    Yes.
```

1    Q    And wanted to make sure that Mattel couldn't have any

2    conceivable claim on those drawings, right?

3    A    I believe so, yes.

4    Q    And that's why MGA's lawyer was contacting your lawyer

5    about what they call these, quote, "representations and

6    warranties," end quote, about who owned the drawings,

7    correct?

8    A    Yes.

9    Q    And so acting as your agent on your behalf, your

10   attorney, Anne Hwang, assured MGA's attorney, Mr. Rosenbaum,

11   that you created the idea in 1998 when you were not working

12   for Mattel, true?

13           MR. PRICE:  Object as to lack of foundation.

14           MS. KELLER:  It's his agent, your Honor.

15           THE COURT:  Overruled.

16           THE WITNESS:  Yes.

17   BY MS. KELLER:

18   Q    And you knew that this was important information for

19   MGA to have, right?

20   A    Yes.

21   Q    Was this the truth, that you created those drawings in

22   1998?  I mean, it was your idea that you originated in 1998,

23   and the original drawings for this concept you created in

24   1998; is that true?

25           MR. PRICE:  Objection.  Compound.  Overbroad with

Case 2:04-cv-09049-DOC-RNB   Document 9772   Filed 02/03/11   Page 127 of 139   Page ID #:293429
CV 04-9049-DOC - 02/01/2011 - Day 10, Vol. 2 of 4

127

1    respect to "these drawings."

2              THE COURT:  Overruled.

3              You can answer.

4              THE WITNESS:  Yes.

5    BY MS. KELLER:

6    Q    Okay.  And was this why, in the e-mail that we just

7    reviewed, your focus was on the confidentiality portion of

8    the Mattel agreement and not on the inventions part of the

9    agreement?

10   A    I'm sorry, I don't understand your question.

11   Q    Okay.  You -- you -- when you -- the exhibit -- the

12   exhibit that we have up on the screen right now --

13             MR. MC CONVILLE:  1309.

14             MS. KELLER:  13 --

15             MR. MC CONVILLE:  09.

16             MS. KELLER:  -- 09, says the ventriloquist at the

17   table.

18             (Laughter.)

19   BY MS. KELLER:

20   Q    1309, you were focusing on confidentiality, right?

21   A    Yes.

22   Q    You are not -- you are not even discussing an

23   inventions agreement, right?

24   A    No.

25   Q    And that's because to you, the important thing was that

```
 1   you keep Mattel's confidence, you keep their work product
 2   confidential, right?
 3   A    Yes.
 4   Q    And if you are working on something for MGA, you keep
 5   that confidential, right?
 6   A    Yes.
 7   Q    You don't tell Mattel about MGA's projects, true?
 8   A    True.
 9   Q    And you don't tell MGA about Mattel's projects, right?
10   A    Yes.
11   Q    But you weren't even thinking about this idea that --
12   that somehow -- somehow these Bratz -- this Bratz concept
13   might actually belong to Mattel, right?
14   A    No.
15   Q    It never even crossed your mind, did it?
16   A    No.
17   Q    And is that because you knew you had come up with this
18   idea in Missouri in 1998?
19   A    Yes.
20   Q    Now, if we could turn to the deal itself, we discussed
21   that Mr. Larian had agreed you could be paid on a royalty
22   basis, we talked about that with Mr. Price, right?
23   A    Yes.
24   Q    And you'd be a freelancer, right?
25   A    Yes.
```

Case 2:04-cv-09049-DOC-RNB   Document 9772   Filed 02/03/11   Page 129 of 139   Page ID #:293431
CV 04-9049-DOC - 02/01/2011 - Day 10, Vol. 2 of 4

129

1   Q    And one of the questions Mr. Price asked you was --

2   well, you know, whether anybody at MGA inquired of you as to

3   why you weren't coming in every day from 9:00 to 5:00 those

4   first -- between October 4th and two weeks later; do you

5   remember that?

6   A    Yes.

7   Q    As a freelancer, what was your understanding of whether

8   you had to come in at regular hours?

9   A    My understanding was that, yeah, I could just go when

10  I needed to and mainly do the other things when I was at

11  home.

12  Q    Now, you discussed an advance until the product hit the

13  shelves --

14  A    Yes.

15  Q    -- and a royalty?  We talked about that with Mr. Price,

16  right?

17  A    Yes.

18  Q    And how did you pick the figure $5,500 a month for the

19  advance?

20  A    I am not exactly sure.

21  Q    Were you being paid 5,000 a month at Mattel?

22  A    I don't recall exactly.

23  Q    Okay.  I want to take a look at -- well, nevermind.

24  We'll just go on from here.

25       One thing we had talked about was this is an advance

 1    against any royalties, right?

 2    A    Yes.

 3    Q    So the $5,500 a month was going to get deducted,

 4    eventually, if the dolls hit?

 5    A    Yes.

 6    Q    Now, you actually had wanted more than this, though,

 7    hadn't you?  You had wanted a royalty for everything that

 8    was even Bratz-related?

 9    A    I believe so, yes.

10    Q    And the -- Mr. Larian refused, right, you can only get

11    3 percent royalty for any Bratz product you consulted on?

12    A    Yes.

13    Q    Not everything that could ever conceivably flow from

14    Bratz years down the line, true?

15    A    True.

16    Q    And Mr. Larian told you he was going to have his lawyer

17    draw something up for the royalty, right?

18    A    I believe so, yes.

19    Q    And that's -- that's the agreement that we've talked

20    about that was dated -- it was submitted September 19th

21    and -- or maybe September 19th, depending on -- it was one

22    of those two dates, right?

23    A    Yes.

24    Q    Now, you didn't sign this until October -- October 4th?

25    A    I think that's when I signed it, yes.

1    Q    And that was after further negotiations?

2    A    I believe so, yes.

3    Q    And MGA had not met the demand to be given 3 percent

4    for everything Bratz-related, right?

5    A    Right.

6    Q    And if you want to take a look at Exhibit 1792, just

7    read that to yourself.  This is from Mr. Rosenbaum to your

8    lawyer, Anne Hwang, October 4th.

9         We are just going to -- we are going to move on.

10        Okay.  You finally signed a consulting agreement with

11   MGA on October 4th, right?

12   A    Yes.

13           MS. KELLER:  And if we can have Exhibit 15.

14   BY MS. KELLER:

15   Q    This is the consulting agreement with MGA?

16   A    Yes.

17   Q    And if we go to the last page, 15-6, is that your

18   signature, the bottom left-hand side?

19   A    Yes.

20   Q    And under your signature, you see in small letters four

21   zeros, 8662.doc\2\10\4\2000, 3:05 p.m.?

22   A    Yes.

23   Q    And October 4th, 2000, is the date you actually signed

24   that agreement?

25   A    Yes.

CV 04-9049-DOC - 02/01/2011 - Day 10, Vol. 2 of 4

132

1   Q     Now, go back to the first page, Exhibit 15-1, and look

2   at the top right-hand side.  It says, "dated as of

3   September 18th, 2000."

4   A     Yes.

5   Q     But that wasn't the date you actually signed the

6   agreement, right?

7   A     No.

8   Q     That was the date of the first draft of this agreement

9   that was submitted to you, right?

10  A     Yes.

11  Q     And you see the handwriting on the top left-hand corner

12  of the letter where it says "final"?

13  A     Yes.

14  Q     So the first draft of this agreement was submitted to

15  you September 18th, but you signed the final version on

16  October 4th; is that fair to say?

17  A     Yes.

18  Q     Now, I want to turn to this concept of what are called

19  "representations and warranties."

20        When you signed the agreement that we just looked at,

21  what did you think you were promising MGA with respect to

22  who owned the rights to Bratz?

23  A     I think I was thinking that I had the right to assign

24  the idea.

25  Q     Okay.  And if we can look at 15-3, the bottom of the

Case 2:04-cv-09049-DOC-RNB   Document 9772   Filed 02/03/11   Page 133 of 139   Page ID #:293435
CV 04-9049-DOC - 02/01/2011 - Day 10, Vol. 2 of 4

133

 1    third page, paragraph 5, it says, "Bryant represents

 2    warrants and agrees that, A, he has the right and is free to

 3    execute this agreement, to grant the rights granted to him

 4    by MGA hereunder; B, neither the execution and delivery of

 5    this agreement nor the performance by Bryant of any

 6    obligations hereunder will constitute a violation, breach or

 7    default under any agreement, arrangement or understanding or

 8    any other restriction of any kind to which Bryant is a party

 9    or by which Bryant is bound; C, the Bryant work product

10    shall be free of all liens and encumbrances, and there will

11    be no claims, demands or actions pending or threatened with

12    respect thereto, and that the Bryant work product is

13    original, and no part thereof infringes or shall infringe

14    upon any common law or statutory rights or intellectual

15    property rights of any third party including, without

16    limitation, contractual rights, patents, copyrights,

17    mask-work rights, trade secrets, rights of privacy and other

18    intellectual property rights."

19         Kind of a mouthful.

20         Would it be true that you felt you needed a lawyer to

21    untangle what all that meant?

22    A    Yes.

23    Q    And at the time you signed this, you did have Anne

24    Hwang helping you, right?

25    A    Yes.

Case 2:04-cv-09049-DOC-RNB   Document 9772   Filed 02/03/11   Page 134 of 139   Page ID #:293436
CV 04-9049-DOC - 02/01/2011 - Day 10, Vol. 2 of 4

134

1   Q     Now, MGA never paid for her services; you paid, right?

2   A     Yes.

3   Q     And do you remember when it was that you retained her?

4   A     I don't exactly.

5   Q     Just that it was before you ever met with MGA?

6   A     Yes.

7   Q     But you don't know if it was a month before, two

8   months, three months?

9   A     I don't remember.

10  Q     If we strip away all of the legalese, is it your

11  understanding -- was -- was -- at the time, was it your

12  understanding that you were assuring MGA that you owned the

13  Bratz concept?

14  A     I believe so, yes.

15  Q     And again, because you came up with the idea in

16  August 1998 when you weren't working for Mattel, true?

17  A     Yes.

18  Q     Now, if we can go back to the first page of that

19  consulting agreement, "Set forth below are the terms and

20  conditions upon which we, hereinafter MGA, are retaining

21  you, Bryant, to consult and advise MGA in the design and

22  development of certain products which MGA wishes to

23  manufacture and distribute," paren, "(hereinafter our

24  agreement is sometimes referred to as the," quote, "'MGA

25  Consulting Agreement,')" closed quotes, closed paren,

1    period.

2         And this confirms your desire that you were not going

3    to be an employee, that you were going to be a consultant,

4    right?

5    A    Yes.

6    Q    And then let's look at the second paragraph, and the

7    part -- this -- this paragraph talks about your provision of

8    services to MGA.  "MGA retains Bryant to provide his

9    services to consult with MGA and advise MGA on the design

10   and development by MGA of a line of dolls presented known

11   as" -- I think it's probably "presently known as 'Bratz,'"

12   quote-unquote.  Paren, "(the 'MGA products')," closed quote,

13   closed paren, period.

14        "Bryant will render his services at such locations and

15   times as may be reasonably be designated by MGA.  It is

16   understood and agreed that Bryant shall provide the services

17   on a top priority basis, as his services pertain to other

18   clients of Bryant."

19        And then it goes on to say that you and your staff will

20   take direction and be under the supervision of people

21   reasonably designated by MGA, from time to time, on notice

22   to you, et cetera.

23        The bottom line is that you knew Mr. Larian wanted you

24   to be involved in the development of Bratz but as part of

25   the team, right?

1   A     Yes.

2   Q     And under the terms of this, you were supposed to put

3   MGA's development of this idea on a top priority basis,

4   ahead of everything else, right?

5   A     Yes.

6   Q     And when you entered into this agreement, Mr. Larian

7   instructed you to quit your job at Mattel and work full time

8   on Bratz, right?

9   A     I believe so, yes.

10  Q     Okay.  Do you -- do you need to see a deposition

11  transcript or is that your memory?

12  A     No.  I think I remember that.

13  Q     Okay.  And in fact, he sent you two e-mails about

14  this.

15          MS. KELLER:  Okay.  If we could see Exhibit

16  16789.

17  BY MS. KELLER:

18  Q     And this is an e-mail chain.  I want to look at the

19  first e-mail at the bottom of the page from Mr. Larian to

20  you, October 5th, 2000, at 11:32 a.m.

21          Do you have that in front of you?

22  A     Yes.

23  Q     And it says, "Carter, now that we have the agreement

24  in place, we need you and Paula to focus 200 percent on

25  getting this done.  Think different.  Think the fashion.

Case 2:04-cv-09049-DOC-RNB   Document 9772   Filed 02/03/11   Page 137 of 139   Page ID #:293439
CV 04-9049-DOC - 02/01/2011 - Day 10, Vol. 2 of 4

137

```
 1    Think and design the accessories.  Think about the
 2    commercial.  Think about the New York showroom presentation.
 3    Think about all of the royalty you are going to make," et
 4    cetera.  And he tells you, "Carter, this is your big break
 5    in business life," and goes on to say that he's put all of
 6    his resources into this.
 7         "You need to put 16 hours a day, starting now, on this
 8    and nothing else.  That's the only way it will happen."
 9         What did you understand he was telling you by that
10    e-mail?
11    A    I think basically he was just trying to say that he
12    really wanted me to put my focus and energy on the -- on
13    this Bratz project and really get it going.
14    Q    And let's look at Exhibit 1762, an October 6th, 2000
15    e-mail from you to Mr. Larian.
16         I'm sorry.  October 5th, 2000.
17         "Hi, Isaac.  I just" --
18              MS. KELLER:  Oh, I'm sorry, your Honor.  Before I
19    go --
20    BY MS. KELLER:
21    Q    Do you recognize this e-mail as one from you to
22    Mr. Larian?
23    A    Yes.
24              MS. KELLER:  Your Honor, I'd move Exhibit 1762
25    into evidence.
```

1          THE COURT:  Received.

2          *(Defendants' Exhibit No. 1762 is received in*

3     *evidence.)*

4          *(Live reporter switch with Sharon Seffens.)*

5                         -oOo-

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 2:04-cv-09049-DOC-RNB   Document 9772   Filed 02/03/11   Page 139 of 139   Page ID #:293441
CV 04-9049-DOC - 02/01/2011 - Day 10, Vol. 2 of 4

139

1                              -oOo-

2                           **CERTIFICATE**

3

4          I hereby certify that pursuant to Section 753,

5    Title 28, United States Code, the foregoing is a true and

6    correct transcript of the stenographically reported

7    proceedings held in the above-entitled matter and that the

8    transcript page format is in conformance with the

9    regulations of the Judicial Conference of the United States.

10

11   Date:  February 2, 2011

12

13

14          _____

15          JANE C.S. RULE, U.S. COURT REPORTER
            CSR NO. 9316

16

17

18

19

20

21

22

23

24

25