1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

– – –

THE HONORABLE DAVID O. CARTER, JUDGE PRESIDING

MATTEL, INC., et al.,
                    Plaintiffs,
    vs.
                                    CV-04-9049-DOC
MGA ENTERTAINMENT, INC.,   DAY 10
et al.,                     Volume 3 of 4
                    Defendants.

    –––––––––––––––––––––––––––

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Santa Ana, California

Tuesday, February 1, 2011

SHARON A. SEFFENS, RPR
United States Courthouse
411 West 4th Street, Suite 1-1053
Santa Ana, CA  92701
(714) 543-0870

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1  APPEARANCES OF COUNSEL:

2  For Plaintiff MATTEL, INC., ET AL.:

3  JOHN B. QUINN
   MICHAEL T. ZELLER
4  WILLIAM PRICE
   QUINN EMANUEL URQUHART OLIVER & HEDGES LLP
5  865 Figueroa Street, 10th Floor
   Los Angeles, CA  90017
6  (213) 443-3180

7  For Defendant MGA ENTERTAINMENT, INC., ET AL.:

8  ORRICK HERRINGTON & SUTCLIFFE LLP
   4 Park Plaza, Suite 1600
9  Irvine, CA  92614
   (949) 567-6700
10
   ANNETTE HURST
11 ORRICK, HERRINGTON & SUTCLIFFE LLP
   The Orrick Building
12 405 Howard Street
   San Francisco, CA  94105
13 (415) 773-4585

14 KELLER RACKAUCKAS LLP
   JENNIFER L. KELLER
15 18500 Von Karman Avenue, Suite 560
   Irvine, CA
16 (949) 476-8700

17 FOR CARLOS GUSTAVO MACHADO GOMEZ:

18 MARK E. OVERLAND
   100 Wilshire Boulevard, Suite 950
19 Santa Monica, CA  90401
   (310) 459-2830

20

21 SCHEPER KIM AND HARRIS LLP
   601 West Fifth Street, 12th Floor
22 Los Angeles, CA  90071-2025
   (213) 613-4655

23

24

25

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

```
 1    ALSO PRESENT:

 2    MGA ENTERTAINMENT, INC.
      JEANINE PISONI
 3    16360 Roscoe Boulevard, Suite 105
      Van Nuys, CA  91406
 4

 5    ALSO PRESENT:

 6    ROBERT ECKERT, Mattel CEO

 7    ISAAC LARIAN, MGA CEO

 8    KEN KOTARSKI, Mattel Technical Operator

 9    MIKE STOVALL, MGA Technical Operator

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

```
 1
 2                              INDEX
 3                                                      PAGE
 4   PLAINTIFFS'
     WITNESS:              DIRECT     CROSS   REDIRECT   RECROSS
 5
     CARTER BRYANT
 6      (Continued)                    5(K)
 7
     PLAINTIFFS'
 8   EXHIBITS:                       MARKED        RECEIVED
 9   (None)
10
11   DEFENSE
     WITNESSES:            DIRECT   CROSS   REDIRECT   RECROSS
12
13   (None)
14   DEFENSE
     EXHIBITS:                       MARKED        RECEIVED
15
16   Exhibit 15609
17
18
19
20
21
22
23
24
25
```

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

```
 1   SANTA ANA, CALIFORNIA; TUESDAY, FEBRUARY 1, 2011; 4:10 P.M.
 2              (Jury present.)
 3      CARTER BRYANT, PLAINTIFFS' WITNESS, PREVIOUSLY SWORN
 4                  CROSS-EXAMINATION (Continued)
 5   BY MS. KELLER:
 6   Q    This is the same day that Mr. Larian sent you his
 7   October 5 e-mail, right, the one we just looked at?
 8   A    Yes.
 9   Q    So you were replying back to him.  Look at the bottom
10   of the page.  "Hi, Isaac.  I just want to thank you for your
11   message earlier, and mostly I want to thank you for this
12   incredible opportunity and for believing in me enough to
13   make this happen.  I have a great story line for a
14   commercial which I will work up a bit for you all to see, as
15   well as a great song in mind for it.  I also have a lot of
16   great ideas for the entire line, and this is going to be
17   big.  Thanks again.  Carter."
18   A    Yes.
19   Q    If you look at the e-mail at the top of the page from
20   Mr. Larian to you -- that's October 6, 2000, the next day --
21   "Carter, you are very creative, and I believe this line if
22   done with focus and strategic thought will be huge.  Please
23   arrange to meet with Paula asap and work on this full-time,
24   and let's make it happen.  Also, Mercedeh will be starting
25   at MGA next Tuesday.  Thanks."
```

```
 1        Now, what was your understanding of what Mr. Larian was
 2   telling you in that e-mail?
 3   A    I think it's just the same thing as with the other
 4   e-mail, just to work really hard and work with Paula and
 5   just get it going.
 6   Q    Just devote yourself to it around the clock?
 7   A    Yes.
 8   Q    Now, in the e-mail chain when you replied back to
 9   Mr. Larian in the part we just read thanking him for his
10   message earlier, you didn't tell him anything in that e-mail
11   about quitting Mattel?
12   A    Which e-mail are you referring to?
13   Q    Let's look at the one you sent Mr. Larian, which is the
14   first e-mail at the bottom of the page, October 5, where you
15   say, "Hi, Isaac.  I just want to thank you for your message
16   earlier."
17   A    Yes.
18   Q    You don't say anything in there about quitting Mattel?
19   A    No.
20   Q    And nothing in there about working 16 hours a day on
21   Bratz?
22   A    No.
23   Q    Nothing about even working an hour a day on Bratz,
24   right?
25   A    No.
```

1    Q    Now, the same day you signed your MGA agreement on

2    October 4 you decided to notify Mattel that you were giving

3    notice?  You were leaving?

4    A    Yes.

5    Q    And instead of quitting immediately and working full

6    time on Bratz as Mr. Larian asked, you gave two weeks'

7    notice to Mattel?

8    A    Yes.

9    Q    You said your last day would be October 19?

10   A    I don't remember exactly what day I gave.

11   Q    Let's look at your trial testimony on June 18, 2008,

12   page 3052, lines 7 through 14.  I'm just asking as to what

13   your last day was going to be at Mattel.

14   A    Yes.

15   Q    What was the last day going to be?

16   A    The 19th.

17   Q    Now, the reason that you gave two-weeks' notice was

18   what?

19   A    I think I was feeling that I should probably finish out

20   some of the projects that I was working on at Mattel.

21   Q    So you thought it was the right thing to do?

22   A    Yes.

23   Q    When you quit in -- you had worked there once

24   previously.  When you quit then, did you give them

25   two-weeks' notice?

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

8

```
 1   A    I don't remember if I did or not.

 2   Q    Was there any ill-intention on your part toward Mattel

 3   in giving that two-weeks' notice?

 4   A    No, none at all.

 5   Q    Was it actually your habit to do that, to give

 6   two-weeks' notice?

 7        MR. PRICE:  Objection, lack of foundation, vague

 8   as to habit.

 9        THE COURT:  Sustained.

10   BY MS. KELLER:

11   Q    Let's look at Exhibit 15609.  And while we are getting

12   that, your first stint at Mattel began in November 1995,

13   right?

14   A    Yes.

15   Q    Until you moved back to Missouri at the end of 1997?

16   A    Yes.

17   Q    Then you began working part-time in Missouri for your

18   supervisor at Mattel whose name was Cassidy Park?

19   A    Yes.

20   Q    Exhibit 15609, do you recognize that as a letter from

21   you to Cassidy Park and another person, Cynthia -- what's

22   her name?

23   A    Cynthia Miller.

24   Q    That's right.  Do you recognize that?

25   A    Yes.
```

9

```
 1              MS. KELLER:  Your Honor, I would move Exhibit
 2    15609 into evidence.
 3              THE COURT:  Received.
 4              (Exhibit 15609 received.)
 5    BY MS. KELLER:
 6    Q     This is an April 15, 1998, letter where you are giving
 7    notice in 1998.  "Please accept this written notice of my
 8    resignation effective two weeks after the date above,
 9    April 29, 1998."
10         Does that refresh your memory a little bit?
11    A     Yeah, a little bit.
12    Q     You don't have any reason to dispute that that's your
13    letter?
14    A     No.
15    Q     Do you see your signature?
16    A     Yes.
17    Q     Is that your signature?
18    A     Yes.
19    Q     So you gave Mattel two-weeks' notice the previous time
20    you quit, right?
21    A     Yes.
22    Q     In your mind, does that also have anything to do with
23    not burning bridges?
24    A     Yeah, I would agree with that.
25    Q     If you are in the middle of a project, for example,
```

1  would you want to finish it for them?

2  A    Yes, I might have wanted to do that.

3  Q    Do you remember feeling that need at the time?  Now I

4  am referring back to 2000.  Do you remember feeling the need

5  to finish up any projects?

6  A    Yes.

7  Q    Now, what you told MGA was, though, that you had

8  already quit your job at Mattel as of October 4, right?

9  A    I don't remember.

10  Q    I want to ask you about Mr. Price's questioning.

11      Do you remember Mr. Price asked you some questions

12  about meeting this fellow named Steve Linker with Paula

13  Garcia and Liz Hogan?

14  A    Yes.

15  Q    That was at a Starbucks in October?

16  A    Yes.

17  Q    Now, you talked about how you spread out your drawings

18  and showed them to Paula Garcia, Steve Linker, and Liz Hogan

19  at the Starbucks.

20  A    Yes.

21  Q    This Starbucks was in El Segundo right by Mattel isn't

22  it?

23          MR. PRICE:  Objection, vague as to right by

24  Mattel.

25          THE COURT:  Overruled.

BY MS. KELLER:

Q    How close is this Starbucks to Mattel?

A    I think it was fairly close if I remember right.  It was close to my home.

Q    Is it true that there were a lot of Mattel people who would go into that Starbucks?

         MR. PRICE:  Objection, lack of foundation.

         THE COURT:  Overruled.

         THE WITNESS:  I don't know.

BY MS. KELLER:

Q    Did you see other Mattel people in there when you would go there?

A    I don't have any recollection of that.

Q    Before April 27, 2004, when Mattel sued you, you had never told Mr. Larian that you had given two-weeks' notice to Mattel and stayed there until October 19, true?

A    I don't remember.

Q    Did you ever tell anybody at MGA that you had actually given Mattel two-weeks' notice and that you were staying until October 19?

A    I don't remember one way or the other.

Q    Let's move on to something else.

     After you signed your MGA consulting agreement and you were officially a free-lancer and you were working at home, what kind of hours were you keeping?

1    MR. PRICE:  Objection, vague and ambiguous as to

2  the time frame.

3    THE COURT:  It's after he -- is it October 4 to

4  the 19th, or is it -- your question was:  "Let's move on to

5  something else.  After you signed your MGA consulting

6  agreement" --

7    MS. KELLER:  All right.

8  BY MS. KELLER:

9  Q    Between October 4 and October 19, were you going to

10  Mattel working your regular hours?

11  A    Yes.

12  Q    So you weren't available to work 16 hours a day on the

13  Bratz project obviously.

14  A    No.

15  Q    What kind of freelance hours were you keeping if you

16  remember from the 4th to the 19th?

17  A    I think I was mainly working in the evenings.

18  Q    You worked 8:30 to 5:00, Monday through Thursday, at

19  Mattel?

20  A    Yes.

21  Q    And Fridays until 1:00, right?

22  A    Yes.

23  Q    So you had Friday afternoons free and after 5:00 free?

24  A    Yes.

25  Q    Did anybody at MGA between October 4 and October 19 say

1   to you, hey, where are you?  You are supposed to be in here

2   from 8:30 to 5:00?

3   A    Not that I remember.

4   Q    And you understood that as a free-lancer that wasn't

5   going to be happening anyway, right?

6   A    Yes.

7   Q    Let's talk for a minute about your compensation.  If we

8   could go back to Exhibit 15 and we look at paragraph four --

9   this is Exhibit 15-2, second page, paragraph 4 under

10  "Compensation."

11       You were going to be paid $5,500 a month by MGA for six

12  months, right?

13  A    Yes.

14  Q    Then the next three months $5,000 a month, right?

15  A    Yes.

16  Q    And it says, "All sums paid to Bryant as monthly fees

17  shall be deemed to be non-refundable, totally recoupable

18  advances against any royalties that may be payable to Bryant

19  pursuant to paragraph 4(b) below."

20       Paragraph 4(b) was the three-percent royalty of net

21  sales receipts from the sales by MGA of any of the MGA

22  products developed by MGA on which Bryant provided his

23  consulting services.  Do you see that?

24  A    Yes.

25  Q    So you were going to get $5,500 a month for six months

1   and then $5,000 for three months?

2   A    Yes.

3   Q    And then if the dolls were ever released, you would get

4   a three-percent royalty for any dolls that you consulted on?

5   A    Yes.

6   Q    The $5,500 a month and the $5,000 a month were advances

7   against the royalties?

8   A    Yes.

9   Q    So those royalties wouldn't be paid to you until or

10  unless the doll was made, released, and started making

11  money, and your $5,500 for six months and $5,000 for three

12  months got deducted, right?

13  A    Yes.

14  Q    So would it be true to say that it wasn't just MGA

15  taking a risk here?  You were taking a risk?

16  A    Yes.

17  Q    At the time you did this consulting agreement, you had

18  a secure job at the biggest toy company in the world, right?

19  A    Yes.

20  Q    And you were making around $60,000 a year or so

21  guaranteed?

22  A    I believe so, something like that.

23  Q    And if the Bratz dolls had never been released, how

24  much would you have earned in royalties?

25  A    I'm sorry.  What now?

```
 1   Q    If the Bratz dolls had never been released, how much

 2   were you going to earn in royalties?

 3   A    You mean from Mattel?

 4   Q    No.  I meant from MGA.  If Bratz never got released,

 5   how much were you going to make in royalties?

 6   A    Nothing.

 7   Q    And you were going to be out of the job at the end of

 8   nine months, too?

 9   A    Yes.

10   Q    Your agreement with MGA doesn't say anywhere that you

11   were going to be $30 millior or $35 million in royalties on

12   the Bratz project, right?

13   A    No.

14   Q    I think that the total of the amount you were going to

15   get paid under this monthly agreement -- if the Bratz

16   project fell through, you were going to have $48,000 for

17   nine months and then no job?

18   A    That's true.

19   Q    Is that yet another reason to try not to burn your

20   bridges at Mattel?

21   A    Yes.

22   Q    If the Bratz project fell through, it was in your mind

23   that you could maybe go back to Mattel?

24   A    I think I probably thought that, yes.

25   Q    And if MGA had made the doll and the doll sold but
```

```
 1   didn't sell very well or the public stopped buying it, let's
 2   say a million -- say they made a profit of $1,100,000 times
 3   three percent.  That would have just been $33,000?
 4   A    Yes.
 5   Q    Was this the biggest risk you had ever taken at that
 6   point in your life up until then?
 7   A    It was a pretty big risk, yes.
 8   Q    Mr. Price asked you whether you were a wealthy man, and
 9   you said no.
10       Did you have enough money in the bank to cover living
11   expenses if the Bratz project fell through?
12   A    No.
13   Q    Now I am going to ask you about a different area.  This
14   has to do with whether in your mind you were allowed to work
15   nights and weekends doing your own projects when you were at
16   Mattel.
17       Have you ever heard anything about moonlighting at
18   Mattel?
19   A    I think so, yes.
20   Q    What have you heard?
21           MR. PRICE:  Objection, hearsay.
22           MS. KELLER:  It goes to his state of mind.
23           THE COURT:  Overruled.  Goes to state of mind.
24           THE WITNESS:  I think I have heard that a lot of
25   Mattel people did other projects that were not for Mattel
```

1    outside of the regular work hours.

2              THE COURT:  Once again, that's not for the truth

3    of the matter asserted, whether people are moonlighting,

4    whether that's accepted or not.  It's his state of mind.

5    BY MS. KELLER:

6    Q    Did that include other toy companies?

7    A    I don't know.

8    Q    If you could take a look at your deposition,

9    January 23, 2008, page 867, line 24, to 868, line 4.

10   A    Which page and which line?

11   Q    Page 867, line 24, through 868, line 4.  Have you found

12   that testimony?

13   A    Yes.

14   Q    So the moonlighting that you have heard about involved

15   people working for other toy companies, right?

16   A    Yes.

17   Q    Would I be right that even if you could remember the

18   names of people that you thought were moonlighting you

19   probably wouldn't want to tell us about them?  Would that be

20   true?

21             MR. PRICE:  Objection, argumentative.

22             THE COURT:  Sustained.

23             You are under oath, and if asked a question, you

24   will tell us.

25   BY MS. KELLER:

18

```
1    Q    You already knew people at Mattel who were moonlighting

2    for you, right?

3    A    Yes.

4    Q    You also moonlit kind of when you did a project for MGA

5    called Prayer Angels, right?

6    A    Yes.

7    Q    That was Veronica Marlow's project?

8    A    Yes.

9    Q    You did some face designs for Prayer Angels?

10   A    Yes.

11   Q    You did that before your last day of employment at

12   Mattel?

13   A    Yes.

14   Q    Let's look at Exhibit 393.  Are these the drawings you

15   did for the Prayer Angels, kind of a tryout that you were

16   having?

17           MR. PRICE:  Objection, argumentative, vague.

18           MS. KELLER:  Okay.  We will back up.

19   BY MS. KELLER:

20   Q    Let's go to your deposition on November 4, 2004, and

21   take a look at page 178, lines 3 through 9.  Tell me when

22   you have had a chance to review that.

23           MR. PRICE:  There has been no lack of memory.

24           THE COURT:  Counsel.

25           MS. KELLER:  I think counsel is right.  Every once
```

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

 1    in a while it can happen.

 2    BY MS. KELLER:

 3    Q    Mr. Bryant, you have done a project with MGA that you

 4    considered a sort of trial, right?

 5    A    Yes.

 6    Q    And this was called Prayer Angels, right?

 7    A    Yes.

 8    Q    You did some face designs for them?

 9    A    Yes.

10    Q    And that's what we just saw there in Exhibit 393?

11    A    Yes.

12    A    You received some payment for those?

13    A    Yes.

14    Q    And if we can look at Exhibit 593, the first page, this

15    is an invoice from you to Paula Treantafelles of MGA

16    Entertainment for angel face hair design and sketches dated

17    August 31, 2000.  You charged $150?

18    A    Yes.

19    Q    By the way, you have some handwriting on here.  What

20    does the handwriting say on the invoice?  Is that your

21    handwriting in the middle?

22    A    I am not sure which handwriting you are referring to.

23    Q    The one that's in the square in the middle.

24    A    I have no idea.

25    Q    Okay.  Let's look at Exhibit 593, the second page, an

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

```
 1   MGA purchase order.  Under "R," reference, it says "Prayer
 2   Angels."  Do you see that?
 3   A    Yes.
 4   Q    Under "Item Description," it says on the left, "Angel
 5   face hair designs and sketch Prayer Angels."  Do you see
 6   that?
 7   A    Yes.
 8   Q    That was a real project for MGA, right?
 9   A    Yes.
10   Q    So "angel" was not a code name for Bratz?
11   A    Not to my knowledge, no.
12   Q    Angel Face" was not a code name for Bratz?
13   A    No.
14   Q    These drawings are definitely not Bratz drawings are
15   they?  If we can go back to 393.  Those do not look like
16   Bratz do they?
17   A    No.
18   Q    The purchase order that you saw and the invoice that
19   you submitted, those were both for $162.38, right?
20   A    Yes.
21   Q    Is this money that you deposited into your Mattel
22   Federal Credit Union account?
23   A    I don't remember if I did or not.
24   Q    Take a look at the deposition on November 4, '04, page
25   196, line 25, through 197, line 10.
```

```
 1    A     Which page and which line?

 2    Q     196, line 25, through 197, line 10.

 3    A     Okay.

 4    Q     Is this money you would have deposited into your Mattel

 5    Federal Credit Union account?

 6    A     More than likely, yes.

 7    Q     You didn't have any other account did you?

 8    A     Not that I remember.

 9    Q     You didn't have any checking account with any

10    commercial bank?

11    A     I can't remember if I did or not.

12    Q     Well, I am talking about back then, not after you --

13    A     I don't remember if I did or not.

14    Q     Well, you didn't ask to be paid in cash, right, under

15    the table?

16    A     No.

17    Q     Would it be fair to say that a lot of Mattel employees

18    banked at the Mattel Federal Credit Union?

19    A     Yes.

20    Q     Now, the work that you did on prayerPrayer Angels, was

21    that done on your own time, during your free time?

22    A     I believe so, yes.

23    Q     Did it interfere with your Mattel responsibilities?

24    A     No.

25    Q     Did you think there was anything wrong with
```

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

22

1    moonlighting like that?

2    A    I don't think I thought so at the time, no.

3    Q    And that's trying to look back 10 or 11 years ago?

4    A    Yes.

5    Q    Are you aware that MGA never used your work on Prayer

6    Angels?

7              MR. PRICE:  Objection, assumes facts as phrased.

8              THE COURT:  Sustained.

9    BY MS. KELLER:

10   Q    Is it your understanding that MGA never used your work

11   on Prayer Angels?

12   A    I don't really know one way or the another.

13   Q    Now, again, was confidentiality the thing that was

14   uppermost in your mind?  In other words, you would keep

15   MGA's Prayer Angels work confidential, and you would keep

16   Mattel's work that you were doing for them confidential?

17   A    Yes.

18   Q    You wouldn't tell one about the other?

19   A    No.

20   Q    Did you keep your Barbie's Collectibles work

21   confidential?

22   A    Yes.

23   Q    Did you ever divulge to MGA all the things that you had

24   done in terms of Barbie collectibles?

25   A    No.

1  Q    Did they even ask you?

2  A    Not that I remember.

3  Q    So you weren't focusing on this inventions agreement

4  again, right?  You were focusing on keeping confidentiality

5  of whoever you were working for on a project, true?

6  A    Yes.

7  Q    Now, we have talked about -- this is a different topic.

8  We have talked about how you told Victoria O'Conner and

9  Paula Garcia at your first meeting with them that you

10  created this idea in '98, and we talked about the September

11  pitch meeting in '98 where you showed your drawings.

12      Now, before you ever showed them your drawings, you had

13  shown them to other people, right?

14  A    Yes.

15  Q    Before you showed your Bratz concept to MGA, you had

16  shown it to your mom hadn't you?

17  A    Yes.

18  Q    How did your mom react to it?

19  A    I think she was pretty excited about them.  She liked

20  them a lot.

21  Q    Do you remember when you showed those to your mom?

22  A    I believe it was sometime in '98.

23  Q    Okay.  Was it -- does late August '98 ring a bell?

24  A    I'm not sure exactly what month.

25  Q    Take a look at your deposition transcript, November 4,

24

```
 1    2004, page 45, lines 7 and 8.
 2    A    Okay.
 3    Q    Does that refresh your memory as to when you showed the
 4    Bratz concept to your mom?
 5    A    Yes.
 6    Q    When was that?
 7    A    August '98.
 8    Q    Was that late August?
 9    A    Late August.
10    Q    Who were you living with at the time?
11    A    I was living with my mom and dad.
12    Q    Where was that?
13    A    That was in Kimberling City, Missouri.
14    Q    You also said you showed the Bratz concept to your
15    partner, Richard Irmen?
16    A    Yes.
17    Q    When was it that you showed it to Mr. Irmen?
18    A    I think it was late that year.
19    Q    Would it help refresh your memory to take a look at
20    your deposition transcript about that?
21    A    Sure.
22    Q    Take a look at page 44, lines 14 through 19 and 22
23    through 23.
24    A    Okay.
25    Q    Does that refresh your memory about that?
```

1    A    Yes.

2    Q    When did you show those drawings to Mr. Irmen?

3    A    It was December 31, '98.

4    Q    How is it that you happen to remember December 31,

5    1998?

6    A    Just having my memory refreshed from prior testimony.

7    Q    Was this when you were coming back to California from

8    Missouri?

9    A    Yes.

10   Q    And you were unpacking?

11   A    I believe so, yes.

12   Q    Take a look at that page if you want to refresh your

13   memory.  That's page 44 again of this November 4, 2004,

14   deposition.

15   A    Okay.

16   Q    Now, was he living in California at the time?

17   A    Yes.

18   Q    So you were moving back.  Were you moving in with him?

19   A    Yes, I think so.

20   Q    And you were unpacking?

21   A    Yes.

22   Q    And how did you happen to have the drawings with you?

23   A    I don't remember exactly.

24   Q    Do you remember how he reacted when he saw the

25   drawings?

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

```
1    A    I think he also really liked them.

2    Q    Now, you also showed the Bratz materials to your friend

3    and former roommate Alise Clooney?

4    A    Yes.

5    Q    That was in 1999, right?

6    A    I don't remember exactly.

7    Q    Okay.  Take a look at the same transcript, page 48,

8    lines 19 through 23.

9    A    Okay.

10   Q    Does that refresh your memory?

11   A    I don't really remember it right now, but, again, I

12   don't disagree with that testimony.

13   Q    And your testimony was that you showed the Bratz

14   materials to Alise Clooney sometime in the spring of 1999?

15   A    Yes.

16   Q    She was also a Mattel employee, as well as your

17   roommate?

18   A    Yes.

19   Q    What specifically did you show her if you remember?

20   A    I believe I showed her the line drawings.

21   Q    Would those also be called a template or a master

22   drawing?

23   A    Yes.

24   Q    Can you explain to us -- which is the term that you

25   used?  Do you call it a master drawing, a template, or a
```

1    line drawing?

2    A    Any of those three.

3    Q    So we can use those interchangeably?

4    A    Yes.

5    Q    And those are the drawings that you put in a light box,

6    and you can trace and create other drawings from those?

7    A    Yes.

8    Q    What kind of media was used?  In other words, was that

9    in pencil or a Magic Marker?  How was that created?

10   A    I think it was a marker.

11   Q    Take a look at your your deposition, page 49, lines 1

12   through 2.

13   A    Okay.

14   Q    Bear in mind you are talking to a non-artist, so you

15   will have to spell this out for me.  How did you create

16   those?

17   A    I'm not sure what you are talking about.

18   Q    Did you use pen and ink?

19   A    Yes.

20   Q    And when you say pen, is it like a ballpoint pen like I

21   am using, or is it a pen that's more like a felt-tip pen or

22   like a marker?

23   A    I think it was like a marker.

24   Q    How many drawings did you show her?

25   A    I don't recall exactly.

```
 1    Q    If you can take a look at page 49, lines 4 through 10.

 2    First, how many drawings did you have with you?

 3    A    Oh, I don't remember.

 4    Q    Would you take a look at 43, lines 9 and 10?

 5    A    I'm sorry.  Which page?

 6    Q    Page 49, lines 9 and 10.

 7    A    Oh, okay.

 8    Q    So how many drawings did you have with you?

 9    A    According to this, I had 13.

10    Q    And that's your prior testimony?

11    A    Yes.

12    Q    Do you remember how many of those you showed to her?

13    A    I don't.

14    Q    Did she see them on more than one occasion?

15    A    I believe so, yes.

16    Q    At home was this where she saw them?

17    A    Yes.

18    Q    Now, you also showed these drawings to somebody named

19    Ramona Prince.  You have talked about her also with

20    Mr. Price.

21         Ramona Prince was a notary wasn't she?

22    A    Yes.

23    Q    She worked with somebody at Mattel, an executive?

24    A    Yes.

25    Q    Who was that?
```

1   A      I think his name was Ron Longsdorf.

2   Q      Was he actually a vice-president?

3   A      I don't know what his position was.

4   Q      Was she also a friend of yours?

5   A      Yes.

6   Q      Was she the secretary in the Barbie Collectibles

7   Division where you worked?

8   A      I think she was, yes.

9   Q      Take a look at your trial testimony, page 2985, lines 2

10  through 8.  See if that refreshes your memory as to what

11  Mr. Longsdorf's title was.

12  A      Which page and which line?

13  Q      Page 2985, lines 9 through 15.

14  A      Okay, yes.

15  Q      So he was a senior vice-president of Barbie

16  Collectibles?

17  A      Yes.

18  Q      This was before you were going to send your drawings

19  off to Alaska Mama to see if they would act as an agent for

20  you?

21  A      Yes.

22  Q      Now, you told Ms. Prince that these were drawings you

23  had done while you were in Missouri in 1998, right?

24  A      Yes.

25  Q      And that was back on August 26, 1999, right?

1    A    I think so, yes.

2    Q    That was long before you ever heard of MGA, correct?

3    A    Yes.

4    Q    And it was long before you ever had any meetings with

5    anybody from MGA, right?

6    A    Yes.

7    Q    And when you told Ms. Prince that these were drawings

8    you had done while you were in Missouri in 1998, were you

9    telling her the truth?

10   A    Yes.

11   Q    Did you tell her that you were thinking of maybe trying

12   to pitch them or do something with them?

13   A    I believe so, yes.

14   Q    And that you felt you needed some sort of protection?

15   A    I don't remember saying something like that.

16   Q    Okay.  Look at your deposition, November 4, 2004, page

17   56, lines 3 through 7.

18   A    I'm sorry.  Which page?

19   Q    Page 56, lines 3 through 7.

20   A    Okay.

21   Q    So did you tell her that you were getting ready to

22   maybe pitch this to somebody, and you felt you needed some

23   sort of protection?

24   A    Yes.

25   Q    That was August 26, 1999, that you made that statement

1  to her, right?

2  A    Yes.

3  Q    So even back then you were already thinking that you

4  wanted to see if you could maybe find a toymaker interested

5  in executing your idea, right?

6  A    Yes.

7  Q    And you knew she was a secretary to a highly placed

8  executive at Mattel, right?

9  A    Yes.

10  Q    But you weren't afraid of telling her about this

11  project or your pitch because you didn't feel you were doing

12  anything wrong?

13  A    That's right.

14  Q    If we could see Exhibit 60, which I believe it's in

15  evidence -- it is -- turning to page 19 of Exhibit 60

16  where it says, "Original sketches of doll idea, character,

17  six total, names are Zoey -- two males, from 1998,

18  Missouri."

19       How come the two guys didn't get names?  I have always

20  wondered.

21  A    I don't remember.

22  Q    One of them ended up being Jared didn't he?

23  A    I don't remember.

24  Q    It says "from 1998, Missouri."  That actually isn't

25  your handwriting where it says that, right?

1   A      No.

2   Q      This was information that you provided to Ms. Prince,

3   the notary?

4   A      Yes.

5   Q      Let's look at Exhibit 60-20.  Here it says, "13

6   drawings each stamped and signed to ACKN.  Sig. of Carter."

7   I assume that means each drawing stamped and signed to

8   acknowledge signature of Carter.

9          That's your signature under "Signature of Signer,"

10  right?

11  A      Yes.

12  Q      So you told Ms. Prince the same thing that you told

13  everybody at MGA, that you had drawn these in 1998 in

14  Missouri, right?

15  A      Yes.

16  Q      In the same way on August 26, 1999, when these were

17  notorized that you had never heard of MGA, you had also

18  never heard of Isaac Larian?

19  A      No.

20  Q      Or Paula Garcia?

21  A      No.

22  Q      Alaska Mama that you were getting ready to send these

23  to was a licensing agency with a stable of artists and

24  photographers and designers?

25  A      I think so, yes.

1   Q    And the CEO was -- do you remember her name?

2   A    I don't.

3   Q    Does Shirley Henshel ring a bell?

4   A    Somewhat, yes.

5   Q    After August of 1999, you sent Alaska Mama color copies

6   of the Bratz drawings?

7   A    Yes.

8   Q    Again, you believed then as you have always believed

9   that you were the owner of the Bratz idea?

10   A    Yes.

11   Q    Now, by September of 2000, had you shown your drawings

12   to at least four Mattel employees:  Sheila Kyaw, Carmen

13   Monteagudo, Elise Cloonan, Ramona Prince?

14   A    Yes.

15   Q    And the latter was the secretary to the vice-president

16   of Barbie Collectibles?

17   A    Yes.

18   Q    And you have met and talked to people who worked -- to

19   independent contractors who work with Mattel?

20   A    Yes.

21   Q    And you talked about Bratz in a Starbucks right near

22   Mattel?

23   A    Yes.

24   Q    Spreading out your Bratz drawings as you did so, right?

25   A    Yes.

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

```
 1              MS. KELLER:  Your Honor, would this be -- I'm
 2    about to change topics.  Is this a good time?
 3              THE COURT:  Yes.
 4              I think all counsel and I agree that we are far
 5    enough long so let me read a couple of instructions to you
 6    just to help us out along the way.  It's kind of a
 7    refresher.
 8              First, let me just speak to you about your
 9    conduct.  I think you have been exemplary, but let me remind
10    you of the following in a more formalistic way for just a
11    moment.
12              During the trial until you have heard all the
13    evidence and retire to the jury room to deliberate, you are
14    not to discuss the case with anyone, not even among
15    yourselves.  And I will re-instruct you occasionally along
16    the way just as a reminder.
17              If anyone should try to talk to you about the
18    case, including a fellow juror, bring it to me attention
19    promptly.  There are good reasons for this ban on
20    discussions, the most important being the need for you to
21    keep an open mind throughout the presentation of all the
22    evidence for both sides.
23              If any lawyer, party, or witness does not speak to
24    you when you pass them in the hallway or you ride the
25    elevator or the like, remember it's because they are not
```

1    supposed to talk to you or visit with you.  That's why you

2    are asked to wear your jury tags around the courthouse.  It

3    shows that you are someone who is not to be approached in

4    any way inadvertently, even by witnesses in the hallway who

5    are coming from all, and they don't know who you are.

6              Second, do not read or listen to anything related

7    to this case.  It's not admitted into evidence.  There has

8    been some modicum of press coverage, so let's just take that

9    head on.  I don't sequester jurors.  I don't believe in

10   that.  I trust you.  If you see something you think pertains

11   to this case, just turn it over immediately upon recognizing

12   it or turn off the media source.

13             Do not read any article or watch and listen to the

14   report.  Certainly don't go out and google and use the

15   internet.  In addition, do not try to do any independent

16   research or investigation.  I kid you not we wouldn't have

17   to tell jurors that unless we have had it happen before.  Do

18   not do any research on the Internet, for example.  You are

19   to decide the case upon the evidence presented here at trial

20   in the courtroom with people under oath who are being

21   examined in this wonderful adversarial system.

22             Do not reach any conclusion on any claims or

23   defenses until all of the evidence has been submitted to

24   you.  Remember just keep an open mind until the beginning of

25   your deliberations at the end of the case.

1          Now, another instruction I would like to tell you

2    is that it may be necessary for me to talk with the lawyers

3    outside of your hearing by having a bench conference.  If

4    that happens, please be patient with us.  It's going to be

5    rare.  We are not trying to keep important information from

6    you, but these conferences are necessary I think for me to

7    fulfill my responsibility on occasion.  I will keep them

8    brief.  That's to make sure the evidence is being presented

9    to you correctly and under the law.

10         We will do what we can to keep the number and

11   length of these conferences to a minimum.  While we meet, I

12   invite you to stand up, stretch, visit with each other, run

13   laps around the building if you want to -- I'm just kidding

14   you, but  you can stretch.  There is no reason you need to

15   sit there from a moment.

16         I may not always grant an attorney's request for a

17   conference.  Do not consider my granting or denying a

18   request for a conference as any indication of my opinion of

19   the case or what your verdict should be.

20         Now, we are far enough along for me to remind you

21   that the evidence from which you find the facts consists of:

22         1.  The testimony of the witnesses;

23         2.  Documents and other things received as

24   exhibits;

25         3.  Any acts which are stipulated, that is,

1    formally agreed upon by the parties, and any facts that are

2    judicial noticed.  There may be some judicial notice later

3    on, although there hasn't been thus far, of documents that

4    might be official records to save both parties time.  That

5    hasn't occurred yet, but it may.

6            The following things are not evidence:

7            1.  The statements and arguments and questions of

8    the lawyers for the parties in this case;

9            2.  The objections by lawyers; and

10           3.  Any testimony I tell you to disregard and

11   anything you may have seen or heard about this case outside

12   the courtroom.

13           Now, there are a number of tricky things that

14   happen in a trial.  First of all, sometimes you will hear me

15   say please strike the question.  Please strike the answer.

16   It's just my caution to make certain that that's coming in

17   appropriately, and sometimes I'm not hearing it.

18           Now, I have got an advantage over you.  Let me

19   tell you what I have got.  I have something called realtime

20   up here, and if you watch me closely sometimes, I disappear

21   behind the screen.  Whatever the court reporter is writing,

22   I can scroll back and see what is written.  That's why I

23   appear to be so blank.  I'm not at all.  I can see what you

24   are only able to hear at the present time.

25           Remember at the end of the case is there is a

1    disagreement or a concern or you just need your memory

2    refreshed, we have got the ability to have the court

3    reporter come back in and read that portion to you.  Now,

4    that means you still have to stay alert.  I still have to

5    make sure you get a lot of sleep.  Remember if we get down

6    to that, you will have to be patient because another

7    courtroom might be in another courtroom as far as Los

8    Angeles or Riverside, but we will get that information

9    during your deliberations back to you if you so request.

10            I think the other thing is you must make your

11   decision based on all the evidence you see and hear in this

12   courtroom.  Do not let rumors, suspicions, or anything else

13   that you may see or hear outside the courtroom influence

14   your decision.

15            Sometimes I am allowing into evidence -- before

16   you evidence that in fact isn't evidence that's coming to us

17   firsthand from the witness who knows or sees that evidence,

18   but it might be evidence that I am allowing you hear for a

19   moment not for the truth, not that it occurred, but to let

20   you hear the witness' state of mind.  Did they really hear

21   that?  What's the basis of their actions based upon this

22   information?  Are these rumors, et cetera?  I will let you

23   know at that time that that's something you shouldn't take

24   for the truth of the matter asserted.  It's simply to give

25   you an idea about what a particular witness is saying.

39

```
 1              You should use your common sense in weighing
 2     the evidence, considering it in light of all the other
 3     evidence.
 4              Now, there are a lot of other instructions that I
 5     could read.  Just occasionally I will just remind you in a
 6     more formalistic way, but sometimes I will come out and joke
 7     with you.  It's just my kind of cautious way of saying has
 8     anybody talked to anybody about the case so I can start all
 9     over again?  Don't do it.  Talk about anything else, but
10     just nothing about the case.  Fair enough.  Does that make
11     sense?  Well, if it doesn't, please abide by it anyway.  I'm
12     just joking with you.
13              Now, go home.  We will see you tomorrow at 8:30.
14              (Jury not present)
15              THE COURT:  Mr. Bryant, if you would resume the
16     stand at 8:25 tomorrow, I would appreciate it.
17              Counsel, if you would have a seat for a moment.
18              I think because of the press coverage some of the
19     comments we made and some of our discussions at sidebar
20     should be sealed.
21              Ms. Keller.
22              MS. KELLER:  Which comments are you referring
23     to?
24              THE COURT:  Let me see counsel for a moment?
25              (Sealed sidebar conference.)
```

1          (The proceedings were concluded.)

2                          -oOo-

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4                              CERTIFICATE

5

6          I hereby certify that pursuant to Section 753,

7   Title 28, United States Code, the foregoing is a true and

8   correct transcript of the stenographically reported

9   proceedings held in the above-entitled matter and that the

10  transcript page format is in conformance with the

11  regulations of the Judicial Conference of the United States.

12

13  Date:  2/2/11

14

15                         Sharon A. Seffens 2/2/11

16                         _____

17                         SHARON A. SEFFENS, U.S. COURT REPORTER

18

19

20

21

22

23

24

25