Case 2:04-cv-09049-DOC-RNB  Document 9795  Filed 02/04/11  Page 1 of 103  Page ID #:293954
CV 04-9049-DOC - 02/02/2011 - Day 11, Vol. 2 of 3

1

1               **UNITED STATES DISTRICT COURT**

2              **CENTRAL DISTRICT OF CALIFORNIA**

3           **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4                     – – – – – – –

5

6    MATTEL, INC., ET AL.,              )
                                        )
7              Plaintiffs,              )
                                        )
8         vs.                           ) No. CV 04-9049-DOC
                                        )    Day 11
9    MGA ENTERTAINMENT, INC., ET AL.,   )    Volume 2 of 3
                                        )
10             Defendants.              )
     _____)

11

12

13

14

15           REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                      Jury Trial

17                 Santa Ana, California

18              Wednesday, February 2, 2011

19

20

21

22   Jane C.S. Rule, CSR 9316
     Federal Official Court Reporter
23   United States District Court
     411 West 4th Street, Room 1-053
24   Santa Ana, California 92701
     (714) 558-7755
25
     11-02-02 MattelV2

1    **APPEARANCES OF COUNSEL:**

2

3    FOR PLAINTIFFS MATTEL, INC., ET AL.:

4                QUINN, EMANUEL, URQUHART & SULLIVAN
                 By:   JOHN B. QUINN
5                      MICHAEL T. ZELLER
                       WILLIAM PRICE
6                      Attorneys at Law
                 865 South Figueroa Street
7                10th Floor
                 Los Angeles, California 90017-2543
8                (213) 443-3000

9

10   FOR DEFENDANTS MGA ENTERTAINMENT, INC., ET AL.:

11               ORRICK, HERRINGTON & SUTCLIFFE, LLP
                 BY:   THOMAS S. MC CONVILLE
12                     Attorney at Law
                 4 Park Plaza
13               Suite 1600
                 Irvine, California 92614
14               (949) 567-6700

15               - AND -

16               ORRICK, HERRINGTON & SUTCLIFFE, LLP
                 BY:   ANNETTE L. HURST
17                     Attorney at Law
                 405 Howard Street
18               San Francisco, California 94105
                 (415) 773-5700

19               - AND -

20               KELLER RACKAUCKAS, LLP
21               BY:   JENNIFER L. KELLER
                       Attorney at Law
22               18500 Von Karman Avenue
                 Suite 560
23               Irvine, California 92612
                 (949) 476-8700

24

25

```
1    APPEARANCES OF COUNSEL (Continued):

2

3    FOR DEFENDANT CARLOS GUSTAVO MACHADO GOMEZ:

4              SCHEPER, KIM & OVERLAND, LLP
               BY:  ALEXANDER H. COTE
5                  Attorney at Law
               601 West Fifth Street
6              12th Floor
               Los Angeles, California 90071
7              (213) 613-4660

8              – AND –

9              LAW OFFICES OF MARK E. OVERLAND
               BY:  MARK E. OVERLAND
10                 Attorney at Law
               100 Wilshire Boulevard
11             Suite 950
               Santa Monica, California 90401
12             (310) 459-2830

13

14   Also Present:

15             ROBERT ECKERT, Mattel CEO

16             ISAAC LARIAN, MGA CEO

17             KEN KOTARSKI, Mattel Technical Operator

18             MIKE STOVALL, MGA Technical Operator

19             RACHEL JUAREZ, Quinn Emanuel Urquhart & Sullivan

20             KIERAN KIECKHEFER, Orrick Herrington & Sutcliffe

21

22

23

24

25
```

Case 2:04-cv-09049-DOC-RNB   Document 9795   Filed 02/04/11   Page 4 of 103   Page ID #:293957
CV 04-9049-DOC - 02/02/2011 - Day 11, Vol. 2 of 3

4

**I N D E X**

**EXAMINATION**

| Witness Name | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| BRYANT, CARTER | | | | |
| BY Ms. Keller | | 5 | | |

**EXHIBITS**

| Exhibit | Identification | Evidence |
|---|---|---|
| Defendants' No. 25 | | 16 |
| Defendants' No. 27 | | 55 |
| Defendants' No. 10480 | | 39 |
| Defendants' No. 10624 | | 91 |
| Defendants' Nos. 13656, 13656A | | 34 |
| Defendants' No. 30687 | | 87 |
| Defendants' No. 35002 | | 82 |
| Defendants' No. 35003 | | 89 |
| Defendants' No. 35008 | | 86 |

1          SANTA ANA, CALIFORNIA, WEDNESDAY, FEBRUARY 2, 2011

2                    DAY 11, VOLUME 2 OF 3

3                         (1:02 p.m.)

4              *(The following proceedings is taken in the*

5          *presence of the jury.)*

6              THE COURT:  Okay.  Then we are back on the record.

7      All counsel are present, the parties are present, the

8      witness is present.

9              And Ms. Keller, if you'd like to continue with

10     your cross-examination, please.

11             MS. KELLER:  Thank you, your Honor.

12                 **CROSS-EXAMINATION (Continued**)

13     BY MS. KELLER:

14     Q    Good afternoon, Mr. Bryant.

15     A    Good afternoon.

16     Q    Mr. Bryant, it was brought to my attention that in a

17     couple of the things we went through, the characters had two

18     master drawings, and so I want to ask you about that, if I

19     can.

20     A    Okay.

21     Q    Exhibits -- if we can compare these, it's Exhibit 5-68

22     and 5-72, and those are both master drawings of Zoe, right?

23     A    Yes.

24     Q    Now, why do we have two different master drawings of

25     Zoe?

1    A    I think because there were two different illustrations

2    of Zoe.

3    Q    And was one for daytime wear?

4    A    Yes.

5    Q    And the other for nighttime wear?

6    A    Yes.

7    Q    Okay.  It's also been brought to my attention by my

8    faithful assistant that we need to go back to Exhibit 5-54

9    for a minute, which was the group pose with the name "Bratz"

10   notarized.  And this was notarized August 26th, 1999, right?

11   A    Yes.

12   Q    You were employed by Mattel at the time?

13   A    Yes.

14   Q    And can you point to where -- can you direct us to

15   where the name "Bratz" is?

16   A    It's in the upper left corner.

17   Q    And so Ramona Prince, the person who notarized this for

18   you, the secretary to the executive vice president of Barbie

19   Collectibles, she saw the name "Bratz" on the drawing,

20   right?

21   A    I assume she did.

22   Q    And this was -- so -- and again, this was August 26th,

23   1999?

24   A    Yes.

25   Q    Thank you very much.

1        Now, I think we can move on.

2        We were -- when we left off, we were starting about --

3    talking about, or beginning to talk about when you started

4    back at Mattel, January 4th, 1999, okay?

5    A    Uh-huh.

6    Q    Now, you said when you started back at Mattel, that you

7    had to sign some paperwork?

8    A    Yes.

9    Q    And tell us the -- where were you when you were given

10   all the paperwork to sign?

11   A    I don't remember exactly.

12   Q    Is it inside Mattel?

13   A    I believe so, yes.

14   Q    And were you sitting in a conference room setting, kind

15   of?

16   A    Not that I remember.

17   Q    If you remember?

18   A    I don't remember.

19   Q    And you were just given a series of papers to sign?

20   A    Yes.

21   Q    Now, during the time you were freelancing from

22   April 1998 until January 4th, 1999, you said Ashton-Drake

23   was the only company that paid you, right?

24   A    I'm sorry, what was the question again?

25   Q    During the time you were freelancing from April of 1998

1    until January 4th, 1999, Ashton-Drake was the only company

2    that paid you, right?

3    A    Yes.

4    Q    Alaska Momma didn't pay you, true?

5    A    No, no.

6    Q    And did you get any money from your Bratz drawing in

7    that period?

8    A    No.

9    Q    Any money from your Sabrina drawings in that period?

10   A    No.

11   Q    Any money from your Rainy Day Rascals drawings during

12   that period?

13   A    No.

14   Q    Any money from your various greeting cards during that

15   period?

16   A    No.

17   Q    Now, is it true that the Ashton-Drake Galleries is

18   known as a premiere source for a wide variety of collectible

19   dolls and dolls' accessories?

20   A    I don't know.

21   Q    Do you know whether they market a line of collectible

22   plush dolls?

23   A    I don't know.

24   Q    Let's look at Exhibit 26, and this is your conflict of

25   interest questionnaire that you had to sign when you went

1    back to work at Mattel; is that right?

2    A    Yes.

3    Q    And who --

4          MS. KELLER:  I'm sorry, your Honor, I have to get

5    my reading glasses on.

6    BY MS. KELLER:

7    Q    You have the document in front of you?

8    A    Yes.

9    Q    You note the very small size of this print?

10   A    Yes.

11   Q    Was there any -- was there any magnification equipment

12   in the room that you remember?

13         MR. PRICE:  Objection.  Argumentative.

14         THE COURT:  Overruled.

15         THE WITNESS:  Not that I remember.

16   BY MS. KELLER:

17   Q    Or was it -- the way we have it projected up here, did

18   anybody project this document for you at that time, back

19   when you signed it?

20   A    Not that I remember, no.

21   Q    Now, the documents that you were given, was it a group

22   of them?

23   A    I think so, yes.

24   Q    And you were a little younger than I am, so you

25   probably didn't have too much trouble reading this; am I

Case 2:04-cv-09049-DOC-RNB   Document 9795   Filed 02/04/11   Page 10 of 103   Page ID #:293963
CV 04-9049-DOC – 02/02/2011 – Day 11, Vol. 2 of 3

10

1    right?  At least seeing what the print said?

2    A    Right.

3    Q    And so you filled it out?

4    A    Yes.

5    Q    And when it says, "Have you been the recipient of any

6    commission, fee, loan, trip, gift, benefit or anything else

7    of value that is derived in any way from a Mattel supplier,"

8    you answered yes.  And then to number 5, "Have you or any

9    relative of yours, by blood or marriage, been a director,

10   officer, consultant, agent, employee or representative of or

11   acted for any Mattel competitor in any capacity," and you

12   answered yes to that, right?

13   A    Yes.

14   Q    And so it said if you answered any of your questions as

15   yes, to please explain.  And you said "Four and five,

16   freelance design and artwork in 1998 from approximately 5/98

17   to 11/98 for the Ashton-Drake Galleries"?

18   A    Yes.

19   Q    So this form doesn't have a box on it that says, "Do

20   you have any drawings of dolls or other toys that you made

21   before beginning with Mattel," right?

22   A    That's right.

23   Q    Now, in general, when you filled these forms out, was

24   there anybody there explaining them, in other words,

25   translating into English some of the legalese in some of the

1   documents?

2   A     No, not that I remember.

3   Q     And do you think you more or less understood this

4   document?

5   A     I think I did.

6   Q     For example, it said, "A Mattel competitor is any

7   person, partnership, trust, corporation or other enterprise

8   which has done business or contemplates doing business in

9   any field that is in competition with Mattel or any Mattel

10   subsidiary"; did you understand it when it said that?

11   A     I don't remember what my understanding was at the time.

12   Q     Did you even pay attention to it?

13   A     I don't know that I paid all that much attention to

14   that.

15   Q     Now, you told us earlier that you weren't thinking of

16   the Bratz doll as a possible competitor product for Barbie

17   because you didn't think Mattel would ever manufacture

18   anything like Bratz; do you remember that?

19   A     Yes.

20   Q     Were you actually thinking of that at the time you

21   signed this, though?

22   A     I -- I don't remember what I was thinking at that time.

23   Q     Would I be right that this was -- have you ever signed

24   escrow instructions, you know, have you ever bought a house

25   or a condo?

1    A    Yes, yes.

2    Q    You know how at the end, they give you this stack of

3    things to sign?

4    A    Yes.

5    Q    And you just go through them and sign and sign and sign

6    and sign?

7              MR. PRICE:  Objection.  This is argument.

8              THE COURT:  Sustained.

9    BY MS. KELLER:

10   Q    Well, is it your custom and -- when you get something

11   like that, like say escrow instructions, to read every

12   single line in the stack and try to understand it all?

13             MR. PRICE:  Objection.  Irrelevant.

14             THE COURT:  Sustained.

15   BY MS. KELLER:

16   Q    When you got the documents from Mattel and you went

17   through the documents Mattel gave you, did you go down line

18   by line by line and try to understand every single thing in

19   it or did you just sign your name?

20   A    Yeah, I -- you know, I basically would sign whatever I

21   was asked to sign.  I mean, yeah.

22   Q    Now, this document that we've been looking at,

23   Exhibit 26, you had to read some of the lines carefully

24   because it had these little bubbles that had to be filled

25   out, the yes and no bubbles?

1    A    Yes.

2    Q    And so did you try to answer those to the best of your

3    ability?

4    A    Yes.

5    Q    Were you relying in part on the fact that you had

6    worked for Mattel before and so you had a general

7    understanding of what you thought Mattel required of its

8    employees?

9    A    I don't remember exactly, but probably.

10   Q    Now, freelancing for Ashton-Drake might constitute

11   acting as a consultant for a Mattel competitor; is that

12   true?  If you look at number 5.

13   A    I suppose, yes.

14   Q    And it says, "Have you or any relative of yours, by

15   blood or marriage, been a director, officer, consultant,

16   agent, employee or representative of or acted for any Mattel

17   competitor in any capacity?"

18        So what did you mean when you answered yes to that?

19   A    (No audible response.)

20   Q    Were you thinking of Ashton-Drake?

21   A    I think maybe, yes.

22   Q    And is that why you wrote in in the handwritten part,

23   "freelance design and artwork for the Ashton-Drake

24   Galleries"?

25   A    I think so, yes.

1   Q     Now, Mr. Price asked you whether you would agree -- I

2   believe it was you would agree that certainly trying to

3   develop a doll line that would be in competition with Mattel

4   would objectively be construed as being a conflict of

5   interest or allegiance; do you remember that question?

6   A     Yes.

7   Q     Now, at this point, you had only done drawings for

8   potential dolls, right?

9   A     Yes.

10  Q     You had done drawings for the Bratz and for Sabrina,

11  right?

12  A     Yes.

13  Q     You hadn't developed a doll line yet, had you?

14  A     No.

15  Q     And you hadn't contacted any toy companies at the time

16  you signed this document about developing dolls, right?

17  A     No.

18  Q     Had not entered into any agreements to develop dolls?

19  A     No.

20  Q     Did you believe that the fact that you had drawn

21  sketches of potential dolls at a time when you were not

22  working for Mattel created a conflict of interest?

23  A     No.

24  Q     And is that why you didn't answer yes to number 8,

25  which is what Mr. Price had asked you about earlier?

CV 04-9049-DOC - 02/02/2011 - Day 11, Vol. 2 of 3

15

```
 1    A    Yes.

 2    Q    And number 8 says, "Excepting normal, everyday

 3    transactions, purchase of toys, et cetera, have you engaged

 4    in any business venture or transaction involving a Mattel

 5    supplier or a competitor or engaged in any activity which

 6    could be objectively construed as being a conflict of

 7    interest or allegiance?"

 8         So when you answered no to that question on

 9    January 4th, 1998, you were telling the truth, weren't you?

10    A    I thought I was, yes.

11    Q    Has Mattel demanded that you give Mattel the rights to

12    Sabrina, Rainy Day Rascals and all your greeting cards?

13    A    No.

14    Q    I'd like to talk to you a little bit about your Mattel

15    inventions agreement, okay?

16    A    (No audible response.)

17    Q    Now, you told MGA that you owned the Bratz idea when

18    you met with MGA, right?

19    A    Yes.

20    Q    And at the time, you had this agreement that we've

21    heard referred to as the inventions agreement, which is

22    Exhibit 25?

23         MS. KELLER:  Your Honor, I think the original is

24    9924, and for display purposes, we have Exhibit 25.  We'll

25    move that into evidence, your Honor.
```

CV 04-9049-DOC - 02/02/2011 - Day 11, Vol. 2 of 3

16

```
 1              THE COURT:  Received.

 2              (Defendants' Exhibit No. 25 is received in

 3         evidence.)

 4    BY MS. KELLER:

 5    Q    Now, the inventions agreement you signed in January,

 6    was the agreement you signed in January 1999 at the same

 7    time you signed that agreement we just saw, right?

 8    A    Yes.

 9    Q    And that was -- this was -- this Exhibit 25 was the

10    agreement that was in effect in October of 2000 when you

11    gave two weeks' notice; am I right?

12    A    I'm sorry, can you ask me the question again?

13    Q    This agreement was the one that was in effect in

14    October of 2000 when you gave notice to Mattel that you were

15    leaving?

16    A    Yes.

17    Q    And not Exhibit 23, which you signed in November 1995?

18              MS. KELLER:  If we could have --

19              (Attorney discussion held off the record.)

20    BY MS. KELLER:

21    Q    Now, Exhibit 25, this employee confidential information

22    and inventions agreement, at the time you signed it, you

23    didn't understand that document at all, did you?

24    A    I don't remember understanding a lot of it, no.

25    Q    Okay.  If you could take a look at your deposition,
```

1    November 8th, 2004, at page 645, line 23 to 646, line 1, and

2    then 646, line 4.

3        Did you have a chance to look at that?

4    A    I'm sorry, no.  We don't know which one you are talking

5    about.

6    Q    I'm sorry, deposition, November 8th, 2004, page 645,

7    line 23 through 646, line 4.

8    A    Okay.

9    Q    Okay.  Back in 2004, when you were deposed about this,

10   you didn't -- you said you didn't understand this document

11   at all, right?

12   A    That's right.

13   Q    Now, since then, this document has been discussed with

14   you at tremendous length, both in depositions and in court,

15   right?

16   A    Yes.

17   Q    And pretty much -- I'll bet you by this point, every

18   word of it has been picked over with you, am I close?

19   A    You're pretty close.

20   Q    But taking yourself back then, not now, not with all

21   you know now, taking yourself back then, you didn't think it

22   was something you really needed to study, did you?

23   A    No, I don't think so.

24   Q    And you don't remember reviewing it at all at the time,

25   right?

CV 04-9049-DOC - 02/02/2011 - Day 11, Vol. 2 of 3

1    A    I don't.

2    Q    And you didn't even remember signing it when you were

3    asked back in 2004, right?

4    A    That's right.

5    Q    And you weren't given a chance to take it home and look

6    at it, right?

7    A    Not that I remember, no.

8    Q    You weren't exactly sure what the terms of the

9    invention agreements were, and you didn't really understand

10   them, right?

11   A    That's right.

12   Q    And, for example, you've said you would not have

13   understood the term "reduced to practice," which is in here?

14   A    Yes.

15   Q    Now, did Mattel have an attorney in the room explaining

16   to the new employees what all these terms meant?

17   A    Not that I remember, no.

18   Q    Was anybody there from human resources to explain to

19   people what these terms meant?

20   A    I don't remember.

21   Q    Was there anybody there telling all the employees, hey,

22   you better really read this, you are giving up a lot of

23   rights, this is very important?

24   A    No.

25   Q    So basically you were just given these documents and

1   told sign these and then you can start; is that true?

2   A    Yes.

3   Q    And to this day, do you understand, even after all the

4   legal proceedings you've been through, what the term in here

5   that is, quote, "reduced to practice," quote-unquote, means?

6   I mean, do you know the legal meaning of that?

7   A    I don't know the legal meaning.  I have a sort of

8   general understanding.

9   Q    Kind of a layperson's understanding?

10  A    Yes.

11  Q    But would you feel qualified today to interpret this

12  contract for somebody else who was signing it?

13  A    No.

14  Q    And this was in the same very small type that the other

15  agreement was in?

16  A    Yes.

17  Q    All on one page?

18  A    Yes.

19  Q    Now, let's go to paragraph 2, which talks about

20  inventions, okay, and paragraph 2A says, "I agree to

21  communicate to the company as promptly and fully as

22  practicable all inventions as defined below conceived or

23  reduced to practice by me alone or jointly with others at

24  any time during my employment by the company.  I hereby

25  assign to the company and/or its nominees all my right,

Case 2:04-cv-09049-DOC-RNB   Document 9795   Filed 02/04/11   Page 20 of 103   Page ID #:293973
CV 04-9049-DOC - 02/02/2011 - Day 11, Vol. 2 of 3

20

1    title and interest in such inventions and all my right,

2    title and interest in any patents, copyrights, patent

3    applications or copyright applications based thereon.  I

4    will assist the company and/or its nominees without charge,

5    but at no expense to me, at any time in every proper way to

6    obtain for its and/or their own benefit patents and

7    copyrights for all such inventions anywhere in the world and

8    to enforce its and/or their rights in legal proceedings."

9         And then there is a part B that says, "As used in this

10   agreement, the term 'inventions' includes, but is not

11   limited to, all discoveries, improvements, processes,

12   developments, designs, know-how, data computer programs and

13   formulae whether patentable or unpatentable."

14        At the time you read this, did you know that the term,

15   quote, "reduced to practice," for example, is a legal term

16   of art that you -- that is used by lawyers who practice

17   intellectual property law?

18   A    No.

19   Q    And this -- this agreement doesn't say that within it,

20   does it?  In other words, it doesn't say, "Warning, this is

21   a legal term, and you should have a lawyer explain it to

22   you," correct?

23   A    That's correct.

24   Q    And there is also this provision, I think, Mr. Price

25   read to you from the California Labor Code, right?  Do you

1    remember that?  This is Section C -- no, let me see if I can

2    find it.

3         Section C under -- it's 2C, "Any provision in this

4    agreement requiring me to assign my rights in any invention

5    does not apply to an invention which qualifies under the

6    provisions of Section 2870 of the California Labor Code."

7         Did you know what that section was?

8    A    No.

9    Q    Had anybody ever given you a handout explaining what

10   that was?

11   A    Not that I remember.

12   Q    By the way, did you ask anybody at Mattel why the print

13   was so small in these agreements?

14   A    Not that I remember, no.

15   Q    Now, it goes on, "That section provides that the

16   requirement to assign shall not apply to an invention that

17   the employee developed entirely on his or her own time

18   without using the employer's equipment, supplies, facilities

19   or trade secret information except for those inventions that

20   either, 1, relate at the time of conception or reduction to

21   practice of the invention to the employer's business, or

22   actually or demonstratively anticipated research of

23   development of the employer, or 2, result from any work

24   performed by the employee for the employer.  I understand

25   that I bear the burden of proving that an invention

1    qualifies under Section 2870."

2         Did you have any idea what that meant?

3    A    No, not that I remember.

4    Q    Now, do you remember whether you noted that this

5    paragraph refers to the time of conception or the time of

6    reduction to practice of the invention?

7    A    I'm sorry, what, now?

8    Q    When you looked at this, do you remember if you noted

9    that this paragraph refers to the time of conception?

10   A    No, I don't think I did.

11   Q    Or the time of reduction to practice?

12   A    No, I don't think so.

13   Q    Now, let's compare the agreement that you signed in

14   1995, Exhibit 23, with the agreement you signed in 1999,

15   Exhibit 25.  And I believe it was previously pointed out to

16   you that they are similar in their language.

17        Is the 1995 agreement on two pages?  And that's

18   Exhibit 23.  Let's see if we can find that for you.

19             THE COURT:  Did you say the 1999 agreement and

20   that's in Exhibit 23, isn't that Exhibit 25?

21             MS. KELLER:  No.  The 1995 agreement, Exhibit 23;

22   the 1999 agreement, Exhibit 25.  I'm sorry, your Honor, if I

23   misspoke.

24             MR. PRICE:  Your Honor, if we are comparing the

25   size of text, I request we use the original, 9924, and not

1    the copy.

2            THE COURT:  Do you have 9924?

3            MR. PRICE:  It's in evidence.

4            MS. KELLER:  Do you have it?

5            THE COURT:  And the 9924 corresponds to what year?

6            MR. PRICE:  Corresponds to Exhibit 25.  I am not

7    suggesting that the copy be shown, but the original.

8            THE COURT:  So we have 9924 which is the same as

9    25; is that correct, Counsel?  Agreed by all parties?

10           MR. PRICE:  Yes.

11           THE COURT:  And 23.

12           MS. KELLER:  Twenty-three is the 1995 agreement.

13           THE COURT:  1995 is 23, 1999 is both 25 and 9924.

14           MS. KELLER:  Okay.

15           THE COURT:  And Counsel, you can show either one.

16   BY MS. KELLER:

17   Q    And the 1995 agreement was on two pages, was it,

18   Mr. Bryant?

19   A    It appears to be, yes.

20   Q    And the 1998 -- I'm sorry, 1999 agreement that you

21   signed 1/4/99, Exhibit 25, that's on only one page, right?

22   A    Yes.

23   Q    Now, almost two years later, when you negotiated with

24   MGA, you had the help of your own lawyer, Anne Hwang, did

25   you not?

1    A    Yes.

2    Q    But Anne Hwang was not your lawyer at the time you

3    signed your agreement in 1999, Exhibit 25, correct?

4    A    That's correct.

5    Q    Did it ever occur to you that you even needed a lawyer

6    to go through those contracts when you went to work at

7    Mattel again?

8    A    Not that I remember, no.

9    Q    And Mr. Price had asked you whether you ever attempted

10   to consult with a lawyer about those contracts.  Why was it

11   that you did not?

12   A    I didn't think I needed to.

13   Q    And why is that?

14   A    I just -- I just didn't think it was going to ever be

15   any kind of a problem.

16   Q    And when you weren't given a copy, did you ask for a

17   copy?

18           MR. PRICE:  Objection.  It assumes facts not in

19   evidence.

20           THE COURT:  Well, I don't know if he was given a

21   copy or not.

22   BY MS. KELLER:

23   Q    Were you a given a copy?

24   A    I -- I don't remember.

25   Q    Are you aware that Mattel takes the position that its

Case 2:04-cv-09049-DOC-RNB   Document 9795   Filed 02/04/11   Page 25 of 103   Page ID #:293978
CV 04-9049-DOC - 02/02/2011 - Day 11, Vol. 2 of 3

25

```
 1    contracts themselves are trade secrets and can't be

 2    disseminated to the public?

 3              MR. PRICE:  Objection.  This is argument.

 4              THE COURT:  Yeah, sustained, Counsel.

 5    BY MS. KELLER:

 6    Q    Did anybody at Mattel tell you that these contracts

 7    were not given out because they were trade secrets?

 8    A    Not that I remember, no.

 9    Q    Would it be fair to say that your memory of that is a

10    little bit hazy?

11    A    Yes.

12    Q    Now, in this document when it talks about the -- the

13    time of conception, if you can take a look at that.

14         Are you able to read 25 okay on the screen?

15    A    Yes.

16    Q    And let's take a look at 2A, and the third line where

17    it says "conceived or reduced to practice by me."  Do you

18    see where it says "conceived or reduced to practice by me"

19    in 2A?

20    A    Yes.

21    Q    Is there any specification, there, on the definition of

22    conceived?  Is there any definition of conceived given

23    there?

24    A    No.

25    Q    Is there any definition of reduced to practice given
```

1   there?

2   A    No.

3   Q    Was it your understanding that any idea you came up

4   with during the time you were employed by Mattel would be

5   owned by Mattel?

6   A    No.

7   Q    Was it your understanding that any idea that had

8   anything to do with toys that you had while you were

9   employed by Mattel would be owned by Mattel?

10   A    I don't think so, no.

11   Q    Was it your understanding that any idea or invention

12   you came up with before you worked at Mattel would belong to

13   Mattel?

14   A    I don't think so, no.

15   Q    What did you think -- what do you think was the rule

16   for anything you came up with on your own time, meaning

17   nights and weekends?

18   A    I felt that whatever I did on my own free time was my

19   idea, that I owned it.

20   Q    And did you -- was it your understanding that if you

21   created an idea or a concept before Mattel hired you, that

22   that idea and concept did not get transferred to Mattel?

23   A    Yes.

24   Q    Is that what you thought?

25   A    Yes.

1    Q    Now, by your last day at Mattel, October 19th, 2000,

2    what was your understanding about who owned anything related

3    to Barbie or the Barbie group?

4    A    I'm sorry, can you reask that question?

5    Q    By the last day you worked at Mattel, October 19th,

6    2000, what was your understanding about anything that

7    related to Barbie or the Barbie group in terms of ownership?

8    A    I believe that was Mattel's.

9    Q    Okay.  So any concepts you came up with that related to

10   Barbie or the Barbie group, you felt were owned by Mattel?

11   A    Yes.

12   Q    But you did not have an understanding that anything at

13   all you created that related to the toy business belonged to

14   Mattel, true?

15   A    That's true.

16   Q    Now, you were asked whether you think it's appropriate

17   to expect -- for Mattel to expect its employees to assign

18   all their ideas at any time to Mattel; do you remember that

19   question?

20   A    No, I actually don't.

21   Q    Well, let's -- let's ask it now, then.

22        You don't think it's appropriate for you to assign

23   ideas you had when you were not working for Mattel to

24   Mattel, do you?

25   A    No.

1  Q   And likewise, ideas you had in 1998, when you were not

2  working for Mattel, was it your understanding that those

3  didn't belong to Mattel just because you were rehired in

4  January of 1999?  I know I'm asking the same thing in a lot

5  of different ways, but I want to make sure we have it

6  covered.

7  A   I think so, yes.

8  Q   And Mr. Price asked you about ideas you have outside of

9  your 9 to 5 job at nights and on weekends, and remember he

10 asked you whether you can turn ideas on and off, correct?

11 A   Yes.

12 Q   Because, after all, you can have ideas at other times

13 during the day or night, right?

14 A   Yes.

15 Q   And he said you can have ideas even when you are

16 sleeping; do you remember that?

17 A   Yes.

18 Q   Do you believe it's appropriate for Mattel to own ideas

19 you have even when you are sleeping, if you're employed by

20 Mattel?

21 A   No.

22 Q   Did that ever even occur to you, that even an idea --

23          THE COURT:  Counsel, excuse me for a moment.

24          Why don't we all just stand up and stretch for a

25 moment.  It's after lunch.

```
 1              (Complied.)

 2              THE COURT:  Together, 10 jumping jacks.

 3              (Laughter.)

 4              THE COURT:  All right.  Good.  Now, nice stretch.

 5   Back to work, now.

 6   BY MS. KELLER:

 7   Q    Now, so you didn't expect that ideas you had while

 8   sleeping belonged to Mattel, right?

 9   A    That's right.

10   Q    And you were also asked whether ideas and designs are

11   the same, and I think you said yes, as I remember.  So I

12   want to ask you about that.

13        Would you agree with me that drawings or designs are

14   things that are on paper or some other medium?

15   A    Yes.

16   Q    You can draw them on a paper, you can draw them on a

17   computer, right?

18   A    Yes.

19   Q    But they have to be drawn, true?

20   A    I would agree with that, yes.

21   Q    But the ideas are in the head, aren't they?

22   A    Yes.

23   Q    And you often have ideas that you don't write down

24   immediately, right?

25   A    That's correct.
```

Case 2:04-cv-09049-DOC-RNB   Document 9795   Filed 02/04/11   Page 30 of 103   Page ID #:293983
CV 04-9049-DOC – 02/02/2011 – Day 11, Vol. 2 of 3

30

1    Q    And sometimes you get an idea and you might not write

2    it down for years, true?

3    A    I'd say that's true.

4    Q    Or ever?

5    A    True.

6    Q    I mean, speaking for myself, sometimes I get bad ideas

7    and nothing ever happens to them.  Does that happen with you

8    sometimes?

9             MR. PRICE:  I doubt that.  Move to strike.

10            (Laughter.)

11            MS. KELLER:  That question was a bad idea.

12   BY MS. KELLER:

13   Q    Okay.  Do you sometimes get bad ideas and do nothing

14   with them?

15   A    Sure.

16   Q    Do you sometimes get good ideas and just don't have

17   enough time to write them down?

18   A    Sure.

19   Q    Now, you had the idea for Bratz in August 1998, right?

20   A    Yes.

21   Q    And you drew the first sketches right after that, and

22   we saw 5-39, 5-40, 5-41 and 5-42, those were all your first

23   sketches, right?

24   A    Yes.

25   Q    And you drew the other sketches over the next two or

Case 2:04-cv-09049-DOC-RNB   Document 9795   Filed 02/04/11   Page 31 of 103   Page ID #:293984
CV 04-9049-DOC – 02/02/2011 – Day 11, Vol. 2 of 3

31

1    three weeks, maybe?

2    A    Yes.

3    Q    Maybe a little more?

4         And that was all based on this idea that you had in

5    August 1998, right?

6    A    Yes.

7    Q    So the idea was here, and then went to the paper?

8    A    Yes.

9    Q    And became a design?

10   A    Yes.

11   Q    And the drawings you did later were also based on that

12   idea that you had had in August of 1998, right?

13   A    Yes.

14   Q    And your drawings weren't all done the same day you had

15   your initial idea, true?

16   A    That's true.

17   Q    So just to clarify this, would you agree with me that

18   designs and ideas are definitely not the same thing?

19   A    Well, yes.

20   Q    Yeah, I mean, an idea can become a design or not,

21   right?

22   A    Yes.

23   Q    Now, when you came back to Mattel in January 1999, you

24   were hired as a project designer in the Barbie collector

25   department, right?

1    A    That's right.

2    Q    Can you tell me what a project designer's duties

3    consisted of?

4    A    My duties were to illustrate, create fashions for the

5    doll, create hairstyles, create face designs for the doll.

6    Q    Makeup?

7    A    Makeup, yes.

8    Q    Accessories?

9    A    Sometimes.

10   Q    But again, as we talked about earlier, these were

11   collectible dolls for a adult market, right?

12   A    Yes.

13   Q    And so you talked earlier about having -- during your

14   second stint at Mattel in collectibles, that you worked on a

15   jewel series, a jewel Barbie, right?

16   A    Yes.

17   Q    Can you think of any of the others you worked on?

18   A    I worked on a -- I think it was a Grecian goddess type

19   series.  I worked on a Hollywood series.  I think I worked

20   on a fairy doll.  I worked on an Alice in Wonderland doll.

21   A lot.  I can't remember all of them.

22   Q    Swan Barbie?

23   A    Yes.

24   Q    A series of flower dolls?

25   A    Yes.

1   Q    And then we've already seen your Grand Entrance Barbie,

2   right?

3   A    Yes.

4   Q    Now, you were to be paid as a designer at Mattel,

5   right?

6   A    Yes.

7   Q    Essentially a fashion designer within Barbie

8   collectibles?

9   A    More or less, yes.

10   Q    And you weren't modeling 3D sculpts, for example, which

11   we've all heard a lot about sculpts at this point, you

12   weren't modeling 3D sculpts, true?

13   A    Yes.

14   Q    And, for example, Grand Entrance collection Barbie, you

15   designed the fashions, because the head and the body already

16   existed, right?

17   A    Yes.

18        MS. KELLER:  And could we see Exhibit 13656.

19   BY MS. KELLER:

20   Q    And we already talked about this a little.  That's

21   the -- you're holding in your hand the actual box of Grand

22   Entrance Barbie?

23   A    Right.

24   Q    And we have on the screen a picture of the box of Grand

25   Entrance Barbie.

1          MS. KELLER:  And the tangible, your Honor, is

2     13656A, the actual doll within box.

3          THE COURT:  Thank you.  Both are received.

4          *(Defendants' Exhibit Nos. 13656 and 13656A*

5     *are received in evidence.)*

6     BY MS. KELLER:

7     Q    Now, the back of the Grand Entrance collection box has

8     this photograph of you we talked about earlier, but it also

9     has some writing.  "Dear Barbie doll collector, I'd like to

10    welcome you to the delightful world of Barbie doll

11    collecting.  Designing for Barbie is very much like

12    designing for a high-fashion couture house."

13         Okay.  Can you tell us what that meant?

14    A    I think I just kind of meant that designing for

15    Barbie -- designing for Barbie collectibles in particular

16    gave me the opportunity to do very intricate, detailed

17    fashion designs.

18    Q    Okay.  And now look at the bottom left section where it

19    says "About Carter Bryant," and it says, "Carter Bryant has

20    been drawing fashions since he was nine years old and always

21    thought it might be fun to design for a Barbie doll some

22    day.  Happily for Barbie, that date came five years ago when

23    Mr. Bryant agreed to join the fashion design staff for

24    Barbie doll, and later, Barbie collectibles"; do you see

25    that?

CV 04-9049-DOC - 02/02/2011 - Day 11, Vol. 2 of 3

35

1    A    Yes.

2    Q    "His extraordinary natural talent for designing women's

3    fashions combined with his formal training from Otis College

4    of Art and Design has been beautifully captured through many

5    remarkable fashions for the Barbie brand."

6         And then it goes on to list some of those.

7         So the emphasis here was on you as a fashion designer,

8    a designer of clothes, shoes, accessories, hats, all the

9    things that would go into women's fashions, right?

10   A    Yes.

11   Q    Now, if you take -- can you take a look at the doll

12   itself, and on the lower back neck, there is a copyright,

13   and can you read that to us?

14   A    It's --

15   Q    Do you need some reading glasses?

16   A    It says Mattel -- Mattel, Inc., but I can't read the

17   date on it.  I think it's 1991.

18   Q    Okay.  Thank you.

19   A    Uh-huh.

20   Q    And if you pull down the bodice of the dress and look

21   at the back of the torso, you'll see another copyright.

22   A    I don't think this is going to let me get this off.

23   Q    Let's see if we can have an assist from -- although you

24   are probably the biggest expert on Barbies in the room, I

25   would think.

1    A    I don't know about that.

2         Yeah, I can't find it.

3    Q    Let's see if we can have our assistant locate this for

4    you.  It's the back of the torso, there is going to be

5    another copyright mark.

6    A    We are having trouble with that.

7    Q    Okay.  Well, maybe Ms. Hurst can help because I know

8    she's a sleuth, and I'll go on while she attempts to find

9    that.

10              MS. HURST:  I am an expert on undressing --

11              MS. KELLER:  Yeah, a total expert on this.

12   BY MS. KELLER:

13   Q    Now, while Ms. Hurst is finding that, you didn't do the

14   sculpt on this doll, right?

15   A    No.

16   Q    And you didn't create any body parts, right?

17   A    That's right.

18   Q    Okay.  Can you read the copyright on the back of the

19   torso?

20   A    Yes.  It says "1991, Mattel, Inc., Indonesia."

21   Q    Okay.  And if you can take another look at that one on

22   the back of the neck and make sure that says "1991" as well?

23   A    I'm pretty sure it does, but it's a little hard to read

24   just because the coloring, I think.

25   Q    Okay.  Well, the bottom line is that this collectible

CV 04-9049-DOC – 02/02/2011 – Day 11, Vol. 2 of 3

37

1   doll was made up of stocked Barbie parts, right?

2   A    Yes.

3   Q    So no new parts at all of any kind were created for

4   this doll, right?

5   A    No, not that I remember.

6   Q    And likewise, okay, you didn't do the hair rooting,

7   true?

8   A    True.

9   Q    You didn't do the face painting, true?

10  A    That's true.

11  Q    You didn't do the packaging, true?

12  A    Other than the illustration, yes.

13  Q    You didn't do the package design?

14  A    No.

15  Q    Or the molding?

16  A    No.

17  Q    Or the manufacturing?

18  A    No.

19  Q    But these are all necessary for building a doll, right?

20  A    Yes.

21  Q    But this wasn't a new doll or a new sculpt, correct?

22  A    That's correct.

23  Q    But you did design the fashions for this doll?

24  A    Yes.

25  Q    Now, did Mattel pay you any royalty or bonus for

1    designing Grand Entrance Barbie?

2              MR. PRICE:  Objection.  Irrelevant.

3              THE COURT:  No, overruled.

4              You can answer that question.

5              THE WITNESS:  No.

6    BY MS. KELLER:

7    Q    Did you ever get paid any royalty or bonus for anything

8    you designed for Mattel?

9    A    I think we got paid -- or I got paid a -- like a

10   holiday type bonus.

11   Q    Okay.  But I'm talking about for your actual designs of

12   dolls.

13   A    Oh, I'm sorry.  No.

14   Q    Okay.  Now, you told Mr. Price that you had had

15   experience developing dolls from concepts to pre-production;

16   do you remember that?

17   A    Yes.

18   Q    And what you meant was that you could help others

19   translate ideas -- translate from ideas to three-dimensional

20   prototype dolls; is that right?

21   A    Yes.

22   Q    And you told Mr. Price you were able to see projects

23   through to these three-dimensional formations, right?

24   A    Yes.

25   Q    But again, if we turn to your -- when you say in your

```
 1    resume that you saw projects through to 3D formations, you

 2    were still talking about fashions, right?

 3    A    I believe so, yes.

 4              MS. KELLER:  And if we could see Exhibit 10480.

 5    BY MS. KELLER:

 6    Q    Is that a letter that you sent out for potential

 7    employers in 1998?

 8    A    It appears to be.  I don't really remember it right

 9    now.

10    Q    Do you see your signature on it?

11    A    I don't see my signature, but my name is on it.

12    Q    Okay.

13              MS. KELLER:  Your Honor, I'd move that that be

14    admitted.

15              THE COURT:  Any objection?

16              MR. PRICE:  No objection.

17              THE COURT:  Received.

18         (Defendants' Exhibit No. 10480 is received in

19         evidence.)

20    BY MS. KELLER:

21    Q    And I understand you don't remember everything.  Don't

22    feel bad, but I want to ask you some questions about this.

23    A    Okay.

24    Q    You say in this letter --

25              THE COURT:  Counsel, we are going to strike the
```

1    comment, okay.  Strike that.

2    BY MS. KELLER:

3    Q    You say in this letter, "My experience at Mattel

4    included all aspects of 2D and 3D design and illustration";

5    do you see that?

6    A    Yes.

7    Q    Now, that reference refers to fashions, right?

8    A    I really don't remember this letter very much, so I

9    don't remember exactly what I was referring to, but fashions

10   would be one of them, yes.

11   Q    Okay.  Let's -- let's have you look at your testimony

12   from June 18th, 2008, page 2966.

13   A    Yes.

14   Q    Okay.  Page 2966, line 21 through 2967, line 12.

15        Have you had a chance to see that?

16   A    Yes.

17   Q    So does that refresh your memory that the reference in

18   Exhibit 10480 to 2D and 3D designs referred to fashions?

19   A    Yes.

20   Q    And when you were talking about translating drawings

21   into three-dimensional objects, you were talking about your

22   experience with Barbie, right?

23   A    Yes.

24   Q    And Mattel never assigned you to create a whole new

25   doll separate from Barbie?

CV 04-9049-DOC - 02/02/2011 - Day 11, Vol. 2 of 3

41

1    A    No.

2    Q    Were you ever assigned by Mattel to any project that

3    would compete with Barbie?

4    A    Not that I remember, no.

5    Q    And were you ever assigned by Mattel to create a whole

6    doll that was contrary to Barbie's image?

7    A    No.

8    Q    Were you ever assigned by Mattel to work on a new doll

9    that was multi-ethnic, hip, trendy or edgy?

10   A    No.

11   Q    And would it be true that you are not a model maker or

12   a doll maker?

13   A    That's true.

14   Q    Now, after you returned from Missouri -- do you

15   pronounce it "Missouri" or "Missoura"?

16   A    I say it "Missouri."

17   Q    Okay.  After you returned from Missouri, sometime in

18   the summer of 1999, you went back to the Bratz drawings,

19   right?

20   A    Yes.

21   Q    And do you know why you went back to the drawings?

22   A    I don't recall exactly.  I think I was going to put

23   color on them.

24   Q    If you could take a look at the transcript from

25   June 18th, 2008, page 2980, lines 8 to 15.

Case 2:04-cv-09049-DOC-RNB   Document 9795   Filed 02/04/11   Page 42 of 103   Page ID #:293995
CV 04-9049-DOC - 02/02/2011 - Day 11, Vol. 2 of 3

42

1    A    Which lines?

2    Q    Eight to 15.

3    A    Okay.

4    Q    Does that refresh your memory as to why you went back

5    to the drawings?

6    A    Yes.

7    Q    Okay.  And why did you?

8    A    I guess I was thinking that maybe I could do something

9    with them.

10    Q    You still thought they were pretty special, didn't you?

11    A    Yes.

12    Q    Now, in 1999, did you begin to apply color to the

13    drawings?

14    A    Yes.

15    Q    And where did you do that work?

16    A    I did that at home.

17    Q    Was that on your own time?

18    A    Yes.

19    Q    Did you ever apply color to the drawings at Mattel?

20    A    No.

21    Q    What was the purpose of applying the color to the

22    drawings when you did?

23    A    I guess just to finish the drawings.

24    Q    Were you preparing to send them to Alaska Momma once

25    you finished them?

1    A    I think at some point I was, yes.

2    Q    Okay.  Let's have you take a look at page -- your

3    deposition transcript, November 4th, 2004, page 153, line 19

4    to 154, line 4.

5    A    Okay.

6    Q    Okay.  So did you -- was the reason for the timing of

7    applying the color, that you wanted to get them finished so

8    you can send them to Alaska Momma?

9    A    Yes.

10   Q    And how did you go about preparing these?  What did you

11   do with those drawings?

12   A    I transferred them to sort of an illustration board and

13   used markers to color over them and finish them off with

14   colored pencil.

15   Q    Okay.  Did you use the light box you told us about

16   earlier?

17   A    Yes.

18   Q    Okay.  So you took your master drawings that you had

19   done in '98, and then you put them on this light box, right?

20   A    Yes.

21   Q    And you said you transferred them to where?

22   A    To an illustration board.

23   Q    What's an illustration board?

24   A    It's just a heavier stock of paper.

25   Q    And after that, what did you do with respect to the

CV 04-9049-DOC – 02/02/2011 – Day 11, Vol. 2 of 3

44

1   color?

2   A    Used markers to color in the various colors and then

3   put colored pencil shading and stuff on it.

4   Q    Okay.  And -- and just to repeat, this work you did

5   where?

6   A    I did this at home.

7   Q    Now, while you did this work, did you change the

8   concept of the drawings?

9   A    No.

10   Q    Did you change the attitude of the drawings?

11   A    No.

12   Q    Did you make any changes at that time to the design

13   from the master drawings?

14   A    Not that I remember, no.

15   Q    And take a look at your transcript, June 18th, 2008,

16   2981, lines 17 through 21.

17   A    Okay.

18   Q    So did you make any changes to the design from the

19   master drawings?

20   A    No.

21   Q    And when you did the mechanical transfers, did you make

22   any changes to the original master drawings that you did in

23   Missouri in 1998?

24   A    No.

25   Q    When you added the color, did you change the

1    biographies?

2    A    No.

3    Q    Did you change the descriptions you had given the

4    characters?

5    A    No.

6    Q    When you added the color, did you change the age of the

7    characters?

8    A    No.

9    Q    Now, the drawings were -- after Alaska Momma didn't

10   give you a positive response, the drawings were put aside

11   again for some period?

12   A    Yes.

13   Q    And in 2000, you came across the drawings again.  Was

14   that when you were moving?

15   A    I think so, yes.

16   Q    And when you saw the -- when you saw those drawings

17   again, what did you think, what went through your head?

18   A    I think I just remembered that they were still really

19   cool and it would be great to -- yeah, just be able to do

20   something with them.

21   Q    Maybe market them?

22   A    Yes.

23   Q    Get them made into a doll -- dolls?

24   A    Yes.

25   Q    Is that when you approached Veronica Marlow?

CV 04-9049-DOC – 02/02/2011 – Day 11, Vol. 2 of 3

46

1    A    Yes.

2    Q    And who was Veronica Marlow to you?

3    A    She was a friend, and at one time, she had been a

4    coworker at Mattel.

5    Q    Why was it that you thought she could help you find a

6    market for your drawings?

7    A    I don't recall exactly.

8    Q    Now, let's look at Exhibit 302, and that's basically

9    the pitch book that you showed to MGA in your September 1st,

10   2000 pitch meeting?

11   A    Yes.

12   Q    And Exhibit 1 is a portion of that pitch book.

13   A    Okay.

14   Q    We are going to give you the originals, Mr. Bryant, and

15   maybe you could hold those up for the jury as I discuss

16   them.  And we'll use the -- we'll use what we have to

17   project on the screen as well.

18        Okay.  Do you have Exhibit 1, there?

19   A    Yes.

20   Q    And can you hold that up for the jurors?

21   A    (Complied.)

22   Q    Okay.  That's the colorized drawings of what we see up

23   on the screen, right?

24   A    Yes.

25   Q    And the difference between Exhibit 1 --

```
 1              THE COURT:  I want you to take down the screen
 2   illustration.  It's confusing.
 3              MS. KELLER:  Okay.  We can do that.
 4              THE COURT:  And ladies and gentlemen, the reason
 5   for that is I don't want there to be confusion about what's
 6   being shown.  When the color is being shown to you, let's
 7   get the color up, because some of you might look at the
 8   projection when it's in black and white, we did that
 9   concerning Mattel, so I want that to be coequal concerning
10   MGA.  Trying to alleviate some of the confusion because you
11   may associate in your mind the black and white on the screen
12   when actually it's a color.
13              So when the color is being shown, Counsel, the
14   color is shown by the witness, and when the black and white
15   is being shown, you can show the black and white on the
16   screen.
17              MS. KELLER:  Okay.
18              THE COURT:  That way they can use the ELMO, and
19   now we can show the coloring.
20   BY MS. KELLER:
21   Q    Now, in Exhibit 302 as opposed to this Exhibit 1, in
22   Exhibit 302, the pitch book you showed to MGA on
23   September 1st, 2000, is there a difference between what we
24   see up here on the screen and what was in the pitch book?
25   A    No.
```

1    Q    In the pitch book, did you have some of the dolls --

2    did you have evening gown sketches provided?

3    A    I believe so, yes.

4    Q    Okay.  And these dolls that we see in Exhibit 1 are not

5    wearing evening gowns, true?

6    A    That's true.

7    Q    Now, we discussed the fact that the pitch book is what

8    you showed when you showed Veronica Marlow, Paula Garcia and

9    Victoria O'Connor --

10           MS. KELLER:  I'm going to take this down, your

11   Honor.

12           I'm sorry.  I'm going to correct myself.

13   BY MS. KELLER:

14   Q    This is -- Exhibit 1 is what you showed to Veronica

15   Marlow, right, and Paula Garcia and Victoria O'Connor when

16   you first met them in August?

17   A    Yes.

18   Q    At MGA?

19   A    Yes.

20   Q    The difference between this exhibit and 302, which is

21   the pitch book, is that 302 contained more, it contained

22   these evening wear designs for Bratz, right?

23   A    Yes.

24   Q    And the later meeting, the September 1st pitch meeting,

25   that was the meeting Mr. Larian attended, right?

Case 2:04-cv-09049-DOC-RNB   Document 9795   Filed 02/04/11   Page 49 of 103   Page ID #:294002
CV 04-9049-DOC – 02/02/2011 – Day 11, Vol. 2 of 3

49

1   A     Yes.

2   Q     Now, was Exhibit 1 based on the old 1998 drawings?

3   A     Yes.

4   Q     And the text contained in Exhibit 1, was that created

5   when you created the characters in 1998?

6   A     Yes.

7   Q     I think you testified that you just typed it onto the

8   computer in 1999, right?

9   A     Yes.

10  Q     But it was the same text that you had written down

11  before?

12  A     Yes.

13  Q     And we've seen that.

14        So basically the pitch book, Exhibit 1 that you took to

15  make your pitch to Mr. Larian, everything had been created

16  in 1999, right?  Everything that was in it already existed

17  then?  I'm sorry, I mean 1998.

18        Everything that you took to show Mr. Larian already

19  existed in 1998, right?

20  A     Other than the evening wear fashions, I think, yes.

21  Q     And you had applied color?

22  A     Yes.

23  Q     And typed up the text?

24  A     Yes.

25  Q     And you know that the evening wear fashions were never

1    used with those Bratz dolls, right?

2    A    That's right, yes.

3    Q    Now, on Exhibit 1, you wrote, "copyright 2000" at the

4    bottom under Bratz; do you see that?

5    A    Yes.

6    Q    And in fact, it says, "all materials," and then there's

7    the little "C, 2000, Carter Bryant," the little C for the

8    copyright mark?

9    A    Yes.

10   Q    And the reason you did that before your meeting with

11   MGA is to make sure that nobody took your designs, right?

12   A    Yes.

13   Q    But you had actually not copyrighted them formally yet,

14   true?

15   A    That's true.

16   Q    And the text --

17        MS. KELLER:  If we can go to Exhibit 302.

18        (Attorney discussion held off the record.)

19   BY MS. KELLER:

20   Q    The text that we see in 302 next to the pictures, that

21   text was also something that you had written back when you

22   had the original idea for the dolls, right?

23   A    Yes.

24   Q    In '98, true?

25   A    Yes.

1   Q    And it was based on Exhibit 5-43, right?

2   A    Yes.  I remember what you are talking about, yes.

3   Q    Okay.  Let's -- let's compare the text there.

4        So even the descriptions of the dolls were not written

5   in 1999, they were written back in '98, right?

6   A    Yes.

7   Q    And this was not long after you were inspired by the

8   Seventeen magazine ads and Kickapoo High School and all the

9   other things that you had seen, right?

10  A    That's right.

11  Q    Including your memories of L.A.?

12  A    Yes.

13  Q    What multi-ethnic people look like, and all that,

14  right?

15  A    Yes.

16  Q    Basically a lot of this was just from life experience,

17  true?

18  A    Yes.

19  Q    Now, we've seen that the logo on Exhibit 302 was

20  created by your friend Elise Cloonan, and we have

21  Exhibit 302.  That's that little Bratz logo.

22  A    Yes.

23  Q    And you recall asking your friend Elise to do that for

24  you, right, to make a little logo that said Bratz?

25  A    Yes.

1    Q    But MGA never actually used that logo, did it?

2    A    No.

3           MS. KELLER:  And if we could see Exhibits 504.

4    BY MS. KELLER:

5    Q    On that box, which is shown on our screen, that's the

6    logo Bratz ultimately used?

7    A    Yes.

8    Q    And there are your characters to the right of that

9    Bratz logo, right?

10   A    Yes.

11   Q    Characters that you drew in '98, true?

12   A    Yes.

13   Q    And let's look at 17551.

14   A    Okay.

15   Q    Do you see the little halo over them?

16   A    Yes.

17   Q    And another example would be 17558, another example of

18   the logo, the Sasha doll.

19         And another example would be 17561, the Yasmin doll?

20   A    Yes.

21   Q    So the logos found on the Bratz doll packaging that

22   we've just shown you were different than the logo you and

23   Ms. Cloonan came up with, right?

24   A    Yes.

25   Q    And as far as those evening wear dresses that were not

CV 04-9049-DOC - 02/02/2011 - Day 11, Vol. 2 of 3

53

1    used, no one from MGA had told you they wanted to even have

2    evening wear for these dolls, right?

3    A    That's right.

4    Q    Now, MGA did eventually make some evening wear for the

5    Bratz dolls, but not the drawings or dolls we've been

6    looking at, right?

7    A    Yes.

8    Q    Let's go back to your inventions agreement that we

9    spoke about.

10        By your last day at Mattel in October of 2000, did you

11   believe that anything you created that was related to Barbie

12   or the Barbie group belonged to Mattel?

13   A    Yes.  Excuse me, yes.

14   Q    And all of your assignments at Mattel were Barbie

15   assignments, right?

16   A    Yes.

17   Q    And again, you believed any ideas you created while not

18   working at Mattel belonged to you, right?

19   A    Yes.

20   Q    And ideas you developed on your own time, right?

21   A    Yes.

22   Q    So your role at Mattel was to take whatever assignment

23   you were given and dress Barbie or one of Barbie's family

24   members in some sort of fashion, or Barbie's friends?

25   A    Yes.

CV 04-9049-DOC – 02/02/2011 – Day 11, Vol. 2 of 3

54

1    Q    Now, you did come up with ideas or concepts for designs

2    that you presented to people at Mattel, but every one of

3    those was as a result of your being assigned to do

4    something, right?

5    A    Generally, yes.

6    Q    So you would be given instructions, and you would do

7    something responsive to the instruction?

8    A    Yes.

9    Q    And did you design, as well as fashions, hairstyles and

10   looks for the face and some accessories for Barbie and her

11   family and friends?

12   A    Yes.

13   Q    And again, this was as an associate designer?

14   A    Yes.

15   Q    Most of the time what you did was sketches and then --

16   is that correct?

17   A    Yes.

18   Q    And then other people would execute the sketches and

19   maybe make the fashions?

20   A    Right.

21   Q    Now, let's look at your -- let's turn to your checkout

22   from Mattel.

23        Your last day at Mattel, October 19th, 2000, you had

24   something that the human resources department calls an exit

25   interview, right?

1    A    Yes.

2    Q    And in connection with that, you were given something

3    called a proprietary checkout form, something else you've

4    seen many, many, many times because of this litigation,

5    right?

6    A    Yes.

7    Q    And that's Exhibit 27, if you could look at that.

8              MS. KELLER:  I think that's in evidence, your

9    Honor.  If not, I would move it.

10             THE COURT:  Received.

11             I think it's already in evidence also, Counsel.

12   It's received again.

13             *(Defendants' Exhibit No. 27 is received in*

14        *evidence.)*

15   BY MS. KELLER:

16   Q    Now, if you look at paragraph 4 that says, "My interest

17   in, A, any and all inventions, improvements and ideas,

18   whether or not patentable, which I have made or conceived

19   and may make or conceive at any time during the period of my

20   employment with the company, either solely or jointly with

21   others," and in "B, any suggestions, designs, trademarks,

22   copyrights, subject matter, literary or artistic works which

23   I have made or conceived or may make or conceive at any time

24   during the period of my employment which relate, or are

25   applicable directly or indirectly, to any phase of the

1    company's business shall be the exclusive property of the

2    company, its successors, assigns or nominees.  The items

3    defined in (A) and (B) above will, hereinafter, be referred

4    to collectively as, quote, 'proprietary subject matter',

5    closed quotes, closed paren."

6         Now, this was -- this was not one of the things given

7    to you when you started your employment, right?

8    A    No.

9    Q    This is dated October 19th, 2000?

10   A    Yes.

11   Q    So this is the day you quit?

12   A    Yes.

13   Q    And you notice in here there is a reference in that

14   fourth paragraph to ideas, "My interest in, A, any and all

15   inventions, improvements and ideas"?

16   A    Yes.

17   Q    That -- that word "ideas" was not included in

18   Exhibit 25, the document you signed when you started back at

19   Mattel, right?

20   A    I don't believe so, no.

21   Q    I'm sorry, what?

22   A    I don't believe so, no.

23   Q    And would it -- do you need to take a look at it to

24   make sure, at Exhibit 25?

25   A    Possibly, yeah.

1   Q    Okay.  Let's -- let's let you have Exhibits 25 and 27

2   so you can look at them side by side.

3   A    Okay, I'm sorry, what was your question again?

4   Q    My question was, the document you signed when you

5   started on January 4th, 1999 doesn't have the word "ideas"

6   in it, does it, this employee confidential information and

7   inventions agreement?

8        If you look at --

9   A    Yeah, I see it.  I see it.

10  Q    Yeah, 2B?

11  A    Yeah.

12  Q    It says, "It includes all discoveries, improvements,

13  processes, developments, designs, know-how, data computer

14  programs and formulae, whether patentable or unpatentable."

15  That's in Exhibit 25, right?

16  A    Yes.

17  Q    But in Exhibit 27, it says, "Any and all inventions,

18  improvements and ideas"?

19  A    Yes.

20  Q    And instead of talking about reduced to practice, it

21  just says that essentially Mattel owns any of your ideas,

22  and I'm talking about in Exhibit 27, the day you quit, the

23  day you left?

24  A    Right.

25  Q    Now, Mattel didn't pay you anything that day in order

1    to sign that, did they?

2    A    No.

3    Q    In other words, Mattel didn't say, "Here is a thousand

4    bucks if you sign Exhibit 27," right?

5    A    That's right.

6    Q    Was this just one of the documents that was put in

7    front of you and you were told you have to sign this as part

8    of quitting?

9    A    Yes.

10   Q    And this -- this proprietary information checkout, it

11   also has a reference to trademarks in it.  Again, if you

12   look at paragraph 4, right?

13   A    Yes.

14   Q    And if you look back to the document you signed when

15   you started back at Mattel, Exhibit 25, January '99, there

16   is nothing about trademarks in that, is there?

17   A    No.

18          MS. KELLER:  Could I have a moment, your Honor.

19          (Attorney discussion held off the record.)

20   BY MS. KELLER:

21   Q    Now, when you signed this checkout form, you didn't

22   think it was a contract, did you?

23   A    I don't remember thinking that, no.

24   Q    And you -- because you weren't getting anything in

25   return, right?

1    A    That's correct, yes.

2    Q    Okay.  So you were just told "sign this," and that was

3    it.

4         And do you know what else you may or may not have

5    signed when you left Mattel?

6              MR. PRICE:  Your Honor, I move to strike the

7    characterization before the question.

8              THE COURT:  I'm not sure which one, Counsel.

9              MS. KELLER:  I'll rephrase, your Honor.

10             THE COURT:  I'm not sure what we are striking.

11   Just a moment.

12             MR. PRICE:  The preface to the question, which

13   wasn't a question.

14             THE COURT:  Whatever wasn't the question, you're

15   supposed to strike.

16             (Laughter.)

17             MS. KELLER:  Is it true --

18             THE COURT:  Hold on, Counsel.  Go back and give me

19   a clue.

20             MS. KELLER:  I don't even remember anymore.

21             THE COURT:  No, no.  Mr. --

22             MR. PRICE:  There is something that ended "that's

23   it."

24             THE COURT:  We'll move on, then.

25             Okay.  I didn't see the portion, Counsel, so at

CV 04-9049-DOC - 02/02/2011 - Day 11, Vol. 2 of 3

60

```
 1    the recess, if you want to raise it, I'll instruct the jury.

 2              MR. PRICE:  Okay.

 3    BY MS. KELLER:

 4    Q    This October 19th, 2000 document, this proprietary

 5    information checkout, when you signed it, was this part of a

 6    group of documents that were put in front of you?  If you

 7    even remember?

 8    A    Yeah, I don't remember if there were any additional

 9    documents.

10    Q    Did you read it thoroughly?

11    A    No.

12    Q    And again, you thought it was not necessary to read it

13    thoroughly because it was just something you had to sign to

14    end your employment?

15    A    Yes.

16    Q    And you didn't think it was a contract anyway because

17    you weren't getting anything in return, true?

18    A    True.

19    Q    Now, if we could turn to Exhibit 1155C.  Mr. Price

20    asked you some questions about this notebook?

21    A    Yes.

22    Q    And did you have a practice of having a particular

23    notebook dated with a given year and only using it during

24    that year?

25    A    No, I would use them over a number of years or over a
```

Case 2:04-cv-09049-DOC-RNB   Document 9795   Filed 02/04/11   Page 61 of 103   Page ID #:294014
CV 04-9049-DOC - 02/02/2011 - Day 11, Vol. 2 of 3

61

1    time span.

2    Q    So work that you did in 1997 would not necessarily be

3    contained in something that said 1997, right?

4    A    That's right.

5    Q    And you don't have any notebooks that are identified by

6    you for only 1997 work, right?

7    A    No.

8    Q    And by the same token, you don't have any notebooks

9    which are only work you did in 1998, true?

10   A    That's true.

11   Q    And is the same true of the year 2000?

12   A    Yes.

13   Q    2001?

14   A    Yes.

15   Q    Is the same true even today?

16   A    Yes.

17   Q    A notebook like this, you don't -- you don't date it on

18   the front and only put things in there from that year; is

19   that true?

20   A    That's true.

21   Q    Now, do you remember Mr. Price showing you some of your

22   fashion sketches from this exhibit, 1155C?

23   A    Yes.

24   Q    And especially page 5.  If we could turn to 1155C-5,

25   and also look at 1155C-7.

```
 1        Going back to 5 for a minute, 1155C-5, what is that
 2   sketch?
 3   A    It's a -- it's a fashion sketch.
 4   Q    Of what?
 5   A    It's just some sort of like either fantasy or evening
 6   wear type sketch.
 7   Q    And what about 1155C-7, can you tell us about that?
 8   A    Basically the same thing.
 9   Q    And this is -- is this lined ruled paper?
10   A    Yes.
11   Q    And let's look at 1155C-17, and what is that?
12   A    That's another just fashion sketch.
13   Q    And let's look at 1155C-19.  And this one has the word
14   "jewel" behind it, right?
15   A    Yes.
16   Q    And is that because this is related to the jewel --
17   jewel Barbie project?
18   A    I believe so, yes.
19   Q    Now, let's look at 11 -- and if we could back up a
20   minute.
21        You told us before the jewel Barbie project had these
22   beautiful gowns with a jewel incorporated somewhere, right?
23   A    Yes.
24   Q    Let's look at 1155C-21, and can you describe this for
25   us?
```

CV 04-9049-DOC - 02/02/2011 - Day 11, Vol. 2 of 3

63

1   A    That's another fashion sketch with the wording "jewel"

2   on it.

3   Q    And this one has jewel with a question mark after it?

4   A    Yes.

5   Q    Any idea why that question mark is there?

6   A    I don't remember.

7   Q    You think this also, though, in some fashion was

8   related to the jewel Barbie project?

9   A    Yes.

10  Q    You think the question mark might be there because you

11  weren't sure you wanted to use that for the jewel Barbie?

12  A    Possibly, yes.

13  Q    And let's look at 1155C-23.  And what -- what kind of a

14  drawing is this?

15  A    This is another fashion sketch, high fashion.

16  Q    And is this -- does this look like kind of part of

17  maybe a series with some of the others?

18  A    It could have been, yes.

19  Q    Now, let's look at 1155C-25; do you see that?

20  A    Yes.

21  Q    And let's look at and see if --

22       MS. KELLER:  Can we blow it up a little and darken

23  it so we can see it a little better.

24       I think we can see it better if it's the whole

25  thing.

CV 04-9049-DOC - 02/02/2011 - Day 11, Vol. 2 of 3

64

1   BY MS. KELLER:

2   Q    And let's look at 1155C-27.  Does that look like also a

3   sketch of a gown, partial, you can't see it too well?

4   A    Yes.

5   Q    And looking around the neck, does that look like it

6   might be a jewel or jewels?

7   A    It could be, yes.

8           MS. KELLER:  Could we blow that up a little bit.

9   BY MS. KELLER:

10  Q    And look at the sash on the belt, does that look like

11  that might be a jewel?

12  A    Possibly.

13  Q    And let's see, have you looked at 1155C-28?  Does that

14  look like another gown type drawing?

15  A    Yes.

16  Q    And you have the -- the arms out, kind of almost a

17  little bit of a trademark for you.

18       Oh, I should never use the word "trademark."

19       That's something you used a lot, the arms out?

20  A    Yes.

21  Q    And does that look like another one of those gowns like

22  the jewel Barbie gowns?

23  A    It looks similar, yes.

24  Q    And let's see if we have a -- 1155C-25.  Okay.  And I

25  think you said that looked like another -- we can't see the

```
 1   whole sketch, but it looks like another -- maybe another

 2   ballgown type sketch?

 3   A    Yes.

 4   Q    In that same series?

 5   A    Possibly, yes.

 6   Q    Now, I think Mr. Price pointed out that this was

 7   similar to Exhibit 10756?

 8            MS. KELLER:  May we see that?

 9   BY MS. KELLER:

10   Q    Oh, I'm sorry, one more.  One more.  1155C-27.  We need

11   to look at that again.

12   A    Okay.

13   Q    And Mr. Price pointed out that this was similar to

14   Exhibit 10756, a drawing that you made for the jewel Barbie

15   series Sapphire?

16   A    Yes.

17   Q    And that was something you did in collectibles?

18   A    Yes.

19   Q    And that was dated February 1999?

20   A    I don't remember exactly.

21   Q    Well, earlier we looked at Exhibit 10737.

22   A    Oh, yes.

23   Q    And you signed and dated this on January 28th, 1998,

24   right?

25   A    Can you blow that up?
```

Case 2:04-cv-09049-DOC-RNB   Document 9795   Filed 02/04/11   Page 66 of 103   Page ID #:294019
CV 04-9049-DOC - 02/02/2011 - Day 11, Vol. 2 of 3

66

1       Thank you.

2       Yes.

3   Q   And you were working in mainline Barbie, then, right?

4   A   Yes.

5   Q   Do you think you could have been mistaken about the

6   date?

7   A   Possibly.

8   Q   Let's look at Exhibit 10738 again.

9   A   Okay.

10  Q   Okay.  And you actually dated that at the time, right?

11  A   Yes.

12  Q   And so Exhibit 10738, you don't think you could be

13  mistaken about that date because you dated it at the time,

14  right?

15  A   That's correct.

16  Q   And let's look back again at 10737.  And that's also

17  signed and dated 1/28/98, right?

18  A   Yes.

19  Q   Okay.  So as to those, those you signed and dated at

20  the time you created them, right?

21  A   Yes.

22  Q   Now, let's look at Exhibit 10739.  That one you also

23  signed and dated 1/28/98, right?

24  A   Yes.

25  Q   And same with Exhibit 10740?

Case 2:04-cv-09049-DOC-RNB   Document 9795   Filed 02/04/11   Page 67 of 103   Page ID #:294020
CV 04-9049-DOC - 02/02/2011 - Day 11, Vol. 2 of 3

67

1    A    Yes.

2    Q    And same with Exhibit 10741, these are all signed and

3    dated 1/28/98, right?

4    A    Yes.

5    Q    And Exhibit 10742, that was also signed and dated

6    1/28/98?

7    A    Yes.

8    Q    So all these sketches that we just showed -- we have

9    just shown dated 1/28/98, you don't believe you could be

10   mistaken about the dates on every one of these sketches, do

11   you?

12   A    No.

13   Q    Now, if we turn to Exhibit 1155C.

14           MS. KELLER:  What page?

15           *(Attorney discussion held off the record.)*

16           MS. KELLER:  Your Honor, do you think we could

17   have a break?

18           THE COURT:  Certainly.

19           You are admonished not to discuss this matter

20   amongst yourselves, nor to form or express any opinion

21   concerning the case.  About 20 minutes or so?

22           Twenty minutes.  We'll see you at that time.

23           Have a nice recess.

24           *(The following proceedings is taken outside*

25       *the presence of the jury.)*

```
 1              THE COURT:  We are still on the record.

 2              Mr. Bryant, thank you, sir.

 3              THE WITNESS:  Thank you.

 4              THE COURT:  Counsel, could I see Exhibit 25 and

 5     9924.

 6              MR. PRICE:  Your Honor, you mean the original

 7     9924, not the copy?

 8              THE COURT:  I would like to see 25 and 9924.

 9              Now, Judge Trott -- just a moment, Counsel.

10              Where are my counsel?  Where are my attorneys?

11              All right.  Judge Trott, in the oral arguments,

12     was very concerned, I think along with the panel, concerning

13     the inability to read the original inventions agreement.

14     You've listened to that tape, I assume, or whatever, the

15     transcript.

16              Is the exhibit marked originals -- what number am

17     I holding in my hand?

18              MR. MC CONVILLE:  9924.

19              THE COURT:  9924.

20              MS. HURST:  Yes.

21              THE COURT:  This appears to be the original?

22              MS. HURST:  It was -- yeah, if that's what --

23              THE COURT:  Well, we are going to find out.  Very

24     simple.  Turning back to the -- not -- to the inventions

25     agreement dated January 4th, 1999.  Is this the original
```

1    that Carter Bryant signed?

2              MR. PRICE:  Yes, it is, your Honor.

3              THE COURT:  Counsel?

4              MR. MC CONVILLE:  That's what they told us.

5              MS. HURST:  That's what we were told by Mattel.

6              MS. KELLER:  That's what we are assuming.

7              THE COURT:  All right.  Now, this is 9924; is that

8    correct?

9              MS. HURST:  Yes.

10             THE COURT:  Show me 25.

11             MS. HURST:  It's up there.

12             THE COURT:  Well, up there doesn't mean a thing to

13   me.

14             MS. HURST:  There is no original of 25, it's just

15   a copy.

16             THE COURT:  So you're showing me a copy up on the

17   screen?

18             MS. HURST:  Yes, as it was marked in the

19   deposition.

20             THE COURT:  Is that a different size than 9924?

21             MS. HURST:  Yes, it was reduced in the --

22             THE COURT:  All right.  So when the Circuit was

23   reviewing this case, they had Exhibit 25, which was causing

24   the difficulty and the comments by Judge Trott about needing

25   a micro -- a magnifying glass.  And 25 is exactly what the

Case 2:04-cv-09049-DOC-RNB   Document 9795   Filed 02/04/11   Page 70 of 103   Page ID #:294023
CV 04-9049-DOC - 02/02/2011 - Day 11, Vol. 2 of 3

70

1    Circuit was reviewing.  They didn't have Exhibit 9924, the

2    original, before them; is that correct?

3                MR. PRICE:  That's correct.

4                MS. HURST:  Yeah, because they -- yeah, that's

5    right.

6                THE COURT:  It's an easy answer.

7                MS. HURST:  Yeah.

8                THE COURT:  Okay.  That's clear then.  Thank you

9    very much.

10               And so to complete the record, the reason the

11   Circuit didn't have this, apparently, was, it's this Court

12   that compelled Mattel to produce the original which

13   apparently wasn't forthcoming in phase 1 in front of

14   Judge Larson.

15               MS. HURST:  That's correct.

16               *(Recess.)*

17               *(The following proceedings is taken in the*

18        *presence of the jury.)*

19               THE COURT:  All right.  Then we are back in

20   session.  The jury is present, all counsel, and Mr. Bryant's

21   on the stand.

22               If you'd be seated, sir.

23               All counsel, thank you for your courtesy, and the

24   parties.

25               Ms. Keller, if you'd like to continue, please.

Case 2:04-cv-09049-DOC-RNB   Document 9795   Filed 02/04/11   Page 71 of 103   Page ID #:294024
CV 04-9049-DOC - 02/02/2011 - Day 11, Vol. 2 of 3

71

 1              MS. KELLER:  Thank you, your Honor.

 2          **CARTER BRYANT, PLAINTIFFS' WITNESS, RESUMED**

 3              **CROSS-EXAMINATION (Continued)**

 4    BY MS. KELLER:

 5    Q    Mr. Bryant, before we broke, we were talking about all

 6    these exhibits, and specifically, we looked at 10737, 10738,

 7    10739, 10740, 10741, 10742, and all of those you said were

 8    signed and dated January 28th, 1998, right?

 9    A    Yes.

10    Q    Now, you also said that you tended to date things

11    before you were going to present them to someone?

12    A    Yes.

13    Q    Right?

14         And so by dating those sketches that you made, that

15    causes you to believe that you presented those to someone at

16    some point, right?

17    A    Yes.

18    Q    Now, I think you -- you said that Exhibit 1155C looks

19    like a rough sketch of some initial ideas you might have had

20    for a Jewel Barbie project; is that right?  1155C.

21              THE COURT:  And is that the whole notebook?  Are

22    you referring to page 5 or 17?

23              MS. KELLER:  I'm talking about some of the

24    sketches throughout the notebook.

25              THE COURT:  Right.  The notebook is 1155C, and

Case 2:04-cv-09049-DOC-RNB   Document 9795   Filed 02/04/11   Page 72 of 103   Page ID #:294025
CV 04-9049-DOC - 02/02/2011 - Day 11, Vol. 2 of 3

72

1   then you referred to specific pages, like 5, 7 and 27,

2   because he doesn't know what to look for.  He's thumbing

3   through it.

4           MS. KELLER:  Yeah, we can say 5 and 7, for

5   example.

6   BY MS. KELLER:

7   Q    This is the notebook we were just looking at with all

8   the lined paper in it?

9   A    Yes.

10  Q    And it has some other stuff, too, in the notebook,

11  right?  There was a -- something that you thought maybe your

12  niece drew, your little niece, right?

13  A    Yes.

14  Q    Perhaps not as artistically talented as her uncle?

15  A    I don't know.  By now, she's pretty good.

16          (Laughter.)

17  BY MS. KELLER:

18  Q    Oh, okay.

19      Well, at any rate, let's say these two we see here, 5

20  and 7, you said they were a rough sketch of some Jewel

21  Barbie projects, right?

22  A    Yes.

23  Q    And you were thinking maybe you did the drawing in

24  1998, right?

25          MR. PRICE:  Objection.  Misstates the testimony,

Case 2:04-cv-09049-DOC-RNB   Document 9795   Filed 02/04/11   Page 73 of 103   Page ID #:294026
CV 04-9049-DOC - 02/02/2011 - Day 11, Vol. 2 of 3

73

1    assumes facts.

2            THE COURT:  Well, I'm going to let him answer the

3    question.

4    BY MS. KELLER:

5    Q    Do you believe you did this drawing in 1998, either of

6    them?

7    A    I think so, yes.

8    Q    And that would be while you were working part-time for

9    Mattel in Missouri at the beginning of 1998?

10   A    Yes.

11   Q    And -- but these -- these drawings, when you were

12   working for Mattel part-time in Missouri beginning 1998, you

13   were working for mainline Barbie, right?

14   A    Yes.

15   Q    And mainline Barbie is the little Barbie dolls that

16   little girls play with, right?

17   A    Yes.

18   Q    Kind of fun little dolls?

19   A    Yes.

20   Q    These drawings, they look a little more like maybe

21   something like collectibles, don't they?

22   A    A little bit more, yes.

23   Q    I mean, Barbie collectibles had some very lavish

24   fashion designs of ball gowns and all sorts of elaborate

25   gowns, right?

1    A    Yes.

2    Q    And you never were really clued in to what Mattel was

3    intending to do with this project, were you?

4    A    I don't remember, no.

5    Q    And let's take a look at your trial testimony on

6    June 17th, 2008.

7    A    Okay.

8    Q    Page 2963, lines 16 and 17.  2963, lines 16 and 17.

9    A    Okay.

10   Q    So is it true that you weren't really too clued in as

11   to what Mattel intended to do with this project?

12   A    Yes.

13   Q    Now, let's turn to page 87 of 1155C, that same --

14   talking about your same notebook.  There were all sorts of

15   stuff, and Mr. Price and you talked about this earlier.

16   A    Yes.

17   Q    It says, "Mom and dad, thanks for everything.  Here is

18   a little grocery money.  We enjoyed our stay so much.  This

19   place is so beautiful.  We look forward to coming back again

20   in the next few weeks.

21        "Love you so, Wade, Lisa, Christopher and Allison."

22        And Wade is your brother, right?

23   A    Yes.

24   Q    Lisa is his wife?

25   A    Yes.

1    Q    And Christopher and Allison are their kids, your niece

2    and nephew?

3    A    Yes.

4    Q    And so obviously, one of them picked up your notebook

5    and wrote this in it, right?

6    A    Yes.

7    Q    Now -- so you agree that the note had to have been

8    written in Missouri, true?

9    A    I'm sorry, what was that?

10   Q    You agree that this note had to have been written in

11   Missouri?

12   A    Yes.

13   Q    And Mr. Price discussed the fact that your family --

14   your brother and his family visited your parents

15   Thanksgiving and Christmas in 1999, right?

16   A    Yes.

17   Q    But as you testified today, they also visited

18   Thanksgiving and Christmas in 1998, right?

19   A    I don't remember.

20   Q    Is this dated?

21   A    No.

22   Q    And your family was pretty close, right?

23   A    Yeah, we still are.

24   Q    And you still are.  Yeah, I'm glad to hear that.

25        You made a practice of spending the holidays together?

1    A    Whenever possible, yes.

2    Q    And you can't remember any time period that your

3    brother and his family did not visit your parents around the

4    holidays, right?

5    A    Not right now, no.

6    Q    And now, when you were still living back in Missouri in

7    1998 --

8            THE COURT:  Excuse me, Counsel.  Could you refresh

9    our recollection what Exhibit Number is this?

10           MS. KELLER:  This is 1155C-87.

11           THE COURT:  Thank you.

12           All right.  Please continue.

13           MS. KELLER:  And we don't need that up anymore.

14   BY MS. KELLER:

15   Q    Now, in 1998, you were still living in Missouri.  We've

16   been over that, right?

17   A    Yes.

18   Q    And you would agree with me that you had many more

19   notebooks lying around the house when you lived with your

20   parents and when you were merely visiting, right?

21   A    Yes.

22   Q    And in fact, when you lived with your parents, you had

23   notebooks just like at your home in L.A., you had a lot of

24   notebooks all over the place, right?

25   A    Yes.

1    Q    So anytime inspiration struck, you could pick one up?

2    A    Yes.

3    Q    And if your brother and sister-in-law wrote in your

4    notebook, would you say that it's reasonable to think that

5    it was out somewhere in the common area where they could

6    find it?

7    A    Yes.

8    Q    And in fact, in 1999, you didn't have a practice of

9    bringing notebooks with you when you traveled on vacation,

10   right?

11   A    I don't remember if I did or not.

12   Q    Okay.  Let's take a look at your testimony, June 18th,

13   2008, 2944.

14   A    What page, now?

15   Q    2944.

16   A    Sorry.

17   Q    That's okay.  We will wait for you.

18   A    Okay.

19   Q    2944, lines 1 through 4.

20   A    Okay.

21   Q    So would you agree with me that in 1999, you didn't

22   have a practice of bringing notebooks with you when you

23   traveled on vacation?

24   A    That's correct.

25   Q    And if you had been doing valuable sketches for Mattel

```
 1    in your notebook, you wouldn't have hauled it across the

 2    country for a short trip, right?

 3    A     No.

 4    Q     Am I correct?

 5    A     You are correct.

 6    Q     So since you didn't have a practice of having a

 7    particular notebook for each calendar year, some work you

 8    did in 1997 might be in a notebook marked 1997 or it might

 9    not, right?

10    A     That's correct.

11    Q     And the fact that you might have had fashion sketches

12    in a notebook that resemble sketches you did for Barbie

13    collectibles that came onto the market in 1999, doesn't mean

14    the sketches were done in 1999, right?

15    A     That's correct.

16    Q     And in fact, the sketches have to precede -- they have

17    to be before the doll happens, right?

18    A     Yes.

19    Q     You make sketches, you work on them, you refine them,

20    you turn them in, and then there is -- at Mattel, at least,

21    there is often quite a long process before a doll results,

22    right?

23    A     Yes.

24    Q     Many months?

25    A     Sometimes, yes.
```

Case 2:04-cv-09049-DOC-RNB   Document 9795   Filed 02/04/11   Page 79 of 103   Page ID #:294032
CV 04-9049-DOC - 02/02/2011 - Day 11, Vol. 2 of 3

79

1   Q    And is it also true that you sometimes draw

2   inspirations from your own sketches that you've sketched

3   earlier, months, years earlier?

4   A    Yes.

5   Q    You told us, for example, that you draw sketches

6   sometimes just for yourself.  There isn't any project, you

7   are not trying to sell, you just draw them for your own

8   pleasure, right?

9   A    Yes.

10  Q    Kind of the nature of being an artist?

11  A    Yes.

12  Q    So you have other sketches done in 1998 that inspire

13  designs you did for Barbie collectibles later on, don't you?

14  A    Yes.

15  Q    And I ask that you be handed an envelope marked as

16  Exhibit 35070, and on the outside, it says "Fashion Hound."

17  A    Okay.

18  Q    Now, did you take a look at these yesterday -- or was

19  it yesterday?  Yes, last week.

20  A    Yes.

21  Q    And one of the things Mr. Price asked you about was

22  when you were -- went over things with MGA lawyers for two

23  hours, were your drawings and your possessions at your desk

24  at Mattel some of the things you went over?

25  A    Yes.

1    Q     In fact, is that mainly what you did, was go over your

2    drawings?

3    A     Yes.

4    Q     And you haven't seen those since -- quite a while,

5    right?

6    A     It's been a while.

7    Q     Now, the contents of Exhibit 35070, do you recognize

8    some of these things as drawings you did?

9    A     Yes.

10   Q     Do you remember these as possessions that you left at

11   Mattel at your cubicle when you left?

12   A     A lot of them, yes.

13   Q     And was it your habit when you worked at Mattel to keep

14   things in big envelopes, like that one that's up there?

15   A     Yes.

16   Q     And what significance does that Fashion Hound have on

17   the envelope?

18   A     It was a project that I worked on for Barbie

19   collectibles.

20   Q     Do you recognize the handwriting that says Fashion

21   Hound?

22   A     Yes.

23   Q     Whose is it?

24   A     That's mine.

25   Q     Now -- so you remember around September of 1998, you

1    stopped working on the Bratz project because you felt that

2    you needed to return to work full time, right?

3    A    Yes.

4    Q    And you realized you would need to update your

5    portfolio.  I think you talked about that earlier today?

6    A    Yes.

7    Q    So you wanted to have an updated portfolio to send to

8    Mattel, and that would help -- help you return to the

9    fashion doll industry?

10   A    Yes.

11   Q    You were hoping they'd look at it and say, "Yeah, we

12   remember how talented this guy is," right?

13   A    Yes.

14   Q    Now, let's look -- look again at that same exhibit --

15   well, no.  Let's look at Exhibit 35002.

16   A    Okay.

17   Q    Do you recognize that?

18   A    Yes.

19   Q    Was that something you did for your portfolio in the

20   fall of '98?

21   A    Yes.

22          MS. KELLER:  We ask that that be admitted, your

23   Honor.

24          THE COURT:  Received.

25

1           (Defendants' Exhibit No. 35002 is received in

2       evidence.)

3   BY MS. KELLER:

4   Q    So this is part of the updated portfolio that you sent

5   Mattel?

6   A    Yes.

7   Q    And you signed and dated it, right?

8   A    Yes.

9   Q    And that was your custom, if you were going to send

10  something to someone or present something, make a

11  presentation, right?

12  A    Yes.

13  Q    And in this case, it's signed and dated 10/98, right?

14  A    Yes.

15  Q    And you returned to Barbie on January 4th, 1999, right?

16  A    Yes.

17  Q    Barbie -- to Mattel.

18       "Returned to Barbie."

19           (Laughter.)

20  BY MS. KELLER:

21  Q    You returned to Mattel in January of '99?

22  A    Yes.

23  Q    Now, you're aware that this ended up in your Mattel

24  file right there that we are talking about, right?

25  A    Yes.

CV 04-9049-DOC - 02/02/2011 - Day 11, Vol. 2 of 3

1    Q    The one that's marked "Fashion Hound"?

2    A    Yes.

3    Q    Now, if you look at the number at the very bottom

4    right-hand side of this exhibit, you see that it was Mattel

5    that produced this exhibit, right?  You have a little "m"

6    there for Mattel?

7    A    Okay.  I didn't know that meant that.

8    Q    All right.  I don't think there will be any dispute

9    about that.

10   A    Okay.

11   Q    And beside the colored portfolio sketch, is there a

12   black and white of it?

13   A    Yes.

14   Q    And there is writing on it, right?

15   A    Yes.

16   Q    What does it say?

17   A    It says, "Box" something "of Mattel, Prod Number 7209;

18   envelope, Fashion Hound."

19   Q    Okay.  "Envelope, Fashion Hound," that's what I'm

20   looking for.

21       Now, you used that in conjunction with another source

22   of inspiration, right, that's also in that envelope?

23   A    This one?  Yes.

24   Q    And I'm looking at -- I'm talking about another

25   reference, the kind of vintage vogue?

1          Can you hold that up for the jurors?

2     A    Sure.

3     Q    And what does that say on it?

4     A    It says, "Vogue this number a forecast of spring

5     fashions."

6     Q    So that was something that you had saved from

7     somewhere, a magazine or something, to use as a source of

8     inspiration?

9     A    Yes.

10    Q    For the updating of your portfolio?

11    A    I'm sorry, what now?

12    Q    For the updating of your portfolio, for a drawing to

13    update your portfolio with?

14    A    Yes.

15    Q    Okay.  Let's look at Exhibit 35008, and do you

16    recognize this as a drawing of a woman wearing a cape and a

17    hat?

18    A    Yes.

19    Q    And was that that same exhibit?

20    A    Yes.

21    Q    Okay.  And can you hold that up?

22              MS. KELLER:  Do we have that?

23              Oh, your Honor, is this whole exhibit in, the

24    entire envelope?

25              THE COURT:  (No audible response.)

1              MS. KELLER:  Thank you.

2              MR. PRICE:  Your Honor, they've been marked

3     separate exhibits.

4              THE COURT:  There's the confusion.  It's been

5     marked as separate exhibits by Mattel (sic) --

6              MR. PRICE:  By MGA.

7              THE COURT:  -- but it's in a complete package.  It

8     just depends on how the two of you want to have this

9     received.

10             See, what we are discussing is we don't want a lot

11    of duplication of the same exhibit, but it may be necessary.

12             And I don't want any emphasis for the jury, if you

13    see the same exhibit over and over again, because some

14    parties have marked, let's say, a stack of papers with page

15    1725 or 32, and they don't see any reason to put the other

16    pages in.  The other party may want the entire exhibit, so

17    we may have this duplication.  And if you see that during

18    your deliberations, you are not to give undue weight because

19    you see one exhibit more than one time, okay?

20             MS. KELLER:  We'll just go one piece by one piece,

21    your Honor.

22             THE COURT:  Counsel, do you want to do that?

23             MR. PRICE:  Yes, because that's how they marked

24    it.  I don't know exactly what's in the file.  We have

25    separate markings of this by MGA, so that's fine.

```
 1              THE COURT:  Okay.  Well, do you two want to come
 2   up and look?
 3              MS. KELLER:  It's fine if you'd like to.  I only
 4   have a few pages of --
 5              MR. PRICE:  No.  One by one is fine because I
 6   think I have them that way.
 7              THE COURT:  Okay.  Thank you.
 8   BY MS. KELLER:
 9   Q    Okay.  So going back to Exhibit 35002, we already saw
10   that.
11   A    Uh-huh.
12   Q    And now let's look at Exhibit 35008.
13   A    Okay.
14              MS. KELLER:  And I would ask that that be
15   admitted, your Honor.  We were just referring to it earlier.
16              THE COURT:  Received.
17              (Defendants' Exhibit No. 35008 is received in
18         evidence.)
19   BY MS. KELLER:
20   Q    Okay.  So this is that drawing of the woman wearing a
21   cape and a hat with a dog on a leash, right?
22   A    Yes.
23   Q    And this, together with this vogue drawing, you used
24   along with your October 1998 portfolio drawing to help
25   design a Barbie collectible, right?
```

1   A    Yes.

2          MS. KELLER:  Let's see Exhibit 30687.

3   BY MS. KELLER:

4   Q    And do you recognize this as "Society Hound Barbie with

5   Greyhound"?

6   A    Yes.

7          MS. KELLER:  And could we have that admitted, your

8   Honor.

9          THE COURT:  It's received.

10          *(Defendants' Exhibit No. 30687 is received in*

11      *evidence.)*

12          MS. KIECKHEFER:  Page 16?

13          MS. KELLER:  Page 16, 30687-16.

14   BY MS. KELLER:

15   Q    So this is what ultimately resulted from those

16   inspirations that we talked about?  This is so-called

17   "Society Hound Barbie with Greyhound," right?

18   A    Yes.

19   Q    And so your 1998 portfolio drawing that we saw helped

20   inspire this Barbie collectible that was produced later than

21   that, right?

22   A    Yes.

23   Q    After you went back to Mattel in 1999?

24   A    Yes.

25   Q    And this wasn't unusual for you, was it, to have

```
 1    inspirations and sketches that you had done earlier used to

 2    kind of produce something later?

 3    A    That's correct, yes.

 4    Q    You used drawings that you had done at other times to

 5    inspire you when you were designing Barbie collectibles

 6    fairly frequently, right?

 7    A    Yes.

 8    Q    So you could have used sketches you did in other years

 9    to inspire Barbie designs you did in 1999, right?

10    A    Yes.

11    Q    And you could have been doing fashion sketches in this

12    notebook, 1155C -- you could have been doing fashion

13    sketches in the notebook we looked at in 1998 and later used

14    them as inspiration when you were working for Mattel and

15    designing Barbie collectibles in 1999 and 2000, right?

16    A    Yes.

17    Q    Now, let's look at Exhibit 35003.

18         Do you have that in front of you?

19    A    Yes.

20    Q    Is this the sketches you did for the portfolio that you

21    updated in the fall of '98?

22    A    Yes.

23              MS. KELLER:  Your Honor, we ask that 35003 be

24    admitted.

25              THE COURT:  Received.
```

CV 04-9049-DOC - 02/02/2011 - Day 11, Vol. 2 of 3

89

```
 1              (Defendants' Exhibit No. 35003 is received in

 2         evidence.)

 3    BY MS. KELLER:

 4    Q    Now, again, if you look at the bottom of this, we call

 5    it a Bates number, a sequence number, it begins with a

 6    little "m"?

 7    A    Yes.

 8    Q    Is this something else that was found in your Mattel

 9    files?

10    A    I believe so, yes.

11    Q    Even though you drew this in 1998, right?

12    A    Yes.

13    Q    So this is something that you could have used for

14    inspiration, right?

15    A    Yes.

16    Q    And you could have done a fashion sketch in '98 and

17    used it for a Barbie collectible in 1999 or later, right?

18              MR. PRICE:  Objection.  This is speculation at

19    this point.

20              THE COURT:  Sustained.

21    BY MS. KELLER:

22    Q    Well, this was a sketch that you know you did in 1998

23    because of the date on this exhibit, right?

24    A    Yes.

25    Q    And you also know that it turned up in your file at
```

1   Mattel, right?

2   A    Yes.

3   Q    And you also know that it was common for you to use

4   sketches that you had done earlier to inspire something that

5   you produced later, right?

6            MR. PRICE:  Objection.  Vague.  Irrelevant.

7            THE COURT:  Well, the question is.  You can

8   certainly argue the point, and I'm going to allow you to get

9   the evidence in.  The question is did he or didn't he rely

10  upon this, and he may say, "I don't know," but it's still

11  arguable, it's an inference, or he may say, "I recall it."

12  I'm going to sustain the objection, but you can certainly

13  ask the question.

14  BY MS. KELLER:

15  Q    Well, you told us earlier that it was your custom and

16  habit that you could use sketches you did earlier, sometimes

17  years earlier to inspire you to produce something later on,

18  right?

19  A    Yes.

20           MR. PRICE:  I'm going to object.

21           THE WITNESS:  Oh, sorry.

22           THE COURT:  I'm going to sustain it.  Now you can

23  move on, Counsel.  Thank you.

24  BY MS. KELLER:

25  Q    Let me ask you about the Rainy Day Rascals.

1        Now, you are absolutely certain, are you not, that you

2   drew the Rainy Day Rascals early rough greeting cards in

3   1998?

4   A    Yes.

5   Q    And that was when you were not working for Mattel,

6   right?

7   A    That's right.

8   Q    That was a period where you were freelancing and hoping

9   to get into the greeting card business, right?

10  A    Yes.

11  Q    And you may have actually gotten around to doing more

12  refined versions of a Rainy Day greeting card later, but

13  these earlier ones that we are talking about were just

14  rough, right?

15  A    Yes.

16  Q    Let's look at Exhibit 10624.

17       You recognize that as a refined, polished greeting card

18  that appears to be a Rainy Day Rascals card?

19  A    Yes.

20       MS. KELLER:  And your Honor, we'd offer

21  Exhibit 10624.

22       THE COURT:  Received.

23       *(Defendants' Exhibit No. 10624 is received in*

24  *evidence.)*

25

1    BY MS. KELLER:

2    Q    And this has an April 4th, 1999 date, right?

3    A    Yes.

4    Q    But as we've seen, just because you did one thing in

5    1999 doesn't mean you did everything in that year, right?

6    A    That's correct.

7    Q    And you know you did your rough sketches initially for

8    Rainy Day Rascals in 1998, right?

9    A    Yes.

10   Q    And you told us with the Bratz project you sometimes

11   put things -- you put the Bratz project away for a while,

12   and then you'd get it out again, and then you'd put it away

13   for a while, and then you'd get it out again.  Was that

14   something uncommon for you to do with projects?

15   A    No.

16   Q    Now, turning to your work with MGA, you regard yourself

17   as the creator of the idea of the Bratz characters, don't

18   you?

19   A    Yes.

20   Q    But as for the creator of the dolls, would you agree

21   that there are a lot of people involved in creating a doll?

22   A    Yes.

23   Q    And that includes the sculptor, right?

24   A    Yes.

25   Q    The people who sew the fashions?

1    A    Yes.

2    Q    The face painters?

3    A    Yes.

4    Q    The manufacturers?

5    A    Yes.

6    Q    The marketers?

7    A    Yes.

8    Q    And although it was your idea, did you regard the Bratz

9    dolls as MGA's baby?

10            MR. PRICE:  Objection.  Argumentative.

11            THE COURT:  Just restate the question.

12   BY MS. KELLER:

13   Q    Although it was your idea, did you regard the dolls as

14   MGA's creation, the dolls themselves?

15   A    I don't think I -- yes, I did.  Yeah.

16   Q    Okay.  If you hadn't had the inspiration for those

17   dolls, and if you hadn't drawn those drawings, we wouldn't

18   have seen the dolls that became the Bratz dolls, right?

19   A    That's true.

20   Q    But if MGA didn't execute your idea, your idea might

21   have just stayed drawings, right?

22   A    Yes.

23   Q    And you've seen over the years many, many drawings that

24   people have come up with of dolls that have never been made,

25   right?

1   A    Yes.

2   Q    Including at Mattel?

3   A    Yes.

4   Q    Including your friend Lily Martinez, here, who created

5   this line called Toon Teenz; never got made, right?

6   A    I don't know if it ever did.

7   Q    And there are Barbies that never got made, right?

8   A    Yes.

9   Q    There are -- would you agree with me that, particularly

10  if you're developing a new doll line, it's relatively rare

11  for a series of drawings to end up being made into an actual

12  doll?

13  A    It is rather rare.

14  Q    Now, would it be true that you don't regard any one

15  person as the creator of the actual Bratz dolls, the dolls

16  that ultimately resulted?

17  A    I would have to say that's true.

18  Q    And you know that you were transferring or assigning to

19  MGA the idea for the Bratz characters, right?

20  A    Yes.

21  Q    And the inspiration for the Bratz characters, right?

22  A    Yes.

23  Q    And certainly some of the fashions for the Bratz

24  characters, right?

25  A    Yes.

1    Q    And certainly some of their personalities, those sorts

2    of things?

3    A    Yes.

4    Q    But basically MGA took your idea and, in many ways,

5    changed it, refined it and actually produced the dolls,

6    right?

7    A    Yes.

8    Q    Would it be true that you think the dolls that resulted

9    that MGA made were inspired by your characters?

10   A    Yes.

11   Q    Now, I want to run through with you, again, your

12   understanding of what all MGA had to do to develop this

13   doll, all right?

14        Let's look at the doll body first.  A sculpt has to be

15   created, right --

16   A    Yes.

17   Q    -- by a doll sculptor?

18   A    Yes.

19   Q    Which was not you?

20   A    No.

21   Q    And in this case, it was Margaret Leahy?

22   A    Yes.

23   Q    You called Margaret Leahy in September to see if she'd

24   like to work on the Bratz doll because you knew she already

25   left Mattel, right?

CV 04-9049-DOC – 02/02/2011 – Day 11, Vol. 2 of 3

1    A    Yes.

2    Q    Did you know of any other independent freelance

3    sculptors at the time?

4    A    No.

5    Q    But even though you were the one who contacted her,

6    wasn't it MGA who hired her to do the actual work?

7    A    Yes.

8    Q    And MGA actually paid her for the work?

9    A    Yes.

10   Q    Now, just making that initial sculpt we've seen isn't

11   enough.  You know that this sculpt went through a lot of

12   different changes?

13        MR. PRICE:  Objection.  Vague as to "initial

14   sculpt," "sculpt."

15        THE COURT:  Sustained.

16   BY MS. KELLER:

17   Q    Making one initial sculpt was not going to be enough to

18   get this doll produced, right?

19   A    Um --

20   Q    A preliminary sculpt?

21   A    No, it wouldn't be.

22   Q    And there were a lot of different stages that various

23   sculpts went through, right?

24        MR. PRICE:  Objection.  Ambiguous.

25        THE COURT:  Overruled.

1           THE WITNESS:  I'm sorry, what was the question?

2    BY MS. KELLER:

3    Q    There were a lot of stages that various sculpts had to

4    go through before we got to the doll, right?

5    A    Yes.

6    Q    The sculpts need to have the joints configured, they'd

7    have to be created so that their joints could move, right?

8    A    Yes.

9    Q    And is it fair to say that since you are not a model

10   maker or a doll maker, that you don't know exactly all the

11   steps that have to be taken to do that?

12   A    No, I wouldn't.

13   Q    And was that the role of this person named Mercedeh

14   Ward?

15   A    I believe so, yes.

16   Q    Was her role to take the sculpt and then go from the

17   sculpt to this actual body of a doll that could actually be

18   produced and marketed?

19   A    I -- I think that was part of her role, yes.

20   Q    So she was the person who knew how to put the doll body

21   together; is that right?

22   A    I believe so, yeah.

23   Q    For example, in addition to the joints, what kinds of

24   things do you have to put on the doll neck so the head could

25   be attached?

1   A    Yes.

2   Q    Not fall off the first time some kid dropped it?

3   A    Right.

4   Q    And was that in the nature sort of engineering input,

5   in a way?

6            MR. PRICE:  Objection.  Foundation.

7            THE COURT:  I am going to sustain the objection.

8   Just a little bit more foundation.  I'm assuming he may know

9   this, but I'm not sure yet about the engineering qualities

10  or the sculpting.

11  BY MS. KELLER:

12  Q    You know there are a number of mechanical things that

13  have to be done with the doll before the doll would get to

14  market?

15  A    Yes.

16  Q    And somebody has to, for example, figure out the size

17  and the shape of the various items that will allow the

18  joints to move, right?

19  A    Yes.

20  Q    Somebody has to figure out the size and the shape of

21  the various items that will allow the head to be attached?

22  A    Yes.

23  Q    And the legs to the torso?

24  A    Yes.

25  Q    And the arms?

CV 04-9049-DOC - 02/02/2011 - Day 11, Vol. 2 of 3

99

1    A    Yes.

2    Q    And that is more in the nature of engineering than

3    artistic input, right?

4    A    I would say that, yes.

5    Q    Now, Veronica Marlow was an in-house MGA -- I'm sorry,

6    tell me who Veronica Marlow was.

7    A    She's a friend of mine who used to work at Mattel, and

8    we remained friends after she left.

9    Q    And she was freelancing --

10   A    Yes.

11   Q    -- when you started to work on the Bratz project?

12   A    Yes.

13   Q    And there were in-house MGA designers, too, right?

14   A    Yes.

15   Q    And you remember Ellen, Melissa, Louie, remember those

16   people?

17   A    I remember a couple of them, yes.

18   Q    Let's take a look at -- you remember somebody named

19   Maria Elena who was a patternmaker?

20   A    Yes.

21   Q    And you came up with some ideas for fashions, but you

22   didn't actually create the fashions, the actual real life

23   three dimensional fashions, right?

24   A    That's right.

25   Q    You and Veronica Marlow initially created the

Case 2:04-cv-09049-DOC-RNB   Document 9795   Filed 02/04/11   Page 100 of 103   Page ID #:294053
CV 04-9049-DOC - 02/02/2011 - Day 11, Vol. 2 of 3

100

1    hairstyles, but later on, an independent contractor who does

2    hairstyling and rooting, Steve Tarmichael, actually created

3    the final hairstyles, right?

4    A    Yes.

5    Q    And the people at MGA who contributed to the creation

6    of the Bratz dolls, can you name some of those people?

7    A    Well, there was Veronica, of course.  Let's see, there

8    was Steven Tarmichael.

9            THE COURT:  I'm sorry, who did you say again?

10           THE WITNESS:  Steven Tarmichael.

11           THE COURT:  Thank you.

12   BY MS. KELLER:

13   Q    Paula Garcia?

14   A    Paula Garcia, yes.

15   Q    And we just talked about Mercedeh Ward?

16   A    Yes, Mercedeh Ward.

17   Q    And the in-house designers, Ellen, Melissa and Louie,

18   right?

19   A    Yes.

20   Q    Maria Elena?

21   A    Yes.

22   Q    And was -- was Paula Garcia basically the director for

23   the Bratz design work?

24   A    Yes.

25   Q    Was she the person who looked at whatever you or

1    Veronica Marlow came up with and commented and made

2    suggestions for changes and improvements?

3    A    Yes.

4    Q    Now, you also know somebody named Anna Rhee, right?

5    A    Yes.

6    Q    You know she's a freelance doll face painter?

7    A    Yes.

8    Q    And Anna Rhee was the person who painted the faces on

9    the first generation Bratz dolls, the year before, right?

10   A    I believe so, yes.

11   Q    And do you think she's pretty good, a pretty good face

12   painter?

13   A    Yeah, she's very good.

14   Q    Now, you didn't ask her to do the face painting on the

15   dummy doll that you put together that MGA didn't know you

16   were bringing to the September 1st pitch meeting, right?

17   A    That's right.

18   Q    And you asked your coworker, Sheila Kyaw, to do it?

19   A    Yes.

20   Q    Okay.  And we've already seen the check you paid Sheila

21   Kyaw?

22   A    Yes.

23   Q    So -- so by the end of August 2000, then, you only had

24   the dummy that you had put together from the Barbie and Ken

25   pieces and -- and the head from the trash, right?

Case 2:04-cv-09049-DOC-RNB   Document 9795   Filed 02/04/11   Page 102 of 103   Page ID #:294055
CV 04-9049-DOC - 02/02/2011 - Day 11, Vol. 2 of 3

102

1    A    Yes.

2              *(Live reporter switch with Sharon Seffens.)*

3                            -oOo-

CV 04-9049-DOC - 02/02/2011 - Day 11, Vol. 2 of 3

103

1                          -oOo-

2                      **CERTIFICATE**

3

4          I hereby certify that pursuant to Section 753,

5    Title 28, United States Code, the foregoing is a true and

6    correct transcript of the stenographically reported

7    proceedings held in the above-entitled matter and that the

8    transcript page format is in conformance with the

9    regulations of the Judicial Conference of the United States.

10

11   Date:  February 3, 2011

12

13

14        _____

          JANE C.S. RULE, U.S. COURT REPORTER
15        CSR NO. 9316

16

17

18

19

20

21

22

23

24

25