**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

– – – – – – –


MATTEL, INC., ET AL.,                )
                                     )
          Plaintiffs,                )
                                     )
     vs.                             ) No. CV 04-9049-DOC
                                     )     Day 12
MGA ENTERTAINMENT, INC., ET AL.,     )     Volume 2 of 3
                                     )
          Defendants.                )
_____)


REPORTER'S TRANSCRIPT OF PROCEEDINGS

Jury Trial

Santa Ana, California

Thursday, February 3, 2011


Jane C.S. Rule, CSR 9316
Federal Official Court Reporter
United States District Court
411 West 4th Street, Room 1-053
Santa Ana, California 92701
(714) 558-7755

11-02-03 MattelV2

1    **APPEARANCES OF COUNSEL:**

2

3    FOR PLAINTIFFS MATTEL, INC., ET AL.:

4              QUINN, EMANUEL, URQUHART & SULLIVAN
               By:   JOHN B. QUINN
5                    MICHAEL T. ZELLER
                     WILLIAM PRICE
6                    Attorneys at Law
               865 South Figueroa Street
7              10th Floor
               Los Angeles, California 90017-2543
8              (213) 443-3000

9

10   FOR DEFENDANTS MGA ENTERTAINMENT, INC., ET AL.:

11             ORRICK, HERRINGTON & SUTCLIFFE, LLP
               BY:   THOMAS S. MC CONVILLE
12                   Attorney at Law
               4 Park Plaza
13             Suite 1600
               Irvine, California 92614
14             (949) 567-6700

15             – AND –

16             ORRICK, HERRINGTON & SUTCLIFFE, LLP
               BY:   ANNETTE L. HURST
17                   Attorney at Law
               405 Howard Street
18             San Francisco, California 94105
               (415) 773-5700

19             – AND –

20

21             KELLER RACKAUCKAS, LLP
               BY:   JENNIFER L. KELLER
                     Attorney at Law
22             18500 Von Karman Avenue
               Suite 560
23             Irvine, California 92612
               (949) 476-8700

24

25

```
1    APPEARANCES OF COUNSEL (Continued):

2

3    FOR DEFENDANT CARLOS GUSTAVO MACHADO GOMEZ:

4              SCHEPER, KIM & OVERLAND, LLP
               BY:  ALEXANDER H. COTE
5                   Attorney at Law
               601 West Fifth Street
6              12th Floor
               Los Angeles, California 90071
7              (213) 613-4660

8              - AND -

9              LAW OFFICES OF MARK E. OVERLAND
               BY:  MARK E. OVERLAND
10                  Attorney at Law
               100 Wilshire Boulevard
11             Suite 950
               Santa Monica, California 90401
12             (310) 459-2830

13

14   Also Present:

15             ROBERT ECKERT, Mattel CEO

16             ISAAC LARIAN, MGA CEO

17             KEN KOTARSKI, Mattel Technical Operator

18             MIKE STOVALL, MGA Technical Operator

19             RACHEL JUAREZ, Quinn Emanuel Urquhart & Sullivan

20             KIERAN KIECKHEFER, Orrick Herrington & Sutcliffe

21

22

23

24

25
```

**I N D E X**

**EXAMINATION**

| Witness Name | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| BRYANT, CARTER | | | | |
|   By Mr. Price | | | 5 | |
|   By Ms. Keller | | | | |

**EXHIBITS**

| Exhibit | Identification | Evidence |
|---|---|---|
| Plaintiffs' No. 5620 | | 14 |
| Plaintiffs' No. 1127-00001 | | 25 |
| Plaintiffs' No. 10179 | | 22 |
| Plaintiffs' Nos. 13634 and 13635 | | 74 |
| Plaintiffs' No. 23850 | | 16 |

| | |
|---|---|
| 1 | **SANTA ANA, CALIFORNIA, THURSDAY, FEBRUARY 3, 2011** |
| 2 | **DAY 12, VOLUME 2 OF 3** |
| 3 | **(1:01 p.m.)** |
| 4 | *(The following proceedings is taken in the* |
| 5 | *presence of the jury.)* |
| 6 | THE COURT:  Okay.  Then we are back on the record. |
| 7 | All counsel are present.  The parties are present. |
| 8 | Mr. Bryant is present.  Thank you. |
| 9 | And Counsel, this is the continued redirect |
| 10 | examination. |
| 11 | MR. PRICE:  Thank you, your Honor. |
| 12 | **CARTER BRYANT, PLAINTIFFS' WITNESS, RESUMED** |
| 13 | **REDIRECT EXAMINATION (Continued)** |
| 14 | BY MR. PRICE: |
| 15 | Q    Mr. Bryant, yesterday, you were shown Exhibit, I think, |
| 16 | 593.  And that's your invoice in October of 2000 for a |
| 17 | project for MGA, right? |
| 18 | A    Yes. |
| 19 | Q    And perhaps we can show you 393. |
| 20 | A    Okay. |
| 21 | Q    And that's the project, right? |
| 22 | A    Yes. |
| 23 | Q    And you talked about receiving a check from MGA, right? |
| 24 | A    Yes. |
| 25 | Q    And depositing it into the Mattel credit union account, |

1    right?

2    A    Yes.

3    Q    And do you have any reason to believe that the clerks

4    at the Mattel credit union check to see where your checks

5    are coming from?

6    A    I don't know.

7    Q    I mean, it never occurred to you that doing that would

8    alert Mattel that you were working for MGA at the same time

9    you're working for Mattel, right?

10   A    No.

11   Q    And I think you said that there were four people at

12   Mattel who knew that you were working for MGA while you also

13   worked for Mattel?

14   A    Yes.

15   Q    Okay.  And you are talking about Ms. Prince, right?

16   A    Yes, we talked about Ms. Prince.

17   Q    Is she one of the four, this is the notary, that knew

18   you were working for MGA at the same time you were working

19   for Mattel?

20   A    I don't know.

21   Q    You met with Ms. Prince at her home, right?

22   A    Yes.

23   Q    And you had met with her at her home before, right?

24            MS. KELLER:  I want to object.  It assumes facts

25   not in evidence that this was the same time period, your

Case 2:04-cv-09049-DOC-RNB   Document 9798   Filed 02/04/11   Page 7 of 94   Page ID #:294272
CV 04-9049-DOC – 02/03/2011 – Day 12, Vol. 2 of 3

7

1    Honor.

2              THE COURT:  What time period?

3              MR. PRICE:  At any time.

4              THE COURT:  Overruled.

5              THE WITNESS:  Yes, I had met with her before.

6    BY MR. PRICE:

7    Q    And you know -- you understood that she considered you

8    to be a friend?

9    A    Yes.

10   Q    And you told her that the documents you notarized

11   weren't done at Mattel, right?

12   A    I'm sorry, what, now?

13   Q    You told her that the documents that she notarized

14   weren't done at Mattel, right?

15   A    Yes.

16   Q    Did you have any fear that she would rush off and tell

17   her boss at work about you?

18   A    No.

19   Q    Okay.  And so who were the other folks who knew

20   about -- who were at Mattel who knew about a connection

21   between you and Bratz or MGA?

22             MS. KELLER:  And your Honor, I am going to object

23   again.  It misstates the testimony with respect to

24   Ms. Prince.  She notarizes --

25             THE COURT:  She's the notary, Counsel.

```
 1                MS. KELLER:  Yes, your Honor.

 2                THE COURT:  Overruled.

 3                THE WITNESS:  I don't know.  I can't remember.

 4    BY MR. PRICE:

 5    Q    You said there were four people.  I'm just trying to

 6    figure out who you're identifying.  In your examination

 7    yesterday, you said, I think that there were four people who

 8    knew about you and Bratz, four people at Mattel.  So who

 9    were you talking about?

10    A    I said that yesterday?

11    Q    I believe.  If you don't recall it, that's fine.

12    A    I don't recall it.

13    Q    Are there four people that you told about Bratz?

14    A    Not sure.

15                MS. KELLER:  Objection.  Vague as to time.

16    BY MR. PRICE:

17    Q    Are there four people who worked at Mattel that you

18    told about Bratz prior to 2003?

19    A    I don't remember.

20    Q    I mean, the woman who did the hair rooting for you?

21    A    Yes, Carmen.

22    Q    Carmen?

23    A    Yes.

24    Q    She thought she was doing you a favor, right?

25    A    Yes.
```

1    Q    And the woman who did the face painting, she thought
2    she was doing you a favor, right?
3    A    Yes.
4    Q    You didn't tell either of them that you were pursuing a
5    doll line with a competitor, right?
6    A    I don't remember saying anything to that effect, no.
7    Q    And Ms. Cloonan was your roommate, correct?
8    A    Yes.
9    Q    And you are good friends?
10   A    Yes.
11   Q    And you -- she helped you just type up the Bratz logo,
12   right?
13   A    Yes.
14   Q    And you didn't tell her it was to go to some
15   competitor, right?
16   A    No.
17   Q    In fact, a couple years later, you told her that you
18   didn't tell her because you didn't want her to get into
19   trouble, right?
20   A    I don't remember if I said that or not.
21   Q    Now, I'd like to ask you some questions about 1107 to
22   1110, if those can be put in front of you.
23        And do you recall testifying that these drawings were
24   done in November of 2000?
25   A    Yes.

CV 04-9049-DOC – 02/03/2011 – Day 12, Vol. 2 of 3

10

```
 1   Q    But when I asked you on -- on January 28th, you said
 2   you couldn't remember when these were drawn; do you recall
 3   that?
 4   A    No.
 5   Q    Do you recall I asked you about a November 7th
 6   presentation to retailers?
 7   A    Yes.
 8   Q    And whether you had completed this drawing at least as
 9   of the time of the presentation to retailers?
10   A    Yes.
11   Q    And that you didn't remember the day it was completed?
12   A    I don't remember what I said.
13   Q    Let's see if we can refresh your recollection, maybe.
14   Page 39, this is January 28th, 2011, day 9, volume 2.
15          MS. KELLER:  I'm sorry, Counsel, what page again?
16          MR. PRICE:  It's page 39 of January 28th, 2011,
17   lines 3 to 15.
18          MS. KELLER:  I must be on the wrong transcript.
19          MR. PRICE:  Volume 2.
20          (Attorney discussion held off the record.)
21   BY MR. PRICE:
22   Q    Do you have that in front of you, sir?
23   A    Yes.
24   Q    And when I examined you, you couldn't remember if this
25   had even been completed prior to the meeting of the
```

1    retailers, right?

2    A    Yes.

3    Q    Now, with respect to these drawings, you have an

4    understanding that -- do you remember we talked about the

5    time between April 29, '98 and January 4, '99, that your

6    understanding is that if you did drawings then, then they

7    would not be assigned to Mattel, correct?

8    A    Yes.

9    Q    And you also have that understanding, or you believe,

10   that that's the case for anything October 19, correct?

11   A    Yes.

12   Q    I take it you don't know anything about derivative

13   works or things like that, right?

14   A    I'm not sure.

15   Q    But you certainly think it's in MGA's best interest

16   that drawings be dated after October 19?

17           MS. KELLER:  Objection.  Argumentative.

18           THE COURT:  Just restate the question.

19   BY MR. PRICE:

20   Q    Your belief is that drawings dated after October 19 are

21   drawings you could assign to MGA?

22   A    Yes.

23   Q    So with respect to 1107 to 1110, you said those were

24   done sometime in November, after October 19, correct?

25   A    Yes.

1    Q    And you've called these final fashion drawings?

2    A    I don't -- I don't remember if I called them that.

3    Q    But the fashions on these drawings are the ones that

4    were used on the dolls that were released, correct?

5    A    Yes.

6    Q    And before doing the drawings, you had to figure out

7    whether the fashions could be done, could be accomplished,

8    right?

9    A    To some extent, yes.

10   Q    You had to figure out if you could get fabric that kind

11   of looked like those fashions?

12   A    Yes.

13   Q    You had to kind of figure out the type of fabric?

14   A    Yes.

15   Q    You had to figure out the design, obviously?

16   A    Yes.

17   Q    You said in your examination yesterday that there was

18   nothing for sample makers to make at MGA before

19   October 19th, correct?

20   A    I think so, yes.

21   Q    Because you -- you remember the question was, if you

22   don't have these designs, nobody is going to be making

23   anything, right?

24   A    Right.

25   Q    But you did have sample makers making fashions, didn't

Case 2:04-cv-09049-DOC-RNB   Document 9798   Filed 02/04/11   Page 13 of 94   Page ID #:294278
CV 04-9049-DOC - 02/03/2011 - Day 12, Vol. 2 of 3

13

1  you?

2  A    I don't remember.

3  Q    Were -- were any of Veronica Marlow's invoices to

4  MGA -- let me rephrase that.

5       Did you see any of the invoices that Veronica Marlow

6  sent to MGA for payment?

7  A    I'm sorry?  Did I see what, now?

8  Q    Did you see, in the October 2000 time frame, any of the

9  invoices that Veronica Marlow sent to MGA for payment for

10  sample makers?

11  A    No.

12  Q    Did you see any of the time sheets of sample makers?

13  A    No.

14  Q    So obviously, putting something like that in front of

15  you would not refresh your recollection, right?

16  A    No.

17  Q    Do you know a woman named Ana Isabella Cabrera?

18  A    Yes.

19  Q    And did you know her in September or October of 2000?

20  A    Yes.

21  Q    She was a -- a sample maker who worked at Mattel while

22  you were there?

23  A    Yes.

24  Q    To your understanding, she worked for Mattel in

25  September and October of 2000 as well?

CV 04-9049-DOC – 02/03/2011 – Day 12, Vol. 2 of 3

14

1    A    Yes, I think so.

2    Q    And do you recall that -- I mean, do you think you're

3    fairly good friends with her?

4    A    I'm sorry?

5    Q    Were you fairly good friends with her?

6    A    No, not really.  I mean, I knew her from Mattel.

7    Q    Let me show you what's been marked as 5620, I think.

8    And do you recognize this as a photo of yourself that you

9    gave to Ms. Cabrera?

10   A    Yes, but I don't really recall when I gave it to her or

11   giving it to her, but yes, that's what it is.

12              MR. PRICE:  I move 5620 into evidence.

13              THE COURT:  Received.

14              (Plaintiffs' Exhibit No. 5620 is received in

15        evidence.)

16   BY MR. PRICE:

17   Q    When you left Mattel, you had kind of a going-away

18   party where you invited about 10 people; do you recall that?

19   A    Yes.

20   Q    And she was one of the 10 people that you invited?

21   A    I don't remember.

22   Q    And she was actually working on MGA samples while she

23   was at Mattel?

24   A    I didn't know anything about that.

25   Q    But I guess as you said yesterday, there is nothing for

1    sample makers to do until you have your final designs?

2    A    Yes, I said that.

3    Q    So if they are making samples before October 19th, that

4    means you had the final fashion designs before that?

5            MS. KELLER:  I'm going to object.  This assumes

6    facts not in evidence.

7            THE COURT:  Overruled.

8            THE WITNESS:  I don't know.  I mean, I think you

9    are just trying to trip me up on my own words.

10   BY MR. PRICE:

11   Q    Well, I'm just asking you about the logic of what you

12   said yesterday.  I think you just said that they wouldn't be

13   making samples unless they had fashion designs, right?

14   A    That would be true.

15   Q    So let me ask you about something that you were asked

16   about yesterday.  I had earlier put this as a demonstrative

17   saying design, vendors, sculptors, sample makers and

18   painters.

19        So you were the inventor and designer of the Bratz

20   dolls, correct?

21   A    Yes.

22   Q    And under vendors, we talked about the -- the hollow

23   saran hair, correct?

24   A    Yes.

25   Q    And you now know that hollow saran hair was used on

Case 2:04-cv-09049-DOC-RNB   Document 9798   Filed 02/04/11   Page 16 of 94   Page ID #:294281
CV 04-9049-DOC - 02/03/2011 - Day 12, Vol. 2 of 3

16

1    Bratz dolls?

2    A    I -- I don't know about that.

3           MS. KELLER:  Objection.  Vague as to which or how

4    many and when.

5    BY MR. PRICE:

6    Q    Do you know which or how many or when?

7    A    No.

8    Q    Let me show you what we marked as Exhibit 23850.  Do

9    you recognize that as an e-mail on which -- which was sent

10   to you by Ms. Garcia, you and others?

11   A    I don't remember it right now, no.

12   Q    Does it appear to be an e-mail that begins with an

13   e-mail from you to Ms. Garcia, and then follows with an

14   e-mail from Ms. Garcia to you and Mercedeh Ward and others?

15   A    Yes.

16           MR. PRICE:  Your Honor, I move 23850 into

17   evidence.

18           MS. KELLER:  May we have a moment, your Honor, to

19   take a look at it?

20           No objection.

21           THE COURT:  Received.

22           *(Plaintiffs' Exhibit No. 23850 is received in*

23       *evidence.)*

24           MR. PRICE:  Can you display it on the camera.

25

1   BY MR. PRICE:

2   Q    Do you see there is an e-mail at the bottom from

3   Mr. Shichijyo to you October 24th saying, "Thank you for the

4   new fax number corrected.  I think you received our

5   invoice"; do you see that?

6   A    Yes.

7   Q    And you forwarded that to Ms. Garcia, and you say, "I'm

8   forwarding this e-mail to you from Kinuyo Shichijyo, who was

9   our contact for our hollow saran hair in Japan"; do you see

10  that?

11  A    Yes.

12  Q    And this was referring to the contact that you began in

13  September 19 in 2000 when you were still working for Mattel,

14  correct?

15  A    Yes.

16  Q    And then you see the e-mail at the top where she sends

17  it to you and Mercedeh Ward and others, and it begins, "This

18  is a letter sent by hollow saran hair vendor to Carter, the

19  designer"?

20  A    Yes.

21  Q    "Please note in the attached, that this vendor is

22  working very hard to support Carter with all requested hair

23  samples by end of this month"; do you see that?

24  A    Yes.

25  Q    And that was your understanding, that they were working

1   very hard to support you with the hair samples?

2   A    I don't know.  I don't remember thinking that one way

3   or another.

4   Q    The work that you were doing in December of 2000,

5   meeting with the hollow saran -- or contacting the hollow

6   saran company, you also met with the sculptor, Ms. Leahy,

7   correct?

8   A    Yes.

9   Q    And Ms. Leahy's sculpt was used for producing Bratz,

10  correct?

11  A    I believe -- yes, I believe it was.

12  Q    And the sample makers, that was Ms. Marlow's company

13  that did the samples?

14  A    Yes.

15  Q    And I guess you don't remember one way or the other as

16  to whether or not they were making samples prior to

17  October 19?

18  A    I can't recall.  I'm very confused.

19  Q    Well, I don't want you to be confused.

20       Would you agree that one way to see whether or not

21  sample makers were working on samples for October 19 would

22  be to look at their time sheets and their bills?

23  A    Yes.

24  Q    And then -- and then face painter, you said that Anna

25  Rhee was used eventually?

1    A    I'm sorry?

2    Q    You said Anna Rhee was eventually used for face

3    painting, correct?

4    A    Yes, she was.

5    Q    But your testimony is that she was not contacted in

6    June of 2000; is that right?

7    A    I don't remember.

8    Q    Now, when we talk about what was going on in September

9    of 2000 -- let me step back.

10         Yesterday, I think you said that in doing this work,

11   you were assisting yourself?

12   A    Yes.

13   Q    But you believe you were assisting MGA in -- in getting

14   this project off the ground, correct?

15   A    I did believe that, yes.

16   Q    And during September, you were telling Ms. Garcia and

17   Mr. Larian what you were doing to get this project moving

18   forward?

19   A    Yes.

20   Q    And no one in September said to you, "Stop doing this,

21   stop moving this project forward"?

22   A    I don't remember if anybody did.

23   Q    And by the way, you told Ms. Garcia on at least two

24   occasions that you at that time worked for Mattel?

25   A    Yes.

CV 04-9049-DOC – 02/03/2011 – Day 12, Vol. 2 of 3

20

1    Q    You told her sometime in mid-August, right?

2    A    I did, yes.

3    Q    And you told her on September 1st, correct?

4    A    Yes.

5    Q    And Mr. Bryant, if you feel confused, just tell us, and

6    I'll try to make it clearer, okay?

7    A    (No audible response.)

8    Q    Let me ask you about your testimony about Kickapoo High

9    School.

10        I take it as you drove by the high school, you didn't

11   see Brad Pitt?

12   A    No.

13   Q    And I think you were shown yesterday some -- some

14   pictures from the 1999 yearbook; do you recall that?

15   A    Yes.

16   Q    And you saw -- you were shown a photograph of someone

17   with a bare midriff?

18   A    I was, yes.

19   Q    And that was a cheerleader?

20   A    I don't recall the photograph right now.

21   Q    Do you recall seeing a photograph of someone with

22   sequins?

23   A    Yes.

24   Q    And that was a flag carrier?

25   A    I don't know.

Case 2:04-cv-09049-DOC-RNB   Document 9798   Filed 02/04/11   Page 21 of 94   Page ID
#:294286
CV 04-9049-DOC – 02/03/2011 – Day 12, Vol. 2 of 3

21

1    Q    When you were driving by Kickapoo, do you recall seeing

2    any cheerleaders or flag carriers?

3    A    I don't -- I don't know.

4    Q    You were also shown a Seventeen Magazine for

5    August 1998; do you recall that?

6    A    Yes.

7    Q    And is that a magazine that you saved all these years,

8    that August 1998 magazine?

9    A    I don't believe so, no.

10   Q    So someone went and found an August 1998 magazine to

11   show you?

12   A    I don't remember.

13            MS. KELLER:  Objection.  Misleading question, your

14   Honor.

15            THE COURT:  Overruled.

16            THE WITNESS:  I don't remember.

17   BY MR. PRICE:

18   Q    Well, how was it that all these years later, you had

19   access to an August 1998 Seventeen Magazine?

20   A    I do believe somebody showed it to me somewhere along

21   the line.

22   Q    Now, you were a subscriber?

23   A    I don't remember if I was.

24   Q    It was your practice to look at like Teen (sic)

25   Magazine, correct?

Case 2:04-cv-09049-DOC-RNB   Document 9798   Filed 02/04/11   Page 22 of 94   Page ID #:294287
CV 04-9049-DOC - 02/03/2011 - Day 12, Vol. 2 of 3

22

1    A    Yes.

2    Q    Now, if you went and looked at any issue of that

3    magazine, you would find ads or drawings that could be an

4    inspiration for something like Bratz?

5    A    Possibly, yes.

6    Q    And if I could show you Exhibit 01079, it's a

7    photocopy.

8         I'm sorry, it's 10179.

9         And do you have that in front of you?

10   A    Yes.

11   Q    And does that appear to be a copy of an August 1999

12   Seventeen Magazine?

13   A    Yes.

14   Q    Now, I'd like you to look, if you could, at page 1 --

15             MR. PRICE:  Oh, your Honor, I move Exhibit 10179

16   into evidence.

17             THE COURT:  Received.

18             *(Plaintiffs' Exhibit No. 10179 is received in*

19        *evidence.)*

20   BY MR. PRICE:

21   Q    And that's Katie Holmes on the cover?

22   A    Yes.

23   Q    And if you look at page 0132.

24             MS. KELLER:  That is inspiring.

25             MR. PRICE:  Let's see if I can get the right page.

Case 2:04-cv-09049-DOC-RNB   Document 9798   Filed 02/04/11   Page 23 of 94   Page ID
#:294288
CV 04-9049-DOC - 02/03/2011 - Day 12, Vol. 2 of 3

23

```
 1              (Laughter.)

 2              THE COURT:  We are going downhill.

 3              Just joking, Counsel.

 4              For the record, so somebody will understand the

 5   Court's comment where everybody is laughing, we are just

 6   referring to some different photos of the magazine.

 7              MR. PRICE:  It's hard to restrain myself.

 8   BY MR. PRICE:

 9   Q    But if you can go to 0134.

10        So you see that in this August '99 Seventeen Magazine,

11   there is an ad for Paris Blues?

12   A    Yes.

13   Q    Now, your belief is that the Bratz you created is

14   unique, correct?

15   A    Yes.

16   Q    But you said there was a Paris Blues act -- Paris Blues

17   ad in '98 that was an inspiration?

18   A    I did, yes.

19   Q    All right.  And if you look in this August '99, and we

20   can blow up the figure here, you see that there are some

21   elements of the Paris Blues ad which look a little bit like

22   Bratz?

23              MS. KELLER:  Objection.  Vague.

24              THE COURT:  Overruled.

25              Now, this is his opinion.
```

1          THE WITNESS:  A little bit, yes.

2    BY MR. PRICE:

3    Q    And these are the kinds of ads you are going to see in

4    Seventeen Magazine in '98, '99, 2000 time frame?

5    A    Possibly.

6    Q    And if we look at 01790133, you remember yesterday you

7    were shown a Steve Madden ad from August of 1998; do you

8    recall that?

9    A    Yes.

10   Q    Okay.  And this is a Steve Madden ad in August of 1999,

11   right?

12   A    Yes.

13   Q    And do you recall that when you had Ms. Leahy -- when

14   you first met with her and said, "I want you to do a

15   sculpt," that you gave her a Steve Madden ad?

16   A    I did, yes.

17   Q    And if you'd look at 1127-00001; do you recognize that?

18   A    Yes.

19   Q    What is 01127-00001?

20   A    That's a Steve Madden ad.

21   Q    Is this the one that you gave Ms. Leahy?

22   A    Yes.

23          MR. PRICE:  I move 1127-00001 into evidence, your

24   Honor.

25          THE COURT:  Received.

Case 2:04-cv-09049-DOC-RNB   Document 9798   Filed 02/04/11   Page 25 of 94   Page ID #:294290
CV 04-9049-DOC - 02/03/2011 - Day 12, Vol. 2 of 3

25

1              *(Plaintiffs' Exhibit No. 1127-00001 is*

2        *received in evidence.)*

3              MR. PRICE:  So let's put these side by side.

4   BY MR. PRICE:

5   Q    The Steve Madden ad you gave her looks a lot like the

6   Steve Madden ad from August '99 Seventeen Magazine, correct?

7   A    Yes.

8   Q    And then if we can look at 17246, it's the one you

9   talked about yesterday.  I think you were shown 17246-00115.

10  Is that the one you identified from August 1998?

11  A    It is, yes.

12  Q    Now, would you agree that the ad in the August '99

13  Seventeen Magazine, which is 0 -- 10179-0133, looks more

14  like Bratz than the one in the August '98?

15             MS. KELLER:  Objection.  Assumes facts not in

16  evidence.

17             THE COURT:  Overruled.

18             THE WITNESS:  I think there are some similarities,

19  yes.

20             THE COURT:  Well, Counsel, you can put that other

21  back up, 10179-133.

22             MR. PRICE:  Let's put that up.

23  BY MR. PRICE:

24  Q    Now we have them both up there, we have August of '98

25  and August of '99, correct?

Case 2:04-cv-09049-DOC-RNB   Document 9798   Filed 02/04/11   Page 26 of 94   Page ID #:294291
CV 04-9049-DOC - 02/03/2011 - Day 12, Vol. 2 of 3

26

1    A    Yes.

2    Q    By the way, you had --

3         THE COURT:  Just a moment, so the record is clear.

4    It's 17245-115, which you are referring as the 1998 ad, and

5    10179-0133, which you are referring to as the August 1999

6    ad; is that correct?

7         MR. PRICE:  Actually it's 17246-115, your Honor,

8    you said 45.

9         THE COURT:  I'm sorry, thank you.

10   BY MR. PRICE:

11   Q    So I'd asked if the August '99 Steve Madden ad, which

12   was 10179-0133, looks more like the Bratz than the '88 --

13   '98 ad, 17246-115?

14   A    A little bit, yes.

15   Q    And if we compare it to what you gave Ms. Leahy, the

16   August '99 ad, 0 -- 10179-0133, put that up next to

17   101127-0001.  That August '99 ad looks almost exactly like

18   what you gave Ms. Leahy?

19   A    Yes.

20   Q    And if we can look, now, at Exhibit 5-89.  That's the

21   drawing of the sculpt that you gave to Ms. Leahy, correct?

22   A    Yes.

23   Q    And yesterday, you talked about the steps that had to

24   be followed to actually produce the doll?

25   A    Yes.

1    Q    And we are talking about you had to put in joints, for

2    example?

3    A    Yes.

4    Q    I mean, there is a manufacturing process which begins

5    with a design, right?

6    A    It does, yes.

7    Q    And it actually begins with kind of an aesthetic

8    design, what you want the doll to look like?

9    A    Yes.

10   Q    And this figure here is a drawing that you had done to

11   what became the final sculpt?

12   A    Yes.

13   Q    And it was the sculpt that was created from this

14   drawing became the final sculpt?

15   A    Yes.

16   Q    And -- and --

17        MS. KELLER:  Objection.  Misstates the evidence,

18   your Honor.

19        THE COURT:  Well, there were a series of

20   transitions, weren't there, Counsel?

21        MS. KELLER:  Yes.

22        THE COURT:  Okay.  Thank you, Counsel.  I'm

23   addressing Mr. Price.

24        I believe that it went through a transitional

25   period, so when you say "final," there was a first sculpt

1    and a second sculpt allegedly.

2    BY MR. PRICE:

3    Q    Let me ask you:  What do you refer to when you say the

4    final sculpt?

5    A    I'm thinking of, I think, the second sculpt that

6    Margaret made.

7    Q    And why do you refer to that as the final sculpt?

8    A    I think that was the one that was -- actually, I don't

9    remember.  I don't know.

10   Q    Well, in the past, you referred -- you referred to

11   something as the final sculpt?

12   A    Yes.

13   Q    Okay.  So when you referred to the final sculpt, what

14   do you mean when you say the final sculpt?

15   A    I was referring to the second sculpt that she did.

16   Q    And why would you call that final?

17   A    I don't know.

18   Q    Why wouldn't you call that the second sculpt?

19   A    Because I thought it was the final sculpt.

20   Q    And that's what you thought in 2004, correct?

21   A    Yes.

22   Q    And using your words, "final," you believe the sculpt

23   that was created from this drawing became the final sculpt?

24   A    Yes.

25            MS. KELLER:  Objection.  Vague as to time.

1              THE COURT:  Overruled.

2              THE WITNESS:  I'm sorry, what, now?  What did you

3     ask me?

4     BY MR. PRICE:

5     Q    I said the sculpt that was created from this drawing,

6     to your knowledge, became the final sculpt?

7     A    That's what I thought, yes.

8     Q    And that's what you testified to under oath?

9     A    Yes.

10    Q    It's correct that you had some significant involvement

11    in the creation of the doll?

12    A    Yes.

13    Q    But you probably didn't have a lot of involvement in

14    the mechanics of the arm joints or hip joints or anything

15    like that, right?

16    A    No, I did not.

17    Q    Your role was to try to make the final sculpt look as

18    close as you could to your vision?

19    A    Yes.

20    Q    Now, I had earlier talked about your '95 contract and

21    your '99 contract?

22    A    Yes.

23    Q    Very quickly, if you could look at the January '99

24    contract, 9224 -- 9 -- 99224.

25         9924, sorry.

1        And Exhibit 23.

2             THE COURT:  Remind the jury, because they just

3    have numbers again, we are familiar with them as counsel and

4    the Court.

5    BY MR. PRICE:

6    Q    Exhibit 23 is the November 6th, '95, employee

7    confidential information and inventions agreement?

8    A    Yes.

9    Q    And 9924 is the January 4, '99, employee confidential

10   information and inventions agreement?

11   A    Yes.

12   Q    Now, I'd like you to look, if you could, at 2A and 2B

13   where it talks about the inventions and the definition of

14   inventions?

15   A    Yes.

16   Q    The ones we went over before?

17   A    Yes.

18   Q    And if you could just look at that and compare it to

19   9924, and tell us whether or not it's the same language?

20   A    It looks very similar, yes.

21   Q    As far as you can tell, the language is identical,

22   correct?

23   A    Yes.

24   Q    And if you would look at paragraph 3A and compare that

25   with -- I'm sorry, look at 3A in 9924, and compare that with

Case 2:04-cv-09049-DOC-RNB   Document 9798   Filed 02/04/11   Page 31 of 94   Page ID #:294296
CV 04-9049-DOC – 02/03/2011 – Day 12, Vol. 2 of 3

31

1    3A at 00 --

2         THE COURT:  Counsel, just a moment.  We need to

3    take a restroom break.

4         MR. PRICE:  Okay.

5         THE WITNESS:  Sorry.

6         THE COURT:  You are admonished not to discuss this

7    matter amongst yourselves, nor form or express any opinion

8    concerning this case.  We will come back and get you in

9    about 15 minutes, okay?

10        *(The following proceedings is taken outside*

11    *the presence of the jury.)*

12        THE COURT:  Then, Counsel, about 15 minutes.

13   Mr. Bryant just needs a restroom break.

14        Thank you.

15        *(Recess.)*

16        *(The following proceedings is taken in the*

17    *presence of the jury.)*

18        THE COURT:  We are back in session.

19        The jury is present, the alternates.  All counsel

20   are present.  The parties are present.

21        And this is Mr. Price back on redirect

22   examination --

23        MR. PRICE:  Thank you, your Honor.

24        THE COURT:  -- on behalf of Mattel.

25

1         **REDIRECT EXAMINATION (Continued)**

2    BY MR. PRICE:

3    Q    So you have -- I was asking to compare paragraphs 3A

4    for 9924, which is the January 4, '99, agreement, and

5    Exhibit 23, the November 6th, '95, agreement, and confirm

6    with me, if you could, that paragraph 3A is the same above?

7    A    Yes.

8    Q    If you'd look at Exhibit 1-1.

9         I actually have the original here.  Do you remember

10   looking at this yesterday, the colored drawings?

11   A    Yes.

12   Q    And I just want to be clear on how you did these

13   drawings.  You had a blank poster board, right?

14   A    Yes.

15   Q    You'd have a sketch that you'd put on this -- is it a

16   light box?

17   A    Yes.

18   Q    And you'd take that blank poster board, draw in the

19   sketch and then color it in, right?

20   A    Yes.

21   Q    And that process for Exhibit 1 was done while you were

22   employed by Mattel?

23   A    I'm sorry, what process?

24   Q    The process of getting a blank poster board, taking a

25   sketch, projecting it and coloring it in?

1    A     Yes.

2    Q     And that's true for Exhibit 3 as well; is that right?

3    A     What's Exhibit 3?

4    Q     You found it?  It's in front of you?

5    A     Yes.

6    Q     And these might be -- well, that was true with respect

7    to any Bratz drawing that's in color except 1107 to 1110,

8    right?

9    A     I'm sorry, I don't know what you are talking about.

10   Q     Okay.

11         THE COURT:  I think the numbers are good for the

12   record, but why don't you show him or tell him what

13   Exhibit 3 is.

14   BY MR. PRICE:

15   Q     Are you looking at 3?

16   A     (No audible response.)

17   Q     And that's -- you can tell some of the drawings without

18   text?

19   A     Yes.

20   Q     And you can tell from the shading that this was a

21   colored -- a drawing that was colored in?

22   A     Yes, yes.

23   Q     And that was done using the same process with the white

24   poster board, projecting and then filling it in or?

25   A     Yes.

1    Q    And that was done in -- while you were at Mattel?

2    A    Yes.

3    Q    And the same would be true for Exhibit -- the same is

4    true for Exhibit 302B?

5              THE COURT:  Well, show Mr. Bryant 302B.

6              THE WITNESS:  Yes.

7    BY MR. PRICE:

8    Q    And is it your recollection -- we had shown you 1107,

9    1108, 1109, 1110, the final fashion drawings; do you recall

10   those?

11   A    Yes.

12   Q    And they are in color, right?

13   A    Yes.

14   Q    So except for those, is every drawing that we see in

15   color from you about the Bratz, a drawing where you followed

16   this process of getting the poster board, projecting an

17   image and coloring it in, that was all done while you were

18   at Mattel, correct?

19   A    Yes.

20   Q    You were asked about your royalty statements and

21   subsequent Bratz dolls; do you recall that?

22   A    Yes.

23   Q    But after the first Bratz dolls, the first four came

24   out, those characters were still used by MGA, correct?

25             MS. KELLER:  Objection.  Vague.

```
 1              THE COURT:  Do you understand the question?  Do
 2    you understand the question?
 3              THE WITNESS:  Yes, I think I do.
 4              THE COURT:  You can answer.
 5              THE WITNESS:  Yes.
 6    BY MR. PRICE:
 7    Q    So it wasn't just 2000 or 2001 or 2002, you would come
 8    up with other themes for those same four characters?
 9    A    Yes.
10    Q    And those themes would be themes like Sunkist Summer,
11    Girls Night Out, Wintertime Wonderland, things like that?
12    A    Yes.
13    Q    And if you'd look at those royalty statements, you can
14    tell, can you not, which character is involved?
15    A    Yes.
16    Q    And you mentioned that in September -- let me rephrase
17    that.
18         In September -- is it your testimony that in September
19    of 2000, the only work you did to assist MGA was work when
20    you were at night or on the weekends?
21    A    I believe so, yes.
22    Q    When you went to see Carmen to have her do -- was she
23    the face painter or the hair rooter, I forget?
24    A    She was the hair rooter.
25    Q    So Carmen, you approached during the day at Mattel,
```

Case 2:04-cv-09049-DOC-RNB   Document 9798   Filed 02/04/11   Page 36 of 94   Page ID #:294301
CV 04-9049-DOC – 02/03/2011 – Day 12, Vol. 2 of 3

36

1    correct?

2    A    Yes.

3    Q    Although that was the August time frame of 2000?

4    A    I think so, yes.

5    Q    And then the other woman, Sheila Kyaw?

6    A    Yes.

7    Q    You approached her at Mattel, correct?

8    A    Yes.

9    Q    And that was in August of 2000?

10   A    Yes.

11   Q    And your extension at Mattel was 6099, correct?

12   A    I think it was.

13   Q    And the main extension at MGA was (417)725-7916?

14   A    I don't remember.

15   Q    Okay.  I'm sorry, I could see why you wouldn't.  Let me

16   try again.

17        The extension at MGA was (818)894-2525?

18   A    I think so, yes.

19   Q    Is it correct that in the month of September, while you

20   were in the Mattel design center, that you made over 15

21   calls from the Mattel design center to MGA?

22   A    I don't remember how many calls I made.

23   Q    In the last couple of days, you've talked about your

24   stress; do you recall that?

25   A    Yes.

1    Q    And it sounds like you said you were cheated out of a

2    real estate investment?

3    A    Yes.

4    Q    And could you tell us how much you lost in that?

5    A    I think it was several -- several million dollars.

6    Q    The -- your contract with MGA says in effect that you

7    are required to reimburse MGA for all damages that they must

8    pay if it's determined that you didn't own the rights to

9    Bratz; is that right?

10   A    Yes.

11   Q    And MGA has continued to assert that it has the right

12   to reimbursement?

13   A    Yes.

14          MR. PRICE:  One moment, your Honor.

15          *(Attorney discussion held off the record.)*

16          MR. PRICE:  Your Honor, no further questions.

17          THE COURT:  Just a moment, Counsel.

18          MS. KELLER:  Just a very few, your Honor.

19          THE COURT:  I'm sorry?

20          MS. KELLER:  I just have a very few.

21          THE COURT:  Just one minute.

22          MS. KELLER:  I'm sorry.

23          THE COURT:  All right.  This would be recross by

24   Ms. Keller on behalf of Mr. Larian and MGA.

25          MS. KELLER:  Thank you, your Honor.

|   |   |
|---|---|
| 1 | **RECROSS EXAMINATION** |
| 2 | BY MS. KELLER: |
| 3 | Q    Good afternoon again, Mr. Bryant. |
| 4 | A    Good afternoon. |
| 5 | Q    Are you getting a little worn out? |
| 6 | A    Extremely. |
| 7 | Q    I'll try to be very quick with you, okay? |
| 8 | A    Sure. |
| 9 | Q    And hopefully you can get on your way. |
| 10 | I want to talk with you a little bit, though, about the |
| 11 | patent issue that was brought up earlier; do you remember |
| 12 | that? |
| 13 | A    Yes. |
| 14 | Q    Declaration regarding Exhibit 502 and... |
| 15 | Could we see Exhibit 11898. |
| 16 | That was the cover letter from an attorney named Alan |
| 17 | Rose to you, right?  Do you remember that? |
| 18 | A    Yes. |
| 19 | Q    And were you aware that the late Mr. Rose was 92 years |
| 20 | old when he wrote that letter? |
| 21 | MR. PRICE:  Objection.  Irrelevant. |
| 22 | MS. KELLER:  Just asking if he knew. |
| 23 | THE COURT:  Well, if he doesn't, maybe he does |
| 24 | now.  I'm just kidding. |
| 25 | *(Laughter.)* |

```
 1              THE COURT:  Do you know how old Mr. Rose was?

 2              THE WITNESS:  I didn't before, but now I do.

 3              THE COURT:  Sustained.

 4    BY MS. KELLER:

 5    Q    Now, you know this case that is in this courtroom

 6    before this jury has nothing to do with patents, right?

 7    A    I didn't know that.

 8    Q    Okay.  Now, you were -- well, you testified that

 9    ultimately, on cross-examination, that you believed that you

10    had signed a false declaration; do you remember that?

11    A    Yes.

12    Q    At the time you signed it, did you think that you were

13    signing a false declaration?

14    A    No, I did not.

15    Q    And in fact, in the past, have you repeatedly testified

16    that you never signed any declaration under oath that you

17    thought was false?

18    A    Yes.

19    Q    Now, did anybody at MGA conspire with you to get you to

20    falsely sign this patent declaration?

21              MR. PRICE:  Objection.  Vague.

22              THE COURT:  No.  Overruled.

23              You can answer that.

24              THE WITNESS:  No.

25
```

Case 2:04-cv-09049-DOC-RNB   Document 9798   Filed 02/04/11   Page 40 of 94   Page ID #:294305
CV 04-9049-DOC - 02/03/2011 - Day 12, Vol. 2 of 3

40

1    BY MS. KELLER:

2    Q    And would it be true that you just signed what you

3    received in the mail kind of routinely without really

4    examining it carefully?

5    A    Yes.

6    Q    Are you aware that no patent ever even issued based on

7    that declaration?

8              MR. PRICE:  Objection.  Irrelevant.

9              THE COURT:  It also assumes facts not in evidence,

10   but overruled.

11             You can answer the question.

12             THE WITNESS:  I'm sorry, what did you ask me?

13   BY MS. KELLER:

14   Q    Are you aware that no patent ever even issued based on

15   that declaration?

16             THE COURT:  It sounds like a statement.  You might

17   say -- you may ask the question.  It just sounds like the

18   patent didn't issue.

19             MS. KELLER:  Okay.

20             THE COURT:  And I don't want you to assume that

21   Mr. Rose was 92 or 85 or 16, so we don't know.

22   BY MS. KELLER:

23   Q    Do you know whether a patent ever even issued based on

24   your declaration?

25   A    No, I don't.

Case 2:04-cv-09049-DOC-RNB   Document 9798   Filed 02/04/11   Page 41 of 94   Page ID #:294306
CV 04-9049-DOC – 02/03/2011 – Day 12, Vol. 2 of 3

41

```
 1   Q    Now, you were asked some questions about a black

 2   notebook that had some drawings of yours in it?

 3   A    Yes.

 4   Q    Now, that was something that you produced in 19 -- I'm

 5   sorry, in 2007, after you found it and voluntarily turned it

 6   over, right?

 7   A    I believe so, yes.

 8   Q    And up until then, you didn't even know that you had

 9   it, right?

10   A    I don't think I did.

11   Q    Now, back in 2004, you testified in your deposition

12   that you had made some greeting cards in the summer of 1998,

13   right?

14   A    Yes.

15   Q    And that was before you found the black notebook in

16   2007, right?

17   A    Yes.

18   Q    And back in 2004, you said you had been doing a lot of

19   greeting cards in the summer of 1998, true?

20   A    Yes.

21   Q    And in fact, you discussed that with Ron Longsdorf when

22   he was interviewing you to come back to Mattel, right?

23   A    I did, yes.

24   Q    And you told him that you had done some greeting card

25   work, true?
```

1    A    Yes.

2    Q    And after you found that notebook, they actually had

3    greeting cards in them, right?

4    A    Yes.

5    Q    And that included the Rainy Day Rascals?

6    A    Yes.

7    Q    You were also asked about a red notebook, and remember

8    being asked if you were requested to flip through that in

9    your deposition in 2008?

10   A    Yes.

11   Q    Now, if -- I don't know if you have that in front of

12   you.  That's a January 24th, 2008 deposition.

13        And if you look at page 896, what time did that

14   deposition start?

15   A    There is no 896.

16   Q    Well, look at the beginning of the deposition.  I think

17   I have that wrong.  The January 24th, 2008.

18        I do have it wrong.  It's page -- is it page 892?

19   Yeah, 892.

20        Do you see what time that started?

21   A    8:14 a.m.

22   Q    And what time did it end?

23             MR. PRICE:  Objection.  Relevance with breaks, et

24   cetera.

25             THE COURT:  Well, there are lunches and breaks, et

Case 2:04-cv-09049-DOC-RNB   Document 9798   Filed 02/04/11   Page 43 of 94   Page ID #:294308
CV 04-9049-DOC – 02/03/2011 – Day 12, Vol. 2 of 3

43

```
 1    cetera.

 2              MS. KELLER:  I'm going to bring that up.

 3              THE COURT:  You are going to cover that?

 4              MS. KELLER:  At least the lunch, your Honor.

 5              THE COURT:  Okay.

 6    BY MS. KELLER:

 7    Q    And it ended at 3:51?

 8    A    Yes.

 9    Q    And you had been -- okay.

10         So that's almost eight hours, right?

11    A    Yes.

12    Q    And if you'd look at page --

13              THE COURT:  Counsel, if the inclination is the

14    time and being worn down, we've been going 10 hours, 12

15    hours on some depos with people.

16              MS. KELLER:  I understand, your Honor.

17              THE COURT:  Okay.  If we are going to get into

18    that, then I'll let the other side come back with some of

19    the hours that have been keeping for both of you.

20              MS. KELLER:  It's just going to take a couple more

21    questions --

22              THE COURT:  Well, it might.

23              MS. KELLER:  No?

24              THE COURT:  No, I don't think so.  I think

25    everybody has been involved in depos.  Those depos have
```

1    ranged from hours, literally, to, I'd say, 12, 13 hours with

2    numerous witnesses throughout the case, so I'm a little

3    concerned that one witness's believing they are in a depo in

4    an excessive period of time or a small period of time

5    concerning depos, I think we'll find Mr. Bryant's experience

6    the same as most witnesses in the case.

7              MS. KELLER:  I'll move right to the end, your

8    Honor.

9              THE COURT:  Okay.  Right to the end.

10   BY MS. KELLER:

11   Q    Okay.  Toward the very end of that deposition, you were

12   asked to flip through a red notebook, right?

13   A    Yes.

14   Q    And literally flip through it, true?

15   A    I think so, yes.

16   Q    So you weren't sitting down and studying it page by

17   page by page by page; also true?

18   A    Yes.

19   Q    And you were asked about saying that you had no idea

20   and could not even begin to guess what dates were -- all

21   these things in it were created.

22        Even so, did you say like -- that it looked like it

23   covered different time periods?  And I'm referring to 1203,

24   line 22 to 1204, line 1.  Page 1203, line 22 to 1204,

25   line 1.

1    A    Yes, I did say that.

2    Q    Okay.  And did you say it looked like it could be

3    anywhere from 1998 to 2000, and that's 1204, lines 7 through

4    10?

5         MR. PRICE:  Your Honor, I object.  That's about a

6    different exhibit.

7         THE COURT:  Sustained.

8         MS. KELLER:  Oh, I'm sorry.

9    BY MS. KELLER:

10   Q    Okay.  I'm almost done.

11        Did anybody at Mattel ever tell you that the work you

12   did on nights and weekends belonged to Mattel?

13   A    No.

14   Q    Did anyone ever tell you -- did anyone at Mattel ever

15   tell you that your own artwork that was not part of the job

16   assignment that you did on your own time at night belonged

17   to Mattel?

18   A    No.

19   Q    Did anyone at Mattel ever tell you that your own

20   artwork that was not part of a job assignment that you did

21   on weekends belonged to Mattel?

22   A    No.

23   Q    Did anybody ever give you a handbook or a manual that

24   said, "We own everything you do 24 hours a day even if it's

25   not part of your job assignment"?

Case 2:04-cv-09049-DOC-RNB   Document 9798   Filed 02/04/11   Page 46 of 94   Page ID #:294311
CV 04-9049-DOC - 02/03/2011 - Day 12, Vol. 2 of 3

46

1    A    No.

2    Q    Did anybody ever tell you to keep everything you did

3    secret, including your own artwork at the time?

4    A    No.

5    Q    And medical and dental benefits were discussed with

6    you, and I think that's part of your compensation at Mattel,

7    right?

8    A    It was, yes.

9    Q    Now, if you -- if you slipped and fell in the shower at

10   your house, would you bring a workers' compensation claim

11   against Mattel?

12            MR. PRICE:  Objection.  Lack of foundation.

13            THE COURT:  No.  Overruled.  I'll let you both

14   stretch the parameters here.

15            THE WITNESS:  No.

16            THE COURT:  So I'm going to go from medical with

17   Mattel to slip and falls with MGA, okay?

18            (Laughter.)

19   BY MS. KELLER:

20   Q    And the last thing I have to ask you, you were asked a

21   little while ago about a final sculpt being in place in

22   September of 2000; do you remember that?

23   A    Yes.

24   Q    And --

25            MR. PRICE:  I object.  That assumes facts not in

Case 2:04-cv-09049-DOC-RNB   Document 9798   Filed 02/04/11   Page 47 of 94   Page ID #:294312
CV 04-9049-DOC - 02/03/2011 - Day 12, Vol. 2 of 3

47

1    evidence.  I didn't say September.

2            THE COURT:  No.  Overruled.

3    BY MS. KELLER:

4    Q    Do you remember being asked about a final sculpt, and I

5    think you said that at the time, you thought the second

6    sculpt Ms. Leahy did was the final sculpt; do you remember

7    that?

8    A    Yes.

9    Q    And you now know that there were four different sculpts

10   before the doll went to production, right?

11   A    Yes.

12   Q    And that's been known to you, to all of us throughout

13   this litigation, right?

14           MR. PRICE:  Objection.  Lack of foundation and

15   time, vague as to time.

16           MS. KELLER:  Nothing further, your Honor.

17           THE COURT:  Sustained.

18           All right.  We are placing all of the witnesses on

19   call, each and every one, no matter how important -- well,

20   all witnesses are all important, but regardless, so we are

21   asking all of them to remain available until May 7th, the

22   case is going to conclude much earlier than that, but I

23   don't want additional subpoenas, inconveniences, and that

24   way I retain jurisdiction.

25           Thank you very much, sir.  You may step down.

```
 1              Let the Court take a brief recess before the next

 2    witness.  I'm sorry for how many times you're going to be up

 3    and down today.  We'll come and get you in about 15 to 20

 4    minutes.

 5              Have a nice recess.

 6              Please don't discuss this case or form or express

 7    any opinions concerning this case.

 8              (The following proceedings is taken in

 9         camera, outside the presence of the jury.)

10              THE COURT:  We are on the record during a recess.

11              And Counsel, I want to get your name, once again,

12    for the record.

13              MR. BONIS:  Sure, it's Peter Bonis, B-o-n-i-s.

14              THE COURT:  I want this to be part of the record

15    that the Court is extremely appreciative of counsel,

16    Mr. Bonis, and his efforts in getting Carter Bryant here.

17    We've always had jurisdiction, but I think you've been

18    extraordinarily courteous and very responsive under some

19    difficult circumstances.

20              MR. BONIS:  Thank you, your Honor.

21              THE COURT:  Also, you've represented to me that

22    your counsel -- you wrote a note one time that your client,

23    I'm sorry, was having a difficult time, and I think one of

24    the counsel had approached me and said he was not doing

25    well, or hadn't been doing well.  I don't know the extent of
```

Case 2:04-cv-09049-DOC-RNB   Document 9798   Filed 02/04/11   Page 49 of 94   Page ID #:294314
CV 04-9049-DOC - 02/03/2011 - Day 12, Vol. 2 of 3

49

```
 1    that.  It may be that he is called upon to come back for a

 2    very brief time in rebuttal.  I don't know yet.  I'm hoping

 3    to avoid that with almost all of the witnesses, but I just

 4    can't tell, you know, what occurs during the next six weeks.

 5          If that's the case, I'll call counsel in and make

 6    certain that it's important, from my standpoint, that I

 7    really believe it's rebuttal, and I'll represent to you that

 8    it will be a very short period of time.  So if there is a

 9    way you can alleviate your client from that stress, so be

10    it.  On the other hand, I can't take the stress of a

11    particular client and make a decision about who returns or

12    not.

13          Lastly, I think we should be giving you at least

14    two weeks' notice.

15          MR. BONIS:  That would be good.

16          THE COURT:  Yeah, or try to because of your

17    professional responsibilities.  And I can represent to you

18    in going back through the record, I think he was on the

19    stand at the first trial for nine days, the way I've counted

20    direct and cross-examination, side bars.

21          MS. KELLER:  It was ugly.

22          THE COURT:  I might be off a day, but it was about

23    nine days.  Here, I think he's started --

24          MR. BONIS:  I think it was about five.

25          THE COURT:  I think he started on Thursday
```

1    afternoon, and it's about the same time on Wednesday -- is

2    this Thursday?

3              MS. KELLER:  Thursday.

4              THE COURT:  So about four days, about four days of

5    actual testimony compared to about nine.  In other words,

6    counsel has been very responsive, and that's what I'm trying

7    to say to you.

8              MR. BONIS:  All right.

9              THE COURT:  This hasn't been a situation that took

10   nine days like the first trial with all the side bars.

11             MR. BONIS:  Thank God.

12             THE COURT:  And that's my representation to you.

13   If he's coming back, it will be a very short --

14             MR. BONIS:  He can go home, right?

15             THE COURT:  He's going home, but I can't have him

16   not available.

17             MR. BONIS:  Your Honor, all I can say is I'll --

18   if you need him, call me, and I'll take it from there.

19             THE COURT:  Yeah, we'll get him back.  I just

20   don't want the additional stress.

21             Now, Counsel, anything on behalf of Mattel?  I

22   just want to pay Mr. Bonis a compliment on the record.  I

23   think he's been extraordinary, and I also wanted to let him

24   know that his client may have to come back, and if he does,

25   it's short and direct.  And he may not be coming back, but I

1     just don't want to surprise, and I don't want him just

2     leaving and simply lose jurisdiction.

3               MR. BONIS:  Well, thank you.

4               THE COURT:  Enjoy the next six minutes of your

5     recess.

6               *(Recess.)*

7               *(The following proceedings are taken in the*

8          *presence of the jury.)*

9               THE COURT:  Okay.  We are back on the record.  The

10    jury is present, the alternates.  All counsel are present.

11    The parties are present.

12              And counsel on behalf of Mattel, would you like to

13    call your next witness, please.

14              MR. QUINN:  Yes, thank you, your Honor.  Mattel

15    calls Lloyd Cunningham.

16              THE COURT:  Thank you.

17              And sir, if you'd step forward through the double

18    doors, please, and now, sir, would you stop and raise your

19    right hand.

20          **LLOYD CUNNINGHAM, PLAINTIFFS' WITNESS, SWORN**

21              THE WITNESS:  I do.

22              THE COURT:  Thank you.

23              Mr. Cunningham, if you'd come along the railing

24    and walk through all the dolls.

25              *(Laughter.)*

1           THE COURT:  And then, sir, if you'd be comfortably

2     seated.

3           THE WITNESS:  Thank you.

4           THE COURT:  And after you are seated, that chair

5     has problems moving, so if you'd kind of move the microphone

6     toward you.

7           And now -- see if you can move the chair this way.

8           THE WITNESS:  Sure.

9           THE COURT:  There we go.

10          And now, sir, will you state your full name for

11    the record.

12          THE WITNESS:  Yes, my name is Lloyd, that's

13    L-l-o-y-d, Cunningham, C-u-n-n-i-n-g-h-a-m.

14          THE COURT:  Thank you.

15          This is direct examination by Mr. Quinn on behalf

16    of Mattel.

17          MR. QUINN:  Thank you, your Honor.

18                       **DIRECT EXAMINATION**

19    BY MR. QUINN:

20    Q    Good afternoon, Mr. Cunningham.

21    A    Good afternoon, sir.

22    Q    What is it that you do?

23    A    I'm a forensic document examiner.

24    Q    We can all hear you have kind of a hoarse voice.  Is

25    there a reason for that?

Case 2:04-cv-09049-DOC-RNB   Document 9798   Filed 02/04/11   Page 53 of 94   Page ID #:294318
CV 04-9049-DOC – 02/03/2011 – Day 12, Vol. 2 of 3

53

1    A    Yes, I have recently damaged a vocal cord and they are

2    going to operate on it this coming Monday.

3    Q    And you need to drink water as you speak, I understand,

4    regularly to keep it hydrated?

5    A    That's correct, sir.

6    Q    There should be some water up there, please don't

7    hesitate to do that.

8    A    Thank you, sir.

9    Q    What is it that a forensic document examiner does?

10   A    A document examiner is commonly referred to as a

11   handwriting identification expert.  However, we are also

12   involved in typewriter comparisons, computer-generated

13   material comparisons, the examination of ink, the

14   examination of paper, and we examine documents for any types

15   of alterations, additions or obliterations.

16   Q    And for how long have you been doing this kind of work

17   as a forensic document examiner?

18   A    Approximately 31 years.

19   Q    Were you given some documents to examine in this case?

20   A    I was, sir.

21   Q    And were you given an assignment?

22   A    I was, sir.

23   Q    Will you please tell the jury what the assignment is

24   that you were given?

25   A    Yes, I was given an assignment to examine numerous

 1    documents and to determine if any of the documents were

 2    related to Bratz dolls or any Bratz dolls accessories.

 3    Q    In connection with that assignment, were you in

 4    particular given a black spiral notebook?

 5    A    I was, sir.

 6    Q    And do you have that up there before you, marked

 7    Exhibit 1155C; do you see that?

 8    A    Yes, I have it in my hands, sir.

 9    Q    And is that one of the items or documents that you

10    reviewed in connection with your assignment in this case?

11    A    Yes, it is, sir.

12    Q    And were you also given some loose pages with some

13    drawings on them?

14    A    I was, sir.

15    Q    We'll hand you copies of Exhibits 5-39, dash 40,

16    dash 41 and dash 42.

17            MR. QUINN:  Already in evidence, your Honor.

18    BY MR. QUINN:

19    Q    And I'll ask you if you were also given -- if those

20    were also among the documents you were asked to examine?

21            MR. QUINN:  And perhaps if we can show those on

22    the screen, Ken.

23            THE WITNESS:  Yes.

24    BY MR. QUINN:

25    Q    And did you -- did you also examine a notary book which

1    has -- should be up there, marked Exhibit 60?

2    A    Yes, this is the notary book that I examined.

3           MR. QUINN:  And two pages there, your Honor, 60-19

4    and dash 20, are already in evidence?

5    BY MR. QUINN:

6    Q    Now, Mr. Cunningham, based on your examination of these

7    materials that you've identified, have you reached any

8    conclusions?

9    A    I have, sir.

10   Q    Before we get to those conclusions, I'd like to talk a

11   little bit about your background.

12          How did you get into this line of work?  How did you

13   become a forensic document examiner?

14   A    It began when I was serving as an inspector of police

15   for the San Francisco Police Department fraud detail.  I was

16   in charge of corporate embezzlements.  I was then accepted

17   to the United States Secret Service Question Document School

18   in Washington, D.C.

19          Upon completion of that school, I was accepted into a

20   full-time, two-and-a-half-year internship with the United

21   States Postal Crime Laboratory, and upon completion of the

22   internship, I was accepted into the Federal Bureau of

23   Investigations Question Document School in Quantico,

24   Virginia.

25          After I completed those courses, I then had to have all

Case 2:04-cv-09049-DOC-RNB   Document 9798   Filed 02/04/11   Page 56 of 94   Page ID #:294321
CV 04-9049-DOC - 02/03/2011 - Day 12, Vol. 2 of 3

56

```
 1    my work peer reviewed for two additional years by practicing
 2    experts in the field.
 3    Q    And then what did you do?
 4    A    Then I was assigned to the San Francisco Police
 5    Department crime laboratory as the forensic document
 6    examiner.
 7    Q    Prior to your being assigned to the crime laboratory as
 8    a forensic document examiner in the San Francisco Police
 9    Department, had there been a question document section in
10    that police department?
11    A    No.  Actually, I created the first question document
12    section for the San Francisco Police Department.
13    Q    And other than the San Francisco Police Department,
14    have you examined questioned documents for any other law
15    enforcement agencies?
16    A    Yes, sir.
17    Q    And what would some of those be?
18    A    I have examined document cases for the United States
19    Secret Service, for the United States Customs, for the IRS,
20    for military, the Army, Navy military, and excuse me, I've
21    examined cases for local police departments throughout the
22    San Francisco Bay area.
23    Q    And do you routinely conduct forensic document
24    examinations in civil cases such as this one?
25    A    Yes, quite often, sir.
```

1    Q    And can you tell the jury, please, in approximately how

2    many instances you've actually prepared formal reports

3    regarding the results of your questioned document

4    examination?

5    A    At this point in my career, in excess of 6,000 formal

6    reports.

7    Q    And how many different times have you testified in

8    connection with your reports?

9    A    Approximately 600 times, now.

10   Q    All right.  And I understand you've actually been

11   retained before by the Orrick Herrington firm, which is

12   representing MGA in this case?

13   A    I have, sir.

14   Q    And testified, as I understand it, in this very

15   courthouse for them when you were retained by them?

16   A    Yes.

17   Q    When was that?

18           MS. HURST:  Objection.  Relevance, your Honor.

19           MR. QUINN:  I'll withdraw it.

20   BY MR. QUINN:

21   Q    Are you a member of any recognized forensic document

22   examiners organizations?

23   A    Yes, sir.

24   Q    Can you describe some of those for us?

25   A    Yes.  I'm a charter member and past president of the

Case 2:04-cv-09049-DOC-RNB   Document 9798   Filed 02/04/11   Page 58 of 94   Page ID #:294323
CV 04-9049-DOC - 02/03/2011 - Day 12, Vol. 2 of 3

58

1    Southwestern Association of Forensic Document Examiners.

2    I'm a life member of the questioned document section of the

3    International Association for Identification, and I'm an

4    honorary member of the American Society of Question Document

5    Examiners.

6    Q    Have you participated in actually setting any of the

7    professional standards that apply to the work of question

8    forensic document examiners?

9    A    Yes, sir.

10   Q    And who asked you to do that?

11   A    The FBI, Federal Bureau of Investigation, invited me to

12   serve on a committee to formulate the standards and

13   protocols for the examination of handwritten items.

14   Q    And how many people from the world of, you know, doing

15   this work in civic cases like you do were invited to serve

16   on that committee?

17   A    Two in the United States.

18   Q    And what was it that you did in that connection at the

19   request of the FBI?

20   A    We met and conferred with government forensic

21   scientists, and we formulated protocols and guidelines, and

22   also we formulated standards for the opinions expressed by

23   forensic document examiners.

24   Q    And have those professional standards been generally

25   accepted in your profession?

1    A    Yes, they have been generally accepted, and they are

2    registered with the American Society for Testing Materials.

3    Q    There is something you told us about -- or you told me

4    about, a SWGOC (sic) Committee, SWGOC Committee, kind of an

5    acronym?

6    A    SWGDOC.

7    Q    What is that?

8    A    A SWGDOC is a scientific working group for document

9    examiners which the FBI created.

10   Q    And have you actually taught forensic document

11   examination?

12   A    Yes, sir.

13   Q    Could you tell us a little bit about your teaching

14   experience in this area?

15   A    Yes, I taught for approximately 14 years at San Jose

16   State University through the Administration of Justice

17   Department.  For approximately the same length of time, I

18   taught for the California Department of Justice.  I've

19   taught for the American Bar Association, district attorney's

20   offices, public defender's offices, excuse me, and I've

21   taught in police academies as well.

22   Q    Have you ever on any occasion when you have prepared an

23   opinion or offered testimony, including the occasions where

24   you were retained by counsel for MGA --

25             MS. HURST:  Objection --

1    BY MR. QUINN:

2    Q    -- have you ever had your opinion rejected by a court?

3              MS. HURST:  Objection.  Move to strike the

4    reference to counsel.

5              THE COURT:  Sustained.  Each time the expert

6    qualifies anew.  You can talk about how many times he's

7    qualified, that's different.

8              MR. QUINN:  Okay.

9    BY MR. QUINN:

10   Q    How many times have you been qualified by a court as an

11   expert?

12   A    Every time I've testified.

13   Q    All right.  You testified that you examined a notebook

14   in this matter, and you told us that's Exhibit 1155C, the

15   black spiral notebook?

16   A    Yes, sir.

17   Q    And when did you do your examination of this notebook?

18   A    Excuse me.  September of 2007.

19   Q    Did you examine the notebook to see if there were any

20   pages missing out of the notebook?

21   A    Yes, sir.

22   Q    And did -- what did you determine in that regard?

23   A    I determined that approximately half of the pages of --

24   were missing.

25   Q    How -- how did you determine that?

1    A    On the front of the binder, there is a 120 count, and I

2    assumed that that was a number of sheets of paper contained

3    in the binder.

4        I also observed that there were paper remnants lodged

5    in the spiral ring that shows that some materials had been

6    torn out, and I could see that the spiral ring which -- was

7    much larger than the amount of paper it was holding.

8    Q    So you determined what in -- concerning the number of

9    the pages removed from the notebook?

10   A    Yes, I did a count later from copies, which was 66

11   pages; however, that is not necessarily accurate.  I feel

12   much more comfortable stating that approximately half the

13   pages were removed.

14   Q    Now, you showed us exhibits, those loose pages,

15   Exhibits 5-39, dash 40, dash 41 and 42, you showed us those

16   and you've got those up there?

17   A    Yes, I do, sir.

18   Q    All right.  Did you draw any conclusions as a result of

19   your work as to whether or not those sheets of notebook

20   paper had any connection with that black notebook?

21   A    I did conduct that examination, sir.

22   Q    And did you reach any conclusion as to whether those

23   pages had any connection with the black notebook?

24   A    I did, sir.

25   Q    And what conclusion did you reach?

 1              MS. HURST:  Objection.  Foundation.  And the

 2    witness hasn't been offered.

 3              MR. QUINN:  I offer the witness as an expert

 4    forensic document examiner, your Honor.

 5              THE COURT:  You may proceed.

 6    BY MR. QUINN:

 7    Q    What conclusion did you reach concerning the connection

 8    of those four loose pages with the notebook that is

 9    Exhibit 1155C?

10    A    I concluded that Exhibit 542 and Exhibit 539 positively

11    were removed from the black notebook.

12    Q    And at one point, they were in that notebook, right?

13    A    Yes.

14    Q    How about the other two, 540 and, what is it, 541?

15    A    Yes, 540 and 541.  I concluded that the paper

16    characteristics of 540 and 541 are in full agreement with

17    the paper characteristics present on the remaining pages in

18    the black spiral notebook.

19         However, there is not sufficient evidence regarding 541

20    and 5 -- excuse me, 540 and 541 to conclusively associate

21    them with the spiral-ring notebook, but there is no evidence

22    to indicate that they did not come from that notebook.

23    Q    And -- but as to 5-39 and 5-42, your conclusion as to

24    those two?

25    A    Yes, they positively were part of this notebook at one

1   point.

2   Q    All right.  So before we go into this, could you just

3   kind of give the jury an idea, what are the basic features

4   or elements that you looked at in order to reach this

5   conclusion that at least two of these pages definitively

6   came from the black notebook?

7   A    I first examined the paper characteristics of each

8   page, that would be 539, 40, 41 and 42, and then I examined

9   the paper characteristics of the pages still contained in

10  the spiral notebook.

11       I examined several pages in the spiral notebook for

12  evidence of what's called indentations in the paper fiber,

13  and I examined pages in the spiral notebook for, what we

14  call in the profession, ink bleed, that's, if you can hear

15  me, ink bleed.  That was hard to say, I'm sorry.

16  Q    So three things, three basic categories?

17  A    Yes, sir.

18  Q    All right.  Let's start with the first thing that you

19  mentioned, the paper similarity.

20       What are the paper characteristics that you examined

21  here?

22  A    The paper characteristics that I examined, the color of

23  the paper, the color and nature of the horizontal lines on

24  which to write on in the paper, the color and the position

25  of the red margin line that goes down vertically the left

CV 04-9049-DOC - 02/03/2011 - Day 12, Vol. 2 of 3

64

```
 1    side of the page.  I examined the position and shape of the

 2    three binder punch holes.

 3        I examined the position and shapes of the spiral ring

 4    holes.  I also examined the manufacturer's paper cut of the

 5    corners of the paper, that being sometimes they are rounded,

 6    sometimes they are square, for example.

 7    Q    All right.  Do you need to take a sip of water,

 8    Mr. Cunningham?

 9    A    I do, sir.  I'm sorry.

10    Q    Okay.  Let's just very quickly go through those paper

11    characteristics.

12            MR. QUINN:  If we can put up on the screen, Ken,

13    Exhibit 5-42 and 1155C-61.

14    BY MR. QUINN:

15    Q    And you mentioned the three-ring holes as being one of

16    the things that you compared.  Could you explain what you

17    mean by the three-ring holes and what it was that you

18    noticed?  It looks like on these copies on the screen, you

19    may not be able to see the holes?

20    A    Yeah, it's pretty difficult to see the holes, but

21    it's -- one hole would be where I'm pointing with the laser

22    pointer, for example, another one would be lower, and

23    another one would be a little bit higher.

24        And the main issue is the size of the holes and the

25    position of the holes on paper.
```

1    Q    In these -- in these types of spiral notebooks, which I

2    think we've all seen, does the size and location of the

3    holes vary from manufacturer to manufacturer?

4    A    Oh, yes.  In fact, they do quite often.

5    Q    And in terms of the spiral holes, you compared those as

6    well, in addition to the three-ring holes?

7    A    Yes, I also did, once again, it's pretty hard to see.

8    You can see the little jaggedness down the left side of the

9    paper, but that is not sufficient to really depict what they

10   truly look like; however, I can describe them as a series of

11   holes running down the left side as you would tear a piece

12   of paper off a spiral ring, and what I look for is, once

13   again, just like the three binder holes, the shape, the size

14   and the position.

15   Q    And in terms of the paper color you mentioned, what was

16   it that you were looking for there, and what did you

17   observe?

18   A    Different papers have different coatings and sizings on

19   the paper, and that will give a little different cast to the

20   white.  This is referred to as a paper brightner.

21       Some paper brighteners under ultraviolet examination,

22   which is commonly referred to by laypeople as a black light,

23   will fluoresce.  In other words, they will light up.

24       And some of the brighteners and coatings on paper have

25   different fluorescence, and when I examined the four pages

CV 04-9049-DOC - 02/03/2011 - Day 12, Vol. 2 of 3

66

1    versus the remaining pages in the notebook, the fluorescence

2    of all the pages was the same.

3    Q    And how do you tell that fluorescence?

4    A    Through ultraviolet radiation.

5    Q    You use a piece of equipment?

6    A    Yes, ultraviolet long wavelength.

7    Q    All right.  You also mentioned in terms of the paper

8    characteristics that you compared, you mentioned ink color.

9    What -- what did you find there?

10   A    That obviously is not depicted on the screen.  However,

11   ink color, I'm referring to the blue color of the horizontal

12   lines which you write upon and also the red color of the

13   margin that goes down the left side of the paper.

14   Q    And then you also refer to the margins?  What are you

15   looking for there?

16   A    The margins, sir?

17   Q    Yes, the margins.

18   A    Yes, the margin, once again, everything is relevant to

19   location and positioning.  I'm looking how far the margin is

20   from the punch hole, how far the margin is from the

21   perforated edges of the paper.  And on all four sheets of

22   paper, it is the same, and it is also the same on the

23   remaining pages in the black spiral notebook.

24   Q    You also referred to something called cut marks.  What

25   are cut marks?

1    A    Well, these documents do not reflect the true cut marks

2    from the manufacurer because, through my experience, this

3    would be a cut mark made by someone else outside the paper

4    manufacturer, but a good example is at the bottom of the

5    paper, the cut mark from the manufacturers is made with the

6    use of a blade in the paper industry called a guillotine

7    blade, and the guillotine blade sometimes will cut the

8    corners very angular and square.

9         And sometimes you'll find a spiral notebook that has

10   little rounded –– rounded corners at the top and bottom.

11   But in this particular matter, all of the manufacturer's

12   paper cuts of the documents in the binder have the square

13   cut, and all of the paper characteristics of the four loose

14   pages have the similar square cuts.

15   Q    And then finally, the printed lines, you said were the

16   final characteristic that you referred to?

17   A    Yes.  The printed horizontal lines, I not only

18   concentrate on the color of the printed horizontal lines, I

19   also concentrate on the same thing; position and location.

20        And the position and location of the printed horizontal

21   lines is –– excuse me, is the same between all four of the

22   loose pages and all of the remaining pages contained in the

23   spiral-ring notebook.

24   Q    All right.  So taking altogether these various paper

25   characteristics that you identified for us, did you find

1    that they were the same for all four of those loose pages,

2    5-39, dash 40, dash 41 and dash 42?

3    A    Yes.

4    Q    And did you observe any differences with respect to any

5    of these paper characteristics in any of those loose pages

6    and the remaining pages in the notebook, Exhibit 1155C?

7    A    No differences were noted.

8    Q    So they were, in terms of paper characteristics, this

9    first category, they were in full agreement?

10   A    Yes, sir.

11   Q    Now, based on these paper characteristics alone, did

12   that permit you as a forensic document examiner to conclude

13   definitively that these four pages came out of that

14   notebook?

15   A    No.

16   Q    So you mentioned two other -- two other things that you

17   did?

18   A    Yes.

19   Q    And I think the second one was indentation analysis?

20   A    Yes, sir.

21   Q    All right.  Would you tell us, please, what indentation

22   analysis is?

23   A    Yes.  Indentation analysis is the development of

24   indented writing into paper fiber.  For example, if I wrote

25   on the top sheet of this tablet of paper, if I use normal

1    pen pressure and a ballpoint pen, what I write on the top

2    sheet of this paper would possibly be indented onto the

3    second page, the third page and maybe, depending on the pen

4    pressure, maybe even into the fourth page.

5        However, the indented writing on the second, third and

6    fourth page may not be visible to the naked eye, so I have a

7    scientific instrument that develops that indented writing.

8    Q    So are all these -- are all indentations, you know,

9    equally visible or do they vary in strength?

10   A    They vary considerably, sure.

11   Q    And what are the variables that effect the visibility

12   of an indentation?

13   A    Well, for example, again, if I used a ballpoint pen

14   with a steel tip, which is very sharp, and I used average

15   pen pressure, I should get some indented writing into the

16   next page.  But if I used a big, soft, felt-tip pen with a

17   real fibrous head to it, I may not get any indented writing

18   onto the next page.

19       Likewise, even if a person used a ballpoint pen and

20   they had a very, very light touch to their writing, I may

21   not get any indented writing onto the second page.  But if I

22   had a young person who presses really hard when they write,

23   it may go down four pages deep.

24       So there's a lot of variants, and it all depends on the

25   writing instruments and the pen pressure exerted, plus one

1    other thing, the thickness in the type of paper you're

2    writing upon.

3    Q    All right.  So how do you do this indentation analysis?

4    A    I have a scientific instrument which is called the

5    indentation materializer, and I will place a piece of the

6    subject paper I'm examining on the table or plat -- I can't

7    even say, the platen of the instrument.  I have a suction

8    pump that sucks it down.  Then I pull imagining film on top

9    of the paper, and then I use a electronic corona wire, and I

10   electrostatically charge the imaging film and paper.

11        And then I apply dry toner, it's toner like you'd find

12   in laser jet printer or in a photocopier machine, and I

13   apply it to the imaging film.  And based on the positive and

14   negative charges from the corona wire, the toner will adhere

15   to the indented writing or embossed writing, whichever the

16   two are.  And at that point, I can seal, that's s-e-a-l, my

17   development with a sealing film and keep it as a permanent

18   record.

19   Q    And you say you can seal it with a film and keep it as

20   a record.  I mean, what -- do you have a name for that, that

21   indentation record that you create?

22   A    That indentation record that I develop and maintain is

23   called an indentation lift, that's l-i-f-t.

24   Q    And did you create some of those as part of your work

25   in this case?

1    A    Yes, many of them.

2    Q    All right.  And you brought those to show the jury

3    here?

4    A    Yes.

5    Q    All right.  Did you -- I mean, you conducted an

6    indentation analysis of the black notebook, 1155C?

7    A    Yes.

8    Q    And in doing your indentation analysis of the pages

9    that remain in 1155C, did you find anything that related to

10   any of those four loose pages?

11   A    I did, sir.

12   Q    And what did you find?

13   A    On page 61 in the black notebook, I examined it with

14   the indentation materializer, and I positively developed the

15   Bratz doll image which is Exhibit 542.

16   Q    Is that 5-42?

17   A    Yes.

18   Q    We've been referring to them as using the dash.  It

19   would be helpful to do that.

20   A    Sorry, sir.  5-42 in the paper fiber of page 61 in the

21   black spiral-ring binder.

22          MS. HURST:  I'm going to object and move to strike

23   the reference to that as a Bratz doll image.

24          THE COURT:  How would you like it referred to?

25          MS. HURST:  A drawing.

1          MR. QUINN:  That's fine, your Honor, a doll

2    drawing.

3          THE COURT:  A doll drawing.

4          MR. QUINN:  I'd be happy to refer to it that way.

5    BY MR. QUINN:

6    Q    So use "doll drawing" if you can, sir.

7    A    Yes, sir.

8    Q    All right.  So you found portions of the image of the

9    doll drawing, which is on Exhibit 5-42, in your indentation

10   analysis on page 61 from the notebook; is that correct?

11   A    Yes, sir.

12   Q    Did you find -- as a result of your indentation

13   analysis, did you find any other connection between the

14   notebook pages that are still there in the notebook and

15   those four loose pages?

16   A    I did, sir.

17   Q    And what was that?

18   A    On the page that is marked as page 63 in the black

19   binder, I developed the image of 5-39, the doll drawing on

20   this image, in the paper fiber of page 63, and, once again,

21   it isn't the entire doll image, it's just portions of it.

22   As I previously testified to, not all the indented writing

23   always indents or can be developed, depending on the pen

24   pressure applied, and not all strokes obviously are applied

25   with the same pressure.

| | |
|---|---|
| 1 | THE COURT:  Just a moment. |
| 2 | MR. QUINN:  Have you -- |
| 3 | THE COURT:  Counsel, just a moment. |
| 4 | Get a drink of water. |
| 5 | THE WITNESS:  Thank you. |
| 6 | BY MR. QUINN: |
| 7 | Q    You told us that you brought with you today some of |
| 8 | those indentations that you did as a result of doing this |
| 9 | indentation analysis? |
| 10 | A    Yes, sir. |
| 11 | MR. QUINN:  And your Honor, we've marked as |
| 12 | Exhibits 13634 and -- |
| 13 | THE COURT:  13634. |
| 14 | MR. QUINN:  Yes, your Honor, and -35. |
| 15 | THE COURT:  And 13635.  And what will they |
| 16 | correspond to? |
| 17 | BY MR. QUINN: |
| 18 | Q    Sir? |
| 19 | A    Yes, they correspond -- |
| 20 | Excuse me, your Honor. |
| 21 | 13634 corresponds to trial Exhibit 542. |
| 22 | Q    5-42? |
| 23 | A    5-42.  And 13635 corresponds to trial Exhibit 5-39. |
| 24 | MS. HURST:  I'm going to object, your Honor.  I |
| 25 | actually think -- well, the witness' lifts are the blank |

CV 04-9049-DOC - 02/03/2011 - Day 12, Vol. 2 of 3

74

1  pages, not the drawn pages.

2          THE COURT:  Thank you.  Overruled.

3          And if you want to use the ELMO at any time, you

4  may.

5          MR. QUINN:  Your Honor, we'd offer the

6  identification lifts that were identified, 13634 and -35.

7          THE COURT:  Received.

8          *(Plaintiffs' Exhibit Nos. 13634 and 13635 are*

9      *received in evidence.)*

10 BY MR. QUINN:

11 Q    Now, these lifts come from pages that are still in the

12 black notebook?

13 A    Yes, sir.

14 Q    And can you tell us, please, which pages those two

15 lifts correspond to?

16 A    Yes.  Plaintiffs' Exhibit 13635 corresponds to page 63

17 in the black spiral notebook.

18         MR. QUINN:  If we can put those two up, perhaps

19 side by side, Ken.

20         THE WITNESS:  And Plaintiffs' Exhibit 13634

21 corresponds to page 63 in the black spiral notebook.

22         THE COURT:  Just a moment.

23         MS. HURST:  Did he just say 63?

24         THE COURT:  Just a moment.

25         THE WITNESS:  Page -- I'm sorry.

1    BY MR. QUINN:

2    Q    I'll tell you, to be candid, Mr. Cunningham, I can't

3    see anything there.  Have you -- it's hard to see images

4    from these lifts.

5            THE COURT:  Well, just a moment.  Let's just stop.

6            You said that 13643 corresponded to 5-42, which

7    corresponds -- and then you named page 63 for both of these

8    exhibits.

9            THE WITNESS:  Yes.

10           THE COURT:  13635 also, you said, corresponded to

11   page 63.

12           THE WITNESS:  Correct, your Honor, and I caught

13   that, and it's page 61.  5-42 corresponds to page 61 in the

14   indentation results.  13634 corresponds to page 61.

15   BY MR. QUINN:

16   Q    All right.  So let me -- just to make this clear, the

17   loose page, the image which is on 5-42, you found an

18   indentation of that on page 115C-61; is that true?

19   A    That's correct, sir.

20   Q    And the lift you created that reflects that is exhibit

21   in evidence now, which is 13634?

22   A    Correct.

23   Q    And then the loose page, which is Exhibit 5-39, you

24   found an indentation of that on notebook page 1155C-63; is

25   that correct?

```
 1              MS. HURST:  Objection.  Leading.

 2              THE COURT:  Overruled.

 3              THE WITNESS:  That's correct.

 4    BY MR. QUINN:

 5    Q    And the indentation analysis that you -- or the

 6    indentation lift that you did that reflects that is 13635?

 7    A    Correct, sir.

 8    Q    Okay.  Now, did you prepare some demonstratives to help

 9    the jury understand what these images are and how they

10    appear in the lifts?

11    A    Yes, sir.

12    Q    Can you take a look, please, at --

13              MR. QUINN:  We have demonstratives, your Honor,

14    Exhibit 23822.

15              And if we could look at the first page of that,

16    which is Demonstrative C1.

17    BY MR. QUINN:

18    Q    And what are we looking at here, Demonstrative C1?

19    A    Yes.  This is a copy of the original doll drawing on

20    Exhibit 5-42.

21    Q    All right.  And based on your examination of that

22    original, what can you tell us about how that was created?

23    A    Yes.  It was drawn on the spiral binder paper.

24    However, it was drawn with two types of writing instruments.

25    One instrument used was a black ballpoint pen.  Those would
```

```
 1    be the finer lines that I'm pointing to.  Those are the
 2    finer lines.
 3    Q    Kind of in the background?
 4    A    Yes.
 5    Q    All right.
 6    A    Those are made with a ballpoint pen.
 7         The second writing instrument that was used is a black
 8    felt tip writing instrument that utilizes water-based ink,
 9    and these are the thicker lines that I'm pointing to.
10    Q    All right.  So based on what you've told us already, I
11    assume that the ballpoint would leave deeper indentations;
12    is that true?
13    A    Yes.
14    Q    What is Demonstrative Exhibit C2?
15    A    C2 is the -- an enhanced copy of my indentation lift,
16    and these occasionally are very difficult to see.  However,
17    when they are enlarged and enhanced, now I can follow the
18    outline of the drawing, including the curlicue hair, the
19    fingertips, the thumbs, the cuff, another fingertips,
20    another thumb, another cuff, the torso of the doll and --
21    Q    All right
22    A    This is developed from the paper fiber of page 61.
23    Q    All right.  So this is a -- this is an enhanced version
24    of your indentation lift?
25    A    Yes.
```

CV 04-9049-DOC - 02/03/2011 - Day 12, Vol. 2 of 3

1    Q    And which of the indentation exhibits are in evidence

2    is this an enhanced version of?

3    A    This is an enhanced version of Plaintiffs'

4    Exhibit 13634.

5    Q    All right.  And what do you mean by "enhanced"?

6    A    "Enhanced," it's a very simple procedure.  It's like

7    using a photocopy machine, and you increase the darkness and

8    the contrast to make the lines a little bolder so they'd be

9    easier to see.  That's a similar process that was used to

10   enhance the indented writing lines just so they'd be easier

11   to view.

12   Q    All right.  Did you do anything else to the indentation

13   list other than to enhance it, to make it more visible, the

14   way you've just described?

15   A    No.  It's in its actual state.

16   Q    So what is Demonstrative Exhibit C3?

17   A    Now, in order to make it even a little more visible,

18   because sometimes these lines are a little difficult to

19   follow, I highlighted the enhanced lines with a yellow

20   highlighter.  Now, without using the laser pointer, a person

21   can follow the indentations from the ballpoint pen, not the

22   felt tip pen, but the ballpoint pen.

23   Q    And in Demonstrative C4, what is that?

24   A    C4 is another enhanced image.  However, it is enhanced

25   of the original 540 -- 5-42 doll, and it's enhanced in

 1    yellow, and it's what I call an overlay.

 2    Q    What have you overlaid?

 3    A    I overlaid my indented writing -- indentation lift, and

 4    I overlaid it over the original doll, and they perfectly

 5    match up.

 6            MS. HURST:  Your Honor, I'm going to object to the

 7    continue reference to a doll.  This is a drawing.

 8            THE COURT:  Overruled.

 9            If we hear "doll," it means "drawing."

10            Please continue.

11    BY MR. QUINN:

12    Q    Okay.  If we can walk through these with a little more

13    detail, Mr. Cunningham.  You have Demonstratives C5 through

14    C8, and can you show those to the jury and explain what they

15    show?

16    A    Yes.  This is an enlarged section of 5-42 of the

17    original.  This is an enlarged section of the same section

18    you just previously looked at from the doll showing the

19    developed indented lines that were caused by the ballpoint

20    pen.

21    Q    We are looking at C6, there, Demonstrative C6?

22    A    Yes.

23    Q    And then C7?

24    A    C7 is the same as C6 that you just saw of the indented

25    lift, and I highlighted, so it would be even more easier to

1    follow, the lines that are indented from the ballpoint pen.

2    Q    These are all of the same portion of the drawing?

3    A    Every one is the same portion.

4    Q    All right.  So what are we looking at here?

5    A    This is -- if the doll is facing -- excuse me.  Yeah,

6    if the doll is facing outwards, this would be --

7    Q    Doll --

8              THE COURT:  "Doll" means "drawing."

9              THE WITNESS:  "Drawing."

10             -- would be facing outward, it would be the right

11   hand, the right cuff, hair coming down from the right side

12   of the head, and a portion of the torso as well.

13   BY MR. QUINN:

14   Q    And then C8?

15   A    And C8 is another overlay of that particular area.

16   This is an enlargement of the same section I just described

17   of the right arm, and I overlaid the developed indented

18   writing of the same section, and it matches perfectly over

19   the ballpoint pen areas of the original doll, not the fiber

20   or felt tip, but the ballpoint, the thinner lines.

21   Q    Okay.  And when you say the "indentation overlay,"

22   that's in the yellow, there, you highlighted?

23   A    Yes, it is, sir.

24   Q    All right.  And then Demonstrative C9 through C12, can

25   you walk us through those, please?

1    A    Yes.  This would be the left side of the doll facing

2    towards you.  We'd have the cuff portion of the waist and

3    torso up to the neckline, some curlicues of the hair.  This

4    is an enlargement of that section from the original drawing.

5    Q    Okay.  If we could look, now, at Demonstrative --

6              MR. QUINN:  What number is that that we were just

7    looking at?

8              MR. STOVALL:  C9.

9              MR. QUINN:  C9

10   BY MR. QUINN:

11   Q    Maybe quickly go through 10, 11, 12.

12   A    Yes.  It's the same procedure for the left side of the

13   body enlargement as well.  This is my indentation lift from

14   page 61 in the black binder, and it is enhanced so the lines

15   could be easily seen.

16   Q    Next.

17   A    The next one is enhanced more so a person can follow

18   the ballpoint ink lines very carefully, and this is my

19   overlay with the original to show that they perfectly

20   superimpose.

21   Q    All right.  Now if we can look at Demonstrative C13.

22   A    Yes.  This is the original of Exhibit 5-39 and --

23   Q    And then C13?

24   A    Yeah, C13.

25   Q    Right.

```
 1   A    It's 5-39.  This is an enlargement of the original head

 2   portion and shoulders -- excuse me -- of C-539 (sic).

 3   Q    And by the way, did you find that 5 -- the drawing,

 4   which is 5-39, was drawn in the same way as 5-42, the other

 5   drawing we were looking at?

 6             MS. HURST:  Objection.  Vague.  Lacks foundation.

 7             THE COURT:  Sustained.

 8             Just restate it.

 9   BY MR. QUINN:

10   Q    Just in terms of the ink that was used --

11   A    Yes.

12   Q    -- the writing instrument?

13   A    Yes.  For example, in this particular image, the

14   eyebrows, the eye sockets and the little mole were done with

15   ballpoint pen ink.  The remainder of the head portion was

16   done with a felt tip pen with water-based ink.  And you can

17   see in the hairline that there is a combination of thinner

18   lines and thicker lines, which represent -- the thinner

19   lines, ballpoint; the thicker lines, felt tip pen.

20   Q    And then Demonstrative C15, what is that?

21   A    C15 is my indentation lift -- excuse me -- from page 63

22   in the black spiral notebook.

23   Q    And that lift, that's -- the lift itself is

24   Exhibit 13635?

25   A    That's correct, sir.
```

1    Q    All right.  And is that an enhanced version of that

2    lift?

3    A    Yes, this is an enhanced version, once again, where I

4    increased the contrast and the darkness just so the existing

5    lines would become a little more visible.

6    Q    Then if we could look at C16.

7    A    C16, here I just enhanced the most visible -- excuse

8    me -- indentations of -- there are some others here that are

9    really difficult to enhance, but they can be seen, such as

10   the mole where I'm pointing now, and the other eye socket to

11   the -- for the right eye if it was facing up.

12   Q    All right.  And then C17, what is that?

13   A    C17 is an enlargement of the original of 5-39 and -- to

14   make it so a person could follow the developed indented

15   writing that was highlighted.  This corresponds, the yellow

16   highlighting, with the indented highlighting, and this is an

17   overlay; the eyebrows, the top part of the eye socket, the

18   bottom part of the eye socket.

19   Q    Now, have you shown the jury every single indentation

20   that you found that correlates with the original drawing?

21   A    For 5-39, I haven't -- I have additional mole that

22   correlates and additional eye socket that correlates, but

23   they are very, very faint, even after being enhanced.

24           MR. QUINN:  All right.  I'm told I haven't moved

25   Exhibit 23822 into evidence and --

Case 2:04-cv-09049-DOC-RNB   Document 9798   Filed 02/04/11   Page 84 of 94   Page ID #:294349
CV 04-9049-DOC - 02/03/2011 - Day 12, Vol. 2 of 3

84

1          MS. HURST:  Objection, your Honor.  They are

2     demonstratives.  They shouldn't come into evidence.  The

3     lifts and the original drawings will, and the jury can make

4     a comparison.

5          THE COURT:  Why don't we conclude the testimony,

6     and then I'll discuss this with counsel.

7          MR. QUINN:  All right.

8          Thank you, Ken.

9     BY MR. QUINN:

10    Q    So we've looked at what your indentations -- some of

11    what your indentation analysis showed.  Were there other

12    indentations that you saw on the pages still in the notebook

13    that corresponded to the drawings?

14    A    Yes, especially 5-42, there are many, many more

15    indentations.  I only highlighted those as a demonstrative.

16    Q    Okay.  Can you see -- is it possible to see every

17    single indentation and lift in this fashion?

18    A    No.

19    Q    Why not?

20    A    Once again, it depends on the pen pressure that the

21    individual is using to make the strokes in the drawing with.

22    Some strokes, such as hair, may have been written or drawn

23    with a nice lighter swift stroke than maybe the chin of a

24    doll.  So it depends on the variation in the pen pressure.

25    Q    Do all of the indentations that you find necessarily

1    come from the same document on top?

2    A    No.

3    Q    Why not?

4    A    Quite often during examinations of documents for

5    indented writing, I will find indentations, for example, in

6    this tablet.  If I was examining page 5, I may find

7    indentations from writing that was done on page 1, writing

8    that was done on page 2, writing that was done on page 3,

9    and eventually they all intermingled on page 5, and that's

10   where the real tough work begins, to separate all that out

11   once I've developed it.

12   Q    All right.  And in the work that you did in this case,

13   on the pages where you lifted those indentations, did you,

14   in fact, find indentations from more than one document that

15   at some point had been on top of those pages?

16   A    Yes.

17   Q    And could you tell the jury what else you saw there?

18   A    On the -- the indentations developed -- excuse me --

19   from page 61 of the black spiral binder, not only did I

20   develop the indentations from the drawing on 5-42, I also

21   developed the indentations of what appears to be a little

22   boy fishing.

23   Q    All right.  And in using the indentation analysis, can

24   you ever determine that a particular document was, in fact,

25   lying right on top of the document from which you are

1    lifting the indentation?

2    A    Directly on top, that's very difficult to determine

3    because, once again, it goes always back to the pen pressure

4    that a person is exerting.  Therefore, just because one

5    indentation is a little darker than the other indentation,

6    that doesn't mean that the darker one was closer to the

7    paper I performed the examination on.  It depends on the pen

8    pressure, so no, you cannot make that determination.

9    Q    All right.  So what can you tell in terms of the

10   relative proximity of pages from an indentation analysis?

11   A    I can determine that they were close enough and

12   probably within three pages of the page I examined to make

13   the indentations in the paper fiber.

14   Q    And is the indentation analysis that you did alone

15   sufficient to prove that the loose notebook sheets came from

16   the black notebook, Exhibit 1155C?

17   A    Yes.

18   Q    And why is that?

19   A    Because the indentations I developed of 5-42 and 5-39

20   positively correlate to those pages, and those pages had to

21   be drawn on top of the pages in the notebook.

22   Q    And by the way, do you know whether or not MGA has also

23   retained a forensic expert who examined and commented on

24   your findings?

25   A    Yes.

1          MS. HURST:  Objection.  Objection.  Relevance.

2          THE COURT:  Overruled.

3    BY MR. QUINN:

4    Q    Do you know whether MGA has retained a forensic expert

5    who reviewed your findings and commented on them?

6    A    Yes, sir.

7    Q    And --

8          MS. HURST:  Objection, your Honor.  This is

9    improper rebuttal.  That witness may or may not be offered.

10         THE COURT:  We'll wait until redirect or recross,

11   but one expert can comment upon another, so I'll delay that,

12   allow you to cross-examine, and then on redirect, Counsel --

13         MR. QUINN:  Defer for now, your Honor?

14         THE COURT:  What?

15         MR. QUINN:  Defer for now?

16         THE COURT:  Defer for now.

17         MR. QUINN:  All right.

18   BY MR. QUINN:

19   Q    All right.  There was a third -- we talked about paper

20   characteristics that you compared?

21   A    Yes, sir.

22   Q    And we talked about indentation analysis, and there was

23   a third sort of body of knowledge or method of analysis that

24   you used to compare these loose pages with the notebook?

25   A    That's correct, sir.

1    Q    And that was ink bleed?

2    A    Ink bleed.

3    Q    All right.  What's an ink bleed?  I think we all

4    probably know, but --

5    A    An ink bleed is if I'm using a writing instrument that

6    contains a water-based ink, and in our profession, we

7    commonly refer to it is as an aqueous ink, but water-based

8    ink.  That means it's a liquid solution.  Ballpoint pen inks

9    have a very thick viscous solution that isn't liquid,

10   actually.

11        So if writing with a felt tip pen on a piece of paper,

12   and this depends upon the type of paper, the thickness of

13   the paper and the type of coating on the paper, when writing

14   with a liquid ink, that ink can be absorbed into the paper

15   fiber.  At times it can be absorbed into the paper fiber

16   where it comes all the way through to the back of the paper.

17   And quite often when it is absorbed all the way through to

18   the back of the paper, sometimes little fragments of ink

19   will deposit on the next page.  That's what's called an ink

20   bleed through.

21   Q    Did you find any evidence of ink bleed in the analysis

22   that you did?

23   A    I did, sir.

24   Q    And would you tell the jury, please, what you found.

25   A    Yes.  On page 61 of the spiral notebook, and that is a

1    page I developed the image of 5-42, I found a series of ink

2    bleed spots.  When I examined the original of 5-42, I was

3    able to determine where there was heavy deposits of ink on

4    that particular drawing.  I then made a transparency of the

5    ink bleeds, and I placed them over the original doll, or

6    copy of that doll, and I was able to line up a series of ink

7    bleeds that corresponded to the specific areas of the doll.

8    And in my opinion, those ink bleeds, not because there was

9    one, but because there was what we call a constellation of

10   ink bleeds that were in alignment with the doll, I was able

11   to conclude that those ink bleeds came from the doll from 5

12   dash -- excuse me -- 42.

13   Q    And the ink bleeds were on paper that was still in the

14   notebook and they matched up?

15   A    Yes, on page 61 that's still contained in the notebook.

16   Q    All right.  And how about -- did you do a similar

17   examination with respect to Exhibit 5-39?

18   A    I did, sir.

19   Q    And what did you determine in that regard?

20   A    I found that there were corresponding ink bleeds from

21   the drawing 5-39 on page 63 in the spiral-ring notebook, and

22   I was able to conclude that those ink-bleed spots came from

23   5-39.

24   Q    Are all of the inkspots that you found on pages 63 and

25   61, in your opinion, a result of the drawing, the ink

1    drawings that were done on 5-39 and 5-42?

2    A    Yes, and in particular -- because a drawing is just

3    what it is, a drawing, quite often some of the strokes in a

4    drawing aren't written as quickly and spontaneously as

5    normal handwriting would be.  Therefore, the longer the felt

6    tip pen remains on the paper, the more ink that would be

7    absorbed into the paper fiber.

8    Q    So were there areas of pages 63 and 61 that did not

9    have corresponding inkspots on 5-39 and 5-42?

10   A    Oh, yes, there were additional inkspots on both

11   pages --

12   Q    And where -- how can that happen?

13   A    That could happen -- just hypothetically, if page --

14             MS. HURST:  Objection.  Calls for speculation.

15   Lacks foundation.

16             THE COURT:  Overruled.

17             You can answer the question, sir.

18             THE WITNESS:  Thank you.

19             Hypothetically, if page 5-42, if the doll image

20   was drawn while contained in the binder and inkspots on the

21   following page resulted from that drawing, then if that page

22   was torn out, and another page on top of page 61, there was

23   another drawing made, well, I would get more inkspots, and I

24   would never know, most likely, where those inkspots came

25   from.

1    BY MR. QUINN:

2    Q    And do -- do pages -- when people write or artists

3    write or anyone draws, do the pages always stay in

4    alignment?

5    A    No.  This is a very common phenomena in handwriting,

6    and that is when dealing with tablets, especially

7    spiral-ring tablets, there is an action that occurs, which

8    is called paper shifting.

9         Now, this is affixed, as I'm showing you, to the

10   binder, but when people place their hand on a piece of paper

11   and they write, you can get a little shift just by simply

12   moving your hand, and that shift moves the paper.  So while

13   you're writing or, in this case, drawing, the paper can

14   shift back and forth, which is a very common occurrence, and

15   that could make the ink deposits be a little off from one

16   another, it could actually even make indented writing be off

17   a little bit from the original, and that's due to what's

18   called the paper shift.

19   Q    So based on your comparison and analysis of the paper

20   characteristics as you've described to us, your indentation

21   analysis, and your ink bleed analysis, were you comfortable

22   forming scientific conclusions regarding the relationship

23   between any of those four loose pages in the black spiral

24   notebook?

25   A    Yes.

Case 2:04-cv-09049-DOC-RNB   Document 9798   Filed 02/04/11   Page 92 of 94   Page ID #:294357
CV 04-9049-DOC - 02/03/2011 - Day 12, Vol. 2 of 3

92

1   Q    And what did you conclude?

2   A    I concluded -- excuse me -- I concluded that trial

3   Exhibit 542 --

4   Q    Is that dash 42?

5   A    Trial Exhibit dash 42 (sic) was in direct contact with

6   page 61 in the binder because of the combination of the ink

7   bleed and the indented writing.  I concluded that page --

8   excuse me -- 5-39 was in direct contact with page 63 in the

9   black spiral binder because of the developed indentations

10  and the ink bleed.

11  Q    How about the other two loose pages, Exhibit 5-40 and

12  5-41, what conclusions, if any, were you able to reach

13  regarding those pages?

14  A    Those pages I didn't develop any indented writing.  I

15  didn't develop any ink bleed.  However, all the paper

16  characteristics between 5-40 and 5-41 are in full agreement

17  with the paper characteristics of 5-42, 5-39 and the

18  remaining pages in the notebook.  Therefore, since I don't

19  have any other corroborating evidence for 5-40 and 5-41, I

20  cannot conclude positively that they came from the black

21  spiral notebook.

22  Q    In your opinion, sir, were Exhibits 5-39 and 5-42, were

23  those pages once in the spiral notebook and have since been

24  torn out of that notebook at some point?

25  A    Positively, yes, sir.

Case 2:04-cv-09049-DOC-RNB   Document 9798   Filed 02/04/11   Page 93 of 94   Page ID #:294358
CV 04-9049-DOC - 02/03/2011 - Day 12, Vol. 2 of 3

93

1    Q    Now, do you have any opinion concerning the dates of

2    any of these images in terms of, you know, when they were

3    drawn?

4    A    No, I have no opinion about dates.  It wasn't my

5    assignment, and I'm not capable of dating.

6    Q    Do you have any opinion as to the dates when these

7    indentations were made or the ink bled through?

8    A    No, sir, I don't.

9    Q    Did you have any opinion concerning when the pages were

10   taken out of the notebook?

11   A    No, I do not.

12   Q    Or when the images on those removed pages, when they

13   were created, do you have any opinion regarding that?

14   A    No, sir.

15   Q    Why not?

16   A    Well, I don't have any scientific method or

17   instrumentation to confirm any dates or to develop any

18   dates, and in addition, that was not part of my assignment

19   or, as we call it in the profession, purpose of examination.

20                 *(Live reporter switch with Sharon Seffens.)*

21                             -oOo-

22

23

24

25

CV 04-9049-DOC – 02/03/2011 – Day 12, Vol. 2 of 3

94

1                        –oOo–

2                    **CERTIFICATE**

3

4        I hereby certify that pursuant to Section 753,

5    Title 28, United States Code, the foregoing is a true and

6    correct transcript of the stenographically reported

7    proceedings held in the above-entitled matter and that the

8    transcript page format is in conformance with the

9    regulations of the Judicial Conference of the United States.

10

11   Date:  February 4, 2011

12

13

14   _____

15   JANE C.S. RULE, U.S. COURT REPORTER
     CSR NO. 9316

16

17

18

19

20

21

22

23

24

25