1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

THE HONORABLE DAVID O. CARTER, JUDGE PRESIDING

MATTEL, INC., et al.,
                  Plaintiffs,
     vs.
                                   CV-04-9049-DOC
MGA ENTERTAINMENT, INC.,    DAY 12
et al.,                     Volume 3 of 3
                  Defendants.
     --------------------------

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Santa Ana, California

Thursday, February 3, 2011

SHARON A. SEFFENS, RPR
United States Courthouse
411 West 4th Street, Suite 1-1053
Santa Ana, CA  92701
(714) 543-0870

1    APPEARANCES OF COUNSEL:

2    For Plaintiff MATTEL, INC., ET AL.:

3    JOHN B. QUINN
     MICHAEL T. ZELLER
4    WILLIAM PRICE
     QUINN EMANUEL URQUHART OLIVER & HEDGES LLP
5    865 Figueroa Street, 10th Floor
     Los Angeles, CA  90017
6    (213) 443-3180

7    For Defendant MGA ENTERTAINMENT, INC., ET AL.:

8    ORRICK HERRINGTON & SUTCLIFFE LLP
     4 Park Plaza, Suite 1600
9    Irvine, CA  92614
     (949) 567-6700
10
     ANNETTE HURST
11   ORRICK, HERRINGTON & SUTCLIFFE LLP
     The Orrick Building
12   405 Howard Street
     San Francisco, CA  94105
13   (415) 773-4585

14   KELLER RACKAUCKAS LLP
     JENNIFER L. KELLER
15   18500 Von Karman Avenue, Suite 560
     Irvine, CA
16   (949) 476-8700

17   FOR CARLOS GUSTAVO MACHADO GOMEZ:

18   MARK E. OVERLAND
     100 Wilshire Boulevard, Suite 950
19   Santa Monica, CA  90401
     (310) 459-2830
20

21   SCHEPER KIM AND HARRIS LLP
     601 West Fifth Street, 12th Floor
22   Los Angeles, CA  90071-2025
     (213) 613-4655
23

24

25

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1    **ALSO PRESENT:**

2    **MGA ENTERTAINMENT, INC.**
     **JEANINE PISONI**
3    **16360 Roscoe Boulevard, Suite 105**
     **Van Nuys, CA   91406**

4

5    **ALSO PRESENT:**

6    **ROBERT ECKERT, Mattel CEO**

7    **ISAAC LARIAN, MGA CEO**

8    **KEN KOTARSKI, Mattel Technical Operator**

9    **MIKE STOVALL, MGA Technical Operator**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

4

| | | | | |
|---|---|---|---|---|

**INDEX**

PAGE

**PLAINTIFFS'**
**WITNESS:**              DIRECT      CROSS    REDIRECT    RECROSS

**LLOYD CUNNINGHAM**
  (Continued)      5(Q)        29(H)

**PLAINTIFFS'**
**EXHIBITS:**                      MARKED            RECEIVED

**Exhibit 60-5**                                        21

**DEFENSE**
**WITNESSES:**            DIRECT    CROSS    REDIRECT    RECROSS

**(None)**

**DEFENSE**
**EXHIBITS:**                      MARKED            RECEIVED

**(None)**

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

```
 1    SANTA ANA, CALIFORNIA; THURSDAY, FEBRUARY 3, 2011; 3:45 P.M.

 2             (Jury present.)

 3      LLOYD CUNNINGHAM, PLAINTIFFS' WITNESS, PREVIOUSLY SWORN

 4                  DIRECT EXAMINATION (Continued)

 5    BY MR. QUINN:

 6    Q    Do you have any opinion as to who removed those pages

 7    from the notebook?

 8             MS. HURST:  Objection, lacks foundation.

 9             THE COURT:  Overruled.

10             THE WITNESS:  No, I don't.

11    BY MR. QUINN:

12    Q    Or why they were removed?

13    A    No, sir.

14    Q    Do you have any opinion regarding the significance of

15    any of these drawings whether they are still in the notebook

16    or out of the notebook as to what that means in terms of the

17    merits of this case?

18    A    No, sir.

19    Q    How is it that you came to look at these particular

20    drawings -- look for evidence of these drawings in the

21    spiral notebook?

22    A    In September 2007, I received numerous documents, nine

23    boxes in my office.  I was given an assignment by Mattel's

24    attorneys at that time.  As I previously mentioned, in our

25    profession, we really don't call it an assignment.  We call
```

1    it purpose of examination.  We all have to have a purpose of

2    examination when something is submitted to us.  At that

3    time, the purpose of the examination that was conveyed to me

4    was to search for and examine anything in the nine boxes

5    that is related to Bratz dolls or any Bratz dolls

6    accessories.  That was my assignment total.

7    Q    In terms of your scientific forensic examination, you

8    looked in the black notebook for what?

9    A    I looked in the black notebook for any information or

10   evidence that's related to Bratz dolls or any of the Bratz

11   dolls accessories.

12   Q    So your assignment did not include learning all about

13   the depositions and summarizing the evidence in this case or

14   that sort of thing?

15   A    No, sir.

16   Q    Earlier, you mentioned that you found in one of the

17   indentations on pages 11556-61 and 63 drawings of a child.

18   Do you recall mentioning that?

19   A    I do, sir.

20          MR. QUINN:  Your Honor, if we could put on the

21   screen -- these are in evidence -- Exhibits 15393 and 15333.

22   BY MR. QUINN:

23   Q    My question to you is whether these appear to be

24   drawings that you found indentations of?

25   A    Yes.  They both were found in the paper fiber.

1    Q    When did you first detect these indentations of this

2    child in the rain hat?

3    A    Approximately the same time that I recognized the doll

4    drawings that were indented into both pages, pages 61 and

5    63.

6    Q    That would have been roughly when?

7    A    September of 2007.

8            THE COURT:  Now that he have more than one

9    drawing, I am to allow you to refer to all drawings, and we

10   are going to have other types of drawings.  So you can go

11   ahead, but distinguish between the child drawing, the doll

12   drawing --

13           MS. HURST:  How about girl drawing?

14           THE COURT:  Young girl drawing?

15           MS. HURST:  Sure.

16   BY MR. QUINN:

17   Q    So you detected these when you did your original

18   analysis back September of 2007?

19   A    Yes.

20   Q    At that time in terms of the assignment that had been

21   given you to see whether these girl drawings could be found

22   in the black notebook, did you have any reason to believe

23   that these little boy drawings had any significance as to

24   whether those pages ever were in the notebook?

25   A    No.  To me the little boys didn't relate to Bratz

```
 1   dolls, and I couldn't relate those to my examination to
 2   anything related to Bratz dolls.  Therefore, it wasn't part
 3   of my purpose of examination.
 4   Q    Now, you prepared an expert report concerning your
 5   work?
 6   A    Yes, sir.
 7   Q    Which in your understanding has been provided to the
 8   other side?
 9   A    Yes, sir.
10   Q    And you prepared that report when, sir?
11   A    I prepared that report in February of 2008.
12   Q    Did you include in that report that you first prepared
13   in February of 2008 -- did you include in that the fact that
14   you found the little boys wearing the hats in your report?
15   A    No, sir.  That wasn't the purpose of my examination.
16   Q    At that time did you have any reason to think that they
17   were important or had anything to do with the little girl
18   drawings?
19   A    I had no information that they were potential or
20   significant evidence at that point?
21   A    Now, after you submitted your report, was your
22   deposition taken concerning your work in your report?
23   A    It was.
24   Q    When was that that your deposition was taken?
25   A    My deposition was first taken in March of 2008.
```

```
1    Q    And were you asked in your deposition about the little

2    girl indentations that you found?

3    A    Yes.

4              MS. HURST:   Objection, relevance and hearsay.

5              THE COURT:  Overruled.

6    BY MR. QUINN:

7    Q    Were you asked any questions about whether you had

8    found any indentations other than the little girl drawings?

9    A    Yes.

10   Q    And had you in fact found those other indentations?

11   A    I found numerous other indentations related to Barbie

12   dolls and the little boys.

13   Q    Did you relate that -- in your deposition when you were

14   asked by the lawyers, did you relate the fact that you found

15   numerous other indentations in the book?

16   A    I did, sir.

17   Q    Were there any questions that were asked you about

18   about what particular -- about particular indentations that

19   you found that you didn't include in your report?

20             THE COURT:  Is this part of his expertise?  It

21   understand sounds like a defense.

22             MR. QUINN:  I am asking about what he was

23   questioned about at this deposition.

24             THE COURT:  I understand that, but what's the

25   relevance of it?  In other words, initially I overruled the
```

  1    objection, but I'm not sure why in fact this is relevant as

  2    it develops.

  3              MR. QUINN:  I think an issue was raised about

  4    whether he found these or missed these.

  5              THE COURT:  I haven't heard that yet on

  6    cross-examination.

  7              MR. QUINN:  I am anticipating it.

  8              THE COURT:  I am going to reverse my ruling.  The

  9    objection is sustained.

 10    BY MR. QUINN:

 11    Q    In any event, did you later do a supplemental report?

 12    A    I did.

 13    Q    Why did you do a supplemental report?

 14    A    Because during the previous proceedings, I was asked

 15    about the little boys, and at that point, I felt that that

 16    may be a potential significant issue in the case, and I

 17    thought I should incorporate that into a supplemental

 18    report.

 19    Q    But you had mentioned before that you had found those

 20    indentations and saw those images?

 21    A    Yes.

 22    Q    When was it that you did your supplemental report?

 23    A    I did the supplement report in November of 2010.

 24    Q    In your supplemental report, did you talk about some of

 25    these other indentations that you found?

1   A      I did.

2   Q      Including the little boys?

3   A      Yes.

4   Q      Do you have any -- as you sit here today, do you know

5   whether the little boys have any significance?

6   A      There may be some potential significance based upon the

7   questions asked at the previous proceeding.  It may be

8   potential to dating, but I'm still not sure if there is.

9   Q      That's not your area of expertise?

10  A      No, it's not.

11  Q      Could we turn now to a completely different subject,

12  and that's a notary book?  Did you also --

13          THE COURT:  I believe that has been marked, Your

14  Honor, as Exhibit 60.

15  BY MR. QUINN:

16  Q      Did you also examine a notary book as part of your work

17  in this case?

18  A      I did, sir.

19  Q      Is Exhibit 60 that you are holding there in your left

20  hand the notary book that you examined?

21  A      It is, sir.

22  Q      In the profession of forensic document analysis, does

23  the phrase "suspicious" or "unusual" have a particular

24  significance or connotation?

25  A      It does.

```
 1   Q    What is that?

 2   A    Quite often when I am given the purpose of examination

 3   or an assignment in a matter by a client, whether it's a law

 4   firm or even law enforcement agencies, I will be presented

 5   with documents, and an investigator or lawyer, which is

 6   quite common, will point something out to me and say this is

 7   suspicious or unusual, or this has raised a red flag.  We

 8   don't know if it has been altered or not.  Would you please

 9   examine it to determine if any alteration, addition, eraser,

10   obliteration, has been made to this entry.  That directs my

11   focus to a certain problem to be examined.

12   Q    Did you do that examination in this case?

13   A    I did.

14   Q    Did you find any entries in this notebook which were

15   suspicious or unusual?

16   A    Yes.

17   Q    What is that?

18   A    That would be on page 11.  It's for a date, the entry

19   8/26/99.

20        MR. QUINN:  Your Honor, I believe we have this

21   page in evidence.  I believe it's trial Exhibit 60-19.  I

22   believe 60-20 is also in evidence.

23   BY MR. QUINN:

24   Q    Can you show us the entry which you thought was

25   suspicious or unusual?
```

1  A    Yes.  For the entry date of 8/26/99, there is a section

2  called "Documents – kind or type."  This is what I

3  considered to be a block, and in the block there are three

4  machine printed lines.  Within the block, there are five

5  lines of writing.  What appeared suspicious to me is the

6  fifth line of writing.

7  Q    Mr. Cunninham, did you prepare a demonstrative to

8  illustrate what you saw?

9  A    I did.

10 Q    Is that C-22, trial Exhibit 23822-22?

11 A    Yes, sir.

12 Q    If we could please put that on the screen.

13        THE COURT:  Just a moment counsel.  What is C-22?

14        MR. QUINN:  It's a demonstrative.  It's been

15 identified as Exhibit 23822-22 as well, Your Honor.

16        THE COURT:  Why don't we give them a separate

17 number.

18        MR. QUINN:  We don't need to do that, Your Honor.

19 It was just an internal number, and we don't need it.

20        THE COURT:  All right, please proceed.

21        MR. QUINN:  If we could put that up on the screen.

22 BY MR. QUINN:

23 Q    Is this a blowup that you prepared to illustrate your

24 testimony?

25 A    It is, sir.

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1    Q    Can you identify for the jury the features of this

2    entry that support your conclusion that this entry was

3    suspicious or unusual?

4    A    Yes.  Beginning with the first four lines, I considered

5    what's called the vertical spacing between the lines.  I

6    also considered what I will call the encroachment of the

7    word "males" and a period going into the actual next block.

8    A very important consideration is the way "from 1998

9    Missouri" was written.

10   Q    What do you mean the way it was written?

11   A    In the profession of handwriting identification we use

12   a term which is "line quality," and line quality has many

13   aspects to it.  Line quality means the speed of the writing,

14   the fluency of the writing, the rhythm of the writing, the

15   soft strokes, the heavy strokes, the tapered beginning

16   strokes, the tapered ending strokes, hand lift in the line,

17   hesitations in the line when the person is writing.

18        This is all part of the term "line quality."  Line

19   quality in writing is one of of the most important elements

20   for handwriting identification, and the line quality in

21   "from 1998 Missouri" was not fluently and spontaneously and

22   naturally written.

23   Q    Can you explain that?  Can you compare that writing

24   versus the other writing?

25   A    Yes.  In the writing on the first four lines, you can

1    see nice tapered beginning strokes, nice fluent off-strokes

2    to the R.  You can see nice tapered strokes at the top of

3    the S, and I could see speed and fluency through microscopic

4    examination of the writing on the first four lines.  This is

5    not present in the writing on the fifth line.

6    Q    What do you mean by that?

7    A    The fifth line was written in a very slow and

8    deliberate manner, and it was written very similar to

9    drawing rather writing.  There are no tapered beginning and

10   ending strokes.  The thickest of long strokes are

11   approximately the same.  There is no speed hardly at all in

12   the writing of the fifth line.  Therefore, the line quality

13   in the fifth line of writing "from 1998 Missouri" is quite

14   different from the line quality of the first four lines.

15   Q    What did your observations about the line quality tell

16   you about how it was created?

17   A    It could be in my opinion one of two things:  Either

18   the person who wrote the first four lines was having

19   difficulty squeezing in "from 1998 Missouri," and because

20   the person had reduce their writing so considerably began

21   slowing drawing.  That's one scenario.  The other scenario

22   is that in the field of handwriting identification if

23   someone wants to imitate the writing of another person,

24   generally they are no longer writing because they are

25   copying the characteristics of another person's writing, and

```
 1   as soon as they begin copying the characteristics of another
 2   person's writing, they are drawing.  They are not writing.
 3   Therefore, "from 1998 Missouri" could be from a person
 4   trying to squeeze it in who could be the first writer of the
 5   first four lines, or it could be another person who is
 6   trying to imitate the writing of the person who wrote the
 7   first four lines.
 8   Q    These observations that you made about line quality,
 9   are these observations you made just using your naked eye,
10   or did you use any instruments to help you with this?
11   A    The instrumentation I used to examine this would be a
12   fiberoptics lighting source, hand-held magnifiers, and a
13   stereoscopic microscope.
14   Q    You mentioned that you also considered the vertical
15   spacing of the first four lines of the entry.
16   A    I did.
17   Q    What did you observe in that regard?
18   A    The individual who began writing the entry obviously
19   realized that they had more information to include in this
20   block than the three printed lines could accommodate.
21   Q    Why is that obvious?
22   A    Because instead of writing the second line on the
23   second printed line, the person adjusted and began writing
24   "doll idea - characteristics" up upon the machine printed
25   line.  Then the person wrote the third line not on the
```

```
1    second machine printed line but through the second machine

2    printed line.  Then the individual wrote "Lupe, Hallidae,

3    Jade, two males," above slightly the bottom machine printed

4    line.

5    Q    What did that tell you as a forensic document examiner

6    about the writer's anticipated length of the entry?

7    A    That's referred to format.  That's considered format.

8    Most people who write have some type of format, how they

9    write.  This person formatted or began to format the writing

10   in this block to accommodate more writing than as I

11   mentioned before the three printed lines could accommodate.

12   Q    Do you have an opinion about whether when this person

13   first started writing about how much they anticipated

14   writing?

15            MS. HURST:  Objection, calls for speculation.

16            THE COURT:  Overruled.

17            THE WITNESS:  Yes.

18   BY MR. QUINN:

19   Q    What is that?

20            MS. HURST:  Objection, speculation, Your Honor.

21            THE COURT:  Overruled.

22            THE WITNESS:  Once again, as I testified, this

23   person anticipated writing more than they could fit into

24   this block because the second line is very important.

25   That's where the person began adjusting.  If the person
```

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1   didn't consider writing extra material in this block, then

2   as other entries in the notary journal, the person would

3   have placed the second line of writing on the second machine

4   printed line.

5   BY MR. QUINN:

6   Q    Have you prepared a demonstrative that shows what this

7   entry would look like without that bottom fifth line?

8   A    Yes.

9   Q    Is that C-23, which --

10        MR. QUINN:  Actually, Your Honor, it's Exhibit

11   23822-23.  If we could put that up on the screen, please.

12   BY MR. QUINN:

13   Q    What is this?

14        MS. HURST:  Your Honor, this demonstrative is very

15   argumentative.  It's an altered document in and of itself.

16        THE COURT:  Overruled.

17   BY MR. QUINN:

18   Q    What did you do here?

19   A    I redacted or removed "from 1998 Missouri."

20   Q    What was your purpose in doing that?

21   A    Two purposes:  The first purpose was to show, for

22   example, from the bottom of the P to the machine printed

23   line and the three extremely large commas.  I would also

24   like to note that the three large commas are almost like

25   slash marks rather than curved little commas.  They proceed

```
 1   right from the fourth line of writing just above and all the
 2   way down to the machine printed line.  The reason I redacted
 3   or removed "from 1998 Missouri" is I wanted to demonstrate
 4   that when the person completed the fourth line of writing,
 5   including "males" and "period," which is very important, and
 6   made these large slash mark type commas that are quite
 7   uniform between each other all the way to the bottom -- in
 8   my opinion, "males, period," was the end of that entry.
 9        At a later time, an individual who either wrote the
10   first four lines or another individual entered "from 1998
11   Missouri," and as you can see "from" was written to the left
12   side of the first very large comma.  Then "1998" was placed
13   on the other side of the first very large comma, and
14   "Missouri" is quite a long name, so they wouldn't have any
15   choices to fit it in in between the commas, so "Missouri"
16   went right through a comma.
17        In my opinion, if a person intended with a very small
18   space that was actually partially occupied already with
19   these very large commas -- if they intended right from the
20   beginning to write "from 1998 Missouri," I wouldn't think
21   they would have made such large commas to cause an
22   obstruction to the writing of the fifth line.
23   Q    Did you examine other commas that whoever the author
24   is -- that this person made in the notary book?  Did you
25   look at other commas as well?
```

1    A     I certainly did, sir.

2    Q     What did you find in examining other commas?

3    A     There weren't many examples.  I think there were two

4    examples of when the person made a comma on the second to

5    the last line.  When the individual made a comma on the line

6    that was the second to the last line, they made real small

7    commas, not commas that extended way down into the next

8    line, but they made small commas so there wouldn't be

9    obviously an obstruction for the next line of writing.

10   Q     Could we look at be Exhibit 60-8, and could you tell

11   the jury whether you see any commas there -- this a trial

12   exhibit -- within the notary book?  Do you see some commas

13   there that illustrate these small commas that you just

14   referred to?

15   A     Yes.  This isn't the page, sir.

16   Q     Is it 60-10?

17   A     No, that's not it either.

18   Q     Let's try 60-12.

19   A     It's page 5, sir.

20   Q     Okay.  60-5.

21   A     Yes, this is the page.

22   Q     This is the page?

23   A     Yes.

24   Q     Could you just read to us what page --

25              MR. QUINN:  Perhaps I could get some help reading

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1    what the page number is.  It's 60A-13.

2    BY MR. QUINN:

3    Q    On this page, do you see some of these commas that you

4    were referring to that illustrate this phenomena?

5    A    Yes.

6            THE WITNESS:  May I stand up and lean over?

7            THE COURT:  Certainly.

8            THE WITNESS:  For example, on lines one, two,

9    three, four -- there is a comma on the line just above the

10   last line where the comma does not protrude.

11           MR. QUINN:  Your Honor, this page is not in

12   evidence.  I would offer this page in evidence.

13           THE COURT:  Received.

14           (Exhibit 60-5 received.)

15           THE WITNESS:  The comma does not excessively

16   protrude down and interfere with the next line of writing.

17   Likewise, in the second to the last line of writing, the

18   comma does not protrude down into the last line of writing.

19   However, in the last line of writing -- in this particular

20   example I am pointing for the "Daniel Funk" entry, now the

21   individual makes pretty large commas.

22   BY MR. QUINN:

23   Q    Could you explain to us what that tells you concerning

24   those commas we were looking at?

25   A    Yes.  Once again, the commas in the entry I just

22

```
 1    described with the five lines are extraordinary long
 2    straight.  They represent almost slash marks rather than a
 3    curved comma, and they extend down into a restricted space
 4    that would serve as an obstruction to any writing that you
 5    would put into that space.
 6    Q    If we could please go back to 23822-22, the
 7    demonstrative of this entry.
 8    A    Once again, I'm pointing out three commas and how the
 9    words had to be navigated around the first comma, how the
10    words had to be slowly squeezed into that limited area.
11    Q    Did you notice anything about the spacing of the four
12    handwritten line and preprinted bottom border of the
13    questioned entry that was significant to you?
14    A    Would you repeat that, sir?
15    Q    Did you notice anything about the spacing between the
16    fourth handwritten line and the preprinted bottom border of
17    the questioned entry that was significant to you?
18    A    Yes.  Some of the letter points like the bottom of P
19    extends into the space, and that space is very limited.  In
20    fact, if the commas were not present, it would still be
21    difficult to squeeze in that handwritten information, and if
22    they were present, there would be enough room to wrap
23    "males, period," around to the beginning of the line and
24    continue on rather than having to end into another block.
25    Q    Is the existence of space between that fourth
```

| | |
|---|---|
| 1 | handwritten line and the preprinted bottom border of the box |
| 2 | consistent or inconsistent with the writing that you see |
| 3 | elsewhere in this journal? |
| 4 | A    It's consistent with some of the other writing I found |
| 5 | in the journal. |
| 6 | Q    If we could look at page 60-14, do you see that -- if |
| 7 | you could look first -- I'm sorry.  It's page 15. |
| 8 | MR. QUINN:  This is not yet in evidence.  If we |
| 9 | could take that down. |
| 10 | BY MR. QUINN: |
| 11 | Q    Mr. Cunningham, do you see an instance of this |
| 12 | phenomena you referred to where the writer leaves a space |
| 13 | before that bottom printed border? |
| 14 | A    Yes.  In my profession, the term commonly used when a |
| 15 | person doesn't write right on the printed line we call it |
| 16 | "floating" above the printed line, and in this particular |
| 17 | matter, this writer for the notary journal varies. |
| 18 | Sometimes the person will write down on the printed line, |
| 19 | and that's for the most part, but there are other only times |
| 20 | when the writer floats slightly above the last printed line. |
| 21 | Even though that line of writing is the last line as an |
| 22 | entry, it is still floated a little bit above the bottom |
| 23 | machine printed line. |
| 24 | Q    Do you see any examples of that on page 23822-15 before |
| 25 | you in the notary book? |

1  A    Yes, referring to "El Segundo, California."

2              MR. QUINN:  Your Honor, I would offer this page.

3              MS. HURST:  Your Honor, that's not the right

4  exhibit.  23822 is a demonstrative.

5              THE COURT:  Well, I believe he is referring to the

6  actual notary book.

7              MR. QUINN:  Yes, 60-15.

8              THE COURT:  Let's check that page first and make

9  sure you have the right page.

10             THE WITNESS:  I don't have any numbers in the

11 notary book.

12             MR. QUINN:  We have got copies in the binder

13 there.  It's Trial Exhibit 60-15.  Your Honor, if we can get

14 some help from the audience here.

15             MR. QUINN:  For the record, what page are we

16 looking at?

17             MS. HUTNYAN:  Page 14.

18 BY MR. QUINN:

19 Q    Page 14 of the notary book, do you have that before

20 you, sir?

21 A    Yes, but actually it's page seven.

22 Q    It's page seven in the notary book that you are holding

23 in your hand?

24 A    Yes.

25             THE COURT:  Is it because the pages are doubled

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

```
 1   over?  In other words, you may have similar pages, Counsel,

 2   in your cross-notebook.  You may have single pages that you

 3   have numbered 1 through 14, but you may have double pages,

 4   front and back, so what you have really got are seven pages.

 5           MS. HURST:  If the witness can't find the

 6   foundation for his opinions, then I object to the testimony.

 7           THE COURT:  Thank you very much, Counsel.  It's

 8   just a matter of having a front and back page in the notary

 9   book.  What they have done is xerox them off 1 through 14,

10   single pages.

11   BY MR. QUINN:

12   Q    So you are looking at page 60-14?

13   A    Yes.

14   Q    Do you see that phenomenon that you were describing to

15   us about how the writer floats the last handwritten line

16   above the border?

17   A    Yes.

18           MR. QUINN:  We have offered this page, so we can

19   show it to the jury, Your Honor.

20           THE COURT:  You can show it to the jury.

21           MR. QUINN:  Thank you, Your Honor.

22   BY MR. QUINN:

23   Q    Could you point out the phenomenon you are describing

24   Mr. Cunningham?

25   A    Yes.  For example, in the last line of the writing,
```

1  there are two entries here.  The individual floats off the

2  machine printed line, and note that the comma goes all the

3  way down the machine printed third line.  This is very

4  similar to the situation of the five lines of writing where

5  the comma protrudes all the way to the printed line, and

6  there is a tiny little space left underneath to squeeze

7  something in.

8      However, if I could see the whole exhibit again, there

9  are also times when I use the word "varies," the person

10  varies.  Sometimes they will write right down on the line

11  almost.  They will float up a bit, go back down.  Sometimes

12  they write right on the line, so it's a variance.  For the

13  most part, this individual rights down on the line but

14  occasionally will float up.

15  Q   If we can go back to the demonstrative, 23822-22, if we

16  could look at 23 where you took that last line out, would

17  the indication of space there indicate to you that this

18  person intended to leave space to write some more words?

19  A   No, because really in all reality, it isn't a space.

20          MS. HURST:  Objection, move to strike.  It's total

21  speculation.

22          THE COURT:  There are two things I'm concerned

23  about:  one, his testimony concerning when this occurred.

24  There is no indication that a person didn't write

25  immediately after on the same day at the same time.

```
 1              MR. QUINN:  I will ask that question, Your Honor.
 2   BY MR. QUINN:
 3   Q    Do you have any opinion as to when that last line was
 4   written in relation to the rest of the entry?
 5   A    No.
 6   Q    Based upon your review of the handwriting, if this
 7   writer had intended to do all five lines at the time she
 8   wrote the entry, what would you have expected to see?
 9              MS. HURST:  Again, that just calls for total
10   speculation.
11              THE COURT:  I will leave that to the jury.  I will
12   let the expert testify.
13              Remember you can accept or reject an expert's
14   opinion.  That's entirely up to you.  An expert is supposed
15   to give clarity, supposed to impart you something that
16   hopefully helps us that's beyond our everyday experience in
17   life.  You can reject any part or all of an answer, so I
18   will give both counsel some latitude.
19   BY MR. QUINN:
20   Q    What you have expected to see based upon your analysis
21   of this handwriting?
22   A    Better adjustment of the lines because the person as I
23   opined obviously intended to adjust and could have adjusted
24   the first line a little higher and could have actually
25   brought the vertical spacing between the second and third
```

```
 1   lines closer together, and that would have left ample room
 2   to add or include "from 1998 Missouri."
 3   Q    If we could go back to the preceding page of the
 4   demonstrative, 23822-22, you referred to a protrusion out of
 5   the box.  What was the significance of that to you?
 6   A    Well, the protrusion into the next box also has a
 7   period.  My examination of other entries in the notary
 8   journal clearly shows that not often does this individual
 9   use periods.  On one occasion, the person used period where
10   there was another line of writing right after it, but on the
11   other occasions, the period was also used on the last line
12   of writing if there was a period.
13   Q    Are there any other instances in the notary book where
14   there is an entry ending in a period, you know, setting
15   abbreviations aside, where after the period there is another
16   line added anywhere else?
17   A    No.
18   Q    This is the only one?
19   A    Yes.
20   Q    Did you compare the handwriting of the first four lines
21   and the fifth line to see if the same person wrote all those
22   lines?  Did you make that comparison?
23   A    Yes.
24   Q    And were you able to reach a conclusion in that regard?
25   A    I was not able to reach a definitive conclusion.
```

```
1    Q     Why not?

2    A     Because of the nature of the fifth line of writing.  As

3    I previously testified to, it really doesn't represent

4    normally executed writing.  It was slowly drawn.  It was

5    squeezed in, and as I previously testified to, it could be

6    the product of the person who wrote the first four lines

7    just slowing down because they had to squeeze it in, or it

8    could be the product of someone imitating or attempting

9    imitate the writer of the first four lines and squeezing it

10   in, but I cannot determine which actually occurred.

11   Therefore, I am at no conclusion as to any findings for that

12   comparison.

13              MR. QUINN:  Thank you, sir.  I have nothing

14   further.

15              THE COURT:  Cross-examination.

16                   CROSS-EXAMINATION

17   BY MS. HURST:

18   Q     Good afternoon, Mr. Cunningham.

19   A     Good afternoon.

20   Q     My name is Annette Hurst.  We have not met before this

21   afternoon, correct?

22   A     That's correct.

23   Q     So when Mr. Quinn was referring to my law firm, he

24   wasn't referring to me?

25   A     No.
```

1   Q    Now, how much do you charge an hour for your services

2   as a forensic document examiner?

3   A    $250 an hour.

4   Q    And do you get more money for testifying?

5   A    Yes.

6   Q    How much do you get for testifying?

7   A    $300 an hour.

8   Q    You have written two reports in this case?

9   A    I have.

10  Q    And you have examined nine boxes of documents?

11  A    Yes.

12  Q    And you have testified three times?

13  A    Yes.

14  Q    Four now today?

15  A    Yes.

16  Q    All of that adds up to more than $20,000 that you have

17  made in connection with this case?

18  A    I would say that's a fair estimate.

19  Q    Is it more than $25,000?

20  A    I don't know.

21  Q    Is it more than $30,000?

22  A    I don't know.

23  Q    Is it more than $50,000?

24  A    I doubt it very much.

25  Q    Somewhere between $20,000 and 50,000; is that right?

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1   A      No, I don't know I said.

2   Q      Now, you have testified hundreds of times; is that

3   correct?

4   A      That's correct, ma'am.

5   Q      In your work as a forensic document examiner, you have

6   examined many notary journals; isn't that true?

7   A      Correct.

8   Q      In this case before you ever opened this notary journal

9   to look at it, you were told by the counsel for Mattel which

10  entry they believed was suspicious; isn't that true?

11  A      Yes, I had a purpose of examination.

12  Q      And the purpose of examination is a fancy way of saying

13  that Mattel told you which entry to look at as to whether it

14  was suspicious or unusual?

15  A      I don't consider it to be a fancy way.  It's not fancy.

16  It's a way, but I don't consider it to be fancy.

17  Q      But the fact of the matter is you worked with an

18  attorney from Mr. Quinn's firm named Diane Hutnyan?

19  A      Yes.

20  Q      And ms. Hutnyan is here today sitting over on the bench

21  behind Mr. Quinn?

22  A      Yes.

23  Q      She was the one who came up and pointed out to you

24  where to find the basis for your opinions earlier; is that

25  right?

```
 1   A    I don't understand what you mean, clarify -- define the
 2   basis for my opinions?
 3   Q    When you were looking for the examples to support your
 4   opinions about floating images earlier, it was Ms. Hutnyan
 5   who came up and pointed them out to you?
 6   A    No.  She just pointed to the entry and said would I
 7   examine it?  It may be suspicious in nature.
 8   Q    Are you talking about today or when you first started
 9   on the case?
10   A    When I first started.
11   Q    Today when you were having trouble with the notary
12   journal up there in front of you finding the other floating
13   images, it was Ms. Hutnyan who came up and found them for
14   you?
15   A    Yes.
16   Q    Just like she pointed out the support for your opinion
17   today, when you first met her and started on this case, she
18   pointed out which was the suspicious entry; isn't that
19   right?
20   A    I really don't understand what you mean support for my
21   opinion.  Could you clarify that?
22   Q    You said that there was a floating image in that
23   five-line entry, right, in the fourth line?  You said there
24   was a floating line in the fourth line.  Isn't that what you
25   said?
```

1    A      A floating space.

2    Q      Pardon me, a floating space.

3    A      Yes.

4    Q      You said the fourth line is floating above the printed

5    line?

6    A      Correct.

7    Q      And you said that there were other examples of that in

8    the notary book, right?

9    A      Yes.

10   Q      But you couldn't find them, right?

11   A      I could find them.  They couldn't find the number to

12   correlate with them.

13   Q      Okay.  So you needed Ms. Hutnyan to find the number for

14   you today?

15   A      Yes, the number.

16   Q      Now, this notary book belonged to a notary, correct?

17   A      I assume so, yes.

18   Q      In fact, in your report, you noted that you had

19   considered some of the testimony of that notary?

20   A      Yes.

21   Q      And her name was Jacqueline Ramona Prince?

22   A      Correct.

23   Q      And you reviewed and considered her deposition in

24   connection with your reports in this matter; isn't that

25   right?

| | | |
|---|---|---|
| 1 | A | Not in connection with my report. |
| 2 | Q | Do you have your reports before you? |
| 3 | A | No. |
| 4 | A | You don't have your report? |
| 5 | A | No.  It's not here. |
| 6 | | MS. HURST:  Would you show the witness Exhibit |
| 7 | 4623, please. |
| 8 | BY MS. HURST: |
| 9 | Q | Do you have that, sir? |
| 10 | A | I do. |
| 11 | Q | And that's your 2008 report? |
| 12 | A | It is. |
| 13 | Q | In that report at page ten -- do you have that? |
| 14 | A | Yes. |
| 15 | Q | In the last paragraph on page ten, you said you |
| 16 | received and considered in connection with this case and |
| 17 | then you go on to list a bunch of stuff? |
| 18 | A | Yes. |
| 19 | Q | Turn over to page 11.  Do you see there that you |
| 20 | reference Jacqueline Prince's deposition testimony? |
| 21 | A | Yes. |
| 22 | Q | And Jacqueline Prince was the notary for this notebook, |
| 23 | correct? |
| 24 | A | Yes. |
| 25 | Q | Now, Ms. Prince testified that she wrote all five |

 1    entries in this box, didn't she?

 2    A    I don't know.  I have never read such information.

 3    Q    And that's because you only looked at the parts of her

 4    deposition that Mattel's counsel gave you; isn't that right?

 5    A    That's correct.

 6    Q    And Ms. Prince also testified that she had to squeeze

 7    it in because there was so much text to write; isn't that

 8    true?

 9    A    I don't know.  I have never read such information.

10         MR. QUINN:  Objection to the use of the deposition

11    unless he has specifically relied on it.

12         THE COURT:  Remember experts can rely upon

13    hearsay.  It's one of the great exceptions or not so great

14    exceptions.

15         MR. QUINN:  Well, it's a foundational objection.

16         THE COURT:  Overruled.

17    BY MS. HURST:

18    Q    She testified at page 112, lines 16 to 20, in her

19    deposition that she had to squeeze it in because there was

20    so much text to write; isn't that true?

21    A    I don't know.  I have never read such information.

22         MR. QUINN:  Move to strike.  No foundation.

23         THE COURT:  Well, it's the issue of preparedness,

24    Counsel.  Overruled.

25    BY MS. HURST:

```
 1   Q    And that's because you only looked at the parts of the
 2   Prince deposition that Mattel's lawyers gave you?
 3   A    That's correct.
 4   Q    Are you aware that Ms. Prince testified that she put
 5   "from 1998 Missouri" because Mr. Bryant told her at the time
 6   of the notorization that he did these drawings while he was
 7   living with his parents in Missouri before he came back to
 8   Mattel?  Are you aware of that, sir?
 9   A    No.
10   Q    And that's because you only looked at the parts of the
11   Prince deposition that the Mattel lawyers gave you; isn't
12   that right?
13   A    That's correct.
14   Q    Are you aware that Ms. Prince testified that he had
15   specifically said he did the drawings while back home
16   visiting with his parents?
17   A    I'm not aware of that.
18   Q    And that's because you didn't look at that part of the
19   deposition because it wasn't amongst the parts that Mattel's
20   lawyers gave you, correct?
21   A    Correct.
22   Q    All right.  Are you aware that Ms. Prince testified
23   that while she was making the five-line entry in the notary
24   journal, Mr. Bryant told her he came up with this concept
25   for dolls while he was back home in 1998?
```

1          MR. QUINN:  Your Honor, request that the jury be

2    told this does come in for the truth, these questions.

3          THE COURT:  Let me try to explain briefly and I

4    then I will instruct you at the end of the case.  Experts

5    who testify may be coming into this trial by one or both

6    parties.  One of the interesting rules of evidence is that

7    we would normally expect a witness on the stand to have

8    percipient information.  In other words, I was there.  I saw

9    or heard the following or I did the following.

10          Experts are allowed to rely on hearsay.  They can

11   take into account, for instance, statements by people who

12   you may not even see in court.  They can even take into

13   account statements by other experts.  Therefore, this

14   evidence is not for the truth of the matter asserted when

15   you start listening to hearsay testimony, but the ultimate

16   opinion is free for you to accept or reject.  You are

17   entitled to know, though, what the expert relied upon and

18   what the expert didn't rely upon.

19          That's kind of a funsy way of summarizing about

20   half a page of instructions I will give you later on.

21          Now, Counsel, if you can do any better, can you

22   help me?

23          MS. HURST:  It sound great to me, Your Honor.

24          THE COURT:  Mr. Quinn, rise to the occasion.

25          MR. QUINN:  I'm on board.

38

```
 1            THE COURT:  All right, let's move on.  Counsel.
 2            MS. HURST:  Thank you, Your Honor.
 3   BY MS. HURST:
 4   Q    So at page 153, line 9, through 154, line 1, Ms. Prince
 5   testified that Mr. Bryant told her he came up with the
 6   concept for the dolls while he was home in 1998, and you're
 7   not aware of that testimony, correct?
 8   A    No.
 9   Q    That's because Mattel didn't give it to you?
10            THE COURT:  I think the proper form is if you
11   heard or if she testified.  You don't have to take this as a
12   fact.  Ms. Prince may come into court and testify, and we
13   will hear from Ms. Prince.
14            MS. HURST:  Thank you.
15   BY MS. HURST:
16   Q    Have you taken into account whether Ms. Prince
17   testified at pages 153 to 154 of her deposition that
18   Mr. Bryant told her at the time of the notorization that he
19   come up with the doll concept while living at home in
20   Missouri in 1998?  Have you take taken that into account?
21   A    No.
22   Q    And that's because Mattel's lawyers didn't you give
23   that part of the deposition, right?
24   A    Yes.
25   Q    Would you be willing to read that deposition tonight
```

```
 1   during the break and see if it makes any difference for your

 2   opinions?

 3   A    Excuse me.  I would like to clarify my previous

 4   answer --

 5            THE COURT:  No, I'm sorry, sir.  Answer the

 6   question.

 7            THE WITNESS:  No, I would not like to read it.

 8   You asked me if they didn't give me the deposition.  I was

 9   given the deposition, but I didn't read that information.

10   BY MS. HURST:

11   Q    Your testimony now is that you were given the complete

12   deposition, but you didn't read that information?

13   A    No, I was given excerpts of it, and I don't know if

14   that was contained in the excerpts.

15   Q    Let's look at which excerpts you were given.  Do you

16   have your report there?

17   A    Yes.

18   Q    It says what pages you were given, right?

19   A    Yes, it does.

20   Q    It says you were given pages 76 to 81; is that right?

21   A    Yes.

22   Q    And you were given pages 140 to 144; is that right?

23   A    Yes.

24   Q    And you were given Exhibit 61, right?

25   A    Yes.
```

1    Q    Now, that means you were not given page 112 where Ms.

2    Prince testified that she had to squeeze the text; is that

3    right?

4              MR. QUINN:  Objection to the form.

5              THE COURT:  Sustained.

6    BY MS. HURST:

7    Q    Were you given page 112?

8    A    No.

9    Q    So you didn't see whether Ms. Prince testified on page

10   112 that there were five lines and that the fifth line was

11   small because she had to squeeze in the text?

12             MR. QUINN:  Objection to the form of the question.

13             THE COURT:  Sustained.

14   BY MS. HURST:

15   Q    Did you consider whether page 112 and the testimony

16   there regarding the squeezing of the text would be relevant

17   to your opinion?

18   A    I never considered it.

19   Q    Did you consider whether page 110 and Ms. Prince's

20   proffered testimony -- did you consider whether her

21   testimony on page 110 that all entries were written at the

22   same time were relevant to your opinion?

23             MR. QUINN:  Objection to the form of the question.

24             THE COURT:  Why don't we send you home tonight.

25   This could go on for a little while.  Let me talk to counsel

1   this evening.

2          You are admonished not to discuss this matter

3   amongst yourselves nor form or express any opinion

4   concerning the case.  We will see you at 8:30 tomorrow

5   morning.  Have a nice evening.

6          (Jury not present.)

7          THE COURT:  Counsel, would you have a seat for

8   just a moment.

9          Sir, if you would have a seat for just a moment

10  also.

11         MS. HURST:  May I be seated, or should I remain

12  standing?

13         THE COURT:  Just be seated.  Thank you.

14         You are certainly entitled to examine on the

15  portions that he hasn't read or relied upon, and you are

16  certainly allowed to ask the expert to review testimony this

17  evening that you would like him to review, and if you want

18  him to review testimony this evening, then he will do so.

19  You can even reserve him if you would like to until Ms.

20  Prince comes into court and testifies.

21         I am just a little concerned about you making the

22  statement about what's contained in those pages in summary

23  form.  I think you are allowed to ask him -- you find

24  yourself in a Catch 22 if he wasn't given the pages -- well,

25  I will let you confer.

1             (Defense counsel conferring.)

2             MS. HURST:  Your Honor, we would like to ask that

3    the witness be directed to read the entirety of the Prince

4    deposition this evening.

5             THE COURT:  How many pages are in that deposition?

6             MR. QUINN:  We are looking it up right now, Your

7    Honor.  It's 199 pages.

8             THE COURT:  And he has already read how many?

9             MS. HURST:  Five.

10            THE COURT:  No, that's not a good record.  Counsel

11   was just joking.

12            MS. HURST:  He has read nine pages.  I was

13   slightly off, 76 to 81 and 140 to 144.  That's what in his

14   report.

15            THE COURT:  Is that --

16            MR. QUINN:  I will accept the representation.

17   Every expert in this case has had provided to them multiple

18   depositions.  If we go down this road, it is going to

19   completely circumvent the rule.

20            THE COURT:  Let's just talk for a moment.  Do you

21   want it to be in the position where he has been requested by

22   MGA to read transcripts and depositions tonight and have him

23   state that he has been unwilling to do so?

24            MR. QUINN:  Of course not.  I don't want to be in

25   that position.

43

```
 1              THE COURT:  Well, I gather they are making that

 2    request, and why don't you have a little conference about

 3    that first.

 4              MS. HURST:  I can narrow it down to the relevant

 5    pages if Mr. Quinn would like.

 6              THE COURT:  I think before you respond you ought

 7    to just sit back for a moment and have a nice discussion

 8    amongst yourselves.  I am not forcing you to.

 9              Mr. Quinn, Mr. Zeller, if that's your position,

10    that's it, but there will be a fairly clear record that

11    counsel has requested that this evening, and they are going

12    to be able to ask that in front of the jury, so I will leave

13    that to you.

14              (Plaintiffs' counsel conferring.)

15              MR. QUINN:  It's fine.  We think he should read

16    the whole thing.

17              THE COURT:  Well, now we are back to reading the

18    whole thing.

19              Ms. Hurst, we are back to reading the whole

20    transcript.  At $250,000 an hour, you ought to be a rich

21    man.  I'm just joking.  So at $250 an hour, he is going to

22    read tonight.

23              I assume you read slowly.  Read very slowly, one

24    page per hour.

25              MR. QUINN:  I understand Ms. Prince is going to
```

1    come and testify.

2                THE COURT:  I do, too.

3                MR. QUINN:  We have a handwriting expert.

4                THE COURT:  That doesn't matter.  That's not the

5    issue.  The issue is you may turn out to have verification

6    from Ms. Prince that says this was created by another

7    person, or I put it in at a later date than this particular

8    date, or it was made with a different pen, or the magic

9    fairy godmother came and did it.  I don't know, but this is

10   the expert on the stand.  We haven't heard from Ms. Prince

11   yet.  We haven't her position yet, and everything else is

12   hearsay.  Although it comes through the door, it's not for

13   the truth of the matter asserted.

14               So I think we are right back to the point we

15   started with.  They are requesting that he read the entire

16   transcript.  It's a measly 199 pages.  So the question is

17   after that request is made, is Mattel objecting?

18               MR. QUINN:  He will read it, Your Honor.

19               THE COURT:  No, I'm not directing it.  He is going

20   to be on the stand tomorrow.  I am going to put it this

21   way --

22               Thank you very much, sir.  If you wait outside in

23   the hallway, counsel will direct you whether to read it or

24   not.  That's their choice, but I'm not forcing you to.

25               The request is clearly noted, and, Counsel, you

1    can comment tomorrow that the request has been made.

2            MS. HURST:  Thank you, Your Honor.

3            THE COURT:  Now, we will have you off the stand at

4    least in a week -- I'm just joking.  I want you to

5    rest-assured we will have you off the stand tomorrow.  You

6    keep whatever appointment you have next week, and all of us

7    wish you the best in that operation.

8            THE WITNESS:  Thank you, Your Honor.

9            THE COURT:  I think you sound terrific.  If I

10   could transfer that back to all counsel in this court --

11   don't forget all of us sincerely wish you the best in that

12   operation.  Rest-assured you will be there next week, and

13   you will be done tomorrow.

14           This issue of demonstratives, demonstratives can

15   be received into evidence.  I don't know why there is an

16   objection if it aids the trier of fact.  What can't be

17   received into evidence are the numerous timelines and

18   doodlings by counsel that you are using on the elmo.  That's

19   also construed to be a demonstrative.  You can make a

20   demonstrative if you want to argue to the jury.  You can put

21   on a PowerPoint as far as the Court is concerned.  Those are

22   created by counsel in a sense, and they are not permissible.

23           If an expert relies on a compilation of materials,

24   C-1 through 29, I don't know of any rule -- if you need to

25   do research this evening, I will certainly accept that

1    tonight.  If I am wrong, I want to be corrected immediately.

2         MS. HURST:  I don't think the testimony was that

3    he relied on these.  They were simply illustrative blowups

4    of his lists.  My problem is we haven't had access to those

5    except for a very limited time, and we are not in a position

6    to be able to make these special scans of what he did, so I

7    am going to be fumbling up here on the elmo with no

8    permanent record of my comparison, and it skews what goes

9    back to the jury if this comes in.

10        THE COURT:  That's a record that I need to respond

11   to.  If he has handed down his initial report in 2008 and

12   his supplemental report in -- his expert report was prepared

13   in February 2008, and I think the supplemental was September

14   2010.  I haven't seen any lack of resources from either

15   side, so everybody has been on notice in terms of the report

16   and the supplemental report.  Whether you choose to produce

17   another expert or not is up to you, but you certainly can

18   produce an expert to respond to this expert if you choose.

19        MS. HURST:  It's really just a matter of creating

20   a record of what he says about the relationship amongst

21   these documents.  It's not about whether to call another

22   expert or not.

23        THE COURT:  I am back to the demonstrative.  I

24   don't know why a demonstrative that's relied upon by an

25   expert as long as it pertains to originals and overlays and

1   drawings can't be received.

2       MS. HURST:  This is not his material that is the

3   product of his test.  Just to be clear, we need to pull out

4   the polyethylene films and shows those.  Those are his

5   reliance materials.  Those are what he created using his

6   indentation materialize.  This is just some photo shop stuff

7   that the lawyers put together to blow that up and try and

8   make it easier to see.  It's not his work.

9       THE COURT:  Well, I was confused.  I thought that

10  he traced over the outlines to make a demonstrative for the

11  jury so that they could easily follow his testimony.  I

12  thought that was the import of 23822, which was the

13  demonstrative that continually referenced originals 542 and

14  539, which corresponded to page 61 and 63, which corresponded

15  to 1964 and 1965 in the notebook.

16      Now, I will go back and do some research, and

17  perhaps I'm wrong, but I am asking for your help/

18      MS. HURST:  I am just looking for the two --

19      THE COURT:  I don't need help with that.  I know

20  it was shown.  I don't need to be reminded of what was

21  shown.  I just want to go back and make certain I'm right.

22  If I'm not, I certainly don't want to allow in a piece of

23  evidence that properly would be excluded, and I am not going

24  to guess.

25      Now, are you going to help me from both parties or

1   not?

2            MR. QUINN:  Yes, Your Honor.

3            THE COURT:  Good.  So I will meet you here in an

4   hour and half.  Go do your research.

5            Now, what else do we need to resolve tonight?

6            MR. MCCONVILLE:  We need to know which witnesses

7   are coming to tomorrow, and I think if one of them is Peter

8   Marlow we haven't reviewed his exhibits yet.

9            THE COURT:  I assume that Odom is here.

10           MR. QUINN:  Ms. Odom is here.

11           THE COURT:  She would probably like to be here for

12   the next two or three months because of the ice storms.

13           MR. QUINN:  I think she is enjoying the weather.

14           THE COURT:  Is she going to be called tomorrow?

15           MR. QUINN:  Yes.

16           THE COURT:  Okay.  No. 2, my belief was that

17   O'Connor was going to be called tomorrow.

18           MR. QUINN:  Yes.

19           THE COURT:  Also, my belief was that Farhad Larian

20   was going to be called tomorrow.

21           MR. QUINN:  Yes.

22           THE COURT:  Mr. Cunningham has about 45 minutes to

23   go and then whatever redirect and recross there is.

24           Now, after those four witnesses, who do you

25   propose to call?

```
1                MR. QUINN:  Peter Marlow.

2                THE COURT:  Is there some possibility of getting

3     to him before Isaac Larian?  We should go over him tonight

4     shouldn't we?

5                MR. MCCONVILLE:  That makes sense, yes.

6                MR. QUINN:  Yes, but we also have Jennifer Morris

7     in there who we have gone over.

8                THE COURT:  You're going to call Odem?

9                MR. QUINN:  Yes.

10               THE COURT:  O'Connor.

11               THE COURT:  Who would you be calling next after

12    those witnesses?

13               MR. QUINN:  Farhad Larian.

14               THE COURT:  With my ruling today, Farhad Larian

15    won't be as long.  What do you estimate in terms of time?

16               MR. QUINN:  Forty-five minutes.

17               MR. MCCONVILLE:  Fifteen minutes.

18               THE COURT:  And after Farhad?

19               MR. QUINN:  Peter Marlow.

20               THE COURT:  I think we have a good chance of

21    getting to Peter Marlow tomorrow, correct?

22               MR. QUINN:  It's possible.  It's how long O'Connor

23    goes.

24               THE COURT:  Let's just assume we do so we are

25    prepared.
```

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

50

```
 1              And then after Peter Marlow?
 2              MR. QUINN:  I think Jennifer Morris.
 3              THE COURT:  And we have already gone over Jennifer
 4    Morris.
 5              MR. QUINN:  Yes.
 6              THE COURT:  And then Mr. Larian will be sometime
 7    next week.
 8              MR. QUINN:  Yes.
 9              THE COURT:  So it sounds to me like we have a
10    couple of things to do.  I need to do some more research
11    concerning demonstratives, and you are going to help me.  I
12    think you ought to go out to dinner then and come back at
13    6:30.  We need to go over Peter Marlow tonight the first
14    thing.  If we do, then I think we are ready for a complete
15    day tomorrow.
16              MR. QUINN:  Yes.
17              MR. MCCONVILLE:  Yes.
18              THE COURT:  Then I will see you at 6:30.
19              MR. MCCONVILLE:  Who did you need back, just me
20    and John?
21              THE COURT:  That's fine.
22              Ms. Keller, good-night.  Get as rested as you can.
23              Mr. Price, good-night.
24              Let's do this.  Regardless, let's not work past
25    9:00 or 9:30 because you are on again tomorrow, aren't you?
```

1              MR. QUINN:  I am.

2              THE COURT:  I want to keep you as fresh as

3      possible.

4              THE COURT:  Now, lastly how are we doing with our

5      experts, one of which who may be here, Mr. Wagner, but since

6      I have ordered simultaneously he may be here sitting

7      Saturday if you truly can't get your expert out of Chicago?

8              MS. HURST:  We have agreed to Tuesday, Your Honor,

9      if that's acceptable to the Court.

10             THE COURT:  It's more than acceptable.  If we

11     would have just done that at the beginning, there wouldn't

12     have been this problem.  Tuesday sounds like a perfect day

13     excellent, so the experts now will testify on Tuesday.

14             Okay, we will see you at 6:30.

15                             -oOo-

16

17

18

19

20

21

22

23

24

25

52

1

2

3

4                                CERTIFICATE

5

6          I hereby certify that pursuant to Section 753,

7    Title 28, United States Code, the foregoing is a true and

8    correct transcript of the stenographically reported

9    proceedings held in the above-entitled matter and that the

10   transcript page format is in conformance with the

11   regulations of the Judicial Conference of the United States.

12

13   Date:  February 4, 2011

14

15                              Sharon A. Seffens 2/4/11

16                              _____

17                              SHARON A. SEFFENS, U.S. COURT REPORTER

18

19

20

21

22

23

24

25