1

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

- - - - - - -

MATTEL, INC., et al.,           )
                                )
          Plaintiffs,           )
                                )
     vs.                        ) No. CV 04-9049 DOC
                                )    Day 13
MGA ENTERTAINMENT, INC., et al., )   Volume 1 of 3
                                )
                                )
          Defendants.           )
_____)


REPORTER'S TRANSCRIPT OF PROCEEDINGS

Jury Trial

Santa Ana, California

Friday, February 4, 2011


Debbie Gale, CSR 9472, RPR, CCRR
Federal Official Court Reporter
United States District Court
411 West 4th Street, Room 1-053
Santa Ana, California 92701
(714) 558-8141

04cv9049 Mattel 2011-02-04 D13V1

Case 2:04-cv-09049-DOC-RNB   Document 9808   Filed 02/07/11   Page 2 of 144   Page ID
#:295552
CV 04-9049 DOC - 2/4/2011 - Day 13, Volume 1 of 3

2

1    **APPEARANCES OF COUNSEL:**

2

     FOR PLAINTIFF MATTEL, INC., ET AL.:

3

              QUINN EMANUEL URQUHART OLIVER & HEDGES LLP
4             BY:  JOHN QUINN
                   WILLIAM PRICE
5                  MICHAEL T. ZELLER
                   Attorneys at Law
6             865 South Figueroa Street
              10th Floor
7             Los Angeles, California 90017
              (213) 443-3000

8

9

10

11   FOR DEFENDANT MGA ENTERTAINMENT, INC., ET AL:

12            ORRICK, HERRINGTON & SUTCLIFFE, LLP (Irvine)
              BY:  THOMAS S. McCONVILLE
13                 Attorney at Law
              4 Park Plaza
14            Suite 1600
              Irvine, California 92614
15            (949) 567-6700

16            - AND -

17            ORRICK, HERRINGTON & SUTCLIFFE, LLP (SF)
              BY:  ANNETTE L. HURST
18                 Attorney at Law
              405 Howard Street
19            San Francisco, California 94105
              (415)773-5700

20            - AND -

21            KELLER RACKAUCKAS
22            BY:  JENNIFER KELLER
                   Attorney at Law
23            18500 Von Karman Avenue
              Suite 560
24            Irvine, California 92612
              (949) 476-8700

25

Case 2:04-cv-09049-DOC-RNB   Document 9808   Filed 02/07/11   Page 3 of 144   Page ID #:295553
CV 04-9049 DOC - 2/4/2011 - Day 13, Volume 1 of 3

3

1    **APPEARANCES OF COUNSEL (Continued):**

2

3    FOR CARLOS GUSTAVO MACHADO GOMEZ:

4
          LAW OFFICES OF MARK E. OVERLAND
5         By:  MARK E. OVERLAND
               Attorney at Law
6         100 Wilshire Boulevard
          Suite 950
7         Santa Monica, California 90401
          (310) 459-2830
8
          - AND -
9
          SCHEPER KIM & HARRIS LLP
10        BY:  ALEXANDER H. COTE
               Attorney at Law
11        601 West 5th Street
          12th Floor
12        Los Angeles, California 90071
          (213) 613-4660
13

14

15
     ALSO PRESENT:
16
          MGA ENTERTAINMENT, INC.
17        BY:  JEANINE PISONI
               Attorney at Law
18        16360 Roscoe Boulevard
          Suite 105
19        Van Nuys, California 91406

20
          ROBERT ECKERT, Mattel CEO
21
          ISAAC LARIAN, MGA CEO
22
          KEN KOTARSKI, Mattel Technical Operator
23
          MIKE STOVALL, MGA Technical Operator
24
          RACHEL JUAREZ, Quinn Emanuel Urquhart, Oliver &
25                         Hedges

1                          **I N D E X**

2  **WITNESSES**              **DIRECT  CROSS  REDIRECT  RECROSS**

3  CUNNINGHAM, Lloyd

4  By Ms. Hurst                        6              36

5  By Mr. Quinn                               30

6

7  O'CONNOR, Victoria

8  By Mr. Quinn             45

9  By Ms. Keller                 106

10

11                          **EXHIBITS**

12  **EXHIBIT NO.**                **IDENTIFICATION   IN EVIDENCE**

13   7055    E-mail between                    104
            Mr. Larian and
14           Ms. O'Connor dated
            10/23/2002
15
     9257    E-mail chain between              75
16           Ms. O'Connor and
            Mr. Rosenbaum dated
17           9/26/2000

18   9258    E-mail chain between              72
            Ms. O'Connor and
19           Mr. Rosenbaum dated
            9/19/2000
20
    13383    Fax cover sheet from             94
21           Ms. O'Connor to
            Ms. Glaser
22
    15493    E-mail from                      139
23           Mr. Rosenbaum to
            Mr. Bryant dated
24           9/19/2000

25

Case 2:04-cv-09049-DOC-RNB   Document 9808   Filed 02/07/11   Page 5 of 144   Page ID #:295555
CV 04-9049 DOC - 2/4/2011 - Day 13, Volume 1 of 3

5

| | **EXHIBITS (Continued)** | | |
|---|---|---|---|
| 1 | | | |
| 2 | **EXHIBIT NO.** | **IDENTIFICATION** | **IN EVIDENCE** |
| 3 | 16788 | E-mail from Mr. Larian to Ms. O'Connor dated 9/13/2000 | 65 |
| 4 | | | |
| 5 | 16995 | Microsoft Outlook meeting request | 58 |
| 6 | | | |
| 7 | 17236 | E-mail from Mr. Rosenbaum to Ms. Wang dated 10/4/2000 | 86 |
| 8 | | | |
| 9 | 18463 | E-mail chain between Ms. O'Connor and Mr. Rosenbaum dated 9/28/2000 | 78 |
| 10 | | | |
| 11 | 23512 | E-mail dated 3/15/2002 | 101 |
| 12 | 23855 | E-mail chain between Ms. O'Connor and Mr. Rosenbaum | 68 |
| 13 | | | |
| 14 | 23944 | Demonstrative exhibit | 9 |
| 15 | 41001 | Lift of 5-39 | 9 |
| 16 | 41002 | Lift of 5-40 | 9 |
| 17 | 41003 | Lift of 5-41 | 9 |
| 18 | 41004 | Lift of 5-42 | 9 |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

|       |    | **SANTA ANA, CALIFORNIA, FRIDAY, FEBRUARY 4, 2011** |
|-------|----|----|

|       | 1  | **SANTA ANA, CALIFORNIA, FRIDAY, FEBRUARY 4, 2011** |
|       | 2  | **Day 13, Volume 1 of 3** |
|       | 3  | (8:37 a.m.) |
| 08:23 | 4  | *(In the presence of the jury.)* |
| 08:37 | 5  | THE COURT:  All right.  The jury's present.  All |
| 08:37 | 6  | counsel are present.  The parties are present.  And the |
| 08:37 | 7  | witness is present. |
| 08:37 | 8  | Sir, if you would be seated.  Thank you. |
| 10:21 | 9  | **LLOYD CUNNINGHAM, MATTEL'S WITNESS, PREVIOUSLY SWORN** |
| 10:21 | 10 | **RESUMED THE STAND** |
| 08:37 | 11 | THE COURT:  This is continued direct examination |
| 08:37 | 12 | by Ms. Hurst on behalf of Mr. Larian and MGA. |
| 08:37 | 13 | MS. HURST:  Good morning. |
| 08:37 | 14 | **CROSS-EXAMINATION (Continued)** |
| 08:37 | 15 | BY MS. HURST: |
| 08:37 | 16 | Q.   Good morning, Mr. Cunningham. |
| 08:37 | 17 | A.   Good morning. |
| 08:37 | 18 | Q.   Let me know if you need to take a break at any time. |
| 08:37 | 19 | A.   Thank you. |
| 08:37 | 20 | Q.   I'm going to move on to the portion of your opinions |
| 08:38 | 21 | concerning the indentation lifts.  Do you recall that |
| 08:38 | 22 | testimony? |
| 08:38 | 23 | A.   I do, ma'am. |
| 08:38 | 24 | Q.   And you used a machine called -- let me make sure I get |
| 08:38 | 25 | this right -- indentation materializer; is that correct? |

Case 2:04-cv-09049-DOC-RNB   Document 9808   Filed 02/07/11   Page 7 of 144   Page ID #:295557
CV 04-9049 DOC - 2/4/2011 - Day 13, Volume 1 of 3

7

| 08:38 | 1 | A.   That's correct. |
| 08:38 | 2 | Q.   And you showed us two of the lifts that you had made, |
| 08:38 | 3 | Exhibits 13634 and -635? |
| 08:38 | 4 | A.   Yes. |
| 08:38 | 5 | Q.   Now, you said that you had examined eight or nine boxes |
| 08:38 | 6 | of documents, correct? |
| 08:38 | 7 | A.   Yes. |
| 08:38 | 8 | Q.   And your purpose of examination was to look for things |
| 08:38 | 9 | related to the doll drawings, correct? |
| 08:38 | 10 | A.   Well, that wouldn't be accurate, ma'am. |
| 08:38 | 11 | Q.   Okay.  So you were really looking for Bratz |
| 08:38 | 12 | doll-related items? |
| 08:38 | 13 | A.   That's correct. |
| 08:38 | 14 | Q.   But in doing so, you looked at the drawings 5-39, 5-40, |
| 08:39 | 15 | 5-41 and 5-42, correct? |
| 08:39 | 16 | A.   Yes. |
| 08:39 | 17 | Q.   And, in fact, you made lifts of those original pages, |
| 08:39 | 18 | at least two of which in your opinion came from the black |
| 08:39 | 19 | notebook, correct? |
| 08:39 | 20 | A.   Yes. |
| 08:39 | 21 | Q.   All right.  Do you have your folder of lifts up there? |
| 08:39 | 22 | MS. HURST:  Actually, the originals -- Kieran, the |
| 08:39 | 23 | Redweld, the originals. |
| 08:39 | 24 | *(Document provided to the witness.)* |
| 08:39 | 25 | THE WITNESS:  I do now. |

| | | |
|---|---|---|
| 08:39 | 1 | BY MS. HURST: |
| 08:39 | 2 | Q.   All right.  And I have premarked for our convenience |
| 08:39 | 3 | four of your lifts in addition to those two that you've |
| 08:39 | 4 | previously described. |
| 08:39 | 5 |     Do you have before you Exhibits 41001, 41002, 41003, |
| 08:40 | 6 | and 41004? |
| 08:40 | 7 | A.   Yes. |
| 08:40 | 8 | Q.   All right.  And are all of those lifts that you made in |
| 08:40 | 9 | the course of your expert work in connection with this |
| 08:40 | 10 | matter? |
| 08:40 | 11 | A.   Yes. |
| 08:40 | 12 | Q.   And 41001, that's a lift of "Bryant 179"; is that |
| 08:40 | 13 | correct? |
| 08:40 | 14 | A.   Yes. |
| 08:40 | 15 | Q.   And that's the same thing as trial Exhibit 5-39; is |
| 08:40 | 16 | that correct? |
| 08:40 | 17 | A.   Yes. |
| 08:40 | 18 | Q.   And is it all right with you if I call that "Lupe" |
| 08:40 | 19 | 'cause sometimes these numbers are hard to keep track of. |
| 08:40 | 20 | A.   If I can remember the names.  I never associated the |
| 08:40 | 21 | documents by name. |
| 08:40 | 22 | Q.   I'll try to use both.  Is that all right? |
| 08:40 | 23 | A.   That's fine. |
| 08:40 | 24 | Q.   All right.  So 41001 is your lift of the original page |
| 08:40 | 25 | of 5-39, which is the same as Bryant 179, which is "Lupe." |

Case 2:04-cv-09049-DOC-RNB  Document 9808  Filed 02/07/11  Page 9 of 144  Page ID #:295559
CV 04-9049 DOC - 2/4/2011 - Day 13, Volume 1 of 3

9

| | | |
|---|---|---|
| 08:41 | 1 | Okay?  Is that right? |
| 08:41 | 2 | A.    Yes. |
| 08:41 | 3 | MS. HURST:  Okay.  Your Honor, I move the |
| 08:41 | 4 | admission of 41001. |
| 08:41 | 5 | THE COURT:  Any objection? |
| 08:41 | 6 | MR. QUINN:  No objection. |
| 08:41 | 7 | THE COURT:  Received. |
| 08:41 | 8 | *(Exhibit No. 41001 received in evidence.)* |
| 08:41 | 9 | THE COURT:  And how about 41002, -3 and -4?  Do |
| 08:41 | 10 | you -- |
| 08:41 | 11 | MS. HURST:  Yes, I -- I am. |
| 08:41 | 12 | MR. QUINN:  No objection. |
| 08:41 | 13 | THE COURT:  Received. |
| 08:41 | 14 | *(Exhibit No. 41002 received in evidence.)* |
| 08:41 | 15 | *(Exhibit No. 41003 received in evidence.)* |
| 08:41 | 16 | *(Exhibit No. 41004 received in evidence.)* |
| 08:41 | 17 | THE COURT:  Any objection to the demonstrative |
| 08:41 | 18 | coming from yesterday, Counsel? |
| 08:41 | 19 | MS. HURST:  No.  That's fine, Your Honor. |
| 08:41 | 20 | THE COURT:  Counsel? |
| 08:41 | 21 | MR. QUINN:  No. |
| 08:41 | 22 | THE COURT:  Received, the demonstrative, which |
| 08:41 | 23 | was, just for everybody's recollection, 23944. |
| 08:41 | 24 | *(Exhibit No. 23944 received in evidence.)* |
| 08:41 | 25 | THE COURT:  All right.  Ms. Hurst, if you would |

CV 04-9049 DOC - 2/4/2011 - Day 13, Volume 1 of 3

10

| 08:41 | 1 | like to continue. |
| 08:41 | 2 | MS. HURST:  Thank you, Your Honor. |
| 08:41 | 3 | BY MS. HURST: |
| 08:41 | 4 | Q.   Now, 41002, do you have that with you, Mr. Cunningham? |
| 08:41 | 5 | A.   Yes, I do. |
| 08:41 | 6 | Q.   All right.  And that's your lift of Bryant 180; is that |
| 08:41 | 7 | correct? |
| 08:41 | 8 | A.   Yes. |
| 08:41 | 9 | Q.   And that's also trial Exhibit 5-40, correct? |
| 08:42 | 10 | A.   Yes. |
| 08:41 | 11 | Q.   I'm going to call that one "Hallidae." |
| 08:42 | 12 | And I made some notes on my pad there to correlate this |
| 08:42 | 13 | all together.  Maybe that would be helpful for you and the |
| 08:42 | 14 | jury if you want to refer to this at any time. |
| 08:42 | 15 | Now, next you have before you 41003; is that correct? |
| 08:42 | 16 | A.   Yes. |
| 08:42 | 17 | Q.   And that is your lift of Bryant 181, correct? |
| 08:42 | 18 | A.   Yes. |
| 08:42 | 19 | Q.   And that also corresponds to trial Exhibit 5-41? |
| 08:42 | 20 | A.   Yes. |
| 08:42 | 21 | Q.   And I'm just gonna -- if you look at my notes, and if |
| 08:42 | 22 | we talk -- if I talk about "Jade," I'm gonna talk about Jade |
| 08:42 | 23 | being Exhibit 5-41.  Okay? |
| 08:42 | 24 | A.   Yes. |
| 08:42 | 25 | Q.   All right.  Now, you've got one more up there, which is |

| | | |
|---|---|---|
| 08:43 | 1 | Exhibit 41004; is that right? |
| 08:43 | 2 | A.   Yes. |
| 08:43 | 3 | Q.   And this is your lift of Bryant 182, correct? |
| 08:43 | 4 | A.   Yes. |
| 08:43 | 5 | Q.   And that is also -- this corresponds to trial |
| 08:43 | 6 | Exhibit 5-42, correct? |
| 08:43 | 7 | A.   Yes. |
| 08:43 | 8 | Q.   And that is -- I'm gonna refer to that as "Zoe."  All |
| 08:43 | 9 | right? |
| 08:43 | 10 | A.   Okay. |
| 08:43 | 11 | MS. HURST:  Now, I'm going to ask my able |
| 08:43 | 12 | assistant, Ms. Kieckhefer, to bring me those originals so I |
| 08:43 | 13 | can use them on the ELMO up here. |
| 08:43 | 14 | *(Assistant complies.)* |
| 08:43 | 15 | BY MS. HURST: |
| 08:43 | 16 | Q.   While she's doing that.  Mr. Cunningham, do you have |
| 08:43 | 17 | before you the two original notebook pages that are trial |
| 08:43 | 18 | Exhibits 15333 and 15393?  They're two sketches of child |
| 08:43 | 19 | figures with some language on them. |
| 08:43 | 20 | *(Documents provide to the witness.)* |
| 08:43 | 21 | THE WITNESS:  Yes. |
| 08:44 | 22 | BY MS. HURST: |
| 08:44 | 23 | Q.   Now, 15393 I'm showing on the ELMO right now; is that |
| 08:44 | 24 | correct? |
| 08:44 | 25 | *(Document displayed.)* |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 2/4/2011 - Day 13, Volume 1 of 3

12

| | | |
|---|---|---|
| 08:44 | 1 | THE WITNESS:  Yes. |
| 08:44 | 2 | BY MS. HURST: |
| 08:44 | 3 | Q.   And that's the "Best of luck" greeting card sketch.  Do |
| 08:44 | 4 | you mind if I call it that? |
| 08:44 | 5 | A.   That's fine. |
| 08:44 | 6 | Q.   All right.  And you've seen that before, right? |
| 08:44 | 7 | A.   I have. |
| 08:44 | 8 | Q.   And the original of that was something that you |
| 08:44 | 9 | examined in connection with your work, correct? |
| 08:44 | 10 | A.   Yes. |
| 08:44 | 11 | Q.   And you saw it at the prior trial as well, true? |
| 08:44 | 12 | A.   The prior proceeding. |
| 08:44 | 13 | Q.   You also have up there 15333, which I'm displaying on |
| 08:44 | 14 | the ELMO. |
| 08:44 | 15 | *(Document displayed.)* |
| 08:44 | 16 | BY MS. HURST: |
| 08:44 | 17 | Q.   Do you see that? |
| 08:44 | 18 | A.   Yes. |
| 08:44 | 19 | Q.   And the original of that is another of the notebook |
| 08:44 | 20 | pages that you examined, correct? |
| 08:44 | 21 | A.   Yes. |
| 08:44 | 22 | Q.   And that's the -- just gonna refer to that as the |
| 08:45 | 23 | "Whenever I need you" greeting card sketch, okay? |
| 08:45 | 24 | A.   Yes. |
| 08:45 | 25 | Q.   All right.  Now, on 13634, that's your lift of page 61 |

| | | |
|---|---|---|
| 08:45 | 1 | in the notebook. |
| 08:45 | 2 | *(Document displayed.)* |
| 08:45 | 3 | BY MS. HURST: |
| 08:45 | 4 | Q.   Is that right? |
| 08:45 | 5 | A.   Yes. |
| 08:45 | 6 | Q.   And you said that you could see some figures on there |
| 08:45 | 7 | as well; is that right? |
| 08:45 | 8 | A.   Yes. |
| 08:45 | 9 | Q.   And, in fact, the figures that you see on that lift of |
| 08:45 | 10 | page 61 -- in addition to the Bratz or the doll drawing or |
| 08:45 | 11 | whatever you want to call 'em -- figures -- come from an |
| 08:45 | 12 | inverted version of 15393, the "Best of Luck" sketch; is |
| 08:46 | 13 | that correct? |
| 08:46 | 14 | A.   Yes. |
| 08:46 | 15 | Q.   All right.  So I'm gonna put an inverted version of |
| 08:46 | 16 | that -- "inverted" means it's on the back of the page, |
| 08:46 | 17 | right? |
| 08:46 | 18 | A.   It was indented into the back of the page. |
| 08:46 | 19 | Q.   All right.  And that would be consistent with -- do you |
| 08:46 | 20 | have 15393 there, the original? |
| 08:46 | 21 | A.   Yes. |
| 08:46 | 22 | Q.   Could you hold that up for the jury? |
| 08:46 | 23 | A.   (Witness complies.) |
| 08:46 | 24 | Q.   And would you show the jury that there's writing on |
| 08:46 | 25 | both sides of that page? |

CV 04-9049 DOC - 2/4/2011 - Day 13, Volume 1 of 3

14

| | | |
|---|---|---|
| 08:46 | 1 | A.   Yes. |
| 08:46 | 2 | Q.   And the "Best of Luck" writing is on the back of the |
| 08:46 | 3 | page; is that right? |
| 08:46 | 4 | A.   That's correct. |
| 08:46 | 5 | Q.   So finding an inverted image on page 61 of the |
| 08:46 | 6 | notebook, which is 13634, would be consistent with the |
| 08:46 | 7 | notion that the "Best of Luck" sketch was behind that page |
| 08:46 | 8 | in the notebook.  The notebook was opened and the sketch was |
| 08:46 | 9 | made on the back of the page; is that correct? |
| 08:47 | 10 | A.   Sketch was made on a page that was resting on the back |
| 08:47 | 11 | of the page. |
| 08:47 | 12 | Q.   On the back? |
| 08:47 | 13 | A.   Yes. |
| 08:47 | 14 | Q.   And that would also be consistent with both pages in |
| 08:47 | 15 | the notebook -- the notebook opened, drawing on the back of |
| 08:47 | 16 | the page, correct? |
| 08:47 | 17 | A.   Not drawing on the back of the page.  If you're |
| 08:47 | 18 | referring to page 61, there was another page behind 61.  And |
| 08:47 | 19 | on the page behind 61, on the back of that page -- |
| 08:47 | 20 | Q.   Yes? |
| 08:47 | 21 | A.   -- this drawing, it may not have been one page behind. |
| 08:47 | 22 | It could have been one or two or maybe even three pages |
| 08:47 | 23 | behind. |
| 08:47 | 24 | Q.   Up to three pages behind? |
| 08:47 | 25 | A.   I would say that's a fair estimate. |

DEBBIE GALE, U.S. COURT REPORTER

| 08:47 | 1 | Q.   But it's consistent with it being in the notebook, the |
| 08:47 | 2 | notebook open, and drawing the "Best of Luck" on the reverse |
| 08:47 | 3 | side of the page as you see in the original, correct? |
| 08:47 | 4 | A.   That's correct. |
| 08:47 | 5 | MS. HURST:  Okay.  So then I just want to show |
| 08:47 | 6 | this. |
| 08:48 | 7 | *(Document displayed.)* |
| 08:48 | 8 | BY MS. HURST: |
| 08:48 | 9 | Q.   What I've got here on the ELMO is an inverted version |
| 08:48 | 10 | of 15393, imagining that you've taken the image through the |
| 08:48 | 11 | back of the page. |
| 08:48 | 12 | Do you see that? |
| 08:48 | 13 | A.   I do. |
| 08:48 | 14 | Q.   All right.  Now, this is a little difficult to see. |
| 08:48 | 15 | I'm gonna do my best here. |
| 08:48 | 16 | Now, you see here on the left?  This is page 61, right? |
| 08:48 | 17 | A.   Yes. |
| 08:48 | 18 | Q.   And that's the child figure, correct? |
| 08:48 | 19 | A.   Yes. |
| 08:48 | 20 | Q.   And the umbrella there? |
| 08:48 | 21 | A.   Yes. |
| 08:48 | 22 | Q.   And that matches over here with 15393, the child figure |
| 08:48 | 23 | and the umbrella, right? |
| 08:48 | 24 | A.   Yes. |
| 08:48 | 25 | Q.   And there's a whole square outline here, as well? |

Case 2:04-cv-09049-DOC-RNB   Document 9808   Filed 02/07/11   Page 16 of 144   Page ID #:295566
CV 04-9049 DOC - 2/4/2011 - Day 13, Volume 1 of 3

16

| | | |
|---|---|---|
| 08:48 | 1 | A.   Yes. |
| 08:48 | 2 | Q.   And that matches with this square outline as well, |
| 08:49 | 3 | correct? |
| 08:49 | 4 | A.   Yes. |
| 08:49 | 5 | Q.   And if we scoot over here, you can see the fishing |
| 08:49 | 6 | pole; is that right? |
| 08:49 | 7 | A.   Yes. |
| 08:49 | 8 | Q.   And the fishing pole is here, too?  And again, each |
| 08:49 | 9 | time I'm comparing 13634 and 13593, correct? |
| 08:49 | 10 | A.   Yes. |
| 08:49 | 11 | Q.   And there's a cloud here that you can see, as well; is |
| 08:49 | 12 | that correct? |
| 08:49 | 13 | A.   Yes. |
| 08:49 | 14 | Q.   And you can see the inverted cloud from 13634 also on |
| 08:49 | 15 | 13593, correct? |
| 08:49 | 16 | A.   Yes. |
| 08:49 | 17 | Q.   All right.  And it's true in your view that -- well, |
| 08:49 | 18 | strike that.  Let me start over. |
| 08:49 | 19 |      Now, on 13634 the indentations that you talked about |
| 08:49 | 20 | were of the female figural drawing, correct? |
| 08:49 | 21 | A.   Yes, 5-42. |
| 08:49 | 22 | Q.   5-42, which corresponds to Zoe, right? |
| 08:50 | 23 | A.   I believe so. |
| 08:50 | 24 |           *(Document displayed.)* |
| | 25 | |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 2/4/2011 - Day 13, Volume 1 of 3

17

| | | |
|---|---|---|
| 08:50 | 1 | BY MS. HURST: |
| 08:50 | 2 | Q.   Zoe.  That one, right? |
| 08:50 | 3 | A.   Yes. |
| 08:50 | 4 | Q.   And what all this means -- and it was your opinion, by |
| 08:50 | 5 | the way, that you could make a positive opinion that Zoe was |
| 08:50 | 6 | in the notebook, right? |
| 08:50 | 7 | A.   Yes. |
| 08:50 | 8 | Q.   And page 61 was in the notebook, right? |
| 08:50 | 9 | A.   Page 61 still is in the notebook. |
| 08:50 | 10 | Q.   Still is in the notebook, right? |
| 08:50 | 11 | A.   Yes. |
| 08:50 | 12 | Q.   So you would agree, then, that also at some point, |
| 08:50 | 13 | 15393 was in the notebook, correct? |
| 08:50 | 14 | A.   Yes, possibly. |
| 08:50 | 15 | Q.   All right.  At least, it was in proximity to page 61 in |
| 08:50 | 16 | an inverted manner at some point in time, correct? |
| 08:50 | 17 | A.   Yes. |
| 08:50 | 18 | Q.   All right.  So if you were trying to sequence these, |
| 08:50 | 19 | would you agree with me that it would be reasonable to |
| 08:50 | 20 | believe that it was Zoe, then blank page 61, not necessarily |
| 08:50 | 21 | next to each other, and then 15393, again not necessarily |
| 08:51 | 22 | next to each other, but within three pages; is that correct? |
| 08:51 | 23 | A.   No. |
| 08:51 | 24 | Q.   Why not? |
| 08:51 | 25 | A.   There's no standard rule that an individual has to |

CV 04-9049 DOC - 2/4/2011 - Day 13, Volume 1 of 3

18

| | | |
|---|---|---|
| 08:51 | 1 | write on pages in the 1, 2, 3, 4, 5 sequence through a page. |
| 08:51 | 2 | An individual can skip around within a notebook and |
| 08:51 | 3 | make certain entries or drawings. |
| 08:51 | 4 | Q.   In fact, that's what Mr. Bryant testified, as to the |
| 08:51 | 5 | manner in which he used his notebook; isn't that right? |
| 08:51 | 6 | A.   I -- I don't know. |
| 08:51 | 7 | Q.   And that's because you were not present for his |
| 08:51 | 8 | testimony the last few days; is that right? |
| 08:51 | 9 | A.   That's correct. |
| 08:51 | 10 | Q.   All right.  Now, the other lift that you discussed in |
| 08:51 | 11 | your examination, that was 13635.  And you said that that |
| 08:51 | 12 | corresponded to page 63 of the black notebook; is that |
| 08:52 | 13 | right? |
| 08:52 | 14 | (Document displayed.) |
| 08:52 | 15 | BY MS. HURST: |
| 08:52 | 16 | Q.   This is the one with the eyes? |
| 08:52 | 17 | A.   Oh, yes. |
| 08:52 | 18 | Q.   You see the eyes? |
| 08:52 | 19 | A.   Yeah.  I wasn't able to see it on the screen until you |
| 08:52 | 20 | just moved it.  Yes. |
| 08:52 | 21 | Q.   And that's 13635.  It's got the eyes on it, right? |
| 08:52 | 22 | A.   Yes. |
| 08:52 | 23 | Q.   And the opinion you offered yesterday was that that was |
| 08:52 | 24 | an indentation from 5-39, which is Lupe, correct? |
| 08:52 | 25 | A.   Yes, if Lupe is the name. |

| | | |
|---|---|---|
| 08:52 | 1 | Q.   So -- now pages 61 and 63, those are just -- that's |
| 08:52 | 2 | just a numbering scheme of the black notebook that we've |
| 08:52 | 3 | used for convenience here in Court, correct? |
| 08:52 | 4 | A.   Correct. |
| 08:52 | 5 | Q.   And do you have that numbered-page set of the black |
| 08:52 | 6 | notebook there in front of you there? |
| 08:52 | 7 | A.   I have copies. |
| 08:52 | 8 | Q.   And would you turn to 1155-C-61. |
| 08:53 | 9 | A.   I have it. |
| 08:53 | 10 | Q.   All right.  It's the page immediately after the second |
| 08:53 | 11 | divider in the three-subject notebook; is that right? |
| 08:53 | 12 | A.   Yes, in the divider, in the page directly after. |
| 08:53 | 13 | Q.   Okay.  And then page 62, in that numbered version of |
| 08:53 | 14 | the exhibit, that's actually the backside of the same page, |
| 08:53 | 15 | right? |
| 08:53 | 16 | A.   Yes. |
| 08:53 | 17 | Q.   So, in fact, 61 and 63 are resting right next to each |
| 08:53 | 18 | other in the original notebook, in the numbering scheme that |
| 08:53 | 19 | we've used here in court; is that correct? |
| 08:53 | 20 | A.   That's correct. |
| 08:53 | 21 | Q.   Okay.  So 61 and 63 are together in this separate, |
| 08:53 | 22 | third section of this three-subject notebook, correct? |
| 08:53 | 23 | A.   Correct. |
| 08:53 | 24 | Q.   Now, when you examined the original of this notebook, |
| 08:53 | 25 | before you took indentations, you first examined it with a |

CV 04-9049 DOC - 2/4/2011 - Day 13, Volume 1 of 3

20

| | | |
|---|---|---|
| 08:54 | 1 | light, correct? |
| 08:54 | 2 | A.   Well, that's partially, correct. |
| 08:54 | 3 | Q.   You went through the notebook page by page, examining |
| 08:54 | 4 | it with some form of light to see, first, whether you could |
| 08:54 | 5 | see any relevant indentations; is that right? |
| 08:54 | 6 | A.   Yes.  I went through with oblique, or side-lighting, |
| 08:54 | 7 | with a fiber optics lighting source and magnification. |
| 08:54 | 8 | Q.   Okay.  And you did all that before you took a lift, |
| 08:54 | 9 | right? |
| 08:54 | 10 | A.   That's correct. |
| 08:54 | 11 | Q.   And you went through page by page with all of those |
| 08:54 | 12 | light sources, right? |
| 08:54 | 13 | A.   Yes. |
| 08:54 | 14 | Q.   And then the first relevant lift that you found was |
| 08:54 | 15 | that page after the divider, correct? |
| 08:54 | 16 | A.   Correct. |
| 08:54 | 17 | Q.   All right.  Now, on 13635, which is page 63 -- which we |
| 08:54 | 18 | now know is also the second page after the divider, correct? |
| 08:55 | 19 | A.   Yes. |
| 08:55 | 20 | Q.   There's some indentations in addition to the Lupe eyes; |
| 08:55 | 21 | is that correct? |
| 08:55 | 22 | A.   Yes. |
| 08:55 | 23 | Q.   And one of those indentations, in addition to the Lupe |
| 08:55 | 24 | eyes, is this word "whenever" over here, right? |
| 08:55 | 25 | A.   Yes. |

Case 2:04-cv-09049-DOC-RNB   Document 9808   Filed 02/07/11   Page 21 of 144   Page ID #:295571
CV 04-9049 DOC - 2/4/2011 - Day 13, Volume 1 of 3

21

| | | |
|---|---|---|
| 08:55 | 1 | (Documents displayed.) |
| 08:55 | 2 | BY MS. HURST: |
| 08:55 | 3 | Q.   And that corresponds to the word "whenever" on the |
| 08:55 | 4 | greeting card sketch in 15333, correct? |
| 08:55 | 5 | A.   Yes. |
| 08:55 | 6 | Q.   And, in fact, it's your opinion that you expressed in |
| 08:55 | 7 | your report that 15333, which is also 2692, is positively |
| 08:55 | 8 | indented on 13635, which is the second blank page after the |
| 08:55 | 9 | divider, page 63, right? |
| 08:55 | 10 | A.   Yes. |
| 08:55 | 11 | Q.   Now, you can't tell us, which -- between the "Whenever |
| 08:55 | 12 | I need you" sketch, greeting card sketch, and the Lupe, |
| 08:55 | 13 | 5-39 -- you can't tell us right now what order those were in |
| 08:55 | 14 | above the blank page, page 63; is that right? |
| 08:56 | 15 | A.   No. |
| 08:56 | 16 | Q.   No, it's not right?  Or I am correct? |
| 08:56 | 17 | A.   You better rephrase the question. |
| 08:56 | 18 | Q.   Can you tell us right now in what order 5-39, the Lupe |
| 08:56 | 19 | sketch, and 15333 were above the blank page 63, which is |
| 08:56 | 20 | also 13635? |
| 08:56 | 21 | A.   Pardon me.  But I have to know what you mean by the |
| 08:56 | 22 | word "order." |
| 08:56 | 23 | Q.   Which one was resting on top. |
| 08:56 | 24 | A.   Of each other? |
| 08:56 | 25 | Q.   Yes. |

| 08:56 | 1 | A. No, I don't know. |
| 08:56 | 2 | Q. Um, don't know that? |
| 08:56 | 3 | A. No. |
| 08:56 | 4 | Q. Okay. Thank you. |
| 08:56 | 5 | Now, after finding your indentations on pages 61 and |
| 08:56 | 6 | 63, the blank pages of the notebook, did you go back and |
| 08:56 | 7 | look at the lifts of all four of the doll drawings to |
| 08:56 | 8 | determine whether you could find them in relation to one |
| 08:56 | 9 | another? |
| 08:57 | 10 | A. I believe I did. I don't recall. |
| 08:57 | 11 | Q. Let's start with your lift of Lupe, which is -- this is |
| 08:57 | 12 | your lift of 5-39, correct? |
| 08:57 | 13 | A. Yes. |
| 08:57 | 14 | *(Document displayed.)* |
| 08:57 | 15 | BY MS. HURST: |
| 08:57 | 16 | Q. You see there's a figure a child figure there? |
| 08:57 | 17 | A. Yes. |
| 08:57 | 18 | Q. And some clouds? |
| 08:57 | 19 | A. Yes. |
| 08:57 | 20 | Q. And do you see the "Whenever I need you" writing there? |
| 08:57 | 21 | A. Yes. |
| 08:57 | 22 | Q. And "There you are" writing, also? |
| 08:57 | 23 | A. Yes. |
| 08:57 | 24 | Q. And that's all on 41001, correct? |
| 08:57 | 25 | A. Yes. |

Case 2:04-cv-09049-DOC-RNB   Document 9808   Filed 02/07/11   Page 23 of 144   Page ID #:295573
CV 04-9049 DOC - 2/4/2011 - Day 13, Volume 1 of 3

23

08:57  1    Q.   And now I'm gonna show you again -- and that's -- what

08:57  2    you're seeing there is the indentations on 41001, which is

08:58  3    blank page -- which is your indentation of the Exhibit 5-39,

08:58  4    the Lupe sketch, correct?

08:58  5    A.   Yes.

08:58  6    Q.   And those indentations correspond to 15333, the

08:58  7    greeting card, "Whenever I need you," sketch, correct?

08:58  8    A.   They appear to, yes.

08:58  9    Q.   All right.  So that would suggest that, in relation to

08:58  10   one another, 15333 was on top of Lupe, 5-39, when drawn,

08:58  11   correct?

08:58  12   A.   Yes.

08:58  13   Q.   All right.  Certainly the greeting card sketch and Lupe

08:58  14   were in proximity to one another when the greeting card

08:58  15   sketch was drawn, correct?

08:58  16   A.   Yes.

08:59  17   Q.   Now, let me show you -- this one is 41002.

08:59  18   BY MS. HURST:

08:59  19   Q.   Do you see that?

08:59  20   A.   I do.

08:59  21   Q.   And this is your lift of 5-40, which is Hallidae,

08:59  22   right?

08:59  23   A.   Um, yes, if that's the name.

08:59  24   Q.   Okay.  Now, in addition to the figure there that you

08:59  25   can see with the aqueous -- you can see the figure, which is

CV 04-9049 DOC - 2/4/2011 - Day 13, Volume 1 of 3

24

| 08:59 | 1 | the aqueous ink that was actually on the page, which shows |
| 08:59 | 2 | up on the lift, right? |
| 09:00 | 3 | A.   Yes.  It shows as a negative image. |
| 09:00 | 4 | Q.   And down here, can you see that there's a tracing of a |
| 09:00 | 5 | curlicue a number of curlicues there? |
| 09:00 | 6 | A.   Yes. |
| 09:00 | 7 | Q.   Now, I want you to look at 5-41, which is Jade.  Do you |
| 09:00 | 8 | have that? |
| 09:00 | 9 | A.   I do. |
| 09:00 | 10 | Q.   And I think you described this yesterday.  5-41 has two |
| 09:00 | 11 | kinds of drawing on it; is that right? |
| 09:00 | 12 | A.   It was drawn with two different types of pens. |
| 09:00 | 13 | Q.   One was a ballpoint pen, right? |
| 09:00 | 14 | A.   Yes. |
| 09:00 | 15 | Q.   And the ballpoint pen, there's a bunch of curlicue |
| 09:00 | 16 | writing on Jade, right? -- on the pants legs. |
| 09:00 | 17 | A.   Yes. |
| 09:00 | 18 | Q.   And, in fact, if you look at this dip here on 41002, |
| 09:00 | 19 | and this dip here on Bryant 181, that appears to be a match, |
| 09:00 | 20 | doesn't it? |
| 09:01 | 21 | A.   It appears similar, but I can't say it's a match |
| 09:01 | 22 | without doing a detailed examination. |
| 09:01 | 23 | Q.   All right.  Well, let's look closer. |
| 09:01 | 24 | *(Document displayed.)* |
| | 25 | |

CV 04-9049 DOC - 2/4/2011 - Day 13, Volume 1 of 3

25

09:01   1    BY MS. HURST:

09:01   2    Q.   Up here at the top of 41002, you found a face, right?

09:01   3    A.   Yes.

09:01   4    Q.   See that face?

09:01   5    A.   I did.

09:01   6    Q.   And you found that face, and you noted that face in

09:01   7    your report, right?

09:01   8    A.   Yes.

09:01   9         MS. HURST:  And let me just --

09:01   10        (Document displayed.)

09:01   11   BY MS. HURST:

09:01   12   Q.   That appears to be Jade's face from 5-41, doesn't it?

09:01   13   A.   It appears to be a portion of it, but I can't be

09:01   14   absolutely sure, but it does.

09:01   15   Q.   Would it help you if I brought the lift up to look more

09:01   16   closely?

09:01   17   A.   No.  This is fine.

09:01   18   Q.   All right.  Do you have any reason to disagree with me

09:01   19   that that appears to be the ballpoint drawing on Bryant 181,

09:02   20   which is also trial Exhibit 5-41, on 41002, which is your

09:02   21   lift of Hallidae, Exhibit 5-40?

09:02   22   A.   No.  I have no reason not to believe it.

09:02   23   Q.   And that would mean that Jade and Hallidae were in

09:02   24   proximity to one another when they were drawn, or when Jade

09:02   25   was drawn, correct?

CV 04-9049 DOC - 2/4/2011 - Day 13, Volume 1 of 3

26

| | | |
|---|---|---|
| 09:02 | 1 | A.   Yes. |
| 09:02 | 2 | Q.   All right.  Now, I'm gonna show you your lift of 41004. |
| 09:02 | 3 | *(Document displayed.)* |
| 09:02 | 4 | BY MS. HURST: |
| 09:02 | 5 | Q.   Do you see is that? -- your lift -- I'm sorry. |
| 09:02 | 6 | Your lift that I've marked 41004, do you see that? |
| 09:02 | 7 | A.   Yes, I do. |
| 09:02 | 8 | Q.   And this is your lift of Bryant 182, which is also |
| 09:02 | 9 | trial Exhibit 5-42, which I'm calling "Zoe," right? |
| 09:03 | 10 | A.   Yes. |
| 09:03 | 11 | Q.   Now, I'm gonna move this green strip out of the way. |
| 09:03 | 12 | Is that important to your examination at all? |
| 09:03 | 13 | A.   Uh, no. |
| 09:03 | 14 | Q.   It's difficult to see.  Let me know if you need me to |
| 09:03 | 15 | bring it up.  But there's a bunch of indented writing here. |
| 09:03 | 16 | Do you recall finding that earlier? |
| 09:03 | 17 | A.   Yes, possibly.  I don't distinctly recall. |
| 09:03 | 18 | MS. HURST:  I'm gonna bring it up if that's okay, |
| 09:03 | 19 | Your Honor.  This is just really hard to see. |
| 09:03 | 20 | THE COURT:  Sure. |
| 09:03 | 21 | *(Document provided to the witness.)* |
| 09:03 | 22 | BY MS. HURST: |
| 09:03 | 23 | Q.   Do you have the original 41004 with you? |
| 09:04 | 24 | A.   I do. |
| 09:04 | 25 | Q.   And do you see there's some faint indented writing |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC – 2/4/2011 – Day 13, Volume 1 of 3

27

| 09:04 | 1 | there?  It looks like words, right? |
| 09:04 | 2 | A.   It's just remnants of what possibly could be words. |
| 09:04 | 3 | Q.   Okay.  Remnants of words, right? |
| 09:04 | 4 | A.   I said, "possibly could be words." |
| 09:04 | 5 | Q.   All right.  Now, did you make an effort to determine |
| 09:04 | 6 | whether those remnants correspond to the words here, "Plays |
| 09:04 | 7 | bass, studies classical violin and child psychology," on |
| 09:04 | 8 | 5-41? |
| 09:04 | 9 | A.   I -- I may have. |
| 09:04 | 10 | Q.   Is that in your report anywhere that you did that? |
| 09:04 | 11 | A.   I don't know. |
| 09:04 | 12 | Q.   Can you look and see? |
| 09:04 | 13 | A.   Sure. |
| 09:05 | 14 | Q.   On page 3 of your report -- are you there, sir? |
| 09:05 | 15 | A.   Yes, I'm just starting. |
| 09:05 | 16 | Q.   Okay.  Page 3 of your report, you indicated that you |
| 09:05 | 17 | found that you termed "illegible indented handwriting "on |
| 09:05 | 18 | 181; is that correct? |
| 09:05 | 19 | A.   Are we referring to 182 or 181? |
| 09:06 | 20 | Q.   Good question. |
| 09:06 | 21 | 182.  My apologies. |
| 09:06 | 22 | A.   Yes. |
| 09:06 | 23 | Q.   So your report makes no mention of 182; is that right? |
| 09:06 | 24 | A.   I have to keep reading. |
| 09:06 | 25 | Yes.  It mentions 182 on the second to the bottom |

CV 04-9049 DOC – 2/4/2011 – Day 13, Volume 1 of 3

28

| | | |
|---|---|---|
| 09:06 | 1 | paragraph. |
| 09:06 | 2 | Q.   But it doesn't talk about indented writing on 182, |
| 09:06 | 3 | right? |
| 09:06 | 4 | A.   From -- no. |
| 09:06 | 5 | Q.   Okay.  So no mention of indented writing on 182 in your |
| 09:06 | 6 | report, correct? |
| 09:06 | 7 | A.   No. |
| 09:06 | 8 | Q.   So you can't tell us right now whether 180 and 181 -- |
| 09:07 | 9 | whether the writing -- you see those both have writing on |
| 09:07 | 10 | 'em; is that correct? |
| 09:07 | 11 | A.   *(No response.)* |
| 09:07 | 12 | Q.   Both Hallidae and Jade have written descriptions, |
| 09:07 | 13 | correct? |
| 09:07 | 14 | A.   Well, I have to find them first. |
| 09:07 | 15 |      Are you referring to Exhibit 5-41? |
| 09:07 | 16 | Q.   And 5-40. |
| 09:07 | 17 | A.   And 5-40. |
| 09:07 | 18 |      *(Documents displayed.)* |
| 09:07 | 19 | BY MS. HURST: |
| 09:07 | 20 | Q.   Those both have printed handwriting on them, correct? |
| 09:07 | 21 | A.   They both have handwriting, yes. |
| 09:07 | 22 | Q.   And you did not examine that handwriting to see whether |
| 09:07 | 23 | it matches the indentations on 182, did you? |
| 09:07 | 24 | A.   I don't recall if I did. |
| 09:07 | 25 | Q.   If that handwriting -- if there were indentations from |

Case 2:04-cv-09049-DOC-RNB   Document 9808   Filed 02/07/11   Page 29 of 144   Page ID #:295579
CV 04-9049 DOC – 2/4/2011 – Day 13, Volume 1 of 3

29

| | | |
|---|---|---|
| 09:07 | 1 | both of those pages, Hallidae and Lupe, which are –– pardon |
| 09:07 | 2 | me –– Hallidae and Jade –– which are 5-40 and 5-41 –– if |
| 09:07 | 3 | there were indentations from both of those pages on the Zoe |
| 09:08 | 4 | drawing, which is 5-42, then that would indicate that they |
| 09:08 | 5 | were within proximity of one another when the handwriting |
| 09:08 | 6 | was placed on 5-40 and 5-41; isn't that right? |
| 09:08 | 7 | A.   Yes. |
| 09:08 | 8 | Q.   And Mattel never offered your opinions on whether those |
| 09:08 | 9 | things could be found to be in proximity to one another |
| 09:08 | 10 | because of that indented handwriting, did they? |
| 09:08 | 11 | A.   Would you repeat that, please? |
| 09:08 | 12 | Q.   Did Mattel ever ask you to offer any opinion about |
| 09:08 | 13 | whether those three drawings could be found in proximity to |
| 09:08 | 14 | one another because of that partial indented handwriting? |
| 09:08 | 15 | A.   Uh, no. |
| 09:08 | 16 | Q.   Okay.  And that's because that would have corroborated |
| 09:08 | 17 | Mr. Bryant's testimony that he drew all these drawings at |
| 09:08 | 18 | the same time; isn't that right? |
| 09:08 | 19 | A.   No. |
| 09:08 | 20 | Q.   You just didn't figure it out that they were all there |
| 09:08 | 21 | at the same time? |
| 09:08 | 22 | A.   I didn't take it into consideration that the fragmented |
| 09:09 | 23 | handwriting related to that particular document. |
| 09:09 | 24 | Q.   Even though your purpose of examination was to look at |
| 09:09 | 25 | the Bratz doll drawings? |

CV 04-9049 DOC - 2/4/2011 - Day 13, Volume 1 of 3

30

| | | |
|---|---|---|
| 09:09 | 1 | A.   That's correct. |
| 09:09 | 2 | MS. HURST:  All right.  No further questions. |
| 09:09 | 3 | THE COURT:  Redirect by Mr. Quinn on behalf of |
| 09:09 | 4 | Mattel. |
| 09:09 | 5 | **REDIRECT EXAMINATION** |
| 09:09 | 6 | BY MR. QUINN: |
| 09:09 | 7 | Q.   Mr. Cunningham, Ms. Hurst gave you an assignment |
| 09:09 | 8 | yesterday? |
| 09:09 | 9 | A.   Yes. |
| 09:09 | 10 | Q.   She asked you to read the notary public's deposition? |
| 09:09 | 11 | A.   Yes. |
| 09:09 | 12 | Q.   Did you do that? |
| 09:09 | 13 | A.   I did it last night, yes, sir. |
| 09:09 | 14 | Q.   How many pages? |
| 09:09 | 15 | A.   I think it was 199. |
| 09:09 | 16 | Q.   Did you manage to stay awake, or did it put you to |
| 09:10 | 17 | sleep? |
| 09:10 | 18 | A.   It was tough, by I stayed awake. |
| 09:10 | 19 | Q.   She asked you some questions about that and -- um, |
| 09:10 | 20 | Ms. Prince's testimony.  I'd like to follow up and ask some |
| 09:10 | 21 | questions. |
| 09:10 | 22 | A.   Yes. |
| 09:10 | 23 | Q.   I mean, hypothetically speaking, if Ms. Prince, the |
| 09:10 | 24 | notary public, had testified that he wanted some drawings |
| 09:10 | 25 | notarized because he didn't want people -- anyone to think |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 09:10 | 1 | that he had done those while he was at Mattel, would that |
| 09:10 | 2 | affect the opinions that you've given? |
| 09:10 | 3 | A.   No. |
| 09:10 | 4 | Q.   Hypothetically speaking, if Ms. Prince had testified |
| 09:10 | 5 | that she had a social relationship with Carter Bryant, would |
| 09:10 | 6 | that affect any of the opinions that you have given? |
| 09:10 | 7 |         MS. HURST:  Objection.  Vague mischaracterization |
| 09:10 | 8 | of the witness's testimony; that is, Ms. Prince's. |
| 09:10 | 9 |         THE COURT:  Well, Ms. Prince hasn't testified yet, |
| 09:11 | 10 | but you both have apparently read 191 pages.  You two want |
| 09:11 | 11 | to get together?  I don't know whether that's true or not. |
| 09:11 | 12 |         So, Ms. Hurst? |
| 09:11 | 13 |         (To the jury:)  They're discussing this. |
| 09:11 | 14 |         MR. QUINN:  Your Honor, I'm perfectly prepared to |
| 09:11 | 15 | read the page.  I thought, from the Court's instructions, |
| 09:11 | 16 | they should be posed in terms of hypotheticals. |
| 09:11 | 17 |         THE COURT:  They should. |
| 09:11 | 18 |         MR. QUINN:  All right. |
| 09:11 | 19 | BY MR. QUINN: |
| 09:11 | 20 | Q.   Hypothetically speaking, if Ms. Prince had testified |
| 09:11 | 21 | that she had a social relationship with Carter Bryant, would |
| 09:11 | 22 | that affect any of your opinions? |
| 09:11 | 23 | A.   No. |
| 09:11 | 24 | Q.   Hypothetically speaking, if Ms. Prince, the notary, |
| 09:11 | 25 | testified that she loved Carter, thinks he's a good guy, and |

Case 2:04-cv-09049-DOC-RNB   Document 9808   Filed 02/07/11   Page 32 of 144   Page ID #:295582
CV 04-9049 DOC - 2/4/2011 - Day 13, Volume 1 of 3

32

| | | |
|---|---|---|
| 09:11 | 1 | would do anything to help him -- |
| 09:11 | 2 | MS. HURST:  Objection. |
| 09:11 | 3 | BY MR. QUINN: |
| 09:11 | 4 | Q.   -- would that affect any of your opinions? |
| 09:11 | 5 | MS. HURST:  I'm gonna have to ask that Mr. Quinn |
| 09:12 | 6 | be instructed to read the actual testimony -- |
| 09:12 | 7 | MR. QUINN:  I'm happy to do that. |
| 09:12 | 8 | MS. HURST:  -- as part of the hypothetical. |
| 09:12 | 9 | THE COURT:  (To the jury:) Now, we have a |
| 09:12 | 10 | disagreement between counsel. |
| 09:12 | 11 | MR. QUINN:  Stipulation, Your Honor.  I'm prepared |
| 09:12 | 12 | to read the testimony. |
| 09:12 | 13 | THE COURT:  Well, thank you. |
| 09:12 | 14 | (To the jury:) They're arguing now.  They'll stop |
| 09:12 | 15 | that.  Usually, with an expert, a hypothetical is asked. |
| 09:12 | 16 | And, of course, it's difficult for both parties because, |
| 09:12 | 17 | obviously, Ms. Prince will be testifying, and we'll hear |
| 09:12 | 18 | from her probably as early as today, or maybe Tuesday. |
| 09:12 | 19 | If counsel's stipulating that that portion can be |
| 09:12 | 20 | read, then in this situation, Counsel, you may read that |
| 09:12 | 21 | question. |
| 09:12 | 22 | MR. QUINN:  Thank you, Your Honor. |
| 09:12 | 23 | Page 77, lines 8 to 12. |
| 09:12 | 24 | "QUESTION:  And when she asked you whether you |
| 09:12 | 25 | were willing to talk to this other person, what did -- what |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 09:12 | 1 | did you say to that? |
| 09:12 | 2 | "ANSWER:  Sure.  That I love Carter, and I think |
| 09:12 | 3 | he's a good guy, and I would do anything to help him." |
| 09:13 | 4 | BY MR. QUINN: |
| 09:13 | 5 | Q.  Hypothetically speaking, if Ms. Prince testified that |
| 09:13 | 6 | she gave custody of the notary book to MGA's attorneys, |
| 09:13 | 7 | would that affect any of your opinions? |
| 09:13 | 8 | A.  No. |
| 09:13 | 9 | Q.  By the way, are you familiar with the laws in the State |
| 09:13 | 10 | of California in connection with your work? |
| 09:13 | 11 | Have you become familiar with the laws in the State of |
| 09:13 | 12 | California as it relates to what notaries are supposed to do |
| 09:13 | 13 | with their notary books? |
| 09:13 | 14 | A.  Yes.  I've examined dozens of notary book cases. |
| 09:13 | 15 | And, through the course of my employment and my |
| 09:13 | 16 | personal knowledge, once a notary's commission expires and |
| 09:13 | 17 | they don't plan to do any more work in that particular |
| 09:13 | 18 | field, they are ordered to produce the notary book to the |
| 09:13 | 19 | California Secretary of State; in other words, surrender the |
| 09:13 | 20 | notary book to the California Secretary of State. |
| 09:14 | 21 | Q.  Now, if -- going back now to the black notebook, what |
| 09:14 | 22 | was the assignment that you were given concerning that black |
| 09:14 | 23 | notebook? |
| 09:14 | 24 | A.  To examine the notebook to determine if there are any |
| 09:14 | 25 | Bratz dolls or any related information to Bratz dolls. |

CV 04-9049 DOC - 2/4/2011 - Day 13, Volume 1 of 3

34

| | | |
|---|---|---|
| 09:14 | 1 | Q.   And I think you said yesterday that you found lots of |
| 09:14 | 2 | indentations in the pages? |
| 09:14 | 3 | A.   Uh, well, in the pages of the notebook, plus other |
| 09:14 | 4 | documents I examined. |
| 09:14 | 5 | Q.   And most of those indentations did not relate to the |
| 09:14 | 6 | girl figures -- the Bratz dolls?  Excuse me. |
| 09:14 | 7 | A.   Uh, the bulk of the indentations I developed did not |
| 09:14 | 8 | relate to the Bratz dolls. |
| 09:14 | 9 | Q.   All right.  And you were not here for Mr. Bryant's |
| 09:14 | 10 | testimony? |
| 09:14 | 11 | A.   No. |
| 09:14 | 12 | Q.   So you're in no position to judge Mr. Bryant's |
| 09:15 | 13 | credibility about when he drew these figures, the little |
| 09:15 | 14 | boys with rain hats? |
| 09:15 | 15 | A.   No.  I'm not in the position to do any dating of that |
| 09:15 | 16 | nature. |
| 09:15 | 17 | Q.   Dating was not part of your assignment in this case? |
| 09:15 | 18 | A.   It was not. |
| 09:15 | 19 | Q.   And the first time you heard that there was any issue |
| 09:15 | 20 | concerning these figures was after your report had been |
| 09:15 | 21 | completed? |
| 09:15 | 22 | A.   That's correct. |
| 09:15 | 23 | Q.   At the previous trial in this case? |
| 09:15 | 24 | A.   Yes. |
| 09:15 | 25 | Q.   And you have no idea what years Mr. Bryant was drawing |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 09:15 | 1 | these types of figures, the little boys with the rain hats; |
| 09:15 | 2 | is that correct? |
| 09:15 | 3 | A.   No. |
| 09:15 | 4 | Q.   My statement's correct? |
| 09:15 | 5 | A.   Yes. |
| 09:15 | 6 | Q.   Thank you. |
| 09:15 | 7 | MR. QUINN:  One moment, Your Honor. |
| 09:16 | 8 | BY MR. QUINN: |
| 09:16 | 9 | Q.   Forgot to ask you.  I began asking some questions about |
| 09:16 | 10 | Ms. Prince's -- or, if -- hypothetically, if Ms. Prince, the |
| 09:16 | 11 | notary, had testified certain ways, and you said that would |
| 09:16 | 12 | not change your opinion, correct? |
| 09:16 | 13 | A.   That's correct, sir. |
| 09:16 | 14 | Q.   Why wouldn't any of that change your opinion? |
| 09:16 | 15 | A.   Because, during the course of my profession, I've been |
| 09:16 | 16 | asked to read deposition transcripts of individuals prior to |
| 09:16 | 17 | my examinations and after my examinations.  And I've found |
| 09:16 | 18 | in so many occasions that the individual, or the deponent, |
| 09:16 | 19 | their testimony I found them to not be truthful.  So based |
| 09:16 | 20 | upon that, I can't firmly believe that everything I read in |
| 09:16 | 21 | a deposition transcript is the truth. |
| 09:16 | 22 | Q.   Well, did you see anything in Ms. Prince's deposition |
| 09:17 | 23 | that relates to handwriting analysis? |
| 09:17 | 24 | A.   No. |
| 09:17 | 25 | Q.   Or the significance of long commas or short commas? |

| 09:17 | 1 | A.    No. |
| 09:17 | 2 | Q.    Or prolongations of handwriting into another box, that |
| 09:17 | 3 | sort of thing? |
| 09:17 | 4 | A.    No. |
| 09:17 | 5 | Q.    Do you see anything in her deposition to indicate that |
| 09:17 | 6 | she had any kind of background in handwriting analysis at |
| 09:17 | 7 | all? |
| 09:17 | 8 | A.    No. |
| 09:17 | 9 | Q.    So was it -- was it your -- is it your job to credit -- |
| 09:17 | 10 | to evaluate credibility?  Is that part of your assignment? |
| 09:17 | 11 | A.    It is not. |
| 09:17 | 12 | MR. QUINN:  Thank you. |
| 09:17 | 13 | THE COURT:  All right.  Recross by Ms. Hurst on |
| 09:17 | 14 | behalf of MGA and Mr. Larian. |
| 09:17 | 15 | **RECROSS-EXAMINATION** |
| 09:17 | 16 | BY MS. HURST: |
| 09:18 | 17 | Q.    In the notary book, looking at the handwriting was not |
| 09:18 | 18 | the only way that you tested it, correct? |
| 09:18 | 19 | A.    That's correct. |
| 09:18 | 20 | Q.    In fact, you subjected that entry in the notary book to |
| 09:18 | 21 | a number of different types of scientific examination; isn't |
| 09:18 | 22 | that true? |
| 09:18 | 23 | A.    Yes. |
| 09:18 | 24 | Q.    All in an effort to determine whether you could |
| 09:18 | 25 | distinguish the ink of the fifth line from the first four |

| 09:18 | 1  | lines, correct? |
| 09:18 | 2  | A.   All of the examinations were pointed at that one type |
| 09:18 | 3  | of examination. |
| 09:18 | 4  | Q.   But you did a number of examinations to see whether you |
| 09:18 | 5  | could distinguish the ink in the fifth line from the fourth |
| 09:19 | 6  | line -- the first four lines, correct? |
| 09:19 | 7  | A.   Yes. |
| 09:19 | 8  | Q.   You used microscopic examination to see whether you |
| 09:19 | 9  | could distinguish the ink in the fifth line from the first |
| 09:19 | 10 | four lines, correct? |
| 09:19 | 11 | A.   Yes. |
| 09:19 | 12 | Q.   And you were unable to make any distinction; is that |
| 09:19 | 13 | right? |
| 09:19 | 14 | A.   Correct. |
| 09:19 | 15 | Q.   You used reflected infrared light in an effort to see |
| 09:19 | 16 | whether you could distinguish the ink in the fifth line from |
| 09:19 | 17 | the prior four lines, correct? |
| 09:19 | 18 | A.   Yes. |
| 09:19 | 19 | Q.   And you were unable to make any distinction on that |
| 09:19 | 20 | basis, right? |
| 09:19 | 21 | A.   Yes. |
| 09:19 | 22 | Q.   You used infrared luminescence in an effort to |
| 09:19 | 23 | determine whether the ink in the fifth line was different |
| 09:19 | 24 | from the prior four lines, correct? |
| 09:19 | 25 | A.   Yes. |

CV 04-9049 DOC - 2/4/2011 - Day 13, Volume 1 of 3

38

| | | |
|---|---|---|
| 09:19 | 1 | Q.   And you were unable to make a determination that it was |
| 09:19 | 2 | different based on that examination, correct? |
| 09:19 | 3 | A.   Yes. |
| 09:19 | 4 | Q.   And you used UV light and a dichroic filter to see if |
| 09:19 | 5 | you could distinguish the ink in the fifth line from the |
| 09:19 | 6 | prior four lines, right? |
| 09:19 | 7 | A.   Yes. |
| 09:19 | 8 | Q.   And you were not able to distinguish the ink in the |
| 09:19 | 9 | fifth line from the prior four lines using UV light and a |
| 09:20 | 10 | dichroic filter, correct? |
| 09:20 | 11 | A.   Yes. |
| 09:20 | 12 | Q.   And that's multiple kinds of scientific instrumentation |
| 09:20 | 13 | that you used in an effort to determine whether the ink in |
| 09:20 | 14 | the fifth line could be distinguished from the prior four |
| 09:20 | 15 | lines, right? |
| 09:20 | 16 | A.   Yes. |
| 09:20 | 17 | Q.   And that didn't involve any determination of the |
| 09:20 | 18 | credibility of Jacqueline Prince, did it? |
| 09:20 | 19 | A.   I don't understand that question, ma'am. |
| 09:20 | 20 | Q.   You didn't need to make any reference to Jacqueline |
| 09:20 | 21 | Prince's testimony or make any determinations about whether |
| 09:20 | 22 | she was friends with Carter Bryant or a liar under oath or |
| 09:20 | 23 | anything else, when you were performing your scientific |
| 09:20 | 24 | examinations; isn't that true? |
| 09:20 | 25 | A.   Yes, that's correct. |

Case 2:04-cv-09049-DOC-RNB   Document 9808   Filed 02/07/11   Page 39 of 144   Page ID #:295589
CV 04-9049 DOC – 2/4/2011 – Day 13, Volume 1 of 3

39

| 09:20 | 1 | Q.   But you didn't tell the jury anything about those |
| 09:20 | 2 | scientific examinations when Mr. Quinn was asking you |
| 09:20 | 3 | questions, did you? |
| 09:20 | 4 | A.   No. |
| 09:21 | 5 | Q.   Now, if Ms. -- let me just ask you something. |
| 09:21 | 6 | There's a scale; is that right? -- a scale of certainty |
| 09:21 | 7 | with which you issue handwriting opinions? |
| 09:21 | 8 | A.   Yes. |
| 09:21 | 9 | Q.   And are there nine points on that scale? |
| 09:21 | 10 | A.   Yes. |
| 09:21 | 11 | Q.   And the most degree of certainty you call a "positive |
| 09:21 | 12 | match"; is that right? |
| 09:21 | 13 | A.   We don't use the term "match." |
| 09:21 | 14 | Q.   I apologize.  What do you call it? |
| 09:21 | 15 | A.   It's the term "positive" or "identification." |
| 09:21 | 16 | Q.   On the other end of the scale, you call it a "positive |
| 09:21 | 17 | elimination"; is that right? |
| 09:21 | 18 | A.   That's correct. |
| 09:22 | 19 | Q.   And that means the handwriting doesn't match, correct? |
| 09:22 | 20 | A.   That's correct. |
| 09:22 | 21 | Q.   All right.  Now, your next degree of certainty for a |
| 09:22 | 22 | positive identification is a "highly probable"; is that |
| 09:22 | 23 | right? |
| 09:22 | 24 | A.   Yes. |
| 09:22 | 25 | Q.   And do you also sometimes use the words -- you, |

Case 2:04-cv-09049-DOC-RNB   Document 9808   Filed 02/07/11   Page 40 of 144   Page ID #:295590
CV 04-9049 DOC - 2/4/2011 - Day 13, Volume 1 of 3

40

| 09:22 | 1 | yourself, "quite probable"? |
| 09:22 | 2 | A.   Yes. |
| 09:22 | 3 | Q.   And the next degree of certainty is "probable"; is that |
| 09:22 | 4 | correct? |
| 09:22 | 5 | A.   Yes. |
| 09:22 | 6 | Q.   And the next degree of certainty is "indications" of a |
| 09:22 | 7 | match; is that correct? |
| 09:22 | 8 | A.   Yes. |
| 09:22 | 9 | Q.   All these are of a match, on the top end of the scale, |
| 09:22 | 10 | right? |
| 09:22 | 11 | A.   Well, we don't use the term "match." |
| 09:22 | 12 | Q.   "Identification."  Sorry. |
| 09:22 | 13 | A.   Well, it's -- indications.  If it's dealing with |
| 09:22 | 14 | handwriting, it would be "quite probably did write," |
| 09:22 | 15 | "probable did write," "indications did write." |
| 09:22 | 16 | Q.   All right.  I'll put "did write" down there. |
| 09:22 | 17 |      And then the next is "total uncertainty."  You just |
| 09:23 | 18 | don't know one way or another, no conclusion, right? |
| 09:23 | 19 | A.   That's correct. |
| 09:23 | 20 | Q.   And the next is "indications did not write"? |
| 09:23 | 21 | A.   That's correct. |
| 09:23 | 22 | Q.   I'll get this terminology one day. |
| 09:23 | 23 |      "Probable did not write"? |
| 09:23 | 24 | A.   That's correct. |
| 09:23 | 25 | Q.   And "highly probable did not write"; is that correct? |

CV 04-9049 DOC - 2/4/2011 - Day 13, Volume 1 of 3

41

| | | |
|---|---|---|
| 09:23 | 1 | A.   Yes. |
| 09:23 | 2 | Q.   All right.  Now, your opinion about the notary book is |
| 09:23 | 3 | right here on this line, correct?  "No conclusion"? |
| 09:23 | 4 | MR. QUINN:  Vague.  Vague and ambiguous. |
| 09:23 | 5 | THE COURT:  Overruled. |
| 09:23 | 6 | THE WITNESS:  What conclusion?  I had several |
| 09:23 | 7 | conclusions about it. |
| 09:23 | 8 | BY MS. HURST: |
| 09:23 | 9 | Q.   Whether the fifth line handwriting matched the prior |
| 09:23 | 10 | four lines, you could not draw any conclusion at all, |
| 09:23 | 11 | correct? |
| 09:23 | 12 | A.   Are you talking about the ink? |
| 09:23 | 13 | Q.   No.  The handwriting. |
| 09:23 | 14 | A.   Oh, the handwriting. |
| 09:24 | 15 | Q.   Yes. |
| 09:24 | 16 | A.   Yes.  No conclusion as to who authored the fifth line. |
| 09:24 | 17 | Q.   Okay.  Now, if you assume that Ms. Prince comes here to |
| 09:24 | 18 | testify that all of the entry in that five lines is her |
| 09:24 | 19 | handwriting, would that change your opinion at all? |
| 09:24 | 20 | A.   No. |
| 09:24 | 21 | Q.   It wouldn't even change it from "no conclusion" to |
| 09:24 | 22 | indications that she did write it?  Not even that much? |
| 09:24 | 23 | A.   No.  Because that's not based on the evidence. |
| 09:24 | 24 | Q.   Did you make a determination that Ms. Prince is a liar? |
| 09:24 | 25 | A.   No. |

Case 2:04-cv-09049-DOC-RNB  Document 9808  Filed 02/07/11  Page 42 of 144  Page ID #:295592
CV 04-9049 DOC - 2/4/2011 - Day 13, Volume 1 of 3

42

| | | |
|---|---|---|
| 09:25 | 1 | Q.   If Ms. Prince comes here and testifies -- if you assume |
| 09:25 | 2 | that she comes here and testifies that she wrote all those |
| 09:25 | 3 | words in there, and that it was information given her by |
| 09:25 | 4 | Mr. Bryant, and she tried to squeeze it in, would that make |
| 09:25 | 5 | any difference in your opinion? |
| 09:25 | 6 | A.   No. |
| 09:25 | 7 | Q.   Wouldn't even change it from "no conclusions" to |
| 09:25 | 8 | "indications of a match"?  Not even that little bit? |
| 09:25 | 9 | A.   No. |
| 09:25 | 10 | Q.   And if Ms. Prince came here -- if you assume she came |
| 09:25 | 11 | here and testified that Carter Bryant gave her the |
| 09:25 | 12 | information that she wrote down in all five lines, including |
| 09:25 | 13 | that the doll ideas were from 1998, in Missouri, the content |
| 09:25 | 14 | of the last -- the fifth line -- if she came here and |
| 09:26 | 15 | testified to that, that he gave her that information at the |
| 09:26 | 16 | time and that's when she wrote in the five lines, including |
| 09:26 | 17 | "from 1998 Missouri," would that make any difference at all |
| 09:26 | 18 | to your opinion? |
| 09:26 | 19 | A.   No. |
| 09:26 | 20 | Q.   Not even changing it from "no conclusion" to |
| 09:26 | 21 | "indications that she did write" -- not even that little |
| 09:26 | 22 | bit? |
| 09:26 | 23 | A.   That's correct. |
| 09:26 | 24 | Q.   And if Ms. Prince came here and testified that |
| 09:26 | 25 | Mr. Bryant was someone she knew from work, but did not have |

| | | |
|---|---|---|
| 09:26 | 1 | frequent interactions with, would that make any difference |
| 09:26 | 2 | in your opinion? |
| 09:26 | 3 | A.   No. |
| 09:26 | 4 | Q.   And if Ms. Prince came here and testified that the |
| 09:26 | 5 | extent of her social relationship with him was that she had |
| 09:26 | 6 | dinner with him once outside of work, would that make any |
| 09:26 | 7 | difference to your testimony? |
| 09:26 | 8 | A.   No. |
| 09:26 | 9 | Q.   It's because -- even though she's the notary, it |
| 09:26 | 10 | doesn't matter to you what she says, that's not gonna change |
| 09:27 | 11 | your opinion at all; is that right? |
| 09:27 | 12 | A.   That's correct. |
| 09:27 | 13 | Q.   Even though, on direct testimony, you offered your |
| 09:27 | 14 | testimony and an opinion about what was in the person's head |
| 09:27 | 15 | at the time that they were writing those five entries; isn't |
| 09:27 | 16 | that right? |
| 09:27 | 17 | A.   As far as format's concerned, that's correct. |
| 09:27 | 18 | MS. KELLER:  Okay.  Thank you. |
| 09:27 | 19 | THE COURT:  Sir, we're placing -- well, I'm |
| 09:27 | 20 | placing all of the witnesses on call until May 7th. |
| 09:27 | 21 | Now, I doubt that you're returning to Court, so go |
| 09:27 | 22 | about your professional responsibilities, any personal |
| 09:27 | 23 | obligations you have.  If we need you, trust me, we'll find |
| 09:27 | 24 | you. |
| 09:27 | 25 | THE WITNESS:  Okay. |

Case 2:04-cv-09049-DOC-RNB   Document 9808   Filed 02/07/11   Page 44 of 144   Page ID #:295594
CV 04-9049 DOC - 2/4/2011 - Day 13, Volume 1 of 3

44

| | | |
|---|---|---|
| 09:27 | 1 | THE COURT:  Thank you very much. |
| 09:27 | 2 | But I don't want subpoenas having to be served |
| 09:27 | 3 | across the country, across the world. |
| 09:27 | 4 | THE WITNESS:  Thank you. |
| 09:27 | 5 | THE COURT:  Thank you.  You may step down. |
| 09:27 | 6 | *(Witness steps down suject to recall.* |
| 09:27 | 7 | THE COURT:  Counsel, your next witness, please. |
| 09:27 | 8 | MR. QUINN:  Victoria O'Connor. |
| 09:27 | 9 | MR. McCONVILLE:  Your Honor, that's the witness we |
| 09:27 | 10 | need to talk about. |
| 09:27 | 11 | THE COURT:  As the witness comes in, Kathy, if you |
| 09:28 | 12 | would swear Ms. O'Connor. |
| 09:28 | 13 | Let me see counsel at sidebar for just a moment. |
| 09:28 | 14 | *(Sidebar held, not reported.)* |
| 09:28 | 15 | THE CLERK:  Ms. O'Connor, please raise your right |
| 09:28 | 16 | hand. |
| 09:28 | 17 | **VICTORIA O'CONNOR, MATTEL'S WITNESS, SWORN** |
| 09:28 | 18 | THE WITNESS:  I do. |
| 09:28 | 19 | *(Pause in the proceedings at 9:28 a.m.)* |
| 09:32 | 20 | *(Proceedings resumed at 9:35 a.m.)* |
| 09:35 | 21 | THE COURT:  All right.  Then we're back in |
| 09:35 | 22 | session. |
| 09:35 | 23 | Counsel -- |
| 09:35 | 24 | You've previously been sworn by the clerk? |
| 09:35 | 25 | THE WITNESS:  Yes. |

CV 04-9049 DOC - 2/4/2011 - Day 13, Volume 1 of 3

45

| 09:35 | 1 | THE COURT:  Would you state your full name to the |
| 09:35 | 2 | jury, please, and spell your last name. |
| 09:35 | 3 | THE WITNESS:  Victoria O'Connor, O, apostrophe, |
| 09:36 | 4 | C-O-N-N-O-R. |
| 09:36 | 5 | THE COURT:  Thank you. |
| 09:36 | 6 | And this is direct examination by Mr. Quinn. |
| 09:36 | 7 | MR. QUINN:  My time starts now, Your Honor? |
| 09:36 | 8 | THE COURT:  Your time starts now.  That is all |
| 09:36 | 9 | what we call nonchargeable time. |
| 09:36 | 10 | MR. QUINN:  Thank you, Your Honor. |
| 09:36 | 11 | **DIRECT EXAMINATION** |
| 09:36 | 12 | BY MR. QUINN: |
| 09:36 | 13 | Q.   Good morning, Ms. O'Connor. |
| 09:36 | 14 | A.   Good morning. |
| 09:36 | 15 | Q.   What do you do for a living? |
| 09:36 | 16 | A.   I'm in licensing. |
| 09:36 | 17 | Q.   Who would you work for? |
| 09:36 | 18 | A.   Warner Brothers. |
| 09:36 | 19 | Q.   You used to work for MGA? |
| 09:36 | 20 | A.   Yes. |
| 09:36 | 21 | Q.   Can you tell us, please, during what period of time you |
| 09:36 | 22 | worked for MGA? |
| 09:36 | 23 | A.   April 1999 through February 2003. |
| 09:36 | 24 | Q.   So roughly almost four years? |
| 09:36 | 25 | A.   Correct. |

Case 2:04-cv-09049-DOC-RNB   Document 9808   Filed 02/07/11   Page 46 of 144   Page ID #:295596
CV 04-9049 DOC - 2/4/2011 - Day 13, Volume 1 of 3

46

| | | |
|---|---|---|
| 09:36 | 1 | Q.    What was your first job there? |
| 09:36 | 2 | A.    Licensing manager. |
| 09:36 | 3 | Q.    And as a licensing manager, what did you do? |
| 09:36 | 4 | A.    I sought out potential properties or brands for |
| 09:36 | 5 | licensing-in to manufacture toy products, as well as meeting |
| 09:36 | 6 | with the inventor community to review inventor concepts to |
| 09:36 | 7 | license for manufacturing, as well. |
| 09:36 | 8 | Q.    You used the term "licensing-in."  Can you explain to |
| 09:37 | 9 | us what that means, please? |
| 09:37 | 10 | A.    Sure.  Licensing-in is when you find a brand like World |
| 09:37 | 11 | Wrestling Federation or Phineas and Ferb and you find a |
| 09:37 | 12 | property, and I would negotiate with the person or the |
| 09:37 | 13 | company that held the rights to that brand or that property, |
| 09:37 | 14 | and we would negotiate a contract, and MGA Entertainment |
| 09:37 | 15 | would manufacture the products and sell the products to |
| 09:37 | 16 | retail. |
| 09:37 | 17 | Q.    And if an inventor came with an idea or a design and |
| 09:37 | 18 | you were looking at that for potential licensing by MGA, |
| 09:37 | 19 | would that be an example of licensing-in? |
| 09:37 | 20 | A.    Correct. |
| 09:37 | 21 | Q.    And when you're doing this type of work, can you tell |
| 09:37 | 22 | us whether or not it's important that you determine that |
| 09:37 | 23 | that person who's coming to you actually owns what they're |
| 09:37 | 24 | bringing you? |
| 09:37 | 25 | A.    Yes. |

Case 2:04-cv-09049-DOC-RNB   Document 9808   Filed 02/07/11   Page 47 of 144   Page ID #:295597
CV 04-9049 DOC - 2/4/2011 - Day 13, Volume 1 of 3

47

| | | |
|---|---|---|
| 09:37 | 1 | Q.   And why is that important? |
| 09:37 | 2 | A.   Because we wouldn't want to manufacture any products if |
| 09:37 | 3 | they did not hold the rights for it. |
| 09:38 | 4 | Q.   You said your first duties were as a licensing manager. |
| 09:38 | 5 | At some point did you get promoted -- |
| 09:38 | 6 | A.   Yes. |
| 09:38 | 7 | Q.   -- at MGA? |
| 09:38 | 8 | And when did you get promoted? |
| 09:38 | 9 | A.   I believe it was in 2000, but I'm not sure of the date. |
| 09:38 | 10 | Q.   And what were you promoted to?  What was your next |
| 09:38 | 11 | position? |
| 09:38 | 12 | A.   Licensing director. |
| 09:38 | 13 | Q.   And sounds like you were kind of in charge of this |
| 09:38 | 14 | licensing activity in that position? |
| 09:38 | 15 | A.   Yes. |
| 09:38 | 16 | Q.   Were you involved with MGA's dealings with Carter |
| 09:38 | 17 | Bryant concerning Bratz? |
| 09:38 | 18 | A.   Yes. |
| 09:38 | 19 | Q.   And as the licensing person, were you the one that had |
| 09:38 | 20 | principal responsibility for that? |
| 09:38 | 21 | A.   Yes. |
| 09:38 | 22 | Q.   Do you recall when you first met Mr. Bryant? |
| 09:38 | 23 | A.   I recall it was either August or September of 2000. |
| 09:38 | 24 | Q.   If we could take a look at Exhibit 11328. |
| 09:38 | 25 | MR. QUINN:  Which is in evidence, Your Honor. |

CV 04-9049 DOC – 2/4/2011 – Day 13, Volume 1 of 3

48

| | | |
|---|---|---|
| 09:38 | 1 | If we could put that up on the scream. |
| 09:39 | 2 | *(Document displayed.)* |
| 09:39 | 3 | *(Document provided to the witness.)* |
| 09:27 | 4 | BY MR. QUINN: |
| 09:39 | 5 | Q.   Is this a meeting notice -- a record of a meeting |
| 09:39 | 6 | notice? |
| 09:39 | 7 | A.   Yes. |
| 09:39 | 8 | Q.   And this indicates -- can you tell what this indicates |
| 09:39 | 9 | in terms of a meeting? |
| 09:39 | 10 | A.   It indicates it was a -- looks like a Microsoft Outlook |
| 09:39 | 11 | meeting request to meet with Carter Bryant on August 18, |
| 09:39 | 12 | 2000. |
| 09:39 | 13 | Q.   And he's identified there as a doll designer? |
| 09:39 | 14 | A.   Yes. |
| 09:39 | 15 | Q.   Was that your understanding of what he was? |
| 09:39 | 16 | A.   Yes. |
| 09:39 | 17 | Q.   Do you recall how this -- how you learned about this |
| 09:39 | 18 | meeting? |
| 09:39 | 19 | A.   Yes. |
| 09:39 | 20 | Q.   How did you learn about it? |
| 09:39 | 21 | A.   Uh, Paula Garcia told me that she had had a friend of |
| 09:39 | 22 | Veronica Marlow who knew someone who was a Barbie designer |
| 09:39 | 23 | at Mattel, who had an invention for a fashion doll and was |
| 09:39 | 24 | coming in to show it to us. |
| 09:39 | 25 | Q.   Did -- when you first heard about this, do you recall |

| | | |
|---|---|---|
| 09:39 | 1 | whether or not Ms. Garcia had already set up this meeting? |
| 09:40 | 2 | A.   I don't recall the sequence of events. |
| 09:40 | 3 | Q.   Did she tell you why she wanted you to attend the |
| 09:40 | 4 | meeting? |
| 09:40 | 5 | A.   No. |
| 09:40 | 6 | Q.   Did you have an understanding as to why you were being |
| 09:40 | 7 | invited to attend this meeting? |
| 09:40 | 8 | A.   Yes. |
| 09:40 | 9 | Q.   And what was that? |
| 09:40 | 10 | A.   I met with inventors; that was my responsibility. |
| 09:40 | 11 | Q.   Now, can you recall whether or not Mr. Larian was at |
| 09:40 | 12 | this first meeting? |
| 09:40 | 13 | A.   No. |
| 09:40 | 14 | Q.   Do you have a recollection of attending a meeting with |
| 09:40 | 15 | Mr. Bryant at some point, before an agreement was signed, |
| 09:40 | 16 | where Mr. Larian was in attendance? |
| 09:40 | 17 | A.   Yes. |
| 09:40 | 18 | Q.   Okay.  Can you place that meeting in relationship to |
| 09:40 | 19 | this August meeting that we're looking at here? |
| 09:40 | 20 | A.   Um, the original meeting was myself, Paula Garcia, and |
| 09:40 | 21 | Carter Bryant.  At some point -- I'm not sure if it was the |
| 09:40 | 22 | same meeting or a second meeting -- Isaac Larian joined the |
| 09:41 | 23 | meeting. |
| 09:41 | 24 | Q.   Might have been the same -- a second part of this same |
| 09:41 | 25 | meeting, or it might have been a later meeting; you're just |

CV 04-9049 DOC - 2/4/2011 - Day 13, Volume 1 of 3

50

| | | |
|---|---|---|
| 09:41 | 1 | not sure? |
| 09:41 | 2 | A.   Correct. |
| 09:41 | 3 | Q.   Do you recall, roughly, how long this initial meeting |
| 09:41 | 4 | lasted? |
| 09:41 | 5 | A.   About 30 minutes. |
| 09:41 | 6 | Q.   And did Mr. Bryant bring anything with him to this |
| 09:41 | 7 | meeting? |
| 09:41 | 8 | A.   Yes. |
| 09:41 | 9 | Q.   What did he bring with him? |
| 09:41 | 10 | A.   He brought a prototype of the Bratz doll and some |
| 09:41 | 11 | illustrations, some drawings of the characters. |
| 09:41 | 12 | Q.   And did he refer to it as Bratz?  Did he use that name? |
| 09:41 | 13 | A.   Yes. |
| 09:41 | 14 | Q.   Could you please describe for the jury this prototype |
| 09:41 | 15 | of the Bratz doll that he brought with him? |
| 09:41 | 16 | MS. KELLER:  I'm going to object to the |
| 09:41 | 17 | characterization as prototype, Your Honor. |
| 09:41 | 18 | THE COURT:  Overruled. |
| 09:41 | 19 | THE WITNESS:  It was a large doll with a big head |
| 09:41 | 20 | and a Barbie doll body and large feet. |
| 09:41 | 21 | BY MR. QUINN: |
| 09:41 | 22 | Q.   And was the face painted? |
| 09:41 | 23 | A.   Yes. |
| 09:41 | 24 | Q.   And what was your reaction to it? |
| 09:42 | 25 | A.   I loved it.  I thought it was beautiful. |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 9808   Filed 02/07/11   Page 51 of 144   Page ID #:295601
CV 04-9049 DOC - 2/4/2011 - Day 13, Volume 1 of 3

51

| | | |
|---|---|---|
| 09:42 | 1 | Q.   Did you make a comment about the -- do you recall |
| 09:42 | 2 | making a comment about the doll? |
| 09:42 | 3 | A.   I'm sure I did.  I don't remember my exact comments. |
| 09:42 | 4 | MR. QUINN:  The drawings, if we could look at |
| 09:42 | 5 | Exhibit 1. |
| 09:42 | 6 | (Exhibit provided to the witness.) |
| 09:42 | 7 | BY MR. QUINN: |
| 09:42 | 8 | Q.   And my question to you is going to be whether you can |
| 09:42 | 9 | identify these as the drawings that Mr. Bryant had with him. |
| 09:42 | 10 | A.   Yes. |
| 09:42 | 11 | MR. QUINN:  And if we could display that on the |
| 09:43 | 12 | screen. |
| 09:43 | 13 | TECHNICIAN:  I just have a black-and-white |
| 09:43 | 14 | version.  The color version is the original. |
| 09:43 | 15 | MR. QUINN:  Perhaps if you could hold up the first |
| 09:43 | 16 | page and maybe a couple of the others, Ms. O'Connor, just to |
| 09:43 | 17 | remind the jury, who's seen these before. |
| 09:43 | 18 | THE WITNESS:  (Witness complies.) |
| 09:43 | 19 | THE COURT:  If you want to put those on the ELMO, |
| 09:43 | 20 | you can. |
| 09:43 | 21 | MR. QUINN:  I just want to move on, Your Honor.  I |
| 09:43 | 22 | think the jury has seen these several times and recognizes |
| 09:43 | 23 | the pictures. |
| 09:43 | 24 | (To the witness:)  Thank you.  Thank you very |
| 09:43 | 25 | much. |

Case 2:04-cv-09049-DOC-RNB   Document 9808   Filed 02/07/11   Page 52 of 144   Page ID #:295602
CV 04-9049 DOC - 2/4/2011 - Day 13, Volume 1 of 3

52

| | | |
|---|---|---|
| 09:43 | 1 | BY MR. QUINN: |
| 09:43 | 2 | Q.   What was Paula Garcia's reaction to this prototype |
| 09:43 | 3 | Bratz doll and these drawings that Mr. Bryant showed? |
| 09:43 | 4 | A.   She loved it as much as I did, if not more. |
| 09:43 | 5 | Q.   Do you recall whether she was demonstrative or actually |
| 09:43 | 6 | what -- how she responded physically to it? |
| 09:43 | 7 | A.   Yes, I do. |
| 09:43 | 8 | Q.   And how was that? |
| 09:43 | 9 | A.   She covered her nose and her mouth and she shrieked and |
| 09:43 | 10 | said, "Oh, my God!"  She loved it.  I don't remember the |
| 09:43 | 11 | exact words, but I remember the, "Oh, my God!" |
| 09:44 | 12 | Q.   And you're the licensing manager? |
| 09:44 | 13 | A.   Yes, or maybe director at the time.  I don't remember. |
| 09:44 | 14 | Q.   And did you have some concerns about that reaction? |
| 09:44 | 15 | A.   Not concerns, but I told her to play it cool before we |
| 09:44 | 16 | went in to meet with him if she liked the concept. |
| 09:44 | 17 | Q.   Why was that? |
| 09:44 | 18 | A.   Because if we liked the concept and wanted to license |
| 09:44 | 19 | it from Carter Bryant, I needed to negotiate the terms of |
| 09:44 | 20 | the contract with him. |
| 09:44 | 21 | Q.   All right.  Do you recall that at some point, either in |
| 09:44 | 22 | a continuation of that meeting or at some later meeting, |
| 09:44 | 23 | that Mr. Larian saw these drawings? |
| 09:44 | 24 | A.   Yes. |
| 09:44 | 25 | Q.   And was Mr. Bryant present for that? |

CV 04-9049 DOC - 2/4/2011 - Day 13, Volume 1 of 3

53

| | | |
|---|---|---|
| 09:44 | 1 | A.   Yes. |
| 09:44 | 2 | Q.   Do you recall Mr. Larian's reaction to the drawings? |
| 09:44 | 3 | A.   Yes. |
| 09:44 | 4 | Q.   And what was his reaction? |
| 09:44 | 5 | A.   He liked them, as well. |
| 09:44 | 6 | Q.   And, by the way, did -- in your first meeting with |
| 09:44 | 7 | Mr. Bryant and Ms. Garcia, was there any indication about |
| 09:45 | 8 | where Mr. Bryant was employed? |
| 09:45 | 9 | A.   Yes. |
| 09:45 | 10 | Q.   And what was -- what was said on that? |
| 09:45 | 11 | A.   That he was working for Mattel. |
| 09:45 | 12 | Q.   Mr. Bryant said that? |
| 09:45 | 13 | A.   Yes. |
| 09:45 | 14 | Q.   Had you known that before you went to the meeting? |
| 09:45 | 15 | A.   Yes. |
| 09:45 | 16 | Q.   How had you learned that before you went to the |
| 09:45 | 17 | meeting? |
| 09:45 | 18 | A.   Paula Garcia told me. |
| 09:45 | 19 | Q.   Did she -- do you know whether or not Ms. Garcia had |
| 09:45 | 20 | previously been employed at Mattel? |
| 09:45 | 21 | A.   Yes. |
| 09:45 | 22 | Q.   And had she? |
| 09:45 | 23 | A.   Yes. |
| 09:45 | 24 | Q.   Did she indicate whether or not she had known |
| 09:45 | 25 | Mr. Bryant from Mattel? |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 9808   Filed 02/07/11   Page 54 of 144   Page ID #:295604
CV 04-9049 DOC - 2/4/2011 - Day 13, Volume 1 of 3

54

| | | |
|---|---|---|
| 09:45 | 1 | A.   She indicated she had not met him prior. |
| 09:45 | 2 | Q.   All right.  So to go back to Mr. Larian's reaction, at |
| 09:45 | 3 | that meeting where Mr. -- that you recall Mr. Larian being |
| 09:45 | 4 | in attendance, was there any reference to the fact that |
| 09:45 | 5 | Mr. Bryant was employed by Mattel at that time? |
| 09:45 | 6 | A.   I don't recall. |
| 09:45 | 7 | Q.   Do you recall Mr. Bryant ever describing his position |
| 09:46 | 8 | at Mattel at that time? |
| 09:46 | 9 | A.   At the meeting with Mr. Larian? |
| 09:46 | 10 | Q.   Yes. |
| 09:46 | 11 | A.   I don't recall. |
| 09:46 | 12 | Q.   Your deposition -- this is a number of years ago.  And |
| 09:46 | 13 | your deposition was taken a number of years ago, correct? |
| 09:46 | 14 | A.   Yes. |
| 09:46 | 15 | Q.   Let's see if we can refresh your recollection.  If you |
| 09:46 | 16 | take a look at your deposition, page 71, line 8. |
| 09:46 | 17 | *(Document provided to the witness.)* |
| 08:42 | 18 | BY MR. QUINN: |
| 09:46 | 19 | Q.   And if you could just read to yourself, 71, line 8 to |
| 09:47 | 20 | 17. |
| 09:47 | 21 | MR. McCONVILLE:  Are we talking page 78, Counsel? |
| 09:47 | 22 | MR. QUINN:  71.  71, line 8 to 17. |
| 09:47 | 23 | THE WITNESS:  Okay. |
| 09:47 | 24 | BY MR. QUINN: |
| 09:47 | 25 | Q.   And does that refresh your recollection that there was |

| | | |
|---|---|---|
| 09:47 | 1 | discussion at this meeting that he was employed? |
| 09:47 | 2 | A.   I do remember that conversation.  I just don't remember |
| 09:47 | 3 | if Mr. Larian was present during it, if this was the first |
| 09:47 | 4 | meeting or a continuation Mr. Larian joined or a follow-up |
| 09:47 | 5 | meeting. |
| 09:47 | 6 | Q.   Okay.  Does it refresh your recollection as to whether |
| 09:47 | 7 | he described his position -- |
| 09:47 | 8 | A.   Yes. |
| 09:47 | 9 | Q.   -- at Mattel? |
| 09:47 | 10 | And what do you now recall in terms of his description |
| 09:47 | 11 | of his position? |
| 09:47 | 12 | A.   That he was a designer in Barbie Collectibles. |
| 09:47 | 13 | Q.   That deposition was -- just so that we know how long |
| 09:47 | 14 | ago -- December 6, 2004? |
| 09:47 | 15 | A.   Yes. |
| 09:48 | 16 | Q.   You indicate that in your job you dealt with inventors. |
| 09:48 | 17 | Had you ever previously had a circumstance where a current |
| 09:48 | 18 | employee of a competitor had come to MGA with some design or |
| 09:48 | 19 | invention that they were looking to license?  Had that ever |
| 09:48 | 20 | happened before? |
| 09:48 | 21 | A.   No. |
| 09:48 | 22 | Q.   So you -- so this was a -- you knew -- did you -- you |
| 09:48 | 23 | knew Mr. Bryant was a doll designer? |
| 09:48 | 24 | A.   Yes. |
| 09:48 | 25 | Q.   Did you know there was something called a "design |

| | | |
|---|---|---|
| 09:48 | 1 | center" over at Mattel? |
| 09:48 | 2 | A.   No. |
| 09:48 | 3 | Q.   But he presented you with designs? |
| 09:48 | 4 | A.   Yes. |
| 09:48 | 5 | Q.   Okay. |
| 09:48 | 6 | A.   Yes. |
| 09:48 | 7 | Q.   Did this cause any concern to you, the fact that a doll |
| 09:48 | 8 | designer, a current doll designer from a competitor, was |
| 09:49 | 9 | coming to MGA and presenting designs? |
| 09:49 | 10 | A.   Yes. |
| 09:49 | 11 | Q.   And what was the nature of your concern? |
| 09:49 | 12 | A.   The fact that he was working for another toy company, a |
| 09:49 | 13 | competitor of MGA's, and he possibly developed this during |
| 09:49 | 14 | his tenure at Mattel. |
| 09:49 | 15 | Q.   And why would that be a concern to you as a licensing |
| 09:49 | 16 | manager, that he may have developed this at Mattel? |
| 09:49 | 17 | A.   Because he may not have owned the rights to Bratz. |
| 09:49 | 18 | Q.   Now, do you recall expressing that concern to people at |
| 09:49 | 19 | MGA? |
| 09:49 | 20 | A.   Yes. |
| 09:49 | 21 | Q.   Who did you express that concern to? |
| 09:49 | 22 | A.   Isaac Larian and Paula Garcia. |
| 09:49 | 23 | Q.   Are you -- were you -- can you recall whether you were |
| 09:49 | 24 | concerned about there might be some potential liability to |
| 09:49 | 25 | MGA if they did a licensing arrangement with a current |

Case 2:04-cv-09049-DOC-RNB   Document 9808   Filed 02/07/11   Page 57 of 144   Page ID #:295607
CV 04-9049 DOC - 2/4/2011 - Day 13, Volume 1 of 3

57

| | | |
|---|---|---|
| 09:49 | 1 | designer relating to -- a current designer at Mattel |
| 09:50 | 2 | concerning some designs? |
| 09:50 | 3 | A.   Yes. |
| 09:50 | 4 | Q.   And did you express that concern, as well? |
| 09:50 | 5 | A.   Yes. |
| 09:50 | 6 | Q.   Are you the type of person that if you think your |
| 09:50 | 7 | employer is doing something that might expose them to |
| 09:50 | 8 | liability, that you'll stay silent about that? |
| 09:50 | 9 | A.   No. |
| 09:50 | 10 | MR. QUINN:  If we could look at -- if we could |
| 09:50 | 11 | place before the witness -- this is not in evidence yet. |
| 09:50 | 12 | Exhibit 16995. |
| 09:50 | 13 | 16995. |
| 09:50 | 14 | *(Document provided to the witness.)* |
| 09:50 | 15 | BY MR. QUINN: |
| 09:50 | 16 | Q.   And I'll ask you, Ms. O'Connor, if you can identify |
| 09:50 | 17 | this document? |
| 09:50 | 18 | A.   Yes. |
| 09:50 | 19 | Q.   What is that? |
| 09:50 | 20 | A.   It looks like a Microsoft Outlook meeting request. |
| 09:50 | 21 | Q.   Relating to? |
| 09:50 | 22 | A.   Relating to Carter Bryant, a meeting with myself and |
| 09:51 | 23 | Paula Garcia -- |
| 09:51 | 24 | MR. QUINN:  I'd offer -- |
| 09:51 | 25 | THE WITNESS:  -- in Isaac's office. |

CV 04-9049 DOC - 2/4/2011 - Day 13, Volume 1 of 3

58

| | | |
|---|---|---|
| 09:51 | 1 | MR. QUINN:  I'd offer that in evidence. |
| 09:51 | 2 | THE COURT:  Any objection? |
| 09:51 | 3 | *(No response.)* |
| 09:51 | 4 | THE COURT:  Received. |
| 09:51 | 5 | *(Exhibit No. 16995 received in evidence.)* |
| 09:51 | 6 | *(Document displayed.)* |
| 09:51 | 7 | MR. QUINN:  If we could please display that, |
| 09:51 | 8 | Exhibit 16995. |
| 09:51 | 9 | *(Document displayed.)* |
| 08:57 | 10 | BY MR. QUINN: |
| 09:51 | 11 | Q.   And this relates to a second meeting in Mr. Larian's |
| 09:51 | 12 | office? |
| 09:51 | 13 | A.   Yes. |
| 09:51 | 14 | Q.   And what is the date of that? |
| 09:51 | 15 | A.   September 1, 2000. |
| 09:51 | 16 | Q.   And Mr. Bryant is identified there as, again, a doll |
| 09:51 | 17 | designer? |
| 09:51 | 18 | A.   Yes. |
| 09:51 | 19 | Q.   Does this -- does seeing this refresh your recollection |
| 09:51 | 20 | that there were at least two meetings and that Mr. Larian |
| 09:51 | 21 | was in the second meeting? |
| 09:51 | 22 | A.   No. |
| 09:51 | 23 | Q.   Okay.  All right.  Do you have a recollection of -- any |
| 09:51 | 24 | other recollection of that second meeting or -- this |
| 09:51 | 25 | meeting -- the September 1 meeting as to what was said |

| | | |
|---|---|---|
| 09:51 | 1 | or...? |
| 09:52 | 2 | A.    No. |
| 09:52 | 3 | Q.    The drawings were there also and shown to Mr. Larian? |
| 09:52 | 4 | A.    Yes. |
| 09:52 | 5 | Q.    How were -- uh, was there -- at some point Mr. Bryant |
| 09:52 | 6 | left, obviously? |
| 09:52 | 7 | A.    Yes. |
| 09:52 | 8 | Q.    And was there a discussion among the -- you, |
| 09:52 | 9 | Ms. Garcia, and Mr. Larian about the presentation? |
| 09:52 | 10 | A.    Yes. |
| 09:52 | 11 | Q.    And what was discussed? |
| 09:52 | 12 | A.    We discussed my working with Carter Bryant to enter |
| 09:52 | 13 | into a license agreement for the rights to Bratz, and Paula |
| 09:52 | 14 | was charged with developing the Bratz doll line in time for |
| 09:52 | 15 | Hong Kong toy fair. |
| 09:52 | 16 | Q.    Can you tell us whether or not, as of the conclusion of |
| 09:52 | 17 | that meeting, a decision had been made to go ahead with |
| 09:52 | 18 | Bratz? |
| 09:52 | 19 | A.    Yes. |
| 09:52 | 20 |         MS. KELLER:  Objection.  Vague as to time. |
| 09:52 | 21 |         THE COURT:  Overruled.  Well, I thought it was |
| 09:52 | 22 | referring to the September 1st meeting. |
| 09:52 | 23 |         MR. QUINN:  That's what -- I'll reask the |
| 09:53 | 24 | question. |
| | 25 | |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 9808   Filed 02/07/11   Page 60 of 144   Page ID #:295610
CV 04-9049 DOC - 2/4/2011 - Day 13, Volume 1 of 3

60

| | | |
|---|---|---|
| 09:53 | 1 | BY MR. QUINN: |
| 09:53 | 2 | Q.   As of the conclusion of the meeting in which Mr. Larian |
| 09:53 | 3 | was present and the things that were said that you've |
| 09:53 | 4 | described, was there a decision made about whether or not to |
| 09:53 | 5 | go ahead with the Bratz doll? |
| 09:53 | 6 | A.   Yes. |
| 09:53 | 7 | Q.   And what was that decision? |
| 09:53 | 8 | A.   To move forward. |
| 09:53 | 9 | Q.   And how long after Mr. Bryant left was that decision |
| 09:53 | 10 | made? |
| 09:53 | 11 | A.   Immediately. |
| 09:53 | 12 | Q.   As of that point, so far as you're aware, as the |
| 09:53 | 13 | licensing director, what type of investigation had been done |
| 09:53 | 14 | to see whether this Mattel doll designer, who had come with |
| 09:53 | 15 | designs, actually owned these drawings, these designs? |
| 09:53 | 16 | A.   I don't recall. |
| 09:53 | 17 | Q.   Can you recall anything that had been done as of that |
| 09:53 | 18 | point when the decision was made to go ahead? |
| 09:53 | 19 | A.   Oh, at that decision, nothing had -- nothing -- no |
| 09:53 | 20 | investigation had been researched. |
| 09:54 | 21 | Q.   Do you recall when the decision -- do you recall |
| 09:54 | 22 | whether there were any reservations that had been expressed |
| 09:54 | 23 | by Mr. Larian or Ms. Garcia about going forward with the |
| 09:54 | 24 | Bratz design, the doll design? |
| 09:54 | 25 | A.   There were no reservations. |

Case 2:04-cv-09049-DOC-RNB   Document 9808   Filed 02/07/11   Page 61 of 144   Page ID #:295611
CV 04-9049 DOC - 2/4/2011 - Day 13, Volume 1 of 3

61

| | | |
|---|---|---|
| 09:54 | 1 | Q.   You made reference to Hong Kong toy fair.  Is that the |
| 09:54 | 2 | same time of the year every year? |
| 09:54 | 3 | A.   Yes. |
| 09:54 | 4 | Q.   And when is that? |
| 09:54 | 5 | A.   Uh, early January. |
| 09:54 | 6 | Q.   Can you tell us whether that meant -- you know, whether |
| 09:54 | 7 | that made it difficult to get this product ready or whether |
| 09:54 | 8 | that was an issue, whether it could be done in time? |
| 09:54 | 9 | A.   It was a very short development cycle, and Paula was |
| 09:54 | 10 | concerned about getting it done so quickly. |
| 09:54 | 11 | Q.   So was there some urgency about getting this doll line |
| 09:54 | 12 | off the ground? |
| 09:54 | 13 | A.   Yes. |
| 09:55 | 14 | Q.   Was it discussed whether or not MGA needed Mr. Bryant's |
| 09:55 | 15 | help in order to bring this doll to life? |
| 09:55 | 16 | A.   Yes. |
| 09:55 | 17 | Q.   And what was said in that regard? |
| 09:55 | 18 | A.   We would hire Carter Bryant as a consultant to assist |
| 09:55 | 19 | with the design and development of the Bratz dolls. |
| 09:55 | 20 | Q.   And why was that necessary? |
| 09:55 | 21 | A.   Because we did not have the expertise to execute it. |
| 09:55 | 22 | Q.   And was that something that was discussed in your |
| 09:55 | 23 | presence? |
| 09:55 | 24 | A.   Yes. |
| 09:55 | 25 | Q.   With Ms. Garcia? |

| | | |
|---|---|---|
| 09:55 | 1 | A.   Yes. |
| 09:55 | 2 | Q.   And Mr. Larian? |
| 09:55 | 3 | A.   Yes. |
| 09:55 | 4 | Q.   Now, did you have some responsibility for -- you know, |
| 09:55 | 5 | as part of your job as a licensing director, did you have |
| 09:55 | 6 | some responsibility for getting in place a contractual |
| 09:55 | 7 | arrangement with Mr. Bryant? |
| 09:55 | 8 | A.   Correct. |
| 09:55 | 9 | Q.   Were you the one who was in charge of that effort? |
| 09:56 | 10 | A.   Yes. |
| 09:56 | 11 | Q.   And did you actually have conversations with Mr. Bryant |
| 09:56 | 12 | concerning the terms of a potential contract? |
| 09:56 | 13 | A.   Yes. |
| 09:56 | 14 | Q.   Were those conversations in person or over the |
| 09:56 | 15 | telephone or both? |
| 09:56 | 16 | A.   Mostly over the telephone. |
| 09:56 | 17 | Q.   Did they happen during the business day? |
| 09:56 | 18 | A.   Yes. |
| 09:56 | 19 | Q.   Did they happen -- did you ever speak to him when he |
| 09:56 | 20 | was at Mattel? |
| 09:56 | 21 | A.   Yes. |
| 09:56 | 22 | Q.   Once or more than once? |
| 09:56 | 23 | A.   More than once. |
| 09:56 | 24 | MS. KELLER:  Objection.  Vague as to when he was |
| 09:56 | 25 | at Mattel. |

Case 2:04-cv-09049-DOC-RNB   Document 9808   Filed 02/07/11   Page 63 of 144   Page ID #:295613
CV 04-9049 DOC - 2/4/2011 - Day 13, Volume 1 of 3

63

09:56  1          THE COURT:  I'm sorry.  I apologize.  I just

09:56  2   didn't hear.

09:56  3          MS. KELLER:  Objection.  Vague as to when he was

09:56  4   at Mattel as opposed to during the period of time of his

09:56  5   employment.

09:56  6          THE COURT:  Well --

09:56  7          MR. QUINN:  I'll rephrase the question, Your

09:56  8   Honor.

09:56  9          THE COURT:  Sustained.  Just rephrase it.

       10   BY MR. QUINN:

09:56 11   Q.   Did you speak to Mr. Bryant on the potential terms of

09:56 12   his contract during business hours?

09:56 13   A.   Yes.

09:56 14   Q.   Did you understand that Mr. Bryant had some type of an

09:57 15   agreement with Mattel?

09:57 16   A.   Yes.

09:57 17   Q.   That is to say, a written agreement?

09:57 18   A.   Yes.

09:57 19   Q.   Did you ever see that written agreement?

09:57 20   A.   I don't recall.

09:57 21   Q.   If you could take a look, please, at Exhibit 16788,

09:57 22   this is actually -- 16788.

09:57 23          (Document provided to the witness.)

09:57 24          THE COURT:  Has that already been received,

09:57 25   Counsel?

Case 2:04-cv-09049-DOC-RNB   Document 9808   Filed 02/07/11   Page 64 of 144   Page ID #:295614
CV 04-9049 DOC - 2/4/2011 - Day 13, Volume 1 of 3

64

| | | |
|---|---|---|
| 09:57 | 1 | MR. QUINN:  No, it has not. |
| 09:12 | 2 | BY MR. QUINN: |
| 09:57 | 3 | Q.   I'd ask you if you can identify that document? |
| 09:57 | 4 | MS. KELLER:  Excuse me, Counsel.  Is that one of |
| 09:57 | 5 | the new ones? |
| 09:58 | 6 | MR. QUINN:  No. |
| 12:59 | 7 | BY MR. QUINN: |
| 09:58 | 8 | Q.   Do you have that before you? |
| 09:58 | 9 | A.   Yes. |
| 09:58 | 10 | MR. QUINN:  Actually, I think this is in evidence. |
| 09:58 | 11 | THE COURT:  I thought it was also. |
| 09:58 | 12 | MR. QUINN:  Yeah, I believe this document is in |
| 09:58 | 13 | evidence. |
| 09:58 | 14 | THE COURT:  It's an e-mail of September 13, 2000. |
| 09:58 | 15 | It should be. |
| 09:58 | 16 | Do each counsel want to check?  It's from |
| 09:58 | 17 | Mr. Larian to Ms. O'Connor. |
| 09:58 | 18 | MR. QUINN:  All right.  I'm not sure, so we'll go |
| 09:58 | 19 | ahead and lay the foundation, Your Honor. |
| 09:58 | 20 | THE COURT:  Please. |
| 09:58 | 21 | BY MR. QUINN: |
| 09:58 | 22 | Q.   Can you identify Exhibit 16788? |
| 09:58 | 23 | A.   Yes. |
| 09:58 | 24 | Q.   And what is this? |
| 09:58 | 25 | A.   It is an e-mail from Isaac Larian to myself. |

Case 2:04-cv-09049-DOC-RNB   Document 9808   Filed 02/07/11   Page 65 of 144   Page ID #:295615
CV 04-9049 DOC - 2/4/2011 - Day 13, Volume 1 of 3

65

| | | |
|---|---|---|
| 09:59 | 1 | Q.    Dated? |
| 09:59 | 2 | A.    September 13, 2000. |
| 09:59 | 3 | MR. QUINN:  I'd offer that, Your Honor. |
| 09:59 | 4 | THE COURT:  Received. |
| 09:59 | 5 | *(Exhibit No. 16788 received in evidence.)* |
| 09:59 | 6 | MR. QUINN:  If we could display that, please. |
| 09:59 | 7 | *(Document displayed.)* |
| 09:59 | 8 | BY MR. QUINN: |
| 09:59 | 9 | Q.    And do you recall the background to this -- do you |
| 09:59 | 10 | recall this e-mail? |
| 09:59 | 11 | A.    No.  I remember a conversation with Isaac Larian about |
| 09:59 | 12 | this.  I just don't remember if it was an e-mail or a verbal |
| 09:59 | 13 | conversation. |
| 09:59 | 14 | Q.    Do you recall Mr. Bryant had made a request for some |
| 09:59 | 15 | royalties on -- I guess what is called "out-licensing"? |
| 09:59 | 16 | A.    Correct. |
| 09:59 | 17 | Q.    Could you explain to the jury what out-licensing is? |
| 09:59 | 18 | We talked about in-licensing; what's out-licensing? |
| 09:59 | 19 | A.    Out-licensing is us licensing Bratz to put on T-shirts |
| 09:59 | 20 | or stationary or bedding, using the name "Bratz," the |
| 10:00 | 21 | character art, and then licensing other companies to |
| 10:00 | 22 | manufacture products based on the Bratz brand. |
| 10:00 | 23 | Q.    And Mr. Bryant had made a request with respect to those |
| 10:00 | 24 | kinds of out-licensing arrangements? |
| 10:00 | 25 | A.    He did. |

66

| | | |
|---|---|---|
| 10:00 | 1 | Q.   And what was that? |
| 10:00 | 2 | A.   He wanted a percentage of royalties based on any future |
| 10:00 | 3 | deals that we did with outside manufacturers. |
| 10:00 | 4 | Q.   And did you raise that with Mr. Larian? |
| 10:00 | 5 | A.   Yes. |
| 10:00 | 6 | Q.   And this is Mr. Larian's response? |
| 10:00 | 7 | A.   Yes. |
| 10:00 | 8 | Q.   And he said, "Tell him licensing royalties is a pie in |
| 10:00 | 9 | the sky in the future"? |
| 10:00 | 10 | A.   Yes. |
| 10:00 | 11 | Q.   And then, "We are going to risk and spend millions |
| 10:00 | 12 | making this brand and line happen."  Do you see that? |
| 10:00 | 13 | A.   Yes. |
| 10:00 | 14 | Q.   And at that point you had seen the designs, correct? |
| 10:00 | 15 | A.   Yes. |
| 10:00 | 16 | Q.   And you'd seen this prototype? |
| 10:00 | 17 | A.   Yes. |
| 10:00 | 18 | Q.   It was your understanding that based on that, |
| 10:01 | 19 | Mr. Larian was saying he was going to risk and spend |
| 10:01 | 20 | millions? |
| 10:01 | 21 | A.   Yes. |
| 10:01 | 22 | Q.   And at that point when Mr. Larian said this, was there |
| 10:01 | 23 | already a contract in place with Mr. Bryant as of then? |
| 10:01 | 24 | A.   No. |
| 10:01 | 25 | Q.   As of the time that Mr. Larian said this, can you |

Case 2:04-cv-09049-DOC-RNB   Document 9808   Filed 02/07/11   Page 67 of 144   Page ID #:295617
CV 04-9049 DOC - 2/4/2011 - Day 13, Volume 1 of 3

67

| | | |
|---|---|---|
| 10:01 | 1 | recall any type of investigation that had been done to try |
| 10:01 | 2 | to determine whether or not Mr. Bryant, in fact, was the |
| 10:01 | 3 | owner of these designs? |
| 10:01 | 4 | A.   No. |
| 10:01 | 5 | Q.   And as of the time of that e-mail, do you recall |
| 10:01 | 6 | whether MGA had already agreed to pay Mr. Bryant royalties |
| 10:01 | 7 | for his designs; this was just a question of whether he |
| 10:01 | 8 | would get royalties on out-licensing? |
| 10:01 | 9 | A.   Yes. |
| 10:01 | 10 | Q.   That, at this point, was an agreement in principle that |
| 10:01 | 11 | hadn't yet been documented? |
| 10:01 | 12 | A.   I'm not sure of the date that the actual draft went |
| 10:02 | 13 | out. |
| 10:02 | 14 | Q.   Okay.  All right.  Well, we'll get to that now. |
| 10:02 | 15 | If you'd look, please, at Exhibit 23855. |
| 10:02 | 16 | *(Document provided to the witness.)* |
| 10:02 | 17 | BY MR. QUINN: |
| 10:02 | 18 | Q.   And can you identify this document? |
| 10:02 | 19 | A.   Yes. |
| 10:02 | 20 | Q.   What is this? |
| 10:02 | 21 | A.   It's an e-mail chain between myself and David |
| 10:02 | 22 | Rosenbaum, who was outside counsel for MGA. |
| 10:02 | 23 | Q.   And who -- what was Mr. Rosenbaum's involvement? |
| 10:02 | 24 | A.   He was responsible for drafting the license agreement |
| 10:02 | 25 | between Carter Bryant and MGA Entertainment. |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 9808   Filed 02/07/11   Page 68 of 144   Page ID #:295618
CV 04-9049 DOC - 2/4/2011 - Day 13, Volume 1 of 3

68

| | | |
|---|---|---|
| 10:02 | 1 | MR. QUINN:  We'd offer Exhibit 23855, Your Honor. |
| 10:02 | 2 | THE COURT:  Any objection? |
| 10:02 | 3 | MS. KELLER:  If I could just have a moment, |
| 10:02 | 4 | Your Honor. |
| 10:03 | 5 | MR. QUINN:  Your Honor, this is one of those that |
| 10:03 | 6 | we received yesterday.  And there's a copy -- should be a |
| 10:03 | 7 | copy up there, which I handed to the clerk.  It's 23855. |
| 10:03 | 8 | MS. KELLER:  No objection. |
| 10:03 | 9 | THE COURT:  It's received. |
| 10:03 | 10 | *(Exhibit No. 23855 received in evidence.)* |
| 10:03 | 11 | MR. QUINN:  If we could display that, please, Ken. |
| 10:03 | 12 | *(Document displayed.)* |
| 10:03 | 13 | BY MR. QUINN: |
| 10:03 | 14 | Q.   If we could start with the bottom e-mail on the chain, |
| 10:03 | 15 | on page 3, that's an e-mail from you to Mr. Rosenbaum? |
| 10:03 | 16 | A.   Yes. |
| 10:03 | 17 | Q.   And he's the lawyer, right? |
| 10:03 | 18 | A.   Yes. |
| 10:03 | 19 | Q.   And you write, "Hi, David, we are hiring Carter Bryant |
| 10:03 | 20 | as a consultant for MGA and need a licensing consultant |
| 10:03 | 21 | contract ASAP."  It's dated September 12th, correct? |
| 10:03 | 22 | A.   Yes. |
| 10:03 | 23 | Q.   And you say, "He will be developing our line of fashion |
| 10:03 | 24 | dolls called 'Bratz'"? |
| 10:04 | 25 | THE COURT:  Just a moment. |

| | | |
|---|---|---|
| 10:04 | 1 | Is this September 22nd, 2000?  Just a moment. |
| 10:04 | 2 | Just one minute. |
| 10:04 | 3 | Let me start again. |
| 10:04 | 4 | Please continue.  And you can start over if you |
| 10:04 | 5 | would like to.  I'm sorry for the interruption. |
| 10:04 | 6 | BY MR. QUINN: |
| 10:04 | 7 | Q.   You wrote, "He be developing our line of fashion dolls |
| 10:04 | 8 | called 'Bratz,'" right? |
| 10:04 | 9 | A.   Yes. |
| 10:04 | 10 | Q.   And then what is the rest of that e-mail that you're -- |
| 10:04 | 11 | what is that information that you're giving the lawyer, |
| 10:04 | 12 | Mr. Rosenbaum? |
| 10:04 | 13 | A.   I'm outlining for him the terms of the agreement that |
| 10:04 | 14 | he's to draft. |
| 10:04 | 15 | Q.   Had you ever worked with Mr. Rosenbaum before? |
| 10:04 | 16 | A.   Yes. |
| 10:04 | 17 | Q.   And then, if you'd turn to page 2, there is an e-mail |
| 10:04 | 18 | in the middle of the page, from you to Mr. Rosenbaum, dated |
| 10:05 | 19 | September 12, 2000.  Do you see that? |
| 10:05 | 20 | *(Document displayed.)* |
| 10:05 | 21 | THE WITNESS:  Yes. |
| 10:05 | 22 | BY MR. QUINN: |
| 10:05 | 23 | Q.   And you write, there, "Carter is currently a Mattel |
| 10:05 | 24 | designer and will be resigning as soon as he executes this |
| 10:05 | 25 | contract.  Carter will manage the design and development of |

Case 2:04-cv-09049-DOC-RNB   Document 9808   Filed 02/07/11   Page 70 of 144   Page ID #:295620
CV 04-9049 DOC - 2/4/2011 - Day 13, Volume 1 of 3

70

| | | |
|---|---|---|
| 10:05 | 1 | the small doll line, Bratz." |
| 10:05 | 2 | Do you see that? |
| 10:05 | 3 | A.   Yes. |
| 10:05 | 4 | Q.   And was that -- that was to be his role, the person who |
| 10:05 | 5 | manages the design and development of the Bratz? |
| 10:05 | 6 | A.   Along with Paula Garcia, yes. |
| 10:05 | 7 | Q.   Okay.  They'd do that together? |
| 10:05 | 8 | A.   Yes. |
| 10:05 | 9 | Q.   And then, if you'd look at the first e-mail in the |
| 10:05 | 10 | chain -- it's actually the last one that's at the top, |
| 10:05 | 11 | September 14th. |
| 10:05 | 12 | (Document displayed.) |
| 11:59 | 13 | BY MR. QUINN: |
| 10:05 | 14 | Q.   That's from you to Mr. Rosenbaum? |
| 10:05 | 15 | A.   Yes. |
| 10:05 | 16 | Q.   And what you wrote there is "he" -- presumably |
| 10:05 | 17 | Mr. Carter? |
| 10:05 | 18 | A.   Yes. |
| 10:05 | 19 | Q.   -- "Came up with Bratz.  Mattel does not do or plan to |
| 10:06 | 20 | do anything similar.  It's too hip for them.  He will fax |
| 10:06 | 21 | you his employment agreement today."  And, "He has an |
| 10:06 | 22 | appointment with his lawyer to go over the contract," |
| 10:06 | 23 | et cetera. |
| 10:06 | 24 | Do you see that? |
| 10:06 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 10:06 | 1 | Q.   Now, what was the source of your information here, |
| 10:06 | 2 | where you wrote, "He came up with Bratz and Mattel does not |
| 10:06 | 3 | do or plan to do anything similar ... too hip for them"? |
| 10:06 | 4 | A.   That's what Carter told me. |
| 10:06 | 5 | Q.   Do you have any source of information for that other |
| 10:06 | 6 | than what Mr. Bryant told you? |
| 10:06 | 7 | A.   Just my knowledge of what Mattel had in the marketplace |
| 10:06 | 8 | at the time. |
| 10:06 | 9 | Q.   Did Mr. Bryant ever say anything to you as to whether |
| 10:06 | 10 | or not he had disclosed the Bratz designs and offered them |
| 10:06 | 11 | to Mattel? |
| 10:06 | 12 | A.   He told me in that first meeting he would not show it |
| 10:07 | 13 | to Mattel because it was too hip for them. |
| 10:07 | 14 | Q.   That he would not show it to Mattel? |
| 10:07 | 15 | A.   Correct. |
| 10:07 | 16 | Q.   All right.  And then in the second line, you tell |
| 10:07 | 17 | Mr. Rosenbaum, "He," Mr. Bryant, "will fax you his |
| 10:07 | 18 | employment agreement today." |
| 10:07 | 19 | Do you see that? |
| 10:07 | 20 | A.   Yes. |
| 10:07 | 21 | Q.   And why -- why was that important? |
| 10:07 | 22 | A.   That was important to know if, during his employment, |
| 10:07 | 23 | he had had any special arrangements with any designs that he |
| 10:07 | 24 | came up with belonging to Mattel. |
| 10:07 | 25 | Q.   Okay.  And that's something that you -- whether there |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 9808   Filed 02/07/11   Page 72 of 144   Page ID #:295622
CV 04-9049 DOC - 2/4/2011 - Day 13, Volume 1 of 3

72

| 10:07 | 1 | was something -- an employment agreement that dealt with |
| 10:07 | 2 | that subject, do you think that was something important to |
| 10:07 | 3 | know? |
| 10:07 | 4 | A.   Yes. |
| 10:07 | 5 | Q.   So did Mr. Rosenbaum prepare a draft of an agreement? |
| 10:07 | 6 | A.   Yes. |
| 10:08 | 7 | Q.   Did Mr. Larian ever tell you to make sure that |
| 10:08 | 8 | Mr. Bryant, in fact, had created these designs, you know, |
| 10:08 | 9 | outside his employment at Mattel? |
| 10:08 | 10 | A.   No. |
| 10:08 | 11 | Q.   If he had given you that instruction, is that something |
| 10:08 | 12 | you believe you would remember? |
| 10:08 | 13 | A.   Yes. |
| 10:08 | 14 |          MR. QUINN:  If we could look at Exhibit 9258. |
| 10:08 | 15 |            *(Document provided to the witness.)* |
| 10:08 | 16 | BY MR. QUINN: |
| 10:09 | 17 | Q.   And can you identify this document? |
| 10:09 | 18 | A.   It's another chain of e-mails between myself and David |
| 10:09 | 19 | Rosenbaum. |
| 10:09 | 20 |          MR. QUINN:  We'd offer this in evidence, |
| 10:09 | 21 | Your Honor. |
| 10:09 | 22 |          MS. KELLER:  No objection. |
| 10:09 | 23 |          THE COURT:  Received. |
| 10:09 | 24 |          *(Exhibit No. 9258 received in evidence.)* |
| 10:09 | 25 |            *(Document displayed.)* |

CV 04-9049 DOC - 2/4/2011 - Day 13, Volume 1 of 3

73

| | | |
|---|---|---|
| 10:09 | 1 | MR. QUINN:  And if we could blow up, perhaps, the |
| 10:09 | 2 | first half of the top page of this exhibit, 9258-1. |
| 10:09 | 3 | THE COURT:  Let's make certain that we're talking |
| 10:09 | 4 | the same numbers we've gone over this weekend.  That would |
| 10:09 | 5 | be the 9/19/2000 e-mail? |
| 10:09 | 6 | MR. QUINN:  Yes, Your Honor. |
| 10:09 | 7 | THE COURT:  Okay.  Thank you. |
| 10:09 | 8 | BY MR. QUINN: |
| 10:09 | 9 | Q.   In the middle there, there's an e-mail from |
| 10:09 | 10 | Mr. Rosenbaum to you? |
| 10:09 | 11 | A.   Yes. |
| 10:09 | 12 | Q.   Re consulting agreement? |
| 10:09 | 13 | A.   Yes. |
| 10:09 | 14 | Q.   And he writes to you, "Thanks.  Would you make sure |
| 10:09 | 15 | that Carter has his lawyer call me to discuss the Mattel |
| 10:09 | 16 | issue and that we want to be able to address the warranties |
| 10:10 | 17 | that he will make regarding originality and ownership, |
| 10:10 | 18 | vis-a-vis Mattel." |
| 10:10 | 19 | Do you see that? |
| 10:10 | 20 | A.   Yes. |
| 10:10 | 21 | Q.   And do you know what the Mattel -- what the Mattel |
| 10:10 | 22 | issue is that's referred to here? |
| 10:10 | 23 | A.   Whether or not he owned Bratz. |
| 10:10 | 24 | Q.   If he had created it during the time he was employed by |
| 10:10 | 25 | Mattel, was that an issue for you? |

Case 2:04-cv-09049-DOC-RNB   Document 9808   Filed 02/07/11   Page 74 of 144   Page ID #:295624
CV 04-9049 DOC - 2/4/2011 - Day 13, Volume 1 of 3

74

| 10:10 | 1 | A.   Yes. |
| 10:10 | 2 | Q.   So what was -- what would -- what type of satisfaction |
| 10:10 | 3 | or resolution were you looking for regarding this Mattel |
| 10:10 | 4 | issue? |
| 10:10 | 5 | A.   I was looking for resolution that he did not create it |
| 10:10 | 6 | while employed at Mattel. |
| 10:10 | 7 | Q.   And what type of evidence would -- would you be kind of |
| 10:10 | 8 | looking for, of that? |
| 10:11 | 9 | A.   I was waiting for David Rosenbaum to tell me that it |
| 10:11 | 10 | was fine. |
| 10:11 | 11 | Q.   All right.  If it could be shown that he had created |
| 10:11 | 12 | this during some time period where he wasn't employed by |
| 10:11 | 13 | Mattel, would that have taken care of that issue for you? |
| 10:11 | 14 | A.   Yes. |
| 10:11 | 15 | Q.   So, for example, if he was not employed by Mattel in |
| 10:11 | 16 | the time period back in 1998 and it was proven to your |
| 10:11 | 17 | satisfaction that he had created it then, would that be |
| 10:11 | 18 | something that would resolve that Mattel issue for you? |
| 10:11 | 19 | A.   Yes. |
| 10:12 | 20 | Q.   And you indicate that you -- at the top you said you |
| 10:12 | 21 | just left Mr. Bryant a message requesting him to send the -- |
| 10:12 | 22 | was that "to send the employment agreement"? |
| 10:12 | 23 | A.   Yes. |
| 10:12 | 24 | Q.   So it was very important to see that? |
| 10:12 | 25 | A.   Yes. |

Case 2:04-cv-09049-DOC-RNB   Document 9808   Filed 02/07/11   Page 75 of 144   Page ID #:295625
CV 04-9049 DOC - 2/4/2011 - Day 13, Volume 1 of 3

75

| | | |
|---|---|---|
| 10:12 | 1 | MR. QUINN:  And if we could take a look now at |
| 10:12 | 2 | Exhibit 9257. |
| 10:12 | 3 | *(Document provided to the witness.)* |
| 10:12 | 4 | BY MR. QUINN: |
| 10:12 | 5 | Q.   Could you identify Exhibit 9257? |
| 10:13 | 6 | THE COURT:  Counsel, for -- will each of you |
| 10:13 | 7 | represent that should be September 26? |
| 10:13 | 8 | MR. QUINN:  September 26, 2000, yes, Your Honor. |
| 10:13 | 9 | BY MR. QUINN: |
| 10:13 | 10 | Q.   Can you identify this document for us? |
| 10:13 | 11 | A.   Yes.  It's another e-mail chain between David Rosenbaum |
| 10:13 | 12 | and myself. |
| 10:13 | 13 | MR. QUINN:  I'd offer Exhibit 9257, Your Honor. |
| 10:13 | 14 | THE COURT:  Any objection? |
| 10:13 | 15 | MS. KELLER:  No objection. |
| 10:13 | 16 | THE COURT:  Received. |
| 10:13 | 17 | *(Exhibit No. 9257 received in evidence.)* |
| 10:13 | 18 | *(Document displayed.)* |
| 10:13 | 19 | BY MR. QUINN: |
| 10:13 | 20 | Q.   So this is -- that last e-mail we looked at was |
| 10:13 | 21 | dated -- uh -- 9258 was dated September 19.  This one is a |
| 10:13 | 22 | week later?  September 26th? |
| 10:13 | 23 | A.   Yes. |
| 10:13 | 24 | Q.   And you write -- or Mr.-- I guess -- Rosenbaum writes |
| 10:13 | 25 | to you, "Victoria, we still have the Mattel issue, which has |

CV 04-9049 DOC - 2/4/2011 - Day 13, Volume 1 of 3

76

| 10:13 | 1 | not been addressed, which is why me having a conversation |
| 10:13 | 2 | with his lawyer will try to address this in a |
| 10:13 | 3 | semi-privileged way." |
| 10:14 | 4 | What did you understand he meant by semi-privileged |
| 10:14 | 5 | way? |
| 10:14 | 6 | MS. KELLER: Objection. Calls for speculation. |
| 10:14 | 7 | THE COURT: Overruled. |
| 10:14 | 8 | MS. KELLER: Legal conclusion. |
| 10:14 | 9 | THE COURT: Overruled. You can state your |
| 10:14 | 10 | opinion. |
| 10:14 | 11 | THE WITNESS: I don't know. |
| | 12 | BY MR. QUINN: |
| 10:14 | 13 | Q. You just don't recall? |
| 10:14 | 14 | A. I don't recall. |
| 10:14 | 15 | Q. All right. Now, the agreement actually -- if you look |
| 10:14 | 16 | at Exhibit 15. This is in evidence. The agreement actually |
| 10:14 | 17 | is signed -- it's signed on the 26th -- on September 26th? |
| 10:14 | 18 | I'm sorry. Signed October 4th? |
| 10:14 | 19 | A. (No response.) |
| 10:14 | 20 | Q. That copy I don't think has a date on it. Exhibit 15? |
| 10:14 | 21 | THE COURT: Exhibit 15 is gonna refer back -- |
| 10:15 | 22 | MR. QUINN: Yeah. |
| 10:15 | 23 | BY MR. QUINN: |
| 10:15 | 24 | Q. If we could look at the last page of Exhibit 15. It's |
| 10:15 | 25 | Exhibit 15-6. |

| | | |
|---|---|---|
| 10:15 | 1 | *(Document displayed.)* |
| 10:15 | 2 | BY MR. QUINN: |
| 10:15 | 3 | Q.   And there's a stamp down there at the bottom that |
| 10:15 | 4 | says –– it's one of those word processing numbers.  It says |
| 10:15 | 5 | "October 4, 2000." |
| 10:15 | 6 |      Do you see that there? |
| 10:15 | 7 | A.   Yes. |
| 10:15 | 8 | Q.   And what we're looking at here, Exhibit 15, is a copy |
| 10:15 | 9 | of the agreement that was ultimately entered into between |
| 10:15 | 10 | MGA and Mr. Bryant? |
| 10:15 | 11 | A.   Yes. |
| 10:15 | 12 | Q.   All right.  So if we can turn back to Exhibit 9257, |
| 10:15 | 13 | September 26th, as of that point this would indicate that |
| 10:15 | 14 | the Mattel issue still had not been resolved, correct? |
| 10:15 | 15 | A.   Yes. |
| 10:15 | 16 | Q.   And this is on a Tuesday.  So that's –– if the |
| 10:15 | 17 | agreement's signed on October 4, that's, uh, about a week |
| 10:16 | 18 | before the –– October 4th?  September 26th to October 4th? |
| 10:16 | 19 | A.   Yes. |
| 10:16 | 20 | Q.   All right.  And then, if you would look, please, at |
| 10:16 | 21 | Exhibit 18463. |
| 10:16 | 22 |           *(Document provided to the witness.)* |
| 10:16 | 23 |           THE COURT:  Just a moment, Counsel.  It should be |
| 10:16 | 24 | September 28th, Counsel. |
| 10:16 | 25 |           MR. QUINN:  September 28th.  Yes, Your Honor. |

CV 04-9049 DOC - 2/4/2011 - Day 13, Volume 1 of 3

78

| | | |
|---|---|---|
| 10:16 | 1 | THE COURT:  Thank you. |
| 10:16 | 2 | BY MR. QUINN: |
| 10:16 | 3 | Q.   And can you identify this for us, please? |
| 10:16 | 4 | A.   It's another e-mail chain between myself and David |
| 10:16 | 5 | Rosenbaum. |
| 10:16 | 6 | MR. QUINN:  I'd offer that in evidence, |
| 10:16 | 7 | Your Honor. |
| 10:16 | 8 | THE COURT:  Received. |
| 10:16 | 9 | *(Exhibit No. 18463 received in evidence.)* |
| 10:17 | 10 | *(Document displayed.)* |
| 11:59 | 11 | BY MR. QUINN: |
| 10:17 | 12 | Q.   And we're now -- this is September 28th.  We're now -- |
| 10:17 | 13 | it indicates this is a Thursday? |
| 10:17 | 14 | A.   Yes. |
| 10:17 | 15 | Q.   If you'd look at the bottom e-mail there on the first |
| 10:17 | 16 | page.  So we're now Thursday, less than a week -- three |
| 10:17 | 17 | business days before October 4? |
| 10:17 | 18 | A.   Yes. |
| 10:17 | 19 | Q.   And Mr. Rosenbaum indicates to you, "I spoke with |
| 10:17 | 20 | Carter's lawyer this a.m. and e-mailed her a copy of the |
| 10:17 | 21 | draft agreement for her review.  I asked her specifically |
| 10:17 | 22 | about the Mattel issue, and she said she has reviewed the |
| 10:17 | 23 | chronology of the creation of this design and is satisfied |
| 10:17 | 24 | that Carter created this outside the scope of his employment |
| 10:17 | 25 | at Mattel.  She says she understands the concerns here. |

| | | |
|---|---|---|
| 10:18 | 1 | Apparently, he conceived this product in 1998, so I |
| 10:18 | 2 | recommend that your patent attorneys review this project as |
| 10:18 | 3 | soon as possible to avoid any time limitations in the patent |
| 10:18 | 4 | laws." |
| 10:18 | 5 | Do you see that? |
| 10:18 | 6 | A.   Yes. |
| 10:18 | 7 | Q.   And he says -- he used -- he says that her attorney -- |
| 10:18 | 8 | Mr. Bryant's attorney is satisfied that Carter created this |
| 10:18 | 9 | outside the scope of his employment at Mattel and he |
| 10:18 | 10 | conceived it in 1998. |
| 10:18 | 11 | Did that -- the difference in those words "creating" |
| 10:18 | 12 | and "conceiving," did that -- did those connote different |
| 10:18 | 13 | things to you? |
| 10:18 | 14 | A.   I don't recall. |
| 10:18 | 15 | Q.   I mean, do you know of anything that was done -- |
| 10:18 | 16 | apparently Mr. Rosenbaum had spoken to this Ms. Wang, who |
| 10:18 | 17 | was Mr. Bryant's lawyer? |
| 10:19 | 18 | A.   Okay.  I don't remember her name. |
| 10:19 | 19 | Q.   Okay.  But is that how you understand this, reading it |
| 10:19 | 20 | now?  That he had spoken to a lawyer for Mr. Bryant? |
| 10:19 | 21 | A.   Yes. |
| 10:19 | 22 | Q.   And do you know of anything that was done to confirm |
| 10:19 | 23 | what apparently was said to Mr. Rosenbaum? |
| 10:19 | 24 | MS. KELLER:  Objection.  Assumes facts not in |
| 10:19 | 25 | evidence. |

| | | |
|---|---|---|
| 10:19 | 1 | THE COURT:  Overruled. |
| 10:19 | 2 | You can answer the question. |
| 10:19 | 3 | THE WITNESS:  No. |
| 11:59 | 4 | BY MR. QUINN: |
| 10:19 | 5 | Q.   All right.  I mean, do you verify a man's word by just |
| 10:19 | 6 | asking for him -- for his word? |
| 10:19 | 7 | THE COURT:  Are you referring to her? |
| 10:19 | 8 | BY MR. QUINN: |
| 10:19 | 9 | Q.   In your experience as a licensing manager, where you're |
| 10:19 | 10 | trying to do due diligence, do you verify the truth of what |
| 10:19 | 11 | somebody tells you just by asking them to tell you was that |
| 10:19 | 12 | the truth? |
| 10:19 | 13 | MS. KELLER:  Objection.  Irrelevant.  And, |
| 10:19 | 14 | objection.  Calls for -- it misstates the testimony. |
| 10:19 | 15 | THE COURT:  Overruled. |
| 10:19 | 16 | She's in the industry.  She can cast her opinion, |
| 10:19 | 17 | but this might be what she would do. |
| 10:20 | 18 | THE WITNESS:  If it's an attorney, I would |
| 10:20 | 19 | believe -- it depends on the person and the situation.  If |
| 10:20 | 20 | it's an attorney, I'm going to listen to what he says. |
| 10:20 | 21 | BY MR. QUINN: |
| 10:20 | 22 | Q.   But in terms of -- do you have any information as to |
| 10:20 | 23 | what Mr. Bryant's attorney did to verify that this was |
| 10:20 | 24 | conceived in '98 and created outside the scope of the |
| 10:20 | 25 | employment? |

CV 04-9049 DOC - 2/4/2011 - Day 13, Volume 1 of 3

81

| | | |
|---|---|---|
| 10:20 | 1 | A.   No, I have no knowledge of that. |
| 10:20 | 2 | Q.   At any point did you or anyone at MGA or, to your |
| 10:20 | 3 | knowledge, Mr. Rosenbaum, do anything to follow up on that |
| 10:20 | 4 | and try to confirm it? |
| 10:20 | 5 | A.   Not that I recall. |
| 10:20 | 6 | Q.   I mean, do you recall ever seeing any type of legal |
| 10:20 | 7 | opinion that was given on this subject? |
| 10:20 | 8 | A.   Outside of this e-mail? |
| 10:20 | 9 | Q.   Yes. |
| 10:20 | 10 | A.   No. |
| 10:20 | 11 | Q.   Did you recall ever seeing any drawings that had dates |
| 10:20 | 12 | on them that were actually put on the drawings in 1998? |
| 10:20 | 13 | A.   No. |
| 10:21 | 14 | Q.   Do you know of anything that was done other than just |
| 10:21 | 15 | talking to Mr. Bryant's lawyer on this subject? |
| 10:21 | 16 | A.   No. |
| 10:21 | 17 | Q.   And to your knowledge, was Mr. Bryant's contract at |
| 10:21 | 18 | Mattel ever reviewed? |
| 10:21 | 19 | A.   Yes. |
| 10:21 | 20 | Q.   The inventions agreement was reviewed? |
| 10:21 | 21 | A.   His employment contract, when he was hired? |
| 10:21 | 22 | Q.   No.  In terms of his employment contract at Mattel, do |
| 10:21 | 23 | you recall ever actually seeing his -- an agreement, an |
| 10:21 | 24 | inventions agreement -- |
| 10:21 | 25 | A.   No. |

Case 2:04-cv-09049-DOC-RNB   Document 9808   Filed 02/07/11   Page 82 of 144   Page ID #:295632
CV 04-9049 DOC - 2/4/2011 - Day 13, Volume 1 of 3

82

| | | |
|---|---|---|
| 10:21 | 1 | Q.    -- he had entered into? |
| 10:21 | 2 | A.    No. |
| 10:21 | 3 | Q.    Now, if, in fact, Mr. Bryant was not working at Mattel |
| 10:21 | 4 | in 1998 and he had created these designs in 1998, then |
| 10:21 | 5 | that's all you needed to hear, right? |
| 10:22 | 6 | A.    Correct. |
| 10:22 | 7 | Q.    If that were true? |
| 10:22 | 8 | A.    Yes. |
| 10:22 | 9 | Q.    But that would be important to know? |
| 10:22 | 10 | A.    Yes. |
| 10:22 | 11 | Q.    Do you know how long Mr. Rosenbaum spoke with |
| 10:22 | 12 | Mr. Bryant's attorney? |
| 10:22 | 13 | A.    No. |
| 10:22 | 14 | Q.    Do you know whether Mr. Rosenbaum himself ever reviewed |
| 10:22 | 15 | Mr. Bryant's contract? |
| 10:22 | 16 | A.    No. |
| 10:22 | 17 | Q.    Do you know whether Mr. Rosenbaum ever actually |
| 10:22 | 18 | reviewed any drawings at all? |
| 10:22 | 19 | A.    No. |
| 10:22 | 20 | Q.    So is it true that so far as you're aware, as the |
| 10:22 | 21 | licensing director, based solely on this statement that |
| 10:22 | 22 | Mr. Bryant's lawyer apparently made to Mr. Rosenbaum, that |
| 10:22 | 23 | MGA decided it was comfortable and the Mattel issue was |
| 10:22 | 24 | resolved? |
| 10:22 | 25 | MS. KELLER:  Objection.  Argumentative. |

| 10:22 | 1 | THE WITNESS:  I remember that we were moving |
| 10:23 | 2 | forward. |
| 10:23 | 3 | THE COURT:  Overruled. |
| 10:23 | 4 | THE WITNESS:  Oh, sorry. |
| 10:23 | 5 | THE COURT:  You can answer the question. |
| 10:23 | 6 | THE WITNESS:  I remember that we were moving |
| 10:23 | 7 | forward. |
| 10:23 | 8 | BY MR. QUINN: |
| 10:23 | 9 | Q.  And are you aware of anything else, other than just |
| 10:23 | 10 | getting this oral statement and this e-mail, that was done |
| 10:23 | 11 | to resolve the Mattel issue? |
| 10:23 | 12 | A.  No. |
| 10:23 | 13 | Q.  If we could look, please, at Exhibit 305, which is |
| 10:23 | 14 | already in evidence. |
| 10:23 | 15 | *(Document provided to the witness.)* |
| 10:23 | 16 | *(Document displayed.)* |
| | 17 | BY MR. QUINN: |
| 10:23 | 18 | Q.  And you'll see there -- you're copied on this e-mail |
| 10:23 | 19 | string? |
| 10:23 | 20 | A.  Yes. |
| 10:24 | 21 | MR. QUINN:  And if we could enlarge the e-mail in |
| 10:24 | 22 | the middle, from Paula Treantafelles to you, dated October |
| 10:24 | 23 | 10th, where she -- |
| 10:24 | 24 | *(Technician complies.)* |
| | 25 | |

Case 2:04-cv-09049-DOC-RNB   Document 9808   Filed 02/07/11   Page 84 of 144   Page ID
#:295634
CV 04-9049 DOC - 2/4/2011 - Day 13, Volume 1 of 3

84

| | | |
|---|---|---|
| 10:24 | 1 | BY MR. QUINN: |
| 10:24 | 2 | Q.   Ms. Garcia says to you, "I would say that Carter has |
| 10:24 | 3 | worked an average about four hours a day, and we began |
| 10:24 | 4 | working on this line the first part of September." |
| 10:24 | 5 | Do you see that? |
| 10:24 | 6 | A.   Yes. |
| 10:24 | 7 | Q.   And is that consistent with your recollection? |
| 10:24 | 8 | MR. QUINN:  Your Honor, would now be a suitable |
| 10:24 | 9 | time for a break? |
| 10:24 | 10 | THE COURT:  Apparently, it would be. |
| 10:24 | 11 | Why don't you go take a nice recess.  We'll come |
| 10:24 | 12 | and get you in about 20 minutes.  You're admonished not to |
| 10:24 | 13 | discuss this matter amongst yourselves, nor form or express |
| 10:24 | 14 | any opinion concerning the case. |
| 10:24 | 15 | Counsel, have a nice recess. |
| 10:24 | 16 | *(Recess held at 10:24 a.m.)* |
| 10:46 | 17 | *(Proceedings resumed at 10:46 a.m.)* |
| 10:46 | 18 | THE COURT:  All right.  Then, we're back in |
| 10:46 | 19 | session.  The jury's present.  Counsel are present.  The |
| 10:46 | 20 | witness is present. |
| 10:46 | 21 | And, Counsel, Mr. Quinn, if you would like to |
| 10:46 | 22 | continue your direct examination, please. |
| 10:46 | 23 | MR. QUINN:  Thank you, Your Honor. |
| 10:46 | 24 | **DIRECT EXAMINATION (Continued)** |
| | 25 | |

CV 04-9049 DOC - 2/4/2011 - Day 13, Volume 1 of 3

85

| | | |
|---|---|---|
| 10:46 | 1 | BY MR. QUINN: |
| 10:46 | 2 | Q.  We were looking at Exhibit 305 into evidence.  If we |
| 10:46 | 3 | could put that back on the screen and enlarge that middle |
| 10:46 | 4 | e-mail. |
| 10:46 | 5 | *(Exhibit displayed.)* |
| 11:59 | 6 | BY MR. QUINN: |
| 10:46 | 7 | Q.  Now, you're copied on this e-mail string? |
| 10:46 | 8 | A.  Yes. |
| 10:46 | 9 | Q.  And you knew that Mr. Bryant was still employed by |
| 10:46 | 10 | Mattel at this time? |
| 10:46 | 11 | A.  Yes. |
| 10:46 | 12 | Q.  And did you observe Mr. Bryant in MGA's offices? |
| 10:46 | 13 | A.  Yes. |
| 10:46 | 14 | Q.  During the time he was still employed by Mattel? |
| 10:46 | 15 | A.  Yes. |
| 10:46 | 16 | Q.  Was that during the business day? |
| 10:46 | 17 | A.  Yes. |
| 10:46 | 18 | Q.  Did you see him in meetings? |
| 10:47 | 19 | A.  I saw him in meetings with Paula. |
| 10:47 | 20 | Q.  Once, or more than once? |
| 10:47 | 21 | A.  More than once. |
| 10:47 | 22 | Q.  Did -- was that -- did that make you uncomfortable that |
| 10:47 | 23 | he was still employed by Mattel and was over in MGA having |
| 10:47 | 24 | these meetings about development of a doll? |
| 10:47 | 25 | A.  Yes. |

| | | |
|---|---|---|
| 10:47 | 1 | MR. QUINN:  If we could take a look at |
| 10:47 | 2 | Exhibit 17236. |
| 10:47 | 3 | *(Document provided to the witness.)* |
| 11:59 | 4 | BY MR. QUINN: |
| 10:47 | 5 | Q.   And I ask you if you can identify this document, 17236, |
| 10:47 | 6 | e-mail dated October 4, 2003. |
| 10:47 | 7 | A.   2000. |
| 10:48 | 8 | Q.   2000, thank you. |
| 10:48 | 9 | A.   Yes. |
| 10:48 | 10 | Q.   Can you identify this? |
| 10:48 | 11 | A.   Yes. |
| 10:48 | 12 | Q.   And what is this? |
| 10:48 | 13 | A.   It's an e-mail from David Rosenbaum to Carter Bryant's |
| 10:48 | 14 | attorney, Anne Wang. |
| 10:48 | 15 | MR. QUINN:  We'd offer that, Your Honor. |
| 10:48 | 16 | THE COURT:  Received -- well, just a moment. |
| 10:48 | 17 | Any objection? |
| 10:48 | 18 | MS. KELLER:  No objection. |
| 10:48 | 19 | THE COURT:  Received. |
| 10:48 | 20 | *(Exhibit No. 17236 received in evidence.)* |
| 10:48 | 21 | *(Document displayed.)* |
| 10:48 | 22 | MR. QUINN:  If we could enlarge that e-mail at the |
| 10:48 | 23 | top. |
| 10:48 | 24 | *(Technician complies.)* |
| | 25 | |

| 10:48 | 1 | BY MR. PRICE: |
|---|---|---|
| 10:48 | 2 | Q.   And, Ms. O'Connor, does this refresh your recollection |
| 10:48 | 3 | that the name of Mr. Bryant's lawyer was Anne Wang? |
| 10:48 | 4 | A.   Yes. |
| 10:48 | 5 | Q.   And you understood that Anne Wang was representing |
| 10:48 | 6 | Mr. Bryant? |
| 10:48 | 7 | A.   Yes. |
| 10:48 | 8 | Q.   In negotiating the terms of a contract? |
| 10:48 | 9 | A.   Yes. |
| 10:48 | 10 | Q.   And there were various revisions or modifications that |
| 10:48 | 11 | were proposed, and some rejected and some accepted? |
| 10:48 | 12 | A.   Yes. |
| 10:48 | 13 | Q.   And you understood she was trying to negotiate the best |
| 10:48 | 14 | deal for him; that would be her job? |
| 10:49 | 15 | A.   Correct. |
| 10:49 | 16 | Q.   In order to get a lucrative deal for him so that he |
| 10:49 | 17 | could get money? |
| 10:49 | 18 | MS. KELLER:  Objection.  Your Honor, leading |
| 10:49 | 19 | questions, continuously. |
| 10:49 | 20 | THE COURT:  Yeah.  I have not designated this as |
| 10:49 | 21 | an adverse witness. |
| 10:49 | 22 | MR. QUINN:  All right. |
| 10:49 | 23 | THE COURT:  So nonleading questions. |
| 10:49 | 24 | Sustained. |
| 10:49 | 25 | MR. QUINN:  All right. |

CV 04-9049 DOC - 2/4/2011 - Day 13, Volume 1 of 3

88

| | | |
|---|---|---|
| 10:49 | 1 | BY MR. QUINN: |
| 10:49 | 2 | Q.   Was it your understanding -- what, in your |
| 10:49 | 3 | understanding, was Mr. Bryant going to get out of this |
| 10:49 | 4 | agreement? |
| 10:49 | 5 | A.   A percentage of the royalties. |
| 10:49 | 6 | Q.   Right.  Do you have -- and he was represented by a |
| 10:49 | 7 | lawyer -- |
| 10:49 | 8 | A.   Yes. |
| 10:49 | 9 | Q.   -- in negotiating that? |
| 10:49 | 10 | Now, do you have any idea what investigation Ms. Wang |
| 10:49 | 11 | did to confirm that he conceived and created the Bratz |
| 10:49 | 12 | drawings in 1998? |
| 10:49 | 13 | A.   No. |
| 10:49 | 14 | Q.   Is it -- do you know whether anyone ever asked |
| 10:49 | 15 | Ms. Wang, to your knowledge, what she did to confirm that? |
| 10:50 | 16 | A.   No. |
| 10:50 | 17 | Q.   So, far as you know, did she do anything other than |
| 10:50 | 18 | simply ask Mr. Bryant? |
| 10:50 | 19 | MS. KELLER:  Objection.  Argumentative, and calls |
| 10:50 | 20 | for speculation as to what -- |
| 10:50 | 21 | THE COURT:  Just restate the question. |
| 10:50 | 22 | MR. QUINN:  All right. |
| 10:50 | 23 | BY MR. QUINN: |
| 10:50 | 24 | Q.   Did you hear from any source whether Ms. Wang did |
| 10:50 | 25 | anything to investigate that other than to simply ask |

Case 2:04-cv-09049-DOC-RNB   Document 9808   Filed 02/07/11   Page 89 of 144   Page ID #:295639
CV 04-9049 DOC - 2/4/2011 - Day 13, Volume 1 of 3

89

| | | |
|---|---|---|
| 10:50 | 1 | Mr. Bryant? |
| 10:50 | 2 | MS. KELLER:  Objection.  Assumes facts not in |
| 10:50 | 3 | evidence. |
| 10:50 | 4 | THE COURT:  Overruled. |
| 10:50 | 5 | I'm not going to allow it for the truth of the |
| 10:50 | 6 | matter.  It's just to see what actions she took -- the |
| 10:50 | 7 | witness took. |
| 10:50 | 8 | Overruled. |
| 10:50 | 9 | THE WITNESS:  No. |
| 10:50 | 10 | BY MR. QUINN: |
| 10:50 | 11 | Q.   I'd like to turn to a different subject now. |
| 10:50 | 12 | After -- the contract was signed at some point? |
| 10:51 | 13 | A.   Yes. |
| 10:51 | 14 | Q.   Do you recall how you first saw it in its signed form? |
| 10:51 | 15 | A.   Yes. |
| 10:51 | 16 | Q.   And how was that? |
| 10:51 | 17 | A.   Via fax machine. |
| 10:51 | 18 | Q.   It was?  Was it faxed to you, then. |
| 10:51 | 19 | A.   It was faxed to me, yes. |
| 10:51 | 20 | Q.   So far as you know, did anyone at MGA see it before |
| 10:51 | 21 | you? |
| 10:51 | 22 | A.   No. |
| 10:51 | 23 | Q.   And how do you know that? |
| 10:51 | 24 | A.   Because Carter called me prior to faxing it, and I went |
| 10:51 | 25 | to the fax machine and waited for it. |

CV 04-9049 DOC - 2/4/2011 - Day 13, Volume 1 of 3

90

| | | |
|---|---|---|
| 10:51 | 1 | Q.    And took the pages as they came off the fax? |
| 10:51 | 2 | A.    Yes. |
| 10:51 | 3 | Q.    And if we'd look at Exhibit 15.  And I'd ask you if |
| 10:51 | 4 | that appears to be a copy of the agreement that you got off |
| 10:51 | 5 | the fax? |
| 10:51 | 6 | *(Document provided to the witness.)* |
| 10:51 | 7 | *(Document displayed.)* |
| 10:51 | 8 | THE WITNESS:  It's not the original. |
| 10:51 | 9 | BY MR. QUINN: |
| 10:51 | 10 | Q.    Right.  But a copy of it. |
| 10:51 | 11 | A.    Yes. |
| 10:51 | 12 | Q.    All right.  Do you recall when you received this -- |
| 10:51 | 13 | when you took these pages off the fax, whether there was one |
| 10:52 | 14 | of those fax header lines on each page? |
| 10:52 | 15 | A.    Yes. |
| 10:52 | 16 | Q.    And what did that fax header line say? |
| 10:52 | 17 | A.    Mattel Barbie Collectibles. |
| 10:52 | 18 | Q.    Do you see that there on that copy that's before you, |
| 10:52 | 19 | Exhibit 15? |
| 10:52 | 20 | A.    No. |
| 10:52 | 21 | Q.    If we could take a look at Exhibit in evidence 1309. |
| 10:52 | 22 | *(Document provided to the witness.)* |
| 10:52 | 23 | MR. QUINN:  If we could enlarge that at the top. |
| 10:52 | 24 | *(Document displayed.)* |
| | 25 | |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:59 | 1 | BY MR. QUINN: |
| 10:52 | 2 | Q.   This is a transmittal from Mr. Bryant to Mr. Rosenbaum? |
| 10:52 | 3 | A.   Yes. |
| 10:52 | 4 | Q.   And if you could take a look at the header at the top |
| 10:52 | 5 | where it says, "Collectibles"? |
| 10:52 | 6 | A.   Yes. |
| 10:52 | 7 | Q.   Is that the header that was on Exhibit 15 when |
| 10:52 | 8 | Mr. Bryant's agreement -- signed agreement -- when you took |
| 10:52 | 9 | it off the fax page? |
| 10:52 | 10 | A.   It looks like it, but "Barbie" is not completely |
| 10:52 | 11 | written out on this copy. |
| 10:52 | 12 | Q.   All right.  Sort of like that? |
| 10:52 | 13 | A.   Yes. |
| 10:53 | 14 | Q.   Did you have some concern when you got this contract -- |
| 10:53 | 15 | can you tell us whether or not you had any concern when you |
| 10:53 | 16 | got this contract with the fax header on it? |
| 10:53 | 17 | A.   Yes. |
| 10:53 | 18 | Q.   And what was the nature of your concern? |
| 10:53 | 19 | A.   I was surprised and shocked that he faxed it from his |
| 10:53 | 20 | current place of employment. |
| 10:53 | 21 | Q.   Did you express that concern to anyone? |
| 10:53 | 22 | A.   Yes. |
| 10:53 | 23 | Q.   And who did you express it to? |
| 10:53 | 24 | A.   To Isaac Larian and Paula Garcia. |
| 10:53 | 25 | Q.   And if you could -- if you'd take a look at the first |

CV 04-9049 DOC – 2/4/2011 – Day 13, Volume 1 of 3

92

| | | |
|---|---|---|
| 10:53 | 1 | page of Exhibit 15, do you see there's a date there at the |
| 10:53 | 2 | top, dated as of September 18, 2000? |
| 10:53 | 3 | A.   Yes. |
| 10:53 | 4 | Q.   And can you tell us whether or not it was your |
| 10:53 | 5 | understanding that Mr. Bryant, as of the date that he sent |
| 10:53 | 6 | you that fax, was still working for Mattel? |
| 10:53 | 7 | MS. KELLER:  Objection.  Leading. |
| 10:53 | 8 | THE COURT:  Overruled. |
| 10:53 | 9 | THE WITNESS:  Yes. |
| 10:53 | 10 | BY MR. QUINN: |
| 10:53 | 11 | Q.   All right.  Now, jumping forward in time, did there |
| 10:54 | 12 | come a point where you were asked to do anything else with |
| 10:54 | 13 | this document -- this agreement? |
| 10:54 | 14 | A.   Yes. |
| 10:54 | 15 | Q.   And who asked you to do something with this agreement? |
| 10:54 | 16 | A.   Isaac Larian. |
| 10:54 | 17 | Q.   And what did he ask you to do with this agreement? |
| 10:54 | 18 | A.   He asked me to white-out the header that said Barbie |
| 10:54 | 19 | Collectibles and fax it to Patty Glaser. |
| 10:54 | 20 | Q.   When was it that he asked you to do that? |
| 10:54 | 21 | A.   I don't recall the exact date. |
| 10:54 | 22 | Q.   Was it some -- can you give us approximately a number |
| 10:54 | 23 | of months or some -- estimate the period of time? |
| 10:54 | 24 | A.   Six -- maybe six months. |
| 10:54 | 25 | Q.   All right.  And who is Patty Glaser? |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 10:54 | 1 | A.   She was outside counsel for MGA. |
| 10:54 | 2 | Q.   Do you know whether or not she is a trial lawyer? |
| 10:54 | 3 | A.   Yes. |
| 10:54 | 4 | Q.   Did Mr. Larian tell you why he was sending this |
| 10:55 | 5 | agreement to a trial lawyer? |
| 10:55 | 6 | A.   I don't recall. |
| 10:55 | 7 | Q.   Did Mr. Larian tell you why he was asking you to |
| 10:55 | 8 | white-out the fax header before sending this to a trial |
| 10:55 | 9 | lawyer? |
| 10:55 | 10 | A.   No. |
| 10:55 | 11 | Q.   Did Mr. Larian ask you to make any changes to the |
| 10:55 | 12 | agreement other than to white-out the "Collectibles" fax |
| 10:55 | 13 | header at the time that you faxed it to Ms. Glaser? |
| 10:55 | 14 | A.   Not that I recall. |
| 10:55 | 15 | Q.   If you'd take a look at Exhibit 133883 -- I'm sorry -- |
| 10:55 | 16 | 13383. |
| 10:55 | 17 | 13383, could you identify that document, please? |
| 10:55 | 18 | A.   Yes. |
| 10:55 | 19 | Q.   What is it? |
| 10:56 | 20 | A.   It's a fax cover sheet with -- sent by me to Patty |
| 10:56 | 21 | Glaser with Carter Bryant's contract attached. |
| 10:56 | 22 | THE COURT:  This should be, Counsel, the July 3rd |
| 10:56 | 23 | 2001? |
| 10:56 | 24 | MR. QUINN:  Yes, Your Honor. |
| 10:56 | 25 | THE COURT:  Counsel? |

Case 2:04-cv-09049-DOC-RNB   Document 9808   Filed 02/07/11   Page 94 of 144   Page ID #:295644
CV 04-9049 DOC - 2/4/2011 - Day 13, Volume 1 of 3

94

| | | |
|---|---|---|
| 10:56 | 1 | MR. QUINN: We'd offer that, Your Honor. |
| 10:56 | 2 | MS. KELLER: No objection. |
| 10:56 | 3 | THE COURT: Received. |
| 10:56 | 4 | *(Exhibit No. 13383 received in evidence.)* |
| 10:56 | 5 | MR. QUINN: If we could display the top there. |
| 10:56 | 6 | *(Document displayed.)* |
| 10:56 | 7 | BY MR. QUINN: |
| 10:56 | 8 | Q. Is this the fax cover sheet for the fax that you sent |
| 10:56 | 9 | to the trial lawyer Patty Glaser? |
| 10:56 | 10 | A. Yes. |
| 10:56 | 11 | Q. And does this refresh your recollection as to when it |
| 10:56 | 12 | was that you were asked to do this? |
| 10:56 | 13 | A. Yes. |
| 10:56 | 14 | Q. And then, if you would look at the pages behind it, do |
| 10:56 | 15 | those appear to be copies of the contract that you sent? |
| 10:56 | 16 | A. Yes. |
| 10:56 | 17 | Q. Is there any fax header at the top of those pages? |
| 10:56 | 18 | A. No. |
| 10:56 | 19 | Q. Is there a fax header at the bottom the pages? |
| 10:57 | 20 | A. Yes. |
| 10:57 | 21 | Q. And what does that say? |
| 10:57 | 22 | A. July 3rd, 2001, 11:06 a.m., MGA Entertainment. |
| 10:57 | 23 | Q. And then you see that little number in the lower |
| 10:57 | 24 | right-hand corner, "CG" -- the first page is 19, "CG-19"? |
| 10:57 | 25 | A. Yes. |

| 10:57 | 1 | Q.   Does that -- do you recall that Ms. Glaser was with a |
| 10:57 | 2 | law firm known as Christensen Glaser? |
| 10:57 | 3 | MS. KELLER:  Objection.  Leading. |
| 10:57 | 4 | THE COURT:  Overruled. |
| 10:57 | 5 | You can answer the question. |
| 10:57 | 6 | THE WITNESS:  Yes. |
| 10:57 | 7 | BY MR. QUINN: |
| 10:57 | 8 | Q.   All right.  So does it appear to you that this document |
| 10:57 | 9 | was produced to us by the Christensen Glaser firm? |
| 10:57 | 10 | MS. KELLER:  Objection.  Leading. |
| 10:57 | 11 | THE COURT:  Overruled. |
| 10:57 | 12 | THE WITNESS:  I don't know. |
| 10:57 | 13 | BY MR. QUINN: |
| 10:57 | 14 | Q.   All right.  And if you'd look at the top there -- |
| 10:57 | 15 | MR. QUINN:  If we could put the first page of |
| 10:57 | 16 | Exhibit 15, Ken, and the first page of the contract, which |
| 10:57 | 17 | is included in Exhibit 13383, on the screen next to each |
| 10:58 | 18 | other. |
| 10:58 | 19 | (Technician complies.) |
| 10:58 | 20 | BY MR. QUINN: |
| 10:58 | 21 | Q.   I note that the copy that was sent to Ms. Glaser, |
| 10:58 | 22 | 13383, does not have that date in the upper right-hand |
| 10:58 | 23 | corner, that "Dated as of September 18, 2000." |
| 10:58 | 24 | Do you see that? |
| 10:58 | 25 | A.   Yes. |

Case 2:04-cv-09049-DOC-RNB   Document 9808   Filed 02/07/11   Page 96 of 144   Page ID #:295646
CV 04-9049 DOC – 2/4/2011 – Day 13, Volume 1 of 3

96

| 10:58 | 1 | Q.   As of September 18, 2000, Mr. Bryant, in your |
| 10:58 | 2 | understanding, was still working for Mattel? |
| 10:58 | 3 | A.   Yes. |
| 10:58 | 4 | Q.   Do you have any knowledge or information as to why the |
| 10:58 | 5 | date is missing from the copy of the contract that was |
| 10:58 | 6 | produced by the firm? |
| 10:58 | 7 | A.   No. |
| 10:58 | 8 | Q.   Did you take that date off? |
| 10:58 | 9 | A.   No. |
| 10:58 | 10 | Q.   Do you have a recollection whether that date was on |
| 10:58 | 11 | when you faxed to the law firm? |
| 10:58 | 12 | A.   No. |
| 10:59 | 13 | THE COURT:  "No" you don't have a recollection or |
| 10:59 | 14 | "no" the date wasn't on? |
| 10:59 | 15 | THE WITNESS:  No, I don't have a recollection. |
| 10:59 | 16 | THE COURT:  Okay.  Thank you. |
| 10:59 | 17 | BY MR. QUINN: |
| 10:59 | 18 | Q.   Did you speak -- did you have a conversation with |
| 10:59 | 19 | Mr. Larian about his instruction to you to white-out the |
| 10:59 | 20 | Barbie Collectibles fax header before sending this to |
| 10:59 | 21 | Ms. Glaser? |
| 10:59 | 22 | A.   Other than telling me to do it, no. |
| 10:59 | 23 | Q.   At any time during your employment at MGA, had anyone |
| 10:59 | 24 | else ever asked you to white something out before sending it |
| 10:59 | 25 | to someone? |

| | | |
|---|---|---|
| 10:59 | 1 | A.   No. |
| 10:59 | 2 | Q.   At any time in your career, has anyone ever asked you |
| 10:59 | 3 | to white-out a fax header in a contract before sending it to |
| 10:59 | 4 | someone else? |
| 10:59 | 5 | A.   No. |
| 10:59 | 6 | Q.   I'd like to change subjects now. |
| 10:59 | 7 | Did Mr. Bryant continue to work for MGA for some number |
| 11:00 | 8 | of years after signing this contract? |
| 11:00 | 9 | A.   I was only there through February 2003. |
| 11:00 | 10 | Q.   Right.  But up until the time that you left? |
| 11:00 | 11 | A.   Yes. |
| 11:00 | 12 | Q.   And did you see reports or -- of accounts about who |
| 11:00 | 13 | actually created Bratz? |
| 11:00 | 14 | A.   Yes. |
| 11:00 | 15 | Q.   Did Mr. Larian give different accounts of who created |
| 11:00 | 16 | Bratz? |
| 11:00 | 17 | A.   Yes. |
| 11:00 | 18 | Q.   And did you have any kind of understanding while you |
| 11:00 | 19 | were at MGA as to whether or not Mr. Bryant's involvement in |
| 11:00 | 20 | the creation of Bratz was to be kept secret? |
| 11:00 | 21 | A.   Yes. |
| 11:00 | 22 | Q.   And what was your understanding in that regard? |
| 11:00 | 23 | A.   We were to keep it secret. |
| 11:00 | 24 | Q.   If we could look at Exhibit 4507. |
| 11:01 | 25 | MR. QUINN:  4507, which is already in evidence. |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 9808   Filed 02/07/11   Page 98 of 144   Page ID #:295648
CV 04-9049 DOC – 2/4/2011 – Day 13, Volume 1 of 3

98

| | | |
|---|---|---|
| 11:01 | 1 | *(Document provided to the witness.)* |
| 11:01 | 2 | *(Document displayed.)* |
| 11:01 | 3 | BY MR. QUINN: |
| 11:01 | 4 | Q.   You're copied on this e-mail dated March 12, 2002? |
| 11:01 | 5 | A.   Yes. |
| 11:01 | 6 | Q.   And can you tell us whether or not this concerns a |
| 11:01 | 7 | David Dees e-mail posting -- or a posting on a site? |
| 11:01 | 8 | A.   Yes. |
| 11:01 | 9 | Q.   And does it? |
| 11:01 | 10 | A.   Yes. |
| 11:01 | 11 | MR. QUINN:  All right.  If you could enlarge, |
| 11:01 | 12 | please, Ken, the top half. |
| 11:01 | 13 | *(Technician complies.)* |
| 11:01 | 14 | BY MR. QUINN: |
| 11:01 | 15 | Q.   All right.  And before we do that -- do you recall this |
| 11:01 | 16 | incident where -- that's referenced here concerning David |
| 11:02 | 17 | Dees? |
| 11:02 | 18 | A.   No. |
| 11:02 | 19 | Q.   Do you have any recollection of it? |
| 11:02 | 20 | A.   No. |
| 11:02 | 21 | MR. QUINN:  If we could take a look at the top of |
| 11:02 | 22 | the first page and enlarge that. |
| 11:02 | 23 | *(Technician complies.)* |
| 11:02 | 24 | BY MR. QUINN: |
| 11:02 | 25 | Q.   It says, "Victoria" -- this is Mr. Larian's e-mail to |

Case 2:04-cv-09049-DOC-RNB   Document 9808   Filed 02/07/11   Page 99 of 144   Page ID
#:295649
CV 04-9049 DOC - 2/4/2011 - Day 13, Volume 1 of 3

99

| 11:02 | 1 | you and to others? |
| 11:02 | 2 | A.    Yes. |
| 11:02 | 3 | Q.    And he writes, "Victoria, Dave:  Who gave David Dees |
| 11:02 | 4 | info and what he does for us to this Yahoo lady and why? |
| 11:02 | 5 | The Yahoo lady is giving us too much legal grief even though |
| 11:02 | 6 | she does not mean it.  Please do not send any information or |
| 11:02 | 7 | reply to her e-mails unless you have cleared it with me. |
| 11:02 | 8 |      "Julie/Beth/Abe:  Please check her website ASAP.  There |
| 11:02 | 9 | must be no mention about Mattel or any of their properties, |
| 11:03 | 10 | Carter, any MGA Bratz arts," comma, "et cetera." |
| 11:03 | 11 |      Do you see that? |
| 11:03 | 12 | A.    Yes. |
| 11:03 | 13 | Q.    Do you recall that -- does this refresh your |
| 11:03 | 14 | recollection at all about whether Mr. Dees had made a post |
| 11:03 | 15 | on a Yahoo fan site identifying Carter Bryant as the creator |
| 11:03 | 16 | of the Bratz dolls? |
| 11:03 | 17 | A.    No. |
| 11:03 | 18 | Q.    You just don't recall? |
| 11:03 | 19 | A.    I just don't recall. |
| 11:03 | 20 |      MR. QUINN:  If we could turn to the second page of |
| 11:03 | 21 | the exhibit and enlarge the bottom paragraph. |
| 11:03 | 22 |      (Technician complies.) |
| 11:03 | 23 | BY MR. QUINN: |
| 11:03 | 24 | Q.    Do you see the language there beginning -- the second |
| 11:03 | 25 | sentence, "However, I can't take credit for creating the |

| 11:04 | 1 | Bratz dolls, or even the first Bratz illustrations, for that |
| 11:04 | 2 | honor would go to a fellow named Carter Bryant, who is truly |
| 11:04 | 3 | a genius of fashion and the sole and only person who first |
| 11:04 | 4 | drew those great pouty lips and that extreme look that only |
| 11:04 | 5 | our heros share." |
| 11:04 | 6 | Do you see that? |
| 11:04 | 7 | A.   Yes. |
| 11:04 | 8 | Q.   And that's what Mr. Larian is responding to in the |
| 11:04 | 9 | e-mail that we looked at on the first page? |
| 11:04 | 10 | A.   Yes. |
| 11:04 | 11 | Q.   Did Mr. Larian make any instructions to you |
| 11:04 | 12 | concerning -- to your recollection, concerning David Dees |
| 11:04 | 13 | and how he got this information? |
| 11:04 | 14 | A.   Not that I recall. |
| 11:04 | 15 | Q.   Do you recall him telling you why he was concerned |
| 11:04 | 16 | about this -- about information being public concerning |
| 11:04 | 17 | Mr. Bryant's involvement in Bratz? |
| 11:04 | 18 | A.   No. |
| 11:05 | 19 | MR. QUINN:  If we could take a look at |
| 11:05 | 20 | Exhibit 23512.  This is not in evidence. |
| 11:05 | 21 | *(Document provided to the witness.)* |
| 11:05 | 22 | BY MR. QUINN: |
| 11:05 | 23 | Q.   I'll ask you if you can identify that, please. |
| 11:05 | 24 | THE COURT:  March 15th, Counsel? |
| 11:05 | 25 | MR. QUINN:  Yes, Your Honor.  March 15th, 2002. |

| | | |
|---|---|---|
| 11:05 | 1 | BY MR. QUINN: |
| 11:05 | 2 | Q.   Do you see that? |
| 11:05 | 3 | A.   Yes. |
| 11:05 | 4 | Q.   And is this an e-mail string between you and others? |
| 11:05 | 5 | A.   Yes. |
| 11:05 | 6 | MR. QUINN:  We'd offer this, Your Honor. |
| 11:05 | 7 | THE COURT:  Received. |
| 11:05 | 8 | *(Exhibit No. 23512 received in evidence.)* |
| 11:05 | 9 | *(Document displayed.)* |
| 11:05 | 10 | BY MR. QUINN: |
| 11:05 | 11 | Q.   And if you'd look at the second -- on the second page, |
| 11:05 | 12 | the e-mail at the top from Isaac Larian, dated March 11, |
| 11:05 | 13 | 2002. |
| 11:05 | 14 | Do you see that? |
| 11:05 | 15 | A.   Yes. |
| 11:06 | 16 | Q.   And he says -- Mr. Larian says, "Who the hell is David |
| 11:06 | 17 | Dees?  And why are we telling people this information and |
| 11:06 | 18 | about where the dolls came from anyway?  I want to see -- I |
| 11:06 | 19 | don't want to see anything said or told or written about |
| 11:06 | 20 | Bratz without my written approval ever again.  No one should |
| 11:06 | 21 | give an interview either.  Send them all to me." |
| 11:06 | 22 | You see that? |
| 11:06 | 23 | A.   Yes. |
| 11:06 | 24 | Q.   And then the e-mail just before, also from Mr. Larian, |
| 11:06 | 25 | the next one in the string, begins -- |

Case 2:04-cv-09049-DOC-RNB   Document 9808   Filed 02/07/11   Page 102 of 144   Page ID #:295652
CV 04-9049 DOC – 2/4/2011 – Day 13, Volume 1 of 3

102

| | | |
|---|---|---|
| 11:06 | 1 | MR. PRICE:  On the first page, Ken, March 11, |
| 11:06 | 2 | 2002. |
| 11:06 | 3 | (Document displayed.) |
| 11:06 | 4 | BY MR. QUINN: |
| 11:06 | 5 | Q.   Mr. Larian writes, "Dianna, is this the guy reporting |
| 11:06 | 6 | to you?  I need this taken," parens, "Carter," closed |
| 11:06 | 7 | parens," out of all written materials, Internet, et cetera, |
| 11:06 | 8 | now." |
| 11:06 | 9 | You see that? |
| 11:06 | 10 | A.   Yes. |
| 11:06 | 11 | Q.   Does this relate -- can you tell us whether or not |
| 11:07 | 12 | these -- you said it was your understanding that |
| 11:07 | 13 | Mr. Bryant's involvement with Bratz was to be kept secret? |
| 11:07 | 14 | You told us that? |
| 11:07 | 15 | A.   Yes. |
| 11:07 | 16 | Q.   Did that have anything -- in your understanding, did |
| 11:07 | 17 | that have anything to do with what you had identified before |
| 11:07 | 18 | as the Mattel issue in the early discussions with |
| 11:07 | 19 | Mr. Bryant? |
| 11:07 | 20 | A.   Yes. |
| 11:07 | 21 | Q.   And what -- what was the relationship between that, the |
| 11:07 | 22 | need to keep it secret, and the Mattel issue that you |
| 11:07 | 23 | referred to from the beginning? |
| 11:07 | 24 | A.   Because he was an ex-Mattel employee, and I don't know |
| 11:07 | 25 | at this point whether or not we were sure if Bratz -- if he |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:07 | 1 | came up with Bratz during his time at Mattel or before. |
| 11:07 | 2 | Q.   So in your mind can you tell us whether that was an |
| 11:07 | 3 | issue that was still out there? |
| 11:07 | 4 | A.   Yes. |
| 11:08 | 5 | MS. KELLER:  Objection.  Vague as to time. |
| 11:08 | 6 | THE COURT:  Overruled. |
| 11:08 | 7 | I assume it's about the time of the e-mail. |
| 11:08 | 8 | BY MR. QUINN: |
| 11:08 | 9 | Q.   And then, if you could look at the third e-mail from |
| 11:08 | 10 | the top, that's really where -- it's dated March 15, 2002, |
| 11:08 | 11 | from Mr. Larian and others -- that's really where you're |
| 11:08 | 12 | added to the e-mail string, correct? |
| 11:08 | 13 | A.   Yes. |
| 11:08 | 14 | Q.   And Mr. Larian there writes, "I think we need to call |
| 11:08 | 15 | this person and nicely ask her to voluntarily shut down her |
| 11:08 | 16 | site because of legal liabilities for MGA." |
| 11:08 | 17 | Do you see that? |
| 11:08 | 18 | A.   Yes. |
| 11:08 | 19 | Q.   And, your understanding, does that refer to the same |
| 11:08 | 20 | Mattel issue? |
| 11:09 | 21 | A.   Yes. |
| 11:09 | 22 | Q.   Okay.  If we could take a look at Exhibit 7055. |
| 11:09 | 23 | *(Document provided to the witness.)* |
| 11:09 | 24 | BY MR. QUINN: |
| 11:09 | 25 | Q.   And can you identify this for us? |

CV 04-9049 DOC - 2/4/2011 - Day 13, Volume 1 of 3

104

| 11:09 | 1 | A.    This is an e-mail between Isaac Larian and myself. |
| 11:09 | 2 | Q.    It's dated, October 23, 2002. |
| 11:09 | 3 | MR. QUINN:  We offer this, Your Honor. |
| 11:09 | 4 | MS. KELLER:  No objection. |
| 11:09 | 5 | THE COURT:  Received. |
| 11:09 | 6 | *(Exhibit No. 7055 received in evidence.)* |
| 11:09 | 7 | THE COURT:  And is this 7055? |
| 11:09 | 8 | MR. QUINN:  It is 7055. |
| 11:09 | 9 | THE COURT:  Thank you. |
| 11:09 | 10 | *(Document displayed.)* |
| | 11 | BY MR. QUINN: |
| 11:10 | 12 | Q.    And if we could look at the e-mail at the bottom of the |
| 11:10 | 13 | first page from a Nathalie Riesen, "Subject:  Interview for |
| 11:10 | 14 | the French magazine*,* *Capital*.  And it's to Isaac Larian. |
| 11:10 | 15 | Do you see that? |
| 11:10 | 16 | A.    Yes. |
| 11:10 | 17 | Q.    And does this appear to be a response Mr. Larian is |
| 11:10 | 18 | making to some questions put to him by a journalist? |
| 11:10 | 19 | A.    Yes. |
| 11:10 | 20 | Q.    Concerning the origins of Bratz? |
| 11:10 | 21 | A.    Yes. |
| 11:10 | 22 | Q.    And the journalist asks -- |
| 11:10 | 23 | MR. QUINN:  If we can enlarge around, "Thank you, |
| 11:10 | 24 | Isaac.  I have a few more questions," down to "Born |
| 11:10 | 25 | September 2000." |

DEBBIE GALE, U.S. COURT REPORTER

| 11:10 | 1 | *(Technician complies.)* |
| 11:10 | 2 | BY MR. QUINN: |
| 11:10 | 3 | Q.   The journalist asks, "I have a few more questions about |
| 11:10 | 4 | the story of the Bratz.  You would be kind to answer by |
| 11:10 | 5 | e-mail.  Date of birth of the Bratz.  Time of development. |
| 11:10 | 6 | First launch in the U.S." |
| 11:10 | 7 | You see that? |
| 11:10 | 8 | A.   Yes. |
| 11:10 | 9 | Q.   And then Mr. Larian has typed in, in solid caps, his |
| 11:11 | 10 | response to that, correct? |
| 11:11 | 11 | A.   Yes. |
| 11:11 | 12 | Q.   Where he said, "Born September 2000.  9 months to |
| 11:11 | 13 | develop, like a baby." |
| 11:11 | 14 | And then you make a response to this in the e-mail up |
| 11:11 | 15 | above, correct? |
| 11:11 | 16 | A.   Yes. |
| 11:11 | 17 | Q.   And your response -- |
| 11:11 | 18 | MR. QUINN:  If we could enlarge the top third, |
| 11:11 | 19 | Ken. |
| 11:11 | 20 | *(Technician complies.)* |
| 11:11 | 21 | BY MR. QUINN: |
| 11:11 | 22 | Q.   From you, Victor O'Connor, September 23, 2002 -- |
| 11:11 | 23 | October 23 -- sorry -- October 23, 2002, to Isaac Larian. |
| 11:11 | 24 | You write, "Don't you think we should say Bratz was |
| 11:11 | 25 | born in October when a certain person was no longer with |

| | | |
|---|---|---|
| 11:11 | 1 | their company?" |
| 11:11 | 2 | That's what you wrote? |
| 11:11 | 3 | A.   Yes. |
| 11:11 | 4 | Q.   And the certain person you were referring to? |
| 11:11 | 5 | A.   Carter Bryant. |
| 11:11 | 6 | Q.   The company you were referring to? |
| 11:11 | 7 | A.   Mattel. |
| 11:11 | 8 | Q.   And Mr. Larian's response up there at the top was what? |
| 11:12 | 9 | A.   "Good point.  Thanks." |
| 11:12 | 10 | MR. QUINN:  Nothing further. |
| 11:12 | 11 | THE COURT:  Cross-examination, please. |
| 11:12 | 12 | MS. KELLER:  Thank you, Your Honor. |
| 11:12 | 13 | **CROSS-EXAMINATION** |
| 11:12 | 14 | BY MS. KELLER: |
| 11:13 | 15 | Q.   Good morning, Ms. O'Connor. |
| 11:13 | 16 | A.   Good morning. |
| 11:13 | 17 | Q.   My name's Jennifer Keller.  And I don't believe we've |
| 11:13 | 18 | ever met, have we? |
| 11:13 | 19 | A.   No. |
| 11:13 | 20 | Q.   Now, in 2003, you left MGA and you took a position at |
| 11:13 | 21 | Warner Bros., correct? |
| 11:13 | 22 | A.   Yes. |
| 11:13 | 23 | Q.   And you're now the executive director of the Hard Lines |
| 11:13 | 24 | group in the Warner Bros. consumer products division, true? |
| 11:13 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 11:13 | 1 | Q.   And Warner Bros. consumer products licenses the right |
| 11:13 | 2 | to name likenesses and logos for various entertainment |
| 11:13 | 3 | properties, categories, and Warner Bros. name icons, right? |
| 11:13 | 4 | A.   Yes. |
| 11:13 | 5 | Q.   For instance, Warner Bros. consumer products and Mattel |
| 11:13 | 6 | joined forces for Green Lantern merchandise in 2010, right? |
| 11:13 | 7 | A.   Yes. |
| 11:13 | 8 | Q.   And, in fact, Warner Bros. consumer products granted |
| 11:13 | 9 | Mattel unprecedented access to its complete DC Comics vault |
| 11:14 | 10 | of characters, right? |
| 11:14 | 11 | A.   Yes. |
| 11:14 | 12 | Q.   And this includes all Warner properties like Superman, |
| 11:14 | 13 | Batman, Wonder Woman, and others? |
| 11:14 | 14 | A.   Yes. |
| 11:14 | 15 | Q.   Mattel is the master toy licensee of all these |
| 11:14 | 16 | properties, right? |
| 11:14 | 17 | A.   Yes. |
| 11:14 | 18 | Q.   Mattel and Warner Bros. have had an ongoing and very |
| 11:14 | 19 | important business relationship for quite some time, have |
| 11:14 | 20 | they not? |
| 11:14 | 21 | A.   Yes. |
| 11:14 | 22 | Q.   And at least since 2003 when you started, true? |
| 11:14 | 23 | A.   I'm not in the toy division, so I'm not sure when that |
| 11:14 | 24 | relationship started. |
| 11:14 | 25 | Q.   Well, we're talking about a relationship that's pretty |

Case 2:04-cv-09049-DOC-RNB    Document 9808    Filed 02/07/11    Page 108 of 144    Page ID #:295658
CV 04-9049 DOC - 2/4/2011 - Day 13, Volume 1 of 3

108

| 11:14 | 1 | well-known within your company, right? |
| 11:14 | 2 | A.   Yes. |
| 11:14 | 3 | Q.   And this relationship existed well before the last |
| 11:14 | 4 | trial where you also testified for Mattel, true? |
| 11:14 | 5 | A.   Yes. |
| 11:14 | 6 | Q.   And you understand -- you know who Brad Globe is, |
| 11:14 | 7 | right? |
| 11:14 | 8 | A.   Yes. |
| 11:15 | 9 | Q.   He's the president of Warner Bros. consumer products? |
| 11:15 | 10 | A.   Yes. |
| 11:15 | 11 | Q.   And, you know, he has said that Mattel -- that, in |
| 11:15 | 12 | Mattel, Warner Bros. consumer products has its best partner |
| 11:15 | 13 | with its strongest track record of bringing great products |
| 11:15 | 14 | and stories together for a winning combination in the toy |
| 11:15 | 15 | aisle. |
| 11:15 | 16 |      You know that, right? |
| 11:15 | 17 | A.   I didn't see that press release, but I'm sure -- sounds |
| 11:15 | 18 | like something he would say. |
| 11:15 | 19 | Q.   And Neil Friedman, you know him? |
| 11:15 | 20 | A.   Not personally, no. |
| 11:15 | 21 | Q.   Well, you know he's the president of Mattel brands, |
| 11:15 | 22 | though, right? |
| 11:15 | 23 | A.   Yes. |
| 11:15 | 24 | Q.   And you understand that he has said that Mattel has a |
| 11:15 | 25 | strong, longstanding relationship with Warner Bros. consumer |

| | | |
|---|---|---|
| 11:15 | 1 | products, and is thrilled to partner with them on |
| 11:15 | 2 | properties, right? |
| 11:15 | 3 | A.   If you say so. |
| 11:15 | 4 | Q.   These two companies are very close, in short, right? |
| 11:15 | 5 | A.   Yes. |
| 11:15 | 6 | Q.   And any hit that Mattel could take might affect |
| 11:15 | 7 | Warner Bros., true? |
| 11:15 | 8 | A.   Um, I don't know what you mean by "any hit." |
| 11:16 | 9 | Q.   Big financial hit. |
| 11:16 | 10 | A.   I don't think that would affect the Warner Bros. |
| 11:16 | 11 | business. |
| 11:16 | 12 | Q.   Now, at the break that we had, I noted that you were in |
| 11:16 | 13 | the Mattel conference room with the Mattel attorneys, right? |
| 11:16 | 14 | A.   Yes. |
| 11:16 | 15 | Q.   And you were speaking to them about the case? |
| 11:16 | 16 | A.   No. |
| 11:16 | 17 | Q.   You had discussions with attorneys for Mattel, though, |
| 11:16 | 18 | about the case in the past, right? |
| 11:16 | 19 | A.   Yes. |
| 11:16 | 20 | Q.   And, in fact, one of those attorneys, Mr. Sarles, is |
| 11:16 | 21 | seated right here.  You've spoken with him? |
| 11:16 | 22 | A.   Actually, I don't -- I don't remember if we spoke. |
| 11:16 | 23 | Q.   Well, in preparation for this case, for testifying this |
| 11:16 | 24 | time around -- |
| 11:16 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 11:16 | 1 | Q.   -- did you consult with any Mattel attorneys? |
| 11:16 | 2 | A.   Uh, yes. |
| 11:16 | 3 | Q.   And who? |
| 11:16 | 4 | A.   Jon Corey. |
| 11:16 | 5 | Q.   And for how long? |
| 11:16 | 6 | A.   Two and a half hours. |
| 11:16 | 7 | Q.   About what? |
| 11:16 | 8 | A.   He showed me the -- some of these exhibits yesterday. |
| 11:16 | 9 | Q.   And then, before that did you talk to anybody? |
| 11:16 | 10 | A.   Ever? |
| 11:16 | 11 | Q.   Well, I'm talking about in preparation for this trial? |
| 11:17 | 12 | A.   No. |
| 11:17 | 13 | Q.   How about preparation for the last trial? |
| 11:17 | 14 | A.   I -- I don't remember. |
| 11:17 | 15 | Q.   How about in preparation for your depositions? |
| 11:17 | 16 | A.   No. |
| 11:17 | 17 | Q.   Now, you're not represented by your own lawyer right |
| 11:17 | 18 | now? |
| 11:17 | 19 | A.   No. |
| 11:17 | 20 | Q.   I'd like to talk to you a little bit about some of the |
| 11:17 | 21 | language that we've used so far in this case. |
| 11:17 | 22 | Um, you referred to, in your testimony a little while |
| 11:17 | 23 | ago, to the doll that Carter Bryant brought to one of the |
| 11:17 | 24 | preliminary meetings as a "prototype." |
| 11:17 | 25 | You remember that? |

Case 2:04-cv-09049-DOC-RNB   Document 9808   Filed 02/07/11   Page 111 of 144   Page ID #:295661
CV 04-9049 DOC - 2/4/2011 - Day 13, Volume 1 of 3

111

| | | |
|---|---|---|
| 11:17 | 1 | A.   Yes. |
| 11:17 | 2 | Q.   And have you been instructed by the attorneys to call |
| 11:17 | 3 | that doll a prototype of the Bratz dolls? |
| 11:17 | 4 | A.   I have not. |
| 11:17 | 5 | Q.   Has it been suggested to you that you refer to it as a |
| 11:17 | 6 | prototype? |
| 11:17 | 7 | A.   No. |
| 11:17 | 8 | Q.   You understand that the dummy doll that was brought was |
| 11:17 | 9 | 16 to 18 inches tall? |
| 11:17 | 10 | MR. QUINN:  Argumentative, Your Honor. |
| 11:17 | 11 | THE COURT:  Overruled. |
| 11:18 | 12 | THE WITNESS:  I don't remember the actual height. |
| 11:18 | 13 | BY MS. KELLER: |
| 11:18 | 14 | Q.   Would you take a look at your deposition transcript. |
| 11:18 | 15 | THE COURT:  Just a moment. |
| 11:18 | 16 | (To the jury:)  You have to understand that these |
| 11:18 | 17 | words may or may not become important.  I'm gonna let |
| 11:18 | 18 | counsel ask the leading question.  Mr. Quinn asked about a |
| 11:18 | 19 | "prototype."  That was not the way the witness responded. |
| 11:18 | 20 | And Ms. Keller's asked about a "dummy doll."  So different |
| 11:18 | 21 | labels may be given by each counsel.  I'm not going to pick |
| 11:18 | 22 | that apart.  But eventually you'll receive the Court's |
| 11:18 | 23 | instructions. |
| 11:18 | 24 | BY MS. KELLER: |
| 11:18 | 25 | Q.   If you would take a look at your deposition transcript, |

| | | |
|---|---|---|
| 11:18 | 1 | December 6, 2004 -- and that was the only time you were |
| 11:18 | 2 | deposed in this case, right? |
| 11:18 | 3 | A.   Yes. |
| 11:18 | 4 | Q.   December 6, 2004, take a look at page 57, lines 7 |
| 11:18 | 5 | through 16. |
| 11:18 | 6 | A.   Okay. |
| 11:18 | 7 | Q.   Does that refresh your memory about how tall the doll |
| 11:19 | 8 | was? |
| 11:19 | 9 | A.   If I stated it in my testimony -- but I still don't |
| 11:19 | 10 | remember. |
| 11:19 | 11 | MS. KELLER:  May I have permission to read it, |
| 11:19 | 12 | Your Honor? |
| 11:19 | 13 | THE COURT:  Any objection? |
| 11:19 | 14 | MR. QUINN:  No objection, Your Honor. |
| 11:19 | 15 | THE COURT:  All right.  You may. |
| 11:19 | 16 | BY MS. KELLER: |
| 11:19 | 17 | "QUESTION:  So are we estimating about, doing -- |
| 11:19 | 18 | you've held your hand up. |
| 11:19 | 19 | "ANSWER:  I think.  *(Indicating.)* |
| 11:19 | 20 | "QUESTION:  Are we talking 18-inches? |
| 11:19 | 21 | "ANSWER:  Maybe. |
| 11:19 | 22 | "QUESTION:  Would you say roughly? |
| 11:19 | 23 | "ANSWER:  Maybe between 16 and 18 inches." |
| 11:19 | 24 | BY MS. KELLER: |
| 11:19 | 25 | Q.   Now, do you see that? |

| 11:19 | 1 | A.   Yes. |
| 11:19 | 2 | Q.   Now, you know that the actual doll was only around 9 |
| 11:19 | 3 | inches, right? |
| 11:19 | 4 | A.   I don't know the actual doll height today. |
| 11:19 | 5 | Q.   Well, but when you worked at MGA, you knew that the |
| 11:19 | 6 | actual doll was quite a bit smaller, right? |
| 11:19 | 7 | A.   Smaller than what I saw on that day, yes. |
| 11:19 | 8 | Q.   And I notice that you refer to Mr. Bryant bringing you |
| 11:19 | 9 | an invention, as opposed to bringing you some drawings. |
| 11:20 | 10 |      Do you recall that? |
| 11:20 | 11 | A.   You're saying in my deposition? |
| 11:20 | 12 | Q.   No, I'm sorry.  I didn't make myself clear.  We're done |
| 11:20 | 13 | with that little portion of your deposition right now. |
| 11:20 | 14 | A.   Okay. |
| 11:20 | 15 | Q.   Do you remember -- you wanted to have a meeting because |
| 11:20 | 16 | you heard Mr. Bryant was bringing you an invention -- I |
| 11:20 | 17 | mean, just a little while ago today you said that? |
| 11:20 | 18 | A.   I don't think I said he was bringing an invention.  He |
| 11:20 | 19 | was showing us a doll concept. |
| 11:20 | 20 | Q.   Okay.  What I'm asking is do you remember just minutes |
| 11:20 | 21 | ago testifying that Mr. Bryant brought you an invention? |
| 11:20 | 22 |           MR. QUINN:  Asked and answered, Your Honor. |
| 11:20 | 23 |           THE COURT:  Overruled. |
| 11:20 | 24 |           THE WITNESS:  I don't recall testifying to those |
| 11:20 | 25 | exact words, no. |

Case 2:04-cv-09049-DOC-RNB   Document 9808   Filed 02/07/11   Page 114 of 144   Page ID #:295664
CV 04-9049 DOC - 2/4/2011 - Day 13, Volume 1 of 3

114

|       |    |                                                           |
|-------|----|-----------------------------------------------------------|
|       | 1  | BY MS. KELLER:                                             |
| 11:20 | 2  | Q.   And it hasn't been suggested to you by any lawyer, has |
| 11:20 | 3  | it, that you refer to Mr. Bryant's drawings as "inventions"? |
| 11:20 | 4  | A.   No.                                                   |
| 11:20 | 5  | Q.   Okay.  So just to be clear, then, we're talking about |
| 11:20 | 6  | Mr. Bryant having brought you a doll concept; is that right? |
| 11:21 | 7  | A.   It was a concept with a -- a prototype with drawings. |
| 11:21 | 8  | Q.   Now, back to Warner Bros.  Has Warner Bros. told you to |
| 11:21 | 9  | cooperate with Mattel in this case?                        |
| 11:21 | 10 | A.   No.                                                   |
| 11:21 | 11 | Q.   And are you -- do you have -- are you allowed to take |
| 11:21 | 12 | time off from work to come and testify without having to use |
| 11:21 | 13 | any personal time?                                         |
| 11:21 | 14 | A.   Yes.                                                  |
| 11:21 | 15 | Q.   When you joined Warner Bros. in 2003, you were director |
| 11:21 | 16 | of the Back-to-School, Housewares and Bakery, right?       |
| 11:21 | 17 | A.   No.                                                   |
| 11:21 | 18 | Q.   Oh, I'm just looking -- do you have that on your      |
| 11:21 | 19 | Linked-In page?                                            |
| 11:21 | 20 | A.   It's possible.                                        |
| 11:21 | 21 | Q.   When you say it's possible that you put -- you were   |
| 11:21 | 22 | director of Back-to-School, Housewares and Bakery?         |
| 11:21 | 23 | A.   I was director.  The categories switched at some point. |
| 11:21 | 24 | When I first started, I was managing other categories.    |
| 11:21 | 25 | Q.   All right.  And what were you as of June 2008?        |

| | | |
|---|---|---|
| 11:22 | 1 | A.    I was director of Housewares, Bakery and Stationery, |
| 11:22 | 2 | Back-to-School. |
| 11:22 | 3 | Q.    And that was in June 2008, right? |
| 11:22 | 4 | A.    June 2008, yes. |
| 11:22 | 5 | Q.    And then you testified for Mattel that month, right? -- |
| 11:22 | 6 | against MGA in the prior trial -- |
| 11:22 | 7 | A.    Yes. |
| 11:22 | 8 | Q.    -- right?  Is that a yes? |
| 11:22 | 9 | A.    Yes. |
| 11:22 | 10 | Q.    And in August of 2008 you were promoted to executive |
| 11:22 | 11 | director of the Hard Lines, right? |
| 11:22 | 12 | A.    Yes. |
| 11:22 | 13 | Q.    Just a couple months later? |
| 11:22 | 14 | A.    Yes. |
| 11:22 | 15 | Q.    And did that constitute a promotion? |
| 11:22 | 16 | A.    Yes. |
| 11:22 | 17 | Q.    And did that constitute a pay increase? |
| 11:22 | 18 | A.    Yes. |
| 11:22 | 19 | Q.    How big a pay increase? |
| 11:22 | 20 | A.    I don't recall.  Maybe 20, 25 percent. |
| 11:22 | 21 | Q.    Meaning that you were paid -- after you were promoted |
| 11:22 | 22 | to executive director in 2000 -- August 2008, how much were |
| 11:22 | 23 | you paid?  What was your annual salary? |
| 11:23 | 24 | A.    150-. |
| 11:23 | 25 | Q.    And before that it had been? |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 9808   Filed 02/07/11   Page 116 of 144   Page ID #:295666
CV 04-9049 DOC - 2/4/2011 - Day 13, Volume 1 of 3

116

| 11:23 | 1 | A.   I don't remember. |
| 11:23 | 2 | Q.   Now, you were hired by MGA in 1999 as a licensing |
| 11:23 | 3 | manager, right? |
| 11:23 | 4 | A.   Yes. |
| 11:23 | 5 | Q.   And I think you told us that -- some of your duties, |
| 11:23 | 6 | but one of your duties was to seek out potential properties |
| 11:23 | 7 | for licensing and bring 'em in-house? |
| 11:23 | 8 | A.   Yes. |
| 11:23 | 9 | Q.   And you were looking for hot shows or brands -- hot TV |
| 11:23 | 10 | shows, right? |
| 11:23 | 11 | A.   Yes. |
| 11:23 | 12 | Q.   Looking for toys that MGA could manufacture, right? |
| 11:23 | 13 | A.   Yes. |
| 11:23 | 14 | Q.   And so you also -- part of your job was to meet with |
| 11:23 | 15 | designers who came to MGA with concepts for toys, true? |
| 11:23 | 16 | A.   Yes. |
| 11:23 | 17 | Q.   And in the year 2000 you were promoted to licensing |
| 11:23 | 18 | director and you took on additional responsibilities, |
| 11:23 | 19 | including some public relations responsibilities? |
| 11:24 | 20 | A.   Yes, and Human Resources. |
| 11:24 | 21 | Q.   Now, before you ever met Carter Bryant in August of |
| 11:24 | 22 | 2000, MGA had some successful doll lines on the market, |
| 11:24 | 23 | didn't it? |
| 11:24 | 24 | A.   Some large dolls, yes. |
| 11:24 | 25 | Q.   Bouncy Baby was a big success, right? |

| 11:24 | 1 | A.   Yes. |
| 11:24 | 2 | Q.   Giddy Up Girl was a big success, right? |
| 11:24 | 3 | A.   Yes. |
| 11:24 | 4 | Q.   My Dream Baby was a big success, true? |
| 11:24 | 5 | A.   Yes. |
| 11:24 | 6 | Q.   And MGA had been considering a fashion doll line before |
| 11:24 | 7 | anyone at MGA had ever heard of Carter Bryant, true? |
| 11:24 | 8 | A.   True. |
| 11:24 | 9 | Q.   In fact, you and Mr. Larian had been looking at |
| 11:24 | 10 | developing a fashion doll, right? |
| 11:24 | 11 | A.   I was not in product development, so I was not looking |
| 11:24 | 12 | at developing a doll line. |
| 11:24 | 13 | Q.   Okay.  If you would look at your trial testimony |
| 11:24 | 14 | transcript, page 1358, lines 15 through 19. |
| 11:25 | 15 | *(Document provided to the witness.)* |
| 11:25 | 16 | THE WITNESS:  Okay. |
| 11:25 | 17 | BY MS. KELLER: |
| 11:25 | 18 | Q.   Does that refresh your memory? |
| 11:25 | 19 | A.   A little bit. |
| 11:25 | 20 | MS. KELLER:  Your Honor, I'd ask permission to |
| 11:25 | 21 | read that portion? |
| 11:25 | 22 | THE COURT:  Any objection? |
| 11:25 | 23 | MR. QUINN:  No objection. |
| 11:25 | 24 | THE COURT:  You may. |
| 11:25 | 25 | MS. KELLER:  (Reading:) |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:25 | 1 | "QUESTION:  Now, at some time around there, you |
| 11:25 | 2 | and Mr. Larian had been considering fashion dolls for MGA, |
| 11:25 | 3 | correct? |
| 11:25 | 4 | "ANSWER:  We were looking at getting a concept, |
| 11:25 | 5 | yes. |
| 11:25 | 6 | "QUESTION:  A concept for fashion dolls? |
| 11:25 | 7 | "ANSWER:  Correct." |
| 11:25 | 8 | BY MS. KELLER: |
| 11:26 | 9 | Q.   And now, you know a woman named Maureen Panzera |
| 11:26 | 10 | *(phonetic)* of a company called Sampan *(phonetic)*? |
| 11:26 | 11 | A.   Yes. |
| 11:26 | 12 | Q.   And she and her husband had pitched a concept for |
| 11:26 | 13 | fashion dolls to MGA in 2000, right? |
| 11:26 | 14 | A.   I don't know if it was fashion dolls or small dolls. |
| 11:26 | 15 | Q.   Do you remember the fashion dolls called the PC Girls |
| 11:26 | 16 | that they pitched? |
| 11:26 | 17 | A.   No.  I remember something called Gearhead Girls.  I |
| 11:26 | 18 | don't know if we're talking the same thing. |
| 11:26 | 19 | Q.   We're not. |
| 11:26 | 20 | THE COURT:  Gearhead? |
| 11:26 | 21 | THE WITNESS:  Gearhead. |
| 11:26 | 22 | THE COURT:  G-E-A-R? |
| 11:26 | 23 | THE WITNESS:  Yes. |
| | 24 | BY MS. KELLER: |
| 11:26 | 25 | Q.   And what were Gearhead Girls? |

| | | |
|---|---|---|
| 11:26 | 1 | A.   They were characters for girls that had something to do |
| 11:26 | 2 | with computers.  I don't remember all the details. |
| 11:26 | 3 | Q.   Now, Carter Bryant, when he came to MGA to present his |
| 11:26 | 4 | doll concept, it was logical for you to meet with him, given |
| 11:27 | 5 | your position, right? |
| 11:27 | 6 | A.   Yes. |
| 11:27 | 7 | Q.   And you said it was your understanding that he was |
| 11:27 | 8 | introduced to Paula Garcia by Veronica Marlow? |
| 11:27 | 9 | A.   Yes. |
| 11:27 | 10 | Q.   Let's look at Exhibit 11328. |
| 11:27 | 11 | *(Document displayed.)* |
| 11:27 | 12 | BY MS. KELLER: |
| 11:27 | 13 | Q.   And this is the meeting request for the August meeting, |
| 11:27 | 14 | right? |
| 11:27 | 15 | *(Document provided to the witness.)* |
| 11:27 | 16 | THE WITNESS:  Yes. |
| 11:27 | 17 | BY MS. KELLER: |
| 11:27 | 18 | Q.   Showing that the meeting was to occur on August 18th, |
| 11:27 | 19 | true? |
| 11:27 | 20 | A.   Yes. |
| 11:27 | 21 | Q.   And you and Paula Treantafelles, Ms. Garcia, met with |
| 11:27 | 22 | Mr. Bryant that day, true? |
| 11:27 | 23 | A.   Yes. |
| 11:27 | 24 | Q.   And he showed you some drawings of his Bratz idea that |
| 11:27 | 25 | day, correct? |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 9808   Filed 02/07/11   Page 120 of 144   Page ID #:295670
CV 04-9049 DOC - 2/4/2011 - Day 13, Volume 1 of 3

120

| | | |
|---|---|---|
| 11:27 | 1 | A.   Yes. |
| 11:27 | 2 | Q.   And I think you testified before that it was your |
| 11:27 | 3 | understanding Paula Garcia had never met Carter Bryant |
| 11:28 | 4 | before this meeting, right? |
| 11:28 | 5 | A.   Right. |
| 11:28 | 6 | Q.   And then there was a second meeting, you said, on |
| 11:28 | 7 | September 1st, 2000.  This one had Mr. Larian attending |
| 11:28 | 8 | along with you and Ms. Garcia, true? |
| 11:28 | 9 | A.   Like I've testified earlier, I don't remember if it was |
| 11:28 | 10 | two separate meetings or one meeting. |
| 11:28 | 11 |           MS. KELLER:  Let's put up Exhibit 16995. |
| 11:28 | 12 |               (Document displayed.) |
| 11:28 | 13 |               (Document provided to the witness.) |
| 11:28 | 14 | BY MS. KELLER: |
| 11:28 | 15 | Q.   Okay.  We've just discussed a meeting on August 18th |
| 11:28 | 16 | and shown an e-mail about that. |
| 11:28 | 17 |      Now, this is a meeting request for September 1st, |
| 11:28 | 18 | showing your meeting with Mr. Bryant, Ms. Garcia, and |
| 11:28 | 19 | Mr. Larian in Mr. Larian's office. |
| 11:28 | 20 |      Now, it was also your understanding that Mr. Larian had |
| 11:29 | 21 | not met Mr. Bryant before this meeting, correct? -- the |
| 11:29 | 22 | meeting that Mr. Larian attended? |
| 11:29 | 23 | A.   Correct.  But I don't know the date of that meeting. |
| 11:29 | 24 | Q.   Okay.  Well, I'm -- I'm referring you to this e-mail to |
| 11:29 | 25 | see if that refreshes your memory about who was there. |

CV 04-9049 DOC – 2/4/2011 – Day 13, Volume 1 of 3

121

| | | |
|---|---|---|
| 11:29 | 1 | THE COURT:  Counsel? |
| 11:29 | 2 | BY MS. KELLER: |
| 11:29 | 3 | Q.   Does it? |
| 11:29 | 4 | A.   No. |
| 11:29 | 5 | Q.   You don't have any reason to doubt that this is an |
| 11:29 | 6 | e-mail on which you were copied, right? |
| 11:29 | 7 | A.   No. |
| 11:29 | 8 | Q.   Now, this doll prototype -- by the way, that was |
| 11:29 | 9 | brought to this meeting where Mr. Larian was in attendance? |
| 11:29 | 10 | A.   Yes. |
| 11:29 | 11 | Q.   And you said you thought it was really beautiful, you |
| 11:29 | 12 | loved it? |
| 11:29 | 13 | A.   Yes. |
| 11:29 | 14 | Q.   And you -- do you understand it was actually thrown |
| 11:29 | 15 | away after this? |
| 11:29 | 16 | A.   No. |
| 11:29 | 17 | Q.   And I -- if I understood your testimony, you said that |
| 11:30 | 18 | Ms. Garcia loved it so much she kind of couldn't keep her |
| 11:30 | 19 | cool.  She became really enthusiastic? |
| 11:30 | 20 | A.   Yes. |
| 11:30 | 21 | Q.   You were the one who was gonna have to negotiate the |
| 11:30 | 22 | terms of any contract, true? |
| 11:30 | 23 | A.   Yes. |
| 11:30 | 24 | Q.   Now, there had been other people who had come to MGA, |
| 11:30 | 25 | who had pitched concepts that MGA had gotten interested in, |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:30 | 1 | with whom you were never able to come to terms -- with a |
| 11:30 | 2 | contract, right? |
| 11:30 | 3 | A.   I can't recall anything specific. |
| 11:30 | 4 | Q.   Well, let's just talk about Mr. Bryant.  It was your |
| 11:30 | 5 | job not just to negotiate the contract with Mr. Bryant but |
| 11:30 | 6 | also to finalize it, true? |
| 11:30 | 7 | A.   Yes. |
| 11:30 | 8 | Q.   And the way you did this is you dealt with outside |
| 11:30 | 9 | counsel engaging them to draft the contracts, right? |
| 11:30 | 10 | A.   Yes. |
| 11:30 | 11 | Q.   And also to do whatever due diligence was required to |
| 11:30 | 12 | make sure that MGA had the green light to go ahead and buy |
| 11:30 | 13 | this concept, true? |
| 11:31 | 14 | A.   Yes. |
| 11:31 | 15 | Q.   Was that -- do you know the concept -- something called |
| 11:31 | 16 | "reps and warranties"?  Reputations and warranties? |
| 11:31 | 17 | A.   Yes. |
| 11:31 | 18 | Q.   And reps and warranties are basically a statement under |
| 11:31 | 19 | oath that you get from somebody that he or she owns a |
| 11:31 | 20 | concept, has the rights to the concept and, therefore, can |
| 11:31 | 21 | sell the concept to the company, right? |
| 11:31 | 22 | A.   Yes. |
| 11:31 | 23 | Q.   Now, in this situation, because Mr. Bryant had been a |
| 11:31 | 24 | Mattel employee, in addition to reps and warranties, you |
| 11:31 | 25 | also engaged outside counsel to look into it, right? |

| 11:31 | 1 | A. Yes. |
| 11:31 | 2 | Q. And that was Mr. Rosenbaum? |
| 11:31 | 3 | A. Correct. |
| 11:31 | 4 | Q. And you were the person who actually reached out to him |
| 11:31 | 5 | to get him to do all this, right? |
| 11:31 | 6 | A. Yes. |
| 11:31 | 7 | Q. Both look into the ownership issue and draft a |
| 11:31 | 8 | contract, if the ownership issue was resolved, true? |
| 11:31 | 9 | A. Yes. |
| 11:31 | 10 | Q. And is it fair to say that if the ownership issue was |
| 11:32 | 11 | not resolved, you were not going to enter into a contract |
| 11:32 | 12 | with Mr. Bryant? |
| 11:32 | 13 | A. True. |
| 11:32 | 14 | Q. Now, in your experience in the industry, is there some |
| 11:32 | 15 | requirement that a company hire private detectives and |
| 11:32 | 16 | sleuths and question document examiners and conduct an |
| 11:32 | 17 | independent investigation of that sort before signing a |
| 11:32 | 18 | contract with a designer? |
| 11:32 | 19 | A. I've never heard of that. |
| 11:32 | 20 | Q. You've never heard of it from any company, right? |
| 11:32 | 21 | A. Correct. |
| 11:32 | 22 | Q. And so your practice and MGA's practice was turn this |
| 11:32 | 23 | over to lawyers and have the lawyers do the so-called due |
| 11:32 | 24 | diligence, right? |
| 11:32 | 25 | A. Correct. |

Case 2:04-cv-09049-DOC-RNB   Document 9808   Filed 02/07/11   Page 124 of 144   Page ID #:295674
CV 04-9049 DOC - 2/4/2011 - Day 13, Volume 1 of 3

124

| | | |
|---|---|---|
| 11:32 | 1 | Q.   And then the lawyers would give you either a green |
| 11:32 | 2 | light or a red light, to put it succinctly, right? |
| 11:32 | 3 | A.   Yes. |
| 11:32 | 4 | Q.   So that's what you did here? |
| 11:32 | 5 | A.   Yes. |
| 11:32 | 6 | Q.   And, in fact, it was Mr. Larian who asked you to take |
| 11:33 | 7 | on the task of making contact with outside counsel, true? |
| 11:33 | 8 | A.   Yes. |
| 11:33 | 9 | Q.   And Mr. Larian asked you to report back to him about |
| 11:33 | 10 | the whole matter, right? |
| 11:33 | 11 | A.   Yes. |
| 11:33 | 12 | Q.   And did you diligently report back to Mr. Larian about |
| 11:33 | 13 | those communications with Mr. Rosenbaum? |
| 11:33 | 14 | A.   I don't recall specific conversations, but I'm sure I |
| 11:33 | 15 | did. |
| 11:33 | 16 | Q.   And Mr. Larian never told you, "Don't tell David |
| 11:33 | 17 | Rosenbaum that Carter Bryant is a Mattel employee," right? |
| 11:33 | 18 | A.   Right. |
| 11:33 | 19 | Q.   In fact, Mr. Rosenbaum, one of the very reasons he was |
| 11:33 | 20 | engaged, was because Mr. Bryant was a Mattel employee, and |
| 11:33 | 21 | so MGA kind of wanted to do the whole belts-and-suspenders |
| 11:33 | 22 | things, have the reps and warranties from Mr. Bryant, but |
| 11:33 | 23 | also have a lawyer check it out, true? |
| 11:33 | 24 | A.   Yes. |
| 11:33 | 25 | Q.   Now, Mr. Bryant -- we've seen a series of -- of e-mails |

Case 2:04-cv-09049-DOC-RNB   Document 9808   Filed 02/07/11   Page 125 of 144   Page ID #:295675
CV 04-9049 DOC - 2/4/2011 - Day 13, Volume 1 of 3

125

| | | |
|---|---|---|
| 11:34 | 1 | where -- there seem to be two tracks.  On the one hand, |
| 11:34 | 2 | we're talking about Mr. Bryant's contract and whether he can |
| 11:34 | 3 | get royalties on additional products; and on the other hand, |
| 11:34 | 4 | we're also talking about Mr. Rosenbaum completing the |
| 11:34 | 5 | investigation, right?  Whatever due diligence he was |
| 11:34 | 6 | supposed to do? |
| 11:34 | 7 | A.   I'd have to look at the e-mail chain again. |
| 11:34 | 8 | Q.   Well, for example, let's look at Exhibit 16788. |
| 11:34 | 9 | *(Document provided to the witness.)* |
| 11:34 | 10 | *(Document displayed.)* |
| 11:34 | 11 | BY MS. KELLER: |
| 11:34 | 12 | Q.   And this is already in evidence.  This is dated |
| 11:34 | 13 | September 13, 2000.  And you were already shown this a |
| 11:34 | 14 | little while ago. |
| 11:34 | 15 | This is an e-mail from Mr. Larian to you.  And |
| 11:35 | 16 | Mr. Larian is saying, "Tell him licensing royalties is a pie |
| 11:35 | 17 | in the sky in the future." |
| 11:35 | 18 | And that's because Mr. Bryant was asking for more |
| 11:35 | 19 | licensing royalties than just 3 percent on his original |
| 11:35 | 20 | designs, right? |
| 11:35 | 21 | A.   Correct. |
| 11:35 | 22 | Q.   "We are going to risk and spend millions making this |
| 11:35 | 23 | brand and line happen.  Maybe it does, maybe it does not. |
| 11:35 | 24 | If it does, we made the brand and not him.  The answer is |
| 11:35 | 25 | no.  Explain the above logic to him." |

| 11:35 | 1 | So, as of September 13, 2000, MGA didn't have a deal |
|---|---|---|
| 11:35 | 2 | with Carter Bryant, right? |
| 11:35 | 3 | A.   We did not have a signed contract, no. |
| 11:35 | 4 | Q.   And if Mr. Bryant continued to insist on what he was |
| 11:35 | 5 | insisting on, and MGA continued to say "no," there wasn't |
| 11:35 | 6 | gonna be a deal, right? |
| 11:35 | 7 | A.   That decision was not mine.  I don't know. |
| 11:36 | 8 | Q.   Well, at least from looking at this, right?  True? |
| 11:36 | 9 | A.   Possibly. |
| 11:36 | 10 | Q.   Now, the problem about -- the issue about the risk, it |
| 11:36 | 11 | really was a risk to try to develop a doll line and put |
| 11:36 | 12 | millions of dollars into it because it could flop, true? |
| 11:36 | 13 | A.   True. |
| 11:36 | 14 | Q.   And, in fact, do you remember the infamous Jump Rope |
| 11:36 | 15 | Jenny? |
| 11:36 | 16 | A.   No, I don't. |
| 11:36 | 17 | Q.   Well, was Jump Rope Jenny a doll that MGA invested in |
| 11:36 | 18 | that flopped? |
| 11:36 | 19 | A.   I don't even remember the doll. |
| 11:36 | 20 | Q.   Do you remember Sugar Planet, et cetera? |
| 11:36 | 21 | A.   I do remember Sugar Planet. |
| 11:36 | 22 | Q.   And Sugar Planet was a doll line that was developed by |
| 11:36 | 23 | none other than Carter Bryant, right? |
| 11:36 | 24 | A.   Yes. |
| 11:36 | 25 | Q.   And it was a flop, true? |

DEBBIE GALE, U.S. COURT REPORTER

| 11:36 | 1 | A.   I don't remember how it sold. |
| 11:36 | 2 | Q.   And that, in itself, makes my point.  You don't even |
| 11:36 | 3 | remember how it sold, right? |
| 11:36 | 4 | A.   Right. |
| 11:36 | 5 | Q.   But needless to say, it did not become a huge hit, |
| 11:37 | 6 | true? |
| 11:37 | 7 | A.   True. |
| 11:37 | 8 | Q.   And when Mr. Larian said, "Maybe it does, maybe it does |
| 11:37 | 9 | not; if it does, we made the brand and not him," you |
| 11:37 | 10 | understood what he was talking about, didn't you? |
| 11:37 | 11 | A.   Yes. |
| 11:37 | 12 | Q.   You knew that it was a far cry from some drawings on a |
| 11:37 | 13 | piece of paper to a completed doll that would actually be a |
| 11:37 | 14 | big hit, true? |
| 11:37 | 15 | A.   Yes. |
| 11:37 | 16 | Q.   And so you reported back to Mr. Larian, according to |
| 11:37 | 17 | this e-mail, anyway, that Mr. Bryant was pushing for a |
| 11:37 | 18 | royalty on any licensed Bratz product, right? |
| 11:37 | 19 | A.   Correct. |
| 11:37 | 20 | Q.   Now, if we could look at Exhibit 23855. |
| 11:38 | 21 | *(Document provided to the witness.)* |
| 11:38 | 22 | BY MS. KELLER: |
| 11:38 | 23 | Q.   This is an e-mail chain that -- part of which has been |
| 11:38 | 24 | previously discussed.  And 2355 *(sic)* has two pages to it. |
| 11:38 | 25 | Do you have those in front of you? |

| | | |
|---|---|---|
| 11:38 | 1 | THE COURT:  2355? |
| 11:38 | 2 | MS. KELLER:  I'm sorry.  23855. |
| 11:38 | 3 | THE COURT:  Thank you. |
| 11:38 | 4 | THE WITNESS:  I have four pages. |
| 11:38 | 5 | MS. KELLER:  Ah, well, you've got more than I've |
| 11:38 | 6 | got. |
| 11:38 | 7 | I'm going to be talking to you, right now, about |
| 11:38 | 8 | what -- it says at the bottom Exhibit A, page 3, Exhibit A, |
| 11:38 | 9 | page 4. |
| 11:38 | 10 | (Document displayed.) |
| | 11 | BY MS. KELLER: |
| 11:38 | 12 | Q.   Now, the oldest -- the first e-mail in this chain, |
| 11:38 | 13 | which is the oldest, is an e-mail from you to David |
| 11:39 | 14 | Rosenbaum on September 12, 2000. |
| 11:39 | 15 | And it says, "Hi, David.  We are hiring Carter Bryant |
| 11:39 | 16 | as a consultant for MGA and need a licensing/consulting |
| 11:39 | 17 | contract ASAP.  He be developing our line of fashion dolls |
| 11:39 | 18 | called Bratz." |
| 11:39 | 19 | And then you set forth some of the terms, right? |
| 11:39 | 20 | A.   Yes. |
| 11:39 | 21 | Q.   And this was your first contact with Mr. Rosenbaum |
| 11:39 | 22 | about this deal with Mr. Bryant, true? |
| 11:39 | 23 | A.   I believe so. |
| 11:39 | 24 | Q.   Now, let's go to the second e-mail in the chain, |
| 11:39 | 25 | continuing up the chain, Mr. Rosen- -- I'm sorry.  This |

CV 04-9049 DOC - 2/4/2011 - Day 13, Volume 1 of 3

129

| | | |
|---|---|---|
| 11:39 | 1 | first e-mail, this is where you're actually engaging |
| 11:39 | 2 | Mr. Rosenbaum to draft the consulting agreement, right? |
| 11:40 | 3 | A.   Yes. |
| 11:40 | 4 | Q.   Now, look at the second e-mail in the chain. |
| 11:40 | 5 | *(Document displayed.)* |
| 11:40 | 6 | BY MS. KELLER: |
| 11:40 | 7 | Q.   And that's dated September 12, 2000.  And that's |
| 11:40 | 8 | Mr. Rosenbaum back to you. |
| 11:40 | 9 | Do you have that in front of you? |
| 11:40 | 10 | A.   Yes. |
| 11:40 | 11 | Q.   And he's looking for some more detail.  He's saying, |
| 11:40 | 12 | "Victoria, please send me the details of Carter and/or |
| 11:40 | 13 | his company, including address, phone, fax, e-mail, and |
| 11:40 | 14 | corporate status of his company.  Also, you list him as a |
| 11:40 | 15 | licensing/consultant and that he will develop the Bratz |
| 11:40 | 16 | line.  What exactly are his duties and responsibilities?" |
| 11:40 | 17 | He tells you he'll be away tomorrow and Thursday, but |
| 11:40 | 18 | will be back in the office on Friday. |
| 11:40 | 19 | And you reply to him, "Carter is currently a Mattel |
| 11:40 | 20 | designer and will be resigning as soon as he executes the |
| 11:41 | 21 | contract. |
| 11:41 | 22 | Do you see that? |
| 11:41 | 23 | A.   Yes. |
| 11:41 | 24 | Q.   And you thought that was true, right? |
| 11:41 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 11:41 | 1 | Q.   You thought that the second the ink dried on the |
| 11:41 | 2 | contract with MGA, Mr. Bryant was walking out the door of |
| 11:41 | 3 | Mattel, true? |
| 11:41 | 4 | A.   Yes. |
| 11:41 | 5 | Q.   And that was your understanding with Mr. Bryant, as |
| 11:41 | 6 | well, right? |
| 11:41 | 7 | A.   Yes. |
| 11:41 | 8 | Q.   Now -- and just so we don't say -- so I don't leave any |
| 11:41 | 9 | doubt about it:  He, Mr. Bryant, told you he was going to |
| 11:41 | 10 | resign from Mattel the moment he signed his agreement with |
| 11:41 | 11 | MGA, right? |
| 11:41 | 12 | A.   Yes. |
| 11:41 | 13 | Q.   Now, let's look at the third e-mail in the chain.  And |
| 11:41 | 14 | that's an e-mail from Mr. Rosenbaum to you sent September |
| 11:41 | 15 | 12, 2000. |
| 11:42 | 16 | *(Document displayed.)* |
| 11:42 | 17 | BY MS. KELLER: |
| 11:42 | 18 | Q.   I think -- let's see.  Where am I?  Yes. |
| 11:42 | 19 | And Mr.-- okay.  You wrote to Mr. Rosenbaum, "He does |
| 11:42 | 20 | have a contract." |
| 11:42 | 21 | You wrote in -- in your e-mail dated September 14th, |
| 11:42 | 22 | "He" -- I'm sorry. |
| 11:42 | 23 | In his e-mail to you dated September 12th, he wrote, |
| 11:42 | 24 | "If he is" -- "Is Carter under an employment agreement with |
| 11:42 | 25 | Mattel?  If he is, we need to know what it says about |

| | | |
|---|---|---|
| 11:42 | 1 | termination so you don't get accused by Mattel of poaching." |
| 11:42 | 2 | Okay.  So Mr. Rosenbaum was sitting there with a |
| 11:43 | 3 | crystal ball, right? |
| 11:43 | 4 | And you wrote back -- |
| 11:43 | 5 | MR. QUINN:  Your Honor, I object to the comment. |
| 11:43 | 6 | Move to strike. |
| 11:43 | 7 | THE COURT:  Sustained. |
| 11:43 | 8 | BY MS. KELLER: |
| 11:43 | 9 | Q.   And you wrote back -- |
| 11:43 | 10 | THE COURT:  I'm sorry.  It's stricken. |
| 11:43 | 11 | Counsel, please, proceed.  You can ask the same |
| 11:43 | 12 | question, though. |
| 11:43 | 13 | BY MS. KELLER: |
| 11:43 | 14 | Q.   You wrote back -- well, you understood this to mean |
| 11:43 | 15 | that Mr. Rosenbaum was saying we need to know what |
| 11:43 | 16 | Mr. Bryant's agreement with Mattel says about termination, |
| 11:43 | 17 | because we don't want Mattel -- we don't want MGA to get |
| 11:43 | 18 | into some sort of legal problem with Mattel, right? |
| 11:43 | 19 | A.   Correct. |
| 11:43 | 20 | Q.   And he uses the term "poaching," right? |
| 11:43 | 21 | A.   Yes. |
| 11:43 | 22 | Q.   Now, you replied back to him -- |
| 11:43 | 23 | MS. KELLER:  If we go to the next one up, |
| 11:43 | 24 | September 14th. |
| 11:43 | 25 | *(Document displayed.)* |

Case 2:04-cv-09049-DOC-RNB   Document 9808   Filed 02/07/11   Page 132 of 144   Page ID #:295682
CV 04-9049 DOC – 2/4/2011 – Day 13, Volume 1 of 3

132

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | BY MS. KELLER:                                                |
| 11:43 | 2  | Q.   "He does have a contract, but there is no mention of    |
| 11:43 | 3  | termination at all.  Can we get a draft tomorrow?  I know     |
| 11:44 | 4  | you're out of the office."                                    |
| 11:44 | 5  |      And then we go up to the next e-mail from Mr. Rosenbaum  |
| 11:44 | 6  | to you.                                                       |
| 11:44 | 7  |              *(Document displayed.)*                          |
| 11:44 | 8  | BY MS. KELLER:                                                |
| 11:44 | 9  | Q.   Replying -- and for some strange reason, if you look at  |
| 11:44 | 10 | the date line, it says, sent "Sunday, June -- January 14,     |
| 11:44 | 11 | 1990"?                                                        |
| 11:44 | 12 | A.   I see that.                                              |
| 11:44 | 13 | Q.   Do you believe that that is incorrect?                   |
| 11:44 | 14 | A.   Yes, I do.                                               |
| 11:44 | 15 | Q.   And do you have any idea how the date of "1990" got on   |
| 11:44 | 16 | there.                                                        |
| 11:44 | 17 | A.   No.                                                      |
| 11:44 | 18 | Q.   But it's in the middle of this e-mail string but --      |
| 11:44 | 19 | right?  And it says, "Victoria, I will try to get you a       |
| 11:44 | 20 | draft tomorrow.  Certainly by Monday.  In the meantime, ask   |
| 11:44 | 21 | him to send you a copy of his employment agreement.  I am     |
| 11:44 | 22 | concerned about any noncompete restrictions."                 |
| 11:44 | 23 |      And you know that a noncompete restriction is a clause   |
| 11:44 | 24 | in a contract that says for some X amount of time after your  |
| 11:45 | 25 | employment ends, you're not allowed to work for a            |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 2/4/2011 - Day 13, Volume 1 of 3

133

| | | |
|---|---|---|
| 11:45 | 1 | competitor, right? |
| 11:45 | 2 | A.   Yes. |
| 11:45 | 3 | Q.   "Tell him" -- and it was your understanding that there |
| 11:45 | 4 | was no such clause in the Mattel contracts? |
| 11:45 | 5 | A.   I don't know. |
| 11:45 | 6 | Q.   Okay.  "Tell him he can redact the financial terms of |
| 11:45 | 7 | his contract, but we need to see everything else:  Who came |
| 11:45 | 8 | up with the Bratz line of dolls?  Is he working on anything |
| 11:45 | 9 | at Mattel that could be arguably similar to this product?" |
| 11:45 | 10 | You see that? |
| 11:45 | 11 | A.   Yes. |
| 11:45 | 12 | Q.   Now, when you reached out to Mr. Rosenbaum and retained |
| 11:45 | 13 | him to represent MGA, one of the reasons was that |
| 11:45 | 14 | Mr. Rosenbaum had experience in what's called intellectual |
| 11:45 | 15 | property law, right? |
| 11:45 | 16 | A.   Yes. |
| 11:45 | 17 | Q.   He was somebody who held himself out as being something |
| 11:45 | 18 | of a specialist in that area, true? |
| 11:45 | 19 | A.   Yes. |
| 11:45 | 20 | Q.   And so you as the licensing director at MGA were |
| 11:46 | 21 | relying upon Mr. Rosenbaum's legal advice to you as to what |
| 11:46 | 22 | you could and couldn't do in terms of hiring, right? |
| 11:46 | 23 | A.   Yes. |
| 11:46 | 24 | Q.   So he asked you, "Who came up with the Bratz line of |
| 11:46 | 25 | dolls?  Is he working on anything at Mattel that could be |

DEBBIE GALE, U.S. COURT REPORTER

| 11:46 | 1 | arguably similar to this product?" |
| 11:46 | 2 | And you replied back to Mr. Rosenbaum on Thursday |
| 11:46 | 3 | September 14th, "He came up with Bratz. Mattel does not do |
| 11:46 | 4 | or plan to do anything similar. It's too hip for them. He |
| 11:46 | 5 | will fax you his employment agreement today. He has an |
| 11:46 | 6 | appointment with his lawyer on Monday to go over the |
| 11:46 | 7 | contract. Hopefully, he'll have it by then. In the |
| 11:46 | 8 | interest of saving time, why don't you e-mail it to Carter |
| 11:46 | 9 | and me simultaneously, unless you foresee a problem?" |
| 11:46 | 10 | So that was the particular back-and-forth that you had |
| 11:47 | 11 | with Mr. Rosenbaum, right? |
| 11:47 | 12 | A.   Yes. |
| 11:47 | 13 | Q.   And, so among other things, Mr. Rosenbaum was asking |
| 11:47 | 14 | you to ask Mr. Bryant to send a copy of his employment |
| 11:47 | 15 | agreement, true? |
| 11:47 | 16 | A.   Yes. |
| 11:47 | 17 | Q.   And this was the only way MGA could really investigate |
| 11:47 | 18 | what his particular agreement was with Mattel, right? |
| 11:47 | 19 | A.   Yes. |
| 11:47 | 20 | Q.   It couldn't call up Mattel and ask, because you hadn't |
| 11:47 | 21 | inked a deal yet with Mr. Bryant, right? |
| 11:47 | 22 | A.   Correct. |
| 11:47 | 23 | Q.   And as somebody who had to deal with licensing |
| 11:47 | 24 | arrangements, you were concerned a little bit, weren't you, |
| 11:47 | 25 | about the fact that you were being presented with a doll |

| | | |
|---|---|---|
| 11:47 | 1 | concept by an employee of a competitor, right? |
| 11:47 | 2 | A.   Yes. |
| 11:48 | 3 | Q.   Little worried about the fact that Mr. Bryant was |
| 11:48 | 4 | employed by Mattel? |
| 11:48 | 5 | A.   Yes. |
| 11:48 | 6 | Q.   Little worried that maybe Mattel was gonna claim later |
| 11:48 | 7 | that it owned the idea? |
| 11:48 | 8 | A.   Yes. |
| 11:48 | 9 | Q.   And, in fact, you were worried that possibly this was a |
| 11:48 | 10 | situation of being presented by a doll -- with a doll |
| 11:48 | 11 | concept by somebody employed by a competitor of yours, |
| 11:48 | 12 | right? |
| 11:48 | 13 | A.   Yes. |
| 11:48 | 14 | Q.   You were uncomfortable about the fact that Mr. Bryant |
| 11:48 | 15 | was working for Mattel, right? |
| 11:48 | 16 | A.   Yes. |
| 11:48 | 17 | Q.   But in that last e-mail in the chain that we referred |
| 11:48 | 18 | to a minute ago -- and I'm referring to Exhibit 23855 -- you |
| 11:48 | 19 | unequivocally told your outside counsel for MGA that |
| 11:48 | 20 | Mr. Bryant came up with Bratz, right? |
| 11:48 | 21 | A.   Yes. |
| 11:48 | 22 | Q.   This doesn't say, "Carter Bryant claims he came up with |
| 11:49 | 23 | Bratz," does it? |
| 11:49 | 24 | A.   No. |
| 11:49 | 25 | Q.   It says he came up with Bratz, right? |

| | | |
|---|---|---|
| 11:49 | 1 | A.   Yes. |
| 11:49 | 2 | Q.   And it doesn't say, "According to Carter Bryant, Mattel |
| 11:49 | 3 | does not do or plan to do anything similar.  It's too hip |
| 11:49 | 4 | for them"? |
| 11:49 | 5 | A.   No, it does not say that. |
| 11:49 | 6 | Q.   Now, in this e-mail, you don't express any of the kinds |
| 11:49 | 7 | of concerns and worries that you told us you had about the |
| 11:49 | 8 | fact that Mr. Bryant was employed by Mattel at the time, |
| 11:49 | 9 | right? |
| 11:49 | 10 | A.   Correct. |
| 11:49 | 11 | MS. KELLER:  If we could -- if we could see |
| 11:49 | 12 | Exhibit 1309. |
| 11:50 | 13 | (Document provided to the witness.) |
| 11:50 | 14 | (Document displayed.) |
| 11:50 | 15 | BY MS. KELLER: |
| 11:50 | 16 | Q.   Have you had a chance to look at that? |
| 11:50 | 17 | A.   Yes. |
| 11:50 | 18 | Q.   We've talked about the fact that it was your |
| 11:50 | 19 | responsibility as licensing director for MGA to ensure that |
| 11:50 | 20 | contracts for inventors and designers be drafted and that's |
| 11:50 | 21 | why, among other reasons, you got Mr. Rosenbaum involved, |
| 11:50 | 22 | the lawyer, right? |
| 11:50 | 23 | A.   Yes. |
| 11:50 | 24 | Q.   And so you monitored the correspondence between |
| 11:50 | 25 | Mr. Rosenbaum and Mr. Bryant because that was part of your |

| | | |
|---|---|---|
| 11:50 | 1 | job, true? |
| 11:50 | 2 | A.   I don't know if I monitored every single piece of |
| 11:50 | 3 | correspondence. |
| 11:50 | 4 | Q.   Well, you certainly reviewed all relevant written |
| 11:50 | 5 | correspondence by MGA and Mr. Bryant, right? |
| 11:50 | 6 | A.   Yes. |
| 11:50 | 7 | Q.   And you're familiar with this fax that we're talking |
| 11:50 | 8 | about here, Exhibit 1309-00001? |
| 11:51 | 9 | A.   I don't recall seeing this document. |
| 11:51 | 10 | Q.   Well, you were the person who received Mr. Bryant's |
| 11:51 | 11 | signed contract via fax, weren't you? |
| 11:51 | 12 | A.   Yes. |
| 11:51 | 13 | Q.   And? |
| 11:51 | 14 |         MR. QUINN:  Vague as to "contract."  Which |
| 11:51 | 15 | contract? |
| 11:51 | 16 |         THE COURT:  Overruled. |
| | 17 | BY MS. KELLER: |
| 11:51 | 18 | Q.   Does this fax -- is this fax dated September 14th -- |
| 11:51 | 19 | A.   Yes. |
| 11:51 | 20 | Q.   -- 2000? |
| 11:51 | 21 |      And, by the way, if you look at the bottom, you see a |
| 11:51 | 22 | little "MGA" that -- you understand this document was |
| 11:51 | 23 | produced by MGA? |
| 11:51 | 24 | A.   Okay. |
| 11:52 | 25 | Q.   Do you notice the fax header on each page? |

| 11:52 | 1 | A.   Yes. |
| 11:52 | 2 | Q.   And what does it say? |
| 11:52 | 3 | A.   Barbie Collectibles. |
| 11:52 | 4 | Q.   And that's on every page? |
| 11:52 | 5 | A.   Yes. |
| 11:52 | 6 | Q.   None of these are whited out? |
| 11:52 | 7 | A.   No. |
| 11:52 | 8 | Q.   And, um, if -- so you were the one who received |
| 11:52 | 9 | Mr. Bryant's signed contract via fax, right? |
| 11:52 | 10 | A.   Yes. |
| 11:52 | 11 | Q.   Mr. Bryant faxed the contract to you directly, true? |
| 11:52 | 12 | A.   Yes. |
| 11:52 | 13 | Q.   And you were the first person at MGA to receive his |
| 11:52 | 14 | fax, right? |
| 11:52 | 15 | A.   Yes. |
| 11:52 | 16 | Q.   Now, let's look at Exhibit 15493. |
| 11:52 | 17 | *(Document provided to the witness.)* |
| 11:52 | 18 | BY MS. KELLER: |
| 11:53 | 19 | Q.   This is an e-mail from David Rosenbaum to Carter Bryant |
| 11:53 | 20 | on which you're copied? |
| 11:53 | 21 | A.   Yes. |
| 11:53 | 22 | Q.   Dated September 19th. |
| 11:53 | 23 | MS. KELLER:  Your Honor, I'd ask that it be |
| 11:53 | 24 | admitted? |
| 11:53 | 25 | THE COURT:  Received. |

139

| | | |
|---|---|---|
| 11:53 | 1 | *(Exhibit No. 15493 received in evidence.)* |
| 11:53 | 2 | *(Document displayed.)* |
| 12:59 | 3 | BY MS. KELLER: |
| 11:53 | 4 | Q.   This is dated September 19, 2000.  And let's look where |
| 11:53 | 5 | it says, "Subject:  Consulting agreement." |
| 11:53 | 6 |       And on this, it's from -- it's sent to Carter Bryant. |
| 11:53 | 7 | Copy:  Victoria O'Connor and Isaac Larian.  Subject: |
| 11:53 | 8 | Consulting Agreement.  And it's from MGA's outside lawyer, |
| 11:53 | 9 | David Rosenbaum. |
| 11:53 | 10 |       "Dear Mr. Bryant, as you know, we represent MGA |
| 11:53 | 11 | Entertainment.  Attached for your review is a draft of the |
| 11:53 | 12 | above-referenced agreement.  Please review the draft and |
| 11:53 | 13 | have your attorney call me to discuss.  Please note that |
| 11:53 | 14 | inasmuch as our client has not had an opportunity to review |
| 11:53 | 15 | this correspondence and/or attachments hereto, I must |
| 11:54 | 16 | reserve their right to comment." |
| 11:54 | 17 |       And attached is the proposed MGA consulting agreement, |
| 11:54 | 18 | right? |
| 11:54 | 19 | A.   Yes. |
| 11:54 | 20 | Q.   So take a look at 15493-A, page 1.  That was the |
| 11:54 | 21 | attachment to this. |
| 11:54 | 22 | A.   Okay. |
| 11:54 | 23 |       *(Document displayed.)* |
| | 24 | BY MS. KELLER: |
| 11:54 | 25 | Q.   You see that? |

| 11:54 | 1 | A.   Yes. |
| 11:54 | 2 | Q.   And so this was a draft agreement, right? |
| 11:54 | 3 | A.   Yes. |
| 11:54 | 4 | Q.   It was not the -- it's not true that the agreement |
| 11:54 | 5 | between Carter Bryant and MGA was signed on September 18, |
| 11:54 | 6 | 2000, right? |
| 11:54 | 7 | A.   Right. |
| 11:54 | 8 | Q.   And Mr. Bryant was told that this was just a draft, |
| 11:54 | 9 | right? |
| 11:54 | 10 | A.   Yes. |
| 11:54 | 11 | Q.   And let's look again at the first page, up on the |
| 11:54 | 12 | right, where it says, "Dated as of September 18th, 2000." |
| 11:55 | 13 | A.   Okay. |
| 11:55 | 14 | Q.   Okay.  So this draft agreement had that on it.  And |
| 11:55 | 15 | according to this, Mr. Rosenbaum said that MGA hadn't had an |
| 11:55 | 16 | opportunity to review the e-mail and/or attachments yet, |
| 11:55 | 17 | right? |
| 11:55 | 18 | A.   Correct. |
| 11:55 | 19 | Q.   But you have testified at trial that you believed you |
| 11:55 | 20 | received the fax of the signed contract on September 18th, |
| 11:55 | 21 | 2000.  Remember that? |
| 11:55 | 22 | A.   No. |
| 11:55 | 23 | Q.   Well, look at your trial testimony, page 1327, lines 15 |
| 11:55 | 24 | through 21. |
| 11:55 | 25 | *(Document provided to the witness.)* |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 9808   Filed 02/07/11   Page 141 of 144   Page ID #:295691
CV 04-9049 DOC - 2/4/2011 - Day 13, Volume 1 of 3

141

| | | |
|---|---|---|
| 11:56 | 1 | THE WITNESS:  Okay. |
| | 2 | BY MS. KELLER: |
| 11:56 | 3 | Q.   Okay.  So what you testified to at trial was that you |
| 11:56 | 4 | believed you received the fax of the signed contract |
| 11:56 | 5 | September 18, 2000, right? |
| 11:56 | 6 | MR. QUINN:  Object to the form of the question.  I |
| 11:56 | 7 | think the entire passage -- |
| 11:56 | 8 | THE COURT:  I couldn't hear. |
| 11:56 | 9 | MR. QUINN:  Object to the form of the question.  I |
| 11:56 | 10 | think the entire passage should be read, if any -- 5 through |
| 11:56 | 11 | 21. |
| 11:56 | 12 | THE COURT:  Counsel, any objection to reading it? |
| 11:56 | 13 | MS. KELLER:  I have none. |
| 11:56 | 14 | THE COURT:  All right. |
| 11:56 | 15 | MS. KELLER:  (Reading:) |
| 11:56 | 16 | "QUESTION:  It shows there in the upper right that |
| 11:56 | 17 | its dated as of September 18th, 2000.  Do you see that? |
| 11:56 | 18 | "ANSWER:  Yes. |
| 11:56 | 19 | "QUESTION:  Was that date there when you received |
| 11:56 | 20 | the document from Mr. Bryant? |
| 11:57 | 21 | "ANSWER:  I believe so, but I couldn't say for |
| 11:57 | 22 | certain. |
| 11:57 | 23 | "QUESTION:  But did you notice that a date was |
| 11:57 | 24 | missing there?  This appears to be the document you got from |
| 11:57 | 25 | Mr. Bryant. |

| | | |
|---|---|---|
| 11:57 | 1 | "ANSWER:  Yes. |
| 11:57 | 2 | "And you understood that Mr. Bryant was still |
| 11:57 | 3 | working for Mattel at the time? |
| 11:57 | 4 | "ANSWER:  Correct. |
| 11:57 | 5 | "And did you receive this around or about |
| 11:57 | 6 | September 18, 2000? |
| 11:57 | 7 | "ANSWER:  I believe so, but it was a long time |
| 11:57 | 8 | ago." |
| 11:57 | 9 | BY MS. KELLER: |
| 11:57 | 10 | Q.   Okay.  That was your testimony, right? |
| 11:57 | 11 | A.   Yes. |
| 11:57 | 12 | Q.   But having looked at this e-mail dated September 19th, |
| 11:57 | 13 | the very next day that that document was dated, it is clear |
| 11:57 | 14 | that as far as -- it is clear, as you've just agreed, that |
| 11:57 | 15 | this document was merely a draft as of September 19th, and |
| 11:57 | 16 | had not even been reviewed by your counsel yet, true? |
| 11:57 | 17 | A.   Well, counsel sent it out. |
| 11:58 | 18 | Q.   On September 19th, according to Exhibit 15493, saying, |
| 11:58 | 19 | "Dear Mr. Bryant, as you know, we represent MGA |
| 11:58 | 20 | Entertainment.  Attached for your review is a draft of the |
| 11:58 | 21 | above-referenced agreement.  Please review the draft and |
| 11:58 | 22 | have your attorney call me to discuss.  Please note that |
| 11:58 | 23 | inasmuch as our client has not had an opportunity to review |
| 11:58 | 24 | this correspondence and/or attachment hereto, I must reserve |
| 11:58 | 25 | their right to comment." |

| | | |
|---|---|---|
| 11:58 | 1 | So, bottom line is, on September 19th, there was no |
| 11:58 | 2 | final agreement inked yet; there was still a draft |
| 11:58 | 3 | circulating, and both parties were going to review it -- MGA |
| 11:58 | 4 | and Mr. Bryant -- true? |
| 11:58 | 5 | A.   True. |
| 11:58 | 6 | MS. KELLER:  Your Honor, would this be a good |
| 11:58 | 7 | time? |
| 11:58 | 8 | THE COURT:  This would be a good time for a |
| 11:58 | 9 | recess. |
| 11:58 | 10 | All right.  You're admonished not to discuss this |
| 11:58 | 11 | matter amongst yourselves nor form or express any opinion |
| 11:58 | 12 | concerning the case. |
| 11:58 | 13 | 1:00 o'clock? |
| 11:58 | 14 | We'll see you at 1:00 o'clock. |
| 11:58 | 15 | Have a nice lunch. |
| 11:59 | 16 | *(Recess held at 11:59 a.m.)(Further* |
| 11:59 | 17 | *proceedings reported by Jane Sutton rule in Volume* |
| 11:59 | 18 | *II.)* |
| 11:59 | 19 | -oOo- |
| 11:59 | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

Case 2:04-cv-09049-DOC-RNB   Document 9808   Filed 02/07/11   Page 144 of 144   Page ID #:295694
CV 04-9049 DOC - 2/4/2011 - Day 13, Volume 1 of 3

144

-oOo-


CERTIFICATE


        I hereby certify that pursuant to Section 753,

Title 28, United States Code, the foregoing is a true and

correct transcript of the stenographically reported

proceedings held in the above-entitled matter and that the

transcript page format is in conformance with the

regulations of the Judicial Conference of the United States.


Date:  February 5, 2011




                         _____
                         DEBBIE GALE, U.S. COURT REPORTER
                         CSR NO. 9472, RPR