1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

HONORABLE DAVID O. CARTER, JUDGE PRESIDING

- - - - - - -


MATTEL, INC., ET AL.,                )
                                     )
          Plaintiffs,                )
                                     )
     vs.                             ) No. CV 04-9049-DOC
                                     )    Day 13
MGA ENTERTAINMENT, INC., ET AL.,     )    Volume 2 of 3
                                     )
          Defendants.                )
_____)


REPORTER'S TRANSCRIPT OF PROCEEDINGS

Jury Trial

Santa Ana, California

Friday, February 4, 2011


Jane C.S. Rule, CSR 9316
Federal Official Court Reporter
United States District Court
411 West 4th Street, Room 1-053
Santa Ana, California 92701
(714) 558-7755

11-02-04 MattelV2

Case 2:04-cv-09049-DOC-RNB   Document 9809   Filed 02/07/11   Page 2 of 94   Page ID #:295696
CV 04-9049-DOC - 02/04/2011 - Day 13, Vol. 2 of 3

2

1    **APPEARANCES OF COUNSEL:**

2

3    FOR PLAINTIFFS MATTEL, INC., ET AL.:

4            QUINN, EMANUEL, URQUHART & SULLIVAN
             By:  JOHN B. QUINN
5                 MICHAEL T. ZELLER
                  WILLIAM PRICE
6                 Attorneys at Law
             865 South Figueroa Street
7            10th Floor
             Los Angeles, California 90017-2543
8            (213) 443-3000

9

10   FOR DEFENDANTS MGA ENTERTAINMENT, INC., ET AL.:

11           ORRICK, HERRINGTON & SUTCLIFFE, LLP
             BY:  THOMAS S. MC CONVILLE
12                Attorney at Law
             4 Park Plaza
13           Suite 1600
             Irvine, California 92614
14           (949) 567-6700

15           - AND -

16           ORRICK, HERRINGTON & SUTCLIFFE, LLP
             BY:  ANNETTE L. HURST
17                Attorney at Law
             405 Howard Street
18           San Francisco, California 94105
             (415) 773-5700
19
             - AND -
20
             KELLER RACKAUCKAS, LLP
21           BY:  JENNIFER L. KELLER
                  Attorney at Law
22           18500 Von Karman Avenue
             Suite 560
23           Irvine, California 92612
             (949) 476-8700

24

25

```
1    APPEARANCES OF COUNSEL (Continued):

2

3    FOR DEFENDANT CARLOS GUSTAVO MACHADO GOMEZ:

4               SCHEPER, KIM & OVERLAND, LLP
                BY:  ALEXANDER H. COTE
5                    Attorney at Law
                601 West Fifth Street
6               12th Floor
                Los Angeles, California 90071
7               (213) 613-4660

8               - AND -

9               LAW OFFICES OF MARK E. OVERLAND
                BY:  MARK E. OVERLAND
10                   Attorney at Law
                100 Wilshire Boulevard
11              Suite 950
                Santa Monica, California 90401
12              (310) 459-2830

13

14   Also Present:

15              ROBERT ECKERT, Mattel CEO

16              ISAAC LARIAN, MGA CEO

17              KEN KOTARSKI, Mattel Technical Operator

18              MIKE STOVALL, MGA Technical Operator

19              RACHEL JUAREZ, Quinn Emanuel Urquhart & Sullivan

20              KIERAN KIECKHEFER, Orrick Herrington & Sutcliffe

21

22

23

24

25
```

CV 04-9049-DOC - 02/04/2011 - Day 13, Vol. 2 of 3

4

```
 1                            I N D E X

 2

 3

 4                          EXAMINATION

 5

 6   Witness Name          Direct     Cross     Redirect     Recross

 7   O'CONNOR, VICTORIA
        By Ms. Keller                  5
 8      By Mr. Quinn                             77

 9

10

11

12                           EXHIBITS

13

14   Exhibit                      Identification     Evidence

15   Defendants' No. 9165                              75

16   Defendants' No. 10477A                            29

17   Defendants' No. 17240                             27

18   Defendants' No. 17251                             28

19   Defendants' No. 18463                             22

20   Defendants' No. 23856                             18

21   Plaintiffs' No. 35000                             79

22

23

24

25
```

CV 04-9049-DOC – 02/04/2011 – Day 13, Vol. 2 of 3

5

```
 1                SANTA ANA, CALIFORNIA, FRIDAY, FEBRUARY 4, 2011

 2                       DAY 13, VOLUME 2 OF 3

 3                            (1:06 p.m.)

 4              (The following proceedings is taken in the

 5         presence of the jury.)

 6              THE COURT:  All right.  We are back in session.

 7    All counsel are present.  The jury, the alternates, the

 8    witness.

 9              And this is Ms. Keller with continued

10    cross-examination.

11              MS. KELLER:  Thank you, your Honor.

12         VICTORIA O'CONNOR, PLAINTIFFS' WITNESS, RESUMED

13                 CROSS-EXAMINATION (Continued)

14    BY MS. KELLER:

15    Q    We were talking before the break about an e-mail chain

16    from you to Mr. Rosenbaum and then also about a draft

17    agreement, and I want to return to that for a moment.

18         Now, if you could look at Exhibit 9258.

19    A    Okay.

20    Q    This was an e-mail chain that Mr. Quinn had shown you a

21    little earlier, and the last e-mail on the chain is the one

22    that we've seen where Mr. Rosenbaum writes Mr. Bryant on

23    September 19th, 2000, telling him that a draft of the

24    consulting agreement was attached; do you see that?

25    A    Yes.
```

1    Q    And that's the bottom of 9258-1 onto the top of 9258-2.

2         Now, notice the time, not just the date, but the time

3    that this is sent.  That's 12:23 a.m., isn't it?

4    A    Yes.

5    Q    Now, let's look at the next e-mail from you to

6    Mr. Rosenbaum on September 19th, 2000, where you thank him.

7    Thanks David, but you didn't have to stay up until midnight;

8    do you see that?

9    A    I said "work," but yes.

10   Q    Oh, you said what?

11   A    I said, "You didn't have to work until midnight."

12   Q    Oh, right you are.  "You didn't have to work until

13   midnight."

14        So you had read Mr. Rosenbaum's e-mail to Mr. Bryant

15   clearly saying that he was sending a draft of the proposed

16   agreement.  And in E-mail Number 3, Mr. Rosenbaum responds

17   that same day, September 19th, 2000, "Thanks.  Would you

18   make sure that Carter has his lawyer call me to discuss the

19   Mattel issue and that we want to be able to address the

20   warranties that he will make regarding originality and

21   ownership vis-a-vis Mattel."

22        So MGA, here, was expressly raising the issue with

23   Carter Bryant's lawyer of whether or not Mr. Bryant actually

24   owned the rights to the Bratz drawings, right?

25   A    Yes.

CV 04-9049-DOC - 02/04/2011 - Day 13, Vol. 2 of 3

7

```
1   Q    And you were the one acting as liaison on this issue,

2   right?

3   A    Yes.

4   Q    And the subject of the discussion was to be whether

5   Mr. -- whether Bratz was Mr. Bryant's idea and whether he

6   owned the idea or whether Mattel did, true?

7   A    Correct.

8   Q    But you testified at your deposition, if I'm not

9   mistaken, that you didn't know whether anyone at MGA had any

10  communication with Carter Bryant's lawyers; do you recall

11  that?

12          MR. QUINN:  Object to the form of the question.

13          THE COURT:  Just a moment.

14          Well, sustained.

15          In other words, are you impeaching her?  If so,

16  she hasn't been asked a question.

17          MS. KELLER:  I'll ask a preliminary question.

18  BY MS. KELLER:

19  Q    Was your memory better in 2004 on this than it is

20  today?

21  A    I don't remember.  Probably.

22  Q    And if you'd look at your deposition transcript,

23  December 6th, 2004, page 230, lines 19 through 23.

24  A    Okay.

25  Q    So back in 2004, is it true that you didn't know
```

CV 04-9049-DOC - 02/04/2011 - Day 13, Vol. 2 of 3

8

```
 1    whether anyone at MGA had had any communication with Carter
 2    Bryant's lawyers?
 3    A    Correct, not stipulating David Rosenbaum.
 4    Q    I'm sorry, what?
 5    A    I wasn't stipulating David Rosenbaum, just anyone at
 6    MGA, yes.
 7    Q    Had any communication with Carter Bryant's lawyers?
 8    A    Correct.
 9    Q    So when you said "anyone at MGA," you were leaving out
10    Mr. Rosenbaum and you were leaving out the indirect
11    communication that you had with Carter Bryant's lawyers?
12              MR. QUINN:  Vague and ambiguous and compound.
13              THE COURT:  Overruled.
14              Do you understand the question?
15              THE WITNESS:  I think there were two questions.
16    What was the first question?
17    BY MS. KELLER:
18    Q    Well, I'll take them in order.
19         You were communicating with Mr. Bryant's lawyers
20    through Mr. Rosenbaum acting as MGA's attorney and agent,
21    right?
22    A    Yes, but I had no communication with Carter Bryant's
23    attorney.
24    Q    And you also testified at your deposition that you
25    didn't know whether anyone at MGA -- whether MGA ever
```

Case 2:04-cv-09049-DOC-RNB   Document 9809   Filed 02/07/11   Page 9 of 94   Page ID #:295703
CV 04-9049-DOC - 02/04/2011 - Day 13, Vol. 2 of 3

9

1    expressly raised the issue with Carter Bryant's lawyer of

2    whether Mr. Bryant actually owned the rights to the Bratz

3    drawings, right?

4    A    Yes, when I said that, I was not referring to David

5    Rosenbaum, who was not an MGA employee.

6    Q    Well, here -- here is the portion I'm asking about.

7    You didn't know whether MGA expressly raised the issue with

8    Carter Bryant's lawyer of whether Mr. Bryant actually owned

9    the rights to the Bratz drawings, but you knew MGA expressly

10   raised the issue, right?

11            MR. QUINN:  That's argumentative, and it assumes

12   facts.

13            THE COURT:  Do you understand the question?

14            THE WITNESS:  No.

15   BY MS. KELLER:

16   Q    You testified at your deposition that you didn't know

17   whether MGA expressly raised the issue with Carter Bryant's

18   lawyer of whether Mr. Bryant actually owned the right to the

19   Bratz drawings, true?

20            MR. QUINN:  Object to the form of the question.

21            MS. KELLER:  It's preliminary, your Honor.

22            THE COURT:  Overruled.

23            You may answer.

24            THE WITNESS:  I'm sorry, can you say it one more

25   time?

1    BY MS. KELLER:

2    Q    You testified at your deposition that you didn't know

3    whether MGA expressly raised the issue with Carter Bryant's

4    lawyer of whether Mr. Bryant actually owned the rights to

5    the Bratz drawings, right?

6    A    Can you show me on what line I said that?  I don't see

7    it.

8    Q    Page 227, lines 8 through 12.

9          MS. KELLER:  And your Honor, I would actually ask

10   to read that passage.

11         THE COURT:  Any objection, Counsel?

12         MR. QUINN:  It's not impeachment.

13         THE COURT:  Well, there is no stipulation,

14   apparently, you can't, but the --

15         MS. KELLER:  I believe it's directly impeaching,

16   your Honor.

17         THE COURT:  I don't believe it is, Counsel, with

18   the answer given on line 12.

19   BY MS. KELLER:

20   Q    Just a little while ago, after we came back, I asked

21   you about MGA expressly raising the issue with Carter

22   Bryant's lawyer of whether Mr. Bryant actually owned the

23   rights to the Bratz drawings, and you said, "Yes, we did,"

24   and that's what this string of e-mail showed; do you

25   remember that?

1    A    Me personally, no, I did not.

2    Q    I'm not asking about you personally.  I'm asking

3    whether you, MGA, okay?

4    A    Are you including David Rosenbaum when you say "you,

5    MGA"?

6    Q    No, let's not even include Mr. Rosenbaum.  Let's talk

7    about you.

8    A    Okay.

9    Q    You knew that you were directing MGA's lawyer to

10   expressly raise the issue with Carter Bryant's lawyers of

11   whether Mr. Bryant actually owned the rights to the Bratz

12   drawing, true?

13   A    Yes.

14   Q    And yet, you previously testified that you did not know

15   from any source --

16        MR. QUINN:  Object to the form.  It's

17   argumentative, your Honor.

18        THE COURT:  I'm going to sustain it.

19   BY MS. KELLER:

20   Q    Did you previously testify --

21        MR. QUINN:  Same objection.

22        THE COURT:  No, no.  Just a moment.

23        Finish your question.

24   BY MS. KELLER:

25   Q    Did you previously testify that you did not know from

1   any source whether MGA expressly raised the issue with

2   Carter Bryant's lawyer of whether Mr. Bryant actually owned

3   the rights to the Bratz drawings?

4              THE COURT:  Now, just a moment.  And are you

5   basing this on line 8 through 12 on page 227?

6              MS. KELLER:  Yes, your Honor.

7              THE COURT:  I'm going to sustain the objection.

8   BY MS. KELLER:

9   Q    Did you know from any source whatsoever whether MGA

10  ever expressly raised the issue with Carter Bryant's lawyer

11  of whether Mr. Bryant actually owned the rights to the Bratz

12  drawing?

13  A    No.

14  Q    You didn't know from any source?

15  A    Oh, from -- well, from David -- I know David Rosenbaum.

16  Q    Any source?

17  A    Yes.

18  Q    Okay.  And the source that you knew was the lawyer you

19  hired to do exactly that, right?

20  A    Yes.

21  Q    Now, your previous testimony that you didn't know from

22  any source whether MGA expressly raised the issue with

23  Carter Bryant's lawyer of whether Mr. Bryant actually owned

24  the rights to the Bratz drawing, your testimony that you

25  didn't know was false, right?

1            MR. QUINN:  Objection, your Honor.

2            THE COURT:  I'm going to sustain that.

3            On this rare occasion, I understand that I may not

4   be following the exact evidentiary rule, but I don't see any

5   reason why, Counsel, lines 8 through 12 can't simply be read

6   as is.  It takes the confusion away; we hear the question

7   and we hear the answer.

8            MR. QUINN:  I have no objection to that.

9            THE COURT:  Counsel?

10           MS. KELLER:  I will move on, your Honor.

11           THE COURT:  No, Counsel.  I'm willing to do that.

12   Lines 8 through 12 is what you've been referring to as

13   potentially impeaching.

14           MS. KELLER:  Yes, your Honor.

15           THE COURT:  Is there any reason why that shouldn't

16   be read to the jury as is?

17           MS. KELLER:  None.

18           THE COURT:  Then read.

19   BY MS. KELLER:

20   Q    Question:  "Okay.  And do you know from -- from any

21   source whether MGA expressly raised the issue with Carter

22   Bryant's lawyer of whether Mr. Bryant actually owned the

23   rights to the Bratz drawings?"

24        Answer:  "I don't know."

25        Now, this testimony was given December 6th, 2004,

1    correct?

2    A    Yes.

3    Q    And have you ever made any attempt to go back and

4    correct that testimony?

5    A    No.

6    Q    And you were sent a copy of your deposition transcript

7    after you gave the deposition, and you were asked if there's

8    anything in here that's not accurate, please correct it,

9    right?

10   A    Yes.

11   Q    And you made no correction on that score, correct?

12   A    Correct.

13   Q    Did you correct anything else?

14   A    I don't believe so.

15   Q    Now that you've been confronted with all these e-mails,

16   you've changed your testimony --

17            MR. QUINN:  This is argumentative, your Honor.

18            THE COURT:  No.  Overruled.

19            You can ask the question.

20   BY MS. KELLER:

21   Q    Now that you have been confronted with all these

22   e-mails establishing that, in fact, not only was MGA

23   exploring that, but you were the one directed by Mr. Larian

24   to hire a lawyer to do so, now you have changed that

25   testimony, correct?

1    A    I would change it from "I don't know" to "yes."

2    Q    Now, let's look at the last e-mail in the chain, which

3    is also yours, also on September 19th, 2000, and it says, "I

4    just left a message requesting him to do this"; do you see

5    that?

6    A    Yes.

7    Q    And that was in response, if you'd just go down to the

8    message just below it, to Mr. Rosenbaum saying, "Thanks.

9    Would you make sure that Carter has his lawyer call me to

10   discuss the Mattel issue, and that we want to be able to

11   address the warranties that he will make regarding

12   originality and ownership vis-a-vis Mattel."

13        So he was answering your question -- or rather, you

14   were answering his question saying, I just left him a

15   message requesting him to do this, right?

16   A    Yes.

17   Q    So you knew he was communicating with Mr. Bryant's

18   lawyer because you told him to, correct?

19   A    Yes.

20   Q    Now, let's look at Exhibit 9257, and this is another

21   e-mail chain that I believe you were shown by counsel.  And

22   directing your attention to E-mail Number 1, the first

23   e-mail on -- the first e-mail, 9257-2 is a September 19th,

24   2000 e-mail from Mr. Rosenbaum to Carter Bryant attaching

25   the draft of the proposed consulting agreement for his

1    review; do you see that?

2    A    Yes.

3    Q    The proposed -- the draft of the proposed consulting

4    agreement.

5         Now, the next e-mail I'd like you to look at is from

6    someone named Dennis Medici to you with David Rosenbaum

7    cc'd, sent September 25th, 2000.

8         And who is Dennis Medici?

9    A    He was CFO for MGA.

10   Q    Okay.  The chief financial officer?

11   A    Yes.

12   Q    So he was the money guy?

13   A    Yes.

14   Q    At the bottom of the e-mail, 9257-2, Medici asks, "Does

15   MGA own the trademark Bratz and any licensing of such name?"

16        So Mr. Medici, the CFO, was also raising that issue,

17   right?

18   A    Yes.

19   Q    He was concerned to make sure everything was as it

20   should be legally, right?

21   A    Yes.

22   Q    And the next e-mail is from you to Mr. Medici sent

23   September 25th, 2000, and your response is, "It looks like

24   we will change the names since the TM is taken."  TM is

25   trademark?

1    A    Yes.

2    Q    "David, I spoke with Carter this morning, who is

3    meeting with counsel on Wednesday.  He hopes to execute the

4    agreement by Friday."

5         So the trademark "Bratz" was already taken by someone?

6    A    Yes.

7    Q    Not by Mattel?

8    A    No.

9    Q    And let's look at E-mail Number 4, the last e-mail in

10   the chain.  This is dated September 26th, and there is still

11   no signed agreement, right?

12   A    Correct.

13   Q    Mr. Rosenbaum again e-mails you to say, "Victoria, we

14   still have the Mattel issue, which has not been addressed,

15   which is why me having a conversation with his lawyer will

16   try to address this in a semi privileged way."

17        So again, at this point, still no signed contract,

18   September 26th, right?

19   A    Correct.

20   Q    And when Mr. Rosenbaum talked about having a

21   conversation with Mr. Bryant's lawyer, you understood he was

22   saying he was going to talk to the lawyer about the Mattel

23   issue, about whether or not Mr. Bryant owned that Bratz idea

24   or not, right?

25   A    Correct.

1    Q    As you had directed him to do, true?

2    A    Yes.

3    Q    And as Mr. Larian, in turn, had directed you to do,

4    right?

5    A    Yes.

6    Q    Now, let's look at Exhibit 23856, and this is the same

7    chain as the one in Exhibit 9257 except there is an

8    additional e-mail.  And so you'll see, if you look at the

9    second one down --

10        MS. KELLER:  Or I'm sorry, your Honor.

11   BY MS. KELLER:

12   Q    Are you copied on this e-mail?

13   A    On the second one down, yes.

14   Q    And the top of the page from David Rosenbaum to you?

15   A    From me to David Rosenbaum.

16   Q    I'm sorry.  I'm looking at 23856 at the top of the

17   page, top left where it says "David Rosenbaum" and from

18   Victoria O'Connor to David Rosenbaum, are we on the same --

19   A    Yes.

20        MS. KELLER:  All right.  Your Honor, I'd ask that

21   that be admitted.

22        THE COURT:  Received.

23        (Defendants' Exhibit No. 23856 is received in

24        evidence.)

25

1    BY MS. KELLER:

2    Q    Now, if you look at the second one down, you can see

3    that's the e-mail we just discussed that was September 26th

4    where Mr. Rosenbaum, this time in the afternoon, was

5    e-mailing you about we still have the Mattel issue, et

6    cetera, okay?

7    A    Okay.

8    Q    Now, let's look right above that at your answer, two

9    minutes later, and your answer is, "I expect his attorney to

10   call you Thursday or Friday to discuss.  Carter knows this

11   is an issue."

12        So you knew that Mr. Bryant's attorney was going to be

13   calling Mr. Rosenbaum, right?

14   A    Yes.

15   Q    And you understood that Mr. Bryant knew this was an

16   issue, right?

17   A    Yes.

18   Q    And you understood that unless the lawyers had cleared

19   it up to their satisfaction, there wasn't going to be a deal

20   with MGA, right?

21   A    Most likely.

22   Q    Well, if the lawyers had come back and said, "This

23   property belonged to Mattel," you were not about to do that

24   deal; am I right?

25   A    I'm pretty sure, no.

CV 04-9049-DOC - 02/04/2011 - Day 13, Vol. 2 of 3

20

1    Q    Well, am I right?

2    A    I would think so, yes, but that wasn't my decision.

3    Q    Well, I think that you said this morning when you were

4    asked, "Are you the type to stay silent if your employer is

5    doing something to expose you or the employer to liability,"

6    and you said "no," okay?

7    A    Okay.

8    Q    Is that a true statement?

9    A    Yes.

10   Q    So if this property had been shown to be owned by

11   Mattel, you weren't going to do the deal, right?

12   A    It wasn't my company to do the deal.

13   Q    Were you going to participate in the deal?

14   A    Me staying silent doesn't mean that the deal

15   necessarily wouldn't happen.  I would have voiced my

16   concern.

17   Q    "Are you the type to stay silent if your employer is

18   doing something to expose you or the employer to liability?

19        "No."

20        So you would have raised holy heck, shall we say,

21   right?

22   A    I would have.

23   Q    You would have really spoken out, right?

24   A    Yes.

25   Q    But that didn't happen here because the lawyers came

1    back and said, "The deal is vetted," right?

2    A    "Vetted"?

3    Q    The lawyers came back and said, "It appears Carter

4    Bryant owns the rights to the Bratz," true?

5    A    Yes.

6    Q    And as we talked about earlier, you don't hire private

7    I's and question document examiners and, you know, people to

8    dig through garbage or whatever you do to try to do a police

9    type investigation on a designer coming to you with a

10   project, right?

11   A    Correct.

12   Q    Usually you'd just get what are called "reps and

13   warranties," a representation and warranty from the

14   designer, right?

15   A    Yes.

16   Q    And in this case, you went beyond that because this was

17   a Mattel employee, you actually got both representations and

18   warranties from him, and you also got Mr. Rosenbaum involved

19   to have him do whatever due diligence he was going to do,

20   right?

21   A    Yes.

22   Q    And is it also true that you don't grill the lawyers as

23   to every last thing they did to comprise that due diligence?

24   A    True.

25   Q    I mean, you assume that an experienced, competent,

Case 2:04-cv-09049-DOC-RNB   Document 9809   Filed 02/07/11   Page 22 of 94   Page ID
#:295716
CV 04-9049-DOC - 02/04/2011 - Day 13, Vol. 2 of 3

22

1    intellectual property lawyer is doing a good job, right?

2    A    Yes.

3    Q    Now, let's look at Exhibit 18463, and this is another

4    e-mail chain between you and David Rosenbaum.  And at the

5    very top, David Rosenbaum e-mails on September 28th, 2000.

6    So you would have seen this whole chain, correct?

7    A    Yes.

8            MS. KELLER:  Your Honor, I think this was already

9    admitted, but just in case it's not, 18463.

10           THE COURT:  It's received.  It should be 928.

11           (Defendants' Exhibit No. 18463 is received in

12       evidence.)

13   BY MS. KELLER:

14   Q    And let's see who else is cc'd on this.  Mr. Larian?

15   A    Yes.

16   Q    And so Mr. Larian would have seen the whole chain too,

17   right?

18   A    Yes.

19   Q    Now, let's look at the bottom of 18463-1 to 18463-2,

20   okay?  This is an e-mail from Mr. Rosenbaum to you dated

21   September 28th, 2000, at 11:55 a.m., and the subject is

22   Carter Bryant.

23       It says, "Victoria, I spoke with Carter's lawyer this

24   a.m. and e-mailed her a copy of the draft agreement for her

25   review.  I asked her specifically about the Mattel issue,

Case 2:04-cv-09049-DOC-RNB   Document 9809   Filed 02/07/11   Page 23 of 94   Page ID #:295717
CV 04-9049-DOC - 02/04/2011 - Day 13, Vol. 2 of 3

23

1   and she said she has reviewed the chronology of the creation

2   of this design and is satisfied that Carter created this

3   outside the scope of his employment at Mattel.  She said she

4   understands the concerns here.  Apparently he conceived this

5   project in 1998.  So I recommend that your patent attorney

6   review this project as soon as possible to avoid any time

7   limitations in the patent laws.  I will let you know her

8   comments on the draft as soon as I receive some."

9            THE COURT:  Could you raise that e-mail so we see

10  "regards."

11           MS. KELLER:  "Regards"?

12           THE COURT:  Yeah.

13           MS. KELLER:  "David S. Rosenbaum."

14           THE COURT:  Thank you.

15           MS. KELLER:  And show the rest of it so the jurors

16  can see the signature area.

17           It looks like Fischbach, Perlstein & Lieberman,

18  LLP.

19  BY MS. KELLER:

20  Q    Now -- and by the way, this concern about the patent

21  rights that Mr. Rosenbaum raised, he's basically saying that

22  apparently he conceived this in '98, so I recommend your

23  patent attorneys basically get on this project ASAP, right?

24  A    Right.

25  Q    Because time was -- was running, true?

1    A    I guess.

2    Q    Well, I mean, I know you are not a patent lawyer, but

3    you know that patents have to be filed within certain time

4    periods, right?

5    A    I don't know that much about patents.

6    Q    I know, I don't either, trust me.

7         But it says apparently he conceived this product in

8    1998, so I recommend that your patent attorneys review this

9    project as soon as possible to avoid any time limitations in

10   the patent laws.

11        So you understood that to mean, "hmm, there could be

12   some time limitations in patent laws given the fact that

13   this was conceived in 1998, so Mr. Rosenbaum was telling us

14   to take action," right?  Get on it?

15   A    Yes.

16   Q    Do something, have your patent attorneys review it,

17   right?

18   A    Yes.

19   Q    So would you agree with me that a reasonable inference

20   from that is that Mr. Rosenbaum believed that information he

21   was being conveyed?

22   A    Yes.

23   Q    And -- and he, in turn, was conveying it to you, right?

24   A    Right.

25   Q    And you, in turn, relied upon it, right?

1    A    Yes.

2    Q    And you, in turn, conveyed it to Mr. Larian or

3    actually, here, Mr. Rosenbaum did directly, right?

4    A    Correct.

5    Q    And he relied on it, right?

6    A    Correct.

7    Q    So your response, then, at the very top, here,

8    Thursday, September -- my eyes are so bad, I am going to

9    have to get my reading glasses, but...

10        Ah, so much better.

11        So he's responding back to you on September 28th at

12   4:04 p.m. -- or I'm sorry.  Yes, he's responding, and he --

13            MS. KELLER:  Let's go down.

14   BY MS. KELLER:

15   Q    At 3:32 p.m., you send a message to him, cc Isaac

16   Larian, "Did she give you an indication on when you would

17   receive comments," okay?

18        And you understood that to be responding to, you know,

19   the "I spoke with Carter's lawyer this morning," et cetera,

20   right?

21   A    Yes.

22   Q    And then if you look at the top, we see that this is to

23   you from Mr. Rosenbaum.  Mr. Larian copied.  "No, she did

24   not, but I will call her tomorrow afternoon to follow up."

25        So as of 4:04 p.m., September 28th, Mr. Rosenbaum has

```
 1   still not got the issue straightened out with Mr. Bryant's

 2   lawyer, right?

 3   A    Correct.

 4   Q    And you are all hoping you're going to be able to do a

 5   deal with Carter Bryant, but that part of it has not yet

 6   been resolved, true?

 7   A    Correct.

 8            (Attorney discussion held off the record.)

 9   BY MS. KELLER:

10   Q    Okay.  Let's just review for a minute the -- let's --

11   let's just review this e-mail again for a second, 17240.

12   I'm sorry.

13            (Attorney discussion held off the record.)

14            MS. KELLER:  Okay.

15   BY MS. KELLER:

16   Q    Let's look at 18463.  This is the one we've just been

17   discussing, and look at the very bottom of page 1 where we

18   see that this was from David Rosenbaum to you.  "I spoke

19   with Carter's lawyer this morning," et cetera, right?

20   A    Right.

21   Q    And that's the one where he said that she said she's

22   reviewed the chronology of the creation of the design and is

23   satisfied that Carter created this outside the scope of his

24   employment, right?

25   A    Correct.
```

Case 2:04-cv-09049-DOC-RNB   Document 9809   Filed 02/07/11   Page 27 of 94   Page ID #:295721
CV 04-9049-DOC – 02/04/2011 – Day 13, Vol. 2 of 3

27

```
 1    Q    And the e-mail right above that that you reply to him,
 2    you cc Mr. Larian on, right?
 3    A    Yes.
 4    Q    So you wanted to make sure that Mr. Larian saw the
 5    e-mail you had just gotten from Mr. Rosenbaum about having
 6    gotten the assurances from Carter Bryant's lawyer, right?
 7    A    Correct.
 8    Q    Now, if we could turn to Exhibit 17240.
 9         And do you recognize this as an e-mail to you from
10    David Rosenbaum dated September 29th, 2000, 4:11 p.m.?
11    A    Yes.
12            MS. KELLER:  Your Honor, I move to admit 17240.
13            THE COURT:  Received.
14         (Defendants' Exhibit No. 17240 is received in
15         evidence.)
16    BY MS. KELLER:
17    Q    Now, here on September 29th, 2000, we have
18    Mr. Rosenbaum forwarding to you, "FYI, Attorney Anne Hwang's
19    e-mail," the attorney for Carter Bryant, "where she says she
20    expects to have comments on the draft agreement by early
21    next week."  So the "draft agreement," right?
22    A    Right.
23    Q    So even as of September 29th, 2000, the contract was
24    still in draft form and hadn't been reviewed by Mr. Bryant's
25    lawyer, right?
```

Case 2:04-cv-09049-DOC-RNB   Document 9809   Filed 02/07/11   Page 28 of 94   Page ID #:295722
CV 04-9049-DOC – 02/04/2011 – Day 13, Vol. 2 of 3

28

1    A    Correct.

2    Q    Now, let's look at Exhibit 17251, and let's look at

3    the -- this is David Rosenbaum, sent October 4th, 2000, to

4    Anne Hwang, cc Victoria O'Connor, re Bryant, MGA agreement;

5    do you recognize that?

6    A    Yes.

7              MS. KELLER:  Your Honor, I'd move that 3866085 --

8    or I'm sorry, 17251 be admitted.

9              THE COURT:  Received.

10             *(Defendants' Exhibit No. 17251 is received in*

11        *evidence.)*

12   BY MS. KELLER:

13   Q    Now, as I said, this is from Mr. Rosenbaum, right?

14             MS. KELLER:  Can we show the top part?

15             There we go.

16   BY MS. KELLER:

17   Q    And this is sent October 4th, 2000, to Anne Hwang, and

18   you're copied, right?

19   A    Correct.

20   Q    And the body of the e-mail says, "Anne, I reviewed your

21   proposed revisions with my client, and they are, by and

22   large, unacceptable.  I understand that my client has

23   discussed these issues with Carter directly, and he has

24   agreed to withdraw most of the proposed changes.  It is

25   imperative that this agreement be concluded today.  Please

```
 1    call me as soon as possible so that we may conclude this

 2    matter.  Regards, David Rosenbaum."

 3         Okay.  So MGA was prepared to walk away from Carter

 4    Bryant and the Bratz idea unless they could come to terms,

 5    right?

 6    A    I would -- I would think so, yes.

 7    Q    And let's look at -- and let's also look at 10477A, and

 8    this is again an e-mail from David Rosenbaum to Anne Hwang,

 9    and you're cc'd.  This is October 4th, 2003, right?

10    A    2000.

11    Q    I'm sorry.  I'm sorry.  2000, at 3:43 p.m.?

12    A    Yes.

13              MS. KELLER:  Your Honor, I'd move Exhibit 10477A

14    into evidence.

15              THE COURT:  Received.

16              (Defendants' Exhibit No. 10477A is received

17         in evidence.)

18    BY MS. KELLER:

19    Q    Now, this is another e-mail from Mr. Rosenbaum to

20    Ms. Hwang on October 4th on which Mr. Rosenbaum copied you,

21    right?

22    A    Yes.

23    Q    Here, he sent a revised version of the agreement, and

24    he asked for Carter Bryant to sign three copies and send

25    them back, right?
```

1    A    Yes.

2    Q    And he also said, "Please let me know today if Carter

3    will execute the agreement.  If these changes are

4    unacceptable, my client has advised me that it will proceed

5    with other product plans are" -- apparently some sort of a

6    grammatical error -- "terminate its discussions with

7    Mr. Bryant"; do you see that?

8    A    Yes.

9    Q    So MGA was prepared to walk away from Carter Bryant and

10   the Bratz idea unless they could come to an agreement on a

11   deal, right?

12   A    Yes.

13   Q    And the deal at this point, October 4th, it's still not

14   done, all parties are still free to walk away, right?

15   A    Yes.

16   Q    Now, based on that and the negotiation history that we

17   just discussed, there is no question that this document was

18   executed on October 4th, 2000, rather than back in

19   September, right?

20   A    Correct.

21   Q    Okay.  Now I'm talking about Exhibit 15, if we could --

22   document that went with this, if we could go over to

23   Exhibit 15, which is the actual document.

24        Okay.  And it says -- you have it -- do you see up

25   there under the block with MGA Entertainment, it says,

1   "Dated as of September 18th, 2000"?

2   A    Yes.

3   Q    But clearly, given everything we've just done and gone

4   through, this was not executed until October 4th, right?

5   A    I don't know the actual date, but as of October 4th --

6   at the time of that e-mail, it doesn't look like it was

7   signed.

8   Q    Okay.  And you see up in the upper left-hand corner

9   where it says "final"?

10  A    Yes.

11  Q    And you see that the document on page 6, so

12  Exhibit 15-6, bears a signature both for Mr. Bryant and for

13  MGA?

14  A    Yes.

15  Q    And Section 5 of this agreement contains a

16  representation and warranty, this is on page 3, so 15-3.

17  "This contains a representation and warranty that the Bratz

18  drawings were original to Carter Bryant and did not infringe

19  on anyone else's right," correct?

20  A    I believe so, but I'm not a lawyer.

21  Q    Well, you know what representations and warranties are,

22  and we discussed that, right?

23  A    Yes, yes.

24  Q    And that's generally what you understand this to mean,

25  true?

1    A    Yes.

2    Q    And Section 5 of the agreement also contained a

3    provision that said Carter Bryant agreed to indemnify MGA if

4    it turned out that he wasn't really the owner of the Bratz

5    product, right?

6    A    Yes.

7    Q    And "indemnify" means pay for any losses, right?

8    A    Correct.

9    Q    So you were wrong, then, when you testified at trial in

10   June of 1998 -- I mean of 2008, that you received the signed

11   agreement by fax on September 18th, 2000, right?

12   A    (No audible response.)

13   Q    The executed signed agreement?

14   A    Is that what I testified to?

15   Q    Yep.

16   A    Can I see it?

17   Q    Sure.  We reviewed that a little earlier, but we'll go

18   back to it.

19        While they are looking for that, is it true --

20            THE COURT:  Counsel, just a moment.  Let her find

21   that.

22            THE WITNESS:  Do you know the page number?

23   BY MS. KELLER:

24   Q    They're looking for it.  We'll get it in a second.

25            THE COURT:  Well, she's got it right here.

```
 1              MS. KELLER:  The trial transcript?

 2              THE COURT:  She's looking at the same time you are

 3    asking a question.

 4              MS. KELLER:  We are going to find the testimony,

 5    your Honor.  It's 1327.

 6              MR. QUINN:  Thirteen --

 7              THE COURT:  Just a moment.  Stop.

 8              THE WITNESS:  Okay.

 9              THE COURT:  Put that away.  They will find the

10    page for you, and then counsel will ask the question.  And

11    I'll get that page also.

12              MS. KELLER:  Yes.

13    BY MS. KELLER:

14    Q    So you were wrong, then, when you testified at the

15    trial in 2008 that you believed you received the agreement

16    back from Mr. Bryant September 18th, 2000?

17              THE COURT:  Well, just a moment.  And this is on

18    page --

19              MS. KELLER:  1327.

20              THE COURT:  I don't have 1327.

21              Thank you very much.

22              Now, you won't answer that, please, until I read

23    this.

24              THE WITNESS:  Okay.

25              THE COURT:  What line again, Counsel?
```

 1           MS. KELLER:  It's pretty much the whole page, your

 2    Honor, except for 23 to 25.

 3           THE COURT:  Okay.

 4           And your question is?

 5           MS. KELLER:  Your Honor, may I read the testimony?

 6           THE COURT:  Certainly.

 7           Counsel?

 8           MR. QUINN:  I think it's fine, your Honor.

 9           THE COURT:  Fine.

10           MR. QUINN:  No objection.

11           THE COURT:  That will resolve the evidence code

12    issues.  That way you've got the actual prior testimony for

13    the jury.  All right.  Thank you.

14    BY MS. KELLER:

15    Q    By Mr. Quinn:

16       Question:  "And this is the agreement that you received

17    from Mr. Bryant by fax?

18       Answer:  "I believe so."

19       Question:  "It shows there in the upper right that it's

20    dated as of September 18th, 2000; do you see that?"

21       Answer:  "Yes."

22       Question:  "Was that date there when you received this

23    document from Mr. Bryant?"

24       Answer:  "I believe so, but I couldn't say for

25    certain."

1      Question:  "But you did notice that a date was missing

2   there?  This appears to be the document that you got from

3   Mr. Bryant?"

4      Answer:  "Yes."

5      "And you understood that Mr. Bryant was still working

6   for Mattel at the time?"

7      Answer:  "Correct."

8      Question:  "And did you receive this on -- did you

9   receive this around or about September 18th, 2000?"

10     Answer:  "I believe so, but it was a long time ago."

11     Would it be correct that now that you have seen all

12  these e-mail strings and documents, that you believe that

13  testimony was mistaken?

14  A    No.

15  Q    Now, is it true that Mr. -- that you don't remember

16  Mr. Larian ever instructing you to make sure that Carter

17  Bryant created Bratz outside his Mattel employment?

18  A    No.

19  Q    And so do you recall on this subject in 2004 what your

20  testimony was?

21  A    No.

22  Q    Would you please take a look at deposition transcript

23  237, lines 12 through 20?

24          THE COURT:  Just a moment.

25          Counsel?

1           MR. QUINN:  No objection, your Honor.

2    BY MS. KELLER:

3    Q    Would it be a true statement that Mr. Larian never

4    instructed you to make sure Carter Bryant created Bratz

5    outside of his Mattel employment?

6    A    He did not ask me to do that.

7    Q    He just asked you to go out and get a lawyer who would

8    investigate it, right?

9    A     (No audible response.)

10   Q    Mr. Rosenbaum?

11   A    He asked me to get a contract signed with Carter

12   Bryant.

13   Q    He asked you -- he asked you to get a lawyer to look

14   into this for him to make sure things were okay, right?

15   A    I don't remember if Isaac Larian had that conversation

16   or if it came up from David Rosenbaum after I e-mailed him

17   letting him know that he worked for Mattel.

18   Q    And Mr. Larian never directed you to do something to

19   make sure that this was something Mattel didn't own, that it

20   was something Mr. Bryant had created outside of his Mattel

21   employment?

22   A    No.

23   Q    But you also testified that as the person tasked with

24   arranging for the contract to be executed between Mattel and

25   MGA, you were at all times acting at Mr. Larian's direction,

Case 2:04-cv-09049-DOC-RNB   Document 9809   Filed 02/07/11   Page 37 of 94   Page ID #:295731
CV 04-9049-DOC – 02/04/2011 – Day 13, Vol. 2 of 3

37

1   right?

2   A    With regard to executing a license agreement, yes.

3   Q    Well, with regard to everything having to do with the

4   contract, right?

5   A    I wouldn't say everything.

6   Q    Well, the reason you copied him on the e-mails from

7   Mr. Rosenbaum about the progress of finding out from Anne

8   Hwang if Carter Bryant really owned the material is

9   Mr. Larian asked you to do that, right?

10  A    I don't recall that.

11  Q    So this is just something you did on your own and you

12  just happened to copy the CEO?

13  A    I was keeping him apprised of the situation.

14  Q    Did Mr. Larian ever come to you and say, "Oh, don't do

15  that, stop investigating"?

16  A    No.

17  Q    Did he ever come to you and say, "We need this Carter

18  Bryant deal to go through, so get rid of all these lawyers

19  who are looking into it"?

20  A    No.

21  Q    You knew that it was critically important to MGA, not

22  just to you, to MGA that Mr. Bryant actually owned the

23  property that MGA was preparing to purchase from him; you

24  testified to that earlier, right?

25  A    Yes.

Case 2:04-cv-09049-DOC-RNB   Document 9809   Filed 02/07/11   Page 38 of 94   Page ID #:295732
CV 04-9049-DOC - 02/04/2011 - Day 13, Vol. 2 of 3

38

1    Q    Today, here.

2         And Mr. Larian, you know, is the major owner of MGA,

3    isn't he?

4    A    I believe so.

5    Q    So when you say MGA, that includes Mr. Larian, doesn't

6    it?

7    A    Yes.

8    Q    And that includes the fact that he's the CEO of MGA,

9    right?

10   A    Yes.

11   Q    That's who you were working for, who was paying you,

12   right?

13   A    Correct.

14   Q    Now, let's turn to a different exhibit.  Let's look at

15   Exhibit 4507, okay, and this is the so-called David Dees

16   blog e-mail, right?

17   A    Right.

18   Q    And David Dees was a guy who made it -- had an internet

19   blog that had some references in it that you discussed

20   earlier today, right?

21   A    I said I don't remember this e-mail.

22   Q    Okay.  It was directed from Mr. Larian to you, right?

23   A    Correct.

24   Q    And --

25              THE COURT:  That would be March 12th, 2002, to

1    make sure it's the same e-mail?

2            MS. KELLER:  That's correct, your Honor.

3    BY MS. KELLER:

4    Q    March 12th, 2002, from Isaac Larian to you and eight

5    other people copied, right?

6    A    Yes.

7    Q    And it says, "Victoria, Dave, who gave David Dees' info

8    and what he does for us to this Yahoo lady and why"?

9            Now, English is not Mr. Larian's first language, right?

10   A    I don't believe so.

11   Q    Well, you know it isn't, don't you?

12   A    I don't think so.

13   Q    "This Yahoo lady is giving us too much legal grief even

14   though she does not mean it.  Please do not send any

15   information or reply to her e-mails unless you have cleared

16   it with me," okay?

17           And then it says, "There must be no mention about

18   Mattel or any of their properties, Carter, any MGA, Bratz,

19   arts, et cetera."

20           If we go down in that e-mail to page 3, 4507-3, there's

21   a lot of confidential information in this, isn't there?

22   A    I haven't read the e-mail in its entirety.

23   Q    Well, let's look at the paragraph that begins with "let

24   me tell you about MGA," okay?  "Let me tell you about MGA.

25   It is located in North Hills, California, at the west end of

1    the beautiful San Fernando Valley where I lived for many

2    years, but now I live in Salt Lake where the Olympics just

3    were.

4         "Anyway, when you walk into the big, high-ceiling

5    lobby, there is a real pretty receptionist with

6    reddish-brown hair that sometimes wears leopard prints, and

7    if you look to the left, you will see stairs wind up to the

8    second floor where all the cool stuff happens.  And as you

9    start up them, there is, to the right, a little rock garden

10   with plants, and it always has some of the new toys, like

11   robot dogs, Insectobots or baby dolls sitting in there as if

12   they are playing.

13        "As you get to the top of the stairs, that is if you

14   can get permission to come up to this top-secret place, the

15   first thing you notice to your right is two big doors

16   opening into a spacious office with a fancy glass desk

17   usually covered with toys, and sitting there working away is

18   a great fellow named Isaac, who is the owner, president and

19   creator of most of the MGA toys.  He always seems to leave

20   his doors open.  And when I stop by to pick up a job, I

21   glance in and wave if he happens to look up."

22        And then it goes on to describe where the business

23   people work, where the financial people work, where the

24   packaging and the advertising people, it really pretty much

25   starts describing a whole layout of the place, right?

Case 2:04-cv-09049-DOC-RNB   Document 9809   Filed 02/07/11   Page 41 of 94   Page ID #:295735
CV 04-9049-DOC - 02/04/2011 - Day 13, Vol. 2 of 3

41

1    A    Yes.

2    Q    And you understand that these websites are accessible

3    to absolutely anyone who wants to look at them, right?

4    A    I'm not really sure we were supposed to, but yes.

5    Q    Well, I mean, we all know there is some nutty people

6    out in this world, aren't there?

7    A    There are nutty people, yes.

8    Q    And there are also people who get obsessed even with

9    things like dolls, right?

10   A    Probably.

11   Q    And there are people that get obsessed with Barbies,

12   aren't there?

13   A    Yes.

14   Q    Middle-aged women who go out and buy tons of Barbie

15   dolls?

16   A    I'm sure.

17   Q    And people who get obsessed with Bratz, right?

18   A    There were.

19   Q    And there also is a need in your business for secrecy,

20   isn't there?

21   A    Yes.

22   Q    I mean, you don't really want everybody to know exactly

23   how your toys are laid out, where -- and this -- I just read

24   you a part.  This thing goes on from there, doesn't it?

25   A    It does.

1    Q    And it talks about the mockup packages being cut and

2    pasted by hand, it goes by the whole description.

3        Now, you wouldn't think that anybody at any toy company

4    would want this stuff sitting out on the internet, would

5    you?

6    A    No.

7    Q    And Carter Bryant wasn't happy about this either when

8    it identified him as the creator of Bratz, right?

9    A    Correct.

10   Q    Carter Bryant was actually a relatively private person

11   in some ways, wasn't he?

12   A    Yes.

13   Q    And while he didn't mind having his name on a Barbie

14   box that a few middle-aged ladies might buy, you don't think

15   he was too happy about having his name splashed all over

16   this internet blog, right?

17   A    He was not.

18           MR. QUINN:  Objection.  Argumentative, your Honor.

19           THE COURT:  You knew Carter Bryant?

20           THE WITNESS:  Yes.

21           THE COURT:  This is just her personal opinion.

22   Carter Bryant already testified, but this is your personal

23   opinion.

24           THE WITNESS:  He was not happy.

25

1    BY MS. KELLER:

2    Q    And he is a private person, right?

3    A    Yes.

4    Q    And if we look at page 2, the bottom paragraph, quite a

5    bit is said about Carter Bryant, right, the genius of

6    fashion and the soul and the only person, right?

7    A    Yes.

8    Q    Now, he also says, though, that -- we also know,

9    though, that --

10              MS. KELLER:  Can I have one second, please.

11              (Attorney discussion held off the record.)

12   BY MS. KELLER:

13   Q    Now, in addition, this is -- let's see the date of this

14   again.  This is March 12th of 2002, right?

15   A    Yes.

16   Q    And on February 7th, 2002, MGA had been sent a letter

17   by the lawyers from the Quinn Emanuel law firm for Mattel

18   known as a cease and desist letter, right?

19   A    I don't know.

20              MS. KELLER:  May I have the witness shown a copy,

21   your Honor?  This is Exhibit 17252-001.

22              THE COURT:  You may.

23              THE WITNESS:  I'm sorry, what was your question?

24   BY MS. KELLER:

25   Q    My question was, on February 7th, 2002, the lawyers --

```
 1              MR. QUINN:  Your Honor, foundation should be laid
 2     as to whether she's ever even seen this.
 3              THE COURT:  We're going to find out.
 4              MR. QUINN:  Before we describe the substance of
 5     it.
 6     BY MS. KELLER:
 7     Q    The letter that you've just seen dated February 7th,
 8     2002, okay?
 9     A    Yes.
10     Q    You were the director of licensing, right?
11     A    Yes.
12     Q    Anything having to do with infringement of trademarks
13     came to you, right?
14     A    No.
15     Q    Anything that had to do with your products being --
16     having licensing issues came to you, right?
17     A    Licensing issues?
18     Q    Licensing issues of any kind came to you, right?
19     A    I would think -- it would depend on what the licensing
20     issue was, but with trademark infringement, no.
21     Q    Didn't Mr. Larian actually give you a copy of this
22     letter?
23     A    No.
24     Q    Wasn't it a pretty big deal around MGA when a
25     threatening letter arrived from Mattel's lawyers --
```

Case 2:04-cv-09049-DOC-RNB   Document 9809   Filed 02/07/11   Page 45 of 94   Page ID #:295739
CV 04-9049-DOC - 02/04/2011 - Day 13, Vol. 2 of 3

45

1        MR. QUINN:  Your Honor, there's been no foundation

2   laid, and asking these questions in this manner is

3   inappropriate.

4        MS. KELLER:  Your Honor, I would ask to have it

5   admitted conditionally because we will lay the foundation

6   with other witnesses.

7        THE COURT:  I don't know if she is the appropriate

8   person to speak about a letter.

9        You know, you may get less work in this afternoon

10  than you think.  Why don't you take a recess for a moment,

11  the jury.  Let me talk to counsel for just a moment.  I may

12  accept this condition, but I want to hear from both counsel

13  outside your presence at the moment.

14        You are admonished not to discuss this matter

15  amongst yourselves, nor form or express any opinion

16  concerning this case.  Give us about 20 minutes.

17        You're going to go home at 4:30, no matter what,

18  okay?

19        *(The following proceedings is taken outside*

20     *the presence of the jury.)*

21        THE COURT:  All right.  The jury is not present,

22  Counsel.  If you'd have a seat for a moment.

23        MS. KELLER:  Your Honor --

24        THE COURT:  Let me see if --

25        MR. MC CONVILLE:  Do you want the witness, your

1   Honor?

2          THE COURT:  No.  I think she can remain present

3   for just a moment.

4          MR. QUINN:  Your Honor, it's inappropriate to

5   ask --

6          THE COURT:  Thank you.  Did you notice I was

7   starting to address the record?  I'm sorry, you must not

8   have seen that.

9          Ms. Keller, why don't you have a seat also.

10  Apparently you two haven't heard that the Court was about to

11  address each of you.

12         Sit down.  Sit down.

13         Now, have you ever seen this letter before?

14         THE WITNESS:  No.

15         THE COURT:  And has this letter ever been made

16  known to you regardless of whether you've seen it before, in

17  other words, the contents of this letter, has anybody spoken

18  to you about this letter?

19         THE WITNESS:  No.

20         THE COURT:  All right.  Now, let me hear your next

21  question, Ms. Keller.

22         MS. KELLER:  My next question was going to be:

23  Isn't it true that she was aware that Mattel had sent a

24  cease and desist letter to MGA, and that because -- well,

25  and the question after that would be, and that because of

Case 2:04-cv-09049-DOC-RNB   Document 9809   Filed 02/07/11   Page 47 of 94   Page ID #:295741
CV 04-9049-DOC – 02/04/2011 – Day 13, Vol. 2 of 3

47

1    that, Mr. Larian had directed everybody to try to have

2    removed from any websites, e-mail discussions or anything

3    else, any mention of Mattel products, Mattel, Bratz --

4              THE COURT:  All right.  Just a moment.  Ask her

5    the question.

6    BY MS. KELLER:

7    Q    Do you remember the question?

8              THE COURT:  No.  Just ask her the question.

9              Do you want me to read it back to you?

10             THE WITNESS:  Sure.

11             *(Record read back by your Honor.)*

12             THE WITNESS:  No.

13             THE COURT:  Okay.  Here's the next question.

14             *(Record read back by your Honor.)*

15             THE COURT:  Counsel, that's a run-on.  What's your

16    second question?

17   BY MS. KELLER:

18   Q    You knew that Mr. Larian was very concerned about the

19   possibility of legal action by any other toy company

20   claiming infringement, right?

21   A    Yes.

22   Q    And that included Mattel, right?

23   A    Yes.

24   Q    And in fact, Mattel was the largest toy company in the

25   world, true?

1    A    Yes.

2    Q    And Mr. Larian was afraid of being sued by Mattel,

3    right?

4    A    Yes.

5    Q    And --

6            THE COURT:  Now, just a moment.  Why can't you ask

7    those questions without reference to this letter?  This

8    letter is going to come in at a later time.  It's just an

9    inappropriate place and inappropriate witness because it

10   causes her to --

11           MS. KELLER:  It's the timing.

12           THE COURT:  -- speculate on a letter that she

13   never received.  You are going to get the same information

14   in.

15           MS. KELLER:  Your Honor, the problem is, first of

16   all, I don't think it's credible that the director of

17   licensing would not have seen a letter this explosive.

18   Secondly --

19           THE COURT:  Well, we'll call her back, if that's

20   the case, after other testimony.

21           Objection is sustained.

22           Now, you're not going to be asked about that

23   letter, but you are going to be going back in, obviously, to

24   your position, and if needed, we'll call you back.

25           Thank you very much.

CV 04-9049-DOC - 02/04/2011 - Day 13, Vol. 2 of 3

49

```
 1              Now, Counsel, you have five minutes for a recess.
 2      And after, I will absolutely open those doors.
 3              Why don't you step down.
 4              (Recess.)
 5              (The following proceedings is taken in the
 6         presence of the jury.)
 7              THE COURT:  All right.  We are back on the record.
 8              Today we'll compute the time off of Jane's
 9      machine, and it will be a total, so you can take it up to
10      the last recess and walk out the door at 4:30.  It's up on
11      the board.
12              Counsel, please continue.  We're back in session.
13      The jury is present, the alternates, all counsel.
14      Ms. Keller is continuing her examination.
15              MS. KELLER:  Thank you, your Honor.
16         VICTORIA O'CONNOR, PLAINTIFFS' WITNESS, RESUMED
17                  CROSS-EXAMINATION (Continued)
18      BY MS. KELLER:
19      Q   Ms. O'Connor, I'd like you to take a look at
20      Exhibit 22482.
21          And if you'd look at page 2, and at the bottom e-mail,
22      this is March 10th, 2002, Carter Bryant to Paula
23      Treantafelles, "David Dees wrote something to the fan club
24      or something like that and mentioned that I created the
25      Bratz.  I know that by now everyone knows that I created
```

```
 1    them, but I do not want my name mentioned to the fan club or
 2    anyone else.  I just want to be anonymous.  Please tell him
 3    to retract his statements or something.  I was furious when
 4    I read his letter, which he forwarded to me, and
 5    unfortunately, I have already deleted it.  Thanks, Carter."
 6         Is that consistent with the Carter Bryant you knew?
 7    A    Yes.
 8    Q    That didn't have anything to do with trying to hide him
 9    from Mattel, did it?
10    A    I didn't know what it had to do with.
11    Q    When he says here, "I know that by now everyone knows
12    that I created them," he's referring to the Bratz, right?
13    A    Yes.
14    Q    And is it your understanding that he was referring not
15    to the whole world, the whole universe, but to people within
16    the industry?
17              MR. QUINN:  It calls for speculation.
18              THE WITNESS:  I don't know.
19              THE COURT:  Well, I was going to sustain the
20    objection, but the answer is in, "I don't know."
21    BY MS. KELLER:
22    Q    Now, if we go up to the e-mail above it, we see one
23    from Paula Treantafelles, copy to Mr. Larian and several
24    other people and Carter Bryant, and he says, "Isaac and
25    Beth, FYI, this is not acceptable.  I would like to call him
```

1    personally.  Please advise."

2         Was Mr. Larian, among other things, concerned?  And you

3    were pretty close to him, weren't you?  I mean, you worked

4    how far away from Mr. Larian's office?

5    A    I've moved locations a couple of times.

6    Q    Well, let's say in 2002?

7    A    I can't even remember which floor I was on in 2002, but

8    not far.

9    Q    And you talked to him all the time, right?

10   A    Yes.

11   Q    And you were a integral part of MGA, right?

12   A    Yes.

13   Q    The -- you knew that he was upset about Mr. Bryant's

14   being upset, right?

15   A    Yes.

16   Q    And he wanted to protect Mr. Bryant, didn't he?

17   A    Yes.

18   Q    And in addition, if you look at the e-mail above that,

19   it says, "Who the hell is David Dees and why are we telling

20   people this information and about where the dolls came from

21   anyway?  I don't want to see anything said or told or

22   written about the Bratz without my written approval ever

23   again."

24        Now, is it standard in the toy industry to try to keep

25   one's trade secrets secret?

1    A    Yes.

2    Q    And is it standard in the toy industry to try to keep

3    the names of the designers quiet?

4    A    I believe so, yes.

5    Q    And that's because, among other things, you don't want

6    other companies to use the term we saw in the e-mail earlier

7    "coming and poaching" your designers, right?  Luring them

8    away, true?

9    A    Yes.

10   Q    Correct?

11   A    Correct.

12   Q    And also, some people, especially kind of sensitive

13   artist types, are just very shy, right, like Carter Bryant?

14   A    Yes.

15   Q    And if we go above that, we see an e-mail from

16   Mr. Larian to several people -- who was Abe Mirza, by the

17   way?

18   A    I think his title was chief operating officer.

19   Q    And Margo Chazenz?

20   A    I think she was a marketing director.  I am not sure

21   what her title was.

22   Q    And Diane Eisenberg?

23   A    Creative director.

24   Q    And this says -- this is from Abe Mirza, and he's

25   copying Isaac Larian, among other people, and he says, "From

 1   now on, all communications on the MGA sites are to be

 2   approved of by me, and if needed, approved by Isaac.  Margo,

 3   please communicate to everyone that is involved in this

 4   process.  Thanks.  Immediately I want this removed from the

 5   fan club.  Margo, please advise.  Thanks."

 6        Now, is it unusual in your experience that companies

 7   seek to promote their brand with one voice?

 8   A    Is it unusual?

 9   Q    Yes.  I mean, isn't it standard in the industry that if

10   you have a brand and you're promoting a brand, you have to

11   have uniformity in promoting that brand?

12   A    Yes.

13   Q    And you don't want a million different people, for

14   example, speaking to the press, true?

15   A    Correct.

16   Q    And you don't want a million people posting things on

17   fan club sites on the internet, right?

18   A    Right.

19   Q    Especially if it has to do with things you're trying to

20   maintain, like how your operation is set up, right?

21   A    Correct.

22   Q    Names of your designers, right?

23   A    Right.

24   Q    If you go above that, you see Margo Chazenz, "I

25   e-mailed Yahoo today requesting the procedure of a club that

1    is in violation of their rules," quote-unquote.  "As soon as

2    I get a response, with your permission, I will try to get

3    this club shut down.  Margo."

4         Now, in your experience as a director of licensing, can

5    a company be responsible for things that are posted on

6    websites even if it's not the company's official website?

7    A    Can they be responsible?

8    Q    Yeah.

9    A    Yes.

10   Q    And they can get into legal trouble, right?

11   A    Yes.

12   Q    And so if something is posted on a website that is

13   potentially detrimental to the company and could give the

14   company legal liability, you try to correct that if you can,

15   right?

16   A    Yes.

17   Q    And especially, but not necessarily, if you've gotten

18   letters from lawyers demanding that you do so, right?

19   A    Correct.

20   Q    And if you've gotten a letter from a lawyer demanding

21   that you do so, it would have even greater urgency, wouldn't

22   it?

23   A    Yes.

24   Q    And that's what this e-mail string was all about,

25   right?

1    A    Yes.

2    Q    Now, if we could turn to Exhibit 7055.  You were shown

3    that earlier, I believe, so that's in evidence.

4         And this pertains -- this e-mail string pertains to an

5    interview given by Mr. Larian with a French magazine called

6    "Capital," right?

7    A    Yes.

8    Q    And if we could focus -- there is a line, if we look

9    directly down to the second portion of the string, from you

10   to Mr. Larian, interview for the French magazine Capital,

11   and you wrote him, "Don't you think we should say Bratz was

12   born in October when a certain person was no longer with

13   their company."  And Mr. Larian replies "Good point,

14   thanks."

15        Do you see that?

16   A    Yes.

17   Q    And that's October 23rd, 2002?

18   A    Yes.

19   Q    Now, as licensing director, you told us that you were

20   very concerned about hiring an employee of a competitor,

21   right?

22   A    Yes.

23   Q    Because who knows, he might have been using an idea he

24   got from Mattel.  That concerned you deeply, right?

25   A    Yes.

1   Q     Now, it wasn't Mr. Larian who suggested saying that

2   Bratz was, quote, "born in October," was it?

3   A     I'm sorry, can you repeat the question?

4   Q     It wasn't Mr. Larian who suggested saying Bratz was,

5   quote, "born in October," unquote, right?

6   A     Right.

7   Q     It was you?

8   A     Yes.

9   Q     And in fact, Mr. Larian had told the author of this

10  article in some French magazine that the Bratz had been born

11  in September, right?

12  A     Yes.

13  Q     So apparently Mr. Larian wasn't terribly concerned

14  about September versus October, right?  You were?

15  A     Possibly, yes.

16  Q     And Mr. Larian had volunteered this September date, at

17  least according to this article, right?

18  A     Yes.

19  Q     And you wanted him to correct it to October?

20  A     Yes.

21  Q     And the -- if we look at the e-mail in the string

22  that's five down where it says it's from Natalie Riesen to

23  Isaac Larian, and again, since you got the last message on

24  the string, we know you saw this too, right?

25  A     Yes.

1    Q    It says, "Thank you, Isaac.  I have a few more

2    questions about the story of the Bratz.  You would be kind

3    to answer by e-mail.  Date of birth of the Bratz, time and

4    development, first launch."

5         And it says, "Born in September 2000, nine months to

6    develop, like a baby," right?

7    A    Right.

8    Q    So Mr. Larian's idea was saying it was born in

9    September of 2000 because then it would seem like it had a

10   nine-month term of gestation, right?

11   A    Yes.

12   Q    And you corrected him and said, hey, better not do

13   that, better say October, correct?

14   A    Yes.

15   Q    I also want to turn your attention to Exhibit 15, which

16   is already in evidence.  You remember that?

17   A    Yes.

18   Q    And this is -- this is the exhibit -- Exhibit 15 is the

19   final Carter Bryant contract, right, with MGA?

20   A    Yes.

21   Q    And if we look at the front, you see "final" up in the

22   corner, left?

23   A    Yes.

24   Q    And if we look at the last page, we see that it is

25   signed.  And we know that the date is October 4th, 2000,

1   right?

2   A    Yes.

3   Q    And you see a stamp on here that says "redacted"?

4   A    Yes.

5   Q    And that means something has been taken out of it under

6   Carter Bryant's name?

7   A    Yes.

8   Q    And do you understand that that's Carter Bryant's

9   social security number, and it's been taken out for privacy

10  reasons?

11  A    Yes.

12  Q    Okay.  Now, let's look at Exhibit 13383.

13          MS. KELLER:  Can I have a moment, please, your

14  Honor.

15          THE COURT:  Certainly.

16          (Attorney discussion held off the record.)

17  BY MS. KELLER:

18  Q    Now, I believe this morning you said that Mr. Larian

19  asked you to white out the fax header on document 13383

20  before sending it to his trial lawyer, Patti Glaser; do you

21  remember that?

22  A    Yes.

23  Q    And Patti Glaser is not just a trial lawyer, but she's

24  also a 20-year close, personal friend of Mr. Larian's,

25  right?

```
 1   A    I don't know.

 2   Q    Go to the same temple --

 3   A    I don't know.

 4   Q    Okay.  You know who Patti Glaser is, don't you?

 5   A    Yes.

 6   Q    And so you're sure that it was six months after the

 7   contract was executed that Mr. Larian said, "White out

 8   'Barbie collectibles' on this fax header and send this

 9   document over to Patti Glaser"?

10   A    I think I testified this morning I wasn't sure about

11   the time.  I said maybe around six months.

12   Q    Okay.  Around six months later.  It could have been

13   five months?

14   A    I don't know the timing.

15   Q    Well, this morning, I believe in response to

16   Mr. Quinn's question, you said around six months later,

17   right?

18   A    Yes.

19   Q    Is that your best estimate?

20   A    Yes.

21   Q    And I think it was emphasized to you that this was

22   Mr. Larian's trial lawyer, right?

23   A    Yes.

24   Q    And you were asked if you had any explanation why

25   Mr. Larian would ask you to white this out and fax it to his
```

 1    trial lawyer around six months after it was executed; do you

 2    remember that?

 3    A    Yes.

 4    Q    But isn't it true that at the trial in 2008,

 5    specifically June 4th of 2008, you said you didn't remember

 6    if this whiting out request was when you first received the

 7    executed contract or later on down the line when you sent

 8    the fax to Patti Glaser?

 9              MR. QUINN:  Object to the form of the question,

10    your Honor.

11              THE COURT:  No.  Overruled.

12              You can answer that question.

13              THE WITNESS:  I don't remember.  I'd have to look

14    at the testimony.

15    BY MS. KELLER:

16    Q    When was the last time you read that testimony?

17    A    Probably right after I got it.

18    Q    Which was when?

19    A    Sometime in 2000 -- after the deposition in 2004.

20    Q    I'm talking just a couple years ago.

21    A    Oh, the trial testimony?

22    Q    Uh-huh.

23    A    I don't think I ever read it.

24         This morning.

25    Q    Okay.  So you read it this morning.  You were given it

CV 04-9049-DOC – 02/04/2011 – Day 13, Vol. 2 of 3

61

1    by Mattel's lawyers, right?

2    A    Just here when I was on the stand.

3    Q    You are just talking about the portion I asked you

4    about?

5    A    Whatever we discussed in court is what I've read.

6    Q    What documents were you given to review before this

7    trial, right now, in 2011?

8    A    I was given -- I was looking at these exhibits, or a

9    binder of exhibits yesterday.

10   Q    Were you given a copy of your deposition transcript?

11   A    Yes.

12   Q    Were you given a copy of your trial transcript?

13   A    Yes.

14   Q    And in your trial transcript at page 1328, and that

15   would be on to page 1329.

16   A    Okay.

17   Q    Okay.  So just two years ago, you said that you weren't

18   sure when you were asked to white it out, right?

19   A    (No audible response.)

20   Q    True?

21   A    True.

22   Q    But your best recollection as to when it was you were

23   asked to white out that fax header, was upon first receiving

24   it, right?

25   A    True.

Case 2:04-cv-09049-DOC-RNB   Document 9809   Filed 02/07/11   Page 62 of 94   Page ID #:295756
CV 04-9049-DOC – 02/04/2011 – Day 13, Vol. 2 of 3

62

1    Q    And that it was later, he asked you to send it to his

2    outside lawyer, right?

3    A    Yes.

4    Q    Sometime in 2001, right?

5    A    Yes.

6    Q    That's just two years ago?

7    A    Yes.

8    Q    Okay.  But this morning, you remembered --

9          THE COURT:  Just a moment.  You said sometime in

10    2001, that's just two years ago?

11         MS. KELLER:  Okay.  I'm sorry.  I'll clear that

12    up, your Honor.

13         THE COURT:  Okay.  You skipped nine years in

14    there.

15   BY MS. KELLER:

16   Q   When you were asked in June 2008, you said you really

17   weren't sure when you were asked to white it out, but your

18   best recollection as to when it was that you were asked to

19   white out the fax header was upon first receiving it, right?

20   A    Yes.

21   Q    And that you were then asked if you recalled when it

22   was that Mr. Larian later asked you to send it to his

23   outside lawyer, right?

24   A    Yes.

25   Q    And you said it was sometime in 2001, right?

1    A    Yes.

2    Q    And when you first received it was October 4th, 2000,

3    right?

4    A    Right.

5    Q    So this was not a document that Mr. Larian had you hold

6    on to for close to six months or six months and then white

7    out the Barbie collectibles header shortly before sending it

8    off to his trial lawyer, Patti Glaser, was it?

9    A    I don't remember.

10   Q    So you just don't have any idea, do you?

11   A    I thought I did, but I guess not.

12   Q    Well, you don't know whether five minutes after you got

13   it, you, yourself, just took a bottle of white out and

14   whited out "Barbie collectibles" on your own, do you?

15   A    No.  I know he instructed me to do that.

16   Q    And have you seen any documents, have you been shown

17   any documents in this trial that refer to the same contract

18   produced by MGA that have "Barbie collectibles" at the top,

19   have you been shown any of those?

20   A    There was a fax -- yeah, there was a fax.

21   Q    Right.  And it had an MGA production on it, right?

22   A    I believe so.

23   Q    So I guess Mr. Larian didn't tell you that anything you

24   get from Carter Bryant with "Barbie collectibles" on it,

25   you'd better white out that header, did he?

1    A    He didn't say anything.  He referred to the specific

2    contract.

3    Q    And do you have any idea -- now, you said Patti Glaser

4    was Mr. Larian's lawyer, right?

5    A    Yes, she was one of them.

6    Q    And she was in a firm of, what, I don't know, around a

7    hundred people or so?

8    A    I have no idea.

9    Q    But she was MGA's and Mr. Larian's lawyer, true?

10   A    Yes.

11   Q    And you don't have any explanation why he would be

12   wanting to white out "Barbie collectibles" on a fax to his

13   very own lawyer, do you?

14   A    Nope.

15   Q    And I believe you said this morning that it actually

16   said "Mattel" on it rather than "Barbie collectibles"?

17   A    I said "Mattel Barbie collectibles."

18   Q    "Mattel Barbie collectibles," but you don't see that on

19   any of the headers that you've seen today, right?

20   A    No.

21   Q    Now, you -- you deleted the fax line from the first

22   page only?

23   A    What are we talking about, which exhibit?

24   Q    I'm asking this very same exhibit, the one that you say

25   you were directed to do the white out on, 13383.  Did you

1    delete the fax header from the first page only?

2    A    Wherever it appeared.

3    Q    Well, do you remember testifying in your deposition

4    that you deleted it from the first page only?

5    A    I remember whiting it out.  I don't remember how many

6    pages.

7    Q    Was your memory fresher in 2004 than it is today in

8    2011?

9    A    Yes.

10   Q    Now, you were the person, I think you said, who was

11   concerned by -- weren't you concerned when you got this fax

12   that said "Barbie collectibles" on it?

13   A    Yes.

14   Q    It was your concern, right, as director of licensing?

15   A    Yes.

16   Q    You felt it was inappropriate for somebody to be

17   sending you a fax from his place of employment, right?

18   A    Yes.

19   Q    And you thought it was inappropriate for him to use his

20   employer's fax machine, right?

21   A    Yes.

22   Q    Employees just shouldn't do that, they shouldn't use

23   their employer's property to send out resumes or contracts

24   or whatever, true?

25   A    True.

CV 04-9049-DOC - 02/04/2011 - Day 13, Vol. 2 of 3

66

```
 1   Q    And again, I believe that this morning you said you are
 2   not the type to stay silent if your employer is doing
 3   something to expose you or your employer to liability; do
 4   you remember that?
 5   A    I don't remember if that was the exact phrase.  Was it
 6   liability?  I don't remember.
 7   Q    Yes, "liability" was the word.
 8   A    Okay.
 9   Q    You remember that?
10   A    Yes.
11   Q    You said, no, you are not the type to stay silent,
12   right?
13   A    Yes.
14   Q    Do you remember that?
15   A    Yes.
16   Q    But you did stay silent, didn't you?  This white out
17   business, you didn't tell anybody about it, did you?
18   A    I did.
19   Q    When?  Mattel's lawyers, three years later?
20   A    I did it under deposition, yes.
21   Q    You didn't tell anybody at MGA, did you?
22   A    I did.
23   Q    Who, other than Mr. Larian?
24   A    Paula Garcia.
25   Q    Well, who else did you complain to other than Paula
```

Case 2:04-cv-09049-DOC-RNB   Document 9809   Filed 02/07/11   Page 67 of 94   Page ID #:295761
CV 04-9049-DOC - 02/04/2011 - Day 13, Vol. 2 of 3

67

1    Garcia?

2    A    That's all I remember.

3    Q    Did you write an e-mail to anybody saying that I'm very

4    concerned about this?

5    A    No, I addressed my concerns to the CEO.

6    Q    Well, you are not the type to remain silent if your

7    employer is doing something to expose you or the employer to

8    liability.

9         Did you ever send an e-mail around saying, "Hey,

10   everybody, I want to remind you, since I'm the director of

11   licensing, you better instruct people not to ever send us

12   faxes using their current employer's equipment," did you do

13   that?

14   A    No.

15   Q    That would have been a logical step to take, wouldn't

16   it, considering you were so uncomfortable and upset?

17   A    No.

18   Q    And you didn't seek counsel to find out if you could be

19   in any trouble, right?

20   A    No.

21   Q    And you were never asked to white out any dates on the

22   document, right?

23   A    Not that I recall, no.

24   Q    You weren't asked to white out "as of September 18th,

25   2000," on the document, correct?

CV 04-9049-DOC - 02/04/2011 - Day 13, Vol. 2 of 3

68

```
 1    A    Correct.
 2    Q    You were never asked to white out the October 4th
 3    footer in the document?
 4    A    Correct.
 5    Q    Or the phone number showing it was Mattel, right?
 6    A    I testified that I whited out "Mattel."
 7    Q    No.  The phone number.
 8    A    Oh, no.  The fax number.
 9    Q    The fax number, right.
10         So "Mattel tel Mattel fax number," you weren't asked to
11    white that out, were you?
12    A    I was asked to white that out.
13    Q    The claim that you have made is that you were asked to
14    remove the Barbie collectible header, right?
15    A    Right.
16    Q    No one at MGA has ever asked you to change or remove
17    the date on this or any other contract, right?
18    A    Correct.
19    Q    Now, it was no secret that Carter Bryant was working at
20    Mattel when he signed this agreement, was it?
21    A    With certain people, certain people didn't know.  Some
22    people knew.
23    Q    Well, certainly it was common knowledge, common
24    knowledge because his former employee -- his former
25    coworkers at Mattel all knew about it, right?
```

1    A    I don't know what Mattel knew.

2    Q    You said Paula Garcia knew, right?

3    A    True, but she was an MGA employee.

4    Q    You knew, right?

5    A    Yes.

6         THE COURT:  No.  Just a moment.  You two are

7    cutting each other off.  So the last answer we got was:

8         *(Record read back by your Honor.)*

9         THE COURT:  So why don't we start again.

10   BY MS. KELLER:

11   Q    Paula Garcia knew, right?

12   A    Yes.

13   Q    Anybody who ever checked Mr. Bryant's resume would

14   know, right?

15   A    I don't know what his resume stated.

16   Q    Anyone who ever checked it would know, right?

17        MR. QUINN:  It assumes facts not in evidence, your

18   Honor.

19        THE COURT:  Sustained.

20   BY MS. KELLER:

21   Q    Now, Mr. Rosenbaum certainly knew, right?

22   A    Yes.

23   Q    And Mr. Larian never told you to hide from

24   Mr. Rosenbaum that Mr. Bryant was working at Mattel, right?

25   A    Right.

CV 04-9049-DOC - 02/04/2011 - Day 13, Vol. 2 of 3

70

```
1    Q    So he didn't tell you to hide from your current lawyer

2    working on the contract that Mr. Bryant was a Mattel

3    employee, right?

4    A    Correct.

5    Q    But he told you to hide from his own lawyer, six months

6    later, that Mr. Bryant had been a Mattel employee?

7    A    He asked me to white out the fax header.

8    Q    And Patti Glaser is actually a pretty good lawyer,

9    isn't she?

10   A    I believe so.  She has a good reputation.

11   Q    She has a great reputation, doesn't she?

12   A    Yes.

13   Q    Do you think she's an idiot?

14   A    No.

15   Q    She wouldn't have found out that this person was

16   working at Mattel at the time that he inked his contract?

17   A    I don't know.

18         MR. QUINN:  It's argumentative, your Honor.

19         THE COURT:  Sustained.

20   BY MS. KELLER:

21   Q    Now, did you consider this something really upsetting

22   when you were asked to white out "Barbie collectibles"?

23   A    Yes.

24   Q    And you were -- you felt it was wrong, right?

25   A    Yes.
```

 1   Q    And you felt it was so wrong, that you probably quit

 2   immediately, didn't you?

 3   A    No.

 4   Q    You continued working at MGA for two more years?

 5   A    Yes.

 6   Q    You continued working for Mr. Larian through February

 7   of 2003, right?

 8   A    Correct.

 9   Q    And other than saying that you told Paula Garcia, you

10   never told another soul until you told Mattel's lawyers,

11   right?

12   A    Correct.

13   Q    Now, at the trial in 2008, did you testify that you

14   didn't recall whiting out the date on the contract?

15   A    I don't recall what I said.

16   Q    Do you want to take a look at page 1331?

17            THE COURT:  Lines?

18            MS. KELLER:  10 through 11.

19            THE WITNESS:  Yes, I see it.

20   BY MS. KELLER:

21   Q    I'm sorry.  Yes, 1331, 10 through 11.

22        Okay.  You were asked, "Did you also white out the date

23   on this contract?"  You said, "Not that I recall," right?

24   A    Correct.

25   Q    A minute ago you told us that you whited out the date

```
 1   too, right?

 2   A    No, I didn't say that.

 3   Q    Isn't it true that you, yourself, made the decision to

 4   white out the Barbie collectibles header because you were

 5   afraid, as director of licensing, that a fax from

 6   collectibles could get you into some kind of trouble?

 7   A    No.

 8   Q    You were the one with the responsibility of making sure

 9   there was no ownership issue, right?

10   A    Yes.

11   Q    And when Mr. Bryant was sued, that was big news, wasn't

12   it?

13   A    Yes.

14   Q    And you were afraid you could be named or sued, right?

15   A    No.

16   Q    You blamed Mr. Larian for something you did, didn't

17   you?

18   A    No.

19   Q    And now you work for a company with close, close, close

20   ties to Mattel, right?

21   A    Yes.

22   Q    And you got a big promotion right after you testified

23   at the last trial, true?

24   A    I did.

25   Q    For Mattel?
```

Case 2:04-cv-09049-DOC-RNB   Document 9809   Filed 02/07/11   Page 73 of 94   Page ID #:295767
CV 04-9049-DOC - 02/04/2011 - Day 13, Vol. 2 of 3

73

1    A    (No audible response.)

2    Q    Yes?

3    A    I received a promotion based on a counter employment

4    contract from Disney, then my employer promoted me.

5    Q    When you were at MGA, you got performance evaluations,

6    didn't you?

7    A    Yes.

8    Q    And one of the criticisms in your performance

9    evaluations at MGA was that you had trouble accepting

10   responsibility for your mistakes, right?

11   A    I don't recall.

12   Q    You had -- you didn't have the ability to make tough

13   decisions and accept the responsibility, right?

14   A    I don't recall.

15   Q    And Mr. Larian was getting impatient with you, wasn't

16   he?

17   A    I don't remember.

18   Q    You want to take a look at Exhibit 3500 -- I'm sorry,

19   35,000, page 6.

20        Did you have a chance to look at that?

21   A    Yes.

22   Q    And I'm referring to page 6, the manager's evaluation

23   on the right.

24   A    (No audible response.)

25   Q    Do you see the checkmarks?

CV 04-9049-DOC - 02/04/2011 - Day 13, Vol. 2 of 3

74

1    A    Yes, yes.

2    Q    So you got fives for everything but one, and that was

3    the ability to make tough decisions and accept

4    responsibility, and that one you got a three, right?

5    A    Yes.

6    Q    Now, let's look at Exhibit 9165, and specifically the

7    middle e-mail.

8              MS. KELLER:  And your Honor, there is a top e-mail

9    on which this witness is not -- is not copied.

10             MR. QUINN:  Which exhibit?

11             MS. KELLER:  9165.

12             THE COURT:  And that should be August 5th, 2002?

13             MS. KELLER:  Yes, your Honor.

14             THE COURT:  All right.

15   BY MS. KELLER:

16   Q    And I want to start with the bottom e-mail on 9165,

17   page 1.

18             MR. QUINN:  I'm sorry --

19             (Attorney discussion held off the record.)

20   BY MS. KELLER:

21   Q    Do you recognize that middle e-mail as an e-mail from

22   Mr. Larian to you?

23   A    Yes.

24             MS. KELLER:  Okay.  Your Honor, I would ask that

25   9165 be admitted.

1          THE COURT:  Any objection?

2          MR. QUINN:  No objection.

3          THE COURT:  Received.

4          *(Defendants' Exhibit No. 9165 is received in*

5     *evidence.)*

6    BY MS. KELLER:

7    Q    And the subject here -- this is from Mr. Larian to you,

8    and the subject is "Re:  Bratz License Agreement."  This is

9    August 5th, 2002.  And this is in reply to an e-mail from

10   Mr. Larian -- from you to Mr. Larian at the bottom of the

11   page, with respect to a potential contract; do you see that?

12   A    Yes.

13   Q    Now, let's go to the middle portion, and Mr. Larian's

14   response to you is, "We pass.  I am not happy that you put

15   their name on the licensee list at Target meeting.  Destroy

16   every copy of that we have.  Who presented this to?  Please

17   don't make mistakes like this.  You are getting us into

18   lawsuits."

19        Do you see that?

20   A    I do.

21   Q    And Mr. Larian spoke with you several times about the

22   fact that you were not being careful enough in vetting the

23   agreements that you were supposed to -- well, you weren't

24   being careful enough in your work, true?

25   A    I don't recall.

```
 1                  THE COURT:  Just a moment.
 2                  Is it Mr. Larian speaking to her about that --
 3                  MS. KELLER:  Yes.
 4                  THE COURT:  -- or are you just asking her
 5      generally?
 6                  MS. KELLER:  No.  Mr. Larian.
 7                  THE WITNESS:  I don't recall specific
 8      conversations.
 9      BY MS. KELLER:
10      Q    Well Mr. Larian told you that -- let's just talk about
11      general conversations.  Mr. Larian told you that your being
12      really careful about following the rules was important to
13      keep the company from being exposed to legal liability,
14      true?
15      A    True.
16      Q    And he complained to you repeatedly that you weren't
17      doing that, true?
18      A    I -- I don't recall.
19      Q    Don't you remember that as being one of the reasons
20      that you ended up leaving MGA?
21      A    No.
22      Q    Let's look at Exhibit 9258.
23                  (Attorney discussion held off the record.)
24                  MS. KELLER:  Oh, I'm sorry.  Okay, okay, okay.
25                  Your Honor, I know this is going to be music to
```

```
 1    the Court's ears, but I've been informed by people who are
 2    more knowledgeable than I that I am done.
 3              (Laughter.)
 4              THE COURT:  Okay.  Counsel, redirect examination.
 5              MR. QUINN:  Yes, your Honor.
 6              THE COURT:  Knowledgeable people are about to
 7    speak to John Quinn also.
 8              (Laughter.)
 9              THE COURT:  All right.  Counsel, this is redirect,
10    and Jennifer Keller had just concluded her --
11              MS. KELLER:  There has to be a brains of every
12    operation, your Honor, and I'm not it.
13                     REDIRECT EXAMINATION
14    BY MR. QUINN:
15    Q    We just looked at that e-mail.
16              MR. QUINN:  If we can put it up there, 9165.
17    BY MR. QUINN:
18    Q    That's dated August 5, 2002.  Mr. Larian tells you to
19    "destroy ever copy we have"; do you see that in the middle?
20    A    Yes.
21    Q    And how long after this e-mail did you stay at MGA?
22    A    Seven months.
23    Q    Your decision to leave or --
24    A    My decision.
25    Q    All right.  And why did you leave?
```

1    A    I left because I didn't agree with some of his

2    practices with the licensees, and the way they were being

3    treated.

4    Q    What do you mean by that?

5    A    There were a couple of instances where we had licensed,

6    for example, one company to manufacture stationery for us

7    for school supplies, and I found out from the licensee, from

8    the manufacturer who had agreed to sign a contract with us

9    for a lot of money, I find out from them that MGA -- a toy

10   company was manufacturing stationery and showing it to

11   Target to try and sell it in, even though we had hired -- we

12   had contracted a licensee who had a financial commitment to

13   us to also sell in, so you had this company, Fab, trying to

14   sell stationery, and MGA also trying to sell Bratz

15   stationery.

16        And then there was another situation with pillows where

17   we had licensed a company called Franco Manufacturing to

18   sell in bedding, sheets, towels and pillows, and I found out

19   that MGA was purchasing pillows from a licensee in Europe

20   and trying to sell them as well, in essence, competing with

21   our own licensee who had a financial commitment to us.  But

22   they weren't able to earn out because we were also pitching

23   the same buyers.

24   Q    Were these instances where you felt MGA was violating

25   contract terms?

1   A      No.

2   Q      Or not being honest with the licensees?

3   A      They were not being honest, no.

4          MR. QUINN:  We offer in evidence the evaluation

5   that was referred to, 35,000.

6          MS. KELLER:  No objection.

7          THE COURT:  Received.

8          *(Plaintiffs' Exhibit No. 35000 is received in*

9   *evidence.)*

10  BY MR. QUINN:

11  Q      And if we could turn to page 3, you were asked some

12  questions about accepts responsibility -- I'm sorry, that's

13  dash 6, 35000-6, in the middle there, "ability to make tough

14  decisions and accept responsibility," by the way, the

15  grading score on the right-hand side, that's -- on the

16  right-hand side we've got your manager's grades; is that how

17  that works?

18  A      Yes.

19  Q      And it's -- the scale is 5 through 1?

20  A      Yes.

21  Q      Of -- is 5 the highest and then 1 the lowest?

22  A      Yes.

23  Q      And at least on that -- on that area there in the

24  middle, your manager gave you all 5's except one 3?

25  A      Correct.

1   Q     And that's the 3 that Ms. Keller referred to?

2   A     Correct.

3   Q     And that's in the middle of a -- of a scale of 1 to you

4   5?

5   A     Yes.

6   Q     Now, you were asked some questions about this whiting

7   out on Exhibit 13383, and, you know, as I heard it, did

8   you -- was this whited out after this lawsuit began, to

9   cover up something that you had done?

10  A     I -- I don't think I was with the company when the

11  lawsuit began.

12          MS. KELLER:  Objection.  Misstates the

13  questioning, your Honor.

14          MR. QUINN:  Your Honor, I think --

15          MS. KELLER:  It misstates the question.

16          THE COURT:  Well, I couldn't -- I apologize.  I

17  didn't hear you.

18          MS. KELLER:  Misstates the questioning.  Mr. Quinn

19  said, "as I understood it, you were asked" --

20          THE COURT:  Just reask the question.  I didn't

21  hear the question.

22  BY MR. QUINN:

23  Q     Without getting into specific dates, you are generally

24  aware when this lawsuit started and whether you were at MGA

25  at the time, correct?

```
 1    A    I don't think I was.

 2    Q    You were not at MGA?

 3    A    I don't think so.

 4    Q    When did you first tell Mattel's lawyers that you had

 5    been instructed to white out that Barbie collectibles

 6    header?

 7    A    At my deposition in December of 2004.

 8    Q    And had you met with Mattel's lawyers in advance of

 9    that?

10    A    No.

11    Q    Had you told anyone at Mattel about that?

12    A    No.

13    Q    In fact, did you refuse to meet with people from Mattel

14    before your deposition?

15    A    Yes.

16    Q    And why was that?

17    A    Because I wanted to be neutral.

18    Q    And so the first time you -- Mattel learned about that,

19    so far as at least from you, was at your deposition?

20    A    Correct.

21    Q    And I heard -- if I heard correctly, Ms. Keller asked

22    you whether -- isn't it true that you have seen produced

23    from MGA copies of Mr. Bryant's agreement, Exhibit 15, that

24    have the Barbie collectibles header on it; do you recall

25    that question?
```

 1              MS. KELLER:  Objection.  Misstates the question,

 2   your Honor.

 3              THE COURT:  Just ask the question, just to be

 4   certain.

 5              MR. QUINN:  All right.

 6   BY MR. QUINN:

 7   Q    Well, did Ms. Keller show you a copy of Exhibit 15,

 8   Mr. Bryant's agreement produced by MGA with MGA Bates

 9   numbers in the lower right-hand corner that have that Barbie

10   collectibles header at the top?

11              MS. KELLER:  Objection.  Misstates my question,

12   your Honor.

13              THE COURT:  Well, it was what was shown, and I

14   don't recall if that had the --

15              MR. QUINN:  I'm just asking whether she had seen

16   on the stand today, whether anybody had shown her, a copy of

17   that agreement with MGA in the lower right-hand corner

18   indicating that it came from MGA's files and it has "Barbie

19   collectibles" at the top.

20              THE COURT:  You can answer that question.

21              Overruled.

22              THE WITNESS:  No.

23   BY MR. QUINN:

24   Q    At any time have you seen that since you whited that

25   out?

1   A     No.

2   Q     I take it that you are at Warners' now, did you say?

3   A     Yes.

4   Q     I take it that testifying at trial is not the route to

5   the top, it's not how you get promotions?

6   A     No.

7   Q     How was it that you got this promotion back in 2008?

8   A     Disney approached me and gave me a job offer, and when

9   I told my senior management that I had an offer for

10  employment from Disney Consumer Products, they

11  counter-offered, and I was promoted.

12  Q     All right.  And then you were asked -- we had some

13  questions again about the David Dees e-mail, Exhibit 23512,

14  and you recall Ms. Keller asking -- pointing out that there

15  was some information about MGA in Mr. Dees' blog, or

16  whatever the entry was on the Yahoo fan site; do you recall

17  those questions?

18  A     Yes.

19  Q     Like the receptionist wears a leopard-print dress, and

20  Mr. Larian's door is open and what products are on display,

21  do you recall that being called to your attention?

22  A     Yes.

23  Q     If you take a look at Mr. Larian's e-mail, which is in

24  the bottom of the first page, 23512-1, and carries over to

25  the top, where he gives his instruction in response to that,

1  does he make -- do you see, there, any reference to what the

2  receptionist wears, he doesn't want to see any reference to

3  that, or what products are on display, or whether his door

4  is opened or anything else at MGA that he doesn't want

5  talked about there; do you see anything?

6  A    No.

7  Q    The one thing he says, "I need this, paren, (Carter),

8  closed paren, taken out all of our written materials,"

9  correct?

10 A    Yes.

11 Q    Now, when I was asking you questions this morning, you

12 said that you had an understanding at MGA that Mr. Bryant

13 and his involvement with Bratz was not to be talked about;

14 do you recall that?

15 A    Yes.

16 Q    In your understanding, was that because Mr. Bryant was

17 a shy person?

18 A    No.

19 Q    In your understanding, that was just because MGA wanted

20 to keep the names of its designers confidential?

21          MS. KELLER:  Objection.  Leading.

22          THE COURT:  Sustained.

23          MR. QUINN:  Okay.

24 BY MR. QUINN:

25 Q    Can you tell us whether that had -- in your

1   understanding, that policy had anything to do with some

2   general policy of keeping the identities of designers

3   confidential?

4   A    No.

5   Q    In your understanding, why was that policy in existence

6   at MGA?

7   A    Because we didn't want the public to know that Carter

8   was the inventor of Bratz since he was a Mattel employee at

9   the time.

10  Q    And were you told that?

11  A    Yes.

12  Q    And who told you that?

13  A    Isaac Larian.

14  Q    All right.  There is a number of questions about

15  Mr. Rosenbaum and Ms. Hwang and their involvement in

16  negotiating Mr. Bryant's contract.

17       Now, to get a meaningful response from a lawyer, do you

18  need to kind of give the lawyer the facts?

19  A    Yes.

20  Q    And Mr. Rosenbaum said that he talked to Mr. Bryant's

21  attorney, you saw that e-mail, he talked to Ms. Hwang?

22            MS. KELLER:  Objection.  Leading the witness

23  again.

24            THE COURT:  It's preliminary.  Overruled.

25            THE WITNESS:  Yes.

CV 04-9049-DOC - 02/04/2011 - Day 13, Vol. 2 of 3

86

1   BY MR. QUINN:

2   Q     And he didn't say he did anything else, did he?

3              MS. KELLER:  Objection.  Leading the witness.

4              THE WITNESS:  Are we looking at a specific

5   exhibit?

6              THE COURT:  Overruled, Counsel.

7              You can answer that question.

8   BY MR. QUINN:

9   Q     In the e-mail exchanges and in your communications with

10  Mr. Rosenbaum, did he say that he did anything other than to

11  investigate this question about ownership other than just

12  talked to Ms. Hwang?

13  A     Correct.

14  Q     Did he say he did anything else besides that?

15  A     Not that I recall.

16  Q     Would your view about -- would your view about relying

17  on Mr. Bryant's word change -- in his representations to you

18  as a licensing person through his attorney about when he

19  conceived an idea, would your view change if you knew he was

20  a dishonest man?

21             MS. KELLER:  Objection, your Honor.

22  Argumentative.

23             THE COURT:  Just a moment.

24             MS. KELLER:  And there is no foundation for that.

25             THE COURT:  Sustained.

1              MR. QUINN:  All right.

2    BY MR. QUINN:

3    Q    You know that through Rosenbaum, you are

4    communicating -- you were communicating with Mr. Bryant?

5    A    Yes.

6    Q    And we looked at e-mails where we saw that you were

7    provided information about when he said he conceived the

8    Bratz idea, correct?

9    A    Yes.

10   Q    Would your assessment about your -- whether you could

11   rely on that information as conveyed to you by an attorney

12   change if you knew that Mr. Bryant was a dishonest man?

13             MS. KELLER:  I'm going to object, your Honor.

14   It's argumentative.

15             THE COURT:  Just a moment.

16             I'm going to sustain the objection.

17             MR. QUINN:  All right.

18   BY MR. QUINN:

19   Q    Well, did you know that in late August 2000, Mr. Bryant

20   was doing work for MGA while he was a Mattel employee?

21   A    I don't know the specific dates --

22   Q    All right.

23   A    -- when he started working.

24   Q    But did you know in the August, September, October time

25   frame, Mr. Bryant was doing work for MGA while he was a

Case 2:04-cv-09049-DOC-RNB   Document 9809   Filed 02/07/11   Page 88 of 94   Page ID #:295782
CV 04-9049-DOC - 02/04/2011 - Day 13, Vol. 2 of 3

88

1    Mattel employee?

2    A    Yes.

3    Q    And in your view, did you think that was appropriate?

4    A    No.

5    Q    All right.  Did you know that on September 18th, 2000,

6    Mr. Bryant contacted a vendor in Asia saying he was working

7    with MGA?

8              MS. KELLER:  Objection.  Irrelevant, your Honor,

9    to this witness.

10             THE COURT:  Well, a lot of this has to do with her

11   initial opinion, but I don't know that she's been put in a

12   position of casting an opinion based upon all these factors

13   later on.  In other words, this was simply her belief that

14   Mr. Bryant was an honest person back in this early stage.

15             Now, it may be relevant.  Maybe we'll bring her

16   back, but I think at this point, Counsel, we're going to

17   move on.

18             MR. QUINN:  All right.  Could I change the

19   question, your Honor, to ask about what was communicated to

20   the lawyer?

21             THE COURT:  Do I have a choice?

22             MR. QUINN:  You have a choice.

23             THE COURT:  Change your question.  Let's hear the

24   question.

25

BY MR. QUINN:

Q    Do you know whether or not Mr. Rosenbaum was told that

on September 18th, 2000, Mr. Bryant contacted a vendor in

Asia saying that he was working with MGA?

A    No.

Q    Did you tell Mr. Rosenbaum that?

A    No, not that I recall.

Q    All right.  Do you know whether Mr. Rosenbaum was told

that in late September, while still employed by Mattel,

Mr. Bryant contacted a sculptor, Margaret Leahy?

A    No.

Q    Do you know that -- do you know whether or not

Mr. Larian and Ms. Garcia knew these things in September,

these things, the contact with the vendor, the contact with

the sculptor, the fact that he was working with MGA in

August and September while still a Mattel employee?

          MS. KELLER:  Objection.  Irrelevant.

          THE COURT:  Overruled.

          THE WITNESS:  I don't know about the sculptor and

the first one you asked about, but they knew that he was

working for us, yes, while still employed at Mattel.

BY MR. QUINN:

Q    Was Mr. Rosenbaum told that, that he was a man who was

working at Mattel and also starting to work at MGA?

A    I don't remember.

1    Q    Do you know whether or not Mr. Bryant told these things

2    to his lawyer, Ms. Hwang, that he had been doing these

3    things for MGA while he was a Mattel employee so that she

4    could evaluate his credibility and honesty?

5    A    I don't know.

6            MS. KELLER:  I'm going to object and move to

7    strike.

8            THE COURT:  Sustain the objection, and I'm going

9    to strike the answer.

10           MR. QUINN:  All right.

11   BY MR. QUINN:

12   Q    Well, I think you've indicated that this was a

13   situation -- kind of a unique situation, one that you hadn't

14   seen before, because you had a Mattel designer, a current

15   Mattel designer coming to MGA with designs, and that hadn't

16   happened before.

17           MS. KELLER:  Objection.  Leading the witness.

18           THE COURT:  No.  You can -- that's just a summary.

19           You can answer that question.

20           THE WITNESS:  Not during my tenure at MGA, no.

21   BY MR. QUINN:

22   Q    All right.  So you hadn't -- during your tenure at MGA,

23   you hadn't had a situation before where a designer currently

24   working for a competitor was presenting doll designs,

25   correct?

1    A    Correct.

2    Q    And Mr. Rosenbaum said that he talked to Mr. Bryant's

3    attorney to check out the ownership issue, the Mattel issue,

4    and did no other investigation that you know of?

5    A    Correct.

6    Q    And you would expect that Ms. Hwang, who was

7    Mr. Bryant's attorney, would be loyal to him, so far as you

8    know?

9            MS. KELLER:  Objection, your Honor.  This calls

10   for speculation.

11           THE COURT:  Sustained.

12   BY MR. QUINN:

13   Q    Well, do you verify something somebody tells you just

14   by asking them if it's true?

15           MS. KELLER:  Your Honor, argumentative.  Asked and

16   answered.

17           THE COURT:  No.  You are in your position.  You

18   can answer that.

19           THE WITNESS:  I'm sorry, can you ask one more

20   time?

21   BY MR. QUINN:

22   Q    I assume in your work as a licensing director,

23   sometimes you have -- is it true that you sometimes have

24   occasion that you need to verify facts and verify things

25   that people tell you?

1    A    Yes.

2    Q    All right.  Do you verify something somebody tells you

3    just by asking them, the person who has told you that,

4    whether it's true; is that how you verify it?

5    A    Yes.

6    Q    Just by asking the person who has told you, is the

7    sun -- you know, did the sun shine 365 days ago, and they

8    say "yes"; that's how you verify it?

9              MS. KELLER:  Argumentative, your Honor.

10             THE COURT:  Sustained.

11   BY MR. QUINN:

12   Q    Is it -- do you regard it as an investigation simply --

13   an adequate investigation simply to ask somebody who's told

14   you something whether what they have told you is true?

15             MS. KELLER:  Assumes facts not in evidence, your

16   Honor, that that's what MGA did.

17             THE COURT:  Well, from your perspective and your

18   position, you can answer from your position.

19             But I don't want you to speculate, ladies and

20   gentlemen, that this is the fact situation.  I'll just let

21   her answer what her habit and custom is.

22             THE WITNESS:  I'm sorry, can you read it back?

23   BY MR. QUINN:

24   Q    Okay.  Do you know of anything that was done to verify

25   what Mr. Bryant said other than to ask Mr. Bryant

Case 2:04-cv-09049-DOC-RNB   Document 9809   Filed 02/07/11   Page 93 of 94   Page ID
#:295787
CV 04-9049-DOC – 02/04/2011 - Day 13, Vol. 2 of 3

93

1    whether what he said was true?

2    A     No, I don't know.

3              *(Live reporter switch with Sharon Seffens.)*

4                          -oOo-

Case 2:04-cv-09049-DOC-RNB   Document 9809   Filed 02/07/11   Page 94 of 94   Page ID #:295788
CV 04-9049-DOC – 02/04/2011 – Day 13, Vol. 2 of 3

94

-oOo-

**CERTIFICATE**

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date:  February 5, 2011

_____
JANE C.S. RULE, U.S. COURT REPORTER
CSR NO. 9316