1

2

3

4              UNITED STATES DISTRICT COURT

5              CENTRAL DISTRICT OF CALIFORNIA

6                    SOUTHERN DIVISION

7                        - - -

8       THE HONORABLE DAVID O. CARTER, JUDGE PRESIDING

9

        MATTEL, INC., et al.,
10                       Plaintiffs,
          vs.
11
                                   CV-04-9049-DOC
12       MGA ENTERTAINMENT, INC.,   DAY 13
         et al.,                    Volume 3
13                       Defendants.

14       --------------------------

15

16

17           REPORTER'S TRANSCRIPT OF PROCEEDINGS

18                 Santa Ana, California

19              Friday, February 4, 2011

20

21                     SHARON A. SEFFENS, RPR
22                     United States Courthouse
                       411 West 4th Street, Suite 1-1053
23                     Santa Ana, CA  92701
                       (714) 543-0870
24

25

1    APPEARANCES OF COUNSEL:

2    For Plaintiff MATTEL, INC., ET AL.:

3    JOHN B. QUINN
     MICHAEL T. ZELLER
4    WILLIAM PRICE
     QUINN EMANUEL URQUHART & SULLIVAN, LLP
5    865 South Figueroa Street, 10th Floor
     Los Angeles, CA  90017
6    (213) 443-3000

7    For Defendant MGA ENTERTAINMENT, INC., ET AL.:

8    ORRICK HERRINGTON & SUTCLIFFE LLP
     4 Park Plaza, Suite 1600
9    Irvine, CA  92614
     (949) 567-6700
10
     ANNETTE HURST
11   ORRICK, HERRINGTON & SUTCLIFFE LLP
     The Orrick Building
12   405 Howard Street
     San Francisco, CA  94105
13   (415) 773-4585

14   KELLER RACKAUCKAS LLP
     JENNIFER L. KELLER
15   18500 Von Karman Avenue, Suite 560
     Irvine, CA
16   (949) 476-8700

17   FOR CARLOS GUSTAVO MACHADO GOMEZ:

18   MARK E. OVERLAND
     100 Wilshire Boulevard, Suite 950
19   Santa Monica, CA  90401
     (310) 459-2830
20

21   SCHEPER KIM AND HARRIS LLP
     601 West Fifth Street, 12th Floor
22   Los Angeles, CA  90071-2025
     (213) 613-4655
23

24

25

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

```
 1    ALSO PRESENT:

 2    MGA ENTERTAINMENT, INC.
      JEANINE PISONI
 3    16360 Roscoe Boulevard, Suite 105
      Van Nuys, CA  91406
 4

 5    ALSO PRESENT:

 6    ROBERT ECKERT, Mattel CEO

 7    ISAAC LARIAN, MGA CEO

 8    KEN KOTARSKI, Mattel Technical Operator

 9    MIKE STOVALL, MGA Technical Operator

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

1

2                              **INDEX**

3                                                        **PAGE**

4   **PLAINTIFFS'**
    **WITNESS:**              **DIRECT   CROSS   REDIRECT   RECROSS**
5
    **VICTORIA O'CONNOR**
6        (Continued)                                5(Q)        16(K)
    **SARAH ODOM**            **24(P)   27(M)   36(P)**
7   FARHAD LARIAN            39(Q)    55(M)   56(Q)        57(M)

8   PLAINTIFFS'
    **EXHIBITS:**                      **MARKED**           **RECEIVED**
9
    Exhibits 23804, 23805,
10       and 23806                                          27
    **Exhibit 13532-4**                                     **49**
11

12  **DEFENSE**
    **WITNESSES:**           **DIRECT   CROSS   REDIRECT   RECROSS**
13

14   **(None)**

15  **DEFENSE**
    **EXHIBITS:**                      **MARKED**           **RECEIVED**
16

17   **(None)**

18

19

20

21

22

23

24

25

```
 1   SANTA ANA, CALIFORNIA; FRIDAY, FEBRUARY 4, 2011; 3:10 P.M.

 2              (Jury present.)

 3      VICTORIA O'CONNOR, PLAINTIFFS' WITNESS, PREVIOUSLY SWORN

 4              REDIRECT EXAMINATION (Continued)

 5   BY MR. QUINN:

 6   Q    You were asked some questions in your deposition about

 7   whether you knew from any source whether MGA expressly

 8   raised the issue with Carter Bryant's lawyer or whether

 9   Mr. Bryant actually owned the rights to the Bratz drawings,

10   and you said, "I don't know."  Do you recall those

11   questions?

12   A    Yes.

13   Q    Was Mr. Rosenbaum an MGA employee?

14   A    No.

15   Q    So he was an outside counsel?

16   A    Yes.

17   Q    If we could take take a look at Exhibit --

18              MR. QUINN:  May I have one moment, Your Honor?

19              THE COURT:  Sure.

20              (Pause in proceedings.)

21              MR. QUINN:  It's Exhibit 23855.  If we could put

22   that up on the screen, please.  If we could blow up just the

23   final lines there down at the bottom.

24   BY MR. QUINN:

25   Q    Ms. Keller asked you about this communication from
```

1    Mr. Rosenbaum to you dated September 12, and he said, "Is

2    Carter under a written employment agreement with Mattel?  If

3    he is, we need to know what it says about termination so

4    that you don't get accused by Mattel of poaching."

5         Do you recall that being called to your attention?

6    A    Yes.

7    Q    Mr. Rosenbaum wrote that before he knew that Mr. Bryant

8    had come up with Bratz; isn't that true?

9    A    Yes.

10   Q    We know that because if we look at the e-mail -- his

11   next e-mail on January 14 at 3:53 --

12             MS. KELLER:  Objection, leading.

13             THE COURT:  Overruled.

14             THE WITNESS:  It's September 14.

15   BY MR. QUINN:

16   Q    I'm sorry, September 14.  That's the wierd January 14,

17   1990, date.  It says, "Victoria, I will try to get you a

18   draft tomorrow, certainly by Monday.  In the meantime, ask

19   him to a send you a copy of his employment agreement.  I am

20   concerned about any noncompete restrictions.  Tell him he

21   can redact the financial terms of his contract, but we need

22   to see everything else.  Who came up with the Bratz line of

23   dolls?"

24        He asked that question in that subsequent e-mail,

25   correct?

1    A    Yes.

2    Q    So when he brought up the poaching issue, he didn't

3    realize there was an issue concerning the ownership and the

4    invention of Bratz, correct?

5    A    Correct.

6    Q    And he is there asking for your -- the lawyer,

7    Mr. Rosenbaum, is asking for your help?  He is asking can

8    you get a copy of the contract?  He now realizes he is the

9    inventor of Bratz and is enlisting your help to try to get a

10   copy of the contract?

11             MS. KELLER:  Objection, leading the witness.

12             THE COURT:  Overruled.

13             THE WITNESS:  Yes.

14   BY MR. QUINN:

15   Q    And you were never able to get a copy of the contract?

16   A    I don't remember me personally getting it, no.

17   Q    Mr. Rosenbaum so far as you know didn't get it either,

18   correct?

19   A    I don't know.

20   Q    Well, let's look at Exhibit 1309 that Ms. Keller showed

21   you.  This is the e-mail from Mr. Bryant to the lawyer,

22   Mr. Rosenbaum.  He says he has an agreement of

23   confidentiality, but I am unable to look into this too much

24   further with our Human Resources director without risking

25   suspicion."  Do you see that?

8

```
1    A    Yes.

2    Q    But he does attach his offer of employment.  If you can

3    turn the page there, I think you will see.

4    A    I see it.

5    Q    If you look at page 1309-00004, what Mr. Rosenbaum did

6    get is --

7              MR. QUINN:  If you can blow up that middle

8    paragraph.

9    BY MR. QUINN:

10   Q    He got this from Mr. Bryant, which says that the offer

11   would be contingent on signing a confidential information

12   and inventions agreement.  Do you see that?

13   A    Yes.

14   Q    This is something that Mr. Rosenbaum got from

15   Mr. Bryant, correct?

16   A    Yes.

17   Q    And so far as you know, Mr. Rosenbaum in doing his

18   investigation never even saw a copy of that agreement,

19   correct?

20   A    Not as far as I know.

21             MS. KELLER:  Objection and move to strike as

22   speculative.

23             THE COURT:  Overruled.

24   BY MR. QUINN:

25   Q    Then there were a number of questions about your
```

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

```
1    receipt of Exhibit 15 in your trial testimony.  That's
2    Mr. Bryant's agreement with MGA.
3         Do you recall your attention was called to page 1327 of
4    your trial testimony where you said you believed that you
5    got it on September 18, 2000, but that was a long time ago?
6    Do you recall that?
7    A    I think I said on or about, around.
8    Q    On or about or around September 18, 2000?
9    A    The question was around or about.
10   Q    And that trial was in 2008, so you are talking about
11   events that were eight years before?
12   A    Correct.
13   Q    And your recollection has been refreshed now?
14   A    Yes.
15   Q    It was pointed out that the -- if we can look at the
16   date up at the top, it's dated as of -- it's uses this
17   formulation of as of, as of September 18, 2000.
18        Do you know why Mr. Rosenbaum chose to date this --
19   give it an as of date?
20   A    No.
21   Q    But you have seen contracts before, haven't you, which
22   have as of dates that are actually signed on some later
23   date?
24   A    Yes.
25   Q    That's actually not entirely uncommon?
```

1   A    Correct.

2   Q    If we could look at Exhibit 16788, this is the e-mail

3   exchange between you and Mr. Larian?

4   A    Yes.

5   Q    If we could blow up that line in the middle, "We are

6   going to risk and spend millions making this brand and line

7   happen."  Do you see that?

8   A    Yes.

9   Q    What does it mean to make a brand happen?

10           MS. KELLER:  Objection, way beyond the scope.

11           MR. QUINN:  It's not beyond the scope.

12           THE COURT:  Overruled.

13           You may answer the question.

14           THE WITNESS:  I would think that that would mean

15   to have it do well at retail, have line extensions.

16   BY MR. QUINN:

17   Q    Was that the idea from the beginning, to make Bratz

18   into a brand?

19   A    Yes.

20   Q    And to have -- what did you call it, extensions?

21   A    Yes.

22   Q    What do you mean by extensions?

23   A    Line extensions in the toy world, to manufacture other

24   products besides the dolls, accessories, and then to further

25   expand it to licensing, maybe movies.

```
1   Q    Is that how you build a brand?

2   A    Yes.

3   Q    How important to the success of that effort and the

4   ability to build a brand was the success of those first

5   dolls?

6   A    Instrumental.

7   Q    Can you explain that?

8   A    If the dolls did not do well at retail, there would not

9   have been additional products.

10        THE COURT:  This does go beyond the direct and

11  cross, but in an effort to save you coming back, I am going

12  to use my discretion and let counsel reopen on both sides if

13  we are going to get into this issue of brand.

14  BY MR. QUINN:

15  Q    Why was it important that the first four dolls succeed

16  in order to be able to build a brand?

17  A    Typically, if toys don't sell well -- that's the first

18  category in any licensing program, to go out with the toys.

19  If they don't sell, nothing else will sell typically.

20  Q    As the date of this document where Mr. Larian is making

21  this commitment on September 13, 2000, when he says he is

22  going to build a brand, all he has is Mr. Bryant's designs,

23  correct?

24  A    And the prototype, yes.

25  Q    And that prototype that you described?
```

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1    A    Yes.

2    Q    You were asked some questions about whether MGA was --

3    the kind of toys that MGA had had and whether MGA was

4    looking for additional toys.  Do you recall those questions?

5    A    Yes.

6    Q    Did Mr. Larian ever tell you that he was conducting or

7    intended to conduct a fashion doll contest?

8    A    No.

9    Q    Do you recall while you were there that there ever was

10   a fashion doll contest at MGA?

11   A    No.

12   Q    You were asked some questions about the use of the word

13   "prototype."  I think you were asked whether the lawyers

14   told you to use that word "prototype."  Do you recall that?

15   A    Yes.

16   Q    Do you recall whether or not you were the first one to

17   use the word "prototype" in your deposition?

18           MS. KELLER:  Assumes facts not it in evidence as

19   to the prep.

20           THE COURT:  Well, her statement is that she has

21   never talked to anybody before the deposition, so the

22   question is when she went to the deposition if she mentions

23   this or in what context.

24   BY MR. QUINN:

25   Q    Do you recall that you used the word "prototype" to

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

```
 1   describe what you have described as this beautiful doll?
 2            THE COURT:  Let me see the page.  Let me see if
 3   that is suggested to her or if she comes up with this on her
 4   own.
 5            MR. QUINN:  It's page 55.
 6            MR. QUINN:  He is scrambling.
 7            THE COURT:  You are not going to ask the question
 8   until I see that page.  I just want to make sure that this
 9   isn't a suggested question by either counsel in the
10   deposition, that this is truly the first mention of the word
11   "prototype" and if she is the one who makes it.
12            THE COURT:  Thank you.  These young people are
13   doing great on both sides.  They need to be complimented
14   both for MGA and Mattel.
15            What page?
16            MR. QUINN:  Page 55, beginning on line 22.
17            THE COURT:  You may ask that question.
18   BY MR. QUINN:
19   Q    Do you have that before you?
20   A    Yes.
21   Q    Do you recall when you were asked about this at your
22   deposition when you first described what Mr. Bryant had
23   brought with him, this doll, that you used the word
24   "prototype"?
25   A    Yes.
```

1    Q    Had anybody at any time suggested to you that that's

2    how you should describe it?

3    A    No.

4    Q    And you had refused to meet with us before that

5    deposition?

6    A    Yes.

7    Q    If we could put Exhibit 16788 up there again where

8    Mr. Larian says "We are going to spend millions to build

9    this brand," you were asked some questions about the

10   indemnity provisions of Mr. Bryant's contract, Exhibit 15.

11   Do you recall that?

12   A    Yes.

13   Q    Counsel asked you whether Mr. Bryant promised to

14   indemnify and reimburse MGA if it turned out that Mattel or

15   somebody else owned the rights to Bratz.  Do you recall

16   that?

17   A    Yes.

18   Q    Now, based upon your dealings with him, did Mr. Bryant

19   have millions of dollars?

20   A    At what point in time?

21   Q    At this time when he signed the contract and undertook

22   this indemnity obligation.

23   A    I don't believe so, but I don't know.

24   Q    Did he give you any -- did anything come to your

25   attention indicating that at that time he was a wealthy man?

1    A    No.

2    Q    One way to structure this contract with Mr. Bryant

3    might have been to have some type of a contingent deal?

4    Would you agree with that?

5              MS. KELLER:  Objection, irrelevant.

6              THE COURT:  Overruled.  You can answer that

7    question.

8              THE WITNESS:  I'm not sure I understand the

9    question.

10   BY MR. QUINN:

11   Q    One way of structuring it would be to say, Mr. Bryant,

12   we will enter into this agreement with you contingent on our

13   reviewing your inventions agreement and satisfying ourselves

14   that in fact you own these drawings?  That would have been

15   one way to do this?

16   A    Yes.

17   Q    Including talking to Mattel?  That could have been a

18   contingency?

19   A    Yes.

20   Q    If we could look at Exhibit 9258, this is the

21   interview -- or Mr. Larian's responses to the French

22   journalist.  Counsel pointed out that it was your suggestion

23   that wouldn't it be a good idea -- I'm sorry, 7055 -- that

24   wouldn't it -- that "Don't you think we should say Bratz was

25   born in October when a certain person was no longer with

1  their company?" and counsel pointed out that was your idea,

2  right?

3  A    Yes.

4  Q    And Mr. Larian -- did he agree with that?

5  A    Yes.

6  Q    And was that because this Mattel issue was still

7  hanging out there?

8        MS. KELLER:  Objection, calls for speculation,

9  witness' state of mind.

10        THE COURT:  Overruled.

11        THE WITNESS:  Yes.

12        MR. QUINN:  Nothing further.

13        THE COURT:  Recross.  Counsel, you can extend

14  beyond the limitations before because allowed branding to be

15  opened up.

16                    RECROSS-EXAMINATION

17  BY MS. KELLER:

18  Q    So, Ms. O'Connor, you never met with Mattel's lawyers

19  before your deposition; is that right?

20  A    Yes.

21  Q    No one was going to influence you, right?

22  A    Yes.

23  Q    You wanted to be neutral?

24  A    Yes.

25  Q    So you didn't meet with the lawyers from Quinn Emanuel,

1    right?

2    A    Correct.

3    Q    Instead, you met with -- you spoke, rather, with Jill

4    Thomas, Mattel's general counsel who is seated here today?

5    A    Yes.

6    Q    That means she is the chief lawyer for Mattel, right?

7    A    Yes.

8              MR. QUINN:  Lacks foundation that she would know.

9              THE COURT:  Overruled.

10             THE WITNESS:  I don't know her title.

11   BY MS. KELLER:

12   Q    Was she the head of litigation, in other words,

13   lawsuits for Mattel?

14   A    I still don't know her title.

15   Q    Well, she called you, right?

16   A    I believe so.

17   Q    Don't you consider her a lawyer for Mattel?  That's her

18   job, isn't it?

19   A    Yes.

20   Q    So you did speak with a lawyer from Mattel before your

21   deposition?

22   A    We didn't have a meeting.

23   Q    Oh, I see.  So it's whether you actually met in person

24   that matters?

25   A    I don't remember the circumstances of our phone call.

```
 1   Q    You spoke with Mattel's head of litigation before you
 2   testified at the deposition, right?
 3   A    Yes.
 4   Q    Now, I'm including all forms of communication.  I want
 5   to be clear this time, not just whether you met in person
 6   but whether you spoke, whether you e-mailed, sent smoke
 7   signals, whatever.
 8        Now, Ms. Thomas called you, didn't she?
 9   A    Yes.
10   Q    And it was actually a little more than a month maybe
11   before your deposition?
12   A    I don't remember the timing.
13   Q    She called you at work at Warner Bros.?
14   A    I don't remember.
15   Q    Do you want to take a look at your testimony, page 204,
16   lines 22 and 23?
17   A    Okay.
18   Q    She called you at work, right?
19   A    Yes.
20   Q    At Warner Bros., right?
21   A    Yes.
22   Q    The same Warner Bros. that you were with now that works
23   with Mattel all the time?
24   A    Yes.
25   Q    She told you that you were going to be served with a
```

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1    subpoena, right?

2    A    Yes.

3    Q    She wanted to pick a mutually convenient day when you

4    could be deposed so you didn't have to be inconvenienced?

5    A    Yes.

6    Q    She called you back later and talked to you, right?

7    A    I don't remember how many times she called me.

8    Q    Well, approximately how many times did she call you?

9    A    I don't remember.

10   Q    Well, I mean give me a range.  Was it five to ten?

11   A    Maybe twice just to set the date.

12   Q    And you met with her repeatedly during the recesses

13   today, right?  Let's talk about today.

14   A    Okay.

15   Q    You met with her repeatedly during the recesses?

16   A    I was in the same room she was in.

17   Q    That's a very small room?

18   A    Yes.

19   Q    A very small room like maybe twice the size of that

20   counsel table?

21   A    Okay.

22   Q    Is that a yes?

23   A    Yes.

24   Q    She told you about the lawsuit between Mattel and

25   Carter Bryant, right?

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

```
 1              MR. QUINN:  Objection, vague.
 2              THE COURT:  Today or back then?
 3    BY MS. KELLER:
 4    Q    When she called you before your deposition, she talked
 5    to you about the lawsuit between Mattel and Carter Bryant?
 6    A    Yes.
 7    Q    Are you looking at your transcript right now before
 8    answering?
 9    A    Yes.
10    Q    Let's see what you remember rather than look at your
11    transcript.  If you need to look at your transcript, then
12    you can refresh your memory.  All right?
13    A    All right.
14    Q    You had already read about the lawsuit at the time?
15    A    I don't recall.
16    Q    Do you want to take a look at your deposition
17    transcript, page 206?
18    A    Okay.
19    Q    Now, I believe you also --
20              MR. QUINN:  Was there a question?
21              MS. KELLER:  No, there isn't.  Thank you.
22              THE COURT:  Counsel are thanking each other.
23              MS. KELLER:  We are very polite.
24    BY MS. KELLER:
25    Q    I believe you also testified a little while ago that
```

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1   Mr. Rosenbaum didn't find out for quite some time that you

2   had actually retained him to check into a project involving

3   the Bratz.  Do you remember that?

4   A    I'm sorry.  Repeat the question.

5   Q    Just a little while ago you testified that

6   Mr. Rosenbaum didn't know that he was actually working for

7   you on the Bratz project until sometime in an e-mail that we

8   saw that was fairly late in the game.  Do you remember that?

9           MR. QUINN:  That misstates the testimony, the

10  question.

11          THE COURT:  Ask her a question instead of a

12  statement just to be sure.

13  BY MS. KELLER:

14  Q    When you hired Mr. Rosenbaum on behalf of MGA to try to

15  check out whether Mr. Bryant in fact owned the rights to

16  Bratz, did you keep it a mystery from him what the project

17  was about?

18  A    No.

19  Q    You told him from the beginning that it involved Bratz,

20  right?

21  A    Yes.

22  Q    Okay.  Now --

23          MS. KELLER:  If I could just are have a moment,

24  Your Honor.

25          THE COURT:  Sure.

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

```
 1              (Pause in proceedings.)
 2   BY MS. KELLER:
 3   Q    This contingent agreement that Mr. Quinn talked about,
 4   you are not a contract lawyer?
 5   A    No.
 6   Q    Is it true that there are possibly hundreds of
 7   different kinds of contracts?
 8   A    Yes.
 9   Q    Did Mr. Rosenbaum ever make any suggestions to you as
10   to any sort of contingent agreement with Carter Bryant?
11   A    Not that I remember.
12   Q    One more time, I understand from your testimony that
13   your practice is if you have any questions beyond just
14   having a designer sign representations and warranties -- if
15   you have any other questions about whether this person's
16   ideas actually belong to the person trying to sell them to
17   the company, you would hire a lawyer to check it out?
18   A    Right.
19   Q    And that's what you did here?
20   A    Yes.
21   Q    For example, do you remember testifying earlier as we
22   showed you an e-mail that Carter Bryant told you that he was
23   going to quit the minute he inked the contract, quit Mattel?
24   A    Yes.
25   Q    Okay.  When he told you that, you didn't feel the need
```

```
1   to hire a private eye to go out and surveil him to make sure

2   he had actually quit did you?

3   A    No.

4            MS. KELLER:  Thank you.  Nothing further.

5            THE COURT:  Now, we are placing all of the

6   witnesses on call until May 7.  Trust me, this case will not

7   be going as long as May 7, but I am being extra cautious

8   because of the number of people both internationally, across

9   the country, and let alone locally.  I don't want either

10  party to have to reach again or inconvenience people.  You

11  go any personal vacation, any professional responsibilites.

12  If we need you, believe me, we'll find you.

13           Thank you very much.  You may step down.

14           Counsel, your next witness, please.

15           MR. PRICE:  Sarah Odom.

16           THE COURT:  Ms. Odom, if you would be kind enough

17  to step forward and raise your right hand, please.

18           SARAH ODOM, PLAINTIFFS' WITNESS, SWORN

19           THE COURT:  Please come along the side of the jury

20  there, and there is an entrance close to the wall.  This

21  chair doesn't move very far.  If you would be seated in the

22  chair.

23           After you are comfortably seated, would you state

24  your full name for the jury.

25           THE WITNESS:  Sarah Odom.
```

```
 1              THE COURT:  Would you spell your last name for the

 2    jury.

 3              THE WITNESS:  O-d-o-m.

 4              THE COURT:  Thank you.

 5              Counsel, direct examination.

 6                        DIRECT EXAMINATION

 7    BY MR. PRICE:

 8    Q    Ms. Odom, hi.

 9         Where do you work?

10    A    I work at Kickapoo High School in Springfield,

11    Missouri.

12    Q    And what is your job there?

13    A    I'm an assistant principal.

14    Q    How long have you been the assistant principal there?

15    A    I have been the assistant principal since the fall of

16    2004, so I am in my seventh year.

17    Q    So before 2004, did you still work at Kickapoo?

18    A    Yes.  I was a teacher at the time.

19    Q    For how long were you a teacher?

20    A    I began working in the '96-'97 school year.

21    Q    Has there been any interruption in your service at

22    Kickapoo between '96 --

23    A    The fall of '96.

24    Q    -- until today?

25    A    No, there has not.
```

1   Q     Kickapoo High School is in Springfield, Missouri.

2   A     Yes.

3   Q     It's located within Springfield Public School District?

4   A     Correct.

5   Q     I'm going to have some yearbooks handed to you, which

6   have been marked as 23804, 23805, and 23806.

7         Have you had a chance to look at them?

8   A     Do you want me to look through them?

9   Q     Yes, if you could, just however much you need to look

10  at them to try to figure out what they are.

11  A     Okay.

12          THE COURT:  Do you want to relate the years to the

13  different numbers so both counsel can follow and the jury?

14          THE WITNESS:  I looked much younger then.

15          MR. QUINN:  It takes you back, huh.

16          (Witness reviewing yearbooks.)

17          MR. QUINN:  You don't need to enjoy them.

18          THE WITNESS:  I'm looking for me.  I'm trying to

19  get a frame of reference for me.  I had a much fresher face

20  back then I think.

21  BY MR. PRICE:

22  Q     Let's do them one at a time.  What is 23804?

23  A     23804 is the 1997 book.

24  Q     And what is 23805?

25  A     That's the '98 book.

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1    Q    And 23806?

2    A    That's the '99 book.

3    Q    How do you know that?  How do you know that these are

4    Kickapoo High School yearbooks for '97, '98, and '99?

5    A    The spine says that's what it is, and your tab

6    references that as -- you know, the exhibit number I guess

7    is what you call it.

8    Q    But you're not relying on the tab to determine if those

9    are the yearbooks?

10   A    Correct.  We have copies of them in our vault at

11   school.

12   Q    Did you personally ever have any duties in connection

13   with the yearbook?

14   A    Actually when I was first hired as an assistant

15   principal, the English Department or the Communication Arts

16   Department was under my direction I guess is probably the

17   best way to put it.  I was responsible for evaluating

18   teachers in that department, overseeing activities, and that

19   kind of thing.  So at the time up until about two or three

20   years ago when we had another lady come in whose expertise

21   was more English, I was the supervisor.

22   Q    Who prepares the yearbooks?

23   A    The advanced journalism staff under the direction of

24   the journalism teacher.

25   Q    So I take it you actually saw these yearbooks at the

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1    time they came out.

2    A    Yes.

3    Q    I am going to ask you to look at them a little bit

4    closer.  If you look at the yearbooks, do they represent

5    kind of what the high school kids were wearing during those

6    years?

7    A    Yes, I would say so.

8    Q    You would generally know what kind of clothes the kids

9    were wearing when they came to school?

10   A    Yes, I would.  I would not want to see them without

11   their clothes on at school, so --

12   Q    And naked people don't get very far in society.

13        Do the photographs in those yearbooks accurately depict

14   the kids and the clothing that they were wearing during

15   these time periods?

16   A    The styles, yes, I would say so.

17            MR. PRICE:  Your Honor, we're going to move

18   Exhibits 23804, 23805, and 23806 into evidence.

19            THE COURT:  Each are received.  Those are the the

20   '97, '98 and '99 yearbooks for Kickapoo High School.

21            (Exhibits 23804, 23805, and 23806 received.)

22            MR. PRICE:  No further questions.

23            THE COURT:  Cross-examination.

24                    CROSS-EXAMINATION

25   BY MR. MCCONVILLE:

```
 1   Q    Ms. Odom, how are you?

 2   A    I'm great.  How are you doing?

 3   Q    We have all been waiting anxiously for your arrival in

 4   the courtroom.

 5

 6        MR. MCCONVILLE:  I'm going to come up and get a

 7   yearbook if I could, please.

 8        THE COURT:  Yes.

 9        If counsel goes a long time of time, she'll be

10   able to spend the weekend and not return to the snowstorms

11   in Missouri.  No, we are going to see if we can get you back

12   home.  We will try and complete this tonight.

13        MR. MCCONVILLE:  We will, Your Honor.

14   BY MR. MCCONVILLE:

15   Q    First things first, you said that you saw your own

16   picture in this yearbook?

17   A    Yes.

18        MR. MCCONVILLE:  I'm going to show it if I could,

19   Your Honor.  Is that permissible?

20        THE COURT:  It certainly is.

21   BY MR. MCCONVILLE:

22   Q    In fairness to you, I wanted to get the original.  We

23   have this all set up on screen, but they just don't do

24   justice sometimes.

25   A    Exactly.
```

```
 1   Q    Let me ask you a question first.  Odom is your married

 2   name?

 3   A    Yes.

 4   Q    What was your maiden name?

 5   A    Reebin (phonetic).

 6   Q    Is that you?

 7   A    That's me.

 8   Q    Cute as a button; am I right?

 9   A    That's what my husband says.

10   Q    Okay.  So let me ask you a question.  They have

11   electricity in Kickapoo -- I mean in Springfield?

12   A    They do.

13          MR. PRICE:  Objection, argumentative.

14          THE COURT:  Keep going.

15   BY MR. MCCONVILLE:

16   Q    For example, they have like a big box back there, that

17   television in Springfield?

18   A    They do.

19   Q    And sometimes in the back of the TV there is a thing

20   called a cable; is that true?

21   A    Yes.

22   Q    Is it fair to say that what gets broadcast into

23   Springfield would be things from all over the world?

24   A    I think that would be fair.

25   Q    That's fair to say?
```

1   A     Yes.

2   Q     Do you believe that, for example, like MTV gets

3   broadcast in Springfield?

4   A     Yes, unfortunately.  Sorry.

5   Q     You say "unfortunately."  Why is that unfortunate?

6   A     Today as an assistant principal.  Probably not so much

7   as a teacher because I wanted to be that cool teacher, but

8   as an assistant principal, saggy pants -- I don't want to

9   see a young man's underwear walking down the hallway, you

10  know, just things of that nature.

11  Q     But you tie the saggy pants to my reference to MTV?

12  A     Pop culture.

13  Q     Let's use pop culture.  So pop culture does manage to

14  make it all the way to Springfield, Missouri?

15  A     Yes.

16  Q     In fact, if I could ask you to look at page -- the 1997

17  yearbook, which is Exhibit 23804, and if you could turn to

18  pages 14 and 15 of that yearbook for me.

19          MR. MCCONVILLE:  Your Honor, it's already in

20  evidence.  If we could show that up on the monitor.

21          THE COURT:  Yes.

22  BY MR. MCCONVILLE:

23  Q     Can you read there the first paragraph of the sentence

24  that begins with "Whether"?

25  A     "Whether it was combat boots and Marilyn Manson shirts

```
 1   or Birkenstocks and Calvin Klein teens, different styles of
 2   dress adorn the corridors and classrooms.  Appearances
 3   ranged from the alternative all black clothes and fishnets
 4   to the preppy polos and khakis."
 5   Q    The reference to "fishnets," did that include the boys
 6   at the school who would wear fishnets as well in '97?
 7   A    Yes.
 8   Q    Did the students also have -- did that reference -- did
 9   they have tattoos?
10   A    I don't remember.
11   Q    Let's see if we can read the caption a little bit
12   further down.  Let's check what this guy has to say right
13   here.
14   A    "If I see someone wearing fishnets, black eyeliner, and
15   I can't tell if they are a guy or a girl, I will probably
16   think they are a scrub.  Jeremy Mhire, Jr."
17   Q    Are you familiar with Mr. Mhire's work?
18   A    Yes, I am actually.
19   Q    And it's these students who -- you have seen a lot of
20   teenagers through your days at Kickapoo?
21   A    Yes.
22   Q    Did you actually attend Kickapoo High School?
23   A    Yes.
24   Q    So your tenure extends not only from 1996, but you
25   actually were a student there as well?
```

1   A    Yes.

2   Q    Based on your experience at Kickapoo -- let me focus it

3   on the relevant time period, which would be 1998 -- is it

4   fair to say that the teens there affected by pop culture

5   tried to be trendy?

6   A    Definitely.

7   Q    And they tried to be fashionable?

8   A    They try.

9   Q    Students aren't issued a sewing machine and said you

10  have to sew your own clothes before you come to school?

11  A    No.

12  Q    They have stores there?

13  A    Yes.

14  Q    So students try to be trendy based on pop culture that

15  they see?

16  A    Yes.

17  Q    Some wear fishnets?

18  A    Yes.

19  Q    I want you to describe for me if you could back in 1998

20  what it would look like if I were driving by Kickapoo High

21  School and I saw a group of kids -- let me ask a better

22  question.  Is there a common meeting place for students at

23  Kickapoo near the school, near the building?

24  A    The two main entrances to the building, one is on the

25  east side of the building and one is on the west side of the

1    building.  The west side of the building is primarily where

2    the bus lanes are and where parents drop off and pick up.

3    The east side of building is student and staff parking, and

4    then also there was a little bit of parent drop off and pick

5    up in the back, too, just for parents trying to avoid the

6    long lines that were on the west side of the building.  I am

7    kind of dancing around, but I wanted to paint that.  Sorry.

8    Q    I appreciate it.  That's fine.

9    A    So if you are on the west side of the building, you are

10   probably going to see the younger students, kids who rely on

11   their parents to pick them up or drop them off, and there

12   are going to be kids waiting out front on the west side of

13   the building, and there will be kids on the back side of the

14   building, probably just not as many.  The kids coming out of

15   the back side of the building are going to be your athletes

16   and your band kids who are involved in activities and

17   probably exiting the building to go to practice or rehearsal

18   or whatever.

19   Q    Do some kids just hang out after school in a social

20   setting?

21   A    Yes.

22   Q    Is that frowned about?  Let's put you as a teacher, not

23   an administrator.

24   A    As a teacher, no.

25   Q    What was the student population of Kickapoo back in

1    1998?

2    A    We have ranged between 1,700 and 1,800 students for

3    probably the last 15 years.  I can't give you an exact

4    number unless I had a report in front of me.

5    Q    No one is going to cross-examine you on that point.

6    A    I appreciate that.

7    Q    How big is the Springfield metropolitan area?

8    A    The metro area is probably about a quarter of a

9    million.

10   Q    Among these 1,700 to 1,800 students are some of them

11   nonwhite?

12   A    Yes.

13   Q    Back in 1998 if you recall?

14   A    I'm sure, yes.

15   Q    This area where the kids hang out, they sometimes hang

16   out with their friends?

17   A    Yes.

18   Q    And they are wearing whatever the trendy clothes are

19   that they pick up from pop culture?

20   A    Whatever they chose to wear that day I guess, yes.

21   Q    Potentially fishnets?

22   A    Potentially.

23   Q    Let me ask you this.  Have you heard a story or an

24   urban legend that the birthplace of Bratz was Kickapoo High

25   School?

```
 1              MR. PRICE:  Objection, irrelevant.
 2              THE COURT:  I don't know where we are going with
 3     this, but you may answer it.
 4              THE WITNESS:  Only probably after this trial came
 5     to light a couple of years ago.
 6              MR. MCCONVILLE:  I'm looking at the judge as to
 7     whether I can ask the follow-up on that.
 8              THE COURT:  I'm not sure what it is.
 9              MR. MCCONVILLE:  Well, I was going to ask.
10              MR. PRICE:  It's after the trial.  It's
11     irrelevant.
12              THE COURT:  She testified at the trial?
13              MR. PRICE:  No, but she said that there was
14     something after the trial.  That opens up a whole --
15              THE COURT:  It's up to you, Counsel.
16              MR. MCCONVILLE:  Okay.  Forget it.
17     BY MR. MCCONVILLE:
18     Q    You have stores that sell magazines in Springfield?
19     A    Yes.
20     Q    One of the magazines, for example, that might be
21     available in Springfield would be "Seventeen" magazine?
22     A    Yes.
23     Q    "Vogue" magazine?
24     A    Yes.
25     Q    Let me ask you this.  Based on your experience, could a
```

1  person drive by Kickapoo High School in August 1998 and see

2  hip kids full of energy wearing trendy clothes and

3  backpacks?

4  A    Yes, it's possible.

5           MR. MCCONVILLE:  Thank you.  No further questions?

6           THE COURT:  Redirect.

7                    REDIRECT EXAMINATION

8  BY MR. PRICE:

9  Q    In the '98-'99 time frame, did you ever by a high

10 school in Los Angeles or New York?

11 A    I don't believe so.

12 Q    So you haven't really compared kids in L.A. to kids in

13 Kickapoo to kids in New York?

14 A    No.

15 Q    Do these yearbooks kind of represent what the kids

16 looked like?

17 A    Yes.

18 Q    By the way, you were asked whether there were nonwhites

19 in Kickapoo in '98, and you kind of paused and looked to the

20 right.  Why were you pausing?

21 A    Our demographics have changed.  I probably wasn't aware

22 of -- when I was a teacher, I wasn't aware of exact numbers,

23 but as I have become an administrator and I see state

24 reports and national reports and we compare data for the

25 last ten years, our numbers have gone up in the last ten

```
 1    years -- I know that -- in various -- ethnic minorities, et

 2    cetera.

 3              THE COURT:  But you are going back to '98?

 4              MR. PRICE:  Yes.

 5    BY MR. PRICE:

 6    Q    Let's go back to '98 then.  You were asked whether

 7    there were any nonwhites in a school that was how big?

 8    A    About between 1,700 and 1,800.

 9    Q    And your answer was -- were there any?

10    A    Yes, there are.

11    Q    So, in 1998, there were some nonwhites?

12    A    Correct.

13    Q    And it's gone up in the last 13 years?

14    A    Yes.

15    Q    How prevalent was the diversity I guess in 1998?

16    A    It's not a diverse high school probably on the same

17    terms as what you would find here in Southern California.

18    We are primarily white.  It was probably 92 percent white

19    back then.

20              MR. PRICE:  Thank you.

21              THE COURT:  Recross.

22              MR. MCCONVILLE:  No questions, Your Honor.

23              THE COURT:  Now, I know you are not returning, but

24    I am placing all of the witnesses on call.  I can't imagine

25    why you would come back to the court, but I don't want
```

1    subpoenas to go across the country or internationally.  You

2    go about your business and your personal vacations and

3    profession responsibilities.  If we need you, we will find

4    you and be very curious.

5            Now, we almost made it to Monday so you could stay

6    the weekend, but you go home and enjoy your family.

7            THE WITNESS:  Thank you.

8            THE COURT:  Counsel, your next witness, please.

9            MR. QUINN:  Farhad Larian.

10           THE COURT:  Thank you, sir.  If you would step

11   forward and raise your right hand.

12           FARHAD LARIAN, PLAINTIFFS' WITNESS, SWORN

13           THE COURT:  Sir,if you would come along the jury

14   wall, please.  There is an entrance right here.  Please be

15   seated.  That chair doesn't move.

16           Sir, would you state your full name for the

17   jurors, please.

18           THE WITNESS:  Farhad Larian.

19           THE COURT:  And would you spell your last name.

20           THE WITNESS:  L-a-r-i-a-n.

21           THE COURT:  Just a moment.  One of the jurors

22   needs to take a bathroom break.  Why don't you go do that

23   right now.  Anybody who needs to use the bathroom -- we will

24   go until about 4:25.

25           MS. KELLER:  Your Honor, does that include

1    counsel?

2              THE COURT:  Five minutes.

3              (Recess.)

4              (Jury present.)

5              THE COURT:  Mr. Quinn.

6                        DIRECT EXAMINATION

7    BY MR. QUINN:

8    Q    Good afternoon, Mr. Larian.

9    A    Good afternoon.

10   Q    You are Isaac Larian's brother?

11   A    Yes.

12   Q    You founded MGA with your brother?

13   A    Yes.

14   Q    At one point you were 50/50 owners?

15   A    Yes.

16   Q    And then at that point you became a 45-percent owner?

17   A    Yes.

18   Q    Until December of 2000 you were an executive

19   vice-president, treasurer, and director?

20   A    Yes.

21   Q    And you sold your interest in MGA, your 45-percent

22   interest, to Isaac Larian on December 4, 2000; is that

23   correct?

24   A    It sounds about right.

25             THE COURT:  Would you move closer and speak into

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1    the microphone so we can hear you.  Thank you, sir.

2    BY MR. QUINN:

3    Q    You sold that interest in December of 2000 for

4    approximately $8.7 million; is that true?

5    A    Yes.

6    Q    After that, you continued to be affiliated in some

7    fashion with MGA?

8    A    Yes.

9    Q    You were a consultant?

10   A    Yes.

11   Q    Up until I think December 31, 2005; is that correct?

12   A    Yes.

13   Q    And you continued to have some responsibilities

14   during -- at least some points during that time period for

15   like litigation support, shipping, and trademark issues?

16   A    Yes.

17   Q    And you got paid for doing that work obviously as a

18   consultant?

19   A    Yes.

20   Q    At some point after -- at some point after you sold

21   your stock in MGA in December 2000 to Isaac Larian -- at

22   some point, you became suspicious that Isaac Larian had not

23   disclosed to you the fact that the Bratz dolls had been

24   under development for some period of time, correct?

25   A    Yes.

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1   Q    And you undertook -- you thought he had kept that from

2   you?

3   A    Yes.

4   Q    And while you were there as a consultant and you had

5   these suspicions and you had the thought that he had kept it

6   from you, you started to do an investigation?

7              MS. KELLER:  Objection, leading.

8              THE COURT:  Overruled.

9              THE WITNESS:  I'm not sure if I did it at that

10  time or afterwards.

11  BY MR. QUINN:

12  Q    Well, at some point after you sold your stock, you

13  started to do an investigation into this idea that Isaac

14  Larian had started the development of Bratz much earlier

15  than he had said, correct?

16  A    He had not said, so --

17  Q    But you at least thought that this was something that

18  had been concealed from you; isn't that correct?

19  A    Yes.

20  Q    So you started to do an investigation into this,

21  correct?

22  A    I hired an attorney, and he filed a lawsuit.

23  Q    But before you did that, you collected some e-mails?

24  A    No.

25  Q    You collected e-mails after you hired an attorney?

```
 1    A    I had e-mails throughout the course of my work at MGA.
 2    Q    You had some e-mails on the subject of Bratz?
 3    A    I had three e-mails from 2000 that had Bratz in them.
 4    Q    You collected some declarations?
 5    A    When?
 6    Q    As you were looking into this, you got some
 7    declarations?
 8    A    What time period?  Do you want to be specific, or do
 9    you want me tell you when I did it?
10    Q    Well, we'll get to that, when you did it, but do you
11    recall collecting some declarations?
12    A    As part of my litigation, yes, I did.
13    Q    This included both declarations of former employees
14    that were signed, correct?
15    A    It's been seven or eight years.  I don't know exactly
16    but, yes, would have included --
17    Q    And you did this as part of this litigation relating to
18    whether or not Isaac Larian had concealed from you when
19    Bratz started development?
20    A    Yes.
21    Q    And you also collected information about Bratz
22    royalties?
23    A    One more time, please.
24    Q    You also collected some information about Bratz
25    royalties, correct?
```

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1    A    I was handling royalties, so I reported the royalties.

2    Q    And you indicated that you filed a lawsuit relating to

3    this alleged concealment?

4    A    Yes.

5    Q    If you would look, please, at Exhibit 10719.  If we

6    could place that before you.  Is this the copy of the

7    lawsuit for fraud that you filed against Isaac Larian?

8    A    Yes.

9    Q    And you filed this in the Los Angeles County Superior

10   Court on August 25, 2003?

11   A    Yes.

12   Q    And this is a -- you verified this Complaint?  That is

13   to say, you signed it under penalty of perjury, correct?

14   A    The Complaint and the verification say that some of the

15   statements -- some of the allegations are verified under

16   penalty of perjury, and some of them are based on

17   information and belief, so those are not verified.  On

18   subsequent review of this, I learned that one of the

19   statements that was verified is inaccurate.

20   Q    So, in other words, in this Complaint, you verified

21   under penalty of perjury, but some of the things that you

22   said you said it on information and belief?  That is to say,

23   it wasn't true of your own personal knowledge?

24   A    That's correct.

25   Q    And you thought beginning in or about -- maybe even in

1    late 1999 or early 2000 that Mr. Isaac Larian became aware

2    of a potential new product line?

3    A    No.

4    Q    If you would take a look at page four of Exhibit 10719,

5    I will call your attention to paragraph 13.

6    A    Okay.

7              MR. QUINN:  Your Honor, I would request permission

8    to read lines 12 and 13.

9              THE COURT:  You may.

10             MR. QUINN:  "Plaintiff is informed and believes

11   that beginning in or about late 1999 and early 2000 Isaac

12   became aware of a potential new product line that had

13   tremendous potential for the company."

14   BY MR. QUINN:

15   Q    Do you see that?

16   A    I do.

17   Q    What you are referring to there is the Bratz doll

18   product line, correct?

19   A    It continues to say the "Bratz doll," and, again, that

20   paragraph is prefaced by "information and belief."

21   Q    I think I read that, but let's take it one step at a

22   time.  In the passage that we have read, the potential new

23   product line that you are referring to is the Bratz doll

24   line?

25   A    Correct.

1  Q    You described these dolls that you thought Mr. Isaac

2  Larian was aware of as being hipper and more edgy than

3  Barbie style dolls and that they would be aimed at a

4  post-adolescent, preteen, early teen market, correct?

5  A    Nothing in here says that I believed Isaac Larian

6  thought those things.

7  Q    Well, you believed that that was an accurate

8  description of these dolls?

9  A    This was made from a news article that I had come

10  across.

11  Q    But that's what you believed at the time, correct?

12  A    I believed that's what the news article said.

13  Q    And you thought that Isaac Larian had devised a plan to

14  keep this business opportunity secret from you and to gain

15  control of the company by buying your shares at a value

16  which did not take into account this new business

17  opportunity?

18  A    That's what I realized.

19  Q    And you thought that he had -- you thought that Isaac

20  Larian had concealed from you his knowledge and his

21  intentions regarding this product line?

22  A    That's what I realized, yes.

23  Q    And you cited some -- there were some specific things

24  that had happened, some meetings that you weren't invited

25  to, that lead you to believe that this had been specifically

1    concealed from you?

2    A    I know I wasn't in some meetings.

3    Q    For example, in early 2000, there was a meeting called

4    to discuss the new Bratz product line with selected

5    individuals, and they were excited about this, but you

6    thought that the result -- that meeting was concealed from

7    you?

8    A    I know I did not attend the meeting, so --

9    Q    Then you were dissuaded by Isaac Larian from attending

10   New York Toy Fair in February of 2000?

11   A    Yes.

12   Q    Even though in the past you had regularly attended

13   those toy fairs?

14   A    I hadn't gone every year, no.

15   Q    But you had routinely a regularly attended those toy

16   fairs in the past?

17   A    I had attended some of those toy fairs.

18   Q    You had routinely and regularly attended those toy

19   fairs?

20   A    I have gone to some of those toy fairs.

21           MR. QUINN:  Your Honor, I would request permission

22   to read from page 5 of Exhibit 10719, lines 3 to 4.

23           THE COURT:  Any objection?

24           MR. MCCONVILLE:  Just on relevance, Your Honor.

25           THE COURT:  Sustained.

```
1    BY MR. QUINN:

2    Q    But in any event, in March 2000, Isaac Larian offered

3    to purchase your 45-percent interest in the company for

4    $9 million, correct?

5              MR. MCCONVILLE:  Objection, relevance.

6              THE COURT:  Sustained.  I thought the focus was on

7    the creation or the time involving Bratz.  It's for a

8    limited purpose and a limited reading.  That's my ruling.

9              MR. QUINN:  Thank you.

10   BY MR. QUINN:

11   Q    In any event, this Complaint that you brought was

12   ultimately -- you actually -- it ended up as an arbitration

13   proceeding?

14   A    Yes.

15   Q    You ultimately dismissed the Complaint?

16   A    I did.

17   Q    You dismissed it because you decided to put family

18   before your case, correct?

19   A    That was part of the reason.

20   Q    Well, you have signed a declaration, haven't you,

21   describing your reasons for dismissing this case?

22   A    I'm sure I have signed several declarations in this

23   case.  If you want to refer me to which one.

24             MR. MCCONVILLE:  Objection, relevance.

25             THE COURT:  What's the relevance for the reason of
```

48

```
 1    the dismissal?  I thought this was limited to the creation
 2    of Bratz and any statements.
 3                MR. QUINN:  It's the reason for the dismissal of
 4    the underlying case.
 5                THE COURT:  I'll sustain the objection.
 6    BY MR. QUINN:
 7    Q    If I could ask you to take a look at 13532.
 8    A    Got it.
 9    Q    Can you identify that document?
10    A    It says "Confidentiality Agreement and Proprietary
11    Information Agreement."
12    Q    Do you know who Michelle Thompson is?
13    A    I think she was in charge of HR.
14    Q    Is she somebody who reported to you back in 2000?
15    A    I don't remember if she reported to me or to the CFO or
16    to Isaac.
17    Q    Did you have responsibility for HR in 2000?
18    A    I had some responsibility for HR.
19    Q    Do you recognize this document here?
20    A    Vaguely.
21    Q    Do you see Isaac Larian's signature on page 13532-4?
22    A    Yes.
23                MR. QUINN:  We would offer this, Your Honor.
24                THE COURT:  Any objection?
25                MR. MCCONVILLE:  No.
```

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1            THE COURT:  Received.

2            (Exhibit 13532-4 received.)

3            MR. QUINN:  If we could put this up on the screen.

4    BY MR. QUINN:

5    Q    This is a Confidentiality Agreement and Proprietary

6    Information Agreement that was distributed to all MGA

7    employees?

8    A    That's what it says.

9    Q    It's dated August 10, 2000; is that correct?

10   A    Yes.

11   Q    We can see Isaac Larian's signature on -4 of the

12   exhibit?  That's his signature?

13   A    Yes.

14   Q    Is this a new form of agreement that was being

15   distributed in August of 2000?

16           MR. QUINN:  I'll withdraw that, Your Honor.

17   BY MR. QUINN:

18   Q    Do you see on the first page it says, "Here is the

19   newly revised MGA Entertainment Confidentiality Agreement"?

20   A    Yes.

21   Q    And also as well "the new Proprietary Information

22   Agreement"?

23   A    Yes.

24   Q    Do you recall that there were Confidentiality and

25   Proprietary Information Agreements that were in place at MGA

1   before these new ones were distributed?

2   A    I don't recall.

3   Q    You don't recall one way or the other?

4   A    I don't.

5   Q    Let's take a look at some of the terms of this

6   agreement that was distributed in August of 2000.  If you

7   would turn to -3.

8            MR. MCCONVILLE:  Objection, relevance.

9            THE COURT:  Overruled.

10  BY MR. QUINN:

11  Q    On page three, the paragraph at the bottom where it

12  says, "Employee further agrees that during his/her

13  employment and for a period of 12 months after termination

14  employee will not solicit the purchase of any products or

15  services from any supplier or vendor who supplies products

16  or services to the company."  Do you see that?

17  A    I do.

18  Q    Do you recall that being included in this form of

19  agreement that was distributed?

20  A    This is a ten-year-old document.  Do I have a memory of

21  this being there ten years ago, or are you asking if it's

22  there now?

23  Q    Only a lawyer could think to ask that question I'm

24  sure.

25            Do you have any recollection of that being an issue,

1  that MGA wanted to make sure that for 12 months after an

2  employee left MGA that they would not solicit the purchase

3  of any products or services from any supplier or vendor who

4  supplies products or services to the company?

5  A    What I believe is that this document was prepared by an

6  attorney that Michelle must have hired, and it must have

7  been distributed to the employees.

8  Q    If you could turn to -4, the heading at the top --

9         MR. QUINN:  If we could enlarge the top paragraph.

10 BY MR. QUINN:

11 Q    The heading is "Inventions Agreement, Assignment of

12 Interest."  Do you see that?

13 A    Yes.

14 Q    And we have this language, "Employee agrees to assign

15 and does hereby assign to Company all interest which

16 employee may have in all patentable and/or nonpatentable

17 ideas and/or inventions made or conceived by employee solely

18 or jointly with others during employee's employment with

19 Company.  The assignment shall not apply to any idea or

20 invention developed by employee entirely on employee's own

21 time without equipment, supplies, facilities, or trade

22 secrets information of Company unless such invention or

23 idea, one, relates to the business of Company or to

24 Company's actual or anticipated research or development,"

25 and then it goes on.  Do you see that?

1    A      I do.

2    Q      There is also a reference to California Labor Code

3    Section 2870, correct, in the last line?

4    A      Yes, I see that.

5    Q      Do you recall that there was an Invention Agreement

6    that was in place that referenced the California Labor Code

7    and applied to MGA employees?

8    A      Again, you are asking me something about a ten-year-old

9    document.  What's there is there.

10   Q      Then if you could turn to page -6, there is a heading

11   "Nonsolicitation of Customers, Clients and Vendors."  Do you

12   see that?

13   A      I do.

14   Q      That says, "Employee acknowledges that because of the

15   nature of employee's work for the Company employee

16   solicitation or serving of certain customers, clients, and

17   vendors related to employee's work for the Company would

18   necessarily involve the unauthorized use or disclosure of

19   proprietary information and the proprietary relationship and

20   goodwill of the Company.

21       "Accordingly, for one year following the termination of

22   employee's employment with the Company for any reason,

23   employee shall not directly or indirectly solicit, induce,

24   or attempt to solicit or induce, any person or entity then

25   known to be a customer or client or vendor of the Company

1   for whom or on whose behalf employee during the three-year

2   period immediately preceding the termination of employee's

3   employment performs any services or participated in the

4   preparation of any proposal to provide such work or services

5   to terminate his or her relationship with the Company for

6   any purpose," and then it goes on.

7       Do you recall there being a policy in place at MGA that

8   after employees left they were not to solicit customers,

9   clients, or vendors of MGA?

10  A    Please repeat your question.

11  Q    Do you recall there being a policy in place at MGA?

12  A    Based on this document, there was a policy.

13  Q    Finally -- and this will be the last section I will ask

14  you about -- on the next page, -7, paragraph 4,

15  "Nonsolicitation of Personnel," it says, "During employee's

16  employment with the Company and for one year thereafter,

17  employee shall not directly or indirectly solicit, induce,

18  or attempt to solicit or induce any person known to employee

19  to be an employee of the Company who directly or indirectly

20  engages in the business on behalf of the Company, each such

21  person a Company person, to terminate his or her employment

22  or other relationship with the Company for the purposes of

23  associating with any entity that engages in the business of

24  which the employee is or becomes an officer, director,

25  member, partner, principal, agent, employee, or consultant,

1    or (b) any competitor of the Company in the business or

2    otherwise encourage any Company person to terminate his or

3    her employment or other relationship with the Company for

4    any purpose, for other purpose, or no purpose."

5         Do you recall there was a policy in place at MGA that

6    employees agree that for one year after they left MGA they

7    wouldn't solicit employees from MGA to leave?

8    A    I don't recall this document.  I'm seeing it now

9    probably after ten years, so maybe you want to rephrase your

10   question so I don't have to --

11   Q    Do you recall that there was a policy in place at MGA

12   that employees were not -- if they left MGA, they were not

13   for one year to solicit MGA employees to leave and go into

14   business with them?

15   A    That's what this document says.

16   Q    Then if you would finally turn to -10 on the exhibit,

17   there is a significant there.

18        Can you tell us whose significant that is?

19   A    Isaac Larian.

20             MR. QUINN:  Nothing further.

21             THE COURT:  Cross-examination -- well, I want to

22   apologize to you.  I made a promise to the jury.

23             MR. MCCONVILLE:  I have got five minutes

24   literally, Your Honor.  Please.

25             THE COURT:  All right.

```
 1              MR. MCCONVILLE:  Thank you.

 2                      CROSS-EXAMINATION

 3  BY MR. MCCONVILLE:

 4  Q    Hello, Mr. Larian.

 5       The agreement that you were just looking at, Exhibit

 6  13532, do you know whether that policy was ever in fact

 7  implemented?

 8  A    I do not.

 9  Q    You were asked some questions about a lawsuit that you

10  filed against your brother.  Do you remember those

11  questions?

12  A    Yes.

13  Q    Isn't it true that the premise -- the reason you filed

14  that lawsuit was because you read a newspaper article that

15  said something about Bratz being created in 1999?

16  A    That was the major premise, yes.

17  Q    And then after you went through a proceeding involving

18  your brother --

19              MR. QUINN:  I object.  I was blocked from going

20  into reasons for -- and I am not going to have time for --

21              THE COURT:  Well, you will have because the

22  gentleman will be coming back.  You will have plenty of time

23  on both sides.

24              Counsel, please proceed.

25  BY MR. MCCONVILLE:
```

56

1    Q    You ultimately dropped that case against your brother?

2    A    I did.

3    Q    And you just testified that part of the reason you

4    dropped it was because of family concerns, right?

5    A    What I recall I said at the arbitration hearing --

6    after I saw some e-mails that MGA produced, I gave the

7    benefit of the doubt to Isaac that he didn't think of much

8    of Bratz when he bought my shares.  That's the major reason

9    I dropped the case.  That's what I said at the arbitration.

10   Q    So at the end, you dropped the case against your

11   brother?

12   A    I did.

13          MR. MCCONVILLE:  Thank you.  No further questions.

14                    REDIRECT EXAMINATION

15   BY MR. QUINN:

16   Q    Your brother got a judgment against you for $1 million

17   in attorneys' fees?

18   A    He did.

19   Q    After you dismissed the case against him?

20   A    He did.

21   Q    Has that judgment ever been satisfied?

22   A    No.

23   Q    So the million dollar obligation to your brother as a

24   legal matter is still out there?

25   A    No.

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

```
1    Q     It has been satisfied?

2    A     I guess legally you could say it has been because four

3    years has passed, and four years after an arbitration award

4    my understanding is that it becomes null and void.

5    Q     That's your understanding of the statute of limitations

6    on an arbitration award?

7    A     Yes.

8              MR. QUINN:  Thank you, Your Honor.

9              THE COURT:  Recross.

10                        RECROSS-EXAMINATION

11   BY MR. MCCONVILLE:

12   Q     Your brother never attempted to collect from you

13   because he promised he wouldn't, correct?

14   A     That's correct.

15   Q     And he made that same promise to your father?

16   A     He did.

17             MR. MCCONVILLE:  Thank you.

18             THE COURT:  Sir, we are placing all of the

19   witnesses on call.  The reason for that is I don't want the

20   inconvenience of additional subpoenas going out either

21   internationally or across the country.  Go about your

22   personal business, take any planned vacation, any profession

23   responsibilities.  If we need you, we will find, and we will

24   be courteous.  We need that until May 7.

25             Thank you, sir.  You may step down.
```

1          First of all, I am going to wish you a very nice

2    weekend.  Counsel will be joining me because of their

3    enthusiasm about this case at what time tomorrow, Counsel?

4          MR. QUINN:  6:00 a.m.

5          MR. MCCONVILLE:  6:00 a.m.

6          THE COURT:  Therefore, they are working very hard.

7    This case will come to you in a timely fashion

8    professionally and eventually understandable from both

9    sides.  All of you are going to have different personal

10   problems.  I promise you.  I just can't get 15 people

11   together without different issues.  Work that out.  Just

12   give me six hours a day.  If you can do that, this case will

13   come to all of you in a timely fashion.  If you don't and we

14   starting make huge exceptions, I promise you after this many

15   years of litigation, every one of you will have an issue.

16         So we will resume Tuesday at 8:30, but if you want

17   to vary the hours -- I know one of you has a commitment.

18   You may have a commitment in the future.  Somebody else may

19   have who has approached me.  Just give me those six hours a

20   day, and I don't care if we go to midnight.

21         Now, has anybody talked to anybody about the case

22   so I get to start all over again?  Don't do it.  There may

23   be additional notoriety in the press at different times

24   depending upon who testifies.  Obviously the case has

25   received press coverage.  I just want to take that on and

1    alert you.  It's out there.  If you think you recognize

2    anything about this case, turn it over right away.  That's

3    the best we can do.  We trust your efforts.

4              Good-night.  We will see you at 8:30 on Tuesday.

5              (Recess.)

6              (Jury not present.)

7              THE COURT:  We are on the record at 5:00 p.m. on

8    February 4, 2011.

9              There is a stipulation by counsel that the time

10   used by Mattel is 34 hours and 8 minutes.  Is that correct,

11   Mr. Keller?

12             MS. KELLER:  Yes, Your Honor.

13             THE COURT:  And the time used by MGA thus far is

14   25 hours and 8 minutes.  Is that correct, Ms. Hurst?

15             MS. HURST:  Yes, Your Honor.

16             THE COURT:  That's binding upon the parties.  Have

17   a wonderful weekend.

18                              -oOo-

19

20

21

22

23

24

25

1

2

3

4

5

6

7                               CERTIFICATE

8

9              I hereby certify that pursuant to Section 753,

10   Title 28, United States Code, the foregoing is a true and

11   correct transcript of the stenographically reported

12   proceedings held in the above-entitled matter and that the

13   transcript page format is in conformance with the

14   regulations of the Judicial Conference of the United States.

15

16   Date:  February 5, 2011

17

18
                              Sharon A. Seffens 2/5/11
19                            _____

20                            SHARON A. SEFFENS, U.S. COURT REPORTER

21

22

23

24

25

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER