QUINN EMANUEL URQUHART & SULLIVAN, LLP
  John B. Quinn (Bar No. 090378)
  johnquinn@quinnemanuel.com
  William C. Price (Bar No. 108542)
  (williamprice@quinnemanuel.com)
  Michael T. Zeller (Bar No. 196417)
  (michaelzeller@quinnemanuel.com)
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Attorneys for Mattel, Inc. and
Mattel de Mexico, S.A. de C.V.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| MATTEL, INC., a Delaware corporation, and Mattel de Mexico, S.A. de C.V., a Mexico entity,<br><br>Plaintiffs,<br><br>vs.<br><br>MGA ENTERTAINMENT, INC., a California corporation, et al.,<br><br>Defendants.<br><br>AND CONSOLIDATED ACTIONS | CASE NO. CV 04-9049 DOC (RNBx)<br>Consolidated with<br>Case No. CV 04-09059<br>Case No. CV 05-02727<br><br>Hon. David O. Carter<br><br>**MATTEL'S OFFER OF PROOF AND SUPPLEMENTAL BRIEF RE MGA'S MOTION *IN LIMINE* NO. 43 REGARDING THEFT OF NON-TRADE SECRET INFORMATION**<br><br>Hearing Date: TBD<br>Time: TBD<br>Place: Courtroom 9D<br><br>Pre-trial Conference: January 4, 2011<br>Trial: January 18, 2011 |

Pursuant to <u>Fed. R. Evid.</u> 103(a)(2), Mattel, Inc. and Mattel de Mexico (collectively "Mattel") hereby submits this offer of proof and supplemental brief regarding MGA's Motion *In Limine* No. 43.

## Preliminary Statement

The Court tentatively granted MGA's motion *in limine* No. 43 to exclude evidence that former Mattel employees copied, downloaded and took non-trade secret information from Mattel just prior to their departures to work for MGA. The Court found this evidence potentially admissible only to exculpate MGA. As a result, the Court tentatively permitted the introduction of such evidence conditioned on a limiting instruction that Mattel's "former employees did not do anything improper in appropriating such documents or information."

<u>Silvaco</u>, which the Court has cited as authority, did not imbue employees with the right to copy, download and take information from their employers based on a right of employee mobility. Federal and state criminal statutes and basic copyright law prohibit that, as do contracts the employees signed. CUTSA supersedes none of these obligations. The contemplated instruction that the employees had "entitlement to access and appropriate non-trade secret information" would contradict these statutes and the employees' agreements.

Moreover, the former Mattel employees' conduct in copying, downloading, taking and using non-trade secret information, along with trade secret information, is circumstantial evidence that proves theft, use and willfulness, all relevant to Mattel's misappropriation of trade secrets claim. For example, evidence that Dan Cooney, a former employee, took not only the trade secret he is alleged to have taken from Mattel to MGA, but at the same time also took a number of other files marked "Mattel, Inc. – Confidential," which MGA later added to its "shared" network drive and produced back to Mattel in this case, supports Mattel's claims that MGA knew of the misconduct and approved it. MGA denies any knowledge or involvement in the takings; it claims these were isolated acts taken against its

instructions. That the former Mattel employees targeted specific Mattel information – both trade secret and non-trade secret – and took volumes of that information to MGA, after meeting with MGA executives, tends to disprove MGA's denials of knowledge and intent. Evidence of the full story behind the takings of information tends to show they were part of a deliberate plan orchestrated by MGA, rather than isolated and sporadic episodes, and should be admitted without the contemplated limiting instruction.

## Statement of Facts and Offer of Proof

**Daniel Cooney.** Mattel alleges that MGA misappropriated the Merchant Modeling Optimization Tool ("MMOT") with embedded confidential and trade secret formulae taken by Dan Cooney from Mattel's computer systems to MGA.[1] In addition, Mattel has evidence that Mr. Cooney brought to MGA a promotional matrix and at least two other electronic files used by Mattel sales teams, which Mattel does not claim contained trade secrets. Mr. Cooney copied all these documents from his Mattel computer and took them to MGA.[2] According to Mr. Cooney, he copied the "promo matrix" file to the "Dan Files" CD to take to MGA because it was a "handy tool" he wanted to use in his "subsequent employment at MGA" and he thought it would be "more efficient" to take the documents from Mattel.[3]

Evidence will show that Mr. Cooney downloaded all these files to the "Dan Files" CD within a matter of days of being contacted by Ron Brawer about going to work for MGA. Mr. Cooney admits he copied the MMOT and the promo matrix to

---

[1] TX 21998B.
[2] Deposition Transcript of Daniel J. Cooney, Jr., dated Jan. 28, 2008 ("Cooney Depo. Tr."), at 90:2-23.
[3] Id. at 102:3-14, 102:24-103:5, 104:1-11, 123:24-124:23.

the "Dan Files" CD during this time.[4] He also admits he did not have Mattel's permission to copy and take the documents.[5] Mr. Cooney admits that, once at MGA, he uploaded the documents to his MGA computer.[6] In fact, soon after joining MGA, Mr. Cooney directed MGA personnel to store on the MGA share drive a version of the promo matrix that contained a "Mattel, Inc. – Confidential" footer and a reference to a Mattel promotion.[7] MGA produced several copies of the promo matrix still bearing a "Mattel, Inc. – Confidential" endorsement in the footer in this case.[8] A later version of the promo matrix produced by MGA shows a nearly identical spreadsheet, with the same reference to the Fisher Price promotion and the same "Mattel, Inc. – Confidential" footer, but with the footer changed to "MGA Entertainment – Confidential" midway through the document.[9]

**Janine Brisbois**. Within hours of speaking to Isaac Larian about leaving Mattel for MGA, Janine Brisbois began downloading documents from Mattel's computer system to a portable storage device.[10] When asked on her last day of employment at Mattel if she was taking anything with her, Ms. Brisbois said she was not.[11] If fact, Ms. Brisbois took to MGA more than 50 documents she had downloaded to a USB device.[12] Mattel alleges that fourteen of these contained trade secret information regarding Mattel's customers, sales, pricing, promotions, projects, advertising and strategy. Ms. Brisbois concedes that she accessed at least

---

[4] Id. at 28:20-31:12, 123:24-124:4, 145:17-146:6; TX 02133.
[5] Cooney Depo. Tr. at 124:24-125:13.
[6] Id. at 79:25-80:22, 84:10-18, 122:15-123:1.
[7] See TX 09840.
[8] See, e.g., TX 09836.
[9] See TX 23751.
[10] Deposition Transcript of Janine Brisbois, dated Dec. 9, 2009, at 150:5-25, 226:17-24.
[11] Deposition Transcript of Steve Totzke, dated Jan. 18, 2010, at 241:20-242:10.
[12] TX 08029.

one of the non-trade secret documents that she downloaded from her MGA laptop computer and used it as a template at MGA for MGA information.[13] She also admits to providing the finished product, which was derived from that Mattel information, to MGA's sales group, which included MGA Canada's president.[14]

**Machado, Trueba, and Vargas**. Mattel and Mattel Mexico allege that MGA and Machado misappropriated more than 60 documents containing trade secrets ranging from specific brand strategies to strategies for dealing with retailers. Machado, Trueba, and Vargas took these documents from the Mattel Mexico offices to MGA and MGA Mexico. In addition, Machado, Trueba, and Vargas brought to MGA over 50 other documents, such as presentations, media plans and brand comparisons, that Mattel does not claim contain trade secrets.

For more than two months before they resigned from Mattel in April 2004, Machado, Vargas and Trueba had regular communications with Isaac Larian, Susana Kuemmerle and Thomas Park.[15] Shortly after Machado met with Larian at the New York Toy Fair, Machado, Vargas and Trueba started downloading files to take with them for use at MGA Mexico.[16] At a later meeting in Mexico City, while still employed by Mattel, Machado and Vargas used Mattel information to prepare a presentation given to Larian, Kuemmerle, and Park in the W Hotel in Mexico City.[17] Machado, Vargas and Trueba each copied files from Mattel computers to a USB device provided by Mr. Machado.[18] As the USB device filled up with Mattel files,

---

[13] Id. at 306:14-24.
[14] Id. at 309:24-310:4.
[15] Machado Dep. Vol. 5 at 853:7-854:17, 858:2-7; Trial Ex. 8464 (Vargas declaration with translation at 6).
[16] Machado Dep. Vol. 3 at 199:21-204:12; Trueba Dep. Vol. 2 at 229:19-230:13; Trial Ex. 8464 (Vargas declaration with translation at 7-14).
[17] Machado Dep. Vol. 6 at 1033:20-1034:6; Machado Dep. Vol. 3 at 351:25-356:8; Trial Ex. 8464 (Vargas declaration with translation at 2-6).
[18] Id.

Case 2:04-cv-09049-DOC-RNB   Document 9826   Filed 02/08/11   Page 6 of 20   Page ID
 #:296093

Machado copied the files onto his personal laptop.[19]  Machado and Vargas admit they used the Mattel documents at MGA Mexico.[20]

While working for MGA, Machado copied some of these documents taken from Mattel to a compact disc with other MGA working files.[21]  He took that compact disc to his MGA Mexico office, and told at least one other MGA employee of the disc and its contents.[22]  As their competitive efforts against Mattel Mexico began to show in the marketplace, internal marketing reports show how proud the new team at MGA Mexico was of their efforts against their former employer.[23] These efforts were enabled by and incorporated the information taken from Mattel.[24]

In October 2005, Mexico law enforcement authorities executed a search warrant on the offices of MGA Mexico.[25]  During that search, the Mexican authorities found a compact disc and other hard copy documents in Machado's office and hard copy Mattel documents in the offices and on the desks of Vargas and Trueba.[26]  That day, Machado admitted to Kuemmerle that he had in his MGA Mexico office a compact disc containing files that he had taken from Mattel.[27]

The system information on the CD shows that a number of the files taken from Mattel were accessed after Machado, Vargas and Trueba left Mattel.  Two of those are files that do not contain Mattel trade secrets.  One, the 2004 Mexico retail

---

[19] Machado Dep. Vol. 3 at 218:13-219:16.
[20] Machado Dep. Vol. 5 at 702:8-22; Machado Depo. Vol. 6 at 1008:17-1009:1; Trial Ex. 8464 (Vargas declaration with translation at 16).
[21] Machado Dep. Vol. 3 at 224:1-225:16.
[22] Machado Dep. Vol. 3 at 227:3-6; Vargas Dep. Vol. 1 at 233:7-16.
[23] Trial Exs. 6746, 22307.
[24] Machado Dep. Vol. 5 at 702:8-22; Machado Depo. Vol. 6 at 1008:17-1009:1; Trial Ex. 8464 (Vargas declaration with translation at 16).
[25] MGA Mexico 30 (b)(6) Dep. Vol. 1 at 247:5-251:14.
[26] Machado Dep. Vol. 5, 689:6-690:11; Vargas Dep. Vol. 2 at 231:24-232:14, 298:7-19; MGA Mexico 30(b)(6) Dep. Vol. 1 at 271:14-21.
[27] MGA Mexico 30 (b)(6) Dep. Vol. 7 at 1634:14-1636:11.

00505.07975/3937887.12
-5-
MATTEL'S OFFER OF PROOF AND SUPPLEMENTAL BRIEF RE THEFT OF NON-TRADE SECRETS

price list, current on April 19, 2004, when they resigned, was accessed on April 28, 2004, when Machado and Vargas were meeting with Larian and other MGA executives at MGA's corporate headquarters in Los Angeles.[28]  The second, an agreement between Mattel and Sears, was delivered to MGA executives in the United States in an effort to justify making MGA's terms to Sears more favorable.[29]  On another non-trade secret Mattel price list located during the search, someone at MGA had placed a post-it note comparing MGA and Mattel prices charged to retailers.[30]

**Castilla**.  Mattel alleges that MGA misappropriated trade secrets relating to Mattel's forecasting and inventory management systems, as well as its 5-year international strategic plan, taken by Castilla from Mattel to MGA.  Mattel does not intend to introduce evidence that Castilla stole non-trade secret information.  To the contrary, Mattel will present evidence that Castilla stole the 71 documents and other information that are very much still being asserted as Mattel trade secrets and as to which the Court expressly found there are triable issues of fact for the jury.[31]

---

[28] Trial Exhibit 7127 (file information); Machado Tr. at 303:20-304:20; 305:8-22; 540:2-13 (traveling to Los Angeles and meeting with Larian); Trial Exhibit 20690 (Machado itinerary); see Trial Exhibit 7131 (file information showing 9/2004 file access).
[29] Trial Exhibit 7151; Vargas Tr. at 304:21-309:8.
[30] Trial Exhibit 7152.
[31] The Court recognized that the stolen forecasting and inventory management material "has tremendous value" and "would [have value to others] in the competitive situation in the same industry."  See Hearing Tr., dated Nov. 16, 2010, at 20:17-23:12.  Thus, in order to evaluate issues still in dispute – the trade secret status of the materials, the acquisition, disclosure and/or use by MGA, and the resulting damages – Mattel will offer evidence about these materials.

## Argument

### I. THE TAKING OF MATTEL NON-TRADE SECRET INFORMATION WAS IMPERMISSIBLE, WRONGFUL CONDUCT

The Court's contemplated limiting instruction would instruct the jury that former Mattel employees departing for a competitor did not do anything improper in downloading and taking Mattel documents or information that does not qualify as a trade secret and that the State of California permits employees to take these types of documents and information. However, each employee had specific legal duties *not* to copy, download and take Mattel information, which duties are not superseded.

#### A. Statutes Prohibit The Copying, Downloading and Taking of Non-Trade Secret Information From Mattel's Computers

California employee mobility policy does not trump statutes criminalizing the copying, downloading and taking of Mattel's information. Under the Computer Fraud and Abuse Act, it is criminal conduct punishable by imprisonment for up to five years if an individual "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains . . . information from any protected computer." See 18 U.S.C. § 1030(a)(2)(C); see also United States v. Willis, 476 F.3d 1121, 1125-26 (10th Cir. 2007) (affirming conviction for aiding and abetting § 1030(a)(2)(C) where employee exceeded authorized access and aided another to access a protected computer). The statute contains no requirement that the data used, copied or taken qualify as a "trade secret."

Similarly, under Cal. Penal Code § 502(c), it is criminal conduct when a person "(1) Knowingly accesses and without permission . . . uses any data, computer, computer system, or computer network in order to . . . wrongfully control or obtain . . . data;" or when he or she "(2) Knowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer network. . . ." This statute likewise does not require the data qualify as a trade secret. See People v. Hawkins, 98 Cal. App. 4th 1428, 1455-56

(2002) (affirming felony conviction under Cal. Penal Code § 502(c)(2) despite acquittal for misappropriation of a trade secret where former employee took computer code from his former employer's computer after termination and rejecting defendant's arguments offered in support of his denied motion to reduce his conviction to a misdemeanor based on "alleged vagueness and lack of a *mens rea* requirement").

These statutes apply to the information taken by the former employees at issue, including the non-trade secret information. Further, their access to the information for this purpose was unauthorized. See infra Part III. Trade secret status is irrelevant to an assessment whether a taking was wrongful – and criminal – under these statutes. As the Castilla plea demonstrates, the takings were wrongful, and unlawful.

### B. The Copyright Laws Prohibit the Copying, Downloading and Taking of Non-Trade Secret Information from Mattel

Copyright law independently prohibits copying, downloading and taking non-trade secret information from Mattel. Under the Copyright Act, the owner of the copyrighted work has the "exclusive rights to do and to authorize" the reproduction, preparation of derivative works, and distribution of copies of the copyrighted work. See 17 U.S.C. § 106. A person who infringes a holder's exclusives rights is not only subject to civil remedies, but can held criminally liable for willful infringement if such infringement is, as was the case here, for "commercial advantage." See 17 U.S.C. § 506. "[T]he Copyright Act does not distinguish between employees and non-employees. Rather, it distinguishes between authorized copying and unauthorized copying." Quantlab Techs. Ltd. (BVI) v. Godlevsky, 719 F. Supp. 2d 766, 773-774 (S.D. Tex. 2010) (denying motion to dismiss where former employee downloaded, without authorization, computer code onto a portable hard drive). Here, the former employees' copying was not authorized. The Court has previously

recognized that trade secret law does not preempt the Copyright Act.  See Amended Summary Judgment Order, dated Jan. 5, 2011 (Dkt. No. 9600), at 72-73.

### C. Contracts Prohibited The Takings As Well

In addition, the former Mattel employees' taking and disclosure of Mattel proprietary information – trade secret or not – independently violated their contracts with Mattel. Cooney and Brisbois were both bound by the Mattel, Inc. 2004 Code of Conduct Survey Agreement, which they signed and accepted, agreeing not to disclose "any nonpublic information that you learn, receive, or discovery in connection with your employment that relates to the business of Mattel or your Employer or one of their business partners (such as customers, suppliers, and licensees)."[32]  Machado, Vargas and Trueba signed similar agreements at Mattel Servicios, in which they agreed to "preserve [the employer's] documents and information in proper condition and to surrender them to the EMPLOYER whenever the EMPLOYER may so require or upon termination of this agreement, for whatever reasons," and not to "disclose any aspect of [Mattel]'s business and will not provide to third parties, whether orally or in writing, directly or indirectly, any information on the systems or activities of any kind. . . ." Trial Exs. 6401, 8137, 8467.

These contractual obligations not to take or disclose Mattel's information exist independent of Mattel's claims for theft of trade secrets.  CUTSA expressly "does not affect . . . contractual remedies, whether or not based upon misappropriation of a trade secret."  Cal. Civ. Code § 3426.7(b)(1); see, e.g., First Advantage Background Servs. Corp. v. Private Eyes, Inc., 569 F. Supp. 2d 929, 936 (N.D. Cal. 2008) (cases "based on breach of contract . . . are not preempted by CUTSA"); HiRel Connectors, Inc. v. United States, No. CV 01-11069, 2006 WL

---

[32]  Trial Exhibit 6902-2 to -3 (Brisbois); Trial Exhibit 2127-2 to -3 (Cooney).

3618008, at *1 n.1 (C.D. Cal. July 18, 2006) (breach of contract claim not preempted under CUTSA); <u>Removable Media Solutions v. AAR Mobility Sys.</u>, 2010 WL 3034219 (E.D. Cal. July 28, 2010) (no preemption under CUTSA for non-disclosure agreement and holding "argument that this implicit preemption extends to contract claims invokes a gross misreading of the caselaw"); <u>see also</u> <u>Glue-Fold, Inc. v. Slautterback Corp.</u>, 82 Cal. App. 4th 1018 (2000) (breach of a non-disclosure agreement claim to proceed in parallel with trade secret misappropriation claim). Mattel has located no California authority, concerning employee mobility or otherwise, that permits employees to take an employer's electronic documents or information in violation of their employment agreements.

Accordingly, Mattel respectfully submits the contemplated limiting instruction – that "former employees did not do anything improper in appropriating such documents or information" – would be legally erroneous and should not be given.

## II. THE FORMER EMPLOYEES' TAKING OF NON-TRADE SECRET INFORMATION IS RELEVANT AND ADMISSIBLE

Claims for misappropriation of trade secrets are often proved through circumstantial evidence. "Misappropriation and misuse can rarely be proved by convincing direct evidence. In most cases plaintiffs must construct a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences which convince him that it is more probable than not that what plaintiffs allege happened did in fact take place." <u>Uniram Tech. v. Taiwan Semiconductor Mfg. Co.</u>, 617 F. Supp. 2d 938 (N.D. Cal. 2007) (quotation omitted); <u>see also</u> <u>In re Dana Corp.</u>, 574 F.3d 129, 155 (2d Cir. 2009) (circumstantial evidence permitted inference that defendant knew of and ratified the theft by taking advantage of the misappropriation to improve its business); <u>Droeger v. Welsh Sporting Goods Corp.</u>, 541 F2d 790, 792 (9th Cir. 1976) (despite lack of direct evidence, circumstantial evidence created jury question); <u>SKF USA Inc. v. Bjerkness</u>, 2010 WL 3155981, at

*1 (N.D. Ill. Aug. 9, 2010) (theft of computer files was circumstantial evidence that defendants intended to use trade secrets to divert customers to competing business); Computer Sciences Corp. v. Computer Assocs. Int'l, Inc., 1999 U.S. Dist. LEXIS 21803 (C.D. Cal. Aug. 12, 1999) (misappropriation may be inferred from ambiguous circumstantial evidence); Joseph E. DiLoreto, Inc. v. O'Neill, 1 Cal. App. 4th 149, 161 (1991) (evidence of misappropriation may be circumstantial); Hanger Prosthetics & Orthotics, Inc. v. Capstone Orthopedic, Inc., 556 F. Supp. 2d 1122, 1125-26 (E.D. Cal. 2008) (similar).

For example, in SKF USA, the plaintiff sued former employees under the Illinois Trade Secrets Act (which is primarily based on the Uniform Trade Secret Act) for misappropriation. 2010 WL 3155981, at *1 (N.D. Ill. Aug. 9, 2010). Plaintiff alleged that after a managerial employee left for a competitor, three additional employees followed, and downloaded thousands of documents they then took to the competitor. The court found defendants liable, after a bench trial, holding that "[d]efendants' theft of thousands of computer files is circumstantial evidence that they intended to use SKF's trade secrets to accomplish the diversion" of customers to the competing business. Id. at *8. This was in spite of the fact that only four categories of taken information constituted confidential information and that "not every piece of confidential information is a trade secret." Id. at *6.

Similarly, as set forth with greater specificity below, evidence of the full scope and circumstances surrounding the former Mattel employees' improper downloading, taking and use of Mattel documents, including non-trade secret documents, is part of the web of evidence Mattel will use to prove its case. Evidence that former employees, after communicating with MGA executives, downloaded and took *massive* amounts of Mattel documents and information (trade secret and non-trade secret alike) tends to show the information was not taken randomly or for the departing employee's sole use, but instead was taken to be used at MGA. The scope of the takings tends to show they were part of a deliberate plan

orchestrated by MGA and not isolated occurrences, and it shows willfulness. Evidence that documents labeled "Confidential – Mattel" were taken to MGA and used there -- even non-trade secret documents -- rebuts MGA's claims that it had no use for Mattel's information. MGA insists that it "adopted specific procedures to instruct employees not to take, or to bring, Mattel information, thus demonstrating that it had no desire to use such information."[33] Mattel should be permitted to respond to that claim by showing the jury the vast breadth of the information that was taken. See In re Dana Corp., 574 F.3d 129, 155-58 (2d Cir. 2009) (reversing grant of summary judgment and discussing, at length, circumstantial evidence of trade secret theft that court should have considered); Greenberg v. Croydon Plastics Co., Inc., 378 F. Supp. 806, 814 (D.C. Pa. 1974) ("Misappropriation and misuse can rarely be proved by convincing direct evidence. In most cases plaintiffs must construct a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences which convince him that it is more probable than not that what plaintiffs allege happened did in fact take place. Against this often delicate construct of circumstantial evidence there frequently must be balanced defendants and defendants' witnesses who directly deny everything.").

Mattel's presentation of its case should not be artificially circumscribed or truncated; the jury should be permitted to see the whole scope of the wrongful conduct. C.f. Old Chief v. United States, 519 U.S. 172, 186-187 (1997) (holding that "the prosecution is entitled to prove its case by evidence of its own choice, or, more exactly, . . . a criminal defendant may not stipulate or admit his way out of the full evidentiary force of the case as the Government chooses to present it."); In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Products Liability Litigation, 369 F.3d 293, 314 (3rd Cir. 2004) (recognizing that a jury "properly

---

[33] See MGA Parties' Opposition to Mattel's Motion for Partial Summary Judgment, dated Oct. 29, 2010 (Dkt. No. 9219).

weighs fact questions in the context of a coherent picture of the way the world works" and finding reversible error where trial court "[u]nduly sterliz[ed]" a party's "trial presentation" by excluding contextual evidence necessary for the party to present a "compelling and coherent exposition of the facts").

### A. Daniel Cooney

MGA has repeatedly asserted that it told departing employees not to bring any Mattel information with them, and that if they did it was without MGA's knowledge. MGA does not claim that it limited its purported instruction to the former Mattel employees to trade secret information; MGA claims it "adopted specific procedures to instruct employees not to take, or to bring, Mattel information, thus demonstrating that it had no desire to use such information."[34] Evidence that Mr. Cooney not only took to MGA a Mattel document with the designation "Mattel, Inc. – Confidential" still in the footer, but also openly instructed MGA personnel to upload the document to MGA's share drive undercuts these claims. It casts doubt on the bona fides of the purported instruction on which MGA relies for its primary defenses -- MGA's claimed lack of knowledge and lack of "desire" to use Mattel information. Having put the matter in issue by claiming that it told Mattel employees not to bring any Mattel information with them, MGA should not be permitted to exclude evidence that shows its knowing use of documents labeled "Mattel, Inc. – Confidential," in plain contradiction of its main defenses.

In addition, the timing of Mr. Cooney's downloading relative to his communications with Mr. Brawer undercuts MGA's efforts to separate itself from the taking of the document. Evidence that Mr. Cooney downloaded a number of Mattel documents to the "Dan Files" CD in close proximity to his call with Mr.

---

[34] See MGA Parties' Opposition to Mattel's Motion for Partial Summary Judgment, dated Oct. 29, 2010 (Dkt. No. 9219).

Brawer, not just the single MMOT, tends to demonstrate that the timing of the downloading of the MMOT is not a matter of coincidence. Evidence that Mr. Cooney downloaded other Mattel documents after speaking with Mr. Brawer and shortly before giving notice also tends to show that Cooney's representation during his exit interview that he had returned all Mattel documents[35] was not an oversight or innocent mistake concerning a single document, but rather a deliberate lie to conceal what he knew to be wrongful conduct.

Further, evidence that Mr. Cooney took from Mattel and brought to and used at MGA a document with the designation "Mattel, Inc. – Confidential" is evidence that tends to show that MGA knew or had reason to know that he had acquired the MMOT by "improper means." It is evidence which suggests that "at best, [MGA] 'turned a blind eye' to what was happening." See, e.g., Ajaxo Inc. v. E*Trade Group, Inc., 135 Cal. App. 4th 21, 68 (2005) (reversing grant of nonsuit on damages for trade secret misappropriation in technology trade secret case under CUTSA and holding that it was "unreasonable to believe" that trade secret acquirer "did not have the opportunity to look into the source" of technological trade secrets misappropriated in the company's technology and "that there was substantial evidence from which the jury could have concluded that [the acquirer's] top management had the opportunity to know of and either ignore or actually approve of Baca's theft of Ajaxo's trade secret.").

Mattel should be permitted to introduce evidence regarding the following additional Mattel documents taken by Mr. Cooney as well evidence of the file names of other documents downloaded to the "Dan Files" CD without a limiting instruction that Mr. Cooney was entitled to access and appropriate such documents and information: TX 02120; TX 02121; TX 09836; TX 09840; TX 23751.

---

[35] See TX 2138; TX 2134; Cooney Depo. Tr. at 192:20-193:20, 200:15-21, 210:7-17.

### B. <u>Janine Brisbois</u>

MGA argues that Mattel should not be able to say a word about the taking of the more than 50 documents Brisbois took to MGA other than the 14 that have been identified as trade secrets. But the sheer volume of the documents downloaded by Ms. Brisbois after speaking with Mr. Larian is relevant. Ms. Brisbois admits she targeted specific documents because they would be useful in the future.[36] The breadth of her taking, coupled with its proximity to her call with Mr. Larian, casts doubt on MGA's claim that it had "no desire" to use Mattel information and undercuts MGA's claims that it instructed Mattel employees not to take anything and understood that they had complied. The sheer volume of the documents taken by Ms. Brisbois also tends to show that her denial to Mattel that she took anything with her was not an oversight or innocent mistake, but rather a deliberate lie to conceal what she knew to be wrongful conduct – this is proof of intentional, wrongful conduct by an MGA agent. <u>See</u>, <u>e.g.</u>, <u>Silvaco</u>, 184 Cal. App. 4th at 225 n.7 ("[Defendant] can of course . . . conduct the entire misappropriation, *vicariously*, e.g., through an agent." (emphasis in original)); <u>Hanger Prosthetics & Orthotics, Inc. v. Capstone Orthopedic, Inc.</u>, 556 F. Supp 2d 1122, 1134-35 (E.D. Cal. 2008) (denying summary judgment because, among other things, defendant had offered financial incentives to and had communicated with competitor's employees before their termination of employment); Cal. Civ. Code § 2339.

Further, as noted, Ms. Brisbois concedes that she accessed at least one of the non-trade secret documents at MGA, used it as a template, and then provided the finished product, which was derived from that Mattel information, to MGA's sales group, which included MGA Canada's president. Evidence that a Mattel document

---

[36] <u>See</u>, <u>e.g.</u>, Brisbois Depo Tr. at 204:16-20, 210:6-10, 211:22-24.

was used in this way at MGA undercuts the plausibility of MGA's denials of knowledge and intent.

Mattel should be permitted to introduce evidence regarding the following Mattel documents taken by Janine Brisbois without a limiting instruction that Ms. Brisbois was entitled to access and appropriate such documents and information: TX 06935; TX 06920; TX 06921; TX 06962; TX 06936; TX 06939; TX 06940; TX 06960; TX 06941; TX 06950; TX 06952; TX 07793; TX 06954; TX 07794; TX 06924; TX 06925; TX 06926; TX 06959; TX 06928; TX 06927; TX 06929; TX 06930; TX 06933; TX 06931; TX 06932; TX 06961;  TX 06966; TX 06967; TX 06969; TX 06963; TX 20360; TX 20361; TX 20362; TX 20363; TX 06915.

### C. Machado, Trueba, and Vargas

Machado is a party. His intent, his willful and malicious conduct, and the scope of his theft are relevant. All of the documents that he stole inform the jury's assessment of those issues.

Independently, the taking and use of the non-trade secret documents intermingled with the stolen trade secret documents, is circumstantial evidence that the stolen documents containing the trade secret documents were used at MGA's offices. As set forth above, at least two of the stolen non-trade secret documents were accessed at MGA, including one on April 28, 2004, when Machado and Vargas were meeting with Larian and other executives at MGA's corporate headquarters in Los Angeles.[37] In addition, the evidence shows the MGA personnel delivered the terms of an agreement between Mattel and Sears to MGA executives in the United States in an effort to justify making MGA's terms to Sears more

---

[37] Trial Exhibit 7127 (file information); Machado Tr. at 303:20-304:20; 305:8-22; 540:2-13 (traveling to Los Angeles and meeting with Larian); Trial Exhibit 20690 (Machado itinerary); see Trial Exhibit 7131 (file information showing 9/2004 file access).

favorable, and they used a Mattel price list to compare MGA and Mattel wholesale product prices.[38]  This direct evidence of use of Mattel information strongly supports Mattel's claim that MGA used the stolen trade secrets, particularly when accompanied by Machado and Trueba's convenient lack of memory about using the documents they took from Mattel.[39]

Moreover, as above, the volume of documents stolen, trade secret and non-trade secret, is also part of Mattel's case to the jury to show with convincing force a high probability that Machado, Trueba, and Vargas misappropriated the trade secrets on MGA's behalf and to harm Mattel willfully or with malice.  <u>Ajaxo, Inc. v. E*Trade Group, Inc.</u>, 135 Cal. App. 4th 21, 66-67 (2005).

Mattel should be permitted to introduce evidence regarding the following Mattel documents taken by Machado, Vargas and Trueba without a limiting instruction that they were entitled to access and appropriate such documents and information: TX 6444, TX 6460, TX 6461, TX 6692 , TX 6720, TX 6725, TX 6726, TX 6728, TX 6737, TX 7092, TX 7093, TX 7094, TX 7097, TX 7098, TX 7099, TX 7101, TX 7102, TX 7105, TX 7111, TX 7114, TX 7125, TX 7127, TX 7128, TX 7129, TX 7131, TX 7135, TX 7136, TX 7143, TX 7144, TX 7145, TX 7146, TX 7147, TX 7149, TX 7150, TX 7151, TX 7152, TX 7153, TX 7154, TX 7157, TX 7158, TX 8478, TX 8564, TX 20303, TX 20306, TX 20308, TX 20376, TX 25925, TX 25926, TX 25928, TX 25930, TX 25931 and TX 26122.[40]

All of this evidence, especially when combined together, is relevant to prove the intentional pattern of misconduct that Mattel has alleged.  To prove willfulness, Mattel should be permitted to show the jury a detailed story.  Mattel should be able to show and explain how these were orchestrated thefts of large quantities of Mattel

---

[38] Trial Exhibit 7151; Vargas Tr. at 304:21-309:8; Trial Exhibit 7152.
[39] <u>E.g.</u>, Machado Tr. at 242:7-243:17, 801:5-14, 1145:4-1146:15.
[40] Including any duplicate exhibits, if any.

documents. Machado, Vargas and Trueba alone misappropriated more than 15,000 pages of Mattel documents, not to mention the other former employees; that volume defeats MGA's claims that these were random, innocent mistakes, and it shows willfulness. A reasonable jury could find that numerous employees' acts of selecting large quantities of the most helpful documents while still employed at Mattel and then taking them to MGA was intentional and willful MGA misconduct. This proof should be admitted.

### III. INDUCING MATTEL EMPLOYEES TO BREACH THEIR CONTRACTUAL OBLIGATIONS AND DUTIES OF LOYALTY TO MATTEL BY UNLAWFULLY ACCESSING MATTEL INFORMATION IS INDEPENDENTLY ACTIONABLE

Cooney and Brisbois each accessed a number of non-trade secret files on Mattel's computer network and computers that they did not have authority to access. By accessing this information for purposes unrelated to their work at Mattel, to assist MGA and with MGA's encouragement, Cooney and Brisbois violated duties to Mattel that exist independent of their duty not to steal Mattel's trade secrets – duties that are not preempted.

Brisbois and Cooney agreed to be bound by Mattel's 2004 Code of Conduct. In so doing they agreed to "only use or disclose such [Mattel] information as necessary to perform job responsibilities" at Mattel.[41] In addition, applicable statutes required Brisbois and Cooney to be loyal to Mattel and not to help a competitor. Cal. Labor Code § 2863; Hangar Prosthetics & Orthotics, Inc. v. Capstone Orthopedic, Inc., 556 F. Supp. 2d 1122 (E.D. Cal. 2008); Otsuka v. Polo Ralph Lauren Corp., 2007 WL 3342721, at * 3 (N.D. Cal. Nov. 9, 2007). Mattel's claims for intentional interference with contract and aiding and abetting breach of

---

[41] TX 6902.

duty of loyalty are based, in part, on breach of these duties. Even if claims predicated on wrongful *use, disclosure or acquisition* of confidential information are preempted by CUTSA, a claim based on wrongful *accessing* of such information is not preempted because it is "not based upon misappropriation of a trade secret." Cal. Civ. Code § 3426.7(b). Claims, like Mattel's here, based on inducing wrongful access of Mattel information in violation of contractual and statutory obligations, are not preempted. Accordingly, the fact of this unauthorized access should be admitted as directly relevant to Mattel's non-trade secret state law tort claims as well.

## Conclusion

For the foregoing reasons, Mattel respectfully renews its request that the Court deny MGA's Motion *In Limine* No. 43 in its entirety and that Mattel be permitted to introduce evidence and argument regarding the downloading and taking of the documents identified above without a limiting instruction that the former Mattel employees were entitled to access and appropriate these documents and/or did not do anything improper in doing so.

DATED: February 8, 2011      QUINN EMANUEL URQUHART & SULLIVAN, LLP

By /s/ Michael T. Zeller
   Michael T. Zeller
   Attorneys for Mattel, Inc. and
   Mattel de Mexico, S.A. de C.V.