1           **UNITED STATES DISTRICT COURT**

2           **CENTRAL DISTRICT OF CALIFORNIA**

3        **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4                    - - - - - - -

5
   MATTEL, INC., et al.,              )
6                                     )
            Plaintiffs,               )
7                                     )
        vs.                           ) No. CV 04-9049 DOC
8                                     )    Day 14
   MGA ENTERTAINMENT, INC., et al.,   )    Volume 1 of 3
9                                     )
                                      )
10          Defendants.               )
   _____ )
11

12

13

14          REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                    Jury Trial

16               Santa Ana, California

17             Tuesday, February 8, 2011

18

19

20

21   Debbie Gale, CSR 9472, RPR, CCRR
     Federal Official Court Reporter
22   United States District Court
     411 West 4th Street, Room 1-053
23   Santa Ana, California 92701
     (714) 558-8141
24

25   04cv9049 Mattel 2011-02-08 D14V1

Case 2:04-cv-09049-DOC-RNB   Document 9844   Filed 02/10/11   Page 2 of 157   Page ID #:297005
CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

2

1    **APPEARANCES OF COUNSEL:**

2

     FOR PLAINTIFF MATTEL, INC., ET AL.:

3

              QUINN EMANUEL URQUHART & SULLIVAN
4             BY:  JOHN QUINN
                   WILLIAM PRICE
5                  MICHAEL T. ZELLER
                   Attorneys at Law
6             865 South Figueroa Street
              10th Floor
7             Los Angeles, California 90017
              (213) 443-3000

8

9

10

11   FOR DEFENDANT MGA ENTERTAINMENT, INC., ET AL:

12            ORRICK, HERRINGTON & SUTCLIFFE, LLP (Irvine)
              BY:  THOMAS S. McCONVILLE
13                 Attorney at Law
              4 Park Plaza
14            Suite 1600
              Irvine, California 92614
15            (949) 567-6700

16            - AND -

17            ORRICK, HERRINGTON & SUTCLIFFE, LLP (SF)
              BY:  ANNETTE L. HURST
18                 Attorney at Law
              405 Howard Street
19            San Francisco, California 94105
              (415)773-5700

20            - AND -

21            KELLER RACKAUCKAS
22            BY:  JENNIFER KELLER
                   Attorney at Law
23            18500 Von Karman Avenue
              Suite 560
24            Irvine, California 92612
              (949) 476-8700

25

1      **APPEARANCES OF COUNSEL (Continued):**

2

3      FOR CARLOS GUSTAVO MACHADO GOMEZ:

4
               LAW OFFICES OF MARK E. OVERLAND
5              By:  MARK E. OVERLAND
                   Attorney at Law
6              100 Wilshire Boulevard
               Suite 950
7              Santa Monica, California 90401
               (310) 459-2830
8
               - AND -
9
               SCHEPER KIM & HARRIS LLP
10             BY:  ALEXANDER H. COTE
                   Attorney at Law
11             601 West 5th Street
               12th Floor
12             Los Angeles, California 90071
               (213) 613-4660
13

14     ALSO PRESENT:

15             MGA ENTERTAINMENT, INC.
               BY:  JEANINE PISONI
16                 Attorney at Law
               16360 Roscoe Boulevard
17             Suite 105
               Van Nuys, California 91406
18

19             ROBERT ECKERT, Mattel CEO

20             ISAAC LARIAN, MGA CEO

21             KEN KOTARSKI, Mattel Technical Operator

22             MIKE STOVALL, MGA Technical Operator

23             RACHEL JUAREZ, Quinn Emanuel Urquart & Sullivan

24

25

Case 2:04-cv-09049-DOC-RNB   Document 9844   Filed 02/10/11   Page 4 of 157   Page ID #:297007
CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

4

1                          **I N D E X**

2  **WITNESSES**                **DIRECT  CROSS  REDIRECT  RECROSS**

3  MAURUS, Jennifer

4  By Mr. Quinn                    6               105

5  By Ms. Keller                          35                  125

6

7  LARIAN, Isaac

8
   By Mr. Price                   129
9

10

11                          **EXHIBITS**

12  **EXHIBIT NO.**                      **IDENTIFICATION   IN EVIDENCE**

13   1100     E-mail from Ms.                            141
             Treantafelles to
14           Mr. Larian dated
             12/13/2000
15
     11152    E-mail from Ms. Maurus                      59
16            to Mr. Larian dated
             11/13/2002
17
     11336    E-mail from Ms. Maurus                      17
18            to marketing team re:
             sales road show
19
     21374    E-mail from Mr. Larian                     137
20            to Mr. Feist dated
             4/25/2001
21
     34686    Attorney-Client Fee                         36
22            Agreement for Ms. Maurus

23   34690    E-mail from Ms. Maurus                       68
             to Mr. Larian dated
24           12/7/2000

25

|       |    | **SANTA ANA, CALIFORNIA, TUESDAY, FEBRUARY 8, 2011** |
|-------|----|-----|
|       | 1  | **SANTA ANA, CALIFORNIA, TUESDAY, FEBRUARY 8, 2011** |
|       | 2  | **Day 14, Volume 1 of 3** |
|       | 3  | (8:44 a.m.) |
| 08:44 | 4  | *(In the presence of the jury.)* |
| 08:44 | 5  | THE COURT:  All right.  The jury's present, |
| 08:44 | 6  | alternates.  All counsel are present.  The parties are |
| 08:44 | 7  | present. |
| 08:44 | 8  | Counsel, thank you for your courtesy.  Would you |
| 08:44 | 9  | please be seated. |
| 08:44 | 10 | Counsel on behalf of Mattel, would you call your |
| 08:44 | 11 | next witness, please. |
| 08:44 | 12 | MR. QUINN:  Yes, Your Honor.  We'd call Jennifer |
| 08:44 | 13 | Maurus. |
| 08:44 | 14 | THE COURT:  Thank you very much, Ms. Maurus.  If |
| 08:44 | 15 | you would be kind enough to step forward and raise your |
| 08:44 | 16 | right hand, please. |
| 08:44 | 17 | **JENNIFER MAURUS, MATTEL'S WITNESS, SWORN** |
| 08:45 | 18 | THE WITNESS:  Yes. |
| 08:45 | 19 | THE COURT:  Thank you.  If you would come up to |
| 08:45 | 20 | the jury box and state your full name to the jury and spell |
| 08:45 | 21 | your last name. |
| 08:45 | 22 | THE WITNESS:  Jennifer Lynn Maurus, M-A-U-R-U-S. |
| 08:45 | 23 | THE COURT:  Thank you. |
| 08:45 | 24 | Direct examination by Mr. Quinn on behalf of |
| 08:45 | 25 | Mattel. |

| 08:45 | 1 | MR. QUINN:  Thank you, Your Honor. |
|---|---|---|
| 08:45 | 2 | **DIRECT EXAMINATION** |
| 08:45 | 3 | BY MR. QUINN: |
| 08:45 | 4 | Q.   Good morning, Ms. Maurus. |
| 08:45 | 5 | A.   Good morning. |
| 08:45 | 6 | Q.   What do you do for a living? |
| 08:45 | 7 | A.   I'm a sales executive and consultant. |
| 08:45 | 8 | Q.   And what is the name of your employer? |
| 08:45 | 9 | A.   Helical Plane. |
| 08:45 | 10 | Q.   Where are they located? |
| 08:45 | 11 | A.   The company is incorporated in Washington; main office |
| 08:45 | 12 | is in San Francisco, and I work from Los Angeles. |
| 08:45 | 13 | Q.   At one point you worked for MGA? |
| 08:46 | 14 | A.   Yes. |
| 08:46 | 15 | Q.   During what time period did you work for MGA? |
| 08:46 | 16 | A.   From June 1999 until December 2001. |
| 08:46 | 17 | Q.   So we'll come back to that, but first, could you tell |
| 08:46 | 18 | the jury a little bit about your educational background. |
| 08:46 | 19 | A.   I have of a bachelor in finance from San Diego State |
| 08:46 | 20 | University. |
| 08:46 | 21 | Q.   And when was it that you got that? |
| 08:46 | 22 | A.   May 1993. |
| 08:46 | 23 | Q.   And after getting your degree in finance, did you go |
| 08:46 | 24 | into the -- did you get a job? |
| 08:46 | 25 | A.   Yes. |

CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

7

| 08:46 | 1 | Q.   And what was your first job? |
| 08:46 | 2 | A.   It was a job at Mutual of New York. |
| 08:46 | 3 | Q.   And what did you do there? |
| 08:46 | 4 | A.   I was a marketing associate and licensed life and |
| 08:46 | 5 | health insurance agent. |
| 08:46 | 6 | Q.   And what kind of things did you do in that position? |
| 08:46 | 7 | A.   I sold life and health insurance.  I took over, um, |
| 08:46 | 8 | accounts from other agents that left, what were called |
| 08:47 | 9 | orphan accounts, and I put together marketing programs. |
| 08:47 | 10 | Q.   How long did you work for Mutual of New York? |
| 08:47 | 11 | A.   I'd say about a year and a half. |
| 08:47 | 12 | Q.   And what was your next job? |
| 08:47 | 13 | A.   I worked for a company called Advanced Marketing |
| 08:47 | 14 | Services.  I was a marketing manager. |
| 08:47 | 15 | Q.   And when was it that you started with them? |
| 08:47 | 16 | A.   I believe it was the summer of 1995. |
| 08:47 | 17 | Q.   What kinds of things did you do with that organization? |
| 08:47 | 18 | A.   I was an account manager.  I was a book distributor.  I |
| 08:47 | 19 | was an account manager on the Sam's Club account, so I |
| 08:47 | 20 | presented book titles to the Sam's Club buyer, put together |
| 08:47 | 21 | marketing and advertising programs, oversaw the ordering and |
| 08:47 | 22 | replenishment ordering for the clubs; various others sales |
| 08:47 | 23 | and marketing activities. |
| 08:47 | 24 | Q.   So you say "the clubs," is this Sam's Clubs? |
| 08:47 | 25 | A.   Yes. |

CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

8

| 08:47 | 1 | Q.   And can you tell us whether or not that was an |
| 08:47 | 2 | important account for your employer? |
| 08:47 | 3 | A.   Yes.  It was the largest account. |
| 08:47 | 4 | Q.   Do you have any idea what the total revenue was for |
| 08:47 | 5 | that account that you were responsible for? |
| 08:48 | 6 | MS. KELLER:  Objection, Your Honor. |
| 08:48 | 7 | THE COURT:  Overruled. |
| 08:48 | 8 | THE WITNESS:  At the time I was there, it was |
| 08:48 | 9 | about $240 million per year. |
| 08:48 | 10 | BY MR. QUINN: |
| 08:48 | 11 | Q.   And that was the account that you were responsible for? |
| 08:48 | 12 | A.   Yes. |
| 08:48 | 13 | Q.   And what was your next job? |
| 08:48 | 14 | A.   After that I worked at MGA. |
| 08:48 | 15 | Q.   And you started there in 1999, did you tell us? |
| 08:48 | 16 | A.   Yes. |
| 08:48 | 17 | Q.   What month was it, if you recall? |
| 08:48 | 18 | A.   June. |
| 08:48 | 19 | Q.   What was your first position at MGA? |
| 08:48 | 20 | A.   Sales analyst. |
| 08:48 | 21 | Q.   And as a sales analyst, what were your job duties? |
| 08:48 | 22 | A.   I was hired to work on the Walmart team to analyze the |
| 08:48 | 23 | sales trends business and facilitate what -- sales with the |
| 08:48 | 24 | account. |
| 08:48 | 25 | Q.   Can you give us some idea how important the Walmart |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

| | | |
|---|---|---|
| 08:48 | 1 | account was to MGA at that time? |
| 08:48 | 2 | A.   It was one of the top three or four revenue-producing |
| 08:48 | 3 | accounts for the company. |
| 08:48 | 4 | Q.   You said you were a sales analyst when you first |
| 08:49 | 5 | started at MGA.  Did you later have some other position? |
| 08:49 | 6 | A.   Yes. |
| 08:49 | 7 | Q.   Were you promoted? |
| 08:49 | 8 | A.   Yes. |
| 08:49 | 9 | Q.   What was your next position at MGA? |
| 08:49 | 10 | A.   District sales manager. |
| 08:49 | 11 | Q.   And what was about -- you were promoted to that |
| 08:49 | 12 | position of district sales manager about how long after you |
| 08:49 | 13 | started at MGA? |
| 08:49 | 14 | A.   I was given a sales territory within a couple months, |
| 08:49 | 15 | and the promotion was officially announced, I believe, in |
| 08:49 | 16 | December of 1999. |
| 08:49 | 17 | Q.   What were your duties as the district sales manager? |
| 08:49 | 18 | A.   I continued to work on the sale -- on the Walmart |
| 08:49 | 19 | account, and in addition, I was given a territory of the |
| 08:49 | 20 | West Coast.  So I managed all of the retail accounts that |
| 08:49 | 21 | fell within the West Coast territory.  And the rep -- I |
| 08:49 | 22 | managed the rep groups also that were -- oversaw the same |
| 08:49 | 23 | territory. |
| 08:49 | 24 | Q.   So were you later promoted to another position? |
| 08:49 | 25 | A.   Yes. |

CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

10

08:49  1    Q.    What was your next position at MGA?

08:49  2    A.    Sales manager, national accounts.

08:50  3    Q.    Roughly when did you -- were you promoted to sales

08:50  4    manager for national accounts?

08:50  5    A.    Sometime in 2000, I don't remember exactly.

08:50  6    Q.    As the sales manager for national accounts, what were

08:50  7    your job duties?

08:50  8    A.    Um, I had responsibility over one of the national

08:50  9    chains, and it varied throughout the time I held that

08:50  10   position.  And in addition, I had a large territory of other

08:50  11   states, and I managed the accounts within those states,

08:50  12   either directly, or I managed the rep groups that worked

08:50  13   within those states, as well.

08:50  14   Q.    You referred to having responsibility for national

08:50  15   chains.  Can you tell us what those chains were?

08:50  16   A.    Uh, yes.  I worked on the Walmart account.  I also was

08:50  17   placed on the Target accounts for a period of time.  And I

08:50  18   also was placed on Kmart for a period of time.

08:51  19   Q.    Were these the most important national accounts at MGA?

08:51  20   A.    Uh, yes.  They were among the most, yes.

08:51  21   Q.    And you've told us that you left MGA at the end of

08:51  22   2001?

08:51  23   A.    Yes.

08:51  24   Q.    And was the sales manager for national accounts the

08:51  25   last position that you held at MGA?

CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

| | | |
|---|---|---|
| 08:51 | 1 | A.   Yes. |
| 08:51 | 2 | Q.   All right.  At the time that you worked for MGA, before |
| 08:51 | 3 | the summer of 2000, would you tell us what the business of |
| 08:51 | 4 | MGA was? |
| 08:51 | 5 | A.   It was a toy manufacturer.  And we specialized in |
| 08:51 | 6 | electronic toys within several toy categories. |
| 08:51 | 7 | Q.   Can you give us some examples? |
| 08:51 | 8 | A.   Yes.  We sold products -- or we made and sold products |
| 08:51 | 9 | that fell within boys' electronics, miscellaneous toys, and |
| 08:51 | 10 | special feature large dolls. |
| 08:52 | 11 | Q.   So there was -- MGA did have some doll products at that |
| 08:52 | 12 | time before the summer of 2000? |
| 08:52 | 13 | A.   Yes. |
| 08:52 | 14 | Q.   Did MGA have any fashion doll products that it offered |
| 08:52 | 15 | before the summer of 2000? |
| 08:52 | 16 | A.   No. |
| 08:52 | 17 | Q.   Do you have an understanding of what a fashion doll is? |
| 08:52 | 18 | A.   Yes. |
| 08:52 | 19 | Q.   And what does a fashion doll mean to you? |
| 08:52 | 20 | A.   It's a small-scale doll that -- like a Barbie doll, |
| 08:52 | 21 | that has fashions that you can dress and undress. |
| 08:52 | 22 | Q.   Hair an important part of that as well? |
| 08:52 | 23 | A.   Yes. |
| 08:52 | 24 | Q.   Were there any fashion doll designers there at MGA |
| 08:52 | 25 | before the summer of 2000? |

CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

12

| 08:52 | 1 | A.   No. |
| 08:52 | 2 | Q.   Was there a fashion doll design department at MGA |
| 08:52 | 3 | before the summer of 2000? |
| 08:52 | 4 | A.   No. |
| 08:52 | 5 | Q.   While you were working at MGA, did you know a woman by |
| 08:52 | 6 | the name of Paula Treantafelles; now Paula Garcia? |
| 08:52 | 7 | A.   Yes. |
| 08:52 | 8 | Q.   Was she an employee while you were there? |
| 08:52 | 9 | A.   Yes. |
| 08:53 | 10 | Q.   Who started with the company first?  I think you said |
| 08:53 | 11 | you started in 1999? |
| 08:53 | 12 | A.   Yes. |
| 08:53 | 13 | Q.   Do you recall when she started? |
| 08:53 | 14 | A.   Yes. |
| 08:53 | 15 | Q.   And when was it that she started? |
| 08:53 | 16 | A.   Spring of 2000. |
| 08:53 | 17 | Q.   So you had -- I think you said you started there in |
| 08:53 | 18 | June of 1999? |
| 08:53 | 19 | A.   Correct. |
| 08:53 | 20 | Q.   So you would have been there for about nine months |
| 08:53 | 21 | before she started? |
| 08:53 | 22 | A.   Yes. |
| 08:53 | 23 | Q.   Do you recall the first time that you had any contact |
| 08:53 | 24 | with or exposure to the concept or the product that became |
| 08:53 | 25 | known as the Bratz dolls? |

| | | |
|---|---|---|
| 08:53 | 1 | A.    Yes. |
| 08:53 | 2 | Q.    When did that occur, that you first had exposure to |
| 08:53 | 3 | this product that became known as the Bratz dolls? |
| 08:53 | 4 | A.    Early summer 2000. |
| 08:53 | 5 | Q.    And how did that -- who was present when you first had |
| 08:53 | 6 | the exposure to this product? |
| 08:53 | 7 | A.    Paula Treantafelles and Carter Bryant. |
| 08:54 | 8 | Q.    And where did this -- where did this happen? |
| 08:54 | 9 | A.    In Paula's cubicle at MGA. |
| 08:54 | 10 | Q.    And where was that -- can you describe where that |
| 08:54 | 11 | cubicle was in MGA's offices? |
| 08:54 | 12 | A.    Sure.  MGA had -- the office at that time had two |
| 08:54 | 13 | floors.  All of the sales, marketing, and product |
| 08:54 | 14 | development and creative design staff were on the second |
| 08:54 | 15 | floor.  And Paula's cubicle was in the central area of that |
| 08:54 | 16 | floor, and she was the first cubicle in a row, right |
| 08:54 | 17 | adjacent to the creative -- the graphic design area. |
| 08:54 | 18 | Q.    Was that on the second floor, then? |
| 08:54 | 19 | A.    Correct. |
| 08:54 | 20 | Q.    And you say this was in early summer of 2000? |
| 08:54 | 21 | A.    Yes. |
| 08:54 | 22 | Q.    And who was present besides yourself? |
| 08:54 | 23 | A.    Paula and Carter Bryant. |
| 08:54 | 24 | Q.    Did you know at the time that Ms. Garcia had come over |
| 08:54 | 25 | to MGA from Mattel? |

| 08:54 | 1 | A.   Yes. |
| 08:54 | 2 | Q.   Did -- when you saw Ms. Garcia and Mr. Bryant in early |
| 08:55 | 3 | summer of 2000 at her cubicle, did she say anything to you |
| 08:55 | 4 | about what Mr. Bryant was doing there? |
| 08:55 | 5 | A.   Yes. |
| 08:55 | 6 | Q.   What did she say? |
| 08:55 | 7 | A.   She introduced me to Carter, and she showed me some |
| 08:55 | 8 | drawings that he had brought in on a concept that they were |
| 08:55 | 9 | talking with Isaac Larian about. |
| 08:55 | 10 | Q.   Can you describe those drawings for the jury? |
| 08:55 | 11 | A.   They were, um, fashion design-type drawings.  They were |
| 08:55 | 12 | sketches of a female figure with clothing, fashion designs |
| 08:55 | 13 | on them, and they were, as I recall, like colored pencils -- |
| 08:55 | 14 | colored-pencil drawings.  They were colored line drawings. |
| 08:55 | 15 | Q.   Do you recall the proportions of the head or the feet |
| 08:55 | 16 | or anything like that? |
| 08:55 | 17 | A.   Yes.  The midsection of the drawings were -- was very |
| 08:55 | 18 | narrow, and the head and feet were exaggerated. |
| 08:56 | 19 | Q.   What did Ms. Garcia say to you at this meeting where |
| 08:56 | 20 | Carter Bryant was present at that time? |
| 08:56 | 21 | A.   She introduced me to him.  She told me that he was a |
| 08:56 | 22 | friend of hers from Mattel, and she showed me the drawings. |
| 08:56 | 23 | She -- you know, she showed me the drawings that he'd done |
| 08:56 | 24 | and was excited about the prospect of them. |
| 08:56 | 25 | Q.   Did she say anything about whether or not this was |

| | | |
|---|---|---|
| 08:56 | 1 | going to be a future product or anything of that nature? |
| 08:56 | 2 | A.   She indicated that it was being discussed and it was |
| 08:56 | 3 | going to be something we were -- she was working on. |
| 08:56 | 4 | Q.   Did she say whether or not Mr. Larian had been |
| 08:56 | 5 | consulted about these drawings or the idea of making a |
| 08:56 | 6 | product out of these illustrations? |
| 08:56 | 7 | A.   Yes. |
| 08:56 | 8 | Q.   And what did she say in that regard? |
| 08:56 | 9 | A.   She said that they had met with Isaac and he liked the |
| 08:56 | 10 | drawings and was excited about it. |
| 08:56 | 11 | Q.   Did she use the name "Bratz"? |
| 08:57 | 12 | A.   No. |
| 08:57 | 13 | Q.   Did you see the word "Bratz" on any of these drawings? |
| 08:57 | 14 | A.   No. |
| 08:57 | 15 | Q.   Was there any writing or date on any of these drawings? |
| 08:57 | 16 | A.   Not as I recall. |
| 08:57 | 17 | Q.   All right.  I'd like to skip forward now, after the |
| 08:57 | 18 | summer.  In your role as being the person in charge of |
| 08:57 | 19 | national accounts, did you have any -- did you become aware |
| 08:57 | 20 | that there was a product that had been developed called |
| 08:57 | 21 | Bratz? |
| 08:57 | 22 | A.   Yes. |
| 08:57 | 23 | Q.   And in your own mind, did you link these to these |
| 08:57 | 24 | drawings you had seen at the early part of the summer? |
| 08:57 | 25 | A.   Definitely. |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

16

| | | |
|---|---|---|
| 08:57 | 1 | Q.   As the person in charge of national sales for national |
| 08:57 | 2 | accounts, did you then get involved in the process of |
| 08:57 | 3 | selling this product to those national accounts -- places |
| 08:58 | 4 | like Kmart and Target and places like that? |
| 08:58 | 5 | A.   Yes. |
| 08:58 | 6 | Q.   And what was your role in that regard? |
| 08:58 | 7 | A.   As the sales manager for Kmart, I was responsible for |
| 08:58 | 8 | putting the meetings together with the buyers and attending |
| 08:58 | 9 | the meetings, doing presentations and facilitating the |
| 08:58 | 10 | meetings, and all the follow-up to the meetings. |
| 08:58 | 11 | Q.   And what is the purpose of these -- may seem |
| 08:58 | 12 | self-evident -- I'm sure it's a stupid question, but what is |
| 08:58 | 13 | the purpose of these meetings when you're introducing a new |
| 08:58 | 14 | product? |
| 08:58 | 15 | A.   Uh, we meet with the buyers.  We bring the samples to |
| 08:58 | 16 | show them what the product is, to discuss what the product |
| 08:58 | 17 | is and to get their interest in the product so that we can |
| 08:58 | 18 | sell them the product. |
| 08:58 | 19 | Q.   If I could show you Exhibit 11336, please. |
| 08:58 | 20 | *(Document provided to the witness.)* |
| 08:58 | 21 | BY MR. QUINN: |
| 08:58 | 22 | Q.   I'm going to ask you if you can identify this document, |
| 08:59 | 23 | 11336. |
| 08:59 | 24 | A.   Yes. |
| 08:59 | 25 | Q.   What is this? |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 08:59 | 1 | A.   This is an e-mail I sent to the marketing team letting |
| 08:59 | 2 | them know what samples I needed for what was called a "sales |
| 08:59 | 3 | road show." |
| 08:59 | 4 | MR. QUINN:  We'd offer this into evidence, |
| 08:59 | 5 | Your Honor. |
| 08:59 | 6 | THE COURT:  Received. |
| 08:59 | 7 | *(Exhibit No. 11336 received in evidence.)* |
| 08:59 | 8 | MR. QUINN:  Now, if we could put that up on the |
| 08:59 | 9 | screen. |
| 08:59 | 10 | *(Document displayed.)* |
| 08:59 | 11 | MR. QUINN:  At the top -- the top e-mail is from |
| 08:59 | 12 | Mr. Larian to Rachel Harris; is that correct? |
| 08:59 | 13 | THE WITNESS:  Yes. |
| 08:59 | 14 | BY MR. QUINN: |
| 08:59 | 15 | Q.   And the subject, he's forwarding "sales road show |
| 08:59 | 16 | sample follow-up, sample request."  Do you see that? |
| 08:59 | 17 | A.   Yes. |
| 08:59 | 18 | Q.   And actually what he's forwarding to Ms. Harris is an |
| 09:00 | 19 | e-mail below that you had written; is that correct? |
| 09:00 | 20 | A.   Yes. |
| 09:00 | 21 | MR. QUINN:  And perhaps if we could just enlarge |
| 09:00 | 22 | "From Jennifer Maurus" to -- the text of her e-mail -- Ken. |
| 09:00 | 23 | *(Technician complies.)* |
| 09:00 | 24 | BY MR. QUINN: |
| 09:00 | 25 | Q.   And you're telling the people that you copied here -- |

09:00  1    it says, "Sales road show sample follow-up."  Could you
09:00  2    explain what the sales road show is?
09:00  3    A.    Sure.  Back in 2000, in the toy industry, the primary
09:00  4    toy shows were in January and February.  So in the fall
09:00  5    months before that, we would do what's called a "road show."
09:00  6    We would go on the road to various different retailers to
09:00  7    give them previews of what our line was so that they would
09:00  8    have an idea of what we were going to be presenting them at
09:00  9    the formal, official toy fairs.
09:00  10   Q.    And so the date of your e-mail here is November 1st?
09:00  11   A.    Yes.
09:00  12   Q.    And you write, "Just a friendly reminder about the
09:01  13   items we need from your department for our road show.  Our
09:01  14   list comes from the meeting Isaac chaired a couple of weeks
09:01  15   ago in which all of sales and marketing attended.  Sales has
09:01  16   already built up, Velcroed, and shipped the inventory
09:01  17   items."
09:01  18         What are you talking about there?
09:01  19   A.    Inventory items were items that already existed in our
09:01  20   product lines, so we would have had actual physical units in
09:01  21   our warehouse.  So the sales team went through the list of
09:01  22   existing products, and we pull -- we provided a request to
09:01  23   our warehouse.  They would have pulled the products, and we
09:01  24   would have boxed them up.
09:01  25         By Velcroing them means we would have put Velcro on

CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

19

09:01    1    them, because at this particular show, we had boards, and we

09:01    2    would've stuck the products to the boards with Velcro so

09:01    3    that they were, you know, on display.  And we shipped them

09:01    4    ahead of time.  So when I'm -- what's left is -- for the

09:01    5    marketing team is the stuff that was mockups or hand samples

09:02    6    or prototypes.

09:02    7    Q.   And you're asking people to help you out, to get

09:02    8    together the materials that you need in order to make

09:02    9    presentations; is that basically it?

09:02   10    A.   Correct.

09:02   11    Q.   All right.  In this e-mail, the next line you say, "The

09:02   12    attached recap list was prepared by Helene and sent to Kerri

09:02   13    on October 20th," correct?

09:02   14    A.   Yes.

09:02   15    Q.   And then there's this list attached.  And I'd ask you

09:02   16    to turn if you would to page 11336-8.

09:02   17              (Document displayed.)

09:02   18              THE WITNESS:  Okay.

09:02   19    BY MR. QUINN:

09:02   20    Q.   And on the bottom there, it says, "price list dated

09:02   21    October 18th."  Do you see that?

09:02   22    A.   Yes.

09:02   23    Q.   And in the middle of this page, dated October 18th,

09:02   24    there's a category, "small dolls."  "TV small dolls."  Do

09:03   25    you see that?

| | | |
|---|---|---|
| 09:03 | 1 | A.   Yes. |
| 09:03 | 2 | Q.   And does that refer to the Bratz dolls? |
| 09:03 | 3 | A.   Yes. |
| 09:03 | 4 | Q.   So would it be true to say that as of October 18th, you |
| 09:03 | 5 | already had the SKU numbers, the prices FOB, L.A., and |
| 09:03 | 6 | availability dates in Hong Kong, and case pack information |
| 09:03 | 7 | as of the date this list was prepared, October 18th? |
| 09:03 | 8 | A.   Yes. |
| 09:03 | 9 | Q.   And what does that category mean, case pack?  It's "F" |
| 09:03 | 10 | there, that column? |
| 09:03 | 11 | A.   Case pack is the -- when you ship products into a |
| 09:03 | 12 | retailer, you don't just ship one product in its retail |
| 09:03 | 13 | packaging.  Several of them get boxed into a larger |
| 09:03 | 14 | cardboard box, and that is called a master carton, and the |
| 09:03 | 15 | number of individual units that fit within that master |
| 09:03 | 16 | carton are the case pack. |
| 09:03 | 17 | So, for example, on the top line, TV small doll |
| 09:04 | 18 | assortment, line 158, it says "6."  That means there would |
| 09:04 | 19 | have been six individual dolls inside one outer box. |
| 09:04 | 20 | Q.   If we can go back to the first page of your e-mail, |
| 09:04 | 21 | 11336-1.  You indicate that the attached recap had been |
| 09:04 | 22 | prepared by Helene.  Who's Helene? |
| 09:04 | 23 | A.   She was another sales manager of national accounts. |
| 09:04 | 24 | Q.   And sent to Kerri on October 20th.  Who is Kerri? |
| 09:04 | 25 | A.   Kerri was the marketing assistant for the marketing |

CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

21

| | | |
|---|---|---|
| 09:04 | 1 | department. |
| 09:04 | 2 | Q.   All right.  And in the second sentence, you say, "our |
| 09:04 | 3 | list" -- and that refers to the sample list -- the list of |
| 09:04 | 4 | samples you need? |
| 09:04 | 5 | A.   Yes. |
| 09:04 | 6 | Q.   It says our list comes from the meeting Isaac chaired a |
| 09:04 | 7 | couple of weeks ago in which all sales and marketing -- all |
| 09:04 | 8 | of sales and marketing attended.  So does that -- does that |
| 09:04 | 9 | mean that sometime perhaps in mid-October -- would that be |
| 09:05 | 10 | the timeframe in which Mr. Larian chaired this meeting? |
| 09:05 | 11 | MS. KELLER:  Objection.  Leading the witness. |
| 09:05 | 12 | THE COURT:  Overruled. |
| 09:05 | 13 | THE WITNESS:  Yes. |
| 09:05 | 14 | BY MR. QUINN: |
| 09:05 | 15 | Q.   All right.  Did you, in fact, then, personally |
| 09:05 | 16 | participate in these road show presentations to major |
| 09:05 | 17 | retailers? |
| 09:05 | 18 | A.   Yes. |
| 09:05 | 19 | Q.   And do you recall whether or not you actually had |
| 09:05 | 20 | prototype dolls to show to the retailers in those |
| 09:05 | 21 | meetings? -- prototype Bratz dolls?  Do you recall? |
| 09:05 | 22 | A.   Yes. |
| 09:05 | 23 | Q.   One way or another? |
| 09:05 | 24 | A.   I recall that we did not have prototypes. |
| 09:05 | 25 | Q.   So what did you have at that point to show retailers? |

09:05  1   A.   We had story boards, mockup packaging, fashion samples.

09:05  2   Um, we had marketing information, sales sheets -- what are

09:05  3   called sales sheets.  Um, I believe we had -- we had

09:06  4   drawings, and we may have had a face sculpt.  I can't recall

09:06  5   for sure.

09:06  6   Q.   All right.  Can you tell us whether or not it's

09:06  7   important in these sales meetings to give the customers an

09:06  8   accurate idea of what the product is going to look like?

09:06  9   A.   It's very important.

09:06  10  Q.   Why is that?

09:06  11  A.   Because the -- when a buyer commits to a product, they

09:06  12  want to know what they're getting.  They need to understand

09:06  13  all of the features and components, and they need to

09:06  14  understand what their -- the final product is going to be so

09:06  15  that they can commit to it.

09:06  16  Q.   All right.  Are their potential reputational issues for

09:06  17  a toy company if they go to a major retailer like Walmart or

09:06  18  target or Toys R Us and don't accurately portray what a

09:06  19  product's going to look like?

09:06  20  A.   Yes.

09:07  21  Q.   At those -- can you tell us at the time that you did --

09:07  22  can you recall the timeframe in which you did these

09:07  23  presentations to the major retailers?

09:07  24  A.   Yes.  November 2000.

09:07  25  Q.   And in those meetings -- at the time -- by the time you

| 09:07 | 1 | did those meetings, had there been focus group research that |
| 09:07 | 2 | had been done regarding the dolls? |
| 09:07 | 3 | A.   As we were informed, yes. |
| 09:07 | 4 | Q.   Informed by whom? |
| 09:07 | 5 | A.   Marketing, Paula, Isaac. |
| 09:07 | 6 | Q.   And that is focus group research? |
| 09:07 | 7 | A.   A focus group is when the marketing or product |
| 09:07 | 8 | development team -- generally, marketing -- brings in a |
| 09:07 | 9 | group of generally kids, sometimes adults, and tries to |
| 09:07 | 10 | solicit their feedback on a product or a concept or a host |
| 09:07 | 11 | of products. |
| 09:07 | 12 | Q.   In the marketing -- in the meeting -- sales meetings |
| 09:08 | 13 | that you had with the large accounts in November, were you |
| 09:08 | 14 | able to present information concerning the responses of |
| 09:08 | 15 | children and others in these focus groups? |
| 09:08 | 16 | A.   Yes. |
| 09:08 | 17 | Q.   Did -- do you recall speaking with Mr. Larian before |
| 09:08 | 18 | going out on these -- do you recall Mr. Larian talking about |
| 09:08 | 19 | an animated TV show for the Bratz? |
| 09:08 | 20 | MS. KELLER:  Objection.  Vague as to time. |
| 09:08 | 21 | THE COURT:  Overruled. |
| 09:08 | 22 | THE WITNESS:  Yes. |
| 09:08 | 23 | BY MR. QUINN: |
| 09:08 | 24 | Q.   What do you recall in that regard? |
| 09:08 | 25 | A.   I recall at the sales line review when the concept -- |

| | | |
|---|---|---|
| 09:08 | 1 | when the product line was presented to us that it was |
| 09:08 | 2 | discussed that there would be potentially a cartoon series |
| 09:08 | 3 | developed. |
| 09:08 | 4 | THE COURT:  I'm sorry.  I'm assuming something, |
| 09:08 | 5 | that this is around November, December of 2000 by the last |
| 09:08 | 6 | question. |
| 09:08 | 7 | Could you tell us the timeframe of when this |
| 09:08 | 8 | discussion took place. |
| 09:08 | 9 | THE WITNESS:  Yes.  The line review would have |
| 09:09 | 10 | been in October of 2000, as referenced in this e-mail. |
| 09:09 | 11 | BY MR. QUINN: |
| 09:09 | 12 | Q.  All right.  Did -- do you recall Mr. Larian mentioning |
| 09:09 | 13 | whether or not he had actually been speaking with producers |
| 09:09 | 14 | about an animated TV series for the Bratz? |
| 09:09 | 15 | A.  I don't recall that specifically. |
| 09:09 | 16 | Q.  Were you able to mention -- were you able -- when you |
| 09:09 | 17 | had those meetings with the national accounts in November, |
| 09:09 | 18 | were you able to tell them about this animated TV series? |
| 09:09 | 19 | A.  Yes.  Limited -- in limited capacity, yes. |
| 09:09 | 20 | Q.  Because -- it was limited for? |
| 09:09 | 21 | A.  Because it wasn't flushed out.  It was presented that |
| 09:09 | 22 | it was something that we were looking to do, that it was in |
| 09:09 | 23 | the works. |
| 09:09 | 24 | Q.  All right.  Can you tell us in these sales meetings |
| 09:09 | 25 | that you had with the national accounts, is it important |

Case 2:04-cv-09049-DOC-RNB   Document 9844   Filed 02/10/11   Page 25 of 157   Page ID
#:297028
CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

25

| | | |
|---|---|---|
| 09:10 | 1 | that MGA be able to demonstrate commitment to this new |
| 09:10 | 2 | product? |
| 09:10 | 3 | A.   Yes. |
| 09:10 | 4 | Q.   And why is that? |
| 09:10 | 5 | A.   In general or specifically to Bratz? |
| 09:10 | 6 | Q.   Well, specifically to Bratz. |
| 09:10 | 7 | A.   It was a new product category for MGA and something |
| 09:10 | 8 | that we hadn't participated in before, so it was important |
| 09:10 | 9 | for us to convey to the buyers that it was a long-term |
| 09:10 | 10 | strategy for the company and something that the company was |
| 09:10 | 11 | committed to, to instill confidence in the retail buyers' |
| 09:10 | 12 | minds that it was a viable category for us and it was |
| 09:10 | 13 | something that they should support. |
| 09:10 | 14 | Q.   Why would that be a concern from the buyer's |
| 09:10 | 15 | standpoint? |
| 09:10 | 16 | A.   Because if they were going to give up space in their |
| 09:10 | 17 | shelving that was dedicated to a different product for a new |
| 09:10 | 18 | product, they would want to have confidence that it was |
| 09:10 | 19 | something that wasn't just a fly-by-night or a one-off.  It |
| 09:11 | 20 | was something that had longevity, potential longevity. |
| 09:11 | 21 | Q.   And were you able -- based on what you were told by |
| 09:11 | 22 | Mr. Larian and Ms. Garcia and others, were you able to make |
| 09:11 | 23 | that commitment to the retailers in these meetings that you |
| 09:11 | 24 | had in November? |
| 09:11 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 09:11 | 1 | Q.   Okay.  I'd like to change subjects now. |
| 09:11 | 2 | While you were at MGA, was there a -- something called |
| 09:11 | 3 | an "inventions agreement" and "confidentiality agreement" |
| 09:11 | 4 | that employees were expected to sign? |
| 09:11 | 5 | A.   Yes. |
| 09:11 | 6 | Q.   And do you recall that when you -- did you sign such an |
| 09:11 | 7 | agreement when you started at the company? |
| 09:11 | 8 | A.   Yes. |
| 09:11 | 9 | Q.   And can you tell us whether or not the agreement |
| 09:11 | 10 | provided that anything that an employee created during the |
| 09:11 | 11 | time of the employee's -- the period of the employee's |
| 09:11 | 12 | employment with MGA would be owned by the company? |
| 09:11 | 13 | MS. KELLER:  Objection.  Calls for a legal |
| 09:11 | 14 | conclusion. |
| 09:11 | 15 | THE COURT:  Overruled. |
| 09:11 | 16 | Now, remember this is her personal opinion about |
| 09:12 | 17 | what she believes her contract entailed.  You'll later |
| 09:12 | 18 | determine a whole series of issues concerning Carter |
| 09:12 | 19 | Bryant's agreement. |
| 09:12 | 20 | THE WITNESS:  Could you repeat the question? |
| 09:12 | 21 | MR. QUINN:  Sure. |
| 09:12 | 22 | BY MR. QUINN: |
| 09:12 | 23 | Q.   The question is, in your understanding, this agreement, |
| 09:12 | 24 | the inventions agreement, that you signed when you started |
| 09:12 | 25 | at MGA, did it provide that anything that MGA -- or you -- |

Case 2:04-cv-09049-DOC-RNB   Document 9844   Filed 02/10/11   Page 27 of 157   Page ID #:297030
CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

27

| | | |
|---|---|---|
| 09:12 | 1 | any other MGA employees created during the time period that |
| 09:12 | 2 | they were employed by MGA, that was in the toy business, |
| 09:12 | 3 | would be owned by the company? |
| 09:12 | 4 | A.   Yes. |
| 09:12 | 5 | Q.   Did that include anything that was created in the toy |
| 09:12 | 6 | business on nights or on weekends, on personal time? |
| 09:12 | 7 | MS. KELLER:  Objection.  Again, it calls -- the |
| 09:12 | 8 | question is -- calls for a legal conclusion as phrased. |
| 09:12 | 9 | THE COURT:  Overruled.  This only goes to her |
| 09:12 | 10 | agreement once again. |
| 09:12 | 11 | THE WITNESS:  Yes. |
| 09:12 | 12 | THE COURT:  And her belief in what her agreement |
| 09:12 | 13 | means. |
| 09:12 | 14 | All right.  And the answer was? |
| 09:13 | 15 | THE WITNESS:  Yes. |
| 09:13 | 16 | THE COURT:  Sorry for the interruption. |
| 09:13 | 17 | THE WITNESS:  That's okay.  I interrupted you, |
| 09:13 | 18 | actually. |
| 09:13 | 19 | BY MR. QUINN: |
| 09:13 | 20 | Q.   If we could look at Exhibit 13532, which is in |
| 09:13 | 21 | evidence. |
| 09:13 | 22 | *(Document displayed.)* |
| 09:13 | 23 | MR. QUINN:  And, Ken, if we could put up the first |
| 09:13 | 24 | page and perhaps just blow up the top there. |
| 09:13 | 25 | *(Document displayed.)* |

CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

28

| 09:13 | 1 | MS. KELLER:  I'm gonna object that this is |
| 09:13 | 2 | irrelevant, Your Honor. |
| 09:13 | 3 | THE COURT:  Overruled. |
| 09:13 | 4 | BY MR. QUINN: |
| 09:13 | 5 | Q.   This is a -- did you know a Michelle Thompson? |
| 09:13 | 6 | A.   Yes. |
| 09:13 | 7 | Q.   And who was Michelle Thompson? |
| 09:13 | 8 | A.   She was the HR manager at that time. |
| 09:13 | 9 | Q.   This is dated what date? |
| 09:13 | 10 | A.   August 10, 2000. |
| 09:13 | 11 | Q.   It says, "Attached please find the newly revised MGA |
| 09:13 | 12 | Entertainment Confidentiality Agreement." |
| 09:13 | 13 | And also, "The new Proprietary Information Agreement." |
| 09:13 | 14 | And it says, "Please return the signed forms to me no |
| 09:14 | 15 | later than August 21, 2000." |
| 09:14 | 16 | Do you see that? |
| 09:14 | 17 | A.   Yes. |
| 09:14 | 18 | Q.   And if we could turn to -- |
| 09:14 | 19 | THE COURT:  Excuse me just a moment.  I want to |
| 09:14 | 20 | caution the jury continually.  I'm allowing a breadth of |
| 09:14 | 21 | evidence in.  This may be relevant.  It may turn out to be |
| 09:14 | 22 | irrelevant.  This is her agreement with MGA. |
| 09:14 | 23 | MS. KELLER:  Your Honor, excuse me.  It's not. |
| 09:14 | 24 | This is not her agreement. |
| 09:14 | 25 | MR. QUINN:  Your Honor, I will get to that, but |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 9844   Filed 02/10/11   Page 29 of 157   Page ID #:297032
CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

29

| | | |
|---|---|---|
| 09:14 | 1 | I'd like to conduct the examination without counsel's |
| 09:14 | 2 | interruption. |
| 09:14 | 3 | THE COURT:  Thank you very much. |
| 09:14 | 4 | Could you show me 13532 once again.  It's a memo. |
| 09:14 | 5 | It should be dated August 10, 2000, according to my notes. |
| 09:14 | 6 | MR. QUINN:  Yes, Your Honor. |
| 09:14 | 7 | THE COURT:  Can I see it, please.  Somebody bring |
| 09:14 | 8 | it to me. |
| 09:14 | 9 | MR. QUINN:  I can bring my copy up to the Court. |
| 09:14 | 10 | THE COURT:  That will be fine. |
| 09:14 | 11 | Now, Counsel have had their series of objections, |
| 09:14 | 12 | and they're done speaking for just a moment.  Let me talk to |
| 09:14 | 13 | you just a moment as the jury. |
| 09:14 | 14 | MR. QUINN:  Here's a clean copy. |
| 09:14 | 15 | THE COURT:  Thank you very much, Counsel.  You're |
| 09:14 | 16 | done speaking now. |
| 09:15 | 17 | The industry itself and what the industry expects, |
| 09:15 | 18 | whether it's MGA or Mattel, may become relevant to you.  In |
| 09:15 | 19 | other words, what do these various confidentiality |
| 09:15 | 20 | agreements mean?  How are they phrased?  How are they |
| 09:15 | 21 | written?  Is there an industry standard?  For goodness's |
| 09:15 | 22 | sake, I have no idea.  But I'd rather have you hear the |
| 09:15 | 23 | breath of evidence involved in the case and then determine |
| 09:15 | 24 | what you think is relevant. |
| 09:15 | 25 | Now, in effect, this may be an agreement, a |

09:15  1   confidentiality agreement, with the MGA employees, but the

09:15  2   main issue will be the confidentiality agreement, of course,

09:15  3   and what that means, if anything, between Carter Bryant and

09:15  4   Mattel.

09:15  5        But I'm allowing the MGA agreements in just so we

09:15  6   have some feeling of what the industry is.  And different

09:15  7   people may have different interpretations, one of those are

09:16  8   legal determinations.  You'll make that determination

09:16  9   eventually as the jury.

09:16  10       But I thought that it would be important just so

09:16  11  you had a smattering of what different people thought about

09:16  12  their own agreement.  It may turn out to be completely

09:16  13  irrelevant.

09:16  14       But that's a backhanded way of saying that we

09:16  15  ought to know what the industry has in terms of

09:16  16  expectations, as well as the individuals, and what different

09:16  17  companies are doing around this period of time so that we

09:16  18  all have some understanding of what, potentially, people

09:16  19  have as expectations.

09:16  20       Now, you may get involved finally in legal

09:16  21  interpretations in terms of what do these words mean; are

09:16  22  the agreements different; if MGA had an agreement, so what?

09:16  23  Or it may be important to you.

09:16  24       But remember it's going to eventually be one of

09:16  25  the primary determinations of what Carter Bryant's agreement

| 09:16 | 1 | meant when he signed this agreement with Mattel. |
| 09:16 | 2 | All right. Now, Counsel -- |
| 09:16 | 3 | You've probably forgotten the question after that |
| 09:16 | 4 | long-winded explanation by me to the jury, so Counsel's |
| 09:16 | 5 | about to reask it. |
| 09:17 | 6 | MR. QUINN: Your Honor, could I swap copies with |
| 09:17 | 7 | you? I have a clean copy. |
| 09:17 | 8 | THE COURT: Thank you. |
| 09:17 | 9 | And, by the way, please accept these objections by |
| 09:17 | 10 | both parties as well-taken. We've gone over this document |
| 09:17 | 11 | outside your presence, so you should know. Counsel may |
| 09:17 | 12 | believe there's an appropriate objection; has to make that |
| 09:17 | 13 | objection on the record. So they're not being obstreperous |
| 09:17 | 14 | or trying to hide something from you. I think we went over |
| 09:17 | 15 | this Saturday or Sunday a week ago. |
| 09:17 | 16 | So remember, they have to make these objections |
| 09:17 | 17 | for both Mattel and MGA's side or they waive their |
| 09:17 | 18 | right -- well, to object. So it's entirely appropriate. |
| 09:17 | 19 | Counsel. |
| 09:17 | 20 | MR. QUINN: Thank you, Your Honor. |
| 09:17 | 21 | BY MR. QUINN: |
| 09:17 | 22 | Q. You indicated that you signed an inventions agreement |
| 09:17 | 23 | when you first started at MGA; is that correct? |
| 09:17 | 24 | A. Yes. |
| 09:18 | 25 | Q. This isn't that agreement? |

CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

32

| | | |
|---|---|---|
| 09:18 | 1 | A.   No. |
| 09:18 | 2 | Q.   Do you recall that in August of 2000 a new form of |
| 09:18 | 3 | agreement was circulated at MGA? |
| 09:18 | 4 | A.   Yes. |
| 09:18 | 5 | Q.   Was distributed to the employees? |
| 09:18 | 6 | A.   Yes. |
| 09:18 | 7 | Q.   And if we could look at page -- dash 4.  3532-4.  Do we |
| 09:18 | 8 | see there Mr. Larian's signature on this form of agreement? |
| 09:18 | 9 | A.   Yes. |
| 09:18 | 10 | Q.   As well as on the attachment which is dash 10.  Is that |
| 09:18 | 11 | Mr. Larian's signature, dated July 25th, 2000? |
| 09:18 | 12 | A.   Yes. |
| 09:18 | 13 | MR. QUINN:  And if we could go back to dash 4, at |
| 09:18 | 14 | the top, if we could enlarge that Paragraph 1, Ken. |
| 09:18 | 15 | (Technician complies.) |
| 09:18 | 16 | BY MR. QUINN: |
| 09:18 | 17 | Q.   "Assignment of interest."  That provides that the |
| 09:18 | 18 | employee agrees to assign and hereby does assign to the |
| 09:19 | 19 | company all interest which the employee may have in all |
| 09:19 | 20 | patentable and/or patentable (sic) ideas and/or inventions |
| 09:19 | 21 | conceived by the employee, et cetera." |
| 09:19 | 22 | THE COURT:  You misread that. |
| 09:19 | 23 | MR. QUINN:  I'm sorry. |
| 09:19 | 24 | THE COURT:  It's "patentable -- |
| 09:19 | 25 | MR. QUINN:  "And" slash "or." |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

33

| | | |
|---|---|---|
| 09:19 | 1 | THE COURT:  -- and/or not patentable ideas." |
| 09:19 | 2 | MR. QUINN:  Thank you, Your Honor. |
| 09:19 | 3 | BY MR. QUINN: |
| 09:19 | 4 | Q.   "Patentable and," slash, "or not patentable ideas |
| 09:19 | 5 | and/or inventions made or conceived by employee" -- and I |
| 09:19 | 6 | won't read the whole thing.  It ends with a reference to the |
| 09:19 | 7 | California Labor Code. |
| 09:19 | 8 | Do you see that? |
| 09:19 | 9 | A.   Yes. |
| 09:19 | 10 | Q.   Do you recall, also, that this form of agreement |
| 09:19 | 11 | provided that if you left the company for a year afterwards, |
| 09:19 | 12 | you're not supposed to solicit the purchase of any products |
| 09:19 | 13 | or services from any supplier or vendor to the company? |
| 09:19 | 14 | A.   Yes. |
| 09:19 | 15 | Q.   And that it also provided that you weren't supposed to |
| 09:19 | 16 | try to solicit for one year -- not supposed to try to hire |
| 09:20 | 17 | any MGA employees.  Do you recall that? |
| 09:20 | 18 | A.   Yes. |
| 09:20 | 19 | Q.   And that you weren't supposed to -- for a period of one |
| 09:20 | 20 | year, you're not supposed to solicit customers, clients, or |
| 09:20 | 21 | vendors.  Do you recall that? |
| 09:20 | 22 | A.   Yes. |
| 09:20 | 23 | Q.   Did you sign this agreement? |
| 09:20 | 24 | A.   No. |
| 09:20 | 25 | Q.   Why not? |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

| | | |
|---|---|---|
| 09:20 | 1 | A.   'Cause it was overreaching, and my boss advised our |
| 09:20 | 2 | entire sales team not to. |
| 09:20 | 3 | Q.   So were there other people who declined to sign this |
| 09:20 | 4 | agreement as well? |
| 09:20 | 5 | A.   Yes. |
| 09:20 | 6 | Q.   Why was it that you thought it was overreaching? |
| 09:20 | 7 | MS. KELLER:  Objection.  Irrelevant. |
| 09:20 | 8 | THE COURT:  Overruled. |
| 09:20 | 9 | THE WITNESS:  Um, we were all sales professionals, |
| 09:20 | 10 | selling to the majority of retailers in the United States. |
| 09:20 | 11 | And so to not be able, for a year after leaving MGA, to sell |
| 09:20 | 12 | to those same retailers would have prevented us from |
| 09:21 | 13 | continuing in our same line of work, same scope with vendors |
| 09:21 | 14 | and same scope with product line.  Most of us continued to |
| 09:21 | 15 | be in the toy industry.  So it would have prevented us from |
| 09:21 | 16 | staying in the toy industry. |
| 09:21 | 17 | BY MR. QUINN: |
| 09:21 | 18 | Q.   Now, you've ultimately resigned from MGA? |
| 09:21 | 19 | A.   Yes. |
| 09:21 | 20 | Q.   And there came a point where you had a legal dispute |
| 09:21 | 21 | with MGA? |
| 09:21 | 22 | A.   Yes. |
| 09:21 | 23 | Q.   Could you tell us what that was about? |
| 09:21 | 24 | A.   Yes.  I filed a pregnancy discrimination suit against |
| 09:21 | 25 | MGA. |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 9844   Filed 02/10/11   Page 35 of 157   Page ID #:297038
CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

35

| | | |
|---|---|---|
| 09:21 | 1 | MR. QUINN:  I have nothing further. |
| 09:21 | 2 | THE COURT:  Cross-examination.  This would be |
| 09:21 | 3 | Ms. Keller on behalf of Mr. Larian and MGA. |
| 09:21 | 4 | MS. KELLER:  Thank you, Your Honor. |
| 09:21 | 5 | **CROSS-EXAMINATION** |
| 09:21 | 6 | BY MS. KELLER: |
| 09:22 | 7 | Q.   Good morning, Ms. Maurus. |
| 09:22 | 8 | A.   Good morning. |
| 09:22 | 9 | Q.   We haven't met before, have we? |
| 09:22 | 10 | A.   No. |
| 09:22 | 11 | Q.   My name is Jennifer Keller.  I'm gonna be asking you |
| 09:22 | 12 | some questions. |
| 09:22 | 13 | Now, you also testified for Mattel against MGA and |
| 09:22 | 14 | Mr. Larian on June 3, 2008, correct? |
| 09:22 | 15 | A.   Yes. |
| 09:22 | 16 | Q.   And about a month before that, in May 2008, you met |
| 09:22 | 17 | with a Mattel lawyer named Dylan Proctor with the firm of |
| 09:22 | 18 | Quinn Emanuel, correct? |
| 09:22 | 19 | A.   Yes. |
| 09:22 | 20 | Q.   Mr. Proctor called you at your workplace? |
| 09:22 | 21 | A.   Yes. |
| 09:22 | 22 | Q.   And you met him at a restaurant in Santa Monica, did |
| 09:22 | 23 | you? |
| 09:22 | 24 | A.   Yes. |
| 09:22 | 25 | Q.   Talked to him for about two hours about the case? |

Case 2:04-cv-09049-DOC-RNB   Document 9844   Filed 02/10/11   Page 36 of 157   Page ID #:297039
CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

36

| | | |
|---|---|---|
| 09:22 | 1 | A.   Yes. |
| 09:22 | 2 | Q.   And you never had any contact with MGA or Mr. Larian to |
| 09:22 | 3 | tell them that the Mattel lawyers had contacted you, right? |
| 09:22 | 4 | A.   No. |
| 09:22 | 5 | Q.   And you never told MGA or Mr. Larian that if called |
| 09:23 | 6 | you'd be willing to testify on MGA's behalf, right? |
| 09:23 | 7 | A.   Correct. |
| 09:23 | 8 | Q.   Now, when you testified for Mattel against MGA in June |
| 09:23 | 9 | of 2008, you were represented by counsel, right? |
| 09:23 | 10 | A.   Yes. |
| 09:23 | 11 | MS. KELLER:  And if we could see Exhibit 34686. |
| 09:23 | 12 | *(Document provided to the witness.)* |
| 09:23 | 13 | BY MS. KELLER: |
| 09:23 | 14 | Q.   Do you recognize this as your attorney-client fee |
| 09:23 | 15 | agreement with the firm that was hired? |
| 09:23 | 16 | A.   Yes. |
| 09:23 | 17 | THE COURT:  Counsel, for our record, this should |
| 09:23 | 18 | be dated May 16, 2008; is that correct? |
| 09:23 | 19 | MS. KELLER:  Yes, Your Honor. |
| 09:23 | 20 | THE COURT:  All right.  Thank you.  Please |
| 09:23 | 21 | continue. |
| 09:23 | 22 | MS. KELLER:  And, Your Honor, I would move |
| 09:23 | 23 | Exhibit 34686 into evidence. |
| 09:23 | 24 | THE COURT:  It's received. |
| 09:23 | 25 | *(Exhibit No. 34686 received in evidence.)* |

| | | |
|---|---|---|
| 09:23 | 1 | (Document displayed.) |
| 09:23 | 2 | BY MS. KELLER: |
| 09:23 | 3 | Q.   Now, on the front page we see that Ryan G. Baker is the |
| 09:23 | 4 | attorney in the firm that's gonna be representing you; is |
| 09:23 | 5 | that right? |
| 09:23 | 6 | A.   Yes. |
| 09:23 | 7 | Q.   Is he present in Court today? |
| 09:23 | 8 | A.   Yes. |
| 09:23 | 9 | Q.   And is he seated -- where is he seated? |
| 09:24 | 10 | A.   He's in the very back row. |
| 09:24 | 11 | THE COURT:  Do you want Mr. Baker to wave his hand |
| 09:24 | 12 | in the air, Counsel? |
| 09:24 | 13 | MS. KELLER:  Thank you. |
| 09:24 | 14 | THE COURT:  Thank you, Mr. Baker. |
| 09:24 | 15 | BY MS. KELLER: |
| 09:24 | 16 | Q.   Let's go to the fourth page, if we could. |
| 09:24 | 17 | You see the letter's signed by Mr. Baker.  You see |
| 09:24 | 18 | that? |
| 09:24 | 19 | A.   Yes. |
| 09:24 | 20 | Q.   And that's your signature also, May 19th, right? |
| 09:24 | 21 | A.   Correct. |
| 09:24 | 22 | Q.   Let's go back to page 1 of 34686, this engagement |
| 09:24 | 23 | letter.  It says that -- the letter confirms that you've |
| 09:24 | 24 | asked the firm of Baker Marquart Crone and Hawxhurst, LLP, |
| 09:24 | 25 | to represent you with respect to your role as a witness in |

CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

38

| 09:24 | 1 | the litigation.  Do you see that? |
| 09:24 | 2 | A.    Yes. |
| 09:24 | 3 | Q.    And it also says, in the paragraph under that, "that |
| 09:24 | 4 | the firm's responsibilities will include undertaking efforts |
| 09:24 | 5 | to prepare you for your testimony at trial in this action." |
| 09:25 | 6 | You see that? |
| 09:25 | 7 | A.    Yes. |
| 09:25 | 8 | Q.    Did the firm do that? |
| 09:25 | 9 | A.    Yes. |
| 09:25 | 10 | Q.    Now, under "fees and costs," we see that the firm was |
| 09:25 | 11 | charging between 355 and $425 an hour for doing that.  You |
| 09:25 | 12 | see that? |
| 09:25 | 13 | A.    Yes. |
| 09:25 | 14 | Q.    And in the next paragraph, it says, "Mattel, Inc., |
| 09:25 | 15 | Mattel, has agreed to pay any fees and costs incurred by you |
| 09:25 | 16 | in the action." |
| 09:25 | 17 | Do you see that? |
| 09:25 | 18 | A.    Yes. |
| 09:25 | 19 | Q.    And to this day, has Mattel paid all your attorney's |
| 09:25 | 20 | fees, bills? |
| 09:25 | 21 | A.    I assume. |
| 09:25 | 22 | Q.    You've never even seen a bill, right? |
| 09:25 | 23 | A.    Correct. |
| 09:25 | 24 | Q.    You don't know how much has been billed, true? |
| 09:25 | 25 | A.    True. |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB  Document 9844  Filed 02/10/11  Page 39 of 157  Page ID #:297042
CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

39

| 09:25 | 1 | Q. And your attorney has worked with the Mattel attorneys |
|---|---|---|
| 09:25 | 2 | in this matter, true? |
| 09:25 | 3 | A. I assume. |
| 09:25 | 4 | Q. Now, let's look at the fourth page of this agreement -- |
| 09:25 | 5 | *(Document displayed.)* |
| 09:25 | 6 | BY MS. KELLER: |
| 09:25 | 7 | Q. -- where we see that someone has accepted this |
| 09:25 | 8 | agreement on behalf of Mattel. Is that Jill Thomas the |
| 09:26 | 9 | director of litigation, the head of lawsuits for Mattel? |
| 09:26 | 10 | A. I don't know who she is. |
| 09:26 | 11 | Q. So this person who signed your attorney-client fee |
| 09:26 | 12 | agreement, you don't even know who that is? |
| 09:26 | 13 | A. I don't see a signature. |
| 09:26 | 14 | Q. Let's look where it says, "Jill Thomas, Esquire." Do |
| 09:26 | 15 | you know who that is? |
| 09:26 | 16 | A. No. |
| 09:26 | 17 | Q. Now -- so Mattel paid your attorney's fees in 2008 and |
| 09:26 | 18 | is paying them again for this round; is that true? |
| 09:26 | 19 | A. I would assume so. |
| 09:26 | 20 | Q. And I assume you reviewed some documents in preparation |
| 09:26 | 21 | for today's testimony. Yes? |
| 09:26 | 22 | A. Yes. |
| 09:26 | 23 | Q. Did you review your trial testimony in the last case? |
| 09:26 | 24 | A. Yes. |
| 09:26 | 25 | Q. Also reviewed your testimony against Isaac Larian in |

Case 2:04-cv-09049-DOC-RNB   Document 9844   Filed 02/10/11   Page 40 of 157   Page ID #:297043
CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

40

| | | |
|---|---|---|
| 09:26 | 1 | his brother's arbitration hearing? |
| 09:26 | 2 | A.    Yes. |
| 09:26 | 3 | Q.    And you reviewed some exhibits, right? |
| 09:26 | 4 | A.    Yes. |
| 09:26 | 5 | Q.    And let's move on to a different topic, then. |
| 09:26 | 6 | Now, your Linked-In biography listed you as being with |
| 09:27 | 7 | MGA entertainment from June '99 to December 2001, correct? |
| 09:27 | 8 | A.    Yes. |
| 09:27 | 9 | Q.    And you've held quite a few jobs since you were at MGA, |
| 09:27 | 10 | right? |
| 09:27 | 11 | A.    Yes. |
| 09:27 | 12 | Q.    Now, you told us about being at Helical Plane? |
| 09:27 | 13 | A.    Helical Plane. |
| 09:27 | 14 | Q.    And is that in the Internet industry? |
| 09:27 | 15 | A.    It's a business services firm, yes. |
| 09:27 | 16 | Q.    In the Internet industry? |
| 09:27 | 17 | A.    It's an IT firm, a business -- it's a business services |
| 09:27 | 18 | firm. |
| 09:27 | 19 | Q.    Do you list that as being in the Internet industry? |
| 09:27 | 20 | A.    Yes, I do. |
| 09:27 | 21 | Q.    And you've been there since 2010? |
| 09:27 | 22 | A.    Yes.  Since the end of 2010. |
| 09:27 | 23 | Q.    Were you there full-time or part-time? |
| 09:27 | 24 | A.    I'm a partner in the firm. |
| 09:27 | 25 | Q.    And before then, from 2009 to 2010, you were a toy |

CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

| 09:27 | 1 | industry specialist and an independent consultant? |
| 09:27 | 2 | A.   Yes. |
| 09:28 | 3 | Q.   Does that mean you were working for yourself? |
| 09:28 | 4 | A.   Yes. |
| 09:28 | 5 | Q.   Does that mean that you were unemployed by any firm at |
| 09:28 | 6 | the time? |
| 09:28 | 7 | A.   As a full-time employee, yes. |
| 09:28 | 8 | Q.   Now, you said that Mr. Proctor called you back in |
| 09:28 | 9 | May 2008 at your place of work; is that true? |
| 09:28 | 10 | A.   Yes. |
| 09:28 | 11 | Q.   And was that when you were at SnapTV? |
| 09:28 | 12 | A.   Yes. |
| 09:28 | 13 | Q.   Is that where he called you? |
| 09:28 | 14 | A.   Yes. |
| 09:28 | 15 | Q.   But after that, though -- from after the trial of this |
| 09:28 | 16 | matter, 2008, you actually went to work at Warner Bros. |
| 09:28 | 17 | Consumer Products, right? |
| 09:28 | 18 | A.   Yes. |
| 09:28 | 19 | Q.   Warner Bros. Consumer Products is a major partner of |
| 09:28 | 20 | Mattel, isn't it? |
| 09:28 | 21 | A.   Uh, yes.  They have a strategic alliance. |
| 09:28 | 22 | Q.   Yeah.  It's a very important strategic alliance, right? |
| 09:28 | 23 | A.   Yeah.  I suppose. |
| 09:28 | 24 | Q.   They license, among other things, the entire line of |
| 09:28 | 25 | DC Comics characters, right? |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

42

| | | |
|---|---|---|
| 09:28 | 1 | A.   DC's licensed to several manufacturers. |
| 09:29 | 2 | Q.   Okay.  And you got a job as actually director of global |
| 09:29 | 3 | toys at Warner Bros. Consumer Products, right? |
| 09:29 | 4 | A.   Yes, I did. |
| 09:29 | 5 | Q.   Now, of course, you knew Victoria O'Connor at MGA, |
| 09:29 | 6 | true? |
| 09:29 | 7 | A.   Yes. |
| 09:29 | 8 | Q.   She was licensing director while you were there, right? |
| 09:29 | 9 | A.   In -- yes, in a different category. |
| 09:29 | 10 | Q.   And you were friends with her, true? |
| 09:29 | 11 | A.   I was -- I knew her from MGA, yes. |
| 09:29 | 12 | Q.   You know that she, after the last trial, was promoted |
| 09:29 | 13 | to executive director of Warner Bros. Consumer Products, |
| 09:29 | 14 | hardlines, in August 2008, right? |
| 09:29 | 15 | A.   I wasn't at Warner Bros. at that time. |
| 09:29 | 16 | Q.   Well, I -- I'm asking about after the trial when you |
| 09:29 | 17 | went to Warner Bros. Consumer Products, from 2008 to 2009. |
| 09:29 | 18 | You recall that, right? |
| 09:29 | 19 | A.   Yes. |
| 09:29 | 20 | Q.   And -- |
| 09:29 | 21 | MR. QUINN:  I think that's -- move to strike, |
| 09:29 | 22 | Your Honor.  I think the question was compound, and the |
| 09:30 | 23 | answer is unclear. |
| 09:30 | 24 | THE COURT:  Yeah, I'm not sure about the question. |
| 09:30 | 25 | Just reask that. |

CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

43

| 09:30 | 1 | BY MS. KELLER: |
|-------|---|----------------|
| 09:30 | 2 | Q.   After the 2008 trial you went to Warner Bros. Consumer |
| 09:30 | 3 | Products, right? |
| 09:30 | 4 | A.   Yes. |
| 09:30 | 5 | Q.   And you're still friends with Victoria O'Connor, are |
| 09:30 | 6 | you? |
| 09:30 | 7 | A.   We were acquaintances.  I haven't spoken to her in over |
| 09:30 | 8 | a year, maybe longer. |
| 09:30 | 9 | Q.   Okay.  So Mattel arranged for your legal representation |
| 09:30 | 10 | in May of 2008, right? |
| 09:30 | 11 | A.   Yes. |
| 09:30 | 12 | Q.   You testified for Mattel against MGA in June of 2008, |
| 09:30 | 13 | right? |
| 09:30 | 14 | A.   Yes. |
| 09:30 | 15 | Q.   And a couple of months later, a month after Victoria |
| 09:30 | 16 | O'Connor was promoted, in August of 2008, you were given a |
| 09:30 | 17 | job at Warner Bros. Consumer Products as director of global |
| 09:30 | 18 | toys, right? |
| 09:30 | 19 |          MR. QUINN:  Argumentative.  Assumes facts not in |
| 09:30 | 20 | evidence. |
| 09:30 | 21 |          THE COURT:  Overruled.  You can answer the |
| 09:30 | 22 | question. |
| 09:30 | 23 | BY MS. KELLER: |
| 09:30 | 24 | Q.   Correct? |
| 09:30 | 25 | A.   Victoria had nothing to do with my job, my hiring at |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 9844   Filed 02/10/11   Page 44 of 157   Page ID #:297047
CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

44

| | | |
|---|---|---|
| 09:30 | 1 | Warner Bros.  So I'm confused by the question. |
| 09:31 | 2 | Q.   Now, the licensing relationship between Warner Bros. |
| 09:31 | 3 | Consumer Products and Mattel, you understand that both the |
| 09:31 | 4 | president of Warner Bros. Consumer Products and the CEO of |
| 09:31 | 5 | Mattel have praised that as one of their most important |
| 09:31 | 6 | strategic relationships, right? |
| 09:31 | 7 | MR. QUINN:  Lacks any foundation, Your Honor. |
| 09:31 | 8 | There's not a good-faith basis for the question. |
| 09:31 | 9 | THE COURT:  It's really two questions. |
| 09:31 | 10 | First of all, let's find out if she's aware of |
| 09:31 | 11 | that; otherwise, it's just a statement. |
| 09:31 | 12 | THE WITNESS:  I'm aware it's important.  I'm not |
| 09:31 | 13 | necessarily aware of those statements. |
| 09:31 | 14 | THE COURT:  Okay. |
| 09:31 | 15 | BY MS. KELLER: |
| 09:31 | 16 | Q.   So, uh, it's just a coincidence that you happened to be |
| 09:31 | 17 | hired by Warner Bros. Consumer Products in 2008, right after |
| 09:31 | 18 | you testified for Mattel against MGA and Mr. Larian, is it? |
| 09:31 | 19 | A.   Yes. |
| 09:31 | 20 | Q.   Now, when you were director of sales at SnapTV, were |
| 09:32 | 21 | you sales manager of national accounts for MGA |
| 09:32 | 22 | Entertainment -- I'm sorry. |
| 09:32 | 23 | When you were director of sales at SnapTV, did your |
| 09:32 | 24 | biography that you posted online say you were sales manager |
| 09:32 | 25 | national accounts for MGA Entertainment, where you were |

CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

45

| | | |
|---|---|---|
| 09:32 | 1 | involved in the launch of the hugely successful Bratz line |
| 09:32 | 2 | of fashion dolls and accessories? |
| 09:32 | 3 | A.   Yes. |
| 09:32 | 4 | Q.   And your -- to this day, your biography on Linked-In |
| 09:32 | 5 | says that you successfully managed product sales of upstart |
| 09:32 | 6 | brands like Bratz, right? |
| 09:32 | 7 | A.   Yes. |
| 09:32 | 8 | Q.   Now, you began work on MGA in June 1999? |
| 09:32 | 9 | A.   Yes. |
| 09:32 | 10 | Q.   And you got pregnant in the fall of 2000, right? |
| 09:32 | 11 | A.   Yes. |
| 09:32 | 12 | Q.   You left on maternity leave in June 2001? |
| 09:32 | 13 | A.   Yes. |
| 09:32 | 14 | Q.   And you were on maternity leave from June 6th to |
| 09:32 | 15 | October 1st, 2001? |
| 09:32 | 16 | A.   Yes. |
| 09:33 | 17 | Q.   Right? |
| 09:33 | 18 |      Came back to work at MGA on October 1st, 2001, right? |
| 09:33 | 19 | A.   Yes. |
| 09:33 | 20 | Q.   But only for ten days, right? |
| 09:33 | 21 | A.   Yes. |
| 09:33 | 22 | Q.   So you were not at MGA from June through October, and |
| 09:33 | 23 | then you came back in October for only ten days in 2001, |
| 09:33 | 24 | right? |
| 09:33 | 25 | A.   Yes. |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 09:33 | 1 | Q.   You then took a medical leave on October 10th, 2001, |
| 09:33 | 2 | correct? |
| 09:33 | 3 | A.   Yes. |
| 09:33 | 4 | Q.   And you've proceeded to -- okay. |
| 09:33 | 5 | So just to recap, then, you went on leave from June 6, |
| 09:33 | 6 | 2001, to October 1st, 2001, true? |
| 09:33 | 7 | A.   True. |
| 09:33 | 8 | Q.   Came back for ten days and then went on another leave |
| 09:33 | 9 | October 10th, 2001, right? |
| 09:33 | 10 | A.   Right. |
| 09:33 | 11 | Q.   And you didn't come back; you resigned from MGA |
| 09:33 | 12 | December 3rd, 2001, right? |
| 09:33 | 13 | A.   Yes. |
| 09:33 | 14 | Q.   Now, you're aware that the Bratz dolls were only |
| 09:33 | 15 | released in Spain around May or June of 2001, right? |
| 09:34 | 16 | A.   I'm aware they were released in May 2001. |
| 09:34 | 17 | Q.   And you're also aware that Bratz dolls were hardly an |
| 09:34 | 18 | immediate success here in the United States, right? |
| 09:34 | 19 | A.   No. |
| 09:34 | 20 | Q.   They only started to take off around Christmas 2001, |
| 09:34 | 21 | after you had already left MGA, true? |
| 09:34 | 22 | A.   The -- yes. |
| 09:34 | 23 | Q.   Now, between June 1st -- |
| 09:34 | 24 | THE COURT:  Just a moment.  That's confusing. |
| 09:34 | 25 | Does that question mean in the United States or overseas? |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 9844   Filed 02/10/11   Page 47 of 157   Page ID #:297050
CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

47

| | | |
|---|---|---|
| 09:34 | 1 | MS. KELLER:  Yes. |
| 09:34 | 2 | BY MS. KELLER: |
| 09:34 | 3 | Q.   The Bratz dolls only started to take off here in the |
| 09:34 | 4 | U.S. and overseas after Christmas 2001? |
| 09:34 | 5 | MR. QUINN:  I think it's vague and ambiguous. |
| 09:34 | 6 | THE COURT:  It's also compound, Counsel. |
| 09:34 | 7 | Just break that question down. |
| 09:34 | 8 | MS. KELLER:  Okay. |
| 09:34 | 9 | BY MS. KELLER: |
| 09:34 | 10 | Q.   You know the Bratz dolls only started to take off |
| 09:34 | 11 | internationally around Christmas 2001, right? |
| 09:35 | 12 | MR. QUINN:  Vague and ambiguous. |
| 09:35 | 13 | THE COURT:  Overruled.  It's the take off |
| 09:35 | 14 | successful, however we define that. |
| 09:35 | 15 | BY MS. KELLER: |
| 09:35 | 16 | Q.   Became a big success, right? |
| 09:35 | 17 | MR. QUINN:  Same objection.  Compound.  Same |
| 09:35 | 18 | objection. |
| 09:35 | 19 | THE COURT:  No.  Big success is fine. |
| 09:35 | 20 | It's just an opinion. |
| 09:35 | 21 | How were they doing around Christmas? |
| 09:35 | 22 | THE WITNESS:  The toy industry is heavily |
| 09:35 | 23 | Christmas based, so, yes, the sales would have been |
| 09:35 | 24 | significant at Christmastime. |
| 09:35 | 25 | THE COURT:  Okay. |

CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

48

| | | |
|---|---|---|
| 09:35 | 1 | BY MS. KELLER: |
| 09:35 | 2 | Q.   And the same thing was true for domestic sales; that |
| 09:35 | 3 | the Bratz dolls only started to become highly successful |
| 09:35 | 4 | around Christmas 2001, right? |
| 09:35 | 5 | A.   Yes.  Lead up to Christmas. |
| 09:35 | 6 | Q.   But between June 1st, 2001, and December 3rd, 2001, |
| 09:35 | 7 | when the Bratz dolls were being launched, you were only at |
| 09:35 | 8 | MGA a grand total of ten days, right? |
| 09:35 | 9 | A.   Yes. |
| 09:35 | 10 | Q.   And yet you describe yourself as playing -- having |
| 09:35 | 11 | played a major role in the successful launch of the Bratz |
| 09:35 | 12 | dolls, right? |
| 09:35 | 13 | A.   Yes. |
| 09:35 | 14 | Q.   Now, a week after resigning from MGA, you went to work |
| 09:36 | 15 | at Maui Toys, true? |
| 09:36 | 16 | A.   True. |
| 09:36 | 17 | Q.   And Maui Toys is another toy manufacturer making spring |
| 09:36 | 18 | and summer toys, right? |
| 09:36 | 19 | A.   Yes. |
| 09:36 | 20 | Q.   And you were national sales manager? |
| 09:36 | 21 | A.   Yes. |
| 09:36 | 22 | Q.   And so you -- you were on medical leave from MGA, but |
| 09:36 | 23 | you became healthy enough to work for Maui Toys fairly |
| 09:36 | 24 | quickly, right? |
| 09:36 | 25 | A.   Yes. |

CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

49

| | | |
|---|---|---|
| 09:36 | 1 | Q.    In fact, you actually interviewed at Maui Toys while |
| 09:36 | 2 | you were on the medical leave from MGA, right? |
| 09:36 | 3 | A.    Yes. |
| 09:36 | 4 | Q.    And before you resigned, true? |
| 09:36 | 5 | A.    True. |
| 09:36 | 6 | Q.    So you never came back to MGA, and you didn't intend |
| 09:36 | 7 | to, correct? |
| 09:36 | 8 | A.    Correct. |
| 09:36 | 9 | Q.    Now, during the time MGA was paying for your insurance |
| 09:36 | 10 | and benefits and paying you to be on leave, you were |
| 09:36 | 11 | actually interviewing with a competitor toy company, right? |
| 09:36 | 12 | A.    Not a competitor, but a toy company. |
| 09:36 | 13 | Q.    You didn't think there was anything wrong with that, |
| 09:37 | 14 | did you? |
| 09:37 | 15 | A.    No. |
| 09:37 | 16 | Q.    Because in your mind you decided that they weren't a |
| 09:37 | 17 | true competitor? |
| 09:37 | 18 | A.    No. |
| 09:37 | 19 | Q.    And you never told MGA or Mr. Larian that while you |
| 09:37 | 20 | were receiving benefits and insurance from MGA, you were |
| 09:37 | 21 | interviewing with another company, right? |
| 09:37 | 22 | A.    No. |
| 09:37 | 23 | Q.    Am I correct? |
| 09:37 | 24 | A.    Correct. |
| 09:37 | 25 | Q.    You only worked for Maui six or seven weeks, right? |

CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

50

| 09:37 | 1 | A.   Correct. |
|---|---|---|
| 09:37 | 2 | Q.   And then you were fired, true? |
| 09:37 | 3 | A.   I was terminated without cause. |
| 09:37 | 4 | Q.   In other words, fired? |
| 09:37 | 5 | A.   Sure. |
| 09:37 | 6 | Q.   And the reason given was poor attitude and |
| 09:37 | 7 | insubordination, true? |
| 09:37 | 8 | A.   I would -- no. |
| 09:37 | 9 | Q.   Now, let me go back to another issue.  Okay?  You left |
| 09:37 | 10 | MGA on December 3rd, 2001, you said, right? |
| 09:37 | 11 | A.   Yes. |
| 09:37 | 12 | Q.   And you started at Maui Toys a week later, right? |
| 09:37 | 13 | A.   Uh-huh, yes. |
| 09:37 | 14 | Q.   And after you got fired from Maui Toys, six or seven |
| 09:37 | 15 | weeks after that, you went to work for Atomic Toys, true? |
| 09:37 | 16 | A.   True. |
| 09:38 | 17 | Q.   The year 2002 passed, didn't it?  Still Atomic Toys? |
| 09:38 | 18 | A.   Yes. |
| 09:38 | 19 | Q.   Year 2003 passed; still at Atomic Toys? |
| 09:38 | 20 | A.   Yes. |
| 09:38 | 21 | Q.   2004, you were still at Atomic Toys, right? |
| 09:38 | 22 | A.   Yes. |
| 09:38 | 23 | Q.   But in the fall of 2004, almost three years after you |
| 09:38 | 24 | left MGA, then you sued MGA for pregnancy discrimination, |
| 09:38 | 25 | right? |

Case 2:04-cv-09049-DOC-RNB   Document 9844   Filed 02/10/11   Page 51 of 157   Page ID #:297054
CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

51

| | | |
|---|---|---|
| 09:38 | 1 | A.   I -- I retained my right to sue in 2002. |
| 09:38 | 2 | Q.   Did you file your lawsuit against MGA three years after |
| 09:38 | 3 | you left MGA? |
| 09:38 | 4 | A.   Yes. |
| 09:38 | 5 | Q.   And that was the lawsuit for pregnancy discrimination, |
| 09:38 | 6 | right? |
| 09:38 | 7 | A.   Yes. |
| 09:38 | 8 | Q.   And as you mentioned a second ago, you had been careful |
| 09:38 | 9 | to set up that lawsuit by filing an administrative complaint |
| 09:38 | 10 | with the Department of Fair Employment and Housing already, |
| 09:38 | 11 | right? |
| 09:38 | 12 |          MR. QUINN:  I object to "set up."  It's a legal |
| 09:38 | 13 | obligation. |
| 09:38 | 14 |          THE COURT:  Well, just rephrase it, Counsel.  It's |
| 09:38 | 15 | a little argumentative. |
| 09:39 | 16 | BY MS. KELLER: |
| 09:39 | 17 | Q.   So you sued MGA after working at two different |
| 09:39 | 18 | employers, right? |
| 09:39 | 19 | A.   Yes. |
| 09:39 | 20 | Q.   And after being fired by another toy company, right? |
| 09:39 | 21 | A.   Yes. |
| 09:39 | 22 | Q.   And you eventually dropped your lawsuit against MGA |
| 09:39 | 23 | completely, right? |
| 09:39 | 24 | A.   Yes. |
| 09:39 | 25 | Q.   MGA did not pay you any settlement money, true? |

| | | |
|---|---|---|
| 09:39 | 1 | A.   True. |
| 09:39 | 2 | Q.   And didn't pay your lawyer any attorney's fees, right? |
| 09:39 | 3 | A.   True. |
| 09:39 | 4 | Q.   You just dismissed it? |
| 09:39 | 5 | A.   True. |
| 09:39 | 6 | Q.   Now, you were very upset when MGA would not settle with |
| 09:39 | 7 | you and pay you any money, true? |
| 09:39 | 8 | A.   No, I wouldn't say that. |
| 09:39 | 9 | Q.   You were -- your testimony both today and in 2008 is |
| 09:39 | 10 | motivated by a desire to get back at MGA and Mr. Larian, |
| 09:39 | 11 | right? |
| 09:39 | 12 | A.   No. |
| 09:39 | 13 | Q.   Now, when you met with Mattel lawyer Dylan Proctor in |
| 09:39 | 14 | May of 2008 about testifying in this case, you never told |
| 09:40 | 15 | him or anyone at Mattel that you had resigned from MGA and |
| 09:40 | 16 | then sued MGA three years later, did you? |
| 09:40 | 17 | A.   I don't believe so. |
| 09:40 | 18 | Q.   Is that a -- is that a -- am I correct in that? |
| 09:40 | 19 | A.   I believe you're correct. |
| 09:40 | 20 | Q.   Now, when Mr. Proctor first called you in May of 2008, |
| 09:40 | 21 | he told you he had reviewed transcripts of another case that |
| 09:40 | 22 | you had testified in, right? |
| 09:40 | 23 | A.   Yes. |
| 09:40 | 24 | Q.   And he was talking about Fred Larian's case against his |
| 09:40 | 25 | brother Isaac, wasn't he? |

CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

53

| | | |
|---|---|---|
| 09:40 | 1 | A.   Yes. |
| 09:40 | 2 | Q.   You testified for Fred Larian against Isaac Larian in |
| 09:40 | 3 | an arbitration hearing, didn't you? |
| 09:40 | 4 | A.   Yes. |
| 09:40 | 5 | Q.   And you know that Fred Larian dismissed his case |
| 09:40 | 6 | immediately after you testified, that same afternoon, |
| 09:40 | 7 | because he realized that he had been wrong about his |
| 09:40 | 8 | allegations that his brother developed Bratz in 1999?  You |
| 09:40 | 9 | know that, don't you? |
| 09:40 | 10 | MR. QUINN:  Compound. |
| 09:40 | 11 | THE WITNESS:  No. |
| 09:40 | 12 | MR. QUINN:  Lacks foundation. |
| 09:40 | 13 | THE COURT:  Sustained. |
| 09:40 | 14 | BY MS. KELLER: |
| 09:40 | 15 | Q.   After you testified, you learned that Fred Larian had |
| 09:41 | 16 | dropped all his claims against his brother, true? |
| 09:41 | 17 | A.   I learned that a year after I testified. |
| 09:41 | 18 | Q.   At the very time you testified, you still had your |
| 09:41 | 19 | lawsuit going against MGA over this pregnancy discrimination |
| 09:41 | 20 | claim, right? |
| 09:41 | 21 | A.   I believe so. |
| 09:41 | 22 | Q.   Do you not recall? |
| 09:41 | 23 | A.   I don't remember the dates of when I dropped my claim |
| 09:41 | 24 | and when I testified.  But I believe that you are correct. |
| 09:41 | 25 | Q.   And you weren't at Atomic Toys anymore either, right? |

Case 2:04-cv-09049-DOC-RNB   Document 9844   Filed 02/10/11   Page 54 of 157   Page ID #:297057
CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

54

| 09:41 | 1 | A. | What's the date? |

09:41   1   A.   What's the date?

09:41   2   Q.   June 3rd, 2008, was the day that you testified --

09:41   3   A.   Correct.  I was not at Atomic Toys.

09:41   4   Q.   I'm sorry -- I'm sorry.

09:41   5        In the arbitration hearing, you testified

09:41   6   November 17th, 2005, right?

09:41   7   A.   Yes.

09:41   8   Q.   So you weren't at Atomic Toys anymore, right?

09:42   9   A.   Correct.

09:42   10  Q.   And you weren't working at the time, true?

09:42   11  A.   I think so.

09:42   12  Q.   You were just hoping to get money out of MGA on your

09:42   13  three-year-old pregnancy discrimination issue, right?

09:42   14  A.   No.

09:42   15        MR. QUINN:  Argumentative.

09:42   16        THE COURT:  Overruled.

09:42   17        THE WITNESS:  No.

09:42   18  BY MS. KELLER:

09:42   19  Q.   Now, let's go back to MGA and its business.

09:42   20        You were aware of the various dolls that MGA

09:42   21  manufactured and sold while you worked at MGA from June 1999

09:42   22  to 2001, with some chunks of time off, right?

09:42   23  A.   Yes.

09:42   24  Q.   And in 1999 you were a sales analyst for MGA, handling

09:42   25  the Walmart account, true?

| 09:42 | 1 | A.   And a district sales manager. |
| 09:42 | 2 | Q.   And you also handled the Kmart account in the same |
| 09:42 | 3 | capacity? |
| 09:42 | 4 | A.   Not in 1999. |
| 09:42 | 5 | Q.   While you were at MGA, you also handled the Kmart |
| 09:42 | 6 | account at some point? |
| 09:42 | 7 | A.   Yes. |
| 09:42 | 8 | Q.   So MGA manufactured and distributed dolls while you |
| 09:43 | 9 | were there, right? |
| 09:43 | 10 | A.   Yes. |
| 09:43 | 11 | Q.   Some of these were special feature, interactive |
| 09:43 | 12 | electronic dolls that could sing a song or talk? |
| 09:43 | 13 | A.   Yes. |
| 09:43 | 14 | Q.   And they did things like, when you bounce them on your |
| 09:43 | 15 | knee, they'd sing a song? |
| 09:43 | 16 | A.   Yes. |
| 09:43 | 17 | Q.   Now, does the -- do you recall the singing Bouncy Baby |
| 09:43 | 18 | doll? |
| 09:43 | 19 | A.   Yes. |
| 09:43 | 20 | Q.   That was a very successful doll, wasn't it? |
| 09:43 | 21 | A.   Yes. |
| 09:43 | 22 | Q.   And do you remember one of the dolls had a cowgirl |
| 09:43 | 23 | theme, and when you joined her feet together, she said, |
| 09:43 | 24 | "giddy-up" and started saying cowgirl-type things? |
| 09:43 | 25 | A.   Yes. |

CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

56

| 09:43 | 1 | Q.   And that was called Giddy Up Gal? |
|-------|---|----------------------------------------|
| 09:43 | 2 | A.   Giddy Up Girl, yes. |
| 09:43 | 3 | Q.   And MGA also manufactured and sold some high-end dolls |
| 09:43 | 4 | that had voice recognition features, right? |
| 09:43 | 5 | A.   Eventually, yes. |
| 09:43 | 6 | Q.   One of those was My Dream Baby? |
| 09:43 | 7 | A.   Yes. |
| 09:43 | 8 | Q.   And that was another big success, right? |
| 09:43 | 9 | A.   I don't know that it was as big a success as the lower |
| 09:44 | 10 | price-point dolls. |
| 09:44 | 11 | Q.   But it was successful? |
| 09:44 | 12 | A.   Yeah, marginally. |
| 09:44 | 13 | Q.   Now, MGA also developed a smaller doll called "Prayer |
| 09:44 | 14 | Angels," which also had electronics, right? |
| 09:44 | 15 | A.   Yes. |
| 09:44 | 16 | Q.   When you put her hands together, she recited prayers |
| 09:44 | 17 | and looked like a cherub with wings? |
| 09:44 | 18 | A.   Yes. |
| 09:44 | 19 | Q.   So MGA was making dolls for the girls market and |
| 09:44 | 20 | distributing them in stores like Walmart, Kmart, Toys R Us, |
| 09:44 | 21 | Target, and JC Penney while you were there, true? |
| 09:44 | 22 | A.   True. |
| 09:44 | 23 | Q.   And in 1997 MGA actually won the FamilyFun Toy of the |
| 09:44 | 24 | Year award for that singing Bouncy Baby doll, right? |
| 09:44 | 25 | MR. QUINN:  Lacks foundation. |

Case 2:04-cv-09049-DOC-RNB   Document 9844   Filed 02/10/11   Page 57 of 157   Page ID #:297060
CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

57

| | | |
|---|---|---|
| 09:44 | 1 | THE WITNESS:  I wasn't there in '97. |
| 09:44 | 2 | THE COURT:  Pardon? |
| 09:44 | 3 | THE WITNESS:  I didn't work at MGA in 1997. |
| 09:44 | 4 | THE COURT:  You weren't there. |
| 09:44 | 5 | BY MS. KELLER: |
| 09:44 | 6 | Q.  Well, even though you weren't there, you were in charge |
| 09:44 | 7 | of sales, right? -- for that -- that line to those stores, |
| 09:44 | 8 | true? |
| 09:45 | 9 | A.  Yes. |
| 09:45 | 10 | Q.  So you knew the history of the doll, right? |
| 09:45 | 11 | A.  I knew it won awards.  I just can't speak to the date |
| 09:45 | 12 | it won the award. |
| 09:45 | 13 | Q.  Well, you remember marketing the doll as having won |
| 09:45 | 14 | this FamilyFun Toy of the Year award, right? |
| 09:45 | 15 | A.  It would have been part of the sales sheet information, |
| 09:45 | 16 | yes. |
| 09:45 | 17 | Q.  Okay.  So the answer is, yes, you used that information |
| 09:45 | 18 | to help sell the doll.  That's kind of a big deal, right? |
| 09:45 | 19 | A.  I'm telling you, yes, I know it won an award.  I just |
| 09:45 | 20 | can't confirm it was 1997. |
| 09:45 | 21 | Q.  And you're aware too that MGA's Dream Baby video was |
| 09:45 | 22 | actually on the Jay Leno Show, even, right? |
| 09:45 | 23 | A.  I'm not aware of that. |
| 09:45 | 24 | Q.  Let's talk about this sales meeting in September or |
| 09:45 | 25 | October of 2000.  Okay?  You say you attended a sales |

CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

58

| | | |
|---|---|---|
| 09:45 | 1 | meeting at MGA where Bratz was discussed, right? |
| 09:45 | 2 | A.   Yes. |
| 09:45 | 3 | Q.   And you think that meeting was in September or October |
| 09:45 | 4 | of 2000? |
| 09:45 | 5 | A.   I believe it's October. |
| 09:45 | 6 | Q.   And -- |
| 09:45 | 7 | A.   2000. |
| 09:45 | 8 | Q.   And is that because you've now seen an exhibit shown to |
| 09:46 | 9 | you a little earlier? |
| 09:46 | 10 | A.   Yes. |
| 09:46 | 11 | Q.   Because back in June of 2008, you didn't know whether |
| 09:46 | 12 | it was September or October, right? |
| 09:46 | 13 | A.   Correct. |
| 09:46 | 14 | Q.   And there was no display of any actual Bratz doll at |
| 09:46 | 15 | that meeting, true? |
| 09:46 | 16 | A.   The physical dolls? |
| 09:46 | 17 | Q.   Yeah. |
| 09:46 | 18 | A.   No. |
| 09:46 | 19 | Q.   'Cause there were no physical dolls yet, right? |
| 09:46 | 20 | A.   Correct. |
| 09:46 | 21 | Q.   And there were no final fashions for the Bratz doll at |
| 09:46 | 22 | that meeting either, right? |
| 09:46 | 23 | A.   There were fashions.  I don't know that they were |
| 09:46 | 24 | final. |
| 09:46 | 25 | Q.   Well, final fashions are the ones that you would |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

59

| | | |
|---|---|---|
| 09:46 | 1 | actually market and sell, right? |
| 09:46 | 2 | A.   Correct. |
| 09:46 | 3 | Q.   And there were no final fashions for this doll line at |
| 09:46 | 4 | that meeting, true? |
| 09:46 | 5 | A.   True. |
| 09:46 | 6 | Q.   Now, if we could discuss the Kmart presentation in |
| 09:46 | 7 | November of 2000. |
| 09:46 | 8 | MS. KELLER:  Could we see Exhibit 11152 again, |
| 09:46 | 9 | please. |
| 09:46 | 10 | I think that's in there, but if not, I'll lay a |
| 09:46 | 11 | foundation. |
| 09:47 | 12 | (Document provided to the witness.) |
| 09:47 | 13 | BY MS. KELLER: |
| 09:47 | 14 | Q.   Is this a November 13, 2002 e-mail that you sent to |
| 09:47 | 15 | Isaac Larian, recapping the November 9, 2000, Kmart preshow? |
| 09:47 | 16 | A.   Yes. |
| 09:47 | 17 | MS. KELLER:  Move it into evidence, Your Honor. |
| 09:47 | 18 | THE COURT:  Received. |
| 09:47 | 19 | (Exhibit No. 11152 received in evidence.) |
| 09:47 | 20 | (Document displayed.) |
| 09:47 | 21 | BY MS. KELLER: |
| 09:47 | 22 | Q.   Now, Kmart was one of the four big retailers that you |
| 09:47 | 23 | had to make pitches to, right? |
| 09:47 | 24 | A.   Yes. |
| 09:47 | 25 | Q.   And you needed to make a strong pitch to Kmart to |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

60

| | | |
|---|---|---|
| 09:47 | 1 | convince them to buy anything from you, right? |
| 09:47 | 2 | A.   Yes. |
| 09:47 | 3 | Q.   And the major buyer's comments, buyers like Kmart, were |
| 09:47 | 4 | critical to deciding whether you could move forward with a |
| 09:47 | 5 | product, right? |
| 09:47 | 6 | A.   Yes. |
| 09:47 | 7 | Q.   And if the four big buyers weren't interested, it |
| 09:47 | 8 | really didn't make much sense to put any more resources into |
| 09:47 | 9 | a product, because you needed their -- their volume buying, |
| 09:47 | 10 | right? |
| 09:47 | 11 | A.   Yes. |
| 09:47 | 12 | Q.   You needed that to justify the tooling cost and the |
| 09:47 | 13 | production cost and the development cost of the product, |
| 09:47 | 14 | right? |
| 09:47 | 15 | A.   Theoretically, yes. |
| 09:48 | 16 | Q.   And in actuality, yes, right?  In the reality of the |
| 09:48 | 17 | business, true? |
| 09:48 | 18 | A.   Yes. |
| 09:48 | 19 | Q.   So you needed to make a strong pitch to Kmart that this |
| 09:48 | 20 | was gonna be a big item for MGA, right? |
| 09:48 | 21 | A.   Yes. |
| 09:48 | 22 | Q.   But you didn't even have a doll to show Kmart in |
| 09:48 | 23 | November of 2000, correct? |
| 09:48 | 24 | A.   Correct. |
| 09:48 | 25 | Q.   You only had a rendering, right? |

DEBBIE GALE, U.S. COURT REPORTER

| 09:48 | 1 | A.   Yes. |
| 09:48 | 2 | Q.   Meaning drawings? |
| 09:48 | 3 | A.   Correct. |
| 09:48 | 4 | Q.   And all you had to show people at the presentation were |
| 09:48 | 5 | what are called story boards, right? |
| 09:48 | 6 | A.   Correct. |
| 09:48 | 7 | Q.   You didn't even have any fashions to show the Kmart |
| 09:48 | 8 | buyer at the November 9, 2000 presentation, correct? |
| 09:48 | 9 | A.   I believe we had concepts, fashion concepts. |
| 09:48 | 10 | Q.   But you didn't have any actual fashions to show them, |
| 09:48 | 11 | right? |
| 09:48 | 12 | A.   I don't think so. |
| 09:48 | 13 | Q.   Am I correct? |
| 09:49 | 14 | A.   I believe you're correct. |
| 09:49 | 15 | Q.   Now, let's look at Exhibit 11336. |
| 09:49 | 16 | *(Document provided to the witness.)* |
| 09:49 | 17 | MS. KELLER:  And this is in evidence. |
| 09:49 | 18 | *(Document displayed.)* |
| 09:49 | 19 | BY MS. KELLER: |
| 09:49 | 20 | Q.   This is the second e-mail in the chain you're sending |
| 09:49 | 21 | to Colleen O'Higgins, Paula Treantafelles, and others, on |
| 09:49 | 22 | October 1st.  And you were asked about that a little |
| 09:49 | 23 | earlier.  Do you recall this e-mail? |
| 09:49 | 24 | A.   Yes. |
| 09:49 | 25 | Q.   And you write, "Hello, marketing, just a friendly |

| | | |
|---|---|---|
| 09:49 | 1 | reminder about the items we need from your department for |
| 09:49 | 2 | our road show." |
| 09:49 | 3 | So in this e-mail, you were getting ready for the road |
| 09:49 | 4 | show, where you're going to be presenting to retailers like |
| 09:49 | 5 | Kmart and JC Penney, true? |
| 09:49 | 6 | A.   Yes. |
| 09:49 | 7 | Q.   Let's go to the third page, 11336-3.  Okay.  You've |
| 09:49 | 8 | enclosed that sample list for the November road show, that |
| 09:50 | 9 | was talked about with you a little bit earlier, right? |
| 09:50 | 10 | A.   Yes. |
| 09:50 | 11 | Q.   And this described the pitch materials that you planned |
| 09:50 | 12 | to present, right? |
| 09:50 | 13 | A.   Yes. |
| 09:50 | 14 | Q.   You see the names here for the Bratz dolls under "TV |
| 09:50 | 15 | small dolls"? |
| 09:50 | 16 | A.   Yes. |
| 09:50 | 17 | Q.   Now, in the far-right column, it says, "boards, |
| 09:50 | 18 | Velcro," right? |
| 09:50 | 19 | A.   Yes. |
| 09:50 | 20 | Q.   And the reason that it says "Velcro" is because Velcro |
| 09:51 | 21 | is necessary to attach things to the boards, right? |
| 09:51 | 22 | A.   Yes. |
| 09:51 | 23 | Q.   And that's again because you had no dolls to show, |
| 09:51 | 24 | right? |
| 09:51 | 25 | A.   Correct. |

| | | |
|---|---|---|
| 09:51 | 1 | Q.   Now, let's go back to the third column, which lists the |
| 09:51 | 2 | names of the dolls.  And it says two each, Zoe and Holliday |
| 09:51 | 3 | (sic).  Was that what you thought the name of the doll was |
| 09:51 | 4 | at that point, the proposed name for the proposed doll? |
| 09:51 | 5 | A.   Those were proposed names, yes. |
| 09:51 | 6 | Q.   And you see "Jade" and "Lupe," right? |
| 09:51 | 7 | A.   Yes.  Uh-huh, yes. |
| 09:51 | 8 | Q.   Now, what were the names the dolls that were released? |
| 09:51 | 9 | A.   Cloe, Sasha, Jade, and Yasmin. |
| 09:51 | 10 | Q.   So Zoe -- I think this is a misprint -- Hallidae, and |
| 09:51 | 11 | Lupe never were released, true? |
| 09:52 | 12 | A.   The dolls were released with different names. |
| 09:52 | 13 | Q.   Three of the four dolls released did not have the names |
| 09:52 | 14 | Lupe, Hallidae, or Zoe, correct? |
| 09:52 | 15 | A.   Correct. |
| 09:52 | 16 | Q.   Let alone Hallidae, true? |
| 09:52 | 17 | A.   Correct. |
| 09:52 | 18 | Q.   And so as of this November 9, 2000 Kmart presentation, |
| 09:52 | 19 | you didn't even have the final names for the doll |
| 09:52 | 20 | characters, right? |
| 09:52 | 21 | A.   Correct. |
| 09:52 | 22 | Q.   Because Bratz was in its early stages of development of |
| 09:52 | 23 | a doll back in November of 2000, right? |
| 09:52 | 24 | A.   Yes. |
| 09:52 | 25 | Q.   And as of January 31st, 2001, Kmart had placed no |

| | | |
|---|---|---|
| 09:52 | 1 | orders with you for Bratz, correct? |
| 09:52 | 2 | A.   Correct. |
| 09:52 | 3 | Q.   Now, there was something else that you mentioned, that |
| 09:52 | 4 | when you -- around the time you made this presentation, |
| 09:52 | 5 | there had been focus groups for girls and the girls had |
| 09:53 | 6 | liked the dolls.  Do you remember that? |
| 09:53 | 7 | A.   Yes. |
| 09:53 | 8 | Q.   But you can only have focus groups once you have actual |
| 09:53 | 9 | dolls for the children to play with, right? |
| 09:53 | 10 | A.   Yes, but it doesn't have to be these dolls. |
| 09:53 | 11 | Q.   Focus groups are conducted with the dolls that you |
| 09:53 | 12 | intend to market, actual physical 3D dolls, not story |
| 09:53 | 13 | boards, right? |
| 09:53 | 14 | A.   Not necessarily. |
| 09:53 | 15 | Q.   Focus groups at MGA that were done to test the |
| 09:53 | 16 | potential success of products were done with actual dolls, |
| 09:53 | 17 | every time, correct? |
| 09:53 | 18 | A.   They were done with dolls.  It could have been |
| 09:53 | 19 | competitor's dolls to elicit the same information. |
| 09:53 | 20 | Q.   We're talking about the Bratz dolls.  We're not talking |
| 09:53 | 21 | about a focus group with competitor dolls.  You said that |
| 09:53 | 22 | little girls were given the Bratz dolls at a focus group and |
| 09:54 | 23 | they really liked them, right around this time.  Do you |
| 09:54 | 24 | remember that? |
| 09:54 | 25 | A.   I never said that. |

CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

65

| | | |
|---|---|---|
| 09:54 | 1 | Q.   Ah, so it was a focus group with somebody else's dolls; |
| 09:54 | 2 | they weren't Bratz dolls? |
| 09:54 | 3 | A.   I said there was a focus group.  I never said kids were |
| 09:54 | 4 | given Bratz dolls. |
| 09:54 | 5 | Q.   A focus group and given what dolls? |
| 09:54 | 6 | A.   They would have been given other fashion dolls. |
| 09:54 | 7 | Q.   I'm not asking about what would they have been given. |
| 09:54 | 8 | What were they given? |
| 09:54 | 9 | A.   I wasn't in the focus group. |
| 09:54 | 10 | Q.   So what you're telling us is this testimony earlier had |
| 09:54 | 11 | nothing to do with the Bratz dolls, right? |
| 09:54 | 12 | A.   No, that's not what I'm saying. |
| 09:54 | 13 | Q.   There were no Bratz dolls to give little girls to look |
| 09:54 | 14 | at to see if -- in any focus group in November of 2000, |
| 09:54 | 15 | correct? |
| 09:54 | 16 | A.   Correct. |
| 09:54 | 17 | Q.   And that's 'cause the dolls were in an early stage of |
| 09:54 | 18 | development and they didn't exist yet, right? |
| 09:54 | 19 | A.   Physical dolls didn't exist, correct. |
| 09:54 | 20 | Q.   And focus groups with little girls, they're not given |
| 09:54 | 21 | story boards or pictures to play with, right? |
| 09:54 | 22 | A.   They could be. |
| 09:54 | 23 | Q.   They were not at MGA, correct? |
| 09:55 | 24 | A.   I don't believe that's correct. |
| 09:55 | 25 | Q.   Name one time that you know of that little girls were |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

66

| | | |
|---|---|---|
| 09:55 | 1 | given pieces of paper or story boards to play with as part |
| 09:55 | 2 | of a focus group at MGA? |
| 09:55 | 3 | A.   I was told there were Bratz -- there were focus groups |
| 09:55 | 4 | for Bratz, and that was prior to having dolls, so they had |
| 09:55 | 5 | to have been given something. |
| 09:55 | 6 | Q.   Well, if I understood your testimony just a minute ago, |
| 09:55 | 7 | you said that the focus groups did not involve little girls |
| 09:55 | 8 | playing with Bratz dolls, but with other fashion dolls? |
| 09:55 | 9 | A.   Ma'am, I'm not saying that they were playing with Bratz |
| 09:55 | 10 | dolls.  The focus groups are designed to elicit information. |
| 09:55 | 11 | They would have been trying to find out what kind of hair |
| 09:55 | 12 | play the girls wanted, if the dolls needed to stand up, many |
| 09:55 | 13 | things that didn't need the physical doll to determine. |
| 09:55 | 14 | Q.   That's not my question. |
| 09:55 | 15 | A.   Okay.  What's your question? |
| 09:55 | 16 | Q.   My question is, are you testifying here today that |
| 09:55 | 17 | there was a focus group at MGA before November of 2000 where |
| 09:55 | 18 | little girls participated in the focus group, but had no |
| 09:56 | 19 | dolls? |
| 09:56 | 20 | A.   Yes. |
| 09:56 | 21 | Q.   When was that? |
| 09:56 | 22 | A.   Prior to -- it would have been prior to the sales |
| 09:56 | 23 | meeting. |
| 09:56 | 24 | Q.   When? |
| 09:56 | 25 | A.   The sales meeting was in October.  It would have been |

| 09:56 | 1 | prior to that. |
| 09:56 | 2 | Q.    Who conducted that? |
| 09:56 | 3 | A.    Paula Treantafelles. |
| 09:56 | 4 | Q.    Were you there? |
| 09:56 | 5 | A.    No. |
| 09:56 | 6 | Q.    Do you know what the little girls had to play with? |
| 09:56 | 7 | A.    No. |
| 09:56 | 8 | Q.    Do you know whether they had anything to play with? |
| 09:56 | 9 | A.    No. |
| 09:56 | 10 | Q.    Do you know whether they were looking at story boards? |
| 09:56 | 11 | A.    No. |
| 09:56 | 12 | Q.    Do you know that there was even a focus group? |
| 09:56 | 13 | A.    Yes. |
| 09:56 | 14 | Q.    Who else was present, other than Paula Treantafelles, |
| 09:56 | 15 | at this focus group, if you know? |
| 09:56 | 16 | A.    I don't know. |
| 09:56 | 17 | Q.    Do you have any memo or documentary evidence of this? |
| 09:56 | 18 | A.    No. |
| 09:56 | 19 | Q.    This is just based on your memory? |
| 09:56 | 20 | A.    This based on the information we were provided. |
| 09:56 | 21 | Q.    By whom? |
| 09:56 | 22 | A.    By the marketing department and Isaac. |
| 09:56 | 23 | Q.    Do you have copies? |
| 09:56 | 24 | A.    No. |
| 09:56 | 25 | Q.    Have you seen copies? |

Case 2:04-cv-09049-DOC-RNB   Document 9844   Filed 02/10/11   Page 68 of 157   Page ID #:297071
CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

68

| | | |
|---|---|---|
| 09:56 | 1 | A.   No. |
| 09:56 | 2 | Q.   Have the Mattel lawyers given you copies? |
| 09:56 | 3 | A.   Mattel lawyers haven't given me anything. |
| 09:57 | 4 | Q.   Has your lawyer? |
| 09:57 | 5 | A.   No. |
| 09:57 | 6 | Q.   Did you have any copies before the arbitration |
| 09:57 | 7 | proceeding that you testified in? |
| 09:57 | 8 | A.   No. |
| 09:57 | 9 | Q.   Now, let's look at Trial Exhibit 34690.  Is this a |
| 09:57 | 10 | December 7th e-mail from you to Mr. Larian? |
| 09:57 | 11 | A.   Yes. |
| 09:57 | 12 | Q.   And this was regarding the Family Dollar Hong Kong |
| 09:57 | 13 | preshow, right? |
| 09:57 | 14 | A.   (No response.) |
| 09:57 | 15 | Q.   And is this dated December 7th, 2000? |
| 09:57 | 16 | A.   Yes. |
| 09:57 | 17 |         MS. KELLER:  I'd move it into evidence, |
| 09:57 | 18 | Your Honor. |
| 09:57 | 19 |         MR. QUINN:  No objection. |
| 09:57 | 20 |         THE COURT:  Received. |
| 09:57 | 21 |         *(Exhibit No. 34690 received in evidence.)* |
| 09:57 | 22 |          *(Document displayed.)* |
| 09:57 | 23 | BY MS. KELLER: |
| 09:57 | 24 | Q.   So Family Dollar was -- |
| 09:57 | 25 |         THE COURT:  I'm sorry.  Is this -- Mr. Chang is on |

DEBBIE GALE, U.S. COURT REPORTER

09:57   1   this e-mail?  I want to make sure I've got the right e-mail.

09:58   2   Just a moment.

09:58   3           This is an e-mail of December 8th, Mr. Larian and

09:58   4   Ms. Maurus.

09:58   5           MS. KELLER:  That's correct, Your Honor.

09:58   6           THE COURT:  Thank you.

09:58   7           MS. KELLER:  Just those two.

09:58   8           THE COURT:  Thank you very much.

09:58   9   BY MS. KELLER:

09:58   10  Q.   Now, in this e-mail you're talking about the Family

09:58   11  Dollar Hong Kong preshow; is that right?

09:58   12  A.   Yes.

09:58   13  Q.   Family Dollar was another buyer of your toys, true?

09:58   14  A.   Yes.

09:58   15  Q.   And if you look at the second page -- look under

09:58   16  Hoppity and Scooter.

09:58   17  A.   Yes.

09:58   18  Q.   It says "Bratz.  I could only speak to this, because I

09:58   19  didn't have good materials.  He wants to see in HK" --

09:58   20  meaning Hong Kong?

09:58   21  A.   Yes.

09:58   22  Q.   And this entire e-mail --

09:58   23          MS. KELLER:  If we can go back to the first page.

09:58   24              (Technician complies.)

        25

CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

70

| | | |
|---|---|---|
| 09:58 | 1 | BY MS. KELLER: |
| 09:58 | 2 | Q.   -- is about other toys, and then that's the only line |
| 09:58 | 3 | in here about the Bratz, right? |
| 09:59 | 4 | A.   Right. |
| 09:59 | 5 | Q.   And that's because as of December 8th, 2000, you still |
| 09:59 | 6 | didn't have a doll, right? |
| 09:59 | 7 | A.   Right. |
| 09:59 | 8 | Q.   You still only had written materials about it, right? |
| 09:59 | 9 | A.   We had written materials and some mockups. |
| 09:59 | 10 | Q.   Well -- "I could only speak to this because I don't |
| 09:59 | 11 | (sic) have good materials." |
| 09:59 | 12 |      So in this e-mail you're telling Mr. Larian -- |
| 09:59 | 13 |          MR. QUINN:  Misquotes the language. |
| 09:59 | 14 |          MS. KELLER:  I'll try it again. |
| 09:59 | 15 | BY MS. KELLER: |
| 09:59 | 16 | Q.   "Bratz," dash, "I could only speak to this, because I |
| 09:59 | 17 | didn't have good materials.  He wants to see in HK." |
| 09:59 | 18 |      Do you see that? |
| 09:59 | 19 | A.   Yes. |
| 09:59 | 20 | Q.   So you're telling Mr. Larian in this e-mail that you |
| 09:59 | 21 | could only talk about the Bratz because you didn't even have |
| 09:59 | 22 | anything to show, right? |
| 09:59 | 23 | A.   Correct. |
| 09:59 | 24 | Q.   Now, let's go back to Trial Exhibit 11152. |
| 10:00 | 25 |          *(Document provided to the witness.)* |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 10:00 | 1 | BY MS. KELLER: |
| 10:00 | 2 | Q.   Isn't it true that the first focus group that was done |
| 10:00 | 3 | for the Bratz dolls was conducted March 27, 2001? |
| 10:00 | 4 | A.   No. |
| 10:00 | 5 | Q.   Are you looking at some written materials in front of |
| 10:00 | 6 | you? |
| 10:00 | 7 | A.   I'm looking at the exhibit you asked me to look at. |
| 10:00 | 8 | Q.   You're going just from memory as to when this focus |
| 10:00 | 9 | group was, right? |
| 10:00 | 10 | A.   Yes. |
| 10:00 | 11 | MS. KELLER:  Your Honor, may I approach? |
| 10:00 | 12 | THE COURT:  Certainly. |
| 10:01 | 13 | MR. QUINN:  It's not something we've gone over. |
| 10:01 | 14 | MS. KELLER:  I want to see if it refreshes her |
| 10:01 | 15 | memory, Your Honor. |
| 10:01 | 16 | THE COURT:  It won't be received, Counsel.  Let's |
| 10:01 | 17 | see if it refreshes her memory, and then I will look at it |
| 10:01 | 18 | during the recess, if there's any attempt to introduce it. |
| 10:01 | 19 | MS. KELLER:  Thank you, Your Honor. |
| 10:01 | 20 | BY MS. KELLER: |
| 10:01 | 21 | Q.   Does this refresh your memory that the focus group for |
| 10:01 | 22 | the Bratz dolls was actually March 27, 2001? |
| 10:01 | 23 | A.   No. |
| 10:01 | 24 | Q.   By which time there were actually dolls? |
| 10:01 | 25 | A.   I've never seen this before.  It doesn't refresh any |

CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

72

| | | |
|---|---|---|
| 10:01 | 1 | memory. |
| 10:01 | 2 | Q.   You see what it says on it, don't you? |
| 10:01 | 3 | MR. QUINN:  Your Honor. |
| 10:01 | 4 | THE COURT:  Excuse me.  We won't be going into it. |
| 10:01 | 5 | MS. KELLER:  I was going to ask her -- |
| 10:01 | 6 | THE COURT:  Just a moment.  If I haven't seen it |
| 10:01 | 7 | on a Saturday or Sunday, ladies and gentlemen, it's |
| 10:01 | 8 | completely irrelevant. |
| 10:01 | 9 | Put the document down.  Next area, next question. |
| 10:02 | 10 | BY MS. KELLER: |
| 10:02 | 11 | Q.   Now, let's go back to Trial Exhibit 11152, your |
| 10:02 | 12 | November 13, 2000 recap of the November 9th, 2000 Kmart |
| 10:02 | 13 | presentation? |
| 10:02 | 14 | A.   Okay. |
| 10:02 | 15 | Q.   You don't know how many changes occurred to this doll |
| 10:02 | 16 | between the time you wrote this memo and the time the final |
| 10:02 | 17 | doll was actually produced for sale in 2001, correct? |
| 10:02 | 18 | A.   I know there were changes.  I don't know the number of |
| 10:02 | 19 | iterations. |
| 10:02 | 20 | Q.   You don't know how many changes occurred between the |
| 10:02 | 21 | time you wrote your November 13, 2000 memo and the time the |
| 10:02 | 22 | final doll was actually produced for sale in 2001, correct? |
| 10:02 | 23 | A.   Correct. |
| 10:02 | 24 | Q.   And you also don't know any exact dates in this case, |
| 10:02 | 25 | correct? -- except what you see in e-mails? |

Case 2:04-cv-09049-DOC-RNB   Document 9844   Filed 02/10/11   Page 73 of 157   Page ID #:297076
CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

73

| | | |
|---|---|---|
| 10:03 | 1 | MR. QUINN:  Excuse me.  It's vague and ambiguous. |
| 10:03 | 2 | "Exact dates in this case." |
| 10:03 | 3 | THE COURT:  Well, just restate the question. |
| 10:03 | 4 | BY MS. KELLER: |
| 10:03 | 5 | Q.   The only reason that you know this date -- |
| 10:03 | 6 | THE COURT:  November 13th, 2000? |
| 10:03 | 7 | MS. KELLER:  Yes. |
| 10:03 | 8 | THE COURT:  Okay. |
| 10:03 | 9 | BY MS. KELLER: |
| 10:03 | 10 | Q.   The only reason you know this date that you've |
| 10:03 | 11 | testified to is you received your recap of the Kmart |
| 10:03 | 12 | presentation as part of the discovery in your lawsuit |
| 10:03 | 13 | against MGA, right? |
| 10:03 | 14 | MR. QUINN:  It's argumentative.  Vague and |
| 10:03 | 15 | ambiguous. |
| 10:03 | 16 | THE COURT:  Overruled.  You can answer the |
| 10:03 | 17 | question. |
| 10:03 | 18 | Do you understand the question? |
| 10:03 | 19 | THE WITNESS:  If she could ask again, I'd |
| 10:03 | 20 | appreciate it. |
| 10:03 | 21 | THE COURT:  Okay. |
| 10:03 | 22 | BY MS. KELLER: |
| 10:03 | 23 | Q.   The only reason that you know this date is that you |
| 10:03 | 24 | received your recap of the Kmart presentation as part of the |
| 10:03 | 25 | discovery in your lawsuit against MGA, correct? |

CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

74

| | | |
|---|---|---|
| 10:03 | 1 | A.    Yes. |
| 10:04 | 2 | Q.    And you know that that Kmart presentation happened |
| 10:04 | 3 | November 9, 2000, right? |
| 10:04 | 4 | A.    Yes. |
| 10:04 | 5 | Q.    Now, throughout your lawsuit against MGA, you looked at |
| 10:04 | 6 | that document that we were just talking about, Trial |
| 10:04 | 7 | Exhibit 11152, true? |
| 10:04 | 8 | MR. QUINN:  It's vague and ambiguous. |
| 10:04 | 9 | THE COURT:  Do you understand the question? |
| 10:04 | 10 | THE WITNESS:  Yes. |
| 10:04 | 11 | THE COURT:  Now, that was "yes" to "Do you |
| 10:04 | 12 | understand the question?" |
| 10:04 | 13 | THE WITNESS:  Yes. |
| 10:04 | 14 | THE COURT:  Now, do you recall the question, and |
| 10:04 | 15 | your answer to the question is? |
| 10:04 | 16 | THE WITNESS:  I don't recall if I looked at this |
| 10:04 | 17 | during that lawsuit or not. |
| 10:04 | 18 | BY MS. KELLER: |
| 10:04 | 19 | Q.    Would it refresh your memory to see a copy of your |
| 10:04 | 20 | testimony in the Larian arbitration hearing? |
| 10:04 | 21 | A.    Yes.  But that's a different case than what you just |
| 10:04 | 22 | asked me about.  I think I'm confused as to your question. |
| 10:04 | 23 | If you could ask again, I'd appreciate it. |
| 10:05 | 24 | Q.    Well, I'll tell you what.  Let's just let you have a |
| 10:05 | 25 | look at your own testimony in the Larian arbitration |

| | | |
|---|---|---|
| 10:05 | 1 | hearing. |
| 10:05 | 2 | Page 262. |
| 10:05 | 3 | A.   Where is that? |
| 10:05 | 4 | Q.   It's coming.  It's page 262, lines 8 through 10. |
| 10:05 | 5 | *(Document provided to the witness.)* |
| 10:05 | 6 | MR. QUINN:  Your Honor, is this to refresh her |
| 10:05 | 7 | recollection? |
| 10:05 | 8 | MS. KELLER:  No, it's not.  It may be. |
| 10:05 | 9 | THE COURT:  Just a moment. |
| 10:05 | 10 | MS. KELLER:  We'll see. |
| 10:05 | 11 | THE COURT:  Excuse me. |
| 10:05 | 12 | Your discussion is now over. |
| 10:05 | 13 | Now, just a moment.  Let me read this. |
| 10:05 | 14 | And your question is, "Does it refresh your |
| 10:05 | 15 | recollection?" |
| 10:05 | 16 | BY MS. KELLER: |
| 10:05 | 17 | Q.   Is it true that you looked at that document throughout |
| 10:05 | 18 | your lawsuit against MGA? |
| 10:06 | 19 | A.   Yes. |
| 10:06 | 20 | Q.   And, in fact, that was the only reason that you knew |
| 10:06 | 21 | the date, November 9th, 2000, in relation to this meeting, |
| 10:06 | 22 | right? |
| 10:06 | 23 | A.   Yes. |
| 10:06 | 24 | Q.   Because you had looked at this exhibit, that we're now |
| 10:06 | 25 | looking at on the screen, throughout your own case, as it |

| | | |
|---|---|---|
| 10:06 | 1 | related to your case, right? |
| 10:06 | 2 | A.    Yes. |
| 10:06 | 3 | Q.    And but for that, you would not have been able to say |
| 10:06 | 4 | when this meeting was just from your memory, right? |
| 10:06 | 5 | A.    (No response.) |
| 10:06 | 6 | Q.    But for studying that exhibit throughout your own case? |
| 10:06 | 7 | A.    No, I disagree. |
| 10:06 | 8 |            MS. KELLER:  Your Honor, may I read lines 3 |
| 10:06 | 9 | through 7? |
| 10:06 | 10 |            THE COURT:  You may. |
| 10:06 | 11 |            MR. QUINN:  Excuse me.  Where are we? |
| 10:06 | 12 |            THE COURT:  We're at lines 3 through 7. |
| 10:06 | 13 |            MR. QUINN:  Of page? |
| 10:07 | 14 |            MS. KELLER:  262. |
| 10:07 | 15 |            THE COURT:  Of page 262. |
| 10:07 | 16 |            MR. QUINN:  I can get there. |
| 10:07 | 17 |            THE COURT:  And that is -- well, I think it's |
| 10:07 | 18 | two -- |
| 10:07 | 19 |            MS. KELLER:  And that was dated November 17, 2005. |
| 10:07 | 20 |            THE COURT:  It's Volume II, Counsel. |
| 10:07 | 21 |            MR. QUINN:  I've got it, Your Honor.  It's not |
| 10:07 | 22 | impeaching.  It has nothing to do with the question. |
| 10:07 | 23 |            THE COURT:  Any objection to it being read? -- |
| 10:07 | 24 | since everything else has been read.  But if there's an |
| 10:07 | 25 | objection. |

| | | |
|---|---|---|
| 10:07 | 1 | MR. QUINN:  262, lines 2 to 5? |
| 10:07 | 2 | THE COURT:  No. |
| 10:07 | 3 | MS. KELLER:  3 through 7. |
| 10:07 | 4 | MR. QUINN:  No objection. |
| 10:07 | 5 | THE COURT:  Okay.  We're reading now. |
| 10:07 | 6 | MS. KELLER:  (Reading:) |
| 10:07 | 7 | "QUESTION:  And you said it was November 9th, and |
| 10:07 | 8 | I'm just curious how you knew that if you haven't looked at |
| 10:07 | 9 | any documents. |
| 10:07 | 10 | "ANSWER:  As part of the discovery in my case |
| 10:08 | 11 | against MGA, there is a document recapping that meeting." |
| 10:08 | 12 | THE COURT:  Now, by reading that, I don't want you |
| 10:08 | 13 | to assume that that's impeaching.  You've heard the witness' |
| 10:08 | 14 | testimony, and counsel have basically stipulated that that |
| 10:08 | 15 | portion could be read.  So you can view that as impeaching, |
| 10:08 | 16 | or you can view that as a prior consistent statement with |
| 10:08 | 17 | what she said in court. |
| 10:08 | 18 | BY MS. KELLER: |
| 10:08 | 19 | Q.   Now, let's go to the last page of your recap, |
| 10:08 | 20 | Exhibit 11152, page 4. |
| 10:08 | 21 | (Document displayed.) |
| 10:08 | 22 | BY MS. KELLER: |
| 10:08 | 23 | Q.   And you write, "I need to get quotes done within the |
| 10:08 | 24 | next (sic) week, so I need accurate dimensions and images |
| 10:08 | 25 | from marketing right away." |

CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

78

| 10:08 | 1 | You see that? |
|---|---|---|
| 10:08 | 2 | A.   Yes. |
| 10:08 | 3 | Q.   So at that point you had a concept of a doll, right? -- |
| 10:08 | 4 | but no doll, correct? |
| 10:08 | 5 | A.   Correct. |
| 10:08 | 6 | Q.   You had a concept of a package, but no package, |
| 10:09 | 7 | correct? |
| 10:09 | 8 | A.   Correct.  We had mock packaging.  Was it final?  No. |
| 10:09 | 9 | Q.   A concept of hair, but no actual hair, right? |
| 10:09 | 10 | A.   Correct. |
| 10:09 | 11 | Q.   A concept of clothes, but no final fashions, correct? |
| 10:09 | 12 | A.   Correct. |
| 10:09 | 13 | Q.   And there was no doll done at all in 2001, right? |
| 10:09 | 14 | A.   Correct. |
| 10:09 | 15 | Q.   You didn't even know how big the doll was gonna be, |
| 10:09 | 16 | true? |
| 10:09 | 17 | A.   I think there was a rough estimate. |
| 10:09 | 18 | Q.   Well, let's turn back to this e-mail.  "I need to get |
| 10:09 | 19 | quotes done within the next (sic) week, so I need accurate |
| 10:09 | 20 | dimensions and images from marketing right away." |
| 10:09 | 21 | You see that? |
| 10:09 | 22 | A.   Yes. |
| 10:09 | 23 | Q.   So you didn't even know how big the doll was going to |
| 10:09 | 24 | be? |
| 10:09 | 25 | A.   Dimensions refer to the packaging. |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 9844   Filed 02/10/11   Page 79 of 157   Page ID #:297082
CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

79

| | | |
|---|---|---|
| 10:09 | 1 | Q.    Okay.  You didn't know the size of the doll, true? |
| 10:09 | 2 | A.    True. |
| 10:09 | 3 | Q.    In fact, in 2005, you believed that the doll was |
| 10:09 | 4 | 13 inches?  13-inches tall, right? |
| 10:10 | 5 | A.    I believe I testified to that.  I guessed. |
| 10:10 | 6 | Q.    You guessed.  And that's because you didn't know, true? |
| 10:10 | 7 | A.    It's because I didn't remember. |
| 10:10 | 8 | Q.    So you just guessed? |
| 10:10 | 9 | A.    Yes. |
| 10:10 | 10 | Q.    Under oath? |
| 10:10 | 11 | A.    Yes. |
| 10:10 | 12 | Q.    Knowingly guessing? |
| 10:10 | 13 | A.    I believe I said that. |
| 10:10 | 14 | Q.    Well -- |
| 10:10 | 15 | THE COURT:  Just a moment counsel.  This might be |
| 10:10 | 16 | a good time for a recess.  Would that be acceptable? |
| 10:10 | 17 | MS. KELLER:  Sure. |
| 10:10 | 18 | THE COURT:  You're admonished not to discuss this |
| 10:10 | 19 | matter amongst yourselves, nor form or express any opinion |
| 10:10 | 20 | concerning the case. |
| 10:10 | 21 | Have a nice recess.  We'll come and get you in |
| 10:10 | 22 | about 20 minutes. |
| 10:10 | 23 | Have a nice recess. |
| 10:10 | 24 | *(Jury recesses at 10:10 a.m.)* |
| 10:11 | 25 | *(Out of the presence of the jury.)* |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB  Document 9844  Filed 02/10/11  Page 80 of 157  Page ID #:297083
CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

80

| | | |
|---|---|---|
| 10:11 | 1 | THE COURT:  The jury's no longer present.  If you |
| 10:11 | 2 | would like to step down.  Thank you.  Have a nice recess. |
| 10:11 | 3 | We'll see you exactly 10:30. |
| 10:11 | 4 | *(Witness exits the proceedings.)* |
| 10:11 | 5 | THE COURT:  Counsel, I need you still in session. |
| 10:11 | 6 | The court reporter and I noticed the same thing |
| 10:11 | 7 | concerning a misreading of that particular section.  A word |
| 10:11 | 8 | was added.  And I'm going to have Debbie read back to you |
| 10:11 | 9 | what your reading was, just so -- I think it's |
| 10:11 | 10 | unintentional, but it potentially changes the answer -- |
| 10:11 | 11 | MS. KELLER:  I'm sorry, Your Honor. |
| 10:11 | 12 | THE COURT:  -- to the question. |
| 10:11 | 13 | MS. KELLER:  This was the reading of? |
| 10:11 | 14 | THE COURT:  Debbie is going to read to you. |
| 10:11 | 15 | Listen carefully. |
| 10:11 | 16 | Debbie, read back. |
| 10:11 | 17 | *(Record read.)* |
| 10:12 | 18 | THE COURT:  The word "next" was added. |
| 10:12 | 19 | MS. KELLER:  Oh. |
| 10:12 | 20 | THE COURT:  Now, it may not change a thing.  I |
| 10:12 | 21 | just want you to be aware if there's a week in contention, |
| 10:12 | 22 | what's happening. |
| 10:12 | 23 | MS. KELLER:  Your Honor, with the Court's |
| 10:12 | 24 | permission, I'll correct that after the break. |
| 10:12 | 25 | THE COURT:  Absolutely.  Debbie and I saw that. |

Case 2:04-cv-09049-DOC-RNB   Document 9844   Filed 02/10/11   Page 81 of 157   Page ID #:297084
CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

81

| | | |
|---|---|---|
| 10:12 | 1 | That's why we made eye contact.  That's why I took a recess. |
| 10:13 | 2 | Now, let me make a couple quick rulings.  Up to |
| 10:13 | 3 | this time, we have a history of each company trying to |
| 10:13 | 4 | demonstrate their different awards and their acumen in the |
| 10:13 | 5 | toy industry.  And this whole area of copying, this Court |
| 10:13 | 6 | believed, up to this time was completely irrelevant. |
| 10:13 | 7 | I'd ruled in an *in limine* motion that copying was |
| 10:13 | 8 | not relevant.  I precluded Mattel based upon a motion by |
| 10:13 | 9 | MGA.  We were going to get into the Toy of the Year award. |
| 10:13 | 10 | We were eventually going to get into the year 2000, which |
| 10:13 | 11 | the Court felt opened a mini-trial within a mini-trial |
| 10:13 | 12 | concerning the virtues of the company. |
| 10:13 | 13 | But this whole idea of copying in and of itself is |
| 10:13 | 14 | not relevant.  The Court's rather consistent about that. |
| 10:13 | 15 | But the whole idea of the ability of a company to at least |
| 10:13 | 16 | produce a prototype or have a design or fashion center has |
| 10:14 | 17 | always been in contention. |
| 10:14 | 18 | I want to inform Mattel I was still prepared and |
| 10:14 | 19 | was going to rule against you.  But I think that on |
| 10:14 | 20 | cross-examination it's fair game for MGA to open the door |
| 10:14 | 21 | concerning the 1997 Toy of the Year award.  But it's not |
| 10:14 | 22 | fair that Mattel can't respond in some timely fashion.  And |
| 10:14 | 23 | that just isn't, quote/unquote, awards; that also, I think, |
| 10:14 | 24 | pertains to copying. |
| 10:14 | 25 | It's too fine a ruling by the Court, now, after |

10:14  1    hearing the cross-examination.  Because the whole idea is

10:14  2    the ability of MGA to bring into production a prototype, a

10:14  3    design, et cetera, which Mattel has consistently argued that

10:14  4    MGA didn't have the ability to do.

10:14  5        The problem is that we opened with an opening

10:14  6    statement by Mr. Quinn, which I find no fault with, but was

10:14  7    really against the Court's *in limine* motion that Mattel --

10:14  8    or MGA, basically, didn't have a creative bone in its body.

10:15  9    And those aren't the exact words, but that's the inference.

10:15  10       To even that out, quite frankly, I thought MGA was

10:15  11   at a disadvantage with that kind of an opening statement.

10:15  12   The Court recognizes it's not evidence.  But I allowed a

10:15  13   small amount of at least your ability in the year 2008 or

10:15  14   2010.  I thought that that was a good ruling by the Court.

10:15  15   We wanted to leave it at that point, as far as I was

10:15  16   concerned, because I thought it was unduly consumptive of

10:15  17   time.

10:15  18       But now we're back into the 1997 Toy of the Year

10:15  19   award.  And it's not the Toy of the Year award; it's the

10:15  20   inference to the jury that MGA had great ability, and even

10:15  21   though you've limited it to, quote/unquote, the Toy of the

10:15  22   Year award, what the jury's really absorbing is, hey, this

10:15  23   is a very competent company, and it must have the ability to

10:15  24   produce a fashion doll.

10:15  25       That strikes me now to open the door into what I

| | | |
|---|---|---|
| 10:16 | 1 | wasn't going to do, and that is some area of copying. |
| 10:16 | 2 | But I believe that the only relevant area of |
| 10:16 | 3 | copying is that 2000 -- 1999/2000 up-to-the-launch period of |
| 10:16 | 4 | the Bratz doll, sometime as early as May, according to this |
| 10:16 | 5 | witness, but as late as June through August, according to |
| 10:16 | 6 | some other witnesses. |
| 10:16 | 7 | So my view is that now you can get into copying. |
| 10:16 | 8 | I think that this whole area, once again, goes to |
| 10:16 | 9 | ability. |
| 10:16 | 10 | So therefore, I'm not going to cut a fine sword, |
| 10:16 | 11 | quite frankly, and slice up the idea that the ability of MGA |
| 10:16 | 12 | to produce these dolls is certainly in question from |
| 10:16 | 13 | Mattel's standpoint. |
| 10:16 | 14 | But I want to limit it there. |
| 10:16 | 15 | The problem is, each ruling seems to have a little |
| 10:16 | 16 | bit of undercutting, not intentionally, but in the heat of |
| 10:16 | 17 | combat.  I'm trying not to limit the parties too much. |
| 10:16 | 18 | Beyond that, though, I think you've gotten in your |
| 10:17 | 19 | response to Mr. Quinn's opening statement; that this is a |
| 10:17 | 20 | productive and creative company in 2008, 2010, especially |
| 10:17 | 21 | with the Moxie doll.  That's been offset.  And I think if we |
| 10:17 | 22 | limit it up to 2001, et cetera, that's really the critical |
| 10:17 | 23 | time when I think that Mattel is contending that there |
| 10:17 | 24 | wasn't really any ability of MGA to get this off the ground, |
| 10:17 | 25 | but for the trade secret misappropriation, from your |

Case 2:04-cv-09049-DOC-RNB   Document 9844   Filed 02/10/11   Page 84 of 157   Page ID #:297087
CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

84

| | | |
|---|---|---|
| 10:17 | 1 | standpoint. |
| 10:17 | 2 | Therefore, even though I would normally feel the |
| 10:17 | 3 | tags, et cetera, are completely irrelevant, here it goes to |
| 10:17 | 4 | the general idea of what's the ability of this company. |
| 10:17 | 5 | And I'm a little afraid of this 1997 toy award |
| 10:17 | 6 | cross-examination, because that creates the impression.  So |
| 10:17 | 7 | that's the change in the Court's ruling. |
| 10:17 | 8 | I thought I'd made a brilliant ruling before -- |
| 10:17 | 9 | I'm just joking with you, counsel.  But I thought it made a |
| 10:17 | 10 | lot of sense in terms of precluding this.  I still do.  I |
| 10:17 | 11 | don't think it's relevant from 2001 on from this point |
| 10:17 | 12 | forward. |
| 10:18 | 13 | Now, you have one more ruling. |
| 10:18 | 14 | These arbitration proceedings get pretty tricky |
| 10:18 | 15 | now.  Arbitration before was somewhat off the board.  I'd |
| 10:18 | 16 | limited Farhad Larian.  If there's any attempt to expand |
| 10:18 | 17 | beyond either the cross-examination that you're eliciting, I |
| 10:18 | 18 | need to know from Mattel.  In other words, they're going to |
| 10:18 | 19 | be up on redirect examination.  I want to hear if this |
| 10:18 | 20 | potentially opened some door.  I know you've potentially |
| 10:18 | 21 | been trying to get in some parts of these arbitration |
| 10:18 | 22 | proceedings. |
| 10:18 | 23 | MR. QUINN:  Not the spoliation, Your Honor.  Not |
| 10:18 | 24 | that. |
| 10:18 | 25 | THE COURT:  Then let's leave it on the table, |

| 10:18 | 1  | because you have nine minutes to use the restroom. |
| 10:18 | 2  | MS. KELLER:  Your Honor, we have one other. |
| 10:18 | 3  | THE COURT:  Now, you have eight. |
| 10:18 | 4  | MS. KELLER:  The Court mentioned the Exhibit 35143 |
| 10:18 | 5  | that hadn't been previewed.  I recall the Court saying that |
| 10:18 | 6  | each side could hold back five documents for impeachment. |
| 10:18 | 7  | THE COURT:  Each side can hold back, but I have to |
| 10:18 | 8  | know about them. |
| 10:19 | 9  | MS. KELLER:  You have to see them. |
| 10:19 | 10 | THE COURT:  That's why I'm spending my nights and |
| 10:19 | 11 | weekends with you. |
| 10:19 | 12 | MS. KELLER:  Okay.  So we would have to ask for a |
| 10:19 | 13 | private audience, so to speak? |
| 10:19 | 14 | THE COURT:  I'm here with Mr. McConville.  You're |
| 10:19 | 15 | not here because I want you well rested.  Mr. Price isn't |
| 10:19 | 16 | here, but Mr. Quinn has blessed me with his presence also, |
| 10:19 | 17 | along with Mr. McConville.  I'm at your disposal. |
| 10:19 | 18 | MS. KELLER:  These have been disclosed as part of |
| 10:19 | 19 | the Larian exhibits already. |
| 10:19 | 20 | THE COURT:  I haven't seen them. |
| 10:19 | 21 | Have I seen them previously in Larian? |
| 10:19 | 22 | MS. HURST:  Yes. |
| 10:19 | 23 | THE COURT:  Let me go back, then.  Just a moment. |
| 10:19 | 24 | MR. McCONVILLE:  And in Paula Garcia, Your Honor. |
| 10:19 | 25 | THE COURT:  Just a moment. |

CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

86

| | | |
|---|---|---|
| 10:19 | 1 | I'm going to go back to Mr. Larian.  And is this |
| 10:19 | 2 | on cross-examination or direct examination? |
| 10:19 | 3 | MS. HURST:  Cross. |
| 10:19 | 4 | THE COURT:  Okay.  We have Volume I through about |
| 10:19 | 5 | 20, so what volume? |
| 10:19 | 6 | MS. HURST:  It's in Volume XV. |
| 10:19 | 7 | THE COURT:  Just a minute.  Let me turn to |
| 10:19 | 8 | Volume XV. |
| 10:20 | 9 | And the exhibit number again, counsel? |
| 10:20 | 10 | MS. HURST:  35143.  It should be toward the end. |
| 10:20 | 11 | MR. QUINN:  Is this what you showed me? |
| 10:20 | 12 | MS. KELLER:  Yes, focus group report. |
| 10:20 | 13 | THE COURT:  Just a minute. |
| 10:20 | 14 | All right.  Counsel, here's the list we went over |
| 10:20 | 15 | two Saturdays ago, I think.  Why don't you find that on my |
| 10:20 | 16 | list. |
| 10:20 | 17 | And then we have, of course, more material that |
| 10:20 | 18 | came in. |
| 10:20 | 19 | MS. KELLER:  You know, that specific exhibit, |
| 10:20 | 20 | Your Honor, isn't even so much on my mind. |
| 10:20 | 21 | THE COURT:  No, no.  I want to find it.  That's |
| 10:21 | 22 | why I'm spending the time with you.  You have my undivided |
| 10:21 | 23 | attention. |
| 10:21 | 24 | And, of course, I know it's not intentional, but |
| 10:21 | 25 | I'm trying to keep lead counsel well rested. |

CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

87

| | | |
|---|---|---|
| 10:21 | 1 | And there is 35143. |
| 10:21 | 2 | Well, why haven't you seen that, Mr. Quinn? |
| 10:21 | 3 | MR. QUINN:  I assume we have, Your Honor.  But... |
| 10:21 | 4 | THE COURT:  Well, we sat here -- |
| 10:21 | 5 | MR. QUINN:  But we didn't identify this for this |
| 10:21 | 6 | witness. |
| 10:21 | 7 | THE COURT:  It doesn't have to be identified. |
| 10:21 | 8 | Remember, we have duplicates.  As long as we've seen it.  I |
| 10:21 | 9 | thought some of you were skipping over -- I don't see any -- |
| 10:21 | 10 | MR. QUINN:  Well, she's been shown the document |
| 10:21 | 11 | now, and she says she's never seen it before, so I don't |
| 10:21 | 12 | understand for what purpose -- it should not come in, and |
| 10:21 | 13 | they shouldn't be questioning her about it. |
| 10:21 | 14 | THE COURT:  I agree.  She hasn't relied upon it. |
| 10:21 | 15 | But what I did is I truncated, cut that information off, |
| 10:21 | 16 | because I wasn't sure, with the 40,000 exhibits, if I'd seen |
| 10:21 | 17 | it, frankly. |
| 10:21 | 18 | MR. QUINN:  Right. |
| 10:21 | 19 | THE COURT:  So it's no surprise. |
| 10:21 | 20 | MS. KELLER:  Yes, Your Honor.  And to tell you the |
| 10:21 | 21 | truth, I'm not going to go into it with her again. |
| 10:22 | 22 | MR. QUINN:  Okay. |
| 10:22 | 23 | MS. KELLER:  We'll go into it later.  I wanted to |
| 10:22 | 24 | make sure I was clear on what the parameters were. |
| 10:22 | 25 | THE COURT:  I'm here.  That's the parameter. |

Case 2:04-cv-09049-DOC-RNB   Document 9844   Filed 02/10/11   Page 88 of 157   Page ID #:297091
CV 04-9049 DOC – 2/8/2011 – Day 14, Volume 1 of 3

88

| 10:22 | 1 | Now you have seven minutes. |
|---|---|---|

10:22   1              Now you have seven minutes.

10:22   2              MS. KELLER:  Thank you.

10:22   3                (Recess held at 10:22 a.m.)

10:31   4                (Proceedings resumed at 10:31 a.m.)

10:31   5                (In the presence of the jury.)

10:31   6              THE COURT:  The jury's present, the alternates.

10:31   7    All counsel are still present, the parties, the witness.

10:31   8              If you will be seated, please.

10:31   9              And, Counsel, your continued cross-examination,

10:31   10   Ms. Keller, on behalf of Mr. Larian and MGA.

10:31   11             MS. KELLER:  Thank you, Your Honor.  Yes,

10:31   12   Your Honor.

10:31   13             If I could just make a correction for the record.

10:31   14   And this is on Exhibit 11152-4.  I think I read that wrong

10:31   15   before.

10:31   16   BY MS. KELLER:

10:31   17   Q.  Ms. Maurus, did you write, "I need to get quotes done

10:31   18   within the week, so I need accurate dimensions and images

10:32   19   from marketing right away"?  And I think I said, "next

10:32   20   week."

10:32   21       Is the correct quote from you, "I need to get quotes

10:32   22   done within the week"?

10:32   23   A.  Yes.

10:32   24   Q.  So it was actually that very week that you were asking

10:32   25   to get dimensions and images from marketing, right?

CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

| | | |
|---|---|---|
| 10:32 | 1 | A.   Correct. |
| 10:32 | 2 | Q.   Now, I believe that you testified a minute ago that, at |
| 10:32 | 3 | the arbitration in 2005, you were just guessing at the size |
| 10:32 | 4 | of the doll? |
| 10:32 | 5 | A.   Yes. |
| 10:32 | 6 | MS. KELLER:  Your Honor, I would ask permission to |
| 10:32 | 7 | read -- |
| 10:32 | 8 | BY MS. KELLER: |
| 10:32 | 9 | Q.   Would you please review, first, page 277. |
| 10:32 | 10 | *(Document provided to the witness.)* |
| 10:32 | 11 | THE COURT:  And lines? |
| 10:32 | 12 | MS. KELLER:  And it's going to actually be |
| 10:32 | 13 | lines -- 277, lines 8 through -- onto the next page, line 5. |
| 10:33 | 14 | MR. QUINN:  It's not in -- |
| 10:33 | 15 | THE COURT:  Just a moment, both of you. |
| 10:33 | 16 | Well, Counsel, I think that the complete statement |
| 10:34 | 17 | starts on the question on line 2, and would extend all the |
| 10:34 | 18 | way through page 277, all the way through 278. |
| 10:34 | 19 | MS. KELLER:  Yes, Your Honor.  We agree. |
| 10:34 | 20 | THE COURT:  I'm not sure that that's consistent or |
| 10:34 | 21 | inconsistent.  It has aspects of both. |
| 10:34 | 22 | MS. KELLER:  Your Honor, I -- |
| 10:34 | 23 | MR. QUINN:  Your Honor -- |
| 10:34 | 24 | THE COURT:  No, no.  I'm sorry. |
| 10:34 | 25 | I'm speaking to Ms. Keller. |

Case 2:04-cv-09049-DOC-RNB   Document 9844   Filed 02/10/11   Page 90 of 157   Page ID #:297093
CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

90

| | | |
|---|---|---|
| 10:34 | 1 | MS. KELLER:  I agree, Your Honor.  And I also |
| 10:34 | 2 | would like permission to read the colloquy of counsel, |
| 10:34 | 3 | because I believe that gives significant -- a significant |
| 10:34 | 4 | explanation to the inconsistent -- |
| 10:34 | 5 | THE COURT:  All right. |
| 10:34 | 6 | Now, Mr. Quinn. |
| 10:34 | 7 | MR. QUINN:  It's not impeaching, Your Honor.  This |
| 10:34 | 8 | is testimony in 2005.  It's not inconsistent with what she |
| 10:34 | 9 | has said. |
| 10:34 | 10 | THE COURT:  Well, a portion of it is, a portion of |
| 10:34 | 11 | it isn't. |
| 10:34 | 12 | The first portion on page 277 is a consistent |
| 10:34 | 13 | statement.  The last portion, depending upon the colloquy |
| 10:34 | 14 | and whatever those comments are, may be consistent or |
| 10:35 | 15 | inconsistent.  And if I allow you to read just page 278, |
| 10:35 | 16 | 2 through 5, or 2 through 4 -- strike that -- 2 through 6, |
| 10:35 | 17 | it's out of context. |
| 10:35 | 18 | MS. KELLER:  Yes, Your Honor, I agree. |
| 10:35 | 19 | THE COURT:  That's the problem. |
| 10:35 | 20 | So we have a complete answer here. |
| 10:35 | 21 | MR. QUINN:  Your Honor, the witness says she |
| 10:35 | 22 | doesn't recall.  That's what she said on the stand. |
| 10:35 | 23 | THE COURT:  I understand that.  Overruled. |
| 10:35 | 24 | You can read that portion. |
| 10:35 | 25 | MR. QUINN:  Your Honor, they should not read the |

| | | |
|---|---|---|
| 10:35 | 1 | question, the lines beginning at 2 to 4 on 277.  That's just |
| 10:35 | 2 | counsel's summary.  It's not a question on 277. |
| 10:35 | 3 | MS. KELLER:  Well, it -- |
| 10:35 | 4 | THE COURT:  Just -- just a moment. |
| 10:36 | 5 | Overruled. |
| 10:36 | 6 | You can read the entire portion. |
| 10:36 | 7 | MS. KELLER:  And, Your Honor, including the |
| 10:36 | 8 | colloquy? |
| 10:36 | 9 | THE COURT:  If you both agree, excluding the |
| 10:36 | 10 | colloquy. |
| 10:36 | 11 | MS. KELLER:  No, Your Honor.  I would like to read |
| 10:36 | 12 | the colloquy because I think it gives meaning to the answers |
| 10:36 | 13 | and the change. |
| 10:36 | 14 | THE COURT:  I do, too. |
| 10:36 | 15 | You may read the entire portion. |
| 10:36 | 16 | MS. KELLER:  Thank you, Your Honor. |
| 10:36 | 17 | "QUESTION:  Of course.  You had a concept of the |
| 10:36 | 18 | doll.  You had a concept of the package.  You had concept of |
| 10:36 | 19 | hair.  You had concept of clothes.  But you did not have a |
| 10:36 | 20 | doll done in a package in the year 2000, did you? |
| 10:36 | 21 | "ANSWER:  We did not have a doll then.  We knew |
| 10:36 | 22 | the size. |
| 10:36 | 23 | "QUESTION:  Pardon me? |
| 10:37 | 24 | "ANSWER:  We knew how big the doll was going to |
| 10:37 | 25 | be. |

| | | |
|---|---|---|
| 10:37 | 1 | "ANSWER:  How big?" |
| 10:37 | 2 | I mean -- |
| 10:37 | 3 | "QUESTION:  How big? |
| 10:37 | 4 | "ANSWER:  It was a fashion doll. |
| 10:37 | 5 | "QUESTION:  How big? |
| 10:37 | 6 | "ANSWER:  Thirteen inches. |
| 10:37 | 7 | "QUESTION: Ma'am, it was 8 inches. |
| 10:37 | 8 | "MR. WILSON:  Are you testifying? |
| 10:37 | 9 | "MR. FELDMAN:  I'm telling you it was 8 inches. |
| 10:37 | 10 | "THE WITNESS:  All right.  Tell me it was 8 |
| 10:37 | 11 | inches. |
| 10:37 | 12 | "BY MR. FELDMAN:  It did not want to compete |
| 10:37 | 13 | with" -- |
| 10:37 | 14 | THE COURT:  "QUESTION:" |
| 10:37 | 15 | MS. KELLER:  (Reading:) |
| 10:37 | 16 | "QUESTION:  It did not want to compete with |
| 10:37 | 17 | Barbie.  They were afraid to compete with Barbie; isn't that |
| 10:37 | 18 | true? |
| 10:37 | 19 | "ANSWER:  I never heard anyone express fear. |
| 10:37 | 20 | "QUESTION:  Isn't the doll smaller?  Don't you |
| 10:37 | 21 | remember that the doll was smaller than the Barbie doll so |
| 10:37 | 22 | it wouldn't compete with Barbie?  Don't you -- didn't you |
| 10:37 | 23 | know that? |
| 10:37 | 24 | "ANSWER:  I don't recall that being a sales point. |
| 10:37 | 25 | "QUESTION:  And didn't it ultimately become ten |

| 10:37 | 1 | and a half inches so it wouldn't compete? |
| 10:38 | 2 | "MR. KELLNER:  It's growing. |
| 10:38 | 3 | "THE WITNESS:  I don't recall the size of it." |
| 10:38 | 4 | MS. KELLER:  And, Your Honor, was that where the |
| 10:38 | 5 | Court wanted me to conclude? |
| 10:38 | 6 | THE COURT:  Well, I don't -- I'm not governing the |
| 10:38 | 7 | lawsuit for either party.  That was your request. |
| 10:38 | 8 | MS. KELLER:  Thank you, Your Honor. |
| 10:38 | 9 | BY MS. KELLER: |
| 10:38 | 10 | Q.   So back in 2005, was your memory better than it is now, |
| 10:38 | 11 | in 2011, about these facts? |
| 10:38 | 12 | MR. QUINN:  Vague and ambiguous as to which facts. |
| 10:38 | 13 | THE COURT:  I'm assuming the facts that were just |
| 10:38 | 14 | read -- |
| 10:38 | 15 | MS. KELLER:  Yes. |
| 10:38 | 16 | THE COURT:  -- or the statement that was just |
| 10:38 | 17 | read. |
| 10:38 | 18 | Overruled. |
| 10:38 | 19 | THE WITNESS:  Yes. |
| 10:38 | 20 | BY MS. KELLER: |
| 10:38 | 21 | Q.   And back in 2005, until the lawyers corrected you, you |
| 10:38 | 22 | said the doll was 13 inches, right? |
| 10:38 | 23 | A.   Yes. |
| 10:38 | 24 | Q.   And once the lawyers corrected you that it was actually |
| 10:38 | 25 | a lot smaller, then you said you didn't recall, right? |

| 10:38 | 1 | A.    Yes. |
| 10:39 | 2 | Q.    Now, do you know actually that the Bratz dolls were |
| 10:39 | 3 | 9 inches tall?  Do you remember that? |
| 10:39 | 4 | A.    No. |
| 10:39 | 5 | THE COURT:  Just a moment.  Let me instruct the |
| 10:39 | 6 | jury about something. |
| 10:39 | 7 | (To the jury:) There was another portion in the |
| 10:39 | 8 | case where, if you recall at the beginning, Mattel was |
| 10:39 | 9 | concerned and -- Mr. Quinn and Mr. Price -- about what they |
| 10:39 | 10 | perceive is a signaling question.  And you can go back |
| 10:39 | 11 | and -- by counsel. |
| 10:39 | 12 | Once again, obviously, MGA is trying to get in |
| 10:39 | 13 | front of you the fact that they believe that this might be a |
| 10:39 | 14 | signaling question from counsel. |
| 10:39 | 15 | Now, remember, it's the testimony of the witnesses |
| 10:39 | 16 | that we're relying upon.  But you should know the colloquy |
| 10:39 | 17 | in between, in case a witness is changing answers, and if |
| 10:39 | 18 | something's being suggested by both sides. |
| 10:39 | 19 | So you have Mattel on one side believing that an |
| 10:40 | 20 | attorney has signaled an answer, which has caused a change, |
| 10:40 | 21 | and you have now MGA believing that there's a signaling |
| 10:40 | 22 | question or a statement by an attorney, which causes a |
| 10:40 | 23 | change.  I'll let you decide that.  But I think you should |
| 10:40 | 24 | see the totality of that from both sides:  Mattel's |
| 10:40 | 25 | perspective, in a critical issue that they believe is |

| 10:40 | 1 | important with the witness, and MGA with a critical question |
| 10:40 | 2 | that's asked and how that interplay takes place, as well. |
| 10:40 | 3 | You'll decide credibility. |
| 10:40 | 4 | Counsel? |
| 10:40 | 5 | MR. QUINN:  Your Honor, in terms of signaling, |
| 10:40 | 6 | that's not us.  That's not Mattel. |
| 10:40 | 7 | THE COURT:  I understand. |
| 10:40 | 8 | Now, who is Mr. Feldman? |
| 10:40 | 9 | MR. QUINN:  He is counsel for Isaac Larian.  The |
| 10:40 | 10 | other lawyer, Mr. Wilson, was counsel for Farhad Larian. |
| 10:40 | 11 | THE COURT:  Ah. |
| 10:40 | 12 | MR. QUINN:  So this is not Mattel at all. |
| 10:40 | 13 | THE COURT:  My apologies. |
| 10:40 | 14 | Now, is it stipulated that those were the counsel? |
| 10:40 | 15 | MS. KELLER:  Yes. |
| 10:40 | 16 | THE COURT:  All right.  So this is apparently |
| 10:40 | 17 | during the arbitration proceeding, then, Counsel? |
| 10:40 | 18 | MR. QUINN:  Yes, Your Honor. |
| 10:40 | 19 | THE COURT:  (To the jury:)  And these are counsel |
| 10:40 | 20 | for Farhad, the brother, who you met last Friday, as the |
| 10:41 | 21 | last witness, and counsel for Isaac Larian.  And Mattel is |
| 10:41 | 22 | not a party to this. |
| 11:59 | 23 | BY MS. KELLER: |
| 10:41 | 24 | Q.   Whether Mattel was a party or not, isn't it true that |
| 10:41 | 25 | until the lawyers corrected you, you said 13 inches -- |

CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

96

| | | |
|---|---|---|
| 10:41 | 1 | A.   Yes. |
| 10:41 | 2 | Q.   -- true? |
| 10:41 | 3 | And, right now, do you know how tall the first dolls |
| 10:41 | 4 | were?  Were they eight inches?  Nine and a half?  Ten |
| 10:41 | 5 | inches?  Thirteen inches?  How tall were they? |
| 10:41 | 6 | A.   I don't recall. |
| 10:41 | 7 | Q.   Is your memory of the dates in this case substantially |
| 10:41 | 8 | comparable in accuracy to your memory of things like that? |
| 10:41 | 9 | MR. QUINN:  It's vague -- vague and ambiguous. |
| 10:41 | 10 | Overbroad. |
| 10:41 | 11 | THE COURT:  Sustained. |
| 10:41 | 12 | BY MS. KELLER: |
| 10:41 | 13 | Q.   Now, you claim you met Carter Bryant in June or July of |
| 10:41 | 14 | 2000; is that right? |
| 10:41 | 15 | A.   Yes. |
| 10:41 | 16 | Q.   And you estimate this date based on the fact that Paula |
| 10:41 | 17 | Garcia started at MGA in April of 2000?  Is that how you |
| 10:42 | 18 | calculate that date? |
| 10:42 | 19 | A.   I had a recollection of certain events. |
| 10:42 | 20 | Q.   I'm asking if you came up with that date in any |
| 10:42 | 21 | particular way -- any particular way that you -- helped you |
| 10:42 | 22 | to remember it. |
| 10:42 | 23 | MR. QUINN:  Vague and ambiguous.  Argumentative. |
| 10:42 | 24 | "Came up with that." |
| 10:42 | 25 | MS. KELLER:  I'll ask again. |

| | | |
|---|---|---|
| 10:42 | 1 | THE WITNESS: You said you were gonna ask again? |
| 11:59 | 2 | BY MS. KELLER: |
| 10:42 | 3 | Q. Did you have a calendar that memorialized that event? |
| 10:42 | 4 | A. No. |
| 10:42 | 5 | Q. Did you have an e-mail that memorialized that event? |
| 10:42 | 6 | A. No. |
| 10:42 | 7 | Q. You don't have any documentary evidence of any kind |
| 10:42 | 8 | memorializing that, correct? |
| 10:42 | 9 | A. Correct. |
| 10:42 | 10 | Q. Not a note jotted in a note pad, true? |
| 10:42 | 11 | A. True. |
| 10:42 | 12 | Q. And at the last trial, did you testify that you based |
| 10:42 | 13 | this date -- |
| 10:42 | 14 | MR. QUINN: Your Honor, I object to the form of |
| 10:43 | 15 | question. |
| 10:43 | 16 | THE COURT: What's the date, first of all? |
| 10:43 | 17 | MS. KELLER: The date that Carter Bryant was seen |
| 10:43 | 18 | by this witness with Paula Garcia in June or July of 2000 at |
| 10:43 | 19 | MGA. |
| 10:43 | 20 | THE COURT: Overruled. |
| 10:43 | 21 | MS. KELLER: And may I complete the question? |
| 10:43 | 22 | THE COURT: You may. |
| 10:43 | 23 | BY MS. KELLER: |
| 10:43 | 24 | Q. At the last trial, did you estimate that this date was |
| 10:43 | 25 | based on the fact that Paula Garcia started at MGA in April |

Case 2:04-cv-09049-DOC-RNB   Document 9844   Filed 02/10/11   Page 98 of 157   Page ID #:297101
CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

98

| | | |
|---|---|---|
| 10:43 | 1 | of 2000 and you thought it was a few months later? |
| 10:43 | 2 | MR. QUINN:  Object to the form of the question. |
| 10:43 | 3 | Going right to testimony.  It's not refreshing, not |
| 10:43 | 4 | impeaching. |
| 10:43 | 5 | THE COURT:  Overruled. |
| 10:43 | 6 | You can answer that question. |
| 10:43 | 7 | THE WITNESS:  Yes, I testified to that. |
| 11:01 | 8 | BY MS. KELLER: |
| 10:43 | 9 | Q.   And is there some reason that today, a minute ago, you |
| 10:43 | 10 | did not believe that you had pegged that date in the same |
| 10:43 | 11 | way? |
| 10:43 | 12 | MR. QUINN:  Vague and ambiguous. |
| 10:43 | 13 | THE COURT:  Well, "pegged" -- just reask it. |
| 07:59 | 14 | BY MS. KELLER: |
| 10:43 | 15 | Q.   Is there some reason that a minute ago, you did not |
| 10:44 | 16 | place that date by the same means that we just talked about; |
| 10:44 | 17 | that you thought it was a few months after Paula Garcia |
| 10:44 | 18 | started at MGA in April of 2000? |
| 10:44 | 19 | MR. QUINN:  Your Honor, it argumentative. |
| 10:44 | 20 | Misstated testimony. |
| 10:44 | 21 | THE COURT:  Overruled. |
| 10:44 | 22 | THE WITNESS:  No. |
| 10:44 | 23 | BY MS. KELLER: |
| 10:44 | 24 | Q.   Now, after your meeting with Paula Garcia and Carter |
| 10:44 | 25 | Bryant, you hadn't thought about that discussion in several |

| | | |
|---|---|---|
| 10:44 | 1 | years until you were asked about it at the arbitration in |
| 10:44 | 2 | 2005, right? |
| 10:44 | 3 | A.    I may have. |
| 10:44 | 4 | Q.    After your meeting with Paula Garcia and Carter Bryant, |
| 10:44 | 5 | had you thought about this discussion with Paula Garcia and |
| 10:44 | 6 | Carter Bryant since 2000 -- since the year 2000, when it |
| 10:44 | 7 | happened? |
| 10:45 | 8 | A.    I may have. |
| 10:45 | 9 | Q.    Did you? |
| 10:45 | 10 | A.    I probably did, yes. |
| 10:45 | 11 | Q.    Had you not -- is it true that you had not thought |
| 10:45 | 12 | about that discussion for several years before the |
| 10:45 | 13 | arbitration?  Is that true? |
| 10:45 | 14 | A.    I guess I don't understand what you're asking me. |
| 10:45 | 15 | Q.    I'm asking you, when you testified about that meeting |
| 10:45 | 16 | that was supposed to be in June or July of 2000, that you |
| 10:45 | 17 | saw where Carter Bryant, you said, was in the MGA |
| 10:45 | 18 | headquarters, meeting with Paula Garcia at her cubicle -- |
| 10:45 | 19 | you remember testifying to that, right? |
| 10:45 | 20 | A.    Yes. |
| 10:45 | 21 | Q.    And what I'm asking you is, until you testified on |
| 10:45 | 22 | November 17th, in 2005, you hadn't even thought about that |
| 10:45 | 23 | for several years, correct? |
| 10:45 | 24 | A.    Perhaps correct. |
| 10:46 | 25 | Q.    Is it correct or not? |

CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

100

| | | |
|---|---|---|
| 10:46 | 1 | A.   I may have thought about it.  That's what I'm telling |
| 10:46 | 2 | you.  I may have; I may not have. |
| 10:46 | 3 | Q.   Would you please take a look at page 251 of the |
| 10:46 | 4 | transcript. |
| 10:46 | 5 | A.   Sure. |
| 10:46 | 6 | THE COURT:  Lines? |
| 10:46 | 7 | MS. KELLER:  I'm trying to get the lines. |
| 10:46 | 8 | THE COURT:  It's line 14 through 17? |
| 10:46 | 9 | MS. KELLER:  Yes, Your Honor. |
| 10:46 | 10 | THE COURT:  In fact, line 10 through 17. |
| 10:46 | 11 | MR. QUINN:  I don't think it's impeaching, |
| 10:46 | 12 | Your Honor. |
| 10:46 | 13 | THE COURT:  Well, I'm not sure it is.  It's only |
| 10:46 | 14 | offered to refresh the witness's recollection and see if |
| 10:46 | 15 | this causes an answer. |
| 10:46 | 16 | THE WITNESS:  It's recollecting what I testified. |
| 10:46 | 17 | THE COURT:  Okay. |
| 10:46 | 18 | THE WITNESS:  Yes. |
| 10:46 | 19 | BY MS. KELLER: |
| 10:46 | 20 | Q.   So is it true that until you testified at the |
| 10:46 | 21 | arbitration hearing, you hadn't thought about that |
| 10:47 | 22 | discussion that you said you had for several years? |
| 10:47 | 23 | A.   True. |
| 10:47 | 24 | Q.   And the first time you thought about this issue at all |
| 10:47 | 25 | is after Fred Larian called you in 2005, almost five years |

| 10:47 | 1 | after the conversation supposedly took place, right? |
| 10:47 | 2 | A.   Yes. |
| 10:47 | 3 | Q.   And so you had not thought about your initial meeting |
| 10:47 | 4 | with Carter Bryant until Fred Larian called you five years |
| 10:47 | 5 | later while you were in the middle of suing MGA, right? |
| 10:47 | 6 | A.   Right. |
| 10:47 | 7 | Q.   And you had no conversations with Ms. Garcia about the |
| 10:47 | 8 | timing of when you met Carter Bryant, correct? |
| 10:47 | 9 | A.   Yes. |
| 10:47 | 10 | Q.   You had no conversations with Carter Bryant about the |
| 10:47 | 11 | time when you first met him, correct? |
| 10:47 | 12 | A.   Yes. |
| 10:47 | 13 | Q.   You have no documents showing you met him in June or |
| 10:47 | 14 | July of 2000, correct? |
| 10:48 | 15 | A.   Correct. |
| 10:48 | 16 | Q.   Nothing in writing at all to document that, correct? |
| 10:48 | 17 | A.   Yes. |
| 10:48 | 18 | Q.   No meeting announcements, right? |
| 10:48 | 19 | A.   Yes. |
| 10:48 | 20 | Q.   No written agendas, true? |
| 10:48 | 21 | A.   Yes. |
| 10:48 | 22 | Q.   And you know, don't you, that it's important to Mattel |
| 10:48 | 23 | that that date be earlier rather than later, correct? |
| 10:48 | 24 | A.   I knew that after the trial in 2008, yes. |
| 10:48 | 25 | Q.   You know it today, right? |

CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

102

| | | |
|---|---|---|
| 10:48 | 1 | A.   Yes, I know it today. |
| 10:48 | 2 | Q.   You know Mattel wants that date to be earlier rather |
| 10:48 | 3 | than later, correct? |
| 10:48 | 4 | A.   Yes. |
| 10:48 | 5 | Q.   Now, no one at MGA ever told you to conceal the |
| 10:48 | 6 | identity of Carter Bryant as the creator of Bratz, right? |
| 10:48 | 7 | A.   No. |
| 10:48 | 8 | Q.   And neither Paula Garcia nor Carter Bryant said, "Don't |
| 10:48 | 9 | tell anyone you saw Carter over here at MGA," correct? |
| 10:48 | 10 | A.   Correct. |
| 10:48 | 11 | Q.   And when you met Carter Bryant, it was in a public area |
| 10:49 | 12 | at MGA where other people could see you, true? |
| 10:49 | 13 | A.   Yes. |
| 10:49 | 14 | Q.   And MGA, as far as you know, made no effort to conceal |
| 10:49 | 15 | the fact that Carter Bryant was meeting with Paula Garcia at |
| 10:49 | 16 | MGA, right? |
| 10:49 | 17 | A.   Correct. |
| 10:49 | 18 | Q.   Now, I want to talk to you just briefly, and then we'll |
| 10:49 | 19 | be -- we'll be finished -- about this Exhibit 13532 that you |
| 10:49 | 20 | were shown, which was entitled the "Revised MGA |
| 10:49 | 21 | Entertainment Confidentiality Agreement." |
| 10:49 | 22 | *(Document displayed.)* |
| 10:49 | 23 | *(Document provided to the witness.)* |
| | 24 | BY MS. KELLER: |
| 10:49 | 25 | Q.   Do you recall that? |

CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

103

| 10:49 | 1 | A.   Yes. |
| 10:49 | 2 | Q.   And this was MGA's Confidentiality Agreement and |
| 10:49 | 3 | Proprietary Information Agreement, right? |
| 10:49 | 4 | A.   Yes. |
| 10:49 | 5 | Q.   And this was actually a proposed agreement, correct? |
| 10:49 | 6 | Proposed? |
| 10:50 | 7 | A.   No. |
| 10:50 | 8 | Q.   You never signed it, did you? |
| 10:50 | 9 | A.   No. |
| 10:50 | 10 | Q.   You said the other people -- the other employees didn't |
| 10:50 | 11 | want to sign it, right? |
| 10:50 | 12 | A.   Correct. |
| 10:50 | 13 | Q.   And you said that -- now, you weren't fired for not |
| 10:50 | 14 | signing it, were you? |
| 10:50 | 15 | A.   No. |
| 10:50 | 16 | Q.   And no one else was fired for not signing it, correct? |
| 10:50 | 17 | A.   Correct. |
| 10:50 | 18 | Q.   In fact, when you and others refused to sign it and |
| 10:50 | 19 | said it was unfair, Mr. Larian actually withdrew it, didn't |
| 10:50 | 20 | he? |
| 10:50 | 21 | A.   He may have.  I don't remember. |
| 10:50 | 22 | Q.   The, um -- you knew, when you were asked about this |
| 10:50 | 23 | agreement, that this was an agreement you never signed, |
| 10:50 | 24 | true? |
| 10:50 | 25 | A.   Yes. |

DEBBIE GALE, U.S. COURT REPORTER

| 10:50 | 1 | Q.   And you don't know anybody else whoever signed it, do |
| 10:50 | 2 | you? |
| 10:50 | 3 | A.   No. |
| 10:50 | 4 | Q.   And so, as far as industry standards go, this agreement |
| 10:50 | 5 | that, as far as you know, nobody ever signed, doesn't |
| 10:50 | 6 | establish any kind of industry standard, in your mind, does |
| 10:50 | 7 | it? |
| 10:50 | 8 | A.   May toy companies have similar agreements. |
| 10:50 | 9 | Q.   This agreement at MGA was withdrawn, right? |
| 10:51 | 10 | A.   I never signed it.  I don't remember specifically if it |
| 10:51 | 11 | was withdrawn. |
| 10:51 | 12 | Q.   You said you were all sales professionals, so not to be |
| 10:51 | 13 | able to compete or not be able to sell for a year, if you |
| 10:51 | 14 | left MGA, would be unfair, right? |
| 10:51 | 15 | A.   Yes. |
| 10:51 | 16 | Q.   And that was actually brought to Mr. Larian's |
| 10:51 | 17 | attention:  That you felt it was unfair, wasn't it? |
| 10:51 | 18 | A.   I don't remember. |
| 10:51 | 19 | Q.   And you don't remember the fact that he withdrew that |
| 10:51 | 20 | and didn't require anybody to sign it? |
| 10:51 | 21 | A.   I remember we didn't sign it, and we weren't penalized |
| 10:51 | 22 | for it.  I don't remember if there was a specific withdrawal |
| 10:51 | 23 | of it. |
| 10:51 | 24 |           MS. KELLER:  Thank you. |
| 10:51 | 25 |           Nothing further. |

| 10:51 | 1 | THE COURT: Redirect examination by Mr. Quinn on |
|---|---|---|
| 10:51 | 2 | behalf of Mattel. |

**REDIRECT EXAMINATION**

10:51   4   BY MR. QUINN:

10:52   5   Q.   Ms. Maurus, you testified in a proceeding, a dispute

10:52   6   between -- that Farhad Larian -- a claim that he brought

10:52   7   against Isaac Larian, right?

10:52   8   A.   Yes.

10:52   9   Q.   And did you testify truthfully in that proceeding?

10:52   10   A.   Yes.

10:52   11   Q.   And in that proceeding, you testified to this meeting

10:52   12   with Carter Bryant and Paula Garcia in June of 2000?

10:52   13   A.   Yes.

10:52   14   Q.   And prior to that, had anybody from Mattel spoken to

10:52   15   you about that?

10:52   16   A.   No.

10:52   17   Q.   And your testimony in that arbitration was -- was in

10:52   18   2005?

10:52   19   A.   Yes.

10:52   20   Q.   So that was five years after the meeting?

10:52   21   A.   Yes.

10:52   22   Q.   I mean, can you recall whether you thought about -- in

10:52   23   that five-year period -- I think the question was, during

10:52   24   that five-year period, did you think about this.

10:53   25   Can you recall what events that happened at MGA you

CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

106

| | | |
|---|---|---|
| 10:53 | 1 | happened to think about during that five-year period? |
| 10:53 | 2 | A.    There were many events I happened to think about during |
| 10:53 | 3 | that period. |
| 10:53 | 4 | Q.    At the time that you testified in that arbitration |
| 10:53 | 5 | proceeding, had you ever met Dylan Proctor, the lawyer you |
| 10:53 | 6 | referred to at our law firm? |
| 10:53 | 7 | A.    No. |
| 10:53 | 8 | Q.    Had you ever spoken with any representative of Mattel |
| 10:53 | 9 | prior to giving that testimony? |
| 10:53 | 10 | A.    No. |
| 10:53 | 11 | Q.    Did you understand that Mr. Larian was -- Mr. Fred |
| 10:53 | 12 | Larian was contending that Isaac Larian had concealed the |
| 10:53 | 13 | development of Bratz from him? |
| 10:53 | 14 | A.    Yes. |
| 10:53 | 15 | Q.    Was that your understanding? |
| 10:53 | 16 | A.    Yes. |
| 10:53 | 17 | Q.    And was it your understanding that he was saying that |
| 10:54 | 18 | Isaac Larian had actually commenced the development of Bratz |
| 10:54 | 19 | back in 1999? |
| 10:54 | 20 | MS. KELLER:  Objection.  Irrelevant.  Hearsay. |
| 10:54 | 21 | Beyond the scope. |
| 10:54 | 22 | MR. QUINN:  It's gone into the arbitration, |
| 10:54 | 23 | Your Honor. |
| 10:54 | 24 | MS. KELLER:  I wanted to -- |
| 10:54 | 25 | THE COURT:  I think we're going to be getting into |

| | | |
|---|---|---|
| 10:54 | 1 | that in just a few minutes, aren't we? -- through another |
| 10:54 | 2 | witness. |
| 10:54 | 3 | MR. QUINN:  We may, Your Honor.  But she's on the |
| 10:54 | 4 | stand now. |
| 10:54 | 5 | THE COURT:  Well, are you aware -- it sounds like |
| 10:54 | 6 | a statement, like that occurred. |
| 10:54 | 7 | (To the witness:) Are you aware of any information |
| 10:54 | 8 | that you had about this allegation? |
| 10:54 | 9 | THE WITNESS:  No. |
| 10:54 | 10 | THE COURT:  Okay.  That ends it.  She's not. |
| 10:54 | 11 | MR. QUINN:  All right. |
| 10:54 | 12 | BY MR. QUINN: |
| 10:54 | 13 | Q.  You were asked some questions about the dismissal of |
| 10:54 | 14 | Mr. Fred Larian's claims. |
| 10:54 | 15 | Did you speak with Fred Larian about why he dismissed |
| 10:54 | 16 | that case? |
| 10:54 | 17 | A.  Yes. |
| 10:54 | 18 | Q.  And did he tell you why he dismissed it? |
| 10:54 | 19 | A.  Yes. |
| 10:54 | 20 | MS. KELLER:  Objection.  Hearsay. |
| 10:54 | 21 | BY MR. QUINN: |
| 10:54 | 22 | Q.  Why? |
| 10:54 | 23 | THE COURT:  Overruled.  This was opened up on |
| 10:54 | 24 | cross-examination. |
| 10:54 | 25 | You can answer the question. |

CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

108

09:02   1    BY MR. QUINN:

10:54   2    Q.   Why did he dismiss the case that he brought against

10:54   3    Isaac Larian relating to the concealment of the development

10:54   4    of Bratz?

10:54   5              MS. KELLER:  Objection.  Foundation.

10:55   6              THE COURT:  Overruled.

10:55   7              Well, just a moment.  A little bit more

10:55   8    foundation.  I assume she had a conversation --

10:55   9              MR. QUINN:  Yeah.

10:55   10             THE COURT:  -- that's the import of your question.

10:55   11   But I want to make sure that that occurred between the

10:55   12   witness and Mr. Farhad Larian.

10:55   13             THE WITNESS:  Yes.

10:55   14             THE COURT:  Okay.

10:55   15             Overruled.

10:55   16             THE WITNESS:  Fred told me that, the weekend

10:55   17   before he dropped the case, that his younger daughter --

10:55   18   they were -- his family was at the beach, and his younger

10:55   19   daughter had gone missing at the beach for, as I recall,

10:55   20   several hours.  And they were frantically searching for her

10:55   21   and terrified about her being missing.  And he was praying

10:55   22   to God to return his daughter safely.

10:55   23             And he told me that that experience made him

10:55   24   realize how important family was, and it was -- she was --

10:55   25   ultimately, they found her, I think, at a lifeguard stand.

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 10:55 | 1 | But he was incredibly thankful that it didn't turn out a |
| 10:55 | 2 | different way. |
| 10:56 | 3 | And he expressed to me that he realized that |
| 10:56 | 4 | family is the most important thing, and business and money |
| 10:56 | 5 | doesn't matter, and, um, so he -- he wanted -- he dropped |
| 10:56 | 6 | the case.  He wanted to re-establish his relationship with |
| 10:56 | 7 | his brother. |
| 10:56 | 8 | BY MR. QUINN: |
| 10:56 | 9 | Q.   Now, you were asked some questions by counsel about |
| 10:56 | 10 | whether you had some documentary evidence of this meeting |
| 10:56 | 11 | with Carter Bryant and Paula Garcia in June of 2000. |
| 10:56 | 12 | Do you recall those questions? |
| 10:56 | 13 | A.   Yes. |
| 10:56 | 14 | Q.   Is there a reason why you wouldn't have, for example, |
| 10:56 | 15 | an Outlook Meeting Announcement for that? |
| 10:56 | 16 | A.   Yes. |
| 10:56 | 17 | Q.   And what is that? |
| 10:56 | 18 | A.   I was walking by, and it wasn't a formal meeting.  It |
| 10:56 | 19 | was a casual conversation and introduction. |
| 10:56 | 20 | Q.   So this was not a situation where there was like an |
| 10:56 | 21 | agenda? |
| 10:56 | 22 | A.   No. |
| 10:56 | 23 | Q.   At the time was it significant enough that you felt |
| 10:56 | 24 | like you needed to go back to your desk and make a calendar |
| 10:56 | 25 | entry to indicate, "I just met Carter Bryant"? |

| | | |
|---|---|---|
| 10:56 | 1 | A.   No. |
| 10:56 | 2 | Q.   I mean, at that time, had you even heard the name |
| 10:57 | 3 | Bratz? |
| 10:57 | 4 | A.   No. |
| 10:57 | 5 | Q.   So why is it that this sticks in your mind that you |
| 10:57 | 6 | know that you met Mr. Bryant and -- with Ms. Garcia in June |
| 10:57 | 7 | of 2000? |
| 10:57 | 8 | MS. KELLER:  Objection.  Even that misstates the |
| 10:57 | 9 | testimony, Your Honor. |
| 10:57 | 10 | THE COURT:  I'm going to sustain the objection. |
| 10:57 | 11 | She didn't give an exact date, Counsel. |
| 10:57 | 12 | MR. QUINN:  I'm not giving it a date, Your Honor. |
| 10:57 | 13 | THE COURT:  Yes, you did.  You suggested June.  So |
| 10:57 | 14 | reask the question. |
| 11:59 | 15 | BY MR. QUINN: |
| 10:57 | 16 | Q.   When was it that you met with -- that you met Carter |
| 10:57 | 17 | Bryant with Paula Garcia? |
| 10:57 | 18 | A.   Early summer 2000. |
| 10:57 | 19 | Q.   And what was your best estimate of what month that was? |
| 10:57 | 20 | A.   June, perhaps July. |
| 10:57 | 21 | THE COURT:  And that was her answer before, |
| 10:57 | 22 | Counsel.  It was early summer. |
| 10:57 | 23 | MR. QUINN:  All right. |
| 10:57 | 24 | THE COURT:  It wasn't a specific month. |
| | 25 | |

Case 2:04-cv-09049-DOC-RNB   Document 9844   Filed 02/10/11   Page 111 of 157   Page ID #:297114
CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

111

| | | |
|---|---|---|
| 10:57 | 1 | BY MR. QUINN: |
| 10:57 | 2 | Q.   And how is it that you remember that, without an |
| 10:57 | 3 | Outlook meeting noted or an entry in your calendar or an |
| 10:57 | 4 | agenda? |
| 10:57 | 5 | A.   I remember it because Carter was a compelling |
| 10:58 | 6 | character.  He was a talented artist.  I thought he was |
| 10:58 | 7 | interesting.  I liked the drawings, so it -- it stuck in my |
| 10:58 | 8 | mind, the meeting -- meeting him. |
| 10:58 | 9 | Q.   And was Bratz ultimately a big success? |
| 10:58 | 10 | A.   Yes. |
| 10:58 | 11 | Q.   And you played a role in that? |
| 10:58 | 12 | A.   I felt like I did, yes. |
| 10:58 | 13 | Q.   So we'll come back and talk about -- about those |
| 10:58 | 14 | questions.  But first, I'd like to look at Exhibit 11336, |
| 10:58 | 15 | the sales road show e-mail that we've been looking at. |
| 10:58 | 16 | MR. QUINN:  And if we could go to page dash 8. |
| 10:58 | 17 | *(Document provided to the witness.)* |
| 10:58 | 18 | *(Document displayed.)* |
| 11:59 | 19 | BY MR. QUINN: |
| 10:58 | 20 | Q.   The listing of dolls by SKU numbers, prices, |
| 10:58 | 21 | availability dates, case packs -- do you see that there? |
| 10:58 | 22 | A.   Yes. |
| 10:58 | 23 | Q.   And the date there, down at the bottom of this |
| 10:58 | 24 | document, is October 18th? |
| 10:58 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 10:59 | 1 | Q.   This was long -- is it true that this was long |
| 10:59 | 2 | before -- you distributed this document long before you ever |
| 10:59 | 3 | had a pregnancy issue with MGA; is that true? |
| 10:59 | 4 | A.   I don't believe I was pregnant as of the date of this |
| 10:59 | 5 | document. |
| 10:59 | 6 | Q.   Now -- but there was a time, you've told us, when you |
| 10:59 | 7 | had a dispute -- a legal dispute, a claim, a lawsuit -- with |
| 10:59 | 8 | MGA relating to a pregnancy discrimination claim, correct? |
| 10:59 | 9 | A.   Correct. |
| 10:59 | 10 | Q.   And that was long in the future after the date of this |
| 10:59 | 11 | document, October 18th -- |
| 10:59 | 12 | A.   Correct. |
| 10:59 | 13 | Q.   -- 2000, correct? |
| 10:59 | 14 | A.   Correct. |
| 10:59 | 15 | Q.   And that's long before you ever testified in the |
| 10:59 | 16 | previous trial? |
| 10:59 | 17 | A.   Yes. |
| 10:59 | 18 | Q.   Long before you testified in Mr. Farhad Larian's case |
| 10:59 | 19 | against Mr. Isaac Larian? |
| 10:59 | 20 | A.   Yes.  Five years before. |
| 10:59 | 21 | Q.   All right.  And long before you ever went to work at |
| 10:59 | 22 | Warner Bros.? |
| 10:59 | 23 | A.   Yes. |
| 10:59 | 24 | Q.   And, by the way, is it your experience that, by being |
| 11:00 | 25 | called as a witness in a previous trial in 2008 by Mattel, |

| 11:00 | 1  | that that got you a job at Warner Bros.? |
| 11:00 | 2  | A.   Absolutely not. |
| 11:00 | 3  | Q.   How did you get that job at Warner Bros.? |
| 11:00 | 4  | A.   A person on the Global Toy Team resigned leaving an |
| 11:00 | 5  | opening, and I was recruited to the position.  I got a phone |
| 11:00 | 6  | call from someone who I knew and, uh -- asked me if I would |
| 11:00 | 7  | be interested, and I went in and I went through several |
| 11:00 | 8  | rounds of interviews and was ultimately selected from a |
| 11:00 | 9  | number of candidates. |
| 11:00 | 10 | Q.   During that interview process, did anybody make mention |
| 11:00 | 11 | of the fact that, "We know you testified at that trial |
| 11:00 | 12 | between Mattel and MGA"?  Did anybody make any reference to |
| 11:00 | 13 | that? |
| 11:00 | 14 | A.   No. |
| 11:00 | 15 | Q.   Or give any indication that they knew that you had |
| 11:00 | 16 | testified at that trial? |
| 11:00 | 17 | A.   No. |
| 11:00 | 18 | Q.   Were they interested in your qualifications and your |
| 11:00 | 19 | background and experience? |
| 11:00 | 20 | A.   Yes. |
| 11:00 | 21 | Q.   Did Victoria O'Connor have anything to do with your |
| 11:01 | 22 | getting that job at Warner Bros.? |
| 11:01 | 23 | A.   No. |
| 11:01 | 24 | Q.   Did you interview with Victoria O'Connor in connection |
| 11:01 | 25 | with that? |

| | | |
|---|---|---|
| 11:01 | 1 | A.   No. |
| 11:01 | 2 | Q.   Did you even know she was working at Warner Bros. at |
| 11:01 | 3 | the time that you interviewed? |
| 11:01 | 4 | A.   Yes. |
| 11:01 | 5 | Q.   Did she have anything to do with your getting an |
| 11:01 | 6 | appointment or being considered for that job? |
| 11:01 | 7 | A.   No. |
| 11:01 | 8 | Q.   I take it -- is it -- did -- people in sales, were they |
| 11:01 | 9 | the one who were responsible for organizing focus groups? |
| 11:01 | 10 | A.   No. |
| 11:01 | 11 | Q.   Who would have been in charge of organizing focus |
| 11:01 | 12 | groups? |
| 11:01 | 13 | A.   The marketing team or product managers. |
| 11:01 | 14 | Q.   Who was the market manager for Bratz? |
| 11:01 | 15 | A.   Paula Treantafelles. |
| 11:01 | 16 | Q.   Did she ever tell you that, in October of 2000, there |
| 11:01 | 17 | was a focus group at a Simi Valley elementary school for |
| 11:01 | 18 | Bratz? |
| 11:01 | 19 | A.   I recall her telling me about a focus group.  I don't |
| 11:01 | 20 | remember her telling me it was at an elementary school. |
| 11:02 | 21 | Q.   Well, you've told us these meetings that you had with |
| 11:02 | 22 | retailers in November, you shared with them results from |
| 11:02 | 23 | focus groups; is that true? |
| 11:02 | 24 | A.   Yes.  In fact, Paula was at the meeting, and she shared |
| 11:02 | 25 | the information, as well. |

| | | |
|---|---|---|
| 11:02 | 1 | Q.   So Paula was in the meeting with you -- |
| 11:02 | 2 | A.   Yes. |
| 11:02 | 3 | Q.   -- is that true. |
| 11:02 | 4 | A.   Yes. |
| 11:02 | 5 | Q.   At which retailers? |
| 11:02 | 6 | A.   Kmart. |
| 11:02 | 7 | Q.   And Paula talked about the results of the focus group? |
| 11:02 | 8 | A.   Yes. |
| 11:02 | 9 | Q.   Did Paula also make reference to the planned animated, |
| 11:02 | 10 | uh -- what you're -- cartoon relating to the Bratz |
| 11:02 | 11 | characters? |
| 11:02 | 12 | A.   Yes. |
| 11:02 | 13 | Q.   You were asked some questions about the sequence of |
| 11:02 | 14 | your jobs and whether -- and, um, you interviewed with |
| 11:02 | 15 | competitors while you were still employed by MGA. |
| 11:02 | 16 | Did you actually, um, start -- did you actually go to |
| 11:03 | 17 | work and start assisting any MGA competitors while you were |
| 11:03 | 18 | still employed by MGA? |
| 11:03 | 19 | A.   No. |
| 11:03 | 20 | MS. KELLER:  Objection.  Argumentative. |
| 11:03 | 21 | THE COURT:  Overruled. |
| 11:03 | 22 | BY MR. QUINN: |
| 11:03 | 23 | Q.   Did you take any designs for toys that had been |
| 11:03 | 24 | developed during the period of your MGA employment and take |
| 11:03 | 25 | them over to a competitor? |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:03 | 1 | MS. KELLER:  Objection.  Assumes facts not in |
| 11:03 | 2 | evidence. |
| 11:03 | 3 | THE COURT:  Overruled. |
| 11:03 | 4 | You can answer the question. |
| 11:03 | 5 | THE WITNESS:  I'm sorry? |
| 11:03 | 6 | THE COURT:  You can answer the question. |
| 11:03 | 7 | THE WITNESS:  No, I didn't. |
| 11:03 | 8 | BY MR. QUINN: |
| 11:03 | 9 | Q.  If we could look at Exhibit 34690, this is the top |
| 11:03 | 10 | e-mail from Isaac Larian, dated December 8th.  And it's your |
| 11:03 | 11 | e-mail to Mr. Larian, dated December 7th, concerning the |
| 11:03 | 12 | Family Dollar recap. |
| 11:03 | 13 | *(Document provided to the witness.)* |
| 11:03 | 14 | BY MR. QUINN: |
| 11:03 | 15 | Q.  Do you see that? |
| 11:03 | 16 | A.  Yes. |
| 11:03 | 17 | Q.  On the second page, under "Hoppity and Scooter," |
| 11:04 | 18 | Counsel asked you some questions about this line, "Bratz, I |
| 11:04 | 19 | could only speak to this because I didn't have good |
| 11:04 | 20 | materials.  He wants to see in HK." |
| 11:04 | 21 | Do you see that? |
| 11:04 | 22 | A.  Yes. |
| 11:04 | 23 | Q.  Does this relate to a presentation that you made to a |
| 11:04 | 24 | retailer by the name of "Family Dollar"? |
| 11:04 | 25 | A.  Yes. |

Case 2:04-cv-09049-DOC-RNB   Document 9844   Filed 02/10/11   Page 117 of 157   Page ID #:297120
CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

117

| | | |
|---|---|---|
| 11:04 | 1 | Q.   When you say you didn't have good materials, what you |
| 11:04 | 2 | did mean by that? |
| 11:04 | 3 | A.   We only had a limited amount of mockups and boards and |
| 11:04 | 4 | prototypes, packaging prototypes at the time.  And they were |
| 11:04 | 5 | allocated to key appointments, key retail appointments.  And |
| 11:04 | 6 | Family Dollar wasn't considered, um, significant.  It was a |
| 11:04 | 7 | discount chain. |
| 11:04 | 8 | So, um, I didn't -- the materials weren't given to me |
| 11:04 | 9 | for that particular meeting.  They went to a different |
| 11:04 | 10 | meeting. |
| 11:04 | 11 | Q.   All right.  So when you say, "I didn't have good |
| 11:04 | 12 | materials" for this Family Dollar meeting, you did mean that |
| 11:04 | 13 | the materials that existed, those things that you just |
| 11:04 | 14 | identified, you didn't have with you because they were being |
| 11:05 | 15 | used by other people who were presenting to larger accounts? |
| 11:05 | 16 | A.   Correct. |
| 11:05 | 17 | MS. KELLER:  Objection.  Leading the witness, |
| 11:05 | 18 | Your Honor. |
| 11:05 | 19 | THE COURT:  Overruled. |
| 11:05 | 20 | THE WITNESS:  Correct. |
| 09:14 | 21 | BY MR. QUINN: |
| 11:05 | 22 | Q.   You were asked, by Counsel, when you took a medical |
| 11:05 | 23 | leave -- she said that you did not -- "Isn't it true that |
| 11:05 | 24 | you did not intend to return to MGA?"  Do you recall that |
| 11:05 | 25 | question? |

| | | |
|---|---|---|
| 11:05 | 1 | A.   Yes. |
| 11:05 | 2 | Q.   Why did you not intend to return to MGA? |
| 11:05 | 3 |      MS. KELLER:  Objection.  Irrelevant. |
| 11:05 | 4 |      THE COURT:  Overruled. |
| 11:05 | 5 |      THE WITNESS:  When I returned from my maternity |
| 11:05 | 6 | leave, um, I was -- I felt I had been discriminated against |
| 11:05 | 7 | for having taken maternity leave and being pregnant.  And I |
| 11:05 | 8 | was stripped of my job responsibilities.  And my office had |
| 11:05 | 9 | been given away.  I didn't have a computer.  I was put into |
| 11:05 | 10 | an area of cubicles with no -- with no specific job |
| 11:05 | 11 | responsibilities.  And I didn't feel that that was going to |
| 11:06 | 12 | change.  It was suggested to me by my boss at the time, and |
| 11:06 | 13 | the HR manager, that I explore my opportunities, as I recall |
| 11:06 | 14 | them saying. |
| 11:06 | 15 | BY MR. QUINN: |
| 11:06 | 16 | Q.   Counsel asked you why -- you made reference to the fact |
| 11:06 | 17 | that -- "Isn't it true that you waited three years in order |
| 11:06 | 18 | to bring your discrimination claim?" |
| 11:06 | 19 |      Do you recall that? |
| 11:06 | 20 | A.   Yes, I recall. |
| 11:06 | 21 |      MS. KELLER:  Objection.  Misstates the question, |
| 11:06 | 22 | and the testimony -- |
| 11:06 | 23 |      THE COURT:  Overruled. |
| 11:06 | 24 |      MS. KELLER:  -- I asked about the law. |
| 11:06 | 25 |      THE COURT:  Overruled. |

| 11:06 | 1 | BY MR. QUINN: |
|---|---|---|
| 11:06 | 2 | Q.   You were asked why you waited -- or "isn't it true that |
| 11:06 | 3 | you waited three years to bring a lawsuit?" |
| 11:06 | 4 | Do you recall that question? |
| 11:06 | 5 | A.   Yes. |
| 11:06 | 6 | Q.   What happened? |
| 11:06 | 7 | A.   Um, what do you mean "What happened"? |
| 11:06 | 8 | Q.   You indicated you had retained your right to sue? |
| 11:06 | 9 | A.   Yes. |
| 11:06 | 10 | Q.   And what do you mean by that? |
| 11:06 | 11 | A.   Um, within a year of the discrimination, I had to file, |
| 11:06 | 12 | um, some documents with the Department of Fair Housing and |
| 11:06 | 13 | Employment -- I think it's called -- which would have |
| 11:06 | 14 | retained my right to sue if I wished to proceed. |
| 11:07 | 15 | Q.   Was it your understanding that that was an |
| 11:07 | 16 | administrative process that you're required to go through -- |
| 11:07 | 17 | A.   Yes. |
| 11:07 | 18 | Q.   -- before you could bring a lawsuit? |
| 11:07 | 19 | A.   Yes. |
| 11:07 | 20 | Q.   And that you could not bring the lawsuit until they |
| 11:07 | 21 | gave you that right to sue? |
| 11:07 | 22 | A.   Correct. |
| 11:07 | 23 | Q.   And that's why there was a three-year lapse? |
| 11:07 | 24 | A.   Correct. |
| 11:07 | 25 | Q.   You were asked some questions about your -- I think |

11:07  1   your Linked-In entry, where you indicate that you were

11:07  2   involved in the successful launch of Bratz.

11:07  3        Can you explain what your contribution to that was --

11:07  4   A.   I --

11:07  5   Q.   -- the launch of Bratz?

11:07  6   A.   Sure.  The sales department was integral to -- with the

11:07  7   marketing teams in providing buyer feedback and retail

11:07  8   information, um, which would then, in many instances, help

11:08  9   modify or change the way a product was being developed or

11:08  10  how it was going to be marketed or some of the specific

11:08  11  aspects of it.

11:08  12       And also we were the ones out getting the sales.  So

11:08  13  without having a sale, the product couldn't have become

11:08  14  successful.  So I -- I was part of the very initial pitches

11:08  15  of that product line to major retailers, and I participated

11:08  16  in meetings with the product team and the marketing teams,

11:08  17  and provided feedback on that product line.  We were also

11:08  18  solicited for ideas on how to extend the product line in the

11:08  19  future.  We were solicited on ideas for the name of the

11:08  20  product, the name of the specific dolls.  There were many,

11:08  21  many aspects where the sales team was solicited for

11:08  22  information.

11:08  23       And as part of that team, I -- I felt that I

11:08  24  participated.

11:08  25  Q.   What is the lead time in terms of pitching to national

| | | |
|---|---|---|
| 11:08 | 1 | accounts like Toys R Us, Walmart, Target, and the time when |
| 11:09 | 2 | a new toy is actually on the shelf? |
| 11:09 | 3 | A.   In general, the fall -- back then, it was called a Fall |
| 11:09 | 4 | Roadshow.  The toy industry has streamlined some of these |
| 11:09 | 5 | processes over the last ten years.  But we would have a line |
| 11:09 | 6 | review toward the end of the summer, generally, September |
| 11:09 | 7 | timeframe, letting us know what the product line was going |
| 11:09 | 8 | to be for the following Fall.  We would do the preshows or |
| 11:09 | 9 | the roadshows leading up to -- throughout that fall, leading |
| 11:09 | 10 | up into winter. |
| 11:09 | 11 | And those would, generally, be all prototypes.  We |
| 11:09 | 12 | wouldn't have final -- final samples.  We might have mockups |
| 11:09 | 13 | and boards or hand samples, but we didn't always have that. |
| 11:09 | 14 | We often just were working off prototypes.  And then there |
| 11:09 | 15 | would be a Hong Kong show in January.  There was -- at that |
| 11:09 | 16 | time frame, there was an import show in Dallas at the end of |
| 11:10 | 17 | February.  And then there was a New York toy fair in |
| 11:10 | 18 | February.  So those would have been all of the times that we |
| 11:10 | 19 | were making presentations.  After New York toy fair, we |
| 11:10 | 20 | would spend the next several months chasing orders and |
| 11:10 | 21 | getting the orders in place. |
| 11:10 | 22 | In the meantime, manufacturing would be, um, being |
| 11:10 | 23 | developed.  And, um, for imported toys, they would generally |
| 11:10 | 24 | leave the Orient the end of May, early June, and be on the |
| 11:10 | 25 | shelves in September timeframe for fourth quarter. |

CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

122

| 11:10 | 1 | Q.   So is it true that the activity that you were involved |
|---|---|---|

11:10   1   Q.   So is it true that the activity that you were involved

11:10   2   in then, in selling to national accounts, in the

11:10   3   September/October/November timeframe of 2000, was really for

11:10   4   toys that could not end up on the shelf, and would not end

11:10   5   up on the shelf, until the following Fall, a year ahead?

11:10   6   A.   Theoretically.  Sometimes toys were fast-tracked, to be

11:10   7   done quicker, but for the most part, yes.

11:11   8   Q.   And you were asked questions of, isn't it true that

11:11   9   Bratz was not successful -- it didn't really take off until

11:11   10  December of 2001?  And I think you said something about

11:11   11  Christmas and the importance in the toy industry.

11:11   12       Could you explain that?

11:11   13  A.   Yes.  Toy -- the toy industry is heavily seasonal.  And

11:11   14  the vast majority of sales happen in the fourth quarter,

11:11   15  which would be October, November, and December.  So Spring

11:11   16  sales, um, are a fraction of fall sales.

11:11   17       If something performed well in spring, then it was a

11:11   18  good indicator that it would do really well in the fall.

11:11   19  But, in general, for something to be truly successful, to

11:11   20  have the term "great success" be around it, it would --

11:11   21  those sales would occur in the fourth quarter.

11:11   22  Q.   And can you say, in the toy industry, roughly, is there

11:11   23  a benchmark about what percentage of sales are in the fourth

11:12   24  quarter of the year?

11:12   25  A.   Sixty percent.

11:12  1   Q.   In your meeting with Mr. Proctor, at any time did he

11:12  2   suggest to you what you should say or not say?

11:12  3   A.   No.

11:12  4   Q.   Did they -- at any time did the folks from MGA contact

11:12  5   you and say they wanted to interview you?

11:12  6   A.   No.

11:12  7   Q.   Did you ever tell anyone that you would not meet with

11:12  8   MGA if they asked to meet with you?

11:12  9   A.   No.

11:12  10   Q.   Did they ever offer to provide you counsel?

11:12  11   A.   Who?

11:12  12   Q.   MGA.

11:12  13   A.   No.

11:12  14        MR. QUINN:  And then, if we could look at

11:12  15   Exhibit 13532.

11:12  16           *(Document provided to the witness.)*

11:12  17        MR. QUINN:  If we could put that up on the screen,

11:12  18   Ken.

11:12  19           *(Document displayed.)*

09:24  20   BY MR. QUINN:

11:12  21   Q.   There was some questions about this agreement that was

11:12  22   distributed in August of 2000.

11:12  23      Is it true that there was a previous inventions

11:13  24   agreement that you had signed at the time that you started

11:13  25   at MGA?

CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

124

| | | |
|---|---|---|
| 11:13 | 1 | A.   Yes. |
| 11:13 | 2 | Q.   And is it your understanding that this form of |
| 11:13 | 3 | agreement was approved by Isaac Larian? |
| 11:13 | 4 | A.   Yes. |
| 11:13 | 5 |       MS. KELLER:  Objection -- |
| 11:13 | 6 | BY MR. QUINN: |
| 11:13 | 7 | Q.   The one we're looking at here, Exhibit 13532? |
| 11:13 | 8 |       MS. KELLER:  Objection.  No foundation, and |
| 11:13 | 9 | assumes facts not in evidence. |
| 11:13 | 10 |       THE COURT:  (To the jury:) Well, this is only her |
| 11:13 | 11 | understanding.  This doesn't mean that it was or was not. |
| 11:13 | 12 |       But her understanding is -- |
| 11:13 | 13 |       Your answer was? |
| 11:13 | 14 |       THE WITNESS:  Yes. |
| 11:13 | 15 | BY MR. QUINN: |
| 11:13 | 16 | Q.   And did he sign it? |
| 11:13 | 17 | A.   Yes. |
| 11:13 | 18 |       MR. QUINN:  If we could look at dash 4. |
| 11:13 | 19 |        (Document displayed.) |
| 11:13 | 20 |       THE WITNESS:  Yes. |
| 11:13 | 21 |       MR. QUINN:  And also, dash 10. |
| 11:13 | 22 |        (Document displayed.) |
| 11:13 | 23 | BY MR. QUINN: |
| 11:13 | 24 | Q.   Does that also include Mr. Larian's signature? |
| 11:13 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 11:14 | 1 | MR. QUINN:  Nothing further. |
| 11:14 | 2 | THE COURT:  Recross? |
| 11:14 | 3 | This would be Ms. Keller on behalf of MGA and |
| 11:14 | 4 | Larian. |
| 11:14 | 5 | **RECROSS-EXAMINATION** |
| | 6 | BY MS. KELLER: |
| 11:14 | 7 | Q.   Ma'am, you said at the break that you did not talk to |
| 11:14 | 8 | the Mattel lawyers.  You remember that? |
| 11:14 | 9 | A.   Yes. |
| 11:14 | 10 | Q.   But you did talk to your own Mattel-paid lawyer, |
| 11:14 | 11 | correct? |
| 11:14 | 12 | A.   I spoke to my lawyer, yes. |
| 11:14 | 13 | Q.   Paid by Mattel, right?  And you know that since you |
| 11:14 | 14 | were represented by counsel that no one can contact you |
| 11:14 | 15 | directly; they have to contact you through your lawyer, |
| 11:14 | 16 | right? |
| 11:14 | 17 | A.   Yes. |
| 11:14 | 18 | Q.   Correct? |
| 11:14 | 19 | A.   Yes. |
| 11:14 | 20 | Q.   And you know that, since your lawyer was being paid by |
| 11:14 | 21 | Mattel and was working with Mattel, that there was |
| 11:14 | 22 | essentially no point in MGA trying to contact you, true? |
| 11:14 | 23 | MR. QUINN:  Argumentative.  Assumes facts. |
| 11:14 | 24 | THE COURT:  Overruled. |
| 11:14 | 25 | You can answer that question. |

| | | |
|---|---|---|
| 11:14 | 1 | THE WITNESS:  I don't know. |
| 11:14 | 2 | BY MS. KELLER: |
| 11:15 | 3 | Q.  Well, you were asked whether MGA offered to provide you |
| 11:15 | 4 | a lawyer. |
| 11:15 | 5 | After you sued Mr. Larian and MGA, did you really |
| 11:15 | 6 | expect them to provide you a lawyer? |
| 11:15 | 7 | MR. QUINN:  Argumentative. |
| 11:15 | 8 | THE COURT:  Overruled. |
| 11:15 | 9 | THE WITNESS:  No. |
| 11:15 | 10 | BY MS. KELLER: |
| 11:15 | 11 | Q.  Now, you were asked a few questions about Fred Larian, |
| 11:15 | 12 | Mr. Larian's brother. |
| 11:15 | 13 | Mr. Larian dismissed his lawsuit immediately after you |
| 11:15 | 14 | testified, right? |
| 11:15 | 15 | MR. QUINN:  Asked and answered.  Lacks foundation. |
| 11:15 | 16 | THE COURT:  That has been asked and answered, |
| 11:15 | 17 | Counsel, hasn't it? |
| 11:15 | 18 | MS. KELLER:  Then I'll ask a follow-up question. |
| 11:15 | 19 | BY MS. KELLER: |
| 11:15 | 20 | Q.  You knew that Mr. Larian had filed his lawsuit because |
| 11:15 | 21 | of a newspaper article alleging that Bratz was being |
| 11:15 | 22 | developed by MGA in 1999, right? |
| 11:15 | 23 | A.  No. |
| 11:15 | 24 | Q.  You knew, because he told you, that after you testified |
| 11:15 | 25 | that it wasn't until 2000, he realized he was wrong and |

| | | |
|---|---|---|
| 11:15 | 1 | dismissed his suit, true? |
| 11:15 | 2 | A.   No. |
| 11:16 | 3 | MS. KELLER:  Nothing further. |
| 11:16 | 4 | THE COURT:  Okay.  Now, in an abundance of |
| 11:16 | 5 | caution, we're placing all of the witnesses on call.  That |
| 11:16 | 6 | will save any additional subpoenas. |
| 11:16 | 7 | But you go about any personal vacation, trips, |
| 11:16 | 8 | professional responsibilities.  If we need you, we'll be |
| 11:16 | 9 | courteous and find you. |
| 11:16 | 10 | THE WITNESS:  Okay. |
| 11:16 | 11 | THE COURT:  Now, don't let this frighten you.  I'm |
| 11:16 | 12 | holding everybody until May 7th.  The lawsuit's going to |
| 11:16 | 13 | conclude far before that time, but I'd feel awfully foolish, |
| 11:16 | 14 | with all the subpoenas going across international |
| 11:16 | 15 | boundaries, or within the United States, if somebody wasn't |
| 11:16 | 16 | on call. |
| 11:16 | 17 | THE WITNESS:  Okay. |
| 11:16 | 18 | THE COURT:  Okay.  Thank you very much. |
| 11:16 | 19 | You may step down. |
| 11:16 | 20 | *(Witness steps down subject to recall.)* |
| 11:16 | 21 | THE COURT:  Counsel, would you call your next |
| 11:16 | 22 | witness, please. |
| 11:16 | 23 | MR. PRICE:  Your Honor, our next witness is Isaac |
| 11:16 | 24 | Larian. |
| 11:16 | 25 | THE COURT:  Thank you.  Sir, if you would be kind |

CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

128

| | | |
|---|---|---|
| 11:16 | 1 | enough to raise your right hand. |
| 11:16 | 2 | MS. KELLER:  May he have a break, Your Honor? |
| 11:16 | 3 | THE COURT:  Certainly.  You want a restroom break? |
| 11:16 | 4 | Why don't we take a 10-minute restroom break. |
| 11:16 | 5 | You're admonished not to discuss this matter |
| 11:16 | 6 | amongst yourselves nor to form or express any opinion about |
| 11:17 | 7 | the case. |
| 11:17 | 8 | Counsel, let's say right at 11:30.  Okay. |
| 11:17 | 9 | *(Recess held at 11:17 a.m.)* |
| 11:29 | 10 | *(Proceedings resumed at 11:29 a.m.)* |
| 11:29 | 11 | THE COURT:  All right.  We're back on the record. |
| 11:29 | 12 | All counsel are present.  The parties are present. |
| 11:29 | 13 | Thank you, Counsel, for your courtesy.  If you |
| 11:29 | 14 | would be seated. |
| 11:29 | 15 | And, Counsel, your next witness on behalf or |
| 11:29 | 16 | called by Mattel. |
| 11:29 | 17 | MR. PRICE:  Isaac Larian, Your Honor. |
| 11:29 | 18 | THE COURT:  Thank you very much, sir.  Would you |
| 11:29 | 19 | be kind enough to step forward between the double doors. |
| 11:29 | 20 | Would you please raise your right hand.  Kathy |
| 11:29 | 21 | will administer an oath to you. |
| 11:29 | 22 | **ISAAC LARIAN, MATTEL'S WITNESS, SWORN** |
| 11:29 | 23 | THE WITNESS:  I do. |
| 11:29 | 24 | THE COURT:  Thank you. |
| 11:29 | 25 | Mr. Larian, if you would come along the side of |

| 11:30 | 1 | the jury box.  And if you'd be seated, sir. |
| 11:30 | 2 | Now, would you state your full name for the jury, |
| 11:30 | 3 | please. |
| 11:30 | 4 | THE WITNESS:  Isaac Larian. |
| 11:30 | 5 | THE COURT:  Would you spell your last name, sir. |
| 11:30 | 6 | THE WITNESS:  L-A-R-I-A-N. |
| 11:30 | 7 | THE COURT:  Direct examination by Mr. Price on |
| 11:30 | 8 | behalf of Mattel. |

**DIRECT EXAMINATION**

BY MR. PRICE:

Q.   Mr. Larian, could you tell us what you do now?  What's your job?

A.   Still the same thing I did before:  CEO of MGA Entertainment.

Q.   And how long have you been the CEO of MGA or its predecessor?

A.   Since 1979.

Q.   I want to ask you a few things that came up this morning.

You've been sitting here throughout the trial, right?

A.   Yes, I have.

Q.   And you recall some questions this morning concerning an arbitration, Larian v. Larian?

A.   Yes.

Q.   And in that arbitration, your brother was suggesting

| | | |
|---|---|---|
| 11:30 | 1 | that you had begun planning for the development of Bratz in |
| 11:31 | 2 | 1999, correct? |
| 11:31 | 3 | A.   Yes. |
| 11:31 | 4 | Q.   That is, not that Mr. Bryant had been doing Bratz in |
| 11:31 | 5 | 1999, but that you had been doing Bratz in 1999.  That was |
| 11:31 | 6 | his allegation? |
| 11:31 | 7 | A.   Well, I don't have the allegation in front of me, but |
| 11:31 | 8 | that was his allegation. |
| 11:31 | 9 | Q.   And the case concerned an issue of your buying some of |
| 11:31 | 10 | your brother's ownership in MGA; is that right? |
| 11:31 | 11 | A.   Yes.  In 2000 I had bought my brother's shares at MGA. |
| 11:31 | 12 | Q.   And was that around November of 2000? |
| 11:31 | 13 | A.   November/December 2000, I think. |
| 11:31 | 14 | Q.   And the allegation in his lawsuit was that you knew |
| 11:31 | 15 | Bratz was more valuable than you had let on? |
| 11:31 | 16 | A.   Again, I don't remember the allegation.  I think his |
| 11:31 | 17 | biggest allegation was that I have developed -- working on |
| 11:32 | 18 | developing Bratz since 1999, which was not true. |
| 11:32 | 19 | Q.   And so, in the arbitration, Ms. Maurus was a witness, |
| 11:32 | 20 | correct? |
| 11:32 | 21 | A.   Yes.  She was one of the witnesses.  Actually, I think |
| 11:32 | 22 | she was the only witness. |
| 11:32 | 23 | Q.   And you've heard suggestion here that she was biased or |
| 11:32 | 24 | kind of out to get you because of disagreements you had had? |
| 11:32 | 25 | A.   Well, she was biased.  It's no question.  She had sued |

| | | |
|---|---|---|
| 11:32 | 1 | us three years after resigning from the company, going to a |
| 11:32 | 2 | competitor, and three years later -- and being fired from -- |
| 11:32 | 3 | during those three years from two other jobs, complaining |
| 11:32 | 4 | that we were discriminating against her for pregnancy. |
| 11:32 | 5 | And, frankly, her goal was to basically extort money. |
| 11:32 | 6 | Q.  So you're saying that when she testified in the |
| 11:32 | 7 | arbitration, it's your belief that when she testified in |
| 11:32 | 8 | 2005, that she was kind of out to get you; is that right? |
| 11:32 | 9 | Yes or no? |
| 11:32 | 10 | A.  She was -- again, she had lawsuit against us.  And she |
| 11:33 | 11 | was basically trying to get back at us because -- I remember |
| 11:33 | 12 | that her lawyers, who had sued us -- it was a contingency |
| 11:33 | 13 | lawyer. |
| 11:33 | 14 | MR. PRICE:  Move to strike.  It was a "yes" or |
| 11:33 | 15 | "no" question. |
| 11:33 | 16 | THE WITNESS:  No.  I need to explain. |
| 11:33 | 17 | So the contingency lawyers wanted to basically -- |
| 11:33 | 18 | when you hire contingency lawyers, when there's a |
| 11:33 | 19 | settlement, they get a portion of it.  So they had taken |
| 11:33 | 20 | that case as a contingency.  And it was to her interest for |
| 11:33 | 21 | us to settle, so she can get some money and -- |
| 11:33 | 22 | MR. PRICE:  Your Honor, it's a "yes" or "no" |
| 11:33 | 23 | question. |
| 11:33 | 24 | THE WITNESS:  -- and we would not just give into |
| 11:33 | 25 | that. |

| | | |
|---|---|---|
| 11:33 | 1 | THE COURT: All right. Let's strike the question. |
| 11:33 | 2 | Let strike the answer. |
| 11:33 | 3 | And let's get the rules straight. If it's going |
| 11:33 | 4 | to be "yes" or "no," then you need to indicate that when you |
| 11:33 | 5 | ask the question. And if that's an unreasonable request on |
| 11:33 | 6 | your part, then the witness has to be able to explain. |
| 11:33 | 7 | By the same token, Mr. Larian cannot volunteer an |
| 11:34 | 8 | answer or extraneous material. |
| 11:34 | 9 | So let's strike the question. Let's strike the |
| 11:34 | 10 | answer. Let's reask it. |
| 11:34 | 11 | BY MR. PRICE: |
| 11:34 | 12 | Q. Mr. Larian, this is a "yes" or "no" question: It's |
| 11:34 | 13 | your view that when Ms. Maurus testified in 2005 in this |
| 11:34 | 14 | proceeding where your brother was saying that you were |
| 11:34 | 15 | involved in Bratz in 1999 -- it's your belief that she was |
| 11:34 | 16 | out to get you? Yes or no? |
| 11:34 | 17 | A. I'm not so sure she was out to get me, or not to get |
| 11:34 | 18 | me, but she was hostile. That's the answer. |
| 11:34 | 19 | Q. And she took the stand and took the oath to testify |
| 11:34 | 20 | truthfully, correct? |
| 11:34 | 21 | A. She did. |
| 11:34 | 22 | Q. And what she said in her testimony was that she had met |
| 11:34 | 23 | Carter Bryant in the early summer of 2000, right? |
| 11:34 | 24 | A. I don't remember her testimony from 2005, but I heard |
| 11:34 | 25 | her say that today, yes. |

Case 2:04-cv-09049-DOC-RNB   Document 9844   Filed 02/10/11   Page 133 of 157   Page ID #:297136
CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

133

| | | |
|---|---|---|
| 11:34 | 1 | Q.   I guess what I'm saying is that, at the time of the |
| 11:34 | 2 | arbitration in 2005, the testimony that she saw Carter |
| 11:35 | 3 | Bryant in the early summer of 2000 actually helped your |
| 11:35 | 4 | case, correct?  Yes or no? |
| 11:35 | 5 | A.   I don't understand your question.  How did it help my |
| 11:35 | 6 | case?  Basically, what happened that the -- right after she |
| 11:35 | 7 | testified, my brother apologized to me on the record and |
| 11:35 | 8 | dropped his case. |
| 11:35 | 9 | Q.   But my question is this:  In the arbitration, you were |
| 11:35 | 10 | taking the position that you had not begun planning for the |
| 11:35 | 11 | development of Bratz in 1999, correct?  Yes or no? |
| 11:35 | 12 | A.   Yes, correct. |
| 11:35 | 13 | Q.   And in that arbitration, after she took the oath, |
| 11:35 | 14 | Ms. Maurus testified that she hadn't seen Carter Bryant |
| 11:35 | 15 | until early summer June or July 2000, correct?  Yes or no? |
| 11:35 | 16 | A.   Yes. |
| 11:35 | 17 | Q.   And that testimony helped you in the case against your |
| 11:35 | 18 | brother, correct?  Yes or no? |
| 11:35 | 19 | A.   It did not help us or did not -- she was just, |
| 11:35 | 20 | basically -- ladies and gentlemen, of the jury -- was lying |
| 11:36 | 21 | as you saw her lying today.  And, basically, my brother -- |
| 11:36 | 22 | after she saw that, she just dropped the case. |
| 11:36 | 23 | MR. PRICE:  Move to strike as nonresponsive. |
| 11:36 | 24 | THE COURT:  Stricken. |
| 11:36 | 25 | It's nonresponsive. |

CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

134

| 11:36 | 1 | Reask the question. |
| 11:36 | 2 | BY MR. PRICE: |
| 11:36 | 3 | Q.   Mr. Larian, this is a "yes" or "no" question. |
| 11:36 | 4 | Her testimony that she didn't see Mr. Bryant until |
| 11:36 | 5 | early summer of 2000, June or July, helped you in your case |
| 11:36 | 6 | against your brother because he was saying you worked on it |
| 11:36 | 7 | in 1999, correct?  Yes or no? |
| 11:36 | 8 | A.   Yes.  Yes, you can say that.  Correct. |
| 11:36 | 9 | Q.   Okay.  So the testimony that she gave under oath in |
| 11:36 | 10 | 2005 about this meeting with Mr. Bryant -- early summer, |
| 11:36 | 11 | June or July, 2000 -- that was testimony that strengthened |
| 11:36 | 12 | your case against your brother, correct?  Yes or no? |
| 11:36 | 13 | A.   Yes. |
| 11:36 | 14 | Q.   Now, you understand in this lawsuit there's a question |
| 11:36 | 15 | of when Mr. Bryant created the materials, when he met with |
| 11:37 | 16 | you, correct? |
| 11:37 | 17 | A.   Yes. |
| 11:37 | 18 | Q.   Now, let me ask something else that came up this |
| 11:37 | 19 | morning, and that was this issue about Ms. Maurus' |
| 11:37 | 20 | Linked-In -- or a resumé where she talks about her |
| 11:37 | 21 | contribution to Bratz. |
| 11:37 | 22 | Do you recall that from this morning?  Yes or no? |
| 11:37 | 23 | A.   Yes, I do. |
| 11:37 | 24 | Q.   And do you recall that there was a suggestion that she |
| 11:37 | 25 | could not have contributed to Bratz sales because she was on |

| | | |
|---|---|---|
| 11:37 | 1 | pregnant leave in June 2001.  Do you remember that? |
| 11:37 | 2 | A.   Well, I think -- what I remember, that she basically |
| 11:37 | 3 | testified that she was only at MGA during that time for ten |
| 11:37 | 4 | days.  So how could she be instrumental in launching Bratz? |
| 11:37 | 5 | That's what I remember. |
| 11:37 | 6 | Q.   Let's describe what you mean by "during that time." |
| 11:37 | 7 | Can you give us the timeframe you're talking about |
| 11:37 | 8 | where she was there for only ten days?  Just give us the |
| 11:38 | 9 | dates. |
| 11:38 | 10 | A.   I don't remember. |
| 11:38 | 11 | Q.   Do you recall that she went on her pregnancy leave, or |
| 11:38 | 12 | there was testimony, sometime in June 2001?  Do you recall |
| 11:38 | 13 | that? |
| 11:38 | 14 | A.   I don't recall when she left.  I know she went on |
| 11:38 | 15 | pregnancy leave, but I don't recall when she went on |
| 11:38 | 16 | pregnancy leave. |
| 11:38 | 17 | Q.   Now, before June 2001, is it correct that there were |
| 11:38 | 18 | meetings with potential customers to sell Bratz? |
| 11:38 | 19 | A.   Before June 2001? |
| 11:38 | 20 | Q.   Yes. |
| 11:38 | 21 | A.   Yes, absolutely. |
| 11:38 | 22 | Q.   And was she a member of the sales team prior to |
| 11:38 | 23 | June 2001?  Yes or no? |
| 11:38 | 24 | A.   She was. |
| 11:38 | 25 | Q.   And in your view, prior to 2001, as a result of |

| | | |
|---|---|---|
| 11:38 | 1 | meetings with potential customers, Bratz was the hottest toy |
| 11:38 | 2 | MGA had ever done in 15 years? |
| 11:38 | 3 | A.   I'm sorry.  Can you speak a little slower and repeat |
| 11:38 | 4 | your question.  I didn't get it. |
| 11:38 | 5 | Q.   Okay.  Isn't it your belief, sir, that prior to |
| 11:38 | 6 | June 2001 -- |
| 11:38 | 7 | A.   Yes. |
| 11:38 | 8 | Q.   -- as a result of these sales meetings, as a result of |
| 11:38 | 9 | you contacting potential customers, that you believed that |
| 11:39 | 10 | Bratz was the hottest toy MGA had ever done in 15 years? |
| 11:39 | 11 | A.   I don't recall my state of mind at that time.  But you |
| 11:39 | 12 | can say, yes, Bratz is one of the hottest, if not the |
| 11:39 | 13 | hottest, toy we have ever done at MGA. |
| 11:39 | 14 | Q.   I'm talking about before Ms. Maurus went on her |
| 11:39 | 15 | pregnancy leave. |
| 11:39 | 16 | A.   I don't remember ten years ago, sir. |
| 11:39 | 17 | Q.   Okay.  Let me see if you'll agree with this or not:  By |
| 11:39 | 18 | April 2001, it was your belief that Bratz was the hottest |
| 11:39 | 19 | toy MGA had ever done in 15 years? |
| 11:39 | 20 | A.   Again, I don't recall.  But Bratz became one of the |
| 11:39 | 21 | hottest toy MGA has done ever. |
| 11:39 | 22 | Q.   By April 2001, months before Ms. Maurus went on her |
| 11:39 | 23 | pregnancy leave, you were already getting huge orders for |
| 11:39 | 24 | Bratz, correct? |
| 11:39 | 25 | A.   Yes, we were. |

| 11:39 | 1 | Q.   And that would be part of these presale meetings that |
|---|---|---|
| 11:39 | 2 | were being done by your sales attempt with potential |
| 11:39 | 3 | customers, correct? |
| 11:39 | 4 | A.   Presales and after.  The real sales and orders happened |
| 11:40 | 5 | right after January 4, 2001, when we showed the product line |
| 11:40 | 6 | to all the customers, including Mattel in Hong Kong. |
| 11:40 | 7 | Q.   So if you'd look at Exhibit 21374. |
| 11:40 | 8 | *(Document provided to the witness.)* |
| 11:40 | 9 | THE WITNESS:  Give me a moment to quickly read |
| 11:40 | 10 | that. |
| 11:40 | 11 | MR. PRICE:  Please take your time. |
| 11:41 | 12 | THE WITNESS:  Yes.  Go ahead. |
| 11:41 | 13 | BY MR. PRICE: |
| 11:41 | 14 | Q.   And you see that Exhibit 21374, the first page, is an |
| 11:41 | 15 | e-mail from you to Pedro Feist? |
| 11:41 | 16 | A.   Yes. |
| 11:41 | 17 | Q.   Dated April 25, 2001, correct? |
| 11:41 | 18 | A.   Yes. |
| 11:41 | 19 | Q.   And this is before the Bratz dolls actually were put on |
| 11:41 | 20 | the market, correct? |
| 11:41 | 21 | A.   That's correct. |
| 11:41 | 22 | MR. PRICE:  Your Honor, move Exhibit 21374 into |
| 11:41 | 23 | evidence. |
| 11:41 | 24 | THE COURT:  Received. |
| 11:41 | 25 | *(Exhibit No. 21374 received in evidence.)* |

11:41    1              (Document displayed.)

11:41    2              MR. PRICE:  And if we can see the top part.

11:41    3              (Technician complies.)

11:41    4    BY MR. PRICE:

11:41    5    Q.    Could you tell us who Mr. Feist is?

11:41    6    A.    Pedro Feist owns a company called Concentra in

11:41    7    Portugal.  He's a distributor of toys.

11:41    8    Q.    And if you look at the fifth full paragraph, beginning

11:41    9    with "Bratz is"?

11:41    10   A.    Yes.

11:42    11   Q.    You wrote to Mr. Feist, "Bratz is the hottest toy MGA

11:42    12   has ever done in 15 years."

11:42    13          And, "We are getting huge orders and support

11:42    14   everywhere.

11:42    15          "Avi Kreisel in Venezuela, Tomy in Japan, JNH in

11:42    16   Australia and" --

11:42    17          Is it Bandai?

11:42    18   A.    "Bandai," Mr. Price.

11:42    19   Q.    -- "Bandai, Europe have all committed full-marketing

11:42    20   program on a three-year contract."

11:42    21          This is what you wrote as of April 25, 2001, right?

11:42    22   A.    I did.

11:42    23   Q.    And that, again, was a few months at least, before the

11:42    24   dolls themselves hit the market, correct?

11:42    25   A.    Well, not a few month.  Actually, the dolls got to the

| | | |
|---|---|---|
| 11:42 | 1 | market -- we shipped them out of China in May 2001.  They |
| 11:43 | 2 | got to Spain first.  So I don't think it's a few month. |
| 11:43 | 3 | Q.   So at least a month before the dolls actually hit the |
| 11:43 | 4 | market, correct? |
| 11:43 | 5 | A.   Uh, no.  Actually, the dolls hit the market in June, so |
| 11:43 | 6 | June 2001 in Spain first. |
| 11:43 | 7 | Q.   All right.  And part of this was the result of |
| 11:43 | 8 | marketing that had taken place prior to April 25, 2001, |
| 11:43 | 9 | correct? |
| 11:43 | 10 | A.   No.  We had not done any marketing before -- |
| 11:43 | 11 | Q.   Oh, I'm sorry.  I apologize. |
| 11:43 | 12 | A.   But can I finish my answers before you interrupt me? |
| 11:43 | 13 |      I mean, we hadn't done any marketing before 2001. |
| 11:43 | 14 | Q.   And I apologize.  I used the wrong word. |
| 11:43 | 15 |      The result you're talking about here in the April 25, |
| 11:43 | 16 | 2001 memo, uh -- partly the result of the sales effort that |
| 11:43 | 17 | MGA had done as of April 2001?  Yes or no? |
| 11:43 | 18 | A.   Yes. |
| 11:43 | 19 | Q.   Now, another issue that came up this morning was an |
| 11:44 | 20 | issue about focus groups; do you recall that? |
| 11:44 | 21 | A.   Yes. |
| 11:44 | 22 | Q.   And you heard Ms. Maurus testify that Ms. Garcia told |
| 11:44 | 23 | her there were focus groups in October/November 2000 -- I |
| 11:44 | 24 | mean -- yes -- till 2000, correct? |
| 11:44 | 25 | A.   Is that your question that what Ms. Maurus said? |

| | | |
|---|---|---|
| 11:44 | 1 | Q.   Let me ask you this:  Sitting here this morning, you |
| 11:44 | 2 | heard Ms. Maurus testify that she had heard from Paula |
| 11:44 | 3 | Garcia around October 2000 that there were focus groups. |
| 11:44 | 4 | You heard that testimony this morning? |
| 11:44 | 5 | A.   I heard her testimony. |
| 11:44 | 6 | Q.   And you saw that she was -- there was a suggestion that |
| 11:44 | 7 | there wasn't a focus group until March of 2001. |
| 11:44 | 8 |      Were you here when that suggestion was made? |
| 11:44 | 9 | A.   Yes, I was.  But I wasn't paying attention to that |
| 11:44 | 10 | suggestion or not. |
| 11:44 | 11 | Q.   That's because you know that suggestion is wrong. |
| 11:44 | 12 | A.   That I wasn't paying attention to it? |
| 11:44 | 13 | Q.   No.  You know it's wrong to suggest that there were no |
| 11:44 | 14 | focus groups until March of 2001, correct?  Yes or no? |
| 11:45 | 15 | A.   I don't remember.  I'm not gonna answer that "yes" or |
| 11:45 | 16 | "no," Mr. Price, because I don't remember.  And I cannot |
| 11:45 | 17 | answer that question "yes" or "no."  I don't remember when |
| 11:45 | 18 | was the focus group. |
| 11:45 | 19 | Q.   You know that there were focus groups before the end of |
| 11:45 | 20 | the year 2000?  You know that at least, correct? |
| 11:45 | 21 | A.   I don't recall.  It could have been.  I don't recall |
| 11:45 | 22 | it. |
| 11:45 | 23 | Q.   You know that there were focus groups prior to |
| 11:45 | 24 | March 2001, correct?  Yes or no? |
| 11:45 | 25 | A.   Again, I cannot answer your question "yes" or "no."  I |

CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

141

| | | |
|---|---|---|
| 11:45 | 1 | have no recollection of it. |
| 11:45 | 2 | Q.   Let's place before you Exhibit 1100. |
| 11:45 | 3 | *(Document provided to the witness.)* |
| 11:45 | 4 | THE WITNESS:  If you can just give me a minute to |
| 11:46 | 5 | read that, please? |
| 11:46 | 6 | MR. PRICE:  Go ahead. |
| 11:46 | 7 | THE COURT:  Is this an e-mail of December 13th? |
| 11:46 | 8 | MR. PRICE:  December 13, yes, Your Honor. |
| 11:46 | 9 | THE WITNESS:  Go ahead. |
| 11:59 | 10 | BY MR. PRICE: |
| 11:46 | 11 | Q.   You recognize this as an e-mail from Paula |
| 11:46 | 12 | Treantafelles, now Paula Garcia, to you around December 13 |
| 11:46 | 13 | of 2000? |
| 11:46 | 14 | A.   I do. |
| 11:46 | 15 | MR. PRICE:  Your Honor, move Exhibit 1100 into |
| 11:46 | 16 | evidence. |
| 11:46 | 17 | THE COURT:  Received. |
| 11:46 | 18 | *(Exhibit No. 1100 received in evidence.)* |
| 11:46 | 19 | *(Document displayed.)* |
| 11:46 | 20 | BY MR. PRICE: |
| 11:46 | 21 | Q.   Let's look at the context here.  If we look at the |
| 11:47 | 22 | second e-mail in the string, the one from Isaac Larian to |
| 11:47 | 23 | Samuel Wong, Mercedeh Ward, and others. |
| 11:47 | 24 | *(Document displayed.)* |
| | 25 | |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 9844   Filed 02/10/11   Page 142 of 157   Page ID #:297145
CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

142

| | | |
|---|---|---|
| 11:47 | 1 | BY MR. PRICE: |
| 11:47 | 2 | Q.  Let me read this.  It's kind of hard to see. |
| 11:47 | 3 | You see there's an e-mail dated December 13, 2000, from |
| 11:47 | 4 | you to Mr. Wong, Mercedeh Ward, Paula Garcia, and others? |
| 11:47 | 5 | A.  That's correct. |
| 11:47 | 6 | Q.  And there's an importance there:  "High"? |
| 11:47 | 7 | A.  Yes. |
| 11:47 | 8 | Q.  And it says, "Put back and do both hair.  The product |
| 11:47 | 9 | must look great."  Do you see that? |
| 11:47 | 10 | A.  Yes, I do. |
| 11:47 | 11 | Q.  And what's that -- that's referring to, in December of |
| 11:48 | 12 | 2000, you still thought it would be a good idea to have the |
| 11:48 | 13 | removable hair on the Bratz dolls, correct? |
| 11:48 | 14 | A.  Yes, I did. |
| 11:48 | 15 | Q.  And, in fact, if you look at the e-mail before that, |
| 11:48 | 16 | also December 13, 2000, from you to Mr. Wong, and Mercedeh |
| 11:48 | 17 | Ward, and Paula Garcia, it says -- That's the second page -- |
| 11:48 | 18 | "If the saving to do only the one hair set is point |
| 11:48 | 19 | $32, then I want to have both hair sets.  This is what makes |
| 11:48 | 20 | our product different.  If it can't be done, I want to know |
| 11:48 | 21 | why in detail". |
| 11:48 | 22 | Do you recall that? |
| 11:48 | 23 | A.  Yes.  Well, I don't recall the e-mail in context |
| 11:48 | 24 | 10 years ago, but that's what the e-mail said, yes.  And my |
| 11:48 | 25 | recollection is it was about the hair change. |

Case 2:04-cv-09049-DOC-RNB   Document 9844   Filed 02/10/11   Page 143 of 157   Page ID #:297146
CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

143

11:48  1    Q.    And the idea of this hair change was in Mr. Bryant's

11:48  2    first drawings, which he presented to you, correct?

11:48  3    A.    Yes, that's true.

11:48  4    Q.    And if we look at the e-mail that's the last

11:49  5    chronologically, but the first on this exhibit, that's from

11:49  6    Ms. Treantafelles, or Ms. Garcia, to you, correct?

11:49  7    A.    Yes.

11:49  8    Q.    And it says, "Isaac, until we receive a sample of the

11:49  9    hair mechanism, I will continue to sell Bratz without this

11:49  10   feature.  If we find that it looks," slash, "works great, we

11:49  11   will surprise them with this added bonus."

11:49  12   A.    Yes.

11:49  13   Q.    And then the next paragraph, "The product is excellent

11:49  14   as it is.  The hair feature is not what is going to set us

11:49  15   apart from the competition.  This was definitely the feature

11:49  16   that caused the girls to feel a bit uncomfortable when they

11:49  17   saw the dolls bald.  They were also concerned that their

11:49  18   doll will always be bald if they happen to lose on (sic) of

11:49  19   their hairs, which is why I wanted to do an exclusive hair

11:49  20   packet.  But we dropped it.  I am confident that the

11:50  21   consumer will be satisfied with the traditional hair play,"

11:50  22   paren, "long and pretty."

11:50  23         Do you see that?

11:50  24   A.    I do.

11:50  25   Q.    Now, does that refresh your recollection that in the

| | | |
|---|---|---|
| 11:50 | 1 | fall of 2000 there were focus groups with little girls where |
| 11:50 | 2 | you didn't have dolls, that you presented them with |
| 11:50 | 3 | something else? |
| 11:50 | 4 | A.   It does not refresh my recollection. |
| 11:50 | 5 | Q.   Well, do you know what Ms. Garcia is referring to when |
| 11:50 | 6 | she says, "that was definitely the feature that caused the |
| 11:50 | 7 | girls to feel a bit uncomfortable when they saw the dolls |
| 11:50 | 8 | bald"? |
| 11:50 | 9 | A.   I could just guess what she was saying.  I think you |
| 11:50 | 10 | should have asked all these questions when she were on the |
| 11:50 | 11 | stand.  But I'm not in her head.  I don't know. |
| 11:50 | 12 | I can guess what she was saying, and I would be happy |
| 11:50 | 13 | to explain it to the jury. |
| 11:50 | 14 | Q.   Reading it now, does this cause you to believe that |
| 11:51 | 15 | there were focus groups before the end of the year 2000 that |
| 11:51 | 16 | Ms. Garcia did with little girls?  Yes or no? |
| 11:51 | 17 | A.   It doesn't refresh my recollection, yes or no, if there |
| 11:51 | 18 | was or there was not a focus group.  It does not. |
| 11:51 | 19 | Q.   Well, you certainly don't believe it's appropriate to |
| 11:51 | 20 | suggest that Ms. Maurus wasn't telling the truth when she |
| 11:51 | 21 | said Paula Garcia told her that there were focus groups in |
| 11:51 | 22 | October 2000.  Yes or no? |
| 11:51 | 23 | A.   I leave Ms. Maurus's credibility to the member of the |
| 11:51 | 24 | jury.  I'm not gonna judge her. |
| 11:51 | 25 | Q.   Well, I'm asking whether you believed the following |

Case 2:04-cv-09049-DOC-RNB   Document 9844   Filed 02/10/11   Page 145 of 157   Page ID #:297148
CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

145

| | | |
|---|---|---|
| 11:51 | 1 | statement is true or untrue.  Here's the statement.  Here's |
| 11:51 | 2 | the statement:  Paula Garcia told Ms. Maurus that there were |
| 11:51 | 3 | focus groups in October of 2000. |
| 11:52 | 4 | A.   There's no way there could have been a focus group in |
| 11:52 | 5 | October 2000.  That's if -- that's what Ms. Maurus testified |
| 11:52 | 6 | to, I believe to be false. |
| 11:52 | 7 | Q.   Let me see if I can refresh your recollection. |
| 11:52 | 8 | MR. PRICE:  Your Honor, may I approach the |
| 11:52 | 9 | witness? |
| 11:52 | 10 | THE COURT:  You may. |
| 11:52 | 11 | MS. KELLER:  Counsel, could we have that |
| 11:52 | 12 | identified? |
| 11:52 | 13 | MR. PRICE:  Yeah.  This is -- I'm gonna give you a |
| 11:53 | 14 | copy.  It's May 29, 2008 testimony of Ms. Garcia. |
| 11:53 | 15 | MS. KELLER:  Is it something that's in our |
| 11:53 | 16 | binders?  Oh, okay.  Okay. |
| 11:53 | 17 | Your Honor, I'm gonna object that -- |
| 11:53 | 18 | THE COURT:  I don't think it's gonna be read, |
| 11:53 | 19 | Counsel.  Refreshing recollection, you can do that from any |
| 11:53 | 20 | source.  But I don't think it's appropriate that it's read, |
| 11:53 | 21 | Counsel, if it's another witness's testimony. |
| 11:53 | 22 | MR. PRICE:  It's page 727, lines 2 to 23. |
| 11:54 | 23 | *(Document provided to the witness.)* |
| 11:54 | 24 | THE WITNESS:  I'm sorry.  What?  727, what lines? |
| 11:54 | 25 | MR. PRICE:  727. |

Case 2:04-cv-09049-DOC-RNB   Document 9844   Filed 02/10/11   Page 146 of 157   Page ID #:297149
CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

146

| | | |
|---|---|---|
| 11:54 | 1 | THE WITNESS:  Yes. |
| 11:54 | 2 | MR. PRICE:  Lines 2. |
| 11:54 | 3 | THE WITNESS:  Go ahead.  To? |
| 11:54 | 4 | MR. PRICE:  Through 23. |
| 11:54 | 5 | THE WITNESS:  This is Paula Garcia's deposition, |
| 11:54 | 6 | correct? |
| 11:54 | 7 | MR. PRICE:  Actually, trial testimony. |
| 11:54 | 8 | THE WITNESS:  Okay. |
| 11:55 | 9 | Yeah.  Go ahead.  I read it. |
| | 10 | BY MR. PRICE: |
| 11:55 | 11 | Q.   Does that refresh your recollection that there may have |
| 11:55 | 12 | been focus groups in Simi Valley, at an elementary school, |
| 11:55 | 13 | in -- by October of 2000? |
| 11:55 | 14 | A.   No, it doesn't.  Maybe we should read that to the jury. |
| 11:55 | 15 | Do you think? |
| 11:55 | 16 | MR. PRICE:  I would have no objection to that. |
| 11:55 | 17 | THE COURT:  It's up to each of you.  If you both |
| 11:55 | 18 | stipulate, but you need to talk to opposing counsel, not |
| 11:55 | 19 | Mr. Larian. |
| 11:55 | 20 | MS. KELLER:  Your Honor, I think it's hearsay. |
| 11:55 | 21 | THE COURT:  Sustained. |
| 11:55 | 22 | MS. KELLER:  No. |
| 11:55 | 23 | MR. PRICE:  Your Honor, actually, I would, at some |
| 11:55 | 24 | point, request to read it as a Rule 32 statement.  But we'll |
| 11:55 | 25 | move on for now. |

| 11:55 | 1 | MS. KELLER: Well, okay. I -- I've changed my |
| 11:55 | 2 | mind. Let's go ahead and have that read. |
| 11:56 | 3 | THE COURT: There's a stipulation by counsel that |
| 11:56 | 4 | they're going to read to you from line 2 to -- |
| 11:56 | 5 | MR. PRICE: 23. |
| 11:56 | 6 | THE COURT: -- 23. |
| 11:56 | 7 | THE WITNESS: Should I read it? |
| 11:56 | 8 | MR. PRICE: I'll read it. |
| 11:56 | 9 | THE WITNESS: You read it. Go ahead. |
| 11:56 | 10 | MR. PRICE: (Reading:) |
| 11:56 | 11 | "QUESTION: Let me ask you, during this October |
| 11:56 | 12 | time frame, did MGA do any focus groups with respect to this |
| 11:56 | 13 | Bratz project? |
| 11:56 | 14 | "ANSWER: That I remember? It's possible. I just |
| 11:56 | 15 | don't remember. |
| 11:56 | 16 | "QUESTION: And why do you say that it's possible |
| 11:56 | 17 | that MGA was in fact doing focus groups as early as October |
| 11:56 | 18 | of 2000? |
| 11:56 | 19 | "ANSWER: Let me back up. We did not do any |
| 11:56 | 20 | formal focus groups on Bratz until into 2001. I will say, |
| 11:56 | 21 | though, it may have been possible we did some informal focus |
| 11:56 | 22 | groups in the Simi Valley area at an elementary school. And |
| 11:56 | 23 | there were times when we would bring in really informal |
| 11:56 | 24 | questions to the kids. I don't know if anything related to |
| 11:56 | 25 | Bratz was part of that research." |

DEBBIE GALE, U.S. COURT REPORTER

148

| | | |
|---|---|---|
| 11:56 | 1 | THE WITNESS: Well, you read that sentence very |
| 11:56 | 2 | fast, I think. "I don't know if anything related to Bratz |
| 11:57 | 3 | was part of that research." |
| 11:57 | 4 | MR. PRICE: I'm gonna continue, Your Honor. |
| 11:57 | 5 | THE WITNESS: Go ahead. |
| 11:57 | 6 | MR. PRICE: (Reading:) |
| 11:57 | 7 | "QUESTION: So no formal focus groups until 2001, |
| 11:57 | 8 | correct? |
| 11:57 | 9 | "ANSWER: Yeah, it was very -- it was close to the |
| 11:57 | 10 | end of our development cycle. |
| 11:57 | 11 | "QUESTION: And you said that informal focus group |
| 11:57 | 12 | in Simi Valley. What time are you talking about with |
| 11:57 | 13 | respect to that? |
| 11:57 | 14 | "ANSWER: It could have happened -- you know, at |
| 11:57 | 15 | any time. And I'm not even sure it actually happened. I'm |
| 11:57 | 16 | just saying that these focus groups that MGA would |
| 11:57 | 17 | participate in within that time period sometimes happened in |
| 11:57 | 18 | Simi Valley. I'm not sure again if Bratz was participating |
| 11:57 | 19 | in any of those. Sorry." |
| 11:57 | 20 | BY MR. PRICE: |
| 11:57 | 21 | Q. And you've testified that before the Hong Kong toy |
| 11:58 | 22 | fair -- and perhaps you can remind us: What was the date of |
| 11:58 | 23 | that? |
| 11:58 | 24 | A. The one that Mattel came to our showroom? Is that the |
| 11:58 | 25 | one that you're talking about? |

Case 2:04-cv-09049-DOC-RNB  Document 9844  Filed 02/10/11  Page 149 of 157  Page ID #:297152
CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

149

| | | |
|---|---|---|
| 11:58 | 1 | Q.   The one that you first presented these Bratz |
| 11:58 | 2 | prototypes. |
| 11:58 | 3 | A.   Oh, it was January 4, 2001. |
| 11:58 | 4 | Q.   And isn't it true that you testified that there was -- |
| 11:58 | 5 | there were informal "kitchen sink" focus groups prior to |
| 11:58 | 6 | that? |
| 11:58 | 7 | A.   I don't recall what I testified to.  I don't remember |
| 11:58 | 8 | any focus groups one way or another, if it happened or did |
| 11:58 | 9 | not happen, kitchen sink, not kitchen sink.  I just don't |
| 11:58 | 10 | recall it. |
| 11:58 | 11 | Q.   Okay.  Let's see if this helps:  If you could look at |
| 11:58 | 12 | July 13 -- 18, 2006.  This is Volume I.  And I'm gonna ask |
| 11:59 | 13 | you to look at page 176, line 24, to 177, line 10. |
| 11:59 | 14 | A.   Can you repeat those, please, again? |
| 11:59 | 15 | Q.   Certainly.  It's 176, line 24 -- |
| 11:59 | 16 | A.   Okay. |
| 11:59 | 17 | Q.   -- to 177, line -- actually, I guess, it's line 9. |
| 11:59 | 18 | *(Document provided to the witness.)* |
| 11:59 | 19 | THE WITNESS:  Line 9, you said? |
| 11:59 | 20 | MR. PRICE:  Yeah, to 177, line 9. |
| 11:59 | 21 | MS. KELLER:  Could we have it to line 14, Counsel? |
| 11:59 | 22 | MR. PRICE:  Oh.  Sure. |
| 12:00 | 23 | THE WITNESS:  Yes.  Go ahead. |
| 12:00 | 24 | MR. PRICE:  Okay. |
| | 25 | |

Case 2:04-cv-09049-DOC-RNB  Document 9844  Filed 02/10/11  Page 150 of 157  Page ID #:297153
CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

150

| | | |
|---|---|---|
| 12:00 | 1 | BY MR. PRICE: |
| 12:00 | 2 | Q.   Does that refresh your recollection that there may have |
| 12:00 | 3 | been these kitchen sink focus groups prior to the Hong Kong |
| 12:00 | 4 | toy fair in January 2001? |
| 12:00 | 5 | A.   Again, this talks about the kitchen sink.  I read this |
| 12:00 | 6 | testimony from six years ago, but I still don't remember if |
| 12:00 | 7 | there was or not. |
| 12:00 | 8 | Q.   Well, if you don't remember whether there was one or |
| 12:00 | 9 | not, it's sort of unfair to accuse someone of lying if they |
| 12:00 | 10 | say that they were told there was one. |
| 12:00 | 11 | A.   Again, you know, when I was growing up, my father told |
| 12:00 | 12 | me not to use the word "lying" a lot, so I would not use |
| 12:00 | 13 | that.  I leave it up to the jury to decide if she was or |
| 12:00 | 14 | not. |
| 12:00 | 15 | Q.   Okay.  Well, I'm talking about the testimony you gave a |
| 12:00 | 16 | few minutes ago about Ms. Maurus' truthfulness. |
| 12:00 | 17 | And you'll agree that, if you don't recall whether or |
| 12:00 | 18 | not there were focus groups in 2000, it wouldn't be fair to |
| 12:01 | 19 | accuse Ms. Maurus of being untruthful if she said she was |
| 12:01 | 20 | told there was. |
| 12:01 | 21 | MS. KELLER:  Objection -- |
| | 22 | BY MR. PRICE: |
| 12:01 | 23 | Q.   Yes or no? |
| 12:01 | 24 | MS. KELLER:  -- argumentative and -- |
| 12:01 | 25 | THE COURT:  Overruled. |

Case 2:04-cv-09049-DOC-RNB   Document 9844   Filed 02/10/11   Page 151 of 157   Page ID #:297154
CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

151

| | | |
|---|---|---|
| 12:01 | 1 | MS. KELLER:  -- irrelevant. |
| 12:01 | 2 | THE COURT:  Overruled. |
| 12:01 | 3 | THE WITNESS:  I'm not sure if I understand your |
| 12:01 | 4 | question.  I think you asked two or three questions at the |
| 12:01 | 5 | same time. |
| 12:01 | 6 | Please restate your question. |
| 12:01 | 7 | MR. PRICE:  Sure, let me -- |
| 02:59 | 8 | BY MR. PRICE: |
| 12:01 | 9 | Q.   If you can't recall one way or another whether or not |
| 12:01 | 10 | there were focus groups in 2000 -- |
| 12:01 | 11 | A.   Yes. |
| 12:01 | 12 | Q.   -- don't you agree it would be unfair to say Ms. Maurus |
| 12:01 | 13 | was being untruthful when she testified that Ms. Garcia told |
| 12:01 | 14 | her that there were?  Yes or no? |
| 12:01 | 15 | A.   I can't -- Mr. Price, I'm sorry.  I can't answer your |
| 12:01 | 16 | question yes or no, so I'm gonna explain it the way I can. |
| 12:01 | 17 | And Ms. Maurus was asked if there was a focus group on |
| 12:01 | 18 | October 15, 2000.  And I'm telling you, absolutely, |
| 12:01 | 19 | 100 percent, there was not because there was nothing to |
| 12:01 | 20 | focus group on, on October 15, 2000.  So her recollection |
| 12:01 | 21 | must have been either wrong or whatever. |
| 12:02 | 22 | Q.   When -- if you can give me a date -- when was there |
| 12:02 | 23 | something to do a focus group on?  Give me the date that you |
| 12:02 | 24 | believe there was a time when there could be a formal or |
| 12:02 | 25 | informal kitchen sink focus group. |

Case 2:04-cv-09049-DOC-RNB   Document 9844   Filed 02/10/11   Page 152 of 157   Page ID #:297155
CV 04-9049 DOC - 2/8/2011 - Day 14, Volume 1 of 3

152

| | | |
|---|---|---|
| 12:02 | 1 | A.   I cannot.  I don't remember the dates. |
| 12:02 | 2 | Q.   But just a range.  You've told us that it's definitely |
| 12:02 | 3 | not in October of 2000. |
| 12:02 | 4 | MS. KELLER:  Your Honor, I'm gonna object to the |
| 12:02 | 5 | question as compound. |
| 12:02 | 6 | THE COURT:  Overruled. |
| 12:02 | 7 | BY MR. PRICE: |
| 12:02 | 8 | Q.   So just tell us the earliest date that could have taken |
| 12:02 | 9 | place. |
| 12:02 | 10 | A.   Definitely not October 15.  I cannot give you an exact |
| 12:02 | 11 | definite or approximate date.  Definitely not October 15. |
| 12:02 | 12 | But there could have been kitchen sink done in |
| 12:02 | 13 | November/December.  Again, I don't remember.  And for sure |
| 12:02 | 14 | there was a focus group done -- a formal focus group done in |
| 12:02 | 15 | 2001.  And, unfortunately, I don't remember the date of that |
| 12:03 | 16 | also.  But I believe there is a document to that effect. |
| 12:03 | 17 | Q.   So just tell me if I'm correct.  You believe that a |
| 12:03 | 18 | formal or informal focus group could have been done as early |
| 12:03 | 19 | as November 2000, correct? |
| 12:03 | 20 | MS. KELLER:  Objection.  Compound. |
| 12:03 | 21 | THE WITNESS:  I don't know.  I cannot answer that. |
| 12:03 | 22 | I don't know if it was or not. |
| 12:03 | 23 | THE COURT:  Overruled. |
| 12:03 | 24 | MR. PRICE:  Your Honor, for completeness of the |
| 12:03 | 25 | record, I'd like to read from the deposition testimony of |

| | | |
|---|---|---|
| 12:03 | 1 | July 18, 2006, Mr. Larian, page 176, line 24, to 177, |
| 12:03 | 2 | line -- I think 14 was the request. |
| 12:03 | 3 | MS. KELLER:  Your Honor, we object that it's not |
| 12:03 | 4 | impeaching. |
| 12:03 | 5 | THE COURT:  And as soon as I have that in front of |
| 12:03 | 6 | me, I'll be able to make a ruling. |
| 12:03 | 7 | *(Document provided to the Court.)* |
| 12:03 | 8 | THE COURT:  Thank you. |
| 12:03 | 9 | 176.  What line, Counsel? |
| 12:04 | 10 | MR. PRICE:  It's 176, line 24, to 177, line 14, |
| 12:04 | 11 | that Mr. Larian said it doesn't refresh his recollection. |
| 12:04 | 12 | THE COURT:  Well, I'm looking at 177, line 14.  It |
| 12:04 | 13 | says, "powder." |
| 12:04 | 14 | MR. PRICE:  I was asked to read down to 14.  I |
| 12:04 | 15 | would read down to 9.  And it's offered as a party |
| 12:04 | 16 | admission. |
| 12:04 | 17 | THE COURT:  9 ends with "I don't think so." |
| 12:04 | 18 | MR. PRICE:  "Besides" -- yeah. |
| 12:04 | 19 | THE COURT:  All right. |
| 12:04 | 20 | MS. KELLER:  And, Your Honor, for completeness -- |
| 12:04 | 21 | THE COURT:  Just a moment.  Thank you, both. |
| 12:05 | 22 | Now, Ms. Keller. |
| 12:05 | 23 | MS. KELLER:  My objection, Your Honor, is it's not |
| 12:05 | 24 | impeaching. |
| 12:05 | 25 | THE COURT:  Overruled.  You can answer the |

| | | |
|---|---|---|
| 12:05 | 1 | question -- or you can read that portion, Counsel. |
| 12:05 | 2 | MR. PRICE:  Thank you. |
| 12:05 | 3 | "QUESTION:  All right.  Another question I asked |
| 12:05 | 4 | you about this morning that we deferred was whether there |
| 12:05 | 5 | was any focus groups that MGA did related to Bratz before |
| 12:05 | 6 | the Hong Kong toy fair. |
| 12:05 | 7 | "ANSWER:  I'm sorry? |
| 12:05 | 8 | "QUESTION:  Were there any focus group studies |
| 12:05 | 9 | that MGA did relating to the Bratz doll prior to the |
| 12:05 | 10 | Hong Kong toy fair? |
| 12:05 | 11 | "ANSWER:  Besides just an informal, kitchen sink |
| 12:05 | 12 | focus group, I don't think so." |
| 12:05 | 13 | MR. PRICE:  I'll continue. |
| 12:05 | 14 | "Right.  That's like kitchen cabinet, I guess. |
| 12:05 | 15 | "ANSWER:  I don't know.  I don't know.  That's |
| 12:05 | 16 | what I heard.  That's like your previous expression about |
| 12:06 | 17 | powder." |
| 12:06 | 18 | THE COURT:  Counsel, you'll tell us when to go to |
| 12:06 | 19 | lunch.  I don't want to get in the way of either side's |
| 12:06 | 20 | questions, so you tell me the appropriate time. |
| 12:06 | 21 | MR. PRICE:  I'll just ask one more area about |
| 12:06 | 22 | this, and then -- if that's okay. |
| 12:06 | 23 | I just want to make sure we have multiple copies. |
| 12:06 | 24 | BY MR. PRICE: |
| 12:06 | 25 | Q.   Mr. Larian, I'd like you to see Exhibit No. 1902. |

| 12:06 | 1 | *(Document provided to the witness.)* |
|-------|---|---|

12:06   2   BY MR. PRICE:

12:07   3   Q.   And I'm just gonna ask if this refreshes your

12:07   4   recollection that there were focus groups at least as of

12:07   5   November 2000.

12:07   6                MS. KELLER:  Um --

12:07   7                MR. PRICE:  If it doesn't, well have lunch.

12:07   8                  *(Document provided to the witness.)*

12:07   9                THE WITNESS:  Go ahead.

12:07   10  BY MR. PRICE:

12:07   11  Q.   Ask you if that refreshes your recollection that there

12:07   12  were focus groups of fourth graders at least as of

12:07   13  November 2000?

12:07   14  A.   As of November 21, 2000, you mean?

12:07   15  Q.   Does it refresh your recollection?

12:07   16  A.   It doesn't one way or another.  But the date is

12:07   17  November 21, 2000.

12:08   18                MR. PRICE:  Good time for lunch, Your Honor.

12:08   19                THE COURT:  Good time for lunch.

12:08   20                Now, is 1:00 o'clock still okay?  I cut into your

12:08   21  lunch hour.  Is that too small a time?

12:08   22                Okay.  Then you're admonished not to discuss this

12:08   23  matter amongst yourselves nor form or express any opinion

12:08   24  concerning the case.

12:08   25                We'll see you in about 50 minutes.  We'll see you

CV 04-9049 DOC – 2/8/2011 – Day 14, Volume 1 of 3

156

| | | |
|---|---|---|
| 12:08 | 1 | at 1:00 o'clock. |
| 12:08 | 2 | Thank you very much. |
| 12:08 | 3 | *(Jury recesses at 12:08 p.m.)* |
| 12:08 | 4 | *(Outside the presence of the jury.)* |
| 12:08 | 5 | THE COURT:  All right.  Counsel, have a nice |
| 12:08 | 6 | lunch.  We'll see you at 1:00 o'clock. |
| 12:08 | 7 | *(Lunch recess held at 12:08 p.m.)* |
| 12:08 | 8 | *(Further proceedings reported by Jane Sutton* |
| 12:08 | 9 | *Rule in Volume II.)* |
| 12:08 | 10 | -oOo- |
| 12:08 | 11 | |
| | 12 | |
| | 13 | |
| | 14 | |
| | 15 | |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

-oOo-


CERTIFICATE


        I hereby certify that pursuant to Section 753,

Title 28, United States Code, the foregoing is a true and

correct transcript of the stenographically reported

proceedings held in the above-entitled matter and that the

transcript page format is in conformance with the

regulations of the Judicial Conference of the United States.


Date:  February 8, 2011



                    _____

                    DEBBIE GALE, U.S. COURT REPORTER
                    CSR NO. 9472, RPR