1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3               HONORABLE DAVID O. CARTER, JUDGE PRESIDING

4                          - - - - - - -

5

6    MATTEL, INC., ET AL.,              )
                                        )
7              Plaintiffs,              )
                                        )
8        vs.                            ) No. CV 04-9049-DOC
                                        )     Day 14
9    MGA ENTERTAINMENT, INC., ET AL.,   )     Volume 2 of 3
                                        )
10             Defendants.              )
     _____)

11

12

13

14

15              REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                           Jury Trial

17                      Santa Ana, California

18                   Tuesday, February 8, 2011

19

20

21

22   Jane C.S. Rule, CSR 9316
     Federal Official Court Reporter
23   United States District Court
     411 West 4th Street, Room 1-053
24   Santa Ana, California 92701
     (714) 558-7755
25
     11-02-08 MattelV2

Case 2:04-cv-09049-DOC-RNB   Document 9845   Filed 02/10/11   Page 2 of 123   Page ID #:297162
CV 04-9049-DOC - 02/08/2011 - Day 14, Vol. 2 of 3

2

```
1    APPEARANCES OF COUNSEL:

2

3    FOR PLAINTIFFS MATTEL, INC., ET AL.:

4              QUINN, EMANUEL, URQUHART & SULLIVAN
               By:   JOHN B. QUINN
5                    MICHAEL T. ZELLER
                     WILLIAM PRICE
6                    Attorneys at Law
               865 South Figueroa Street
7              10th Floor
               Los Angeles, California 90017-2543
8              (213) 443-3000

9

10   FOR DEFENDANTS MGA ENTERTAINMENT, INC., ET AL.:

11             ORRICK, HERRINGTON & SUTCLIFFE, LLP
               BY:   THOMAS S. MC CONVILLE
12                   Attorney at Law
               4 Park Plaza
13             Suite 1600
               Irvine, California 92614
14             (949) 567-6700

15             - AND -

16             ORRICK, HERRINGTON & SUTCLIFFE, LLP
               BY:  ANNETTE L. HURST
17                   Attorney at Law
               405 Howard Street
18             San Francisco, California 94105
               (415) 773-5700
19
               - AND -
20
               KELLER RACKAUCKAS, LLP
21             BY:   JENNIFER L. KELLER
                     Attorney at Law
22             18500 Von Karman Avenue
               Suite 560
23             Irvine, California 92612
               (949) 476-8700

24

25
```

CV 04-9049-DOC – 02/08/2011 – Day 14, Vol. 2 of 3

3

```
1    APPEARANCES OF COUNSEL (Continued):

2

3    FOR DEFENDANT CARLOS GUSTAVO MACHADO GOMEZ:

4             SCHEPER, KIM & OVERLAND, LLP
              BY:  ALEXANDER H. COTE
5                  Attorney at Law
              601 West Fifth Street
6             12th Floor
              Los Angeles, California 90071
7             (213) 613-4660

8             – AND –

9             LAW OFFICES OF MARK E. OVERLAND
              BY:  MARK E. OVERLAND
10                 Attorney at Law
              100 Wilshire Boulevard
11            Suite 950
              Santa Monica, California 90401
12            (310) 459-2830

13

14   Also Present:

15            ISAAC LARIAN, MGA CEO

16            KEN KOTARSKI, Mattel Technical Operator

17            MIKE STOVALL, MGA Technical Operator

18            RACHEL JUAREZ, Quinn Emanuel Urquhart & Sullivan

19            KIERAN KIECKHEFER, Orrick Herrington & Sutcliffe

20            WARRINGTON PARKER, Orrick Herrington & Sutcliffe

21

22

23

24

25
```

```
 1                        I N D E X

 2

 3

 4                      EXAMINATION

 5

 6   Witness Name        Direct    Cross    Redirect    Recross

 7   LARIAN, ISAAC
        By Mr. Price                 5

 8

 9

10

11                       EXHIBITS

12

13   Exhibit                    Identification    Evidence

14   Plaintiffs' No. 630                             36

15   Plaintiffs' No. 1117                            93

16   Plaintiffs' No. 1763                            21

17   Plaintiffs' No. 5511                            76

18   Plaintiffs' No. 9855                           112

19   Plaintiffs' No. 11277                           25

20   Plaintiffs' No. 13620                           91

21

22

23

24

25
```

CV 04-9049-DOC - 02/08/2011 - Day 14, Vol. 2 of 3

5

 1          SANTA ANA, CALIFORNIA, TUESDAY, FEBRUARY 8, 2011

 2                    DAY 14, VOLUME 2 OF 3

 3                      (1:01 p.m.)

 4            *(The following proceedings is taken in the*

 5       *presence of the jury.)*

 6            THE COURT:  All right.  We are back in session.

 7   The jury is present, alternates are present, all counsel.

 8   The witness is on the stand.

 9            Counsel, your continued direct examination.

10          ISAAC LARIAN, PLAINTIFFS' WITNESS, RESUMED

11                DIRECT EXAMINATION (Continued)

12   BY MR. PRICE:

13   Q    Good afternoon, Mr. Larian.

14   A    Good afternoon.

15   Q    Let me ask you, toy business, is it seasonal?

16   A    Yes, it is.

17   Q    And during what season do you make most of your sales?

18   A    Mostly Christmas.

19   Q    And I want to focus on MGA's experience as of

20   September 2000.

21       Now, prior to September 2000, for how long had MGA or

22   its predecessor sold toys?

23   A    September 2000.  19 -- 13 years, 1987.

24   Q    And I'd like you to look, if you could, at

25   Exhibit 10188.

CV 04-9049-DOC - 02/08/2011 - Day 14, Vol. 2 of 3

6

```
 1    A    Go ahead.

 2    Q    Do you have that in front of you?

 3    A    I do.

 4    Q    And do you recognize this as --

 5              MS. KELLER:  Can we please have one second,

 6    Counsel.

 7              MR. PRICE:  Sure.

 8              MS. KELLER:  We are trying to locate it.

 9              THE COURT:  Counsel, please continue.  They will

10    find the exhibit.

11    BY MR. PRICE:

12    Q    Do you recognize that as an audited financial statement

13    of ABC International Traders?

14    A    Yes, I do.

15    Q    And ABC International Traders was the name that was

16    used before you switched to MGA, right?

17    A    Yes.

18              MR. PRICE:  Your Honor, I move Exhibit 10188 into

19    evidence.

20              THE COURT:  Received.

21              (Plaintiffs' Exhibit No. 10188 is received in

22         evidence.)

23    BY MR. PRICE:

24    Q    Now, to get some history, in 1997, MGA's predecessor

25    had filed for bankruptcy, correct; yes or no?
```

CV 04-9049-DOC - 02/08/2011 - Day 14, Vol. 2 of 3

7

```
1    A    Yes.

2    Q    And what we have in front of us now are these audited

3    reports.  Do you understand what an audited financial report

4    is?

5    A    Yes.

6    Q    Is this the sort of thing that you had to get in order

7    to get loans and financing for the company?

8    A    Yes.

9    Q    And the purpose of auditing the financials was so that

10   a third party, say a bank, could note that the figures were

11   reliable, correct?

12   A    Yes.

13   Q    And if you'd look at -- I think we are three pages in,

14   10188-3.

15   A    Yes.

16   Q    And do you see there are some figures there for 1999

17   and 2000, correct?

18   A    Yes.

19   Q    So, for example, in 1999, MGA's predecessor had net

20   sales of about 63 -- 66 million, correct?

21   A    Yes.

22   Q    And when you deducted expenses and loss from

23   operations, et cetera, if you'd look down at the bottom,

24   there is a net loss income figure; do you see that?

25   A    I do.
```

Case 2:04-cv-09049-DOC-RNB   Document 9845   Filed 02/10/11   Page 8 of 123   Page ID #:297168
CV 04-9049-DOC - 02/08/2011 - Day 14, Vol. 2 of 3

8

1    Q    And in 1999, MGA had made about $4.6 million, correct?

2    A    Yes.

3    Q    So let's focus on 2000.  Do you see there are net sales

4    of about 77 million?

5    A    Yes.

6    Q    And then when you -- of course, one of the points of

7    the company is to try to make money, right?

8    A    Yes.

9    Q    And when you do all the calculations with cost, in

10   2000, you had a loss of about $6.4 million, correct?

11   A    Correct.

12   Q    Okay.  Now, as of -- by the way, in just three years,

13   do you see how in 2000 it says net sales of 77 million?

14   A    Yes.

15   Q    So in just about three years, that rose to about a

16   quarter of a billion dollars, right?

17   A    I don't remember exactly when.

18   Q    Three years later, weren't you making about

19   $750 million in revenue?

20   A    I don't remember.  I got to look at financial

21   statement.

22   Q    Okay.  Let's see if this refreshes your recollection.

23   If you could look at 13743.

24   A    Go ahead.

25   Q    Do you have that in front of you?

1   A    I do.

2          MS. KELLER:  Your Honor, I don't want to slow

3   things --

4          THE COURT:  Counsel, they will find it, but this

5   is their time.  You've got three attorneys working on it.

6          Counsel, please continue.

7          There's no more interruptions.  You'll find your

8   own exhibits quickly, now.

9   BY MR. PRICE:

10  Q    And do you see -- do you know who a -- the managing

11  director of MGA Hong Kong was in the 2003, 2004 time frame?

12  A    I believe it was Stephen Lee.

13  Q    And is that the -- do you see there is a name on this,

14  Lee Shu Chung?  Is that Stephen Lee?

15  A    Yes.

16  Q    And was he -- one of the things he did was -- let me

17  rephrase that.

18       What was his position?

19  A    He was managing director of MGA Hong Kong.

20  Q    What were his duties as the managing director of MGA

21  Hong Kong?

22  A    He managed MGA Hong Kong.

23  Q    What exactly did MGA Hong Kong do?

24  A    We coordinated product development, selling, shipping

25  for merchandise made in China.

1    Q    Do you recognize this as -- 13743 as --

2         MS. KELLER:  Objection, your Honor.  Prior ruling

3    of the Court.

4         THE COURT:  Overruled.

5    BY MR. PRICE:

6    Q    Do you recognize this as an affirmation, a statement

7    that -- that Stephen Lee --

8         THE COURT:  Just a moment, Counsel, the date on

9    this, once again?

10   BY MR. PRICE:

11   Q    If we can look at page 19, 13743-0019.  Do you see it's

12   dated 13th day of January, 2004?

13   A    It is.

14   Q    And you recognize this -- on the bottom there, it has

15   MGA and it has a number.  Do you see that's a document that

16   was produced by MGA in this lawsuit?

17   A    I believe so, yes.

18   Q    And if we could look at the first page?

19        MR. PRICE:  And your Honor, at this point, I would

20   move into evidence the first and second pages.

21        THE COURT:  All right.  Just one moment.

22        What binder -- in other words, is this on the new

23   additions that were presented to -- Counsel, I'm sorry, you

24   weren't here.

25        Are these the new additions that were presented to

1    me, Counsel?  In other words, I received these in three

2    separate sessions.

3              MR. QUINN:  Yes, your Honor.

4              THE COURT:  What volume?  Is this yesterday or

5    last night?

6              MR. QUINN:  Yes, it was.

7              THE COURT:  Last night.

8              MR. QUINN:  It was.

9              THE COURT:  Just a moment.

10             All right.  Somebody bring me that copy in just a

11   moment.

12             Thank you very much.

13             What page, Counsel?

14             MR. PRICE:  The page I'm going to direct his

15   attention to --

16             THE COURT:  What page?

17             MR. PRICE:  -- is 13743-002.

18             THE COURT:  002?

19             MR. PRICE:  Yes.

20             THE COURT:  What paragraph?

21             MR. PRICE:  Paragraph 3.

22             THE COURT:  Counsel, the first page is excluded.

23             You may refer to the third page.  There is no

24   reason for the introduction of this document at this time.

25   You can refer to paragraph 3, you can put only paragraph 3

1    up.

2    BY MR. PRICE:

3    Q    Mr. Larian, I'd like to call your attention to the

4    second sentence.  Do you see it says, "In the years 2002 and

5    2003, the Plaintiff's revenue exceeded U.S. 225 million and

6    U.S. 750 million respectively."

7         That's an accurate statement, correct?

8    A    Again, unfortunately, I haven't looked at the financial

9    statement.  I assume it's accurate.

10   Q    You understand it was a statement made by the managing

11   director of your Hong Kong office?

12   A    This is the first time I've seen this.  I don't know if

13   that's his signature or what it is.

14   Q    You see it says, "The projected revenue for the year

15   2004 is over U.S. 1.2 billion due to the remarkable success

16   of a range of dolls known as Bratz"; do you see that?

17   A    I do.

18   Q    Again, that's a true statement as well, as of 2004,

19   correct?

20   A    No, I don't think we ever reached $1.2 billion.

21   Q    The statement is correct that this increase was -- in

22   revenue was due to the remarkable success of a range of

23   dolls known as Bratz, correct?

24   A    This is what it says, but we never reached $1.2 billion

25   in sales.

1    Q    The increase from 75 million in sales in 2000 to

2    750 million in 2003 was due to the remarkable success of a

3    range of dolls known as Bratz, correct?

4    A    I believe Bratz was a big portion of our success,

5    correct.

6    Q    So getting back to the year 2000, the year you lost

7    6 million overall, as of September of 2000, MGA did not have

8    a fashion doll, correct?

9    A    We did not have a fashion doll in September 2000.

10   Q    And it wasn't for a lack of trying.  That is, MGA had

11   been looking for some sort of fashion doll, correct?

12   A    Correct.

13   Q    And I think you said that they were looking for about a

14   two-year time frame?

15   A    It was a couple of years they were looking for, yes.

16   Q    And I -- you said there was some kind of fashion doll

17   contest?

18   A    I never said it was a fashion doll contest.  That was

19   something that was in a newspaper article.  To me, there was

20   a challenge.  We were looking for a fashion doll.

21   Q    Did you say that there was -- ever testify that there

22   was sort of a fashion doll contest involving Ms. Garcia and

23   Ms. O'Connor?

24   A    It could -- I could have said that.  Again, in my mind,

25   it was basically challenging our employees to come up with a

1    fashion doll concept.

2    Q    And you've described it as a contest?

3    A    Again, I think you are referring to Wall Street Journal

4    article, and I don't recall if I described it as a contest

5    or not.

6    Q    If you could look at -- it's June 5, 2008.  It's

7    page 1660, lines 4 through 24.

8              THE COURT:  I'm sorry, which line?

9              MR. PRICE:  It's 1660, line 24, through 1661,

10   line 8.

11             THE COURT:  Cathy, thank you very much.  I

12   appreciate it.

13             THE WITNESS:  To what line again, line 8?

14             THE COURT:  1660, line 24 over to 1661, line 8.

15             THE WITNESS:  Yes, go ahead.

16   BY MR. PRICE:

17   Q    Okay.  Does that refresh your recollection that you

18   testified that you started sort of a contest to tell people

19   to bring you a fashion doll concept?

20   A    Yes.

21             MS. KELLER:  Objection.  It misstates the

22   testimony, your Honor.

23             THE COURT:  Overruled.

24   BY MR. PRICE:

25   Q    And indeed, you testified that the -- there wasn't

1    really a prize for that contest except you get to keep your

2    job?

3    A    I'm sorry?

4    Q    You testified there wasn't really a prize for that

5    contest except you get to keep your job?

6    A    I don't recall testifying "yes" or "no" to that.  I

7    don't remember.

8    Q    If you'd look, sir, at July 18, 2006, and we will be at

9    page 18 -- actually it starts 17, 17, line 4, to 18, line

10   15.

11            MS. KELLER:  Could we start at page 15, Counsel,

12   where it begins?

13            MR. PRICE:  If I can get a full copy of the

14   transcript.

15            MS. KELLER:  Page 14, line 9.

16            MR. PRICE:  I'm sorry, start where?

17            MS. KELLER:  Page 14.

18            MR. PRICE:  That takes up too much of my time.

19   BY MR. PRICE:

20   Q    Mr. Larian, you can look at page 14, if you'd like, but

21   I'm focusing you on --

22   A    What line?

23   Q    -- 17, line 4, to 18, line 15.

24   A    I'm sorry, you said page 14, line 17; is that what

25   you --

Case 2:04-cv-09049-DOC-RNB   Document 9845   Filed 02/10/11   Page 16 of 123   Page ID #:297176
CV 04-9049-DOC - 02/08/2011 - Day 14, Vol. 2 of 3

16

1    Q    I'm focusing on 17, line 4, to 18, line 13, recalling

2    I'm asking you, was there some kind of prize reward offered

3    with this contest?

4    A    I'm sorry, I'm a little bit lost here.  Can you give me

5    the page number again and the line?

6    Q    Seventeen, line 4, to 18, line 15.

7              MS. KELLER:  If it helps, you can also have him --

8              THE COURT:  That's not impeaching, Counsel.  I

9    believe the answer is contained on line 13 on page 18.

10             MR. PRICE:  Right.

11   BY MR. PRICE:

12   Q    Mr. Larian?

13   A    Yeah, I'm still reading.

14   Q    I'm going to ask you a question.

15   A    Should I stop reading?

16   Q    Stop reading.

17        In connection with the contest, was there any kind of

18   prize reward offered other than you get to keep your job?

19   A    There was no prize offered.

20   Q    The prize offered was you get to keep your job?

21   A    There was no prize offered.

22   Q    My question was:  Is it your testimony that the prize

23   for this fashion doll contest was you get to keep your job

24   and that's --

25   A    Here I was joking with Mr. Zeller or Mr. Quinn, where

1    he was pushing me if there was a prize, and I said, yes,

2    they get to keep their job.

3    Q    And you testified that there was, in fact, a fashion

4    contest, and that Mr. Bryant's drawings became the basis of

5    Bratz as a result of that contest, right?

6    A    Again, I don't recall if there was a fashion contest.

7    We asked people to come up with ideas for a fashion doll,

8    but the fact is what became a fashion doll that MGA did was

9    Bratz, which was inspired by Carter Bryant's drawings.

10   Q    If you look at June 5, 2008, line -- page 1658 --

11   A    Line?

12   Q    Line 5 through 13.

13        THE COURT:  Thank you very much, Cathy.

14        THE WITNESS:  Yes, go ahead.  That's what I just

15   testified to.

16   BY MR. PRICE:

17   Q    Not only did you tell a Wall Street Journal reporter

18   that you had this sort of fashion doll contest that led

19   Mr. Bryant being brought to MGA, you also said that under

20   oath, correct?

21   A    I said the same thing as I just testified to again.

22   Q    You said that, in fact, there was a fashion contest,

23   correct?

24   A    Again, my definition of fashion contest was that we

25   asked MGA employees to come up with a fashion doll idea.  We

1    didn't get any ideas.  We settled with Carter Bryant's

2    drawings as inspiration for Bratz.

3    Q    Your previous testimony was you had a fashion contest,

4    correct?

5    A    Again, the previous testimony was I just mentioned to

6    you that we had a sort of fashion doll concept, contest if

7    that's what you call it.  It was a challenge.  We asked

8    employees to come up with a doll concept, fashion doll

9    concept.

10   Q    That's not what I called it, that's what you called it,

11   "contest"?

12   A    No, I think your question was there a fashion doll

13   contest.

14   Q    And you said, "If your question is did we have a

15   fashion contest, yes"?

16   A    Yes.

17   Q    And the reason you're backing off that a little bit is

18   because you know Ms. Garcia and Ms. O'Connor said there was

19   no such contest?

20   A    No.

21          MS. KELLER:  Objection.  Argumentative and

22   misstates his prior testimony.

23          THE COURT:  Overruled.

24          THE WITNESS:  The answer is no.

25

CV 04-9049-DOC – 02/08/2011 – Day 14, Vol. 2 of 3

19

```
1   BY MR. PRICE:
2   Q    Well, you do know that Ms. O'Connor and Ms. Garcia have
3   said there was no fashion contest?
4   A    That's correct.
5   Q    And you know Ms. Garcia said she was never asked to go
6   out and look for a fashion doll, correct?
7   A    That's correct.
8   Q    And you previously testified that Ms. Garcia was asked
9   by you to go out and look for a fashion doll?
10  A    I had asked her to do a fashion doll, yes, look for a
11  fashion doll.
12  Q    In any event, as of September 1st, no fashion doll for
13  MGA, right?
14  A    Yes.
15  Q    And as of that time, MGA didn't have in house what it
16  needed in terms of resources and people to make a fashion
17  doll, correct?
18  A    We had some of the resources.
19  Q    Well, you didn't have a designer that could do fashion
20  dolls, right?
21  A    What's your definition of a designer?
22  Q    Someone who designs, someone who creates designs for a
23  fashion doll?
24  A    We have fashion designers, there are doll designers, so
25  we do have fashion designers.  We didn't have a doll
```

1    designer, no.

2    Q    So as of September 1st, the designers you did have had

3    not come up with a fashion doll?

4    A    Yes, that's correct.

5    Q    And I guess that you had obviously told them over the

6    last two years, you know, I want a fashion doll?

7    A    No, I don't remember if I told them for the last two

8    years if I was looking for a fashion doll.  I don't think

9    some of those people were at MGA for two years at that time,

10   but I had been personally looking for a fashion doll for at

11   least two years, fashion doll concept.

12   Q    So if you're looking for a fashion doll for two years,

13   you would ask your in-house designers to get you a fashion

14   doll, right?

15   A    Not necessarily.  You go to outside to ask for it.

16   Q    I know you might go outside, but if you already had

17   designers who you think might be able to come up with a

18   fashion doll, you would ask them to try as well, correct?

19   A    Yes.

20   Q    Did you do that?

21   A    Again, I asked all of the employees at MGA to come up

22   with a -- challenge them to come up with a concept, and we

23   didn't have anything that we like until we saw Carter

24   Bryant's drawings.

25   Q    So as of September 1, 2000, MGA did not have any

1    designers on staff that had come up with a fashion doll even

2    though you had been asking for one?

3    A    That's correct.

4    Q    Another thing you didn't have was -- in house was

5    sample makers that could do a fashion doll samples, correct?

6    A    I don't remember if I did -- we did or not.

7    Q    I'll ask you to look at 1763.

8    A    Yes, go ahead.

9    Q    Do you recognize this as -- it's an e-mail that -- at

10   the top, that you sent to Ms. Garcia, Mercedeh Ward and

11   Mr. Bryant on October 17, 2000?

12   A    Yes.

13         MR. PRICE:  Your Honor, if it's not in evidence, I

14   move 1763 into evidence.

15         THE COURT:  Received.

16         *(Plaintiffs' Exhibit No. 1763 is received in*

17   *evidence.)*

18   BY MR. PRICE:

19   Q    And you see it starts with an e-mail to you from

20   Ms. Garcia dated October 17, 2000?

21   A    Yes.

22   Q    It says, "Isaac and Mercedeh" -- by the way, who is

23   Mercedeh?

24   A    Mercedeh Ward.

25   Q    I'm sorry, what was her job?

1    A    She was an engineer.

2    Q    And when you say she was an engineer, what kind of

3    engineer, what did she focus on?

4    A    She is a mechanical engineer, she focuses on dolls,

5    robots, et cetera.

6    Q    It says, "Isaac and Mercedeh, I need to have

7    seamstresses and pattern makers ready and committed to

8    supporting Carter and Veronica week of October 30 for Bratz

9    fashions.  Do you guys know of anyone that we can call?  I

10   wanted to call some of my buddies at Mattel, but maybe this

11   isn't the best idea.

12        "Victoria, did you run across anyone when you went

13   through the recent resume submissions?

14        "Maureen, do you know of any of the little ladies that

15   used to work at Mattel that can support us?"

16        So by the way, who was Victoria, was that --

17   A    Victoria O'Connor.

18   Q    And Maureen?

19   A    I don't recall Maureen.

20   Q    Do you remember Maureen Mullen?

21   A    Yes.

22   Q    And you responded, "I don't know of one.  Victoria,

23   call Fashion Institute and see if we can get some interns";

24   do you see that?

25   A    I do.

1    Q      So getting back to September 1, 2000, you didn't have

2    sample makers who can do fashions for a fashion doll,

3    correct?

4    A      Again, I don't have recollection if we did or not.  We

5    were in the doll business.  We used to make Giddy Up, Bouncy

6    Baby, Singing Bouncy Baby, those all had fashions, and those

7    fashions needed sample makers to make the fashions, so I

8    don't have a fresh recollection of that.

9    Q      So as of October 17, 2000, you are being told by

10   Miss Garcia that there weren't any seamstresses or pattern

11   makers who were able to create samples and patterns for the

12   Bratz fashions, right?

13   A      That's not what it says.  It says, "I need to have

14   seamstresses and pattern makers ready and committed to

15   supporting Carter and Veronica week of 10/30 for Bratz

16   fashions."  It didn't say what you said, that they were

17   ready and able.

18   Q      Do you read this as saying, We've got to go out and get

19   somebody to do -- some seamstresses and pattern makers that

20   would work on Bratz; do you read that this way?

21   A      Yes, I do.

22   Q      And that's because as of October 17, there was nobody

23   available and ready and committed to supporting Bratz

24   fashions, right?

25   A      Again, I don't have recollection whether we did or not.

1    I am not disagreeing with you.  I don't have a recollection

2    of it.

3    Q    That's how you read this e-mail that you responded to?

4    A    Yes.

5    Q    So we talked about designers, we talked about sample

6    makers.

7         You didn't have anyone at MGA that was a face painter

8    who can work on a fashion doll, correct?

9    A    That's correct.

10   Q    You didn't have anyone at MGA who could sculpt a

11   fashion doll, correct?

12   A    Well, we -- we had used many freelance sculptors, but

13   as a full-time employee at MGA, you're correct, we didn't

14   have one.

15   Q    And what was the -- the function of Hong Kong at this

16   time frame?

17   A    They have -- they do engineering, they do product

18   development, they work with the factories, shipping,

19   selling.

20   Q    And you didn't have anybody at Hong Kong who could

21   really undertake this Bratz project as of October of 2000,

22   correct?

23   A    That's not correct.

24   Q    Well, look at Exhibit 11277.  Do you recognize that?

25   The top one is an e-mail that you sent to Franki Tsang and

1   Stephen Lee around October 31, 2000?

2   A    Yes, can you give me a moment to just scan this?

3        Go ahead.

4   Q    This is an e-mail that you sent around October 31, 2000

5   to Franki Tsang and Stephen Lee?

6   A    Yes.

7            MR. PRICE:  Your Honor, I move Exhibit 11277 into

8   evidence.

9            THE COURT:  Received.

10           *(Plaintiffs' Exhibit No. 11277 is received in*

11       *evidence.)*

12  BY MR. PRICE:

13  Q    Who was Franki Tsang?

14  A    He was head of project development at MGA Hong Kong.

15  Q    And Stephen Lee?

16  A    Managing director.

17  Q    And you write to Franki, October 31, 2000, "Franki,

18  please listen to me carefully.  This is a FASHION DOLL, all

19  caps, we project 25 million in sales"; do you see that?

20  A    Yes.

21  Q    And so by the end of October, you were already

22  predicting 25 million in sales for -- or projecting that for

23  Bratz, correct?

24  A    For the year -- for 2001, for the year -- for the year

25  after.

CV 04-9049-DOC – 02/08/2011 – Day 14, Vol. 2 of 3

26

```
 1    Q     And as of October 31, 2000, what you had were
 2    Mr. Bryant's drawings?
 3    A     October 31st, yeah, those are one of the things we had.
 4    Q     Well, as of October 31, 2000, what else did you have
 5    besides Mr. Bryant's drawings?
 6    A     I don't recall everything that we had.
 7    Q     But you do recall you had Mr. Bryant's drawings?
 8    A     Yes.
 9    Q     And that says, "Cecilia has never developed any
10    product, let alone a fashion doll"; do you see that?
11    A     I do.
12    Q     And who are you referring to when you say "Cecilia"?
13    A     One of the many project managers that we had in
14    Hong Kong who worked on toys.
15    Q     "We don't have time to teach.  Our company is getting
16    too big to hire inexperienced people, and we are suffering.
17    I need to see a change there in Hong Kong in R and D people
18    quickly.  I want experienced people hired and replace the
19    ones who don't have experience.  I will not have a lot of
20    patience on this issue and will not allow for MGA to be
21    dragged down.  Get the right horses in place.  I hope I'm
22    making this very clear."  And Isaac there, that is your
23    name, that is you?
24    A     That is my name.
25    Q     And you were sent the e-mail that's on this string
```

1    that's below that, which is from Mercedeh Ward to Cecilia

2    Kwok and Paula Garcia and you and others, right?

3    A    Yes.

4    Q    And you see that paragraph from Mercedeh Ward to

5    Cecilia Kwok, it talks about the manufacturing of -- of the

6    doll's body; do you see that?

7    A    Where are you looking at, sir?  This is two-page

8    document.  Can you direct me?

9    Q    It's the same page, it says, "Cecilia, please slow down

10    a bit.  We are still defining the product and you are miles

11    ahead of us.  I'm going to comment on the sculpting and the

12    doll's body at this point."  Do you see that?

13    A    Yes, it continues.

14    Q    And if you look at the continuation of the e-mail on

15    the next page.

16    A    This sentence did not finish, but you want to go to

17    next page?

18    Q    Go to the next page.  And you see it says, "The doll

19    has a movable head like the," quote, "'Skipper doll'"; do

20    you see that?

21    A    I do.

22    Q    And the Skipper doll was a Mattel Skipper doll that was

23    sent to MGA Hong Kong to look at so they could see how the

24    head should move, correct?

25    A    Again, I think per this e-mail, yes, that Skipper doll

1   was sent to Hong Kong.

2   Q    And by the way, did Mr. Bryant tell you in September

3   that he had worked on the Skipper doll?

4   A    No, he did not.

5   Q    If you look -- it keeps going, "The arms will move like

6   the Skipper doll."  So that's talking about how the arms are

7   going to work on the doll, correct?

8   A    That's what the e-mail says, yes.

9   Q    And the hip joints are just like the Skipper doll and

10  not ball points?

11  A    Yes.

12  Q    That refers also to Mattel's Skipper doll, right?

13  A    Yes.

14  Q    The knee will be -- will bent and the Skipper doll; do

15  you see that?

16  A    Yes.

17  Q    Probably meant bends.

18       So it's your understanding that the way MGA was

19  communicating to Hong Kong as to create this doll and the

20  joints and the arms and the head, was to send MGA Hong Kong

21  a Mattel doll that was out there in the public, the Skipper

22  doll?

23  A    This is what Mercedeh Ward was communicating with MGA

24  Hong Kong, correct.

25  Q    And Miss Ward was senior product design engineer

1   manager as of this time?

2   A    She was.

3   Q    And you needed to have a senior product design engineer

4   manager on the project to get this thing going, right?

5   A    Yes, Mercedeh Ward was very instrumental.

6   Q    And Miss Ward was a former Mattel employee, right?

7   A    She was.

8   Q    And you hired her in October of 2000 to work on Bratz?

9   A    Among other things, but Bratz as well, yes.

10  Q    Well, the main reason you hired her in October 2000 was

11  to work on the Bratz doll, right?

12  A    Bratz was a major part of her job, yes.

13  Q    So again, as of the time you are talking to Mr. Bryant

14  in September of 2000, you didn't have the mechanical

15  engineer that you needed to create a Bratz doll?

16  A    As of September?

17  Q    As of September when you are meeting with Mr. Bryant

18  and he's showing you these -- these drawings?

19  A    That's not correct.  Samuel Wong in Hong Kong is a very

20  experienced mechanical engineer who had worked on many dolls

21  for MGA for years.

22  Q    Well, a month later in October, you thought it was

23  necessary to hire Mercedeh Ward as an engineer to oversee

24  the Bratz doll, right?

25  A    In L.A., in U.S.A., she was overseeing the engineering,

1    correct.

2    Q    And you didn't have her or that capability back in

3    September when you were meeting with Mr. Bryant and looking

4    at these designs, right?

5    A    We did not have the capability in Los Angeles, but we

6    did have the capability Hong Kong.  We had made many, many

7    complicated, mechanical electronic dolls before Mercedeh

8    Ward came to MGA.

9    Q    But you needed someone in Los Angeles, and that's why

10   you hired her?

11   A    Yes, we hired her.

12   Q    And in connection with the Hong Kong people, you had to

13   show them Skipper to show them what was to be done?

14   A    Well, she showed her Skipper, but I have seen, in my

15   preparation for this testimony, other e-mails, especially

16   one from Samuel Wong, where it says we don't need the

17   Skipper.  Those are very common to make in Hong Kong.

18   Q    Well, this e-mail where she makes those comments and

19   says she sent the Skipper doll October 30, 2000, this was

20   sent to you?

21   A    No, I was copied on this.

22   Q    Right.  You were copied on this, you were cc'd?

23   A    Yes, I was on the CC, yes.

24   Q    And the part at the beginning, the first part of the

25   e-mail, was your response?

CV 04-9049-DOC – 02/08/2011 – Day 14, Vol. 2 of 3

31

1    A    The e-mail to Franki Tsang and Stephen Lee, yes, that's

2    my response to that e-mail.

3    Q    And that's where you say that you need someone with,

4    and this is all caps, doll development experience on this

5    product; do you see that?

6    A    Yes, and Cecilia Ward did not have the doll experience.

7    Q    So let's then go to the September 2000 meeting that you

8    recall having with Mr. Bryant.

9        To begin with, your understanding going into the

10   meeting was that he was a doll designer?

11   A    No, my understanding was that he was a fashion

12   designer.

13   Q    If you look at Exhibit 301.

14           MR. PRICE:  And this is already in evidence, your

15   Honor.

16   BY MR. PRICE:

17   Q    This is some sort of meeting notice for a September 1,

18   2000 meeting, correct?

19   A    Yes, it's from Outlook.

20   Q    And who would have sent this out?

21   A    Most likely my secretary.

22   Q    And do you have any understanding as to who talked to

23   your secretary about sending this out?

24   A    Either Victoria or Paula.

25   Q    And did you receive this?

1   A    Yes.

2   Q    And it says, "Subject, Carter Bryant, doll designer,

3   with Victoria and Paula"; do you see that?

4   A    Yes, that's what my secretary wrote.

5   Q    And the location was your office?

6   A    Yes.

7   Q    And it was going to be on Friday, September 1, 2000?

8   A    Yes.

9   Q    And there, in fact, was a meeting on that date?

10  A    The time -- yes, there was.  The time was tentative.  I

11  know, I remember the meeting was after 1:00.

12  Q    And at this meeting, you had Ms. Garcia there, right?

13  A    Yes.

14  Q    You had Miss O'Connor?

15  A    Yes.

16  Q    And I think your daughter was there as well?

17  A    Yes.

18  Q    Was anyone else there?

19  A    Victoria, Veronica Marlow, Carter Bryant, Paula, those

20  are the ones that come to my mind, and myself.

21  Q    And at the meeting in front of all those people there,

22  Mr. Bryant said he was a -- a -- an employee of Mattel,

23  correct?

24  A    He did.

25  Q    And Ms. Garcia was there when he said that?

1    A    Yes.

2    Q    So your understanding is that Ms. Garcia learned that

3    Mr. Bryant was then a Mattel employee not in 2004 but at

4    least by 2000, September?

5    A    2004?

6    Q    Your understanding is that Ms. Garcia knew that

7    Mr. Bryant was an employee at Mattel as of September 2000,

8    that she knew that at the latest on September 1, 2000?

9    A    I don't know if she knew that or not.

10   Q    Well, you heard Mr. Bryant say that in the meeting?

11   A    I asked, yes, and he said that.

12   Q    And he presented to you these designs, and if we could

13   show you 302.  And flip through that.  These are the designs

14   that he presented at that September 2000 meeting, right?

15   A    I don't remember if all these were in there or not, but

16   some of them look familiar to me, but I cannot testify every

17   one of these were in that.

18   Q    Okay.  You can't remember one way or the other whether

19   all of these were?

20   A    That's correct.

21   Q    If you look at the first page.

22   A    Yes.

23   Q    It says, "Bratz"; do you see that?

24   A    I do.

25   Q    It says, "Copyright, all materials copyrighted 2000,

1    Carter Bryant"; do you see that?

2    A    Yes.

3    Q    So after seeing just these materials, you made the

4    decision that your company is going to invest millions and

5    make a brand for Bratz?

6    A    What do you mean by "after"?  After we saw this, many,

7    many steps happened before we decided to do that.  So after,

8    do you mean five minutes after or do you mean a month after?

9    Can you please define that?

10   Q    That's fair.  I mean within a couple of weeks.

11   A    By September -- the best of my recollection is that I

12   didn't know if this could be made into a doll, so I asked

13   that some exploration to be made if -- to see if these 2D

14   drawings could be made into a 3D.

15       The other I directed -- first thing I asked Carter

16   Bryant is, I saw something that you have done at Mattel,

17   does it belong to Mattel, and he said no.

18       And I directed Victoria O'Connor, who was in charge of

19   licensing at the time, to go ahead and do due diligence to

20   make sure that these do not belong to Mattel or any other

21   designer or anybody else before we -- while we were

22   exploring to see if this can be made into a doll or not.

23   Q    Do you recall my question?

24   A    I did.  That's what I answered to.

25   Q    Do you recall what my question was?

1    A    That you said two weeks after?

2    Q    Yeah, around two weeks after, had you decided that you

3    were going to invest millions and make the brand happen; do

4    you recall that was the question?

5    A    I did.

6    Q    Okay.  And the answer to that question is "yes" or

7    "no"; which one?

8    A    Actually we decided two weeks later to invest millions,

9    the answer is no.

10   Q    Did you decide to do that contingent upon Mr. Bryant

11   agreeing to transfer rights to you?

12   A    You are talking about just two weeks after?

13   Q    Yeah, by September 14th?

14   A    No, not until then, we had not.

15   Q    If you look at Exhibit 16788.  Do you recognize that as

16   an e-mail exchange between you and Victoria O'Connor?

17   A    That's correct.

18   Q    You see the one at the bottom dated September 12, 2000,

19   where Ms. O'Connor tells you, "I knew it.  He called and

20   said he wanted to make sure that if we license out Bratz, he

21   would like a royalty"; do you see that?

22   A    I do.

23   Q    And there he's asking for royalties not on the dolls

24   themselves but if you go outside and license it, correct?

25   A    That's right.

1    Q    And by the way, before you met Mr. Bryant and did

2    Bratz, before then, MGA had never licensed a product,

3    correct?

4    A    We had, but nothing to the success of that.

5    Q    No.  I mean, you hadn't licensed a product, right?

6    A    We had.

7    Q    Okay.  Let's look at Exhibit 630 quickly.

8    A    Yes, go ahead.

9    Q    And do you recognize 630 as an e-mail between you

10   and -- and a reporter around June 30, 2003?

11   A    Yes, Sam Phillips from the License magazine, yes.

12             MR. PRICE:  Your Honor, I move Exhibit 630 into

13   evidence.

14             THE COURT:  Received.

15             (Plaintiffs' Exhibit No. 630 is received in

16        evidence.)

17   BY MR. PRICE:

18   Q    This is one of those interviews which is they send you

19   the questions and then you type out your answer, right?

20   A    Yes.

21   Q    So that way you can -- you can be --

22   A    I apologize for my spelling, but go ahead.

23   Q    That way you can be specific about your answer, I mean,

24   you can be careful about your answer, right?

25   A    I just answered.  I just answered the question.  I

1    wasn't paying attention if I'm going to be careful or not

2    careful.

3    Q    Well, you were trying to give accurate responses in

4    writing to these questions, right?

5    A    Yes, at 1:00 or 2:00 a.m.

6    Q    And if you'd look at the second page.

7    A    I'm there.

8    Q    There is a question, "Had you been a licensor before?"

9    It's about the middle of the page.

10   A    Yes.

11   Q    And the answer you wrote down was "No, this is the

12   first time, but we have been a licensee many times"; do you

13   see that?

14   A    Yes.

15   Q    Now, a licensee is where someone gives you permission

16   to use a trademark or -- or a product, and then you pay the

17   licensing fee, right?

18   A    Yes, it's called licensing in, yes.

19   Q    And a licensor is when you go to someone and say, You

20   can make this Bratz-related thing, but you've got to pay me?

21   A    Or you can make a Donkey Kong, you got to pay me, or

22   you can make a Bouncy Baby, you can pay me.

23   Q    Or if you want to make a Bratz sleeping bag, they'd

24   have to pay you?

25   A    That's correct.

1    Q    So focusing on this September 2000 time period, if

2    you'd look, now, at 16788, which you have in front of you,

3    and your response dated September 13, 2000, was, "Tell him

4    licensing royalties is a pie in the sky in the future"; do

5    you see that?

6    A    I do.

7    Q    Now, you had already talked with Mr. Bryant about

8    royalties for the dolls, right?

9    A    Those dolls that he worked on, yes.

10   Q    So you then go on to say, "We are going to risk and

11   spend millions making this brand and line happen.  Maybe it

12   does, maybe it does not.  If it does, we make the brand and

13   not him.  The answer is, no, explain the above logic to

14   him"; do you see that?

15   A    Yes.

16   Q    What you're negotiating at this time was that he would

17   get an advance on royalties for a few months and then he

18   would get whatever royalties there were, right?

19   A    He would get -- well, this is exactly what happened, we

20   paid him $5,500 a month for six months, which was $500 more

21   than, per month, that he was making at Mattel.  And then

22   after six months, we gave him $5,000 a month, and then that

23   advance would end, and he would receive 3 percent royalty on

24   any doll -- Bratz doll that he worked on.

25   Q    So he wasn't going to make a commitment to MGA, to your

1    understanding, unless he thought MGA was going to make the

2    dolls, because otherwise, he's out of a job in a few months?

3    A    That's the risk he took, yes.

4    Q    That's because you told him you were committed to

5    making the dolls, right?

6    A    Yes, I did tell him that I'm committed to making the

7    dolls.

8    Q    And as of September 13, you were committed to risking

9    and spending millions to make the brand happen?

10   A    No, as of September 13, I was telling him that once we

11   have an agreement, we are going to risk spending millions of

12   dollars in development of Bratz, which we did, we're going

13   to spend millions of dollars in marketing, advertising,

14   promoting Bratz, which we did, and if that brand, the Bratz

15   brand, became successful, he would make a lot of royalties,

16   but there is -- I know in toy business, and now I've been in

17   it for many, many years, there is no guarantees.  Sometimes

18   it happens, and sometimes it doesn't.

19   Q    So that representation was made to him sometime in

20   September 2000, right?

21   A    What representation?

22   Q    The representation that if he signs the agreement, that

23   you were going to risk and spend millions to try to make the

24   brand happen, correct?

25   A    This wasn't a statement.  I was making to him in

1    response to his question that he wanted to get also in his

2    agreement royalties on the brand, and I was telling him, no,

3    if we make the brand, it's MGA who's going to make the

4    brand, not you, and you are not going to get any royalties

5    on that.

6    Q    My question is more specific, tell me "yes" or "no."

7    By mid-September, you had told Carter Bryant that if he

8    signed the agreement, you are going to risk millions to try

9    to make the brand happen; yes or no?

10   A    Yes.

11   Q    And you told him that in mid-September 2000 based

12   solely on seeing what we've seen in Exhibit 302, his

13   designs, right?

14   A    Yes.

15   Q    He didn't have a sculpt, right?

16   A    No.

17   Q    He didn't have Mercedeh Ward on board, correct?

18   A    We had Mercedeh Ward on board, not him.

19   Q    Not on September 13, 2000?

20   A    No, but you said he didn't have -- he never had

21   Mercedeh Ward on board.  MGA brought Mercedeh Ward on board.

22   I think your question was he didn't have Mercedeh Ward.

23   Q    I apologize if I said that.

24        MGA didn't have Mercedeh Ward on board, correct?

25   A    That's correct.

1   Q    They hadn't contacted the sample makers, correct?

2   A    I'm sorry?

3   Q    MGA hadn't contacted sample makers as of mid-September,

4   correct?

5   A    Which sample makers?

6   Q    The ones that worked on Bratz?

7   A    I think September, we had no sample makers working on

8   Bratz.

9   Q    So based just on the designs that he showed you --

10  A    Yes.

11  Q    -- just on that, you were making this commitment to

12  make the Bratz doll line if he signed a contract, correct;

13  yes or no?

14  A    Yes.

15  Q    Now, the fact is, though, that he was -- you understood

16  he was a Mattel designer from the Mattel design center

17  bringing you designs, correct?

18  A    He was -- he was a Mattel fashion designer who worked

19  in Mattel design center who was bringing us some drawings

20  that he said he had done in 1998 when he was not in

21  Missouri -- when he was in Missouri, sorry.

22  Q    So it was a red flag for you, you wanted to know did

23  these belong to Mattel or did they belong to you, right?

24  A    That's correct.

25  Q    Because you really couldn't have a more suspicious

1    circumstance, there's a Mattel designer from the Mattel

2    design center bringing you designs while he is employed at

3    Mattel, right?

4    A    I'm sorry, what was the question?

5              MS. KELLER:  Objection.  Argumentative.

6              THE COURT:  Overruled.

7    BY MR. PRICE:

8    Q    You couldn't have a more suspicious circumstance where

9    you have a Mattel designer from the Mattel design center

10   bringing you designs for a fashion doll?

11             THE COURT:  Those are suspicious circumstance that

12   counsel's objecting to, Counsel?

13             MS. KELLER:  Yes, your Honor.

14             MR. PRICE:  Let me ask it this way.

15   BY MR. PRICE:

16   Q    It worried you, it concerned you that you had a Mattel

17   designer from the Mattel design center bringing you doll

18   designs, right?

19   A    Yes.

20   Q    It was -- it was critical for you to find out who owns

21   these, right?

22   A    Yes.

23   Q    And in fact, at the time of September 2000, you knew it

24   would be inappropriate for MGA to create a business based

25   upon Mattel's confidential information; you knew that would

CV 04-9049-DOC - 02/08/2011 - Day 14, Vol. 2 of 3

43

1   be inappropriate?

2   A    Or anybody else's confidential information, yes, that

3   would be wrong.

4   Q    You knew at that time it would be inappropriate to even

5   be inspired to act, looking at somebody else's confidential

6   information?

7   A    I'm sorry.  You went too fast.  I didn't understand

8   your question.  Can you repeat the question?

9   Q    Yes.  You thought at the time it would be inappropriate

10  for MGA to even be inspired to act based upon looking at

11  somebody else's proprietary confidential information?

12              MS. KELLER:  Objection.  Vague, your Honor.

13              THE WITNESS:  If these drawings that he was

14  showing us belonged to Mattel or belonged to anybody else, I

15  did not want to do anything with it.

16  BY MR. PRICE:

17  Q    And you thought that --

18              THE COURT:  Overruled.

19  BY MR. PRICE:

20  Q    You thought at the time that it would be inappropriate

21  to try to create a profitable brand if the inspiration for

22  that was to look at a competitor's proprietary, confidential

23  information, that's what you thought at the time?

24  A    My thought was that if these did not belong to Carter

25  Bryant and if he had not done them on his own as he was

1  representing to us when he was not at Mattel, I wanted to

2  have nothing to do with it.

3  Q    And one of the reasons is because it was your thought

4  that MGA shouldn't try to create a profitable brand if the

5  inspiration of that was something which was Mattel's

6  confidential information; yes or no?

7  A    Yes.

8  Q    So one thing you want in that situation is something

9  called a representation of warranties from the seller,

10  right?

11  A    Yes.

12  Q    It's sort of like when you -- like when you buy a

13  house, that you want the seller to say everything's okay,

14  right?

15  A    Yes.

16  Q    And you've seen those things where you get

17  representations and warranties about that, right?

18  A    Yes, but in this context, also in the toy industry,

19  it's pretty standard.

20  Q    And so in this situation --

21        MR. PRICE:  Can we switch to the ELMO, Ken?

22  BY MR. PRICE:

23  Q    In this situation --

24        *(Attorney discussion held off the record.)*

25

1    BY MR. PRICE:

2    Q    -- MGA was the buyer, right?

3    A    Yes.

4    Q    And Mr. Bryant was the seller?

5    A    The seller of the drawings, yes.

6    Q    And you wanted to get his representation, at least,

7    that I own these, right?

8    A    That's correct.

9    Q    But you understood at the time that if these designs

10   belonged to Mattel, and then you spent millions making a

11   brand, you kind of devoted your company to it, if it turned

12   out they belonged to Mattel, that that was going to be a

13   problem no matter what Mr. Bryant said, right?

14   A    We know -- he said that he did them in 1998 in Missouri

15   when he wasn't working at Mattel.  Not only we got reps and

16   warranties from him, but we also got representation from his

17   lawyer of the same thing.  And that's when we signed a

18   contract on October 4, and then we invested millions of

19   dollars building the brand over many, many years, not

20   overnight.

21   Q    Let me ask you, this is a yes-or-no question, you

22   understood that regardless of the representations and

23   warranties from Mr. Bryant from the seller, that if it

24   turned out Mattel owned them, that they would belong to

25   Mattel and not you, regardless of what he said, if that were

1    the case?

2    A    Yes, and Mattel didn't own them.

3          MS. KELLER:  Objection.  Calls for a legal

4    conclusion, your Honor.

5          THE COURT:  It's overruled.

6    BY MR. PRICE:

7    Q    So your understanding is no matter what Mr. Bryant

8    said -- that says rep and warrant.

9          That no matter what Mr. Bryant says, you'll have to

10   find out -- strike that.

11         Regardless of what Mr. Bryant says, if Mattel actually

12   owned these, then he can't give them to you, you understood

13   that; yes or no?

14   A    If these belonged to Mattel, we didn't want to have

15   anything to do with it, and we verified it, and that's the

16   end of that story.

17   Q    Well, I have a few questions, so it's not quite the

18   end.

19   A    Go ahead.  I have three or four days.

20   Q    I am asking you a yes-or-no question, like when you're

21   buying a house, you get representations and warranties from

22   the seller, right?

23   A    Yes, we do.

24   Q    And if it turns out they don't own the house, you still

25   don't own the house, right?

```
1    A    I don't know, I'm not a lawyer, but the house that I

2    bought, actually with my wife, but we did -- we did check,

3    and we got what we call title insurance, et cetera, to make

4    sure that that belongs to us.

5    Q    Because what matters to you as a toy maker about to

6    invest millions of dollars to make a brand, what matters to

7    you are the facts, that is whether or not this belongs to

8    Mattel, correct; yes or no?

9    A    Yes, and it didn't belong to Mattel.  It doesn't belong

10   to Mattel.

11   Q    So because you're worried about the facts whether it

12   actually belongs to someone else --

13             THE COURT:  Is that a question or --

14   BY MR. PRICE:

15   Q    -- you are not just going to take the seller's word for

16   it, correct; yes or no?

17   A    We didn't just didn't take his word for it, yes, we got

18   from him reps and warranties and we also got representation

19   from his lawyer.

20   Q    And we'll get there, but first, because it matters to

21   you the fact of whether or not he actually owns it?

22   A    Yes.

23   Q    Because of that, you are not just going to just rely on

24   what he says, correct; yes or no?

25   A    Of course we relied on what he says.
```

1    Q    That's not my question.

2    A    I'm sorry, maybe I misunderstood your question.

3    Q    You care, you say, about whether or not Mr. Bryant

4    actually owned these designs, correct?

5    A    I did.

6    Q    And you said because he was a Mattel designer from the

7    Mattel design center presenting you with designs, you had a

8    concern about who owned the designs, correct; yes or no?

9    A    Yes.

10   Q    And because of that concern, you are not just going to

11   rely on the seller's word about whether he owns the designs,

12   you are not going to rely just on that, correct; yes or no?

13   A    Not correct.  In the toy industry, and I believe

14   Miss O'Connor also testified to that, when you have a

15   designer who brings you a concept, you ask them, is this

16   yours, and if they say "yes" or "no" -- if they say "yes,"

17   you get -- all you do is get reps and warranties.  We went

18   beyond and above that and we checked and made sure that he

19   was telling us the truth.

20   Q    Let me make sure I have this.  What you are saying is

21   that you would invest millions, you would try to make a

22   brand simply on the word of Carter Bryant; yes or no?  Is

23   that what you are saying?

24   A    No.

25   Q    Okay.  Then let me ask you the next question.  It

1    makes -- you wouldn't rely just on his word because if it

2    turns out he didn't own them, then after spending millions,

3    after dedicating your company, it could turn out it belonged

4    to someone else, correct; yes or no?

5    A    I cannot answer that question "yes" or "no," Mr. Price.

6    We did not just take his words.  We went ahead and did due

7    diligence.  We negotiated with him for a royalty, and we had

8    our lawyers check with his lawyers, I think you saw that

9    during Victoria O'Connor's testimony, to confirm that he

10   does own it, and only after that, we started investing money

11   to start the product development of Bratz dolls, which later

12   on MGA made multi-million dollar brand.

13   Q    I'm going in baby steps.  We'll get to the other

14   representations.  I'm asking you something different.  I'm

15   focusing just on Carter Bryant, okay?

16   A    Yes.

17   Q    And I think you can answer this "yes" or "no."  Isn't

18   it true that you would not have relied just on the word of

19   the seller, Mr. Bryant, because if it turns out he's wrong,

20   this might belong to someone else; isn't that true?

21   A    I'm going to answer the first part of your question,

22   which is you were going to only rely on his word, and the

23   answer is, yes, I would not just rely on his word.

24   Q    Thank you.

25        So like when you're buying a house, you get your own

1    inspector to go through and see what's wrong with the house

2    even if the seller says it's okay, right?

3    A    With the house we bought, my wife did that.  I was busy

4    working.

5    Q    You knew she did it?

6    A    Yes.

7    Q    And just like with the house, you didn't take the

8    seller's word that he owned it, you got title insurance, and

9    they looked at the title, right?

10   A    She did do that, yes.

11   Q    And your wife is a pretty smart person?

12   A    Yes.  She's right behind you.

13   Q    So with Mr. Bryant, we are talking about something

14   worth more than a house, we are talking about something

15   which could be worth millions of dollars, right?

16            MS. KELLER:  Objection.  Argumentative.

17            THE COURT:  Overruled.

18            THE WITNESS:  We paid -- I'm sorry, those drawings

19   and that contract is not worth more than a house anyways,

20   not a house that I have seen anywhere in Southern

21   California, and I been living here for 38 years.  That

22   contrast -- that contract, if you look at it, is worth

23   $48,000.

24   BY MR. PRICE:

25   Q    But you are going to risk and spend millions, right?

1    Is that right; yes or no?

2    A    Yes.

3    Q    And so when you say what the contract's worth, you are

4    going to invest millions of dollars, right, on developing

5    Bratz, and you thought that in mid-September, 2000, right?

6    A    I said to him that we are going to -- if this brand

7    makes it, we are going to spend millions of dollars, and

8    it's going to be MGA who's going to do that.

9         If it happens, great; if it doesn't happen, it's MGA's

10   risking money, we are not going to give you any royalties,

11   and that's the context of this e-mail, sir.  You are trying

12   to make something bigger out of it that really it's not.

13   Q    Wait a minute.  I'm talking about what you are going to

14   give Carter Bryant.  To make the brand happen --

15   A    Well, you said -- I don't want to argue with you,

16   Mr. Price, but I think earlier you said that the contract we

17   did with him was worth what I paid for my house, and that's

18   not correct.

19   Q    Let me finish this question, okay?

20   A    Go ahead.

21   Q    Under the September 13, 2000 e-mail, by then, you were

22   going to risk and spend millions to make the brand happen,

23   right?

24   A    That's what -- exactly, that's what it says, yes.

25   Q    And of course, you are not going to do that unless you

```
 1    have the facts which lead you to believe that Carter Bryant
 2    owns them, correct; yes or no?
 3    A     Yes.
 4    Q     And you just told us that as a smart buyer that's about
 5    to risk and spend millions, you are not just going to take
 6    the seller's word for it, correct; yes or no?
 7    A     Yes.
 8    Q     And you earlier testified -- strike that.
 9          There was the suggestion that Miss O'Connor was
10    delegated that responsibility; do you recall that?
11    A     Miss O'Connor's job was licensing, and she was supposed
12    to do all the negotiations and due diligence, that's
13    correct.
14    Q     But you're someone who's fairly hands on, right?
15    A     In the areas that I like a lot, I'm very hands on; not
16    everything.
17    Q     Well, your testimony is you were a principal contact
18    with Mr. Rosenbaum, right?
19    A     I was the principal contact?
20    Q     You were a principal contact with Mr. Rosenbaum for
21    these negotiations?
22    A     I'm sorry, I don't understand a principal contact.  I
23    knew -- are you asking me if I know David Rosenbaum, yes, I
24    do.
25    Q     I mean in connection with these negotiations, were you
```

1    a principal contact with David Rosenbaum?

2    A    Victoria O'Connor was the principal contact, I was

3    copied on some of the e-mails, not all of them.

4    Q    If you'd look at Exhibit 23875.

5         THE COURT:  That would be February 7th, 2008,

6    Counsel?

7         MR. PRICE:  Yes.

8         THE COURT:  Thank you.

9    BY MR. PRICE:

10   Q    And do you recognize that, Mr. Larian, as a declaration

11   you filed under penalty of perjury in connection with this

12   case?

13   A    Yes.  Can you give me a minute to review, please?

14        Yes, go ahead.

15   Q    Is it correct that you declared under penalty of

16   perjury that you were a principal contact at MGA with

17   Mr. Rosenbaum in connection with his work on the Carter

18   Bryant consulting agreement?

19   A    Yes, I did.

20   Q    And that statement that you gave under oath is a true

21   statement, correct, that you were a principal contact with

22   Mr. Rosenbaum in connection with his work on the Carter

23   Bryant consulting agreement?

24   A    Yes.

25   Q    And in connection with that, you saw an e-mail from

1   Mr. Rosenbaum in connection with the representations and

2   warranties Mr. Bryant was going to make, correct?

3   A    I've seen many e-mails with David Rosenbaum's on it, I

4   don't recall all of them.

5   Q    Well, do you recall that as part of this negotiation,

6   initially Mr. Bryant didn't want to put in any

7   representations and warranties?

8   A    I don't recall that -- I don't remember.  I'm not

9   denying.  I just don't recall it.

10  Q    What you do know is that Mr. Rosenbaum was negotiating

11  with Mr. Bryant's counsel, Ms. Hwang, about the

12  representations and warranties, right?

13  A    Yes, among other things.

14  Q    Yeah, there was royalties, there was how much time you

15  were to give advances and how much -- things of that nature?

16  A    That's correct.

17  Q    And I want you to see Exhibit 18463.

18        THE COURT:  18463, Counsel?

19        MR. PRICE:  Yes, sir.

20        THE COURT:  Thank you.

21        THE WITNESS:  Just give me a moment to review it,

22  please.

23  BY MR. PRICE:

24  Q    Sure.

25  A    Yes, go ahead.

```
1    Q    If you look at the top of that, do you see this string

2    is being sent to you, correct?  You are on the e-mail

3    string?

4    A    I am on the CC.

5    Q    Meaning that you received this e-mail string?

6    A    That's right.

7    Q    And in fact, if you'd look at the bottom of this, it's

8    from David Rosenbaum to Miss O'Connor.  This was something

9    she forwarded to you, correct?

10   A    Later on, yes, on the next e-mail, the e-mail above it.

11   Q    They are all on September 28, 2000, correct?

12   A    Yes, but she forwarded that to me at 3:22 p.m. --

13   3:32 p.m.

14   Q    And so this is something you looked at and read in

15   connection with the Carter Bryant negotiation, correct?

16   A    I believe so, yes.

17   Q    Okay.  Now, you've told us that as a buyer who's going

18   to invest millions in making the brand happen, you wouldn't

19   just rely on the seller's word, correct?

20   A    Yes.

21   Q    And the reason is because no matter what the seller

22   says, if it belongs to somebody else, you are going to have

23   wasted those millions, right?

24   A    We didn't want anything to do with it if they didn't

25   belong to him, so --
```

1  Q    Let me repeat the question.  The reason you weren't

2  going to rely just on the seller's word is because if it

3  turned out the seller didn't own it, you could have invested

4  millions and it would belong to somebody else, correct; yes

5  or no?

6  A    Yes.

7  Q    And so look at the e-mail here where Mr. Rosenbaum

8  says, "I spoke with Carter's lawyer this a.m. and e-mailed

9  her a copy of the agreement"; do you see that?

10  A    Yes.

11  Q    So what we are talking about here is, now, we're

12  talking about what the seller's lawyer says, correct?

13  A    Yes.

14  Q    Not what your lawyer says, right?

15  A    Yes.

16  Q    It's what the seller's lawyer says?

17  A    Yes.

18  Q    And what you're interested in is not the seller's

19  opinion or what the seller's lawyer said, you want to know

20  facts about who owns this, right?

21  A    We wanted to know if he did this in -- as he said to

22  us, in 1998 in Missouri when he was not working at Mattel.

23  We had our lawyers go ahead and check that.  And this e-mail

24  confirms what we have been saying to you guys for seven,

25  eight, 10 years you've been holding me in this lawsuit, and

CV 04-9049-DOC - 02/08/2011 - Day 14, Vol. 2 of 3

57

1    that's the fact.

2    Q    Mr. Larian, you wanted to know what the facts were,

3    correct; yes or no?

4    A    Yes.

5    Q    You didn't want to know what the seller's lawyer's

6    opinion was, correct; yes or no?

7    A    Yes, I did want to know what the seller's lawyer said,

8    or using your house analogy, what the insurance policy said,

9    because I -- I learned that you have to rely on lawyers who

10   are officers of the court, who get paid and -- to tell the

11   truth, and his lawyer said he did it in 1998.

12   Q    Ms. Hwang was Mr. Bryant's lawyer, correct?

13   A    That's correct.

14   Q    Ms. Hwang had duties to Mr. Bryant, correct?

15   A    Yes.

16   Q    In the insurance company situation you are talking

17   about, the insurance company has duties to you, right?

18   Correct; yes or no?

19            THE COURT:  Excuse me.  Sir, sit down.

20            Sorry, Counsel, thank you.

21            MS. KELLER:  Your Honor, I am going to object that

22   that calls for a legal conclusion.  No foundation.

23            THE COURT:  Overruled.

24            You can answer the question.

25

1   BY MR. PRICE:

2   Q    You understand the insurance company has obligations to

3   you, correct; yes or no?

4   A    Yes, and also I believe that the lawyers have --

5            MR. PRICE:  Move to strike.

6            THE WITNESS:  Ms. Hwang's lawyer, as an officer of

7   the court, has an obligation to tell the truth to the seller

8   as well as the buyer; that's my understanding.

9   BY MR. PRICE:

10  Q    And this statement wasn't made in court, was it?

11  Correct; yes or no?

12  A    It was not.  And will you please not raise your voice

13  at me, please.  I'd appreciate that.

14  Q    In the insurance company situation, again, they have

15  duties to you, correct?

16  A    And yes, they have -- they have -- insurance companies

17  have a duty both because that's how they insure, when you

18  are talking buying a house, yes, they have a duty, they get

19  paid to insure something.

20  Q    And Mr. Rosenbaum in this case, your lawyer, is the one

21  who had duties to you, correct?

22  A    Yes.

23  Q    And in this situation, you've got Mr. Rosenbaum

24  conveying to you what Mr. Bryant's, what the seller's

25  attorney said she did, correct?

1    A    Yes.

2    Q    And let's look at it.  It says, "I asked her

3    specifically about the Mattel issue, and said she said she

4    has reviewed the chronology of the creation of this design

5    and is satisfied that Carter created this outside of his

6    scope of employment at Mattel"; do you see that?

7    A    Yes.

8    Q    So your attorney, Mr. Rosenbaum, as far as you know,

9    did not look at a chronology, correct?

10   A    I don't know what he did or not.

11   Q    Well, let's look at the e-mail.  This is what you

12   received, right?

13   A    I did.

14   Q    And this is in connection with the negotiations for the

15   representations and warranties of Mr. Bryant, correct?

16   A    Yes.

17   Q    And as you said, you are not going to rely on those

18   representations and warranties as far as Mattel's concerned,

19   you have to look at the facts yourself, right?

20   A    No.  What I said to you is in the toy industry, you

21   usually rely on reps and warranties the toy designer give

22   you.  We went above and beyond to make sure, because Carter

23   Bryant used to work at Mattel, and I didn't want to have

24   anything to do with it if these drawings belonged to Mattel;

25   that's what I testified to.

1   Q    As far as you know, did your attorney look at a

2   chronology?

3   A    I don't know if he did or not.  I doubt it.  I don't

4   think so.

5   Q    Your attorney certainly never told you he looked at a

6   chronology, correct?

7   A    He did not.

8   Q    He's relaying to you what the seller's attorney said to

9   him, correct?

10  A    Yes.

11  Q    And at any time did you say, can I see that chronology

12  that you are talking about?

13  A    I did not.

14  Q    At any time did your attorney say, can I see that

15  chronology that you are talking about?

16  A    I don't know if he did or not.

17  Q    In fact, you have no idea at all what Mr. Bryant's

18  attorney did with respect to the chronology, right?

19  A    I don't.

20  Q    And as far as you know, Mr. Rosenbaum had no idea what

21  Ms. Hwang, the seller's attorney, looked at in connection

22  with the chronology, correct?

23  A    Correct.

24  Q    You don't know if Ms. Hwang simply sat down with Carter

25  Bryant and said, tell me the chronology, right?

1    A    I don't know what she did.  I never met her.  I don't

2    know how she looks like.  I don't know what she did.  I

3    never talked to her.

4    Q    So what you understood this letter to be was a

5    representation by the seller's lawyer that she looked at an

6    unspecified chronology and thought it confirmed what

7    Mr. Bryant said, that's what you interpret this letter to

8    say, correct; yes or no?

9    A    This letter, to me, said that David Rosenbaum, at the

10   direction of Victoria O'Connor, had talked to Anne Hwang,

11   Carter Bryant's lawyer, and Carter Bryant's lawyer had

12   confirmed -- I don't know what steps she took, had confirmed

13   what Carter Bryant had told us, that he did this in 1998

14   when he was in Missouri and he wasn't working at Mattel.

15   Q    And you can tell from this e-mail that Mr. Rosenbaum

16   didn't do a thing to confirm it, correct?

17   A    That's correct, this e-mail doesn't say that Carter --

18   that David Rosenbaum did anything as to confirm that, you're

19   right.

20   Q    And you didn't ask your attorney to do anything or give

21   an opinion as to who owned the designs, correct?

22   A    I did not, correct.

23        THE WITNESS:  Excuse me, your Honor, if I can take

24   a restroom break.

25        THE COURT:  Counsel, I think the witness is

Case 2:04-cv-09049-DOC-RNB   Document 9845   Filed 02/10/11   Page 62 of 123   Page ID #:297222
CV 04-9049-DOC - 02/08/2011 - Day 14, Vol. 2 of 3

62

```
 1    signaling that he'd like a break.  Is this convenient?

 2              MR. PRICE:  Fine with me.

 3              THE COURT:  Is this all right?

 4              MR. PRICE:  I don't want him to be uncomfortable.

 5              THE COURT:  Ladies and gentlemen, you're

 6    admonished not to discuss this matter amongst yourselves,

 7    nor form or express any opinion concerning the case.  Have a

 8    nice recess.  We'll come and get you in about 15 minutes.

 9              (The following proceedings is taken outside

10         the presence of the jury.)

11              THE COURT:  So the reviewing court has no doubt

12    about what just occurred.  The public is certainly welcome,

13    but I want them to be seated quickly.  I'll have a CSO

14    brought up to the courtroom so when people come in, they are

15    not standing in the back.  It's distracting for the witness.

16    This is a critical time in the testimony.  There's not to be

17    any interruptions.

18              All right.  Fifteen minutes, Counsel.

19              (Recess.)

20              (The following proceedings is taken in the

21         presence of the jury.)

22              THE COURT:  All right.  The jury is back in

23    session with the alternates.  Thank you for your courtesy.

24    Counsel, if you'd please be seated.

25              The witness is present.
```

```
 1              And Mr. Price, if you'd like to continue your

 2    examination on behalf of Mattel.

 3              MR. PRICE:  Thank you, your Honor.

 4         ISAAC LARIAN, PLAINTIFFS' WITNESS, RESUMED

 5              DIRECT EXAMINATION (Continued)

 6    BY MR. PRICE:

 7    Q    Mr. Larian, you were talking about custom and practice?

 8    A    Yes.

 9    Q    Prior to September of 2000, had you had a doll designer

10    with -- currently working for a competitor come to you and

11    present you with doll designs?

12    A    No.

13    Q    It's that situation that raised the red flag for you,

14    right, that you had a doll designer from a competitor

15    presenting you with doll designs, right?

16    A    Yes.

17    Q    And what we just saw with Mr. Rosenbaum conveying what

18    the seller's attorney said, you didn't care what the answer

19    was, did you?

20    A    You are absolutely wrong.  I did care, that's why I

21    directed Victoria O'Connor to check.  And we didn't just

22    rely on Anne Hwang, who was Carter Bryant's lawyer.  David

23    Rosenbaum, who is an attorney who I worked with for many

24    years, also came back and says there is nothing wrong with

25    it.
```

1       So -- and he's -- and he's there to protect me, as you

2    said, and if he knew there was something wrong, he would

3    say, no, don't do it.  Nowhere ever did he ever say that.

4    Q    I'm sorry, I didn't mean to interrupt.

5       Mr. Larian, Mr. Rosenbaum, in his e-mail, doesn't give

6    any opinion, he just relays Ms. Hwang's opinion, correct?

7    A    That's correct, he doesn't give an opinion.

8    Q    And you didn't hire him to or ask him to give his

9    opinion, correct?

10   A    We asked him to do the contract negotiations, and also

11   to make sure, as an extra insurance policy, that what Carter

12   Bryant was saying was correct.

13   Q    Mr. Larian, you hired attorneys to give opinions

14   before, correct?

15   A    Yes, I have.  Do you mean -- what are you talking

16   about?

17   Q    I mean, there have been situations where you've asked

18   for your attorney's opinion and gotten it in writing so that

19   you could operate and do something in good faith, correct?

20   A    No, I know that we've gotten written opinions, but it's

21   our legal department that handled that.

22   Q    And you did not ask Mr. Rosenbaum to give you a legal

23   opinion, correct?

24   A    That's right.  We did not.

25   Q    And of course, you have no idea what Anne Hwang,

1    Mr. Bryant's attorney, did, the seller's attorney did; is

2    that correct?

3    A    I think I testified to that, I don't know what she did.

4    Q    And it's true that it wouldn't have been a problem to

5    you if Bryant had made any of his drawings while he was

6    employed at Mattel?

7    A    If he had done his drawings -- if this was -- actually,

8    you know, in my own personal opinion, we don't own people,

9    and if this -- he had done these drawings, not part of his

10   job at Mattel, fashion designer in the Barbie collectible,

11   but if he had done these drawings on his own when he was not

12   under the payroll of Mattel, working those hours, working in

13   Barbie collectible, I personally would not have any problem

14   with it, but that's not what he did.  He did them in 1998

15   when he was not working at Mattel.

16   Q    At the time you asked Mr. Rosenbaum to check with the

17   seller's attorney, at that time, it didn't matter to you,

18   would not have been a problem to you if Bryant had made any

19   of his drawings when he was employed by Mattel, correct?

20   A    If he had done these drawings at Mattel as part of his

21   job, what he was getting $5,000 a month for, I wanted to

22   have nothing to do with it.  I want to have nothing to do

23   with Mattel's property then or now or ever.

24   Q    At the time you were meeting with Mr. Bryant in

25   September of 2000, is it correct that as far as you were

1    concerned, it would not have been a problem if Carter Bryant

2    had created or made any of his drawings when he was employed

3    by Mattel, in your view?

4    A    If -- again, I explained it.  If he had done those, in

5    my view, on his own time and not part of his job description

6    and job at Mattel, my personal opinion, I don't have a

7    problem with that.

8    Q    So if, for example, Ms. Hwang had then come back and

9    said, I asked Mr. Bryant, and he said he did this while he

10   was at Mattel but on his own time --

11   A    That's not what happened, Mr. Price.  This is not what

12   she came back with.  The fact is that she came back and said

13   he did it in 1998 in Missouri when he wasn't working at

14   Mattel, so you are asking me a hypothetical question that

15   did not happen.

16   Q    I'm asking you your state of mind whether this mattered

17   to you, whether or not Ms. Hwang's statement mattered to

18   you, and what I'm asking you is, at the time, according to

19   your view, if she had come back and said, yes, she created

20   these at Mattel but on nights and weekends, then at the

21   time, that wouldn't have been a problem for you, correct?

22   A    I don't remember.  I wasn't even focusing on that.  My

23   focus was if this belonged to him, didn't belong to Mattel,

24   that he had done them on his own, and this is what was

25   confirmed to me before I went ahead with the contract.

Case 2:04-cv-09049-DOC-RNB   Document 9845   Filed 02/10/11   Page 67 of 123   Page ID #:297227
CV 04-9049-DOC – 02/08/2011 – Day 14, Vol. 2 of 3

67

```
 1   Q    I'd like to call your attention to March 26th, 2008,
 2   page 450, it's 450, March 26th, 2008.
 3              MR. PRICE:  And your Honor, if I can read as a
 4   party admission.
 5              THE COURT:  Not until I get a copy.
 6              Lines?
 7              MR. PRICE:  It's 450, lines 10 through 17.
 8              THE COURT:  Just a moment.
 9              You may.
10              THE WITNESS:  Go ahead.
11   BY MR. PRICE:
12   Q    Question:  "Would it have been a problem if Carter
13   Bryant had created or made any of his drawings while he was
14   employed by Mattel, in your view?"
15        Answer:  "No."
16        Question:  "Why not?"
17        Answer:  "Because I don't think whether it's MGA or
18   Mattel, we own the people, especially the creative people,
19   forever."
20        That's the answers -- those are the answers you gave
21   under oath, correct?
22   A    I did.
23   Q    And by the way, with respect to nights and weekends,
24   you have your own confidentiality and inventions agreement
25   at MGA, correct?
```

CV 04-9049-DOC - 02/08/2011 - Day 14, Vol. 2 of 3

68

1    A    We do.

2    Q    Agreements that were in effect in September of 2000,

3    right?

4    A    Yes.

5    Q    And you hadn't seen Mattel's agreements by that point,

6    correct?

7    A    We had not.

8    Q    And it's also true, is it not, that what was conveyed

9    to you that Ms. Hwang said had no significance in your mind

10   as to whether or not Mattel had rights to those drawings?

11   A    I'm sorry?  Mattel didn't have rights to those

12   drawings, never had, never will.

13   Q    I'm talking about your mind set.  You received this

14   e-mail from David Rosenbaum conveying what the seller's

15   attorney said.  In your mind, getting that from the seller's

16   attorney, Ms. Hwang, had no significance on whether or not

17   Mattel might have rights to those drawings; isn't that true?

18   A    I don't recall -- I don't recall if that was in my mind

19   or not.  My mind was always, if Carter Bryant had done these

20   drawings as part of his job at Mattel where he was making

21   $60,000 a year, and if he had done those at Mattel for

22   Mattel, I want to have nothing to do with it.

23        MR. PRICE:  Your Honor, if we could read as

24   admission, if we could get his Honor March 26th, 2008,

25   459 and 460.

```
 1              THE COURT:  Lines?

 2              MR. PRICE:  It's 459, your Honor, lines 12, to --

 3              THE COURT:  460.

 4              MR. PRICE:  To 460, we'll go down to line 20.

 5              THE COURT:  Just a moment.

 6              Counsel, you are going to ask him if this

 7    refreshes his recollection.

 8    BY MR. PRICE:

 9    Q    Mr. Larian, do you have it in front of you?

10    A    Yes.  I'm sorry, I didn't get the last line.

11    Q    I was going to go down to 460, line 20, and I'm asking

12    you whether this refreshes your recollection that at the

13    time you received that e-mail from Mr. Rosenbaum conveying

14    Ms. Hwang's representation, whether you thought it had no

15    significance as to whether or not Mattel might have rights

16    to those drawings?

17              MS. KELLER:  Objection.  Misstates the testimony,

18    your Honor.

19              THE COURT:  Well, it's also confusing, Counsel.

20              Reask the question.

21    BY MR. PRICE:

22    Q    At the time you received that e-mail from

23    Mr. Rosenbaum, are you with me so far?  That time frame, you

24    thought that what was in that e-mail from Ms. Hwang had no

25    significance to whether or not Mattel might have rights to
```

1   those drawings, correct?

2   A    That's not correct.  And you should read the testimony

3   that he just showed me.  Should I read it?  Maybe I should

4   read it.

5          MR. PRICE:  Your Honor, I request permission to

6   read the testimony.

7          THE COURT:  You may.

8          MR. PRICE:  Question:  "Was the fact that Carter

9   Bryant's lawyer represented to MGA that Carter Bryant had

10  done the drawings in 1998 in Missouri when he was not a

11  Mattel employee have any significance to you at that time?"

12         Answer:  "He confirmed what Carter Bryant had told

13  us."

14         Question:  "And did you find some comfort in

15  this?"

16         Answer:  "Of course."

17         Question:  "And why was that?"

18         Answer:  "Because, you know, I hope the lawyers in

19  court, your profession tell the true."

20         Question:  "Well, you thought that it would have

21  some significance to whether or not Mattel might have rights

22  to those drawings; is that true?"

23         Answer:  "No."

24         Question:  "Well, then, please tell me what

25  comfort you derived from the fact that this, as you describe

1    it, confirmed what Carter Bryant had told you about creating

2    these drawings in 1998 in Missouri when he was not employed

3    by Mattel?"

4              Answer:  "Besides what I just testified, I have

5    nothing else to add."

6              Question:  "So you were just comforted by the fact

7    that he had told you the truth?"

8              Answer:  "And his lawyer confirmed it."

9              Question:  "And beyond that, it had no

10   significance to you; is that true?"

11             Answer:  "That's true."

12   BY MR. PRICE:

13   Q    Now, Mr. Larian, at this time frame in September, you

14   knew some things about Mr. Bryant that his lawyer might not

15   have known?

16   A    I didn't know Mr. Bryant until I saw him for the first

17   time on September 1, 2000, in my office after lunch.  I've

18   never heard of -- met him or knew who he was.  I had no idea

19   who he is.  I don't understand your question.

20   Q    And by the way, you said you're sure it was after

21   lunch --

22   A    Yes.

23   Q    -- because Mr. Bryant got off work at 1:00 p.m. on

24   Friday, right?

25   A    No, I think you should read my testimony, because I

1    remember it was after lunch, because we eat rice, usually

2    Persians, for lunch, and I remember my daughter was there

3    and I had to clean the rice off the table before we meet

4    with Carter Bryant; that's why.

5    Q    At some point, you learned that Mr. Bryant was working

6    for MGA the whole month of September, right?

7    A    I don't think he ever worked for MGA the whole month of

8    September.  That's not correct.

9    Q    Okay.  If you'd look at April 12, 2010, at page 2362,

10   lines 11 to 14.  And let me reask the question again because

11   I was told I might have misspoke.

12       You learned at some point that at the same time Carter

13   Bryant worked for Mattel in September, he also worked for

14   MGA the whole month of September?

15   A    Yes, but your previous question was not that question.

16   Q    I might have messed it up, so let me make sure we are

17   clear.

18       At some point, you learned that while Carter Bryant was

19   working for Mattel in September, he was also working for MGA

20   that whole month?

21   A    Yes, that whole month.  I learned later on after this

22   litigation, that he was doing some work for MGA at the same

23   time when he was working at Mattel.

24   Q    Is that the kind of thing that might make you question,

25   just you, Mr. Bryant's honesty?

```
 1   A    No.  I think it makes me question his character.  I
 2   wouldn't -- if the shoe was on the other side, I would not
 3   like it if somebody was working for me and also working for
 4   Mattel, I would not like that.
 5   Q    And that's because it would be wrong for someone to be
 6   taking a paycheck for you, supposedly working for you, and
 7   then behind your back, work for a competitor, correct?
 8   A    Yes, I would not like that.
 9   Q    That would be being dishonest with you, correct?
10   A    It's bad judgment, it's very bad judgment.
11   Q    Well, it would reflect on their, as you said,
12   character?
13   A    It's bad judgment.
14   Q    I think you said it would reflect on their character;
15   do you agree?
16   A    Yes, character, bad judgment, to me, the same thing.  I
17   don't want to argue with you.
18   Q    Okay.  For example, if someone who was doing that said
19   something to you, represented something to you, you would
20   take that with more of a grain of salt if you knew that they
21   hadn't been completely honest with you previously?
22   A    I'm lost.  Say to me that word.  I'm lost a little bit.
23   Q    If someone made a representation to you about, for
24   example, when they created drawings --
25   A    Yes.
```

1    Q    -- an MGA employee, and you learned that that employee

2    had not been honest with you, had been working for a

3    competitor at the same time they worked for you, that might

4    make you somewhat suspicious about their honesty?

5              MS. KELLER:  Objection.  Improper hypothetical.

6              THE COURT:  Overruled.

7              You can answer the question, sir.

8              THE WITNESS:  And I am not sure if I still

9    understand the question, sir.

10   BY MR. PRICE:

11   Q    If an MGA employee said something like, I own these --

12   A    Yes.

13   Q    -- but you knew that employee had for a month been

14   working for a competitor at the same time they were working

15   for you and taking a paycheck from you at the same time they

16   were working for a competitor, you might not trust that

17   employee's word, correct?

18   A    No, it's two different issues.  If that employee says

19   that I owned this, I've done it on my own, and we verified

20   that he was telling the truth through lawyers, who their

21   profession is to tell the truth, then I would not have --

22   there's two different issues.  If he was working for me and

23   working for Mattel at the same time, I think it's bad

24   judgment.  He should not have done that.

25   Q    But you said -- you said lawyers tell the truth.  It's

CV 04-9049-DOC - 02/08/2011 - Day 14, Vol. 2 of 3

1   your view, yourself, that you control the lawyers, the

2   lawyers don't control you?

3   A    No, Mr. Price.  I know -- that's not correct, and I

4   know where you're going, and you can go ahead and show that

5   document, I would like to explain that.

6   Q    When you say you know where I'm going, you've

7   anticipated this?

8   A    Yes, because you asked me these questions and

9   Mr. Zeller has asked me these questions maybe more than a

10  hundred times, previous trial deposition, et cetera, yes, of

11  course I anticipate where you're going, but can I explain?

12  Would you like me to explain?

13  Q    I don't want to disappoint you.  Let me show you where

14  I'm going.  I'll show you Exhibit 5511.

15  A    Yes, go ahead.

16  Q    Do you recognize that as an e-mail string between you

17  and your brother sometime around April 19, 2004?

18  A    Yes, I do.

19  Q    And this is concerning you and your brother trying to

20  reach closure on his disagreements with you; was that

21  accurate?

22  A    Yes.

23  Q    And if we look --

24       MR. PRICE:  Your Honor, if we can move 5511 into

25  evidence.

CV 04-9049-DOC – 02/08/2011 – Day 14, Vol. 2 of 3

76

```
 1              MS. KELLER:  Objection.  Irrelevant.

 2              THE COURT:  Counsel, could I see a copy of that

 3     for just a moment?

 4              MR. PRICE:  Sure.

 5              Specifically, your Honor, referring to page 2 of

 6     the e-mail string.

 7              THE COURT:  Overruled.  It's received.

 8              (Plaintiff's Exhibit No. 5511 is received in

 9        evidence.)

10              THE COURT:  Page 2.

11     BY MR. PRICE:

12     Q    If you'd go to page 2.

13     A    Yes.

14     Q    And you see that the bottom e-mail is from you to your

15     brother, correct?

16     A    Yes.  The subject is Releasing the Evidence on that

17     e-mail.

18     Q    And it says, "Fred, you and I control the lawyers and

19     not the other way around"; that's what you wrote?

20     A    Yes, I did.

21     Q    And let me follow up on something, Mr. Larian,

22     concerning Mr. Bryant working that month of September for

23     MGA and for Mattel.

24     A    Should I put this away?

25     Q    Yeah, for now, or put it down for now.
```

1        If you know someone, as you put it, has bad character,

2   would you agree that you're less likely to accept what they

3   say at face value?

4   A    But I didn't say bad character, I think I said it goes

5   to his character and bad judgment, but again, afterwards, we

6   found out that especially from October 4 to October 19,

7   2000, he was still working at Mattel while he was getting

8   money from MGA also.  After your lawsuit, I found out about

9   that, and that's bad judgment on his side.  And if he was

10  doing any work in September while he was working for Mattel,

11  that's also bad judgment.

12  Q    I'm focusing on September 2000.

13  A    Yes.

14  Q    Now, you were sitting here when Mr. Bryant said he was

15  telling you and Ms. Garcia what he was doing in September;

16  do you remember that?

17  A    Yes, that he was working at Mattel, correct.

18  Q    So did he tell you that he contacted Universal and

19  represented that he was from MGA?

20  A    He did not.

21  Q    Did he tell you that he was working with a sculptor for

22  the Bratz dolls in September?

23  A    I don't recall if he did or not.  I don't remember him

24  saying that.  I -- in my mind, Paula Garcia was working with

25  the sculptor, not him.

1    Q    Did he tell you that he was working with Veronica

2    Marlow on Bratz in the September time frame?

3    A    I don't recall him saying that, no.

4    Q    I mean, are you denying that he told you about that as

5    he said or are you saying you don't recall one way or the

6    other?

7    A    He did not say that, he did not.  I am not denying.  He

8    did not say that to me.

9    Q    Well, did you see the invoices, the bills from

10   Ms. Marlow concerning the sample makers?

11   A    What do you mean, in this court?

12   Q    No, I mean at the time, at the time in September or

13   October, did you see Ms. Marlow's bills that reflected work

14   in September?

15   A    Not that I recall, no.

16   Q    How about, did you see the invoice from Mr. Bryant for

17   drawing Prayer Angel faces for MGA in August while he still

18   worked for Mattel?

19   A    I saw a couple of e-mails.  Are you talking about the

20   $162 invoice; is that what you are talking about?

21   Q    That's how much he was paid for the Prayer Angels.

22   A    I do not.

23   Q    You will agree that that would reflect on his

24   character, if he was doing drawings to help a competitor to

25   come out with a doll while he still worked at Mattel?

1    A    Absolutely bad judgment for him if he was working at

2    Mattel and was drawing Prayer Angel faces for MGA, even

3    though that was not part of his job; bad judgment.

4    Q    And it would be wrong for Paula Garcia, who became head

5    of this Bratz doll, to be requesting that, correct?

6    A    If she knew, I don't know if she did or Veronica

7    Marlow, so I am a little confused on that, but if she did

8    know that he was working at Mattel and asked her to do these

9    drawings, absolutely.  Shame on her.

10   Q    Those facts would be facts you would want to know, at

11   least consider, if you were going to judge whether or not

12   you are going to rely on Mr. Bryant's statements; would you

13   agree with that?

14   A    I wasn't judging him, Mr. Price.  He came in, he showed

15   the drawings, he said he did them in 1998.  We verified that

16   from lawyers.  We negotiated with him hard, back and forth.

17   The whole deal almost fell through as we saw when Carter

18   Bryant and Paula Garcia testified.  We finally made a deal

19   with him on October 4th, and we moved from there.

20        I did not know, nor did I go and check and see did he

21   do the face drawing for Prayer Angel, I did not do any of

22   that.

23   Q    You did speak with Paula Garcia throughout September?

24   A    Yes, I did talk to her.

25   Q    And your testimony was --

```
 1   A     About what?  Talking to her, I mean, how are kids or

 2   are you talking about that?

 3   Q     You had frequent conversations with her in --

 4   A     Yes.

 5   Q     And she was working for you at the time?

 6   A     Yes.

 7   Q     And one of the things she was focusing on at that time

 8   was Bratz?

 9   A     When?  In September?  Yes.

10   Q     September of 2000?

11   A     Right.

12   Q     And your understanding is she was giving you all of the

13   relevant facts she had about Mr. Bryant about Bratz,

14   correct?

15   A     I'm sorry?

16   Q     You would have expected Ms. Garcia to tell you about

17   what was happening with the development of Bratz in

18   September, correct?

19   A     Well, in September, yes, she was.  She was telling me

20   that they -- based on my direction, because I never thought

21   those dolls -- those drawings, you can just go ahead and

22   magically give it to a factory and make them a doll that

23   looked like a production Bratz dolls that came out.

24         I mean, you saw Lily Martinez's drawing and what came

25   out of that, so I had a concern that if you are going to
```

1    make dolls that would look like Bratz that you can sell, and

2    she said she wanted to do some exploration, and I said go

3    ahead.

4    Q    And are you saying she didn't tell you she was using

5    Carter Bryant to do that in September?

6    A    She did not.

7    Q    She, at one point, did tell you that Mr. Bryant had

8    been working an average of four hours a day on Bratz in

9    September, correct?

10   A    I saw an e-mail to that, and you should please take a

11   look at it and show the jury what I said on top of that

12   e-mail, and that's before you showed me.

13   Q    Well, let me ask you this:  Mr. Bryant was to get

14   advances, correct?

15   A    Yes.

16   Q    He wasn't supposed to get paid by the hour, correct?

17   A    Yes.  No, not by the hour, correct.

18   Q    So it really wouldn't have mattered to you in terms of

19   paying him whether or not he worked four hours or 50 hours,

20   correct?

21   A    After the date of the contract.  After the date of the

22   contract.  After October 4, 2000.

23   Q    So I'll rephrase.

24       After October 4, 2000, it wouldn't matter to you one

25   way or the other whether he was working four hours or 15

1    hours in terms of compensation?

2    A    No, he didn't, but I expected him after October 4,

3    2000, to work really hard to make this happen.

4    Q    But in terms of how much he should be paid, how many

5    hours he worked after he signed the contract would not

6    matter to you, correct?

7    A    That's correct.

8    Q    So if you could look at, I think it's Exhibit 305.

9    A    Yes, go ahead.

10   Q    And you see this is an e-mail string which was between

11   you and Ms. Garcia and Mr. -- I'm sorry, you and Ms. Garcia

12   and Miss O'Connor, correct?

13   A    And Dennis Medici, yes.

14          MR. PRICE:  If we can blow up the top down to --

15   one more, if you can, so I can get this in context.

16   BY MR. PRICE:

17   Q    So this string was forwarded to you after the second

18   from the top e-mail, correct?

19   A    I'm sorry?  The e-mail starts from the bottom and goes

20   up.  When I say from the date he signed the contract is the

21   last e-mail.

22   Q    So --

23   A    You see that at the top?

24   Q    Yes.  So let's go through that.

25          Do you see the bottom of what we've blown up here,

1    there's an e-mail from Ms. O'Connor to Ms. Garcia?

2    A    Yes.

3    Q    "Please let me now how many hours Carter has worked and

4    the day he started meetings with you, thanks"; do you see

5    that?

6    A    I'm sorry?  The e-mail starts from the bottom, Dennis

7    Medici to Victoria --

8    Q    Right.

9    A    -- right?

10        That's not what you read.

11   Q    I was reading the second from the bottom.  If you'd

12   like us to start at the bottom, we can.

13   A    Okay.  I think we should.

14   Q    Okay.  So the bottom one is from Mr. Medici to

15   Ms. O'Connor, "Victoria, please reply what amount we should

16   pay Carter and have Isaac approve, thanks"; do you see that?

17   A    I do.

18   Q    Okay.  And now let's go to what we were looking at.

19   And it's Ms. O'Connor to Ms. Garcia, "Please let me know how

20   many hours Carter has worked and the day he started meetings

21   with you, thanks"; do you see that?

22   A    I do.

23   Q    And you read this when you got the e-mail, correct?

24   A    I read the last e-mail.  I'm not copied in this e-mail,

25   if you look at it.

1    Q    No, but the whole string is forwarded to you.

2    A    Yes, but it's a little confusing.  On October 10, 2000,

3    at 8:11 a.m., I am not copied on that e-mail, so I didn't

4    see that e-mail.

5    Q    This entire string is copied to you.

6    A    It is copied to me, but my focus was -- I guess maybe I

7    misunderstood.  I apologize.

8    Q    Okay.

9    A    If I were just -- you were asking me -- my mind was if

10   I had seen the e-mail of October 10th, 2000, at 9:02 a.m. or

11   the one below it.

12   Q    Well, the one I just read, "Please let me know how many

13   hours Carter has worked the day he started meetings with

14   you," that was forwarded to you?

15   A    That's correct.

16   Q    And then we get Ms. Garcia to Ms. O'Connor, "I would

17   say that Carter has worked an average of about four hours a

18   day, and we began working on this line the first part of

19   September"; do you see that?

20   A    I do.

21   Q    And that's the day he first started meeting with

22   Ms. Garcia, to your understanding, correct?

23   A    Yes.

24   Q    And when you see "an average of about four hours a

25   day," if you took out a day from that --

1    A    Yes.

2    Q    -- you would still read that to be an average,

3    correct?

4    A    What?

5    Q    If you took out the words "a day" -- do you remember

6    Ms. Garcia said she didn't mean to write down "a day"?

7    A    Yes.

8    Q    If you took those words out, it would still be

9    referring to an average, correct?  You would still be saying

10   that he worked an average of about four hours; do you see

11   that?

12   A    So are we now into removing words, adding words back in

13   this case?  I mean, is that how we are going to do it?

14   Q    I didn't mean to.

15   A    Well, you mean to.  You asked me to.

16   Q    Let me ask you this:  Your understanding is that an

17   average means more than one?

18   A    Yes.

19   Q    Okay.  And then you go up and it says, "Do you want to

20   start his salary for the month of October since he began in

21   September"; do you see that?

22   A    Victoria says to me, yes.

23   Q    And at this time when you looked at this, you looked at

24   both Ms. Garcia's statement, "He was working four hours a

25   day beginning the first part of September," and then

1    Ms. O'Connor saying, "So when should we start his salary

2    since he began working in September," right?

3    A    No, Mr. Price.  I get, unfortunately, still today, 400

4    to 500 e-mails a day, and I didn't go all the way down.  I

5    just put one sentence at the top, "From the date he signed

6    the contract," and --

7    Q    And that wasn't -- I'm sorry.

8    A    -- and that's what I replied to.  I replied to, "Do you

9    want to start his salary from the month of October since he

10   began in September?  Please advise."  That's what I focused

11   on, and my answer was --

12   Q    We'll highlight that, too, if you'd like, "From the

13   date he signed the contract," correct?

14   A    Right, correct.  Please highlight that.

15   Q    We did.  We can see it.

16   A    Well, okay.

17   Q    But you read at least, then, the e-mail underneath it,

18   correct?

19   A    I did not.  Again, as I told you, I get 400 to 500

20   e-mails.  I have, unfortunately, attention deficit disorder,

21   and I don't read all long e-mails.  I just pay attention

22   quickly and move on.

23   Q    Okay.  Well, I'm just talking about the one at the top.

24   You've had to have read that to respond.

25   A    No.

1    Q    How would you know to say "From the date he signed the

2    contract" if you didn't know what the question was

3    underneath it?

4    A    Because he was not supposed to do -- did not do, in my

5    mind, any work for MGA.  We had no agreement, no deals with

6    him until October 4.  I negotiated personally with him on

7    October 3rd, and I said we're going to walk, and I was not

8    going to pay this guy for any work because he could have

9    just walked away.  We almost did on October 3rd.  Actually,

10   even during the morning time of October 10 -- 4, and I was

11   not going to pay him until we had a contract.  We are not

12   running a charity.

13   Q    Mr. Larian, if we -- we blacked out everything but your

14   response.  I mean, just it wasn't there.

15   A    Why would you want --

16   Q    The only thing -- the only thing there was "From the

17   date he signed the contract."

18   A    Mr. Price, I'm not going to argue with you.  You want

19   to now black out things, take this word out, take that word

20   in; that's this e-mail.  It is there.  We -- we produced

21   that to you, and the facts are there, and this is before

22   four years -- more than four years before you sued me.  I

23   destroyed my family, four years before, and I put in

24   there -- I didn't put that for your sake.  I put in there

25   "From the date he signed the contract."

1    Q    This was actually -- as you said, this was created

2    before there was a dispute on Bratz between Mattel and MGA,

3    correct?

4    A    Yes.

5    Q    So this wasn't your trying to position yourself in this

6    litigation, correct?

7    A    Never I was going to position myself for this

8    litigation.

9    Q    So what I'm asking you is you said you wrote the

10   response without reading the e-mail before it, but that's

11   kind of impossible, isn't it, because you are responding to

12   the question?

13   A    Okay, whatever you say.  It is not impossible.  This is

14   what I did, but if you want it to be impossible in your

15   mind, go ahead.

16   Q    Well, Mr. Bryant wasn't paid a salary; you agreed with

17   that, right?

18   A    He was not paid a salary.

19   Q    And certainly as of October 10, 2000, you knew that he

20   began working for MGA --

21   A    I'm sorry?

22   Q    Let me finish the question.

23   A    Yes, because I lost your question.  Go ahead.

24   Q    Certainly as of October 10, 2000 --

25   A    Right.

1    Q    -- you knew that by just looking at the e-mail

2    underneath your reply that he began in September; do you see

3    that?

4    A    No.  He began -- they were saying that they want to pay

5    him from September where he was pitching his idea and

6    helping with the exploratory wax model that they did, and I

7    said "no," and I said "no" before you sued me, before there

8    was a Bratz, before you killed my father.

9              MR. PRICE:  Your Honor, I move to strike.

10             THE COURT:  Strike the last portion of the answer,

11   Counsel.

12             Ladies and gentlemen, you are to disregard that

13   comment.

14   BY MR. PRICE:

15   Q    You testified a little while ago that it was your view

16   that if an employee --

17   A    I apologize.  I lost my -- my composure.

18   Q    You testified a little while ago that your view was

19   that if an employee, a designer, created designs in

20   connection with the toy business on the weekends and at

21   night on his own time, your view was that it did not belong

22   to his employer; is that correct?

23   A    Can you repeat that question again?

24   Q    I think earlier you said, you know, when I was asking

25   you about whether it mattered to you what Ms. Hwang

1   conveyed, you said, in your mind, if a designer or an

2   employee created things related to his business on the

3   weekends or at night or on his own time, that did not belong

4   to the employer; did you say that?

5   A   I'm sorry, I am not getting you.  If what I have said

6   before --

7   Q   If you didn't understand it, let me -- let me try to --

8   to hone in on this.

9        Now, at the time Mr. Bryant came to you and presented

10  the designs, you already had Mattel employees at MGA; that

11  is, employees who had formally worked at Mattel and had

12  joined MGA?

13  A   You mean, people that worked at Mattel at one time that

14  were either fired or laid off or they -- we recruited to

15  come to MGA, if that's what you are talking about, yes, we

16  had.

17  Q   For some reason they left Mattel and came to MGA,

18  correct?

19  A   Yes.

20  Q   You had -- is it Kami Gillmour?

21  A   Yes.

22  Q   You had Paula Garcia?

23  A   Yes.

24  Q   And they both signed MGA's confidentiality and

25  invention agreements, correct?

1    A    They did.

2    Q    And if we can show you Exhibit 13620.

3    A    Go ahead.

4    Q    And if you'd look at the last page --

5    A    Yes, that's my signature.  Go ahead.

6    Q    Okay.  That's your signature on this confidentiality

7    and inventions assignment agreement that Ms. Gillmour

8    signed, correct?

9    A    Yes, it is.

10          MR. PRICE:  Your Honor, I move 13620 into

11    evidence.

12          THE COURT:  Received.

13          *(Plaintiffs' Exhibit No. 13620 is received in*

14    *evidence.)*

15    BY MR. PRICE:

16    Q    And at the top, you see, there, it says

17    "Confidentiality and Inventions Assignment Agreement"; do

18    you see that?

19    A    Yes.

20    Q    And you had all of your employees sign these, correct?

21    A    I am not sure if we had all of our employees, but we

22    had, for sure, people in management, design, et cetera.

23    Q    By the way, previously you've testified that you didn't

24    remember if MGA even had this sort of contract, right?

25    A    That's correct, I did not remember.

```
1    Q    And this is one that, if we go to the last page, page

2    13620-003, that you signed?

3    A    I testified to that already.

4    Q    And if you could go up to the "Inventions Assignment,"

5    it's paragraph 1, it says, "Assignment of interest, employee

6    agrees to assign and does hereby assign the company all

7    interest which employee may have in all patentable and/or

8    not patentable ideas and/or inventions made or conceived by

9    employees solely or jointly with others during employee's

10   employment with the company.  This assignment shall not

11   apply to any idea or invention developed by employee

12   entirely on employee's own time without equipment, supplies,

13   facilities or trade secret information of the company unless

14   such invention or idea," paren, "relates to the business of

15   the company or to company's actual or anticipated research

16   or development"; do you see that up to that point?

17   A    I do.

18   Q    And you signed certainly more than one confidentiality

19   and employment agreement on behalf of MGA?

20   A    Yes.

21   Q    And you had other people, at some point, sign these

22   confidentiality and inventions agreements on behalf of MGA?

23   A    Yes.

24   Q    And if you could take a look at Exhibit 1117.

25   A    Yes, go ahead.
```

CV 04-9049-DOC - 02/08/2011 - Day 14, Vol. 2 of 3

93

```
1    Q    And do you see that is an offer of employment by Paula

2    Garcia and the confidentiality and inventions assignment

3    agreement that she signed; do you see that?

4    A    Yes.

5    Q    And if we could --

6          MR. PRICE:  Your Honor, I think this is in

7    evidence, 1117.

8          THE COURT:  It is, but just to be certain, it's

9    received.

10         MR. PRICE:  Thank you.

11         (Plaintiffs' Exhibit No. 1117 is received in

12    evidence.)

13   BY MR. PRICE:

14   Q    And if you'd go to 1117-005.

15   A    Yes.

16   Q    Do you see there is another paragraph, "Assignment of

17   Interest"; do you see that?

18   A    I do.

19   Q    And by the way, do you see at the end of the third

20   line, it says, "solely or jointly with others during

21   employee's employment with the company"; do you see that?

22   A    Yes.

23   Q    I mean, it doesn't say "during the period of

24   employment," it just says "during employee's employment,"

25   correct?
```

1    A    That's what it says.

2    Q    And your understanding is that doesn't make a

3    difference whether it says "during the period of employee's

4    employment," or "during employee's employment"?

5    A    No.  I disagree with you.

6    Q    Well, your understanding is that MGA's contracts

7    provide that if they do work on weekends and nights

8    pertaining to MGA's business, that under contract, that

9    belongs to MGA, correct?

10   A    No.  My understanding from this agreement and for

11   30-some years that I have been with this company is that we

12   don't own creative people.  They have a God-given gift.

13   It's like a piano player, and that's their gift.  We don't

14   own them because we pay them a salary, because we can fire

15   them any minute for any reason and no reason.  We just don't

16   own them.  They are not slaves.  And if they do things that

17   has nothing to do with their job on nights, weekends, when

18   they are in the shower, whether in Bermuda on vacation, we

19   don't own that, sir.  That's my understanding.

20        And again, we have not sued or enforced this contract,

21   even the way it is, on anybody, because I am the CEO of the

22   company, and I don't think we own people's ideas.  We own

23   (sic) people's minds, we own (sic) what's in their head

24   because we just happen to give them $5,000 a month in

25   salary, which we can lay them off and fire them at any time.

```
 1    That's my understanding.

 2    Q    You said, by the way, you haven't enforced the

 3    understanding that I've suggested.  It's true that this

 4    situation, that is where a designer says, "Oh, I came up

 5    with a toy design on nights or on weekends," this situation

 6    has never come up at MGA, correct?

 7    A    As a matter of fact it has, Mr. Price.

 8    Q    Was that after October 23, 2010?

 9    A    Yes -- no, not before -- before October 23, 2010.

10    Q    If you'd look at October 23, 2010, page 2453.

11    A    Go ahead.

12    Q    And actually, let's start at 2452 --

13             MR. PRICE:  We'll provide this to your Honor.

14    BY MR. PRICE:

15    Q    -- line 25, to 2453, line 23.

16             (Attorney discussion held off the record.)

17             THE WITNESS:  Go ahead.

18             THE COURT:  Not yet.  I need to make sure I read

19    everything, and until it's in front of the Court, there

20    won't be any further questions, and you don't need to supply

21    an answer.

22             All right, Counsel, the page again?

23             MR. PRICE:  It's 2452, your Honor, line 25 --

24             THE COURT:  2452, line 25.

25             MR. PRICE:  -- to 2453, line 23.
```

1              THE COURT:  Just a moment.

2              I don't see the discrepancy, Counsel.

3              MR. PRICE:  Well, the question is whether or not

4    he had ever been faced with that situation before.

5              THE COURT:  Well, no.  Just a moment, now.  Let's

6    not jump around.

7              Line 25 through 9, I don't see any contradictory

8    testimony.

9              MR. PRICE:  It's 2453, lines --

10             THE COURT:  Just a moment.  Now, 2453, I'll turn

11   to that page.  I don't see any contradictory testimony down

12   to line 9.

13             MR. PRICE:  Your Honor, it's down to line 23.  I'm

14   sorry.

15             THE COURT:  Line 23?  Just a moment.

16             And your question, once again?

17             MR. PRICE:  Whether he had been faced with the

18   situation of employees working outside of 9:00 to 5:00.

19             MS. KELLER:  Your Honor --

20             THE COURT:  Your answer, sir.

21             THE WITNESS:  That's not the question I

22   understood.

23             THE COURT:  I'm sorry?

24             THE WITNESS:  That's not the question I

25   understood.

```
 1              THE COURT:  He doesn't understand the question,

 2    Counsel.  Objection is sustained.

 3    BY MR. PRICE:

 4    Q    So if MGA employees do work outside of the 9:00 to 5:00

 5    time period --

 6    A    Right.

 7    Q    -- are you saying that even if it relates to MGA's

 8    business, those employees own that work?

 9    A    This is my understanding.  If it has nothing to do with

10    their line of work, it has nothing to do with -- like let's

11    take Carter Bryant, for example.  He was a fashion designer

12    hired at Mattel to work in Barbie Collectible and do fashion

13    designs for Barbie Collectible.  If he came tomorrow and

14    went home and designed a board game, I don't know about

15    Mattel, but if he was at MGA and this has happened, we would

16    say, "Okay, great.  This is your idea.  If we do it, we'll

17    pay you royalty.  If we don't do it, you can go and sell it

18    to somebody else," and this is exactly the situation that's

19    happened.

20    Q    Didn't you previous testify that you couldn't answer

21    that questions because you've never been faced with that

22    kind of situation, and you are not a lawyer --

23              MS. KELLER:  Objection, your Honor.  Misstates the

24    prior testimony.

25              THE COURT:  No.  Overruled.
```

1              You can answer that question.

2              THE WITNESS:  I have not been faced with the

3    situation where I had an employee who worked in Barbie

4    Collectible, that he had designed a concept on his own time

5    in 1998, when he was not working at Mattel, and goes to make

6    a better life for himself, and then he goes and licenses to

7    somebody else, and six years later, Mattel finds out that,

8    "Oh, boy, we have a problem because this is getting big, and

9    we are the big boys, so we are going to sue him and sue

10   MGA," I have never been faced with that position; never.

11             MR. PRICE:  Your Honor, I request to be able to

12   read 2453, lines 11 through 23.

13             THE COURT:  Counsel, that can be interpreted in

14   any way by either of the parties because there are two

15   answers, and it depends upon the question being asked.

16             So is there any objection of this being read by

17   either counsel?

18             MS. KELLER:  No, your Honor.

19             THE COURT:  Counsel?

20             MR. PRICE:  No objection.

21             THE COURT:  I don't think there's any objection by

22   either counsel, so let's read the total portion, and that

23   way it won't be a mystery to the jury.

24             Counsel, read.

25             MR. PRICE:  By the total portion, you mean 2452,

1    line 2?

2            THE COURT:  Well, you are going to start, Counsel,

3    back, I believe, at 2453 (sic), question on line 25.

4            MR. PRICE:  Your Honor -- I'm sorry, there's

5    lines -- on 2453, it's lines 11 through 23.

6            THE COURT:  No.  It will start, Counsel, on page

7    2452, question at line 25 --

8            MR. PRICE:  I'll do that.

9            THE COURT:  -- so it's complete.

10           MR. PRICE:  I thought you said 2453, so --

11           THE COURT:  Well, I did, and I got confused,

12   Counsel, because I was jumping around two pages.

13           MR. PRICE:  Okay, 2452, line 25:  "Does MGA own

14   anything that its employees do during nights and weekends?"

15           Answer:  "My understanding is that we pay people

16   to work 9:00 to 5:00 on a particular job, and they do that

17   work, that belongs to MGA.  That's the only understanding I

18   have."

19       Question:  "So if MGA employees do work outside of the

20   9:00 to 5:00 time frame --"

21       Answer:  "Uh-huh."

22       Question:  "-- that' you're talking about, even if

23   relates to MGA's --"

24       Answer:  "Uh-huh."

25       Question:  "-- business, those employees own that work,

Case 2:04-cv-09049-DOC-RNB   Document 9845   Filed 02/10/11   Page 100 of 123   Page ID #:297260
CV 04-9049-DOC - 02/08/2011 - Day 14, Vol. 2 of 3

100

1    correct?"

2        Answer:  "I can't answer that because we've never been

3    faced with that kind of situation, and I -- I'm not a

4    lawyer."

5    BY MR. PRICE:

6    Q    And if we look just at -- if we look at your contract

7    that we've been over, that's the ones with Ms. Garcia and

8    the ones with the -- with Kami Gillmour, the contract says

9    that if it relates to your business, if an employee comes up

10   with a design, it belongs to MGA even if they claim they did

11   in the shower before they came to work?

12   A    I don't find the word "shower" in here.  Maybe Ken can

13   highlight it.

14   Q    I'm asking you about your understanding.  Your

15   understanding is that what your contract says is that if a

16   design relates to your business, an employee who comes up

17   with a design, it still belongs to MGA even if they say they

18   did it, say, when they were in the shower before they came

19   to work; do you agree that that's what your contract

20   provides?

21   A    That's what the contract says.  My understanding of

22   this contract is that if an employee we hire, especially a

23   creative employee, and they do things on their own time that

24   doesn't relate to the specific job that they are doing, it

25   doesn't belong to MGA.

CV 04-9049-DOC - 02/08/2011 - Day 14, Vol. 2 of 3

101

1    Q    I think I missed your first answer.  I was asking a

2    specific question, and maybe you answered it, and that

3    was -- I was referring to the contract that you have with

4    your employees.

5    A    Yes.

6    Q    Do you agree that what your contract says is that if a

7    design relates to MGA's business, toys, and if an employee

8    comes up with a design relating to MGA's business, it still

9    belongs to MGA even if they say they did it in the shower

10   before they came to work?  Now, I'm asking you is that your

11   understanding what the contract says?

12   A    No, it's not my understanding.

13           MR. PRICE:  Your Honor, if we could turn to

14   June 5, 2008.

15           THE COURT:  What page, Counsel?

16           MR. PRICE:  It's page 1627, lines 19 through 24.

17           THE WITNESS:  Did you say line 9?

18           THE COURT:  Line 9 through 24.

19           MR. PRICE:  Line 19 through 24.

20           THE COURT:  Line 19 to 24.

21           MR. PRICE:  Yes.

22           THE WITNESS:  Okay.  Go ahead.

23           THE COURT:  All right.  You may read.

24           MR. PRICE:  Thank you.

25           Question:  "Now, you said regardless of the

 1   contract, you understand what your contract says is that if

 2   it relates to your business, an employee -- an employee

 3   comes up with a design, it still belongs to you even if they

 4   claim they did it in the shower before they came to work?"

 5        Answer:  "That's correct, that's what the contract

 6   says."

 7             THE WITNESS:  That's exactly what I just testified

 8   to.

 9             MS. KELLER:  Your Honor, could we have lines 11 to

10   18 just above that read?

11             THE COURT:  Certainly.  Why don't you both agree

12   to read lines 11 through 18, and if you want to make it a

13   complete reading, why don't you just go from 11 down to 24,

14   that way it will incorporate the whole portion.

15             MR. PRICE:  We'll do that, your Honor.

16             Question:  "That still belongs to you because they

17   are employed by you and it relates to your business, right?"

18             Answer:  "Again, my personal understanding is that

19   if somebody" --

20             THE COURT:  No, Counsel, "Again, my own personal

21   understanding."

22             MR. PRICE:  Sorry.

23             "Again, my own personal understanding is that if

24   somebody is working on Saturday or Sunday" --

25             THE COURT:  No.  Just a moment.  "Is working home

 1    on Saturday."  Let's start again, rereading.

 2              MR. PRICE:  Yes.

 3              Question:  "That still belongs to you because

 4    they're employed by you and it relates to your business,

 5    right?"

 6              Answer:  "Again, my own personal understanding is

 7    that if somebody is working home on Saturday or Sunday, they

 8    are not getting paid for Saturday and Sunday.  This is my

 9    own personal understanding, regardless of this contract,

10    that if they do something on the weekends, on their own

11    time, that belongs to them.  I don't own the people because

12    they just work for me."

13        Question:  "Now, you said regardless of the contract,

14    you understand that -- you understand what your contract

15    says is that if it relates to your business, an employee --

16    an employee comes up with a design, it still belongs to you

17    even if they claim they did it in the shower before they

18    came to work?"

19        Answer:  "That's correct, that's what the contract

20    says."

21    BY MR. PRICE:

22    Q    So correct me if I'm wrong, Mr. Larian, what you

23    testified to as your personal understanding -- and let me

24    back up.  You testified about your personal understanding

25    obviously after this lawsuit, correct?

1   A     Are you talking about this, here?

2   Q     Yes, here.

3   A     I don't know the date of this.

4   Q     This is June 5, 2008.

5   A     Yes, I -- I read the date, but I testified this

6   June 2008 is years after he sued me, correct.

7   Q     And at that point, the time you testified, you realized

8   that Mattel was taking the position that if a designer comes

9   up with a design relating to its business, that under its

10  contracts, those designs belong to Mattel; you understood

11  that Mattel was taking that position, correct?

12  A     Yes, that's Mattel's position.

13  Q     And -- and knowing that, you testified that your

14  personal understanding was what we just read, correct?

15  A     Yes.

16  Q     But if you just looked at the contract, the contract

17  says that if designs relate to your business, even if an

18  employee comes up with it in the shower, it belongs to MGA;

19  that's what your contract says.

20          MS. KELLER:  Objection, your Honor.  Calls for a

21  legal opinion of Mr. Larian's --

22          THE COURT:  Overruled.  I'll let him state what he

23  believes his own contract states.

24          THE WITNESS:  Yes, the contract states what I can

25  read and you can read and everybody else can read, but my

Case 2:04-cv-09049-DOC-RNB   Document 9845   Filed 02/10/11   Page 105 of 123   Page ID #:297265
CV 04-9049-DOC - 02/08/2011 - Day 14, Vol. 2 of 3

105

1    understanding is what I testified to.

2    BY MR. PRICE:

3    Q    Now, as -- as the CEO of MGA, you had employees come to

4    you and say, "Hey, I did this design," correct?

5    A    I'm sorry?

6    Q    Sure.  As the CEO of MGA, you've had employees come to

7    you and present designs to you, correct?

8    A    Yes.

9    Q    And these are employees whose job it is to do designs,

10   right?

11   A    Yes.

12   Q    Now, whenever they've done that, have you ever asked

13   them, "Hey, did you do this on nights and weekends?"

14   A    No, I did not.

15   Q    And in fact, in 2006, a couple years before you gave

16   this testimony, you said you didn't even remember if MGA had

17   contracts at all, correct?

18   A    That's correct.

19   Q    Now, I want to get back to -- I want to get back to

20   your understanding about what Mr. Bryant told you with

21   regards to when he created these -- these designs, these

22   drawings, okay?

23   A    Go ahead.

24   Q    Now, at the time when you had Exhibit 302, you saw that

25   on the first page --

CV 04-9049-DOC - 02/08/2011 - Day 14, Vol. 2 of 3

106

```
1    A    I'm sorry, there are so many exhibits.  I got 26

2    binders over the weekend to read, so I didn't memorize all

3    of the exhibits.  I apologize.

4    Q    This one we are putting up, but we'll give you the hard

5    copy as well.

6    A    I don't know if this is Exhibit 302 or 3002.

7    Q    I understand that.

8         So if we look at the front page of 302 --

9    A    Yes, go ahead.

10   Q    You see it has the copyright date of 2000 on it; do you

11   see that?

12   A    Yes, I do.

13   Q    Now, it obviously would be important to you, if you're

14   discussing it with your attorney, that Mr. Bryant said he

15   did things in 1998, that would be an important fact,

16   correct?

17   A    That he did it in 1998, that was an important fact.

18   Q    And, obviously, if you were seeking advice of your

19   counsel, that's something you would relay to them, correct?

20   A    Relate what, that he did them in 1998?

21   Q    Yes, that he told you that.

22   A    Yes, and we did relay that.

23   Q    And as of -- well, Mr. Bryant never told you that he

24   designed or developed Bratz during his free time outside

25   Mattel on nights and weekends, correct; he never, ever told
```

Case 2:04-cv-09049-DOC-RNB   Document 9845   Filed 02/10/11   Page 107 of 123   Page ID #:297267
CV 04-9049-DOC - 02/08/2011 - Day 14, Vol. 2 of 3

107

1    you that?

2    A    What I remember, Mr. Price, more than -- is it 10, 11

3    years ago?  I've lost track, now.  I asked him, "When did

4    you do this?  Did you do this part of your work at Mattel?"

5    And he told me, "No.  I did this in 1998 when I was not

6    working at Mattel.  I was living in Missouri."  And I

7    believed him then, and I believe him now.  He's a broke man.

8    When after his testimony, did you know that he went to the

9    airport and had a stroke?  He was not lying.

10             MR. PRICE:  Your Honor -- your Honor, this is --

11             THE COURT:  We are going to sustain the objection,

12   Counsel.  We are going to strike the last portion.

13             I don't know that Mr. Bryant had a stroke or not.

14   In fact, I believe he may even be returning to court.  So

15   we'll strike the last portion.  I don't know what his

16   condition is, if he even has a serious condition or not.

17             Counsel?

18             MR. PRICE:  Thank you.

19   BY MR. PRICE:

20   Q    Mr. Larian, let me ask the question this way:  Did

21   Mr. Bryant ever say to you, in words or substance, that he

22   designed and developed Bratz during his free time outside

23   Mattel on weekends or evenings?

24   A    I don't recall that.

25   Q    You say "I don't recall."  Is the answer no, he --

Case 2:04-cv-09049-DOC-RNB   Document 9845   Filed 02/10/11   Page 108 of 123   Page ID #:297268
CV 04-9049-DOC - 02/08/2011 - Day 14, Vol. 2 of 3

108

1    A    The answer is I don't recall.

2           MR. PRICE:  And in that case, your Honor, I'd

3    like --

4    BY MR. PRICE:

5    Q    Mr. Larian, if you'd look at October 23, 2010, and

6    Ms. Juarez can show you that, and I'm going to be asking you

7    to look at page 2412, lines 16 through 25.

8           Have you seen that --

9           THE COURT:  Just one moment, Counsel.

10          MR. PRICE:  Yes.

11          THE COURT:  All right.  Thank you.

12   BY MR. PRICE:

13   Q    Mr. Larian, did you look at that?

14   A    I did.

15   Q    And does that refresh your recollection that Mr. Bryant

16   never said to you, in words or substance, that he designed

17   or developed Bratz in his free time outside of Mattel on

18   weekends or evenings?

19   A    No.  By that time, Mr. Zeller had taken my deposition

20   more than 10 times and asked the same question over and over

21   again, and I just was tired, and this is what I answered;

22   same question over and over and over and over again.

23   Q    This is a transcript from October 23 --

24   A    It is.

25   Q    And you had the chance to meet with your counsel

1   afterwards, correct?

2   A     Yes.

3   Q     And these are made up in little booklet's that have the

4   questions and answers?

5   A     They are.  I have this many of them (indicating).

6   Q     And this has been over a seven-year period; is that

7   right?

8   A     Yes.

9   Q     And you know that you have the opportunity afterwards

10  to go over these with your counsel and correct any

11  misstatements, right?

12  A     Yes, and I did didn't do that.

13  Q     On any of them?

14  A     I don't remember if I did or not, frankly.

15  Q     Well, certainly on what you just read, you didn't

16  correct?

17  A     That's correct.

18  Q     And in fact, you were -- you were pretty emphatic about

19  it, the answer, weren't you?

20  A     What's the meaning of "emphatic"?  I'm sorry, I'm a

21  foreigner.  I was born not in this country.  What does the

22  word "emphatic" mean?

23  Q     Sure.  When you answered, you were -- you were certain

24  about your answer?

25  A     I gave that answer, and I did not go and correct it.

Case 2:04-cv-09049-DOC-RNB   Document 9845   Filed 02/10/11   Page 110 of 123   Page ID #:297270
CV 04-9049-DOC - 02/08/2011 - Day 14, Vol. 2 of 3

110

```
 1              MR. PRICE:  Your Honor, if we could read 2412, 16

 2    through 25?

 3              THE COURT:  You may.

 4              MR. PRICE:  Question:  "Did Mr. Bryant say to you,

 5    in words or substance, that he designed or developed Bratz

 6    during his free time outside of Mattel on weekends or

 7    evenings?"

 8              Answer:  "No."

 9              Question:  "I'm sorry?"

10              Answer:  "No, not that I recall him ever saying

11    that."

12    BY MR. PRICE:

13    Q    Now, I'd like you to look, now, at Exhibit 9855.

14    A    Go ahead.

15    Q    Do you recognize that?

16    A    Yes, that's my e-mail.

17    Q    And this is an e-mail between you and Patty Glaser at

18    the Christensen White Law Firm, correct?

19    A    Christensen White?  I don't remember.  I think it's

20    Christensen Glaser, whatever, yes, but it's Patty Glaser.

21    Q    And this is June 29, 2001?

22    A    It is.

23    Q    And Ms. Glaser is your attorney, correct?

24    A    She is, and a personal friend.

25    Q    And this e-mail, 9855, is an e-mail which Mattel didn't
```

```
1    see until 2010, correct?
2             MS. KELLER:  Objection.  Relevance, your Honor.
3             THE COURT:  Overruled.
4             THE WITNESS:  I don't know when he saw it.
5    BY MR. PRICE:
6    Q    Well, isn't it correct that you thought at the time you
7    wrote this that no one else would see this except for your
8    counsel?
9    A    I'm sorry?  When I wrote this, of course I only sent it
10   to her, so it's logical that she is the only one who saw it.
11   I didn't send it to you.
12   Q    And you put on this e-mail "attorney-client privilege,"
13   correct?
14   A    Yes, I did.
15   Q    So if someone ever sued you or asked for the document,
16   you would say you can't have it, it's privilege?
17            MS. KELLER:  Objection.  Improper comment on
18   "privilege," your Honor.
19            MR. PRICE:  I am just asking about this document.
20            MS. KELLER:  Objection.  Improper comment on
21   this --
22            THE COURT:  Well, the difficulty is that attorneys
23   really decide and make representations to the Court about
24   documents that are confidential, and there is an
25   attorney-client privilege just like a clergy privilege, just
```

Case 2:04-cv-09049-DOC-RNB   Document 9845   Filed 02/10/11   Page 112 of 123   Page ID #:297272
CV 04-9049-DOC - 02/08/2011 - Day 14, Vol. 2 of 3

112

```
 1     like a marital privilege.  In other words, there's certain

 2     things that the law really decides are somewhat confidential

 3     for a lot of decent and good policy reasons that the

 4     legislature sets forth.

 5             I don't want you to assume with any of these

 6     witnesses that in particular -- this is a particular

 7     witness' decision.  It may be a decision of counsel.  It may

 8     be in good faith; it may not.  And therefore, if I allow

 9     this testimony, I don't want this testimony to reflect on

10     Mr. Larian's personal decision about when this document

11     became known to either of the parties or both of the

12     parties.

13             Now, that's very complicated.  Lawyers go to law

14     school for three years to learn that simple statement.

15             Now, Counsel, if you can approve upon that, I

16     invite you to tell me how.

17             (Laughter.)

18             THE COURT:  Therefore, they can't.

19             Now, ask your question.

20             MR. PRICE:  Your Honor, I move Exhibit 9855 into

21     evidence.

22             THE COURT:  It's received.

23             (Plaintiffs' Exhibit No. 9855 is received in

24         evidence.)

25             MR. PRICE:  If we could show that.
```

```
 1    BY MR. PRICE:

 2    Q    So Mr. Larian, you do have an understanding that Mattel

 3    did not have this document until this year, correct?

 4              MS. KELLER:  Objection.  Misstates the evidence,

 5    your Honor.

 6              THE COURT:  Well, I'm not certain about the actual

 7    date, so why don't I discuss this at side bar with both of

 8    you, as a courtesy.  This will be one of the few side bars

 9    we take.  In fact, one of you said that you had an

10    appointment today, and by agreement of the jury, you needed

11    to recess at 4:00; was that the agreement?  Is that what

12    Cathy's telling me?

13              THE JUROR:  4:00 or 4:15 or -- I mean, whenever we

14    have six hours, that's fine.

15              THE COURT:  Okay.  Just a moment.

16              Counsel, can I see you for just a minute?

17              Why don't you visit amongst yourselves, you can

18    stand up if you'd like to, do 10 jumping jacks.  We'll be

19    right back.

20              (Laughter.)

21              (The following proceedings is taken outside

22         the presence of the jury at side bar.)

23              THE COURT:  All right.  Counsel?

24              MS. KELLER:  Your Honor --

25              THE COURT:  One counsel.
```

CV 04-9049-DOC - 02/08/2011 - Day 14, Vol. 2 of 3

114

```
 1              MS. HURST:  The document was inadvertently

 2    produced years ago, and that's why there were multiple

 3    motions -- part of the reason why there were multiple

 4    motions on crime fraud and other grounds even before the

 5    last trial.

 6              THE COURT:  That's correct.  Now, it's the year

 7    that's causing the problem.  Whether it's intentional or

 8    inadvertent, this is what I warned all counsel about.  This

 9    is what discovery uses for both sides, and I can make quite

10    a record concerning both sides, and come back to haunt you.

11    And therefore, I think that the proper question is, years

12    after, but not 2010.  It was inadvertently disclosed I think

13    sometime in 2007 --

14              MS. HURST:  I believe that's correct.

15              THE COURT:  I believe that that's the correct

16    date.

17              MR. QUINN:  Your Honor, that's not our

18    understanding and recollection.  We believe it was produced

19    as a result of the Court's order that there had been a

20    waiver of privilege on --

21              THE COURT:  It was.

22              MR. QUINN:  -- on related e-mails.

23              THE COURT:  It was by this Court.

24              MR. QUINN:  By this Court.

25              THE COURT:  But there was also an inadvertent
```

1    disclosure earlier.  That's my understanding.

2         Now, I think we can get around this by simply

3    saying "many years later," or whatever.  And I think we're

4    quibbling whether it's 2010 other 2007, quite frankly.

5         MR. PRICE:  That --

6         THE COURT:  Now, we can examine that this evening,

7    but I think you can ask the question, and we can move on.

8    And if I'm wrong, we can go back tomorrow and say 2010.  I

9    think he'll be back on the stand for a while.

10        MR. PRICE:  Can we say years after the lawsuit --

11        THE COURT:  Pardon?

12        MR. PRICE:  Can we say years after the lawsuit

13   that this --

14        THE COURT:  Well, absolutely.  Of course.  In

15   other words, the only quibbling is whether it's 2007, and it

16   was inadvertently disclosed with a clawback effort --

17        MR. QUINN:  Right.

18        THE COURT:  -- or whether it was disclosed in

19   2010.  Mr. Quinn is right that it was disclosed to this

20   Court in 2010 after a series of motions, but it was known to

21   the parties, I believe, as early as 2007.  So therefore, you

22   are both right, and unless we are going to get into how that

23   came about, because if I open up the door there -- I think

24   it will be interesting on the other side, too.  So I just

25   ask you both to proceed with caution, so we don't go in way

```
 1    of sanctions, which I haven't imposed at this point by both
 2    parties.
 3               (The following proceedings is taken in the
 4         presence of the jury.)
 5               THE COURT:  All right.  We are back on the record.
 6    BY MR. PRICE:
 7    Q    Mr. Larian, are you looking at 9855?
 8    A    I have.
 9               THE COURT:  And Counsel, why don't we just
10    disclose the two years in dispute.  Do you want to do that
11    and clear that up tomorrow?
12               MR. PRICE:  That's fine.
13               THE COURT:  The dispute between the parties is
14    whether it came to the parties in 2007 or 2010.  I can look
15    back in the record tonight, but this document came to the
16    parties possibly as early as -- well, as late as 2007 or as
17    late as 2010, and I need to look at the record, but
18    regardless, it doesn't matter because it's after 2001,
19    obviously, and after the lawsuit.  I think counsel will
20    discuss dates.
21               Counsel?
22    BY MR. PRICE:
23    Q    And if we look at what you say in here, and it says,
24    "attorney-client privilege, Carter," paren, "the inventor,
25    has a roommate," paren, "Richard, who witnessed Carter
```

1    designing and developing the Bratz line at his free time

2    outside of Mattel on weekends or evenings"; do you see that?

3    A     I do.

4    Q     And incidentally, in this e-mail to your counsel, you

5    refer to Mr. Bryant, Carter Bryant, as being the inventor;

6    do you see that?

7    A     I do.

8    Q     And is there anything -- when you say that, you're

9    talking about the inventor of Bratz, correct?

10   A     No.  I'm talking about in the industry.  When somebody

11   brings you a design in the toy industry, usually they call

12   them an inventor.  He was the inventor of those drawings,

13   there is no question about it.  And he had a lot of input in

14   what happened and how Bratz came out, there is no question

15   about it.  But the inventor of Bratz, the company that put

16   their money and sole behind it was MGA.

17   Q     I believe you just testified that in the industry, the

18   inventor refers to someone who just brings you designs.  Is

19   that what you said about the understanding in the industry

20   as to what the inventor means?

21   A     No.  In the -- in the industry, when somebody in the

22   toy industry, when somebody brings you a toy concept and it

23   can have different forms, they usually refer to them as an

24   inventor.  And there is no question that Carter Bryant was

25   one of the inventors of Bratz, there is no question.  I am

Case 2:04-cv-09049-DOC-RNB   Document 9845   Filed 02/10/11   Page 118 of 123   Page ID
#:297278
CV 04-9049-DOC - 02/08/2011 - Day 14, Vol. 2 of 3

118

1    not disputing it.

2    Q    But -- I just want to make sure that what you are

3    testifying is that in the industry, the understanding is

4    that the inventor only covers someone who presents design?

5    A    No, that's not what I'm saying.

6    Q    But I think you said there is industry understanding as

7    to what "inventor" means, so I'd like you to tell us what

8    your understanding is of what that means in the industry?

9    A    I just testified what I meant.  What portion do you

10   want me to say again?

11   Q    Well, apparently I misheard you because I tried to ask

12   you a leading question.  So I'm just giving you the

13   opportunity to tell the jury what the industry standard is,

14   what does it mean in the industry when you refer to someone

15   as the inventor?

16   A    Usually when they bring you a concept and you sign

17   that, and you have a contract with them for that concept,

18   they're referred to as an inventor or designer for the

19   product.

20            THE COURT:  Counsel, concerning the date that this

21   came to the parties, upon further reflection, you can use

22   the word "2010."

23   BY MR. PRICE:

24   Q    Mr. Larian, is it correct that this e-mail was not

25   produced in this litigation until 2010?

Case 2:04-cv-09049-DOC-RNB   Document 9845   Filed 02/10/11   Page 119 of 123   Page ID #:297279
CV 04-9049-DOC - 02/08/2011 - Day 14, Vol. 2 of 3

119

1    A    I don't know.

2    Q    Is it your understanding that this e-mail was not

3    produced until after the trial that we've referred to in

4    2008?

5    A    No, that's -- I don't have an understanding.  Maybe I'm

6    confused, but I think there was an e-mail something like

7    that in the first trial that you guys had received.

8    Q    And this particular e-mail where you say Mr. Bryant has

9    a roommate who witnessed Carter designing and developing the

10   Bratz line at his free time outside Mattel on weekends or

11   evenings, that's a different story than what Mr. Bryant told

12   you, isn't it?

13   A    No, he did not.

14   Q    Well, you said -- you've told us that Mr. Bryant told

15   you he did it in 1998, correct?

16   A    Yes.

17   Q    And that he never told you that he designed and

18   developed the Bratz line at his free time outside of Mattel

19   and weekends, that's your prior sworn testimony, correct?

20   A    He told me he did this in 1998 in Missouri on nights

21   and weekends when he was not working for Mattel, and during

22   the day he was working for Old Navy.  This is what he had

23   said, and I will now testify to that more than a hundred

24   times, I believe.

25   Q    So your testimony is in this document where you say,

1    "Carter has a roommate, Richard, who witnessed Carter

2    designing and developing the Bratz line at his free time

3    outside Mattel on weekends or evenings," your testimony is

4    that that is referring to 1998 when he worked at Old Navy?

5    A    Yeah, that was my understanding as of June 29, 2001,

6    when I wrote this e-mail.  This is October -- nine months

7    after we had already signed the contract and we had a deal

8    going on, and I remember exactly what happened.  We were out

9    to a dinner party to somebody's birthday, and Richard -- I

10   forgot his last name -- said that.  And I knew they were

11   roommates, so --

12   Q    So when you wrote to your attorney, when you said

13   outside Mattel, you meant at old Navy; that's what you just

14   testified to, right?

15   A    No, sir, that's not what I testified to.  I testified

16   that he did this in 1998 in Missouri when he was not working

17   for Mattel, and during the day -- this is what he told me --

18   that he worked for Old Navy.

19   Q    Well, you'd agree that, if we look at this document,

20   certainly Old Navy in Missouri is over 1500 miles outside

21   Mattel, right?

22   A    I don't know how many miles it is, Mr. Price.

23   Q    And your testimony is that when you were writing this

24   to your attorney, what you meant to convey to her is that

25   Mr. Bryant had a roommate who witnessed -- witnessed him

Case 2:04-cv-09049-DOC-RNB   Document 9845   Filed 02/10/11   Page 121 of 123   Page ID
#:297281
CV 04-9049-DOC - 02/08/2011 - Day 14, Vol. 2 of 3

121

1    designing and developing the Bratz line at his free time in

2    1998 outside his work at Old Navy?

3    A    What I was relaying to my lawyer, Patty Glaser, is what

4    Richard Irmen had told me.

5    Q    Well, you'll agree that this e-mail says nothing about

6    1998, correct?

7    A    Yes, it doesn't.

8    Q    And if you wanted to convey accurate information to

9    your lawyer, you'd tell her he said he did it in 1998,

10   correct?

11   A    I don't understand.  You know, I -- I relate to my

12   lawyer what Richard Irmen told me, and that's exactly

13   what's in here.  So you can put words I didn't say that.  I

14   didn't say that, you're right.  In this e-mail, I did not

15   say 1998.

16   Q    By this time, June 2001, you didn't think the 1998

17   story was going to fly, right?

18   A    What?

19   Q    You didn't think that anybody would believe the 1998

20   story in --

21            MS. KELLER:  Objection.  Misstates the evidence.

22            THE COURT:  Overruled.

23            THE WITNESS:  It was not a story.  He did this in

24   1998.

25

CV 04-9049-DOC - 02/08/2011 - Day 14, Vol. 2 of 3

122

1    BY MR. PRICE:

2    Q    And --

3    A    He testified that he did this in 1998.  His lawyer and

4    my lawyer confirmed that he did this in 1998.  He testified

5    here again, as a broken man, that he did it in 1998, and he

6    did it in 1998.  You can put all the spins in the world that

7    you want on it, that's not going to change.

8    Q    On June 29, 2001, there was no litigation between

9    Mattel and MGA concerning the origins of the Bratz doll,

10   correct, as of that date?

11   A    But you're right, it wasn't, but there were rumors that

12   Mattel was going to sue us.

13   Q    So Mattel sued you in 2004; is that right?

14   A    Actually, Mattel sued Carter Bryant in 2004, and then

15   later sued MGA two years later in 2006.

16              *(Live reporter switch is Denise Paddock.)*

17                          -oOo-

18

19

20

21

22

23

24

25

1                              -oOo-

2                         **CERTIFICATE**

3

4         I hereby certify that pursuant to Section 753,

5    Title 28, United States Code, the foregoing is a true and

6    correct transcript of the stenographically reported

7    proceedings held in the above-entitled matter and that the

8    transcript page format is in conformance with the

9    regulations of the Judicial Conference of the United States.

10

11   Date:  February 9, 2011

12

13

14        _____

                JANE C.S. RULE, U.S. COURT REPORTER
15              CSR NO. 9316

16

17

18

19

20

21

22

23

24

25