UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

HONORABLE DAVID O. CARTER, JUDGE PRESIDING

- - - - - - -

# CERTIFIED TRANSCRIPT

| | |
|---|---|
| MATTEL, INC., et al., )<br><br>                    Plaintiffs, )<br><br>          vs. )<br><br>MGA ENTERTAINMENT, INC., et al., )<br><br>                    Defendants. )<br>_____) | No. CV 04-9049-DOC (RNBx)<br>     Day 14<br>     Volume 3 of 3 |

REPORTER'S DAILY TRANSCRIPT OF REDACTED UNSEALED PROCEEDINGS
JURY TRIAL
SANTA ANA, CALIFORNIA
TUESDAY, FEBRUARY 8, 2011

Denise Paddock, CSR 10199, CMRS, RMR, CRR
Federal Official Court Reporter
United States District Court
411 West 4th Street, Room 1-053
Santa Ana, California 92701
transcripts@ocrecord.com www.ocrecord.com
020811 DCCD CR 9D CARTER MATTEL CIVIL JURY TRIAL DAY 14 V3
02/08/2011

**APPEARANCES OF COUNSEL:**

FOR PLAINTIFF MATTEL, INC., ET AL.:

      QUINN EMANUEL URQUHART & SULLIVAN LLP
      BY: JOHN QUINN
          WILLIAM PRICE
          MICHAEL T ZELLER
          Attorneys at Law
      865 S Figueroa Street, 10th Floor
      Los Angeles, CA 90017-2543
      213-443-3000

FOR DEFENDANT MGA ENTERTAINMENT, INC., ET AL:

      ORRICK HERRINGTON & SUTCLIFFE LLP
      BY: THOMAS S McCONVILLE
          Attorney at Law
      4 Park Plaza, Suite 1600
      Irvine, CA 92614
      949-567-6700

      - AND -

      ORRICK HERRINGTON & SUTCLIFFE LLP
      BY: ANNETTE L HURST
          Attorney at Law
      405 Howard Street
      San Francisco, CA 94105
      415-773-5700

      KELLER RACKAUCKAS LLP
      BY:  JENNIFER L KELLER
          Attorney at Law
      18500 Von Karman Avenue, Suite 560
      Irvine, CA 92612
      949-476-8700

UNITED STATES DISTRICT COURT

1   **APPEARANCES OF COUNSEL (Continued):**

2

3

4   FOR CARLOS GUSTAVO MACHADO GOMEZ:

5       LAW OFFICES OF MARK E OVERLAND
        BY: Mark E Overland
6           Attorney at Law
        100 Wilshire Boulevard, Suite 950
7       Santa Monica, CA 90401
        310-459-2830
8
        -AND-
9
        SCHEPER KIM AND HARRIS LLP
10      BY: ALEXANDER H COTE
            Attorney at Law
11      601 West Fifth Street, 12th Floor
        Los Angeles, CA 90071-2025
12      213-613-4655

13      ALSO PRESENT:

14      MGA ENTERTAINMENT, INC.
        BY: JEANINE PISONI
15          Attorney at Law
        16360 Roscoe Boulevard, Suite 105
16      Van Nuys, California 91406

17

18   ALSO PRESENT:

19          ISAAC LARIAN, MGA CEO

20          KEN KOTARSKI, Mattel Technical Operator

21          MIKE STOVALL, MGA Technical Operator

22          RACHEL JUAREZ, Quinn Emanuel Urquhart & Sullivan

23          KIERAN KIECKHEFER, Orrick Herrington & Sutcliffe

24          WARRINGTON PARKER, Orrick Herrington & Sutcliffe

25

UNITED STATES DISTRICT COURT

CV 04-9049 DOC - 02/08/2011 - Volume 3 of 3 - REDACTED UNSEALED

4

| | |
|---|---|
| 1 | SANTA ANA, CALIFORNIA; TUESDAY, FEBRUARY 8, 2011 |
| 2 | Day 14, Volume 3 of 3 |
| 3 | P.M. SESSION |
| 4 | **Isaac Larian**, |
| 5 | witness, called by Plaintiff(s), previously sworn |
| 6 | **DIRECT EXAMINATION RESUMED** |
| 7 | BY MR. PRICE: |
| 8 | Q.   So here we are in 2001 before there was a dispute, and |
| 9 | you were relaying to your attorney when Mr. Bryant designed |
| 16:01 10 | and developed the Bratz line; correct? |
| 11 | A.   I am relaying what Richard Irmen told me and I relayed |
| 12 | that directly to my lawyer. |
| 13 | Q.   And you're conveying the information as to when you're |
| 14 | saying Mr. Bryant came up with the Bratz designs, you're |
| 16:01 15 | relaying that in an e-mail that you marked "attorney-client |
| 16 | privilege"; correct? |
| 17 | A.   Yes.  The e-mail, it says "attorney-client privilege." |
| 18 | Q.   This is an e-mail that you thought would never see the |
| 19 | light of day; correct? |
| 16:01 20 | MS. KELLER:  Objection; improper comment on |
| 21 | assertion of the privilege. |
| 22 | THE COURT:  Well, the difficulty is aimed -- the |
| 23 | question is aimed at Mr. Larian. |
| 24 | Lawyers make those representations to the court and |
| 16:02 25 | therefore whether Mr. Larian is involved or not in that kind |

1    of conversation is a question for counsel to ask.  But you

2    are not to assume that Mr. Larian governed the assertion of

3    the attorney-client privilege based upon those questions.

4    Q.   BY MR. PRICE:  I'm just asking your understanding at the

16:02 5    time you wrote this.

6         Look at where it says "attorney-client privilege."

7    A.   Yes.

8    Q.   Who typed that?

9    A.   I did.

16:02 10   Q.   At the time you wrote this e-mail, June 29, 2001, you

11   never thought it would see the light of day; correct?

12   A.   I never thought it will or will not.  I was just

13   relaying the facts, what I had heard from Carter Bryant's

14   roommate to me, to my lawyer because I had heard that Mattel

16:02 15   was about to sue MGA.  And that is June 2001, and you have

16   testimony on that.

17   Q.   So let me ask you this.  When you said "outside Mattel"

18   in this e-mail, when you said "developing the Bratz line at

19   his free time outside Mattel on weekends or evenings," were

16:03 20   you trying to convey that you had heard Mr. Bryant had done

21   this while he was employed at Mattel on weekends and

22   evenings?

23   A.   No.

24   Q.   Did you ever get -- this second line should be "get him

16:03 25   to do and sign a declaration to this effect now,

CV 04-9049 DOC - 02/08/2011 - Volume 3 of 3 - REDACTED UNSEALED

6

1    just in case"?

2    A.   I'm sorry?

3    Q.   Did you -- see the last line:  "Should we get him to do

4    and sign a declaration to this effect now, just in case?"

16:04  5    A.   Yes.

6    Q.   Did you ever get such a declaration?

7    A.   I don't think so, no.

8    Q.   And -- and based upon what you say your knowledge was,

9    if you had heard that Mr. Bryant had designed and developed

16:04 10    the Bratz line while he was employed by Mattel, but on his

11    free time on weekends or evenings, if you had heard that you

12    would have been shocked; right?

13    A.   I don't understand your question.

14    Q.   Sure.

16:04 15          If you had heard from someone in June 2001 that

16    Mr. Bryant had developed the Bratz designs, designed and

17    developed those while employed by Mattel, but on his free

18    time on weekends or evenings, if you had been told that you

19    would have been shocked because it wasn't the story you had

16:04 20    heard; right?

21    A.   Mr. Price, Carter Bryant told us he did this in 1998 in

22    Missouri -- and Missouri happened to be outside Mattel -- on

23    nights and weekends when he wasn't working for Mattel.  And

24    that's what I believe today, tomorrow, until I go to my

16:05 25    grave.  And this is the fact, and you know that's the truth.

UNITED STATES DISTRICT COURT

Case 2:04-cv-09049-DOC-RNB  Document 9846  Filed 02/10/11  Page 7 of 67  Page ID #:297290
CV 04-9049 DOC - 02/08/2011  Volume 3 of 3 - REDACTED UNSEALED

7

```
 1   Q.    My question's a little different.

 2         Are you okay?

 3   A.    Yes.

 4   Q.    So you told us what Mr. Bryant told you, and so that's

 5   why I'm asking this:  If in June 2001 you had been told that

 6   Mr. Bryant designed and developed these while employed by

 7   Mattel, on nights and weekends, if you had been told that,

 8   you would have been shocked?

 9   A.    I don't know.  Ten years ago, I don't know what my state

10   of mind was.  Would I be shocked?  Would I not be shocked?  I

11   don't know.  I don't remember my state of mind then.

12   Q.    Well, you just said, I believe -- very strongly -- that

13   Mr. Bryant told you he did these in 1998?  That was the story

14   he told you; correct?

15   A.    It's not the story.  It's a fact.  And you brought your

16   cunning hand on all of those guys, ink analyst, et cetera.

17   They could not put a hole in that story, that fact, he did

18   them in 1998, when he wasn't working for Mattel.

19   Q.    And since you say you believe that -- this is my

20   question -- since you say you believe that, in June 29, 2001,

21   if someone had told you that they saw Carter Bryant designing

22   and developing the Bratz dolls while he was at Mattel, but on

23   nights and weekends, that would be something inconsistent

24   with what you told us you were told; correct?

25   A.    Nobody told me that.  Nobody told me something
```

1    that is inconsistent.

2            THE COURT:  Counsel, when you get to a good point,

3    because of the jury, tell me.  I don't want to interrupt the

4    examination.

16:07  5            MR. PRICE:  I'm switching to another topic at this

6    point, Your Honor.

7            THE COURT:  Would this be a good time?

8            MR. PRICE:  Yes.

9            THE COURT:  Ladies and Gentlemen, I don't think

16:07 10    we're going to be too concerned about 15 minutes over a long

11    trial, so you go home tonight.

12            Everybody -- has anybody talked to anybody about

13    the case so I can start all over again?

14            Don't do it.  It was just a polite way of saying,

16:07 15    "please don't."  I trust your ethics.  You are admonished not

16    to discuss this matter amongst yourself, nor form or express

17    any opinion about the case.

18            Get some rest, please.

19            Fourteen and a half minutes?

16:07 20            THE JUROR:  Not this time of night.  We'll see.

21            THE COURT:  Good bye.

22            Or maybe 75?

23            (Open court - jury not present.)

24            THE COURT:  First I'm going to instruct that I want

16:08 25    a CSO present.  I think that the audience has been exemplary,

CV 04-9049 DOC - 02/08/2011 - Volume 3 of 3 - REDACTED UNSEALED

1    but these are critical times and I don't want -- for the CSO

2    and the group -- I don't want people coming into court and

3    milling around.  Invite them to have a seat.  They're more

4    than welcome, but I don't want any distractions during some

16:08  5   of the key witnesses here.

6         Second, there's no dispute, Counsel, so let's set

7    the record on this.

8         My memory -- and I'll stand corrected tonight when

9    we have our evening session -- if you can gather the

16:08 10  information was -- that this allegedly privileged exhibit,

11   which is 9855, I believe -- strike that -- what was -- we

12   referred to as the Patty Glaser, document, Counsel --

13        MS. HURST:  That's right, Your Honor.  9855.

14        THE COURT:  This was not made available for legal

16:09 15  purposes to the party until the court ruled on this in 2010.

16   So I think Mr. Quinn, in your argument, and Mr. Price, you're

17   absolutely correct about that.  It had no legal significance.

18        But my memory is that it became known to the

19   parties with a clawback in 2007.

16:09 20        So, from the court's perspective, it's di minimus

21   whether it's 2007 or 2010, but it might have import to the

22   parties.  So I don't mind on cross-examination if you state

23   that it was made known to the parties on 2007; but, legally,

24   it wasn't available to the parties until the court ruled on

16:09 25  2010.

1        So, therefore, we get into an examination of the

2   use of the privilege.

3        I've warned all parties of this matter because of

4   what I perceive -- and I'll make a clear record of it, both

16:10 5   informally -- but formally, that there have been numerous

6   discovery abuses here and numerous abuse of the privileged

7   logs.

8        The difficulty is that Mr. Larian may not control

9   that.  Now, whether he's available or not -- I'm sorry --

16:10 10   aware of that, is a fair question for you to ask.  But the

11   unfair question is that he's actually making those decisions

12   because counsel made those representations to the court.

13        So I want you to reflect upon that, and why don't

14   we meet at 6:00 tonight.  You go out and discover that.

16:10 15        What else do we have to do tonight?  We've covered,

16   I think, most of the exhibits and we thought that instead of

17   your normal eight o'clock to ten o'clock hours, that

18   Mr. Larian would be on the stand some period of time.

19        Do we need to discuss some more witnesses this

16:10 20   evening?  And, if so, let's -- let's send you out to dinner,

21   and I'll excuse primary counsel, so you get some rest.

22        Ms. Keller, you're on cross-examination?

23        MS. KELLER:  Yes, Your Honor.

24        THE COURT:  And, Mr. Price, you're on the rest of

16:11 25   it?

```
 1              MR. PRICE:  Yeah.

 2              THE COURT:  It seems like you're still on direct?

 3              MR. PRICE:  Yes.

 4              THE COURT:  Why don't you two excuse yourself and

16:11  5   let me talk to other counsel.  I want you as fresh as

 6   possible.  You need sleep, and you need to discuss this

 7   matter, Ms. Keller, of course, if you need to.  And

 8   Mr. Price, you need to be as well prepared tomorrow as you

 9   were today.

16:11 10              Now, Mr. Quinn, what do we need to do tonight?

11              MR. QUINN:  There might be a few more -- based on

12   the way the testimony has gone, it's possible there will be a

13   few more Larian exhibits.

14              THE COURT:  And we need those before tomorrow?

16:11 15              MR. QUINN:  Yes.

16              THE COURT:  You want time to gather those, go back

17   across the street?

18              MR. QUINN:  I mean back at 6:00, Your Honor, would

19   be fine.

16:11 20              THE COURT:  I think we can accomplish that, then.

21              7:00?  How much time do you need, Mr. Zeller?

22              MR. ZELLER:  6:00 is fine.

23              MR. QUINN:  6:00 is fine.

24              THE COURT:  I like 8:00.

16:11 25              I work best between 8:00 and 12:00-ish.
```

```
 1              Are you sure 6:00?  Because I don't want to stand
 2      around.  Okay.  I've got a scintillating patent case here.
 3              MR. ZELLER:  We have them assembled.  It's a matter
 4      of making sure.
16:11  5              THE COURT:  Okay.  Now, you have additional
 6      exhibits --
 7              MR. QUINN:  I don't think we do.  I'll
 8      double-check.
 9              Okay.  Why don't we reconvene at 6:00 this evening.
16:12 10              Ms. Hurst, are you going to be with us?
11              MS. HURST:  Yes.
12              THE COURT:  Mr. Zeller?
13              MR. ZELLER:  Yes.
14              THE COURT:  Now, I need, Jane, for you to go over
16:12 15      and compute the time before you leave court today.  And I
16      need Debbie up here, Kathy or Jane, and I want to see that
17      the time is adequately put up on this board and it's
18      absolutely accurate and stipulated to by counsel.
19              Now, what else, Counsel, just so there are no
16:12 20      surprises?  Because I can do another hour's worth of research
21      and hopefully save you from a late evening tonight.
22              Once again, on the record and out of the presence
23      of the jury, I want to compliment all counsel, they've been
24      extraordinarily well prepared and they've enjoyed their
16:12 25      weekends with the court.
```

UNITED STATES DISTRICT COURT

CV 04-9049 DOC - 02/08/2011 - Volume 3 of 3 - REDACTED UNSEALED

```
 1              Anything else that we need to do tonight?
 2              MR. QUINN:  I know there's the issue -- I don't
 3    know whether the court has received the metadata on that one
 4    e-mail.
16:12 5         THE COURT:  I stated that you could have the
 6    metadata.
 7              MR. QUINN:  Well, I thought it was going to be
 8    submitted to the court first.  That was my understanding of
 9    the court's order.  Maybe I got that wrong.
16:13 10             MS. HURST:  Yeah.  Yes, because it's privileged.
11    It's a privileged e-mail, so the court ordered the metadata
12    come to the court.
13              THE COURT:  Well, if it is privileged, then where
14    is it?
16:13 15             MS. HURST:  I believe it was lodged a short time
16    ago.
17              THE COURT:  Was it?
18              MS. HURST:  I saw a notice of lodging come across,
19    which is what I believe it was.
16:13 20             THE COURT:  Thank you.  Because we've been in
21    session and I wouldn't know that when we're out in open
22    court.
23              Also, I've opened up all the e-mails from counsel
24    concerning the --
16:13 25             MR. QUINN:  Rosenbaum and --
```

CV 04-9049 DOC - 02/08/2011 - Volume 3 of 3 - REDACTED UNSEALED

14

```
 1              THE COURT:  -- Mr. Rosenbaum, and there was a

 2      representation, informally, by Mr. McConville on Saturday and

 3      also this morning that I received from counsel, Ms. Hurst,

 4      that all the e-mails, at least until October 4th, 2000, have

16:13 5   been turned over, and had previously been turned over

 6      concerning Mr. Rosenbaum; correct?

 7              MS. HURST:  That is correct.

 8              And I've rereviewed those this morning, Your Honor.

 9              The only document --

16:13 10             THE COURT:  Just a moment.

11              MS. HURST:  Yeah.

12              THE COURT:  The next is what e-mails remain,

13      because I'm ordering all e-mails to be turned over concerning

14      Rosenbaum after October 4th, and it was represented to me

16:14 15   that they would be here to me last evening and I didn't get

16      them.

17              What e-mails, do you think, if any, are privileged?

18              MS. HURST:  There are three categories of things

19      that are still being withheld.

16:14 20             One --

21              THE COURT:  Have I received those?

22              MS. HURST:  I don't know if they're here or not

23      here.

24              THE COURT:  Why weren't they here last night?

16:14 25             MS. HURST:  Because there were hundreds of -- more
```

UNITED STATES DISTRICT COURT

```
 1    than 300 items on the log that was attached to their motion,

 2    and we couldn't, in three hours, pull all of those.

 3              THE COURT:  Why?

 4              MS. HURST:  Because there is --

 5              THE COURT:  Okay.  I'm going to be very demanding.

 6              MS. HURST:  I understand.

 7              THE COURT:  Hundreds of millions of dollars on both

 8    sides.  Both sides are prepared.  I'm not accepting excuses.

 9              MS. HURST:  Your Honor --

10              THE COURT:  If they're not -- listen to me.

11              They had better be here at 6:00.

12              Understood?

13              MS. HURST:  Yes.

14              THE COURT:  Okay.  Thank you.

15              (Recess taken.)

16              (Open court - jury not present.)

17              THE COURT:  We're back on the record.

18              Mr. McConville, Ms. Hurst, Mr. Zeller and Mr. Quinn

19    are present.

20              Concerning the direct examination of

21    counterdefendant Isaac Larian, Mattel's counsel, Mr. Price,

22    asked Mr. Larian about an e-mail communication between

23    Mr. Larian and his outside counsel.

24              In addition to asking Mr. Larian about the content

25    of the communication, Mattel's counsel asked Mr. Larian about
```

16:14
16:14
16:15
18:48
18:49

UNITED STATES DISTRICT COURT

1    the date the e-mail was produced in the course of this

2    litigation, and in doing so the court called one of its few

3    in-camera sessions.

4         Mattel's counsel sought to establish -- seeks to

18:49 5    establish that the e-mail communication had been withheld as

6    privileged for more than six years after Mattel filed its

7    original complaint against Carter Bryant.

8         Counsel's line of questioning necessarily involves

9    the court and potentially is going to open the door to

18:49 10   evidence concerning the evolution and outcome of the Phase 1

11   proceedings, which I'm very concerned about.

12        The privileged designation was upheld as to the

13   e-mail communications by Judge Larson after MGA inadvertently

14   produced the e-mail and then clawed it back.

18:50 15        In fact, Mattel conceded that the e-mail was an

16   attorney-client communication ordinarily protected by the

17   privilege, but nevertheless argued that the e-mail should

18   have been produced pursuant to the crime-fraud and waiver

19   exceptions to the attorney-client privilege.

18:50 20        Judge Larson had rejected Mattel's argument, and

21   Mattel appealed this ruling to the Ninth Circuit, which

22   eventually dismissed Mattel's appeal on July 22, 2010.

23        Only after the Ninth Circuit abandoned jurisdiction

24   over Mattel's appeal did this court find that MGA had waived

18:50 25   the privilege as to the e-mail communication.

Case 2:04-cv-09049-DOC-RNB   Document 9846   Filed 02/10/11   Page 17 of 67   Page ID
#:297300
CV 04-9049 DOC - 02/08/2011 Volume 3 of 3 - REDACTED UNSEALED

17

1           I think it is misleading to suggest that MGA is

2      responsible for any delay in the production of the e-mail

3      communication, when the e-mail actually resulted from

4      Judge Larson's ruling, the pendency of the appeal before the

18:50  5      Ninth Circuit, and this court's adjudication of Mattel's

6      motion.

7           Informing the jury about the circumstances that

8      actually delayed and ultimately resulted in the production of

9      the e-mail had run afoul of this court's ruling ordering the

18:51 10     exclusion of evidence ordering the exclusion of evidence

11     concerning the Phase 1 proceedings and the appeal before the

12     Ninth Circuit.

13          I'm also concerned it paints an incomplete picture

14     to simply inform the jury that the court had ordered the

18:51 15     production of the e-mail.

16          As of September 25th, 2010, the -- my order found

17     that MGA waived the protections of the attorney-client

18     privilege by raising an advice-of-counsel defense during the

19     Phase 1 proceedings which did not take place until 2008.

18:51 20          I had already concluded, as Judge Larson did, that

21     the e-mail was properly withheld as privileged until MGA's

22     invocation of the advice-of-counsel defense during the prior

23     trial.

24          I strongly feel it would contradict these prior

18:51 25     rulings to suggest that MGA's seven-year delay in producing

CV 04-9049 DOC - 02/08/2011   Volume 3 of 3 - REDACTED UNSEALED

18

```
 1    the e-mail was improper.

 2            The second concern I had I raised with counsel, and

 3    somewhat inartfully with the jury, and that is the import of

 4    the question is, is that Mr. Larian is responsible for the

 5    withholding of this e-mail, when, in fact, it's counsel's

 6    determination.

 7            Mr. Price, though, has raised a legitimate question

 8    and that is Mr. Larian's knowledge about the e-mail, and the

 9    court's allowed that to be asked.

10            So I'm a little concerned how I resolve this with

11    the jury, because I'm not certain that my quick-handed

12    explanation is complete enough.  So I had proposed the

13    following, and then I'm going to listen to any suggestion by

14    counsel.

15            The e-mail between Mr. Larian and his outside

16    counsel was properly withheld as privileged until 2010 when

17    the court ordered its production.

18            Now, if you want to add that the parties were aware

19    of this e-mail as of 2007, that could also be added by the

20    court because it was, in fact, I think, knowledge of the

21    parties and potentially Mr. Larian at that time, so Mr. Price

22    isn't precluded from asking, and MGA produced the e-mails,

23    then, within the time frame ordered by the court.

24            So I'm going to have you reflect on that for a

25    couple moments and move on to the metadata, Mr. Zeller, that
```

UNITED STATES DISTRICT COURT

1    you raised the other day, and I'm going to even take another

2    extraordinary precaution.

3            First, let me say to you that I know you're seeking

4    the metadata associated with this e-mail communication

18:53 5    drafted by Isaac Larian, and I had ordered MGA to lodge the

6    metadata with Mr. Larian's draft e-mail for my in-camera

7    review -- I've gone through that now -- along with a -- an

8    expert who is fairly renowned in some in-camera documents

9    submitted to the court.

18:54 10            I've reviewed the metadata.  I'm initially

11   concluding that MGA's assertion of the privilege as to the

12   date of the e-mail communication's warranted.

13           I also am initially finding the metadata has not

14   been altered in any way.  That's why I've taken the extra

18:54 15   hour this evening.

16           The document was inadvertently produced and MGA's

17   counsel -- MGA has attempted to claw back this e-mail.

18           I think there is a concession by all parties that

19   this is, in fact, privileged communication, unless the

18:54 20   crime-fraud exception applies.

21           Just in an abundance of caution, Mr. Zeller, to set

22   this to rest for once and for all, I'm going to refer that

23   out to the court's 706 expert, Judge Smith, and an

24   independent evaluation, also, so that there's just no

18:54 25   question that my determination is, in fact, correct.

CV 04-9049 DOC - 02/08/2011 - Volume 3 of 3 - REDACTED UNSEALED

```
 1              And, therefore, I'll contact Judge Smith tonight.

 2      I'll see how quickly they can get on this.  If there's

 3      anything inappropriate or untoward, you're going to be

 4      allowed to call Mr. Larian back on this subject, but I'm not

18:55  5      finding anything during the in-camera review during the last

 6      hour.

 7              So in an abundance of caution, there has been so

 8      much discovery, you two will split the cost in that regard.

 9      It should be minimal.  It shouldn't take much time at all and

18:55 10      that way you've got a sense that's the case and we can set

11      the issue aside.

12              The last thing is I need a little bit of time now

13      with these documents submitted to the court.

14              An hour?  Let's go through an hour.  Give us an

18:55 15      hour, okay?  Let's get on this right away.  We've just seen

16      this.

17              Do you want to go out to dinner, join us at 9:00 or

18      8:00 or whatever?

19              MR. QUINN:  Whatever the court's preference.

18:55 20              THE COURT:  Let's see.  Why don't you just sit

21      there now.  We'll see how fast we get through it, because by

22      the time you get done with dinner, maybe we'll be done with

23      this.

24              So why don't you have a seat.

18:55 25              By the way, do you have any better suggestion of
```

1    the way we can resolve it?

2         Let me say in just plain English, what my concern

3    is.

4         The concern is that there shouldn't be any

18:56 5    intonation that Mr. Larian is responsible for asserting the

6    attorney-client privilege.

7         Second, that he is the person who's directed or is

8    somehow implicated in the delay.  But Mr. Price should be

9    allowed to ask what the time frames are concerning

18:56 10   Mr. Larian's knowledge and his state of mind and any

11   perception of a changed testimony.

12        But the more I get into the process of procedure,

13   the more danger we run about the verdict in the first trial

14   coming to light, and what I'm afraid of is no matter how well

18:56 15   Mr. Larian is instructed in the heat of combat, through

16   questioning, somebody's going to blurt out or, you know, lead

17   us down a road, either by questioning artfully-phrased or by

18   answers that are responsive of -- to a very damaging piece of

19   evidence that would be inappropriate, and I don't want MGA to

18:57 20   be in the position, then, of the -- in that box of a damaging

21   piece of evidence where you feel that your only alternative

22   is either to ask for a mistrial which you, quite frankly,

23   can't afford, or, you know, just riding with this piece of

24   evidence that shouldn't properly be before the jury.

18:57 25        So I think the best solution I can come up at the

Case 2:04-cv-09049-DOC-RNB  Document 9846  Filed 02/10/11  Page 22 of 67  Page ID
#:297305
CV 04-9049 DOC - 02/08/2011 - Volume 3 of 3 - REDACTED UNSEALED

22

1    time when we were in front of the jury, and just on the spur

2    of the moment, because I thought it was timely, was that the

3    attorney-client privilege was asserted by counsel, that 2010

4    is the date that the evidence was disclosed, but giving you

18:57 5    the option of saying that it was available as early as 2007.

6              Now, if you can think of a better solution I'm

7    happy to entertain that.

8              And I'm really looking to MGA first and then I'm

9    going to look to Mattel.

18:58 10             So let me read again the admonition to you.  Okay.

11   Write this down.

12             The e-mail between Mr. Larian and his outside

13   counsel was properly withheld as privileged until 2010 when

14   the court ordered its production.

18:58 15             MGA produced the e-mail within the time frame

16   ordered by the court.

17             Now, that may be incomplete, though, from MGA's

18   perspective.

19             You may want the jury to know that the e-mail,

18:58 20   Ms. Hurst, as you argued in the hallway, was actually known

21   to the parties in 2007.

22             MS. HURST:  I think -- I would like a little time

23   to think about it, Your Honor, but I think Ms. Keller's

24   concern when she was objecting earlier was that the form of

18:59 25   the question, you marked this attorney-client privilege and

1    you meant it to be concealed -- essentially --

2              THE COURT:  Uh-huh.

3              MS. HURST:  -- was an improper comment --

4              THE COURT:  But I've already resolved that.

18:59  5        MS. HURST:  Well --

6              THE COURT:  In other words, I've already stated

7    that this is not Mr. Larian's choice, basically, nor is it

8    his prerogative.

9              Now, what is done is done.  The question is what

18:59 10   limiting instruction can I give now so you can tell me the

11   parade of horribles and, thank you, that's not the issue now.

12             The issue is I'm giving you an offer of your input

13   and if you don't have any input then I'm just going to move

14   on with this record.

18:59 15        MS. HURST:  Your Honor, I would request that a

16   statement be added that there's nothing wrong with invoking

17   the attorney-client privilege or seeking to invoke the

18   attorney-client privilege under proper circumstances.

19             THE COURT:  Well, nothing wrong --

19:00 20        MS. HURST:  No adverse inference or no negative

21   inference can be drawn.

22             THE COURT:  No negative inference should be drawn.

23             MS. HURST:  And we would like the court-suggested

24   addition about it being available to the parties in 2007.

19:00 25        THE COURT:  I'm sorry?

Case 2:04-cv-09049-DOC-RNB   Document 9846   Filed 02/10/11   Page 24 of 67   Page ID
#:297307
CV 04-9049 DOC - 02/08/2011 - Volume 3 of 3 - REDACTED UNSEALED

24

1        MS. HURST:  We would like the court's suggested

2    addition of it being available, initially, to Mattel, really,

3    in 2007.

4        I mean, it was always available to MGA, so --

19:00 5        THE COURT:  Now, just a moment.  I want to hear

6    from Mattel.

7        Mr. Price isn't here this evening.

8        So, Mr. Quinn or Mr. Zeller.

9        MR. QUINN:  Your Honor, I think the latter addition

19:01 10   that it was available to Mattel is, one, inaccurate.  It

11   wasn't available to Mattel, and moreover --

12       THE COURT:  And I agree, it's not available because

13   it's still being considered by the court.  Of course it's not

14   available.  The question is if there was knowledge.  In other

19:01 15   words, the real inference that Mr. Price was driving at is,

16   what did Mr. Larian know and when did he know it?

17       MR. QUINN:  Well, I think the point of that

18   questioning was that Mr. Larian believed when he authored the

19   e-mail at 2001 -- in 2001 that no one would ever see it.

19:01 20   That was the point of that.

21       THE COURT:  And I've allowed him to ask that

22   question.

23       MR. QUINN:  And you've allowed him to ask that.  I

24   don't think --

19:01 25       THE COURT:  It's only the year that's of concern

Case 2:04-cv-09049-DOC-RNB   Document 9846   Filed 02/10/11   Page 25 of 67   Page ID
#:297308
CV 04-9049 DOC - 02/08/2011 Volume 3 of 3 - REDACTED UNSEALED

25

         1    because it looks like it's being hidden, but, although I said

         2    in the hallway, it seems to be de minimus between 2007 and

         3    2010.

         4           The import is back to 2000 when he issued this

19:01    5    e-mail, and I've allowed Mr. Price to ask that.

         6           MR. QUINN:  I have no problem with what the court

         7    has suggested.

         8           I think adding on that something about 2007

         9    suggests to the jury, perhaps, that we misled the jury about

19:02   10    when we got this or when we had knowledge of it, and it's

        11    immaterial for the purpose of the question.

        12           THE COURT:  Didn't I already state to the jury that

        13    there was an issue about 2007 and 2010?  They already know

        14    that.

19:02   15           MR. QUINN:  You did, but then you -- then you added

        16    to that.  You said, as -- you know, it was produced in 2010.

        17           THE COURT:  As further reflection, you can talk

        18    about 2010.

        19           MR. QUINN:  Well, I have no problem saying that

19:02   20    what Ms. Hurst has requested -- there's no issue, nothing

        21    wrong with invoking the attorney-client privilege.  We have

        22    no problem with that, no negative inference from that.

        23           I mean, my concern about saying -- I think you can

        24    just say that the court ordered it produced in 2010 and the

19:02   25    jury should draw no -- attach no significance to the fact

1    that it was ordered produced at that time.

2              THE COURT:  Just a moment.

3              The court ordered the e-mail between Mr. Larian and

4    his outside counsel.  Counsel produced in 2010, but -- now,

19:03  5   Ms. Hurst -- Ms. Hurst -- but -- but the parties were aware

6    of the contents of this e-mail as early as 2007?

7              MS. HURST:  Yes.  Thank you.

8              THE COURT:  Were aware of the contents.

9              MR. QUINN:  We don't agree with that addition,

19:03 10   Your Honor.

11             THE COURT:  Well, weren't you aware of this in

12   2007?

13             MR. QUINN:  We -- we were, but there's no

14   significance at all on the table to this three-year period

19:04 15   about whether we were aware of it and then it was produced.

16   Nothing attaches to the fact that it was produced in 2010 but

17   we knew about it before.  That just doesn't have any

18   significance.

19             If we do that, then don't we have to get into the

19:04 20   fact that it was, in fact, clawed back?

21             I mean, just to say that we were aware of it

22   suggests to the jury -- it raises a big question mark, well,

23   what does that mean?  Did we have it?  Did we have access to

24   it?  Could we use it?

19:04 25             It suggests that we've somehow misled the jury.

1        THE COURT:  Well, why can't we simply say, then,

2   the court ordered the e-mail produced and the parties were

3   aware -- in other words, leave out 2010 -- and the parties

4   were aware of the contents as early as 2007?

19:04 5        MR. QUINN:  Well, with respect, Your Honor, I just

6   don't think that the 2007 date, the jury needs to hear

7   anything about that.  I think the jury can just say the court

8   ordered this produced in 2010, and the jury should attach no

9   significance to the timing of the ordering of the production.

19:05 10       If you get into 2007 it just raises all kinds of

11  questions about, you know, has -- did Mattel use it or could

12  it have used it or why didn't they use it or why was it

13  produced in 2010 and we knew of it but it wasn't produced

14  before?

19:05 15       It would be in the questioning.  There is

16  nothing -- no weight has been attached, there's no issue

17  regarding that three-year period, 2007 to 2010.

18       THE COURT:  Well, then let me ask you, why isn't

19  the court's instruction up to this time appropriate?  Why

19:05 20  shouldn't I rest on what I've already said to the jury?

21       MR. QUINN:  I think you can.  They've requested

22  that you tell the jury that, you know, improper invocation of

23  the attorney privilege is fine and that they should attach no

24  significance to that and I have no problem with that.  That's

19:05 25  something they've asked for.

 1          And, you know, as a proposition of law we agree

 2     with that.

 3          THE COURT:  And lastly, though, I've indicated to

 4     you that you can ask the question about 2007.  In other

19:06  5     words, I haven't limited you at all since Mr. Price, you

 6     know, asked a leading question, quite frankly, about 2010.

 7          We got into this mess, quite frankly, because of

 8     the way the question was initially asked and there was no way

 9     to unring the bell.

19:06 10          MS. HURST:  Right.

11          THE COURT:  And technically it was not available

12     until 2010 until the court made its ruling.

13          By the same token, I don't think that you're

14     precluded from asking about 2007.

19:06 15          And perhaps I should just leave it where it stands

16     and let you ask the question.

17          MS. HURST:  The problem is that there has been the

18     suggestion of a change in testimony.  And although it was not

19     legally available to them, they certainly asked numerous

19:06 20     questions in deposition over the years.

21          THE COURT:  Well, just a moment, though.

22          I can anticipate the following, and that is,

23     Mr. Price, where he'd really like to go is after hearing

24     Judge Larson's summary judgment ruling, then what Mr. Price

19:06 25     would like to do is walk the fine line of "and that's why

1      your testimony changed."

2              And I'm very, very concerned about if we go down

3      that line of questioning that we're going to get into the

4      jury verdict again in the first trial.

19:07  5              MS. HURST:  But this is Mr. Price -- with all due

6      respect, Mr. Price is the one who went down this road by

7      asking the question and making the implication that testimony

8      has changed when, respectfully, we don't think it had been

9      changed.

19:07 10             But in all events, they had available to them all

11     the time they were asking the questions they knew there was

12     this e-mail back there with the words "nights and weekends"

13     in them and they certainly asked questions on that basis.

14             I'm not saying they violated the protective order.

19:07 15     I don't think we need to go into violating the protective

16     order or anything like that, but to the extent Mr. Quinn's

17     arguing there's no relevance that they were aware of the

18     document and exactly what the wording in it was for three

19     years when they asked questions at every testimonial

19:07 20     opportunity of Mr. Larian, that just isn't right.

21             Of course it has some relevance because they were

22     aware of the contents of it.  It's a one-sentence e-mail.

23     Even though we clawed it back, everybody knew what it said

24     and they certainly examined the witness over the years with

19:08 25     that in mind and then with the goal of one day reobtaining

        1   possession of it, which they vigorously pressed throughout

        2   that entire period.

        3           So it's a -- it's just an absolute fiction to -- to

        4   leave in the jury's mind the notion that they were somehow --

19:08   5   had this e-mail concealed with them and weren't able to ask

        6   the witness questions about, you know, his prior

        7   understanding with knowledge of the contents of that e-mail,

        8   because they were and they did.

        9           THE COURT:  Well, they weren't able to ask him

19:08  10   questions about this e-mail at the first trial.

       11           MS. HURST:  True.

       12           But also the Rosenbaum e-mail with 1998 in it

       13   didn't come in in the first trial either.

       14           THE COURT:  That's not on point, Counsel.

19:08  15           They weren't able to ask questions until this trial

       16   about this particular e-mail until after I made my ruling.

       17           So, all right, I'll come out with a final order.

       18           Let me go back and go to work and we'll see you in

       19   a little while.

19:09  20           MS. HURST:  Your Honor, I apologize.  We needed to

       21   report -- not -- a juror contact that occurred this evening

       22   while the court reporter was still here.

       23           THE COURT:  We're going to let you go home in just

       24   a moment.

19:09  25           Counsel, we're still on the record, what

CV 04-9049 DOC - 02/08/2011 Volume 3 of 3 - REDACTED UNSEALED

```
 1        was the contact?
 2                MS. HURST:  Apparently, Your Honor, one of our
 3        colleagues, Ms. Hardip-Passananti, was on the panel with
 4        Mr. Reckers at UCI tonight.  She reports that there was no
19:09 5   interaction between them and that they were separated into
 6        different rooms with different groups of students.
 7                We had no idea, obviously, Your Honor.  I just got
 8        an e-mail while we were sitting here.
 9                THE COURT:  Describe this panel to me.
19:10 10          Is Ms. Passananti an attorney?
11                MS. HURST:  She is, Your Honor.
12                THE COURT:  Is this the lady that was house
13        counsel?
14                MS. HURST:  No.  She's an Orrick associate,
19:10 15  Your Honor.
16                THE COURT:  Is she -- has she been in this
17        courtroom?
18                MS. HURST:  I think she was here for the opening
19        statements.
19:10 20          THE COURT:  I don't know what she looks like.
21                MS. HURST:  She's an Asian-Indian woman with very
22        long brown hair, you know.
23                THE COURT:  Has she been in this courtroom since?
24                MS. HURST:  No, I don't believe so.
19:10 25          THE COURT:  Did she have any conversation
```

UNITED STATES DISTRICT COURT

1    with Mr. Reckers?

2            MS. HURST:  No, she's reporting she did not,

3    Your Honor.

4            THE COURT:  Tell me what this panel was about.

19:10 5          MS. HURST:  You know, I don't know what the exact

6    subject is.

7            It was a panel at UCI this evening.

8            I can read you the e-mail thread, Your Honor.  I'm

9    happy to do so.

19:10 10         She sent us an e-mail at 6:03 p.m.

11           The subject:  "Juror by name of Robert Reckers?"

12           "On a panel at UCI now with him and he just

13   commented that he is a juror on a three-month civil trial in

14   Ronald Reagan building with Mondays off.  Got to be the MGA

19:11 15  case."

16           I responded, "Yes, he is on our jury.  Please do

17   not talk to him at all.  Please step down off the panel if

18   you can possibly do it.  I am sorry."

19           She responded, "We didn't even say hello.  They

19:11 20  broke us into separate rooms so students could meet with us

21   individually.  He went into a different room and the panel

22   concluded at 6:30."

23           THE COURT:  So this wasn't a joint panel?

24           MS. HURST:  Apparently not, Your Honor, no.

19:11 25         THE COURT:  I mean, a large auditorium with two or

1    three hundred people.

2            MS. HURST:  I think that's right.

3            THE COURT:  I'm going to leave that to Mattel.  How

4    would you like us to resolve that or handle it?

19:11  5            MR. ZELLER:  Is it possible for us to get some sort

6    of a disposition of what the program is just so we have an

7    understanding?

8            THE COURT:  Why don't we all go down there.

9            MS. HURST:  I'll just ask.

19:11 10            THE COURT:  Do you want to get in your car?

11            MR. ZELLER:  I don't know what that's going to tell

12    me.

13            THE COURT:  I'm just joking with you, Mr. Zeller.

14    Let's not.

19:11 15            MR. ZELLER:  Yeah.

16            THE COURT:  Why don't we make the inquiry, you and

17    Annette, Mike -- I mean, Mr. Zeller and Ms. Hurst, while I'm

18    back looking at these privileged logs.

19            And if you have a concern, I can speak to him

19:12 20    earlier tomorrow morning.  Of course that always heightens

21    the drama.  By the same token, if there's any inappropriate

22    contact we should make a record and resolve it.

23            MR. ZELLER:  So it sounds like, perhaps, the best

24    thing is we can direct any inquiries to Ms. Hurst.  See if we

19:12 25    can resolve it amongst ourselves.

1          THE COURT:  I want you to have some confidence

2     level and if not then we can certainly have a hearing.  I

3     will leave that to Mattel because I think that -- you just

4     have to be comfortable that the proceeding's fair.  It's as

19:12  5     simple as that.

6          And if you're not comfortable then we need to get a

7     record and we need to find out what occurred.

8          And if nothing occurred, my fear is, then, it

9     heightens that.  If you have what I say -- what you feel is a

19:13 10     good juror between two sides, because they know who is making

11     the inquiry, obviously.

12          By the tame token, I certainly don't want two

13     people sitting on the same panel if there's any kind of

14     audience participation.  So there are four people on a panel

19:13 15     typically and we're all bonding together making our point --

16     known as kindred souls.  Not appropriate.

17          All right.  Why don't you inquire informally with

18     Ms. Hurst, get as much information as we can and then let's

19     make a record of this.

19:13 20          MS. HURST:  Thank you, Your Honor.

21          (Recess taken.)

22          (Open court - jury not present.)

23          THE COURT:  First, I understand that if you, on

24     behalf of MGA, voluntarily turned over Exhibit A, that

19:32 25     tactically, your fear would be that you've waived the

 1    attorney-client privilege and that Mattel would then ask for

 2    all sorts of documents because of this alleged waiver.  This

 3    information is extraordinarily helpful to MGA.  This

 4    information shows the negotiations back and forth, frankly,

19:32 5    with the attorney's interlineations both on MGA's part,

 6    Rosenbaum.

 7            And I think that you're right that it falls within

 8    the attorney-client privilege and I'm not going to order that

 9    it be turned over, but it's an extraordinarily valuable piece

19:33 10   of evidence for MGA and I am just going to make a record of

 11   that.

 12           I understand apparently, tactically, you fear if

 13   you turn this over, regardless of the benefit to MGA, that

 14   you must tactically fear that this is going to cause the

19:33 15   attorney -- of the waiver of the attorney-client privilege.

 16           I'll just inform Mattel, I don't know that this is

 17   a document that you really want to receive.  It's full of

 18   interlineations on both counsel's part.

 19           I think it might be perceived by the jury to prove

19:33 20   that there were a series of negotiations that went on back

 21   and forth over a period of time of interlineations, but I

 22   leave that to the parties and I'm going to sustain the

 23   objection.  It falls within the attorney-client privilege.

 24           (Pause in the proceedings.)

19:34 25           THE COURT:  May I just have an in-camera session

1    with counsel?

2          I'm just really curious why there's any concern

3    with 90 percent of these documents.  The excluded information

4    is, frankly, not very helpful to both parties.

19:34  5          So I'm going to take Exhibit B for a moment, this

6    first one.  Why don't you sit beside me because these are the

7    only copy of the notes.

8          Mr. Quinn, don't go too far.  We'll be right with

9    you.  This won't take very long at all.

19:35 10          This is in-camera, this will remain sealed.

11          (Sealed proceedings.)

12    ██████████████████████████████████████████████

13    ██████████████████████████████████████████████████

14    █████████████████████████████████████████████████

15    ████████████

16    ███████████████████████████████████████████████

17    █████████████████████████████████████████████████

18    █████████████████████████████████████████████████████

19    █████████████████████████████████████████████████████

19:35 20    ███████████████████████████████████████████

21    ████████████████

22    ████████████████████████

23    ███████████████████████████████████

24    ████████████████████████████████████

19:35 25    ██████████████████████████████████████████



1
2
3
4
19:35  5
6
7
8
9
19:36  10
11
12
13
14
19:36  15
16
17
18
19
19:36  20
21
22
23
24        (End of sealed proceedings.)
19:37  25     (Open court - jury not present.)

UNITED STATES DISTRICT COURT

```
 1              THE COURT:  All right.  Now we're back on the
 2      record.  We are not in-camera.
 3              Mr. Quinn is present with Mr. Zeller.
 4              I've sustained MGA's objection that they are
19:37 5   attorney-client privileged, but I will indicate to you, just
 6      so that there's no suspicion, you have this document in lined
 7      form.  The only thing you don't have are the attorney's
 8      little notes off to the side.
 9              MR. PRICE:  Okay.
19:37 10            THE COURT:  Now we're back in-camera and Mr. Quinn
11      and Mr. Zeller are leaving.
12              (Sealed proceedings.)
13              (Discussion held off the record.)
14              (End of sealed proceedings.)
19:39 15            (Open court - jury not present.)
16              THE COURT:  We're now on the record but we're not
17      in-camera.  Mr. Quinn is present and Mr. Zeller.
18              MS. HURST:  He's still behind the green curtain.
19              (Discussion held off the record.)
19:39 20            THE COURT:  We're now on the record with both
21      counsel present, along with Mr. McConville and Ms. Hurst.
22              So that there's no suspicion, the next Exhibit B in
23      the notebook is 1309.  It's already in evidence, you've
24      already got it.
19:39 25            So to take the mystery out of it, the only thing
```

1    off to the side are the trial attorney's notes.

2              MR. ZELLER:  Uh-huh.

3              MR. QUINN:  (Nodded head.)

4              THE COURT:  Now we're in-camera.

19:39 5              (Sealed proceedings.)

6              (Discussion of the record.)

7              (End of sealed proceedings.)

8              (Open court - jury not present.)

9              THE COURT:  This is an unsealed record.

19:44 10         I am going to cause -- you will be given a

11   completely unredacted e-mail on February 12th, 2001, at

12   12:12 p.m.

13              That will be unredacted on Page 1 in its entirety,

14   and you already have a redacted portion on Page 2, but the

19:45 15   last two lines I am going to redact.  There the client is

16   asking for legal advice; okay?  That is, believe me

17   de minimus and of no help to Mattel.

18              So besides being the correct legal ruling, let me

19   just allay Mattel's concerns that the redacted one and a half

19:45 20   lines is not the turning point of this case.

21              MR. QUINN:  You'll let us know when you get to that

22   one, Your Honor?

23              (Laughter.)

24              THE COURT:  I will.  I will especially single that

19:45 25   one out.

```
 1                    Off the record for a moment.  Rest your hands.

 2                    (Recess taken.)

 3                    THE COURT:  This is now sealed.

 4                    (Sealed proceedings.)

19:47 5               (Discussion held off the record.)

 6                    (End of sealed proceedings.)

 7                    (Open court - jury not present.)

 8                    THE COURT:  In looking at Exhibit D, you already

 9       have this redacted portion of the e-mail?

20:05 10              MR. ZELLER:  Yes.

11                    THE COURT:  Not only is the rest irrelevant, it's

12       privileged, and the remainder of the e-mail --  I've looked

13       at that for the fourth or fifth time.

14                    Also, it doesn't fall within the scope of the

20:05 15      waiver.

16                    And this was nothing that you don't already know.

17       In addition to that, just to make my record complete.

18                    MS. HURST:  Which one was that, Judge?

19                    THE COURT:  That's Exhibit D, and I'll need it for

20:05 20      the Circuit -- I'll need this book exactly duplicated,

21       because I'm going to go through every one of them.

22                    Privileged has to do with Hasbro.  Has nothing to

23       do with the case, attorney-client privilege.

24                    So beside the privilege, I just want to make

20:06 25      certain that there's nothing that's irrelevant as well, where
```

UNITED STATES DISTRICT COURT

 1    I feel that there'd be any argument.

 2            So in referring to Exhibit E-1, the best record I

 3    can set for the Circuit is it's attorney-client privilege

 4    having nothing to do with this case.  It's discussion about

20:06  5    Hasbro, just so you know.

 6            Two, VR3D approval.  Infogames, privileged.  Has

 7    nothing to do with this case.

 8            Three, privileged.

 9            In addition to that, I've looked through this,

20:07 10    there's nothing in terms of relevancy grounds that appears to

11    be helpful to Mattel.

12            Four, it's a -- so you know -- a Joe Tiongco,

13    T-i-o-n-g-c-o, to Isaac Larian, but it's about an

14    international distribution agreement having nothing to do

20:07 15    with this case, and it's unrelated to the original contract

16    concerning Bryant, which was my most important concern -- my

17    what I call "clawback future discussions" about, well, we

18    meant to say the following.

19            Five, or E-5, is not about the Bratz-Bryant

20:07 20    agreement, and the bottom portions of this have been produced

21    with redactions.

22            So even though the top page has been redacted, the

23    first page, you already have the nonprivileged portions.  In

24    addition to that, the rest is completely irrelevant.

20:08 25            And, Annette, come on over for a moment.

Case 2:04-cv-09049-DOC-RNB  Document 9846  Filed 02/10/11  Page 42 of 67  Page ID #:297325
CV 04-9049 DOC - 02/08/2011 Volume 3 of 3 - REDACTED UNSEALED

42

1          It's the redacted portion.  You got this.

2          I can represent to you that that portion

3     (indicating) is of no value to you.

4          MR. QUINN:  You're having too much fun, Judge.

20:08 5          (Laughter.)

6          THE COURT:  This is what I do, and I go through

7     thousands of documents for the benefit of the parties.

8          E-6 has already been produced also in redacted

9     form.  This is the third time the court's gone through this

20:09 10    e-mail.

11          It's a Larian to Victoria O'Connor e-mail of

12    May 7th, 2001.  And you already have the redacted portions.

13    The portion that has been redacted is totally -- is totally

14    attorney-client privilege, but even more important to you,

20:09 15    totally irrelevant to your case.

16          E-7; this is not related to the original Bryant

17    agreement.  It is attorney-client privilege.

18          E-8; once again, attorney-client privilege, and

19    there's no relation to the original agreement.  It's about

20:10 20    merchandise.

21          E-9; once again, complete attorney-client

22    privilege.  And it's irrelevant, although it does have some

23    information about Bratz.  And without disclosing the

24    privilege, about the Bratz commercial and a dispute over it,

20:10 25    just to allay some of your concerns.

 1          E-10; it's a Rosenbaum to Victoria e-mail of

 2     July 18th, 2001, so you can keep track of it later on in the

 3     Circuit.

 4          It's totally irrelevant.  It has to do with some

20:11 5     international agents' agreements, but it is attorney-client

 6     privileged.

 7          E-11; it's completely unrelated to the

 8     attorney-client period.  It's an attorney contact.  It's

 9     Isaac Larian to David Rosenbaum on July 27, 2001.

20:11 10          E-12; this has been produced in redacted form.

11          The one line that you don't have an E-12 that's

12     been redacted is attorney-client privilege.

13          E-13; it's not about the Bryant contract.  It's

14     August 22nd, 2001.  It concerns the Bratz trademark filings,

20:12 15     but it's attorney-client privilege between Rosenbaum and

16     O'Connor.  Once again, the date is August 26, 2001.

17          Okay.  So for purposes I'm giving you those dates

18     even though it's privileged, so if you have any disagreement,

19     you know what to refer back to and I've got a good enough

20:12 20     record so you know which is being spoken about.

21          But I can represent to you that the content of this

22     is completely irrelevant.

23          E-14 is an Isaac Larian to Victoria O'Connor e-mail

24     dated August 27, 2001.

20:13 25          It does have to do with Bratz' trademark filings,

CV 04-9049 DOC - 02/08/2011 - Volume 3 of 3 - REDACTED UNSEALED

1    but it's attorney-client privilege.

2              MR. QUINN:  It's Larian to O'Connor?

3              THE COURT:  But it's got some content inside.

4              Well, just a moment.

20:13 5        MS. HURST:  It's the same as the prior e-mail.

6              THE COURT:  Yeah, it's the same as the prior e-mail

7    and it's David -- it's written by David Rosenbaum, and it's

8    then sent by Larian to O'Connor.  So there your concern would

9    be what? that it's not privileged because --

20:13 10             MR. PRICE:  No.  If Larian is simply forwarding to

11   O'Connor privileged material, it remains privileged.

12             THE COURT:  That's -- that's what's happening.

13             MR. ZELLER:  That was E-14?

14             THE COURT:  That's E-14.

20:14 15             And that's the way I read this.

16             MS. HURST:  Yeah.

17             THE COURT:  E-15 -- what I was just doing for the

18   record was I just walked over to Annette Hurst and just

19   confirmed that I was reading that correctly, because I had

20:14 20   read it back in chambers.

21             E-15 is a -- an Isaac Larian to David Rosenbaum

22   e-mail dated September 4th, 2001.

23             And this has, first of all --

24             (Pause in the proceedings.)

20:15 25             THE COURT:  So you can refer to it and have some

 1    semblance of comfort, it involves Infograms, and it's advice.

 2    It's attorney-client privilege.  It also was not about the

 3    Bryant contract on October 4th or September 18th.

 4            E-16 is an e-mail, Isaac Larian to David Rosenbaum.

20:15  5            It is not only attorney-client privilege, it's

 6    clearly marked that way.  It was intended that way on the

 7    e-mail, and I represent to you it is not about the contract.

 8            So therefore I hope to mollify some concerns that

 9    it has relevance to your case.

20:16 10            E-17 is not about the contract, it's about an AME

11    contract.  It's from Rosenbaum to Beth Kay Hill and Victoria

12    O'Connor dated October 23rd, 2001.

13            18 is from Beth Kay Hill to Victoria O'Connor on

14    December 6, 2001.  It does concern TV rights.

20:16 15            I will tell you, though, I don't see that it

16    concerns anything about the Bryant contract, and it's

17    basically negotiation advice.

18            And, finally, E-19 is totally unrelated to Bratz.

19    It has to do with legal costs in the *Eisenberg* matter.

20:17 20            So what Ms. Hurst did was she divided out those

21    sections, Exhibit E-1 through 19, that she believed didn't

22    have any relation to the court's order concerning the

23    contract and were attorney-client privilege.

24            And in going through those I can state that the

20:17 25    vast majority of those have nothing to do with Bratz.

```
 1              MR. ZELLER:  Can I ask a question about --
 2              THE COURT:  Everything else you have in either an
 3      unredacted form or a redacted form.
 4              And I represent to you that in most cases this is
20:17 5     the third time the court has seen the same document, so I
 6      don't see anything either that's of value.
 7              Now, I'm going to need a copy of this, though, for
 8      my records.
 9              MS. HURST:  You can keep it because I have one now.
20:18 10            THE COURT:  Yes, Mr. Zeller.
11              MR. ZELLER:  The entry for E-6, I know it was
12      produced in redacted form.
13              Can I gets the Bates number for that, please.
14              THE COURT:  Sure, sure, sure.
20:18 15            MS. HURST:  I've got it, Judge.  Do you want me to
16      read it?
17              THE COURT:  Please.
18              MS. HURST:  MGA 20560732 and 33.
19              THE COURT:  Now, instead of keeping you tonight, I
20:18 20    want to keep you as well rested as I can.  I'll call
21      Judge Smith tonight about 10:00 or 11:00 when I go home.
22              I'll ask him to pick up the metadata tomorrow
23      morning and I'll ask the independent analysis to take place.
24              But I've looked at it in chambers.  But I'm going
20:18 25    to verify that just for all of our comfort levels.
```

```
 1              MR. ZELLER:  Okay.  I appreciate it.  Thank you,
 2     Your Honor.
 3              THE COURT:  It won't take very long and that way
 4     we'll set it aside because I think it's conceded that it's
20:19 5  attorney-client privilege, unless there is a crime-fraud.
 6     Let's find out.  Too much discovery; too much effort by both
 7     parties.
 8              Let's just set that aside -- or if there's
 9     something there.  But, right now, there doesn't appear to be.
20:19 10 So tentatively I'll simply make sure that that's done in the
11     next couple of days.
12              MR. QUINN:  Does Judge Smith have an appreciation
13     of the issue --
14              THE COURT:  Oh, trust me.
20:19 15              MR. PRICE:  -- about whether there were two
16     documents created?
17              THE COURT:  Trust me -- he has an appreciation of
18     the issue.
19              MR. QUINN:  Okay.
20:19 20              MS. HURST:  Your Honor, I have further information
21     on the issue involving the juror and the panel.
22              THE COURT:  I think I'm going to take your advice.
23     I don't think I'm going to heighten too much what I've
24     already said to the jury.
20:19 25              I think I'm simply going to make a general
```

UNITED STATES DISTRICT COURT

 1    statement once again without continually ringing the bell

 2    that the assertion of the attorney-client privilege is

 3    expected, accepted, whatever.

 4            Let me draft that tonight.

20:20  5            But I'm not going to preclude you if you think

 6    you're being disenfranchised or harmed in some way for asking

 7    the year 2007.

 8            And that is consistent with what I already said to

 9    the jury.  In other words, I already said there is a dispute

20:20 10   between 2007 and 2010.

 11           Counsel, you can refer to it as 2010.

 12           I don't wish to heighten that any more.  If there's

 13   any prejudice, it's minimal and the real prejudice would be

 14   if the court continually advised in the same area.

20:20 15          I think it was adequate.  Just in case, I'm going

 16   to state that the assertion of the attorney-client privilege

 17   is not only acceptable but expected.

 18           But let me draft that tonight.  Finally, we have

 19   more information concerning the juror.

20:20 20          MS. HURST:  All right.

 21           The panel was the University of California at

 22   Irvine Career Fest Bio-Technology and Science Panel.

 23           It began at 5:00 p.m. as a general panel with five

 24   participants.

20:21 25          Ms. Passananti was one of the participants.

```
 1    Mr. Reckers was one of the participants.  And there were some
 2    other representative of Allergan, a water engineer, someone
 3    from the FDA.  Each of them were introduced by name and
 4    affiliation at the outset.
20:21  5         Ms. Passananti was not here during the jury
 6    selection and did not recognize Mr. Reckers' name when he was
 7    first introduced.
 8         The panel spoke for about an hour with the
 9    moderator asking each of them the same series of four to five
20:21 10    questions about their career path, that sort of thing.
11         At about six o'clock -- at some point the students
12    were allowed to ask questions, and about six o'clock a
13    student asked a question which procured from Mr. Reckers a
14    comment about his participation on a jury in federal court in
20:22 15    Santa Ana.
16         THE COURT:  Did he mention the case?
17         MS. HURST:  He did not.  He said he should not
18    mention the case and he would not mention it by name.
19         THE COURT:  Good.
20:22 20         MS. HURST:  And then after that they broke up into
21    small groups with various of the students going with various
22    members of the panel, and Ms. Passananti and Mr. Reckers were
23    not in the same room after that.
24         She said they did not speak directly during the
20:22 25    course of the panel or otherwise throughout the evening.
```

1        THE COURT:  Did he indicate that he recognized her

2   in any way?

3        MS. HURST:  No.

4        THE COURT:  Did she indicate that she was counsel

20:22 5   for a firm?

6        MS. HURST:  She did say, when she was initially

7   introduced at the beginning of the night, her name and her

8   affiliation with the Orrick law firm.

9        THE COURT:  Now, two questions for you.

20:22 10       Remember Mr. Reckers is the one who reported to the

11   court --

12       MR. ZELLER:  Right.

13       THE COURT:  -- to refresh your recollection, that

14   one of the jurors had made a comment that I divulged to all

20:23 15   of you.

16       Second, I think it would be wise, regardless of

17   your decision, if that the attorney who was on that panel not

18   appear in court in the audience, so there's absolutely no

19   association.

20:23 20       And then let me turn to Mattel and see what action

21   you'd like me to take.

22       Would you like me to single this juror out for

23   questioning?

24       MR. QUINN:  No.  I think we are comfortable,

20:23 25   Your Honor, especially if the attorney does not show up in

UNITED STATES DISTRICT COURT

|    |    |
|----|----|
| 1 | the courtroom. |
| 2 | MS. HURST:  We'll instruct her not to appear for |
| 3 | the remainder of the trial. |
| 4 | THE COURT:  Now, what else is remaining this |
| 20:23 5 | evening? |
| 6 | We've got an additional six binders being given to |
| 7 | me at six o'clock.  I hardly know what to do with myself this |
| 8 | evening. |
| 9 | MR. ZELLER:  Well, it's woefully short of six |
| 20:24 10 | binders, but we do have additional documents to add to that. |
| 11 | THE COURT:  I knew you would. |
| 12 | Can I send the court reporter home, though? |
| 13 | MS. HURST:  It's fine with us. |
| 14 | THE COURT:  So those two orders I'll put out. |
| 20:24 15 | MR. QUINN:  Well, there is one thing that perhaps |
| 16 | ought to go on the record, Your Honor. |
| 17 | THE COURT:  Please. |
| 18 | MR. QUINN:  You know, Mr. Larian, bless his heart, |
| 19 | volunteered today that he said -- |
| 20:24 20 | THE COURT:  Use the microphone -- |
| 21 | MR. QUINN:  Mr. Larian said that, apropos of |
| 22 | nothing, volunteered that Carter Bryant had had a stroke at |
| 23 | the airport, and, you know, we're kind of concerned about |
| 24 | the -- the impact on that and -- |
| 20:24 25 | THE COURT:  Frankly, I am too.  I mean, let's just |

 1   get that on the record.

 2           That was absolutely fortuitous, just like the death

 3   of his father.

 4           MR. QUINN:  That was the second thing I was going

20:24 5   to mention.

 6           THE COURT:  And I am very concerned about the

 7   currying of sympathy from the jury and, quite frankly, the

 8   first half hour of his testimony and his decision that he

 9   apparently was going to be the judge and decide when and how

20:25 10  he was going to answer questions was about to meet with this

 11  court's disapproval at 1:15 in the strongest terms.

 12          Somehow over the lunch hour he changed that.

 13          But I unfortunately notice I'm the only judge in

 14  this court and Mr. Larian and no witness will be directing

20:25 15  anything other than answering the questions asked.  And this

 16  fortuitous comment, if I hear that one more time, he's going

 17  to meet with the court's strongest disapproval in front of

 18  the jury.

 19          Now I'm not so naive to believe that that doesn't

20:25 20  cure the problem and, quite frankly, I would imagine that

 21  Mattel would like Mr. Larian to be what they perceive in his

 22  normal mode, spouting off about everything conceivable and

 23  possible.  But apparently Mr. Larian is prepared to answer

 24  questions with a couple attempts at sympathy.

20:26 25          I'm not quite certain how to handle that.  I tried

Case 2:04-cv-09049-DOC-RNB   Document 9846   Filed 02/10/11   Page 53 of 67   Page ID #:297336
CV 04-9049 DOC - 02/08/2011 Volume 3 of 3 - REDACTED UNSEALED

53

 1   to handle that at the time immediately as best I could with,

 2   one, the court didn't know that that had occurred because I

 3   wasn't there and I don't have any more information and I

 4   don't know if it was a stroke.  I was informed that he got

20:26  5   sick at the airport or had a stroke.  Nobody could confirm

 6   that.  I asked if he got on the plane.

 7            So I have no further information.

 8            So that's hearsay upon hearsay.

 9            Second, this allegation that his father was killed,

20:26 10   maybe he believes that -- by Mattel -- because he's been

11   forced to testify.

12            What do you want me to do about it?

13            MR. QUINN:  Well, I -- I --

14            THE COURT:  In other words, I'm putting everybody

20:26 15   on notice.

16            Another fortuitous comment like that's going to

17   cause, unfortunately, the court to step in.

18            Now, that's going to be coequal, though.  When

19   Mr. Eckert is on the stand and he decides that he's going to

20:27 20   tell us about the virtues of his family, et cetera, I'm

21   stepping in.

22            So remember at the beginning of the case I said,

23   How do you want the case to go?  A little bit of laughter, a

24   little bit of looseness, everybody kind of decided that they

20:27 25   wanted a trial that was as close to the rules as we could get

1   it because of the first occurrence of the first trial.

2         So I'll talk to you, Mr. Quinn.  I'm happy to ring

3   the bell again by saying please disregard the fact that

4   Mr. Bryant may have had a stroke, and please disregard the

20:27 5   fact of Mr. Larian blurting out that his father believes that

6   he was killed -- or that Mr. Larian believes his father was

7   killed by Mattel.  It's like I'm ringing the bell again and

8   again and again.  So that was the court's immediate attempt

9   to step in without you being placed in the position of even

20:28 10   making the objection.

11         If you noticed, you didn't have to make the

12   objection.  It was so inappropriate.  And I didn't want

13   Mattel to be disadvantaged by having to jump to the lectern.

14   I saw Mr. Price's face.  It was enough to indicate to the

20:28 15   court that he was chagrinned by it.  Obviously it was

16   improper.

17         But what action would you like me to take?

18         MR. QUINN:  Well, I -- I'm -- I'm -- I'm more

19   concerned about the Carter Bryant comment.  I'm concerned

20:28 20   about the father comment, but I think I'm more concerned

21   about the Carter Bryant comment because these folks on the

22   jury have seen that man up there just last week for several

23   days.

24         THE COURT:  He looked fine to me.  Other than some

20:28 25   restroom breaks, I didn't see an indication of any -- and I

1    don't want to say what we've said in chambers about

2    Carter Bryant, because this will be a public record.  I'm not

3    sealing this record.

4           But there was no indication of a stroke.

20:28 5           Whatever we heard was not manifested in terms of

6    his testimony.  He looked healthy and whole, in my opinion,

7    when he got off that stand.

8           Now, I'm happy to advise the jury, once again, that

9    they're to disregard any comments about Carter Bryant.

20:29 10          MR. QUINN:  Well, and to further go on and say that

11   we have no reason to believe there is anything wrong with

12   Mr. Bryant's health, that a statement was made, which --

13   there's no evidence of.

14          THE COURT:  Just a moment.

20:29 15          What happens -- think this through for a moment.

16          What happens if Carter Bryant is called back to the

17   stand by either MGA, which I doubt, or you want him back,

18   which you've indicated for rebuttal?

19          Regardless, things have a way of coming full

20:29 20   circle, and you really need to take the evening, I think, and

21   think that through.

22          MR. QUINN:  Okay.

23          THE COURT:  Because I don't know what's going to be

24   said.  I don't know what gets blurted out.  I don't know what

20:30 25   gets asked.  It may be -- and I'm concerned that if that

UNITED STATES DISTRICT COURT

56

```
 1    statement's made and it turns out that he did have a stroke,

 2    which I sincerely doubt, by the way, because if he's back in

 3    Missouri, you don't put a person who has had a stroke on the

 4    plane.

 5         So perhaps you might want to call his attorney

 6    tomorrow morning first.

 7              MR. QUINN:  And ask?

 8              THE COURT:  And ask.

 9         And then give me further direction because

10    Mr. Larian will be on the stand, but we need to resolve it

11    quickly if there's going to be any further comment by the

12    court.

13         But I would just really implore both people to hold

14    to the answers to the questions and I don't think, quite

15    frankly, MGA thinks that that was to their advantage in the

16    long run.

17              MR. QUINN:  I think that's a good suggestion.

18         We'll try to get ahold of Mr. Bonus (ph),

19    Your Honor.

20              THE COURT:  Okay.  What else this evening?

21              MR. PRICE:  I don't know that these have to be

22    resolved this evening, but in terms of issues coming up that

23    we've discussed, the -- and this is -- the court has briefs

24    on this and we've discussed it.

25              The Castilla plea, whether that -- the court has
```

UNITED STATES DISTRICT COURT

Case 2:04-cv-09049-DOC-RNB   Document 9846   Filed 02/10/11   Page 57 of 67   Page ID #:297340
CV 04-9049 DOC - 02/08/2011 Volume 3 of 3 - REDACTED UNSEALED

57

1   indicated that, tentatively, at least, that that will come

2   in, perhaps, for credibility when Mr. Castilla is on the

3   stand.

4           We've argued the position in our briefing that it

20:31 5   comes in substantively because of the nature of the

6   conviction.  So that is something that potentially we would

7   like to ask Mr. Larian about this week.

8           THE COURT:  Okay.

9           MR. QUINN:  A second issue, which I know the court

20:31 10   is very much looking forward to grappling with are the

11   accused dolls in other proceedings.

12           Your Honor, this is the one issue where I think --

13   I know the court is -- based on the Ninth Circuit's decision,

14   I know the court is weary of getting into issues of

20:32 15   similarity.  But this is one issue -- one instance where I

16   believe it cannot be avoided because if it is determined that

17   we -- that Mattel owns the drawings, then the question must

18   be addressed as to whether the first generation dolls

19   infringe the drawings or whether, as has been suggested by

20:32 20   MGA, they are so different that they could not infringe.

21           And as we've indicated in the submission we made to

22   the court, we believe the positions that they have taken on

23   that -- on that issue, that is to say, the similarity of the

24   drawings with what we think are completely dissimilar dolls,

20:33 25   is relevant.

 1            THE COURT:  In these Hong Kong proceedings?

 2            MR. QUINN:  Hong Kong, UK, and one case here in the

 3   Central District of California.

 4            THE COURT:  I'm already prepared on that.  Quite

20:33 5   frankly, I'm just thinking that through one more time this

 6   evening.

 7            MR. QUINN:  Right.

 8            THE COURT:  I've already given directions for a

 9   draft on that.  I just want another evening.  I was going to

20:33 10  hand it down, but I'm just delaying that for a couple hours.

 11           MR. QUINN:  Okay.

 12           I think those are the only immediate things, the

 13   things that we see on the immediate horizon, Your Honor.

 14           THE COURT:  In other words the procurement of the

20:33 15  dolls concerning the other proceedings, dissimilarity, the

 16   fact that MGA, at least, and Mr. Larian through MGA is taking

 17   the position that these dolls are so similar when they appear

 18   to be so dissimilar.

 19           MR. QUINN:  Exactly.

20:33 20           THE COURT:  Would you like me to try this case a

 21   third time?

 22           I'm just joking with you.

 23           MR. QUINN:  It's a lot of fun, Your Honor.

 24           THE COURT:  I'm a little concerned about the

20:34 25  Ninth Circuit's direction to the court on that,

```
 1    taking that position.
 2              Thank you.
 3              MR. QUINN:  Thank you, Your Honor.
 4              And then we have the issue about factual statements
20:34 5    in affidavits and other documents in other proceedings.
 6              We already saw one paragraph today.  I would expect
 7    that there will be offers -- similar offers about factual
 8    statements.
 9              THE COURT:  Here -- here's where I think the
20:34 10   controversy's going to be.
11              I think it was well-handled today by Mr. Price,
12    because there was simply a reference to a statement made in
13    Paragraph 3.  What I'm trying to avoid, if I rule against you
14    concerning the accused dolls in other proceedings, which I
20:34 15   tentatively am, is a reference to another proceeding in a
16    different jurisdiction.
17              So there may be factual statements in the document
18    itself that I think are appropriate to put in.  The fact it
19    derives out of another lawsuit causes me concern.
20:35 20              And the second thing that causes me concern are the
21    different standards that apply in different jurisdictions.
22              That's what I'm wrestling with.
23              MR. QUINN:  Right.
24              THE COURT:  What the requirements are in Hong Kong
20:35 25   versus the United States.
```

```
 1              MR. QUINN:  Right.  I --

 2              THE COURT:  So give me -- just give me an evening

 3    on that.

 4              MR. QUINN:  Yes, Your Honor.

20:35 5         THE COURT:  Now, the third thing is --

 6              MR. QUINN:  Castilla.

 7              THE COURT:  No.  Castilla -- I'll get back to you

 8    on Castilla probably tomorrow.

 9              MR. QUINN:  All right.

20:35 10        THE COURT:  I'm more inclined to let your

 11   statements in in these other proceedings if there aren't

 12   references to these being --

 13             MR. QUINN:  All right.

 14             THE COURT:  -- these being specific proceedings or

20:35 15  proceedings, and that's why I thought it was well handled

 16   today in Paragraph 3.  It didn't say in the Hong Kong lawsuit

 17   involving.

 18             Second, I need to verify why they're relevant.

 19             I think your argument is, first of all, they're

20:36 20  signed on behalf of MGA as a corporate entity because on many

 21   of these Mr. Larian's name doesn't appear.

 22             MR. PRICE:  That is correct.

 23             THE COURT:  So it has to be that your argument is

 24   it's MGA, it's not Larian.

20:36 25            How do I divide that out in front of the jury?
```

```
 1              In other words, how do I segment that so the jury

 2    understands that these statements are directed towards the

 3    corporate defendant who sits here and not Mr. Larian

 4    specifically who didn't sign off on this particular

20:36 5    complaint?

 6              Think about it tonight.

 7              MR. QUINN:  All right.

 8              THE COURT:  That's my second concern, because

 9    otherwise Mr. Price will make it sound as if the statement in

20:37 10   the lawsuit, which he's not to mention is a lawsuit, is

 11   attributable to Mr. Larian, when it, in theory, should only

 12   be attributable -- not only -- but should be attributable to

 13   MGA.

 14             And since Larian didn't sign off and they're

20:37 15   separate corporate entities, I need some way of dealing with

 16   that.

 17             MR. PRICE:  Well, I expect there will be -- that

 18   won't be the only instance of evidence in this case that

 19   comes in as relevant for claims against MGA but not

20:37 20   Mr. Larian.

 21             THE COURT:  Absolutely, and all I'm asking is some

 22   way to deal with that from the very beginning.

 23             MR. QUINN:  Uh-huh.

 24             THE COURT:  In other words, the first intonation of

20:37 25   that was today in Paragraph 3.  That's a preview of me -- for
```

1       me of things to come.

2                I need to deal with that same way effectively, so

3       it's understood it's against MGA, not against Larian.

4                Okay.  There the prejudicial effect would outweigh

20:38 5       the probative value because of confusion to the jury, and you

6       don't want to face that obstacle.

7                So by tomorrow morning at --

8                MR. QUINN:  7:30?

9                THE COURT:  Okay.

20:38 10              MR. ZELLER:  Joy checked our records, Your Honor.

11               With respect to entry E -- -6, which is why I asked

12      for the Bates number -- apparently we don't have produced to

13      us a redacted version of that.

14               It was produced to us, apparently an unredacted

20:38 15      form at one point.  It was clawed back, and so we do not have

16      it.

17               THE COURT:  You do now.

18               MS. HURST:  I'm walking across the room.

19               MR. McCONVILLE:  Your Honor, on the issue of the

20:38 20      Paragraph 3 or whatever it was in the declaration, so we

21      renew our objection to the publication of an exhibit that

22      isn't in evidence and will --

23               THE COURT:  It's not going to be published.

24               MR. McCONVILLE:  It was published today,

20:39 25      Your Honor.

```
 1              THE COURT:  I understand that.  That's a mistake on
 2     my part.
 3              MR. McCONVILLE:  Okay.
 4              THE COURT:  It's not coming into evidence --
20:39  5     well --
 6              MR. QUINN:  But why wouldn't it, Your Honor?
 7              THE COURT:  Wait a minute.  Just a moment.  Maybe
 8     that's not a mistake.
 9              What I'm trying to balance is predicting the fact
20:39 10     that there's another lawsuit, but it's certainly a public
11     document, it's certainly an official document in some sense,
12     and if you disagree with me about that, it's certainly a
13     filing that pertains to MGA.
14              MR. McCONVILLE:  So the -- that paragraph, as I
20:39 15     recall it, described plaintiffs and whatnot, so it actually
16     described another lawsuit.
17              So if the court's --
18              THE COURT:  No, it described the income --
19              MR. McCONVILLE:  Your Honor, I recall when that --
20:39 20     because I didn't have it in front of me when it came up on
21     the screen.
22              THE COURT:  No argument.  I may be wrong, so let's
23     drag it out and look at it.
24              In other words, it's a good time.  It's a de
20:39 25     minimis problem, if it's occurred, but let's not repeat the
```

 1    error if we can solve it now.

 2              (Pause in the proceedings.)

 3              THE COURT:  Now I'm not certain that Mr. Price

 4    can't get started tomorrow.

20:40 5          MR. QUINN:  Well, I'm sure he can.

 6              THE COURT:  Without Castilla?  Then why are we

 7    meeting at 7:30?

 8              MR. PRICE:  I guess we just need to address the --

 9    the Carter Bryant issue and -- and "you killed my father"

20:41 10   so --

 11             THE COURT:  I'll see you at 8:00.

 12             MR. QUINN:  8:00, then.

 13             All right.

 14             THE COURT:  That's your call.

20:41 15        If you want me to bring attention to it again I'm

 16   happy to make an attempt.

 17             I think it was adequately handled, frankly, with

 18   the admonition without heightening that.

 19             MR. QUINN:  I'm just -- they may be wondering about

20:41 20  Carter Bryant's well-being.  They did see him up there for

 21   several days.

 22             THE COURT:  Why don't you call the attorney.

 23             MR. QUINN:  We will.

 24             THE COURT:  And I don't think you're going to

20:41 25  get -- you see, here's the problem.

1      We can meet at 7:30.  We can meet at 6:00 if you

2  want to tomorrow morning.  I don't think you're going to get

3  ahold of the attorney until mid-morning sometime.

4           MR. QUINN:  I suspect you are right.

20:41 5           THE COURT:  So I've got you sitting here now.

6           By the way, please come down at 7:00.  I'll

7  demonstrate to you that I'm here and happy to meet with you.

8           I'm trying to reserve my trial counsel and for you

9  to sit here for an hour waiting for an attorney from Northern

20:41 10  California to come in here at 10:00.

11           MR. QUINN:  I agree, Your Honor.

12           Would it be out of the question to tell a white lie

13  to the jury and tell them there's nothing wrong with

14  Mr. Bryant's health?

20:42 15           MS. HURST:  That would be --

16           THE COURT:  There's nothing wrong with it except if

17  he is and he's called back and it's going to catch ya,

18  potentially.  Find out first.

19           MR. QUINN:  Okay.

20:42 20           THE COURT:  Knowledge is wisdom and then, you know,

21  the truth is always good because a lie walks around on legs

22  and we try to patch it up and the court could get away with

23  it.  You can't -- especially if he comes in on oxygen.

24           Find out.

20:42 25           MR. QUINN:  All right.

66

```
 1              THE COURT:  Or in a wheelchair or with a cane or

 2     with slurred speech if it's a stroke or a bad left arm?  Am I

 3     making my point?

 4              MR. ZELLER:  You are.

20:42 5          THE COURT:  Good.

 6              MR. McCONVILLE:  Your Honor, Exhibit 13743, which

 7     was the one that was -- we looked at today, Paragraph 3

 8     refers to the plaintiff in the action.

 9              THE COURT:  You're right.

20:43 10         Has that been received into evidence?

11              MR. McCONVILLE:  No, you didn't receive it into

12     evidence.

13              THE COURT:  What an incredibly great ruling by the

14     court.

20:43 15         MR. McCONVILLE:  Again, Your Honor.

16              THE COURT:  It went up on the screen and nobody

17     noticed it, because the reference to the question were to the

18     assets.

19              I never heard plaintiff refer to it flashed up on

20:43 20    the screen but we'll make sure that that's not duplicated.

21              MR. McCONVILLE:  Thank you.

22              THE COURT:  Anything else?

23              MR. QUINN:  I think that's it, Your Honor.

24              THE COURT:  Goodnight.

25         //                                          //
```

UNITED STATES DISTRICT COURT

CV 04-9049 DOC - 02/08/2011 - Volume 3 of 3 - REDACTED UNSEALED

67

1                    (Proceedings concluded at 20:43 on 02-08-2011.

2    Next proceedings reported by Debbie Gale.  Proceedings

3    concluded until Wednesday, February 9, 2011, 8:30 a.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25