1                    **UNITED STATES DISTRICT COURT**

2                    **CENTRAL DISTRICT OF CALIFORNIA**

3             **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4                        - - - - - - -

5
   MATTEL, INC., et al.,              )
6                                      )
               Plaintiffs,            )
7                                      )
        vs.                           ) No. CV 04-9049 DOC
8                                      )    Day 15
   MGA ENTERTAINMENT, INC., et al.,   )    Volume 1 of 3
9                                      )
                                       )
10             Defendants.            )
   _____)

11

12

13

14             REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                       Jury Trial

16                   Santa Ana, California

17               Wednesday, February 9, 2011

18

19

20

21   Debbie Gale, CSR 9472, RPR, CCRR
     Federal Official Court Reporter
22   United States District Court
     411 West 4th Street, Room 1-053
23   Santa Ana, California 92701
     (714) 558-8141
24

25   04cv9049 Mattel 2011-02-09 D15V1

Case 2:04-cv-09049-DOC-RNB   Document 9863   Filed 02/14/11   Page 2 of 148   Page ID #:297561
CV 04-9049 DOC - 2/9/2011 - Day 15, Volume 1 of 3

2

1    **APPEARANCES OF COUNSEL:**

2

     FOR PLAINTIFF MATTEL, INC., ET AL.:
3
                QUINN EMANUEL URQUHART & SULLIVAN
4               BY:  JOHN QUINN
                     WILLIAM PRICE
5                    MICHAEL T. ZELLER
                     Attorneys at Law
6               865 South Figueroa Street
                10th Floor
7               Los Angeles, California 90017
                (213) 443-3000
8

9

10

11   FOR DEFENDANT MGA ENTERTAINMENT, INC., ET AL:

12              ORRICK, HERRINGTON & SUTCLIFFE, LLP (Irvine)
                BY:  THOMAS S. McCONVILLE
13                   Attorney at Law
                4 Park Plaza
14              Suite 1600
                Irvine, California 92614
15              (949) 567-6700

16              - AND -

17              ORRICK, HERRINGTON & SUTCLIFFE, LLP (SF)
                BY:  ANNETTE L. HURST
18                   Attorney at Law
                405 Howard Street
19              San Francisco, California 94105
                (415)773-5700
20
                - AND -
21
                KELLER RACKAUCKAS
22              BY:  JENNIFER KELLER
                     Attorney at Law
23              18500 Von Karman Avenue
                Suite 560
24              Irvine, California 92612
                (949) 476-8700
25

DEBBIE GALE, U.S. COURT REPORTER

1    **APPEARANCES OF COUNSEL (Continued):**

2

3    FOR CARLOS GUSTAVO MACHADO GOMEZ:

4
             LAW OFFICES OF MARK E. OVERLAND
5            By:  MARK E. OVERLAND
                  Attorney at Law
6            100 Wilshire Boulevard
             Suite 950
7            Santa Monica, California 90401
             (310) 459-2830
8
             - AND -
9
             SCHEPER KIM & HARRIS LLP
10           BY:  ALEXANDER H. COTE
                  Attorney at Law
11           601 West 5th Street
             12th Floor
12           Los Angeles, California 90071
             (213) 613-4660
13

14   ALSO PRESENT:

15           MGA ENTERTAINMENT, INC.
             BY:  JEANINE PISONI
16                Attorney at Law
             16360 Roscoe Boulevard
17           Suite 105
             Van Nuys, California 91406
18

19           ROBERT ECKERT, Mattel CEO

20           ISAAC LARIAN, MGA CEO

21           KEN KOTARSKI, Mattel Technical Operator

22           MIKE STOVALL, MGA Technical Operator

23           RACHEL JUAREZ, Quinn Emanuel Urquart & Sullivan

24

25

1                              **I N D E X**

2    **WITNESSES**                    **DIRECT  CROSS  REDIRECT  RECROSS**

3    LARIAN, Isaac

4
     By Mr. Price                   5
5

6                              **EXHIBITS**

7    **EXHIBIT NO.**                    **IDENTIFICATION   IN EVIDENCE**

8      17      Modification of the                      22
               MGA-Bryant agreement
9
       1932    Chart of Mattel                          95
10             employees and positions
               that went to MGA
11
       4924    E-mail between                           85
12             Ms. Valencia and
               Mr. Larian
13
       7055    E-mail between                          104
14             Mr. Larian and
               Ms. O'Connor
15
       11840   Modification and                         21
16             Clarification of the
               Agreement dated
17             September 18, 2000

18     11907   E-mail chain betweeen                   101
               Mr. Larian and
19             Ms. O'Connor

20     13561   Pages 37 through 40,                     56
               e-mail string between
21             Mr. Larian and Mr. Black
               re: Toy Deopt Limited
22
       13621   Contract with "Final"                     9
23             written on it

24     17252   Letter from Quinn                         53
               Emmanuel firm to MGA
25

DEBBIE GALE, U.S. COURT REPORTER

|       |    |                                                                  |
|-------|----|------------------------------------------------------------------|
|       | 1  | **SANTA ANA, CALIFORNIA, WEDNESDAY, FEBRUARY 9, 2011**            |
|       | 2  | **Day 15, Volume 1 of 3**                                        |
|       | 3  | (8:33 a.m.)                                                       |
| 08:33 | 4  | *(In the presence of the jury.)*                                 |
| 08:33 | 5  | THE COURT:  All right.  We're back in session.                   |
| 08:33 | 6  | The jury is the present, the alternates.  All counsel are        |
| 08:33 | 7  | still present -- Mr. Larian, thank you -- and the parties.       |
| 08:33 | 8  | And this is continued examination by Mr. Price on               |
| 08:34 | 9  | behalf of Mattel.                                                |
| 08:34 | 10 | **ISAAC LARIAN, MATTEL'S WITNESS, PREVIOUSLY SWORN**            |
| 08:34 | 11 | **RESUMED THE STAND**                                           |
| 08:34 | 12 | **DIRECT EXAMINATION (Continued)**                             |
| 08:34 | 13 | BY MR. PRICE:                                                    |
| 08:34 | 14 | Q.   Good morning, Mr. Larian.                                   |
| 08:34 | 15 | A.   Good morning.                                               |
| 08:34 | 16 | Q.   I'd like to start where we left off.  We were looking      |
| 08:34 | 17 | at Exhibit 9855.                                                 |
| 08:34 | 18 | MR. PRICE:  If we could put that up.                             |
| 08:34 | 19 | *(Document displayed.)*                                          |
| 08:34 | 20 | BY MR. PRICE:                                                    |
| 08:34 | 21 | Q.   Mr. Larian, I was asking you about the language where      |
| 08:34 | 22 | it says that Carter was designing and developing the Bratz       |
| 08:34 | 23 | in his free time outside Mattel on weekends or evenings.  Do     |
| 08:34 | 24 | you see that?                                                    |
| 08:34 | 25 | A.   I do.                                                       |

CV 04-9049 DOC - 2/9/2011 - Day 15, Volume 1 of 3

6

| | | |
|---|---|---|
| 08:34 | 1 | Q.   And it referred to Richard.  And you're talking about |
| 08:34 | 2 | Richard Irmen? |
| 08:34 | 3 | A.   Yes. |
| 08:34 | 4 | Q.   And I believe you said -- you're referring, in this |
| 08:34 | 5 | e-mail to Ms. Glaser, to the time in Missouri, correct? |
| 08:35 | 6 | A.   At that time my understanding was that Richard Irmen |
| 08:35 | 7 | and Carter Bryant been together for a long time.  And that |
| 08:35 | 8 | he had seen him in Missouri; that's correct. |
| 08:35 | 9 | Q.   Well, I think you said this was based on a conversation |
| 08:35 | 10 | you actually had with Mr. Irmen; is that right? |
| 08:35 | 11 | A.   Yes. |
| 08:35 | 12 | Q.   And, in fact, Mr. Irmen did not live with Mr. Bryant in |
| 08:35 | 13 | Missouri in 1998, correct? |
| 08:35 | 14 | A.   As the date of this e-mail, June 29, 2001, I was not |
| 08:35 | 15 | aware of that.  I became aware of that during this |
| 08:35 | 16 | litigation. |
| 08:35 | 17 | Q.   Well, but I think you've told us that this e-mail is |
| 08:35 | 18 | based on an actual conversation you had with Mr. Irmen, |
| 08:35 | 19 | correct? |
| 08:35 | 20 | A.   Yes. |
| 08:35 | 21 | Q.   And it's correct that Mr. Irmen never represented to |
| 08:35 | 22 | you that he was living with Carter Bryant in 1998? |
| 08:35 | 23 | A.   That's correct. |
| 08:35 | 24 | Q.   Now, in this e-mail, one of the things you're trying to |
| 08:36 | 25 | do is convey to Ms. Glaser that Mr. Bryant did something |

Case 2:04-cv-09049-DOC-RNB   Document 9863   Filed 02/14/11   Page 7 of 148   Page ID #:297566
CV 04-9049 DOC - 2/9/2011 - Day 15, Volume 1 of 3

7

| 08:36 | 1 | outside of Mattel, correct? |
| 08:36 | 2 | A.   No.  I was just relaying what I heard from Rich Irmen. |
| 08:36 | 3 | Q.   Well, you say that Mr. Bryant -- Carter designed and |
| 08:36 | 4 | developed the Bratz line on his own -- on his free time |
| 08:36 | 5 | outside Mattel.  That's what you're telling Ms. Glaser, |
| 08:36 | 6 | correct? |
| 08:36 | 7 | A.   That's correct. |
| 08:36 | 8 | Q.   And you understand that a lawyer, in trying to give you |
| 08:36 | 9 | advice, can give you the best advice if they know all the |
| 08:36 | 10 | facts, right? |
| 08:36 | 11 | A.   Yes. |
| 08:36 | 12 | Q.   And here, you use the phrase "outside Mattel," correct? |
| 08:36 | 13 | A.   Yes. |
| 08:36 | 14 | Q.   And you didn't want Ms. Glaser to know that Mr. Bryant |
| 08:36 | 15 | had done anything inside Mattel; isn't that right? |
| 08:36 | 16 | A.   That's not correct. |
| 08:36 | 17 | Q.   Well -- |
| 08:36 | 18 | A.   I wasn't hiding anything from Ms. Glaser. |
| 08:36 | 19 | Q.   Well, if you look at -- well, first of all, was it your |
| 08:37 | 20 | belief that when Ms. Glaser read this e-mail saying that |
| 08:37 | 21 | Carter designed and -- and developing the Bratz line at his |
| 08:37 | 22 | free time outside Mattel -- was it your belief that when she |
| 08:37 | 23 | read that, she would understand that you're referring to a |
| 08:37 | 24 | place way outside Mattel, in Missouri in 1998? |
| 08:37 | 25 | A.   I don't know.  I never had a discussion with her to |

| 08:37 | 1 | find out what was her understanding. |
| 08:37 | 2 | Q.   Well, you did, shortly after this, send her a fax of |
| 08:37 | 3 | Mr. Bryant's contract, correct? |
| 08:37 | 4 | A.   Yes. |
| 08:37 | 5 | Q.   You directed Ms. O'Connor to send that fax? |
| 08:37 | 6 | A.   That's correct. |
| 08:37 | 7 | Q.   And if Ms. O'Connor had sent an accurate fax of that |
| 08:37 | 8 | contract, it would show that Mr. Bryant was acting inside |
| 08:37 | 9 | Mattel in connection with his relationship with MGA, |
| 08:37 | 10 | correct? |
| 08:38 | 11 | A.   That's not correct. |
| 08:38 | 12 | Q.   Well, let's look at 13383. |
| 08:38 | 13 | *(Document provided to the witness.)* |
| 08:38 | 14 | *(Document displayed.)* |
| 08:38 | 15 | THE WITNESS:  Yes, go ahead.  I'm familiar with |
| 08:38 | 16 | this. |
| 08:38 | 17 | BY MR. PRICE: |
| 08:38 | 18 | Q.   And you see the cover page, which says, "July 3, 2001"? |
| 08:38 | 19 | A.   That's correct. |
| 08:38 | 20 | Q.   And that's a few days after your June 29 e-mail -- |
| 08:38 | 21 | A.   It is. |
| 08:38 | 22 | Q.   -- to Ms. Glaser? |
| 08:38 | 23 | And it was faxed to Ms. Glaser from Victoria O'Connor |
| 08:38 | 24 | at your direction, correct? |
| 08:38 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 08:38 | 1 | Q.   And if we look at the next page. |
| 08:38 | 2 | *(Document displayed.)* |
| 08:38 | 3 | BY MR. PRICE: |
| 08:38 | 4 | Q.   You see it says, "final"? |
| 08:38 | 5 | A.   It does. |
| 08:38 | 6 | Q.   And there was -- MGA had in its files a copy of the |
| 08:38 | 7 | contract which also had that writing "final" on it, correct? |
| 08:39 | 8 | A.   I don't know. |
| 08:39 | 9 | Q.   Well, let me ask you to look at Exhibit 13621. |
| 08:39 | 10 | *(Document provided to the witness.)* |
| 08:39 | 11 | THE WITNESS:  Yes. |
| 08:39 | 12 | BY MR. PRICE: |
| 08:39 | 13 | Q.   And you can compare the top parts of this.  You see |
| 08:39 | 14 | that 13621 has MGA Bates numbers at the bottom? |
| 08:39 | 15 | A.   Yes. |
| 08:39 | 16 | Q.   It was produced by MGA, correct? |
| 08:39 | 17 | A.   Yes, that's correct. |
| 08:39 | 18 | MR. PRICE:  If we could put the top halves of |
| 08:39 | 19 | 13621 and 13383 -- |
| 08:39 | 20 | Oh, Your Honor, I'm sorry.  I move 13621 into |
| 08:40 | 21 | evidence. |
| 08:40 | 22 | THE COURT:  Received. |
| 08:40 | 23 | *(Exhibit No. 13621 received in evidence.)* |
| 08:40 | 24 | *(Document displayed.)* |
| | 25 | |

CV 04-9049 DOC – 2/9/2011 – Day 15, Volume 1 of 3

10

| | | |
|---|---|---|
| 08:40 | 1 | BY MR. PRICE: |
| 08:40 | 2 | Q.   You see that both have the handwriting "final" on them, |
| 08:40 | 3 | correct? |
| 08:40 | 4 | A.   They do. |
| 08:40 | 5 | Q.   But the one that was faxed to Ms. O'Connor -- I'm |
| 08:40 | 6 | sorry -- to Ms. Glaser.  The one that was faxed by |
| 08:40 | 7 | Ms. O'Connor to Ms. Glaser is missing the "Dated as of |
| 08:40 | 8 | September 18, 2000."  Do you see that? |
| 08:40 | 9 | A.   I see that. |
| 08:40 | 10 | Q.   So when this was sent to Ms. Glaser, she did not have |
| 08:40 | 11 | the information that the contract itself was dated as of |
| 08:40 | 12 | September 18, 2000, correct? |
| 08:40 | 13 | A.   Apparently did not, yes. |
| 08:40 | 14 | Q.   Now, if you'll also look at the one you faxed |
| 08:40 | 15 | Ms. Glaser, 13383, you see there's a fax at the bottom? |
| 08:40 | 16 | A.   Yes. |
| 08:40 | 17 | Q.   It says July 3 -- it's upside-down. |
| 08:40 | 18 | A.   Yes, I see that. |
| 08:41 | 19 | Q.   It says July 3, 01, MGA Entertainment, and it has a |
| 08:41 | 20 | number.  Do you see that? |
| 08:41 | 21 | A.   Yes. |
| 08:41 | 22 | Q.   That's a fax number? |
| 08:41 | 23 | A.   Yes. |
| 08:41 | 24 | Q.   And it's your understanding that when you fax a |
| 08:41 | 25 | document to another party, that there's an indication of |

CV 04-9049 DOC - 2/9/2011 - Day 15, Volume 1 of 3

11

| | | |
|---|---|---|
| 08:41 | 1 | faxing it, correct? |
| 08:41 | 2 | A.   I have seen that, yes. |
| 08:41 | 3 | Q.   I mean, in fact, you always see it.  It's a federal |
| 08:41 | 4 | requirement.  It's a requirement of law that the fax have |
| 08:41 | 5 | that identifying information, correct? |
| 08:41 | 6 | A.   I have sometimes seen that they don't have it, and I |
| 08:41 | 7 | not sure if there's a federal law or not. |
| 08:41 | 8 | Q.   Well, if you look at what you sent Ms. Glaser, 13 -- |
| 08:41 | 9 | I'm sorry -- what you have in your files, 13621. |
| 08:41 | 10 | A.   Yes. |
| 08:41 | 11 | Q.   And looking at that, does that have any indication that |
| 08:41 | 12 | it was faxed? |
| 08:42 | 13 | A.   I don't see that. |
| 08:42 | 14 | Q.   Now, if you'll look at Mr.-- I'm sorry.  If you'll look |
| 08:42 | 15 | at Exhibit 15. |
| 08:42 | 16 | A.   Yes, go ahead. |
| 08:42 | 17 | *(Document provided to the witness.)* |
| 08:42 | 18 | BY MR. PRICE: |
| 08:42 | 19 | Q.   And you see that Exhibit 15 -- |
| 08:42 | 20 | MR. PRICE:  If we can blow up the bottom part -- |
| 08:42 | 21 | *(Document displayed.)* |
| 08:42 | 22 | BY MR. PRICE: |
| 08:42 | 23 | Q.   You see that at the bottom it says, "Bryant," that this |
| 08:42 | 24 | was produced by Mr. Bryant? |
| 08:42 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 08:42 | 1 | Q.    And if you'd look at the last page of that document -- |
| 08:42 | 2 | A.    Yes. |
| 08:42 | 3 | Q.    -- you see at the bottom there's a fax, it says, |
| 08:43 | 4 | "October 4, 2000."  You see that? |
| 08:43 | 5 | A.    I do. |
| 08:43 | 6 | Q.    And it says, "MGA Entertainment," right? |
| 08:43 | 7 | A.    It does. |
| 08:43 | 8 | Q.    And that indicates that this was faxed to Mr. Bryant on |
| 08:43 | 9 | October 4, 2000, right? |
| 08:43 | 10 | A.    The last page, you mean? |
| 08:43 | 11 | Q.    Yes. |
| 08:43 | 12 | A.    Yes. |
| 08:43 | 13 | Q.    On the date that it was signed, October 4, 2000, right? |
| 08:43 | 14 | A.    That's correct. |
| 08:43 | 15 | Q.    And you heard the -- Mr. Bryant testify that he faxed |
| 08:43 | 16 | this back? |
| 08:43 | 17 | A.    Uh, I don't remember his testimony. |
| 08:43 | 18 | Q.    Well, is it your recollection that he faxed this back |
| 08:43 | 19 | from Mattel, from Barbie Collectibles, from their fax |
| 08:43 | 20 | machine? |
| 08:43 | 21 | A.    Yes. |
| 08:43 | 22 | Q.    And, of course, that wouldn't appear on his copy; that |
| 08:43 | 23 | is, the copy he's sending, right?  That would appear on the |
| 08:43 | 24 | copy that's received by MGA? |
| 08:43 | 25 | A.    I'm not so sure. |

| | | |
|---|---|---|
| 08:43 | 1 | Q.   Well, when you put documents into a fax machine -- |
| 08:44 | 2 | A.   Yes. |
| 08:44 | 3 | Q.   -- and then it comes out, it doesn't come out with a |
| 08:44 | 4 | stamp on it, right? |
| 08:44 | 5 | A.   Hmm.  That's not my -- I -- I don't have a -- I don't |
| 08:44 | 6 | have that in my mind. |
| 08:44 | 7 | Q.   Okay.  But you do have in your mind that when you -- |
| 08:44 | 8 | you're on the other end and you get that fax, that it does |
| 08:44 | 9 | have a stamp from where it came from? |
| 08:44 | 10 | A.   Uh, I have seen "Barbie Collectibles" or "Collectibles" |
| 08:44 | 11 | on the pages of Carter Bryant's fax to MGA. |
| 08:44 | 12 | Q.   But -- you saw it on the fax to Mr. Rosenbaum, for |
| 08:44 | 13 | example? |
| 08:44 | 14 | A.   I'm sorry, which fax to Rosenbaum? |
| 08:44 | 15 | Q.   Where he says he can't -- |
| 08:44 | 16 | A.   Yes. |
| 08:44 | 17 | Q.   -- get his contract because of suspicious |
| 08:44 | 18 | circumstances? |
| 08:44 | 19 | A.   Yes, I remember. |
| 08:44 | 20 | Q.   And you see, on the one Mr. Bryant has, that it has the |
| 08:44 | 21 | fax header from MGA, correct? |
| 08:44 | 22 | A.   Yes. |
| 08:44 | 23 | Q.   But the copy that MGA has in its files, 13621, doesn't |
| 08:45 | 24 | have a fax header from Mr. Bryant at Mattel, Barbie |
| 08:45 | 25 | Collectibles, right? |

| | | |
|---|---|---|
| 08:45 | 1 | A.   It does not. |
| 08:45 | 2 | Q.   And that's because it was whited out? |
| 08:45 | 3 | A.   Yes. |
| 08:45 | 4 | Q.   And that was whited out at your direction? |
| 08:45 | 5 | A.   It was not whited out at my direction. |
| 08:45 | 6 | Q.   You didn't want Ms. Glaser to know that Mr. Bryant was |
| 08:45 | 7 | inside Mattel, not outside, working with MGA? |
| 08:45 | 8 | MS. KELLER:  Objection.  Argumentative and vague |
| 08:45 | 9 | as to time. |
| 08:45 | 10 | THE COURT:  Just restate the question. |
| 08:45 | 11 | Overruled. |
| 08:45 | 12 | BY MR. PRICE: |
| 08:45 | 13 | Q.   You didn't want Ms. Glaser to know that in September |
| 08:45 | 14 | and October of 2000, that Mr. Bryant was inside Mattel -- |
| 08:45 | 15 | A.   Well -- |
| 08:45 | 16 | Q.   -- and communicating with MGA? |
| 08:45 | 17 | A.   Well, this document was faxed to Patty Glaser.  I think |
| 08:45 | 18 | you showed that to me, on... |
| 08:46 | 19 | Q.   13383. |
| 08:46 | 20 | A.   On July 3rd, 2001, so I don't know how you get to |
| 08:46 | 21 | September.  I'm really confused. |
| 08:46 | 22 | Q.   Well, if we look at 13383, and the second page -- |
| 08:46 | 23 | A.   Yes. |
| 08:46 | 24 | Q.   -- the September 18, 2000 date has been whited out, |
| 08:46 | 25 | correct? |

| | | |
|---|---|---|
| 08:46 | 1 | A.    Yes. |
| 08:46 | 2 | Q.    So that's what I'm talking about when I said September. |
| 08:46 | 3 |       And you see there's no fax header from Mr. Bryant |
| 08:46 | 4 | faxing it from Mattel on October 4, 2000, correct? |
| 08:46 | 5 | A.    That's correct. |
| 08:46 | 6 | Q.    And you didn't want -- since you were telling |
| 08:46 | 7 | Ms. Glaser that Mr. Bryant worked on Bratz outside Mattel, |
| 08:46 | 8 | you didn't want her to send a document that showed that in |
| 08:46 | 9 | September and October 2000 he was working with MGA while at |
| 08:47 | 10 | Mattel? |
| 08:47 | 11 | A.    Absolutely incorrect.  Patty Glaser is my lawyer, is a |
| 08:47 | 12 | family friend for over 20 years.  I wasn't hiding anything |
| 08:47 | 13 | from Patty Glaser or anybody else. |
| 08:47 | 14 | Q.    You were trying to get legal advice from her, correct? |
| 08:47 | 15 | A.    No, I was not. |
| 08:47 | 16 | Q.    Well, weren't you shopping for -- weren't you trying to |
| 08:47 | 17 | get an opinion from her that if Mr. Bryant worked on Bratz |
| 08:47 | 18 | outside Mattel on nights and weekends, that Mattel wouldn't |
| 08:47 | 19 | own those? |
| 08:47 | 20 | A.    No. |
| 08:47 | 21 |       MS. KELLER:  Objection.  Your Honor, there is no |
| 08:47 | 22 | waiver of the privilege with respect to Ms. Glaser. |
| 08:47 | 23 |       THE COURT:  Well, I just heard that he wasn't |
| 08:47 | 24 | relying upon her for legal advice. |
| 08:47 | 25 |       MS. KELLER:  Yes, but what that advice was. |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 08:47 | 1 | THE COURT:  I thought Ms. Glaser was acting as his |
| 08:47 | 2 | counsel at this time. |
| 08:48 | 3 | MS. KELLER:  Yes. |
| 08:48 | 4 | THE COURT:  But not in the last answer. |
| 08:48 | 5 | MS. KELLER:  Well, no, Your Honor.  The question |
| 08:48 | 6 | was whether he was asking her for a legal opinion about the |
| 08:48 | 7 | contract. |
| 08:48 | 8 | THE COURT:  Just a moment. |
| 08:48 | 9 | (Reading from realtime:) |
| 08:48 | 10 | "ANSWER:  Absolutely incorrect.  Patty Glaser is |
| 08:48 | 11 | my lawyer, is a family friend for over 20 years.  I wasn't |
| 08:48 | 12 | hiding anything from Patty Glaser or anybody else. |
| 08:48 | 13 | "You were trying to get legal advice from her, |
| 08:48 | 14 | correct? |
| 08:48 | 15 | "No, I was not." |
| 08:48 | 16 | MS. KELLER:  Your Honor, it pertained to the |
| 08:48 | 17 | contract.  That was the -- higher in the chain of questions. |
| 08:48 | 18 | THE COURT:  All right. |
| 08:48 | 19 | Let me remind the jury we've gotten into quite a |
| 08:48 | 20 | discussion so far concerning this attorney-client privilege. |
| 08:48 | 21 | Once again, let me remind you that the law does allow for an |
| 08:48 | 22 | attorney-client privilege.  It gives the ability for any of |
| 08:48 | 23 | us to go to an attorney.  Also, the law keeps marital |
| 08:49 | 24 | communications, for instance, privileged.  Somebody can't |
| 08:49 | 25 | call somebody to the stand and ask about what your spouse |

Case 2:04-cv-09049-DOC-RNB   Document 9863   Filed 02/14/11   Page 17 of 148   Page ID #:297576
CV 04-9049 DOC - 2/9/2011 - Day 15, Volume 1 of 3

17

| | | |
|---|---|---|
| 08:49 | 1 | said or what you said to your spouse. |
| 08:49 | 2 | There's also a clergy privilege in the law, by way |
| 08:49 | 3 | of example.  And there are very good reasons for that.  It |
| 08:49 | 4 | allows people to go to the clergy and divulge, you know, |
| 08:49 | 5 | either confession or whatever their conversation is. |
| 08:49 | 6 | Those are appropriate privileges, and I'm going to |
| 08:49 | 7 | continue to uphold the attorney-client privilege except with |
| 08:49 | 8 | the -- with the exceptions I've made, Counsel. |
| 08:49 | 9 | And there's nothing wrong with the assertion of |
| 08:49 | 10 | the attorney-client privilege.  Remember, attorneys make |
| 08:49 | 11 | that assertion on behalf of a client; they're duty-bound to |
| 08:49 | 12 | do so. |
| 08:49 | 13 | Okay. |
| 08:49 | 14 | BY MR. PRICE: |
| 08:49 | 15 | Q.   So, Mr. Larian, I think you said you had no intent of |
| 08:49 | 16 | getting legal advice from Ms. Glaser, correct? |
| 08:50 | 17 | A.   In regards to when he created Bryant *(sic)* or not.  No, |
| 08:50 | 18 | that's not -- that's not -- I was not. |
| 08:50 | 19 | Q.   And in connection with Exhibit 13383 -- I'm sorry -- |
| 08:50 | 20 | 9855 -- |
| 08:50 | 21 | *(Document provided to the witness.)* |
| 08:50 | 22 | *(Document displayed.)* |
| 08:50 | 23 | BY MR. PRICE: |
| 08:50 | 24 | Q.   It's your testimony that in this communication it was |
| 08:50 | 25 | not your intent to get legal advice, correct? |

| | | |
|---|---|---|
| 08:50 | 1 | A.   Uh, I don't remember the state of mind I was.  What I |
| 08:50 | 2 | know -- and I don't want to waive any attorney-client |
| 08:50 | 3 | privilege, but, basically, by this time there were rumors |
| 08:50 | 4 | that Mattel was gonna sue us, and she's our trial lawyer. |
| 08:50 | 5 | She has been a trial lawyer for many years.  And I was just |
| 08:50 | 6 | giving this information to her so she -- she's ready. |
| 08:51 | 7 | Q.   So because of -- because of rumors, you actually did go |
| 08:51 | 8 | to your trial lawyer just to ask for advice?  Because if you |
| 08:51 | 9 | did, I'm not gonna ask any more questions about what |
| 08:51 | 10 | happened. |
| 08:51 | 11 |        THE COURT:  That's not what he said.  He didn't |
| 08:51 | 12 | say he was going to his trial lawyer.  What he said was she |
| 08:51 | 13 | was his trial lawyer. |
| 08:51 | 14 |        THE WITNESS:  That's exactly... |
| 08:51 | 15 |        THE COURT:  Significant difference between the |
| 08:51 | 16 | two.  Let's get that cleared up. |
| 08:51 | 17 |        MR. PRICE:  Okay. |
| 08:51 | 18 | BY MR. PRICE: |
| 08:51 | 19 | Q.   Were you e-mailing this to Ms. Glaser to get legal |
| 08:51 | 20 | advice from your trial lawyer? |
| 08:51 | 21 | A.   No.  I just wanted her to be aware that Mattel was |
| 08:51 | 22 | about to sue us, from what I'd heard from Toys R Us. |
| 08:51 | 23 | Q.   So the response that -- did she respond to this? |
| 08:51 | 24 | A.   I don't think she did. |
| 08:51 | 25 | Q.   All right. |

Case 2:04-cv-09049-DOC-RNB   Document 9863   Filed 02/14/11   Page 19 of 148   Page ID #:297578
CV 04-9049 DOC - 2/9/2011 - Day 15, Volume 1 of 3

19

| | | |
|---|---|---|
| 08:51 | 1 | A.   I haven't seen it anyways. |
| 08:51 | 2 | Q.   Without substance, now, do you recall Ms. Glaser |
| 08:51 | 3 | responding to your e-mailing her on June 29, to tell her |
| 08:52 | 4 | that Mr. Irmen witnessed Carter designing and developing the |
| 08:52 | 5 | Bratz line on his free time outside Mattel on weekends or |
| 08:52 | 6 | evenings? |
| 08:52 | 7 | A.   I recall no response from Ms. Glaser on this issue. |
| 08:52 | 8 | Q.   Now, we were looking at the contract that you -- that |
| 08:52 | 9 | was faxed to Ms. O'Connor, the one where the date has been |
| 08:52 | 10 | whited out. |
| 08:52 | 11 | A.   Yes. |
| 08:52 | 12 | Q.   I'd like you to look, if you would, at Exhibit 11480. |
| 08:53 | 13 | *(Document provided to the witness.)* |
| 08:53 | 14 | BY MR. PRICE: |
| 08:53 | 15 | Q.   Do you recognize 11840?  And I call your attention to |
| 08:53 | 16 | page 12 as a modification and clarification of the agreement |
| 08:53 | 17 | dated September 18, 2000. |
| 08:53 | 18 | A.   I see that title on it.  I don't recognize this |
| 08:53 | 19 | document. |
| 08:53 | 20 | Q.   Look at the last page, 11840-0012.  Can you tell us if |
| 08:53 | 21 | that's your signature? |
| 08:53 | 22 | A.   It's not. |
| 08:53 | 23 | Q.   Pardon? |
| 08:53 | 24 | A.   Is it 006? |
| 08:53 | 25 | Q.   0012. |

Case 2:04-cv-09049-DOC-RNB   Document 9863   Filed 02/14/11   Page 20 of 148   Page ID #:297579
CV 04-9049 DOC - 2/9/2011 - Day 15, Volume 1 of 3

20

| 08:53 | 1 | A. I don't think there's an 0012 here. These are two |
| 08:53 | 2 | different exhibits. These are mixed up. |
| 08:53 | 3 | Q. One is attaching the prior contract, right? |
| 08:54 | 4 | A. I don't see where it says it's attaching it, I'm sorry. |
| 08:54 | 5 | Q. Okay. I apologize. Let me direct you, then, to the |
| 08:54 | 6 | page you were at, which is 11840-0006. |
| 08:54 | 7 | A. I'm sorry. Where? |
| 08:54 | 8 | Q. 11840-0006. |
| 08:54 | 9 | A. Yes, go ahead. |
| 08:54 | 10 | Q. And you see it's dated -- there's one signature, which |
| 08:54 | 11 | is February 13, 2004. Do you see that? |
| 08:54 | 12 | A. Yes. |
| 08:54 | 13 | Q. And that's Daphne Gronich? |
| 08:54 | 14 | A. That's what it says I don't recognize the signature. |
| 08:54 | 15 | Q. Who is Ms. Gronich? |
| 08:54 | 16 | A. She used to be our general counsel. |
| 08:54 | 17 | Q. And there's a signature of Carter Bryant, dated |
| 08:54 | 18 | February 11, 2004? |
| 08:54 | 19 | A. Again, that's what it says, yes. |
| 08:54 | 20 | Q. And do you recognize Mr. Bryant's signature? |
| 08:54 | 21 | A. I don't. |
| 08:54 | 22 | Q. Was this a document you believe was produced from MGA's |
| 08:54 | 23 | files? I call your attention to the date stamp. |
| 08:55 | 24 | A. Yes. |
| 08:55 | 25 | Q. Attached to the first part of that, after 0006, there |

| 08:55 | 1 | is a copy of Mr. Bryant's contract as Exhibit A, the one |
| 08:55 | 2 | dated as of September 18, 2000.  Do you see that? |
| 08:55 | 3 | A.   I see that.  Again, I don't know if it's attached or |
| 08:55 | 4 | not attached.  I have no familiarity with that document. |
| 08:55 | 5 | Q.   You see at the bottom it says Exhibit A? |
| 08:55 | 6 | A.   I do see that. |
| 08:55 | 7 | MR. PRICE:  Move Exhibit 11840 into evidence. |
| 08:55 | 8 | THE COURT:  Received. |
| 08:55 | 9 | *(Exhibit No. 11840 received in evidence.)* |
| 08:55 | 10 | *(Document displayed.)* |
| 08:55 | 11 | BY MR. PRICE: |
| 08:55 | 12 | Q.   If you look at the first page where it says, |
| 08:55 | 13 | "Modification and clarification of the agreement dated |
| 08:55 | 14 | September 18, 2000"? |
| 08:55 | 15 | A.   That's what I see, yes. |
| 08:55 | 16 | Q.   And this was, uh, if you look at page 00 -- dash, 0006, |
| 08:55 | 17 | this was executed on its face before there was any lawsuit |
| 08:55 | 18 | between Mattel and Mr. Bryant, correct? |
| 08:55 | 19 | A.   Yes. |
| 08:55 | 20 | Q.   Now, if you'd look at Exhibit 00 -- I'm sorry. |
| 08:56 | 21 | Exhibit -- it's 17. |
| 08:56 | 22 | *(Document provided to the witness.)* |
| 08:56 | 23 | THE WITNESS:  Yes, go ahead. |
| 08:56 | 24 | BY MR. PRICE: |
| 08:56 | 25 | Q.   And if you look at the last page of that, do you see |

Case 2:04-cv-09049-DOC-RNB   Document 9863   Filed 02/14/11   Page 22 of 148   Page ID
#:297581
CV 04-9049 DOC - 2/9/2011 - Day 15, Volume 1 of 3

22

| | | |
|---|---|---|
| 08:56 | 1 | that appears to be signed by Ms. Gronich and Mr. Bryant in |
| 08:56 | 2 | May of 2004? |
| 08:56 | 3 | A.   Yes. |
| 08:56 | 4 | Q.   And your understanding is that is after Mattel has |
| 08:56 | 5 | brought a lawsuit against Mr. Bryant, correct? |
| 08:56 | 6 | A.   Yes. |
| 08:56 | 7 | MR. PRICE:  Your Honor, move Exhibit 17 into |
| 08:56 | 8 | evidence. |
| 08:56 | 9 | *(Exhibit No. 17 received in evidence.)* |
| 08:56 | 10 | *(Document displayed.)* |
| 08:56 | 11 | BY MR. PRICE: |
| 08:56 | 12 | Q.   Now, let's compare the titles of these two documents. |
| 08:57 | 13 | On -- |
| 08:57 | 14 | A.   Which two documents?  Because I have four in front of |
| 08:57 | 15 | me. |
| 08:57 | 16 | MR. PRICE:  We'll put on the -- which is easiest |
| 08:57 | 17 | to put on the left, Ken? |
| 08:57 | 18 | TECHNICIAN:  Exhibit 17. |
| 08:57 | 19 | MR. PRICE:  Exhibit 17 on the left, then |
| 08:57 | 20 | Exhibit 11840 on the right, and if we could highlight the |
| 08:57 | 21 | titles. |
| 08:57 | 22 | *(Technician complies.)* |
| 08:57 | 23 | BY MR. PRICE: |
| 08:57 | 24 | Q.   So before there was any lawsuit filed, the modification |
| 08:57 | 25 | agreement was entitled the "Modification and Clarification |

| | | |
|---|---|---|
| 08:57 | 1 | of the Agreement Dated September 18, 2000," correct? |
| 08:57 | 2 | A.    That's what it says, yes. |
| 08:57 | 3 | Q.    And after the lawsuit was filed, the modification title |
| 08:57 | 4 | was changed to "Modification and Clarification of the 2000 |
| 08:57 | 5 | Agreement", correct? |
| 08:57 | 6 | A.    I see that, yes. |
| 08:57 | 7 | Q.    And that was made so as not to highlight the fact that |
| 08:58 | 8 | Mr. Bryant was working at Mattel as of the effective date of |
| 08:58 | 9 | the contract between Mattel and MGA? |
| 08:58 | 10 | A.    I have no familiarity with these two documents.  I have |
| 08:58 | 11 | not seen it.  I don't know who prepared it, why did they put |
| 08:58 | 12 | that.  I have no -- no understanding of it. |
| 08:58 | 13 | Q.    Did you understand that there was going to be a |
| 08:58 | 14 | modification and clarifications of Mr. Bryant's contracts? |
| 08:58 | 15 | A.    I did not. |
| 08:58 | 16 | Q.    If you'd look at the May agreement. |
| 08:58 | 17 | A.    Which May agreement? |
| 08:58 | 18 | Q.    The May agreement is Exhibit 17.  And specifically, at |
| 08:58 | 19 | Paragraph 3.2. |
| 08:59 | 20 | A.    I've never seen this before.  Should I spend the time |
| 08:59 | 21 | to read it? |
| 08:59 | 22 | Q.    I'm going to ask you specifically about 3.2 and the |
| 08:59 | 23 | first couple of sentences, which says, "Without limiting |
| 08:59 | 24 | Section 3.1 with respect to all work done by Bryant prior to |
| 08:59 | 25 | September 18, 2000."  Do you see that? |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 08:59 | 1 | A.   Yes. |
| 08:59 | 2 | Q.   I'm sorry.  This is modification of the MGA-Bryant |
| 08:59 | 3 | agreement.  And you see in that section there is a reference |
| 08:59 | 4 | to September 18, 2000, correct? |
| 08:59 | 5 | A.   Yes. |
| 08:59 | 6 | Q.   And your understanding of this paragraph is that |
| 08:59 | 7 | Mr. Bryant is confirming that he has assigned all rights in |
| 08:59 | 8 | his designs, drafts, concepts, ideas, et cetera, to MGA that |
| 08:59 | 9 | he created prior to September 18, 2000? |
| 09:00 | 10 | A.   I'm sorry.  As I mentioned to you, this is the first |
| 09:00 | 11 | time I'm seeing this agreement.  I don't know what it says. |
| 09:00 | 12 | If you'd like me to take the time to read it, I would like |
| 09:00 | 13 | to do that.  I cannot testify to it.  I have no idea what it |
| 09:00 | 14 | says.  This is the first time I've seen it.  Even during my |
| 09:00 | 15 | prep, I have not seen it. |
| 09:00 | 16 | Q.   It's your understanding, sir, isn't it, that the |
| 09:00 | 17 | contract, the original contract with Carter Bryant, is dated |
| 09:00 | 18 | as of September 18th, because after September 18th anything |
| 09:00 | 19 | he created was considered owned by MGA, because that was the |
| 09:00 | 20 | effective date of his contract? |
| 09:00 | 21 | A.   No, that's not my understanding. |
| 09:00 | 22 | Q.   Do you understand that the contracts that clarify that, |
| 09:00 | 23 | the modifications, the clarifications, said that anything |
| 09:00 | 24 | before September 18th he assigned to MGA? |
| 09:00 | 25 | MS. KELLER:  Objection. |

Case 2:04-cv-09049-DOC-RNB   Document 9863   Filed 02/14/11   Page 25 of 148   Page ID
#:297584
CV 04-9049 DOC - 2/9/2011 - Day 15, Volume 1 of 3

25

| | | |
|---|---|---|
| 09:00 | 1 | THE WITNESS:  I have not. |
| 09:00 | 2 | MS. KELLER:  Assumes facts not in evidence. |
| 09:00 | 3 | THE COURT:  Overruled. |
| 09:00 | 4 | THE WITNESS:  I have not seen -- this is the first |
| 09:00 | 5 | time I'm seeing this documents, modifications, whatever you |
| 09:01 | 6 | call them.  I have not read them.  And if you're gonna ask |
| 09:01 | 7 | me questions about 'em, I would like to take the time to |
| 09:01 | 8 | read 'em, to understand what it says. |
| 09:01 | 9 | BY MR. PRICE: |
| 09:01 | 10 | Q.   Well -- |
| 09:01 | 11 | A.   I have not seen them before. |
| 09:01 | 12 | Q.   Let me ask you about your understanding of the original |
| 09:01 | 13 | contract, the one that Mr. Bryant signed October 4th. |
| 09:01 | 14 | A.   Yes. |
| 09:01 | 15 | Q.   You had an understanding of that contract, correct? |
| 09:01 | 16 | A.   Yes. |
| 09:01 | 17 | Q.   And was your understanding of that contract that |
| 09:01 | 18 | Mr. Bryant assigned to MGA everything he had done prior to |
| 09:01 | 19 | September 18? |
| 09:01 | 20 | A.   Everything he had done in 1998 on the master drawing |
| 09:01 | 21 | and any modification to that in Missouri, when he had done |
| 09:01 | 22 | the master drawings in Missouri, and any modification that |
| 09:01 | 23 | he had done to them afterward, he was assigning them to us. |
| 09:01 | 24 | That's my understanding. |
| 09:01 | 25 | Q.   Anything prior to September 18, 2000 -- do you have any |

| | | |
|---|---|---|
| 09:01 | 1 | understanding as to what -- how that was divvied up between |
| 09:01 | 2 | September 18, 2000, and after September 18, 2000?  And if |
| 09:01 | 3 | you don't have an understanding, I'll move on. |
| 09:02 | 4 | A.    I don't. |
| 09:02 | 5 | Q.    I want to ask you -- go back to your -- to my question |
| 09:02 | 6 | about your communications with Ms. Glaser. |
| 09:02 | 7 |        Was it your intent to keep the communications with |
| 09:02 | 8 | Ms. Glaser on June 29, 2001 -- to keep those communications |
| 09:02 | 9 | about the topic you were raising with her confidential? |
| 09:02 | 10 | A.    My understanding, general understanding, is that when I |
| 09:02 | 11 | discuss things with my lawyers, especially in regards to |
| 09:02 | 12 | litigation -- and Mattel was about to bring litigation |
| 09:02 | 13 | against us -- it's confidential. |
| 09:02 | 14 | Q.    Was it your intent to keep your communications to her |
| 09:02 | 15 | confidential, such as the communications that were in |
| 09:02 | 16 | Exhibit 9855? |
| 09:02 | 17 | A.    Yes. |
| 09:02 | 18 | Q.    So let me ask you about -- about your understanding -- |
| 09:03 | 19 | trying to phrase this so that we can communicate.  MGA has |
| 09:03 | 20 | had designers work for it, correct? |
| 09:03 | 21 | A.    Yes. |
| 09:03 | 22 | Q.    Has it had designers leave MGA? |
| 09:03 | 23 | A.    Yes. |
| 09:03 | 24 | Q.    Uh, has it had designers leave MGA and work for another |
| 09:03 | 25 | toy company? |

| | | |
|--|--|--|
| 09:03 | 1 | A.   Yes.  Such as Mattel. |
| 09:03 | 2 | Q.   And do you see -- as someone who's been in the industry |
| 09:03 | 3 | for a number of years, would that raise any suspicion if a |
| 09:03 | 4 | designer at MGA left and started working for Mattel? |
| 09:03 | 5 | A.   No. |
| 09:03 | 6 | MS. KELLER:  Objection.  Asked and answered. |
| 09:03 | 7 | THE COURT:  Overruled. |
| 09:03 | 8 | THE WITNESS:  No, it does not. |
| 09:03 | 9 | BY MR. PRICE: |
| 09:03 | 10 | Q.   And would it raise suspicion if a designer from MGA |
| 09:03 | 11 | left MGA, started working for Mattel, and then came up with |
| 09:03 | 12 | a brilliant toy design? |
| 09:03 | 13 | A.   No, it does not.  Happens all the time. |
| 09:04 | 14 | Q.   And that's partly because you expect designers to |
| 09:04 | 15 | design? |
| 09:04 | 16 | A.   That's their gift. |
| 09:04 | 17 | Q.   So that wouldn't raise any red flags to you if a |
| 09:04 | 18 | designer left MGA, went to a competitor, and then came up |
| 09:04 | 19 | with a brilliant design, correct? |
| 09:04 | 20 | A.   It does not. |
| 09:04 | 21 | Q.   Now, would it raise red flags for you if a designer |
| 09:04 | 22 | left MGA, went to a competitor, and came up with a brilliant |
| 09:04 | 23 | design, and then you got an anonymous note -- you have no |
| 09:04 | 24 | idea where it came from -- saying, you know, this guy came |
| 09:04 | 25 | up with that design while he was at MGA? |

| | | |
|---|---|---|
| 09:04 | 1 | A.   If there was something at MGA -- MGA is small company. |
| 09:04 | 2 | And when we have people designing products for the jobs that |
| 09:04 | 3 | they're -- been told to do, I for one, because I love |
| 09:04 | 4 | design, I am down there all the time looking at it.  I know |
| 09:05 | 5 | what they're working on.  If that design all of a sudden |
| 09:05 | 6 | showed up at Mattel, I would be concerned. |
| 09:05 | 7 | Q.   Okay. |
| 09:05 | 8 | A.   If that person was designing that at MGA. |
| 09:05 | 9 | Q.   So my question's a little more specific.  I mean, what |
| 09:05 | 10 | you're saying is, if you saw them designing something at |
| 09:05 | 11 | MGA, then saw it at Mattel, that would raise concern? |
| 09:05 | 12 | A.   Or other people who saw that that designer was |
| 09:05 | 13 | designing certain things at MGA, for MGA, as part of his job |
| 09:05 | 14 | and that design all of a sudden showed up at Mattel, yes, I |
| 09:05 | 15 | would be concern. |
| 09:05 | 16 | Q.   Now I'm asking you a different question. |
| 09:05 | 17 | What if a designer left MGA, began working for a |
| 09:05 | 18 | competitor, and then you just got an anonymous note saying, |
| 09:05 | 19 | hey, he designed this doll while he was at MGA.  Anonymous, |
| 09:05 | 20 | no identification, nothing else beyond that.  Would that |
| 09:05 | 21 | raise your suspicion? |
| 09:05 | 22 | A.   Yes, it would. |
| 09:05 | 23 | MS. KELLER:  Objection.  Improper opinion. |
| 09:06 | 24 | THE COURT:  Overruled. |
| 09:06 | 25 | THE WITNESS:  I would go and ask people, "You know |

CV 04-9049 DOC - 2/9/2011 - Day 15, Volume 1 of 3

29

| | | |
|---|---|---|
| 09:06 | 1 | anything about this?" |
| 09:06 | 2 | BY MR. PRICE: |
| 09:06 | 3 | Q.   And would you do anything beyond that, to ask people, |
| 09:06 | 4 | "Do you know anything about this?" |
| 09:06 | 5 | A.   Probably not.  I don't know.  I have not been faced |
| 09:06 | 6 | with that situation. |
| 09:06 | 7 | THE COURT:  So we clear up that area so there's no |
| 09:06 | 8 | misunderstanding.  I believe if you go back in the record, |
| 09:06 | 9 | Mr. Larian's designated himself a 30(b)6 witness as well. |
| 09:06 | 10 | So you can check that record on numerous occasions, so he |
| 09:06 | 11 | can testify concerning hypotheticals. |
| 09:06 | 12 | BY MR. PRICE: |
| 09:06 | 13 | Q.   So if you got this anonymous note, you said you would |
| 09:06 | 14 | ask around MGA to see if someone saw him do such designs, |
| 09:06 | 15 | correct? |
| 09:06 | 16 | A.   That's correct. |
| 09:06 | 17 | Q.   Would you sue the person based on an anonymous note? |
| 09:06 | 18 | A.   If I went ahead and found out more information that |
| 09:06 | 19 | gave me any suspicion that there was some truth to that, |
| 09:06 | 20 | yes, I would. |
| 09:06 | 21 | Q.   But what if you asked the people and they said they |
| 09:06 | 22 | didn't see him designing it, uh, all you had was the |
| 09:07 | 23 | anonymous note, unsigned?  At that point would you sue the |
| 09:07 | 24 | designer who had once worked at MGA? |
| 09:07 | 25 | A.   Probably do more investigation to make sure that was |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 2/9/2011 - Day 15, Volume 1 of 3

30

| | | |
|---|---|---|
| 09:07 | 1 | true or not, but, you know, it depends.  It really depends. |
| 09:07 | 2 | Q.   It would depend -- it sounds like you're saying it |
| 09:07 | 3 | would depend upon finding something among your folks that |
| 09:07 | 4 | confirmed the anonymous accusation, correct? |
| 09:07 | 5 | A.   Yes, that would be a first step. |
| 09:07 | 6 | Q.   And if you didn't find anything within MGA that -- that |
| 09:07 | 7 | confirmed the anonymous accusation, would you sue the former |
| 09:07 | 8 | MGA designer? |
| 09:07 | 9 | A.   If I didn't have any proof that -- that that person |
| 09:07 | 10 | was, for example, copying somebody else's work -- if I |
| 09:07 | 11 | didn't have any proof on that or nobody had said that, no, I |
| 09:07 | 12 | would not sue. |
| 09:07 | 13 | Q.   So it's accurate to say that you wouldn't sue this |
| 09:07 | 14 | former MGA designer based solely on an anonymous accusation; |
| 09:07 | 15 | is that correct? |
| 09:07 | 16 | A.   That's correct. |
| 09:07 | 17 | Q.   Now, let me go a step further. |
| 09:08 | 18 | Let's say that you found out that this former MGA |
| 09:08 | 19 | designer actually had a contract dated at a time when he |
| 09:08 | 20 | worked for MGA? |
| 09:08 | 21 | A.   Yes. |
| 09:08 | 22 | Q.   So that at the same time he's working for MGA, there's |
| 09:08 | 23 | a contract that says it's effective while he's still working |
| 09:08 | 24 | for MGA.  Would that raise your suspicion? |
| 09:08 | 25 | A.   No.  Again, as I testified before, we owned -- we don't |

Case 2:04-cv-09049-DOC-RNB   Document 9863   Filed 02/14/11   Page 31 of 148   Page ID #:297590
CV 04-9049 DOC – 2/9/2011 – Day 15, Volume 1 of 3

31

| | | |
|---|---|---|
| 09:08 | 1 | own people because we pay 'em $50,000 a year.  Designers |
| 09:08 | 2 | have a God-given gift.  That's how they make their living. |
| 09:08 | 3 | And if they were working on something on their own, would |
| 09:08 | 4 | not raise a suspicion for me. |
| 09:08 | 5 | Q.   Let me be clear.  If at the same time this person's |
| 09:09 | 6 | working for MGA, he is concurrently, at the same time, |
| 09:09 | 7 | working for a competitor of MGA, you're saying that wouldn't |
| 09:09 | 8 | raise suspicion? |
| 09:09 | 9 | A.   If I found out that somebody was working for MGA and at |
| 09:09 | 10 | the same time working for Mattel, yes, that would -- that |
| 09:09 | 11 | would concern me. |
| 09:09 | 12 | Q.   And if that happened, in fact, you might think the |
| 09:09 | 13 | person had breached some obligations to you, right? |
| 09:09 | 14 | A.   Yes.  That would not be -- that would not be right if |
| 09:09 | 15 | at the same time when he's on my payroll, during those time, |
| 09:09 | 16 | 9:00 to 5:00, and he's also working for my competitor, I |
| 09:09 | 17 | would not like that. |
| 09:09 | 18 | Q.   And with respect to Mr. Bryant, one thing that you did |
| 09:09 | 19 | not want Mattel to know was that at the same time he was |
| 09:09 | 20 | working for Mattel, he had signed a contract with MGA, |
| 09:09 | 21 | effective date of which was while he was still at Mattel, |
| 09:09 | 22 | right? |
| 09:09 | 23 | A.   The effective date of that contract is October 4, 2000. |
| 09:10 | 24 | And that's the day he designed for Mattel.  Did he not tell |
| 09:10 | 25 | me or anybody else that he had given Mattel two weeks' |

Case 2:04-cv-09049-DOC-RNB   Document 9863   Filed 02/14/11   Page 32 of 148   Page ID #:297591
CV 04-9049 DOC - 2/9/2011 - Day 15, Volume 1 of 3

32

| | | |
|---|---|---|
| 09:10 | 1 | notice.  And that's the effective date of that contract. |
| 09:10 | 2 | Q.   Well, if we look at Paragraph 1 -- Exhibit 13621. |
| 09:10 | 3 | *(Document displayed.)* |
| 09:10 | 4 | *(Document provided to the witness.)* |
| 09:10 | 5 | BY MR. PRICE: |
| 09:10 | 6 | Q.   This is MGA's copy of the contract? |
| 09:10 | 7 | A.   Yes. |
| 09:10 | 8 | Q.   You see it says, "dated as of September 18, 2000," |
| 09:10 | 9 | correct? |
| 09:10 | 10 | A.   Yes. |
| 09:10 | 11 | Q.   And if you were a -- MGA, and you found a contract, one |
| 09:10 | 12 | of your employees, dated as of a day he was still employed |
| 09:10 | 13 | by you, but the contract's with a competitor, that's gonna |
| 09:11 | 14 | raise red flags for you, isn't it? |
| 09:11 | 15 | A.   No.  Because I know the facts about this contract and |
| 09:11 | 16 | why is the date as of September 18, 2000.  But I wait for |
| 09:11 | 17 | you to ask me the specific question before I tell you. |
| 09:11 | 18 | Q.   Well, let's assume that MGA gets a contract like this, |
| 09:11 | 19 | where its designer has a contract with Mattel, and it says |
| 09:11 | 20 | dated as of a date when he's still working for you, MGA. |
| 09:11 | 21 | And don't know anything else.  You haven't had conversations |
| 09:11 | 22 | with him.  That would raise suspicions, wouldn't it? |
| 09:11 | 23 | A.   Again, I'm not sure how else -- what is you're asking |
| 09:11 | 24 | me.  I'm confused about what you're asking me.  If I get |
| 09:11 | 25 | this contract and it says as of September 18, 2000 -- but |

| | | |
|---|---|---|
| 09:11 | 1 | you got to look at the bottom of this contract -- when you |
| 09:12 | 2 | look at it, the bottom, it says 10/04/2000 at 3:05 p.m. |
| 09:12 | 3 | That would tell me that this contract was not finalized and |
| 09:12 | 4 | finished until October 4, 2000.  And there was no contract. |
| 09:12 | 5 | The fact is there was no contract, Mr. Price, as of |
| 09:12 | 6 | September 18, 2000. |
| 09:12 | 7 | Q.   So what you're saying is that if Mattel saw this |
| 09:12 | 8 | contract -- |
| 09:12 | 9 | A.   Uh-huh. |
| 09:12 | 10 | Q.   -- where it says, "dated as of September 18, 2000," and |
| 09:12 | 11 | Mr. Bryant is still working at Mattel -- |
| 09:12 | 12 | A.   Right. |
| 09:12 | 13 | Q.   -- even knowing that, Mattel had no reason to file a |
| 09:12 | 14 | lawsuit, right? |
| 09:12 | 15 | A.   I don't know what Mattel's thought was when they |
| 09:12 | 16 | decided the lawsuit.  The fact is that they -- they sued MGA |
| 09:12 | 17 | on April 27, 2000 -- I'm sorry.  They sued Carter Bryant on |
| 09:12 | 18 | April 27, 2004, four years after this contract -- almost |
| 09:12 | 19 | four years. |
| 09:13 | 20 | Q.   But you understand that -- that Mattel didn't learn |
| 09:13 | 21 | about this contract dated as of September 18, 2000 -- |
| 09:13 | 22 | A.   I didn't -- |
| 09:13 | 23 | Q.   -- until much later? |
| 09:13 | 24 | A.   I don't know when Mattel learned about it or did not |
| 09:13 | 25 | learn about it.  There is some dispute about that. |

| | | |
|---|---|---|
| 09:13 | 1 | Q.   Do you recall receiving or having forwarded to you an |
| 09:13 | 2 | e-mail from your brother, Farhad Larian, discussing how |
| 09:13 | 3 | Mattel found out that there was a contract dated as of |
| 09:13 | 4 | September 18, 2000? |
| 09:13 | 5 | A.   I don't recall that. |
| 09:13 | 6 | Q.   Let me show you Exhibit 21714. |
| 09:13 | 7 | *(Document provided to the witness.)* |
| 09:14 | 8 | MS. KELLER:  Your Honor, this document was |
| 09:14 | 9 | previously -- |
| 09:14 | 10 | THE COURT:  I'm sorry. |
| 09:14 | 11 | MS. KELLER:  This document was excluded by the |
| 09:14 | 12 | Court previously. |
| 09:14 | 13 | THE COURT:  It was previously.  But based upon the |
| 09:14 | 14 | testimony, it's not going to be now, Counsel. |
| 09:14 | 15 | And just to make certain I have that in front of |
| 09:14 | 16 | me, why don't one of you retrieve that for me. |
| 09:14 | 17 | MR. PRICE:  It's 21714. |
| 09:14 | 18 | THE COURT:  I just want to check for privileges or |
| 09:14 | 19 | anything else, with the thousands of exhibits, to make |
| 09:14 | 20 | absolutely certain that it's the document I recall. |
| 09:14 | 21 | MR. PRICE:  Let me ask you, Mr. Larian, do you |
| 09:14 | 22 | have a copy in your binder?  Just tell me yes or no. |
| 09:14 | 23 | THE WITNESS:  Yes. |
| 09:14 | 24 | Just give me a minute to read this. |
| 09:14 | 25 | MR. PRICE:  Your Honor, may I approach? |

CV 04-9049 DOC – 2/9/2011 – Day 15, Volume 1 of 3

35

| | | |
|---|---|---|
| 09:14 | 1 | THE COURT:  Certainly. |
| 09:15 | 2 | *(Document provided to the Court.)* |
| 09:15 | 3 | BY MR. PRICE: |
| 09:15 | 4 | Q.   Do you recognize that as an e-mail that was forwarded |
| 09:15 | 5 | to you? |
| 09:15 | 6 | A.   I'm just trying to finish reading it. |
| 09:15 | 7 | Q.   Sure. |
| 09:15 | 8 | A.   Yes, go ahead. |
| 09:15 | 9 | Q.   And do you recognize this as an e-mail that was |
| 09:15 | 10 | forwarded to you? |
| 09:15 | 11 | A.   I don't see that.  I see the e-mail that -- from Patty |
| 09:15 | 12 | Glaser to me. |
| 09:15 | 13 | Q.   And you see below that another e-mail from Fred Larian, |
| 09:15 | 14 | correct? |
| 09:15 | 15 | A.   Yes.  But it doesn't say it was forwarded to me. |
| 09:15 | 16 | Q.   Is it your belief that the e-mail from Fred Larian went |
| 09:16 | 17 | directly to you? |
| 09:16 | 18 | A.   No.  From reading it, it looks like it went to Patty |
| 09:16 | 19 | Glaser, and Patty Glaser sent it to me. |
| 09:16 | 20 | Q.   And that's -- again, this is one of the MGA Bates |
| 09:16 | 21 | numbers? |
| 09:16 | 22 | A.   Yes, it is. |
| 09:16 | 23 | MR. PRICE:  Your Honor, move Exhibit 21714 into |
| 09:16 | 24 | evidence. |
| 09:16 | 25 | THE COURT:  I'll take it up during the recess so |

Case 2:04-cv-09049-DOC-RNB  Document 9863  Filed 02/14/11  Page 36 of 148  Page ID #:297595
CV 04-9049 DOC - 2/9/2011 - Day 15, Volume 1 of 3

36

| | | |
|---|---|---|
| 09:16 | 1 | we create a full record, Counsel. |
| 09:16 | 2 | You can question on this document, though. |
| 09:16 | 3 | BY MR. PRICE: |
| 09:16 | 4 | Q. So in March 2007, is it correct that Mr. Larian -- |
| 09:16 | 5 | you're Mr. Larian, so I'll distinguish. Is it true that |
| 09:16 | 6 | your brother communicated to Ms. Glaser that he was curious |
| 09:16 | 7 | as to how Mattel obtained a copy of Mr. Bryant's contract? |
| 09:16 | 8 | MS. KELLER: Your Honor, we would object to |
| 09:16 | 9 | publishing, through questions, the document. |
| 09:17 | 10 | THE COURT: Yeah, we're not going to publish it at |
| 09:17 | 11 | this time until you make a full record, Counsel. But I'm |
| 09:17 | 12 | going to allow counsel to question on how this information |
| 09:17 | 13 | came to Mr. Larian. |
| 09:17 | 14 | THE WITNESS: I'm sorry. What's the question? |
| 09:17 | 15 | BY MR. PRICE: |
| 09:17 | 16 | Q. MGA filed an action in Hong Kong against a company that |
| 09:17 | 17 | he believed was infringing its trademark, correct? |
| 09:17 | 18 | A. That's correct. |
| 09:17 | 19 | Q. And when was that action filed? |
| 09:17 | 20 | MS. KELLER: Your Honor, this was also excluded by |
| 09:17 | 21 | the Court. |
| 09:17 | 22 | THE COURT: I understand that. Previously, it |
| 09:17 | 23 | was, Counsel; you're absolutely correct. |
| 09:17 | 24 | Counsel, you may continue with your questions. |
| 09:17 | 25 | THE WITNESS: I don't know when it was. |

| | | |
|---|---|---|
| 09:17 | 1 | BY MR. PRICE: |
| 09:17 | 2 | Q.   The name of the action -- do you recall an action |
| 09:18 | 3 | against City World? |
| 09:18 | 4 | A.   Yes. |
| 09:18 | 5 | Q.   Filed sometime in 2003? |
| 09:18 | 6 | A.   I don't know the date, but if that's what it says, then |
| 09:18 | 7 | it's 2003. |
| 09:18 | 8 | Q.   And in connection with that action, MGA produced a copy |
| 09:18 | 9 | of Mr. Bryant's contract, correct? |
| 09:18 | 10 | A.   To that court, I believe so, yes. |
| 09:18 | 11 | Q.   And -- and prior to then, then, certainly MGA had not |
| 09:18 | 12 | produced a copy of that contract to Mattel, right? |
| 09:18 | 13 | A.   No, we had not. |
| 09:18 | 14 | Q.   Prior to then, was Mr. Bryant's contract with MGA made |
| 09:18 | 15 | public? |
| 09:18 | 16 | A.   I'm sorry? |
| 09:18 | 17 | Q.   Prior to the City World action in 2003, was |
| 09:18 | 18 | Mr. Bryant's contract with MGA, the one dated as of |
| 09:18 | 19 | September 18, 2000 -- was that made public? |
| 09:18 | 20 | A.   I don't know. |
| 09:18 | 21 | Q.   Do you have any recollection or recall any circumstance |
| 09:18 | 22 | under which Mr. Bryant's contract with MGA, dated as of |
| 09:19 | 23 | September 18, 2000, was somehow made public prior to the |
| 09:19 | 24 | City World action? |
| 09:19 | 25 | A.   Yes.  I think, if my recollection is correct, that in |

CV 04-9049 DOC – 2/9/2011 – Day 15, Volume 1 of 3

38

| | | |
|---|---|---|
| 09:19 | 1 | 2002, in Brazil, there was another infringer named Estrella, |
| 09:19 | 2 | who had infringed Bratz, and we filed an action there.  And |
| 09:19 | 3 | we filed for copyright fully disclosing Carter Bryant's name |
| 09:19 | 4 | in 2002 to the public.  And I'm not sure, but I think a copy |
| 09:19 | 5 | of his contract was also filed in that action. |
| 09:19 | 6 | Q.   So your testimony is that Mr. Bryant's contract was |
| 09:19 | 7 | made public in an action in Brazil in 2002? |
| 09:19 | 8 | A.   I am not 100 percent sure. |
| 09:19 | 9 | Q.   And at that time in 2002, was Mr. Bryant's contract |
| 09:19 | 10 | sent to Mattel? |
| 09:20 | 11 | A.   No, I don't think it was. |
| 09:20 | 12 | Q.   Is it your understanding that City World contacted |
| 09:20 | 13 | Mattel after MGA filed the action in Hong Kong in 2003? |
| 09:20 | 14 | A.   I don't know when they contacted you. |
| 09:20 | 15 | Q.   Is it your understanding that Mattel received a copy of |
| 09:20 | 16 | Mr. Bryant's contract dated as of September 18, 2000 -- |
| 09:20 | 17 | MS. KELLER:  Objection -- |
| 09:20 | 18 | BY MR. PRICE: |
| 09:20 | 19 | Q.   -- from -- |
| 09:20 | 20 | MS. KELLER:  I'm sorry. |
| 09:20 | 21 | BY MR. PRICE: |
| 09:20 | 22 | Q.   -- from City World? |
| 09:20 | 23 | A.   I don't know when he received it. |
| 09:20 | 24 | MS. KELLER:  Objection.  Your Honor, no foundation |
| 09:20 | 25 | whatsoever. |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB  Document 9863  Filed 02/14/11  Page 39 of 148  Page ID #:297598
CV 04-9049 DOC - 2/9/2011 - Day 15, Volume 1 of 3

39

| | | |
|---|---|---|
| 09:20 | 1 | THE COURT:  Overruled. |
| 09:20 | 2 | You can answer the question, sir. |
| 09:20 | 3 | THE WITNESS:  I don't know when you received the |
| 09:20 | 4 | information from Carter Bryant, what you received.  Did you |
| 09:20 | 5 | receive the contract?  Did you receive the drawings?  I have |
| 09:20 | 6 | no knowledge of that. |
| 09:20 | 7 | BY MR. PRICE: |
| 09:20 | 8 | Q.   Now, it's true, is it not, that court files in Brazil |
| 09:20 | 9 | are not made public? |
| 09:20 | 10 | A.   I'm not familiar with that. |
| 09:21 | 11 | Q.   In fact, it's true that Hong Kong files are not |
| 09:21 | 12 | generally made public either? |
| 09:21 | 13 | A.   I don't know. |
| 09:21 | 14 | Q.   You will agree, will you not, that if Mattel, in 2003, |
| 09:21 | 15 | received a copy of what's been marked as Exhibit 13621, that |
| 09:21 | 16 | then Mattel would have questions about whether or not |
| 09:21 | 17 | Mr. Bryant breached some obligation to Mattel? |
| 09:21 | 18 | A.   Well, from this -- can I answer that?  From being |
| 09:21 | 19 | through this litigation for seven years, I have seen |
| 09:21 | 20 | documents and papers to know that Mattel as a matter of fact |
| 09:21 | 21 | was aware of Carter Bryant being behind Bratz and having |
| 09:21 | 22 | come to MGA as late as 2001. |
| 09:22 | 23 | As a matter of fact, we had invited Mattel to MGA's |
| 09:22 | 24 | showrooms in Hong Kong, where Carter Bryant's drawings were |
| 09:22 | 25 | openly displayed, I believe even with his name on it.  And |

Case 2:04-cv-09049-DOC-RNB   Document 9863   Filed 02/14/11   Page 40 of 148   Page ID #:297599
CV 04-9049 DOC - 2/9/2011 - Day 15, Volume 1 of 3

40

| | | |
|---|---|---|
| 09:22 | 1 | Mattel executives were there. |
| 09:22 | 2 | Q.   Let me start this -- |
| 09:22 | 3 |    So you're saying in the Hong Kong toy fair, |
| 09:22 | 4 | Mr. Bryant's name was on the drawings that were displayed to |
| 09:22 | 5 | the public?  Is that your testimony? |
| 09:22 | 6 | A.   That's my recollection.  Because we had -- we had again |
| 09:22 | 7 | published those through -- those drawings with Carter |
| 09:22 | 8 | Bryant's name on it to Walmart prior to the Hong Kong toy |
| 09:22 | 9 | show as well.  I think there is document to that. |
| 09:22 | 10 | Q.   And my question is different.  You just said |
| 09:22 | 11 | Mr. Bryant's signature was on the artwork at the Hong Kong |
| 09:22 | 12 | toy fair? |
| 09:22 | 13 | A.   That's my recollection.  Maybe I'm mistaken. |
| 09:22 | 14 | Q.   So you can't tell us under oath whether that's true one |
| 09:22 | 15 | way or the other, correct? |
| 09:22 | 16 | A.   Again, I'm just relying on my recollection that I know |
| 09:23 | 17 | that those drawings for sure were displayed. |
| 09:23 | 18 | Q.   Are you saying under oath that it is a fact that |
| 09:23 | 19 | Mr. Bryant's name was on the drawings that was presented at |
| 09:23 | 20 | the Hong Kong toy fair? |
| 09:23 | 21 | A.   I don't have the picture in front of me, but my |
| 09:23 | 22 | recollection is that he was. |
| 09:23 | 23 | Q.   Well, let me show you -- I'm not sure this is in your |
| 09:23 | 24 | binder.  It's in evidence.  It's Exhibit 911, pictures from |
| 09:23 | 25 | the Hong Kong toy fair.  And if you'd look at pages 2 or 3 |

CV 04-9049 DOC – 2/9/2011 – Day 15, Volume 1 of 3

41

| 09:23 | 1 | or 4. |
| 09:23 | 2 | *(Document provided to the witness.)* |
| 09:23 | 3 | THE WITNESS:  Yes. |
| 09:23 | 4 | *(Document displayed.)* |
| 09:23 | 5 | THE WITNESS:  Go ahead. |
| 09:23 | 6 | BY MR. PRICE: |
| 09:23 | 7 | Q.   On those pictures anywhere, do you see the name "Carter |
| 09:23 | 8 | Bryant"? |
| 09:23 | 9 | A.   No.  I don't see it in this picture that's on the |
| 09:23 | 10 | screen, I don't. |
| 09:23 | 11 | Q.   And -- |
| 09:23 | 12 | A.   There are other pictures on the floor. |
| 09:24 | 13 | Q.   So your memory is that his signature was on some other |
| 09:24 | 14 | drawings other than the ones you can see in the photograph? |
| 09:24 | 15 | A.   There, you see these drawings on the floor -- I can't |
| 09:24 | 16 | see it on the screen. |
| 09:24 | 17 | MR. PRICE:  Can you blow the ones up on the floor, |
| 09:24 | 18 | Ken. |
| 09:24 | 19 | *(Technician complies.)* |
| 09:24 | 20 | BY MR. PRICE: |
| 09:24 | 21 | Q.   So you're saying his signature were on these pictures |
| 09:24 | 22 | that were on the floor? |
| 09:24 | 23 | A.   I recall seeing it. |
| 09:24 | 24 | Can I get up? |
| 09:24 | 25 | THE COURT:  You can.  And put your back to me. |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 2/9/2011 - Day 15, Volume 1 of 3

42

09:24   1   I'm not concerned about that.  So if you point out something

09:24   2   to the jury on the larger screen behind, they can see what

09:24   3   you're pointing to.  So, sir, just put your back to me.

09:24   4   It's fine.

09:24   5        THE WITNESS:  I think I see something here.

09:24   6   Again, my recollection is not completely there.

09:24   7        I see.  And I could be wrong, but I remember --

09:24   8   again, we had disclosed Carter Bryant with his name and

09:24   9   drawings to Walmart before Hong Kong toy show, and we had

09:25   10  invited Mattel executives from Mexico, together with -- I

09:25   11  think some people from Mexico were there also -- to MGA

09:25   12  Hong Kong toy show.

09:25   13  BY MR. PRICE:

09:25   14  Q.   I'm asking you about the Hong Kong toy show right now.

09:25   15  I think -- if we can show you the originals of Exhibit 4.

09:25   16        (Document provided to the witness.)

09:25   17        MR. PRICE:  While Ms. Juarez is looking for that,

09:25   18  let me ask you.  You said in November of -- November of

09:25   19  2000, that there was a pitch to Walmart?

09:25   20  A.   No, no.  I think -- again, I don't remember the exact

09:25   21  date, but December I think we e-mailed Carter Bryant's --

09:25   22  again, I don't have the exact name in my mind, but could be

09:26   23  November.  We e-mailed Carter Bryant's drawings with his

09:26   24  name clearly on it -- and I think it's in the record -- to

09:26   25  Walmart.

Case 2:04-cv-09049-DOC-RNB   Document 9863   Filed 02/14/11   Page 43 of 148   Page ID #:297602
CV 04-9049 DOC - 2/9/2011 - Day 15, Volume 1 of 3

43

| | | |
|---|---|---|
| 09:26 | 1 | BY MR. PRICE: |
| 09:26 | 2 | Q.   And in connection with the presentation to Walmart, |
| 09:26 | 3 | Walmart had to sign a confidentiality agreement, right? |
| 09:26 | 4 | A.   I don't know if they had or not.  As a matter of fact, |
| 09:26 | 5 | I think Mattel was and is the category captain for Walmart, |
| 09:26 | 6 | so they see everything including competitor information. |
| 09:26 | 7 | Q.   Okay.  I want to make sure what you're saying is that: |
| 09:26 | 8 | If MGA provides information to Walmart, where Walmart signs |
| 09:26 | 9 | a confidentiality agreement, it's your expectation that |
| 09:26 | 10 | Mattel will see that anyway? |
| 09:26 | 11 | A.   Well, two questions.  First of all, do I know if |
| 09:26 | 12 | Mattel -- do I know if Walmart has a confidentiality |
| 09:26 | 13 | agreement with MGA?  I'm not -- I'm not sure. |
| 09:26 | 14 | Second question, I know that Mattel is the category |
| 09:27 | 15 | captain for fashion dolls at Walmart.  Being a category |
| 09:27 | 16 | captain means that they see everything.  They see competitor |
| 09:27 | 17 | product.  They see competitor pricing.  They see competitor |
| 09:27 | 18 | packaging before it comes to the market, as a category |
| 09:27 | 19 | captain. |
| 09:27 | 20 | Q.   So I just want to be clear.  Even if Walmart signs a |
| 09:27 | 21 | confidentiality agreement with MGA, it's your expectation |
| 09:27 | 22 | that Walmart will show whatever you've shown them to Mattel? |
| 09:27 | 23 | A.   I believe that's how it works, because category |
| 09:27 | 24 | captains go to the planogram rooms and help the buyers set |
| 09:27 | 25 | up the product and the pricing, et cetera. |

CV 04-9049 DOC - 2/9/2011 - Day 15, Volume 1 of 3

44

09:27   1   Q.   So it's your understanding -- is it your understanding
09:27   2   that that's always been true; that whatever you show to
09:28   3   Walmart will be shown to Mattel regardless of whether you
09:28   4   designate it as confidential?
09:28   5   A.   Not everything.  Because again, you have to understand
09:28   6   what's the rule of a category captain at retail, and I have
09:28   7   to explain that to the jury and to you to understand it.
09:28   8   Q.   Well, was it your understanding that if you showed to
09:28   9   Walmart potential doll lines --
09:28   10   A.   Yes.
09:28   11   Q.   -- doll lines that were not yet in the public --
09:28   12   A.   Yes.
09:28   13   Q.   -- and you showed them those potential doll lines and
09:28   14   even had them sign a confidentiality agreement -- are you
09:28   15   with me so far?
09:28   16   A.   Yes.
09:28   17   Q.   -- that they would nonetheless reveal that information
09:28   18   to Mattel?
09:28   19   A.   In the planogram room, yes.
09:28   20   Q.   What about -- why just in the planogram room?
09:28   21   A.   Because that's where the category captains go to help
09:28   22   the buyer set up the product line for next year.
09:28   23   Q.   So in the -- in the November/December 2000 timeframe,
09:29   24   when you had meetings with Walmart and showed them the Bratz
09:29   25   drawings, was that in a planogram room?

Case 2:04-cv-09049-DOC-RNB   Document 9863   Filed 02/14/11   Page 45 of 148   Page ID #:297604
CV 04-9049 DOC – 2/9/2011 – Day 15, Volume 1 of 3

45

| 09:29 | 1 | A.   No.   We sent –– no.   What happens is –– the process is |
| 09:29 | 2 | the following.   You sent –– we wanted to get this buyer, Ron |
| 09:29 | 3 | Stover, who was a buyer for Walmart, to come and see our |
| 09:29 | 4 | showroom, for him to see all the dolls we had –– Giddy Up, |
| 09:29 | 5 | Bouncy Baby, et cetera, and Bratz.   And he would not give us |
| 09:29 | 6 | an appointment before seeing some of the things that we have |
| 09:29 | 7 | to offer. |
| 09:29 | 8 | So we e-mailed him the drawings, Carter Bryant's |
| 09:29 | 9 | drawings, told him that we gonna have a doll line based on |
| 09:29 | 10 | this.   Please come and see us. |
| 09:29 | 11 | And that was, I think, in November and December.   I |
| 09:29 | 12 | don't remember the exact date.   And when he came to a |
| 09:29 | 13 | showroom, he saw it.   Then he asked for samples to be sent |
| 09:29 | 14 | to the planogram room to set up and those are seen for sure |
| 09:30 | 15 | by Mattel. |
| 09:30 | 16 | Q.   Well, you –– I want to get the steps here.   You sent |
| 09:30 | 17 | him drawings, correct? |
| 09:30 | 18 | A.   Yes. |
| 09:30 | 19 | Q.   Expected him to reveal that to Mattel? |
| 09:30 | 20 | A.   I don't –– I didn't have an expectation if he revealed |
| 09:30 | 21 | it to Mattel or not. |
| 09:30 | 22 | Q.   He then came to your showroom? |
| 09:30 | 23 | A.   Yes. |
| 09:30 | 24 | Q.   Correct? |
| 09:30 | 25 | And you would expect him to share whatever he saw with |

CV 04-9049 DOC - 2/9/2011 - Day 15, Volume 1 of 3

46

| 09:30 | 1 | Mattel? |
|---|---|---|

09:30    1    Mattel?

09:30    2    A.   No.   Not what he saw in my showroom.   What -- when you

09:30    3    have a showroom, we are showing a lot of products that we

09:30    4    hope the buyers buy.   And the products that the buyer

09:30    5    selects then are sent to Walmart's planogram, which is in

09:30    6    China, and that's where Mattel would see 'em.

09:30    7    Q.   So -- okay.   So your showroom -- you wouldn't expect

09:30    8    Walmart to tell Mattel what they see in your showroom; is

09:30    9    that right?

09:30    10   A.   No, not in the showroom.   But that's irrelevant.

09:30    11   Anyways, Mattel was in the same showroom either day before

09:31    12   or day after.

09:31    13   Q.   But the next step is to do, you said, a planogram after

09:31    14   the buyers select the product?

09:31    15   A.   That's correct.

09:31    16   Q.   And what's the timeframe between --

09:31    17   A.   Week or two weeks.

09:31    18   Q.   Okay.   So there's a showroom, and then a week or two

09:31    19   weeks, there's the planogram room?

09:31    20   A.   The planogram room is not in our showroom.   It's in

09:31    21   Walmart's offices in Shenzhen, China.

09:31    22   Q.   And so you would expect Walmart to tell Mattel what was

09:31    23   in the planogram showroom a week or so after the toy fair

09:31    24   showroom?

09:31    25   A.   No.   What I say is that the Mattel category captain, an

09:31   1   employee of Mattel, who is the category captain for all

09:31   2   fashion dolls, whether it's Mattel's, MGA's, Hasbro's, Play

09:32   3   Alongs, everybody -- as a category captain, he or she sees

09:32   4   all the products.

09:32   5   Q.   I'm just trying to tell the timing.  You said there is

09:32   6   your showroom?

09:32   7   A.   Yes, January 4.

09:32   8   Q.   Okay.  And then a week or two later there's -- the

09:32   9   retailers will have a planogram, their showroom, right?

09:32   10   A.   It's not a showroom.  It's a simulated store, where

09:32   11   they set up to figure out what they're gonna buy for next

09:32   12   year and where does it go on the shelf.

09:32   13   Q.   Okay.  So you're saying that although Mattel was not

09:32   14   invited, may not see what's in your showroom -- correct? --

09:32   15   they will see a week or so later what's in Walmart's

09:32   16   planogram room?

09:32   17   A.   Well, first of all, I'm a little confused.

09:32   18       Mattel, there's no question was invited to MGA's

09:32   19   showroom in January 4, 2000.  We have documents, et cetera,

09:33   20   on that.

09:33   21       Second step, a week or two weeks later when they go to

09:33   22   the planogram room for Mattel -- for Walmart, I know for a

09:33   23   fact, even today, that Nancy Sweeney is an employee of

09:33   24   yours, who in January 2010 -- 2011, just a couple weeks ago,

09:33   25   went to the showroom and saw every product that MGA has

Case 2:04-cv-09049-DOC-RNB   Document 9863   Filed 02/14/11   Page 48 of 148   Page ID #:297607
CV 04-9049 DOC - 2/9/2011 - Day 15, Volume 1 of 3

48

| 09:33 | 1 | coming next week -- next -- in this fall. |
| 09:33 | 2 | Q.   So -- |
| 09:33 | 3 | A.   Because she's a category captain, she's allowed to go |
| 09:33 | 4 | there.  That's a Walmart rule.  I cannot help it.  I don't |
| 09:33 | 5 | like it, but that's the way it is. |
| 09:33 | 6 | Q.   So with respect to Walmart, if you show something in |
| 09:33 | 7 | your showroom at the toy fair, then you expect that a week |
| 09:33 | 8 | or so later Mattel will have access to Walmart's planogram |
| 09:33 | 9 | and will see the products Walmart has selected? |
| 09:33 | 10 | A.   The category captain of Mattel. |
| 09:34 | 11 | Q.   Okay.  So the category captain of Mattel will have |
| 09:34 | 12 | access to that? |
| 09:34 | 13 | A.   That's correct. |
| 09:34 | 14 | Q.   Is there any other retailer that -- where Mattel is a |
| 09:34 | 15 | category captain? |
| 09:34 | 16 | A.   I know for sure for Walmart.  I'm not so sure for other |
| 09:34 | 17 | retailers. |
| 09:34 | 18 | Q.   So I just wanted to understand that part of the toy |
| 09:34 | 19 | business. |
| 09:34 | 20 | So let me get back, then, to -- to what Mattel knew |
| 09:34 | 21 | with respect to Carter Bryant.  And I think you've told us |
| 09:34 | 22 | before that, uh, if a designer leaves MGA and goes to work |
| 09:34 | 23 | for a competitor, uh, that alone doesn't make you |
| 09:34 | 24 | suspicious, correct? |
| 09:34 | 25 | A.   It doesn't.  Happens all the time. |

Case 2:04-cv-09049-DOC-RNB   Document 9863   Filed 02/14/11   Page 49 of 148   Page ID #:297608
CV 04-9049 DOC - 2/9/2011 - Day 15, Volume 1 of 3

49

| | | |
|---|---|---|
| 09:34 | 1 | Q.   So -- but let's first look at -- if we could look at |
| 09:34 | 2 | Exhibit 4.  Ms. Juarez has found those. |
| 09:34 | 3 | *(Document provided to the witness.)* |
| 09:34 | 4 | THE WITNESS:  Could we get rid of some of these |
| 09:34 | 5 | exhibits?  It's getting a little crowded here. |
| 09:34 | 6 | BY MR. PRICE: |
| 09:34 | 7 | Q.   That's fine.  If you could hold that, Ms. Juarez |
| 09:34 | 8 | will -- |
| 09:34 | 9 | A.   Yes, go ahead. |
| 09:34 | 10 | Q.   Now, is Exhibit 4 -- are Mr. Bryant's signatures on |
| 09:35 | 11 | those? |
| 09:35 | 12 | A.   No, I don't see his signature on them. |
| 09:35 | 13 | Q.   Do you know if Exhibit 4, if that is -- are the |
| 09:35 | 14 | drawings that were on the floor in the Hong Kong toy fair? |
| 09:35 | 15 | A.   I think so something like -- this one I'm familiar |
| 09:35 | 16 | with.  *(Indicating.)*  I saw in that picture.  I haven't seen |
| 09:35 | 17 | this one.  It could be, but I don't know. |
| 09:35 | 18 | Q.   So some of the pictures in Exhibit 4 are pictures that |
| 09:35 | 19 | you saw on the floor there in the Hong Kong showroom? |
| 09:35 | 20 | A.   Again, I have seen so many different renditions of |
| 09:35 | 21 | these, I'm not so sure it's exactly that picture or another |
| 09:35 | 22 | version of it. |
| 09:35 | 23 | Q.   And you don't see Mr. Bryant's signature on those, |
| 09:35 | 24 | correct? |
| 09:35 | 25 | A.   I do not. |

CV 04-9049 DOC - 2/9/2011 - Day 15, Volume 1 of 3

50

| | | |
|---|---|---|
| 09:35 | 1 | Q.   But if you were in Mattel's situation and you were |
| 09:35 | 2 | invited to a showroom that had pictures with Carter Bryant's |
| 09:35 | 3 | signature on them, that would not concern you, right? |
| 09:35 | 4 | A.   For me? |
| 09:35 | 5 | Q.   Yeah. |
| 09:35 | 6 | A.   No, it would not. |
| 09:35 | 7 | Q.   Because that doesn't mean that Mr. Bryant necessarily |
| 09:35 | 8 | did those when he was at Mattel, correct? |
| 09:35 | 9 | A.   Well, except now I know through this litigation that in |
| 09:36 | 10 | 2000 before Mattel came to our showroom -- now I know from |
| 09:36 | 11 | this litigation that there were people at Mattel who -- who |
| 09:36 | 12 | knew and thought that Carter Bryant had come to MGA and was |
| 09:36 | 13 | behind Bratz. |
| 09:36 | 14 | Q.   Well, if you knew that a designer had left MGA and went |
| 09:36 | 15 | to a competitor, and then he'd come up with this doll idea, |
| 09:36 | 16 | that wouldn't concern you, correct? |
| 09:36 | 17 | MS. KELLER:  Objection.  Asked and answered. |
| 09:36 | 18 | THE COURT:  Overruled. |
| 09:36 | 19 | THE WITNESS:  If that doll idea was not something |
| 09:36 | 20 | that MGA was doing, no, it would not. |
| 09:36 | 21 | BY MR. PRICE: |
| 09:36 | 22 | Q.   So you invited, you said, some people from Mattel |
| 09:36 | 23 | Mexico to come to your Hong Kong showroom in January of |
| 09:36 | 24 | 2001, right? |
| 09:36 | 25 | A.   To the best of my recollection, Mattel -- there were |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 09:36 | 1 | not only Mattel Mexico; they came with Mattel USA people as |
| 09:36 | 2 | well. |
| 09:36 | 3 | Q.   And at that time if there had been Mr. Bryant's |
| 09:36 | 4 | signature on these drawings, that would be something that |
| 09:37 | 5 | shouldn't have concerned Mattel because that's what |
| 09:37 | 6 | designers do, right? |
| 09:37 | 7 | A.   Again, I was not in the head of Mattel and what did |
| 09:37 | 8 | they know, what did they not know at the time.  The fact is |
| 09:37 | 9 | that we were not trying to hide anything.  We invited Mattel |
| 09:37 | 10 | to our showroom.  We asked them to become our distributor |
| 09:37 | 11 | for Bratz line. |
| 09:37 | 12 | Q.   When you invited them to the showroom and they saw the |
| 09:37 | 13 | Bratz product, did you tell them that Carter Bryant had been |
| 09:37 | 14 | working for MGA at the same time he had been working for |
| 09:37 | 15 | Mattel? |
| 09:37 | 16 | A.   No. |
| 09:37 | 17 | Q.   Did you tell them that Carter Bryant had, uh, created |
| 09:37 | 18 | some of the Bratz drawings while he worked at Mattel? |
| 09:37 | 19 | A.   No, we did not. |
| 09:37 | 20 | Q.   So in the Hong Kong showroom, you showed them this new |
| 09:37 | 21 | Bratz line, correct? |
| 09:37 | 22 | A.   Yes, we did. |
| 09:37 | 23 | Q.   You didn't tell 'em Carter Bryant had even worked on |
| 09:37 | 24 | it? |
| 09:37 | 25 | A.   I don't remember if we did or not. |

CV 04-9049 DOC - 2/9/2011 - Day 15, Volume 1 of 3

52

| 09:37 | 1 | Q.   But if you did, that wouldn't set off red flags, you |
| 09:37 | 2 | think, for Mattel? |
| 09:37 | 3 | A.   No.  Because designers move from one company to |
| 09:38 | 4 | another. |
| 09:38 | 5 | Q.   Your understanding is that actually the only -- the |
| 09:38 | 6 | first press report or publication which identified Carter |
| 09:38 | 7 | Bryant as a creator of Bratz was around July 15, 2003, |
| 09:38 | 8 | correct? |
| 09:38 | 9 | A.   The general normal press, yes.  But if you call Yahoo |
| 09:38 | 10 | some sort of press, no, then before that, in 2002. |
| 09:38 | 11 | Q.   Now, Yahoo, you're referring to a posting that was made |
| 09:38 | 12 | by Mr. Dees on Yahoo, correct? |
| 09:38 | 13 | A.   Yes. |
| 09:38 | 14 | Q.   And as soon as you learned about that posting, you had |
| 09:38 | 15 | Yahoo take it down, correct? |
| 09:38 | 16 | A.   No.  As soon as Mattel -- your law firm, Quinn Emanuel, |
| 09:38 | 17 | send us a letter -- cease and desist letter saying that |
| 09:38 | 18 | there is a Yahoo website and people are using MGA -- |
| 09:39 | 19 | Mattel's name, such as Diva Starz, Barbie, et cetera, we |
| 09:39 | 20 | giving you seven days to take that down, that's when we -- I |
| 09:39 | 21 | found out about the Yahoo and David Dees.  I didn't know |
| 09:39 | 22 | about that beforehand. |
| 09:39 | 23 | Q.   Okay.  Let's look at 17252, and we'll see if that's the |
| 09:39 | 24 | letter from our law firm that you're talking about.  Okay? |
| 09:39 | 25 | A.   Okay.  There were two letters, but... |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 9863   Filed 02/14/11   Page 53 of 148   Page ID #:297612
CV 04-9049 DOC - 2/9/2011 - Day 15, Volume 1 of 3

53

| 09:39 | 1 | MR. PRICE:  We'll bring you a copy. |
| 09:39 | 2 | *(Document provided to the witness.)* |
| 09:40 | 3 | BY MR. PRICE: |
| 09:40 | 4 | Q.   And you recognize this as a letter that was sent to you |
| 09:41 | 5 | around February 7, 2002, correct? |
| 09:41 | 6 | A.   Yes.  From reading the attachment. |
| 09:41 | 7 | MR. PRICE:  If we could move 17252 into evidence. |
| 09:41 | 8 | THE COURT:  Received. |
| 09:41 | 9 | *(Exhibit No. 17252 received in evidence.)* |
| 09:41 | 10 | BY MR. PRICE: |
| 09:41 | 11 | Q.   And you will see this letter, Mr. Larian, starts out |
| 09:41 | 12 | with, "We are counsel to Mattel, Inc.  We are writing to |
| 09:41 | 13 | request that MGA Entertainment immediately and permanently |
| 09:41 | 14 | cease infringing Mattel's Barbie and Diva Starz trademarks." |
| 09:41 | 15 | Do you see that? |
| 09:41 | 16 | A.   I do. |
| 09:41 | 17 | Q.   And you understand Mattel had a trademark in Barbie? |
| 09:41 | 18 | A.   Yes. |
| 09:41 | 19 | Q.   And you understand they had a trademark in Diva Starz? |
| 09:41 | 20 | A.   Yes. |
| 09:41 | 21 | Q.   And you've had trademarks as well, MGA? |
| 09:41 | 22 | A.   We had a trademarks. |
| 09:41 | 23 | Q.   And MGA vigorously enforces its trademarks, correct? |
| 09:41 | 24 | A.   Yes. |
| 09:41 | 25 | Q.   It sends letters like this to people that it believes |

Case 2:04-cv-09049-DOC-RNB   Document 9863   Filed 02/14/11   Page 54 of 148   Page ID #:297613
CV 04-9049 DOC - 2/9/2011 - Day 15, Volume 1 of 3

54

| | | |
|---|---|---|
| 09:41 | 1 | are infringing its trademarks? |
| 09:41 | 2 | A.   I'm not familiar with the letters we sent. |
| 09:41 | 3 | Q.   Okay.  Let me show you Exhibit 13561. |
| 09:42 | 4 | A.   Yes, go ahead. |
| 09:42 | 5 | Q.   Now, when you -- you usually request that your counsel |
| 09:42 | 6 | send the trademarks (sic), so it comes from MGA's attorney, |
| 09:42 | 7 | correct? |
| 09:42 | 8 | A.   I just leave that to our legal department.  I |
| 09:42 | 9 | personally am not involved with that. |
| 09:42 | 10 | Q.   Do you recognize Exhibit 13561? |
| 09:42 | 11 | MS. KELLER:  Your Honor, we're going to object. |
| 09:42 | 12 | The Court had previously ruled on this. |
| 09:42 | 13 | THE COURT:  Thank you. |
| 09:42 | 14 | And, Counsel, you may proceed. |
| 09:42 | 15 | THE WITNESS:  I -- this exhibit is hundreds of |
| 09:42 | 16 | pages. |
| 09:42 | 17 | MR. PRICE:  Yeah. |
| 09:42 | 18 | BY MR. PRICE: |
| 09:42 | 19 | Q.   Let me direct you to a specific page. |
| 09:43 | 20 | THE COURT:  And because I've got about 30 |
| 09:43 | 21 | notebooks, why don't one of you give me that exhibit, also. |
| 09:43 | 22 | It would be a lot easier. |
| 09:43 | 23 | MR. PRICE:  And, Your Honor, we're only going to |
| 09:43 | 24 | be referring to pages 37 through 40. |
| 09:43 | 25 | THE COURT:  Well, as soon as I have the exhibit in |

| | | |
|---|---|---|
| 09:43 | 1 | front of me.  I don't want to wrestle with the notebooks. |
| 09:43 | 2 | I've seen the exhibits on the weekends. |
| 09:43 | 3 | All right.  Which page? |
| 09:43 | 4 | MR. PRICE:  It's page 37 through 40. |
| 09:43 | 5 | THE COURT:  37 through what? |
| 09:43 | 6 | MR. PRICE:  37 through 40. |
| 09:43 | 7 | THE COURT:  Thank you. |
| 09:44 | 8 | THE WITNESS:  Go ahead. |
| 09:44 | 9 | BY MR. PRICE: |
| 09:44 | 10 | Q.   Mr. Larian, do you have pages 37 through 40? |
| 09:44 | 11 | A.   I do. |
| 09:44 | 12 | Q.   And do you see that as an e-mail string between you and |
| 09:44 | 13 | Mr. Black and others concerning Toy Depot Limited? |
| 09:44 | 14 | A.   Yes.  This is Ray Black, is my attorney.  I don't know |
| 09:44 | 15 | how this document is in your hand.  It's definitely a |
| 09:44 | 16 | privileged document, but go ahead. |
| 09:44 | 17 | Q.   This was used in a prior proceeding, right? |
| 09:44 | 18 | A.   I don't recall. |
| 09:44 | 19 | Q.   You saw this in a prior proceeding and were asked |
| 09:44 | 20 | questions about it, right? |
| 09:44 | 21 | A.   I don't remember. |
| 09:44 | 22 | MR. PRICE:  Okay.  Your Honor, move 13561, pages |
| 09:44 | 23 | 37 to 40, into evidence. |
| 09:44 | 24 | THE COURT:  Is the intent to show that Mr. Larian |
| 09:44 | 25 | is aware of these kinds of cease and desist letters, |

CV 04-9049 DOC - 2/9/2011 - Day 15, Volume 1 of 3

56

| | | |
|---|---|---|
| 09:44 | 1 | Counsel? |
| 09:44 | 2 | MR. PRICE:  Yes, and the direction he gives to |
| 09:45 | 3 | his -- |
| 09:45 | 4 | THE COURT:  All right.  For that limited purpose. |
| 09:45 | 5 | Whether this is attorney-client privileged or not, I'm going |
| 09:45 | 6 | to allow this letter to come in, in trying to balance that |
| 09:45 | 7 | privilege against the relevant evidence in the matter. |
| 09:45 | 8 | What it's purportedly attempting to show is that |
| 09:45 | 9 | Mr. Larian is, in fact, aware from his company's standpoint, |
| 09:45 | 10 | apparently, that these cease and desist are letters are |
| 09:45 | 11 | rather common -- |
| 09:45 | 12 | So, Counsel, it's received. |
| 09:45 | 13 | *(Exhibit No. 13561 received in evidence.)* |
| 09:45 | 14 | BY MR. PRICE: |
| 09:45 | 15 | Q.   If we could look at 13561-0037. |
| 09:45 | 16 | THE COURT:  -- and common in the industry. |
| 09:45 | 17 | Now, I'm not sure of that, but that's apparently |
| 09:45 | 18 | the intent of Mattel's counsel. |
| 09:45 | 19 | BY MR. PRICE: |
| 09:45 | 20 | Q.   Do you have that in front of you, sir? |
| 09:45 | 21 | A.   I do. |
| 09:45 | 22 | Q.   And if you see, second from the top, an e-mail from you |
| 09:45 | 23 | to Mr. Black and Mr. -- I guess it's Kamarck; is that right? |
| 09:45 | 24 | K-A-M-A-R-C-K. |
| 09:45 | 25 | A.   Mitch Kamarck, who's also our attorney. |

57

| | | |
|---|---|---|
| 09:46 | 1 | Q.   And you say, "Ray, we need to hurt them so the word |
| 09:46 | 2 | gets out.  Don't settle for just stopping and paying 10,000 |
| 09:46 | 3 | pounds."  Do you see that? |
| 09:46 | 4 | A.   I do. |
| 09:46 | 5 | Q.   And by "stopping," that meant enjoining them, that is, |
| 09:46 | 6 | prohibiting them from doing this? |
| 09:46 | 7 | A.   That's correct. |
| 09:46 | 8 |         MS. KELLER:  Objection. |
| 09:46 | 9 |         THE COURT:  Overruled. |
| 09:46 | 10 | BY MR. PRICE: |
| 09:46 | 11 | Q.   You had an understanding when you wrote those words, |
| 09:46 | 12 | right? |
| 09:46 | 13 | A.   I don't remember it, but yes, I had an understanding |
| 09:46 | 14 | that this company was infringing Bratz's properties. |
| 09:46 | 15 | Q.   And so one thing you wanted done is to stop that, |
| 09:46 | 16 | correct? |
| 09:46 | 17 | A.   That's correct. |
| 09:46 | 18 | Q.   And you've heard the phrase "enjoin"? |
| 09:46 | 19 | A.   Yes. |
| 09:46 | 20 | Q.   Lawyer way for saying "stop"? |
| 09:46 | 21 | A.   Yes. |
| 09:46 | 22 | Q.   And the phrase "injunction"? |
| 09:46 | 23 | A.   Yes. |
| 09:46 | 24 | Q.   A lawyer way for saying "stop"? |
| 09:46 | 25 | A.   Yes.  Or don't do it again, or don't sell. |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 09:46 | 1 | Q.   And sometimes you want to send a message to the -- to |
| 09:46 | 2 | other toy manufacturers that you can't get away with this |
| 09:46 | 3 | sort of thing, correct? |
| 09:47 | 4 | A.   That's correct. |
| 09:47 | 5 | Q.   And that's what you're saying here.  "Ray, we need to |
| 09:47 | 6 | hurt them so the word gets out," right? |
| 09:47 | 7 | A.   That's right. |
| 09:47 | 8 | Q.   So let's get back, then, to the letter you received |
| 09:47 | 9 | February 7, 2002. |
| 09:47 | 10 | (Document displayed.) |
| 09:47 | 11 | BY MR. PRICE: |
| 09:47 | 12 | Q.   And you see they talk about, in the second paragraph, |
| 09:47 | 13 | "The marks are being infringed by the Bratz Yahoo discussion |
| 09:47 | 14 | group websites." |
| 09:47 | 15 | Do you see that? |
| 09:47 | 16 | A.   I do. |
| 09:47 | 17 | Q.   And enclosed was the home page for one of those sites. |
| 09:47 | 18 | Do you see that? |
| 09:47 | 19 | A.   Yes. |
| 09:47 | 20 | Q.   Now, if you'd look at the home page that is attached. |
| 09:47 | 21 | (Document displayed.) |
| 09:47 | 22 | THE WITNESS:  Yes. |
| 09:47 | 23 | BY MR. PRICE: |
| 09:47 | 24 | Q.   Do you see Carter Bryant's name in the page that was |
| 09:48 | 25 | attached to you? |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 9863   Filed 02/14/11   Page 59 of 148   Page ID #:297618
CV 04-9049 DOC - 2/9/2011 - Day 15, Volume 1 of 3

59

| | | |
|---|---|---|
| 09:48 | 1 | A.    No. |
| 09:48 | 2 | Q.    And the purpose of this letter was -- was concerning |
| 09:48 | 3 | Barbie and Diva Starz, correct? |
| 09:48 | 4 | A.    You mean Mattel's purpose? |
| 09:48 | 5 | Q.    Yeah.  Reading this, you understood that the author of |
| 09:48 | 6 | the letter, Mr. Quinto, was complaining about infringing |
| 09:48 | 7 | Mattel's Barbie and Diva Starz, correct? |
| 09:48 | 8 | A.    Well, Ms.(sic) Quinto was also sending it to -- copying |
| 09:48 | 9 | Michele McShane, who I believe was Mr. Thomas' predecessor |
| 09:48 | 10 | as the head of litigation from Mattel, and Adrian Pruetz, |
| 09:48 | 11 | who was also at one time as a Quinn's partner, I believe. |
| 09:48 | 12 | Now she started her own law firm.  But she was a person who |
| 09:48 | 13 | sued every company for Mattel.  So those two people were |
| 09:48 | 14 | also copied here. |
| 09:48 | 15 | Q.    My question was a bit different.  The letter was |
| 09:49 | 16 | concerning infringement of Mattel's Barbie and Diva Starz |
| 09:49 | 17 | trademarks, correct? |
| 09:49 | 18 |         MS. KELLER:  Objection.  Misstates the evidence, |
| 09:49 | 19 | Your Honor. |
| 09:49 | 20 |         THE WITNESS:  It was -- |
| 09:49 | 21 |         MS. KELLER:  For completeness. |
| 09:49 | 22 |         THE COURT:  Overruled. |
| 09:49 | 23 |         THE WITNESS:  It -- it contained more than that. |
| 09:49 | 24 | You should read the whole letter.  It was basically telling |
| 09:49 | 25 | us that a lady on her own has gone ahead and set up a Bratz |

| | | |
|---|---|---|
| 09:49 | 1 | fan -- a Yahoo fan site on her own.  And here the law firm |
| 09:49 | 2 | of Mr. Quinn was sending us a cease and desist letter, go |
| 09:49 | 3 | and tell this person -- who I have no idea who she is -- |
| 09:49 | 4 | take it down or else. |
| 09:49 | 5 | Q.   And what they're referring to were the Barbie and Diva |
| 09:49 | 6 | Starz trademarks, right? |
| 09:49 | 7 | A.   At the first two sentences, yes. |
| 09:49 | 8 | Q.   Well, you can look throughout.  I mean, it's talking |
| 09:49 | 9 | about the Barbie and Diva Starz trademarks? |
| 09:50 | 10 | A.   I see Bratz Yahoo in there.  I mean, if you want me to |
| 09:50 | 11 | read this completely, I can tell you; otherwise -- he's |
| 09:50 | 12 | telling me about Playboy and cases and that -- he, David |
| 09:50 | 13 | Quintino *(sic)*.  All I'm -- I'm sure at the direction |
| 09:50 | 14 | Mattel, because Ms. McShane is completely copied on that. |
| 09:50 | 15 | Q.   My question is just about the topic. |
| 09:50 | 16 | A.   I'm trying to answer your topic.  But you're asking me |
| 09:50 | 17 | is it only about Bratz -- I mean, Barbie and Diva Starz |
| 09:50 | 18 | trademark.  That's what your letter says.  If you're asking |
| 09:50 | 19 | me what was the intention of your law firm or Ms. McShane to |
| 09:50 | 20 | write this letter, I have no idea.  They have a better |
| 09:50 | 21 | answer. |
| 09:50 | 22 | Q.   I'll ask you just if you'd look at the letter.  The |
| 09:50 | 23 | only trademarks from Mattel that are mentioned are Barbie |
| 09:50 | 24 | and Diva Starz? |
| 09:50 | 25 | A.   That's correct. |

CV 04-9049 DOC - 2/9/2011 - Day 15, Volume 1 of 3

61

| 09:51 | 1 | BY MR. PRICE: |
|---|---|---|
| 09:51 | 2 | Q.   It doesn't say anything about Carter Bryant, correct? |
| 09:51 | 3 | A.   Not in this letter it doesn't. |
| 09:51 | 4 | Q.   In fact, your understanding is that Carter Bryant was |
| 09:51 | 5 | not a trademark of Mattel, correct? |
| 09:51 | 6 | A.   No, I don't think he is. |
| 09:51 | 7 | Q.   And is it your understanding that what this letter is |
| 09:51 | 8 | referring to is the use of a competitor's mark to divert |
| 09:51 | 9 | Internet users to -- to a website associated with a |
| 09:51 | 10 | competitor? |
| 09:51 | 11 | A.   I really didn't understand this letter.  I forwarded it |
| 09:51 | 12 | to Patty Glaser, who was my trial lawyer, to respond to. |
| 09:51 | 13 | Q.   Have you heard of anything -- something called |
| 09:51 | 14 | "metatags"? |
| 09:51 | 15 | A.   No, I have not. |
| 09:51 | 16 | Q.   Uh, do you -- without using that word, do you |
| 09:51 | 17 | understand that there's a way that a website can put |
| 09:52 | 18 | information on its website so that if, for example, someone |
| 09:52 | 19 | searches for the word "Barbie," it will get search results |
| 09:52 | 20 | that -- that direct the user, or list, you know, on the |
| 09:52 | 21 | Google results, that website? |
| 09:52 | 22 | A.   No, I'm too old for that.  I used to use telex |
| 09:52 | 23 | machines, but my kids do, I'm sure. |
| 09:52 | 24 | Q.   Well, you sell Nintendo; is that right? |
| 09:52 | 25 | A.   Nintendo had their games.  We had telex machine at the |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 2/9/2011 - Day 15, Volume 1 of 3

62

| | | |
|---|---|---|
| 09:52 | 1 | time. |
| 09:52 | 2 | Q.   Well -- |
| 09:52 | 3 | A.   I don't think people -- many people remember telex |
| 09:52 | 4 | machines. |
| 09:52 | 5 | Q.   Well, do you -- does MGA have some sort of metatag so |
| 09:52 | 6 | if there's a search for Bratz, it will go to the MGA |
| 09:52 | 7 | website? |
| 09:52 | 8 | A.   I really have no idea what metatags are.  We have an IT |
| 09:52 | 9 | department; they're young and bright.  I'm sure they do. |
| 09:52 | 10 | Q.   Uh, will you agree that it wouldn't be appropriate |
| 09:53 | 11 | for -- for MGA to have what I've called these metatags on |
| 09:53 | 12 | its site so that if someone searched for Barbie, the search |
| 09:53 | 13 | result would be Bratz? |
| 09:53 | 14 | A.   I don't even know, Mr. Price, what metatag is.  I |
| 09:53 | 15 | really don't. |
| 09:53 | 16 | MS. KELLER:  Your Honor, objection.  Vague, as to |
| 09:53 | 17 | whether it's appropriate versus legal. |
| 09:53 | 18 | THE COURT:  No, overruled.  This only goes to |
| 09:53 | 19 | state of mind. |
| 09:53 | 20 | You can answer that question. |
| 09:53 | 21 | THE WITNESS:  I don't know what "metatags" is. |
| 09:53 | 22 | How does it work? |
| 09:53 | 23 | BY MR. PRICE: |
| 09:53 | 24 | Q.   I'll define it.  I'll just say metatags is some |
| 09:53 | 25 | encoding in your website, say Bratz, so that if someone |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 09:53 | 1 | searches for Barbie, it will go to Bratz.  So if I'm |
| 09:53 | 2 | defining it that way, okay? -- you'll agree that it would be |
| 09:53 | 3 | inappropriate for MGA to do that; that is, to have this |
| 09:53 | 4 | coding on its website, so if someone searches for Barbie, |
| 09:53 | 5 | the search result is -- is MGA and Bratz? |
| 09:53 | 6 | A.  I don't know.  I don't know the laws on that. |
| 09:53 | 7 | Mr. Quinn probably knows.  He represents Google. |
| 09:54 | 8 | Q.  Well, you're not aware of MGA doing that? |
| 09:54 | 9 | A.  I'm -- I don't know if we do or not. |
| 09:54 | 10 | Q.  So here we have a letter, February 7, 2002.  It has no |
| 09:54 | 11 | mention of Carter Bryant, correct? |
| 09:54 | 12 | A.  This letter does not have mention of Carter Bryant. |
| 09:54 | 13 | Q.  And doesn't suggest Carter Bryant is a trademark, |
| 09:54 | 14 | correct? |
| 09:54 | 15 | A.  No, it doesn't. |
| 09:54 | 16 | Q.  And so let's look at Exhibit 4507. |
| 09:54 | 17 | *(Document produced to the witness.)* |
| 09:54 | 18 | *(Document displayed.)* |
| 09:54 | 19 | MR. PRICE:  I believe this is in evidence, |
| 09:54 | 20 | Your Honor. |
| 09:55 | 21 | THE COURT:  Counsel, I just got a note that the |
| 09:55 | 22 | jurors need a bathroom break. |
| 09:55 | 23 | MR. PRICE:  That's common. |
| 09:55 | 24 | THE COURT:  Should we take that? |
| 09:55 | 25 | MR. PRICE:  Yes.  Yes, please. |

| | | |
|---|---|---|
| 09:55 | 1 | THE COURT:  Ladies and gentlemen, you're |
| 09:55 | 2 | admonished not to discuss this matter amongst yourselves, |
| 09:55 | 3 | nor form or express any opinion concerning the case. |
| 09:55 | 4 | Have a nice restroom break.  We'll come back and |
| 09:55 | 5 | get you in about 20 minutes or so. |
| 09:55 | 6 | Counsel, if you'll be seated. |
| 09:55 | 7 | Mr. Larian, if you would step down, sir. |
| 09:55 | 8 | Ladies and gentlemen of the audience, if you would |
| 09:55 | 9 | be seated, please.  This is not a break. |
| 09:55 | 10 | *(Jury recesses at 9:55 a.m.)* |
| 09:55 | 11 | *(Outside the presence of the jury.)* |
| 09:55 | 12 | THE COURT:  All right.  The record should reflect |
| 09:55 | 13 | that the Court made a number of *in limine* motion rulings at |
| 09:55 | 14 | the counsels' request.  I think about 80; 40 from |
| 09:55 | 15 | approximately each side at the beginning of the case.  But I |
| 09:55 | 16 | warned counsel at that time that those were *in limine* |
| 09:56 | 17 | motions that might affect the opening statement; that those |
| 09:56 | 18 | weren't *in limine* motions that the Court would particularly |
| 09:56 | 19 | be bound by in light of the evidence and the volume of |
| 09:56 | 20 | evidence coming in this case, and I also indicated to all |
| 09:56 | 21 | counsel the Court would remain quite flexible. |
| 09:56 | 22 | Two of my dissatisfactions about the first trial, |
| 09:56 | 23 | with no criticism, is I believe Mr. Larian had been placed |
| 09:56 | 24 | in a position by the time he took the stand of already |
| 09:56 | 25 | having various accusations concerning his character called |

09:56    1    into account through various attacks by Mattel.  That left
09:56    2    this Court with a very dissatisfied feeling that once
09:56    3    Mr. Larian took the stand in the first trial, the way that
09:56    4    the evidence came in really put Mr. Larian in the position
09:56    5    of being perceived to be a fabricator the moment he took the
09:56    6    stand.  Now, this Court needs to be blunt about that,
09:56    7    because it affects a number my rulings.
09:56    8            Second, the Court was determined in this matter
09:56    9    that that wouldn't occur; in other words, it might be a
09:56   10    matter of timing, but it wasn't a matter of, quote/unquote,
09:56   11    relevance.  So my in limine motions were designed to shape
09:57   12    the case in terms of opening statement but to always leave
09:57   13    some flexibility depending upon the evidence.
09:57   14            First, the Court has placed two issues in front of
09:57   15    the jury in light of the Ninth Circuit's ruling, or at least
09:57   16    the Court's best reading of the Ninth Circuit's ruling.  One
09:57   17    is ideas and whether that should be a Court determination or
09:57   18    a jury determination.  I've left that for the jury, but I've
09:57   19    also left statute of limitations.  I did not adopt
09:57   20    Judge Larson's rulings.  Therefore, statute of limitations
09:57   21    is in play, and what the Court's confronted with now is this
09:57   22    interchange, if you will, this clash between the privilege
09:57   23    and, if you will, a critical issue for the jury to decide;
09:57   24    and that is, when Mattel should have known or could have
09:57   25    known about Carter Bryant.

Case 2:04-cv-09049-DOC-RNB   Document 9863   Filed 02/14/11   Page 66 of 148   Page ID #:297625
CV 04-9049 DOC - 2/9/2011 - Day 15, Volume 1 of 3

66

09:57    1          Now, the second thing the record needs to reflect

09:57    2    is that up to this point the Court has been extraordinarily

09:57    3    cautious concerning the privilege and as it pertained to

09:58    4    Patty Glaser and other counsel.  And the Court can't help

09:58    5    but note numerous counsel and law firms that Mr. Larian has

09:58    6    retained, hired, fired, and transferred.

09:58    7          Patty Glaser is obviously a lifetime friend, but

09:58    8    she still enjoys and enjoyed the status of being counsel, so

09:58    9    she had a duality.  That doesn't waive the attorney-client

09:58   10    privilege.  But in light of the critical issue of the

09:58   11    statute of limitations, the Court had already considered

09:58   12    21714, had already redacted, in this Court's opinion, any

09:58   13    attorney-client privilege, and had let the parties see the

09:58   14    bottom portion, which is a forward from Farhad Larian -- or

09:58   15    Farhad Larian's e-mail from Patty Glaser to Isaac Larian.  I

09:59   16    do not consider and did not consider that privileged.

09:59   17    That's why the Court -- or the parties were made aware of

09:59   18    this.

09:59   19          Now, there's an objection to 21714 by Ms. Keller.

09:59   20          The second concern that's arisen on behalf of MGA

09:59   21    so we have a blunt discussion about this, is that these

09:59   22    opinions take on an argumentative tone.  It's really

09:59   23    Mattel's effort to shape their case for further argument.

09:59   24    And the Court well understands that.  The difficulty is

09:59   25    Mr. Larian has designated him a 30(b) witness throughout

Case 2:04-cv-09049-DOC-RNB   Document 9863   Filed 02/14/11   Page 67 of 148   Page ID #:297626
CV 04-9049 DOC - 2/9/2011 - Day 15, Volume 1 of 3

67

| | | |
|---|---|---|
| 09:59 | 1 | these proceedings.  The Court has read, frankly, too many of |
| 09:59 | 2 | the depositions now. |
| 09:59 | 3 | The question is, what did Mattel know or when |
| 09:59 | 4 | should it have known?  And I perceive and believe, subject |
| 10:00 | 5 | to argument by MGA, that this is relevant evidence.  I well |
| 10:00 | 6 | recognize that there may be a clash in the attorney-client |
| 10:00 | 7 | privilege area, by the same token, the Court's confronted |
| 10:00 | 8 | with the statute of limitations area, which is to be decided |
| 10:00 | 9 | by the jury. |
| 10:00 | 10 | So, Counsel, you may address the Court concerning |
| 10:00 | 11 | 21714. |
| 10:00 | 12 | MS. KELLER:  Thank you, Your Honor. |
| 10:00 | 13 | Um, Your Honor, the -- Mr. Larian was designated |
| 10:00 | 14 | on some matters as a 30(b)(6) witness, but he was not |
| 10:00 | 15 | designated as an expert on the statute of limitations, let |
| 10:00 | 16 | alone industry standards for discovering infringement, let |
| 10:00 | 17 | alone Mattel's knowledge of dates and times. |
| 10:00 | 18 | And the problem that we have, in addition to the |
| 10:00 | 19 | underlying problem of attorney-client privilege is -- its |
| 10:00 | 20 | ostensible reason to overcome that privilege is that Mattel |
| 10:01 | 21 | wants to elicit from Mr. Larian various pieces of |
| 10:01 | 22 | information about when he would have known something or did |
| 10:01 | 23 | know something and what actions he would have taken and, |
| 10:01 | 24 | therefore, what Mattel could have or would have done. |
| 10:01 | 25 | So when you weigh that against the privilege, um, |

| 10:01 | 1 | and you take -- you bear in mind that he's being asked to |
|---|---|---|

and you take -- you bear in mind that he's being asked to

give these opinions with essentially no foundation as to

what Mattel did or did not know, I don't think that should

be seen as sufficient to overcome the privilege.

         The second problem that we have is that we are

confronted with a series of exhibits that go into other

litigation by Mr. Larian.  Again, offered for -- ostensibly

for issues like Mr. Larian's knowledge, what Mr. Larian

would have done, what -- what Mattel should have done.  But

they don't go to that at all.  And they all relate to other

litigation, Your Honor.  Every one of these things relates

to other litigation.  And the Court had ruled in 403 motions

that it was gonna be kept out.

         The date of this Fred Larian communication is

March 7th, 2007.  It's very difficult to see what relevance

this has to what Mattel knew or should have known on the

statute of limitations.  I mean, I just think these

arguments that are being used to advance a waiver of the

attorney-client privilege or arguments that are being used

to advance getting into other litigation are -- are really

just a roundabout way by Mattel of dirtying up Mr. Larian,

either with showing that he too had filed lawsuits and,

therefore, he's a bad guy.

         And in the case of the Fred Larian, March 7, 2007,

e-mail contained within the Patty Glaser e-mail, it says,

CV 04-9049 DOC - 2/9/2011 - Day 15, Volume 1 of 3

69

| 10:03 | 1 | "Had I been treated with a little caring, instead of being |
| 10:03 | 2 | told," quote,'I am not a man if I don't sue.'"  You know, |
| 10:03 | 3 | there are a number of things in here that have nothing to do |
| 10:03 | 4 | with the proffered purpose of this e-mail, including, "It is |
| 10:03 | 5 | unfortunate that what does not get emphasized is the fact |
| 10:03 | 6 | that at the end I put family first and dropped the case." |
| 10:03 | 7 | There are all sorts of things in here, none of which advance |
| 10:03 | 8 | the ball that is being claimed needs to be advanced by |
| 10:03 | 9 | Mattel. |
| 10:03 | 10 | And so I think the Court's previous rulings -- I |
| 10:03 | 11 | don't see that -- that there is anything here sufficiently |
| 10:03 | 12 | compelling to overcome the Court's previous rulings. |
| 10:03 | 13 | THE COURT:  All right.  Thank you. |
| 10:03 | 14 | Counsel on behalf of Mattel. |
| 10:03 | 15 | MR. PRICE:  Your Honor, first my understanding is |
| 10:03 | 16 | that you denied Motion in Limine No. 2 about other |
| 10:04 | 17 | litigation, although you've had further discussions about |
| 10:04 | 18 | that. |
| 10:04 | 19 | Certainly, to the extent Mr. Isaac Larian makes a |
| 10:04 | 20 | statement, in any context -- if he says it to a waitress, |
| 10:04 | 21 | that comes in.  It comes in as a party admission.  Now, one |
| 10:04 | 22 | has to weigh the prejudicial effect, perhaps, but we're not |
| 10:04 | 23 | quoting things which have a prejudicial effect.  I mean, |
| 10:04 | 24 | they may harm Mr. Larian, but not because they're not |
| 10:04 | 25 | relevant, but because they are relevant. |

Case 2:04-cv-09049-DOC-RNB   Document 9863   Filed 02/14/11   Page 70 of 148   Page ID #:297629
CV 04-9049 DOC - 2/9/2011 - Day 15, Volume 1 of 3

70

| | | |
|---|---|---|
| 10:04 | 1 | With respect to 21714 in particular, uh, the |
| 10:04 | 2 | e-mail from Fred Larian to Patty Glaser is not privileged. |
| 10:04 | 3 | She wasn't his attorney. |
| 10:04 | 4 | THE COURT:  Counsel, that's why I've already |
| 10:04 | 5 | disclosed it.  In other words, you got it in a redacted |
| 10:04 | 6 | form.  That portion that was redacted has, in fact, been |
| 10:04 | 7 | excised by the Court because it was privileged. |
| 10:04 | 8 | MR. PRICE:  And it's relevant, as you say, to the |
| 10:04 | 9 | statute of limitations issue. |
| 10:04 | 10 | THE COURT:  I don't know why this comes as any |
| 10:04 | 11 | surprise to both counsel.  In other words, I'd already made |
| 10:05 | 12 | my determination about the privileged portions.  Those |
| 10:05 | 13 | aren't coming in.  I submitted this in a redacted form |
| 10:05 | 14 | because your expectation should have been that it had every |
| 10:05 | 15 | likelihood of coming in, so I don't think that the privilege |
| 10:05 | 16 | is applicable here.  I didn't think when I looked at this |
| 10:05 | 17 | document originally. |
| 10:05 | 18 | And I'm inclined to receive this. |
| 10:05 | 19 | Now, I do agree that there's certain parts, |
| 10:05 | 20 | though -- because each of you want a sweeping ruling.  One, |
| 10:05 | 21 | you'd like the entire document in, but I'm not so naive to |
| 10:05 | 22 | believe that you wouldn't like seize upon those portions |
| 10:05 | 23 | where Farhad Larian discusses why he desisted or ceased his |
| 10:05 | 24 | litigation.  Of course Mattel wants to seize upon that and |
| 10:05 | 25 | wants to undermine the Court's ruling.  On the other hand, I |

| 10:05 | 1 | don't think that I have to make a sweeping ruling excluding |
| 10:05 | 2 | this document which appears to be relevant concerning when |
| 10:05 | 3 | the disclosure of the information took place, and it |
| 10:05 | 4 | somewhat does undermine Farhad's testimony and Mr. Larian's. |
| 10:06 | 5 | The next exhibit was 17252.  It's a cease and |
| 10:06 | 6 | desist letter.  I'm a little perplexed how the statement can |
| 10:06 | 7 | be made that this letter put Mattel on notice and MGA's |
| 10:06 | 8 | argument concerning that; it certainly doesn't. |
| 10:06 | 9 | And second, if the statute of limitations issue is |
| 10:06 | 10 | before the jury, that testimony seems to be a little |
| 10:06 | 11 | suspect. |
| 10:06 | 12 | 13561 also is another portion of the Court's |
| 10:06 | 13 | concern. |
| 10:06 | 14 | But the Court not only doesn't believe that this |
| 10:06 | 15 | is attorney-client privilege, the real question is 403 and |
| 10:06 | 16 | whether the prejudicial effect is outweighed by the |
| 10:06 | 17 | probative value and what that probative value is.  And as |
| 10:06 | 18 | long as the statute of limitations is in play, I don't see |
| 10:07 | 19 | how there's an argument concerning attorney-client privilege |
| 10:07 | 20 | on 17252 or 13561. |
| 10:07 | 21 | And so what is the argument by MGA?  That the |
| 10:07 | 22 | prejudicial effect outweighs the probative value?  That it's |
| 10:07 | 23 | irrelevant?  Or are you hanging by a thread because I've |
| 10:07 | 24 | repeatedly forewarned you -- sit done, Mr. Price -- that |
| 10:07 | 25 | I've repeatedly forewarned you that while you cling to your |

CV 04-9049 DOC - 2/9/2011 - Day 15, Volume 1 of 3

72

| | | |
|---|---|---|
| 10:07 | 1 | record of *in limine* motions -- apparently you haven't been |
| 10:07 | 2 | with us on the weekends, and I don't find any fault, but I |
| 10:07 | 3 | do find a disconnect.  There's been a complete understanding |
| 10:07 | 4 | by all parties' parts that -- I fully expected you to throw |
| 10:07 | 5 | back the *in limine* motions on me, but all parties are very |
| 10:07 | 6 | aware that in the fluidity of trial, you've been warned |
| 10:07 | 7 | informally a number of times, that I constantly would |
| 10:07 | 8 | consider the Court's own motions. |
| 10:07 | 9 | MS. KELLER:  I am aware of that, Your Honor. |
| 10:07 | 10 | THE COURT:  All right. |
| 10:07 | 11 | MS. KELLER:  Your Honor, as to 17252, though, I |
| 10:08 | 12 | thought I heard the Court just now say that the Court |
| 10:08 | 13 | thought we were objecting on privilege.  That's not -- |
| 10:08 | 14 | THE COURT:  Well, your objections are sweeping, so |
| 10:08 | 15 | I'm going to clarify my record.  I'm not going to take a |
| 10:08 | 16 | chance that you're running up to the Circuit, frankly, in |
| 10:08 | 17 | the future and saying, "Oh, Judge Carter didn't consider |
| 10:08 | 18 | that." |
| 10:08 | 19 | Let's go to 17252.  We're going to move right down |
| 10:08 | 20 | the line concerning the next exhibit. |
| 10:08 | 21 | MS. KELLER:  17252, we don't have any objection |
| 10:08 | 22 | to.  We want it in. |
| 10:08 | 23 | THE COURT:  It's received. |
| 10:08 | 24 | *(Exhibit No. 17252 previously received in* |
| 10:08 | 25 | *evidence earlier in this volume.)* |

Case 2:04-cv-09049-DOC-RNB  Document 9863  Filed 02/14/11  Page 73 of 148  Page ID #:297632
CV 04-9049 DOC - 2/9/2011 - Day 15, Volume 1 of 3

73

| | | |
|---|---|---|
| 10:08 | 1 | THE COURT:  13561. |
| 10:08 | 2 | MS. KELLER:  That's the foreign litigation, |
| 10:08 | 3 | Your Honor. |
| 10:08 | 4 | THE COURT:  Now, foreign litigation is not going |
| 10:08 | 5 | to come in concerning similarity.  I'm going to stay with my |
| 10:08 | 6 | prior *in limine* ruling.  We're not going to get into a |
| 10:08 | 7 | similarity test between MGA's suit with infringing dolls. |
| 10:08 | 8 | But where a statement is made or where there's knowledge |
| 10:08 | 9 | concerning the statute of limitations and there's a claim |
| 10:08 | 10 | that we just don't have knowledge, no.  Then it has some |
| 10:08 | 11 | relevance. |
| 10:08 | 12 | Now, the whole document shouldn't come in.  I |
| 10:08 | 13 | forewarned counsel about that.  But it's obvious now that |
| 10:08 | 14 | there's Hong Kong litigation. |
| 10:09 | 15 | As long as the Court doesn't tread upon the |
| 10:09 | 16 | Circuit's ruling, and I would make the independent ruling |
| 10:09 | 17 | regardless of the Circuit, I'm not gonna get into what I |
| 10:09 | 18 | call a similarity test.  The Circuit's forewarned this Court |
| 10:09 | 19 | it's improper, it's unduly consumptive of time, it's |
| 10:09 | 20 | prejudicial.  This is a suit about Bratz. |
| 10:09 | 21 | MS. KELLER:  But, Your Honor, this Exhibit 13561 |
| 10:09 | 22 | has nothing to do with the statute of limitations.  This is |
| 10:09 | 23 | about Mr. Larian's litigation in Hong Kong, where he was |
| 10:09 | 24 | authorizing his attorney -- |
| 10:09 | 25 | THE COURT:  No, it doesn't. |

Case 2:04-cv-09049-DOC-RNB   Document 9863   Filed 02/14/11   Page 74 of 148   Page ID #:297633
CV 04-9049 DOC - 2/9/2011 - Day 15, Volume 1 of 3

74

| | | |
|---|---|---|
| 10:09 | 1 | MS. KELLER:  -- about a knockoff. |
| 10:09 | 2 | THE COURT:  It's not about Bratz.  It's about |
| 10:09 | 3 | injunctions.  It's about Mr. Larian's claim that he doesn't |
| 10:09 | 4 | understand, you know, on the stand:  Stop.  And you're suing |
| 10:09 | 5 | me.  So it's not being received for the concern that you |
| 10:09 | 6 | have.  And, in fact, I'm not even certain that this document |
| 10:09 | 7 | should be received. |
| 10:09 | 8 | I think you can be questioned about it.  It can be |
| 10:09 | 9 | pointed out to the jury, but then Mr. Larian needs to answer |
| 10:09 | 10 | the question. |
| 10:10 | 11 | Okay.  The idea that he doesn't know, I won't |
| 10:10 | 12 | comment upon.  But this is so common in the industry that |
| 10:10 | 13 | MGA would protect itself.  It's so common in the industry |
| 10:10 | 14 | that Mattel would protect itself.  And these are numerous |
| 10:10 | 15 | cease and desist letters.  There are numerous injunctions |
| 10:10 | 16 | that fly back and forth.  It's almost ridiculous. |
| 10:10 | 17 | So this document shouldn't be coming in, and I'm |
| 10:10 | 18 | going to preclude the counsel from getting into a similarity |
| 10:10 | 19 | test.  The circuit's absolutely right, because they're |
| 10:10 | 20 | always right.  I'm just kidding you.  But they're always |
| 10:10 | 21 | right.  And number two, I would make that independent |
| 10:10 | 22 | determination.  We're not going there. |
| 10:10 | 23 | But as far as Mr. Larian being referred to this |
| 10:10 | 24 | document, absolutely.  He well understands in this industry, |
| 10:10 | 25 | in this Court's opinion, injunctions.  And, quite frankly, |

| | | |
|---|---|---|
| 10:10 | 1 | if we want to get into this and make the point, we'll go |
| 10:10 | 2 | through numerous other documents, and I'll point out maybe |
| 10:10 | 3 | five or ten others where we have this same issue.  So... |
| 10:11 | 4 | Now, once again, I forewarned you there was a way |
| 10:11 | 5 | to handle that.  This document isn't coming in.  Okay.  This |
| 10:11 | 6 | is foreign litigation; different standards, different tests, |
| 10:11 | 7 | and I'm not getting into similarity, and I'm not taking the |
| 10:11 | 8 | chance of retrying this, hopefully, a third time.  But you |
| 10:11 | 9 | can refer to it. |
| 10:11 | 10 | And I think you have adequately.  And I think you |
| 10:11 | 11 | can put that up on the screen, those limited portions.  And |
| 10:11 | 12 | I'm not fearful of the jury knowing about other litigation. |
| 10:11 | 13 | What I'm fearful and concerned about is that we get into the |
| 10:11 | 14 | similarity test. |
| 10:11 | 15 | Don't go there.  Do you understand that, |
| 10:11 | 16 | Mr. Price? |
| 10:11 | 17 | MR. PRICE:  I do. |
| 10:11 | 18 | THE COURT:  Is there any misunderstanding between |
| 10:11 | 19 | us? |
| 10:11 | 20 | MR. PRICE:  No. |
| 10:11 | 21 | THE COURT:  Do you need any clarification since I |
| 10:11 | 22 | seem to get each night a batch of concerns by Mattel and the |
| 10:11 | 23 | counsel about asking for reclarification or a new |
| 10:11 | 24 | understanding.  Do you understand? |
| 10:11 | 25 | MR. PRICE:  May I raise -- |

| | | |
|---|---|---|
| 10:11 | 1 | THE COURT: Repeat back to me. |
| 10:11 | 2 | MR. PRICE: We're not to get into foreign |
| 10:11 | 3 | litigation or the similarities. |
| 10:11 | 4 | THE COURT: Excellent. |
| 10:11 | 5 | MR. PRICE: Especially the similarities. |
| 10:12 | 6 | THE COURT: Can you refer to this in terms of |
| 10:12 | 7 | injunctions and his knowledge? Absolutely. |
| 10:12 | 8 | MR. PRICE: And may we put it in as just that |
| 10:12 | 9 | part? His e-mails? |
| 10:12 | 10 | THE COURT: Yes. |
| 10:12 | 11 | MR. PRICE: That's just pages 37 through 40. |
| 10:12 | 12 | THE COURT: Yes. |
| 10:12 | 13 | MR. PRICE: That's all we moved in. |
| 10:12 | 14 | THE COURT: Just like Paragraph 3. Now, last |
| 10:12 | 15 | night at 9:00 o'clock or so, Mr. McConville pointed out |
| 10:12 | 16 | something that was critical. Because of the volume of |
| 10:12 | 17 | information, I didn't realize that the Hong Kong litigation |
| 10:12 | 18 | was being mentioned. I went home last evening, and although |
| 10:12 | 19 | the Court, quite frankly, made a mistake in terms of that |
| 10:12 | 20 | paragraph, I'm not concerned anymore about Hong Kong |
| 10:12 | 21 | litigation or other lawsuits. As long as it's a relevant |
| 10:12 | 22 | paragraph. What I'm concerned about is similarity. You're |
| 10:12 | 23 | not to go there. |
| 10:12 | 24 | MS. KELLER: Your Honor, 37 through 40 discusses |
| 10:12 | 25 | similarities. It has comparisons. It's replete with it. |

Case 2:04-cv-09049-DOC-RNB   Document 9863   Filed 02/14/11   Page 77 of 148   Page ID #:297636
CV 04-9049 DOC – 2/9/2011 – Day 15, Volume 1 of 3

77

| | | |
|---|---|---|
| 10:12 | 1 | THE COURT:  Show me. |
| 10:12 | 2 | MS. KELLER:  That's why I don't think that |
| 10:12 | 3 | document should be coming in. |
| 10:12 | 4 | THE COURT:  Show me. |
| 10:12 | 5 | MS. KELLER:  We're getting it right now, |
| 10:12 | 6 | Your Honor. |
| 10:12 | 7 | Mr. Parker will bring it to you. |
| 10:12 | 8 | THE COURT:  You're very right.  You're absolutely |
| 10:12 | 9 | right.  It's on page 0038.  And there we get into the |
| 10:13 | 10 | similarity issue on subparagraph 2.  So I think we can refer |
| 10:13 | 11 | to it.  That's the proper way for the Court to limit it, to |
| 10:13 | 12 | make certain it's relevant and that the document doesn't |
| 10:13 | 13 | come in. |
| 10:13 | 14 | MR. QUINN:  Can we excerpt it, Your Honor, to just |
| 10:13 | 15 | what we showed the jury there? |
| 10:13 | 16 | THE COURT:  Well, sure, but not now.  Tonight. |
| 10:13 | 17 | And we'll go over it tonight.  Okay.  Subject to a good |
| 10:13 | 18 | record and the objections, et cetera.  And that way it comes |
| 10:13 | 19 | in for a relevant purpose.  But I forewarn you, if we go |
| 10:13 | 20 | through the laborious process of bickering about that and |
| 10:13 | 21 | you don't do it appropriately the first time, there's no |
| 10:13 | 22 | reason for me to waste from 9:00 to 12:00 tonight bickering |
| 10:13 | 23 | about that. |
| 10:13 | 24 | Now, I want to turn back to Mr. Price.  Sometimes |
| 10:13 | 25 | there's a failure to communicate. |

Case 2:04-cv-09049-DOC-RNB   Document 9863   Filed 02/14/11   Page 78 of 148   Page ID #:297637
CV 04-9049 DOC - 2/9/2011 - Day 15, Volume 1 of 3

78

| | | |
|---|---|---|
| 10:13 | 1 | What did I just say? |
| 10:13 | 2 | MR. PRICE:  You said there's to be no mention of |
| 10:13 | 3 | Hong Kong litigation, particularly with respect to |
| 10:13 | 4 | similarities.  We're not going there. |
| 10:14 | 5 | THE COURT:  Mr. Price, that's why you're an |
| 10:14 | 6 | outstanding attorney. |
| 10:14 | 7 | Ms. Keller, what did I just say? |
| 10:14 | 8 | MS. KELLER:  There is no mention to be made of the |
| 10:14 | 9 | Hong Kong litigation or the similarities. |
| 10:14 | 10 | THE COURT:  Excellent.  That's why you're an |
| 10:14 | 11 | outstanding attorney. |
| 10:14 | 12 | What did I say about the cease and desist letters? |
| 10:14 | 13 | MS. KELLER:  You said that the relevance of the |
| 10:14 | 14 | information would be to show Mr. Larian's familiarity with |
| 10:14 | 15 | such letters. |
| 10:14 | 16 | THE COURT:  Mr. Price, what did I say about the |
| 10:14 | 17 | cease and desist letter? |
| 10:14 | 18 | MR. PRICE:  What she said, which is that it comes |
| 10:14 | 19 | in to show Mr. Larian's knowledge. |
| 10:14 | 20 | THE COURT:  Excellent.  That's why I have the |
| 10:14 | 21 | finest counsel, literally, in this Court, before the Court, |
| 10:14 | 22 | and I'm humbled by their intelligence. |
| 10:14 | 23 | Now, what else do you need, quote/unquote, |
| 10:14 | 24 | clarification about, because you have now five minutes to |
| 10:14 | 25 | use the restroom? |

| | | |
|---|---|---|
| 10:14 | 1 | MS. KELLER:  I have one thing, Your Honor. |
| 10:14 | 2 | If we could have the unredacted version of 4507 if |
| 10:14 | 3 | they're going to use it -- um, for example, we're about to |
| 10:14 | 4 | go into this, the very first paragraph.  I would ask that |
| 10:14 | 5 | the unredacted version be used. |
| 10:15 | 6 | THE COURT:  Just a moment, 4507. |
| 10:15 | 7 | MS. KELLER:  Yes, Your Honor. |
| 10:15 | 8 | THE COURT:  I haven't quite memorized the numbers |
| 10:15 | 9 | yet. |
| 10:15 | 10 | Now, would you refer back to 31,862 for a moment. |
| 10:15 | 11 | MS. KELLER:  I'm worse on numbers than anyone in |
| 10:15 | 12 | this room. |
| 10:15 | 13 | THE COURT:  Counsel, would you then turn to 8047, |
| 10:15 | 14 | and would you compare the two with, finally, 1018.  Thank |
| 10:15 | 15 | you.  Get back to me on that and write a brief.  All right? |
| 10:15 | 16 | I think that makes the point. |
| 10:15 | 17 | MR. QUINN:  By 6:00 o'clock, Your Honor? |
| 10:15 | 18 | THE COURT:  By 6:00 o'clock. |
| 10:15 | 19 | Now, that makes the point. |
| 10:15 | 20 | I'm just joking with counsel. |
| 10:15 | 21 | All right.  4507.  And what portion do you want? |
| 10:15 | 22 | MS. KELLER:  Your Honor, they're showing a |
| 10:15 | 23 | redacted version, and it's -- if you look at the first |
| 10:15 | 24 | paragraph where it says, "Julie/Beth/Abe," on the bottom |
| 10:15 | 25 | line of the first paragraph, there's a redacted stamp across |

| | | |
|---|---|---|
| 10:15 | 1 | there.  And then underneath -- |
| 10:15 | 2 | THE COURT:  I have the redacted portion. |
| 10:15 | 3 | MS. KELLER:  That's correct. |
| 10:16 | 4 | THE COURT:  Now, I'd like to see the redacted |
| 10:16 | 5 | portion and compare it. |
| 10:16 | 6 | MS. KELLER:  We have it -- I think. |
| 10:16 | 7 | THE COURT:  In other words, I think I've read |
| 10:16 | 8 | everything, or at least looked at everything during the |
| 10:16 | 9 | evening hours, but it's a little difficult to go back and |
| 10:16 | 10 | forth. |
| 10:16 | 11 | But remember, work on that brief on those three |
| 10:16 | 12 | exhibits tonight, Ms. Keller.  Just a joke. |
| 10:16 | 13 | Now, let the record reflect there's four attorneys |
| 10:16 | 14 | gathering to discuss this matter with MGA. |
| 10:16 | 15 | MS. KELLER:  I think we've resolved it, |
| 10:16 | 16 | Your Honor. |
| 10:16 | 17 | MS. HURST:  It's resolved.  My fault. |
| 10:16 | 18 | THE COURT:  It's been miraculously resolved. |
| 10:16 | 19 | MS. HURST:  My fault. |
| 10:16 | 20 | THE COURT:  You have now four minutes, Counsel. |
| 10:16 | 21 | MS. KELLER:  Thank you. |
| 10:16 | 22 | THE COURT:  In three and a half minutes, I'm going |
| 10:16 | 23 | to open those doors, and the jury's coming in. |
| 10:16 | 24 | *(Recess held at 10:16 a.m.)* |
| 10:16 | 25 | |

CV 04-9049 DOC – 2/9/2011 – Day 15, Volume 1 of 3

81

| 10:19 | 1 | *(In the presence of the jury.)* |
| 10:23 | 2 | THE COURT:  All right.  We're back in session. |
| 10:23 | 3 | The jury's present.  All counsel are present.  The parties |
| 10:23 | 4 | are present.  Mr. Larian -- thank you, sir -- if you would |
| 10:23 | 5 | be seated. |
| 10:23 | 6 | Counsel, Mr. Price, if you would like to continue, |
| 10:23 | 7 | sir. |
| 10:23 | 8 | **DIRECT EXAMINATION (Continued)** |
| 10:23 | 9 | BY MR. PRICE: |
| 10:23 | 10 | Q.   Mr. Larian, I think we were on 4507.  And if you could |
| 10:23 | 11 | take a look at the top part of that, which is your e-mail to |
| 10:23 | 12 | Ms. O'Connor and others. |
| 10:23 | 13 | A.   Yes. |
| 10:23 | 14 | Q.   And you say, "Victoria/Dave:  Who gave David Dees info |
| 10:23 | 15 | and what he does for us to this Yahoo lady and why?  This |
| 10:24 | 16 | Yahoo lady is giving us too much legal grief even though she |
| 10:24 | 17 | does not mean it.  Please do not send any information or |
| 10:24 | 18 | apply (sic) to her e-mails unless you have cleared it with |
| 10:24 | 19 | me. |
| 10:24 | 20 | "Julie/Beth/Abe" -- and could you tell us who Julie |
| 10:24 | 21 | Beth and Abe are? |
| 10:24 | 22 | A.   Julie was our in-house counsel at the time.  Abe was, I |
| 10:24 | 23 | believe, our -- either CFO or COO.  And Beth was a |
| 10:24 | 24 | paralegal. |
| 10:24 | 25 | Q.   And you say, "Julie/Beth/Abe:  Please check her website |

Case 2:04-cv-09049-DOC-RNB   Document 9863   Filed 02/14/11   Page 82 of 148   Page ID #:297641
CV 04-9049 DOC - 2/9/2011 - Day 15, Volume 1 of 3

82

| | | |
|---|---|---|
| 10:24 | 1 | ASAP.  There must be no mention about Mattel or any of their |
| 10:24 | 2 | properties," comma, "Carter," comma, "any MGA, Bratz, arts," |
| 10:24 | 3 | comma, "et cetera." |
| 10:24 | 4 | Do you see that? |
| 10:24 | 5 | A.   Yes. |
| 10:24 | 6 | Q.   Now, you have, uh, testified that there was no reason |
| 10:24 | 7 | to keep Carter Bryant's name out of the public and you never |
| 10:25 | 8 | tried to. |
| 10:25 | 9 | A.   That's 100 percent accurate. |
| 10:25 | 10 | Q.   But you've also testified that you wanted to keep him |
| 10:25 | 11 | out of the public because you didn't want people poaching |
| 10:25 | 12 | him.  You didn't want headhunters calling him and trying to |
| 10:25 | 13 | hire him. |
| 10:25 | 14 | A.   In general, we don't want to publicize the name of our |
| 10:25 | 15 | designers because headhunters and other people come and hire |
| 10:25 | 16 | them. |
| 10:25 | 17 | Q.   And you've also said that you wanted to keep his name |
| 10:25 | 18 | out because he's private? |
| 10:25 | 19 | A.   Yes, he asked for it. |
| 10:25 | 20 | Q.   So then, you did have a reason to keep Carter Bryant's |
| 10:25 | 21 | name out of the public, and you did try to -- because he was |
| 10:25 | 22 | private? |
| 10:25 | 23 | A.   That was one of the reasons, yes.  But we didn't go |
| 10:25 | 24 | intentionally to hide his name. |
| 10:25 | 25 | Q.   Well, when you say you didn't intentionally hide his |

Case 2:04-cv-09049-DOC-RNB   Document 9863   Filed 02/14/11   Page 83 of 148   Page ID #:297642
CV 04-9049 DOC - 2/9/2011 - Day 15, Volume 1 of 3

83

| | | |
|---|---|---|
| 10:25 | 1 | name, you –– you said there shouldn't be any mention about |
| 10:25 | 2 | Carter.  That's one of the things in your e-mail, correct? |
| 10:25 | 3 | A.   What it refers –– this e-mail refers to the cease and |
| 10:26 | 4 | desist letter that we had received from Mattel. |
| 10:26 | 5 | And as a matter of fact, during the break, I looked at |
| 10:26 | 6 | the last paragraph of that letter, and you mention all |
| 10:26 | 7 | Mattel trademarks, not just Diva Starz and Bratz. |
| 10:26 | 8 | Q.   Okay.  Let's go to it.  17252. |
| 10:26 | 9 | A.   Yes. |
| 10:26 | 10 | MR. PRICE:  And I think Mr. Larian's referring to |
| 10:26 | 11 | the last paragraph on the second page. |
| 10:26 | 12 | (Document displayed.) |
| 10:26 | 13 | BY MR. PRICE: |
| 10:26 | 14 | Q.   Where it says, "Accordingly, Mattel must request that |
| 10:26 | 15 | MGA Entertainment provide written confirmation within one |
| 10:26 | 16 | week that all key words on Bratz' cites that consist of |
| 10:26 | 17 | terms identical or confusingly similar to Mattel marks have |
| 10:26 | 18 | been removed, and that MGA Entertainment will not again use |
| 10:26 | 19 | Mattel's marks in such manner." |
| 10:26 | 20 | Do you see that? |
| 10:26 | 21 | A.   I do. |
| 10:26 | 22 | Q.   Let me ask you is "Carter" a Mattel mark? |
| 10:26 | 23 | A.   Well, according to me, it's not; but maybe tomorrow you |
| 10:27 | 24 | will say he is. |
| 10:27 | 25 | Q.   Well, in this letter, does it say "Carter Bryant's" a |

CV 04-9049 DOC - 2/9/2011 - Day 15, Volume 1 of 3

84

| | | |
|---|---|---|
| 10:27 | 1 | Mattel mark? |
| 10:27 | 2 | A.   No, it doesn't. |
| 10:27 | 3 | Q.   And, in fact, you were -- you didn't want Mattel to |
| 10:27 | 4 | know about Carter Bryant because you didn't want them to put |
| 10:27 | 5 | two and two together to learn that he did work for MGA at |
| 10:27 | 6 | the same time he worked for Mattel? |
| 10:27 | 7 | A.   Absolutely incorrect.  We had Mattel invited to MGA |
| 10:27 | 8 | Hong Kong showroom and New York toy show right after that, |
| 10:27 | 9 | and asking them to distribute Bratz, so there was no reason |
| 10:27 | 10 | for us to hide Carter Bryant's name ever. |
| 10:27 | 11 | Q.   But no mention about Carter Bryant in the Hong Kong |
| 10:27 | 12 | showroom or the New York showroom, right? |
| 10:27 | 13 | A.   Well, I'm not so sure about that, if there was a |
| 10:27 | 14 | mention about that or not. |
| 10:27 | 15 | Q.   You mean, you can't tell us there was? |
| 10:27 | 16 | A.   No.  I'm telling you that I don't remember if there was |
| 10:27 | 17 | or not.  But I know that people at Mattel knew about Carter |
| 10:28 | 18 | Bryant and his involvement with Bratz, even prior to |
| 10:28 | 19 | Hong Kong toy show. |
| 10:28 | 20 | Q.   Let's look at Exhibit 4942. |
| 10:28 | 21 | *(Document provided to the witness.)* |
| 10:28 | 22 | THE WITNESS:  Yes.  Go ahead. |
| 10:28 | 23 | BY MR. PRICE: |
| 10:28 | 24 | Q.   And do you recognize that as an e-mail between you and |
| 10:28 | 25 | Dee Dee Valencia? |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 2/9/2011 - Day 15, Volume 1 of 3

85

| | | |
|---|---|---|
| 10:28 | 1 | A.   Yes, I do. |
| 10:28 | 2 | Q.   Could you tell us who Dee Dee Valencia is? |
| 10:28 | 3 | A.   She was a product manager at MGA. |
| 10:28 | 4 | MR. PRICE:  Your Honor, move Exhibit 4924 into |
| 10:28 | 5 | evidence. |
| 10:28 | 6 | THE COURT:  Received. |
| 10:28 | 7 | *(Exhibit No. 4924 received in evidence.)* |
| 10:28 | 8 | *(Document displayed.)* |
| 10:28 | 9 | BY MR. PRICE: |
| 10:28 | 10 | Q.   And the top of that is your response to Ms. Valencia, |
| 10:28 | 11 | which says, "Good ideas.  Let's share with the team after |
| 10:28 | 12 | New York and execute." |
| 10:28 | 13 | Do you see that? |
| 10:29 | 14 | A.   Yes, I do. |
| 10:29 | 15 | Q.   Now, let's look at the e-mail from her. |
| 10:29 | 16 | MR. PRICE:  If we can go down to the end of |
| 10:29 | 17 | "Features," Ken -- I'm sorry -- from the top to the end.  I |
| 10:29 | 18 | think there's actually one more line under "Features," just |
| 10:29 | 19 | so we have that complete. |
| 10:29 | 20 | *(Technician complies.)* |
| 10:29 | 21 | BY MR. PRICE: |
| 10:29 | 22 | Q.   Now, what we've blown up here is a portion of the |
| 10:29 | 23 | e-mail which she sent to you, correct? |
| 10:29 | 24 | A.   That's correct. |
| 10:29 | 25 | Q.   And under "Features" -- by the way, do you know what |

CV 04-9049 DOC – 2/9/2011 – Day 15, Volume 1 of 3

86

| | | |
|---|---|---|
| 10:29 | 1 | she's talking about when she says "Features"? |
| 10:29 | 2 | A.   I have no idea. |
| 10:29 | 3 | Q.   Well, did you ever -- |
| 10:29 | 4 | A.   He was talking about different -- she was talking about |
| 10:29 | 5 | different products. |
| 10:29 | 6 | Q.   Did she -- |
| 10:29 | 7 | A.   Different features. |
| 10:29 | 8 | Q.   Well, let's look under "Features" there.  It says, |
| 10:29 | 9 | "Signed by" -- question mark, question mark, question mark, |
| 10:29 | 10 | question mark, dash, "I know we want to keep Carter under |
| 10:29 | 11 | wraps." |
| 10:29 | 12 | Do you see this? |
| 10:29 | 13 | A.   I do. |
| 10:30 | 14 | Q.   And you received this around February 6, 2003, correct? |
| 10:30 | 15 | A.   That's correct. |
| 10:30 | 16 | Q.   And by then -- by the way, was Ms. Valencia a product |
| 10:30 | 17 | manager on any particular product or? |
| 10:30 | 18 | A.   Plush products and some dolls. |
| 10:30 | 19 | Q.   On February 6, 2003, you learned that one of your |
| 10:30 | 20 | product managers, at least, had the impression that, uh, MGA |
| 10:30 | 21 | wanted to keep Carter under wraps, right? |
| 10:30 | 22 | A.   That's what she wrote. |
| 10:30 | 23 | Q.   Well -- and that's what you read? |
| 10:30 | 24 | A.   Yes. |
| 10:30 | 25 | Q.   Okay.  And in reading that, your response was, "Good |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 10:30 | 1 | ideas.  Let's share them with the team after New York, and |
| 10:30 | 2 | execute." |
| 10:30 | 3 | A.   No.  My response to "Good ideas" was all the product |
| 10:30 | 4 | ideas that she had.  If you go, please, to -- |
| 10:30 | 5 | Q.   So -- |
| 10:30 | 6 | A.   I'm sorry.  Can I -- should I finish my answer? |
| 10:30 | 7 | Q.   I'm sorry.  I didn't mean to interrupt you.  Go ahead. |
| 10:31 | 8 | A.   Yes.  I was referring -- you see there, where it says, |
| 10:31 | 9 | "Product ideas"? |
| 10:31 | 10 |        MR. PRICE:  Move it on down, Ken, so we can show |
| 10:31 | 11 | that part. |
| 10:31 | 12 |           (Technician complies.) |
| 10:31 | 13 |        THE WITNESS:  That's what I was referring to, the |
| 10:31 | 14 | product ideas.  I wasn't paying attention to keeping Carter |
| 10:31 | 15 | Bryant under wrap, not under wrap. |
| 10:31 | 16 | BY MR. PRICE: |
| 10:31 | 17 | Q.   Well, you're -- |
| 10:31 | 18 | A.   My response is that -- to that portion of the e-mail. |
| 10:31 | 19 | Q.   So it's not to the -- |
| 10:31 | 20 |        MR. PRICE:  If we can show the entire e-mail, on |
| 10:31 | 21 | this page at least. |
| 10:31 | 22 |           (Technician complies.) |
| 10:31 | 23 | BY MR. PRICE: |
| 10:31 | 24 | Q.   It's not about selling and distribution strategy? |
| 10:31 | 25 | A.   No.  I'm looking at his "product ideas," and that's |

Case 2:04-cv-09049-DOC-RNB   Document 9863   Filed 02/14/11   Page 88 of 148   Page ID #:297647
CV 04-9049 DOC - 2/9/2011 - Day 15, Volume 1 of 3

88

| | | |
|---|---|---|
| 10:31 | 1 | when I said, "Good ideas." |
| 10:31 | 2 | Q.    It's not about the features? |
| 10:31 | 3 | A.    No.  Just talking about the good ideas, product ideas |
| 10:31 | 4 | that she's talking about. |
| 10:31 | 5 | Q.    So under feature, for example, when she says, "Custom |
| 10:31 | 6 | slash, "original art of girls as the certificate of |
| 10:31 | 7 | authenticity, framed for room and showing off to friends." |
| 10:32 | 8 | So when you said "good ideas," you weren't referring to |
| 10:32 | 9 | that idea, for example? |
| 10:32 | 10 | A.    No.  Because, again, if you go down a little bit, it |
| 10:32 | 11 | says, "Product ideas."  And my answer is "Good ideas" -- |
| 10:32 | 12 | Q.    So you didn't -- |
| 10:32 | 13 | A.    -- to the product ideas. |
| 10:32 | 14 | Q.    You didn't think that -- that having custom, original |
| 10:32 | 15 | art of girls as -- as the certificate of authenticity, and |
| 10:32 | 16 | frame for the room, and showing off to friends, you didn't |
| 10:32 | 17 | think that was an idea she was conveying to you? |
| 10:32 | 18 | A.    I was -- all I'm telling you is that my focus was, when |
| 10:32 | 19 | I answered that, when I said, "Good ideas" to the products |
| 10:32 | 20 | ideas that she was commenting about. |
| 10:32 | 21 | Q.    But you wouldn't want one of your product managers to |
| 10:32 | 22 | be under the misimpression that MGA wanted to keep Carter |
| 10:32 | 23 | under wraps, would you? |
| 10:32 | 24 | A.    I don't know where she came up with that from.  Maybe |
| 10:32 | 25 | Mr. David Dees.  I have no recollection.  You should call |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 2/9/2011 - Day 15, Volume 1 of 3

89

| | | |
|---|---|---|
| 10:32 | 1 | her.  She's local. |
| 10:32 | 2 | Q.   Well -- but I didn't receive the e-mail in |
| 10:32 | 3 | February 6 of 2003. |
| 10:32 | 4 |      You did, right? |
| 10:32 | 5 | A.   I did. |
| 10:33 | 6 | Q.   And did you respond to her by saying something like, |
| 10:33 | 7 | "Oh, you know, you're way off there.  We -- we have no |
| 10:33 | 8 | desire, never have had a desire to keep Carter Bryant under |
| 10:33 | 9 | wraps"? |
| 10:33 | 10 | A.   I did not. |
| 10:33 | 11 | Q.   The features we're talking about "Signed by," question |
| 10:33 | 12 | mark, question mark, question mark, question mark -- do you |
| 10:33 | 13 | have an understanding as to what she was referring to when |
| 10:33 | 14 | she was talking about features? |
| 10:33 | 15 | A.   I wasn't paying attention to that.  I was paying |
| 10:33 | 16 | attention to her product ideas. |
| 10:33 | 17 | Q.   Well, was she -- was she suggesting one of these |
| 10:33 | 18 | limited edition type of dolls that would have the designer |
| 10:33 | 19 | sign the doll? |
| 10:33 | 20 | A.   Yes. |
| 10:33 | 21 | Q.   And you can tell that by just reading it, correct? |
| 10:33 | 22 | A.   Yes, probably. |
| 10:33 | 23 | Q.   And that was one of the ideas she had -- was to have |
| 10:33 | 24 | this limited edition doll where you have someone sign it, |
| 10:33 | 25 | correct? |

| | | |
|---|---|---|
| 10:33 | 1 | A.    The product ideas she had was porcelain, real hair, |
| 10:33 | 2 | real fabric, has accents, high, high detail, tied to |
| 10:33 | 3 | well-known hip fashion designers that design clothing for |
| 10:34 | 4 | extra equity, sale of four dolls 6-inch to 8-inch high, size |
| 10:34 | 5 | smaller than mass market dolls, display only pieces. |
| 10:34 | 6 | Those are the ideas that she was talking about.  That's |
| 10:34 | 7 | what I was -- |
| 10:34 | 8 | Q.    Well -- |
| 10:34 | 9 | A.    -- that's what I responded to in the e-mail. |
| 10:34 | 10 | Q.    Uh, when you read it, though, you did understand she |
| 10:34 | 11 | was suggesting a limited edition doll with original art, |
| 10:34 | 12 | with certificates of authenticity, frame for the rooms that |
| 10:34 | 13 | they could show off to friends? |
| 10:34 | 14 | A.    I did not pay attention to all of that e-mail.  I just |
| 10:34 | 15 | went to the product ideas.  My -- my love is for product. |
| 10:34 | 16 | Q.    So if we look at this e-mail, then, your testimony is |
| 10:34 | 17 | that you didn't pay attention to -- from, "okay," down to |
| 10:34 | 18 | "product ideas"? |
| 10:34 | 19 | A.    I don't remember if I did or not.  But my answer, in |
| 10:35 | 20 | knowing myself and how I read e-mails -- 4-, 500 e-mails a |
| 10:35 | 21 | day and how I respond, and knowing myself, that my gift is |
| 10:35 | 22 | looking at products, that's what I was referring to. |
| 10:35 | 23 | THE COURT:  Counsel, could I interrupt you for |
| 10:35 | 24 | just a moment? |
| 10:35 | 25 | MR. PRICE:  Sure. |

| | | |
|---|---|---|
| 10:35 | 1 | THE COURT:  Marshal Torres is here and |
| 10:35 | 2 | Marshal Salt.  He was the homeless looking person, who |
| 10:35 | 3 | looked like he was wondering around. |
| 10:35 | 4 | Gentlemen, I can't meet with you until about noon. |
| 10:35 | 5 | Okay?  And I apologize.  I just saw you come in.  But I just |
| 10:35 | 6 | didn't want you sitting there inconvenienced. |
| 10:35 | 7 | So if you need to talk, 12:00 o'clock.  Okay?  I |
| 10:35 | 8 | just didn't want you wasting your time by sitting in the |
| 10:35 | 9 | audience thinking I'd take a break. |
| 10:35 | 10 | We just took a break.  Okay?  But it's a pleasure |
| 10:35 | 11 | seeing both of you. |
| 10:35 | 12 | (To the jury:)  Now, it has nothing to do with the |
| 10:35 | 13 | case.  I have not summoned the marshals.  Whatever side |
| 10:36 | 14 | they're sitting on is no reflection.  All the silly things |
| 10:36 | 15 | that can happen, in terms of impressions, is just negated. |
| 10:36 | 16 | But they've come up -- sometimes we talk about |
| 10:36 | 17 | pending criminal cases, sweeps, gang sweeps, et cetera. |
| 10:36 | 18 | But I saw them sitting there. |
| 10:36 | 19 | So thank you, Counsel.  I'm sorry for the |
| 10:36 | 20 | interruption. |
| 10:36 | 21 | MR. PRICE:  As long as it doesn't come off my |
| 10:36 | 22 | time. |
| 10:36 | 23 | THE COURT:  When they start approaching either |
| 10:36 | 24 | side, you know you're in trouble. |
| 10:36 | 25 | You're fine. |

| | | |
|---|---|---|
| 10:36 | 1 | BY MR. PRICE: |
| 10:36 | 2 | Q.   Mr. Larian, was the idea of having a limited edition |
| 10:36 | 3 | doll with original artwork and certificates of |
| 10:36 | 4 | authenticity -- was that a product idea? |
| 10:36 | 5 | A.   I have no idea what was in her mind. |
| 10:36 | 6 | Q.   Well, wouldn't you consider that to be a product idea, |
| 10:36 | 7 | a limited edition doll? |
| 10:36 | 8 | A.   Yeah, we have done limited edition dolls. |
| 10:36 | 9 | Q.   And that would qualify in your mind as a product idea? |
| 10:36 | 10 | A.   Yes.  Limited edition dolls can be product idea. |
| 10:36 | 11 | Q.   So that's something you would have read here since that |
| 10:37 | 12 | is talking about a product idea you -- would have paid |
| 10:37 | 13 | attention to because that's a product idea? |
| 10:37 | 14 | A.   Again, I know this is an e-mail.  And I'm not saying |
| 10:37 | 15 | that I didn't receive it, read it, because I replied to it. |
| 10:37 | 16 | But knowing myself, I was responding to her product ideas. |
| 10:37 | 17 | Q.   Now, I -- yesterday, though, didn't you testify that |
| 10:37 | 18 | you only read the beginning of e-mails in the chain and not |
| 10:37 | 19 | much other than that? |
| 10:37 | 20 | A.   No.  I said that, in general, I don't read long, long |
| 10:37 | 21 | e-mails. |
| 10:37 | 22 | Q.   Well, if we go to the line -- you see underneath the |
| 10:37 | 23 | "custom original art," it says, "The box is" -- and then |
| 10:37 | 24 | there's something in bold -- "just as important" -- you see |
| 10:37 | 25 | that? |

| | | |
|---|---|---|
| 10:37 | 1 | A.   I do. |
| 10:37 | 2 | Q.   "As" and then it's capitalized in bold, "the product"? |
| 10:37 | 3 | A.   Right. |
| 10:37 | 4 | Q.   "And the collectible market"? |
| 10:37 | 5 | A.   Yes. |
| 10:37 | 6 | Q.   "So package needs to be authentic and out of this |
| 10:37 | 7 | world." |
| 10:37 | 8 |      You see that? |
| 10:37 | 9 | A.   Yes. |
| 10:37 | 10 | Q.   So if your mind kind of goes to product -- |
| 10:37 | 11 | A.   Right. |
| 10:37 | 12 | Q.   -- that's your -- you would -- you certainly would -- |
| 10:38 | 13 | would be attracted to those -- that -- those words in -- |
| 10:38 | 14 | capitalized in bold, right? |
| 10:38 | 15 | A.   That's correct.  I don't deny that I have read this |
| 10:38 | 16 | e-mail or having seen that.  I was -- my -- what I'm |
| 10:38 | 17 | testifying to is that I responded to her product ideas.  And |
| 10:38 | 18 | definitely this could have been also one of her product |
| 10:38 | 19 | ideas. |
| 10:38 | 20 | Q.   Uh -- and, uh, yesterday, when we were talking about |
| 10:38 | 21 | Exhibit 305, which we just put on the overhead -- you've |
| 10:38 | 22 | seen this -- and you recall in connection with |
| 10:38 | 23 | Exhibit 305 -- |
| 10:38 | 24 | A.   This is Exhibit 305?  I'm sorry. |
| 10:38 | 25 |      MR. PRICE:  Well, put that up. |

Case 2:04-cv-09049-DOC-RNB   Document 9863   Filed 02/14/11   Page 94 of 148   Page ID #:297653
CV 04-9049 DOC - 2/9/2011 - Day 15, Volume 1 of 3

94

| | | |
|---|---|---|
| 10:38 | 1 | Ken, it's in evidence. |
| 10:38 | 2 | *(Document displayed.)* |
| 10:38 | 3 | BY MR. PRICE: |
| 10:38 | 4 | Q.    'member this is the one where Ms. O'Connor forwarded |
| 10:38 | 5 | you Ms. Garcia's e-mail about -- |
| 10:38 | 6 | A.    Right. |
| 10:38 | 7 | Q.    -- Carter Bryant working an average of about four hours |
| 10:38 | 8 | a day? |
| 10:38 | 9 | A.    Right. |
| 10:38 | 10 | Q.    On this one, didn't you testify that you only read the |
| 10:38 | 11 | beginning of the chain because you were kind a busy? |
| 10:38 | 12 | A.    No.  Also, it's -- this e-mail, it's talking about |
| 10:39 | 13 | products.  And I love products.  It's just about paying |
| 10:39 | 14 | somebody for four hours a day, and I was not going to do |
| 10:39 | 15 | that.  I don't think he had ever worked four hours a day. |
| 10:39 | 16 | And even if he did, we were not gonna pay for it. |
| 10:39 | 17 | Q.    Did you ever do a Carter Bryant exclusive Bratz |
| 10:39 | 18 | product? |
| 10:39 | 19 | A.    No. |
| 10:39 | 20 | Q.    Did you think that was a good idea at the time you were |
| 10:39 | 21 | being sent the e-mail by Ms. Valencia? |
| 10:39 | 22 | A.    I don't remember if that -- if I thought it was good |
| 10:39 | 23 | idea or bad idea. |
| 10:39 | 24 | Q.    If you will look at Exhibit 1932. |
| 10:39 | 25 | *(Document provided to the witness.)* |

CV 04-9049 DOC – 2/9/2011 – Day 15, Volume 1 of 3

95

| | | |
|---|---|---|
| 10:40 | 1 | THE WITNESS:  Go ahead. |
| 10:40 | 2 | BY MR. PRICE: |
| 10:40 | 3 | Q.    Do you recognize Exhibit 1932? |
| 10:40 | 4 | A.    I do. |
| 10:40 | 5 | Q.    And this is something that was prepared by MGA |
| 10:40 | 6 | concerning, uh, uh, the dates at which MGA employees worked |
| 10:40 | 7 | at Mattel, when they were formerly at Mattel? |
| 10:40 | 8 | A.    My best understanding is that this was prepared by MGA |
| 10:40 | 9 | lawyers at the request of Mattel in this litigation. |
| 10:40 | 10 | Q.    So your understanding is this was -- this was prepared |
| 10:40 | 11 | because Mattel asked for it? |
| 10:40 | 12 | A.    Yes.  That's my understanding, yes. |
| 10:40 | 13 | Q.    So this was something that was meant to be -- to be |
| 10:40 | 14 | given to Mattel? |
| 10:41 | 15 | A.    It was given to Mattel.  It has MGA Bates number on the |
| 10:41 | 16 | bottom. |
| 10:41 | 17 | MR. PRICE:  Okay.  In that case, move |
| 10:41 | 18 | Exhibit 1932 into evidence. |
| 10:41 | 19 | THE COURT:  Received. |
| 10:41 | 20 | *(Exhibit No. 1932 received in evidence.)* |
| 10:41 | 21 | *(Document displayed.)* |
| 10:41 | 22 | BY MR. PRICE: |
| 10:41 | 23 | Q.    And if we look at the chart here, it has the employee, |
| 10:41 | 24 | the MGA position? |
| 10:41 | 25 | A.    Yes. |

| | | |
|---|---|---|
| 10:41 | 1 | Q.   The MGA date? |
| 10:41 | 2 | A.   Yes. |
| 10:41 | 3 | Q.   And then the Mattel date, right? |
| 10:41 | 4 | A.   Yes. |
| 10:41 | 5 | Q.   And if we look at page 1932-00004. |
| 10:41 | 6 | *(Document displayed.)* |
| 10:41 | 7 | BY MR. PRICE: |
| 10:41 | 8 | Q.   You see that Mr. Bryant is listed there. |
| 10:41 | 9 | You see that? |
| 10:41 | 10 | A.   I do.  And so is Anna Rhee. |
| 10:41 | 11 | Q.   And this exhibit, at least as of April 2006, shows all |
| 10:42 | 12 | the folks who went from Mattel to MGA, correct? |
| 10:42 | 13 | A.   That's correct. |
| 10:42 | 14 | Q.   And you notice that a lot of the employees have the |
| 10:42 | 15 | dates they were at Mattel, correct? |
| 10:42 | 16 | A.   Yes. |
| 10:42 | 17 | Q.   So, uh, for example, it'd say, "January" or "July 31, |
| 10:42 | 18 | 2006 to present" or -- or -- it'll give their Mattel dates |
| 10:42 | 19 | and their MGA dates, right? |
| 10:42 | 20 | A.   And some have question mark dates. |
| 10:42 | 21 | Q.   Well, let's look at, uh, page 1. |
| 10:42 | 22 | Uh, one thing you know MGA knows are the MGA dates? |
| 10:42 | 23 | A.   Hopefully. |
| 10:42 | 24 | Q.   So on the first page, we got 40 former Mattel employees |
| 10:42 | 25 | who've -- who were coming over, correct? |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 2/9/2011 - Day 15, Volume 1 of 3

97

| | | |
|---|---|---|
| 10:42 | 1 | A.   Coming over?  Or they were at MGA? |
| 10:42 | 2 | Q.   They were at Mattel and then they were at MGA. |
| 10:42 | 3 | A.   That's correct. |
| 10:43 | 4 | Q.   And there were 40 on the first page, right? |
| 10:43 | 5 | A.   Yes, they are. |
| 10:43 | 6 | Q.   And the second page goes up to, I guess, number 72? |
| 10:43 | 7 | A.   Yes. |
| 10:43 | 8 | Q.   And they all show MGA dates and Mattel dates, right? |
| 10:43 | 9 | A.   Yes. |
| 10:43 | 10 | Q.   And that -- that third column, "C" -- |
| 10:43 | 11 | A.   I'm sorry.  One of them says "not applicable."  I don't |
| 10:43 | 12 | know what that means.  On line number 59. |
| 10:43 | 13 | Q.   Okay.  That has -- that's Column D, which is Mattel |
| 10:43 | 14 | dates, right? |
| 10:43 | 15 | A.   That's correct. |
| 10:43 | 16 | Q.   And then the list goes on, the third page, up to |
| 10:43 | 17 | 116, right? |
| 10:43 | 18 | A.   Yes. |
| 10:43 | 19 | Q.   And, uh, you wouldn't have to -- |
| 10:44 | 20 | A.   And again, here is another one says, "Not applicable." |
| 10:44 | 21 | I don't know what that is.  On line number 107. |
| 10:44 | 22 | Q.   Okay.  And that's a "not applicable" under the Mattel |
| 10:44 | 23 | dates? |
| 10:44 | 24 | A.   Right. |
| 10:44 | 25 | Q.   And then when we get to page 4, you've got "Carter |

| 10:44 | 1 | Bryant," correct? |
| 10:44 | 2 | A.   And Anna Rhee. |
| 10:44 | 3 | Q.   And some others, right? |
| 10:44 | 4 | A.   Right. |
| 10:44 | 5 | Q.   And if you look at "Carter Bryant," Column C, that's |
| 10:44 | 6 | the -- that's the column for MGA dates. |
| 10:44 | 7 | A.   Yes. |
| 10:44 | 8 | Q.   Right?  And, obviously, MGA would know the MGA dates. |
| 10:44 | 9 | A.   Yes. |
| 10:44 | 10 | Q.   So you would know whether it was September of 2000 or |
| 10:44 | 11 | October of 2000 or August of 2000, correct? |
| 10:44 | 12 | A.   When you look at the top heading, in here, it says, |
| 10:45 | 13 | "Former Mattel employees."  Carter Bryant was never a |
| 10:45 | 14 | Mattel -- MGA employee.  That's why Column C, where you see |
| 10:45 | 15 | MGA dates, he was never an MGA employee, nor was Anna Rhee. |
| 10:45 | 16 | Q.   Well, let's -- let's -- |
| 10:45 | 17 |      MR. PRICE:  Ken, can you put the headers so that |
| 10:45 | 18 | they're over A, B, C and D? |
| 10:45 | 19 |      *(Technician complies.)* |
| 10:45 | 20 |      MR. PRICE:  Thanks. |
| 10:45 | 21 | BY MR. PRICE: |
| 10:45 | 22 | Q.   So -- I'm sorry.  It's already there. |
| 10:45 | 23 |      So if we look at C, it says "MGA dates," correct? |
| 10:45 | 24 | A.   Yes, it does. |
| 10:45 | 25 | Q.   And you've got one date.  You've got "present," |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 10:45 | 1 | correct? |
| 10:45 | 2 | A.   Yes. |
| 10:45 | 3 | Q.   Which means as of the date of the document:  April 20, |
| 10:45 | 4 | 2006 -- |
| 10:45 | 5 | A.   Yes. |
| 10:45 | 6 | Q.   -- right? |
| 10:45 | 7 | A.   But he was never an employee of MGA, nor was Anna Rhee. |
| 10:46 | 8 | Q.   But you've got a date there for the -- for the date |
| 10:46 | 9 | when he's -- he's still working for MGA.  You've got |
| 10:46 | 10 | "present," right? |
| 10:46 | 11 | A.   Yes, I see that. |
| 10:46 | 12 | Q.   You don't have question mark, question mark, question |
| 10:46 | 13 | mark on the end time of that range, do you? |
| 10:46 | 14 | A.   We don't. |
| 10:46 | 15 | Q.   What you have question mark, question mark, question |
| 10:46 | 16 | mark is on when he began working with MGA? |
| 10:46 | 17 | A.   That is what the document says.  He was never an |
| 10:46 | 18 | employee in MGA, nor was Anna Rhee. |
| 10:46 | 19 | Q.   Well, you've heard, uh, there's an issue of when |
| 10:46 | 20 | Ms. Rhee first worked on a Bratz face -- painted a Bratz |
| 10:46 | 21 | face; do you recall that? |
| 10:46 | 22 | A.   I recall that. |
| 10:46 | 23 | Q.   And again, with Ms. Rhee, you've got a date for -- |
| 10:46 | 24 | "Present" for April 20, 2006, right? |
| 10:46 | 25 | A.   Present? |

| | | |
|---|---|---|
| 10:47 | 1 | Q.   It says "Present." |
| 10:47 | 2 | A.   Yes. |
| 10:47 | 3 | Q.   And that refers to the date this was created, right? |
| 10:47 | 4 | A.   Right. |
| 10:47 | 5 | Q.   And you have a question mark, question mark, question |
| 10:47 | 6 | mark as to her first date? |
| 10:47 | 7 | A.   Yes, I see that. |
| 10:47 | 8 | Q.   And the reason you have this for Mr. Bryant is because |
| 10:47 | 9 | his contract's dated as of a date that he was still working |
| 10:47 | 10 | with Mattel? |
| 10:47 | 11 | A.   No.  This was prepared by Daphne Gronich in regards |
| 10:47 | 12 | this litigation.  I don't know the answers to those.  But I |
| 10:47 | 13 | definitely know the answers to Column D.  Don't ask |
| 10:47 | 14 | answers -- questions -- I have answers to that.  I know the |
| 10:47 | 15 | facts for that. |
| 10:47 | 16 | Q.   So what you can't explain is why it doesn't have a date |
| 10:47 | 17 | for Carter Bryant as to the first time he began working with |
| 10:47 | 18 | MGA? |
| 10:47 | 19 | A.   I don't know why she put that in there, no.  But I |
| 10:47 | 20 | think she's a witness here. |
| 10:48 | 21 | Q.   Just tell me whether or not you can answer this "yes" |
| 10:48 | 22 | or "no":  Isn't it true that you never wanted Mattel to |
| 10:48 | 23 | learn that Carter Bryant was working for Mattel at the same |
| 10:48 | 24 | time he was working with MGA? |
| 10:48 | 25 | A.   No. |

Case 2:04-cv-09049-DOC-RNB   Document 9863   Filed 02/14/11   Page 101 of 148   Page ID #:297660
CV 04-9049 DOC - 2/9/2011 - Day 15, Volume 1 of 3

101

| | | |
|---|---|---|
| 10:48 | 1 | Q.   Let me show you Exhibit 11907. |
| 10:48 | 2 | *(Document provided to the witness.)* |
| 10:49 | 3 | THE WITNESS:  Go ahead. |
| 10:49 | 4 | BY MR. PRICE: |
| 10:49 | 5 | Q.   You recognize 11907 as an e-mail chain? |
| 10:49 | 6 | A.   Yes. |
| 10:49 | 7 | Q.   Involving you? |
| 10:49 | 8 | A.   Yes. |
| 10:49 | 9 | MR. PRICE:  I believe this is in evidence, |
| 10:49 | 10 | Your Honor, but just in case. |
| 10:49 | 11 | THE COURT:  Received. |
| 10:49 | 12 | *(Exhibit No. 11907 received in evidence.)* |
| 10:49 | 13 | *(Document displayed.)* |
| 10:49 | 14 | BY MR. PRICE: |
| 10:49 | 15 | Q.   Let's look at the e-mail chain.  If you look at this |
| 10:49 | 16 | chain -- |
| 10:49 | 17 | MR. PRICE:  Let's blow up the first part so we can |
| 10:49 | 18 | see it. |
| 10:49 | 19 | *(Technician complies.)* |
| 10:49 | 20 | BY MR. PRICE: |
| 10:49 | 21 | Q.   Uh, you see there's no indication on this that, uh, |
| 10:49 | 22 | there's any part that's redacted, correct? |
| 10:50 | 23 | A.   I don't see -- no, I don't.  I don't see that. |
| 10:50 | 24 | Q.   So if someone saw this, they would think that this was |
| 10:50 | 25 | the complete e-mail chain between you and Ms. O'Connor |

| | | |
|---|---|---|
| 10:50 | 1 | concerning your interview for the French magazine *Capital*, |
| 10:50 | 2 | correct? |
| 10:50 | 3 | A.   On this e-mail by itself without other sections. |
| 10:50 | 4 | Q.   This e-mail -- |
| 10:50 | 5 | A.   Because I've seen e-mails that have other sections. |
| 10:50 | 6 | Q.   I'm asking you, if someone looked at this, they would |
| 10:50 | 7 | think this is the complete e-mail chain between you and |
| 10:50 | 8 | Ms. O'Connor concerning the interview for the French |
| 10:50 | 9 | magazine *Capital*, right? |
| 10:50 | 10 | A.   Yes. |
| 10:50 | 11 | Q.   And this e-mail was produced by MGA -- you see, there's |
| 10:50 | 12 | the production number? |
| 10:50 | 13 | A.   Yes. |
| 10:50 | 14 | Q.   Uh, prior to, uh, this trial we've heard about, |
| 10:50 | 15 | correct? |
| 10:50 | 16 | A.   I don't know why it was produced. |
| 10:50 | 17 | Q.   Well, you recall you being asked about this at the |
| 10:51 | 18 | other trial? |
| 10:51 | 19 | A.   I believe you asked me about this, yes. |
| 10:51 | 20 | Q.   And, uh, if you look at -- there's a section there, |
| 10:51 | 21 | "Born" -- you see that it says, "Born "September 2000.  Nine |
| 10:51 | 22 | month to develop, like a baby." |
| 10:51 | 23 |      Do you so that? |
| 10:51 | 24 | A.   I do. |
| 10:51 | 25 | Q.   And that's under the date of birth of the Bratz, time |

| | | |
|---|---|---|
| 10:51 | 1 | of development, first launch in U.S. discussion, correct? |
| 10:51 | 2 | A.   Yes. |
| 10:51 | 3 | Q.   This isn't the complete e-mail chain, is it? |
| 10:51 | 4 | A.   No.  I have seen another e-mail on this that continues. |
| 10:51 | 5 | Q.   The e-mail chain that continues wasn't produced until |
| 10:51 | 6 | 2009, correct? |
| 10:51 | 7 | A.   I don't know when it was produced. |
| 10:51 | 8 | MS. KELLER:  Objection.  Irrelevant. |
| 10:51 | 9 | THE COURT:  Overruled. |
| 10:51 | 10 | THE WITNESS:  I don't know when it was produced. |
| 10:51 | 11 | All I can tell you is that we turned over all of our |
| 10:51 | 12 | documents -- everything, everything -- millions and millions |
| 10:51 | 13 | of pages to our lawyers -- |
| 10:52 | 14 | BY MR. PRICE: |
| 10:52 | 15 | Q.   Well -- |
| 10:52 | 16 | A.   -- to produce to you.  I left them to the lawyers to |
| 10:52 | 17 | produce 'em. |
| 10:52 | 18 | Q.   Well -- and -- and you've actually testified in 2010 |
| 10:52 | 19 | about this e-mail and another e-mail which includes a little |
| 10:52 | 20 | bit more of the string, correct? |
| 10:52 | 21 | A.   I have testified many times.  I don't remember which -- |
| 10:52 | 22 | which -- when. |
| 10:52 | 23 | Q.   Well, do you remember that you testified that you |
| 10:52 | 24 | discussed a continuation of this e-mail chain with a firm |
| 10:52 | 25 | called Skadden, Arps? |

CV 04-9049 DOC - 2/9/2011 - Day 15, Volume 1 of 3

104

| 10:52 | 1 | A.   I'm sorry? |
| 10:52 | 2 | MS. KELLER:  Your Honor, objection.  This is -- |
| 10:52 | 3 | this was an *in camera* hearing. |
| 10:52 | 4 | MR. PRICE:  No, it's -- |
| 10:52 | 5 | THE COURT:  Overruled.  Thank you. |
| 10:52 | 6 | MR. PRICE:  It's a deposition. |
| 10:52 | 7 | BY MR. PRICE: |
| 10:52 | 8 | Q.   On April 12, 2010, you were asked questions about a |
| 10:53 | 9 | continuation of this e-mail.  Do you recall that? |
| 10:53 | 10 | A.   I don't remember the date and when.  If you show it to |
| 10:53 | 11 | me. |
| 10:53 | 12 | Q.   Well, let me show you that continuation, Exhibit 7055. |
| 10:53 | 13 | *(Document provided to the witness.)* |
| 10:53 | 14 | THE WITNESS:  Go ahead. |
| 10:53 | 15 | BY MR. PRICE: |
| 10:53 | 16 | Q.   Now, the e-mail we had -- I'm sorry. |
| 10:53 | 17 | Do you recognize 7055? |
| 10:53 | 18 | A.   I do. |
| 10:53 | 19 | MR. PRICE:  Move that into evidence, Your Honor. |
| 10:53 | 20 | THE COURT:  Received. |
| 10:53 | 21 | *(Exhibit No. 7055 received in evidence.)* |
| 10:53 | 22 | *(Document displayed.)* |
| 10:53 | 23 | BY MR. PRICE: |
| 10:53 | 24 | Q.   And the e-mail we showed you before stopped with "FYI," |
| 10:54 | 25 | correct? |

| | | |
|---|---|---|
| 10:54 | 1 | A.    Yes. |
| 10:54 | 2 | Q.    And on 7055 -- |
| 10:54 | 3 | MR. PRICE:  Ken, if we can... |
| 10:54 | 4 | (Technician complies.) |
| 10:54 | 5 | BY MR. PRICE: |
| 10:54 | 6 | Q.    So the e-mail that we just looked at goes up to "FYI," |
| 10:54 | 7 | the e-mail that you're sending to Victoria O'Connor, |
| 10:54 | 8 | correct? |
| 10:54 | 9 | A.    Yes, it does. |
| 10:54 | 10 | Q.    And, in fact, this e-mail chain continued, and you can |
| 10:54 | 11 | see the top two parts of the e-mail above the blue line that |
| 10:54 | 12 | we put there. |
| 10:54 | 13 | Do you see that? |
| 10:54 | 14 | A.    I do. |
| 10:54 | 15 | Q.    And there's an e-mail from Ms. O'Connor to you dated |
| 10:54 | 16 | the same date, October 23, 2002, as the "FYI," saying, |
| 10:55 | 17 | "Don't you think we should say Bratz was born in October |
| 10:55 | 18 | when a certain person was no longer with their company." |
| 10:55 | 19 | A.    Yes, I see that. |
| 10:55 | 20 | Q.    And then your response is "Good point.  Thanks." |
| 10:55 | 21 | A.    Yes. |
| 10:55 | 22 | Q.    This wasn't produced until after that first trial, |
| 10:55 | 23 | correct? |
| 10:55 | 24 | MS. KELLER:  Objection.  Assumes facts not in |
| 10:55 | 25 | evidence. |

| | | |
|---|---|---|
| 10:55 | 1 | THE COURT: Overruled. |
| 10:55 | 2 | THE WITNESS: All of our documents, including this |
| 10:55 | 3 | one, were produced to our lawyers. If they produced it to |
| 10:55 | 4 | Mattel -- when, not -- I don't know. |
| 10:55 | 5 | BY MR. PRICE: |
| 10:55 | 6 | Q. You know that this document wasn't produced to Mattel |
| 10:55 | 7 | until after that first trial. |
| 10:55 | 8 | A. I'm aware of that, yes. |
| 10:55 | 9 | Q. And, by the way, if you look at this document -- you'll |
| 10:55 | 10 | agree that, for one thing, Victoria O'Connor is not an |
| 10:56 | 11 | attorney, right? |
| 10:56 | 12 | A. She's not. |
| 10:56 | 13 | Q. And you are not an attorney? |
| 10:56 | 14 | A. I'm not. |
| 10:56 | 15 | Q. Okay. And if you -- if you look at the document, just |
| 10:56 | 16 | the face of it, there doesn't appear to be any attorney |
| 10:56 | 17 | advice in this document, does there? |
| 10:56 | 18 | A. Not in the face of it, no. |
| 10:56 | 19 | Q. And you remember how, in your communication to |
| 10:56 | 20 | Ms. Glaser, you wrote "Attorney-client confidential"? |
| 10:56 | 21 | A. Yes. |
| 10:56 | 22 | Q. And you didn't write that on this document, right? |
| 10:56 | 23 | A. I did not. |
| 10:56 | 24 | Q. So let's talk about the production of this document. |
| 10:56 | 25 | Do you recall that prior to the first trial you |

CV 04-9049 DOC - 2/9/2011 - Day 15, Volume 1 of 3

107

| | | |
|---|---|---|
| 10:56 | 1 | discussed this full e-mail -- that is, 7055 -- with some |
| 10:56 | 2 | attorneys at a law firm called Skadden, Arps? |
| 10:56 | 3 | MS. KELLER:  Objection, Your Honor. |
| 10:56 | 4 | Attorney-client privilege. |
| 10:56 | 5 | THE COURT:  Overruled. |
| 10:56 | 6 | THE WITNESS:  Before -- before this trial? |
| 10:56 | 7 | BY MR. PRICE: |
| 10:56 | 8 | Q.   Before that first trial. |
| 10:56 | 9 | A.   Did I discuss this with my attorneys?  Yes, I had |
| 10:56 | 10 | discussions with them about this. |
| 10:56 | 11 | Q.   And this was, again, Skadden, Arps? |
| 10:57 | 12 | A.   Yes. |
| 10:57 | 13 | Q.   And one of the attorneys was Mr. Nolan? |
| 10:57 | 14 | A.   Yes. |
| 10:57 | 15 | Q.   Do you recall who the other attorneys were? |
| 10:57 | 16 | A.   There were many of 'em.  Jason Russell -- many lawyers. |
| 10:57 | 17 | Too many lawyers. |
| 10:57 | 18 | Q.   And when you had this meeting with too many lawyers |
| 10:57 | 19 | about this document, it was a fairly lengthy meeting |
| 10:57 | 20 | discussing the document, correct? |
| 10:57 | 21 | A.   Actually, this -- there was, uh, when I was having |
| 10:57 | 22 | discussion, this was in my office, Mr. Klevens -- I don't |
| 10:57 | 23 | remember his first name -- and then another gentleman, who, |
| 10:57 | 24 | I remember him, because he stuttered.  His name skips my |
| 10:57 | 25 | mind. |

| | | |
|---|---|---|
| 10:57 | 1 | Q.   Mumford? |
| 10:57 | 2 | A.   Mumford, yes. |
| 10:57 | 3 | Q.   And those folks represented you until what time? |
| 10:58 | 4 | A.   They still represent us. |
| 10:58 | 5 | Q.   In connection with any disputes concerning Bratz, when |
| 10:58 | 6 | is the last time they represented you? |
| 10:58 | 7 | A.   They still represent us. |
| 10:58 | 8 | Q.   They're not litigation counsel in this case, correct? |
| 10:58 | 9 | A.   They are. |
| 10:58 | 10 | Q.   Certainly here at trial, you have -- you have able |
| 10:58 | 11 | counsel.  Represented by Ms. Keller and Mr. McConville and |
| 10:58 | 12 | attorney's from Orrick Herrington, right? |
| 10:58 | 13 | A.   Able and beautiful. |
| 10:58 | 14 | MS. KELLER:  So stipulated. |
| 10:58 | 15 | (Laugher in the courtroom.) |
| 10:58 | 16 | MR. PRICE:  So stipulated. |
| 10:58 | 17 | BY MR. PRICE: |
| 10:58 | 18 | Q.   But prior to that earlier trial, you weren't talking |
| 10:58 | 19 | with these beautiful folks; you were talking with Skadden, |
| 10:58 | 20 | Arps? |
| 10:58 | 21 | A.   That's correct.  They had some beautiful people there, |
| 10:58 | 22 | too, but let's not get to that. |
| 10:58 | 23 | Q.   So you're sitting there in your office with all these |
| 10:58 | 24 | attorneys, talking about this document and whether the |
| 10:59 | 25 | sections above that blue line there should be given to |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 9863   Filed 02/14/11   Page 109 of 148   Page ID #:297668
CV 04-9049 DOC - 2/9/2011 - Day 15, Volume 1 of 3

109

| | | |
|---|---|---|
| 10:59 | 1 | Mattel, correct? |
| 10:59 | 2 | A.    No. |
| 10:59 | 3 | MS. KELLER:  Your Honor, may we impose -- |
| 10:59 | 4 | interpose a continuing attorney-client privilege objection? |
| 10:59 | 5 | THE COURT:  You have a continuing objection.  It's |
| 10:59 | 6 | overruled.  This is not a privileged document. |
| 10:59 | 7 | MS. KELLER:  No, Your Honor, as to the |
| 10:59 | 8 | conversation, I mean. |
| 10:59 | 9 | THE COURT:  Well, I'm not certain, Counsel, if we |
| 10:59 | 10 | want to make a further record, that this is privileged. |
| 10:59 | 11 | And the exception would be? |
| 10:59 | 12 | MS. KELLER:  I understand, Your Honor. |
| 10:59 | 13 | THE COURT:  You understand? |
| 10:59 | 14 | MS. KELLER:  (Nods head.) |
| 10:59 | 15 | THE COURT:  All right.  Thank you. |
| 10:59 | 16 | THE WITNESS:  There were many, many issues being |
| 10:59 | 17 | discussed.  I remember this also came up. |
| 10:59 | 18 | BY MR. PRICE: |
| 10:59 | 19 | Q.   And your attorneys at Skadden, Arps weren't around when |
| 10:59 | 20 | this 2002 e-mail communication took place between you and |
| 10:59 | 21 | Ms. O'Connor, correct? |
| 10:59 | 22 | A.   They were not. |
| 10:59 | 23 | Q.   And, by that, I mean they were old enough to be around, |
| 10:59 | 24 | but they weren't representing you, correct? |
| 11:00 | 25 | A.    That's correct. |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 2/9/2011 - Day 15, Volume 1 of 3

110

| | | |
|---|---|---|
| 11:00 | 1 | Q.   Uh, and if they looked at this document, you'll agree, |
| 11:00 | 2 | looking at this document, there doesn't appear to be |
| 11:00 | 3 | anything that reflects privileged communication between an |
| 11:00 | 4 | attorney and a client, right? |
| 11:00 | 5 | A.   Yes. |
| 11:00 | 6 | Q.   You didn't like this document.  You didn't want it |
| 11:00 | 7 | produced to Mattel, right? |
| 11:00 | 8 | A.   Your representation is false, Mr. Price. |
| 11:00 | 9 | Q.   Well, at this meeting with the Skadden attorneys, |
| 11:00 | 10 | you're the one who told them this was privileged? |
| 11:00 | 11 | A.   Again, your accusation is false. |
| 11:00 | 12 | Q.   Well, they couldn't -- looking at this, they couldn't |
| 11:00 | 13 | tell that it's -- there's anything in here that's |
| 11:00 | 14 | attorney-client communication. |
| 11:00 | 15 | A.   They asked me questions about this document, and I gave |
| 11:00 | 16 | 'em all I knew about this document.  And I left them to -- I |
| 11:00 | 17 | left it to them to do what they have to do to produce, not |
| 11:00 | 18 | to produce.  I didn't get involved with that. |
| 11:01 | 19 | Q.   Well, when you say that you spoke to them -- I mean, an |
| 11:01 | 20 | attorney can only make decisions based upon the information |
| 11:01 | 21 | they have, correct? |
| 11:01 | 22 | A.   Or ask. |
| 11:01 | 23 | Q.   Or ask.  They asked you for information; you give them |
| 11:01 | 24 | information, correct? |
| 11:01 | 25 | A.   I did. |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 9863   Filed 02/14/11   Page 111 of 148   Page ID #:297670
CV 04-9049 DOC – 2/9/2011 – Day 15, Volume 1 of 3

111

| | | |
|---|---|---|
| 11:01 | 1 | Q.   Okay.  And so they looked at this document with you |
| 11:01 | 2 | and -- and you realized at the time this was a document that |
| 11:01 | 3 | didn't look so good for you, right? |
| 11:01 | 4 | A.   It doesn't look -- it does look good.  It looks very |
| 11:01 | 5 | good. |
| 11:01 | 6 | Q.   So -- but, when Ms. O'Connor says, "Don't you think we |
| 11:01 | 7 | should say Bratz was born in October when a certain person |
| 11:01 | 8 | was no longer with their company?" -- you see that? |
| 11:01 | 9 | A.   I do. |
| 11:01 | 10 | Q.   You understood "certain person" referred to Carter |
| 11:01 | 11 | Bryant, right? |
| 11:01 | 12 | A.   That's correct. |
| 11:01 | 13 | Q.   And "was no longer with their company," the company is |
| 11:01 | 14 | referring to Mattel, correct? |
| 11:01 | 15 | A.   Yes. |
| 11:01 | 16 | Q.   And if we -- if we go down, you had told the |
| 11:01 | 17 | interviewer that Bratz was born in September, correct? |
| 11:01 | 18 | A.   I did. |
| 11:01 | 19 | Q.   And there's no question in your mind that in September |
| 11:02 | 20 | Mr. Bryant was working for Mattel, right? |
| 11:02 | 21 | A.   On September 1, 2000 -- yes, for the month of |
| 11:02 | 22 | September, I knew he was working for Mattel. |
| 11:02 | 23 | Q.   And so, in the context of you saying Bratz was born in |
| 11:02 | 24 | September, Ms. O'Connor said -- uh, let's get the exact |
| 11:02 | 25 | language -- "Don't you think we should say Bratz was born in |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:02 | 1 | October when a certain person was no longer with their |
| 11:02 | 2 | company?" |
| 11:02 | 3 | You see that? |
| 11:02 | 4 | A.   I see that. |
| 11:02 | 5 | Q.   And you understood that what she was saying is you |
| 11:02 | 6 | shouldn't say September because a certain person, Carter |
| 11:02 | 7 | Bryant, was still with Mattel in September.  That's what you |
| 11:02 | 8 | understood this to mean, right? |
| 11:02 | 9 | A.   No. |
| 11:02 | 10 | Q.   Well, let's look at it.  "Don't you think we should say |
| 11:02 | 11 | Bratz" -- that's referring to Bratz concept, Bratz, born -- |
| 11:02 | 12 | being born? |
| 11:02 | 13 | A.   Yes, that's what she's saying. |
| 11:02 | 14 | Q.   "Shouldn't we say that Bratz was born in October?" |
| 11:03 | 15 | Now, you understood -- your view is, in October -- |
| 11:03 | 16 | you're saying you didn't know Mr. Bryant was working for |
| 11:03 | 17 | Mattel after October 4th, right? |
| 11:03 | 18 | A.   No. |
| 11:03 | 19 | Q.   You did know he was working for Mattel after |
| 11:03 | 20 | October 4th? |
| 11:03 | 21 | A.   I'm sorry.  I did not know he worked for Mattel as of |
| 11:03 | 22 | October 4. |
| 11:03 | 23 | Q.   So when a "certain person "-- that's Carter Bryant, |
| 11:03 | 24 | right? |
| 11:03 | 25 | A.   Right. |

Case 2:04-cv-09049-DOC-RNB   Document 9863   Filed 02/14/11   Page 113 of 148   Page ID #:297672
CV 04-9049 DOC - 2/9/2011 - Day 15, Volume 1 of 3

113

| | | |
|---|---|---|
| 11:03 | 1 | Q.   All right.   "-- was no longer with their company" -- |
| 11:03 | 2 | that means Mattel, correct? |
| 11:03 | 3 | A.   That's correct. |
| 11:03 | 4 | Q.   So when you sat down and spoke with Skadden, Arps, |
| 11:03 | 5 | before they asked questions and you answered, your |
| 11:03 | 6 | understanding is those attorneys had no idea, no reason to |
| 11:03 | 7 | believe that this communication was attorney-client |
| 11:03 | 8 | communication and should be withheld from Mattel, right? |
| 11:03 | 9 | A.   Before they started talking to me? |
| 11:03 | 10 | Q.   Before they started talking to you, when they had this |
| 11:03 | 11 | document in front of them, they had no reason to believe |
| 11:03 | 12 | that, uh, this document should be withheld from Mattel |
| 11:03 | 13 | because of some attorney-client communication, right? |
| 11:03 | 14 | A.   I have -- yes, that's correct. |
| 11:04 | 15 | Q.   And the reason they came to believe that and thought |
| 11:04 | 16 | they were justified in not letting Mattel know about this |
| 11:04 | 17 | document was because of what you told them. |
| 11:04 | 18 | A.   I told them all the facts.   They made the determination |
| 11:04 | 19 | to produce this to Mattel or not to produce them. |
| 11:04 | 20 | THE COURT:   (To the jury:)   Let me remind you that |
| 11:04 | 21 | it's appropriate for an attorney to bring the |
| 11:04 | 22 | attorney-client privilege on behalf of a client.   This is |
| 11:04 | 23 | for a very limited purpose.   That's for the mindset of |
| 11:04 | 24 | Mr. Larian at this time. |
| 11:04 | 25 | But, technically, it could be argued that this is |

DEBBIE GALE, U.S. COURT REPORTER

| 11:04 | 1 | the attorney-client privilege.  And this is being introduced |
| 11:04 | 2 | for a very, very limited purpose. |
| 11:04 | 3 | BY MR. PRICE: |
| 11:04 | 4 | Q.   Now, you say Skadden, Arps withheld this from Mattel |
| 11:04 | 5 | based upon their judgment that it should be, and was |
| 11:04 | 6 | properly, withheld from Mattel, correct? |
| 11:05 | 7 | A.   That's correct. |
| 11:05 | 8 | MS. KELLER:  Objection.  Assumes facts not in |
| 11:05 | 9 | evidence, that he understands what's proper. |
| 11:05 | 10 | THE COURT:  I'm not going to get into Skadden, |
| 11:05 | 11 | Arps' mindset, Counsel.  I've limited it.  You can ask |
| 11:05 | 12 | questions about Mr. Larian's mindset, what his intent was. |
| 11:05 | 13 | (To the jury:)  You're to strike the last |
| 11:05 | 14 | question.  I want you to completely disregard it.  Okay? |
| 11:05 | 15 | Skadden, Arps is not on trial here.  Those decisions may |
| 11:05 | 16 | have been made in good faith by that firm. |
| 11:05 | 17 | This is only for the limited purpose of |
| 11:05 | 18 | Mr. Larian. |
| 11:05 | 19 | BY MR. PRICE: |
| 11:05 | 20 | Q.   So you understood that a decision was made based upon |
| 11:05 | 21 | information you conveyed? |
| 11:05 | 22 | A.   That's correct. |
| 11:05 | 23 | Q.   And it was the information you conveyed that resulted, |
| 11:05 | 24 | you believe, in this document being withheld from Mattel? |
| 11:05 | 25 | A.   I don't know what -- I gave all the facts and |

| | | |
|---|---|---|
| 11:05 | 1 | information to Skadden, Arps.  And if they decided that that |
| 11:05 | 2 | information, attorney-client privilege, and they didn't |
| 11:05 | 3 | produce it, I had nothing to do with it.  They made that |
| 11:06 | 4 | determination.  They're lawyers.  They get the big bucks. |
| 11:06 | 5 | Q.   But they made the determination based on information |
| 11:06 | 6 | you gave them, correct? |
| 11:06 | 7 | A.   I gave 'em all the facts. |
| 11:06 | 8 | Q.   And, uh, your new counsel produced the document? |
| 11:06 | 9 | A.   Yes, they did. |
| 11:06 | 10 | Q.   And your new counsel knew the same facts? |
| 11:06 | 11 | A.   I give 'em same facts. |
| 11:06 | 12 | Q.   And one of the facts that you gave Skadden, Arps |
| 11:06 | 13 | lawyers was that the information in this part of the e-mail |
| 11:06 | 14 | was based on legal advice that you got back in 2002? |
| 11:06 | 15 | A.   I'm sorry.  Say that again? |
| 11:06 | 16 | Q.   Part of the information you told the Skadden |
| 11:07 | 17 | attorneys -- |
| 11:07 | 18 | A.   Right. |
| 11:07 | 19 | Q.   -- was that Ms. O'Connor's e-mail to you, "Don't you |
| 11:07 | 20 | think we should say Bratz was born in October when a certain |
| 11:07 | 21 | person was no longer with their company." |
| 11:07 | 22 | A.   Right. |
| 11:07 | 23 | Q.   And your response, "Good point.  Thanks." |
| 11:07 | 24 | A.   Yes. |
| 11:07 | 25 | Q.   You told Skadden, Arps that that communication between |

| | | |
|---|---|---|
| 11:07 | 1 | you and Ms. O'Connor was based on legal advice that you had |
| 11:07 | 2 | gotten in 2003. |
| 11:07 | 3 | A.   I don't know about 2003, but it was based on a legal |
| 11:07 | 4 | advice I had received. |
| 11:07 | 5 | THE COURT:  (To the jury:) Once again, let me |
| 11:07 | 6 | constantly remind you:  Attorneys have a right to bring the |
| 11:07 | 7 | attorney-client privilege.  And if they believe that that's |
| 11:07 | 8 | appropriate, that's an entirely appropriate thing for |
| 11:07 | 9 | counsel to do. |
| 11:07 | 10 | This is for a very, very limited purpose and that |
| 11:07 | 11 | is what information, what's the mindset of Mr. Larian at |
| 11:07 | 12 | this time. |
| 11:07 | 13 | BY MR. PRICE: |
| 11:07 | 14 | Q.   So when the conversation with, uh, Mr. Nolan and others |
| 11:08 | 15 | at Skadden began about this document -- when the |
| 11:08 | 16 | conversation began, before they asked you the details, they |
| 11:08 | 17 | gave you no indication that they thought this was |
| 11:08 | 18 | attorney-client privilege, right? |
| 11:08 | 19 | A.   I don't recall that.  I remember that, on the day that |
| 11:08 | 20 | my father had passed away, Mr. Nolan came to my father's |
| 11:08 | 21 | house and asked -- |
| 11:08 | 22 | MR. PRICE:  Move to strike as nonresponsive. |
| 11:08 | 23 | THE COURT:  Sustained.  Stricken. |
| 11:08 | 24 | THE WITNESS:  I'm just trying to give you my state |
| 11:08 | 25 | of mind. |

| | | |
|---|---|---|
| 11:08 | 1 | BY MR. PRICE: |
| 11:08 | 2 | Q.   Well, I'm talking about your state of mind when you |
| 11:08 | 3 | were in this meeting with Mr. Nolan and they were asking you |
| 11:08 | 4 | questions about this document. |
| 11:08 | 5 |      Do you see where we're at? |
| 11:08 | 6 | A.   Yes. |
| 11:08 | 7 | Q.   And I'm asking you what the communications were between |
| 11:08 | 8 | Mr. Nolan and you. |
| 11:08 | 9 |           THE COURT:  Well, Counsel, I think that there we |
| 11:08 | 10 | have the attorney-client privilege.  I've allowed this for a |
| 11:08 | 11 | very, very limited purpose.  I think that's overstretching |
| 11:08 | 12 | my ruling.  We won't be going there. |
| 11:09 | 13 |           Understood? |
| 11:09 | 14 |           MR. PRICE:  I understand. |
| 11:09 | 15 |           THE COURT:  Do we have any miscommunication about |
| 11:09 | 16 | that? |
| 11:09 | 17 |           MR. PRICE:  No. |
| 11:09 | 18 |           THE COURT:  All right.  Thank you. |
| 11:09 | 19 |           MS. KELLER:  Your Honor, one more thing, if I |
| 11:09 | 20 | may -- |
| 11:09 | 21 |           THE COURT:  Counsel, thank you very much. |
| 11:09 | 22 |           Move on now. |
| 11:09 | 23 | BY MR. PRICE: |
| 11:09 | 24 | Q.   Mr. Larian, if you would look at April 12, 2010, your |
| 11:09 | 25 | prior testimony, at page 2374, line 23, to 2375, line 20. |

| 11:09 | 1 | *(Document provided to the witness.)* |
| 11:09 | 2 | THE WITNESS:  Repeat those lines again, please? |
| 11:09 | 3 | MR. PRICE:  Sure. |
| 11:09 | 4 | BY MR. PRICE: |
| 11:09 | 5 | Q.   It's 2374, line 23. |
| 11:09 | 6 | A.   Is it okay for me to mark this so I can know where it |
| 11:09 | 7 | is? |
| 11:09 | 8 | Q.   If it's our copy, sure. |
| 11:09 | 9 | A.   Okay.  2374? |
| 11:09 | 10 | Q.   Yes.  Line 20.  To 2375, line 20 -- I'm sorry -- 2374, |
| 11:10 | 11 | line 23, to 2375, line 20.  If you'd just look at that, then |
| 11:10 | 12 | I'm gonna ask you a question.  This might help you with some |
| 11:10 | 13 | background. |
| 11:10 | 14 | A.   Sir, you said this was trial testimony?  Ms. Hurst was |
| 11:10 | 15 | not our lawyer -- |
| 11:10 | 16 | Q.   No.  This was testimony on April 12, 2010, after the |
| 11:10 | 17 | trial. |
| 11:11 | 18 | A.   Go ahead. |
| 11:11 | 19 | Q.   And so your best recollection that -- what you told |
| 11:11 | 20 | Skadden, Arps -- or your belief was that, uh, this -- the |
| 11:11 | 21 | top two e-mails on that string reflected attorney advice |
| 11:11 | 22 | given to you either in 2001 or 2002? |
| 11:11 | 23 | MS. KELLER:  Objection.  That misstates the |
| 11:11 | 24 | evidence. |
| 11:11 | 25 | THE COURT:  Overruled. |

| 11:11 | 1 | THE WITNESS:  What I told them was based when I |
|-------|---|--|

11:11   1      THE WITNESS:  What I told them was based when I

11:11   2   have talked to another attorney during those three, four

11:11   3   years.  I didn't recall exactly the date.

11:11   4   BY MR. PRICE:

11:11   5   Q.   But as of April 12, 2010, you thought that was either

11:11   6   in 2001 or 2002, correct?

11:11   7   A.   Yes.

11:12   8   Q.   And it's correct that, as of December 11, 2009, uh, you

11:12   9   didn't have any understanding as to why it was not produced,

11:12   10  other than what your attorneys told you.  Just a yes or no

11:12   11  response.

11:12   12  A.   I'm sorry.  Repeat the question.

11:12   13  Q.   Focusing on, as of December 11, 2009 --

11:12   14  A.   Yes.

11:12   15  Q.   -- is it true that you didn't have any understanding as

11:12   16  to why this document was not produced, other than what your

11:12   17  attorneys told you?  That's a "yes" or "no" question.

11:12   18  A.   Yes.

11:12   19  Q.   And it's true that -- directing your attention to the

11:13   20  top two e-mails of Exhibit 7055.

11:13   21       MR. PRICE:  Put that up, Ken.

11:13   22        (Document displayed.)

11:13   23       THE WITNESS:  Can I put the testimony away now?

11:13   24       MR. PRICE:  Yes.

11:13   25       THE WITNESS:  Okay.

| | | |
|---|---|---|
| 11:13 | 1 | BY MR. PRICE: |
| 11:13 | 2 | Q.   As of December 11, 2009, when shown this document, you |
| 11:13 | 3 | said you did not recall there being anything in there that |
| 11:13 | 4 | you see that reflected or reminded you of legal advice? |
| 11:13 | 5 | A.   As of that date? |
| 11:13 | 6 | Q.   As of December 11, 2009 -- |
| 11:13 | 7 | Directing your attention to the top two e-mails of |
| 11:13 | 8 | Exhibit 7055. |
| 11:13 | 9 | A.   All right. |
| 11:13 | 10 | Q.   Is there anything in there that you see that reflected |
| 11:13 | 11 | or reminded you of legal advice? |
| 11:13 | 12 | A.   There is legal advice.  I don't know if I can talk |
| 11:13 | 13 | about that or not. |
| 11:13 | 14 | Q.   Is it true that, as of December 11, 2009, you couldn't |
| 11:14 | 15 | recall ever believing that any part of the e-mail exchange |
| 11:14 | 16 | reminded you of legal advice that had been given? |
| 11:14 | 17 | A.   I don't recall. |
| 11:14 | 18 | Q.   And it's true that, as of the date, December 11, 2009, |
| 11:14 | 19 | you didn't recall that you ever believed that any part of |
| 11:14 | 20 | this e-mail exchange reminded you of legal advice that had |
| 11:14 | 21 | been given? |
| 11:14 | 22 | A.   I don't recall. |
| 11:14 | 23 | Q.   Let me make sure we have a clean record here. |
| 11:14 | 24 | You don't recall these two exchanges reminding you of |
| 11:14 | 25 | legal advice that had been given; is that what you're |

| | | |
|---|---|---|
| 11:14 | 1 | saying? |
| 11:14 | 2 | MS. KELLER:  Objection.  That misstates the |
| 11:14 | 3 | testimony. |
| 11:14 | 4 | THE COURT:  Well, I'm not sure what is being |
| 11:14 | 5 | referred back to.  It's obvious that there's a reference |
| 11:14 | 6 | back, Counsel.  It's just being asked in a different way, |
| 11:14 | 7 | apparently in an attempt to match up some prior testimony. |
| 11:14 | 8 | MR. PRICE:  Right. |
| 11:14 | 9 | THE COURT:  Overruled. |
| 11:14 | 10 | BY MR. PRICE: |
| 11:14 | 11 | Q.  All right.  Did you ever believe that any part of this |
| 11:14 | 12 | e-mail exchange reminded you of legal advice that you had |
| 11:15 | 13 | been given? |
| 11:15 | 14 | A.  Yes, it did. |
| 11:15 | 15 | Q.  And on what date did you believe that the part of the |
| 11:15 | 16 | e-mail exchange we're showing you reminded you of legal |
| 11:15 | 17 | advice that had been given? |
| 11:15 | 18 | A.  I don't remember the exact date.  Somewhere in 2001, |
| 11:15 | 19 | 2002. |
| 11:15 | 20 | MR. PRICE:  Your Honor, if we could read from |
| 11:15 | 21 | December 11, 2009, page 947, lines 22 through 25, and 948, |
| 11:15 | 22 | lines 11 to 17. |
| 11:15 | 23 | THE COURT:  Can you repeat those lines? |
| 11:15 | 24 | MR. PRICE:  947, line 22 through 25, and 948, |
| 11:15 | 25 | lines 11 to 17. |

CV 04-9049 DOC - 2/9/2011 - Day 15, Volume 1 of 3

122

| | | |
|---|---|---|
| 11:16 | 1 | THE COURT:  Lines 11 through? |
| 11:16 | 2 | MR. PRICE:  It's page 947, lines 22 through 25, |
| 11:16 | 3 | and line (sic) 948 -- |
| 11:16 | 4 | THE COURT:  No, no.  Page 9 -- |
| 11:16 | 5 | MR. PRICE:  I'm sorry.  It's 947, lines 22 through |
| 11:16 | 6 | 25. |
| 11:16 | 7 | THE COURT:  And page 948? |
| 11:16 | 8 | MR. PRICE:  And 948, lines 11 through 17. |
| 11:16 | 9 | THE COURT:  All right.  Just a moment. |
| 11:16 | 10 | Just a minute. |
| 11:17 | 11 | You may read, Counsel. |
| 11:17 | 12 | MR. PRICE:  (Reading:) |
| 11:17 | 13 | "QUESTION:" -- |
| 11:17 | 14 | This is on December 11, 2009. |
| 11:17 | 15 | -- "directing your attention to the top two |
| 11:17 | 16 | e-mails of Exhibit 7055, is there anything in here that you |
| 11:17 | 17 | see that reflected or reminded you of legal advice? |
| 11:17 | 18 | "ANSWER:  I don't recall." |
| 11:17 | 19 | At 948, lines 11 through 17: |
| 11:17 | 20 | "Directing your attention to the top two e-mails |
| 11:17 | 21 | of Exhibit 7055. |
| 11:17 | 22 | "ANSWER:  Yes. |
| 11:17 | 23 | "QUESTION:  Did you ever believe that any part of |
| 11:17 | 24 | this e-mail exchange was to remind you of legal advice that |
| 11:17 | 25 | had been given? |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:17 | 1 | "ANSWER:  I don't recall." |
| 11:17 | 2 | BY MR. PRICE: |
| 11:17 | 3 | Q.   And its true, sir, that -- |
| 11:17 | 4 | THE COURT:  And the answer is, "I don't recall |
| 11:17 | 5 | that." |
| 11:17 | 6 | MR. PRICE:  "I don't recall that." |
| 11:17 | 7 | Thank you. |
| 11:17 | 8 | BY MR. PRICE: |
| 11:17 | 9 | Q.   And it's true here, sir, that, as you sit here now, do |
| 11:17 | 10 | you believe that any portion of this e-mail reflects legal |
| 11:17 | 11 | advice? |
| 11:17 | 12 | A.   I don't recall that.  I don't.  I don't know.  I gave |
| 11:17 | 13 | all the facts to my lawyers and let them make the decision. |
| 11:18 | 14 | Q.   But one of the facts you gave your lawyers was that |
| 11:18 | 15 | those top two e-mails reflected legal advice that you were |
| 11:18 | 16 | given in 2001 and 2002? |
| 11:18 | 17 | A.   No, Mr. Price.  They asked me questions about this |
| 11:18 | 18 | document, and I gave them all the facts. |
| 11:18 | 19 | Q.   This is an example of you controlling the lawyers, and |
| 11:18 | 20 | the lawyers not controlling you, isn't it? |
| 11:18 | 21 | MS. KELLER:  Objection.  Argumentative. |
| 11:18 | 22 | THE COURT:  Overruled. |
| 11:18 | 23 | You can answer that question, sir. |
| 11:18 | 24 | THE WITNESS:  I do not control the lawyers. |
| 11:18 | 25 | THE COURT:  (To the jury:)  Now, ladies and |

CV 04-9049 DOC - 2/9/2011 - Day 15, Volume 1 of 3

124

11:18   1   gentlemen, that's a question -- obviously, the intent is to

11:18   2   implant in you, by that question, that Mr. Larian's

11:18   3   controlling lawyers.

11:18   4         Remember, I remind you that lawyers make the

11:18   5   decision about what is submitted to the Court in terms of a

11:18   6   claim for attorney-client privilege.  But the relationship

11:18   7   between the lawyers and a client may be important, so I'm

11:18   8   allowing this for a very limited purpose, and also what's

11:19   9   given to the lawyers.

11:19   10   BY MR. PRICE:

11:19   11   Q.   Let's look at the document, itself, 7055.  And maybe we

11:19   12   can --

11:19   13         MR. PRICE:  Can we show a little more of that,

11:19   14   Ken, and still be legible? -- where you go down to his

11:19   15   answer about "born on September."

11:19   16         (Technician complies.)

11:19   17         MR. PRICE:  Not very readable.

11:19   18   BY MR. PRICE:

11:19   19   Q.   So on October 23, 2002, you had one of those, uh,

11:20   20   interviews where you type in a response to a question,

11:20   21   correct?

11:20   22   A.   Yes.

11:20   23   Q.   And, uh, this was from, uh, Nathalie Riesen?

11:20   24   A.   Yes.

11:20   25   Q.   And one of the questions was "Date of birth of the

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:20 | 1 | Bratz?  Time of development?  First launch in the U.S." |
| 11:20 | 2 | Do you see that? |
| 11:20 | 3 | A.   Yes. |
| 11:20 | 4 | Q.   And what you typed in was "Born September 2000," right? |
| 11:20 | 5 | A.   Yes. |
| 11:20 | 6 | Q.   "Nine month to develop," paren, "like a baby"? |
| 11:20 | 7 | A.   Yes. |
| 11:20 | 8 | Q.   "Launched in the USA in July 2001 and Spain, 2001," |
| 11:20 | 9 | paren, "before USA." |
| 11:20 | 10 | Do you see that? |
| 11:20 | 11 | A.   Yes. |
| 11:20 | 12 | Q.   And on -- little bit further down there you project the |
| 11:20 | 13 | years -- the yearly sales. |
| 11:20 | 14 | In 2003, it's projected to be one billion.  Do you see |
| 11:20 | 15 | that? -- including licensed goods. |
| 11:20 | 16 | A.   I'm sorry? |
| 11:21 | 17 | Q.   See under "2003," you say "Projected one billion |
| 11:21 | 18 | dollars in sales"? |
| 11:21 | 19 | A.   Yes, retail sales. |
| 11:21 | 20 | Q.   And was that actually met?  Did you meet projections? |
| 11:21 | 21 | A.   In retail sales, I don't know if we did or not. |
| 11:21 | 22 | Q.   And then you forward that, where it says "FYI," to |
| 11:21 | 23 | Ms. O'Connor, right? |
| 11:21 | 24 | A.   Yes, I do. |
| 11:21 | 25 | Q.   And then we see Ms. O'Connor's response to you. |

| | | |
|---|---|---|
| 11:21 | 1 | Uh, now let me just ask your understanding.  Is it your |
| 11:21 | 2 | understanding that Ms. O'Connor's response was based on |
| 11:21 | 3 | legal advice? |
| 11:21 | 4 | A.   I have no idea.  She was here on the stand.  I have no |
| 11:21 | 5 | idea.  That's what she said. |
| 11:21 | 6 | Q.   Well, you told us about this meeting with the attorneys |
| 11:21 | 7 | from Skadden, Arps, right? |
| 11:21 | 8 | A.   I did. |
| 11:22 | 9 | Q.   Okay.  So I'm gonna ask you your belief as of the time |
| 11:22 | 10 | you had the meeting with the Skadden, Arps attorneys.  Okay? |
| 11:22 | 11 | A.   Yes. |
| 11:22 | 12 | Q.   Okay.  As of the time you had that meeting -- |
| 11:22 | 13 | THE COURT:  Let me remind the jury once again, |
| 11:22 | 14 | this is a very, very difficult area. |
| 11:22 | 15 | The only reason this is being submitted to you is |
| 11:22 | 16 | Mr. Larian's mindset.  And, once again, it's appropriate for |
| 11:22 | 17 | attorneys to claim the attorney-client privilege on behalf |
| 11:22 | 18 | of their client. |
| 11:22 | 19 | So the limited purpose is Mr. Larian's mindset and |
| 11:22 | 20 | what he gave to the attorneys to consider. |
| 11:22 | 21 | BY MR. PRICE: |
| 11:22 | 22 | Q.   So I'm talking about your mindset and what you gave |
| 11:22 | 23 | Skadden, Arps to consider.  Okay? |
| 11:22 | 24 | A.   The facts. |
| 11:22 | 25 | Q.   Okay.  At the time, did -- was it your mindset and you |

| | | |
|---|---|---|
| 11:22 | 1 | did communicate to your attorneys that you thought that |
| 11:22 | 2 | Ms. O'Connor's e-mail to you involved attorney advice? |
| 11:23 | 3 | A.   No.   I just gave attorneys all the facts.   They were |
| 11:23 | 4 | asking a lot of questions.   This is one of them.   I have |
| 11:23 | 5 | gave 'em all the facts. |
| 11:23 | 6 | Q.   Well, one of the facts you gave us today was your |
| 11:23 | 7 | belief that the first two parts of this e-mail, the parts |
| 11:23 | 8 | that were not produced to Mattel, uh, reflected |
| 11:23 | 9 | attorney-client advice.   You told us that? |
| 11:23 | 10 | A.   No.   I told you that I gave all the facts to my lawyers |
| 11:23 | 11 | at Skadden, Arps, and left it to them to make a decision. |
| 11:23 | 12 | Now, I repeated that five times, maybe more. |
| 11:23 | 13 | Q.   Didn't you tell us that you believed that this upper |
| 11:23 | 14 | portion of the e-mail was based on legal advice? |
| 11:23 | 15 | A.   No.   What I said to you is that I give all the facts to |
| 11:23 | 16 | Skadden, Arps, based on the information I had from my |
| 11:24 | 17 | lawyers, and I let them make a decision. |
| 11:24 | 18 | Q.   Okay.   Well, if you look back -- I think this was in |
| 11:24 | 19 | front of you.   It's April 12, 2010.   And if you look at |
| 11:24 | 20 | 2374, line 23, to 2375 -- actually, go to 2376, line 1. |
| 11:24 | 21 | *(Document provided to the witness.)* |
| 11:24 | 22 | THE WITNESS:   Repeat those pages again and the |
| 11:24 | 23 | lines. |
| 11:24 | 24 | MR. PRICE:   Certainly. |
| 11:24 | 25 | 2374, line 23. |

| 11:24 | 1 | THE WITNESS: All right. |
|---|---|---|
| 11:24 | 2 | MR. PRICE: Let's go up to 2376, line 1. |
| 11:24 | 3 | THE WITNESS: Go ahead. |
| 11:24 | 4 | BY MR. PRICE: |
| 11:24 | 5 | Q. Okay? Okay. Does that refresh your recollection? |
| 11:25 | 6 | A. I'm not finished reading. |
| 11:25 | 7 | THE COURT: I don't have, Counsel, this full |
| 11:25 | 8 | document. I have 2376. |
| 11:25 | 9 | MR. PRICE: I think -- |
| 11:25 | 10 | THE COURT: You're referring to 2374, line 23? |
| 11:25 | 11 | MR. PRICE: Yeah. I think that's already in front |
| 11:25 | 12 | of you, Your Honor, when I showed it to him to refresh his |
| 11:25 | 13 | recollection. |
| 11:25 | 14 | THE COURT: It may be. Let me look up here. |
| 11:25 | 15 | MR. PRICE: There's a lot of stuff there. |
| 11:25 | 16 | THE COURT: Let me see. Thank you. Let me look |
| 11:25 | 17 | back. |
| 11:25 | 18 | Counsel, you're absolutely, right. Thank you. |
| 11:25 | 19 | THE WITNESS: Go ahead. |
| 11:25 | 20 | BY MR. PRICE: |
| 11:25 | 21 | Q. Have you read that section? |
| 11:25 | 22 | A. I have. |
| 11:25 | 23 | Q. And what you said under oath was that you believed that |
| 11:25 | 24 | the language in Exhibit 7055 reflected legal advice you got |
| 11:25 | 25 | in 2001 or 2002 timeframe, correct? |

11:26    1    A.    Yes.   The facts that I gave to my attorney.

11:26    2    Q.    Let's break it down.   You believed that this was based

11:26    3    on legal advice received in 2001/2002 timeframe, correct?

11:26    4    A.    Yes.

11:26    5    Q.    And --

11:26    6    A.    Based on the facts I had received from my attorney.

11:26    7    And I know, from one attorney, I gave it to another

11:26    8    attorney.

11:26    9    Q.    And you -- you conveyed to your then attorney, Skadden,

11:26   10    Arps, that this reflected legal advice you'd received back

11:26   11    in 2001/2002?

11:26   12    A.    Yes.

11:26   13    Q.    And that's the only way they could have come to a

11:26   14    conclusion that this was attorney-client privilege, based

11:26   15    upon what you told them, right?

11:26   16                MS. KELLER:   Objection.   Argumentative.   Calls for

11:26   17    speculation.   Lacks foundation.

11:26   18                THE COURT:   In its present form, I agree.

11:26   19                Sustained.

11:26   20    BY MR. PRICE:

11:26   21    Q.    Do you know of any other way that your counsel,

11:26   22    Skadden, Arps, could have concluded that these two sections

11:26   23    were based on legal advice other than what you told them?

11:26   24    A.    I gave 'em all the facts.   They made the decisions.

11:26   25    They are the lawyers.

| | | |
|--|--|--|
| 11:27 | 1 | Q.   And my question was, other than what you told them -- |
| 11:27 | 2 | that this was based on legal advice you got in 2001 and |
| 11:27 | 3 | 2002 -- other than that, do you know of any information that |
| 11:27 | 4 | they had that would lead to the conclusion -- |
| 11:27 | 5 | THE COURT:  I think that that's dangerously close, |
| 11:27 | 6 | Counsel. |
| 11:27 | 7 | And I think that he can answer about what |
| 11:27 | 8 | information he conveyed, what information was available to |
| 11:27 | 9 | his attorneys, which is consistent with my prior ruling and |
| 11:27 | 10 | the limited purpose; but he's not going to speculate. |
| 11:27 | 11 | (To the jury:) Counsel -- once again, let me |
| 11:27 | 12 | remind you -- can bring the attorney-client privilege.  In |
| 11:27 | 13 | fact, they're really required to on behalf of their client, |
| 11:27 | 14 | ladies and gentlemen.  And, of course, they're going to be |
| 11:27 | 15 | cautious. |
| 11:27 | 16 | But, by the same token, I think you're entitled to |
| 11:27 | 17 | know when information is conveyed to an attorney by a |
| 11:27 | 18 | client.  And I think you're entitled to know the mindset of |
| 11:27 | 19 | that person at the time and whether the document was marked |
| 11:27 | 20 | "confidential" or what the status of this document was. |
| 11:28 | 21 | BY MR. PRICE: |
| 11:28 | 22 | Q.   What other information did you give the Skadden, Arps |
| 11:28 | 23 | attorneys concerning 7055 being based on legal advice -- |
| 11:28 | 24 | other than your telling them this was based on legal advice |
| 11:28 | 25 | in 2001/2002, what other information did you give them? |

CV 04-9049 DOC - 2/9/2011 - Day 15, Volume 1 of 3

131

| 11:28 | 1 | MS. KELLER:  Your Honor, I'm gonna ask again to |
| 11:28 | 2 | interpose a continuing attorney-client privilege objection |
| 11:28 | 3 | to the communications back and forth between client and |
| 11:28 | 4 | lawyer. |
| 11:28 | 5 | THE COURT:  I'm not letting it come back from |
| 11:28 | 6 | Skadden, Arps, in a sense.  And I understand your concern, |
| 11:28 | 7 | Counsel.  It's a very difficult decision by the Court. |
| 11:28 | 8 | But, in this situation, if there's any other |
| 11:28 | 9 | information that was given, you can convey that to the jury. |
| 11:28 | 10 | THE WITNESS:  I don't recall if there was other |
| 11:28 | 11 | information or not.  We were not trying to hide anything, |
| 11:28 | 12 | sir. |
| 11:28 | 13 | THE COURT:  Let's do this, Counsel:  I received a |
| 11:28 | 14 | note from the jury.  It says they need a bathroom break. |
| 11:29 | 15 | THE WITNESS:  So do I. |
| 11:29 | 16 | THE COURT:  Why don't we do this:  Instead of |
| 11:29 | 17 | coming back in 15 minutes, for 15 minutes, can we just come |
| 11:29 | 18 | back at 12:30?  Would that be okay?  And I think that's not |
| 11:29 | 19 | only appropriate, I do too.  So if you weren't going to take |
| 11:29 | 20 | a bathroom break, I was.  I'm just joking with you, but it's |
| 11:29 | 21 | time. |
| 11:29 | 22 | So let's make that 12:30.  Okay?  Let's get right |
| 11:29 | 23 | back into session at 12:30. |
| 11:29 | 24 | And, by the way, I think these quicker breaks are |
| 11:29 | 25 | good for us also.  I think that two-hour stretch we took |

| | | |
|---|---|---|
| 11:29 | 1 | that time is just a little bit too long.  So I appreciate |
| 11:29 | 2 | you keeping me a little bit in line, as the jury.  'Cause I |
| 11:29 | 3 | can sit here all day, believe it or not. |
| 11:29 | 4 | So we'll see you at what time? |
| 11:29 | 5 | MEMBERS OF THE JURY:  12:30. |
| 11:29 | 6 | THE COURT:  What time? |
| 11:29 | 7 | MEMBERS OF THE JURY:  12:30. |
| 11:29 | 8 | THE COURT:  Excellent.  That's why the jury's so |
| 11:29 | 9 | good.  They all said "12:30." |
| 11:29 | 10 | All right.  You have a nice break now.  You're |
| 11:29 | 11 | admonished not to discuss this matter amongst yourselves nor |
| 11:29 | 12 | to form or express any opinion concerning the case. |
| 11:29 | 13 | *(Jury recesses for lunch at 11:29 a.m.)* |
| 11:30 | 14 | THE COURT:  Counsel, we're still in session. |
| 11:30 | 15 | *(Outside the presence of the jury.)* |
| 11:30 | 16 | THE WITNESS:  Can I step down? |
| 11:30 | 17 | THE COURT:  Thank you, sir.  Mr. Larian, if you |
| 11:30 | 18 | would like to step down. |
| 11:30 | 19 | We're still in session. |
| 11:30 | 20 | All right. |
| 11:31 | 21 | All right.  Counsel, I can set a much more |
| 11:31 | 22 | complete record. |
| 11:31 | 23 | I'm a little concerned about the notoriety and |
| 11:31 | 24 | press that might grow out of some of the comments that might |
| 11:31 | 25 | be made.  But I'm certainly willing to undertake that |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 9863   Filed 02/14/11   Page 133 of 148   Page ID #:297692
CV 04-9049 DOC - 2/9/2011 - Day 15, Volume 1 of 3

133

| | | |
|---|---|---|
| 11:31 | 1 | discussion with both of you.  I don't want to have a |
| 11:31 | 2 | chilling effect in this matter, and so I just want to |
| 11:31 | 3 | forewarn you that your questions to the Court concerning the |
| 11:31 | 4 | rulings will be met with an absolute candid response. |
| 11:31 | 5 | So I want to have MGA perfect their record.  And I |
| 11:31 | 6 | want to have Mattel perfect their record.  I know Mattel |
| 11:31 | 7 | wants to go further, in terms of attorney-client privilege; |
| 11:31 | 8 | and I know that MGA is objecting based upon the |
| 11:31 | 9 | attorney-client privilege. |
| 11:31 | 10 | So I just invite counsel, Ms. Keller -- and I want |
| 11:32 | 11 | to make certain you've consulted with Ms. Hurst, because you |
| 11:32 | 12 | weren't counsel of record at that time.  It's just a |
| 11:32 | 13 | courtesy. |
| 11:32 | 14 | MS. KELLER:  I understand, Your Honor. |
| 11:32 | 15 | THE COURT:  The microphone's yours. |
| 11:32 | 16 | MS. KELLER:  We -- I think we've perfected our |
| 11:32 | 17 | record with respect to the continuing objections we |
| 11:32 | 18 | interposed.  I don't think we need to add anything to that. |
| 11:32 | 19 | THE COURT:  I think I may, just so the Circuit has |
| 11:32 | 20 | a complete understanding of why the Court's making that |
| 11:32 | 21 | ruling. |
| 11:32 | 22 | But I'll give the lectern to you. |
| 11:33 | 23 | MS. KELLER:  So, Your Honor, after conferring with |
| 11:33 | 24 | my co-counsel, we, in light of Court's ruling, are |
| 11:33 | 25 | withdrawing our attorney-client objection to the information |

| | | |
|---|---|---|
| 11:33 | 1 | Mr. Larian provided to Skadden.  But we will continue to |
| 11:33 | 2 | object to any discussion of information or advice that |
| 11:33 | 3 | Skadden gave back to Mr. Larian. |
| 11:33 | 4 | THE COURT:  I agree.  Not that I agree with that |
| 11:33 | 5 | decision, but -- |
| 11:33 | 6 | MR. QUINN:  Can't do that. |
| 11:33 | 7 | THE COURT:  Well, just a moment. |
| 11:33 | 8 | It's a fine line.  And the reason I'm having |
| 11:33 | 9 | difficulty with it, and the Circuit's going to have |
| 11:33 | 10 | difficulty with it, is that I had made a number of previous |
| 11:33 | 11 | *in camera* rulings concerning Mr. Nolan. |
| 11:33 | 12 | By the same token, I've come to believe, in |
| 11:33 | 13 | listening to the testimony, that the input concerning a |
| 11:34 | 14 | non-privileged, nonconfidential communication and what the |
| 11:34 | 15 | client's mindset is, is an important piece of evidence for |
| 11:34 | 16 | the jury. |
| 11:34 | 17 | Second, what is being conveyed by the client to |
| 11:34 | 18 | subsequent law firms -- of which there have been a number of |
| 11:34 | 19 | law firms -- takes on a different hue when a client has so |
| 11:34 | 20 | many law firms involved, and is -- becomes one of the |
| 11:34 | 21 | primary carriers of information about another clerk's -- |
| 11:34 | 22 | strike that -- law firm's ruling. |
| 11:34 | 23 | Third, you have to look back in the transcripts to |
| 11:34 | 24 | see how upset and concerned Judge Larson was about this very |
| 11:34 | 25 | area.  I don't know the eventual determination by the jury |

Case 2:04-cv-09049-DOC-RNB   Document 9863   Filed 02/14/11   Page 135 of 148   Page ID #:297694
CV 04-9049 DOC - 2/9/2011 - Day 15, Volume 1 of 3

135

| | | |
|---|---|---|
| 11:35 | 1 | or whether they think that this will be important or not. |
| 11:35 | 2 | But this Court is desirous of having relevant facts brought |
| 11:35 | 3 | to the jury. |
| 11:35 | 4 | And I'm fairly convinced that the jury's entitled |
| 11:35 | 5 | to hear what a law firm receives when they bring an |
| 11:35 | 6 | attorney-client privilege claim before the Court in what |
| 11:36 | 7 | obviously appears to be a non-privileged document. |
| 11:36 | 8 | In addition, this document was not fully |
| 11:36 | 9 | disclosed. I think that it was Ms. Hurst, in fact -- who |
| 11:36 | 10 | the Court has extraordinary praise for -- when she became |
| 11:36 | 11 | counsel of record, had the wisdom and ethics to make this |
| 11:36 | 12 | known immediately. |
| 11:36 | 13 | I will refer the Circuit or reviewing court back |
| 11:36 | 14 | to a very close call concerning crime fraud. And I will, |
| 11:37 | 15 | Counsel, state on the record that, when I first came into |
| 11:37 | 16 | contact with all counsel, I told counsel that this was their |
| 11:37 | 17 | one opportunity to stop what this Court was seeing as a |
| 11:37 | 18 | significant number of discovery abuses. I'd also made the |
| 11:37 | 19 | statement a number of times there were enough abuses that, |
| 11:37 | 20 | if this Court would have had it from the beginning, I could |
| 11:37 | 21 | have granted terminal sanctions as to one or both sides. |
| 11:37 | 22 | And I've left the record at that. |
| 11:37 | 23 | And that's, Ms. Keller, long before you came into |
| 11:37 | 24 | the case. It's no reflection on you or any present counsel. |
| 11:38 | 25 | Possibly, because of my belief in the ethics that |

Case 2:04-cv-09049-DOC-RNB   Document 9863   Filed 02/14/11   Page 136 of 148   Page ID #:297695
CV 04-9049 DOC - 2/9/2011 - Day 15, Volume 1 of 3

136

| 11:38 | 1 | are supposed to be displayed, that it is not an appropriate |

11:38   1   are supposed to be displayed, that it is not an appropriate

11:38   2   standard to allow any leeway for any subterfuge or any

11:38   3   possibility, by either side, that attorneys are being given

11:38   4   information, by either side, that would leave them in a

11:38   5   position of bringing motions before a Court based upon the

11:39   6   information, of either client, to place counsel in a

11:39   7   position of not upholding the highest ethics.

11:39   8        I repeatedly said to you that I was concerned in

11:39   9   the first trial about what I will say was a position

11:39   10  Mr. Larian, I feel, was put in, that -- before he ever got

11:39   11  on the stand, because of a significant amount of e-mails and

11:39   12  what I perceive to be character evidence -- that, in my

11:39   13  reading, I believe that he was probably already deemed to be

11:40   14  somebody who had not told the truth.

11:40   15       I've been very careful not to allow that kind of

11:40   16  character evidence into this trial, and very careful in a --

11:40   17  trying to regulate when and how people were questioned about

11:40   18  some of these significant e-mails.  Most of those calls, I

11:40   19  believe, have been correct.

11:40   20       But with the morass of evidence before the Court,

11:40   21  I'm the first to recognize not all of those have been

11:40   22  consistent; although, there's been an attempt by this Court.

11:40   23       But once the principals are on the stand --

11:40   24  Mr. Larian, Mr. Eckert, Carter Bryant -- it's not that many

11:40   25  of these are insignificant or irrelevant, they become

| | | |
|---|---|---|
| 11:40 | 1 | extraordinarily relevant.  The evidence comes in now through |
| 11:40 | 2 | the appropriate persons who are on the stand, and not some |
| 11:40 | 3 | of the minions or people who don't know why they acted. |
| 11:41 | 4 | Next, a repeated answer of "I don't remember" or |
| 11:41 | 5 | "I don't recall," at least under Bernie Jefferson's |
| 11:41 | 6 | treatise, may be construed by the Court to be a lack of |
| 11:41 | 7 | credibility.  So that I don't make that determination, let |
| 11:41 | 8 | me just say that the repeated "I don't recalls," from |
| 11:41 | 9 | depositional testimony throughout what I'm starting to hear |
| 11:41 | 10 | on the stand, from any of these witnesses, may be perceived |
| 11:41 | 11 | by this Court to be a lack of credibility.  And, at least |
| 11:41 | 12 | under the Evidence Codes that I understand, now it's |
| 11:41 | 13 | permissible to impeach, which is why I allowed Mr. Price to |
| 11:41 | 14 | jump from not having to refresh Mr. Larian's recollection. |
| 11:41 | 15 | The difficulty is, I agree with you on one hand |
| 11:41 | 16 | that the advice back from Skadden, Arps is privileged.  And |
| 11:42 | 17 | I would normally agree with you -- and, in fact, wrote an |
| 11:42 | 18 | opinion that is somewhat contradictory to this Court's |
| 11:42 | 19 | position at the present time -- that the information, of |
| 11:42 | 20 | course, given by a client to counsel is normally privileged. |
| 11:42 | 21 | But it's not if it's incorrect information, or |
| 11:42 | 22 | incomplete information; and it is not, if there's a |
| 11:42 | 23 | misrepresentation of that information. |
| 11:42 | 24 | I'm not finding that on the record at the present |
| 11:42 | 25 | time.  Let me just say that I'm concerned enough that this |

Case 2:04-cv-09049-DOC-RNB   Document 9863   Filed 02/14/11   Page 138 of 148   Page ID #:297697
CV 04-9049 DOC - 2/9/2011 - Day 15, Volume 1 of 3

138

| | | |
|---|---|---|
| 11:42 | 1 | is going to the jury. |
| 11:42 | 2 | Now, if you would like me to make a further |
| 11:42 | 3 | record, I'm happy to do so.  And I'm putting you in a little |
| 11:42 | 4 | bit of a box here.  I understand that.  But I'm quite |
| 11:42 | 5 | prepared to make a very strong record in this regard. |
| 11:42 | 6 | MS. KELLER:  We're not requesting that, |
| 11:42 | 7 | Your Honor. |
| 11:42 | 8 | THE COURT:  All right.  You've perfected your |
| 11:42 | 9 | appeal now. |
| 11:42 | 10 | And if we haven't done this correctly, I'll |
| 11:43 | 11 | certainly be sitting here, and we'll do it a third time, if |
| 11:43 | 12 | we need to, or a fourth. |
| 11:43 | 13 | Now, Mr. Price, I'm gonna address you now. |
| 11:43 | 14 | I thought my ruling was clear about why this was |
| 11:43 | 15 | being received:  Very limited person in terms of information |
| 11:43 | 16 | that wasn't conveyed from your perspective, or was omitted, |
| 11:43 | 17 | or was incorrectly conveyed from Skadden, Arps -- I'm |
| 11:43 | 18 | sorry -- to Skadden, Arps from prior law firms.  And there's |
| 11:43 | 19 | been so many law firms that the primary carrier, from your |
| 11:43 | 20 | perception, has to be Mr. Larian.  And his input has to be a |
| 11:43 | 21 | primary driving force, as far as Mattel's concerned. |
| 11:43 | 22 | But this case has, for the first time, some |
| 11:43 | 23 | likelihood of coming back, because this is a very, very |
| 11:43 | 24 | difficult call concerning the attorney-client privilege. |
| 11:44 | 25 | But I've become convinced concerning, I believe, 7055, that |

| | | |
|---|---|---|
| 11:44 | 1 | this was not a privileged document, never was a privileged |
| 11:44 | 2 | document, hasn't treated this as a privileged document; and, |
| 11:44 | 3 | in fact, even Ms. Hurst readily recognized, thank goodness, |
| 11:44 | 4 | that this was not a privileged document, and it was turned |
| 11:44 | 5 | over immediately upon her becoming counsel of record.  In a |
| 11:44 | 6 | sense, she probably saved some severe sanctions. |
| 11:44 | 7 | You are not to ask or get into any advice given by |
| 11:44 | 8 | Skadden, Arps.  Do you understand that? |
| 11:44 | 9 | MR. PRICE:  I do.  I do, Your Honor. |
| 11:44 | 10 | THE COURT:  Then, why did you ask the question? |
| 11:44 | 11 | MR. PRICE:  I -- |
| 11:44 | 12 | THE COURT:  You lost your mind? |
| 11:44 | 13 | MR. PRICE:  Temporarily. |
| 11:44 | 14 | THE COURT:  All right. |
| 11:44 | 15 | MR. PRICE:  But, I understand.  One way -- |
| 11:44 | 16 | THE COURT:  You better understand. |
| 11:44 | 17 | Because, if MGA's correct -- and their perception |
| 11:45 | 18 | is that this is litigation to death -- then this is nothing |
| 11:45 | 19 | more than an overt attempt to have this case go up on appeal |
| 11:45 | 20 | and have this Court's ruling questioned by the court. |
| 11:45 | 21 | Do you understand? |
| 11:45 | 22 | MR. PRICE:  I do. |
| 11:45 | 23 | THE COURT:  And, therefore, that's volitional on |
| 11:45 | 24 | your part.  Is that understood? |
| 11:45 | 25 | MR. PRICE:  I understand. |

11:45  1          THE COURT:  I'm not going to make that record at

11:45  2     the present time, just as I'm paying a courtesy of not

11:45  3     making a record that MGA might not appreciate, so we remain

11:45  4     fair and balanced.

11:45  5          Don't do that again.

11:45  6          MR. PRICE:  Understood.

11:45  7          THE COURT:  It's a close enough call that this is

11:45  8     the one area the Circuit should examine and may find

11:45  9     disagreement with this Court about.

11:45  10          But I do believe that, with Mr. Larian going from

11:45  11     counsel to counsel to counsel, he has become a primary

11:45  12     carrier of information about what other attorneys have said.

11:46  13     You're entitled and you've gone into his mindset.  He's

11:46  14     conveying this information from one to another, claiming he

11:46  15     can't recall.  And this is the same document that's now

11:46  16     caused consistent problems with two courts, as well as one

11:46  17     other document that Judge Larson was concerned about, as

11:46  18     well.  So we're rather consistent in our concerns.  And it's

11:46  19     a very difficult call for the Court.

11:46  20          The more sweeping call would simply be the

11:46  21     assertion of the attorney-client privilege.  The other call

11:46  22     is, quite frankly, crime fraud.

11:46  23          This is not an attorney-client privileged

11:46  24     document.  The question will be whether Mr. Larian, quite

11:46  25     frankly, set up Skadden, Arps and used them as a shield, or

| | | |
|---|---|---|
| 11:46 | 1 | equally arguable whether Skadden, Arps allowed themselves to |
| 11:47 | 2 | be used as a shield. |
| 11:47 | 3 | Now, I may perfect that record more, because I |
| 11:47 | 4 | think the Circuit's going to be concerned, and they should |
| 11:47 | 5 | be concerned.  But what this Court is not going to do is |
| 11:47 | 6 | allow this case to be decided on a basis of fabrication and |
| 11:47 | 7 | the judgment calls of various law firms in their own |
| 11:47 | 8 | self-interest.  If we need to do this again, we stand here |
| 11:47 | 9 | ready to do that again, but this isn't decided upon who's |
| 11:47 | 10 | telling the least amount of lies. |
| 11:47 | 11 | Concerning the Castillo plea, as we move on this |
| 11:47 | 12 | afternoon:  This plea 'causes me a number of concerns. |
| 11:47 | 13 | First of all, it's the mini trial that would take |
| 11:47 | 14 | place because of the first sentence in that plea. |
| 11:47 | 15 | First of all, I don't think the factual basis is |
| 11:48 | 16 | relevant.  If a person takes the stand, the reason that |
| 11:48 | 17 | they're impeached with a felony is because of their |
| 11:48 | 18 | credibility.  And there are four factors, historically, that |
| 11:48 | 19 | the courts examine, but I'll go back to the State court days |
| 11:48 | 20 | with *Beagle*, because they're not so significantly different. |
| 11:48 | 21 | One was, was it a crime of credibility under |
| 11:48 | 22 | *Beagle*.  And if everybody recalls, that was a 211, a |
| 11:48 | 23 | robbery.  And the Court ruled that, there, credibility was |
| 11:48 | 24 | in issue. |
| 11:48 | 25 | The second was, was it remote in time.  And at |

| | | |
|---|---|---|
| 11:48 | 1 | least in the State law jurisprudence, there were incredible |
| 11:48 | 2 | discussions about time factors.  Finally, the California |
| 11:48 | 3 | Legislature said, "For all purposes and for all time," |
| 11:48 | 4 | which, of course, the federal courts disagree with and find |
| 11:48 | 5 | ten years -- and there's always a controversy, if you've |
| 11:48 | 6 | done seven of those years in prison, how do you count those? |
| 11:48 | 7 | The third was, are they the same or similar?  And |
| 11:48 | 8 | for a long time, there's been a lot of jurisprudence in both |
| 11:49 | 9 | the State courts, which seemed to have examined this much |
| 11:49 | 10 | more thoroughly than the federal courts, about what happens |
| 11:49 | 11 | if you have somebody charged with forgery and the prior |
| 11:49 | 12 | felony is a forgery?  So California went through a whole |
| 11:49 | 13 | series of issues concerning sanitation.  Should we sanitize |
| 11:49 | 14 | these? |
| 11:49 | 15 | And when the California courts finally seized upon |
| 11:49 | 16 | this sanitation -- by some of the State court judges, back |
| 11:49 | 17 | in the 1970's and 80's -- it was recognized that sanitation |
| 11:49 | 18 | even raised a greater horror story, and that was possibly |
| 11:49 | 19 | the person was convicted of murder or rape or child molest, |
| 11:49 | 20 | and it was simply a crime of theft. |
| 11:49 | 21 | And finally, there was a ridiculous factor that |
| 11:49 | 22 | was examined.  And that was whether it would have -- the |
| 11:49 | 23 | fourth factor, whether it would have a chilling effect, |
| 11:49 | 24 | whether the person would take the stand or not, because of |
| 11:49 | 25 | the prior.  Of course, with anybody would have some chilling |

Case 2:04-cv-09049-DOC-RNB   Document 9863   Filed 02/14/11   Page 143 of 148   Page ID #:297702
CV 04-9049 DOC - 2/9/2011 - Day 15, Volume 1 of 3

143

| | | |
|---|---|---|
| 11:49 | 1 | effect.  And that was somewhat negated by the courts. |
| 11:49 | 2 | Then, along came a brilliant case written by the |
| 11:49 | 3 | California Supreme Court, in Footnote, I believe, No. 11, |
| 11:49 | 4 | referring the Court, in *Castro*, to a "Readiness to do evil." |
| 11:50 | 5 | No court could understand that because it was based upon the |
| 11:50 | 6 | tax Court that they cited. |
| 11:50 | 7 | Finally, the California legislature kept stepping |
| 11:50 | 8 | in and saying "priors for all purposes." |
| 11:50 | 9 | Now, the federal courts have a ten-year |
| 11:50 | 10 | limitation.  This certainly falls within that limitation. |
| 11:50 | 11 | Mr. Castillo's only recently pled guilty.  But let's be very |
| 11:50 | 12 | blunt about it. |
| 11:50 | 13 | I am concerned -- and I'm directing this to |
| 11:50 | 14 | Mattel -- that, on one hand -- |
| 11:50 | 15 | I'm speaking and you're listening. |
| 11:50 | 16 | I'm concerned that, on one hand, you're entitled |
| 11:50 | 17 | to the felony, when Mr. Castillo takes the stand; in other |
| 11:50 | 18 | words, he's a person convicted of a felony.  But I'm equally |
| 11:51 | 19 | concerned that, when he takes the stand, that the real |
| 11:51 | 20 | import from MGA, and MGA's real concern is that, because |
| 11:51 | 21 | Castillo admitted to this felony under the same factual |
| 11:51 | 22 | situation, that, therefore, Larian or anybody privy to this |
| 11:51 | 23 | information must be guilty of the same crime.  And it's just |
| 11:51 | 24 | simple as that. |
| 11:51 | 25 | So in balancing that, I have tried to forecast |

Case 2:04-cv-09049-DOC-RNB   Document 9863   Filed 02/14/11   Page 144 of 148   Page ID #:297703
CV 04-9049 DOC - 2/9/2011 - Day 15, Volume 1 of 3

144

| | | |
|---|---|---|
| 11:51 | 1 | that Castillo's going to get on the stand -- and he's been |
| 11:51 | 2 | rather consistent throughout these proceedings -- and it |
| 11:51 | 3 | appears to be very truthful about -- as long as he remains |
| 11:51 | 4 | consistent in my Court, by the way -- with what he did and |
| 11:51 | 5 | how he did it. |
| 11:51 | 6 | Now, I expect that you can go through that, and |
| 11:51 | 7 | you can go through listening and seeing if there's a |
| 11:52 | 8 | contradiction to his factual basis.  And if he contradicts |
| 11:52 | 9 | his factual basis, I think you're entitled possibly to go |
| 11:52 | 10 | back and point out that contradiction. |
| 11:52 | 11 | But normally, a factual basis doesn't come in with |
| 11:52 | 12 | a prior.  In other words, the whole document just doesn't |
| 11:52 | 13 | roll in, and "Here's the felony" and "Here's the factual |
| 11:52 | 14 | basis."  It's the fact, "Have you been convicted of a felony |
| 11:52 | 15 | or pled guilty to a felony in 2010" -- whatever the month |
| 11:52 | 16 | is. |
| 11:52 | 17 | If he contradicts that, then there's an opening |
| 11:52 | 18 | for the factual basis.  But what there's not a opening for |
| 11:52 | 19 | is this:  The first sentence, which could arguably be that |
| 11:52 | 20 | MGA influenced the first sentence; that Mattel came back and |
| 11:52 | 21 | influenced the striking of the first sentence, because it |
| 11:52 | 22 | all involves a superfluous issue of whether MGA is |
| 11:52 | 23 | knowledgeable or not. |
| 11:52 | 24 | And I don't know why that was ever considered, why |
| 11:53 | 25 | that would be put in a plea, why it's taken out.  And it |

| | | |
|---|---|---|
| 11:53 | 1 | seems to me to be a lot of contact between different counsel |
| 11:53 | 2 | and the District Attorney's Office up in Los Angeles.  I |
| 11:53 | 3 | think that that's completely irrelevant. |
| 11:53 | 4 | And if that's allowed, what it's going to do, in a |
| 11:53 | 5 | sense, is sweep Larian into Castillo's plea.  And it's |
| 11:53 | 6 | extraordinarily prejudicial. |
| 11:53 | 7 | Now, we're going to discuss that this evening. |
| 11:53 | 8 | If you're done with Mr. Larian today, you're not |
| 11:53 | 9 | done with him; in other words, we're going to bring him |
| 11:53 | 10 | back.  And we're going to bring him back during your case. |
| 11:53 | 11 | So you're not limited.  But I want a thorough and thoughtful |
| 11:53 | 12 | discussion with you at 5:00 o'clock if you think you're |
| 11:53 | 13 | going there -- because you're not. |
| 11:53 | 14 | What did I just say, Mr. Price? |
| 11:53 | 15 | MR. PRICE:  I'm not going into Mr. Castillo's |
| 11:53 | 16 | guilty plea at all with Mr. Larian, and certainly not the |
| 11:53 | 17 | first sentence. |
| 11:53 | 18 | THE COURT:  You're not doing that. |
| 11:53 | 19 | Did you plan to do that? |
| 11:53 | 20 | MR. PRICE:  No. |
| 11:53 | 21 | THE COURT:  Well, then that's -- my little speech |
| 11:54 | 22 | was not needed. |
| 11:54 | 23 | MR. PRICE:  But educational. |
| 11:54 | 24 | THE COURT:  But when Castillo takes the stand, |
| 11:54 | 25 | he's a convicted felon, and you can ask him that.  It goes |

| 11:54 | 1 | to his credibility. |
|---|---|---|

11:54   1    to his credibility.

11:54   2         Now, there may be an opening.  So we're having a

11:54   3    blunt discussion about trial work.  If he lies or

11:54   4    contradicts his factual basis, the Court, in all likelihood,

11:54   5    will let you impeach him with that prior inconsistent

11:54   6    statement.  And if there's depositional testimony wherein

11:54   7    he's lied, I'll let you impeach him with that prior

11:54   8    inconsistent statement.

11:54   9         What I do not want, without warning to this Court

11:54   10   and *in camera* hearing, is any conversation about what I call

11:54   11   this first line about MGA's involvement or noninvolvement,

11:54   12   and how that was stricken.  That's completely irrelevant.

11:54   13        And, quite frankly, it smacks of manipulation by

11:54   14   both parties at different times.  And I think the claim

11:54   15   could equally be made that somebody from MGA's talking to

11:55   16   him.

11:55   17        Now, I know, Ms. Keller, just had a heart attack,

11:55   18   but that's the way the Court sees this.

11:55   19        So I think it's beneficial that this be kept out.

11:55   20        Understood?

11:55   21        MR. PRICE:  Understood.

11:55   22        THE COURT:  Okay.

11:55   23        Now, you don't know this yet, but I can sit here

11:55   24   forever.  I don't need a lunch break, and I don't need a

11:55   25   restroom break.  So what would we like to do next?

11:55   1              We can perfect records.  We can sit here, or you
11:55   2    can be excused, if you have nothing further, until
11:55   3    34 minutes from now.
11:55   4              Mr. McConville?
11:55   5              MR. McCONVILLE:  I'd like to be excused,
11:55   6    Your Honor.
11:55   7              THE COURT:  Only as a group.
11:55   8              MR. McCONVILLE:  Our group would like to be
11:55   9    excused.
11:55   10             THE COURT:  Okay.  Just a moment.
11:55   11             Let's see if Mattel would like to join you.
11:55   12             MR. PRICE:  We'd like to join 'em.
11:55   13             THE COURT:  All right.  I'll see you in exactly
11:55   14   34 minutes.  I'll open the doors at 12:30.
11:56   15                 *(Lunch recess held at 11:55 a.m.)*
11:56   16                 *(Further proceedings reported by Denise*
11:56   17          *Paddock in Volume II.)*
11:56   18                             -oOo-
11:56   19
        20
        21
        22
        23
        24
        25

| 11:56 | 1 | -oOo- |
| 11:56 | 2 | |
| 11:56 | 3 | CERTIFICATE |
| 11:56 | 4 | |

11:56  5        I hereby certify that pursuant to Section 753,

11:56  6   Title 28, United States Code, the foregoing is a true and

11:56  7   correct transcript of the stenographically reported

11:56  8   proceedings held in the above-entitled matter and that the

11:56  9   transcript page format is in conformance with the

11:56  10  regulations of the Judicial Conference of the United States.

11:56  11

11:56  12  Date:  February 9, 2011

11:56  13

11:56  14
11:56
11:56  15  _____
11:56
11:56  16       DEBBIE GALE, U.S. COURT REPORTER
           CSR NO. 9472, RPR

11:56  17

       18

       19

       20

       21

       22

       23

       24

       25