UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

HONORABLE DAVID O. CARTER, JUDGE PRESIDING

- - - - - - -

# CERTIFIED TRANSCRIPT

| | |
|---|---|
| MATTEL, INC., et al., )<br>　)<br>　　　　　Plaintiffs, )<br>　)<br>　　vs. )<br>　)<br>MGA ENTERTAINMENT, INC., et al., )<br>　)<br>　)<br>　　　　　Defendants. )<br>_____) | No. CV 04-9049-DOC (RNBx)<br>Day 15<br>Volume 2 of 3 |

REPORTER'S DAILY TRANSCRIPT OF PROCEEDINGS
JURY TRIAL
SANTA ANA, CALIFORNIA
WEDNESDAY, FEBRUARY 9, 2011

Denise Paddock, CSR 10199, CMRS, RMR, CRR
Federal Official Court Reporter
United States District Court
411 West 4th Street, Room 1-053
Santa Ana, California 92701
transcripts@ocrecord.com www.ocrecord.com
020911 DCCD CR 9D CARTER MATTEL CIVIL JURY TRIAL DAY 15 V2
02/09/2011

**APPEARANCES OF COUNSEL:**

FOR PLAINTIFF MATTEL, INC., ET AL.:

      QUINN EMANUEL URQUHART & SULLIVAN LLP
      BY: JOHN QUINN
         WILLIAM PRICE
         MICHAEL T ZELLER
         Attorneys at Law
      865 S Figueroa Street, 10th Floor
      Los Angeles, CA 90017-2543
      213-443-3000

FOR DEFENDANT MGA ENTERTAINMENT, INC., ET AL:

      ORRICK HERRINGTON & SUTCLIFFE LLP
      BY: THOMAS S McCONVILLE
         Attorney at Law
      4 Park Plaza, Suite 1600
      Irvine, CA 92614
      949-567-6700

      - AND -

      ORRICK HERRINGTON & SUTCLIFFE LLP
      BY: ANNETTE L HURST
         Attorney at Law
      405 Howard Street
      San Francisco, CA 94105
      415-773-5700

      KELLER RACKAUCKAS LLP
      BY:  JENNIFER L KELLER
         Attorney at Law
      18500 Von Karman Avenue, Suite 560
      Irvine, CA 92612
      949-476-8700

```
 1   APPEARANCES OF COUNSEL (Continued):

 2

 3

 4    FOR CARLOS GUSTAVO MACHADO GOMEZ:

 5          LAW OFFICES OF MARK E OVERLAND
            BY: Mark E Overland
 6              Attorney at Law
            100 Wilshire Boulevard, Suite 950
 7          Santa Monica, CA 90401
            310-459-2830
 8
            -AND-
 9
            SCHEPER KIM AND HARRIS LLP
10          BY: ALEXANDER H COTE
                Attorney at Law
11          601 West Fifth Street, 12th Floor
            Los Angeles, CA 90071-2025
12          213-613-4655

13          ALSO PRESENT:

14          MGA ENTERTAINMENT, INC.
            BY: JEANINE PISONI
15              Attorney at Law
            16360 Roscoe Boulevard, Suite 105
16          Van Nuys, California 91406

17

18   ALSO PRESENT:

19          ROBERT ECKERT, Mattel CEO

20          ISAAC LARIAN, MGA CEO

21          KEN KOTARSKI, Mattel Technical Operator

22          MIKE STOVALL, MGA Technical Operator

23          KIERAN KIECKHEFER, Orrick, Herrington & Sutcliffe

24

25
```

UNITED STATES DISTRICT COURT

## CHRONOLOGICAL INDEX

020911 DCCD CR 9D CARTER MATTEL CIVIL JURY TRIAL DAY 15 V2
CV 04-9049 DOC

**WITNESS:**                                                                    **PAGE:**

**Isaac Larian**
DIRECT EXAMINATION RESUMED
BY MR. PRICE.............................................................  6
DIRECT EXAMINATION RESUMED
BY MR. PRICE............................................................. 51


**EXHIBIT(S) RECEIVED INTO EVIDENCE:**

500      ............................................................. 20

615      ............................................................. 41

1701     ............................................................. 21

11203    ............................................................. 16

11856    ............................................................. 63

```
 1              SANTA ANA, CALIFORNIA; WEDNESDAY, FEBRUARY 9, 2011

 2                       Day 15, Volume 2 of 3

 3                          A.M. SESSION

 4              (Open court - jury not present.)

12:34  5        THE COURT:  We're on the record, we're out of the

 6      presence of the jury.  All counsel are present.

 7              And before the jury comes in, I recognize that this

 8      is an extraordinarily difficult issue.

 9              MGA may propose a limiting instruction, if you'd

12:34 10        like to, in the next hour for my consideration.

11              We're back in session, Counsel.

12              Mr. Larian is on the witness stand.

13              Counsel are present.

14              Let me say to you, Mr. Larian is entitled to

12:34 15        withhold the content of communications pursuant to the -- or

16      any communications with his own attorney.

17              I really want you to understand that's appropriate,

18      it's time honored, it's the law, and you're not to draw any

19      inference at all in terms of the attorney-client privilege

12:34 20        other than it's appropriate privilege.

21              Counsel --

22              Mr. Price, once again continuing on behalf of

23      Mattel.

24                          **Isaac Larian**,

12:34 25        witness, called by Plaintiff(s), previously sworn
```

UNITED STATES DISTRICT COURT

Case 2:04-cv-09049-DOC-RNB   Document 9864   Filed 02/14/11   Page 6 of 65   Page ID #:297713
CV 04-9049 DOC - 02/09/2011 - Volume 2 of 3

6

1           **DIRECT EXAMINATION RESUMED**

2    BY MR. PRICE:

3    Q.   Good afternoon.

4    A.   Good afternoon.

12:34 5   Q.   So if we go back to 7055, just to hopefully get a few

6    more questions.

7           And in Ms. O'Connor's e-mail to you:

8           "Don't you think we should say Bratz was born in

9    October when a certain person was no longer with their

12:34 10  company?"

11          Is it correct that you understood from that that

12   you shouldn't be say -- Mr. Bryant -- I'm sorry -- that you

13   shouldn't be saying that Bratz was born in September because

14   on that date Mr. Bryant still worked for Mattel?

12:34 15        Was that your understanding when you read it?  I

16   was just responding to her e-mail where she says:

17          "Don't you think we should say Bratz was born in

18   October when a certain person" -- Carter Bryant -- "was no

19   longer at their company?" -- Mattel.

12:34 20        And they responded "Good point."

21          I'm -- I'm trying to find out what you -- what

22   you -- how you understood that.

23          Did you understand that Ms. O'Connor was saying to

24   you that we shouldn't say Bratz were born in September

12:34 25  because if we do that, that's the same time Mr. Bryant

1    was at Mattel?

2    A.    No.  My understanding was Isaac -- we did not have a

3    contract with this guy until October 4, 2000.  There was no

4    contract until then.

12:34  5              Why did you say September?

6    Q.    Did you have any communication with her other than by

7    e-mail?

8    A.    No, just this one here.

9    Q.    So you've told us that you communicated to Skadden Arps

12:34 10   that this was based upon some advice you had gotten in 2001,

11   2003; correct?

12   A.    Yes.

13   Q.    Now I'm trying to figure out which part of it did you

14   say was based on advice you got in 2001, 2003?

12:35 15             MS. HURST:  Objection; misstates the testimony.

16             THE COURT:  Overruled.

17   Q.    BY MR. PRICE:  The part from Ms. O'Connor to you, which

18   is -- "Don't you think we should say Bratz was born in

19   October," or the part where you said "good point, thanks"?

12:35 20   A.    It reminded me when I talked with the people at

21   Skadden Arps, I told them it reminded me of a discussion that

22   I had with another lawyer before.

23             I didn't remember the name of the lawyer, but it

24   reminded me of that.  It had to do with copyright.

12:35 25   Q.    Okay.  And I'm just asking you which -- which part, that

```
 1    is, is it Ms. O'Connor's e-mail to you that, you know, we

 2    shouldn't say Bratz was born in October when a certain person

 3    was no longer with their company, was it the "good point,

 4    thanks"?  Which -- which part was it?

12:35 5  A.   The October -- the October, because we didn't have a

 6    contract with Carter Bryant until October, and it reminded me

 7    when they were talking to me about this that they had a

 8    discussion with another lawyer -- other lawyers -- not

 9    Skadden Arps.  It reminded me of a discussion I had with

12:36 10 them.

11            Now, I don't know if I want to disclose that or

12    not.  I guess I did.

13    Q.   I'm not asking you to.  I'm not asking you to.

14            This meeting that you had with Skadden Arps, was

12:36 15 Ms. O'Connor present?

16    A.   No, she was not.

17            The meeting was Skadden Arps was long after

18    Ms. O'Connor had left MGA.  The lawsuit that they filed

19    against us was long after Ms. O'Connor had left MGA.

12:36 20 Q.   Now, you were here, I believe, when it was suggested

21    that this was Ms. O'Connor's concern, not yours?  That is,

22    that she was the one worried about saying Bratz was born in

23    September because a certain person was with Mattel at that

24    time.

12:37 25            Is that accurate?  Was this -- was this
```

CV 04-9049 DOC - 02/09/2011 Volume 2 of 3

1   just her concern?

2   A.   My recollection of the testimony that was received from

3   Ms. O'Connor last week was, indeed, it was her, not me,

4   saying -- I had said before September, et cetera.

12:37 5              It was her saying, "Don't you think we should say

6   Bratz was born in October when a certain person was no longer

7   with the company?"

8              And I think that's the question that was asked from

9   Ms. O'Connor, and that she said, yes, that it was her, not

12:37 10  me.

11  Q.   Well, I -- I thought that you told us that you told

12  Skadden that that concern was based on previous advice you

13  got from counsel in 2001/2002 time frame.

14  A.   No.   When Skadden asked me about this e-mail, I told

12:38 15  them all the facts, and I told them that it reminded me of a

16  discussion I had with another lawyer.

17              I did not remember the name of the lawyer at the

18  time, and even now I'm just guessing.   I have two names to

19  give you.   Those are the ones I'm guessing.

12:38 20  Q.   Your response was that that -- whoever came up with the

21  point that she made, that you thought it was a good one;

22  correct?

23  A.   Her point that her -- Bratz -- we didn't have a contract

24  with Carter Bryant until October.   Yes, to my mind was a good

12:38 25  point because we didn't have a contract with Carter Bryant

1    until October of 2000.

2    Q.    Now, can you show me in her e-mail to you where it talks

3    about there being a contract with Carter Bryant in October of

4    2000?

12:39  5    A.    It's not in the e-mail.  You know that.

6    Q.    So I want to make sure I understand this.  You

7    interpreted her e-mail from her to you to be her saying, We

8    didn't have a contract in October 2000 and that's why you

9    shouldn't be saying this?

12:39 10    A.    That's what I interpreted.

11    Q.    Okay.  If -- then do you have any understanding, if that

12    was her point, why she didn't put the name Carter Bryant

13    there, why she instead said "when a certain person"?

14    A.    I don't know.  She was here.  I don't know.  I think you

12:39 15    had an opportunity to ask her, sir.

16    Q.    So her being ambiguous there about "when a certain

17    person," does that seem to you to be inconsistent with the

18    interpretation of this communication that she was just saying

19    we didn't have a contract with Mr. Bryant until October of

12:40 20    2000?

21            MS. HURST:  Objection; calls for speculation.

22            THE COURT:  Sustained.

23            You can save that for argument, Counsel; questions

24    concerning Mr. Larian's state of mind.

12:40 25    Q.    BY MR. PRICE:  Mr. Larian, when you saw this, did you

```
 1    have any understanding as to why Ms. O'Connor put in "a

 2    certain person" rather than putting in Mr. Bryant's name?

 3    A.   No.

 4    Q.   When you read this, did you have any understanding as to

12:40  5    why Ms. O'Connor referred to "with their company" instead of

 6    referring to Mattel?

 7    A.   No.

 8    Q.   When you saw this, you did understand that she was being

 9    ambiguous with respect to who the person was and who the

12:40 10    company was?  That was your understanding?

11    A.   It was not ambiguous to me.  I knew she was referring to

12    Carter Bryant and I knew she was referring to Mattel.

13    Q.   So when you saw this you knew that what this said was:

14    Don't you think we should say Bratz was born in October when

12:41 15    Carter Bryant was no longer with Mattel?

16         Correct?

17    A.   Yes.

18    Q.   Now, I think you said earlier that -- that -- that if it

19    were MGA, that it would raise suspicions if MGA learned that

12:41 20    one of their designers was working for MGA and at the same

21    time working for a competitor; right?

22    A.   I'm very confused.  Are we still on this document?

23    Q.   I'm not asking you about this document now.

24    A.   Oh, okay.

12:41 25    Q.   So I think you've told us earlier that at MGA it would
```

1    concern you if one of your designers was working for a

2    competitor at the same time they were working for you?

3    A.   It does.

4    Q.   All right.  And if you could look at 21714 --

12:42 5         MR. PRICE:  And at this point, Your Honor, we do

6    move 21714 into evidence.  That's the Fred Larian.

7              MS. HURST:  Same objection, Your Honor.

8              THE COURT:  Well, there are certain portions,

9    Counsel, that I don't think are relevant, so at this time

12:42 10   it's denied.  You're not going to receive it into evidence.

11             Other portions maybe.  We can excise those portions

12   that might apply to this case.  If I'm going to receive it,

13   you can do that tonight.

14             You can question him on it.

12:42 15        MR. PRICE:  Let me lay a foundation to see if we --

16             THE COURT:  No. Not until I exercise it the entire

17   document's not coming in.

18             MR. PRICE:  I understand.

19             Let me see if I can lay a foundation on one of the

12:42 20   issues.

21   Q.   BY MR. PRICE:  You were here when -- when your brother,

22   Farhad testified; correct?

23   A.   Unfortunately, yes.

24   Q.   And you were here when Ms. Morris -- when Ms. Morris

12:42 25   testified; correct?

1    A.    I was.

2    Q.    And you recall that one of the things that your brother

3    testified to was -- was why he -- he dropped his case against

4    you?

12:43 5    A.    Yes.  He found out that his allegations were false.

6    Q.    And in Ms. Morris' examination by Ms. Keller they went

7    into the topic of, again, why -- why your brother dropped his

8    case against you; correct?

9    A.    I don't think Ms. Keller talked to my brother.

12:43 10   Q.    No.  When Ms. Keller examined Ms. Morris one of the

11   topics she talked about was why your brother dropped his case

12   against you; correct?

13   A.    My recollection is that you asked him or Quinn asked

14   him.  I don't remember -- Mr. Quinn.  I don't remember.

12:43 15  Ms. Keller, maybe she did.

16   Q.    Now, do you recall your brother testifying that one of

17   the reasons he dropped his case was he -- is that you told

18   him you didn't think much of Bratz when you bought his

19   shares?

12:44 20   A.    My brother testified to that?

21   Q.    Yes.  When he testified here on the 13th day of the

22   trial, do you recall him testifying that he gave you the

23   benefit of the doubt to you that you didn't think much of

24   Bratz when you bought his shares?

12:44 25   A.    Frankly, Mr. Price, you guys putting my brother on the

1    stand was so depressing for me that I was not even paying

2    attention to what he was saying.

3    Q.   Okay.  So let me ask you this.  Is -- did you tell your

4    brother at the time you bought his shares that you didn't

12:44  5    think much of Bratz at that time?

6              MS. HURST:  Objection; irrelevant, Your Honor.

7              THE COURT:  I'm not sure where we're going with

8    this, Counsel.

9              MR. PRICE:  I'm going to Mr. Farhad Larian's

12:44 10    testimony and the -- and the inquiry of Ms. Morris as to --

11             THE COURT:  He's testified.  What's the relevance

12    concerning this witness' testimony about his brother's

13    testimony?

14             MR. PRICE:  The relevance, Your Honor, is whether

12:45 15    or not that was an accurate statement, that is, whether or

16    not that's what Mr. Larian actually said and whether or not

17    there was a --

18             THE COURT:  Sustained.  Let's move on.

19             MR. PRICE:  Let me show you Exhibit 11277.

12:45 20             And I believe this is in evidence, Your Honor,

21    Exhibit 11277.

22    Q.   BY MR. PRICE:  And you see, Mr. Larian, this is an

23    e-mail you sent on October 31st, 2000?

24    A.   Yes, I did.

12:46 25    Q.   And this is where you say, "please listen to me

```
 1    carefully.  This is a fashion doll."

 2           Do you see that?

 3    A.   I do.

 4    Q.   And we talked about the $25 million in sales that were

 5    projected; right?

 6    A.   Yes.

 7    Q.   So was it, in fact, your projection in October -- on

 8    October 31, 2000, that you projected sales in 2001 of

 9    approximately 25 million?

10           MS. HURST:  Objection, Your Honor; asked

11    and answered and also collateral impeachment on the same

12    issue as we just discussed.

13           THE COURT:  Overruled.

14           You can answer the question.

15           THE WITNESS:  What was the question again?

16    Q.   BY MR. PRICE:  Whether or not on October 30, 2000, you,

17    in fact, did project $25 million in sales for the year 2001.

18    A.   I did.

19    Q.   And would you have considered that to be a success,

20    $25 million in sales, in 2001?

21    A.   Yes.

22    Q.   And if you could look at 11203.

23           And do you recognize 11203?

24    A.   Give me a moment, please.

25    Q.   Sure.
```

Case 2:04-cv-09049-DOC-RNB   Document 9864   Filed 02/14/11   Page 16 of 65   Page ID #:297723
CV 04-9049 DOC - 02/09/2011 - Volume 2 of 3

16

```
 1                    (Pause in the proceedings.)

 2                    THE WITNESS:  Go ahead.

 3      Q.   BY MR. PRICE:  And do you recognize this as an e-mail

 4      that you sent to Eric Yip and Helene Bartels?

12:48 5  A.   Yes.

 6      Q.   And this is about November 30, 2000?

 7      A.   I did.

 8                    MR. PRICE:  Your Honor, I would move Exhibit 11203

 9      into evidence.

12:48 10                THE COURT:  Is this dated, once again, November 30,

11      2000?

12                    MR. PRICE:  It is, Your Honor.

13                    THE COURT:  It would be the Kmart, Wal-Mart; it's

14      received.

12:53 15                (Exhibit(s) 11203, received.)

16      Q.   BY MR. PRICE:  And could you tell us who Eric Yip and

17      Helene Bartels are?

18      A.   Eric Yip was in charge of sales in Hong Kong office.

19      Helene Bartels, she was my secretary first, but by this time

12:49 20  she was in charge of sales for Wal-Mart.

21      Q.   Now, you say at the beginning:

22                    "Eric regarding Wal-Mart.

23                    "1.  We need Ron Stover for sure for Bratz, which

24      is a huge part of our business.  He need at least 30 minutes.

12:49 25  If Prel says no, Helene must go to Ron."
```

Case 2:04-cv-09049-DOC-RNB  Document 9864  Filed 02/14/11  Page 17 of 65  Page ID #:297724
CV 04-9049 DOC - 02/09/2011 - Volume 2 of 3

17

```
 1              Do you see that?
 2    A.   Yes.
 3    Q.   Could you tell us what you're talking about here, what
 4    that means?
12:49 5    A.   That Prel was the agent for Wal-Mart in China and
 6    Hong Kong.  The buyers at Wal-Mart usually don't go and see
 7    small vendors, and we were a small vendor at the time, and we
 8    wanted him to get a chance to come and see our line in our
 9    showroom, and he would have refus- -- he said he didn't have
12:50 10   time to come and see us, and I was telling Eric to go and
 11   tell Ron, "Please come and see us."  And other -- if you go
 12   look there are other buyers named here.
 13              It was a tough time for us to get buyer appointment
 14   at the time.
12:50 15             And one of the things I was telling him was to go
 16   and tell Ron that Bratz is going to be a huge part of our
 17   business for 2001; please come and see us for 30 minutes.
 18              Did I explain that to you?
 19   Q.   You did.
12:50 20             So in the first sentence when you say, "Bratz,
 21   which is huge part our business" --
 22   A.   Yes.
 23   Q.   -- was it your belief in November 30, 2000, that Bratz
 24   was a huge part of your business?
12:50 25   A.   No, it was not.
```

1    Q.    Were you intending to convey that you plan to have it be

2    a huge part of your business?

3    A.    Yes.  I should have said "will be."

4    Q.    And what you're talking about is -- are you okay?  Do

12:51 5    you want to take a drink?

6    A.    Yeah, just one second.

7    Q.    I'll join you.

8              (Pause in the proceedings.)

9    Q.    BY MR. PRICE:  So what you meant to say as of

12:51 10   November 30, 2000, was that you expected Bratz to be a huge

11   part of your business?

12   A.    Yes.

13   Q.    And that you were investing a lot of resources to make

14   sure that Bratz will be a huge part of your business?

12:51 15   A.    No.  I was just telling him that Bratz is going to be a

16   huge part of our business -- "Please come and see us for

17   30 minutes."

18   Q.    Did you have it in mind at this point, in November 30,

19   2000, that you were going to invest a lot of resources to

12:51 20   make Bratz a huge part of your business?

21   A.    If they were not going to buy it, especially Wal-Mart, I

22   don't think we would have spent a whole bunch of money making

23   that happen.

24   Q.    Let me ask you about your relationship with

12:51 25   Carter Bryant.

UNITED STATES DISTRICT COURT

| | |
|---|---|
| 1 | A.    Yes. |
| 2 | Q.    Now, there came a time when he was asked to file a |
| 3 | declaration for MGA in connection with a patent application; |
| 4 | correct? |
| 12:52  5 | A.    I saw that in this courtroom. |
| 6 | Q.    And there is a patent application that you had filed |
| 7 | concerning these interchangeable footwear; correct? |
| 8 | A.    Yes. |
| 9 | Q.    And if you could look at Exhibit 500. |
| 12:52 10 |     THE WITNESS:  Go ahead. |
| 11 | Q.    BY MR. PRICE:  And you see this, recognize this as the |
| 12 | application that was filed in connection with this -- you |
| 13 | seeking to get a patent on aesthetic changeable footgear; |
| 14 | correct? |
| 12:53 15 | A.    Yes. |
| 16 |     MS. HURST:  Your Honor, I'm going to object as |
| 17 | irrelevant. |
| 18 |     THE COURT:  Overruled. |
| 19 | Q.    And if you look at the first page -- actually, I'll move |
| 12:53 20 | Exhibit 500 into evidence. |
| 21 |     I'm not sure it is. |
| 22 |     THE COURT:  I want to make sure that this is the |
| 23 | document that has the statements.  I'm just not equating 500. |
| 24 |     MR. PRICE:  Oh, this doesn't have the statements. |
| 12:53 25 | This is just the application itself that that relates to. |

```
 1              THE COURT:  But you'll eventually get to that

 2    document?

 3              MR. PRICE:  Yes.

 4              THE COURT:  All right.  Overruled.

12:53 5         THE WITNESS:  Go ahead.

 6              MR. PRICE:  So, again, before we show it, I move

 7    500 into evidence, Your Honor.

 8              THE COURT:  Received.

 9              When I said "overruled," Counsel, I meant

12:53 10   "received."

 11             My apologies.

 12             (Exhibit(s) 500, received.)

 13   Q.   BY MR. PRICE:  So we see here it says, "United States

 14   patent application for doll with aesthetic changeable

12:53 15   footgear," and you're listed as the inventor on that;

 16   correct?

 17   A.   That's correct.

 18   Q.   And you filed a declaration in support of that; right?

 19   A.   I believe I did.

12:54 20   Q.   And that's 1701.  We could have you look at that.

 21   A.   Yes, go ahead.

 22   Q.   And do you recognize this as a declaration you signed in

 23   connection with that?

 24   A.   Declaration and power of attorney; yes.

12:54 25   Q.   And that's your signature on the second page?
```

1  A.   It is.

2            MR. PRICE:  Your Honor, I move Exhibit 1701 into

3  evidence.

4            THE COURT:  Received.

12:54 5            (Exhibit(s) 1701, received.)

6  Q.   BY MR. PRICE:  And you see on the first page that says:

7            "As a below-named inventor I hereby declare

8  that" --

9            Do you see that?

12:55 10 A.   I do.

11 Q.   And in the third paragraph it says:

12            "I believe I am the original, first and sole

13 inventor (if only one name is listed below) or an original,

14 first, and joint inventor (if plural names are listed below)

12:55 15 of the subject matter which is claimed and for which a patent

16 is sought on the invention entitled, *doll with aesthetic*

17 *changeable footwear*, the specification of which is attached

18 hereto?"

19            You see that?

12:55 20 A.   I do.

21 Q.   And part of that is a power of attorney appointing

22 people who can speak on your behalf to the patent office?

23 A.   People like Mr. Allen Rose, who was my attorney.

24 Q.   And there is only one name listed for the inventor, and

12:55 25 that's you?

```
 1    A.    That is correct.

 2    Q.    And if we look at the second page that's your signature

 3    where it says:

 4              "Full name of sole or first inventor:   Isaac

12:56 5  Larian."

 6              Correct?

 7    A.    Second page of --

 8    Q.    1701.

 9    A.    Yes.

12:56 10  Q.    Now, the first time you had ever heard of the concept of

11    having the -- the feet with the shoe attached to the leg of a

12    doll was from Carter Bryant; correct?

13    A.    Yes.

14    Q.    And if we look at, I think it's Exhibit 302, that was

12:56 15  part of Mr. Bryant's initial -- what you saw as his initial

16    presentation at MGA; correct?

17    A.    Yes.

18    Q.    If we can go a few pages into that, Ken.

19              Keep going until I say "stop."

12:56 20              Here we go.

21              Go back to 4.

22              This is 302 B-00004.

23              And that's where Mr. Bryant talks about

24    interchangeable footwear, so you can see the -- the change in

12:57 25  the -- changed the look of the dolls; correct?
```

1    A.    Yes.

2    Q.    Now, in his drawing he has that little protuberance

3    coming from the shoe; correct?

4    A.    I'm not sure if it's a protuberance or just a little --

12:57 5    it doesn't have a "tip," as they say in engineering.

6    Q.    It's a -- a nub of some sort?

7    A.    It's just a straight line going out.

8    Q.    And what he was presenting to you, that's coming from

9    the shoe; correct?

12:57 10    A.    Yes, but it's a straight line.

11    Q.    And on the dolls themselves it comes from the leg;

12    correct?

13    A.    That's right.

14          MS. HURST:   Objection; vague as to which dolls.

12:57 15    Q.    BY MR. ZELLER:   On the Bratz dolls it comes from the

16    leg; correct?

17          MS. HURST:   Objection; vague as to which Bratz

18    dolls.

19    Q.    BY MR. PRICE:   The Bratz dolls that were released

12:58 20    starting in 2001 there is a protuberance coming from the leg;

21    correct?

22    A.    Yes.

23    Q.    Now, did you ever file a declaration yourself as to when

24    Bratz dolls appeared on the market, which had attachable

12:58 25    footwear where they had strap-type shoes and where the color

```
 1   of the leg, you know, matched the color of the skin that was

 2   on the strap shoes, did you ever file a declaration about

 3   that?

 4   A.   I thought that's the declaration you just showed me.

 5   Q.   Maybe I wasn't specific enough, and I apologize.

 6        Did you ever file a declaration about when Bratz

 7   dolls first came onto the market which had attachable shoes

 8   to the leg, which had strap-type shoes and where the color of

 9   the leg matched the color of the skin on the strap shoes?

10   A.   I might.  I don't recall it.

11   Q.   Sitting here today, you can't recall that you ever filed

12   such a declaration; correct?

13   A.   Again, I don't recall it one way or the other.  I might

14   have.

15   Q.   Well, let me show you Exhibit 11898.

16   A.   Are we going to go to the patent or --

17   Q.   I'm going to go to the declarations.

18   A.   Go ahead.

19   Q.   So you have 11898 in front of you?

20   A.   Yes, I do.

21   Q.   By the way, let me ask you, was it your understanding

22   that Mr. Bryant was a medical engineer?

23   A.   No.

24   Q.   I mean, he's an artist; right?

25   A.   He's a fashion designer.
```

Timestamps in left margin: 12:58 (line 5), 12:59 (line 10), 12:59 (line 15), 13:00 (line 20), 13:00 (line 25)

1   Q.   Well, he is someone who would be aware of the appearance

2   of the dolls rather than their mechanical workings; correct?

3   A.   Yes.

4   Q.   You, on the other hand, do have an engineering degree?

13:00  5   A.   I'm sorry?

6   Q.   You, on the other hand, do have an engineering degree?

7   A.   I do.

8   Q.   And have you seen this letter from Mr. Rose to

9   Mr. Bryant before?

13:00 10   A.   I saw it during this litigation in this court.

11   Q.   Did you understand when you were filing your patent

12   application that there was an issue as to when dolls were in

13   the market that had your invention, that is, that there was

14   an issue as to when were they first sold?

13:01 15   A.   The only issue that I remember was that that patent did

16   not get published.  I don't remember the details of it.

17   Q.   Well, actually, you remember -- you remember why -- you

18   remember why it was rejected; right?

19   A.   I'm sorry?

13:01 20   Q.   You remember why the patent office rejected the patent?

21   A.   I don't remember the exact detail.  One of them was the

22   product was in the market or prior art was in the market.

23   Q.   Your understanding was one of the reasons it was

24   rejected was because your invention was already in the market

13:01 25   as of 2001; correct?

```
 1    A.   I don't remember -- I don't know exact detail, but I

 2    know that one of them -- one of the reasons was that there

 3    was prior art.

 4    Q.   Well --

13:01  5    A.   As they call it in the -- in patents.

 6    Q.   Is it true that one of the reasons you remember it being

 7    rejected was because Bratz dolls, which had your invention --

 8    A.   Yes.

 9    Q.   -- were being sold in 2001?

13:02 10    A.   Absolutely.  One of Bratz' dolls with my invention were

11    being sold in 2001.

12    Q.   And it's your understanding that that's when the patent

13    office rejected the application; correct?

14    A.   I take your representation.

13:02 15    Q.   Did you -- do you recall ever filing a declaration,

16    swearing under oath, that Bratz dolls with your invention did

17    not come on the market until 2002?

18    A.   I don't.  I don't remember if I did or not.  I just

19    don't recall.

13:02 20    Q.   You would certainly be someone who would be aware of

21    that; right?

22    A.   Aware of what?  That I filed a declaration?  I have

23    filed many declarations.  I'm not aware of all of them.

24    Q.   Well, I had a bad question.

13:02 25         You would certainly have been aware of as to
```

1    whether or not Bratz dolls, which embodied your invention,

2    were on the market in 2001?

3    A.   Yes, I knew they were out in 2001.

4    Q.   So at some point you understood that if the Bratz dolls

13:03 5    were on the market in 2001 that you wouldn't get your patent?

6    A.   I was not aware of that.

7    Q.   Well, look at the letter that we have here to

8    Mr. Bryant -- and, by the way Mr. Rose wasn't Mr. Bryant's

9    attorney; right?

13:03 10    A.   No, he was MGA's attorney.

11    Q.   So he was acting on behalf of MGA when he wrote this

12    letter to Mr. Bryant; correct?

13    A.   Yes.

14    Q.   And you see on the third paragraph where it says:

13:03 15         "Our patent application was filed on February 24,

16    2003, so a release back in 2001 would be anticipatory" --

17    A.   Yes.

18    Q.   -- "while a release in the fall of 2002 would be within

19    the one-year grace period."

13:04 20         Do you see that?

21    A.   I do.

22    Q.   And you have some understanding as to what he was

23    talking about there?

24    A.   Again, this is the first time during this litigation I

13:04 25    have seen this letter and he is dead, so I don't know what

CV 04-9049 DOC - 02/09/2011 - Volume 2 of 3

```
 1   was in his head.  I'm talking about Alan Rose, not
 2   Carter Bryant.
 3   Q.   So at the time you filed the patent, though -- let's say
 4   in the August 2003 time frame, you had an understanding that
 5   if the dolls came out in 2001 with your invention, that that
 6   would be a problem.  But if they came out in 2002, there
 7   would be a grace period?
 8   A.   I did not have an understanding then.  I do now.
 9   Q.   So you believe that you didn't have that understanding
10   even though that was conveyed to Mr. Bryant?
11   A.   I'm not copied on this letter to Mr. Bryant, and if --
12   so I don't know what was in Mr. Alan Rose's head.  I mean,
13   I'm just looking at these.  If you look at Page 2, there is a
14   picture.  I don't know what does this have to do with any
15   patent?
16          I have no idea.
17   Q.   Well, you see that this -- that this was produced by
18   Mr. Bryant, where it says "Bryant 2"?
19   A.   Yes.  All of these pages say "Bryant," including Page 2.
20   Q.   Did you have an understanding that someone had to file a
21   statement with the patent office under oath that your
22   invention wasn't released in 2002, or else you weren't going
23   to get it -- the patent?
24   A.   At the time in 2003 I had no understanding of that.
25   Q.   Do you have an understanding of why the artist,
```

Case 2:04-cv-09049-DOC-RNB   Document 9864   Filed 02/14/11   Page 29 of 65   Page ID #:297736
CV 04-9049 DOC - 02/09/2011 - Volume 2 of 3

29

 1   Carter Bryant, wasn't listed as an inventor, but you were?

 2   A.   Because I invented the mechanism as an engineer that

 3   went into shoes.  Carter Bryant's design would not work.

 4   Q.   So you were probably the most qualified person to file

13:06 5   any declarations concerning the engineering aspect; correct?

 6   A.   Yes.

 7   Q.   And you were also probably one of the most knowledgeable

 8   people to file a declaration about when Bratz dolls came onto

 9   the market that had your invention; correct?

13:06 10  A.   Probably, yes.

 11   Q.   And as best as you can recall, you didn't file a

 12   declaration about when the dolls came onto the market with

 13   your invention; correct?

 14   A.   I don't know if I did or not.

13:06 15  Q.   But you understand that Mr. Bryant, the artist, was --

 16   or as you say, the fashion designer, was asked to file a

 17   declaration under oath that the Bratz dolls of the

 18   configuration that had your invention weren't released until

 19   the fall of the year 2002; correct?

13:07 20  A.   I'm sorry.  Why he was signing it is?  I don't know why.

 21   I don't know why Alan Rose sent it to him.  I have no idea.

 22   Q.   All you know is that he was the one asked to give a

 23   declaration under oath about that?

 24   A.   Per this letter, yes.

13:07 25  Q.   And if we look at Exhibit 502 --

1    A.    Yes, go ahead.

2    Q.    -- you can see that's Mr. Bryant's signed declaration,

3    if you look at the second page?

4    A.    It is.

13:07 5    Q.    Let me ask you this:  If you look at the third

6    paragraph --

7    A.    Yes.

8    Q.    -- where it says:

9          "I am familiar with the doll designs as shown in

13:08 10   the attached drawings from the above-identified patent

11   applications.

12          "These dolls have strap-type shoes, and the dolls

13   have a snap-on feature at about the ankle of the dolls so

14   that different footgear may be mounted on the doll.

13:08 15          "Regarding the strap-type shoes, as disclosed in

16   the patent application, the coloring of the skin tone on the

17   exposed areas of the feet are matched to the coloring of the

18   lower legs of the dolls" --

19          Do you see that?

13:08 20   A.    I apologize.  Yes.

21   Q.    And you have personal knowledge, you know that doll

22   designs, as described in that paragraph, were on the market

23   in 2001?

24   A.    Yes.

13:08 25   Q.    Okay.  So let's go to the next paragraph where

1    Mr. Bryant says:

2         "I was actively involved with the release of the

3    Bratz dolls, of the configuration as set forth in Paragraph 3

4    above, and this release did not occur until the fall of the

13:09 5    year 2002."

6         Do you see that?

7    A.   I do.

8    Q.   And you know from your own personal knowledge that that

9    is an incorrect statement?

13:09 10   A.   It is incorrect.

11   Q.   Now, do you have any understanding as to what

12   Carter Bryant would gain by giving that false statement under

13   oath?

14         MS. HURST:  Objection; calls for speculation.

13:09 15        THE COURT:  Overruled.

16         THE WITNESS:  Nothing.

17   Q.   BY MR. PRICE:  I mean, the patent that would be issued

18   would be yours; right?

19   A.   Yes, it is mine.

13:09 20   Q.   Well, the patent wasn't released; right?

21   A.   It wasn't, but the invention was mine.

22   Q.   So it's your invention; correct?

23   A.   Yes.

24   Q.   And if a patent is issued, it would be issued to you;

13:10 25   right?

UNITED STATES DISTRICT COURT

```
 1    A.    Yes.
 2    Q.    But the fact of the matter is you weren't willing to
 3    make a statement under oath that the release of Bratz dolls
 4    with that configuration did not occur until the fall of the
13:10 5    year 2002?
 6    A.    Your allegation is false, Mr. Price.  I was never asked.
 7    Q.    Yeah, well, let me ask it this way:  You would not sign
 8    a declaration under oath that dolls of the configuration
 9    described in Paragraph 3 were not on the market until 2002?
13:10 10   A.    I don't know if I would or not.  Usually I rely on my
11    lawyers to prepare declarations, and I don't read them much.
12    I rely on the lawyers, so I might have signed it.
13            If you're talking about hypothetical, if they're
14    put -- if they had put a declaration in front of me and it
13:10 15   says 2002, and I relied, and Alan Rose was a good lawyer,
16    even though later on at his age, I think he was over 90 years
17    old, I think he was getting a little bit fussy, but he was a
18    pretty good lawyer.  I relied on him.
19    Q.    So if a declaration was put before you where you were
13:11 20   saying something under penalty of perjury -- do you
21    understand what that is?
22    A.    I understand the penalty of perjury.  You have said it
23    many times.
24            MS. HURST:  Objection, Your Honor.
13:11 25           THE COURT:  Sustained.
```

1    Q.   BY MR. PRICE:  Let me ask you, do you have an

2    understanding as to what it means to say something under

3    "penalty of perjury"?

4            MS. HURST:  Objection; argumentative, Your Honor.

13:11  5        THE COURT:  Well, in relation to this document, you

6    can answer that.  I'm going to reverse that ruling.

7            You can answer that, sir.

8            THE WITNESS:  I understand as to this document,

9    with other documents, that when you sign something under

13:11 10   penalty of perjury you're saying that you're telling the

11   truth.

12   Q.   BY MR. PRICE:  And you understood, for example, in

13   connection with this declaration, that you're telling the

14   truth under penalty of fine or imprisonment or both if you're

13:11 15   not telling the truth?

16   A.   Well, this is not my declaration and I didn't look under

17   imprisonment, et cetera.  I have seen other declarations that

18   have a clause, but it doesn't say "imprisonment."

19           But basically what I'm saying to you is my practice

13:12 20   is, I'm a busy man.  I have lawyers who I pay a lot of money

21   to.  I rely on them.  They prepare my declarations based on

22   the information that they get.

23           And do they make mistakes sometimes?  Absolutely.

24   Q.   BY MR. PRICE:  Your lawyer would have to rely on you in

13:12 25   connection with whether or not Bratz dolls were on the market

 1    in 2001 with the invention that you were applying for;

 2    correct?

 3    A.    On me or other people at MGA, our legal office, a lot of

 4    people.

13:12 5    Q.    I mean, lawyers have to be given the facts from their

 6    clients; correct?

 7    A.    Yes.

 8    Q.    And I think you said that you might sign a declaration

 9    like this under penalty of perjury without reading it?

13:13 10   A.    It has happened, yes.  I have signed -- not this one --

 11    this is not mine -- but what I'm saying to you is that I have

 12    signed declarations before that I haven't read.

 13           I've relied on my lawyer to have all the facts.

 14           And have they made mistakes?  Yes.  We're all

13:13 15   humans.  We make mistakes.

 16    Q.    You wouldn't consider it your mistake if you signed a

 17    declaration under penalty of perjury that was false?

 18    A.    At the end, if it's my signature on it, it's my -- my

 19    mistake.

13:13 20   Q.    It would --

 21    A.    I'm not perfect.

 22    Q.    Signing something under penalty of perjury is kind of a

 23    big deal, isn't it?

 24           MS. HURST:  Objection; argumentative.

13:13 25           THE COURT:  Overruled.

Case 2:04-cv-09049-DOC-RNB   Document 9864   Filed 02/14/11   Page 35 of 65   Page ID #:297742
CV 04-9049 DOC - 02/09/2011 - Volume 2 of 3

35

```
 1              You may answer it.
 2              THE WITNESS:  It is a big deal.
 3    Q.  BY MR. PRICE:  It's not like just sending an e-mail to
 4    someone; right?
13:14 5    A.  No.  It's a declaration and it's under penalty of
 6    perjury.
 7              But I -- I am saying to you is whether it's me or
 8    Carter Bryant or Bill Price, we all make mistakes.
 9    Q.  Well, I'm talking about a specific area, not whether we
13:14 10   make mistakes in other areas of our life, because we all do.
11    But I'm talking about signing declarations under penalty of
12    perjury.
13              Okay.  So that's the topic; you understand that?
14    You understand?
13:14 15   A.  Yes.
16    Q.  All right.  And -- and you understand that signing a --
17    a written document under penalty of perjury, your
18    understanding is that's the same effect as taking the oath
19    that you took when you took the stand; right?
13:14 20   A.  Yes, sir.
21    Q.  And I guess what you're saying is that taking that same
22    oath in connection with a declaration, you're somewhat
23    cavalier about whether or not you make the statement?
24    A.  No, Mr. Price.  I'm talking about if somebody put 2001
13:15 25   or 2002 or I saw an e-mail where somebody put 1999 or 1990.
```

Case 2:04-cv-09049-DOC-RNB   Document 9864   Filed 02/14/11   Page 36 of 65   Page ID #:297743
CV 04-9049 DOC - 02/09/2011 - Volume 2 of 3

36

```
 1    These are mistakes that happen.  It's part of human nature.

 2              Maybe you're perfect, but I have made those

 3    mistakes.

 4    Q.   So what you are saying is that you have made false

 5    statements under penalty of perjury?

 6    A.   I have not made false statements --

 7              MS. HURST:  Argumentative, Your Honor.

 8              THE COURT:  Overruled.

 9              THE WITNESS:  Let me put it this way:  I have never

10    intentionally made any false statement under the penalty of

11    perjury.

12              THE COURT:  Now, Counsel, you're referring to this

13    document or generally?

14              MR. PRICE:  I'm following up on his statement that

15    if he were asked to sign this, he might have signed it.

16              THE COURT:  Okay.

17              THE WITNESS:  And I told you it's possible.  I'm

18    just giving you a hypothetical.  And the same thing true

19    about Carter Bryant.  I don't think the poor guy knew what he

20    was signing.

21    Q.   BY MR. PRICE:  On August -- on August 11, 2003, would

22    you have signed, under penalty of perjury, a statement to be

23    filed with the US patent office that your invention was not

24    on the Bratz dolls until the fall of the year 2002?  Would

25    you have done that?
```

1    A.    Intentionally I would not have done that.

2    Q.    And so if this declaration, Exhibit 502, had been

3    presented to you -- and if you look at it, it's four

4    paragraphs; right?

13:16 5    A.    Yes.

6    Q.    It doesn't go on forever and ever; right?

7    A.    It doesn't.

8    Q.    So if this had been presented to you in August of 2003

9    you wouldn't have signed it because you would have seen that

13:17 10    it was false?

11    A.    No, sir.  As I explained to you, I don't know if I would

12    have or not, because mistakes can happen.  If he had put 2002

13    instead of 2001 in there, I might -- I might have signed it,

14    not intentionally.  Definitely I would not have signed it

13:17 15    to -- for you to sue me.

16    Q.    So are you saying that this inaccurate declaration

17    signed by Mr. Bryant was somehow your attorney's fault?

18    A.    No.  I'm saying I don't know.  Alan Rose is dead, and I

19    don't know why he put that in here and why did Carter Bryant

13:18 20    sign it.  I really don't.  I have no knowledge of that.

21    Q.    What you do know is that the date 2001/2002 was critical

22    as to whether or not you, Isaac Larian, would get ownership

23    rights to the patent application; correct?

24    A.    Today I know.  And as you know well, that patent,

13:18 25    whether this is 2002 or 2001, did not issue.  It's -- it did

1    not issue.  You know that; right?

2    Q.   I do.  But you were trying to get it to issue; right?

3    You were trying to get a patent?

4    A.   Yes, we were trying to get a patent.

13:18  5    Q.   And in trying to get a patent, you knew that the date

6    that's identified as to when those dolls are first sold was a

7    critical date; correct?

8    A.   I did not know at the time.  I did not sign this

9    declaration.  I gave it to Alan Rose and the lawyers to

13:19 10    handle.

11    Q.   So this is a -- another situation that you were saying

12    to your lawyers, It's up to you?

13    A.   I'm not going to argue with you, sir.  I just testified

14    what I have best.  If you have another question, please ask

13:19 15    me.

16    Q.   Do you take any responsibilities as to what is filed

17    with the US patent office with your signature on it under

18    oath?

19    A.   Yes.  I -- the buck stops with me at the end, even if

13:19 20    there is a mistake.

21    Q.   And you understand that if you sign a declaration under

22    penalty of perjury the punishment is you going to

23    imprisonment, not your attorney?

24         MS. HURST:  Objection, Your Honor.  That assumes

13:19 25    facts not in evidence about the definition of perjury, the

```
 1    elements that have to be proved, what would be required for

 2    somebody to go to prison.

 3            That seems a lot.

 4            THE COURT:  Well, we can -- we can cut out the

 5    prison, but it's an appropriate question.

 6            Just reask it.

 7    Q.   BY MR. PRICE:  You understand that the person who would

 8    be subject to some sort of penalty would be you, if you said

 9    something under penalty of perjury that was found to be

10    intentionally false?

11    A.   Yes.

12    Q.   And what happened in 2003 is that Mr. Bryant was willing

13    to sign such a statement, but you weren't?

14    A.   That's not correct, sir.  I was not -- I don't know -- I

15    don't remember if I even was asked.  I don't know if maybe I

16    did sign.  I don't even know if I was asked to sign something

17    like that or not.

18            The bottom line is that this patent was never

19    issued.

20    Q.   Well, Mr. --

21    A.   Why is it such a big issue in this case is a puzzle for

22    me.  Go ahead.  I'm sorry.

23    Q.   It didn't issue because the patent office caught it.

24    The patent office looked at that time and saw the dolls were

25    out in 2001; correct?
```

1    A.    Yes, they did.

2    Q.    So the attempt to mislead them from the declaration

3    didn't work?

4              MS. HURST:  Objection; argumentative.

13:21  5       THE COURT:  The part that's argumentative is the

6    attempt to mislead; but you can ask the question, Counsel.

7              Now, you don't know, Ladies and Gentlemen, if that

8    is or isn't.  The question shouldn't suggest the answer.  By

9    the same token, I'll let counsel ask the question.  You'll be

13:21 10   the judge.

11   Q.    BY MR. PRICE:  It's your understanding that the patent

12   office rejected the patent because they found that, in fact,

13   the dolls were released in 2001; right?

14   A.    That's right.

13:21 15  Q.    And you knew that all along?

16   A.    I knew that --

17              MS. HURST:  Argumentative.

18              THE COURT:  Overruled.

19              You can answer the question:  Did you know that all

13:21 20  along?

21   Q.    BY MR. PRICE:  Did you know that all along that the

22   dolls with your invention were released in 2001 and not 2002?

23   A.    I did.  I said that a few times.

24   Q.    And Mr. Rose also assisted you with a patent request for

13:22 25  packaging?

```
 1    A.    Yes.

 2    Q.    And did you rely on him for -- for that?

 3    A.    No.  I gave him all the information.

 4    Q.    Okay.  So did you rely on Mr. Rose in connection with

13:22 5    what statements you made under oath in connection with the --

 6    the -- the trapezoidal packaging?

 7    A.    No.  This was information from me.

 8    Q.    Okay.  So if you would look at Page -- Exhibit 615.

 9          MS. HURST:  Your Honor, objection.  This exhibit is

13:22 10   irrelevant.

11          THE COURT:  Overruled.

12          THE WITNESS:  Go ahead.

13    Q.    BY MR. PRICE:  And you see this is a -- a filing that

14    was made on your behalf with the US patent office concerning

13:23 15   transparent display packaging?

16    A.    Yes.

17    Q.    And that there is a declaration you signed on the sixth

18    page?

19    A.    Correct.

13:23 20         MR. PRICE:  Your Honor, I move Exhibit 615 into

21    evidence.

22          THE COURT:  Received.

23          (Exhibit(s) 615, received.)

24    Q.    BY MR. PRICE:  And if you look at the first page you'll

13:23 25   see it says, "Applicant:  Isaac Larian."
```

UNITED STATES DISTRICT COURT

1    A.    Yes.

2    Q.    And the title is, "Transparent display packaging."

3          Do you see that?

4    A.    Yes.

13:23 5  Q.    And, by the way, this was a patent that was issued?

6    A.    Yes, a design patent.

7    Q.    And -- and by "design patent," what do you mean?

8    A.    It's not utility.  I mean, do you want to take the time

9    to educate everybody what's "utility" versus "design"?

13:23 10          I think some people on the jury know -- do

11   understand what's a design or a utility patent.

12   Q.    Okay.  Well, you described it.  I just wanted to make

13   sure we use the same definition.

14          So it's kind of an aesthetic look?

13:24 15  A.    Yes.

16   Q.    And if we look at Pages 3 and 4 and 5, there are

17   drawings of the design?

18   A.    Yes.

19   Q.    And then on Page 6 there is a declaration and petition.

13:24 20          Do you see that?

21   A.    Yes, there is.

22   Q.    And that's your signature at the bottom?

23   A.    Yes, it is.

24   Q.    And it begins with:

13:24 25          "As a below-named inventor, I hereby

```
 1   declare that" --
 2           Do you see that?
 3   A.   I do.
 4   Q.   And the second paragraph is:
13:24  5           "I believe I am the original, first and sole
 6   inventor" --
 7   A.   That's correct.
 8   Q.   And it goes on:
 9           -- "or an original, first and joint inventor (if
13:24 10  plural names are listed below)."
11           Do you see that?
12   A.   Yes.
13   Q.   And the last paragraph says:
14           "I hereby declare that all statements herein of my
13:25 15  own knowledge are true and that all statements made on
16   information and belief are believed to be true?"
17           Do you see that?
18   A.   I do.
19   Q.   And it again states that:
13:25 20           "These statements were made with the knowledge that
21   willful, false statements and the likes so made are
22   punishable by fine or imprisonment."
23           Do you see that?
24   A.   I do.
13:25 25  Q.   So you understood that this declaration is the same oath
```

1    you're taking when you take the stand here?

2    A.    Yes, sir.

3    Q.    And that then has the signature of the full name of the

4    sole or first inventor, which is Isaac Larian; correct?

13:25  5    A.    I do.  Yes, I see that.

6    Q.    And at the time you signed this you knew that wasn't

7    true?

8    A.    I was not the sole inventor of this.  That's true.

9    That's a mistake.  I was one of the other inventors.  The

13:25 10    name of the other inventors should have been in this document

11    and they are not.

12    Q.    Well, let me ask you, how was this invented?  What was

13    the history of how the trapezoidal packaging was invented?

14    A.    We were looking for different packagings for Bratz,

13:26 15    different ideas.  We were brainstorming all over the company.

16    We had hired, I believe, two or three firms to give us

17    packaging idea and, intentionally, at the end, I believe

18    Aileen Storer -- that's my recollection, either Aileen Storer

19    or Rachel Harris came with the trapezoidal look of the

13:26 20    doll -- of the -- of the package.

21    Q.    And we've heard Ms. Storer's name before.

22          In your recollection she's the one who came with

23    the idea of this trapezoidal packaging; correct?

24    A.    Either she or Rachel Harris together.  I don't remember

13:26 25    exactly.  But they were for sure those two people were part

CV 04-9049 DOC - 02/09/2011 - Volume 2 of 3

1    of it.

2    Q.    So if you're going to assign, "this person was more an

3    inventor than this person," Aileen Storer would be at the top

4    of the list?

13:27 5    A.    Or Rachel -- I think they came -- it was a

6    collaboration.

7    Q.    It wasn't you?

8    A.    For the -- for the shape, the look of the trapezoid?

9    Absolutely it wasn't me.

13:27 10    Q.    And your understanding is that this patent application

11    was for the -- I think you put it, the design, the

12    aesthetics?

13    A.    Yes.

14    Q.    And so you say it was a mistake to say you were the sole

13:27 15    inventor?

16    A.    It is a mistake.

17    Q.    Okay.  For one thing, you understood when you made this

18    application as the sole inventor, that if and when the patent

19    was issued it would be just in your name, you would have the

13:27 20    sole rights to collect royalties, for example, or to get paid

21    if someone used this sort of design?

22    A.    Yes.  And Mattel has used it and they haven't paid us

23    royalties; but that's okay.

24    Q.    So was it your mistake when you signed this declaration

13:28 25    under penalty of perjury that you were the first -- the sole

| | |
|---|---|
| 1 | or first inventor? |
| 2 | A.   Yes, it is my mistake. |
| 3 | Q.   So this is not something which you blame Mr. Rose for? |
| 4 | A.   I don't blame Rose.  He's dead. |
| 13:28 5 | Q.   Well, even if he were alive you still would not blame |
| 6 | him for it; right? |
| 7 | A.   I wouldn't blame him even if he was alive.  He was a |
| 8 | nice man. |
| 9 | Q.   And the reason you wouldn't blame him is because he was |
| 13:28 10 | taking information from you, that is, he was relying on his |
| 11 | client to get the facts? |
| 12 | A.   Yes, in this regard he was.  It was a mistake.  I don't |
| 13 | know why Eileen or Rachel's name was not mentioned here. |
| 14 | It's a mistake. |
| 13:28 15 | Q.   Okay.  Well, the reason Eileen or Rachel's name wasn't |
| 16 | mentioned here was because you didn't tell that to Mr. Rose? |
| 17 | A.   Apparently I did not. |
| 18 | Q.   Now, when did you first learn that you made this |
| 19 | mistake? |
| 13:29 20 | A.   When, I think, Mr. Zeller or you guys took me in the |
| 21 | deposition and started asking me questions about it. |
| 22 | Q.   And -- and -- and do you recall how long ago that was? |
| 23 | A.   I don't. |
| 24 | Q.   So I take it that by today this has been amended? |
| 13:29 25 | A.   No.  I gave the instruction to my lawyers to handle.  I |

          1    don't know if it has or not.

          2          But right after the first trial I did give

          3    instructions to my lawyers to go ahead and make sure it's

          4    corrected.  I don't know if they have or not.

13:29     5          I was told -- I don't think it can be for whatever

          6    technical reason.

          7    Q.   So it went from --

          8    A.   I hope I didn't disclose attorney-client privilege.

          9    Q.   So it went from 2002 through 2008 before you instructed

13:30    10    lawyers to correct the mistake?

         11    A.   Well, no, actually, it went from when, I believe,

         12    Mr. Zeller made it an issue at my deposition or something.

         13    That's when I found out.  It was definitely after 2004, when

         14    you filed the lawsuit.

13:30    15          MS. HURST:  Your Honor, this is definitely going to

         16    go into the area of attorney-client privilege for sure.

         17          THE COURT:  Concerning Mr. Rose?

         18          MS. HURST:  No.  I'm talking about what Mr. Larian

         19    was advised about the ability to correct that patent by

13:30    20    current counsel.

         21          THE COURT:  I agree, Counsel.

         22          MR. PRICE:  I don't plan to go into it.

         23          THE COURT:  He does not plan to go into it,

         24    Counsel.

13:30    25          MS. HURST:  He just did.

```
 1              MR. PRICE:  No, I --

 2              THE COURT:  Just a moment.

 3              Which portion would you like stricken?

 4              MS. HURST:  The portion -- the questions and

13:31  5   answers on whether it could be corrected, what he was told.

 6              THE COURT:  Ladies and Gentlemen, you are to strike

 7    the portion concerning what he was told and if it can be

 8    corrected.

 9    Q.    BY MR. PRICE:  So it's clear, though, that you don't

13:31 10   blame Mr. Rose for either Mr. Bryant's statement or the

11    changeable footwear or your statement in connection with the

12    packaging; correct?

13    A.    No.  I want him to rest in peace.  I don't blame him.

14    Q.    Let's give him the benefit of the doubt.  Let's assume

13:31 15   if he were alive today, you still would not blame him;

16    correct?

17    A.    I would not.  He's a nice gentleman.

18    Q.    Well, not just that, but he's relying on you for the

19    facts; right?

13:31 20   A.    Yes, he is.

21    Q.    And so you can't blame him if he does something relying

22    on you for the facts, based on what you told me; correct?

23    A.    I would not.

24    Q.    Yesterday when I was asking you about MGA's contracts

13:32 25   with its employees, the confidentiality and inventions
```

CV 04-9049 DOC - 02/09/2011   Volume 2 of 3

```
 1    agreement, do you recall that you made the statement that
 2    your belief was you didn't own the employees?  Do you recall
 3    that?
 4    A.   My statement the same today.  We don't own the
13:32 5    employees.
 6    Q.   And your statement was that even though the contract
 7    says that MGA has the rights to designs if they are done on
 8    weekend or nights if they relate to MGA's business, your
 9    personal belief was that that should not be appropriate;
13:32 10   correct?
 11   A.   My personal belief is that we don't own people who we
 12   pay for certain hours a day who we can fire at any time.  We
 13   don't owe them -- we don't own them, especially gifted
 14   designers.  If they are doing something on their own time
13:33 15   that has nothing to do with the job, the specific job that
 16   we've given them to do, that is my belief.
 17   Q.   And that, I guess, enlightened belief, was what you
 18   thought in August/September of 2000?
 19   A.   Yes.
13:33 20        MS. HURST:  Objection; argumentative.
 21   Q.   BY MR. PRICE:  That belief --
 22        MS. HURST:  Objection; argumentative.
 23        THE COURT:  Sustained.
 24   Q.   BY MR. PRICE:  That belief is what you had in the
13:33 25   August/September time period; isn't that right?
```

| | |
|---|---|
| 1 | A.    That's always my belief. |
| 2 | Q.    Let me show you Exhibit 1352, which is already in |
| 3 | evidence. |
| 4 | THE COURT:  Is that the MGA agreement, Counsel? |
| 13:33  5 | MR. PRICE:  That's the MGA agreement that was |
| 6 | circulated to the employees. |
| 7 | Do I have the wrong number? |
| 8 | I may have given the court the wrong number, |
| 9 | although you still knew what I was talking about. |
| 13:34 10 | How did you do that? |
| 11 | Let me find out what it is. |
| 12 | I was told it's actually 13620. |
| 13 | THE COURT:  13620. |
| 14 | MR. PRICE:  I'm told that's wrong too.  So let's -- |
| 13:35 15 | I'll get the brain trust together here. |
| 16 | THE COURT:  Would this be a good time for a brief |
| 17 | recess? |
| 18 | MR. PRICE:  It would be a wonderful time. |
| 19 | THE COURT:  It's a perfect time for recess. |
| 13:35 20 | You are admonished not to discuss this matter |
| 21 | amongst yourselves, nor form or express any opinion |
| 22 | concerning the case.  Have a nice recess. |
| 23 | We'll take a couple recesses. |
| 24 | And that way, Counsel, you can find that without |
| 13:35 25 | the jury. |

Case 2:04-cv-09049-DOC-RNB   Document 9864   Filed 02/14/11   Page 51 of 65   Page ID #:297758
CV 04-9049 DOC - 02/09/2011 - Volume 2 of 3

51

```
 1              (Open court - jury not present.)

 2              THE COURT:  All right.  Counsel, when the big hand

 3    it on the 10:00 I will reopen the doors again.

 4              (Recess taken.)

13:50  5              THE COURT:  All right.  The jury's present, all

 6    counsel are still present, the parties, Mr. Larian is on the

 7    witness stand and, Mr. Price, if you'd like to continue, sir.

 8              (Open court - jury present.)

 9                   DIRECT EXAMINATION RESUMED

13:50 10   BY MR. PRICE:

11    Q.   Mr. Larian, apparently it is Exhibit 13532.

12              And you see this is an e-mail from Michele Thompson

13    to all MGA employees?

14    A.   Yes.

13:51 15   Q.   Could you tell us who Michele Thompson is?

16    A.   I believe she was a human resource person at the time.

17    Q.   And you see the date of this memo is August 10, 2000?

18    A.   Yes.

19    Q.   And that was before the meeting you described with

13:51 20   Mr. Bryant?

21    A.   Yes.

22    Q.   And you see it says:

23              "Attached please find the newly revised MGA

24    Entertainment Confidentiality Agreement."

13:51 25              Do you see that?
```

```
 1   A.   I do.
 2   Q.   And that's one of two agreements that are attached to
 3   this document?
 4   A.   Yes.
13:52  5   Q.   And then No. 2, the new Proprietary Information
 6   Agreement; do you see that?
 7   A.   Yes.
 8   Q.   And it says:
 9        "Please read this document carefully and sign when
13:52 10   finished"?
11   A.   Yes.
12   Q.   And Ms. Thompson says:
13        "Please return the signed forms to me no later than
14   August 21, 2000."
13:52 15        Do you see that?
16   A.   Yes.
17   Q.   And if we look at the first agreement, there is a
18   Confidentiality and Inventions Assignment Agreement.
19        Do you see that?
13:52 20   A.   Yes.
21   Q.   And if you look at Page 4, 13532-0004 we see your
22   signature; right?
23   A.   Yes.
24   Q.   So this was sent to all MGA employees with your
13:52 25   signature already on it; correct?
```

UNITED STATES DISTRICT COURT

1    A.    Yes.

2    Q.    And if we look at Page -- Page 5, 13532-0005, you see

3    there's the Proprietary Information Agreement --

4    A.    Yes.

13:53 5    Q.    -- and if you look at the last page of that, that's your

6    signature; correct?

7    A.    Yes.

8    Q.    And you date it there, July 25th, 2000?

9    A.    Yes.

13:53 10    Q.    And around August 10th, 2000, this was sent to all of

11    the MGA employees; right?

12    A.    I believe so, yes.

13    Q.    And it caused quite an uproar?

14    A.    I don't remember if it caused an uproar or not, but

13:53 15    there were people -- I remember some people not being happy

16    about it.

17    Q.    Well, these were agreements that you signed, reviewed

18    and approved before you sent it out?

19    A.    I don't know if I reviewed or approved before it was

13:53 20    sent out, but I did sign them.

21    Q.    Well, your understanding was that these were the

22    agreements that were then going to govern the legal

23    obligations from the employees to MGA?

24    A.    Yes.

13:54 25    Q.    And if you'd look at Page 3, 13532-0003, and this is

```
 1   part of the revised Confidentiality Agreement?

 2   A.   Yes.

 3   Q.   And if you'd look at the last paragraph, one of the

 4   things you asked of the employees -- and this is -- or a

13:54  5   quote:

 6            "Employee further agrees that during his/her

 7   employment and for a period of 12 months after termination,

 8   employee will not solicit the purchase of any products or

 9   services from any supplier or vendor who supplies products or

13:54 10   services to the company."

11            Do you see that?

12   A.   I do see that.

13   Q.   So what this would mean, for example, is that there are

14   some vendors who supply services to a number of toy

13:55 15   companies; correct?

16   A.   That's correct.

17   Q.   Anna Rhee is an example of that.  She would do face

18   painting for Bratz, for MGA, and she also sometimes would do

19   face painting for other companies; correct?

13:55 20   A.   She does face painting for Mattel and sometimes she does

21   it for other companies.

22   Q.   And she did the face painting for Bratz?

23   A.   That's correct.

24   Q.   So if an employee of MGA left and went to another

13:55 25   company, then, under this proposed agreement that employee
```

```
 1    couldn't ask Anna Rhee to provide services to the new
 2    company?
 3    A.    Under this proposed agreement -- proposed agreement,
 4    you're right.
13:55 5    Q.    And this proposed agreement is the one that you signed
 6    on Page 4; correct?
 7    A.    Yes, that's my signature on it.  Right.
 8    Q.    And you understand that that could cause a problem for
 9    someone who wanted to leave MGA and join another toy company,
13:56 10   that they couldn't use the vendors or purchase any products
 11   or services from a supplier who supplied products or was a
 12   vendor to MGA?
 13   A.    If this contract was in effect, you're 100 percent
 14   right; but this is just a proposed agreement.
13:56 15   Q.    Well, if we look at the cover, 13522-0001 --
 16   A.    Yes.
 17   Q.    -- the cover doesn't say it's a proposed agreement, does
 18   it?
 19   A.    It doesn't, no.
13:56 20   Q.    In fact, it says, "read the document carefully and sign
 21   it when you're finished"; right?
 22   A.    Yes.
 23   Q.    So we've talked about your understanding of the existing
 24   confidentiality and inventions agreement, that is, what you
13:56 25   thought the company did or did not own; correct?
```

Case 2:04-cv-09049-DOC-RNB   Document 9864   Filed 02/14/11   Page 56 of 65   Page ID #:297763
CV 04-9049 DOC - 02/09/2011 - Volume 2 of 3

56

1    A.    Yes.

2    Q.    But at the same time you thought it was appropriate to

3    ask your employees to -- for a year period -- not use the

4    same suppliers or vendors who supplied anything to MGA;

13:57  5    right?

6    A.    No, it was not appropriate.

7    Q.    But that's what you sent to the employees to sign after

8    putting your signature on it?

9    A.    Yes.

13:57 10    Q.    And you understood that if -- if an employee did that,

11    basically they wouldn't be able to get a job at another toy

12    company?

13    A.    This agreement never went into effect.  It was wrong.

14    It was withdrawn.  And this -- this agreement, the way I

13:57 15    understand, is not enforceable.

16    Q.    The reason it was withdrawn is because there was an

17    incredible uproar?

18    A.    No.  In my mind, this agreement -- when somebody brought

19    it to my attention and I finally read it, was wrong.  You

13:58 20    cannot do that, and it was withdrawn immediately.  Not one

21    person at MGA ever signed this agreement.  Not one.

22    Q.    It's because your management came to you and said this

23    would eliminate us from the industry.  We will never sign

24    this; right?

13:58 25    A.    Some people came to me, brought to my attention that

1   this agreement is overbroad and they will not sign it.

2   Q.   And they had good reason not to sign it because if they

3   did they would be restricted from working in the toy industry

4   for about a year because of its restrictions; right?

13:58 5   A.   They had great reasons not to sign it.

6   Q.   By the way, on the fourth page you see you have a

7   section which is "assignment of interest" --

8   A.   Yes.

9   Q.   And that's the same provision you had under your other

13:58 10   contracts; right?

11   A.   I don't know.  I haven't compared it line by line.  But

12   if you say it's the same, I accept that.

13   Q.   Now, if you look at 13532-0005, that's the Proprietary

14   Information Agreement that Ms. Thompson directed the

13:59 15   employees to read and sign; correct?

16   A.   It is.

17   Q.   And if we look at 13532-0006, you see there is a -- a

18   provision, No. 3, which is nonsolicitation of customers,

19   clients, and vendors.

13:59 20        Do you see that?

21   A.   I do.

22   Q.   And if you look at the paragraph it's one, two, three,

23   four, five, lines down.  It begins with "accordingly":

24        "Accordingly, for one year following the

13:59 25   termination of employee's employment with the company for any

1    reason, employee shall not directly or indirectly solicit,

2    induce, or attempt to solicit or induce any person or entity

3    then known to be a customer or client or vendor of the

4    company for whom, or on whose behalf, employee, during the

14:00  5    three-year period immediately preceding the termination of

6    the employee's employment:  a) performed any work or services

7    or, b) participated in the preparation of any proposal to

8    provide any work or services (refers that to a restricted

9    customer client/vendor)."

14:00 10         Basically what this says is if you worked for a

11    client at MGA and you go somewhere else, you can't work for

12    that same client at another toy company; right?

13    A.    This proposed agreement say that.

14    Q.    And you knew this went out?

14:00 15    A.    I can see it went out.  I don't personally know it went

16    out or not because it doesn't show.  It's not an e-mail or

17    something, but I'm sure it went out.  I accept that it --

18    that it went out from the face of it.

19    Q.    And if you look at Paragraph 4, that's on Page -0007

14:01 20    where it says:

21         "During employee's employment with the company and

22    for one year thereafter, employee shall not directly or

23    indirectly solicit, induce, or attempt to solicit or induce,

24    any person known to employee to be an employee of the company

14:01 25    who directly or indirectly engages in business on behalf of

Case 2:04-cv-09049-DOC-RNB   Document 9864   Filed 02/14/11   Page 59 of 65   Page ID #:297766
CV 04-9049 DOC - 02/09/2011 - Volume 2 of 3

59

1    the company."

2          Do you see that?

3    A.   I do.

4    Q.   And -- and this provision, for example, if Mattel had

14:01 5    had such a provision, would have prohibited -- let me --

6    would have prohibited Mattel from trying to get someone to

7    come join Mattel; correct?

8    A.   I'm sorry.  Say that again?

9    Q.   Let me rephrase that.

14:02 10         What you're saying here is that if someone leaves

11   your company and joins another company, they can't then try

12   to hire someone from your company?

13   A.   That basically this provision of this proposed agreement

14   says that.

14:02 15   Q.   And so if Mattel had had such a provision, for example,

16   then, Paula Garcia could not have left Mattel and then tried

17   to convince Carter Bryant to work for MGA; right?

18         MS. HURST:  Objection, Your Honor; calls for a

19   legal conclusion.

14:02 20         THE COURT:  Sustained, Counsel.

21   Q.   BY MR. PRICE:  Just your understanding of what this

22   means.

23         MS. HURST:  Objection; irrelevant.

24         THE COURT:  Just ask him his understanding again,

14:02 25   but not the comparison of people in the case.

```
 1   Q.   BY MR. PRICE:  So your understanding is the way this

 2   would apply to MGA, to their employees, that if an MGA person

 3   left to work at any competing toy company --

 4   A.   Such as Mattel, for example.

14:02 5   Q.   -- such as Mattel, then that person at Mattel couldn't

 6   try to get other employees to join them; correct?

 7   A.   Again, the reading of this, yes; but I don't think it's

 8   enforceable.  I think this contract was a mistake.  It was

 9   withdrawn.  Nobody signed it.

14:03 10   Q.   So this -- this -- this was, what you've described as

11   another mistake?

12   A.   It is -- this --

13            MS. HURST:  It's argumentative.

14            THE COURT:  Overruled.

14:03 15            THE WITNESS:  This contract is not enforceable,

16   sir.

17   Q.   BY MR. PRICE:  This contract was delivered to all MGA

18   employees with your signature?

19   A.   Yes.

14:03 20   Q.   At the time this was delivered to your employees for

21   their signature, at that very time MGA employees were

22   appropriately, legally trying to get Mattel employees --

23   their friends -- to join MGA?

24   A.   I don't know about the time, but I don't see anything

14:03 25   wrong with one company trying to recruit people from another
```

Case 2:04-cv-09049-DOC-RNB  Document 9864  Filed 02/14/11  Page 61 of 65  Page ID #:297768
CV 04-9049 DOC - 02/09/2011 - Volume 2 of 3

61

```
 1    company.  Not in America.

 2    Q.   Well, this provision would have prevented that?

 3    A.   Again, this -- in my mind, this provision is not

 4    enforceable and it's a mistake.  I don't know who drafted

14:04 5    this.  Probably not a very good lawyer, but I don't want to

 6    go there.

 7    Q.   So when you said that -- recently, that you don't own

 8    your employees, we can look at this document that you signed

 9    and sent out to kind of get an understanding as to what you

14:04 10   meant by that?

11            MS. HURST:  Objection; argumentative.

12            THE COURT:  I don't understand the question,

13    Counsel.

14            Sustained.

14:04 15   Q.   BY MR. PRICE:  This contract -- this proposed contract

16    which you signed and had sent out to your employees, this

17    fits with your definition of that you don't own your

18    employees; is that right?

19            MS. HURST:  Objection; argumentative.

14:05 20           THE COURT:  I don't understand the question.

21            I'm going to sustain the question, Counsel.

22    Q.   BY MR. PRICE:  Yesterday, do you recall testifying --

23            THE COURT:  Counsel, you can ask again.  It may

24    just be my inability.  I apologize.

14:05 25           MR. PRICE:  I'm trying to think of a better way to
```

UNITED STATES DISTRICT COURT

```
 1    ask it so I'm going to go on until it comes to me.
 2              THE COURT:  I'm not precluding you from it.  I just
 3    didn't understand.
 4              I apologize.
14:05 5         MR. PRICE:  I think Mr. Quinn will hand me a note
 6    eventually.
 7              (Laughter.)
 8    Q.  BY MR. PRICE:  Mr. Larian, yesterday you testified
 9    that -- about MGA hiring Mattel employees who were fired or
14:05 10   laid off.
11              Do you remember that testimony?
12    A.  I'm sorry?  Yes.  They had hired Mattel employees who
13    worked at Mattel and were fired, were laid off, and we were
14    also trying to recruit people from Mattel, if we can.
14:06 15   Q.  What you said yesterday, though, is that you would hire
16    people from Mattel who were fired or laid off.
17              Do you recall that?
18    A.  No.  I put that as one of the categories.
19    Q.  And, actually, there was another category, which was you
14:06 20   were trying to hire people from Mattel who were excellent,
21    who were doing quite well at Mattel?
22    A.  Absolutely.
23    Q.  In fact, your view was don't wait for people to lay off,
24    you should be aggressively recruiting from inside Mattel?
14:06 25   A.  Absolutely.
```

```
 1   Q.   And you sent e-mails to -- first let me ask you, who is

 2   Mary Claire Tiffany?

 3   A.   She was, at one time, in our human resources.

 4   Q.   And you, for example, sent her communications saying,

14:06  5   you know, focus on the people who -- who are the Mattel

 6   stars?

 7   A.   Yes.

 8   Q.   And just to see if this is an example of that, if you

 9   could look at 11856-0001.

14:07 10        (Pause in the proceedings.)

11   Q.   BY MR. PRICE:  And do you recognize 11856 as an e-mail

12   that you sent to Ms. Tiffany around November of 1999?

13   A.   Yes.

14             MR. PRICE:  Your Honor, I move Exhibit 11856 into

14:08 15   evidence.

16             THE COURT:  Received.

17             (Exhibit(s) 11856, received.)

18   Q.   BY MR. PRICE:  And if you look at the first page, that's

19   you sending Ms. Tiffany an e-mail around November 20, 1999;

14:08 20   correct?

21   A.   Yes.

22   Q.   And if we look at the second page it says:

23             "Kami doesn't think Mattel will have any more

24   layoffs until February."

14:08 25             Do you see that?
```

1    A.    Yes.

2    Q.    And then what's typed underneath, is that your response?

3    A.    Probably.  Yes, actually, I see my name on the end.

4    Q.    And it says, "why are we waiting for a layoff?  They

14:09  5   don't lay off their stars.  We should aggressively recruit

6    from inside Mattel.  People are looking to move out."

7            And then it said "Isaac"; right?

8    A.    It does.

9    Q.    And this sort of thing was Mattel would not have been

14:09 10   able to recruit your stars if they had signed Exhibit 13532?

11           MS. HURST:  Objection; calls for speculation and a

12   legal conclusion.

13           THE COURT:  Overruled.

14           THE WITNESS:  I don't know if they could or not.

14:09 15           Again, that contract was withdrawn.  It was a

16   proposed contract.  It's not enforceable.  My understanding

17   is people are free to move from one job to another, and there

18   is nothing wrong to recruit from MGA, recruiting from Mattel,

19   or Mattel recruiting from MGA.  That's free enterprise.

14:09 20   Q.    BY MR. PRICE:  Well, your understanding was that your

21   proposed contract, 13532, would have thwarted what you call

22   "free enterprise" because an employee at MGA, employee for

23   Mattel, would not have been able to solicit an employee from

24   MGA?

14:10 25   A.    Yeah, that's why I withdrew it.

1            (Proceedings concluded at 14:10 on 02-09-2011.

2   Next proceedings reported by Jane Sutton.  Proceedings

3   concluded until Wednesday, February 9, 2011, 2:11 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25