1           **UNITED STATES DISTRICT COURT**

2           **CENTRAL DISTRICT OF CALIFORNIA**

3          **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4                    - - - - - - -

5

6   MATTEL, INC., ET AL.,              )
                                       )
7              Plaintiffs,             )
                                       )
8       vs.                            ) No. CV 04-9049-DOC
                                       )    Day 15
9   MGA ENTERTAINMENT, INC., ET AL.,   )    Volume 3 of 3
                                       )
10             Defendants.             )
    _____)

11

12

13

14

15         REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                    Jury Trial

17               Santa Ana, California

18            Wednesday, February 9, 2011

19

20

21

22   Jane C.S. Rule, CSR 9316
     Federal Official Court Reporter
23   United States District Court
     411 West 4th Street, Room 1-053
24   Santa Ana, California 92701
     (714) 558-7755
25
     11-02-09 MattelV3

Case 2:04-cv-09049-DOC-RNB   Document 9865   Filed 02/14/11   Page 2 of 116   Page ID #:297774
CV 04-9049-DOC - 02/09/2011 - Day 15, Vol. 3 of 3

2

1    **APPEARANCES OF COUNSEL:**

2

3    FOR PLAINTIFFS MATTEL, INC., ET AL.:

4              QUINN, EMANUEL, URQUHART & SULLIVAN
               By:   JOHN B. QUINN
5                    MICHAEL T. ZELLER
                     WILLIAM PRICE
6                    Attorneys at Law
               865 South Figueroa Street
7              10th Floor
               Los Angeles, California 90017-2543
8              (213) 443-3000

9

10   FOR DEFENDANTS MGA ENTERTAINMENT, INC., ET AL.:

11             ORRICK, HERRINGTON & SUTCLIFFE, LLP
               BY:   THOMAS S. MC CONVILLE
12                   Attorney at Law
               4 Park Plaza
13             Suite 1600
               Irvine, California 92614
14             (949) 567-6700

15             - AND -

16             ORRICK, HERRINGTON & SUTCLIFFE, LLP
               BY:   ANNETTE L. HURST
17                   Attorney at Law
               405 Howard Street
18             San Francisco, California 94105
               (415) 773-5700

19             - AND -

20
               KELLER RACKAUCKAS, LLP
21             BY:   JENNIFER L. KELLER
                     Attorney at Law
22             18500 Von Karman Avenue
               Suite 560
23             Irvine, California 92612
               (949) 476-8700

24

25

```
1    APPEARANCES OF COUNSEL (Continued):

2

3    FOR DEFENDANT CARLOS GUSTAVO MACHADO GOMEZ:

4              SCHEPER, KIM & OVERLAND, LLP
               BY:  ALEXANDER H. COTE
5                   Attorney at Law
               601 West Fifth Street
6              12th Floor
               Los Angeles, California 90071
7              (213) 613-4660

8              - AND -

9              LAW OFFICES OF MARK E. OVERLAND
               BY:  MARK E. OVERLAND
10                  Attorney at Law
               100 Wilshire Boulevard
11             Suite 950
               Santa Monica, California 90401
12             (310) 459-2830

13

14   Also Present:

15             ISAAC LARIAN, MGA CEO

16             KEN KOTARSKI, Mattel Technical Operator

17             MIKE STOVALL, MGA Technical Operator

18             RACHEL JUAREZ, Quinn Emanuel Urquhart & Sullivan

19             KIERAN KIECKHEFER, Orrick Herrington & Sutcliffe

20             WARRINGTON PARKER, Orrick Herrington & Sutcliffe

21

22

23

24

25
```

1                                    **I N D E X**

2

3

4                                 **EXAMINATION**

5

6   **Witness Name**         **Direct**    **Cross**    **Redirect**    **Recross**

7   LARIAN, ISAAC
       By Mr. Price                          5

8

9

10

11                                   **EXHIBITS**

12

13  **Exhibit**                         **Identification**      **Evidence**

14  Plaintiffs' No. 1762                                          25

15  Plaintiffs' No. 7052                                          54

16  Plaintiffs' No. 8629                                          48

17  Plaintiffs' No. 8936                                          50

18  Plaintiffs' No. 11269                                          7

19  Plaintiffs' No. 13382                                         13

20  Plaintiffs' No. 13606                                          7

21  Plaintiffs' No. 23727                                         63

22  Plaintiffs' No. 23728                                         61

23  Plaintiffs' No. 23729                                         64

24  Plaintiffs' No. 23730                                         65

25

```
 1              SANTA ANA, CALIFORNIA, WEDNESDAY, FEBRUARY 9, 2011

 2                       DAY 15, VOLUME 3 OF 3

 3                            (2:10 p.m.)

 4           (Live reporter switch with Denise Paddock.)

 5           (The following proceedings is taken in the

 6       presence of the jury.)

 7           ISAAC LARIAN, PLAINTIFF'S WITNESS, CONTINUED

 8                  DIRECT EXAMINATION (Continued)

 9   BY MR. PRICE:

10   Q    So you withdrew it because after you sent it out, you

11   had a crisis of conscience or --

12   A    No.  People brought -- I had not paid attention to this

13   agreement when I signed it and sent it back, I don't know

14   who prepared it.  People in the company brought this to my

15   attention.  When I read it, I just said -- I don't want to

16   say the bad words, but we withdraw it.

17   Q    Do the provisions in 13532, what you signed and were

18   sent out to your employees, do those provisions, are they

19   consistent with your view that, quote, "We don't own our

20   employees"?

21   A    We don't own our employees.  Mattel doesn't own their

22   employees.  This is a free enterprise in America.

23   Q    If you could look at -- consistent with your notion of

24   free enterprise, it is okay to seek Mattel employees, right?

25   A    It is.
```

Case 2:04-cv-09049-DOC-RNB   Document 9865   Filed 02/14/11   Page 6 of 116   Page ID #:297778
CV 04-9049-DOC - 02/09/2011 - Day 15, Vol. 3 of 3

6

1    Q    And you would do that in connection with, for example,

2    the Bratz project?

3    A    Excuse me?

4    Q    You would do that in connection with, for example, the

5    Bratz project?

6    A    What's in connection?

7    Q    You would seek Mattel employees to come and help, to

8    join MGA and help on the project?

9    A    Yes, there is -- there is nothing wrong with it.

10   Q    All right.  For example, if you look at 11269.

11   A    Yes.

12   Q    And do you see this as an e-mail you sent to Chris

13   Lynch around June of 2001?

14   A    It is.

15   Q    Could you tell us who Chris Lynch is?

16   A    She's a friend of mine.

17   Q    Did she work in -- at MGA?

18   A    No, she did not.

19   Q    And -- what was -- do you know where she was working in

20   June of 2001?

21   A    New York.  She has her own company.

22   Q    What kind of company was it?

23   A    She makes -- she makes adult toys, I guess.

24   Q    And if you --

25         MR. PRICE:  Your Honor, I move Exhibit 11269 into

1   evidence.

2           THE COURT:  Received.

3           (Plaintiffs' Exhibit No. 11269 is received in

4       evidence.)

5   BY MR. PRICE:

6   Q    And on June 21, 2001, you are telling her, "Hope all is

7   well.  We've got a hot one with Bratz dolls.  Desperately

8   looking for a good, experienced doll product manager so

9   Paula can focus on Bratz.  Do you know a good one from

10  Mattel or Toys Biz or Playmate"; do you see that?

11  A    Yes.

12  Q    Again, that's free enterprise, that's okay?

13  A    It is okay.

14  Q    And if you look at 13606, March 1, 2001.

15       And this is an e-mail sent to you from Martin Hitch on

16  March 1, 2001?

17  A    It is.

18  Q    And who was Martin Hitch?

19  A    He was head of international sales at MGA, and at one

20  time he used to work at Mattel.

21          MR. PRICE:  Your Honor, I move Exhibit 13606 into

22  evidence.

23          THE COURT:  Received.

24          (Plaintiffs' Exhibit No. 13606 is received in

25      evidence.)

```
 1   BY MR. PRICE:

 2   Q    And if we could look at the e-mail below the top one,

 3   it's from actually Patrick Williams to you and Dennis

 4   Medici; do you see that?

 5   A    Yes.

 6   Q    And who was Patrick Williams?

 7   A    He was head of sales.

 8   Q    And he --

 9   A    He also used to work at Mattel at one time.

10   Q    It says, "Dennis, I will be in the office the rest of

11   the week.  We should get together as soon as possible and

12   discuss what is needed here.  I suggest that we pull in any

13   Mattel people from marketing, Lon would be great.  Let me

14   know when we can meet and discuss.  This is a critical piece

15   to managing the profit picture for the company."

16        Do you see that?

17   A    I do.

18   Q    And this was before the Bratz dolls hit the market,

19   correct?

20   A    This is dated March, you're right, yes.  "Market," you

21   mean the retail shelves, that's right.

22   Q    And what was your understanding when Mr. Williams

23   suggested that they pull in any Mattel people from market?

24   A    Go recruit from Mattel.

25   Q    Do you know who they are referring to with Lon?
```

1    A    Lon Ross.

2    Q    And is that someone who was recruited from Mattel?

3    A    I don't know if he was at Mattel or Nickelodeon, I

4    don't remember.  I think he was at Nickelodeon, not Mattel.

5    Q    Now, we talked about, I think Mr. Williams and

6    Mr. Hitch.  Let me ask you this:  One of the issues that

7    came up once you began to put your resources on the Bratz

8    project, was one of the issues that came up that was sort of

9    hindering the development was your management style, right?

10   A    No.  My management style is my management style, but I

11   have been successful in my business, and some people like my

12   management style, some people don't.  I have employees who

13   have been working for me for 30 years, and I have employees

14   who come and leave in three months.

15   Q    Do you recall there being a meeting with a couple of

16   your top guys where they were upset with your management

17   style?

18   A    I don't recall.  There could have been.  I don't recall

19   the meeting.

20   Q    Okay.  Well, let me show you first Exhibit 13382.

21   A    Go ahead.

22   Q    And do you have 13382 in front of you?

23   A    I do.

24   Q    And is this an e-mail that you sent toward the end of

25   the year in 2001?

1    A    I did.

2             MR. PRICE:  Your Honor, I move Exhibit 13382 into

3    evidence.

4             MS. KELLER:  Objection, your Honor.  This is

5    completely irrelevant.

6             THE COURT:  Yeah, I'm going to sustain the

7    objection, Counsel, if this goes to management style.  I

8    don't see the relevance.

9             Both of you appreciate the Court's management

10   style?

11            MR. PRICE:  I do.

12            *(Laughter.)*

13            THE COURT:  Thank you, Counsel, for appreciating

14   the Court's management style.

15            MR. QUINN:  Very well, your Honor.

16            THE COURT:  Thank you very much, Mr. Quinn.  I

17   appreciate it.

18            Now let's move on.

19   BY MR. PRICE:

20   Q    Let me ask this:  Was it your policy that if you didn't

21   put it in writing, you didn't say it?

22            MS. KELLER:  Same objection, your Honor.  It's

23   irrelevant.

24            THE COURT:  The management style and how, you

25   know, character comes into evidence or whether people are

CV 04-9049-DOC - 02/09/2011 - Day 15, Vol. 3 of 3

11

```
 1    blessed or not, I'm going to sustain the objection.
 2              MR. PRICE:  And I'm not asking about --
 3              THE COURT:  That goes to Bratz, you know, et
 4    cetera, so be it, but not in terms of management style.
 5    BY MR. PRICE:
 6    Q    Could you tell us who Dennis Medici was?  I think you
 7    told us yesterday.
 8    A    A CFO.
 9    Q    Didi Brown?
10    A    My secretary.
11    Q    Were there -- in January of 2001, how many -- what
12    percentage of people in MGA were working on Bratz?
13    A    I don't know.
14    Q    You've said a few times that you didn't read some of
15    the e-mails you got, correct?
16    A    I don't read them completely.  I get 4-, 500 e-mails.
17    Usually I don't read long e-mails.
18    Q    So was it your practice to see the first part of it, to
19    just go to something that interested you or to skim it?
20    A    I don't have a specific practice.  Basically if I'm
21    cc'd on an e-mail, usually I just skim it and press delete.
22    Q    So did you tell your employees that if you didn't
23    respond in writing to something, that you didn't approve it?
24              MS. KELLER:  Your Honor, this is the same
25    objection, the same area, management style.
```

```
 1              THE COURT:  Just a moment.

 2              Overruled.  You can talk about e-mails, whether he

 3    reads them or not, how concise he is.

 4    BY MR. PRICE:

 5    Q    So was it your policy with respect to getting these

 6    e-mails and responding to them, that if you didn't respond

 7    in writing, you didn't approve it?

 8    A    That's not -- I don't have a policy like that.

 9    Q    Did you have a policy in respect to the way you made

10    your decisions, looking at these e-mails, that if you didn't

11    put it in writing, you didn't say it?

12    A    I don't have a policy like that.

13    Q    Did you have that policy in January 31, 2000?

14    A    I don't have a policy like that.

15              MR. PRICE:  Your Honor, I would re-move into

16    evidence 13382.

17              MS. KELLER:  Same objection, your Honor.

18              THE COURT:  Can I see that for a moment?

19              MR. PRICE:  You may.

20              THE COURT:  Let the record reflect also, the

21    Court's looked at all of the exhibits, but the numbers

22    sometimes, I can't match up quickly enough until I see the

23    document once again, so I appreciate both counsel helping

24    the Court with that.

25              Well, Counsel, now it's received, and you can ask
```

CV 04-9049-DOC - 02/09/2011 - Day 15, Vol. 3 of 3

13

1    the question.

2              (Plaintiffs' Exhibit No. 13382 is received in

3         evidence.)

4              MR. PRICE:  Thank you.

5              If we could put up 13382.

6    BY MR. PRICE:

7    Q    So this is from you to all in marketing and PD, that's

8    product development?

9    A    Yes.

10   Q    And also everybody in sales?

11   A    Yes.

12   Q    Mr. Medici and Didi Brown?

13   A    Yes.

14   Q    And I take it the first sentence there is a joke,

15   right?

16   A    Yes.  The subject is a joke also.

17   Q    The "My Alzheimer's disease"?

18   A    Yes.

19   Q    And you say, "Please note that I have been diagnosed

20   with having Alzheimer's and I don't remember anything

21   anymore"; do you see that?

22   A    I do.

23   Q    And then you say, "So if it's not in writing, I did

24   not," all caps, "approve it; I did not say it; whatever!"

25        Do you see that?

1    A    I do.

2    Q    And that part you weren't joking about, were you?

3    A    I was joking, but I was also serious because people

4    were spending money left and right, especially marketing and

5    product development, and going around and saying, "Hey,

6    Isaac approved it, Isaac approved it."  I just wanted

7    to make sure -- send the message that don't do that.

8    Q    Because you had a great deal of involvement in

9    decisions that MGA made?

10   A    I have a great deal of involvement in decisions MGA

11   makes.

12   Q    You were a -- what you would consider a hands-on CEO?

13   A    I am a hands-on CEO in the areas that interest me.

14   Q    And how big was MGA, say in the 2000, 2001 time frame?

15   A    I think we had about 100, 150 employees.

16   Q    And you described it as being a fairly small group of

17   employees, correct?

18   A    Yes, a hundred compared to Mattel with 26,000, yes,

19   it's small.

20   Q    And you, at this time, at least as of January 31, 2001,

21   were still very involved in what was going on at MGA with

22   your hundred or so employees, right?

23   A    I was very involved, I am a very involved CEO.

24   Q    And your employees, once they received this, basically

25   said you have to delegate some more responsibility here to

1   us?

2   A    I don't remember.

3   Q    Do you recall Mr. Hitch and Mr. Williams meeting with

4   you to say that you really can't be this involved?

5   A    I do recall a meeting with Mr. Hitch or Mr. Williams

6   regarding my Alzheimer's.

7   Q    No, I'm talking about -- not about the joke but the

8   second line where you were serious?

9   A    I do not recall.

10  Q    Well, let me see if this refreshes your recollection.

11  If you'd look at 13626.

12            MS. KELLER:  Your Honor, we are going to have the

13  same objection to this.  This is again going to management

14  style, all these questions are.

15            THE COURT:  Thank you.  Would you bring me that

16  exhibit, please.

17            And Counsel, this evening, once again, will you

18  research Exhibit Number 3842 compared to Exhibit 33846, the

19  one with 47,200 and give me a brief by 8:00, just kidding

20  you, Counsel.  I just want to see the exhibit matching up

21  with the number.

22            MR. PRICE:  And your Honor, I don't intend to

23  introduce this into evidence.

24            THE COURT:  Well, there will still be an objection

25  to relevancy, trust me.  So just a moment.

```
 1              You can ask about the document, Counsel.
 2    BY MR. PRICE:
 3    Q    Do you have 13626 in front of you?
 4    A    I do.
 5    Q    And do you recall that in connection -- in response to
 6    your directive that Mr. Williams and Mr. Hitch had a meeting
 7    with you to -- to say that there was a problem that every
 8    decision has to be sanctioned by you?
 9    A    No.
10    Q    Do you remember any complaints from any of your
11    employees that there's a problem that every decision has to
12    be sanctioned by you?
13    A    No.
14    Q    Was that what you were trying to convey by your
15    Alzheimer's disease e-mail which is, every decision has to
16    be sanctioned by you?
17    A    No.  I was trying to tell people, please, don't spend
18    money left and right and say, "Hey, Isaac approved it."
19    Q    Do you recognize Exhibit 13626 as being produced from
20    the MGA files?
21    A    It is.  It says MGA Bate on it.  I don't recall this
22    e-mail or I don't think it's even an e-mail, it's just a
23    piece of document which I don't believe I've ever seen
24    before.
25    Q    So this was something that was in your files but you
```

1   don't recall seeing?

2   A    That's correct.  Not in my files but apparently in MGA

3   files.

4   Q    I'm going to leave this for now.

5        Would you agree that without Mr. Bryant coming to you

6   and showing you the designs, that MGA would not have done

7   Bratz?

8   A    Well, I'm not so sure.  We would not have done the

9   dolls that were based on his inspiration based on his

10  drawings, but I am not so sure we would not have done Bratz.

11  The name Bratz was out in the public since, I believe, 1996,

12  at least, since I remember.

13  Q    Well, I'll -- I'll ask it a little bit differently,

14  then.  If Mr. Bryant hadn't brought you the designs which he

15  called Bratz, then you agree you would not have done --

16  produced a doll with the oversized head, the oversized feet,

17  you know, with the unique characteristics of Bratz?

18  A    No, that's not correct.  We would not have done the

19  dolls that have similarities to Mr. Bryant's drawings, but

20  at that time and many years before that, there has been

21  dolls, Bly, et cetera, I can name a number of them,

22  Powerpuff Girls, I can go through a whole list, if you'd

23  like, that had big head, big eyes, big lips, big shoes, big

24  feet, so --

25  Q    I'm sorry, I didn't mean to interrupt your answer.  Go

CV 04-9049-DOC - 02/09/2011 - Day 15, Vol. 3 of 3

18

1    ahead.

2    A    So I'm trying to be precise.  It's very possible we

3    could have done a doll line and call it Bratz, but nothing

4    that would have looked something like this, like the doll

5    samples that we have here.

6    Q    I think what you said is that you were trying for two

7    years to come up with a fashion doll and you had failed to

8    come up with anything?

9    A    Yes, we hadn't come up with anything before, that's

10   correct.

11   Q    And in fact, you didn't have in your files or anywhere

12   in MGA even proposed fashion doll designs, correct?

13   A    We had proposed fashion doll designs from Saipan, and

14   some of those, like one, I think it was called either

15   Gearhead dolls or PC -- PC Girls, they had some big lips,

16   big eyes, we just hadn't chosen those.

17   Q    Well, as of September 2000, you hadn't made the

18   decision to put the company's resources behind any fashion

19   doll, correct?

20   A    Yes, 100 percent correct, you're right.

21   Q    And prior to September 2000, you had never seen a

22   fashion doll design that you liked?

23   A    You're right, I did not.

24   Q    And you thought that what Mr. Bryant showed you was

25   unique?

1    A    It was different, yes.

2    Q    And once you started working on the designs, your

3    belief was that the Bratz product was unique in all the

4    marketplace, correct?

5    A    The Bratz product at MGA finally developed and put in

6    the market, yes, those are very unique and different.

7    Q    Well, even before anything was in the market, you

8    recognized that the Bratz designs were unique?

9    A    You are talking about Carter Bryant's drawings, is that

10   what you are talking --

11   Q    I'm sorry, I'm talking about whatever designs you had

12   as of March 2001?

13   A    As of March 2001, I think we had already had some

14   mockup samples, et cetera, but as of September 1, 2000, when

15   Carter Bryant came to MGA, the only thing we had was his

16   drawings in his pitch book, and I did not believe those can

17   be made to a doll the way they were.

18   Q    Prior to September of 2000, when Mr. Bryant presented

19   you with his designs, prior to then --

20   A    Yes.

21   Q    -- did MGA have any plans to introduce a design of a

22   doll with big eyes, pronounced lips where the head and feet

23   were oversized?

24   A    I don't recall if we did or not.

25   Q    And your view was that the growth of the Bratz product,

CV 04-9049-DOC - 02/09/2011 - Day 15, Vol. 3 of 3

20

1   the sales of the Bratz design came at the expense of Mattel?

2   A    Came at the expense of Mattel?  What do you mean by

3   that?

4   Q    Well, let me step back.  I believe your testimony is

5   that you got the idea of -- to look for a fashion doll when

6   a Walmart buyer said they wanted a Barbie killer?

7   A    Yes.  Killing -- I am not sure he called it a Barbie

8   killer.  He said -- he just didn't want to buy anything from

9   me, so he said you bring in something that competes with

10  Barbie, call me again, and I took it as a challenge.  That

11  was in 1998.

12  Q    Aren't the words you used is that he wanted a Barbie

13  killer?

14  A    I might have used that.  It's very possible.

15  Q    And you think those are the words he used?

16  A    I don't know if he used it or I used it.  It's

17  irrelevant.

18  Q    And in any event, once Bratz did go in the market, your

19  belief is that came at the expense of Mattel sales?

20  A    No.  As a matter of fact, I think Bratz dolls grew the

21  fashion doll market as a whole, because until we introduced

22  Bratz, Barbie was only sold to a core demographic of girls

23  between the ages of four to six, and when we came with

24  Bratz, we basically expanded the pie.

25  Q    If you'd look at Exhibit 630.

```
 1    A    Of course, if we take -- it's a doll business, so we

 2   did take some business from Mattel; there is no question.

 3    Q    Do you have 630 in front of you?

 4    A    I do.

 5    Q    This is another one of those interviews that are done

 6   by sending you questions and then you writing out the

 7   answers?

 8    A    Yes.

 9    Q    And this is in connection with License Europe magazine?

10    A    I believe it is, yes.

11         MR. PRICE:  And is 630 already in evidence?

12         MR. STOVALL:  Yes.

13         MR. PRICE:  This is already in evidence.

14   BY MR. PRICE:

15    Q    Sir, if you'd look at the first page.

16    A    Yes.

17    Q    And there is a question, "How did Bratz evolve"; do you

18   see that?

19    A    Yes.

20    Q    And your answer is, "They evolved as a challenge by a

21   Walmart buyer to design and bring a product that will beat

22   Barbie"; do you see that?

23    A    That's right.

24    Q    And so in this response, you use the word "beat" in

25   connection with what you're trying to come up with?
```

Case 2:04-cv-09049-DOC-RNB   Document 9865   Filed 02/14/11   Page 22 of 116   Page ID #:297794
CV 04-9049-DOC - 02/09/2011 - Day 15, Vol. 3 of 3

22

1    A    That's right.

2    Q    And if you'll go to the second page, there is a

3    question, "How has the Bratz phenomenon affected your

4    company and how will it impact the company and toy business

5    long term"; do you see that?

6    A    Where is that again?

7    Q    I think --

8    A    Yes, okay.

9    Q    And your response was, "MGA was growing 30 to

10   40 percent per year prior to Bratz.  This growth was fueled

11   by product innovation.  With Bratz, the growth has been more

12   than 200 or 300 percent.  The toy business as a whole does

13   not grow more than 2 percent per year, so our growth is

14   coming at the expense of other toy companies like Mattel."

15   A    Yes.

16   Q    And that was the answer you gave in June 30, 2003,

17   correct?

18   A    I did.

19   Q    Let me go into some detail about what you did after you

20   met with Mr. Bryant in September to try to develop the Bratz

21   concept.

22   A    Should I put --

23   Q    Pardon me?

24   A    Should I put this aside?

25   Q    Yeah, it's probably better.

1      Now, there came a time after October 4 where Mr. Bryant

2   signed that contract, right?

3   A    He signed it October 4.

4   Q    And then at that time, you sent out what's been

5   identified as Exhibit 15, if we can put that in front of

6   you.

7   A    I'm sorry, I sent out Exhibit 15?

8   Q    Yeah.  Is that in front of you?  I'm sorry.  I've got

9   the wrong number here.  If we can do Exhibit 16789.  It's a

10  somewhat different binder.

11             MR. PRICE:  Sorry, Rachel.

12             THE WITNESS:  Go ahead.

13  BY MR. PRICE:

14  Q    And so this is an e-mail that you sent out on

15  October 5th, 2000, correct?

16  A    I did.

17  Q    And the bottom is an e-mail from you to Mr. Bryant and

18  Ms. Garcia, Victoria O'Connor, correct?

19  A    Yes.

20  Q    And this says, "Now that we have the agreement in

21  place, we need you and Paula to focus 200 percent on getting

22  this done"; do you see that?

23  A    I do.

24  Q    "Think different, think the fashion, think and design

25  the accessories, think about the commercial, think about the

1    New York showroom presentation, paren, we are thinking of

2    catwalk, think about all of the royalty you are going to

3    make," that's what you put in caps, right?

4    A    I did.

5    Q    And then you say, "This is your big break in business

6    life.  I have put my whole resources, money, people,

7    development, et cetera, on this to make your dream happen

8    because I believe in young people's dream," and then it goes

9    on to say, "Now it is up to you."

10        Do you see that?

11   A    Yes.

12   Q    Now, as of October 5th, 2000, all you had was the

13   designs that Mr. Bryant had shown you at the beginning of

14   September of 2000, right?

15            MS. KELLER:  Asked and answered, your Honor.

16            THE COURT:  Overruled.

17            THE WITNESS:  Yes.

18   BY MR. PRICE:

19   Q    And based upon that, based just on these designs, you

20   were putting your whole resources, money, people and

21   development, behind making this happen, correct?

22   A    Yes.

23   Q    And you were asking Mr. Bryant to think about a

24   commercial, his ideas about a commercial?

25   A    Yes.

CV 04-9049-DOC – 02/09/2011 – Day 15, Vol. 3 of 3

25

1    Q    You were telling him to think and design the

2    accessories, correct?

3    A    Yes.

4    Q    And at this point, you began putting your resources

5    behind the Bratz project, correct?

6    A    Yes.

7    Q    Now, if you'd look at Exhibit 1762.

8         THE COURT:  What was the number again?  I'm sorry.

9         MR. PRICE:  1762, your Honor.

10        THE COURT:  Thank you.

11        THE WITNESS:  Yes, go ahead.

12        MR. PRICE:  I believe this is already in evidence,

13   your Honor.

14        THE COURT:  No.  It's re-received.

15        MR. PRICE:  Thank you.

16        *(Plaintiffs' Exhibit No. 1762 is received in*

17        *evidence.)*

18   BY MR. PRICE:

19   Q    And you see this is an e-mail of October 6th, just a

20   day later, to Mr. Bryant and Ms. Garcia?

21   A    Here's the response to his e-mail on the bottom.

22   Carter Bryant sends an e-mail at the bottom of this e-mail;

23   do you see that?

24   Q    Yes.

25   A    And then this is my response to that e-mail.

1  Q    And the response re the Bratz, where it says, "Carter,

2  you are very creative, and I believe this line if done with

3  focus and strategic thought will be huge"; do you see that?

4  A    Yes.

5  Q    And then there's a sentence about meeting with Paula

6  ASAP, correct?

7  A    Yes.

8  Q    And then there's, "Also, Mercedeh will be starting at

9  MGA next Tuesday"; do you see that?

10  A    Yes.

11  Q    And then you say, "Thanks."

12       So Mercedeh Ward was being hired by MGA around this

13  time --

14  A    Yes.

15  Q    -- to work on this Bratz project, right?

16  A    And other things.

17  Q    And she was the engineer who lived in L.A.?

18  A    That's correct.

19  Q    Or who was going to work in L.A., anyway, right?

20  A    She lives in L.A.  She still lives in L.A.

21  Q    And as of October 6th, 2000, again, all you had were

22  the designs that Carter Bryant had shown to you in September

23  of 2000, right?

24  A    We had those drawings.

25  Q    Now, I think we said, one of the things that you wanted

1   to do with Bratz was create a brand, right?

2   A    Yes.

3   Q    And that was something that you decided you wanted to

4   do back in September, right?

5   A    I don't remember, but I wanted to make a brand.

6   Q    And back when you had your early communications with

7   Mr. Bryant, you said that you were going to be the one that

8   made the brand happen; do you remember that?

9   A    Yes, I do.

10  Q    And if we can look at 11276.

11  A    Go ahead.

12         MR. PRICE:  And I believe this is in evidence as

13  well, your Honor.

14  BY MR. PRICE:

15  Q    Do you see there is an e-mail at the bottom from you to

16  everyone in product development talking about brainstorming,

17  developing the 2002 line, about dolls, you see all that,

18  correct?

19  A    Yes, it goes on.

20  Q    And if you'd look at the e-mail response from

21  Ms. Garcia, "What about the line extension to Bratz"; do you

22  see that?

23  A    Yes.

24  Q    And your response was, "Yes, everything"?

25  A    Yes, and "yes, everything" means that if you look at

Case 2:04-cv-09049-DOC-RNB   Document 9865   Filed 02/14/11   Page 28 of 116   Page ID #:297800
CV 04-9049-DOC - 02/09/2011 - Day 15, Vol. 3 of 3

28

1    that e-mail at the bottom, I was telling all of the people

2    in product development in L.A. and Hong Kong to start

3    brainstorming about all of MGA products, sports activity,

4    dolls, games, feature plush, small toys, music, others.

5         And she was asking what about line extension to Bratz,

6    and I said yes, everything, everything means everything that

7    MGA makes.

8    Q    Well, one of the things you were conveying here,

9    though, was that you wanted toys plus accessories, line

10   extensions for the Bratz concept, right?

11   A    No, we were talking about everything that MGA makes.

12   She was talking about line extension to Bratz such as, for

13   example, we came up with four dolls first, okay, are we

14   going to extend it next year, are we going to have six, are

15   we going to have a car, are we going to have playhouse,

16   that's what she was talking about.  And I said yes, those

17   are also included.  When I said yes, everything, that means

18   the dolls are also included.

19   Q    So in this e-mail, when you are talking about the

20   extension, you are talking about character, fashions,

21   accessories, et cetera, for -- for the Bratz line?

22   A    That portion about Bratz?  Yes.

23   Q    So by this point, 11276, this is October 16th, you're

24   already thinking that you were going to try to develop this

25   brand and include the characters, fashions, accessories,

Case 2:04-cv-09049-DOC-RNB   Document 9865   Filed 02/14/11   Page 29 of 116   Page ID #:297801
CV 04-9049-DOC - 02/09/2011 - Day 15, Vol. 3 of 3

29

1    things of that nature, right?

2    A    Yes, for the next year line, for 2002.

3    Q    And at this point, you're basing that on Mr. Bryant's

4    concept, the designs you got in December 2000, correct?

5    A    We're basing it on the contract that we signed and paid

6    $48,000 for to get, that now we are going to exploit that

7    contract.

8    Q    And what you had seen by that point were the designs?

9    A    What we had seen by that time were the drawings that

10   Carter Bryant had shown us on his pitch book.

11   Q    If you'd look at 1107, 1108, 1109, 1110, this is what

12   we referred to as the fashion drawings.

13   A    I'm sorry?

14   Q    If you look at 1107, 1108, 1109, 1110.

15   A    Yes.

16   Q    You've seen those before, right?

17   A    I have.

18   Q    Do you recognize those as being the final fashion

19   drawings for -- that were used in the first four Bratz

20   dolls?

21   A    I don't know if they were or not.  I'm sure -- I know

22   that there were changes constantly all the way to 2001 to

23   the final fashions, so I'm not sure if that was a final or

24   not.  And I have seen a lot of documents to that effect

25   preparing for this testimony.

Case 2:04-cv-09049-DOC-RNB   Document 9865   Filed 02/14/11   Page 30 of 116   Page ID #:297802
CV 04-9049-DOC - 02/09/2011 - Day 15, Vol. 3 of 3

30

1   Q    Well, one of the things that you've seen are the dolls

2   themselves that came out in 2001, right?

3   A    I have for sure seen those.

4   Q    And if you look at those dolls, they appear to have the

5   fashions that you see in 1107, 1108 --

6   A    Can you show me the doll with the fashion so I can tell

7   you the similarities and differences?

8   Q    Sure.

9        MR. PRICE:  Let's look at, if you have 504 up

10  there, Ms. Juarez, or whichever doll is handy.  Pick a doll,

11  any doll.

12       MS. KELLER:  Your Honor, I would object.  This is

13  irrelevant.

14       THE COURT:  I think concerning similarities and

15  differences, Counsel?

16       MR. PRICE:  Pardon?

17       THE COURT:  Concerning similarities and

18  differences?

19       MR. PRICE:  Concerning that this is what they base

20  the doll on, the fashions.

21       THE COURT:  This is the first generation?

22       MR. PRICE:  Yes.

23       THE COURT:  Well, you know my concern about

24  similarities.

25       MR. PRICE:  I do.

```
 1              THE COURT:  How can we resolve that so --

 2              MR. PRICE:  The question now is, is this the same

 3    fashions?

 4    BY MR. PRICE:

 5    Q    So do you see Jade, there, in Exhibit 504?

 6    A    Yes, I do.

 7    Q    I think you have --

 8    A    It's not Jade.  It's Sasha.

 9    Q    Sasha.  I said grab a doll, any doll, and apparently

10    that happened.

11         What exhibit number do we have --

12    A    17558.

13    Q    Thank you.

14              THE COURT:  And that would be Sasha?

15              THE WITNESS:  Right.

16              Go ahead.

17    BY MR. PRICE:

18    Q    And so those appear to be the final fashions that made

19    their way onto the doll, correct?

20    A    On this here?

21    Q    Yes.

22    A    Yes, that's the final fashion production sample.

23    Q    And if you look at 1236.

24    A    Is that --

25    Q    That is another document.
```

```
 1              THE COURT:  What was the number again?  I'm sorry.

 2              MR. PRICE:  Your Honor, it's 1236.

 3              THE COURT:  Thank you.

 4   BY MR. PRICE:

 5   Q    And you see that the top part of this is an e-mail from

 6   you to Ms. Garcia, Cecilia Kwok and others?

 7   A    Yes.

 8   Q    And if you look at the e-mail below that from

 9   Ms. Garcia to Cecilia Kwok where you're copied, dated

10   October 24, 2000; do you see that?

11   A    I'm sorry?  Say that again.

12   Q    Sure.  Do you see the e-mail you are responding to is

13   Ms. Garcia, dated October 24, 2000, to Cecilia Kwok and

14   you're copied on that?

15   A    Correct.

16   Q    And you see in the second paragraph, it says, "L.A.

17   will need component cost breakdowns, paren, packaging number

18   of paint ops, yields of fabric, grams of hair, et cetera,

19   for every price point against our final designs.  We have

20   finalized the fashion designs, and I am releasing the

21   following final design packages to you on our Friday"; do

22   you see that?

23   A    Yes.

24   Q    Is it correct that you have no idea what that means?

25   A    What do you mean?
```

CV 04-9049-DOC - 02/09/2011 - Day 15, Vol. 3 of 3

33

1    Q    Is it correct that you have no idea what she means by

2    that second paragraph, talking about finalizing the fashion

3    designs and --

4    A    Those are all the things I know, like paint op, I know

5    what that means, yield, I know what that means, yield of

6    fabric, so I'm sorry --

7    Q    Let me narrow it down.

8    A    Please ask me a specific question.

9    Q    Do you know what Ms. Garcia means when she says "We

10   have finalized the fashion designs"?

11   A    She means that she had finalized the fashion design,

12   but I know that -- for a fact that fashion designs were not

13   finalized until late 2000, going all the way to January, I

14   know for a fact.  I have seen documents in the 25 binders

15   that you gave me to read in that regard.

16   Q    Well, if you look at 1107 and 1108, 1109 and 1110, do

17   you remember those are the drawings that you saw?

18   A    Yes.

19   Q    Those were presented to Kmart in early November,

20   correct?

21   A    I believe so, yes.  I don't know exactly when in

22   November, but November, yeah, I think November 8 rings a

23   bell.

24   Q    And in looking at those fashions, they appear to be the

25   same fashions that are on the first four dolls, correct?

Case 2:04-cv-09049-DOC-RNB   Document 9865   Filed 02/14/11   Page 34 of 116   Page ID #:297806
CV 04-9049-DOC – 02/09/2011 – Day 15, Vol. 3 of 3

34

1    A    Not necessarily, no.  Again, I just looked at Sasha,

2    and even with Sasha, there was another set of fashion, which

3    is not on this drawing, so you --

4    Q    I'm sorry, in connection with the fashions that were on

5    Sasha --

6    A    Yes.

7    Q    -- it's the same as you see in the drawings, correct?

8    A    There are similarities to it, yes.

9    Q    And do you know whether or not those -- those drawings

10   were presented to Kmart in early November?

11   A    I think they were.

12   Q    Pardon?

13   A    I think they were presented to Kmart.

14        Excuse me.

15   Q    And are you aware that Veronica Marlow was -- her

16   company was working on creating fashions between the

17   September and October time frame?

18   A    I don't.  I don't know.  I assumed she was, but I don't

19   know the detail on that.

20   Q    Let me show you what we've marked -- actually it's in

21   evidence, 13520.

22             MS. KELLER:  Is this in evidence, yet, Counsel?

23             MR. PRICE:  It's 13520, it should be the business

24   plan.

25             MS. KELLER:  I was just asking if it's in

1    evidence.

2              MR. PRICE:  Oh, yeah.  Sorry.

3    BY MR. PRICE:

4    Q    And you recognize that as a business plan as of

5    March 2001?

6    A    Yes.

7    Q    And it has your name on the front cover there, Isaac

8    Larian?

9    A    Yes, it is.

10   Q    And can you tell us, is this something that you

11   yourself did, was it something prepared with something else?

12   A    No.  My best recollection is somebody else did it.  I

13   don't know.  Most likely Lon Ross.

14   Q    But this is something that was distributed at least to

15   you in March of 2001?

16   A    I don't remember, but most likely, yes.

17   Q    Now, let me have you look at page 15.

18   A    Go ahead.

19   Q    And under strengths, under the first paragraph --

20   A    Yes.

21   Q    -- you see it says, "In terms of product strength,

22   Bratz have several distinct advantages over the

23   competition"?

24   A    Yes.

25   Q    "And first, because its marked advancement and the

```
1    physical appearance of the dolls, the Bratz are unique in

2    many ways, their eyes are big with a hint of Anime style,

3    their lips are more pronounced, their feet and heads are

4    oversized.  There is no fashion doll in the market that

5    bears the resemblance" --

6    A    "On the market," but go ahead.

7    Q    "There is no fashion doll on the market that bears the

8    resemblance to Bratz"; do you see that?

9    A    I do.

10   Q    You agreed with that, correct?

11   A    This is dated March 31st, 2001.  By that time, we had

12   made mockups, so yes, I agree with that.

13   Q    You agreed that there was no fashion doll on the market

14   that bears the resemblance to Bratz, correct?

15   A    Yes.

16   Q    And there had been a --

17   A    As of that date.

18   Q    And it's correct there was no fashion doll in the

19   history of the market that bears the resemblance to the

20   Bratz, correct?

21   A    Prior or after?

22   Q    Prior, I said prior.

23   A    Not that I know of.  Yes, you're right.

24   Q    And so I asked you earlier, without Mr. Bryant bringing

25   to you these designs --
```

1    A    Yes.

2    Q    -- it's correct that you -- to your belief, you had

3    never presented or manufactured anything that had the unique

4    appearance of Bratz?

5    A    The unique appearance of the Bratz doll that came out

6    that MGA made, yes, I -- I agree with that.

7    Q    And you agree that if we look at MGA's history, it had

8    no history of ever coming up with any fashion doll at all,

9    whether it looked like Bratz or somebody else?

10   A    Yes, we didn't -- we didn't have a fashion doll before

11   that.  Well, according to the -- my definition, not Ivy

12   Ross's definition, because I think I was here when Ivy Ross

13   said that any doll that you put fashions on and has hair is

14   a fashion doll, including Bouncy Baby or Diva Starz, but I

15   don't think that's a correct definition of fashion doll.

16   Q    Using the correct definition --

17   A    Yes.

18   Q    -- MGA's history never came up with a fashion doll?

19   A    That's correct.

20   Q    And I think you said prior to Bratz coming on the

21   market, there had really been no fashion doll that

22   approached the success of Barbie, correct?

23   A    I'm sorry, say that again.

24   Q    Prior to Bratz coming on the market, there had never

25   been a fashion doll that approached the success of Barbie,

1    correct?

2    A    Yes.

3    Q    And there is no reason to believe, your understanding,

4    that MGA would have come up with a fashion doll that would

5    have approached the success of Barbie, except for the fact

6    that Mr. Bryant came to you and showed you his designs?

7    A    No, incorrect.  MGA and other companies have tried to

8    come up with fashion dolls that will exceed Barbie sales,

9    but they have been stifled by your company.

10   Q    Well, prior to September 2000, had MGA managed to come

11   up with something?

12   A    Not MGA, but other companies.

13   Q    There is no reason to believe that MGA would have come

14   up with a successful product if it hadn't seen Mr. Bryant's

15   designs, correct?

16   A    That's not correct.  We would have.

17   Q    Well, who would have designed this fashion doll that

18   would have been as successful as Bratz?

19   A    MGA would have.

20   Q    Who?

21   A    What do you mean who?  Myself, putting my money,

22   resources, time behind it and all the people we would hire

23   to do in the free enterprise.

24   Q    So Mr. Larian, so you --

25   A    I'm sorry, for one second.  I have a sore throat.

1  Q    I'm sorry.

2  A    Can I get another bottle of water, please.

3           THE COURT:  Would this be a good time for a

4  recess?

5           *(No audible response.)*

6           THE COURT:  Okay.  You are admonished not to

7  discuss this matter amongst yourselves, nor form or express

8  an opinion concerning the case.  Why don't we take about a

9  15-minutes recess and then come back in session.

10          You may step down.

11          And Counsel, then at a quarter after the hour, I

12 will open the doors.  Thank you.

13          *(Recess.)*

14          *(The following proceedings is taken outside*

15     *the presence of the jury.)*

16          THE COURT:  Okay.  We are on the record outside

17 the presence of the jury.

18          Counsel, I think the best way to resolve this

19 continuing, well-taken warning by the Circuit concerning

20 similarities might be as follows, and it was Mr. Larian on

21 cross-examination, once again, who used the word

22 "similarities."

23          I'm very, very concerned about the use of that

24 word.  The Ninth Circuit has put all of us on notice.  It's

25 just an absolute red flag, but I'm thinking the following:

 1              I think the jury should be told and you shouldn't

 2     be precluded, and that is they should be told that I'll

 3     instruct you, the jury, on the specific unique features

 4     because, remember, that's the code, that's the language, if

 5     any, that are expressed in Mr. Bryant's alleged works in

 6     putting his sketches and the sculpts, and that let's you get

 7     into the, quote-unquote, the unique features, the proper

 8     standards being used, and it's the Court's decision about

 9     what those are and instruct the jury concerning those.

10              Now, if you have a better suggestion, so be it,

11     but --

12              MS. HURST:  Um.

13              MR. QUINN:  Again, your Honor --

14              THE COURT:  Mr. Quinn, again.

15              MR. QUINN:  I apologize, your Honor.

16              THE COURT:  Then I would instruct the jury that

17     there may be evidence concerning unique features, that I

18     will eventually instruct them on the specific unique

19     features, if any, because that is what the Court does, by

20     the way, and that are expressed in Mr. Bryant's alleged

21     works, including his sketches and sculpts.

22              MS. HURST:  I would suggest he uses the words

23     "protected elements" or "original elements" or

24     "copyrightable elements" rather than "unique features."

25              THE COURT:  Well, are we going into this area

 1    next, Mr. Price?  In other words, I don't want to preclude

 2    your examination.

 3              MR. PRICE:  No.  We are going into brand building.

 4              THE COURT:  Then we can resolve this tonight?

 5              MR. PRICE:  Oh, yeah.

 6              THE COURT:  Okay.  Ask the jury in, please.

 7              *(The following proceedings is taken in the*

 8        *presence of the jury.)*

 9              THE COURT:  All right.  We are back in session.

10    The jury is present, the alternates, all counsel, the

11    parties, Mr. Larian.

12              Thank you for your courtesy, counsel, if you'd be

13    seated.

14              And Mr. Price, if you'd like to continue.

15              MR. PRICE:  Yes, thank you.

16              **ISAAC LARIAN, PLAINTIFFS' WITNESS, RESUMED**

17                  **DIRECT EXAMINATION** (Continued)

18    BY MR. PRICE:

19    Q    Mr. Larian, if you look at Exhibit 13520, and

20    specifically, we are on page 16, now, if you'd look at that.

21    A    Go ahead.

22    Q    And there is a section "Unexploited Opportunities"; do

23    you see that?

24    A    Yes.

25    Q    And the second paragraph there talks about ABC, and

1   that's referring to MGA, right?

2   A    Yes, it is.

3   Q    "Can effectively leverage the Bratz brand by

4   introducing not only apparel but accessories such as

5   handbags, book bags, footwear, eye wear, head wear, jewelry,

6   watches and luggage to name a few.  This opportunity will be

7   exploited further at the licensing show in June"; do you see

8   that?

9   A    Yes, I do.

10  Q    That had been your intention since mid-September of

11  2000, that you were going to leverage this brand into other

12  areas?

13  A    It was our intention to make -- if we were going to do

14  Bratz, make it the brand, invest to make it a brand, and we

15  did.

16  Q    And when you say "invest to make it a brand," you make

17  it a brand so that you can use the Bratz brand on not just

18  the dolls themselves, correct?

19  A    That's correct.

20  Q    So we would be talking about clothing, some things

21  which MGA would itself manufacture, correct?

22  A    Yes.

23  Q    And what kind of things would that be that you would

24  leverage this brand so that MGA can sell things it

25  manufactured?

1    A    We did toys, eventually we did bikes, for example, but

2    those are the type of things, besides the toys -- besides

3    just the dolls.

4    Q    And other things you would leverage that brand would

5    include the things, for example, that are named in this

6    document, which are the handbags, the book bags, et cetera,

7    correct?

8    A    That we would license.

9    Q    And you would license it with -- you would be paid

10   royalties for letting someone else use that brand, correct?

11   A    Yes.

12   Q    And the idea is that the licensees sell their goods,

13   sleeping bags, the whatever, because it was associated with

14   the Bratz brand, correct?

15   A    Brand, yes.

16   Q    And your intention was to do that, to create that brand

17   by the end of September 2000, if Mr. Bryant went ahead and

18   signed off on his contract?

19   A    I'm sorry, Mr. Bryant did not sign off his contract

20   until October 4, 2000.

21   Q    Right.  And what I'm saying is by September 2000, you

22   had made the decision that if Mr. Bryant signs off on his

23   contract, you are going to attempt to create the brand and

24   leverage the brand, correct?

25   A    That was our goal, yes.

1   Q    And that was based on seeing the designs you saw in
2   September of 2000, correct?
3   A    It takes a lot more to make a brand than just for
4   drawings.
5   Q    I understand you are saying that, but my question is,
6   your decision to attempt to do that, to put your resources
7   into building the brand so you could leverage --
8   A    Right.
9   Q    -- that was based at that point on just seeing the
10  designs that Mr. Bryant had presented you in September of
11  2000, correct?
12  A    No, it was a whole series of things that, first of all,
13  to see if we can make those drawings to a three-dimensional
14  doll, then -- that was the first step.  The second hurdle
15  was to do the packaging, to do the fashion.  The third step
16  was to get retailers such as Walmart to buy them.
17       The fourth step was to create TV advertising,
18  marketing, shipping, manufacturing, hair rooting, face
19  painting, et cetera, to get that to the market.  And if we
20  had done all of those and those products had gone to retail,
21  and there are many, many examples of them, at least at MGA
22  and Mattel, if that brand, if that product would not sell,
23  you could not have a brand to license.
24  Q    My question is a little more focused.  It's about your
25  decision-making process as of the end of September of 2000;

1    are you with me so far?

2    A    Yes.

3    Q    So I'm focusing on your decision-making process, okay?

4         And it's true that by the end of September 2000, you

5    had decided that you were going to try to put your resources

6    to make this a brand; am I right?

7    A    I have to look, too, you keep saying September, I don't

8    know why, but there was no contract, no deal until after

9    October 4.  So it's only after October 4, 2000 when we

10   decided to put our resources to create this as a brand.

11   Q    You decided in September of 2000 that if Mr. Bryant

12   signed an agreement with you, that you would risk millions

13   trying to make a brand happen, correct?

14   A    Yes, and we did that.

15   Q    And you made that decision by mid-September of 2000

16   based, at that time, on having seen the designs that

17   Mr. Bryant showed you, correct?

18   A    We had not made a decision to spend millions on

19   September 15th or September 14th or September 12th, that is

20   something you showed me yesterday, because there was no

21   contract until October 4th.

22        So it doesn't make sense for me to commit my company's

23   resources on something that could have happened or could not

24   have happened, so I don't agree with your -- with your

25   assessment.

 1        Yes, did we make that statement?  Yes, but we did not,

 2   specifically to your question, on September 12 or 13 or 14

 3   or 15, we just didn't go ahead and take a bank loan and say,

 4   okay, we are going to go ahead and invest this all on Bratz.

 5   Q    So let me try to be a little clearer, because I'm

 6   having a problem, and that is, by mid-September, you had

 7   decided that if Mr. Bryant signed a contract with you, if he

 8   did, then you were going to spend millions to try to make

 9   Bratz into a brand, correct?

10   A    Yes.

11   Q    And at the time you decided that, that if Mr. Bryant

12   signs a contract with you, you are going to try to spend

13   millions to make the brand and line happen, at the time you

14   decided that, all you had seen were the designs that

15   Mr. Bryant showed you in September of 2000, correct?

16   A    Had seen the drawings that he showed us in his pitch

17   book.

18   Q    So the statement is correct, right?

19   A    We had just seen those drawings.  We did not know if

20   they can be made a doll or not.  Yes, your statement is

21   correct.

22   Q    Now, let me talk to you about the language of

23   competition.

24   A    Yes.

25   Q    You have written an e-mail saying that you want to kick

CV 04-9049-DOC - 02/09/2011 - Day 15, Vol. 3 of 3

47

1   Barbie's ass?

2   A    Yes, I have.

3   Q    And I'll show you 14655.  I think this is in evidence.

4        It's not Barbie's, it's Mattel's, where you -- this is

5   July 30, 2003, where you say, at the end, "Let's kick

6   Mattel's ass again" again; do you see that?

7   A    That's one of the things it says in there.

8   Q    And certainly by July 30th, 2003, it was your belief

9   that MGA was competing with Mattel, they were competitors,

10  correct?

11  A    Yes.

12  Q    And when you said, "Please read the attached," I guess

13  what you attached were some focus group information?

14  A    That's what it says.  I don't know what's attached.

15  Q    And then you also said -- and we'll show you

16  Exhibit 8629.

17       And do you recognize -- sorry, I'm ahead of myself.

18  A    I recognize Rachel.

19  Q    I have an assembly line so it gets to me faster.

20  A    Go ahead.

21  Q    8629, is that an e-mail you wrote to Nick Austin of

22  Vivid Imaginations?

23  A    Yes.

24  Q    And its subject, "Play things on track with Barbie"?

25  A    Yes.

1   Q    And in this e-mail --

2        MR. PRICE:  Your Honor, I move Exhibit 8629 into

3   evidence.

4        THE COURT:  Received.

5        *(Plaintiffs' Exhibit No. 8629 is received in*

6     *evidence.)*

7   BY MR. PRICE:

8   Q    And you see it says, "Yes, we have big plans that will

9   be announced in the next few weeks.  Barbie needs all the

10  help she needs, but these will not do it.  We are going for

11  the kill"; do you see that?

12  A    I do.

13  Q    And "for the kill," you are saying that with respect to

14  Barbie product?

15  A    No.  It means to get my market share.

16  Q    Market share for --

17  A    Fashion dolls.

18  Q    And Barbie is a fashion doll?

19  A    Yes, it is.

20  Q    And so when you are saying, "We are going for the

21  kill," you meant going for the kill in connection with the

22  competition with Barbie?

23  A    It means that we are going to go after and get more

24  market share.

25  Q    And that market share would be at the expense of

1   Barbie?

2   A    Not necessarily, because, again, Barbie had, of course,

3   the monopoly at the end of 2000, but it was basically the

4   only fashion doll which is out there, but that sold -- it

5   was like a pie.  That sold to certain demographics, four to

6   six.

7        When we came out with Bratz, we expanded that pie and

8   the total market share, so basically, mathematically,

9   Barbie's market share went down because we increased the

10  pie, and Bratz went up.

11  Q    So when you say, "We're going for the kill," what you

12  are telling us you meant there was, we're going to do

13  something which will still make Barbie more money but which

14  will increase our market share?

15  A    No, it meant that we are going to increase our market

16  share.

17  Q    And instead of using the word "market share," you said

18  kill, right?

19  A    Yes, the same thing that basically I heard on the

20  football team, Packers and Steelers said the same thing in

21  terms of competition.

22  Q    And when you say kill, you're usually referring to

23  someone else, right?

24  A    I wasn't going to kill somebody.

25  Q    Oh, I understand that, but when you use that phrase,

1    you are referring to a competitor or -- or -- not yourself,

2    right?  Not referring to yourself?

3    A    To kill myself?

4    Q    Yes, that's not what you're referring to, you are not

5    referring to MGA, right?

6    A    No.

7    Q    All right.  What you are referring to there is,

8    primarily, Barbie, killing Barbie?

9    A    No, the competition.  Basically this means here in the

10   marketplace, in the marketplace, we wanted to have a bigger

11   market share of the fashion doll business than Mattel.

12   Q    You as a good competitor wanted to put Mattel away for

13   good?

14   A    I have said that in the spirit of competition, yes.

15   Q    And if you'd look at 8936.

16   A    Yes, go ahead.

17   Q    And you recognize 8936 as an e-mail you wrote to a

18   bunch of folks in February of 2005, correct?

19   A    I did.

20         MR. PRICE:  And I believe this is in evidence, but

21   we'll move it into evidence, your Honor.

22         THE COURT:  Received.

23         *(Plaintiffs' Exhibit No. 8936 is received in*

24         *evidence.)*

25

1    BY MR. PRICE:

2    Q    And if you look at the first part, there, the subject,

3    "Are we here to lose?  Hell no."  You wrote that, correct?

4    A    I did.

5    Q    This is an attempt to rally the troops?

6    A    Yes.

7    Q    And in this e-mail, what you are saying is that we are

8    at war with Mattel, correct?

9    A    Yes, this is after you had sued Carter Bryant, sued

10   MGA, sued me personally, we are at war with Mattel.  Today

11   also we are still at war with Mattel.

12   Q    So in this e-mail, you weren't talking about

13   competition, you were talking about the lawsuits that have

14   taken place?

15   A    Lawsuit that you filed, I think, is part of a stifling

16   competition, that's what Mattel does, that's what I mean.

17   Q    Well, you said that you were saying, "Kick ass, kill

18   Barbie" as part of competition, correct?

19   A    Where did you see that?

20   Q    Those are the documents we just showed you, it said,

21   "Kill Barbie, kick ass"; do you remember those documents we

22   just looked at?

23   A    Yes, kick ass, kick Mattel's ass in the marketplace,

24   yes.

25   Q    What you're saying is, here, you weren't referring just

1    to the marketplace?

2    A    No, this is also part of the marketplace.  I think

3    Mattel has, again, uses litigation to stifle competition.

4    There is a book written on it.

5    Q    Well, have you used litigation to stifle competition?

6    A    I don't think I have.

7    Q    But MGA has sued a lot of companies for -- for

8    infringing its trademarks or copying its products or somehow

9    infringing upon its intellectual property rights, correct?

10   A    We have sued some people, yes.

11   Q    And in connection with that, in some cases you have

12   said, "We want to hurt them," correct?

13   A    In one e-mail you showed me, we did.

14   Q    And this one, in the spirit of competition, you say on

15   the third line, "Let's show them who's better and let's put

16   them away for good in 2005"; do you see that?

17   A    I do.

18   Q    And after that, you talk about the products that you

19   believe will put Mattel away for good in 2005, correct?

20   A    There's a whole story about these products, but I am

21   not going to get into it right now.

22   Q    Well, you go through and you list products that are

23   going to show Mattel who's better and put them away for good

24   in 2005, right?

25   A    Yes.

```
1    Q    Who's Matt Bousquette?
2    A    Matt Bousquette is president of Mattel, or he used to
3    be president of Mattel.
4    Q    And of course you know who Bob Eckert is?
5    A    Yes.
6    Q    CEO of Mattel?
7    A    Yes, and chairman of the board.
8    Q    And it's true that you have said to your employees that
9    you want to kill Matt and Bob?
10   A    Yes, I have.
11   Q    Now, you recall that you were asked that on
12   December 10, 2009, you probably don't recall the date.  Do
13   you recall you were asked that when you were testifying in a
14   deposition?
15   A    I've been asked many questions in my depositions ad
16   nausea.
17   Q    Do you recall being asked whether it was true that you
18   said to your employees that you wanted to kill Matt
19   Bousquette and Bob Eckert?
20   A    Yes.
21   Q    And that your response was, "That is absolutely not
22   true"?
23   A    Yes, I didn't remember.
24   Q    And when you were asked if you had said such a thing in
25   writing, you said, "I've never said that, that's language
```

```
1    that your people use"?

2    A    Yes, and language your people use also, that's correct.

3    Q    Well, you said, I -- absolutely, it's not true, I did

4    it, and that you folks have done things like that?

5    A    I said that.

6    Q    And of course, you would continue to deny that if it

7    weren't in writing?

8              MS. KELLER:  Objection.  Argumentative.

9              THE COURT:  Well, you can ask the question.

10   BY MR. PRICE:

11   Q    You would continue to not ever saying that if it

12   weren't in writing?

13   A    That's not correct.

14   Q    Well, you denied it on December 10, 2009, because you

15   hadn't been shown the writing, yet, right?

16   A    No, sir, I just didn't remember.  It was irrelevant.

17   Q    Well, so when you said, "That is absolutely not true,"

18   what you meant to say was I don't remember?

19   A    I guess my recollection, I didn't remember, that's

20   correct, it's not important.

21   Q    If you'd look at Exhibit 7052.

22              MR. PRICE:  And I believe that is in evidence,

23   your Honor, and I move it if it's not.

24              THE COURT:  Received.

25              (Plaintiffs' Exhibit No. 7052 is received in
```

1        *evidence.)*

2    BY MR. PRICE:

3    Q    And you see in the middle of the page, there, there's

4    an e-mail to you from Ms. Garcia, then Ms. Treantafelles?

5    A    Yes.

6    Q    This is April 21st, 2004; do you see that?

7    A    I do.

8    Q    And you say, "Love ya, position Babies against Shorties

9    line by line, item by item"; do you see that?

10   A    I do.

11   Q    Now, what does Babies refer to?

12   A    It's a line that we did.

13   Q    And --

14   A    Line of dolls that we did.

15   Q    And what does Shorties refer to?

16   A    It's a line of doll Mattel had done and was in the

17   market.

18   Q    And then you say, "I want to kill Matt and Bob."  And

19   by Matt, who are you referring to?

20   A    Matt Bousquette.

21   Q    And by Bob, who are you referring to?

22   A    Bob Eckert.

23   Q    You said earlier that it was your belief that it would

24   be inappropriate for someone to work at Mattel and MGA at

25   the same time, correct?

```
 1    A    It is.

 2    Q    And it would be inappropriate to ask someone to go

 3    inside Mattel --

 4    A    Is that based on this document?

 5    Q    No.

 6    A    Okay.

 7    Q    It would be inappropriate to have somebody go inside

 8    Mattel and report to MGA what they had seen, correct?

 9    A    Absolutely, that is not appropriate.

10    Q    And in fact, you would consider such a thing to be sort

11    of outrageous?

12    A    Morally not right.

13    Q    And if it were presented -- if it drawn to your

14    attention that something like that was happening, you would

15    certainly say that you shouldn't do that?

16    A    I would not be happy about it.

17    Q    You would come down the strongest terms and say that's

18    not appropriate, correct?

19    A    I don't know if I would do that or not.  I would not be

20    happy about it.

21    Q    Do you know a Ryan, and I'm going to mispronounce his

22    name, Tumaliuan?  I'm probably mispronouncing his name.  Is

23    that close enough pronunciation to someone you know?

24    A    Your guess is as good as mine.

25    Q    Okay.  Let's show you a document and see if this
```

Case 2:04-cv-09049-DOC-RNB   Document 9865   Filed 02/14/11   Page 57 of 116   Page ID #:297829
CV 04-9049-DOC – 02/09/2011 – Day 15, Vol. 3 of 3

57

1    refreshes your recollection or that my butchered

2    pronunciation hasn't --

3            MS. KELLER:  I'm going to object.  Irrelevant,

4    your Honor.

5            THE COURT:  I think this time it is, Counsel.

6    Wasn't there a understanding about how this was going to

7    develop?

8            MS. KELLER:  Yes, your Honor.

9            MR. PRICE:  And we already had testimony with

10   Ms. Garcia about that as well.

11           THE COURT:  We may have, but I think we have an

12   agreement.

13           I can --

14           MR. PRICE:  We blacked out -- yeah, the document

15   we'll eventually we get to is redacted.

16           THE COURT:  I'm sorry, the document?

17           MR. PRICE:  That we'll eventually get to is

18   redacted in one point.  That was the -- that was the

19   decision and agreement on that.

20           THE COURT:  All right.  So this document is coming

21   in for a limited purpose and it's not in violation of the

22   agreement between the parties?

23           MR. PRICE:  No.

24           MS. KELLER:  There is not an agreement.

25           THE COURT:  Well, yes, there is.  You are not

 1    keeping some of the nights and weekends.  Yes, there is.

 2            MR. PRICE:  We have claims based on this, my

 3    understanding, and we redacted -- as the Court instructed,

 4    we redacted the document.  It's going to be the fifth

 5    document.

 6            THE COURT:  Let me see the redacted portion.

 7            Excuse me, ladies and gentlemen, I may explain to

 8    you further what's happening, but I want to talk to counsel

 9    first so there is no -- nothing kept from you, but there

10    seems to be a disconnect between counsel.

11            *(Attorney discussion held off the record.)*

12            THE COURT:  Let me see the redacted portion.

13            Counsel, I don't see any concern about this.

14            You may proceed.

15            MR. QUINN:  It's in evidence.

16            MR. PRICE:  Yeah.  We are going to get to that

17    document eventually.

18            THE COURT:  Let me just explain to the jury so

19    you're not tantalized by the mysticism that's overtaking

20    you.  I'm just kidding you.

21            But remember I said each side can sit on the

22    respective claimant or counterclaimant's chair?  Certain

23    sides are going to be allowed to present portions and the

24    other side will react to those accusations.  The other side,

25    that by agreement, can initially present to you some claims

1    that they have, and the other side can react.

2            And there's been kind of an agreement reached

3    between the parties about how that is to proceed.  Nobody is

4    trying to violate it.  It's just that a lot of these

5    documents kind of overlap this agreement that the parties

6    have reached about which accusations will be leveled by

7    which claimant or counterclaimant at which time.

8            That's what you're hearing behind the scenes, and

9    believe me, within a year, it will become self-evident to

10    you.  I'm just kidding you.  I'm just joking.  That's a bad

11    joke.  Within a couple weeks or even a week, it will be

12    self-evident to you, all right?

13            So, Counsel.

14    BY MR. PRICE:

15    Q    Mr. Larian, do you have Exhibit 23728 in front of you?

16    A    No, I don't.

17    Q    I'll ask you again in a few minutes.

18            THE COURT:  This is 9335.

19            MR. PRICE:  Your Honor, this one is -- we'll get

20    to 9335, this is 23728.

21            THE COURT:  23728.  Thank you.

22            THE WITNESS:  Yes.

23            THE COURT:  Ladies and gentlemen, first of all,

24    let me compliment counsel for both sides.  Believe it or

25    not, we've gone through every one of these exhibits.  I

 1    promise you, not every one of these exhibits will be in.

 2    Some are totally irrelevant, but I demanded, so you know,

 3    from counsel that I be shown every exhibit and I hear every

 4    objection outside your presence, okay?

 5            Now, that's been an excruciating task for counsel,

 6    and they've performed superbly well.  What you are seeing as

 7    sometimes 23,728, I've seen the document, but I can't match

 8    up the number quickly enough, and so they are trying to get

 9    the information to me, otherwise I spend my time going

10    through literally 30 binders in back of me.

11            You are not going to be burdened with that kind of

12    volume, but that -- what that's allowing us to do is

13    proceed, 120 hours is really the equivalent of about -- per

14    side, is really the equivalent of about 500 hours per side,

15    because normally courts are taking time to look at each

16    document again, and that's the way they are spending their

17    weekends and evenings with us.  So my compliments to both

18    parties.

19            Counsel.

20            MR. PRICE:  Thank you.

21    BY MR. PRICE:

22    Q    So 23728, you recognize this is an e-mail that you

23    wrote Ryan Tumaliuan?

24    A    I have no idea.  Your spelling is -- your pronunciation

25    is as good as mine, so I take your pronunciation, you're

1    good.

2    Q    And you recognize this as an e-mail that you received

3    from him and that you then sent back to him?

4    A    Yes.

5            MR. PRICE:  Move 23728 into evidence.

6            THE COURT:  Received.

7            *(Plaintiffs' Exhibit No. 23728 is received in*

8        *evidence.)*

9            THE COURT:  Now, at the present time, ladies and

10   gentlemen, it's a redacted form --

11           MR. PRICE:  Not this one, your Honor.

12           THE COURT:  I'm sorry, I'm back to 9335.  My

13   apologies.  This is not redacted.

14   BY MR. PRICE:

15   Q    And you see that Mr. Tumaliuan, on September 26th,

16   2002, wrote to you, "Isaac, here is the list of fashion

17   designers.  Only one is a graduate while the others are

18   still in school," and he lists some and talks about the top

19   three people from this group, and then ends with, "I will

20   look for more fashion design people for you.  Thank you."

21       Do you see that?

22   A    I do.

23   Q    And who is Ryan Tumaliuan?

24   A    I don't remember him.  I believe he was an intern who

25   went to Otis College and worked at MGA at one time as an

1    intern.

2    Q    And when you say "as an intern," that means he's

3    working for you without pay?

4    A    Unfortunately I don't know if we pay -- I think we do

5    pay interns.

6    Q    And was he working --

7    A    I think we paid them a small amount per hour.

8    Q    Pardon me?

9    A    I think we paid them a small amount per hour.

10   Q    And he is, at this time frame, helping you recruit

11   talent, correct?

12   A    From Otis College.

13   Q    So from Otis College, he's helping you recruit talent,

14   right?

15   A    Yes.

16   Q    And if you look at 23727, that's an October 2, 2002

17   e-mail?

18   A    Yes.

19           MR. PRICE:  That's at 23727.

20           THE WITNESS:  No, this one I have is 27?  It's 27,

21   I'm sorry.

22   BY MR. PRICE:

23   Q    It's a pretty short one.

24   A    Yes.

25   Q    You see this is an e-mail from you to Mr. Tumaliuan?

1    A    Yes, it is.

2              MR. PRICE:  Move 23727 into evidence, your Honor.

3              THE COURT:  All right.  It's received.

4              *(Plaintiffs' Exhibit No. 23727 is received in*

5         *evidence.)*

6    BY MR. PRICE:

7    Q    And you see on October 2nd, 2002, you're sending

8    Mr. Tumaliuan an inquiry saying, "We need people from the

9    toy design group.  Which one of these people have toy design

10   EXP?"

11        Do you see that?

12   A    Yes.

13   Q    And you mean experience by that?

14   A    Yes.

15   Q    And so you are communicating with Mr. Tumaliuan, asking

16   for more information about the folks that he's might want to

17   send over to MGA, correct?

18   A    His classmates at Otis College.

19   Q    And if you look at 23729 in this exchange.  That's

20   another e-mail dated October 2nd, 2002.  Again, that's

21   23729.

22   A    Yes.

23   Q    And that's an e-mail from E. Johnson to Paula Garcia

24   concerning an e-mail you received from Mr. Tumaliuan,

25   correct?

CV 04-9049-DOC - 02/09/2011 - Day 15, Vol. 3 of 3

64

1    A    Yes.

2            MR. PRICE:  Your Honor, I move Exhibit 23729 into

3    evidence.

4            THE COURT:  Received.

5            *(Plaintiffs' Exhibit No. 23729 is received in*

6        *evidence.)*

7    BY MR. PRICE:

8    Q    And you see that in response to your statement that you

9    needed people from the toy design group, and then your

10   question, which one of these people have a toy design

11   experience -- have toy design experience, I'm sorry.

12   A    It says, "from toy design program."

13   Q    And you have a response from him at 10:16 a.m. where he

14   says, "Isaac, from the toy design group, and then he lists

15   people from the toy design group," correct?

16   A    At Otis College, yes.

17   Q    And then you, then, forward that to Ms. Johnson and

18   Ms. Garcia, right?

19   A    I do.

20   Q    And who is Ms. Johnson?

21   A    She was in human resources at the time.

22   Q    And you say, "Looks like these people have what we are

23   looking for, and they are not expensive.  Let's get them

24   here, please, and make more Bratz"; do you see that?

25   A    Yes.

1    Q    So you were appreciative of Mr. Tumaliuan's assistance

2    here in trying to get you talent in the design group,

3    correct?

4    A    When he went to Otis College, he was an intern at MGA,

5    and I thought that he knows who are some of the good

6    students who would graduate and we can hire.

7    Q    And then if you look at 23730.

8    A    Yes.

9    Q    And this is an e-mail from Mr. Tumaliuan to you and

10   then your reply, correct?

11   A    Yes.

12   Q    Your reply is dated October 24, 2002, right?

13   A    Yes.

14        MR. PRICE:  Your Honor, we move Exhibit 23730 into

15   evidence.

16        THE COURT:  Received.

17        (Plaintiffs' Exhibit No. 23730 is received in

18        evidence.)

19   BY MR. PRICE:

20   Q    And we see that on October 2nd, Mr. Tumaliuan

21   identifies another person from his class who he thinks would

22   be a powerful asset to Bratz; do you see that?

23   A    I do.

24   Q    And ends with, "I think that if you can combine her

25   with the talents of Claire Cole and Elena Velasquez and add

my younger brother Dean and myself to do finished Bratz artwork, you will have a powerful design team. Thank you."

Do you see that?

A I do.

Q And you respond -- you copy this to Ms. Garcia and Ms. Johnson?

A Yes.

Q And you say, "Meet with Ryan and get these people onboard ASAP"; do you see that?

A Yes.

Q And do you recall, was Mr. Tumaliuan interning in just the summer or was it in other parts of the year as well?

A Unfortunately this goes back to 2002, I see the e-mails, I cannot -- I don't recall him and when he was there. I'm sure he was there during that time.

Q He was certainly expressing --

A I don't know if he was there at that time. I was speculating.

Q He was certainly expressing interest in being a part of the MGA design team?

A Yes.

Q I'd like you to look now at 9335, which is already in evidence.

A Go ahead.

Q And you see the top of that is an e-mail from you to

```
 1    Yuval Caspi; do you see that?

 2    A    One second, please.

 3         Yes, go ahead.

 4    Q    And at the top of this e-mail chain is an e-mail

 5    between you and a Mr. Caspi?

 6    A    Yes, it is.

 7    Q    And can you tell me who Mr. Caspi is?

 8    A    He's a designer at MGA.

 9    Q    And if we can look at the e-mail that started all this.

10         MR. PRICE:  I'm sorry, it's on the second page,

11    Ken.

12         THE WITNESS:  Yes.

13    BY MR. PRICE:

14    Q    Do you see it starts with an e-mail from Mr. Caspi to

15    you, subject Ryan; do you see that?

16    A    I do.

17    Q    And Mr. Caspi writes to you:  "Ryan finished the

18    semester with low grades; therefore, the school had sent him

19    and others with a teacher to what he called, quote, 'boot

20    camp' in Mattel"; do you see that?

21    A    I do.

22    Q    "I have asked him to keep his mouth closed and at the

23    same time, keep his eyes and ears opened.  We will see him

24    again when the fall semester begins"; do you see that?

25    A    Yes.
```

1    Q    And so there is no question in your mind that you

2    actually read this e-mail where Mr. Caspi says that he has

3    asked Ryan to keep his mouth closed and at the same time,

4    keep his eyes and ears opened, we will see him again when

5    the fall semester begins?

6    A    No question.

7    Q    And that's because you responded, right?

8    A    Yes.

9    Q    In your response -- when you read this e-mail --

10   A    Yes.

11   Q    -- did you think that's inappropriate to have someone

12   who's planning on coming back to MGA to go into Mattel and

13   keep his mouth closed and at the same time, keep his eyes

14   and ears opened; did you think that was somewhat shocking to

15   you?

16   A    No.  He was an intern at MGA, and I think this

17   basically says that he was going to go become an intern at

18   Mattel.  As long as he didn't take MGA's information to

19   Mattel or didn't bring Mattel's information to MGA, there is

20   no problem.

21   Q    Isn't this what it suggests, "I have asked him to keep

22   his mouth closed and at the same time, keep his eyes and

23   ears opened"; do you see that?

24   A    Yes, and my answer at the top is, "Do you trust him,"

25   and I mean do you trust him that he will not take MGA's

1    information to Mattel.

2    Q    So your response, "Do you trust him," you're worried

3    about will he say something to Mattel, correct?

4    A    I didn't want him to take MGA's information to Mattel,

5    nor did I want him to bring Mattel's information to MGA.

6    And interns go from one toy company to another all the time.

7    Q    Let's look at the two parts of the equation.

8         "Do you trust him?"  I guess at that point, you are

9    asking whether or not he will be trusted to keep his mouth

10   closed?

11   A    No.  To me, it meant -- this goes back seven, eight

12   years ago, to me, it's that he's been here working as an

13   intern for MGA.  Now he's going to go become an intern at

14   Mattel.  Do you trust him?  Is he going to take our

15   information over there?

16   Q    And so that's -- when you see he says, "I've asked him

17   to keep his mouth closed," that's kind of what you are

18   referring to, that he's not going to say anything to Mattel

19   about anything at MGA?

20   A    Right.

21   Q    And -- but the sentence doesn't just talk about keeping

22   his mouth closed.  He says, "I've asked him to keep his

23   mouth closed and at the same time, keep his eyes and ears

24   opened"?

25   A    That's what Yuval says, yes.

1   Q    So when he was at MGA, you understood he kept his eyes

2   and ears opened, right?

3   A    Yes.

4   Q    And what you were worried about is having kept his eyes

5   and ears opened at MGA, that he'd be going to Mattel and

6   telling them something, right?

7   A    Yes.

8   Q    But Mr. Caspi has said he's instructed Ryan, at Mattel,

9   to keep his eyes and ears open there?

10  A    Where does it say that?

11  Q    On the second line, "I've asked him to keep his mouth

12  closed," one part of the equation, and --

13  A    Yes, but you inserted the word "Mattel" right in there

14  somewhere.

15  Q    Well, it says, "and keep his mouth closed and at the

16  same time, keep his eyes and ears opened"; do you see that?

17  A    Certainly.

18  Q    And certainly you understood that that referred to

19  Mattel?

20  A    No.

21  Q    Well, this tells you that the school had sent him and a

22  teacher to, quote, "boot camp" in Mattel, correct?

23  A    That's what it says.

24  Q    And the next sentence says, "I've asked him to keep his

25  mouth closed and at the same time, keep his eyes and ears

1  opened"; do you see that?

2  A    I do.

3  Q    You didn't think it was referring to keep his eyes and

4  ears opened at MGA, right?

5  A    Keep his eyes and open, his eyes were open at MGA.

6  Q    Well, he's going in Mattel, right?

7  A    Yes.

8  Q    You understand that Mattel has fairly strict security

9  in its design center?

10  A    I don't know where boot camp is at Mattel, do they have

11  boot camp, but I do know Mattel has very secured design

12  centers, so does MGA.

13  Q    Well, in fact, at one point you said, "We need to be

14  more like Mattel when it comes to our security."

15  A    I have said that.

16  Q    And this sentence, I'm just asking you your

17  understanding when you read it, "I've asked him to keep his

18  mouth closed and at the same time, keep his eyes and ears

19  opened."  I want you to focus on that other part of the

20  sentence, "keep his eyes and ears opened."

21       When you read that, you understood that that was

22  referring to keep -- keep his eyes and ears opened in

23  Mattel?

24  A    Probably.  I don't remember my state of mind, but

25  probably that's what he meant.  That's what Yuval meant.

```
 1   Q    And then his next line, "We will see him again when the
 2   fall semester begins"; do you see that?
 3   A    I do.
 4   Q    Because June 6th, this is the summer, right?
 5   A    Yes.
 6   Q    And he had been an intern at MGA, right?
 7   A    Yes.
 8   Q    And he was coming back in the fall?
 9   A    Well, that's what he says.  I don't think he came back
10   to MGA in the fall.
11   Q    But that was your understanding on June 6th, 2003?
12   A    I don't remember what was my understanding.  I wasn't
13   paying attention to that.
14   Q    Well, reading it now, do you think you'd have any
15   different understanding than you did when you read it then?
16   A    No.  I read the same way.
17   Q    So what you knew was that he had been at MGA, right?
18   A    Yes.
19   Q    He was -- had to go for the summer -- because of low
20   grades, he had to go in Mattel at boot camp, right?
21   A    I don't know because if you get low grades, you go to a
22   boot camp.  I don't know about that.  That's your words.
23   Q    That's what Mr. Caspi tells you?
24   A    Yes.
25   Q    And you expect him -- or Mr. Caspi expects him to come
```

1    back in the fall semester to MGA?

2    A    That's what he says, "We will see him," yes.

3    Q    So getting back to the sentence above that, you

4    understood that when Mr. Larian was asked to keep his eyes

5    and ears opened --

6    A    Mr. Larian?

7    Q    I'm sorry, when Mr. Caspi, I apologize, said he told

8    Ryan to keep his eyes and ears open?

9    A    Yes.

10   Q    You knew that was referring to keep his eyes and ears

11   open when he was in Mattel?

12   A    Probably, yes.

13   Q    And I take it Mr. Caspi didn't say, "I want you to keep

14   your mouth closed about what you see in Mattel when you keep

15   your eyes and ears open," correct?

16   A    I don't know what he meant.  He's here in California.

17   He works for us.  Probably should ask him what he meant.

18   Q    Well, I'm interested in your response to Mr. -- to

19   Mr. Caspi now that you've kind of given us your

20   understanding of what he said.

21       You were okay with that, you were okay with -- with

22   Ryan going into Mattel, keeping his eyes and ears open, and

23   then coming back to MGA in the fall and telling you what he

24   saw?

25   A    I am not okay then, now, ever, if he or somebody else

1    goes to Mattel and brings Mattel's information to us, nor am

2    I okay if somebody from MGA goes to Mattel and give my

3    information to them.  No.  The answer to your question is

4    not correct.  No is the answer.

5    Q    Did you have any understanding at the time you read

6    this as to why Mr. Caspi was telling Mr. Tumaliuan to keep

7    his eyes and ears open when he was in Mattel?

8    A    I have no --

9              THE COURT:  I think you said "I have no"?

10             THE WITNESS:  Then I stop.

11             THE COURT:  Because it got translated "I don't

12   know."

13             I think he said "I have no," but I want to have

14   you restate the answer.  I have no --

15             THE WITNESS:  Can we just get rid of that whole

16   thing?  The answer is no.

17             THE COURT:  Let me explain why, I'm reading off of

18   a screen sometimes at the same time, so --

19             THE WITNESS:  I appreciate that.

20             THE COURT:  Thank you.

21   BY MR. PRICE:

22   Q    At the time you wrote your response to Mr. Caspi, you

23   sent your response just to Mr. Caspi, correct?

24   A    Yes.

25   Q    At the time you sent his response, you thought no one

1   else would see your answer, right?

2   A    That's not correct, sir.  If you go back, that whole

3   e-mail has been forwarded to a whole bunch of other people,

4   so we were not trying to hide anything, and you know that.

5   Q    It was forwarded to Ms. Garcia?

6   A    Yes.

7   Q    Correct?

8   A    Yes.

9   Q    And that's -- that's one other person?

10  A    Yes.

11  Q    And -- and Ms. Garcia was someone who was in charge of

12  Bratz product development?

13  A    Yes.

14  Q    At this time, a fairly significant member of your team?

15  A    Yes.

16  Q    And at the time you wrote this, you did not believe

17  that your answer would be seen by anybody outside of MGA,

18  correct?

19  A    That is not correct.  As a matter of fact, since you do

20  have this document in your hand and MGA produced it, means

21  that you saw it, we gave it to you, we have nothing to hide.

22  Q    Wait a minute.  Many of the documents that MGA has

23  handed over in this litigation were as a result of motions

24  requiring you to hand over such documents, correct?

25  A    I don't know.  We gave you everything, everything,

1    everything that Mattel has asked, and I mean everything.

2    Q    We didn't have everything by the time of that trial,

3    right?

4    A    I don't know what you had there.  We -- let me tell you

5    this:  We turned everything --

6    Q    The question was:  Did we have everything by the time

7    of that trial in '08, 2008?

8    A    I don't know.  I don't know if you did or not.

9    Q    And what we have is largely a result of the Court

10   ordering that documents being produced, correct?

11             MS. KELLER:  Objection.  Irrelevant.

12             THE COURT:  Let's just say that the Court's

13   ordered both parties to produce numerous documents.  Leave

14   it at that, okay?

15             Thank you.

16             Counsel?

17   BY MR. PRICE:

18   Q    And I'm asking at the time that you wrote this, when

19   you wrote, "Do you trust him, can he design something

20   quick," at the time you wrote this in 2003, you thought that

21   this e-mail would not go outside of MGA?

22   A    By surprise, the answer to your question is no, that is

23   not the reason.

24   Q    I didn't ask you if anything was a reason --

25   A    But you asked me -- what I think I understood you say,

1    that the reason you only sent this e-mail to Yuval is that

2    you didn't want anybody else to see it, and the answer to

3    that question is no.  If I misunderstood your question,

4    please rephrase.

5    Q    I will.  I apologize if I wasn't clear.

6         At the time you wrote this response on June 9, 2003,

7    you did not expect this e-mail would leave MGA?

8    A    I did not -- I'm sorry.  I -- I didn't even think about

9    this e-mail leaving MGA, not leaving MGA.  There was not a

10   whole conspiracy going on, that it's going to go, not going

11   to go.  This is 2003 before you sued us.

12   Q    Why didn't you tell Mr. Caspi, "You shouldn't ask Ryan

13   to go into Mattel and keep his eyes and ears open"?

14   A    I don't know why I didn't.

15   Q    What you were concerned about when you said, "Do you

16   trust him," is you wanted to make sure that Ryan wouldn't

17   say anything to Mattel, correct?

18   A    No, sir.  I didn't want him to take MGA's information

19   when he was working at MGA as an intern over to Mattel.

20   That's what I meant.  And I've said that I think maybe now

21   four, five times.

22   Q    So you're worried about him taking information from MGA

23   to Mattel, why did you not say anything about Mr. Caspi

24   asking him to keep his eyes and ears open at Mattel and he

25   is going to come back to MGA?

1    A    I didn't -- I don't know why I didn't ask that.

2    Q    You will agree that that would be something which would

3    be totally, I think you put it, unethical?

4    A    It is.  And he never came back to MGA with anything.

5    And it is unethical if he did that, and it's the same thing,

6    it's unethical if he took MGA's information to Mattel.  And

7    I believe now he works for Mattel.

8    Q    It would be unethical for somebody at MGA to instruct

9    him to do that, to instruct him to go to Mattel and keep his

10   eyes and ears opened and then come back, correct?

11   A    This is what he put in here.  I really don't know

12   what -- I cannot speculate what Yuval Caspi meant.  Again,

13   you have known about Yuval Caspi about seven years, eight

14   years, you should have asked him that.  You still can.

15   Q    I'm asking you because you received this.

16        So you agree that it would have been unethical for

17   Mr. Caspi to direct Mr. Tumaliuan to do what he asked him to

18   do in this e-mail, you agree with that?

19   A    If -- if you're insinuating that Yuval Caspi was asking

20   this guy Ryan to go to Mattel and find out what Mattel has

21   and come back and give it to us, that is absolutely,

22   absolutely immoral.  He should not have done that.

23   Q    And if you understood this e-mail to do that, to ask

24   for that, your response would have been this is immoral, he

25   shouldn't do it, right?

1    A    This is not what I understood and this is not what I

2    said.

3    Q    I'm just saying, if that's what you understood this to

4    mean, your response would have been, this is immoral, don't

5    do it?

6    A    I'm sorry, I did not -- I did not tell him that because

7    that's not what I understood.

8    Q    We were talking yesterday about the resources that MGA

9    had in the September, October 2000 time frame to move

10   forward on the Bratz project; do you remember that?

11   A    Yes.

12   Q    And you knew that Ms. Marlow was working with her team

13   of sample makers to make clothes for Bratz, correct?

14   A    I had no idea who she was working with.

15   Q    You knew about Ms. Marlow, you've known about her for a

16   long time, right?

17   A    I have known Ms. Marlow for a long time, yes, from 2000

18   to now.

19   Q    And Ms. Marlow would send invoices to MGA for using

20   these sample makers to make the clothes on Bratz, right?

21   A    I don't know what sample makers did she use, did she

22   not use, but if you are asking if she sends invoices to MGA,

23   yes, she sent invoices to MGA.

24           THE WITNESS:  Your Honor, can I take a two-minute

25   break, go to the bathroom and come back.

1          THE COURT:  Absolutely.

2          Why don't we take a couple-minute break, if any of

3     the jurors need to go use the restroom for just a moment,

4     the witness does.  And Counsel, if you need to use the

5     restroom for just a moment.

6          Why don't you all just get up and stretch and go

7     use the restroom all at once.  That way in case anybody

8     needs to go, as counsel, to the restroom, why don't you take

9     this break, and then we'll continue on.

10         We'll come get you in less than five minutes.

11         Counsel, if you need to use the restroom.

12         MS. KELLER:  Yes, thank you.

13         *(Recess.)*

14         *(The following proceedings is taken in the*

15     *presence of the jury.)*

16         THE COURT:  All right.  Once again, the jury is

17    present, the alternates, all counsel in this matter, the

18    witness.

19         And Mr. Price, if you'd like to continue your

20    examination.

21         **ISAAC LARIAN, PLAINTIFFS' WITNESS, RESUMED**

22              **DIRECT EXAMINATION (Continued)**

23    BY MR. PRICE:

24    Q    Mr. Larian, the sample makers that Ms. Marlow was using

25    to make the fashions for Bratz, they worked for Mattel,

1    didn't they?

2    A    Yes.  I found that out after litigation.

3    Q    And didn't you tell Ms. Garcia at her deposition not to

4    recall if they worked for Mattel?

5    A    I did not.

6    Q    You knew that they worked for Mattel, at the very

7    latest, in 2005, correct?

8    A    I don't remember when I found out, but I found out.

9    Q    At some point you learned that the people who were

10   making the very fashions that were going on, not just the

11   first Bratz dolls, but the Bratz dolls after that, were

12   working at Mattel at the same time they were helping you --

13   helping MGA with Bratz?

14   A    I found out at one time they were working on fashions

15   for Bratz with Veronica Marlow when they were not working at

16   Mattel.

17   Q    And MGA didn't have the ability to make the clothes,

18   the fashions, for Bratz?

19   A    When?

20   Q    From, let's say, 2000 until 2006.

21   A    I don't know if we had or not, but we did not have --

22   we definitely did not have sample makers.  That's why we

23   contracted that to Veronica Marlow.

24   Q    And certainly you agree it would have been wrong for

25   MGA to knowingly use sample makers who worked for Mattel?

1    A     Again, these sample makers are -- they were, the way I

2    understand it, these were hourly workers.  All what they

3    know how to do is sewing, and if they were sewing -- whether

4    they work for MGA or whether they work for Mattel, they were

5    sewing -- making -- sample making on their own time as long

6    as they were not telling Mattel what they were making for

7    MGA, and they were not telling MGA what they were making for

8    Mattel, I don't see anything wrong with it.  Those are

9    hourly workers, Spanish ladies who work per the hour to make

10   their life.  It's like having a housekeeper, you know, who

11   sometimes work for you four, five nights a week and then

12   works for somebody else.

13   Q    Is it your understanding that the employees at Mattel

14   signed confidential and inventions agreements?

15   A    I don't know if they have or not.  I found out through

16   this litigation that at least Carter Bryant has.

17   Q    And are you equating these sample makers to

18   housekeepers?

19   A    Basically, they are hourly workers, they are hourly

20   workers.  It's like when I went to -- when I was going to

21   college, I worked in a restaurant.  In order to make ends

22   meet -- ends meet, I used to work in two different

23   restaurants.

24   Q    Your understanding is that these sample makers are

25   highly skilled craftsmen, right?

```
 1   A    They are sewers, they sew clothing, and there are tons
 2   of them in Southern California, tons of them.  I don't want
 3   to take anything away from them.  They are skilled sewers,
 4   but it's not a unique thing.  There are apparel companies in
 5   Southern California, American Apparel, Guess Jeans you've
 6   heard of, and they employ thousands -- hundreds of sewers
 7   and sample makers.
 8   Q    If you'd look at one of the dolls, the first doll.
 9            MR. PRICE:  Tell us what number it is, Ms. Juarez.
10            MS. JUAREZ:  17551, same as 504, and that's Jade.
11            THE WITNESS:  I'm just going to take this out.
12            Go ahead.
13   BY MR. PRICE:
14   Q    So I want you to look at the fashions on that.
15   A    Yes.
16   Q    Okay.  You're telling me that being able to create
17   those fashions by hand in that size --
18   A    Yes.
19   Q    -- is something that how many thousands of people did
20   you say could do?
21   A    At least, I know at one factory in Hong Kong called
22   Early Light, 3,000.  They manufactured these.  We sold
23   millions of them, and those people sewed every one of these,
24   and I've seen them personally.  I have a video of them, if
25   you'd like to see.
```

1    Q    So if that's the case, if they are so easy to come by,

2    why didn't you just hire some between 2000 and 2004, 2005?

3    A    I didn't get involved in that decision until later on,

4    when I found out that we are paying a lot of money to

5    Veronica Marlow.

6    Q    In fact, you sent Ms. Garcia an e-mail saying you were

7    outraged to how much this cost because it cost more than

8    your wives' dresses.

9         Excuse me, "wife."

10        Your wife's dress.  I apologize.

11   A    That was not -- sir, that was not a very good joke.

12   Q    I know.

13   A    Your partner said before I have girlfriends in front of

14   my wife, and now you said "wives," who is sitting here, and

15   you know where I'm coming from.  And you made this racial

16   remarks in the last trial, and I do not appreciate it.  I

17   don't think it's -- I don't think it's funny.  I know you

18   thought it's funny.  I don't think it's funny.

19   Q    I didn't think it was funny.  I misspoke.  And I never

20   made --

21   A    Please apologize, then.

22   Q    I apologize, but I never made a racist remark, sir, and

23   you know it.

24   A    I don't want to go to that, but you did make a racist

25   remark in the last trial.  It's on the record.

1    Q    No.  That's disgusting.

2    A    You are disgusting.

3    Q    Are you saying that these women who work on these

4    aren't highly skilled crafts people who you desperately

5    wanted?

6    A    I'm sorry, what is your question?

7    Q    These women who work on these, they are highly skilled

8    crafts people, right?

9    A    The people who work on making samples?

10   Q    Who worked on those -- on these fashions, yeah.

11   A    There are 3,000 of them just in Early Light in

12   Hong Kong, and they make these by hand.  I have video of

13   them.  Actually, it's on CMBC.  You can see it.

14   Q    So before we leave tonight, I want to make sure I

15   understand one thing, that you think it is ethical, it is

16   appropriate, there is nothing wrong with the sample makers

17   who work for a competitive company to also work for MGA?  I

18   just want to make sure that that's what you are saying.

19   A    If they are not taking MGA's information to Mattel or

20   Mattel's information to MGA, and they are working on the

21   times, they are hourly workers, they are sewers, they are

22   sewers, they sit behind sewing machine and they sew, and

23   that's how they support their families.  And if they are

24   doing that -- when they leave MGA -- I'm just going to talk

25   about MGA.

1    Q    I asked if you thought it was appropriate.

2    A    I was just going to answer that.

3    Q    The answer is "yes"?

4    A    Yes, because as long as they are not going and telling

5    Mattel what MGA is making.

6    Q    And your understanding -- is that the same

7    understanding even if you know they have contracts saying

8    that they can't assist a competitive company?

9              MS. KELLER:  Objection.  Assumes facts not in

10   evidence.

11             THE WITNESS:  I don't know if these people had

12   contracts or not.  I have no idea.  I've never met them.  I

13   don't know who they are.

14   BY MR. PRICE:

15   Q    So is it your testimony that if you had known from the

16   beginning -- by the end of September of 2000, if you had

17   known that the sample makers that Veronica Marlow was using

18   were women who worked at Mattel were Mattel employees, but

19   they were also working to create the clothes that you put on

20   the Bratz dolls, your understanding is there would have been

21   nothing wrong with that, as far as you are concerned,

22   correct?

23   A    If they were doing it when they were on the clock for

24   Mattel, absolutely that would be wrong.  If they were doing

25   it when they were on the clock for Mattel, it would be

1    absolutely wrong, but again, when you hire somebody, and

2    these sample makers that make $20, $25 an hour, they have

3    families of four or five, and just because I am paying them

4    $20 an hour, and when they clock out, I don't pay them

5    anymore, and all they know how to do is sew, and they go

6    out, whether they sew clothes for somebody's wedding or --

7    as a matter of fact, I think one of these people made --

8    made a dress for Mr. Eckert's daughter's wedding -- that's

9    what I read -- I don't see anything wrong with that.

10   Q    So I want to adopt to your language so I have those --

11   those conditions in it.

12        Your view as of September/October of 2000 would have

13   been if sample makers who are working with Mattel and

14   working with MGA after hours, and they're not conveying

15   confidential information between the companies; are you with

16   me so far?

17   A    Yes.

18   Q    Under that situation, your view is there is nothing

19   wrong with, or would have been nothing wrong with, Veronica

20   Marlow using those sample makers on Bratz, correct?

21   A    In my personal view, if those sample makers were not

22   making, for Veronica Marlow, samples while these guys were

23   on the clock for Mattel, I don't see anything wrong with it,

24   as long as they were not telling MGA or Veronica Marlow

25   that, "Hey, I'm making a dress for Barbie XYZ."

1    Q    And therefore, if you had known in September or October

2    of 2000 that Ms. Marlow, your vendor, was using sample

3    makers who worked at Mattel to, after hours, make the

4    fashions for Bratz, a competitor of Mattel, and they weren't

5    exchanging confidential information, if you had known that,

6    you would have found nothing wrong with that, and you would

7    have done nothing about it, correct?

8    A    I don't know my --

9              MS. KELLER:  Objection.  Calls for speculation.

10             THE WITNESS:  I don't know my state of mind and

11   what it was.  The fact is we did not know -- did not find

12   out that Veronica Marlow was using sample makers at Mattel

13   to make samples for MGA until after this litigation, and we

14   had no idea about it.

15             THE COURT:  The objection is overruled.

16   BY MR. PRICE:

17   Q    I know you testified to that.  I'm trying to see if you

18   would have done anything about it if you had known, okay?

19   And that's why I asked that question.

20   A    I don't know if I would or not.  I don't remember.  I

21   don't -- not that I don't remember.  I don't know if I would

22   or not.  That's not what happened.

23   Q    Well, you just told us it would have been okay, you

24   would have thought it was ethical, okay, appropriate for a

25   sample maker to work at Mattel and then, at the same time,

1    after hours, work on fashions for Bratz if a sample maker

2    wasn't exchanging confidential information, as far as you're

3    concerned, that's okay, correct?

4    A    Yes.

5    Q    And since that's your belief that you've told us, then

6    I take it that it would have been okay with you if you had

7    learned earlier, if you learned as early as September of

8    2000 that the sample makers that were working on the Bratz

9    fashions worked for Mattel during the day and were working

10   on those fashions in the evening as long as they weren't

11   exchanging confidential information.  I'm just saying that

12   would have been okay with you because you just told us you

13   think it's okay, right?  That's all I'm asking.

14   A    You make a big long speech.  What's your question?

15   Q    My question is, under those circumstances, it would

16   have been okay with you if you had learned that in

17   September/October of 2000, right?

18   A    Yes, I don't see anything wrong with it.

19   Q    And so therefore, if you had known the facts you now

20   know, seeing nothing wrong with it, you wouldn't have done

21   anything about it, right?

22   A    If they were doing -- if they were making sample

23   making, sewing for Bratz, and if I knew about it, which I

24   didn't, but if they were doing it after hours on their own

25   time when they are no longer on the clock for Mattel, I

1    don't see anything wrong with it because that's their skill.

2    It's like a waiter waiting tables.  I know how to wait

3    tables.  I waited tables.  In order to put myself through

4    school, I worked at Greek restaurants, and then I worked at

5    Host International.  That's what I did, and I didn't see

6    anything wrong with it, and that's how I equated it.  They

7    paid me $6.50 at one place, they paid me 4.50 on the other.

8    I was getting paid by the hour.  I don't see anything wrong

9    with that.  I knew how to wait tables.  That's how I equate

10   it.

11            MR. PRICE:  Your Honor, we are getting to the

12   documents, and it might take -- maybe we may break now so I

13   can do that in a --

14            THE COURT:  A note just arrived for you.

15            MR. PRICE:  That can wait until tomorrow, too.

16            THE WITNESS:  Your Honor, I am very upset about --

17            THE COURT:  Thank you very much.  We will talk to

18   you about whatever that is in just a moment.

19            Ladies and gentlemen, do not discuss this matter

20   amongst yourselves, nor form or express any opinion

21   concerning the case.  Have a nice evening.  See you tomorrow

22   at 8:30.

23            *(The following proceedings is taken outside*

24        *the presence of the jury.)*

25            THE COURT:  Mr. Larian, would you step down for

1    just a moment.

2            Thank you, sir.

3            And counsel, if you'd be seated.  We are still in

4    session.

5            I want to report back to you, initially,

6    concerning the metadata that you were kind enough to send

7    out to Judge Smith today, and if you'd like the Court to

8    pursue this further, I would be happy to.  You'll get a

9    report sometime tomorrow.

10            The neutral discovery consultant, ILS, who is

11    Diane Berry, who you met and her group, Mr. Zeller, has

12    concluded that the explanation provided by MGA's expert

13    regarding the reason for the empty data field in the

14    metadata for one of the e-mails is logical.  There are no

15    counter-indications in the data that they've received.

16    Ms. Berry has contacted MGA and had been advised that if the

17    Court wants the source data from the e-mails, which were

18    recovered by inspected -- or to be inspected, that data

19    could be provided by tomorrow, which is Thursday afternoon,

20    and the examination by ILS will probably take another

21    additional day, bringing it to Friday, at the earliest.  And

22    I told Judge Smith to put the pedal to the metal and give me

23    some early indication as quickly as possible.  I think I

24    called him last night at -- well, he doesn't sleep either,

25    so 11:00, 11:30, and, of course, he'll respond quickly.

 1            I -- I'm really hesitant to go any further with

 2     this.  I'm fairly well-convinced, now, that copies of the

 3     e-mails, et cetera, leads to the conclusion that these are

 4     duplicate e-mails, notwithstanding the apparent differences.

 5            And that, Mr. Zeller, is to the two field, which

 6     is blank in the metadata for one of the e-mails, but they

 7     find it's logical.  Their finding is that one of the e-mails

 8     was recovered from unallocated space, and that the data

 9     element in the metadata had been simply been overwritten

10     prior to its recovery.  I've taken that extra caution,

11     although I've initially ruled against Mattel in that regard,

12     just to make absolutely certain.

13            But I would just suggest we get that report back

14     in a more formal form.  You look at it.  If you have a

15     serious disagreement, once again -- I know all disagreements

16     are serious, but bring it back to this Court's attention.  I

17     think, though, from my perspective, that ends that

18     discussion.

19            Now --

20            MR. QUINN:  Your Honor, it ends the discussion

21     concerning the e-mail altogether because there's --

22            THE COURT:  No.  Concerning the metadata.

23            MR. QUINN:  All right.

24            THE COURT:  We have lots of discussions to enter

25     into tonight.

```
 1              MR. QUINN:  I just meant that e-mail.

 2              THE COURT:  I know.  I know what you mean.

 3    Nothing never ends, as we found out, so on we go.

 4              Well, what are we going to do this evening?

 5              MR. QUINN:  Your Honor, we have some subjects we'd

 6    like to talk about on the record.  We believe some doors

 7    have been opened.

 8              THE COURT:  That's my concern also.

 9              MR. QUINN:  That's one.

10              THE COURT:  Do you want me to point out one of

11    them that I'm concerned about?

12              What am I going to do with statements that get

13    volunteered when, in fact, I made limiting -- or in-limine

14    motions.  Everything, of course, is on the table, but trial

15    is so fluid, and one of those is the volunteering.  And I

16    know there are some bating going on, obviously, from Mattel,

17    but literally the volunteering that the document was not

18    hidden, it's a completely unresponsive answer because it was

19    handed over and there's nothing to hide.  Of course, MGA had

20    objected.  I simply responded that both sides have been

21    ordered to hand over the information, and I think that

22    resolves it.

23              MR. QUINN:  Well --

24              THE COURT:  But the second more --

25              I'm sorry, did I interrupt you?
```

 1              MR. QUINN:  No.  I'm afraid I interrupted --

 2              THE COURT:  Well, thank you, Mr. Quinn.  I

 3    apologize if I did.

 4              MR. QUINN:  No.  I apologize, your Honor.

 5              THE COURT:  Now, the second one is obviously the

 6    Court, I hope, is wise enough to see this coming, and that

 7    is Mr. Larian volunteered that Mattel uses litigation to

 8    stifle competition.  Obviously, this is in relation to the

 9    antitrust suit that's been filed, and apparently his

10    representation by Mr. Blecher, who's esteemed counsel, it's

11    a completely gratuitous comment.  This Court has previously

12    ruled today that the Hong Kong litigation was not to come

13    in, and now I'm faced, once again, with the real world of

14    trial work, having made what I thought was an absolutely

15    brilliant decision and writing three or four pages on the

16    decision, and completely undermined.

17              Now, in a few moments, the Court anticipates that

18    MGA is going to say, basically, that this shouldn't open the

19    door, that the prejudicial effect outweighs the probative

20    value, that Mattel had been baited, but it's a completely

21    gratuitous comment, completely nonresponsive, Mr. Price, to

22    the question you asked.  And here we are right now, right

23    back in the Hong Kong litigation, which was the Court's

24    effort to completely avoid, the stifling of competition,

25    because frankly, it could be construed that both sides have

 1    stifled competition.  It could be argued to the jury that

 2    Mattel has.  As Mr. Larian points out, it could be argued

 3    that MGA has, that this gratuitous comment has opened the

 4    door to the numerous lawsuits filed in Hong Kong, the

 5    Central District of California, the United Kingdom by MGA.

 6    And Mr. Quinn's prior argument, that some of these dolls

 7    aren't even close, in a sense, if you compared them, which

 8    the Court had sought to avoid.

 9         The third problem we have is that while I agree

10    that you can get into Tumaliuan and other people who have

11    gone over to take employees, we are really getting into a

12    situation where the agreement between the parties was that

13    since each of you could sit in each seat, claimant,

14    counterclaimant, and we could literally reverse those, the

15    agreement was that MGA could go first in terms of what I

16    call "sneaking into the showrooms"; you could set the table,

17    in other words, from MGA's perspective, and then, of course,

18    Mattel was going to counter.  I don't think that that's been

19    breached, but what it does is it takes the sting out a

20    little bit of what's going to become an awfully nasty fight

21    between two dolls who can't get along, and the American

22    public is soon going to find out that they seem to be

23    stealing from each other, which is not the American

24    womanhood in its most virtuous posture, and it's going to

25    get very ugly.

```
 1              So now I'm done.  I can just anticipate those

 2    three things this evening.

 3              And now, Mr. Quinn, what have I missed?

 4              MR. QUINN:  The comments "We gave you everything"

 5    that was repeated, we think has opened the door on certain

 6    spoliation issues.  We are prepared to make offers of proof

 7    on that.

 8              THE COURT:  I want you to do that, but be careful,

 9    though, because there are some things out there also that

10    are very harmful to Mattel.

11              MR. QUINN:  We think that his comments --

12              THE COURT:  Be very careful.  I think we ought to

13    go to dinner, not with each other --

14              MR. QUINN:  Right.

15              THE COURT:  -- and think about that --

16              MR. QUINN:  Sure, but your --

17              THE COURT:  -- because once that door gets

18    opened --

19              MR. QUINN:  In terms of just putting out --

20              THE COURT:  -- in terms of law firms also --

21              MR. QUINN:  I have no problem with that, your

22    Honor.  I welcome that.

23              THE COURT:  Okay.  All right.

24              MR. QUINN:  But just in terms of an agenda, your

25    Honor, could I put out the points, which I think --
```

```
 1              THE COURT:  Please.

 2              MR. QUINN:  "I gave you everything" repeated;

 3    spoliation.

 4              Two, "You've destroyed me"; insurance.

 5              Three, "Stifling competition," the Court, we

 6    think, has got that exactly right.

 7              And then there's a couple of instructions.  We

 8    have had communications with Carter Bryant's counsel and

 9    have some information we can share concerning Mr. Bryant's

10    health.

11              THE COURT:  Tell me about that.  Did he have a

12    stroke?

13              MR. QUINN:  They don't know.  He got dizzy.  He

14    was at the airport.  He even boarded the plane.  He --

15    there -- he was dizzy, apparently there was some pain.  They

16    actually took him off, and he went in an ambulance to the

17    Hoag Hospital.  He was there for six hours.  They did tests,

18    and apparently it was indeterminate.  He then flew back to

19    Missouri.  He's in Missouri.  He's dizzy.  His counsel says

20    he hasn't seen a doctor yet, so there isn't a diagnosis.

21              THE COURT:  How in the world -- just a moment.

22              How in a world would a competent doctor release

23    anybody who's had a stroke and allow them to fly on a plane?

24              MR. QUINN:  Well, apparently, there actually

25    hasn't been a diagnosis that he's had a stroke, but we think
```

1    the Court should, having now done what we discussed last

2    night, should tell the jury that Mattel has nothing to do

3    with Carter Bryant's health or tell him that he was

4    threatened with $150 million and let that document come in

5    from MGA.  Mattel did not kill his father.  And now, today,

6    Mattel doesn't know any royalties for trapezoidal packaging,

7    which Mr. Larian blurted out, and that's irrelevant, has

8    nothing to do with anything, and we don't owe him anything.

9              THE COURT:  Now, Mr. Zeller is going to pass you a

10   note.

11             MR. QUINN:  Your Honor, I don't know what to do.

12   I don't know what to do about the racist -- the exchange on

13   the racist comment.  I haven't begun to think about that.

14             THE COURT:  This will be a first, that you don't

15   know what to do, Mr. Quinn.

16             (Laughter.)

17             THE COURT:  All right.  Ms. Keller?

18             MS. KELLER:  Let me start with the last thing

19   first.

20             The Court's aware of Mr. Larian's sensitivities on

21   this front, given what happened at the last trial, and he

22   doesn't take it as a joke when somebody makes a comment

23   about his "wives," he doesn't at all.  And I know he is --

24   the Court may have perceived him to have overreacted to

25   that, but this is something that he's had to deal with all

```
 1   his life, and he is, I think, justifiably sensitive about

 2   it.

 3            THE COURT:  Yeah.

 4            MS. KELLER:  As far as Carter Bryant, I had

 5   heard -- oh, and he -- he was actually -- Mr. --

 6            THE COURT:  Stop for just a moment.  Let Ms. Hurst

 7   talk to you.  Take your time with this.

 8            MS. KELLER:  In addition, your Honor, Mr. Zeller,

 9   in Mr. Larian's deposition, accused him on the record of

10   having had an affair based on nothing.  It is -- the history

11   of this litigation has been very contentious, and it has

12   been very personal starting, literally, with the day that

13   Mr. Larian was served when people started pounding on his

14   door at 5:30 in the morning terrifying his whole family, and

15   he was then, after everybody jumped out of their beds and

16   ran downstairs to the door, he was then told, "You're

17   served."  So he is prickly, and he is -- he is primed per

18   the kinds of things that have happened to him to happen to

19   him again.

20            When he was on the stand, I know the Court had

21   told us to admonish him that he was not to have any

22   outbursts, and as far as -- I'm sure the Court saw that

23   throughout the day, there were no outbursts of the type we

24   had yesterday until the comment about his "wives," and his

25   reaction, your Honor, was not a deliberate one.  It was --
```

1    it was anger, I think, that wells up from very deep within.

2            As far as the Carter Bryant issue goes, perhaps I

3    should not have told Mr. Larian, but I did, when I had

4    received information from Peter Bonis on Monday,

5    February 7th, at about 10:26 in the morning, that Mr. Bryant

6    was suspected to have had a stroke at the airport, but

7    Mr. Bonis didn't have any additional information.  And I'm

8    sure I received the same e-mail today that Mr. Quinn

9    received where Mr. Bonis told us that what had happened was

10   that Mr. Bryant had been at the Orange County airport when

11   he started experiencing a twinge in his neck and back,

12   became dizzy and had trouble walking, got on the airplane

13   but then realized that he was not in shape to go and an

14   ambulance took him to Hoag Hospital, where he was given a

15   CAT scan and blood work, but again, there was apparently no

16   diagnosis, and he flew back to -- he flew back to Missouri.

17           Mr. Larian reacted with shock when I told him that

18   I didn't have any information, but I thought Mr. Bryant

19   might have had a stroke.  He was upset, and he -- knowing

20   how ill Mr. Bryant has been on and off over the years, was

21   emotional about it.  I -- I -- I'm sure that he wishes he

22   had not blurted that out on the stand, your Honor, but this

23   has been a very emotional matter for him, and it has been

24   made very personal.

25           He was, in my opinion, baited throughout his

Case 2:04-cv-09049-DOC-RNB  Document 9865  Filed 02/14/11  Page 101 of 116  Page ID #:297873
CV 04-9049-DOC - 02/09/2011 - Day 15, Vol. 3 of 3

101

1    examination.  He has been asked the same question, in some

2    cases I've actually kept count, as many as 12, 13, 14 times

3    on a given topic.  He has been asked argumentative and

4    sarcastic questions.  He's been inferentially and more

5    directly accused of being a liar, and frankly, he was

6    handling it much better than he had handled it yesterday

7    until -- until the end of the day.

8             He was presented with partial e-mails, little

9    snippets of e-mails without the whole context being

10   provided.  There were allegations against him that he had

11   concealed this Patty Glaser e-mail when the fact of the

12   matter is it was a decision by the law firm, and that law

13   firm was presented with information by Mr. Larian.

14   Mr. Larian's law firm decided not to turn it over.  He got a

15   new law firm.  The new law firm looked at the information

16   and turned it over.  That, in and of itself, would seem to

17   indicate that Mr. Larian wasn't responsible for the

18   decision, but he was beaten up with that for over a half an

19   hour and asked the same questions over and over and over

20   again.

21            So I think in context and -- oh, and -- and, your

22   Honor, additionally, I might point out that the e-mail, the

23   Glaser e-mail where he was -- it was repeatedly stressed,

24   including by your Honor, that it was all about his state of

25   mind at the time, what was his state of mind at the time of

Case 2:04-cv-09049-DOC-RNB   Document 9865   Filed 02/14/11   Page 102 of 116   Page ID #:297874
CV 04-9049-DOC - 02/09/2011 - Day 15, Vol. 3 of 3

102

1   the meeting with Mr. Nolan, and it was stricken from the

2   record when he replied that it was the day his father died,

3   he was at his father's house, and he was sitting shiva when

4   Mr. Nolan dropped by; speaking of state of mind.  But he was

5   beaten up with that for a good half an hour without being

6   able to say that his father had just died at the time, and

7   that he was home greeting mourners, one of whom was

8   Mr. Nolan.

9            THE COURT:  One of the reasons I cut that off,

10  Counsel, so now that I have a clear record in response, is

11  you could certainly respond to that if you'd like to, but

12  your objection I think well-taken, and that is, I don't want

13  the conversation between Mr. Nolan coming in, which was

14  about to come in, with the death of his father.  Now, that

15  doesn't preclude you from going back into that area if you

16  choose, but to be concerned about that ruling, I think that

17  that was the appropriate ruling at that time to cut off the

18  conversation.  I didn't know what I was going to hear.  I

19  was concerned it was attorney-client privilege, and you have

20  all the options.

21           MS. KELLER:  And I understand that, your Honor,

22  and I certainly respect the Court's ruling.  It's just that

23  I -- I think that in the cold, critical atmosphere of the

24  courtroom, we sometimes forget that these are real human

25  beings, even in the biggest disputes, and he was having

1    questions fired at him over and over about something that,

2    frankly, the context for him, in his mind, is that his

3    father was lying there dead in the house and had just died.

4    And he does attribute the stress that was imposed on him and

5    his family, especially on him that exacerbated the situation

6    with his brother who was called to the stand by Mattel.  He

7    does attribute his father's death when it occurred and how

8    it occurred to -- to that.  And so I, you know, I -- I hope

9    that -- I hope that his occasional emotional reactions, your

10   Honor, can be seen in that light.

11          MR. PRICE:  Your Honor, may I say something?  Bill

12   Price here.

13          THE COURT:  Mr. Price?

14          MR. PRICE:  As the Court and Ms. Keller know, at

15   the end of a long day standing up, I literally have trouble,

16   sometimes, with words.

17          THE COURT:  Have trouble --

18          MR. PRICE:  With words, at the end of the day.  So

19   when "wives" came out, it wasn't intended to come out, and I

20   was embarrassed.  The reason that I reacted was because

21   Mr. Larian then made an accusation about racism at the last

22   trial, and he made that accusation at the last trial, and I

23   would welcome the Court or anybody to look at the transcript

24   of the last trial to see what was said.  And it was my

25   belief that Mr. Larian was trying to take advantage of that,

 1   and refer to racism at the last trial, which is why I

 2   responded.

 3          The second thing is that I have asked a lot of

 4   questions many times.  The question is how many times has

 5   there been an answer, and, of course, the Court can control

 6   the proceedings if the Court believes that things are

 7   getting repetitious.

 8          THE COURT:  All right.  Thank you.  Now, just give

 9   me a few moments.

10          *(Interruption in the proceedings.)*

11          *(Discussion between the Court and court*

12      *reporter held off the record.)*

13          THE COURT:  These are not rulings.  These are some

14   tentative thoughts on, I think, whatever wisdom I have,

15   which tells me to take my time and to reflect.  There is

16   nothing that will guide the Court in this.  It's somewhat of

17   an equitable decision.

18          First, let's start with some pretty harsh

19   discussion with both parties.  Concerning Mr. Larian, if

20   this was a single comment in reaction to Mr. Price's

21   question concerning "wives," this Court would fully

22   understand the insult that was just hurled at you on the

23   stand.  Your wife is present in the court, has been present

24   here.  That's a very hurtful comment, and it doesn't matter

25   if it's volitional or unvolitional.  There is a past history

Case 2:04-cv-09049-DOC-RNB   Document 9865   Filed 02/14/11   Page 105 of 116   Page ID #:297877
CV 04-9049-DOC – 02/09/2011 – Day 15, Vol. 3 of 3

105

1    in this case, apparently, in the first trial of some

2    accusations that were made in that first trial, and this

3    Court had hoped to avoid it.  I think many people would

4    react to any insult concerning our spouse, be it male or

5    female on the stand.

6            On the other hand, Mr. Larian has cast numerous

7    gratuitous comments long before Mr. Price's question today.

8    In other words, the Court has seen a habit pattern, although

9    he's certainly been somewhat restrained of -- apparently

10   through either the excuse of language or emotion and getting

11   in front of the jury the death of his father, which is

12   sympathetic, of course, as all of our parents have died, but

13   the blaming of Mattel, quote-unquote.

14           Second, the blurting out that Mr. Bryant had had a

15   stroke in front of this jury when, in fact, there is nothing

16   to verify that.  No information had come to the Court, and I

17   find it astounding that a doctor, even after six hours in a

18   hospital, would put a suspected stroke victim on a plane;

19   rather extraordinary.

20           So first, there is no excuse for the prior history

21   of Mr. Larian's unsolicited comments.  They are designed to

22   gain favor and sympathy with this jury and influence them,

23   in this Court's opinion, or they may be at least construed

24   that way.

25           From Mattel, Mr. Price, there is no excuse.

Case 2:04-cv-09049-DOC-RNB   Document 9865   Filed 02/14/11   Page 106 of 116   Page ID #:297878
CV 04-9049-DOC - 02/09/2011 - Day 15, Vol. 3 of 3

106

1    You're paid counsel, hundreds of millions of dollars, and I

2    don't care whether it's volitional or unvolitional, it

3    doesn't matter.  It's not intentional baiting.  The end

4    result is you saw the reaction.  The problem is the reaction

5    was overboard, and it gave the excuse, if you will, to get a

6    lot of the information in front of the jury when that

7    diatribe came out.  I don't know if that would have happened

8    eventually, but the genesis of that is you, and you are

9    responsible for it.

10        So therefore, somehow this Court has to get off

11   the bench and equitably try to figure out with no bright

12   lined rule from the Rules of Evidence, but with some wisdom,

13   I hope, something that balances this out and keeps this as a

14   fair trial.

15        I'm not certain that this opens the door to the

16   Hong Kong litigation, but I'm not certain you are not going

17   to be able to ask about it in a succinct fashion.  But

18   second, I am not certain that you get away, and I mean that

19   whether it's volitional or unvolitional, with your expertise

20   of a baiting comment that is argued and may be construed to

21   have brought about a reaction, because remember, we fight

22   wars over words.  I mean, what's a person's reputation

23   worth?  It's worth a whole lot in terms of the way we react.

24        So going through the record, as I've just been

25   able to reread, and listening to yesterday, whether

 1    intentional or not, whether emotional or not, Mr. Larian has

 2    absolutely been violating, in my opinion, repeatedly, now,

 3    the admonition to answer questions, or at least I hope the

 4    instruction by his counsel, and there is no excuse for that.

 5            By the same token, Mr. Price, there is no excuse

 6    for your comment.

 7            I'm going to get off the stand, and we'll rejoin

 8    each other sometime this evening.  I just think it would be

 9    wise that we took a break.  I don't know if I'm going to

10    require the court reporter to be present this evening.  It

11    may take an hour or so, but I'm just going to get away from

12    this for a while and just do some quiet reflection and try

13    to resolve this as best I can.

14            The first problem that's going to occur to me is

15    how do deal with Carter Bryant, as you said, Mr. Quinn, and

16    this alleged stroke where the doctor puts him back on the

17    plane and the gratuitous comment.  The second, how am I

18    going to deal with the blurting out that the death of the

19    father is the blamed on Mattel, regardless of his state of

20    mind, both comments being totally inappropriate and

21    nonresponsive to the question by Mr. Larian.

22            Third, how am I going to deal with Mr. Price's

23    either volitional or nonvolitional statement, which is

24    baiting, and whether that opens up the door, because then,

25    the comments extend far beyond the packaging and into the

1    area of the Hong Kong litigation, which this Court was

2    determined to keep out, opening up many trials within many

3    trials and completely abusing the Court's decision.

4            I should have had you each post a million dollars,

5    write a check and put it on the corner of your desk, and

6    what I would be doing right now for the great taxpayers of

7    this country is taking the million dollars from each of you

8    and giving it to the great taxpayers of the federal

9    government to pay them back for this nonsense.

10           Mr. Larian, I'm going to deal with this, trust me,

11   tomorrow, and it will not be favorable.

12           Mr. Price, I'm going to deal with this tomorrow.

13   It will not be favorable to Mattel either; understood by

14   both of you?

15           MR. PRICE:  I understand.

16           THE COURT:  Good.  Now, I'm going to go back, get

17   off the bench and take some quiet time for reflection, maybe

18   even walk around the courthouse a few times.  You are going

19   to meet me back here at 7:00.  You may be sitting until

20   9:00, but when I finally work this out, both of you are

21   going to be dealt with.

22           The difficulty for this Court, so the Circuit

23   knows upon review, is that this Court doesn't want to react

24   precipitously, and I certainly don't want to be in a

25   position of damaging one of the parties by this Court's

1    comments.  But this seems to be an ongoing effort by both

2    parties, Mattel and MGA, to undermine the Court's rulings,

3    and apparently it started with Judge Larson, it's been

4    continuing through the depositions, and I'm not sure that

5    either party has gotten the message yet.

6            I don't think I can sanction MGA for Mr. Larian

7    blurting out or Mr. -- his gratuitous comments under the

8    feigned position that these are just emotional.  I really

9    don't care if a witness is emotional or not.  This appears

10   to be somewhat intentional, now, and a pattern, and I'm

11   really not accepting whether volitional or not, the end

12   result is that this has opened the door by Mattel and

13   Mr. Price's comments.

14           7:00, okay?  We're done now.

15           *(Recess.)*

16           *(The following proceedings is taken outside*

17       *the presence of the jury.)*

18           THE COURT:  All right.  All counsel and the

19   parties are present, the jury is, of course, not present.

20           After the Court's ruling, I'm going to excuse the

21   parties this evening so you can focus on your case.  There

22   will be no further discussion of this after the Court's

23   orders.

24           First, no evidence -- there is absolutely no

25   evidence that Mattel killed Mr. Larian's father.  There is

Case 2:04-cv-09049-DOC-RNB   Document 9865   Filed 02/14/11   Page 110 of 116   Page ID #:297882
CV 04-9049-DOC - 02/09/2011 - Day 15, Vol. 3 of 3

110

 1   no evidence that Mr. Larian wanted to kill Bob Eckert.  This

 2   Court's going to make no further comment about Mr. Larian's

 3   statement that Mattel killed his father.  This Court has

 4   complete faith in this jury to recognize evasive and

 5   nonresponsive answers.  Counsel is free to argue on behalf

 6   of Mattel or MGA nonresponsiveness bears on credibility.

 7   The Court also informed the parties and the jury early on

 8   that I'll continue to instruct the jury to this effect

 9   during the trial.

10        Second, there is no proof that Carter Bryant has

11   suffered a stroke or that Mattel was responsible for any of

12   his health difficulties.  This is a trial.  Carter Bryant

13   testified at the first trial, and he was expected to testify

14   and did testify at this trial.  He may be back for another

15   portion of this trial.  This Court has already adequately

16   instructed this jury to the effect when this was initially

17   blurted out by Mr. Larian.  I don't feel that the Court need

18   make any further comment, and there will be no further

19   comment by any counsel unless it's brought to the Court's

20   attention first and out of the presence of the jury.

21        Third, there is a request by Mattel to get into

22   the area of spoliation on the grounds that Mr. Larian opened

23   the door with his comment that MGA had turned everything

24   over to Mattel.  Mr. Larian was baited into this comment

25   through the nature of Mr. Price's questioning.

Case 2:04-cv-09049-DOC-RNB   Document 9865   Filed 02/14/11   Page 111 of 116   Page ID #:297883
CV 04-9049-DOC - 02/09/2011 - Day 15, Vol. 3 of 3

111

 1              The testimony that Mattel claims opened the door

 2     could be found at 16:05:54 through 16:09.  The context of

 3     the questioning is an e-mail concerning Ryan Tumaliuan, who

 4     was a Mattel intern that had previously interned at MGA.

 5     Mr. Price stated that, quote, "At the time you wrote this,

 6     you did not believe that your answer would be seen by

 7     anybody outside of MGA, correct?" end of quote.  Mr. Larian

 8     responded, quote, "That is not correct.  Since you do have

 9     this document in your hand and MGA produced it means that

10     you saw it.  We gave it to you.  We had nothing to hide,"

11     end of quote.

12              This Court notes the fact that Mr. Larian used the

13     word "had," the past tense of the verb, suggesting that his

14     comment was in specific reference to the Tumaliuan e-mail

15     and MGA's thinking with respect to that e-mail.  However,

16     Mr. Price used this answer to go off on a tangent about

17     overall document production in this litigation.  Mr. Price

18     asked, quote, "Wait a minute.  Many of the documents that

19     MGA has handed over in this litigation were as a result of

20     motions requiring you to hand over such documents, correct?"

21     end of quote.  Mr. Price did not restrict his question to

22     the circumstances of this particular e-mail, even though

23     that was what the line of questioning was about.  Mr. Larian

24     answered, "I don't know.  We gave you everything,

25     everything, everything that Mattel has asked for," end of

1    quote.

2           The finding of this Court is that the door has not

3    been opened to spoliation by Mr. Larian based on this line

4    of questioning.  Regardless, even if the door had been

5    opened, the Court has already rejected Mattel's claimed

6    evidence of spoliation.  In fact, it's continued to take

7    extraordinary measures to make certain that Mr. Zeller's

8    concern, including this last metadata, has been resolved.

9           Fourth, in discussing TX 8936, it's a

10   February 2nd, 2005 e-mail making war references.  Larian

11   lists all the entities Mattel had sued, MGA, Carter Bryant,

12   and says, "Yes, we are still at war with Mattel today," end

13   of quote.  Mr. Price then says, quote, "So in this e-mail,

14   you are not talking about competition, you are talking about

15   lawsuits that have been filed?" end of quote.  Larian

16   responds with a "yes" and states that lawsuits are Mattel's

17   means of stifling competition.

18          This is a gratuitous comment in a string of

19   gratuitous comments about Mattel's motives in filing this

20   lawsuit, as well as Mattel's anti-competitive tendencies.

21   This Court was on the record last evening at 8:00, 9:00 or

22   10:00 -- I forget the evening hours -- warning counsel to

23   get these gratuitous comments under control.

24          Because of this continuing string of gratuitous

25   comments, Mattel can ask Mr. Larian about MGA's lawsuits

Case 2:04-cv-09049-DOC-RNB   Document 9865   Filed 02/14/11   Page 113 of 116   Page ID #:297885
CV 04-9049-DOC - 02/09/2011 - Day 15, Vol. 3 of 3

113

1    against other entities, for instance, Hong Kong, but must

2    stay away from discussions of similarity of the dolls.

3           In any event, I'm putting the parties on notice

4    that if Mattel elicits, though, that testimony regarding

5    MGA's use of litigation against competitors, the door will

6    be permanently opened on the litigation-to-death issue that

7    Mattel has been seeking to introduce into evidence.

8           So now, I'm turning that to Mattel.  You can make

9    the first tactical decision.

10          Finally, the Court addresses Mr. Price's comment

11   regarding Mr. Larian's "wives' dresses."  I've taken some

12   time this evening, it's only 7:40, but I've reviewed the

13   audio portion of the testimony numerous times.  We're very

14   fortunate, not only to have the transcript but the audio,

15   which I'm going to order preserved for the Circuit, Jane.

16          After Mr. Price makes this comment, he chuckles.

17   The Court also notes that he then apologized immediately

18   after.  This Court cannot make a determination if this

19   chuckle arose from nervousness or whether Mr. Price had

20   ulterior motives in drawing attention to the comment or

21   whether Mr. Price was genuinely concerned with trying to

22   correct his mistake.  At the end of the day, it does not

23   matter; the effect is the same.  Attorneys have been paid

24   hundreds of millions of dollars on both sides of this

25   lawsuit to be careful with their words.

 1              The Court also notes that there is something of a

 2     history at play with respect to the comments about

 3     Mr. Larian's marriage.  Looking back through the

 4     depositional testimony, which, once again, the Court took

 5     the time to do this evening, I note that questions were

 6     asked by Mattel that attempted to insinuate that Mr. Larian

 7     was having an extra-marital -- strike that, an extra-marital

 8     relationship.  The Court chooses not to elaborate further on

 9     the record this evening.  The Circuit, upon review, can find

10     this testimony in the depositional questions asked by

11     Mr. Zeller.  Those questions may have been appropriate at

12     the time, but this history has made witnesses sensitive to

13     comments like the one Mr. Price gave today.  Given this

14     history, comments like this are bound to cause a reaction.

15     That does not mean that witnesses always take the bait or

16     should use this as an excuse to give nonresponsive answers.

17              I'm struck by Judge Kozinski's comment, and I'm

18     going to quote him.  Quote, "The parties are advised to

19     chill out," and I'll leave it at that this evening.

20              Now, there's no further discussion.  I don't wish

21     to be in your presence this evening.  I've taken the time to

22     get out of your presence this evening and thoughtfully

23     reflect in chambers.

24              Goodnight without further comment.

25              MR. PRICE:  Your Honor --

CV 04-9049-DOC – 02/09/2011 – Day 15, Vol. 3 of 3

1          THE COURT:  Goodnight without further comment.

2      (Recess.)

3                      -oOo-

Case 2:04-cv-09049-DOC-RNB   Document 9865   Filed 02/14/11   Page 116 of 116   Page ID #:297888
CV 04-9049-DOC – 02/09/2011 – Day 15, Vol. 3 of 3

116

1                            -oOo-

2                         **CERTIFICATE**

3

4        I hereby certify that pursuant to Section 753,

5   Title 28, United States Code, the foregoing is a true and

6   correct transcript of the stenographically reported

7   proceedings held in the above-entitled matter and that the

8   transcript page format is in conformance with the

9   regulations of the Judicial Conference of the United States.

10

11  Date:  February 10, 2011

12

13

14        _____

         JANE C.S. RULE, U.S. COURT REPORTER
15       CSR NO. 9316

16

17

18

19

20

21

22

23

24

25