Case 2:04-cv-09049-DOC-RNB   Document 9866   Filed 02/14/11   Page 1 of 136   Page ID #:297889
CV 04-9049 DOC – 2/10/2011 – Day 16, Volume 1 of 4

1

1            **UNITED STATES DISTRICT COURT**

2            **CENTRAL DISTRICT OF CALIFORNIA**

3        **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4                    – – – – – – –

5

6   MATTEL, INC., et al.,              )
                                       )
7            Plaintiffs,               )
                                       )
8        vs.                           ) No. CV 04-9049 DOC
                                       )    Day 16
9   MGA ENTERTAINMENT, INC., et al.,   )    Volume 1 of 4
                                       )
10                                     )
            Defendants.                )
11   _____)

12

13

14          REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                  Jury Trial

16              Santa Ana, California

17          Thursday, February 10, 2011

18

19

20

21   Debbie Gale, CSR 9472, RPR, CCRR
     Federal Official Court Reporter
22   United States District Court
     411 West 4th Street, Room 1-053
23   Santa Ana, California 92701
     (714) 558-8141
24

25   04cv9049 Mattel 2011-02-10 D16V1

Case 2:04-cv-09049-DOC-RNB   Document 9866   Filed 02/14/11   Page 2 of 136   Page ID #:297890
CV 04-9049 DOC - 2/10/2011 - Day 16, Volume 1 of 4

2

1    **APPEARANCES OF COUNSEL:**

2

     FOR PLAINTIFF MATTEL, INC., ET AL.:

3

              QUINN EMANUEL URQUHART & SULLIVAN
4             BY:  JOHN QUINN
                   WILLIAM PRICE
5                  MICHAEL T. ZELLER
                   Attorneys at Law
6             865 South Figueroa Street
              10th Floor
7             Los Angeles, California 90017
              (213) 443-3000

8

9

10

11   FOR DEFENDANT MGA ENTERTAINMENT, INC., ET AL:

12            ORRICK, HERRINGTON & SUTCLIFFE, LLP (Irvine)
              BY:  THOMAS S. McCONVILLE
13                 Attorney at Law
              4 Park Plaza
14            Suite 1600
              Irvine, California 92614
15            (949) 567-6700

16            - AND -

17            ORRICK, HERRINGTON & SUTCLIFFE, LLP (SF)
              BY:  ANNETTE L. HURST
18                 Attorney at Law
              405 Howard Street
19            San Francisco, California 94105
              (415)773-5700

20            - AND -

21            KELLER RACKAUCKAS
22            BY:  JENNIFER KELLER
                   Attorney at Law
23            18500 Von Karman Avenue
              Suite 560
24            Irvine, California 92612
              (949) 476-8700

25

Case 2:04-cv-09049-DOC-RNB   Document 9866   Filed 02/14/11   Page 3 of 136   Page ID #:297891
CV 04-9049 DOC - 2/10/2011 - Day 16, Volume 1 of 4

3

1    **APPEARANCES OF COUNSEL (Continued):**

2

3    FOR CARLOS GUSTAVO MACHADO GOMEZ:

4
         LAW OFFICES OF MARK E. OVERLAND
5        By:  MARK E. OVERLAND
              Attorney at Law
6        100 Wilshire Boulevard
         Suite 950
7        Santa Monica, California 90401
         (310) 459-2830
8
         - AND -
9
         SCHEPER KIM & HARRIS LLP
10       BY:  ALEXANDER H. COTE
              Attorney at Law
11       601 West 5th Street
         12th Floor
12       Los Angeles, California 90071
         (213) 613-4660
13

14   ALSO PRESENT:

15       MGA ENTERTAINMENT, INC.
         BY:  JEANINE PISONI
16            Attorney at Law
         16360 Roscoe Boulevard
17       Suite 105
         Van Nuys, California 91406
18

19       ROBERT ECKERT, Mattel CEO

20       ISAAC LARIAN, MGA CEO

21       KEN KOTARSKI, Mattel Technical Operator

22       MIKE STOVALL, MGA Technical Operator

23       RACHEL JUAREZ, Quinn Emanuel Urquart & Sullivan

24

25

```
1                         I N D E X

2

3   WITNESSES                    DIRECT  CROSS  REDIRECT  RECROSS

4   LARIAN, Isaac

5   By Mr. Price                  6

6

7

8                          EXHIBITS

9   EXHIBIT NO.                   IDENTIFICATION    IN EVIDENCE

10    827      E-mail between                          13
             Mr. Larian and
11           Mr. Bryant

12   7056     E-mail string betweeen                  113
             Mr. Larian and
13           Mr. Brawer, dated
             4/11/2005
14
     7540     E-mail chain between                    115
15           Mr. Larian and Ms. Hocut

16   7544     E-mail from Mr. Larian                  118
             dated 2/24/2006
17
     8928     E-mail string                            10
18
     8947     E-mail string between                    23
19           Mr. Larian and
             Ms. Garcia dated
20           1/29/2004

21   11641    E-mail                                     8

22   13223    E-mail from Mr. Marlow                    38
             to Ms. Garcia and
23           Mr. Larian

24   13624    E-mail string from                        26
             Mr. Marlow to Mr. Larian
25
```

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 9866   Filed 02/14/11   Page 5 of 136   Page ID #:297893
CV 04-9049 DOC - 2/10/2011 - Day 16, Volume 1 of 4

5

1                    **EXHIBITS** (Continued)

2    **EXHIBIT NO.**              **IDENTIFICATION**      **IN EVIDENCE**

3

4    22173   E-mail chain between                              16
             Mr. Larian, Ms. Garcia
5            and Mr. Hall

6    22292   E-mail string between                            35
             Mr. Larian and
7            Ms. Garcia

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | **SANTA ANA, CALIFORNIA, THURSDAY, FEBRUARY 10, 2011**       |
|       | 2  | **Day 16, Volume 1 of 4**                                    |
|       | 3  | (8:33 a.m.)                                                   |
| 08:24 | 4  | *(In the presence of the jury.)*                             |
| 08:33 | 5  | THE COURT:  All right.  We are back in session.              |
| 08:33 | 6  | The jury is present, the alternates.  Good morning, counsel. |
| 08:34 | 7  | Mr. Larian's present.                                        |
| 08:34 | 8  | And, Mr. Price, if you would like to continue with           |
| 08:34 | 9  | your examination, please.                                    |
| 08:34 | 10 | **ISAAC LARIAN, MATTEL'S WITNESS, PREVIOUSLY SWORN**         |
| 08:34 | 11 | **RESUMED THE STAND**                                        |
| 08:34 | 12 | **DIRECT EXAMINATION (Continued)**                           |
| 08:34 | 13 | BY MR. PRICE:                                                 |
| 08:34 | 14 | Q.   Good morning, Mr. Larian.                               |
| 08:34 | 15 | A.   Good morning.                                           |
| 08:34 | 16 | Q.   When we left last night, we were talking about the      |
| 08:34 | 17 | patternmakers.  Do you recall that?                          |
| 08:34 | 18 | A.   The sample makers?                                      |
| 08:34 | 19 | Q.   Yes.  And I think at the end we ended with a question   |
| 08:35 | 20 | about whether or not it would be appropriate for them to     |
| 08:35 | 21 | work for Mattel and also work for MGA at the same time,      |
| 08:35 | 22 | assuming they weren't giving confidential information.  Do   |
| 08:35 | 23 | you recall that?                                             |
| 08:35 | 24 | A.   Yes.                                                    |
| 08:35 | 25 | Q.   And I think your testimony was that as far as you're    |

Case 2:04-cv-09049-DOC-RNB   Document 9866   Filed 02/14/11   Page 7 of 136   Page ID #:297895
CV 04-9049 DOC - 2/10/2011 - Day 16, Volume 1 of 4

7

| 08:35 | 1  | concerned, that would be okay.  Do you recall that? |
| 08:35 | 2  | A.   Yes. |
| 08:35 | 3  | MR. PRICE:  Your Honor, I would like to read from |
| 08:35 | 4  | Mr. Larian's deposition -- not deposition -- let's say a |
| 08:35 | 5  | transcript, June 6, 2008, page 1826, lines 2 through 16. |
| 08:35 | 6  | *(Document provided to the witness.)* |
| 08:35 | 7  | *(Document provided to the Court.)* |
| 08:36 | 8  | THE COURT:  You may. |
| 08:36 | 9  | MR. PRICE:  (Reading:) |
| 08:36 | 10 | "QUESTION:  You would agree that it would have |
| 08:36 | 11 | been wrong for Veronica Marlow to use Mattel employees to |
| 08:36 | 12 | sew fashions for Bratz dolls? |
| 08:36 | 13 | "ANSWER:  If she did, yes, she would be wrong. |
| 08:36 | 14 | "QUESTION:  Is it correct that if you had |
| 08:36 | 15 | discovered that, you would have stopped her from working on |
| 08:36 | 16 | any Bratz dolls? |
| 08:36 | 17 | "ANSWER:  I would have stopped her if I knew that |
| 08:36 | 18 | she was working on -- she was using Mattel employees to work |
| 08:36 | 19 | on Bratz dolls.  I would definitely stop her, yes. |
| 08:36 | 20 | "QUESTION:  And that's because you know that that |
| 08:36 | 21 | simply is inappropriate activity? |
| 08:36 | 22 | "ANSWER:  That's correct." |
| 08:36 | 23 | BY MR. PRICE: |
| 08:36 | 24 | Q.   So Mr. Larian, I want to show you a few e-mails that |
| 08:36 | 25 | you received concerning the seamstresses from 2000 to 2005. |

| | | |
|---|---|---|
| 08:36 | 1 | And I'd like to start with 11641. |
| 08:37 | 2 | (Document provided to the witness.) |
| 08:37 | 3 | THE WITNESS:  Yes, go ahead. |
| 08:37 | 4 | MR. PRICE:  Your Honor, I believe this is already |
| 08:37 | 5 | in evidence. |
| 08:37 | 6 | (Document displayed.) |
| 08:37 | 7 | BY MR. PRICE: |
| 08:37 | 8 | Q.   You recall, Mr. Larian, that we were talking about this |
| 08:37 | 9 | in connection with what resources MGA had when -- in the |
| 08:37 | 10 | October timeframe, after Mr. Bryant brought you the designs; |
| 08:37 | 11 | do you recall that? |
| 08:37 | 12 | A.   Yes. |
| 08:37 | 13 | Q.   And you recall that as of mid-October |
| 08:37 | 14 | Ms. Treantafelles -- Ms. Garcia, the bottom of this, was |
| 08:37 | 15 | saying she needed to have seamstresses and patternmakers -- |
| 08:38 | 16 | MR. PRICE:  Your Honor, I'm told this version is |
| 08:38 | 17 | not -- I think they're duplicate numbers.  I move 11641 into |
| 08:38 | 18 | evidence. |
| 08:38 | 19 | THE COURT:  Received. |
| 08:38 | 20 | (Exhibit No. 11641 received in evidence.) |
| 08:38 | 21 | BY MR. PRICE: |
| 08:38 | 22 | Q.   And you see there's an e-mail from Ms. Garcia saying, |
| 08:38 | 23 | "Isaac and Mercedeh, I need to have seamstresses and |
| 08:38 | 24 | patternmakers ready and committed to supporting Carter and |
| 08:38 | 25 | Veronica the week of October 30 for Bratz fashions.  Do you |

| | | |
|---|---|---|
| 08:38 | 1 | guys know of anyone that we can call?  I wanted to call some |
| 08:38 | 2 | of my buddies at Mattel, but maybe this isn't the best |
| 08:38 | 3 | idea," and it goes on. |
| 08:38 | 4 | You recall that at the middle of October, there was a |
| 08:38 | 5 | need to have seamstresses and patternmakers to help with |
| 08:38 | 6 | Bratz?  Do you recall that? |
| 08:38 | 7 | A.   Yes. |
| 08:38 | 8 | Q.   And do you recall that Ms. Garcia, searching for |
| 08:38 | 9 | seamstresses and patternmakers, couldn't find anybody and |
| 08:38 | 10 | had to use Ms. Marlow? |
| 08:38 | 11 | A.   I don't know if she could find or not find anybody, but |
| 08:38 | 12 | we ended up using Ms. Marlow. |
| 08:39 | 13 | Q.   And you were unhappy because Ms. Marlow's operation, |
| 08:39 | 14 | providing sample makers and seamstresses, was quite |
| 08:39 | 15 | expensive? |
| 08:39 | 16 | A.   At one time I was, yes. |
| 08:39 | 17 | Q.   Let's look at 8928-002. |
| 08:39 | 18 | *(Document provided to the witness.)* |
| 08:39 | 19 | MR. PRICE:  Do you have 8928 in front of you? |
| 08:39 | 20 | THE WITNESS:  Yes.  Can I review it for a moment? |
| 08:39 | 21 | BY MR. PRICE: |
| 08:40 | 22 | Q.   Please do. |
| 08:40 | 23 | A.   Yes, go ahead. |
| 08:40 | 24 | Q.   Mr. Larian, that document you see where you've written |
| 08:41 | 25 | an e-mail to Ms. Garcia and then Louise (sic) Ungar? |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 08:41 | 1 | A.   Yes, I have. |
| 08:41 | 2 | Q.   And it's concerning the Bratz vendors? |
| 08:41 | 3 | A.   Yes. |
| 08:41 | 4 | Q.   So these are people who aren't working within MGA, but |
| 08:41 | 5 | MGA is hiring as a vendor to provide services, correct? |
| 08:41 | 6 | A.   Yes.  We call 'em freelancers, correct. |
| 08:41 | 7 | MR. PRICE:  Move Exhibit 8928 into evidence. |
| 08:41 | 8 | THE COURT:  Received. |
| 08:41 | 9 | *(Exhibit No. 8928 received in evidence.)* |
| 08:41 | 10 | *(Document displayed.)* |
| 08:41 | 11 | BY MR. PRICE: |
| 08:41 | 12 | Q.   And you see the top here says, "Paula, please see below |
| 08:41 | 13 | and let's discuss."  Do you see that? |
| 08:41 | 14 | A.   Yes. |
| 08:41 | 15 | Q.   And there's an e-mail to Ms. Garcia and you saying, |
| 08:41 | 16 | "Please can we reasonably ask that we consider exclusivity |
| 08:41 | 17 | for only Margaret, Veronica, and Anna."  Do you see that? |
| 08:41 | 18 | A.   Yes, I see that. |
| 08:41 | 19 | Q.   And by Veronica, was it your understanding that she was |
| 08:41 | 20 | talking about Veronica Marlow? |
| 08:41 | 21 | A.   Yes. |
| 08:41 | 22 | Q.   And Anna, she's talking about Anna Rhee? |
| 08:41 | 23 | A.   Yes. |
| 08:42 | 24 | Q.   And Margaret, Margaret Leahy? |
| 08:42 | 25 | A.   That's correct. |

| | | |
|---|---|---|
| 08:42 | 1 | Q.   And this is one of those e-mails at the bottom where |
| 08:42 | 2 | there's an e-mail and then you type in your response, |
| 08:42 | 3 | correct? |
| 08:42 | 4 | A.   Yes. |
| 08:42 | 5 | Q.   And if we go to the second page, you see there's a |
| 08:42 | 6 | thing -- "What molds?  Explain.  Isaac."  And, I guess, |
| 08:42 | 7 | that's referring to the one about that, where it says, |
| 08:42 | 8 | "Jesse, South Bay molds."  Do you see that? |
| 08:42 | 9 | A.   Yes. |
| 08:42 | 10 | Q.   And then it says, "Veronica Marlow, $303,087.87."  Do |
| 08:42 | 11 | you see that? |
| 08:42 | 12 | A.   I do. |
| 08:42 | 13 | Q.   And these were payments made from April 2001 to |
| 08:42 | 14 | September 2002.  Do you see that? |
| 08:42 | 15 | A.   Yes. |
| 08:42 | 16 | Q.   So we're talking about a year and a half? |
| 08:42 | 17 | A.   Yes. |
| 08:42 | 18 | Q.   And your response is, "My God!  What is she doing for |
| 08:43 | 19 | us -- what is she doing for us for this money?  Let's |
| 08:43 | 20 | discuss.  We can hire four high quality doll fashion |
| 08:43 | 21 | designers with experience full-time for this money.  I need |
| 08:43 | 22 | to see and sign all her future" -- and it has "PO" -- I |
| 08:43 | 23 | think that's a dot --"ISAA"? |
| 08:43 | 24 | A.   I left the C out.  It's supposed to say Isaac. |
| 08:43 | 25 | Q.   Oh, okay.  And so PO means? |

| 08:43 | 1 | A.    A purchase order. |
| 08:43 | 2 | Q.    So this is in October 2002.  It's true, is it not, that |
| 08:43 | 3 | you contend and continued to use Veronica Marlow to provide |
| 08:43 | 4 | sample makers and seamstresses because you couldn't find |
| 08:43 | 5 | anybody else? |
| 08:43 | 6 | A.    I don't know what she was exactly doing.  That's why I |
| 08:43 | 7 | was asking this question.  But I think she was doing the |
| 08:43 | 8 | fashions for the Bratz dolls. |
| 08:43 | 9 | Q.    And one of the things that the sample makers and the |
| 08:44 | 10 | seamstresses do is -- it's not just the sewing; they also |
| 08:44 | 11 | help come up with some of the ideas sometimes? |
| 08:44 | 12 | A.    They don't. |
| 08:44 | 13 | Q.    So your understanding is that the $303,087.87 was just |
| 08:44 | 14 | for the seamstresses, the sewing? |
| 08:44 | 15 | A.    No. |
| 08:44 | 16 | Q.    What was it for? |
| 08:44 | 17 | A.    I think she was going to shop for samples, for fabrics |
| 08:44 | 18 | that we could use, comparative shopping for fashions, what's |
| 08:44 | 19 | out there in fashion and not in there.  I'm sure she charged |
| 08:44 | 20 | money for herself. |
| 08:44 | 21 | MR. PRICE:  One moment, Your Honor. |
| 08:44 | 22 | Your Honor, in light of the exchange yesterday at |
| 08:45 | 23 | the end of the day, there is another document concerning |
| 08:45 | 24 | this which I'd like to use, if I can provide it to the |
| 08:45 | 25 | Court. |

CV 04-9049 DOC - 2/10/2011 - Day 16, Volume 1 of 4

13

| | | |
|---|---|---|
| 08:45 | 1 | THE COURT: If you would, please. Let me see it. |
| 08:45 | 2 | MR. PRICE: I've provided a copy to counsel. |
| 08:45 | 3 | *(Document provided to the Court.)* |
| 08:45 | 4 | MR. PRICE: And, Your Honor, particularly, I'm |
| 08:45 | 5 | looking at the fourth paragraph on the first e-mail. |
| 08:45 | 6 | THE COURT: That would be on page what? |
| 08:45 | 7 | MR. PRICE: First page, Your Honor, and it's the |
| 08:45 | 8 | fourth paragraph. |
| 08:45 | 9 | THE COURT: All right. |
| 08:46 | 10 | You may. |
| 08:46 | 11 | MR. PRICE: Do you have a copy up there?  827. |
| 08:46 | 12 | *(Document provided to the witness.)* |
| 08:46 | 13 | BY MR. PRICE: |
| 08:46 | 14 | Q.   Mr. Larian, if you would look at 827 and see if that's |
| 08:46 | 15 | an e-mail exchange between you and Carter Bryant. |
| 08:47 | 16 | A.   Good. |
| 08:47 | 17 | Q.   Do you recognize this as an e-mail exchange between you |
| 08:47 | 18 | and Mr. Bryant concerning, in part, promises he had made to |
| 08:47 | 19 | Veronica Marlow and your advice concerning that? |
| 08:47 | 20 | A.   Yes. |
| 08:47 | 21 | MR. PRICE: Your Honor, move 827 into evidence. |
| 08:47 | 22 | THE COURT: Received. |
| 08:47 | 23 | *(Exhibit No. 827 received in evidence.)* |
| 08:47 | 24 | *(Document displayed.)* |
| | 25 | |

CV 04-9049 DOC – 2/10/2011 – Day 16, Volume 1 of 4

14

| | | |
|---|---|---|
| 08:47 | 1 | BY MR. PRICE: |
| 08:47 | 2 | Q.   If we look at the bottom of the first page, you see |
| 08:47 | 3 | this is Mr. Bryant e-mailing you, and in the first sentence |
| 08:47 | 4 | he says, "I promised Veronica that I'd give her 10 percent |
| 08:47 | 5 | of whatever I was to earn from the Bratz as a thank you." |
| 08:48 | 6 | Do you see that? |
| 08:48 | 7 | A.   Yes. |
| 08:48 | 8 | Q.   And he wanted you to read through an e-mail from |
| 08:48 | 9 | Mr. Marlow and get your thoughts and advice.  Do you recall |
| 08:48 | 10 | that? |
| 08:48 | 11 | A.   Yes. |
| 08:48 | 12 | Q.   And he asked at the end, "Can you -- "Can our original |
| 08:48 | 13 | Bratz contract be amended to give Veronica 10 percent of my |
| 08:48 | 14 | 3 percent?" |
| 08:48 | 15 | Do you see that? |
| 08:48 | 16 | A.   Yes. |
| 08:48 | 17 | Q.   So that she would still get, under that suggestion, |
| 08:48 | 18 | 10 percent of what was promised him by MGA, correct? |
| 08:48 | 19 | A.   10 percent of the 3 percent royalties that Carter |
| 08:48 | 20 | Bryant would make on Bratz products that he worked on. |
| 08:48 | 21 | Q.   And your understanding was that Peter Marlow was |
| 08:48 | 22 | Veronica Marlow's husband? |
| 08:48 | 23 | A.   Yes. |
| 08:48 | 24 | Q.   And let's go to the top and your response, dated |
| 08:48 | 25 | May 30, 2001. |

Case 2:04-cv-09049-DOC-RNB   Document 9866   Filed 02/14/11   Page 15 of 136   Page ID #:297903
CV 04-9049 DOC - 2/10/2011 - Day 16, Volume 1 of 4

15

| 08:48 | 1 | A.   Go ahead. |
| 08:48 | 2 | Q.   And do you see the last paragraph, last full paragraph? |
| 08:49 | 3 | A.   Yes. |
| 08:49 | 4 | Q.   It says, "Also, we have paid Veronica over $90,000 on |
| 08:49 | 5 | this project already.  This is a very healthy amount.  Don't |
| 08:49 | 6 | let her/him, make you feel guilty on this issue.  They were |
| 08:49 | 7 | paid well for the work they did.  My wife's tailor-made |
| 08:49 | 8 | dresses don't cost as much as she charges for one doll." |
| 08:49 | 9 | Do you see that? |
| 08:49 | 10 | A.   I do. |
| 08:49 | 11 | Q.   And when you're talking "as much as she charges for one |
| 08:49 | 12 | doll," you're literally talking about one doll? |
| 08:49 | 13 | A.   No.  I'm just talking -- I'm just making a sarcastic |
| 08:49 | 14 | remark there. |
| 08:49 | 15 | Q.   Well, by May of 2001, at that point Bratz dolls had not |
| 08:49 | 16 | been released, correct? |
| 08:49 | 17 | A.   Actually, they had been shipped, yes.  No, that's not |
| 08:49 | 18 | correct. |
| 08:49 | 19 | Q.   Were they on the market at that point? |
| 08:50 | 20 | A.   I don't know if it was May or June, but they definitely |
| 08:50 | 21 | have been manufactured and shipped. |
| 08:50 | 22 | Q.   It was very early on in the cycle of putting Bratz on |
| 08:50 | 23 | the market, correct? |
| 08:50 | 24 | A.   Yes. |
| 08:50 | 25 | Q.   And by May 31, Ms. Marlow and her team had been paid |

| | | |
|---|---|---|
| 08:50 | 1 | over $90,000, correct? |
| 08:50 | 2 | A.   According to this, yes. |
| 08:50 | 3 | Q.   And there's no reason for you to believe this is |
| 08:50 | 4 | incorrect, right? |
| 08:50 | 5 | A.   That's correct. |
| 08:50 | 6 | Q.   I'd like you to look now at 22173. |
| 08:50 | 7 | (Document provided to the witness.) |
| 08:51 | 8 | BY MR. PRICE: |
| 08:51 | 9 | Q.   And you see this as an e-mail chain between you and |
| 08:51 | 10 | Ms. Garcia and a gentleman named Jeffrey Hall? |
| 08:51 | 11 | A.   I need a moment to read it. |
| 08:51 | 12 | Q.   Sure. |
| 08:51 | 13 | A.   Okay.  Yes, it is. |
| 08:51 | 14 | Q.   Who, by the way, is Jeffrey Hall? |
| 08:51 | 15 | A.   I think he was in our accounting department.  I don't |
| 08:51 | 16 | recollect him well. |
| 08:51 | 17 | Q.   If you look at the bottom of the page, the first e-mail |
| 08:51 | 18 | sent to Mr. Hall, and this is an e-mail that was forwarded |
| 08:52 | 19 | to you, correct? |
| 08:52 | 20 | A.   Yes, the last portion was. |
| 08:52 | 21 | MR. PRICE:  I'm sorry.  Your Honor, I move 22173 |
| 08:52 | 22 | into evidence. |
| 08:52 | 23 | THE COURT:  Received. |
| 08:52 | 24 | (Exhibit No. 22173 received in evidence.) |
| 08:52 | 25 | (Document displayed.) |

| | | |
|---|---|---|
| 08:52 | 1 | BY MR. PRICE: |
| 08:52 | 2 | Q.   And the bottom e-mail from Ms. Garcia to Mr. Hall says, |
| 08:52 | 3 | "Jeff, this is my list of vendors and what I hope to expend |
| 08:52 | 4 | per month.  Can the new process commence immediately since |
| 08:52 | 5 | we are onset of new month.  I leave on Thursday for |
| 08:52 | 6 | New York, so I was hoping we can come to conclusion before I |
| 08:52 | 7 | leave." |
| 08:52 | 8 | And you see the first expense is Marlow, 40,000 a |
| 08:52 | 9 | month. |
| 08:52 | 10 | Do you see that? |
| 08:52 | 11 | A.   Yes. |
| 08:52 | 12 | Q.   And did you understand that Ms. Marlow had three of |
| 08:52 | 13 | these patternmakers working for her? |
| 08:52 | 14 | A.   I have no idea how many she had. |
| 08:52 | 15 | Q.   Well, for an expense of 40,000 a month, did you have |
| 08:52 | 16 | any discussions with Ms. Garcia to find out what am I |
| 08:52 | 17 | spending 40,000 a month, 480,000 a year for? |
| 08:53 | 18 | A.   If you look in the top of the e-mail, I had concern |
| 08:53 | 19 | what -- where was she spending the money for. |
| 08:53 | 20 | Q.   And let's go to the top, then, which expresses that. |
| 08:53 | 21 | And that's e-mail dated February 5, 2003, correct? |
| 08:53 | 22 | A.   That's correct. |
| 08:53 | 23 | Q.   And you say, "40,000 a month for Veronica, 20,000 for |
| 08:53 | 24 | Leahy?  Are you okay?  This is not approved and we need to |
| 08:53 | 25 | discuss." |

| | | |
|---|---|---|
| 08:53 | 1 | Do you see that? |
| 08:53 | 2 | A.   I do. |
| 08:53 | 3 | Q.   And you assume that you did discuss with Ms. Garcia? |
| 08:53 | 4 | A.   I'm sure there was discussion.  I just don't recall it. |
| 08:53 | 5 | Yes, yes. |
| 08:53 | 6 | Q.   Well, if you don't recall the specific discussion, do |
| 08:53 | 7 | you recall at this time learning -- around this time |
| 08:53 | 8 | learning that -- that Ms. Marlow had, you know, three |
| 08:53 | 9 | patternmakers and seamstresses that were working on the |
| 08:53 | 10 | Bratz fashions? |
| 08:53 | 11 | A.   I don't.  I did not know what she was doing.  That's |
| 08:53 | 12 | why I was asking these questions.  And if she had three, she |
| 08:54 | 13 | had five, she had ten sample makers, I did not. |
| 08:54 | 14 | Q.   Well, you said you didn't know what she was doing; |
| 08:54 | 15 | that's why you were asking the question.  And so that's what |
| 08:54 | 16 | I'm wondering. |
| 08:54 | 17 | Having asked the question, did you get any response?  I |
| 08:54 | 18 | mean, did you learn around this timeframe that Ms. Marlow |
| 08:54 | 19 | was using three patternmakers to assist her in making the |
| 08:54 | 20 | Bratz fashions? |
| 08:54 | 21 | A.   No, I don't remember that. |
| 08:54 | 22 | Q.   Do you recall anything you did learn about Veronica |
| 08:54 | 23 | Marlow's operation based upon your statement that "We need |
| 08:54 | 24 | to discuss"? |
| 08:54 | 25 | A.   I -- my focus was $40,000 a month for Veronica Marlow |

Case 2:04-cv-09049-DOC-RNB  Document 9866  Filed 02/14/11  Page 19 of 136  Page ID #:297907
CV 04-9049 DOC – 2/10/2011 – Day 16, Volume 1 of 4

19

| | | |
|---|---|---|
| 08:54 | 1 | or $20,000 a month for Margaret Leahy were outrageous |
| 08:54 | 2 | amount.  And I needed to see that to approve it. |
| 08:54 | 3 | Q.   Do you know -- you've heard the name "Beatriz Morales"? |
| 08:55 | 4 | A.   I have not. |
| 08:55 | 5 | Q.   In this litigation, you have never heard the term |
| 08:55 | 6 | "Beatriz Morales"? |
| 08:55 | 7 | A.   I have heard that name through this litigation. |
| 08:55 | 8 | Q.   And is it your understanding that in this timeframe she |
| 08:55 | 9 | was a senior sample maker, paid full-time and with salaries |
| 08:55 | 10 | and compensation over 40,000 at Mattel? |
| 08:55 | 11 | A.   I had not.  I do not.  You're talking about 2003, |
| 08:55 | 12 | correct?  As of date of this e-mail, I did not, nor do I |
| 08:55 | 13 | know as of today.  This is first time I hear that she was |
| 08:55 | 14 | making $40,000 a year. |
| 08:55 | 15 | Q.   Yesterday, I think you told the jury that -- your |
| 08:55 | 16 | belief that patternmakers were -- all of them were hourly |
| 08:55 | 17 | workers? |
| 08:55 | 18 | A.   They are.  At MGA they are for sure. |
| 08:56 | 19 | Q.   Even the senior sample makers who have supervisory |
| 08:56 | 20 | duties, even those are hourly at MGA? |
| 08:56 | 21 | A.   I don't know if we even have something called senior -- |
| 08:56 | 22 | what did you call it?  Senior sample maker.  I don't know |
| 08:56 | 23 | that.  I don't get involved with that level or supervise |
| 08:56 | 24 | them. |
| 08:56 | 25 | Q.   Well, through this litigation, you've heard the name |

CV 04-9049 DOC – 2/10/2011 – Day 16, Volume 1 of 4

20

08:56  1    "Ana Isabella Cabrera"?

08:56  2    A.   I have heard this through this litigation, yes.

08:56  3    Q.   And you understand that when she was at Mattel, she was

08:56  4    a full-time salaried lead sample maker, making over $50,000

08:56  5    with benefits?

08:56  6    A.   I have no idea what she made and what benefits she had.

08:56  7    I have no idea.  Never met the lady.

08:56  8    Q.   Well, in this litigation, you heard these names in

08:56  9    connection with whether or not the Marlows were using Mattel

08:56  10   sample makers to work on Bratz products, correct?

08:57  11   A.   I have, yes.

08:57  12   Q.   And yesterday -- you said yesterday that sample makers

08:57  13   are hourly employees, correct?

08:57  14   A.   At MGA they are hourly employees, that's correct.

08:57  15   Q.   Well, yesterday you didn't say at MGA they were hourly

08:57  16   employees; you simply said sample makers are hourly

08:57  17   employees, correct?

08:57  18   A.   Yes.  And that's my understanding in the industry.

08:57  19   Q.   Well, since you knew specifically about Beatriz Morales

08:57  20   and about Ana Isabella Cabrera --

08:57  21        MS. KELLER:  Objection.  That misstates the

08:57  22   testimony, Your Honor, that he knew specifically about

08:57  23   Ms. Morales, or that he knew then about Ms. Cabrera.

08:57  24        MR. PRICE:  The timeframe here.  I'm gonna do a

08:57  25   timeframe.

CV 04-9049 DOC – 2/10/2011 – Day 16, Volume 1 of 4

21

| 08:57 | 1 | THE COURT:  Overruled. |
| 08:57 | 2 | BY MR. PRICE: |
| 08:57 | 3 | Q.    Since in this litigation you learned specifically about |
| 08:57 | 4 | Beatriz Morales and Ana Isabella Cabrera, did you look at |
| 08:57 | 5 | documents or do anything or look at depositions to determine |
| 08:57 | 6 | whether or not they were hourly employees without benefits? |
| 08:58 | 7 | A.    No, I don't know if -- I don't recall ever looking at |
| 08:58 | 8 | any deposition from -- I'm sorry -- these two ladies you |
| 08:58 | 9 | just mentioned. |
| 08:58 | 10 | Q.    Do you have any understanding as to whether or not the |
| 08:58 | 11 | senior sample makers -- the lead sample makers, the senior |
| 08:58 | 12 | sample makers, whether or not at Mattel and other companies, |
| 08:58 | 13 | those are salaried employees with benefits, who signed |
| 08:58 | 14 | confidentiality inventions agreements? |
| 08:58 | 15 | MS. KELLER:  Objection.  Your Honor, this is all |
| 08:58 | 16 | assuming facts not in evidence. |
| 08:58 | 17 | THE COURT:  Overruled. |
| 08:58 | 18 | THE WITNESS:  I don't know what senior or leader |
| 08:58 | 19 | or CEO sample makers at Mattel make.  I have no idea.  Or |
| 08:58 | 20 | what their benefits are. |
| 08:58 | 21 | BY MR. PRICE: |
| 08:58 | 22 | Q.    So what you told the jury yesterday that sample makers |
| 08:58 | 23 | in general were hourly, you didn't have any basis to say |
| 08:58 | 24 | that, did you, because you don't know what other companies |
| 08:59 | 25 | pay or how it's structured? |

| | | |
|---|---|---|
| 08:59 | 1 | A.   I do.  MGA pays its sample makers hourly, and I know, |
| 08:59 | 2 | for example, in China, where our factories employ 3-, 4,000 |
| 08:59 | 3 | sample makers, they are paid hourly. |
| 08:59 | 4 | Q.   Well, you talked -- you said -- you talked yesterday |
| 08:59 | 5 | about there being thousands of sample makers that would be |
| 08:59 | 6 | available to work, for example, on Bratz dolls, people who |
| 08:59 | 7 | now work on Guess jeans or other -- other locations.  Do you |
| 08:59 | 8 | recall testifying about that? |
| 08:59 | 9 | A.   Yes.  In Southern California there is a lot of apparel |
| 08:59 | 10 | companies; there are a lot of toy companies.  And they, in |
| 08:59 | 11 | my experience and knowledge, employ seamstresses for |
| 08:59 | 12 | fashions. |
| 08:59 | 13 | Q.   So there -- |
| 08:59 | 14 | A.   We -- |
| 08:59 | 15 | Q.   Sorry. |
| 08:59 | 16 | A.   We did that before when we made Bouncy Baby.  We made |
| 09:00 | 17 | Dream Baby.  We have made Giddy Up Baby.  We did those. |
| 09:00 | 18 | Q.   So with the thousands available -- |
| 09:00 | 19 | A.   Yes. |
| 09:00 | 20 | Q.   -- it really shouldn't have been a problem for MGA to |
| 09:00 | 21 | find a couple of sample makers to work on Bratz, correct? |
| 09:00 | 22 | A.   Shouldn't have. |
| 09:00 | 23 | Q.   I'd like you to look at 13624. |
| 09:00 | 24 | *(Document provided to the witness.)* |
| 09:01 | 25 | THE WITNESS:  Go ahead. |

CV 04-9049 DOC – 2/10/2011 – Day 16, Volume 1 of 4

23

| | | |
|---|---|---|
| 09:01 | 1 | BY MR. PRICE: |
| 09:01 | 2 | Q.   Now, this is an e-mail you got in January of 2003 from |
| 09:01 | 3 | Veronica Marlow; is that right? |
| 09:01 | 4 | A.   From Peter Marlow.  From Peter Marlow. |
| 09:01 | 5 | Q.   I'm sorry.  Your e-mail is to Veronica Marlow and –– |
| 09:01 | 6 | I'm sorry.  The e-mail is to Veronica Marlow, but the e-mail |
| 09:01 | 7 | to you was from Peter Marlow; is that right? |
| 09:01 | 8 | A.   That's correct. |
| 09:02 | 9 | Q.   I have these out of order, I think, Mr. Larian, so let |
| 09:02 | 10 | me ask you first to look –– and my apologies for that –– at |
| 09:02 | 11 | 8947.  And that's dated January 29, 2004. |
| 09:02 | 12 | *(Document provided to the witness.)* |
| 09:03 | 13 | THE WITNESS:  Go ahead. |
| 09:03 | 14 | BY MR. PRICE: |
| 09:03 | 15 | Q.   And you recognize that this e-mail string begins with |
| 09:03 | 16 | an e-mail from Ms. Garcia to you, dated January 29, 2004, |
| 09:03 | 17 | correct? |
| 09:03 | 18 | A.   Yes.  I'm on the same one, correct. |
| 09:03 | 19 | MR. PRICE:  Your Honor, move in Exhibit 8947. |
| 09:03 | 20 | THE COURT:  Received. |
| 09:03 | 21 | *(Exhibit No. 8947 received in evidence.)* |
| 09:03 | 22 | *(Document displayed.)* |
| 09:03 | 23 | BY MR. PRICE: |
| 09:03 | 24 | Q.   If we look at the bottom e-mail, this is the one sent |
| 09:03 | 25 | by Ms. Garcia to you at the beginning of 2004, correct? |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 09:03 | 1 | A.   Yes, it is. |
| 09:03 | 2 | Q.   And by this time MGA still had not found the ability to |
| 09:03 | 3 | hire a few patternmakers, right? |
| 09:03 | 4 | A.   I don't know if we had or not. |
| 09:03 | 5 | Q.   Well, you see Ms. Garcia saying, "I was thinking I can |
| 09:03 | 6 | hire right now the pending three seamstresses I have been |
| 09:03 | 7 | looking for.  They are the best and ready to leave Mattel, |
| 09:04 | 8 | but it says they are wonderful Latin women who are not |
| 09:04 | 9 | comfortable with their driving skills.  They all live in |
| 09:04 | 10 | South Bay.  If we would be willing to sponsor a carpool to |
| 09:04 | 11 | pick them up, they would come.  Apparently, this is a |
| 09:04 | 12 | service that Mattel already provides them.  Is this |
| 09:04 | 13 | reasonable?  Would MGA sponsor something like this?  I've |
| 09:04 | 14 | been looking now for nearly 8 months for good seamstresses, |
| 09:04 | 15 | and I need to recruit ASAP, since we are starting" -- I |
| 09:04 | 16 | think that's "S, 2005, next week." |
| 09:04 | 17 | Do you see that? |
| 09:04 | 18 | A.   Yes. |
| 09:04 | 19 | Q.   And you had, earlier than this, given Ms. Garcia |
| 09:04 | 20 | permission to go look for seamstresses, correct? |
| 09:04 | 21 | A.   Yes. |
| 09:04 | 22 | Q.   And from this e-mail, you understood that apparently |
| 09:04 | 23 | she was batting worse than zero for 1,000 over eight months. |
| 09:05 | 24 | A.   I just replied at the top, saying to Janice Foti, who |
| 09:05 | 25 | is head of human resources, that if we need to provide |

Case 2:04-cv-09049-DOC-RNB   Document 9866   Filed 02/14/11   Page 25 of 136   Page ID #:297913
CV 04-9049 DOC - 2/10/2011 - Day 16, Volume 1 of 4

25

| | | |
|---|---|---|
| 09:05 | 1 | carpool service for these people, find out how much it's |
| 09:05 | 2 | cost.  I'm not a baseball player. |
| 09:05 | 3 | BY MR. PRICE: |
| 09:05 | 4 | Q.  Well, you told the jury yesterday, I think, that there |
| 09:05 | 5 | were thousands of these folks in the Southern California |
| 09:05 | 6 | area, right? |
| 09:05 | 7 | A.  There are. |
| 09:05 | 8 | Q.  But those thousands of people aren't the kind of |
| 09:05 | 9 | craftsmen that you need to do the kind of fashions that |
| 09:05 | 10 | Bratz needed, right? |
| 09:05 | 11 | A.  That is not correct. |
| 09:05 | 12 | Q.  Well, then, how was it that Ms. Garcia was looking for |
| 09:05 | 13 | these patternmakers, good seamstresses for nearly eight |
| 09:06 | 14 | months when thousands were available and she couldn't find |
| 09:06 | 15 | any? |
| 09:06 | 16 | A.  I don't know why she'd say that. |
| 09:06 | 17 | Q.  Well, might she have said that because it was true? |
| 09:06 | 18 | A.  I don't know why she'd say that.  I know it's not true. |
| 09:06 | 19 | I know that there are toy companies in Southern California, |
| 09:06 | 20 | Jakks Pacific, Spin Master's, Bandai, Playmate.  I can give |
| 09:06 | 21 | you names after names after names that they use |
| 09:06 | 22 | seamstresses.  So I don't know why she was focused on |
| 09:06 | 23 | Mattel. |
| 09:06 | 24 | Q.  Did -- well, if you look at the third line, she said |
| 09:06 | 25 | they are the best, correct? |

Case 2:04-cv-09049-DOC-RNB  Document 9866  Filed 02/14/11  Page 26 of 136  Page ID #:297914
CV 04-9049 DOC – 2/10/2011 – Day 16, Volume 1 of 4

26

| | | |
|---|---|---|
| 09:06 | 1 | A.   That's what she said. |
| 09:06 | 2 | Q.   And you were looking for, in connection with the Bratz |
| 09:06 | 3 | line, the best? |
| 09:06 | 4 | A.   We always look for the best. |
| 09:06 | 5 | Q.   Did you ever send an e-mail or communicate at all with |
| 09:06 | 6 | Ms. Garcia to say, uh, you -- you couldn't have been looking |
| 09:07 | 7 | for seamstresses for eight months and come up with nothing; |
| 09:07 | 8 | that's impossible in this market? |
| 09:07 | 9 | A.   What is the question? |
| 09:07 | 10 | Q.   Did you ever send an e-mail to Ms. Garcia saying |
| 09:07 | 11 | something like, how could it take -- how could you go eight |
| 09:07 | 12 | months without finding someone?  The market's full of |
| 09:07 | 13 | people? |
| 09:07 | 14 | A.   I did not. |
| 09:07 | 15 | Q.   Look at 13624, which I did have -- I had in front of |
| 09:07 | 16 | you earlier.  And I apologize. |
| 09:07 | 17 | *(Document provided again to witness.)* |
| 09:07 | 18 | THE WITNESS:  Go ahead. |
| 09:08 | 19 | BY MR. PRICE: |
| 09:08 | 20 | Q.   I think we discussed before this is an e-mail string |
| 09:08 | 21 | first from Peter Marlow to you and then from you to Veronica |
| 09:08 | 22 | Marlow.  And other people? |
| 09:08 | 23 | MR. PRICE:  Move Exhibit 13624 into evidence. |
| 09:08 | 24 | THE COURT:  Received. |
| 09:08 | 25 | *(Exhibit No. 13624 received in evidence.)* |

| | | |
|---|---|---|
| 09:08 | 1 | *(Document displayed.)* |
| 09:08 | 2 | BY MR. PRICE: |
| 09:08 | 3 | Q.   And it starts with an e-mail from Mr. Marlow, talking |
| 09:08 | 4 | about Veronica Marlow's operation, correct? |
| 09:08 | 5 | A.   Yeah, it goes on and on.  That's correct. |
| 09:08 | 6 | Q.   And if you would look at the third paragraph, beginning |
| 09:08 | 7 | with -- on the second page beginning with "because"? |
| 09:08 | 8 | A.   I'm sorry? |
| 09:08 | 9 | Q.   If you would look at -- it's the third full paragraph |
| 09:08 | 10 | on the second page, beginning with "because"? |
| 09:08 | 11 | A.   Yes. |
| 09:08 | 12 | Q.   You see it says, "Because Veronica and her team of |
| 09:08 | 13 | three helpers accomplish in three days what such a team |
| 09:08 | 14 | would take ten days to do to get the same volume |
| 09:09 | 15 | productivity, you would need to employ at least twelve, plus |
| 09:09 | 16 | a manager, and this is assuming that they nail every project |
| 09:09 | 17 | the first time like Veronica does.  It is likely that this |
| 09:09 | 18 | team of employees," paren, "now department, will not always |
| 09:09 | 19 | have a clear vision of a Bratz concept.  Some of the |
| 09:09 | 20 | fashions they create may not be consistent with the Bratz |
| 09:09 | 21 | style.  Some of it may look trashy or cheap.  Some may be |
| 09:09 | 22 | reminiscent of Barbie." |
| 09:09 | 23 | You read that before replying? |
| 09:09 | 24 | A.   I did not.  It's a long, long e-mail.  He was -- my |
| 09:09 | 25 | recollection of this e-mail is that I just did not want to |

| 09:09 | 1 | pay the outrageous amount that Veronica Marlow was charging. |
| 09:09 | 2 | And if you look at my response, it's a few sentences telling |
| 09:09 | 3 | him that, basically, if you gonna do any work for MGA, from |
| 09:10 | 4 | now on you better get a purchase order.  It has to be |
| 09:10 | 5 | approved or we won't pay it. |
| 09:10 | 6 | Q.   Well, it took a while to get into this e-mail from |
| 09:10 | 7 | Mr. Marlow before he said, "What I'm complaining about is," |
| 09:10 | 8 | uh, "the untimely payment on invoices," right? |
| 09:10 | 9 | A.   No, there's another e-mail prior to that, as you're |
| 09:10 | 10 | well aware.  And it -- copied.  The one you just saw, I |
| 09:10 | 11 | said, "What the hell is she charging that kind of amount?" |
| 09:10 | 12 | So this is a whole series of e-mail, basically. |
| 09:10 | 13 | Q.   Well -- well, that one was -- what?  February 5th, |
| 09:10 | 14 | 2003, I believe, the 40,000 a month? |
| 09:10 | 15 | A.   I don't remember the dates.  But there has been a whole |
| 09:10 | 16 | bunch of e-mails in this regard. |
| 09:10 | 17 | Q.   Okay. |
| 09:10 | 18 | A.   Go ahead.  I'll answer your question. |
| 09:10 | 19 | Q.   Oh great.  If you would look at the second page, |
| 09:10 | 20 | 13624-002? |
| 09:10 | 21 | A.   Yeah. |
| 09:11 | 22 | Q.   You see at the bottom of the page, after Mr. Marlow |
| 09:11 | 23 | talks about Veronica and her team of three helpers, that it |
| 09:11 | 24 | says, "An occasional note of appreciation from you will go a |
| 09:11 | 25 | long ways towards keeping her happy, as will timely payment |

| | | |
|---|---|---|
| 09:11 | 1 | on her invoices.  Late payments and unexpected requests for |
| 09:11 | 2 | discounts cause her a lot of stress, mostly because she |
| 09:11 | 3 | reads into some sort of dissatisfaction with her work." |
| 09:11 | 4 | You remember that part of the e-mail? |
| 09:11 | 5 | A.   I don't recall if I did or not, if I received this |
| 09:11 | 6 | e-mail. |
| 09:11 | 7 | Q.   Well, if you look at your response, where you say, |
| 09:11 | 8 | "Dear Peter, it is good to hear from you.  Indeed, Veronica |
| 09:11 | 9 | does a -- great work and is very talented, and I and |
| 09:11 | 10 | everyone else truly appreciates her work and passion." |
| 09:11 | 11 | And that was something you were doing in response to |
| 09:11 | 12 | his saying, you know, every now and again a compliment would |
| 09:12 | 13 | be a good thing? |
| 09:12 | 14 | A.   To Veronica, yes. |
| 09:12 | 15 | Q.   And says, "We're always going to work with her as long |
| 09:12 | 16 | as the prices are reasonable." |
| 09:12 | 17 | Do you see that? |
| 09:12 | 18 | A.   Yes. |
| 09:12 | 19 | Q.   So around this timeframe -- we're talking about 2002, |
| 09:12 | 20 | 2003, you knew that Ms. Marlow had a team of three who were |
| 09:12 | 21 | doing all the Bratz fashions? |
| 09:12 | 22 | A.   I don't know how many team people that she had, and who |
| 09:12 | 23 | were they, I did not. |
| 09:12 | 24 | Q.   Well, you knew they weren't operating from China. |
| 09:12 | 25 | You've talked about factories in China you could show me |

| | | |
|---|---|---|
| 09:12 | 1 | pictures of with -- with thousands of seamstresses.  You |
| 09:12 | 2 | knew that they were operating here in the United States? |
| 09:12 | 3 | A.   I said we have videos to show you, but pictures is |
| 09:12 | 4 | fine.  But, yes, these three people, or whoever they were -- |
| 09:12 | 5 | five, ten -- I assume they were USA, yes.  They are USA. |
| 09:12 | 6 | Q.   And your understanding that Ms. Garcia, when she had |
| 09:13 | 7 | been looking for months trying to find someone, that she was |
| 09:13 | 8 | looking for people in -- in the Southern California area, |
| 09:13 | 9 | right? -- not for -- in Hong Kong or China? |
| 09:13 | 10 | A.   Yes. |
| 09:13 | 11 | Q.   So I guess the question is why does it matter if there |
| 09:13 | 12 | are thousands of people working in Hong Kong and China?  Why |
| 09:13 | 13 | does it have anything to do with the problems you were |
| 09:13 | 14 | having in getting good, talented patternmakers to give you |
| 09:13 | 15 | high quality work for the Bratz dolls? |
| 09:13 | 16 | A.   What it matters, Mr. Price, is that since 2001 we have |
| 09:13 | 17 | made and sold 100 million Bratz fashion dolls and not three |
| 09:13 | 18 | people can make it.  It takes thousands and thousands of |
| 09:13 | 19 | people to do that.  That's what it matters. |
| 09:13 | 20 | Q.   But it takes these seamstresses to do the first |
| 09:13 | 21 | fashions and show you how they should be done and how they |
| 09:14 | 22 | can be done; that's why you're paying them so much, right? |
| 09:14 | 23 | A.   No.  They make those -- from my understanding, they |
| 09:14 | 24 | make those first samples so you can go to toy show to show |
| 09:14 | 25 | your product and get acceptance before you go to |

| | | |
|---|---|---|
| 09:14 | 1 | manufacturing.  Once you get to manufacturing, there are a |
| 09:14 | 2 | lot of changes made to the material, to the fabric, to the |
| 09:14 | 3 | design, to make sure that it's within the price point, |
| 09:14 | 4 | et cetera, to make the product. |
| 09:14 | 5 | Q.   So what these folks are doing are the -- by these folks |
| 09:14 | 6 | I mean, the patternmakers and Ms. Marlow -- are doing the |
| 09:14 | 7 | first samples that you first have to have to get approval |
| 09:14 | 8 | and then do mass manufacturing? |
| 09:14 | 9 | A.   No, they are sample makers.  They are seamstresses and |
| 09:14 | 10 | they make the first -- somebody comes out with a drawing in |
| 09:14 | 11 | the fashion, like the real fashion industry, and then they |
| 09:14 | 12 | make the small samples to show -- to look at the product. |
| 09:15 | 13 | Does it look good on this doll.  Then we go present it to |
| 09:15 | 14 | the buyers.  Then we make more changes, more changes, more |
| 09:15 | 15 | changes until it goes to mass production. |
| 09:15 | 16 | In mass production there are thousands of seamstresses |
| 09:15 | 17 | sitting behind sewing machines making these, uh, fashions by |
| 09:15 | 18 | hand. |
| 09:15 | 19 | Q.   You need to have final versions to send to China so |
| 09:15 | 20 | they can do the tool costs so they can do this efficiently |
| 09:15 | 21 | so you can make changes and make money, right? |
| 09:15 | 22 | A.   You make -- yes.  Finally after you go over, uh, toy |
| 09:15 | 23 | shows and show many different samples and mockups of the |
| 09:15 | 24 | toys, you finalize and say, okay, these are the ones we |
| 09:16 | 25 | gonna go with because this is what Walmart says I like or |

Case 2:04-cv-09049-DOC-RNB   Document 9866   Filed 02/14/11   Page 32 of 136   Page ID #:297920
CV 04-9049 DOC – 2/10/2011 – Day 16, Volume 1 of 4

32

| 09:16 | 1 | what Toys R Us says I like.  And then you finalize it.  You |
| 09:16 | 2 | send it to Hong Kong.  They still work on that before it |
| 09:16 | 3 | become final.  That's how the process work. |
| 09:16 | 4 | Q.   So the final versions are made here and then sent to, |
| 09:16 | 5 | in this case, Hong Kong? |
| 09:16 | 6 | A.   They are not.  Those are not final.  Even when they get |
| 09:16 | 7 | to MGA Hong Kong, they are not final.  They go to the |
| 09:16 | 8 | factory next, and then the factory has to go and find |
| 09:16 | 9 | patterns, fabrics that matches what we have sent them from |
| 09:16 | 10 | here.  They make further changes.  This is a process that |
| 09:16 | 11 | happens all the time. |
| 09:16 | 12 | Q.   You would agree that the sample makers who were working |
| 09:16 | 13 | for Veronica Marlow cannot be compared to housekeepers or |
| 09:16 | 14 | waiters or -- or that type of position? |
| 09:17 | 15 | A.   Or lawyers, no. |
| 09:17 | 16 | Q.   Well, yesterday I was listening -- I don't think you |
| 09:17 | 17 | told the jury that they could be compared to lawyers.  You |
| 09:17 | 18 | didn't insult them that much, right? |
| 09:17 | 19 | A.   Go ahead.  What's your question? |
| 09:17 | 20 | Q.   Well, you said "or lawyers."  Yesterday you didn't |
| 09:17 | 21 | compare sample makers to lawyers, did you? |
| 09:17 | 22 | A.   I did not. |
| 09:17 | 23 | Q.   But you did compare them to waiters and housekeepers, |
| 09:17 | 24 | right? |
| 09:17 | 25 | A.   I did.  I was just making -- I was explaining that like |

| | | |
|---|---|---|
| 09:17 | 1 | waiters, like housekeepers -- and I'm just gonna, basically, |
| 09:17 | 2 | talk about waiters because I used to be a waiter, and they |
| 09:17 | 3 | get -- I would get hour -- money -- my own experience -- per |
| 09:17 | 4 | hour, plus tips.  And when I was going to school, I worked |
| 09:17 | 5 | in two, three different restaurants. |
| 09:17 | 6 | Q.   So when you were a waiter, you weren't a full-time |
| 09:17 | 7 | salaried employee, right? |
| 09:17 | 8 | A.   I was not. |
| 09:17 | 9 | Q.   You didn't have benefits, right? |
| 09:18 | 10 | A.   I had benefits. |
| 09:18 | 11 | Q.   Did you have a signed conflict of interest and |
| 09:18 | 12 | inventions agreements? |
| 09:18 | 13 | A.   I don't know if we did or not.  I don't remember.  But |
| 09:18 | 14 | I had -- in order to get a job, they give you a whole bunch |
| 09:18 | 15 | of papers to sign.  I hope they don't come and sue me now |
| 09:18 | 16 | for working two jobs. |
| 09:18 | 17 | Q.   And you'll agree that -- that the people who create |
| 09:18 | 18 | these samples to send overseas to then be mass-produced, |
| 09:18 | 19 | that these folks are craftsmen; they're not like a waiter or |
| 09:18 | 20 | a housekeeper.  You'd agree with that? |
| 09:18 | 21 | A.   Well, you know, they're -- they're craftsmen, but I |
| 09:18 | 22 | considered myself a good waiter.  I used to make good tips. |
| 09:18 | 23 | So that was my craft. |
| 09:18 | 24 | Q.   Through the 2005 time period, you were -- you were |
| 09:18 | 25 | still trying to find sample makers, right? |

| 09:19 | 1 | A.    Yes.  We always look for sample makers as we grow.  We |
| 09:19 | 2 | are always looking for people to hire. |
| 09:19 | 3 | Q.    And you were having problems doing that? |
| 09:19 | 4 | A.    I don't know if we had problems doing that. |
| 09:19 | 5 | Q.    Well -- |
| 09:19 | 6 | A.    That's not something I'm gonna agree with you. |
| 09:19 | 7 | Q.    Well, sample makers -- you've paid -- over the first |
| 09:19 | 8 | four years of Bratz, you paid over a million dollars to |
| 09:19 | 9 | Ms. Marlow, right? |
| 09:19 | 10 | A.    I don't know, but outrageous amount. |
| 09:19 | 11 | Q.    And, uh, the sample makers were an important part of |
| 09:19 | 12 | the production of Bratz, right? |
| 09:19 | 13 | A.    They are one of the -- they are one of the components, |
| 09:19 | 14 | making the samples.  One of the components of making Bratz. |
| 09:19 | 15 | Q.    And you don't want to spend that kind of money |
| 09:19 | 16 | unnecessarily, right? -- over a million dollars? |
| 09:19 | 17 | A.    I don't want to spend any money unnecessarily, correct. |
| 09:20 | 18 | Q.    And the amount of money that you were having to pay for |
| 09:20 | 19 | these fashions was -- was something which was on your radar |
| 09:20 | 20 | screen? |
| 09:20 | 21 | A.    That -- the money that Veronica Marlow was charging was |
| 09:20 | 22 | definitely came on my radar string -- screen, whatever you |
| 09:20 | 23 | call it, at one time for sure. |
| 09:20 | 24 | Q.    And there was a problem, though, in that you were |
| 09:20 | 25 | having trouble communicating with Ms. Garcia and -- and |

| | | |
|---|---|---|
| 09:20 | 1 | giving her the go-ahead, you know, the green light to hire |
| 09:20 | 2 | patternmakers? |
| 09:20 | 3 | A.   I don't think I had a problem giving her a green light |
| 09:20 | 4 | to go hire sample makers.  You keep saying patternmakers.  I |
| 09:20 | 5 | don't think these people make pattern.  Another person makes |
| 09:20 | 6 | pattern. |
| 09:20 | 7 | Q.   At some point you gave Ms. Garcia the verbal direction |
| 09:20 | 8 | to go forward and try to hire five sample makers; do you |
| 09:20 | 9 | recall that? |
| 09:21 | 10 | A.   I don't recall.  But I have -- I have told her to go |
| 09:21 | 11 | hire her own sample makers, yes. |
| 09:21 | 12 | Q.   But -- it was a long time ago.  So let's let you look |
| 09:21 | 13 | at Exhibit 22292. |
| 09:21 | 14 | *(Document provided to the witness.)* |
| 09:21 | 15 | THE WITNESS:  Go ahead. |
| 09:21 | 16 | BY MR. PRICE: |
| 09:21 | 17 | Q.   And you see this is an e-mail string between you and |
| 09:22 | 18 | Ms. Garcia and others? |
| 09:22 | 19 | A.   It is. |
| 09:22 | 20 | MR. PRICE:  Your Honor, move Exhibit 22292 into |
| 09:22 | 21 | evidence. |
| 09:22 | 22 | THE COURT:  Received. |
| 09:22 | 23 | *(Exhibit No. 22292 received in evidence.)* |
| 09:22 | 24 | *(Document displayed.)* |
| | 25 | |

| | | |
|---|---|---|
| 09:22 | 1 | BY MR. PRICE: |
| 09:22 | 2 | Q.   And the bottom here is an e-mail from Ms. Garcia to you |
| 09:22 | 3 | and others, right? |
| 09:22 | 4 | A.   It is. |
| 09:22 | 5 | Q.   Regarding sample makers/seamstresses? |
| 09:22 | 6 | A.   Yes. |
| 09:22 | 7 | Q.   It says, "Isaac, can you please reply to this e-mail |
| 09:22 | 8 | confirming your verbal direction to hire five sample makers |
| 09:22 | 9 | in the absence of Veronica's support in the future |
| 09:22 | 10 | projects?" |
| 09:22 | 11 | Now, is it your understanding the reason she was asking |
| 09:22 | 12 | for an e-mail in writing was because you had told folks it's |
| 09:22 | 13 | got to be in writing? |
| 09:22 | 14 | A.   Probably. |
| 09:22 | 15 | Q.   And she said, "We have identified three candidates from |
| 09:22 | 16 | the competition, and they are ready to come, but Schuler |
| 09:22 | 17 | needed your consent to the reqs to proceed." |
| 09:23 | 18 | Do you see that? |
| 09:23 | 19 | A.   Reqs. |
| 09:23 | 20 | Q.   It has R-E-Q-S.  Is that short for requisitions? |
| 09:23 | 21 | A.   I have no idea. |
| 09:23 | 22 | Q.   And when she said, "We've identified three candidates |
| 09:23 | 23 | from the competition," your understanding is she was talking |
| 09:23 | 24 | about Mattel? |
| 09:23 | 25 | A.   Probably. |

| | | |
|---|---|---|
| 09:23 | 1 | Q.   Because by -- certainly, by 2005 you recognized that |
| 09:23 | 2 | Mattel was the primary competition? |
| 09:23 | 3 | A.   As is Spin Master's, as is Jakks, as is Playmates.  But |
| 09:23 | 4 | if I was gonna guess, I guess that she was talking about |
| 09:23 | 5 | Mattel here. |
| 09:23 | 6 | Q.   At least that's the word -- that's the name that came |
| 09:23 | 7 | to mind when you read this -- when you said the competition, |
| 09:23 | 8 | the name that came to mind was Mattel? |
| 09:23 | 9 | A.   I don't remember what was in my mind six years ago when |
| 09:23 | 10 | this e-mail was read.  But looking at it now -- I could be |
| 09:23 | 11 | wrong, but she was probably referring to Mattel. |
| 09:23 | 12 | Q.   And your response is "Okay"? |
| 09:24 | 13 | A.   Yes. |
| 09:24 | 14 | Q.   And, of course, there's nothing wrong with going and |
| 09:24 | 15 | hiring employees from another company, right? |
| 09:24 | 16 | A.   There is not. |
| 09:24 | 17 | Q.   So if you'd now look at Exhibit 13223. |
| 09:24 | 18 | (Document provided to the witness.) |
| 09:24 | 19 | BY MR. PRICE: |
| 09:24 | 20 | Q.   And you recognize that as an e-mail which has been |
| 09:24 | 21 | forwarded to you by -- I'm sorry -- yeah, CBE1068.  Do you |
| 09:24 | 22 | see that? |
| 09:25 | 23 | A.   No, it's forwarded to me from Peter Marlow.  No, it's |
| 09:25 | 24 | from Peter. |
| 09:25 | 25 | Q.   I apologize.  You're on this string somehow.  Can you |

| | | |
|---|---|---|
| 09:25 | 1 | figure it out? |
| 09:25 | 2 | A.   Yes.  I am on the second e-mail where -- Isaac Larian. |
| 09:25 | 3 | Q.   So this is forwarded. |
| 09:25 | 4 | *(Document displayed.)* |
| 09:25 | 5 | BY MR. PRICE: |
| 09:25 | 6 | Q.   I'm sorry.  I apologize.  So that the long e-mail is |
| 09:25 | 7 | sent from Mr. Marlow to Ms. Garcia copying you? |
| 09:25 | 8 | A.   That's correct. |
| 09:25 | 9 | Q.   And you recognize this e-mail as being an e-mail from |
| 09:25 | 10 | Mr. Marlow to Ms. Garcia and you? |
| 09:25 | 11 | A.   I do. |
| 09:25 | 12 | MR. PRICE:  Your Honor, I move Exhibit 13223 into |
| 09:25 | 13 | evidence. |
| 09:25 | 14 | THE COURT:  Received. |
| 09:25 | 15 | *(Exhibit No. 13223 received in evidence.)* |
| 09:25 | 16 | BY MR. PRICE: |
| 09:25 | 17 | Q.   At this time in August of 2005, there were efforts by |
| 09:25 | 18 | MGA to hire Veronica Marlow, that is, just bringing her into |
| 09:26 | 19 | MGA, correct? |
| 09:26 | 20 | A.   For the amount of money that she was charging, I |
| 09:26 | 21 | thought, yes, she would come work with MGA full-time. |
| 09:26 | 22 | Q.   And this e-mail was, in part, an attempt to address |
| 09:26 | 23 | that offer? |
| 09:26 | 24 | A.   I don't recall.  I am copied on this e-mail, but I'm |
| 09:26 | 25 | not so sure if I even read it or not.  I don't remember. |

| | | |
|---|---|---|
| 09:26 | 1 | Q.   Well, it has numbers on that first page.  Do you see |
| 09:26 | 2 | that? |
| 09:26 | 3 | A.   I do. |
| 09:26 | 4 | Q.   And if you look at -- see the total payments, "Note 2." |
| 09:26 | 5 | You see there are numbers there, 318,731, 545,077? |
| 09:26 | 6 |      Do you see those? |
| 09:26 | 7 | A.   I do. |
| 09:26 | 8 | Q.   And if you look at the next page, it says, under "2" -- |
| 09:26 | 9 | and defines the notes -- it says -- it shows "Payments |
| 09:26 | 10 | received from MGA during the calendar year.  Payments do not |
| 09:26 | 11 | include Sugar Planets royalty payments." |
| 09:26 | 12 |      Do you see that? |
| 09:27 | 13 | A.   Yes, I see that. |
| 09:27 | 14 | Q.   And you understand this was for a 2002, 2003, is 2004, |
| 09:27 | 15 | 2005? |
| 09:27 | 16 | A.   I don't recall this e-mail.  I have, frankly, no |
| 09:27 | 17 | understanding of it.  I don't think I've ever read it.  I'm |
| 09:27 | 18 | not denying that I received it, but this the first time I'm |
| 09:27 | 19 | seeing it. |
| 09:27 | 20 | Q.   Well, it's certainly not the first time you've seen it? |
| 09:27 | 21 | A.   No.  I'm copied on it, you're right, but I have no |
| 09:27 | 22 | recollection of this e-mail. |
| 09:27 | 23 | Q.   And you've been asked about this e-mail before in some |
| 09:27 | 24 | detail? |
| 09:27 | 25 | A.   Possible.  I just don't recall it. |

CV 04-9049 DOC – 2/10/2011 – Day 16, Volume 1 of 4

40

| | | |
|---|---|---|
| 09:27 | 1 | Q.   And if you look at those payments, if you just look at |
| 09:27 | 2 | the first four, I mean, they total over a million dollars, |
| 09:27 | 3 | around a million two, something like that? |
| 09:27 | 4 | A.   Big money. |
| 09:27 | 5 | Q.   And you do recall that's when -- one of the reasons you |
| 09:27 | 6 | wanted to bring Veronica Marlow and her team into MGA, |
| 09:28 | 7 | because you were paying big money? |
| 09:28 | 8 | A.   My mind was Veronica Marlow was charging outraging |
| 09:28 | 9 | money to MGA, and I wanted to get to the bottom of it and |
| 09:28 | 10 | bring her, if that's what Paula wanted, in-house. |
| 09:28 | 11 | Q.   If you go to the second page, 13223-00002. |
| 09:28 | 12 | At the bottom of that page, it says, "Veronica has |
| 09:28 | 13 | seriously considered your very generous offer of employment |
| 09:28 | 14 | with MGA" -- |
| 09:28 | 15 | A.   I got to find it.  Hold on one second. |
| 09:28 | 16 | Q.   Sure.  It's the second page.  It's the paragraph -- |
| 09:28 | 17 | second paragraph from the bottom. |
| 09:28 | 18 | A.   Veronica? |
| 09:28 | 19 | Q.   Where it says, "Veronica has seriously considered your |
| 09:28 | 20 | very generous offer of employment with MGA." |
| 09:28 | 21 | A.   I'm still not finding that. |
| 09:28 | 22 | I find "with Veronica at MGA."  That's the second |
| 09:28 | 23 | paragraph. |
| 09:29 | 24 | Q.   I'm sorry, sir, I think you're looking at the last |
| 09:29 | 25 | page, 13223-00003. |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 09:29 | 1 | A. Yes, I'm sorry. Go ahead. I apologize. |
| 09:29 | 2 | Q. Quite all right. |
| 09:29 | 3 | So Ms. Marlow turned down the offer? |
| 09:29 | 4 | A. Yes, she did. She never became an employee of MGA, |
| 09:29 | 5 | correct. |
| 09:29 | 6 | Q. And then you see the next line, "If Veronica goes to |
| 09:29 | 7 | work for MGA, she will no longer be able to work with her |
| 09:29 | 8 | team of pattern and sample makers. They have secure day |
| 09:29 | 9 | jobs with an outlook of many more years of stability that |
| 09:29 | 10 | they are unwilling to leave. They will only moonlight for |
| 09:29 | 11 | Veronica." |
| 09:29 | 12 | A. Right. |
| 09:29 | 13 | Q. "About six months ago, we offered each of them |
| 09:29 | 14 | full-time employment at double their present salaries with a |
| 09:29 | 15 | very generous benefits package, but they all refused." |
| 09:29 | 16 | A. I see that. |
| 09:29 | 17 | Q. So if you had read this letter, you would have known |
| 09:29 | 18 | that the sample makers -- pattern and sample makers working |
| 09:29 | 19 | for Ms. Marlow were moonlighting for some company? |
| 09:30 | 20 | A. Yes. |
| 09:30 | 21 | Q. And that they turned down employment with her because |
| 09:30 | 22 | they -- even though Ms. Marlow was offering double their |
| 09:30 | 23 | present salaries? |
| 09:30 | 24 | MS. KELLER: I'm gonna object, Your Honor. This |
| 09:30 | 25 | is all hearsay. This is what the e-mail says, but he |

Case 2:04-cv-09049-DOC-RNB   Document 9866   Filed 02/14/11   Page 42 of 136   Page ID #:297930
CV 04-9049 DOC – 2/10/2011 – Day 16, Volume 1 of 4

42

| 09:30 | 1  | doesn't have any way of knowing that's what actually |
| 09:30 | 2  | happened. |
| 09:30 | 3  | MR. PRICE:  It's his state of mind, Your Honor. |
| 09:30 | 4  | THE COURT:  As long as it goes to his state of |
| 09:30 | 5  | mind, Counsel, you can continue. |
| 09:30 | 6  | Overruled. |
| 09:30 | 7  | BY MR. PRICE: |
| 09:30 | 8  | Q.   So your state of mind is these folks who were |
| 09:30 | 9  | moonlighting had salaries and were being offered more than |
| 09:30 | 10 | that by Ms. Marlow? |
| 09:30 | 11 | A.   I have no –– had no state of mind if –– who these |
| 09:30 | 12 | people were, if they were moonlighting, what they were |
| 09:30 | 13 | getting, what they were not getting.  This is something that |
| 09:30 | 14 | she wrote, and I don't –– I don't even believe I responded |
| 09:30 | 15 | to it.  It's a three-page e-mail, and I think we talked |
| 09:30 | 16 | about yesterday that I don't read long e-mails.  And this |
| 09:30 | 17 | e-mail was not addressed to me.  It was addressed to Paula. |
| 09:31 | 18 | I'm CC'd on it. |
| 09:31 | 19 | Q.   It concerned something that was important to you, which |
| 09:31 | 20 | was the outstanding offer to Veronica Marlow to come into |
| 09:31 | 21 | MGA so MGA could save dollars, right? |
| 09:31 | 22 | A.   Yes. |
| 09:31 | 23 | Q.   And there were significant dollars going out from MGA |
| 09:31 | 24 | to Ms. Marlow, over a million dollars, right? |
| 09:31 | 25 | A.   There were. |

Case 2:04-cv-09049-DOC-RNB   Document 9866   Filed 02/14/11   Page 43 of 136   Page ID #:297931
CV 04-9049 DOC - 2/10/2011 - Day 16, Volume 1 of 4

43

| | | |
|---|---|---|
| 09:31 | 1 | Q.   And you thought that was too much, correct? |
| 09:31 | 2 | A.   I did. |
| 09:31 | 3 | Q.   And you were copied on an e-mail from Ms. Marlow |
| 09:31 | 4 | rejecting her offer, the offer you gave, and explaining to |
| 09:31 | 5 | you why, correct? |
| 09:31 | 6 | A.   I'm copied on this e-mail.  I did not go to the detail |
| 09:31 | 7 | of this e-mail what she wrote, what she meant, what was in |
| 09:31 | 8 | her mind.  I did not. |
| 09:31 | 9 | Q.   So you agree the e-mail concerned topics that were very |
| 09:31 | 10 | important to you, the amount of money that was being paid to |
| 09:31 | 11 | Ms. Marlow and whether or not she would accept your offer, |
| 09:31 | 12 | correct? |
| 09:31 | 13 | A.   The biggest thing in my mind was that how much money we |
| 09:32 | 14 | are paying her, and with the amount of money that we paying |
| 09:32 | 15 | her, we should hire her or somebody like her to come to MGA, |
| 09:32 | 16 | work full-time. |
| 09:32 | 17 | Q.   So is it your testimony that you have a recollection |
| 09:32 | 18 | that you intentionally decided not to read this e-mail that |
| 09:32 | 19 | was sent to you? |
| 09:32 | 20 | A.   No -- |
| 09:32 | 21 |        MS. KELLER:  Objection.  Your Honor, that's an |
| 09:32 | 22 | argumentative question. |
| 09:32 | 23 |        THE COURT:  Just reask the question, Counsel. |
| 09:32 | 24 | BY MR. PRICE: |
| 09:32 | 25 | Q.   Is it your recollection that you made a decision at the |

Case 2:04-cv-09049-DOC-RNB   Document 9866   Filed 02/14/11   Page 44 of 136   Page ID #:297932
CV 04-9049 DOC - 2/10/2011 - Day 16, Volume 1 of 4

44

| | | |
|---|---|---|
| 09:32 | 1 | time not to read this e-mail that was sent to you? |
| 09:32 | 2 | MS. KELLER:  That misstates the testimony. |
| 09:32 | 3 | THE COURT:  Overruled. |
| 09:32 | 4 | THE WITNESS:  I just don't remember reading this |
| 09:32 | 5 | e-mail.  I usually don't read three-, four-page, |
| 09:32 | 6 | small-written e-mails like this.  Especially if I'm copied. |
| 09:32 | 7 | I get 4- to 500 e-mails a day.  If I have to read every one |
| 09:32 | 8 | of them, where I'm CC'd, I would not have time to do |
| 09:32 | 9 | anything else. |
| 09:32 | 10 | BY MR. PRICE: |
| 09:33 | 11 | Q.   You're a hands-on CEO, right? |
| 09:33 | 12 | A.   Hands-on BlackBerry CEO, yes. |
| 09:33 | 13 | Q.   And if we look at the e-mail here, the fourth full |
| 09:33 | 14 | paragraph, it begins with "so." |
| 09:33 | 15 | A.   What page are you on? |
| 09:33 | 16 | Q.   It's on page 2. |
| 09:33 | 17 | A.   Page 2 or 3? |
| 09:33 | 18 | Q.   It's 13223 -- I'm sorry.  132-0003 *(sic)*.  I'm sorry. |
| 09:33 | 19 | Page 3 this time. |
| 09:33 | 20 | A.   Go ahead. |
| 09:33 | 21 | Q.   You see, "So how do they get any work done like this? |
| 09:33 | 22 | Maybe it's just that they are so talented.  They have more |
| 09:34 | 23 | than 100 years total of doll-making experience between |
| 09:34 | 24 | them." |
| 09:34 | 25 | Do you see that? |

| 09:34 | 1 | A.   Yes, I do. |
| 09:34 | 2 | Q.   So if you had read the e-mail that was sent to you, you |
| 09:34 | 3 | would have known that -- would have understood from the |
| 09:34 | 4 | e-mail that they were salaried? |
| 09:34 | 5 | A.   No. |
| 09:34 | 6 | Q.   And that these three women were moonlighting and that |
| 09:34 | 7 | they had over a hundred years of doll-making experience |
| 09:34 | 8 | between them, right? |
| 09:34 | 9 | A.   I have no idea who these ladies are.  I have no idea if |
| 09:34 | 10 | they're on salary or hourly.  I don't know if they're a |
| 09:34 | 11 | hundred years old.  I don't know if they had hundred years |
| 09:34 | 12 | of working at Mattel.  Did they work a hundred years in |
| 09:34 | 13 | Jakks Pacific, Spin Master, Playmate, all these companies -- |
| 09:34 | 14 | Bandai, all in Southern California.  I really have no idea. |
| 09:34 | 15 | Nor do I, in my own experience, believe 100 percent |
| 09:34 | 16 | that I would read a long-winded e-mail like this.  This |
| 09:35 | 17 | is -- everybody knows.  My wife complains about that all the |
| 09:35 | 18 | time. |
| 09:35 | 19 | Q.   Now, if you had read the e-mail, would you have had the |
| 09:35 | 20 | understanding if someone told you these are moonlighting |
| 09:35 | 21 | employees that are paid salaries, that have 100 years total |
| 09:35 | 22 | of doll-making experience between them? |
| 09:35 | 23 | A.   Yes. |
| 09:35 | 24 | MS. KELLER:  Objection.  Calls for speculation. |
| 09:35 | 25 | Compound.  And does not go to Mr. Larian's state of mind. |

CV 04-9049 DOC - 2/10/2011 - Day 16, Volume 1 of 4

46

09:35  1           THE COURT:  Overruled.

09:35  2    BY MR. PRICE:

09:35  3    Q.   If you had read this and knew those facts --

09:35  4    A.   Yes.

09:35  5    Q.   -- your conclusion would have been these folks are

09:35  6    moonlighting from the number one doll maker in the world:

09:35  7    Mattel?

09:35  8    A.   Not necessarily.

09:35  9    Q.   I'm not saying necessarily.  I'm just saying if you had

09:35  10   known these facts, that these folks were moonlighting, have

09:35  11   salaries, have a hundred years of doll-making experience

09:36  12   between them.

09:36  13   A.   Where does it say salaries?  I'm sorry, I'm lost.

09:36  14   Q.   At the top where it says they're going to double their

09:36  15   present salaries.

09:36  16   A.   Yes, okay.  I really have no idea what she meant.  I'm

09:36  17   telling you truth.  I have no idea what she meant.  I didn't

09:36  18   pay attention to that.

09:36  19   Q.   Are you -- well, did you understand -- if you'd read

09:36  20   this, you would have understood if she had said they have

09:36  21   secure day jobs with an outlook of many more years of

09:36  22   stability?

09:36  23   A.   Yes.  What is the question?

09:36  24   Q.   So you at least understood that they were working for a

09:36  25   competitor?

09:36  1  A.    Not necessarily.  For example, if you look at Mattel,

09:36  2  what kind of stability is that?  I mean, if you want to talk

09:36  3  about stability, you guys have had ten layoffs that I know

09:37  4  of.  So is that the stability?  I don't know what was in her

09:37  5  mind.  So I have no idea what she meant.  You laid off in

09:37  6  2003, 2004 over 3,000 people.  Is that -- to me that's not

09:37  7  stability.

09:37  8  Q.    So you think there are people at Mattel who don't have

09:37  9  stable jobs; is that right?  Just yes or no.

09:37  10  A.    Or at MGA or at any other company.  This is -- this is

09:37  11  the way business is.

09:37  12  Q.    But my question was that by -- if you had read this,

09:37  13  you would have known that these women were working full-time

09:37  14  with a competitor?

09:37  15  A.    They were working.  If I had read this, that would say

09:37  16  to me that they have day jobs.

09:37  17  Q.    Well, not just day jobs, not like with -- with jeans

09:38  18  or -- or, you know -- or some of the thousands of

09:38  19  seamstresses you talked about earlier.  They don't just have

09:38  20  day jobs.  They have day jobs with a competitive company.

09:38  21  You would have understood that?

09:38  22  A.    No.

09:38  23  Q.    You wouldn't have understood -- if you go to that

09:38  24  paragraph on 13223-0003 that begins with "So how do they get

09:38  25  any work done," you see where it says, "maybe it's just that

| 09:38 | 1 | they are so talented.  They have more than 100 years total |
| 09:38 | 2 | of doll-making experience between them."  You see that? |
| 09:38 | 3 | A.   Yes. |
| 09:38 | 4 | Q.   That would have given you -- |
| 09:38 | 5 | A.   That they're -- |
| 09:38 | 6 | Q.   -- a hint? |
| 09:38 | 7 | A.   They come from the toy business. |
| 09:38 | 8 | Q.   That they're working in the toy business? |
| 09:38 | 9 | A.   Yes.  If I had read that, that would say -- yes, that |
| 09:38 | 10 | would give me the hint.  You're right. |
| 09:38 | 11 | Q.   So if you had read this, you would have had the |
| 09:38 | 12 | impression that Veronica Marlow was using patternmakers, |
| 09:39 | 13 | sample makers on the Bratz dolls who had employment, |
| 09:39 | 14 | salaried, and a hundred years of doll-making experience |
| 09:39 | 15 | between them, and were moonlighting, right? |
| 09:39 | 16 | A.   First of all, you keep saying "patternmakers."  Again, |
| 09:39 | 17 | maybe you don't understand the toy business.  But |
| 09:39 | 18 | patternmakers and sample makers are two different skills and |
| 09:39 | 19 | two different people. |
| 09:39 | 20 | Q.   Well, if you would look at 13223-00002? |
| 09:39 | 21 | A.   Yes. |
| 09:39 | 22 | Q.   And just the last line says, "If Veronica goes to work |
| 09:39 | 23 | for MGA, she will no longer be able to work with her team of |
| 09:39 | 24 | pattern and sample makers."  Do you see that? |
| 09:39 | 25 | A.   Yes, I see that. |

| | | |
|---|---|---|
| 09:39 | 1 | Q.   So Veronica Marlow was in the business of providing |
| 09:39 | 2 | these services to you, right? |
| 09:39 | 3 | A.   She was consultant for MGA, yes.  Independent |
| 09:39 | 4 | contractor. |
| 09:39 | 5 | Q.   And so was it your understanding that she was confused |
| 09:40 | 6 | about pattern and sample makers? |
| 09:40 | 7 | MS. KELLER:  Objection. |
| 09:40 | 8 | THE WITNESS:  No, sir.  I don't know -- |
| 09:40 | 9 | MS. KELLER:  Objection, Your Honor.  Speculation |
| 09:40 | 10 | as to someone else's state of mind. |
| 09:40 | 11 | THE COURT:  Just a minute. |
| 09:40 | 12 | Overruled. |
| 09:40 | 13 | THE WITNESS:  I don't know what was she thinking, |
| 09:40 | 14 | what was she saying.  I didn't read this e-mail. |
| 09:40 | 15 | BY MR. PRICE: |
| 09:40 | 16 | Q.   So it's -- it's now your testimony that -- not that you |
| 09:40 | 17 | may have read it or you may not have, but it's now your |
| 09:40 | 18 | testimony that you did not -- |
| 09:40 | 19 | A.   No. |
| 09:40 | 20 | Q.   -- read this e-mail? |
| 09:40 | 21 | A.   No, I'm sorry.  I don't know if I read this e-mail or |
| 09:40 | 22 | not.  I don't recall reading this e-mail or not. |
| 09:40 | 23 | And I don't know what she was saying here:  Pattern, |
| 09:40 | 24 | team of pattern and sample makers. |
| 09:40 | 25 | I know at MGA patternmakers and sample makers are two |

CV 04-9049 DOC - 2/10/2011 - Day 16, Volume 1 of 4

50

| | | |
|---|---|---|
| 09:40 | 1 | different people.  Patternmakers come up with the pattern, |
| 09:41 | 2 | give it to the sample makers; they sew and make the |
| 09:41 | 3 | fashions.  I'm just basing it on my own experience at my own |
| 09:41 | 4 | company. |
| 09:41 | 5 | Q.   If Veronica Marlow was using a competitor's sample and |
| 09:41 | 6 | patternmakers to work on Bratz dolls, you know that would be |
| 09:41 | 7 | wrong? |
| 09:41 | 8 | A.   It would be very bad, poor judgment on Veronica |
| 09:41 | 9 | Marlow's -- to do.  But for those sample makers, who, I know |
| 09:41 | 10 | at my own company, for example, they have families of six or |
| 09:41 | 11 | seven, they make $25 an hour.  And we -- and when they go |
| 09:41 | 12 | home and clock out and go home at 5:00, we don't pay them |
| 09:42 | 13 | anymore.  For them to go and do that for other people, I |
| 09:42 | 14 | personally see no -- no issue with it.  Maybe it's because |
| 09:42 | 15 | of my upbringing.  Maybe it's because of my -- the days I |
| 09:42 | 16 | came here and I had to struggle to make a living.  But in my |
| 09:42 | 17 | mind, I see nothing with it.  That's their skill. |
| 09:42 | 18 | THE WITNESS:  I'd like to take a break, go to the |
| 09:42 | 19 | restroom. |
| 09:42 | 20 | THE COURT:  You're admonished not to discuss this |
| 09:42 | 21 | matter amongst yourselves, nor to form or express any |
| 09:42 | 22 | opinion concerning this case. |
| 09:42 | 23 | Ladies and gentlemen, why don't we take about a |
| 09:42 | 24 | 20-minute recess.  Maybe a little longer.  Thank you. |
| 09:42 | 25 | *(Jury recessed at 9:42 a.m.)* |

Case 2:04-cv-09049-DOC-RNB   Document 9866   Filed 02/14/11   Page 51 of 136   Page ID #:297939
CV 04-9049 DOC - 2/10/2011 - Day 16, Volume 1 of 4

51

| | | |
|---|---|---|
| 09:42 | 1 | THE COURT:  Counsel, I'll be right back with you. |
| 09:42 | 2 | I want to go on the record. |
| 09:42 | 3 | *(Pause in the proceedings at 9:42 a.m.)* |
| 09:42 | 4 | *(Proceedings resumed at 9:46 a.m.)* |
| 09:46 | 5 | *(Outside the presence of the jury.)* |
| 09:46 | 6 | THE COURT:  All right.  Then we're on the record. |
| 09:46 | 7 | Mr. Quinn, where is your crew? |
| 09:46 | 8 | MR. QUINN:  Let me grab Zeller. |
| 09:46 | 9 | THE COURT:  All right.  We're on record.  All |
| 09:46 | 10 | counsel are present.  And, counsel, Kathy informed me this |
| 09:46 | 11 | morning, Mr. Quinn, that you were trying to speak to me on |
| 09:46 | 12 | the record.  Sit down for a moment.  Sit down Mr. Quinn, |
| 09:46 | 13 | Mr. Price.  Unfortunately, I was at a Federal Bar |
| 09:46 | 14 | Association meeting and didn't get here until about 7:20 |
| 09:47 | 15 | from the meeting downstairs.  I was informed by Kathy that |
| 09:47 | 16 | you had filed a motion for mistrial. |
| 09:47 | 17 | And then I saw you trying to catch my eye, so I |
| 09:47 | 18 | wanted to get right back on the record with you. |
| 09:47 | 19 | The lectern's yours now. |
| 09:47 | 20 | MR. QUINN:  Thank you, Your Honor.  And we've seen |
| 09:47 | 21 | the Court's order on that, and we will refile the motion. |
| 09:47 | 22 | THE COURT:  I want the other side to have a chance |
| 09:47 | 23 | to respond. |
| 09:47 | 24 | MR. QUINN:  Of course. |
| 09:47 | 25 | Your Honor, last night some comments were made |

Case 2:04-cv-09049-DOC-RNB  Document 9866  Filed 02/14/11  Page 52 of 136  Page ID #:297940
CV 04-9049 DOC – 2/10/2011 – Day 16, Volume 1 of 4

52

| | | |
|---|---|---|
| 09:47 | 1 | about Mr. Price.  And he wasn't given a chance to respond to |
| 09:47 | 2 | it. |
| 09:47 | 3 | The Court is privy to information about |
| 09:47 | 4 | Mr. Price's condition.  And, you know, that -- he would at |
| 09:47 | 5 | the end of the day on his feet confuse a syllable in saying |
| 09:47 | 6 | the phrase "wives' dresses," rather than "wife's dresses," |
| 09:47 | 7 | which was, as the Court now knows, a quote from Mr. Larian's |
| 09:48 | 8 | e-mails. |
| 09:48 | 9 | But that would be cited by the Court and that the |
| 09:48 | 10 | Court would say whether that was volitional or |
| 09:48 | 11 | in-volitional, it was improper or inappropriate conduct. |
| 09:48 | 12 | We just don't agree with Your Honor. |
| 09:48 | 13 | THE COURT:  I understand that. |
| 09:48 | 14 | MR. QUINN:  And Mr. Price, who has an unblemished |
| 09:48 | 15 | record as an attorney would be accused, after that, you |
| 09:48 | 16 | know, the race card is played of having said a racist remark |
| 09:48 | 17 | in a previous trial and not have a chance to respond to any |
| 09:48 | 18 | of that, Your Honor; that these would be treated -- that |
| 09:48 | 19 | this conduct that we've seen would be treated with -- as if |
| 09:48 | 20 | it's kind of equal or balanced to us is incomprehensible. |
| 09:48 | 21 | That a misplaced syllable at the end of the day -- |
| 09:48 | 22 | of a day by a person with a disability, that that could |
| 09:49 | 23 | somehow excuse two days of what the Court recognized was a |
| 09:49 | 24 | pattern of misconduct and an effort to curry favor, we have |
| 09:49 | 25 | a real, real problem with. |

Case 2:04-cv-09049-DOC-RNB  Document 9866  Filed 02/14/11  Page 53 of 136  Page ID
#:297941
CV 04-9049 DOC - 2/10/2011 - Day 16, Volume 1 of 4

53

09:49    1              And then that the Court would make the statements

09:49    2    that were made about Mr. Zeller and that he brought up the

09:49    3    issue about some inappropriate relationship and with a vague

09:49    4    reference to deposition transcripts without Mr. Zeller

09:49    5    having a chance to respond to that, I also think was

09:49    6    inappropriate, Your Honor.

09:49    7              I think the Court, before comments like this are

09:49    8    made in a public forum on the record, about attorneys who

09:49    9    have unblemished records, they should have a chance to

09:49   10    address the Court and respond to these things.

09:49   11              And under no circumstances can any of this be

09:49   12    equated with or excuse the kind of outrageous behavior we've

09:50   13    seen from Mr. Larian on the stand.  There was no baiting.

09:50   14              If you go back -- the Court said there was baiting

09:50   15    about the issue about we produced everything.  That was

09:50   16    about the third time Mr. Larian said that.

09:50   17              And finally, Mr. Price responded to it.

09:50   18              I just think on the -- the public record needs to

09:50   19    be complete on this, and these gentlemen should be given a

09:50   20    chance to respond to it.  And as we indicate in our mistrial

09:50   21    motion, the damage that's been done, we don't think can be

09:50   22    corrected without the statements to the jury that the Court

09:50   23    indicated the night before last it was prepared to do.

09:50   24              The only issue, Your Honor, the only issue was to

09:50   25    find out -- we weren't on the record, unfortunately -- was

Case 2:04-cv-09049-DOC-RNB   Document 9866   Filed 02/14/11   Page 54 of 136   Page ID #:297942
CV 04-9049 DOC - 2/10/2011 - Day 16, Volume 1 of 4

54

| | | |
|---|---|---|
| 09:50 | 1 | to find out what the status of Mr. Bryant's health was.  And |
| 09:50 | 2 | the Court indicated it was prepared to give an instruction. |
| 09:51 | 3 | THE COURT:  We were on the record. |
| 09:51 | 4 | MR. QUINN:  I don't think we were on the record |
| 09:51 | 5 | the night before last. |
| 09:51 | 6 | THE WITNESS:  I had a court reporter here when I |
| 09:51 | 7 | warned counsel, I believe, that they should make certain |
| 09:51 | 8 | Mr. Larian responded appropriately to the questions. |
| 09:51 | 9 | MR. QUINN:  All right.  Well -- |
| 09:51 | 10 | THE COURT:  Now, we'll check back on that, but I |
| 09:51 | 11 | believe I had a reporter. |
| 09:51 | 12 | MR. QUINN:  I might have mis-remembered, but I |
| 09:51 | 13 | think -- whether we did have a candid discussion -- |
| 09:51 | 14 | THE COURT:  Let me say I don't disagree with you. |
| 09:51 | 15 | MR. QUINN:  All right.  And the way it was left, |
| 09:51 | 16 | we were to -- we didn't -- the Court said -- remember, we |
| 09:51 | 17 | don't want to -- I suggested maybe you could just tell the |
| 09:51 | 18 | jury a white lie. |
| 09:51 | 19 | You said, "Well, lies walk around."  Let's go and |
| 09:51 | 20 | find out exactly what the facts are concerning Mr. Bryant's |
| 09:51 | 21 | health.  But the Court had indicated the Court thought what |
| 09:51 | 22 | Mr. Larian had done was completely inappropriate, it had |
| 09:51 | 23 | tainted the proceedings, and that something needed to be |
| 09:51 | 24 | done about it. |
| 09:51 | 25 | We learned last night that apparently nothing is |

Case 2:04-cv-09049-DOC-RNB   Document 9866   Filed 02/14/11   Page 55 of 136   Page ID #:297943
CV 04-9049 DOC – 2/10/2011 – Day 16, Volume 1 of 4

55

| | | |
|---|---|---|
| 09:51 | 1 | to be done about it. |
| 09:51 | 2 | THE COURT:  Why do you assume that? |
| 09:52 | 3 | MR. QUINN:  Because the Court left. |
| 09:52 | 4 | THE COURT:  That's right. |
| 09:52 | 5 | MR. QUINN:  Walked off the bench. |
| 09:52 | 6 | THE COURT:  Probably for your own safety.  Both of |
| 09:52 | 7 | you.  Just joking with you.  Everybody needed a cooling |
| 09:52 | 8 | period last night. |
| 09:52 | 9 | MR. QUINN:  People on this side lost a little |
| 09:52 | 10 | sleep over this last night. |
| 09:52 | 11 | THE COURT:  That's good. |
| 09:52 | 12 | MR. QUINN:  It was surreal that that man -- |
| 09:52 | 13 | THE COURT:  Excuse me.  Excuse me.  You're taking |
| 09:52 | 14 | unnecessary time now.  You have a motion for mistrial.  It's |
| 09:52 | 15 | been filed.  File it appropriately and I'll consider it. |
| 09:52 | 16 | MR. QUINN:  All right. |
| 09:52 | 17 | THE COURT:  Okay. |
| 09:52 | 18 | Now, I want you to get all that exuberance out of |
| 09:52 | 19 | you.  You have. |
| 09:52 | 20 | MR. QUINN:  No, I haven't. |
| 09:52 | 21 | THE COURT:  All right.  Then we'll take a little |
| 09:52 | 22 | bit more time. |
| 09:52 | 23 | MR. QUINN:  There are -- before we complete this |
| 09:52 | 24 | business about he can blurt out Mattel stifles competition, |
| 09:52 | 25 | so therefore, they get to litigate -- they get to put in |

Case 2:04-cv-09049-DOC-RNB   Document 9866   Filed 02/14/11   Page 56 of 136   Page ID #:297944
CV 04-9049 DOC – 2/10/2011 – Day 16, Volume 1 of 4

56

| | | |
|---|---|---|
| 09:52 | 1 | Mattel litigates to death, the other case.  And the question |
| 09:52 | 2 | I have for the Court was the Court before said if they go |
| 09:52 | 3 | litigate to death, if they run that theme, then insurance |
| 09:52 | 4 | comes in.  So we'd like to know from the Court:  Will |
| 09:53 | 5 | insurance come in? |
| 09:53 | 6 | THE COURT:  I don't know.  We're waiting to see |
| 09:53 | 7 | what MGA does.  Aren't we? |
| 09:53 | 8 | MR. QUINN:  Well, we're asking for the Court's |
| 09:53 | 9 | guidance on that. |
| 09:53 | 10 | THE COURT:  We'll wait to see what MGA does. |
| 09:53 | 11 | MR. QUINN:  Second, in addition, we're confused |
| 09:53 | 12 | about what use can be made concerning other litigation and |
| 09:53 | 13 | the dolls in the other cases.  We're told we can't talk |
| 09:53 | 14 | about similarity, even though in their case they're |
| 09:53 | 15 | permitted to talk at length about differences, differences |
| 09:53 | 16 | between the drawings and the dolls.  But we can't talk about |
| 09:53 | 17 | similarity.  We don't understand that. |
| 09:53 | 18 | We would like some direction about whether -- even |
| 09:53 | 19 | if we don't use the "S" word of similarity, whether we can |
| 09:53 | 20 | put in those dolls from the other cases. |
| 09:53 | 21 | We have a request -- the Court has ruled that |
| 09:53 | 22 | privileged communications with lawyers, that, apparently, |
| 09:53 | 23 | the things the client says to the lawyer come in, but what |
| 09:53 | 24 | the lawyer says to the client does not come in.  We'll |
| 09:53 | 25 | submit a brief on this.  That's not our understanding of the |

09:54    1    law, Your Honor.  If there's a privileged communication, a

09:54    2    back and forth with a lawyer, you don't just get to hear one

09:54    3    side of the call or the conversation.

09:54    4          But in any event, there's a declaration of Tom

09:54    5    Nolan -- I don't know if the Court has seen this -- that was

09:54    6    filed *in camera* at Judge Larson's request, where Mr. Nolan

09:54    7    was instructed to give his account concerning why that

09:54    8    particular document was withheld, what the justification

09:54    9    was.  It's Docket No. 6674.  At a minimum, we request that

09:54   10    the Court release to us a redacted version of that document,

09:54   11    setting forth what Mr. Nolan says Mr. Larian told him.

09:54   12          Um, and then we have the open issue -- we know

09:54   13    Exhibit 21714, the e-mail from Farhad Larian, the Court has

09:54   14    said that it's got some redactions in mind.  Before we

09:54   15    conclude our examination this morning, we will appreciate

09:55   16    some guidance from the Court as to what redactions the Court

09:55   17    needs on that -- or would like to see on that before the

09:55   18    document's used.

09:55   19          Finally, before we conclude this examination, we'd

09:55   20    appreciate an understanding of the Court's position

09:55   21    regarding the e-mail from Mr. Larian, telling himself and,

09:55   22    they say, his lawyer that "make sure Paula doesn't remember

09:55   23    the seamstresses at her deposition."

09:55   24          MS. KELLER:  That's not what it says.

09:55   25          THE COURT:  I thought I'd already ruled on that,

Case 2:04-cv-09049-DOC-RNB   Document 9866   Filed 02/14/11   Page 58 of 136   Page ID #:297946
CV 04-9049 DOC - 2/10/2011 - Day 16, Volume 1 of 4

58

| | | |
|---|---|---|
| 09:55 | 1 | counsel, but we'll come back to it. |
| 09:55 | 2 | MR. QUINN:  You had ruled on the metadata, but I |
| 09:55 | 3 | had understood the Court understood that there was a crime |
| 09:55 | 4 | fraud issue. |
| 09:55 | 5 | THE COURT:  I thought that you had, first of all, |
| 09:55 | 6 | conceded that it was attorney-client privilege before and |
| 09:55 | 7 | that the metadata was in issue, but you only subsequently |
| 09:55 | 8 | raised the crime fraud issue with that.  So if you would of |
| 09:55 | 9 | like me to consider that, I'm happy to do it. |
| 09:55 | 10 | MR. QUINN:  Well, I think we've consistently and |
| 09:55 | 11 | always from the beginning raised the crime fraud issue. |
| 09:55 | 12 | THE COURT:  We won't quibble about it.  We'll |
| 09:55 | 13 | consider it. |
| 09:56 | 14 | MR. QUINN:  All right.  Thank you, Your Honor. |
| 09:56 | 15 | THE COURT:  Pleasure. |
| 09:56 | 16 | Mr. Price. |
| 09:56 | 17 | MR. PRICE:  I'd like to reserve time.  I don't |
| 09:56 | 18 | know if this is the right time.  I did not know Mr. Quinn |
| 09:56 | 19 | was going to do that. |
| 09:56 | 20 | THE COURT:  We'll take the time. |
| 09:56 | 21 | MR. PRICE:  Okay. |
| 09:56 | 22 | THE COURT:  Now, I've been very careful with this |
| 09:56 | 23 | record, so what you say is your -- because, remember, when |
| 09:56 | 24 | you came into this case, I forewarned everybody about my |
| 09:56 | 25 | hours. |

| 09:56 | 1 | MR. PRICE: I understood. |
| 09:56 | 2 | THE COURT: And I forewarned everybody about |
| 09:56 | 3 | whatever those issues were with either/or both parties. You |
| 09:56 | 4 | came at your own risk. It's a tremendous kindness excusing |
| 09:56 | 5 | lead counsel during the hours I keep. |
| 09:56 | 6 | MR. PRICE: I'm not here to talk about that. |
| 09:56 | 7 | THE COURT: What you say on the record is up to |
| 09:56 | 8 | you. |
| 09:56 | 9 | MR. PRICE: I'm not here to talk about that. What |
| 09:56 | 10 | I want to say on the record is -- is, obviously I was |
| 09:56 | 11 | unhappy not to be able to address the Court's comments when |
| 09:56 | 12 | the reporters were here. |
| 09:56 | 13 | THE COURT: When who was here? |
| 09:56 | 14 | MR. PRICE: There were reporters here, my |
| 09:56 | 15 | understanding. Don't have eyes in the back of my head, but |
| 09:56 | 16 | this -- as the Court's recognized, it's a high publicity |
| 09:57 | 17 | case. And I think, as the Court's recognized, the Court's |
| 09:57 | 18 | sensitive to comments -- |
| 09:57 | 19 | THE COURT: I'm not aware of who's a reporter and |
| 09:57 | 20 | who's not. Would all the reporters in the audience hold up |
| 09:57 | 21 | your hand? I'm just kidding. I have no idea who the |
| 09:57 | 22 | reporters are. |
| 09:57 | 23 | MR. PRICE: Well, Your Honor, my concern is -- we |
| 09:57 | 24 | have talked on the record about your sensitivity about |
| 09:57 | 25 | saying things because it will end up in the papers. And I |

Case 2:04-cv-09049-DOC-RNB   Document 9866   Filed 02/14/11   Page 60 of 136   Page ID #:297948
CV 04-9049 DOC - 2/10/2011 - Day 16, Volume 1 of 4

60

| 09:57 | 1 | think we're all sensitive to that, and I think you've been |
| 09:57 | 2 | sensitive to that, and I think both parties appreciate that. |
| 09:57 | 3 | So, uh, I have, you know, worked 30 years to build |
| 09:57 | 4 | my reputation professionally and a few more years on that |
| 09:57 | 5 | personally, and I was worried that I wouldn't be able to -- |
| 09:57 | 6 | to explain what happened.  And what happened was simply it |
| 09:57 | 7 | wasn't a tongue twister; it was more of a tooth and lower |
| 09:57 | 8 | lip twister, which is "wife's" versus "wives."  And I'm not |
| 09:57 | 9 | even sure that I -- wife's versus wives.  It was not an |
| 09:57 | 10 | attempt to tell the joke.  If you look at the record, there |
| 09:58 | 11 | was no joke. |
| 09:58 | 12 | It would have been -- apart from the fact that I |
| 09:58 | 13 | would not say anything racist, I'm in front of a jury here. |
| 09:58 | 14 | And I would never do anything could possibly make them think |
| 09:58 | 15 | that I was racist. |
| 09:58 | 16 | I was you -- uh, when I heard that pronunciation |
| 09:58 | 17 | late yesterday, I was uh, uh, I don't know, kind of, uh, |
| 09:58 | 18 | mortified.  And uh, uh, and uh, you know -- and the Court |
| 09:58 | 19 | has seen me over, I think, probably six days on my feet with |
| 09:58 | 20 | adverse examinations. |
| 09:58 | 21 | I am -- it is not my style to be horribly |
| 09:58 | 22 | confrontational in the sense of, you know, pointing the |
| 09:58 | 23 | fingers and do that.  I tend to have a sometimes more |
| 09:58 | 24 | rambling and sometimes more indirect style, uh, you know, |
| 09:58 | 25 | I -- sometimes it could be funny, but I know Mr. McConville |

Case 2:04-cv-09049-DOC-RNB  Document 9866  Filed 02/14/11  Page 61 of 136  Page ID #:297949
CV 04-9049 DOC - 2/10/2011 - Day 16, Volume 1 of 4

61

| | | |
|---|---|---|
| 09:59 | 1 | kind of has a monopoly on that.  I wish it were.  But it is |
| 09:59 | 2 | not my style to bait.  I ask questions, I continue asking |
| 09:59 | 3 | them until it seems to me the witness looks silly.  And |
| 09:59 | 4 | again, the Court's aware of my reputation.  My reputation |
| 09:59 | 5 | with this Court.  And I did not do anything intentionally. |
| 09:59 | 6 | And I had hoped that having you observe me over a |
| 09:59 | 7 | period of days and observe me yesterday, that you would come |
| 09:59 | 8 | out and say that your opinion was, it was not volitional. |
| 09:59 | 9 | It was unfortunate.  Perhaps Mr. Larian's response was |
| 09:59 | 10 | appropriate.  I know the Court thinks it was. |
| 09:59 | 11 | The reason I have doubts about that and the reason |
| 09:59 | 12 | I think it was made so the jury would hear it is because he |
| 09:59 | 13 | said, "You made racist comments in the prior trial." |
| 09:59 | 14 | And what I would like to do with Mr. Larian, with |
| 09:59 | 15 | the Court's permission, is to say, you made this comment |
| 10:00 | 16 | yesterday and perhaps I can be educated -- we all learn. |
| 10:00 | 17 | Please look to that record and show me what you're talking |
| 10:00 | 18 | about.  *Carte blanche*. |
| 10:00 | 19 | But, you know, Your Honor, you've made rulings |
| 10:00 | 20 | we've both disagreed with.  But no one questions that you |
| 10:00 | 21 | are doing the best job you can and that you are a man of |
| 10:00 | 22 | character.  You've made rulings *in limine*, which I'm sure |
| 10:00 | 23 | some parties think, oh, gosh, that's crazy, but we know that |
| 10:00 | 24 | you were acting in good faith and have the utmost character. |
| 10:00 | 25 | People sometimes disagree. |

Case 2:04-cv-09049-DOC-RNB   Document 9866   Filed 02/14/11   Page 62 of 136   Page ID
#:297950
CV 04-9049 DOC - 2/10/2011 - Day 16, Volume 1 of 4

62

| | | |
|---|---|---|
| 10:00 | 1 | What I wanted to be able to say yesterday at some |
| 10:00 | 2 | point was, uh, this is not a question of character or |
| 10:00 | 3 | professionalism.  I've been up on my feet for hours for |
| 10:00 | 4 | multiple days, and you've seen how professional I am. |
| 10:01 | 5 | It simply was a mispronunciation of what, if said |
| 10:01 | 6 | ten times, to be quite a tongue twister:  Wife's, wife's, |
| 10:01 | 7 | wife's, wife's. |
| 10:01 | 8 | It was based upon setting up Mr. Larian for an |
| 10:01 | 9 | e-mail where he said that.  It was in the context of |
| 10:01 | 10 | minimizing these workers. |
| 10:01 | 11 | And so I just wanted to go on the record and say |
| 10:01 | 12 | that I am extremely disappointed with the Court's comments. |
| 10:01 | 13 | I can see the Court saying it was unfortunate.  But uh -- |
| 10:01 | 14 | I -- I disagree with the Court that it was unprofessional. |
| 10:01 | 15 | I am shocked the Court did not realize it was not |
| 10:01 | 16 | volitional.  And what I was worried about, of course, was |
| 10:01 | 17 | the Court suggesting it could be either way. |
| 10:01 | 18 | And I certainly would have liked to have talked to |
| 10:01 | 19 | Court before that was said in a public forum. |
| 10:01 | 20 | THE COURT:  All right.  Thank you very much for |
| 10:01 | 21 | your comments. |
| 10:01 | 22 | Counsel. |
| 10:01 | 23 | MS. KELLER:  Your Honor, the Court has also been |
| 10:02 | 24 | aware of Mr. Larian's sensitivity about the issues that were |
| 10:02 | 25 | raised and the fact that -- the fact that there is a |

Case 2:04-cv-09049-DOC-RNB   Document 9866   Filed 02/14/11   Page 63 of 136   Page ID #:297951
CV 04-9049 DOC - 2/10/2011 - Day 16, Volume 1 of 4

63

| | | |
|---|---|---|
| 10:02 | 1 | tremendous amount of bias in this society in this day and |
| 10:02 | 2 | age, given where we are in the world, against Middle |
| 10:02 | 3 | Easterners is not lost on anybody.  We don't have a single |
| 10:02 | 4 | member of our jury, either the jurors or the alternates, who |
| 10:02 | 5 | are from the Middle East. |
| 10:02 | 6 | And the Court's view, I think, was not one taken |
| 10:02 | 7 | in isolation.  It was -- there has been a pattern in this |
| 10:02 | 8 | case, as I mentioned last night, in the depositions |
| 10:02 | 9 | suggesting Mr. Larian was having an extramarital |
| 10:02 | 10 | relationship. |
| 10:02 | 11 | In one of the first exhibits that was shown by |
| 10:02 | 12 | counsel, suggesting that Mr. Larian had girlfriends, when |
| 10:02 | 13 | everybody knew it was a joke -- we knew, the counsel did -- |
| 10:02 | 14 | and the Court tried to quickly correct that misapprehension |
| 10:03 | 15 | by telling the jurors that both sides stipulated it was a |
| 10:03 | 16 | joke, which, in fact, both sides had not, but both sides |
| 10:03 | 17 | quickly did when the Court made its intention clear. |
| 10:03 | 18 | And, and then, toward the end of the day, with |
| 10:03 | 19 | Mr. Larian on the stand, a reference to Mr. Larian's wives |
| 10:03 | 20 | followed by a chuckle and a glance back at Mr. Larian's wife |
| 10:03 | 21 | was the sort of thing that, um, was likely to have the very |
| 10:03 | 22 | effect on Mr. Larian that it had.  And for the reasons that |
| 10:03 | 23 | it had. |
| 10:03 | 24 | I'm not casting any aspersions on Mr. Price.  I |
| 10:03 | 25 | don't know why it happened.  And I don't pretend to know, |

Case 2:04-cv-09049-DOC-RNB   Document 9866   Filed 02/14/11   Page 64 of 136   Page ID #:297952
CV 04-9049 DOC - 2/10/2011 - Day 16, Volume 1 of 4

64

| | | |
|---|---|---|
| 10:03 | 1 | and I'm not gonna throw any mud in Mr. Price's direction, |
| 10:03 | 2 | but I do know that the Court took the time to go back and |
| 10:03 | 3 | actually listen to the audio, as well the Court witnessed |
| 10:04 | 4 | what happened. |
| 10:04 | 5 | And, um, I think the Court's reading of it was a |
| 10:04 | 6 | generous one.  No conclusions were drawn either way.  And I |
| 10:04 | 7 | think it was the right one. |
| 10:04 | 8 | THE COURT:  Well, first of all, I'm a little |
| 10:04 | 9 | concerned that the Court's getting drawn in, Mr. Price and |
| 10:04 | 10 | Mr. Quinn, to a personal discussion with you about this. |
| 10:04 | 11 | I refuse to enter into that discussion with you. |
| 10:04 | 12 | I think the Court was drawn in with Judge Larson |
| 10:04 | 13 | to a certain extent in the last proceeding.  This Court is |
| 10:04 | 14 | not going to go anything further than what I stated on the |
| 10:04 | 15 | record yesterday. |
| 10:04 | 16 | Second, the record will not only stand regarding |
| 10:04 | 17 | that, but I will say to you, Mr. Price, that I gave you both |
| 10:04 | 18 | sides of the coin in that ruling.  If you choose to believe, |
| 10:04 | 19 | after you heard the Court's statement last evening, that |
| 10:04 | 20 | this is a smirch on your character, so be it.  I thought |
| 10:05 | 21 | that was a very balanced ruling where the Court didn't make |
| 10:05 | 22 | a finding in either regard and left it simply neutral, and |
| 10:05 | 23 | the circuit court can look at it.  I'm preserving the tape. |
| 10:05 | 24 | I don't find any problem going forward on your |
| 10:05 | 25 | part.  What happened yesterday between both parties is |

Case 2:04-cv-09049-DOC-RNB   Document 9866   Filed 02/14/11   Page 65 of 136   Page ID #:297953
CV 04-9049 DOC - 2/10/2011 - Day 16, Volume 1 of 4

65

| | | |
|---|---|---|
| 10:05 | 1 | irrelevant to today's proceedings. |
| 10:05 | 2 | So hopefully that doesn't have a chilling effect. |
| 10:05 | 3 | If it does, that rests with you. |
| 10:05 | 4 | The second problem I have is that I guess you must |
| 10:05 | 5 | be in a lot of courts where judges don't mean what they say. |
| 10:05 | 6 | I was very careful, on one hand, to tell all of |
| 10:05 | 7 | that along the way, words like "I don't recall" or |
| 10:05 | 8 | nonresponsive questions were going to be viewed with, by |
| 10:05 | 9 | this Court -- and, in fact, I think MGA was the first one |
| 10:05 | 10 | that criticized this Court for and tried to draw it into a |
| 10:05 | 11 | personal dispute with counsel involving Ms. Larian.  I fully |
| 10:06 | 12 | intend at some point to make the following statement; and |
| 10:06 | 13 | that is, nonresponsive answers to questions posed to a |
| 10:06 | 14 | witness may be considered by you regarding the truthfulness |
| 10:06 | 15 | and credibility of that witness. |
| 10:06 | 16 | And second, I fully intend at some point -- and I |
| 10:06 | 17 | hope not in the dramatic point in the middle of Mr. Larian's |
| 10:06 | 18 | testimony -- to state that gratuitous information that you |
| 10:06 | 19 | determine is designed to invoke sympathy or ingratiate a |
| 10:06 | 20 | witness to a factfinder is not only irrelevant information, |
| 10:06 | 21 | but it should be distrusted by you and may be considered on |
| 10:06 | 22 | the issue of that witness's credibility. |
| 10:06 | 23 | Now, for the life of me, I do not understand, from |
| 10:06 | 24 | Mattel's standpoint, why you don't think I'm going to back |
| 10:06 | 25 | up exactly what I said to MGA; and from MGA's standpoint, I |

Case 2:04-cv-09049-DOC-RNB   Document 9866   Filed 02/14/11   Page 66 of 136   Page ID #:297954
CV 04-9049 DOC - 2/10/2011 - Day 16, Volume 1 of 4

66

| | | |
|---|---|---|
| 10:06 | 1 | don't understand why you don't think I'm going to back up |
| 10:06 | 2 | exactly what I said to Mattel. |
| 10:06 | 3 | So I've always got jury instructions. |
| 10:06 | 4 | I can even make comments on the evidence when I |
| 10:06 | 5 | choose not to. |
| 10:06 | 6 | So now I'm going to give the lectern back to |
| 10:07 | 7 | Mr. Quinn and Mr. Price for a moment. |
| 10:07 | 8 | So you have all that you want to say this morning, |
| 10:07 | 9 | and we'll wait for the jury for a while.  And then I'm going |
| 10:07 | 10 | to give it back to Ms. Keller, of course, to object and |
| 10:07 | 11 | Mr. McConville.  But I'm not going to be brought into a |
| 10:07 | 12 | personal dispute with counsel.  I think that's exactly where |
| 10:07 | 13 | each counsel would like the Court to be as each one of you |
| 10:07 | 14 | perceives you're winning or losing the case, depending upon |
| 10:07 | 15 | the witnesses on the stand.  That silliness apparently has |
| 10:07 | 16 | prevailed up to this time with some other courts. |
| 10:07 | 17 | And by the way, Mr. Quinn, I don't negotiate with |
| 10:07 | 18 | counsel.  Your response that you will withdraw your motion |
| 10:07 | 19 | for mistrial based upon the Court doing the following is |
| 10:07 | 20 | nonsense.  You keep your motion for mistrial just like it is |
| 10:07 | 21 | so you have a record. |
| 10:07 | 22 | MR. QUINN:  The Court must have misunderstood me. |
| 10:07 | 23 | I did not say we would withdraw it. |
| 10:07 | 24 | THE COURT:  Your documents do, that you filed this |
| 10:07 | 25 | morning. |

| | | |
|---|---|---|
| 10:07 | 1 | MR. QUINN:  I said in the alternative. |
| 10:07 | 2 | THE COURT:  In the alternative, which is |
| 10:07 | 3 | negotiation, as far as I'm concerned.  I refuse to negotiate |
| 10:07 | 4 | with you.  You just keep the record just like it is, |
| 10:07 | 5 | Mr. Quinn. |
| 10:07 | 6 | Now, Mr. Price. |
| 10:07 | 7 | MR. PRICE:  Your Honor, first I'd like to correct |
| 10:07 | 8 | a factual misstatement of Ms. Keller. |
| 10:08 | 9 | There was an e-mail where Mr. Larian jokes about |
| 10:08 | 10 | no one or everyone arguing with him, which includes |
| 10:08 | 11 | employees, girlfriends, wives, and I don't know if he |
| 10:08 | 12 | included Ms. Garcia in that. |
| 10:08 | 13 | It was irrelevant e-mail.  The Court did not give |
| 10:08 | 14 | any indication at all.  You -- I don't think the Court or |
| 10:08 | 15 | counsel thought there was anything to that.  When Ms. Keller |
| 10:08 | 16 | began her examination of Ms. Garcia in asking about the |
| 10:08 | 17 | relationship between Mr. Larian and his wife, I'm the one, |
| 10:08 | 18 | not the Court -- I'm the one who said it was a joke.  We'll |
| 10:08 | 19 | stipulate it was a joke. |
| 10:08 | 20 | It was -- it was much ado about nothing, and it |
| 10:08 | 21 | wasn't because the Court indicated anything. |
| 10:08 | 22 | THE COURT:  No, but, Counsel, the disconnect -- |
| 10:08 | 23 | let's short-circuit this.  The disconnect is apparently |
| 10:08 | 24 | between you and your associates.  If you go back to the |
| 10:08 | 25 | depositional testimony, a lot of questions were asked about |

Case 2:04-cv-09049-DOC-RNB   Document 9866   Filed 02/14/11   Page 68 of 136   Page ID #:297956
CV 04-9049 DOC – 2/10/2011 – Day 16, Volume 1 of 4

68

| | | |
|---|---|---|
| 10:08 | 1 | alleged relationships between Mr. Larian and –– and I won't |
| 10:09 | 2 | put the lady's name on the record.  Of course that |
| 10:09 | 3 | sensitizes us.  I mean, any of us with a spouse who gets |
| 10:09 | 4 | accused of something that doesn't have a basis –– and maybe |
| 10:09 | 5 | it was asked in good faith.  I made a very careful record so |
| 10:09 | 6 | that Mr. Zeller had a good record last evening that perhaps |
| 10:09 | 7 | that was made in good faith. |
| 10:09 | 8 |           But of course that sensitizes people. |
| 10:09 | 9 |           MR. PRICE:  And I'll let Mr. Zeller speak for |
| 10:09 | 10 | himself. |
| 10:09 | 11 |           But I don't –– |
| 10:09 | 12 |           THE COURT:  There's no reason to –– there's no |
| 10:09 | 13 | finding against Mr. Zeller. |
| 10:09 | 14 |           MR. PRICE:  Well, he was mentioned last night, not |
| 10:09 | 15 | always in a positive light.  But the time the e-mail came |
| 10:09 | 16 | in, there was –– I don't recall there being objection.  I |
| 10:09 | 17 | don't recall the Court being sensitive.  And I wasn't, |
| 10:09 | 18 | because there was a joke combined with something |
| 10:09 | 19 | substantive. |
| 10:09 | 20 |           And I just want to correct the record that it |
| 10:09 | 21 | wasn't the Court who said anything.  When Ms. Keller started |
| 10:09 | 22 | asking about that, I said in front of the jury, "It's a |
| 10:09 | 23 | joke."  And then you said there's a stipulation, we don't |
| 10:09 | 24 | need to get into that. |
| 10:10 | 25 |           So that had not been brought up by me. |

Case 2:04-cv-09049-DOC-RNB   Document 9866   Filed 02/14/11   Page 69 of 136   Page ID
#:297957
CV 04-9049 DOC - 2/10/2011 - Day 16, Volume 1 of 4

69

| 10:10 | 1 | THE COURT: You notice I didn't mention that |
| 10:10 | 2 | e-mail. I mentioned back in the depositional testimony and |
| 10:10 | 3 | what had sensitized the person. |
| 10:10 | 4 | MR. PRICE: And again, I would need someone more |
| 10:10 | 5 | familiar with that to talk about that. I wasn't a part of |
| 10:10 | 6 | that. |
| 10:10 | 7 | The second thing is I know Your Honor believes |
| 10:10 | 8 | that it was -- it was being fair and even last night. |
| 10:10 | 9 | But in the light of any suggestion that it was an |
| 10:10 | 10 | intentional racist comment, I think it's -- could be |
| 10:10 | 11 | newsworthy for a Court to say that, uh, what I did was |
| 10:10 | 12 | unprofessional, because we get paid a lot of money for using |
| 10:10 | 13 | words and there's no question about that. |
| 10:10 | 14 | The Court did say it was unprofessional. |
| 10:10 | 15 | THE COURT: I thought I stayed away from the |
| 10:10 | 16 | racist comment, Counsel. I didn't address that last |
| 10:10 | 17 | evening. |
| 10:10 | 18 | MR. PRICE: Your Honor, I think on the record you |
| 10:10 | 19 | said that my saying "wives" was -- was unprofessional given |
| 10:11 | 20 | how much we're paid. |
| 10:11 | 21 | THE COURT: That's not racism. And I didn't say |
| 10:11 | 22 | that, Counsel. |
| 10:11 | 23 | MR. PRICE: Okay. |
| 10:11 | 24 | THE COURT: I was very careful to say that the |
| 10:11 | 25 | Court couldn't discern or make a factual determination; that |

Case 2:04-cv-09049-DOC-RNB  Document 9866  Filed 02/14/11  Page 70 of 136  Page ID #:297958
CV 04-9049 DOC - 2/10/2011 - Day 16, Volume 1 of 4

70

| | | |
|---|---|---|
| 10:11 | 1 | I was preserving the tape, including the audio, for the |
| 10:11 | 2 | circuit; that they could make the determination; that it |
| 10:11 | 3 | could be any one of three things, and it didn't matter |
| 10:11 | 4 | which. |
| 10:11 | 5 | MR. PRICE:  I agree, and I think that's -- of |
| 10:11 | 6 | course, we'll have the transcript.  I was worried about the |
| 10:11 | 7 | statement that volitional or not, it was unprofessional.  I |
| 10:11 | 8 | have not been unprofessional. |
| 10:11 | 9 | And again, I hope given what the Court knows -- |
| 10:11 | 10 | THE COURT:  Excuse me.  You're changing the words. |
| 10:11 | 11 | I never said "unprofessional."  I said, first, it doesn't |
| 10:11 | 12 | matter because the impact, basically, is the same. |
| 10:11 | 13 | Now, if you want to translate that to |
| 10:11 | 14 | unprofessional, you're the one using that word; the Court |
| 10:11 | 15 | hasn't. |
| 10:11 | 16 | MR. PRICE:  I may have misheard, and it could be |
| 10:11 | 17 | because I was sitting here in the -- a little bit under a |
| 10:11 | 18 | microscope. |
| 10:11 | 19 | But I'm -- I want the Court to know I am |
| 10:12 | 20 | disappointed that you couldn't make that call, given what |
| 10:12 | 21 | you know about the examination, given what you know about my |
| 10:12 | 22 | reputation. |
| 10:12 | 23 | THE COURT:  Oh, I did.  I think it was very |
| 10:12 | 24 | balanced, Counsel. |
| 10:12 | 25 | MR. PRICE:  Okay.  So that's -- that's... |

Case 2:04-cv-09049-DOC-RNB   Document 9866   Filed 02/14/11   Page 71 of 136   Page ID #:297959
CV 04-9049 DOC - 2/10/2011 - Day 16, Volume 1 of 4

71

| | | |
|---|---|---|
| 10:12 | 1 | THE COURT:  All right.  I hear your pain. |
| 10:12 | 2 | I'm sorry that you feel that way.  I'm not going |
| 10:12 | 3 | to enter into a further discussion with you about it. |
| 10:12 | 4 | All right.  Counsel on behalf of MGA. |
| 10:12 | 5 | MS. KELLER:  Nothing further, Your Honor. |
| 10:12 | 6 | MR. PRICE:  May I ask Mr. Larian that question? |
| 10:12 | 7 | Since he accused me of a racist comment in the June trial, |
| 10:12 | 8 | which is simply -- I'd love to see it. |
| 10:12 | 9 | THE COURT:  Um... |
| 10:12 | 10 | MS. KELLER:  I think that's opening a can of |
| 10:12 | 11 | worms, Your Honor. |
| 10:12 | 12 | THE COURT:  I think -- what I balanced last |
| 10:12 | 13 | evening were the numbers of gratuitous comments that the |
| 10:12 | 14 | Court perceived Mr. Larian might be making to ingratiate |
| 10:12 | 15 | himself or to cause sympathy with the jury. |
| 10:12 | 16 | And as you know, I felt that that had become |
| 10:13 | 17 | redundant, and I'd warned all parties to speak to their |
| 10:13 | 18 | clients now and in the future concerning that. |
| 10:13 | 19 | The concern is that I don't want to make any |
| 10:13 | 20 | factual determinations, but I'd warned all parties that |
| 10:13 | 21 | along the way I'd be making comments about how witnesses |
| 10:13 | 22 | were to be judged, and that started with Paula Garcia.  The |
| 10:13 | 23 | parties are certainly on notice concerning that. |
| 10:13 | 24 | That racist comment -- I've got a "timing tape" |
| 10:13 | 25 | back.  And I need to go back again and once again look at |

Case 2:04-cv-09049-DOC-RNB   Document 9866   Filed 02/14/11   Page 72 of 136   Page ID #:297960
CV 04-9049 DOC – 2/10/2011 – Day 16, Volume 1 of 4

72

| | | |
|---|---|---|
| 10:13 | 1 | the order. |
| 10:13 | 2 | If that comment came –– and I believe it came not |
| 10:13 | 3 | related to the comment about wives, then the answer is yes. |
| 10:14 | 4 | If it came in that section, the answer is no.  And I will |
| 10:14 | 5 | want to go back and look at that tape again.  I listened to |
| 10:14 | 6 | it four times last evening, and I want to be certain. |
| 10:14 | 7 | Now, I'm going to read to you and pay each of you |
| 10:14 | 8 | the courtesy, because I understand what it's like being |
| 10:14 | 9 | under the microscope.  So let me just read my ruling again |
| 10:14 | 10 | last night to you. |
| 10:14 | 11 | That way there's no –– now, Mr. Zeller, I don't |
| 10:14 | 12 | want to disappoint you.  If you have anything you want to |
| 10:14 | 13 | say concerning your comments, let's get everybody out, and |
| 10:14 | 14 | then Annette Hurst also. |
| 10:14 | 15 | MR. ZELLER:  I will submit the deposition |
| 10:14 | 16 | transcript pages, Your Honor. |
| 10:14 | 17 | THE COURT:  We've already read them. |
| 10:14 | 18 | MR. ZELLER:  And what's quite clear is the word |
| 10:14 | 19 | "affair" was interjected by Annette Hurst, and it was done |
| 10:14 | 20 | in order to interrupt questioning about the flow of money |
| 10:14 | 21 | between Isaac Larian and people who were participating in |
| 10:14 | 22 | Omni.  I asked about the nature of relationships.  I am |
| 10:14 | 23 | entitled to do that.  I did not use the word "affair."  I |
| 10:15 | 24 | did not insinuate the word "affair."  Annette Hurst |
| 10:15 | 25 | disrupted the deposition by screeching out that I was |

Case 2:04-cv-09049-DOC-RNB   Document 9866   Filed 02/14/11   Page 73 of 136   Page ID #:297961
CV 04-9049 DOC – 2/10/2011 – Day 16, Volume 1 of 4

73

| | | |
|---|---|---|
| 10:15 | 1 | accusing Isaac Larian of having an affair, which was simply |
| 10:15 | 2 | factually false.  The discovery master was there.  He then |
| 10:15 | 3 | permitted and authorized me to ask the question that I |
| 10:15 | 4 | asked. |
| 10:15 | 5 | And I have now, myself, been accused several times |
| 10:15 | 6 | by MGA -- and I'm not -- my comments aren't directed toward |
| 10:15 | 7 | the Court, Your Honor.  It's really MGA's distortion of the |
| 10:15 | 8 | record as to how that occurred. |
| 10:15 | 9 | The sensitizing of Mr. Larian was not by me.  It |
| 10:15 | 10 | was by MGA's own counsel. |
| 10:15 | 11 | Thank you. |
| 10:15 | 12 | THE COURT:  Okay.  Now, Ms. Hurst, let's make sure |
| 10:15 | 13 | we have all the counsel and Mr. McConville, and then we'll |
| 10:15 | 14 | finish this off. |
| 10:15 | 15 | MS. HURST:  Prior to the proceedings in that |
| 10:15 | 16 | deposition, off the record, Mr. Zeller had made a number of |
| 10:15 | 17 | comments insinuating an extramarital affair between |
| 10:15 | 18 | Mr. Larian and the woman at issue.  The question, "What is |
| 10:16 | 19 | the nature of your relationship, and have you had any other |
| 10:16 | 20 | relationship?" was clearly designed to imply or insinuate an |
| 10:16 | 21 | extramarital relationship. |
| 10:16 | 22 | It was perceived at the time by me, the witness, |
| 10:16 | 23 | and the discovery master as containing that implication.  An |
| 10:16 | 24 | objection was made.  The witness was extremely upset. |
| 10:16 | 25 | I don't believe I screeched. |

Case 2:04-cv-09049-DOC-RNB   Document 9866   Filed 02/14/11   Page 74 of 136   Page ID
#:297962
CV 04-9049 DOC - 2/10/2011 - Day 16, Volume 1 of 4

74

| | | |
|---|---|---|
| 10:16 | 1 | And nonetheless, that was an issue that came up. |
| 10:16 | 2 | It was understood by all in the room to carry that |
| 10:16 | 3 | implication.  That's all I have to say. |
| 10:16 | 4 | THE COURT:  Kathy, would you tell the jury we'll |
| 10:16 | 5 | be a few more moments, as a courtesy. |
| 10:16 | 6 | MS. HURST:  I apologize.  I don't mean to draw the |
| 10:16 | 7 | Court into any kind of he said/she said scenario regarding |
| 10:16 | 8 | that deposition. |
| 10:16 | 9 | MR. ZELLER:  Your Honor, and it's, obviously, |
| 10:16 | 10 | false.  It is made up after the fact.  This assertion that |
| 10:16 | 11 | somehow I said something off the record -- the discovery |
| 10:17 | 12 | master was there for that deposition.  It is telling that |
| 10:17 | 13 | Ms. Hurst now, for the first time, has to resort to what is |
| 10:17 | 14 | quite clearly a false claim about an off-the-record comment. |
| 10:17 | 15 | The deposition transcript is clear.  It is on |
| 10:17 | 16 | video what it is that occurred.  And for MGA to continue to |
| 10:17 | 17 | distort this in order to, again, curry favor, both with |
| 10:17 | 18 | apparently the Court as well as the jury, is really utterly |
| 10:17 | 19 | outrageous. |
| 10:17 | 20 | THE COURT:  Ms. Hurst. |
| 10:17 | 21 | MS. HURST:  Your Honor, I think the record is |
| 10:17 | 22 | clear from the statements made on the record in the |
| 10:17 | 23 | deposition.  I was simply providing additional information. |
| 10:17 | 24 | We're happy to rest on the record in the deposition as well. |
| 10:17 | 25 | We think it was clear the insinuation of the extramarital. |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 9866   Filed 02/14/11   Page 75 of 136   Page ID #:297963
CV 04-9049 DOC - 2/10/2011 - Day 16, Volume 1 of 4

75

| | | |
|---|---|---|
| 10:17 | 1 | THE COURT:  Mr. McConville, we don't want to leave |
| 10:17 | 2 | you out. |
| 10:17 | 3 | MR. McCONVILLE:  I'm good, Your Honor. |
| 10:17 | 4 | THE COURT:  Ms. Keller? |
| 10:18 | 5 | MS. KELLER:  Your Honor, I have nothing further. |
| 10:18 | 6 | THE COURT:  Mr. Quinn? |
| 10:18 | 7 | MR. QUINN:  Nothing, Your Honor. |
| 10:18 | 8 | THE COURT:  Mr. Price? |
| 10:18 | 9 | MR. PRICE:  Nothing else, Your Honor. |
| 10:18 | 10 | THE COURT:  All right.  I'd read into the record |
| 10:18 | 11 | last evening the following:  There is no evidence that |
| 10:18 | 12 | Mattel killed Mr. Larian's father.  There is no evidence |
| 10:18 | 13 | that Mr. Larian wanted to kill Bob Eckert.  The Court's |
| 10:18 | 14 | going to make no further comment about Mr. Larian's |
| 10:18 | 15 | statement that Mattel killed his father.  The Court has |
| 10:18 | 16 | faith in the jury to recognize evasive and nonresponsive |
| 10:18 | 17 | answers, and counsel is free to argue that nonresponsiveness |
| 10:18 | 18 | bears on credibility in their argument. |
| 10:18 | 19 | The Court also informed the jury at the time -- |
| 10:18 | 20 | the Court also informed the parties that it will continue to |
| 10:18 | 21 | instruct the jury to this effect during the trial. |
| 10:18 | 22 | Now, what's unclear about that?  That should come |
| 10:18 | 23 | as no surprise that the Court is going to continue to |
| 10:18 | 24 | instruct the jury. |
| 10:19 | 25 | It started with Paula Garcia. |

Case 2:04-cv-09049-DOC-RNB   Document 9866   Filed 02/14/11   Page 76 of 136   Page ID #:297964
CV 04-9049 DOC – 2/10/2011 – Day 16, Volume 1 of 4

76

| 10:19 | 1 | Second, there's no proof that Carter Bryant |
|---|---|---|
| 10:19 | 2 | suffered a stroke or that Mattel has responsibility for any |
| 10:19 | 3 | of his health difficulties.  This is a trial.  Carter Bryant |
| 10:19 | 4 | testified at the first trial, and he was expected to testify |
| 10:19 | 5 | at this trial.  He may be back for another portion of this |
| 10:19 | 6 | trial.  The Court has already instructed the jury to this |
| 10:19 | 7 | effect.  The Court need not make any further comment, and |
| 10:19 | 8 | there will be no further comment by counsel concerning that. |
| 10:19 | 9 | And I think I added a couple words, and you'll |
| 10:19 | 10 | call that to my attention. |
| 10:19 | 11 | Third, the request by Mattel to get into the area |
| 10:19 | 12 | of spoliation on the grounds that Mr. Larian opened the door |
| 10:19 | 13 | with his comment that MGA had turned everything over to |
| 10:19 | 14 | Mattel.  Mr. Larian was baited into this comment through the |
| 10:19 | 15 | nature of Mr. Price's questioning. |
| 10:19 | 16 | Now, the testimony that Mattel claims opened the |
| 10:19 | 17 | door can be found at 1605-54 through 1609.  The context of |
| 10:19 | 18 | the questioning is an e-mail concerning Ryan Tumaliun, who |
| 10:20 | 19 | was a Mattel intern that had previously interned at MGA. |
| 10:20 | 20 | Mr. Price stated that, quote, "At the time you wrote this, |
| 10:20 | 21 | you did not believe that your answer would be seen by |
| 10:20 | 22 | anybody outside of Mattel, correct? |
| 10:20 | 23 | Mr. Larian responded, "That is not correct." |
| 10:20 | 24 | "Since you do have this document in your hand and |
| 10:20 | 25 | MGA produced it means that you saw it.  We gave it to you. |

| | | |
|---|---|---|
| 10:20 | 1 | We had nothing to hide," end of quote. |
| 10:20 | 2 | I note the fact that Mr. Larian used the word |
| 10:20 | 3 | "had," and I represent I've listened to that at least three |
| 10:20 | 4 | and probably four times last evening before I came back into |
| 10:20 | 5 | Court. |
| 10:20 | 6 | That's the past tense of the verb suggesting that |
| 10:20 | 7 | his comment was in a specific reference to the Tamilian |
| 10:20 | 8 | e-mail and MGA's thinking with respect to that e-mail. |
| 10:20 | 9 | However, Mr. Price used this answer to go off on a tangent |
| 10:20 | 10 | about overall document production in this litigation.  And |
| 10:21 | 11 | that's the very area I had precluded counsel, quite frankly, |
| 10:21 | 12 | as an added statement today, about entering into. |
| 10:21 | 13 | Aggressive litigation doesn't open doors. |
| 10:21 | 14 | Mr. Price asked, "Wait a minute.  Many of the |
| 10:21 | 15 | documents that MGA has handed over in this litigation were |
| 10:21 | 16 | as a result of motions requiring you to hand over such |
| 10:21 | 17 | documents, correct?"  End of quote. |
| 10:21 | 18 | Mr. Price did not restrict his question to the |
| 10:21 | 19 | circumstances of this particular e-mail, even though what |
| 10:21 | 20 | was the line -- that that was the line of questioning and |
| 10:21 | 21 | this e-mail was the document that was being questioned. |
| 10:21 | 22 | Mr. Larian answered, "I don't know.  We gave you |
| 10:21 | 23 | everything, everything, everything that Mattel's asked for." |
| 10:21 | 24 | Now, that expansion by Mr. Price about the |
| 10:21 | 25 | question led to the very nonresponsive answer that you now |

Case 2:04-cv-09049-DOC-RNB  Document 9866  Filed 02/14/11  Page 78 of 136  Page ID #:297966
CV 04-9049 DOC – 2/10/2011 – Day 16, Volume 1 of 4

78

| | | |
|---|---|---|
| 10:21 | 1 | say opens the door to spoliation. |
| 10:21 | 2 | That motion is denied. |
| 10:21 | 3 | MR. PRICE:  It's not that answer, Your Honor. |
| 10:21 | 4 | THE COURT:  The finding of the Court is that the |
| 10:21 | 5 | door has not been opened to spoliation, as Mr. Quinn has |
| 10:22 | 6 | continually asked for, based on this line of questioning. |
| 10:22 | 7 | Even if the door has been opened, I've already rejected the |
| 10:22 | 8 | claim of evidence of spoliation up to this point. |
| 10:22 | 9 | I also made the comment last evening that the |
| 10:22 | 10 | Court's gone to extraordinary lengths concerning the |
| 10:22 | 11 | metadata and the last request by Mr. Zeller concerning this |
| 10:22 | 12 | document that went over to the Special Master, and you'll |
| 10:22 | 13 | have a report sometime today. |
| 10:22 | 14 | I think the thing that's of great concern to you |
| 10:22 | 15 | are the following two, though:  In discussing TX8936, |
| 10:22 | 16 | February 2, 2005, an e-mail that made more references, |
| 10:22 | 17 | Mr. Larian lists all the entities Mattel had sued –– MGA |
| 10:22 | 18 | Carter Bryant –– and says, "Yes, we are still at war with |
| 10:22 | 19 | Mattel today." |
| 10:22 | 20 | Mr. Price then says, "So in this e-mail you are |
| 10:22 | 21 | not talking about competition; you're talking about lawsuits |
| 10:22 | 22 | that have been filed?" |
| 10:22 | 23 | Larian responds with a, "yes," and states that |
| 10:22 | 24 | "Lawsuits are Mattel's means of stifling competition." |
| 10:22 | 25 | This is a gratuitous comment by Mr. Larian in a |

Case 2:04-cv-09049-DOC-RNB   Document 9866   Filed 02/14/11   Page 79 of 136   Page ID
#:297967
CV 04-9049 DOC – 2/10/2011 – Day 16, Volume 1 of 4

79

| | | |
|---|---|---|
| 10:22 | 1 | string of gratuitous comments about Mattel's motives in |
| 10:23 | 2 | filing this lawsuit as well as Mattel's anticompetitive |
| 10:23 | 3 | tendency.  Because of this continuing string of gratuitous |
| 10:23 | 4 | comments, Mattel can ask Larian about MGA's lawsuits against |
| 10:23 | 5 | other entities concerning Hong Kong. |
| 10:23 | 6 | There's nothing unclear about my ruling last |
| 10:23 | 7 | night, Mr. Price and Mr. Quinn, and it doesn't need any |
| 10:23 | 8 | further clarification -- unless you chose to interpret it. |
| 10:23 | 9 | But you must stay away from discussions concerning |
| 10:23 | 10 | the similarity of the dolls or non-similarity in those |
| 10:23 | 11 | lawsuits. |
| 10:23 | 12 | In any event, I'm putting the parties on notice |
| 10:23 | 13 | that if Mattel elicits testimony regarding MGA's use of |
| 10:23 | 14 | litigation against competitors, the door will be permanently |
| 10:23 | 15 | open on the litigation-to-death issue.  That's my concern. |
| 10:23 | 16 | That's exactly where MGA would like to place you, quite |
| 10:23 | 17 | frankly, in a litigation-to-death status that I precluded |
| 10:23 | 18 | them from entering into in my *in limine* motions. |
| 10:23 | 19 | But apparently each of you believe that aggressive |
| 10:23 | 20 | prosecution of your respective cases is going to cause some |
| 10:24 | 21 | concern. |
| 10:24 | 22 | Mr. Price, this is addressed directly to you. |
| 10:24 | 23 | Listen carefully, and if you think you've been |
| 10:24 | 24 | wounded, I certainly apologize, but I don't apologize |
| 10:24 | 25 | professionally.  Of course, this Court would not want to |

Case 2:04-cv-09049-DOC-RNB   Document 9866   Filed 02/14/11   Page 80 of 136   Page ID #:297968
CV 04-9049 DOC - 2/10/2011 - Day 16, Volume 1 of 4

80

| | | |
|---|---|---|
| 10:24 | 1 | cause you any harm -- I say that on a very personal basis -- |
| 10:24 | 2 | nor your reputation.  You're an excellent counsel. |
| 10:24 | 3 | The Court next addresses Mr. Price's comment |
| 10:24 | 4 | regarding Mr. Larian's wives' dresses.  The Court's reviewed |
| 10:24 | 5 | the audio of this portion of the testimony.  Now, I'll |
| 10:24 | 6 | say -- instead of reviewing it, I'll say I've reviewed it |
| 10:24 | 7 | four times, maybe five and read the transcript at least five |
| 10:24 | 8 | times before I came back into open Court in conjunction with |
| 10:24 | 9 | the audio.  Which is why, counsel, I'd ask you to quit |
| 10:24 | 10 | bothering my court reporter last night, who was Jane, and I |
| 10:24 | 11 | had to finally order her into chambers because you were |
| 10:24 | 12 | taking unnecessary time. |
| 10:24 | 13 | I've reviewed the audio of this portion of the |
| 10:24 | 14 | testimony as well. |
| 10:24 | 15 | After Mr. Price makes this comment, he chuckles. |
| 10:25 | 16 | The Court also notes that he then apologized.  In other |
| 10:25 | 17 | words, Mr. Price I paid you the courtesy of letting the |
| 10:25 | 18 | Circuit know and all parties know that you attempted to |
| 10:25 | 19 | apologize immediately before the outburst. |
| 10:25 | 20 | The Court cannot determine if this chuckle arose |
| 10:25 | 21 | from nervousness, whether Mr. Price had more ulterior |
| 10:25 | 22 | motives in drawing -- to draw attention to the comment, or |
| 10:25 | 23 | whether Mr. Price was genuinely concerned with trying to |
| 10:25 | 24 | correct his mistake.  All three options.  You haven't been |
| 10:25 | 25 | accused of anything, unless you choose to accuse yourself. |

| | | |
|---|---|---|
| 10:25 | 1 | At the end of the day, that does not matter.  The |
| 10:25 | 2 | effect is the same.  Attorneys have been paid hundreds of |
| 10:25 | 3 | millions of dollars in this lawsuit to be careful with their |
| 10:25 | 4 | words. |
| 10:25 | 5 | The Court notes that there's something of a |
| 10:25 | 6 | history at play with respect to the comments about |
| 10:25 | 7 | Mr. Larian's message.  So let me address you and Mr. Zeller |
| 10:25 | 8 | and Ms. Hurst. |
| 10:25 | 9 | Looking back through the depositional testimony, |
| 10:25 | 10 | the Court notes that questions were asked by Mattel that |
| 10:26 | 11 | attempted to insinuate that Mr. Larian was having an |
| 10:26 | 12 | extramarital relationship. |
| 10:26 | 13 | Now, whatever happened between the two of you, the |
| 10:26 | 14 | record's really very clear without getting too much into |
| 10:26 | 15 | that morass.  And the Court chooses not to elaborate further |
| 10:26 | 16 | on the record this evening. |
| 10:26 | 17 | I didn't want to get involved or the names of the |
| 10:26 | 18 | person or the parties that were accused or caused any |
| 10:26 | 19 | further embarrassment, and I'll let the Circuit sort that |
| 10:26 | 20 | out by looking back at the depositional testimony.  Those |
| 10:26 | 21 | questions may have been appropriate. |
| 10:26 | 22 | But this history has made witnesses sensitive to |
| 10:26 | 23 | comments like the one Mr. Price made today.  Given this |
| 10:26 | 24 | history, comments like this are bound to cause a reaction. |
| 10:26 | 25 | That does not mean that witnesses always take the bait or |

Case 2:04-cv-09049-DOC-RNB   Document 9866   Filed 02/14/11   Page 82 of 136   Page ID #:297970
CV 04-9049 DOC - 2/10/2011 - Day 16, Volume 1 of 4

82

| | | |
|---|---|---|
| 10:26 | 1 | should use this as an excuse to give nonresponsive answers. |
| 10:26 | 2 | So to quote Judge Kozinski -- and I love this |
| 10:27 | 3 | quote.  It's just like, well, many of Judge Kozinski's |
| 10:27 | 4 | quotes.  But the parties are advised to "chill out."  And |
| 10:27 | 5 | the reason I didn't want to discuss this further with you |
| 10:27 | 6 | last evening is I thought everybody, one, needed some rest |
| 10:27 | 7 | and a cooling period. |
| 10:27 | 8 | Now, I was informed this morning that a motion for |
| 10:27 | 9 | mistrial had been filed.  I didn't receive that until about |
| 10:27 | 10 | 7:23, and I was in a Federal Bar Association meeting in the |
| 10:27 | 11 | bottom of this courthouse when I got that. |
| 10:27 | 12 | I came up at 7:25.  Kathy told me at 7:28, |
| 10:27 | 13 | Mr. Quinn, that you wanted to address me.  I'd seen the |
| 10:27 | 14 | motion; didn't think it was properly filed; instructed my |
| 10:27 | 15 | clerk to do the following; wrote out three quick sentences. |
| 10:27 | 16 | So I didn't mean any disrespect to you. |
| 10:27 | 17 | And then ushered the jury in, thinking that we'd |
| 10:27 | 18 | have time, in a properly filed motion, to hash this out, and |
| 10:27 | 19 | to get a properly filed response from MGA. |
| 10:27 | 20 | Now, I saw Mr. Quinn trying to catch the Court's |
| 10:27 | 21 | eyes this morning.  I think I knew what that was about. |
| 10:28 | 22 | And, Mr. Quinn? |
| 10:28 | 23 | MR. QUINN:  Yes, Your Honor. |
| 10:28 | 24 | THE COURT:  Okay.  And now I think we have a |
| 10:28 | 25 | complete record. |

| 10:28 | 1 | Now, once again, Mr. Price, I know that you feel |
| 10:28 | 2 | put upon. I think I was very careful last night. I made no |
| 10:28 | 3 | accusations. I left this in a completely neutral form, and |
| 10:28 | 4 | the Circuit can sort this out. |
| 10:28 | 5 | MR. PRICE: Your Honor, I would request that the |
| 10:28 | 6 | Court look at the transcript before we took the break; that |
| 10:28 | 7 | is, we took a break between 5:00 and 7:00. |
| 10:28 | 8 | THE COURT: Those were not findings, though. |
| 10:28 | 9 | Those were initial comments and concerns. My findings came |
| 10:28 | 10 | out about 7:30 last evening. Those are findings. |
| 10:28 | 11 | MR. PRICE: I understand that's the Court's order, |
| 10:28 | 12 | but the comments made about me before then are the ones |
| 10:28 | 13 | that -- I had a tough two hours there. |
| 10:28 | 14 | THE COURT: Well, let's strike those comments, |
| 10:28 | 15 | then. |
| 10:28 | 16 | The final order of the Court is what counts, and |
| 10:28 | 17 | that's why I took the time and got off the bench. |
| 10:28 | 18 | MR. PRICE: I understand that. |
| 10:29 | 19 | THE COURT: So we can strike that, if you'd like |
| 10:29 | 20 | to. That's an initial thought I had. That's certainly not |
| 10:29 | 21 | a final ruling. |
| 10:29 | 22 | MR. PRICE: That would certainly be great, because |
| 10:29 | 23 | I think -- |
| 10:29 | 24 | THE COURT: Why don't we strike those comments so |
| 10:29 | 25 | you're not professionally harmed. |

Case 2:04-cv-09049-DOC-RNB  Document 9866  Filed 02/14/11  Page 84 of 136  Page ID #:297972
CV 04-9049 DOC – 2/10/2011 – Day 16, Volume 1 of 4

84

| 10:29 | 1 | MR. PRICE:  Hopefully, the horse isn't out of the |
| 10:29 | 2 | barn.  I would love that. |
| 10:29 | 3 | THE COURT:  The last thing that counts is the |
| 10:29 | 4 | Court's final determination. |
| 10:29 | 5 | MR. PRICE:  I would appreciate that. |
| 10:29 | 6 | THE COURT:  Thank you. |
| 10:29 | 7 | Now, anything further? |
| 10:29 | 8 | MR. PRICE:  There was the -- for this witness's |
| 10:29 | 9 | examination, there was the Farhad Larian document, which the |
| 10:29 | 10 | Court had talked about that you might want to redact. |
| 10:29 | 11 | THE COURT:  Oh, but I don't have it in front of |
| 10:29 | 12 | me.  Are you going into that next? |
| 10:29 | 13 | MR. PRICE:  Not next. |
| 10:29 | 14 | THE COURT:  Okay. |
| 10:29 | 15 | MS. KELLER:  Your Honor, we desperately need a |
| 10:29 | 16 | bathroom break over here. |
| 10:29 | 17 | THE COURT:  Well, I need that Farhad Larian |
| 10:29 | 18 | document. |
| 10:30 | 19 | MS. KELLER:  May Mr. McConville be excused while |
| 10:30 | 20 | we do that? |
| 10:30 | 21 | THE COURT:  Sure. |
| 10:30 | 22 | *(Pause in the proceedings at 10:30 a.m.)* |
| 10:30 | 23 | *(Proceedings resumed at 10:32 a.m.)* |
| 10:32 | 24 | THE COURT:  Counsel, we had just gone over this |
| 10:32 | 25 | the other night.  Mr. Quinn was with me and Mr. Zeller. |

| | | |
|---|---|---|
| 10:32 | 1 | MR. PRICE:  Yesterday, during court, Your Honor, |
| 10:32 | 2 | we wanted to move this in, and you suggested you might |
| 10:32 | 3 | require more redaction, which is why I think you said we'd |
| 10:32 | 4 | talk about it at 5:00. |
| 10:32 | 5 | THE COURT:  Well, I was concerned that both of you |
| 10:32 | 6 | were going to get into that bottom portion.  So let's just |
| 10:32 | 7 | read the only portion that really concerned me.  It was the |
| 10:32 | 8 | following:  "I put my family first and dropped the case." |
| 10:32 | 9 | Remember, there had been a lot of gratuitous |
| 10:32 | 10 | comments about Mr. Larian, on one side, about his family and |
| 10:32 | 11 | Mr. Larian and the association; on the other hand, Mattel |
| 10:32 | 12 | has a good point, and that is that -- |
| 10:32 | 13 | MR. QUINN:  Your Honor, there's been -- that's the |
| 10:32 | 14 | whole point.  I mean, it's not the whole point, but that's a |
| 10:33 | 15 | key point.  There's been testimony from three different |
| 10:33 | 16 | witnesses as to why Farhad Larian dropped the case.  Was it |
| 10:33 | 17 | because -- as they claim, because he decided it was |
| 10:33 | 18 | completely without merit; that, after Jennifer Maurus |
| 10:33 | 19 | testified, he realized, "This is a terrible case.  I don't |
| 10:33 | 20 | have a meritorious claim," and dismissed it; or whether it |
| 10:33 | 21 | was because, as Maurus testified, no, he realized, after |
| 10:33 | 22 | this terrible incident at the beach when he lost his |
| 10:33 | 23 | daughter, that family is more important and he would drop |
| 10:33 | 24 | the case?  Now that's out there.  And there's been three |
| 10:33 | 25 | witnesses testifying on this subject. |

| | | |
|---|---|---|
| 10:33 | 1 | MS. KELLER:  Your Honor, can we have the Exhibit |
| 10:33 | 2 | number, please? |
| 10:33 | 3 | THE COURT:  Yes.  It's 21714, and it's page 1. |
| 10:33 | 4 | MS. KELLER:  And is there a new proposed redacted |
| 10:33 | 5 | version? |
| 10:33 | 6 | THE COURT:  No.  This is always -- this has always |
| 10:33 | 7 | been redacted.  There's no complaint about -- well, there's |
| 10:33 | 8 | no change in the Court's order concerning the redacted |
| 10:33 | 9 | version. |
| 10:33 | 10 | I was a little unclear about that particular |
| 10:33 | 11 | section that was unredacted.  All parties have been aware of |
| 10:34 | 12 | it.  I'm inclined to receive it into evidence, after |
| 10:34 | 13 | Mr. Larian's testimony.  But at the time, I wasn't certain, |
| 10:34 | 14 | so I delayed that. |
| 10:34 | 15 | MS. KELLER:  Your Honor, this is really nothing |
| 10:34 | 16 | but collateral impeachment, and it's very collateral.  We do |
| 10:34 | 17 | not think that it should come in, period. |
| 10:34 | 18 | You know, why Fred Larian dismissed his case, what |
| 10:34 | 19 | was in his head, and what Jennifer Maurus understood, and |
| 10:34 | 20 | what Isaac Larian understood, and what Fred Larian |
| 10:34 | 21 | understood about why he -- that is about as collateral as |
| 10:34 | 22 | you can get. |
| 10:34 | 23 | THE COURT:  How did we get into this morass of |
| 10:34 | 24 | testimony? |
| 10:34 | 25 | MS. KELLER:  We got into it because Fred Larian |

| 10:34 | 1 | was asked by Mattel, counsel for Mattel, about his lawsuit. |
| 10:34 | 2 | In fact, portions of the complaint were actually read to the |
| 10:34 | 3 | jury.  And he was asked about -- and the Court finally |
| 10:34 | 4 | stopped him from doing that.  But it's the same thing as the |
| 10:34 | 5 | shoe patent, Your Honor.  It's collateral impeachment -- |
| 10:35 | 6 | really collateral. |
| 10:35 | 7 | And the problem is, there's a stink that's been |
| 10:35 | 8 | left out there that, "Oh, this is a guy who'd cheat his own |
| 10:35 | 9 | brother."  That's really what the purpose of all this is: |
| 10:35 | 10 | "This is a guy who'd cheat his own brother."  And this -- |
| 10:35 | 11 | this collateral impeachment on that issue further increases |
| 10:35 | 12 | that stink.  And that's why it's being offered.  It doesn't |
| 10:35 | 13 | go to any issue in this case. |
| 10:35 | 14 | THE COURT:  But what is inconsistent with what's |
| 10:35 | 15 | already been said?  That's the confusing part.  He already |
| 10:35 | 16 | stated on the stand -- somebody elicited -- that he dropped |
| 10:35 | 17 | the case because of his family. |
| 10:35 | 18 | MS. KELLER:  That's what Fred Larian testified to. |
| 10:35 | 19 | THE COURT:  That's correct. |
| 10:35 | 20 | MS. KELLER:  Yes. |
| 10:35 | 21 | MR. QUINN:  I don't believe so, Your Honor.  He |
| 10:35 | 22 | said he dropped the case because he realized after Jennifer |
| 10:35 | 23 | Maurus testified that the case did not have any merit.  And |
| 10:35 | 24 | counsel asked Maurus questions to the same effect, so -- and |
| 10:35 | 25 | Mr. Larian, Isaac Larian on the stand, has at least once, |

Case 2:04-cv-09049-DOC-RNB   Document 9866   Filed 02/14/11   Page 88 of 136   Page ID #:297976
CV 04-9049 DOC - 2/10/2011 - Day 16, Volume 1 of 4

88

| | | |
|---|---|---|
| 10:35 | 1 | and probably more than once, said that the case was dropped |
| 10:35 | 2 | because his brother realized the claim that Bratz had been |
| 10:36 | 3 | concealed had no merit. |
| 10:36 | 4 | So we've had three different witnesses address |
| 10:36 | 5 | this. |
| 10:36 | 6 | THE COURT:  All right. |
| 10:36 | 7 | Now, I hadn't turned my attention to that this |
| 10:36 | 8 | morning in the limited time I had because of the motion for |
| 10:36 | 9 | new trial.  I spent my time back in chambers.  I don't think |
| 10:36 | 10 | I've fully considered this.  I was concerned at the time, |
| 10:36 | 11 | and I've tried to recollect back, and I'll go back in my |
| 10:36 | 12 | notes. |
| 10:36 | 13 | Do you need this in the next hour and a half? |
| 10:36 | 14 | MR. PRICE:  I doubt it, if I go an hour and a |
| 10:36 | 15 | half. |
| 10:36 | 16 | THE COURT:  Then can we take it up over lunch? |
| 10:36 | 17 | MR. PRICE:  I think so. |
| 10:36 | 18 | THE COURT:  That gives me a chance to get back to |
| 10:36 | 19 | it. |
| 10:36 | 20 | Well, why don't you go take a bathroom break, |
| 10:36 | 21 | then. |
| 10:36 | 22 | MS. KELLER:  Thank you, Your Honor. |
| 10:36 | 23 | *(Recess held at 10:36 a.m.)* |
| 10:44 | 24 | *(Proceedings resumed at 10:44 a.m.)* |
| 10:44 | 25 | *(In the presence of the jury.)* |

| | | |
|---|---|---|
| 10:44 | 1 | THE COURT:  Back on the record. |
| 10:44 | 2 | All counsel are present.  The alternates are |
| 10:44 | 3 | present, parties are present, counsel, Mr. Larian. |
| 10:44 | 4 | Mr. Price, this is continuing examination of |
| 10:44 | 5 | Mr. Larian. |
| 10:44 | 6 | MR. PRICE:  Thank you, Your Honor. |
| 10:44 | 7 | **DIRECT EXAMINATION (Resumed)** |
| 10:44 | 8 | BY MR. PRICE: |
| 10:44 | 9 | Q.   Mr. Larian, I think, before we broke, you were |
| 10:44 | 10 | explaining why you personally would not have a problem with |
| 10:45 | 11 | Mattel patternmakers working for MGA moonlighting. |
| 10:45 | 12 | Do you recall that? |
| 10:45 | 13 | A.   Yes.  I don't have a problem with it, if -- again, if |
| 10:45 | 14 | they were doing it on their own time and they were not |
| 10:45 | 15 | taking MGA information to Mattel or bringing Mattel |
| 10:45 | 16 | information to MGA. |
| 10:45 | 17 | Q.   But previously, on June 6, 2008, you said that it would |
| 10:45 | 18 | have been wrong, and you would have stopped Ms. Marlow if |
| 10:45 | 19 | you had known that she was using Mattel employees to work on |
| 10:45 | 20 | Bratz dolls, that you would definitely stop her, right? |
| 10:45 | 21 | A.   Yes.  It's bad judgment.  It was bad judgment for her |
| 10:45 | 22 | to use. |
| 10:45 | 23 | Q.   Well, no.  That -- I'm not asking you about her bad |
| 10:45 | 24 | judgment.  And I referred you before to page 1826, June 6, |
| 10:46 | 25 | 2008, which we've already -- we've already read. |

| | | |
|---|---|---|
| 10:46 | 1 | What you said, "I would have stopped her if I knew that |
| 10:46 | 2 | she was working on -- she was using Mattel employees to work |
| 10:46 | 3 | on Bratz dolls.  I would definitely stop her, yes". |
| 10:46 | 4 | And then when asked, "And that's because you know that |
| 10:46 | 5 | that simply is inappropriate activity?" you said "That's |
| 10:46 | 6 | correct." |
| 10:46 | 7 | That's what you previously said under oath? |
| 10:46 | 8 | A.   I did. |
| 10:46 | 9 | Q.   And you recognize that's 180 degrees different than |
| 10:46 | 10 | what you're telling the jury now? |
| 10:46 | 11 | A.   No, it's not. |
| 10:46 | 12 | Q.   Well, these -- these sample makers, they create samples |
| 10:46 | 13 | that are on unreleased products, right? |
| 10:46 | 14 | A.   That's correct. |
| 10:46 | 15 | Q.   You've said that that's one of the most valuable trade |
| 10:46 | 16 | secrets that MGA has, correct? |
| 10:47 | 17 | A.   What is?  The toy that has not been introduced? |
| 10:47 | 18 | Q.   The toy that hasn't been introduced, right? |
| 10:47 | 19 | A.   It is. |
| 10:47 | 20 | Q.   And these -- this case, we're talking about fashion |
| 10:47 | 21 | dolls, right? |
| 10:47 | 22 | A.   Yes. |
| 10:47 | 23 | Q.   So we're talking about fashions? |
| 10:47 | 24 | A.   That was on the dolls.  But that's one -- one element |
| 10:47 | 25 | of the toy, yes. |

| | | |
|---|---|---|
| 10:47 | 1 | Q.   And it's -- it's your belief that those fashions on |
| 10:47 | 2 | unreleased dolls are among the most important trade secrets |
| 10:47 | 3 | that MGA has? |
| 10:47 | 4 | A.   No.  The whole toy:  When you put the fashions, the |
| 10:47 | 5 | accessories, the hair, the packaging, the theme -- and if |
| 10:47 | 6 | that has not been out in the market, that's one of the most |
| 10:47 | 7 | valuable information that MGA or Mattel or any other toy |
| 10:47 | 8 | company has. |
| 10:47 | 9 | Q.   So it wouldn't bother you if someone working for MGA |
| 10:47 | 10 | went to Mattel and told Mattel what the fashions were going |
| 10:48 | 11 | to be on your unreleased dolls? |
| 10:48 | 12 | MS. KELLER:  Objection.  Assumes facts not in |
| 10:48 | 13 | evidence, and improper hypothetical. |
| 10:48 | 14 | THE COURT:  Sustained. |
| 10:48 | 15 | Just reask the question. |
| 10:48 | 16 | MR. PRICE:  Sure. |
| 10:48 | 17 | BY MR. PRICE: |
| 10:48 | 18 | Q.   Would it be of concern to you if someone from MGA went |
| 10:48 | 19 | to Mattel and revealed to Mattel what the fashions were |
| 10:48 | 20 | going to be on unreleased MGA dolls? |
| 10:48 | 21 | A.   If somebody from MGA went to Mattel and said, "Hey, MGA |
| 10:48 | 22 | is coming out with Bratz dolls that are gonna wear blue |
| 10:48 | 23 | jeans" -- dolls wear blue jeans, "They gonna wear a |
| 10:48 | 24 | T-shirt," dolls wear T-shirts, so do human beings -- I don't |
| 10:48 | 25 | think just the fashion by itself is a trade secret. |

Case 2:04-cv-09049-DOC-RNB   Document 9866   Filed 02/14/11   Page 92 of 136   Page ID #:297980
CV 04-9049 DOC – 2/10/2011 – Day 16, Volume 1 of 4

92

| | | |
|---|---|---|
| 10:48 | 1 | MR. PRICE:  So, Ms. Juarez, I'm gonna see if you |
| 10:48 | 2 | can pick a doll, any doll again, and tell us what the |
| 10:48 | 3 | exhibit number is when you find it. |
| 10:49 | 4 | MS. JUAREZ:  17558, Sasha. |
| 10:49 | 5 | *(Exhibit handed to the witness.)* |
| 10:49 | 6 | *(Document displayed.)* |
| 10:49 | 7 | BY MR. PRICE: |
| 10:49 | 8 | Q.   And if you could look at that, and then show it to the |
| 10:49 | 9 | jury -- although we have a picture of it. |
| 10:49 | 10 | A.   *(Witness complies.)* |
| 10:49 | 11 | Q.   And so, what you're saying is that the clothes that |
| 10:49 | 12 | were selected for that doll -- the sweater, it looks like, |
| 10:49 | 13 | the way the jeans look -- |
| 10:49 | 14 | Was that jeans or a jean skirt? |
| 10:49 | 15 | A.   This is -- |
| 10:49 | 16 | MS. KELLER:  Your Honor, I'm gonna object.  This |
| 10:49 | 17 | goes to the affirmative case for MGA.  This is not relevant |
| 10:49 | 18 | here. |
| 10:49 | 19 | MR. PRICE:  It goes to credibility. |
| 10:49 | 20 | MS. KELLER:  It's irrelevant, Your Honor. |
| 10:49 | 21 | THE COURT:  Overruled. |
| 10:49 | 22 | You can ask in a limited area in this regard. |
| 10:49 | 23 | THE WITNESS:  This is a jeans skirt.  It comes |
| 10:49 | 24 | off.  It's in two pieces. |
| | 25 | |

| | | |
|---|---|---|
| 10:49 | 1 | BY MR. PRICE: |
| 10:49 | 2 | Q.   And -- and so what you're saying is that, if -- if one |
| 10:49 | 3 | of these sample makers helped create that for MGA and, |
| 10:50 | 4 | before the release of the doll, revealed that information to |
| 10:50 | 5 | Mattel, that would be okay with you 'cause it wouldn't be a |
| 10:50 | 6 | trade secret? |
| 10:50 | 7 | A.   So if -- if somebody came here and just took this by |
| 10:50 | 8 | itself *(indicating)* and went to Mattel or MGA and says, |
| 10:50 | 9 | "Hey, MGA is coming with this" -- Okay?  What is this? |
| 10:50 | 10 | Q.   Well, let's say all the clothes.  I don't want you to |
| 10:50 | 11 | totally take the clothes off the doll. |
| 10:50 | 12 | A.   But, no, that's part of the clothes. |
| 10:50 | 13 | Q.   Okay.  But I'm just saying -- I'm saying "all the |
| 10:50 | 14 | clothes."  Look at the doll in front of you. |
| 10:50 | 15 | A.   Yes. |
| 10:50 | 16 | Q.   We've got the picture up for the jury. |
| 10:50 | 17 | So if a sample maker took all those clothes and went to |
| 10:50 | 18 | Mattel and said, uh, "Here are all these clothes that MGA's |
| 10:51 | 19 | going to be using with a new fashion doll they're coming up |
| 10:51 | 20 | with." |
| 10:51 | 21 | A.   Those fashions, in my mind, if -- without the doll -- I |
| 10:51 | 22 | can go ahead and dismantle this, so the jury can see it. |
| 10:51 | 23 | If you just take the doll out and put all of this in |
| 10:51 | 24 | there.  *(Indicating.)*  It's a jean dress like any other |
| 10:51 | 25 | thing that you can find. |

CV 04-9049 DOC - 2/10/2011 - Day 16, Volume 1 of 4

94

| | | |
|---|---|---|
| 10:51 | 1 | When you put it all together with the product line -- |
| 10:51 | 2 | when you put the -- sorry -- when you put the poster which |
| 10:51 | 3 | comes with it, when you put the hairbrush, when you put |
| 10:51 | 4 | extra shoe, when you put the extra clothes, when you put the |
| 10:51 | 5 | top -- when all of those go on the doll, and this doll has |
| 10:51 | 6 | not come to the market, that, as a whole, in my mind, |
| 10:51 | 7 | becomes a trade secret. |
| 10:51 | 8 | But just having a piece of fashion like this -- |
| 10:51 | 9 | *(Indicating.)*  I can take this to anybody in the jury and |
| 10:52 | 10 | say, "Oh, my God!"  They don't think that I stole this. |
| 10:52 | 11 | Where did it come from? |
| 10:52 | 12 | Q.   Okay.  The sample makers were working on the entire |
| 10:52 | 13 | outfit, right? |
| 10:52 | 14 | A.   I don't know what the sample makers were working on. |
| 10:52 | 15 | But in my general understanding is that, you know, it could |
| 10:52 | 16 | be one sample makers making it, working on this. |
| 10:52 | 17 | We always have difficult time dismantling. |
| 10:52 | 18 | *(Indicating.)* |
| 10:52 | 19 | Q.   I know.  I hate the way you package those. |
| 10:52 | 20 | A.   I'm sorry.  Somebody else might be working on this. |
| 10:52 | 21 | *(Indicating.)*  And somebody else might be working on this. |
| 10:52 | 22 | *(Indicating.)*  I don't know. |
| 10:52 | 23 | Q.   Well -- |
| 10:52 | 24 | A.   That's how it works. |
| 10:52 | 25 | Q.   Well, your understanding is Ms. Marlow had three sample |

Case 2:04-cv-09049-DOC-RNB   Document 9866   Filed 02/14/11   Page 95 of 136   Page ID #:297983
CV 04-9049 DOC - 2/10/2011 - Day 16, Volume 1 of 4

95

| | | |
|---|---|---|
| 10:52 | 1 | makers, right? |
| 10:52 | 2 | A.   I don't know how many sample makers she have. |
| 10:52 | 3 | Q.   And, I think it's 13 -- make sure I have the right |
| 10:52 | 4 | exhibit number here -- 13223. |
| 10:53 | 5 | Well, certainly, if you read 13223, you'd realize that |
| 10:53 | 6 | there were the three sitting together, working together, |
| 10:53 | 7 | right? |
| 10:53 | 8 | A.   Sorry?  What's 13223? |
| 10:53 | 9 | Q.   Oh, that was the one from Mr. Marlow you were copied |
| 10:53 | 10 | on, which talks about the doubling of the salaries and |
| 10:53 | 11 | moonlighting and hundreds of years of doll experience. |
| 10:53 | 12 | A.   This is -- I read this as Mr. Peter Marlow making a |
| 10:53 | 13 | sales pitch, trying to sell MGA, "Hey, don't let my -- |
| 10:53 | 14 | Veronica go.  Keep us."  That's how I read this e-mail. |
| 10:53 | 15 | Q.   So -- so here's my question.  If you looked at the |
| 10:54 | 16 | doll -- I think you took most of the clothes off the doll so |
| 10:54 | 17 | we can show it to the jury. |
| 10:54 | 18 | A.   Not most.  I just took the trowsers. |
| 10:54 | 19 | Q.   Okay.  I saw a lot of ripping. |
| 10:54 | 20 | But if you -- if you took that combination -- you know, |
| 10:54 | 21 | the trowsers, the sweater, the -- I guess, the cap -- you're |
| 10:54 | 22 | saying it wouldn't bother you if a Mattel employee saw all |
| 10:54 | 23 | of those in that combination before the doll went on the |
| 10:54 | 24 | market? |
| 10:54 | 25 | MS. KELLER:  Objection.  Misstates the testimony. |

| | | |
|---|---|---|
| 10:54 | 1 | THE WITNESS:  What I'm saying is -- |
| 10:54 | 2 | THE COURT:  Overruled. |
| 10:54 | 3 | THE WITNESS:  What I'm saying is that just |
| 10:54 | 4 | fashions, just samples, by itself, doesn't make a doll. |
| 10:54 | 5 | People don't go to store and just say, "Hey, I |
| 10:54 | 6 | want to buy this fashion and maybe next year there's doll |
| 10:55 | 7 | for it."  They want to buy the doll with the fashions on it |
| 10:55 | 8 | for their little daughters, with the hair on it, with the |
| 10:55 | 9 | face paint on it, with the shoes on it, with everything else |
| 10:55 | 10 | that goes in it -- in that package. |
| 10:55 | 11 | BY MR. PRICE: |
| 10:55 | 12 | Q.  What you're saying -- I think I understand -- is you |
| 10:55 | 13 | don't -- you don't spend money on these fashions without a |
| 10:55 | 14 | doll, right? |
| 10:55 | 15 | A.  That's correct.  But we have made -- we make fashions |
| 10:55 | 16 | to be separately sold with the dolls, but... |
| 10:55 | 17 | Q.  But, as you said, no one's going to buy the fashions |
| 10:55 | 18 | unless you have the doll, right? |
| 10:55 | 19 | A.  That's correct. |
| 10:55 | 20 | Q.  And you recall that business plan that you did in |
| 10:55 | 21 | March 2001.  Do you recall that? |
| 10:55 | 22 | A.  I do. |
| 10:55 | 23 | Q.  And do you recall that part of that plan was, you know, |
| 10:55 | 24 | the only way we can really fail on licensing is if the dolls |
| 10:55 | 25 | don't sell?  It depends upon the doll selling, right? |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 9866   Filed 02/14/11   Page 97 of 136   Page ID #:297985
CV 04-9049 DOC - 2/10/2011 - Day 16, Volume 1 of 4

97

| | | |
|---|---|---|
| 10:55 | 1 | A.   I didn't memorize that business plan. |
| 10:55 | 2 | Q.   But you remember -- |
| 10:55 | 3 | A.   But if the dolls don't sell, you cannot have a brand. |
| 10:56 | 4 | Q.   So, that aside, that is, you -- you don't have a brand, |
| 10:56 | 5 | you don't do licensing, you don't leverage unless the dolls |
| 10:56 | 6 | sell -- we all agree on that? |
| 10:56 | 7 | A.   Yes. |
| 10:56 | 8 | Q.   So I'm just asking whether you would think there would |
| 10:56 | 9 | be anything wrong for, you know, a Mattel employee, a |
| 10:56 | 10 | patternmaker, to work on Bratz at the same time.  And I want |
| 10:56 | 11 | to focus on the fashions.  Okay?  You with me so far?  And |
| 10:56 | 12 | I'm just trying to find out whether it's your portion that |
| 10:56 | 13 | those fashions on that doll -- |
| 10:56 | 14 |      Is that -- which doll is that? |
| 10:56 | 15 | A.   Sasha. |
| 10:56 | 16 | Q.   Sasha.  Thank you. |
| 10:56 | 17 |      -- whether you think that combination of fashions is |
| 10:56 | 18 | something you wouldn't mind having a Mattel employee see |
| 10:56 | 19 | before the doll is on the market. |
| 10:56 | 20 | A.   I don't mind them seeing it if they not disclosing it |
| 10:57 | 21 | to Mattel.  I don't mind that because those fashions, by |
| 10:57 | 22 | itself, that seamstresses don't know what we gonna use the |
| 10:57 | 23 | fashions for, what dolls things we have coming, what |
| 10:57 | 24 | marketing plans we have coming, how do these fashions play |
| 10:57 | 25 | with the toy, so just by themselves, I don't mind. |

| 10:57 | 1 | Q. Now, you said you wouldn't mind if they had -- if they |
|---|---|---|
| 10:57 | 2 | didn't tell Mattel. So I'm trying to get to the next step. |
| 10:57 | 3 | And, first of all, let me ask you, these patternmakers |
| 10:57 | 4 | who were working at Mattel and then working on Bratz dolls, |
| 10:57 | 5 | did you require them to sign confidentiality agreements? |
| 10:57 | 6 | A. The -- I'm sorry. The sample -- you keep saying |
| 10:57 | 7 | "patternmakers." In my mind, they're two different people, |
| 10:57 | 8 | so I assume you mean sample makers. |
| 10:57 | 9 | Q. I'm -- whoever Ms. Marlow was referring to when she |
| 10:57 | 10 | talks about pattern and sample makers. |
| 10:57 | 11 | A. And your guess is as good as mine. So, if you're |
| 10:57 | 12 | asking about the sample makers, and did we ask them to sign |
| 10:58 | 13 | a confidentiality agreement with MGA, we never hired the |
| 10:58 | 14 | sample makers. |
| 10:58 | 15 | Veronica Marlow hired these people. And I found out |
| 10:58 | 16 | about that during this litigation. And I don't know what |
| 10:58 | 17 | she asked 'em to sign or not to sign. |
| 10:58 | 18 | Q. So do you have any understanding as to whether or not |
| 10:58 | 19 | the pattern and sample makers -- I'll lump them together -- |
| 10:58 | 20 | that Veronica Marlow was using were under some sort of |
| 10:58 | 21 | confidentiality agreement with respect to the work they did |
| 10:58 | 22 | on the Bratz dolls? Do you have any understanding? |
| 10:58 | 23 | A. I don't. |
| 10:58 | 24 | Q. And isn't that something you would be concerned about? |
| 10:58 | 25 | MS. KELLER: Objection. Irrelevant. |

Case 2:04-cv-09049-DOC-RNB   Document 9866   Filed 02/14/11   Page 99 of 136   Page ID #:297987
CV 04-9049 DOC - 2/10/2011 - Day 16, Volume 1 of 4

99

| | | |
|---|---|---|
| 10:58 | 1 | THE COURT:  In its present form, sustained. |
| 10:58 | 2 | Just reask the question.  It's a proper area. |
| 10:58 | 3 | BY MR. PRICE: |
| 10:58 | 4 | Q.  Is that something you'd be concerned about? |
| 10:58 | 5 | MS. KELLER:  Objection. |
| 10:58 | 6 | THE COURT:  It's the same question, Counsel. |
| 10:58 | 7 | MR. PRICE:  Went from "isn't" to "is." |
| 10:58 | 8 | BY MR. PRICE: |
| 10:58 | 9 | Q.  Would it have worried you -- let me ask it this way: |
| 10:59 | 10 | You said you wouldn't mind if Mattel sample makers were |
| 10:59 | 11 | working on Bratz dolls if they weren't telling Mattel, |
| 10:59 | 12 | right? |
| 10:59 | 13 | A.  Or vice versa, or they were not telling MGA about what |
| 10:59 | 14 | Mattel was working on.  Again, these are people who work on |
| 10:59 | 15 | hourly, as far as I know, at MGA when they work.  When they |
| 10:59 | 16 | clock out, they go home.  That's all how they -- they know |
| 10:59 | 17 | how to do. |
| 10:59 | 18 | Q.  And these are the people with the five kids you talked |
| 10:59 | 19 | about? |
| 10:59 | 20 | A.  What's your question, Mr. Price? |
| 10:59 | 21 | Q.  So my question is, did you want the people who were |
| 10:59 | 22 | working on the Bratz dolls, the sample and patternmakers, to |
| 10:59 | 23 | keep what they were doing confidential? |
| 10:59 | 24 | A.  If they were making -- yes, I wanted 'em to keep what |
| 10:59 | 25 | they were doing confidential. |

Case 2:04-cv-09049-DOC-RNB   Document 9866   Filed 02/14/11   Page 100 of 136   Page ID #:297988
CV 04-9049 DOC - 2/10/2011 - Day 16, Volume 1 of 4

100

| | | |
|---|---|---|
| 10:59 | 1 | Q.   And do you know of anything MGA did to ensure that the |
| 10:59 | 2 | pattern and sample makers working for Veronica Marlow kept |
| 11:00 | 3 | their work confidential? |
| 11:00 | 4 | A.   I don't. |
| 11:00 | 5 | Q.   Your understanding is they were working on the final -- |
| 11:00 | 6 | the samples that would be displayed to the retailers, |
| 11:00 | 7 | correct? |
| 11:00 | 8 | A.   They were making -- they were working on those samples. |
| 11:00 | 9 | I'm not gonna agree with your statement that they were |
| 11:00 | 10 | "final." |
| 11:00 | 11 | Q.   Okay. |
| 11:00 | 12 | A.   But they were working on sewing these. |
| 11:00 | 13 | Q.   And I'm gonna ask you -- |
| 11:00 | 14 | A.   And I learned about that after the litigation. |
| 11:00 | 15 | Go ahead. |
| 11:00 | 16 | Q.   I'm gonna ask you a question; and I apologize, but I |
| 11:00 | 17 | just don't think it's been answered yet; and that is, the |
| 11:00 | 18 | combination of those fashions that are on the doll -- the |
| 11:00 | 19 | sweater, the hat, the jeans -- Okay? -- was it your |
| 11:00 | 20 | understanding that that was something which was one of MGA's |
| 11:00 | 21 | most valuable trade secrets? |
| 11:01 | 22 | MS. KELLER:  Objection.  Your Honor, this goes to |
| 11:01 | 23 | the affirmative case.  It is no longer about credibility. |
| 11:01 | 24 | THE COURT:  I'm going to allow the question. |
| 11:01 | 25 | Partially you're correct; partially it has relevance in this |

Case 2:04-cv-09049-DOC-RNB   Document 9866   Filed 02/14/11   Page 101 of 136   Page ID #:297989
CV 04-9049 DOC - 2/10/2011 - Day 16, Volume 1 of 4

101

| 11:01 | 1 | area. |

11:01    1    area.

11:01    2         MR. PRICE:  It may have relevance, but this is...

11:01    3    BY MR. PRICE:

11:01    4    Q.   So, do you remember the question?

11:01    5    A.   I don't.

11:01    6         THE COURT:  Do you want to read it back?

11:01    7         THE WITNESS:  Please.

11:01    8         THE COURT:  Counsel.

11:01    9         MR. PRICE:  You want to read back, Your Honor, or

11:01   10    should I ask again?

11:01   11         THE COURT:  (Reading from realtime:)

11:01   12         It states, "I'm gonna ask you a question, and I

11:01   13    apologize, I just don't think it's been answered yet; and

11:01   14    that is, the combination of those fashions that are on the

11:01   15    doll -- the sweater, the hat, the jeans -- okay? -- was it

11:01   16    your understanding that it was something which was one of

11:01   17    MGA's most valuable trade secrets?"

11:02   18         THE WITNESS:  Again, in my mind, just this -- if

11:02   19    you put all of this together on a piece of paper, without a

11:02   20    doll, without knowing what is it gonna go on, what product

11:02   21    is gonna go on, what marketing is gonna go on -- into it,

11:02   22    it's not.  Because you don't know what's in it.  You don't

11:02   23    know what we gonna do with it.

        24    BY MR. PRICE:

11:02   25    Q.   Okay.  Well -- but these sample makers, to make the

11:02  1    samples -- sample and patternmakers -- they got the design

11:02  2    drawings, the fashions, and the doll, right?

11:02  3    A.   I don't know if they did or not.  I have no idea.  I've

11:02  4    never met these people.  I don't know what Veronica Marlow

11:02  5    gave them or didn't give them.  I don't know.

11:02  6    Q.   Well, the fashions had to fit, right?  Had to fit the

11:02  7    doll?

11:02  8    A.   Yes.  I'm not sure if they -- frankly, no.  I don't

11:02  9    know if they, at the beginning, did they fit the doll or

11:03  10   not.  I don't know.

11:03  11   Q.   Let's -- I'll show you 1107.  It will be on the screen,

11:03  12   or Ms. Juarez can fish it out.  It's one of those drawings

11:03  13   that we spoke about earlier.

11:03  14           MR. PRICE:  If you can put 1107 up.  In fact,

11:03  15   which one's the Sasha?  Do 1108, 1109, 1110 to see if we

11:03  16   have Sasha.  There we go.

11:03  17           (Document displayed.)

11:03  18           MR. PRICE:  So we've got 1108 up there,

11:03  19   Mr. Larian.

11:03  20           (Document provided to the witness.)

11:03  21   BY MR. PRICE:

11:03  22   Q.   And you recognize this as a fashion drawing, correct?

11:03  23   A.   I recognize as a drawing, yes, fashions on it.  That's

11:03  24   correct.

11:03  25   Q.   And it's your understanding that -- that this drawing

| | | |
|---|---|---|
| 11:03 | 1 | was, uh, one of the things that was used to create the, uh, |
| 11:03 | 2 | prototype dolls that were shown at the Hong Kong toy fair, |
| 11:04 | 3 | right? |
| 11:04 | 4 | A.   Yes. |
| 11:04 | 5 | Q.   And for the Hong Kong toy fair, there were actually |
| 11:04 | 6 | fashions created, right? |
| 11:04 | 7 | A.   Yes. |
| 11:04 | 8 | Q.   And by Veronica Marlow? |
| 11:04 | 9 | A.   I don't know who prepared it. |
| 11:04 | 10 | Q.   Well, you know that you were, uh -- got invoices almost |
| 11:04 | 11 | every month from Veronica Marlow, right? |
| 11:04 | 12 | A.   I was not aware we got invoices from Veronica Marlow in |
| 11:04 | 13 | 2000.  I became aware when we were getting big amounts being |
| 11:04 | 14 | paid to Veronica Marlow a few years after that.  And that's |
| 11:04 | 15 | when I started getting involved. |
| 11:04 | 16 | Q.   Well, would it have concerned you if you thought these, |
| 11:04 | 17 | uh, sample and patternmakers were seeing drawings like in |
| 11:05 | 18 | Exhibit 1108 so that they could create, you know, the |
| 11:05 | 19 | clothes for the Bratz doll? |
| 11:05 | 20 | A.   I don't know what these sample makers were shown by |
| 11:05 | 21 | Veronica Marlow.  I cannot testify to that.  I don't know if |
| 11:05 | 22 | they saw this drawing, they didn't see this drawing.  I |
| 11:05 | 23 | don't know if she just gave 'em a patent.  I'm just |
| 11:05 | 24 | speculating.  I have no idea. |
| 11:05 | 25 | Q.   Okay.  Mr. Larian, today you testified it wouldn't have |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 9866   Filed 02/14/11   Page 104 of 136   Page ID #:297992
CV 04-9049 DOC – 2/10/2011 – Day 16, Volume 1 of 4

104

| 11:05 | 1 | bothered you if someone were working at Mattel and then |
|-------|---|---|

11:05   1   bothered you if someone were working at Mattel and then

11:05   2   working for Bratz at the same time, right?

11:05   3   A.   No, no.  I didn't say that "at the same time."

11:05   4       I said that, if they were -- when they were off the

11:05   5   clock from Mattel, these hours, and they were working, in my

11:05   6   mind, on Bratz or any other company -- Jakks Pacific toys --

11:05   7   and getting paid by the hour -- that's how they know what to

11:05   8   do -- it wouldn't bother me, as long as they didn't go and

11:06   9   tell Jakks Pacific, "Hey, Mattel is coming with this Barbie,

11:06  10   X, Y, Z."

11:06  11   Q.   And so my question is this:  I'm trying to explore your

11:06  12   understanding.  Okay?

11:06  13       I want you to assume that these sample makers were

11:06  14   working at Mattel and then working with Ms. Marlow on Bratz

11:06  15   dolls, and in doing so, saw drawings such as 1108.

11:06  16       Are you with me so far?  Just want you to assume this.

11:06  17   A.   Okay.

11:06  18   Q.   That would -- that would be something you would be

11:06  19   concerned about, wouldn't it?  If a -- if a current Mattel

11:06  20   employee were at MGA and seeing these drawings of Bratz, and

11:06  21   then creating fashions for these drawings, right?

11:07  22   A.   Well, this sample, you know, you -- the assumption that

11:07  23   you're trying to tell me is -- he throwing other things in

11:07  24   there which is not true -- none of these sample makers who

11:07  25   worked for Veronica Marlow came to MGA, or at least not I'm

| 11:07 | 1 | aware of. |
| 11:07 | 2 | So you say "at MGA."  But putting that aside, if |
| 11:07 | 3 | Veronica Marlow was taking what you have on the screen -- |
| 11:07 | 4 | Q.   It's 1108. |
| 11:07 | 5 | A.   -- 1108 -- and giving it to them to work on, say, make |
| 11:07 | 6 | fashions for this year, I think it was bad judgment for her |
| 11:07 | 7 | to do so.  I still don't fault the sample makers for making |
| 11:07 | 8 | a living, but I fault Veronica Marlow to do that.  I don't |
| 11:07 | 9 | think it was a good judgment. |
| 11:07 | 10 | Q.   So -- just so we're clear, you're saying it was bad |
| 11:07 | 11 | judgment for Veronica Marlow? |
| 11:08 | 12 | A.   Yes. |
| 11:08 | 13 | Q.   I want to know if that's something that you would |
| 11:08 | 14 | approve of.  If you would approve of a sample maker at |
| 11:08 | 15 | Mattel then working with Ms. Marlow on Bratz doll fashions, |
| 11:08 | 16 | using drawings such as 1108 to help create those fashions -- |
| 11:08 | 17 | I want to know if you would find something inappropriate |
| 11:08 | 18 | with that? |
| 11:08 | 19 | A.   I would find that inappropriate by Veronica Marlow, for |
| 11:08 | 20 | her to take our drawings to somebody who is working at |
| 11:08 | 21 | Mattel, because I don't know who these people are.  Can they |
| 11:08 | 22 | talk about it?  Can they say, "Oh, my God!  MGA is doing |
| 11:08 | 23 | this, doing that."  I find that bad judgment by Veronica |
| 11:08 | 24 | Marlow, if she did that. |
| 11:08 | 25 | Q.   And it's something that you would have wanted to put a |

| 11:08 | 1 | stop to because the Mattel employees would be seeing these |
|---|---|---|
| 11:09 | 2 | drawings of Bratz dolls that were released? |
| 11:09 | 3 | A.   Were released where? |
| 11:09 | 4 | Q.   "Weren't" released.  I'm sorry.  I'm not as articulate |
| 11:09 | 5 | sometimes. |
| 11:09 | 6 | You would have wanted to put a stop to that because |
| 11:09 | 7 | these Mattel employees would be seeing designs of Bratz |
| 11:09 | 8 | dolls that were not released to the public, right? |
| 11:09 | 9 | A.   Yes. |
| 11:09 | 10 | MS. KELLER:  Objection, Your Honor.  That -- it's |
| 11:09 | 11 | vague as phrased, given all that has been asked. |
| 11:09 | 12 | THE COURT:  Overruled. |
| 11:09 | 13 | THE WITNESS:  I would not want, in general, Mattel |
| 11:09 | 14 | employees to see what we are coming up with -- |
| 11:09 | 15 | BY MR. PRICE: |
| 11:09 | 16 | Q.   And on the flip side -- |
| 11:09 | 17 | A.   -- before they came to market. |
| 11:09 | 18 | Q.   And on the flip side, you would understand that Mattel |
| 11:09 | 19 | wouldn't want its sample makers, who work on samples and |
| 11:09 | 20 | patterns for its unreleased dolls, to be working at MGA in |
| 11:10 | 21 | off hours? |
| 11:10 | 22 | MS. KELLER:  Objection.  Calls for speculation as |
| 11:10 | 23 | to Mattel's state of mind. |
| 11:10 | 24 | THE COURT:  Overruled. |
| 11:10 | 25 | THE WITNESS:  Again, you're -- I think you're -- |

Case 2:04-cv-09049-DOC-RNB   Document 9866   Filed 02/14/11   Page 107 of 136   Page ID #:297995
CV 04-9049 DOC – 2/10/2011 – Day 16, Volume 1 of 4

107

| 11:10 | 1 | you're combining two different things. |
|---|---|---|
| 11:10 | 2 | I don't know what's Mattel policies are with these |
| 11:10 | 3 | people.  You said they're paying -- their paid by salary. |
| 11:10 | 4 | This is the first time I hear the sample makers are paid |
| 11:10 | 5 | salary.  In -- 30 years I been in toy business.  That's not |
| 11:10 | 6 | my understanding. |
| 11:10 | 7 | THE COURT:  Let me create a clear record also, |
| 11:10 | 8 | Counsel. |
| 11:10 | 9 | Oftentimes, I would have sustained the objections; |
| 11:10 | 10 | but, since Mr. Larian's designated himself as 30(b)(6) |
| 11:10 | 11 | witness for all purposes in numerous depositions, it doesn't |
| 11:10 | 12 | seem a reasonable position for the Court to take. |
| 11:10 | 13 | So it's overruled. |
| 11:10 | 14 | BY MR. PRICE: |
| 11:10 | 15 | Q.   I don't mean to confuse you, sir.  I'm just trying to |
| 11:10 | 16 | see what your view is of the propriety of what happened. |
| 11:11 | 17 | And I'll just tell you -- assume this is what |
| 11:11 | 18 | happened -- 'cause, originally, you said you see nothing |
| 11:11 | 19 | wrong with it, so I'm just trying to get into a little more |
| 11:11 | 20 | detail. |
| 11:11 | 21 | If you were Mattel -- we already talked about your |
| 11:11 | 22 | side -- if you were Mattel, you wouldn't want your sample |
| 11:11 | 23 | makers who were working on your unreleased fashions and |
| 11:11 | 24 | dolls to work with MGA through Veronica Marlow on Bratz |
| 11:11 | 25 | fashions, 'cause you would be concerned that they would have |

Case 2:04-cv-09049-DOC-RNB   Document 9866   Filed 02/14/11   Page 108 of 136   Page ID #:297996
CV 04-9049 DOC – 2/10/2011 – Day 16, Volume 1 of 4

108

| 11:11 | 1 | Mattel trade secrets, right? |
| 11:11 | 2 | A.   I don't know what they had.  Again, I think I've |
| 11:12 | 3 | testified this -- to this now 50 times. |
| 11:12 | 4 | If the sample makers -- and I'm making assumption based |
| 11:12 | 5 | on your statement.  If the sample makers were hourly |
| 11:12 | 6 | workers, and all they know how to do is sew fashions, and |
| 11:12 | 7 | when they clock out and go home at 5:00 o'clock on Friday |
| 11:12 | 8 | night, Mattel doesn't pay them anymore, and to support their |
| 11:12 | 9 | family, they go ahead for a third party, Veronica Marlow, |
| 11:12 | 10 | and start making fashions for another toy company, as long |
| 11:12 | 11 | as they are not telling Veronica Marlow, "Hey, Veronica, by |
| 11:12 | 12 | the way, we are working on X, Y, Z fashions for Mattel," I |
| 11:12 | 13 | see no problem with that. |
| 11:12 | 14 | Q.   You keep saying "hourly" so let me change the -- change |
| 11:12 | 15 | your understanding. |
| 11:12 | 16 | I want you to assume that two of the three sample |
| 11:13 | 17 | makers who were working at Mattel at that time, the two |
| 11:13 | 18 | senior ones, you know, were on salary. |
| 11:13 | 19 | A.   Okay. |
| 11:13 | 20 | Q.   'Cause you keep saying "hourly workers," et cetera. |
| 11:13 | 21 | So I want you to assume that they were on salary, as |
| 11:13 | 22 | Mr. Marlow told you in Exhibit 13223-0003. |
| 11:13 | 23 | Does that change your view that, if these are salaried |
| 11:13 | 24 | employees at Mattel, uh, sample makers exposed to Mattel's |
| 11:13 | 25 | trade secrets, uh, would that change your opinion as to |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC – 2/10/2011 – Day 16, Volume 1 of 4

109

| | | |
|---|---|---|
| 11:13 | 1 | whether or not it was all right for -- for Ms. Marlow to use |
| 11:13 | 2 | them on Bratz products? |
| 11:13 | 3 | A.   I guess -- I think you said that you're paying these |
| 11:13 | 4 | people $40,000 a year.  Maybe I'm wrong, but you said |
| 11:13 | 5 | earlier. |
| 11:13 | 6 | Q.   40- to 50-. |
| 11:13 | 7 | A.   Okay.  40- or $50,000 a year. |
| 11:14 | 8 | Again, if they are working -- this is in my mind, not |
| 11:14 | 9 | in Mattel's mind -- if they are working, 40-, $50,000 a |
| 11:14 | 10 | year, and all they do -- know how to do is to sew fashions, |
| 11:14 | 11 | when they go home, and if they are not bringing what they |
| 11:14 | 12 | did at Mattel to Veronica Marlow or anybody else, and they |
| 11:14 | 13 | start also applying their skill and making fashions -- |
| 11:14 | 14 | whether it's making a fashion for Mr. Eckert's daughter's |
| 11:14 | 15 | wedding dress, or making fashions for somebody else -- I see |
| 11:14 | 16 | nothing wrong with that. |
| 11:14 | 17 | Q.   We've been on this a long time, so I'm gonna ask you |
| 11:14 | 18 | this; give you an opportunity to explain this: |
| 11:14 | 19 | If that's what you believe, then why, in the trial of |
| 11:14 | 20 | 2008, did you say under oath you would have stopped |
| 11:14 | 21 | Ms. Marlow if you'd known it, and you would have stopped it, |
| 11:14 | 22 | because that was inappropriate activity? |
| 11:15 | 23 | A.   Because -- and, you know, I don't want to be admonished |
| 11:15 | 24 | by the Court, so I don't know how to answer that without |
| 11:15 | 25 | really getting to it. |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 9866   Filed 02/14/11   Page 110 of 136   Page ID #:297998
CV 04-9049 DOC - 2/10/2011 - Day 16, Volume 1 of 4

110

| | | |
|---|---|---|
| 11:15 | 1 | Q.   Well, let me ask you this:  Is there something that |
| 11:15 | 2 | you've learned -- let me rephrase that. |
| 11:15 | 3 | Was the sworn testimony you gave in the trial on |
| 11:15 | 4 | June 6, 2008, that, if you had discovered what Veronica |
| 11:15 | 5 | Marlow was doing, you would have stopped her and you would |
| 11:15 | 6 | have stopped her because it was inappropriate activity?  At. |
| 11:15 | 7 | The time you gave it, was that testimony the truth? |
| 11:15 | 8 | A.   It is.  And it is true today.  And I don't think -- I |
| 11:15 | 9 | don't think this Court wants me to get to the detail of |
| 11:15 | 10 | that. |
| 11:15 | 11 | Q.   It's true today, too?  What you said before, true today |
| 11:15 | 12 | too? |
| 11:15 | 13 | A.   It is. |
| 11:15 | 14 | Q.   And you don't -- just a yes or no.  You don't -- |
| 11:15 | 15 | THE COURT:  I'm going to strike that comment. |
| 11:16 | 16 | This Court's involved in a number of rulings. |
| 11:16 | 17 | What the Court wants or doesn't want is totally irrelevant. |
| 11:16 | 18 | And I don't want to get dragged into an answer of that type, |
| 11:16 | 19 | frankly, nor does the court system. |
| 11:16 | 20 | So, Counsel. |
| 11:16 | 21 | BY MR. PRICE: |
| 11:16 | 22 | Q.   This is a yes-or-no question:  Do you see anything |
| 11:16 | 23 | inconsistent with your testimony today -- do you see |
| 11:16 | 24 | anything inconsistent with the testimony you gave in |
| 11:16 | 25 | June 2008, that the activity would be wrong and you would |

| | | |
|---|---|---|
| 11:16 | 1 | immediately stop it? |
| 11:16 | 2 | A.   Absolutely, I see nothing inconsistent with my |
| 11:16 | 3 | testimony. |
| 11:17 | 4 | Q.   Did you ever have an employee at MGA -- uh, a |
| 11:17 | 5 | Mr. Castilla? |
| 11:17 | 6 | A.   Yes. |
| 11:17 | 7 | Q.   And is it your understanding that he was hired sometime |
| 11:17 | 8 | around, uh, March of 2006? |
| 11:17 | 9 | A.   I don't know when he was hired, but he works at MGA. |
| 11:17 | 10 | Q.   Does he -- does he still work at MGA? |
| 11:17 | 11 | A.   He does. |
| 11:17 | 12 | Q.   And MGA was having inventory issues in 2005 and early |
| 11:17 | 13 | 2006, correct? |
| 11:17 | 14 | A.   I think you meant to say we had forecasting issue. |
| 11:17 | 15 | And, yes, we had forecasting issue. |
| 11:17 | 16 | Q.   And have you ever said anything like, "No one goes out |
| 11:17 | 17 | of business, if they" -- if, uh -- if, uh, "they've sold all |
| 11:17 | 18 | their inventory.  But lots of companies have gone out of |
| 11:18 | 19 | business when they have excess inventory"? |
| 11:18 | 20 | A.   Yes, I said that. |
| 11:18 | 21 | Q.   And part of determining how much inventory you're gonna |
| 11:18 | 22 | end up with is forecasting? |
| 11:18 | 23 | A.   Yes. |
| 11:18 | 24 | Q.   That's a -- that's a fairly critical, uh, issue for a |
| 11:18 | 25 | company like MGA -- is to have accurate forecasting and |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 9866   Filed 02/14/11   Page 112 of 136   Page ID #:298000
CV 04-9049 DOC – 2/10/2011 – Day 16, Volume 1 of 4

112

| | | |
|---|---|---|
| 11:18 | 1 | manage the inventory? |
| 11:18 | 2 | A.   For any toy company it is. |
| 11:18 | 3 | Q.   And in 2005, do you recall being on some e-mail strings |
| 11:18 | 4 | where you were, uh, expressing, uh, some displeasure about |
| 11:18 | 5 | how well MGA was doing in terms of forecasting and |
| 11:18 | 6 | inventory? |
| 11:18 | 7 | A.   Yes.  I'm never happy about the forecasting at MGA. |
| 11:18 | 8 | Q.   So if you look at -- I think it's 7506.  I said that |
| 11:19 | 9 | wrong. |
| 11:19 | 10 |          MS. KELLER:  Is it 7506? |
| 11:19 | 11 |          MR. PRICE:  I'm sorry.  It's 7056.  I'm sorry.  I |
| 11:19 | 12 | misspoke. |
| 11:19 | 13 |          THE WITNESS:  She doesn't have it. |
| 11:19 | 14 |          MR. PRICE:  In my binder, it was actually under |
| 11:19 | 15 | "7506."  I think that could be the issue. |
| 11:19 | 16 |          *(Document provided to the witness.)* |
| 11:19 | 17 | BY MR. PRICE: |
| 11:20 | 18 | Q.   When you have had a chance to look at 7056, let me |
| 11:20 | 19 | know. |
| 11:21 | 20 | A.   Go ahead. |
| 11:21 | 21 | Q.   That's an e-mail string between you and Mr. Brawer? |
| 11:21 | 22 | A.   Yes. |
| 11:21 | 23 | Q.   And could you tell me who Mr. Brawer is? |
| 11:21 | 24 | A.   It was an executive at MGA. |
| 11:21 | 25 | Q.   What was his primary responsibility? |

| 11:21 | 1 | A.    Sales and marketing. |
| 11:21 | 2 |        MR. PRICE:  Your Honor, move Exhibit 7056 into |
| 11:21 | 3 | evidence. |
| 11:21 | 4 |        THE COURT:  Received. |
| 11:21 | 5 |        *(Exhibit No. 7056 received in evidence.)* |
| 11:21 | 6 |         *(Document displayed.)* |
| 11:21 | 7 | BY MR. PRICE: |
| 11:21 | 8 | Q.    If you can look at the top e-mail from you to |
| 11:21 | 9 | Mr. Brawer, April 11, 2005, where you say, "In our |
| 11:21 | 10 | warehouse" -- is that where you were when you sent the |
| 11:21 | 11 | e-mail? |
| 11:21 | 12 | A.    No, no, no.  It goes back, because it talks about "In |
| 11:21 | 13 | our warehouse." |
| 11:21 | 14 | Q.    Okay.  It says, "I can't sleep and am sick to my |
| 11:22 | 15 | stomach with excess inventory.  I used to look at this and |
| 11:22 | 16 | manage weekly, and I dropped the ball, and now I'm going to |
| 11:22 | 17 | be away for two weeks.  We need to get the forecast and |
| 11:22 | 18 | inventory in control." |
| 11:22 | 19 |       And this is, I guess, where you said, "Many companies |
| 11:22 | 20 | have gone out of business with warehouses full of inventory. |
| 11:22 | 21 | None have gone out with no inventory." |
| 11:22 | 22 |       Do you see that? |
| 11:22 | 23 | A.    Yes.  A wise man told me that before. |
| 11:22 | 24 | Q.    And then later, in 2006, you still have the same kind |
| 11:22 | 25 | of issues where you weren't happy with the forecasting and |

CV 04-9049 DOC - 2/10/2011 - Day 16, Volume 1 of 4

114

| 11:22 | 1 | the inventory, right? |
| 11:22 | 2 | A.   I wasn't happy in 2006.  I'm not happy in 2011. |
| 11:22 | 3 | Q.   But you tried to do something about it, right? |
| 11:22 | 4 | A.   I always try to do something about it.  It's a big |
| 11:22 | 5 | issue for me. |
| 11:22 | 6 | Q.   And one of the things that you tried to do about it was |
| 11:22 | 7 | to hire Mr. Castilla? |
| 11:22 | 8 | A.   Personally, no.  I did not know who Mr. Castilla is |
| 11:22 | 9 | that we hired, but we did hire Mr. Castilla. |
| 11:22 | 10 | Q.   Well, was Mr. Brawer the person who was -- do you know |
| 11:23 | 11 | who hired Mr. Castilla? |
| 11:23 | 12 | A.   I don't know who was his boss.  I think Nicole Coleman |
| 11:23 | 13 | was his boss. |
| 11:23 | 14 | Q.   Do you know whether or not -- well, you know that |
| 11:23 | 15 | Mr. Castilla had been working at Mattel, right? |
| 11:23 | 16 | A.   Yes. |
| 11:23 | 17 | Q.   And that -- |
| 11:23 | 18 | A.   At that time, when he came to us, I don't know if I |
| 11:23 | 19 | knew that or not.  But now I know that he used to work at |
| 11:23 | 20 | Mattel. |
| 11:23 | 21 | Q.   Well, did you know now that he was in sales planning |
| 11:23 | 22 | and forecasting while he was at Mattel? |
| 11:23 | 23 | A.   I don't -- I thought he was in international -- that's |
| 11:23 | 24 | was my understanding -- international planning. |
| 11:23 | 25 | Q.   Well, in 2005/2006 timeframe, early on, did you think |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:23 | 1 | that something had to be done to make the forecasting and |
| 11:23 | 2 | inventory of MGA better? |
| 11:24 | 3 | A.   I always think that, yes, even today. |
| 11:24 | 4 | Q.   And if you'd look at -- it's Exhibit 7540.  And do you |
| 11:24 | 5 | recognize that as an e-mail -- |
| 11:24 | 6 | A.   I don't recognize it yet.  I don't have it. |
| 11:24 | 7 | Q.   Okay. |
| 11:24 | 8 | *(Document provided to the witness.)* |
| 11:25 | 9 | THE WITNESS:  Yes.  Go ahead. |
| 11:25 | 10 | BY MR. PRICE: |
| 11:25 | 11 | Q.   And do you recognize that as an exchange between you |
| 11:25 | 12 | and, among others, a Heather -- is it "Hocut"? |
| 11:25 | 13 | A.   I don't know how to pronounce her last name. |
| 11:25 | 14 | Q.   H-O-C-U-T, who was with Walmart. |
| 11:25 | 15 | A.   She was buyer at Walmart. |
| 11:25 | 16 | MR. PRICE:  Move Exhibit 7540 into evidence. |
| 11:25 | 17 | THE COURT:  Received. |
| 11:25 | 18 | *(Exhibit No. 7540 received in evidence.)* |
| 11:25 | 19 | *(Document displayed.)* |
| 11:25 | 20 | BY MR. PRICE: |
| 11:25 | 21 | Q.   If you could look at the third page, what begins this |
| 11:25 | 22 | e-mail, you see it's from Ms. Hocut -- Heather -- that she |
| 11:25 | 23 | writes to you on February 3rd, 2006: |
| 11:25 | 24 | "Isaac, Bratz was down 17 percent comp yesterday.  This |
| 11:25 | 25 | is due to us not having any product.  Barbie was up in sales |

116

| | | |
|---|---|---|
| 11:25 | 1 | yesterday.  They are taking market share from you as we |
| 11:26 | 2 | speak, and it is all due to the fact that your fill rate is |
| 11:26 | 3 | 60 percent." |
| 11:26 | 4 | Do you see that? |
| 11:26 | 5 | A.   Yes. |
| 11:26 | 6 | Q.   Maybe you can tell us, what does the "fill rate" mean? |
| 11:26 | 7 | A.   That they place orders with you.  Like, for example, |
| 11:26 | 8 | they give you an order for a million dollars, and you only |
| 11:26 | 9 | ship $600,000 of it, that means you filled only 60 percent |
| 11:26 | 10 | of it. |
| 11:26 | 11 | Q.   And that's not a good thing. |
| 11:26 | 12 | A.   Well, for them, it's not a good thing, but -- go ahead. |
| 11:26 | 13 | Q.   Well, if you'd look at the next page -- I mean, you |
| 11:26 | 14 | respond: |
| 11:26 | 15 | "Did you know we've shipped more than of 60 percent of |
| 11:26 | 16 | your total spring forecast already." |
| 11:26 | 17 | And then she responds:  "Did you know that we need to |
| 11:26 | 18 | stop dwelling on that and get this fixed.  Did you know that |
| 11:26 | 19 | your sales are down right now?  Did you know that Barbie is |
| 11:26 | 20 | up?  If you are okay with that, then that's fine.  But I am |
| 11:26 | 21 | leaning towards taking space away from you guys and giving |
| 11:27 | 22 | it to Barbie so I can get my sales up." |
| 11:27 | 23 | You got that, right. |
| 11:27 | 24 | A.   I got that. |
| 11:27 | 25 | Q.   And -- |

Case 2:04-cv-09049-DOC-RNB  Document 9866  Filed 02/14/11  Page 117 of 136  Page ID #:298005
CV 04-9049 DOC – 2/10/2011 – Day 16, Volume 1 of 4

117

| 11:27 | 1 | A.   Apparently, Walmart's forecasting system was not pretty |
| 11:27 | 2 | good either, because this is dated February 3, 2006.  And |
| 11:27 | 3 | the spring season is January, February, March, April -- four |
| 11:27 | 4 | month.  And I'm telling her, "We have already shipped |
| 11:27 | 5 | 60 percent of your forecast," so I'm complaining to her that |
| 11:27 | 6 | the mighty Walmart's system also is not so good. |
| 11:27 | 7 | Q.   But your response is that you'll fix it -- |
| 11:27 | 8 | A.   Yes. |
| 11:27 | 9 | Q.   -- right? |
| 11:27 | 10 | I take it, you weren't talking about you're gonna fix |
| 11:27 | 11 | Walmart's forecasting system, right? |
| 11:27 | 12 | A.   No.  I was just trying to be nice to her and tell her |
| 11:27 | 13 | "Okay.  We would fix it.  We would try to ship you more |
| 11:27 | 14 | merchandise." |
| 11:27 | 15 | Q.   And that's in the top where you say, "Heather, it is |
| 11:27 | 16 | not a good thing, and we are all concerned.  We just |
| 11:27 | 17 | finished a meeting as to how to tackle this." |
| 11:28 | 18 | Do you see that? |
| 11:28 | 19 | A.   I did. |
| 11:28 | 20 | Q.   And at the end, you say, "We will get this fixed. |
| 11:28 | 21 | Thanks for your patience and support." |
| 11:28 | 22 | A.   Yes. |
| 11:28 | 23 | Q.   And this is February 3rd of 2006? |
| 11:28 | 24 | A.   That's correct. |
| 11:28 | 25 | Q.   And if you look at an e-mail dated February 24, 2006 -- |

| | | |
|---|---|---|
| 11:28 | 1 | and that's 7544. |
| 11:28 | 2 | A.   It's the same e-mail?  I'm sorry. |
| 11:28 | 3 | Q.   No.  It's a different one, Mr. Larian.  And I'll, this |
| 11:28 | 4 | time, wait until Rachel, Ms. Juarez, finds it for you. |
| 11:28 | 5 | A.   She's doing a great job. |
| 11:28 | 6 | *(Document provided to the witness.)* |
| 11:28 | 7 | BY MR. PRICE: |
| 11:28 | 8 | Q.   So you have 7544 in front of you? |
| 11:28 | 9 | A.   Yes.  Just give me a moment to... |
| 11:28 | 10 | Q.   Certainly. |
| 11:29 | 11 | A.   Go ahead.  Yes, I have -- I'm on this e-mail, at least |
| 11:29 | 12 | the bottom portion. |
| 11:29 | 13 | MR. PRICE:  Your Honor, move Exhibit 7544 into |
| 11:29 | 14 | evidence. |
| 11:29 | 15 | THE COURT:  Received. |
| 11:29 | 16 | *(Exhibit No. 7544 received in evidence.)* |
| 11:29 | 17 | *(Document displayed.)* |
| 11:29 | 18 | BY MR. PRICE: |
| 11:29 | 19 | Q.   And so this is e-mail -- if we can look at 7544 -- |
| 11:29 | 20 | there's the bottom e-mail that you send out, correct?  I'm |
| 11:29 | 21 | sorry.  7544-00002.  There's the e-mail which you send out, |
| 11:29 | 22 | correct? |
| 11:29 | 23 | A.   Yes. |
| 11:29 | 24 | Q.   That's dated February 24, 2006? |
| 11:29 | 25 | A.   Yes. |

DEBBIE GALE, U.S. COURT REPORTER

CV 04-9049 DOC - 2/10/2011 - Day 16, Volume 1 of 4

119

| | | |
|---|---|---|
| 11:29 | 1 | Q.   That's about three weeks after the e-mail we just saw |
| 11:29 | 2 | on February 3rd, 2006, right? |
| 11:30 | 3 | A.   Yes. |
| 11:30 | 4 | Q.   And if you look at -- at the one you wrote on |
| 11:30 | 5 | February 24th.  "I want this reviewed and handled for the |
| 11:30 | 6 | first day when I come back.  Our forecast sales is out of |
| 11:30 | 7 | whack." |
| 11:30 | 8 | Do you see that? |
| 11:30 | 9 | A.   Yes, I did. |
| 11:30 | 10 | Q.   And the number two item there is that "we are not |
| 11:30 | 11 | forecasting correctly," which you say is a sales problem, |
| 11:30 | 12 | correct? |
| 11:30 | 13 | A.   Yes. |
| 11:30 | 14 | Q.   And you tell Mr. Brawer that he has to "take this on |
| 11:30 | 15 | and lead it," that it's a big concern of yours, right? |
| 11:30 | 16 | A.   Yes. |
| 11:30 | 17 | Q.   And Mr. Castilla is hired about three weeks after that; |
| 11:30 | 18 | isn't that right? |
| 11:30 | 19 | A.   I don't know.  I take your representation. |
| 11:30 | 20 | Q.   At some point it came to your attention that, before |
| 11:30 | 21 | leaving his job at Mattel, that he downloaded information |
| 11:31 | 22 | from Mattel on his -- on his PDA? |
| 11:31 | 23 | A.   Yes.  At some point it came to my attention during this |
| 11:31 | 24 | litigation. |
| 11:31 | 25 | Q.   And do you remember what year that came to your |

| | | |
|---|---|---|
| 11:31 | 1 | attention? |
| 11:31 | 2 | A.   No, I don't. |
| 11:31 | 3 | Q.   Can you give us some estimate as to whether it was in |
| 11:31 | 4 | the last two years or three years? |
| 11:31 | 5 | A.   I can't. |
| 11:31 | 6 | Q.   Okay.  Do you recall, I think, yesterday saying that |
| 11:31 | 7 | you don't want Mattel employees to bring any Mattel |
| 11:31 | 8 | information to you, not now, not ever? |
| 11:31 | 9 | A.   Yes, and not tomorrow. |
| 11:31 | 10 | Q.   But at some point you understood that Mr. Castilla |
| 11:31 | 11 | joined MGA, and before that, downloaded files that he had at |
| 11:32 | 12 | Mattel, right? |
| 11:32 | 13 | A.   I found out about that, yes.  He never brought 'em to |
| 11:32 | 14 | MGA. |
| 11:32 | 15 | Q.   Well, do you have any understanding as to what, you |
| 11:32 | 16 | know, the types of things were that he downloaded? |
| 11:32 | 17 | A.   I have no idea.  I don't. |
| 11:32 | 18 | Q.   Does, uh –– does MGA do strategic plans? |
| 11:32 | 19 | A.   Once in a while. |
| 11:32 | 20 | Q.   A strategic plan, is that an exercise where you try to |
| 11:32 | 21 | figure out where the company's going, where you're going to |
| 11:32 | 22 | concentrate your resources, things of that nature? |
| 11:32 | 23 | A.   Yeah, we do 'em once in a while.  We a small company. |
| 11:32 | 24 | Q.   And is it your understanding that one of the things |
| 11:32 | 25 | that Mr. Castilla downloaded before he left Mattel was a |

Case 2:04-cv-09049-DOC-RNB   Document 9866   Filed 02/14/11   Page 121 of 136   Page ID #:298009
CV 04-9049 DOC – 2/10/2011 – Day 16, Volume 1 of 4

121

| | | |
|---|---|---|
| 11:33 | 1 | five-year strategic plan? |
| 11:33 | 2 | A.   No.  I have no idea what he downloaded.  It's the first |
| 11:33 | 3 | time I'm hearing that he downloaded five-year strategic plan |
| 11:33 | 4 | of Mattel -- even today. |
| 11:33 | 5 | Q.   Have you ever tried to find out what Mr. Castilla |
| 11:33 | 6 | downloaded before he left Mattel and went to MGA? |
| 11:33 | 7 | A.   No.  What I did try to find out -- if he brought |
| 11:33 | 8 | anything to MGA, and it was confirmed to me that he didn't |
| 11:33 | 9 | bring anything from Mattel to MGA. |
| 11:33 | 10 | Q.   Well -- but you wouldn't want to have an employee |
| 11:33 | 11 | working for MGA that you know downloaded important |
| 11:33 | 12 | information from Mattel when he left Mattel, right? |
| 11:33 | 13 | A.   I'm sorry? |
| 11:33 | 14 | Q.   Sure.  You wouldn't want to employ someone at MGA who |
| 11:33 | 15 | you know downloaded information from Mattel before he came |
| 11:34 | 16 | and worked for MGA? |
| 11:34 | 17 | A.   Yes.  It's very stupid for somebody -- especially when |
| 11:34 | 18 | he was told not to bring anything with him, it's very stupid |
| 11:34 | 19 | of anybody -- Jorge Castilla -- to download something to |
| 11:34 | 20 | take out of Mattel.  Very stupid. |
| 11:34 | 21 | Q.   And you wouldn't want to employ someone who did that |
| 11:34 | 22 | 'cause you wouldn't trust them anymore, right? |
| 11:34 | 23 | A.   If we knew that, yes, I would not want to hire him, |
| 11:34 | 24 | absolutely. |
| 11:34 | 25 | Q.   If you knew that he had downloaded it? |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:34 | 1 | A.   If I knew that he was bringing -- we had told Jorge |
| 11:34 | 2 | Castilla -- we tell actually every employee at MGA that we |
| 11:34 | 3 | hire, "Just come with your brain.  We don't want you to |
| 11:34 | 4 | bring anything else."  And he was told that.  And I learned |
| 11:34 | 5 | afterwards, when he was hired, that he had downloaded the |
| 11:34 | 6 | information from Mattel against our advice. |
| 11:35 | 7 | Q.   So -- |
| 11:35 | 8 | A.   And I don't know what he had downloaded.  Today is the |
| 11:35 | 9 | first time I hear that he downloaded -- whatever you called |
| 11:35 | 10 | it -- strategic plan.  And I don't think it's right.  He |
| 11:35 | 11 | should not have done that. |
| 11:35 | 12 | Q.   So, obviously, you fired him because you said "Just |
| 11:35 | 13 | come with your brain"? |
| 11:35 | 14 | A.   Fired him when? |
| 11:35 | 15 | Q.   Mr. Castilla, once you learned that he had downloaded |
| 11:35 | 16 | information from Mattel on his PDA and that that was the |
| 11:35 | 17 | wrong thing to do -- once you learned that, you obviously |
| 11:35 | 18 | fired him because you had told him "Just come with your |
| 11:35 | 19 | brain"? |
| 11:35 | 20 | A.   No.  Because people make mistakes.  He made mistake. |
| 11:35 | 21 | He has a family.  He has children.  And I knew that Mattel |
| 11:35 | 22 | was doing this to get to me.  I had no issues with Jorge |
| 11:35 | 23 | Castilla. |
| 11:35 | 24 | You wanted to get to me.  And I did not fire him.  He |
| 11:36 | 25 | apologized.  He said he was remorseful, he was sorry for |

DEBBIE GALE, U.S. COURT REPORTER

Case 2:04-cv-09049-DOC-RNB   Document 9866   Filed 02/14/11   Page 123 of 136   Page ID #:298011
CV 04-9049 DOC – 2/10/2011 – Day 16, Volume 1 of 4

123

| | | |
|---|---|---|
| 11:36 | 1 | doing what he did.  And I did not fire him. |
| 11:36 | 2 | Q.   I think you've told us you tell everybody who you hire |
| 11:36 | 3 | from Mattel just "Bring your brains.  Don't download stuff," |
| 11:36 | 4 | right? |
| 11:36 | 5 | A.   I tell 'em "Not to bring anything but your brain." |
| 11:36 | 6 | Q.   And you -- |
| 11:36 | 7 | A.   Whether they from Mattel or any other toy company. |
| 11:36 | 8 | Q.   And you eventually learned that Mr.-- is that an |
| 11:36 | 9 | important promise that you get when you hire people? |
| 11:36 | 10 | A.   Yes. |
| 11:36 | 11 | Q.   And you know that, if they download stuff from |
| 11:36 | 12 | Mattel -- right? -- that even if they don't bring it into |
| 11:36 | 13 | the offices of MGA, that that's something they will have |
| 11:36 | 14 | access to that they might be able to use in performing their |
| 11:36 | 15 | job, right? |
| 11:36 | 16 | A.   I don't know if that's true or not. |
| 11:36 | 17 | I know for a fact, 100 percent, two things:  That, A, |
| 11:37 | 18 | he never brought that information to MGA; and more |
| 11:37 | 19 | importantly, our forecasting system has gotten worse since |
| 11:37 | 20 | Jorge Castilla joined MGA. |
| 11:37 | 21 | Q.   Hope springs eternal. |
| 11:37 | 22 | But let me ask you about Mr. Castilla.  I think you |
| 11:37 | 23 | said that's an important promise that he -- that you ask 'em |
| 11:37 | 24 | to make to you, that they not do things like download |
| 11:37 | 25 | information from a competitor, right? |

Case 2:04-cv-09049-DOC-RNB   Document 9866   Filed 02/14/11   Page 124 of 136   Page ID #:298012
CV 04-9049 DOC - 2/10/2011 - Day 16, Volume 1 of 4

124

| | | |
|---|---|---|
| 11:37 | 1 | A.   Yes.  It's not appropriate. |
| 11:37 | 2 | Q.   And, if that's important, then you certainly would -- |
| 11:37 | 3 | would want to, uh, discipline the employee in some way. |
| 11:37 | 4 | A.   If they didn't bring it to MGA and he didn't use it for |
| 11:37 | 5 | MGA, again, I don't know what to do about disciplining him. |
| 11:37 | 6 | I didn't fire him.  I had compassion for him and his family. |
| 11:37 | 7 | I did not fire him. |
| 11:37 | 8 | Q.   Well, you -- you didn't discipline him in any way |
| 11:38 | 9 | either, right? |
| 11:38 | 10 | A.   I don't remember that.  He didn't report to me |
| 11:38 | 11 | directly.  I don't know if he was disciplined or not, but |
| 11:38 | 12 | again, he didn't bring anything to MGA. |
| 11:38 | 13 | Q.   In situations like this, do you agree that you send a |
| 11:38 | 14 | message to other employees by the way you handle situations |
| 11:38 | 15 | like this:  You send a message as to how seriously you take |
| 11:38 | 16 | the promise that they won't download information from a |
| 11:38 | 17 | competitor before joining you? |
| 11:38 | 18 | A.   We take it very seriously.  That's why we tell them in |
| 11:38 | 19 | person and in writing.  We take it very seriously. |
| 11:38 | 20 | Q.   But as important as what you tell them is the way you |
| 11:38 | 21 | act, correct?  Would you agree with that? |
| 11:38 | 22 | A.   What you say?  I'm sorry. |
| 11:39 | 23 | Q.   As important as what you tell them, I mean, is the way |
| 11:39 | 24 | you act, correct? |
| 11:39 | 25 | A.   Yes. |

Case 2:04-cv-09049-DOC-RNB   Document 9866   Filed 02/14/11   Page 125 of 136   Page ID #:298013
CV 04-9049 DOC – 2/10/2011 – Day 16, Volume 1 of 4

125

| 11:39 | 1 | Q.   And you don't want to be sending a message to your |
| 11:39 | 2 | other employees that you don't take the promise seriously |
| 11:39 | 3 | that you -- that you have them make, that they haven't |
| 11:39 | 4 | downloaded anything from a competitor? |
| 11:39 | 5 | MS. KELLER:  Objection.  Your Honor, this assumes |
| 11:39 | 6 | facts not in evidence about when Mr. Larian found out, and |
| 11:39 | 7 | how, and how much. |
| 11:39 | 8 | THE COURT:  Overruled. |
| 11:39 | 9 | THE WITNESS:  Again, we found out -- I mean, |
| 11:39 | 10 | should I get into the detail of when I found out, and how I |
| 11:39 | 11 | found out?  Or -- that should be for another day? |
| 11:39 | 12 | BY MR. PRICE: |
| 11:39 | 13 | Q.   You can give us a day or a week or a year. |
| 11:39 | 14 | A.   I mean, I don't remember the date.  But I can tell you |
| 11:39 | 15 | the circumstances when I found out through this litigation |
| 11:39 | 16 | what happened.  Should I say that?  I don't know. |
| 11:39 | 17 | Q.   Your counsel might ask you the circumstances, and then |
| 11:39 | 18 | I'll get a chance to ask questions. |
| 11:40 | 19 | But my question right now is -- |
| 11:40 | 20 | A.   Okay.  My answer is, Mr. Price, that 100 percent Jorge |
| 11:40 | 21 | Castilla, what he did at Mattel was wrong.  But he did not |
| 11:40 | 22 | bring any of that to MGA.  And that information, whatever it |
| 11:40 | 23 | is, has never been used at MGA, and we can prove that. |
| 11:40 | 24 | Q.   My question's a bit different. |
| 11:40 | 25 | You tell these folks not to download information from |

Case 2:04-cv-09049-DOC-RNB  Document 9866  Filed 02/14/11  Page 126 of 136  Page ID #:298014
CV 04-9049 DOC - 2/10/2011 - Day 16, Volume 1 of 4

126

| | | |
|---|---|---|
| 11:40 | 1 | your competitors when they leave, right? |
| 11:40 | 2 | A.    I do. |
| 11:40 | 3 | Q.    Okay.  And you want that request to be taken seriously, |
| 11:40 | 4 | right? |
| 11:40 | 5 | A.    Yes, I do. |
| 11:40 | 6 | Q.    And you understand that sometimes actions speak louder |
| 11:40 | 7 | than words, right? |
| 11:40 | 8 | A.    Yes. |
| 11:40 | 9 | Q.    And so other employees might be looking at you to see |
| 11:40 | 10 | what do you do when you learn that an employee has |
| 11:40 | 11 | intentionally downloaded information of a competitor at the |
| 11:41 | 12 | time they leave the competitor, right? |
| 11:41 | 13 | A.    Yes, you're right. |
| 11:41 | 14 | Q.    And even sitting here today, you told me you don't know |
| 11:41 | 15 | what he took? |
| 11:41 | 16 | A.    I don't.  You just told me what he took. |
| 11:41 | 17 |         MS. KELLER:  Objection.  Your Honor, these were |
| 11:41 | 18 | AEO materials. |
| 11:41 | 19 |         THE COURT:  Overruled. |
| 11:41 | 20 |         THE WITNESS:  You just told me what he took.  I |
| 11:41 | 21 | didn't know it up till now. |
| 11:41 | 22 | BY MR. PRICE: |
| 11:41 | 23 | Q.    Well, I don't want you to take my word for it.  So, |
| 11:41 | 24 | even before you took the stand, you did not know what it was |
| 11:41 | 25 | that Mr. Castilla took, correct? |

| | | |
|---|---|---|
| 11:41 | 1 | A.   Absolutely, correct. |
| 11:41 | 2 | Q.   And, therefore, you don't know if he referred to it |
| 11:41 | 3 | while doing his job or used the information in those |
| 11:41 | 4 | materials to do his job 'cause you don't know what he took? |
| 11:41 | 5 | A.   I don't know what he took.  But whatever he took, and |
| 11:41 | 6 | if he referred to it, our forecasting system today is worse |
| 11:41 | 7 | than what was when Jorge Castilla joined MGA. |
| 11:42 | 8 | Q.   So it's -- |
| 11:42 | 9 | A.   So it must have not been very good things that he took. |
| 11:42 | 10 | Q.   So, uh, it's okay for you, then, if someone takes |
| 11:42 | 11 | information from a competitor and it turns out when you use |
| 11:42 | 12 | it, it doesn't work out? |
| 11:42 | 13 | A.   Two questions you asked, and I'm gonna answer 'em one |
| 11:42 | 14 | by one. |
| 11:42 | 15 | MS. KELLER:  Your Honor, that assumes facts not in |
| 11:42 | 16 | evidence. |
| 11:42 | 17 | THE COURT:  Overruled. |
| 11:42 | 18 | THE WITNESS:  Absolutely, it is not.  It is not |
| 11:42 | 19 | okay for any employee to take one company's trade secret to |
| 11:42 | 20 | another.  It's absolutely not okay to download it, |
| 11:42 | 21 | especially if that person's been told not to do it. |
| 11:42 | 22 | Secondly, the second answer to your question is, |
| 11:42 | 23 | you said he used it at MGA.  He did not use it at MGA. |
| 11:42 | 24 | BY MR. PRICE: |
| 11:42 | 25 | Q.   And you can't know that without knowing what it is he |

| | | |
|---|---|---|
| 11:42 | 1 | took, right? |
| 11:42 | 2 | A.   You're right. |
| 11:43 | 3 | Q.   And without knowing what he took and, therefore, |
| 11:43 | 4 | without knowing whether he could have used it at MGA, |
| 11:43 | 5 | beginning in about August of 2007, MGA began paying his |
| 11:43 | 6 | legal fees? |
| 11:43 | 7 | A.   We did. |
| 11:43 | 8 | Q.   So at that time you knew he had downloaded information |
| 11:43 | 9 | from Mattel when he left Mattel, correct? |
| 11:43 | 10 | A.   We found out through litigation that he had done that, |
| 11:43 | 11 | yes. |
| 11:43 | 12 | Q.   And you knew that before you started paying his |
| 11:43 | 13 | attorneys fees, correct? |
| 11:43 | 14 | A.   I don't know if we did -- we knew that before or after, |
| 11:43 | 15 | I don't. |
| 11:43 | 16 | Q.   Uh -- |
| 11:43 | 17 | A.   I don't know we knew that then, no. |
| 11:43 | 18 | Q.   You knew at the time you began paying his attorneys |
| 11:44 | 19 | fees that there was at least an accusation he had downloaded |
| 11:44 | 20 | information from MGA, correct? -- from Mattel.  I'm sorry. |
| 11:44 | 21 | A.   Again, I know a lot of detail.  I'm not sure if I can |
| 11:44 | 22 | get into it right now or not.  But we hired a lawyer for |
| 11:44 | 23 | him, yes.  That's all I'm gonna say at this time. |
| 11:44 | 24 | Q.   And at the time you did that, you understood that there |
| 11:44 | 25 | were allegations against Mr. Castilla that he had downloaded |

DEBBIE GALE, U.S. COURT REPORTER

| | | |
|---|---|---|
| 11:44 | 1 | information from Mattel when he quit and went to MGA, right? |
| 11:44 | 2 | A.   That's what he told us, yes, when he came to my office. |
| 11:44 | 3 | Q.   And -- |
| 11:44 | 4 | A.   That was month after he was hired at MGA. |
| 11:44 | 5 | Q.   And I think I have the date wrong here. |
| 11:45 | 6 | You began paying his fees in -- it was about February |
| 11:45 | 7 | of 2007? |
| 11:45 | 8 | A.   I don't know the date. |
| 11:45 | 9 | Q.   Have you continued paying Mr. Castilla's legal fees? |
| 11:45 | 10 | A.   When? |
| 11:45 | 11 | Q.   I mean, to this date, have you continued paying? |
| 11:45 | 12 | A.   No.  We don't pay his legal fees anymore. |
| 11:45 | 13 | Q.   When did you stop -- I just want a date now:  When did |
| 11:45 | 14 | you stop paying Mr. Castilla's legal fees? |
| 11:45 | 15 | MS. KELLER:  Objection, Your Honor.  Calls for a |
| 11:45 | 16 | information that was the subject of MIL's. |
| 11:46 | 17 | THE COURT:  Just a moment.  What would the next |
| 11:46 | 18 | question be? |
| 11:46 | 19 | The question, right now, is "When did you stop |
| 11:46 | 20 | paying?" |
| 11:46 | 21 | MR. PRICE:  Just a timeframe.  That's why I said |
| 11:46 | 22 | "just a date." |
| 11:46 | 23 | THE COURT:  Overruled. |
| 11:46 | 24 | THE WITNESS:  And I don't know the date. |
| | 25 | |

Case 2:04-cv-09049-DOC-RNB   Document 9866   Filed 02/14/11   Page 130 of 136   Page ID #:298018
CV 04-9049 DOC – 2/10/2011 – Day 16, Volume 1 of 4

130

| | | |
|---|---|---|
| 11:46 | 1 | BY MR. PRICE: |
| 11:46 | 2 | Q.   It was over a number of years, correct? |
| 11:46 | 3 | A.   What was over a number of years? |
| 11:46 | 4 | Q.   That you were paying Mr. Castilla's attorneys fees |
| 11:46 | 5 | after the accusation that he'd downloaded material from |
| 11:46 | 6 | Mattel when he left Mattel? |
| 11:46 | 7 | A.   Well, no, you're -- either I'm confused or you're |
| 11:47 | 8 | trying to confuse me, but... |
| 11:47 | 9 | Q.   Let me try to make it simpler. |
| 11:47 | 10 | A.   Yes. |
| 11:47 | 11 | Q.   I'm gonna ask that Ms. Juarez put before you |
| 11:47 | 12 | Exhibit 6741. |
| 11:47 | 13 | *(Document provided to the witness.)* |
| 11:47 | 14 | THE WITNESS:  Okay.  Go ahead.  You want me to |
| 11:47 | 15 | read this? |
| 11:47 | 16 | MR. PRICE:  Yeah.  I'm gonna take you to a certain |
| 11:47 | 17 | page. |
| 11:47 | 18 | BY MR. PRICE: |
| 11:47 | 19 | Q.   You see 6741-00010? |
| 11:47 | 20 | A.   Yes. |
| 11:47 | 21 | Q.   And you see there's a chart there? |
| 11:47 | 22 | A.   Yes. |
| 11:47 | 23 | Q.   And at the front of this, you see this, uh, |
| 11:48 | 24 | Supplemental Response of MGA Entertainment to |
| 11:48 | 25 | Interrogatories? |

CV 04-9049 DOC - 2/10/2011 - Day 16, Volume 1 of 4

131

| | | |
|---|---|---|
| 11:48 | 1 | A. Which page? |
| 11:48 | 2 | Q. That's the first page. But keep your finger on |
| 11:48 | 3 | page 10. |
| 11:48 | 4 | A. Yes. Go ahead. |
| 11:48 | 5 | Q. And on the chart, on page 10, do you see "Payments made |
| 11:48 | 6 | on behalf of Mr. Castilla"? |
| 11:48 | 7 | A. That's what it says, yes. |
| 11:48 | 8 | Q. And does that refresh your recollection that, if you |
| 11:48 | 9 | look at this page, for example, there were payments through |
| 11:48 | 10 | September of 2008 reflected on this page? |
| 11:48 | 11 | A. Yes. I see "September 2008" in there. |
| 11:48 | 12 | Q. And if you'd look at page 16. |
| 11:49 | 13 | A. Go ahead. |
| 11:49 | 14 | Q. Do you see there are other payments to Mr. Castilla? |
| 11:49 | 15 | A. To Mr. Castilla? Payments to? |
| 11:49 | 16 | Q. On behalf of Mr. Castilla to his counsel. |
| 11:49 | 17 | A. Yes. |
| 11:49 | 18 | Q. And then if you look at 06741-0023, do you see -- |
| 11:49 | 19 | A. Hold on. I'm not there yet. |
| 11:49 | 20 | Q. Sure. |
| 11:49 | 21 | A. Yes. Go ahead. |
| 11:49 | 22 | Q. Do you see that reflects bonus payments? |
| 11:49 | 23 | A. Where do you see that? |
| 11:49 | 24 | Q. Okay. If you look at -- you won't see the context -- |
| 11:49 | 25 | 06741-00022. |

Case 2:04-cv-09049-DOC-RNB   Document 9866   Filed 02/14/11   Page 132 of 136   Page ID #:298020
CV 04-9049 DOC - 2/10/2011 - Day 16, Volume 1 of 4

132

| | | |
|---|---|---|
| 11:50 | 1 | A.   Yes. |
| 11:50 | 2 | Q.   And when this chart starts, it says, that, uh, "The |
| 11:50 | 3 | only such payments made by MGA are bonus payments."  You see |
| 11:50 | 4 | that?  That's in the -- couple sentences right before the |
| 11:50 | 5 | chart. |
| 11:50 | 6 | A.   Yes.  Go ahead.  I see the bonus payments. |
| 11:50 | 7 | Q.   And you see on the next page that there are a couple of |
| 11:50 | 8 | bonus payments made to Mr. Castilla in 2007 and 2008? |
| 11:50 | 9 | A.   Yes. |
| 11:50 | 10 | Q.   Now, do you know whether there have been bonus payments |
| 11:50 | 11 | made to Mr. Castilla since 2008? |
| 11:50 | 12 | A.   I don't. |
| 11:51 | 13 | Q.   Did you -- as far as you're aware, uh, there was no |
| 11:51 | 14 | discipline that was imposed on Mr. Castilla, correct? |
| 11:51 | 15 | A.   At MGA, no, it was not. |
| 11:51 | 16 | Q.   And as far as you are aware, did he have raises? |
| 11:51 | 17 | A.   I don't know. |
| 11:51 | 18 | Q.   You are aware that he had bonuses, correct? |
| 11:51 | 19 | A.   Well, according to this chart, he had two bonuses. |
| 11:51 | 20 | Q.   And you're not aware of any negative impact on |
| 11:51 | 21 | Mr. Castilla's advancement with MGA after you became aware |
| 11:51 | 22 | that, uh, he had downloaded Mattel information before he |
| 11:51 | 23 | left Mattel? |
| 11:51 | 24 | A.   As far as I know, he still does the same job at MGA. |
| 11:52 | 25 | Q.   Now, I want to talk to you now about a Mr. Cooney. |

Case 2:04-cv-09049-DOC-RNB   Document 9866   Filed 02/14/11   Page 133 of 136   Page ID #:298021
CV 04-9049 DOC – 2/10/2011 – Day 16, Volume 1 of 4

133

| 11:52 | 1 | Do you know a Dan Cooney? |
| 11:52 | 2 | A.   Yes, I do. |
| 11:52 | 3 | Q.   And was he an individual who worked at Mattel and then |
| 11:52 | 4 | left Mattel to join MGA? |
| 11:52 | 5 | A.   Yes. |
| 11:52 | 6 | Q.   And do you recall that when he was at Mattel he was |
| 11:52 | 7 | responsible for the boys, kind of, products for Toys R Us? |
| 11:52 | 8 | A.   I know he was a salesman for Toys R Us.  I don't know |
| 11:52 | 9 | boys or whatever.  I don't know. |
| 11:52 | 10 | Q.   Did you come to learn that -- when he left Mattel, that |
| 11:52 | 11 | he burned on a CD information that was on Mattel's |
| 11:52 | 12 | computers? |
| 11:52 | 13 | A.   I learned through this litigation, yes. |
| 11:52 | 14 | Q.   And do you have, uh, any knowledge as to what it was he |
| 11:53 | 15 | downloaded? |
| 11:53 | 16 | A.   Yes.  I have some knowledge now through this |
| 11:53 | 17 | litigation.  I do. |
| 11:53 | 18 | Q.   And is it knowledge you've gotten from your attorneys, |
| 11:53 | 19 | or is it something which you became aware of in some other |
| 11:53 | 20 | way? |
| 11:53 | 21 | A.   I got it through my attorneys and also as a 30(b)(6) |
| 11:53 | 22 | deponent. |
| 11:53 | 23 | Q.   And when you say "30(b)(6)," this is when you were |
| 11:53 | 24 | deposed as the person at MGA most knowledgeable about what |
| 11:53 | 25 | Mr. Cooney downloaded when he left Mattel? |

Case 2:04-cv-09049-DOC-RNB   Document 9866   Filed 02/14/11   Page 134 of 136   Page ID #:298022
CV 04-9049 DOC – 2/10/2011 – Day 16, Volume 1 of 4

134

| 11:53 | 1 | MS. KELLER: Objection, Your Honor. That is |
| 11:53 | 2 | incorrect. |
| 11:53 | 3 | THE COURT: Well, I thought it was a general |
| 11:53 | 4 | 30(b)(6). |
| 11:53 | 5 | MS. KELLER: No. |
| 11:53 | 6 | MR. PRICE: I'll just ask him. |
| | 7 | BY MR. PRICE: |
| 11:53 | 8 | Q. You say you learned this as part of being a 30(b)(6) |
| 11:53 | 9 | witness. Could you tell us what you -- |
| 11:53 | 10 | A. My mind is really, frankly, fuzzy on this. I think I |
| 11:53 | 11 | learned this -- I'm not sure if I was designated as a |
| 11:53 | 12 | 30(b)(6) -- and these are new terminologies I'm learning |
| 11:54 | 13 | through seven years of litigation everyday -- gonna pass the |
| 11:54 | 14 | bar exam after -- but I don't know if I learned this from my |
| 11:54 | 15 | lawyers or as a 30(b)(6). I just don't recall that. |
| 11:54 | 16 | Q. Uh, there were some times when your deposition was |
| 11:54 | 17 | take -- taken as something called a 30(b)(6) witness, right? |
| 11:54 | 18 | A. Yes. |
| 11:54 | 19 | Q. And those times there were topics designated for you to |
| 11:54 | 20 | speak to, correct? |
| 11:54 | 21 | A. Yes. |
| 11:54 | 22 | Q. And you were speaking on behalf of the corporation as |
| 11:54 | 23 | the person most knowledgeable about those topics at MGA; is |
| 11:54 | 24 | that your understanding? |
| 11:54 | 25 | A. My understanding was that my lawyers would educate me |

| 11:54 | 1 | about all these different topics, and I would sit down and |
| 11:54 | 2 | answer to Mr. Zeller's hours and hours and hours about |
| 11:54 | 3 | the -- that's what deposition -- that's what's deposition. |

11:55   4          MR. PRICE:  Your Honor, I know you previously gave

11:55   5   instruction on this.

11:55   6          Could you give another instruction to remind the

11:55   7   jury about the relevance of this?

11:55   8          THE COURT:  Why don't we take a recess so that we

11:55   9   have a thorough, thoughtful discussion about that.  Okay?

11:55  10          MR. PRICE:  Thank you.

11:55  11          THE COURT:  Ladies and gentlemen, why don't you go

11:55  12   to lunch.  I'll see you at 1:00 o'clock.

11:55  13          You're admonished not to discuss this matter

11:55  14   amongst yourselves, nor form or express any opinion

11:55  15   concerning the case.

11:55  16          Thank you very much.

11:55  17          We'll see you at 1:00 o'clock.

11:56  18              *(Jury recesses at 11:56 a.m.)*

11:56  19              *(Further proceedings reported by Deborah*

11:56  20         *Parker in Volume II.)*

11:56  21                          -oOo-

11:56  22

       23

       24

       25

Case 2:04-cv-09049-DOC-RNB  Document 9866  Filed 02/14/11  Page 136 of 136  Page ID #:298024
CV 04-9049 DOC - 2/10/2011 - Day 16, Volume 1 of 4

136

11:56    1                              -oOo-

11:56    2

11:56    3                           CERTIFICATE

11:56    4

11:56    5        I hereby certify that pursuant to Section 753,

11:56    6   Title 28, United States Code, the foregoing is a true and

11:56    7   correct transcript of the stenographically reported

11:56    8   proceedings held in the above-entitled matter and that the

11:56    9   transcript page format is in conformance with the

11:56   10   regulations of the Judicial Conference of the United States.

11:56   11

11:56   12   Date:  February 10, 2011

11:56   13

11:56   14
11:56
11:56   15   _____
11:56
11:56   16        DEBBIE GALE, U.S. COURT REPORTER
             CSR NO. 9472, RPR
11:56   17

        18

        19

        20

        21

        22

        23

        24

        25