1      **UNITED STATES DISTRICT COURT**

2      **CENTRAL DISTRICT OF CALIFORNIA**

3      **SOUTHERN DIVISION AT SANTA ANA**

4          HONORABLE DAVID O. CARTER, JUDGE PRESIDING

5

6
       MATTEL, INC., ET AL.,              )
7                                         )
                    PLAINTIFFS,           )
8                                         )
               vs.                        ) CV NO. 04-9049-DOC
9                                         ) Day 16
       MGA ENTERTAINMENT, INC., ET AL.,   ) VOLUME 2 of 4
10                                        )
                    DEFENDANTS.           )
11     _____)

12

13

14              REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                        JURY TRIAL

16                   SANTA ANA, CALIFORNIA

17               THURSDAY, FEBRUARY 10, 2011

18                        11:57 A.M.

19

20
                  **DEBORAH D. PARKER, CSR 10342**
21                    **OFFICIAL COURT REPORTER**
                  **UNITED STATES DISTRICT COURT**
22                    **411 WEST FOURTH STREET**
                         **SUITE 1-053**
23                **SANTA ANA, CALIFORNIA 92701**
                        **(714) 542-8409**
24                 **D.PARKER@IX.NETCOM.COM**

25

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
 1    APPEARANCES OF COUNSEL:

 2        FOR THE PLAINTIFF, MATTEL, INC.:

 3                            JOHN QUINN
                             WILLIAM PRICE
 4                            MICHAEL T. ZELLER
                             QUINN EMANUEL URQUHART
 5                            & SULLIVAN, LLP
                             865 S. FIGUEROA STREET
 6                            10TH FLOOR
                             LOS ANGELES, CALIFORNIA 90017
 7                            (213) 443-3000

 8
          FOR THE DEFENDANT, MGA ENTERTAINMENT, INC.:
 9
                             THOMAS S. MC CONVILLE
10                            ORRICK HERRINGTON & SUTCLIFFE, LLP
                             4 PARK PLAZA
11                            SUITE 1600
                             IRVINE, CALIFORNIA 92614
12                            (949) 567-6700

13
                             ANNETTE L. HURST
14                            ORRICK HERRINGTON & SUTCLIFFE, LLP
                             THE ORRICK BUILDING
15                            405 HOWARD STREET
                             SAN FRANCISCO, CALIFORNIA 94105
16                            (415) 773-5700

17
                             JENNIFER L. KELLER
18                            KELLER RACKAUCKAS, LLP
                             18500 VON KARMAN AVENUE
19                            SUITE 560
                             IRVINE, CALIFORNIA 92612
20                            (949) 476-8700

21

22

23

24

25
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
1   APPEARANCES OF COUNSEL:

2        FOR THE DEFENDANT, CARLOS GUSTAVO MACHADO GOMEZ:

3                           MARK E. OVERLAND
                            LAW OFFICES OF MARK E. OVERLAND
4                           100 WILSHIRE BOULEVARD
                            SUITE 950
5                           SANTA MONICA, CALIFORNIA 90401
                            (310) 459-2830
6

7                           ALEXANDER H. COTE
                            SCHEPER KIM & HARRIS, LLP
8                           601 WEST FIFTH STREET
                            12TH FLOOR
9                           LOS ANGELES, CALIFORNIA 90071
                            (213) 613-4660
10

11
    ALSO PRESENT:
12
                            JEANINE PISONI
13                          MGA ENTERTAINMENT, INC.
                            16360 ROSCOE BOULEVARD
14                          SUITE 105
                            VAN NUYS, CALIFORNIA 91406
15

16                          ROBERT ECKERT, MATTEL CEO
                            ISAAC LARIAN, MGA CEO
17                          KEN KOTARSKI, MATTEL TECHNICAL OPERATOR
                            MIKE STOVALL, MGA TECHNICAL OPERATOR
18

19

20

21

22

23

24

25
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

4

```
 1                           I N D E X

 2

 3    PLAINTIFF'S WITNESSES:    DIRECT  CROSS  REDIRECT  RECROSS

 4     ISAAC LARIAN                27

 5

 6                         E X H I B I T S

 7    PLAINTIFF'S EXHIBITS:               IDENTIFICATION  EVIDENCE

 8     3601-000001E-MAIL                                   39

 9     3609  E-MAIL                                        50

10     3617  E-MAIL                                        55

11     3618  E-MAIL                                        56

12     6416  E-MAIL                                        53

13     6754  PRESENTATION                                  46

14     8859  E-MAIL                                        57

15     8865  E-MAIL                                        63

16     20838 E-MAIL                                        37

17     22408 E-MAIL                                        42

18

19

20

21

22

23

24

25
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1      SANTA ANA, CALIFORNIA; THURSDAY, FEBRUARY 10, 2011;

2                          11:57 A.M.

3        *(The following proceedings were had outside the*

4         *presence of the jury:)*

5              THE COURT:  We're back on the record.

6              Now, Mr. Price.

7              MR. PRICE:  Your Honor, Mr. Larian has said a

8    number of times he was deposed so many days for hours and

9    hours, and Mr. Eckert was deposed for, I think, nine days or

10   so for hours and hours.  I would -- I'm just requesting a

11   reminder to the jury that that's irrelevant.

12             THE COURT:  Once again, the truth doesn't have to

13   walk around on legs.  Why aren't we just telling the jury

14   simply that Mr. Larian has been deposed, as well as

15   Mr. Eckert on many different occasions.  It's the truth.

16             MR. PRICE:  I think that's fine.  I think the last

17   time added to that that's --

18             THE COURT:  It's appropriate.

19             MR. PRICE:  That's appropriate.

20             THE COURT:  It's appropriate.  Especially in light

21   of many of the answers given by many parties.  There have

22   been accusations back and forth in this record that parties

23   didn't respond to questions.  Each side feels that their

24   party did, or attempts to argue so to the court.  The next

25   thing is, it was my memory when I came into contact, first,

1   with Ms. Hurst 10 years ago and Mr. Zeller about a year ago,

2   that we went through Ms. Kuemmerle, if you recall, when she,

3   basically, had some issues concerning a deposition.  Then,

4   we started getting another series of 30(b)(6) witnesses.

5   And if you look at all the empty vessels that were produced

6   during that period of time by MGA, there were, for my

7   record -- I forget how many 30(b)(6) witnesses designated,

8   but many of those, including a former FBI agent, really were

9   of very little value or help, and I know that there were

10  constant complaints by Mattel about that empty vessel

11  problem and, of course, counterdesignations by MGA at that

12  time.  But it was my impression that Mr. Larian designated

13  himself or, at least, that's the information take came to me

14  that Mr. Larian designated himself as a 30(b)(6) witness and

15  the lawyers didn't designate him at all.  It was upon

16  Mr. Larian's insistence.  And then, we have a whole series

17  of increased depositions, because it not only pertained to

18  Mr. Larian, it pertained to MGA as an entire entity.

19         So I'm a little concerned with the impression

20  being placed before the jury that either Mr. Eckert, or

21  Mr. Larian, or Mr. O'Brien -- Carter Bryant are

22  inconvenienced in some way.  A large part of the time that

23  they spend in court, or a large part of the time they spend

24  in deposition is related to the answers to the questions.

25  By the same token, there's been accusations that the same

1   questions were asked repeatedly over and over again.

2          So I think you're correct, Mr. Price.  I think

3   that there needs to be me explanation by the court, once

4   again, that these witnesses, like the witnesses in this

5   case, including Mr. Larian and Mr. Eckert and Mr. Bryant,

6   have been deposed many times, and it's entirely appropriate.

7          MS. HURST:  Our concern is on a different part of

8   the question and answers, your Honor.

9          THE COURT:  Let's deal with that part.

10          Any issue, Ms. Hurst, Ms. Keller?

11          MS. HURST:  No.

12          THE COURT:  Mr. Quinn?  Mr. Zeller?

13          MR. QUINN:  No, your Honor.

14          THE COURT:  Does that resolve it, Mr. Price?

15          MR. PRICE:  Yes.

16          THE COURT:  I'll do that right when we come back

17   at 1:00 o'clock.

18          Now, the next issue.

19          MS. HURST:  So Mr. Larian was not designated on

20   any defense to Mattel's trade secret claims, and he was not

21   made knowledgeable about the various employee accusations

22   through the 30(b)(6) practice.  He was designated only on

23   MGA's affirmative claims and an unclean hands defense to the

24   extent it overlapped with the affirmative claims.  He was

25   not designated on this subject.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
 1              But second and more important, your Honor, Federal
 2    Rule 30(b)(6) does not use the person most knowledgeable.
 3    State law, but the Federal Rule does not.  And as the court
 4    knows as it's recited, both sides used empty vessels, so to
 5    speak, including Mr. Story, an accountant who testified on
 6    behalf of Mattel for many, many days about their trade
 7    secret claims.
 8              To use the articulating you were designated as the
 9    person most knowledgeable at MGA on this, implies a set of
10    preexisting knowledge rather than a process undertaken to
11    educate oneself about all the information reasonably
12    available to the organization.
13              Mr. Brawer was our 30(b)(6) witness on these
14    issues.  He testified at length, repeatedly educated
15    himself, the implication of person most knowledgeable --
16              First of all, this witness did not testify on
17    these issues.  But, second of all, the formation of the
18    question "person most knowledgeable" is an argument about
19    preexisting knowledge, which is particularly pertinent here.
20              THE COURT:  Whether he's a 30(b) witness or the
21    president of the company, I expect that you're going to
22    attack Mattel and Mr. Eckert when he's on the stand for
23    having knowledge about this supposedly -- this supposed
24    war room, this supposed, you know, effort by a Mattel, just
25    a couple floors below him.
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
 1              I can't imagine Mattel being able to pose an

 2      objection Mr. Eckert is non-knowledgeable and also he -- and

 3      I think that Mr. Larian, whether he's a 30(b) witness or the

 4      president of the company, is cutting an awfully fine line,

 5      so look ahead a little bit.  You want to make sure that

 6      that's the position you want to take.  Because, you know,

 7      winning a battle and losing a war is a terrible thing.

 8              MS. KELLER:  Your Honor, the problem with the

 9      Castilla line of questions, first of all, Mr. Larian wasn't

10      even allowed to see the documents pertaining to that,

11      because they were marked "AEO," until just a few days ago,

12      as you remember, right before he started prepping.  We

13      haven't had a chance with 25 binders to even show him those.

14      But all this time, all these years, he hasn't been allowed

15      to see them, nor have the attorneys been allowed to tell him

16      what they contain.

17              So between that and then saying that he was

18      designated as the person most knowledgeable at his company

19      about what had happened is really, really misleading,

20      because he was completely handcuffed.  We were handcuffed in

21      telling him about it, and now it's being presented to the

22      jury as if he knew all along.  In fact, he was the most

23      knowledgeable person there about the illegal downloading and

24      did nothing.  And that's what I'm concerned about.  I just

25      don't think it's fair, given the fact that the jury doesn't
```

 1    know any of this.  It's a really false impression that's

 2    being created.

 3              MR. ZELLER:  Your Honor, if I may on this?

 4              THE COURT:  Just a moment.

 5              I just heard someone from Mattel say that they

 6    spent a sleepless night.  So I'm supposed to worry about

 7    Mattel's counsel's sleep.

 8              And I'm hearing that you're not able to prepare,

 9    and I'm supposed to worry about your non-preparedness.

10    Nonsense.

11              You have the lunch hour.  Go show it to him.  If

12    nobody is moving -- so, in other words, your objection is

13    overruled.  You got a chance to talk to him.  You got a

14    chance to show him some of these documents before moving on.

15              MS. KELLER:  Your Honor, these are claimed to be

16    Mattel trade secrets.

17              THE COURT:  That's my ruling.  That's the end of

18    this discussion now.

19              Now, Mr. Quinn.

20              MR. QUINN:  Your Honor, on this issue of *Make sure*

21    *Paula is prepared not to testify on whether we raise the*

22    *crime fraud,* I remember now that that's fully been briefed.

23    There are three briefs.  We moved on that.  They filed an

24    opposing brief.  There's a reply brief.

25              That's Exhibit 22345.

```
 1          THE COURT:  At the present time, the tentative I
 2   have in mind is that that's excluded on the attorney-client.
 3   What I'm doing is desperately trying to get some time to go
 4   back and look at it.  The less I'm going to have to go back
 5   and look at it, that's my ruling.
 6          So whenever I have time, I'll look at it, but I
 7   don't have time right now, again.  But I have a brief
 8   written; it finds against you.  So I'm paying you the
 9   courtesy of going back and looking at it one more time, in
10   light of the testimony.
11          Now, next issue.  I need to look at the timing for
12   a moment.  My recollection is that there's the outburst that
13   occurred that attacks you, Mr. Price, about racism in the
14   first trial.  And your request is to go back.  My memory --
15   and what I need a few moments for in chambers -- is that
16   that occurred before the comment about wives.  Now, I may be
17   wrong on that.  That may have occurred afterwards.  I need
18   to look at it one more time, so I don't have the timing down
19   in my mind, right now.
20          MR. PRICE:  My recollection is that it was prior
21   to that, to tell you the truth.  And it was part of why I
22   responded the way I did, because I thought, how am I going
23   to prove to this jury that I didn't make a racist comment in
24   the last trial?
25          That's why, because the comment was made.  That's
```

 1   why, even if it was in that context, that I would ask that I

 2   would be able to ask Mr. Larian or give him the invitation

 3   to come up with it.

 4         THE COURT:  Well, three things are about to happen

 5   because of the gratuitous comments.  It's almost

 6   self-evident:  One, I didn't know if Carter Bryant was

 7   coming back or not but, apparently, I can foresee that he

 8   probably is.  And, second, it's the attempt to correct what

 9   the jury may feel are gratuitous comments.  And I had

10   thought that the best way to handle that was through an

11   instruction or at least a reminder to the jury along the way

12   about nonresponsive questions and gratuitous information.

13         If you ask that question, my greatest concern is

14   that in the heat of that discussion as it occurred

15   yesterday -- so let's talk this through for a moment.  Now,

16   Mr. Larian feels he's in a box because he can't find that or

17   refer back to that when you're doing any questioning at the

18   first trial.  And what we then get is an answer:  *Well, that*

19   *was considered by Judge Larson, because a juror made*

20   *comments about I wouldn't believe somebody of Iranian of*

21   *Jewish descent.*

22         It was much more pointed than that.  Now, we're

23   off and running into even a further problem; and that is,

24   what happened in that first trial?  I mean, who prevailed?

25         On one hand the jury may think that MGA prevailed,

1    and that this was the cause of a new trial when it wasn't.

2    That comment was found by Judge Larson because it came at

3    the end of the proceedings to -- I don't want to use the

4    word "harmless," but he didn't declare a mistrial.  On the

5    other, it can have the opposite effect also.  It can be

6    presumed that Mattel prevailed at the first trial.

7        I've never wanted the jury to know what the

8    verdict was or be in a position of speculating, although

9    it's become more and more evident to the court that the jury

10   now, apparently, has to know that a first trial took place.

11   Those are my concerns.  It's not the immediate problem.

12   It's where this spins out of control, again.  By the same

13   token, as you heard this morning, in my reading last night,

14   I was going to correct that through a series of statements

15   and instructions which is why I had stated in at least three

16   different occasions last night:  *The court has also informed*

17   *the parties that it will continue to instruct the jury*

18   *during this trial.*

19       Now, I know that none of you could foresee exactly

20   what I was going to instruct because I hadn't drafted it

21   yet, last night.  I drafted portions of what I think I

22   wanted to say, but I haven't completed that yet.  There's

23   another part to that; and that is, if the jury determines

24   that there is an, you know, improper question asked designed

25   to elicit emotional testimony, and I haven't gotten that far

1   yet in the instruction.

2          MR. PRICE:  Your Honor, I think Mr. Larian was --

3   what he said was:  *I had made a racist statement.*  Not there

4   were things that happened with the jury.  And I know that

5   he -- during that first trial did tell a reporter that I had

6   on the record in his examination.

7          THE COURT:  That you had?

8          MR. PRICE:  That I had in his examination and his

9   statement, I think, yesterday --

10          THE COURT:  Well, could we pull that portion out

11   at least and see if we can find what we are referring.

12   Because if the question is "can you find it" and the answer

13   is, *No, I can't,* that doesn't mean that we've given a fair

14   look at the transcript.  By the same token, if it's not

15   there, then you got, probably, a pretty good point, and I

16   just would like to see that transcript and have you both sit

17   down and go through it with me.

18          MR. PRICE:  There's nothing there, but I think I

19   do know what he referred to.

20          THE COURT:  Well, let's get to that point, instead

21   of guessing and speculating.  The problem isn't the initial

22   question and answer, necessarily.  It's all the things that

23   start occurring in the heat of combat up here on the witness

24   stand between counsel and witness.  So I'm just going to sit

25   here and watch both of you get out a binder and find it for

1    me.

2           Believe me, I don't have to go to the bathroom,

3    and I don't have to eat, and I don't have to sleep.  So I'm

4    just sitting here waiting for you.

5           MR. PRICE:  I would be proving a negative, but I

6    think I can find what he told me.

7           THE COURT:  It doesn't matter.  I'm sitting here.

8    Everybody is sitting with you.  Except the audience, you can

9    certainly go to lunch, if you would like to, but all counsel

10   will remain.

11      *(Pause.)*

12          THE COURT:  In other words, by the time we're

13   getting into this, instead of speculation, there's nothing

14   like the truth:  What was said and what was the response.

15      *(Pause.)*

16          MR. PRICE:  What we're handing you is what I've

17   been told last trial as far as what was objectionable.

18   There may be something else.

19          THE COURT:  Just gather all the information you'd

20   like.

21          MS. HURST:  I just want to know what pages.

22          MR. PRICE:  At the time, it was 2257, lines --

23   this is June 11th, 2008, 2257, lines 2 through 8.

24      *(Pause.)*

25          THE COURT:  Now, I'm sorry.  Counsel, we're back

1   on the record.

2          What's been presented to me are pages 2256, 2257

3   and 2258 from the first trial.

4          The date is?

5          MR. PRICE:  June 11th.

6          THE COURT:  June 11th, 2008.  Let me read for just

7   a moment.

8      *(Pause.)*

9          THE COURT:  All right.  Let me turn to MGA for

10  just a moment.

11         I've actually read those pages on the prior

12  occasion.  I just didn't pick up the import of 2257, quite

13  frankly.  It must have passed by me.  But my question back

14  to MGA is:  Anything else from that first trial, including

15  opening statement, closing arguments, or during the trial

16  that you would like to present to the court that would

17  justify Mr. Larian's comment?

18         In other words, instead of talking to me about it,

19  give it to me to read.

20         MS. HURST:  All right.  One moment, your Honor.

21         THE COURT:  Actually read.

22     *(Pause.)*

23         MS. HURST:  Your Honor, it's going to take me a

24  few minutes to find the cites.  I'm sorry.

25         THE COURT:  Ms. Hurst, you have all the time in

1    the world.

2         (Pause.)

3              MS. HURST:  Your Honor, we bring to the court's

4    attention page 68, which is the opening statement of

5    Mr. Quinn.

6              THE COURT:  That's what I was looking at,

7    originally.

8              So why don't you just read that for a moment.

9              MS. HURST:  Your Honor, at page 68, lines 6

10   through 14:  *The company was founded by Isaac Larian and his*

11   *brother, Farhad Larian, and there's actually kind of a*

12   *disagreement between the two of them, the brothers, as to*

13   *where the money came from to start the company.*

14              *Mr. Isaac Larian says he came to this country from*

15   *Iran.  He only had $750 in his pocket.  And that really he*

16   *came up with the seed money to start the company.*

17              *Farhad Larian said that their wealthy parents over*

18   *in Iran provided them with the money to start the company.*

19   *So we have two different accounts.*

20              That's page 68, lines 6 through 14.  Your Honor,

21   we would also bring to the court's attention two additional

22   events that occurred.

23              During the voir dire?

24              THE COURT:  Page what?

25              MS. HURST:  On this one, I can't find the page

1  right now, but I believe that --

2          THE COURT:  I have lots of time.

3          MS. HURST:  There was a note from the jury, your

4  Honor.  It's not reflected in the transcript of the

5  proceedings.

6          During the voir dire there was an issue that came

7  up and, eventually, a note was passed about someone -- from

8  a juror about someone in the audience wearing a skull cap,

9  and the issue of the Jewish religion came up.  And that was

10  made known to Mr. Larian.  I'm not saying it was made --

11         THE COURT:  Just a moment.  Was that in front of

12  the jury?

13         MS. HURST:  I believe it was a note during the

14  voir dire.

15         THE COURT:  A note during voir dire.

16         MS. HURST:  And then, of course, your Honor, there

17  was the issue that came up with respect to the

18  deliberations.

19         THE COURT:  I know about the deliberations and all

20  of that.

21         MS. HURST:  And the juror and all of that.

22         THE COURT:  I think you're skipping over my

23  question.  I don't think that's intentional, but I'm going

24  to say it, again:  What in front of the jury was said by

25  counsel?  And I'm going to expand that:  What counsel made

1   comment?

2          MS. HURST:  Your Honor, at sidebar, at pages 327

3   and 328, there was a discussion of Mr. Larian's Judaism and

4   the issue related to the skull cap.

5          THE COURT:  Well, read that.

6          MS. HURST:  And then, your Honor, do I need to

7   provide the court with citations regarding the whole issue

8   on Juror No. 8, or the court's aware of that?

9          THE COURT:  I'm aware of that.  But why don't you

10  make a complete record of it, so the circuit doesn't have to

11  search through, as a courtesy.

12         MS. HURST:  Obviously, that was not a comment by

13  counsel, your Honor.  That was a --

14         THE COURT:  Read it into the record, though.  I

15  want to get all the pertinent parts so later on somebody is

16  not saying that the judge didn't consider the following:  *On*

17  *appeal, we have a concern because the court didn't*

18  *adequately look at the record.*

19         Nonsense.  Ms. Pisoni, are you joining us as

20  counsel?

21         Welcome.  I'm just kidding you.  You're more than

22  welcome to be here.

23      *(Pause.)*

24         MR. QUINN:  While Ms. Hurst is looking --

25         THE COURT:  Issue by issue, Mr. Quinn.  I'm not

1   going to get off track.  That's the usual method of both

2   parties.  Let's take on five other things.  That's been --

3   no criticism of either party.  We'll do this by the numbers,

4   one by one.

5        (Pause.)

6            THE COURT:  If there are any support systems out

7   there for MGA or Mattel, if you have some power bars, or

8   something, you're more than welcome to give them to counsel.

9   They probably won't get a break, so there's enough

10  associates on both sides to go help your lead counsel get

11  some food.  They're here now.

12           Now, this isn't dining at the Ritz.  This is a

13  couple power bars, or something.

14       (Pause.)

15           THE COURT:  I want specifics.  Not generalities.

16           MS. HURST:  Understood, your Honor.

17           The portion in the transcript where the discussion

18  of the juror comment and the mistrial, it begins, I believe,

19  at 5646.  And that is after the comment that Mr. Larian is

20  referring to in his testimony.  But there's no doubt that it

21  colors his recollection of the proceedings.

22           It's many pages.  The whole motion for mistrial

23  related to the Juror No. 8.

24           THE COURT:  This is during the deliberations?

25           MS. HURST:  Right.  What happened during the

1    deliberations; right.

2            THE COURT:  You're jumping around on me.

3            MS. HURST:  I'm sorry, your Honor.  Let me

4    apologize.

5            THE COURT:  Let me do this.  I understand your

6    frustration, but remember --

7            MS. HURST:  No, I'm not frustrated at all.  I'm

8    just apologizing for not giving you what you wanted.  I'm

9    sorry.

10           THE COURT:  Opening statement.  What was made that

11   would cause Mr. Larian to make this gratuitous statement

12   from Mattel's perspective?

13           MS. HURST:  It was the discussion of wealthy

14   Iranian parents, your Honor.

15           THE COURT:  And that was made by Mr. Quinn?

16           MS. HURST:  Correct.

17           THE COURT:  Read that into the record again, or

18   give me the page.

19           MS. HURST:  Page 68.

20           THE COURT:  Page 68.

21           MS. HURST:  Line 6 through 14 I believe was what I

22   read before.

23           THE COURT:  Read it again.

24           MS. HURST:  Okay.  Thank you, your Honor.

25   Actually, why don't I start with line 4.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1          THE COURT:  Line 4.

2          MS. HURST:  *MGA is also a toy company.*

3   *Historically, frankly, they had not been very successful in*

4   *developing new products.  The company was founded by*

5   *Isaac Larian and his brother, Farhad Larian.  And there's*

6   *actually kind of a disagreement between the two of them, the*

7   *brothers, as to where the money came from to start the*

8   *company.*

9          *Mr. Isaac Larian says he came to this country from*

10  *Iran.  He only had $750 in his pocket, and that really he*

11  *came up with the seed money to start the company.*

12         *Farhad Larian said that their wealthy parents over*

13  *in Iran provided them with the money to start the company.*

14  *So we have two different accounts.*

15         THE COURT:  Is that the comment that causes the

16  gratuitous comment that Mr. Price is, basically, a racist?

17         MS. HURST:  No, your Honor.

18         THE COURT:  Now, let's move on.  Let's go to the

19  document you submitted to me:  2256, 2257, 2258.  Is this

20  portion on 2257?

21         QUESTION:  *In fact, you were quoted in that Wall*

22  *Street Journal article as saying that; right?  No risk, no*

23  *reward?*

24         *ANSWER:  I'm not sure if it's the Wall Street*

25  *Journal, but I have said that.  And, again, I apologize for*

1    *my accent, sir.*

2         *QUESTION:  No one has asked you to, and there is*

3    *nothing wrong with an accent.  Can you tell?  I'm from the*

4    *south.*

5         *THE COURT:  Next question, counsel.*

6         Is that the portion that causes the accusation

7    that Mr. Price is a racist?

8         MS. HURST:  Yes, it is.

9         THE COURT:  That is the portion?

10         MS. HURST:  That is the portion that Mr. Larian

11   recollects as being -- I'm not -- I'm just relaying

12   information.

13         THE COURT:  I understand that.

14         MS. HURST:  He --

15         THE COURT:  This is not your personal opinion.

16         MS. HURST:  Correct.  He recollects that *can you*

17   *tell I'm from the south* as a mocking and sarcastic comment

18   that he perceived as directed to ethnicity?

19         THE COURT:  What other part or portion of the

20   transcript leads Mr. Larian, other than the juror's conduct

21   wherein the juror had commented upon, you know, the Jewish

22   faith and the Iranian ethnicity as being a person he

23   wouldn't believe?

24         MS. HURST:  Nothing else other than the arguments

25   surrounding it.

```
 1              THE COURT:  How is Mr. Price tied to that
 2    accusation by Mr. Larian that seems to be rather gratuitous
 3    from the stand?
 4              I would like Ms. Keller to join also, because
 5    Ms. Hurst, I've put you on the spot.  Mr. McConville, any of
 6    you can join.
 7              And, Ms. Hurst, you can certainly finish that
 8    argument, but --
 9              MS. KELLER:  I think, your Honor, it's
10    Mr. Larian's perception that all of these things that he
11    experienced taken in context have led him to his belief
12    today.
13              THE COURT:  That's an excellent argument.
14              Mr. Price.
15              MR. PRICE:  I just started a power bar.
16              THE COURT:  That's all right.
17              MR. PRICE:  Interestingly, I wasn't even there for
18    opening statements and voir dire because my father had
19    passed away.  But Mr. Larian said that I had made a racist
20    comment, and I think it's fair to have the jury know what he
21    says that was.
22              THE COURT:  If the court hadn't previously felt
23    that there was a habit pattern developing, as I had stated
24    in my summary last evening and it was one comment, I
25    wouldn't be concerned.  But I am concerned.  It's repeated.
```

1    I want to be very careful not to make a finding that it's

2    either intentional or unintentional, volitional or

3    nonvolitional.  I'll leave that to the jury.  But you're

4    going to be allowed to inquire into that, counsel.

5            Second, I want to remind you I'm not a

6    fact-finder.  I really don't know what to do with the

7    statement concerning Carter Bryant, but the court is not

8    going to enter into finding whether he had a stroke, or

9    didn't have a stroke, or if he went to the hospital.  But it

10   will be -- apparently, Mr. Bryant is going to be forced to

11   return; that he's probably on two legs and still breathing,

12   hopefully.

13           MS. KELLER:  Your Honor, the issue with asking

14   Mr. Larian about it is that it really does have to be put in

15   context; and if we put it in context, we have a lot of

16   problems.  This was a really searing experience for him, and

17   that particular juror who created the problems, I think it's

18   infected his thinking to the point where he can no longer

19   sort it all out very easily.

20           THE COURT:  Well, we take our witnesses as we find

21   them.  And that means preparation, preparation, preparation.

22   All counsel have done an outstanding job.  Let me repeat on

23   the record, but I'm not in the position where I'm going to

24   protect any of these witnesses.  And if that's the way the

25   witness chooses to answer, we find our witnesses as we find

1    them, just like our victims.

2          So, counsel, you're going to be inquiring.  That's

3    the end of the discussion.  I'm going to allow you to do so.

4          MR. PRICE:  Thank you, your Honor.

5          THE COURT:  Now, everyone is put on fair notice

6    about this.  There's no surprise.  And I'm going to back up

7    what I said.

8          Now, what I'm not going to do, though, is instruct

9    immediately concerning nonresponsiveness or gratuitous

10   information.  I think coming right during Mr. Larian's

11   testimony, it's very pointed.  I'm going to do that at some

12   point, a witness down the line, and I'm also going to

13   include some section concerning questions that might be

14   invoked to cause a response.  So I haven't quite completed

15   my thoughts on that, and I need more time.

16         Okay.  Now, what are we going to do next?

17         MR. PRICE:  Use the bathroom?

18         MS. KELLER:  I think we have some exhibits, your

19   Honor.  We were presented with some from -- new ones from

20   Mattel this morning, and we have a few new ones as well.

21         THE COURT:  Sure.

22         Who shall I gather with?  In other words,

23   Mr. McConville and Mr. Quinn, so we can let our lead counsel

24   get a little bit of rest.  So Mr. Price, why don't you grab

25   a bite, or use the bathroom?

```
 1              And Ms. Keller, why don't you, because I don't
 2     know when you're up?
 3              Mr. McConville will remain with me.  Ms. Hurst.
 4     Mr. Zeller, good.  And Mr. Quinn.
 5         (Pause.)
 6         (The following proceedings were had in open court
 7          in the presence of the jury:)
 8              THE COURT:  We're back on the record.
 9              The jury is present.  The alternates.  All
10     counsel.  The parties.
11              Mr. Larian is on the stand.
12              Mr. Price, if you would like to continue, please.
13                        DIRECT EXAMINATION
14     BY MR. PRICE:
15     Q.   Good afternoon, Mr. Larian.
16     A.   Good afternoon.
17     Q.   I want to go back just for a second to Mr. Castilla.
18     And I believe your testimony was that after 2005 your
19     inventory issues got worse so that hiring Mr. Castilla,
20     obviously, would not help that.
21              Do you recall that?
22     A.   Nothing has helped so far.
23     Q.   So nothing has helped in connection with the
24     forecasting system?
25     A.   No, not yet.
```

1  Q.   Getting worse and worse?

2  A.   It's not getting better.

3  Q.   I think you said that it actually gotten worse?

4  A.   Yes, it has gotten worse.

5       MR. PRICE:  Your Honor, I would like to read from

6  Mr. Larian's deposition.  It's page 1604.  Let me get the

7  date.

8       *(Pause.)*

9       MR. PRICE:  January 19, 2010, particularly 1604,

10  lines 10 to 21.

11       *(Pause.)*

12       THE COURT:  Counsel.

13       THE WITNESS:  Go ahead.

14       MR. PRICE (Reading):

15  *QUESTION:  Do you have any recollection after this*

16  *April 17th, 2005 time period that's shown here reflected in*

17  *Exhibits 7890 and 7891 whether particular steps were taken*

18  *in connection with the forecasting system?*

19  *ANSWER:  No.*

20  *QUESTION:  Do you know one way or another whether*

21  *it got better or worse after that time period?*

22  *ANSWER:  I think we getting better every day.*

23  *QUESTION:  When you say "every day," you're*

24  *talking about the current time period?*

25  *ANSWER:  Every time we getting better.*

```
 1   BY MR. PRICE:
 2   Q.   Mr. Larian, I think we were talking about Mr. Cooney.
 3            What was your knowledge of Mr. Cooney, prior to
 4   2008?
 5   A.   Excuse me.  During this location -- during this
 6   litigation, you mean?
 7   Q.   Prior to -- yeah, to litigation.  What was your
 8   knowledge of Mr. Cooney?
 9   A.   Prior to litigation.  I don't know when he started MGA,
10   so I don't have a date in my mind when he started MGA.  He
11   was a salesman at Toys "R" Us, if that's your question.  He
12   worked for Mattel.
13   Q.   And at some point he joined MGA; correct?
14   A.   That's correct.
15   Q.   And at some point, you came to learn that when he left
16   Mattel that he put some Mattel documents on a CD?
17   A.   I learned about that during litigation.
18   Q.   And do you have any knowledge of what documents he put
19   on a CD from Mattel?
20   A.   Yes, I do.
21   Q.   Do you know whether he downloaded a Promo Matrix?
22   A.   I don't know the name of it, but I know --
23            MS. KELLER:  Objection.  Irrelevant.
24            THE COURT:  Overruled.
25            MS. KELLER:  Prior court's rulings.
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
 1              THE COURT:  Overruled.
 2   BY MR. PRICE:
 3   Q.   Let me ask you if you recognize this.  It's 23751.
 4              MS. KELLER:  Your Honor, this document the court
 5   had already ruled on.
 6              THE COURT:  I thought that the -- perhaps, I have
 7   it confused with another document.  I apologize.  Could I
 8   see it?
 9              I've got all my binders.  It's just easier if
10   counsel will get it for me.  It takes less time.
11        (Pause.)
12              THE COURT:  I don't have any recollection of
13   ruling on this, counsel.
14              MS. KELLER:  At summary judgment, your Honor.
15              THE COURT:  Overruled.
16              MS. HURST:  Motion in limine 43, your Honor.
17              THE COURT:  Okay.  Thank you very much.
18   Overruled.
19              MS. HURST:  Your Honor --
20        (Pause.)
21              MS. KELLER:  Your Honor, there is no foundation as
22   well for this.
23              THE COURT:  We'll find out if he recognizes it,
24   first.
25   ////
```

1    BY MR. PRICE:

2    Q.    Mr. Larian, do you recognize 23751?

3    A.    I have never seen this.  Even during the litigation.

4           THE COURT:  You testified concerning 30(b)(6) on

5    this?

6           MS. KELLER:  No.

7           MR. PRICE:  Not on this.

8           THE COURT:  This was brought up at summary

9    judgment, counsel, but those rulings, of course, do not

10   apply to the court, as counsel well knows on both sides.

11   The case law is replete with that.

12          Counsel, how do we deal with this with a

13   "Confidential for Attorney's Eyes Only"?

14          MR. PRICE:  Let me find out from my colleagues.

15          I understand that's been lifted.

16          THE COURT:  It's my understanding also.  I don't

17   think it's a privileged document.

18          MS. KELLER:  Your Honor, there is no foundation

19   for it.

20          THE COURT:  No, I understand the foundation.

21   Let's get into privilege, first.  It's not a privilege

22   document.  It's been lifted.

23          So what we need, counsel, is foundation, but it

24   comes from MGA.

25          Is that a MGA mark?

1          MS. KELLER:  Your Honor, he's not on this e-mail.

2          THE COURT:  No, I understand that.  But isn't this

3     a MGA mark?

4          MS. KELLER:  It is.

5          THE COURT:  So MGA produced.  So let's ask him if

6     he's aware of it.  If he has no foundation, then he's not

7     aware of it, we'll know that; if he is, then he can testify

8     to it.

9     BY MR. PRICE:

10    Q.   So, Mr. Larian, you do see at the bottom, it has an MGA

11    Bates number.  That's what we have been referring to.

12    A.   Yes.

13    Q.   So the question is:  Do you know what this document is?

14    A.   I have no idea what this is.

15    Q.   Do you know what "Little Tikes" is?

16    A.   Yes.  I know what Little Tikes is.

17    Q.   What is Little Tikes?

18    A.   It's a company we owned.

19         THE COURT:  Ladies and gentlemen, I'm going to

20    allow the receipt of this.  Let me explain to you.  Lack of

21    foundation is well taken as an objection.  But presidents of

22    companies, maybe they don't know all things; but by the same

23    token, maybe they know a lot of things.  Maybe this is

24    relevant under these circumstances.  It's produced by MGA,

25    just as we'll find later on, Mattel has produced different

1   documents.

2            The court's first to recognize that possibly

3   Mr. Larian doesn't recognize this.  But that doesn't mean

4   that there may not be some information in here that's

5   relevant that he can testify to.

6            So instead of bringing him back on the stand

7   unnecessarily, overruled.

8            Counsel.

9            MR. PRICE:  Thank you, your Honor.

10  BY MR. PRICE:

11  Q.   If we can look at the first page.

12           Could you tell us who Dave Dutton and Sean Randall

13  are?

14  A.   I have no idea.

15           THE COURT:  By the way, when the president of

16  Mattel testifies, Mr. Eckert, we'll afford him the same

17  courtesy.  He will be responsible for his company, as

18  Mr. Eckert is -- as Mr. Larian is for his.

19           THE WITNESS:  I don't know who they are.

20  BY MR. PRICE:

21  Q.   Little Tikes is a company, though, that MGA purchased?

22  A.   That's correct.

23  Q.   When did MGA produce Little Tikes?

24  A.   2006.

25  Q.   And you see here, there is an e-mail from Mr. Cooney,

1   dated November 10, 2006.

2           I take it that MGA purchased Little Tikes before

3   then?

4   A.   I really don't remember the exact date.  I don't know.

5   I cannot testify to that, one way or other.  I don't know

6   the exact date we bought it.  I know it was in 2006.

7   Q.   Have you ever heard of a Promotion Matrix?

8   A.   Never heard of it.

9   Q.   If you look at the third -- it's the second page, but

10  it's 23751-00003.

11          Do you see that?

12  A.   Yes.

13  Q.   And there's something at the bottom of it:  "Mattel,

14  Inc. Confidential."

15          Do you see that?

16  A.   I do.

17  Q.   Okay.  And do you know how that made it on the

18  document?

19  A.   I have no idea.

20          THE COURT:  Just a moment, counsel.  I'm on

21  page 3.

22          MR. PRICE:  It's 23751-0003, and we're looking at

23  the bottom left of the page.

24          THE COURT:  Could you highlight that for me?  I

25  don't know where that is.  I can't find it.

1          MR. PRICE:  It's bottom left, right above the --

2          THE COURT:  Oh, I'm sorry.  Thank you.  I was

3     looking at the line item.

4     BY MR. PRICE:

5     Q.   And then, if you look at 23751-00013.

6     A.   Same document, page 13?

7     Q.   Yes.

8     A.   Yes.

9     Q.   And if you look at the bottom of that, you see it says:

10    "MGA Entertainment Confidential"?

11    A.   Yes.

12    Q.   And would MGA Entertainment put these sorts of

13    designations on its internal confidential information?

14    A.   I have no idea about this document.  I've never seen

15    it.  I don't know what it is.  Very strange.

16          MS. KELLER:  Your Honor, this was expressly

17    dropped by Mattel, this trade secret.

18          THE COURT:  Thank you.  It doesn't go to the trade

19    secret claim.  It goes to confidentiality and what

20    Mr. Cooney is downloading.

21          Overruled.

22    BY MR. PRICE:

23    Q.   You and your family own 100 percent of MGA; is that

24    right?

25    A.   Yes.  Me and my sister, yes.  It's a family-owned

1    business.

2    Q.   And the time period that you bought Little Tikes, was

3    that also a time period in which MGA was owned by you and

4    your sister?

5    A.   And my brother-in-law.  It's a family-owned business.

6    We're immigrants.

7    Q.   What percentage of MGA do you own?

8    A.   About 81 percent.

9    Q.   And it's correct, is it not, that you were involved in

10   Mr. Cooney's hiring?

11   A.   I don't recall if I was or not.  I don't remember.

12   Q.   If you would look at 20838.

13   A.   I'm sorry?

14   Q.   It's 20838.

15   A.   It's the same?

16   Q.   I'm not sure if it's in the same binder.  It's 20838.

17          THE COURT:  Certain claims may or may not be

18   before you, just as Ms. Keller and Ms. Hurst just stated.

19   The only import of this evidence is to the trade secret

20   misappropriation claim and whether this is confidential

21   information or not, how it gets to MGA or doesn't and who

22   these people are and what the knowledge is or isn't.

23   BY MR. PRICE:

24   Q.   Do you see 20838 at the top as being an e-mail between

25   you and Ron Brawer?

1    A.   Yes.

2              MR. PRICE:  I move 20838 into evidence, your

3    Honor.

4              THE COURT:  Received.

5         *(Plaintiff's Exhibit 20838 received in evidence.)*

6    BY MR. PRICE:

7    Q.   And does this reflect your recollection that you told

8    Mr. Brawer to go ahead and hire Mr. Cooney?

9    A.   Yes.

10   Q.   And that was on April 26, 2006; correct?

11   A.   That's the date of this e-mail; correct.

12   Q.   Now, I want to talk to you -- go back to, around 2004

13   time frame.  At that time, MGA had a distributor for Bratz

14   in Mexico; correct?

15   A.   2004, I don't know what 2004 -- if it was 2004 or 2003,

16   but Hasbro was a distributor for MGA Mexico.

17   Q.   At that time, you thought that Hasbro wasn't paying

18   enough attention to Bratz as a distributor?

19   A.   That's correct.

20   Q.   And because they weren't paying enough attention to

21   Bratz as a distributor, you didn't have much of a presence

22   in Mexico at that time; correct?

23   A.   Well, I wasn't happy with the distribution they had.

24   Q.   You thought that with a change that you might be able

25   to get a greater presence in the Mexico area; correct?

```
1    A.    That's correct.

2    Q.    And so at some point, you went to interview three --

3    two gentleman and one woman, in Mexico, in connection with

4    forming a Mexico MGA subsidiary; right?

5    A.    That's correct.

6    Q.    And those folks were Gustavo Machado?

7    A.    Yes.

8    Q.    Pablo Vargas?

9    A.    Yes.

10   Q.    And Mariana Trueba?

11   A.    Yes.

12   Q.    So there was a trip where you went to Mexico and you

13   met with Mr. Machado; correct?

14   A.    Yes.

15   Q.    And you're not sure one way or another whether in that

16   first trip you met with Mr. Vargas and Ms. Trueba.

17   A.    I don't remember if they were in the same meeting or

18   different.

19   Q.    And at some point, you decided you wanted to create

20   this Mexican subsidiary with these individuals; correct?

21   A.    That's correct.

22   Q.    And at the time you spoke with them, they were working

23   for Mattel in Mexico; correct?

24   A.    Yes.

25   Q.    And if you look at Exhibit 3601 --
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    A.    Go ahead.

2    Q.    And you recognize that as the e-mail string between you

3    and someone identified on here as Susana, around February 5,

4    2004; correct?

5    A.    Yes.

6            MR. PRICE:  Your Honor, move Exhibit 3601-000001

7    into evidence.

8            THE COURT:  Received.

9        *(Plaintiff's Exhibit 3601-000001 received in*

10       *evidence.)*

11           MR. PRICE:  We can show that, Ken.

12       *(The exhibit was displayed on the screen.)*

13   BY MR. PRICE:

14   Q.    Let's look at the bottom part.

15           And you see it says from, looks like,

16   argentrade@aol.com.

17           You have an understanding of who sent this e-mail;

18   correct?

19   A.    I'm sorry?

20   Q.    You have an understanding of who it was that sent this

21   e-mail?

22   A.    Yeah, it says on the bottom:  Susana Kuemmerle.

23   Q.    Susana Kuemmerle, can you tell us what her position was

24   at the time in 2004 when she sent you this e-mail?

25   A.    She was independent sales representative for MGA.

1   Q.   And if we look, she says:  *Yes, we can pull the best*

2   *from Mama Mattel Mexico, ex-Tyco employees that I know.  I*

3   *have some of the info already.  Where are you?*

4          Do you see that?

5   A.   I do.

6   Q.   And she is talking about the ex-Tyco employees.  Did

7   you come to learn among the people she was talking about

8   were Mr. Machado?

9   A.   Yes.

10  Q.   And did you come to learn that she was also going to

11  refer you to Mr. Vargas and Ms. Trueba?

12  A.   No.  Because I think this is dated February 5.  And

13  what I recall next was, we went to the New York toy fair,

14  and she introduced Gustavo to me.

15  Q.   Okay.  The toy fair, we see this is February 5.

16  A.   Yes.

17  Q.   What time was the New York toy fair?

18  A.   I believe just around Valentine's Day.

19  Q.   And was Tyco a Mattel company?

20  A.   Yes.  At the time, yes.  Before that they were not.

21  Mattel had purchased it.

22  Q.   So at the New York toy fair, Mr. Machado was at the toy

23  fair in New York; correct?

24  A.   He was.

25  Q.   And you had an initial meeting with him?

```
 1   A.   Yes.

 2   Q.   After that initial meeting, shortly thereafter, you and

 3   I think it was Thomas Park went to Mexico?

 4   A.   We went to Mexico.  I don't know how -- how far after

 5   that meeting.

 6   Q.   You recall that in Mexico City with Ms. Kuemmerle --

 7   A.   Kuemmerle.

 8   Q.   -- that you met at the W Hotel in Mexico City?

 9   A.   Yes.

10   Q.   And at that meeting, you had Mr. Machado, Mr. Vargas

11   and Ms. Trueba?

12   A.   Again, I don't remember if they were all together or

13   not.  But I met them there in Mexico at the W Hotel.

14   Q.   When you went there, you knew that they were planning

15   on making a presentation to you; right?

16   A.   I had no idea.  I don't remember if I did or not.

17   Q.   Okay.  Let's look at 22408.

18   A.   Yes.  Go ahead.

19   Q.   And do you recognize 22408 as e-mails between you and

20   Ms. Kuemmerle and Thomas Park?

21   A.   Yes.

22   Q.   And Mr. Park was at this time the COO?

23   A.   Yes.

24   Q.   Chief operating officer?

25   A.   Yes.
```

42

1           MR. PRICE:  Your Honor, I move Exhibit 22408 into

2    evidence.

3           THE COURT:  Received.

4        (Plaintiff's Exhibit 22408 received in evidence.)

5    BY MR. PRICE:

6    Q.   If we look at the bottom e-mail here, you see that's an

7    e-mail dated February 24, '04 from Ms. Kuemmerle to, among

8    others, you and Mr. Park.

9           Do you see that?

10   A.   I do.

11   Q.   Who is the other -- there's a Shirin Makabi?

12   A.   That's my sister sitting right behind you.

13   Q.   Okay.  I'll have to look later.  I don't have eyes in

14   the back of my head.

15          You see it's regarding Mexico; right?

16   A.   Yes.

17   Q.   You received this before you went down to meet at the

18   W Hotel?

19   A.   That's correct.

20   Q.   And the e-mail to you says:  *Perfect.  The people in*

21   *Mexico want to show us some retail points during the*

22   *weekend.  Is anybody interested in seeing this?  Best*

23   *regards, Susana.*

24          Do you see that?

25   A.   Yes.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

 1    Q.    And your response here at the top was:  *Yes.*

 2    A.    Yes.

 3    Q.    Does this refresh your recollection that when you went

 4    to Mexico, you knew that, quote, the people in Mexico wanted

 5    to show you some retail points?

 6    A.    It doesn't refresh my memory, but I guess that's what

 7    they wanted to show.

 8    Q.    When you went there, there was some presentation;

 9    right?

10    A.    I don't recall the presentation.  There might have

11    been, but I don't recall it.  It's very possible they had,

12    but I don't just recall it.

13    Q.    Let me show you Exhibit 6754.

14    A.    *(Witness so complies.)*

15    Q.    If you look through that, Mr. Larian, and I'm going to

16    be asking whether or not you recognize that as a

17    presentation that was made by you, in Mexico City, in 2004?

18            MR. OVERLAND:  Object as misstating the evidence.

19            THE COURT:  That's Mr. Overland, on behalf of

20    Mr. Machado.

21    BY MR. PRICE:

22    Q.    Mr. Larian, I'm looking through 06754.

23    A.    It's many pages.  Should I just go through every page?

24    Q.    Look through it and tell me whether or not you

25    recognize all or a portion of this as being a presentation

1    that was made to you when you went to Mexico City, in March

2    of 2004?

3    A.    Okay.

4            THE COURT:  Counsel, hasn't Mr. Larian been shown

5    this before?

6            MS. HURST:  Yes, and he didn't recognize it then

7    either.

8            THE COURT:  Counsel, do you know?  Has he been

9    shown this before?

10           MR. PRICE:  I'll take Ms. Hurst's representation.

11           THE COURT:  Well, I don't mean whether he

12   recognizes it or not.

13           And we're going to strike that comment by

14   Ms. Hurst.  I mean, has he seen these documents?  Have they

15   been put before him at deposition before?

16           So at least he ought to recognize if he's seen

17   these before; correct?

18           MR. PRICE:  Yes.

19           THE COURT:  All right.

20           THE WITNESS:  Again, I still don't recognize it.

21   I don't remember if they showed this to me or not.

22   BY MR. PRICE:

23   Q.   Earlier this morning, you mentioned something about you

24   being a 30(b)(6) witness?

25   A.    Yes.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    Q.    And one of the things -- well, let's step back.

2           Your understanding of a 30(b)(6) witness is that

3    you were testifying as a MGA representative about certain

4    topics; correct?

5    A.    My understanding is that I'm just like an empty vessel,

6    and the attorneys try to tell me these are the things and

7    you go and talk about it.  That doesn't mean that I knew

8    about it.

9    Q.    Well, for the deposition you were supposed to be

10   briefed so that you could testify about topics that were

11   designated; correct?

12   A.    That's correct.

13   Q.    And MGA, with respect to those topics, could have

14   chosen anyone to be that what you've called empty vessel;

15   correct?

16   A.    Unfortunately, they chose me.

17   Q.    Well, did they choose you, or did you choose you?

18   A.    I think I chose me.

19   Q.    Okay.  So this was a situation where there's a

20   deposition and the lawyers could have educated anyone to

21   testify about the topics as a representative of MGA, but you

22   wanted -- you chose yourself to do it?

23   A.    I don't remember exactly if -- one way or another.

24   But, again, I was asked and I said, *Yeah, I'd be the*

25   *30(b)(6).*

46

1   Q.   Your testimony at the 30(b)(6) -- your testimony not of

2   yourself individually but the testimony of the company.

3           Do you understand that?

4   A.   I guess -- I'm not a lawyer.  I guess -- I guess

5   30(b)(6) is the company, yes, then.  Yes.

6   Q.   And one of the things that you were designated as the

7   company representative to testify about were searches and

8   seizures of documents by Mexican authorities from MGA's

9   Mexico City offices and then related communications in

10  connection with that?

11  A.   I believe so.

12  Q.   So in connection with that empty vessel, did you see

13  Exhibit 6754?

14  A.   I think so.  Again, there was so many documents.  I

15  didn't memorize all of them.  If that was in my folders, I

16  must have seen it.

17          MR. PRICE:  I'm going to move Exhibit 6754 into

18  evidence.

19          THE COURT:  Received.

20      (Plaintiff's Exhibit 6754 received in evidence.)

21  BY MR. PRICE:

22  Q.   If you just look through this, there's some information

23  about -- for example, 6754-00004, you'll see there is some

24  information starting about -- the economics in Mexico.

25          Do you see that?

1    A.   Yes.

2    Q.   And it talks about economic indicators, stores by

3    region, things like that.

4              Do you see that?

5    A.   On this page, it talks about --

6    Q.   You look through the pages.  Like, for example,

7    6754-00011, you see there's some kind of presentation of

8    self-service, stores by region.

9              Do you see that?

10   A.   Yes.

11   Q.   And some of the information -- look, for example, at

12   6754-00040.

13   A.   *(Witness so complies.)*  Yes.

14   Q.   There is a chart there, and it says:  "Source:

15   Nielson"?

16   A.   Yes.

17   Q.   Now, prior to this time MGA was using, I think, Hasbro

18   as a distributor?

19   A.   Yes.

20   Q.   And there are services you can subscribe to, to pay to

21   get information about the toy market; right?

22   A.   Yes.

23   Q.   Before you opened MGA Mexico, was MGA paying for that

24   kind of information about Mexico?  Were they a subscriber?

25   A.   I don't think we were.  Hasbro, I'm sure was.  MGA,

1    directly, no, we didn't have an office there.

2    Q.    And so what we see at 6754-00040, you see it says:

3    "Source:  Nielson"?

4    A.    Yes.

5    Q.    So someone had to pay for that information to get it;

6    correct?

7    A.    I assume so.

8    Q.    And your understanding is as of that date, MGA wasn't

9    paying for that service and that information?

10   A.    I don't know we were or not.  I don't know.

11   Q.    There's no doubt that you knew that what you were

12   getting in this presentation was information from Mattel

13   employees; correct?

14   A.    I don't even remember this presentation being made to

15   me when I was in Mexico.

16   Q.    So you remember a presentation being made to you?

17   A.    No, I don't.  I saw that e-mail saying that they're

18   going to make a presentation.  I just don't remember the

19   presentation.  It's very well possible that they made this

20   presentation.  I just don't have a memory of it.

21   Q.    There is no doubt that the people you were meeting with

22   at the W Hotel -- Mr. Machado, Mr. Vargas and Ms. Trueba --

23   were at that time employees of Mattel Mexico?

24   A.    That's correct.  They were.

25   Q.    Now, as MGA's 30(b)(6) witness -- let me strike that.

1          You eventually had the understanding that after

2    meeting with you, in March 2004, that Mr. Machado,

3    Mr. Vargas and Ms. Trueba went to Mattel and started

4    downloading information?

5    A.   I learned this during this litigation.  After they

6    left, I don't know if it was after or before they left, but

7    I know that they downloaded information from Mattel against

8    our advice.

9    Q.   Was this one of those situations where you said, *Just*

10   *bring your brain*?

11   A.   I told them to bring their brain, absolutely.

12   Q.   But in any event, you have come to learn that they

13   brought more than their brain?

14            MR. OVERLAND:  Objection.  Vague as to time.

15            THE COURT:  Overruled.

16            THE WITNESS:  I learned afterward, yes,

17   unfortunately, they brought more than their brain.

18   BY MR. PRICE:

19   Q.   And as of March 17, 2004 -- let me strike that.

20            As of March 17, 2004, Mr. Machado, Mr. Vargas and

21   Mr. Trueba were, at that point, willing to come see you in

22   L.A. and start working to create a MGA Mexico?

23            MR. OVERLAND:  Objection.  Calls for speculation.

24   It's the state of mind of others.

25            THE COURT:  Overruled.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
 1            THE WITNESS:  I'm sorry.  Can you repeat the
 2   question?
 3   BY MR. PRICE:
 4   Q.   In fact, let me give you Exhibit 3609.
 5            THE WITNESS:  One thing I just want to go back to,
 6   this exhibit that he just showed me on that page, which I
 7   just noticed, page 40.  It shows "Toy Sensuality 2003," and
 8   I thought we were talking about 2004.  It says "2003."
 9   BY MR. PRICE:
10   Q.   Now, if you'll look at Exhibit 3609-0001.
11            Do you recognize this as communications between
12   you, Mr. Machado, Mr. Vargas and Ms. Trueba?
13   A.   Yes.
14            MR. PRICE:  Your Honor, move Exhibit 3609-0001 --
15   actually, just 3609 into evidence.
16            THE COURT:  Received.
17       (Plaintiff's Exhibit 3609 received in evidence.)
18   BY MR. PRICE:
19   Q.   I would like you to look at the top e-mail, and you see
20   that's from you to plot04@yahoo.com and Susana.
21            Do you see that?
22   A.   I do.
23   Q.   And "Susana" is Ms. Kuemmerle; right?
24   A.   Yes.
25   Q.   And "plot04" was the e-mail address that Mr. Machado,
```

1    Mr. Vargas and Ms. Trueba were using; correct?

2    A.    I believe so, yes.

3    Q.    And in that first e-mail, you say we need copies of any

4    employment agreements you currently have.  And that's

5    urgent.

6                 Do you see that?

7    A.    Yes.

8    Q.    Did you get copies of those employment agreements?

9    A.    I don't know if we did or not.

10   Q.    And in the e-mail below that --

11   A.    Yes.

12   Q.    -- that's from -- you see it's Carlos Fuentes, plot04?

13   A.    This says "Carlos Fuentes," then in parentheses.

14   Q.    Can you tell us what was your understanding as to who

15   was using the name Carlos Fuentes at the e-mail address

16   plot04?

17   A.    I have no idea.  Today still I don't know who is Carlos

18   Fuentes.

19   Q.    Well, you knew it was either Mr. Machado, Ms. Trueba,

20   or Mr. Vargas; right?

21   A.    Well, yes, I think the e-mail is the e-mail address

22   that they're using, so I assumed that's what it meant.

23   Q.    And at this point, your father was ill at this time

24   frame; correct?

25   A.    He was.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
1    Q.   And they give you regards and kind of apologized for, I
2    guess, kind of intruding at that point.  I mean, they
3    apologize for -- don't worry.  We understand your mind is
4    with your dad now and please receive our best wishes for his
5    prompt recovery.
6    A.   That's what it says.  Can we move on?
7    Q.   And the P.S., you see it says:  We are very excited too
8    and ready for war.  We are ready to travel on March 25th at
9    night.  Please confirm if this date is okay with you.
10   A.   Yes, I see that.
11   Q.   And when they say We're to travel on March 25th at
12   night, it was your understanding that they were ready to fly
13   to Los Angeles on the night of March 25th to meet with you?
14   A.   Probably, yes.
15   Q.   And at this time, they're talking to you about being
16   excited and ready for war.  At this time, was your
17   understanding that they were still Mattel employees?
18   A.   I don't know at this time or not.  I don't know.
19   Probably they were still Mattel employees.  I don't know.
20   Again -- yes, because I think -- yes, they were, because
21   we're asking for their employment agreements at the top.  If
22   you go to the top.
23   Q.   Yes.  You were asking for the employment agreements?
24   A.   Yes.  They were still Mattel employees.
25   Q.   So they are telling you that they are ready for war.
```

```
 1              Did you understand that meant to compete with
 2   Mattel?
 3   A.   Yes.  Or Hasbro, or other people.
 4   Q.   And they are telling you that they're ready for that
 5   while they're still working at Mattel?
 6   A.   Yes.
 7   Q.   And before they had gotten job offers?
 8   A.   Yes.
 9   Q.   Okay.  So if you look at 6416, Exhibit 6416 --
10   A.   (Witness so complies.)
11   Q.   -- do you recognize this as an e-mail from you to
12   plot04 with an attachments of offer letters?
13   A.   Yes.
14              MR. PRICE:  Your Honor, I move Exhibit 6416 into
15   evidence.
16              THE COURT:  Received.
17        (Plaintiff's Exhibit 6416 received in evidence.)
18   BY MR. PRICE:
19   Q.   So by this communication, you were sending to
20   Mr. Machado and Ms. Trueba and Mr. Vargas offer letters to
21   join MGA Mexico?
22   A.   Yes.
23   Q.   And if we look at the first letter -- let's go to
24   page 0002 -- that's a letter to Mr. Machado which contains
25   what you are offering him in terms of salary and vacation,
```

1    et cetera; right?

2    A.    Yes.

3    Q.    If we look at the next page, you see that it says:

4    "Sincerely, Isaac Larian, CEO"?

5    A.    Yes.

6    Q.    MGA de Mexico.

7          Do you see that?

8    A.    Yes.

9    Q.    So as of this date, you were representing yourself to

10   be the chief executive officer of MGA Mexico; correct?

11   A.    Yes.

12   Q.    And then, we have in this document the offer letters

13   for Mr. Vargas and Ms. Trueba; correct?

14   A.    Yes.

15   Q.    If you look at 3617 --

16   A.    *(Witness so complies.)*

17   Q.    And do you recognize this as an e-mail from you to

18   Ms. Kuemmerle and Mr. Park around April 14 of 2004?

19   A.    I don't recollect anything yet.  She's getting it.

20   Q.    Hopefully, you will.

21   A.    Go ahead.

22   Q.    So do you recognize Exhibit 3617?

23   A.    Yes.  An e-mail, but I'm on it.

24         MR. PRICE:  Move 3617 into evidence.

25         THE COURT:  Received.

 1          *(Plaintiff's Exhibit 3617 received in evidence.)*

 2    BY MR. PRICE:

 3    Q.    And you see the first e-mail in that string is to you

 4    from Ms. Kuemmerle; right?

 5    A.    That's correct.

 6    Q.    And she says:  *Hello, just arrived from South America*

 7    *and talked with Gustavo Machado.  As of today, they have not*

 8    *received the contracts.  Machado talked with the Mexican*

 9    *lawyers and he was told that they do not have a power of*

10    *attorney to handle these contracts.*

11              Do you see that?

12    A.    Yes.

13    Q.    So there was some issue about getting the contract

14    signed as of April 14 of 2004?

15    A.    That they didn't receive their contract, I guess.

16    That's what it meant.

17    Q.    And then, Ms. Kuemmerle writes:  *Gustavo, Mariana and*

18    *Pueblo want to resign (all at the same time and you can't*

19    *believe my smile!) next Wednesday.  But without a contract*

20    *signed, they will not be able to do it.*

21              Do you see that?

22    A.    Yes.

23    Q.    The plan or your understanding of what they were

24    planning to do was to all three resign from Mattel Mexico at

25    the same time and then start up the MGA Mexico office?

1    A.   Yes.

2    Q.   And your response to this was, including Mr. Parks,

3    saying:  *Tom told me the contract is done.  Please follow*

4    *up*?

5    A.   Yes.

6    Q.   Now, look at 3618.

7    A.   Go ahead.

8    Q.   Do you recognize 3618?

9    A.   Yes, I'm remember seeing it.

10            MR. PRICE:  Your Honor, I move Exhibit 3618 into

11   evidence.

12            THE COURT:  Received.

13       *(Plaintiff's Exhibit 3618 received in evidence.)*

14   BY MR. PRICE:

15   Q.   And do you see the e-mail at the bottom is sent to you

16   on April 21, 2004 from that plot04 e-mail address?

17   A.   Yes.

18   Q.   And it's from Mr. Machado?

19   A.   It is.  Bless you.

20   Q.   And he says:  *Hello, new boss.  As you might have*

21   *heard, we resigned yesterday and let me tell you, quote,*

22   *Rome is on fire.  We left the office at 1:30 p.m. yesterday*

23   *and since then they have already made 10 changes in the*

24   *staff.  We are driving them crazy!!!*

25            Do you see that?

57

A.    I do.

Q.    And when you received this, you understood that

although he was referring –– he said *Rome was on fire* that

that referred to Mattel?

A.    Yes.

Q.    And that at this point, Mr. Machado and Mr. Vargas and

Ms. Trueba, again working on a business plan to get MGA

Mexico off and running?

          MR. OVERLAND:  Objection.  Calls for speculation.

No personal knowledge.

          THE COURT:  Overruled.

          You may answer the question.

          THE WITNESS:  I don't know if they did or not.

BY MR. PRICE:

Q.    Well, look at the 8859.

A.    *(Witness so complies.)*

Q.    Do you have 8859 in front of you?

A.    Give me a minute to review it.  Yes, I do have it.

          MR. PRICE:  Your Honor, move Exhibit 8859 into

evidence.

          THE COURT:  Received.

     *(Plaintiff's Exhibit 8859 received in evidence.)*

BY MR. PRICE:

Q.    You see at the top of this is to "Isaac, Tom", and

that's you and Mr. Park; correct?

1    A.   Yes.

2    Q.   It says:  *We've been thinking of a handful of issues.*

3    *We should be talking when we are with you in L.A. next week,*

4    *aside from seeing the line and begin with the commercial*

5    *plan.*

6            Do you see that?

7    A.   I do.

8    Q.   So this is something that they came up with, that is,

9    Mr. Machado, Ms. Trueba and Mr. Vargas; that they created

10   this to send to you before coming to Los Angeles to see the

11   line and begin the commercial plan.

12           MS. KELLER:  I going to object, your Honor.

13           No foundation.  There is no signature.  No date,

14   no showing who it's from.

15           THE COURT:  Can I see the stamp on it down at the

16   bottom?

17           MR. PRICE:  Yes.

18           THE COURT:  Overruled.

19           THE WITNESS:  I see this document.  I don't

20   remember this document at all.

21   BY MR. PRICE:

22   Q.   Your understanding is that it came from MGA's file?

23   A.   Yes.  It has a MGA Bates number on it, yes.

24   Q.   And you see it appears to be a communication to you?

25   A.   Yes.

1   Q.   Concerning issues that they wanted to talk to you about

2   when they came to L.A.?

3   A.   It has my name and Tom's name on it, but I just don't

4   remember this -- when was it sent, et cetera.

5   Q.   Look under "overall."

6   A.   Where is that?

7   Q.   At the bottom where it says "overall."

8   A.   Yes.

9   Q.   It says, under, like, bullet point 2:  *We need a legal*

10  *representative in Mexico.  Either of us could be and/or the*

11  *administrative director, otherwise Tom will have to be*

12  *flying very often to sign.*

13          Do you see that?

14  A.   I do.

15  Q.   And does this indicate, then, it's coming from your --

16  gives you the understanding it's coming from your New Mexico

17  office?

18  A.   What's coming from my New Mexico office?

19  Q.   This document.

20  A.   I have no idea where is it coming from.

21  Q.   Well, when it says *We need a legal representative in*

22  *Mexico* --

23  A.   Yes.

24  Q.   -- what's your understanding as to who that is

25  referring to?

1   A.    That we -- the three of them need a legal

2   representative in Mexico.

3   Q.    And when you say the three of you, are you talking

4   about Mr. Machado, Mr. Vargas and Ms. Trueba?

5   A.    Yes.

6   Q.    And if you look under "marketing," it talks about, for

7   example, the first bullet point:  Line selection.

8        Do you see that?

9   A.    Yes.

10  Q.    And "line selection" means what?

11  A.    Selecting your line that you're going to sell in

12  Mexico.

13  Q.    And the second bullet point is:  "Lodge event and

14  showroom."  *We must launch no later than June 15th.*

15       Do you see that?

16  A.    I do.

17  Q.    And that's referring to the launch of MGA Mexico;

18  right?

19  A.    Probably.

20  Q.    And that would be a consistent time frame if in

21  April 21, 2004 they left Mattel.  They're talking about just

22  a couple months later having -- being ready for the launch;

23  correct?

24  A.    I don't know.  Have a party, or -- or have a party.  I

25  don't know what it means.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

61

```
 1   Q.   If you look at this -- let me ask you this:  The trio,
 2   as you refer to them, were creating this plan without MGA
 3   guidance.  That is, they were coming up with this on their
 4   own?
 5             MR. OVERLAND:  Objection.  Calls for speculation.
 6             THE COURT:  You can ask him if that's your
 7   opinion.
 8   BY MR. PRICE:
 9   Q.   Is that your opinion?
10   A.   That this is a plan?
11   Q.   Is it your opinion that when the trio came up with
12   what's in this document --
13   A.   Yes.
14   Q.   -- that they were doing that on their own without
15   guidance at this point from MGA United States?
16   A.   I have no idea what they were doing and how they were
17   coming this from.  Frankly, I don't even know if this is or
18   this is not from the trio.  I don't see the names in here.
19   I know it's a document in our file.  I have no idea what
20   this document is.
21   Q.   Can you name anyone else who would be sending this to
22   you and talking about a launch no later than June 15th and
23   needing a legal representative in Mexico, other than the
24   folks who were in MGA Mexico?
25   A.   Yes, I can speculate.  Could have been Tom.  Could be
```

```
 1   Carmen.  Could be Susana.  Could be anyone.
 2   Q.    Were they in Mexico?
 3   A.    Carmen lives in Mexico, yes.
 4   Q.    And Tom, here, you see it's sent to Tom; right?
 5   A.    Right.  That's what it says.
 6   Q.    And if you look at, overall, Bullet Point 2, it said:
 7   Either of us could be and/or the administrative director,
 8   otherwise Tom will have to be flying very often to sign.
 9            Do you see that?
10   A.    Yes.  Either of us could have been.  Either Susana
11   Kuemmerle, or Carmen.  I forget her last name.
12   Q.    So who was supposed to come up with the management in
13   the plan to run MGA Mexico?
14   A.    Susana and Carmen was supposed to do that.
15   Q.    What was Mr. Machado hired to do?
16   A.    Marketing.
17   Q.    And what about Mr. Vargas?
18   A.    Selling.
19   Q.    And Ms. Trueba?
20   A.    Also marketing.
21   Q.    Do you know what, if any, guidance was coming from MGA
22   U.S. in putting together what you see in this document?
23   A.    I don't.  I delegated that to Tom Park to handle.  He
24   was the chief operating officer.
25   Q.    And your understanding from looking at this document is
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
 1   that it wasn't Tom Park who created the document; right?
 2   A.   I'm speculating.  I don't know who created this
 3   document.
 4   Q.   I'm just saying, your view -- your understanding, if
 5   you look at this, it's not Tom because it's sent to him?
 6   A.   I don't know if it was sent to him, or not.  I'm not
 7   arguing with you.  It probably was not done by Tom, but I
 8   don't know who done it.
 9   Q.   Okay.  Now, you began receiving weekly reports from
10   Mexico; right?
11   A.   I received weekly reports.  I don't remember if they
12   were regularly, or not.  At what time?
13   Q.   Well, let's see if I can show you an example of what --
14   maybe a weekly report, may not.  You can tell us.  It's
15   8865.
16   A.   (Witness so complies.)  This is an e-mail with my name
17   on it.
18        MR. PRICE:  Your Honor, may I move Exhibit 8865
19   into evidence?
20        THE COURT:  Received.
21        (Plaintiff's Exhibit 8865 received in evidence.)
22        MS. KELLER:  Is that pages 1 and 2, counsel?
23        MR. PRICE:  It will be a two-page document.
24   BY MR. PRICE:
25   Q.   And you see this is the e-mail dated October 15, 2004?
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    A.    It is.

2    Q.    From Mr. Machado to you and copied to others?

3    A.    Yes.

4    Q.    And it says:  *Marketing status for the week ending*

5    *October 15th.*

6    A.    That's what it says.

7    Q.    So if you look at this, does this refresh your

8    recollection that you had weekly status reports on marketing

9    from Mr. Machado?

10   A.    No.

11   Q.    You at least got this marketing status for the week

12   ending October 15th?

13   A.    I did.

14   Q.    Look at the third paragraph here:  *Flavas is hitting*

15   *more retailers.  We now know that it will be TV supported*

16   *and they have a special consignment term with those two*

17   *elements.  It means the stores will be packed.*

18          Do you see that?

19   A.    Yes.

20   Q.    And Fla-vus was whose --

21   A.    Fla-vas.

22   Q.    I should know that.

23   A.    You represent them.

24   Q.    Yeah.

25   A.    Mattel.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1          MR. PRICE:  Your Honor, could I request a short

2     break?

3          THE COURT:  Certainly.

4          All right.  Now, ladies and gentlemen, you're

5     admonished not to discuss the matter amongst yourselves, nor

6     to form or express any opinion concerning this case.

7          See you back in a few minutes.  Take a good

8     recess.

9          *(At 1:59 p.m., proceedings were adjourned.)*

10

11                              -oOo-

12

13                          CERTIFICATE

14          I hereby certify that pursuant to Section 753,

15     Title 28, United States Code, the foregoing is a true and

16     correct transcript of the stenographically reported

17     proceedings held in the above-entitled matter and that the

18     transcript page format is in conformance with the

19     regulations of the Judicial Conference of the United States.

20

21     Date:  February 10, 2011

22

23

24                    _____

25                         Deborah D. Parker, Official Reporter

*DEBORAH D. PARKER, U.S. COURT REPORTER*