1           **UNITED STATES DISTRICT COURT**

2           **CENTRAL DISTRICT OF CALIFORNIA**

3       **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4                   - - - - - - -

5

6   MATTEL, INC., ET AL.,              )
                                       )
7           Plaintiffs,                )
                                       )
8       vs.                            ) No. CV 04-9049-DOC
                                       )    Day 16
9   MGA ENTERTAINMENT, INC., ET AL.,   )    Volume 3 of 4
                                       )
10          Defendants.                )
    _____)

11

12

13

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                   Jury Trial

17              Santa Ana, California

18          Thursday, February 10, 2011

19

20

21

22  Jane C.S. Rule, CSR 9316
    Federal Official Court Reporter
23  United States District Court
    411 West 4th Street, Room 1-053
24  Santa Ana, California 92701
    (714) 558-7755
25
    11-02-10 MattelV3

Case 2:04-cv-09049-DOC-RNB   Document 9868   Filed 02/14/11   Page 2 of 112   Page ID #:298091
CV 04-9049-DOC - 02/10/2011 - Day 16, Vol. 3 of 4

2

 1    **APPEARANCES OF COUNSEL:**

 2

 3    FOR PLAINTIFFS MATTEL, INC., ET AL.:

 4            QUINN, EMANUEL, URQUHART & SULLIVAN
              By:  JOHN B. QUINN
 5                 MICHAEL T. ZELLER
                   WILLIAM PRICE
 6                 Attorneys at Law
              865 South Figueroa Street
 7            10th Floor
              Los Angeles, California 90017-2543
 8            (213) 443-3000

 9

10    FOR DEFENDANTS MGA ENTERTAINMENT, INC., ET AL.:

11            ORRICK, HERRINGTON & SUTCLIFFE, LLP
              BY:  THOMAS S. MC CONVILLE
12                 Attorney at Law
              4 Park Plaza
13            Suite 1600
              Irvine, California 92614
14            (949) 567-6700

15            - AND -

16            ORRICK, HERRINGTON & SUTCLIFFE, LLP
              BY:  ANNETTE L. HURST
17                 Attorney at Law
              405 Howard Street
18            San Francisco, California 94105
              (415) 773-5700

19            - AND -

20
              KELLER RACKAUCKAS, LLP
21            BY:  JENNIFER L. KELLER
                   Attorney at Law
22            18500 Von Karman Avenue
              Suite 560
23            Irvine, California 92612
              (949) 476-8700

24

25

Case 2:04-cv-09049-DOC-RNB   Document 9868   Filed 02/14/11   Page 3 of 112   Page ID #:298092
CV 04-9049-DOC – 02/10/2011 – Day 16, Vol. 3 of 4

3

```
 1   APPEARANCES OF COUNSEL (Continued):

 2

 3   FOR DEFENDANT CARLOS GUSTAVO MACHADO GOMEZ:

 4            SCHEPER, KIM & OVERLAND, LLP
             BY:  ALEXANDER H. COTE
 5               Attorney at Law
             601 West Fifth Street
 6           12th Floor
             Los Angeles, California 90071
 7           (213) 613-4660

 8           – AND –

 9           LAW OFFICES OF MARK E. OVERLAND
             BY:  MARK E. OVERLAND
10               Attorney at Law
             100 Wilshire Boulevard
11           Suite 950
             Santa Monica, California 90401
12           (310) 459-2830

13

14   Also Present:

15            ISAAC LARIAN, MGA CEO

16            KEN KOTARSKI, Mattel Technical Operator

17            MIKE STOVALL, MGA Technical Operator

18            RACHEL JUAREZ, Quinn Emanuel Urquhart & Sullivan

19            KIERAN KIECKHEFER, Orrick Herrington & Sutcliffe

20            WARRINGTON PARKER, Orrick Herrington & Sutcliffe

21

22

23

24

25
```

**I N D E X**

**EXAMINATION**

| Witness Name | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| LARIAN, ISAAC<br>  By Mr. Price | | 5 | | |

**EXHIBITS**

| Exhibit | Identification | Evidence |
|---|---|---|
| Plaintiffs' No. 1 | | 82 |
| Plaintiffs' No. 4907 | | 33 |
| Plaintiffs' No. 4909 | | 39 |
| Plaintiffs' No. 5561 | | 70 |
| Plaintiffs' No. 6785 | | 51 |
| Plaintiffs' No. 7104 | | 11 |
| Plaintiffs' No. 8466 | | 25 |
| Plaintiffs' No. 8874 | | 71 |
| Plaintiffs' No. 11259 | | 86 |
| Plaintiffs' No. 20656 | | 44 |
| Plaintiffs' No. 21068 | | 73 |
| Plaintiffs' No. 21283 | | 42 |

```
 1              SANTA ANA, CALIFORNIA, THURSDAY, FEBRUARY 10, 2011

 2                        DAY 16, VOLUME 3 OF 4

 3                             (2:21 p.m.)

 4                 (The following proceedings is taken in the

 5             presence of the jury.)

 6                 THE COURT:  All right.  Then we are back in

 7       session.  The jury is present, all alternates, all counsel,

 8       the witness Mr. Larian, and Mr. Price is continuing with his

 9       direct examination.

10                 ISAAC LARIAN, PLAINTIFFS' WITNESS, RESUMED

11                      DIRECT EXAMINATION (Continued)

12       BY MR. PRICE:

13       Q    Mr. Larian, we were looking at 8865, and you see the

14       date on that as being October 15, 2004; do you see that?

15       A    I do.

16       Q    Mr. Machado and Ms. Trueba and Mr. Vargas worked for

17       MGA Mexico throughout the end of the year 2004, certainly

18       through 2005, correct?

19       A    Yes.

20       Q    And in about October 2005, MGA's offices were searched

21       by the Mexican authorities, correct?

22       A    Yes.

23       Q    And on that day, you got a phone call from Ms. --

24       Ms. Kuemmerle?

25       A    Yes.
```

1    Q    Saying that the MGA Mexico offices had been searched?

2    A    Yes.

3    Q    And that's the first time that you heard an allegation

4    that Mattel information has been taken when Mr. Machado,

5    Mr. Vargas and Ms. Trueba left Mattel, correct?

6    A    I believe so, yes.

7    Q    And then eventually it came to your attention that

8    there were Mattel -- internal Mattel documents that were at

9    the Mexico MGA office?

10   A    During the litigation, it came to my attention, yes.

11   Q    When is the first time it came to your attention that

12   there were internal Mattel documents at the Mexico MGA

13   office?

14   A    I don't remember the date.

15   Q    Do you recall if it was 2006, 2007?

16   A    After the raid, but I don't know the date.

17   Q    And we've got the date as being -- the raid as being

18   October of 2005, right?

19   A    I don't remember, but if that's the date that you say

20   so, yes, I agree with it.

21   Q    Whatever the date is, you heard about that raid on that

22   day, right?

23   A    Again, I don't remember -- yes, I heard -- I got a

24   call, I believe, on that day.

25   Q    And have you subsequently come to learn specifically

1    the -- the kind of documents that were found at the MGA

2    offices?

3    A    Through this litigation, yes.

4    Q    Now, there was a time when -- when, again, you were

5    identified as a 30(b)(6) corporate representative on the

6    issue of search and seizure documents by Mexican authorities

7    from MGA's Mexico City offices?

8    A    I can't remember.  Can you show me the 30(b)(6)

9    designations?

10            THE COURT:  I'm going to hold Mr. Eckert and

11   Mr. Larian, you know, in your eyes, as those people who have

12   now been unduly prepared on both sides, but they are the

13   head of their respective corporations, and if the person

14   knows or doesn't know, so be it, there may be a lack of

15   foundation, but these are the principals.

16            Counsel?

17   BY MR. PRICE:

18   Q    Mr. Larian, to prepare for this trial, you -- you read

19   through some deposition transcripts, right?

20   A    Some of my own, yes.

21   Q    And you recall that you did testify as a 30(b)(6)

22   witness for MGA on a couple of occasions?

23   A    Yes, on different topics.  The only thing I don't

24   remember here are the topics that I testified about and I

25   was prepared for.  Again, prior to this trial, most of the

CV 04-9049-DOC - 02/10/2011 - Day 16, Vol. 3 of 4

8

```
 1    documents were AEO, attorney eyes only, so I hadn't seen a

 2    lot of these documents.

 3    Q    Well, for your 30(b)(6) examination, as the corporate

 4    representative, were you shown AEO documents?

 5    A    Yes, I was, regarding those topics.

 6    Q    So if you were testifying on behalf of the company

 7    regarding a certain subject, you could see attorney eyes

 8    only documents concerning that subject, right?

 9    A    On those topics, yes.

10    Q    So if you look at July 7, 2010, and page 2409, lines 17

11    through 21.

12    A    I'm sorry, give me those lines again, please.

13    Q    It's 2409.

14    A    Yes.

15    Q    Lines 17 through 21.

16    A    Yes, go ahead.

17    Q    And does that refresh your recollection that one of the

18    topics you were testifying to as a 30(b)(6) witness was

19    about the search and seizure of certain documents in Mexico

20    City?

21    A    Yes, as of the date of this deposition, July 7, 2010.

22    Q    And that does refresh your memory?

23    A    Yes.

24    Q    Now, before that --

25              (Attorney discussion held off the record.)
```

1    BY MR. PRICE:

2    Q    Before July 7, 2010, close to the time of the search in

3    October of 2005, did you become aware of the types of

4    documents that were found in MGA's offices?

5    A    In July 2005?

6    Q    In around October 2005, when the search took place,

7    remember when you got that phone call?

8    A    Yeah, I don't recall if they told me what was in there

9    or not.  I don't think they did, as a matter of fact.  The

10   lawyers that I talked to, I mean, I don't want to get into

11   attorney-client privilege.

12   Q    Did you have an understanding that the Mexican

13   authorities left copies of what they took from the MGA

14   offices?

15   A    I believe -- I believe that's what I understood, yes.

16   Q    And at any time did you become aware of the type of

17   Mattel information that was contained in those copies?

18   A    I did, as I was getting prepared for my July 2010

19   deposition.

20   Q    Let me give you --

21         MR. PRICE:  Your Honor, I think it's marked

22   currently as 8149, but we showed a better copy to -- to

23   counsel because 8149 is very difficult.  I think it's 7104.

24         THE COURT:  So it's the same document?

25         MR. PRICE:  Same document.

Case 2:04-cv-09049-DOC-RNB   Document 9868   Filed 02/14/11   Page 10 of 112   Page ID #:298099
CV 04-9049-DOC - 02/10/2011 - Day 16, Vol. 3 of 4

10

```
 1              THE COURT:  Some of these documents, as you've
 2    heard, have been marked in duplicates.  You are not going to
 3    see them, but there are probably 40,000 exhibits or more
 4    that we've gone through.  Some of them are simply
 5    duplicates, so they have duplicate markings, and some are
 6    better copies either by Xeroxing or production.
 7              So I'm going to allow 7104, but later on, you may
 8    have different documents that you are seeing more than once
 9    because the parties are having an interesting time keeping
10    track of those.  You are not to put any undue weight because
11    you see a document twice and it's the same document.  It has
12    no more or less importance to you, but otherwise, counsel
13    for both sides are going to have a little difficulty getting
14    them to you.
15              So Counsel, that's fine.  So 7104 is received.  Do
16    you just want to withdraw 8149, to make it simple in this
17    case?
18              MR. PRICE:  Yes.
19              THE COURT:  Okay.  So we'll withdraw 8149,
20    Counsel, for your records.  7104 is a better copy.  It's the
21    same copy?
22              MGA, any problems?
23              MS. KELLER:  No, your Honor.
24              THE COURT:  Thank you.
25              MR. MC CONVILLE:  I don't know that that original
```

1   document was ever in evidence.  I think he was just

2   cross-referencing it, so I don't know that this document has

3   ever actually been shown.

4           THE COURT:  If it was never received, we don't

5   have to withdraw.  We don't have to worry about it.

6           MR. MC CONVILLE:  Right.

7           THE COURT:  7104 is in evidence, and counsel and I

8   will go over that tonight so you are not bothered with it as

9   the jury.

10          (Plaintiffs' Exhibit No. 7104 is received in

11      evidence.)

12  BY MR. PRICE:

13  Q    Mr. Larian?

14  A    Yes, go ahead.

15  Q    So you have 7104 in front of you?

16  A    I do.

17  Q    Now, looking at this --

18          MR. PRICE:  Oh, your Honor, I'm sorry.

19  BY MR. PRICE:

20  Q    You recognize this as one of the documents that you

21  reviewed for your deposition as the corporate spokesperson

22  on the topic of the searches in Mexico?

23  A    It's possible.  I just don't recall it.  There were so

24  much documents.

25  Q    So looking at this document, you see it's about 46

1   pages long?

2   A    Yes.

3   Q    And you see it has information on the "Barbie 2005

4   preliminary," is that "line list"; do you see that?

5   A    I do.

6   Q    And it's got volumes; do you see that?

7   A    Yes.

8   Q    It's got -- on some of these, it has retail margin?

9   A    Yes.

10   Q    And what's your understanding as to what retail margin

11   is?

12   A    The margin that Toys R Us makes, for example, on the

13   product.

14   Q    And is that something which is information which MGA

15   considers to be secret?

16   A    The retail margin that the retailers make?

17   Q    The margins they are making on your product?

18   A    No, because you cannot set the retail margin.  At least

19   at MGA, we can't set the retail margin -- I think it's

20   illegal to set up a retail margin for the retailer.

21   Q    Now, knowing the margin they have on your product, is

22   that something that you consider secret?

23   A    The margin that they would have on our product?

24   Q    Yes.

25   A    No, because we never know what margin retailer is going

1   to make.  Toys R Us sometimes buys something and sells it

2   for 50 percent off, sometimes they sell it for no margin at

3   all, so I am not sure if I understand your question.  But we

4   cannot fix pricing.

5   Q    I am not talking about fixing pricing.  I am talking

6   about information.

7        Are you saying that the information that is in this

8   document, and you recognize this as concerning Mattel

9   products?

10  A    Yes, Barbie's a Mattel product.

11  Q    So it's your understanding that what's here under

12  retail margin is something which MGA doesn't know about for

13  its own products?

14  A    Yes, we don't, because what you do is give a suggested

15  retail price, and the retailers make their own margin.  In

16  30 years in toys business, we have never been able to tell

17  retailer how you can only make 20 percent or 25 percent or

18  50 percent.  My understanding is that's illegal.

19  Q    I am not saying that you tell them.  I'm saying you

20  can, through observation, you know, through -- through

21  research, you can find out what their margin is on your

22  products, right?

23  A    I guess when they buy our product and I go -- let's say

24  we sell a product to Toys R Us for $10, and I go to their

25  store and they are selling it for 15, their margin is $5 for

1  that day, but the next day it can be $13, so it's a variable

2  question, I guess.

3  Q   So it would take a lot of effort to -- to arrive at

4  that sort of information about your own product, you'd have

5  to take trips to the store, you'd have to put some manpower

6  behind it, right?

7  A   If you want to.  I think it's a waste of time, what the

8  retailer makes on a margin on your product.

9  Q   That's certainly something you'd be interested in, to

10  know how much profit somebody's making off your product,

11  right?

12  A   No, I'm interested to know what we are going to make on

13  our product, not what Toys R Us makes on ours.

14  Q   Sure.  But if someone says -- you learn someone is

15  making a huge margin on your product, you might realize that

16  you have some opportunity to -- to charge more or maybe you

17  have to charge less?

18  A   No, that's not true.

19  Q   So it's your testimony -- if you look at the first page

20  of this document, is it your testimony that the information

21  you see on this first page would have no value to MGA if MGA

22  had this information on their products?

23  A   The retail margin that Mattel is forcing someone to

24  make?  There is no value to us.

25  Q   Nobody said anything about anybody forcing anybody to

1    make --

2    A    This is a Mattel document, right?

3    Q    It's a Mattel document that was in your offices in

4    Mexico, yeah.

5    A    I understand.  But you have a column here that says

6    "Retail Margin," so I don't know.  We have -- all I know,

7    for MGA, we don't have such a thing, any columns says, okay,

8    that's your retail margin.

9    Q    Okay.  How about if you look over at the far left,

10   there is something about retail doll --

11   A    This is a very interesting document.

12   Q    Pardon?

13   A    This is a very interesting document.  Go ahead.

14   Q    If you have something like retail doll breakdown; do

15   you see that on the far left?

16   A    What's the exhibit number again?  7104.

17   Q    7104.  I'm sorry, left and right.  If you look at the

18   far right, it says, "Retail doll breakdown"?

19   A    Yes.

20   Q    And you see there's -- on the left hand, it has less

21   than 10, 10 to 15, 15 to 20, 20 plus; do you see that?

22   A    I do.

23   Q    And then it has "SKU."  Can you tell us what that is?

24   A    That is stock keeping unit.  It stands for "stock

25   keeping unit."

Case 2:04-cv-09049-DOC-RNB   Document 9868   Filed 02/14/11   Page 16 of 112   Page ID #:298105
CV 04-9049-DOC – 02/10/2011 – Day 16, Vol. 3 of 4

16

1    Q    And can you tell us in lay terms what that refers to?

2    A    Stock keeping unit, for example, if you're selling this

3    glass, is one stock keeping unit, if I'm selling Jane's

4    glass, that's another stock keeping unit, they are

5    different.

6    Q    So just to be clear, if they are different, there would

7    be different units?

8    A    I'm sorry, yes.

9    Q    Okay.  And so do you see where it says retail -- retail

10   doll breakdown, this is keeping track of -- of prices for

11   different SKUs?

12   A    I'm sorry?

13   Q    Okay.  How do you -- what do you understand this to

14   mean where it says "SKUs," "QTA," and then it's got

15   "volume"; do you see that?

16   A    I really have no idea.  This is a Mattel document.  I

17   have no idea.  I can't -- I know what "SKU" is.  I have no

18   idea what the other things, "QTA," I don't know what that

19   means.

20   Q    Do you know whether Mr. Machado or Mr. Vargas or

21   Ms. Trueba would know how to interpret this?

22   A    I don't know.  If they worked at Mattel, probably, yes.

23   Q    Would it be useful or does MGA keep track of its SKUs

24   to various retailers, things of that nature?

25   A    We -- I mean what nature?  We keep track --

1   Q    That was too -- that was too broad.

2        Does MGA estimate the margins for MGA sales to

3   retailers and going forward?

4   A    Auto product margin?

5   Q    Yeah.

6   A    Yes, of course.

7   Q    And that's valuable because that would give you an idea

8   of how to plan for the future, correct?

9   A    Not necessarily.  It just says if we are making this

10  doll, do we make 30 percent on it, do we make 25 percent on

11  it, do we make 50 percent on it.  It's just an accounting.

12  We keep track --

13  Q    You keep -- I'm sorry to interrupt you.  You keep track

14  of what your margin is for your sales to retailers, right?

15  A    Yes, our own margin.

16  Q    All right.

17  A    But we don't set retail margin.  This is the first time

18  I see a toy vendor set up a retail margin.

19  Q    Well, it would be useful for you to know going forward

20  what Mattel was thinking its margin would be for its sales

21  to retailers, right?

22  A    Sorry, the -- Mattel's margin would be --

23  Q    Wouldn't it be useful to you to compete against Mattel

24  to know what Mattel thought its margins to retailers would

25  be?

```
 1    A    The margins that --

 2    Q    That Mattel would make on specific products.

 3    A    Mattel's margins are very public.  Every quarter, they

 4    announce it, what's their margin.

 5    Q    I'm talking about prospective.  You -- you predict

 6    prospective margin so you can plan your line, right?

 7    A    (No audible response.)

 8    Q    Going forward, don't you try to find out, you know,

 9    figure out what your margin is going to be for your sales to

10    make decisions as to what products to include and what lines

11    to pursue, what products to pursue, not pursue?

12    A    Yes, we do.  We look at our own product margins,

13    absolutely.

14    Q    And you predict what your profit margins will go into

15    the future, correct?

16    A    Not predict.  We will know, yes.  At the end, once we

17    produce a product, we know what will be the margin for a

18    product.

19    Q    And you said you know your profit margins, individual

20    SKU margins?

21    A    Yes.

22    Q    Is that information known to the public, individual SKU

23    margins?

24    A    Our margins, no, it's not.

25    Q    And Mattel's individual SKU margins aren't known to the
```

1    public, correct?

2    A    Mattel's, no.  That's right.  You're right.

3    Q    So if you had a document which showed your competitor's

4    individual SKU profit margins --

5    A    Yes.

6    Q    -- that's something which might assist you in your own

7    business?

8    A    Yes, but this is -- this shows retail margin, this

9    doesn't show Mattel margin.  If you are still -- I guess --

10   I'm -- I think you are still asking me a question about this

11   document which is on the screen, that shows retail margin.

12   Q    Well, first of all, I think what you first told us was

13   you didn't even know how to interpret this document?

14   A    No.  I said certain portion, I know how to interpret.

15   "SKU," "retail margin," I can definitely interpret.  Some of

16   the other things, "QTA," I don't know what that is.  "SEG,"

17   I don't know what that is.  "Volume," I understand volume

18   and dollars.  "TV Spots" means that you had a TV commercial

19   for it.  "Fall" means fall.  "SPR" stands for spring.  There

20   are a lot of things in here that I understand, but there are

21   certain things here I don't.

22   Q    If you look at page dash 00005, it's a different type

23   of chart.

24   A    This starts with 008, I'm sorry.

25   Q    7104-00005.

Case 2:04-cv-09049-DOC-RNB   Document 9868   Filed 02/14/11   Page 20 of 112   Page ID #:298109
CV 04-9049-DOC - 02/10/2011 - Day 16, Vol. 3 of 4

20

1    A    Okay, I apologize.  Go ahead.

2         It's too small.

3    Q    It is small.

4         MR. PRICE:  If you could blow up the top portion

5    of 7104-00005.

6    BY MR. PRICE:

7    Q    Is that blown up enough so you can see it?

8    A    Yeah, I'm trying to figure it out.

9         Yes, go ahead.

10   Q    And so do you see that this document, for example, at

11   the top has "Estimated retail"; do you see that?

12   A    Yes.

13   Q    And there's "EA," it's very small type, "By T Margin

14   and Margin" at --

15   A    I'm sorry, I'm losing you.

16   Q    Sure.

17   A    Estimated retail, what else?

18   Q    You see "Retail," and then you say "A/DI Dollars"; do

19   you see that?

20   A    I have no idea what that is.  Yes.

21   Q    So you said you don't have any idea what these mean --

22   A    No, no.  I don't mean -- yes.  This specific one, "AD,"

23   I don't know what it means, but there are other things in

24   here which I know what it means.

25   Q    And certainly the four Mattel employees who were in

1   your Mexico office would know what this means?

2   A    I assume so, I don't know.  Yes, I am speculating.

3   Q    And you think they would probably have a better basis

4   than you of understanding what this document means?

5   A    Yes.

6   Q    And your understanding is that when they left Mattel,

7   they chose this as one of the documents that they downloaded

8   on a thumb drive?

9   A    I don't know if that's one of them that they downloaded

10  in a thumb drive or not, but I think this is one of the

11  documents that was found at MGA Mexico.

12  Q    Other than being downloaded on a thumb drive -- other

13  than being downloaded by the Mattel employees at the MGA

14  Mexico office, you have no knowledge as to how this

15  document, 7104-000 -- well, 7104 would make its way into the

16  MGA Mexico offices, right?

17  A    It could have been sent UPS, it could have been

18  hand-delivered.  I don't know.  I don't know if it was on a

19  thumb drive or not.  Somebody could have dropped it off.

20  They could have gotten it from a retailer.  I really have no

21  idea.

22  Q    You were the witness who was chosen by MGA --

23  A    Yes.

24  Q    -- to talk on behalf of the company about what

25  documents of Mattel's were found in the MGA's office during

```
 1    the search, correct?

 2    A    Yes, I was.

 3    Q    So -- and you were educated to do that, right?

 4    A    Yes.  Maybe not educated enough, but I was.

 5    Q    But it's true, is it not, that when you came to your

 6    deposition to testify on behalf of MGA and to be educated on

 7    behalf of MGA as to what documents were taken in the search,

 8    that you didn't look for any documents, you didn't look at

 9    any documents?

10    A    Mr. Price, Mr. Zeller knows that I looked at tons of

11    documents, and I put tabs on them.  I think you have them,

12    so your assertion is incorrect.

13    Q    Well, I probably --

14    A    We gave you guys a copy of it, boxes after boxes of

15    documents, so your assertion that I did not look for

16    documents is not correct.

17    Q    I may have not been precise.  When you were testifying

18    as MGA's corporate representative --

19    A    Yes.

20    Q    -- about documents that were located by the Mexican

21    authorities during the search, in connection with that

22    testimony, you did not look at the documents that were found

23    in the MGA search?

24              MS. KELLER:  Objection, your Honor.  There was

25    some advice of counsel as to what documents he could look
```

Case 2:04-cv-09049-DOC-RNB   Document 9868   Filed 02/14/11   Page 23 of 112   Page ID #:298112
CV 04-9049-DOC - 02/10/2011 - Day 16, Vol. 3 of 4

23

1    at.

2              THE COURT:  Overruled.

3              THE WITNESS:  I looked at a lot of documents.  Did

4    I memorize all those documents?  There were, I believe, at

5    least 15 binders.  Did I memorize everything in those

6    binders?  I don't.  I looked at a lot of documents.

7              MR. PRICE:  Your Honor, if we could read from

8    Mr. Larian's 30(b)(6) deposition, July 7, 2010, 2469, lines

9    15 through 21.

10             THE COURT:  You may read.

11             MR. PRICE:  Question:  "Did you look at any

12   documents that you understood to be among the documents that

13   were located by the Mexican authorities during the search of

14   the Mexico City office of MGA in 2005?"

15             Answer:  "I did not."

16             "Did you ask for these?"

17             Answer:  "I did not."

18             MS. KELLER:  May we have lines 23 and 24, your

19   Honor, read.

20             MR. PRICE:  That's an objection.

21             MS. KELLER:  Yes, it is.

22             THE COURT:  No.

23   BY MR. PRICE:

24   Q    Does MGA keep track of its sales to customers on a

25   daily basis?

1    A     Sales to customers on a daily basis?  I hope so.  I

2    don't know.

3    Q     Why would you keep track of that?

4    A     To see, I hope, what we have sold.  Again, that is not

5    in our accounting department.  I hope we do.

6    Q     Is the information that MGA monitors about sales to its

7    customers on a daily basis, that's information which is

8    important to MGA?

9    A     I guess to our sales -- I don't know.  To our sales

10   department.  Usually we look at them at the end of the

11   quarter.

12   Q     That is certainly not information that MGA makes public

13   at the time it acquires it, right?

14   A     No, we don't.

15   Q     And MGA wouldn't want Mattel to have that information

16   about tracking sales to customers on a daily basis?

17   A     No, we don't want Mattel to have it.

18   Q     Or even tracking sales to customers on a weekly basis,

19   you wouldn't want that either?

20   A     No, we don't, or the monthly.

21   Q     Let me show you Exhibit 8466.

22         A fairly large document, correct?

23   A     A book bigger than Fountainhead.

24   Q     And -- kind of difficult to read, isn't it?

25   A     It is.

1    Q    And do you see this -- do you recognize this as being

2    information that was found in the MGA Mexico offices?

3    A    Yes.

4          MR. PRICE:  Your Honor, I move Exhibit 8466 into

5    evidence.

6          THE COURT:  Received.

7          MR. MC CONVILLE:  Objection.  Foundation.

8          THE COURT:  Received.

9          *(Plaintiffs' Exhibit No. 8466 is received in*

10        *evidence.)*

11   BY MR. PRICE:

12   Q    And if we look at the first page, and I know it's small

13   type, so you see the first line there has "UPC," I think

14   "item MBR," "item description," "quota," "Mattel shipping,"

15   "Mattel shipments to customer"?

16   A    Yes.

17   Q    And it goes on, talking about week one, week two, week

18   three, week four; do you see that?

19   A    I do.

20   Q    Tracking on a -- this part of the document, on a

21   week-to-week basis what is sold; do you see that?

22   A    I see week numbers.  I don't know -- I don't know what

23   this means.

24   Q    Pardon?

25   A    I see week numbers.  I don't know what this means.

Case 2:04-cv-09049-DOC-RNB   Document 9868   Filed 02/14/11   Page 26 of 112   Page ID #:298115
CV 04-9049-DOC – 02/10/2011 – Day 16, Vol. 3 of 4

26

1    Q    If you look at 8466-00103.

2    A    The same document?

3    Q    The same document.

4    A    Yes.

5    Q    Just to go into it a little bit further, kind of

6    skipping way ahead here; do you have that?

7    A    Yes.

8    Q    Do you see it has week 22, week 23, week 24, do you see

9    that, week 25, et cetera?

10   A    I do.

11   Q    And what you can see here is that they are tracking

12   something on a week-to-week basis, here, correct?

13   A    Yes.

14   Q    If you'd look at 8466-00461.

15   A    Same document, page 461?

16   Q    Yes, same document.

17        Do you see there are columns which include real sales

18   year to day?

19   A    Hold on.  Hold on.  I'm not there.

20   Q    Okay.

21   A    455.

22   Q    461.

23   A    Excuse me.  Go ahead.

24   Q    Do you see here it talks about year sales year to date,

25   current inventories, POS four weeks average?

Case 2:04-cv-09049-DOC-RNB   Document 9868   Filed 02/14/11   Page 27 of 112   Page ID #:298116
CV 04-9049-DOC - 02/10/2011 - Day 16, Vol. 3 of 4

27

```
 1   A    Hold on a second.  POS four weeks --

 2        Yes.

 3   Q    POS refers to point of sale?

 4   A    Yes.

 5   Q    There's a column there, "current sell through"?

 6   A    Yes.

 7   Q    Do you have an understanding as to what that means?

 8   A    How much of the merchandise was sold to our retail.

 9   Q    Is that something that MGA keeps track of as well?

10   A    I am not sure if we do or not.

11   Q    Do you keep track of -- well, certainly it's important

12   to keep track of physical inventories?

13   A    Our own inventory, yes.

14   Q    And the shipments to customer?

15   A    Yes, but I believe this is -- anyways, I don't want to

16   educate anybody on this.  Go ahead.

17   Q    It's your understanding that the Mexico employees that

18   you hired from Mattel would know the importance, if any, of

19   the information that they downloaded from Mattel and then

20   took to MGA?

21   A    If there is any, yes, but this, to me, looks like -- if

22   you look at the front page of this.  This is regarding

23   Walmart.  This is regarding Walmart.  If you look at the

24   first page of this document.

25   Q    On this page, it says "Customer Walmex"?
```

1    A    Yes, Walmex is Walmart Mexico.  That's Walmart Mexico's

2    information.

3    Q    And there is 883 pages, you are saying, of information

4    concerning Walmart Mexico, the customer Walmart Mexico?

5    A    Yes, that's what I'm going, this here, it says,

6    "Customer Walmex," it's Walmart Mexico.  Walmart Mexico is

7    known as Walmex.

8    Q    That would be a pretty big customer?

9    A    They are a pretty big customer.  Walmart is a pretty

10   big customer overall.

11   Q    And it would be pretty detailed information to have 883

12   pages of information concerning a customer?

13   A    Yes, I have seen information bigger than that that

14   Walmart provides to you.

15   Q    Does MGA give this sort of information to its

16   competitors?

17   A    I don't even know we have information like this.  This

18   is from Walmart, and you can go on what's called retail

19   link, which is something that Walmart will give you, and to

20   check and see what kind of inventory they have and how many

21   do they have, how many are they selling, how many they are

22   not selling, that's Walmart's information.  And we have

23   never printed them because we want to keep the Yosemite

24   trees still alive.

25   Q    So your testimony is that the information that we just

Case 2:04-cv-09049-DOC-RNB   Document 9868   Filed 02/14/11   Page 29 of 112   Page ID #:298118
CV 04-9049-DOC - 02/10/2011 - Day 16, Vol. 3 of 4

29

```
 1    looked at is public information that you could get about

 2    Mattel's products at Walmex?

 3              MS. KELLER:  Objection.  Misstates the testimony.

 4              THE WITNESS:  No, what I'm saying --

 5              THE COURT:  Overruled.

 6              THE WITNESS:  What I'm saying, that this is --

 7    when I'm looking at this here, this is Walmart Mexico's

 8    information, inventory, et cetera, of Mattel products that

 9    they have, that Walmart has.

10    BY MR. PRICE:

11    Q    And --

12    A    The retailer.  And they can share it with -- if Walmart

13    chooses to share it with people, that's their prerogative.

14    Q    So do you get this kind of information from Walmart

15    about Mattel's products?

16    A    No, we are not interested in Mattel's information.

17    Q    Well, do you get -- when you say you are not interested

18    in Mattel's information, I mean, you -- you monitor the

19    market and Mattel's information so that you can see what the

20    competition is doing, right?

21    A    Of course, we monitor the public market.  Of course we

22    do.

23    Q    And in fact, you also monitor products of Mattel to

24    see -- to get inspiration, to get ideas?

25    A    Or other companies, yes.  Product which is in the
```

Case 2:04-cv-09049-DOC-RNB   Document 9868   Filed 02/14/11   Page 30 of 112   Page ID #:298119
CV 04-9049-DOC - 02/10/2011 - Day 16, Vol. 3 of 4

30

1    stores, yes, we do.  It's normal.

2    Q    And it's normal for you to, for example, buy Mattel

3    products and say, within MGA, let's do this like they are

4    doing it?

5    A    Well, let's not do this like they are doing.

6    Q    But you also do, let's do it like they do it sometimes?

7    A    Yes.

8    Q    In fact, I'm coming off topic a little bit here, but I

9    want to follow up on something that you said.  During the

10   time frame, you know, from September 2000, okay?

11   A    Yes, hold on one second.  Go ahead.

12   Q    From September 2000, when you met Mr. Bryant, or the

13   2000 time frame, until, let's say, August of 2001, during

14   that time frame when you're developing Bratz; are you with

15   me so far?

16   A    Yes.

17   Q    There were instances where you would look at what

18   Mattel was doing and say -- with respect to Bratz and say,

19   hey, we should do it this way.  They've got a better

20   solution than we do, right?

21            MS. KELLER:  Objection, your Honor.  This was

22   excluded.

23            THE COURT:  Just a moment.

24            No, that's overruled.

25            THE WITNESS:  Whether it's a Mattel product or MGA

Case 2:04-cv-09049-DOC-RNB   Document 9868   Filed 02/14/11   Page 31 of 112   Page ID #:298120
CV 04-9049-DOC - 02/10/2011 - Day 16, Vol. 3 of 4

31

```
 1    product that's sold at Toys R Us, I can go buy it, you can

 2    go buy it, everybody can go buy it and take a look at it,

 3    that's public information, to see what they are doing.

 4    BY MR. PRICE:

 5    Q    I'm not suggesting with respect to that.  That's not

 6    stealing trade secrets, right?

 7    A    Going to Toys R Us?

 8    Q    Yeah.

 9    A    I hope not.

10    Q    But at least in talking about this time frame between

11    September of 2000 and August of 2001, there were times when,

12    to help you develop the Bratz product, you had to copy

13    something that was in the public that Mattel was doing?

14    A    Not copied, but being inspired by various Mattel

15    products that are sold at Toys R Us, or Hasbro products that

16    are sold at Toys R Us and vice versa.  This is normal.

17              THE COURT:  Let me set this record once and for

18    all, Ms. Keller, I allowed this up until the launch in 2001.

19    I've indicated that to Mr. McConville and Mr. Quinn.  Now,

20    how that's breaking down, I don't know, but the original

21    ruling was changed in light of some of the testimony.  You

22    should be aware of that.

23              Counsel?

24              MR. PRICE:  My understanding, your Honor, is I

25    gave that time frame.
```

Case 2:04-cv-09049-DOC-RNB   Document 9868   Filed 02/14/11   Page 32 of 112   Page ID #:298121
CV 04-9049-DOC - 02/10/2011 - Day 16, Vol. 3 of 4

32

```
 1              THE COURT:  You did.  I want to set the record,

 2    though, over the objection because then the insinuation is

 3    that this was rejected before and wasn't to be allowed;

 4    that's not true.  This is known to all the parties.  I think

 5    this occurred on Saturday.  It occurred on Monday.  It

 6    occurs as late as -- I don't know the exact dates, but I

 7    said you could go into this area from '99, 2000 up until the

 8    launch in July of 2001.  How that's breaking down in

 9    communication, I don't know.

10              But please continue.

11              MGA should know that.

12    BY MR. PRICE:

13    Q    Just give you, for example, Mr. Larian, if you look at

14    Exhibit 4907.

15    A    Is that here?

16    Q    While she is doing her good work, remember yesterday we

17    were looking at some documents in, I think, October 2000

18    about using the Skipper doll, Mattel's Skipper doll for

19    armature and joints and things like that?

20    A    Yes, I do.

21              MR. MC CONVILLE:  What's the number?

22              MR. PRICE:  This is 4907.

23              THE WITNESS:  Go ahead.

24    BY MR. PRICE:

25    Q    And you recognize this as e-mails to and from you and
```

1    other folks at MGA?

2    A    Yes.

3             MR. PRICE:  Your Honor, we move 4907 into

4    evidence.

5             THE COURT:  Received.

6             (Plaintiffs' Exhibit No. 4907 is received in

7        evidence.)

8    BY MR. PRICE:

9    Q    And we see in the first e-mail from Stephen Lee to

10   you -- I'm sorry, the first on the document, talks about, in

11   the second paragraph, there being a major quality problem

12   with early light on the Bratz dolls for Bandai; do you see

13   that?

14   A    Yes, I see that.

15   Q    Now, I want to present or show you the -- the

16   communications that led up to that, and at the bottom of

17   that page, you see -- you can see "From Isaac Larian, May 5,

18   2001," and that e-mail goes on to the next page; do you see

19   that?

20   A    Yes.

21   Q    And you've told us that Stephen Lee was in your

22   Hong Kong office, right?

23   A    Yes.

24   Q    And in that e-mail your -- you're talking about the

25   packaging?

Case 2:04-cv-09049-DOC-RNB   Document 9868   Filed 02/14/11   Page 34 of 112   Page ID #:298123
CV 04-9049-DOC - 02/10/2011 - Day 16, Vol. 3 of 4

34

1   A     Yes.

2   Q     And in the second paragraph there, you say, "After you

3   get these, please sit down with the Bratz product manager in

4   HK, show them the competition package as well as ours," and

5   that's in bold caps; do you see that?

6   A     Yes.

7   Q     And let me know by next Thursday why another toy

8   company can do something our MGA people in HK say we cannot

9   do the exact same thing for MGA product; do you see that?

10  A     Sorry, yes.

11          MS. KELLER:  I thought that word is "but."

12          MR. PRICE:  It may be.

13  BY MR. PRICE:

14  Q     "Something, but MGA people in HK say we cannot do the

15  exact thing for MGA product."

16  A     Yes.

17  Q     So this is an example of trying to meet the competition

18  in terms of quality?

19  A     No, it's just about the packaging.  I remember this one

20  here, because Mattel had a product that it was easy to take

21  the product out of the package, which I had bought at Toys R

22  Us.  And I kept telling our people that we got to make our

23  packaging easier for the consumers to remove product from,

24  and why can they do it and we cannot.  It had nothing to do

25  with the quality.

1    Q    Okay.  It had to do with the experience for the

2    consumer?

3    A    Yes.

4    Q    And then if you look at Exhibit 4909.

5         THE COURT:  I'm going to want to know the date on

6    that, Counsel.

7         MR. PRICE:  Yes, your Honor, that's May 7, 2001.

8         THE COURT:  Thank you.

9    BY MR. PRICE:

10   Q    And do you recognize this 4909 as being an e-mail from

11   Ms. Garcia to Mr. Kwok, Ms. Ashong dated May 7, 2001?

12   A    Yes, I'm not on this e-mail, but --

13   Q    Pardon?

14   A    I don't see my name on this e-mail.

15   Q    And do you recall there being an issue in about May

16   2001 about a hang tag?

17   A    I don't, unfortunately.

18   Q    Do you know what a hang tag is?

19   A    Yes, I know what a hang tag is.

20   Q    Can you tell us?

21   A    It's a little tag that hangs on the -- do any of you

22   guys buy Beanie Babies?  That tag.

23   Q    And do you have any recollection of MGA looking at a

24   Barbie sample to get an idea of how to fix a hang tag issue

25   with Bratz?

Case 2:04-cv-09049-DOC-RNB  Document 9868  Filed 02/14/11  Page 36 of 112  Page ID #:298125
CV 04-9049-DOC - 02/10/2011 - Day 16, Vol. 3 of 4

36

1    A    I have no recollection of that, I'm sorry.

2    Q    And you are not copied on this e-mail, right?

3    A    I am not.

4    Q    But it does have a MGA Bates number, produced by MGA?

5    A    Yes, it is.

6    Q    Do you have any doubt to believe that this is not an

7    e-mail that was sent by Ms. Garcia around May 17, 2001?

8    A    I have no doubt.

9            MR. PRICE:  Your Honor, I won't examine this

10   witness further on it, but I move it into evidence, 4909.

11           THE COURT:  Any objection?

12           MS. KELLER:  No foundation, your Honor.

13           THE COURT:  All right.  We'll take this out of the

14   presence of the jury in a few moments.

15           Counsel, you can continue to examine on it.

16           THE WITNESS:  Excuse me?

17           THE COURT:  Yes.  Do you need a break?

18           THE WITNESS:  I think I have the same bug from

19   Mr. Price.

20           THE COURT:  We're going to take a restroom break.

21   You are admonished not to discuss this matter amongst

22   yourselves, nor form or express any opinion concerning this

23   case.  Have a nice recess.

24           Counsel, please remain.

25

Case 2:04-cv-09049-DOC-RNB   Document 9868   Filed 02/14/11   Page 37 of 112   Page ID #:298126
CV 04-9049-DOC - 02/10/2011 - Day 16, Vol. 3 of 4

37

1              *(The following proceedings is taken outside*

2          *the presence of the jury.)*

3              THE COURT:  All right.  Counsel, have a seat.  I

4    want to set this record so the circuit knows exactly what's

5    occurring.

6              Initially, for want of a better word, Mattel was

7    much too expansive, they wanted copying to come into this

8    case which would cause a mini trial within a mini trial, and

9    the Court initially ruled that I was going to exclude

10   copying in a general sense in unrelated items.  Mattel came

11   back and pointed to the relevancy from their perspective

12   that copying was important close to the time or a little

13   after the -- what they believe is the trade secret

14   misappropriation of Carter Bryant's drawings, et al., in

15   October -- September, October of 2000.

16             After reconsideration, this Court -- because of

17   the narrowing of that initially broad and too broad request

18   and this Court's fear that this was unduly consumptive of

19   time and a mini trial within a mini trial, agreed with

20   Mattel and allowed for a limited time period, up to the

21   launch, that launch being as early as May, according to one

22   witness, but more appropriately June, July or at the latest

23   August, Mattel to get into copying even in unrelated areas.

24             The reason for that change in this Court's part,

25   which was made known to counsel for MGA and counsel for

 1    Mattel, was that this has to do with the capability and the

 2    development-ability of MGA on or around the time of Bratz.

 3    In other words, what did they have at their facility, what

 4    did they have the capability of doing, and some of these

 5    involved tags, et cetera.

 6            The second problem is this idea that the buck

 7    doesn't stop here.  I'm a little concerned as a trial judge

 8    that if Mr. Larian and Mr. Eckert don't know what are

 9    occurring eventually in their own companies, who does?  The

10    claim will be that documents weren't read, that different

11    employees are not available, that -- well, I can just

12    imagine the ability of a major corporation or entities to

13    literally hide behind the foundation objection for both

14    sides.

15            Compounded is the fact that Mr. Larian has

16    insisted on being the 30(b)(6) witness.  From Mattel's

17    perspective, that's so that the information could be

18    controlled, that's what's been presented to me.

19            From MGA's position, they believe that that's in

20    good faith and that he's the most knowledgable.  I make no

21    finding concerning that.

22            But it appears to me where you have a development,

23    whether it's tags, et cetera, within this reason, that there

24    is every reason with the resources of counsel and the

25    preparation and the complaint that Larian, Eckert, et al.,

```
 1    have been subject to multiple interrogatories and copying,

 2    it's rather astounding that either they haven't been

 3    prepared or chosen not to be prepared.

 4            I'm going to receive this document, Counsel, over

 5    your objection, and first of all, I understand that there is

 6    a lack of foundation, there should be.

 7            I'll open the doors in 15 minutes.

 8            (Recess.)

 9            (The following proceedings is taken in the

10        presence of the jury.)

11            ISAAC LARIAN, PLAINTIFFS' WITNESS, RESUMED

12            THE COURT:  All right.  We are back in session.

13    The jury is present.  All counsel are present.

14            Mr. Larian is present.

15            And Counsel, Mr. Price, if you'd like to continue

16    with your direct examination, please.

17            MR. PRICE:  I'm not sure if it's on the record,

18    but I move 4909 into evidence.

19            THE COURT:  It's received.

20            (Plaintiffs' Exhibit No. 4909 is received in

21        evidence.)

22            MR. PRICE:  Show that to Mr. Larian.

23                    DIRECT EXAMINATION (Continued)

24    BY MR. PRICE:

25    Q    And if you'd look at the second e-mail down from
```

1   Cecilia Kwok to Ms. Garcia and others, she is the woman in

2   Hong Kong that you believed was not experienced in doll

3   making, fashion doll making, correct?

4   A    Yes.

5   Q    And you see it says "Dear all, as per telephone call

6   with Nana, confirmed that we should not use any hang tag to

7   fix the position of the head in order to make sure that the

8   doll head faced to the front in the production now.  L.A.

9   accepted the head may move upwards, downwards, left or right

10  after shipment.  We will send sample with hang tag for

11  Paula's comments.  If the sample approved, the hang tag will

12  be added in running change basis.  Please confirm."

13       So this is an issue with the doll shifting and the head

14  shifting up and down, sideways?

15  A    I don't remember what it was.

16  Q    Do you see the one at the top from Ms. Garcia to

17  Ms. Kwok and others, "I apologize for the confusion.  I

18  returned from my vacation and pulled a Barbie sample.  I

19  understand now what you're proposing for the hang tag.

20  Please implement ASAP.  This is a good solution to ensuring

21  that the doll is best represented in pack out"; do you see

22  that?

23  A    I do.

24  Q    Do you recall that in August of 2001, that there was a

25  exchange concerning being able to twist the hair and having

1    a flexible waist; do you recall that?

2    A    (No audible response.)

3    Q    It's a different -- let me show you the e-mail.

4         THE COURT:  And remember, ladies and gentlemen,

5    I'm only allowing this for a limited purpose.  This isn't to

6    become a mini trial within a mini trial about which company

7    is doing what with which concerning nonrelated products, but

8    up until the time of the launch of Bratz, I'm allowing

9    counsel a limited opportunity for any unrelated products to

10   see what the development capabilities are or are not of the

11   corporations involved.

12   BY MR. PRICE:

13   Q    Do you have 21283 in front of you?

14   A    I don't.

15   Q    Probably haven't mentioned the number yet.

16        MS. KELLER:  21283.

17        MR. PRICE:  21283.

18        THE WITNESS:  Go ahead.

19   BY MR. PRICE:

20   Q    Do you recognize this as an e-mail to you dated in

21   August of 2001?

22   A    It's an e-mail from me to --

23   Q    From you to Mr. Tsang, I'm sorry?

24   A    Yes.

25   Q    And basically it says, "See below," and there's an

1    e-mail below which are one of those things where you put in

2    answers to questions?

3    A    Yes.

4              MR. PRICE:  I move Exhibit 21283 into evidence.

5              THE COURT:  Received.

6              (Plaintiffs' Exhibit No. 21283 is received in

7         evidence.)

8    BY MR. PRICE:

9    Q    And if we look at the top, you can see it's from you to

10   Mr. Tsang, that's the last e-mail, correct?

11   A    That's correct.

12   Q    And it's regarding line updates?

13   A    Yes.

14   Q    And if you'd look at the e-mail below it dated

15   August 17, 2001, that's from Mr. Tsang to you, correct?

16   A    Yes.

17   Q    And it has "Isaac's Q and A dated August 17, 2001"; do

18   you see that?

19   A    I do.

20   Q    If we go a couple down where it says, "Bratz fall

21   2002"; do you see that?

22   A    Yes.

23   Q    And it says, "What is the status of each item?  Look at

24   Barbie Teresa doll where you can twist the hair and change

25   hair color, paren, (I bought one sample), closed paren.

Case 2:04-cv-09049-DOC-RNB   Document 9868   Filed 02/14/11   Page 43 of 112   Page ID #:298132
CV 04-9049-DOC - 02/10/2011 - Day 16, Vol. 3 of 4

43

1   Does Mattel have patent on the flexible waist"; do you see

2   that?

3   A    Yes.

4   Q    And further down, perhaps you can tell me who this FT

5   is, I think it's the second from the bottom?

6   A    Franki Tsang.

7   Q    Where it says FT, is it your understanding he's sending

8   that or that's a question to you?  I mean, in the context of

9   this e-mail, who's making this statement?

10  A    A lot of people are making statements.

11  Q    Where it says, "paren, FT, Barbie Teresa doll, please

12  send over the sample for reference.  Flexible waist patent.

13  Please find out at your end."

14       Can you tell from the context of this e-mail who's

15  writing that?

16  A    Franki Tsang, FT.

17  Q    That's on August 19th, if you'd look at, I'll put in

18  front of you, 20656.

19  A    Two zero --

20  Q    Yeah, it's going to be 20656.

21       And do you recognize 20656 as an e-mail from Ms. Kwok

22  to Ms. Garcia and copying you?

23  A    Yes.

24            MR. PRICE:  Move 20656 into evidence.

25            THE COURT:  What's the date on it, Counsel?

Case 2:04-cv-09049-DOC-RNB   Document 9868   Filed 02/14/11   Page 44 of 112   Page ID #:298133
CV 04-9049-DOC - 02/10/2011 - Day 16, Vol. 3 of 4

44

1           MR. PRICE:  That's August 25, 2001.

2           THE COURT:  Received.

3           (Plaintiffs' Exhibit No. 20656 is received in

4       evidence.)

5    BY MR. PRICE:

6    Q    And you see it starts with, "Dear Paula, I received the

7    Barbie Teresa with twisted hair color sample today, paren,

8    August 24"?

9    A    Yes.

10   Q    And on the second line, I think the last sentence, "Our

11   development was on hold and waited for this twisted Barbie

12   sample"?

13   A    That's what it says.

14   Q    And then it goes on to say, "The Barbie sample also

15   have the line/gap between the head and the hair cup and the

16   trim between the hair cap and the rooted hair, Barbie

17   covered these by hair only"; do you see that?

18   A    I do.

19   Q    And I can't remember why we went off on that, but it

20   was an answer that you gave in connection when I was talking

21   about Mexico City.  I apologize if I distracted you or the

22   jury from that topic, but let's go back to that.

23   A    Are we going to Mexico City or are we going here?

24   Q    Yes, back to Mexico City.

25           MR. PRICE:  So we can take that down, Ken.

Case 2:04-cv-09049-DOC-RNB   Document 9868   Filed 02/14/11   Page 45 of 112   Page ID #:298134
CV 04-9049-DOC - 02/10/2011 - Day 16, Vol. 3 of 4

45

1    BY MR. PRICE:

2    Q    So we talked about -- I showed you a couple of

3    documents, including that really thick one; do you recall

4    that, the one with MGA's office in Mexico?

5    A    Yes.

6    Q    At the time -- well, after you learned about the search

7    in Mexico City, and even after you learned the allegations

8    that there were Mattel documents in the office, MGA paid

9    attorney's fees for Mr. Machado, Mr. Vargas and Ms. Trueba,

10   correct?

11   A    Yes, up to a point.

12   Q    Now, when you say "up to a point," MGA -- is MGA still

13   paying Mr. Machado's counsel's fees?

14   A    Yes.

15   Q    And they are paying those fees even though MGA is now

16   aware that Mr. Machado, Ms. Trueba, Mr. Vargas downloaded

17   documents from Mattel and actually had them in the MGA

18   Mexico City office?

19   A    Yes.

20   Q    Now, MGA Mexico is -- is that still in existence?

21   A    No.

22   Q    When was that shut down?

23   A    Last couple of years.

24   Q    So about 2009?

25   A    I don't remember the exact date.

Case 2:04-cv-09049-DOC-RNB   Document 9868   Filed 02/14/11   Page 46 of 112   Page ID #:298135
CV 04-9049-DOC - 02/10/2011 - Day 16, Vol. 3 of 4

46

1    Q    Well, just an estimate of when you closed down the

2    subsidiary.

3    A    Last two years.

4    Q    And until that point, were either Mr. Machado or

5    Mr. Vargas or Ms. Trueba working with MGA?

6    A    When MGA was opened, they were working at MGA.

7    Q    And when was the last day that Mr. Machado was working

8    there?

9    A    I don't know.  I don't remember the date.

10    Q    Was he working there until -- well, actually,

11    Mr. Machado -- after you learned about the seizure,

12    Mr. Machado was promoted, right?

13    A    Yes.

14    Q    Now, Mr. Machado, you say, said to you that he was only

15    going to bring -- bring his brain to MGA Mexico, correct?

16          MR. OVERLAND:  Objection.  Misstates the evidence.

17    I think that's what he said, not what Mr. Machado said.

18          MR. PRICE:  I think you're right.  Let me rephrase

19    that.

20    BY MR. PRICE:

21    Q    You told Mr. Machado only to bring his brain to MGA

22    Mexico, right?

23    A    Yes, thank you.

24          I'm smiling.  Mr. Overland woke up.

25    Q    He may be the only one here, but let me ask you the

```
 1    question anyway.
 2         You told Mr. Machado to only bring his brain, right?
 3    A    I told all of them to bring only their brain.
 4    Q    And you believe that was a critical instruction?
 5    A    Absolutely.
 6    Q    And that was an important concept to you, right?
 7    A    Yes.
 8    Q    And this, again, is something that you wanted anyone
 9    coming in from a competitor to know that you were serious
10    about?
11    A    Yes.
12    Q    But you know that Mr. Machado brought more than his
13    brain?
14    A    I do.
15    Q    And you promoted him?
16    A    I did.
17    Q    And let's see, he was transferred to the United States?
18    A    For a while, yes.
19    Q    And he was vice president of marketing in the United
20    States?
21    A    For a short while, yes.
22    Q    Do you know the towers in Marina Del Rey, that area?
23    A    I'm sorry?
24    Q    Do you know where the towers are in Marina Del Rey?
25    A    I don't.
```

```
 1              MS. KELLER:  Objection.  Irrelevant.

 2              THE COURT:  If it goes into his housing, Counsel,

 3    it's irrelevant.

 4              MR. PRICE:  Let me ask it this way --

 5              THE COURT:  Are you talking about salary, how much

 6    he made?

 7              MR. PRICE:  Let's ask that.

 8    BY MR. PRICE:

 9    Q    Was he provided with any benefits when he came to the

10    United States?

11    A    He had benefits, yes.

12    Q    When he got a promotion, did he make more money?

13    A    I don't know if he did or not.

14    Q    Did he get bonuses?

15    A    I don't know if he did or not.

16    Q    How about Ms. Trueba, after the -- the seizure of

17    Mattel's documents in the MGA Mexico City office, was she

18    promoted?

19    A    I don't know.

20    Q    Did she get bonuses?

21    A    I don't know.

22    Q    Was she disciplined?

23    A    I don't know.

24    Q    Okay.  Now, you are the chief executive officer of MGA,

25    right?
```

1    A    (No audible response.)

2    Q    And your employees at MGA in Mexico City had taken

3    Mattel documents and brought them into MGA, right?

4    A    Mattel Mexico, yes, they did.

5    Q    And you didn't keep track of whether the employees who

6    did that were disciplined or promoted?

7    A    I know that Gustavo Machado was promoted.  I testified

8    to that.

9    Q    You know there were two other people who were involved,

10   right?

11   A    Yes.

12   Q    And so -- well, did you take any action to discipline

13   Ms. Trueba or Mr. Vargas?

14   A    I did not.

15   Q    Did you do anything to make sure that they -- they

16   weren't promoted?

17   A    No.

18   Q    Did you do anything to make sure that they didn't get

19   bonuses?

20   A    I don't know if I did or not.  I don't remember.  I

21   have might have.

22   Q    Is the instruction that you give to only bring your

23   brain, is that just window dressing?

24              MS. KELLER:  Objection.  Argumentative.

25              THE COURT:  "Window dressing," sustained.

1    BY MR. PRICE:

2    Q    Is the direction you give to a competitor's employee to

3    only bring their brain, is that direction something you ever

4    tend -- intend to give any teeth to, that is, to enforce?

5    A    I do.

6    Q    But you didn't enforce that with respect to

7    Mr. Machado, anyway, correct?

8    A    What do you mean by that?

9    Q    Well, discipline him, fire him, reduce his salary, make

10   sure he didn't get bonuses?

11   A    We did discipline him.

12   Q    And how did you discipline Mr. Machado?

13   A    We told him, why did you do that.

14   Q    I'm sorry, you what?

15   A    We told him -- we brought him into our human resource

16   office, and we told him, why did you do that.

17   Q    Okay.  So the discipline was to ask him why?

18   A    Yes.

19   Q    Okay.  And you thought engaging that conversation was

20   enough discipline for someone who left Mattel and brought

21   Mattel information into the MGA Mexico office?

22   A    Yes.  He was very sorry, remorseful about what he had

23   done and promised that he would never do such a thing again.

24   Q    Was it before or after that that you gave him his

25   promotion?

Case 2:04-cv-09049-DOC-RNB   Document 9868   Filed 02/14/11   Page 51 of 112   Page ID #:298140
CV 04-9049-DOC – 02/10/2011 – Day 16, Vol. 3 of 4

51

1    A    I don't remember when it was.  Probably before.

2    Q    By the way, these three individuals, Mr. Machado,

3    Ms. Trueba, Mr. Vargas, these three ran your MGA Mexico,

4    right?

5    A    Not by themselves, no.

6    Q    But if you are going to identify the people who were

7    going to run MGA Mexico, it was those three?

8    A    No.  Susana Kuemmerle was the managing director from

9    MGA Mexico.  She was the big boss.

10   Q    Let me show you Exhibit 6785.

11   A    Go ahead.

12   Q    Do you recognize 6785?

13   A    Yes.

14   Q    An e-mail from you to Nancy Koppang?

15   A    Yes.

16        MR. PRICE:  Your Honor, I move Exhibit 6785 into

17   evidence.

18        THE COURT:  Received.

19        *(Plaintiffs' Exhibit No. 6785 is received in*

20   *evidence.)*

21   BY MR. PRICE:

22   Q    And let's look at the -- the e-mail at the bottom where

23   it has CarlosFuentes@plot04 to Isaac Larian.  It says, "Good

24   morning, Isaac.  Sorry for the delay, but nobody checked the

25   mail on the weekend since each went away.  The numbers are

1    as follows."  And you see there's Pablo, Mariana and

2    Gustavo, correct?

3    A    Yes.

4    Q    And it's your understanding that Pablo refers to

5    Mr. Vargas?

6    A    Yes.

7    Q    And it's your understanding that Mariana refers to

8    Ms. Trueba?

9    A    Yes.

10   Q    And that Gustavo refers to Mr. Machado?

11   A    Yes.

12   Q    And what they are sending you are their -- their cell

13   phones; is that right?

14   A    I believe so, yes.

15   Q    And then you e-mail Nancy Koppang.  And could you

16   remind us who she is?

17   A    She's my assistant.

18   Q    And this is on April 11, 2004, correct?

19   A    Yes.

20   Q    And what you tell her is, "These people will run MGA

21   Mexico's" -- "MGA Mexico," I'm sorry.  "Please note their

22   numbers," correct?

23   A    I do.

24   Q    So Mr. Machado, then, when he came in to you and said

25   he was remorseful and that he would not do it again --

1   A    Yes.

2   Q    -- was it your understanding, "won't do it again," that

3   he won't go join a competitor, download documents, and then

4   come back to MGA; is that what you understood him to mean

5   when he said he won't do it again?

6   A    No.  That he was remorseful of what he had done, that

7   he's sorry.  He thought he was wrong for doing it, that he

8   would just -- that was the experience for him, that he would

9   not do that, in general.

10  Q    So you didn't think there was any opportunity for him

11  to, quote, "do it again," right?

12  A    What do you mean by that?

13  Q    I mean download information from a competitor and then

14  take it to MGA Mexico's offices?

15  A    Download information from MGA Mexico and take it to

16  wherever he was going, I don't think he would do that again.

17  Q    So it was your concern that he would steal something

18  from MGA and go somewhere else?

19  A    No.  He was remorseful of what he had done.  I think he

20  had learned his lesson.  I think Mattel Mexico instigated

21  this seizure through means that I don't want to talk about.

22  Is Mr. Khouri is still here?  Yes, Mr. Khouri is there with

23  his head down.  And I felt that this is what they were using

24  to get back at me, and he was sorry for doing it, and he --

25  he said that he would not do it again.

1   Q     You said they were trying to get back at you, I just

2   want to ask you this, there were Mattel documents in the MGA

3   Mexico City office, right?

4               MR. OVERLAND:  Objection, your Honor.  No

5   foundation as to what -- whether he was there.

6               THE COURT:  Overruled.

7               MS. KELLER:  Objection.  Vague as to time, your

8   Honor.

9               THE COURT:  Overruled.

10              THE WITNESS:  I can hear you well, yes --

11  BY MR. PRICE:

12  Q     You were the corporate representative?

13  A     I'm trying to answer your earlier question.  Yes, there

14  were Mattel Mexico documents in Mattel -- in MGA Mexico.  I

15  heard you well.

16  Q     And the seizure was one year after -- let's see, more

17  than one year after they left Mattel Mexico, right?

18  A     I don't remember the exact day.

19  Q     Well, a seizure was October of 2005, right?

20  A     I don't remember the date.  If you say it's

21  October 2005, I accept that.

22  Q     I'm sorry, the seizure of October and the -- they left

23  MGA Mexico, do you remember that, "Rome is burning," around

24  April of 2004, right?

25  A     Yes.

1    Q    So it's a year and a half that has gone by -- there is

2    a search of the MGA Mexico offices, and a year and a half

3    after they left Mattel, there are documents of Mattel in the

4    MGA offices, right?

5    A    Right.

6    Q    Did you do anything to investigate whether any of the

7    documents that the authorities found in the search of the

8    MGA Mexico City offices were ever sent to MGA Entertainment

9    in the United States?

10   A    I did.

11   Q    And did you do that after July 7, 2010?

12   A    No, right -- to the best of my recollection, right

13   after we found out about the seizure, I directed my legal

14   department to look into that and investigate.

15   Q    Well, having done that, I guess, then, you probably

16   have some idea as to whether or not documents found in the

17   Mexico -- by the Mexican authorities during the search of

18   the MGA Mexico City offices, you would have some idea of

19   whether the Mattel documents were sent to MGA in the United

20   States, correct?

21   A    Yes, and to the best of my recollection, nothing was

22   sent to the MGA United States.  Again, I could be wrong, but

23   I don't think -- what I was told that none of those

24   documents came to MGA U.S.A.

25   Q    So when did you come to the belief that none of the

1   documents came to MGA U.S.A.?

2   A    I don't remember the date.

3   Q    Was it shortly after the -- the search in 2005?

4   A    It was after our legal department had done an

5   investigation.

6   Q    Can you give me any time frame between 2005 to 2010?

7   A    Between 2005 and 2010.

8   Q    You can't narrow it down any further than that?

9   A    No.

10   Q    At the time you were testifying as a 30(b)(6) witness

11   on July 7, 2010?

12   A    Yes.

13   Q    By then, did you have any idea whether or not documents

14   seized in 2005 from MGA Mexico had been sent to MGA U.S.A.?

15   A    Can you repeat that again?

16   Q    Yeah.  As of July 7, 2010, when you testified as a

17   30(b)(6) witness.

18   A    Right.

19   Q    By that time, did you have any idea whether or not

20   documents seized in MGA Mexico, the Mattel documents, were

21   sent to the U.S., MGA, U.S.A.?

22   A    Yes, they were not.

23   Q    So you would conclude that by the time of your 30(b)(6)

24   deposition?

25   A    Yes.

Case 2:04-cv-09049-DOC-RNB   Document 9868   Filed 02/14/11   Page 57 of 112   Page ID #:298146
CV 04-9049-DOC - 02/10/2011 - Day 16, Vol. 3 of 4

57

1          MR. PRICE:  Your Honor, I'd like to read from the

2    July 7, 2010, 30(b)(6) deposition of Mr. Larian from

3    page 2473, line 11 to line 25.

4          THE WITNESS:  Go ahead.

5          THE COURT:  Just a moment.

6          You may.

7          MR. PRICE:  Question:  "Were any of the documents

8    that the Mexican authorities located during the search of

9    the MGA Mexico City offices in 2005 --"

10          Answer:  "Right."

11          "-- that were Mattel documents ever sent to MGA

12    Entertainment, Inc., in the U.S.?"

13          Answer:  "I don't know.  I have no idea."

14          Question:  "Did you investigate that?"

15          Answer:  "I did not."

16    BY MR. PRICE:

17    Q    And it's your understanding that the Mattel documents

18    found in the Mexico City office were actually found on and

19    in the desks of Mr. Machado, Ms. Trueba and Mr. Vargas,

20    correct?

21          MR. OVERLAND:  Objection.  No foundation.

22    Speculation.

23          THE COURT:  Overruled.

24          THE WITNESS:  In MGA Mexico?

25

Case 2:04-cv-09049-DOC-RNB   Document 9868   Filed 02/14/11   Page 58 of 112   Page ID #:298147
CV 04-9049-DOC - 02/10/2011 - Day 16, Vol. 3 of 4

58

1    BY MR. PRICE:

2    Q    I'm sorry, you're right.

3        You understand that the documents that are Mattel

4    documents were found in the MGA Mexico City offices, the

5    Mattel documents were found on and in the desks of

6    Ms. Trueba, Mr. Machado and Mr. Vargas?

7            MR. OVERLAND:  Same objection.  Also his

8    understanding is irrelevant.

9            THE COURT:  Overruled.

10           THE WITNESS:  I don't know whose desk it was

11   found, but it was found at MGA Mexico.

12   BY MR. PRICE:

13   Q    When you were testifying as the corporate

14   representative on the topic of the search --

15   A    Yes.

16   Q    -- were you given information on that?

17   A    No, because I was told that if they give me that

18   information, that exposes me to Mattel's trade secret, and

19   my lawyer did not want me to be exposed to Mattel's trade

20   secrets.

21   Q    So is it your understanding that where the documents

22   were located in the search was a Mattel trade secret?

23   A    They just -- I am not sure if I can talk about that.

24   Q    Well, I'm talking about where the Mattel documents were

25   found, that information, not a trade secret, is it?

Case 2:04-cv-09049-DOC-RNB   Document 9868   Filed 02/14/11   Page 59 of 112   Page ID #:298148
CV 04-9049-DOC - 02/10/2011 - Day 16, Vol. 3 of 4

59

1   A    If I disclose what I know, it's going to infringe on my

2   attorney-client privilege discussion, and I'm not going to

3   talk about it, unless I'm advised by my lawyer and the

4   judge.

5          MS. KELLER:  Your Honor, may we have a rule of

6   completeness testimony on the earlier testimony that would

7   explain this?  And we have the page and the line numbers.

8          THE COURT:  What line numbers would those be?

9          MS. KELLER:  Page 2471, 2 to 23.

10          THE COURT:  Can I see 2471?

11          2471, what lines, Counsel?

12          MS. KELLER:  Lines 2 through 23.

13          THE COURT:  And what line on page 2472?

14          MS. KELLER:  That's the one, your Honor, 2471, 2

15   to 23.

16          THE COURT:  Well, just a moment.  2471, lines 2

17   through 23, and on page 2472, the entire page?

18          MS. KELLER:  I don't think anything on 2472, your

19   Honor.

20          THE COURT:  Okay.  So it's 2471, because I thought

21   you said through 2473.  So I want to make sure, 2471, lines

22   2 through 23, and then what's already been read from 2473?

23          MS. KELLER:  Well, then at 2470, lines 3

24   through --

25          THE COURT:  Wait.  Now we are going back to 2470.

1          Counsel, why don't we go on with this and give me

2     the pages at a different time.

3          All right.  Counsel, your next question.

4     BY MR. PRICE:

5     Q    Well, let me ask you, Mr. Larian, as you said, you were

6     an empty vessel being given information as the corporate

7     representative of MGA at the 30(b)(6) deposition, right?

8     A    For the subjects that the Court had ordered, I

9     testified to.

10    Q    Right.  Including documents that you understood to be

11    among the documents that were located by Mexican authorities

12    during the search of the Mexico City office of MGA in 2005?

13    A    I have not memorized the court order.  I'd like to take

14    a look at that before I can say "yes" or "no," definitely.

15    Q    Well, we've been over that, so I don't want to waste

16    too much time on it, but the information you received

17    concerning the topics that were designated, the information

18    you received was conveyed to you by your counsel, right?

19    A    The information that -- I'm sorry, I'm getting a little

20    tired and I'm not paying attention.  Go ahead.  Say that

21    again.

22    Q    Your lawyers prepared you for that deposition by giving

23    you information, correct?

24    A    Yes.

25    Q    So that you could testify as the corporate

1    representative of MGA on the topics that were designated,

2    right?

3    A    Yes.

4    Q    And in connection with that 30(b)(6) deposition, you

5    were required to review attorney-eyes-only material, right?

6    A    Only certain amount of attorney-eyes-only material.

7    Repeatedly I've asked my attorneys to ask the Court to let

8    me see attorney-eyes-only material, and that was denied.

9    Q    We're talking about on the subjects that you were

10   deposed on in connection with being a 30(b)(6) witness,

11   okay?  On those subjects, the Court required that you review

12   the attorney-eyes-only material on those subjects, correct?

13   A    And what I'm saying to you is my attorneys gave me only

14   sections of those documents that they thought was

15   responsive, because they did not want to be in the breach of

16   the protective court order, not so -- to make it very clear,

17   I did not and today still, even though I'm a named party in

18   this case, have not seen all the documents that you have

19   marked "AEO."

20   Q    And my question is more specific, you were required to

21   look at all documents marked "AEO" that related to the

22   topics you were being put forth on as the MGA corporate

23   representative, correct?

24   A    Yes, and my answer to you is that my lawyers gave me

25   only sections that they thought was responsive for me to

Case 2:04-cv-09049-DOC-RNB   Document 9868   Filed 02/14/11   Page 62 of 112   Page ID #:298151
CV 04-9049-DOC - 02/10/2011 - Day 16, Vol. 3 of 4

62

1    review.  They did not give me everything.  For example, if
2    there was a deposition, they only gave me a few pages of it.
3    They said that's the only thing you can read.  Or there were
4    documents, they only gave me a -- a portion of it.  They did
5    not give me the whole portion because of the protective
6    order.
7    Q    Was it your understanding that your lawyers gave you
8    all the documents that pertained to the topics that were
9    identified in the 30(b)(6) notice, the topics you were
10   testifying about?
11   A    Yes.
12   Q    So that's what I've been focusing on.
13        So with respect to documents that were located by
14   Mexican authorities during the search of the Mexico City
15   office of MGA in 2005, your understanding is you were given
16   all the documents that pertained to that topic?
17   A    I am not sure if I was given all the documents or not
18   because I have not, up to date, been able to see all the
19   documents, so the answer is no.
20   Q    Do you believe that in preparing for your 30(b)(6)
21   deposition, that your attorneys did not give you all the
22   documents relating to the topics that you were to be
23   testifying about, I'm talking about those topics --
24            MS. KELLER:  Objection, your Honor.  That calls
25   for this witness to speculate about what his attorneys did

1    or didn't give him.

2            THE COURT:  It goes to the state of mind.

3    Overruled.

4            THE WITNESS:  All I can tell you is that they gave

5    me a lot of documents, and there were sections of them when

6    I asked them, for example, "Can I read this whole

7    deposition?  Where is the rest of it?"  And they said, "You

8    are not allowed to read the rest of it because that's AEO.

9    You can only read this portion because this is what the

10   Court ordered."

11   BY MR. PRICE:

12   Q    And your understanding was that you couldn't read

13   portions that didn't relate to the topics that you were

14   designated to testify about?

15   A    I really don't know.  I can't speculate about that.  I

16   left that to my capable lawyers to decide.

17   Q    So you left it appropriately to your lawyers to decide

18   what materials related to the topics you were testifying

19   about and what materials did not?

20   A    I did.

21   Q    And you have the utmost confidence that they gave you

22   all the documents that pertained to the topics you were

23   testifying about and didn't let you look at some other

24   documents, right?

25   A    They did not let me look at other documents, that's

1   absolutely correct.

2   Q    Yeah, but you skipped the first part of my question.

3   A    They gave me -- Mr. Price, all of the documents that

4   they gave me to review, I did.

5   Q    And you have the utmost confidence in your counsel that

6   they gave you all the documents that related to the topic of

7   the search in Mexico City that found Mattel documents at the

8   MGA Mexico City office, you're confident about that?

9   A    Yes.

10         MS. KELLER:  Objection.  Calls for speculation.

11         THE COURT:  Overruled.

12  BY MR. PRICE:

13  Q    Now, if you'd look at 6741, and this is a document I

14  showed to you earlier.

15  A    Yes.

16  Q    And then I'm going to ask you to turn your attention to

17  6741-0017; do you see that?

18  A    Not yet.

19         Now I do, yes.

20  Q    And do you see that that reflects payments made on

21  behalf of Mr. Machado, Mr. Vargas and Ms. Trueba to counsel;

22  do you see that?

23  A    I do.

24  Q    And at least on this page, 00017, you see next to where

25  it has that big number 11, you see there is a payment as

1    early as February 14, 2006, correct?

2    A    What 11?

3    Q    Yeah, if you look down on the left-hand side there,

4    those big numbers, it's the line numbers, and next to that

5    there is an entry, "February 14, 2006"; do you see that?

6    A    I do.

7    Q    And payments started for counsel for Mr. Vargas,

8    Mr. Machado and Ms. Trueba at least as early as February 14,

9    2006, correct?

10   A    Yes.

11   Q    And if you'd look at the next page, 00018, do you

12   see -- do you see on the eighth line down, do you see there

13   are payments for the trio on March 20, 2009?

14   A    That's correct.

15   Q    And it's your understanding that Mr. Machado -- that

16   the payments on behalf of Mr. Machado have continued to this

17   day?

18   A    No -- oh, to Mr. Machado?  Yes, yes, I'm sorry.

19   Q    And if you look at 6741-00022, that's the chart which

20   shows bonus payments made by MGA?

21   A    Yes.

22   Q    And you see there's a bonus payment on July 17, 2008 of

23   8500 to Mr. Machado?

24   A    What line are you on?

25   Q    It's the last line on 06741-00022.

1    A    Has the number like 17?

2    Q    The last one in the box, March 17, 2008.

3    A    Yes, I see that.

4    Q    You see there is a bonus payment of 8500 to

5    Mr. Machado?

6    A    Yes.

7    Q    And if you'd look on the next page, you see there are

8    payments to Ms. Trueba and Mr. Vargas, October 9, 2006, of

9    $25,271?

10   A    I'm sorry?

11   Q    That's the fourth line up from the bottom.

12   A    Sorry, I don't see it.

13   Q    I'm sorry, I'm –– I'm looking at the wrong thing.  It's

14   my –– if you look on the next page, you see at the top ––

15   A    Which page, please, what number?

16   Q    I'm sorry, 00023.

17   A    Okay.

18   Q    And at the top, you see a March 15, 2007, Mr. Machado,

19   20,400; do you see that?

20   A    Yes.

21   Q    And if you go down two-thirds of the way down, you see

22   payments, bonus payments to Mr. Vargas in June of 2005, May

23   of 2006, April of 2007; do you see that?

24   A    I do.

25   Q    Bonus to Ms. Trueba, June of 2005?

1    A      Yes, yes.

2    Q      And then a couple more bonus payments to Mr. Machado in

3    2005 and 2006?

4    A      Yes.

5             THE COURT:  Is this 6741, Counsel?

6             MR. PRICE:  Yes, 6741-00023.

7             THE COURT:  Have those been received?

8             MR. PRICE:  It has not, your Honor.  Those are

9    these interrogatory responses.

10            THE COURT:  I'm sorry.  I thought he was referring

11   to an e-mail.  My apologies.

12            Thank you.

13   BY MR. PRICE:

14   Q      Now, in addition to Ms. Trueba and Mr. Vargas and

15   Mr. Machado, MGA has also paid attorneys' fees for other

16   individuals in connection with Bratz?

17   A      What do you mean by that?

18   Q      Well, you've paid attorneys' fees for other individuals

19   in connection with this case?

20   A      Yes, we have.

21   Q      You paid attorneys' fees to Mr. Bryant?

22   A      Mr. -- yes.

23   Q      To Peter Marlow?

24   A      Yes.

25   Q      To Veronica Marlow?

1    A    I'm not so sure about Peter Marlow, but Veronica

2    Marlow.  I am not so sure about Peter Marlow.

3    Q    Margaret Leahy?

4    A    Yes.

5    Q    Elise Cloonan?

6    A    I don't know.

7    Q    Ron Brawer?

8    A    Yes.

9    Q    Sarah Halpern?

10   A    I don't know who she is.

11   Q    Could you look at --

12            (Attorney discussion held off the record.)

13            MR. PRICE:  Your Honor, I am not sure if this is

14   in Mr. Larian's binder.  It concerns the answer regarding

15   Peter Marlow and attorneys' fees.  I can bring a copy up to

16   the Court.  Maybe it's Exhibit 5561.

17            (Attorney discussion held off the record.)

18            MR. PRICE:  My understanding is that was shown to

19   you, your Honor.

20   BY MR. PRICE:

21   Q    So you have 5561 in front of you?

22   A    I do.

23   Q    And that's a letter sent in connection with

24   representation of Veronica and Peter Marlow; do you see

25   that?

1    A     I do.

2    Q     All right.  It's concerning who's paying the fees and

3    costs for their representation?

4              MS. KELLER:  Objection.  Hearsay, your Honor.

5              THE COURT:  You can ask him if this refreshes his

6    recollection.

7    BY MR. PRICE:

8    Q     Does Exhibit 5561 refresh your recollection that MGA

9    agreed to be responsible for the fees and costs incurred in

10   the representation of Veronica Marlow and Peter Marlow in

11   connection with the Mattel versus Bryant lawsuit?

12   A     It does not refresh my -- it does not.

13             THE COURT:  All right.  Counsel, can I see that

14   exhibit?  Does it have an MGA stamp on it?

15             THE WITNESS:  It does not.

16             MR. PRICE:  No.  It has KNW.

17             I'll ask this.

18   BY MR. PRICE:

19   Q     Were you represented at one point by O'Melveny & Myers?

20   A     I was.

21   Q     Around March 18, 2005, they were your counsel, correct?

22   A     They were my counsel at one time.  I don't remember the

23   date.

24   Q     And as your counsel, they were authorized to send

25   confirming letters to individuals to represent that MGA

```
 1   would pay their attorneys' fees, correct?

 2   A    I don't know if they were or not.  I did not handle

 3   them.  My legal department handled them.

 4   Q    And that legal department would include Ms. Gronich?

 5   A    Yes.

 6   Q    And were you -- did Ms. Gronich report to you as to

 7   whose attorneys' fees MGA was paying for?

 8   A    I don't remember if she did or not, so many years ago,

 9   but she was a pretty independent person.

10   Q    She was general counsel, right?

11   A    She was.

12   Q    And do you remember -- you wouldn't let her pay

13   attorneys' fees for somebody unless she ran it by you,

14   right?

15   A    Not necessarily.  I was involved trying to run the

16   business, but she was pretty good, and she was very

17   independent.

18           MR. PRICE:  Your Honor, I think it's sufficient

19   for --

20           THE COURT:  It's received.

21           (Plaintiffs' Exhibit No. 5561 is received in

22       evidence.)

23           MR. PRICE:  So we could just look at 5561-00001.

24   BY MR. PRICE:

25   Q    And this is from O'Melveny & Myers, your counsel,
```

1    regarding representation of Veronica and Peter Marlow, "Dear

2    Steve, this is to confirm that because of her work for MGA

3    Entertainment, Inc., MGA has agreed to be responsible for

4    the fees and costs incurred in your representation of

5    Veronica Marlow and her husband Peter Marlow in connection

6    with the Mattel versus Bryant lawsuit."  And then it says,

7    "You may direct your invoices to," and it gives

8    Ms. Gronich's address at MGA, correct?

9    A    Correct.

10   Q    And along that line, if we could show you Exhibit 8874.

11        Do you have that in front of you?

12   A    I do.

13   Q    And this is your signature?

14   A    It is.

15   Q    And this is the retention agreement where there is an

16   acknowledgment that MGA will pay for services performed in

17   representing Mr. Machado, correct?

18   A    Correct.

19            MR. PRICE:  I move Exhibit 8874 into evidence.

20            THE COURT:  Received.

21            *(Plaintiffs' Exhibit No. 8874 is received in*

22        *evidence.)*

23   BY MR. PRICE:

24   Q    When Mr. Machado, Ms. Trueba and Mr. Vargas were

25   running MGA Mexico, MGA Mexico's market share increased?

1    A    They were not running MGA Mexico.  Susana Kuemmerle was

2    running MGA Mexico, and yes, MGA Mexico's market share

3    increased at one time.

4    Q    And if you'd look at 21068-00001.

5         MS. KELLER:  Counsel, what number is that?

6         MR. PRICE:  That's a press release, 21068.

7    BY MR. PRICE:

8    Q    Do you have that in front of you?

9    A    I do.

10   Q    And is this a press release?

11   A    It is.

12   Q    By MGA, of course?

13   A    Yes.

14        MR. PRICE:  And move Exhibit 21068 into evidence.

15        THE COURT:  Okay.  Now, are these redacted?

16        MR. PRICE:  I don't believe there is any need,

17   these are press releases from MGA.

18        THE COURT:  I have so many press releases that I

19   want to make sure that we're not having to give an

20   explanation to the jury, for both parties, about any

21   redactions that we are getting into.  That can wait until

22   tomorrow, then?

23        MR. PRICE:  This is not redacted.

24        THE COURT:  Okay.  What volume is it in?

25        MR. MC CONVILLE:  Seventeen.

Case 2:04-cv-09049-DOC-RNB   Document 9868   Filed 02/14/11   Page 73 of 112   Page ID #:298162
CV 04-9049-DOC - 02/10/2011 - Day 16, Vol. 3 of 4

73

1          THE COURT:  Seventeen?  Any objection?

2          MS. KELLER:  Huh-uh.

3          THE COURT:  Received.

4          *(Plaintiffs' Exhibit No. 21068 is received in*

5      *evidence.)*

6   BY MR. PRICE:

7   Q    If you'd look at the third paragraph -- I'm sorry, it's

8   the fourth paragraph of this February 8, 2006, press release

9   which says, "Also MGA announced that its market share of the

10  fashion doll category increased in Latin America, led by

11  Mexico, with an announced 21.2 percent for 2005 compared to

12  11.1 percent at the conclusion of 2004, paren, (increase of

13  90 percent in market share), closed paren, according to

14  Nielsen."

15       So this was something that you were disclosing to the

16  public as part of a PR release?

17  A    We were.

18  Q    Mr. Larian, I'd like you to look, if you could, at

19  Exhibit 827.  We looked at this earlier.

20          MR. PRICE:  Ken, if we can blow up the top right

21  there.

22  BY MR. PRICE:

23  Q    Do you see this?  We were talking about the --

24  Ms. Marlow's bills, and do you see the last paragraph where

25  your -- I think she is being paid well for the work she did;

1    do you see that?

2    A    Yes.

3    Q    And it says, "My wife's tailor-made dresses" –– "My

4    wife's tailor-made dresses don't cost as much as she charges

5    for one doll"; do you see that?

6    A    I do.

7    Q    Okay.  And you recall yesterday at –– toward the end of

8    the day, when we were talking about the sample makers, that

9    I said "wives" instead of "wife's"; do you recall that?

10   A    I do.

11   Q    And I'm –– I'm truly sorry for that mispronunciation.

12        After that, you said that I had made a racist statement

13   in the 2008 trial; do you recall that?

14   A    I do.

15   Q    And –– and you've –– you've previously made that

16   statement to a reporter, right?

17   A    I'm sorry?

18   Q    And you've previously made that statement to a

19   reporter, that you –– that I –– I, Bill Price, made a racist

20   statement in the 2008 trial?

21   A    I don't remember, but what you had said in 2008 I

22   perceived to be racist, but again, this –– this case for

23   past seven years ––

24   Q    I am just asking if you told a reporter that, that's

25   all.

```
 1   A     All right.  I don't remember if I did or not.

 2   Q     And we had a break where you and your counsel found the

 3   section of the examination in the 2008 trial concerning my

 4   examination of you that was the basis for your statement

 5   that I, Bill Price, made a racist statement in the 2008

 6   trial, correct?

 7   A     Yes, what was -- what was on the record.

 8   Q     Well, you went with your counsel, and this was the

 9   statement you said I made that was the basis of your

10   statement that at that trial I made a racist statement,

11   correct?

12   A     That's my -- that was my perception, correct.

13   Q     And if we could show this, this is page 2257, it's from

14   June 11, 2008, and it's lines 2 through 8.

15         Question:  "In fact, you were quoted in that Wall

16   Street Journal article as saying that, right, 'no risk, no

17   reward?'"

18         Answer:  "I am not sure if it was the Wall Street

19   Journal, but I have said that before.  And again, I

20   apologize for my accent, sir."

21         Question:  "No one has asked you to and there is

22   nothing wrong with an accent.  Can you tell I'm from the

23   South?"

24         I read that correctly, correct?

25   A     You did.
```

1    Q    So Mr. Larian, in that examination, it was concerning a

2    Wall Street Journal article, correct?

3    A    In this examination, yes.

4    Q    And if we would have placed before you, I think this is

5    a -- pursuant to a, I believe, agreement and instruction, a

6    redacted portion of that article that contains just

7    statements that are attributed to you --

8            THE COURT:  Now, let me explain why it's being

9    redacted, and there may be numerous press coverage,

10   articles, et cetera, in the future coming in, but the course

11   I'm going to take is, I'm allowing counsel to put in

12   paragraphs that they believe that are relevant, but I don't

13   want you, as the only decider of this case, to be influenced

14   by what a reporter's writing, because remember, a reporter

15   or reporters have and will cover this case, and if there's

16   been press generated, they could write or summarize a

17   witness' testimony, and oftentimes they are not here.

18   Sometimes it's accurate, sometimes it's not, but it's

19   hearsay.  So those redacted portions aren't relevant.  The

20   redacted portions, counsel for both sides and I have gone

21   over, and that's why you're receiving it in some paragraph

22   form, okay?

23            Now, Counsel?

24            MS. KELLER:  And your Honor, we are continuing to

25   object to the whole thing as hearsay unless a reporter

Case 2:04-cv-09049-DOC-RNB   Document 9868   Filed 02/14/11   Page 77 of 112   Page ID #:298166
CV 04-9049-DOC - 02/10/2011 - Day 16, Vol. 3 of 4

77

1    testifies.

2            THE COURT:  Understood.  And there are all sorts

3    of problems with reporters testifying, most of the time they

4    don't.  They take the privilege that the reporter has in not

5    divulging sources, and that's obviously for the public.  If

6    they burned all their sources, we probably wouldn't get any

7    information.

8            So there is a privilege that reporters have, and

9    they are very rarely seen in court.  So if it's relevant or

10   I believe it might be relevant, then I'm giving it to you in

11   a redacted form, but I don't want that other hearsay, and

12   counsel is right for MGA in terms of objecting that that

13   other would be hearsay and it's not coming in.

14           Those portions that I'm submitting to you may or

15   may not be relevant after a series of rulings outside of

16   your presence, obviously.  You'll judge whether the

17   relevance is there or not.

18           Counsel?

19           THE WITNESS:  Before you go to the next question,

20   I just want to apologize to you, the member of the jury and

21   the judge, for my outbursts calling you a racist yesterday.

22   I've been married to my wife for 27 years, and I took that

23   personally, and I apologize to you.

24   BY MR. PRICE:

25   Q    I understand you taking my mispronunciation personally,

1    and I apologize to you.

2         So can we move on?

3    A    Yes.

4    Q    So if you look at Exhibit -- I think it's 00001C, is

5    what I have.  Is that --

6              MS. KELLER:  Is this 2257, Counsel?  This is

7    0001C.

8              MR. PRICE:  It's 1C.

9              THE COURT:  It's 2257, it's one page, and it

10   should be a redacted portion of -- I believe it's the Wall

11   Street; is that correct, Counsel?

12             MR. PRICE:  Yes, it's actually three pages, but

13   the only information is on the second page.

14             THE COURT:  Now, once again, let me remind you

15   that the case has gotten significant past coverage, it's

16   getting coverage at the present time, and I don't know how

17   else to take that on except to tell you that.  And if I

18   forewarn you, then you know that you might be reading

19   something about the case.  As soon as you do, please put

20   that over.  I don't sequester juries even in the longest

21   criminal cases.  I just trust the American public.  You are

22   judges in that regard, and I expect you to uphold that, but

23   I don't expect to lock you up in a hotel and treat you in

24   any way with any indignity, okay?

25             Counsel?

```
 1   BY MR. PRICE:
 2   Q    So, Mr. Larian, do you have Exhibit 1, or are they
 3   bringing it to you now?
 4        And do you see that's a Wall Street Journal, July 18,
 5   2003?
 6   A    Yes.
 7   Q    And earlier we were talking about the first time
 8   Mr. Bryant's name was associated with Bratz in -- in the
 9   traditional press magazines or newspapers; do you recall
10   that?
11   A    I do.
12   Q    And at that point you said the first time in -- in the
13   press or newspapers or magazines was July 18, 2003, correct?
14   A    In the general regular press, if you exclude Yahoo,
15   yes.
16   Q    And we talked about the Yahoo thing already, right?
17   A    (No audible response.)
18   Q    So is this the article that you are talking about, the
19   July 18, 2003 article?
20   A    It is.
21   Q    And in that article --
22   A    I only have two lines in this article here, but I have
23   memorized it pretty well.
24   Q    And actually, hopefully nine.
25   A    Okay.
```

Case 2:04-cv-09049-DOC-RNB   Document 9868   Filed 02/14/11   Page 80 of 112   Page ID #:298169
CV 04-9049-DOC - 02/10/2011 - Day 16, Vol. 3 of 4

80

1    Q    And again, this has been redacted just to concentrate

2    on your statements and not other things.

3         Did you say to the Wall Street Journal reporter that

4    you chose Mr. Bryant's idea for Bratz over several others

5    after holding a sort of fashion doll design contest in late

6    1999?

7    A    I don't recall that or not.  News people, journalists

8    write a lot of things.  I read a newspaper article that says

9    that your tie is worth what every jury spends on the weekend

10   taking their families out for Sunday night dinner.  I have

11   the article if you want me to bring it.  So I don't know if

12   that's accurate or not.

13   Q    But you can give me the site to that.  I hope it didn't

14   quote me.

15   A    Nor did they quote me here, but they did quote you

16   there.  Anyway, I'll bring it tomorrow.

17   Q    That's great but --

18   A    Maybe Ken can put it on the ELMO.

19   Q    But my question is, I guess, do you recall saying to

20   anyone, Wall Street Journal, a newspaper, a magazine, anyone

21   that -- that you chose Mr. Bryant's idea for the Bratz over

22   several others after holding sort of a fashion doll design

23   contest in late 1999?

24   A    I don't recall if I did say that or not.

25   Q    Sitting here today, do you believe that is something

Case 2:04-cv-09049-DOC-RNB   Document 9868   Filed 02/14/11   Page 81 of 112   Page ID #:298170
CV 04-9049-DOC - 02/10/2011 - Day 16, Vol. 3 of 4

81

1    that you said?

2    A    I don't know if I did say that or not.  I don't recall

3    it.

4         MR. PRICE:  Your Honor, I'll move redacted

5    Exhibit 1 into evidence.

6         THE COURT:  It's received.

7         (Plaintiffs' Exhibit No. 1 is received in

8         evidence.)

9    BY MR. PRICE:

10   Q    Now, if we could have placed before 13608R-00001, and

11   this is a redacted copy.  It's 13- -- it's 13608R, and it's

12   apparently Total Licensing 2004.

13   A    Where does it say "Licensing"?

14   Q    If you'd look at the second page at the top.

15   A    Yes.

16   Q    Did you speak with Total Licensing Magazine at some

17   point in 2004?

18   A    I don't recall if I did or not.  I think maybe this is

19   the same one that you were showing me yesterday where I had

20   typed responses to.

21   Q    If you look at it -- look at that paragraph.  I am not

22   sure it is, but --

23        Do you know Total Licensing Magazine?

24   A    I know it, yes.  I believe that's the same magazine,

25   and I don't -- beside giving them that information in

1    writing, I don't think I talked to them.  I think this is --
2    this is an expert -- excerpt from the same article.
3    Q    Did you ever say to a publication that your team spent
4    over a year researching the product and refining their ideas
5    before coming up with Bratz?
6    A    I don't know if I said that or not.  Again, at least I
7    think -- I'm pretty sure Total Licensing is the same
8    magazine you questioned me about yesterday where the
9    reporter asked questions and they responded, and those are
10   the only responses that I had given.  Retailers just --
11   reporters just write things sometimes on their own, which
12   is --
13   Q    I'm sorry.  Is it correct that you spent well over a
14   year researching the product?
15   A    No.  Researching the Bratz product?  That's not
16   correct.
17   Q    And refining your ideas?
18   A    No, that's not correct.
19   Q    Yesterday we were talking about License Europe
20   Magazine --
21   A    Yes.
22   Q    -- is that the same as this magazine, Exhibit 13608?
23   A    I'm no so sure.  I'm just -- too many license -- I
24   don't know if they're the same or not, or maybe they picked
25   it up from -- a lot of times newspapers, magazines pick one

1    article from another.

2    Q    Did you have a practice, particularly in this time

3    frame, 2001 through 2004, of -- of getting the articles

4    about Bratz, that's collecting them and then reading them to

5    see what was out there in the public?

6    A    No.

7    Q    So you kind of understood these articles to be, in some

8    ways, kind of publicity for the Bratz, right?

9    A    Yes, the same thing the public -- the article about you

10   and your tie was -- and I'll bring that tomorrow so the jury

11   can see it.  It's publicity about you.  Did you read it?

12   Q    I haven't heard a thing about it, but let me go on

13   about you, or see about you.

14   A    Great.  Your picture is on it.

15   Q    Well, I'd like to see it.  I don't think the jury needs

16   to.

17        But as a company running a business trying to get a

18   product, you know, off the ground and competitive, you had

19   someone paying attention to your press?

20   A    I, personally?

21   Q    MGA had someone paying attention to the press.

22   A    I'm sure we have people in our PR department who pay

23   attention to the press.

24   Q    In fact, I think if you look at the Bates number on

25   this --

1    A    Yeah, that's from MGA.

2    Q    And this is something that you had collected at MGA,

3    right?

4    A    I'm sure they did.

5         MR. PRICE:  Your Honor, I move Exhibit 13608 into

6    evidence.

7         MS. KELLER:  Objection.  Hearsay, your Honor.

8         THE COURT:  Same.  It will be a continuing

9    objection, Counsel.  That's hearsay.

10        Let me remind the jury, once again, we don't

11   have -- technically, much of this is hearsay.  We don't have

12   the person here in front of us, but by the same token, it

13   gives you a chance to see what allegedly has been said.  How

14   much weight you give to that, though, is entirely up to you.

15   But normally, the reporters do not come into court.  There

16   is a shield privilege.

17   BY MR. PRICE:

18   Q    If you'd look at Exhibit 11259.

19        MS. HURST:  What was that number again, Bill?

20        MR. PRICE:  It's 11259.

21        THE WITNESS:  Yes.

22   BY MR. PRICE:

23   Q    And this is something produced within MGA files, right?

24   A    Yes.

25   Q    An article in the Kansas City Star on April 6th, 2003,

1    right?

2    A    Yes.

3    Q    It has a picture, nice picture of the Bratz "Passion

4    for Fashion"; do you see that?

5    A    Yes.

6    Q    Okay.  If you'd look at the second page where it says,

7    "The idea for the Bratz came from young girls.  Isaac

8    Larian, president of MGA Entertainment," paren, "the company

9    that creates Bratz, said his daughter Yasmin and her cousins

10   complained that they were tired of Barbie, they wanted dolls

11   to play with that looked more like everyday girls and dolls

12   that were more stylish, Mr. Larian said"; do you see that?

13   A    Yes.

14   Q    It's not true -- prior to September 2000, did you have

15   the Bratz idea because your daughter, Yasmin, had complained

16   about that she was tired of Barbie?

17   A    My daughter had complained that she was -- she didn't

18   want to play with Barbie because it's babyish, but I don't

19   know if it was before September 1 or after.

20   Q    Well, the idea for the Bratz came from Carter Bryant?

21   A    Yes.

22   Q    So would it be incorrect to say that the idea for the

23   Bratz came from young girls?

24   A    Yes, it didn't come from young girls, that's correct.

25              MR. PRICE:  Okay.  Move Exhibit 11259.

Case 2:04-cv-09049-DOC-RNB   Document 9868   Filed 02/14/11   Page 86 of 112   Page ID #:298175
CV 04-9049-DOC – 02/10/2011 – Day 16, Vol. 3 of 4

86

```
 1              THE COURT:  First of all, Counsel, before doing

 2   so, have you asked if, in fact, that statement was made?

 3              MR. PRICE:  Good point.

 4   BY MR. PRICE:

 5   Q    Did you, in fact, make the statement which is contained

 6   in this article in the Kansas City Star?

 7   A    I have no recollection of Kansas City -- what did you

 8   call it?

 9   Q    Let me ask you --

10              MS. KELLER:  Your Honor, could we note that this

11   is not a quote, this is not in quotation marks?

12              THE COURT:  I need to look at that article again.

13   Will somebody bring it up?  I want to see if it says

14   "Mr. Larian says" or how that is worded by the reporter.

15              Excuse me for just a moment.  I remember, also,

16   that one portion of the press can be picking up an article

17   from another portion of the press.  That's what's so

18   dangerous.  This is for a very, very limited purpose, and

19   this is not for the truth of the matter asserted.  It's to

20   give Mr. Larian an opportunity to state whether he made

21   these statements or not, but once again, we don't have these

22   people in front of us for verification.

23              Received.

24              (Plaintiffs' Exhibit No. 11259 is received in

25         evidence.)
```

```
 1   BY MR. PRICE:

 2   Q    Mr. Larian, were you telling people at the press,

 3   whether it's Kansas City Star or someone else, that you got

 4   the idea for Bratz by seeing the way your own kids dressed,

 5   or the fact that they were no longer happy with Barbie, or

 6   didn't no longer want to play with Barbie?

 7            MS. KELLER:  Objection.  Compound.

 8            THE COURT:  Do you understand the question, sir?

 9            THE WITNESS:  I don't.

10            THE COURT:  Okay.

11            Counsel?

12   BY MR. PRICE:

13   Q    Did you tell anyone in the press -- I mean, not -- I

14   know you might forget the Kansas City press, but did you

15   tell anyone that you got the idea for Bratz based upon

16   comments from your family or seeing young girls play?

17   A    Not just based on that.

18   Q    If you'd look at Exhibit 631R.

19   A    Is this the Kansas City?

20   Q    No.  We are going to a different --

21        And do you recognize this?  It's BusinessWeek Magazine

22   dated July 28, 2003, with an article on the heavily redacted

23   article on Bratz.

24   A    I see, on page 3, something that I cannot read.

25   Q    Did you say to BusinessWeek, "Like they say in business
```

Case 2:04-cv-09049-DOC-RNB   Document 9868   Filed 02/14/11   Page 88 of 112   Page ID #:298177
CV 04-9049-DOC – 02/10/2011 – Day 16, Vol. 3 of 4

88

```
 1   school, no risk, no reward"?

 2   A    I probably said that, yes.

 3   Q    And did you say that you got the idea for Bratz after

 4   seeing your own kids run around -- it's hard to read --

 5   something in hiphuggers?

 6            MS. KELLER:  Your Honor, may the record reflect

 7   that that also was not in quotes.

 8            THE COURT:  May I see that, please?

 9            MS. KELLER:  And may we also lodge a hearsay

10   objection as well, your Honor?

11            THE COURT:  Certainly.

12            Counsel, I can't read this.

13            MR. PRICE:  It is difficult, but some of it can be

14   read.  We'll try to get a better copy.

15            THE COURT:  Well, perhaps some of it can be read,

16   but I'll have to be able to read it.

17            MR. PRICE:  Your Honor, maybe this is a good time

18   to break -- I was going to end on this article -- and then

19   we can try to find a better copy?

20            THE COURT:  All right.  Why don't we send you home

21   this evening.  Let me see if I can read this.

22            You are admonished not to discuss this matter

23   amongst yourselves, nor form or express any opinion

24   concerning the case.  We'll see you tomorrow morning.  Have

25   a nice evening.
```

```
1                (The following proceedings is taken outside
2          the presence of the jury.)
3                THE COURT:  All right.  Counsel, have a seat,
4    please.
5                First, Mr. Overland, do you need time this evening
6    concerning those phone calls into Mexico?
7                MR. OVERLAND:  I'm getting a call at 8:30, so --
8                THE COURT:  Okay.  Is that coming into the court
9    or back --
10               MR. OVERLAND:  No.  It's coming into my cell
11   phone.
12               THE COURT:  All right.  Mr. Overland is trying to
13   find out the status of a number of witnesses.
14               MR. OVERLAND:  Correct.
15               THE COURT:  Then if you'd like to remain this
16   evening, that's fine; if not -- I think that phone call is
17   very important.
18               MR. OVERLAND:  (No audible response.)
19               THE COURT:  Okay.  I need a better copy of this.
20   I can't read it.
21               MS. KELLER:  Your Honor, may we be heard, briefly,
22   on the issue of these newspaper articles?
23               THE COURT:  Certainly.
24               MS. KELLER:  The Evidence Code makes an exception
25   to the hearsay rule for learned treatises, almanacs, items
```

Case 2:04-cv-09049-DOC-RNB   Document 9868   Filed 02/14/11   Page 90 of 112   Page ID #:298179
CV 04-9049-DOC - 02/10/2011 - Day 16, Vol. 3 of 4

90

1   like that not for newspapers.  These are being offered for

2   the truth of the matter asserted, and we can all expect that

3   in closing argument, Mattel is going to argue that

4   Mr. Larian in fact made these statements.  We have no chance

5   to cross-examine the authors of these articles.  This is

6   classic hearsay.  It's an out-of-court statement being

7   offered for the truth of the matter asserted.  Whether

8   Mr. Larian is a party or not doesn't make any difference.

9           If the reporter were here to testify to statements

10   and could be cross-examined, that would be different, but

11   not only is that not the case, but it's almost the opposite

12   of the rule that sometimes is permitted in extremely -- in

13   situations where there's extreme trustworthiness associated

14   with the statement that could be admitted.  This is the

15   opposite of that.

16           We all know, any of us who has ever been quoted in

17   the press, know that sometimes we pick up the article the

18   next day and can't even recognize what we actually said,

19   given what is printed.  It's exacerbated by the fact that

20   these aren't even in quotation marks because most reporters

21   at least attempt to be accurate when they are actually

22   quoting somebody.  These are not even in quotes, and it's

23   going to be -- it's going to be highly prejudicial because

24   it's going to be used to argue that Mr. Larian, in fact, in

25   truth, made these statements, and that they are varying

1    statements about the birth of the Bratz.  And these -- these

2    redacted versions of statements are going to go to the

3    jurors, who are going to focus on them, of course, because

4    they are statements of a party, as Mr. Larian is not just a

5    corporate representative, but an individual named as a party

6    in his own right.  And it may be true that it's hard to get

7    reporters here, but it's also impossible for us to have any

8    chance to bring out the truth of -- of the circumstances

9    surrounding these statements.

10        I know how the Court is so reluctant to permit

11   depositions, video depositions in because -- rather than

12   having the live witness here subject to cross-examination

13   for the various concerns that I've got about these articles.

14   Articles can be written carelessly and in haste, especially

15   when they are summarizing what someone said, or purporting

16   to, and we are left without any ability to counter that.

17        THE COURT:  Okay.

18        Counsel?

19        MR. PRICE:  Well, part of this is -- is order of

20   proof.  The reporters have testified, and MGA has

21   cross-examined them.  There was no shield question.  They

22   were asked about these --

23        THE COURT:  Well, just a moment.  It was

24   represented to me that the reporters weren't forthcoming in

25   this trial by Mr. Zeller.

```
1              MR. ZELLER:  That's correct, your Honor.

2              THE COURT:  So I think there is a disconnect, once

3    again, with Mattel.

4              MR. ZELLER:  No.  If I may, your Honor.  It's not

5    disconnect.  The depositions were taken of the key

6    reporters, Wall Street Journal reporter, for example,

7    Maureen Tkacik.

8              THE COURT:  Just a moment.  Slow down.

9              MR. ZELLER:  Okay.

10             THE COURT:  All right.

11             MR. ZELLER:  And so both sides had the opportunity

12   to question those reporters who were deposed.  Ms. O'Neil,

13   the Chicago Sun Times reporter, was another example.

14             THE COURT:  Just a moment.

15             Okay.  Her depo was taken, and that was

16   represented to me also.

17             MR. ZELLER:  That's correct, yes.  And both sides

18   had the opportunity to examine her as well.

19             What has occurred since is that pursuant to the

20   Court's direction that live witnesses need to appear, we

21   contacted those reporters and, in fact, in some instances,

22   gave them -- probably in all instances, I should say, served

23   them with subpoenas.  The counsel representing those --

24             THE COURT:  Just a moment.  Have you served

25   Maureen Tkacik?
```

 1           MR. ZELLER:  Yes.

 2           THE COURT:  Have you served Jennifer O'Neil?

 3           MR. ZELLER:  Actually, I don't think her name is

 4     Jennifer.  It's Denise.

 5           THE COURT:  Excuse me.  I am not going to quibble.

 6     Have you served O'Neil?

 7           MR. ZELLER:  I have.

 8           THE COURT:  With the Chicago Sun Times?

 9           MR. ZELLER:  That's correct, yes.

10           THE COURT:  All right.  Now, there were three

11     articles.  I want to match these up for just a moment.  You

12     can start bringing me volumes in just a minute.

13           MR. ZELLER:  Sure.

14           THE COURT:  The 835 -- I'm sorry, 11259 pertains

15     to the Kansas City Star.  Who is the reporter?

16           MS. KELLER:  None of the ones deposed, your Honor.

17           THE COURT:  Who is the reporter?

18           MR. PRICE:  Let me try to find --

19           MS. KELLER:  Jenee Oster -- it looks like

20     Osterheldt, O-s-t-e-r-h-e-l-d-t.

21           THE COURT:  No.  Remember, I don't have the

22     unredacted in front of me.  I only the redacted, so

23     O-s-t-e-r- --

24           MS. KELLER:  It looks like h-e-l-d-t, and the

25     first name is J-e-n-e-e.

Case 2:04-cv-09049-DOC-RNB   Document 9868   Filed 02/14/11   Page 94 of 112   Page ID #:298183
CV 04-9049-DOC – 02/10/2011 – Day 16, Vol. 3 of 4

94

```
 1              THE COURT:  J-e-n-e-e.

 2              Has she been served?

 3              MR. ZELLER:  No, she has not.

 4              THE COURT:  Why?

 5              MR. ZELLER:  Because we went down the road of

 6    serving reporters for the other articles --

 7              THE COURT:  Okay.

 8              MR. ZELLER:  -- and we were contacted by their

 9    counsel.

10              THE COURT:  Thank you.

11              Was she deposed?

12              MR. ZELLER:  No.

13              THE COURT:  All right.  Just a minute.

14              I thought each one of these had not only been

15    served but had been deposed, so this could be a mistake on

16    the Court's part.  Just a minute.

17              Has Maureen Tkacik, once again, been served with

18    the Wall Street Journal?

19              MR. ZELLER:  Yes.

20              THE COURT:  Has she been deposed?

21              MR. ZELLER:  Yes.

22              THE COURT:  Has the Wall Street Journal counsel

23    indicated to you or stated to you that she will not appear?

24              MR. ZELLER:  Yes.

25              THE COURT:  Have you made that information known
```

Case 2:04-cv-09049-DOC-RNB   Document 9868   Filed 02/14/11   Page 95 of 112   Page ID #:298184
CV 04-9049-DOC – 02/10/2011 – Day 16, Vol. 3 of 4

95

1    to MGA as you did to the Court?  I thought MGA was here and

2    heard the same information.

3              MR. ZELLER:  They were, your Honor.

4              THE COURT:  Just a moment.

5              Has MGA verified that since the parties seem to be

6    distrustful of each other?

7              MR. MC CONVILLE:  Your Honor, I'll accept the

8    representation that the woman wouldn't come --

9              THE COURT:  Okay.  The Chicago Sun Times, O'Neil,

10   has she been served?

11             MR. ZELLER:  Same situation, yes.

12             THE COURT:  Just a minute.

13             Has she been deposed?

14             MR. ZELLER:  Yes.

15             THE COURT:  Who else, Mr. Price, besides these

16   three, the Kansas City Star, the Wall Street Journal, the

17   Chicago Sun Times, and now I'm going to go to BusinessWeek

18   for a moment.  That would be 631R.  Who is the reporter for

19   BusinessWeek?

20             MR. MC CONVILLE:  Chris Palmeri, P-a-l-m-e-r-i.

21             THE COURT:  And has he been served?

22             MR. ZELLER:  In this phase, no, your Honor.

23             THE COURT:  Well, there are no phases here.  He

24   has not been served.

25             MR. ZELLER:  He was served -- for the first trial,

 1    we both attempted to depose him and subpoena him for trial.

 2              THE COURT:  I'm sorry.  Too much information.

 3              MR. ZELLER:  Okay.

 4              THE COURT:  Has he been served?

 5              MR. ZELLER:  He was previously.

 6              THE COURT:  Was he served for this trial?

 7              MR. ZELLER:  No.

 8              THE COURT:  Has he ever been deposed?

 9              MR. ZELLER:  No.  The Court quashed it.

10              THE COURT:  This Court?

11              MR. ZELLER:  No, not this Court, your Honor.

12    Judge Larson.

13              THE COURT:  All right.

14              So, so far, I want to check my notes, I have

15    BusinessWeek, Kansas City Star, Licensing Europe Magazine,

16    which is 13608.  Who is the reporter?

17              MR. MC CONVILLE:  There is not one listed.

18              THE COURT:  Well, just a moment.

19              Mr. Zeller or Mr. Price or Mr. Quinn, who is the

20    reporter?

21              *(Attorney discussion held off the record.)*

22              MR. PRICE:  The -- the article does not have a

23    byline.

24              THE COURT:  So obviously the "no byline" person

25    has not been served.

1          MR. PRICE:  That's true.

2          THE COURT:  Okay.  And it has not been deposed?

3          MR. PRICE:  Yes, that's correct.

4          THE COURT:  Just a minute.

5          Total Licensing Magazine in 2004, which is 13678,

6     I believe, Mr. Price?

7          MR. MC CONVILLE:  13608.

8          MS. KELLER:  13608R, your Honor.

9          THE COURT:  Well, Licensing Europe, then, is

10    what?

11         MR. MC CONVILLE:  That was a reference to

12    Mr. Larian --

13         THE COURT:  No.  I want to know the number.

14         MR. MC CONVILLE:  It wasn't shown today.

15         MR. PRICE:  There was no article.

16         THE COURT:  All right.  So there is no Licensing

17    Europe --

18         MR. PRICE:  There is no article.

19         THE COURT:  There is no article.  Let me cross

20    that out.

21         So let me go back, then.  I wrote down 13608 for

22    Total Licensing Magazine; is that correct?

23         MR. MC CONVILLE:  Yes.

24         THE COURT:  Wall Street Journal should be 2257; is

25    that correct?

Case 2:04-cv-09049-DOC-RNB   Document 9868   Filed 02/14/11   Page 98 of 112   Page ID #:298187
CV 04-9049-DOC – 02/10/2011 – Day 16, Vol. 3 of 4

98

1          MR. PRICE:  The redacted version is 1.

2          MS. KELLER:  Yes, 1.

3          THE COURT:  2251?

4          MR. PRICE:  Just 00001.

5          THE COURT:  All right.  Just a moment.  Because it

6    was referred to as 2257.

7               Now, let's go down each one of these again and get

8    my exhibits straight.

9          The Wall Street article is 2251; is that correct?

10          MR. PRICE:  The version we used today and that I

11   stated in court was 00001C.  That's the redacted version.

12          THE COURT:  Zero --

13          MR. PRICE:  00001C.

14          THE COURT:  Okay.

15          Kansas City is 11259?

16          MR. MC CONVILLE:  Yes.

17          THE COURT:  Well, let me talk to Mr. Price about

18   that.  He's the one who has the exhibits.

19          BusinessWeek is 631?

20          MR. PRICE:  BusinessWeek is 631, yes.

21          THE COURT:  Licensing Europe, or is it Total

22   Licensing Magazine?  I'm confused.

23          MR. PRICE:  It's total Licensing.

24          THE COURT:  Total Licensing is 13608?

25          MR. PRICE:  Yes.

Case 2:04-cv-09049-DOC-RNB   Document 9868   Filed 02/14/11   Page 99 of 112   Page ID #:298188
CV 04-9049-DOC – 02/10/2011 – Day 16, Vol. 3 of 4

99

 1          THE COURT:  Now, why don't each of you check your

 2     records for a moment.  Is there any other article that's

 3     been referred to thus far?

 4          There is a 2168 press release, but that came

 5     through MGA.  You might look at 827, but that was a

 6     reference back to an e-mail.  So I'm going to repeat these

 7     numbers back to you to make certain that this record is

 8     clear as possible for the Circuit.

 9          2251 (sic) is a Wall Street Journal article from

10     Maureen Tkacik, who has been served and deposed; 11259 is a

11     Sun Times article from a writer called O'Neil, served and

12     deposed; 631 is BusinessWeek, Chris Palmeri, not served,

13     not deposed; 13608 is Licensing Europe Magazine, not

14     served, not deposed; and the Kansas City article by

15     Osterheldt is 11259.

16          MR. PRICE:  Your Honor, 1360 --

17          THE COURT:  No, no.

18          MR. PRICE:  I'm sorry.

19          THE COURT:  I have Chicago Sun Times as 11259, and

20     I also have the Kansas City as 11259.

21          MR. MC CONVILLE:  The Chicago Sun Times article

22     was not referenced in today's testimony, so it was not

23     marked or referenced today.

24          THE COURT:  So there we go.

25          So it's the Kansas City that's 11259?

Case 2:04-cv-09049-DOC-RNB   Document 9868   Filed 02/14/11   Page 100 of 112   Page ID #:298189
CV 04-9049-DOC - 02/10/2011 - Day 16, Vol. 3 of 4

100

1           MR. MC CONVILLE:  Correct.

2           THE COURT:  All right.  We are going to do that

3    again, then.

4           So there's nothing been received from Sun Times

5    and O'Neil, correct?

6           MR. MC CONVILLE:  Correct.

7           THE COURT:  Now, we are going to go down this one

8    more time.  11259 Kansas City, Osterheldt, not served, not

9    deposed; 2251 (sic), Wall Street Journal, Maureen Tkacik,

10   not served, not deposed; Chicago Sun Times was not referred

11   to in front of the jury, the author being O'Neil, who has

12   been served and deposed, and if I misstated the Wall Street

13   Journal, served and deposed; 631 BusinessWeek, Chris

14   Palmeri, not served, not deposed; 13608, Licensing Europe

15   Magazine, not served, not deposed, correct?

16          MR. PRICE:  13608 is Total Licensing, not

17   European.

18          THE COURT:  Is what?

19          MR. PRICE:  Total License.

20          THE COURT:  Total License.  And what number is --

21   well, Total Licensing Magazine.  What is Licensing Europe?

22          MR. PRICE:  That was referred to in an e-mail.

23          THE COURT:  All right.  Thank you.

24          So we have four articles in front of this jury

25   that the objections are hearsay; is that correct,

1   Ms. Keller?

2           MS. KELLER:  Yes, your Honor.

3           THE COURT:  Is there any doubt about my record?

4   Am I referring to the right exhibits?

5           MS. KELLER:  I believe so.

6           THE COURT:  Well, that's the way police officers

7   talk to me, "I believe so."

8           11259, Kansas City, Osterheldt.

9           MS. KELLER:  Yes, your Honor.

10          THE COURT:  Not served, not deposed.

11          MS. KELLER:  Yes.

12          THE COURT:  Mr. Zeller?

13          MR. ZELLER:  This was --

14          THE COURT:  11259, Kansas City, Osterheldt is the

15  writer, not served, not deposed.

16          MR. ZELLER:  That's correct.

17          THE COURT:  2251, Wall Street, Marine Tkacik,

18  served and deposed.

19          MR. ZELLER:  Correct.

20          THE COURT:  We can do this as many times as you

21  want.

22          MR. MC CONVILLE:  The only confusion on that one,

23  your Honor, is Mr. Price referred to two different exhibits

24  but ultimately offered Exhibit 1C, which is the same as

25  Exhibit --

```
 1              THE COURT:  001C.

 2              MR. MC CONVILLE:  Yes.

 3              THE COURT:  Thank you.

 4              Chicago Sun Times, not before the jury, not

 5   received, not served -- or strike that -- but served and

 6   deposed.

 7              MR. ZELLER:  Correct.

 8              THE COURT:  So 631, BusinessWeek, Chris Palmeri,

 9   not served, not deposed.

10              MR. ZELLER:  Served previously, quashed by Judge

11   Larson.

12              THE COURT:  I'll write that down, that Judge

13   Larson did this.  I'm just kidding you, Counsel.

14              MR. ZELLER:  We didn't serve him, obviously,

15   because of the prior ruling.

16              THE COURT:  13608 is Total License -- let me just

17   refer to it as Total License, not served, not deposed,

18   right?

19              MS. KELLER:  And no byline.

20              THE COURT:  All right, and no byline.

21              Now, I think you're right.  The Court is making a

22   number of mistakes.  I thought these persons were served and

23   deposed, and I may have taken a shortcut.

24              I want to see the transcripts of 2251, Maureen

25   Tkacik, tonight.  I want to see -- if you are going to refer
```

Case 2:04-cv-09049-DOC-RNB   Document 9868   Filed 02/14/11   Page 103 of 112   Page ID #:298192
CV 04-9049-DOC - 02/10/2011 - Day 16, Vol. 3 of 4

103

1    back to the Chicago Sun Times, because now this person is no

2    longer available, and this person speaks to the issue of

3    what Mr. Larian's statements are at deposition, I want to

4    see the transcripts tonight, and you'll be with me, and I

5    want to see the references, specifically.

6              As to BusinessWeek, Chris Palmeri, this Court has

7    made a mistake.  I've admitted 631, it's hearsay, and it's

8    going to be withdrawn.  Minimally, I'm going to require at

9    least the person's been served for this trial, and number

10   two, hopefully deposed, or at least have a better record,

11   and I lumped those together, and my apologies to both

12   parties.

13             13608, Total Licensing, not served, not deposed,

14   not even a byline.

15             Kansas City, not served, not deposed, 11259.

16   Frankly, and for the record, is a mistake by this Court in

17   terms of its receipt.  It's hearsay.

18             Now, if, in fact, Maureen Tkacik, Wall Street

19   2251, has statements, Mr. Zeller, concerning this at a

20   deposition, I'm going to deem that that person is not

21   available, and those portions may be read in.

22             If you have statements of the Chicago Sun Times

23   from O'Neil, and that person has been deposed, that person

24   may be now available, and that may be read in.

25             Are there any other articles so we have these for

Case 2:04-cv-09049-DOC-RNB   Document 9868   Filed 02/14/11   Page 104 of 112   Page ID #:298193
CV 04-9049-DOC - 02/10/2011 - Day 16, Vol. 3 of 4

104

```
 1   tomorrow, because I want to do the work tonight, and I think
 2   the minimum requirement is that they were served, that they
 3   were deposed, and, of course, now that they are not
 4   available, and then over Ms. Keller's objections --
 5           MS. KELLER:  And your Honor, I wonder what we can
 6   do now that these statements have been shown on the screen
 7   to the jury and read and --
 8           THE COURT:  Mistrials are flying around today.
 9   Would you like to add that, too?
10           MS. KELLER:  Well, I was just thinking of what we
11   can do to instruct the jury on that because they're sitting
12   there reading --
13           THE COURT:  It's very easy, "You're to disregard
14   it.  The Court finds that it's hearsay.  That was the
15   Court's mistake," and they have my humblest apology and move
16   on.
17           MS. KELLER:  Unring that bell?
18           THE COURT:  Well, do you want me to ring it again
19   or, I mean, your choice, but I'm quite capable of admitting
20   to the jury that I made a mistake.
21           MS. KELLER:  And so the exhibits are being
22   withdrawn as well, obviously?
23           THE COURT:  Absolutely.  They're hearsay.  You're
24   absolutely right.  It's my mistake.  Let me bear full
25   responsibility.  I thought that in our discussions, you
```

1    know, way back when, that these were deposed, that I had

2    with each one of these, now after the deposition, an

3    unwillingness by counsel for the respective press not to

4    have the person appear.  I, frankly, lumped those together;

5    my mistake.  But I expect the jury to do exactly what I say,

6    and I'm capable and will say to them tomorrow that that's a

7    mistake, and they are to disregard these specific articles.

8    So my criteria is:  Must be served in this trial, must be

9    deposed.

10             MR. PRICE:  Your Honor, what we'd like to do, and

11   it's another source, it's an interview -- a video interview

12   with Mr. Larian, which we provided to the other side.  It's

13   13182B.

14             THE COURT:  Just a minute.  13182B.

15             MR. PRICE:  Yes, and it's a --

16             THE COURT:  On what date?  Is it on a television

17   program or --

18             MR. PRICE:  It's at the toy fair when they won

19   toy-of-the-year award.

20             THE COURT:  I can see those issues getting opened

21   up very quickly.  What year?

22             MR. PRICE:  It's in 2002, and it's an interview

23   about --

24             THE COURT:  Oh, 2002.  All right.

25             MR. PRICE:  It's an interview about how they came

1   up with the Bratz name.  It's 15 seconds.

2          THE COURT:  Well, let's see it tonight.

3          MR. PRICE:  Fifteen seconds of entertainment.

4          Do we have the audio?

5          *(Attorney discussion held off the record.)*

6          *(Videotape played.)*

7          THE COURT:  There is no sound.

8          *(Videotape played.)*

9          THE COURT:  I'm sorry.  Play that again.

10         *(Videotape played.)*

11         THE COURT:  I can't hear the last part, something

12   "was the whole idea."

13         MS. KELLER:  "That was the whole idea."

14         THE COURT:  "That was the whole idea."  Thank you.

15         Play it one more time.

16         *(Videotape played.)*

17         THE COURT:  I'm sorry, can somebody help me with

18   that last line?  What does he say?

19         MR. PRICE:  "That was the whole idea."

20         THE COURT:  "That was the whole idea."

21         One more time.

22         *(Videotape played.)*

23         THE COURT:  I think I'm getting feedback.  I want

24   to hear it again.

25         *(Videotape played.)*

Case 2:04-cv-09049-DOC-RNB   Document 9868   Filed 02/14/11   Page 107 of 112   Page ID #:298196
CV 04-9049-DOC - 02/10/2011 - Day 16, Vol. 3 of 4

107

```
 1              THE COURT:  All right.  Counsel?

 2              MS. KELLER:  We don't have any objection, your

 3    Honor.

 4              THE COURT:  Okay.

 5              MR. PRICE:  Your Honor, there is another

 6    16-second --

 7              THE COURT:  Well, certainly.  Let's play that.

 8              MR. PRICE:  -- MPR interview.

 9              THE COURT:  MPR.  Just a moment.

10              And what number is that exhibit?

11              MR. PRICE:  That's 23939.  This is just audio.

12              (Audiotape played.)

13              MR. PRICE:  That's it.

14              THE COURT:  It was a terrific, terrific clip.  Now

15    it's clear what the case is for both parties.

16              I'm just joking.

17              So let's go over this again.

18              Mr. Zeller, my criteria is this, it's as simple as

19    this:  The case is not done, we're off and running on both

20    sides.  You subpoena the people.  If they will consent to

21    depositions, so be it, but I would expect now with the

22    deposition -- strike that -- now with the subpoena, there is

23    no reason for a deposition.  Just bring them in.  And if

24    they won't come in and they take the privilege, it's

25    hearsay.  But certainly, if you have BusinessWeek -- strike
```

Case 2:04-cv-09049-DOC-RNB   Document 9868   Filed 02/14/11   Page 108 of 112   Page ID #:298197
CV 04-9049-DOC - 02/10/2011 - Day 16, Vol. 3 of 4

108

 1   that, strike that -- the Wall Street Journal, and you have a

 2   deposition, the Sun Post --

 3              MR. ZELLER:  Sun Times.

 4              THE COURT:  Sun Times, Chicago Sun Times, I'm

 5   sorry, which hasn't been marked yet.  What exhibit number is

 6   Sun Times, 11259?

 7              MR. QUINN:  No.  That's 632R2.

 8              THE COURT:  Okay.

 9              MR. QUINN:  632R2.

10              THE COURT:  632R2.  Then, could I see that portion

11   of the deposition where there is a supposed adversarial

12   situation with comments being made about what Mr. Larian

13   said about the birth of Bratz.

14              So Ms. Hurst, can you write this down for me?

15              MS. HURST:  I'm writing it.

16              THE COURT:  Or Mr. Zeller, it doesn't matter.

17              Now, "Yesterday, the Court improperly allowed the

18   introduction of 11259, a Kansas City article, 631, a

19   BusinessWeek article, and 13608, a Total License Magazine

20   article.  The Court is withdrawing those articles from your

21   consideration, and I state to you that they are hearsay at

22   the present time and not to be considered by you."

23              Mr. Zeller?

24              MR. ZELLER:  Just so there is a clear record on

25   this part of it, the assertion was made previously that the

Case 2:04-cv-09049-DOC-RNB   Document 9868   Filed 02/14/11   Page 109 of 112   Page ID #:298198
CV 04-9049-DOC - 02/10/2011 - Day 16, Vol. 3 of 4

109

1    articles were shown, such as the Kansas City Star one, it

2    was not displayed to the jury, just so the record is clear

3    on that point.

4                THE COURT:  Okay.

5                MR. PRICE:  Your Honor, the only part that was

6    displayed to the jury was the first page of the Wall Street

7    Journal article, which had the title.

8                THE COURT:  Which sounds to me that if you have

9    the depositional testimony, it's going to be even more

10   incisive on that subject.  And if you are going to attempt

11   Sun Times, then I want to see that this evening.

12               MR. ZELLER:  Yes.

13               THE COURT:  So I'm sitting here.

14               MR. ZELLER:  It's on its way.

15               THE COURT:  Counsel, how long should I sit here?

16               MR. OVERLAND:  Your Honor, while we are sitting,

17   can I be heard briefly on objections raised on behalf of

18   Mr. Machado?

19               THE COURT:  Just a moment.  Let me do one thing at

20   a time, and I'll be right with you, Mr. Overland.

21               MR. ZELLER:  I'm told 10 minutes.  These are short

22   depositions, so they shouldn't take long to print or copy.

23               THE COURT:  That's all right.  I am not worried

24   about the time.

25               All right.  Now, Ms. Hurst, if I can get a copy,

Case 2:04-cv-09049-DOC-RNB   Document 9868   Filed 02/14/11   Page 110 of 112   Page ID #:298199
CV 04-9049-DOC - 02/10/2011 - Day 16, Vol. 3 of 4

110

1   or Mr. Zeller, of what I just stated to you, I'll refine

2   that this evening, but that's basically what I'm going to

3   say.

4           The second this is, after lunch, we continued on,

5   but we really had agreed through both parties that I was

6   going to instruct the jury that witnesses have been deposed

7   on many occasions, and I think that this would be the

8   appropriate time -- I don't know when the timing should be,

9   but I represented to each of you I would, so if you'd like

10  to work out the language, okay?

11          Go ahead.

12          *(Discussion held off the record.)*

13          THE COURT:  Ms. Hurst, you might want to go over

14  and work with Mr. Zeller.  It's a relatively simple

15  statement we agreed before lunch, but there is no reason for

16  me to have any controversies about the depositions.  So when

17  Mr. Zeller gets out of his chair and Ms. Hurst gets out of

18  her chair, as they move towards each other at the lecturn.

19  Thank you.

20          *(Attorney discussion held off the record.)*

21          THE COURT:  This is off the record.

22          *(Discussion held off the record.)*

23          THE COURT:  We are back on the record.

24          Mr. Larian is excused this evening, if he'd like

25  to leave.  I think we'll be here for some period of time

Case 2:04-cv-09049-DOC-RNB   Document 9868   Filed 02/14/11   Page 111 of 112   Page ID #:298200
CV 04-9049-DOC - 02/10/2011 - Day 16, Vol. 3 of 4

111

1    this evening.

2            Mr. Larian, you are more than welcome to stay.

3    Would you like to be excused, sir?

4            This is off the record.

5            *(Discussion held off the record.)*

6            *(Live reporter switch with Denise Paddock.)*

7                            -oOo-

Case 2:04-cv-09049-DOC-RNB   Document 9868   Filed 02/14/11   Page 112 of 112   Page ID #:298201
CV 04-9049-DOC - 02/10/2011 - Day 16, Vol. 3 of 4

112

1                           -oOo-

2                        **CERTIFICATE**

3

4          I hereby certify that pursuant to Section 753,

5    Title 28, United States Code, the foregoing is a true and

6    correct transcript of the stenographically reported

7    proceedings held in the above-entitled matter and that the

8    transcript page format is in conformance with the

9    regulations of the Judicial Conference of the United States.

10

11   Date:  February 12, 2011

12

13

14   _____

15   JANE C.S. RULE, U.S. COURT REPORTER
     CSR NO. 9316

16

17

18

19

20

21

22

23

24

25