UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

HONORABLE DAVID O. CARTER, JUDGE PRESIDING

- - - - - - -

# CERTIFIED TRANSCRIPT

MATTEL, INC., et al.,           )
                                )
                Plaintiffs,     )
                                )
        vs.                     )
                                )
MGA ENTERTAINMENT, INC., et al., ) No. CV 04-9049-DOC (RNBx)
                                )     Day 16
                                )     Volume 4 of 4
                Defendants.     )
_____)


REPORTER'S DAILY TRANSCRIPT OF PROCEEDINGS
JURY TRIAL
SANTA ANA, CALIFORNIA
THURSDAY, FEBRUARY 10, 2011


Denise Paddock, CSR 10199, CMRS, RMR, CRR
Federal Official Court Reporter
United States District Court
411 West 4th Street, Room 1-053
Santa Ana, California 92701
transcripts@ocrecord.com www.ocrecord.com
021011 DCCD CR 9D CARTER MATTEL CIVIL JURY TRIAL DAY 16 V4
02/10/2011

**APPEARANCES OF COUNSEL:**

FOR PLAINTIFF MATTEL, INC., ET AL.:

      QUINN EMANUEL URQUHART & SULLIVAN LLP
      BY: JOHN QUINN
          WILLIAM PRICE
          MICHAEL T ZELLER
          Attorneys at Law
      865 S Figueroa Street, 10th Floor
      Los Angeles, CA 90017-2543
      213-443-3000

FOR DEFENDANT MGA ENTERTAINMENT, INC., ET AL:

      ORRICK HERRINGTON & SUTCLIFFE LLP
      BY: THOMAS S McCONVILLE
          Attorney at Law
      4 Park Plaza, Suite 1600
      Irvine, CA 92614
      949-567-6700

      - AND -

      ORRICK HERRINGTON & SUTCLIFFE LLP
      BY: ANNETTE L HURST
          Attorney at Law
      405 Howard Street
      San Francisco, CA 94105
      415-773-5700

      KELLER RACKAUCKAS LLP
      BY:  JENNIFER L KELLER
          Attorney at Law
      18500 Von Karman Avenue, Suite 560
      Irvine, CA 92612
      949-476-8700

UNITED STATES DISTRICT COURT

1   **APPEARANCES OF COUNSEL (Continued):**

2

3

4    FOR CARLOS GUSTAVO MACHADO GOMEZ:

5         LAW OFFICES OF MARK E OVERLAND
          BY: Mark E Overland
6             Attorney at Law
          100 Wilshire Boulevard, Suite 950
7         Santa Monica, CA 90401
          310-459-2830
8
          -AND-
9
          SCHEPER KIM AND HARRIS LLP
10        BY: ALEXANDER H COTE
              Attorney at Law
11        601 West Fifth Street, 12th Floor
          Los Angeles, CA 90071-2025
12        213-613-4655

13        ALSO PRESENT:

14        MGA ENTERTAINMENT, INC.
          BY: JEANINE PISONI
15            Attorney at Law
          16360 Roscoe Boulevard, Suite 105
16        Van Nuys, California 91406

17

18   ALSO PRESENT:

19            ROBERT ECKERT, Mattel CEO

20            ISAAC LARIAN, MGA CEO

21            KEN KOTARSKI, Mattel Technical Operator

22            MIKE STOVALL, MGA Technical Operator

23            KIERAN KIECKHEFER, Orrick, Herrington & Sutcliffe

24

25

UNITED STATES DISTRICT COURT

```
 1            SANTA ANA, CALIFORNIA; THURSDAY, FEBRUARY 10, 2011

 2                      Day 16, Volume 4 of 4

 3              (Open court - jury not present.)

 4            THE COURT:  Counsel's reached a stipulation

17:27  5   concerning what you'd like me to read concerning the

 6   depositions.

 7            MS. HURST:  Each of the parties has taken

 8   depositions in this case.

 9            In many instances witnesses for both sides have sat

17:27 10   for deposition or for the course of more than one session and

11   for multiple days at a time.

12            Depositions are entirely proper and expected in a

13   case like this, and there is nothing wrong with the parties

14   taking such depositions.

17:27 15            THE COURT:  All right.  Type that out for me.

16            MS. HURST:  Yes.

17            THE COURT:  Agreed to, Mr. Zeller?

18            MR. ZELLER:  Yes.

19            THE COURT:  And Ms. Hurst?

17:27 20            MS. HURST:  Yes, Your Honor.

21            THE COURT:  Now, the depositional testimony.

22            All right.  While we're waiting now, Mr. Overland,

23   let's go back to you, so you're not here any longer than

24   necessary this evening.

17:28 25            Your concerns.
```

UNITED STATES DISTRICT COURT

1          MR. OVERLAND:  Yes, Your Honor.

2          I made several objections with respect to

3    foundational -- a foundation for testimony with respect to

4    certain factual issues testified to --

17:28  5          THE COURT:  Could I repeat those back to you.

6          First, the documents and where they were located.

7          Second, what those documents were.

8          I can go back through my notes and state, I think,

9    each objection and to each document.

17:28 10          Your objection was lack of foundation.

11          MR. OVERLAND:  I understand that the court

12    admits -- admits this and other evidence with respect to

13    determining Mr. Larian's state of mind or, perhaps to --

14    other evidence as an admission by Mr. Larian, but that's not

17:29 15    admissible against Mr. Machado.

16          Mr. Machado is a separate party, and Mr. Larian's

17    state of mind, whatever it may be, unless it relates to a

18    particular claim against Mr. Machado, number one, is

19    irrelevant and -- and --

17:29 20          THE COURT:  I agree; but just a moment.

21          I found it relevant concerning Larian.  You two

22    have been a party up to this point, so when those objections

23    are flying so quickly in court I don't know whether the

24    interests are synonymous or not.  So as to Mr. Larian, I

17:29 25    agree with you that those are relevant.

1          Now, how we sort that out with a limiting

2     instruction depends upon you potentially having a

3     conversation with MGA and I'm happy to give an instruction to

4     the jury about what it's relevant for.

17:30  5          But, remember, it was a -- the representation was

6     that you were taking synonymous positions.  I've oftentimes

7     made the statement that, perhaps as the trial went along,

8     there might be a contrary view between Mr. Machado and MGA --

9     Mr. Larian.  And some of the evidence, I recognize, may apply

17:30 10     to Mr. Larian and it may not to Mr. Machado.

11          But when that was lodged, I understand it came from

12     you.  I'm happy to correct that, but I don't want the

13     inference that it's not received concerning Mr. Larian.

14          MR. OVERLAND:  I understand that, and -- and --

17:30 15          THE COURT:  As Ms. Hurst is about to make a record

16     on that too.

17          MR. OVERLAND:  I'm not saying it's not -- that our

18     positions are not synonymous, but when I make an objection

19     it's an objection on the admissibility of the evidence with

17:30 20     respect to Mr. Machado.

21          THE COURT:  I understand that and so what I should

22     be stating is that this is relevant concerning Mr. Larian and

23     is admitted for that purpose.

24          In terms of state of mind or whatever, the

17:31 25     exception is or finding of the court, but not Mr. Machado.

1          MR. OVERLAND:  That's perfectly --

2          THE COURT:  Good.  Well, let's go back and clean

3     that up.  It's never too late.

4          Now, just a moment.  Ms. Hurst is jumping up and

17:31  5     down.

6          Ms. Hurst.

7          MS. HURST:  I'm sorry, Your Honor.

8          Here's -- I'm going to just -- I'll try to be

9     brief.

17:31 10          First, Mr. Larian was not designated as a 30(b)(6)

11     witness on the documents seized, and this is made clear in

12     Pages 2470 and 2471 of the transcript.

13          The court's prior order had said MGA's knowledge of

14     the events at its subsidiary office remains undiscovered, and

17:31 15     we interpreted -- and I said this right on the record at

16     Page 2471, Lines 7 to 10:

17          "All right.  So, to be clear, our interpretation of

18     the topic is MGA's knowledge of the search and seizure, which

19     is what the witness is prepared to testify on."

17:32 20          And we had given the witness all the testimony

21     about the search and seizure, but had not prepared him on the

22     documents in the offices.  So, I mean, he had no foundation

23     whatsoever for those documents, not even as a 30(b)(6)

24     witness.

17:32 25          If we misunderstood the court's order, then that's

1    on me.

2         Other witnesses did testify about the documents.

3    Ms. Kuemmerle did, Mr. Small did, but Mr. Larian did not, and

4    he was not provided the documents because at that point he

17:32  5    was not designated -- that was not our understanding of the

6    topic and we did not think we could provide them on an AO

7    basis at that time.

8         Now, in addition to that, this is in July 2010.  So

9    if he became aware of them in July 2010, his state of mind as

17:32  10    of then doesn't have anything to do with anything.

11         So he did testify, he was prepared to testify on

12    MGA's knowledge of the search and seizure, and we gave him

13    three different transcripts on that; we gave him the relevant

14    portion.  He had his own conversations that he had had with

17:33  15    Mr. Machado and Ms. Kuemmerle.  But we did not give him the

16    documents and you can see he was up there today, saying,

17    well, I've never seen this before, this is interesting, blah

18    blah, blah.

19         So the witness did not have a foundation for those

17:33  20    documents, either from a 30(b)(6) perspective or otherwise,

21    and as far as state of mind goes, July 2010, that's not

22    relevant to anything if he was provided as a 30(b)(6)

23    witness.

24              THE COURT:  Thank you.

17:33  25              Mr. Zeller.

|   |   |
|---|---|
| 1 | MR. ZELLER:  Well, taking the second argument |
| 2 | first, it is still relevant.  It's ratification, and that |
| 3 | comes through crystal clear.  He is now aware, from whatever |
| 4 | source it is, of this information.  Nevertheless, he has |
| 17:33 5 | treated the individuals in a way that the jury can reasonably |
| 6 | infer he approved, authorized, ratified and otherwise |
| 7 | endorsed their misconduct. |
| 8 | That's point 1. |
| 9 | Point 2 is that the instruction given to the |
| 17:34 10 | court's topic -- or actually to the topic and to the court's |
| 11 | order basically sucked the life out of it and that's just not |
| 12 | appropriate. |
| 13 | The topic was, "The search and seizure of documents |
| 14 | by Mexican authorities from MGA's Mexico City offices and |
| 17:34 15 | related communications." |
| 16 | The court will recall that, of course, the very |
| 17 | problem was that MGA witnesses were coming in and disavowing |
| 18 | knowledge.  So the idea that Mr. Larian was then going to |
| 19 | come in, having read the transcripts of the prior improperly |
| 17:34 20 | prepared 30(b)(6) witnesses who disavowed knowledge, and say |
| 21 | that's the state of MGA knowledge?  That is simply -- I don't |
| 22 | want to call it a mockery -- but it simply does not appear to |
| 23 | be in the spirit or the letter of the court's order, and it |
| 24 | simply was not providing the information that we were seeking |
| 17:35 25 | by way of that motion. |

1          In any event, the third point is, is that

2    Mr. Larian was designated on this topic, he is the CEO of the

3    company, he is someone who is clearly in a position to have

4    known, and the questioning was proper.

17:35 5          THE COURT:  Well, I think that the complaint is

6    basically twofold.  It's even more unique, and that is that

7    the court order limited preparedness and that, also I'm

8    hearing that attorneys withheld documents.

9          The inference is that Mr. Larian is not prepared

17:35 10   because of his counsel having made a mistake in the court's

11   ruling.

12         It's not dependent, Counsel, on what you've

13   referred to as "the eyes only."

14         Mr. Larian is well prepared.  He certainly has

17:35 15   enough information.  He can be shown these documents.  The

16   30(b)(6) is a rather unique situation because Mr. Larian

17   placed himself in the position of being that 30(b)(6) witness

18   by choice and then interrelating that with advice of counsel,

19   which is a quagmire created by Mr. Larian.

17:36 20         So it's a rather unique issue, but in Mr. Larian's

21   insistence on 30(b)(6) and -- and most important, being the

22   executive officer, I find it difficult to believe that

23   Mr. Larian isn't prepared, that he doesn't know about tags,

24   copying, and that he doesn't know about the -- well --

17:36 25         MS. HURST:  Your Honor --

           1              THE COURT:  Just a moment now.  I want to be

           2      careful about what I say.

           3              If not the exact information and whose desk the

           4      information was on, certainly that information was inside

17:37      5      MGA's Mexico's offices, and the vagueness of the answer, from

           6      Mattel's position -- the nonresponsiveness -- and from

           7      Mr. Larian's position, I find it hard to believe after these

           8      depositions that he's not prepared on every topic or whether

           9      that's simply a choice.

17:37     10              Lastly, I think since some of you have been

          11      confused in the past, you have to understand that I take the

          12      position that the buck stops with the top executive, that

          13      it's too easy for these witnesses and these corporations to

          14      segment out responsibility pointing to each of the

17:38     15      underlings.  The claim that, "I didn't know," for goodness'

          16      sakes, these parties from Mr. Eckert to Mr. Larian have been

          17      at war -- battle with each other now for six years, seven

          18      years.

          19              I'm going to hold to my ruling.  I think it's a

17:38     20      good ruling under the circumstances, and if you'd like him to

          21      be better prepared tomorrow, tell me how I can aid you.

          22              MS. HURST:  Your Honor, Mr. Larian is an individual

          23      defendant in this lawsuit, Mr. Eckert is not.

          24              The instruction to the jury --

17:38     25              THE COURT:  I'm sorry.  How can I aid you?

1       MS. HURST:  Your Honor, by a curative instruction

2   that this does not go to Mr. Larian's personal liability if

3   he didn't have knowledge of it.

4       There are legal standards here.

17:38 5       He cannot be held personally liable unless he knew

6   about these documents at the time they came into the company

7   and either acquired, used or disclosed them with personal

8   knowledge of them.

9       THE COURT:  I don't think that precludes

17:39 10   examination on these documents.

11       A party could assume from some of the evasiveness

12   of the answers that Mr. Larian's fabricating.  Now, certainly

13   I'm not making that finding, but I think that there is a

14   indication in terms of the vagueness in some of this material

17:39 15   that he should absolutely be aware of it.

16       MS. HURST:  Your Honor, even Mr. Vargas has

17   testified that Mr. Larian never requested that they bring

18   anything from Mattel and, in fact, told them not to, and that

19   he never provided anything to Mr. Larian.

17:39 20       There is absolute unanimity of testimony, even by

21   Mr. Vargas, that Mr. Larian had no personal involvement at

22   all in the fact that those documents walked over from

23   Mattel - Mexico.

24       So the evidence will be and has been, that

17:40 25   Mr. Larian had no involvement on that.

1    And I understand the court wants to treat documents

2    and let them come into evidence and have it be an efficient

3    trial -- I totally understand that -- but to say, then, with

4    the witness on the stand looking at a document that he's

17:40  5    never seen and the possession of which could result in

6    personal liability for him, that the buck stops here, which

7    is not the standard under the Uniform Trade Secret Act, is a

8    problem.

9         THE COURT:  Okay.  Thank you.

17:40 10         MS. KELLER:  Your Honor, the other -- the other

11    problem is that assuming that a jury at the end will be able

12    to sort all this out when, frankly, not just Mr. Larian, but

13    his lawyers are being repeatedly besmirched by the

14    implication that either we're hiding things from him or he's

17:40 15    being evasive when he says, "I've never seen this before" --

16    when, in fact, his counsel was trying to protect him from

17    exposing him to trade secrets, and we have evidence of that

18    throughout the depositions and throughout the orders.

19         This jury is not going to be able to sort that out

17:41 20    at the end.  And I know this court tried a lot of the cases,

21    as a trial lawyer, and I've tried an awful lot of cases and

22    juries get confused on this stuff.  And when they start to

23    form these impressions at the end they can't neatly sort them

24    into boxes and say as an individual defendant he -- it

17:41 25    doesn't really matter that his lawyers apparently hid things

1    from him when he was being deposed; but as a corporate

2    representative he -- the buck stops here.  They can't do

3    that.  And I really do think that if -- that if -- if it

4    continues along these lines with him where, essentially, any

17:41 5    document with an MGA stamp on it that someone saw sometime

6    somewhere, he's held accountable for because the buck stops

7    there, then that same buck is going to stop there at his

8    doorstep with personal liability and a big judgment.

9         And it -- it -- I too understand and appreciate the

17:42 10   court's both desire for an efficient trial and -- and

11   questions that are arising in the court's mind about

12   credibility of various witnesses, including Mr. Larian.  I

13   understand that, but if we -- if we --

14        THE COURT:  It's easily solved.  It's easily

17:42 15   rectified.

16        What documents does he need to look at?

17        He's going to be on cross-examination, and it's

18   easily rectified that you can inquire and say that these were

19   presented to him for his review and now he's aware of them.

17:42 20        MS. KELLER:  It isn't easily rectified when he's

21   been cross-examined about, so, you were designated to be the

22   corporate representative, but your lawyers didn't give you

23   any of these at the time, so you said in your deposition that

24   you didn't know anything about this.

17:42 25        And if he says, now, yes, last night I reviewed

1    these documents, so now I know something about them, now at

2    least I've read them and now I know what's in them -- that

3    doesn't solve the problem.

4            THE COURT:  Unfortunately, I'll just refer the

17:43 5    Circuit and the reviewing court if liability's reached to

6    those to depositions where Mr. Larian was a 30(b)(6) witness.

7            And while the criticism of Mattel could be that the

8    questions are repetitive, the criticisms of MGA and

9    Mr. Larian would be that there were no answers forthcoming,

17:43 10    that these were normally -- that these were purposefully

11    unprepared.

12            I mean, you really have to go back and dig in this.

13    I don't know if the Circuit has enough law clerks to do it,

14    frankly.  But if you look at the overall record there were

17:43 15    numerous opportunities for preparedness here.

16            Now, if Ms. Keller -- I'm sorry -- if Ms. Hurst

17    read my warnings incorrectly, I think it's di minimus so far.

18            I think it pertains, quite frankly, to one or two

19    exhibits.

17:43 20            One is in the copying area --

21            MS. HURST:  Your Honor, it's only --

22            THE COURT:  Just a minute.  No, Ms. -- that's

23    exactly why I'm not going to allow it.  I'm just looking at

24    my notes.

17:44 25            I just appreciate the courtesy.  I'm finishing my

Case 2:04-cv-09049-DOC-RNB  Document 9869  Filed 02/14/11  Page 16 of 110  Page ID #:298217
CV 04-9049 DOC - 02/10/2011  Volume 4 of 4

16

1    thoughts.

2         4907, 4909 -- also there are prior e-mails that

3    indicate, at least, in what I call the "copying" area, that

4    he was quite aware in this limited time frame, and that's two

17:44 5    thousand -- or it's 20656 and 21283.

6         Also I have a very difficult time with that

7    argument for one reason.

8         Paula Garcia occupied such a position with MGA and

9    is so close to Mr. Larian with a major major say in this

17:44 10    particular company, regardless of her "on age," that it does

11    concern me, frankly -- and let me use those words artfully --

12    that Mr. Larian claims that he's not prepared and doesn't

13    know anything about these different areas and fields.

14         Now, I also want to cover one more thing -- and

17:45 15    I'll come back and let you perfect your record -- but I've

16    made that ruling.  And I'm curious about this.

17         I think I've been very kind in some situations to

18    both parties, one with Ms. Keller because you were trying to

19    catch up.  So you've been resting, from my perspective.  And

17:45 20    Mr. Price, for whatever reasons -- I've excused you also.

21         That is a first for this court.  I have never

22    excused lead counsel before.  And just ask around.  I've had

23    counsel in hours that you wouldn't even dream of sitting in

24    my court, all 11 of them.  So I'm hearing this disconnect,

17:45 25    and it's starting to concern me.

 1         Of course you have the right to object, but I was

 2    very, very clear that I thought Mattel had overreached.  I'd

 3    handed down a decision concerning copying.  Mr. Quinn asked

 4    me in one session with Mr. McConville present, to reconsider

17:46  5    this, if it was a limited time frame.

 6         I told counsel that I was going to allow that.  It

 7    would be up to the launch of Bratz and no further, that I was

 8    unsure whether it was May -- according to one witness, who I

 9    thought was way too early -- but it was as late as August,

17:46 10    and there was nothing unclear about that.

 11         So I'm just saying -- I'm not finding any

 12    criticism -- I'm just saying talk to each other, because if

 13    I'm going to rule against you and you don't know that, it

 14    looks like you're hiding and you're not.

17:46 15         And it's in good faith, Ms. Keller, and you're

 16    entitled to lodge all the objections you want in the world,

 17    but there's a disconnect.  There is a disconnect.

 18         Let me just say might be.  Might be.

 19         Finally, you know that I'm always trying to get it

17:46 20    right -- and I'll state to the reviewing court that I think

 21    it's as Ms. Estridge said, that whatever you want it to be in

 22    concerns of RICO, well, it's whatever the Circuit court's

 23    going to eventually choose in terms of very difficult calls

 24    by this court on some equity, on occasion, which I hope don't

17:47 25    violate the Evidence Code too much.

1          So I'm going to discuss two other matters with you.

2          So by tonight you need to write a brief, Ms. Hurst.

3    In other words, you need to perfect these in writing for the

4    court, and let me look at it tonight and let me go over it

17:47  5    again.  And if I'm not trying to get it right, I wouldn't be

6    inviting you to do that.  Okay.  I'd just cut you off.  I'm

7    not doing that, just as I haven't done that to Mattel.

8          So if I'm wrong, that means I'm good and wrong.

9          So you're going to have that to me by what time

17:47 10    tonight?

11          You look at the clock.  Tick-tock, tick-tock.

12          I don't care.  I don't sleep, and you're not going

13    to sleep.  None of you are.  You'll sleep after the trial.

14          10:00? 9:00? 7:00?

17:48 15          MS. HURST:  I just want to be clear.

16          This is not about the copying thing at all.  It's

17    only about the Mexico documents.

18          THE COURT:  I understand that.  Get it in writing

19    for me.

17:48 20          MS. HURST:  All right.

21          THE COURT:  The copying, I've made that clear.

22          I don't care if you write a brief on that.

23          MS. HURST:  No.

24          THE COURT:  It's about the Mexican documents, and

17:48 25    I'm asking Mr. Overland to sort that out for me also.

```
 1              You see, what I thought was damaging is, although

 2      his objection is correct or probably correct as to

 3      Mr. Machado, it's not correct as to Mr. Larian.

 4              And because I didn't know Mr. Overland was going to

17:48  5   pop up at that exact moment, I couldn't sort through that,

 6      quite frankly, enough to give him an instruction without

 7      confusion.

 8              Now I can undo that in terms of Mr. Machado and who

 9      it applies to, but I want it clear that it applies to

17:48 10   Mr. Larian, and I don't think there should be any confusion

11      in the jury's mind from my perspective.

12              So once again, as you look at the clock, just tell

13      me the time.

14              MS. HURST:  When can I go to write it?

17:49 15           THE COURT:  You can go any time we're done.

16              I have a deposition that I'm still sitting here

17      waiting for, and I want to talk to you about three other

18      things because I'm trying to anticipate problems that are

19      going to occur.

17:49 20           MS. HURST:  Okay.  How about 10:00 p.m. at the

21      latest?

22              THE COURT:  That's great.

23              I'll be sitting here at 10:00 p.m.

24              Now, hold on.

17:49 25           Now we have the deposition.  Now, I want to
```

1     anticipate two things.

2           Where is Ms. Kuemmerle?  I want a good record of

3     this because I know it's about to happen.

4           Ms. Kuemmerle has allegedly disappeared into the

17:49 5     wilds of Brazil and Susanna Kuemmerle is an integral part of

6     this.  She's one of the first witnesses that I met.  She's

7     one of the first problems that this court had in terms of

8     depositions.

9           Has she been served?

17:49 10          MR. ZELLER:  I believe that she has, Your Honor.

11          THE COURT:  No, my belief.

12          Has she been served, yes or no?

13          MR. ZELLER:  She has.

14          THE COURT:  When?

17:50 15          MR. ZELLER:  I'll have to get the details.

16          THE COURT:  Okay.

17          MR. ZELLER:  But one thing is she actually lives

18    here in the United States, Your Honor.

19          THE COURT:  Well, she may not be coming back.

17:50 20          MR. ZELLER:  She has a house in New Jersey.

21          MS. KELLER:  All the more reason not to come back.

22          THE COURT:  Now, is she in Brazil?  What

23    information do we have?  Because it was represented to me on

24    a Saturday session or a Sunday session by Mr. Zeller -- and I

17:50 25    want to get a clear record of this -- that she's gone to

Case 2:04-cv-09049-DOC-RNB   Document 9869   Filed 02/14/11   Page 21 of 110   Page ID #:298222
CV 04-9049 DOC - 02/10/2011   Volume 4 of 4

21

```
 1    Brazil and she's not available.
 2              I don't know if that's true or not.
 3              Mr. McConville.
 4              MR. MCCONVILLE:  Your Honor, I recall that
 5    representation and I recall my response was, "I don't know,"
 6    but I did commit to the court that we would continue to try
 7    to get Ms. Kuemmerle back and -- and --
 8              THE COURT:  How are we doing?
 9              MR. MCCONVILLE:  I understand that someone has
10    actually been in contact with her.
11              THE COURT:  Okay.  Now, if I've got continuing
12    jurisdiction and she's been served, you know what I'm going
13    to do -- the very thing that I don't want to do --
14              MR. MCCONVILLE:  I don't know if she's been served,
15    Your Honor.
16              THE COURT:  That's what I'm trying to find out as
17    I'm sitting here.
18              MR. MCCONVILLE:  And she did not give us the
19    authority to accept a subpoena on her behalf, so --
20              THE COURT:  Has she been served?
21              MR. ZELLER:  We're trying to find updated
22    information, Your Honor, but --
23              THE COURT:  Well, that's enough conversation.
24              It's a simple question.  We're just going to wait
25    for the answer.
```

Case 2:04-cv-09049-DOC-RNB   Document 9869   Filed 02/14/11   Page 22 of 110   Page ID #:298223
CV 04-9049 DOC - 02/10/2011 Volume 4 of 4

22

                     Second, you had a request concerning the contact by

Ms. Ray -- or of Ms. Ray -- I'm sorry -- and I had not ruled

on that and had not allowed you to bring that person into

court at that juncture.

17:52            Are you going to be asking Mr. Larian about

Ms. Ray?

                 MR. QUINN:  Yes, Your Honor.

                 It's my understanding you wanted to hear Mr. Larian

first.

17:52            THE COURT:  Yes.  And I didn't know how close you

were to finishing, because tonight you said, "my last

exhibit."  I think you meant your last exhibit for tonight.

                 MR. QUINN:  Yeah, the last exhibit in the articles.

                 THE COURT:  Okay.  Number 3, I well understand the

17:52 Evidence Code, but I also understand truthfulness, so I'm

going to put you both on notice.

                 Prepare your witnesses.

                 MR. MCCONVILLE:  Your Honor, can I address just one

issue to just -- to make sure that we were communicating

17:52 clearly with you earlier today.  There was an exhibit

involving a Mr. Cooney.  It was Exhibit 23751 --

                 THE COURT:  Just a moment.

                 MR. MCCONVILLE:  Yeah.

                 THE COURT:  Just a minute.

17:53            Counsel, do you remember 3618?

|      |                                                                  |
|------|------------------------------------------------------------------|
| 1    | I'm just kidding you.                                             |
| 2    | MR. MCCONVILLE:  It was --                                        |
| 3    | THE COURT:  Hold on.                                              |
| 4    | I actually have excellent notes.                                 |
| 17:53 5 | MR. MCCONVILLE:  It was after lunch.                           |
| 6    | THE COURT:  I don't take it by lunch counsel                     |
| 7    | because I don't have lunch.                                       |
| 8    | MR. MCCONVILLE:  I write down the time.                          |
| 9    | THE COURT:  Well, just a moment.                                 |
| 17:53 10 | Okay.                                                         |
| 11   | (Pause in the proceedings.)                                      |
| 12   | THE COURT:  I have 23751.                                         |
| 13   | MR. MCCONVILLE:  That's it, yes.                                  |
| 14   | THE COURT:  Dan Cooney, while at Mattel, was                      |
| 17:54 15 | responsible for Toys"R"Us.  He prepared CD information that   |
| 16   | was on Mattel's computer.  827 was referred to just before        |
| 17   | that.  Mr. Cooney had put Mattel docs on the CD and he            |
| 18   | downloaded a Promatrix, which is what you're referring to.       |
| 19   | MR. MCCONVILLE:  Yes.                                             |
| 17:55 20 | THE COURT:  And then in 2357, if I could see that            |
| 21   | once again, marked, "Mattel confidential," there were a          |
| 22   | number of pages referred to, and the testimony carried on        |
| 23   | that Mr. Larian was involved in Mr. Kuemmerle's hiring, and      |
| 24   | 20838 was next referred to.                                      |
| 17:55 25 | It's a 4-26-06, e-mail involving Larian and Ron             |

1    Brawer where Mr. Larian is telling Mr. Brawer, basically, to

2    hire Cooney.

3              Am I in the right area?

4              MR. MCCONVILLE:  That's exactly it, Your Honor.

17:55  5      So the issue is this:  Exhibit 23751, which you've

6    -- what I have it down to is a Promatrix spreadsheet --

7              THE COURT:  Uh-huh.

8              MR. MCCONVILLE:  -- and a couple of points on

9    that -- but the principal point is that it is no longer

17:55  10    Mattel's position that it's a trade secret.

11             THE COURT:  I understand that.  I made my ruling.

12             MR. MCCONVILLE:  So --

13             THE COURT:  It didn't go to that, Counsel, it went

14    to the confidentiality of the document.  It went to the trade

17:56  15    secret misappropriation, and it doesn't have to be a "trade

16    secret."  It goes to his intent.

17             MR. MCCONVILLE:  But Mr. Larian was not on the

18    document, Your Honor.  That was the whole -- the document has

19    no connection to Isaac Larian.  It's not a Mattel trade

17:56  20    secret, and if the idea is, then, that they can introduce a

21    bunch of what is, in essence, 404(b) evidence in order to

22    show actions in conformity with other evidence, then we're

23    swimming upstream, and I didn't think the court's ruling was

24    if there is a document that is not a trade secret that is

17:56  25    taken, that they get to argue that it's part of a pattern of

UNITED STATES DISTRICT COURT

1   taking confidential information.

2          THE COURT:  But this document applied to

3   Mr. Kuemmerle in downloading -- and I thought when I made the

4   ruling that although we didn't have a chance to discuss it,

17:56 5   it was relevant to Mr. Larian's intent.

6          MR. MCCONVILLE:  Mr. Larian was not on the document

7   at all --

8          THE COURT:  He doesn't have to be.

9          MR. MCCONVILLE:  And -- and so, Judge -- so, then,

17:57 10  it's legally they don't have a claim associated with that

11  document.

12         THE COURT:  I understand that.

13         MR. MCCONVILLE:  So if the -- so if the -- I just

14  want to understand what the ground rules are.

17:57 15         So if there's a document that was taken from Mattel

16  that they are not claiming is of any value, it can be

17  imputed --

18         THE COURT:  No.  No, no, no, no.

19         That -- there's the "all or nothing" position.  No,

17:57 20  that's not the ruling.

21         MR. MCCONVILLE:  Okay.

22         THE COURT:  Cooney has a close association to

23  Mr. Larian.

24         Mr. Brawer has a close association to Mr. Larian.

17:57 25  You have a situation where Mr. Larian doesn't have any idea

1    about what appears or may be argued are enriching documents,

2    enriching documents marked with "Mattel confidential" on

3    them -- which some may find hard to believe, given I think

4    this is the one with the -- if not the SKU -- it had a number

17:58  5    of categories.  I need to see it again across the top.

6            MR. ZELLER:  Promatrix.

7            THE COURT:  Well, just let me see the document.

8            (Pause in the proceedings.)

9            THE COURT:  I was referred to a number of pages on

17:58 10    this document, and now -- since I've returned the document --

11    I don't recall which pages I was referred to.  I remember it

12    was the first.

13            But what caught the court's attention was the

14    relationship between Cooney, Larian -- Cooney is the vice

17:59 15    president of national accounts, if I recall, for MGA -- the

16    oh, the document is replete with Mattel confidential, and I

17    noted that on page, amongst others, 00016 -- my apologies --

18    "MGA confidential" -- well, no.  My apologies.

19            Here we go.  I cited the wrong page.

18:00 20    00026, 00025, 00024 -- there we go -- 00023, 00003,

21    00004, and -- without repeating the zeros -- -5.

22            In other words, these documents were intermixed

23    with MGA's material.

24            So, Counsel, why don't you go ahead and perfect

18:01 25    your record even further this evening.

Case 2:04-cv-09049-DOC-RNB  Document 9869  Filed 02/14/11  Page 27 of 110  Page ID #:298228
CV 04-9049 DOC - 02/10/2011 Volume 4 of 4

27

 1          MR. MCCONVILLE:  So I thought the testimony was he

 2     asked, "Did you have a relationship with Cooney?  Were you

 3     involved in his hiring?"

 4          And he said, you know, "I know Dan Cooney worked

18:01 5     for us."

 6          I don't believe that there was the nexus of

 7     closeness, but I understand the court's ruling.

 8          THE COURT:  You don't have to agree with it.

 9          MR. MCCONVILLE:  I said I understand it.

18:01 10          I didn't even say "respectfully," Your Honor.

11          THE COURT:  Thank you.

12          Every time Ms. Hurst says that I know what's

13     coming.

14          MS. HURST:  I'm going to stop.

18:01 15          MR. MCCONVILLE:  So, anyhow, Your Honor, I wanted

16     to make sure this is not a trade secret.  It seems to me like

17     classic 404(b), they're offering something for -- to show

18     propensity for a document that isn't legally sufficient to

19     get them anywhere because they've dropped a claim on it.

18:01 20          THE COURT:  I understand that, in a technical

21     sense.  I also understand it's a matter of credibility.  I

22     don't want to go any further with that.

23          MR. MCCONVILLE:  Okay.  Okay.  All right.

24          THE COURT:  Okay.  Let's just say some could

18:02 25     surmise that this is a document that has value, and that the

```
 1    confidential of Mattel is appearing intermixed with MGA
 2    documents.
 3              Now, we have exhibits in front of us.
 4              The first is the deposition of Denise O'Neal.
18:02  5         What page, Counsel?  Mr. Zeller?
 6              (Discussion held off the record.)
 7              THE COURT:  Now, let me see if I can preserve my
 8    trial attorneys.
 9              Ms. Keller, if you'd like to be here, you're
18:03 10   invited.  Otherwise, you go and get fresh.
11              Mr. Price, if you want to be here, you're invited.
12    You don't have to be.
13              Go home and --
14              MR. QUINN:  Thank you.
18:03 15        THE COURT:  Get rested as best you can for
16    tomorrow.
17              (Pause in the proceedings.)
18              THE COURT:  Mr. Zeller.
19              MR. ZELLER:  There are a couple of passages.
18:03 20        The first is --
21              THE COURT:  I'm happy to read the whole thing, if
22    you'd like.
23              MR. ZELLER:  What?
24              THE COURT:  I'm happy to read the whole thing.
18:04 25        MR. ZELLER:  It's actually -- one struggle I'm
```

| | |
|---|---|
| 1 | having, Your Honor -- it is extremely short. |
| 2 | THE COURT:  Just read the entire -- |
| 3 | MR. ZELLER:  We literally walk through the article |
| 4 | and say, "What's the source of this?"  And she confirms -- |
| 18:04  5 | THE COURT:  Just a minute. |
| 6 | (Pause in the proceedings.) |
| 7 | THE COURT:  All right.  There are a series of |
| 8 | questions/answers beginning on Page 8, so let me read for a |
| 9 | moment. |
| 18:06 10 | Page 8, Line 4 -- well, strike that. |
| 11 | Page 8, Line 1:  (Reading.) |
| 12 | "Question:  I would ask you to take a quick look at |
| 13 | that and tell me if you recognize it, this document. |
| 14 | "Answer:  It appears to be a story that I wrote for |
| 18:06 15 | the paper.  It has my byline, so I'm assuming it is the story |
| 16 | I wrote. |
| 17 | "Question:  Do you recall this particular article? |
| 18 | "Answer:  I know that I wrote an article on the |
| 19 | Bratz, one lengthy article, and that is the only, I do |
| 18:07 20 | believe." |
| 21 | And I'm reading that correctly, as an aside. |
| 22 | "It is the one that appeared in 2004, yes." |
| 23 | "Question:  Okay.  And would you like to take a |
| 24 | minute and review it or are you quite confident you wrote |
| 18:07 25 | this article? |

1          "Answer:  If it has my byline, I'm sure I wrote it.

2          "Question:  And if you turn to Page 2, please, you

3    will see some highlighted portions.  And if I could have you

4    focus on the first sentence it says, quote, when Larian's

18:07  5    daughter was seven, he noticed that she had become bored with

6    Barbie dolls.

7          "Do you see that?

8          "Answer:  Yes.

9          "Question:  Do you recall interviewing, for this

18:07 10    article, an individual named Isaac Larian?

11          "Answer:  Yes.

12          "Question:  You do?  Do you remember approximately

13    when that interview occurred compared to the publication of

14    this article?

18:07 15          "Answer:  It would more likely be one to two weeks

16    prior to --

17          "Question:  To the publication date?

18          "Answer:  To the publication date.  Right.

19          "Question:  So approximately mid-February?

18:08 20    Somewhere in February?

21          "Answer:  Yeah.

22          "Question:  2004?

23          "Answer:  Yeah, right.

24          "Question:  Thank you.

18:08 25          "Now, turning back to that first sentence, do you

1    recall Mr. Larian telling you that information during your

2    interview with him?

3            "Answer:  I do.

4            "Question:  And if I could have you focus on the

18:08 5  next sentence, it says, quote:

6            *He decided to again change the focus of his*

7    *company, wanting to create a doll product for girls 7 to 13.*

8    *The dolls would have to be urban dolls representing America's*

9    *multiethnicity.  They also had to reflect the trends and*

18:08 10 *attitudes the tween"* -- t-w-e-e-n -- *generation.*"

11           "Question:  "Do you recall Mr. Larian telling you

12   that information?

13           "Answer:  To the best of my knowledge; yes.

14           "Question:  Turning to the next paragraph, you will

18:08 15 see a quote.  It says, quote:

16           *We are looking for a new toy to challenge Barbie,*

17   *something that would span girl's interests in dolls for a few*

18   *more years,* end of quote, says Larian.

19           "And you attribute that quote to Mr. Isaac Larian;

18:09 20 correct?

21           "Answer:  Yes.

22           "Question:  And to the best of your knowledge, that

23   was an exact quote from him to you; correct?

24           "Answer:  Most quotes are such verbatim; yes.

18:09 25           "Question:  And to the best of your memory that

```
 1    quote was words specifically spoken to Mr. Larian?
 2            "Answer:  To the best of my knowledge, yes, it
 3    was."
 4            And, once again, checking my notes as to the Sun
 5    Times, Ms. O'Neill, served and deposed.  Exhibit 632.
 6            Has it been represented to you that she's
 7    unavailable, unwilling to come to court?
 8            MR. ZELLER:  Yes, sir.
 9            THE COURT:  By whom?
10            MR. ZELLER:  I can get --
11            THE COURT:  Get that for me tomorrow so I can have
12    a complete record.
13            And if MGA cares to check that -- in fact, get that
14    for me tonight.
15            MR. ZELLER:  If it pleases the court, what we can
16    do for both the reporters, we actually have e-mail exchanges
17    with them.  We can simply lodge them with the court this
18    evening.
19            THE COURT:  Why don't you e-mail them now with MGA
20    present.
21            All right.  The next one is from
22    Maureen T-k-a-c-i-k, and it's a deposition on --
23    M-a-u-r-e-e-n -- and it's dated September 28th, 2007.
24            The prior deposition of the -- Denise O'Neal --
25    D-e-n-i-s-e O-apostrophe-N-e-a-l-- is October 3rd, 2007.
```

```
 1                    (Discussion held off the record.)

 2                    MR. QUINN:  Page 8, Lines 6 through Page 10,

 3        Line 14.

 4                    THE COURT:  Okay.

18:11  5              Now, as a courtesy to the Circuit, I can imagine

 6        how difficult it's going to be to review this case, and the

 7        reason I'm going to read this in is it saves the Circuit from

 8        having to go back and even look at the depo and read it

 9        separately.

18:11 10             It's just a courtesy.

11                   So page --

12                   MR. QUINN:  Page 8, Line 6.

13                   THE COURT:  Line 6.

14                   (Pause in the proceedings.)

18:11 15             THE COURT:  Up to Page 10?

16                   MR. QUINN:  Page 10, Line 14.

17                   THE COURT:  Thank you (Reading.)

18                   "Question:  And just for the record, this is a Wall

19        Street Journal article dated July 18th, 2003, entitled,

18:12 20   quote, To lure older girls Mattel brings in hip-hop crowd,

21        end of quote.

22                   "Answer:  Correct.

23                   "Question:  And this is an article that you wrote?

24                   "Answer:  Yes.

18:12 25             "Question:  And if I could have you turn to the
```

1    second page you will see a highlighted paragraph.

2              Do you see that?

3              "Answer:  Yes.

4              "Question:  Could I have you read that out loud?

18:12  5          "Answer:  Yes.

6              *Isaac Larian, chief executive of MGA, said he never*

7        *heard of a project similar to the Bratz at Mattel.  He says*

8        *he chose Mr. Bryant's idea for the Bratz over several others*

9        *after holding a sort of fashion doll design contest in late*

18:12 10   *1999,"* end of quote.

11             "Question:  And did you interview Isaac Larian in

12       preparation for writing this article?

13             "Answer:  Yes.

14             "Question:  And you would agree, wouldn't you, that

18:13 15   the article attributes certain statements to Mr. Larian?

16             "MS. CENDALI:  Objection.

17             "Answer: I'm not sure what that statement that is

18       highlighted.  I would say that that was attributed to

19       Mr. Larian, Isaac Larian.

18:13 20          "Question:  And again, turning to the highlighted

21       paragraph.

22             The --

23             "MR. CARL:  And we are staying on that paragraph.

24             "MR. NIBORSKI:  Yes.

18:13 25          "Question:  The second sentence reads:

 1              *He says he chose Mr. Bryant's idea over the Bratz,*

 2      *over several others after holding a sort of fashion doll*

 3      *contest in late 1999,* end of quote.

 4              Did I read that correctly?

18:13  5              "Answer:  You missed the word "design."  It's a

 6      fashion doll design contest.

 7              "Question:  Fair enough.  Let me repeat it.

 8              *He says he chose Mr. Bryant's idea for the Bratz*

 9      *over several others after holding a sort of fashion doll*

18:13 10     *design contest in late 1999.*

11              Is that correct?

12              "Answer:  Yes.

13              "Question:  And did Mr. Larian tell you that

14      statement during your interview?

18:14 15              "Answer:  Yes.

16              "Question:  Following the publication of your

17      article, did anybody from MGA ever contact you and ask for a

18      correction or retraction or anything from the article?

19              "Answer:  No.

18:14 20              "Question:  Did Mr. Larian ever contact you and ask

21      for a correction, redaction or anything from the article?

22              "Answer:  No."

23              Mr. Zeller, once again, for my record, has this

24      person been subpoenaed?

18:14 25              MR. ZELLER:  Yes, sir.

| | |
|---|---|
| 1 | THE COURT:  For this trial? |
| 2 | MR. ZELLER:  Correct. |
| 3 | MR. MCCONVILLE:  Your Honor, if we could refer you |
| 4 | to pages -- the same deposition, Page 29, Line 9 -- |
| 18:14 5 | THE COURT:  9 -- |
| 6 | MR. MCCONVILLE:  -- through -- |
| 7 | THE COURT:  -- 9 -- |
| 8 | MR. MCCONVILLE:  -- through Page 30, Line 17. |
| 9 | THE COURT:  Page 29, Line 9. |
| 18:15 10 | "Question:  The article goes on to say: |
| 11 | *The history of the Bratz is intertwined with* |
| 12 | *Mattel,*" end of quote. |
| 13 | And it says, quote: |
| 14 | *MGA says that Bratz were designed by Carter Bryant,* |
| 18:15 15 | *a former member of the Barbie team,*" end of quote. |
| 16 | "Answer:  Uh-huh. |
| 17 | "Mr. Carl:  If you could say yes or no. |
| 18 | "Answer:  Yes." |
| 19 | Sorry. |
| 18:15 20 | "Question:  Who at MGA told you that? |
| 21 | "Answer:  I talked to Isaac Larian at MGA and he |
| 22 | told me that.  There were probably other people at MGA who |
| 23 | also told me that. |
| 24 | "Question:  Mr. Larian, when he spoke to you, did |
| 18:15 25 | he attempt to in any way hide Mr. Bryant's involvement with |

1    Bratz from you?

2              "Answer:  I don't remember.

3              "Question:  You don't remember him saying anything

4    to that effect; correct?

18:15 5              "Answer:  Yes, I don't remember.

6              "Question:  And he told you that Bratz were

7    designed by Carter Bryant; is that right?

8              "Answer:  He did.  Yeah, he did.  He did say that.

9              "Question:  You didn't quote Mr. Larian directly on

18:16 10   that?  Is that true?

11              "Answer:  Well, this highlighted paragraph is a

12   paraphrase of him, basically, you know, saying that, so I

13   didn't quote him.  Just because I didn't quote him directly

14   does not mean he did not say that."

18:16 15              Question by Ms. T-k-a-c-i-k:

16              "Question:  Do you have any notes reflected of any

17   of the interviews that you did for this article?

18              "Answer:  No."

19              MR. QUINN:  Well, the -- the passage 29, Line 9

18:16 20   through 24 should not come in.  First off, the statements in

21   the question beginning at Line 9 is not attributed to anyone:

22   "The history of the Bratz is intertwined with Mattel."

23              The statement that, "MGA says Bratz was designed by

24   Carter Bryant, a former member of the Barbie team."

18:17 25              And it goes on:  "Who at MGA told you that?

1    "I talked to Isaac Larian at MGA and he told me

2    that.  There were probably other people at MGA who also had

3    told me that."

4         That's hearsay as to "them."

18:17 5     THE COURT:  As to the other people, it is.

6         What about Mr. Larian?

7    "I talked to Isaac Larian at MGA and he told me

8    that."

9         "Question:  Mr. Larian, when he spoke to you, did

18:17 10   he attempt to in any way hide Mr. Bryant's involvement with

11   Bratz from you?

12        "I don't remember.

13        "Question:  You don't remember him saying anything

14   to that effect?

18:17 15        "Answer:  Yes.  I don't remember.

16        "Question:  And he told you that Bratz was designed

17   by Carter Bryant; is that right?

18        "Answer:  Yeah, he did.  He did say that."

19        Now, what's wrong with the complete reading?

18:17 20        MR. QUINN:  It's just that, "there are probably

21   other people at MGA who also told me that."

22        THE COURT:  I'll strike that.  That's hearsay.

23        MR. QUINN:  Okay.

24        THE COURT:  So as long as I have, now, a better

18:18 25   record --

UNITED STATES DISTRICT COURT

CV 04-9049 DOC - 02/10/2011 - Volume 4 of 4

```
 1              MR. QUINN:  But, also, Your Honor, the beginning --
 2              THE COURT:  You subpoenaed the person and they're
 3     not willing to come.
 4              MR. QUINN:  The article goes on to say, "the
18:18  5     history of Bratz is intertwined with Mattel."
 6              That's not attributed to anybody.
 7              THE COURT:  That's correct.  It should be stricken.
 8              MR. QUINN:  So that should not be read.
 9              THE COURT:  It should be stricken.
18:18 10              It should start, and it says, quote:
11              "MGA says that the Bratz were designed by
12     Carter Bryant, a former member of the Barbie team."
13              "Answer:  Uh-huh.
14              "Question:  And if you can say yes or no.
18:18 15              "Answer:  Yes.  Sorry.
16              "Question:  And who at MGA told you that?
17              "Answer:  I talked to Isaac Larian at MGA and he
18     told me that."
19              And then we're going to strike, "there were
18:18 20     probably other people at MGA who also told me that," as
21     hearsay.
22              It goes on to say:
23              "Question:  Mr. Larian, when he spoke to you, did
24     he, in any way, attempt to hide Mr. Bryant's involvement with
18:19 25     Bratz from you?
```

UNITED STATES DISTRICT COURT

 1          And it goes on.

 2          Any objection to the reading of that by MGA?

 3          MR. MCCONVILLE:  Your Honor, I apologize.  I'm

 4    trying to read through this pretty quickly.

18:19  5          THE COURT:  I can read it from beginning to end, if

 6    you'd like me to.

 7          MR. MCCONVILLE:  I don't want to stop you from

 8    doing that, but I'm just trying to get through it myself.

 9          THE COURT:  Okay.

18:19 10          I read beautifully between 7:00 and 10:00.

11          Off the record.

12          (Discussion held off the record.)

13          THE COURT:  We're back on the record.

14          Mr. McConville, you had an additional paragraph.

18:28 15          MR. MCCONVILLE:  Yes, Your Honor.

16          I can read it myself, if you'd like, if it be --

17          THE COURT:  What page?

18          MR. MCCONVILLE:  Page 33 of the T-k-a-c-i-k

19    deposition --

18:28 20          THE COURT:  Got it.

21          MR. MCCONVILLE:  -- Line 6 through Page 34,

22    Line 25.

23          THE COURT:  Page 6?

24          MR. MCCONVILLE:  No, I'm sorry.

18:29 25          Page 33, Line 6.

UNITED STATES DISTRICT COURT

```
 1              THE COURT:  Page 33, Line 6.

 2              MR. MCCONVILLE:  Through Page 34, Line 25.

 3              THE COURT:  Through Page 34, Line 25.

 4              MR. MCCONVILLE:  Line 25.

 5              MR. QUINN:  For what it's worth, Your Honor, we

 6      have no objection to that.

 7              THE COURT:  Okay.  Now, how do you want that done?

 8              Do you want to interrupt Mr. Larian's testimony and

 9      have that read tomorrow morning or do you want to wait?

10              In other words, I'm going to withdraw those hearsay

11      items immediately.

12              MR. QUINN:  All right.

13              I think we'd like to -- to read it in the testimony

14      as part of this sequence of articles.

15              THE COURT:  Just when I withdraw those incorrect

16      admissions by the court of that -- those three -- two pieces

17      of evidence, do you want to read it at that point?

18              MR. QUINN:  Yes.

19              THE COURT:  And I'll indicate and read for the jury

20      that the other two items are received?

21              MR. QUINN:  That would be great.

22              THE COURT:  And then read it at that point.

23              Okay.

24              MR. MCCONVILLE:  But we would continue to interpose

25      our objection on hearsay grounds.
```

```
 1              THE COURT:  Thank you.

 2              MR. MCCONVILLE:  Okay.

 3              THE COURT:  Why don't you get on the phone and the

 4     e-mail with Mr. Zeller and if you have any concerns about the

 5     nonappearance, because then they're not available, having

 6     already been deposed, I'd like to you make certain that

 7     you're satisfied that they're not coming.

 8              MR. ZELLER:  I have forwarded that information to

 9     them.

10              THE COURT:  Why don't we make a record of that

11     right now while we're waiting for our brief.

12              Do you have that information?  Do you want to read

13     it?

14              Did they respond to you from --

15              MR. ZELLER:  They're lengthy e-mail chains.  I'm

16     happy to read them, Your Honor, but -- but they are --

17     they're e-mail chains that, in some instances, began with the

18     reporters --

19              THE COURT:  Well, you've got to remember, I made a

20     mistake because I thought that this was the same situation

21     for all of the newspaper articles, and I don't want to repeat

22     that error.

23              MR. ZELLER:  Sure.

24              So I -- I can read them.  I have to scroll down.

25              So the first e-mail chain involves Maureen Tkacik,
```

18:30 5
18:31 10
18:31 15
18:31 20
18:32 25

 1  and prior to this she had been -- she had agreed to accept

 2  service of the subpoena, and initially she had actually said

 3  that she would come to California and testify, and then we

 4  received the following e-mail on Wednesday, January 26, 2011,

18:32  5  to one of our lawyers who had been in communication with her,

 6  Viola Trebicka, T-r-e-b-i-c-k-a.

 7          The subject is "Hi" and it says -- it says:

 8          "I'm sorry, but Jason Conti -- C-o-n-t-i -- in the

 9  Dow Jones general counsel's office, is advising me not to

18:32 10  testify.  Can you contact him for future correspondence?"

11          And then goes -- has a signature of "Moe," M-o-e,

12  "Tkacik," T-k-a-c-i-k.

13          That's her nickname -- that's the name she goes by,

14  is "Moe."

18:33 15          The lawyer in my firm responded on Wednesday,

16  January 26, 2011, at 4:28 p.m. by e-mailing Jason Conti,

17  C-o-n-t-i, and forwarded the e-mail from Ms. Tkacik -- so it

18  has the subject of "Forward:  Hi," H-i.

19          "Dear Mr. Conti,

18:33 20          "I am an attorney for Mattel.  Mattel would like

21  Ms. Tkacik to testify in the Mattel versus MGA trial on or

22  around February 3, 2011.  Ms. Tkacik informed me that I

23  should contact you to discuss her appearance at trial.  As I

24  already explained to Ms. Tkacik, the trial is in Santa Ana,

18:33 25  California, in front of Judge David O. Carter.  We intend to

```
 1    ask her questions about public information in a published
 2    article.  We expect that she would be on the stand for an
 3    hour or less.  Mattel, of course, will reimburse Ms. Tkacik
 4    for her transportation and accomodation expenses and any lost
 5    wages that she may incur while in California.  When are you
 6    available for a short phone conversation to discuss her
 7    appearance?  Look forward to your response.  Best."
 8              And then:
 9              "Viola Trebicka."
10              THE COURT:  Just a moment.
11              Are you reading the same thing, Mr. McConville?
12    Are you accepting the representation?
13              MR. MCCONVILLE:  It's been forwarded to me but I
14    don't have the ability to read --
15              THE COURT:  Why don't you look over his shoulder.
16              MR. MCCONVILLE:  I trust him.
17              THE COURT:  Okay.  Thank you.
18              MR. ZELLER:  And then the next e-mail chain is from
19    Jason Conti, sent Wednesday, January 26, 2011, at 1:30 p.m.,
20    and that's undoubtedly because he's on the East Coast, so
21    it's an earlier timestamp in responding to the Pacific Time
22    Zone e-mail.
23              "Dear Viola,
24              "I'm available this afternoon.  My contact
25    information is below."
```

1        And then it provides his contact information.

2        The next e-mail is then from Viola Trebicka,

3    Wednesday, January 26, 2011, at 4:45 p.m., Pacific, to

4    Mr. Conti, with a CC to me, Michael Zeller, and it states:

18:35  5        "Dear Jason,

6        "Thank you for the phone conversation earlier

7    today.  Mattel regrets Ms. Tkacik's decision not to appear to

8    testify live at the Mattel versus MGA trial due to your

9    concern that reporter-source privilege issues may be

18:35 10   implicated during her cross-examination.  As I mentioned over

11   the phone, Mattel is very interested in having Ms. Tkacik

12   testify live.  If anything changes in your position, please

13   let me know."

14        "Best, Viola."

18:35 15       The next e-mail in the chain is from Jason Conti to

16   Viola Trebicka with a CC to me, Mike Zeller, of January 26,

17   2011.  It has a military timestamp of 13:56:08.

18        "Dear Viola,

19        "As I'm sure you understand, media companies work

18:36 20   hard to avoid having any of their current or former reporters

21   testify, protecting news gathering information, keeping the

22   confidentiality of our sources and maintaining impartiality

23   in any civil disputes are of the utmost importance.  As such,

24   we cannot accept service of a subpoena in this action.

18:36 25       "Thank you for understanding."

CV 04-9049 DOC - 02/10/2011 Volume 4 of 4

```
 1              And it looks like that is the final e-mail in that
 2       chain --
 3              THE COURT:  Okay.
 4              MR. ZELLER:  -- regarding Ms. Tkacik.
18:36 5         THE COURT:  Mr. McConville, your objection is?
 6              MR. MCCONVILLE:  Pardon me, sir?
 7              THE COURT:  Your objection is -- do you believe
 8       she's available?
 9              MR. MCCONVILLE:  My objection is that the testimony
18:36 10      without that witness present is hearsay.  That's my -- that's
11       my objection.
12              THE COURT:  It's overruled.
13              It appears to the court she's unavailable.  Her
14       testimony will be read.
18:37 15        MR. ZELLER:  And this is -- there's an e-mail chain
16       with respect to the other porter -- reporter, rather,
17       Denise O'Neal.
18              THE COURT:  Now, I also invite you, Mr. McConville,
19       to call counsel.
18:37 20        MR. MCCONVILLE:  I appreciate it, Your Honor.
21              THE COURT:  In fact, that's an order.
22              MR. MCCONVILLE:  Okay.
23              THE COURT:  So we have an even clearer record and
24       if you have any contradictory information, get it to me.
18:37 25        MR. ZELLER:  And this is -- this e-mail chain
```

 1    pertains to Denise O'Neal, the reporter for the Chicago Sun

 2    Times.  They likewise had agreed to accept and did accept

 3    service of the subpoena voluntarily, and then we were put in

 4    communication with Damon Dunn -- D-u-n-n -- counsel for the

18:37 5    Chicago Sun Times.

 6          And Viola Trebicka again wrote him.  This is on

 7    January 27, 2011, at 12:57 p.m.

 8          "Dear Mr. Dunn,

 9          "I am an attorney for Mattel.  Mattel would like

18:38 10    Ms. O'Neill to testify in the Mattel versus MGA trial in

 11    early February 2011.

 12          "The trial is in Santa Ana, California, in front of

 13    Judge David O. Carter.  We intend to ask her questions about

 14    public information in a published article.  We expect that

18:38 15    she would be on the stand for an hour or less.

 16          "Mattel, of course, will reimburse Ms. O'Neill for

 17    her transportation and accomodation expenses and any lost

 18    wages that she may incur while in California.

 19          "When are you available for a short phone

18:38 20    conversation to discuss her appearance?  I look forward to

 21    your response.  Best, Viola."

 22          And then Viola Tribecka's electronic signature.

 23          Damon Dunn responded on Friday, January 28th, 2011,

 24    at 8:23 a.m.

18:38 25          It states:

1        "Dear Viola,

2        "I am back in the office today if you wish to

3    discuss this matter" -- oh, I apologize.  I may have gone too

4    far.

18:39  5        It appears to be the next one in the chain.  It's a

6    little confusing.

7        "Ms. O'Neill, however, has not changed her

8    position, first expressed in my December correspondence, that

9    she does not wish to travel to California or answer

18:39 10   additional questions about her reporting, including with

11   respect to the story in question."

12        And then Viola Tribecka writes him back on Friday,

13   January 28, 2011, at 10:26 a.m. and states:

14        "Thank you, Damon.  When is a good time for you to

18:39 15   speak over the phone?  Best, Viola."

16        Mr. Dunn then responded on Friday, January 28,

17   2011, at 8:32 a.m. by stating:

18        "3:30 Central time is best."

19        The next e-mail in the chain is from Viola Tribecka

18:40 20   to Mr. Dunn and it's 3:38 p.m. on January 28, 2011, and it

21   states:

22        "Dear Damon,

23        "Thank you for the phone conversation this

24   afternoon.  Mattel regrets Ms. O'Neil's position not to

18:40 25   appear to testify live at the Mattel versus MGA trial in

        1   Santa Ana, California.  As I mentioned over the phone, Mattel

        2   is very interested in having Ms. O'Neill testify live.  If

        3   anything changes in your position, please let me know.  Best,

        4   Viola."

18:40   5           The next e-mail in the chain is from Mr. Dunn to

        6   Ms. Tribecka on January 28th, 2011, with a military timestamp

        7   of 13:44:41.

        8           And it states:

        9           "Viola,

18:40  10           "It was my pleasure and I will pass your message on

       11   to my client.  Mattel should not expect that Ms. O'Neill

       12   would change her position, but I would, of course, let you

       13   know if she does. Damon."

       14           And then that -- that concludes the e-mail chain.

18:41  15           THE COURT:  You are ordered to give all the

       16   information concerning phone numbers and e-mail addresses to

       17   Mr. McConville.

       18           Mr. McConville, you are ordered tomorrow morning to

       19   contact each of those agencies and to verify that they're

18:41  20   still unwilling to appear.

       21           MR. MCCONVILLE:  (Nodded head.)

       22           THE COURT:  And you will report back to the court

       23   on that.

       24           Okay.  Now, in the meantime, I'm going to allow the

18:41  25   reading of the transcript, and if I have to further withdraw

18:41 | 1     it, if they're willing to come out, so be it; but you'll go
2     forward with the reading both of these transcripts.

3          I've deem that both of them are available based on
4     the information you've given me this evening.

18:41 5          I'll keep these transcripts.

6          You have these copies, don't you?

7          MR. ZELLER:  Yes, we do.

8          THE COURT:  All right.

9          Concerning the draft e-mail in which Mr. Larian

18:41 10   states, "Make sure Paula is prepped and doesn't know that
11   Veronica was using Mattel seamstresses," I'm going to deem
12   and continue to deem that that's privileged and therefore
13   inadmissible.  There's no exception to the privilege that I
14   can find applies.  It's also irrelevant because it concerns
18:42 15   discovery conduct which I had previously excluded by way of
16   the in limine motions.

17          There's no pretrial conference order, counsel, so
18   we're going to get busy tonight also.  That's been filed
19   because your earlier proposed orders contain disagreements
18:42 20   about the summary judgment rulings.

21          I think there were two disagreements about the
22   statute of limitations on the non-Bratz claims and whether
23   Brawer was part of the intentional interference claim.

24          The answers are that the non-Bratz claims are
18:42 25   timely to the extent Mexican law doesn't apply, and that

1    Brawer is not a part of the intentional interference claim

2    because his only misconduct also forms the basis for the

3    misappropriation claim.

4          I've also issued several in limine motions, so if

18:42 5    you want -- I think you should -- you can include those in

6    the revised pretrial conference order.  I expect that that

7    would be filed by tomorrow.

8          MR. ZELLER:  Uh-huh.

9          THE COURT:  Now, what else do we need to do before

18:43 10   we reconvene?

11          MR. QUINN:  Your Honor, there is still the issue of

12   the redactions, if any, to the Farhad-Larian e-mail.

13          THE COURT:  Thank you.

14          MR. QUINN:  Exhibit 21714.

18:43 15          THE COURT:  Yeah.  Thank you very much.  I may have

16   returned that to -- to the parties.

17          Chris, I think I gave that to you.

18          Do you have that again?

19          Let me go back and take a look at that for just a

18:43 20   second.

21          Thank you very much.

22          Now, I've given you the right to go back into some

23   of the lawsuits because of the testimony from Mr. Larian

24   concerning protection.

18:44 25          In the first paragraph it mentions the Hong Kong

1      action.

2              Is that your intent, Mr. Quinn?

3              MR. QUINN:  Yes, Your Honor.

4              THE COURT:  Okay.

18:44 5        MR. QUINN:  We would like that in.

6              THE COURT:  All right.  Prior to Mr. Larian's

7      testimony, I don't know that that would be relevant in light

8      of the other rulings that the court's made.  Now it appears

9      to be relevant, because, once again, Mr. Larian had blurted

18:45 10   out a nonresponsive answer.

11             Just a moment.

12             (Pause in the proceedings.)

13             THE COURT:  Let's go on the record concerning

14     21714.  We read Farhad Larian's testimony and,

19:00 15   Mr. McConville, I disagree and I'm going to ask you to reread

16     that entire testimony again.

17             The dropping of the lawsuit comes up on your

18     examination.  It doesn't come up before that time.  And if

19     I'm wrong, I certainly want to be corrected.

19:01 20           And the pertinent question is on Page 56:

21             Question by Mr. McConville:

22             "Question:  You just testified that part of the

23     reason you dropped it is because of family concerns, which is

24     consistent with 21714."

19:01 25           But then the answer is:

UNITED STATES DISTRICT COURT

1          "Answer:  What I recall I said at the arbitration

2     hearing after I saw some e-mails that MGA produced, I gave

3     the benefit of the doubt to Isaac that he didn't think of --

4     much of Bratz when he bought my shares.  That's the major

19:01 5     reason I dropped the case.  That's what I said at the

6     arbitration."

7          Now, I want you to go through that, because if I

8     misread that I want you to read it.

9          And what the e-mail purports to show is in this one

19:02 10     disputed line, is the consistency of an explanation that he

11     put family first and dropped the case, and then it's

12     contradictory to the statements that were asked by you in

13     terms of dropping the lawsuit.

14          I want to make sure you've read that completely.

19:02 15          If I go back to Mr. Quinn's testimony first --

16     well, I didn't feel that that was privileged before.  I left

17     it unredacted and I'm inclined to admit it as-is and --

18          So I understand you have both the consistency and

19     you have the inconsistency, and the inconsistency comes in

19:03 20     cross.

21          MR. MCCONVILLE:  So, Your Honor, I'm looking at

22     Page 47 --

23          THE COURT:  Okay.  I'm going to read over your

24     shoulder.

19:03 25          MR. MCCONVILLE:  And it says, in any event -- this

UNITED STATES DISTRICT COURT

| | |
|---|---|
| 1 | is questioning by Mr. Quinn -- |
| 2 | "Question:  In any event this complaint that you |
| 3 | brought was ultimately -- you actually ended up as an |
| 4 | arbitration proceeding? |
| 19:03 5 | "Answer:  Yes. |
| 6 | "Question:  You ultimately dismissed the |
| 7 | complaint?" |
| 8 | THE COURT:  Correct. |
| 9 | MR. MCCONVILLE:  (Reading.) |
| 19:03 10 | "Answer:  I did. |
| 11 | "Question:  You dismissed it because you decided to |
| 12 | put family before your case; correct? |
| 13 | "Answer:  That was the reason. |
| 14 | THE COURT:  And then turn to Page 54, if my memory |
| 19:03 15 | is correct. |
| 16 | MR. MCCONVILLE:  You highlighted it. |
| 17 | THE COURT:  56, I'm sorry.  Would you read the |
| 18 | question and the answer.  Question by Mr. McConville, Line 3. |
| 19 | MR. MCCONVILLE:  (Reading.) |
| 19:04 20 | "Question:  You testified that part of the reason |
| 21 | you dropped it was because of family concerns; right? |
| 22 | Which is consistent with what he testified already. |
| 23 | THE COURT:  And what's his answer? |
| 24 | MR. MCCONVILLE:  (Reading.) |
| 19:04 25 | "Answer:  What I recall, after the arbitration |

1    hearing, after I saw some e-mails that MGA produced, I gave

2    the benefit of the doubt to Isaac that he didn't think much

3    of the Bratz when he bought my shares.  That's the major

4    reason I dropped the case.  That's what I said at the

19:04 5    arbitration."

6            THE COURT:  Just to be sure, question, on Line 10:

7            "Question:  So at the end you dropped the case

8    against your brother?

9            "Answer:  I did."

19:05 10           THE COURT:  So finally, the last argument on this

11   matter, Mr. Quinn.

12           MR. QUINN:  I think it's a disputed issue,

13   Your Honor.

14           Your Honor will recall that the claim here is that

19:05 15   the early -- and the timing and the development of Bratz was

16   hidden and that it was started much earlier than Mr. Larian

17   had claimed.  Farhad Larian thought it was early 2000 or late

18   1999.  This has been a disputed issue in the testimony of

19   Farhad Larian, Jennifer Maurus, and Isaac Larian who has

19:05 20   volunteered that this was dismissed, not for reasons related

21   to the claim, but because of family.

22           They say that it was dismissed because of the

23   merits -- I'm sorry.  I put that wrong.  That he became

24   convinced that Mr. Larian did not -- or Mr. Isaac Larian did

19:05 25   not conceal the early development of Bratz.  But this tends

 1    to prove the opposite, that it was really just a question of

 2    putting family first.

 3         THE COURT:  And finally, to perfect the record for

 4    both parties.

19:06 5         Mr. McConville.

 6         MR. MCCONVILLE:  Your Honor, this is, as we said,

 7    before Farhad Larian ever was called to testify.  That the

 8    sole basis for Farhad Larian's belief that the doll -- that

 9    the Bratz concept was created prior to 2000 was based on a

19:06 10   newspaper article.  That was his testimony on direct, that

 11   we've now -- the court has reviewed a newspaper article that

 12   references the creation of Bratz in 1999, which is consistent

 13   with that, and now we're back into an area where there's --

 14   we're into collateral impeachment on an issue that has --

19:06 15   that is not related to the core issues of this case.

 16         And, you know, Your Honor, I know you're concerned

 17   about trials within trials.  You know, we've got -- we've now

 18   got hours and hours of testimony about a shoe patent, which

 19   has nothing to do with this case, and now we're back in with

19:07 20   Farhad Larian doing the exact same thing, which has nothing

 21   to do about this case.

 22         THE COURT:  I don't think that this would be an

 23   issue, but for Farhad Larian's explanation on

 24   cross-examination.  There is a prior consistent statement in

19:07 25   this e-mail that's relevant and I'm going to allow you to

          1    proceed, Counsel, in the redacted form with what the court

          2    had previously disclosed to both parties.

          3              So this will be received.

          4              Now, what else do we have to do?

19:07     5              MR. QUINN:  Your Honor, just to give the court a

          6    heads up and so that there won't be -- to avoid any

          7    surprises, there are certain -- we would like to elicit

          8    testimony from Isaac Larian tomorrow concerning shareholder

          9    distributions to him from MGA.  These documents have already

19:08    10    been identified and gone over with the court.  They are

         11    Exhibits 655, 657, 659 --

         12              THE COURT:  Just a minute.

         13              655.

         14              MR. QUINN:  655.

19:08    15              THE COURT:  657?

         16              MR. QUINN:  Yes.

         17              THE COURT:  6- --

         18              MR. QUINN:  -59 is the third.

         19              THE COURT:  And what volume are those in?

19:08    20              MR. QUINN:  Oh, my gosh.

         21              Chris?

         22              If it's helpful, Your Honor, I have clean copies of

         23    these.

         24              THE COURT:  Oh, that would be -- thank you.

19:08    25              MR. MCCONVILLE:  Volume 1.

```
 1              THE COURT:  Volume 1.  That's an easy volume to
 2    find.
 3              Now, your argument before was this goes to his
 4    personal liability, isn't it?  Damages?
19:08 5           MR. QUINN:  Yes, that's part of it, Your Honor.
 6              THE COURT:  And what's the rest of your argument?
 7              In other words, the concealment issue has been
 8    resolved by the court.
 9              MR. QUINN:  Your Honor, it's -- they are -- part of
19:09 10   the basis of the experts -- our experts -- a damages expert's
 11    analysis concerning his own personal liability --
 12             THE COURT:  Tell me where we're going with this
 13    totally, so I'm not surprised.
 14             MR. QUINN:  That's one thing this -- this data, the
19:09 15   distributions in terms of his share of the profits --
 16             THE COURT:  Is what I'm really hearing that you had
 17    hoped that the damage expert would get into the machinations
 18    that you believe that Isaac Larian went through to secret
 19    money?
19:09 20          MR. QUINN:  No.  No, that's not it at all.
 21             THE COURT:  Okay.  Okay.
 22             MR. QUINN:  It's the money that he receives, his
 23    share of the profits.
 24             It's also -- we think it's relevant also to bias.
19:09 25   It's relevant also to --
```

 1          THE COURT:  Explain -- explain that to me.

 2          MR. QUINN:  Well, I mean, MGA is a defendant here.

 3   He's here testifying.  He's gotten a lot of money, has the

 4   potential to get a lot of money from MGA.  It's made him a

19:10 5   billionaire.

 6          THE COURT:  And has in the past.

 7          MR. QUINN:  And has in the past.

 8          THE COURT:  And it goes to damages concerning his

 9   individually liability.

19:10 10          MR. QUINN:  Yes.

 11          And it's also -- I mean, he has -- he volunteered

 12   to the jury the day before yesterday that Mattel has

 13   destroyed him and his family, so we think he's opened the

 14   door on whether he, in fact, is destroyed.

19:10 15          And even today we had comments about Mr. Price's

 16   tie, which were completely irrelevant -- more than any of the

 17   jurors here, turning to look at the jury, would spend for

 18   Sunday dinner.  So we think he's -- he's certainly opened the

 19   door to his own wealth.

19:10 20          THE COURT:  Well, the tie doesn't make any

 21   difference concerning damages.

 22          Mr. McConville.

 23          MR. MCCONVILLE:  Your Honor, I'm going to defer to

 24   Ms. Hurst on this one.

19:10 25          THE COURT:  Ms. Hurst.

 1          MS. HURST:  Your Honor, there is a difference

 2    between distributions and net worth, first of all, and I

 3    think that Mr. -- I think Mr. Quinn is conflating the two, so

 4    I don't --

19:11  5          THE COURT:  Explain that to me, and here's why:

 6          How else does a plaintiff get accuracy other than

 7    the records that come from the defendant?  And then isn't

 8    there some responsibility if you're going to increase net

 9    worth versus distribution, for Mr. Larian to give us that

19:11 10    information?

 11          MS. HURST:  In the punitive damages phase of the

 12    case, but not presently.

 13          So let me say this:

 14          With respect to the distributions, okay, here --

19:11 15    there's multiple problems.

 16          One is that they're seeking duplicative liability

 17    from both MGA and Mr. Larian.

 18          They're seeking all of the profits MGA ever made on

 19    Bratz and they're seeking Mr. Larian's distribution.

19:11 20          THE COURT:  That's a matter of instructions.

 21          MS. HURST:  It's the same pot of money.

 22          THE COURT:  That's a matter for instruction.

 23          MS. HURST:  Okay.  Then his distributions are

 24    relevant to damages --

19:12 25          THE COURT:  Okay.

CV 04-9049 DOC - 02/10/2011   Volume 4 of 4

```
 1              MS. HURST:  -- but net worth at the present --
 2     they've put net worth statements in there as well.  We
 3     strenuously object to those.  That is not relevant at the
 4     present time, and his net worth has not been updated and it's
19:12 5     going to lead us down the path into Omni and all these other
 6     things based on a current valuation of MGA, and we should not
 7     do that unless and until we get to a punitive damages phase.
 8              THE COURT:  That's why I'm asking Mr. Quinn, if
 9     we're getting any place near that or I feel I'm getting
19:12 10     trapped --
11              MR. QUINN:  This -- these are not net worth
12     statements.  There's nothing about Mr. Larian's net worth
13     here.
14              THE COURT:  Distributions.
19:12 15              MR. QUINN:  Distributions.
16              THE COURT:  Hold on.
17              Let me turn back to Ms. Hurst.
18              MS. HURST:  All right.  My final concern is -- I
19     haven't had a chance to look at this here at this period of
19:12 20     time.
21              THE COURT:  Well, I'm going to meet you at 10:00.
22              MS. HURST:  So on that period-of-time issue, if
23     we're going to get into anything from 2008 to 2010, we need
24     to have a discussion of this because there is no way that the
19:13 25     damages experts and Mr. Larian and anybody else can talk
```

1    about the financial status of MGA in that 2008 to 2010 time

2    period without understanding that that hundred million dollar

3    verdict caused Wachovia to foreclose on the company's debt

4    and that the temporary receivership restricted credit to the

19:13  5    company, that Moxie was put on the market.

6             THE COURT:  Which is smoke.  You're giving me a

7    parade of horribles, but the request is that I preclude what

8    appears to be relevant evidence.

9             MS. HURST:  No.  Just if they're trying to go from

19:13 10    2008 to 2010, all I'm saying is if they're going to seek

11    damages from that period of time, then we've got to be able

12    to explain what was happening to the company during that

13    period of time, and that is necessarily going to involve

14    mostly opening the door to further discussions in the -- of

19:13 15    the litigation.

16             If they're going to seek --

17             THE COURT:  Let me read back what I heard from you.

18             Judge, if you allow them a discussion of 2008

19    through 2010, that we are now going to take the position on

19:14 20    behalf of MGA that we want to bring out the hundred million

21    dollar verdict by the jury?

22             MS. HURST:  It's the injunction and the

23    receivership.

24             THE COURT:  The injunction, receivership.

19:14 25             MS. HURST:  The Wachovia foreclosure.

1          How are we going to talk about these things without

2     talking about what was happening in the litigation?

3          Look, I mean, you know, their claim for damages

4     from 2008 through 2010 is ridiculous, frankly, and it --

19:14 5          THE COURT:  Well, let me turn back to these

6     documents.

7          These are for 2002 and 2001, up through

8     Page 65500014.

9          And then we have 2004 through 2003.

19:16 10          We have 2005, 2006.

11          Counsel, these only extend to 2006.  What's your

12     concern?

13          Here.  I'm going to give you the copy that was

14     handed to me.

19:17 15          MR. QUINN:  In fairness, Your Honor, those -- those

16     are the documents we would have, but we would ask him without

17     the benefit of documents about subsequent periods,

18     distributions after.

19          THE COURT:  Let me see them back.

19:17 20          Now I have the answer.

21          They gave me up to 2006, but not --

22          Okay.  Now --

23          MR. QUINN:  That's what we've got, Your Honor.

24     That's --

19:17 25          THE COURT:  Now, just a moment.  Where are the

UNITED STATES DISTRICT COURT

1    rest?  Why don't we go find those?

2            MR. QUINN:  They don't exist, Your Honor.  There

3    are no audited financial statements.  My understanding is

4    they stopped having audited financial statements.

19:17  5           THE COURT:  But up to the time of the -- I'm going

6    to call it the "worldwide injunction" -- strike that.

7            Let's just take the safest period of time for a

8    moment, and, that is, the date that the hundred million

9    dollar verdict was brought forth by the jury, September

19:18 10   2008 -- or was it August?

11           MR. ZELLER:  August 26.

12           MR. QUINN:  August 26.

13           THE COURT:  August 26, 2008.

14           What is so critical to Mattel, if that's the cutoff

19:18 15  date in terms of distribution, because it avoids the hundred

16   million dollar verdict -- you know from their -- from MGA's

17   perspective -- and it seems to me that the amount of money is

18   greater for Mattel in a sense.

19           In other words, there's more money if there's no --

19:18 20  no explanation about a potential hundred million dollar

21   verdict that's not paid.

22           The court doesn't take the risk of the quagmire of

23   concealment that I've already ruled against you on.

24           You can't be perceived by the Circuit to be using

19:18 25  that as a vehicle.

Case 2:04-cv-09049-DOC-RNB   Document 9869   Filed 02/14/11   Page 65 of 110   Page ID #:298266
CV 04-9049 DOC - 02/10/2011   Volume 4 of 4

65

1     Three, we don't get into the "worldwide

2    injunction."  In other words, I'm not understanding what

3    seems to be a di minimus amount of money when most of

4    Mr. Larian's largess -- if he has largess -- is 2008 and

19:19 5    earlier?  You're dealing with hundreds of millions of

6    dollars.

7         Now, remember, we've teetered on this brink a

8    couple times, where you've got a sweeping "no" from the court

9    and then you've rescued yourself with, you know, "I've got a

19:19 10   reasonable position concerning copying."  And I've constantly

11   said that to you:  It's always a teeter.  So just take a

12   moment concerning that.  I'm not telling you to do that, but

13   I'm telling you you've been balancing so many times with just

14   being out on a subject.

19:19 15        So tell me, once again, while they are considering

16   that, why wouldn't 2008 be an appropriate date to avoid 2009

17   and 2010?

18        MS. HURST:  During this phase.  If we don't get --

19   if we don't get to the punitive phase.

19:19 20        THE COURT:  Well, we're not going to the punitive's

21   phase on this phase because you've both convinced me to

22   bifurcate it.

23        MS. HURST:  Right.

24        THE COURT:  Over my adamancy because this had been

19:20 25   cut into so many phases, quite frankly, I turned out to be

1    wrong on that initial judgment call, and you both stipulated

2    that it would be bifurcated.  So I don't understand the

3    comment.  We're not going to the punitive phase on this.

4           MS. HURST:  I just --

19:20  5           THE COURT:  Right?

6           MS. HURST:  -- I just wanted to be clear that we

7    would have to reserve the right to bring in the subsequent

8    circumstances in explanation of Mr. Larian's net worth in the

9    subsequent phase.  That's all I'm saying.

19:20 10           THE COURT:  And, also -- I'll repeat to you -- if

11   we get to the punitive phase, we're going right back through

12   a whole consideration of whether concealment's relevant or

13   not.

14           In other words, we may be in a punitive's phase.

19:20 15   That's why I wrote the opinion the way I did.

16           MS. HURST:  Right.

17           THE COURT:  I didn't close the door on any one of

18   you in the punitive's phase for the alleged concealment

19   concerning Kadisha, et cetera, and I didn't close the

19:20 20   punitives phase in terms of the verdict --

21           MS. HURST:  Right.

22           THE COURT:  -- or the hundred million that MGA

23   would like to show and, you know, the worldwide impact.

24           I left that off the table.

19:20 25           So I'm wondering what you're really gaining,

1   Mr. Quinn, in the initial phase?  I don't know how much

2   money's involved.

3            MR. QUINN:  We're just talking about distributions

4   and maybe the answer is there have been no distributions

19:21 5   since then.  We're concerned it might be a question in the

6   jury's mind.

7            Maybe they will tell us that there have been no

8   distributions and we can stipulate to that.

9            THE COURT:  Well, let's find out.

19:21 10           In other words, it's a place we don't need to go,

11   frankly.

12           Have there been distributions?

13           MS. HURST:  I don't think so.

14           THE COURT:  Could you call Mr. Larian and ask him?

19:21 15           MS. HURST:  Yeah, I will.

16           THE COURT:  And then we'll put him under oath,

17   maybe outside the presence the jury, and get an answer.

18           MS. HURST:  I mean, as long as it's not going to be

19   construed later, if he says -- if we stipulate that there's

19:21 20   no distributions, that somehow interest payments to Omni 808

21   or whatever --

22           THE COURT:  You know, you have to agree that that

23   couldn't be, you know, used -- well, this is MGA's position.

24           What they're afraid of is if they stipulated and it

19:21 25   turns out he really did conceal.

UNITED STATES DISTRICT COURT

```
 1              (Laughter.)

 2              MS. HURST:  No --

 3              MR. QUINN:  What am I asking for?

 4              THE COURT:  And Mattel's ears just lit up.

19:22 5         They love that.

 6              (Laughter.)

 7              MS. HURST:  Where's -- no, I just don't want --

 8              THE COURT:  It's easily resolved under oath, isn't

 9         it?

19:22 10        Isn't it easily resolved outside the presence of

 11       the jury, and it gives the court a clear indication of what

 12       to do.

 13             MR. QUINN:  Yes, as far as we're concerned.

 14             THE COURT:  So why can't we meet tomorrow morning

19:22 15   at 7:30 and get Mr. Larian here and get him on the record?

 16             MR. QUINN:  That's fine.  That's fine with us,

 17       Your Honor.

 18             THE COURT:  It makes my ruling a lot clearer and it

 19       gives me a basis for making the ruling.

19:22 20        For goodness' sakes, we can put in the effort.

 21       Okay?

 22             So, can you call Mr. Larian?

 23             MS. HURST:  Yeah.  You -- do you want me to do it

 24       now?

19:22 25        THE COURT:  Well, I don't --
```

UNITED STATES DISTRICT COURT

```
 1              7:30, and I'll need one of the court reporters

 2     tomorrow at 7:30.  Okay?

 3              THE REPORTER:  Okay.

 4              THE COURT:  Now, what else are we going to do?

19:22  5         MR. QUINN:  Your Honor, we would offer tomorrow

 6     with Mr. Larian Exhibit -- Trial Exhibit 8855 which is a CD

 7     that was found at MGA's Mexico's offices.  It was produced by

 8     MGA.

 9              There's MGA Bates stamp 3815506.  This is Mattel

19:23 10    information.

 11             THE COURT:  Okay.

 12             MR. QUINN:  It's on the CD.

 13             THE COURT:  Is this some of the critical

 14    information you're later going to claim concerning trade

19:23 15    secret, misappropriation?

 16             MR. QUINN:  Yes.

 17             MR. ZELLER:  (Nodded head.)

 18             MR. MCCONVILLE:  Your Honor, there's -- there has

 19    been a host of questions of how that CD got here, and -- and

19:23 20    I understand the court's proclivity for if there is a

 21    document that has an MGA Bates number on it it's coming in

 22    through Mr. Larian, but --

 23             THE COURT:  I'm not sure it's coming in.  I don't

 24    know why I'm not taking it subject to a motion to strike, or

19:23 25    he's going to find himself right back up there for maybe a
```

| | |
|---|---|
| 1 | third time, if not a second time. |
| 2 | MR. MCCONVILLE:  So, again, just the analysis -- |
| 3 | THE COURT:  Just a moment. |
| 4 | I don't have to believe that. |
| 19:23  5 | MR. MCCONVILLE:  Okay.  So -- |
| 6 | THE COURT:  In other words, that's for the jury to |
| 7 | determine. |
| 8 | They may find that Mr. Larian had knowledge of |
| 9 | this, that there's no way, because of his position, that he |
| 19:24 10 | wouldn't have knowledge, that it's critical, or they might |
| 11 | find that it's just de minimus, as Mr. Overland's arguing. |
| 12 | MR. MCCONVILLE:  But, Judge, the facts are -- and |
| 13 | I'm willing to bet if you ask John Quinn, he'd agree -- |
| 14 | Isaac Larian was not present in Mexico -- |
| 19:24 15 | THE COURT:  Just a moment.  I understand that. |
| 16 | MR. MCCONVILLE:  Okay.  So -- |
| 17 | THE COURT:  That doesn't stop a telephone. |
| 18 | Remember the plug in the back of the TV set in |
| 19 | Kickapoo, Missouri? |
| 19:24 20 | MR. MCCONVILLE:  Yes, I recall that. |
| 21 | THE COURT:  And MTV? |
| 22 | MR. MCCONVILLE:  I recall that. |
| 23 | THE COURT:  Does Mexico have telephones? |
| 24 | MR. MCCONVILLE:  They do, Your Honor; but a |
| 19:24 25 | telephone can't transport a CD, Your Honor. |

UNITED STATES DISTRICT COURT

1          It's a physical object they're trying to say

2     Isaac Larian can get into evidence, which he cannot.

3          THE COURT:  No, I'm not saying it's coming in.

4          I'm saying it's subject to a motion to strike.

19:24 5          In other words, there's no reason that they

6     shouldn't be allowed to question him about it when he's on

7     the stand.  And you don't know what's coming.  He could

8     potentially be right back up there.

9          MR. MCCONVILLE:  That's fine, Your Honor.

19:25 10          Look, I just -- I don't want to set anybody's

11    expectations differently.

12          He wasn't in Mexico.  He's not going to know about

13    the CD.

14          THE COURT:  Just a moment.

19:25 15          I understand that.

16          MR. MCCONVILLE:  Okay.

17          THE COURT:  And if he says, "I don't know,"

18    that's -- there's your answer.

19          But it's coming in, obviously.  It's coming in at

19:25 20    some point.  Whether it comes in through Isaac Larian,

21    that -- I agree with your concern, and the impression is that

22    it's coming through Isaac Larian because he knows about it.

23          I'm not going to allow that to happen, but I can

24    certainly take it subject to a motion to strike because

19:25 25    there's going to be other witnesses who are going to state it

1    was found in Mexico --

2              MR. QUINN:  (Nodded head.)

3              MR. ZELLER:  (Nodded head.)

4              THE COURT:  -- on such -- on some person's desk and

19:25  5    it's vital to Mattel.

6              I mean, it seems like a tempest in a tea pot.

7              MR. MCCONVILLE:  I don't believe there will be such

8    a witness, Your Honor.

9              THE COURT:  Well, is that because Mr. Machado's not

19:25 10    going to be here?

11             MR. MCCONVILLE:  I don't know.

12             THE COURT:  Mrs. Vargas or Mr. Trueba?

13             I don't think you want to be in that position, so

14    I'll just leave that unsaid for a moment.

19:26 15             MR. MCCONVILLE:  Okay.  Your Honor, so the only

16    issue is -- Mr. Quinn prefaced it with, and it has an MGA

17    Bates number on it, I mean, that seems to be the talisman for

18    getting a document in through Isaac Larian?

19             THE COURT:  I didn't say it was coming in.

19:26 20             I'm saying he's going to be questioned about it.

21             MR. MCCONVILLE:  Okay.

22             THE COURT:  Now, Kuemmerle.  No surprise for me.

23             Where is she and when will she be here?

24             Mr. McConville, I'm looking now to you and I'm

19:26 25    looking to MGA.  And listen to me very carefully:  She's

```
 1      going to be here.

 2                  (Discussion held off the record.)

 3                  (Pause in the proceedings.)

 4                  THE COURT:  Mr. Zeller, do I have continuing

 5      jurisdiction over her?

 6                  MR. ZELLER:  Yes, you do, Your Honor.

 7                  THE COURT:  And for a moment if we have some

 8      difficulty you'll state why you believe I do, and I'll go

 9      back and do my own research.

10                  Just a moment.

11                  MR. ZELLER:  Yes, Your Honor.

12                  You'll recall that Ms. Kuemmerle was designated as

13      a Rule 30(b)(6) witness for party defendants in this action.

14                  She, of course, did that voluntarily.  She

15      subjected herself to the jurisdiction of the court in doing

16      that.

17                  The court, in fact, of course, required her, and

18      she did appear, as that designee, here in California.

19                  THE COURT:  Do you -- do you want to make it at

20      8:00 tomorrow?  Would that be better?

21                  I just don't know how long this takes.

22                  MS. HURST:  Let me just make another comment, if I

23      may, for the record, Your Honor, and then we'll see where we

24      are.

25                  Mr. Larian has not received any distributions since
```

CV 04-9049 DOC - 02/10/2011 - Volume 4 of 4

```
 1    something in the 2006 time frame.
 2              THE COURT:  Is he going to state that on the stand?
 3              MS. HURST:  And he will state that.
 4              The problem is, if we think back to where we are in
19:27 5   the case now, we have six dolls only that are the subject of
 6    the copyright claim.
 7              THE COURT:  Just a moment.
 8              I limited it in terms of copyright.  I'm still
 9    dealing with --
19:28 10             MS. HURST:  I know.  I was going to say that next.
 11             MR. ZELLER:  And all the sculpts for copyright.
 12             MS. HURST:  Okay.  The trade secret claim -- the
 13   trade secret concept claim, it would not be consistent with
 14   the Ninth Circuit's order -- as we've been discussing -- to
19:28 15  allow a disgorgement of all profits.
 16             So what we're going to --
 17             THE COURT:  No, no.  I'm going to set my record.
 18             We've been through this six times now.  I'm asking
 19   each of you and imploring each of you to help the court, and
19:28 20  so far neither one of you are doing that.
 21             Whatever I do, I'd like to make that divided out
 22   and divisible so Judge Kozinski and the panel can see what
 23   this court's doing.
 24             And since I understand you've had problems, from
19:28 25  your perspective with Mattel concerning lost profits --
```

1          MS. HURST:  Right.

2          THE COURT:  -- in terms of trade secret

3    misappropriation and figuring out what their trade secrets

4    are, the court's been now privy to a whole set of documents

19:29 5    this weekend -- that you weren't here for, but Mr. McConville

6    has memorized.

7          MS. HURST:  I have them too.

8          THE COURT:  Year by year?

9          MS. HURST:  I wasn't here, but I have studied them

19:29 10   thoroughly.

11         THE COURT:  Year by year, three volumes of them?

12         MS. HURST:  Yes.

13         THE COURT:  Okay.  Each entity?

14         MS. HURST:  Right.

19:29 15   THE COURT:  Each broken down by Bratz, by number,

16   by amount?

17         MS. HURST:  Right.

18         With a three -- a tripartite definition of trade

19   secrets that makes no sense.  But that's another issue for

19:29 20   another day.

21         Here's -- I mean, if I may finish, Your Honor -- I

22   mean, here's the problem:

23         They're going to put in evidence of the entirety of

24   the distributions.

19:29 25   THE COURT:  I'm not sure I'm going to allow that.

UNITED STATES DISTRICT COURT

1   I don't know that.

2           MS. HURST:  Right.

3           THE COURT:  Which is why I'm trying to get to the

4   jury --

19:29 5         No, no, no.  I'm speaking now.

6           MS. HURST:  Right.

7           THE COURT:  That's why I'm trying to get to the

8   jury instructions, and then you want to keep the weekends

9   with me.

19:29 10        I wanted to start last weekend and you asked to

11   delay that, because a lot of the things I do concerning

12   instructions will help me with this very issue.

13           So I've been begging.

14           Now your turn.  I'm sorry for cutting you off.

19:30 15         MS. HURST:  Because the court has this issue still

16   on the table and because the court is, perhaps, not going to

17   allow consideration of the entirety of the profits --

18           THE COURT:  Or allow it but make it divisible --

19           MS. HURST:  Right.

19:30 20         THE COURT:  I don't know that.

21           MS. HURST:  That's right.

22           THE COURT:  I've been asking Mr. Quinn to come up

23   with some thoughtful process other than the lump sum again.

24           MS. HURST:  Right.

19:30 25         So we will stipulate to the admissibility of these

UNITED STATES DISTRICT COURT

1    documents for use by the experts once the court has made its

2    ruling about what the proper basis for consideration of the

3    numbers is.

4              THE COURT:  Okay.

19:30  5         MS. HURST:  Okay.

6              But to permit the big numbers to come in tomorrow

7    with Mr. Larian when the court is --

8              THE COURT:  Just a moment.

9              I wouldn't be in this position if we would have

19:30 10   been working last weekend.

11             Do you understand that?

12             It was MGA's request that I continue this over for

13   a week.

14             MS. HURST:  Okay.

19:31 15        THE COURT:  I was ready to tackle this last

16   weekend.  Now, I'm not finding any fault with that, but it's

17   somewhat falling on deaf ears that I have Sunday free and

18   everybody's asking me to delay the instructions for a week.

19             Now, that's not finding fault, it's just --

19:31 20        MS. HURST:  Right.

21             THE COURT:  -- you've got to run at my pace now.

22             MS. HURST:  These are just -- they're consolidated

23   financial statements.  They can come in through other

24   witnesses later.  They don't have to come in through

19:31 25   Mr. Larian.  The CFO can be called for these --

UNITED STATES DISTRICT COURT

Case 2:04-cv-09049-DOC-RNB  Document 9869  Filed 02/14/11  Page 78 of 110  Page ID #:298279
CV 04-9049 DOC - 02/10/2011  Volume 4 of 4

78

 1          THE COURT:  Why wouldn't he?  For goodness sakes,

 2    he's the president of the company.

 3          MS. HURST:  Only because we have this issue now.

 4    Okay.

19:31  5          If they're allowed to talk about these big numbers

 6    which are never going to be the proper basis for a damages

 7    claim, it's going to be extremely prejudicial.

 8          So there's no way they're not going to get this

 9    evidence in.

19:31 10          We'll stipulate that they're the business records

 11    of the company.  When the experts come they will be able to

 12    make a calculation consistent with the court's direction.

 13          I mean, Your Honor, it's going to be really

 14    misleading, because you're going to have all these big

19:32 15    numbers and what's really happened since is the company is

 16    valueless.

 17          And we know that the court's not going to commit

 18    100 percent, and they're going to be asking questions that

 19    are going to be misleading because it's going to look like

19:32 20    100 percent --

 21          THE COURT:  Just a moment.

 22          I'm not going to permit 100 percent.  If I admitted

 23    anything, it would be those items that pertain to Bratz.  And

 24    I'll trace it out for you.

19:32 25          This is not a ruling.

 1          You know that I'm only dealing with -- and I mean

 2    "only" -- not facetiously -- I'm only telling up to

 3    approximately 2004 with two entities:  Hong Kong and MGA USA.

 4    And if you look down at the numbers, it divides out because

19:33 5    MGA's doing its own accounting.  It's telling me what they're

 6    receiving money for, whether it's Little Tikes or Bratz.

 7          The same thing with 2003.

 8          In 2004, if my memory's correct, it's MGA's own

 9    recordkeeping that -- just a moment.  Just a minute.

19:34 10          Well, I'm going to go back and get my notes in just

 11    a minute.

 12          But it's MGA's own recordkeeping that show that

 13    although they didn't charge Hong Kong -- so Hong Kong becomes

 14    relevant -- or irrelevant -- or Canada or France or Germany,

19:34 15    that the next entity we see -- I forget if it's 2004 -- a

 16    di minimus amount down in MGA Mexico, 2005 and '06,

 17    MGA Mexico, and USA, and then '07 and '08.

 18          Now, if he's received no distribution from 2006 on

 19    in terms of his personal liability, what do I do with MGA

19:35 20    here?

 21          We seem to be forgetting there's two defendants

 22    here; one who may not have a large amount of money, the other

 23    who has an extremely large amount of money.

 24          Now, coupled against all that, you're absolutely

19:35 25    right.  In today's valuation the box that you're arguing is

Case 2:04-cv-09049-DOC-RNB   Document 9869   Filed 02/14/11   Page 80 of 110   Page ID #:298281
CV 04-9049 DOC - 02/10/2011   Volume 4 of 4

80

1    this:  Judge, don't go into 2009 or '10, because if you do

2    then we should bring forth a hundred million dollar verdict

3    and the position that MGA's in at the present time, whatever

4    that position is.

19:35 5              MS. HURST:  (Nodded head.)

6              THE COURT:  And I don't have any documents to show

7    me what that position is at the present time.

8              I have representations that Moxie was a huge

9    success, but I have no present -- I don't know that.  How do

19:35 10   I know that?

11             I have no documents in front of me that you

12   presented to me.  Okay.

13             MS. HURST:  I think they dropped Moxie.

14             THE COURT:  They what?

19:35 15             MR. MCCONVILLE:  They dropped Moxie as a trade

16   secret.

17             MS. HURST:  They dropped Moxie as a trade secret.

18             THE COURT:  I know that.  I know that.

19             But I have no Bratz accounting -- I'm not seeing

19:36 20   that -- well, I've got it up to 2010, when it trails off.

21             MS. HURST:  Yeah, we do.

22             Your Honor, if I may, I noticed --

23             THE COURT:  Just a moment.

24             But your argument's this -- let me finish, because

19:36 25   it's confusing to me.  On one hand you limit it to the

1   discussion of Bratz, which I agree with.

2           On the other hand, you say, but, Judge, you have to

3   look at the whole financial background of this company if

4   you're going to let us allow Mattel to get into income.

19:36  5           I've got two different entities to deal with.

6           How do I deal with that?

7           One's Mr. Larian, the other's MGA.  So I've been

8   asking each of you to be a part of the solution.  And when

9   you don't give me the solution, then I will give you the

19:36 10  answer.

11          So I need something positive from you.  Just like I

12  asked Mr. Quinn, if he really wants to protect the verdict if

13  it comes in, he'd better figure out a way to make that

14  divisible.

19:37 15          Because if it's just presented to me as a lump sum,

16  my response may be "no," so --

17          MS. HURST:  And to be clear, in our view, just

18  dividing it between Bratz and Little Tikes is not adequate.

19          You can't claim 100 percent of the Bratz' money.

19:37 20  It doesn't separate out what we've called the "sweat equity."

21          Our solution is we move to exclude their damages

22  expert, because their damages expert has not made an

23  apportionment --

24          THE COURT:  There's some responsibility on your

19:37 25  part to bring forth figures that show sweat equity.

  1          So it's not we're just going to remove all this

  2   evidence because we have a problem calculating sweat equity.

  3          That's something affirmative that I think MGA has

  4   to consider doing.

19:37  5          MS. HURST:  We have.

  6          THE COURT:  Okay.

  7          MS. HURST:  We have.  And our expert did, but their

  8   expert did not.

  9          He's got some hocus-pocus involving the earnings

19:37 10   before interest, taxes, depreciation of other companies that

 11   don't have anything to do with trying to calculate return on

 12   investment for MGA's investment in Bratz.  Nothing at all.

 13          THE COURT:  You see, here's the problem.  This is

 14   what we should have been discussing last weekend, and that I

19:38 15   asked to have discussed, and it was the request of MGA to put

 16   this over and we find ourselves with Mr. Larian on the stand.

 17   So I'm not inclined to limit the evidence.

 18          But if there's no distribution after 2006, why

 19   doesn't that resolve that issue?

19:38 20          MS. HURST:  It -- it resolves that issue with

 21   respect to the presentation of evidence tomorrow.  It does

 22   not resolve the problem that they're going to be talking

 23   about numbers that are not ever going to be a legitimate

 24   basis for calculation of damages in this case.

19:38 25          We absolutely stipulate to the admissibility of

 1   these documents as a basis for a proper expert calculation at

 2   the appropriate time in the case.

 3        We will stipulate to them being business records of

 4   the company and to them being admissible with respect to

 19:39 5   Mr. Larian, as well to establish his distributions.

 6        But they should not come in in a context where it's

 7   open in the jury's mind that there's any possibility that

 8   this full sum can be awarded when that is not ever going to

 9   be the basis for calculation of damage -- a proper

 19:39 10   calculation of damages in the case.

 11        THE COURT:  And why isn't that resolved through

 12   instructions?

 13        MS. HURST:  Because -- because --

 14        THE COURT:  Here's what I'm hearing.  You're afraid

 19:39 15   I'm ringing the bell because the numbers are so large.

 16        MS. HURST:  Exactly.  Huge numbers.  And then it's

 17   weeks and weeks and weeks before we get instructions on this.

 18        THE COURT:  All right.  Now, Mr. Zeller.

 19        MR. ZELLER:  MGA is attempting to portray this in

 19:39 20   an unduly complicated manner.

 21        What we are attempting to establish are, here are

 22   the revenues from Bratz.  This is how one proves damages.

 23        And, of course, ultimately, yes, the court will be

 24   instructing on what needs to be done.

 19:40 25        Tactically what's going on, Your Honor -- the real

UNITED STATES DISTRICT COURT

```
 1    complaint isn't that these numbers are going to come out -- I

 2    mean, that's inevitable.  They're stipulating to those

 3    records.  The jury's going to see them.  MGA, you'll see, is

 4    that -- for their cross, I guess we will call it -- has a

 5    whole variety of apportionment documents they want to get in

 6    through Isaac Larian.  We want to question him on causation.

 7              We're entitled to do that.

 8              What -- what was it that was driving these revenues

 9    for Bratz?  That is going to be our examination.

10              MGA doesn't get to block us from doing that.

11              As a plaintiff we get to go first on this.

12              And they certainly can't say that -- what witness

13    we're entitled to have this evidence come in through.

14    Obviously, Mr. Larian is the center person to address why was

15    Bratz successful?  What were the reasons behind it?  And MGA,

16    for a fact, is going to be doing that itself.

17              And so had -- I mean, there's just -- simply, this

18    is tactical.  This is -- this has absolutely nothing to do

19    with concern about large numbers.  The jury already knows

20    these numbers.

21              THE COURT:  I'll think about it more this evening,

22    but tentatively you should be prepared to go forward

23    tomorrow.

24              Now, what else are we going to do this evening

25    other than having you finish your brief, giving it to Mattel
```

UNITED STATES DISTRICT COURT

  1    and having them respond tonight?

  2            MR. MCCONVILLE:  We have some additional

  3    Isaac Larian -- assuming we get to Mr. Larian tomorrow, we

  4    had the set of documents that we talked about that we wanted

19:41  5    to review with the court.

  6            THE COURT:  Great.

  7            MR. MCCONVILLE:  I don't know that they're

  8    controversial or not, but we have them if you want to look at

  9    them.

19:41 10            THE COURT:  No.  I want to finish everything that

 11    doesn't need the court reporter and then send her home.

 12            MR. MCCONVILLE:  Okay.

 13            THE COURT:  In other words, I want her on the

 14    record as long as we need her and then I want to pay her the

19:41 15    courtesy of going home.

 16            MR. QUINN:  I have a couple of things,

 17    Your Honor --

 18            MS. HURST:  I have these instructions that we

 19    drafted earlier.

19:41 20            THE COURT:  Thank you very much.

 21            I appreciate it, Annette.

 22            Thank you.

 23            Okay.

 24            MR. QUINN:  You know, unfortunately, Your Honor,

19:42 25    the -- the pattern of Mr. Larian blurting out gratuitously

Case 2:04-cv-09049-DOC-RNB   Document 9869   Filed 02/14/11   Page 86 of 110   Page ID #:298287
CV 04-9049 DOC - 02/10/2011   Volume 4 of 4

86

| | |
|---|---|
| 1 | irrelevant, prejudicial things continued today, even after |
| 2 | the court's comments this morning. |
| 3 | THE COURT:  Uh-huh. |
| 4 | MR. QUINN:  Today he said, apropos of nothing: |
| 19:42 5 | Mattel is setting retailer margins, and that's |
| 6 | "illegal." |
| 7 | He says we -- "I learned about" -- "Mattel got that |
| 8 | search warrant executed by means I don't want to talk about." |
| 9 | That we were able to procure that, suggesting |
| 19:42 10 | inappropriate bribery. |
| 11 | That -- and then the comments -- the gratuitous |
| 12 | comments about Mr. Price's tie. |
| 13 | The pattern continues.  There is -- there is no |
| 14 | change, and we -- we request that the jury be told that, you |
| 19:43 15 | know, this issue of Mattel setting retailer margins, the |
| 16 | legality of that, there is no evidence of that and it's |
| 17 | completely irrelevant to this case. |
| 18 | I mean, the time has come for the court to tell the |
| 19 | jury that what this man says on the stand, in defiance of |
| 19:43 20 | this court's instructions, is wrong and -- and has to stop." |
| 21 | THE COURT:  Okay.  Anything else? |
| 22 | MR. QUINN:  Mr. Price asked me to request again -- |
| 23 | remind the court that -- to strike the comments last evening |
| 24 | that the court's made about him just before the break and ask |
| 19:43 25 | the court to consider, actually, putting that under seal. |

```
 1              THE COURT:  Why don't I simply put it under seal?
 2              MR. QUINN:  I think that would be good.
 3              THE COURT:  Yeah.
 4              Well, I agree with you.
19:43  5              But I -- I'll refer back -- and I've read that
 6      transcript -- and I think -- well, I'll let the record stand
 7      as it is.
 8                   I'll put it under seal as a courtesy to Mr. Price.
 9                   I certainly don't mean to besmirch his reputation,
19:44 10    but I'm going to leave my findings just as I did, and I think
11      that's rather neutral.
12                   But Mr. Price feels wounded, and there's no reason
13      I can't pay him that courtesy.  Put it under seal.
14                   But that's not the final ruling of the court.  The
19:44 15    final ruling of the court is what I made last evening at
16      8:00.
17              MS. HURST:  Your Honor, they filed their motion for
18      mistrial publically.
19              THE COURT:  Then they keep it publically.
19:44 20              MS. HURST:  Then it needs to be kept public.
21                   The whole transcript needs to be kept public as
22      well.
23                   They filed their motion for mistrial publically.
24      They sent it to the press, the AP and Law360.
19:44 25                   These are interrelated.
```

  1             MR. ZELLER:  Your Honor, it is absolutely false --

  2             THE COURT:  Well, I got the Associated Press

  3    article here, because I required you to give us all the press

  4    so we can see what the jury's potentially reading.

19:44  5             I don't see any harm in this to Mr. Price.

  6             MR. ZELLER:  That's just apples and oranges.

  7             That article is about the mistrial motion, which,

  8    for the record, is simply false.

  9             This latest accusation that we shared it with the

19:45 10   press, this is false.

 11             THE COURT:  Just a moment.  Just a minute.

 12             MR. ZELLER:  Right.

 13             THE COURT:  I don't know who is here at 5:00, let

 14    alone who was here last evening at 8:00.

19:45 15            You two can go read your own press articles for

 16    both sides.

 17             And I don't know what's to be gained by keeping

 18    that a public document.  I mean, why can't that be sealed up

 19    as a matter of courtesy concerning Mr. Price?

19:45 20            That's not the final ruling of the court.

 21             MR. ZELLER:  It has nothing to do with the

 22    articles, Your Honor.  That's my point.

 23             THE COURT:  That's my point also.

 24             I'm asking MGA what value is that in terms of the

19:45 25   court's initial comments?

---

UNITED STATES DISTRICT COURT

1          Because I think they were equally harsh concerning

2     Mr. Larian.  That's why I finally took a break and that's why

3     I didn't want to speak to you last evening after the ruling.

4          I wasn't interested in going back through that

19:46  5     again.

6          Now, if I would have known you wanted me earlier, I

7     would have come in and skipped the Federal Bar Association

8     meeting, and not at 7:25 in the morning.

9          MS. HURST:  The issue, Your Honor, was that the

19:46 10    court's order was even-handed and it's --

11          THE COURT:  Just a moment.

12          You've got the court's order.  The court's order

13    remains the 8:00 order.

14          That's not being settled.

19:46 15          MS. HURST:  That's not being *sealed?*

16          THE COURT:  No.

17          I'm not backing away from that one bit.

18          MS. HURST:  Oh.

19          THE COURT:  That's exactly what I felt and wrote

19:46 20    after reflection in chambers, and that's the end of the

21    discussion on that.

22          Now the Circuit can reverse me or do whatever they

23    want to, but that's exactly, I think, a neutral statement

24    about what happened and I'm ordering the reporter's

19:46 25    transcript, as well as the audio, to be preserved.

UNITED STATES DISTRICT COURT

1          MS. HURST:  So, Your Honor--

2          THE COURT:  The earlier comments concerning

3     Mr. Larian that they're concerned about -- or Mr. Price that

4     they're concerned about and Mr. Larian.

19:46 5          MS. HURST:  And I think that -- I don't remember

6     what that was right now.

7          We're not agreeing; we're not objecting.  We'll go

8     back and take a look at it.

9          If the court orders in the meantime, we'll --

19:47 10         THE COURT:  In an abundance of caution why don't we

11    simply seal those earlier comments.

12         I don't think that they're harmful to either side.

13    You do.

14         What's the harm in sealing it?

19:47 15         MR. QUINN:  Thank you, Your Honor.

16         THE COURT:  And if it protects Mr. Price's

17    reputation, for goodness sakes, I don't intend to lay MGA's

18    counsel out or Mr. Price's.  It's a reputation on the line.

19    It's inconsequential, frankly.

19:47 20         But if everybody's comfortable and, essentially, if

21    it doesn't have a chilling effect.  That's the real problem.

22         You'll have to contact whatever the court reporter

23    was.  You'll have to look that up in your records and you'll

24    probably have to have that sealed tomorrow morning.

19:47 25         MR. MCCONVILLE:  So, Your Honor, just to respond --

1           THE COURT:  Let's be very clear on this record,

2    though.

3           The comments that I handed down at 7:30 or 8:00 are

4    not sealed.

19:48  5           MR. MCCONVILLE:  Understood.

6           I just wanted to respond briefly to Mr. Quinn's

7    comments about Mr. Larian blurting out.

8           First of all, his comments about retail margins,

9    they were the ones who put a document in front of him that he

19:48 10    had never seen.  They're trying to drive a truck through

11    Mr. Larian on the witness stand.

12           He looked at the document.  He interpreted the

13    document because they put the document in front of him.

14           You know that's -- I mean, that's -- that's his

19:48 15    interpretation of the document based on the question that was

16    asked.

17           THE COURT:  Apparently you must be in courts that

18    jump back and forth depending on who makes the loudest or the

19    last motion.

19:48 20           No.  The end result's going to be I'm going to

21    resolve this by instruction.  I've already indicated what I'm

22    going to do, and that's what I'm going to do.

23           We can entertain ourselves all night with your

24    arguments back and forth.  That's going to be the end result.

19:48 25           I've got this power of instruction.

```
 1              MR. MCCONVILLE:  Okay.  Then I will reserve my

 2      comments.

 3              MR. QUINN:  I don't have anything else.

 4              Do you?

19:49 5         MR. MCCONVILLE:  Nothing for MGA, Your Honor.

 6              THE COURT:  While Ms. Hurst is busily typing away.

 7              MS. HURST:  I'm close.

 8              THE COURT:  Okay.  We're sitting.

 9              (Pause in the proceedings.)

19:49 10        MS. HURST:  Let me -- do you want me to make my

11      argument rather than respond, rather than filing a brief?

12              THE COURT:  It's up to you.

13              MS. HURST:  Do you want to do it that way?

14              MR. QUINN:  It's fine with me.

19:49 15        MS. HURST:  Okay.  I'll do it that way.

16              That's okay with the court?

17              THE COURT:  Absolutely.

18              I just wanted you to perfect your record.  You see,

19      each night I go back and Mattel has some objection to some

19:49 20    ruling I've made that night.  I want to afford you equal

21      opportunity.

22              MS. HURST:  Thank you, Your Honor.

23              During the direct examination of Mr. Larian on

24      February 10th, the court permitted testimony from Mr. Larian

19:49 25    regarding documents purportedly seized from MGA Mexico and
```

1    allowed that testimony on the basis that Mr. Larian had been

2    a 30(b)(6) witness on the topic in July 2010.

3              THE COURT:  On numerous occasions, a 30(b)(6) by

4    Mr. Larian's own choosing.

19:50  5           MS. HURST:  The court admitted Exhibits 7104, 8149

6    and 8466.

7              These are the three Mexico documents -- during the

8    examination on the basis of Mr. Larian's prior status as a

9    30(b)(6) witness.  Although the witness testified he had not

19:50 10   seen them before.

11             The court permitted impeaching testimony to be read

12   from the July 7, 2010, transcript, which impeached both

13   Mr. Larian and counsel with the suggestion that documents

14   were not provided to him or were concealed from him by

19:50 15   counsel.

16             The court deferred a request pursuant to Rule 106

17   for completeness.

18             During the examination the court also stated, "the

19   buck stops here," with Mr. Larian regarding the documents or

19:51 20   words to that effect.

21             We don't yet have the transcript.

22             I don't want to purport to quote the court

23   correctly without the transcript.

24             THE COURT:  Did I say "the buck stops here" in

19:51 25   front of the jury?

1      MS. HURST:  I believe so.

2      THE COURT:  I don't think so.  I think I said that

3  to you out of the presence the jury.

4      In fact, I know I did.

19:51  5      MS. HURST:  So the court's -- I believe --

6      Why don't you delay this until you get a

7  transcript?  Okay?

8      I mean, if I'm wrong about that, then that makes a

9  big difference in terms of the relief we're seeking.

19:51 10      I did remember, and if I misremembered, I apologize

11  to the court.

12      THE COURT:  I apologize, because, of course, that's

13  from Harry Truman.  That's not original.  But I did indicate

14  that the responsibility, I thought, lay -- you know, now, if

19:51 15  I used, "the buck stops here," I'd like to know that also.

16  But I don't think that's going to change my ruling.

17      MS. HURST:  Well, let me just continue.

18      Either way, I think there was some suggestion that

19  the responsibility lay with Mr. Larian during the testimony.

19:51 20      The problem with this is that it conflates the

21  discovery issue with the liability for trade secret

22  misappropriation because Mr. Larian was sitting there with

23  the Mexico documents in front of him at the time.

24      It is not an accurate statement of the law that Mr.

19:52 25  Larian's status as a corporate officer and director is

 1    sufficient to hold him liable for trade secret

 2    misappropriation.

 3            It's an intentional tort.

 4            His status as a corporate officer cannot, by

19:52  5    itself, be used to hold him vicariously liable on an

 6    individual basis.

 7            That's under 34 -- Civil Code 3426.1.

 8            The CACI 4401 instruction makes clear the elements

 9    need to be met with respect to every defendant.

19:52 10            And under California law, *Francis T. versus Village*

11    *Green Owners Association*, 42 Cal. 3rd 490 at 504:

12            "It is well settled that corporate directors cannot

13    be held vicariously liable for a corporation's torts in which

14    they did not participate.  Their liability, if any, stems

19:53 15    from their own tortious conduct, not from their status as

16    directors or officers of the enterprise."

17            THE COURT:  Why don't you get a transcript and get

18    that to me tomorrow in written form.

19            He's going to be on the stand a period of time.

19:53 20    Nobody's looking at these documents at the present time.

21            MS. HURST:  All right.

22            THE COURT:  You have a chance, also, to

23    rehabilitate him regardless of my ruling.

24            He's seen these documents.  He can make the

19:53 25    explanation to you in a more friendly atmosphere than if he

1    didn't see them.

2              Now, to perfect the record, Mr. Zeller and

3    Mr. Quinn.

4              MR. ZELLER:  We, of course, will stand on the prior

19:53 5    points that we've made and of course we agree with the court

6    on this.

7              The one continual point I would add in terms of

8    relevance of this material is that the court is aware that

9    Mr. Larian's position has been -- and this was in opening --

19:53 10   and that Mr. Larian repeated it on the stand is that he

11   instructed all of them:  Bring only your brains.

12             We now know for these three employees who are at

13   issue that they did not do that.  They, in fact, brought

14   more.  They brought a lot more.

19:54 15             So Mr. Larian's knowledge or his lack thereof of

16   what it is that these employees brought over, and his

17   response to them is directly relevant to that simple core

18   defense that they've raised.

19             THE COURT:  Your strongest argument is the one

19:54 20   that's not being stated, and that is, MGA takes the position

21   that Mr. Larian has no knowledge, but the jury may surmise

22   that he does have knowledge because of the quantity and

23   quality of the information and, therefore, regardless of

24   Mr. Larian's direct testimony, the inferences may be stronger

19:54 25   because of this alleged pattern, from your perspective, and

| | |
|---|---|
| 1 | therefore I'm going to hold to my ruling. |
| 2 | Now, you know I'm always open, Ms. Hurst. |
| 3 | Get that in written form so I can look at it |
| 4 | tomorrow, and I will take another look at it one more time. |
| 19:55  5 | Now what are we going to do? |
| 6 | MS. HURST:  We need to -- we just need to go over |
| 7 | those other exhibits. |
| 8 | MR. QUINN:  I gather they have some new Larian |
| 9 | documents? |
| 19:55 10 | THE COURT:  Yeah.  They had them today and we |
| 11 | didn't have enough time.  I wanted to cover Mattel's |
| 12 | documents today because Mr. Price still has him on a direct |
| 13 | examination. |
| 14 | What else do we need to do tonight with the court |
| 19:55 15 | reporter present? |
| 16 | MR. MCCONVILLE:  Nothing for MGA, Your Honor. |
| 17 | THE COURT:  Okay. |
| 18 | I want to thank you very much for being with us |
| 19 | tonight. |
| 19:55 20 | THE REPORTER:  Thanks. |
| 21 | THE COURT:  And goodnight, and I'll work with |
| 22 | counsel on their exhibits. |
| 23 | Do we need -- what time do we need to resume |
| 24 | tomorrow? |
| 19:55 25 | In other words, I'll be available, but I didn't |

 1    expect today.

 2             So, I didn't know until I came in that you needed

 3    me.

 4             MS. HURST:  Let's make it 8:00, if that's okay with

 5    the court.

 6             THE COURT:  What time?

 7             MR. ZELLER:  8:00 is fine, Your Honor.

 8             THE COURT:  8:00.

 9             Now, is there anything that we need on the record

10    tomorrow, because I'm not calling a court reporter in at

11    8:00.

12             MS. HURST:  Well, are we going to do that

13    distributions issue or can -- I thought you wanted to take

14    Mr. Larian's testimony outside the presence the jury --

15             THE COURT:  I thought you just represented that it

16    was 2006 and it wasn't needed, and I thought --

17             MS. HURST:  Right.  I don't know if they're

18    accepting that or if they wanted the testimony or what.

19             THE COURT:  I don't know.

20             I thought that they had, or maybe that's --

21             MR. QUINN:  No, we'll -- we'll accept that.

22             THE COURT:  Then 8:15.

23             MS. HURST:  Okay.

24             THE COURT:  Now, if you need me, I need to know

25    that now, though.

1         MR. ZELLER:  The only thing I would say,

2    Your Honor -- and whether this is done on the record or not

3    is not really a matter that I have much of an opinion on --

4    but we are going to have to resolve some of those witness

19:56 5    issues relatively soon with respect to Machado, Kuemmerle,

6    and some of these others, because we're now approaching that

7    part of our case.

8         THE COURT:  Did you notice that I'm the one who

9    continues to ask?

19:57 10        MR. ZELLER:  Absolutely, Your Honor.

11        THE COURT:  Now, number two, it was represented to

12   me by Mr. Overland that that's exactly what he's doing

13   tonight.

14        There's supposed to be an 8:30 phone call.

19:57 15        I'm not too worried about Machado or Vargas.  That

16   will sort itself out however it does.

17        MR. ZELLER:  (Nodded head.)

18        THE COURT:  I'm worried about Kuemmerle, and if

19   I've got jurisdiction I need to know that.  I need to verify

19:57 20   that and then I need to issue a warrant if she's not going to

21   be here.

22        MR. ZELLER:  Uh-huh.

23        THE COURT:  And she's -- that's the last thing I

24   want to do.

19:57 25        I keep repeating that to each of you and certainly

1    to an appellate court.

2              MR. ZELLER:  Uh-huh.

3              THE COURT:  But she's not disappearing down in

4    Brazil in a timely fashion without some repercussion from

19:57 5    this court.

6              MR. ZELLER:  Uh-huh.

7              THE COURT:  And then I've got to decide what do I

8    do after that in terms of wanting to have live witnesses

9    subject to cross-examination so that the jury can see

19:57 10    demeanor, which is the part that the Circuit can't see and

11    can't capture, but a jury can.

12              That's why we have the adversarial system.

13              MR. ZELLER:  Uh-huh.

14              THE COURT:  So I'm waiting for the feedback

19:58 15    concerning Vargas and Trueba, and Machado, et al., from

16    Mr. Overland tomorrow who is talking to their attorneys

17    tonight.

18              MR. ZELLER:  Uh-huh.

19              THE COURT:  Now, second, so you know this and it's

19:58 20    part of the record, I not only sent a letter down to Mexico,

21    but I'm not sure the judge got it.

22              You've seen that letter.  You've read that letter

23    asking that Mr. Machado be returned to us.

24              I sent another letter this morning down requesting

19:58 25    that Mr. Machado be with us.

Case 2:04-cv-09049-DOC-RNB   Document 9869   Filed 02/14/11   Page 101 of 110   Page ID #:298302
CV 04-9049 DOC - 02/10/2011   Volume 4 of 4

101

```
 1              So it's Kuemmerle so far that I'm really worried
 2     about, and Daphne Gronich.
 3              MR. ZELLER:  Yeah, Daphne Gronich.
 4              THE COURT:  Where is she?
19:58  5         MS. HURST:  She's available for Tuesday.
 6              THE COURT:  Excellent.
 7              Now, remember, this weekend when you weren't here I
 8     was left with "we don't know."
 9              MS. HURST:  No, they were asking for a Friday,
19:59 10    which --
11              THE COURT:  No.  No, no, I'm sorry.
12              All of my information up to this point has been
13     "we're trying."
14              MS. HURST:  Oh, I thought we said --
19:59 15         THE COURT:  "We think she's going to be here.  We
16     don't think we have a concern," but I had no specific
17     information after Mattel hit the panic button.  Now I know
18     she's going to be available.
19              Done.  Off the table.
19:59 20         So who do we have left that's a problem besides
21     Kuemmerle?
22              If I have jurisdiction my answer's very quick and
23     very decisive.
24              MR. ZELLER:  I believe that Cendali is resolved as
19:59 25    well.  It's my understanding that they are going to produce
```

```
 1    her as well on Tuesday.

 2            MR. MCCONVILLE:  We don't represent -- that's the

 3    woman that used to work at O'Melveny.  We don't represent

 4    her.  Apparently O'Melveny is currently in a dispute with

 5    MGA.

 6            I will say this, Your Honor.  As I understand, the

 7    proffered testimony is going to be that she sent a letter to

 8    somebody to tell them to deliver --

 9            THE COURT:  I thought we stipulated to it.

10            MR. MCCONVILLE:  I don't understand the relevance

11    of the testimony.

12            MR. ZELLER:  We sent MGA a stipulation some ten

13    days ago and we have no response --

14            THE COURT:  No response.

15            MR. ZELLER:  -- which is why we are now pressing to

16    have Dale Cendali show up because this is an issue about

17    chain of custody, and it goes specifically to a point that

18    MGA had made in the case involving who had custody of this

19    notary book.

20            And what she will testify to -- and she is the one

21    who is on this letter -- is that she directed, as MGA's chief

22    lead counsel in this case, for it to be picked up from Ramona

23    Prince when she was in Georgia and to take possession of it.

24            THE COURT:  I thought they kept their book?

25            MS. HURST:  Ms. Cendali never had custody of the
```

19:59  20:00  20:00  20:00  20:00

         1    book.  She's not the right witness.

         2           MR. ZELLER:  She directed an underling to go get

         3    it.

         4           MS. HURST:  That's not true.  It was a lawyer at

20:00    5    another law firm.

         6           THE COURT:  Just a moment.  I don't know.

         7           MR. MCCONVILLE:  I will -- I represent to you,

         8    Your Honor --

         9           THE COURT:  Just a moment.

20:00   10           I don't know, and I trust each of your

        11    representations.

        12           Where's Cendali?  I can take her out of the

        13    presence of the jury.  I'm happy to see what she knows.  I'm

        14    happy to get her down here, but the idea that she's just not

20:01   15    appearing --

        16           MR. MCCONVILLE:  Your Honor, I -- I can show you

        17    the stipulation they provided.

        18           It says Ms. Cendali told someone to go get the

        19    notebook.

20:01   20           MS. HURST:  If that's what they want us to

        21    stipulate to, we'll do that, but it had a whole bunch of

        22    other stuff in it about how MGA's agents had always had

        23    possession of the notary book and all this other stuff that

        24    we obviously would not agree to.

20:01   25           THE COURT:  I'm not going to enter into that kind

         1    of quibbling.  Get Cendali down here.  That's it.

         2          It will take more time than the quibbling that's

         3    gone on in this case.

         4          Who else?  No surprises, because I can't do

20:01    5    anything to get people here if it's dropped on me.

         6          I appreciate it.

         7          I've always known about Kuemmerle.

         8          Daphne Gronich seems to be resolved.

         9          I can't imagine Counsel, up in Los Angeles, Cendali

20:02   10    not appearing here.

        11          MR. ZELLER:  There -- there is the issue -- and --

        12    and -- and part of the issue is that we don't know who the

        13    right person is -- but you'll recall that when we get to the

        14    point of the case involving the sneaking into showrooms, that

20:02   15    there were two colleagues -- they aren't identified, we were

        16    never given their names in discovery -- the two colleagues of

        17    MGA/Zapf, who went into the Mattel showroom in Nuremberg in

        18    2008.

        19          We have asked for those people to be identified and

20:02   20    produced by MGA.  We have never gotten a straight answer on

        21    that.

        22          THE COURT:  They will give you the name.

        23          Ask them.

        24          MR. ZELLER:  We want the names of the two people

20:02   25    who went into the showroom.

1        Those names were redacted from Zapf's production.

2        The 30(b)(6) claimed not to know who they were, and

3   MGA's 30(b)(6) also claimed not to know.

4        THE COURT:  Do you know who they are?

20:03  5        MS. HURST:  No.

6        MR. MCCONVILLE:  No.

7        THE COURT:  That's because it got redacted?

8        MS. HURST:  No.  That's -- I mean, the court

9   already denied a further motion to compel on the Zapf stuff.

20:03 10        THE COURT:  I did.  You're absolutely right.

11        MR. MCCONVILLE:  Your Honor, so they took the

12   deposition of somebody who is the equivalent of a 30(b)(6)

13   from Zapf.

14        I mean, we are not Zapf.  We don't represent Zapf.

20:03 15   The witness came and testified.

16        They're dissatisfied with the answers.  I mean --

17        THE COURT:  But that's a ways down the way.

18        That's another discussion another evening.

19        MR. ZELLER:  It is.

20:03 20        THE COURT:  Okay.  And I, quite frankly, need to go

21   back and look, but that's my memory also.  I had already

22   ruled on this and was fairly confident in the ruling.  But

23   I'm not going to discuss it further this evening.

24        We're going to close it off and save it for another

20:03 25   evening.

```
 1              MR. ZELLER:  Okay.

 2              MS. HURST:  Thank you.

 3              THE COURT:  Now, finally, who is your witness after

 4    Mr. Larian?

20:03 5         MR. ZELLER:  Well, most immediately we expect to

 6    call Peter Marlow --

 7              THE COURT:  Okay.

 8              MR. ZELLER:  -- right after that.

 9              We also are hoping that we will have Cendali and

20:04 10   Gronich.

11              THE COURT:  In other words, are we far enough

12    along?  Do we need a night session or can we accomplish -- in

13    other words, I don't know where you're at in terms of timing,

14    Mr. Quinn, so I don't know -- I don't need to keep you here

20:04 15   unless it's necessary.

16              MR. QUINN:  Yeah.  I -- I mean -- we've given them

17    a list of eight or nine names.

18              Marlow, Rosenberg --

19              MR. ZELLER:  -baum.

20:04 20        THE COURT:  Rosenbaum.

21              MR. QUINN:  I'm sorry, Rosenbaum.

22              THE COURT:  Sure.

23              MR. QUINN:  Gronich --

24              MR. ZELLER:  Cendali.

20:04 25        THE COURT:  Okay.
```

CV 04-9049 DOC - 02/10/2011 - Volume 4 of 4

1          MR. QUINN:  Cendali.

2          And we really have to see.  We have these people in

3     Hong Kong, we gave their names and we're not sure there's any

4     point in bringing them.

20:04  5          THE COURT:  Rachel Harris?

6          MR. QUINN:  Yes.  And Rachel Harris.

7          THE COURT:  Kuemmerle?

8          MR. QUINN:  Absolutely Kuemmerle.

9          THE COURT:  And she's going to have a lot of

20:04 10    exhibits to cover.

11          I'm trying to find out which one takes some time,

12    even though they're becoming redundant.

13          Now, it seems to me we've gone over a huge

14    percentage of the exhibits that we're going to be dealing

20:05 15    with.  So it gets easier, frankly.

16          Now, two more things.

17          Dauberts, what are we going to do, because there

18    were requests for Daubert hearings and I'm happy to entertain

19    prolonged hearings.

20:05 20          I heard Mr. Quinn say it -- and I'm not holding you

21    to this -- that you'd rather just take their expert on --

22    perhaps you don't -- you want a Daubert hearing --

23          MR. ZELLER:  I think that's what we'd prefer to do.

24          MR. QUINN:  (Nodded head.)

20:05 25          THE COURT:  Well, let's see.  Coequal -- straight

1    across the board.

2            If they want a Daubert then you should have a

3    Daubert, so you're not bound by that.

4            MS. HURST:  Can I inquire of Mr. Quinn about their

20:05 5    estimate of when they're going to get to Mr. Wagner?

6            THE COURT:  Sure, go over and talk to each other.

7            But you have to take into account the court's

8    availability also.  You can't just bring that on me.

9            So I'll see you Saturday or Sunday or Monday or

20:06 10   something.

11           (Discussion held off the record.)

12           MS. HURST:  All right.

13           So we don't want to waive our Daubert, Your Honor.

14           They're indicating that they would not get him on

20:06 15   any time next week, certainly, and probably not the week

16   after that.

17           THE COURT:  They can't have the week after that.

18   Look at the hours.

19           MS. HURST:  So we'd like to do -- we'd propose

20:06 20   doing the Daubert not this weekend but either the following

21   weekend or that following Monday.

22           THE COURT:  Well, you've got a three-day weekend

23   coming up the following weekend.

24           I'm going to be here, but I don't think the court

20:06 25   reporters are going to be around.

```
 1                  In other words, you've got to keep up with me now.

 2                  So make the decision.  Do you want a Daubert or not

 3      and tell me by tomorrow.

 4                  MS. HURST:  Okay.  I --

 5                  THE COURT:  Because I've got to fit you.

 6                  MS. HURST:  I'm just talking about scheduling.

 7                  We do.

 8                  THE COURT:  And I'm talking about scheduling too.

 9                  I'm going to carry 350 more cases and I'm happy to

10      spend the hours, but I'm not happy to spend the hours when I

11      can't get resources on a three-day weekend that I can

12      anticipate.

13                  MS. HURST:  Okay.

14                  THE COURT:  When I'm --

15                  MS. HURST:  I didn't have that in mind.  I

16      apologize.  I didn't have in mind that it was a three-day

17      weekend.  I'm sorry.

18                  We'll figure out the scheduling.

19                  Can counsel confer about the scheduling tonight and

20      we'll talk to you about it tomorrow?

21                  THE COURT:  Tomorrow.  That's fair enough.  Okay.

22                  MS. HURST:  Okay.  And could I just ask a personal

23      favor that we not go all three days this weekend, because I

24      haven't been home in a month and I would like to go home for

25      a day and a half this weekend.
```

20:06 (line 5)
20:06 (line 10)
20:07 (line 15)
20:07 (line 20)
20:07 (line 25)

1          THE COURT:  As long as you have somebody working on

2     the instructions, and what I don't get is what I call

3     "blow-back" and, that is, oh, I can't believe that you

4     covered all that material and now we have some more concerns.

20:07  5          That goes on forever.

6          I'm going to start making some final decisions

7     about these instructions pretty quick.

8          MS. HURST:  I'm just asking that if we're going to

9     do instructions this weekend that we choose one day to do it

20:07 10   so that I can go home the other day and a half.

11          That's all I'm asking.  Okay.

12          THE COURT:  You two work out the schedule and tell

13    me what to do, but tell me early tomorrow morning.

14          MS. HURST:  Okay.

20:07 15         THE COURT:  All right.

16          Now, anything else with the court reporter here?

17          MR. MCCONVILLE:  Well, just -- we just -- I don't

18    know if you were here.  We need the time for the day.

19          You weren't here for any witnesses?

20:08 20         THE REPORTER:  (Shook head.)

21          THE COURT:  Well, thank you very much.

22          I appreciate it.

23          (Proceedings concluded at 20:08 on 02-10-2011.

24    Next proceedings reported by reporter.  Proceedings concluded

20:08 25   until Friday, February 11, 2011, 9:00 a.m.)

UNITED STATES DISTRICT COURT