1          **UNITED STATES DISTRICT COURT**

2          **CENTRAL DISTRICT OF CALIFORNIA**

3        **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4                    - - - - - - -

5

6  MATTEL, INC., ET AL.,              )
                                      )
7              Plaintiffs,            )
                                      )
8         vs.                         ) No. CV 04-9049-DOC
                                      )    Day 17
9  MGA ENTERTAINMENT, INC., ET AL.,   )    Volume 2 of 4
                                      )
10            Defendants.             )
   _____)

11

12

13

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                     Jury Trial

17                Santa Ana, California

18              Friday, February 11, 2011

19

20

21

22  Jane C.S. Rule, CSR 9316
    Federal Official Court Reporter
23  United States District Court
    411 West 4th Street, Room 1-053
24  Santa Ana, California 92701
    (714) 558-7755
25
    11-02-11 MattelV2

```
 1   APPEARANCES OF COUNSEL:

 2

 3   FOR PLAINTIFFS MATTEL, INC., ET AL.:

 4            QUINN, EMANUEL, URQUHART & SULLIVAN
              By:  JOHN B. QUINN
 5                 MICHAEL T. ZELLER
                   WILLIAM PRICE
 6                 Attorneys at Law
              865 South Figueroa Street
 7            10th Floor
              Los Angeles, California 90017-2543
 8            (213) 443-3000

 9

10   FOR DEFENDANTS MGA ENTERTAINMENT, INC., ET AL.:

11            ORRICK, HERRINGTON & SUTCLIFFE, LLP
              BY:  THOMAS S. MC CONVILLE
12                 Attorney at Law
              4 Park Plaza
13            Suite 1600
              Irvine, California 92614
14            (949) 567-6700

15            - AND -

16            ORRICK, HERRINGTON & SUTCLIFFE, LLP
              BY:  ANNETTE L. HURST
17                 Attorney at Law
              405 Howard Street
18            San Francisco, California 94105
              (415) 773-5700
19
              - AND -
20
              KELLER RACKAUCKAS, LLP
21            BY:  JENNIFER L. KELLER
                   Attorney at Law
22            18500 Von Karman Avenue
              Suite 560
23            Irvine, California 92612
              (949) 476-8700

24

25
```

```
 1   APPEARANCES OF COUNSEL (Continued):

 2

 3   FOR DEFENDANT CARLOS GUSTAVO MACHADO GOMEZ:

 4           SCHEPER, KIM & OVERLAND, LLP
             BY:  ALEXANDER H. COTE
 5               Attorney at Law
             601 West Fifth Street
 6           12th Floor
             Los Angeles, California 90071
 7           (213) 613-4660

 8           - AND -

 9           LAW OFFICES OF MARK E. OVERLAND
             BY:  MARK E. OVERLAND
10               Attorney at Law
             100 Wilshire Boulevard
11           Suite 950
             Santa Monica, California 90401
12           (310) 459-2830

13

14   Also Present:

15           ISAAC LARIAN, MGA CEO

16           KEN KOTARSKI, Mattel Technical Operator

17           MIKE STOVALL, MGA Technical Operator

18           RACHEL JUAREZ, Quinn Emanuel Urquhart & Sullivan

19           KIERAN KIECKHEFER, Orrick Herrington & Sutcliffe

20           WARRINGTON PARKER, Orrick Herrington & Sutcliffe

21

22

23

24

25
```

1                            **I N D E X**

2

3

4                          **EXAMINATION**

5

6    <u>**Witness Name**</u>        <u>**Direct**</u>    <u>**Cross**</u>      <u>**Redirect**</u>      <u>**Recross**</u>

7    LARIAN, ISAAC
       By Mr. Price                    13

8

9

10

11                           **EXHIBITS**

12

13   <u>**Exhibit**</u>                        <u>**Identification**</u>    <u>**Evidence**</u>

14   Plaintiffs' No. 655                                    13

15   Plaintiffs' No. 657                                    33

16   Plaintiffs' No. 659                                    36

17   Plaintiffs' Nos. 1356 - 1363                           38

18

19

20

21

22

23

24

25

1          SANTA ANA, CALIFORNIA, FRIDAY, FEBRUARY 11, 2011

2                   DAY 17, VOLUME 2 OF 4

3                        (12:50 p.m.)

4          (The following proceedings is taken outside

5      the presence of the jury.)

6          THE COURT:  We are on the record, and all counsel

7      are present.

8          And I thank Mr. McConville and Mr. Zeller for

9      their help and their attendance.

10         The Court went with both counsel to view a camera

11     view of the courtroom after the first recess and was able to

12     view the interaction by the parties, and I've ordered that

13     tape to be preserved by the Marshal's Office.

14         The tape was self-descriptive.  The Court did not

15     have audio.  The court reporter, though, had left on her

16     recording equipment, and what was said was as follows:

17         Mr. Larian, as he exits the stand, states, "I will

18     never settle with you, you son of a bitch."

19         And there is a voice you can hear in the

20     background saying, "I have it on tape."

21         So, Mr. Quinn, do you have that tape or --

22         MR. QUINN:  I know --

23         THE COURT:  -- Mr. Price?

24         MR. QUINN:  I know of no tape, your Honor.

25         THE COURT:  No tape?

```
 1              MR. PRICE:  No tape, your Honor.

 2              THE COURT:  Okay.  Did someone make a statement,

 3       "I have it on tape"?

 4              MR. PRICE:  Not that I heard.

 5              THE COURT:  Well, we have a voice saying "I have

 6       it on tape," so do we have -- you gentlemen don't?

 7              MR. QUINN:  We have no knowledge of any tape.

 8              THE COURT:  Okay.

 9              MGA?

10              MS. KELLER:  We certainly have no tape, your

11       Honor, of any kind.

12              MS. HURST:  Didn't even hear of it, your Honor.

13              THE COURT:  Is anybody tape recording in the

14       audience?

15                  (No audible response.)

16              THE COURT:  Nobody made that statement,

17       apparently?

18                  (No audible response.)

19              THE COURT:  All right.  First of all, there is no

20       tape recording in federal court, as we all know, okay?

21              I think we will proceed this afternoon, Brian, as

22       is, so we can get back to the trial.

23              I've got a number of remedies in mind, but I'm not

24       certain I want to inflict those because I can't discern if

25       somebody is taping.
```

Case 2:04-cv-09049-DOC-RNB   Document 9871   Filed 02/14/11   Page 7 of 41   Page ID #:298456
CV 04-9049-DOC - 02/11/2011 - Day 17, Vol. 2 of 4

7

```
 1            Now, second, it was now reported to me, so the
 2   drama heightens, by Mr. Zeller that Mr. Larian bumped into
 3   Mr. Quinn, or Mr. Quinn bumped into Mr. Larian, and
 4   Mr. McConville was there and said it didn't happen.  So I
 5   just want to perfect that record, so I've called up the
 6   marshal, and the drama continues.
 7            I'm going to deal with this at 5:00 because we
 8   have a jury sitting back there who, I think, would like to
 9   try to resolve some of these issues.  So let's simply move
10   on and keep our eye on the ball, which is supposed to be
11   litigation.
12            First, concerning your attempt to clawback, I'm
13   going to find, after the review, that you are correct
14   concerning the draft mail of Craig Holden.  It is protected
15   by the attorney-client privilege, and I'm going to invite
16   Mr. Quinn to, once again, argue that at 5:00.  But what I
17   did, partially, during the recess is, first, I had already
18   ruled on this draft e-mail, and I ruled that the -- that
19   even factual communications by a client to the attorney are
20   protected by the privilege under the Supreme Court's
21   decision of Upjohn versus -- Upjohn Company v. U.S. 449 U.S.
22   383, 395.  In that case, I believe it's, as well as the
23   subject matter, protected, so the entire document is.  And
24   the Court held, while it will probably be more convenient
25   for the government to secure the factual matter through a
```

Case 2:04-cv-09049-DOC-RNB   Document 9871   Filed 02/14/11   Page 8 of 41   Page ID #:298457
CV 04-9049-DOC - 02/11/2011 - Day 17, Vol. 2 of 4

8

 1   subpoena, such considerations of convenience do not overcome

 2   the policy served by the attorney-client privilege.

 3          Second, the request for continued questioning

 4   about how the $1 million was requested for attorneys fees by

 5   Isaac Larian for Farhad Larian is denied.  This evidence is

 6   already in and, in fact, can be argued to the jury.

 7          Finally, the problem with this CD has confronted

 8   the Court from the very inception of the case.  First of

 9   all, without finding any fault of any counsel, I think that

10   the order was clear concerning search and seizure.  But

11   regardless, what I am concerned about is that the CD in

12   question is or was created by the Mexican police, and it's

13   been represented to the Court that this was, quote-unquote,

14   "with Mattel's assistance to the prosecution in Mexico."

15          I don't know enough, yet, about the circumstances

16   about the police, and I don't know why this was compiled,

17   and I'm not certain of the totality of the information on

18   this particular disk.  So I don't know why this Court

19   wouldn't hold that in abeyance.  Certainly, Mr. Larian is

20   going to be back after cross-examination, and I will allow

21   you to exceed the scope, if it's appropriate.  But I'd like

22   to see the 30(b)(6) transcripts, all of them, this evening,

23   if you'd start helping me gather them, and I think if I take

24   a little time, I'll be in a much better position to make a

25   ruling with all the facts in front of me.

 1          My concern is this:  I don't know where the

 2     relevant evidence is.  I don't know why the chain isn't

 3     quickly being perfected to get that to us.  I don't know

 4     under the circumstances of why this was prepared.  I don't

 5     even know if the original evidence still exist.

 6          Do you, Mr. Price?

 7          MR. PRICE:  I don't.  I don't know enough about

 8     it.  Mr. Zeller does.

 9          THE COURT:  It's been related to me also in just

10     discussion upon discussion with different counsel that the

11     police haven't been helpful.  I -- I don't know that.  So I

12     think we just need a little bit of time with counsel this

13     evening to -- to see what's on this disk, and to find out a

14     little bit more without holding the jury up.

15          Now, I don't intend to send them home, but

16     Mr. Price, you're not prejudiced because if it turns out the

17     disk is coming in, it can come in at redirect, so I think we

18     ought to move along.

19          Gentlemen, thank you.

20          MR. OVERLAND:  Your Honor?

21          THE COURT:  Mr. Overland.

22          MR. OVERLAND:  The Court requested that I prepare

23     an instruction for the jury.

24          THE COURT:  Can I see that?

25          Thank you very much.

Case 2:04-cv-09049-DOC-RNB   Document 9871   Filed 02/14/11   Page 10 of 41   Page ID #:298459
CV 04-9049-DOC - 02/11/2011 - Day 17, Vol. 2 of 4

10

1        Now, let's get argument from -- have you shown

2   this to Mattel?

3        MR. OVERLAND:  I have not.

4        THE COURT:  Well, why don't you show this to

5   Mattel for a moment and see if they disagree, okay?  And if

6   you believe it's non-hearsay or -- I haven't looked at it

7   yet, but Mr. Price, I'd like your participation so that --

8        Now, what's clear, Ms. Hurst and counsel and

9   Mr. Larian and Mattel, from viewing this tape, which you

10  haven't seen yet is that regardless of, quote-unquote, "the

11  emotional state," Mr. Larian is the instigator of this

12  conversation and his conduct is inappropriate, regardless of

13  what you believe the Court's ruling should be.

14       THE WITNESS:  I apologize.

15       THE COURT:  You don't have to apologize.  In fact,

16  I'm not accepting it at the present time.  This is federal

17  court.  I don't care if counsel or a witness agrees or

18  disagrees with one of my rulings.  That's for the Circuit to

19  correct this Court if I'm wrong, but having made a ruling,

20  then that ruling is in effect --

21       THE WITNESS:  I understand.

22       THE COURT:  -- you understand?

23       THE WITNESS:  I understand.

24       THE COURT:  All right.  I don't think I want to go

25  any further because I don't want any chilling effect with

1   you as a witness and primary witness on the stand, okay?

2           THE WITNESS:  I understand.

3           THE COURT:  All right.

4           Now, I want the jury to come back in in just a

5   moment, as soon as we see this.

6           MS. HURST:  Your Honor, while they are looking

7   at --

8           THE COURT:  One thing at a time.

9           Let me also say, back to Mr. Larian while we are

10  on the record, that I am going to accept your apology, and I

11  expect you to conduct yourself accordingly.

12          THE WITNESS:  Thank you.

13          Your Honor, may I go to the restroom?

14          THE COURT:  Certainly.

15          MR. OVERLAND:  Your Honor, apparently we have a

16  disagreement, and we'll deal with this later.

17          THE COURT:  All right.  Then we'll bring the

18  jury --

19          MR. OVERLAND:  We don't want to hold up the jury.

20          THE COURT:  All right.  Once Mr. Larian comes

21  back, we'll start.

22          MS. HURST:  Your Honor, may I give the Court a

23  couple of citations to authority on the 30(b)(6) issue?

24          THE COURT:  I'm going to resolve that tonight.

25          MS. HURST:  Okay.  I just -- if you had wanted

1    somebody to look at it in the meantime, I would give you

2    these.

3              THE COURT:  Okay.

4              And also, for the record, Jane, I've ordered the

5    preservation of both the recording by the court reporter and

6    the videotape of the incident, to be preserved.

7              While we are waiting, Ms. Hurst and Mr. Zeller, do

8    you have the limiting instruction concerning Mr. Price's

9    question of Mr. Larian about the O'Connor e-mail?

10             MR. QUINN:  Your Honor, is that something we

11   can -- we haven't had a chance to discuss that.  Is that

12   something we can discuss tonight?

13             THE COURT:  Well, that's my ruling.

14             MS. HURST:  And your Honor, we are not going to

15   offer a limiting instruction because we don't believe it can

16   be cured.

17             THE COURT:  All right.  That resolves it, then.

18             MS. HURST:  That we'll address -- we're happy to

19   address with Mr. Quinn later this evening any other measures

20   that may need to be taken.

21             THE COURT:  All right.  Thank you.

22             *(The following proceedings is taken in the*

23        *presence of the jury.)*

24             THE COURT:  All right.  The jury is present, the

25   alternates, all counsel, the parties.

1          Thank you, Mr. Larian.

2          And Counsel, if you'd like to continue, Mr. Price,

3    with your examination, please.

4              **ISAAC LARIAN, PLAINTIFFS' WITNESS, RESUMED**

5          MR. PRICE:  Your Honor, if Ms. Juarez can put

6    before Mr. Larian Exhibits 655, 657 and 659.

7              **DIRECT EXAMINATION (Continued)**

8    BY MR. PRICE:

9    Q    Mr. Larian, we will begin with 655.

10   A    Go ahead.

11   Q    Do you recognize this as a consolidated financial

12   statement for the years ended December 31, 2002 and 2001, an

13   independent auditor's report?

14   A    Yes.

15         MR. PRICE:  We move Exhibit 655 into evidence,

16   your Honor.

17         THE COURT:  Received.

18         *(Plaintiffs' Exhibit No. 655 is received in*

19      *evidence.)*

20   BY MR. PRICE:

21   Q    If you'd look at the first page, Mr. Larian, you see

22   under "Independent Auditor's Report" and under "Board of

23   Directors and Stockholders," it says -- I'm sorry, this is

24   the second page, 655-00002.  Do you see in that first full

25   paragraph it says, "We have audited the accompanying

1    consolidated balance sheets of MGA Entertainment, Inc., and

2    subsidiaries, paren, the company, as of December 31, 2002

3    and 2001," and that goes on; do you see that?

4    A    I do.

5    Q    Now, I want to ask you about the company and

6    subsidiaries.

7         Now, MGA had subsidiaries, MGA U.S.A., correct?

8    A    As of what date?

9    Q    As of 2001 and 2002?

10   A    Yes.

11   Q    And has it had subsidiaries from that date forward?

12   A    Yes, different subsidiaries.

13   Q    And the reports that you are looking at is a

14   consolidated balance sheet of MGA Entertainment and those

15   subsidiaries, correct?

16   A    I believe so, yes.

17   Q    And when we talk about subsidiaries, did MGA set up

18   subsidiaries in various countries in which MGA was selling

19   Bratz dolls and Bratz-related accessories?

20   A    As of what date?

21   Q    From two -- well, let's say from 2001 forward.

22   A    Yes, but in 2001, 2002, we didn't -- the only

23   subsidiary we had was MGA Hong Kong.

24   Q    What was the your understanding of the purpose of

25   setting up subsidiaries?

1   A    Again, you have to give me a date.  MGA Hong Kong was

2   set up to -- to coordinate manufacturing, product

3   development, product design, shipping and selling.

4   Q    And at some point there was what we have MGA Mexico?

5   A    Yes.

6   Q    And that was between about 2004 and 2010?

7   A    Yes.

8   Q    And there was MGA Canada?

9   A    Yes.

10  Q    Between 2005 and 2010?

11  A    No.  I believe it was before that.  We have had MGA

12  Canada for a while.  I think even in 2000, 2001 we had MGA

13  Canada, to the best of my recollection.

14  Q    There was an MGA France?

15  A    At one time there was, yes.

16  Q    MGA Belgium?

17  A    Belgium or Benelux.

18  Q    Or --

19  A    Benelux.

20  Q    MGA Spain?

21  A    I am not so sure if we had MGA Spain or not.

22  Q    MGA Ireland?

23  A    Yes.

24  Q    MGA Germany?

25  A    Yes.

Case 2:04-cv-09049-DOC-RNB   Document 9871   Filed 02/14/11   Page 16 of 41   Page ID #:298465
CV 04-9049-DOC - 02/11/2011 - Day 17, Vol. 2 of 4

16

1   Q    MGA Netherlands?

2   A    Again, that goes probably with the Benelux.  I think

3   it's the same thing as Belgium.

4   Q    MGA Sweden?

5   A    Yes, we had it at one time.

6   Q    MGA Poland?

7   A    I don't recall MGA Poland.

8   Q    MGA United Kingdom?

9   A    Yes.

10  Q    And then there was an MGA China?

11  A    Yes.

12  Q    Now, I just want to briefly discuss your understanding

13  of the roles of the subsidiaries in the selling of Bratz.

14  Did these MGA subsidiaries in these various countries

15  purchase Bratz dolls from MGA Hong Kong?

16  A    If that was their purpose, yes, if they were

17  distributing.

18  Q    So when you have these MGA subsidiaries in the various

19  countries, was the primary purpose to distribute Bratz

20  dolls?

21  A    Amongst other things, yes.

22  Q    And the way that would work would be the MGA

23  subsidiaries in the various countries would purchase the

24  dolls from Hong Kong, MGA Hong Kong?

25  A    Or China, yes.

1    Q    And -- so how -- how would the flow work?  If, for

2    example, MGA Canada, it would buy the Bratz doll from MGA

3    Hong Kong or MGA China, correct?

4    A    Yes.

5    Q    And then they would sell the dolls to the retailers,

6    right?

7    A    In Canada, yes.

8    Q    And so as an example, when MGA Canada would sell the

9    Bratz dolls, money would flow into MGA Canada, correct?

10   A    I don't know completely about the setup, or maybe both

11   MGA Hong Kong.  I don't know the whole -- how -- how the

12   money flows.

13   Q    In any event, somehow the money would flow into MGA,

14   U.S.A. for the benefit of the shareholders, correct?

15   A    Again, I am not so sure about how the accounting works

16   and how the money flows.

17   Q    Was it your understanding that the profits from the

18   sales of Bratz were available to be distributed to the MGA

19   U.S.A. stockholders?

20   A    No.

21   Q    So what was available to be distributed to the MGA

22   U.S.A. stockholders?

23   A    The profits of Bratz or MGA products sold in U.S.A.

24   Q    So to whom would the profits of the subsidiaries, if

25   any, be distributed to?

Case 2:04-cv-09049-DOC-RNB   Document 9871   Filed 02/14/11   Page 18 of 41   Page ID #:298467
CV 04-9049-DOC – 02/11/2011 – Day 17, Vol. 2 of 4

18

1    A    To different entities that they were set up.

2    Q    What entities were those?

3    A    MGA Hong Kong, MGA China, MGA Ireland, they all had --

4    again, I'm not proficient in the accounting system that was

5    set up by our accounting department.  That's not my area of

6    expertise, but to these different entities.

7    Q    Okay.  I'm just trying to find out, would you leave

8    profit in, for example, MGA Canada?  Would you leave that

9    profit just sitting there in MGA Canada?

10   A    I don't know.  This is something you can ask our CFO.

11   They handle the accounting.  I don't know how they worked

12   that out.  Maybe they used it to pay for the vendors in

13   China that produced the product, reinvest.  I don't know the

14   exact detail of it.

15   Q    And I'm asking about the profit.  Obviously, as part of

16   your operating income or as part of your business, you'd

17   have to pay vendors and pay for costs, correct?

18   A    Yes.

19   Q    Okay.  So I'm talking about the profit.  So if an MGA

20   subsidiary made a profit --

21   A    Yes.

22   Q    -- is it your understanding that profit would be

23   distributed to stockholders?

24   A    If there was a profit, I -- my assumption is it will be

25   eventually, or reinvested, not distributed but reinvested

Case 2:04-cv-09049-DOC-RNB   Document 9871   Filed 02/14/11   Page 19 of 41   Page ID #:298468
CV 04-9049-DOC - 02/11/2011 - Day 17, Vol. 2 of 4

19

1    in -- in the investment of the business.

2    Q    So was it your understanding that eventually, with

3    respect to these subsidiaries, that profit would make its

4    way to some stockholder somewhere?

5    A    This is just my layman's way, yes, but if there was a

6    profit, and maybe they -- they would invest it.  I know that

7    they invested in other -- other investments, whether it's

8    manufacturing, whether it is purchasing, advertising,

9    marketing, et cetera.

10   Q    So your understanding is the profits in these MGA

11   subsidiaries would either be reinvested or distributed to

12   some stockholders, and that's your layman's understanding,

13   correct?

14   A    Yes.

15   Q    And by "layman," we are talking about you were chief

16   executive officer of MGA U.S.A., correct?

17   A    I am.

18   Q    And there were profits distributed to you from MGA

19   U.S.A., right?

20   A    When the company made money, yes, there was.

21   Q    Were you -- did you have any -- well, for example, we

22   saw MGA Mexico, it had you listed as the CEO of MGA Mexico;

23   do you remember that?

24   A    Yes.

25   Q    Were you also the CEO of the other subsidiaries?

CV 04-9049-DOC – 02/11/2011 - Day 17, Vol. 2 of 4

20

```
 1    A    I am not sure if I am or not.  No.  I think we had

 2    other managing directors.

 3    Q    MGA, I think you said, is a family-owned business?

 4    A    MGA Entertainment is a family-owned business, yes.

 5    Q    And what percentage of MGA's stock -- I think you said

 6    81 percent is what you own?

 7    A    That's what I said.

 8    Q    What percentage did MGA own of the subsidiaries?

 9    A    I don't remember all the -- all the breakdowns, I do

10    not.

11    Q    Were the MGA subsidiaries 100 percent owned by MGA?

12    A    MGA subsidiaries -- I honestly don't have the exact --

13    I don't know the structures how they are built.  I can't

14    answer that.

15    Q    You, as the majority owner of MGA U.S.A., had control

16    over the decisions of MGA U.S.A., correct?

17    A    Yes, I do.

18    Q    And isn't it correct that you also had control over the

19    decisions of the subsidiaries?

20    A    No, that's not correct.

21    Q    Who had control over the decisions of the subsidiaries?

22    A    Different managing directors in different countries.

23    Q    Did the managing directors have ownership interest in

24    these subsidiaries?

25    A    I think one or two of them might have.  Again, I don't
```

Case 2:04-cv-09049-DOC-RNB   Document 9871   Filed 02/14/11   Page 21 of 41   Page ID #:298470
CV 04-9049-DOC - 02/11/2011 - Day 17, Vol. 2 of 4

21

1  know the exact -- I don't know the exact structure, as I

2  said before.

3  Q    You hired the managing directors of the -- of the MGA

4  subsidiaries?

5  A    Yes.

6  Q    And you had the capability of -- of terminating the

7  employment of the managing directors of the MGA

8  subsidiaries?

9  A    Me, personally?

10  Q    You as CEO of MGA U.S.A.

11  A    I am not so sure of certain countries that I have the

12  authority to terminate them, no.

13  Q    Could you name for us any managing director of a

14  subsidiary who had an ownership interest in that subsidiary?

15  A    I think, again, I'm just going to go by my memory, but

16  I think Carlston (phonetic) -- I forgot his last name -- had

17  some ownership.  I can't recall all of them.

18  Q    You said Carlston, that's a --

19  A    A man.

20  Q    Okay.  Now, Mr. Carlston had an ownership interest, as

21  best as you can recall, in what subsidiary?

22  A    Yes.

23  Q    Which subsidiary?

24  A    I believe it was in Sweden.

25  Q    And can you tell us an estimate of how much his

1   ownership interest was?

2   A    I can't.

3   Q    More than 1 percent?

4   A    Probably.

5   Q    More than 5 percent?

6   A    I don't know.

7   Q    What period of time did Mr. Carlston (sic) have an

8   ownership interest in MGA Sweden?

9   A    During the past 10 years.  I don't know the date.

10  Q    Now, these subsidiaries, were you -- they had boards of

11  directors?

12  A    They had directors, yes.  They had their own directors.

13  Q    Were you on the board of directors on any of the

14  subsidiaries?

15  A    I don't know if I was on all of them or not, but on

16  some of them I was.

17  Q    Do you recall any of the subsidiaries that you weren't

18  on the board of directors?

19  A    I don't think I was on the board of director -- again,

20  I'm just going by memory.  I don't remember.  I guess I was

21  not on the board of director of Ireland.  I don't even know.

22  I testified that we have an MGA U.K.  I don't even know if

23  we have an MGA U.K.  I don't think we have an MGA U.K.  I

24  don't have all of those memories, sir.

25  Q    You said Mr. Carlston, is he related to you in any

1   way?

2   A    No, he's not.

3   Q    Other than Mr. Carlston, can you name a person outside

4   of your family who had stock in any of the MGA subsidiaries?

5   A    I can't recall all the names.  Some of these foreign

6   names, I can't --

7   Q    Can you recall any name other than Mr. Carlston who

8   was -- had stock in your subsidiaries, other than people

9   in your family?

10  A    I can't right now, but I can go back and check and get

11  those names.

12  Q    Okay.  MGA currently has a board of directors, MGA

13  U.S.A.?

14  A    Yes.

15  Q    And who is on the board of directors?

16  A    I believe it's myself, my brother-in-law, my sister,

17  those are the ones.

18  Q    Isn't it true that the MGA subsidiaries were controlled

19  by MGA U.S.A.?

20  A    No, not necessarily.

21  Q    When you say "not necessarily," does that mean that in

22  some cases they were and in some cases they weren't?

23  A    They -- they are independent organizations, sir.  They

24  are independent organizations under the laws of different

25  countries.

CV 04-9049-DOC - 02/11/2011 - Day 17, Vol. 2 of 4

24

1   Q    And I know you are saying they are independent

2   organizations, but do you mean they are set up under the

3   laws of specific countries in which they are incorporated?

4   A    Yes.

5   Q    And so my question is a little bit different.  Was it

6   your understanding that MGA U.S.A. could control its

7   decision-making process in those countries where the

8   subsidiaries were -- were created?

9   A    No.

10  Q    Did MGA U.S.A. own the controlling interest of the

11  stock in all of those subsidiaries?

12  A    We had either myself -- I'm not so sure if it was MGA.

13  I think I personally have ownership of some of those stocks,

14  but I'm not so sure it's MGA.  No, that's not correct.  It's

15  myself.

16  Q    When you say yourself, did you have controlling

17  interest in all of the MGA subsidiaries?

18  A    Yes.

19  Q    Was it your understanding that MGA and MGA subsidiaries

20  were all under common control?

21  A    No.

22  Q    If you'd look at the second page of Exhibit 665.

23       I'm sorry, 655.

24            MR. PRICE:  Thank you, Ken.

25

1   BY MR. PRICE:

2   Q    If you'd look at the last paragraph, in the middle

3   you'll see there is a sentence that begins with "because,"

4   where it says, "Because the entities are under common

5   control, the transaction has been accounted for similar to a

6   pooling of interest and, accordingly, reflects the

7   consolidated financial position and results of operations,

8   as if the entities were consolidated for all periods

9   presented"; do you see that?

10  A    Yes, and if you'd go up, it talks about MGA Hong Kong.

11  The first portion of the sentence you did not read.

12  Q    Well, I think you told us that in 2001, 2002, that was

13  the subsidiary of MGA.

14  A    Yes, that's what's referring to here.  That's what I

15  was just trying to clarify.

16  Q    And that, at that point, was the only subsidiary of

17  MGA?

18  A    I believe so.  Again, I don't know when MGA Canada was

19  incorporated.  I don't remember.

20  Q    So it's your understanding that MGA Hong Kong and MGA

21  Entertainment were under common control at the time of this

22  statement?

23  A    Yes, under my control.

24  Q    And you mean individually, Isaac Larian?

25  A    Yes.

Case 2:04-cv-09049-DOC-RNB   Document 9871   Filed 02/14/11   Page 26 of 41   Page ID #:298475
CV 04-9049-DOC - 02/11/2011 - Day 17, Vol. 2 of 4

26

1    Q    And can you tell us how was MGA under your control?

2    A    I am the biggest investor of MGA.

3    Q    Now, who approves the distributions that -- let me give

4    you a time frame, actually.  In 2001 and 2002, who approved

5    the distributions to the stockholders?

6    A    I did, if there was a distribution.

7    Q    And after the 2001, 2002 time frame, who controlled the

8    distributions of MGA Entertainment?

9         Excuse me.

10   A    I'm sorry, is that two different questions?  I'm

11   confused.

12   Q    No, I'm -- 655, we are talking about 2001, 2002,

13   correct?

14   A    Yes.

15   Q    So I'm just asking you for another time period.

16   A    Okay.

17   Q    Going forward in 2002, 2003, et cetera, who controlled

18   the distributions to the stockholders of MGA Entertainment

19   and the subsidiaries?

20   A    The board of directors.

21   Q    And I think you said the board of directors consists

22   of, I think, you, your brother-in-law and your sister; is

23   that correct?

24   A    No.  I told you -- I think you asked me currently

25   who's the board of directors, and that's what I mentioned

Case 2:04-cv-09049-DOC-RNB   Document 9871   Filed 02/14/11   Page 27 of 41   Page ID #:298476
CV 04-9049-DOC – 02/11/2011 – Day 17, Vol. 2 of 4

27

1    to you.

2    Q    Okay.

3    A    At different times we have had different boards of

4    directors.

5    Q    If you'd just give me an idea of 2001 going forward,

6    you know, when that membership changed on the board of

7    directors, what it was in 2001, and whether or not that

8    changed.

9    A    I don't remember when is the change, but I know it has

10   changed.  Other people have been on and off of our board.

11   Q    Who has been on the board, other than you and your

12   sister and your brother-in-law?

13   A    My brother, Fred, was on the board of director.  Leon

14   Neiman was on the board of director at one time.  Leon

15   Farahnik (phonetic) was on the board of director at one

16   time.  And if I am not mistaken, Mel Woods at one time was

17   on the board of directors.

18   Q    And you?

19   A    Yes.

20   Q    And did each vote count the same on the board of

21   directors?

22   A    I'm sorry?

23   Q    Did each vote count the same on the board of directors,

24   your vote was one and Mel Woods' vote was one, or was it

25   weighted?

1    A    I don't understand your question.

2    Q    Could you, Isaac Larian, you know, cause the board of

3    directors, by yourself, to act in a certain way?

4    A    Personally, no.  When we had a board of directors, we

5    took a vote, and everybody had the same vote.

6    Q    Were any of the people you mentioned that were on the

7    board of directors members of your family?

8    A    Yes.

9    Q    Was anyone you mentioned not a member of your family?

10   A    Yes.

11   Q    Could you tell us who among the names you mentioned

12   were not members of your family?

13   A    Leon Farahnik, Mel Woods, if he was -- I don't remember

14   exactly if he was on the board and when.

15   Q    Because of your ownership interest in MGA, could you

16   elect and remove every board of director?

17   A    No.

18   Q    What did it require to remove a board of director?

19   A    I don't remember the bylaws of the company, but I think

20   the -- all the shareholders had to vote a certain way.  I

21   don't remember the bylaws.

22   Q    You said all of the shareholders, but during this time

23   frame from 2004, have you always had 81 percent of the

24   shares?

25   A    I did.

1    Q    Each share had a vote?

2    A    No, I'm not so sure that's how it was set up.  I don't

3    remember the bylaws, but I didn't think the voting was set

4    up based on the ownership.

5    Q    Did you have any relationship with Mr. -- is it

6    Farahnik?

7    A    Farahnik.

8    Q    Okay.  With Mr. Farahnik, did you have any relationship

9    with him?

10   A    What do you mean by "relationship"?

11   Q    Not family relationship, but did you have a social

12   relationship with him?

13   A    Yes.

14   Q    And was he one of your better friends?

15   A    He is one of my friends.

16   Q    And what was your relationship to Mr. Woods?

17   A    He was president of the company at one time.

18   Q    Well, Mr. Larian, you recall yesterday I was asking you

19   questions about certain news articles?

20   A    Yes.

21   Q    And that you were explaining that the news articles

22   didn't always get your -- your words correct, correctly?

23   A    Yes.

24   Q    And in connection to that, you had volunteered that you

25   had seen an article about how much ties cost?

1    A    Yes.  I have it here; your tie.

2    Q    I'll be glad to look at that.

3         My question is, you volunteered that information

4    yesterday; do you recall that?

5    A    I did based on the newspaper article that you did, the

6    interview that you did.

7    Q    And were you -- were you trying to convey to the jury

8    that I had made a certain amount of money?

9    A    No, I was not.

10   Q    Well, let's look at Exhibit 655-00006.

11   A    Go ahead.

12   Q    And I want you to look at -- there's a category in the

13   middle of that which says "Cash flows from financing

14   activities"; do you see that?

15   A    I do.

16   Q    And second from the bottom, you see it says "Advances

17   to stockholder"?

18   A    Yes.

19   Q    And on the far right, which is 2001 --

20        MR. PRICE:  Ken, can you get the heading there?

21   BY MR. PRICE:

22   Q    It has in 2001, an advance to stockholder of $378,000;

23   do you see that?

24   A    I don't know if that's an advance or a negative.  To

25   me, in accounting when you put in parentheses, it means the

```
 1   other way around.
 2   Q    It means -- it means outflow from the company, right?
 3   A    What page are you on?
 4   Q    This is 655-00006.
 5   A    I don't know if this was an outflow or an inflow,
 6   because I had lent a lot of money to the company, also.
 7   Q    Do you recall getting an advance in about 2001 of
 8   $378,000, or something like that?
 9   A    I don't.
10   Q    You had received advances from the company, right?
11   A    I have.
12   Q    And you know how to read a consolidated statement of
13   cash flows, don't you?
14   A    Not that good.
15   Q    You can't read it good enough to confirm that that
16   number, $378,521, is money going out of the firm as an
17   advance to a stockholder?
18   A    It's possible.  I -- I can't, because I can't -- it's a
19   negative, so I can't.  Maybe it's not.  I don't know.
20   Q    If there -- if there were an advance from the company
21   to a stockholder, that would be a negative flow of income
22   from the company, right, a negative flow of cash from the
23   company?
24   A    Can you say that again?
25   Q    Sure.  If there were an advance to a stockholder, that
```

Case 2:04-cv-09049-DOC-RNB   Document 9871   Filed 02/14/11   Page 32 of 41   Page ID #:298481
CV 04-9049-DOC - 02/11/2011 - Day 17, Vol. 2 of 4

32

 1   advance would be a negative cash flow from the company.

 2   A     Yes.

 3   Q     And this is the consolidated statements of cash flows

 4   for MGA Entertainment, Inc., correct?

 5   A     Yes.

 6   Q     So if it has a parentheses, that means that's money

 7   going out of MGA Entertainment, Inc., correct?

 8   A     Yes.  Probably, yes.

 9   Q     Do you recall who the advance to stockholder was in

10   2001?

11   A     I don't know.  Probably to me and my sister or to one

12   of us.

13   Q     In 2002, you see that there are distributions --

14   distributions to the stockholders; do you see that?

15   A     I do.

16   Q     So in 2002, there was a distribution to the

17   stockholders of $7,965,129, correct?

18   A     I believe so, yes.

19   Q     And -- and your portion of that would be 81 percent?

20   A     Yes.

21   Q     And this is before -- before you had to pay taxes,

22   right?

23   A     Yes.

24   Q     If you'd look at Exhibit 657.

25         Do you recognize 657 as a consolidated financial

1   statement for MGA Entertainment, Inc., for the years ended

2   December 31, 2004 and 2003?

3   A     What did you call it again?

4   Q     The consolidated financial statements, MGA

5   Entertainment, Inc., years ended December 31, 2004 and

6   2003.

7   A     Yes.

8          MR. PRICE:  Your Honor, I move Exhibit 657 into

9   evidence.

10         THE COURT:  It's received.

11         *(Plaintiffs' Exhibit No. 657 is received in*

12     *evidence.)*

13   BY MR. PRICE:

14   Q     And if you would look, Mr. Larian, to page 7, it's

15   00657-00007; do you see that?

16   A     Yes, I see that.

17   Q     And that is the consolidated statement of cash flows

18   for 2003 and 2004, right?

19   A     Yes.

20   Q     And I meant to ask you, if you'd look at 2003, 2004,

21   this is a report of independent auditors Ernst & Young?

22   A     Yes.

23   Q     And what's your understanding as to what Ernst & Young

24   was doing in these consolidated financial statements?

25   A     Auditing.

1  Q    And they were auditing based upon financial information

2  that was provided to them by MGA Entertainment, Inc.,

3  correct?

4  A    Yes.

5  Q    So if you look at 00657-00007 and look at the financing

6  activities -- I'm sorry, investing -- I can't talk --

7  "Financing Activity" section toward the bottom, and do you

8  see there is, I think, three down, it says "Advance to

9  stockholders"; do you see that?

10 A    Yes.

11 Q    And in 2003, there is an advance of $29,498,189,

12 correct?

13 A    Yes.

14 Q    Do you know which stockholder or which stockholders

15 received an advance in 2003 of over $29 million?

16 A    Myself and my sister and her husband.

17 Q    And what percentages was that advance allocated?

18 A    81 percent, approximately, was allocated to me and my

19 family.

20 Q    Well, I just want to be clear when you say to you and

21 your family, your sister had a separate interest, right?

22 A    "My family," I meant my wife, my children.

23 Q    Okay.  And what was your sister's percentage; do you

24 recall?

25 A    18.9, something like that, percentage.

Case 2:04-cv-09049-DOC-RNB   Document 9871   Filed 02/14/11   Page 35 of 41   Page ID #:298484
CV 04-9049-DOC - 02/11/2011 - Day 17, Vol. 2 of 4

35

1   Q    And then you see there is distribution to stockholders?

2   A    Yes.

3   Q    So in 2003, there was a distribution to stockholders of

4   $49,937,220, correct?

5   A    Yes.

6   Q    81 percent of that went to you?

7   A    Yes.

8   Q    And basically the rest went to your sister?

9   A    Yes.

10  Q    And then you have year-end of 2004, there was a

11  distribution to stockholders of $83,924,316, correct?

12  A    Yes.

13  Q    Again, 81 percent of that went to you, and then the

14  rest went to your sister?

15  A    I believe so, yes.

16  Q    If you would look at Exhibit 659.

17  A    Go ahead.

18  Q    Do you recognize that as the consolidated financial

19  statements of MGA Entertainment, Inc., for the years ended

20  December 31, 2006, and 2005?

21  A    Yes.

22         MR. PRICE:  Your Honor, I move Exhibit 659 into

23  evidence.

24         THE COURT:  Received.

25

Case 2:04-cv-09049-DOC-RNB   Document 9871   Filed 02/14/11   Page 36 of 41   Page ID #:298485
CV 04-9049-DOC - 02/11/2011 - Day 17, Vol. 2 of 4

36

```
 1              (Plaintiffs' Exhibit No. 659 is received in

 2        evidence.)

 3   BY MR. PRICE:

 4   Q    And on page 3, 659-00003, you see there's the report of

 5   independent auditors Ernst & Young?

 6   A    Yes.

 7   Q    And if you could go to page 00659-00007; have you found

 8   that?

 9   A    Yes.

10   Q    And again, if we look at that section that says

11   "Financing Activities."

12   A    Yes.

13   Q    And 2005, was there a distribution to stockholders of

14   $151,796,000?

15   A    I don't know if it says million or -- or -- yes, it is.

16   When you look at the top, yes, it was.

17   Q    Does the top say "In Thousands"?

18   A    Yes.

19   Q    And of the $151,796,000, 81 percent went to you?

20   A    Yes.

21   Q    And if we look at 2006, you see it says, "Distributions

22   to stockholders, $143,023,000"; do you see that?

23   A    Yes.

24   Q    So basically, in 2003, 2004, 2005 and 2006, there were

25   over $400 million distributed to the stockholders of the
```

Case 2:04-cv-09049-DOC-RNB   Document 9871   Filed 02/14/11   Page 37 of 41   Page ID #:298486
CV 04-9049-DOC - 02/11/2011 - Day 17, Vol. 2 of 4

37

1    company?

2    A    Yes.

3    Q    81 percent of which went to you, correct?

4    A    Yes.

5    Q    So Mr. Larian, has there been distributions since then,

6    2006, any distribution to stockholders?

7    A    I don't think so.

8    Q    In addition to the distribution to stockholders, you

9    also received salaries and bonuses, correct?

10   A    Yes, salaries.  I don't think we get bonuses.

11   Q    Could you look at Exhibit 1362.

12   A    Yes.

13            MS. KELLER:  Is it just one page, Counsel?

14            MR. PRICE:  Yes, it would be 1362-00002.  And

15   maybe we can speed this along.

16   BY MR. PRICE:

17   Q    Mr. Larian, can you give me a ballpark number as to

18   what your wages were between '99 and 2006?

19   A    It varied, 2-, 300,000.

20   Q    Well, let me see if I can do this.

21            MR. PRICE:  Your Honor, I would offer into

22   evidence -- one second, your Honor.  I am going to talk to

23   counsel.

24            (Attorney discussion held off the record.)

25            MR. PRICE:  Your Honor, there is an agreement

1    that -- to take out the address and social security number,

2    and that's been redacted, and that's 1363-00003.

3              MS. KELLER:  1362 or 1363, Counsel?

4              MR. PRICE:  I'll get back to 1362.  I said 1363

5    first.

6              So 1363-00003, 1362-00002; 1361-00003, 1360-00002;

7    1359-00002, 1358-00002; 1357-00002, and 1356-00002.

8              THE COURT:  Is that stipulated to by MGA,

9    Ms. Keller?

10             MS. KELLER:  Yes, your Honor.  I'm just going to

11   have to go through and make sure they are all agreed to.

12             THE COURT:  Why don't we accept it subject to

13   further review this evening; would that be acceptable?

14             MS. KELLER:  Yes, it would.

15             THE COURT:  Acceptable, Mr. Price?

16             MR. PRICE:  Yes.

17             THE COURT:  All right.  Those will be received,

18   but if there's any disagreements, we can do that this

19   evening outside your presence, but they are received into

20   evidence at this time by stipulation.

21             *(Plaintiffs' Exhibit Nos. 1356 through 1363*

22        *are received in evidence.)*

23             MR. PRICE:  Your Honor, no further questions.

24             THE COURT:  All right.  Thank you.  Thank you,

25   Mr. Price.

Case 2:04-cv-09049-DOC-RNB   Document 9871   Filed 02/14/11   Page 39 of 41   Page ID #:298488
CV 04-9049-DOC - 02/11/2011 - Day 17, Vol. 2 of 4

39

1      Now, I promised counsel for both sides that they

2  could get rid of these binders on direct examination and get

3  cross-examination binders on, so we are going to take a

4  recess.  I apologize for all of the interruptions;

5  completely my responsibility.  So I'm going to give counsel

6  about 20 minutes, and we'll start with cross-examination.

7      You are admonished not to discuss this matter

8  amongst yourselves, nor form or express any opinion

9  concerning this case.  Have a nice recess.

10     *(The following proceedings is taken outside*

11     *the presence of the jury.)*

12     THE COURT:  The jury is no longer present.

13  Counsel are present.

14     I realized that you'll need time, so all the

15  associates, if you'd like to come up and start and give

16  counsel a hand, we'll move out these binders, if you need

17  the binders for cross-examination.

18     Also, Mr. Larian, I realized on the record,

19  looking back at the transcript, I do accept your apology.  I

20  want to make certain that that's clear, all right --

21     THE WITNESS:  Thank you very much.

22     THE COURT:  -- as long as you conduct yourself

23  appropriately, it's appreciated.

24     Thank you, sir.

25     All right, counsel.

CV 04-9049-DOC – 02/11/2011 – Day 17, Vol. 2 of 4

40

1          Step down, sir.

2          THE WITNESS:  Thank you.

3          *(Recess.)*

4                         -oOo-

1                           -oOo-

2                        **CERTIFICATE**

3

4          I hereby certify that pursuant to Section 753,

5    Title 28, United States Code, the foregoing is a true and

6    correct transcript of the stenographically reported

7    proceedings held in the above-entitled matter and that the

8    transcript page format is in conformance with the

9    regulations of the Judicial Conference of the United States.

10

11   Date:  February 12, 2011

12

13

14          _____

                 JANE C.S. RULE, U.S. COURT REPORTER
15               CSR NO. 9316

16

17

18

19

20

21

22

23

24

25