UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

HONORABLE DAVID O. CARTER, JUDGE PRESIDING

- - - - - - -

# CERTIFIED TRANSCRIPT

MATTEL, INC., et al.,            )
                                 )
                Plaintiffs,      )
                                 )
        vs.                      )
                                 )
MGA ENTERTAINMENT, INC., et al., )  No. CV 04-9049-DOC (RNBx)
                                 )     Day 17
                                 )     Volume 4 of 4
                Defendants.      )
_____)


REPORTER'S DAILY TRANSCRIPT OF PROCEEDINGS
JURY TRIAL
SANTA ANA, CALIFORNIA
FRIDAY, FEBRUARY 11, 2011


Denise Paddock, CSR 10199, CMRS, RMR, CRR
Federal Official Court Reporter
United States District Court
411 West 4th Street, Room 1-053
Santa Ana, California 92701
transcripts@ocrecord.com www.ocrecord.com
021111 DCCD CR 9D CARTER MATTEL CIVIL JURY TRIAL DAY 17 V4
02/11/2011

**APPEARANCES OF COUNSEL:**

FOR PLAINTIFF MATTEL, INC., ET AL.:

        QUINN EMANUEL URQUHART & SULLIVAN LLP
        BY: JOHN QUINN
            WILLIAM PRICE
            MICHAEL T ZELLER
            Attorneys at Law
        865 S Figueroa Street, 10th Floor
        Los Angeles, CA 90017-2543
        213-443-3000

FOR DEFENDANT MGA ENTERTAINMENT, INC., ET AL:

        ORRICK HERRINGTON & SUTCLIFFE LLP
        BY: THOMAS S McCONVILLE
            Attorney at Law
        4 Park Plaza, Suite 1600
        Irvine, CA 92614
        949-567-6700

        - AND -

        ORRICK HERRINGTON & SUTCLIFFE LLP
        BY: ANNETTE L HURST
            Attorney at Law
        405 Howard Street
        San Francisco, CA 94105
        415-773-5700

        KELLER RACKAUCKAS LLP
        BY:  JENNIFER L KELLER
             Attorney at Law
        18500 Von Karman Avenue, Suite 560
        Irvine, CA 92612
        949-476-8700

UNITED STATES DISTRICT COURT

1   **APPEARANCES OF COUNSEL (Continued):**

2

3

4    FOR CARLOS GUSTAVO MACHADO GOMEZ:

5            LAW OFFICES OF MARK E OVERLAND
             BY: Mark E Overland
6                Attorney at Law
             100 Wilshire Boulevard, Suite 950
7            Santa Monica, CA 90401
             310-459-2830
8
             -AND-
9
             SCHEPER KIM AND HARRIS LLP
10           BY: ALEXANDER H COTE
                 Attorney at Law
11           601 West Fifth Street, 12th Floor
             Los Angeles, CA 90071-2025
12           213-613-4655

13           ALSO PRESENT:

14           MGA ENTERTAINMENT, INC.
             BY: JEANINE PISONI
15               Attorney at Law
             16360 Roscoe Boulevard, Suite 105
16           Van Nuys, California 91406

17

18   ALSO PRESENT:

19           ROBERT ECKERT, Mattel CEO

20           ISAAC LARIAN, MGA CEO

21           KEN KOTARSKI, Mattel Technical Operator

22           MIKE STOVALL, MGA Technical Operator

23           KIERAN KIECKHEFER, Orrick, Herrington & Sutcliffe

24           BILL MOLINSKI, Orrick, Herrington & Sutcliffe

25

UNITED STATES DISTRICT COURT

## CHRONOLOGICAL INDEX

021111 DCCD CR 9D CARTER MATTEL CIVIL JURY TRIAL DAY 17 V4
CV 04-9049 DOC

**WITNESS:**                                                              **PAGE:**

**Isaac Larian**
CROSS-EXAMINATION RESUMED
BY MS. KELLER...........................................     5


**EXHIBIT(S) RECEIVED INTO EVIDENCE:**

5-102 through 5-107      .............................     16

301                      .............................     12

18458                    .............................      9

| | |
|---|---|
| 1 | SANTA ANA, CALIFORNIA; FRIDAY, FEBRUARY 11, 2011 |
| 2 | Day 17, Volume 4 of 4 |
| 3 | P.M. Isaac Larian |
| 4 | **Isaac Larian**, |
| 5 | witness, called by Plaintiff(s), previously sworn |
| 6 | **CROSS-EXAMINATION RESUMED** |
| 7 | BY MS. KELLER: |
| 8 | Q.   That was in 2001? |
| 9 | A.   That's correct. |
| 16:07 10 | Q.   October 2000?  Because you said October of 2000. |
| 11 | A.   I made a mistake. |
| 12 | Q.   So October 2001, how many -- how much of an order was |
| 13 | cancelled by Toys"R"Us? |
| 14 | A.   $6.3 million. |
| 16:07 15 | Q.   Was that a potential -- potentially disastrous |
| 16 | development for you? |
| 17 | A.    It was, because this is product that Toys"R"Us had |
| 18 | purchased -- in what I call "DI" -- "direct import" -- so all |
| 19 | this product was made with Toys"R"Us's logo and name on it, |
| 16:08 20 | and Wal-Mart doesn't want to buy a toy that -- with |
| 21 | Toys"R"Us's name on that, so it was a big, big dilemma for |
| 22 | us. |
| 23 | Q.   So what did you do about it? |
| 24 | A.    My wife is here -- but, anyways, I got a loan on the |
| 16:08 25 | house. |

CV 04-9049 DOC - 02/11/2011 Volume 4 of 4

```
 1    Q.    On your house?
 2    A.    Yes.  And she wasn't happy about it; but I put that
 3    money, increased the TV advertisement, together with the
 4    bump.
16:08 5    Q.    And did it work?
 6    A.    Yes, it did.
 7    Q.    Now, some of the other -- some of the toys that you had
 8    that were not so successful, was there a toy developed by
 9    Carter Bryant and Victoria Marlow that flopped?
16:08 10   A.    Victoria Marlow -- Veronica Marlow.
 11   Q.    I'm sorry.  Veronica Marlow?
 12   A.    Veronica Marlow and Carter Bryant never developed the
 13   toy.  They came to us in 2001 with a brand new toy concept
 14   called Sugar Planet, which we finally licensed from them.
16:09 15   Q.    And what was Sugar Planet?  What was the theme of it?
 16   A.    These are -- these are small dolls with play sets and we
 17   invested a lot of money in development, tooling, TV
 18   advertising for that product line, and it flopped.
 19   Q.    And what -- what did you have to do with the excess
16:09 20   product that you had?
 21   A.    Close them out below cost, give retailers marked-down
 22   money.
 23   Q.    And this is -- I take it that this process of having
 24   some toys that are big hits and other toys that are flops,
16:09 25   it's not unique to MGA?
```

1    A.   No.   Everybody -- every toy company has that.

2    Q.   Now, what effect -- what -- what -- if you could explain

3    to us what effect the existing sales channels that you had in

4    the year 2000 and 2001 had on the success of Bratz.

16:10  5          And first of all, tell us what is a "sales

6    channel"?

7    A.   Sales channel is different retailers that you sell to.

8    Wal-Mart is a sales channel, Toys"R"Us is a sales channel,

9    drug stores such as Rite Aid, CVS, Walgreen is another sales

16:10 10  channel, RadioShack is a sales channel, on Navy and Army

11   bases is another sales channel.

12          Mail order company, JCPenney.

13   Q.   So having those sales channels in place was important?

14   A.   Yes, of course.

16:10 15  Q.   And what about sales distribution and marketing, having

16   that in place?  Can you tell us about that?

17   A.   What do you mean by "sales distribution"?

18   Q.   Yes.

19   A.   Yes, we had the warehouse, shipping --

16:11 20  Q.   So you didn't have to run out in the year 2000 and buy a

21   warehouse?  You actually had warehouses?

22   A.   We did.

23   Q.   And what -- what -- what does it take to develop

24   relationships with retailers?  I mean.  You hear "Wal-Mart,"

16:11 25  but you obviously can't go up to the store that says

CV 04-9049 DOC - 02/11/2011   Volume 4 of 4

8

```
 1    "Wal-Mart" and develop a relationship with the building;
 2    right?
 3    A.    No.  It takes a long, long, long time.  And I was
 4    fortunate that I met, personally, with Sam Walton, before he
16:11  5    died, who was chairman of the board with Wal-Mart and,
 6    frankly, one of my mentors.
 7    Q.    So back in the year 2000, then, you already had existing
 8    relationships with the Wal-Mart sales channel, the other
 9    sales channels that you talked about?
16:11 10    A.    Yes, I did.
11    Q.    You didn't have to build those from scratch in the year
12    2000?
13    A.    No.
14    Q.    Now, tell us about the fashion doll market a little bit.
16:12 15          What, ultimately, did cause you to decide that you
16    would like to get into the fashion doll, market?
17    A.    I was the salesman for the company for these -- for the
18    major retailers at the time -- we're talking about the year
19    1999, 2000, 2001 time period -- and I had these two black
16:12 20    sample cases that I would put product on, go from one
21    retailer to another retailer.
22          And there was this gentleman at Wal-Mart, his name
23    was Ron Stover.  He was a buyer for dolls.  Every time, it
24    was very hard, very hard to get to.  Arkansas.  You've got to
16:12 25    travel from Dallas; Dallas, take a propeller plane to
```

UNITED STATES DISTRICT COURT

 1    northwest Arkansas, and then drive to Wal-Mart.  So it was a

 2    whole day just to get there.

 3          And I would get there, get in front of him and

 4    pitch my product line; and he rarely bought anything from me.

16:13 5          As a matter of fact, the first doll he bought from

 6    me was Singing Bouncy Baby, and that's how I changed the

 7    company name from Microgames to MGA Entertainment.

 8          But subsequent to that, every time I went to him,

 9    he would really not buy anything.  And I said, Ron, come on,

16:13 10   I've traveled all the way down here; throw me a bone.  And in

 11   one of those trips he says, bring me something in the fashion

 12   doll business that competes with Barbie, and then I'll buy it

 13   from you.

 14   Q.   Now --

16:13 15   A.   1998 time period.

 16   Q.   -- let's look at Exhibit 18458.

 17         Do you recognize this as an e-mail from you to

 18   Ron Stover of Wal-Mart dated August 21st, 2001?

 19   A.   Yes.

16:14 20        MS. KELLER:  I move that that be introduced,

 21   Your Honor.

 22         THE COURT:  Received.

 23         (Pause in the proceedings.)

 24         (Exhibit(s) 18458, received.)

16:15 25   Q.   BY MS. KELLER:  Now, this is an e-mail from

1    you to Mr. Stover.

2             And what's the subject of the e-mail?

3    A.   This is the toy guy.

4    Q.   And who is the "toy guy"?

16:15  5    A.   A gentleman by the name of Chris Byrne.  He's been

6    around for many, many years, and he reviews toys, and he

7    calls himself the "toy guy."

8    Q.   Now let's go to the very last paragraph of this, where

9    it says, "I don't know if you remember."

16:15  10    A.   I'm sorry.  I don't know where you're at.

11    Q.   The very last paragraph after "Hi, Ron" at the top time.

12    A.   Yes.

13    Q.   Look right above "Take care, Isaac."

14    A.   Yes.

16:15  15    Q.   And it says, "I don't know if you remember, but

16    three years ago, you told me, Isaac, come up with an

17    innovative girl's product that will replace the Barbie

18    business.  Well, Ron, Bratz is for you!"

19             Is that the conversation you were just talking

16:16  20    about?

21    A.   Yes, it is.

22    Q.   And what steps did you take to enter the fashion doll

23    market before Bratz?

24    A.   A few things.

16:16  25             We asked inventors, we asked the people at MGA to

```
 1    come up with something which was different that didn't look

 2    like Barbie.

 3          I remember that, a company called San Pan.

 4    Maureen Panzera is her name.

 5    Q.   Is that S-a-n P-a-n, San Pan?

 6    A.   Yes.

 7    Q.   Okay.

 8    A.   And her name is Maureen Panzera?

 9    Q.   P-a-n-z-e-r-a?

10    A.   Yes; and her husband's name is Rip, R-i-p.

11          They showed me a concept in 1998 called "Gearhead"

12    dolls, and then in 2000 they showed me another concept called

13    "PC Girls," and --

14    Q.   And those were fashion doll concepts?

15    A.   Yes, they were.

16    Q.   So you were actively looking for a fashion doll?

17    A.   Yes, I was.

18    Q.   And you hired Paula Garcia in 2000; right?

19    A.   Yes, April 2000.

20    Q.   Did she have any -- any thoughts on whether you should

21    get into the fashion doll business?

22    A.   Yes.  She was --

23          MR. PRICE:  Objection; that's ambiguous as to time.

24          THE WITNESS:  Just in early 2000.

25          THE COURT:  Overruled.
```

UNITED STATES DISTRICT COURT

```
 1              THE WITNESS:  Yes.
 2     Q.   BY MS. KELLER:  And what were her thoughts on whether
 3     you should get into the fashion doll business?
 4     A.   She thought that the market is ripe for a new different
 5     fashion doll to get into.
 6     Q.   And why was it that she thought that?
 7     A.   Because that's -- everybody in the industry saw that
 8     there was a void.  Barbie sales were going down.
 9              There was no innovation coming.
10     Q.   So Barbie wasn't seen as trendy anymore?
11     A.   That's correct.
12     Q.   Now let's talk a little bit about your meeting with
13     Carter Bryant on September 1st, 2000.
14     A.   Yes.
15     Q.   Could we have Exhibit 301, please.
16              I believe that's already in evidence, Your Honor.
17              THE COURT:  If not, it is received.
18              It's in, Counsel.
19              (Exhibit(s) 301, received.)
20     Q.   BY MS. KELLER:  You see this meeting notice for a
21     meeting with "Carter Bryant - Doll designer
22     w/ Victoria & Paula" "Isaac's office."
23              "Required attendees:  Paula Treantafelles and
24     Victoria O'Connor."
25              Do you see that?
```

```
 1    A.    Yes.

 2    Q.    And we've heard both those people testify in this trial;

 3    right?

 4    A.    Yes.

16:18 5    Q.    As well as Carter Bryant?

 6    A.    Yes.

 7    Q.    Now, when was the first time that you ever had heard the

 8    name, Carter Bryant?

 9    A.    September -- September 1, 2000.

16:18 10    Q.    Had Paula mentioned you to him at all?

 11    A.    No.

 12    Q.    When the meeting was set up, did anybody mention him to

 13    you?

 14          THE COURT:    What do you mean, "when the meeting was

16:19 15    set up"?

 16    BY MS. KELLER:

 17    Q.    Well, when you got the meeting notice, what did you

 18    think the meeting was about?

 19    A.    My secretary had set this -- this meeting.  Her name was

16:19 20    Dee Dee Brown.  I asked her, what is this about?  And she

 21    says, it's a fashion designer that they want you to meet.

 22    Q.    So you thought he was just a fashion designer?

 23    A.    Yes.  I thought, he's coming for an interview.

 24    Q.    Maybe to show you some doll clothing or something?

16:19 25    A.    For interview as a fashion designer.
```

1  Q.   Okay.  When you talk about -- when you see him referred

2  to here as a doll designer, or when you sometimes do, what is

3  it that you mean by that?

4  A.   I didn't put "doll designer" here.  My secretary put

16:19  5  that -- put that in here.

6  Q.   Okay.  But if you hear the term, what do you generally

7  think of?

8  A.   Doll designer, in the industry, is somebody that takes a

9  drawing and literally makes the doll, comes up with the

16:20 10  mockups, directs people to come up with the mockup, with

11  hair, with face paint, with fashions, with package,

12  mechanical movement, engineering.

13  Q.   And did -- how did Mr. Bryant introduce himself with you

14  at the meeting?

16:20 15  A.   He told me he works at Mattel, and he's a fashion

16  designer in the Barbie Collectibles.

17  Q.   Now, how is it that you happen to remember that your

18  daughter Jasmine was there?

19  A.   Because I take -- when my kids were younger I always

16:20 20  took them to work when it was summertime, et cetera.  And she

21  was there, and we had lunch together, and she happened to be

22  there.

23  Q.   She made a little bit of a mess with the rice on the

24  table?

16:20 25  A.   She did.

1    Q.   Now, when Mr. Bryant came in, Paul or Victoria said he

2    had a concept to show you?

3    A.   Yes.

4    Q.   Now, the concept --

16:21 5          If we could have Exhibit 5-102 through 5-107.

6          I think we've got some of the -- some of the

7    original drawings.

8    A.   I have Exhibit 302; or, no, the original.

9    Q.   5-102 through 5-107, the original portfolio?

16:21 10   A.   I don't have that in here.

11         THE COURT:  Does that also have an alternative

12   number?

13         MS. KELLER:  Your Honor, Exhibit 1 has the complete

14   collection of what was seen, but -- but not -- but -- but it

16:22 15   didn't have the Bratz logo and copyright notice on it, so --

16   so they're different sizes as well, Your Honor.

17   Q.   Is that the original portfolio that you saw, Mr. Larian?

18   A.   One second.

19         (Pause in the proceedings.)

16:22 20   MR. PRICE:  Your Honor, I'm just going to object,

21   it's vague, because I thought counsel said it might be

22   incomplete.

23         MS. KELLER:  Well, I think we have an incomplete

24   set of the original portfolio drawings.  I should have

16:22 25   articulated a little bit better, but these, I think, are the

UNITED STATES DISTRICT COURT

1   original portfolio.

2           THE COURT:  Why don't you just come up, Mr. Price.

3   See if there's any concern.

4           If there is, I'm going to let Ms. Keller sort that

16:23 5   out, so we can continue.

6           (Pause in the proceedings.)

7           THE COURT:  And Mr. Quinn or Mr. McConville, if

8   you'd like to join them, if you have any concerns.

9           MS. KELLER:  The ceremonial viewing.

16:23 10          MR. PRICE:  Your Honor, we have no objection.  This

11  is among the things that --

12          THE COURT:  Among.

13          MS. KELLER:  We'll use that word.  We'll say the

14  drawings that you're looking at, 5-102 through 5-107, those

16:23 15  are among the drawings from the original portfolio.

16  Q.   Is that right, Mr. Larian?

17  A.   Yes.

18          MS. KELLER:  And, Your Honor, may we move those

19  into evidence?

16:24 20          THE COURT:  Proceed.

21          (Exhibit(s) 5-102 through 5-107, received.)

22  Q.   BY MS. KELLER:  Now, those drawings that you see, do

23  those have a Bratz logo on them?

24  A.   No, they don't.

16:24 25  Q.   Do those drawings have some little copyright notice

Case 2:04-cv-09049-DOC-RNB   Document 9873   Filed 02/14/11   Page 17 of 59   Page ID #:298575
CV 04-9049 DOC - 02/11/2011   Volume 4 of 4

17

1        written down at the bottom?

2        A.    What do you mean?

3        Q.    A little C with a circle around it.

4              Is that on there anymore?

16:24 5  A.    No.

6        Q.    You just hold that up as a sample, for the jurors to see

7        the size.

8              Thank you.

9              Now, when you saw these -- these drawings, what was

16:24 10 your reaction?

11       A.    I thought they looked weird.

12       Q.    And when you say that you thought they looked "weird,"

13       in what way?

14       A.    I thought they looked weird.

16:25 15 Q.    And the -- do you remember what you told Mr. Bryant when

16       you saw them?

17       A.    They looked like aliens to me.  To me, at that time,

18       they looked like aliens.

19       Q.    They looked like aliens?

16:25 20 A.    Yes.

21       Q.    And not in a good way?  Not friendly aliens?

22       A.    That's my own reaction.

23       Q.    Well, what did you tell Mr. Bryant after you looked at

24       those and thought that they looked weird?

16:25 25 A.    I said, is this what you have done for

Case 2:04-cv-09049-DOC-RNB   Document 9873   Filed 02/14/11   Page 18 of 59   Page ID #:298576
CV 04-9049 DOC - 02/11/2011   Volume 4 of 4

18

1    Mattel, at Mattel?

2    Q.    I'm sorry.  What did you say?

3    A.    I said, is this what you have done as part of your work

4    at Mattel, for Mattel?

16:25  5    Q.    And what did he say?

6    A.    No.

7    Q.    What did he tell you?

8    A.    He says he has done these in 1998 in Missouri, when he

9    wasn't working for Mattel.

16:25 10    Q.    Now, at the time that he showed you these drawings, did

11    he have a little prototype of the doll to show you?

12    A.    Yeah.  He had something like this.  It wasn't a

13    prototype.  It looks like a -- it looked like a big alien.

14    Q.    A big alien?  So this -- this was the dummy doll that we

16:26 15    heard talked about earlier?

16    A.    Right.

17    Q.    And was this anything that you thought you could use in

18    any way if you were going to manufacture the doll?

19    A.    Absolutely not.  And I -- I asked him, what is this

16:26 20    about?  Do you think that this doll's going to look like

21    this?  And his answer was, no, just to show you how -- the

22    proportions.

23    Q.    Okay.  And when you say, just to show you the

24    proportions --

16:26 25    A.    Big heads.

Case 2:04-cv-09049-DOC-RNB  Document 9873  Filed 02/14/11  Page 19 of 59  Page ID #:298577
CV 04-9049 DOC - 02/11/2011 - Volume 4 of 4

19

```
 1    Q.    -- in what respect?

 2    A.    Like big heads, small body and -- and basically the

 3    proportions of the head and the torso and the legs.

 4    Q.    Now, we've seen that you sometimes have referred to

16:26 5   Mr. Bryant as the inventor.

 6    A.    Yes.

 7    Q.    And sometimes as the fashion designer.

 8    A.    Yes.

 9    Q.    And sometimes as a doll designer.

16:26 10  A.    Yes.

 11   Q.    When you've referred to him as an inventor, what --

 12   what, in your mind, did that mean?

 13   A.    He is the inventor of these drawings.

 14          And in the toy industry, when somebody comes to

16:27 15  show you a concept, basically, he's referred to as an

 16   "inventor."

 17   Q.    And the fact that he didn't bring a prototype with him,

 18   a real prototype of the doll he actually intended to see

 19   made --

16:27 20  A.    Uh-huh.

 21   Q.    -- how did that factor into whether you usually called

 22   him an "inventor" versus a "designer"?

 23          Are you with me?  Do you know what I mean?

 24   A.    No.

16:27 25  Q.    Have you called him -- have you historically intended to
```

UNITED STATES DISTRICT COURT

```
 1    call him a designer rather than an inventor, because he

 2    didn't come do you initially with an actual doll?

 3                MR. PRICE:  Objection; leading.

 4                THE COURT:  Sustained.

16:27 5    Q.   BY MS. KELLER:  Did you understand my question a minute

 6    ago?

 7    A.   Yes.

 8    Q.   Okay.  Why was it that you didn't refer to him,

 9    historically, always as an inventor?

16:27 10    A.   Because the true inventors that I have seen in the toy

11    business -- and I can name them -- they come to you, not with

12    just a drawing like this (indicating), they come to you with

13    an actual working, what we call works like, looks like --

14    this is the term used in the industry --

16:28 15    Q.   Works like, looks like?

16    A.   -- yes, sample of what they think the doll is going to

17    look like, or the toy is going to look like.

18                MS. KELLER:  Thank you.

19                Your Honor, would this be a good time for the

16:28 20    break?

21                THE COURT:  This would be a good time.

22                Right at 4:30.

23                Now, Ladies and Gentlemen, let me just talk to you

24    for just a moment.

16:28 25                You're admonished not to discuss this matter with
```

```
 1      anyone, nor form or express any opinion concerning the case.

 2             Now we'll go off the record for a moment and wish

 3      the jury good night.

 4             Hold on.

 5             This is a chart over here.  And over here, it's got

 6      about 49 hours and about 26 hours, and we've gone about

 7      through another five.  We're well over a third done.  Well

 8      over a third done.

 9             Okay?  So I want you to get some sleep.

10             I want you to get rested.

11             But the case is going by, maybe from your

12      perspective, fast, maybe slow; but trust me, it's going by.

13             Now there's something else that's happening -- and

14      we ought to thank all counsel -- Mr. Zeller --

15             Put this on the record.

16             -- Mr. Zeller and Mr. Quinn, Mr. Price, Ms. Keller,

17      Mr. McConville and Ms. Hurst and Mr. Overland and Mr. Cote.

18             A lot of times, in a court, what happens in a

19      complex trial is, you see the court sitting there for

20      five minutes, looking at documents, and all that time is

21      running off the clock.  That's what they're doing.

22             And sometimes you see us have to slow down, because

23      we're grabbing binders and different items.

24             But this trial has not only 120 minutes per side --

25      or hours.  It's probably the equivalent of having about 200
```

1    hours per side, because we're not -- we're not wasting any

2    time.

3              That's why they're putting in an awful lot of time;

4    okay?  They really are, and they deserve all our compliments

16:30 5    to get this to us.

6              If any of us talk about this case, or form or

7    express an opinion -- you know, if we're not just sitting

8    there listening, absolutely neutral along the way, it's

9    really an injustice; and I say that in a very polite way.

16:30 10             We have a long ways to go, we have a little ways to

11   go.

12             There are a lot of other people coming in.  That

13   will be Mr. Eckert from Mattel, who is the president, and an

14   awful lot of people coming up in a very short period of time.

16:30 15             The case is getting, and has gotten, a certain

16   amount of notoriety, and it will continue to get notoriety.

17   So I want to take that head on and tell you about that.

18             We see it on a daily basis, quite frankly, and

19   we're hoping you don't see it on a daily basis.  So if you

16:30 20   recognize it on the Times or the Register or TV, please turn

21   it off.  Please trust your ethics.  And I don't know how else

22   to take that on, except to say that to you.

23             Now, finally, if we can average six hours a day,

24   we're doing extraordinarily well.  We're not.

16:31 25             There have been too many interruptions; and those

1    are my responsibility, and don't bear on counsel.

2            Totally my responsibility for being unprepared.

3    And so if I knew these 40,000 exhibits by heart, we wouldn't

4    have a couple of the recesses we had today, and I apologize

16:31 5    to you for that.

6            The last thing is, you've got to stay alert.

7            In other words, it's not that we go into a slump

8    part way through, and then we kind of arouse ourselves with

9    interest.  In other words, we've got to listen to all the

16:31 10    evidence, all the way through.

11            And at the end of the case, as complicated or

12    uncomplicated as it is, it's counsels' argument and their

13    duty to explain this case to you in their final argument.

14            So a lot of the exhibits are for record-keeping

16:31 15    purposes.  So sometimes you'll hear, when 2843 is referred

16    to, you'll see counsel scrambling in the courtroom, looking,

17    because they can't match up the numbers quite fast enough.

18            And during the closing argument, all of that is an

19    argument.  They're duty-bound to try to discover and explain

16:32 20    that to you, some of these exhibits that you're seeing.

21            Some of these are becoming redundant.

22            And finally, I'm the first to tell you, I've

23    allowed certain portions of testimony more than once, certain

24    exhibits are coming in more than once.  But I believe some

16:32 25    amount of redundancy gets you familiar with the issues.

1    So, therefore, if you think one witness has gone

2 too long, or another too short, I'm trying to give counsel on

3 both sides a little bit of a leash in terms of getting this

4 evidence to you.  And I don't believe that we all absorb

16:32 5 things the first time.

6    Did you know that the rate is supposed to be about

7 11 percent, if we hear -- if we hear it and see it, it goes

8 up to 30 or 40 percent?

9    If we hear it and see it a couple times, it goes up

16:33 10 even higher.  And the difference is, since I used to teach

11 fact-finding and decision-making to judges for years, that

12 the reason we have a jury is because all eight of you --

13 maybe more -- will -- will absorb information in a way that

14 no one of us can fully absorb.

16:33 15    That's why we have those deliberations.  And

16 nothing takes the place of not only your ability to hear and

17 absorb, but your wisdom, your life experiences, your common

18 sense, the law that we give to you.

19    And, finally, at the end of the day, of course, all

16:33 20 the evidence.  And remember this evidence comes from the

21 witness stand.

22    Now, finally, I want to humbly apologize to you.

23    I've made a couple of calls that I, upon further

24 reflection, considered to be incorrect.  I'm working just as

16:33 25 hard to try to make certain I try to get it right.  And if

Case 2:04-cv-09049-DOC-RNB   Document 9873   Filed 02/14/11   Page 25 of 59   Page ID #:298583
CV 04-9049 DOC - 02/11/2011 - Volume 4 of 4

25

 1   I've made a mistake, I'm going to come back to you and tell

 2   you what that mistake was.

 3        For example, there were two mistakes concerning two

 4   items of hearsay that were properly objected to.  Two other

16:34 5   items that were objected to were properly received, and you

 6   heard those read into evidence; okay?

 7        Now, you go home and get some sleep.

 8        We're going to go to work.  And you have a nice

 9   weekend.  We'll see you at 8:30 on Tuesday.

16:34 10       But could you remain for just a moment?

 11       You wrote us a note, didn't you?

 12       JUROR NO. 2:  Yes.

 13       THE COURT:  Please remain for a moment.  I want to

 14   talk to the others.  Please go on about your business, and

16:34 15   let me talk to you about your schedule for just a moment.

 16       (Discussion held off the record.)

 17       (Pause in the proceedings.)

 18       (Open court - jury present.)

 19       THE COURT:  We just want to know, help us, how

16:35 20   that's going to work.

 21       You've got class on Wednesday, February 23rd?

 22       JUROR NO. 2:  Uh-huh.

 23       THE COURT:  Wednesday, March 2nd; Wednesday,

 24   March 9th, and Wednesday, March 16th?

16:35 25       JUROR NO. 2:  Yes.

```
 1              THE COURT:  So it's one class a week?

 2              JUROR NO. 2:  Yes.

 3              No, it's just this one.  I also have it on Monday,

 4    but we don't have court Monday.

16:36 5         THE COURT:  We don't have court Monday.  As long as

 6    I keep you out of court on Monday, we're okay?

 7              JUROR NO. 2:  Yes.

 8              THE COURT:  Explain, because I didn't understand,

 9    8:30 until 10:00?  Is this your class?

16:36 10        JUROR NO. 2:  No, no, no.  This is the schedule, if

11    we could do on these Wednesdays in here.

12              THE COURT:  Okay.  In other words, have you talked

13    to the jurors about this?

14              JUROR NO. 2:  Yes, because remember last Tuesday,

16:36 15   when we had his -- I kind of just mentioned it all at the

16    same time.  I said, can we do two 15-minute breaks and a

17    40-minute lunch?

18              THE COURT:  Are they generally in agreement?

19              JUROR NO. 2:  Yes.

16:36 20        THE COURT:  Can you get to class and back, driving

21    the legal speed limit?

22              JUROR NO. 2:  I think with parking and stuff, I

23    would be about ten minutes late, but I was going to talk to

24    the teacher.

16:36 25        THE COURT:  So let me go over this.  If we went
```

1    from 8:30 to 10:00 in the morning, if we took a morning break

2    of 15 minutes until 10 to 10:15, instead of half an hour,

3    30 minutes?

4              JUROR NO. 2:  Yes.

16:36 5          THE COURT:  If we went from 10:15 until 12:00, but

6    then if we took a lunch break of 40 minutes, from 12:00 noon

7    to 12:40, and we went from 12:40 until 2:00, the afternoon

8    break would be 15 minutes from 2:40 to 2:15, and we go from

9    2:15 to 3:45 on Wednesday.

16:37 10         And if we left at 3:45, could you make your class?

11             JUROR NO. 2:  Yes.

12             THE COURT:  Do most -- do the jury agree to it?

13             JUROR NO. 2:  That I'll make my class?

14             (Laughter)

16:37 15         THE COURT:  That they'll keep the schedule?

16             JUROR NO. 2:  Yeah.

17             THE COURT:  On Wednesday?

18             JUROR NO. 2:  Yeah.

19             THE COURT:  Let me discuss that.  We'll be

16:37 20   absolutely reasonable.  That's all we're asking is six hours

21    per day.  I didn't understand what it was, so I wanted to

22    talk to counsel in your presence, and make sure that this

23    would work.

24             So why don't we send you on your way, and we'll see

16:37 25   you next Tuesday.

 1          JUROR NO. 2:  Thanks.  'Bye.

 2          THE COURT:  Off the record.

 3          (Discussion held off the record.)

 4          (Open court - jury not present.)

16:39 5          THE COURT:  We're back on the record.

 6          All counsel are present.

 7          Let me just talk to you about, once again, how much

 8     each of you really want to attempt to open up this case.

 9          I had always believed that a lot of this was

16:40 10     collateral, unduly consumptive of time.  But by the same

 11     token, I don't want a narrow lawsuit artificially where

 12     either one of you feels so deprived that you don't believe

 13     you've had a fair hearing.

 14          And I've limited this, initially, Ms. Keller, to

16:40 15     about 2001, thinking that the ingenuity either displayed or

 16     not displayed was critical up to about, at least the launch

 17     of Bratz.  But by the same token, I know that Mattel's wanted

 18     to get into a whole series of copying issues over the years,

 19     each copy, you know, what each company's copying.

16:40 20          It's a road that if each of you choose to go down,

 21     and you both stipulate to it, I don't know that I'm going to

 22     stand in your way.

 23          The other thing is, Mr. Quinn made an opening

 24     statement, basically, about the noncreativity of MGA.  But,

16:41 25     you know, equitably, that was balanced a little bit with

Case 2:04-cv-09049-DOC-RNB  Document 9873  Filed 02/14/11  Page 29 of 59  Page ID #:298587
CV 04-9049 DOC - 02/11/2011 - Volume 4 of 4

29

1    Moxie, and that's the end of it.

2         In other words, that's all that was needed to kind

3    of rectify the idea that there was no ability.  But by the

4    same token, I don't believe that testimony beyond that is

16:41 5  called for, and the Toy of the Year, et cetera, may be fine

6    up to 2001.  It's a time period showing at least its

7    creativity in the place.  And I've allowed copying now,

8    because Mattel's narrowed that to the year 2001, and the

9    launch.

16:41 10      So I just -- before you blurt out what you'd like

11   to do, or Mattel wants to do, I'd just like to take a moment

12   off the bench and let you decide.

13        Because if everybody wants to open it up, here's

14   where we go.

16:41 15      We go into copying back and forth between the two

16   companies, we go into trapezoidal packaging, we go into

17   Mattel employees having pictures taken of each other with

18   trapezoidal packaging, on the one hand.  We go into a whole

19   set of copying issues that go far beyond the tags and the

16:42 20 mechanical shoulder.  And I thought that that was absolutely

21   where this court didn't want to go, and that was subject to a

22   series of motions in limine.

23        Now, I don't know that you've opened up the door

24   with a brief discussion that seems to be limited to

16:42 25 Rescue Pets, Robotic Doll, Spiderman and Shrek license, which

Case 2:04-cv-09049-DOC-RNB Document 9873 Filed 02/14/11 Page 30 of 59 Page ID #:298588
CV 04-9049 DOC - 02/11/2011 Volume 4 of 4

30

1    are -- many of them were electronic toys from the time

2    period, apparently, of 2006.  At least that was the time

3    period referred to.

4            But, by the same token, if you both come to an

16:43 5   agreement, if you think the limine motions come to an

6    agreement, without the bickering back and forth, I'm happy to

7    open this up.

8            Finally --

9            MS. KELLER:  Your Honor, I have a question before

16:43 10  you move on, if you're going to another topic.

11           THE COURT:  Sure; go.

12           MS. KELLER:  I'm assuming that -- and maybe I'm

13   wrong on this -- but I'm assuming that we have to be able to

14   talk about building the brand over those years.  And

16:43 15  Mr. Larian winning awards as Entrepreneur of the Year and

16   Toy of the Year, and all that, it's all part of building the

17   Bratz brand.  And Mattel is claiming, as I understand it,

18   that they're entitled to all the profits from all the Bratz

19   brand, all of it.

16:43 20          And so it seems to me that what we did in all those

21   years that they're claiming the right to profits, and all

22   that we did to build the brand, to market, to sell --

23           THE COURT:  The sweat equity that the Circuit talks

24   about.

16:43 25          MS. KELLER:  -- the sweat equity that the Circuit

 1    talks about, as well as the recognition that the company was

 2    getting for its efforts in the -- in the industry, which of

 3    course, that was part of building the brand, too.

 4          You know, when Wal-Mart names you their -- their

16:44  5    manufacturer of the year, whatever it was that they named

 6    him, or MGA, that's pretty important, because that's part of

 7    building your brand with all the other retailers.

 8          THE COURT:  How do you account for that?

 9          I understand what the Circuit said.  How do I

16:44 10    account for that in damages?  Let me take you to an example,

11    before I go with the Circuit's opinion.

12          Let's take the year 2006 -- or 2005, and assume

13    that Bratz made 450 -- strike that -- 5 hundred million in

14    sales -- and I'm just picking that number -- I've got all the

16:44 15    documents in the back -- but their costs, let's say, in the

16    USA -- forget Hong Kong for a moment -- were $250 million.

17          Traditionally, we might have a profit -- you know,

18    let's get rid of Little Tykes and some of the rest of the

19    notations -- but let's just say we had oh, 2 hundred million

16:45 20    in profit for those years, historically, and traditionally

21    you'd look down the list and say that MGA, or whatever the

22    distribution was, would be an X million of dollars.

23          Now we have, of course, the concept of sweat

24    equity.  How is that measured?  In other words, how does the

16:45 25    jury say, well, here's a balance sheet and, by the way,

1    there's something called "sweat equity."  We don't see it

2    here -- in other words, I asked Mr. Quinn formally the other

3    day -- and I'll put it on the record -- if the court is

4    expansive in its outlook on trade secret misappropriation --

16:45  5            And by the way, every time I've said "trademark," I

6    apologize.  I of course meant, "trade secret

7    misappropriation."

8            -- how do I segment that out in boxes, so that if

9    I'm wrong, the Circuit can literally go down and take away or

16:46 10   rule against me without a holistic approach in terms of

11   damages; where if the damages award came in, you know, so

12   large that the Circuit's initial reaction was, this is so

13   large that, you know, the fundamental part of this case is

14   suspect also -- and now I always assumed that your client

16:46 15   didn't really want to go through another trial, but I think

16   motions for mistrial will fly back and forth, because I'm the

17   first to admit, this is one of the more difficult trials I've

18   been involved in -- and I think Mr. Quinn, this weekend, is

19   going to give me that answer, if you want to, or just take

16:46 20   the position, Judge, it's everything -- what do I do with

21   sweat equity, in terms of damages?

22            MS. KELLER:  Well, I think one way to approach

23   it -- and I'm not remotely as knowledgeable as any of the

24   other counsel in this room --

16:46 25            THE COURT:  You will be, by the end

Case 2:04-cv-09049-DOC-RNB Document 9873 Filed 02/14/11 Page 33 of 59 Page ID #:298591
CV 04-9049 DOC - 02/11/2011 Volume 4 of 4

33

1    of this weekend.

2              MS. KELLER:  -- but one way that seems completely

3    logical to me to approach it is that if, in fact, we have

4    been found to have misappropriated the dolls, the original

16:47 5    designs, that damages would be capped at what the designer

6    himself was paid, what he himself was given, and it was

7    considered to be fair compensation for the drawings, which is

8    3 percent.

9              Now, that -- that, to me, seems to be very logical.

16:47 10   It was the amount that he -- if he looked at his -- his

11   inventions agreement with Mattel, he's assigning to Mattel

12   whatever he gets.

13             THE COURT:  Okay.  What about the argument that --

14   I call it the "but for," but it's not a "but for" argument --

16:47 15   the trade secret misappropriation in a sense, from Mattel's

16   perspective, or I expect that they will argue with me,

17   launches, if you will, this concept that MGA would not have

18   seized upon, and there isn't a limitation that because this

19   would have never occurred at MGA, that virtually everything,

16:48 20   even items that don't have copyright protection, would flow

21   in under the trade secret misappropriation damage analysis.

22             Now, I don't know if they're going to take that

23   position, but I think they have, in the jury instructions

24   submitted to me so far.

16:48 25             MS. KELLER:  It certainly seems odd, though, that

```
 1    the Ninth Circuit would reject such an analysis so grossly

 2    unfair in the copyright context, and not -- and yet allow it

 3    to come in through the back door of the trade secret concept,

 4    because the analysis is really very much the same.

16:48  5            The analysis is who -- who put the value in Bratz?

 6            Who -- who really -- not just sweat equity:  Real

 7    equity, lots of money, lots of labor, lots of advertising

 8    money.  I mean, it's not just sweat equity; it's actual

 9    dollars, too.

16:49 10            THE COURT:  Another question becomes, after

11    listening to the oral argument of the Circuit time and time

12    again, if the Circuit considered that, because Mr. Price and

13    Mr. Quinn's position will be that the Circuit didn't have

14    trade secret misappropriation before them, and didn't speak

16:49 15    to that issue.

16            Your position will be, yes, they did.

17            MS. KELLER:  I think it's illogical to say -- when

18    you look at the Ninth Circuit's analysis, so much of which --

19    so much of which involved around robust competition and

16:49 20    fostering robust competition, and not taking away the hard

21    won gains that somebody has earned -- that a company has

22    earned, because he had original drawings for four dolls, plus

23    two, might have been done while this person was still an

24    employee of another company, it just seems completely

16:50 25    illogical to me that the Circuit would say, okay, that
```

UNITED STATES DISTRICT COURT

Case 2:04-cv-09049-DOC-RNB  Document 9873  Filed 02/14/11  Page 35 of 59  Page ID #:298593
CV 04-9049 DOC - 02/11/2011  Volume 4 of 4

35

1    analysis applies in copyright and not in trade secret.

2            THE COURT:  Now, I misspoke, and I caused a huge

3    generation of material and I apologize to counsel for Mattel

4    for my misspeaking.

16:50  5            Obviously, copyright is lost profits.  And

6    obviously, we have trade secret misappropriation that is lost

7    profits.  Should the court also consider a running royalty?

8            Remember in Judge Trott's oral argument, he was

9    concerned, and wondered why -- why a reverse royalty wasn't

16:50 10   simply put into effect.

11           Now, I don't know if he was speaking about

12   settlement purposes, or if he was speaking about the law; but

13   my view is, he's got a pretty state of -- pretty strong

14   position.

16:50 15           Should the court be in a position where I take lost

16   profits on the first-generation dolls, the two dolls that

17   follow, potentially, the sculpts, and have running royalty on

18   the rest?

19           MS. KELLER:  May I have MGA's human compendium of

16:51 20   intellectual property law respond on that, Your Honor?

21           THE COURT:  Mr. McConville started for the

22   microphone and shrunk, in anticipation of Ms. Hurst.

23           MS. HURST:  Mr. McConville is the pretty one on the

24   team, Your Honor.

16:51 25           THE COURT:  Look at him.  He's aging

Case 2:04-cv-09049-DOC-RNB   Document 9873   Filed 02/14/11   Page 36 of 59   Page ID #:298594
CV 04-9049 DOC - 02/11/2011 Volume 4 of 4

36

 1   before my eyes.

 2              (Laughter.)

 3              MS. HURST:  Indeed.

 4              Your Honor, our view, first of all, is that a

16:51 5   Georgia Pacific style analysis -- as we said in a brief we

 6   filed last week --

 7              THE COURT:  Right.

 8              MS. HURST:  -- is not available under Section 504

 9   of the Copyright Act.

16:51 10             It may be available under the

 11   Uniform Trade Secret Act, but only after the remedies of

 12   damages and unjust enrichment have failed.  That's the

 13   language of the statute.

 14              So we don't get to a running royalty, unless the

16:51 15   two experts say for some reason that becomes legally relevant

 16   under this sweat equity analysis, like Carter Bryant's

 17   royalty, we have something specific we can peg it to.

 18              But our view was, there is no hypothetical

 19   negotiation that should be coming in here as a matter of

16:52 20   estimating damages.

 21              THE COURT:  What was Judge Trott speaking to then?

 22              MS. HURST:  Your Honor, that was the eBay analysis.

 23              Recall that when the Supreme Court decided eBay,

 24   the Court said, look, we have been operating under some crazy

16:52 25   like presumption that a permanent injunction is always going

1    to be issued.  That's not right.  We have gotten too far away

2    from our traditional four-factor equitable analysis in

3    granting injunctions -- and that was patent case, of course,

4    but every court's applied it in every context in some sense,

16:52 5    except for trademark, in some exceptions -- so the discussion

6    there was, should the royalty have been considered on a

7    going-forward basis, only as an alternative to permanent

8    injunctive relief.

9           THE COURT:  Uh-huh.

16:52 10           MS. HURST:  That was not a discussion of damages.

11           That was the eBay alternative to permanent

12    injunctive relief.

13           Now, our view here -- and our expert will

14    testify -- is that the concept of what we're talking about

16:53 15    here is the concept -- as defined in their chart -- that that

16    concept was fully disclosed in the marketplace no later than

17    the introduction of Diva Starz.

18           It was a fashion doll.  It had big heads, big feet,

19    big eyes.  It was multi-ethnic, it was kind of bratty, it was

16:53 20    hip, trendy, and not only that the name "Bratz" had

21    previously been disclosed, as sent out in our request for

22    judicial notice, in numerous other ways.

23           So our expert will say, the most they can get under

24    that scenario under the trade secret analysis would be a lead

16:53 25    time, a very short lead-time analysis.

 1             And, Your Honor, when we're talking about this "but

 2      for" analysis that they're putting forth, what they're really

 3      talking about is the specific expression in Carter Bryant's

 4      drawings.  That's not about the concept of a fashion doll.  I

16:54 5      mean, give me a break.  You read that 'Meet the Bratz' page,

 6      they swap outfits and they swap hairstyles.

 7             That's not a trade secret.  That's a basic fashion

 8      doll description.

 9             So really, when they say "but for" Carter Bryant's

16:54 10     drawings, what they're talking about is the specific

 11     expression, and that is a copyright claim.  That is not a

 12     trade secret claim.

 13            THE COURT:  Now let me talk to Mattel for a moment.

 14            I had -- we've had a lot of informal weekends, but

16:54 15     I'd ask Mr. Quinn, frankly, how that might look.

 16            In other words, if the court took an expansive

 17     view, I expressed to you, and I'll put it on the writing --

 18     on the record, that I was concerned that if the verdict came

 19     in with a huge verdict, how the Circuit might feel about

16:54 20     that, in terms of some of the expressions by some of the

 21     members of the panel, and if there was a way to segment out

 22     the different damage claims within -- amounts within the

 23     trade secret misappropriation, so it literally made the

 24     Circuit easy to overturn the court if they felt that the

16:55 25     damages were inappropriate with potentially -- without, you

 1    know, harming the verdict itself, any thoughts?

 2            The other human compendium is here, Mr. Zeller.

 3            (Laughter.)

 4            MR. ZELLER:  First, we -- we agree that it can be

16:55  5    segmented out, and should be.

 6            THE COURT:  You're going to do that tomorrow for

 7    me; good.

 8            MR. ZELLER:  And I think that's -- that's really

 9    the starting point.

16:55 10            What they're talking about are a number of issues.

11            I mean, let me just start with the point that

12    obviously, the Ninth Circuit could have ruled that we were

13    entitled to no remedy at all, if it -- if it saw fit to rule

14    that.

16:55 15            It could have ruled that, in fact, as they're now

16    advocating that we could be entitled to nothing more than a

17    3 percent royalty.

18            THE COURT:  Right.

19            MR. ZELLER:  It did do so.

16:56 20            THE COURT:  And there is a question if they even

21    considered the trade secret misappropriation claim.

22            MR. ZELLER:  Right.

23            THE COURT:  Although it can be argued that they did

24    by nuance.  I'm a trial court.  And unless the Circuit

16:56 25    explicitly gives me direction, I think it's my

         1    responsibility, and I don't know if they addressed it,

         2    although the argument could be made that they do, so --

         3              MR. ZELLER:  And we certainly think there are

         4    reasons as to why we don't think the Ninth Circuit did

16:56    5    address it.  But, even so, why the analysis is not --

         6              THE COURT:  Uh-huh.

         7              MR. ZELLER:  -- identical between copyright and

         8    trade secret, is really as being advocated here.

         9              I mean certainly, a large part of the circuit's

16:56   10    thinking in that decision was predicated expressly on the

        11    fact that it viewed the copyright protections that were

        12    available in this situation to be limited in various ways.

        13              THE COURT:  Now, where's the dissimilarity?  I

        14    wanted to look at it holistically for just a moment.

16:56   15              Over in copyright, you'd have a lost profits claim

        16    that might entail six dolls, based upon the court's ruling

        17    and this agreement.

        18              MR. ZELLER:  Plus the sculpt.

        19              THE COURT:  No, I'm there.  Make me do the work

16:57   20    intellectually; all right.

        21              And the sculpts.

        22              Over in the trade secret misappropriation claim,

        23    you've got potentially more than the six dolls, the

        24    sculpts -- I'm going to call them fashion accessories -- all

16:57   25    right -- and the question is, some of those fashion

     1    accessories, for instance, might be well-taken, from your

     2    perspective, like the handbag with the little cat on it.  But

     3    other accessories that are listed under Bratz that are MGA's

     4    own records, where they're paying a royalty, would be color

16:57 5    combinations, not usually protected.

     6            MR. ZELLER:  Not under copyright, but --

     7            THE COURT:  Not under copyright, but we're getting

     8    into trade secret misappropriation.

     9            MR. ZELLER:  Right.

16:58 10            THE COURT:  The jury is going to be potentially in

     11    a situation -- unless I segment that out some way -- of being

     12    utterly confused.

     13            And, in other words, I should be able to basically

     14    check the -- if they come back with damages -- and let's take

16:58 15    the one uniform entity, sculpts, we ought to be able to look

     16    over sculpts and copyright and sculpt and trademark

     17    misappropriation, and they should be about the same number,

     18    in theory.

     19            Dolls, potentially not.

16:58 20            Accessories, not at all.  And that's why I asked

     21    Mr. Quinn informally a couple weeks ago to start thinking

     22    that through with you.

     23            Now I'm not going to make any rulings tonight, but

     24    tomorrow is a critical day.  And, of course, Mr. Price, you

16:58 25    are excused.

```
 1              Unless you're arguing this matter, and I need to
 2      know, are you opening or rebuttal, because I need the opening
 3      attorney here to make decisions.
 4              If you're rebuttal, have a nice weekend.
16:59 5              If you're opening, I need you here.
 6              And if Mr. Quinn's rebuttal, then I'm going to
 7      excuse him.
 8              And I'm not forcing you to a position; I just
 9      really need the trial attorneys here, making decisions.
16:59 10             MR. PRICE:  I don't think we've made that decision
11      yet as to who is doing the opening or closing.
12             THE COURT:  Then, Mr. Quinn, why don't I borrow you
13      this weekend, so Mr. Price is prepared for Tuesday.
14             MR. QUINN:  That's fine, Your Honor.
16:59 15             THE COURT:  All right.  Because this won't be our
16      discussion.
17             Now, Mr. Price, also, I'd encourage you to contact
18      my court reporter.  Show me those areas of concern.  I'll
19      seal them up.  On the first, on the earlier comment, not just
16:59 20      on the 8:00 comment.
21             MR. PRICE:  I understand.
22             THE COURT:  And that's just a courtesy to counsel
23      so there's no harm.
24             Who is giving the final argument for MGA?
16:59 25             MS. KELLER:  I'll be making the closing argument.
```

UNITED STATES DISTRICT COURT

1              THE COURT:  The whole thing?

2              MS. KELLER:  I don't know that we've talked about

3      that yet with Mr. Larian, Your Honor.

4              THE COURT:  I don't care who's here.  I need the

17:00 5   trial attorney here, along with the esteemed resource lead --

6              MS. KELLER:  I'll be here.

7              THE COURT:  -- trial counsels.

8              MS. KELLER:  What time tomorrow, Your Honor?

9              THE COURT:  You don't want to know the time I'm

17:00 10  suggesting, but we'll get to that in a moment.  We can talk

11     about that informally, so it's not more drama today.

12              I know that both of you worked on the opening and

13     closing instructions.  We can fly through those very quickly

14     tomorrow.

17:00 15              How should I approach the telephone books that

16     you've given me?

17              In other words, I just have to work through the, in

18     a methodical way this weekend, because next weekend, we're

19     back with some finalization.  And I don't care how we

17:00 20  approach it.  I'm just looking for some system that makes

21     sense to both of you, so we're not here, you know, Saturday

22     and Sunday and whatever time I had Monday, so I can try to

23     give you a day of rest on Sunday.

24              But I will get through these this weekend.

17:00 25              I want you to informally talk about that for

```
 1    just a moment.
 2           I want to excuse you and Mr. Overland -- we'll have
 3    time this evening -- Mr. Overland, how are we doing with
 4    Mr. Molinski?
17:01  5           MR. OVERLAND:  I'm still waiting to hear from
 6    Mr. Molinski.
 7           THE COURT:  How soon does Mattel need these
 8    witnesses?
 9           In other words, I don't want you backed up against
17:01 10    the wall, where you're -- you're expecting a witness to
11    appear, and they're not coming in, and we have to take time
12    to sort that out.
13           MR. ZELLER:  We -- we had hoped and we had selected
14    a date that we basically --
17:01 15           THE COURT:  No, no, no.  Tell me the date.
16           MR. ZELLER:  We had hoped that soon after
17    Mr. Larian, so that we're talking next week.
18           THE COURT:  Give me a date next week.
19           In other words, there are attorneys --
17:01 20    Mr. Overland's communicating with him last evening.  He's
21    going to communicate with them again today.
22           If he has a date.
23           Mr. Overland, what was the last letter?  What were
24    the time frames?  We have to move it back a week.
17:01 25           MR. OVERLAND:  I think the last letter was
```

 1    February 18th through March 4th.

 2              THE COURT:  That's what I thought.

 3              We originally were going to try for the 11th.  We

 4    couldn't get them here.

17:02 5          And I thought that we were looking -- what was the

 6    letter, again, the 14th?

 7              MR. OVERLAND:  February 18th through March 4th.

 8              MR. ZELLER:  That must be the second letter,

 9    because --

17:02 10         THE COURT:  That's the second letter.  We're not

 11   certain if it got to the court.

 12             So we sent it again, special delivery, return

 13   receipt, et cetera.

 14             MR. ZELLER:  I -- I think what we're looking at for

17:02 15  Mr. Machado now, it would be the week of the 21st.

 16             THE COURT:  Okay.

 17             Give me a date.

 18             How about the 22nd?

 19             MS. HURST:  Your Honor, we have a --

17:02 20         MR. ZELLER:  The 22nd.

 21             MS. HURST:  Your Honor, we have confirmed that

 22   Ms. Kuemmerle can be here.

 23             THE COURT:  Just a moment.  Remember, we're doing

 24   this sequentially.  Let me stay with Mr. Machado.

17:03 25         MS. HURST:  It was the same date.  That's the only

 1   reason I brought him in.

 2              THE COURT:  We have Ms. Kuemmerle?

 3              MS. HURST:  Ms. Kuemmerle can be here on the 21st

 4   and the 22nd.

17:03  5              THE COURT:  Mr. Molinski, thank you very much.

 6         I want to recognize you on the record for the

 7   outstanding job you're doing.

 8              MR. MOLINSKI:  Thank you, Your Honor.

 9              THE COURT:  That's excellent.

17:03 10         So now the 22nd Ms. Kuemmerle will be here.

11              Mr. Zeller, that's good news.

12              MR. ZELLER:  So I think, then, perhaps for

13   Mr. Machado, the 23rd.

14              THE COURT:  Okay.  Mr. Molinski, Ms. Kuemmerle will

17:03 15   be here on the 22nd?

16              MR. MOLINSKI:  The 22nd, Your Honor.

17              THE COURT:  The 22nd.

18         All right.  That's a great relief for the court.

19         The last thing I want to do is issue a warrant.

17:03 20         The second thing is, Ms. Gronich, or *Gronich*, she

21   owns a home in New Jersey, she's available?

22              MS. HURST:  No, that's Ms. Kuemmerle.

23              THE COURT:  Oh, that's right.  New Jersey home, who

24   was formerly in Brazil, and is now returning.

17:04 25         Ms. Gronich was local.  She's local, Counsel, and

 1   it's represented that she was available.

 2              MS. HURST:  Yeah, she can be here on Tuesday.

 3              THE COURT:  Tuesday.

 4              Mr. Molinski, thank you very much for the

17:04 5   extraordinary job on your part again.

 6              (Laughter.)

 7              THE COURT:  Ms. Hurst was about to take

 8   credit for it.

 9              MS. HURST:  No.

17:04 10              (Laughter.)

11              THE COURT:  Okay.  Now, let me work for a moment

12   with Mr. Zeller and Mr. Quinn.  But just because they're

13   here, that doesn't mean that fits your case.

14              They're going to be here.  They're going to be here

17:04 15   in an orderly fashion, so you can present your case the way

16   you want to.

17              So do you want Ms. Kuemmerle here the 22nd?

18              MR. ZELLER:  Yes.

19              THE COURT:  Okay.

17:04 20              MR. QUINN:  Yes.

21              THE COURT:  How about Gronich?  Do you want her to

22   follow Kuemmerle?

23              MR. ZELLER:  No.  They're unrelated.

24              THE COURT:  She's going to be here the 22nd also.

17:04 25              MR. ZELLER:  I thought that she would be here on

1    the 15th.

2              MR. McCONVILLE:  Yeah, next week.

3              MS. HURST:  Next week is Gronich.

4              THE COURT:  I'm not hearing correctly, then.

17:05  5       Gronich, then, on the 15th.

6              Kuemmerle on the 22nd.

7              Are we going to be done with Mr. Larian by the

8    15th?

9              MS. KELLER:  I think I have another day.

17:05 10      MR. ZELLER:  You know, I'm wondering --

11             THE COURT:  I'm wondering, then, too.  I can't

12   imagine Mr. Price not spending some more time with her --

13   with Mr. Larian.

14             MR. McCONVILLE:  He's got the two questions; right?

17:05 15      MR. PRICE:  So far.

16             MS. KELLER:  An hour and a half.

17             THE COURT:  I just think it's an extraordinary

18   effort by all counsel, and I know that they don't want to

19   inconvenience the witnesses.

17:05 20      Why don't we ask Ms. Gronich to be here on the --

21   available on the 16th, as late as the 17th?

22             MR. MOLINSKI:  That's fine.  She's local and she's

23   here all next week.

24             THE COURT:  Great.  That resolves the problem.

17:05 25      Okay.  Mr. Machado, I think, will be here.

```
 1              MR. ZELLER:  We were actually looking at a couple

 2     of other dates here.

 3              It may be that -- is Ms. Kuemmerle available on any

 4     other day other than the 22nd?

17:06  5              MR. McCONVILLE:  The 21st.

 6              MR. ZELLER:  The 21st, well, that's not a court

 7     day.  It's a Monday.

 8              MR. McCONVILLE:  But she's available.

 9              THE COURT:  Well, we'll all be here, but we won't

17:06 10     be in session.

11              I'm just joking.  We probably won't be in session.

12              I'm going to get off the bench and let you work for

13     just a couple of minutes to accommodate Mattel, so that you

14     can get your witness lists basically in the order that you

17:06 15     want them.  But I want to come back and make a record of

16     that, so that we're holding basically to that schedule,

17     depending upon how long the examinations take.

18              Okay.  The last just housekeeping matter is --

19     before I come back in a few moments -- you've taken the

17:06 20     position concerning the O'Connor-Larian e-mail, that you

21     don't believe that that is a curable -- or that it's curable,

22     and I understand that.

23              You want to have appellate reasons out there and

24     never want to consent to a limiting instruction.

17:07 25              If you'd like a mistrial on that, also, I invite
```

1   you to file that at the same time that Mattel is.  If I ever

2   have a coalition, we'll see.

3           Okay?

4           But I think each side, depending upon, you know,

17:07 5   how the case is going, I'm going to get some interesting

6   requests along the way.  Some of you will perceive that.

7   You're doing well and not doing well at different times, and

8   each will feel motivated upon who's -- I'm just joking with

9   you.

17:07 10          So I'm proposing to read the following sua sponte:

11          "Members of the Jury, during Mr. Larian's direct

12   examination on Tuesday, February 9th, Mattel inquired into

13   whether Mr. Larian and his attorneys discussed a particular

14   e-mail.

17:08 15          "Although I instructed you at the time to consider

16   the testimony for a limited purpose, my further research has

17   revealed that I should not have allowed that line of

18   questioning for any purpose.

19          "Much like in the context of a doctor/patient

17:08 20   relationship, communications with our attorneys are private

21   and protected by the attorney-client privilege, and we do not

22   have to share those communications.

23          "Thus, I should not have ordered Mr. Larian to

24   share the content of his communications with his attorneys.

17:08 25   You may not consider the questions and answers about

Case 2:04-cv-09049-DOC-RNB   Document 9873   Filed 02/14/11   Page 51 of 59   Page ID #:298609
CV 04-9049 DOC - 02/11/2011 Volume 4 of 4

51

 1    Mr. Larian's conversations with his attorneys.

 2              "That testimony is stricken."

 3              Now, the position you're in is the following:

 4              You can object to that particular reading, which

17:08 5    means without another suggestion, I'll probably read that.

 6              You can attempt to make that better, and not waive

 7    the privilege.  I think that's a fair position for you to be

 8    in to participate.

 9              Third, you can ask for a mistrial, if you feel that

17:09 10   that's fatal, but get that in over the weekend, along with

 11   Mattel's.

 12             Or, fourth -- I'm sorry -- or, fourth, you can

 13   participate.

 14             Okay.  I'm sorry.

17:09 15             Mr. Quinn.

 16             MR. QUINN:  I was just going to say, Your Honor,

 17   we -- we don't think it's appropriate to give that

 18   instruction.

 19             We believe the privilege was waived.  He testified

17:09 20   to all those things in his deposition.

 21             THE COURT:  Yeah, yeah, I understand that.  I

 22   understand.

 23             MR. QUINN:  So we think that was all opened up.

 24             THE COURT:  Okay.

17:09 25             MS. KELLER:  Your Honor, the --

```
 1              THE COURT:  You don't have to make a decision now.

 2         Just think about it.

 3         We'll do that tonight.

 4              MS. KELLER:  I would tell you -- we haven't made a

17:09  5   decision -- but what I will tell you, what we see is the

 6    biggest problem, and the biggest problem is -- is a practical

 7    one, which is that --

 8              THE COURT:  Oh, by the way, in response to

 9    Mr. Quinn, possibly, but the court made the error, and I

17:10 10   don't think I want to compound that mistake.

11              MR. QUINN:  I'm sorry, Your Honor.  At his

12    deposition, he testified to those things.

13              MS. KELLER:  With a stipulation that it wasn't a

14    waiver to the attorney-client privilege, and he was

17:10 15   stipulating on a very limited fashion.  And in a very limited

16    fashion, both sides stipulated to that.

17              MR. QUINN:  It's in the record.  Once it's in the

18    record, Your Honor, I mean, it's --

19              THE COURT:  Well, then --

17:10 20              MR. QUINN:  It's like we're taking a deposition,

21    and then the testimony in the deposition, it can't be used

22    for any purpose.

23              THE COURT:  And your point is, how can you

24    stipulate to that to begin with?

17:10 25              MR. QUINN:  Were they just wasting our time, then,
```

UNITED STATES DISTRICT COURT

 1    in eliciting that testimony?

 2          THE COURT:  Now, before we get into the merits of

 3    that, okay, which will take all evening, back and forth --

 4    take your time, think about what you want to do --

17:10  5          MS. KELLER:  Here's our problem, though, if the

 6    court would just hear me out for a minute.

 7          The -- sitting here listening to the testimony come

 8    out, I can tell you what my strong impression was, and what I

 9    think the strong impression was of the jury.

17:11 10          The whole line of questioning suggested, in no

11    uncertain terms, that Mr. Larian and his lawyers had played

12    games, trying to conceal the document, and -- and he was

13    specifically asked, even, after all the -- all the setup to

14    what a game had been played, he had been asked repeatedly,

17:11 15    you control your lawyers, don't you?  You control them.  He

16    can only respond based on information you give them, on and

17    on and on.

18          And the indelible impression left -- and it would

19    have been left with me, if I was sitting in the audience,

17:11 20    even as a lawyer, is this guys are sleazeballs.  They were

21    really playing games, and this guy was in on it.  This

22    witness, he was directing them what to do.  He was actively

23    directing them to hide and conceal the document.

24          And, of course, that's belied by the facts, which

17:12 25    are that one firm was given the information and didn't turn

1    it over.  Another firm was given the information and did turn

2    it over.  That would seem to suggest he doesn't control it.

3              But the stink in this courtroom from that line of

4    questioning was unbelievable.  I mean, it was really bad.

17:12  5   The expression on the jurors' faces, the eye rolling that I

6    observed, I mean it was -- it was really bad.

7              And I don't know how a mild instruction could cure

8    it, and I'm not sure how you can cure it at all because of

9    this.

17:12  10            THE COURT:  It's easy.  Just ask for a mistrial.

11             MS. KELLER:  But I would have to go back with

12   Mr. Larian and point it out, look, you gave the information

13   to one law firm, they didn't turn it over.  You gave the

14   information to another law firm, and they did turn it over.

17:12  15            You know, you weren't controlling anybody, were

16   you?

17             And of course, my learned opponents would say, ah,

18   further waiver of the privilege.  Now you're going into --

19   I've gone around and around in my head how I can --

17:13  20            THE COURT:  Just a moment.

21             I hear you.

22             You have options.

23             So now --

24             MS. KELLER:  Not good ones.

17:13  25            THE COURT:  Mr. Quinn.

1      MR. QUINN:  Your Honor, I heard Mr. Larian say

2   emphatically that his lawyers made the decision, not him --

3   he gave everything to his lawyers, they made the decision.

4          I think the court instructed the jury --

17:13 5      THE COURT:  Limited.

6      MR. QUINN:  -- four or five times --

7      THE COURT:  There was a limited --

8      MR. QUINN:  -- that lawyers must make these

9   decisions, it's the lawyers' privilege call, and there's

17:13 10  nothing inappropriate about that.  I think the court is very

11  clear on that.

12         THE COURT:  I'm staring -- in front of a

13  Supreme Court opinion, and with more research, of course, I'm

14  concerned.

17:13 15      MR. QUINN:  On the question of the deposition,

16  Your Honor, and what it was stipulated, that this wasn't a

17  waiver of the privilege, and then he was going to go ahead

18  and testify, we didn't stipulate that we weren't going to use

19  it.

17:14 20         (Laughter.)

21         MR. QUINN:  Otherwise, why are we -- why are we

22  taking the testimony?  What's the -- what's the point of the

23  exercise?

24         MS. KELLER:  Because --

17:14 25         MR. QUINN:  In other words, it's a stipulation.

UNITED STATES DISTRICT COURT

 1   It's not a waiver of the privilege, to the extent he

 2   testifies.  We're not going to claim that he should get

 3   anything beyond that what he says.

 4         So he's going to testify and waive it to the extent

17:14 5   he wants to.

 6         THE COURT:  You're going to listen to Mr. Quinn

 7   finish before you jump in.

 8         MS. HURST:  I was just raising my hand.

 9         THE COURT:  And, Mr. Quinn, go ahead.

17:14 10         He's used to me doing it and interrupting you.

 11         MR. QUINN:  That's my point.  He didn't say

 12   anything on the stand that he didn't say in his deposition.

 13         THE COURT:  We've gone back and forth on this.

 14         There will be plenty of time to argue this again.

17:14 15         Tuesday's a long ways away.

 16         Now I'm going to take a recess for just a moment.

 17         Mr. Overland, could you call us this weekend?

 18         MR. OVERLAND:  I could.

 19         THE COURT:  Okay.  Or come down.

17:14 20         We'll be here most of the weekend.

 21         And I was wondering if you could get us the

 22   information as quickly as possible about Mr. Machado.

 23         MR. OVERLAND:  It's my understanding that an

 24   agreement has been reached, so --

17:15 25         THE COURT:  Amazing.

 1           Tell me at least your tentative understanding, and

 2    how recently we received this, because this is news to all of

 3    us.

 4           MR. OVERLAND:  It's very recent.  Apparently an

17:15 5    agreement has been reached, and it just depends on the

 6    judge approving his travel.

 7           THE COURT:  Okay.

 8           And that's as -- it must be in the last hour that

 9    you've got the information?

17:15 10          MR. OVERLAND:  It's in the last half hour.

 11          THE COURT:  Half hour; okay.

 12          MR. OVERLAND:  Do you still want me to call you?

 13          THE COURT:  Well, I'd love you to call me.

 14          (Laughter.)

17:15 15          MR. OVERLAND:  If I get anything more, I'll --

 16          THE COURT:  Yeah, over the weekend, I just want to

 17    make sure that people have some ability to prepare.

 18          You know, people aren't just coming in.

 19          And, also, that we don't keep Mr. Machado anything

17:15 20    over than what I've represented to the judge.

 21          You know, he's on and off the stand.  And then if

 22    you need to call him back, so be it, because you're counsel.

 23          But at least Mattel's in the position of having the

 24    power to have the court see their blustering or bullying, or

17:16 25    in this case, humbly asking.

```
 1              MR. OVERLAND:  No, I think unless something
 2      unforeseeable happens, if the judge approves it, he'll be
 3      here.
 4              THE COURT:  Okay.  Now, Mr. Zeller, if that's the
17:16 5  case, that would resolve Mr. Machado --
 6              MR. OVERLAND:  And Ms. Trueba.
 7              THE COURT:  Ms. Trueba.
 8              It takes care of ground I have.  It takes care of
 9      Kuemmerle.
17:16 10             MR. ZELLER:  Right.
11              THE COURT:  Who else is causing difficulty?  There
12      was a --
13              MR. ZELLER:  Dale --
14              MR. OVERLAND:  When I say "Trueba," I don't think
17:16 15  we have any dates for her, and I don't think she was included
16      in the --
17              THE COURT:  Do you want another letter down?
18              MR. OVERLAND:  Well, I -- I'm not representing her,
19      so --
17:16 20             THE COURT:  Well, I mean, do you want me sending a
21      letter?
22              MR. OVERLAND:  I think maybe once we've got an idea
23      when Mattel wants her, I think that probably would be a good
24      idea.
17:17 25             THE COURT:  Let's find out from Mr. Zeller.
```

UNITED STATES DISTRICT COURT

1           When do you want her?

2               MR. QUINN:  Your Honor, you made the suggestion a

3    moment ago that we confer on all these dates.  And I think

4    that would be a good thing to --

17:17 5          THE COURT:  I'm going to get off the bench now and

6    not take any more time.

7               MR. ZELLER:  There was one more person, however,

8    who was an issue, which was Dale Cendali, and we have no

9    information on that.

17:17 10         THE COURT:  Why don't you talk to the other side

11   informally for a moment, so I'm not wasting your time.  And

12   I'll come back in 15 minutes, because I want to get you out

13   of here and discuss a time we can meet tomorrow.

14              MR. ZELLER:  Okay.

17:17 15         (Proceedings concluded at 17:17 on 02-11-2011.

16   Next proceedings reported by Debbie Gale.  Proceedings

17   concluded until Tuesday, February 14, 2011, 9:00 a.m.)

18

19

20

21

22

23

24

25