UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

OCT 26 2010

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

---

MATTEL, INC., a Delaware corporation,

               Defendant-counter-claimant - Appellee

v.

MGA ENTERTAINMENT, INC.; et al.,

          Counter-defendants - Appellants

---

CARTER BRYANT, an individual,

        Plaintiff-counter-defendant

CARLOS GUSTAVO MACHADO GOMEZ, an individual; MGAE DE MEXICO, S.R.L. DE C.V., a Mexico business entity,

        Counter-defendants

ANNE WANG,

        Third-party-defendant

OMNI 808 INVESTORS LLC,

No. 09-55673

D.C. No. 2:04-cv-09049-SGL-RNB

U.S. District Court for Central California, Los Angeles

**MANDATE**



Movant

CARTER BRYANT, an individual,

                    Plaintiff-counter-defendant - Appellee
and

MGA ENTERTAINMENT, INC.; et al.,

                    Counter-defendants - Appellees

v.

MATTEL, INC., a Delaware corporation,

                    Defendant-counter-claimant - Appellant

CARLOS GUSTAVO MACHADO GOMEZ, an individual; MGAE DE MEXICO, S.R.L. DE C.V., a Mexico business entity,

                    Counter-defendants

No. 09-55812

D.C. No. 2:04-cv-09049-SGL-RNB
U.S. District Court for Central California, Los Angeles

The judgment of this Court, entered July 22, 2010, takes effect this date.

This constitutes the formal mandate of this Court issued pursuant to Rule 41(a) of the Federal Rules of Appellate Procedure.

FOR THE COURT:

Molly C. Dwyer
Clerk of Court

Gabriela Van Allen
Deputy Clerk

FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MATTEL, INC., a Delaware corporation,
    *Defendant-counter-claimant-Appellee,*

v.

MGA ENTERTAINMENT, INC.; MGA ENTERTAINMENT (HK) LIMITED, a Hong Kong Special Administrative Region business entity; ISAAC LARIAN, an individual,
    *Counter-defendants-Appellants,*

CARTER BRYANT, an individual,
    *Plaintiff-counter-defendant,*

CARLOS GUSTAVO MACHADO GOMEZ, an individual; MGAE DE MEXICO, S.R.L. DE C.V., a Mexico business entity,
    *Counter-defendants,*

ANNE WANG,
    *Third-party-defendant,*

OMNI 808 INVESTORS LLC,
    *Movant.*

No. 09-55673

D.C. No. 2:04-cv-09049-SGL-RNB

10523

CARTER BRYANT, an individual,
          *Plaintiff-counter-defendant-*
                        *Appellee,*

MGA ENTERTAINMENT, INC.; MGA
ENTERTAINMENT (HK) LIMITED, a
Hong Kong Special Administrative
Region business entity; ISAAC
LARIAN, an individual,
          *Counter-defendants-Appellees,*

                    v.

MATTEL, INC., a Delaware
corporation,
          *Defendant-counter-claimant-*
                        *Appellant,*

CARLOS GUSTAVO MACHADO
GOMEZ, an individual; MGAE DE
MEXICO, S.R.L. DE C.V., a Mexico
business entity,
          *Counter-defendants.*

No. 09-55812

D.C. No.
2:04-cv-09049-SGL-
RNB

OPINION

Appeal from the United States District Court
for the Central District of California
Stephen G. Larson, District Judge, Presiding

Argued and Submitted
December 9, 2009—Pasadena, California

Filed July 22, 2010

Before: Alex Kozinski, Chief Judge, Stephen S. Trott and
Kim McLane Wardlaw, Circuit Judges.

Opinion by Chief Judge Kozinski

## COUNSEL

E. Joshua Rosenkranz (argued) and Lisa T. Simpson, Orrick, Herrington & Sutcliffe LLP, New York, New York; Annette L. Hurst and Warrington S. Parker III, Orrick, Herrington & Sutcliffe LLP, San Francisco, California; and Thomas J. Nolan and Jason D. Russell, Skadden, Arps, Slate, Meagher & Flom LLP, Los Angeles, California, for the appellants.

Daniel P. Collins (argued), Kelly M. Klaus, Aimee Feinberg and Mark Yohalem, Munger, Tolles & Olson LLP, Los Angeles, California; and John B. Quinn, Susan R. Estrich, Michael T. Zeller and B. Dylan Proctor, Quinn Emanuel Urquhart Oliver & Hedges, LLP, Los Angeles, California, for the appellee.

Simon J. Frankel, Margaret D. Wilkinson and Steven D. Sassaman, Covington & Burling LLP, San Francisco, California; Steven M. Freeman and Steven C. Sheinberg, Anti-Defamation League, New York, New York; and Michelle N. Deutchman, Anti-Defamation League, Los Angeles, California, for amici Anti-Defamation League et al.

## OPINION

KOZINSKI, Chief Judge:

Who owns Bratz?

## I

Barbie was the unrivaled queen of the fashion-doll market throughout the latter half of the 20th Century. But 2001 saw the introduction of Bratz, "The Girls With a Passion for Fashion!" Unlike the relatively demure Barbie, the urban, multi-ethnic and trendy Bratz dolls have attitude. This spunk struck a chord, and Bratz became an overnight success. Mattel, which produces Barbie, didn't relish the competition. And it was particularly unhappy when it learned that the man behind Bratz was its own former employee, Carter Bryant.

Bryant worked in the "Barbie Collectibles" department, where he designed fashion and hair styles for high-end Barbie dolls intended more for accumulation than for play. In August 2000, while he was still employed by Mattel, Bryant pitched his idea for the Bratz line of dolls to two employees of MGA

Entertainment, one of Mattel's competitors. Bryant was soon called back to see Isaac Larian, the CEO of MGA. Bryant brought some preliminary sketches, as well as a crude dummy constructed out of a doll head from a Mattel bin, a Barbie body and Ken (Barbie's ex) boots. The Zoe, Lupe, Hallidae and Jade dolls in Bryant's drawings eventually made it to market as Cloe, Yasmin, Sasha and Jade, the first generation of Bratz dolls.

Bryant signed a consulting agreement with MGA on October 4, 2000, though it was dated September 18. Bryant gave Mattel two weeks' notice on October 4 and continued working there until October 19. During this period, Bryant was also working with MGA to develop Bratz, even creating a preliminary Bratz sculpt.[1] A sculpt is a mannequin-like plastic doll body without skin coloring, face paint, hair or clothing.

MGA kept Bryant's involvement with the Bratz project secret, but Mattel eventually found out. This led to a flurry of lawsuits, which were consolidated in federal district court. Proceedings below were divided into two phases. Phase 1 dealt with claims relating to the ownership of Bratz; Phase 2 is pending and will deal with the remaining claims. This is an interlocutory appeal from the equitable orders entered at the conclusion of Phase 1.

During Phase 1, Mattel argued that Bryant violated his employment agreement by going to MGA with his Bratz idea instead of disclosing and assigning it to Mattel. Mattel claimed it was the rightful owner of Bryant's preliminary sketches and sculpt, which it argued MGA's subsequent Bratz dolls infringed. And it asserted that MGA wrongfully acquired the ideas for the names "Bratz" and "Jade," so the Bratz trademarks should be transferred from MGA to Mattel.

---

[1]The sculpt was actually crafted by a freelance sculptor with input from Bryant. The parties disputed below whether Bryant "created" it, and the jury found that Bryant did. This finding is not challenged on appeal.

Mattel won virtually every point below. The jury found that Bryant thought of the "Bratz" and "Jade" names, and created the preliminary sketches and sculpt, while he was employed by Mattel. It found that MGA committed three state-law violations relating to Bryant's involvement with Bratz. And it issued a general verdict finding MGA liable for infringing Mattel's copyrights in Bryant's preliminary Bratz works. Mattel sought more than $1 billion in copyright damages but the jury awarded Mattel only $10 million, or about 1% of that amount, perhaps because it found only a small portion of the Bratz dolls infringing. *See* p.10537 *infra*.

The district court entered equitable relief based on the jury's findings. As to the state-law violations, the district court imposed a constructive trust over all trademarks including the terms "Bratz" and "Jade," essentially transferring the Bratz trademark portfolio to Mattel.[2] The transfer prohibited MGA from marketing any Bratz-branded product, such as Bratz dolls (Bratz, Bratz Boyz, Lil' Bratz, Bratz Lil' Angelz, Bratz Petz, Bratz Babyz, Itsy Bitsy Bratz, etc.), doll accessories (Bratz World House, Bratz Cowgirlz Stable, Bratz Spring Break Pool, Bratz Babyz Ponyz Buggy Blitz, etc.), video games ("Bratz: Girlz Really Rock," "Bratz: Forever Diamondz," "Bratz: Rock Angelz," etc.) and *Bratz* the movie.

As to the copyright claim, the district court issued an injunction prohibiting MGA from producing or marketing virtually every Bratz female fashion doll, as well as any future dolls substantially similar to Mattel's copyrighted Bratz works. The injunction covered not just the original four dolls, but also subsequent generations (e.g., "Bratz Slumber Party Sasha" and "Bratz Girlfriendz Nite Out Cloe") and other doll

---

[2]Based on the finding that MGA wrongfully acquired the ideas for the names "Bratz" and "Jade," the district court also entered a UCL injunction and a declaratory judgment concerning MGA's right to the Bratz trademarks. For simplicity, we will refer only to the constructive trust to describe all equitable relief.

characters (e.g., "Bratz Play Sportz Lilee" and "Bratz Twins Phoebe and Roxxi").

In effect, Barbie captured the Bratz. The Bratz appeal.

## II

[1] A constructive trust is an equitable remedy that compels the transfer of wrongfully held property to its rightful owner. *Communist Party of U.S. v. 522 Valencia, Inc.*, 41 Cal. Rptr. 2d 618, 623 (Cal. Ct. App. 1995); *see also* Cal. Civ. Code § 2223 ("One who wrongfully detains a thing is an involuntary trustee thereof, for the benefit of the owner."). A plaintiff seeking imposition of a constructive trust must show: (1) the existence of a *res* (property or some interest in property); (2) the right to that *res*; and (3) the wrongful acquisition or detention of the *res* by another party who is not entitled to it. *Communist Party*, 41 Cal. Rptr. 2d at 623-24.

Prior to trial, the district court held that Bryant's employment agreement assigned his ideas to Mattel, and so instructed the jury. What was left for the jury to decide was *which* ideas Bryant came up with during his time with Mattel. It found that Bryant thought of the names "Bratz" and "Jade" while he was employed by Mattel, and that MGA committed several state-law violations by interfering with Bryant's agreement as well as aiding and abetting its breach. After trial, the district court imposed a constructive trust over all Bratz-related trademarks. We review that decision for abuse of discretion. *See GHK Assocs. v. Mayer Group, Inc.*, 274 Cal. Rptr. 168, 182 (Cal. Ct. App. 1990).

### A.

[2] A constructive trust would be appropriate only if Bryant assigned his ideas for "Bratz" and "Jade" to Mattel in the first place. Whether he did turns on the interpretation of Bryant's 1999 employment agreement, which provides: "I agree

to communicate to the Company as promptly and fully as practicable all *inventions* (as defined below) conceived or reduced to practice by me (alone or jointly by others) at any time during my employment by the Company. I hereby assign to the Company . . . all my right, title and interest in such *inventions*, and all my right, title and interest in any patents, copyrights, patent applications or copyright applications based thereon." (Emphasis added.) The contract specifies that "the term 'inventions' includes, but is not limited to, all discoveries, improvements, processes, developments, designs, know-how, data computer programs and formulae, whether patentable or unpatentable." The district court held that the agreement assigned Bryant's ideas to Mattel, even though ideas weren't included on that list or mentioned anywhere else in the contract.[3] We review the district court's construction of the agreement de novo. *See L.K. Comstock & Co.* v. *United Eng'rs & Constructors Inc.*, 880 F.2d 219, 221 (9th Cir. 1989).

Mattel points out that the list of examples of what constitutes an invention is illustrative rather than exclusive. Ideas, however, are markedly different from most of the listed examples. *Cf. People ex rel. Lungren* v. *Superior Ct.*, 926 P.2d 1042, 1057 (Cal. 1996) (courts avoid constructions that would make "a particular item in a series . . . markedly dissimilar to other items on the same list"). Designs, processes, computer programs and formulae are concrete, unlike ideas, which are ephemeral and often reflect bursts of inspiration that exist only in the mind. On the other hand, the agreement also lists less tangible inventions such as "know-how" and "discoveries." And Bryant may have conveyed rights in innovations that were not embodied in a tangible form by assigning inventions he "conceived" as well as those he reduced to practice.

---

[3]Contrary to Mattel's argument, MGA adequately preserved its objections to this ruling.

[3] We conclude that the agreement could be interpreted to cover ideas, but the text doesn't compel that reading. The district court thus erred in holding that the agreement, by its terms, clearly covered ideas. Had the district court recognized the ambiguity, it might have evaluated whether it could be resolved by extrinsic evidence. *See Wolf* v. *Superior Court*, 8 Cal. Rptr. 3d 649, 655-56 (Cal. Ct. App. 2004). At various stages of litigation, the parties introduced such evidence supporting their respective interpretations of "inventions." Contracts Mattel drafted for other employees, for example, expressly assigned their "ideas" as well as their "inventions." This tends to show that the term "inventions" alone doesn't include ideas. On the other hand, a Mattel executive claimed during her deposition that it was common knowledge in the design industry that terms like "invention" and "design" did include employee ideas. Because the district court concluded that the language of the contract was clear, it didn't consider the extrinsic evidence the parties presented. Even if it had, it may not have been able to resolve the meaning of "inventions." If the meaning turns in part on the credibility of conflicting extrinsic evidence, a properly instructed jury should have decided the issue. *See Morey* v. *Vannucci*, 75 Cal. Rptr. 2d 573, 579 (Cal. Ct. App. 1998). Because we must vacate the constructive trust in any event, for reasons explained below, this is a matter the district court can take up on remand.

## B.

The very broad constructive trust the district court imposed must be vacated regardless of whether Bryant's employment agreement assigned his ideas to Mattel. Even assuming that it did, and that MGA therefore misappropriated the names "Bratz" and "Jade," the value of the trademarks the company eventually acquired for the entire Bratz line was significantly greater because of MGA's own development efforts, marketing and investment. The district court nonetheless transferred MGA's entire Bratz trademark portfolio to Mattel on the ground that the "enhancement of value [of the property held

in trust] is given to the beneficiary of the constructive trust."
As a result, Mattel acquired the fruit of MGA's hard work,
and not just the appreciation in value of the ideas Mattel
claims it owns.

[4] In general, "[t]he beneficiary of the constructive trust
is entitled to enhancement in value of the trust property."
*Haskel Eng'g & Supply Co.* v. *Hartford Accident & Indem.
Co.*, 144 Cal. Rptr. 189, 193 (Cal. Ct. App. 1978). This is so
"not because [the beneficiary] has a substantive right to [the
enhancement] but rather to prevent unjust enrichment of the
wrongdoer-constructive trustee." *Id.* Thus, a person who
fraudulently acquired a house worth $100,000 in 2000 that
appreciates to $200,000 by 2010 because of a strong real
estate market can't complain when the rightful owner takes
the benefit of the $100,000 increase. "[I]t is simple equity that
a wrongdoer should disgorge his fraudulent enrichment."
*Janigan* v. *Taylor*, 344 F.2d 781, 786 (1st Cir. 1965).

[5] This principle has the greatest force where the appreci-
ation of the property is due to external factors rather than the
efforts of the wrongful acquisitor. *Id.* at 787. "When the
defendant profits from the wrong, it is necessary to identify
the profits and to recapture them without capturing the fruits
of the defendant's own labors or legitimate efforts." Dan B.
Dobbs, *Dobbs Law of Remedies: Damages-Equity-Restitution*
§ 6.6(3) (2d ed. 1993). This is because "the aim of restitution
has been to avoid taking the defendant's blood along with the
pound of flesh." *Id.* § 6.6(3) n.4. A constructive trust is there-
fore "not appropriate to every case because it can overdo the
job." *Id.* § 4.3(2).

[6] When the value of the property held in trust increases
significantly because of a defendant's efforts, a constructive
trust that passes on the profit of the defendant's labor to the
plaintiff usually goes too far. For example, "[i]f an artist
acquired paints by fraud and used them in producing a valu-
able portrait we would not suggest that the defrauded party

would be entitled to the portrait, or to the proceeds of its sale." *Janigan*, 344 F.2d at 787. Even assuming that MGA took some ideas wrongfully, it added tremendous value by turning the ideas into products and, eventually, a popular and highly profitable brand. The value added by MGA's hard work and creativity dwarfs the value of the original ideas Bryant brought with him, even recognizing the significance of those ideas. We infer that the jury made much the same judgment when it awarded Mattel only a small fraction of the more than $1 billion in interest-adjusted profit MGA made from the brand.

From the ideas for the names "Bratz" and "Jade," MGA created not only the first generation of Bratz dolls (Cloe, Yasmin, Sasha and Jade), but also many other Bratz characters (Ciara, Dana, Diona, Felicia, Fianna and so on), as well as subsequent generations of the original four dolls ("Bratz Flower Girlz Cloe," "Bratz on Ice Doll Yasmin," etc.). MGA also generated other doll lines, such as the Bratz Boyz, Bratz Petz and Bratz Babyz. And it made a variety of Bratz doll accessories, along with several Bratz video games and a movie. These efforts significantly raised the profile of the Bratz brand and increased the value of the Bratz trademarks.

[7] It is not equitable to transfer this billion dollar brand—the value of which is overwhelmingly the result of MGA's legitimate efforts—because it may have started with two misappropriated names. The district court's imposition of a constructive trust forcing MGA to hand over its sweat equity was an abuse of discretion and must be vacated.

### III

[8] Mattel also claimed ownership of Bryant's preliminary Bratz drawings and sculpt under Bryant's employment agreement, and that MGA's subsequent Bratz dolls infringed its copyrights in those works. The drawings and sculpt clearly *were* "inventions" as that term is defined in Bryant's employ-

ment agreement with Mattel. However, MGA argued that the employment agreement didn't assign the items because Bryant created them outside the scope of his employment at Mattel, on his own time. At summary judgment, the district court held that the agreement assigned inventions even if they were not made during working hours, so long as they were created during the time period Bryant was employed by Mattel. So instructed, the jury found that Bryant made the drawings and sculpt while he was employed by Mattel, and the agreement therefore assigned them to Mattel.[4] The jury was not asked to find whether Bryant made the drawings and sculpt during Mattel work hours, and it's unclear whether the record contained any evidence on this point.

Once Mattel established ownership of Bryant's preliminary sketches and sculpt, it pursued a copyright claim against MGA. The district court instructed the jury that any "substantially similar" Bratz doll infringed Mattel's copyrights in the sketches and sculpt. During deliberations, the jury sent the judge a note asking if it could find infringement as to the first generation of Bratz dolls and no others. The judge said it could. The jury returned a general verdict finding MGA liable for copyright infringement, but awarded Mattel only $10 million in damages, a tiny fraction of the more than $1 billion to which Mattel claimed it was entitled. The district court thought it unclear which Bratz dolls, or how many dolls, the jury thought infringing, so it made its own infringement findings in determining whether Mattel was entitled to equitable relief. The district court found the vast majority of Bratz dolls infringing and enjoined MGA from producing them or any other substantially similar dolls.

---

[4]The jury also found that Bryant created the dummy doll, *see* p.10530 *supra*, while he was at Mattel. The dummy was thrown away long before this litigation ensued, and was so crude that no copyright claim is based on it.

## A.

Bryant's 1999 employment agreement assigns to Mattel inventions created "at any time during my employment by the Company."[5] MGA argues that "at any time during my employment" covers only works created within the scope of Bryant's employment, not those created on his own time and outside of his duties at Mattel. Bryant wasn't tasked with creating new doll lines there; he designed fashions and hair styles for Barbie Collectibles. MGA thus argues that Bryant created the Bratz designs and came up with the names "Bratz" and "Jade" outside the scope of his employment, and that he therefore owns the work.[6]

The district court disagreed, holding at summary judgment that the agreement assigned to Mattel "any doll or doll fashions [Bryant] designed during the period of his employment with Mattel." It was therefore irrelevant "whether Bryant worked on [Bratz] on his own time [or] during his working hours at Mattel." We again review the district court's construction of the contract de novo. *See L.K. Comstock*, 880 F.2d at 221.

[9] The phrase "at any time during my employment" is ambiguous. It could easily refer to the entire calendar period Bryant worked for Mattel, including nights and weekends.

---

[5]The agreement excepts inventions that "qualif[y] under the provision of Section 2870 of the California Labor Code[, which] provides that the requirement to assign 'shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities or trade secret information except for those inventions that either (1) relate at the time of conception or reduction to practice of the invention to the employer's business . . . or (2) result from any work performed by the employee for the employer.' "

[6]It won't matter whether Bryant came up with the ideas in the course of employment if the district court or a properly instructed jury determines that the agreement didn't assign ideas in the first place. *See* Part II.A *supra*.

But it can also be read more narrowly to encompass only those inventions created during work hours ("during my employment"), possibly including lunch and coffee breaks ("at any time").[7] Extrinsic evidence doesn't resolve the ambiguity. For example, an employee testified that it was "common knowledge that a lot of people were moonlighting and doing other work," which wasn't a problem so long as it was done on "their own time," and at "their own house." She agreed when asked, "Was it your understanding that if you designed dolls when you were at home at night that you owned them?" However, another employee testified, "Everything I did for Mattel belonged to Mattel. Actually, everything I did while I was working for Mattel belonged to Mattel."

[10] Because the agreement's language is ambiguous and some extrinsic evidence supports each party's reading, the district court erred by granting summary judgment to Mattel on this issue and holding that the agreement clearly assigned works made outside the scope of Bryant's employment. *See City of Hope Nat'l Med. Ctr.*, 181 P.3d at 156. The issue should have been submitted to the jury, which could then have been instructed to determine (1) whether Bryant's agreement assigned works created outside the scope of his employment at Mattel, and (2) whether Bryant's creation of the Bratz sketches and sculpt was outside the scope of his employment.

**B.**

The district court's error in construing the employment agreement is sufficient to vacate the copyright injunction. On

---

[7]Mattel argues that because employers are already considered the authors of works made for hire under the Copyright Act, 17 U.S.C. § 201(b), the agreement must cover works made outside the scope of employment. Otherwise, employees would be assigning to Mattel works the company already owns. But the contract provides Mattel additional rights by covering more than just copyrightable works. The contract can also be enforced in state court, whereas Copyright Act claims must be heard in federal court.

remand, Mattel might well convince a properly instructed jury that the agreement assigns works created outside the scope of employment, or that Bryant's preliminary Bratz sketches and sculpt were created within the scope of his employment at Mattel. The district court would then once again have to decide whether to grant a copyright injunction. We therefore believe it prudent to address MGA's appeal of the district court's copyright rulings.

[11] Mattel argued that MGA's Bratz dolls infringed its copyrights in the sketches and sculpt. To win its copyright claim, Mattel had to establish three things. First, Mattel had to prove that it owned copyrights in the sketches and sculpt (it did). Second, it had to show that MGA had access to the sketches and sculpt (obviously). Third, it had to establish that MGA's dolls infringe the sketches and sculpt (the kicker). *See Aliotti v. R. Dakin & Co.*, 831 F.2d 898, 900 (9th Cir. 1987).

[12] Assuming that Mattel owns Bryant's preliminary drawings and sculpt, its copyrights in the works would cover only its particular expression of the bratty-doll idea, not the idea itself. *See Herbert Rosenthal Jewelry Corp.* v. *Kalpakian*, 446 F.2d 738, 742 (9th Cir. 1971). Otherwise, the first person to express any idea would have a monopoly over it. Degas can't prohibit other artists from painting ballerinas, and Charlaine Harris can't stop Stephenie Meyer from publishing *Twilight* just because Sookie came first. Similarly, MGA was free to look at Bryant's sketches and say, "Good idea! We want to create bratty dolls too."

[13] Mattel, of course, argues that MGA went beyond this by copying Bryant's unique expression of bratty dolls, not just the idea. To distinguish between permissible lifting of ideas and impermissible copying of expression, we have developed a two-part "extrinsic/intrinsic" test. *See Apple Computer, Inc.* v. *Microsoft Corp.*, 35 F.3d 1435, 1442 (9th Cir. 1994). At the initial "extrinsic" stage, we examine the similarities between the copyrighted and challenged works and then determine

whether the similar elements are protectable or unprotectable. *See id.* at 1442-43. For example, ideas, scenes a faire (standard features) and unoriginal components aren't protectable. *Id.* at 1143-45. When the unprotectable elements are "filtered" out, what's left is an author's particular expression of an idea, which most definitely *is* protectable. *Id.*

   **[14]** Given that others may freely copy a work's ideas (and other unprotectable elements), we start by determining the breadth of the possible expression of those ideas. If there's a wide range of expression (for example, there are gazillions of ways to make an aliens-attack movie), then copyright protection is "broad" and a work will infringe if it's "substantially similar" to the copyrighted work. *See id.* at 1439, 1146-47. If there's only a narrow range of expression (for example, there are only so many ways to paint a red bouncy ball on blank canvas), then copyright protection is "thin" and a work must be "virtually identical" to infringe. *See id.*; *Satava v. Lowry*, 323 F.3d 805, 812 (9th Cir. 2003) (glass-in-glass jellyfish sculpture only entitled to thin protection against virtually identical copying due to the narrow range of expression).

   The standard for infringement—substantially similar or virtually identical—determined at the "extrinsic" stage is applied at the "intrinsic" stage. *See Apple Computer*, 35 F.3d at 1443. There we ask, most often of juries, whether an ordinary reasonable observer would consider the copyrighted and challenged works substantially similar (or virtually identical). *See id.* at 1442. If the answer is yes, then the challenged work is infringing.

   The district court conducted an extrinsic analysis and determined that the following elements of Bryant's sketches and sculpt were non-protectable:

   1.  The resemblance or similarity to human form and human physiology.

2.   The mere presence of hair, heads, two eyes, eyebrows, lips, nose, chin, mouth, and other features that track human anatomy and physiology.

3.   Human clothes, shoes, and accessories.

4.   Age, race, ethnicity, and "urban" or "rural" appearances.

5.   Common or standard anatomical features relative to others (doll nose and relatively thin, small bodies).

6.   Scenes a faire, or common or standard treatments of the subject matter.

It found that the following elements were protectable:

1.   Particularized, synergistic compilation and expression of the human form and anatomy that expresses a unique style and conveys a distinct look or attitude.

2.   Particularized expression of the doll's head, lips, eyes, eyebrows, eye features, nose, chin, hair style and breasts, including the accentuation or exaggeration of certain anatomical features relative to others (doll lips, eyes, eyebrows, and eye features) and de-emphasis of certain anatomical features relative to others (doll nose and thin, small doll bodies).

3.   Particularized, non-functional doll clothes, doll shoes, and doll accessories that express aggressive, contemporary, youthful style.

Based on this determination, the district court decided that "substantial similarity" is the appropriate test for infringe-

ment. And, in determining whether Mattel was entitled to
equitable relief, it found that the two Bratz sculpts and the
overwhelming majority of the Bratz female fashion dolls were
substantially similar to Mattel's copyrighted works. The dis-
trict court therefore entered an injunction prohibiting MGA
from producing the infringing dolls or any future substantially
similar dolls. We review de novo the district court's determi-
nation as to the scope of copyright protection. *See Ets-Hokin*
v. *Skyy Spirits, Inc.*, 225 F.3d 1068, 1073 (9th Cir. 2000).

   **1. Doll Sculpt.** The district court enjoined MGA from mar-
keting or producing any doll that incorporates the "core Bratz
fashion doll production sculpt" or the "Bratz Movie sculpt"
because it held they were substantially similar to Bryant's
preliminary sculpt.[8] By adopting the "substantially similar"
standard, the district court afforded Bryant's sculpt broad
copyright protection. *See* pp.10540-41 *supra.* MGA argues
that the district court should have given Bryant's preliminary
sculpt only thin protection against virtually identical works.

   **[15]** In order to determine the scope of protection for the
sculpt, we must first filter out any unprotectable elements.
Producing small plastic dolls that resemble young females is
a staple of the fashion doll market. To this basic concept, the
Bratz dolls add exaggerated features, such as an oversized
head and feet. But many fashion dolls have exaggerated
features—take the oversized heads of the Blythe dolls and My
Scene Barbies as examples. Moreover, women have often
been depicted with exaggerated proportions similar to those of
the Bratz dolls—from Betty Boop to characters in Japanese
anime and Steve Madden ads. The concept of depicting a
young, fashion-forward female with exaggerated features,

---

   [8]The district court's analysis was brief, so we must infer this finding.
It's possible that the district court also thought MGA's two sculpts were
substantially similar to some of Bryant's sketches of doll bodies. Even if
this were so, it wouldn't change our analysis because the sketches of doll
bodies would be entitled to no more protection here than Bryant's sculpt.

including an oversized head and feet, is therefore unoriginal as well as an unprotectable idea. *Cf. Herbert Rosenthal*, 446 F.2d at 742 ("We think the production of jeweled bee pins is a larger private preserve than Congress intended to be set aside . . . . A jeweled bee pin is therefore an 'idea' that defendants were free to copy.").

Mattel argues that the sculpt was entitled to broad protection because there are many ways one can depict an exaggerated human figure. It's true that there's a broad range of expression for bodies with exaggerated features: One could make a fashion doll with a large nose instead of a small one, or a potbelly instead of a narrow waist. But there's not a big market for fashion dolls that look like Patty and Selma Bouvier. Little girls buy fashion dolls with idealized proportions —which means slightly larger heads, eyes and lips; slightly smaller noses and waists; and slightly longer limbs than those that appear routinely in nature. But these features can be exaggerated only so much: Make the head too large or the waist too small and the doll becomes freakish, not idealized.

**[16]** The expression of an attractive young, female fashion doll with exaggerated proportions is thus highly constrained. *Cf. Data East USA, Inc.* v. *EPYX, Inc.*, 862 F.2d 204, 209 (9th Cir. 1988) ("Because of these constraints, karate is not susceptible of a wholly fanciful presentation."). Because of the narrow range of expression, the preliminary sculpt is entitled to only thin copyright protection against virtually identical copying. *Cf. Ets-Hokin* v. *Skyy Spirits Inc.*, 323 F.3d 763, 766 (9th Cir. 2003) (photo of vodka bottle merits only thin protection because of limited range of expression); *Satava*, 323 F.3d at 812 (similar). The district court erred in affording broad protection against substantially similar works to the sculpt.

**2. Bratz Sketches.** The district court also enjoined MGA from marketing or producing nearly every Bratz female fashion doll—not just the first generation of dolls, but also subsequent dolls like "Bratz Nighty-Nite Yasmin" and "Bratz

Campfire Felicia"—because it held they were substantially similar to Bryant's preliminary sketches.[9] MGA argues that the district court erred in failing to filter out the unprotectable elements of the dolls and by applying the substantial similarity standard.[10]

[17] Unlike the limited range of expression for the sculpt, there's a wide range of expression for complete young, hip female fashion dolls with exaggerated features. Designers may vary the face paint, hair color and style, and the clothing and accessories, on top of making minor variations to the sculpt. One doll might have brown eyes with bronze eyeshadow, wavy auburn hair, leather boots, a blue plaid mini matched with a black button-down, silver knot earrings and a barrel bag. Another might have green eyes with pink eyeshadow, brown hair in a messy bun, gold wedges, dark skinny jeans matched with a purple halter, a turquoise cuff and a clutch, along with a slightly different body and facial structure.[11] *See JCW Invs.* v. *Novelty, Inc.*, 482 F.3d 910, 917 (7th

---

[9]Infringement can occur even though the copyrighted work is done in a different medium than the challenged work. *Meshwerks, Inc.* v. *Toyota Motor Sales U.S.A., Inc.*, 528 F.3d 1258, 1267-68 (10th Cir. 2008); *see Blanch* v. *Koons*, 467 F.3d 244, 252 (2d Cir. 2006).

[10]Contrary to Mattel's argument, MGA's opening brief adequately preserved its objections to the district court's decision.

[11]MGA argues that doll clothes aren't entitled to copyright protection. Copyright law doesn't protect "useful articles" that have an "intrinsic utilitarian function" apart from their expression or appearance. *See* 17 U.S.C. §§ 101, 102(a)(5). Human clothing is considered utilitarian and unprotectable. *See Poe* v. *Missing Persons*, 745 F.2d 1238, 1242 (9th Cir. 1984). However, articles that are intended only to portray the appearance of clothing are protectable. *Id.* Dolls don't feel cold or worry about modesty. The fashions they wear have no utilitarian function. *Cf. Masquerade Novelty* v. *Unique Indus.*, 912 F.2d 663, 670-71 (3d Cir. 1990) (animal nose masks have no utilitarian function apart from portraying appearance of animal nose); *Gay Toys, Inc.* v. *Buddy L Corp.*, 703 F.2d 970, 973 (6th Cir. 1983) (toy airplane merely portrays appearance of actual airplane and has no utilitarian function). Even if we were to defer to the letter from the Copyright Office saying that doll clothing isn't protected, as MGA argues we should, the letter's interpretation is obviously wrong.

Cir. 2007) ("Novelty could have created another plush doll of
a middle-aged farting man that would seem nothing like Fred.
He could, for example, have a blond mullet and war flannel,
have a nose that is drawn on rather than protruding substan-
tially from the rest of the head, be standing rather than
ensconced in an armchair, and be wearing shorts rather than
blue pants."). The district court didn't err in affording the doll
sketches broad copyright protection against substantially simi-
lar works.

[18] The district court did err, however, in failing to filter
out all the unprotectable elements of Bryant's sketches. The
only unprotectable elements the district court identified were:
(1) the dolls' resemblance to humans; (2) the presence of hair,
head, two eyes and other human features; (3) human clothes,
shoes and accessories; (4) age, race, ethnicity and "urban" or
"rural" appearances; (5) standard features relative to others
(like a thin body); and (6) other standard treatments of the
subject    matter.    And    it    reasoned    that    the    doll's
"[p]articularized, synergistic compilation and expression of
the human form and anatomy that expresses a unique style
and conveys a distinct look or attitude" is protectable, along
with the doll fashions that expressed an "aggressive, contem-
porary, youthful style." But Mattel can't claim a monopoly
over fashion dolls with a bratty look or attitude, or dolls sport-
ing trendy clothing—these are all unprotectable ideas.

[19] This error was significant. Although substantial simi-
larity was the appropriate standard, a finding of substantial
similarity between two works can't be based on similarities in
unprotectable elements. *See Data East*, 862 F.2d at 209 (clear
error for district court to determine substantial similarity
existed based on unprotectable elements). When works of art
share an idea, they'll often be "similar" in the layman's sense
of the term. For example, the stuffed, cuddly dinosaurs at
issue in *Aliotti v. R. Dakin & Company*, 831 F.2d at 901, were
similar in that they were all stuffed, cuddly dinosaurs—but
that's not the sort of similarity we look for in copyright law.

"Substantial similarity" for copyright infringement requires a similarity of expression, not ideas. *See id.* The key question always is: Are the works substantially similar beyond the fact that they depict the same idea?

[20] MGA's Bratz dolls can't be considered substantially similar to Bryant's preliminary sketches simply because the dolls and sketches depict young, stylish girls with big heads and an attitude. Yet this appears to be how the district court reasoned:

> Especially important to the Court's [substantial similarity finding] is the consistency of the particularized expression of the dolls' heads, lips, eyes, eyebrows, eye features, noses, as well as the particularized expression of certain anatomical features relative to others . . . and de-emphasis of certain anatomical features (most notably the minimalized doll nose and thin, small doll bodies). Also important to the Court is the particularized, synergistic compilation and expression of the human form and anatomy that quite clearly expresses a unique style and conveys a distinct look or attitude . . . .

It might have been reasonable to hold that *some* of the Bratz dolls were substantially similar to Bryant's sketches, especially those in the first generation. But we fail to see how the district court could have found the vast majority of Bratz dolls, such as "Bratz Funk 'N' Glow Jade" or "Bratz Wild Wild West Fianna," substantially similar—even though their fashions and hair styles are nothing like anything Bryant drew—unless it was relying on similarities in ideas.

\* \* \*

Bryant's employment agreement may not have assigned his ideas for the names "Bratz" and "Jade" to Mattel at all, and the district court erred by holding that it did so unambigu-

ously. Even if Bryant did assign his ideas, the district court abused its discretion in transferring the entire Bratz trademark portfolio to Mattel. We therefore vacate the constructive trust, UCL injunction and declaratory judgment concerning Mattel's rights to the Bratz trademarks. The district court may impose a narrower constructive trust on remand only if there's a proper determination that Mattel owns Bryant's ideas.

[21] The district court also erred in holding, at summary judgment, that the employment agreement assigned works created outside the scope of Bryant's employment. We therefore vacate the copyright injunction. On remand, Mattel will have to convince a jury that the agreement assigned Bryant's preliminary sketches and sculpt, either because the agreement assigns works made outside the scope of employment or because these works weren't made outside of Bryant's employment. And, in order to justify a copyright injunction, Mattel will have to show that the Bratz sculpts are virtually identical to Bryant's preliminary sculpt, or that the Bratz dolls are substantially similar to Bryant's sketches disregarding similarities in unprotectable ideas.

Nothing we say here precludes the entry of equitable relief based on appropriate findings.[12] Because several of the errors we have identified appeared in the jury instructions, it's likely that a significant portion—if not all—of the jury verdict and damage award should be vacated, and the entire case will

---

[12]We decline to address MGA's appeal of the mistrial order and Mattel's cross-appeal of the attorney-client privilege finding. These issues are likely moot, and their resolution is unnecessary to dispose of this interlocutory appeal. Our jurisdiction over them is also doubtful. *See Poulos v. Caesars World, Inc.,* 379 F.3d 654, 668-70 (9th Cir. 2004). We also decline to address MGA's appeal of the district court's decisions concerning the three alleged state-law violations, which Mattel argues show that MGA wrongfully acquired the ideas for the names "Bratz" and "Jade." We've found that the district court didn't properly analyze whether Mattel owns Bryant's ideas under his contract, so it's premature to try to determine whether MGA's acquisition of them was wrongful.

probably need to be retried. We express no opinion on this
issue here, except to say that any further proceedings must be
consistent with our decision.

America thrives on competition; Barbie, the all-American
girl, will too.

**EQUITABLE RELIEF VACATED.** Each party shall
bear its own costs.